| | | | concern for the environment by a younger generation. | the increasing popularity of the electronic media, especially video gaming.  The BLM believes that that these trends are almost impossible to predict, let alone quantify.  Over the life of the plan there will likely be other developments of which no one is currently aware. |
|---|---|---|---|---|
| Questar Exploration and Production Company | 210 | 9 | The socio-economics analysis does not adequately discuss the role of the planning area in contributing to the nation's natural gas supply. The full positive impact of mineral development in the planning area was not considered, nor was the negative impact that will result from imposing stringent restrictions on energy development. The Preferred Alternative closes nearly 60% of the lands currently open to leasing under standard stipulations and the amount of land designated NSO increases by an amazing 459%! Added to that are the right-of-way exclusion and avoidance areas prescribed by the document which severely limit operator's abilities to access and develop leases and to transport energy products to market. These actions will result in significantly less benefit to the local communities in terms of employment and economy, as well as to the state and the nation in terms of available energy, and cannot justifiably be characterized as only slightly impacting socio-economics. | See response to comments 203-25, 203-26, 203-27, 203-28, 203-29, 203-30, 203-31 and 203-32. |
| Questar Exploration and Production Company | 210 | 10 | Because the oil and gas potential has been severely underestimated in this document, it is likely that the economies of Grand and San Juan counties would be severely impacted. Section 3.13.1.6.7 discusses the contribution of tourism to the Grand County economy, but does not reference the energy industry's contribution. The DRMP/EIS acknowledges that tourism-related revenues have leveled off in Grand County. Because the document also underestimates the Reasonably Foreseeable Development (RFD), the public is not being provided adequate information on the actual impacts to local communities. | See response to comments 203-32, 203-33, 203-34 and 203-35. |

BLM_0012483

| Questar Exploration and Production Company | 210 | 11 | Questar believes it is important that the DRMP/EIS provide an accurate RFD analysis and fully consider the economic benefits oil and gas activities rather than simply seeking to put huge areas off-limits to responsible energy development. Although Questar realizes that there is usually a lag time between the time of the RFD is prepared and the final Record of Decision, we have recently seen several Draft RMPs that undervalue the energy potential. This is not in the spirit of NEPA and does a disservice to the local communities by underestimating the economic benefits of energy development. BLM should correct this deficiency in the DRMP/EIS. Questar would be happy to provide BLM with its assessment of those economic impacts if that would be helpful. The socio-economic analysis should more accurately depict the negative socio-economic impacts of the myriad of additional restrictions that the DRMP/EIS would apply to energy development, as well as the positive economic impacts associated with tax revenues, increased employment opportunities, and increased national energy supply from the potential energy development within the Moab Field Office. | See response to comments 214-1 and 203-15, as well as to the socioeconomic comments 203-25 through 203-35. |
| --- | --- | --- | --- | --- |
| Delta Petroleum Corporation | 220 | 1 | The economic analysis presented in the DEIS is based on old and outdated information with respect to oil and gas development.  It relies on data from 2003 and older.  The economic picture, development activities and approaches to resource extraction have undergone a major shift in the last 7 years based on several factors including demand for energy resources, federal policy and legislation and rises in the energy costs.  It is critical that the DEIS depend on the best and most recent data available.  The analysis on oil and gas resources does not rely on available recent data, but primarily on information prior to 2004 which does not reflect changes in the economy, need to increase domestic supplies of energy, impacts of high energy | The BLM has incorporated updated production data in Chapter 3 of the DRMP/EIS.  State of Utah data shows a continuing decline in production in Grand County through 2007.  The BLM acknowledges that production could increase in the future, and has incorporated its predictions of future well activity in its RFD. The BLM has also incorporated data from The Structure and Economic Impact of Utah's Oil and Gas Exploration and Production Industry Phase III - Grand County.  This recent study (January, 2008), commissioned by the State of Utah and done by the University of Utah, confirms the relatively minor contribution that minerals development makes to the planning area's economy. |

BLM_0012484

| | | | | |
|---|---|---|---|---|
| | | | costs on communities and federal resource priorities from the Energy Policy Act of 2005. That information is readily available from both State and Federal sources, including some information in 2007, yet non of this recent information has been included in the DEIS. This is a major flaw under NEPA, since readily available information should be used for decision making. This affects economic impacts and projections within all of the alternatives. Since this information is readily available, the BLM should amend the DEIS to reflect that information. A decision that affects land uses for the next 15-20 years should not be based on faulty assumptions and old information | |
| Delta Petroleum Corporation | 220 | 3 | On September 28, 2007, the Utah BLM canceled its November 13th lease sale covering 141,717 acres. The financial impact of this cancellation can be measured by taking the average price per acre paid at the previous lease sale of August 21, 2007 of $31 per acre times 141,717 acres to be sold. The projected value of this sale would have been over $4,500,000. However, that number does not take into account lost wages, royalty payments, taxes and other economic benefits related to production from that acreage. Nor does it take into account the shift in trade balance from domestic production versus foreign importing of oil and gas resources. These are important considerations that must be included within the economic analysis for the DEIS.<br><br>Finally, the economic value of proposed land restrictions must be evaluated for the economic losses and penalties to the resource industry as well as the economic value produced by protections to those lands ecological or other perceived benefits. Economic impacts occur both from lost extraction as well as ecological and social benefits. The value of a pristine vista must be weighted against the temporary impact to | Addressing the economic impacts of a single past lease sale cancellation is beyond the scope of the DRMP/EIS. The BLM acknowledges the (temporary) loss of revenue from this cancelled sale. There is no reason to believe, however, that a future lease sale involving these (or similar) parcels would not generate similar positive economic benefits. The DRMP/EIS attempts to address the impacts over a longer period of time than a single sale, and estimates economic impacts from the projected number of wells expected to be drilled over the 15-20 year life of the plan. There is no way for the BLM to predict the exact timing of these sales, or to predict their results.<br><br>Data on the fiscal impacts from the various action alternatives have been added to the PRMP/FEIS.<br><br>The shifts in trade balance suggested by the commentor are influenced by a myriad of local, national and international factors, most of which are beyond the control of the BLM, and certainly beyond the scope of planning for the Moab Field Office.<br><br>CEQ regulations (40 CFR 1502.1) require BLM to |

480

| | | | | |
|---|---|---|---|---|
| | | | that vista from oil and gas development in implementing land use restrictions. It is not an either or decision, nor an irrevocable commitment of resources in this case. A true valuation of both sides of the equation is needed to reach a truly balanced decision on how to administer multiple land use policies. Such evaluations and considerations have not been presented within the DEIS. The BLM has not presented a rationale for reaching a balance as claimed in alternative C | consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.). While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public. Public participation was essential in this process and full consideration was given to all potential alternatives identified.<br><br>The BLM, in developing the PRMP/FEIS, can chose management actions from within the range of the alternatives presented in the DRMP/EIS and can create a management plan that is effective in addressing the current conditions in the planning area based on FLPMA's multiple-use mandate.<br><br>The term "multiple use" as defined in FLPMA means "the management of the public lands and their various resource values so that they are used in the combination that will best meet the present and future needs of the American people." This direction indicates that not all uses need to be accommodated in all areas. The DRMP/EIS includes a detailed evaluation of all options to ensure a balanced approach. This balanced approach will ensure protection of resource values and sensitive resources while allowing opportunities for mineral exploration and production. The PRMP/FEIS will offer management flexibility to ensure that resource values and uses are protected while allowing for acceptable levels of mineral development. |
| Fidelity Exploration and Production Co. | 221 | 2 | BLM has a responsibility to include a comprehensive socio-economic analysis that is lacking in this DRMP. The following should be giving more consideration: | In 2007, Grand County provided 0.5% of Utah's total oil production and 1.8% of Utah's total gas production (DOGM, 2006). Utah ranks 12th nationally in oil production and 10th nationally in gas production (DOGM, |

BLM_0012486

| | | | -Oil and gas are vital sources of energy for the nation. BLM should discuss increasing energy demands, decreasing domestic energy supplies, and the strategic necessity for development of mineral resources. Utah oil and natural gas resources need to be identified as crucial to help offset the deficit between supply and demand.<br><br>-Federal lands contribute nearly one-third of the nation's natural gas supply; therefore, accounting for every resource rich area is crucial to producers and consumers. The DRMP should discuss the role of the planning area in the nation's natural gas supply<br><br>-The full, positive economic impact of mineral development in the planning area was not adequately analyzed, nor did the document analyze the negative impact associated with the severe restrictions called for in the Preferred Alternative C. Furthermore, the DRMP states that under Alternative b, the long-term economic benefits from oil and gas development would be slightly less than current circumstances or if Alternatives C or D were adopted (Table 2.2, p.2-78-2-79) This conclusion is counter-intuitive; it defies logic how the extremely restrictive Alternative B would have only slightly lower economic benefits from oil and gas when it would place so many more restrictions on development. Clearly, that analysis is flawed.<br><br>BLM would greatly benefit from a comprehensive economic analysis of the impact of oil and gas to the region such as is currently underway by the University of Utah's Bureau of Economic and business Research for the Utah Governor's Office of Public Land Policy Coordination Office (The Structure and Economic Impact of Utah's Oil and Gas Exploration and Production Industry Phase I-The Uinta Basin) (Draft, | 2008). These figures do not support the commentor's assertion that this is crucial to the nation's energy supply.<br><br>The impacts of minerals on social and economic conditions are detailed on pg. 4-259 through pg. 4-264. This analysis provides a reasonable assessment of the socioeconomic impacts.<br><br>The restrictions imposed on oil and gas leasing in Alt B would result in fewer wells developed than in Alts, C, D, or A. These numbers are 264, 432, 448, 451, respectively. Therefore, Alt B would result in 168 fewer wells over the life of the plan. The well numbers were based on the Reasonably Foreseeable Development scenario for oil and gas and spread by alternative based on the restrictions impased under each alternative. Impacts of minerals on socioeconomics are based on these well numbers. Economic information on royalties, employment, severance taxes, and impacts to State revenues have been augmented in Chapter 4 of the PRMP/FEIS.<br><br>Information has been added to the PRMP/FEIS using the newly completed study by the University of Utah Bureau of Economic and Business Research (Juanuary 2008) "The Structure and Economic Impact of Utah's Oil and Gas Production and Industry, Phase III - Grand County". Therefore, use of the study in Uintah County suggested by the commentor is not appropriate. |
|---|---|---|---|---|

BLM_0012487

| | | | November 2007))<br><br>-Each alternative contained in the DRMP includes some lands closed to energy resource development. Such closures re based on BLM's assessment of resource values on those lands.  Closure also implications, however, in terms of national energy consumption and commodity prices, foregone employment opportunities, tax revenues, and support for state and local economies.  Although BLM must necessarily base land use decisions on consideration of all resources values, social and economic impacts of closure decisions should be estimated to fulfill the agency's mandate under FLPMA, and to comply with guidelines contained in BLM's Land Use Planning Handbook (H-1601-H) and Instruction Memorandum (IM) No. 2002-167 | |
|---|---|---|---|---|
| Fidelity Exploration and Production Co. | 221 | 3 | BLM has not adequately addressed the negative impacts to the School and Institutional Trust Lands Administration (SITLA) that would follow adoption of Alternatives B or C.  Restrictions imposed by these alternatives would impede access to SITLA minerals, severely reduced the income generated by Federal mineral royalties, and thereby, significantly impact all public schools in the region. | See response to 120-10 and 120-101. |
| Fidelity Exploration and Production Co. | 221 | 28 | The Structure and Economic Impact of Utah's Oil and Gas Exploration and Production Industry Phase I-The Uinta Basin<br><br>Prepared for:<br>Public Land Policy Coordination Office<br>Utah Governor's Office<br>5110 State Office Building<br>PO Box 141107<br>Salt Lake City, UT 84114<br><br>Prepared by:<br>Bureau of Economic and Business Research | The BLM is aware of this study.  In addition, the Moab BLM has been given an advance copy of the study done for Grand County on the same subject.  This study was done by the University of Utah for the Public Land Policy Coordination Office.  Results from the Grand County study of oil and gas development have been added to chapter 4.<br><br>See also response to comment 203-25. |

BLM_0012488

| | | | | |
|---|---|---|---|---|
| | | | University of Utah<br>1645 East Campus Center Drive<br>Salt Lake City, UT 84112<br><br>November 2007 | |
| Green River City | 263 | 2 | Under Chapter 3 of the DEIS, (socio conditions/context) Green River encourages, without significantly delaying the final RMP, the addition of a section highlighting the context and overlap of Energy Development in Grand County and its importance to the economy of Green River. Many truckers, contractors, and vendors do or will utilize services in Green River and these numbers need to be measured and included in your analysis. The contributions to our community from these taking place in Grand County lands adjacent to our municipal borders need to be described in your final document as our town will likely comment on future projects that affect our community. In recent years, Grand County relinquished its portion of Green River to Emery County, making Green River City an anomaly of sorts and as such, Green River encourages the BLM to identify what exploratory and long-term mineral production benefits will occur in Green River as the closest municipality to exploratory development north and south of I-70 within the Moab planning area. Such an addition would enhance the quality of the NEPA analysis by acknowledging the role Green River plays in servicing the mineral operations that occur in the Moab BLM field office planning area. Green River asks that this item be addressed in the final EIS and ROD. | As described in Chapter 4, the BLM does not expect to see significant oil and gas development in the Moab planning area over the life of the plan, and therefore does not expect major socioeconomic benefits or costs from these activities.  However, acknowledgement of the potential economic benefits to the surrounding communities of Green River and Grand Junction has been added to the document.<br><br>The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. The impacts such activities have had in other parts of the West is unlikely to apply to the MPA. |
| | 265 | 1 | It is my understanding that you are in the process of formulating the new Moab RMP that will affect our town.  The plan may not have totally considered (or at least doesn't mention) the benefits of ongoing energy extraction to our economy and how future access to minerals will be important in keeping our economy moving in the right direction. I believe the RMP is | As described in Chapter 4, the BLM does not expect to see significant oil and gas development in the Moab planning area over the life of the plan, and therefore does not expect major socioeconomic benefits or costs from these activities.<br>The BLM summarizes the minor costs and benefits associated with oil and gas development on local |

BLM_0012489

| | | | | |
|---|---|---|---|---|
| | | | required by law to consider those effects even though Green River isn't in the boundaries of he Moab RMP. Decisions reached in the RMP will have big impacts on Green River's economy. | communities in Chapter 4, p. 260-264. The impacts such activities have had in other parts of the West is unlikely to apply to the MPA. |
| San Juan Public Entry and Access Rights | 267 | 4 | On page 4-253 you make the statement that it is not likely that BLM-related management decisions (apart from recreation decisions that could increase revenues to recreation based businesses) would result in significant changes to current population trends I don't know where you got your data for this statement. | Population data were obtained from the U.S Census Bureau.  Population trends in Grand county have not been tied to BLM actions in past years;  it is therefore assumed that BLM actions will have little to do with shaping population trends in the future. |
| Red River Canoe Company | 283 | 6 | On the subject of local business, BLM makes blanket assumptions about the economic impacts of its plan (i.e. that motorized access and extractive industry opportunities will enhance Moab's economy) with no study to back up these postulations. In fact, in looking at the NVUM data, more motorized use and extractive industry will drive away the bulk of Moab's visitors who come here for a quiet, natural experience. As BLM turns more backcountry areas into front country managed recreation sites (alt C creates five new campgrounds in areas farther a field than current sites), visitors are setting up camp and recreating farther away from Moab and are less likely to even come into town and spend money. Everyone from restaurants to retail shops to gas stations will be affected. | See response to comments 124-2, 124-133 and 124-134. |
| Grand County Backcountry Council | 289 | 8 | As motorized use continues to impact the river experience – and many visitors stop running the Green for a quieter experience elsewhere – local businesses that rely on river runners (shuttles, equipment suppliers, guide services, etc) will be adversely impacted, negating the benefit of dollars motorized use might bring to town. | The BLM has monitored vehicle use along the Green River (at Spring Canyon) and has not found this use to be excessive.  There is far more vehicle use on the White Rim Road in Canyonlands National Park (along the Green River).

The BLM is aware of the economic values that river running (including the Green River) brings to the local economy. |
| Grand County Backcountry Council | 289 | 9 | Also on the subject of local business, BLM makes blanket assumptions about the economic impacts of its plan (i.e.: that more motorized access and extractive | See response to comments 124-133 and 124-134. |

BLM_0012490

| | | | | |
|---|---|---|---|---|
| | | | industry opportunities will enhance Moab's economy) with no study to back up these postulations. In fact, in looking at the NVUM data, more motorized use and extractive industry will drive away the bulk of Moab's visitors who come here for a quiet, natural experience. | |
| Grand County Backcountry Council | 289 | 10 | As the BLM turns more backcountry areas into frontcountry managed recreation sites (Alt C creates five new campgrounds in areas farther afield than current sites), visitors are setting up camp and recreating farther away from Moab and are less likely to even come into town and spend money. | The BLM does not intend to detract business from Moab. The campgrounds that are the closest to town fill up first - - campgrounds that are further afield will undoubtedly prove to be popular only when all sites near town are full. The campgrounds proposed in Alt C are still well within the range of Moab, which is still the only place near by in which to spend money. |
| | 299 | 2 | The analysis states that Alternative B, which is the most restrictive, will have only slightly lower economic benefits than Alt C and D (which contain more energy development). That may be true for Moab, itself, but certainly not communities like Green River. I believe the analysis is severely flawed - it defies common sense. | Under the Reasonably Foreseeable Development (RFD) scenario for oil and gas projects relatively few wells would be drilled and would employ relatively few people. The BLM's analysis is based on the RFD. On pg. 4-264 of the Draft RMP/EIS it is stated that employment related to oil and gas development would be less under Alt B. Alternative B projects 264 wells over the life of the plan; Alt. C projects 432 wells over the life of the plan. The economic returns from 264 wells are compared with the economic returns from 432 wells.  The economic returns from 432 wells are greater than those from 264 wells. The effects on employment and wages have been added to Chapter 4 of the PRMP/EIS. Although Green River is outside the planning area, the fact that planning area decisions affect neighboring towns has been added to Chapter 3. |
| Delta Petroleum Corporation | 306 | 3 | The multiple use mandate can achieve a diversification and expansion of the local economies. Encouraging resource development and all the other myriad uses that may be undertaken on public lands should be paramount concerns of the BLM. The result will be stable local economies and potentially bright futures for the residents of these communities and the country.<br><br>The BLM needs to recognize within the RMP that the | The economic benefits of oil and gas development have been fully disclosed in the DRMP/EIS on pgs. 4-259 through 4-265. |

BLM_0012491

| | | | | |
|---|---|---|---|---|
| | | | balancing of multiple uses must still provide for economic growth and stability in the planning area and not overly restrict those uses in favor of ones that limit or eliminate the few economic opportunities that exist for residents of the MRA. | |
| Delta Petroleum Corporation | 306 | 13 | On September 28, 2007, the Utah BLM canceled its November 13th lease sale covering 141,717 acres. The financial impact of this cancellation can be measured by taking the average price per acre paid at the previous lease sale of August 21, 2007 of $31 per acre times 141,717 acres to be sold. The projected value of this sale would have been over $4,500,000. However, that number does not take into account lost wages, royalty payments, taxes and other economic benefits related to production from that acreage. Nor does it take into account the shift in trade balance from domestic production versus foreign importing of oil and gas resources. These are important considerations that must be included within the economic analysis for this DEIS. | This action does not pertain to the current land use planning process.  See also response to comment 220-3. |
| Delta Petroleum Corporation | 306 | 14 | The economic value of proposed land restrictions must be evaluated for both economic losses and penalties to the resource industry as well as the economic value produced by protections to those lands ecological or other perceived benefits. Economic impacts occur both from lost extraction as well as ecological and social benefits. The value of a pristine vista must be weighted against the temporary impact to that vista from oil and gas development in implementing land use restrictions. It is not an either or decision, nor an irrevocable commitment of resources in this case. A true valuation of both sides of the equation is needed to reach a truly balanced decision on how to administer multiple land use policies. Such evaluations and consideration shave not been presented within the DEIS. The BLM has not presented a rationale for reaching a balance as claimed in alternative C. | See response to comment 220-3. |

BLM_0012492

| | 313 | 1 | Our community [Green River] has three main bases – natural resources, local tourism, and people passing through needing gasoline, food, and lodging. The decisions reach in the DRMP will have an impact on the future of energy development in our area, and thus, on our community.<br><br>Your analysis does not give enough consideration to these aspects and how energy development may benefit Green River over the next 15 years or so years. It seems that the impacts on the city of Moab are the only items considered. While it's the largest, richest, and most influential community in our area, its concerns shouldn't be the only ones considered. | Under the Reasonably Foreseeable Development (RFD) scenario for oil and gas projects relatively few wells would be drilled and would employ relatively few people. The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. The large-scale development that has occurred in certain areas would not occur in the MPA. A recently completed study by the University of Utah concludes that less than 1 per cent of the Grand County's economy is dependent on oil and gas activities, which corresponds closely to BLM's analysis in Chapter 4. |
| | 314 | 1 | As a resident of Green River, Utah, energy development and Off-Road Use are imporant to our future economy and community. The "Preferred" Alternative C which supposedly balances environmental and natural resource aspects, places too many restrictions on natural resource development. | The projected level of oil and gas activities in the MPA is low, with consequently low expected socio-economic impacts. Under the Reasonably Foreseeable Development (RFD) scenario for oil and gas projects, relatively few wells would be drilled and would employ relatively few people. The large-scale development that has occurred in certain areas, such as Vernal, would not occur in the MPA. The BLM has sought to provide recreation opportunities and benefits for the wide variety of users, all of whom potentially contribute to the local economy. For the reasons outlined in Chapter 4, p. 4-271, the BLM believes that Alternative C (the Preferred Alternative) provides the greatest economic benefit to the Moab planning area's economy in the context of OHV management.<br><br>The number of wells projected in Alt C is 432.  Alternative A (no action) projects 451 wells; Alt. D projects 448 wells. That is, even with all the "restrictions" imposed on oil and gas production in the preferred alternative, there are only 19 fewer wells over the life of the plan in Alt. C than in the no action alternative.  Thus, the economic value of those 19 foregone wells is the "cost" of all the oil and gas |

BLM_0012493

| | | | | |
|---|---|---|---|---|
| | | | | restrictions imposed in Alt. C. It should be remembered that these 19 foregone wells are spread throughout the entire field office area; only a few of these wells are reasonably expected to be in the vicinity of Green River. |
| | 315 | 2 | I think the BLM minimizes the potential economic benefits of energy production and over-estimates the benefits of conservation. While Moab will see positive impacts from Conservation – it is after all a relatively wealthy community with a major tourism base – other smaller and less wealthy communities like Green River will not see much in the way of those benefits. Green River will see much greater opportunity from more energy development. | The BLM's analysis is based on the RFD. The large-scale development that has occurred in certain areas would not occur in the MPA. As described in Chapter 4, the BLM does not expect to see significant oil and gas development in the Moab planning area over the life of the plan, and therefore does not expect major socioeconomic benefits or costs from these activities. The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. A recently completed study by the University of Utah concludes that less than 1 per cent of the Grand County's economy is dependent on oil and gas activities, which corresponds closely to BLM's analysis in Chapter 4. |
| | 318 | 1 | The town of Green River is actually in Emery County and may be covered in a different RMP; however, I think it should also be covered in the Moab RMP since the activities on your lands affect our town and business. Development in the Moab RMP will have enormous effects on our community. By placing too many restrictions on this development, oil and gas companies may go elsewhere, including outside the country, for their operations. This will have a severe negative economic impact on our local economy. | See response to comment 124-125 .There appears to be confusion concerning the Reasonably Foreseeable Development (RFD) scenario for oil and gas development in the Moab planning area with other places in the West such as Pinedale, Wyoming or Vernal, Utah, both of which have seen major positive and negative impacts from minerals development. Under the Reasonably Foreseeable Development (RFD) scenario for oil and gas projects relatively few wells would be drilled and would employ relatively few people, especially those from within the planning area. The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264.<br><br>The number of wells projected in Alt C is 432. Alternative A (no action) projects 451 wells; Alt. D projects 448 wells. That is, even with all the "restrictions" imposed on oil and gas production in the preferred alternative, there are only |

BLM_0012494

| | | | | 19 fewer wells over the life of the plan in Alt. C than in the no action alternative.  Thus, the economic value of those 19 foregone wells is the "cost" of all the oil and gas restrictions imposed in Alt. C.  It should be remembered that these 19 foregone wells are spread throughout the entire field office area; only a few of these wells are reasonably expected to be in the vicinity of Green River.<br><br>The text in Chapter 3 concerning socioeconomics has been altered to include the fact that economic effects include those on the neighboring communities of Green River or Grand Junction.  Green River is within the Price BLM planning area. |
| | 319 | 1 | It states that most restrictive alternative B will only have a minimally lower economic benefit to communities affected. This doesn't make sense. If we were to fully develop ALL natural resources that are reasonably available, the local economies would all do extraordinarily well. Because of this, it seems that the analysis in the RMP does not adequately consider economic effects (or possibilities) especially on the rural communities outside of Moab. | The fiscal impacts have been described in Table 2.2 on pg. 2-78 (DRMP/EIS) in terms of royalty revenue. This table shows that royalty revenues will be reduced by 50% in Alt B. In addition property tax revenue, and severance tax data have been added to the table for the PRMP/FEIS and likewise show a 50% reduction in revenues in Alt B as compared to Alt C. On pg. 4-264 of the Draft RMP/EIS it is stated that employment related to oil and gas development would be less under Alt B. The effects on employment and wages have been added to Chapter 4 of the PRMP/EIS. However, it is important to note that under the Reasonably Foreseeable Development (RFD) scenario for oil and gas projects relatively few wells would be drilled and would employ relatively few people, especially those from within the planning area. The BLM's analysis is based on the RFD; the commenter has provided no evidence that the RFD is incorrect.<br><br>Although Green River is outside the planning area, the fact that planning area decisions affect neighboring towns has been added to Chapter 3.  It should be noted that the 1985 Grand RMP makes available virtually all natural resources of the planning area.  These resources have not been leased or developed to date. |

BLM_0012495

| | | | | |
|---|---|---|---|---|
| | 320 | 1 | Many people who live and work in Green River would like the Moab RMP to acknowledge the importance that ongoing mineral development like uranium and natural gas have on our community. Our current economic base is very dependent on both recreation and supporting the resource industries. Development in the Moab RMP will have enormous effects on our community – some positive and some negative that you need to adequately consider in your deliberations. | See response to 124-125. There appears to be confusion concerning the Reasonably Foreseeable Development (RFD) scenario for oil and gas development in the Moab planning area with other places in the West such as Pinedale, Wyoming or Vernal, Utah, both of which have seen major positive and negative impacts from minerals development. As described in Chapter 4, the BLM does not expect to see significant oil and gas development in the Moab planning area over the life of the plan, and therefore does not expect major socioeconomic benefits or costs from these activities. The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. The impacts such activities have had in other parts of the West is unlikely to apply to the Moab planning area (MPA). |
| | 321 | 1 | It closes too many areas, not only to oil and gas, but also to motorized vehicle use. Both of these items are extremely important to the current and future economy of Green River. The preferred alternative will restrict the economies of the rural communities of eastern Utah, both within the RMP area and areas outside the area, including Green River and Monticello. | The projected level of oil and gas activities in the MPA is very low, with consequently low expected socio-economic impacts.<br><br>The BLM has sought to provide recreation opportunities and benefits for the wide variety of users, all of whom potentially contribute to the local economy. For the reasons outlined in Chapter 4, p. 4-271, the BLM believes that Alternative C (the Preferred Alternative) provides the greatest economic benefit to the Moab planning area's economy in the context of OHV management. |
| | 322 | 1 | Green River is very close to the area being discussed in the Moab RMP. Green River's economy is currently depending on recreation [activities]. However, natural resource development is the best way for us to take the next step and really improve the economic well being of residents here. All of these things need to be considered and analyzed in your proceedings with regard to the Moab RMP. | Under the Reasonably Foreseeable Development (RFD) scenario for oil and gas projects. relatively few wells would be drilled and would employ relatively few people. The BLM summarizes the minor costs and benefits associated with oil and gas development on local communities in Chapter 4, p. 260-264. |
| | 334 | 6 | No economic impact study has been done to determine | See response to comments 124-2, 124-133 and 124-134. |

BLM_0012496

| | | | | |
|---|---|---|---|---|
| | | | what this plan will do to our business community in Moab and Grand County. The BLM is ignoring their NVUM study that provides them with data that the vast majority of visitors come for quiet recreation. Why does the BLM see a need to change from less impactful recreation to extremely impactful recreation? Only 10.5% of the visitors surveyed came for motirzed recreation while 49.3% came for hiking. The results of the NVUM surveys are in direct conflict with the BLM's assumptions that all these roads are necessary. | and 124-135. The NVUM study should not be considered a definitive snapshot of recreation activities in the MPA. The commentor seems to assume that recreationists to the Moab planning area (MPA) are cleanly divided into motorized versus non-motorized users, with members of one group never participating in activities associated with the other group. The BLM has no data to separate out motorized versus non-motorized recreation spending at this time, even assuming that the two groups are completely distinguishable. However, it is worth noting the growth that the economy of the MPA has enjoyed in the past decade, primarily in the areas of recreation and tourism, but also the presumably related second home market. This has occurred within the context of the current Grand Resource Plan (aka the No Action alternative), with its less restrictive OHV management. There is no reason to expect that a more restrictive environment for OHV recreation (as would be the case in all action alternatives) would harm these industries. Throughout its action alternatives, but especially in alternative C, the BLM has sought to provide recreation opportunities and benefits for the wide variety of users, all of whom potentially contribute to the local economy. |
| Public Lands Advocacy | 491 | 15 | BLM's socioeconomic analysis is fundamentally flawed because it failed to address the positive aspects of energy development.  Moreover, it also failed to analyze and document the negative economic impacts of the severe restrictions proposed under each management alternative. The current unavailability of lands with high potential for mineral development coupled with the increased restrictions contained in Alternatives B and C will have significant negative economic impacts on local, state, and federal revenues, not to mention the negative impacts on domestic energy supplies and cost to the consumer.

We are also concerned that the analysis manipulates | See response to comments 203-25,  203-26, and 203-27. |

BLM_0012497

| | | | | |
|---|---|---|---|---|
| | | | the impacts associated with Alternative B. The analysis shows that the impacts associated with Alternative B, the most restrictive alternative, would have little more impact than Alternative C and D. This result is highly suspect because the alternative would make 43% less acreage available for oil and gas leasing. Therefore, it is necessary for BLM to revise its socioeconomic significance criteria.  For example, the energy sector generally generates a tremendous amount of Value Added.  Part of this the higher than average employee compensation but also the higher returns on capital. Another variable that needs to be included in the RMP is Employee Compensation. Apparently these factors were not addressed in the analysis. | |
| | 643 | 1 | While this comment period allows us to voice our concerns for the land use, remember these decisions affect not just the dirt, but the surrounding communities. Green River, Fruita/Mack and Moab all reap a large portion of their economy from the OHV community. Attractions such as Arches NP, Dead Horse, Canyonlands, etc., while a large "tourist draw" will not sustain these communities should OHV be greatly limited, especially areas like Green River which are not close to the "parks." These communities will suffer deep economic impacts. | Throughout its action alternatives, but especially in alternative C, the BLM has sought to provide recreation opportunities and benefits for the wide variety of users, all of whom potentially contribute to the local economy. |
| | 655 | 1 | I am a Moab resident and am extremely concerned about the future economic vitality of Moab in relation to the disproportionate emphasis in the Draft RMP placed on motorized recreation. According to a recent user survey, only 6% of the visitors come for motorized recreation and 94% come for non-motorized recreational opportunities. | The commentor is referring the Table 4.67 which 59 respondents (6%) indicated OHV use as their MAIN activity. The commenter has not included the 10+% that participate in scenic driving as their MAIN activity. Table 4.67 also includes percentages of those that participated in motorized recreation to some extent, regardless of main purpose of their visit. Those percentages are 11.5 and 36.3 respectively. See also response to comments 124-134 and 124-135 The NVUM study should not be considered a definitive snapshot of recreation activities in the MPA. The commentor seems to assume that recreationists to the |

BLM_0012498

Moab planning area (MPA) are cleanly divided into motorized versus non-motorized users, with members of one group never participating in activities associated with the other group. Morevoer, The BLM has no data to separate out motorized versus non-motorized recreation spending. However, it is worth noting the growth that the economy of the MPA has enjoyed in the past decade, primarily in the areas of recreation and tourism, but also the presumably related second home market. This has occurred within the context of the current Grand Resource Plan (aka the No Action alternative), with its less restrictive leasing and OHV management. There is no reason to expect that a more restrictive environment for oil and gas leasing or OHV recreation (as would be the case in all action alternatives) would harm these industries. For the reasons outlined in Chapter 4, pg. 271, the BLM believes that Alternative C (the Preferred Alternative) provides the greatest economic benefit to the MPA's economy in the context of OHV management.

The commentor seems to assume that recreationists to the Moab planning area (MPA) are cleanly divided into motorized versus non-motorized users, with members of one group never participating in activities associated with the other group. Even assuming that the two groups are completely distinguishable, the BLM has no data to separate out motorized versus non-motorized recreation spending. However, it is worth noting the growth that the economy of the MPA has enjoyed in the past decade, primarily in the areas of recreation and tourism, but also the presumably related second home market. This has occurred within the context of the current Grand Resource Plan (aka the No Action alternative), with its less restrictive leasing and OHV management. There is no reason to expect that a more restrictive environment for oil and gas leasing or OHV recreation (as would be the case in all action alternatives) would harm these

BLM_0012499

| | | | | industries. For the reasons outlined in Chapter 4, pg. 271, the BLM believes that Alternative C (the Preferred Alternative) provides the greatest economic benefit to the MPA's economy in the context of OHV management. |
|---|---|---|---|---|
| | 993 | 2 | We request that you halt any decision on the RMP until proper and accurate economic and social benefit is studied and included into the RMP in section 3.<br><br>I am sending along with my comment a copy of The Economic Contribution of Off-Highway Vehicle Use in Colorado report from July 2001. Their report was done my Hazen and Sawyer for the Colorado Off-Highway Vehicle Coalition. I feel this is an excellent example of the kind of economic numbers that are available to the BLM for use. I understand that the report is done for Colorado. I feel that when the Moab BLM office does a similar report for their area that with the geographic proximity that the numbers will be similar.<br><br>In the report on pages 4, you will see that there is a total of $519,333,239 spent on OHV recreation in Colorado. This I feel is a considerable amount that is not listen in your RMP in section three as it should.<br><br>I won a motorcycle shop in Grand Junction and the Moab area is a substantial part of that business. I gross 2.2 mil a year in sales and feel that people from Mesa County traveling to Moab and other travelers account for about 3 to 5 percent of my business. That is about $110,000 a year in income to my business. If that is impacted by a reduction in available OHV recreation the economic and social dis-benefit is a trickle down effect. Lost jobs, lost travel opportunities, and less purchases are just a few that are not included in the RMP.<br><br>Recently two friends and I took a trip down the Kokapelli, stayed the night in Moab, purchased gas, | Throughout its action alternatives, but especially in alternative C, the BLM has sought to provide recreation opportunities and benefits for the wide variety of users, all of whom potentially contribute to the local economy. For the reasons outlined in Chapter 4, pg. 271, the BLM believes that Alternative C (the Preferred Alternative) provides the greatest economic benefit to the MPA's economy in the context of OHV management.<br><br>The economic value of recreation to the Grand County economy is analyzed in the DRMP/EIS. With the data available, it is not possible to fully separate the economic benefits that accrue from various types of recreationists. The Hazen and Sawyer report was a report commissioned by the Colorado Off Highway Vehicle Coalition. The engineering firm of Hazen and Sawyer analyzed the economic contribution of OHV use in Colorado. The report was paid for with OHV fees and pertains only to Colorado. It does not contain data specific to the economy of Moab, Utah.<br><br>The social benefit of recreation of all types is recognized in the DRMP/EIS. Appendix F provides specific benefits to recreationists, although the list is not meant to be exhaustive. FLPMA requires that BLM lands be managed for multiple use, of which recreation, including motorized recreation, is one. The DRMP/EIS provides a great deal of recreation opportunities, both to enhance economic return and to provide social benefit to groups and to individuals. |

495

BLM_0012500

| | | | | |
|---|---|---|---|---|
| | | | had dinner and breakfast, rode to Sovereign Trail to Thompson, purchased food and fuel, used the Thompson single-track to come back home to Rabbit Valley. This trip included a huge social benefit to three people. We took time off work, time away from family, traveled to the put in area. Enjoyed the scenery, discussed where we were and the geography of the area we were in, and had a great time. This is the type of social benefit that I feel is not in section three and must be put in there. | |
| | 1026 | 23 | In many areas in this study you have stated that you do not fully understand how much money is being spent by each of the different user groups yet you have come to the conclusion that severly limiting the motorized community will not have an economic impact. | Any assessment of the social and economic impact of a decision covering a 15-20 year timeframe will have elements of speculation. BLM used best available data to assess impacts. The BLM has no data to separate out motorized versus non-motorized recreation spending (assuming that the two groups are completely distinguishable). The BLM's discussion to which the commentor refers is heavily qualified, due to the lack of available data on which to project economic impacts from changes from recreation patterns under the various action alternatives. On pg. 4-269 of DRMP/EIS, the BLM argues that should OHV use decline in the planning area, it is possible that there could be a decline in local revenues. |
| | 1026 | 44 | Assumptions made concerning the economic impact to the Moab area have no documented information to support those assumptions | Any assessment of the social and economic impact of a decision covering a 15-20 year timeframe will have elements of speculation. BLM used the best available data to assess impacts; in many cases, no data were available. In a landscape level plan such as the RMP, qualitative discussions are often all that are necessary (or even possible). |
| Capital Trail Vehicle Association | 1031 | 19 | We request that the analysis include an adequate benefit-cost analysis of non-motorized versus motorized trail use. This analysis should include the annual cost of the non-motorized trails per the actual and documented number of non-motorized trail user The economic analysis should also compare the annual | The BLM has no data which could be used to undertake the analysis suggested by the commentor. The BLM's anecdotal assertion is that cost of route maintenance does not differ appreciably by motorized or non-motorized use. There are many more miles of motorized route (3700 miles of motorized route versus approximately 50 |

496

BLM_0012501

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | | | benefit-cost per non-motorized user versus the annual benefit-cost per motorized user if the trails and funding were used as multiple-use/motorized trails. | miles of hiking, 50 miles of equestrian and 25 miles of bike-only routes).  The BLM spends more time and effort maintaining motorized routes, although the cost per mile is not known.<br><br>The issue that the commentor discusses is not a land use planning issue. |
| Utah State Office of Education | 1036 | 2 | The Moab RMP addresses the impacts on tribal lands and interests. But it does not have similar sections addressing the SITLA lands and impacts, particularly on economic matters. Further, the BLM should go much further in counting the cost in economic impact to people of the state of Utah. The economic impact for the people in this area will be immense. This RMP has, in general, vastly understated the economic costs, and vastly overstated the proportional importance of recreation. | See comments 120-101 & 120-103 for an explanation of closed acreage by alternative.  In Alt B, the loss of revenue from SITLA wells foregone has been calculated and added to the analysis on page 4-264. |

## Soils

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| ECOS Consulting | 9 | 12 | BLM's Failure to make Trampling and other Surface Disturbance and Destruction Activities a Top Priority. Throughout this Moab RMP/EIS there are statements implying that trampling and other disturbances of the soil would have only short-term adverse impacts. BLM provides no supporting data for this position, and based on my research and experience, this is simply not true. This view denigrates the serious long-term adverse impacts of the destruction of biological soil crusts.  Any trampling of biological soil crusts (BSCs), which cover over 90% of exposed soil in the Moab Planing area, will have serious short- and long-term negative impacts because of the high soil erosion potential, importance to maintaining native | On pg. 4-279 of the DRMP/EIS the BLM recognizes the importance of biological soil crusts.  On this page it states that these crusts help to stabilize soils, reducing erosion, and increasing soil productivity.  It is further noted that these soils have not been mapped and are therefore only discussed qualiatively.<br><br>On pg. 4-282 the BLM acknowledges that "grazing would have direct adverse impacts on soil productivity…due to trampling of soils and loss of biological soil crusts.<br><br>On pg. 4-286 the BLM acknowledges that mineral development to biological soil crusts.  It goes on to say biological soil crusts would potentially be crushed during |

BLM_0012502

| | | | | |
|---|---|---|---|---|
| | | | vegetation communities, and slow natural restoration rates of these soil and vegetation types.<br><br>Trampling and other soild disturbances have serious widespeard and negative long-term ramifications on the quality of wildlife habitat and wildlife populations. Avoiding trampling and other surface destruction activities must be first and formost in the BLM planning of soil 'multiple use' management activities that have the goal of "sustained yeild". | surface disturbance....Damaged biological soil crusts would also take longer to be reclaimed after the completion of development due to the long period of time needed to develop these crusts.  On pg. 4-287 it states that minerals development would have both shot term impacts including the destruction of biological soil crusts.<br><br>The references cited above are examples of the analysis of impacts to biolgocial crusts in Chapter 4.<br><br>There are no laws, regulations, or policies requiring  the protection of biological soil crusts. |
| ECOS Consulting | 9 | 36 | Page 4-279, 1st paragraph, 4.3.13: Biological soil crusts naturally occur (not "could" occur as stated) on over 90% of the soils in the Moab Planning Area.  To map the occurrence of biological soil crusts would be extremely simple, wherever there are no rocks, there is, or should be, biological crusts. They do not occur only in small patches of Mancos Shale and in areas where the soil has been disturbed and the biological soil crusts have been destroyed.<br><br>Page 4-279, 2nd Paragraph, 4.3.13: Acreage may be approximate but it can be assumend that almost anywhere there is soil and not hard rock, you will find biological soil crusts. Since these crusts are anywhere there is soil, then all areas of the Moab Planning Area contain sensitive soils. This is not clear in this document, but should be stated unequivocally. | See response to comment 9-12. |
| ECOS Consulting | 9 | 37 | Page 4-279, 3rd Paragraph, 4.3.13: This paragraph is misleading in many ways. Decisions regarding the management of most of the listed resources do have an effect on soil and water quality.  Degraded air quality due to increased vehicle or industrial activities in an area can effect soil and water quality through increased dust in the air and "dry deposition" of toxic chemicals.  This can lead to decreased productivity | See response to comment 124-7.<br><br>The narrative on pg. 4-279 of the DRMP/EIS states that management decisions regarding air quality, paleontology, socioeconomics, special status species, vegetation, visual resources, wildlife resources, or woodland resources would have negligible impacts to soils and water resources. |

BLM_0012503

| | | | and other problems throughout the lifecycle of many plants and animals, and biological soil crusts.

Allowing recreational fossil collection can lead to soil disturbance and the destruction of biological soil crusts.  This can occur by vehicles driving to the sites, and by the actual digging of specimens or in areas where specimens are suspected.

What is meant by improving the local and regional economy?  If this means increasing visitors then there can be significant increase in soil disturbance and water quality degradation.  Increased trampling of soils from vehicles and walking can destroy the biological soil crusts.  Human waste can contaminate water sites. Hydrocarbons from vehicles can also contaminate soils and water sites.

Improving and maintaining native vegetation communities can involve mechanical removal of exotics, application of herbicides, and mechanical placement of native seeds, seedlings, or grown plants. All these activities can trample and destroy the biologcal soil crusts and contaminate local water sources.

Activities associated with woodland harvesting can be enormously destructive of biological soil crusts.  Much soil trampling and compaction occurs when driving vehicles on biological soil crusts, and much trampling of the biological soil crusts can occur when retrieving, cutting, and dragging wood to vehicles, etc. These activities can also increase erosion rates and contaminate nearby water resources.

All of these activities must be analyzed in this EIS for direct, indirect, and cumulative impacts to soil, | Air quality decisions involve protecting air quality so they would not impat soils and water resources.  Paleontology decisions involve protecting paleontological resources and restrictions to collection so impacts to soils and water resources would be negligible.  The socioeconomic benefits of the proposed management decisions would not result in impacts to soils and water resources. Vegetation decisions involve treatments, restoration and rehabilitation, stabilization, and control of weed infestation.  These decisions are intended to improve vegetation in order to meet the desired future conditions.  Special status species decisions involve protecting these species so there would be no impacts to soil and water resources. Vegetation projects are implementation decisions in which the potential environmental impacts would be analyzed on a case by case site specific basis following completion of the land use plan.  Wildlife decisions involve protecting wildlife species so there would be no impact to soil and water resources.  The visual management decisions provide visual protections and do not impact soil and water resources in and of themselves.   The woodland decisions provide areas available for the casual collection of woodland resources. This collection  is limited to dead and down trees and access by designated routes.  The possibility of illegal cross-country travel is not analyzed because it is not allowed. |

BLM_0012504

| | | | vegetation, and water resources. | |
|---|---|---|---|---|
| ECOS Consulting | 9 | 50 | Page 4-287 4th Paragraph, 4.3.13.5: It is recommended that the BLM presume that most of the predicted 1,015 acres of surface disturbance contain sensitive soils in the form of biological soil crusts. | The commentor has not provided any information regarding the location of biological crusts. There are no maps available of biological crusts and the BLM can not presume that most of this area would contain biological soil crusts. |
| ECOS Consulting | 9 | 51 | Page 4-287, Alternatives, 4.3.13.5: Under the alternatives presented, there are estimates of the amount of soils in the Moab Planning Area that will be disturbed. Are these estimates based on total land surface that will be disturbed, or have the soils been mapped and the amount of actual soil disturbance calculated? Since it is not clear, and there is no mention of seperating out the rock from the soil surfaces then we must presume the BLM is talking about total land surface. Is this correct? If it is, then the BLM is describing some massive mining activities in the next 20-30 years. According to this Moab RMP, in Alternative A, 40% if the land surface of the Moab Planning Area will be disturbed. This represents roughly 720,000 acres of soil disturbance. Under Alternative B, 26% of soils of the Moab Planning Area will be disturbed, reprresenting roughly 468,000 acres of soil disturbance. Under Alternative C, 38% of soils of the Moab Planning Area will be disturbed, representing roughly 684,000 acres of soil disturbance. Under Alternative D, 40% of soils of the Moab Planning Area will be disturbed, representing roughly 720,000 acres of soil disturbance.

This magnitude is unacceptable and completely ignores the importance of biological soil crusts to this ecosystem. It also ignores a number of Federal mandates concerning the management of BLM lands. All planning efforts by the BLM are bound to the legal and regulaory mandates contained in FLPMA, 43 CFR 1600, the National Enviromental Policy Act of | Table 4.81, table 4.82, and table 4.83 on pgs. 4-288, 4-289, and 4-293 of the DRMP/EIS provide toatal acres by soil type for different resource activities and allocations. The numbers represent toal acreage by soil type and not the total acreage to be disturbed. |

BLM_0012505

1969 (NEPA, 42 U.S.C. 4321 et seq.), the Council on Enviromental Quality (CEQ) regulations at 40 CFR 1500-1508, and other applicable Federal laws and regulations.

BLM's mandate under the Federal Land Policy and Management Act of 1976 (FLPMA) is to manage the public lands for multiple use, while protecting the long-term health of the land. Where is the multiple use if the range of Alternatives allows between 468,000 acres and 720,000 acres of land surface and biological soil crusts to be destroyed? Given the preferred Alternative (C), the BLM is willing to destroy approximately 684,000 acres of soil in order to allow mineral development.  That represents almost 40% of the total Moab Planning Area! Is this management for multiple use, or primarily for one use?  Is this protecting the long-term health of the land?  It appears there isn't any room for other uses besides livestock grazing, mining, and oil and gas development. This is a backward vision that ignores the future and ignores the long-term health of the land.  The BLM must have a vision for the future that includes the mandates of FLPMA.  The BLM must make room for alternative uses of the land.  Uses that are less destructive and incorporate the spirit of FLPMA: to allow for multiple use, and to protect the long-term health of the land.

The National Enviromental Policy Act (NEPA) of 1969 specifically provides instructions to the BLM and other Federal agencies for developing a range of reasonable alternatives in environmental impact statements (EIS). NEPA assures that the BLM other federal agencies) will consider the impact of an action on the human environment before decisions are mad and the action is taken. It requires that NEPA documents concentrate on issues that are significant

BLM_0012506

to the action in question. The NEPA process is intended to help public officials make better decisions based on an understanding of the direct, indirect and cumulative environmental consequences and take actions that protect, restore, and enhance the human environment.

This Moab RMP/EIS appears to be ignoring the mandate of NEPA by not providing a reasonable range of alternatives nor sufficient indirect and cumulative effects. The BLM must develop different Alternatives for mining and mineral development activities that cover the whole spectrum from no activity, to a mix with other activities, to Alternative D. Also the BLM must analyze the indirect and cumulative impacts using commonly accepted methods such as a discussion on thresholds, trends analyses, and carrying capacity analysis? How about ecosystem analysis, economic system analysis , and social system analysis? Has the BLM attempted to engage any of these kinds of analyses with specific and known impacts. The lack of this information constitutes a major fault in this environmental analysis and thus in this Moab RMP/EIS.

The Council on Environmental Quality (CEQ) provides guidance to the BLM and other Federal agencies on the extent to which agencies of the Federal government are required to analyze the enviromental effects of past actions when they describe the cumulative environmental effect of a proposed action. In the Moab RMP, there is no apparent attempt to look at the environmental effects of past actions concerning the effects of mineral production, nor is there any mention of cumulative effects. Regarding cumulative effects, these can be significant when considering the destruction of soils

BLM_0012507

| | | | | |
|---|---|---|---|---|
| | | | and biological soil crusts. The destruction of biological soil crusts will affect all species at every trophic level, and result in a degraded state of the ecosystem, probably even impairment. These negative impacts will not be limited to the area disturbed but will spread out into the surrounding region. An example is the increase of wind-blown sand due to the destruction of biological soil crusts. This dust and sand eventually covers the biological soil crusts of the surrounding area, killing the crusts. We must be extremely careful when allowing activities that destroy biological soil crusts, these crusts are the glue that holds the natural system together. The continuum of impacts can spread out over large tracts of land, adding a cumulative impact that could spread to 60-80% of the Moab Planning Area.

It is recommended that the BLM fully consider the extent of ecosystem impairment caused by past mining and mineral development activities. We also recommend that the BLM completely analyze the cumulative effects of the proposed Alternatives. We need locations, numbers and acres affected by direct, indirect and cumulative impacts, not general statements, in order effectively analyze the effects of mining and mineral development on soils and water resources. | |
| ECOS Consulting | 9 | 54 | Page 4-298, 6th Paragraph, 4.3.13.9.2: What are the Best Management Practices (BMPs) mentioned in this paragraph?  We need to see these BMP's in order to make a judgment as to their usefulness and efficacy. This is extremely important because increased soil erosion and dust storm activity is directly linked to soil disturbance activities.  Dust storms in the Cisco Desert area have covered biological soil crusts, destroying them and their ecoligical functions, and have caused numerous auto | Best Management Practices (BMPs) are found throughout BLM policy and guidance for each resource program. The reference on pg. 4-298 is to state the BLM will follow these policies.  BMPs are continually being updated and improved with experience.

On pg. 2-31 of the DRMP/EIS it states the BLM will work with partners to implement Best Management Practices and continue the BLM's work with the Division of Water Rights and Water Quality in accordance with the |

BLM_0012508

| | | | | |
|---|---|---|---|---|
| | | | wrecks, many times with human injury and deaths. | administrative Memorandum of Understanding and the Cooperative Agreement addressing water quality monitoring. |
| ECOS Consulting | 9 | 55 | Page 4-298, 9th paragraph, 4.3.13.9.2: Again, limiting activities to a certain time of year is of limited ecological value since biological soil crusts would be destroyed regardless of time of year at most sites in the Moab Planning Area.  It is recommended that slopes greater than 30% should not be disturbed.

BLM Manual 1730-2 states: "Stocking levels and season of use should be ascertained on an annual basis, jointly by managers and users, with optimal coverage of both vascular plants and biological soil crusts as the management goal (Kaltenecker and Wicklow-Howard 1994; Kaltenecker et al. 1999b). Optimal coverage should be based on site capability and rangeland health indicators of site stability and nutrient cycling".  Has the BLM determined proper rangeland health indicators of the site stability and nutrient cycling for the vegetation types in the Moab Planning Area?  If so, where is that information?  Shouldn't it be included in this important planning document since livestock grazing could have such a detrimental ecological effect on the landscape?  Is the BLM using this information when planning annual grazing strategies?  If so, how is it being used, and are there records of this?  If so, are they available to the public?  This information is extremely important to the public so that the proper of improper management of the land can be determined. | The purpose of the stipulation on pg. 4-298 of the DRMP/EIS is for erosion control on steep slopes greater than 30%.  The restriction is applied during the wet period of the yerar.  The stipulation was not intended to protect bilogical soil crusts.

Resource concerns involving stocking levels are analyzed during the permit renewal process using the Standards for Rangeland Health and Guidelines for Grazing Management. |
| ECOS Consulting | 9 | 56 | Page 4-298, 10th paragraph, 4.3.13.9.2: The guidelines from BLM Technical Reference Manual 1730-2 should be strictly adhered to considering the extent and importance of biological soil crusts in the Moab Planning Area.  The BLM should remove the wording "where feasible" in this paragraph because it | Technical Reference 1730-2 is not a manual and therefore is not policy.  The BLM will adhere to this technical guidance where feasible. |

BLM_0012509

| | | | nullifies the strength of the commitment to land health. If the guidelines of the BLM Technical Reference Manual 1730-2 are not feasible, then a proposed project or activity should not be allowed, that is the intention and spirit of 1730-2. | |
|---|---|---|---|---|
| ECOS Consulting | 9 | 57 | Page 4-300, 3rd paragraph, 4.3.13.9.3.2: The timing limitation listed, December 1 to May 31, would have little to no value in protecting biological soil crusts. The only time these crusts are remotely protected is when that are frozen, which only lasts a couple of weeks in December and/or January. Thus, this would not reduce short- or long-term effects of these activities.  The only viable protection of biological soil crusts is avoidance.  Does the BLM have any guidance on avoidance of biological soil crusts when planning road construction and other surface disturbing activities?  If so, we would like to see this guidance. If not, we would like to see the BLM develop guidelines that truly limit surface destruction during many activities. | There are no laws, regulations, or policies requiring  the protection of biological soil crusts. |
| ECOS Consulting | 9 | 74 | Plan for Drought and Climate Change Drought and Climate change has had and will have major negative ecological impacts on the upland, riparian and floodplain areas, especially areas where livestock grazing and OHV use is still allowed; thus, the DRMP must include drought-specific management for resource protection. "An issue of recent concern is the ongoing drought throughout the planning area. Since 1998, the planning area has suffered severe to extreme to exceptional drought conditions" (Utah Climate Center 2004). Drought has affected vegetation and soil moisture, with watershed health declining accordingly. Major decreases in the amount of ground cover, the vigor and diversity of plants, and soil moisture levels have been documented" (BLM 2005). Considering the current and projected drought problems the BLM must plan | On pg. 251 of the DRMP/EIS, the BLM identifies adaptive drought management criteria to be implemented during times of drought. |

BLM_0012510

| | | | for the worst drought scenario as projected by the Utah Climate Center. This is extremely important for the new Moab RMP as it will dictate resource management for the next 10-20 years, and because drought will exacerbate and intensify any human caused impacts to the land, and in particular, to riparian habitat and wetlands. | |
|---|---|---|---|---|
| Samson | 201 | 13 | Soils and Watershed<br>On page 2-32 the BLM indicates that it will not allow surface occupancy and preclude surface-disturbing activities within 100-year floodplains, 100m of riparian area, public water reserves, and 100m of springs. The BLM should clarify this Management Common to All Action Alternatives slightly to indicate that road and pipeline crossings would be allowed in streams and other potential riparian habitats when approved by the BLM and Army Corp of Engineers. The BLM also indicates under this section that it will minimize surface disturbance in areas with sensitive soils. Although the BLM mapped areas with saline soils, it has not mapped sensitive soils. See DRMP/EIS, Map 2-13. The BLM should map sensitive soils within the planning area so that the public better understands how this management action will impact use of the public lands. In particular, the BLM should disclose and analyze how oil and gas leasing and oil and gas development operations would be impacted by this management approach. Similarly, although the BLM indicates that limitations placed on "fragile soils" will adversely impact oil and gas operations, see DRMP/EIS, pg. 4-96, the BLM does not provide any specific information on where fragile or sensitive soils may be located. | See response to comment 214-21. |
| Cabot Oil and Gas Corporation | 202 | 14 | Soils and Watershed<br>On page 2-32 the BLM indicate that it will allow no surface occupancy and preclude surface-disturbing activities within 100-year floodplains, 100m of riparian | See response to comment 214-21. |

BLM_0012511

| | | | | |
|---|---|---|---|---|
| | | | area, public water reserves, and 100m of springs. The BLM must redraft this requirement slightly to indicate that road and pipeline crossings would be allowed in streams and other potential riparian habitats when approved by the BLM and Army Corp of Engineers. As currently drafted, the management action could be viewed as prohibiting all stream crossings within the planning area.<br>The BLM also indicates that it will minimize surface disturbance in areas with sensitive soils. Although the BLM mapped areas with saline soils, it has not mapped sensitive soils. See DRMP/EIS, Map 2-13. The BLM should map sensitive soils within the planning area so that the public better understands how this management action will impact use of the public lands. The BLM must also disclose and analyze how oil and gas leasing and oil and gas development operations would be impacted by this management approach. Although the BLM indicates that limitations placed on "fragile soils" will adversely impact oil and gas operations, see DRMP/EIS, pg. 4-96, the BLM does not provide any specific information on where fragile or sensitive soils may be located. | |
| The Nature Conservancy | 204 | 23 | Soils and Watershed (Pg 2-31—2-32) The items listed under Management Common to All and All Action Alternatives are generally good and should be carried forward into the Final RMP. Several items under the latter heading, though very desirable, are stated pretty vaguely, for example:<br>-Maintain vegetation based on desired future condition to provide adequate ground cover to prevent accelerated erosion in wind erodible soils.<br>–Maintain or improve soil quality and long-term soil productivity through the implementation of Standards for Rangeland Health and other soil protection measures.<br>–Manage uses to minimize and mitigate damage to | Interpreting Indicators of Rangeland Health (Tech. Ref. 1734-6, 2000) is utilized during the permit renewal process. It is the impelmentation tool of the Standards for Rangeland Health and Guidelines for Grazing Management process. As such, it does not need to be mentioned in the PRMP/FEIS. |

BLM_0012512

| | | | soils.<br>-Maintain and/or restore overall watershed health and reduce erosion, stream sedimentation, and salinization of water.<br>The key to making these items more specific and measurable, so that accomplishment (or not) can be judged, is mentioned within the second of these points. Implementing Standards for Rangeland Health in a credible way calls for a robust effort to conduct range and watershed assessments according to Interpreting Indicators of Rangeland Health (Tech. Ref. 1734-6, 2000 or latest version) in order to know when those standards are (and are not) being met. | |
|---|---|---|---|---|
| Bill Barrett Corporation | 214 | 21 | The BLM should map sensitive soils within the planning areas so that the public better understands how this management action will impact use of the public lands.  In particular, the BLM should disclose and analyze how oil and gas leasing and oil  and gas development operations would be impacted by this management approach. | Map 2-13 of the DRMP/EIS displays moderate to high saline soils.  Saline soils are the component of sensitive soils of most concern to the Moab Field Office.  A map of these soils is also referenced in Chapter 3.  The stipulations for oil and gas leasing and other surface disturbing activities is provided in Appendix C under sensitive soils.  The sensitive soils of concern are the saline soils delineated on Map 2-13. |
| EnCana Oil and Gas (USA) Inc. | 215 | 21 | In this Section, effects on soils and water resources are determined by comparing the Alternatives against one another. However, there appears to be no determination that any of the four alternatives are so detrimental to soil and water resources as to be unacceptable.  Please keep in mind that the BLM has developed standards for stormwater controls and reclamation using certified seed mixtures, etc., and Spill Prevention, Countermeasure and Control Regulations are also applied to this area for soil and groundwater protection.  To be consistent with the air quality determination, the following statement should be included in this section:<br><br>   Assuming appropriate application of control measure and strict adherence to existing regulatory and permitting processes, no appreciable cumulative, | The mitigation measures identified by the commentor are applied to site specific proposals.  The assessment of impacts to soils was based on projections of surface disturbance by alternative.  This provides a reasonable basis for the comparison of impacts by alternative. Control measures can reduce impacts such as soil erosion but they do not eliminate the impacts. |

BLM_0012513

| | | | | |
|---|---|---|---|---|
| | | | short-term or long-term, adverse soil and water resource effects are projected specific to oil and gas development. | |
| | 281 | 1 | I found the statement that soils in the area have low to moderate wind erodibilty in the Draft RMP (Chpt 4, Fugitive Dust [Page 4-23]). I believe that very good data from the local USGS (see work by Jayne Belnap et al.) shows that although this may be the case for undisturbed soils, many of these soils are highly erosive from the time they are disturbed until they are rained on, a time period that could last months in this region. Not only is good data available to show this SSURGO data is flawed and/or not applicable to disturbed soils. | The statement referenced by the commentor on low to moderate wind erodibility of soils in the MPA is found on page 4-23 of the DRMP/DEIS. Although the first sentence in the Fugitive Dust paragraph on p. 4-23 generalized the soils as having low to moderate wind-erodibility rating. However, the remainder of the paragraph acknowledges that the MPA has high wind erodibility ratings on some of the soils. SSURGO data is the best available data regarding soils for the planning area.  This is the recommended data set from the NRCS, the agency with jurisdictional responsibility for soils.  The BLM referenced all published Belnap studies.  Any studies as yet unpublished have not been referenced in this DRMP/EIS. See also the soils nad watershed section of the DRMP/EIS (Section 4.3.13.7) which discusses the effects of travel management, and other disturbances, on the erodibility of soils. |
| | 309 | 1 | I find the Soil/Watershed analysis to be very good on the whole despite the fact that critical mapping of cryptogrammic soils was not made available to the analyst. The integrity of the soil resource is the foundation for protection for all the other resources identified. I encourage you to give much weight to effects on the soil resource to select even more protective measures than those outlined in Alternative B. Section 4.3.21, which describes unavoidable adverse impacts, also gives you supporting documentation to choose more protective measures. | The commentor's desire for the BLM to adopt more protective soil resource protection measures than those in Alternative B is noted. |
| | 309 | 2 | Based on much reading of this literature and on-the-ground experience, I disagree that impacts from all the potential activities described are short term (5-year). Please provide more supporting data and discuss the justification for identifying soil impacts as short-term. Please provide supporting information | Most, if not all, of the existing routes in the Labyrinth, Hatch Point and Harts areas were constructed prior to 1985.  They were in existence at the time of the 1985 RMP.  All three of these areas were left open to cross country travel in the 1985 RMP, although Labyrinth was limited to existing roads by a FEderal Register notice in |

509

BLM_0012514

| | | | | |
|---|---|---|---|---|
| | | | concerning what reclamation techniques are contemplated and why they will succeed within the 5-year time frame. | 2001 (to be in effect only until the new RMP was revised, and Harts and Hatch were limited to existing road by the 2002 Plan Amendment to the Grand RMP.  Thus, the designation of a subset of the existing roads in the present Travel Plan does not represent a "loss" of wilderness values, since these roads have been in existence since the 1950's and 1960's. Limiting travel to designated roads, and eliminating cross country travel enhances any wilderness values that may lie in these areas. |
| | 309 | 3 | Since the metric for soils (watershed) impact analysis is 'amount of disturbance' and considering all the activity that is out there, ranging from hikers to OHVers to commercial boating to fuels management to industrial mining and beyond, I think the analysis should reevaluate the amount of potential disturbance. Disturbances from larger scale activities that require permitting, even grazing, may be addressed in site-specific mitigation plans but the actual disturbance caused by 'dispersed' activity that is not reviewable by project-level analysis can lead to very extensive damage, very quickly. | BLM acknowledges that soil disturbance from dispersed activity can be substantial. However, BLM stands by the acres of disturbance impact analysis conducted for soil resources. In its analysis BLM took into account disturbance from dispersed and site specific activities to the extent possible. It is not possible for BLM to adequately quantify the amount of surface disturbance from most dispersed activities, such as hiking, because the data does not exist. Numbers have been added to Chapter 4 and to Appendix G that show the miles of route designated and not designated in erodible soils types. There are 167 miles of route that are closed in the preferred alternative because of soils conflicts. |
| | 309 | 4 | I would ask that cryptogrammic soils be mapped and quantitatively incorporated into the analysis because the extent of cryptogrammic communities is almost district wide. If I understand the analysis, these types of soils were considered sensitive (and key to soil integrity) but since they were not mapped, there was not a quantitative way to identify the full extent of impacts to them and thus sensitive soils as a whole which was used as the basis for analysis. | To date no mapping of biological soil crusts has occurred in the MPA. For the purposes of a planning level analysis this level of data is not necessary to adequately assess resource impacts especially given that implementation level decisions, prior to being made, will undergo site specific analysis. Further, extensive resources would be required to complete MPA wide mapping of biological soil crusts. BLM cannot justify allocation of these resources for such a mapping effort in light of the fact that current data is adequate for purposes of analysis of impacts in this document. |
| | 309 | 5 | The proposed road density is not acceptable and does not reflect a sound scientific analysis. This density will most assuredly result in deterioration of | The Moab Field Office area has been subject to a great deal more mineral activity (especially uranium exploration and oil and gas exploration and drilling) than has the San |

BLM_0012515

| | | | | |
|---|---|---|---|---|
| | | | the foundation soil resource. This aspect of disturbance is not adequately addressed under soil/watershed resources. The road density when compared to adjacent BLM resource areas (e.g. San Rafael) is startlingly different. Please include road disturbance in the analysis of direct, indirect, and cumulative impacts. | Rafael area.  This is why Moab has six times the number of inventoried miles of route.  The percentage of routes designated in Moab's preferred alternative is actually a lower percentage than those routes designated in the San Rafael Travel Plan.  Road density was not a factor in the analysis of soils, as the greatest disturbance to soils occurred at the time the road was constructed/bladed. Miles of route, by alternative, in highly erodible soils has been added to the analysis. |
| Environmental Protection Agency | 479 | 18 | The EPA is concerned that the Greater Cisco and Bookcliffs RFD areas have large acreages of sensitive soils and would be impacted by oil and gas development.  The EPA recommends that development in these areas be limited to the 149 wells proposed under Alt. B.  This represents approximately 50% less surface disturbance than proposed under any of the other alternatives.  This would lessen the impacts of development to biological soil crusts, reduce erosion and sedimentation/salinization of surface waters, improve visibility, reduce the loss of soil productivity and reduce the invasion of noxious weeds. | Under alternatives B and C in the DRMP/EIS sensitive soils are protected with timing limitation stipulations (see Appendix C).  The BLM analyzed the impacts to soils from oil and gas development under the various alternatives.  Alt C balances commodity production with resource protection. |
| | 995 | 5 | For each mile of designated route, there should be an assumption factored in for the total acreage of soils damaged on surrounding land. | Disturbance off the road would be illegal under the terms of the Travel Plan.  The DRMP/EIS assumes that users will engage in legal activity.  Illegal activity is not analyzed in a DRMP/EIS. |
| Western Watersheds Project | 1025 | 13 | The combined effects of sediments from watershed uses such as roads, OHVs, grazing and logging, have not been addressed in a  comprehensive analysis. No evaluation has been done for the contribution of hazardous pollutants to the air and watersheds where motorized vehicles are used. | See response to comment 124-7.<br><br>No logging occurs on BLM lands within the Moab planning area. |
| Western Watersheds Project | 1025 | 31 | Alternatives identified within the soils/watershed and livestock grazing sections should be adjusted to apply use restrictions such as closure, season-of-use and rest-rotation grazing systems consistently on all high to moderately saline soils to reduce non-point surce | Use restrictions such as closure, season-of-use and rest-rotation grazing systems related to livestock grazing do not require a land use planning decision.  The resource considerations are addressed on a site specific allotment basis utilizing Standards for Rangeland Health and |

BLM_0012516

| | | contributions within the Colorado River basin, not just saline soils within mancos areas. Such restrictions should specify individual allotments and particular seasonal or management adjustments or closures to protect sensitive soils. | Guidelines for Grazing Management.<br><br>See response to comment 1025-4 and 9-3. |
|---|---|---|---|

## Special Status Species

| Organization | Record ID & Comment Number | Comment Text | Response to Comment |
|---|---|---|---|
| ECOS Consulting | 9 | 20 There are no Plans to Protect and Enhance Threatened and Endangered Fish Habitat.  The goal stated in this Draft Moab RMP/EIS for wildlife and fisheries are to protect and enhance habitats to support natural wildlife diversity, reproductive capability, and a healthy self-sustaining population of wildlife and fish species.  In addition, the BLM has committed to managing crucial, high value, and unfragmented habitats as management priorities.<br><br>Yet, nowhere in this document can there be found any provisions for protecting, enhancing, or restoring crucial floodplain habitat along the Green and Colorado Rivers. The following fish species need backwaters in healthy floodplains in order to reproduce successfully and become self-sustaining: Roundtail chub, Flannel mouth sucker, Colorado Pike Minnow, and the Humpback Chub.  These highly productive low-velocity habitats are thought to be an essential component of the life history of these species.  But they have been hydraulically cut off because of low flows due to dams, water use upstream, and poor riparian and floodplain conditions.<br><br>The BLM must provide a plan for restoring and enhancing this valuable habitat along the Green and Colorado Rivers during the next 10-20 years. Natural | On pg. 2-45 of the DRMP/EIS it states that for all alternatives no surface disturing activities would be allowed within the 100 year floodplain of the Colorado River, Green River, and at the confluence of the Dolores and Colorado Rivers.  Any exceptions to this requirement would require consultation with the U.S. Fish and Wildlife Service.  Restrictions on surface disturbance within this critical habitat would be developed through this consultation process.<br><br>On pg. 2-44 of the DRMP/EIS it states that the BLM would follow current and future recovery plans  and manageme habitat for Threatened and Endangered and BLM sensitive species.  Thiis would include the Colorado Squawfish recovery plan, the Colorado Pikeminnow recovery goals:  amendment and supplement to the Colorado Squawfish recovery plan, the Humpback recovery plan, the Humpback Chub recovery goals: amendment and supplement to the Humpback recovery plan, the Bonytail recovery plan, the Bonytail recovery goals amendment and supplement to the Bonytail recovery plan, Razorback Sucker recovery plan, Razorback Sucker recovery goals:  amendment and supplement to Razorback recovery plan. |

BLM_0012517

| | | | | |
|---|---|---|---|---|
| | | | healthy floodplain functions the BLM should manage for include: 1. Food, decay of plant material, phytoplankton, algae, zooplankton, invertebrates, small fish; 2. Enhanced water temperatures, nutrients, and light intensities; 3. High quality water; 4. Shelter from high velocities; 5. Vegetative cover for predator avoidance, a structurally complex environment; 6. Nursery rearing habitats; 7. Spawning habitats.<br><br>By working to restore, enhance, and protect riverine riparian and floodplain habitat for the Threatened and Endangered fish of the Green and Colorado Rivers, the BLM will also provide for the habitat needs of many other wildlife species, including migratory birds, the endangered willow flycatcher, the threatened Bald Eagle, and the Yellow-Billed Cuckoo. | |
| PacficCorp | 12 | 7 | The EIS states there is one bald eagle nest on the MPA on pg 3-178 and that there are three Bald eagle nests in the MPA on pg. 3-143. | There are three bald eagle nests on the Colorado River within the Moab planning area.  One is located on BLM land and the other two are on private land.  The reference on page 3-178 of the DRMP/EIS refers to BLM land only.  The reference on pg. 3-143 of the DRMP/EIS is to all lands within the planning area. |
| PacficCorp | 12 | 8 | The Bald Eagle has been de-listed from a threatened status.  It is uncertain from the language in the the draft whether the BLM's management objectives would be changed due to the status change. | See response to comment 121-56.<br><br>Management objectives for bald eagles would not change because of the status change.  Bald eagles remain federally protected. |
| State of Utah - Public Lands Policy Coordination | 120 | 35 | The State recommends listing the following nine species of concern:  Allen's big-eared bat, American three-toed woodpecker, big free-tailed bat, cornsnake, ferruginous hawk, spotted bat, and Townsend's big-eared bat. | These species are listed on pg. 3-146 to 3-148. |
| San Juan County | 121 | 25 | Southwestern Willow Flycatcher.  What is their habitat?  There is no map provided. | The Southwestern Willow Flycatcher is an endangered species;  the U. S. Fish and Wildlife Service has not mapped their critical habitat within the Moab Field Office boundaries.  The USFWS defines their breeding habitat as dense riparian tree and shrub communities associated |

BLM_0012518

| | | | | with rivers, swamps, and other wetlands (USFWS Recovery Plan, Southwestern Willow Flycatcher). |
|---|---|---|---|---|
| San Juan County | 121 | 26 | Are there any Gunnison sage grouse leks within the MPA?  Will the restrictions be imposed whether or not the grouse are present? | There are currently no Gunnison sage grouse leks or occupancy within the MPA.  On page 2-47, the Draft RMP/EIS states:  "If sage grouse occupancy is identified, the stipulations would be imposed as follows:"  Thus, stipulations would only be imposed if the grouse are present. |
| San Juan County | 121 | 56 | Bald Eagles are not on the Federal Endangered Species List.  The animal was removed last June. | The delisting of the Bald Eagle had not occurred prior to the printing of the DRMP/EIS.  This change has been made to the PRMP/FEIS. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 59 | Of the BLM Sensitive species mapping indicates that only burrowing owl habitat occurs in the area [White Wash Sand Dunes].  However, when looked at on a site-specific basis there is very little of the area that provides conditions for these birds.  Much of the area lacks habitat for prairie dogs and ground squirrels which is their primary prey base.  Suitable nesting habitat is also lacking.  Suitable habitat for prey species may be found in areas where there are existing trails, but no new trails would be allowed.  No prairie dog habitat is mapped for the area. | The maps of habitats regarding sensitive species were obtained from the U.S. Fish and Wildlife Service and the Utah Division of Wildlife Resources.  These agencies are recognized as the agencies with jurisdictional expertise for sensitive species.<br><br>No routes were excluded from the White Wash area for sensitive species habitat management.  The issues in the White Wash area were cultural, riparian and bighorn sheep habitat. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 61 | None of the remainder of the area [White Wash Sand Dunes] is mapped as habitat for other listed species.  Obviously, other wildlife species use the area, including neo-tropical birds, mammals, amphibians and reptiles.  Without surveys or studies to assess the importance of this area to any of these species, it must be assumed that use is in line with the available habitat.  It must also be assumed that at current use levels without any additional trail development wildlife use would remain constant. | The BLM agrees that no other listed wildlife species are present in the White Wash area.  The designation or non-designation of trails in the White Wash area was not due to the habitat needs for listed species. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 63 | There are a few very small areas mapped in the Dee Pass Focus Area as potential Mexican Spotted Owl (MSO) foraging habitat.  These are very small isolated pockets and are well removed from any suitable nesting habitat, which precludes the chances of any of this area | The BLM is directed by the U.S. Fish and Wildlife Service to utilize the model for identifying potential Mexican Spotted Owl (MSO) habitat.  However, due to isolated pixels of breeding habitat and no foraging habitat this area is not suitable for MSO occupancy.   No existing |

BLM_0012519

| | | | | |
|---|---|---|---|---|
| | | | would be used by the owl.  Further, this mapped foraging habitat was based upon a model and it is probably safe to assume there was no ground truthing of the area to verify habitat conditions. | routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with MSO. Establishment of new routes would not require MSO surveys before they could be added to the Travel Plan. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 65 | This area [Dee Pass] is mapped as providing suitable habitat for burrowing owls. This appears to have been a general observation about habitat availability in the area for these birds.  Without site-specific surveys of the area it cannot be assumed that these birds use the area for nesting and brood rearing.  Surveys of the area would have to be conducted before any determinations could be made about trail closures or the establishment of new trails. | No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with burrowing owls.  Establishment of new routes would require surveys before they could be added to the Travel Plan.  Burrowing owls are protected under the Migratory Bird Treaty Act. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 66 | Except for the Mexican Spotted Owl (MSO) none of this SRMA [Utah Rims], as currently laid out, is mapped as habitat for any of the federally listed Threatened, Engangered, or Candidate Species.<br><br>There are a few very small areas mapped as potential MSO foraging habitat. These are very small isolated pockets and are well removed from any suitable nesting habitat, which precludes the chances of any of this area would be used by the owl. Further, this foraging habitat was based upon a model and it is probably safe to assume there was not ground truthing of the area to verify habitat conditions. Any motorized or mountain bike trails in this area would be removed from these pockets of timber or cliff areas. | The BLM agrees that none of the Utah Rims SRMA is mapped as habitat for any federally listed species.  No routes were removed from the Utah Rims area due to issues with special status species.  Those routes not designated were primarily due to cultural resource conflicts.<br><br>Refer to response to comment 123-63. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 67 | The area [Utah Rims SRMA] is mapped as burrowing owl habitat.  The amount of burrowing owl activity in the area is unknown.  Given limited prairie dog activity in the area it must be assumed that this is probably helping to hold burrowing owl numbers down. Burrowing owls also prey on ground squirrels and will be found where there are concentrations of these animals.  The small amount of habitat that is affected by single-track routes would not have an affect on the prey | Refer to response to comment 123-65.  No routes in the Utah Rims area were not designated due to burrowing owl habitat.  The primary resource of concern in the Utah Rims area was cultural resource conflict. |

BLM_0012520

| | | | | |
|---|---|---|---|---|
| | | | base or nesting and brood rearing habitat for the burrowing owl. | |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 68 | There is nesting and foraging habitat for both bald and golden eagles in the area [Utah Rims SRMA]. Nesting by these birds would occur on cliffs or cottonwoods along the river. Both summer and winter foraging habitat for bald eagles and to a lesser degree golden eagles is shown as occurring in the area where there are designated motorized trails. The chance of motorized activity affecting foraging activities is very minor. It is doubtful that there has been a problem in the past with riders disturbing foraging activities by these birds. It must also be assumed that with the large expanses of suitable nesting habitat in the canyonlands area that nest disturbance has not and will not be an issue. | The issue raised by the commentor is not a comment on the plan. No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with eagles, so the issues raised by thwe commentor are moot. Establishment of new routes would require surveys before they could be added to the Travel Plan. Eagles are protected under the Migratory Bird Treaty Act and the Bald Eagle Protection Act. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 69 | The Utah Rims SRMA is located in an area mapped as ferruginous hawk habitat. There are not known nest sites immediately adjacent to any of the trails. There is suitable P/J habitat in the area and is probably used by these birds. It was not indicated in the document to what degree the area is used for nesting and foraging. | The issue raised by the commentor is not a comment on the plan. No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with ferruginous hawks. Establishment of new routes would require surveys before they could be added to the Travel Plan. Ferruginous hawks and all raptors are protected under the Migratory Bird Treaty Act. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 70 | Thompson Trail has already been surveyed by the BLM and is shown on the Alternative C & D map. However, this route is not the same as that proposed by RwR. The alignment proposed by RwR does deviate from the BLM proposed route, but not significantly. While conducting an aerial survey of the route it was obvious that this route would provide a better riding experience than the BLM route. When compared to the BLM route, using the RwR route would not result in any additional measurable impacts on habitat and wildlife found in the area. | Establishment of any new routes, or realignment, would require surveys for raptors and sensitive species before they could be added to the Travel Plan. Raptors are protected under the Migratory Bird Treaty Act. The BLM is required to manage sensitive species so that impacts would not lead to Federal listing under the Endangered Species Act.<br><br>The Thompson Trail, a user made trail in an area that has been limited to existing routes since the 1985 Grand RMP, was not verified during the travel plan identification process. |
| Colorado Off-Highway | 123 | 71 | A review of wildlife information contained in the DRMP shows portions of the Thompson Trail passing through | There are numerous routes in the alternatives for the Travel Plan of the DRMP/EIS that provide access to |

BLM_0012521

| | | | | |
|---|---|---|---|---|
| Vehicle Coalition (COHVCO) | | | historic white-tailed prairie dog habitat.  Because there are no roads accessing these prairie dog towns, people going to those areas to shoot prairie dogs would be the primary impact. | prairie dog habitat.<br><br>The shooting of prairie dogs is governed by wildlife regulations promulgated by the Utah Division of Wildlife Resources.  Access to where persons wish to shoot is not always guaranteed by the BLM Travel plan. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 72 | The area [Thompson Trail] is mapped as burrowing owl habitat. The amount of burrowing owl activity in the area is unknown. The small amount of habitat that is affected by the single-track route would not have an affect on the prey base or nesting and brood rearing habitat for the burrowing owl. | Refer to response to comment 123-65.  The non-designation of the Thompson Trail is Alt C is not because of burrowing owl habitat. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 73 | The area [Thompson Trail] where this trail is located provides habitat for golden eagles.  The active number of eagle nests along the cliffs indicated that ongoing human activity including motorcycle riders and oil/gas field development is not affecting their nesting activities. | Refer to response to comment 123-68. The non-designation of the Thompson Trail is not because of golden eagle habitat. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 74 | The route [Thompson Trail] does go through mapped ferruginous hawk habitat.  There are no known nest sites immediately adjacent to the trail.  As a mitigation measure, trail user groups could help erect structures, monitor nesting activity, and provide data to the BLM. | Refer to response to comment 123-69.<br><br>Coordination with user groups to work with the BLM on a volunteer basis is an administrative action and does require a land use planning decision. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 81 | Except for the Mexican Spotted Owl (MSO) none of this area [Pole Canyon/Black Ridge] is mapped as habitat for any of the federally listed Threatened, Endangered, or Candidate Species.<br><br>Almost the entire area is mapped as potential MSO foraging habitat.  The mapped foraging habitat is based upon a model, which leaves the door open to question whether these birds do forage in the area.  There is no nesting habitat mapped for the area.  USFWS designated critical habitat is found well away from this area. | The BLM is directed by the U.S. Fish and Wildlife Service to utilize the model for identifying potential Mexican Spotted Owl (MSO) habitat.  Suitable habitat has been identified in or near the Pole Canyon/Black Ridge area and is under protocol surveys for MSO absence. |
| Colorado Off-Highway Vehicle | 123 | 84 | This area [Copper Ridge] is mapped as providing suitable habitat for burrowing owls.  This appears to have been a general observation about habitat for these | See response to comment 123-65. |

BLM_0012522

| | | | | |
|---|---|---|---|---|
| Coalition (COHVCO) | | | birds. Without site-specific surveys of the area it cannot be assumed that these birds use the area for nesting and brood rearing. Surveys of the area would have to be conducted before any determinations could be made about the importance of this area to these birds. The absence of any mapped prairie dog towns further reduces the changes that any of these birds would be found in the area. | |
| Samson | 201 | 16 | The United States Fish and Wildlife Service (USFWS) determined that the current condition of the greater sage-grouse did not warrant protection under the Endangered Species Act (ESA) in January of 2005. 70 Fed. Reg. 2244 (Jan. 12, 2005). As such, the species is not entitled to any specific protection under the ESA. The BLM must ensure it has sufficient flexibility to manage the public lands for other multiple uses in sage brush habitat, particularly oil and gas development. | See response to comment 203-40.  The BLM can choose to impose stipulations for animals so that they not be listed under ESA. |
| Samson | 201 | 17 | The BLM's proposed management for Gunnison sage-grouse is similarly restrictive, particularly under Alternative B, which would prohibit most multiple use activities, including oil and gas development, in that vast majority of the Lisbon Valley area. See DRMPIEIS, pg. 2-47, Map2- 20. BLM's proposal to limit most surface occupancy on 175,727 acres of potential habitat under Alterative C, or 246,107 acres of "pre-settlement" habitat under Alternative B is unnecessary and potentially illegal. BLM cannot impose limitations inconsistent with Operators existing lease rights in the Lisbon Valley area and, therefore, would be precluded from imposing additional timing or controlled use conditions of approval on Operators operations if such limitations were inconsistent with the terms of Operators leases. Once the BLM has issued a federal oil and gas lease, a lessee has not only the right to utilize the leasehold, but the obligation to develop oil and gas resources therefrom. See 43 C.F.R. § 3101-1-2. | See response to comments 203, 40, 203-41 and 203-42. Existing leases are subject to the terms and conditions in place at the time of the lease.  The BLM has chosen to impose stipulations on operations in Gunnison sage-grouse habitat to prevent the listing of this species. |
| Cabot Oil and | 202 | 17 | The BLM's proposed management for Gunnison sage- | See response to comments 203-40, 203-41, & 203-42. |

BLM_0012523

| | | | | |
|---|---|---|---|---|
| Gas Corporation | | | grouse is similarly unduly restrictive, particularly under Alternative B, which would prohibit most multiple use activities, including oil and gas development, in that vast majority of the Lisbon Valley area. See DRMPIEIS, pg. 2-47, Map 2-20. BLM's proposal to limit most surface occupancy on 175,727 acres of potential habitat under Alterative C, or 246,107 acres of "pre-settlement" habitat under Alternative B is unwise, unnecessary, and potentially illegal. BLM cannot impose limitations inconsistent with Cabot's existing lease rights in the Lisbon Valley area and, therefore, would be precluded from imposing additional timing or controlled use conditions of approval on Cabot's operations if such limitations were inconsistent with the terms of Cabot's leases. Once the BLM has issued a federal oil and gas lease, a lessee has not only the right to utilize the leasehold, but the obligation to develop oil and gas resources therefrom. See 43 C.F.R. § 3101-1-2. | |
| The Nature Conservancy | 204 | 1 | In addition to the species in the MPA with formal status as listed above, we urge that special attention be given to one additional plant: Astragalus iselyi (Isely's milkvetch). At present this plant has no special status. We had recommended that it be added to the Utah BLM list of Sensitive Plants when that list was being reviewed for revision in March 2007. Through no revised BLM Sensitive Plant list has yet resulted from that process, the status of Astragalus iselyi as a G1 (globally impared) taxon is still valid, and potential threats to its occurrences – ALL of which world-wide are within the MPA – remain active and potent (renewed uranium prospecting, OHV use, etc.). The need for special status is heightened by a particular proposal for public-land disposal that appears within the three Action Alternatives of the DRMP. This action would, if implemented, remove from BLM control a major population center for this plant, probably increasing the need for BLM Sensitive designation of the remaining | The Moab RMP does not add or subtract potential special status species to the Utah BLM list of Sensitive Plants.  Parcel R-11, which contains habitat for the astragalus iselyi, has been removed from the list of lands identified for disposal. |

BLM_0012524

| | | | occurrences, and possibly creating a rationale for federal listing of the whole species. | |
|---|---|---|---|---|
| The Nature Conservancy | 204 | 2 | The MPA contains several ecological communities or habitats that are of conservation concern by virtue of scarcity, sensitivity, decline, and/or importance to SSS. Perhaps of greatest merit for conservation attention in the Final FMP are: (1) riparian areas, especially at lower elevations; (2) sagebrush shrubland and steppe communities; and (3) presence of biological (cryptobiotic) soil crusts in appropriate habitats. | The DRMP/EIS provides protection for riparian areas by disallowing oil and gas development and other surface disturbing activities, in accordance with Utah Riparian Policy.  Provisions are made to enhance sagebrush steppe communities throughout the document.  In addition, the limiting of OHVs to designated routes throughout the MPA (except for 2,000 acres within the White Wash Sand Dunes) is intended to limit damage to biological soil crusts, among other resources. |
| The Nature Conservancy | 204 | 3 | Ideally, in the words of BLM Manual 6840.22A "Land use plans shall be sufficiently detailed to identify and resolve significant land use conflicts with special status species without deferring conflict resolution to implementation-level planning." However, the necessarily coarse level of resolution in an RMP may make it difficult to fine-tune every land allocation or resource use decision within it so that every potential conflict is avoided. Therefore, the RMP must ensure in over-arching terms that provisions for the conservation of SSS, particularly objectives from approved recovery plans and conservation agreements, are given priority. Then when subsequent activity-level plans and projects are developed, with their attendant EAs, the RMP serves as the higher-tier authority for requiring that unacceptable adverse effects to SSS do not occur at the finer scales of planning and implementation that are relevant to the occurrences of those species. | Analysis of impact to Special Status Species is required for every site-specific, implementation level action.  The intent of the RMP is to provide the guidance to give protection to Special Status Species.  The decisions on pgs. 2-44 through 2-48 do this.  In addition, see the specific stipulations for oil and gas leasing and other surface disturbing activities that are imposed as a result of management for special status species. |
| The Nature Conservancy | 204 | 4 | Under section 2.1.1.5 Special Status Species (page 2-5), the DRMP states that "Land use plan decisions should be consistent with…" various mandates, plans and agreements for T and E species. A stronger and more accurate statement to put into the Final RMP is that "Land use plan decisions must be consistent with…" those mandates and agreements etc. | The verb has been changed from 'should' to "must" in two places in the first sentence on pg. 2-5 of the DRMP/EIS to reflect the strength of the agreements and mandates to which the BLM is subject regarding special status species. |
| The Nature | 204 | 5 | Under Management Common to All Alternatives, one | The BLM is mandated to give primacy to the conservation |

BLM_0012525

| Conservancy | | | point states that "The protection of habitat for listed and non-listed plant and animal species would be considered prior to authorizing any actions that could alter or disturb such habitat." While it is fine to consider such SSS habitat protection, the BLM needs to give primacy to the conservation of SSS in such cases—not necessarily a wholesale halting or precluding of other valid uses of public lands, but fine-scale design of such uses so as to be compatible with the priority of maintaining SSS habitats/occurrences. | of special status species. |
|---|---|---|---|---|
| The Nature Conservancy | 204 | 6 | Under Management Common to All Alternatives, a point states that "No management action would be permitted on public lands that would jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E." Given that the BLM Manual 6840.06E and the DRMP (page 3-140) provide Sensitive species with (at least) the same level of protection as Candidate species, then we would read this statement as being applicable to BLM Sensitive Species as well. | The BLM is aware of its obligation to prevent sensitive species from being listed on the Endangered Species list. |
| The Nature Conservancy | 204 | 7 | The final RMP must be explicit about giving priority to maintenance of SSS over the implementation of resources uses that may have adverse impacts on those species. For example, appreciable areas of the MPA that would be open to oil and gas leasing with standard stipulations or special stipulations under Alternatives C and D (Maps 2-5-C, 2-5-D) contain many occurrences of sensitive species, which must be maintained in the face of potential adverse impacts from energy actions and other resource uses. These Alternatives, and more importantly the Final RMP, would be acceptable in this regard only if the Standard and Special (CSU/TL) leasing categories contain specific, effective stipulations against adverse impact to SSS.<br>Further, because on-the-ground implementation of the RMP's protective measures for SSS would happen at | BLM Policy 6840, Special Status Species Management, provides policy and guidance to conserve all special status speis, including "those designated by each State Director as sensitive". No BLM actions would be permitted that would lead to the listing of or harm to any of the species mentioned by the commentor. |

BLM_0012526

| | | | the project-planning or activity level, it is of the utmost importance that the strategic level RMP explicitly mandate the protection of SSS as over-arching policy with which all finer-level actions must comply. Simply put, it is the SSS that must have primacy over resources uses where the two may conflict, not the other way around. The reason this subject is so crucial, and that we repeat and emphasize it so greatly, is that the MPA contains several species that are found nowhere else. For example, the entire world-wide distributions of three special status plants [plus one worthy of Sensitive status], and most of the entire distributions of three other plants, occur within the MPA: Entire distribution within MPA: Astragalus sabulosus var. sabulosus, Astragalus sabulosus var. vehiculus, Mentzeila shultziorum, [Astragalus iselyi] Most of distribution within MPA: Lomatium latibloum, Oreoxis trotteri, Pediomelum aromaticum var. tuhyi Few or no alternate opportunities exist to conserve or maintain these seven plants elsewhere outside the MPA. If they are not conserved here, then they are vulnerable to extinction or (at best) would require more stringent federal listing. | |
| The Nature Conservancy | 204 | 9 | We would recommend that all statements referenced above that demonstrate commitment to conserve or enhance SSS and "healthy" vegetation communities be carried forward into the Final RMP as broadly and strongly (i.e. as Management Common to All Alternatives) as possible. | The statements in the DRMP/EIS have been carried forward to the PRMP/FEIS. |
| The Nature Conservancy | 204 | 24 | Is the total complement of land allocations and resource/use decisions that makes up each Alternative- and especially Alternative D- in compliance with all of these Common Management statements for special status species? We did not try to answer this, and it would not be possible without thorough cross-checking. This is why we were so persistent and adamant earlier | The decisions under Management Common to All Alternatives or Management Common to All Action Alternatives apply to Alts. B, C, and D. The BLM recognizes its obligations to protect special status species. This protection is a matter of law, regulation and policy. Nothing in this RMP is intended to abrogate the BLM 's duty to uphold law, regulation and policy. |

BLM_0012527

| | | | | |
|---|---|---|---|---|
| | | | in this letter about the Final RMP serving as the higher-tier authority for requiring that unacceptable adverse effects to special status species do not occur at the finer scales of planning and implementation that are relevant to the occurrences of those species. Or stated more succinctly: Special status species must have primacy over resource uses where the two may conflict, not the other way around. | |
| Bill Barrett Corporation | 214 | 24 | It would be inappropriate to require oil and gas lessees to "fully mitigate" impacts from oil and gas operations when oil and gas development is mandated and appropriate use of public lands.  The management action should be eliminated or, at the very least, redrafted as follows:  "Reasonably mitigate unavoidable habitat losses for special status species when such losses are anticipated to have a direct, measurable, and negative impact upon sensitive species."  To  the extent this requirement is intended to apply to species listed under the Endangered Species Act (ESA), the requirement is unnecessary because the formal consultation process required  by the ESA already contains a requirement to consider "reasonable and prudent alternatives" to mitigate potential impacts. The BLM should clarify this management action, define exactly which species or type of  species to which it applies, and indicate that the BLM does not  have the authority to reauire offsite mitigation. | The statement on pg. 2-44 of the DRMP/EIS which states "Fully mitigate all unavoidable habitat losses for special status species at a minimum of 1:1 ratio" has been changed from "fully mitigate" to "mitigate". |
| Bill Barrett Corporation | 214 | 25 | When developing the Moab RMP, the BLM should not place unnecessary restriction on management activities for the Gunnison's prairie dog in anticipation of potential listing. | BLM Manual 6840 states "Ensure actions requiring authorizations or approval by the BLM are consistent with the conservation needs of special status species and do not contribute to the need to list any special status species under provision of the Endangered Species Act.". The proposed restrictions in the preferred alternative of DRMP/EIS were developed to meet this Manual requirement. |

523

| | | | | BLM policy is to protect the habitat of the Gunnison's prairie dog so that management actions do not result in listing under the Endangered Species Act. |
|---|---|---|---|---|
| EnCana Oil and Gas (USA) Inc. | 215 | 11 | Section 3.16.2.1.14 on page 3-151 states, "No sightings [of Gunnison sage grouse] have been reported in the past ten years." The imposition of restrictions associated with leks is incongruous with the lack of presence of the species. In addition, the buffer around Sage Grouse leks is excessive. Preferred Alternative C specifies a 0.6 mile buffer around all Gunnison Sage Grouse leks within approximately 175,727 acres of potential habitat, and a 0.5 mile bugger around all Greater Sage Grouse leks within approximately 3,068 acres of habitat. (See DRMP page 4-105) These buffers are excessive. Normal practice throughout the Intermountain West is reflected Alternative D, 0.25 mile buffers around leks, which should be the buffer specified in the final RMP | See response to comment 203-40. |
| Fidelity Exploration and Production Co. | 221 | 13 | Preferred Alternative C specifies a 0.6-mile buffer around all Gunnison Sage Grouse leks within approximately 175,727 acres of potential habitat, and a 0.5-mile buffer around all Greater Sage grouse leks within approximately 3,068 acres of habitat. These buffers are excessive. Normal practice throughout the Intermountain West is 0.25-mile buffers around leks, which is supported by research data and should be the same in the final RMP. | See response to comments 203-40, 203-41 and 203-42. |
| Fidelity Exploration and Production Co. | 221 | 14 | Preferred Alternative C specifies that timing limitations would apply from March 20th to May 15th each year in the potential habitat for Gunnison Sage Grouse. Also, timing limitations would apply from March 1st to May 15th each year in the potential habitat for Greater Sage Grouse. The DRMP should instead specify a buffer around actual nesting habitat, as is common practice throughout the Intermountain West, rather than a blanket restriction for the entire potential habitat. The highest concentration of nesting is within two miles of a | See response to comment 203-40. |

BLM_0012529

| | | | | |
|---|---|---|---|---|
| | | | lek. Therefore, the final RMP should only limit activity within a two-mile buffer around leks in the 175,727 acres of habitat for Gunnison and the 3,068 acres for Great Sage Grouse, rather than a blanket timing restriction in areas that may not have sage grouse. According to a study by R.C. Kaiser, (2006, Recruitment by Greater Sage-Grouse in Association With Natural Gas Development in Western Wyoming, Thesis, University of Wyoming, Laramie, USA), two-mile stipulations are effective in protecting nesting and brood-rearing habitat and preserving breeding behavior. | |
| US Geological Survey | 410 | 2 | Section 3.16, Special Status Species (pages 3-140 to 3-157); Section 4.3.15, Special Status Species (pages 4-353 to 4-404); and Section 4.3.19, Wildlife and Fisheries (pages 4-442 to 4-486)<br><br>There are several special status species (threatened, endangered, and candidate species) identified in the DEIS that have been found in the study area in the past 10 years. The document includes an impacts summary table for special status species and for wildlife and fisheries resources (Table 2.2, pages 2-94 – 2-97 and pages 2-101 – 2-105, respectively). However, a summary analysis of proposed mitigation measures with respect to these species for the various proposed alternatives is not provided. It would benefit the public if the final EIS included a summary analysis of proposed mitigation measures based on available scientific studies with supporting references. | Appendix C of the DRMP/EIS details the stipulations applicable to special status species for oil  and gas leasing and other surface disturbing activities.  The U.S. Fish and Wildlife Service will issue a Biological Opinion on the impacts to candidate and listed threatened and endangered species. |
| Moab Area Climbers Association | 434 | 2 | To have such a large area be deemed off-limits for a species [Mexican Spotted Owl] that none of us have ever seen seems out of character with the way a habitat management plan is established. If this area is deemed critical to the currently nesting birds, we understand the need for a limited closure. However, it would not be acceptable to close such a large section of cliff simple because it might be a future nesting area. A copy of the | No specific recreation activities are proposed to be curtailed because of Mexican Spotted Owl habitat.  The Protected Activity Center for the nesting pair of owls in the planning area is not in a popular recreation area.  No sections of cliff have been proposed to be closed.<br><br>The habitat management plan for Mexican spotted owl is administered by the U.S. Fish and Wildlife Service. |

BLM_0012530

| | | | habitat management plan, which would explain how the areas were designated to be so large, would greatly aid in the public's understanding. | |
| Center for Native Ecosystems | 485 | 3 | The BLM must disclose how it determined that proposed buffers are adequate, and why different buffers are applied in different situations.<br><br>The DEIS proposed buffers of differing sizes for prairie dogs, yet we were not able to locate an explanation of how any of these buffers were chosen and why they are believed to be adequate.<br><br>Alternative B applies a 1300' buffer for white-tailed and Gunnison's prairie dog habitat (C-22, 4-57). Alternative C applies a 660' buffer within white-tailed and Gunnison's prairie dog habitat (2-34, 2-47, 2-48, 4-57, 4-394). However, pages 2-84 and 4-316 refer to a 600' buffer for Alternative C. Page 4-395 seems to indicate that under Alternative D, white-tailed prairie dog habitat will be granted a 660' buffer while Gunnison's prairie dog habitat will not be conserved.<br><br>This is confusing, and could easily be considered arbitrary and capricious.<br><br>In comparison the Utah BLM uses the following buffers for Utah prairie dogs in the T&E stipulations applied to oil and gas lease parcels in habitat for this species:<br>-Surface occupancy of other surface disturbing activity will be avoided within .5 mil of active prairie dog colonies.<br>-Permanent surface disturbance or facilities will be avoided within .5 mile of potentially suitable, unoccupied prairie dog habitat, identified and mapped by Utah Division of Wildlife Resources since 1976.<br><br>Half-mile buffers would be 2640', twice what the BLM is | The buffer was listed wrongly page 2-84 & 4-316 of the DRMP/EIS.  The buffer is 660 feet, no 600; these errors have been corrected.<br><br>In coordinating with the USFWS, a single research report was located that disclosed the distance from disturbance to prairie dogs.  This study was conducted on the endangered Utah prairie dog;   1300' was the distance where prairie dogs reacted to events near their colony. As Alternative B presents the most protective management, 1300' was felt to be appropriate, given the lack of documented data on White Tailed or Gunnison's prairie dogs.<br><br>Alternative C imposes a buffer that can be implemented on all leases, including active and existing leases, thus allowing the BLM to protect active colonies consistently throughout the entire area.<br><br>Alternative D presents the least protective management measures.  The Moab BLM includes only small portions of the Gunnison prairie dog range.  Much of the habitat indentified in Map 2-21 was delineated by soil and vegetative conditions that may have the potential to support active prairie dog colonies which are located on adjacent private and state lands.  Currently, active colonies are very limited on public lands and few historical colonies have been identified.  Due to the limited potential for Gunnison prairie dog expansion on public lands, it was determined that mitigation measures could be developed on a site specific basis and the development of protective measures was not applicable in the D Alternative.<br><br>The USFWS has developed specific protective measures |

526

| | | | | |
|---|---|---|---|---|
| | | | proposing even under the more conservative option in the DEIS.

In its set of comments to the Utah BLM from May 28, 2004 regarding a proposed oil and gas leasing in white-tailed prairie dog habitat, the US Fish and Wildlife Service stated:

We recommend lease notifications identifying the occurrence of white-tailed prairie dog colonies or habitat be added to all the parcels that either contain existing or historic prairie dog habitat. Stipulations should specify a no surface occupancy of at least 500 meters surrounding the prairie dog colonies (page 10)

This is equivalent to 1640', again, larger than any of the proposed buffers in the DEIS. It is important to note that the Service recommended No Surface Occupancy stipulations rather than Controlled Surface Use, as well.

In our ACEC nominations we advocated for NSO stipulations for prairie dog complexes plus .5 mile buffers, and we still believe that this is what the BLM should adopt. | to recover the once endangered, but now threatened Utah prairie dog.  Of the four species of prairie dogs found the western US, the original range of Utah prairie dogs was less than 500,000 acres. The range of the white-tail prairie dog encompasses almost 50,000,000 acres and the Gunnison prairie dog encompasses over 65,000,000 acres.  To recover a listed species that occupies a relatively small range, such as the Utah prairie dog, requires extreme protection measures.   Both the White-tailed and Gunnison prairie dog are BLM state sensitive species that require the BLM to manage their habitat in a way that will not lead to listing. However, imposing the same protective measures that have been developed for the Utah prairie dog is overly restrictive to the multiple uses which are mandated for public lands.  The Utah prairie dog is a threatened species that occupies less than 1% of the range occupied by the White tailed and Gunnison prairie dogs. |
| Center for Native Ecosystems | 485 | 4 | The Cisco Complex is on the short list of sites that have been considered for ferret reintroduction and should be managed as such.

When I attended last spring's stakeholder meeting for the Utah Gunnison's Prairie Dog and White-tailed Prairie Dog Conservation Plan, I was surprised that UDWR was still talking about black-footed ferret reintroduction in the Cisco Complex. The BLM should be doing everything it can to facilitate prairie dog recovery in this area so that ferret reintroduction may become a reality. UDWR recently adopted the Northeastern Region Black-Footed Ferret Management | The USFWS has reviewed the management prescriptions and land management decisions developed in Alternative C and the Cisco Desert still remains a viable black footed release site.   By policy, the BLM is required to support ESA recovery of species and will continue to coordinate with the USFWS in the ferret recovery program.

Though the BLM refers to 'colonies', proximity of colonies in relationship to the size of the disturbance will determine the site specific mitigation.   The PRMP/FEIS will provide general management prescriptions that will be tailored to site specific needs. |

BLM_0012532

| | | | | |
|---|---|---|---|---|
| | | | Plan, and the BLM should carefully consider its management recommendations. These include:<br>-Place roads and well pads outside prairie dog complexes.<br>-If avoidance is not possible, place roads and well pads close to colony edge or in areas that keep surface disturbances of colonies to a minimum.<br>-After drilling activities cease, reduce well pad size to the smallest possible size (tear-drop shape).<br>-Keep road size width to a minimum.<br>-When roads/well pads are no longer needed, reclaim disturbed areas with suitable seed mix. This will also help control the spread of noxious weeds.<br>-Where possible, bury power lines to reduce raptor perching/hunting sites.<br>-Drill multiple wells from one pad where opportunities exist. (pp. 13-14)<br><br>It is important to note that UDWR has recommended that disturbances be kept out of complexes as a whole, rather than just outside of individual colonies. | |
| Center for Native Ecosystems | 485 | 5 | The BLM must ensure that it manages white-tailed prairie dogs appropriately – the agency should not rely on UDWR to take care of this.<br><br>In several places, the DEIS simply states that the BLM will manage white-tailed prairie dogs according to UDWR's plans or recommendations. For example, page 2-45 states, "Manage both prairie dog species and their habitats in coordination with the UDWR. Apply habitat management guidance and population monitoring strategies as recommended in the newly developed multi-agency white-tailed and Gunnison's prairie dog management plan." However, this plan has not yet been completed or adopted. In fact, on of our criticisms of the plan was that rather than reviewing what the BLM actually proposes to do in all of the DEISes out for | The responsibility of the Utah Division of Wildlife Resources (UDWR) is for the animals themselves. The BLM is entrusted with the management of the habitat that supports animals residing in a given area.<br><br>As stated in response to comment 485-1, he BLM works in coordination with the UDWR, not only in the development of the DRMP/EIS, but also in the development of conservation plans and management guidance for varying species.  The DRMP/EIS is a landscape level management plan that provides the BLM a general framework within which to work.  As various plans are developed, the PRMP/FEIS will provide the needed direction and authorization to implement recommendations from other state and federal agencies as applicable.  The BLM's Special Status Species |

BLM_0012533

| | | | plans under revision, it only listen options that may appear in the RMP alternatives. Here is the discussion for the white-tailed prairie dogs:<br><br>The WTPD in Utah is also considered a "State Sensitive Species" by the BLM. The BLM in Utah is currently revising land us plans in Moab, Vernal, Price and Salt Lake Field Offices, covering the entire range of the WTPD in Utah. In the revised land use plans, BLM will recognize the WTPD as a State Sensitive Species, and will address WTPD habitat conservation measures through a range of alternatives. Because the WTPD is considered a State Sensitive Species, the Bureau's 6840 Policy requires that the Bureau "…ensure that actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become listed." Within these new plans, the BLM may propose to manage habitat for WTPDs according to UDWR recommendations, by; developing cooperative agreements with UDWR or other agencies to inventory WTPD habitat, consider suitable unoccupied habitat for population expansion, develop conservation measures to protect active WTPD colonies, mitigate impacts from new roads, oil and gas developments, and rights-of-way, adjust livestock grazing to favor spring plant growth where feasible, limit OHV use to existing roads and trails, and/or propose establishment of Areas of Critical Environmental Concern (ACECs) where WTPD habitat would receive management priority over other resource uses. (p. 20)<br><br>Most of these measures only appear in Alternative B, not the preferred alternative, in the Moab DEIS. There is a bit of a shell game going on – UDWR tries to reassure the Service in its plan that the BLM will take care of managing prairie dog habitat, and the BLM does the same by pointing to the UDWR plan as the one that | Management Manual 6840 Policy functions as an implementation mechanism to adequate conserve sensitive species, including the prairie dog.  Manual 6840 directs the BLM to "…ensure that actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become listed." The BLM intends, by the management prescriptions imposed  in the DRMP/EIS, to follow state and federal recommendations where applicable. |

BLM_0012534

will conserve the species. In reality, neither plan does much of anything to change the status quo.

The current draft of the UDWR plan also only proposes to implement management changes once a prairie dog species has registered a 40% decline range wide based on occupancy monitoring data. Here is an excerpt from our comments on the draft UDWR plan explaining why this is inappropriate:

Finally on page 37 we get to actions, and the plan straight out says "Implement actions ... when/if a 40% decline [sic] (95% CI) range-wide occupancy decline is detected from the baseline survey; short-term trigger) [sic] or ongoing as appropriate." This is garbled to begin with, but it seems to state that nothing in Appendix C, or the Assessments, or the Strategies, or the ferret plan will actually be implemented until we see this further 40% range-wide crash in one of the species. This also means that nothing could possibly be implemented until 2011 for white-tailed prairie dogs because this is the first year that such a decline could be registered based on the monitoring strategy. Perhaps the authors would argue that the "as appropriate" allows discretion to implement actions earlier, but the realities of budgets and program priorities will come into play and if you do not actually call for the implementation of actions in this plan, they will not occur.

Because the plan ties conservation measures to a 40% decline in occupancy range wide, it is doomed to be ineffective. If prairie dogs disappear from 40% of plots occupied in 2007 or 2008 in a three-year period, it is hard to imagine that the State of Utah would be able to do anything meaningful to bring these species back from the brink. Management in Utah itself also does not really factor into the trigger for conservation actions. For

BLM_0012535

| | | | | |
|---|---|---|---|---|
| | | | example, if Utah poisons every prairie dog in the state, the 40% decline threshold may still not be met range wide.<br><br>There still has been no attempt to show that a 40% decline in occupancy range wide would not be catastrophic for these species, and WAFWA and the states are wasting their time in developing these plans that evidentially will do nothing to change the status quo for prairie dogs. This is terribly disappointing, especially because, as the plan notes, conserving prairie dogs offers tremendous hang for the buck – you have the opportunity to bolster populations of many imperiled associated species at the same time.<br><br>Neither the BLM nor UDWR have shown in the plans that they have drafted that existing regulatory mechanisms are adequate to conserve either the white-tailed or Gunnison's prairie dog. This violates the BLM manual. | |
| Center for Native Ecosystems | 485 | 6 | The DEIS does not provide the type of protections that were promised to the US Fish and Wildlife Service according to their 90-day white-tailed prairie dog petition finding.<br><br>The language in the current draft of the UDWR plan was tempered from an earlier draft that (over)stated:<br><br>Within these new plans, the BLM proposes to manage habitat for prairie dogs according to USFWS and UDWR recommendations, develop cooperative agreements with other agencies to inventory prairie dog densities, and provide a suitable habitat for expansion, protect active colonies, and require buffer zones from new road and oil and gas development, and adjust grazing to allow spring plant growth (P. Riddle, BLM, Moab Field Office personal communication). In addition, | Both the U.S. Fish and Wildlife Service (USFWS) and Utah Division of Wildlife Resources (UDWR) have reviewed the DRMP/EIS.  Neither agency has provided comments as to any deficiencies in Alternative C in relationship to prairie dog habitat management prescriptions.  The BLM worked closely with both agencies. Although the BLM did not completely adopt the initial recommendations from either agency (which were not identical), the BLM did use both USFWS and UDWR recommendations, giving consideration to the BLM's multiple use mandate.  The BLM developed a set of management prescriptions for the prairie dog, and these prescriptions met the approval of both agencies.   In 2004 (after the initiation of the RMP process), the Moab BLM has implemented and funded an agreement with UDWR to inventory all sensitive species (prairie dogs, ferruginous hawks, burrowing owl, kit foxes and bats) within the area |

BLM_0012536

<table>
<tr><td></td><td></td><td></td><td>the BLM restricts off-highway vehicle (OHV) use to designated roads, which benefits WTPDs. (April 5, 2007 draft)

The BLM keeps backpedaling on what it will actually do for prairie dogs. The Service's 90-day finding on our Endangered Species Act listing petition reported that neither the Price nor Moab RMPs currently specifically address white-tailed prairie dog protection (69 Fed. Reg. 649899 (Nov. 9, 2004)), but that the revised RMPs will include "protections similar to those for species protected under ESA." Unfortunately, almost all of the protections in the DEIS are only within Alternative B, which is not the preferred alternative, and these pale in comparison to the protections that listing under the Act would convey.

The BLM should be aware that the Service has admitted that the petition findings for both the white-tailed and Gunnison's prairie dogs were illegally tampered with by political appointee Julie MacDonald, and the agency intended to move forward with listing under the Act by completing a status review for each species. Again, the agency has the perfect opportunity to provide adequate management via all of the RMPs that are under revision, but this DEIS does not indicate that the BLM is prepared to do so.</td><td>encompassed by the ACEC proposal, as well as in wildlife corridors from other important habitats into this area.

Upon completion of the DRMP the Moab BLM is planning to develop a Habitat Management Plan in this area to address not only prairie dog habitat management, but all other sensitive species in the area. The Moab BLM recognizes the importance of this area and the potential impacts of energy and recreational development and will use the HMP to future implement any management prescription that may be needed as new information is gather and developed.

There is expansive unoccupied prairie dog habitat within the area that will be protected as populations increase. Page 4-316 discusses the requirement for surveys and buffer zones that have been developed for the White tailed and Gunnison prairie dogs. Although these buffers are not as large as recommended for the Utah prairie dog (a threatened species), they are sufficient to facilitate colony protection. Grazing practices that will support spring plant growth and seed development, and travel management that will restrict travel to designated roads are also discussed in this section.   Two of the biggest threats to prairie dog populations are Bubonic plague and drought. The BLM cannot develop land management prescriptions that will offset the declines that plague and drought can cause. As long as plague remains a threat, prairie dog populations will remain very cyclic.</td></tr>
<tr><td>Center for Native Ecosystems</td><td>485</td><td>7</td><td>The BLM must analyze impacts to all Special Status Species. The DEIS states, "It was determined that quantitative analyses would be made for Federally listed species as well as a few BLM sensitive species selected as representative of a variety of vegetation types." (p. 4-354) However, the BLM has considerable direction to address Special Status Species management during plan revision. For example:</td><td>The BLM has analyzed impacts to Special Status Species in Chapter 4 where impacts are expected.  Each of the special status species was aggregated by habitat type for purposes of analysis.

Actions to achieve desired vegetation conditions have been developed in the alternatives.</td></tr>
</table>

532

| | | | -For priority plan species and habitats, "identify the actions and area wide use restrictions needed to achieve desired vegetative conditions." BLM Land Use Planning Handbook H-1601-1, Appendix C at 3.<br><br>-For priority populations, species, or habitats of fish and wildlife, "identify actions and area wide use restrictions needed to achieve desired population and habitat conditions while maintaining a thriving natural ecological balance and multiple-use relationships." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.<br><br>-Also, BLM must "identify site-specific actions, such as riparian fencing, guzzler placement, etc. needed to manage ecosystems for all species and habitat for special status species." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.<br><br>Additionally BLM must:<br><br>Identify strategies and decisions to conserve and recover special status species. Given the legal mandate to conserve threatened or endangered species and BLM's policy to conserve all special status species, land use planning strategies and decision should result in a reasonable conservation strategy for these species. Land use plan decisions should be clear and sufficiently detailed to enhance habitat or prevent avoidable loss of habitat pending the development and implementation of implementation-level plans. This may include identifying stipulations or criteria that would be applied to implementation actions. Land use plan decision should be consistent with BLM's mandate to recover approved recovery plans, conservation agreements and strategies, MOUs, and applicable biological opinions for | Actions and restrictions for priority fish and wildlife species have been developed in the alternatives. See Chapter 2 and Appendix C for these restrictions.<br><br>The BLM has not determined the need for site specific management needs for prairie dog habitats, but rather has developed prescriptions that will offer protection throughout large tracts of habitat. Site specific habitat improvements will be developed subsequent to the PRMP/FEIS and will be analyzed, using the NEPA process, on a case-by-case basis.<br><br>Strategies and decisions to conserve and recover special status species have been developed in the alternatives.<br><br>Conservation Strategies for special status species are developed on a state wide basis, in cooperation with the U.S. Fish and Wildlife Service (USFWS), the Utah Division of Wildlife Resources (UDWR) and the surface-managing agencies that manage the habitat for the species.  Once these Conservation Strategies are developed, the BLM's field offices are mandated to implement these strategies.  Until such time as Conservation Strategies are developed, the BLM will defer to the prescriptions that have been developed in the DRMP/EIS.  The BLM will also continue to coordinate with UDWR and USFWS on all actions, as applicable. |

BLM_0012538

| | | | threatened and endangered species.<br><br>BLM Land Use Planning Handbook H-1601-1, Appendix C at 5. Although neither the BLM manual nor the land use planning handbook appear to explicitly require the development of Conservation Strategies, such a responsibility is clearly inferred. The BLM Manual's definition of a "Conservation Strategy" further underscores this understanding:<br><br>A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threat. Conservation strategies are generally developed for species of plans and animals that are designated as BLM Sensitive Species or that have been determined by the Fish and Wildlife Service or National Marine Fisheries Service to be Federal Candidates under the Endangered Species Act.<br><br>BLM Manual § 1601, Glossary at 2.<br><br>Instead, the BLM seems to have chosen the species that it feels are receiving the most scrutiny these days and included them in the DEIS while basically ignoring the other Special Status Species in the Field Office. | |
| Center for Native Ecosystems | 485 | 8 | The DEIS does offer some hope. Alternative B would go a long way to conserving prairie dogs – the BLM even appears to be considering a year-round shooting closure in the Cisco. And even Alternative D would require 660' buffers around active colonies. But all of the stipulations are much too weak now because of the broad exceptions and modifications that can be applied. The BLM should step back and consider how this RMP could foster recovery of the white-tailed prairie dog, Gunnison's prairie dog, black-footed ferret, ferruginous hawk, and burrowing owl – the entire prairie dog | The Moab BLM, in coordination with the Utah Division of Wildlife Resources and the U.S. Fish and Wildlife Service, plans to develop a Habitat Management Plan in the Cisco area to address not only prairie dog habitat management, but the management of all other sensitive species in the area. |

BLM_0012539

| | | | ecosystem – and then provide a more comprehensive conservation strategy in the FEIS. | |
|---|---|---|---|---|
| Public Lands Advocacy | 491 | 12 | Sage Grouse – BLM proposes to mitigate sagebrush habitat loss using a 2:1 ratio under Alternative B, and a 1:1 ratio under Alternative C in Greater and Gunnison Sage-Grouse habitats.<br><br>Comment and Recommendation:  BLM's proposed management of Greater Sage-Grouse and the Gunnison Sage-Grouse is unjustifiable restrictive under both Alternatives B and C.  The fish and Wildlife Service found in 2005 that the Greater Sage-Grouse did not meet the criteria for protection under the Endangered Species Act (ESA) and removed the Gunnison Sage-Grouse from the candidate species list in 2006. Therefore, BLM's mitigation proposal is excessive.  We remind BLM that in accordance with valid existing rights, the agency does not have that authority to apply conditions of approval (COA) that exceed existing lease rights.<br><br>Given the fact that the neither of these Sage-Grouse species are listed under ESA, we find the proposal to require a 1 to 1 ratio of habitat improvement outlandish. Since this could only be accomplished by requiring off-site mitigation, we object to this proposal.  As mentioned previously in these comments, it is BLM's policy that off-site mitigation can only be accomplished if VOLUNTEERED by an operator.  BLM's role is limited to possible identification of offsite mitigation opportunities which also means BLM cannot coerce an operator into performing habitat replacement by threatening to withhold approval of a permit.<br><br>In addition, we object to the broad application of timing stipulations on areas that may not be suitable habitat for either the Greater or Gunnison Sage-Grouse. The | The BLM Manual at 6840 states that the policy for special status specis is to ensure that actions by the BLM are consistent with the conservation needs of special status species and do not contribute to the need to list  any special status species under the Endangered Species Act.<br><br>The BLM, in fulfilling its obligation to avoid listing of the species, has chosen the 1:1 mitigation strategy as the least restrictive mechanism to avoid listing.  This 1:1 mitigation does not require off-site mitigation nor does it state that the mitigation must be imposed at the time of the disturbance.  The statement has been changed in the PRMP/FEIS that the 1:1 mitigation is a recommendation.<br><br>See response to comment 214-4 regarding valid existing rights.<br><br>See response to comments 203-40 and 121-26. |

BLM_0012540

| | | | | |
|---|---|---|---|---|
| | | | stipulations must be limited to specific areas known to contain active leks.<br><br>Moreover, BLM's excessive restrictions in its proposal to prohibit all above ground facilities within two miles of an active lek prevent any flexibility for addressing each case individually.  Many other measures are available to mitigate perceived impacts without resorting to this inflexible restriction. | |
| Public Lands Advocacy | 491 | 13 | Gunnison Prairie Dog Habitat – BLM proposes under Alternative C to prohibit permanent above-ground facilities within 1,300 feet of prairie dog colonies.<br><br>Comment and Recommendation:  This proposal is overly restrictive and inflexible.  It is assumed that the concern relates to predation from above-ground facilities.  BLM should be aware that there are many alternatives to preventing predation rather than resorting to a ban on certain facilities.  This management approach only serves to make oil and gas development needlessly burdened and should be eliminated. | See response to comment 214-25. This stipulation was developed in coordination with the U.S. Fish and Wildlife Service.<br><br>The BLM recognizes an error for Alt C where the 1,300 feet restriction specified for colonies should be 660 feet. The PRMP/FEIS has been changed to correct this error. In addition, exceptions are identified in Appendix C that allow flexibility in the placement of facilities. |
| U.S. Fish and Wildlife Service | 586 | 1 | Specific land management measures should be developed to ensure and enhance long-term survival of Jones cycladenia, with the goal of de-listing the species.  We would like to work with you to include in the final RMP resource management protections specific to the species' long term recovery. | Decisions within the plan protect the Jones cycladenia. These include limiting travel to designated routes and the imposition of a no surface occupancy stipulation for oil and gas and other surface disturbing activities within Jones cycladenia habitat.  The Ida Gulch grazing allotment, which is almost entirely within Jones cycladenia habitat, is unavailable for grazing in both Alts B and Alts C (the preferred alternative). |
| U.S. Fish and Wildlife Service | 586 | 2 | The bald eagle was removed from the Endangered Species list.  It is, however, still protected under the MBTA and the BGEPA. | The wording in the plan has been corrected to correspond to this action.  The two laws protecting bald eagles have been added to the text on pg. 3-143 of the DRMP/EIS. |
| U.S. Fish and Wildlife Service | 586 | 3 | Page 2-5, Section 2.1.1.5<br>1st paragraph: The MFO has 3 listed bird species (and 1 candidate species), 1 listed mammal species, 1 listed plant species, and 4 listed fish species (see also | The number of sensitive species has been corrected to 43.  In addition, the enumeration of listed species has been changed to match USFWS's wording. |

BLM_0012541

| | | | | |
|---|---|---|---|---|
| | | | Section 3.16).  According to page 3-140, there are additionally 43 "Sensitive Species", not 4 as stated here. | |
| U.S. Fish and Wildlife Service | 586 | 4 | Page 2-5, Section 2.1.1.5 1st paragraph:  The standard stipulations that have been developed in coordination between BLM and FWS (i.e., the Species Conservation Measures in the BO for Existing Utah BLM RMPs (2007)), should be included in the document.  Appendix K is a close approximation in many respects, but there are inconsistencies and rearranged organization, and it is difficult to determine if items have been left out.  The 2007 BO conservation measures were mutually developed and agreed to by FWS and BLM, and should be included in their entirety in the new RMP to ensure long-term species conservation as well as streamlined section 7 consultation. See attached document. | This last sentence in the first paragraph on p. 2-5 of the DRMP/EIS has been changed to: "Species conservation measures (see Appendix K) have been developed in coordination with the United States Fish and Wildlife Service.  They will be implemented under all alternatives."  Appendix K has been updated with the 2007 "Species Conservation Measures for Utah BLM RMPs". |
| U.S. Fish and Wildlife Service | 586 | 7 | page 2-95, table 2.2, Special Status Species - Impacts from Riparian management: There must be typos in these descriptions (at the bottom of page 2-95), because they do not make sense.  Alt. C cannot be the same as Alt. B, except with less riparian acres excluded than under Alt. C.  ?? | The wording has been corrected. |
| U.S. Fish and Wildlife Service | 586 | 8 | page 2-95, table 2.2 Special Status Species - Impacts from Minerals: A more quantitative comparison between the alternatives would be more illuminating than simply saying "less mineral development… would occur" and that it would have the lowest/second lowest/second highest/highest adverse impacts.  We recommend that you identify acreages for Closed, NSO, CSU, and Standard Stips to allow for a more informative, quick overview. | Table 2.2 is only a summary table; please  refer to pages 4-371 through 4-380 for a more complete discussion and a comparison of leasing stipulations and acreages within habitats. |
| U.S. Fish and Wildlife Service | 586 | 9 | page 3-38, section 3.73. A number of the allotments identified in this section contain special status species and should be further discussed in Section 4.3.15.6 (page 4-367). | The following sentence has been added to Chapter 4: "Those allotments that remain unavailable for grazing are not subject to these impacts to special status species." |

BLM_0012542

| U.S. Fish and Wildlfie Service | 586 | 15 | 3-143, section 3.16.1.3 This bald eagle section should be moved to Section 3.16.2 (Sensitive Speces). | This correction has been made. |
|---|---|---|---|---|
| U.S. Fish and Wildlfie Service | 586 | 16 | 3-143, section 3.16.1.4 The first sentence ("MSO habitat includes high canopy closure…") should be eliminated.  The second sentence should read: "Steep slopes and canyons with rocky cliffs characterize much of the MSO habitat in Utah." | The sentence has been eliminated and the second sentence has been adjusted in accordance with the commentor's request. |
| U.S. Fish and Wildlfie Service | 586 | 17 | page 3-145, section 3.16.2 The descriptions for the sensitive species should include a description of their distribution within the MPA. | The addition of this information would require an array of maps that cannot be added to this section of the DRMP/EIS.  Information on sensitive species distribution is available at the Moab Field Office. |
| U.S. Fish and Wildlfie Service | 586 | 18 | page 4-355, table 4.106 Place latin names after common names for plant species. | The Latin names have been added to Table 4.106 for all plants. |
| U.S. Fish and Wildlfie Service | 586 | 19 | page 4-357, table 4.106 MSO has designated Critical Habitat that contains habitat types of "Caves and Rock Crevices" and "Rocky Slopes and Canyons" within the MPA. | The Mexican Spotted Owl is listed under these two habitat types on pg. 4-357 of the DRMP/EIS. |
| U.S. Fish and Wildlfie Service | 586 | 20 | 4-363 section 4.3.15.3.5 What habitat types is this section referring to, and what special status species might be affected? | The title of the section has been changed. |
| U.S. Fish and Wildlfie Service | 586 | 21 | 4-365, section 4.3.15.5.3 Utility and communication infrastructure ROWs are also likely to fragment habitat, increase human access, and increase non-native invasive plants.  These effects would have resulting impacts on various special status species, including prairie dogs and sage-grouse. | This sentence has been added to Section 4.3.15.5.3 of the DRMP/EIS. |
| U.S. Fish and Wildlfie Service | 586 | 22 | page 4-370 section 4.3.15.7.1 Mineral exploration activities would also lead to greater road density, creating greater opportunity for OHV and other human disturbance. | This sentence has been added to Section 4.3.15.7.1 of the DRMP/EIS. |
| U.S. Fish and Wildlfie Service | 586 | 23 | page 4-371, section 4.3.15.7.2.1 Potential direct adverse effects from oil and gas development would include: potential for spills, mortality from reserve pits, increased human access, OHV access, road mortality. | This sentence has been added to Section 4.3.15.7.2.1. |
| U.S. Fish and Wildlfie Service | 586 | 24 | page 4-372, section 4.3.15.7.2.2 Explanation for greater detailed analysis on sage-grouse is reasonable, but you | Wording has been added to clarify that the habitat fragmentation analysis was performed for sage grouse as |

BLM_0012543

| | | | | |
|---|---|---|---|---|
| | | | should still describe the impacts to other species as well. | an example of this type of action. |
| U.S. Fish and Wildlfie Service | 586 | 25 | 4-372, section 4.3.15.7.2.2. 5th paragraph: It's also possible that the analysis could be an underestimate of habitat degradation because more frequently used roads could cause disturbance greater than 400m. | The following sentence has been added to pg. 4-372 of the DRMP/EIS:  "It is also possible that the analysis could underestimate habitat degradation because more frequently used roads could cause disturbance greater than 400 meters from the road." |
| U.S. Fish and Wildlfie Service | 586 | 26 | page 4-375, section 4.3.15.7.4 MSO do occupy rocky slope/canyon habitat in the MPA (not just the "potential" to occupy this habitat type). | The sentence now reads:  "MSO are known to occupy the rocky slope/canyon habitat in the MPA. |
| U.S. Fish and Wildlfie Service | 586 | 27 | page 4-376, table 4.116. Why is there a difference of 37 acres between Alternative B and C for Jones cycladenia?  Are these 37 acres in Jones cycladenia habitat?  If so, we suggest these acres also be made NSO/Closed. | The 37 acres has been added to the Jones cycladenia habitat that is NSO or closed to leasing in Alt C. |
| U.S. Fish and Wildlfie Service | 586 | 28 | 4-376, table 4.116. Some of the percentages of habitat designated NSO are very low -- for example, Alternative C (preferred) only sets 5% NSO for Gunnison sage-grouse, 1% for Gunnison prairie dog; <1% for white-tailed prairie dog, and 20% for MSO.  These are very low levels of protection from oil and gas development and would seemingly have significant impacts.  What other measures would be in place to provide protection for these species? | Controlled Surface Use and Timing Stipulations within identified habitats for many species have been imposed to protect the individual animals if an area is occupied. Standard Stipulations also provide mechanisms to allow for seasonal changes and local adjustments to avoid negative impacts to specific species or individuals.   See Appendix C as well as species maps. |
| U.S. Fish and Wildlfie Service | 586 | 29 | 4-390, table 4.119. The document states there are 24,370 acres of habitat for Jones cycladenia.  Please clarify, is this the size of the amount of suitable habitat or habitat potential for the plant? | The habitat is suitable for Jones cycladenia.  The word has been added to Table 4.119. |
| U.S. Fish and Wildlfie Service | 586 | 30 | 4-390, table 4.119. Confused on the number of acres protected for Jones cycladenia.  How is this number being obtained.  Where is it being considered closed to leasing? | Jones cycladenia occurs in the Richardson Amphitheater area on gympsophile semi-barren soils.  Within the Amphitheater, there are approximately 24,470 acres of this soil type, making it suitable habitat.  It should be noted that the Jones cycladenia actually grows on a limited subset of this acreage.  The Richardson Amphitheater area is closed or NSO for leasing due to a number of special values, of which the Jones cycladenia habitat is one. |

BLM_0012544

| U.S. Fish and Wildlife Service | 586 | 31 | page 4-393, section 4.3.15.13.2.1. Are active Greater sage-grouse leks buffered in any way from construction of permanent structures?  Permanent structures near leks increase habitat fragmentation and can create disturbance that can affect strutting, breeding, nesting, brood-rearing behavior, no matter what time of year they are actually constructed.  We recommend a 2.0 mile buffer unless it can be shown that the development will not affect sage-grouse or habitats during breeding, nesting, brood-rearing, and wintering periods. | Protections are provided for active Greater sage-grouse leks, including from the construction of permanent structures.  See pgs. C-19 & C-21, which stipulate that no above ground facilities will be allowed within 2, 0.5 or 0.25 miles (differs by Alternative)  from an occupied lek, on a year round basis.

BLM notes USFWS's recommendation of a 2 mile buffer.

We currently have no active lek sites and have not had any known resident occupancy of sage grouse in over 10 years.  On page 2-45 of the DRMP/EIS, it is stated that the BLM would follow pertinent Conservation Strategies and Management Plans, as needed, and work cooperatively with UDWR and other agencies.  If occupancy and lek sites are discovered, the BLM would coordinate closely with UDWR, and if necessary, USFWS, to ensure propagation of new resident sage grouse within the Field Office. |
| U.S. Fish and Wildlife Service | 586 | 32 | page 396, Table 4.123. Why are there no acres closed to OHV / lack of protection for Jones cycladenia?  OR are these areas already currently closed? | See response to comment 586-1.  Only heavily used roads are designated within the Jones cycladenia habitat area.  No Jones cycladenia grow on the roadbeds. No new routes are proposed in this habitat, nor would new routes be granted in the future. |
| U.S. Fish and Wildlife Service | 586 | 34 | page C-35, table C-4. Golden eagles are not listed under ESA.  They are protected under the MBTA and BGEPA. | The title has been changed in Appendix C to read "Federally protected species" |
| U.S. Fish and Wildlife Service | 586 | 35 | Page C-36, Table C-4. SWWF: As per the Species Conservation Measures in the BO for Existing Utah BLM RMPs (2007), 1) permanent surface disturbance should be avoided within 0.5 mi of suitable SWWF habitat, and 2) all surface disturbing activities should be restricted within a 0.25 mile buffer from suitable SWWF riparian habitat. | This stipulation was developed through coordination with the Utah BLM state office and the Utah USFWS state office specifically for oil and gas leasing and development.  Appendix K gives additional Conservation Measures that would be followed.  Additionally, any proposed project that is in proximity to potential or suitable SWWF habitat is subject to Section 7 consultation and will therefore have the needed protective measures implemented through this processes. |
| U.S. Fish and | 586 | 36 | Appendix D. The parcels identified for disposal should | The parcels identified for disposal have been screened for |

BLM_0012545

| | | | | |
|---|---|---|---|---|
| Wildlfie Service | | | be specifically evaluated for potential for special status species. | the presence of special status species.  Parcel R-11 has been removed from the list because of the presence of Gunnison prairie dogs.  Appendix A (pg. A-1) lists the criteria for the disposal of public lands.  It states:  "Lands will not be considered for disposal if they have: (a) any habitat for listed, endangered or special status species or (b) any habitat for any non-listed species if such action could lead to the need to list any species as threatened or endangered."  Thus there is no need to specifically evaluate the potential for impacts to special status species. |
| U.S. Fish and Wildlfie Service | 586 | 37 | Appendix K. The BLM Committed Conservation Measures identified in this appendix should be consistent with the Species Conservation Measures developed for the Biological Opinion for Existing Utah BLM RMPs (2007) (see attached document). | Appendix K will be replaced with the correct and updated document. |
| Moab Area Climbers Association | 962 | 2 | While the area that is proposed to be habitat for Mexican Spotted Owl nesting (near the potash plant and ponds) is not heavily used by climbers, the closure seems somewhat expansive. None of our members, who include biologists as well is the most experienced climbers in this region, have ever found this species of owl nesting in the area. To have such a large area be deemed off-limits for a species that none of us have ever seen seems out of character with the way the habitat management plan is established. If this area is deemed critical to the currently nesting birds, we understand the need for a permited closure. However, it would not be acceptable to close such large section of cliff simply because it 'might' be a nesting area. A copy of the habitat management plan, which would explain how the areas were designated to be so large, would greatly aid in the publics understanding. | There is a nesting Mexican spotted owl pair in the Potash area.  Actions to protect this species are restricted as a site specific level and are based on the Protected Activity Center surrounding the actual nest site.  The BLM is unaware of any restrictions that Mexican spotted owl have imposed upon the climbing community. |
| Moab Trails Alliance | 964 | 12 | Typos: p. I-8 Under Relevance Criteria, seventh line, "......threatened plants do not occur....." Shouldn't "do not" be deleted or else the whole sentence be deleted? | The sentence has been corrected |
| | 967 | 1 | I was amazed to learn that there was a prairie dog | The commentor's desire for the BLM to protect the area |

BLM_0012546

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | | | population off of I-70. This whole area should be protected, as praitie dogs should be on the Endangered Species list. | around the known prairie dog population near Interstate-70 is noted. |
| Western Watersheds Project | 1025 | 34 | California condor have been documented in the Moab RA as far north as Flaming Gorge, as well as proposed reintroductions of grey wolves, both of which are not analyzed within the Draft RMP/EIS with respect to habitat requirements and impacts from other authorized uses. | Both of these species were released on an experimental basis. The U.S. Fish and Wildlife Service have not identified habitat requirements within the Moab Field Office. |
| | 1030 | 5 | P 2-5, section 2.1.1.5. What does "spread by alternative" mean? Clarify. Timing Limitations and Controlled Surface Use stipulations are applied to the habitat for these four species under each alternative. | In the DRMP/DEIS "Timing Limitations and Controlled Surface Use stipulations are applied to the habitat for these four species and are spread by alternative" means that these stipulations are varied by alternative to create a reasonable range of alternatives with respect to timing and controlled surface use stipulations intended to reduce impacts to these species. Either the time period or the acreage has been increased in Alt. B (Conservation) and/or decreased in Alt D (Commodity). |

## Travel Management, Trail-specific

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| Arches National Park | 8 | 5 | Several roads are shown within Arches NP that are not park roads. These are circled on the attached map; please delete them. Alternately, since the RMP does not apply to Arches, we would prefer that the park simply be shown as a "blank spot" on the map, with all roads removed. | All routes within Arches National Park have been deleted from the Travel Plan maps accompanying the PRMP/FEIS. |
| Arches National Park | 8 | 6 | Various routes or spurs that approach Arches (Salt Valley, Yellow Cat, Lost Spring Canyon and Cache Valley/Dry Mesa areas) are shown as class D roads in alternative C but not in alternative B. We would prefer, as in alternative B, that these routes not be designated roads. | The desire of Arches National Park for Alt. B route designations near the Park has been noted. |

BLM_0012547

| ECOS Consulting | 9 | 4 | Table 4.73 on page 4-245 indicates that Alternatives B, C, and D…Hell Roaring Canyon. …The BLM should state clearly and unequivocally that "limited" means that OHV use will merely be limited to designated routes within riparian areas, that OHV use will not be precluded from riparian areas, and that such OHV use will adversely affect the riparian areas. In fact, the limited category does, indeed, have routes in riparian areas-i.e. Tenmile Canyon, White Wash, and Hell Roaring Canyon.<br><br>The BLM should state clearly and unequivocally that "limited" mean that OHV use will mere be limited to designated routes within riparian areas, that OHV use will not be precluded from riparian areas, and that such OHV use will adversely affect the riparian areas. | Table 4.73 shows the acreage of riprian area by OHV designation.  The table does not indicate that there are no routes in riparian areas.  The BLM acknowledges that some routes are designated within riparian areas.<br><br>The definition of limited routes is found on pg. X-35 of the DRMP/EIS.<br><br>On pg. G-24 of the Travel Plan it is  acknowledged that the use of routes located in riparian areas can contribute to loss of riparian vegetation, degrade stream banks, and lead to erosion problems.<br><br>Hell Roaring canyon has a total of 5 riparian acres. |
| ECOS Consulting | 9 | 15 | What are the direct, indirect, and cumulative effects of leaving the White Wash Dunes Area Open to OHV use? Has the BLM assessed the cumulative effects of past management on this area? If so, are there any data, analyses, reports?  Does BLM have baseline data for resources such as vegetation, soil, wildlife, invertebrates and macro-invertebrates, and water quality for the dune area?  If yes, where is this data and when was the baseline data collected? Does BLM have resource monitering data for the dune area predating the use of the area by OHVs? This information must be disclosed in the DRMP so that the public can review and assess the BLM's proposal to allow cross-country OHV use in this unique ecosystem. The BLM determined in 2005 that most of the riparian habitat in White Wash was in a "Functional at Risk" condition with a downward trend.  Of a total of 1066 acres of riparian habitat in White Wash, 1042 acres are Functional at Risk with a downward trend (BLM 2005).  Has the BLM monitored this since 2005? What is the current condition of the riparian areas in the White Wash Dunes area? | Alt C in the DRMP/EIS greatly reduces the area open to cross country travel thus reducing the impacts from cross country travel in this area.  In addition, within the proposed open area the BLM imposes management decisions to protect the White Wash water sources and dune field Cottonwoods.  The BLM does not have any monitoring data predating OHV use in this area.  The BLM contracted a study with Brigham Young University in 2005 to inventory the dunes for rare and unique plants. No rare unique or endemic plants were found.<br><br>Throughout Chapter 4 of the DRMP/EIS the BLM discloses the impacts of the White Wash open area on natural resources. |
| ECOS | 9 | 75 | Prohibit All OHV Routes in Floodplain and Riparian | The Utah Riparian Management Policy (IM 2005-91) does |

BLM_0012348

| | | | | |
|---|---|---|---|---|
| Consulting | | | Areas.<br>The BLM must prohibit OHV routes and OHV use in floodplain and riparian habitat.  According to BLM's own assessment, "Road construction and maintenance in flood plains of perennial and intermittent stream systems is an important issue.  Impacts to the associated riparian zone are related. Streams with major road conflicts include Onion Creek, Kane Creek, Ten Mile Creek, Bartlett Wash, Tusher Wash, Cottonwood Creek, Diamond Creek, and Westwater Creek" (BLM 2005).  Due to the serious impacts of OHV routes and their influence I preventing many riparian areas from attaining Proper Functioning Condition, the BLM must not designate OHV routes in riparian and floodplain habitat.  Most of the areas listed above were rated Functional at Risk with a downward trend a number of years ago.  However the BLM has not followed up on much of its monitoring in order to look at any trends.  This can be easily remedied by simply closing the OHV routes. | not direct the BLM to close all existing routes within riparian areas. |
| State of Utah - Public Lands Policy Coordination | 120 | 15 | Under the preferred alternative (Alt C), certain existing routes that provide the only physical access to trust lands would be terminated.  The Draft RMP does not address the impact of these closures on the economic value of the affected trust lands in either this section or its section on socioeconomic impacts. | The travel plan provides restrictions to the public for recreational purposes, but does not restrict uses permitted or authorized by the BLM.  State inholdings may or may not currently have access, depending upon whether or not exisitng vehicle routes lead to them.  Under different alternative scenarios, existing routes may be proposed to closure.  BLM policy, as required by the Cotter decision (State of Utah v. Andrus, 10/1/79), is that "the state must be allowed access to the state school trust lands so that those lands can be developed in a manner that will provide funds for the common school…"  This decision confined the issue of access to situations directly invloving economic revenues generated for the school trust.  The recreation restrictions do not prohibit the State from reasonable access to its lands for economic purposes through separate permit authorization as specified by the Cotter decision.   Routes to State sections may not have been identified for recreation |

BLM_0012549

| | | | | purposes due to resource conflicts or actual route conditions. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 91 | There are no designated routes in the Duma Point area under any of the alternatives and there is no explanation as to why these routes were omitted. | The BLM received several route submissions in the Duma Point area during the scoping period. Several of these routes were not identified in any of the action alternatives due to resource conflicts, particularly with big horn sheep and sensitive soils. The BLM received a comment from UDWR regarding the bighorn sheep herd in this area with respect to human disturbance. The BLM Manual 8342.1 requires that OHV designations must "minimize harassment of wildlife and/or significant disruption of wildlife habitiat". |
| State of Utah - Public Lands Policy Coordination | 120 | 92 | The State requests that the OHV riding area just north of the Airport on the Blue Hills Road remain open. The area is well-suited to the existing use (shale soils with no vegetation) and provides an authorized area for hill climbing. | The area described is actually west of the airport. This area was limited to existing roads and trails in the 1985 RMP due to concerns with sensitive soils. There are no identified routes within any of the alternatives for the travel plan. However, in Alt C, provisions are made for the Airport Hills Motorcross Focus Area (285 acres) to be established upon application by local government under the Recreation and Public Purposes Act. |
| Ride with Respect | 122 | 24 | Miscellaneous impacts of action alternatives should be revised. In suggesting revisions to Chapter 4, RwR is not necessarily supporting the actions. Rather we are trying to improve the accuracy of reports. Section 4.3.10.2.10.6 (page 4-220) should acknowledge that Labyrinth Rims in Alternative C would negatively impact motorcycling to the extent that it prohibits future use of Bartlett Slickrock by motorcycle. | Alt C of the DRMP/EIS provides an open area for bicycles only in the Bartlett Slickrock Freeride Focus area (166 acres) of the Labyrinth Rims Special Recreation Management Area. The general negative impacts of restricting cross country travel to motorized users is stated in Chapter 4 on pg. 4-409. The impacts of this restriction on motorcycling opportunities have been added to the text of the PRMP/FEIS. |
| Ride with Respect | 122 | 25 | Section 4.3.10.2.10.8 (page 4-220) claims Alternative B would be safer for bicyclists than Alternative C by closing Slickrock Trail to motorcyclists. This point should be removed, since bicycle-bicycle and motorcycle-motorcycle collisions are more likely than bicycle-motorcycle ones. Bicyclists can hear motorcyclists approaching, which gives them reaction time that is critical to preventing accidents. | The consequences of a motorcycle-bicycle collision are greater than that of a bicycle-bicycle collision because motorcycles are heavier and faster than bicycles. The BLM stands by its statement of increased safety for bicyclists by removing motorcycles from the Slickrock Trail. |

BLM_0012550

| Ride with Respect | 122 | 26 | Section 4.3.10.2.10.12 (pages 4-223&4) alleges that the Moab ERMA benefits all recreationists because Alternative C would provide more recreational opportunities.  Instead the section should state "All action alternatives significantly reduce motorized access by roads and trails, thus negatively impacting this form of recreation."  Likewise Section 4.3.10.2.12 (page 4-229) should state that soil decisions substantially reduce vehicular access to certain environments, including high-saline soils, and both riparian and non-riparian washes. | The negative impacts to motorized users of restricting travel to designated routes is disclosed in Chapter 4 on pg. 4-409 and 4-410 of the DRMP/EIS under Travel Management rather than under Recreation.

Text has been added to Chapter 4 of the PRMP/EIS acknowledging that soils and riparian decisions limit motorized users. The decision in soils has been changed so that soils are a limiting factor, rather than a factor that absolutely forbids new routes in saline soils. |
| Ride with Respect | 122 | 27 | Appendix G (page G-24) asserts that "the primary watershed concern identified in the RMP (1985) was the prevention and reduction of salinity and sedimentation from public lands.  Unless trail-based recreation is documented to significantly increase salt transport, remove the statement "No additional OHV routes would be allowed in saline soils other than those already designated in the Travel Plan accompanying this RMP" (page 2-32).  If graded roads are the only types of route in concern, retain the above statement by replacing "OHV routes" with "graded roads.

Appendix G (page 24) also claims "Compaction of soils in these washes can lead to accelerated flood velocity, further contributing to erosion and sedimentary transfer." This seems counterintuitive. OHVs tend to loosen sediment in sand washes, not compact it. Even if some compaction occurred, how much could this effect large-scale flooding events? Please provide documentation of increased erosion resulting from OHV travel in washes, or remove the statement. | The BLM assembled an interdisciplinary (ID) team of resource specialists to assess the impacts of routes upon natural resources, including soils.  The impacts to soils of new routes, including those in washes, was deemed sufficient by the ID team to lead to the plan decision regarding no new routes in sensitive soils. |
| Ride with Respect | 122 | 29 | In the ERMA, Thompson Trail is unique by virtue of its sheer length and remoteness. Trail adoption by volunteers could preserve its singletrack character. Together with Thompson Wash and Copper Ridge Motorcycle Loop, Thompson Trail creates a unique route from the Sovereign Trail to Colorado.  The Green River | The Thompson Trail as proposed by the commentor is included in Alt D of the DRMP/EIS, although additional NEPA documentation would be required prior to designation because the trail was not verified on the ground by the BLM.  The proposed Copper Ridge Motorcycle Trail was also not verified on the ground by |

BLM_0012551

| | | | | |
|---|---|---|---|---|
| | | | Gap and Browns Wash tie Colorado to the town of Green River. These singletracks should be preserved, along with adjacent doubletracks. Together such remote, rugged routes offer a chance to experience the desert like neither SRMAs nor graded roads can do. | the BLM; it was not included in one of the alternatives in the same fashion as the Thompson Trail because of the inherent recreation conflict with the non-motorized focus area proposed for the area (Klondike Bluffs Mountain Bike Focus Area).<br><br>The Green River Gap and Browns Wash trails were not proposed to the BLM during the scoping period for the land use planning process.<br><br>The alternatives for the Travel Plan accompanying the DRMP/EIS designate existing routes. Future travel planning for new routes could be considered based on site specific NEPA analysis. |
| Ride with Respect | 122 | 30 | Kokopelli's Trail could be enhanced to create higher quality opportunities for motorized and non-motorized travel. Including Table 2.1 (pages 2-18&29) the RMP should pledge to construct a Kokopelli Singletrack and mark a Kokopelli Doubletrack that would roughly parallel one another. Through Utah Rims, the Singletrack should be open to motorcycles. Through Yellowjacket, the Singletrack should actually be an ATV trail. Everywhere else, the Singletrack should be non-motorized. The Doubletrack would generally follow the current trail, with revisions to achieve a rugged, backcountry opportunity. | The alternatives to the Travel Plan in the DRMP/EIS provide a reasonable range of routes for motorized use. Routes included in the alternatives for the Travel consisted solely of routes that already existed on the ground. The Travel Plan decisions could not include the myriad of possibilities for future new routes. Following completion of the Moab RMP, new routes could be considered for inclusion into the Travel Plan based on site site specific NEPA analysis.<br><br>See also response to comment 122-15. |
| Ride with Respect | 122 | 31 | Northeast of Green River, the non-WSA lands surrounding Tusher Canyon have great potential for mountain bike trails. This northwest corner of the Bookcliffs has access roads, rims with sweeping views including Desolation Canyon, and relatively good soil development. Similar to bicycle trails in Fruita, a Tusher Canyon trail system would boost the economy of Green River, and dedicate quality trails for mountain biking. | There is essentially no recognized bicycle use in this portion of the Bookcliffs. Therefore, the BLM did not see any need to consider this area for a mountain bike Focus Area. The BLM does not consider this area as fulfilling a mountain bike recreation niche. |
| Ride with Respect | 122 | 32 | RwR generally supports establishment of Labyrinth Rims SRMA in Alternative C. However, the Dee Pass Motorized Trail focus area should be expanded beyond Alternative D eastward to the powerlines. The White | Expansion of the Dee Pass Motorized Trail Focus Area is not necessary to accommodate the motorized use currently taking place around the White Wash sand dunes. |

BLM_0012552

| | | | | |
|---|---|---|---|---|
| | | | Wash Sand Dunes OHV Open Area should be expanded by two square-miles beyond Alternative D (northward to Ruby Ranch Road and southward toward Red Wash Road). Fee programs should be determined with public involvement through a Resource Advisory Council (page 2-25). Approximately twenty-five miles of the surrounding OHV trails are popular among ATV riders, and should be designated as such. The Dead Cow Loop could be designated with the exception of the "low-water" alternate, to reduce riparian impacts. The Tenmile Point area from Dripping Spring to Levi Well has relatively few routes and could be designated for non-mechanized focus. Tenmile Wash should be designated without speed limits, since speed has little influence on the biophysical impacts of travel (page 2-37). | The White Wash Sand Dunes Open Area has been expanded to the west to accommodate the camping that occurs between the Ruby Ranch Road and the dunes themselves (see response to comment 120-83).<br><br>The Dead Cow Loop (except for the low water alternative) is included in the Travel Plan for motorized use in Alt. C.<br><br>The Travel Plan in Alt C of the DRMP/EIS did not identify specific routes for ATVs because none were proposed by the public during scoping.<br><br>See response to comment 120-90 for discussion of ATV vs. motorcycle routes.<br><br>All fee programs instituted in the Moab Field Office will follow the procedures outlined in the Federal Land Recreation Enhancement Act (see response to comment 208-5).<br><br>The interdisciplinary team reviewing ACEC prescriptions identified excessive speed from motorized vehicles as an impact to the riparian values in Ten Mile Wash. |
| Ride with Respect | 122 | 33 | The southwest corner of Labyrinth Rims is a relatively primitive area, and should be managed to preserve this quality. Spring Canyon, Hellroaring Canyon, Spring Canyon Point, Deadman Point, and south Horsethief Point are best allocated as a non-mechanized focus. Motorized use there can be adequately accommodated by the Jeep Safari routes, plus a few choice spurs to overlooks. Closing the river road downstream from Spring Canyon would reduce recreation conflicts, while retaining access to Hey Joe Mine. Dubinky Wash is valuable for all vehicle use, and the singletrack near Jug Rock should remain available for motorcycles. | A BLM interdisciplinary team reviewed each route for purpose and need weighed against resource conflicts. See Appendix G for details on the Travel Plan development process. The resource conflicts on the routes mentioned by the commentor were not sufficient enough to close these routes in the preferred alternative. |
| Ride with | 122 | 35 | South of Highway 313, an additional bicycle focus area | An additional biking Focus Area is not necessary to allow |

BLM_0012553

| Respect | | | west of South Fork Sevenmile Canyon could provide cross-country and vehicle-assisted rides from the upper Gemini trailhead down to the switchbacks on Highway 313. The Gemini Bridges motorized backcountry touring area could be shifted to include all of Little Canyon Rim. The spur to Gemini Bridges should remain open to allow the unique experience of driving the bridge. Mountain bike alternates to the roads could be developed in this area, as proposed by Trail Mix. The Goldbar hiking area could be expanded further up Day Canyon, while only closing one spur road. | bicycles to use the route from the upper Gemini traihead to Highway 313. Motorized use is allowed on Little Canyon Rim consistent with the Travel Plan. The spur to Gemini Bridges is not identified under all action alternatives due to user conflicts and demonstrated resource damage. The mountain bike route proposed by the commentor does not currently exist. It could be added later based on site specific NEPA analysis. The Goldbar Hiking Focus Area includes the majority of Day Canyon. Hikers can continue to utilize the rest of Day Canyon under all alternatives. |
|---|---|---|---|---|
| Ride with Respect | 122 | 36 | The Klondike Mountain Bike focus area is a great foundation to develop mechanized singletrack. Most spur roads could be closed east of Bar M and Sovereign Trail areas. Still, the Sovereign ATV Loop should be permitted in its current location. The spur road contained within the Sovereign ATV Loop should be closed since it has little recreational value, yet invites four-wheeled users to poach the Sovereign Singletrack. Spur roads should also be closed north of the Copper Ridge Sauropod Trackway. Copper Ridge Motorcycle Loop is highly valuable to motorcyclists. Trail adoption could help to ensure enjoyment for mountain bikers, like the Sovereign Trail. And like the Sovereign ATV Loop, the Copper Ridge Motorcycle Loop could actually protect any non-mechanized trails that it surrounds by steering motorcyclists toward a legal alternative. | Some of the routes mentioned by the commentor are on State of Utah Land. The "Sovereign ATV Loop" does enter BLM lands, but it has been marked by users with no specific authority to do so from the BLM. The BLM routes in this area were not deleted from the Travel Plan because there were no specific resource conflicts. After the completion of the Travel Plan, these routes could be considered for closure on a case by case basis and site specific NEPA analysis.<br><br>Some of the spur routes near the dinosaur trackway are on the permitted Jeep Safari system; these routes have were determined to have a demonstrated purpose and need during the travel planning process.<br><br>The Copper Ridge motorcycle loop was not verified by the BLM on the ground during the travel planning process. Therefore, it was not included in the baseline route inventory during the travel planning process. This route could be considered for inclusion in the Travel Plan at a later date based on site specific NEPA analysis. |
| Ride with Respect | 122 | 37 | RwR recommends designating Airport Hills as a managed OHV open area, with the boundary adopted from Alternative D. This location provides a small portion of Mancos Shale Hills that are distinct from the terrain around White Wash. An open designation would be | The Airport Hills Motocross Focus Area (285 acres) is proposed only in the preferred alternative (Alt. C). The decision in this alternative is to manage the area for motocross use in conjunction with local government under a Recreation and Public Purposes Act lease. Under the |

549

BLM_0012554

| | | | flexible for a lease to adjust course routing for competitive events.  The grey hills between powerlines and an airport make this use appropriate in terms of VRM. | terms of the lease, a course could be rerouted as necessary.<br><br>The Mancos Shale in this area is not considered suitable for open cross country riding, as it is highly erodible and creates dust, a special problem in the vicinity of an airport. |
|---|---|---|---|---|
| Ride with Respect | 122 | 40 | The Dolores Triangle includes a few remote areas where primitive character should be preserved.  By closing two less-valuable spurs, Big Triangle substantially expands the Westwater roadless area to the north.  Further south toward Buckhorn Draw, a few roads could be added to ensure that quality motorized opportunities exist in the Dolores Triangle as well. From Steamboat Mesa to South Beaver Mesa, another focus area should be designated for primitive recreation. Half of the Dolores River overlooks could be preserved as cherry stems. Also, a road on the southeast ridge of South Beaver Mesa lies outside of this focus area, and should remain open. | The routes in the Dolores Triangle were analyzed by the interdisciplinary team for Travel Plan designation.  The routes mentioned by the commentor contained no specific resource conflicts that outweighed the purpose and need for the route.<br><br>The alternatives for the Travel Plan accompanying the DRMP/EIS designate existing routes.  Future travel planning for new routes could be considered based on site specific NEPA analysis.<br><br>The Dolores River Canyons Special Recreation Management Area (SRMA) proposed in the preferred alternative (Alt C) would be managed to maintain primitive recreation opportunities.  Since the entire SRMA has a single focus of management, there is no need for individual focus areas within the SRMA. |
| Ride with Respect | 122 | 41 | The Sand Flats Road traditionally connected trails such as Hells Revenge, Slickrock, and Fins 'N Things. Paving the road, and prohibiting OHVs from pavement, has fragmented the trail system.  Thus OHVs should be permitted to use Sand Flats Road from Hells Revenge exit to the end of the pavement. The new, reduced speed limit of 25mph should be preserved.  A non-motorized lane should be constructed to parallel the road and reduce congestion.  Additionally, the 1/4-mile slickrock route connecting Slickrock Trail with Fins 'N Things should be designated for two-wheeled use to alleviate traffic along the main road.  All of these measures would make Sand Flats more user-friendly | Grand County paved the Sand Flats Road.  In Grand County, non street legal vehicles are prohibited from travelling on paved roads.  The BLM does not contradict county law.<br><br>The route mentioned by the commentor is considered cross-country travel and was never recognized as an existing route.  Furthermore, the route was not proposed during the scoping period for the land use planning process and therefore was not considered in the Travel Plan process.  The alternatives for the Travel Plan accompanying the DRMP/EIS designate existing routes. Future travel planning for new routes could be considered |

BLM_0012555

| | | | | |
|---|---|---|---|---|
| | | | and manageable, without further impacts to the environment. | based on site specific NEPA analysis. |
| Ride with Respect | 122 | 42 | Special policies should continue permitting slickrock exploration.  The Moab Field Office Off-Highway Vehicle Travel Map states that "Two-wheel motorcycles are allowed on established slickrock riding areas in the Slickrock Trail, Bartlett Wash and Tusher Canyon areas and on slickrock areas along the Monitor and Merrimac and Lower Monitor and Merrimac trails where such use does not further disturb vegetation or soils" (dated March 8, 2001 as part of emergency restrictions).  In these areas, travel could be further restricted, but not so drastically as the draft RMP intends. Mechanized travel should still be allowed on any barren rock surface. Slickrock within one hundred yards of a designated route could remain open to motorized travel, except for Tusher Slickrock , which would be reserved for non-motorized use. This two-hundred yard corridor would accommodate the ways that people currently enjoy slickrock areas.  For consistency, Slickrock Trail should appear on the map of designated motorcycle routes. | "Slickrock exploration" is the same as open designations where cross country travel is allowable.  Open designations are used for intensive OHV use areas where there are no special restrictions or where there are no special resource protection needs, user conflicts, or public safety issues to warrant limiting cross country travel. Slickrock areas can include cultural resources, recreation conflicts, islands of soils and vegetation, and wildlife habitat.

The impacts from cross country travel are documented in Chapter 4 of the DRMP/EIS.  No open slickrock areas were proposed for motorized use during the scoping period for the land use planning process.

The Slickrock Trail has been added to the map of motorcycle routes in the PRMP/EIS for alternatives C and D. |
| Ride with Respect | 122 | 43 | The Black Ridge area presents many potential recreation opportunities nearby Moab.  The South Spanish Valley Mountain bike area could be extended to include part of Pole Canyon.  This augments the variety of terrain, and provides enough room for a full-day's ride.  Sweeping travel restrictions associated with the draft RMP warrant designating an area for specialized sports which depend on unrestricted areas.  Durable and irregular terrain that is suitable for motorcycle and bicycle trials riding exists in Pole Canyon from the powerlines to Area BFE.  In the same vein, a rock crawling area could be established on Black Ridge east of the powerlines.  This area is littered with old mine roads, and is currently open to cross-country travel.  The site could be limited to designated rock crawling routes, and adopted by local clubs.  West of the powerline, the north flank of Black Ridge could be | With the exception of trials motorcycling and cross-country rock crawling, all of the activities mentioned by the commenter can occur within the ERMA (which includes the Black Ridge area) consistent with the Travel Plan.  Current recreation use in this area is low and does not warrant designation as an SRMA.

Travel in Kane Creek poses cultural and riparian conflicts. For these reasons, this route was not identified for OHV use in the Travel Plan. |

BLM_0012556

| | | | | |
|---|---|---|---|---|
| | | | designated for equestrian use, as the backdrop to a residential area.  The south flank could be a bicycle freeride area, since it provides one thousand feet of vertical relief, and graded roads for shuttling.  Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road.  It should be open for OHVs to create a loop with Behind-The-Rocks while avoiding the highway. | |
| Ride with Respect | 122 | 45 | Hatch Wash backpacking focus area could be expanded for better backpacking.  Alternative C proposes to designate roughly twenty spur roads to the rim of Hatch Wash.  However, only five are necessary to view most stretches of the canyon.  Hatch Wash is a great opportunity for solitude seekers with easy access from the highway. | The Hatch Wash backpacking Focus Area was designed to include the prime backpacking opportunities within the Canyon.  The routes mentioned by the commentor are on the rims of the canyon and were reviewed for purpose and need and weighed against resource conflict.  There were no resource conflicts identified that outweighed purpose and need for the routes mentioned.  Since all backpacking occurs below the rim the presence of the routes on the rim were not found to have a conflict with hiking in the canyon. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 29 | BRC supports RwR's proposals:  Additional bicycle focus area. RwR proposes South of highway 313, an additional bicycle focus area west of South Fork Sevenmile Canyon could provide cross-country and vehicle assisted rides from the upper Gemini trailhead down the switchbacks on Highway 313.  The Gemini Bridges motorized backcountry touring area could be shifted to include all of Little Canyon Rim.  The spur to Gemini Bridges should remain open to allow the unique experience of driving the bridge. Mountain bike alternates to the roads could be developed in this area, as proposed by Trail Mix.  The Goldbar hiking area could be expanded further up Day Canyon, while only closing one spur road. | See response to comment 122-35. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 34 | The trail known as "the Tubes" or "Dead Cow Wash"; BRC differs with RwR and recommends keeping all of the existing routes in the area of this loop available for motorized use. | The BLM considered this trail during the travel planning process.  The main loop is identified for motorcycle travel under Alt C (preferred alternative).  Several of the side routes of this main trail had riparian resource conflicts.  These resource conflicts were considered to outweigh the purpose and need for the trail. |

BLM_0012557

| | | | | |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 36 | BRC believes a short trail should be included in the Travel Plan.  It is commonly known as "the High Teck" trail, described below.<br>Specific Route Suggestions:<br>The Hi Teck Trail should be open to motorized use.  The Hi Teck trail is shown on page 40.  This trail was featured in several UTMA club rides often led by Joel Frulli, from Denver, Colorado.  Please consider incorporating this trail into the final Travel Plan. | The trail referred to by the commentor was considered during the travel planning process.  Conflicts with desert bighorn sheep escape terrain outweighed the purpose and need for the trail in all action alternatives in the DRMP/EIS. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 38 | BRC supports RwR's proposals: Likewise, Kokopelli's Trail could be enhanced to create higher quality opportunities for motorized and non-motorized travel. The RMP should pledge to construct a Kokopelli Single-track and mark a Kokopelli Double-track that would roughly parallel one another. Through Utah Rims, the Single-track should be open to motorcycles. Through Yellowjacket, the Single-track should actually be ATV trail. Everywhere else, the Single-track should be non-motorized. The Double-track would generally follow the current trail, with revisions to achieve a rugged, backcountry opportunity. | See response to comment 122-30. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 40 | BRC supports RwR's proposals:  North of Highway 313, the single-track which drops off Hidden Canyon Rims is a key link for motorcyclists and bicyclists, alike.  The Mill Canyon – Sevenmile Rim mountain bike area should be rotated to become Mill Canyon - Tusher Rims.  Tusher has better bicycling potential than Sevenmile due to less and, more slick rock, and fewer roads.  Then Sevenmile – Upper Courthouse motorized backcountry touring area could be created to recognize the high-value roads that extend through Monitor & Merrimac to Big Mesa campground. Upper Sevenmile Equestrian Area should be expanded by four square-miles to include some terrain above the rim. | See response to comment 122-34. |
| Colorado Off-Highway Vehicle | 123 | 41 | BRC supports RwR's proposals:  The Dolores Triangle includes a few remote areas where primitive character should be preserved.  By closing two less-valuable | See response to comment 122-40. |

BLM_0012558

| Coalition (COHVCO) | | | spurs, Big Triangle substantially expands the Westwater roadless area to the north.  Further south toward Buckhorn Draw, a few roads could be added to ensure that quality motorized opportunities exist in the Dolores Triangle as well.  From Steamboat Mesa to South Beaver Mesa, another focus area should be designated for primitive recreation.  Half of the Dolores River overlooks could be preserved as cherry stems. Also, a road on the southeast ridge of South Beaver Mesa lies outside of this focus area, and should remain open. | |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 42 | BRC supports RwR's proposals: The Sand Flats Road traditionally connected trails such as Hells Revenge, Slickrock, and Fins 'N Things. Paving the road, and provhibiting OHVs from pavement, has fragmented the trails system. Thus OHVs should be permitted to use Sand Plats Road from Hells Revenge exit to the end of the pavement. The new, reduced speed limit of 25 mph should be preserved. A non-motorized lane should be constructed to parallel the road and reduce congestion. Additionally, the ¼ mile slick rock route connecting Slickrock Trail with Fins N' Things should be designated for two-wheeled use to alleviate traffic along the main road. All of these measures would make Sand Flats more user-friendly and manageable, without further impacts to the environment. | See response to comment 122-41. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 44 | BRC supports RwR's proposals: In the ERMA, Thompson Trail is unique by virtue of its sheer length and remoteness. Trail adoption by volunteers could preserve its single-track character. Together with Thompson Wash and Copper Ridge Motorcycle Loop, Thompson Trail creates a unique route from the Sovereign Trail to Colorado. The Green River Gap and Browns Wash tie Colorado to the town of Green River. These single tracks should be preserved, along with adjacent double tracks. Together such remote, rugged routes offer a chance to experience the deserts like neither SRMAs nor graded roads can do. | See response to comment 122-29. |

BLM_0012559

| | | | | |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 77 | It has been stated that where the Thompson Trail crosses dry washes and washes supporting riparian vegetation there is a negative impact on the watercourse.  It has been indicated that soil stability is affected and increased salinity results.  It is questionable that this small area of disturbance could cause a detectable change in discharges of soils and elevated salinity at the discharge point of the wash into a perennial waterway.  Further, these small disturbances at the crossings have a minimal effect on riparian vegetation where it exists.  If these crossings were armored the minimal amount of impact that is occurring would be further reduced. | Unrestricted travel in wash bottoms results in resource impacts as determined by BLM staff specialists. Concerns include destabilization of banks, accelerated erosion and use of wash bottoms by wildlife as travel corridors.  In addition, observations indicate that some users do not remain in the wash bottoms, but leave them to return to the main travel routes. This results in cross country travel and its related impacts to wildlife and other resource values. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 62 | The BLM should only designate routes with distinct purpose and need south of the Mineral Bottom road. Redundant routes within areas found to possess wilderness characteristics should be closed.  A wild buffer to protect Canyonlands National Park should be provided. | Several of the routes to which the commentor refers are not identified for motorized use in one or more action alternatives.  The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals.  As described in Chapter 2 of the DRMP/EIS, pp. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.  Also, the BLM is not required to create buffers around National Parks. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 63 | The BLM should close the road along the Green River which accesses Hell Roaring Canyon (north of the airstrip) for the following reasons: 1) the route is seldom used, 2) the route in Hell Roaring Canyon is located in the floodplain and causes damage to riparian and water quality, 3) the route conflicts with non-motorized users in Labyrinth Canyon, and 4) designation of this route is inconsistent with management of the wilderness characteristics (WC) resource. | The commentor provides no evidence to support their assertions of resource damage and/or user conflicts.  As described in Appendix G, the BLM used a interdisciplinary team to identify resource conflicts weighed against the purpose and need.  The BLM stands by its route designation.

The route the commentor proposes closing lies almost entirely within their wilderness proposal.  As described in Chapter 2 of the DRMP/EIS on pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance | 124 | 64 | The BLM should close redundant low value routes on Mineral Point to prevent habitat fragmentation, reduce user conflicts, and lower cumulative dust creation. | In all action alternatives of the DRMP/EIS, the BLM does not identify for motorized use several of the routes in question, including routes found to be redundant. |

BLM_0012560

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | | The routes the commentor proposes closing lie almost entirely within its wilderness proposal.  As described in Chapter 2 of the DRMP/EIS on pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 65 | The BLM should close all ORV use past the state land on Deadman Point to eliminate redundant routes and routes through lands with wilderness characteristics. | In all action alternatives of the DRMP/EIS, the BLM does not identify for motorized use several of the routes in question, including routes found to be redundant.  SUWA provides no specific conflicts other than their wilderness proposal.

The routes the commentor proposes closing lie almost entirely within its wilderness proposal.  As described in Chapter 2 of the DRMP/EIS on pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 66 | The BLM should close the road along the Green River north of Spring Canyon (to Hey Joe Mine).  Motorized use on this road conflicts with comercial and private boating. | This route was identified as a road during the 1999-2003 wilderness inventory.  It leads to a large disturbed mining area.  It is a Jeep Safari route popular with motorized recreationists.  The commentor provides no evidence to support their assertion of a conflict with hikers and boaters.  The BLM made several visists to this route during Easter Jeep Safari.  At the time of these visits the BLM observed very little motorized use or river use let alone any user conflict.

The route the commentor proposes closing lies almost entirely within their wildemess proposal.  As described in Chapter 2 of the DRMP/EIS on pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 67 | White Wash is a unique riparian ecosystem that is proposed as a open ORV play zone in the preferred alternative.  The BLM admits to the uniqueness of this system in altemative B.  Nevertheless, BLM proposes to sacrifice this area.  The BLM must manage this dune | The BLM recognizes the affected resources in this area.  Alt B proposes closing the dunes to motorized use and creating an Area of Critical Environmental Concern.  All action alternatives propose significant reductions in the areas currently open to OHV use with mitigation to protect |

BLM_0012561

| | | | | |
|---|---|---|---|---|
| | | | system to preserve it. | vegetative and riparian resources.  This area lies within the commentor's wilderness proposal.  As described in Chapter 2 of the DRMP/EIS on pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 144 | The BLM should close the upper RH Tusher route, as it has no need.  It contains some of Utah's important wildlife habitat.  The route is just a rough wash bottom.  Access should be limited to oil and gas leasees. | The route in question is a constructed and regularly maintained County B road which accesses several state sections, and is also used by grazing permittees and recreationists.<br><br>This route lies within a SUWA proposed wilderness area, which in effect would be "roadless", except for the fact that a route is present.  Closing this route to motorized use would not make the area "roadless", as the impact on naturalness would still exist.  It is beyond the scope of the plan for BLM to create "roadless" areas where such areas do not currently exist.  Rather, BLM evaluates routes for purpose and need balanced against resource conflict.  A preference for a route to not be present is not in itself a resource. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 145 | The route up Floy Canyon should be closed above the ranch.  Closing this route would help maintain wildlife and non-motorized recreation. | The route in question is not identified for motorized use in Alternatives B or C. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 146 | The route up Nash Wash should be closed.  This route is blocked by private land. | The route in question is not identified for motorized use in Alternatives B or C. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 147 | The route in Diamond Canyon should be closed above the ranch. | The route in question is a constructed and regularly maintained County B road.  The route in question is not identified for motorized use in Alternatives B or C beyond the end of the B road. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 148 | The route in Cottonwood Canyon should be closed above the ranch. | The route in question is a constructed and regularly maintained County B road.  The route in question is not identified for motorized use in Alternatives B or C beyond the end of the B road. |

BLM_0012562

| Southern Utah Wilderness Alliance (SUWA) | 124 | 149 | The BLM should close most routes on the flank of South Mountain, especially to improve deer habitat. | As part of its travel plan formulation process, the BLM conducted numerous meetings with its ID team, which included wildlife specialists.  Additionally, the BLM consulted with Utah DWR on all aspects of its plan, including travel.  The problems cited by the commentor were not raised as resource conflicts. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 150 | The BLM should close many routes in lower Sagers Wash, as the routes serve little purpose and lie in sensitive soils. | In all its action alternatives, the BLM closes numerous routes to motorized travel due to conflicts with sensitive soils. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 151 | Many routes on Dome Plateau should be closed to motorized travel, since they are redundant and pose resource conflicts.  Closing these routes would maintain opportunities for non-motorized recreation and protect deep microbial crusts and other soils. | The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals.  There is no distinction made on the basis of use, and the proposal includes closing county B roads and popular permitted motorized routes.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 152 | The BLM should close routes on Dry Mesa in order to "create a rare remote and wild area".  This would also protect the viewshed from Arches National Park. | Many of the routes on Dry Mesa are not identified for motorized use in one or more action alternatives.  The routes the commentor proposes closing consist entirely of routes lying within its wilderness proposals.  There is no distinction made on the basis of purpose or need.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.<br><br>The BLM has proposed viewshed protection surrounding Arches National Park in all action alternatives of the DRMP/EIS.  Travel on designated routes is not considered an impact to the viewshed of Arches because it is not a permanent surface disturbing activity. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 153 | The BLM should close the Winter Camp Ridge route to motorized travel to create non-motorized recreational opportunities.  This route does not lead to a good view point or logical destination. | This route accesses Arches National Park; contrary to the commentor's assertion, it leads to a spectacular viewpoint above Salt Wash.  The route in question lies within a SUWA wilderness proposal.  As described in Chapter 2, pg. 108-109, the BLM is not obligated to create roadless |

BLM_0012563

| | | | | areas in response to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 154 | The BLM should close a "user-created" Jeep Safari route in the southwest part of the Dome Plateau area because "it intrudes into a high-priority non-motorized area". | As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. This route has a demonstrated purpose and need as it is part of the permitted route system. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 156 | The BLM should close routes on Adobe Mesa. People in Castle Valley would like this route closed and there is no purpose and need for the route. | In all action alternatives, the BLM does close redundant routes on Adobe Mesa for motorized use. The main route on Adobe Mesa remains open under all action alternatives. The routes the commenter proposes closing consist entirely of routes lying within their wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.

The BLM has received no indication from residents of Castle Valley that they would like routes on Adobe Mesa closed. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 157 | The BLM should close routes in the vicinity of Mary Jane and Fisher Canyons. Vehicle routes are few and seldom used, as they do not lead to anything and are not especially enjoyable or challenging drive. | In all action alternatives, the BLM does not identify the majority of inventoried routes for motorized use in this area. The routes the commenter proposes closing consist almost entirely of routes lying within their wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 158 | The BLM should close a variety of routes on Top of the World and Seven Mile Mesa, as they "intrude into priority non-motorized areas". | In all action alternatives, the BLM closes a number of routes to motorized use on these mesas, due to a lack of purpose and need. As the commentor acknowledges in its comments, the routes to be closed consist of routes lying within its wilderness proposals. As described in Chapter 2, pgs. 108-109, BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 159 | There are too many redundant routes in the Dolores Triangle, and these should be closed by the BLM. | The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response |

BLM_0012564

| | | | | to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 160 | The BLM should close access routes beyond the campground near Castle Rock, and close routes in the upper part of Castle Valley.  The BLM should look at the Castle Valley road plan. | In all action alternatives, the BLM does not identify for motorized use several of the routes in question near Castle Rock.  In upper Castle Valley, the BLM proposes not identifying redundant routes.  The commentor's proposal closes all routes, including access to State lands and occupied private property, with no distinctions made as to purpose and need.

The BLM has not received a route proposal from the town of Castle Valley. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 161 | The BLM should close routes on Porcupine Rim and Mat Martin Point "in order to preserve the entire area for non-motorized use".  Motorized use is resulting in lessening the appeal for bikers and walkers. | In all action alternatives, the BLM does not identify for motorized use several of the routes in question near Castle Rock.  In one or more action alternatives, the BLM identifies for non-motorized use routes within the Negro Bill Canyon Wilderness Study Area.  The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.

The commentor's assertion regarding the impacts to bikers and walkers from motorized use is unfounded. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 162 | The BLM should close most routes in the Beaver Creek area.  The routes are rarely used and the area is excellent habitat for wildlife. | The routes the commentor proposes closing consist almost entirely of routes lying within their wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.  The BLM has closed routes with resource conflicts in this area that were found to have no purpose and need and |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 163 | The BLM should close a number of routes in the Sand Flats area to protect non-motorized recreation.  The Hells Revenge route should be closed.  SUWA suggests that BLM incorporate the expertise of the Sand Flats team. | As is true of most of the commentor's comments on the DRMP/EIS, SUWA appears to be addressing the county road inventory, and not BLM's travel plan.  The assertion that some of these routes are causing damage to the Wilderness Study Area is unfounded, and the BLM has ample evidence to the contrary.  The Slickrock Trail would |

BLM_0012565


| | | | | be closed to motorized use under one action alternative. However, it is closed to jeeps in all action alternatives. The Hells Revenge Jeep Trail is one of the most popular jeep routes in the area, and a major commercial activity for guided trips.  The Sand Flats team is a Grand County entity and thus a cooperator in the BLM's planning effort; the BLM has considered its input.

Many of the routes the commentor proposes closing lie within its wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 164 | The BLM should close routes in the Mill Creek area. ORV use in the streambed is highly damaging to riparian and cultural resources.  ORVs affect water quality, stream bank erosion, habitat, and Moab's water supply. | The commentor provides no evidence of its assertion of OHV damage in the streambed.  As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdisciplinary ID team (including vegetation, riparian, wildlife, and hydrology specialists).  Potential resource conflicts were identified, their extent evaluated and then weighed against purpose and need for the particular route under discussion.

The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 165 | The BLM should close a number of routes west of Westwater, which serve no purpose or need and "intrude on a priority non-motorized area". | Several of the routes to which the commentor refers are not identified for motorized use in one or more action alternatives.  The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 166 | The BLM should close less-used routes that encroach on roadless areas of Arches National Park to enhance non-motorized recreation. | Several of the routes to which the commentor refers are not identified for motorized use in one or more of the action alternatives.  The routes the commentor proposes closing consist almost entirely of routes lying within their |

BLM_0012566

| | | | | wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 167 | The BLM should close many of the side routes of Utah Highway 313 for visual resources, vegetation, soils, and cultural conflict reasons. | Several of the routes to which the commentor refers are not identified for motorized use in one or more action alternatives. Several others are routes lying within their wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.

As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdisciplinary team (including vegetation, soils, wildlife and cultural resource specialists). Potential resource conflicts were identified, their extent evaluated, and then weighed against purpose and need for the particular route under discussion. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 168 | The BLM should close most of the routes on the Bull Canyon rims, as they serve little purpose and are barely used. | Several of the routes to which the comme ntor refers are not identified for motorized use in one or more action alternatives. Several others are routes lying within SUWA's wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 169 | The BLM should close most routes in the Bull Canyon bottoms to enhance non-motorized recreation. | Several of the routes to which the commentor refers are not identified for motorized use in one or more action alternatives. The route below Gemini Bridges will be closed under all action alternatives. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 170 | The BLM should close a number of routes on Goldbar Rim and Poison Spider Mesa to enhance non-motorized recreation. | Several of the routes to which the commentor refers are not identified for motorized use in one or more action alternatives. The principal route to which the commentor objects is a very popular permitted 4WD route. As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdisciplinary team. Potential resource conflicts were identified, their extent evaluated and then weighed against purpose and need for the particular route under discussion. |

BLM_0012567

| | | | | Several of these are routes lying within SUWA's wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 171 | The BLM should close a number of routes in Shafer Canyon to protect the viewshed from Dead Horse Point. It also hosts bighorn sheep and Mexican spotted owls. | The routes the commentor proposes closing consist almost entirely of routes lying within its wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.<br><br>As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdisciplinary team.  Potential resource conflicts were identified, their extent evaluated and then weighed against purpose and need for the particular route under discussion. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 172 | The BLM should close most of the route in Mineral Canyon, as "this is a good place for quiet recreation". | One or more action alternatives identify this route for motorized use only up to the state section in Mineral Canyon. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 173 | The BLM should close the route along the Green River to Hell-Roaring canyon to mitigate the "large conflict with non-motorized use in this canyon." | The commentor provides no evidence to support its assertion of the "large conflict".  The route above the State section in Hell Roaring Canyon is closed to motorized use in one or more action alternatives.<br><br>The route the commentor proposes closing lies within its wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 174 | The BLM should close the route to Hey Joe Canyon along the Green River because of conflicts with non-motorized users.   There is a long tradition of both commercial and private non-motorized use of the river. These uses are being harmed by the noise of motors along the Hey Joe route. | This route was identified as a road in the 1999-2003 wilderness inventory.  It leads to a large disturbed mining area.  It is a permitted route popular with motorized recreationists.  The "long tradition of non-motorized use of the river" to which the commentor refers is irrelevant to the existence of a route which has been in use for nearly 50 years.  The commentor provides no evidence to |

BLM_0012568

| | | | | support its assertion of harm to commercial businesses that use this area. The BLM made several documented visits to this route during a recent Easter Jeep Safari ; at the time of these visits, the BLM observed very little motorized or river use, let alone user conflict.<br><br>The route the commentor proposes closing lies within their wilderness proposal. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 175 | The BLM should close the route in Ten Mile Canyon to protect riparian and cultural resources. The extreme well documented and steadily increasing damage to this place can only be mitigated if the canyon is closed to motorized use. | See response to comment 124-81.<br><br>This route, very popular with motorized recreationists, is not identified for motorized use in one or more action alternatives. The current travel route has been heavily signed to minimize damage to riparian and cultural resources. Side routes accessing cultural resources have been closed to motorized travel.<br><br>The route the commentor proposes closing lies within its wilderness proposal. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 176 | The BLM should close many of the routes leading to "points" along the Labyrinth Canyon rims, leaving a few available for "quiet recreation". | The commentor proposes closing to motorized travel a large number of routes covering a large land mass. Many of these routes do access popular viewpoints, and are described in guidebooks. The BLM has recognized the needs of non-motorized recreationists by not identifying for motorized use many of the travel routes in the area in question.<br><br>The commentor provides no information as to why the specific routes they wish closed were selected. The routes the commentor proposes closing consist almost entirely of routes lying within their wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to |

BLM_0012569

| | | | | wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 177 | The BLM should close most of the White Wash area to motorized use, due to a large number of resource conflicts including scenery, cultural, biological, riparian, wildlife, and water resources.  There are inadequate inventories of potential sensitive and Threatened and Endangered Species.  This is a lawless area and needs closure to motorized vehicles.<br><br>The likelihood of endemics is high in White Wash.  Wildlife affected include amphibians, peregrines, and bighorn.  Negative impacts on riparian areas include loss of function, channelization, bank destabilization and erosion, turbidity, compaction, petrochemical contaminants, and loss of flood resilience. | Much of this comment could be characterized as a "rant" against the OHV community.  A representative sentence: "Gigantic unmonitored, unpermitted gatherings happen here most weekends in Spring.  If they were rainbow gatherings, every law enforcement agency within 200 miles would be alert and have a presence, but, since they are ORVers only here to rip out and burn live cottonwoods, chase wildlife and foot travelers, shoot off automatic weapons, and tear through the canyons at a breakneck speed, the BLM sees no need to be here or even provide toilets or guidelines."<br><br>The commentor provides no evidence to support these very broad assertions concerning the OHV community, and the BLM feels no need to respond to what is an emotional outburst of opinion.<br><br>The BLM recognizes the affected resources in this area.  Alternative B proposes closing the dunes to motorized use.  Other action alternatives propose significant reductions in the areas currently open to OHV use, with measures to protect vegetative and riparian resources.  Several of the routes to which the commentor refers would not be designated for motorized use in one or more action alternatives.  Other routes which the commentor proposes closing lie within its wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.<br><br>The BLM contracted a study with Brigham Young University in 2005 to inventory the dunes for rare and unique plants in 2005.  No rare, unique, or endemic plants were found on the dunes.<br><br>The commentor provides no evidence to support its list of |

BLM_0012570

| | | | | negative impacts to the White Wash area. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 178 | The BLM should close "recently pioneered" motorcycle routes in the Duma Point area to protect big horn sheep habitat, sensitive soils, and provide opportunities for quiet recreation. The bighorn sheep herd is stressed. | Many of the "recently pioneered" motorcycle routes to which the commentor refers are constructed routes, primarily left over from minerals exploration. The northern portion of this area contains a very large number of these routes. This may be a reason why the commentor's comments to BLM proposals on managing lands for wilderness characteristics raised no explicit objection to BLM's Wilderness Characteristics Review finding that the large number of constructed impacts in this area rendered it as lacking wilderness characteristics. The stress on bighorn sheep and the damage to soils referred to by the commentor is not backed up by any documentation.<br><br>Several of the motorcycle routes to which the commentor refers were not identified for motorized travel in any action alternative. The BLM interdisciplinary team reviewing travel routes, concluded that conflicts with bighorn sheep outweighed the purpose and need for these motorcycle routes. Those routes BLM has concluded could affect wildlife are not identified for motorized use in any action alternative.<br><br>Most of the routes the commentor proposes closing are routes lying within its wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 179 | The BLM should close routes above the rim in the north Behind the Rocks area. The area is popular with hikers and "this outweighs the not-very-special motorized recreation opportunities". | The routes to which the commentor refers are popular permitted 4WD routes which have been in use for over 30 years. The comment that hiking use "outweighs" motorized use is simply stating a preference, but not a conflict.<br><br>The route the commentor proposes closing lies within their wilderness proposal. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless |

BLM_0012571

| | | | | areas in response to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 180 | The BLM should close the dune area in north Behind the Rocks to motorized use.  It is a major embarrassment to the Moab FO.  SUWA uses photos of it in press releases.

The route beyond the top of the Moab Rim trail should be closed. | The dune area to which the commentor refers (and their website photo taken several years earlier) has had most of the user-created routes closed and BLM can document its recovery.

As with response to comment 124-179, the route the commentor proposes closing lies within their wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 181 | The BLM should close several routes in south Behind the Rocks, especially the route in Hunter Canyon which contains "near here" one of the few springs in the area. This would enhance non-motorized recreation opportunities. | Several of the routes to which the commentor refers are not identified for motorized use in one or more action alternatives.  The route in upper Hunter Canyon is a constructed route popular with motorized recreationists and provides access to other constructed routes on the mesa top leading back to the main Behind the Rocks and Kane Creek Rims routes.  The commentor provides no evidence that the spring "near here" is being affected by motorized use.

Several of the routes the commentor proposes closing lie within their wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 182 | The BLM should close the Hunter Canyon rim route to motorized use since "this is a place where non-motorized gains clearly outweigh the motorized losses."  This is a high priority hiking area and jeep noise is a problem. | The loss versus gain to which the ocmmentor refers is clearly a matter of opinion, with no documentation provided to support their assertion.  The route to which the commentor refers receives little motorized use, and the commentor provides no evidence of the noise and conflict which its identification creates.  The route itself is not identified for motorized use in one action alternative (Alt B). |
| Southern Utah Wilderness Alliance | 124 | 183 | The BLM should close the single-track bicycle route along the Hunter Canyon rim due to erosion and trail-widening. | Throughout its comments, the commentor chides the BLM for not providing more non-motorized recreation opportunities, which this trail represents.  The commentor |

567

BLM_0012572

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | | provides no evidence to support its assertion of damage along this trail. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 184 | The BLM should close a number of routes on Hatch Point, mostly little used jeep trails and seismic lines. This is an important area for pronghorns. | The commentor's proposal actually closes numerous routes in a very large land area, without regards to purpose or need.  The only resource conflict identified is wildlife, specifically pronghorn antelope.  The commentor provides no evidence that these routes are causing harm to this resource.<br><br>As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdisciplinary team (including wildlife).  Potential resource conflicts were identified, their extent evaluated and then weighed against purpose and need for the particular route under discussion.<br><br>Virtually all the routes SUWA proposes closing lie within their wilderness proposals.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 185 | The BLM should close most of the routes in the East Coyote area which receive little or no use in order to preserve a "remote/roadless area".  The adjoining area in Colorado "has already been recognized for its wilderness values". | The commentor's characterization of the area as remote/roadless is not correct.  The area has many routes from past minerals activities, all of which the commentor proposes closing.  The entire area lies within SUWA's wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.<br><br>The reference to the adjoining "wilderness" in Colorado is irrelevant, and has been addressed in BLM's responses to SUWA's comments on wilderness characteristics alternatives.  The area to which SUWA refers has not been recognized for "wilderness values" by any public agency. |
| Southern Utah Wilderness Alliance | 124 | 186 | The BLM should close the route along the Green River to Hey Joe mine. | See response to comment 124-174. |

BLM_0012573

| (SUWA) | | | | |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 187 | The BLM should close and rehabilitate an unnamed spur of Hey Joe access route.  The spur is damaging to VRM and has no purpose and need. | This route is not identified for motorized use under any action alternative.  Rehabilitation is an implementation level decision and outside the scope of the current planning effort. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 188 | The BLM should close the route along the Green River to Hell Roaring Canyon (1224) due to a lack of purpose and need and variety of resource conflicts.  Hell Roaring Canyon possesses wilderness characteristics and is pristine.  This route additionally conflicts with cultural, riparian, wildlife, and primitive recreation resources. | This route had not been identified as open to motorized use under one or more action alternatives.  See response to comment 124-173.  A BLM interdisciplinary team reviewed each route for purpose and need weighed against resource conflicts.  See Appendix G for details on the Travel Plan development process.  The resource conflicts in Hell Roaring Canyon were not sufficient enough to close this route in the preferred alternative. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 189 | The BLM should close the route in Hell Roaring Canyon (1223) due to a lack of purpose and need and variety of resource conflicts.  The route is not in alignment with BLM OHV designation regulations. | See response to comment s 124-173 and 124-188.  The commentor provides no rationale why this route is "not in alignment with BLM OHV designation regulations". |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 190 | The BLM should close an unnamed spur of Red Wash (2762) due to ORV resource damage warranting closure.  ORV use has damaged the naturalness of this popular lunch spot for boaters along the Green River. | Without a map, it is not possible to know to which "route" the commentor refers.  There is a motorcycle route in the vicinity, which would not be identified for motorized use across all action alternatives.  Similarly, there is a named (the commentor refers to an "unnamed" route) county route heading south from this spur, which would also not be identified for motorized use across all action alternatives.  The open to cross country OHV designation currently in Alt A has been changed to limited to designated routes in all action alternatives. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 191 | The White Wash Sand Dunes are an ecologically unique feature in the Moab planning area.  These dunes should be closed to OHV use and the proposed Ecological Study area should be established.  This scenic and unique area should be closed to open cross country travel area. | The BLM's Alternative B closes the dunes to OHV use and established them as an ACEC.   See response to comment 124-177. |
| Southern Utah Wilderness Alliance | 124 | 192 | The BLM should close the route in Ten Mile Wash because of conflicts from motorized use with riparian and cultural resources. In addition, there are conflicts with | The BLM should close the route in Ten Mile Wash because of conflicts from motorized use with riparian and cultural resources. In addition, there are conflicts with |

569

BLM_0012574

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | non-motorized users.  The BLM should protect these delicate resources. | non-motorized users.  The BLM should protect these delicate resources. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 193 | The BLM should close the route in Salt Valley Gorge (4006) due to a lack of purpose and need and conflict with wilderness values. The route has nearly reclaimed. | The route the commentor proposes closing lies within its wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.  See also response to comment 124-188 for a discussion of the role of the interdisciplinary team in assessing resource conflicts. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 194 | The BLM should close Arches Salt Wash (3939) because it has no purpose and need and "paleontological resources are likely at risk." | This short (0.23 miles) route lies within SUWA's wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.  The commentor provides no evidence to support their assertion of possible risk to paleontological resources. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 195 | The BLM should close the route to Day Canyon Point I (1625) due to conflicts with hikers in Day Canyon and wilderness characteristics. | This route had not been identified as open to motorized use under one or more action alternatives.  The route the commentor proposes closing lies within its wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.  The route in question does not create conflicts with hikers in Day Canyon, as the closest it comes to the rim is 0.25 miles.  Sound from motors above does not enter Day Canyon.  Utah Highway 279, a major paved road, intersects the canyon mouth and is much more likely to add to the asserted and undocumented conflict with Day Canyon hikers. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 197 | The BLM should close motorized routes running along the river in Labyrinth Canyon, including the routes running up and down canyon from Spring Canyon.  This would correct the noise problems that "plague" river runners and hikers in the canyon. | See response to comments 124-174 and 124-186.  This route was identified as a road in the 1999-2003 wilderness inventory.  It leads to a large disturbed mining area.  It is a route popular with motorized recreationists, including those under BLM permit.  The commentor provides no evidence to support its assertion of the noise that plagues hikers and boaters.  The BLM made several visits to this route during a recent Easter Jeep Safari; at the time of these visits, the BLM observed very little |

570

BLM_0012575

| | | | | |
|---|---|---|---|---|
| | | | | motorized or river use, let alone user conflict.<br><br>The route the commentor proposes closing lies within its wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 198 | The BLM should close the route alongside the river north of Mineral Canyon, since the route causes user conflicts along the river and resource damage in Hell-Roaring Canyon. | See response to comment 124-172.  The commentor provides no evidence to support its assertion of user conflict and/or resource damage.  The route in Hell Roaring Canyon is identified for motorized use only to the state section in one or more action alternatives.<br><br>The route the commentor proposes closing lies within its wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 199 | The BLM should close the motorized route in Ten Mile Canyon due to damage to cultural and riparian resources.  Ten Mile is a perennial stream and would be eligible for inclusion as a Wild and Scenic River. | See response to comments 124-94, 124-175, and 124-192. This route, which is very popular with motorized recreationists, is not identified for motorized use in one action alternative.  The current travel route has been heavily signed to minimize damage to riparian resources. Routes accessing cultural resources have been closed to motorized travel.<br><br>The route the commentor proposes closing lies within its wilderness proposal.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 200 | The BLM should close the proposed motorized route in Hell Roaring Canyon to protect scenic values, riparian values, and fragile soils. | See response to comments 124-173, 124-188, and 124-189.<br><br>The BLM identifies this route for motorized use only up to the state section in one or more action alternatives. This route provides access to a state section and a wildlife guzzler in the area.  The commentor provides no evidence to support its assertions of resource damage. As described in Appendix G, the BLM's travel plan |

BLM_0012576

| | | | | formulation involved numerous meetings of an interdisciplinary team (including the resource specialists for riparian, soils, and scenery). Potential resource conflicts were identified, their extent evaluated and weighed against purpose and need for the particular route under discussion.

The route the commentor proposes closing lies within its wilderness proposal. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 201 | The BLM should close routes with no clear purpose and need, that have "a resource or use conflict", or overlap areas that "have been found to possess wilderness characteristics". The specific areas of concern include Horsethief Point, Mineral Point, Deadman Point, Spring Canyon Point, Tenmile Point and the area north of Ruby Ranch extending to Crystal Geyser. | See response to comment 124-62, 124-63, 124-64, 124-65, and 124-143. The commentor's proposal in this comment covers a very large land area covering tens of thousands of acres, and with hundreds of miles of inventoried routes. SUWA provides no specific route data to support their broad assertions of resource and user conflicts. The principal "resource conflict" appears to be the fact that virtually all of these routes are within SUWA's wilderness proposals. As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.

The commentor asserts that the BLM should close routes that have a "resource or user conflict". The presence of such a conflict does not in itself warrant not identifying a route for motorized use. Rather, the BLM identifies potential resource conflicts, assesses the significance of such conflicts, and weighs any such conflicts against purpose and need. As described in Appendix G, the BLM's travel plan formulation involved numerous meetings of an interdisciplinary team. Potential resource conflicts were identified, their extent evaluated and then weighed against purpose and need for the particular route under discussion. |
| Southern Utah Wilderness | 124 | 202 | The BLM should adopt a management plan that protects areas with wilderness characteristics. Wilderness | The relevant important values considered in the Area of Critical Environmental Concern process to not include |

BLM_0012577

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | characteristics should be one of the resources specifically protected in the expanded Labyrinth ACEC. | wilderness characteristics.<br><br>The "expanded ACEC" to which the commentor refers has not been found by BLM to possess any relevant and important values to qualify it as an ACEC.  See response to comment 124-86. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 203 | The BLM should manage lands included in substantive citizens' wilderness proposals in such a way that no activities are permitted that permanently degrade the resource. | See response to comments 124-52, 124-53, and 124-54 on BLM's requirements to manage lands for wilderness characteristics.<br><br>As described in detail in Chapter 4, as part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process (whose findings are available on the MFO planning website, and in the administrative record).  The BLM stands by its findings of its wilderness characteristics inventory maintenance.<br><br>The BLM assumes that the commentor's comment refers to the Labyrinth Canyon area, the focus of the commentor's Exhibit C.  Much of this area was found to lack wilderness characteristics in BLM's wilderness characteristics inventory maintenance process.  The area found to possess wilderness characteristics would be managed for such under Alternative B. |
| Van Loan Ranches | 195 | 6 | Why are some roads which were constructed in relatively recent times for access to wildfires or for energy research andwhich were never intended to be public right of ways left open while long standing routes constructed to meet specific and vital needs many years earlier are selected to be closed? | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The |

BLM_0012578

| | | | | impacts identified for travel management in the DRMP/DEIS are derived from this data. |
|---|---|---|---|---|
| Moab Trails Alliance | 196 | 1 | It is blatantly obvious that the old way of sharing jeep routes with everyone, the basis of mountain biking in Moab, no longer works. Gemini Bridges, Poison Spider Mesa, and Gold Bar Rim are classic examples. With new 4-wheeled drive technology the alterations (damage) to the trails are such that cyclists cannot use the same route unless they like taking their bike for a walk. The Grand County Non-Motorized Trails Master Plan proposes alternate routes in each of these areas. The Green Dot (Gemini area), Blue Dot (Gold Bar Singletrack listed in "D"), and Wags Way (Poison Spider area) Trails should be priority projects ASAP. These are user created routes that traverse slickrock in areas that have been overrun by motorized traffic.<br><br>After a few years of trying to develop new trails in the Moab Field Office it is apparent that our niche here is slickrock. The predominantly sandy soils make for maintenance nightmares and undesirable routes. MTA recommends that more slickrock routes be developed and marked. A route from the Monitor-Merrimack area over to SR313 is an example. Slickrock riding made Moab famous, it is low impact, and it is what will keep people coming back. The Bartlett Wash Freeride area in "C" is a great idea. | The routes considered in the alternatives for the Travel Plan accompanying the DRMP/EIS were those submitted by the public during the scoping period, including those submitted by Trail Mix and Moab Trails Alliance, and verified on the ground by BLM staff (see pgs. G-15 through G-21).  On pg. 2-48 of the DRMP/EIS there is a provision for adding new routes.  The provision states "identification of specific designated routes would be initially established through the chosen travel plan accompanying the RMP and may be modified through subsequent implementation planning and project planning on a case by case basis".  New routes proposed by the commentor will be considered after completion of the Record of Decision for the Moab RMP unless those routes are in a closed area.  However, at the completion of the RMP, all travel will be restricted to the routes designated in the plan. |
| Moab Trails Alliance | 196 | 2 | The amount of new trail ("C"= 150 miles, "B"= 75, etc) should be specifically stated as, "In addition to trails developed on existing roads as mapped on the Grand County Transportation Inventory map". The allotted new mileage will include only those routes mapped across previously undisturbed terrain. | Wording has been added to the DRMP/EIS on pg. 2-49 to clarify that the mileage is for new trails;  converted existing routes are in addition to the specific mileage listed for each alternative. |
| Moab Trails Alliance | 196 | 3 | It is a sore spot with cyclists to be grouped with OHVs. The definition of OHV in the glossary on page X-37 precludes bicycles from this category. The explanation hidden at the bottom of page G-5 groups motorized and mechanized together. Please remove bicycling from any | The BLM recognizes that the BLM National Mountain Bicycling Strategic Action Plan does not group bicycles with OHVs. The statement on pg. G-5 is intended to clarify that bicycles are allowed on routes designated for OHVs.  Travel management covers mechanized as well |

BLM_0012579

| | | | | |
|---|---|---|---|---|
| | | | definitions of OHVs and other all-encompassing variations of "wheeled vehicle" classifications. While a bicycle has wheels, this is the extent of any similarity with motorized forms of transportation. Placing mountain biking within the non-motorized category is consistent with the BLM National Mountain Bicycling Strategic Action Plan and many other BLM management plans across the country. | as motorized use. |
| Moab Trails Alliance | 196 | 4 | In fact, the BLM Wilderness Study Area Interim Management Policy H-5880-1 (Wilderness IMP) does not categorically ban mountain biking from WSAs. MTA requests that the Moab RMP adopt a management policy that would permit bicycling on some trails in non-WSA (ACEC) areas. While bicycling may not be appropriate on some trails in these areas, others can provide a welcome relief from front-country and motorized areas. A decision to ban this use should be based on scientific reasoning. | Bicycles are allowed only on inventoried routes within Wilderness Study Areas.  The DRMP/EIS identifies some of these inventoried routes for vehicular use across various alternatives.  Bicycles would be allowed on those inventoried routes that are identified for vehicular travel.

The commentor mentions no specific trails in non-WSA areas that bicycles should be allowed on.  The plan manages specific hiking trails for hiking use only on pg. 2-49 of the DRMP/EIS..  Bicycles would not be allowed on these trails. |
| | 200 | 18 | Squaw Park Area-A road from the Highlands departs from the Auger Springs area, UTM 4297680N 0637240E, to descend a slickrock dome into Squaw Park. From there it travels through some sand hills, into a wash bottom passing Caves Spring before ascending from the wash to the level of the road in Squaw Park, which it joins at UTM 4296820N 0638920E. Most of this route is clearly visible and mechanically constructed, the obscure parts are in the sandy sections. | This route seems to be the same as identified in Alternative A and included in the Grand County inventory. The County was unable to identify a purpose or need for this route, nor was any suggested by a member of the public during scoping.  See response to comment 206-4. |
| | 200 | 1 | Travel Management Map C is the best choice, with the adjustments listed below to correct errors or add interesting roads that were omitted. 1. Parts of roads used on five permitted Jeep Safari routes are missing from your Alternative C designated road map. I think this issue needs to be addressed before finalizing the plan. Details are provided in Appendix A. | See responses to comments 206-3, 206-10 through 21. |

BLM_0012580

| | | | | |
|---|---|---|---|---|
| | | | 2. There are a couple road segments in existing WSAs that I think could be reopened without impairing the suitability of the area for preservation. In one instance Search and Rescue efforts would be enhanced by this action. Details are provided in Appendix B.<br>3. The connection of the Klondike Bluffs Road from US 191 to the northern section of the Little Valley Road, as well as the connection at this point of the southern and northern sections of the Little Valley Roads, is missing from the maps. This is a part of the Copper Ridge Safari route and mentioned in Appendix A, but I imagine a lot of mountain bikers will be upset to lose this access to the parking area for Klondike Bluffs as well.<br>4. Some routes shown on Alternative A in red, indicating they will be kept on the system in Alternatives C or D, do not appear on Alternative C. Three examples of this are included in Appendix C that are important to me, and I urge that they be added to the Alternative C map.<br>5. There are some road segments that are not Jeep Safari trails, but I feel they are important enough to note and ask for revisions on Alternative C to add them. These are covered in Appendix D. | |
| | 200 | 4 | Permitted Jeep Safari Routes not on Alternative C. Copper Ridge-connection between southern and northern Little Valley Roads at Klondike Bluffs Road intersection is missing. Another segment of the route, one that is used to bypass the difficult pipeline hill, is not shown on the map in it's entirety. It departs from the newer pipeline near US 191 at UTM 4282150N 0614340E and connects with a route shown on Alternative C at about 4283390N 0615420E. Next, there has been some discussion among CR trail leaders as to two modifications to the trail that would allow shortening it yet retaining the trail's character. These changes would require two road segments to be left in Alternative C that are eliminated from Alternative A. While there is no plan at present to ask for any changes to the Jeep Safari | See response to comment 206-11 and 206-12. |

BLM_0012581

| | | | | |
|---|---|---|---|---|
| | | | Permit, it would be desirable to keep these roads legal for future incorporation into the permit. The first starts at UTM 4286060N 0615910E in the Sovereign area, proceeds roughly ESE, and then turns NE to connect with the pipeline road about 4286190N 0617590E. This would allow using a segment of road that passed dinosaur tracks on the way to the usual lunch spot. The second road segment is a loop that starts from the Little Valley Road at approximately 4290630N 0614020E it starts in a SW direction, climbs the hill top, then beads NW along the ridgeline before dropping into a wash and bearing NE to reconnect back with Little Valley Road at 4291230N 0612940E. This loop provides some elevation gain and therefore produces nice views into Arches NP. | |
| | 200 | 5 | Strike Ravine Trail-two sections are missing. The N-S road crossing the private property that the Club had to defend it's right to use in court is not shown, approximate UTM4253670N 0638440E on the northern end, 4252320N 0638040E on the southern end; a portion of the "Big Ugly" hill is not shown UTM 4254480N 0638550E. | See response to comment 206-11. |
| | 200 | 6 | 3D Trail-a section of road is missing from about UTM 4285900N 609900E north then west to UTM 4286400N 609300E. | See response to comment 206-11. |
| | 200 | 7 | Dolores Triangle Trail-an E-W shortcut near Steamboat Mesa, at about UTM 4295500N 668000E, is eliminated, and it is quite useful. | See response to comment 206-11. |
| | 200 | 8 | Flat Iron Mesa Trail-four portions of this trail are not included in Alternative C. First, from UTM 4246450N 636300E jiggling NW to the pipeline road. Second, from UTM 4245600N 634700E going SW to Plan trail. Third, from UTM 4246200N 633400E going SW to meet the SJ County B road. Also, at approximately UTM 4246440N 634910E the roads do not appear to connect, when in fact they do, and this connection is used on the | See response to comment 206-11. |

BLM_0012582

| | | | | |
|---|---|---|---|---|
| | | | Flat Iron safari trip. Last, the loop around "Hammerhead Rock" from about UTM 4242400N 633400E southerly and then east to the plan route. Another note for this trail, the last bit of the permitted route to the county B road has been fenced across with no gate, and a longer existing road is now used to reach the county road. It would be helpful to update this on the official map. | |
| | 200 | 9 | Road segments suggested for designation as open in existing WSAs: 1) Behind the Rocks WSA- Short segment to "Egg Ranch Fin", a nice viewpoint and a real thrill to drive. 2) Negro Bill Canyon WSA-the road west from Coffee Pot Rock. The western end is shown in Alternative D, but the connection to the Porcupine Rim Trail near Coffeepot Rock is not. It should all be in Alternative C. | See response to comment 206-20. |
| | 200 | 10 | Day Canyon Point-A side spur from the main road that heads west to an overlook of Long Canyon does not show the route's full length. It proceeds beyond what is shown to cross a small wash and end at a turnaround point. This serves as both a natural turnaround point as well as a nice starting point for a hike to overlooks of Long Canyon and the interesting rock formations along the rim in this area, it adds only about 1/8 mile. It begins at UTM 4268370N 0614600E and ends about 4267570N 0614830E. | See response to comment 206-13. |
| | 200 | 11 | Gemini Bridges-The club would like to see the road across the top of the bridges remain open. | See response to comment 206-14. |
| | 200 | 12 | Mill Canyon-A road that connects from the Mill Canyon Road on the north heads southward into Courthouse Pasture, connecting with roads there. It would also seem to be an important road for Search and Rescue efforts in the pasture area. | See response to comment 206-15. |
| | 200 | 13 | The Pickle-This challenging wash bottom route appears to be shown on the Alternative C map, but we want to be sure. It begins at the Bartlett Wash Road about UTM | See response to comment 206-16. |

BLM_0012583

| | | | | |
|---|---|---|---|---|
| | | | 4285183N<br>0605027E and heads up the wash to intersect the road to Hidden Valley about 4284925N<br>0604272E. | |
| | 200 | 14 | Flat Iron Mesa- A strong, useful connecting road that is shown on USGS maps exists between UTM 4245328N 0634685E (the main Flat Iron Road) and UTM 4245272N 0636835E (US191). This road connects with one shown on Alternative C, making that a connecting road rather than a dead end as currently mapped. | See response to comment 206-17. |
| | 200 | 15 | Ray Mesa & Lisbon Gap 15' Quad Area-There are some roads along the Utah/Colorado border that leave Utah and continue in Colorado. The roads referred to are in the Ray Mesa and Island Mesa area. A check with the Colorado BLM affirmed that these roads<br>were part of their existing legal travel routes (Julie Jackson, Uncompahgre Office, Nov.<br>13, 2007). Therefore, it makes no sense to eliminate the Utah end of a road if the<br>Colorado end is legally open to travel, particularly when the Utah end is needed to access the Colorado section. The first road departs from a road shown on alternative C at UTM<br>4234752N 0669852E to head northeast, it wanders back and forth across the state border<br>around UTM 4235280N 0670139E, and then continues northeast to intersect with another road in the Yip Yip Mine vicinity. The next road also departs from the same road shown on alternative C that was referred to above, about UTM 4233247N 0669563E. It travels<br>generally eastward, crossing the state line at UTM 4233513N 0670416E as it travels<br>along the southern end of Ray Mesa. The final road departs from the above mentioned<br>alternative C road at UTM 4227870N 0670144E and heads eastward toward the Colorado<br>line. Just before reaching the state line it heads north, | See response to comment 206-18. |

BLM_0012584

| | | | | |
|---|---|---|---|---|
| | | | and finally crosses the border about UTM 4227870N 0671005E as it continues eastward along a bench of Island Mesa. | |
| | 200 | 16 | Levi Well Road spur-There is an interesting route that follows a small, sandy wash bottom to access a unique terrace that features an array of balanced rocks. The route stays in the wash bottom, and visitors stop when they are in closest proximity to the balanced rocks. At this point they begin a hike to the terrace. I have personally done this trip several times, and it has been a thrill every time. It starts at UTM 4290910N 0593370E and terminates within sight of the terrace around UTM 4290510N 0595440E. See Pictures included with this Appendix. | This route is not part of the Grand County route inventory, nor was it proposed during scoping.  As a result, it was not evaluated in the DRMP/EIS.  This route can be considered for identification on a site-specific basis in the future.  See also response to comment 206-4. |
| | 200 | 17 | Tenmile Wash-An access road into Tenmile from the south is important. It serves as the only access from the rim viewpoints on this side of the wash into the wash itself. It is a well defined road that is only partially shown on the Alternative A map. It starts at the BLM fence line on the western side of the fence at UTM 4285890N 0589660E, roughly parallels the fence for a bit before heading slightly away from it. The Alternative A map terminates it at an ancient playa, but in fact it descends from there on a well defined mechanically constructed road, crosses the small wash to proceed down the other side, through a gate in a fence, and then proceed pretty directly to a descent down the last little bit into Tenmile at about UTM 4287670N 0588320E. | See response to comment 206-19. |
| The Nature Conservancy | 204 | 11 | *See DRMP 2-48* Finally, within this area we would like to see the designation of motorized travel on the road up Ida Gulch from Hwy 128 proceed no farther up-valley than the northern boundary of our section of private land (Sec 32, T24S R23E, SLM) in Ida Gulch. In the DRMP under all Action Alternatives this route is shown as | The BLM does not designate routes on private land.  The Nature Conservancy may restrict travel on this route.  The route will be removed from the designated travel maps in Alts C and D.  This would restrict all motorized travel past the Nature Conservancy's private land. |

BLM_0012585

| | | | designated for motorized travel through our property and onto BLM-administered lands to the east. We do not oppose non-motorized travel on this route through our property, but would like to see motorized travel terminate at our boundary, and are prepared to construct a gate there for this purpose. | |
|---|---|---|---|---|
| The Nature Conservancy | 204 | 27 | Travel Management (Pg 2-28—2-50) Several motorcycle routes that would be designated under Alternatives C and D (DRMP Map 2-11-E) are in the midst of the occurrences of the Stage Station milkvetch (Astragalus sabulosus var. vehiculus). Designation of these routes by the Final RMP would need to be accomplished by vigilant monitoring to avoid adverse impacts (from non-compliant bikers) to this Sensitive plant. | The BLM is aware of the problems of cross country travel associated with motorbike trails. However, the action in the RMP authorizes only on-trail use of these routes. Travel off the designated trails would be illegal and subject to citation. It is hoped that by marking trails on the ground, cross country travel would lessen. |
| Red Rock 4-Wheelers, Inc. | 206 | 1 | The Club supports Travel Management Alternative C, the preferred alternative, with a few changes that are detailed in the following section.<br>1. Parts of roads used on five permitted Jeep Safari routes are missing from your Alternative C designated road map. I think this issue needs to be addressed before finalizing the plan. Details are provided in Appendix A.<br>2. There are a couple road segments in existing WSAs that I think could be reopened without impairing the suitability of the area for preservation. In one instance Search and Rescue efforts would be enhanced by this action. Details are provided in Appendix B.<br>3. The connection of the Klondike Bluffs Road from US 191 to the northern section of the Little Valley Road, as well as the connection at this point of the southern and northern sections of the Little Valley Roads, is missing from the maps. This is a part of the Copper Ridge Safari route and mentioned in Appendix A, but I imagine a lot of mountain bikers will be upset to lose this access to the parking area for Klondike Bluffs as well.<br>4. A few routes shown on Alternative A in red, indicating they will be kept on the system in Alternatives C or D, do | See responses to comments 206-3, 206-10 through 21. |

BLM_0012586

| | | | | |
|---|---|---|---|---|
| | | | not appear on Alternative C. Three examples of this are included in Appendix C that are important to me, and I urge that they be added to the Alternative C map.<br>5. There are some road segments that are not Jeep Safari trails, but we feel they are important enough to note and ask for revisions on Alternative C to add them. These are covered in Appendix D. | |
| Red Rock 4-Wheelers, Inc. | 206 | 9 | The Club is aware of some aspects of the Ride With Respect Group's proposal. The RR4WD Club would like to be involved in the decision making process concerning their proposal, but what we have seen is well thought out and easy to implement. Specifically this refers to ideas about: 1) utilizing existing roads in the Cisco Desert and Copper Ridge area to provide a motorcycle route from Fruita to Moab and 2) expansion of the proposed South Moab SRMA to include Black Ridge, and then establishing focus areas within the expanded area to deal with mountain bikes, equestrians, trials motorcycles, and rockcrawlers. | Alternative C of the Travel Plan in the DRMP/EIS provides a motorized motorcycle route relying primarily on existing routes from the Colorado border to Thompson.<br><br>See response to comment 122-36 regarding Copper Ridge.<br><br>See also response to comment 122-43 regarding the Black Ridge area. |
| Red Rock 4-Wheelers, Inc. | 206 | 10 | The only adjustments to the South Moab SRMA, proposed by Ride with respect, that seem to be required appear to be the inclusion of the segments of the Strike Ravine Jeep Safari trail mentioned in Appendix A, but the Club wants to stress its desire to be involved with the planning of this proposal, if accepted by the BLM. | See response to comment 206-11. |
| Red Rock 4-Wheelers, Inc. | 206 | 11 | There are a number of permitted Jeep Safari routes not included in Alternative C, and these should be added to this Alternative.  These include segments of the Copper Ridge, Strike Ravine, 3D, Dolores Triangle, and Flat Iron Mesa routes. | The short segments on BLM are mapping errors which have been corrected (route numbers 13637, 15331, 15332, 15334, 15336).   Strike Ravine and Flat Iron Mesa routes will need to be hand digitized, since they are not part of current Travel Plan database.  Several of the segments are exclusively on State lands, and beyond the scope of the Travel Plan formulation. |
| Red Rock 4-Wheelers, Inc. | 206 | 12 | There has been some discussion among Copper Ridge trail leaders as to two modifications to the trail that would allow shortening it yet retaining the trail's character. These changes would require two road segments to be left in Alternative C that are eliminated from Alternative | One of the two segments is on State land, and beyond the scope of Travel Plan formulation.<br><br>The other route was identified in the baseline route inventory.  The BLM requested information on routes from |

BLM_0012587

| | | | | |
|---|---|---|---|---|
| | | | A.  While there is no plan at present to ask for any changes to the Jeep Safari Permit, it would be desirable to keep these roads legal for future incorporation into the permit. | the public for potential inclusion in the travel planning process.  No information was received regarding this route (segment numbers 15605, 15606, and 15623).  An interdisciplinary team, which included County road officials, determined that this route lacked purpose and need.  Once a route was determined to lack purpose and need, it was not weighed against potential resource conflicts and was not included in any of the action alternatives.<br><br>For a discussion on the process for adding or subtracting routes to the Travel Plan on a site specific basis subsequent to adoption of the Moab RMP, see response to comment 122-15. |
| Red Rock 4-Wheelers, Inc. | 206 | 13 | (Additional Roads Need Adjustment)<br>Day Canyon Point-A side spur from the main road that heads west to an overlook of Long Canyon does not show the route's full length.  It proceeds beyond what is shown to cross a small wash and end at a turnaround point.  This serves as both a natural turnaround point as well as a nice starting point for a hike to overlooks of Long Canyon and the interesting rock formations along the rim in this area, it adds only about 1/8 mile.  It begins at UTM 4268370N 0614600E and ends about 4267570N 0614830E. (See map) | This route is not part of the baseline route inventory utilized for formulating the alternatives for the Travel Plan in the DRMP/EIS.<br><br>The BLM requested information on routes from the public for potential inclusion in the travel planning process.  No information was received regarding this route.  As a result, this route was not analyzed.<br><br>For a discussion on the process for adding or subtracting routes to the Travel Plan on a site specific basis subsequent to adoption of the Moab RMP, see response to comment 122-15. |
| Red Rock 4-Wheelers, Inc. | 206 | 14 | (Additional Roads Need Adjustment)<br>Gemini Bridges-The club would like to see the road across the top of the bridges remain open. (See map) | The route in question was found to have a conflict with other recreational uses, as well as safety issues, that the BLM's interdisciplinary team concluded outweighed the purpose and need for this route. |
| Red Rock 4-Wheelers, Inc. | 206 | 15 | (Additional Roads Need Adjustment)<br>Mill Canyon-A road that connects from the Mill Canyon Road on the north heads southward into Courthouse Pasture, connecting with roads there. It would also seem to be an important road for Search and Rescue efforts in | This route was identified in the baseline route inventory .  The BLM requested information on routes from the public for potential inclusion in the travel planning process.  No information was received regarding this route (segment number 27493 and 31779 ).  An |

BLM_0012588

| | | | the pasture area. (See map) | interdisciplinary team, which included County road officials, determined that this route lacked purpose and need. Once a route was determined to lack purpose and need. For a discussion on the process for adding or subtracting routes to the Travel Plan on a site specific basis subsequent to adoption of the Moab RMP, see response to comment 122-15.<br><br>The Federal regulations at 43 CFR 8340 state that any fire, military, emergency, or law enforcement vehicle when used for emergency purposes is exempted from OHV decisions.  This is state on G-15 of the DRMP/EIS. |
|---|---|---|---|---|
| Red Rock 4-Wheelers, Inc. | 206 | 16 | (Additional Roads Need Adjustment)<br>The Pickle-This challenging wash bottom route appears to be shown on the Alternative C map, but we want to be sure. It begins at the Bartlett Wash Road about UTM 4285183N 0605027E and heads up the wash to intersect the road to Hidden Valley about 4284925N 0604272E. (See map) | This route has been identified for motorized use in Alt C for the Travel Plan of the DRMP/EIS. |
| Red Rock 4-Wheelers, Inc. | 206 | 17 | (Additional Roads Need Adjustment)<br>Flat Iron Mesa- A strong, useful connecting road that is shown on USGS maps exists between UTM 4245328N 0634685E (the main Flat Iron Road) and UTM 4245272N 0636835E (US191).  This road connects with one shown on Alternative C, making that a connecting road rather than a dead end as currently mapped. (See map) | This route was evaluated by the BLM's interdisciplinary team, which included County road officials, as part of its travel plan formulation.  Resource conflicts, particularly cultural, were found to outweigh purpose and need.  The route is identified for motorized use in Alternative D of the Travel Plan for the DRMP/EIS. |
| Red Rock 4-Wheelers, Inc. | 206 | 18 | (Additional Roads Need Adjustment)<br>Ray Mesa & Lisbon Gap 15' Quad Area-There are some roads along the Utah/Colorado border that leave Utah and continue in Colorado.  The roads referred to are in the Ray Mesa and Island Mesa area.  A check with the Colorado BLM affirmed that these roads were part of their existing legal travel routes (Julie Jackson, Uncompahgre Office, Nov. 13, 2007).  Therefore, it makes no sense to eliminate the Utah end of a road if the Colorado end is legally open to travel, particularly when | Although depicted on the USGS topographical maps, these routes were not identified by San Juan County in its route inventory, nor were these routes brought forward by the public during scoping period for the land use planning process.  See responses to comments 206-4 and 206-13.  The area mentioned by the commentor in Colorado lies in an area open to cross-country OHV travel, meaning that all BLM lands in that part of the state are open to travel, regardless of whether it is on-road or off-road. |

BLM_0012589

| | | | | |
|---|---|---|---|---|
| | | | the Utah end is needed to access the Colorado section. The first road departs from a road shown on alternative C at UTM 4234752N 0669852E to head northeast, it wanders back and forth across the state border around UTM 4235280N 0670139E, and then continues northeast to intersect with another road in the Yip Yip Mine vicinity. The next road also departs from the same road shown on alternative C that was referred to above, about UTM 4233247N 0669563E.  It travels generally eastward, crossing the state line at UTM 4233513N 0670416E as it travels along the southern end of Ray Mesa. The final road departs from the above mentioned alternative C road at UTM 4227870N 0670144E and heads eastward toward the Colorado line. Just before reaching the state line it heads north, and finally crosses the border about UTM 4227870N 0671005E as it continues eastward along a bench of Island Mesa. (See map) | |
| Red Rock 4-Wheelers, Inc. | 206 | 19 | (Additional Roads Need Adjustment) Tenmile Wash-An access road into Tenmile from the south is important. It serves as the only access from this side of the wash into the wash itself.  It is a well defined road that is only partially shown on the Alternative A map.  It starts at the BLM fence line on the western side of the fence at UTM 4285890N 0589660E, roughly parallels the fence for a bit before heading slightly away from it.  The Alternative A map terminates it at an ancient playa, but in fact it descends from there on a well defined mechanically constructed road, crosses the small wash to proceed down the other side, through a gate in a fence, and then proceed pretty directly to a descent down the last little bit into Tenmile at about UTM 4287670N 0588320E. (See map) | See response to comment 206-13. |
| Red Rock 4-Wheelers, Inc. | 206 | 20 | Two short routes in Wilderness Study Areas (WSA) should be identified for motorized use in Alternative C. These are spurs to Egg Ranch Fin in the Behind the | The spur to Egg Ranch Fin is located in an area closed to motorized use as part of the 1985 Grand Resource Area RMP, in order to enhance primitive recreation |

BLM_0012590

| | | | | |
|---|---|---|---|---|
| | | | Rocks WSA, and a spur west from Coffee Pot Rock in the Negro Bill Canyon WSA. | opportunities.  It is situated in an area closed to motorized travel across all alternatives in the DRMP/EIS.  It was not part of the route inventory submitted to BLM during the scoping period for the land use planning process.  The spur west from Coffee Pot rock is identified for motorized use in Alternative D.  This route was not identified for motorized use in Alternative C, due to the BLM's conclusion that resource conflicts, particularly wilderness, outweighed purpose and need. |
| Red Rock 4-Wheelers, Inc. | 206 | 21 | There are several roads missing from the Alternative A map that should be included in Alternative C.  These include (1) two spurs to overlooks on Dry Mesa and an extension of the main road on its eastern end; (2) a road to an overlook in the Tenmile area; and (3) two overlook roads in the Rainbow Rocks area. | The routes in question on Dry Mesa are identified for motorized use in Alternative D of the Travel Plan for the DRMP/EIS.  They are not identified in Alt C due to resource conflicts, particularly wildlife, which the BLM concluded outweighed purpose and need.  These segments are 27532, 27569, 27611, 27644, 27631, 27322, 20323, 27333, 27346, and 27461.  The road to the overlook in the Tenmile area (number 27272) is identified for motorized use in Alternative D, but not in Alts B or C due to conflicts with wildlife and soils resources.  The two overlook roads in the Rainbow Rocks area (numbers 27285, 27460, 27430, 27422, 27394) are identified for motorized use in Alt D only due to wildlife conflicts. |
| Red Rock 4-Wheelers, Inc. | 206 | 22 | (Additional Roads Need Adjustment) Tenmile Wash-An access road into Tenmile from the south is important. It serves as the only access from the rim viewpoints on this side of the wash into the wash itself. It is a well defined road that is only partially shown on the Alternative A map. It starts at the BLM fence line on the western side of the fence at UTM 4285890N 0589660E, roughly parallels the fence for a bit before heading slightly away from it. The Alternative A map terminates it at an ancient playa, but in fact it descends from there on a well defined mechanically constructed road, crosses the small wash to proceed down the other side, through a gate in a fence, and then proceed pretty directly to a descent | See response to comment 206-13. |

BLM_0012591

| | | | down the last little bit into Tenmile at about UTM 4287670N 0588320E. (See map) | |
|---|---|---|---|---|
| San Juan Trail Riders | 207 | 1 | …we support the area and route designations proposed by Ride with Respect, nonprofit. | See response to comments 122-1 to 122-49. |
| San Juan Trail Riders | 207 | 4 | Sections 3.11.1.2.16 and 3.17.2 (pages 3-79 and 3-158) estimate road mileage based on county inventories. They mention that "motorcycle routes" exist around White Wash. The document should specify that this includes motorcycle single track and ATV trails. Additionally, off-highway vehicle trails exist in high concentration from " Utah Rims" to Cottonwood Wash. Isolated OHV routes exist throughout the Moab field office, such as the Thompson Trail. Mountain bike trails also exist beyond those mapped in Alternative D. | See response to comment 122-10. |
| San Juan Trail Riders | 207 | 5 | In the Moab field office, non-road mountain bike, motorcycle, and ATV trails were never inventoried. The only exceptions are roughly 15 square-miles around Bitter Creek and 100 square-miles around White Wash, which together comprise less than 5% of the field office. Grand County's Trail Mix Master Plan highlighted many popular bicycle trails, but was not intended as an inventory. Beyond the county roads, several hundred miles of trail exist, if not thousands. | See response to comment 122-14. |
| San Juan Trail Riders | 207 | 6 | Once the travel plan is implemented, BLM should practice adaptive management by testing mitigation techniques such as visitor education, signage, trail maintenance, and/or rerouting before prohibiting access. Further, the agency should prioritize the development of new bicycle, motorcycle, and ATV trails, with preference to SRMAs, and especially to the appropriate focus areas. Trail expansion would avoid pitting recreational trail users against one another on a rigid system of roads. By the same token, wide wash bottoms should remain open to all vehicles, instead of unduly restricting them to smaller vehicles. | See response to comment 122-14, |

BLM_0012592

| | | | | |
|---|---|---|---|---|
| San Juan Trail Riders | 207 | 9 | (Please refer to maps provided by Ride with Respect, nonprofit)<br>In the ERMA, Thompson Trail is unique by virtue of its sheer length and remoteness. Trail adoption by volunteers could preserve its single track character. Together with Thompson Wash and Copper Ridge Motorcycle Loop, Thompson Tail creates a unique route from the Sovereign Trail to Colorado. The Green River Gap and Browns Wash tie Colorado to the town of Green River. These single track trails should be preserved, along with adjacent two-tracks. Together such remote, rugged routes offer a chance to experience the desert like neither SRMAs nor graded roads can do. | See response to 122-29. |
| San Juan Trail Riders | 207 | 10 | (Please refer to maps provided by Ride with Respect, nonprofit)<br>…Kokopelli's Trail could be enhanced to create higher quality opportunities for motorized and non-motorized travel. The RMP should pledge to construct a Kokopelli Single track and mark a Kokopelli two track that would roughly parallel one another. Through Utah Rims, the single track should be open to motorcycles. Through Yellow Jacket, the single track should actually be an ATV trail. Everywhere else, the single track should be non-motorized. The two track would generally follow the current trail, with revisions to achieve a rugged, backcountry opportunity. | See response to comment 122-30. |
| San Juan Trail Riders | 207 | 11 | (Please refer to maps provided by Ride with Respect, nonprofit)<br>Northeast of Green River, the non-WSA lands surrounding Tusher Canyon have great potential for mountain bike trails. This northwest corner of the Book Cliffs has access roads, rims with sweeping views including Desolation Canyon, and relatively good soil development. Similar to bike trails in Fruita a Tusher Canyon trail system would boost the economy of Green River, and dedicate quality trails for mountain biking. | See response to comment 122-31. |
| San Juan Trail | 207 | 13 | (Please refer to maps provided by Ride with Respect, | See response to comment 122-33. |

BLM_0012593

| | | | | |
|---|---|---|---|---|
| Riders | | | nonprofit)<br>The southwest corner of Labyrinth Rims is a relatively primitive area, and should be managed to preserve this quality. Spring Canyon, Hell Roaring Canyon, Spring Canyon Point, Dead Man Point, and south Horse Thief Point are best allocated as a non-mechanized focus. Motorized use there can be adequately accommodated by the Jeep Safari routes, plus a few choice spurs to overlooks. Closing the river road downstream from Spring Canyon would reduce recreation conflicts, while retaining access to Hey Joe Mine. Dubinky Wash is valuable for all vehicle use, and the single track near jug Rock should remain available for motorcycles. | |
| San Juan Trail Riders | 207 | 14 | (Please refer to maps provided by Ride with Respect, nonprofit)<br>North of Highway 313, the single track which drops off Hidden Canyon Rims is a key link for motorcyclists and bicyclists, alike. The Mill Canyon – Seven Mile Rim mountain bike area should be rotated to become Mill Canyon – Tusher Rims. Tusher has better bicycling potential than Seven Mile due to less sand and more slick rock, with fewer roads. The Seven Mile – Upper Courthouse motorized backcountry touring area could be created to recognize the high-value roads that extend through Monitor and Merrimac to Big Mesa campground. Upper Seven Mile Equestrian Area should be expanded by four square-miles to include some terrain above the rim. | See response to comment 122-33. |
| San Juan Trail Riders | 207 | 15 | (Please refer to maps provided by Ride with Respect, nonprofit)<br>North of Highway 313, the single track which drops off Hidden Canyon Rims is a key link for motorcyclists and bicyclists, alike. The Mill Canyon – Seven Mile Rim mountain bike area should be rotated to become Mill Canyon – Tusher Rims. Tusher has better bicycling potential than Seven Mile due to less sand and more slick rock, with fewer roads. The Seven Mile – Upper | See response to comment 122-34. |

BLM_0012594

| | | | Courthouse motorized backcountry touring area could be created to recognize the high-value roads that extend through Monitor and Merrimac to Big Mesa campground. Upper Seven Mile Equestrian Area should be expanded by four square-miles to include some terrain above the rim. | |
|---|---|---|---|---|
| San Juan Trail Riders | 207 | 16 | (Please refer to maps provided by Ride with Respect, nonprofit) The Klondike Mountain Bike focus area is a great foundation to develop mechanized single track. Most spur roads could be closed east of Bar M and Sovereign Trail areas. Still, the Sovereign ATV Loop should be permitted in its current location. Spur roads should also be closed north of the Copper Ridge Sauropod Trackway. Copper Ridge Motorcycle Loop is highly valuable to motorcyclists. Trail adoption could help to ensure enjoyment for mountain bikers, like Sovereign Trail. And like Sovereign ATV Loop, the Copper Ridge Motorcycle Loop could actually protect any non-mechanized trails that it surrounds by steering motorcyclists toward a legal alternative. | See response to comment 122-36. |
| San Juan Trail Riders | 207 | 17 | (Please refer to maps provided by Ride with Respect, nonprofit) Yellow Cat, Yellow Jacket, and Dome Plateau are worthy of SRMA designation. Yellow Cat and Yellow Jacket are densely roaded and increasingly popular among four-wheeled visitors, so they should have a motorized backcountry touring focus. Few adjustments are needed to the travel plan, except around Owl Canyon where road access should be preserved. A non-mechanized focus area could buffer the entire boundary of Arches national Park, wrap around Dome Plateau, and terminate near Dewey Bridge. Only a couple overlooks of Lost Spring Canyon and Dome Plateau are needed, but they should remain open all the way to the rim. | See response to comment 122-38. |
| San Juan Trail Riders | 207 | 18 | (Please refer to maps provided by Ride with Respect, nonprofit) | See response to comment 122-39. |

BLM_0012595

| | | | Utah Rims SMRA ought to extend further southwest to the Cisco Road. From the Cisco Road to Cottonwood Wash, a mountain bike focus could lay the groundwork for bicycle trails. From Cottonwood Wash to the West Water Road, a motorcycle focus would help preserve Guy's Trail and associated single track trails. From West Water Road to the state line, several existing single track trails should be recognized in the travel plan, plus one ATV loop in the northeast corner of May Flat. A non-mechanized focus area could be expanded from the West Water WSA further southwest all the way to private property. The entire spur road to Big Hole could be closed to enhance primitive characteristics. None the less, the West Water Canyon overlook road should not be closed. Mechanized visitors should be granted at least one viewpoint of the place that their activities are prohibited from. | |
|---|---|---|---|---|
| San Juan Trail Riders | 207 | 19 | (Please refer to maps provided by Ride with Respect, nonprofit) The Dolores Triangle includes a few remote areas where primitive character should be preserved. By closing two less-valuable spurs, Big Triangle substantially expands the West Water road less area to the north. Further south toward Buckhorn Draw, a few roads could be added to ensure that quality motorized opportunities exist in the Dolores Triangle as well. From Steamboat Mesa to South Beaver Mesa, another focus area should be designated for primitive recreation. Half of the Dolores River overlooks could be preserved as cherry stems. Also, a road on the southeast ridge of South Beaver Mesa lies outside of this focus area, and should remain open. | See response to comment 122-40. |
| San Juan Trail Riders | 207 | 20 | (Please refer to maps provided by Ride with Respect, nonprofit) The Sand Flats Road traditionally connected trails such as Hells Revenge, Slickrock, and Fins 'N Things. Paving the road, and prohibiting OHVs from pavement, has | See response to comment 122-41. |

591

| | | | | |
|---|---|---|---|---|
| | | | fragmented the trail system. Thus, OHVs should be permitted to use Sand Flats Road from Hells Revenge exit to the end of the pavement. The new, reduced speed limit of 25 mph should be preserved. A non-motorized lane should be constructed to parallel the road and reduce congestion. Additionally, the ¼-mile slick rock route connecting Slick Rock Trail with Fins 'N Things should be designated for two-wheeled use to alleviate traffic along the main road. All of these measures would make Sand Flats more user-friendly and manageable, without further impacts to the environment. | |
| San Juan Trail Riders | 207 | 21 | (Please refer to maps provided by Ride with Respect, nonprofit)<br>Special policies should continue permitting slick rock exploration. The Moab Field Office Off-Highway Vehicle Travel Map states that "Two-wheel motorcycles are allowed on established slick rock riding areas in the Slick Rock Trail, Bartlett Wash and Tusher Canyon areas and on slick rock areas along the Monitor and Merrimac and Lower Monitor and Merrimac trails where such use does not further disturb vegetation or soils" (dated march 8, 2001 as part of emergency restrictions). In these areas, travel could be further restricted, but not so drastically as the draft RMP intends. Mechanized travel should still be allowed on any barren rock surface. Slick rock within one hundred yards of a designated route could remain open to motorized travel, except for Tusher slickrock which would be reserved for non-motorized travel. This two-hundred yard corridor would accommodate the ways that people currently enjoy slick rock areas. | See response to comment 122-42. |
| San Juan Trail Riders | 207 | 22 | (Please refer to maps provided by Ride with Respect, nonprofit)<br>The Black Ridge area presents many potential recreation opportunities nearby Moab. The South Spanish Valley Mountain bike area could be extended to include part of Pole Canyon. This augments the variety of terrain, and | See response to comment 122-43. |

BLM_0012597

| | | | | |
|---|---|---|---|---|
| | | | provides enough room for a full-day's ride. Sweeping travel restrictions associated with the draft RMP warrant designating an area for specialized sports which depend on unrestricted areas. Durable and irregular terrain that is suitable for motorcycle and bicycle trials riding exits in Pole Canyon from the power lines to Area BFE. In the same vein, a rock crawling area could be established on Black Ridge east of the power lines. This area is littered with old mine roads, and is currently open to cross-country travel. The site could be limited to designated rock crawling routes, and adopted by local clubs. West of the power line, the north flank of Black Ridge could be designated for equestrian use, as the backdrop to a residential area. The south flank could be a bicycle free ride area, since it provides one thousand feet of vertical relief, and graded roads for shuttling. Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road. It should be open for OHVs to create a loop with Behind-The-Rocks while avoiding the highway. | |
| San Juan Trail Riders | 207 | 23 | (Please refer to maps provided by Ride with Respect, nonprofit) Hatch Wash backpacking focus area could be expanded for better backpacking. Alternative C proposes to designate roughly twenty spur roads to the rim of Hatch Wash. However, only five are necessary to view most stretches of the Canyon. | See response to comment 122-45. |
| San Juan Trail Riders | 207 | 24 | (Please refer to maps provided by Ride with Respect, nonprofit) Cameo Cliffs SRMA should also be expanded for better OHV riding. The current boundary offers a meager half-day for the skilled rider. Extending the SRMA east to Big Indian Valley could still avoid mining activity. Shifting the boundary north to the Brown's Hole Road could still skirt the nearby residential area. | See response to comment 122-44. |
| Bookcliff Rattlers Motorcycle | 208 | 19 | BRMC supports the adoption of this recommendation from RWR with modifications.  Kokopelli's Trail could be enhanced to create higher quality opportunities for | See response to comment 122-30. |

BLM_0012598

| Club | | | motorized and non-motorized travel.  The RMP should pledge to construct a Kokopelli Single track and mark a Kokopelli two track that would roughly parallel one another.  Through Utah Rims, the single track should be open to motorcycles.  Through Yellow Jacket, the single track should actually be an ATV trail.  Everywhere else, the single track should be non-motorized.  The two track would generally follow the current trail, with revisions to achieve a rugged, backcountry opportunity. | |
|---|---|---|---|---|
| Bookcliff Rattlers Motorcycle Club | 208 | 20 | BRMC supports the adoption of this recommendation from RWR with modifications.  The single track which drops off Hidden Canyon Rims is a key link for motorcyclists and bicyclists, alike. The Mill Canyon – Seven Mile Rim mountain bike area should be rotated to become Mill Canyon – Tusher Rims. Tusher has better bicycling potential than Seven Mile due to less sand and more slick rock, with fewer roads.  The Seven Mile – Upper Courthouse motorized backcountry touring area could be created to recognize the high-value roads that extend through Monitor and Merrimac to Big Mesa campground.  Upper Seven Mile Equestrian Area should be expanded by four square-miles to include some terrain above the rim. | See responses to comments 122-34 concerning the areas discussed by the commentor and 208-8 concerning the addition of new routes. |
| Bookcliff Rattlers Motorcycle Club | 208 | 22 | BRMC supports the adoption of this recommendation from RWR with modifications.  An additional bicycle focus area west of South Fork Seven Mile Canyon could provide cross-country and vehicle-assisted rides from the upper Gemini trailhead down to the switchbacks on Highway 313.  The Gemini Bridges motorized backcountry touring area could be shifted to include all of Little Canyon Rim.  The spur to Gemini Bridges should remain open to allow the unique experience of driving the bridge.  Mountain bike alternatives to the roads could be developed in this area, as proposed by Trail Mix.  The Gold Bar hiking area could be expanded further up Day Canyon, while only closing one spur road. | See response to comment 122-35 regarding the area south of Highway 313.

The very short spur route to Gemini Bridge has been closed to motorized use in one or more action alternatives due to resource conflicts identified by the BLM in its Travel Plan formulation.  This process is described in detail in Appendix G of the DRMP/EIS. |
| Bookcliff | 208 | 23 | BRMC supports the adoption of this recommendation | See response to comment 122-36. |

BLM_0012599

| | | | | |
|---|---|---|---|---|
| Rattlers Motorcycle Club | | | from RWR with modifications.  The Klondike Mountain Bike focus area is a great foundation to develop mechanized single track.  Most spur roads could be closed east of Bar M and Sovereign Trail areas.  Still, the Sovereign ATV Loop should be permitted in its current location.  Spur roads should also be closed north of the Copper Ridge Sauropod Trackway.  Copper Ridge Motorcycle Loop is highly valuable to motorcyclists.  Trail adoption could help to ensure enjoyment for mountain bikers, like Sovereign Trail.  And like Sovereign ATV Loop, the Copper Ridge Motorcycle Loop could actually protect any non-mechanized trails that it surrounds by steering motorcyclists toward a legal alternative. | |
| Bookcliff Rattlers Motorcycle Club | 208 | 24 | BRMC supports the adoption of this recommendation from RWR with modifications.   The Dolores Triangle includes a few remote areas where primitive character should be preserved. By closing two less-valuable spurs, Big Triangle substantially expands the West Water road less area to the north.  Further south toward Buckhorn Draw, a few roads could be added to ensure that quality motorized opportunities exist in the Dolores Triangle as well.  From Steamboat Mesa to South Beaver Mesa, another focus area should be designated for primitive recreation.  Half of the Dolores River overlooks could be preserved as cherry stems.  Also, a road on the southeast ridge of South Beaver Mesa lies outside of this focus area, and should remain open. | See response to comment 122-40. |
| Bookcliff Rattlers Motorcycle Club | 208 | 27 | BRMC supports the adoption of this recommendation from RWR with modifications.  In the ERMA, Thompson Trail is unique by virtue of its sheer length and remoteness.  Trail adoption by volunteers could preserve its single track character.  Together with Thompson Wash and Copper Ridge Motorcycle Loop, Thompson Tail creates a unique route from the Sovereign Trail to Colorado.  The Green River Gap and Browns Wash tie Colorado to the town of Green River.  These single track trails should be preserved, along with adjacent two- | See response to comment 122-29. |

BLM_0012600

| | | | | |
|---|---|---|---|---|
| | | | tracks. Together such remote, rugged routes offer a chance to experience the desert like neither SRMAs nor graded roads can do. | |
| Glen Canyon Group | 209 | 32 | Re: Labyrinth Rims/Gemini Bridges SRMA: Alternative C should establish the Tenmile Hiking and Equestrian Focus area; Tenmile Canyon should be closed to motorized use to ensure protection of cultural resources.<br>Gemini Bridges is a world-class arch, one of the best outside the National Parks. Protect it by outlawing all vehicles on the bridge itself. Close and restore damaged lands in the Canyon under Gemini Bridges. (page 2-25) | The commentor's preferences are incorporated in Alternative B. The BLM can chose from any of the alternatives in formulating the PRMP/FEIS. Also see response to comment 209-3.<br><br>The spur route to Gemini Bridges and the bridges themselves have been closed to motorized use under all action alternatives. The route accessing the land beneath Gemini Bridges has been closed to motorized use in all action alternatives. Restoration of this land is an implementation action and does not require a land use plan decision. |
| Glen Canyon Group | 209 | 33 | Re: Labyrinth Rims/Gemini Bridges SRMA: Dee Pass (Alternative C): The Section 106 cultural resources inventory should be done before, not after, designation as a motorcycle/ATV "specialized sport venue," in order to protect all eligible sites. This should apply to existing and new routes as well as granting permits for competitive events. (page 2-25) | As stated in Washington Office Instruction Memorandum 2007-030, Section 106 cultural clearances are only required for decisions proposing new routes or designating new open OHV areas, neither of which is proposed in Alt C. There is no requirement for a Section 106 inventory for competitive events, unless they fall under the exceptions outlined above. |
| Glen Canyon Group | 209 | 34 | Non-mechanized recreation: Steelbender and Pritchett Canyon should be one-way in order to prevent trail widening and damage to vegetation. (page 2-27) | The action requested by the commentor can be done at the implementation level, should the authorizing officer deem it appropriate. Implementation decisions do not require a land use planning decision. |
| Glen Canyon Group | 209 | 35 | Hidden Valley trail should be hiking only to avoid erosion and user conflicts. The trail is not really conducive to bicycling. This is a favorite hiking trail for visitors and should be maintained solely for tourists and local hikers. (page 2-27) | The BLM monitors the condition of this trail on a regular basis, and has not noted any degradation of the trail which is attributable to mountain bike use. The BLM has not received complaints regarding user conflicts between bicyclists and hikers. The trail could be closed to mountain bike use should such use be determined to impair wilderness character. This action could be undertaken under the Interim Management Policy for Lands Under Wilderness Review. It does not require a land use planning decision. |

BLM_0012601

| Glen Canyon Group | 209 | 39 | Re: Ten Mile Wash Potential ACEC<br>Furthermore, there should be no vehicular travel in Ten Mile at all under any alternative because speed limits cannot be enforced and because it has proven impossible to keep vehicles out of side canyons. For example, repeated re-signing of Trough Canyon has been ineffective. We have hiked the area several times and have seen motorcycle tracks up and down Trough as well as downed signs. | See responses to comments 124-38, 122-18 and 124-21. |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 40 | No new motorized or mechanized travel routes should be established within the Canyon Rims potential ACEC.<br><br>All or portions of several potential ACECs should undergo a Class III cultural resources inventory.  These potential ACECs include Behind the Rocks, Bookcliffs, Mill Creek Canyon, and Upper Courthouse. | This area is limited to designated routes under all alternatives.  Identifying any additional routes could be done on a site-specific basis in the future, and would require site-specific environmental analysis.  The Canyon Rims Recreation Area Management Plan does not call for new OHV routes in this area.<br><br>A Class III inventory is not required as part of the ACEC identification or designation process.  ACEC designation is sought to protect areas of high cultural occurrence. The BLM may prioritize certain ACECs (or other designations) for a Class III inventory, but the inventory itself is not a planning decision. |
| Glen Canyon Group | 209 | 41 | Re: White Wash Potential ACEC<br>…however, we suggest that the BLM retain the option of closing the White Wash Sand Dunes to open use if damage is occurring to the riparian dune system and/or if OHVs are damaging resources outside the open use area. Its proximity to Ten Mile leads to vehicles – especially ATVs, crossing over into more fragile areas. (pages 2-38 and 2-39) | The BLM can change the OHV designation for White Wash from "open" to another category (such as "limited") if conditions warrant, although such an action would require a future plan amendment. |
| Blueribbon Coalition, Inc. | 211 | 1 | White Wash Dunes Management Plan is unacceptable. | This comment represents the opinion of the commentor. For specific information on White Wash, see response to comments 120-83, 123-10 and 123-35. |
| Blueribbon Coalition, Inc. | 211 | 2 | Please keep the Thompson Loop and Tenmile Wash trails open. They are both widely enjoyed by me, and my friends and family. | See response to comment 122-29 for the Thompson Trail. Tenmile Wash is open to motorized travel in Alts A, C and D. |

BLM_0012602

| Blueribbon Coalition, Inc. | 211 | 65 | I would like for you to consider designating more ATV trails, especially between White Wash and Red Wash. | See response to comment 122-15 and 122-30. |
|---|---|---|---|---|
| Blueribbon Coalition, Inc. | 211 | 66 | Please keep the Gemini Bridges road open. The natural stone bridges are awesome. I would like to be able to ride the Thompson trail and Copper Ridge loop in the future. | See response to 211-55. |
| Blueribbon Coalition, Inc. | 211 | 70 | BLM's open areas should be located along existing boundary roads of Duma Point, Ruby Ranch, Blue Hills road. | See response to comment 123-35. |
| Blueribbon Coalition, Inc. | 211 | 71 | The FEIS should designate more ATV trails, between Ruby Wash and White Wash. | See response to comments 122-15 and 122-30. |
| Blueribbon Coalition, Inc. | 211 | 74 | The White Wash area that is open is too small. The White Wash ACEC is not appropriate. I strongly oppose ACEC Alternative B. | See response to comment 123-35. |
| Blueribbon Coalition, Inc. | 211 | 75 | I oppose closing "the Dunes" to motorized travel as proposed in Alternative B. | The opinion of the commentor is noted. |
| Blueribbon Coalition, Inc. | 211 | 76 | Please keep existing riparian washes open. | See response to comment 122-14. |
| Blueribbon Coalition, Inc. | 211 | 77 | Keep the Copper Ridge loop and Thompson trail open as proposed by Ride with Respect. | See response to comments 122-29 and 122-36. |
| Blueribbon Coalition, Inc. | 211 | 78 | Keep open the last bit of the Gemini Bridges road. I look forward to being able to drive across a natural bridge. | See response to comment 206-14. |
| Blueribbon Coalition, Inc. | 211 | 79 | Although there are many ATV roads open on BLMs travel plan some motorcycle routes should be introduced as ATV routes as well. | See response to comment 120-90. |
| Blueribbon Coalition, Inc. | 211 | 80 | The FEIS should consider designating more ATV trails, especially between White Wash and Red Wash. | See response to comments 122-15 and 122-30. |
| Blueribbon Coalition, Inc. | 211 | 87 | Another area that we use at present is the Rabbit Valley – Westwater area. It is close to Grand Junction and has long been a multiple use area. No changes in the area are necessary. | See response to comment 122-39. This area, called Utah Rims, is proposed as an SRMA to enhance route opportunities in the preferred alternative. |
| Blueribbon Coalition, Inc. | 211 | 88 | The Yellow Cat area is an area that is very conducive to motorized recreation and multiple use. | See response to comment 122-38. All travel in the Yellow Cat area would be in accordance with the Travel Plan in the preferred alternative. |
| Blueribbon Coalition, Inc. | 211 | 90 | The triangle area on Glade park should remain open to allow public access to the west end of Pinyon Mesa. | The "Triangle" area is proposed to be limited to designated roads and trails under all action alternatives. |

BLM_0012603

| | | | | The commentor should specify exactly which route he is referring to. |
|---|---|---|---|---|
| Blueribbon Coalition, Inc. | 211 | 8 | Issue – Special Recreation Management Area: If SMRA are to be used there are several that need to be expanded. The Utah Rims area needs to be interlaced with Rabbit Valley in Colorado since most of the trails start in Colorado it only makes sense to have only one staging area. The trails of this area should extend further west to include Mel's Loop. | See response to comment 122-39. |
| Blueribbon Coalition, Inc. | 211 | 9 | Issue: Some important motorcycle trails are missing from all of the alternatives. Specifically the Copper Ridge Trail should connect to the Thompson Trail. Non-riparian washes should be included in the plan. Additional inventories should be allowed and considered for implementation. | See response to comment 122-36 for discussion of the Copper Ridge route.  See response to comment 122-14 for discussion of riding in washes.  See response to comments 122-15 and 122-30 for a discussion of adding routes. |
| Blueribbon Coalition, Inc. | 211 | 10 | Issue: Keep White Wash Sand Dunes open. This is an area that has been a very popular area for all people to enjoy. There is not a weekend that goes by that people are not out there enjoying the experience. This is an area that restores itself and should remain as an open area. | White Wash is open in the preferred alternative, Alt. C.  In addition, the open area has been expanded to the west to accommodate dispersed camping (see response to comment 120-83). |
| Blueribbon Coalition, Inc. | 211 | 15 | Please do not use these issues to effectively close down public land recreation areas such as White Wash Sand Dunes! | White Wash Sand Dunes are open to cross country travel in Alts. C and D. |
| Blueribbon Coalition, Inc. | 211 | 16 | I love to go jeeping in the White Wash Sand Dunes so I would hate to see it closed to us and everyone else who wheels there. | See response to comment 211-15. |
| Blueribbon Coalition, Inc. | 211 | 18 | Keep Gemini Bridges road (the stone bridge) open. | See responce to comment 206-14. |
| Blueribbon Coalition, Inc. | 211 | 19 | Keep the Thompson Trail and the Copper Ridge Loop as proposed by ride with respect. | See response to comments 122-29 and 122-36. |
| Blueribbon Coalition, Inc. | 211 | 20 | Ten Mile Wash, a popular area, should be accessible from the dunes area and open to the river, areas that have been in use for years should remain open. | Routes are available in all action alternatives of the Travel Plan to enable motorized users to access the dunes area from Ten Mile wash.  Ten Mile wash itself remains available for motorized travel on the designated route in Alt. C. |

599

BLM_0012604

| Blueribbon Coalition, Inc. | 211 | 23 | The three alternatives aren't much different from each other. Alternative D fails to provide true motorized focus and renders Rabbit Valley/Westwater non-motorized. This area is a very important area for motorized users from western Colorado. | Alternative D does not identify Utah Rims (which is the Utah side of Rabbit Valley) as an SRMA with a motorized focus. Travel would remain available in Utah Rims in accordance with the Travel Plan accompanying Alt. D. |
|---|---|---|---|---|
| Blueribbon Coalition, Inc. | 211 | 24 | In the Moab BLM's travel plan some ATV trails are not proposed as open and some of the motorcycle routes should be designated ATV trails as well. More ATV trails are needed in White Wash and Red Wash and we suggest looking closely at the plan. | See response to comment 120-90 for a discussion of ATV vs. motorcycle routes. See response to comments 122-15 and 122-30 for a discussion of adding new routes subsequent to the RMP. |
| Blueribbon Coalition, Inc. | 211 | 26 | We have no objections to multiple use of most trails but realize mountain bike trails are in short supply. Mill Canyon – Sevenmile Rim biking areas should be expanded and the travel plan should extend the south Spanish Valley bike area further south toward Black Ridge if possible. | See response to comments 122-34 and 122-43.. |
| Blueribbon Coalition, Inc. | 211 | 27 | We honor "travel limited to designated roads, trails, and areas" wherever we ride but feel some areas could be expanded such as the White Wash open area and the Sand Flats recreation area. | The White Wash open area has been expanded slightly to accommodate a popular hill climb and camaping area. See response to comments 122-42 and 123-35 for a further discussion of expansion of open areas. |
| Blueribbon Coalition, Inc. | 211 | 28 | Please keep the following routes open – Gemini Bridges, the Thompson trail and the Copper Ridge Loop (Ride with Respect) and Ten Mile Wash – we have ridden these trails for many years and feel they should remain open. | See response to comments 206-14 (Gemini Bridges), 122-29 (Thompson Trail), 122-36 (Copper Ridge Trail) and 211-20 (Ten Mile Wash) |
| Blueribbon Coalition, Inc. | 211 | 34 | One of our favorite trails goes to Gemini Bridges. I would hate to see any changes made to that trail. It is such a beautiful area it would be a shame to limit access to that area as it is right now. | See response to comment 206-14. |
| Blueribbon Coalition, Inc. | 211 | 35 | Ten Mile Wash has been an ATV trail for many years and should remain open. | See response to comment 211-20. |
| Blueribbon Coalition, Inc. | 211 | 39 | I am definitely against the closing of any OHV trails that are now open. | See response to comment 208-2. |
| Blueribbon Coalition, Inc. | 211 | 40 | The White Wash "area" is much too small and should be expanded. Additionally the idea of closing the White Wash Sand Dunes is truly alarming! Riding the dunes as | See response to comments 120-83 and 123-35. White Wash is available for open cross country travel in Alt. C. |

BLM_0012605

| | | | | |
|---|---|---|---|---|
| | | | part of our club's night ride is a tradition and one that is very important to a lot of people. | |
| Blueribbon Coalition, Inc. | 211 | 41 | I ask you not to close Ten Mile Wash. It has been a popular OHV route for several decades now. | See response to comment 211-20. |
| Blueribbon Coalition, Inc. | 211 | 42 | The plan seems to recommend closure of washes that have had vehicle use for many years. | Certain washes would be designated for travel under Alt. C. All washes, however, are not available for travel. See response to comment 122-14 for more information. |
| Blueribbon Coalition, Inc. | 211 | 45 | I support leaving White Wash Sand Dunes and surrounding areas open to "open" (cross country) recreation. This is one of few areas left that sustains this type of use. Slickrock is another sustainable terrain of open/cross country travel. | White Wash Sand Dunes is avialable for open travel under Alt. C. See response to comment 122042 for a discussion of slickrock exploration. |
| Blueribbon Coalition, Inc. | 211 | 49 | I oppose the fee area in the White Wash Sand Dunes in Alternatives C and D. That area in Alternatives C and D needs to be expanded also. It's much too small. The whole White Wash Sand Dunes management plan isn't a good plan in my opinion. If you put fences around the trees they will be down the first big rain. It will be a waste of money and you will have to put them back up over and over again. It's totally unpractical. | See response to comments 123-10 (fees), 123-35 (larger open area) and 208-3 and 479-6 (cottonwoods). |
| Blueribbon Coalition, Inc. | 211 | 50 | The trails need to be for ATV's and motorcycles both. It's too hard to make separate areas for each user group. We sometimes have friends that will come ride with our ATV's and they have a motorcycle. Are they not to ride with me? I hope not. We need more trails not less. | The BLM recognizes motorized singletrack as a recreation resource. Some routes are to be designated solely for two-wheeled use. However, the issue of shared routes is discussed in response to comment 120-90. |
| Blueribbon Coalition, Inc. | 211 | 52 | I am concerned over several issues surrounding White Wash Sand Dunes. One is the closure and restriction of existing motorcycle single track. Single track should be left open, particularly Copper Ridge and Thompson Trail should be combined. Non riparian washes should be left open. The challenges found on some of these trails are exhilarating. | No specific concern is listed for White Wash Sand Dunes. The BLM designates mileage of motorcycle single track in both Alts C and D. See response to comments 122-36 and 122-29 for Thompson Trail and Copper Ridge. See response to comment 122-14 for a discussion of riding in washes. |
| Blueribbon Coalition, Inc. | 211 | 55 | Please keep the following routes open: The last bit of Gemini Bridges road, the Thompson Trail and Copper Ridge loop as proposed by Ride with Respect. Ten Mile Wash – popular washes that have had vehicle use for | See response to comments 206-14 (Gemini Bridges), 122-29 (Thompson Trail), 122-36 (Copper Ridge) and 211-20 for Ten Mile wash. |

BLM_0012606

| | | | many years should remain open. | |
|---|---|---|---|---|
| Blueribbon Coalition, Inc. | 211 | 56 | We love the Sand Dunes and Ten Mile Wash and all the surrounding areas. Please keep them open. | The sand dunes are open to cross country travel in the preferred alternative, and the route in Ten Mile Wash is designated for travel in that alternative as well. |
| Blueribbon Coalition, Inc. | 211 | 57 | I would like to keep the White Wash area open to everyone. | See response to comment 211-56. |
| Blueribbon Coalition, Inc. | 211 | 58 | I am also against special fees in this area. Special recreation permits and fees are not supported by me. Fees should be implemented by public process. The public lands should be open to the public. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 63 | Please keep the following routes open: the last bit of Gemini Bridges road, the Thompson Trail and the Copper Ridge loop as proposed by Ride with Respect, and Ten Mile Wash. | See response to comment 211-55. |
| Blueribbon Coalition, Inc. | 211 | 93 | There is no need for change in the White Wash Sand Dunes. Please keep it open as possible for future multiple use. | See response to comments 123-10. |
| Blueribbon Coalition, Inc. | 211 | 94 | I support designating more ATV trails, especially between White Wash and Red Wash. I suggest looking at the proposal made by Ride with Respect. | See response to comments 122-15 and 122-30 as well as the entire response to comments from commentor #122 (Ride with Respect). |
| Blueribbon Coalition, Inc. | 211 | 96 | Currently the White Wash, Ten Mile, Dead Cow loop provide a great experience for motorcycle riding. These routes have been long time favorites. | All three routes (with the exception of the low water variant of the Dead Cow route along the Green River) are in the preferred alternative. |
| Blueribbon Coalition, Inc. | 211 | 101 | The idea of making the White Wash Sand Dunes into a hiking and equestrian area is ridiculous!  How many people or horses would have the strength or stamina to hike or travel through loose sand that is 6-12 inches deep? Making this an exclusive use area of this nature would effectively close the area. | There is no mention of White Wash as an equestrian area in any of the alternatives accompanying the DRMP/EIS. The White Wash area is proposed as a hiking area in Alt. B only. |
| Blueribbon Coalition, Inc. | 211 | 103 | If there is an existing two track to a site that has been historically used (for camping) it should not be closed. | Many such spurs to dispersed sites are available in the preferred Travel Plan alternative.  Access to campsites was considered an express purpose and need for designating a route. |
| Bill Barrett Corporation | 214 | 22 | The BLM should include a map showing the location of the Old Spanish Trail so that the public and oil and gas operators such as BBC understand how the trail | The National Park Service is currently preparing the Draft Comprehensive Management Plan/Environmental Impact Statement for the Congressionally designated Old |

BLM_0012607

| | | | | |
|---|---|---|---|---|
| | | | designation may impact future uses of the public lands. | Spanish Trail. Maps will be included in this document when it is issued to the public expected by the end of year 2008. The commentor should refer to this document for detailed maps when it is competed. The DRMP/EIS states on pg. 2-39 that this Old Spanish Trail Comprehensive Management Plan will be incorporated into the Moab RMP based on a Congressional mandate. |
| | 216 | 1 | I support the area and route designations proposed by Ride with Respect, nonprofit | NRR |
| | 216 | 4 | Sections 3.11.1.2.16 and 3.17.2 (pages 3-79 and 3-158) estimate road mileage based on country inventories. They mention that "motorcycle routes" exist around White Wash. The document should specify that this includes motorcycle singletrack and ATV trails. Additionally, off-highway vehicle trails exist in high concentration from "Utah Rims" to Cottonwood Wash. Isolated OHV routes exist throughout the Moab field office, such as the Thompson Trail. Mountain bike trails also exist beyond those mapped in Alternative D | See response to comment 122-46 |
| | 216 | 5 | In the Moab field office, non-road mountain bike, motorcycle, and ATV trails were never inventoried. The only exceptions are roughly 15 square-miles around Bitter Creek and 100 square-miles around White Wash, which together comprise less than 5% of the field office. Grand County's Trail Mix Master Plan highlighted many popular bicycle trails, but was not intended as n inventory. Beyond the county roads, several hundred miles of trail exist, if not thousands.<br>Short of performing an inventory of trails, Moab BLM plans should at least acknowledge that they cannot fully measure the impacts to bicycling, motorcycling, and ATV riding in the absence of train inventory. To compensate for this, the agency should consider designation trail data provided during the planning process. Once the travel plan is implemented, BLM should practice adaptive management by testing mitigation techniques such as visitor education, signage, trail maintenance, and/or | See response to comment 122-46 |

603

BLM_0012608

| | | | | |
|---|---|---|---|---|
| | | | rerouting before prohibiting access.  Further, the agency should prioritize the development of new bicycle, motorcycle, and ATV trails, with preferences to SRMAs, and especially to the appropriate focus areas.  Trail expansion would avoid pitting recreationists against one another on a rigid system of roads.  By the same token, wide wash bottoms should remain open to all vehicles, instead of unduly restucting them to smaller vehicles. | |
| | 216 | 9 | In the ERMA, Thompson Trail is unique by virtue of its sheer length and remoteness.  Trail adoption by volunteers could preserve its singletrack character.  Together with Thompson Wash and Copper Ridge Motorcycle Loop, Thompson Trail creates a unique route from Sovereign Trail to Colorado.  The Green River Gap and Browns Wash tie Colorado to the town of Green River.  These singletracks should be preserved along with adjacent doubletracks.  Together such remote, rugged routes offer a chance to experience the desert like neither SRMAs nor graded roads can do. | See response to comment 122-29 |
| | 216 | 10 | Likewise, Kokopelli's Trail could be enhanced to create higher quality opportunities for motorized and non-motorized travel.  The RMP should pledge to construct a Kokopelli Singletrack and mark a Kokopelli Doubletrack that would roughly parallel one another.  Through Utah Rims, the Singletrack should be open to motorcycles.  Through Yellowjacket, the Singletrack should actually be ATV trail.  Everywhere else, the Singletrack should be non-motorized.  The Doubletrack would generally follow the current trail, with revisions to achieve a rugged, backcountry opportunity. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 216 | 11 | Northeast of Green River, the non-WSA alnds surrounding Tusher Canyon have great potential for mountain bike trails.  This northwest corner of the Bookcliffs has access roads, rims with sweeping views including Desolation Canyon, and relatively good soil development.  Similar to bicycle trails in Fruita, a Tusher Canyon trail systerm would boost the economy of Green | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012609

| | | | | |
|---|---|---|---|---|
| | | | River and dedicate quality trails for mountain biking. | |
| | 216 | 13 | The southwest corner of Labyrinth Rims is a relatively primitive area, and should be managed to preserve this quality.  Spring Canyon, Hellroaring Canyon, Spring Canyon Point, Deadman Point, and south Horsethief Point are best allocated as a non-mechanized focus.  Motorized use there can be adequately accommodated by the Jeep Safari routes, plus a few choice spurs to overlooks.  Closing the river road downstream from spring Canyon would reduce recreation conflicts, while retaining access to Hey Joe Mine.  Dubinky Was is valuable for all vehicle use, and the singletrack near Jug Rock should remain available for motorcycles | See response to comment 122-46 |
| | 216 | 14 | North of Highway 313, the singletrack which drops off Hidden Canyon Rims is a key link for motorcyclists and bicyclists, alike.  The Mill Canyon-Sevenmile Rim mountain bike area should be rotated to become Mill Canyon-Tusher Rims.  Tusher has better bicycling potential then Sevenmile due to less sand, more slickrock, and fewer roads.  Then Sevenmile-Upper Courthouse motorized backcountry touring area could be created to recognize the high-value roads that extend through Monitor & Merrimac to Big Mesa campground.  Upper Sevemile Equestrian Area should be expanded by four square-miles to include some terrain above the rim | See response to comment 122-46 |
| | 216 | 15 | South of Highway 313, an additional focus area west of south Fork Sevenmile Canyon could provide cross-country and vehicle-assisted rides from the upper Gemini trailhead down to the switchbacks on Highway 313.  The Gemini Bridges motorized backcountry touring area could be shifted to include all of Little Canyon Rim.  The spur to Gemini  Bridges should remain open to allow the unique experience of driving the bridge.  Mountain bike alternates to the roads cold be developed in this area, as proposed by Trail Mix.  The Goldbar hiking area could be expanded further up Day Canyon, while only closing one spur road. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012610

| | 216 | 16 | The Klondike Mountain Bike focus area is a great foundation to develop mechanized singletrack. Most spur roads could be closed east of Bar M and Sovereign Trail areas. Still, the Sovereign ATV Loops should be permitted in its current location. Spur roads should also be closed north of the Copper Ridge Sauropod Trackway. Copper Ridge Motorcycle Loop is highly valuable to motorcyclists. Trail adoption could help to ensure enjoyment for mountain bikers, like the Sovereign Trail. And like the Sovereign ATV Loop, the Copper Ridge Motorcycle Loop could actually protect any non-mechanized trails that it surrounds by steering motorcyclists toward a legal alternative | See response to comment 122-46 |
| | 216 | 17 | Yellow Cat, Yellow Jacket, and Dome Plateau are worthy of SRMA designation. Yellow Cat and Yellow Jacket are densely roaded and increasingly popular amount four-wheeled visitors, so they should have a motorized backcountry touring focus. Few adjustments are needed to the travel plan, except around Owl Canyon where road access should be preserved. A non-mechanized focus area could buffer the entire boundary of Arches National Park, wrap around Dome Plateau, and terminate near Dewey Bridge. Only a couple overlooks of Lost Spring Canyon and Dome Plateau are needed, but they should remain open all the way to the rim. | See response to comment 122-38 |
| | 216 | 18 | Utah Rims SRMA ought to extend further southwest to the Cisco Road. From the Cisco Road to Cottonwood Wash, a mountain bike focus could lay the groundwork for bicycle trails. From Cottonwood Wash to the Westwater Road, a motorcycle focus would help preserve Guy's Trail and associated singletracks. From Westwater Road to the state line, several existing singletracks should be recognized in the travel plan, plus one ATV loop in the northeast corner of May Flat. A non-mechanized focus area could be expanded from the Westwater WSA further southwest all the water to private property. The entire spur road to Big Hold could | See response to comment 122-39 |

BLM_0012611

| | | | | |
|---|---|---|---|---|
| | | | be closed to enhance primitive characteristics.  Non the less, the Westwater Canyon overlook road should not be closed.  Mechanized visitors should be granted at least one viewpoint of the place that their activities are prohibited from. | |
| | 216 | 20 | The Sand Flats Road traditionally connected trails such as Hells Revenge, Slickrock, and Fins 'N Things.  Paving the road, and prohibiting OHVs from pavement, has fragmented the trail system.  Thus OHVs should be permitted to use Sand Flats from Hells Revenge exit to the end of the pavement.  The new, reduced speed limit of 25 mph should be preserved.  A non-motorized lane should be constructed to parallel the road and reduce congestion.  Additionally, the 1/4-mile slickrock route connecting Slickrock Trail with Fins 'N Things should be designated for two-wheeled use to alleviate traffic along the main road.  All of these measure would make Sand Flats more user-friendly and manageable, without further impacts to the environment. | See response to comment 122-42 |
| | 216 | 21 | Special policies should continue permitting slickrock exploration.  The Moab Field Office Off-Highway Vehicle Travel Map states that "Two-wheel motorcycles are allowed on established slickrock riding areas in the slickrock Trail, Bartlett Wash and Tusher Canyon areas and on slickrock areas along the Monitor and Merrimac and Lower Monitor and Merrimac trails where such use does north further disturb vegetation or soils" (dated March 8, 2001 as part of emergency resections) In these areas, travel could be further restricted, but not so drastically as the draft RMP intends.  Mechanized travel should still be allowed on any barren rock surface.  Slickrock within one hundred yards of designated route could remain open to motorized travel, except for Tusher slickrock, which would be reserved for non-motorized use.  This two-hundred yard corridor would accommodate the ways that people currently enjoy slickrock areas | See response to comment 122-42 |

BLM_0012612

| | 216 | 22 | The Black Ridge area presents many potential recreation opportunities nearby Moab. The South Spanish Valley Mountain bike area could be extended to include part of Pole Canyon. This augments the variety of terrain, and provides enough room for a full-days's ride. Sweeping travel restrictions associated with the draft RMP warrant designating an area for specialized sports which depend on unrestricted areas. Durable and irregular terrain that is suitable for motorcycle and bicycle trails riding exists in Pole Canyon for the powerlines to Area BFE. In the same vein, a rock crawling area could be established on black Ridge east of the powerlines. This area is littered with old mine roads, and is currently open to cross-country travel. The site could be limited to designated rock crawling routes, and adopted by local clubs. West of the powerline, the north flank of Black Ridge could be designated for equestrian use, and the backdrop to a residential area. The south flank could be a bicycle freeride area, since it provides one thousand feet of vertical relief, and graded roads for shuttling. Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road. It should be open for OHVs to create a loop with Behind-The-Rocks while avoiding the highway | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|
| | 216 | 23 | Hatch Wash backpacking focus area could be expanded for better backpacking. Alternative C proposes to designate roughly twenty spur roads to the rim of Hatch Wash. However, only five are necessary to view most stretches of the Canyon | See response to comment 122-45. The backpacking opportunities in Hatch Wash are below the rim. There are no backpacking opportunities on top of the canyon. |
| | 259 | 1 | The Green from Labyrynth Canyon to the confluence should be enjoyed without the distrubance of motors. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| | 260 | 1 | Please consider an alternatate plan that will not impact the river user so negatively at Ten Mile and Spring | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under |

608

BLM_0012613

| | | | | |
|---|---|---|---|---|
| | | | Canyons. | Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 261 | 1 | I would like to see Gemini Bridges remain open to motorized users after blocking off all extranous roues into the birdges.  The historic use of the are ais important but has been abused.  I urge you to keep it open, while working with the community to repair damage and begin controlled use of the area. | See response to comment 206-14 |
| Ruby Ranch | 264 | 1 | The maps outlining the White Wash "open area" are not in enough detail to make any detailed analysis of your proposals. | The White Wash open area comprises 1,866 acres east of the Ruby Ranch road.  It primarily encompasses the sand dunes proper. |
| Ruby Ranch | 264 | 2 | It is very clear that BLM intends to make a large area in White Wash "open" to motorized use. We request that any "open" areas do not directly border our private property and that there is an adequate buffer between our private property and any designated open area.  Please include a .25 - .5 mile buffer to minimize the vandalism and destruction of property that has been occuring ( fence vandalism-- wires cut, posts used for firewood, gates destroyed-- also property  shot at, livestock hassasment, etc). See attached map. | The BLM proposes an open area of fewer than 2,000 acres in White Wash.  The open area is primarily the sand dunes themselves.  Everywhere else, all travel would be limited to designated routes.  The acreage of open area in the PRMP/FEIS has been greatly reduced from the acreage of open area in the No Action (current) alternative.  The southwest boundary of the open area has been adjusted to provide a buffer between the open area and the private property to accommodate the commentor. |
| Ruby Ranch | 264 | 5 | We are requesting that the area close to the Ruby Ranch and north of the Ruby Ranch Ranch road , where there are no currently roads or designated trails be left closed to OHV use so that livestock and wildlife have a safety zone. | The area referred to by the commentor is not within the Dee Pass Motorized Focus Area in Alt C.  The area has been limited to designated routes in the PRMP/FEIS. New route construction would be minimized in this area because it is not within a focus area intended to provide for such uses.  Any new route authorized in this area would be required to undergo site specific NEPA analysis.  The Dee Pass Motorized Focus Area was drawn to specifically exclude the area to the north of the commentor's property. |
| Ruby Ranch | 264 | 8 | I would suggest closing the upper portion of White Wash to all motorized use. | The commentor provides no specific evidence as to why the upper portion of White Wash should be closed, nor is |

BLM_0012614

| | | | | the "upper portion" of White Wash defined. |
|---|---|---|---|---|
| Ruby Ranch | 264 | 9 | There are many roads and trails that have been created in these areas in the last 20 years. Many of the roads and trails have been included in BLM planning and have been included on the Moab BLM planning maps. Many of these roads and trails were created in violation of BLM policy. Many were included in the inventory after someone on an OHV logged their favorite trails on a GPS and brought them into the Moab FO. Have these newly constructed roads and trails has to undergo any significant scrutiny? | The BLM acknowledges that the singletrack motorcycle routes included in the DRMP/EIS analysis were user made. Those that were made in "open" areas were not in violation of any law. Those that were made in "limited" areas may have been in violation, but it is difficult to prove what was "existing" prior to 1985, which was the timeframe of the RMP which limited travel to existing routes in some areas of the Moab planning area. This difficulty is one reason why the current plan revision does not propose that any area be limited to existing roads -- all routes in the travel plan are to be limited to mapped, designated routes.

Appendix G explains the Travel Plan process. County-submitted route data was verified by BLM using random sampling techniques. All route data submitted by the public was verified on the ground by BLM staff. Those routes that actually existed on the ground were considered in the Travel Plan formulation. Those routes that presented resource conflicts (those resources are listed in Appendix G) were not designated in one or more alternatives. Thus, the BLM provided scrutiny" regarding those routes that are to be designated in the Travel Plan accompanying the PRMP/FEIS.

After the Record of Decision, all new routes must undergo a case by case NEPA analysis. Travel off those routes designated in the Travel Plan will be illegal. The legal routes will be known, mapped and incontrovertable. |
| | 266 | 1 | Protect areas like Beaver Creek, Behind-the-Rocks, Desolation Canyon, Fisher Towers, Goldbar, Granite Creek, Hatch Wash, Hunter Canyon, Mary Jane Canyon, Shafer Canyon, Westwater Canyon, Coyote Wash from OHV use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012615

| | 268 | 2 | There are missing trail segments on Flat Iron Mesa and 3D, and there have been private land issues on Strike Ravine. Our request is that missing segments be included in the final plan, including the segment on Strike, which has been settled in court. | See response to comment 206-11 |
|---|---|---|---|---|
| | 269 | 2 | Your open area at White Wash in Alternative C and D must be expanded. The current proposal is unworkable because it closes the killer hill climb and camping area to the west of the Dunes. | See response to comment 123-35 |
| | 271 | 2 | White Wash Sand Dunes Open OHV area: It should be enlarged. There should be a better mix of sand and slick rock with a logical boundary. | See response to comment See response to comment 123-35 |
| | 271 | 4 | Motorcycle: Single Track Routes. In several cases, motorcycle trails shown in Alternatives C and D have been used for several years, and are currently being used, by ATVs and or 4x4s as integral segments of longer loop routes. Most of all these trails have been used by ATVs from the mid 1980s. We feel these routes should be designated as motorized, or ATV/OHM routes, with some as 4x4. When we contacted your office we were told that the ATV community did not ask for any routes. This is not true PLEAA used your TRIMBLE GPS and did this inventory for the Moab Field Office. Putting these routes as motorcycle only on this draft RMP shows a bias and a predetermination of the outcome. The proposed changes in these route designations are shown on the attached maps. Also, the initial inventory and subsequent designation of motorcycle routes was incomplete. Recommended additions are also shown on the attached map. | See response to comment 120-90 |
| | 271 | 6 | Missing links for loop routes: There are a few additional connected routes needed. Some are double track ATV routes and were probably missed in the field inventory. In other cases, routes were designated as motorcycle routes where ATVs or even full-sized vehicles had been using them to complete loops. These missing links are shown on the attached map along with their vehicle type | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012616

| | | | | |
|---|---|---|---|---|
| | | | designation. | |
| | 271 | 7 | ATV motorcycle routes: There were no ATV/Motorcycle only routes designated in the proposed alternative. This is a useful designation to complete the array of OHV alternatives, especially for routes where use by the larger vehicles is not desired or acceptable. | See response to comment 22-46 |
| | 271 | 8 | Duma Point Area (excluding the sand dune open area): With few exceptions, there are no designated routes in this area in any of the alternatives and there is no explanation as to why this occurred. We recommend the routes shown on the attached maps be included in Alternative C as the final preferred alternative. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 271 | 10 | Alignment of routes with those of other jurisdictions. See attached map for a few suggested changes. This may be difficult to do for motorcycle routes in some areas because inventories are probably not complete. This is particularly critical for the border with Colorado in the Rabbit Valley/Bitter Creek area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 272 | 1 | All roads, jeep roads/trails, OHV double track trails and single track trails in the Moab BLM management area, I would like to remain open. | See response to comment 122-46 |
| | 272 | 2 | Jeep and ATV roads and trails out of Rabbit Valley on the Utah side of the state line. The Kokopelli trails is just one of these route's. Please keep this area open for all to enjoy. *See attached map. | See response to comment 206-11 |
| | 272 | 3 | There is a road going into Granite Creek (close to the Colorado State line) that accesses an old homestead. Please keep this area open to ATV/Dirt Bike, Jeeps, and other OHV enthusiasts. *See attached map. | See response to comment 206-11 |
| | 274 | 1 | Gemini Bridges, Mill Canyon, Courthouse Wash, Tenmile Canyon, Island Mesa Trail, Rail Mesa open for OHV. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to |

BLM_0012617

| | | | |
|---|---|---|---|
| | | | resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 275 | | Please expand the White Wash area and establish one at Sand Flats. | See response to comment 123-35 |
| | 275 | | Connect Thompson trail with copper ridge motorcycle trail. | See response to comment 122-29 |
| | 275 | | I support Ride with Respect's recommendations that open travel would not be allowed 100 yards from a designated trail on slick rock. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 275 | | The Hillclimb and camping areas in the west side of the White Wash Dunes need to be included as they are, or expanded, not reduced. | See response to comment 123-35 |
| | 275 | | The Yellowcat area has an excellent network of old mining roads to explore. Please designate an SRMA to manage Yellowcat. | See response to comment 122-38 |
| | 275 | | The Gemini Bridge Crossing is a highlight of my tour. Please keep it open. | See response to comment 206-14 |
| | 275 | | Keep 10 mile wash and surrounding motorcycle trails open. | See response to comment 211-20 |
| | 276 | | Keep the last bit of Gemini Bridges open. Please Keep the Thompson Trail and Copper Ridge loop as proposed by Ride with Respect. Then Mile Wash has been a popular OHV route for several decades. Popular washes that have had vehicle use for years should remain open! | See response to comment 206-14 |
| | 276 | | The plan for open area at White Wash in Alt C and D needs to be expanded. | See response to comment 123-35 |
| | 277 | 3 | The routes included for designation are not inclusive of the routes that are "on the ground." This would be particularly true for some ATV and more single-track motorcycle routes. Local groups that have provided maps of these routes should be commended for their efforts and these routes added to the travel plan | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and |

BLM_0012618

| | | | | |
|---|---|---|---|---|
| | | | inventory. Also, provisions for the addition of routes to the final travel plan should be included in the final RMP. | site specific NEPA analysis. |
| | 278 | 4 | Some of the motorcycle trails are really ATV trails. | See response to comment 120-90 |
| | 279 | 2 | Your open area at White Wash in Alt C and D must be expanded. | See response to comment 123-35 |
| | 280 | 1 | Some of the trails are not complete on the maps. | See response to comment 206-11 |
| | 282 | 1 | Alt C and D for the White Wash area is too small and must be expanded, the dunes should be open for all to enjoy. | See response to comment 123-35 |
| | 282 | 6 | Some of the "motorcycle trails" are actually ATV trails. | See response to comment 120-90 |
| Red River Canoe Company | 283 | 2 | Many routes on the travel plan map (Alt C) run within a half-mile or less from one another and arrive at the same destination. (See areas north of Dead Horse Point S.P., Mineral Point, Gemini Bridges area, Black Ridge, and Canyon Rims for instance) This cannot possibly be a defined purpose and need (as required by the BLM instruction memoranda on designating routes) for each of these redundant routes. If there is a low purpose and need for a route, even if there are no resource conflicts present, the routes need to be taken out. Its mere existence is not grounds for designation. A purpose and need must be present. | A purpose and need was identified for each road not eliminated from Alt. C.  Oftentimes, this determination was made by seeing that the route had been used for travel within the past time frame.  Adjustments to the travel plan can be made a later date, should it be demonstrated the route is not in use. |
| | 284 | | Please protect places like Fisher Towers, Goldbar Rim, Labyrinth Canyon, and the viewsheds of Arches and Canyonlands National Parks from oil and gas development and excessive ORV use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 285 | 2 | The Fisher Towers area, as well as Labyrinth Canyon are destinations where I believe ORV traffic should be aggressively eliminated. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012619

| Grand County Backcountry Council | 289 | 4 | Many routes on the travel plan map (Alt C run within a half-mile or less from one another and arrive at the same destination. (See areas north of Dead Horse Point SP, Mineral Point, Gemini Bridges area, Black Ridge and Canyon Rims, for instance.) There cannot possibly be a defined purpose and need (as required by the BLM instruction memoranda on designating routes) for each of these redundant routes. If there is a low purpose and need for a route, even if there are not resource conflicts present, the route should be closed. Its mere existence is not grounds for designation. A purpose and need must be present. | Purpose and ned for the routes was determined on the ground by seeing if travel had occurred on the routes in question.  In other words, if the route had been used, it was determined that there was some purpose for the route.  "Superfluous" routes included over 2,500 miles of route that are not designated for travel because there was no use on these routes.  Once a route was determined to have been used, a resource conflict was required in order to not designate a particular route.  See Appendix G of the DRMP/EIS for a detailing of the Travel Plan process. |
| --- | --- | --- | --- | --- |
| Grand County Backcountry Council | 289 | 6 | Of specific concern are routes in Tenmile Canyon, Hell Roaring Canyon, and Spring Canyon – all tributary canyons of the Green River – and all along the Green River itself. Routes in these canyons and along the river pose threats to fragile riparian resources and numerous undocumented archaeological and historic sites. At the very least, extensive archaeological surveys should be conducted before route designation occurs in such areas. | The routes mentioned by the commentor are all constructed routes. Damage to archeological resources may have occurred at the time the route was constructed. Continued legal use of the routes does not further impact these sites.  Any new routes considered for construction would require archeological clearances. |
| | 290 | 2 | There is not much difference that I can see in the three alternatives formulated by the BLM that would allow limited or no motorized access. Is the BLM exempt from the ADA passed by congress? | The ADA accessibility guidelines do not specify or quantify the type or degree of access that must be allowed on public lands.  The ADA does not require that all public lands be vehicle accessible. In addition, designated recreational motorized routes are an administrative decision and not subject to ADA.  However, the ADA accessibility guidelines will be use in construction of any Federal facilities on public lands. |
| | 290 | 3 | Some of the motorcycle trails in the BLM Moab Travel Plan are very popular with ATV users. | See response to comment 120-90 |
| | 290 | 4 | The FEIS should consider opening more ATV trails especially between White Wash and Red Wash. I encourage you to take another look at the proposeal developed by Ride with Respect. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and |

615

| | | | | site specific NEPA analysis. |
|---|---|---|---|---|
| | 290 | 6 | Please keep the following routes open:<br>The last stretch of the Gemini Bridges road.<br>The Thompson Trail and the Copper Ridge loop as proposed by Ride with Respect.<br>Ten Mile Wash and other popular washes that have had vehicle use for years should remain open. | See response to comment 206-14 |
| | 291 | 2 | Hatch Point and Canyon Rims: This area is remote, with few signs of human activities except a primitive ORV road and ATV tracks we saw about a mile off that road. This segment of Canyon Rims is wild but easily accessible for hiking and other quiet forms of recreation. It is just off the Needles/Anticline Overlooks Road and near the Windwhistle Campground.  Excluding ORVs will greatly benefit quiet recreation uses and secure critical wildlife habitat for desert bighorn sheep and pronghorn. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 291 | 4 | White Wash Sand Dunes: We urge BLM to proceed with an expanded ACEC, as the boundaries in Alternative B (map 2-14-B) leave much of the complex exposed to continued ORV traffic. Please bar ORVs from the entire dune complex, water sources, cottonwoods, and associated desert bighorn sheep habitat ecological values of the dune complex. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 291 | 5 | We urge closure to ORVs and mineral leasing of the following, plus their designation as ACECs:<br>Green River corridor; also recommend it for Wild and Scenic River status<br>Mesas by Labyrinth Canyon: Deadman Point, Horsetheif Point, Mineral Point, Spring Canyon Point, and Tenmile Point<br>Side canyons: Tenmile Canyon, White Wash, Hell Roaring Canyon | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 291 | 6 | We urge the BLM to establish wider buffer zones around park [Canyonlands and Arches] boundaries and along SR 313. | See response to comment 980-1.  The 'buffer zones' that have been established are considered sufficient to protect the resources in question.  The commentor provides no data to indicate why wider zones are needed. |

BLM_0012621

| | 291 | 8 | The tract around the Deadhorse Point road should receive protection. The ACEC proposed in map 2-14-B ("Highway 279 Corridor/Shafer Basin/Long Canyon"), with a ban on oil/gas leasing and ORVs. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|
| | 292 | 1 | It's not just the OHV traffic you must factor into the equation. There is also the increasing numbers of super-sized trucks hauling huge trailer loads of off-road machines with dirty-burning engines from all across the region. Encouraging this action would make no contribution at all to downsizing the state's carbon footprint.<br><br>Please reconsider your plan to expand off-road travel routes and limit this to the generous miles of existing roads. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 293 | 3 | Some of the motorcycle trails are really ATV trails. | See response to comment 120-90 |
| | 293 | 4 | We believe there should be more ATV trails designated, especially between White Wash and Red Wash. It seems to us that the proposal by Ride with Respect should be carefully considered. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 293 | 5 | Please keep the last bit of Gemini Bridges road open. | See response to comment 206-14 |
| | 293 | 6 | We agree with Ride with Respects proposal to keep the Copper Ridge loop and the Thompson trail open. Many washes that have been open to vehicle traffic for many years are being proposed for closure. We believe that Ten Mile Wash should remain open, as should others. | See response to comment 122-29 |
| | 294 | 2 | Some of the motorcycle trails are actually ATV trails. | See response to comment 120-90 |
| | 294 | 5 | I would like to see the last bit of Gemini Bridges road remain open. This is one of a few that can be driven across and has been a thrill and available for decades. | See response to comment 206-14 |

BLM_0012622

| | | | | |
|---|---|---|---|---|
| | | | Also the Thompson trail and the Copper Ridge Loop as proposed by Ride with Respect. I would also also like to see the Ten Mile Wash and many other riparian washes as being proposed for closure left open. | |
| | 295 | 1 | Keep open Moab Rim, Poison Spider Mesa, Fins 'n Things, Metal Masher, Porcupine Rim, Kane Creek, Elephant Hill, Lockhart Basin, Hole in the Rock Trail. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 300 | 2 | "Open areas" in alternatives C and D must be expanded and should be designated along easily identifiable geographical features and formations or preferable along boundary roads like the Ruby Ranch Road on the west, the Blue Hills Road on the North, and the Duma Point/Ruby Ranch (back way) on the east. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 300 | 3 | Please keep the following routes open: The last portion of the Gemini Bridges Road The Thompson Trail and Copper Ridge loop, as proposed by Ride With Respect The Ten Mile Wash OHV route – including washes that have been open to vehicle use for many years now. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 301 | 1 | Integral parts of the following Jeep Safari Trails added to the inventory of designated routes in Map 2-11-C: Strike Ravine Trail, 3-D Jeep Trail, Flat Iron Mesa Trail. I have included maps with GPS tracks of the routes for these existing trails, shown in red. Please add the missing trail segments to the designated route inventory on Map 2-11-C. *See attached maps. | See response to comment 206-11 |
| American Motorcyclist Association | 302 | 1 | We suggest that they [Moab Field Office] continue to look for opportunities to streamline and simplify the permitting process within the RMP. For example, the Bookcliff Rattlers have funded several archeological inventories. Those routes should be identified in the | The Dee Pass motorized Focus Area is identified for competitive events in Alts C and D of the DRMP/EIS.  Any routes not specifically identified on the Travel Plan accompanying the DRMP/EIS may be considered on a site-specific basis at a later date (see pg. 2-48 of the |

BLM_0012623

| | | | | |
|---|---|---|---|---|
| | | | RMP as being available for competitive events under standard stipulations. | DRMP/EIS). |
| American Motorcyclist Association | 302 | 8 | Wash Bottoms- The plan should allow that wash bottoms be open to OHV use. | See response to comment 122-14. |
| | 303 | 6 | Please note that these are already-existing roads that have been overlooked by the Moab BLM. These areas include:<br>Copper Ridge/Little Valley/Klondike Bluffs<br>Sovereign area<br>Strike Ravine<br>3-D Trail<br>Flat Iron Mesa<br>Behind the Rocks<br>Negro Bill Canyon<br>Dry Mesa<br>Ten Mile Canyon<br>Rainbow Rocks<br>Gemini Bridges<br>Mill Canyon<br>Flat Iron Mesa<br>A short segment (less than ¼ mile of road from an existing recognized road to the edge of the cliff overlooking Junes Bottom on the Green River.<br>A short road segment that should be recognized nearby going to a viewpoint of Trin-Alcove *see attached maps. | See response to comment 206-11 |
| | 303 | 8 | Open play areas for such vehicles in most of the White Wash Sand Dunes<br>-a Copper Ridge Motorcycle Loop<br>-A Cisco Desert Wash area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 304 | 1 | Cross country unrestricted OHV travel should not be an option anywhere except the special sand dunes recreation area that is proposed. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan |

BLM_0012624

| | | | | based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|
| | 305 | 2 | Cross country OHV travel should not be an option anywhere except the special sand dunes recreation area that is proposed in option C under Travel management consisting of 1,886 acres. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 305 | 3 | A designated route of Hell Roaring Canyon (the route doesn't go as far up-canyon in alternative B) is upsetting - there are numerous archeological sites in the canyon's upper reaches, it encompasses a riparian area, and the current route up-canyon hasn't been used in years and is overgrown with brush. Why designate this little-used route, especially when riparian and cultural resources are at risk of degredation? | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 308 | 2 | The proposed motorized travel route from where Dubinky Wash crosses the county road to Spring Canyon (near Jug Rock Flat) to its confluence with Hell Roaring Canyon. This route and all travel up Hell Roaring above the school section should be eliminated from the travel plan no matter what alternative is adopted. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 308 | 3 | The map for Alternatives C and D show a short route immediately to the south of the confluence of Hell Roaring and Dubinky Wash and going about 0.5 miles above Hell Roaring onto the sand dune before it turns north and dead ends. This appears to be a relict uranium-prospecting tract that has not been used in decades. It appears to have no purpose and should be eliminated from the travel plan no matter what alternative is adopted. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 308 | 4 | Ten Mile Wash below the midway cut off should be closed to motorized travel. As the only purpose for keeping Ten Mile below the midway cut off open to | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

BLM_0012625

| | | | | |
|---|---|---|---|---|
| | | | motorized recreation is for the purpose of motorized recreation itself, this would be an appropriate compromise between motorized and non-motorized recreation uses. There does not appear to be any other need or purpose for motorized access into lower Ten Mile. | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 308 | 5 | The Northwest end of Castle Valley via the "Golden Stairs" route to the Big Bend area on the river. This use [motorized recreation] should be eliminated as the entire Mat Martin Point area has outstanding value for non-motorized recreation. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 310 | 5 | BLM's open area in Alternative C and D must be expanded. The current proposal is unworkable because it confines a huge amount of vehicle use into a very small area and the area's boundaries are not well defined and cannot be easily identified on the ground. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 310 | 7 | BLM's open area at White Wash Sand Dunes should include the popular and challenging hill-climb on the Northwest of the Sand Dunes. | See response to comment 123-35 |
| | 310 | 8 | BLM's open area should be located along easily identified geologic features, or preferably along boundary roads of Ruby Ranch Road on the West, Blue Hills Road on the North, and Duma Point/Ruby Ranch (back way) on the East. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 310 | 18 | Although many popular ATV routes are classified as roads in the travel plan, some ATV trails are not proposed as open and some of the Motorcycle routes should be designated as ATV/motorcycle trails as well. Some of the "motorcycle trails" are very popular with ATV users. The final travel plan should designate a mix of single-track and ATV trails. | See response to comment 120-90 |

BLM_0012626

| | | | The FEIS should consider designating more ATV trails, especially between White Wash and Red Wash. I strongly suggest looking closely at the proposal developed by Ride with Respect. | |
|---|---|---|---|---|
| | 310 | 19 | In the Moab Field Office, true mountain bike single track trails are in short supply. The Mill Canyon- Sevenmile Rim biking focus area should be redrawn as Mill Canyon-Tusher Rims in order to provide better terrain for pedaling. The Final Plan should extend the South Spanish Valley biking area further south towards Black Ridge. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 310 | 21 | The Sand Flats Recreation Area could adopt special policies to permit slickrock exploration. We support Ride with Respect's recommendation that mountain bike travel be allowed on any barren rock surface. Slickrock within one hundred yards of a designated route could be open to motorized travel. This two-hundred yard corridor would accommodate the ways that people currently enjoy Sand Flats. | See response to comment 122-42 |
| | 310 | 22 | Some important motorcycle trails are missing from all alternatives. The preferred alternative includes about 100 miles of true motorized single track. Alternative D adds another 100 miles. But in total, the final plan should spare roughly 300 miles of non-road motorcycle routes from being closed.

Alternative D falls just short of providing sufficient motorcycling opportunities. Since no single-track inventory was performed, the BLM should continue accepting data on existing routes, and consider them for implementation.

The Utah Rims single-track network should include at least 25 miles of additional routes, in order to be as complete as the Dee Pass network. In particular, long-distance single-tracks and rugged roads that connect | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012627

| | | | | |
|---|---|---|---|---|
| | | | SRMAs offer a unique experience and spread people. The Copper Ridge Motorcycle Loop should be combined with Thompson Trail in the final plan.<br><br>A few more non-riparian washes should be left open, especially in the Cisco Desert. These travel-ways provide ATV and motorcycle riders an unconfined challenge that roads cannot. | |
| | 327 | 1 | Please consider expanding the "open" area at White Wash, to be large than drafted in Alternatives C & D. I practice "staying the trail," but there are such few places left that will sustain cross country travel and open riding, this is one suited for that. I express this for leaving open area for dispersed camping also. The proposed boundaries of open vs restricted/closed would leave too small an area for the amount of vehicle use this area experiences. And the boundaries are not well defined which would make it difficult to identify on the ground. | See response to comment 123-35 |
| | 328 | 2 | It is not sound management to close areas, as in the White Wash area, to restrict users to a small area, is not a good idea, if anything, the open areas in Alt C and D should be increased. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 328 | 8 | Many of the motorcycle trails are actually ATV trails. | See response to comment 120-90 |
| | 330 | 1 | Leave the Sand Dunes open to travel. The Dunes are the dunes, they recover from track at the nest wind storm, let people play. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 331 | 1 | Please review and rethink the proposed resource management plan and reduce the motorized areas, especially access to and along the Green River. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

BLM_0012628

| | | | | |
|---|---|---|---|---|
| | | | Eliminate the road access through Hell Roaring Canyon. | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 332 | 2 | The whole route from the mouth of Spring Canyon to the Hey Joe Mine should be closed to preserve the natural character of the river corridor and prevent conflict with recreation not at odds with that character. Additionally, route extends degradation of natural qualities on the floor of Hey Joe Canyon above the mine and turn-around by offering access to ATVs. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 339 | 1 | Your open area at White Wash in Alternative C and D should be expanded. Closing the challenging trails like killer hillclimb will not add to the experience of Moab. | See response to comment 123-35 |
| | 340 | 1 | Your open area at White Wash in Alternative C and D should be expanded. Closing the challenging trails like killer hillclimb will not add to the experience of Moab. | See response to comment 123-35 |
| | 344 | 1 | Your open area at White Wash in Alternative C and D needs to be expanded. The current proposal is unworkable because it  closes the killer hillclimb and camping area to the west of the Dunes. | See response to comment 123-35 |
| | 344 | 3 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39 |
| | 344 | 4 | Yellowcat is increasingly popular for 4-wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to comment 122-38 |
| Public Lands Equal Access Allaince | 346 | 4 | In several cases, motorcycle trails shown in Alternatives C and D have been used for several years, and are currently being used, by ATVs and or 4x4s as integral segments of longer loop routes. Most all of these routes have been used by ATVs, from the mid 1980s. We feel these routes should be designated as motorized, or ATV/OHM routes, with some as 4x4. When we contacted your office we were told that the ATV community did not as for any routes. This is not true PLEAA used your TRIMBLE GPS and did this inventory for the Moab Field | See response to comment 120-90.

The  commentor worked as a short term volunteer for less than a week well before initiation of travel management planning undertaken in conjunction with the DRMP/EIS. The Trimble GPS was returned in poor condition to the Richfield BLM office and the data  were not utilized. |

BLM_0012629

| | | | | |
|---|---|---|---|---|
| | | | Office. Putting these routes as motorcycle only on this draft RMP shows a bias and a predetermination of the outcome. | |
| Public Lands Equal Access Allaince | 346 | 8 | Yellowcat/The Poison Strip/Dome Plateau is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network county and of mine roads that already exist. | See response to comment 122-38. |
| Public Lands Equal Access Allaince | 346 | 10 | Page G11, Public Safety: The term "extreme" should be further defined. What is an extreme hazard to one person may not be extreme to another, depending on their riding/driving skills. | The wording on page G-11 is directly from the BLM Manual at 8340.  The Moab BLM has no authority to change the wording of BLM Manuals. |
| Public Lands Equal Access Allaince | 346 | 11 | Moab Jeep Safari Trails. When we take our ATV/dirt bikes, we enjoy riding in the White Wash Sand Dunes, 10 Mile Wash, Little Grand Wash, the Tubes, Red Wash, Oil Well Wash, Salt Wash. | In Alt. C of the DRMP/EIS, White Wash Sand Dunes remains available for open ATV/dirt bike travel.  The other routes mentioned by the commentor are available in one or more alternatives of the DRMP/EIS. |
| | 347 | 2 | Easter Jeep Safari should remain fully open and accessible to motor vehicles and be included in full in the designated routes of the Final RMP. | See response to comment 206-11 |
| | 347 | 3 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: Dry Mesa (N38º43'15.75"/W109º27'20.72" heading Southwest- the area south of Wolf Ranch as you leave the Arches National Park boundary with view into the park itself and down into the Colorado Riverway) | See response to comment 206-11 |
| | 347 | 4 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: Mat Martin Point (N38º37'32.28"/W109º27'34.38" heading Northeast – the far northern area of Porcupine Rim as bounded by Castle Valley, the Colorado Riverway, and Negro Bill Canyon) | See response to comment 206-11 |
| | 347 | 5 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: The Rusty Nail Trail (N38º36'5.76"/W109º39'20.18" heading East – the | See response to comment 206-11 |

BLM_0012630

| | | | | |
|---|---|---|---|---|
| | | | alternate route that connects the lower portion of the Gold Bar Rim trail and the Golden Crack area of the Golden Spike trail) | |
| | 347 | 6 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: Hunter Canyon Rim (N38º29'43.84"/W109º33'53.53" heading Northwest to N38º30'25.67"/W109º35'13.78" – the spur between the Pritchett Canyon route and Kane Creek Blvd) | See response to comment 206-11 |
| | 347 | 7 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: The Shafer Trail Spur (N38º28'16.80"/W109º42'45.88" heading North – the spur that heads north off Shafer Trail and dead ends directly below the eastern side of Dead Horse Point) | See response to comment 206-11 |
| | 347 | 8 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: Long Canyon Overlook (38º33'04.68"/W109º42'02.76" heading East- the area that is bounded by Long Canyon to the South, the Colorado Riverway to the East, and Day Canyon to the North) | See response to comment 206-11 |
| | 347 | 9 | I am concerned about the following routes / areas that do not show up as open to motorized travel on the designated route maps of Alternative B: Coyote Canyon (N38º24'40.40"/W109º25'43.41" heading North – located in the area west of Area BFE) | See response to comment 206-11 |
| | 347 | 10 | I believe that the following routes / areas were mistakenly mapped incompletely on the DRMP on Alternative C, I oppose these route remaining partially or completely absent from the designated trails in the Final RMP; I support the position of the Utah 4 Wheel Drive Association and Red Rock 4 Wheelers with respect to these omissions and any that I may have personally overlooked:<br>Flat Iron Mesa Route. It appears that several short sections of the Flat Iron Mesa Easter Jeep Safari route | See response to comment 206-11 |

BLM_0012631

| | | | | |
|---|---|---|---|---|
| | | | are missing from the designated routes maps, including the popular Easter Egg Hill. I hope this is an accidental omission. I would like to see the entire route shown clearly on the Final RMP.<br>Strike Ravine route. The popular obstacle, the "Big Ugly," as well as the section of Strike Ravine that crosses Kiley Miller's property have been left off the designated routes maps. Again I hope that this is an accidental omission. I remind BLM that the Red Rock 4 Wheelers have successfully defended this route as legal in court over the last few years. I would like to see the entire route shown clearly on the Final RMP.<br>Crystal Geyser route. Short sections of the Crystal Geyser Easter Jeep Safari route are missing from the designated routes maps. Hopefully accidentally omitted, I would like to see the entire route shown clearly on the Final RMP.<br>3D route. Short sections of the 3D Easter Jeep Safari route are missing from the designated route maps. Hopefully accidentally omitted, I would like to see the entire route shown clearly on the Final RMP. | |
| | 347 | 11 | I believe the following routes / areas are conflictingly mapped. Each of these listed designated routes, as shown on the maps for Alternative C, appear to be within the boundaries of areas that are closed to motorized vehicles as shown on the travel plan. These conflicting maps are confusing to me as I have attempted to decipher them. I know that the Blue Ribbon Coalition is working hard to identify additional conflicts and inconsistencies and might find some that I have overlooked in the short time that I've had available to review the documents; I support the position of the Blue Ribbon Coalition concerning mapping conflicts. Please assure that all designated routes are clearly mapped and that the boundaries of areas closed to motorized travel are adjusted so as to clarify the status of all proposed designated routes as open to motor vehicle use, | See response to comment 206-11 |

BLM_0012632

|  |  |  | especially the following:<br>Rusty Nail (N38º36'5.76"/W109º39'20.18" heading East)<br>Moab Rim (N38º33'34.05"/W109º34'57.88" heading Northeast)<br>Pritchett Canyon (N38º32'11.49"/W109º35'55.15" heading Southeast)<br>Long Canyon "Overlook" (38º33'04.68"/W109º42'02.76" heading East) |  |
|---|---|---|---|---|
|  | 347 | 12 | The Black Ridge area, the Sand Flats Recreation Area, and the Yellow Circle Mine area have terrain that could work well to incorporate additional open travel. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|  | 353 | 1 | There are certain areas that OHV use is allowed and quite prominent such as Sand Flats and Behind the Rocks and both areas show heavy impact from OHV use both on and off the designated trails. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|  | 354 | 1 | Just look at the Piute Trail System west of Moab and see the benefits it gives to the small towns interconnected to it. It is managed and there are rules to follow but it does not exclude any one user group. Please consider it as a successful case study as you formulate a proposed resource management plan for the Moab area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|  | 355 | 1 | We love camping out there and accessing Mary's Trail, 10 Mile Wash, White Wash, and all the areas around the town of Moab and south of Green River. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012633

| | 355 | 2 | Gemini Bridges road has amazing bridges to ride across, please keep these open. Ride with Respect has addressed ten Mile Wash, the Thompson Trail and Copper Ridge all, and we support their proposal. | See response to comment 206-14 |
|---|---|---|---|---|
| | 356 | 1 | At a time when more people are retiring and population is increasing it is counterproductive to close off recreation areas. For example, the White Wash area in Alternative C & D needs more open areas. Confining vehicles and campers to smaller areas is not the way to go. | See response to comment 123-35 |
| | 356 | 2 | Gemini Bridges, Thompson Trail, and Copper Ridge loop and Ten Mile Wash need to be kept open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 357 | 1 | When we are riding our dirt bikes, we enjoy riding the White Wash Sand Dunes, 10 Mile Wash, Green River Trail, and the area's other great motorcycle trails. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 357 | 2 | Your open area at White Wash in Alternative C and D must be expanded. The current proposal is unworkable because it closes outstanding hill-climbing and camping area to the West of the Dunes. | See response to comment 123-35 |
| | 357 | 3 | Yellowcat is increasingly popular for four wheeling and ATV riding. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to comment 122-38 |
| | 358 | 1 | I would like to see the entire Flat Iron Mesa Trail included on the proposed maps. | See response to comment 206-11 |
| | 358 | 2 | I would like to see "Big Ugly" on the Strike Ravine Trail included. | See response to comment 206-11 |
| | 358 | 3 | Sections of Crystal Gyser and 3D trails are also not | See response to comment 206-11 |

BLM_0012634

| | | | | |
|---|---|---|---|---|
| | | | included on the proposed maps. | |
| | 358 | 4 | I would like Coyote Canyon Trail to be included on proposed maps. | See response to comment 206-11 |
| | 386 | 1 | Expansion of the open area in White Wash along with the trails named; Flat Iron Mesa, Strike Ravine, 3D trail, Gemini Bridges, White Wash Sand Dunes, and Coyote Canyon. | See response to comment 123-35 |
| | 387 | 1 | Flat Iron Mesa, Strike Ravine, and 3D Trails left open for future travels. | See response to comment 206-11 |
| | 388 | 1 | Include the Coyote Canyon Trail, expand the open area at White Wash, and include the "missing areas" of Flat Iron Mesa, Strike Ravine, 3D Trail | See response to comment 206-11 |
| | 389 | 1 | Flat Iron Mesa and Gemini Bridges left open for public use. | See response to comment 206-14 |
| | 390 | 1 | Flat Iron Mesa, Coyote Canyon, and Gemini Bridges must remain open for access. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 391 | 1 | I do not want Gemini Bridges to close | See response to comment 206-14 |
| | 392 | 1 | Flat Iron Mesa, Strike Ravine, 3D, Gemini Bridges, White Wash Sand Dunes, and Coyote Canyon to be open for access. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 393 | 1 | Coyote Canyon is missing from Alternative C | See response to comment 206-11 |
| | 394 | 1 | Gemini Bridges should close | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and |

BLM_0012635

| | | | | site specific NEPA analysis. |
|---|---|---|---|---|
| | 394 | 2 | Missing Segments include Flat Iron Mesa, Strike Ravine, and 3-D | See response to comment 206-11 |
| | 394 | 3 | I hope to be able to go to White Wash Sand Dunes and oppose fees. | See response to comment 123-10 |
| | 395 | 1 | I want to see trails such as Flat Iron Mesa, Gemini Bridges, and Coyote Canyon open | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 396 | 1 | Do not close Flat Iron Mesa, Coyote Canyon, and White Wash | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 397 | 1 | Gemini Bridges to stay open | See response to comment 206-14 |
| | 397 | 2 | White Wash Sand Dunes should be enlarged | See response to comment 123-35 |
| | 398 | 1 | Trails that exist already should stay open such as the West Wakes WSA route. These proposals should have no "missing" sections because then you will conveniently forget to put them back on. The maps such as those of Flat Iron Mesa and Strike Ravine. Leave Gemini Bridges open for drivers and walkers. White Wash Dunes travel area should be much larger. | See response to comment 206-11 |
| | 399 | 1 | The two acres that stood out to me the most (that shouldn't be closed) were the 3-D Jeep Trail and the White Wash Sand Dunes. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 400 | 1 | Alternative D closes far too many trails, specifically the | Although this issue was raised during scoping, the |

BLM_0012636

| | | | | |
|---|---|---|---|---|
| | | | White Wash Sand Dunes | application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 400 | 2 | Do not close Flat Iron Mesa, Gemini Bridges, 3D Jeep Trail, Strike Ravine, White Wash Sand Dunes | See response to comment 206-11 |
| | 401 | 1 | White Wash Sand Dunes. BLM is on the right track in proposing an Area of Critical Concern here. I would urge expansion of the ACEC to cover the dune complex, along with associated bighorn sheep habitat, cottonwood groves, and water sources. Situated less than 15 miles off I-70, these dunes will be popular with visitors for their beauty and ecological interest. It is time to phase out ORVs here and welcome the larger public to enjoy the area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 402 | 1 | The overlooks of the Colorado River off Dry Mesa and the Egg Ranch Fin part of the Behind the Rocks WSA should be left open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 403 | 1 | The overlooks of the Colorado River off Dry Mesa and the Egg Ranch Fin part part of the Behind the Rocks WSA should be left open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 404 | 1 | It is my understanding that you are considering designating some areas open to "cross country travel" by Trails Motorcycles and Mountain Bikes. I believe one area you are looking at is Pole Canyon. That would be a fantastic area for our sport. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and |

BLM_0012637

| | | | | site specific NEPA analysis. |
|---|---|---|---|---|
| | 404 | 2 | Parts of Black Ridge should remain open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 406 | 1 | After reviewing the management plan options I feel there is a serious lack of details and boundaries missing. Many trails are missing sections that appeared to other 4x4 and biking enthusiasts such as Strike Ravine | See response to comment 206-11 |
| | 406 | 2 | Please add Coyote Canyon to your maps as it's the only 5 rated true trail in the Moab area. | See response to comment 206-11 |
| | 408 | 1 | The BLM must prepare a supplemental DEIS, taking into account a modified Alternative C, which would correct the following deficiencies in the DEIS.  Failure to adequately discuss the impacts in proportion to their significance regarding the reduction of OHV access and the resultant increase in number of users/uses in the areas remaining available. The DEIS fails to adequately disclose the impacts that will occur as a result of increased use in the areas remaining available to OHV use. For example, failure to disclose the impacts related to the same and growing number of OHVs utilizing less area. Alternative B and C have 68 times more closed areas than currently exists yet the agency does not expect the number of users to fall. The DEIS fails to disclose the environmental effects of having the same number of users squeezed into 68 times less area. Federal regulations require the agency to discuss any adverse environmental effects which cannot be avoided should be proposal be implemented. | The commentor's assertion that Alternatives B and C have "68 times" the closed area as under current management is incorrect.  The BLM believes that the commentor is confusing the "closed" category with the "limited" category.  The commentor provides no evidence to support the contention that environmental damage will occur as a result of more users being "squeezed" into a smaller area.  Nor does the commentor provide any evidence that the BLM has provided insufficient opportunities for OHV recreationists. The BLM acknowledges in the DRMP/EIS that all action alternatives will reduce OHV opportunities relative to Alternative A, but believes that sufficient opportunities will still be available. |
| | 408 | 2 | Failure to discuss the indirect effects and their significance on the travel plan and RMP direction | The commentor offers no evidence to support the assertion that the BLM's efforts to accommodate more |

633

| | | | | |
|---|---|---|---|---|
| | | | regarding an increase in the number of acres designed closed or limited and regarding a decrease in the number of miles accessible for motor vehicle use. Federal regulations require the agency to include discussions of indirect effects, which are caused by the action and later in time or farther removed in the distance, but which are still reasonable foreseeable, including effects related to changes in pattern of land use and population density or growth rate. The DEIS has not discussed the indirect effect on areas which would be designated limited or open, when accommodating more users on less acreage. It is reasonably foreseeable that areas designated limited or open will be impacted by an increase in use caused when users are displaced from areas newly designated as closed or newly designated as limited where they had been open in the past.<br><br>A court is likely to conclude that it, as well as the agency, can with high confidence say that the impacts are likely to occur. The agency can describe such impacts "now" with sufficient specificity to make their consideration useful. Furthermore, if the agency does not take them into account "now" it will not be able to take account of them before the agency is so firmly committed to the project that further environmental knowledge, as a practical matter, will prove irrelevant to the government's decision. Commonwealth of Massachusetts v. Watt, 716 F2d 946, 952-53 (1st Cir. 1983). Therefore, the agency must consider the indirect effects and their significance on the travel plan and RMP direction regarding an increase in the number of acres designed closed or limited and regarding a decrease in the number of miles accessible for motor vehicle use in relation to the increased number of users/uses on such areas. | users on less acreage and fewer miles of routes will lead to adverse environmental impacts.  The commentor's assertion is founded on an unsupported hypothesis that there will be insufficient space for anticipated increases in users, and that this concentration of use will lead to undesirable impacts. The BLM has assessed the impacts of travel management alternatives on a wide variety of resources in Chapter 4 of the DRMP/EIS, and concludes that additional restrictions on OHV use will have largely beneficial impacts. |
| | 408 | 3 | Failure to adequately consider beneficial impacts when considering whether Alternatives B, C, and D | See responses to comments  408-1 and 408-2. |

BLM_0012639

| | | | | |
|---|---|---|---|---|
| | | | significantly impact the environment when additional acres are closed or limited to OHV use, or when fewer miles of routes are designated. The agency is required to consider both the adverse and the beneficial effects likely to occur when fewer acres are closed or limited to OHV use or when more miles of routes are designated. The DEIS fails to evaluate the beneficial impacts of an alternative where areas that are closed or limited are more than Alternative A but significantly less than the proposed alternatives. For example, the number of miles designated for OHV use in Alternative B, C, and D are similar in mileage to each other and all drastically differ in number of miles designated when compared to Alternative A. The DIES fails to analyze the beneficial impacts on the environment which are likely to occur when access is better dispersed, as would occur with a modified Alternative C. | |
| New Mexico OHV Alliance | 411 | 3 | Unused Roads: Roads and trails that are not used in the final version of the system should be retained in the inventory for future consideration. Some may be needed as re-routes, loop connectors, and to provide more recreation opportunities for the future needs. The unused routes should NOT be made to 'go away,' or disappear from the records as if they never existed, or as if they don't continue to exist. They should be classified as currently closed but retained in the system inventory. | The BLM worked with Grand and San Juan counties in developing the Travel Plan alternatives.  Grand County and the BLM agreed that 2,500 miles of largely unused routes had no purpose and need and should not be designated for motorized travel.

If any of these routes is found to be needed in the future, it could be added to the Travel Plan using site specific NEPA analysis.  See response to comment 122-30 for the process of adding new routes. |
| | 412 | 2 | Monitor and Merrimac Blues. Please close this unique, excellent and sensitive area to motorized use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 412 | 3 | Please close The Poison Spider Rim trail to motorized use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

BLM_0012640

| | | | | |
|---|---|---|---|---|
| | | | | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 412 | 4 | Please eliminate the user created road spurs that travel next to the Green River in Labyrinth Canyon – another area where noise impacts are extreme, echo loudly, and destroy the river experience. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 412 | 5 | Please address the criss/cross of trails over the hills and ridges at Professor Valley. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 412 | 6 | Please use your efforts to close the illegal UPS Trail. Keeping bicycles off is the first step. If the trail is not closed, motorcycles will follow. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 412 | 7 | I urge you to close all trails, tracks, routes or roads on Mat Martin Point to any and all motorized use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Rising Sun 4x4 Club | 413 | 1 | Managing increasing acreage of BLM land as 'wilderness-like' not only is a violation of the BLM's mandate, but marginalizes legitimate motorized users into a smaller 'piece of the pie' with increasing per-mile impact. Ironically, this degrades the remaining OHV | See responses to comment 121-10, 120-8 and 121-63. |

BLM_0012641

| | | | | |
|---|---|---|---|---|
| | | | areas even more. | |
| Rising Sun 4x4 Club | 413 | 4 | An existing and documented route exists on the southern side of the Colorado River within the boundaries of the Westwater WSA. The route begins outside the WSA and terminates near Star Canyon. This route has been open for decades, and it appears on USGS topographical maps from the 1970's. | The Star Canyon route was within the Travel Plan inventory.  Grand County recommended to the BLM that the route be removed from all alternatives because it had no demonstrated purpose and need.  The BLM included the Star Canyon route in Alt D; the BLM eliminated the Star Canyon route in Alts. B and C.<br><br>The BLM knows that the Star Canyon route is on the USGS  map.  It is an inventoried way within the Westwater WSA and presents conflicts with wilderness values. |
| Rising Sun 4x4 Club | 413 | 5 | Several short route segments associated with permitted Easter Jeep Safari routes are missing from the proposed Travel Plan maps. The segments are located on Flat Iron Mesa, Strike Ravine, and 3-D. We understand that the Utah Four Wheel Drive Association has been informed this is merely an accidental omission, but we would like to formally request that these segments be included on the final maps. | See response to comment 206-11, |
| Rising Sun 4x4 Club | 413 | 7 | The current proposal is unworkable because it confines a huge amount of vehicle use into a very small area and the area's boundaries are not well defined and cannot be easily identified on the ground. This will have the ironic effect of increasing environmental impact mentioned earlier, as well as creating user confusion. | The commentor does not explain exactly what the small area is.  The BLM assumes that it is White Wash Sand Dunes.  For a discussion of the open area at White Wash, see response to comment 123-35. |
| Rising Sun 4x4 Club | 413 | 8 | BLM's open area at White Wash Sand Dunes should include the popular and challenging hill-climb on the West of the Sand Dunes. It should also be located along easily identified geologic features, or preferably along boundary roads of Ruby Ranch Road on the West, Blue Hills Road on the North, and Duma Point/Ruby Ranch (back way) on the East. | See response to comment 123-35.  In addition, the White Wash area has been expanded to the west to include the camping area and the hill climb mentioned by the commentor.  See response to comment 120-83 for discussion of the expansion of the White Wash open area. |
| Rising Sun 4x4 Club | 413 | 10 | Keep Behind the Rocks area, OHV trails in Pritchett Canyon, also near Golden Spike/Gold Bar Rim, Rusty Nail 4x4, Goldbar/Corona Arch open to motorized | The Golden Spike, Pritchett Canyon, Rusty Nail and Goldbar Rim routes are in the Travel Plan for Alternative C, the preferred alternative.  There are additional routes |

BLM_0012642

| | | | vehicles. | in the "Behind the Rocks Area", but without specifics, it is impossible to say which ones the commentor refers to. The route to Corona Arch is confined to hikers only. |
|---|---|---|---|---|
| Rising Sun 4x4 Club | 413 | 14 | The BLM should also consider a SRMA in the Yellowcat area. Yellowcat is increasingly popular for four wheeling and ATV riding. | See response to comment 122-38. |
| Utah Rock Art Research Association | 415 | 4 | We believe all roads should be closed beyond the existing spur road to "Old Folks Home." | The BLM believes that the commentor is referring to the archeological site near the end of the Moab Rim route. The route past the existing spur road to this site has been closed to motorized use in Alt C. The route remains open to hiking and mountain biking use. |
| Utah Rock Art Research Association | 415 | 11 | Hellroaring Canyon. An unauthorized off-road vehicle road has been created from the Green River to the Barrier Canyon Style pictograph site in this canyon. | The route in Hell Roaring Canyon was constructed during the uranium mining of the 1950's. Off road travel off this route is illegal and will continue to be so under the DRMP/EIS, which limits travel to designated routes. |
| Utah Rock Art Research Association | 415 | 13 | We are concerned about a road segment that bisects an area with a high archeological site density. It is south of Levi Well located in the south half of section 25 Township 23S, Range 18E. | All routes designated as part of the Travel Plan were analyzed for cultural resource conflicts. The BLM professional archeologist noted which routes posed unacceptable cultural resource conflicts. These routes were not designated in the preferred alternative unless the purpose and need outweighed the cultural conflict.<br><br>Any routes included in the Travel Plan may be reconsidered at a future date for designation or non-designation. |
| | 417 | 1 | White Wash Sand Dunes: The suggested open area should be expanded to an easily identified boundary that allows a larger area to reduce impact in too small of an area. I would like to suggest the boundary to extend to the Ruby Ranch Roach on the west, Blue Hills Road on the north and Duma Point on the east. | See response to comment 123-35 |
| | 417 | 4 | The Copper Ridge should be combined with Thompson Trail. | See response to comment 122-29 |
| | 418 | 1 | Open riding must exist in the White Wash Area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel |

BLM_0012643

| | | | | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|
| | 419 | 1 | I suggest BLM's open area at White Wash in Alternatives C and D be expanded. | See response to comment 123-35 |
| | 419 | 4 | We noted that some of the motorcycle trails are actually ATV trails. | See response to comment 120-90 |
| Utah Four Wheel Drive Association | 420 | 1 | An existing and documented route exists on the southern side of the Colorado River within the boundaries of the Westwater WSA. The route begins outside the WSA and terminates near Star Canyon. | See response to comment 413-4. |
| Utah Four Wheel Drive Association | 420 | 2 | Several short reroute segments associated with permitted Easter Jeep Safari routes are missing from the proposed Travel Plan Maps. The segments are located on Flat Iron Mesa, Strike Ravine, and 3-D. We have been informed this is merely an accidental omission, but would like to formally request that these segments be included on the final maps. Maps detailing the missing segments are included at the end of this letter. [See attachments] | See responses to comments 206-11 and 206-17. |
| Utah Four Wheel Drive Association | 420 | 3 | The Gemini Bridges natural arch is one of the few natural bridges in the entire country that can still be driven. We feel that this route offers a unique driving opportunity that will be lost of the proposed closure is enacted. Please include this route in the Final RMP and Travel Plan. | See response to comment 206-14. |
| Utah Four Wheel Drive Association | 420 | 4 | White Wash Sand Dunes. This area is of particular concern to our members. First, the open travel area as proposed under Alternative C is too small. The open travel area should be expanded, and determined by easily identifiable geological boundaries or existing roads to make adherence to the new restrictions easy for all users. Second, the open travel area should include the challenging hill climb on the northwest portion of the sand dunes. Third, we oppose the proposed fee system described in Alternatives C and D. The proposed system | See response to comment 120-83, explaining that the open area has been expanded to the west to accommodate camping. This expansion would include the challenging hill climb on the west side of the dunes.

See response to comment 123-10 for discussion of a proposed fee system at White Wash. |

BLM_0012644

| | | | | |
|---|---|---|---|---|
| | | | seems to indicate that individual use and camping permits would be required for individuals and groups of any size. We strongly oppose such a fee system, and would encourage that a more appropriate fee system be established if it is necessary. | |
| | 422 | 6 | The proposed open area in Alternative C and D must be expanded. The current proposal is unworkable because it confines a huge amount of vehicle use into a very small area and the area's boundaries are not well defined and cannot be easily identified on the ground. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 422 | 10 | The FEIS should consider designating more ATV trails, especially between White Wash and Red Wash. I strongly encourage you to look at the proposal developed by Ride With Respect. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 422 | 11 | The Mill Canyon- Sevenmile Rim biking focus area should be redrawn as Mill Canyon-Tusher Rims in order to provide better terrain for pedaling. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 422 | 12 | The Final Plan should extend the South Spansih Valley Biking area further south toward Black Ridge. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 422 | 14 | The Utah Rims single-track network should include at least 25 miles of additional routes, in order to be as complete as the Dee Pass network. | See response to comment 122-46 |

BLM_0012645

| | 422 | 15 | The Copper Ridge Motorcycle Loop should be combined with Thompson Trail in the final plan. | See response to comment 122-29 |
|---|---|---|---|---|
| | 425 | 4 | Canyon Rims area south of the Hell Roaring Point Road should be protected from the present and proposed access by indiscriminate ORV use and RV-type recreation. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 427 | 2 | FEIS should include more ATV trails in White Wash and Red Wash | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 428 | 2 | The White Wash Open area is much to small. | See response to comment 123-35 |
| | 428 | 3 | Many washes in the 10 Mile area are being proposed for closure. They should be left open. | See response to comment 211-20 |
| | 428 | 4 | Extend [Utah Rims SRMA] to include Mel's Loop and beyond | See response to comment 122-39 |
| | 431 | 2 | Your open area at White Wash in Alternatives C and D must be expanded. The current proposal is unworkable because it closes the killer hill climb and camping area to the west of the Dunes. | See response to comment 123-35 |
| | 431 | 8 | Some of the "motorcycle trails" are actually ATV trails. | See response to comment 120-90 |
| | 432 | 2 | Your open area at White Wash in Alternatives C and D must be expanded. The current proposal is unworkable because it closes the killer hill climb and camping area to the west of the Dunes. | See response to comment 123-35 |
| | 432 | 8 | Some of the "motorcycle trails" are actually ATV trails. | See response to comment 120-90 |
| | 433 | 1 | When riding our Jeep, we like to explore the many back roads and the "lower than 4 rated" Moab Jeep Safari trails. When we take our ATV/dirt bikes, we enjoy riding the White Wash Sand Dunes, 10 Mile Wash | See response to comment 206-11 |
| | 433 | 2 | Your open area at White Wash in Alternatives C and D | See response to comment 123-35 |

BLM_0012646

| | | | | |
|---|---|---|---|---|
| | | | must be expanded. The current proposal is unworkable because it closes the killer hill climb and camping area to the west of the Dunes. | |
| | 433 | 7 | Some of the "motorcycle trails" are ATV trails. | See response to comment 120-90 |
| | 436 | 1 | You must restrict OHV use to designated roads and trails. There should be no "open" areas and all routes through riparian areas and other ecologically damaging routes should be off-limits. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 437 | 1 | Ruby Ranch / White Wash Sand Dune area must be kept open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 438 | 1 | Hell Roaring Canyon is no place for ORVs. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 439 | 1 | Don't close White Wash. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 441 | 3 | All existing roads, trails and travel ways should remain open to all the public. The closures to motorized travel will stop our less fortunate public, the handicapped, from enjoying this area. Does the plan address the needs of | The ADA accessibility guidelines do not specify or quantify the type or degree of access that must be allowed on public lands.  The ADA does not require that all public lands be vehicle accessible. In addition, |

BLM_0012647

| | | | | |
|---|---|---|---|---|
| | | | the handicapped and address the federal ADA requirements? | designated recreational motorized routes are an administrative decision and not subject to ADA.  However, the ADA accessibility guidelines will be use in construction of any Federal facilities on public lands. |
| | 442 | 2 | White Wash- The suggested open area is too small and will feel the impact of so many users in one small area. Please expand this at least to the Ruby Ranch Road beyond on the west, Duma Point on the east, and the Blue Hills Road on the north. | See response to comment 123-35 |
| | 442 | 4 | Right of way – Some of the trail designations outlined in Alternative D need to be reevaluated. Many trails are both ATV and Motorcycle trails. Many ATV and Motorcycle trails need to be opened to the other. | See response to comment 120-90 |
| | 443 | 1 | Keeping some trails open: including Flat Iron Mesa, Coyote Canyon, and Gemini Bridges | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 443 | 2 | Lowering in number of rigs limited to running a trail together (49 down to 24) | See response to comment 123-26. |
| | 444 | 1 | Include 300 miles or more of single-track trail | See response to comment 122-46 |
| | 445 | 1 | Specific areas I would like to explore and that are in danger of closure are the White Wash Dunes, Flat Iron Mesa, Strike Ravine and Barlett Wash areas. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 447 | 1 | The White Wash area in Alternative C & D is not adequate. It restricts in some areas, which are the main reasons for going there in the first place. | See response to comment 123-35 |
| | 449 | 1 | The Green River is not the right place for motorized vehicles. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

BLM_0012648

| | | | | |
|---|---|---|---|---|
| | | | | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 450 | 1 | Closing off all but the necessary access roads into the area by Hell Roaring Canyon – there are irreplaceable cultural artifacts (pictograph panel and inscriptions) nearby and great access puts these resources at risk. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 450 | 2 | Close off the road that runs along the river [in Labyrinth Canyon] for approximately three miles. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 451 | 1 | I hope the BLM will not put additional roads through [Labyrinth & Hell Roaring Canyon] these canyons. There are cultural resources (like pictographs  ) and more roads would increase the opportunity for people to come in and vandalize these artifacts. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 452 | 1 | Hearing of SUWA's proposal to keep this area [Dead Man's Point and Hell Roaring Canyon] unaffected by ORVs – by limiting current roads, I feel compelled to express my sincere support of maintaining what wilderness there is and increasing wilderness boundaries. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 453 | 1 | Block off the side roads – specifically the one going into Spring Canyon. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to |

BLM_0012649

| | | | | resources. This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|
| | 456 | 1 | I camp at Dead Man Point at the entrance to Hell Roaring Canyon. I would greatly prefer that the area is managed to minimized motorized vehicle traffic off of the main road access. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| | 456 | 2 | Labyrinth Canyon. I would like to see minimal motorized vehicle traffic in that vicinity as well. Please designate as few roads as possible. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| | 457 | 2 | Your open area at White Wash in Alternatives C and D must be expanded. It closes the killer hill climb and camping area to the west of the dunes. | See response to comment 123-35 |
| | 457 | 6 | The Utah Rims SRMA should extend further southwest to encompass Mel's Loop and beyond. | See response to comment 122-39 |
| | 457 | 7 | Yellowcat is increasingly popular for fourwheeling and ATV riding and is one of the areas that we enjoy. Designating a SRMA there would utilize the dense network of mine roads that already exist. | See response to comment 122-38 |
| | 457 | 8 | Some of the "motorcycle" trails are actually ATV trails. | See response to comment 120-90 |
| | 467 | 9 | Some of the "motorcycle trails" are actually ATV trails. We support the recommendation of the Utah State Parks onwhich should be open to ATVs. | See response to comment 120-90 |
| | 469 | 1 | Hell Roaring Canyon is in no way a viable road in my eyes or in those of whom are with me. To include this, among many others illogical roads does nothing but ask for a degradation of the area in the near future. Please, take time to check out "roads" in the plan in person, see which ones truly need to be designated as such and eliminate the numerous redundant pathways to pointless | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012650

| | | | | |
|---|---|---|---|---|
| | | | dead ends that many create. | |
| | 471 | 3 | Due to the growing numbers of people who enjoy the motorized recreational opportunities Moab has to offer, more areas should be opened to motorized recreation the policy of closing areas only increases the impacts to the remaining open areas. More people, less area equals more impacts to these areas. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 471 | 4 | Gemini Bridges: The road allowing access to drive across the bridges should remain open. This is the only place in Utah--maybe the world--where you can drive across a large natural bridge. This unique driving experience should remain open. If people desire the experience to viewing natural bridges with out vehicles driving across them, they merely drive a few miles to Arches National Park, Bridges national monument and numerous other arches/bridges in the area. | See response to comment 206-14 |
| | 471 | 5 | Please add the following to your proposal: to reduce traffic conflict and increase motorized opportunities, a motorized route should be designated between upper end of Mine Sweeper Road and Cliff Hanger Road. I would be glad to assist in the route selection. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| BLM - Grand Junction Field Office | 473 | 2 | Utah Rims SRMA (adjacent to Rabbit Valley):  The Alt C direction and management actions are overall consistent with management in the Rabbit Valley portion of the NCA. MFO and MCA staff should meet to discuss all designated roads and trails that cross the state line to ensure consistency on route designations and provide loop opportunities for recreationists. | A meeting between NCA and Moab BLM staff has already occurred to ensure consistency on route designations. |
| BLM - Grand Junction Field Office | 473 | 3 | re: designated routes map: The MFO draft plan does not show a designated route on a road that comes from the south end of Rabbit Valley out of the NCA and to the railroad tracks at May Flat, Thisis a designated route in CO and a popula roadused by recreationsits to access | This route was not designated because it leads primarily to state and private land and because of a cultural conflict on a large sand hill right next to the route.  The route will remain non-designated in the Moab RMP. |

BLM_0012651

| | | | the May Flat area. | |
|---|---|---|---|---|
| BLM - Grand Junction Field Office | 473 | 4 | re: designated routes map: There is a  road from May Flats that goes upriver in the floodplain and accesses a private parcel in CO. A 1/2 mile portion of this road is shown on the MFO draft map as a designated route, without a connection to any other designated routes. | This piece of road is in error -- it was to be removed along with the rest of the May Flat loop. |
| BLM - Grand Junction Field Office | 473 | 5 | re: designated routes map:  The MFO draft map shows a designated route starting at the State line near the Little Dolores River, crossing private and State of Utah land, following the Black Ridge Canyon Wilderness boundary, and ending at the CO river., approx 2 miles downstream from the Westwater Ranger station. The CO pportion of this road does not have legal public access in Colorado. It should not show on the MFO map as a route open for public use. | This route was designated in error.  It has been removed from the designated route map. |
| BLM - Grand Junction Field Office | 473 | 6 | NCA staff should meet and discuss all road and trail linkages that cross the state line. | This meeting has already occurred. |
| BLM - Grand Junction Field Office | 473 | 7 | Alt C shows that most of the land on the Utah-Co border currently open to OHV travel would be limited to designated routes, The GJFO has completed an extensive inventory of routes near the UT-CO border. The routes on which potential conflicts exist are in the area N of I-70 along bitter creek and near coates creek. Our staff has identified a few routes that would be closed under Alt C that are known to be well-used by visitors crossing the UT-CO border. Our Rec staff is having difficulty interpreting some of the maps in the EIS and cannot be certain of the extent of these conflicts.  It is not clear, for example, why some motorized routes (single-track trails) that cross the border north of I-70 do not appear on the MFO inventory nor is it clear what would happen to them under Alt C. GJFO must assume that they would be closed, since they are not shown on may 2-11E designated motorcycle routes. We request a meeting between the MFO and GJFO to clarify and resolve these questions. | The requested meeting has occurred and the routes in question were discussed. |

647

BLM_0012652

| Environmental Protection Agency | 479 | 7 | Ten Mile Wash is the second largest tributary drainage in the Moab planning area, and is a rich riparian/wetland/cultural/scenic/hydrologic resource. It provides wildlife habitat within a very arid region of the Moab planning area. These resources are considered vulnerable from surface disturbances such as OHV travel. We are concerned that proposing designation of a travel route through the Canyon's unique riparian corridor for OHV travel will substantially increase the likelihood of further significant impacts to these resources, including loss of riparian vegetation and increased erosion, thereby adversely affecting riparian/watershed resource values. The EPA supports the ACEC designation in the preferred alternative, but recommends that no OHV travel route be designated in the Wash in the Final RMP/EIS. | Alternative C (Preferred Alternative) in the DRMP/EIS lists the Ten Mile Wash area as "limited to designated roads and trails" for OHV use. The BLM contends that this designation will protect the unique resource values in this area and still allow OHV travel. On the ground actions to ensure travel on the one route within the wash have included marking, constructing barricades, closing side canyons, and installing educational information. The BLM is committed to continuing these efforts in Ten Mile Wash. |
| | 484 | 1 | I recently hiked the proposed motorized travel route from where Dubinky Wash crosses the county road to Spring Canyon (near Jug Rock Flat) to its confluence with Hell Roaring Canyon. There is no evidence of human activity in Dubinky Wash except for a couple of claim markers that appeared to have been dropped from aircraft as they displayed no evidence of having been hammered or otherwise anchored into the ground. The wash bottom is pristine and allowing travel up it does not appear to serve any actual purpose while destroying a significant opportunity for back-country hiking/non-motorized recreation and solitude. This route and all travel up Hell Roaring above the school section should be eliminated from the travel plan no matter what alternative is adopted. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| | 484 | 2 | In addition, the map for Alternatives C & D show a short route immediately to the south of the confluence of Hell Roaring and Dubinky Wash and going about .5 miles above Hell Roaring onto the sand dune before it turns north and dead ends. This appears to be a relict uranium-prospecting tract that has not been used in | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and |

BLM_0012653

| | | | | |
|---|---|---|---|---|
| | | | decades. It appears to have no purpose and should be eliminated from the travel plan no matter what alternative is adopted. | site specific NEPA analysis. |
| | 484 | 3 | I recently explored Ten Mile Wash are by four-wheeled drive vehicle and on foot. Ten mile Wash below the midway cut off should be closed to motorized travel. This out-and-back section of the proposed route serves no apparent purpose and compromises an area with outstand opportunities for hiking and solitude. Limiting the motorized access in Ten Mile to the area above (and including) the fun midway  cut off route would preserve a trail that is great for motorized recreation and the wonderful area below midway for hiking and non-motorized recreation. As the only purpose for keeping Tem Mile below the midway cut off open to motorized recreation is for the purpose of motorized recreation itself, this would be an appropriate comparison between motorized recreation and non-motorized uses. There does not appear to be any other purpose or need for motorized access into lower Ten Mile. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 484 | 4 | This past winter I had the occasion to hike from the northwest end of Castle Valley via the "Golden Stairs" route to the Big Bend area on the river by several different routes. In doing so I noticed several discontinuous "road" segments on top of Mat Martin point north of the Porcupine Rim Bike Trail. Alternatives C & D propose to allow motorized recreation in this area, presumably via these remaining pieces of road. This use should be eliminated as the entire Mat Martin Point area has outstanding value for non-motorized recreation. The quiet, solitude and amazing views and hiking routes down to the river make this area ideal for non-motorized use. The use of the Porcupine Rim bike trail does not disrupt this. Given the great difficulty of following the old roads, let along driving them and the lack of any real purpose for keeping them open, non-motorized use for this area should be preserved no matter what alternative | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

649

BLM_0012654

| | | | is adopted. | |
|---|---|---|---|---|
| NOLS/ Outdoor Industry Association | 487 | 4 | While in principal NOLS and OIA support the Moab Field Office's (MFO) efforts to inventory and identify all designated routes rather than opening up wide swaths of land to motorized recreation, in practice this initiative raises a few concerns. Unofficial, user-created routes that have previously not been recognized will enjoy administrative protection if they are included in the final RMP. It will be much harder to close routes the MFO deems to be detrimental to other multiple uses if they are incorporated into the plan. In fact, it would require a plan amendment. This limits the BLM's ability to manage routes in a timely manner.<br><br>In particular, there are two designated routes along the Green River in Labyrinth Canyon that represent a clear conflict of uses. Most disconcerting is a route at Hey Joe that actually follows the canyon bottom and is accessible by jeep. OHV activity along the canyon bottom clearly conflicts with a primitive river experience. Further downriver, at Spring Canyon, a similar route extends too far north in both Alternatives B and C. Route development along the Labyrinth Canyon floor should be discouraged, not legitimized. The MFO is likely aware of the Horseshoe Canyon Wilderness Study Area within the Price Field Office that extends to the west bank of the river, immediately across from the route along Hey Joe. NOLS and OIA consider that having one bank of a river managed to retain its wilderness character while the other bank remains open to motorized jeep travel to be a flawed prescription.<br><br>Ideally, the MFO will create a larger buffer zone along the canyon rim, with the exception of a few limited access points, to better protect the visual resources, the air quality, the opportunities for solitude, and the primitive experience frequently associated with river | The two roads that the commentor refers to were both built during the uranium mining days of the 1950's and 1960's.  These two roads are not new, nor are they user created.  While they are to be included in the travel plan that accompanies the preferred alternative, their removal would not require a plan amendment, but rather a simple EA.  The intent of the travel plan is to restrict travel to designated routes, not to open up new swaths of lands to motorized recreation.<br><br>Routes above the Green River rim do not generally cause conflicts with users below, as the distances are quite great. |

BLM_0012655

| | | | | |
|---|---|---|---|---|
| | | | trips. The Final RMP should provide at least a ¼ mile buffer from the canyon rim, unless the viewshed from the river extends beyond ¼ mile, in which case the buffer zone should be extended as well. A few limited access points can be maintained, but not at the excessive levels currently being considered. | |
| Coconino Trail Riders | 488 | 4 | We support the 200 yard motorcycle corridor and open area status for mountain bikes proposed by Ride With Respect and the Blue Ribbon Coalition on the Slickrock Trail. This is a good compromise between providing for exploration for motorcyclists while still providing an escape from motor noise for mountain bikers and hikers on the Slickrock Trail | See response to comment 122-42. |
| Coconino Trail Riders | 488 | 10 | Long-distance single-tracks and rugged roads that connect 7 SRMAs offer a unique experience. The Copper Ridge Motorcycle Loop should be combined with Thompson Trail in the final plan. | See responses to comments 122-29 and 122-36. |
| | 622 | 1 | BLM's proposal will result in 84 percent of public lands near Moab (those south of I-70 which attract most of the area's visitors) being within ½ mile of a designated ORV route (see proposed route map on our website). At the same time, BLM has done no-site specific studies to determine the impact of these routes on Native American cultural sites or other natural resources like riparian areas or wildlife habitat. Science to back up the ORV route designations does not exist in this document. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 628 | 1 | Keep the following routes open to motorized and non-motorized recreation:<br>-White Wash Sand Dunes<br>-Goblin Valley<br>-The last bit of Gemini Bridges<br>-Thompson Trail and Copper Ridge Loop (as proposed by Ride with Respect)<br>-Ten Mile Wash | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 629 | 1 | I was glad to see that Coyote Ugly Trail in the Black Ridge area was not included in any of the options. I strongly agree with the BLM decision not to include this | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

BLM_0012656

| | | | | |
|---|---|---|---|---|
| | | | trail, but I am also concerned that the BLM may change their decision due to pressure from the OHV groups. The reasons why this trail should not be designated:<br><br>1-The trail was established just over 2 years ago under questionable conditions. Even though this area is designated open to cross country travel, it seems that some laws were broken in its establishment. The creation of the trail has created "unique and unnecessary degradation" to the land, i.e. killing of trees and plants, scaring of rock and large quantities of spilled oil and gas.<br>2-     The Trail is not a thoroughfare, it is a simple horseshoe that exits close to its entry.<br>3-      San Juan County has made no claims on this trail as a road or right of way.<br>4-      The Coyote Ugly is in very close proximity to 4 large parcels of private property. One of which has been sub-divided for development.<br>5-      My property is located between the Coyote Ugly and Area BFE, this creates a trespassing problem, i.e. cutting of fences and creating spur trails, along a wash on our property, this was has not been claimed as a road or right of way by San Juan County or State of Utah.<br>6-      The BLM has done extensive research on its draft and chose not to include it.<br>7-      No person or government office made any claim to this trail. | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Outward Bound Wilderness | 630 | 5 | There are "new roads" that have been established by OHV users that would not have been considered viable roads that may now be considered as viable. Many of these roads are in areas that have been labeled as having Wilderness characteristics. These areas include:<br>     -The route on the river left miles 93-91.5 and up the small canyon at mile 91.5.<br>     -The route from Spring Canyon (river mile 66.5) heading downriver towards the Mineral Bottom Road | The roads referred to by the commentator are along the Green River.  The first is in the Placer Bottom area.  This route was built to access mining operations before World War II.  The second route (which does not go all the way to Mineral Bottom) was built during the 1950's uranium boom and is not a "new road".  Althouygh these routes may recently have been adopted by OHV users, they were not established by them. |
| | 636 | 3 | Regarding specific routes in the Westwater area, I am | Although this issue was raised during scoping, the |

BLM_0012657

| | | | | |
|---|---|---|---|---|
| | | | especially concerned about the two southward spur extensions in the Little Hole area which are shown as ORV routes by BLM but which are not proposed as vehicle routes by Grand County nor are in Alternative B. I frequently hike the Little Hole area and every year I see more extensive tracks pushed through previously undisturbed vegetation that is within the WSA boundary. It appears that these spurs attract vehicle trespass further into the designated WSA. These spurs should be closed as proposed in Alternative B. | application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 636 | 4 | I have a BLM R/W lease for access from the existing County D road, mapped as an ORV route to the boundary of my property. My existing vehicle track was correctly not designated as an open ORV route, but I presume the current R/W lease will continue and be able to be renewed under all alternatives. | See response to comment 120-16 |
| | 636 | 5 | Having addressed specific road issues near Westwater, I will comment that in general, the proliferation of ORV routes shown in BLM Alt C is far in excess of any reasonable accommodation of recreational vehicle use and will lead to future resource management problems. A well defined network of main routes, scenic loops, and spurs to overlooks is manageable and enforceable. The haphazard jumble of proposed routes in areas such as Mineral Point and Tenmile Point is not. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 637 | 1 | Trail segments that should be included: Flat Iron Mesa – From about 4346450 N 636300 E heading NW to the pipeline road. From about 4345600 N 634700 E going SW to Plan trail 2. From 4246200 N 633400 E going SW to the county B road 4. From about 4242400 N 633400 E south then east to the plan road. | See response to comment 206-17. |
| | 637 | 2 | Trail segments that should be included: Strike Ravine – A portion of the "Big Ugly" hill at about 4254500 N 636600 E. The north-to-south section accessing and traversing the property purchased by Kiley Miller (note: San Juan County has continuously supported this right of way in claim court). | The Strike Ravine Jeep Safari route in its entirety is in all travel plan alternatives. |

BLM_0012658

| | 637 | 3 | Trail segments that should be included:<br>3-D Trail – From about 4285900 N 609900 E north then west to 4286400 N 609300 E | See response to comment 206-11. |
|---|---|---|---|---|
| | 640 | 1 | There are a couple sections of this trail [Flat Iron Mesa] that are not clearly documented in your plan. Based on what we've seen in the past, if it isn't clearly documented as a road, it will be closed. I was also looking forward to trying Strike Ravine, but it also has missing sections in our documentation. | See response to comment 206-11 |
| | 643 | 2 | There must be opportunities for "open" riding. The White Wash Dunes have supported OHV use for decades and should be kept open at all costs. Making this area "foot traffic only" is utterly ridiculous. The distances and sand dune character make the idea of this being a "hiking" area pretty remote. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 643 | 3 | Each alternative is greatly lacking in "true" trail inventory. Several long standing routes were omitted and it is my understanding that miles of single-track were not even inventoried. In an era of "closed unless open" management, how is this the right thing to do? In addition there are several areas including the Cisco Desert area where many of the washes should be listed as "open" to the Copper Ridge system should be added/included in the Thompson Trail. | See response to comment 122-29 |
| | 645 | 1 | Please consider, if you have not already, putting this trail [Cisco Desert trail approx. 80 mile trail just outside of Thompson Springs]. This trail appears to be on the Designated Motorcycle Routes Alternatives C & D, but only as an alternative D route. Since the plan appears to be the acceptance of Alternative C I am assuming this trail will no longer be open – please reconsider if this is true. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Florida 4x4 | 649 | 1 | Trail segments that should be included:<br>Flat Iron Mesa – From about 4346450 N 636300 E heading NW to the pipeline road. From about 4345600 N 634700 E going SW to Plan trail 2. From 4246200 N | See response to comment 206-17. |

654

BLM_0012659

| | | | 633400 E going SW to the county B road 4. From about 4242400 N 633400 E south then east to the plan road. | |
|---|---|---|---|---|
| Florida 4x4 | 649 | 2 | Trail segments that should be included: Strike Ravine – A portion of the "Big Ugly" hill at about 4254500 N 636600 E. The north-to-south section accessing and traversing the property purchased by Kiley Miller (note: San Juan County has continuously supported this right of way in claim court). | The Strike Ravine Jeep Safari Route is in the Travel Plan accompanying Alt C of the DRMP/EIS.  See also response to comment 206-11. |
| Florida 4x4 | 649 | 3 | Trail segments that should be included: 3-D Trail – From about 4285900 N 609900 E north then west to 4286400 N 609300 E | See responses to comments 206-11 and 206-17. |
| | 650 | 1 | Klondike Bluff's Area. We hope it will remain a multiple use area allowing bicyclists and motorized travel to enjoy this route. The views are spectacular into Arches National Park and it's a unique route to see ancient dinosaur tracks. I hope the route over the top into the north road above Arches National Park will remain open as it has been for years to come. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 653 | 1 | Additional closure of the more well known and established motorized routes, such as the proposed closure of Rabbit Valley/Westwater motorcycle riding area in alternative D is, to me, a profound tragedy. I cannot understand why this area is seriously being considered for closure. I have never seen a hiker or an equestrian in this area. The trails are sustainable and generally in good condition. The area is not overused. Please do not close Rabbit Valley/Westwater to motorized use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 656 | 2 | Please keep access open to all Americans. Some Americans are disabled, less able, or just older. Denying access is not fair and maybe in violation of Federal ADA regulations. | The ADA accessibility guidelines do not specify or quantify the type or degree of access that must be allowed on public lands.  The ADA does not require that all public lands be vehicle accessible. In addition, designated recreational motorized routes are an administrative decision and not subject to ADA.  However, the ADA accessibility guidelines will be use in construction of any Federal facilities on public lands. |

BLM_0012660

| | 659 | 1 | Alternative C itself needs some work (i.e. the segments of Flat Iron Mesa, Strike Ravine, and 3D trails are missing, and I think Yellowcat is becoming popular for 4x4 activities and should be reviewed for further use). I also see things in Alt C that confine vehicle use to small areas without easily identified ground boundaries (i.e. White Wash area. | See response to comment 206-11 |
|---|---|---|---|---|
| | 665 | 1 | It is obvious that the old way of sharing jeep routes with everyone, the basis of mountain biking in Moab, no longer works, Gemini Bridges, Poison Spider Mesa, and Gold Bar Rim are classic examples. With new 4-wheeled drive technology, the alterations (Damage) to the trails are such that cyclists cannot use the same routes unless they like taking their bike for a walk. The Grand County Non-Motorized Trails Master Plan proposes alternate route in each of these areas. The Green Dot / Bull Canyon (Gemini area), Blue Dot (Gold Bar single-track listed in "D"), and Wags Way-which is all slickrock (Poison Spider area). Trails should be priority projects ASAP. There are user created routes that traverse slickrock in areas that have been overrun by motorized traffic. | See response to comment 122-46 |
| | 672 | 1 | Flat Iron Mesa: 1. From about 4246450 N 636300 E heading NW to the pipeline road 2. From about 4245600 N 634700 E going SW to Plan trail 3. From about 4246200 N 63400 E going SW to the county B road 4. From about 4242400 N 63400 E south then east to plan road | See response to comment 206-11 |
| | 672 | 2 | Strike Ravine: 1. A portion of the "big ugly" hill at about 4254500 N 636600 E 2. The north-to-south section accessing and traversing the property purchased by Kiley Miller (note: San Juan County has continuously supported this right-of-way claim in court). | See response to comment 206-11 |
| | 672 | 3 | 3-D Trail: From about 4285900 N 609900 E north then west to 4286400 N 609300 E | See response to comment 206-11 |
| | 673 | 2 | Fisher Towers area. Your preferred alternative would allow oil and gas development on the mesa north of the | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under |

BLM_0012661

| | | | | |
|---|---|---|---|---|
| | | | towers, and to the west of the towers. It also proposes ORV routes on the mesa north of the towers. I have hiked and climbed in this area many times and greatly enjoy the solitude and views which can be experienced from the mesa top. I feel that ORV routes on the mesa would ruin the wilderness values critical to my recreational experience in this area. Furthermore, I believe that oil and gas development on these visually spectacular lands would leave lasting scars and permanently degrade the wilderness values of nearby areas. Please reconsider your preferred alternative so that it will not impact the non-motorized recreational user so negatively and will protect existing wilderness values. | Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 673 | 3 | Tenmile Canyon: Your preferred alternative proposed an ORV route down the entire length of Tenmile Canyon, from Dripping Springs all the way to the confluence with the Green River. Tenmile Canyon has one of the few perennial streams in the Moab area and is home to some of the oldest archaeological sites in the state. As such, it is difficult to imagine a less appropriate place for an ORV route than Tenmile Canyon. To make matters worse, your agency has not surveyed the archaeological sites in the canyon, so the risks associated with ORV use (such as vandalism and looting) are unknown. I have hiked in this canyon several times; each time I was continually disturbed by noise from ORVs. Unfortunately, ORVs can be heard form very far away when one is hiking in a naturally quiet place. I have also witnessed the damage that ORVs have inflicted on stream banks and "off-trail" areas in Tenmile Canyon. Please reconsider your preferred alternative so that it will protect the riparian, archaeological, and wilderness values of this area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 678 | 1 | The proposed amendments are difficult for me to review and fully understand, however many familiar trail names I have enjoyed using jump out at me. It want to continue using routes such as Strike Ravine, 3-D, Gemini Bridges, | See response to comment 206-11 |

657

BLM_0012662

| | | | and the Flat Iron Mesa as they exist now. | |
|---|---|---|---|---|
| | 679 | 1 | The Easter Jeep Safari is a popular event for myself and my friends. I believe that some portions of Flat Iron Mesa, Strike Ravine, and the 3-D Trail have been left out of the new travel plan. These trails include the following segments:<br><br>Flat Iron Mesa: 1. From about 4246450 N 636300 E heading NW to the pipeline road 2. From about 4245600 N 634700 E going SW to Plan trail 3. From about 4246200 N 63400 E going SW to the county B road 4. From about 4242400 N 63400 E south then east to plan road<br><br>Strike Ravine: 1. A portion of the "big ugly" hill at about 4254500 N 636600 E 2. The north-to-south section accessing and traversing the property purchased by Kiley Miller (note: San Juan County has continuously supported this right-of-way claim in court).<br><br>3-D Trail: From about 4285900 N 609900 E north then west to 4286400 N 609300 E | See response to comment 206-11 |
| | 679 | 2 | Gemini Bridges is a popular destination for my family and I'm saddened to see that it's proposed for closure. It's hard to imagine much resource damage to rocks from vehicles. | See response to comment 206-14 |
| | 680 | 1 | Keep the route in Westwater WSA open. This has been accessible for years and should remain so. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 680 | 2 | Provide the missing segments to the maps for Flat Iron Mesa, Strike Ravine, and 3-D. These should be included in the final maps. | See response to comment 206-11 |

BLM_0012663

| | 680 | 3 | Keep the Gemini Bridges route open. My son and I were in Moab last spring in Gemini Bridges. We met with a group of senior citizens. Several of these seniors would have been unable to fully enjoy the arches as if they were required to hike to them as opposed to driving to them. | See response to comment 206-14 |
|---|---|---|---|---|
| | 682 | 1 | There are a couple of trails on the Utah/Colorado border with access from the Utah side. They are Island Mesa and Wray Mesa. Both of these should be left open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 682 | 2 | Gemini Bridges should not be closed to motor vehicles. | See response to comment 206-14 |
| | 682 | 3 | Mill Canyon and Courthouse Wash should be left open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 682 | 4 | The rock fall in the Tenmile Canyon Trail should be removed and opened to all motorized traffic. | See response to comment 211-20 |
| | 684 | 1 | Strike Ravine: 1. A portion of the "big ugly" hill at about 4254500 N 636600 E 2. The north-to-south section accessing and traversing the property purchased by Kiley Miller (note: San Juan County has continuously supported this right-of-way claim in court). | See response to comment 206-11 |
| | 684 | 2 | Flat Iron Mesa: 1. From about 4246450 N 636300 E heading NW to the pipeline road 2. From about 4245600 N 634700 E going SW to Plan trail 3. From about 4246200 N 63400 E going SW to the county B road 4. From about 4242400 N 63400 E south then east to plan road | See response to comment 206-11 |
| | 684 | 3 | 3-D Trail: From about 4285900 N 609900 E north then west to 4286400 N 609300 E | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under |

659

| | | | | Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|
| | 687 | 1 | Mountain bike single-track. The Mill Canyon - Sevenmile Rim biking focus area should be expanded as Mill Canyon-Tusher Rims in order to provide terrain for pedaling. | See response to comment 122-46 |
| | 687 | 2 | The Final plan should extend the South Spanish Valley biking area further south toward Black Ridge. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 689 | 1 | An open area in addition to White Wash could provide a different terrain for everything from bicycle free riding to trails motorcycling to hardcore rock crawling. As 99% of the Moab Field Office becomes limited to designated routes, open areas play an even more critical role for accommodating specialized sports. Perhaps parts of Black Ridge could remain unrestricted for this purpose. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 689 | 2 | The Sand Flats Recreation Area could adopt special policies to permit slickrock exploration. We support Ride with Respect's recommendation that mountain bike travel be allowed on any barren rock surface. Slickrock within one hundred yards of a designated route could be open to motorized travel. This two-hundred yard corridor would accommodate the ways that people currently enjoy Sand Flats. | See response to comment 122-42 |
| | 692 | 1 | I am particularly concerned about the impact of ORV use at a location named Potato Salad Hill on Mill Creek, just outside the town of Moab.

As is pointed out in the RMP, less than 1% of BLM administered lands are riparian in nature, and "are often | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and |

BLM_0012665

| | | | | |
|---|---|---|---|---|
| | | | among the first landscape features to reflect impacts from management activities. These habitats are used as indicators of overall land health and watershed condition."<br><br>The Potato Salad Hill area is one that has seen substantial recent degradation immediately adjacent to Mill Creek, the most important drainage in the Moab RMP that originates in the Moab area. To continue to allow this high impact use in such a sensitive area is an indication that care and protection of the resource is secondary to allowing ORVs to do anything they want. | site specific NEPA analysis. |
| | 693 | 1 | I am backing the position of the Utah 4 Wheel Drive Association. The analysis ithis group has done is thorough and ground level. I would ask in my personal interest to keep the user created trail known as Coyote Canyon open. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 694 | 1 | All existing roads, trails, and travel ways should remain open to the all the public. The closures to motorized travel will stop our less fortunate public, the handicapped from enjoying this area. Does the plan address the needs of the handicapped and address the federal ADA requirements? | The ADA accessibility guidelines do not specify or quantify the type or degree of access that must be allowed on public lands.  The ADA does not require that all public lands be vehicle accessible. In addition, designated recreational motorized routes are an administrative decision and not subject to ADA.  However, the ADA accessibility guidelines will be use in construction of any Federal facilities on public lands. |
| | 695 | 1 | Please don't close roads and trails that have been open for many years such as the Gemini Bridges road and the Ten Mile Wash. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 697 | 1 | The roads traversing Flat Iron Mesa and those around Gemini Bridges are places I enjoy taking my family, I would be very disappointed to lose access to those | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

661

| | | | | |
|---|---|---|---|---|
| | | | areas. | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 752 | 1 | I have included maps showing GPS tracks of existing routes for these trails indicated in red. Please add the missing segments to the designated route inventory on Map 2-11-C. | See response to comment 206-11 |
| | 817 | 1 | Paving the road, and prohibiting OHV's from pavement, has fragmented the trail system. Thus OHV's should be permitted to use Sand Flats Road from Hells Revenge exit to the end of the pavement. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 817 | 2 | Additionally, the 1/4-mile Slickrock route connecting Slickrock Trail with Fins 'N' Things should be designated for two-wheeled use to alleviate traffic along the main road. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 817 | 3 | Special policies should continue permitting Slickrock exploration. The Moab Field Office Off-Highway Vehicle Travel Map states that  "Two-wheel motorcycles are allowed on established Slickrock riding areas in the Slickrock Trail. Bartlett Wash and Tusher Canyon areas and on Slickrock areas along the Monitor and Merrimac and Lower Monitor and Merrimac trails where such use does not further disturb vegetation or soils" (dated March 8, 2001 as part of emergency restrictions). In these areas, travel could be further restricted, but not so drastically as the Draft RMP intends. Mechanized travel should still be allowed on any barren rock surface. Slickrock within one hundred yards of a designated route could remain open to motorized travel, except for Tusher Slickrock, which would be reserved for non-motorized | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012667

| | | | | |
|---|---|---|---|---|
| | | | use. This two-hundred yard corridor would accommodate the ways that people currently enjoy slickrock areas. | |
| | 817 | 4 | The Black Ridge area presents many potential recreation opportunities nearby Moab. The South Spanish Valley Mountain bike area could be extended to include part of Pole Canyon. This augments the varrity of terrain, and provides enough room for a full-days ride. Sweeping travel restrictions associated with the Draft RMP warrant designating an area for specialized sports which depend on unrestricted areas. Durrable and irregular terrain that is suitable for motorcycle and bicycle trail riding exists in Pole Canyon from the powerlines to Area BFE. In the same vein, a rock crawling area could be established on Black Ridge east of the powerlines. This area is littered with old mine roads, and is currently open to cross-country travel. The site could be limited to designated rock crawling routes, and adopted by local clubs. West of the powerline, the north flank of Black Ridge could be designated for equestrian use, as the backdrop to a residential area. The south flank could be a bicycle free ride area, since it provides one thousand feet of vertical relief, and graded roads for shuttling. Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road. It should be open for OHV's to create a loop with Behind-The-Rocks while avoiding the highway. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 2 | AGATE: For connecting purposes, shouldn't we keep the good NE-SW pipeline road (perhaps as "Frontage Road") that joins the major road at its northeast end about 4328400 N 655200E (NAD27 CONUS). {Apparently excluded is a short segment needed for continuity going southwest from about 4320000 N 659000 E. There is a disconnect about 4223000 N 655400 E (disconnected on Alt. D, as well) where the included road near the the old railroad grade road seems not to meet an included road to the northeast. Although the road on the northwest side of the railroad tracks does connect (despite a rather abrupt wash crossing) to roads | See response to comment 206-11 |

BLM_0012668

| | | | | |
|---|---|---|---|---|
| | | | on both sides of the tracks.} | |
| | 818 | 3 | ANTONE CANYON: Some of the roads in the southeast quarter of the quad make efficient connections, especially to the road above the first rim (in Alt. D). | See response to comment 206-11 |
| | 818 | 4 | BAR X WASH: The road up Winter Camp Draw does connect at about 4348800 N 663300 E (see Bitter Creek Well) and could be well included. | See response to comment 206-11 |
| | 818 | 5 | BIG BEND: {The spur to an overlook on Dry Mesa at about 4283200 N 633700 E is worth the whole trip}. Opening thwe road into Cache Valley wash from about 4287200 N 634400 E and some of the wash is worthwhile (senic upstream, access to view and hike to Cache Arch downstream). | See response to comment 206-11 |
| | 818 | 6 | BIG TRIANGLE: Why not lower Coats Creek? There are some fine roads to consider in case the Westwater WSA is not designated: North of the river going southwest and including a road into Big Hole, and espically, on the south side of the river as far as Star Canyon. | See response to comment 206-11 |
| | 818 | 7 | BITTER CREEK WELL: The road from about 4240700 N 666200 E going east through a SITLA section to the Rabbit Valley Interchange (in Colorado) is a valuable connection. {Why is the road up Winter Camp Draw not included? It connects in Bar X Wash (included in Alt. D). An important connection from a dugway west from about 4336100 N 663200 E appears to be excluded, denying access without driving the dugway}. | See response to comment 206-11 |
| | 818 | 8 | BLUE CHIEF MESA: {No terrible problems, but the continuation of the dead-end road from about 4296500 N 657900 E to the west on the southwest side of Scharf Mesa was a fine experience to drive, as well as the road through Buckhorn Draw from about 4302900 N 658400 E. Both of these roads were considered to have impasses during inventory, but they can be traversed with good equipment and determination (making it more fun)}. | See response to comment 206-11 |
| | 818 | 9 | BOBBY CANYON N: I got about 3km farther up Left | NRR |

BLM_0012669

| | | | | |
|---|---|---|---|---|
| | | | Hand Tusher (in Alt. D), but was thwarted by rockfall in Naylor Canyon. | |
| | 818 | 10 | BOBBY CANYON S: Upper Coal Canyon (seems to be in "closed" area) is interesting, having some apparent historical use for locals gathering coal (a bit is in Tusher Canyon). | NRR |
| | 818 | 11 | BRYSON CANYON: Saddle Ridge (west side of quad) seems like a nice view area to the dead-end. Why not? | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 12 | CALF CANYON: A few connecting roads could be considered arount Pinto Wash (in Alt. D). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 13 | CISCO SPRINGS: A few roads below the Book Cliffs are worthy of consideration; e.g., one going west from Corral Canyon Bench and one going past Strychnine Pond. {Starting at 4320300 N 636900 E, a connection toward the north (only about 500 meters) is excluded (it's in Alt.D)}. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 14 | CISCO SW: Some roads in lower Fish Seep Draw are interesting enough to keep. Some of the included roads in the Poison Strip area are very-to-extremely faint and of questionable value. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 15 | CRESCENT JUNCTION: Why not access to the nice ride to the D&RGW radio tower; the road leaves 1-70 at an "informal interchange" at about | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

BLM_0012670

| | | | | |
|---|---|---|---|---|
| | | | 4309600 N 698200 E to die tower at about 4310900 N 698900 E? Numerous access to the railroad are ignored. {A seis line is included continuing straight (roughly west) at about 4313800 N 604300 E, where the original route meets some bad washes and is not being used (Oct. '07); the inventoried parallel route just to the south is in good condition and considerably used. | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 16 | DANISH FLAT: Missing are two worthwhile roads3 on Cisco Mesa, one to a dam, one to a DH. Why is pipeline road here included but not elsewhere (see AGATE)? Ditto old railroad grade? In the northeast corner at roughly 4330500 N 650500 E, the old railroad grade appears to be included, but the bypass (which must have been made for a reason) is not. | See response to comment 206-11 |
| | 818 | 17 | DEE PASS: We wish for some connections in the vicinity of 4298000 N 591000 E although the transient (due to flooding) nature of some gully crossings makes it hard to define exact routes. {We would like access to a challenging road (in SITLA) going west from the Duma Point road about 4295900 N 592500 E3.5 and climbing northerly to a dugway to about 4296000 N 591400 E | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 18 | DEWEY: The USGS-mapped road that meets the Owl Draw road at about 4300800 N 642400 E is essentially invisible, and I can't tell if it or another merely poor road is the included road, which would be ok. Possible useful connection to tie roads together is a short E-W road at about 4299300 N 641500 E3. Fun-to-explore roads to Roberts Mesa top3 and along Dolores River down from Roberts Bottom are missing. {Road with dugway down west side of Hotel Mesa from about 4298400 N 650100 E3 to a defunct placer gold operation with historic equipment at about 4299300 N 649000 E. The included road going south from 4301564 N | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012671

| | | | | |
|---|---|---|---|---|
| | | | 643464 E is difficult to find (I missed it on GPS trips in '92, '95, '98, '05 and found it with determination in '07) and may not have been machine constructed; a better choice for connections is the road going south from about 4301300 N 642700 E3 to about 4298800 N 642200 E3 with a junction at about 4300200 N 642600 E3 with a road going east to join the aforementioned included road at 4300641 N 643501 E. The latter roads are on the USGS map; the included road is not.} | |
| | 818 | 19 | DOLORES POINT N: The spur from the river up Beaver Creek is a good start for hiking and perhaps horsebacking. (See also: Fisher Valley re dead-end road on N. Beaver Mesa.) {For connections to and from Colorado, we should keep two E- W roads about 4276800 N5 and 4278100 ~, both about 668300 E.} | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 20 | DOLORES POINT SOUTH: The road going west from about 4276000 N 668300 E is significant access to Colorado roads.3 The road from a mine to the Forest boundary about 4276200 N 665000 E (in Alt. D) continues east in the Foresf and is interesting despite its grown-over condition. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 21 | DRY CANYON: Why not access to Pear Park Gas Field3? The road climbing out of Bull Canyon3 (4355800 N 646700 E) was blocked by rockfalls at the time of my visit, but it has all the elements of a scenic, challenging, and exciting ride (I am told it used to be maintained, but). is not passable by a road grader now). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 22 | DUBINKY WASH: {We believe a useful connection into Tenrnile Wash is at "Texas Bob Dugway," once a challenging sandy climb at 4287000 N 587500 E3A but now bypassed directly into the wash just below a fairly new cattle guard (!) at a | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to |

BLM_0012672

| | | | | |
|---|---|---|---|---|
| | | | fence line. A NE-SW seis. line is shown in the inventory as discontinuous at a wash crossing about 594000 E 4287000 N. In fact, if a straight-line route at that crossing was ever used, a constructed bypass was in use at least when my GPS data were gathered in October 1994, May 2003, and October 2007. That (excluded) route was much the best way in 2007, rather than the included way from the south, which was in very poor condition, not being used, and even difficult to find in 2007. }4A As a separate issue, the same seis line is interesting where it continues NE to near the cliff at about 596000 E. | resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 23 | EIGHTMILE ROCK: A fairly long spur goes NE from about 4245500 N 624600 El; (this is appropriately named "Behind the Rocks Overlook" on Barnes' Canyon Rims Rec. map and is of value for touring and exploring). There is a nest of roads, virtually all in SITLA, having recreational value in and out of an interesting canyon in the vicinity of 423700 N 621000 E1, but short BLM access roads are needed; preferred eastern access is from 4237200 N 622100 E and a western access is from 4236700 N 620000 E (on Lockhart Basin quad) ( other west accesses could be chosen). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 24 | FISHER TOWERS: Several BLM roads in Professor Valley, roughly 4281400-4285000 N 642000-645000 E are pleasant to visit, and sharing with other users should be considered. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 25 | FISHER VALLEY: On N. Beaver Mesa, the included road ends about 4287700 N 662100 E3 where the road continues up to a ridge and dead-ends - | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

BLM_0012673

| | | | | |
|---|---|---|---|---|
| | | | scenic possibilities. {The included road at about 4281100 N 655600 E enters private property, effectively denying on access to BLM roads farther south, while a parallel public road3 just to the east is excluded.}4A Some BLM roads in the south end of Fisher Valley are fun to explore. | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 26 | FLOY CANYON N: With only one mile of D road (not reservation) on the whole quad, why can't we have Showerbath Canyon3, if only for the name? | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 27 | FLUME CANYON: We wish the cherry-stem could be extended somewhat farther into Diamond ~anyon; it can be challenging to drive but beautiful (in Alt. D). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 28 | GOLD BAR CANYON: We consider the route to and across Gemini Bridges an important rare treat for motorized users.3A We'll miss the spur to beneath Gemini Bridges (picnic spot), but we understand the problem. The road on Amasa Back from about 4265500 N 618300 E to above The Billboard is challenging fun for driver and navigator. My data show "no gate" at the State Park boundary about 4265200 N 610600 E, making the BLM road rather useless. Old mine roads, often interesting to visit, about 4275700 N 616000-617000 E3A are have value for recreation. {Beginning at the junction of the Gemini Brides road and the road south to Bull Canyon bottom, Alt. C shows three spurs from the Bull Canyon road, apparently departing at | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012674

| | | | | |
|---|---|---|---|---|
| | | | about 4272660 N going east, 4271500 N going east, and 4271100 N going west. Having not found tltese spurs in previous inventories, r searched again Nov. 8 & 19, 2007, possibly seeing evidence of two of tlte tltree. I also searched from tlte west end of one (I've been told it connects tltrough) and found only scattered A TV tracks off of tlte visible road. In tltis heavily visited area, tlte absence of usage on these spurs reenforces tlte notion that tltey are essentially invisible and suggests tltat they are not very important. I suggest that these tltree be deleted from Alt. C ; hard-to-find roads in popular areas b~get off-road tracks.} | |
| | 818 | 29 | JUG ROCK: {RMP maps in the vicinity of Big Mesa campground do not match current activity. Alt C includes some roads that are now posted closed, some roads that are being "rehabbed," one road spur tltat has disappeared, and one road soutlt of UT-313 that I have been unable to find. | See response to comment 206-11 |
| | 818 | 30 | KANE SPRINGS: There is a rocky, small canyon loopl just north of tlte Black Ridge road, beginning and ending about 4252350 N 637380 E, called "Coyote Canyon" by rock-crawling entltusiasts; tltis is one of the places that can divert extreme four-wheelers away from creating new routes along better-known, heavily traveled trails. (A map copy is attached.) The spur running N-S toward Kane Creek at about 633000 E terminates before its time (about 4250900 N), considering viewpoints.1 A connecting road going from about 4254000 N 632500 E northeast to an obscure junction at about 4256000 N 633700 E1 ha~ some slickrock and is fun to drive, and it offers a long bypass to the daunting crossing of "High-Dive Canyon" on tlte | See response to comment 206-11 |

BLM_0012675

| | | | | |
|---|---|---|---|---|
| | | | Behind tlte Rocks trail. It passes a less important, hardly used connecter, which includes a steep dirt hill, from about 4255150 N 633000 E going north to cross an included road. {Missing are two portions of the Jeep Safari Strike Ravine trail. (1) The N-S road accessing and traversing tlte contentious private property (where San Juan County supported tlte road claim!). (2) A portion of the "big ugly" hill at roughly 4254500 N 636600 E.} | |
| | 818 | 31 | KLONDIKE BLUFFS: {I have been unable to find tlte road going SW from about 4299600 N 618700 E; tlte combination of its unused condition and its questionable status witltin Arches N.P. (tlte county inventory stopped at the boundary) make its inclusion in Alt. C moot. Missing is a vital tiny part of "Klondike Bluffs (bicycle) Trall" access going NE at about 4291900 N 611600 E3 and its shortcut used by "Copper Ridge Trail".} | See response to comment 206-11 |
| | 818 | 32 | LA SAL EAST: There are two largely scenic routes that also provide north-south access in tlte SE quarter of tltis quad tltat should be preserved (both were seriously machine-made roads, but labeled "pack" by USGS). The western one is included, but ironicaliy, is currently nearly impassable (large rock, huge "Pondie", and BRUSH!). We drove it painfully 6/1/07; it could be salvaged witlt some volunteer work. The eastern route, which splits into multiple roads at about 4238500 N 661600 E3, is in good condition for 4WD, but is excluded. This route is coded "non-motorized" in tlte San Juan County Map Book; we would like to know why. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 33 | LA SAL JUNCTON: I expected inclusion of a pretty good road going east from Hwy. 191 about 4245200 N 636900 E to join included roads -even | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel |

671

BLM_0012676

| | | | the terminus of one of the included roads. I suggest keeping the road from about 4244800 N 632600 E going north (to complete a loop witIt an included road) to the county B road at about 4245650 N 632600 E1. {Four portions of tIte Flat Iron Mesa Jeep Safari trail are not included: (1) From about 4246450 N 636300 E jiggling NW to the pipeline road. (2) From about 4245600 N 634700 E going SW to an included road [this popular route may not be in the permit]. (3) Although this now-faint section has not been used recently (in favor of the county B road), from about 4246200 N 633400 E going SW to meet the county Broad. (4) The loop around the south side of "Hammerhead Rock" from about 4242400 N 633400 E south then east to the included road.}4 Again, including roads through a not-gated fence is confusing. In this area, an included road segment that looks like a short-cut (from about 4242500 N 634400 E to about 4243300 N 634500 E) has been in very poor condition and has no redeeming values to merit inclusion, in my opinion. | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 34 | LISBON GAP: Are we trying to keep Utah people in state or keep Colorado people out? I count two important accesses and three useful but less important that are not included! A really fine trip is to circumnavigate the Colorado part of Island Mesa beneath its rim. As near as I can tell, the Colorado roads are in the Uncompaghre F.O., which limits travel to existing roads, suggesting that access is valuable. One can start a counter-clockwise loop from the main E- W road in Colorado and reach the N-S road east of Island Canyon by either a poor road that joins at about 4227100 N 670300 E1 or a decent road that | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012677

| | | | | |
|---|---|---|---|---|
| | | | joins at about 4228100 N 670050 E2 near the rock-house ruins. The "poor road" makes an interesting connection but is so little used that it is hard for me to defend, but the "decent road" is valuable as part of the loop. Neither road is on the "San Juan County 7.5 Minute Map Book". From about 4233250 N 669600 E, a strong road2 goes basically east to access the many old roads of Ray Mesa. An included seis' line goes NNW dead-ending near the Colo. line, but an interesting road departs northeast from about 4223800 N 671200 E1, and branches south then east into Colorado and back to the main road (useful). Travel downstream in Greasewood Canyon bottom is fascinating for the drive and scenery, although continuation into Colorado (once all the way to the Dolores River) is now limited. I note one consequence of the fat lines on the map; some roads that are not continuous may appear to connect (e.g. 4227900 N 667300 E had no connection at the time of my inventory). | |
| | 818 | 35 | LISBON V ALLEY: On Three Step Hill there is a dead-end(core drill) road that departs NE from included roads at about 4221300 N 662900 E1 offering excellent views to the north (if you like to see the copper mine). Only partly included is a pleasant drive along the ridge on the NE side of Lisbon Valley from about 4231700 N 656600 E to about 4225100 N 562900 E1 with a connection NE to included roads. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 36 | LOCKHART BASIN: Worthwhile further views are to be had on an extension of about a quarter mile beyond the B road at about 4338400 N 615000 E1. Barnes' "Kamikaze Trail" has a spur running SSE-NNW ending about 4243700 N 620000 E1 that is worthwhile for another view | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and |

BLM_0012678

| | | | of Lockhart Basin. | site specific NEPA analysis. |
|---|---|---|---|---|
| | 818 | 37 | MARBLE CANYON: For access to and from Colorado roads; two roads (one of them forking farther south) start at about 4211100 N 668700 E3 go southerly then easterly, and one southerly extension crosses and re-crosses the border. (What are isolated roads north of Picture Gallery Ranch? | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 38 | MERRIMAC BUTTE: We think the road through Mill Canyon3 going south from the Mill Canyon Dinosaur Site as well as the N-S road on the west side of Courthouse Rock connecting to near the old stage station3 are important for the scenic experience and some challenge in driving in the canyons. We would like: the road on NE side of Merrimac Butte completing circumnavigation of butte, and the road heading SE from about 4277800 N 617200 E3 to the NP boundary (for hiking access through a pedestrian "maze ") .{Not included is the part of 3D Trail from about 4285900 N 609900 E3 north then west to 4286400 N 609300 E}3,4. The included road that connects to the 3D Trail going southwest from about 4286900 N 610100 E appears to be user created and has little merit. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 39 | MINERAL CANYON: The ride up Mineral Canyon is a desirable experience past the SITLA section, despite impasses on original road that can be bypassed in the wash bottom. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 40 | MOAB: The spur to parking for Halls Bridge hike (4263600 N 625600 E3) not shown, although. few hikers are likely to drive there anymore Looks as if the road through SMM Wetlands is includeds (as well as the road on S side of tailings pileS). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to |

674

BLM_0012679

| | | | | |
|---|---|---|---|---|
| | | | | resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 41 | MOLLIE HOGANS: {To complete a gorgeous scenic loop, the short NE-SW road that reaches the NP boundary at about 4294800 N 623400 E3 should be included (Alt. A inventory shows a discontinuity; my 1994 data are continuous, and a revisit in 2007 finds a decent road all the way). Be aware that the road that enters Salt Wash at 4297827 N 623160 E has virtue as a connector but is faint at best and fully obscured by deep brush in Salt Wash (2007).} | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 42 | MOUNT TUK: "Ride with Respect" has proposed devoting an area near Yellow Circle I)1ines to rock crawling activity. As with the "Coyote Canyon" loop, such a designation would help preserve other established trails that are more oriented toward touring. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 43 | PR SPRING: At the time of my visit (1996), the road in upper Middle Canyon (above 4360700 N 645300 E) was "not seen" and the included side canyon was blockaded. | NRR |
| | 818 | 44 | RAY MESA: No significant problems, but it would be desirable to include a Colorado access below the cliffs (access to a dam and pond plus other connections in Colorado) going SE from about 4242700 N 669700 E; there is no other nearby access to this road. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 45 | RILL CREEK: Porcupine Rim jeep/bike trail included only to WSA boundary; motorized cannot reach start of single-track and beyond (to maintain the single-track junction and to find lost bikers who ignored the junction!). Would like the scenic spur going NW starting at about 4263700 N 638000 E3A; and another short spur to | See response to comment 122-46 |

675

BLM_0012680

| | | | | |
|---|---|---|---|---|
| | | | access "old mail trail" at about 4265900 N 638000 E.3A Could the road west from Coffee Pot Rock'A be included in case the WSA is not designated, or at least to the WSA boundary (I used it as part of a Labor Day Camp-Out trail in 1985)? A challenging, scenic, and fun-to-drive spur to the rim starts about 4274900 N 637800 E1. Why not road SE to overlook starting about 4270000 N 635830 E3? | |
| | 818 | 46 | SAGERS FLAT: A dead-end road giving westerly access from about 4213900 N 627900 E excluded (even in Alt. D), but its good condition suggests some usefulness. I wish we could use the roads along the RR tracks; how else could we access the old railroad grade, along with other disconnected segments, that appear on Alt. D? {Something seems strange near 4209000-42010000 N 620000 E: A discontinuity (apparently at 4209500 N 619800 E where there is a washed-out, deep wash crossing) near the SITLA section. The included road has become invisible in places; I was able to find very little of it in Oct~ '07. Some better new roads access some dam work near there, but best access seems to be from an excluded road going SW from about 4210000 N 620800 E, then another, perhaps new, road to the west. In this area of deep washes, the only active (passable) wash crossing we found (in '07) was at about 4209100 N 620200 E. See also Thompson Springs. } | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 47 | SANDSTONE: No significant problems, but there are many old mine roads that are fun to explore. | NRR |
| | 818 | 48 | SHAFER BASIN: An included road is only the beginning of a wonderful spur going south from about 4258300 N 611900 E continuing south and reaching a scenic bench across from Chicken | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan |

BLM_0012681

| | | | | |
|---|---|---|---|---|
| | | | Corners, with foot access to area of in-matrix petrified wood about 4256900 N 611700 El (mentioned in Barnes' guide book) just above a historic drill site beside the river. | based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 49 | SOP CANYON: No significant problems. For possible inclusion, is a strong road angling 450 NE-SW from about 4219350 N 663500 E and connecting an included road to the continuation of an included road into the Monticello F. O. (it has a short spur to a stock pond). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 50 | STEAMBOAT MESA: {We use (permitted for Dolores Triangle trail) the tiny EW shortcut at about 4295500 N 668000 E.} | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 51 | TEPEE CANYON: Cottonwood Canyon is an adventure - more than I undertook (in Alt D.) | NRR |
| | 818 | 52 | THOMPSON SPRINGS: Blaze Canyon3 might be worthwhile. {I re-visited and found (absent from my earlier inventory) the included seis line going northeast from about 4306000 N 617500 E, where there is an impassable gully, reachable via a (cross-country?) bypass beyond the gully. The included line basically reaches recent dam construction on the Sagers Flat quad. This line is parallel to an excluded line just southeast of it, but the excluded line is a better road and the 'dozer-tracks (possibly a pre-existing route) that reached it northeast of the included connection seems the better way.} | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 53 | TROUGH SPRINGS: In the vicinity of an oil tank near 4254000 N 624000 E are two roads going northeast to canyon rim views; one, the more southern, is worthwhile. There is a | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan |

677

BLM_0012682

| | | | | |
|---|---|---|---|---|
| | | | "seismic mesa lite" at about 4253000-4254000 N 628000-629000 E with access roads from north and south -not great recreation significance and surely needing no more than one of the seis lines to complete the loop, but interesting country to visit. I'll miss having access to a loop that reaches east to about 4258100 N 629300 E, although some spurs are trivial. The "Cane Creek Canyon Rim Trail" (Barnes) continues beyond the proposed end about 3/4 mile to other excellent views (it was apparently for core drilling above mines in the canyon). | based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 54 | VALLEY CITY: Seems reasonable access in an area of (my observations) "v. faint" and "x. faint" roads, which are, at best, very and extremely faint. {Includes Canyonlands Airport runway?} | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 55 | WARNER LAKE: {Includes a road (not on my inventory) going SE from about 4272200 N 644100 E, entering private land but excludes a parallel road about 300 meters NE.}4A | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 56 | WESTWATER: Is the BLM teasing us with the road (through private and to private) along the Little Dolores River, then out to the Colorado River, where there is no public access? | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 818 | 58 | WINDOWS, THE: {Just to improve credibility of the map, it would be desirable to remove the foot trails to Double Arch, Delicate Arch, Park Avenue, and Tower Arch, and in the MOLLIE | See response to comment 206-11 |

BLM_0012683

| | | | | |
|---|---|---|---|---|
| | | | HOGANS quad, the Devils Garden trail (the foot trail to landscape, Double O, ad Fin Canyon was already removed!) | |
| | 819 | 2 | The Utah Rims single-track network should include at least 25 miles of additional routes, in order to be as complete as the Dee Pass network. In particular, long-distance single-tracks and rugged roads that connect SRMAs offer a unique experience. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 819 | 3 | The Copper Ridge Motorcycle Loop should be combined with Thompson Trail in the Final Plan. | See response to comment 122-29 |
| | 819 | 4 | A few more washes should be left open, especially in the Cisco Desert. These travel-ways provide ATV and motorcycle riders an unconfined challenge that roads cannot. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 819 | 5 | The Sand Flats Recreation Area could adopt special policies to permit slickrock exploration. We support Ride with Respect's recommendation that mountain bike travel be allowed on any barren surface. Slickrock within one hundred yards of a designated route could be open to motorized travel. This two-hundred yard corridor would accommodate the ways that people currently enjoy Sand Flats. | See response to comment 122-42 |
| | 819 | 6 | BLM's open area at White Wash Sand Dunes should include the popular and challenging hill-climb on the Northwest of the Sand Dunes.<br><br>BLM's open area should be located along easily identified geologic features, or preferably along boundary roads of Ruby Ranch Road on the West, Blue Hills Road on the North, and Duma Point/Ruby Ranch (backway) on the East. | See response to comment 123-35 |

BLM_0012684

| | 822 | 1 | I support keeping motorized travel open in the following places:<br><br>White Wash: This is a sandy area and impact is minimal. Pit toilets and an info kiosk would help.<br>10 Mile Wash: This is also very sandy trail and impact is minimal.<br>Monitor and Merrimac Area including Bartlet Wash, Tusher Canyon, Dubinky Rd<br>Sovereign Trail<br>The Poison Strip<br>Rabbit Valley Colorado<br>San Rafael Reef<br>Indian Creek | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 823 | 1 | In particular, all of the alternatives for the White Wash Dunes area are ill-thought out. This is an important and heavily used area for off-road vehicle recreation, and there is little conflict with other actual users. The open area of the White Wash Dunes in alt C and D is far too small for the use the area receives. It must be expanded to include all the traditional open-use area, and the boundary must be located along easily identifiable geologic features and/or roads, so that it is clear to users on the ground. | See response to comment 123-35 |
| | 827 | 1 | I support keeping motorized travel open in the following places:<br><br>White Wash: This is a sandy area and impact is minimal. Pit toilets and an info kiosk would help.<br>10 Mile Wash: This is also very sandy trail and impact is minimal.<br>Monitor and Merrimac Area including Bartlet Wash, Tusher Canyon, Dubinky Rd<br>Sovereign Trail<br>The Poison Strip<br>Rabbit Valley Colorado<br>San Rafael Reef | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012685

| | | | Indian Creek | |
|---|---|---|---|---|
| Sage Riders Motorcycle Club | 870 | 1 | The final DRMP should include 25 miles of additional routes, Utah Rim Trails, in order to be as complete as the Dee Pass network. In particular, long-distance single-tracks and rugged roads that connect SRMAs offer a unique experience. The Copper Ridge Motorcycle Loop should be combined with Thompson Trail in the final plan. We recommend that more non-riparian washes should be left open, especially in the Cisco Desert. These travel ways provide ATV and motorcycle riders an unconfined challenge that roads cannot offer. We are concerned that many of the restrictions in all of the Action Alternatives are simply not justified and the FEIS should clearly draw a connection between the facts on the ground and the decision made. | See response to comments 122-39 (Utah Rims), 122-36 (Copper Ridge) and 122-29 (Thompson Trail).  For a discussion of travel in washes, see response to comment 122-14.  For a discussion of adding new routes, see response to comments 122-15 and 122-30. |
| Sage Riders Motorcycle Club | 870 | 2 | Some of the "motorcycle trails" are vary popular with the ATV users. The Final Travel Plan should designate a mix of single track and ATV trails. | See response to comment 120-90. |
| Sage Riders Motorcycle Club | 870 | 4 | We are requesting that the final RMP should direct land managers to work with the affected public to ensure all available mitigation efforts have been exhausted before closure. When using adaptive management principals, the RMP should mandate the mitigation of closing routes and areas to recreational use by designating a more sustainable, but similar recreational opportunity elsewhere. | Working with volunteers and interest groups does not require a planning decision. |
| Sage Riders Motorcycle Club | 870 | 9 | This area has very few miles of true mountain biking single track trail. Concerning Mill Canyon, Sevenmile Rim biking focus area should be redrawn as Mill Canyon- Tusher Rims in order to provide better terrain for pedaling. The Final Plan should extend the South Spanish Valley biking area further south toward Black Ridge. | The new SRMA boundaries suggested by the commentor were not analyzed in the DRMP/EIS. |
| | 928 | 1 | The Final RMP should direct land managers exhaust mitigation efforts prior to closure of any area. | Mitigation can be put in place without an emergency limitation or closure. |
| | 932 | 1 | Keep Ten Mile Wash and other riparian washes open as | See response to comment 211-20 |

BLM_0012686

| | | | | |
|---|---|---|---|---|
| | | | they have had use for decades. A great example of why a wash is approiate for motorized use is what happened to Ten Mile Wash in the storm 10 months ago. The area was totally resurfaced by the storm and all use evidence was erased. | |
| | 933 | 3 | The White Wash Dunes should be left as is, or expanded. This area recieves a huge number of ATV's and dirt bikers, and should remain as a premier recreation location. Being sand, it does not deteriorate from heavy use like other dirt or grass areas would, and is perfect for riding in the winter time, since it is warmer there. Likewise, the Ten Mile Wash area should be left open to ATV's, dirt bikes, horses, hikers, and anyone else that wants to travel that route. Although it is definitely not a big draw for hikers or mountain bikes due to the sand! It's a beautiful area, but definitely NOT wilderness area potential. | See response to comment 123-35 |
| | 933 | 4 | The number of motorcycle trails in the final version should include at least several hundred miles of trails. I suggest connecting the Copper Ridge and Thompson trails. | See response to comment 122-29 |
| | 934 | 17 | It is important to keep as many motorized routes open as possible. It does not help to close routes, it only puts more pressure on the remaining ones. As roads become more crowded, more dusty from use, and provide fewer places to go, the satisfaction level of the motorized recreationalist diminishes greatly. This dissatisfaction and the perception that motorized recreation is being traeted unfairly when compaired to non-motorized leads to management problems. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 938 | 1 | I would like to see Muddy Creek be re-opened to complete the loop to Factory Butte. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012687

| | 943 | 3 | Expanding the Sevenmile Rim area to include Mill Canyon and Tusher Rim would provide more than a single day of riding in this area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 946 | 3 | The Bartlett Wash Slickrock is also a favorite. This needs to continue to be open to motorcycles as well as the Slickrock Bike Trail which was developed by motorcyclists. | See response to comment 122-42 |
| | 949 | 1 | Specifically, I would hope that you would reconsider the closure of several Jeep Safari Trails. Short segments for the Flat Iron Mesa, Strike Ravine, and 3-D trails are missing from the travel plan. This seems to me as a backhanded way to close EJS trails, because when parts of the trail are missing , the entire trail becomes unusable. Closing long- accepted and established EJS trails is not a good idea, and I would like to point out how important the famous EJS trails are for the economy of a small town like Moab. | See response to comment 206-11 |
| | 953 | 1 | An existing and documented route exists on the southern side of the Colorado River within the boundaries of the Westwater WSA. The route begins outside the WSA and terminates near Star Canyon. This route has been open for decades, and it appears on USGS topographical maps from the 1970's. Alternative D proposes that this route remain open, and we would like to see that recomandation implemented in the Final RMP and Travel Plan. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 953 | 2 | Several short route segments associated with permitted Easter Jeep Safari routes are missing from the proposed Travel Plan maps. The segments are located on Flat Iron Mesa, Strike Ravine, and 3-D. I was informed this is merely an accidental omission, but would like to formally request that these segments be included on the final maps. | See response to comment 206-11 |

BLM_0012688

| | 955 | 2 | Support limiting motorized travel to designated routes, areas and inventoried roads for mechanized travel. Sections 3.11.1.2.16 and 17.2 (pages 3-79 and 3-158) of the DRMP estimate road mileage based on county inventories which identify "motorcycle routes" that exist around White Wash. This area has historically served much of the motorized community by providing motorcycle singletrack and ATV trails specificially. The off-highway vehicle trails that exist in high concentration from "Utah Rims" to Cottonwood Wash, isolated OHV routes that exist throughout the Moab field office, such as the Thompson Trail and MOUNTAIN BIKE TRAILS THAT EXIST BEYOND THOSE MAPPED IN ALTERNATIVE D SHOULD ALSO BE INCLUDED IN THE FINAL RESOURCE MANAGEMENT PLAN (RMP). | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| --- | --- | --- | --- | --- |
| | 955 | 9 | The ERMA, Thompson Trail is unique by virtue of its sheer length and remotness. Trail adoption by volunteers could preserve its singletrack character. Together with Thompson Wash and Copper Ridge Motorcycle Loop, Thompson Trail creates a unique route from the Sovereign Trail to Colorado. The Green River Gap and Browns Wash tie Colorado to the town of Green River. These singletracks should be preserved, along with dajacent double-tracks. Together such remote, rugged routes offer a chance to experience the desert like neither SRMAs nor graded roads can do. | See response to comment 122-29 |
| | 955 | 10 | Likewise, the Kokopelli Trail could be enhanced to create higher quality opportunities for motorized and non-motorized travel. The RMP should pledge to CONSTRUCT A KOKOPELLI SINGLETRACK AND MARK A KOKOPELLI DOUBLETRACK that would roughly parallel one another. Through Utah Rims, the singletrack should be open to motorcycles. Through Yellowjacket, the singletrack should actually be ATV trail. Everywhere else, the singletrack should be non-motorized. The doubletrack would generally follow the current trail, with revisions to achieve a rugged, | See response to comment 122-46 |

684

BLM_0012689

| | | | backcountry opportunity. | |
|---|---|---|---|---|
| | 955 | 11 | Northeast of Green River, the NON-WSA LANDS SURROUNDING TUSHER CANYON HAVE GREAT POTENTIAL FOR MOUNTAIN BIKE TRAILS. This northwest corner of the Bookcliffs has access roads, rims with sweeping views including Desolation Canyon, and relatively good soil development. Similar to bicycle trails in Fruita, a Tusher Canyon system would boost the economy of Green River, and dedicate quality trails for mountain biking. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 955 | 12 | GENERALLY SUPPORT ESTABLISHMENT OF LABRYNTH RIMS SRMA IN ALTERNATIVE C; HOWEVER, MOTORIZED USERS MUST HAVE SUFFICIENT AREA TO RECREATE OR THEY ARE MORE LIKELY TO ROAM, EXPOLORE OR TRESPASS AREAS RESTRICTED TO THEIR USER GROUP. The Dee Pass Motorized Trail focus area should be expanded beyond Alternative __ eastward to the powerlines. The White Wash Sand Dunes OHV Open Area should be expanded by two square miles beyond Alternative D (northward to Ruby Ranch Road and southward toward Red Wash Road). Fee programs should be determined with public involvement  through a Resource Advisory Council. Approximately twenty-five miles of the surrounding OHV trails are popular among ATV riders, and should be designated as such. The Dead Cow Loop could be designated with the exception of the "low-water" alternate, to reduce riparian impacts. The Tenmile Point area from Dripping Spring to Levi Well has relatively few routes and could be designated for non-mechanized focus. Tenmile Wash should be designated without speed limits, since speed has little influence on the biophysical impacts of travel. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 955 | 13 | THE SOUTHWEST CORNER OF LABYRINTH RIMS IS A RELATIVELY PRIMITIVE AREA, AND SHOULD BE MANAGED TO PRESERVE THIS QUALITY. Spring Canyon, Hellroaring Canyon, Spring Canyon Point, and | See response to comment 122-46 |

BLM_0012690

| | | | | |
|---|---|---|---|---|
| | | | South Horse Thief Point are best allocated as a non-mechanized focus. Motorized use there can be adequately accommodated by the Jeep Safari routes, focus a few choice spurs to overlooks. Closing the river road downstream from Spring Canyon would reduce recreation conflicts, while retaining access to Hay Joe Mine. Dubinky Wash is valuable for all vehicle use, and the singletrack near Jug Rock should remain available for motorcycles. | |
| | 955 | 14 | NORTH OF HIGHWAY 313, THE SINGLETRACK WHICH DROPS OFF HIDDEN CANYON RIMS IS A KEY LINK FOR MOTORCYCLISTS AND BICYCLISTS, ALIKE. The Mill Canyon- Sevenmile Rim mountain bike area ahould be rotated to become Mill Canyon- Tusher Rims. Tusher has better bicycling potential than Sevenmile due to less sand, more slickrock, and fewer roads. Then Sevenmile- Upper Courthouse motorized backcountry touring area could be created to recognize the high-value roads that extend through Monitor & Merrimac to Big Mesa campground. Upper Sevenmile Equestrian Area should be expanded by four square-miles to include some terrain above the rim. | See response to comment 122-46 |
| | 955 | 15 | SOUTH OF HIGHWAY 313, AN ADDITIONAL BICYCLE FOCUS AREA WEST OF SOUTH FOR SEVENMILE CANYON COULD PROVIDE CROSS-COUNTRY AND VEHICLE-ASSISTED RIDES FROM THE UPPER GEMINI TRAILHEAD DOWN TO THE WITCHBACKS ON HIGHWAY 313. the Gemini Bridges motorized backcountry touring area could be shifted to include all of Little Canyon Rim. The spur to Gemini Bridges should remain open to allow the unique experience of driving to the bridge. MOUNTAIN BIKE ALTERNATES TO THE ROADS COULD BE DEVELOPED IN THIS AREA, AS PROPOSED BY TRAIL MIX. The Goldbar hiking area could be expanded further up Day Canyon, while only closing one spur road. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 955 | 16 | The Klondike Mountain Bike Focus Area is a great | See response to comment 122-46 |

BLM_0012691

| | | | | |
|---|---|---|---|---|
| | | | foundation to develop mechanized singletrack. Most spur roads could be closed east of Bar M and Sovereign Trail areas. Still, the Sovereign ATV Loop should remain permitted in its current location. Spur roads should also be closed north of the Copper Ridge Sauropod Trackway. THE COPPER RIDGE MOTORCYCLE LOOP IS HIGHLY VALUABLE TO MOTORCYCLISTS AND MOUNTAIN BIKERS ALIKE BECAUSE OF THE POINT-TO-POINT APPEAL THAT SINGLETRACK USERS COVET IN OUR AREA. Trail adoption could help to ensure enjoyment for mountain bikers, like the Sovereign Trail. And like the Sovereign ATV Loop, the Copper Ridge Motorcycle Loop could actually protect any non-mechanized trails that it surrounds by steering motorcyclists toward legal alternative. | |
| | 955 | 20 | The Sand Flats Road traditionally connected trails such as Hells Revenge, Slickrock, and Fins 'N Things. Paving the road, and prohibiting OHVs from pavement, has fragmented the trail system. Thus OHVs should remain permited to use Sand Flats Road from Hells Revenge exit to the end of the pavement. The new, reduced speed limit of 25mph should be preserved. A NON-MOTORIZED LANE SHOULD BE CONSTRUCTED TO PARALLEL THE ROAD TO INCREASE SAFTY AND REDUCE CONGESTION. ADDITIONALLY, THE 1/4-MILE SLICKROCK ROUTE CONNECTING SLICKROCK TRAIL WITH FINS 'N THINGS SHOULD BE DESIGNATED FOR TWO-WHEELED USE TO ALLEVIATE TRAFFIC ALONG THE MAIN ROAD. All of these measures would make it and Flats more user-friendly and manageable, without further impacts to the environment. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| | 955 | 21 | PE__AL POLICIES SHOULD CONTINUE PERMITTING SLICKROCK EXPLORATION. The Moab Field Office Off-Highway Vehicle Travel Map states that "Two-wheel motorcycles are allowed on established slickrock riding areas in the Slickrock trail, Bartlett Wash and Tusher | See response to comment 122-42 |

BLM_0012692

| | | | | |
|---|---|---|---|---|
| | | | Canyon areas and on slickrock areas along the Monitor and Merrimac and Lower Monitor and Merrimac trails where such use does not further disturb vegetation or soils" (dated March 8, 2001 as part of emergency restrictions). In these areas, travel should be further restricted, but not so drastically as the DRMP intends. MECHANIZED TRAVEL SHOULD STILL BE ALLOWED ON ANY BARREN ROCK SURFACE. Slickrock within 100yds of a designated route could remain open to motorized travel, except for Tusher Slickrock, which would be reserved for non-motorized use. This two-hundred yard corridor would accomidate the ways that people currently enjoy slickrock areas. | |
| | 955 | 22 | The Black Ridge area presents many potential recreation opportunities nearby Moab. The South Spanish Valley Mountain bike area could be extended to include part of Pole Canyon. This augments a varrity of terrain, and provides enough room for a full day's ride. Sweeping travel restrictions associated with the DRMP warrant designating an area for specialized sports which depend on unrestricted areas. Durable and irregular terrain that is suitable for motorcycle and bicycle trails riding exists in Pole Canyon from the powerlines area to Area BFE. In the same vein, a rock crawling area could be established on Black Ridge east of the powerlines. This area is littered with old mine roads, and is currently open to cross-country travel. The site could be limited to designated rock crawling routes, and adopted by local clubs. West of the powerline, the north flank of Black Ridge could be designated for equestrian use, as the backdrop to a residential area. THE SOUTH FLANK COULD BE A BICYCLE FREERIDE AREA, SINCE IT PROVIDES ONE THOUSAND FEET OF VERTICAL RELIEF, AND GRADED ROADS FOR SHUTTLING. Kane Creek is a dry wash from Highway 191 up to the Black Ridge Road. It should be open for OHVs to create a loop with Behind-the-Rocks  while avoiding the | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012693

| | | | | |
|---|---|---|---|---|
| | | | Highway. | |
| | 956 | 2 | There should be buffer zones around Arches, Island In The Sky, Fisher Towers and Labyrinth Canyon. I have hiked in Goldbar Canyon and it is no place for ORVs. I have floated through Labyrinth Canyon and its environs are no place for ORVs. The Fisher Towers should be off limits to machines. | See response to comment 980-1.  The 'buffer zones' that have been established are considered sufficient to protect the resources in question.  The commentor provides no data to indicate why wider zones are needed. |
| | 958 | 6 | An open area, in addition to the White Wash area would provide addiotional and different terrain for everything from trails motorcycle riding to rock crawlers, with separate loops for hikers, bicycles and equestrian users. The Black Ridge could remain unrestricted for this purpose. | See response to comment 123-35 |
| | 959 | 1 | In the '70's, '80's and into the '90's, the WTA used to hold annual events in the rocks just above the Slickrock Trail parking lot, but a few years ago there was a push to close much of the rock area, and we were restricted from being able to use that area for our competitions. I would love to see the slick rock trail area expanded laterally to allowfor exploration and allow us room to navigate around the bicycle riders. | See response to comment 122-42 |
| | 959 | 2 | I understand that a proposal is in the works to create a dedicated "open" trails motorcycle/bicycle area at Pole Mountain near the BFE area. I whole heartedly applaud this effort, and hope that you will do everything possible to make it happen. Although we enjoy the opportunities in Moab of riding on designated roads and trails, we also need open areas where we can set our competition sections as the sport requires rugged terrain that can't be found on marked roads and trails. Please don't make the mistake of trying to lock us into a small area. As I am sure you are all well aware, OHV's are the fastest growing sport in the nation, and we need an area large enough that will accomidate those growing numbers. | The BLM Manual at 8342.1 identifies protection requirements for OHV designation.  The following resources must be considered in the designation process; cultural, historical, archaeological, soil, water, air, scenery, vegetation, wildlife, wildlife habitat, threatened or endangered species, and wilderness suitability.  The larger open area  poses conflicts with many of these resources.  An open area is proposed near the White Wash Sand dunes to provide recreation opportunities of this nature in the area best suited for this activity. |
| | 960 | 2 | Recreationalists need a few distinct areas open for travel. In 1.8million acrea, White Wash is not quite | The BLM Manual at 8342.1 identifies protection requirements for OHV designation.  The following |

BLM_0012694

| | | | | |
|---|---|---|---|---|
| | | | enough. An open area in addition to White Wash could provide different terrain for everything from bicycle riding, to motorcycling, to hard core rock crawling. As much of the Moab area becomes limited to designated routes, open areas play an even more critical role for accommodating specialized sports. I hope the final RMP designates some additional open areas. | resources must be considered in the designation process; cultural, historical, archaeological, soil, water, air, scenery, vegetation, wildlife, wildlife habitat, threatened or endangered species, and wilderness suitability. The larger open area poses conflicts with many of these resources. An open area is proposed near the White Wash Sand dunes to provide recreation opportunities of this nature in the area best suited for this activity. |
| | 963 | 2 | White Wash Sand Dunes- ORVs have dominated this area for too long, jepordizing it ecological value as a dune comples with cottonwood trees and with bighorn sheep habitat close by. BLM is right to close part of the dunes in Alternative C, but I urge you to close the entire complex. It is too valuable to be left to ORV activity, which keeps the rest of the public from enjoying the area. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Moab Trails Alliance | 964 | 2 | It is blantantly obvious that the old ways of sharing jeep routes with everyone, the basis of mountain biking in Moab, no longer works. Gemini Bridges, Poison Spider Mesa, and Gold Bar Rim are classic examples. With new 4-wheeled drive technology the alterations (damage) to the trails are such that cyclists cannot use the same route unless they like taking their bike for a walk. The Grand County Non-Motorized Trails Master Plan proposes alternate routes in each of these areas. The Green Dot (Gemini area), Blue Dot (Gold Bar Singletrack listed in "D"), and Wags Way (Poison Spider area) Trails should be priority projects ASAP. These are user created routes that traverse slickrock in areas that have been overrun by motorized traffic. | The routes considered in the alternatives for the Travel Plan accompanying the DRMP/EIS were those submitted by the public during the scoping period, including those submitted by Trail Mix and Moab Trails Alliance, and verified on the ground by BLM staff (see pgs. G-15 through G-21). On pg. 2-48 of the DRMP/EIS there is a provision for adding new routes. The provision states "identification of specific designated routes would be initially established through the chosen travel plan accompanying the RMP and may be modified through subsequent implementation planning and project planning on a case by case basis". New routes proposed by the commentor will be considered after completion of the Record of Decision for the Moab RMP unless those routes are in a closed area. However, at the completion of the RMP, all travel will be restricted to the routes designated in the plan. |
| Moab Trails Alliance | 964 | 4 | The Slickrock Trail, up until a few years ago was thought to be open to cross country travel for bikes. Any resource damage, i.e. Crypto crushing or tree destroying was taboo. The Federal Register rules limiting travel to | Alt C of the DRMP/EIS restricts travel on the Slickrock Trail to the designated route. The level of traffic on the Slickrock Trail does not lend itself to open free riding by mountain bikes. A slickrock free ride area for bicycles is |

BLM_0012695

| | | | | |
|---|---|---|---|---|
| | | | "designated routes only" are temporary until this RMP is adopted. The Slickrock Trail should be open to cross-country travel for bicycles (stated in Alternative "D") because it is the perfect practice area for beginner riders, the perfect technique area for experienced riders and the classic setting for tour companies to introduce clients to the ecology, geology, and scenery of Grand County. It is regulated and patrolled and this designation is consistant with historic use. | provided in Alt C at the Bartlett Slickrock. |
| | 966 | 1 | We started out riding competitions around the Slick Rock Trail Head (near what I believe is called the Sand Flats Recreation area?) but were denied access to that area for confusing reasons. The Slick Rock "bike" trail, by the way, was designed for and by off-road motorcycle users. Its popularity as a mountain bike trail has overshadowed the use by OHVs, and I suppose I'm okay with that, but I ask that, in return, we are provided with trails-specific use area.<br><br>The Nature of trails dictates that we have an open area with suitable terrain. This includes, but is not limited to, rocks, logs, mud, sand, dirt, and some more rocks. With the revision of the Moab Field Office RMP, this is an opportune time to consider a trails specific riding area and a dedicated rock crawling area for those who enjoy those forms of recreation. I fully support the proposal by Ride With Respect for additional mountain bike, trails, and rock crawling areas. For trails use, we don't require a large area as long as the terrain is suitable. One square mile would be more than sufficient, contingent on the terrain. The area around Pole Mountain near Area BFE, as described by Ride With Respect, would likely be suitable location. | See response to comment 208-7, 122-42 |
| | 966 | 2 | The proposed White Wash open area is much too small. As 99% of the Moab Field Office becomes limited to designated routes, open areas play an even more critical role for accommodating specialized sports. Perhaps | See response to comment 123-35 |

BLM_0012696

| | | | | |
|---|---|---|---|---|
| | | | parts of Black Ridge could remain unrestricted for this purpose? The Moab DRMP would reduce the "open" portion of the Moab Field Office from 38% to 0.001%. That's outrageous. However, a mere additional 0.001% left open would greatly improve the options for certain specialized sports like rock crawling and bicycle/motorcycle trails. A reserved rock crawling area could be centered around the previously disturbed lands of the Yellow Circle Mine. | |
| | 966 | 3 | I ask you to seriously consider the needs of rock crawlers, trails/freestyle bicyclist, and motorcycle trails riders. Providing badly needed open areas for them will take much pressure off other restricted areas and give us a place to recreate where we won't bother those desiring a "wilderness experience". | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 968 | 5 | The Mill Canyon- Sevenmile Rim biking focus area should be expanded as Mill Canyon- Tusher Rims in order to provide better terrain for pedaling. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 968 | 5 | The Final Plan should extend the South Spanish Valley biking area further south toward Black Ridge. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 968 | 6 | An open area in addition to White Wash could provide different terrain for everything from bicycle free riding, to trails motorcycling, to hardcore rock crawling. As 99% of the Moab Field Office becomes limited to designated routes, open areas play an even more critical role for accomidating specialized sports Perhaps part of Black Ridge could remain unrestricted for this purpose. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |

BLM_0012697

| | 968 | 7 | The Sand Flats Recreation Area could adopt special policies to permit slickrock exploration. We support Ride With Respect's recommendation that mountain bike travel be allowed on any barren rock surface. Slickrock within one hundred yards of a designated route could be open to motorized travel. This two-hundred yard corridor would accomidate the ways that people currently enjoy Sand Flats. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|
| | 968 | 9 | The Utah Rims single-track network should include at least 25miles of additional routes, in order to be as complete as the Dee Pass network. | See response to comment 122-46 |
| | 968 | 10 | Long-distance single-tracks and rugged roads that connect SRMAs offer a unique experience. The Copper Ridge Motercycle Loop should be combined with Thompson Trail in the Final Plan. | See response to comment 122-29 |
| | 968 | 11 | A few more non-riparian washes should be left open, especially in the Cisco Desert. Wash riding is very popular. These travel-ways provide ATV and motorcycle riders an unconfined challenge that roads cannot. | See response to comment 122-14 |
| | 973 | 2 | I am extreamly disappointed at the exclusion of the current Cisco Desert single-track, the trail connects the Colorado Border to Thompson Springs, UT, from the preferred alternative. Simply traveling down the only other alternative, a pothole-laden interstate frontage road, is a poor substitution for this wonderful trail system (shown in Alternative D) that has minimal impact on the area. I hope that you will reconsider and keep this trail open from the Colorado border to Thompson Springs, as the premier alternative for dual rport riders like me, for traveling cross-country and staying out of earshot of the interstate highway system. | See response to comment 122-46 |
| | 977 | 3 | I strongly support the inclusion of the Cisco Desert single-track because it is miles and miles of enjoyment. I thoroughly enjoy riding the tight little sandy washes and winding sandy hills. I find the views of the Bookcliffs and La Sals from the Cisco Desert trail to be starkly beautiful and I would hate to loose such a perspective. Because | See response to comment 122-46 |

BLM_0012698

| | | | | |
|---|---|---|---|---|
| | | | the Cisco Desert single-track is a long trail not located near anything else, it could be developed as a way to disperse recreation from other more concentrated areas. | |
| | 977 | 4 | I disagree with the non-motorized area designations surrounding the Gold Bar Rim, Rusty Nail, and Pritchett Canyon trails. These trails are shown on the alternative maps as a single motorized line running through a non-motorized area. The lack of identifiable or logically-sized corridor inherently creates confusion and is a target for future disputes. These particular trails are historically classic and extremely popular trails that get a huge amount of use. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited. Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
| Utah 4 Wheel Drive Association | 979 | 1 | Several short sections of the Flat Iron Mesa Easter Jeep Safari (EJS) route are missing from the proposed maps. One missing section includes the popular obstacle Easter Egg Hill. Most likely this is an accidental omission, but this should be brought to the BLM's attention. | See response to comment 206-17. |
| Utah 4 Wheel Drive Association | 979 | 2 | On the Strike Ravine trail, the obstacle known as "Big Ugly" has been left off the maps. Additionally, the section of Strike Ravine that crosses Kiley Miller's property is also missing from the maps. RR4W has successfully defended the legality of this route in court over the last few years, and this valid route should be included to bring to the BLM's attention. | See response to 206-11. |
| Utah 4 Wheel Drive Association | 979 | 3 | Short sections of the Easter Jeep Safari routes for Crystal Geyser and 3D are also omitted from the BLM maps. Again, this is probably an accidental exclusion, but something to bring to the BLM's attention. | Corrections to Easter Jeep Safari routes have been made in the Travel Plan. |
| Utah 4 Wheel Drive Association | 979 | 4 | Coyote Canyon is a popular hardcore trail on public land west of Area BFE. This trail is not included on current proposed maps, but should be established as a designated route. | Coyote Canyon was not in the inventory of routes analyzed in the Travel Plan process (see Appendix G). For adding new routes to the Travel Plan after the signing of the Record of Decision, see response to comments 122-15 and 122-30. |
| | 994 | 1 | I am in favor of alternative C but would like to have integral parts of the following trails used in the Easter Jeep Safari added to the inventory of designated routes | See response to comment 206-11 |

BLM_0012699

| | | | | |
|---|---|---|---|---|
| | | | in Map 2-11-C: Strike Ravine, 3-D Jeep Trail, Flat Iron Mesa.<br><br>I have included maps showing GPS tracks of existing routes for these trails indicated in red. Please add the missing segments to the designated route inventory on Map 2-11-C.<br><br>*See map info. | |
| | 996 | 3 | Several short sections of the Flat Iron Mesa Easter Jeep Safari route are missing from the proposed maps. One missing section includes the popular obstacle "Easter Egg Hill." Hopefully this is an accidental omission, but I (we) want to bring it to your attention. | See response to comment 206-11 |
| | 996 | 4 | On the OHV trail known as Strike Ravine, the obstacle often referred to as "big ugly" has been left off the maps. Additionally, the section of Strike Ravine that crosses Kiley Miller's property is also missing from the maps. The RR4W group has successfully defended the legality of this route in court over the last few years, and this valid route should be included on BLM maps.<br><br>Short sections of the Easter Jeep Safari routes for Crystal Geyser and 3D trails are also omitted from the BLM maps. Again, this is probably just an accidental exclusion, but something to bring to your attention.<br><br>Coyote Canyon is a popular OHV "hardcore" trail on public land west of Area BFE. This trail is not included on current proposed maps, but should be established as a designated route. | See response to comment 206-11 |
| | 100<br>1 | 1 | I do not see on Map 2-11-E (included) the motorcycle trails that are between highway 191 and Arches, are they included in the travel plan?<br><br>*see attached maps | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and |

BLM_0012700

| | | | | site specific NEPA analysis. |
|---|---|---|---|---|
| Moab Friends-for-Wheelin' | 1002 | 1 | There are sections of several permitted Easter Jeep Safari Trails that are left off the Travel plan maps.<br>-Copper Ridge Trail<br>-Strike Ravine Trail<br>-3D Trail<br>-Dolores Triangle Trail<br>-Flat Iron Mesa Trail | All Easter Jeep Safari route data has been corrected.  All Jeep Safari routes are in Alt. C of the Travel Plan. |
| | 1003 | 1 | I have included a copy of a portion of topographical map (Exhibit #1) that shows a GPS track of the route along the spur road and the slickrock climb. I urge that the BLM allow continued use of this last few hundred feet of route. Exhibit #2 details other Labyrinth Canyon overlooks that I have traveled.<br><br>*Map included. | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 1003 | 2 | On Exhibit #3, I point out a route in that region that is missing on the BLM travel plan maps.<br><br>*see attached maps | See response to comment 206-11 |
| | 1008 | 1 | There are several trails that appear to have portions missing on the maps provided. Flat Iron Mesa has 4 parts missing. Strike Ravine has 2 parts missing on the map – such as a portion of the Big Ugly Hill and the portion of the trail that crosses through the Miller property. 3-D – a portion of the trail near the head of mill canyon that is missing from the map. | See response to comment 206-11 |
| | 1026 | 28 | The Final RMP should direct mitigation efforts will be exhausted prior to closure | Mitigation can be put in place without an emergency limitation or closure. |
| | 1026 | 29 | The Final Rmp should direct land managers to work with the affected public to ensure all available mitigation efforts have been exhausted before closure. | Mitigation can be put in place without an emergency limitation or closure. |
| | 1026 | 39 | An open area in addition to White Wash could provide different terrain for everything from bicycle free riding, to trails motorcycling to hard core rockcrawling. As 99% of the Moab Field Office becomes limited to designated | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan |

696

| | | | routes, open areas play an even more criticle role for accommodating specialized sports. Perhaps parts of Black Ridge could remain unrestricted for this purpose. | based on public demand or unacceptable impacts to resources. This action would be based on monitoring and site specific NEPA analysis. |
|---|---|---|---|---|
| | 1026 | 40 | The Utah Rims single-track network should include at least 25miles of additional routes, in order to be as complete as the Dee Pass Network. | See response to comment 122-46 |
| | 1026 | 41 | In particular, long-distance single-tracks and ruged roads that connect SRMAs offer a unique experience. The Copper Ridge Motorcycle Loop should be combined with Thompson Trail in the final plan. | See response to comment 122-36 |
| | 1026 | 42 | A few more non-riparian washes should be left open, especiall in the Cisco Desert. These travel-ways provide ATV and motorcycle riders an unconfined challenge that roads cannot. | See response to comment 122-14 |
| Moab Friends-for Wheelin' | 1027 | 1 | There are sections of several permitted Easter Jeep Safari trails that are left off the Travel Plan Maps. We understand that Ber Knight has met with the MFO regarding these omissions, and was told that they woould be corrected, but we mention them here as a reminder of their importance to us.<br>  * Copper Ridge Trail:  The connection betweeen southern and northern Little Valley Roads at Klondike Bluffs Road intersection is missing.  Another segment of the route, one that is used to bypass the difficult pipelinge near US 191 at UTM 4282150N 0614340E. Next there has been some discussion among CR trail leaders as to two modifications to the trail that would allow shortening it yet retaining the trail's character. These changes would require two road segments to be left in Alternative C that are eliminated from Alternative A.  The first starts at UTM 4286060N 0615910E in the Sovereign area, proceeds roughly ESE, and then turns NE to connect with the pipeline road about 4286190N 0617590E.  This would allow using a segment of road that passed dinosaur tracks of the way to the usual lunch spot.  The second road segment is a loop that starts from the Little Valley Road at approximately 4290630N | See response to comment 206-11. |

BLM_0012702

| | | | | |
|---|---|---|---|---|
| | | | 0614020E; it startsin a SW direction, climbs the hill top, then heads NW along the ridgeline before dropping into a wash and bearing NE to reconnect back with Little Valley Road at 4291230N 0612940E.  This loop provides some elevation gain and therefore produces nice veiws into Arches NP.<br>    *  Strike Ravine Trail:  Two sections are missing.  The N-S road crossing the private property that Red Rock 4 Wheelers had to defend its right to use in court is not shown, approximate UTM4253670N 0638440E on the southern end; a portion of the "Big Ugly" hill is not shown UTM 4254480N 0638550E.<br>    *  3D Trail:  A section of road is missing from about UTM 4285900N 609900E north then west to UTM 4286400N 609300E.<br>    *  Dolores Triangle Trail:  An E-W shortcut near Steamboat Mesa, at about UTM 4295500N 668000E, is eliminated, and it is quite useful.<br>    *  Flat Iron Mesa Trail:  Four portions of this trail are not included in Alternative C.  First, from UTM 4246450N 636300E jiggling NW to the pipeline road.  Second, from UTM 4245600N 634700E going SW to Plan trail.  Third, from UTM 4246200N 633400Egoing SW to meet the SJ County B road.  Also at approximately UTM 4246440N 634910E the roads do not appear to connect, when in fact they do, and this connection is used on the Flat Iron safari trip.  Last the loop around "Hammerhead Rock" from about UTM 4242400N 633400E southerly and then east to the plan route.  Another note for this trail, the last bit of the permitted route to the county B road has been fenced across with no gate, and a longer existing road is now used to reach the county road.  It would be helpful to update this on the official map. | |
| Moab Friends-for Wheelin' | 1027 | 2 | There are two road segments in existing WSA's that we believe could be reopened without impacting the suitability of the area for preservation.  In one instance Search and Rescue efforts would be enhanced by this | See response to comment 206-20. |

BLM_0012703

| | | | | |
|---|---|---|---|---|
| | | | action.  These routes are:<br>    * Behind the Rocks WSA:  Short segment to "EggRanch Fin", a nice viewpoint.<br>    * Negro Bill Canyon WSA:  The road west from Coffee Pot Rock. | |
| Moab Friends-for Wheelin' | 1027 | 3 | Some routes shown on Alternative A in red, indicating they will be kept on the system in Alternatives C and D, do not appear on Alternative C.  Three examples of this are listed below.  We feel this issue should be addressed and corrections made for the entire map before the plan is finalized.<br>    * Dry Mesa spurs to two overlooks, and the extension of the main road on eastern end.<br>    * Tenmile area has a road to and overlook missing.<br>    * Rainbow Roacks area has two overlook roads missing. | See response to comment 206-21. |
| Moab Friends-for Wheelin' | 1027 | 4 | "Coyote Canyon":  We fully support the designation of the Coyote Canyon trail.  The extreme rock crawling trail is just to the west of Area BFE and Kiley Miller's private property.  It is a user-created trail (in an area currently designated as "open"), and is not in the BLM road inventory and Travel Plan.  Extreme trails are important, as they fill a need for a growing segment of 4WD enthusiasts, and there is a shortage of extreme trails in the Moab area.  In addition, extreme trails such as Coyote Canyon can help take pressure off of other difficult trails, such as Moab Rim and Pritchett Canyon. | This route is not part of the San Juan County route inventory, nor was it proposed by any member of the public during scoping.  As a result, it was not evaluated in the DRMP/EIS.  This route can be considered for identification on a site-specific basis in the future.  See also response to comment 206-4. |
| Capital Trail Vehicle Association | 1031 | 6 | The action must develop a preferred alternative that mitigates the significant impacts on the public from the loss of motorized access and motorized recreational opportunities from the proposed action and the combined cumulative effect of all other actions in the State. | The majority of the routes not designated in the Travel Plan accompanying the Moab RMP (Alt C) are, for the most part, routes that have never been utilized by recreational motorized users.  Grand and San Juan counties were part of the Travel Planning team; the representatives of these counties ascertained that motorized access was being preserved in the development of the Travel Plan.<br><br>The major routes used by recreationists have been |

699

| | | | | designated, including all Jeep Safari routes, routes highlighted in guidebooks and on commercially-available maps, routes utilized by guided driving outfitters, over 250 miles of motorcycle route route and other heavily used motorized routes.  There is no significant impact on motorized users as a result of the actions taken in the Travel Plan.  Those impacts on motorized users that are present are disclosed in Chapter 4 under direct, indirect and cumulative impacts. |
| Capital Trail Vehicle Association | 103 1 | 17 | Existing single-track trails or potential single-track trails were not adequately identified and included in the project. There are many single-track "cow" trails that motorcyle trail riders could use in the project area. | Cow trails are not, in and of themselves, motorcycle routes.<br><br>The BLM invited the public to submit singletrack routes during the scoping process (see Appendix G for a description).  All singletrack routes that were submitted by the public underwent a verification process.  BLM staff visited the proposed route.  Those that had established "on the ground" were verified as being existing routes.  All of these existing routes were analyzed in the Travel Plan process.  Their purpose and need was assumed to be recreational fun, and their designation was weighed against resource conflicts.  Some, such as the route above Duma Point and the Hidden Canyon Rim had resource conflicts severe enough to outweigh their purpose and need.  (The conflict at Duma Point was bighorn sheep, and the conflict at Hidden Canyon Rim was an abundance of cultural sites).  The BLM stands by its efforts to designate a single track motorcycle route system. |
| | 3 | 2 | Your open area at White Was in Alternative C and D must be expanded. The current proposal is unworkable because it closes the camping area to the west of Dunes. | See response to comments 120-83 and 123-35. |
| | 3 | 5 | Some of the "motorscycle" trails are actual ATV trails. We suuport the recommendation of the Utah State Parks on which should be open to ATVs. | See response to comment 120-90 |
| | 58 | 2 | Naturally, since this plan will restrict OHVs to designated | Ten Mile Wash is open under the preferred alternative, as |

700

BLM_0012705

| | | | | |
|---|---|---|---|---|
| | | | roads and trails, I would like to see as many OHV trails designated in this plan as possible. I think that more of the sand washes, like Ten Mile Wash, which have had historical OHV use should remain open. I would especially like to see more ATV trails designated between Red Wash and White Wash. I would strongly suggest that the BLM consider the proposal by Ride with Respect. This proposal also keeps open the Thompson Trail and the Copper Ridge loop, as well as proposes additional mountain bike, trail motorcycle, and rock crawling focus areas. I believe that the Gemini Bridges road should also remain open to OHV use, as they are truly unique experience. The BLM should also consider a motorized-focus SRMA in the Yellowcat area to make use of the network of mine roads that already exist and are popular with 4x4s and ATVs. | are many of the routes between Red Wash and White Wash. See response to comments 122-15 and 122-30 regarding adding new routes to the travel plan. See response to comment122-29 regarding the Thompson Route, and response to comment 122-36 regarding the Copper Ridge Route.  See response to comment 206-14 concerning Gemini Bridges, and response to comment 122-38 regarding the Yellowcat area. |
| | 58 | 3 | The Moab area is a very special area with a long history of recreational use by a variety of people. The rocks and dunes in the Moab area provide an opportunity for OHV recreation that is unparalleled in the country. I feel that there needs to be an alternative in this DRMP that does more to preserve the current levels of motorized use in areas like the White Wash Sand Dunes and the Rabbit Valley/Westminster area. | White Wash Sand Dunes is open to cross country travel in the preferred alternative.  All dirt bike routes that were inventoried in 2003 were included in the preferred alternative for Rabbit Valley.  These actions would preserve the current levels of motorized use in these two areas. See response to comments 122-15 and 122-30 regarding adding new routes to the travel plan. |
| | 30 | 1 | OHV use around camping areas and trailheads: A significant problem facing all managers of public lands is the intense and indiscriminate OHV use around dispersed camp areas and some trailheads. It is usually caused by young, unsupervised riders socializing and testing their skills while the adults are busy or resting in camp. Enforcing closures in these areas is very difficult. A model for managing this type of use has been implemented on the Manti La Sal National Forest in Lake Canyon. Designated routes called "training trails" offer a significant length of sustainable trail within a confined area that provide the experience these young riders are seeking. Off trail riding has become almost non-existent | See response to comments 120-81 about training trails, and response to comments 122-15 and 122-30 regarding adding new routes to the travel plan

Enforcement is not a land use planning issue. |

BLM_0012706

| | | | since these trails were put in place. Some provision for addressing this issue should be mentioned in Appendix G. | |
|---|---|---|---|---|

| **Travel, General** | | | | |
|---|---|---|---|---|
| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
| Colorado 500 | 6 | 11 | Soils:  Adding the 271 miles of motorcycle trails and rounding off, we cannot say that roads and trails disturb a maximum of 4% of the land base.  The most recent cited working a USFS document was prepared by D.B. Coe and published in 2006.  Coe's objective was to determine the production and delivery of sediment to forest streams via the road system, but in the course of his field work he observed, measured, and recorded another phenomena.  Quoting from Page 21 of the D.B. Coe 2006 paper:  "The native surface road segments that had been recently graded produced about twice as much sediment per unit erosivity as the ungraded segments (p=0.02) (Figure 2.8).  A pairwise comparison indicated that there was no evidence of a decline in sediment production rates between the first and second years after grading (p=0.86).  Page 26 & 27, Coe 2006:  "The data from four recently-graded road segments show that sediment production rates per unit precipitation were much higher in the early portion of the wet season (Figure 2.11).  The high initial sediment pulse can be attributed to the rapid removal of the thick, fine dust layer that had formed on the road surface as a result of [heavy vehicle traffic].  The subsequent decline in sediment production per unit rainfall suggests that the recently-graded roads rapidly become supply limited as the road surface becomes armored and more resistant to sediment detachment and transport | The issue of road maintenance is not a planning issue.  The roads that are regularly graded in the Moab Field Office belong to the "B" road system.  All B roads are included in all of the alternatives.

The majority of miles of route that are not designated between Alts. A and C are routes that have never been used by anyone. This is why they were deemed to have no purpose and need.  See response to comments 1031-5 and 1031-5 for a discussion of the types of routes that were not designated.  Those routes that are designated in the preferred alternative would be graded only if they are "B" routes.  There is no maintenance performed by either Grand or San Juan counties, or by the BLM on D roads.  The difference in mileage among the four alternatives is entirely made up of D routes, which will not be maintained no matter what their use.  See also response to comment 208-2.

Thus, although the mileage of routes designated in all action alternatives is less than the mileage that is inventoried in A, Alt. A includes all inventoried routes. Many of these inventoried routes consist of old seismic lines, pack trails (which have never been opened to motorized use, but are a line on a USGS map, and were included in the Grand County inventory) and other never-used or seldom-used routes.  The commentor's suggestion that this means that the designated routes will |

BLM_0012707

| | | | | |
|---|---|---|---|---|
| | | | processes." And a review of USDA General Technical Report 193 (2004) confirms Coe's work: ungraded native surface roads consistently produced lower sediment loads than graded roads in every year that was studied. In Coe's work and in the USFS Technical Report, the results suggested that partially overgrown routes, and routes with irregular surfaces such as rocks, ledges, and roots, and lighter traffic loads, produced far less soil loss from the road surface. This research clearly indicates that reducing the mileage available for vehicle access by @50% (as all action alternatives propose) will result in soil losses that are worse, and not just a little worse. Over time, the losses will be worse by several orders of magnitude. Assuming that all traffic will be restricted to designated roads and trails regardless of the alternative used in the ROD, the proposed action in any alternative except A will result in more erosion, more road damage, and increased demands for maintenance. Increased maintenance, as the 2006 Coe study has revealed, will exacerbate the losses. In other words, concentrating traffic on few routes is a significant concern in the consideration of cumulative impacts. | receive substantially more traffic than they did previously is in error. Those routes that have been used over the last two decades, and thus have demonstrated purpose and need, vary from 3,855 miles designated in Alt D to 3,328 designated in Alt B (3,693 miles are designated in C). This represents a percentage decrease of less than 5% between roads that have purpose and need and/or are regularly used (virtually all of these are included in Alt D) and those roads that are designated in the preferred alternative. That fact, and the fact that D roads are nor maintained, means that soil losses of the type mentioned by the commentor would not result from the BLM's decision to designate 3,693 miles of full sized motorized vehicle route and 282 miles for motorcycles in the preferred alternative.<br><br>See also response to comment 208-2. |
| Colorado 500 | 6 | 12 | ...the MFO staff's choice to separate the citations from the body of the text makes it extremely cumbersome to review the use of the literature in this analysis. We have selected a citation that is pretty obviously aimed at roads, and because our comment is about roads, it seemed the most likely match. Please bear with us. From the Chapter in the DEIS called "References:" Forman, R.T.T. and L.E. Alexander. 1998. Roads and their major ecological effects. Annual Review of Ecology and Systematics '29:207-231. This does not have anything to do with undeveloped dirt roads and narrow trails, lightly trafficked, in a desert ecosystem. Just so you do not have to take our word for it, we have located and read the article, plus we have | Placing all references at the back of the document is standard operating procedure when assembling Environmental Impact Statements.<br><br>The reference to the article by Foreman and Alexander is found on pg. 4-485 of the DRMP/EIS in the section on wildlife habitat fragmentation. The reference to the article concerns vehicles killing birds that are attracted to roadkills.<br><br>The BLM has added an expanded discussion to Appendix G of the extensive research on the impacts of OHV use on a variety of natural resources, including soils and watersheds, vegetation, wildlife and habitat, and water |

BLM_0012708

| | | | | |
|---|---|---|---|---|
| | | | followed the citations in the article. None of the material we found is related to what this DEIS is analyzing. (multiple reference examples followed, text not included here) | and water quality . The BLM has also added an expanded discussion of the impacts of OHV use on socioeconomics, including user conflict, to Appendix G. Where appropriate, references to this section of Appendix G will be added to the relevant resource sections of Chapter 4. |
| Colorado 500 | 6 | 13 | Please include this information in the "Environmental Consequences." Please correct the assumption that more roads will inevitably cause more invasions. What this author is saying is that more disturbance is the culprit. The greatest possible disturbance to a dirt road is grading, as it deposits loose soil on the verge, whereupon exotics transported by the vehicles can gain a foothold. If the natural road "armor" is left undisturbed, the native vegetation is fully capable of outcompeting invading exotics. | The BLM stands by its disclosure of the impacts of travel on vegetation (pg. 4-428 of the DRMP/EIS). Travel leads to disturbed soils, whether it is caused by grading, route widening, or other disturbances. Noxious weeds are spread by the disturbance of soils. Furthermore, vehicles themselves can cause the spread of noxious weeds as their seeds are transported by the vehicles.<br><br>Please see response to 6-12. |
| Colorado 500 | 6 | 14 | I would like you to correct a mistake in the Travel Plan. The mistake has its origin in the absence of an OHV Specialist on staff. Evidence that this lack of skills on staff has produced a serious omission in the Travel Plan is revealed by the following examples. 1) Ch.10 P.32: [.. Making management of this activity (OHV) more difficult...]. The fact is, recreation managers who are experienced in motor recreation will unequivocally disagree. Motorized users are actually the easiest to manage. However, if the recreations manager has no understanding of what the motor visitors seek, it will appear that motor recreation is harder to manage. 2) Discussions like this are not even in the analysis: 'Providing sufficient quality route opportunities gives the land manager enormous control, by removing, or moving, desirable access. There are many nuances to "desirable:" destination, the difficulty level, the touring aspect of driving for pleasure, the sense of "going somewhere," and always important to every Moab visitor, the sightseeing. 3) Appendix F, page F-3 through page F-17, Tables of Activity/Experience/Benefits. These tables reveal a | he adequacy of BLM staffing is not a land use planning decision.<br><br>The BLM cannot find the reference to "Chapter 10, pg. 32." There is no Chapter 10 in the DRMP/EIS. There is a reference on page 32 of Chapter 10 in the Analysis of Management Situation that lists "Issues and Concerns". The BLM is required to identify issues prior to working on the land use plan. Issues were listed for many types of recreation users, including river users.<br><br>The BLM has recognized the need to provide route opportunities. The purpose and need of the majority of routes designated in the Travel Plan accompanying the PRMP/FEIS was recreation. This was true of each of the motorcycle singletrack routes that are designated in the Travel Plan. Routes that were highlighted on commercial maps and guidebooks were included in the Travel Plan solely to provide recreation opportunities.<br><br>Appendix F provides a very brief summary of each of the Special Recreation Management Areas. Each of the |

BLM_0012709

| | | | profound lack understanding of all motor recreation.  4) The absence (on the maps) of recreational mileage that the public has shown to MFO staff.  ...the MFO staff has disregarded the BLM Washington Office Technical Reference 9113-1, "Planning and Conducting Route Inventories."  If MFO had an OHV specialist on staff this would be excusable.  We request that in the Travel Plan, five categories of routes for RMP level management be established, and general criteria (width, surface, level of improvement) be prepared for each, as follows:  1.  Commercial Routes ( O&G); 2. 2WD Routes; 3.  4WD Routes; 4. ATV Routes; and 5.  Motorcycle Singletrack Routes. This will qualify as a minor variation of the preferred alternative, and because it is well within the spectrum of Alternatives it is entitled to consideration under the authority of CEQ 1503.4, as explained in the 40 Questions 29b, "How must an agency respond to a comment on a draft EIS that raises a new alternative not previously considered which is a minor variation of one of the alternatives discusses in the draft EIS, but this variation was not given any consideration by the agency.  The answer is, in such a case, the agency should develop and evaluate the new alternative, if it is reasonable, in the final EIS.  If it is qualitatively within the spectrum of alternatives that were discussed in the draft, a supplemental draft will not be needed."  In fact, a new alternative is not needed; rather, a simple modification of Alternative C will satisfy the issue.  This will entail only two changes to the Travel Plan:  1) GIS data revisions so that all the routes in the database are included on the maps pending site-specific analysis, and each route is attributed with the simple criteria noted above.  2) Short descriptions of each type of route will be added to the Travel Plan narrative and to the Route Selection Criteria.  Including these descriptions will make it clear that the stipulations for | SRMAs will have a Recreation Activity Management Plan (RAMP) prepared after its designation.  The development of these RAMPs will allow for further explanation of the recreation resources of these areas.

Technical Reference 9113-1 is a database requirement for classification.  See response to comments 123-7 and 124-58.

The Travel Plan has designated four categories of routes, which are shown on the maps accompanying the PRMP/FEIS.  These categories are "routes" (which are opened to all types of vehicles, including motorcycles, bicycles and ATVs), ATV routes (which are opened to ATVs, motorcycles and bicycles), motorcycle routes (which are opened to motorcycles and bicycles), and bike routes (which are opened to bicycles only).

There are 33,000 route segments in the Travel Plan accompanying the PRMP/FEIS.  A description of each of them is not feasible.  The GIS data which accompanies each of these 33,000 route segments indicates the purpose of the route.  That is, those that are for motorcycles and/or ATVs are tagged in the GIS data.

The Moab BLM asked for route inventories from the public.  Many segments of the public provided routes, including motorcyclists and bicyclist.  The BLM verified each of the routes provided on the ground.  Those routes that were verified were included in the Travel Plan deliberations.  Appendix G explains the process for route designation.

The Moab BLM team does actually have expertise in motorized use.  However, BLM staffing is not a land use planning decision. |
| --- | --- | --- | --- | --- |

705

BLM_0012710

| | | | | |
|---|---|---|---|---|
| | | | each type of route will be very, very different than those for O&G roads.  This will facilitate the post-ROD decision steps required for implementation.  In the event that staff refuses to consider this minor variation, and wishes to leave the route selection criteria as it is presently written, please add the following true statement at the beginning of Page G-11, immediately prior to the discussion of route selection criteria:  "Full Disclosure:  Table 5 on page G-8 shows that the Moab ID Team lacks the skills to find existing motorcycle/ATV routes; and, the team's capacity to evaluate the purpose and need for recreational motorcycle, ATV, or 4-wheel-drive routes is severely constrained and impaired by the absence of a motorized recreation specialist, or any Team member who can offer serious discussion of the purpose and need for any given route or of the appropriate stipulations for each type of route. | |
| Colorado 500 | 6 | 18 | Adaptive Management:  This phrase appears frequently throughout the document.  BLM plans to use "adaptive management" techniques to correct problems or make changes during the life of this plan.  However, for the travel management proposals, there do not appear to be any standards for determining when management adjustments may be needed.  Please add to the FEIS reasonable, predictable, and feasible standards and triggers to guide future changes that may be needed.\n\nWe realize that in the context of an RMP these standards will be general, and not site-specific.  But there are any number of benchmarks and/or markers that can be set in the RMP to guide site-specific situations.\nIn other words, we want this RMP to provide a level of predictability for the business-oriented and the recreating public. | A decision under Travel Management (pg. 2-48 of the DRMP/EIS) allows additions to the Travel Plan (using NEPA analysis) as travel needs are identified.  The purpose and need for a proposed new route would be provided in the Environmental Assessment prepared to add the route to the system.  Public review is provided for each Environmental Assessment written by the BLM.  That is, each proposed new route to be added to the Travel Plan will undergo the NEPA process, including public review.  The public may comment on each new travel plan proposal.\n\nThe need for adding a specific route to the Travel Plan after completion of the land use planning process is a site-specific item and cannot be specified in advance in the land use plan. |

BLM_0012711

| | | | | |
|---|---|---|---|---|
| | | | The problem with setting those standards now, after the close of comment, is that we will have no public review of the standards. Therefore, we request that BLM prepare those standards and offer a separate review period in order to provide for that legal necessity. | |
| Colorado 500 | 6 | 19 | Please refer to Chapter 3, 3.11.1.2.16 in DEIS: Quote [There are no routes solely dedicated to OHV use. These activities take place on the same routes as used by four-wheel drive vehicles, and often occur on Jeep Safari routes. There is an informal, user-made network of motorcycle routes in the White Wash Dunes Ares.] end quote<br> The total exclusion in the 2007 DEIS of a type of OHV route called "motorcycle trails" is a radical change, inserted by staff after the close of scoping. Furthermore, there was absolutely nothing, general or specific, in the Notice of Intent published 6/4/2003 that could be perceived to even imply that recreational routes called "motorcycle trails" would be eliminated from consideration in this RMP and Travel Plan. 3.11.1.2.16 contradicts several statements in this EIS that explicitly describe the presence of "casual systems" of motorcycle trails (as in the quote above.) 3.11.1.2.16 contradicts with the data provided in the original Alternative A that was on the website prior to the issuance of the DEIS. That document listed 271 miles of motorcycle trails. 3.11.1.2.16 contradicts Page 3-84. "It is important to note that the majority of OHV and dirt bike users in the MPA are residents of Colorado." A detail reference in the original scoping was omitted: "dirt bikers" come from Colorado to ride single-track OHV trails. They do not come to ride on roads. 3.11.1.2.16 contradicts the published BLM map #2-11E "Designated Motorcycle Routes Alternative C and D," now withdrawn from public review. | Chapter 3 of the DRMP/EIS describes the actual situation when the plan is under preparation. There are currently no routes in the Moab Field Office that are designated for ATV or dirt bike use under previous planning efforts (four wheel drive vehicles are also considered OHVs). The BLM acknowledges that there are user-made routes that ATV drivers and dirt bike riders have made on their own. These routes, however, have never been designated for any particular use; they have not been limited to any one use, nor have they been sanctioned by the BLM.<br><br>The new land use plan under preparation seeks to remedy this by designating routes specifically for ATV and/or dirt bike use. These routes are identified on Map 2-11-E; hose routes that are in the preferred alternative would be designated at the time of the ROD. It should be noted that they would be designated without any further environmental analysis. This RMP/EIS is the environmental analysis for these routes. Two hundred and eighty two miles of motorcycle route are designated in Alt C of the DRMP/EIS. The BLM fails to understand how "motorcycle trails" have been excluded from the planning process.<br><br>On November 1, 2003, the Moab BLM issued a "Request for Route Data" planning bulletin. This bulletin, which asked the public to submit information on all types of motorized routes, was posted on the Moab internet page, and was sent to every interested party in the RMP process. The majority of the motorcycle trail data was obtained by the BLM as a result of this data call. The |

BLM_0012712

| | | | | |
|---|---|---|---|---|
| | | | 3.11.1.2.16 contradicts the tiny, scattered mileage shown on the DEIS Alternative C map 2-11-E called "Designated Motorcycle Trails."  According to that map there is some sort of "dedicated OHV trail."  But 3.11.1.2.16 says there are "no routes solely dedicated to OHV use." | BLM has not eliminated motorcycle trails from consideration in the RMP or the Travel Plan.<br><br>The figure of 271 miles of motorcycle trail in Alt. A was an estimate of existing motorcycle trails in the No Action alternative.  This numerical estimate was provided to provide a baseline comparison for Chapter **4**.<br>The motorcycle trails in the existing condition were entirely user made.<br><br>Dirt bikers from Colorado may very well come to Utah to ride the user-made network of motorcycle routes.  The Travel Plan accompanying the DRMP/EIS attempts to systematize this user-made network and designate those routes that do not cause unacceptable resource damage.  See Appendix G for a description of the Travel Plan process.  See also response to comment 124-71.  Many dirt bikers do ride on roads in the Moab Field Office.  Many of the "roads" in the Moab Field Office present a challenge to any dirt bike rider.<br><br>Chapter 3 describes the current Affected Environment. There are no routes solely dedicated to dirt bike or ATV use currently.  Map 2-11-E is a depiction of routes that would be designated for motorcycles under the action alternatives of the DRMP/EIS.  Thus, this land use planning effort does provide for motorcycle users. |
| Colorado 500 | 6 | 20 | We dislike using the expression, but the dishonesty of the MFO staff inserting "popular mountain bicycle" trails in place of motorcycle trails is exposed by: <br>1) The placement of a "Mountain Bike Focus Area" (Map 2-9-C) exactly where the popular Copper Ridge motorcycle trail already is.  This is an existing singletrack loop, plus singleback connectors to the Sovereign Trails system (state land) and an existing single-track connector to Thompson Springs.<br>2) The record supporting this analysis:  refer to the | 1. As stated explicitly in the DRMP/EIS. Focus areas are not designed to exclude other uses, such as the single-track motorcycle trail cited by the commentor.  Klondike Bluffs is a mountain bike focus area because the predominant use of Klondike Bluffs is mountain bike use. The Copper Ridge motorcycle trail was submitted to the BLM during scoping; the route could not be verified on the ground.  This means that it was not popular enough to be evident on the ground. See also response to comment 122-36. |

BLM_0012713

| | | | "Comments" section, quote, "Keep it (lands) open to mountain bikers and motorbikes.  We are mountain bikers and appreciate the motorcyclists who discovered it.  Everyone that we met on the trail was respectful to us and as far as we could see, the environment too (Slickrock Trail Parking Lot, Comment Cruiser Comments, 11 October 2003).  This comment is especially important because it does not originate from the "self-selected" commenter's who attended meetings or wrote letters.***<br>3)  The 1985 Grand RMP.(LISTS passages form the 1985 Grand RMP)<br>Requests that will resolve this comment:<br>1.  We want BLM to provide the analysis that supports the statement "There are no routes solely dedicated to OHV use."  Reprinting the same sentence from the AMS will not satisfy this request, as there is no analysis in the AMS that supports BLM's claim in 3.11.1.2.16.  This additional analysis will obviously include maps of every existing road and trail.  This analysis must detail who made each route, for what purpose, and when it was made.  To accomplish this, interviews with residents of the Moab area, as well as residents of western Colorado and western Utah will be necessary, and interviews with motorcycle clubs and businesses, to gather the factual evidence that supports (or refutes) the claim that off-road motorcycles do not have their own dedicated system of routes in the MPA and in the MFO jurisdiction.<br>2.  We want a third-party, non partisan review of this analysis.  The reason this is necessary is that many private citizens donated hundreds of hours to help BLM map the single-track OHV routes in the run-up to this DEIS.  Hundreds of miles of motorcycle trails were mapped.  Since BLM has no compunctions about discarding that work, we have no reason to trust BLM in the conduct of any new route inventory or route | 2.  The BLM acknowledges the comment cited by the commentor, but fails to see its relevance to the issue at hand.<br><br>3.  The sentence referred to by the commentor from the 1985 Grand RMP is simply a statement by the BLM that there are no trails managed solely for OHV use, which is the case in the No Action alternative. No amount of research or interviews or third-party analysis will change this fact from the 1985 Grand RMP.  The commentor provides no evidence to suggest otherwise.  The fact that user groups may have their own trail systems does not mean that the BLM manages these for that single use.  Additionally, no user group has the self-appointed authority to manage trails on public lands for their exclusive use.<br><br>4.  The BLM, as part of its scoping for the land use planning process, requested route information from the public.  A result of this request, the BLM received several hundred miles of routes from the public, including numerous motorcycle routes.  Most, but not all, of these routes were verified on the ground by the BLM and were included in one or more action alternatives for analysis.  This process is described in detail in Appendix G of the DRMP/EIS. These include many (perhaps most, but the BLM is not familiar with each group's route naming system) of the routes presented by the commentor.  Some of the routes mentioned by the commentor were not presented to the BLM during scoping, and were therefore not included in the travel plan process.  The BLM is not in a position to forego travel planning indefinitely to accommodate new route proposals.  As the DRMP/EIS explicitly states, new routes can be considered for inclusion in the travel plan on a site-specific basis in the future.  See also response to |

BLM_0012714

| | | | development history.<br>3. Reprinting the same sentence from the AMS will not satisfy this request, because there is no analysis in that document that supports BLM's claim in 3.11.1.2.16.<br>4. If there is no such analysis, we want BLM to add this statement to 3.11.1.2.16: "MFO staff has elected to omit at least 200 miles of existing motorcycle singletrack trails form the inventory and to eliminate form consideration the designation of a "system" of existing singletrack OHV trails in Alternative C. Staff has chosen to remove this data in advance of the Deciding Offer's review and Decision. Staff realizes that this will prevent the Deciding Officer any opportunity to evaluate and designate singletrack OHV systems. Based on the record supporting this DEIS and Plan, it will likely be perceived as a pre-emptive Decision by the ID Team. There is no analysis that supports this action. There is ample evidence that these routes do exists, as many members of the public assisted in located and mapping them. However, MFO staff has elected to discard that data. Please refer to 3.11.1.2.16."<br>Alternatively, and less contentious and less time consuming, and more likely to get this project to a Decision in a more timely way, we want eh Moab BLM to restore the trails in the MFO database that were collected under the public perception that the trails would be called "motorcycle singletrack" and included in the travel plan for consideration. We will not try to guess at the name BLM has assigned these trails. Restoring these trails to the database will simplify completion of the RMP, and it would fill several glaring voids in the "Travel Plan." Then, in the post-ROD implementation, site-specific monitoring would support the eventual site specific analysis of the impacts of these trails. | comments 122-15 and 122-30.<br><br>It is worth noting that several of the routes proposed by the commentor are located in an area limited to existing trails as of 1985. The commentor needs to be aware that on pg. 2-32 of the DRMP/EIS, it is stated: "No additional OHV routes would be allowed in saline soils other than those already designated in the Travel Plan".<br><br>The Slickrock Bike Trail has been added to the motorcycle trail route map (2-11-E). The following routes mentioned by the commentor are open to all motorized vehicles, including motorcycles: Gemini Bridges, Amasa Back, Flat Pass, Klondike Bluffs, Kokopelli's Trail, Poison Spider, Bartlett Wash, Moab Rim, Kane Creek Canyon Rim, Hurrah Pass and Onion Creek.<br><br>The commentor should consult the motorcycle trail map (2-11-E) to see if the routes he names are available to motorcycles. The BLM is unfamiliar with some of the names used by the commentor.<br><br>The Mel's Loop route has been placed in the proposed alternative for the PRMP/FEIS. |

BLM_0012715

We also request that BLM add the following section to Chapter 3:

1. Beginning on page 3-79, part 3.11.1.2.16 must be changed to "Popular Motorcycle Routes." These will be the same as the "popular bicycle" trails, plus many more miles. The reason they are the same is, BLM changed the usage for this DEIS even though (because it is in the record) BLM cannot dispute the fact that motorcycles were suing those trails when the 1985 RMP was written.

2. We want BLM to include Gemini Bridges, Porcupine Rim, the Slickrock Bike trail, Amasa Back, Flat Pass, Klondike Bluffs, Kokpelli's Trails, Poison Spider, Lower Monitor and Merrimac, Bartlett Wash, Moab Rim, Kane Creek Canyon Rim, Bar M, Hurray Pass and Onion Creek ("popular bicycle trails),

3. And, add trails including but not limited to:

4. Copper Ridge Singletrack

5. Thompson Wash Singletrack

6. Guy's Trail Singletrack

7. Enduro Trail Singletrack

8. Bitter Creek Singletrack

9. Beyond Bitter Creek Singletrack

10. Thompson Trail Singletrack

11. Western Rim Singletrack

12. Zion Curtain Singletrack

13. Westwater Rim Singletrack

14. Mel's Loop Single-track

15. Mel's Westwater Connector Singletrack

16. Prairie Canyon Singletrack

17. Dubinky Singletrack

18. Whitewash Singletrack system

19 Ten Mile Wash Singletrack system

These trails are part of the database that a trusting public helped MFO staff to assemble, with the hope of an accurate analysis.

It is not our intention to stop BLM's progress toward a

BLM_0012716

| | | | | |
|---|---|---|---|---|
| | | | Decision, and it is not our intention to "torpedo" Alternative C as the preferred.  It is our intention to encourage the government to produce accurate planning documents that truly reflect the conditions in front of the Planning Team.<br>That is why in each of our comments, and especially this comment, we offer a solution that BLM can achieve in the FEIS. | |
| Colorado 500 | 6 | 23 | We have four specific requests regarding the re-do of the analysis when BLM gives up pretending that these singletrack OHV trails do not exist:<br>1.  Please add all OHV singletrack submitted by the public, both individuals and organizations, and those individuals who personally assisted BLM in finding the OHV singletrack trails, to the DEIS inventory.<br>2.  Please provide peer-reviewed evidence that they represent or could sometime in the future represent an irretrievable loss, keeping front and foremost in the analysis the fact that MFO staff has suggested those trails have grown over and/or staff could not find them.<br>3.  In the event no such evidence is uncovered please revise the Affected Environment so that it is consistent with the new information, and consistent with staff statements about indiscernible trails and/or the trails disappearing both on the ground and in aerial photos.<br>4.  Please designate these singletrack trails as motorized OHV singletrack trails, after following the above steps, in the ROD.<br>We realize that this will require reworking some of the SRMA's.  We appreciate your work on this request. | All the OHV singletrack submitted by the public was considered.  Each route submitted was verified on the ground by BLM staff and some of them were also verified by Grand County personnel.  These routes are in the BLM's administrative record and are publicly available to the commentor.  As described in Appendix G, those singletrack routes that did not pose unacceptable resource conflicts were placed in Alts C and/or D of the DRMP/EIS.  See Appendix G of the DRMP/EIS and the administrative record accompanying the Travel Plan.<br><br>Where BLM staff could not find an inventoried trail, they were assisted by county personnel.  Thus, more than one individual attempted to find the trails in question.  Motorcyclists were asked about unfound routes and stated that they "never went the same way twice".  Not following a specified route constitutes cross country travel and not trail or route travel.<br><br>The BLM has provided an entire Focus Area for Motorized singletrack (Dee Pass), an SRMA for motorized trails (Utah Rims) and an SRMA for ATVs (Cameo Cliffs).<br><br>See also response to comment 6-12. |
| Colorado 500 | 6 | 25 | Quote form Page 11-20 [To date, only half of the allotments have implemented the livestock adjustments identified in the 1985 Grand RMP through agreements with the livestock operator or by monitoring adjustments (Appendix D, page A-29). | Grazing is permitted under the Taylor Grazing Act.  Grazing is a permitted activity, governed by the Standards for Rangeland Health and Guidelines for Grazing Management.  These standards guide season of use and stocking decisions.  That is, livestock are permitted in |

BLM_0012717

| | | | | |
|---|---|---|---|---|
| | | | ...Table 11-2 identifies issues by selected steams that are currently receiving restoration or focus.] End Quote<br>Request to correct a significant omission:<br>Based on the above quotes: ...grazing, a significantly surface disturbing and riparian disturbing activity, occupies 66 percent of the MFO landbase.<br>Off-Highway Vehicle use, and specifically motorcycle use, is permitted on existing roads and trails and in one open area, with intermittent off-road and cross country travel. The MFO supplies no data on acreage affected. This is a significant omission, given that one of the primary concerns of the MFO staff is the perceived negative effects of motorcycle use upon soil and vegetation and the MFO staff insistence upon including singletrack OHV effects on the soil and vegetation with the effects of grazing on the soil and vegetation. This concern is so hysterical that MFO has apparently elected to eliminate 90% of the singletrack OHV opportunity in the planning area.<br>However, before the government disrupts the social and economic structures of a community, government is supposed to use the "best available" information. That information is readily available, but it has been omitted from this analysis. Therefore, we will provide the information in this comment with the express request that it be used in the EIS.<br>** (This figure is from the AMS, which has been taken off the website. The removal of several key data components of the AMS before is re-used as the "Affected Environment" in this DEIS is the subject of another comment. | certain numbers and at certain times. The RMP makes the decision as to which allotments are available or unavailable for grazing.<br><br>Travel by the general public on designated routes is governed by the Travel Plan accompanying the RMP. In areas limited to designated routes, all travel would be allowed only on roads designated in this plan.<br><br>Miles of singletrack route have been provided in the DRMP/EIS. All singletrack routes proposed during scoping were verified and analyzed (see Appendix G for a description of the travel planning process.) The great majority of the routes proposed were in fact designated in the DRMP/EIS. The BLM expended much effort in designating single tracks and has no agenda to eliminate them.<br><br>Cross country travel by cows, horses or hikers is not regulated by the land use plan. Cross country travel by motorized and mechanized vehicles is regulated by the land use plan. |
| Colorado 500 | 6 | 26 | Request to add field research that is absent from this analysis. Riparian/ ephemeral/ dry washes<br>In the study that examined erosion during weather events, in every sample over a 3-year program, the amount of soil loss into the live waterway from the trail | Unrestricted travel in wash bottoms results in resource impacts as judged by BLM staff specialists. Concerns include destabilization of banks, accelerated erosion and use of wash bottoms by wildlife as travel corridors. In addition, observations indicate that some users do not |

BLM_0012718

| | | | | |
|---|---|---|---|---|
| | | | was always below the EPA standard for nonpoint pollution sources and with a single exception, the samples were far below the EPA standard.  In the one exception, one sample from a three year program approached the limit but did not exceed it. | remain in the wash bottoms, but leave them to return to the main travel routes. This results in cross country travel. See response to comment 6-12 for a summary of research regarding this issue. |
| Colorado 500 | 6 | 27 | Request to rewrite inaccurate portions of the document ...we request that in this Planning document, references which place OHV activity in the same class of disturbance and impacts as grazing as well as other landscape scale impacts such as fire and flood, be removed.  We want all references to singletrack OHV to be rewritten according to the actual surface impacts. The discussion above would suffice to enlighten any disinterested reader to the extent of the difference between these activities and we request that the MFO staff use it verbatim. | The DRMP/EIS analyzes the impacts of each resource on every other resource so that the decision maker has full information.  Please see response to comment 6-12. |
| Colorado 500 | 6 | 28 | Request to add information: We formally request that the following five steps be taken to correct this gross omission and resulting inaccuracy: a) the acreage of motorcycle-disturbed soil be calculated and included in the data provided in this analysis; b) the discussion of the nature of the acreage (linear, and lightly used due to extensive mileage) be included in the recreation/OHV section of the AMS; c) the two dedicated OHV-stream intersection field studies be included and utilized in the Affected Environment chapter, and the Environmental Consequences  revised so it is consistent with this new information; d) the acreage of cattle-disturbed soil be calculated and provided in this analysis; e) The level of agency resources (by percentage) devoted to ensuring compliance with the agency's own agreements, policy, and regulation for grazing vs. motorcycle use, is provided in this analysis. | The BLM lacks data of the specificity requested by the commentor.  The linear miles of motorcycle routes are provided as the basis of the analysis.  There is no suggestion that the disturbed soil is beyond the width of the motorcycle route.  That is, no miles of singletrack motorcycle route are provided in Alt. B.  Thus, Alt B assumes no impacts from motorcycles.  The comparison among alternatives is based on linear miles of route, with Alt. B being the least impacting, and Alt. D being the most impacting.

See response to comment 6-12 for the addition of research regarding the impacts of OHVs on public lands. The commentor is also referred to "Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources (U.S. Geological Survey, 2007).

Law enforcement is not a land use planning issue. Grazing and off highway vehicle use are governed by |

714

BLM_0012719

| | | | | |
|---|---|---|---|---|
| | | | With this information, the Deciding Officer will be able to compare the actual effects upon the natural resources of different activities, and by understanding the existing situation more accurately, select more appropriate actions for the Final Decision. | separate laws, regulations and policies. |
| Colorado 500 | 6 | 29 | We have reviewed the citations in the "References" chapter and there is not a single one which provides professional field research to indicate or even imply that trail-based OHV recreation has any measurable negative effects.  In fact, we did not find one that even mentioned "OHV" at all.  In other words, it appear to be the case that there is no science informing the analysis supporting the road closures and OHV recreation curtailments proposed in all of the action alternatives.  Our revisions:<br>1. We want all the roads and trails proposed for closure be designated open, along with the present proposals.  The reason is, this analysis has uncovered no evidence to implicate trail-based OHV recreation in any negative natural resource results.<br>2.  After the ROD is settled, if any road or trail may potentially cause resource damage we want independent field monitoring programs instituted, with public review. | See response to comment 6-12.<br><br>The following summary of studies has been added to the Travel Plan Appendix G, and is referred to in the analysis: "Environmental Effects of off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources" (U.S. Geological Survey, 2007).<br>Routes not designated in the preferred alternative will not be available for travel after the Record of Decision is signed.  For the most part, these 2,506 miles of route had no discernible purpose and need, including the purpose of recreational use.  For additions of routes to the Travel Plan, see response to comments 122-15 and 122-30. See the above cited study for evidence of OHV effects on natural resources. |
| Colorado 500 | 6 | 30 | We request that you remove "OHV" from any discussion that implies that OHV has the same impacts on the natural environment as landscape-scale events such as fires, floods, windstorms, drought, livestock grazing, and vegetation treatments.  The reason is, this analysis has uncovered no evidence to support that OHV has effects on that scale.<br>Our point here is threefold (PLEASE SEE LETTER FOR SPECIFIC REFERENCES DISCUSSED):<br>A.  Trail based recreation is not present in any of these discussions (no surprise; the present acreage of MFO lands classified as erodible and accessed by OHV is | Please see response to comment 6-12.  See also "Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources", compiled by the U.S. Geological Survey in 2007.  Information from this ompilation of studies has been added to the PRMP/FEIS. |

BLM_0012720

absolutely minute, as previously noted).

B. According to this RMP, BLM has implemented none of the methods listed to determine what if any sediment loads are delivered to waterways from activities on BLM lands.

C.  At this time, if BLM is receiving reports of NPS pollution from BLM lands it is the height of irresponsibility for BLM to remain silent on the subject in this RMP, and even worse, to fail to institute any program based on the priorities and research in the Utah Plan, to reduce the NPS problem.

Since we are quite sure that BLM would never intentionally conceal this information, we can safely assume that the grazing and mining and the present level of recreation management is adequately managed by MFO, and downstream problems have been successfully prevented.

And finally, the single cite provided in this RMP on the activity itself:  Stokowski, P. A., and C. LaPointe. 2000.  Environmental and Social Effects of ATVs and ORVs:  An Annotated Bibliography and Research Assessment.  School of Natural Resources, University of Vermont, Burlington.

Abstract:  This report provides an annotated bibliography of published research related to the environmental and social effects of ATVs on public and private lands.  Citations were gathered in a literature review of published research reports and peer-reviewed scholarly writing, and from a review of internet sources.  Key findings from the research are synthesized and evaluated, and suggestions for future research are provided.

The reference that MFO resource specialists accessed for their information on "ORV's and "ATV's" is a list of other research.  Whether that other research is relevant to proposed MFO management actions is unknown.  Whether any of the research listed provides

BLM_0012721

| | | | | |
|---|---|---|---|---|
| | | | monitoring results, or whether the research is peer-reviewed, or whether it is even research, or whether there is any original field research such as monitoring at specific sites to verify or refute hypotheses, is unknown, because the MFO specialists only used the list.  According to the references cited in the RMP, no specialist retrieved and used any of the actual research itself.<br><br>So the answer to our original inquiry about the science that informs the Moab RMP and Travel Plan proposals is that, there does not appear to be any.  No monitoring; no original, peer-reviewed research; no sociological research.  This makes the relentless references to "resource damage caused by OHV" not credible. | |
| ECOS Consulting | 9 | 8 | How can the BLM cite a scientific publication like the Stokowski and LaPointe (2000) paper (BLM Moab RMP/EIS page 4-464 Sec 4.3.19.8.2), and then ignore all the conclusions about the adverse environmental and social effects of roads?  By not providing and adequate range of alternatives for the number and extent of "D Roads"/OHV routes allowed, the BLM is ignoring its own admissions of serious impacts, and appears to discount these adverse impacts as insignificant.<br><br>Many of the "D Roads" were originally formed by mineral exploration and development activities that have ceased long ago.  They are unplanned and redundant, and many of these areas can be easily accessed using other "B Roads", and /or state highways.  All designated routes should have a designated function.  What are the purposes for many of the "D Roads" currently in the Travel Plan?  If many of these roads remain open for the next 10-20 years, the future of much wildlife habitat is at risk due to many of the adverse impacts listed above.  This has not | See response to comment 124-40 regarding the range of alternatives.<br><br>See response to comments 124-43 and 124-59 relating to purpose and need of routes.<br><br>The BLM asserts that by limiting travel to designated routes and by eliminating about 2500 miles of inventoried routes would have a positive impact on wildlife habitat. |

BLM_0012722

| | | | | |
|---|---|---|---|---|
| | | | been adequately addressed in the Moab RMP/EIS | |
| ECOS Consulting | 9 | 31 | Page 4-244, 3rd Paragraph, 4.3.11.6: Here it is emphasized that limitations on the number and duration of river users and OHV use would minimize damage to riparian resources. This is not true. Regarding OHV damage, there are many studies that have shown that is the first few passes of an OHV that causes 80-90% of the damage in desert environments. Therefore, limiting the amount of use will only reduce the amount of actual damage by an insignificant amount. Thus, this management strategy is useless from protecting riparian areas from the negative impacts of OHV's.

The environmental damage caused by OHV use is well documented in the litature. (Andrews 1990, Brown 1994, Dittmer and Johnson 1975, Forman and Hersperger 1996, Forman and Alexander 1998, Gelbard 1999, Harris and Gallagher 1989, Harris and Scheck 1991, Iverson et al. 1981, Langton 1989, Miller et al. 1996, Montgomery 1994, Oxley et al. 1974, Schmidt 1989). Negative ecological effects of OHV use in and near riparian areas include:
1) increased soil erosion and compaction;
2) increased water velocity;
3) plant community destruction;
4) loss of terrestrial and aquatic insect communities;
5) soil, water, and air pollution;
6) sound pollution;
7) exotic plant invasion;
8) loss of fish and wildlife habitat;
9) reduction of fish and wildlife populations;
10) lowering of the water table.

In order to manage riparian areas successfully, so that they become functioning systems, OHV's must not be allowed. OHV use destroys vegetation, degrades | The BLM stands by the assertion that reducing the number of river users has beneficial impacts on riparian resources. This is based BLM experience in managing the major river systems in the area.

The BLM agrees with the commentor that most of the impacts associated with cross-country OHV use occurs with the first few passes. This is why cross-country travel has almost been completely eliminated, except for White Wash sand dunes, in the action alternatives for the Travel Plan in the DRMP/EIS.

See response to comment 124-7. |

BLM_0012723

stream banks, and forms channels that floodwaters follow and gouge during storms. The BLM must consider the direct, indirect, and cumulative impacts of OHV use in riparian areas more detail and must include its quantative and scientific analysis in this Moab RMP/EIS. Can the BLM provide analyses and examples of riparian areas where OHV's are allowed but there are no serious impacts?

I have documented (Schelz 2006 and 2007) the destructive impacts of OHV's in Tenmile Canyon in the Moab RMP Planning Area and in Arch Canyon, just south of the Moab Planning Area. My documentation included a Proper Functioning Condition analysis, including before and after photos, showing many areas where impairment of riparian resources is occurring. OHV use in these riparian areas causes serious impacts to stream sinuosity, stream banks, vegetation, floodplain dynamics, etc.

In Tenmile Canyon, most of the length of the canyon investigated was found to be in a "Nonfunctional" condition, or at risk of becoming Nonfunctional with a downward trend, due to the use of OHV impacts. Except for a lack of the potential number of young cottonwood trees, the impacts I observed on the vegetation in Ten-mile Canyon focused primarily in areas where the OHV route was establishedd, and especially in the many areas where there was downstream erosion due to the route location within the streambed, on the stream bank, or where it crossed the stream channel.  At these locations, it was common to see denuded and washed out stream banks; a lack of regenerating shrubs (in contrast to the higher levels of shrub regeneration away from the route); a reduction and elimination of ground cover of native grasses, brushes and forbs; lower than

BLM_0012724

expected deep binding root masses along the stream bank; and the presence of undesirable exotic plants (in particular, Tamarisk).

The exposed soil in Tenmile Canyon at route crossings, in the stream channel, and on the road bed allows an intensifying cycle of erosion to occur at and downstream of the initial denuded areas, which includes all the attedant negative effects of erosion on water quality and quantity, the elimination of native vegetation, and changes in channel sinuosity and morphology. Negative hydrological impacts were obvious in areas where the OHV route ran alongside and where it crossed the stream channel. Although some segments of stream channels, meanders and point bar formation were evident in the canyon, much of the study area was negatively affected by the straightening of the channel and increased erosion effects caused by the OHV routes. In many instances multiple routes were evident in the same area, probably due to erosion problems and vehicle operators attempting to avoid eroded and damaged areas. Channel straightening occurred from high flows jumping into the incised channels of the OHV route that was adjacent to the stream channel, and from lateral cutting when high flows jumped up onto the route at stream crossings and scoured the stream banks causing the loss of soils and vegetation (Schelz 2007).

The impacts described above in Tenmile Canyon are common in riparian areas where OHVs are allowed. Similar impacts are also found in Arch Canyon near Blanding and in Salt Creek in Canyonlands National Park where OHV's are allowed (Schelz 2001, Schelz 2006). Similar negative impacts would be expected in most or all of the riparian areas in which the Moab

BLM_0012725

| | | | BLM is proposing to allow OHV use.<br><br>The BLM's own management stategies recommended the the protection and restoration of riparian areas. Standard 2 states that "riparian areas and wetlands must be in properly functioning condition" (BLM 1997a). As described above, lands within the Moab Project Area have been assessed by independent researchers and found not to be properly functioning condition (Schelz 2007) and in great need of restoration. Whenever an OHV route is found in a riparian area, almost without exception, these routes can be linked as the primary cause of riparian degradation and impairment. | |
|---|---|---|---|---|
| ECOS Consulting | 9 | 69 | Page 4-464, 4th paragraph, 4.3.19.8.1: As cited in this Moab RMP, Stokowski and LaPointe (2000) list numerous negative impacts of roads/routes and OHV use on wildlife species and land degradation. This paragraph discusses the loss of wildlife habitat quality but barely mentions the fact that the complete loss of wildlife habitat quantity is also a major factor. Many wildlife species will completely abandon former habitat when there is a road or OHV route nearby, and the dust and disturbance created by designated and rogue OHV routes has contributed greatly to the degradation of adjacent wildlife habitat in the Moab Planning Area. When an agency cites a paper like the Stokowski and LaPointe paper, and proceeds to ignore all the conclusions about the negative environmental and social effects of roads and OHV's by not providing true Alternatives to the location and amount of roads/routes allowed, there is something terrible wrong.  There is a major disconnect between the scientific findings regarding impacts and BLM's proposal to continue to providing for the special interest uses that cause the greatest damage to natural resources: livestock grazing, gas, oil, minerals, and OHV's. | See response to comment 124-39, 124-140, 1025-14, and 1025-15.<br><br>Habitat fragmentation is caused, not by the routes themselves, but by use of the routes.  In fact, one could argue that closing routes concentrates traffic, thus increasing wildlife habitat fragmentation.  However, the BLM stands by its analysis of wildlife habitat fragmentation. |

BLM_0012726

| | | | | |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 16 | The State asks the BLM to explain its intention to designate D roads, and explain why different D roads may be designated across alternatives.  Please clarify the authority under which BLM would designate county roads, and what happens to a D road if BLM chooses not to designate it… pursuant to RS 2477. | A "D" route does not equate to a County road assertion.  The routes identified as "D" routes in the land use plan are routes located on public lands and managed by the BLM until properly adjudicated.  The DRMP/EIS proposes four different alternatives for which to manage these routes

As specified in the Draft RMP/EIS (pg. 1-12), addressing RS 2477 assertions is beyond the scope of this planning effort.  However, nothing extinguishes any right-of-way or alters in any way the legal rights the State and counties have to assert and protect RS 2477 rights.

The Proposed RMP/Final EIS will not address RS 2477 assertions.  Such assertions will be settled administratively on a case-by-case basis or a s confirmed through other legal means. |
| State of Utah - Public Lands Policy Coordination | 120 | 81 | The BLM should designate OHV "training trails" near dispersed camp sites to reduce OHV damage in those area. | As stated in the Draft RMP/EIS (pg. 2-48)  routes may be modified through subsequent implementation planning on a case by case basis.  No specific trails or suggestions for "training trails" were submitted during the scoping period.  After the RMP is completed and on a site specific basis, the BLM could consider training trails near dispersed camp sites in areas designated in the limited or open to OHV category. |
| State of Utah - Public Lands Policy Coordination | 120 | 82 | To avoid having routes closed in the future which cross properties owned by SITLA, rights-of-ways should be placed in public ownership for OHV access. | The BLM recognizes that under Utah v. Andrus the State is entitled to reasonable access across public lands to school trust lands, including those located within WSAs and other areas where management prescriptions would restrict general public access.  Any restrictions such as route closures within these management areas pertain to general public access.  Public access to OHV routes on public lands is accomplished through travel management planning.  We make a distinction between closures to the public, and State access entitlements and access needs of others that can be addressed as specific needs arise.  Land tenure adjustment efforts including pending and |

722

BLM_0012727

| | | | | anticipated land exchanges between the BLM and the State should properly focus on SITLA lands located within WSAs and other special management areas identified in RMPs. Therefore, the BLM does not believe it is necessary or prudent to globally grant rights-of-way or designated routes to school trust lands for public use. The BLM is happy to work with the State to process any FLPMA Title V ROW application the State feels is necessary to protect ingress and egress to State property.<br><br>The concern about DRMP/EIS access restrictions other than those for general public access, such as the designation of right-of-way avoidance or exclusion areas, can be clarified with specific mention in the PRMP/FEIS that these designations are subject to State access entitlements under Utah v. Andrus, as described above. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 83 | The White Wash sand dunes OHV open area should be larger than proposed under Alternative C. There should be a larger mix of sand and slick rock with a logical boundary. | A larger OHV open area for the White Wash area is proposed in Alt D. A portion of this larger open area has been added to the PRMP/Final EIS which consists of the popular camping area to the west of the sand dunes and just east of the Ruby Ranch Road. |
| State of Utah - Public Lands Policy Coordination | 120 | 84 | The State asks the BLM to explain its intention to designate D roads, and explain why different D roads may be designated across alternatives. Please clarify the authority under which BLM would designate county roads, and what happens to a D road if BLM chooses not to designate it… pursuant to RS 2477. | See response to comment 120-16. |
| State of Utah - Public Lands Policy Coordination | 120 | 85 | Table 4.54 on page 4-147 indicates that, under Alternative C and D, no portion of Lost Canyon would be either "open" or subject to "limited" OHV use. | The limited acreage is identical in Alternatives B, C, & D. Table 4.54 has been corrected. |
| State of Utah - Public Lands Policy Coordination | 120 | 86 | Driving off designated routes to access dispersed camp sites would be in violation of the proposed travel plan. This plan should address this issue so that legitimate camp spots can be accessed from a legal route. | Driving off designated routes to access dispersed campsites would be a violation. Access to dispersed campsites is addressed on pg. 2-48 of the Moab DRMP/DEIS; "designated routes and spurs were identified specifically for dispersed camping" under all action alternatives. Many of the designated routes lead to |

723

BLM_0012728

| | | | | or access dispersed campsites. |
|---|---|---|---|---|
| | | | | Dispersed camping was considered in designating routes in all of the action alternatives.  So that the public is aware of these sites, the dispersed campsites would be signed.  Additional routes to dispersed campsites can be considered after the RMP process is completed on a case-by-case basis in areas designated as limited or open to OHV use. |
| State of Utah - Public Lands Policy Coordination | 120 | 87 | Duplicate routes may provide beneficial recreation experiences to OHV users of varying skills and interests. | No information was provided during the scoping phase identifying specific duplicate routes for consideration in this planning effort.  During the development of the travel plan with Grand and San Juan Counties, consideration of these types of needs was discussed.  However, most duplicate routes not designated were routes receiving little or no use and thus presumably not providing the experience suggested in the comment.  After the RMP process is completed, additional routes can be considered on a case-by-case basis in areas designated as limited or open to OHV use. |
| State of Utah - Public Lands Policy Coordination | 120 | 88 | The BLM is encouraged to coordinate route alignments with other jurisdictions including the border with Colorado in the Rabbit Valley/Bitter Creek area. | During development of the travel plan, the Moab BLM coordinated with Grand and San Juan Counties, the National Park Service, the Forest Service, SITLA, and all adjoining BLM offices, including the Grand Junction Office concerning the Rabbit Valley area. |
| State of Utah - Public Lands Policy Coordination | 120 | 89 | There are a few additional connecting routes needed in the travel plan for Alt C to create loops for ATVs and full-sized vehicles | All route data received during scoping was considered in the alternatives for the travel plan.  No specific information is provided about these "additional connecting routes".  Any new routes can be considered for addition to the travel plan after the RMP is completed on a case by case basis in areas designated as limited to OHV use. |
| State of Utah - Public Lands Policy Coordination | 120 | 90 | There are no ATV/motorcycle only routes proposed in the preferred alternative.  This is a useful designation to complete the array of OHV alternatives.  The initial inventory and subsequent designation of motorcycle routes was incomplete. | During the scoping period, the BLM received data on routes proposed for motorcycle use.  The majority of these routes are included in the Travel Plan for Alt C or Alt D.  During the comment period for the DRMP/EIS, some of the motorcycle route proposals were modified by their proponents to indicate that a few of these motorcycle |

724

BLM_0012729

| | | | | routes were also suitable for ATVs. The map has been corrected in the PRMP/FEIS to delineate these ATV/motorcycle routes where they are identified in the Travel Plan for Alt C and Alt D. The BLM incorporated all route data received during scoping into formulation of travel plan alternatives. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 93 | Please clarify whether page G-11's reference to wildlife habitat includes habitat for all species or is it intended to apply to habitat for more significant species or groups of species. | Page G-11 refers to the guidance found in BLM Manual 8342.1 which states that OHV designations "must minimize harassment of wildlife and/or significant disruption of wildlife habitat". On pg. G-25 BLM lists the relevant species considered in formulation of the alternatives for the travel plan. |
| State of Utah - Public Lands Policy Coordination | 120 | 94 | Page G-11, uses the term "extreme". Explain what constitutes an "extreme" hazard which can be considered an element of subjectivity. | This language is verbatim from BLM Manual 8342.1 which states "designations must minimize or eliminate OHV use in areas of extreme natural or man-made hazards". |
| State of Utah - Public Lands Policy Coordination | 120 | 95 | Page G-15, Emergency Limitation or Closure: Perhaps "immediately closed" should read, "immediately mitigated or closed" or some similar wording. | The Federal regulations at 8341.2(a) state "the authorized officer shall immediately close the areas affected to the types of vehicle causing the adverse affect". The wording on page G-15 is derived directly from the referenced regulations. |
| State of Utah - Public Lands Policy Coordination | 120 | 96 | The implementation process section on page G-29 should stress the need for maps and signing as both are needed. | On pg. G-30, the Draft RMP/EIS states "in the final RMP decisions, designated OHV routes will be portrayed by a map. This map will be the basis for signing and enforcement. The implementation goals include completing signage, maps, public information, kiosks, and working with partners". |
| San Juan County | 121 | 7 | San Juan County supports Alt C for travel management. The county wants the BLM to highlight specific prescriptions to promote responsible use, such as areas that would be highlighted for OHV use, maps, signing, kiosks etc. In addition, BLM does not mention impacts from hikers or mountain bikers. | The RMP proposes many areas to be focus areas or SRMAs emphasizing responsible motorized use. These include Cameo Cliffs SRMA, Gemini Bridges/Poison Spider Mesa Motorized Touring Area, Utah Rims SRMA, Dee Pass Motorized Trail Area, and the Airport Hills Moto Cross Area. These areas are proposed for specialized management emphasizing that activity. The RMP would designate these areas but a Recreation Area Management Plan will follow the RMP, where specific prescriptions suggested by the county would be detailed. |

BLM_0012730

| | | | | The Travel Plan (Appendix G, pg. 30) details mapping, signigng, and construction of kiosks as actions that would be part of implementation of this Plan.<br><br>Mountain bikes are restricted to the designated route system under all action alternatives.  Impacts of mountain bikes vs. motorized travel were not separated out in the discussion.  All impacts of off-route travel were combined for all types of wheeled vehicles.  The impacts of hikers were not considered because no decision in this plan requires hikers to stay on trail. |
|---|---|---|---|---|
| Ride with Respect | 122 | 3 | Section 3.11.1.3 (page 3-80) estimates the relatively popularity of recreational uses in the Moab Field Office as of 2003.  Since then, OHV riding has increased dramatically.  So OHV riding should be categorized as "high use," at least on par with nature study.  Also, the table should specify that these estimates are not based on empirical research.<br><br>Appendix F should acknowledge that recreation area visitation is estimated without activity-specific monitoring data. That said, the best guess for Dee Pass (page F-7) is that current OHV use levels are light to heavy, not "light to moderate." This is also a more realistic use-level estimate for Utah Rims (page F-15). | The BLM stands by its estimate that ATVing and dirt biking are in the "medium use" category.  Observation, traffic counter data and preliminary National Visitor Use Monitoring (NVUM) Study data all support the fact that the activities listed in the "high use" category exceed ATV and dirt bike riding in the Moab Field Office.  While the commentor provides no data to show that OHV riding has increased dramatically, the actual issue is whether or not ATV and dirt bike activity levels are "high" or "medium".<br><br>The table to which the commentor refers has a note which clearly indicates that these are estimates by professional staff.  The empirical data that are available to the BLM (traffic counter and NVUM data) support these estimates.<br><br>The BLM makes no assertion that recreation activity levels are based on actual monitoring data.  Traffic counter data and professional estimates by field staff were used to estimate use levels.  On a year round basis, and throughout the week (i.e., not just on Saturdays), use levels in Dee Pass and in the Utah Rims area are light to moderate.  The words "light" and "moderate" are relative, and the implicit comparison is to activity levels in areas nearer to Moab. |
| Ride with Respect | 122 | 4 | Section 4.3.10 generalizes the interests of recreationists based on their types of travel.  BLM | The BLM has distinguished singletrack motorized routes from four wheel drive full sized vehicle routes in its travel |

BLM_0012731

| | | | | |
|---|---|---|---|---|
| | | | should dissect motorized use more fully.  Motorcyclists prefer singletrack trails, ATV riders prefer ATV trails and four wheeling drivers prefer doubletrack more than improved roads.  Converting roads to singletrack rarely satisfies two-wheeled trail users.  Pg. 2-49 should be changed to read that singletrack would be created "in part" by converting existing inventoried routes not designated for motorized travel.<br><br>Trials motorcyclists depend on small unrestricted areas. The National Management Strategy for Motorized OHV Use on Public Lands states that the BLM recognizes designated OHV recreation sites play a vital role in satisfying a portion of the recreation experience for OHV enthusiasts.  The DRMP does not provide enough recreation sites for motorcycle trials and rock crawling. | plan formulation.  During the scoping period, the public was asked to provide input on the inventory of motorized routes in the Moab Field Office.  If these routes were verified by the BLM, they were considered for designation in one or more alternatives of the Travel Plan.  While singletrack and four wheel drive routes were provided to the BLM during this period, no ATV routes were submitted.  ATV travel in the Moab planning area occurs on full sized vehicle routes.  Subsequent to the Record of Decision, the BLM could consider new travel proposals (including singletrack routes) on a case by case basis, subject to NEPA review.  Pg. 2-49 offers the possibility that singletrack could be created by converting old routes to singletrack, with less new surface disturbance than would be required by a new route.  The statement is not intended to preclude new route development.<br><br>The BLM received no input during the scoping period regarding the public's desire for a trials motorcycle area.  In Alt C, there are 1,866 acres of lands open to cross country travel.  This acreage is available to all types of vehicles, including trials motorcycles. |
| Ride with Respect | 122 | 5 | Section 3.11.2.6 (page 3-85&6&7) addresses use conflict and displacement, but not adequately so. It crudely lists a few circumstances the agency believes to exist. The lists are arbitrary, and should be removed. For example, does Monitor and Merrimac really have unique conditions that make "conflicts between motorcycle users and mountain bikers" any more common than, say "ATV users and mountain bikers"?  If not removed, the lists should at least disclose that its conflict assessment is based on personal experience, not empirical research or monitoring of any kind.  Further they should include a wider array of examples to represent the scope of conflicts, including the following: | The list of recreation conflicts in Section 3.11.2.6 of the DRMP/EIS is based upon professional judgement of Moab Field Office BLM staff.  The areas listed are those that have come to the attention of BLM staff due to reports of conflicts by users themselves.  The sentence on pg. 3-86 of the DRMP/EIS has been changed to read: "specific areas in which BLM staff have had reports of user conflict and displacement include…"<br><br>The BLM agrees that user conflict can occur between other groups and in other areas.  The list of user conflicts on p.3-86 is intended to be illustrative of the fact that recreationists in the Moab planning area have conflicts with one another.  The three areas of user conflict mentioned by the commentor (Dee Pass, Utah Rims and |

BLM_0012732

| | | | | |
|---|---|---|---|---|
| | | | Dee Pass - conflicts between motorcyclists and ATV riders<br>Utah Rims - conflicts between motorcyclists and ATV riders<br>Hidden Valley - conflicts between bicyclists and hikers<br>Crystal Geyser - impacts of oil and gas industry on OHV trails<br>Thompson Trail - impacts of ranching industry on OHV trails<br>Sand Flats - impacts of BLM law enforcement  on bicyclists<br>Sand Flats - impacts of road improvement on OHV route connectivity | Hidden Valley) have not been reported to BLM staff.  The three areas of resource conflict mentioned by the commentor do not follow the pattern of the listed resource conflicts on pg. 3-86 of the DRMP/EIS.  Those resource conflicts state where recreation use impacts other resources.  The commentor seeks to address the impacts of other resources on recreation use. |
| Ride with Respect | 122 | 6 | (Please refer to letter which quoted and attached: Recreational Trail Conflict:  Achieving Equity Through Diversity (Koontz 2005).  Applied to the Moab RMP, the above research could broaden and deepen its treatment of use conflicts. Ride with Respect supports many mitigation measures that can happen during implementation.  We are pleased to read Table 2.1 Recreation (page 2-17), which plans to provide visitor information and outreach programs that foster a land ethic. | Implementation actions are issues that are addressed through administrative actions or policy.  They do not require a land use planning decision (see pg. 1-11 of the DRMP/EIS).<br><br>On pg. G-29 of the DRMP/EIS the BLM recognizes the actions that are necessary for implementation of the Travel Plan. |
| Ride with Respect | 122 | 7 | For planning, we suggest highlighting one more critical item.  Noise is the most common complaint against OHVs (American Motorcyclist Association 2005). Thus for all vehicles across the entire field office we recommend implementing and enforcing and 96-decibel limit based on the "20-inch" test (SAE J1287). | Specific decibel limitations on motorized vehicles are under the jurisdiction of the Environmental Protection Agency, and a matter of State Law.  As stated in 43 CFR 8343.1(b):  "No off-road vehicle equipped with a muffler cutout bypass, or similar device, or producing excessive noise exceeding Environmental Protection Agency standards, when established, may be operated on public lands." |
| Ride with Respect | 122 | 8 | Section 3.11.2.6 (pages 3-85&6) should insert the following paragraph: "Use conflicts can sometimes be resolved without separating uses.  Managers can try a variety of mitigation techniques.  If unsuccessful, displacement will occur in one of two ways.  No restrictions will displace the less conspicuous use. | The DRMP/EIS does not seek to completely separate recreation uses.  Focus areas have been established within Special Recreation Management Areas so that the BLM can emphasize opportunities for specific types of recreation.  However, other uses are not precluded that are consistent with the Travel Plan.  The majority of the |

BLM_0012733

| | | | | |
|---|---|---|---|---|
| | | | Conversely, restrictions placed on the more conspicuous use will obviously displace that activity. Where mitigation fails, providing a quality alternative for one or both uses is key to resolving conflict." " | planning area is not within a focus area, and there is no attempt to separate recreation uses in these areas. |
| Ride with Respect | 122 | 10 | Ride with Respect believes the draft travel plan falls short of providing adequate recreational opportunities, especially on mountain bike, motorcycle, and ATV trails. It is sensible to limit motorized travel to designated routes, plus inventoried roads for mechanized travel. Such an extensive restriction requires careful consideration of its impacts.  Sections 3.11.1.2.16 and 3.17.2 (pages 3-79 and 3-158) estimate road mileage based on county inventories. They mention that "motorcycle routes" exist around White Wash.  The document should specify that this includes motorcycle singletrack and ATV trails. Additionally, off-highway vehicle trails exist in high concentration from "Utah Rims" to Cottonwood Wash. Isolated OHV routes exist throughout the Moab field office, such as the Thompson Trail.  Mountain bike trails also exist beyond those mapped in Alternative D. | The BLM's travel plan formulation (see Appendix G of the DRMP/EIS) was based on a thorough inventory of routes for full sized, two wheeled vehicles, and mountain bikes. During the scoping period (June 4, 2003 to January 31, 2004), the BLM requested that the public submit routes for consideration for inclusion in the Travel Plan accompanying the DRMP/EIS.  The BLM received submissions on dirt bike and mountain bike routes.  No ATV route submissions were received.  All routes received during the scoping period were verified by BLM staff on the ground.  Those that were verified as "existing" routes were considered for inclusion in one or more of the alternatives for the Travel Plan.  As described in Appendix G, the BLM's Travel Plan formulation involved numerous meetings of an interdisciplinary team.  Potential resource conflicts were identified, their extent evaluated and then weighed against purpose and need for the particular route under discussion.  Those motorcycle and mountain bike routes that did not pose undue resource conflicts are proposed for designation in one or more alternatives of the DRMP/EIS.

Chapter 3 of the DRMP/EIS does not attempt to provide a complete description of every inventoried route.  Each inventoried route (around 33,000) was assigned a number, and the resource conflicts associated with that route are listed in the GIS data base accompanying the DRMP/EIS .  This information is available by request.

In addition, Chapter 4 of the DRMP/EIS details the impacts of travel routes on natural and cultural resources. |
| Ride with Respect | 122 | 11 | Appendix G (page G-8) lists members of the Travel Plan Interdisciplinary Team, which includes no avid | The function of the interdisciplinary team for travel management was to weigh purpose and need for the |

BLM_0012734

| | | | | |
|---|---|---|---|---|
| | | | ATV or motorcycle rider.  This lack of representation limits the ability to identify OHV opportunities and assess their value to that segment of visitors.  To compensate, the agency should formally involve OHV leaders in developing the final RMP. | route against resource conflicts.  The team included representatives from recreation, who stated the purpose and need for the motorcycle trails.  Of the 129 miles of inventoried and verified single track, 123 miles were included in the preferred alternative (Alt C).  The value of OHV opportunities were fully represented in the interdisciplinary team.<br><br>Representatives of various interest groups (wilderness, OHV, utility, oil and gas, mining) do not qualify for cooperating agency status and are not formally included in the development of the PRMP/FEIS.  The public, which includes OHV leaders, is involved  throughout the land use planning process (see Chapter 5 of the DRMP/EIS).  Comments from the public and user groups will be considered in development of the PRMP/EIS. |
| Ride with Respect | 122 | 12 | Appendix G (pages 12&13) also lists the criteria for determining routes for the travel plan.  Absent from this list is route connectivity, route or area uniqueness, and any kind of diversity (such as encounter-types).  To form the final travel plan, the agency should consider these criteria.<br><br>Motorcyclists and ATV riders were not provided equal status in the Grand County travel planning process. | One of the criteria listed on pg. G-12 and G-13 for purpose and need for routes  is "recreation opportunities and experiences".  This general category includes the criteria mentioned by the commentator.<br><br>Grand County was a cooperator in the development of the DRMP/EIS.  How Grand County chose to structure its travel planning in preparation for its participation in the DRMP/EIS process is a matter for the county to consider. |
| Ride with Respect | 122 | 13 | Since 2005, Grand County endorsed a proposal by Ride with Respect to designate existing motorcycle singletrack known as Thompson Trail and Copper Ridge Motorcycle Loop.  Despite county support, the BLM included virtually none of  this proposal in its preferred Alternative. | Grand County was a full cooperator in the travel planning process.  County representatives endorsed the Copper Ridge Area as a Mountain Bike Focus Area (called Klondike Bluffs Mountain Bike Focus Area).  The county negotiated with representatives of that community to convert several routes in the area to non-motorized use.<br><br>The Thompson Trail as proposed by Ride with Respect is contained in Alt D (pg. 2-49 of the DRMP/EIS), although subsequent NEPA analysis would be required.  A modification to the Thompson Trail in Alt C was developed by BLM staff at the request of Grand County. |

BLM_0012735

| | | | | This route is an alternative to the one proposed in Alt D. It presents lessened resource conflicts. |
|---|---|---|---|---|
| Ride with Respect | 122 | 14 | In the Moab field office, non-road mountain bike, motorcycle, and ATV trails were never inventoried. The only exceptions are roughly 15 square-miles around Bitter Creek and 100 square-miles around White Wash, which together comprise less than 5% of the field office. Grand County's Trail Mix Master Plan highlighted many popular bicycle trails, but was not intended as an inventory. Beyond the county roads, several hundred miles of trail exist, if not thousands.<br><br>Short of performing an inventory of trails, Moab BLM plans should at least acknowledge that they cannot fully measure the impacts to bicycling, motorcycling, and ATV riding in the absence of a trail inventory. To compensate for this, the agency should consider designating trail data provided during the planning process. Once the travel plan is implemented, BLM should practice adaptive management by testing mitigation techniques such as visitor education, signage, trail maintenance, and/or rerouting before prohibiting access. Further, the agency should prioritize the development of new bicycle, motorcycle, and ATV trails, with preference to SRMAs, and especially to the appropriate focus areas. Trail expansion would avoid pitting recreationists against one another on a rigid system of roads. By the same token, wide wash bottoms should remain open to all vehicles, instead of unduly restricting them to smaller vehicles. | See response to comment 122-10.<br><br>A route inventory was requested from the public during scoping.  Trail Mix provided their inventory of mountain bike trails to the BLM during scoping.<br><br>The Federal Land Policy and Management Act does not require complete and exhaustive inventories prior to land use planning efforts, but rather directs the BLM to plan with existing inventories.<br><br>There is a provision in the DRMP/EIS (pg. 2-48) for adding new routes to the Travel Plan once it is adopted. This will be accomplished through site specific NEPA analysis.<br><br>Unrestricted travel in wash bottoms results in resource impacts as judged by BLM staff specialists. Concerns include destabilization of banks, accelerated erosion and use of wash bottoms by wildlife as travel corridors.  In addition, observations indicate that some users do not remain in the wash bottoms, but leave them to return to the main travel routes. This results in cross country travel. |
| Ride with Respect | 122 | 15 | The Moab field office developed criteria for inventorying OHV trails when Clifton Koontz mapped White Wash OHV trails in 2001 and 2002 (refer to "OHV trail inventory criteria" on CD).  It defined a "trail" as "any route that (1) is a continuous line void of vegetation and (2) can be followed by anyone with (i) a | Clifton Koontz was a short term volunteer for the BLM. His criteria for inventorying routes were never adopted by the BLM.<br><br>The routes considered in the alternatives for the Travel Plan accompanying the DRMP/EIS were those submitted |

BLM_0012736

trained eye for OHV routes but (ii) no prior knowledge of the particular route in consideration. The 'trained eye' accounts for natural forces that may temporarily conceal portions of a route, such as water in active washes, wind over sand flats, free-thaw cycles of clay-rich soil, hoof prints on heavily grazed areas, as well as the inability of bare rock to record the passage of vehicles."

The enclosed folder "agency definitions of existing trails" represent alternative definitions. By any of these definitions, many OHV trails exist in the Moab field office beyond the data from BLM, RwR, or any other known source. RwR's data is the best available information. All of the routes we submit currently exist, and new data of existing routes includes photographs to aid your staff in verification. RwR expects that you to contact us before determining that any of these routes are not legal, existing travel ways. We urge you to discuss any other concerns you have about the submitted routes and areas. Feel free to request any further information or data. Please count all the trails RwR submits, including ones that we propose for closure, in the OHV trail mileage that your plan reports.

The draft plan insinuates that travel is currently limited to existing roads and designated trails. Sections 4.3.16.1 and 4.3.16.2.6 (page 4-405 & 4-408 through 411) intend to measure the impact of action alternatives on travel management. As is, they fail to document changes in trail access. In particular, Table 4.126 indicates that in most of the field office travel is completely "open" or limited to existing roads and trails." The table appropriately reports the mileage of Class D county roads, which accurately represent the mileage of existing roads. However, for trails the table reports "Designated Motorcycle Routes" as 0 miles.

by the public during the scoping period, including those submitted by Ride with Respect, and verified on the ground by BLM staff (see pgs. G-15 through G-21). On pg. 2-48 of the DRMP/EIS there is a provision for adding new routes. The provision states "identification of specific designated routes would be initially established through the chosen travel plan accompanying the RMP and may be modified through subsequent implementation planning and project planning on a case by case basis". New routes proposed by the commentor will be considered after completion of the Record of Decision for the Moab RMP unless those routes are in a closed area to OHV use. However, at the completion of the RMP, all travel will be restricted to the routes designated in the plan.

At present, there are no motorcycle routes designated for single track motorcycle use by the BLM in the Moab planning area. Thus, Table 4.126 lists 0 miles of designated motorcycle routes. The BLM acknowledges that many user-made motorcycle routes exist in the planning area. On pg. 2-48, 129 miles of inventoried motorcycle routes are listed in Alt A. Table 4.126 is intended to show a comparison of OHV acreage designations by alternative. The miles of existing motorcycle route in the No Action alternative is not listed in this table. The table does show the miles of designated motorcycle routes that would be identified in Alts C and D.

Section 202(c)(4) of the Federal Land Policy and Management Act states that the BLM shall "rely to the extent that it is available on the inventory of the public lands". The Moab Field Office in formulating the alternatives for the Travel Plan relied on the best available data at the time of alternative formulation. This included route data that the BLM requested from the public during the scoping period. The complex task of formulating Travel Plan alternatives required individual

732

BLM_0012737

Obviously the RMP should list the mileage of existing trails, just as it has done for existing roads. To do so, the table should consider all data submitted to BLM by November 30, 2007. The agency should include the mileage separately for routes submitted as ATV, motorcycle, or bicycle trails. Mileage should only be discarded if a particular route is (1) located in (a) an area limited to designated routes, (b) a closed area, © a WSA or is (2) proven to be (a) nonexistent, (b) nonexistent when the area became restricted to existing routes, or © virtually never used by the stated vehicle-type.

Since no trail inventory was performed in 95% of the field office, this tally would not even approximate the total trail mileage. Therefore, Table 4.126 should list minimum mileage, such as 50+ miles bicycle trail, 500+ miles motorcycle trail, and 50+ miles ATV trail. In lieu of an extensive trail inventory comparable to Grand County's road inventory, this is the only accurate way to report the planning baseline, and thus measure the impacts of each action alternative.

Table 2.1 Travel Plan (2-48) suggests that Alternative A limits travel to "129 miles of inventoried motorized single-track." Switching from "limited to existing" to "limited to inventoried" requires that a complete inventory be performed for an area. Using RwR's data, you have a legitimate inventory of Dee Pass and Utah Rims Trail Systems. For the area that is contained by these trail systems, you could justifiably limit travel to inventoried trails. Elsewhere you can only limit travel to inventoried trails after thoroughly inventorying the area for OHV and bicycle trails.

Considering new data on old trails is critical to making

analysis and verification of over 33,000 route segments. Within the DRMP/EIS (pg. 2-48) a process has been established to consider the addition of new routes to the Travel Plan. Route additions would not require a land use plan amendment but only site specific NEPA analysis.

The new routes proposed by the commentor would require extensive amounts of time for field verification and analysis of purpose and need and resource conflicts. At this stage in the land use planning process, this amount of time cannot be expended if the land use plan is to be completed in a timely manner.

BLM_0012738

| | | | | |
|---|---|---|---|---|
| | | | an informed decision. Existing trails that are newly submitted deserve the same designation as older data. That said, if it's impossible at this time, then new data should be given "provisional designation."<br><br>RwR apologizes for the complexity of this presentation. To summarize, proper travel planning requires a route inventory. Otherwise, special consideration should be given to utilizing the best available information, regardless of its timing. Structural limitations of the BLM planning process inevitably lead to a draft plan which provides a sufficient system of roads, but a scarcity of non-road trails for an array of uses.  Please work with trail users to finalize a plan which everyone can "live with." | |
| Ride with Respect | 122 | 16 | The Travel Plan appendix (page G-27) lists the considerations for travel plan amendment.  The criteria should include "provide ample quantity and quality of diverse recreational opportunities." | The Travel Plan Appendix on pg. G-27 lists factors that would be considered for inclusion of new routes.  One of the factors is "routes suitable for different categories of OHVs including dirt bikes, ATVs, dune buggies, and four wheel drive touring vehicles."  This factor provides for potential diverse recreational opportunities. |
| Ride with Respect | 122 | 17 | Table 2.1 Travel Plan (2-48) states "Where the authorized officer determines that off-road vehicles are causing or will cause considerable adverse effects, the authorized officer shall close or restrict such areas." The term off-road vehicles should be substituted by "a particular type of use" to broaden management's ability to stop degradation from any activity. | The sentence referred to by the commentor is contained in the Federal Regulations at 43 CFR 8341.2.  The BLM cannot alter the language of these Federal regulations. |
| Ride with Respect | 122 | 18 | Table 2.1 Travel Plan (2-48) should add the following statement:  "Before prohibiting use, the BLM will attempt to mitigate problems through an appropriate combination of visitor education, directional signage, trail maintenance (including tread stabilization), law enforcement, or other methods of adaptive management." | The actions suggested by the commentor do not require a specific land use planning decision.<br><br>These actions are specifically addressed in Chapter 1 of the DRMP/EIS (pg. 1-11), where "education, enforcement/prosecution, vandalism and volunteer coordination are listed as issues that are addressed through policy or administrative actions. |
| Ride with | 122 | 19 | Table 2.1 Travel Plan (2-48) should add another | The BLM can utilize the resources of outside entities |

BLM_0012739

| | | | | |
|---|---|---|---|---|
| Respect | | | statement: "BLM will invite individuals, organizations, and agencies to assist in land management projects and programs, such as route and facility maintenance, visitor education, and monitoring." | without a land use planning decision. This is specifically addressed in Chapter 1 of the DRMP/EIS (pg. 1-11), where "education, enforcement/prosecution, vandalism and volunteer coordination are listed as issues that are addressed through policy or administrative actions. |
| Ride with Respect | 122 | 20 | Section 3.11.2.7.1 states "The ability of OHV users to penetrate the backcountry where patrols are difficult may lead to secondary impacts to cultural resources from increased vandalism and theft." If by "penetrate" the BLM means travel on designated routes, the term should be replaced by "reach." If "penetrate" means travel off-route, then the sentence should begin "The physical ability of OHV users to travel off-route into the backcountry where..." Also, the following statement should be inserted: "Poaching cultural resources is illegal. Therefore individuals who poach artifacts are constrained by the physical terrain more so than the legality of vehicular travel." | The statement in Section 3.11.2.7.1 that the commentor refers to does not distinguish between on and off road travel by OHV users. It mans that the ability to access the backcountry puts cultural resources at risk. This is true whether the travel is on or off road.

See also response to comment 123-48. |
| Ride with Respect | 122 | 21 | Table 2.1 Wilderness & Travel Management (page 2-43 & 2-48) refer to WSA ways when stating that "If Congress designates the area as Wilderness, the routes will be closed." This sentence should be removed. Congress has final authority, so if they want to close ways, they can easily do so. However, prohibiting the option of cherry stems could prevent a Wilderness bill from passing. Furthermore, making cherry stem truncation a necessity pits Wilderness designation against those who utilize the current ways. Therefore, the agency should not constrain its options on this issue. | The sentence has been changed to read "If Congress designates the area as Wilderness, the routes could be closed." This sentence means that the will of Congress would override any route designation made in the DRMP/EIS. Congress does have the final authority, and close any route that it chooses. |
| Ride with Respect | 122 | 23 | Route terminology throughout the documents is carelessly applied. The terms "route," "road," and "trail" should be switched in many sentences. These terms have very different meanings. Routes include roads and trails. Roads are open to full-size vehicles. Trails are restricted to ATV, motorcycle, bicycle, horse, or foot use. Thus it's imperative to use proper | The term "route" is preferred by the BLM and has been used throughout the document.

In many instances, the use of terms "road" and "trail" are in reference to regulations or policies that utilize the specific term. The BLM will carefully review the text of the PRMP/FEIS to clarify any misuse of terms. Route maps |

BLM_0012740

| | | | terminology.<br><br>The DRMP/EIS states on pg. 2-48 that "only designated roads are available for motorized commercial and organized group use."<br><br>Further, the document periodically seems to treat the terms "OHV travel," "off-route travel," and "off-road travel" interchangeably.  Again these terms have distinct meaning that should be carefully chosen.  OHV travel refers to any travel by OHVs, on or off of designated routes.  Off-route travel specifically means travel off routes, usually by mechanized vehicles.  Off-road travel refers to travel off roads, but can mean travel off or on designated routes.  Therefore, "off-road travel" is a nearly useless terms that should be avoided entirely.<br><br>The current treatment of these terms warrants an opportunity for stakeholders to review the final RMP for accuracy before it is implemented.  RwR encourages the BLM to solicit proof-reading from various recreation and industry representatives.<br><br>Here are a few examples of terminology misuse.  Table 2.1 Travel Management (2-48) states "BLM could impose limitations on types of vehicle allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated roads."  The term road should be replaced by route in both instances.  Table 2.1 Travel Management (2-48) also states "Only designated roads are available for motorized commercial and organized group use."  The term road should be replaced by route.  Furthermore, it should | will be labeled as to the type of vehicles that are allowed.  For example, single track motorcycle routes will be labeled as open only to two-wheeled vehicles.<br><br>The words "and managed open areas" have been added to the appropriate section of the PRMP/EIS to clarify that permittees would be allowed in these areas.<br><br>UTVs are wider than 50 inches and would not be allowed on routes specifically restricted to those vehicles under 50 inches in width. |
|---|---|---|---|---|

BLM_0012743

| | | | read "designated routes and areas." Otherwise, a commercial tour operator would be prohibited from crossing White Wash Sand Dunes, since no route is designated.<br><br>Here are a few of the instances obscuring OHV travel from off-route travel. Section 3.14.2.2.1 (page 3-119) identifies "off-road travel" as a surface-disturbing activity. It should read "off-route travel." Section 3.14.2.2.2 identifies "OHVs" as contributing to accelerated erosion. Again the proper term is "off-route travel," since travel off-routes by any means could accelerate erosion. Further examples that should be corrected include 3.15.1.2.3.1.4 (page 3-16) which states that "prairie dog habitat is fragile and very sensitive to damage from OHV use" but should read "damage from off-route travel." Sections 3.17.2.3, 3.17.2.4, 3.17.2.6 and 3.17.2.7 (pages 3-158&9) all should refer to damage from "off-route travel" instead of "OHVs."<br><br>Route terminology can help prepare for emerging activities. The OHV industry predicts that side-by-side or Utility Terrain Vehicles (UTVs) will become very popular in the coming years. These machines can be used appropriately on public lands. However, they pose a concern about trail widening, as do all other vehicles. UTVs are typically manufactured to be 55-inches wide, and are commonly modified to be 65-inches. Thus the Moab RMP should specifically regarded UTVs as full-size vehicles, and routes should be restricted by vehicle-width (ie "50-inch" trail, not "ATV" trail). | |
| Ride with Respect | 122 | 28 | Broadly speaking, the road plan provides sufficient road-based opportunities. So the final plan should add and subtract some roads based on Alternative C. More of the existing roads surrounding Interstate 70 | All the alternatives for the Travel Plan provide a large number of routes which may be utilized by all types of motorized and mechanized recreationists. In Alt C, 282 miles of route have been provided specifically for |

BLM_0012742

| | | | | |
|---|---|---|---|---|
| | | | should be designated for long-distance touring. Compared to the road plan, motorized and mechanized trail designations are scarce. So the final plan should designate trails in Alternative D, plus others submitted by recreationists during this entire planning process. For all of the recreation conflict that the draft RMP purports, the travel plan in Alternative C does little to expand non-motorized opportunities. Several areas could provide substantial primitive opportunities by closing a few less-valuable roads. Homogeneity of the road plan would intensify conflicts and hurt all user groups in the long term. So the final plan should incorporate a subset of "wilderness character" or similar primitive designation from Alternative B. | motorcycles and 22 miles of route have been provided specifically for bicycles.

Alt C of the Travel Plan provides a sufficient number of routes n the area surrounding Interstate 70 which could be utilized for  long-distance touring.

Alt D of the Travel Plan includes 3,855 miles of motorized routes and 345 miles of single track. These routes include those submitted by recreationists

The BLM developed a variety of Special Recreation Management Areas (SRMAs), as well as a variety of Focus Areas to meet a variety of recreational needs including those for non-motorized users. This includes designation of hiking Focus Areas and non-WSA lands with wilderness characteristics. In addition Wilderness Study Areas (353,000 acres) are available for non-motorized recreation across all alternatives in the DRMP/EIS. |
| Ride with Respect | 122 | 46 | BLM's route designation process is not equitable among trail users. The process relied on aerial photography interpretation. It does not provide a system for non-full sized vehicle users. It ignores ROS, which could be applied in a linear fashion to provide greater fairness in the travel plan. Fairness could be achieved if the planners seriously considered the routes submitted by citizens, organizations and local government. | The BLM's travel plan provides opportunities for all types of motorized users. The preferred alternative (Alt C) provides 282 miles of single track motorcycle trails. These miles of trail are those submitted by the public, verified by the BLM on the ground, and designated under the preferred alternative. The BLM fully considered all routes submitted by the public, organizations and local government.

While aerial photography was utilized in part for verification of full sized vehicle routes, on the ground field checks were undertaken on each of the submitted singletrack routes.

There is no policy or direction for the BLM to utilize the Recreation Opportunity Spectrum (ROS) in the land use planning process. |

BLM_0012743

| Ride with Respect | 122 | 47 | Special Recreation Management Areas should be large enough to "grow into". Low use trails should be kept in the travel plan for those seeking solitude. | The BLM's Special Recreation Mangement Areas are proposed based largely on existing uses with consideration of potential future use. Many of the routes proposed in the alternatives for the Travel Plan currently see very little use.<br><br>See also response to comment 123-13. |
| --- | --- | --- | --- | --- |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 1 | Moab BLM's Travel plan designates motorized routes in areas with a non motorized setting. BRC understands that the planning team's intent is to have the Travel Plan "trump" (our word) the SRMA guidance. | Non-motorized focus areas are not intended to be managed as roadless. On pg. 2-18 of the DRMP/EIS in Management Common to All Alternatives, Focus Areas "are Recreation Management Zones for emphasizing particular types of recreation activities while still allowing for other uses in accordance with the Travel Plan". There are routes identified in the Travel Plan within non-motorized Focus Areas and these routes will remain available to travel. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 2 | It is likely that some relatively small adjustments will be necessary to the Travel Plan. In addition, there is some guidance in the RMP which, in some areas, would allow the development of new travel routes should they be necessary. | The guidance concerning adjustments to the Travel Plan is outlined on pg. 2-48 of the DRMP/EIS. See also response to comment 208-8. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 3 | There is no mention in the Moab DEIS regarding the obvious conflict in the Draft RMP's guidance and the Travel Plan. There is nothing to indicate the Travel plan will "trump" any other management prescription. | See response to comment 123-1. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 7 | The Final Plan and ROD must more completely address routes which are subject to overlapping or concurrent jurisdiction, such as routes identified as county roads.<br><br>The BLM's Draft Travel Plans do not contain references to agency guidance on route classification. The DEIS and Travel Plan do not specify if a route is a Road, a Trail, or a Primitive Road pursuant to agency directives. This seems to be inconsistent with agency guidance. | All routes identified in the alternatives of the DRMP/EIS for the Travel Plan are BLM routes. It is stated on pg. 1-12 that the RMP does not adjudicate, analyze, or otherwise determine the validity of claimed RS 2477 right-of-ways.<br><br>The route names the commentor refers to were recommended in a BLM Washington Office Instruction Memorandum (IM) 2006-173, and will be applied to future route classification in the BLM's Facility Asset Management System. The implementation of this |

BLM_0012744

| | | | | database requirement is still being refined and does not pertain to the identification of routes within the Travel Plan process. |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 8 | The BLM alternative assumes it will be able to completely change all vehicle based camping as currently available.  This is a flawed approach due to the following:  a) a regional prohibition on vehicle based camping does not absolve the agency of a duty to disclose and analyze the effects of camping on discrete, individual sites throughout the applicable region, b) it is impossible for the public and the decision makers to reasonably determine what affects each alternative will have on camping, c) there is no range of alternatives on the camping policy, and d) it is impossible to incorporate all the "spurs" necessary to provide access to many campsites resulting in areas where camping is nearly eliminated.<br><br>A map is provided of the White Wash area which displays an area where access to dispersed camping sites has been eliminated. | On pg. 2-17 of the DRMP/EIS in Management Actions Common to All Action Alternatives, it states that dispersed camping is allowed where not specifically prohibited.  Dispersed camping is allowed on over 95% of the Moab planning area.  There is no regional prohibition against vehicle based camping; although vehicle based camping is restricted to designated sites in heavily used areas around Moab (about 5% of the area).  These actions were initially prompted due to concerns regarding public health and sanitation raised by local health officials.<br><br>In development of the alternative Travel Plans, all motorized routes considered during scoping were assessed for purpose need and weighed against resource conflicts.  Recreation opportunities and experiences are listed as a purpose and need as specified on pg. G-13.  Dispersed camping was considered a recreation opportunity and experience.  The interdisciplinary team, which included Grand County road officials, was very familiar with dispersed camp sites accessed by spur roads<br><br>As stated in Chapter 4, pg. 405, of the DRMP/EIS, the BLM can modify or adjust designated motorized routes at the implementation and project-planning level.  Therefore, specific spur routes to dispersed campsites can be added to the Travel Plan.  The open area to the west side of the White Wash Sand Dunes has been enlarged to accommodate the camping that occurs to the south of the oil well.  See also response to comment 120-83.<br><br>Since dispersed camping is tied to the availability of identified spur routes, the range of alternatives for vehicle based camping is provided in the alternatives for the |

740

| | | | | Travel Plan. |
|---|---|---|---|---|
| | | | | Throughout Chapter 4 of the DRMP/EIS, the impacts to the resources affected by dispersed camping are analyzed.  A statement will be added to Chapter 4 of the PRMP/FEIS in the section on the Impacts of Recreation and Travel on Social and Economic Conditions which states "Restrictions on dispersed camping and access routes to campsites may negatively affect those recreationists seeking this type of experience". |
| | | | | Other than the White Wash area, the commentor has not provided any additional information regarding specific routes to dispersed camp sites that have allegedly been eliminated. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 10 | BRC strongly opposes the fee system proposed for White Wash Sand Dunes in Alts C and D.  A fee system at White Wash will be difficult to implement because of the distance from the Moab Field Office and ease of access to the Dunes and nearby trails.  A fee system with the Federal Lands Recreation Enhancement Act.  The BLM should remove the section requiring the Special Recreation Permit idea, and instead, insert guidance to pursue funding sources. | The possibility of a fee system for use of the open area in White Wash Sand Dunes is proposed in the DRMP/EIS as a means of funding the cost of the intensive management that this area would require to keep it open to cross country travel and provide services to visitors.  Actual implementation of any new fee would follow the guidelines of the Federal Lands Recreation Enhancement Act, and be considered by the Utah BLM Resource Advisory Council.  This action does not preclude pursuing other funding sources to help manage the White Wash Sand Dunes.  For clarity the statement on pg. 2-25 of the DRMP/EIS has been changed to read "Implement a fee system under the guidelines of the Federal Lands Recreation Enhancement Act. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 12 | Generally speaking, the DEIS assumes and concludes that reduction of OHV use within an area will provide a beneficial result on a particular issue.  However, the DEIS fails to connect specific closures with site-specific data justifying the closure. | The BLM worked with an interdisciplinary team of resource specialists which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DEIS/RMP.  The ID team reviewed each route for purpose and need and weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The |

BLM_0012746

| | | | | impacts identified for travel management in the DRMP/EIS are derived from this data. |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 15 | The DEIS fails to accurately and sufficiently disclose the nature of the Travel Planning decisions and how that plan relates to RMP decisions. Indeed, the nature of the Travel Plan decision is not even addressed until Chapter 2. | Refer to response to comments 123-4, 123-5, and 123-6. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 16 | Issue 1 of the DEIS states "How can increased recreation use, especially motorized vehicle access, be managed while protecitng natural resource values?" The question has been answered, in large part, by BLM's national directives that require Field Offices to a "travel limited to designated roads, trails, and managed open areas." The agency has, in effect, modified the land use plan decision of "open" to "managed open". The alternatives should only differ in number of motorized routes and acres of managed open areas. | There commentor appears to have a misinterpretation of definitions. The Federal regulations at 43 CFR 8340.0-5 define an "open" OHV area as one "where all types of vehicle use is permitted at all times". These regulations also define limited as "an area restricted at certains times, in certain areas, or certain types of vehicular use. These restriction may be of any type." The BLM utilized these definitions in the land use planning process. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 17 | Alternative B totally eliminates all dirt bike single track trails. It also totally eliminates the "dune riding" experience so popular at White Wash. Alt B provides even less opportunity for mountain bikers than Alt C. Alt B changes the use at White Wash from a popular OHV destination to an equestrian and hiking area. Alt D conversely does not eliminate any non-motorized opportunity or make any hiking areas in rockcrawling areas. It does put the Westwater area into an ERMA and the ERMA is non-motorized. These are among the examples of the manner in which the DEIS fails to present a reasonable range of Alternatives that respond to the issues. The range of alternaitives is inappropriately skewed toward significant closures to public access and vehicle-based recreation (Alt A - 4,673 miles, Alt B - 2,144 miles, Alt C - 2,519 miles, Alt D - 2,671 miles). | The White Wash area was determined to meet the criteria for an Area of Critical Environmental Concern (ACEC) and is proposed for designation in Alt B. The only recreation activities that are compatible with the management actions in the ACEC are non-motorized ones. Although cross-county OHV use is eliminated in Alt B, OHV travel is still available on identified routes. Alt D provides a larger open area for cross-country OHV travel and maintains the motorized focus areas while eliminating many hiking focus areas. However, hiking is not restricted anywhere on public lands. The Wilderness Study Area (WSA) in the Westwater Area is managed according to the Interim Management Policy for Lands Under Wilderness Review. This policy precludes motorized use except on identified routes. The remainder of the Westwater area outside the WSA is managed as an Extensive Recreation Management Area in Alt D. Travel in the ERMA is managed according to the Travel |

BLM_0012747

| | | | | Management Plan (see pg. 2-29). |
|---|---|---|---|---|
| | | | | As described in Appendix G, the BLM used an interdisciplinary approach, which included County road officials, in formulating the alternatives for the Travel Plan in the DRMP/EIS.  All routes submitted during the scoping period were evaluated.  A large number of routes were found to lack purpose and need (over 2,500 miles) which explains the relatively large span between Alt A and the action alternatives.  The purpose and need of each route was weighed against potential resource conflicts which provided a spread across the action alternatives.  These alternatives provide a broad range of management actions to address the issues raised during scoping. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 18 | First Related Issue to Issue 1:  Which areas should be designated as open, limited, or closed to OHV use, and which OHV routes should be designated within the limited category? Again, we'll emphasize that given the analysis in the MSA, eliminating the open area in a place that has been recognized as one of the most popular OHV sand dune destinations is not a reasonable way to respond to the issue. The proposed open areas in both Alternatives B and C present substantial problems. BRC agrees with the approach of the managed open area and has embraced the concept in our proposal in the next section. One more thing to emphasize, adjustment of the western boundary of the Open area will be critical, unless you want everyone to camp on the dunes. | The commenter is mistaken about the closure of the White Wash sand dunes in Alt C of the DRMP/EIS.  The western boundary of the open area has been expanded to accommodate camping in Alt C.  See response to comment 120-83. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 19 | Third Related Issue: Where should adaptive management practices be applied in response to unacceptable resource impacts? The alternatives don't meaningfully respond to this issue.  In candor, this doesn't seem to be a very good planning issue. Adaptive management practices might | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and |

BLM_0012748

| | | | be applied in response to new management challenges or unacceptable outcomes on individual sites. This obvious reality is addressed within existing law and regulation and need not be identified or prioritized as a separate issue. | site specific NEPA analysis. |
|---|---|---|---|---|
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 43 | BRC supports RwR's proposals: Special policies should continue permitting slick rock exploration. The Moab Field Office Off-Highway Vehicle Travel Map states that "two-wheeled motorcycles are allowed on established slick rock riding areas in the Slickrock Trail, Bartlett Wash and Tusher Canyon areas and on slick rock areas along the Monitor and Merrimac and Lover Monitor and Merrimac trails where such use does not further disturb vegetation or soils" (dated March 8, 2001 as part of emergency restrictions). In these areas, travel could be further restricted, but not so drastically as the draft RMP intends. Mechanized travel should still be allowed on any barren rock surface. Slick rock within one hundred yards of a designated route could remain open to motorized travel, except for Tusher Slickrock, which would be reserved for non-motorized use. This two-hundred yard corridor would accommodate the ways that people currently enjoy slick rock areas. | See response to comment 122-42. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 46 | We are concerned about the assumption the agency seems to have regarding vehicle use on mancos shale soils contributing to salinity in the Colorado River. The assumption is repeated throughout the DEIS. The data we have reviewed would indicate erosion is occurring in such a massive scale than an increase of TSS/TDS/TMDL caused by all human activities, including road building activities and other vehicle use, cannot be detected. It is insignificant compared to what occurs naturally. | The commentor provides no citation on the data referred. Our sources (Lusby, 1963 and BLM, 1993d) on the Mancos conclude that land use activities, including OHV use, contribute to accelerated erosion and thus increase salinity to the Colorado River. |
| Colorado Off-Highway Vehicle | 123 | 47 | The portion of the DEIS discussing the Alternatives identifies as a goal and objective maintenance of current air quality. BRC's difficulty with the air quality | Air quality emissions were not considered in Travel Plan decisions within the DRMP/EIS. The designation of routes in the Travel Plan will not in itself increase travel |

BLM_0012749

| | | | | |
|---|---|---|---|---|
| Coalition (COHVCO) | | | data is that it is difficult to ascertain from the DEIS the extent to which (a) the asserted incremental benefit influenced the decision to prefer Alternative C; and (b) if it did have significant influence on the decision, why the decision was made to reduce available OHV opportunities when there has been no showing that OHVs contribute to air quality degradation. BlueRibbon respectfully suggests more data on OHV emissions be included in the Final EIS and that a discussion of OHV emissions be included in the Final EIS if OHV emissions influence a decision. | and emissions. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 51 | Again, it is difficult to ascertain the extent to which any concern of the impact of OHV use on riparian areas had on designating Alternative C as the preferred alternative, but to the extent it influenced the decision at all, there is less than meaningful analysis; there simply is none.  Thus, closures are not justifiable on grounds that OHV use will adversely affect riparian areas.  This section generally identifies the resource benefits of reducing OHV and camping activities without discussion of how existing OHV and camping activities will further impair resource protection. | The BLM utilized the Standards for Public Land Health and Guidelines for Recreation Management for BLM lands in Utah in considering the impacts of OHV use and dispersed camping on riparian areas (Appendix R of the DRMP/EIS).  On pg. R-2, Rangeland Health Standard 2 directs the BLM to "where feasible, developed travel routes should be located away from sensitive riparian areas" and "camping in riparian areas should be avoided …to reduce vegetation disturbance and sedimentation". |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 55 | GIS mapping of vegetation and making assumptions about wildlife activity based upon the vegetation is not an accurate way of assessing importance of any given area for wildlife.  Without ground truthing of vegetation conditions it can only be assumed what both density and diversity is in an area.  Thus, invalid assumptions can be made about habitat and wildlife in an area and wrong decisions made about potential impacts on wildlife as the result of motorized routes and their use. Trails could be removed or not allowed using unsubstantiated information. | Vegetation habitat types were utilized in Chapter 4 of the DRMP/EIS to analyze general potential impacts to sensitive species.  No travel plan decisions were based on this information.<br><br>Routes were only eliminated from identification in the alternatives for the Travel Plan based on specific wildlife habitat coverage. |
| Colorado Off-Highway Vehicle Coalition | 123 | 58 | There would have to be more supportive documentation to show why these areas (ACECs in Alt B) should be closed to motorized use.  Absent data demonstrating that both habitat and wildlife are being | ACECs in Alt B are limited to identified routes and are not closed to motorized use as specified in the DRMP/EIS on pg. 2-33 through pg. 2-39. |

BLM_0012750

| | | | | |
|---|---|---|---|---|
| (COHVCO) | | | adversely affected by the presence of motorized trails the areas should not be closed to use. As shown in Alternative C the BLM must feel the same way about justification for these closures. | |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 10 | The Draft RMP/EIS does not have an alternative that mitigates the harm of designating certain routes such as Hey Joe. | The DRMP/EIS analyzed a range of reasonable alternatives. Closing all roads is not considered a reasonable alternative. The Hey Joe road was considered to have a purpose and need for recreational use (including permitted use) under all alternatives. Alt A designates 2,871 more miles of routes than does Alt B. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 24 | The plan never considers whether current or proposed ORV use levels are sustainable over the long run. | The BLM will continue to monitor the impacts to resources from all uses and will make adjustments as necessary. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 27 | Given the over 2600 miles of ORV trails the plan proposes to designate, the potential for soil erosion is significant. Soil erosion is one of the primary impacts of ORV use. | The alternative Travel Plans in the DRMP/EIS designate about 2600 miles of existing and constructed routes. In Alt C 123 miles of user made single track are designated for motorcycles. Impacts of OHV use on soils is extensively analyzed in section 4.3.13.7. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 28 | At 4-405, there's a list of resources that are not considered in the section on impacts to travel management on the theory that whatever BLM does to manage grazing, for example, or other types of recreation, won't impact travel. Wouldn't decisions to limit grazing based on riparian area destruction also impact ORV's. As would decisions to protect areas based on visual resources, or wildlife? Please provide an explanation for this approach. | Limiting grazing in riparian areas is considered on a case by case basis utilizing Standards for Rangeland Health and Guidelines for Grazing Management. Restricting cattle in riparian areas is not directly related to OHVs. It is possible to restrict OHVs to designated routes, which minimizes impacts to riparian areas; however, cattle can not be limited in this fashion. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 31 | The plan notes that adverse effects from a variety of uses occur in Moab's riparian areas, and that reasonably foreseeable future uses will make it worse, but that mitigation would happen through implementation of PFC standards. There is no attempt to break down the assessment by alternative, or any real quantitative analysis. For example, on 4-282, there's a discussion of the significant adverse impacts to riparian areas from grazing. Can these same areas | See response to comment 124-28.<br><br>The assumptions underlying this assertion are invalid. In the action alternatives of the DRMP/EIS, no open OHV use is allowed in riparian areas (pg. 4-425). In addition, under all action alternatives, no surface disturbing activities are allowed within 100 meters of riparian areas (pg. C-5). |

BLM_0012751

| | | | also sustanin ORV use? | |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 32 | The plan says that all alternatives would ensure PFC, and that "the loss or degradation of riparian areas, wetlands and associated floodplains would be avoided or minimized; natural and beneficial values would be preserved and enhanced; and fish and wildlife and special status species would be provided for," 4-182, there is no explanation of how ORV use in these same streams affects that conclusion. | On page 4-245 of the DRMP/EIS, the impacts of travel on riparian resources are analyzed.  The acres of riparian areas by OHV designation are specified.  No cross-county travel is allowed in riparian areas under any of the action alternatives.  To provide further analyses, a table has been added to Appendix G of the PRMP/FEIS detailing the number of miles of routes not designated due to resource conflicts including riparian areas.  This data has been incorporated into the appropriate resource sections of Chapter 4.  In Appendix G of the DRMP/EIS it is acknowledged that OHV use in riparian areas can result in loss of vegetation, degraded stream banks, and erosion. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 33 | There are trails in riparian areas, and there doesn't appear to be any criteria or methodology by which riparian areas are chosen for protective measures against ORV use.  While it appears that the BLM has focused on how strategies to protect riparian areas would adversely affect ORV use, it does not analyze how ORV use damages riparian areas. | An interdisciplinary team of resource specialists including representatives for riparian, wildlife, vegetation, and soils reviewed each route with a potential riparian conflict (see pg. G-23).  Where potential conflicts were identified, the team determined the extent of the conflict and what mitigation might be appropriate.  The identified resource conflict was then balanced against the purpose and need for the route for each alternative. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 34 | The EIS lacks any statement of purpose and need for the ORV trail designations.  How many trails designated in the plan addresses the needs of non-motorized visitors.  How many trails designated in the plan are for ORVs and how many for hikers? | The purpose and need for designating travel routes are discussed on pgs. G-12 and G-13.  This discussion provides all the criteria utilized for identifying the routes with a purpose and need.  The interdisciplinary team considered these criteria in designating routes.  The specific criteria utilized were not identified route by route.<br><br>The needs of non-motorized visitors have been addressed in the plan by providing Focus Areas specifically for their use, identifying routes previously available for motorized use as restricted to non-motorized use (2,506 miles in Alt C), and greatly reducing the amount of open OHV areas.  In addition hikers are not restricted anywhere on public lands. |

BLM_0012752

| Southern Utah Wilderness Alliance (SUWA) | 124 | 43 | The Moab Draft RMP does not fulfill the minimization criteria required by law especially pertaining to the designation of OHV routes. The Draft RMP fails to provide an alternative avoiding potential environmental effects of designating particular routes. The plan does not provide equal recreational opportunities for non-motorized opportunities. The Draft RMP fails to analyze the cumulative effects of a wide spread designation of motorized routes. | Impacts to natural and cultural resources from designation of OHV routes have been minimized by weighing purpose and need against resource conflict on a route by route basis. Of the 6,199 miles of inventoried routes in Alt A, 2,871 routes are excluded from any of the action alternatives. While these 2,871 miles or routes were determined to have no purpose and need, resource conflicts with these routes were eliminated or avoided. Furthermore, these routes are now available for non-motorized use. In addition, more routes were eliminated in the action alternatives due to resource conflicts. It is not reasonable all routes with any resource conflicts; the purpose and need for the routes must be considered.

Of the 1,821,374 acres of public lands within the Moab Field Office there are 353,615 acres of land designated as Wilderness Study Areas and 5,200 acres Congressionally designated as Wilderness. The WSAs and the Wilderness Areas are designated across all alternatives in the DRMP/EIS and are available for primitive and non-motorized use. In addition the DRMP/EIS includes SRMAs and Focus Areas managed for non-motorized recreation. The preferred Alternative (Alt C) includes three entire SRMAs for non-motorized recreation (Dolores River - 31,661 acres; Two Rivers - 29,839 acres; and Lower Gray Canyon - 3,759 acres). In addition to the non-motorized SRMAs, non-motorized Focus Areas in Alt C total 107,282 acres. Therefore, Alt C provides substantial opportunities for non-motorized recreation.

The cumulative impacts of route designation are analyzed in Chapter 4 of the Draft RMP/EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 45 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP). The first of these factors is the inclusion of B routes in the Redrock Heritage Proposal. BLM should have altered | See Chapter 2 of the DRMP/EIS, page 108.

BLM's rationale for its decision not to carry forward the Redrock Heritage Proposal in its entirety is clearly |

BLM_0012753

| | | | the RHP to include B roads as cherry-stems to the RHP alternative. | described in Chapter 2.  BLM is not obligated to take an external proposal and analyze it in its entirety or to alter the proposal. The commentor assumes that BLM relied on only one of its criticisms for rejecting the RHP plan. For example, the commentor's comment concerning B roads suggests that BLM rejected the entire RHP plan simply because it would have eliminated county B roads. B roads are regularly maintained to passenger car standards;  this maintenance is funded with state reimbursement.  Although an important factor, BLM rejected the RHP plan in its entirety for the combination of reasons described in Chapter 2 (Alternatives Considered but Eliminated from Further Analysis). |
| | | | | By eliminating B roads from its proposal, the commentor does not consider purpose and need for route designation throughout the field office. Cherry-stemming is a term used exclusively for WSAs and wilderness. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 46 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP).  One of these factors is the inclusion of SITLA lands in the Redrock Heritage Proposal. Where there is not B route access (sic), the BLM could reserve administrative access to SITLA lands without providing access to the general public. | See Chapter 2 of the DRMP/EIS, page 108. BLM's rationale for its decision not to carry forward the Redrock Heritage Proposal in its entirety is clearly described in Chapter 2.  BLM is not obligated to take an external proposal and analyze it in its entirety. The commentor's proposal includes SITLA lands;  BLM is obligated to provide reasonable access to SITLA lands based on Utah vs. Andrus. Furthermore, BLM cannot remove routes from SITLA lands. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 47 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP).  One of these factors is the focus of the RHP on BLM lands south of I-70.  BLM should create more non-motorized opportunities near Moab. | See Chapter 2 of the DRMP/EIS, page 108. BLM is not required to create "roadless areas" in order to provide primitive recreation opportunities. Three WSAs are located within four miles of the city of Moab.  In addition, there are two National Parks. Alt. C provides non-motorized focus areas near Moab (in the Colorado Riverway, Labyrinth and South Moab SRMAs.) Two non-WSA lands with WC areas are located near |

BLM_0012754

| | | | | Moab.<br><br>Alternative B provides 266,485 acres of non-WSA lands with Wilderness Characteristics.<br><br>See also response to comment 124-43. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 48 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP).  One of these factors is the comparison of the RHP with the county inventory rather than with the BLM's Alt. C travel plan alternative. | See Chapter 2 of the DRMP/EIS, page 108.<br><br>RHP does its analyses regarding distance from a road in comparison with the county inventory. The BLM reduced the miles of route by 2,871 miles by eliminating routes with no purpose and need.  The BLM used purpose and need as well as resource conflicts to eliminate routes, as described in Appendix G. Creating "roadless areas" was not the intent of the BLM's route designation process. The RHP's route designation seeks first and foremost to create "roadless areas"by eliminating roads in areas proposed for wilderness in external wilderness proposals. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 49 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP).  One of these factors is that the RHP ROS analysis fails to account for topographic differentiation and such analyses unfairly impacts non-motorized recreation opportunities. | As stated clearly in Chapter 2 in the DRMP/EIS, pg. 108, ROS was not utilized by the BLM because the varied topography of the MPA results in greater opportunities for primitive, non-motorized recreation than would be indicated by ROS analyses.  There is no requirement to use ROS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 50 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP).  One of these factors is that SUWA assumes wilderness character lands can only be enjoyed without motorized access and discounts the near-town opportunities for enjoyment of these wilderness characteristics. SUWA agrees that near-town recreational opportunities afforded by the WSAs and their access points and the roadless lands within the national Parks are a valuable resource for primitive, non-motorized recreation. However, this is not a justifiable argument for denying protection for the wilderness quality lands in the other parts of the planning area. | See Chapter 2 of the DRMP/EIS, page 109.  The BLM cannot create new WSAs. While non-WSA lands may be managed to protect their wilderness characterstics, there is no requirement to do so.  Many of the lands to which the commentor refers have been found to lack wilderness characteristics due to a plethora of routes.  Other areas have been proposed for management of wilderness characteristics under Alt. B. |

BLM_0012755

| Southern Utah Wilderness Alliance (SUWA) | 124 | 51 | BLM cites several factors for its wholesale dismissal of the Redrock Heritage Proposal (RHP). One of these factors is that the BLM cannot create new WSAs. SUWA asserts that BLM can create new WSAs. | See Chapter 2 of the DRMP/EIS, page 109 and response to comment 124-41. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 58 | The travel plan accompanying the DEIS violates the BLM's own rules for designating trails outlined in its 2006 "Clarification Guidance". The BLM has provided no definitions, criteria, or guidelines as provided by this guidance. | The Clarification Guidance referred to (Technical Reference 9113-1) was issued far after the Travel Plan was formulated. On pg. 6 of this document it states "The document does not address how to establish an appropriate route designation, evaluate environmental effects, perform a condition assessment, or decide when to add or remove a route. Rather the goal of the transportation route inventory is to identify and properly classify all existing routes whether planned or unplanned (user created)". This guidance is not mandatory and was not intended for travel route designation in the land use planning process. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 59 | The BLM simply "inherited roads and trails from Grand County maps and from off-road vehicle advocates in violation of the Clarification Guidance of 2006. In a meeting in Salt Lake City on October 3, 2007, the BLM staff informed SUWA that it has not visited each of the routes but simply relied on a statistical sampling technique to confirm the information on County maps. | As part of the scoping process for the DEIS/RMP, the BLM solicited route data from Counties and other interested parties. As described in Appendix G on pgs. 15 and 16, the BLM verified the routes provided from the public by statistical sampling and on the ground verification. The statistical sampling yielded a 99.7% accuracy rate at a 95% confidence level. Each of the verified routes was then individually reviewed for purpose and need weighed against resource conflicts. The BLM did not inherit roads and trails but rather examined each one individually. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 60 | The draft RMP does not demonstrate a full range of travel types. ORV routes total 2600 miles and hiking routes total 20 miles. | The needs of non-motorized visitors have been addressed in the plan by providing Focus Areas specifically for their use, identifying routes previously available for motorized use as restricted to non-motorized use (2,506 miles in Alt C), and greatly reducing the amount of open OHV areas. In addition hikers are not restricted anywhere on public lands.<br><br>The commentor implicitly assumes that the routes identified in the BLM travel plan represent primarily "ORV |

BLM_0012756

| | | | | |
|---|---|---|---|---|
| | | | | trails". In fact, routes are identified to serve a wide variety of travel needs (range, minerals, private lands access, wildlife projects, etc), although they are all available for recreation. Use of the term ORV implies that these routes are designated only for the more extreme forms of motorized recreation, when in fact most are passable by common street-legal vehicles. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 61 | SUWA can not identify the basis for specific route designations to confirm that the BLM has complied with legal and policy obligations. | There are over 33,000 route segments considered in the Travel Plan. Information on each of these segments is coded in a GIS data base which was provided to the commentor during the comment period for the DRMP/EIS. This information is publicly available at the Moab Field Office. It is impractical to include this volume of data within the covers of the DRMP/EIS document. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 138 | The BLM should not designate routes based on R.S. 2477 claims. The BLM must make decisions regarding motorized use base on its legal obligations to protect the resources of our public lands. The BLM should not designate routes merely because of R.S. 2477 assertions. | The BLM did not designate routes based on RS 2477 claims as evidenced by its non-designation of over 2500 miles of routes. Alternative A identifies 6,199 miles of routes while Alternative C identifies 3,693 miles of routes. The RS 2477 is discussed on pg. 1-12 of the DRMP/DEIS as an issue eliminated from further analysis because it is beyond the scope of the plan. The RMP does not adjudicate, analyze, or otherwise determine the validity of claimed RS 2477 rights-of-way.<br><br>The BLM analyzed each travel route according to its purpose and need weighed against potential resource conflicts. This process is detailed in Appendix G of the DRMP/DEIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 143 | SUWA's Exhibit I is a site specific list of travel plan comments. A general point throughout Exhibit I is that SUWA believes a number of routes should be closed to motorized use for a variety of reasons. | The comments on the DRMP/EIS incorporated in Exhibit I are identical to the materials provided by the commentor during scoping. As was the case with the commentor's scoping submission, the comments address the Grand and San Juan County route inventories, and not the travel plan encompassed by the action alternatives. As such, the scoping comments as well as the comments received on the DRMP/EIS refer to Alternative A (No Action), as many of the routes in question are not identified for |

BLM_0012757

motorized travel in one or more action alternatives.

Appendix G to the DRMP/EIS explains in detail the methods and tools used by BLM to formulate its travel plan alternatives.  The road closures proposed by the commentor reflect their Red Rock Heritage Travel Plan, the BLM response to which can be found in Chapter 2, pgs. 108-109.

Most of the routes proposed for closure by the commentor lie within its wilderness proposals.  The commentor itself, in many of its specific route comments, expresses the concern that, were it not for the existence of the route(s) in question, the area would be roadless.  As described in Chapter 2, pgs. 108-109, the BLM is not obligated to create roadless areas in response to wilderness proposals.

Related to the above, many of this organization's comments call for a greater balance between motorized and non-motorized recreation.  The BLM's action alternatives recognize this concern.  OHV categories, in all action alternatives, greatly reduce the acreage currently "open", proposing that virtually all of it be in the "limited" category.  Similarly, the BLM proposes in one or more action alternatives that all lands in WSAs be in the "closed" category; alternative B does not identify any vehicle "ways" for motorized use, while alternative C identifies 2.55 miles of routes.

All action alternatives propose identifying more than 2500 miles of current vehicle routes for non-motorized use; all of these are potentially available for hiking, equestrian and bicycling use.  The BLM's proposal identifies fewer miles of routes for motorized use than the Red Rock Travel Plan proposed by the commentor in scoping.  All public lands remain open to hiking.

BLM_0012758

| Southern Utah Wilderness Alliance (SUWA) | 124 | 155 | The BLM should close the route on Fisher Mesa because of its scenic qualities, wildlife values, and opportunities for non-motorized recreation. | The route in question leads to a large chained area, and accesses several stock ponds and a state section. The route itself was "cherry-stemmed" in HR 1500 (which formed the basis for the 1999-2003 wilderness inventory), presumably for these reasons stated above. The BLM interdisciplinary team, reviewing travel routes, did not identify resource conflicts with the Fisher Mesa route. Furthermore, the commentor did not provide any evidence regarding the conflicts it refers to. |
|---|---|---|---|---|
| The Nature Conservancy | 204 | 25 | Travel Management (Pg 2-28—2-50) The term "baseline routes" is used within the last of these Management Common points, but no definition of this term appears in the glossary. Are baseline routes all of those that are specifically designated for travel, or some subset of designated routes? | Baseline routes means those routes that are initially established in the Travel Plan accompanying the PRMP/FEIS. All other existing routes that are not designated will be marked "closed" on the ground; travel on these existing routes will cease to be legal at the time of the ROD. |
| Sierra Club Utah Chapter | 205 | 1 | The section on Travel Management fails to meet the requirements of NEPA, APA, the Information Quality Act (IQA)(also known as the Data Quality Act), and legal requirements for recognizing state or county highway or road claims. The use of state and county road inventories is either beyond the scope of this DRMP or is inadequately analyzed and justified by the DRMP. | See response to comment 205-9. |
| Sierra Club Utah Chapter | 205 | 2 | Section 3.17 and 4.16 are cursory discussions of the impacts of roads on the human environment. The information provided is inadequate to for the agency to make an informed decision about the transportation system. For example Gelbard and Belnap (2003) are listed as a reference but no where is it shown how this information was used. Considering the import of this research it does not make sense to have the road densities in any of the alternatives. The BLM totally fails to use information contained in their own references. | The BLM recognizes that the great majority of impacts to soils were created when the route was initially bladed. The BLM must assume that, in identifying routes for travel, that the public will adhere to the travel management rules, and that the impacts to soils from cross country travel would be lessened.<br><br>The commentor should realize that the impact analysis compares the action alternatives to the No Action alternative. The impacts to soils from the preferred alternative are demonstrably more positive than those in the No Action alternative, because cross travel motorized travel is virtually eliminated. |
| Sierra Club | 205 | 3 | The DRMP also fails to consider the effects of an | Throughout Chapter 4 of the DRMP/DEIS, the BLM has |

BLM_0012759

| Utah Chapter | | | extensive and excessive travel map with regard to other issues such as the extent of ORV use permitted, the development potential for oil and gas, the effects of road dust on biological soil crusts (This is a particularly egregious failure since much of the available research comes from this region.), the effects of grazing on biomass and ground cover, and other permitted activities. | assessed the impacts of travel management on a wide variety of resources.  Nowhere in Chapter 4 does the BLM suggest that the presence of routes and their identification for travel is without environmental impact.  The commentor should realize that the impact analysis compares the action alternatives to the No Action alternative.  The impacts to resources from the preferred alternative are demonstrably more positive than those in the No Action alternative, because cross travel motorized travel is virtually eliminated. The alternatives explicitly discuss the other issues raised by the commentor, including the extent of OHV use permitted, the development potential for oil and gas, the effects of grazing on biomass and ground cover, and other permitted activities.  The commentor does not indicate where the BLM erred in its choice of data, its analytical methods or the conclusions drawn from such analysis.<br><br>The article cited pertains to the spread of invasive weeds by vehicular travel.  The BLM is aware of this.  The impacts of "road dust" on biological soils crusts is not documented.  Vascular plants may be more susceptible to road dust than biological soil crusts. |
| Sierra Club Utah Chapter | 205 | 4 | The cumulative effects of these interacting activities is completely ignored and denied in 4.3.16.2. This section completely misunderstands the requirement to look at the cumulative impacts of a variety of activities that will be permitted in the decision. | The section of the DRMP/DEIS referred to by the commentor discusses the effects of various resource decisions on travel management, and has nothing to do with cumulative impacts.  The DRMP/DEIS discusses cumulative impacts in section 4.3.24.  The commentor may disagree with the BLM's assessment of cumulative impacts, but offers no specifics as to where or how the BLM erred in its analysis or conclusions. |
| Sierra Club Utah Chapter | 205 | 5 | Because the DRMP makes only cursory, vague and unsupported statements concerning travel management it fails to meet the requirements of NEPA, any decisions resulting from this discussion would be arbitrary and capricious. For this reason it would also fail to meet the requirements of the APA. | The commentor offers no specifics to support these very general assertions.  The commentor seems to be unaware of the extensive discussion of travel plan formulation in Appendix G.  The "crucial issues" to which the commentor refers are undefined, making response difficult. |

BLM_0012760

| | | | | |
|---|---|---|---|---|
| | | | The DRMP discusses travel management for only 2.5 pages in Sec 3.17. Most of that is only a description of various locations within the Field Office Area. The DRMP discusses travel management for about 8.5 pages in Sec 4.16. Neither section contains substantive discussion of the problems and issues related to travel management. The environmental consequences are not well documented and avoid some crucial issues. | An extensive administrative record, available for public inspection, underlies the conclusions reached by the BLM in its formulation of travel plan alternatives. |
| Sierra Club Utah Chapter | 205 | 6 | The consequences to non-mechanized recreation are considered to be the same for Alternatives B, C, and D. How could the road densities proposed for travel management not impact hiking, backpacking and equestrian activities negatively? If there is a difference between the alternatives then they should have different effects on non-motorized recreation. If there is no difference then this is one example of the lack of a reasonable range of alternatives in the DRMP. | The BLM discusses the impacts of travel management on these activities on pages 4-410 to 4-111 in the DRMP/EIS.  On these pages, the BLM specifically discusses the different impacts on these activities from the three action alternatives.  The commentor assumes that the three action alternatives will impact negatively these activities.  This ignores the fact that all three action alternatives greatly reduce (almost to zero) acreage designated open to OHV travel.  All three action alternatives identify over 2500 miles of routes currently available for motorized recreation as being restricted to non-motorized activities. The BLM believes that these alternatives will have positive impacts on non-motorized recreation, and this is stated explicitly on page 4-112 of the DRMP/EIS. |
| | | | | The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, 4 alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/EIS |

756

BLM_0012361

| | | | | provides in comparative form the management actions associated with each alternative. |
|---|---|---|---|---|
| Sierra Club Utah Chapter | 205 | 7 | The creation of non-motorized routes does not mitigate the hiking or backpacking experience if one remains in earshot of motors, if one can see the dust plumes of ATVs, dirt bikes or 4WD vehicles, or see the evidence of off-route travel on most trips into the backcountry? The essence of good planning requires balance. The DRMP lacks any sense of balance between uses. (at 4-411 and 412) | The BLM is not required to guarantee that the adverse impacts suggested by the commentor will never be present in any part of the planning area.  Noise regulation of motors is a matter of state law.  See response to comment 122-7.<br><br>See also responses to comments 205-6 and 209-3. |
| Sierra Club Utah Chapter | 205 | 8 | While the DRMP makes a cursory analysis of the effects of vegetation management on travel management it fails to analyze the effects of travel management on vegetation. | Section 4.3.17.13 "Impacts of Travel Management Decisions on Vegetation Resources" contains the analysis the commentor asserts is not present in the DRMP/EIS. |
| Sierra Club Utah Chapter | 205 | 9 | The DRMP states: "Utah State road classes were considered in the impacts analysis. The road classification relevant to the analysis was the Utah Department of Transportation Class-D roads. These are unpaved roads, and not regularly maintained nor funded for maintenance by the state. Most of the routes within the MPA are in this road class (see Travel Plan, Appendix G). Utah Class-B roads are also proposed as designated routes under the Travel Management prescriptions (see Chapter 2 Summary Table of Alternatives); however, these routes were not used as analysis criteria because they are maintained San Juan County and Grand County roads that currently provide motorized access throughout the MPA and whose travel function or designation would not change under any of the proposed alternatives." (At 4-405)<br><br>BLM cannot use these because:<br><br>1)      The use of Utah State, Grand County and San Juan County road maps for purposes of planning is illegal. The county B and D roads are essentially | The BLM solicited route information from all interested parties as part of its scoping process, leading to formulating travel plan alternatives.  The BLM received route information from both public bodies (such as the Counties) and private citizens.  The commentor seems to believe that using this route information as a basis for travel planning is designed to validate RS 2477 claims, which is not the case.  If this were the case, the BLM presumably would have included all County route inventories in all its action alternatives; instead, the BLM did not identify for motorized use more than 2500 miles of inventoried routes in its preferred alternative.  The assertion that the DRMP/EIS recognizes state and county road claims for planning purposes is incorrect.  The BLM accepts county route inventory data (as well as data from others) as the first step in its travel plan formulation.  As stated in Appendix G of the DRMP/EIS, the BLM then evaluates purpose and need of verified (not simply inventoried) routes against resource conflicts, spreading these analyses across alternatives.  See also response to comment 124-138.<br><br>The commentor assumes that the BLM accepted route |

BLM_0012762

equivalent to the county R.S. 2477 claims. The BLM attempts to dodge this by saying the plan will not make a decision regarding the validity of R.S.2477 claims. It does use the equivalent data in a planning decision. The BLM appears to be making a differentiation where there is none to be found. The BLM is attempting to establish a policy that would permit them to make non-binding determinations of R.S. 2477 claims for planning purposes. This concept has yet to pass legal challenge.

In essence the DRMP recognizes state and county road claims for planning purposes. In this way it exceeds any permissible or possibly permissible rule or policy. This process is far beyond even the limited decision making process conceived in the non-binding determination process outlined by the BLM.

The DRMP gives credence to R.S. 2477 claims since these are largely if not entirely equivalent to state and county road claims. It is entirely likely that the use of this information in planning violates the intent of Congress.

Congress prohibited the recognition of any R.S. 2477 rights of way. The language of the relevant statutory provision first appeared as substitute language to Senate Bill 1425, 104th Cong. "Revised Statutes 2477 Rights-of-Way Settlement Act." See S. Rep. 104-261 at 1. As the Senate later explained, "As originally written S. 1425 provided a process by which RS 2477 rights-of-way could be validated by means other than a quiet title action in the courts. Because of controversy over the legislation the Full Committee on May 1, 1996 passed a substitute amendment by voice vote. The substitute amendment placed a permanent moratorium on any agency of the federal government from issuing

data from the counties and other parties without qualification. In fact, as explained in detail in Appendix G, the BLM used scientifically defensible sampling techniques to verify the route data presented. The commentor does not provide a single instance of the BLM including in its database or in any of its alternatives a route which actually does not exist on the ground. The commentor asserts that the county and state-provided data is "unlikely" to be accurate or unreliable, yet provides no evidence to support this assertion.

"B" and "D" routes do not equate to County road assertions. At some point in the future, the Counties may assert claims to any or all of these routes; conversely, they may choose not to assert claims to any or all of these routes. The routes identified as "B" and "D" routes in the DRMP/EIS are routes located on public lands and managed by the BLM until properly adjudicated. The DRMP/EIS proposes four different alternatives to manage these routes.

As specified in the Draft RMP/EIS (pg. 1-12), addressing RS 2477 assertions is beyond the scope of this planning effort. However, nothing extinguishes any right-of-way or alters in any way the legal rights the State and Counties have to assert and protect RS 2477 rights. The commentor is insistent on the assertion that using county or state-provided route data as part of the input into the BLM's travel planning formulation effectively confirms RS 2477 claims is unfounded, no matter how often the commentor makes this assertion. The commentor repeatedly confuses route "data" with route "claims"; the BLM only considered route data in its travel plan formulation. The maps referred to by the commentor are not maps of county "claims", but maps of verified routes which form the baseline (not the final product) for travel planning.

BLM_0012763

final regulations on RS 2477 without Congressional approval."

While the RMP may not appear to be a final regulation, by using and recognizing state and county road claims it is making a decision that will be difficult to change in the future.

The state of Utah and the counties continue to have recourse to the courts to assert road claims. In fact this is still the only route by which the counties can assert and have adjudicated road claims.

2)      Using the state and county road claims also violates the IQA. The IQA (sometimes referred to as the "Data Quality Act") was meant to ensure that agencies, including the BLM, did not disseminate to the public or rely on information of dubious quality in the agency's public pronouncements or decision-making. The DOI and BLM guidelines make clear that when the agency makes a decision, the IQA's guidelines would apply to that decision and dissemination of information allegedly supporting that decision. DOI guidelines at 3; BLM guidelines at 4. DOI guidelines state that to ensure the "quality" of information the agency relies upon or disseminates, the agency must ensure that the information is "accurate, reliable, and unbiased," and is "presented in an accurate, clear, complete, andunbiased manner." DOI guidelines at 8; see also BLM guidelines at 6. Where the information at stake is "influential," the agency must more rigorously evaluate the information to ensure itsintegrity. DOI guidelines at 10; BLM guidelines at 4-5. DOI defines "influential information" to include that data that will have a "clear and substantial impact on important public policies." DOI guidelines at 10; see also BLM guidelines at 4

BLM_0012764

(influential information is that which is "expected to have a genuinely clear and substantial impact at the national level").

IQA guidelines make clear that BLM must ensure the objectivity of information providedto the agency by third parties that may form the basis for the agency's decision. DOI's guidelines state that if DOI "relies upon technical [or other] information submitted or developed by a third party, that information is subject to the appropriate standards of objectivity and utility" under the IQA.

The BLM fails to provide any reason for including the state and county road claims on the travel maps in the DRMP. It fails to indicate that the information is accurate, reliable and unbiased. Since the state and counties in Utah have repeatedly made adverse claims for roads against the United States it is entirely unlikely that the information provided would be unbiased. So far nearly all such claims have also failed to be adjudicated in favor of the counties or state. It is unlikely the information provided by the state or counties is accurate and reliable. Anyone looking at the travel maps would easily determine many of the routes are old seismic exploration scars and not roads or highways. They were not constructed for transportation purposes.

The Moab Field Office does not have the legal authority to determine the accuracy, reliability or unbiased nature of state or county road claims. It cannot fulfill the requirements of the IQA by using data from the state or counties.

3)      The DRMP does not make it clear under what authority the state and county road claims were

760

BLM_0012765

constructed (if they actually did construct them). Prior to the passage of FLPMA 1976 the roads could have been constructed under the authority of R.S. 2477. The BLM should research its records for adjudicated R.S. 2477 ROWs in the Field Office area to verify the accuracy and reliability of the state and county road maps. This also makes evident the conflict in using the state and county road claims in any planning process with intent of Congress.

Are the maps and road claims submitted by the state and counties consistent with Utah State law? Did the state or counties verify that the claims they submitted have been compared to the require plats of roads and highways as they existed in 1976 (or 1966 because of another requirement of Utah law)?

The 1977 Grand County Road Maps [see attached] show a very different set of roads claimed by the county. The three figures below show portions of Grand County Road Maps. We can make the full maps of Grand County available to the BLM if the Moab FO does not already have them.

You will note that one map shows the Utah Department of Transportation did not verify the accuracy of the maps. This would indicate that at least one agency responsible for the maps cannot assert the accuracy or reliability of these maps. Yet this is what was available in 1976 when FLPMA repealed R.S. 2477. Since these maps vary tremendously from the travel maps in the DRMP the BLM would need to verify the authority under which new roads could be claimed. The BLM once again needs to verify roads claimed through adjudicated R.S. 2477 ROW claims or through records showing ROWs granted under Title V of FLPMA. Without either R.S.2477 or Title V authority

761

BLM_0012766

the state and county road maps cannot be accurate, reliable or unbiased.

If the Moab Field Office is asserting these road claims are valid then it is acting contrary to the direction of Congress. If it is asserting these road claims are valid under FLPMA then it should be able to show the Title V authority for these claims. Again the nature of accepting these claims reaches far beyond any procedure the BLM has conceived for making even non-binding determinations. Either the BLM is acknowledging R.S. 2477 ROW claims or it is recognizing Title V ROW claims. Neither of these are permissible with the information given in the RMP. Both would be illegal under the information given.

Recommendation:

Since Travel Management and Travel Maps are an integral part of almost all aspects of management to be determined by the RMP revision most of the DRMP will require significant revision. The BLM should withdraw the DRMP and begin a truly collaborative process for creating a balanced Resource Management.

The integral and complex issues that relate to travel management must be explored. The relationship of roads and other mechanized routes to weeds, wildlife, cultural sites, wilderness, landscapes resilient to global and local climate change, and host of other issues must be analyzed.

Travel management cannot be adequately analyzed in a few pages especially considering the limited and illegal range of materials used for analysis.

The entire Transportation Management Section should

BLM_0012767

| | | | | |
|---|---|---|---|---|
| | | | be withdrawn. The Travel Management maps should be discarded. Because travel management is integral to all aspects of the RMP the DRMP should be re-written. Because of the heavy dependence on information that the Moab Field Office cannot use for planning purposes a team of BLM staff from offices outside of the State of Utah may be needed to supervise the development of a new DRMP. The taint of the illegal use of state and county road claims would likely prejudice the outcome of a new DRMP if local field office staff continues to supervise the development of a new Resource Management Plan. | |
| Sierra Club Utah Chapter | 205 | 13 | This must be added to the cumulative effects of vehicles. Six photographs show vehicles on the road. The vehicles traveled past me from 5:35 PM to 6:46 PM. Note the dust from each vehicle. Several of the vehicles towed trailers loaded with ATVs. It is likely the ATVs were creating dust for several hours prior to this. Along side I-70 were a series of colored bags. They appear to be related to a series of geophones (but this is only a guess). Over the last few weeks a vehicular way has become increasing pronounced with loose soil and diminishing vegetation. Again this activity needs to looked in its cumulative effects with grazing and other motorized uses. | The impacts of travel management decisions on soils are discussed on pages 4-292 through 4-296 of the DRMP/EIS. The impacts of air quality decisions (including dust) are discussed in section 4.3.16.2.1 of the DRMP/EIS. See also response to comment 202-8.<br><br>The geophone-related activity to which the commentor refers was likely from a recent seismic exploration project along I-70. The BLM did a full environmental analysis of this activity on site-specific basis, and will continue to do the same level of analysis (including cumulative impacts) on a site-specific basis. The BLM has estimated the impact of geophysical exploration activities on pages 4-286 through 4-291 of the DRMP/EIS. See also response to comment 205-4. |
| San Juan Trail Riders | 207 | 8 | In areas where camping is not restricted to designated sites, the travel plan should be adjusted to access campsites. | See response to comment 122-48. |
| Bookcliff Rattlers Motorcycle Club | 208 | 1 | BLM should re-evaluate the overall planning direction. First, please seriously look at reducing the number of management "overlays". It is simply impossible to understand what the BLM wants to do. Second, Multiple Use requires a special balance between use and protection of resources. When attempting to strike that balance, look for ways to maximize uses. Oil and | See response to comment 121-9. |

BLM_0012768

| | | | | |
|---|---|---|---|---|
| | | | gas and other commercial uses should be viewed as an adjacent recreational uses. Utilize the analysis required for "clearance" of existing and proposed recreation infrastructure (trails, trail heads, campsites etc.).  Aggressively mitigate impacts. Promote an ethic of 'shared use' instead of restrictive zoning. | |
| Bookcliff Rattlers Motorcycle Club | 208 | 2 | Alternative D has less of an emphasis on motorized recreation than Alternative C. There is no arguing this point.  Although D designates a few more miles of trail and gives motorized users a tad more open area in White Wash and the focus area, it negates all that by putting the hugely popular Westwater area in an ERMA!

All of the Alternatives represent a huge reduction in motorized recreation.  It is our understanding that NEPA and BLM's planning regulations require a wide range of Alternatives.  Based on the DEIS and the other materials provided for review, it looks as if vegetation and wildlife indicators are trending upward and BLM is meeting its sustainability goals, despite a prolonged drought. It seems to us then that there is a responsibility, if not a legal mandate, to at least consider one Alternative that didn't represent a huge loss to motorized uses.

Regarding labeling Alternative D as "emphasizing motorized uses:" doesn't NEPA require that a DEIS be accurate in describing the agency's proposals? This seems to be a major problem. How will this be addressed in the final DIES without requiring additional public comment?

BRMC Recommendation:  BLM should develop another alternative that truly DOES emphasize motorized recreation by NOT effectively closing off | The DRMP/EIS identifies 6,199 miles of inventoried routes in Alt A; 2,871 miles of inventoried routes are excluded from any of the action alternatives because there was no purpose and need for these routes.  Alt C designates 3,693 miles of full-sized vehicle routes and 282 miles of motorized single track.  Alt D includes 3,855 miles of full-sized vehicle routes and 340 miles of motorized single track.  Therefore, Alt D provides more motorized opportunities than does Alt C.

The commentor's assertion that placing the Westwater area in an Extensive Recreation Management Area (ERMA) negates the additional miles of motorized routes and open areas in Alternative D is incorrect.  The Westwater area is in an ERMA under the current plan (Alt A).  Travel management in the Westwater area is less restrictive under Alternative D than under Alternative C, although Alt C is more restrictive than Alt A.

The commentor's assertion that all the action alternatives represent a "huge loss" in motorized recreation is incorrect.
Although 2,871 miles of inventoried routes were eliminated between Alt A and the action alternatives, these routes were determined to have no purpose and need primarily because they were redundant or received virtually no use.  The comment assumes that the motorized recreation opportunities in the action alternatives are inadequate to meet current or anticipated future demand.   The BLM in Chapter 4 admits that all the |

764

BLM_0012769

| | | | | |
|---|---|---|---|---|
| | | | large areas to it. | action alternatives reduce motorized recreation opportunities, but that Alternative D emphasizes motorized use relative to the other action alternatives.<br><br>NEPA and CEQ require that BLM provide a reasonable range of alternatives in the DRMP/EIS, and the BLM asserts that it has done so.  As described in Appendix G, the BLM's travel plan formulation attempts to balance transportation needs (including motorized recreation) with other resource uses and protections. |
| Bookcliff Rattlers Motorcycle Club | 208 | 3 | Putting a requirement to erect miles of fences across the dune field in the RMP is problematic.  The obvious question is; if your RMP says "...the dune field cottonwood trees and White Wash water sources which would be closed to motorized travel and fenced," and that proves to be unworkable, would it take an RMP amendment to alter the plan?<br><br>BLM is concerned about the cottonwood trees, BRMC suggests that this concern be addressed in the RMP. This recommendation is based on the success the BLM has had in 10 Mile Wash.  The White Wash RMP could direct that, in "wet areas" travelways would be marked so as to minimize or eliminate impacts on young cottonwood trees. | Alt C and Alt D of the DRMP/EIS designate the White Wash area as open to cross country travel.  Fencing of the Cottonwood trees and water sources is an implementation action to protect these resources and does not require a land use planning decision.  The White Wash area would remain open to cross country travel unless the status is changed through an amendment to the land use plan. |
| Bookcliff Rattlers Motorcycle Club | 208 | 4 | The open area (at White Wash Sand Dunes) should be located along easily identified roads, as these are easier to locate and enforce.  We have reviewed and support the "encourage/allow /prohibit" plan proposed by the Blue Ribbon Coalition.  Not all cross country use occurs on the sand field.  There is a great deal of vehicle travel that will now be limited to designated roads.  Making that kind of change in use is hard to do overnight.  BRC's plan basically freezes the use as it is now, allows BLM to close areas should that be needed and directs review and analysis of the existing routes and their possible incorporation into the Travel Plan. | See response to comment 123-35. |

BLM_0012770

| | | | This sort of approach will be needed for proper implementation of BLM's plan. | |
|---|---|---|---|---|
| Bookcliff Rattlers Motorcycle Club | 208 | 8 | All of the action alternatives fail to supply a sufficient number of OHV routes to meet existing demand. There needs to be some process to consider adding routes to the Travel Plan, either in the FEIS or under subsequent site specific planning. | The commentor provides no data to support the assertion of an insufficient supply of OHV routes to meet existing demand.  Furthermore, the BLM must consider all resources and resource uses under the multiple use mandate of the Federal Land Policy and Management Act, of which motorized recreation is only one.  See responses to comments 208-2 and 208-6.<br><br>The DRMP/EIS specifically allows for the addition of routes to the Travel Plan.  The document states on p. 2-48 that the Travel Plan "may be modified through subsequent implementation planning and project planning on a case-by-case basis". |
| Bookcliff Rattlers Motorcycle Club | 208 | 9 | BLM should identify routes suitable for ATVs in its travel plan, rather than passively assuming that many of the OHV routes submitted in scoping are motorcycle-only.<br><br>The FEIS should consider designating more ATV trails.<br><br>The BLM should identify routes as "roads, primitive roads, or trails". | The BLM has incorporated the commentors suggestion for a change in route use involving ATVs in the PRMP/EIS. See response to comment 120-90.<br><br>See also responses to comments 208-8 and 122-30 regarding the process for designating new routes.<br><br>See response to comment 123-7 for a discussion of BLM road terminology. |
| Bookcliff Rattlers Motorcycle Club | 208 | 10 | There needs to be a mechanism built into the plan that allows for construction of new trails. | See responses to comments 122-30 and 208-8. |
| Bookcliff Rattlers Motorcycle Club | 208 | 11 | The plan should allow that wash bottoms be open to OHV use. These make challenging and interesting trails that naturally repair themselves after rain events and which are generally not visible to the public. | In formulating the alternatives for the Travel Plan in the DRMP/EIS, the BLM considered route designation by weighing purpose and need against resource conflicts. Floodplain and riparian areas were identified as resource conflicts that inventoried routes were weighed against. Travel in washes degrades stream banks, leads to accelerated flood velocity and erosion (see pg. G-24) See also response to comment 122-14. |

BLM_0012771

| | | | | The commentor provides no site specific information pertaining to motorized travel in wash bottoms.<br><br>See also response to comment 208-8. |
|---|---|---|---|---|
| Bookcliff Rattlers Motorcycle Club | 208 | 12 | The plan should stipulate that for every mile of trail closed, there must be another mile of new equivalent trail opened. | The commentor has not provided any site specific information on proposed additional routes to be added to the Travel Plan.<br><br>There are no laws, policies, or directions which require the BLM to substitute new routes for routes closed. |
| Bookcliff Rattlers Motorcycle Club | 208 | 25 | BRMC supports the adoption of this recommendation from RWR with modifications.  The Sand Flats Road traditionally connected trails such as Hells Revenge, Slickrock, and Fins 'N Things. Paving the road, and prohibiting OHVs from pavement, has fragmented the trail system.  Thus, OHVs should be permitted to use Sand Flats Road from Hells Revenge exit to the end of the pavement.  The new, reduced speed limit of 25 mph should be preserved. A  non-motorized lane should be constructed to parallel the road and reduce congestion. Additionally, the ¼-mile slick rock route connecting Slick Rock Trail with Fins 'N Things should be designated for two-wheeled use to alleviate traffic along the main road.  All of these measures would make Sand Flats more user-friendly and manageable, without further impacts to the environment. | See response to comment 122-41. |
| Bookcliff Rattlers Motorcycle Club | 208 | 26 | BRMC supports the adoption of this recommendation from RWR with modifications.  Special policies should continue permitting slick rock exploration. The Moab Field Office Off-Highway Vehicle Travel Map states that "Two-wheel motorcycles are allowed on established slick rock riding areas in the Slick Rock Trail, Bartlett Wash and Tusher Canyon areas and on slick rock areas along the Monitor and Merrimac and Lower Monitor and Merrimac trails where such use does not further disturb vegetation or soils" (dated March 8, 2001 as part of emergency restrictions).  In | See response to comment 122-48 |

BLM_0012772

| | | | | |
|---|---|---|---|---|
| | | | these areas, travel could be further restricted, but not so drastically as the draft RMP intends.  Mechanized travel should still be allowed on any barren rock surface. Slick rock within one hundred yards of a designated route could remain open to motorized travel, except for Tusher slickrock which would be reserved for non-motorized use.  This two-hundred yard corridor would accommodate the ways that people currently enjoy slick rock areas. | |
| Glen Canyon Group | 209 | 5 | We are dismayed that the Travel Management Plan has so many miles of road that the roads cannot be adequately patrolled or monitored by the BLM staff. | The issue raised by the commentor is one of implementation.  See responses to comments 124-120 and 124-122. |
| Glen Canyon Group | 209 | 6 | We are also dismayed that although Grand County was closely consulted on all road decisions, BLM was aware that the County representative, Jerry McNeely, was consulting only with the motorized users and not with the "quiet" users. We feel totally disenfranchised from the process of selecting open and closed roads. A balanced travel plan is not developed by just consulting with OHV drivers.<br>        As shown on Table 8 of Appendix G (pages G-20 and G-21), numerous routes and segments of routes were added to the database, but BLM completely rejected the recommendations of the Red Rock Heritage Travel Plan on the excuse that there are conflicts with Grand County's road inventories.<br>        BLM even failed to examine the information available to them in draft form from the National Visitor Use Monitoring study conducted by the MFO in FY 2006, which described numbers, motives, likes and dislikes and other characteristics of quiet users – hikers, bikers, boaters, and visitors driving for pleasure. | The BLM's Alternative C was supported by the entire Grand County Council, and not just one representative. As described in Appendix G, The DRMP/EIS used a systematic interdisciplinary approach fully considering physical, biological, economic, and social aspects of management actions for the range of alternatives.  The BLM did not rely on the counsel of any one individual; the DRMP/EIS is the BLM's plan, and not that of any of the BLM's cooperating agencies.<br><br>See response to comment 124-9, explaining the several reasons for the BLM's rejection of the Red Rock Heritage Travel Plan.  It is worth noting that the commentor's earlier comment complaining that the BLM would not be able to patrol all the miles of routes in the action alternatives, yet supports a plan with more miles of routes than any of the BLM's action alternatives.<br><br>See response to comment 124-2 concerning the BLM's incorporation of NVUM data into the plan. |
| Glen Canyon Group | 209 | 7 | BLM must be much more proactive on this Travel Management Plan, and anticipate the next two decades of motorized recreation. This RMP is the perfect time to actually put some "teeth" into what BLM | The issues raised by the commentor are implementation issues.  See responses to comments 124-120, 124-122 and 120-95. |

BLM_0012773

| | | | | |
|---|---|---|---|---|
| | | | refers to as a Travel Management Plan, but which appears to be just a Travel Plan. The Final RMP should do more than state where vehicles can go and where they can't go – It needs to provide meaningful management and enforcement. BLM should include in the Travel Plan the possibility of permits and temporary and permanent closures throughout the MFO area.<br><br>            BLM has proved over the past 5 years of the Easter Jeep Safari that they can both monitor usage and manage travel. They set up a monitoring plan with specific goals and objectives, with before and after examination of effects over a 10-day period of high road usage. As they analyzed the results, they instituted one-way travel, exclusive use (ie permitting) and educational tools for keeping vehicles where they are permitted. This experience should be used as a model for monitoring the designated roads in the RMP. | |
| Glen Canyon Group | 209 | 8 | Using Scoping Comments to develop Travel Plan<br>As reflected in the Scoping Process Report, 2004, the great majority of those sending letters and emails called for restrictions on OHV travel, for unambiguous designation "on the ground," education of users, for closing unnecessary routes, and monitoring and enforcement. A small minority asked for increased access, playgrounds and open areas, and for no closure of routes, tracks and trails.<br><br>            Similar sentiments were found in a survey of Grand County residents in February of '05 regarding tourism and off-road vehicle (ORV) activities. The poll showed that 63.5% of residents thought tourists were bothered by ORV activity. Forty percent thought that tourists came to the area for non-ORV recreation; 44.5% thought tourists were evenly divided between motorized and non-motorized sports enthusiasts, while only 6.5% thought most tourists came primarily "to play in an off-road vehicle." ("Results announced from local | The BLM has addressed the concerns raised in scoping through its Travel Plan formulation.  The DRMP/EIS specifically addresses the desires of non-motorized recreationists and the impacts created by OHV use, especially cross-country travel.  See responses to comments 124-4 and 124-34. |

BLM_0012774

| | | | | |
|---|---|---|---|---|
| | | | survey," Moab Times Independent 3/3/2005) | |
| Glen Canyon Group | 209 | 9 | Implementation and Project Planning BLM defers modifications/adjustments of designated routes until "implementation and project-planning " phases through "a collaborative process involving local governments and the public. The impacts to travel management would be beneficial in the long-term because potential travel-related resource use conflicts would be identified and satisfactorily resolved since the route modification process would include interested and/or concerned stakeholders." (Page 4-405) Need we remind the BLM that this approach was tried and failed. Although carefully constructed for proportional representation of all relevant segments of the community, the County's Access Committee was finally dissolved as the members were unable to reach a consensus on anything. BLM needs to reconsider its approach, perhaps going to a public hearing and appeal process or a mediated decision-making process. | This is an implementation issue.  See responses to comments 124-120, 124-122 and 120-95. |
| Glen Canyon Group | 209 | 10 | …confusing Table 4.126 OHV Designations by Alternative on page 4-409. The table which contains both acres and miles has four footnotes, of which the second is not referenced in the table itself. "These are the miles of designated routes at time of EISA publication. After the issuing of the ROD, minor adjustments may be made by the MFO to more accurately define the designated routes." BLM should let us know where the superscript belongs in the table, what the definition of "minor" is, and how the public will be involved. | Footnote 2 refers to the bottom two rows of Table 4.126; this has been fixed.  The "minor adjustments" that the commentor wishes defined relate to GIS data smoothing issues, which the BLM would expect (but cannot predict with certainty before the data smoothing is completed) to add up to well less than one per cent in either direction.<br><br>The manner of public involvement is an implementation activity.  The process is described on page 2-48 of the DRMP/EIS. |
| Glen Canyon Group | 209 | 36 | The descriptions of all of the potential ACEC's carry the disclaimer that "The occasional presence and noise of OHV use would reduce opportunities for solitude and conflict with primitive forms of recreation." While this is unfortunately true, we expect BLM to develop and implement approaches to eliminate this | The BLM is required to prepare plans subsequent to signing the Record of decision for the RMP to protect the relevant and important vales associated with any specific ACEC.  Opportunities for solitude and primitive forms of recreation are not a relevant and important value for any ACEC, and management of these areas would not |

BLM_0012775

| | | | | |
|---|---|---|---|---|
| | | | problem. If the noise of OHV's continues to disturb users, one possibility would be noise limitations in the form of mufflers especially on motorcycles. | address the noise issue raised by the commentor.  Noise restrictions on mufflers are beyond the scope of the DEIS/RMP. See response to comment.  See response to comment 122-7. |
| Glen Canyon Group | 209 | 42 | Re: 4.3.8.2.13.1 OHV Travel Management Pages 4-146 thru 4-152, Table 4.5, Page ES-6<br>This section is very hard to fathom as the frame of reference changes back and forth from acres to miles of routes. Who can understand Table 4.54 (page 4-146 and 4-147) when it seems that Alternatives B, C, and D are identical with the sole exception of Long Spring Canyon? Also, the Table may be meaningless anyway because it does not define "limited." It would have been meaningful if it had been presented as was done in Table ES1 by categories: Closed, Limited to Existing, Limited to Designated, and Open. Does the BLM intend to mean "Limited to existing/designated routes," per summary Table 4.59 on page 4-164. | The "frame of reference" changes in the DRMP/EIS from acres to miles of routes because the BLM is required in planning to designate all areas of the planning area as "open", "limited", or "closed".  Within the "limited" category, the BLM is encouraged to identify which routes are available for motorized use.  These are separate, but related, planning decisions.<br><br>The commentor is correct in noting that, for most areas in Table 4.54, the acreages are the same across all action alternatives.  This is discussed explicitly on page 4-149.<br><br>The data for Lost Spring Canyon in Table 4.54 is incomplete; alternatives C and Have the same acreage in "limited as in alternative B, and this has been corrected.<br><br>The term "limited" means "limited to designated routes" for all action alternatives.  This is explicitly stated on page 2-48.  Table 4.59 includes the "no action" alternative; hence, the use of the label "Limited to existing/designated routes". |
| Glen Canyon Group | 209 | 43 | Re: 4.3.8.2.13.1 OHV Travel Management Pages 4-146 thru 4-152, Table 4.5, Page ES-6<br>The paragraph on page 4-149 of impacts common to the "action alternatives" (B, C, and D) states that game retrieval and antler collection must be done on foot, that vehicles are not permitted to go off designated routes for "such activities." What about rock collecting, gathering wood, etc? This paragraph should state that cross country travel for any activity would be impermissible. | Page 2-48 states under Management Common to All Action Alternatives: "Adherence to the Travel Plan is required for all activities, except where otherwise explicitly permitted". |
| Glen Canyon Group | 209 | 44 | Re: 4.3.8.2.13.1 OHV Travel Management Pages 4-146 thru 4-152, Table 4.5, Page ES-6 | The commentor is correct, and the wording has been changed to "designated". |

BLM_0012776

| | | | The paragraph beginning at the bottom of page 4-149 also apparently contains an error. Clearly, it means that OHV use will be limited to designated, not existing, routes. The same error is found in the last paragraph on page 4-150. Under all of the action alternatives, vehicles must stay on designated routes. | |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 49 | The RMP needs to contain monitoring stipulations which at a minimum contain the following: annual monitoring with photos, mile sections of road with the number of motorized tracks leaving the road, width of road, status of signs (shot, missing, down, defaced). Among actions which could be instituted are: one way travel, noise limitations (muffles), permits with maximum number of vehicles, closed during certain times of the season, closed to recover, closed permanently. | The establishment of monitoring stipulations is not a land use planning decision.  The BLM will determine on a site-specific basis the level of monitoring required, and the appropriate response to the information gathered. The commentor provides no evidence to support specific monitoring measures as the only acceptable method. |
| Glen Canyon Group | 209 | 50 | Any route or segment of route which cannot be monitored by BLM should be closed. | See response to comment 209-49. |
| Glen Canyon Group | 209 | 51 | It is understood that only having two BLM rangers is not sufficient for 1.7 million acres. BLM needs to pursue some sort of in-the-field monitoring in highly used areas. People are more likely to behave when there is an official presence (law enforcement or not) then when no one is around. | See responses to comments 124-21 and 124-38. |
| Glen Canyon Group | 209 | 52 | Another area in which the RMP is very weak is how the Travel Plan is going to be implemented. We urge BLM to include in the RMP step they will take to ensure that vehicles stay on designated roads. One rule that could be instituted is: every road is closed unless there is a sign marking it open. Manpower to do this would come from many organizations when they find out that their travel is limited only because signs are not installed. Also, routes that are dead-end should be signed dead-end at the beginning, and the turnaround should also be signed. | See response to comment 120-96. |
| Blueribbon Coalition, Inc. | 211 | 3 | There needs to be a mechanism for new trails and also provisions for competition use trails. | See response to comments 122-15 and 122-30. |

772

BLM_0012777

| | | | | |
|---|---|---|---|---|
| Blueribbon Coalition, Inc. | 211 | 4 | Many of these areas have been in use for many years by ranching, motorized groups and industries. You are "closing" routes, areas and trails by not including them in your Alternatives. | See response to comment 208-2. |
| Blueribbon Coalition, Inc. | 211 | 5 | Fee system when not in existence starts a plethora of problems for everyone. | See response to comment 123-10. |
| Blueribbon Coalition, Inc. | 211 | 81 | …most of all these roads being closed off are places that the will always exist because of the use of these roads in the past. | See Appendix G of the DRMP/EIS for a description of the Travel Plan alternative formulation process.  See also response to comment 208-2. |
| Blueribbon Coalition, Inc. | 211 | 84 | I also believe all right-of-ways that would qualify under Rs 2477 remain open and any law under Utah Revised statute. | See response to comment 120-16. |
| Blueribbon Coalition, Inc. | 211 | 7 | Issue – USEA conflict proposal to create exclusive use zones. The final document should not use the term exclusive use zone. This will only create conflict where little or none has existed in the past. | There are no exclusive use zones proposed in the DRMP/EIS.  Focus Areas (see definition on p. 2-18 of the DRMP/EIS) are those in which certain types of recreation are encouraged and provided for.  All use of all Focus Areas is to be consistent with the Travel Plan. |
| Blueribbon Coalition, Inc. | 211 | 11 | Issue: Trails for competitive use. There is no allowance for competitive events in this area. This absolutely should be allowed on designated routes. The routes should be flexible to allow for connections and loops. | See response to comment 208-7. |
| Blueribbon Coalition, Inc. | 211 | 60 | Your motorized alternative in my opinion is not a motorized plan. You need to keep more of the trails open and use your money to open new ATV trails. Don't close trails and not give us any other place to go. Look at what Grand Junction BLM is doing. Build trails for us. A lot of your two track roads would make really good ATV loops and give us a place to go. | See response to comments 122-15, 122-30, and 208-2. |
| | 216 | 3 | For planning, I suggest highlighting one more critical item.  Noise is the most common complaint against OHVs. Thus for all vehicles across the entire field office I recommend implementing and enforcing and 96-decibel limit based on the "20 inch" test (SAEJ1287) | See response to comment 122-14 |
| International Mountain | 217 | 1 | IMBA supports the Grand County Non-Motorized Trails Master Plan recommendations for alternate routes in | The Green Dot and Wags Way were not analyzed in the current RMP effort.  At the conclusion of the planning |

BLM_0012778

| | | | | |
|---|---|---|---|---|
| Bicycling Association | | | these areas.  IMBA also supports the recommendations of MTA that the Green Dot (Gemini), Blue Dot (Gold Bar Singletrack listed in "D"), and Wags Way (Poison Spider) trails be identified as critically in need of work to reduce damaging user-created routes,  Projects to rehabilitate trails and provide high-quality experiences often attract many volunteers from the mountain biking community. | effort, the Moab Field Office will entertain proposals for new trails.  See response to comment 122-15 and 122-30. |
| International Mountain Bicycling Association | 217 | 3 | IMBA requests that the Moab RMP adopt a management policy that would permit bicycling on some trails in non-WSA (ACEC) areas.  While bicycling may not be appropriate on some trails in these areas, others can provide a welcome relief from front-country and motorized areas.  A decision to ban this use should be based on scientific reasoning | The policy referred to by the commentor is not a land use planning issue.  New bicycle trails outside WSAs can be considered in any area of the field office.  Only hiking focus areas would be excluded from new bike trail construction. |
| | 258 | 1 | The real issue is inadequate notification and enforcement. Roads such as Poison Spider and Gold Bar keep getting pushed further and further into the trackless areas. There are spurs off Gold Bar trail that are just for the sake of seeing where ATVs, jeeps, motorcycles and bicycles can do. These spurs needs to be blocked off where possible and we need people on the ground enforcing the plans. With out enforcement, the whole plan in an exercise in futility | See response to comment 122-18 |
| | 262 | 1 | There are areas that should not be devastated due to an increase or introduction of OHVs. We do not know what the effects would be because there is no assessment process going on! How can you uunderstand the effect this plan will have? For example, what would the effects be on riparian corridors (Green River, Ten Mile, White Wash, etc)? | See response to comment 124-11 |
| Ruby Ranch | 264 | 3 | It is very clear that BLM intends to make a large area in White Wash "open" to motorized use. Noise level limits should be implemented. We have been kept awake all hours of the night. It disturbs wildlife and livestock as well. Even other motorized recreationists have commented to us on this. Cities and Counties | Noise level limits on machines are a matter of state law. See response to comment 122-7. |

774

| | | | | |
|---|---|---|---|---|
| | | | have been using noise level restrictions in areas of OHV use as far back as the 1970s.These should be implented.  Is it possible to implement an hour restrictions for the open area? Even if the actifity in the open area as allowed bdetween 6 AM and 11 PM and closed from 11PM to 6 AM, it would be a huge benefit to us and the majority of OHV people who come out here. | |
| | 271 | 1 | OHV rights-of-way across STILA properties: Many designated OHV routes cross properties owned by STILA. To avoid having these routes closed in the future by sale of these lands, rights-of-way should be placed in public ownership. Programs and funding are in place to accomplish the goal. This opportunity should be noted in the plan. | See response to comment 120-82 |
| | 271 | 13 | Page G-11, 7.1 OHV Designation Criteria 2. Wildlife: Does the reference to wildlife habitat include habitat for all species or is it intended to apply to habitat for more significant species or groups of species? | The reference to wildlife habitat is for all species.  The BLM acknowledges that there is general wildlife habitat in every acre of the planning area.  However, the routes that were examined for wildlife conflicts were where there were specialized areas, such as bighorn sheep lambing and rutting, or sage grouse areas. |
| | 271 | 14 | Page G-11, Public Safety: The term "extreme" should be further defined. What is an extreme hazard to one person may not be to another, depending on their riding/driving skills. In some cases these hazards add to the use experience. | The wording on page G-11 is directly from the BLM Manual at 8340.  The Moab BLM has no authority to change the wording of BLM Manuals. |
| | 271 | 15 | Page G-15, Emergency Limitation or Closure: Perhaps "immediately closed should read, "immediately mitigated or closed" or some similar wording. Some mitigation can be immediately put in place and closure would not be necessary. | Mitigation can be put in place without an emergency limitation or closure.  The statement on pg. G-15 is a quote from the federal regulations at 43 CFR 8341.2.  The BLM cannot alter the wording of Federal regulations. |
| Red River Canoe Company | 283 | 3 | While travel-planning looks at impacts generated by each individual route segment, the cumulative impact of a 3,693-mile route network (alt C) is not addressed. Even though the impact of road construction already exists out there, BLM is not taking into account the additional and probably impacts of people traveling off- | Off route travel constitutes illegal activity, and is not the focus of the analysis of the RMP.  The BLM has removed over 2500 miles of routes for the reasons mentioned by the commentor. |

BLM_0012780

| | | | | |
|---|---|---|---|---|
| | | | trail (there are countless incidences of this), nor the benefit to wildlife, soils, and habitat of allowing currently constructed roads to reclaim themselves. | |
| Red River Canoe Company | 283 | 4 | BLM mandates state that new route construction must first go through rigorous environmental assessments before construction may begin. Why is that existing routes never underwent such assessments and never will? This is an inconsistency in management regulations, to the detriment of uninventoried resources. | Routes that were constructed prior to FLPMA (1976) were not subject to NEPA analysis. |
| | 284 | | The BLM has done no site-specific studies to determine the impact of these routes on Native American cultural sites or other natural resources like riparian areas or wildlife habitat. Science to back up the ORV route designations does not exist. | See response to comment 123-12 |
| International Adventure Tours | 287 | 2 | The open area at White Wash in Alt C and D must be expanded. | See response to comment 123-35. |
| Grand County Backcountry Council | 289 | 3 | In the travel-planning process, BLM did little ground-truthing of potential designated routes. Thus determining only the existence of the routes. Surveys were not conducted to determine on-the-ground conflicts with archeological sites, riparian areas, or other sensitive resources. Only it is BLM's job to know the resources under its charge, but under the provisions of FLPMA, these resources must be preserved and protected. Unknowable future recreational uses should not trump unknown existing finite resources. | The BLM verified the existence of over 6,000 miles of route in the Moab planning area. After the initial verification, over 2,500 miles of route were deleted from the designated system as having no purpose and need. An additional 500 miles of route were deleted because they posed resource conflicts with riparian, recreation, wildlife or cultural resources. The result is a Travel Plan which designates a finite number of roads. The Travel Plan provides fewer than 2,000 acres for cross country motorized travel. |
| Grand County Backcountry Council | 289 | 5 | While travel planning looks at impacts generated by each individual route segment, the cumulative impact of a 2,642-mile route network (Alt C) is not addressed. Even though the impacts of road construction already exist out there, BLM is not taking into account he additional and probable impacts of the people traveling off-trail, not he benefit to wildlife, soils and habitat of allowing currently constructed and little-used roads to | The route network to be designated under Alt C represents a reduction of over 2,500 miles of existing route, and a reduction of over 620,000 acres that are currently open to cross country travel. The cumulative benefits to wildlife, soils and habitat of disallowing cross country travel is the largest benefit gained by travel restrictions. |

BLM_0012781

| | | | | |
|---|---|---|---|---|
| | | | reclaim themselves. | The BLM does make the assumption that users will stay on the designated routes. An RMP/EIS cannot analyze the effects of illegal activity. |
| | 291 | 1 | We believe this [2,642 mile] network exceeds BLM's ability to enforce regulations keeping vehicles on the designated routes. | See response to comment 122-18 |
| American Motorcyclist Association | 302 | 2 | Cottonwoods are found all over the Moab Field Office, including along the Colorado River corridor where "non-OHV use" is intensive and impacting soils near mature and young cottonwood trees. Yet the Draft Plan suggests no fencing in these areas. If BLM is concerned about the cottonwood trees, this concern should in fact be addressed in the RAMP. | See response to comment 208-3. |
| American Motorcyclist Association | 302 | 4 | The travel plan alternatives along the Ruby Ranch Road hear White Wash have not proposed to designate any routes to the existing campsites along the road. So in all of the alternatives you close nearly all of the existing camping opportunities by default. This plan cannot be successfully implemented, and clearly demonstrates the flaw in attempting to limit vehicle camping to designated sites only. | The open area to the west of White Wash Sand Dunes has been expanded to accommodate dispersed camping. See response to comment 120-86. |
| American Motorcyclist Association | 302 | 6 | Insufficient quantity of OHV routes: all of the action Alternatives fail to supply a sufficient number of OHV routes to meet existing demand. | See responses to comments 123-13 and 208-8. |
| American Motorcyclist Association | 302 | 7 | The AMA understands the reluctance to consider "new" routes for inclusion within the Travel Plan as described in the DEIS. However, this problem cannot be addressed without some process to consider adding routes to the Travel Plan, either in the FEIS or under subsequent site specific planning. | See responses to comments 122-30 and 208-8. |
| American Motorcyclist Association | 302 | 10 | Wild Cow trails. Moab BLM should consider designating this trail system in the Travel Plan. | See responses to 122-15 and 122-30 regarding the addition of new routes to travel plan. |
| | 303 | 5 | If the Moab BLM is going to try to use user conflict as a management tool, it has to be on the basis of a significant amount of factual data collected by the | See response to comment 122-9 |

777

| | | | | |
|---|---|---|---|---|
| | | | BLM, not just reports of perceived conflict by extremist groups. | |
| | 307 | 1 | It's apparent that all of the alternatives, even "C", fall short of a true trail inventory, as many non-road mountain bike, motorcycle and ATV trails are missing. That can be addressed by allowing for additions to the trail inventories as the planning process continues. Also as Kim [Schappert, Moab Trails Alliance] points out, new trail mileage allotments in the Alternatives should "include only those routes mapped across previously undisturbed terrain" and not be reduced by "trails developed on existing mapped roads." Anything already on the Grand County Transportation Inventory map should not be included as a "new" trail, even when used as part of a newly developed trail system. | See response to comment 122-15 |
| | 307 | 3 | Alternative C addresses open cross country travel for ATVs but proposes strict boundaries around these areas. I would like to see included in the plan, areas where cross-country travel by hikers, bikers, equestrians, and motorcycles is allowed. These are the many large areas of slickrock in the resource area such as the Bartlett Wash area, the Monitor Merrimac area and the Slickrock Trail. | See response to comment 124-14 |
| | 310 | 10 | Proposing a "close first – mitigate last" approach to OHV use is unacceptable.<br><br>The final RMP should mandate that adaptive management practices be used across the field office.<br><br>The final RMP should direct that mitigation efforts will be exhausted prior to closure.<br><br>The final RMP should direct land managers to work with the affected public to ensure all available mitigation efforts have been exhausted before closure.<br><br>When using adaptive management principles, the | See response to comment 122-18 |

BLM_0012783

| | | | | |
|---|---|---|---|---|
| | | | RMP should mandate the mitigation of closing routes and areas to recreational use by designating a more sustainable, but similar recreational opportunity elsewhere. | |
| | 310 | 11 | Providing opportunity for a non-motorized recreation experience is great, but by imposing a near categorical exclusion of other uses it removes the ability to designate key motorized uses that are needed in a well managed road and trail system.<br><br>When addressing "user conflict," the Final RMP should avoid "exclusive use zones" where based on perceived or potential "user conflict" one or more conflicting uses is categorically prohibited.<br><br>Most of the non-motorized focus areas have designated routes open to motorized vehicles within them. If implemented as written in Alternatives B, C, and D, many visitors will perceive these focus areas as establishing blanket restrictions on motorized use. The unintended consequences will likely result in increasing, not reducing actual or perceived "user conflict."<br><br>In order to address the "user conflict" issue, the final RMP should direct land managers to educate the non-motorized visitors (who may perceive conflict with the motorized uses) where they may encounter vehicle traffic in certain areas as well as informing them of areas where they may avoid such encounters.<br><br>The Final RMP should direct land managers to educate vehicle-assisted visitors of where a road or trail might be shared with non-motorized visitors, and if appropriate, direct lower speeds.<br><br>The Final RMP should direct land managers to re- | See response to comment 122-9 |

BLM_0012784

| | | | | |
|---|---|---|---|---|
| | | | route either use so as to avoid sections of roads or trails that are extremely popular with both groups. For example, a hiking trail can be constructed to avoid a section of a popular OHV route. Or an equestrian trail may be constructed to avoid a section of popular mountain bike route, etc. | |
| | 310 | 20 | An open area in addition to White Wash could provide different terrain for everything from bicycle free riding, to trails motorcycling, to hardcore rock crawling. As 99% of the Moab Field Office becomes limited to designated routes, open areas play an even more critical role for accommodating specialized sports. Perhaps even part of Black Ridge could remain unrestricted for this purpose. | See response to comment 124-14 |
| Slate River Resources | 312 | 2 | In addition to the well activity, Monument Ridge Road runs through these sections eventually connecting with Seep Ridge road. This is a major agricultural and oil field access between Vernal and Fruita. | Hell's Hole is not designated to be managed to protect its wilderness characteristics in the preferred alternative. |
| | 333 | 2 | The impact of groups of motorized ATV's or motorcycles is extreme [in Hey Joe Canyon] due to the nature of the echo of the canyon. A solution would be to eliminate ORV access to Hey Joe Canyon. Visitation to Spring Canyon and the river at Spring Canyon doesn't result in the noise since the groups tend to turn the motors off and lunch/visit the river. Spring Canyon seems to be a grazing allotment at the moment so the road access is necessary for the grazing. | See response to comment 122-7 |
| | 334 | 3 | The BLM has not identified a purpose and need for all 2642 miles for roads in the travel plan. As a matter of fact, the BLM did not ground truth the roads but only looked at a portion of them on aerial photographs. Multiple roads going to the same dead end location are neither needed nor sensible in the fragile desert country. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 334 | 4 | The BLM used a map of roads that was provided by Grand County to create their travel plan. Grand County's plan was provided by a member of a local 4 | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel |

BLM_0012785

| | | | | |
|---|---|---|---|---|
| | | | wheel drive club. The BLM did not ground truth these roads due to a complete lack of adequate man power in the Moab field office. | routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 337 | 3 | Of the 464,777 acres of non-WSA lands that qualify as wilderness, which are in America's Red Rock Wilderness Act, you propose to protect just 47,761 acres or 10%. And, your agency proposes to designate 2,652 miles of ORV routes, many on lands within America's Red Rock Wilderness Act and which BLM previously said had wilderness character, i.e., were "roadless." Damage from ORV use will be widespread and cannot be reversed. | The BLM examined about 558,807 acres of lands proposed in the Red Rock Wilderness Act for the existence of wilderness characteristics.  The BLM found that 266,485 acres of these lands contained wilderness characteristics and are proposed for protective management in Alternative B. |
| | 338 | 3 | Plans proposed by the group "Ride with Respect" and USA ALLIANCE/BLUE RIBBON COALLITION make far more sense than the other options. | NRR |
| | 338 | 4 | The FEIS should consider adding more single-track and designated OHV areas and maintaining them with proper signage containing trail ettiquite reminds along with historical or ecology facts about the specific trail/road/wash/mine/well site/ranch etc. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 341 | 2 | The final plan should include full public involvement, and not just specialm monied, environmental groups. If "user conflict" is noted, the BLM should simply re-route one of the uses. Horses or hikers can easily take a side trail. | See response to comment 123-14 |
| | 341 | 3 | Alternative D is too restrictive. The dry washes should be left open, as they provide travel-ways for dirt bikes/ATVs, and are not harming important wildlife habitat. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 345 | 2 | In regards to the inventory done by Moab BLM, I believe that there are many motorcycle, mountain bike, | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under |

BLM_0012786

| | | | | |
|---|---|---|---|---|
| | | | and ATV trails that were not included, I would strongly suggest that these need to be inventoried prior to the final plan. The current inventory is deeply flawed and omits some very important trails. | Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Public Lands Equal Access Allaince | 346 | 1 | Designated routes called "training trails" offer a significant length of sustainable trail within a confined area that provide the experience these young riders are seeking. Off trail riding has become almost non-existent since these trails were put in place. Some provision for addressing this issue should be mentioned in Appendix G. | See response to comment 120-81. |
| Public Lands Equal Access Allaince | 346 | 2 | Many designated OHV routes cross properties owned by SITLA. To avoid having these routes closed in the future by sale of these lands, rights-of-way should be placed in public ownership. Programs and funding are in place to accomplish this goal. This opportunity should be noted in the plan. | See response to comment 120-82. |
| Public Lands Equal Access Allaince | 346 | 3 | Requiring fences around the cottonwood trees and "water sources" is both impractical and unnecessary. | See response to comment 208-3. |
| Public Lands Equal Access Allaince | 346 | 5 | The initial inventory and subsequent designation of motorcycle routes was incomplete. Recommended additions are also shown on the attached map. | See responses to comments 122-15 and 122-30. |
| Public Lands Equal Access Allaince | 346 | 6 | We agree duplicate routes are generally not needed. However, they may be desirable when they provide different riding/driving experiences or require very different user skills. Also, washes are not always reliable routes because of weather events. If these washes become temporarily impassible, the alternative route would still allow a person to complete a loop. A case in point would be the road adjacent to Salt Wash. | Alternative riding experiences were considered when formulating the alternatives to the Travel Plan accompanying the DRMP/EIS. |
| New Mexico OHV Alliance | 411 | 2 | Travel Plan Alternative D: This alternative fails to provide enough motorcycling opportunities. The analysis is deficient since you do not have an inventory of single-track routes. Therefore, the BLM should continue accepting data on existing routes and | See response to comment 122-15. |

BLM_0012787

| | | | | |
|---|---|---|---|---|
| | | | consider them for implementation. | |
| | 417 | 2 | Exclusive Use Zones: These will create user conflict not eliminate it in a way it is suggested to be managed. Whereas an exclusive use zone allows cherry stemmed routes to pass through and give the idea to other users it is not allowed due to perceived blanket restrictions. Multiple route designations with proper signage would be a better way to go. | See response to comment 122-9 |
| | 418 | 2 | Each alternative is greatly lackin in "true" trail inventory. Several long standing routes were omitted and it is my understanding that miles of single track were not even inventoried. In an era of "closed unless marked open" management, how is this the right thing to do? | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 422 | 13 | Alternative D falls short of providing sufficient motorcycling opportunities. Since no single-track inventory was performed, the BLM should continue accepting data on existing routes, and consider them for inclusion, again, a meaningful decision cannot be made while data is incomplete. | See response to comment 122-14 |
| | 454 | 1 | The travel plan should include areas south of I-70 where a person can experience a primitive outing. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 454 | 2 | Please do not go ahead with your preferred. Excessive amounts of roads, especially south of I-70 and [Labyrinth Canyon] | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 455 | 1 | I worry that this area [Deadman's Point in general] will | Although this issue was raised during scoping, the |

BLM_0012788

| | | | | |
|---|---|---|---|---|
| | | | be negatively impacted under the new Travel Plan. It seems to me that the more roads and vehicles that criss-cross this area will bring more environmental degradation. I would love to see less roads included in this plan. | application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 471 | 1 | The DEIS/DRMMP did not address any meaningful mitigation plans to mitigate the loss of existing motorized routes. The plans should be withdrawn and revised to include measures to mitigate loss of any recreational opportunities. | See response to comment 122-9 |
| | 474 | 2 | Transportation plan seems to present alternatives that in ways do not vary much. For example, the total open route mileage varies between 2,144 for the most conservation -oriented alternative to 2,671 for the least. | The least conservation-oriented alternative for travel is Alternative A, which has 5,033 miles of "D" Road (the two figures provided by the commentor refer to "D" roads for Alts. B and D).  The BLM therefore presents a range of alternatives in route designation of 2,889 miles difference between Alts. A and B. |
| Environmental Protection Agency | 479 | 5 | The EPA commends the BLM for moving from "open" OHV travel to designated routes.  Unrestricted OHV use and unrestricted camping are damaging natural and cultural resources, especially in heavy use areas. | The BLM recognizes that resource damage is occurring due to unrestricted OHV use and unrestricted camping as indicated in Chapter 3, pg. 3-87of the DRMP/EIS.  The action alternatives presented in this document are intended to lessen the impacts from these activities. |
| Environmental Protection Agency | 479 | 6 | The EPA supports the open designation in the White Wash Sand Dunes Area in the Final RMP/EIS only if the BLM is able to restore and protect the Dunes' ecological resources and scenic values including the cottonwood trees found in the open dune fields, drinking water sources, stream banks, and bighorn sheep habitat.  If these actions cannot take place, EPA suggests that travel in the White Wash area be limited to designated routes. | The BLM contends that Alternative C (Preferred Alternative) in the DRMP/EIS will protect the resources of the Dunes while allowing open OHV use.  To achieve this goal, the following management actions are proposed in Alt C:  1) closing by fencing the dune field Cottonwood trees and White Wash water sources and 2) limiting camping to designated sites.  In addition motorcycle trails have not been identified for travel in bighorn sheep escape terrain. |
| Back Country Horsemen of Utah | 482 | 1 | In general the RMP is very specific and detailed in what is planned. However, it leaves questions as to what you are planning and the expected impact on the stock use in the area. Some specific questions are:<br><br>Negro Bill Canyon – This trail was originally | There is no road proposed for motorized travel in Negro Bill Canyon.  The BLM is aware that the trail was originally utilized for livestock operations.  However, there has been no cattle grazing in Negro Bill Canyon since 1997.  The foot trail currently in the canyon receives over 50,000 people per year.  The trail is not maintained so |

BLM_0012789

| | | | | |
|---|---|---|---|---|
| | | | constructed be livestock operators who utilized horses to move cattle. Under alt B, C, and D; you propose the closure of this trail to horse use. However, I cannot find the reason for this closure. Have you talked with horse users to determine If there is an alternative and will this closure block horse use from accessing other lands. There also seems to be some disconnect because you propose the designation of 2.5 miles of road for motorized travel in Negro Bill Canyon but are closing it to equestrian use. Can stock use of this canyon be determined by either improving the existing trail or constructing a new trail in the canyon? | that it can sustain horses.  The trail was removed from equestrian use because each time a horse goes on it, the trail is severely compromised and needs repair.

Horses may still access the canyon from the stock trails in the upper portions of the canyon.  The only portion of the trail that is forbidden to horses is the 2 miles in the lower part of the canyon.  The BLm does not believe that the need for horse use there is great, nor is there an alternative location in which to build an equestrian trail. Each and every other part of the Moab Field Office remains open to equestrian use. |
| Back Country Horsemen of Utah | 482 | 2 | In general the RMP is very specific and detailed in what is planned. However, it leaves questions as to what you are planning and the expected impact on the stock use in the area. Some specific questions are:

The Chapter 3 Existing Environment lists Negro Bill Canyon as being limited to hiking only, while Chapter 2 Alternatives 2 states that equestrian use is discouraged in Negro Bill Canyon. Which is correct? | In practicality, Negro Bill Canyon is limited to hiking only. The RMP proposes to close the 2 miles at the very mouth of Negro Bill Canyon to horse use because of the damage that the trail sustains when it is traversed by horses. |
| Back Country Horsemen of Utah | 482 | 3 | In general the RMP is very specific and detailed in what is planned. However, it leaves questions as to what you are planning and the expected impact on the stock use in the area. Some specific questions are:

General – Common to all the non-mechanized recreation travel section in chapter 2 states "limit non-mechanized travel on specific lands to designated trails and managed routes for resource protection purposes." No where can we find what this might refer to with the exception of Negro Bill Canyon. Chapter 3.11.1.2.1.8 Popular Hiking Trails does identify some trails that are presently open only for foot traffic. Are you planning to close additional areas or trails to horse use? If so we would request that it is done with a public process and a minimum of 30 day comment | No other trails are closed to horses other than Negro Bill Canyon in the DRMP/EIS. |

BLM_0012790

| | | | | |
|---|---|---|---|---|
| | | | period. The public process should identify the trails being closed and the resource concerns for the closure. | |
| Coconino Trail Riders | 488 | 2 | The DRMP does not offer a true motorized alternative. ALL alternatives represent a major reduction in motorized use. The "motorized" Alternative D provides somewhat more miles of trail and gives motorized users somewhat more open area in White Wash and some other areas. These small increases in motorized use over the Preferred Alternative C do not nearly make up for the designation of all of Rabbit Valley /Westwater as non-motorized. A true motorized alternative is necessary. | See response to 208-2. |
| Coconino Trail Riders | 488 | 3 | Any trails planning must provide for motorized single track and motorcycle slickrock routes. Please incorporate the existing routes as suggested by Ride With Respect and the Blue Ribbon Coalition and please provide for future planning and implementation of such trails. | The DRMP/EIS provides 282 miles of singletrack motorcycle route in the preferred alternative.  See response to the Blue Ribbon Coalition (ID 123) and Ride with Respect (ID 122) comments for specific suggestions from these groups. |
| Coconino Trail Riders | 488 | 7 | Important motorcycle trails are missing from all alternatives. The preferred alternative includes about 100 miles of true motorized single-track. Alternative D adds another 100 miles. Instead, the final plan should - at a minimum—keep roughly 300 miles of non-road motorcycle routes from being closed. | The BLM asked the public to submit routes during the scoping period, including singletrack motorcycle routes. The BLM analyzed all routes that were verified by BLM personnel.<br><br>See response to comments 122-15 and 122-30 for a discussion of the addition of new routes to the Travel Plan. |
| Coconino Trail Riders | 488 | 8 | Travel Plan Alternative D falls short of providing sufficient motorcycling opportunities. Since no single-track inventory was performed, the BLM should continue accepting data on existing routes and consider them for implementation. | See responses to comments 122-15, 122-30 and 488-7. |
| Coconino Trail Riders | 488 | 9 | The Utah Rims single-track network should include at least 25 miles of additional routes, in order to be as complete as the Dee Pass network. | See responses to comments 122-15 and 122-30.<br><br>The Utah Rims motorcycle routes were inventoried by the BLM and user group representatives in Colorado prior to the initiation of the RMP revision.  On January 22, 2001, |

786

BLM_0012791

| | | | | the Utah Rims area was limited to existing routes, which meant the existing inventory undertaken by the BLM. |
|---|---|---|---|---|
| Coconino Trail Riders | 488 | 11 | A few more non-riparian washes should be left open, especially Cisco Desert. Wash riding is very popular. These travel-ways provide ATV and motorcycle riders an unconfined challenge that roads cannot. | See response to comment 122-14. |
| Outward Bound Wilderness | 630 | 6 | A further request on these issues, is how the current management plan proposes to ensure that there are not further "new routes" made in areas that have documented Wilderness Characteristics. To best help guide the public in making comments about the new management plan I feel the onus is on the BLM to show the public what routes are "new" and what routes are old since the last management plan was published. Without that information I do not feel the BLM is providing information necessary to inform the public about the impact of the management plan. (Has there been any NEPA work done on any of these new "routes?") | All of the full sized vehicle routes proposed in the Moab RMP are old, pre-existing routes. Some of the user-made motorcycle trails do not fall into this category. At the establishment of the Moab RMP, a set of designated routes would be established. Future additions to these routes would require NEPA analysis, including archaeological clearances.<br><br>It should be noted that the Moab DRPM/EIS proposes to close over 2,500 miles of existing route. |
| | 636 | 2 | Regarding ORV travel, I strongly support the closing of areas to unlimited cross country travel and the designation of routes. ORV trespass has been an ongoing problem on my property and on that of adjacent landowners since the BLM-private boundary is not completely fenced. On the adjacent BLM land I have noted extensive ORV tracks cut into hillsides that disturb the limited vegetation and will lead to future erosion and other resource loss. This area is also rich in archeological resources and I have hiked along ORV tracks that pass directly through significant chipping sites on BLM land. Closure of unlimited cross-country travel will improve the situation. | The BLM Manual at 8342.1 identifies protection requirements for OHV designation. The following resources must be considered in the designation process; cultural, historical, archaeological, soil, water, air, scenery, vegetation, wildlife, wildlife habitat, threatened or endangered species, and wilderness suitability. The larger open area poses conflicts with many of these resources. An open area is proposed near the White Wash Sand dunes to provide recreation opportunities of this nature in the area best suited for this activity. |
| | 647 | 1 | The current road and trail network in SE Utah is the unplanned result of historical seismic and mineral exploration. This haphazard spider web of routes makes no sense whatsoever as a reasonable recreational transportation plan. Consider the Redrock | The BLM Manual at 8342.1 identifies protection requirements for OHV designation. The following resources must be considered in the designation process; cultural, historical, archaeological, soil, water, air, scenery, vegetation, wildlife, wildlife habitat, threatened or |

BLM_0012792

| | | | | |
|---|---|---|---|---|
| | | | Heritage transportation plan which is based on the following principles:<br><br>-Vehicles should be restricted to designated roads and trails throughout the entire SE Utah region no "open" ORV play areas<br>-In order to facilitate enforcement, there should be a "closed unless signed open" policy<br>-All routes should serve some identifiable and compelling purpose<br>-There needs to be adequate opportunities for both motorized and non-motorized recreation while avoiding conflicts between these two groups<br>-Ecologically damaging routes, such as route through riparian areas, should be closed.<br>-There needs to be adequate opportunities to get out of earshot of motorized trails | endangered species, and wilderness suitability.  The larger open area  poses conflicts with many of these resources.  An open area is proposed near the White Wash Sand dunes to provide recreation opportunities of this nature in the area best suited for this activity. |
| | 655 | 2 | None of the Alternatives proposed by BLM adequately address the off-road-vehicle crisis that is evolving in the Moab area. The BLM's Preferred Alternative calls for a network of unnecessary roads to nowhere that puts 96.5% of the BLM land south of I-70 less than a mile from a road. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.<br><br>The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives |

788

BLM_0012793

| | | | | |
|---|---|---|---|---|
| | | | | are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
| | 673 | 7 | I would also like to comment genrally on the DRMP as it relates to designated ORV routes. Your preferred alternative designates a spaghetti-like tangle of ORV routes across the world-renowned scenic public lands surrounding Moab. Maps of the proposed routes near Moab clearly show that ORVs will be able to drive to within a short distance of just about anywhere; in other words, non-motorized recreational users will find it difficult to get away from ORVs on the vast majority of BLM lands near Moab. This plan is ill-conceived and will unnecessarily promote conflict between motorized and non-motorized recreational users. Please reconsider your preferred alternative so that it will reduce the destructive, redundant web of ORV routes and will protect the quiet, natural backcountry experiences of traditional non-motorized users. | See response to comment 122-9 |
| | 819 | 1 | Alternative D fails just short of providing sufficient motorcycling opportunities. Since no single-track inventory was performed, the BLM should continue accepting data on existing routes, and consider them for implementation. | See response to comment 122-14. |
| | 820 | 1 | I know that one of the biggest objections to motorized vehicle use by others is the noise from unmuffled engines. On suggestion then is to create noise limits for OHV's if 90 db is the limit, responsible OHVers will find a way to keep the noise down. | See response to comment 122-7 |
| | 820 | 2 | Another objection to both bicycle and motorized vehicle use can be a speed conflict. If the BLM imposes a speed limit, responsible OHVers will be willing to maintain speed limits as needed. | See response to comment 122-9 |

BLM_0012794

| | | | | |
|---|---|---|---|---|
| Sage Riders Motorcycle Club | 870 | 5 | The Sage Riders recommends that when addressing "user conflict" , the final RMP should avoid "exclusive use zones" where,  based on perceived or potential "user conflict", one or more "conflicting uses" is categorically prohibited. Most of the non-motorized focus areas have designated routes open to motorized vehicles within them. If implemented as written in Alternatives B, C, and D, many visitors will preceive these focus areas as establishing blanket restrictions on motorized use. The unintended consequences will likely result in increasing, not reducing actual or perceived "user conflict". | Focus Areas are not intended as exclusive use zones. This is clearly stated in the Recreation section. |
| Sage Riders Motorcycle Club | 870 | 6 | We recommend in order to address the "user conflict" issue, the Final RMP should direct land managers to educate non-motorized visitors (who may percieve conflict with motorized uses) where they may encounter vehicle traffic in certain areas as well as informing them of areas where they may avoid such encounters. The Final RMP should direct land managers to educate vehicle-assisted visitors of where a road or trail might be shared with non-motorized visitors, and if appropriate, direct slower speeds. | Education is not a land use planning issue. |
| | 928 | 2 | Final RMP should also direct land managers to work with recognized groups, such as the 4x4WDA and USAALL, to ensure mitigation efforts have been exhausted. | Mitigation can be put in place without an emergency limitation or closure. |
| | 933 | 5 | Motorized recreation requires more miles of trails than mountain bikes, horses, or hiking, because motorized travel faster. A normal ATV or dirt bike ride covers 50-70miles, where a normal mountain bike ride covers 15-20 miles, and hikers cover maybe 10-15miles in a normal hike. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 934 | 11 | Visitors who are not comfortable sharing the public lands with all types of recreation should be directed to areas which already prohibit motorized use. There are vast numbers of acers where solitude can be enjoyed | See response to comment 122-9 |

BLM_0012795

| | | | | |
|---|---|---|---|---|
| | | | without further restricting the recreation of a large percentage of visitors to the Moab area. We oppose creating more areas which allow exclusive use by one type of recreationalist. | |
| | 934 | 12 | The trails and roads for motorized, and the non-motorized trails can be seperated in the same area so different types of users have minimal contact with eachother. The needs of all users can be accommodated without unduly restricting one (motorized) group. We oppose allowing public lands to become virtually exclusive domain of non-motorized users. | See response to comment 127-8 |
| | 934 | 13 | Even if an area has a non-motorized focus, roads and trails for motorized should be allowed through all areas so that motorized recreationalists can continue on to enjoy other public lands. We oppose blocking any motorized routes. | See response to comment 127-8 |
| | 934 | 15 | ATV use in the Moab area is increasing and this activity needs to be recognized. There will be a need for more ATV trails in the future and a way to provide this need must be addressed in this document. Some trails that are listed for motorcycles should be for both motorcycles and ATVs. We oppose any plan which ignores planning for the increased ATV use which is coming. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 934 | 18 | Close a road or trail only after all means of eliminating or reducing a problem have been exhausted. Work closely with local groups to identify and remedy damaging situations. Hold public meetings to explain problems and ask for help in resolving issues. Create education directed at illuminating a specific problem to those who may not know it is a problem. Rigorously enforce complience to regulations and laws, and fine those who do not cooperate. | See response to comment 122-18 |
| | 934 | 19 | Use barriers or rerouters to protect resources. | Barriers and rerouters refer to means of implementation of the Travel Plan.  The BLM will utilize all reasonable techniques to implement its Travel Plan |

791

BLM_0012796

| | | | | |
|---|---|---|---|---|
| | 934 | 20 | Provide more open areas, where those who just want to play around with their vehicles can do so legally. This will help take that behavior off of the roads and trails. | The BLM Manual at 8342.1 identifies protection requirements for OHV designation.  The following resources must be considered in the designation process; cultural, historical, archaeological, soil, water, air, scenery, vegetation, wildlife, wildlife habitat, threatened or endangered species, and wilderness suitability.  The larger open area  poses conflicts with many of these resources.  An open area is proposed near the White Wash Sand dunes to provide recreation opportunities of this nature in the area best suited for this activity. |
| | 934 | 21 | Provide detailed information for OHVs about where they can go, what laws and regulations are in effect, what the BLM needs from OHVers to keep trails open, how to report problems, how bad behavior affects riding privileges, and how to respect other people who are using public lands. | See response to comment 122-18 |
| | 934 | 22 | Educate non-motorized recreationalists about the legitimacy of motorized use on public lands. | See response to comment 123-25 |
| | 934 | 23 | Provide positive interaction in the field between the BLM and motorized recreationalists. Give positive reinforcement and encouragement to users who are doing such things as staying on the trail, or driving/riding slowly past others on the road. | Positive interaction between BLM staff and recreationists is not a planning issue.  The BLM recognizes the need for education, and its field staff endeavors to positively reinforce proper behaviors. |
| Great Old Broads for Wilderness | 941 | 2 | Under the BLM proposed plan, wilderness landscapes will, in large part, become sacrifice zones for off-road vehicles. | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The impacts identified for travel management in the DRMP/DEIS are derived from this data. |
| | 942 | 2 | In regards to the inventory done by the Moab BLM, I believe that there are many motorcycle, mountain bike, and ATV trails that were not included. I would strongly suggest that these need to be inventoried prior to | See response to comment 122-14 |

BLM_0012797

| | | | | |
|---|---|---|---|---|
| | | | forming a final plan. The current inventory is deeply flawed and omits some very important trails. | |
| | 946 | 1 | Many of the important motorcycle trails are not on any of the alternatives. The Utah Rims area, for example, is far from a complete inventory, as well is the area north of I-70. The Thompson Trail is an epic ride that offers an endless single track experience that is vary hard to find. It should be combined with Copper Ridge Motorcycle Loop in the final plan. Since no inventory was done on single track trails, the BLM should continue accepting data. I recommend that routes provided by Ride with Respect, the Sage Riders, and other individuals be investigated and considered for the final plan. | See response to comment 122-14 |
| | 947 | 2 | When the proposed road density is as great as the BLM accepts in this RMP, it becomes literally unmanageable--- a plan that allows high impact activity on such a huge proportion of our PUBLIC lands is simply a recipe for chaos. | The commentor's preference for fewer designated routes is noted.  Alt. C designates 2,500 fewer miles of route than under the No Action alternative. The BLM asserts that by eliminating over 2,500 miles of routes, it will have created a more manageable route system. |
| | 947 | 3 | I'll also put out this perspective: I am a member of Grand County Sheriff's Search and Rescue; are we now being forced to travel into more and more dangerous situations merely so someone can have easy motorized access? This plan opens up a huge and unnecessary challenge to those who volunteer their time for the public's well being. | The Travel Plan restricts travel by not designating 2,500 miles of "D" route that was inventoried by the county and verified by BLM.  Thus, the "easy motorzed access" referred to by the commentor has not been opened up. |
| | 951 | 6 | Where are the specifics as to how you will educate the public to the value of these lands in concrete ways. How will you monitor the success of this? | See response to comment 123-20 |
| Californians For Western Wilderness | 952 | 3 | The Southern Utah Wilderness Alliance estimates that south of Interstate 70, 84% of the land that BLM manages will be within 1/2mile of a designated OHV route. This is incredible and unconscionable. And this doesn't even address the well-known environmentally damaging consequences of OHV use: erosion, crushed wildlife, pollution of streams, destruction of plant life and cryptobiotic crusts. | The Travel Plan accompanying Alt C of the DRMP/EIS eliminates close to 3,000 miles of existing route;  in addition, the DRMP/EIS eliminates cross country motorized travel on all but 2,000 acres.<br><br>See Appendix G for details of how the Travel Plan was formulated. |

BLM_0012798

| Californians For Western Wilderness | 952 | 5 | Instead, the Plan authorizes over 2,600 miles of OHV routes in areas that have wilderness character, including areas determined by the BLM to have such character. This is unconscionable. BLM and all the federal land management agencies find themselves strapped when it comes to their budgets, especially budgets for enforcement. It's not clear from the draft how the Moab office will police these routes to ensure that unacceptable damage is not being caused by OHV use. The better alternative would be not to authorize them in the first place. Especially, the office should not authorize any routes that were created by already illegal use. This merely serves to reward the illegal use. | The full sized vehicle routes designated were not illegally made, but are rather constructed routes from the minerals exploration and ranching periods.  While over 2,600 miles of route are authorized, an addition 2,600 miles of route are not designated in the Moab RMP.  The routes created by motorcyclists, while user made, were largely made in areas open to cross country travel, thus making the routes legal.

The BLM assumes that it will have the resources necessary to implement the plan, including the Travel Plan. |
| | 954 | 8 | No inventory was done on the single track trail network. Because of this I believe that there should be an ongoing evaluation of new trails to be considered as part of the trail network. I would like to see about 300 miles of trail through out the area in question. That would keep the users spread around and provide a challenging and interesting system of looping and interconnecting trails. These types of trails are the best means for keeping on designated trails. | See response to comment 122-14 |
| | 955 | 3 | In addition to the county roads inventoried by the BLM, SEVERAL HUNDRED MILES OF TRAIL EXISTS THAT WERE NOT INCLUDED IN THE BLM'S INVENTORY. Grand County's Trail Mix Master Plan highlighted many popular bicycle trails, some of which are not included in the BLM's inventory.  I believe this is a violation of the 2001 BLM National Management Strategy for motorized OHV use that states "Successful resource management depends on gathering quality data using the best science available" (page 15) and the 2006 BLM technical reference on Planning and Conducting Route Inventories which states "Route inventories are an integral part of Land Use Plans (LUPs)/ Resource Management Plans | See response to comment 122-14 |

BLM_0012799

| | | | | |
|---|---|---|---|---|
| | | | (RMPs)" (page 5). The Moab RMP should acknowledge that the impacts to bicycling, motorcycling, and ATV riding cannot be fully measured in the absence of a complete trail inventory. PLEASE CONSIDER DESIGNATING TRAIL DATA THAT WAS PROVIDED DURING THE PLANNING PROCESS. | |
| | 955 | 4 | Once the travel plan is implemented, the BLM should practice adaptive management by testing mitigation techniques such as visitor education, signage, trail maintenance, and/or rerouting before prohibiting access. | See response to comment 123-25 |
| | 955 | 6 | Likewise, trails should not be ruled out simply by virtue of their low use levels. Low-use trails represent an opportunity for Grand County to be prepared for times of high volume visitation by particular user groups when recreationalists seek out less popular routes. Some trails only appear to experience low use because they are durable, or have not been abused. LOW-USE TRAILS OFTEN PROVIDE A UNIQUE EXPERIENCE FOR RECREATIONISTS SEEKING SOLITUDE. | Assuming the commentor is referring to motorized routes for non full-size vehicles, no such route was ruled to be not identified for motorized use on the basis of low usage. Any such route not identified for motorized use in one or more action alternatives was a result of resource conflicts outweighing purpose and need.  In the case of full-size vehicle routes, the process of route designation is outlined in Appendix G.  The DRMP/EIS also provides a mechanism for future motorized routes to be added to the travel plan on a site-specific basis. |
| | 955 | 8 | The road plan in Alternative C is sufficient road-based opportunities. More of the existing roads surrounding Interstate 70 should be designated for long-diastance touring. Compared to the road plan, motorized and mechanized trail designations are scarce. So the FINAL RMP SHOULD DESIGNATE TRAILS IN ALTERNATIVE D, PLUS OTHERS SUBMITTED BY RECREATIONISTS DURING THIS ENTIRE PLANNING PROCESS. The travel plan in Alertnative C does little to expand non-motorized oppertunities. Several areas could provide substancial primitive oppertunities by closing a few less-valuable roads. Homogeneity of the road plan would intensify conflicts and hurt all user groups in the long term. Alternatively, a few steps to diversify the travel plan could benefit recreationists across the activity spectrum. | See response to comment 124-55. |

BLM_0012800

| | 957 | 1 | I am writing to request that the Final RMP include a travel plan that will adequately protect the natural and cultural resources harbored within this BLM planning area. The transportation plan simple proposes far too many miles of vehicle routes in areas of rare and unique value. In the appended information regarding the travel plan (section 7.1, page G-11) is a reiteration that the BLMis required to follow a non-impairment standard with regard to the management of WSA tracts. The preferred alternative proposes managing roughly 20% of areas acknowledged as possessing wilderness characteras such and seems  out of line with the expressed non-impairment mandate. In general, the transportation plan seems to present alternatives that in ways do not vary much. For example, the total open route milage varies between 2,144 for the most conservation-oriented alternative to 2,671 for the least. While there will be constraints on closing some routes, I urge the BLM to explore the possibility that for some regions the preferred transportation alternative may not fully protect existing resources. | The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified.<br><br>The BLM used the scoping process to explore and objectively determine a reasonable range of alternatives that best addressed the issues, concerns, and alternatives identified by the public.  As a result, [four] alternatives were identified (including the No Action Alternative) for further analysis.  The management prescriptions and actions outlined in these alternatives are not identical as suggested by the comment.  Each alternative considers various levels or degree of resource use or resource protection to give the public the ability to fully compare the consequences of each management prescription or action.  Table 2.1 in the Moab DRMP/DEIS provides in comparative form the management actions associated with each alternative. |
| | 958 | 5 | Since no single track inventory was preformed, the BLM should continue accepting data on existing single track routes and consider them for implementation. Saying that there is a lack of funds or resources to review these routes is not an acceptable reason for not providing access to this user group. | See response to comment 122-14 |
| | 960 | 1 | It seems that the BLM is proposing a "close first-mitigate last" approach to OHV use. I would suggest that the final RMP mandate that adaptive management practices be used across the Field Office and that the | Mitigation can be put in place without an emergency limitation or closure. |

BLM_0012801

| | | | | |
|---|---|---|---|---|
| | | | RMP should direct that mitigation efforts will be exhausted prior to closure. If a closure does take place another area equal in recreational opportunity should be opened elsewhere. This will prevent congestion and 'over use' of any particular area. This is important to maintain the environment and still allow recreation. When an area is closed it just doubles the demand on another area. | |
| Moab Trails Alliance | 964 | 3 | After a few years of trying to develop new trails in the Moab Field Office it is apparent that our niche here is slickrock. The predominantly sandy soils make for maintenance nightmares and undesirable routes. MTA recommends that more slickrock routes be developed and marked. A route from the Monitor-Merrimack area over to SR313 is an example. Slickrock riding made Moab famous, it is low impact, and is what will keep people coming back. The Bartlett Wash Freeride area in "C" is a great idea. | The DRMP/EIS provides for the addition of new mountain bike routes throughout the life of the plan.  Up to 75 miles of new route is authorized in Alt C.  Site specific NEPA analysis will be undertaken to approve new routes. |
| Moab Trails Alliance | 964 | 5 | The amount of new trail ("C"= 150 miles, "B"= 75, etc.) should be specifically stated as, "In addition to trails developed on existing roads as mapped on the Grand County Transportation Inventory map". The allotted new mileage will include only those routes mapped across previously undisturbed terrain. | Wording has been added to the text on pg. 2-49 to clarify that the "new trail" is in addition to decommissioned existing routes on the Grand County Inventory Map. |
| Moab Trails Alliance | 964 | 6 | It is a sore spot with with OHVs. The definition of OHV in the glossery on page X-37 precludes bicycles from this category. The explaination hidden at the bottom of G-5 groups motorized and mechanized together. Please remove bicycling from from any definitions of OHVs and other all-encompassing variations of "wheeled vehilcle" classifications. While a bicycle has wheels, this is the extent of any similarity with motorized forms of transportation. Placing mountain biking within the non-motorized category is consistant with the BLM National Mountain Bicycling Strategic Action Plan and many other BLM management plans across the country. | The DRMP/EIS has attempted to classify mountain bikes as their own category.  Mountain bikes are restricted to designated routes, but any other definition of OHV's does not include mountain bikes. |

BLM_0012802

| Moab Trails Alliance | 964 | 7 | Please do not ban bicycling from non-WSA (ACEC) lands. MTA does not advocate for access to all trails and areas, but believes this particular policy might be based on the false assumption that bicycling would damage the wilderness characteristics of such lands. This is not true: as mentioned above, the environmental impacts of mountain bicycling are similar to hiking and far less than equestrian or OHV use. In fact, the BLM Wilderness Study Area Intrim Management Policy H-5880-1 (Wilderness IMP) does not categorically ban mountain biking from WSAs. MTA requests that the Moab RMP adopt a management policy that would permit bicycling on some trails in non-WSA (ACEC) areas. While bicycling may not be appropriate on some trails in these areas, others can provide a welcome relief from front-country and motorized areas. A decision to ban this use should be based on scientific reasoning. | Bicycles are allowed on all routes open to travel by wheeled vehicles.  There are several trails mentioned in the DRMP/EIS that are restricted to hikers (such as Fisher Towers).  There is no blanket ban of cycling on non-WSA lands in the Moab planning area. |
| Moab Trails Alliance | 964 | 8 | Whenever different user groups are listed in the RMP, road cycling should be included as a category just the same as "driving for pleasure". This is fast becoming a popular use on the spectacular scenic byways of Grand County. | Road cycling has been added to the list of recreation activities in the Moab Field Office on pg. 3-80 of the DRMP/EIS. |
| Moab Trails Alliance | 964 | 9 | The alt Lake Tribune article 11/04/07 titled  BLM Off-Road Excess Plans Need More Caution, Review by Daniel Patterson states that the number of miles of ORV roads in the Moab field office totals 5000, and the total throughout southern Utah would be 10,000. "Imagine driving three times across America on an ATV." That clearly makes the number sound excessive. It does not explain that some of these miles would be designated non-motorized for future biking and hiking trails. Perhaps this plan should put a percentage number on how much each user category would get out of these endless miles. | Alt C designates 2,527 of non-maintained dirt roads and 1,166 miles of regularly maintained dirt roads in the Moab Field Office.  These routes are available to all motorized (and non-motorized) users.  Those inventoried routes not designated (over 2,500 miles) would be available for non-motorized users. |
| Moab Trails Alliance | 964 | 10 | As avid defenders of biological soil crusts, MTA suggests they be highlighted as a star feature of the | The DRMP/EIS is a planning tool that guides BLM actions in the future.  Its purpose is not an educational tool for the |

BLM_0012803

| | | | | |
|---|---|---|---|---|
| | | | desert, thus emphasizing their importance. MTA along with Trail Mix spends significant resources on public education and crypto biotic soil and this publication is an excellent opportunity to headline their attributes. The restrictions in this plan would be more palatable if readers completely understood the role these crusts play in holding the desert together. | public.  The DRMP/EIS does mention the importance of biotic soil crusts. |
| | 965 | 2 | The Final RMP should avoid "exclusive use zones" where, based on percieved or potential "user conflict," one or more "conflicting uses" is categorically prohibited. Most of the non-motorizrd focus areas have designated routes open to motorized vehicles within them. If implemented as written in Alternatives B, C and D, many visitors will precieve these focus areas as establishing blanket restrictions on motorized use. The unintended concequences will likely result in increasing, not reducing actual or perceived "user conflict". | See response to comment 122-9 |
| | 965 | 3 | The Final RMP should direct land managers to educate the non-motorized visitors (who may perceive conflict with motorized uses) where they may encounter vehicle traffic in certain areas as well as informing them of areas where they may avoid such encounters. The Final RMP should direct land managers to educate vehicle-assisted visitors of where road or trail might be shared with non-motorized visitors, and if appropriate, direct slower speeds. The Final RMP should direct land managers to re-route either use so as to avoid sections of roads or trails that are extremely popular with both groups. | See response to comment 122-9 |
| | 968 | 8 | Since no singletrack inventory was preformed, the BLM should continue accepting data on existing routes to consider them for implementation. | See response to comment 122-14 |
| National Parks Conservation Association | 970 | 7 | It is particularly troubling that BLM has included designated ORV routes that are within the boundaries of Arches NP. This error needs to be removed. The BLM also needs to address how it will monitor routes it | The BLM does not make decisions on route designations within Arches National Park.  The routes shown on the map within the park have been deleted from the PRMP/FEIS. |

799

BLM_0012804

| | | | intends to designate that run up to the park boundaries. | Those designated routes that run up to the park boundaries may be monitored by either the BLM or the park.  If these routes are causing damage in the park, they can be closed on a site specific basis after the completion of the RMP.  Page 2-48 of the DRMP/EIS states that adjustments to the Travel Plan may be made at a site specific level, using the NEPA process. |
|---|---|---|---|---|
| Howard County Bird Club | 972 | 1 | We rely on land-managing agencies like BLM to advise us, through regulations and closures, which routes are not suitable for ORVs because of potential damage to the land and wildlife habitat. We want the agencies to place protection of the habitat as the highest priority. Every ORV route creates impacts harmful to wildlife habitat. The impacts can be especially severe where the route is subject to erosion, where routes involve fording streams, and where too many routes fragment blocks of wildlife habitat.<br><br>The ORV routes in Alternative C (shown in map 2-11-C) are a dense network with many redundant routes, many that intrude on essential wildlife habitat, and many that would degrade the wilderness character of areas proposed for wilderness designation in America's Red Rock Wilderness Act. A total of 2,642 miles would be open to ORVs. In this planning area of 4,300 square miles, that means an average of six-tenths of a mile of ORV route for every square mile in the planning area. We urge BLM to exclude ORVs from the important wildlife and scenic areas. | The preferred alternative of the Travel Plan considered purpose and need for each route versus any resource conflicts the route may have had.  Wildlife habitat was considered a resource conflict, and routes were removed from the Alt. C travel plan for this reason.  The route designation plans removes over 3,000 miles of existing route from designation.  In addition, all lands (with the exception of 2,000 acres) are limited to designated routes, removing over 600,000 acres from the "open to cross country travel" category.  The impacts to wildlife habitat from these actions are beneficial.<br><br>In addition, see response to comments124-15 and 124-55. |
| | 973 | 1 | I am a Geographic Information Systems Professional (GISP) and have had the opportunity to closely review the GIS data used for the maps that were submitted as part of this Draft RMP-EIS. By zooming in on certain areas of the data, using ArcMap, it is clear that this plan is setting up user groups to be at odds with each other for many years to come. In particular, the | See response to comment 127-8 |

BLM_0012805

| | | | | |
|---|---|---|---|---|
| | | | designation of lines on the map as "motorized use" traveling through a polygon area listed as "non-motorized use" sets the stage for future court battles between groups like the Southern Utah Wilderness Alliance (SUWA), a varity of Off-Highway Vehicle (OHV) user groups, and the BLM. I am referring specifically to the designations shown in Alternative C, your preferred alternative, for locations such as Pritcherd Canyon, and the OHV corridors of Gold Bar, Rusty Nail, and Gold Spike. Rather than have a corridor or route "line" sit directly on top of a "polygonal" area, I would hope that the single polygonal area be split into multiple areas, to eliminate this "vagueness of use" and future conflict among user groups. Let's please try to get this right the first time and not have the user groups spend many years bickering over the definition of words and "intent", in court, if that's even in the realm of possibility. | |
| | 974 | 1 | Your own data shows that there has been an increase of hundreds of percent in the number of people recreating using ATV's and other ORV since the last time you did a travel plan, I find it hard to understand that with the increase and the trends showing that more people will be buying ATV's and needing a place to recreate that we are closing 2/3 of the trails. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 975 | 4 | It is my understanding that over 80% of the 1.8 million acres covered by the plan will be within 1/2  mile of an OHV trail. Too much wildlife habitat and wildlife are disturbed by such a pattern of trail. We need to protect ecosystems. An understanding of the need for biological integrity of the areas studied is lacking. Concentrate all of the vehicular use in one area. Let the rest of the land- huge expanses that allow for continuous habitat for local fauna and minimize the introduction of exotic species-remain off-limits to OHV use. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 976 | 5 | The plan needs a better balance between | As described in detail in Appendix G, the BLM assessed |

BLM_0012806

| | | | | |
|---|---|---|---|---|
| | | | conservation and motorized recreation impacts. In every alternative, the maps show a spider web of redundant motor vehicle routes, particularly in the area East of the Colorado River. Many of these routes travel through areas identified by the Utah Wilderness Coalition as having wilderness values, which means that these particular areas are the ones that many citizens consider especially important to manage for natural character and potential for primitive and unconfined recreation. Motorized recreation in these areas is a completely incompatible use. At the October 3rd Public meeting at the Salt Lake Public Library, a BLM representative said that the density of vehicle routes in this area is "not a problem, because when I go out there I almost never see another vehicle." It is true that low population has helped protect public lands in the Moab area in the past, but low population is a bad assumption for future management. A report in the Deseret News (11/16/2007) says that in the past year the state grew by 84,425 people, adding 10 people per mile. That makes it especially poor management strategy to assume that Off-Road Vehicle use will continue to be low. If the BLM representative was accurate in saying that very few vehicles travel on these roads, it is clearly unnecessary and undesirable to leave so many different routes to the same places. | several thousand miles of inventoried motorized routes, assessing each on for purpose and need balanced against resource conflicts. As a result of its deliberations, over 2500 miles of currently available motorized routes were identified for non-motorized use. In addition, the BLM reduced the acreage available for open cross-country travel to zero (or near-zero) in all action alternatives. The commentor provides no specifics as to which particular routes are redundant. |
| | 976 | 6 | Wherever Off-Road Vehicle use is allowed it has the potential to expand the maximum allowed level, so it seems worse than foolish to write a travel plan that specifically assumes a particular Class D road will never become a popular off-road recreation route. | The routes identified as "D" routes in the DRMP/DEIS are roads located on public lands and managed by the BLM until properly adjudicated. The DRMP/DEIS proposes four different alternatives to manage these routes. |
| | 976 | 7 | The sheer number of roads on the map looks like it would be impossible for the BLM to adequately monitor off-road vehicle impacts such as unauthorized trail-building. | See response to comment 122-18 |
| | 976 | 8 | At the public meeting the BLM representative stated | See response to comment 120-87 |

BLM_0012807

| | | | | |
|---|---|---|---|---|
| | | | that the redundant routes are necessary because "nearly all of them access a view". This excuse seems absolutely unjustifiable since pretty much the entire Moab area constitutes a "view" and clearly non-motorized users would also like to see views without the smoke, exhaust, noise, and landscape scars caused by motorized recreation. | |
| | 976 | 9 | The information on the OHV use and user conflicts on pages 3-82 through 3-88 pretty clearly shows why merely expanding the areas subject to OHV recreation pressure is an exceptionally poor management strategy to cope with growing numbers of OHVs. BLM already knows that OHV management is a huge headache and that OHV use conflicts not only with non-motorized recreation but with other land uses such as oil and gas and ranching. When OHVs start using an area, even in realitively small numbers, the concept of multiple use goes out the window because intentionally or not a fairly low level of motorized recreation use still bullies all other uses out of the way for various reasons. The example given in the Draft RMP (p. 3-85) of Gemini Bridges is exactly right. 10 years ago that was an area where I enjoyed bicycling, but nowadays the number of OHVs has made riding in the area too unpleasant for anyone else to enjoy the area. Essentially any area that is open to unrestricted OHV use is being managed to potentially become and area that is ONLY for OHV use. The RMP is the only chance to develop stratigies that will make the problem truly manageable. That means OHV recreation should be limited to marked roads and trails. Areas should be closed to OHV travel unless they are clearly marked as open. OHVs should be excluded from all areas that area currently identified as having wilderness characteristics. Redundant routes should be trimmed from the map. Recreational OHVs should be kept away from all river corridors and riparian areas. | See response to comment 122-9 |

BLM_0012808

| | 991 | 1 | The point relevant to the DRMP/DEIS which illustrates its incompetence is that there is no credible assessment of the impacts of this rather intense density of motorized recreation on the natural values of lands already recognized by the BLM as having wilderness character, much less resource values on other lands within the Moab Area DRMP's jurisdiction. Eighty-two percent of the lands inventoried by the BLM and confirmed to have wilderness characteristics qualifying them for inclusion in the National Wilderness Preservation System would be "roaded" with designated motorized routes under Alternative C. This is a significant federal action clearly having environmental effects. What are they? Alas, the DRMP/EIS does not credibly enlighten me. | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The impacts identified for travel management in the DRMP/DEIS are derived from this data. |
| | 995 | 1 | There appears to be no case-by-case analysis of (1) the need for each individual route, (2) the likelihood and potential impact of riders fanning out from each route anyway, in spite of the ban on cross-country travel, and (3) whether the needs of vehicle users could be met with a much smaller network of roads, while leaving larger areas of wild land intact. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 995 | 2 | The analysis of the overall OHV issue in the EIS is not very illuminating. The document needs to forthrightly address the tremendous loss of wilderness-type recreation opportunities that has occurred since 1985. The discussion of Alternative C should state that under it, places such as Labyrinth Canyon, the Harts Point, and Hatch Point Cliffs, and other undeveloped areas will continue to suffer serious damage to their wildland values. | The areas mentioned by the commentor have been reviewed by the BLM for wilderness characteristics. Those areas deemed to possess such characteristics are proposed for management to protect wilderness characteristics under one or more action alternatives. The loss of wilderness character referred to by the commentor, for those areas judged to lack such character, is the result of those areas having a large number of impacts to naturalness, typically in the form of constructed motorized routes.  Most, perhaps all, of these routes have been in existence for many years and predate 1985.  The resultant lack of naturalness (and thus wilderness characteristics) is not a result of decisions from the 1985 nor the current plan, but a reflection of the on-the-ground reality.  The BLM does not have the legal |

BLM_0012809

| | | | | |
|---|---|---|---|---|
| | | | | authority to create roadless areas where they currently do not exist. |
| | 995 | 4 | The EIS needs to assess how route restrictions will realistically be implemented. | See response to comment 122-18 |
| | 995 | 6 | The document should note that mountain biking, as well as motorized OHV use, displaces hikers from trails and routes they have formerly used. | See response to comment 122-9 |
| | 995 | 7 | The EIS states that OHV use impacts on riparian resources would generally by the same under the preferred alternative as under Alternatives B and D (page 4-246). How can this be when the preferred alternative would designate riparian zones such as Tenmile Canyon for extensive motorized use? | The comparison on pg. 4-246 is based on the number of riparian acres that is "limited" vs. open to cross country travel. Using this level of comparison, there is very little difference among the action alternatives.  Additional data regarding the miles of route designated in riparian areas, by alternative, has been added to Chapter 4 and to Appendix G.  This mile by mile analysis clearly shows that there is less mileage designated in Alternative B than in Alternatives C or D.  See also response to comment 123-51. |
| | 996 | 2 | The following suggesting with respect to the "alternatives" have been attributed to Mr. Seaman and I concur. Alternatives should include:<br>-Educating the non-motorized visitors about when and where they may encounter vehicle traffic, as well as informing them of areas where they may avoid such encounters.<br>-Educating the vehicle assisted visitor of where the road or trail might be shared with non-motorized visitors, and encouraging slower speeds and a more courteous ethic in these areas.<br>-Re-routing either use so as to avoid sections of roads or trails that are extremely popular with both groups. For example, a hiking trail can be constructed to avoid a section of popular OHV route. Or an equestrian trail may be constructed to avoid a section of popular mountain bike route, etc.<br>-Dispersing all forms of recreational use so as to minimize conflict and create a more desirable experience. | See response to comment 122-18 |

BLM_0012810

| | 997 | 2 | Some important motorcycle trails are missing from all alternatives. The preferred alternative includes about 100 miles of true motorized single-track. Alternative D adds another 100 miles. But in total, the final plan should keep roughly 300 miles of non-road motorcycle routes from being closed. | See response to comment 122-14 |
|---|---|---|---|---|
| | 999 | 1 | It is my understanding that at the same time, BLM has done no site-specific studies to determine the impact of these routes in Native American cultural sites or other natural resources like riparian areas or wildlife habitat. Science to back up the ORV route designations does not exist in this document. | See response to comment 123-12 |
| Western Watersheds Project | 1025 | 15 | BLM has not adequately analyzed the direct, indirect, and cumulative effects of the RA's road and trail network, the large number of closed roads and trails that continue to be used illegally by ATVs and dirt bikes, and the incidence of newly created, illegal routes. There has been no analysis of road density effects. These factors were not considered in addressing wildlife impacts in the DEIS. | An analysis of habitat fragmentation due to roads is found on pgs. 4-482 through 4-486 of the DRMP/EIS.<br><br>The DRMP/EIS proposes to close 2,506 miles of inventoried existing routes in the preferred alternative (Alt C).<br><br>Illegal activities are not a land use planning issue but, as stated on pg. 1-11 of the DRMP/EIS, is an issue addressed through policy or administrative action. |
| Western Watersheds Project | 1025 | 22 | The proposed Tavel Plan should recommend signing travel routes as open instead of closed, therefore removal of signs would not be as costly or result in additional labor, compliance and enforcement problems. | See response to comment 206-5, 120-96, and 479-8. |
| Western Watersheds Project | 1025 | 23 | Motorized vehicle use as proposed within the White Sand Dune area and within 10-mile Wash does not adaquately protect the unique riparian, springs, wildlife and cultural values as initially identified within their respective ACEC proposals. Prescriptions necessary for the Protection of environmental resources within the proposed 10-mile wash ACEC should not differ between Alt B and Alt C with respect to motorized routes within the stream corridor, when special management is identified to avoid damage of identified | See response to comments 479-6 and 124-81. |

BLM_0012811

| | | | | |
|---|---|---|---|---|
| | | | resources. Furthermore, include with the impact analysis for special designations related to 10-mile Wash ACEC benefits to riparian/wetland resources by prohibiting motorized vehicles downstream of Dripping Stream to the Green River. | |
| Western Watersheds Project | 1025 | 24 | Designations of identified motorized vehicle routes within the riparian/wetland streams of Kane Creek, Upper Courthouse Wash Focus Area and Labyrinth Focus Area, including proposed competitive motorized events, do not adaquately protect the stream ecologies and riparian dependent wildlife.  The proposed travel routes, as well as records of non-compliance existing throughout these critical ecosystems indicate resource damage is currently occurring at alarming rates. | Non-compliance and enforcement actions are issues addressed through policy and adminstrative actions as stated on pg. 1-11 of the DRMP/EIS.

In designating routes for travel, riparian issues were carefully considered.  Of the 2,506 miles of existing routes that are eliminated in the Travel Plan accompanying Alt. C, many were removed because of riparian conflicts.  Where the purpose and need for the route outweighed the riparian conflict, the route was designated in Alt. C such as Kane Creek.  Indiscriminate cross country travel in riparian areas has been almost entirely eliminated in Alt C by limiting travel to designated routes.

Competitive motorized events are directed to the Dee Pass motorized trail focus area in Alt C.  The DRMP/EIS states on pg. 2-25:  "Competitive routes within this area would be based on site specific NEPA analysis. |
| | 1026 | 3 | PDF pg. 64 pg. ES.5.1 Alternative A- No Action. Designated as No Action but closes 5,062 acres to motorized use. | NRR |
| | 1026 | 4 | PDF pg. 65 ES.5.4 Alternative D: Is focused on Motorized use but has fewer miles designated. Alt A has 4,673 Alt D has 2,890 motorized miles. | NRR |
| | 1026 | 6 | PDF pg. 77 1-7 Section 1.3.2.2 Issue 1: It says "OHV use needs particular attention --- for the protection of other resource values." Does that mean other resources have a greater value than OHV use? What exactly does this mean? | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The |

BLM_0012812

| | | | | impacts identified for travel management in the DRMP/DEIS are derived from this data. |
|---|---|---|---|---|
| | 1026 | 7 | PDF pg. 78 1-7 Section 1.3.2.2 Issue 1 Related Recreational Issues: Using the term "conflict" between OHV and other. What does that mean? In my 18 years of riding I have only had one "Conflict" with another user, she yelled at me. If conflict means "Contact" then that is a whole other disscussion. | User conflict was raised as an issue by the public during the scoping period for the RMP.  User conflict and displacement is defined on pg. 3-85 of the DRMP/EIS. See also response to comments 6-10, 6-24 and 122-9. |
| | 1026 | 9 | PDF pg. 79 pg 1-9 Section 1.3.2.2 Issue 6 Identifies OHV as a particular impact to Riparian areas. How did you come to that conclusion as in my 30 years of riding I avoided Riparian areas to ride because they are difficult to ride who wants to fall into the river? | The BLM worked with an interdisciplinary team of resource specialists, which included representatives from Grand and San Juan Counties to develop the alternatives for the Travel Plan in the DRMP/DEIS.  The ID team reviewed each route for purpose and need weighed against resource conflicts.  These conflicts are identified route by route in the GIS data developed for the Travel Plan which is available in the administrative record.  The impacts identified for travel management in the DRMP/DEIS are derived from this data. |
| | 1026 | 13 | PDF pg. 162 pg. 2-74 Table 2 Travel Management OHV. Under Alternative A. It says "destruction of recreational-related Cultural Resources" What in the world does that mean? | The BLM recognizes that destruction of cultural resources is illegal.  The analysis summarized in Table 2.2 points out that if people (of any type or activity) do not have access to cultural resources, they can do them no harm. "Recreation related cultural resources" means that recreationists of any type may cause advertent or inadvertent impacts. |
| | 1026 | 16 | You have OHV use listed as a medium level of activity. Based on my 18 years of use in the Moab area, looking at the number of Motorized carriers vs. non-motorized carriers in the parking lots I believe that this table is wrong. How did you come to that conclusion? | Table 3.18 merely attempts to give some indication of the levels of recreation use.  OHV use (dirt biking and ATVing) does not approach the levels of "jeeping", hiking, sight seeing or camping.  The preliminary data from the National Visitation Use Monitoring Study (NVUM) (2006) is provided in Table 4.67.  This preliminary data confirms the use levels given in Table 3.18.  The commentor should remember that the recreation use levels are for all BLM lands.  For instance, the commentor may recreate in the White Wash area, which mainly has OHV users.  The hundreds of thousands of recreation users along Highway 128 are counted as "sightseeing" and/or "hikers".  The |

BLM_0012813

| | | | | |
|---|---|---|---|---|
| | | | | conclusions in Table 3.18 are based on observational data of BLM staff.  The numbers in Table 4.67 are the preliminary NVUM results. |
| | 1026 | 17 | You say in this paragraph that motorized use has increased which seems to contradict what you put in the table PDF pg 278 pg 3-80 Table 3.18 activities in the MPA by Use Level. | A use may increase without that use being the "highest use".  For example, an increase from 10 to 20 is a 100% increase.  If another value is at 100 and has no increase, 100 is still 5 times greater than 20.  Thus, increase and rank order are not equivalent. |
| | 1026 | 18 | PDF pg 283 pg 3-85 3.11.2.6 User Conflict and Displacement: Second paragraph you site as an example that mountain bikers in the Gemini bridge area have been displaced by the "faster moving and louder modes of transportation" First time I went to Gemini Bridge area was in 1990 and there were no Mountain Bikers in the area, for that matter what few mountain bikers that were in Moab, almost all of them were in the Slickrock area. They may not be choosing to go to the Gemini Bridge area but they are not being displaced. | See response to comment 122-9 |
| | 1026 | 19 | You list 9 examples of conflict area. Every one of these conflict area lists motorized as one of the conflict parties. This supports my theory that the majority of use in the Moab area is by motorized users. | See response to comment 122-9 |
| | 1026 | 20 | Last sentence "may lead to increased vandalism and theft"  How did you come to the conclusion that OHV users are vandals and theifs? How can this document be an unbiased report on the best use of BLM land if you feel that a particular user group are vandals and theifs? | The BLM does not conclude that OHV users (or recreationists in general) are vandals and thieves. Access to sites makes it easier for those who are vandals to vandalize.  Vandalism may occur if access is on foot, horseback or non-motorized boat. |
| | 1026 | 22 | PDF pg652 pg 4-272 4.3.12.2.10.6 Alternative D. This whole section seriously flawed. Pharaphrasing, the more OHV users, the less likely the other users will not return to the Moab area and thus hurt the overall economy.  That assumes that the OHV user community has a greater impact without increasing itself. This whole study disproves that because you have continued to state that the OHV community and | See response to comment 124-127 |

BLM_0012814

| | | | | |
|---|---|---|---|---|
| | | | it's presence is increasing. Increasing the OHV activity increases the Moab Economy. I also contend that the OHV community spends a great deal more money in Moab than any other user group. The OHV user group is the one staying in the motels/hotels and eating at the restaurants. The mountain bikers, hikers are the ones sleeping at the campsites and using the ground as a toilet facility | |
| | 1026 | 24 | The fact that comments are needed on Alternatives for the RMP and the Alternatives for the travel plan is not made clear in the document.<br><br>The difference between an RMP (general guidance) and the Travel Plan (implementation decision) is not clearly described in the DEIS. The FEIS should clearly articulate the difference. | See response to comment 124-71 |
| | 1026 | 25 | The current proposal is unworkable because it confines a huge amount of vehicle use into a very small area and the area's boundaries are not well defined and cannot be easily identified on the ground. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 1026 | 30 | When using adaptive management principals, the RMP should mandate the mitigation of closing routes and areas to recreational use by designating a more sustainable, but similar recreational opportunity elsewhere. | Adaptive management merely means using site specific factors to guide future decisions. |
| | 1029 | 2 | As a 4x4 and ORV user I would actually like to see less trails and more areas of quiet and solitude made available. Every square mile does NOT need an ORV trail and immediate access. The quality of the outdoor experience is being systematically destroyed by excessive ORV trail use. The Draft Moab RMP needs to be changed to limit ORV use, not increase it. | Although this issue was raised during scoping, the application in the DRMP/EIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| Capital Trail Vehicle | 1031 | 1 | There is nothing radically wrong with the existing condition except that it does not meet all of the needs | The DRMP/EIS identifies 6,199 miles of inventoried routes in Alt A; 2,871 miles of inventoried routes are |

BLM_0012815

| | | | | |
|---|---|---|---|---|
| Association | | | of motorized recreationists, does not provide equal opportunity, and does not adequately address the growing need of motorized recreationists. The evaluation and proposal must adequately address these issues and the predisposition to motorized closures must be avoided. | excluded from any of the action alternatives because there was no purpose and need for these routes.  Alt C designates 3,693 miles of full-sized vehicle routes and 282 miles of motorized single track.  Alt D includes 3,855 miles of full-sized vehicle routes and 340 miles of motorized single track.  Therefore, Alt D provides more motorized opportunities than does Alt C.

The commentor's implication that all the action alternatives represent a loss in motorized recreation opportunities (when compared with the No Action alternative) is incorrect.  Although 2,871 miles of inventoried routes were eliminated between the No Action and the action alternatives, these routes were determined to have no purpose and need primarily because they were redundant and received virtually no use.  The comment assumes that the motorized recreation opportunities in the action alternatives are inadequate to meet current or anticipated future demand.   The BLM in Chapter 4 discloes that all the action alternatives reduce motorized recreation opportunities.

NEPA and CEQ require that BLM provide a reasonable range of alternatives in the DRMP/EIS, and the BLM asserts that it has done so.  As described in Appendix G, the BLM's travel plan formulation attempts to balance transportation needs (including motorized recreation) with other resource uses and protections.  The BLM must manage for multiple uses, of which motorized recreation is only one. |
| Capital Trail Vehicle Association | 1031 | 2 | A motorized travel plan is a plan that specifically designates roads, trails and areas for motorized use, designates which vehicles will be allowed on which routes and if seasonal restrictions apply. A comprehensive trail designation plan does the same thing except it includes all trail users, including mountain bike, equestrian and hiking. This is a very | The Travel Plan accompanying Alt. C in the DRMP/EIS designates routes for motorized use, as required by law and policy. The majority of these routes accommodate any type of motorized vehicles, although some of the routes are designated specifically for dirt bike or ATV/dirt bike use only. The DRMP/EIS also designates routes for mountain bike use; in addition, mountain bikes may use |

BLM_0012816

| | | | | |
|---|---|---|---|---|
| | | | important distinction because the anti-access groups will attempt to convince the planning team to develop a "comprehensive" travel plan by using the existing inventory of motorized routes. They do this by identify existing motorized trails that are good for mountain bikes, equestrians, and for bird watching... or whatever. The current approach is inequitable because it takes the current motorized route inventory and tries to make it the route inventory for all users. It leaves out possibilities for constructing or otherwise developing non-motorized trails and ignores existing non-motorized trails that exist in both the planning area and adjacent lands. Now, that doesn't mean the agency can't take into consideration the effect each alterative will have on non-motorized visitors. It can- and it should be part of the NEPA analysis. But that is totally different from specifically providing a non-motorized trail system via the existing inventory of motorized routes. We support the creation, designation and management of non-motorized trails, but not at the expense of motorized visitors. We request that the agency not use the existing motorized trail inventory for designating non-motorized trails. Instead, if there is a need for non-motorized trails, then the agency should consider options that do not reduce the existing opportunity for motorized users. | all routes designated for motorized travel.

Although some trails are specifically designated for hikers and equestrians, these users are not limited to a designated route system. Therefore, the number of routes designated for non-motorized use is not as extensive as that designated for motorized use and mountain bike use, as these uses are limited to designated routes by law and policy. The majority of the non-motorized routes designated in the DRMP/EIS, (e.g., Fisher Towers, Porcupine Rim Singletrack, Hidden Valley, and Corona Arch) are not and have never been motorized vehicle routes.

New trails for non-motorized users can be developed after the completion of the PRMP/FEIS. Although these trails may utilize routes that were not designated for motorized vehicle use, non-motorized users may also suggest entirely new routes. All such proposals would be analyzed using site-specific NEPA analysis.

For information regarding the addition of new motorized routes to the Travel Plan (after completion of the RMP), see response to comments 122-15 and 122-30. |
| Capital Trail Vehicle Association | 1031 | 3 | The project has a critical flaw which is the lack of a true "pro-recreation" alternative that adequately address motorized recreation. All of the alternatives developed for consideration represent the current opportunity. Conversely, virtually every project has developed a "preservation" alterative, where a maximum amount of closures are considered. The increasing demand for OHV recreation opportunities on public lands is extensively documented. Therefore, it is incumbent upon the project team to formulate at least one alternative that maximizes motorized | The Moab BLM is very aware of the need to provide for motorized recreation opportunities in the planning area. The BLM acknowledges that there are fewer miles of route in any of the action alternatives than in the No Action alternative. However, the reduction in route miles was largely accomplished by not designating seldom-- or never- used old minerals extraction routes, seismic lines, and pack trails (which never were used for 4WD use, but were rather artifacts of the U.S.G.S mapping system). The needs of motorized users were maintained throughout the Travel Planning process. Any routes that |

BLM_0012817

recreation, or at least does not reduce motorized recreational opportunities in the planning area. Therefore, we request that the project team formulate a wide range of alternatives including at least one Alternative that maximizes motorized recreational opportunity in the project area and addresses the following:
**The project team must formulate a least one alternative that emphasizes OHV use in Roaded Natural and Semi-Primitive Motorized opportunity settings for recreation.
**The pro-recreation alternative should strive to provide for the current and future demand for OHV recreational routes.
**Alternatives should include areas where OHV trails can be constructed and maintained when demand increases.
**Where appropriate, the agency should use this process to analyze the impacts of any future route construction and include those in the decision.
**Direction for the required process to construct new routes should be incorporated into each alternative.
**At least one alternative should maximize the ability to construct new sustainable trails to meet the current and future need.
**The project team should develop management alternatives that allow for proactive OHV management.
**All alternatives should include specific provisions to mark, map, and maintain designated roads trails and areas in cooperation with OHV users.
**All alternatives should include direction to engage in cooperative management with OHV groups and individuals.

were in guidebooks, were utilized by special recreation permittees (such as the Jeep Safari) and/or were regularly used by motorized recreationists were assumed to have a purpose and need. Very few of these routes were not designated in the Travel Plan accompanying the DRMP/EIS. For instance, every mile of the 633 mile Jeep Safari route system is designated in Alt. C.

The primary purpose and need for the great majority of the total system of routes designated in Alt C was, in fact, motorized recreation. The great majority of these routes has no other purpose or need except for motorized recreationists to tour the backcountry. Alt D designates the maximum miles of routes for motorized recreation.

In addition, the Moab RMP planning team considered the needs of singletrack dirt bike users. A dirt bike route system has been designated as part of Alts. C and D in the Travel Plan. The dirt bike route system developed as part of the DRMP/EIS is extensive. It has no use other than motorized recreation.

Both Alts C and Alt D emphasize motorized recreation, although Alt. D emphasizes it slightly more. Focus Areas and Special Recreation Management Areas (SRMA) have been formulated and proposed solely for motorized recreationists in both Alts C and D. For instance, the Dee Pass Motorized Trail Focus Area, the Cameo Cliffs (ATV) Special Recreation Area, the Utah Rims (dirt bike emphasis) SRMA, and the Gemini Bridges Motorized Backcountry Touring Area are all proposed in Alt. C.

Both the preferred and the commodity alternatives (C and D) provide for current and future OHV recreation. The motorized focus areas and motorized SRMAs are areas where OHV routes can be constructed and maintained if demand increases. New routes can be added to the

BLM_0012818

| | | | | Travel Plan on a site-specific basis using the NEPA process.  This is specifically provided for in the Travel Plan decisions.  See response to comments 122-15 and 122-30 for more information on adding new routes.<br><br>The Travel Plan (Appendix G) details the basic outline of an implementation plan, including the provision to mark, map and maintain routes. Cooperation with user groups is an administrative action and does not require a land use planning decision.  See chapter 1 (p. 1-11) of the DRMP/EIS for a statement regarding volunteer coordination. |
|---|---|---|---|---|
| Capital Trail Vehicle Association | 1031 | 4 | One of the specific requirements under NEPA is that an agency must consider the effects of the proposed action in the context of all relevant circumstances, such that where "several actions have a cumulative... environmental effect, this consequence must be considered in an EIS." Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1378 (9th Cir. 1998) (quoting City of Tenakee Springs v. Clough, 915 F.2d 1308, 1312 (9th Cir. 1990)) A cumulative effect is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonable foreseeable future actions." 18 40 C.F.R. § 1508.7. The cumulative effect of all motorized closures has been significant and is growing greater every day yet they have not been adequately addressed. Ignoring cumulative effect allows the agency to continue to close motorized routes unchecked because the facts are not on the table. CEQ guidance on cumulative effects was developed to prevent just this sort of blatant misuse of NEPA. | The effects of the cumulative impacts of restricting travel are disclosed in the DRMP/EIS.  This disclosure is stated on pg. 4-510 of the DRMP/EIS:  "Cumulative impacts to transportation and access would occur primarily from actions that facilitate, restrict or preclude motorized access.  Management actions that restrict OHV use would limit the degree of travel opportunities and the ability to access certain portions of the planning area."  The title of this section is "Cumulative Impacts: Travel Management."<br><br>The BLM contends that it has disclosed the cumulative impacts to travel management from the management actions proposed in the DRMP/EIS. |
| Capital Trail Vehicle Association | 1031 | 5 | The site specific analysis of each road or trail to be closed must address or identify where the public would go to replace the motorized resource proposed for closure. In other words, the analysis must adequately | The routes not designated in the Travel Plan accompanying the DRMP/EIS are, for the most part, routes that have never been used by motorized recreationists.  Many of them are old seismic lines, pack |

BLM_0012819

| | | | | |
|---|---|---|---|---|
| | | | evaluate the site specific value of a road or trail proposed for closure to motorized recreationists. It must also quantify the significant negative cumulative impact experienced when motorized recreationists could not find a trail or road with a similar experience in the area. The quality of our experience has been significantly reduced. It must also quantify the significant cumulative impact that the closure of a system of road and trails would have collectively when enough routes are closed to eliminate a good motorized day outing. An incomplete analysis is not acceptable under NEPA requirements. | trails never open to motorized use and unused mining routes.  No purpose or need could be discerned by the travel planning team (which included representatives from both Grand and San Juan counties) for the majority of the routes not designated in the Travel Plan.  See response to comment 124-71, as well as Appendix G, for an explanation of the Travel Planning process.

The impacts of route closures to motorized recreation opportunities are disclosed in Chapter 4 of the DRMP/EIS on pg. 4-408 through pg. 4-411.  The BLM contends that the quality of motorized recreation experiences has not been reduced.

See also response to comment 208-2. |
| Capital Trail Vehicle Association | 1031 | 7 | Note that some new construction may be required to accomplish a reasonable system of loops. Therefore, new construction must be included in the scope of the project. | The Travel Management section specifically allows for the addition of new routes after the Travel Plan is completed.  See response to comments 122-15 and 122-30 for a description of this process. |
| Capital Trail Vehicle Association | 1031 | 8 | The existing level of motorized access and recreation must not be dismissed without adequate consideration because it is only associated with the No Action Alternative. The existing level of motorized access and recreation is reasonable alternative and alternative other than No Action must be built around it. This reasonable alternative should also include mitigation to protect the natural environment and compensate motorized recreationists for the significant cumulative effect of past losses, and enhancement to adequately address the growing need for motorized access and recreation | Recreational opportunities and motorized access have not been significantly decreased between the No Action alternative and Alt. C (the preferred). The major routes used by recreationists have been designated, including all Jeep Safari routes, routes highlighted in guidebooks and on commercially-available maps, routes utilized by guided driving outfitters, over 250 miles of motorcycle route and other heavily used motorized routes.  There is no significant impact on motorized users as a result of the actions taken in the Travel Plan.

See also response to comment 208-2. |
| Capital Trail Vehicle Association | 1031 | 9 | A sense of magnitude must be used when making decisions about road closures based on indicators such as sediment production. For example, a route should not be closed because it is estimated to produce 10 cubic yards less sediment. The sediment yield must be compared to naturally occurring | Each of 33,000 route segments was individually assessed in the Travel Plan formulation.  Purpose and need for the route was weighed against resource conflicts that may have occurred with the route.  Appendix G details the Travel Plan process.  Resource conflicts included riparian, cultural, wildlife, recreation, soils and wilderness. |

BLM_0012820

| | | | | |
|---|---|---|---|---|
| | | | conditions which includes fires. Recent fires in the Sequoia National Forest discharged thousands of cubic yards of sediment to area streams which is more than all of the motorized routes in the project areas for the next 100 years. | A balance was struck between the purpose and need and the conflict.  Routes with conflicts were designated when the purpose and need outweighed the resource conflict.  Thus, an indicator alone was not sufficient to not designate a road.<br><br>See also response to 124-71. |
| Capital Trail Vehicle Association | 1031 | 10 | Lack of Reasonable Alternatives<br><br>* The fact that comments are needed on Alternatives for the RMP and the Alternatives for the Travel Plan is not made clear in the document.<br><br>* The difference between an RMP (general guidance) and the Travel Plan (implementation decisions) is not clearly described in the DEIS. The FEIS should clearly articulate the difference.<br><br>* None of the Alternatives presented are acceptable as they stand, including the Preferred Alternative C, which mandates unworkable and impractical management of camping and motorized travel. In addition, in all of the Alternatives, management for the White Wash Sand Dunes is fatally flawed and must be reconsidered (see comment below).<br><br>*Alternative D fails to provide a true motorized focus. | The Travel Plan is part of the RMP; maps were included of the proposed designated routes so that specific comments could be made on the Travel Plan.  The alternative number of miles of route were listed under Travel Management decisions (pg. 2-48 of the DRMP/EIS), and the map accompanying those decisions was referenced.<br><br>Implementation decisions have been clearly delineated in the PRMP/FEIS.  The Travel Plan is an implementation decision.  The BLM designates areas as "open", "closed" or "limited to designated routes".  The Travel Plan delineates which routes have been designated within that latter category.  BLM national and Utah policy requires field offices to disclose the routes to be designated, if possible, during the RMP process.  See also response to comments 123-1 and 123-5.<br><br>The CEQ regulations (40 CFR 1502.1) require BLM to consider reasonable alternatives, which would avoid or minimize adverse impacts or enhance the quality of the human environment, based on the nature of the proposal and facts in the case (CEQ 40 Most Asked Questions 1b.).  While there are many possible management prescriptions or actions, the BLM used the scoping process to determine a reasonable range alternatives that best addressed the issues, concerns, and alternatives identified by the public.  Public participation was essential in this process and full consideration was given to all potential alternatives identified. |

BLM_0012821

| | | | | For management of White Wash Sand Dunes, see response to comments 120-83, 123-35 and 123-10.<br><br>The land use plan allocates resources among uses. Motorized recreation is but one use of public lands. Alt. D is the alternative that is most weighed towards the needs of motorized recreationists. Alt D puts less emphasis on protection of resources, and more emphasis on uses of the public lands.<br><br>The commentor's disapproval of any of the four alternatives is noted. |
|---|---|---|---|---|
| Capital Trail Vehicle Association | 1031 | 11 | BLM's open area in Alternative C and D must be expanded. The current proposal is unworkable because it confines a huge amount of vehicle use into a very small area and the area's boundaries are not well defined and cannot be easily identified on the ground. | See response to comments 120-83, and 123-35. |
| Capital Trail Vehicle Association | 1031 | 12 | Similar Stats needed for the Moab RMP and DEIS.<br><br>Commentor presents stats for a Forest Service area that reports total number of forest/motorized visitors versus the total number of wilderness visits. Uses this as an argument for more mutiple use and motorized access because the total number of forest visitors/motorized users is much higher (64%) than wilderness users. (36%). Statistics are from the Social Assessment of the Beaverhead-Deerlodge National Forest, a national survey on Recreation titled Outdoor Recreation Participation, and the Southern Research Station's report Off-Highway Vehicle Recreation in the US. | This comment does not apply to the Moab DRMP/EIS. The Moab BLM does not have comparable statistics to those quoted from the "Social Assessment of the Beaverhead-Deerlodge National Forest". |
| Capital Trail Vehicle Association | 1031 | 13 | Note: Similar Statistics Needed for the Moab DRMP and DEIS. Provided as an example.<br><br>Commentor provides FS stats on high rate of | This comment does not apply to the Moab DRMP/EIS. The Moab BLM does not have comparable statistics to those quoted from the "Social Assessment of the Beaverhead-Deerlodge National Forest". |

BLM_0012822

| | | | | |
|---|---|---|---|---|
| | | | wilderness designation (24%) while no more than 2.55 % of visitors are wilderness visitors. Reiterates points above in comment #12. | |
| Capital Trail Vehicle Association | 1031 | 15 | All planning projects should disclose the added benefit to non-motorized recreational resources resulting from the closure of roads by adding the miles of closed roads to the miles of existing non-motorized trails. Additionally, we request that the cumulative negative impact on motorized recreationists resulting from this lack of adequate accounting be evaluated and adequately mitigated | The non-designated routes are discussed under Travel Management (pg. 2-48 of the DRMP/EIS) as being available for non-motorized users to develop into non-motorized trails.  However, these routes would need to be analyzed using a NEPA process for bicycles. (Horses and hikers are not restricted to designated trails, and so they could go on these non-designated routes immediately).  The cumulative impacts to motorized users of non-designation of routes is discussed under Cumulative Impacts in Chapter 4 (pg. 4-510 of the DRMP/EIS). |
| Capital Trail Vehicle Association | 1031 | 16 | The different management plans being developed by the BLM and Forest Service are using generated, estimated and inadequate data to forward an agenda of eliminating access and motorized recreation from public lands. Economic models such as Implan should not be used when the input data is estimated and not factual or actual. Adequate effort must be exercised by the agencies to gather true and the ground data from businesses and individuals that use our public lands. | The Moab BLM, during the scoping period for the RMP, asked the public to submit route and trail inventory for possible consideration to the Travel Plan.  This process is outlined in Appendix G of the DRMP/EIS.  Motorized users were invited to submit data to the planning process. These data were then verified by the BLM staff on the ground.  There is no economic statement in the Moab DRMP/EIS regarding the topic suggested by the commentor.   Implan (an economic modeling system) was not used in the preparation of the Moab DRMP/EIS. |
| Colorado 500 | 1032 | 10 | ...the MFO staff's choice to separate the citations from the body of the text makes it extremely cumbersome to review the use of the literature in this analysis.  We have selected a citation that is pretty obviously aimed at roads, and because our comment is about roads, it seemed the most likely match.  Please bear with us. From the Chapter in the DEIS called "References:" Forman, R.T.T. and L.E. Alexander.  1998.  Roads and their major ecological effects.  Annual Review of Ecology and Systematics '29:207-231.  This does not have anything to do with undeveloped dirt roads and | |

BLM_0012823

| | | | | |
|---|---|---|---|---|
| | | | narrow trails, lightly trafficked, in a desert ecosystem. Just so you do not have to take our word for it, we have located and read the article, plus we have followed the citations in the article.  None of the material we found is related to what this DEIS ins analyzing.  (multiple reference examples followed, text not included here) | |
| Colorado 500 | 1032 | 11 | Please include this informationin the "Environmental Consequences."  Please correct the assumption that more roads will inevitably cause more invasions.  What this author is saying is that more disturbance is the culprit.  The greatest possible disturbance to a dirt road is grading, as it deposits loose soil on the verge, whereupon exotics transported by the vehicles can gain a foothold.  If the natural road "armor" is left undisturbed, the native vegetation is fully capable of outcompeting invading exotics. | |
| Colorado 500 | 1032 | 17 | Please refer to Chapter 3, 3.11.1.2.16 in DEIS: Quote [There are no rotues solely dedicated to OHV use.  These activities take place on the same routes as used by four-wheel drive vehicles, and often occur on Jeep Safari routes.  There is an informal, user-made network of motorcycle routes in the White Wash Duens ares.] end quote<br> The total exclusion in the 2007 DEIS of a type of OHV route called "motorcycle trails" is a radical change,inserted by staff after the close of scoping. Furthermore, there was absolutely nothing, general or specific, in the Notice of Intent published 6/4/2003 that could be perceived to even imply that recreational routes called "motorcycle trails" would be eliminated from consideration in this RMP and Travel Plan. 3.11.1.2.16 contradicts several statements in this EIS that explicitly describe the presence of "casual systems" of motorcycle trails (as in the quote above.) 3.11.1.2.16 contradicts with the data provided in the original Alternative A that was on the website prior to | |

BLM_0012824

| | | | | |
|---|---|---|---|---|
| | | | the issuance of the DEIS.  That document listed 271 miles of motorcycle trails.<br>3.11.1.2.16 contradicts Page 3-84.  "It is important to note that the majority of OHV and dirt bike users in the MPA are residents of Colorado."  A detail reference in the original scoping was omitted:  "dirt bikers" come from Colorado to ride single-track OHV trails.  They do not come to ride on roads.<br>3.11.1.2.16 contradicts the published BLM map #2-11E "Designated Motorcycle Routes Alternative C and D," now withdrawn from public review.<br>3.11.1.2.16 contradicts the tiny, scattered mileage shown on the DEIS Alternative C mpa 2-11-E called "Designated Motorcycle Trails."  According to that map there is some sort of "dedicated OHV trail."  But 3.11.1.2.16 says there are "no routes solely dedicated to OHV use." | |
| Colorado 500 | 1032 | 18 | We dislike using the expression, but the dishonesty of the MFO staff inserting "popular mountain bicycle" trails in place of motorcycle trails is exposed by:<br>1) The placement of a "Mountain Bike Focus Area" (Map 2-9-C) exactly where the popular Copper Ridge motorcycle trail already is.  This is an existing singletrack loop, plus singleback connectors to the Sovereign Trails system (state land) and an exisitng singletack connector to Thompson Springs.<br>2) The record supporting this analysis:  refer to the "Comments" section, quote, "Keep it (lands) open to mountain bikers and motorbikes.  We are moutnain bikers and appreciate the motorcyclists who discovered it.  Everyone that we met on the trail was respectful to us and as far as we could see, the environment too (Slickrock Trail Parkign Lot, Comment Bruiser Comments, 11 October 2003)  This comment is especially important because it does not originate from the "self-selected" commenters who attended meetings or wrote letters.*** | |

BLM_0012825

3) The 1985 Grand RMP.(LISTS passages form the 1985 Grand RMP)

Requests that will resolve this comment:

1. We want BLM to provide the analysis that supports the statement "There are no routes solely dedicated to OHV use." Reprinting the same sentence from the AMS will not satisfy this request, as there is no analysis in the AMS that supports BLM's claim in 3.11.1.2.16. This additional analysis will obviously incude maps of every existing road and trail. This analysis must detail who made each route, for what prupose, and when it was made. To accomplish this, interviews with residents of the Moab area, as well as residents of western Colorado and western Utah will be necessary, and interviews with motorcycle clubs and businesses, to gather the factual evidence that supports (or refutes) the claim that off-road motorcycles do not have their own dedicated system of routes in the MPA and in the MFO jurisdiction.

2. We want a third-party, non partisan reviw of this analysis. The reason that is necessary si that many private citizens donated hundreds of hours tohelp BLM map the single-track OHV routes in the run-up to this DEIS. Hundreds of miles of motorcycle trails were mapped. Since BLM has no compunctions about discarding that work, we have no reason to trust BLM in the conduct of any new route inventory or route development history.

3. Reprinting the same sentence from the AMS will not satisfy this request, because there is no analysis in that document that supports BLM's claim in 3.11.1.2.16.

4. If there is no such analysis, we want BLM to add this statement to 3.11.1.2.16: "MFO staff has elected to omit at least 200 miles of existing motorcycle singletrack trails form the inventory and to eliminate form consideration the dsignation of a "system" of

BLM_0012826

existing singletrack OHV trails in Alternative C. Staff
has chosen to remove this data in advance of the
Deciding Offer's review and Decision. Staff realizes
that this will prevent the Deciding Officer any
opportunity to evaluate and designate singletrack OHV
systems. Based on the record supporting this DEIS
and Plan, it will likely be preceived as a pre-emptive
Decision by the ID Team. There is no analysis that
supports this action. There is ample evidence that
these routes do exists, as many members of the public
assisted in lcoated and mapping them. Hoever, MFO
staff has elected to discard that data. Please refer to
3.11.1.2.16."

Alternatively, and less contentious and less time
consuming, and more likely to get this project to a
Decision in a more timely way, we want eh Moab BLM
to restore the trails in the MFO database that were
collected under the public perception that the trails
would be called "motorcycle singletrack" and included
in the travel plan for consideration. We will not try to
guess at the name BLM has assigned these trails.
Restoring these trails to the database willsimplify
completion of the RMP, and it would fill several glaring
voids in the "Travel Plan." Then, in the post-ROD
implementation, site-specific monitoring would support
the eventual site specific analysis of the impacts of
these trails.

We also request that BLM add the following section to
Chapter 3:

1. Beginning on page 3-79, part 3.11.1.2.16 must be
changed to "Popular Motorcycle Routes." These will
be the same as the "popular bicycle" trails, plus many
more miles. The reason they are the same is, BLM
changed the usage for this DEIS even though
(because it is in the record) BLM cannot dispute the
fact that motorcycles were suing those trails when the
1985 RMP was written.

BLM_0012827

|  |  |  | 2.  We want BLM to include Gemini Bridges, Procupine Rim, the Slickrock Bike trail, Amasa Back, Flat Pass, Klondicke Bluffs, Kokpelli's Trails, Poison Spider, Lower Monitor and Merrimac, Bartlett Wash, Moab Rim, Kane Creek Canyon Rim, Bar M, Hurray Pass and Onion Creek ("popular bicycle trails), <br> 3.  And, add trails including but not limited to: <br> 4.  Copper Ridge Singletrack <br> 5.  Thompson Wash Singletrack <br> 6.  Guy's Trail Singletrack <br> 7.  Enduro Trail Singletrack <br> 8.  Bitter Creek Singletrack <br> 9.  Beyond Bitter Creek Singletrack <br> 10. Thompson Trail Singletrack <br> 11. Western Rim Singletrack <br> 12. Zion Curtain Singletrack <br> 13. Westwater Rim Singletrack <br> 14. Mel's Loop Singlectrack <br> 15. Mel's Westwater Connector Singletrack <br> 16. Prairie Canyon Singletrack <br> 17. Dubinky Singletrack <br> 18. Whitewash Singletrack system <br> 19 Ten Mile Wash Singletrack system <br> These trails are part of the database that a trusting public helped MFO staff to assemble, with the hope of an accurate analysis. <br> It is not our intention to stop BLM's progress toward a Decision, and it is not our intention to "torpedo" Alternative C as the preferred.  It is our intention to encourage the governmnet to produce accurate planning documents that truly reflect the conditions in front of the Planning Team. <br> That is why in each of our comments, and especially this comment, we offer a solution that BLM can achieve in the FEIS, and thus produce a Decision in a timely fashion. |  |
| Colorado 500 | 1032 | 19 | ...the published Final Scoping Summary has aroused |  |

BLM_0012828

suspicion. …in approximately 750 to 1,000 comments in support of "OHV," the word motorcycle appears just once and "motorcycles" only twice, although "dirt bikes" and "motorbikes" slipped through someone's word search. Yet off-road motorcyclists never refer to themselves as OHV or ORV users, and never refer to their trails as "OHV trails." They refer to their trails as "singletrack."

For example, the Bookcliff Rattlers Motorcycle Club does not call itself the Bookcliff Rattlers OHV Club. This is a universal trend; a Google search of "OHV" clubs will turn up non who use that acronym in their club name.

And we noticed something odd in the comments as published in the BLM AMS "Summary of Public Comment Final." Relying on BLM interpretation, as we do not have access to original material, we note here for the record, the following:

"OHV" appears 257 times and "ORV" appears 25 times. "Dirtbike" never appears. "Dirt bike" appears once. "Motoccyle" appears once in the name of the club, and "motorcycles" appears twice.

And for some strange reason, there is not one occurrence of the word "singletrack" in the scoping record, either, and "single track" appears only once, in spite of the fact that for both motorcycleists and mountain biers, singletrack is the most prized type of trail.

Because this makes us suspicious that the scoping comments may have been "interpreted" we will briefly examine the published scoping comments that mention "Trails, OHV, and Recreation." We present this as additional evidence that both motorized users and nonmotorized users do recognize a specific type of one-track trail that is used only by motorcyclists. This is the record that staff will present to the Deciding Officer in the FEIS. Thus, for staff to truncate the

BLM_0012829

| | | | | |
|---|---|---|---|---|
| | | | results in such a way that an entire type of very popular and economically positive recreation (which has thousands of clubs, organized events, and is recognized worldwide), is concealed, is a serious issue for the public. | |
| Colorado 500 | 1032 | 20 | We are particularly concerned about Moab BLM's motorized recreation strategy, because there is not a single OHV management information source in the DEIS lsit of citations.<br>In light of the madate that the BLM use the "best avaialble information" for its analysis this is a serious omission.  It clearly appears as though MFO staff is not measuring their assumptions, strategies and predicted environmental consequences according to currently accepted resource management standards and research.<br>BLM has split the list of references from the body of the text, so the utility of every cite is impaired, and we don't have the time to indentify how many are actually needed to support this document.  The following samples are intended as evidence to support our requests.<br>Examples fo relevant research that is omitted (PLEASE SEE LETTER):<br>Examples of apparently irrelevant citations (PLEASE SEE LETTER):<br>We request seven changes:<br>1.  We want professional recreation management literature included and utilized in the guidance of the travel plan development and the designation of recreational routes.<br>2.  We want the citations to be joined with the relevant text, in order that the discussions and analysis in the DEIS be supported and guided by the existing research and guideleins and to enable the public to check them.<br>3.  We want motorized recreation managemetn to be | |

BLM_0012830

| | | | |
|---|---|---|---|
| | | | guided by the current nationally recognized OHV professions, using standard OHV management strategies.<br>4.  More specifically, we want the MFO to use standard recreation management protocols to formulate the Travel plan and Alternatives, and we want the Environmental Consequences re-analyzed where the proposed actions in the DEIS conflict with thet literature that has been developed by nationally recognized experts in OHV management.<br>5. In the absence of supporting literature and in the absence of the actual presence of impacts to any wildlife species, we want all restrictions on OHV (based on that species) removed from consideration. We want confirmation of the actual presence of the species, and not the "potential" for the species, to guide the designation of all OHV trails.<br>6.  We want the obvioius fact that the presence of any species cannot possibly precede the presence of motorized recreation prominently acknowledged (unless the species of concern as a life span of more than 30 years).<br>7.  We want the potential for all river recreation impacts on the natural resource analyzed, and restrictions proposed as needed to protect riparian resources. | |
| Colorado 500 | 1032 | 21 | We have four specific requests regarding the re-do of the analysis when BLM gives up pretending that these singletrack OHV trails do not exist:<br>1.  Please add all OHV singletrack submitted by the public, both individuals and organizations, and those individuals who personally assisted BLM in finding the OHV singletrack trails, to the DEIS inventory.<br>2.  Please provide peer-reviewed evidence that they represent or could somtime in the future represent an irretreivable loss, keeping front and foremost in the analsyis the fact that MFO staff has suggested those | |

BLM_0012831

| | | | | |
|---|---|---|---|---|
| | | | trails have grown over and/or staff could not find them. 3. In the event no such evidence is uncovered please revise the Affected Environment so that it is consistent with the new information, and consistent with staff statements about indiscernible trails  and/or the trails disappearing both on the ground and in aerial photos. 4. Please designate these singletrack trails as motorized OHV singletrack trails, after following the above steps, in the ROD. We realize that this will require reworking some of the SRMA's. We appreciate your work on this request. | |
| Colorado 500 | 1032 | 22 | Please refer to 3.11.2.5 User Conflict Displacement Quotation: "Another source of tension is among various recreation user groups.  When recreational use reaches a certain threshhold, user groups start to resent the multi-use nature of public lands.  For example, ...Poison Spider Trail - conflict between OHVs and mountain bikers"] end of quote Please provide a peer-reviewed analysis which support the implcation of "OHV" as the origin of 100% (one hundred percent) of the conflict cited above.  If there is none, please add in a prominent postion in the discussion on page 3-86 the following statement: "MFO has no data or peer-reviewed analysis supporting any of the above statements." The MFO staff analysis is omittting fromt his investigation the defining study in this field, "Conflicts on Mutiple-Use Trails." (Moore 1995).  It comprises a thorough synthesis of the literature in the sociological field that examines the exact type of conflicts the MFO staff is concerned about. In order to address the core issue that is identified as the source of almost every problem cited in 3.11.2.6, 3.11.2.7.1, the solution is to offer more opportunity, not less.  If is the frequency of the encounters, not the type, that elicit the greatest number of dis-satisfied visotr responses.   Adding well-designed trail mileage will attacke the problem at its | |

BLM_0012832

| | | | |
|---|---|---|---|
| | | | source.<br>If the MFO staff chooses to ignore the standard and most accessible research in the field, please provide the analysis and peer-reviewed literature that staff is relying upon that shows that reduing recration opportunities will resolve the above cited problems.  If there is none, please add the following in the Executive Summary and in the Environmental Consequences assumptions:  "There is no peer-reviewed research that sets forth the recreation mangemetn concept that a reduction of opportunity will resolve the user conflicts cited in this analysis."<br>Please cite the legal authority that mandates imposing criminal penalties upon any lawful activity in the total absence of any sociological, physical, or scientific evidence that such criminalization is a worthwhile and constructive management strategy.  If there is none, please add to the Executive Summary and in the Alternatives the following true statement:  BLM does not have any evidence to support the concept that criminalizing a lawful activity is a worthwhile and constructive management strategy. | |
| Colorado 500 | 1032 | 23 | Quote form Page 11-20 [To date, only half of the allotments have implemented the livestock adjustments identified in the 1985 Grand RMP through agreemetns with the livestock perator orby monitoring adjustments (Appendix D, page A-29). ...Table 11-2 idetifies issues by selected steams that are currently receiving restoration or focus.]  End Quote<br>Request to correct a significant omission:<br>Based on the above quotes:  ...grazing, a significantly surface distrubing and riparian disturbing activity, occupies 66 percent of the MFO landbase.<br>Off-Highway Vehicle use, and specifically motorcycle use, is permitted on existing roads and trails and in one open area, with intermittent off-road and cross country travel.  The MFO supplies no data on acreage | |

BLM_0012833

| | | | |
|---|---|---|---|
| | | | affected.  This is a significant omission, given that one of the primary concerns of the MFO staff is the perceived negative effects of motorcycle us upon soil and vegetation and the MFO staff inssitence upon including singletrack OHV effects on the soil and vegetation with the effects of grazing on the soil and vegetation.  This concern is so hysterical that MFO has apparently elected to eliminate 90% of the singletrack OHV opportunity in the planning area. However, before the government disrupts the social and economic structures of a community, government is supposed to use the "best available" information. That information is readily available, but it has been omitted form this analysis.  Therefore, we will provide the infroamtion in this comment with the express request that it be used in the EIS. ** (This figure is from the AMS, which has been taken off the website.  The removal of several key data components fo the AMS before is was re-used as the "Affected Environment" in this DEIS is the subject of another comment. |
| Colorado 500 | 1032 | 24 | Request to add field research that is absent from this analysis.  Riparian/ ephemeral/ dry washes In the study that examined erosion during weather events, in every sample over a 3-year program, the amount of soil loss into the live waterway from the trail was always below the EPA statndard for nonpoint pollution sources and with a single exception, the samples were far below the EPA standard.  In the one exception, one sample from a three year program approached the limit but did not exceed it. |
| Colorado 500 | 1032 | 25 | Request to rewrite inaccurate portions of the document ...we reqest that in this Planning document, references which place OHV activity in the same class of distrbance and impacts as grazing as well as other landscape scale impacts such as fire and flood, be removed.  We want all references to singletrack OHV |

BLM_0012834

| | | | | |
|---|---|---|---|---|
| | | | to be rewritten according to the actual surface impacts. The discussion above would suffice to enlighten any disinterested reader to the extent of the difference between these activiities and we request that the MFO staff use it verbatim. | |
| Colorado 500 | 1032 | 26 | Request to add information: We formally request that the following five steps be taken to correct this gross omission and resulting inaccuracy: a) the acreage of motocycle-disturbed soil be calculated and included in the data provided in this analysis; b) the discussion of the nature of the acreage (linear, and lightly used due to extensive mileage) be ncluded in the recreation/OHV section of the AMS; c) the two dedicated OHV-stream intersection field studies be included and utilized in the Affected Environment chapter, and the Environmental Consequences  revised so it is consistent with this new information; d) the acreage of cattle-distrubed soil be calculated and provided in this analysis; e) The level of angecy resources (by percentag) devoted to ensuring compliance with the agency's own agreements, policy, and regulation for grazing vs. motorcycle use, is provided in this analysis. With this information, the Deciding Officer will be able to compare the actual effects upon the natural resources of different activities, and by understanding the existing situation more accurately, select more appropriate actions for the Final Decision. | |
| Colorado 500 | 1032 | 27 | we have reviewed the citations in the "References" chapter and there is not a single one which provides professional field research to indicate or even imply that trail-based OHV recreation has any measurable negative effects.  In fact, we did not find one that even mentioned "OHV" at all.  In other words, it appear to be | |

BLM_0012835

| | | | | |
|---|---|---|---|---|
| | | | the case that there is no science informning the analysis supporting the road closures and OHV recreation curtailments proposed proposed in all of the action alternatives.<br>Our revisions:<br>1. We want all the roads and trails proposed for closure be designated open, along with the present proposals.  The reason is, this analysis has uncovered no evidence to implicate trail-based OHV recreation in any negative natural resource results.<br>2.  After the ROD is settled, if any road or trail may potentially cause resource damage we want independent field monitoring programs instituted, with public review. | |
| Colorado 500 | 1032 | 28 | We request that you remove "OHV" from any discussion that implies that OHV has the same impacts on the natural environment as landscape-scale events such as fires, floods, windstorms, drought, livestock grazing, and vegetation treatments. The reason is, this analysis has uncovered no evidence to support that OHV has effects on that scale.<br>Our point here is threefold (PLEASE SEE LETTER FOR SPECIFIC REFERENCES DISCUSSED):<br>A.  Trail based recreation is not present in any of these discussions (no surprise; the present acreage of MFO lands classified as erodible and accessed by OHV is absolutely minute, as previously noted).<br>B. According to this RMP, BLM has implemented none of the methods listed to determine what if any sediment loads are delivered to waterways from activities on BLM lands.<br>C.  At this time, if BLM is receiving reports of NPS pollution from BLM lands it is the height of irresponsibility for BLM to remain silent on the subject in this RMP, and even worse, to fail to institute any program based on the priorities and research in the | |

BLM_0012836

Utah Plan, to reduce the NPS problem.

Since we are quite sure that BLM would never intentionally conceal this information, we can safely assume that the grazing and mining and the present level of recreation management is adquately managed by MFO, and downstream problems have been successfully prevented.

And finally, the single cite provided in this RMP on the activity itself: Stokowski, P. A., and C. LaPointe. 2000. Environmental and Social Effects of ATVs and ORVs: An Annotated Bibliography and Research Assessment. School of Natural Resources, University of Vermont, Burlington.

Abstract: This report provides an annotated bibliography of published research related to the environmental ans social effects of ATVs on public and private lands. Citations were gathered in a literature review of published research reports and peer-reviewed scholarly writing, and from a review of internet sources. Key findings from the research are synthesized and evaluated, and suggestions for future research are provided.

The reference that MFO resource specialists accessed for their information on "ORV's and "ATV's" is a list of other research. Whether that other research is relevant to proposed MFO management actions is unknow. Whether any of the research listed provides monitoring results, or whether the research is peer-reviewed, or whether it is even research, or whether there is any original field research such as monitoring at specific sites to verify or refute hypotheses, is unknown, because the MFO specialists only used the list. According to the references cited in the RMP, no specialist retrieved and used any of the actual research itself.

So the answer to our original inquiry about the science that informs the Moab RMP and Travel Plan proposals

BLM_0012837

| | | | | |
|---|---|---|---|---|
| | | | is that, there does not appear to be any.  No monitoring; no orginal, peer-reviewed research; no sociological research.  This makes the relentless references to "resource damage caused by OHV" not credible. | |
| | 30 | 2 | Access to dispersed camping areas: Technically anyone driving off a designated route to access a dispersed camping area would be in violation of the proposed travel plan. Where this type of camping is permitted it may not be feasible to carry all the necessary camping gear to a camp spot. The plan should address this issue so that legitimate camp spots can be accessed on a legal route. The Fishlake National Forest has implemented a program to address this subject, which has been successful. | See response to comment 271-5. |
| | 30 | 3 | Page G11, 7.1 OHV Designation Criteria, 2. Wildlife: Does the reference to wildlife habitat include habitat for all species or is it intended to apply to habitat for more significant species or groups of species? This should be clarified. | See response to comment 271-13. |
| | 30 | 4 | Page G11, Public Safety: The term "extreme" should be further defined. What is an extreme hazard to one person may not be to another, depending on their riding/driving skills. In some cases these hazards add to the use experience. | See response to comment 120-94. |
| | 30 | 5 | Page G15, Emergency Limitation or Closure: Perhaps "immediately closed" should read, "immediately mitigated or closed" or some similar wording. Sometime mitigation can be immediately put in place and closure would not be necessary. | See response to comment 120-95. |
| | 30 | 6 | Page G29, Implementation Process: This section should stress the need for maps and signing. It takes both. Most users cannot use maps as a navigational tool, especially broad scale maps without sufficient detail to allow accurate location of designated routes. All designated routes should have a number or some other identifying symbol or name that corresponds to | See response to comment 120-96. |

BLM_0012838

| | | | the number, name or symbol on the map. These same identifiers should correspond to what is shown on route signage. With good signs and good maps, it is reasonable to expect users to stay on the designated routes. Until these aids are in place, law enforcement personnel and users will be equally frustrated. | |
|---|---|---|---|---|

## Vegetation

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| Arches National Park | 8 | 8 | The RMP states (page 2-50) that "Restoration and rehabilitation would use native seed-mixes wherever possible. Non-native species may be used as necessary for stabilization or to prevent invasion of noxious or invasive weed species." We would request that only native species be used near Arches and Canyonlands. | The desire for only native seed mixes to be used near the National Parks has been noted. |
| ECOS Consulting | 9 | 78 | Heightened Management for Invasions of Exotic and Noxious Species.<br>Exotic species management must be a top priority for the BLM in riparian areas within the Moab Planning Area. The Moab BLM offices states: "Exotic and noxious species (namely tamarisk, Russian olive, and Russian knapweed) are now common within most riparian/wetland ecosystems along major river ways, and involve all types [of] restoration methods. Possibly the most devastating aspect of invasive exotic species is the cumulative alteration to an unhealthy riparian ecosystem; however the individual functions or processes which exotic species can alter include:<br>*exotics often de-water riparian sites since they have deeper tap roots to out-compete natives for availability of water in acrid environments;<br>*tamarisk secrete slat and increase soil and water salinity, resulting in reduced seed establishment of | The BLM is aware of the impacts associated with noxious and exotic weeds. There is an active program in place for monitoring and control of these species. This program involves adminstrative actions and policies that do not require land use planning decisions. The direction for treating exotic and noxious species is found in the Vegetation Treatments Using Herbicides on BLM Lands in Seventeen Western States (2007) found in Appendix U of the DRMP/EIS. |

BLM_0012839

| | | | | |
|---|---|---|---|---|
| | | | native species, and reduced downstream water quality. This has severe economic impacts;<br>*exotics compete for sun, space in narrow available habitats;<br>*exotics reduce over bank flooding, decreasing establishment of nursery seed beds;<br>*exotics have large numbers of seeds and long seed establishment periods (very prolific in comparison ti native species);<br>*exotic communities have reduced bio diversity (significant decreases in numbers and types of associated biotic species including birds, bats, insects, amphibians ect );<br>*exotic communities promote entrenched systems with highly destructive flooding energies which remain un dissipated within deep channels, resulting in high bank loss, sedimentation, and salinity" (BLM 2005).The control of exotic species is most effective if the agents of introduction are eliminated or reduced. The two most important factors contributing to the introduction and spread of exotic weeds are livestock grazing and roads (including OHV routes). | |
| State of Utah - Public Lands Policy Coordination | 120 | 37 | It is stated on pg. 4-453 that interim and final reclamation will use native seeds.  The State believes there are situations and circumstances where non-native plants may be the only tool to mange non-native weeds. | On pg. 2-50 it is stated that "Restoration and rehabilitation would use native seed mixes wherever possible. Non-native species may be used as necessary for stabilization or to prevent invasion of noxious or invasive weed species."  The reference on pg. 4-453 has been changed to reflect this. |
| The Nature Conservancy | 204 | 8 | It would also be worthwhile to repeat the commitment to meet the Standards for Rangeland Health (as on Page 2-12) under Management Common to All Alternatives for Vegetation (Page 2-50), because uses other than grazing affect vegetation. | The BLM's commitment to meet the Standards for Rangeland Health are described under Livestock Grazing, but do apply to all uses. |

BLM_0012840

| Visual Resource Management | | | |
|---|---|---|---|
| Organization | Record ID & Comment Number | Comment Text | Response to Comment |
| Arches National Park | 8 | 7 | We would suggest that the visual impact analysis consider night lighting and effects on night sky. | Night lighting is a component of Visual Resource Management and would be considered on a case by case basis as projects are analyzed for impacts to visual resources.  Impact to night skies would be considered a cumulative impact within these site-specific analyses. |
| San Juan County | 121 | 27 | VRM Management appears to be the same for Alts C and D within San Juan County.  San Juan County would like Shafer Basin managed as VRM I, Mill Creek managed as VRM II and the rest of San Juan County managed the same as Alt. A.  BLM should adjust Alt. C. | Alts C and D are not identical within San Juan County, with 15,326 acres managed as VRM I, 65,273 acres of VRM II, 116,101 acres of VRM III, and 96,471 acres of VRM IV within the county in Alt C and 6,316 acres of VRM I, 42,887acres of VRM II, 147,496 acres of VRM III and 96,471 acres of VRM IV within the county in Alt D.  In Alt C, Shafer Basin is managed as VRM I, and the areas around Mill Creek are managed as VRM II.  The 1985 Grand RMP did not manage for VRM.  However, in 2002, a plan amendment was completed for the Canyon Rim Recreation Area, which is managed as VRM II and III.  All WSAs, including Behind the Rocks WSA within San Juan County, are managed as VRM I.  However, in Alt A, the remainder of San Juan County has no VRM management.  This is not an option for the revised RMP. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 37 | Over one half of the wilderness characteristics lands in the Moab plan have VRMs of Class III or IV which would allow activities that will degrade wilderness values, and the area's world famous scenic vistas.  Yet there is no rationale for the application of the Class III/IV designations.  See 4-154 et seq and 164. | Under Alt B in DRMP/EIS all non-WSA lands with wilderness characteristics (WC; 266,485 acres) are managed for their protection and are managed at a minimum of VRM Class II.  Under Alt C, 47,761 acres of these WC lands (266,485 acres) are managed specifically to protect these characteristics, and are managed as VRM II.  However, in Alt. C, an additional 108,459 acres of these WC lands would be managed as VRM II based largely on the underlying |

BLM_0012841

| | | | | visual resource inventory.  The remaining 110,275 acres are managed as VRM III and VRM IV in Alt C and are also based on the underlying visual resource inventory. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 116 | The BLM should ensure that scenic value is a resource that is conserved.<br><br>All lands proposed for wilderness or with wilderness characteristics should be managed as VRM Class I.<br><br>Lands within popular and easily accessible vantage points should be managed as VRM II.<br><br>ACECs should be managed as VRM I or VRM II.<br><br>All lands within America's Red Rock Wilderness Act should be managed as VRM I or VRM II. | The BLM has designated VRM management for the entire planning area within the DRMP/EIS.  The scenic values of the planning area are placed in appropriate management classes by alternative .<br><br>All Wilderness Study Areas are designated as VRM I.  Non-WSA lands to be managed to protect their wilderness characteristics are designated as VRM II, as are many popular scenic attractions.  Those ACECs that are proposed for  management in Alt  C are designated as either VRM I and II.<br><br>The BLM has no obligation to designate all lands within the Red Rock Wilderness Act as VRM I or II.  The BLM's VRM designations rely on the underlying VRM inventory. |
| Independent Petroleum Assoc. of Mountain States | 203 | 22 | Right of Way Exclusion Areas: Denying access to pipelines and roads would further restrict access to land for oil and gas development, beyond the proposed 43% reduction in leasing acreage mentioned in the DRMP/EIS. The DRMP/EIS does not fully analyze the impact to land access and how this restriction would make additional lands inaccessible. The DRMP/EIS does not contain sufficient information to enable operators to evaluate the effect of ROW exclusions on their current and potential operations. Maps of the exclusion areas should be included in the DRMP/EIS. | See response to comment 214-12.<br><br>In Appendix C of the DRMP/EIS, it states that areas closed to oil and gas leasing are right-of-wat exclusion areas.  In Alt C there are 370,250 acres closed to oil and gas leasing and are right-of-way exclusion areas.  Most of this acreage is WSAs and designated wilderness which preclude leasing and development by policy and regulation.  The WSAs are not subject to management decisions in the land use planning process. |
| Moab Area Climbers Association | 434 | 1 | The map for Option C shows a number of areas, most notably upper Kane Creek and Tusher Canyon/Mill Creek, as VRM-1. These areas are important to climbers. As such, we of course want them to be as beautiful as possible. Unfortunately, the VRM-1 status, being the highest level of visual resource management, could be construed in the future to curtail any activity, including climbing. If the VRM-1 status would mean | Kane Creek and the Tusher Canyon Mill Creek area are both designated as VRM II in the preferred alternative (Alt. C).  The Behind the Rocks WSA is VRM I. |

BLM_0012842

| | | | | |
|---|---|---|---|---|
| | | | changing the conditions that make climbing safe and enjoyable in those areas, then we are opposed to it. | |
| NOLS/ Outdoor Industry Association | 487 | 3 | According to Map 2-24-B, entitled Areas with Wilderness Characteristics – Alternative B, a piece of Gray Canyon beyond the Desolation Canyon WSA, across from Gunnison Butte along the Book Cliffs, retains the wilderness qualities. Likewise, areas with wilderness characteristics border much of the Green River along Labyrinth Canyon. Only in Alternative B do these wilderness-quality areas receive Visual Resource Management (VRM) Class I viewshed status, and even then it is only along the edge of the Labyrinth Canyon Rim. Everywhere else is Class II or Class III. In section 4.3.18 of the Moab DEIS, VRM Class II allows that, "Management activities may be seen, but should not attract the attention of the casual observer. Any changes to the landscape must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape" (p. 4-433). NOLS and OIA feel that VRM Class II inadequately protects the canyon viewshed.<br><br>VRM Class I "does not preclude very limited management activities," and specifies that, "the level of change to the characteristic landscape should be very low and should not attract attention" (p.4-432). Such a designation is more appropriate for a river viewshed with wilderness-quality characteristics. NOLS recommends that the Final RMP prescribe a VRM Class I viewshed for all areas along the Green River that have been shown to have wilderness characteristics in Alternative B in the Draft RMP, in both Gray and Labyrinth Canyons. | The Green river corridor is to be managed as no surface occupancy in the preferred alternative. This means that new surface disturbing activities would not be allowed. Given this oil and gas management, VRM II is deemed to be sufficient to protect visual resources along the Green River. |
| Moab Area Climbers Association | 962 | 1 | The map for option C shows a number of areas, most notably Upper Kane Creek and Tusher Canyon/ Mill Creek, as VRM-1. These areas are important to climbers. As such, we of course want them to be as beautiful as possible. Unfortunately, the VRM-1 status, | In Alt C, the only VRM I area outside the WSAs is the Shafer Basin. Neither Upper Kane Creek nor the Tusher Canyon area are to be managed as VRM I in the preferred alternative. |

BLM_0012843

| | | | | |
|---|---|---|---|---|
| | | | being the highest level of visual resource management, could be construed in the future to curtail any activity, including climbing. If the VRM-1 status would mean changing the conditions that make climbing safe and enjoyably in those area's, then we are opposed to it. | |
| National Parks Conservation Association | 970 | 6 | Night skies are an important resource at Arches and Canyonlands NP. This resource is affected by both air quality and light emitting sources.  The BLM has completely failed to address the impact that increased oil and gas development would have upon the pristine night skies within the parks.  This resource is a critical component of the visitor experience. | In the Preferred Alternative of the DRMP/EIS the viewshed from Arches is managed as VRM II.  The major viewshed from Canyonlands is Shafer Basin which is proposed as VRM I.  Night lighting can mitigated in a VRM II area and night lighting would be excluded in a VRM I area.  Impact to night skies would be considered a cumulative impact within these site-specific analyses. |
| Holiday Expeditions | 980 | 1 | I would like BLM to consider designating some buffer zones next to the quality lands that should exist along the borders of State and National Parks. These buffer zones would guard against the pollution of sight, smell, and noise that are going to exist on certain BLM lands. Also, BLM should provide buffer zones along the Green River and the undeveloped lands that are left next to the Colorado and Dolores Rivers in the Moab District. | The preferred alternative manages lands along the Green, Colorado and Dolores rivers as no surface occupancy for oil and gas development as well as all other surface disturbing activities.  A no surface occupancy stipulation has also been placed on BLM lands surrounding Dead Horse Point State Park. In addition, a VRM II designation has been placed along the border of Arches National Park. |
| | 1026 | 8 | PDF pg. 78 pg 1-8 Section 1.3.2.2 Issue 1 Related Recreational Issues- Last bullet- How will Visual Resources be Managed. What exactly does that mean I have read the VRM in Table 2 but am still confused as to what that means. | The BLM's goals and objectives for visual resources are to protect the quality of scenic values; manage them for multiple use, filming and recreational opportunities; and preserve those scenic vistas that are most important (See Table 2.1, page 2-51). The reader is directed to Section 3.19 for an overview of the visual resources of the area and how they are being impacted by current management practices; and to Section 4.3.18 for an overview of the BLM VRM management class system. The visual portion of Table 2.1 applies the classification system to BLM lands within a range of alternatives designed to meet the goals and objectives listed above. |
| | 1026 | 14 | PDF pg. 275 pg.3-77 3.11.1.2.9 Kane Creek Crossing. You say "Off Highway Vehicle play at camp is the major threat to senic values to the area" If you have ever been to this area you would know that most all of this area is not visible to someone traveling on the access road most | The scenic vista the commentor refers is experienced by all recreationists in the area.  Off road vehicle play is currently illegal in the Kane Creek Crossing Area.  It is not entirely confined to the riparian area and is not entirely invisible to those travelling on the Utah State |

BLM_0012844

| | | | of it is in a low lying area blocked by the trees and bushes adjacent to Kane Creek. Unless you can see through the trees riding in this area hass little if any affect on "Senic Value". | Scenic Backway (Kane Creek Road).  The commentor should remember that visual resources are not the only values in the Kane Creek area.  Riparian values are also affected by cross country travel.  In addition, the trees are not foliated all year long, and cross country OHV riders can be seen, even in the riparian areas, during some parts of the year.

The BLM has been directed to designate open OHV areas only where other resources are not at risk.  There are many other resources in the Kane Creek Crossing area, including visuals and riparian. |

<table>
<tr><td colspan="4" align="center"><strong>Water</strong></td></tr>
<tr><td><strong>Organization</strong></td><td><strong>Record ID & Comment Number</strong></td><td align="center"><strong>Comment Text</strong></td><td align="center"><strong>Response to Comment</strong></td></tr>
<tr><td>ECOS Consulting</td><td>9   17</td><td>The BLM mentions in this document that it is monitoring aquatic macroinvertebrates at various sites throughout the Moab Planning Area.  What are the results of this monitoring program?  This information can be extremely valuable in determining the condition of a water body or system, and must also be summarized and presented in this document.</td><td>The BLM could not find any reference to aquatic macroinvertebrate monitoring anywhere in the DRMP/EIS.  Any data that the BLM may have would be used to analyze impacts for site specific proposals.</td></tr>
<tr><td>ECOS Consulting</td><td>9   18</td><td>The monitoring, analysis of data, and active protection of water quality and quantity in this desert environment must be a top priority in this Moab RMP/EIS. The results of past monitoring must be presented in order for the public to determine if these areas are being properly managed, and if not, what mitigation needs to be done to improve condidtions.</td><td>On pg. 3-121 of the DRMP/EIS it states that the BLM participates in a cooperative program with the Utah Department of Environmental Quality to sample sites for water chemistry.  Through this cooperation streams that do not meet water quality standards are placed on the list of impaired waters of Utah.  For the Moab planning area the streams are Onion Creek, Mill Creek, Castle Creek, and Kens Lake.  The BLM is actively engaged with site specific measures to improve these water bodies ultimately hoping to remove them from the impaired list. Alt C of the DRMP/EIS provides measures to protect these streams.</td></tr>
</table>

| ECOS Consulting | 9 | 19 | The BLM must develop Water Management Plans (WMPs) for each watershed as soon as possible in order to properly manage all the resources of a watershed, and in particular, to prevent, to protect vital and sensitive components such as riparian areas, perennial streams, seeps, and springs. | There is no policy, guidance, or legal requirement for the BLM to prepare watershed management plans. The BLM land use planning manual (H-1601-1) does not specify for management of BLM lands on a watershed basis.<br><br>On pg. 2-3 of the DRMP/EIS it states for all action alternatives that the BLM would develop watershed management plans for municipal watersheds to ensure water sources are protected adequately. These implementation plans would be prepared upon completion of the land use plan.<br><br>It also states on pg. 2-3 for all action alternatives to allow no surface occupancy and preclude surface disturbing activities within 100-year floodplains, within 100 meters of a natural spring, or within public water reserves. |
| --- | --- | --- | --- | --- |
| ECOS Consulting | 9 | 33 | 4.3.11.8 Impacts of Soils and Water Resources. Page 4-247, last Paragraph, 4.3.11.8: What is the Definition of the "100-year floodplain". The Moab DRMP fails to define this term, although it is used numerous times. As mentionted above, the 100-year floodplain can be extremely difficult to define when considering the amounts of impacts from livestock overgrazing and other disturbances over the past 130 years. Oftentimes, in this environment, the historic floodplain has been left "high and dry" from arroyo cutting, channelization, and erosion due to over grazing, mining and off-road vehicle impacts. Under the pressure of these impacts, the former floodplain can be transformed over the years into an upland vegetation community that barely resembles a floodplain. Of particular concern are areas adjacent to the "100-year floodplain" and the riparian areas. These areas should have a buffer zone that protects them and the adjacent floodplain from surface disturbing activities.<br><br>It is highly recommended that a buffer zone of 1500 | Maps of the 100-year floodplain are not available across BLM lands. An evaluation of proposed projects within the 100-year floodplain would be conducted for site specifc projects.<br><br>See response to comment 9-2. |

BLM_0012846

| | | | | |
|---|---|---|---|---|
| | | | meters from the riparian area and floodplain be established in order to greatly reduce the possibility of negative impacts stretching into the floodplain and riparian areas. | |
| ECOS Consulting | 9 | 34 | Page 4-248, 1st Paragraph, 4.3.11.8: The development of "Watershed Management Plans (WPM's)" must be a top priority for the BLM. These documents are the first step in effective management of these areas.  Impact issues can be best managed if analyzed from a watershed (big picture) perspective. It is unfortunate that none of these plans have been developed to date because proper management is much more difficult without them, and BLM's planning and implementation decisions area become based on inadequate data. When will WPM's be developed? Who will develop them? The DRMP must include a timline commitment to complete these, otherwise the promises in the RMP are hollow.  It is recommended that a cooperative effort amongst state, federal, and private organizations be organized. The development of these plans must become a top priority of this RMP in order for the BLM to effectively manage these natural resources for the next 10-20 years. | See response to comment 9-19. |
| ECOS Consulting | 9 | 35 | Page 4-248, 2nd- 5th Paragraphs: There is no mention of how many actual watersheds there are in the planning area.  How many are there? Have they been prioritized according to condition? What percentage of watersheds are 17 watersheds as proosed in Alternative B, or 8 watersheds proposed in Alternative C? It is stongly recomened that WMP's are vitally necessary in order to properly manage an area into the next 10-20 years. It is extremely important that the development of WMP's for every watershed be given the highest priority. | Table 3.22 on pg. 3-90 of the DRMP/EIS lists the watersheds and associated streams.  The Analysis of the Management Situation contains a map of the major watersheds (Figure 14-1).  This document is available to the public on the Moab RMP website.<br><br>See response to comment 9-19. |
| ECOS Consulting | 9 | 47 | What are the results of water quality monitoring the BLM has been doing for many years now in the Moab Planning Area?  What are the trends for the particular | See response to comment 9-18.<br><br>Other than the list of water bodies not meeting state water |

BLM_0012847

| | | | | |
|---|---|---|---|---|
| | | | areas? Is there a "Water Quality Report" with an analysis of the data and a full explanation of where, when, and what the BLM has been monitoring?  Is there an explanation of the results and how the relate to conditions on the ground, and to health standards set by the State of Utah Federal Government? Are there recommendations for improving the water quality? Does an area have to become seriously degraded or qualify for the Clean Water Act 303(d) list before any water quality mitigation is sanctioned by the BLM? Are there any areas within the Moab Planning Area where mitigation measures to improve water quality have been taken before listing on the 303 (d) list? Is the raw data all the BLM is willing or able to supply? The BLM must include summary water quality monitoring information on all water systems that it monitors within the Moab RMP Planning Area, and release a report of past monitoring results and water quality trends. Has there been any monitoring of aquatic macro-invertebrates as stipulated in the BLMs own standards? What is the methodology? Where are macro-invertebrates monitored? How often and when are they monitored? If so, is there a report with data and analyses of macro-invertebrate communities and how they relate to degraded waters? These results should be included in this Moab RMP so that citizens can determine the effects of livestock and other uses on our public lands. We request that the BLM include summary of aquatic macro-invertebrate monitoring information in this RMP, and release a report of past monitoring. | quality standards (303(d) list), water quality was not an issue raised to be resolved by the land use planning process.  Water monitoring data will be utilized for site specific projects and this data is available to the public upon request.<br><br><br><br>Water quality monitoring data will be utilzed for site specific projects. |
| ECOS Consulting | 9 | 52 | The Clean Water Act (CWA) is the cornerstone of surface water quality protection in the United States. The statute employs a variety of regulatory and non-regulatory tools to sharply reduce direct pollutant discharges into waterways, finance municipal wastewater treatment facilities, and manage polluted runoff.  These tools are employed to achieve the | The BLM is obligated to comply with the Clean Water Act, the Endangered Species Act, and Executive Order 11988.<br><br>See response to comment 9-2.<br><br>The types of impacts discussed by the commentor are site specific and the impacts can only be analyzed at the |

BLM_0012848

| | | | | |
|---|---|---|---|---|
| | | | broader goal of restoring and maintain the chemical, physical, and biological integrity of the nation's waters so that they can support "the protection and propagation of fish, shellfish, and wildlife and recreation in and on the water." Under the water shed approach of the CWA, equal emphasis is placed on protecting healthy waters and restoring impaired ones.  The direct, indirect and cumulative impacts of a number of activities in and adjacent to flood plains would be in direct opposition to the Clean Water Act.  Thus it is recommended that all surface disturbing or destructive activities, in particular mining, oil and gas development, OHV use, and livestock grazing be kept at least 1500 meters from the edge of streams, riparian areas and flood plains.<br><br>We request that the BLM list and describe the known impacts of mining, oil and gas development, OHV use, and livestock grazing and to re-evaluate them in light of the mandates of Executive Order 11988, the Endangered Species Act, and the Clean Water Act. The BLM should also consider the cumulative effects of past management of these activities on riparian ares, flood plains, streams, water quality, and uplands. | implementation level. |
| ECOS Consulting | 9 | 73 | Protect and Restore Specific Perennial and Intermittent Streams.<br>The following perennial streams should have the highest priority for protection and management of riparian and wetland resources in this Moab RMP. These areas should also have the highest priority for habitat preservation, conditions assessment, trend monitoring, and habitat enhancement:<br>1) Beaver Creek<br>2) Burkholder<br>3) Castle Creek<br>4) Coates Creek<br>5) Colorado River | The streams referred to by the commentor are proposed for management in the alternatives for the DRMP/EIS based on Utah Riparian Management Policy (Utah State Instruction Memorandum No. UT 2005-091). |

BLM_0012849

| | | |
|---|---|---|
| | | 6) Cottonwood (Books)<br>7) Cottonwood (Black R.)<br>8) Cowskin Canyon<br>9) Coyote Creek<br>10) Diamond Creek<br>11) Dolores Creek<br>12) Fisher Creek<br>13) Floy Creek<br>14) Granite Creek<br>15) Green River<br>16) Hatch Wash<br>17) Hatch Ranch Wash<br>18) Hell Roaring<br>19) Hunter Creek<br>20) Kane Creek<br>21) La Sal Creek<br>22) Little Dolores<br>23) Little Water<br>24) Mill Creek<br>25) Mill Canyon (West of Arches NP)<br>26) Muleshoe Creek<br>27) Nash Wash<br>28) Negro Bill Creek<br>29) Onion Creek<br>30) Pack Creek<br>31) Poverty Creek<br>32) Professor Creek<br>33) Rattlesnake Creek<br>34) Rill Creek<br>35) Ryan Creek<br>36) Salt Wash<br>37) Seven Mile (north)<br>38) Spring Creek<br>39) Ten Mile<br>40) Thompson Wash<br>41) Three Mile Wash<br>42) Trough Spring Creek | |

845

| | | | | |
|---|---|---|---|---|
| | | | 43) Tusher (Books)<br>44) Westwater Creek<br>45) White Wash<br><br>Any areas with perennial or intermittent water, such as those listed above, must be managed for preservation because of their overall importance to humans, wildlife, fish, and sensitive and listed species. | |
| State of Utah - Public Lands Policy Coordination | 120 | 18 | No mention is made of water rights.  The State Engineer recommends that the BLM consider the impact its actions may have on water rights in general and non-BLM water rights in particular. | On pg. 1-13 of the Moab DRMP/EIS under Planning Criteria, it is noted 1) the planning process recognizes the existence of valid existing rights, and 2) the BLM would adhere to all applicable laws (including State water laws).  The text was clarified to ensure that valid water rights are recognized as valid existing rights.On page 1-13 of the DRMP/EIS under Planning Criteria, the BLM states 1) the planning process would recognize the existence of valid existing rights, and 2) the BLM would adhere to all applicable laws (including state and local laws).  The text has been edited to ensure that water rights are recognized as valid existing rights.<br><br>See response to comment 120-4. |
| State of Utah - Public Lands Policy Coordination | 120 | 109 | Under the Mill Creek Canyon Potential ACEC, Alternatives B and C propose to "maintain 3 cfs in the South Fork of Mill Creek below the Shelly diversion" (pg. 2-37).  Please explain whether BLM possess a water right applicable to this area, how BLM would maintain this level of flow at the Shelly diversion, how it would prevent appropriation of instream flows below this point, and who would hold instream flow rights. | The BLM does not have instream flow rights on Mill Creek.  The BLM would maintain 3 cfs through a stipulation in the right-of-way grant to the Grand County Water Conservancy District.  The BLM does not control appropriation of water rights.  Water rights are appropriated by the State of Utah.  In Utah, the only agencies that can hold instream flow rights are the UDWR and the Utah State Parks. |
| State of Utah - Public Lands Policy Coordination | 120 | 110 | The enhancement of riparian and wetland areas will increase the depletion of water within the Moab FO.  The State requests the BLM modify its goal to require mitigation of any increased water depletion that may result from its activities.  Such mitigation may require the acquisition and change of a valid existing water | Restoration of riparian vegetation will not result in water depletion.  In fact, this activity should increase the amount of available water.  Enhancing riparian vegetation results in a decrease in stream temperature, a decrease in evaporation, and the storage of water in the bank for low flow seasons (summer).  In addition, the replacement of |

BLM_0012851

| | | | | |
|---|---|---|---|---|
| | | | right.  As part of a mitigation effort, it is suggested the BLM consider the institution of a program to eradicate tamarisk and other highly water consumptive, non-native species and their replacement with native species.  Water required for any enhancement effort will need to be obtained in accordance with State law. | tamarisk and Russian olive by native vegetation  results in reduced water use and  higher stream flow.  If any additional water should become necessary, the BLM will obtain this water in accordance with Utah State law.

On pg. 2-50 under Management Common to All for Vegetation, it states "Reduce tamarisk and Russian olive where appropriate using allowable vegetation treatments.  Restore riparian habitat to native willow and cottonwood communities". |
| State of Utah - Public Lands Policy Coordination | 120 | 111 | The UDWQ suggests the following practices identified in the TMDL that would reduce Mill Creek water temperatures to bring conditions into compliance with standards for Class 3A waters.  These practices include: 1) provide higher stream flows during summer by maintaining 3 cfs flow below the Ken's Lake diversion, 2) increase water depth by narrowing the stream channel with restoration techniques involving use of heavy equipment, and 3) plant and protect riparian vegetation to increase shading a minimum of 11 percent to attain water quality standard. | The Draft RMP/EIS on pg. 2-31 states under Management Common to All Alternatives for Soils and Watershed:  "Coordinate with Grand Water and Sewer Service Agency to ensure required minimum instream flow of 3.0 cfs in Mill Creek below the Sheley diversion".  Through ongoing restoration and management actions stream channel dimensions are improving without the use of heavy equipment.  The use of heavy equipment is not appropriate due inaccessibility, the size of the stream system, and other sensitive resources.  On pg. 2-50 under Management Common to All for Vegetation, the Draft RMP/EIS states "Reduce tamarisk and Russian olive where appropriate using allowable vegetation treatments.  Restore riparian habitat to native willow and cottonwood communities".  Mill Creek has been and will continue to be a high priority for such restoration efforts due to its TMDL status. |
| State of Utah - Public Lands Policy Coordination | 120 | 112 | Onion Creek is impaired for temperature.  To attain a temperature reduction in Onion Creek, the TMDL recommends restricted access to the stream channel by off road vehicles and riparian restoration to facilitate canopy cover.  To restore the beneficial use in the creek, a more protective alternative than those described by the BLM/Moab RMP may be required. | Under all alternatives, travel within the Onion Creek stream corridor is restricted to the "B" road.  Riparian restoration in this area has been ongoing; as a TMDL, Onion Creek is a priority for restoration efforts.  In addition, the BLM has worked with the Grand County Road Department to improve the stability of the "B" road, thus improving riparian and water quality conditions in Onion Creek. |
| State of Utah - Public Lands | 120 | 113 | Ken's Lake should be protected for cold water species of game fish and other cold water aquatic life.  It is | The Ken's Lake TMDL concludes that stream temperatures are appropriate for the beneficial uses.  The |

BLM_0012852

| | | | | |
|---|---|---|---|---|
| Policy Coordination | | | impaired for temperature.  The protection of riparian vegetation may improve conditions around the lake. | impairments are due to natural conditions and not management actions. Ongoing recreation management efforts for Ken's Lake have involved promoting native vegetation. |
| State of Utah - Public Lands Policy Coordination | 120 | 114 | Best Management Practices should be included in the plan for impaired water bodies. | The BLM is adopting the State's TMDL recommendations for impaired waterbodies.  These constitute the best management practices for those streams. |
| State of Utah - Public Lands Policy Coordination | 120 | 115 | Monitoring should be defined for the plan, including water quality and biological parameters.  Monitoring of recreation events should also be conducted to help provide data of the impacts. | The Federal regulations at 43 CFR 1610.4-9 require that land use plans establish intervals and standards and evaluations based on the sensitivity of the resource decisions involved.  The Record of Decision (ROD) for the RMP will commit to a monitoring plan the specifics of which will be developed subsequent to the signing of the ROD. |
| San Juan County | 121 | 4 | San Juan County feels more emphasis should be placed on sustaining and developing healthy watersheds. The functionality of watersheds underlies all resources values.  The best way to improve the functionality of watersheds is by increasing the ground cover.  Well managed grazing is one of the best, most economical, large scale tools for increasing ground cover. | The BLM actively supports efforts to improve watersheds. The BLM is a partner in the Healthy Lands Initiative for Utah.  The RMP, under all action alternatives, specifies that restoration efforts be undertaken in cooperation with the Utah Partners for Conservation and Development (pg. 2-50).  The RMP, under all alternatives, also specifies that grazing would be managed according to the Guidelines for Livestock Grazing Management to meet the Standards for Rangeland Health.  Implementation of these standards would improve watershed health and functioning. |
| San Juan County | 121 | 23 | Alternatives B and C propose to "maintain 3 cfs in the South Fork of Mill Creek below the Shelly diversion" (pg. 2-37).  Please explain whether BLM possess a water right applicable to this area, how BLM would maintain this level of flow at the Shelly diversion, how it would prevent appropriation of instream flows below this point, and who would hold instream flow rights. | See response to comment 120-109. |
| EnCana Oil and Gas (USA) Inc. | 215 | 7 | Section 3.14.3.2.2 Salinity (p. 3-112)  The second paragraph of this section states that the release of saline groundwater during drilling activities is a point source for salinity.  This statement is inaccurate | The reference to the release of saline groundwater during drilling has been deleted from the text of the PRMP/FEIS. |

BLM_0012853

| | | | | |
|---|---|---|---|---|
| | | | because groundwater is not released during drilling activities in natural gas drilling operations | |
| Environmental Protection Agency | 479 | 22 | More site-specific information is needed (e.g., on pg. 4-294) in the Final RMP/EIS on how water quality is being threatened and impacted from contaminant sources. These sources include intrusion of saline groundwater, erosion of saline soils, invasive plants, introducing salts into riparian streams, metals and other chemical contaminants leaching from abandoned mines, temperature and restricted flows from return irrigation, erosion from fire-impacted areas, sedimentation from grazing and impacts from OHV travel and dispersed camping.  Of special concern are the Kane Creek Crossing, Bartlett/Tusher/Ten Mile areas and Mill Creek. | Land use planning level decisions involve broad resource allocations and qualitative analysis is often all that is available.  Further site specific analysis on the impacts to the resources specified by the commentor will be conducted on the project level.  The DRMP/EIS on pg. 1-14 recognizes that the BLM must comply with the Clean Air Act, the Clean Water Act, and many other nondiscretionary laws.  This would include conformance with State and local laws. |
| | 826 | 2 | In the time available for review of the document, I did not find a discussion of air or water pollution in the alternative discussion. I submit that these will be a problem that should be addressed in considering more intense alternatives, such as C and D. | Impacts to air quality and soils and watersheds are discussed in detail in the DRMP/DEIS in Sections 4.3.1 and 4.3.13, respectively. |
| Western Watersheds Project | 1025 | 3 | BLM, in relying on the State of Utah to list streams in its TMDL process, is abrogating its responsibility to manage so that water quality standards are met. | The Environmental Protection Agency has delegated the responsibilty under the Clean Water Act to the State of Utah.  The BLM manages the public lands so as not to exceed the State of Utah water quality standards.  The State identifies waters that are not meeting water quality standards. |
| Western Watersheds Project | 1025 | 4 | By grazing livestock on the sensitive and erodible soils found in the RA, BLM is impairing watershed function, creating salinity problems in the Colorado River, which is in opposition to the Colorado River Salinity Control Act.  This also results in the impairment of habitat for sensitive, threatened and endangered fish.  It is BLM's obligation to research and provide citations and a summary of this research that clearly documents the role of livestock grazing within upland and riparian ecosystems in altering watershed function as well as water quality , and delineate what particular practices | The land use planning process is utilized to identify lands that are available not availble for livestock grazing.

The impacts of livestock grazing on the resources mentioned by the commentor are addressed not at the land use planning level but rather when the grazing permit is renewed.  Standards for Rangeland Health and Guidelines for Grazing Management are utilized to protect these resources on a case by case allotment basis.

Site specific impacts resulting from livestock grazing are |

BLM_0012854

| | | will be followed to protect water quality, including effectiveness monitoring. | addressed on a site specific allotment basis for soils, riparian areas, impairment of habitat, and threatened and endangered species.<br><br>See response to comment 9-3. |
|---|---|---|---|
| 3 | 3 | We strongly oppose the provision of the Draft Plan that requires fences around the cottonwood trees and "water sources" is really impractical and unnecessary. | See response to comments 208-3 and 479-6. |

| Wilderness Characteristics | | | |
|---|---|---|---|
| Organization | Record ID & Comment Number | Comment Text | Response to Comment |
| State of Utah - Public Lands Policy Coordination | 120 | 8 | The State asks BLM to provide a detailed explanation of the rationale and authority for management of lands solely because of wilderness characteristics, and why such management does not circumvent the provisions of the statutorily required wilderness review process. | The BLM's authority for managing lands to protect or enhance wilderness characteristics comes directly from FLPMA Section 202 (43 U.S.C. §1712).  This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield.  Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences."  (FLPMA, Section 202©(2) (43 U.S.C. §1712©(2)).)  Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ."  (FLPMA, section 103© (43 U.S.C. §1702©).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations. |

BLM_0012855

| | | | | In addition, the BLM's Land Use Planning Handbook (H-1601-1) directs BLM to "identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation). Include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives. For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics." |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 9 | The BLM should give strong consideration to recommendations submitted by local government and not manage lands to protect wilderness character where such management would, in the opinion of local governments, be contrary to the interests of local residents. | Sections 103, 201, and 202 of FLPMA direct the BLM to take into account the national interest, as well as the local interest. In accordance with FLPMA and BLM rules, regulations, and policies, the BLM must provide for the balanced management of all resources and resource uses on public lands.<br><br>The BLM gave strong consideration to the concerns of local governments throughout the planning process. In particular, Grand and San Juan Counties are cooperating agencies and have been active cooperators, including during the development of alternatives where Non-WSA areas with wilderness characteristics were considered.<br><br>See also response to comment 121-70. |
| State of Utah - Public Lands Policy Coordination | 120 | 51 | The BLM should clarify the criteria utilized to determine which areas with wilderness characteristics (WC) were included in the preferred alternative. | Four alternatives for managing public lands, including lands with wilderness characteristics, are present in the Draft RMP/EIS. The range of alternatives considered issues and concerns raised during the scoping period, planning criteria, and the guidance applicable to resource uses. The alternatives constitute a range of management actions that set forth different priorities and measures to emphasize certain uses or resource values over other uses or resource values under the multiple use and sustained yield mandate of FLPMA to achieve certain goals and objectives. The preferred alternative, Alternative C was crafted by an interdisciplinary team and |

BLM_0012856

| | | | | |
|---|---|---|---|---|
| | | | | cooperating agencies to provide a balance between commodity production and resource uses while providing protection to a wide spectrum of resource values.  These resource values include those associated with wilderness characteristics, ACECs, Wild and Scenic Rivers, sensitive soils, watersheds, visual resources, wildlife values, and floodplain/riparian areas. |
| State of Utah - Public Lands Policy Coordination | 120 | 52 | The BLM needs to consider the new information on roads (2007) to reevaluate the findings of the 1999/2003 wildereness inventory. | The 2003 Revision Document for the Moab Field Office made adjustments to Wilderness Inventory Areas based on county road data, none of which differs from the current county inventory. BLM stands by its 1999/2003 data. |
| State of Utah - Public Lands Policy Coordination | 120 | 53 | The BLM inconsistently applied road data between the 1999 inventory and the 2007 WC review. | The BLM did not inconsistently apply the road data, but used the policies and procedures applicable at the time of review.  The Wilderness Study Area Interim Management Policy (IMP, H-8550-1; BLM 1995).  The "IMP" or "WSA Handbook") was used during the inventory process conducted prior to 2004.  The WSA IMP emphasized the difference between "roads" and "ways".  Under that policy, the presence of a "road" was considered to negatively affect the wilderness characteristics of an inventory unit, therefore, the road and affected area needed to be excluded.  The presence of a "way" however, was not considered, in and of itself, to have a sufficient negative affect on naturalness of an area to disqualify all or part of an inventory unit.<br><br>In 2004, the BLM settled the ongoing litigation with the State of Utah (Utah v. Norton Settlement Agreement).  It was acknowledged that the BLM may continue to inventory public lands for resources or other values, including wilderness characteristics, as a part of managing the public lands and land use planning.  Inventories conducted post-2004 applied current policy, which is based on Washington Office Instruction Memorandum 2003-275, Change 1, which emphasizes naturalness and does not distinguish "roads" from "ways". |

BLM_0012857

| | | | | The BLM has evaluated wilderness characteristics since 2004 on the basis of affects to the naturalness of an area, which could either be from roads or ways. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 54 | On page 4-157, the DEIS states that under Alt B, all 266,485 acres of non-WSA lands with wilderness characteristics would be managed as VRM class II. Table 4.55 indicates some WC lands that would be managed as VRM class I, please clarify. | The VRM I acreage within WC areas in Alt B results from other decisions made under Alt B. For example, Beaver Creek, Fisher Towers, Mary Jane Canyon, and Mill Creek Canyon contain rivers found suitable as "wild" for Wild and Scenic River status. Wild Rivers are managed as VRM I. Portions of the other areas are managed as scenic ACECs under Alt B resulting in VRM I management in that alternative. WC management alone does not result in VRM I management under any alternative. |
| State of Utah - Public Lands Policy Coordination | 120 | 55 | On pages 4-158 and 159, the DEIS states that under Alternative B, new water development facilities for wildlife would likely be precluded within non-WSA lands with wilderness characteristics. Please discuss the extent to which Alt C would preclude development of water facilities. | New water developments would be precluded under Alt B since non-WSA lands with wilderness characteristics (WC) are closed to surface disturbing activities. However, in Alt C WC lands are managed as No Surface Occupancy which provides an exception if the use is consistent and compatible with protection or enhancement of the resource values (see Appendix C). Under Alt C, a new wildlife water development could potentially be considered an enhancement of the natural values based on future NEPA analysis for such a proposal. |
| State of Utah - Public Lands Policy Coordination | 120 | 56 | Many of the WC areas were divided into sub-units based on "substantially noticeable routes". Is this division appropriate? | In Appendix P (pg. P-2), the BLM discusses the size criteria for areas with WC. The size criterion of 5,000 acres was applied only to stand alone units. Units contiguous with other Federal lands with WC were evaluated for naturalness alone. |
| State of Utah - Public Lands Policy Coordination | 120 | 57 | Portions of Arches Adjacent WC subunits 4-6 are not identified on the map. The text discussing unit five identifies wilderness characteristics for 625 acres, but the map does not show contiguity with the Park. | Placement of the labels on the WC supplemental maps have been refined for clarity. |
| State of Utah - Public Lands Policy Coordination | 120 | 58 | The text for the Diamond Canyon WC indicates that unit six does not meet wilderness characteristic requirements but the map appears to indicate otherwise. | The WC supplemental map for the Diamond Canyon WC shows a small portion of unit 6 as possessing WC. This is a mapping error which has been corrected; the text is correct. |

BLM_0012858

| State of Utah - Public Lands Policy Coordination | 120 | 59 | The map for the Goldbar WC show two exclusions from the analysis area (blue circles) that are not discussed in the text. What are these areas? Area six is discussed in the text but not identified on the map. | These exclusions are "doughnuts" in the data provided by the proponent and are meant to be exclusions due to impacts on naturalness. Unit six is shown on the map but the label has been improved. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 60 | Portions of the Labyrinth Canyon and Lost Spring WC area determined to possess wilderness characteristics in the 1999-2003 review appear to have high route density. Please explain why these routes do not compromise either naturalness or the outstanding opportunities for solitude or a primitive and unconfined type of recreation. | Refer to response to comments for 120-52 & 53 for an explanation of roads vs. ways and the withdrawal of the Wilderness Handbook. The 2003 Revision Document removed from the original Wilderness Inventory Area those portions with "way" density so high as to preclude such opportunities. The routes in the remaining Wilderness Inventory Area are sufficiently unnoticeable and unused that their inclusion does not substantially detract from the wilderness characteristics. |
| State of Utah - Public Lands Policy Coordination | 120 | 61 | Area four of the Labyrinth Canyon WC is mapped as having WC but the text is contradictory. | The label for Area 4 has been repositioned to be more clear. |
| State of Utah - Public Lands Policy Coordination | 120 | 62 | The Mary Jane Canyon WC area appears to have high route density. Please explain why these routes do not compromise either naturalness of the outstanding opportunities for solitued or a primitive and unconfined type of recreation. | See response to comments G-120-52,53, & 60 on route density. Most of the routes depicted in the Mary Jane Canyon area are substantially unnoticeable oil and gas seismic lines which are not being designated for travel under any of the Action Alternatives (B, C, & D). Alt C removes from WC management virtually all of the lands in the Mary Jane Canyon WC area in which these routes are located. |
| State of Utah - Public Lands Policy Coordination | 120 | 63 | The text and map for the Mill Creek WC area conclude that the analysis area lacks wilderness characteristics, but the wilderness characteristics review form shows that "some or all of the area has wilderness characteristics as shown on the attached map". | The 1999/2003 review found 3,388 acres of the Mill Creek WC area to possess wildlerness characteristics. Subsequent review in 2007 found no additional areas to possess WC. The supplemental WC files on the BLM website state this in the text and on the map. |
| San Juan County | 121 | 10 | Managing Non-WSA Lands for so-called wilderness chracteristics violates FLPMA, Utah Code 63-38d-401(6)(b), the San Juan County master plan, the Norton-Leavitt Agreement and other agreements. | The BLM's authority for managing lands to protect or enhance wilderness characteristics is derived directly from FLPMA Section 202 (43 U.S.C. §1712).

This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield. Nothing in this section |

BLM_0012859

constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences." (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2))) Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land, and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c))) The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.

The BLM has long acknowledged that FLPMA Section 603 (43 U.S.C. §1782) requiring a one-time wilderness review has expired. All current inventory of public lands is authorized by FLPMA Section 201 (43 U.S.C. §1711). In September 2006, the Utah District Court affirmed that the BLM retained authority to protect lands it determined to have wilderness characteristics in a manner substantially similar to the manner in which such lands are protected as WSAs.

The BLM is aware that there are specific State laws relevant to aspects of public land management that are discrete from, and independent of, Federal law. However, BLM is bound by Federal law. As a consequence, there may be inconsistencies that cannot be reconciled. The FLPMA requires that BLM's land use plans be consistent with State and local plans "to the extent practical" where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved. The BLM will identify these conflicts in the FEIS/PRMP so that the

BLM_0012860

| | | | | State and local governments have a complete understanding of the impacts of the PRMP on State and local management options.<br><br>Finally, the Utah v. Norton Settlement Agreement does not affect BLM's authority to manage public lands. This Agreement merely remedied confusion by distinguishing between wilderness study areas established under FLPMA §603 and those lands required to be managed under §603's non-impairment standard, and other lands that fall within the discretionary FLMPA §202 land management process. |
|---|---|---|---|---|
| San Juan County | 121 | 18 | BLM should not manage lands for wilderness characteristics, taking into account the Utah v. Norton settlement, the opinions of local governments and residents, the existence of inholdings and valid existing rights, and the existence of SITLA lands. BLM has ignored county travel route and intrusion information in the 1999 wilderness inventory. BLM should clarify the difference between "natural", "largely natural", and "generally natural", and define "allotment files" and "master title plat data". | Refer to response to comment 121-10. No non-WSA lands with wilderness characteristics are proposed for management in Alt C for San Juan County. County travel route information was utilized in the Travel Plan and in the selection of non-WSA lands for the preferred alternative. For impacts to SITLA lands refer to response to comments 120-101 and 120-103. The terms specified for clarification are taken from the 1999 Wilderness Inventory and can not be changed at this time. |
| San Juan County | 121 | 58 | For lands in question in the wilderness re-inventory, BLM has not adequately considered historical uses of the land, present and potential future uses of the land. Several court cases show that the wilderness planning process fails to adequately address several issues. Wilderness is a land classification and not a management modality. Wilderness is not within the scope of multiple use management. BLM is a rogue agency because it has a single-minded, headlong thrust to declare additional wilderness study areas within San Juan County. BLM has openly and brazenly defied the will of congress and the will of the people. BLM must coordinate with local plans, such as that of San Juan County | No lands are proposed to be managed as Wilderness or WSA in any alternative of the DRMP/EIS. However, the impacts of protecting Non-WSA lands with wilderness characteristics is fully disclosed in Chapter 4 of the DRMP/EIS. The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103© (43 U.S.C. §1702©).) The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way |

BLM_0012861

| | | | | that provides uses for current and future generations. |
|---|---|---|---|---|
| San Juan County | 121 | 59 | BLM has refused to issue oil and gas leases because of the introduction of H.R. 1500, "America' Red Rock Wilderness" | Certain oil and gas parcels were deferred from leasing pending completion of the Moab RMP because of dated NEPA analysis.  The BLM does not manage public land based on pending draft or proposed legislation. |
| San Juan County | 121 | 61 | BLM must make a clear statement of whether it intends to designate WSAs for those areas that have wilderness character. | The BLM is not authorized to designate "Non-WSA Lands with Wilderness Characteristics" as WSAs or manage these lands under the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  The BLM authority to establish new WSAs pursuant to Section 603 of FLPMA expired no later than October 21, 1993, therefore as stated on pg. 1-12 of the Moab DRMP/EIS designation of new wilderness areas or WSA proposals are decisions outside of the scope of the DRMP/EIS. |
| San Juan County | 121 | 62 | BLM should have a more generous road set-back.  The BLM "standard" is indefensible.  It provides no reasonable or rational opportunity for maintenance of roads.  The BLM's boundaries are at man made barriers, which has resulted in capturing large chunks of State Trust land as well as some parcels of private land. This violates the County Comprehensive Plan which calls for no net loss of private land within the county. | The road set-back described by San Juan County only applies to roads within or adjacent to WSAs.  The WSA setback is established by National BLM policy and is beyond the scope of the plan.

Routes adjacent to or within Non-WSA lands with wilderness characteristics have been accorded setbacks varying according to the classification of the road.  These setbacks range from 3 to 91 meters.  The acreage of Non-WSA areas with wilderness characteristics has been reduced to realize these setbacks.  Information has been added to Chapter 3 of the PRMP/FEIS to clarify these setbacks.

The BLM is aware that there are specific County and State plan decisions relevant to aspects of public land management that are discrete from, and independent of, Federal law.  However, the BLM is bound by Federal law. As a consequence, where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved or reconciled.  The FLPMA requires that BLM's land use plans be consistent with State and local plans "to the extent practical" where State and local |

857

BLM_0012862

| | | | | |
|---|---|---|---|---|
| | | | | plans conflict with Federal law there will be an inconsistency that cannot be resolved.  The BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options. |
| San Juan County | 121 | 63 | San Juan County objects to the 1996-99 Wilderness Character Reinventory process.  FLPMA does not provide for wilderness as a multiple use. | The BLM is required by FLPMA to maintain inventories of all resources and to use the inventory information during land use planning (FLPMA Section 201 and 202 (43 U.S.C. §1711-1712)).  The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ."(FLPMA, Secton 103(c) (43 U.S.C. §1702(c)))  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>See also responses to comments 120-8 and 121-10. |
| San Juan County | 121 | 64 | BLM did not make information public regarding the impact of additional WSA designations. | The DRMP/EIS proposes no lands for additional WSA designation.<br><br>The document identifies non-WSA lands that are proposed to be managed to maintain their wilderness characteristics.  There are 26,162 acres of such lands within San Juan County in Alt B, and none in the Preferred Alternative, Alt C.  All of the information that was utilized in making these determinations is publicly available, and any information which is not on the Moab RMP website will be provided to any interested party. |
| San Juan County | 121 | 65 | BLM must consider all grazing files, mineral files, lands cases, recreation use permits etc. in terms of the | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land use planning effort, as |

BLM_0012863

| | | | | |
|---|---|---|---|---|
| | | | suitability of the land to be managed for wilderness designation. | identified on pg. 1-2 of the DRMP/DEIS.<br><br>Chapter 4 of the DRMP/DEIS analyzes the impacts from management prescriptions which protect Non-WSA lands with wilderness characteristics, and the impacts on other resources and uses because of that protection.  In addition, during the inventory process, the majority of the existing land uses were identified and taken into consideration when determining areas with wilderness characteristics.  The source of the information was documented unit-by-unit during the wilderness review.  An Interdisciplinary team of resource specialist, with on-the-ground knowledge of the units, was part of the review process.  This inventory is available on the Moab RMP website, and is part of the Administrative Record.  The information is also available upon request.<br>Those non-WSA lands that are considered for management of wilderness characteristics in Alternative B were analyzed for their suitability for other uses.  These uses were the reasons why there are no non-WSA lands within the county that are managed for wilderness characteristics in the Preferred Alternative.<br><br>Those Non-WSA lands that are considered to be managed to maintain the wilderness characteristics in Alternative B were also analyzed for their suitability for other uses.<br><br>See also response to comment 121-63. |
| San Juan County | 121 | 66 | BLM must consider access, economic analyses, Native American issues and alternatives for management in terms of manageability for wilderness. | No lands are considered for wilderness designation.<br><br>Those non-WSA lands that are considered for management for wilderness characteristics in Alternative B were analyzed for access, economic uses, alternatives for management, and Native American concerns.  These were among the reasons why there are no non-WSA lands within the San Juan County that are managed for |

BLM_0012864

| | | | | |
|---|---|---|---|---|
| | | | | wilderness characteristics in the Preferred Alternative (Alt C). |
| San Juan County | 121 | 67 | The mineral evaluations associated with the wilderness re-inventory are inadequate.  The values of the foregone minerals must be calculated in areas under study for possible WSA designation.  BLM violates its national minerals policy.  BLM has failed to issue oil and gas leases because of planning.   USGS is not involved in the wilderness process. | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land use planning effort, as identified on pg. 1-2 of the DRMP/EIS.

A comprehensive Mineral Report was prepared for the entire Moab planning area.  This report was prepared by the Utah Geological Survey, in cooperation with the BLM.  The report includes a comprehensive evaluation of the mineral potential of all mineral resources in the area.  It also included an assessment of the development potential of all mineral resources in the area.  In addition, a Reasonably Foreseeable Development scenario for oil and gas resources was prepared in cooperation with the Utah Geological Survey.  The scenario provides projections of the potential oil and gas development in the entire area over the next 15 years.

The mineral evaluations included all the Non-WSA lands found to have wilderness characteristics and were conducted in conformance with the BLM national minerals policy.  The EPCA inventory of oil and gas resources prepared by the USGS was used in drafting the Mineral Report.  Impacts to the affected mineral resources were analyzed and disclosed in Chapter 4 of the DRMP/EIS. |
| San Juan County | 121 | 68 | The BLM should examine and discuss the potential economic losses to those areas associated with potential wilderness or WSA designation.  It should also put forth alternatives where these adverse economic affects can be mitigated, such as larger PILT payments. | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land use planning effort, as identified on pg. 1-12 of the DRMP/DEIS.

Those Non-WSA lands that are considered for management of wilderness characteristics were analyzed for the economic effects of that action.  For example, on pg. 4-94 of the DRMP/DEIS, the number of oil and gas wells foregone in Alternative B is discussed.

The PILT payments are outside the scope of the land use |

BLM_0012865

| | | | | planning process. |
|---|---|---|---|---|
| San Juan County | 121 | 69 | San Juan County objects to using "cherry stemming" to create wilderness where none exists under the law.  If BLM recognizes a road as a boundary, what is the setback? | Considering lands for WSA or wilderness designation is beyond the scope of BLM's land use planning effort, as identified on pg. 1-2 of the DRMP/DEIS.

"Cherry stemming" is a land management technique that facilitates better land management by allowing ingress and egress without compromising a special designation. This technique is often applied to WSAs.  However, the BLM is not proposing any WSAs under any alternative in the Moab DRMP/DEIS.  Furthermore, no lands are proposed for management of wilderness characteristics in San Juan County for Alternative C of the DRMP/DEIS.

Road setbacks are addressed in response to comment 121-62. |
| San Juan County | 121 | 71 | Solitude is a subjective concept. Area ranchers would express the view that recreationists have a negative influence on solitude.  What does "outstanding" opportunities for solitude mean?  What constitutes primitive or unconfined recreation.  What is more important -- the economic viability of a county or solitude for an elite few? | Congress crafted the terms "outstanding opportunities for solitude" and "primitive or unconfined recreation" when it enacted the Wilderness Act of 1964.  The BLM Washington Office Instruction Memorandum 2003-275 Change 1 defines these terms for the purposes of land use planning.  In general, when the sights, sounds, and evidence of other people are rare or infrequent, where visitors can be isolated, alone or secluded from others, where the use of the area is through non-motorized, non-mechanical means, and where no or minimal developed recreation facilities are encountered can provide visitors with the opportunity for solitude or primitive or unconfined recreation.

The economic impacts of managing non-WSA lands with wilderness characteristics were analyzed in Chapter 4 of the DRMP/EIS. |
| San Juan County | 121 | 73 | Comment from 1999 Wilderness Inventory: Behind the Rocks:  this area should not be considered for further wilderness activities.  It is within the Paradox Fold and Fault Belt and has high potential for oil and gas. It has | No lands are considered for wilderness designation in the DRMP/EIS.

No non-WSA lands with wilderness characteristics are |

BLM_0012866

| | | | | |
|---|---|---|---|---|
| | | | the potential for uranium and vanadium, as well as potash and copper.  It does not qualify for wilderness because of past impacts. There are 13 roads within the unit, each of which is discussed specifically, with photos provided. | proposed for management in Alternative C (Preferred) of the DRMP/EIS in the Behind the Rocks area. |
| San Juan County | 121 | 74 | Comment from 1999 Wilderness Inventory: Gooseneck: San Juan County has no information that would refute BLM's finding in this area.  It contains about 5,000 acres of public land, and to our knowledge has few intrusions.  It should be pointed out, however, that this area does have the potential for minerals including potash, uranium and oil and gas. The economic potential of these minerals should be done if the area is designated wilderness. The minerals values outweigh the wilderness values. The BLM did miss four roads within or adjacent to the unit (photos and write-ups provided). | No lands are considered for wilderness designation in the DRMP/EIS.

No non-WSA lands with wilderness characteristics are proposed for management in Alternative C (Preferred) of the DRMP/EIS in the Gooseneck area. |
| San Juan County | 121 | 75 | Comment from 1999 Wilderness Inventory: Hatch Wash: this unit is particularly disturbing to San Jan County. BLM is creating wilderness where wilderness does not exist.  There are roads, seismograph lines, fences and other intrusions covering the landscape. The Hatch Wash area has high potential for oil and gas, uranium, vanadium, copper and potash.  San Juan County requests that the area be dropped from further wilderness consideration.  Specific roads in the area are identified by San Juan County. | No lands are considered for wilderness designation in the DRMP/EIS.

No non-WSA lands with wilderness characteristics are proposed for management in Alternative C (Preferred) of the DRMP/EIS in the Hatch Wash area. |
| San Juan County | 121 | 76 | Comment from 1999 Wilderness Inventory: Hunter Canyon:  Mineral values will be foregone if wilderness is designated for this area.  It has oil and gas, uranium, vanadium, copper, barite and potash. Specific roads are discussed within the comment. | No lands are considered for wilderness designation in the DRMP/EIS.

No non-WSA lands with wilderness characteristics are proposed for management in Alternative C (Preferred) of the DRMP/EIS in the Hunter Canyon area. |
| San Juan County | 121 | 77 | Comment from 1999 Wilderness Inventory: Shafer Canyon: This unit  is not suitable or managable as wilderness, and it violates the 5,000 acre requirement. It has oil and gas, uranium, vanadium, copper and | No lands are considered for wilderness designation in the DRMP/EIS.

No non-WSA lands with wilderness characteristics are |

BLM_0012867

| | | | | |
|---|---|---|---|---|
| | | | potash resources.  Individual roads are also discussed.  San Juan County suggests that it could easily be managed as an area of critical environmental concern to protect the scenic qualities and vistas from Dead Horse Point. | proposed for management in Alternative C (Preferred) of the DRMP/EIS in the Shafer Canyon area.<br><br>The area does constitute a portion of the Highway 279/Long Canyon/Shafer Basin ACEC that is proposed in Alt C (Preferred) to protect scenic resources, particularly the vista from Dead Horse Point State Park. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 11 | There is no justification, no mandate in FLPMA and no process requirement for engaging in ongoing wilderness inventory and review.  Once the "603 Process" was completed, the agency is done.  The question of which lands should be included in the National Wilderness Preservation System is now between Congress and the American People.  Other than the management of existing WSA's the BLM should have no part in this issue.  To do so is a tragic loss of management resources. | The BLM's authority for managing lands to protect or enhance wilderness characteristics is derived directly from FLPMA Section 202 (43 U.S.C. §1712).<br><br>This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield.  Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences." (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2)))  Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land, and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)))  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>The BLM has long acknowledged that FLPMA Section 603 (43 U.S.C. §1782) requiring a one-time wilderness review has expired.  All current inventory of public lands is authorized by FLPMA Section 201 (43 U.S.C. §1711).  In September 2006, the Utah District Court affirmed that the BLM retained authority to protect lands it determined to |

BLM_0012868

| | | | | |
|---|---|---|---|---|
| | | | | have wilderness characteristics in a manner substantially similar to the manner in which such lands are protected as WSAs.<br><br>The BLM is aware that there are specific State laws relevant to aspects of public land management that are discrete from, and independent of, Federal law.  However, BLM is bound by Federal law.  As a consequence, there may be inconsistencies that cannot be reconciled.  The FLPMA requires that BLM's land use plans be consistent with State and local plans "to the extent practical" where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved.  The BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options.<br><br>Finally, the Utah v. Norton Settlement Agreement does not affect BLM's authority to manage public lands.  This Agreement merely remedied confusion by distinguishing between wilderness study areas established under FLPMA §603 and those lands required to be managed under §603's non-impairment standard, and other lands that fall within the discretionary FLMPA §202 land management process. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 52 | The DEIS fails to adequately consider all resource values in its decision to establish "Areas with Wilderness Characteristics."  It is improper to make decisions based upon an inventory for a single resource value, in this case; 'wilderness character'.  FLPMA's Section 201, which is the section of FLPMA under which the Department claims authority for the 1999 wilderness inventory, does not give the Secretary authority to undertake such an inventory effort for just one resource value. | The DRMP/EIS includes 4 alternatives that provide different ways of managing uses and other resources.  Wilderness characteristics are just part of the myriad of resources we consider in the land use planning process.<br><br>See response to comment 121-10. |
| Colorado Off-Highway | 123 | 53 | One serious concern with utilizing the 1999 Wilderness Inventory has to do with the lack of public involvement | The criteria used by the BLm in its 1999 Wilderness Inventory were those of the noiw withdrawn "Wilderness |

BLM_0012869

| | | | | |
|---|---|---|---|---|
| Vehicle Coalition (COHVCO) | | | both in the development of inventory criteria.  These concerns are directly related to the agency's congressional mandates and obligations to the public when developing management plans.  In fact, although the original Wilderness Inventory Handbook acknowledged the importance of public involvement when inventorying for Wilderness characteristics, the 1999 Wilderness inventory criteria and procedures went out of its way to eliminate public involvement. | Handbook."  The Handbook itself was based on the criteria of the 1964 Wilderness Act, which had ample public input and comment as part of the normal legislative process.<br><br>Upon completion of the 1999 inventory, the BLM solicited comments from the public through public meetings and published invitations to comment.  The resultant approximately 12,000 responses led to numerous BLM field checks.  The findings from the BLM's response to comments for the Moab Field Office were incorporated in the 2003 "Revisions to the 1999 Utah Wilderness Inventory". |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 54 | The "Utah Wilderness Review Procedures" adopts some of the guidelines and requirements laid out in the original WIH  and the Organic Act Directives (OAD's). The Interior Department maintains that the re-inventory procedures are the same as the previous ones, thereby fulfilling Secretary Babbitt's commitment to the Utah's Congressional Delegation that the re-inventory team "is explicitly instructed to apply the same legal criteria that were used in the original inventory" to his re-inventory effort.  Clearly, the re-inventory document has a much lower threshold for what qualifies as "natural" than the one applied in the original inventory. | See response to comments 120-8 and 121-10. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 53 | Alt C does not sufficiently protect BLM roadless lands i.e. non-WSA lands with wilderness characteristics.  Alt C only protects 10% of the non-WSA lands in the citizen's wilderness proposal.  Until the wilderness issues is settled by legislative means, BLM should manage all wilderness characteristics areas to prevent actions causing degradation of their wilderness characteristics. | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  However, the BLM may manage the lands to protect and/or preserve some or all of those characteristics through the land use planning process.  In addition, under the land use planning process, the BLM must consider a range of alternatives for the lands identified with wilderness characteristics.  This gives the public the ability to fully compare the consequences of protecting or not protecting the wilderness characteristics |

BLM_0012870

| | | | | |
|---|---|---|---|---|
| | | | | on these Non-WSA lands.  If all alternatives contained comparable protections of the Non-WSA lands with wilderness characteristics, the alternatives would have substantially similar consequences and would not be significantly distinguishable. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 54 | SUWA and others maintain that many wilderness quality lands have yet to be appropriately identified as possessing wilderness characteristics by the BLM. There remain some areas that the BLM has yet to conduct an appropriate on-the-ground inventory, and has instead relied on aerial photos (which tend to exaggerate impacts because vegetation patterns from old impacts are far more visible from the air than on the ground).  SUWA contends that BLM has only performed a cursory assessment of these wilderness character units. | As part of BLM's wilderness characteristics inventory maintenance, BLM performed a combination of data and on-site reviews.  This included specific field inspections, Interdisciplinary team review of data such as range files, County and BLM GIS data, and high-resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation, as well as the 2007 wilderness characteristics review process (findings from this review are available on the Moab Field Office planning website, and in the Administrative Record).  The BLM is confident of high-standard approach used to inventory the public lands and stands by its findings, particularly the findings, which involved wilderness characteristics inventory maintenance.

The BLM examined about 558,807 acres of lands proposed in the Red Rock Wilderness Act for the existence of wilderness characteristics.  The BLM found that 266,485 acres of these lands contained wilderness characteristics and are proposed for protective management in Alternative B.  The remaining 292,322 acres of the Red Rock proposal did not have wilderness characteristics based on the inventory maintenance conducted by the BLM between 1996 and 2007. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 55 | The BLM erroneously includes in its travel plan "naturally reclaiming and seldom used routes".  The resultant damage caused by designating these routes would impact wilderness characteristics.  Appendix D provides specific information on various routes and lands. | In formulation of the Travel Plan, the BLM specifically considered resource conflicts along with purpose and need for individual routes in the action alternatives.  In these alternatives, the BLM identified over 2500 miles of currently available vehicle routes for non-motorized use. Furthermore, BLM reduces acreages in the areas "open" to cross country vehicle travel to nearly 0 and eliminates |

BLM_0012871

| | | | | the category of "existing roads and trails" in all action alternatives. These proposed management actions would reduce the resource damage asserted by SUWA.<br><br>It is beyond the scope of the plan for the BLM to create "roadless" areas where such areas do not currently exist. Rather the BLM evaluates routes for purpose and need balanced against resource use conflicts. A preference for a route not to be designated in order to create a "roadless" area is not in itself a resource conflict, let alone a conflict, which would always outweigh the purpose and need. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 56 | The BLM uses County route data as the boundary of naturalness for wilderness characteristics units. The BLM performed no on the ground inventory of these routes. | See response to comment 124-54 regarding inventory procedures.<br><br>The County GIS route data used in the wilderness review process was verified by a combination of data and on-the-ground verification. An Interdisciplinary team reviewed data such as range files, County and BLM GIS data, and high-resolution 2006 aerial photographs. The BLM's findings are described in the 1999-2003 wilderness reinventory documentation, as well as the 2007 wilderness characteristics review process (findings from this review are available on the Moab Field Office planning website, and in the Administrative Record). The BLM is confident of high-standard approach used to inventory the public lands and stands by its findings, particularly the findings, which involved wilderness characteristics inventory maintenance.<br><br>See also response to comment 124-55 for reference to route specific comments. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 57 | The BLM must use the edge of the significance of disturbance rather than relying on arbitray boundaries to account for the full extent of wilderness characteristics. Aerial photograph can not be substituted for on the ground inventory. | The wilderness review process was verified by a combination of data and on-the-ground verification to determine areas of disturbance. An Interdisciplinary team reviewed data such as range files, County and BLM GIS data, and high-resolution 2006 aerial photographs. The |

BLM_0012872

| | | | | BLM's findings are described in the 1999-2003 wilderness reinventory documentation, as well as the 2007 wilderness characteristics review process (findings from this review are available on the Moab Field Office planning website, and in the Administrative Record). The BLM is confident of high-standard approach used to inventory the public lands and stands by its findings, particularly the findings which involved wilderness characteristics inventory maintenance.<br><br>See also respone to comment 124-54. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 207 | For Arches Adjacent Unit 1, the BLM has performed a cursory and erroneous review concerning wilderness characteristics, failing to take into account new information presented to BLM on June 30, 2007. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs. The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process . These findings are available on the MFO planning website, and in the administrative record. The BLM stands by its findings  of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 208 | For Arches Adjacent Unit 2, the BLM arbitrarily excludes an area from wilderness characteristics by using an inaccurate boundary. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process.  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings  of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 209 | For Arches Adjacent Unit 3, BLM arbitrarily excludes an area from wilderness characteristics that appears natural, providing no reason for doing so. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial |

BLM_0012873

| | | | | |
|---|---|---|---|---|
| | | | | photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The  BLM stands by its findings  of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 210 | For Arches Adjacent Unit 4, the BLM excludes an area from wilderness characteristics that appears natural. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO website and in the administrative record. The  BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 211 | The BLM erroneously excludes land with WC in Arches Adjacent Unit 5, relying on aerial photography and county route data.  BLM fails to include an area possessing wilderness characteristics. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs. The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The  BLM stands by its findings  of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 212 | The BLM erroneously relies on County GIS data to make an incomplete wilderness characteristics evaluation in Arches Adjacent Unit 6.  Specifically, the BLM uses "purported" county routes as boundaries of naturalness. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record.  The BLM |

BLM_0012874

| | | | | stands by its findings of its wilderness characteristics inventory maintenance. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 213 | The BLM uses an arbitrary boundary down a cliff line, rather than go to the edge of naturalness in Dome Plateau. This excludes an area with wilderness characteristics. | The area in question totals 304 acres of steep talus slopes.  Under Alternative C, this area is no surface occupancy for oil and gas leasing.  This area was withdrawn from new mining claims under the Three Rivers Withdrawal.  There are no travel routes proposed in this area under any alternative.  Thus, the salient features of wilderness characteristics are being protected by other proposed management actions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 214 | The BLM excludes the Dry Mesa area from its findings of naturalness, although the area is natural, consisting mainly of "rehabilitating" seismic lines. This excludes an area with wilderness characteristics from the Dome Plateau. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process.  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 215 | The BLM fails to go to the edge of naturalness along the western boundary with Arches NP.  These lands are endorsed for wilderness by the National Park Service.  This excludes an area with wilderness characteristics from the Dome Plateau. | See response to comment 124-213, which refers to this area. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 216 | The BLM did not reconsider a portion of Beaver Creek in its 2007 wilderness characteristics review.  The BLM fails to go to the edge of naturalness along Beaver Creek WIA's northern boundary with Granite Creek WIA.  This excludes an area with wilderness characteristics.  The BLM did not inventory this area on the ground. | The area in question was determined to lack wilderness characteristics in the 1999 inventory.  The 2003 revision accounted for public comments regarding the 1999 findings.  The BLM stands by its findings of its wilderness characteristics inventory maintenance.   While the BLM did not perform additional on the ground inventory in 2007, ground truthing of the area was done for the 1999 inventory and its 2003 revision.  Aerial photography review confirmed the findings of earlier field trips. |
| Southern Utah Wilderness | 124 | 217 | The BLM fails to go to the edge of naturalness in the Steamboat Mesa area, excluding lands with wilderness | As depicted by the commentor on the map submitted with this comment, most of the land in question was found to |

BLM_0012875

| Alliance (SUWA) | | | characteristics in the Beaver Creek Unit. | lack wilderness characteristics in the 1990-2003 wilderness inventory.  The BLM stands by its findings   of its wilderness characteristics inventory maintenance. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 218 | SUWA disagrees with BLM's wilderness characteristics review determination on the lands below Steamboat Mesa.  This excludes lands with wilderness characteristics in the Beaver Creek Unit. | This comment refers to the BLM's findings from the 1999-2003 wilderness reinventory.  As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process.  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 219 | The BLM failed to consider adjacent wilderness character lands in Colorado when evaluating Beaver Creek Unit 4, and erred in its 1999-2003 findings on lands to the west. This excludes lands with wilderness characteristics from the Beaver Creek Unit. | The Colorado lands that the commentor refers have not been found to possess wilderness characteristics by any federal or state agency, but only by the Colorado Environmental Coalition.  It is beyond the scope of the Moab DRMP/EIS to evaluate wilderness characteristics beyond the field office boundary. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 220 | The BLM fails to include lands with wilderness characteristics identified in the accompanying SUWA map as Area C of the Beaver Creek Unit. | The area in question was determined to lack wilderness characteristics in the 1999 inventory.  The 2003 revision accounted for public comments regarding the 1999 findings. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 221 | The BLM fails to include lands with wilderness characteristics identified in the accompanying SUWA map as Area D of the Beaver Creek Unit. | The area in question was determined to lack wilderness characteristics in the 1999 inventory.  The 2003 revision accounted for public comments regarding the 1999 findings. The BLM stands by its findings  of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 222 | The BLM erred in its 2007 determination of non-wilderness characteristics for Beaver Creek, Unit 2. The BLM needs to expand the Beaver Creek Unit to include these natural lands as shown on the accompanying map. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well |

BLM_0012876

| | | | | as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website and in the administrative record. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 223 | The BLM uses a faint and reclaiming route as the boundary of naturalness for Beaver Creek, Unit 1. The BLM justifies the exclusion of the area to the west by noting that the route is "substantially noticeable." This excludes lands from wilderness characteristics. | This route was described as a road in the 1999-2003 inventory. It is shown as a 4WD route on the Blue Chief Mesa 24K topo. It is clearly visible on aerial photos. The commentor provides no documentation to support its assertion on the condition of this route. Furthermore, the commentor does not dispute the existence of this route, and suggests that the BLM could "cherry-stem" this route. The route is clearly not "natural", and thus is an appropriate boundary of naturalness. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 224 | The BLM erred in its conclusions in its 1999-2003 wilderness inventory for the area in Behind the Rocks south and west of the WSA. The BLM's inventory files and the on ground conditions confirm that natural characteristics remain. The BLM needs to extend the boundary of the unit to the south slightly and include this area, utilizing the used vehicle routes as the unit's boundary. Any other configuration in this area fails to identify natural and wilderness character lands. The BLM's WCR did not address this particular area. | As depicted by the commentor on the map submitted with this comment, the land in question was found to lack wilderness characteristics in the 1999-2003 wilderness inventory. These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by the conclusions of the 1999-2003 inventory. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 225 | The BLM arbitrarily excluded the northern portion of Big Triangle by using an inappropriate boundary of naturalness, relying on county GIS data as "default boundaries". This excludes lands from wilderness characteristics. No on the ground inventory was performed. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs. The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |

BLM_0012877

| Southern Utah Wilderness Alliance (SUWA) | 124 | 226 | The BLM erroneously excluded a small parcel (~32 acres as shown on accompanying map) of lands adjoining Coal Canyon WSA.  The current wilderness characteristics boundary does not follow an impact.  This excludes lands from wilderness characteristics. | As depicted by the commentor on the map submitted with this comment, the land in question was found to lack wilderness characteristics in the 1999-2003 wilderness inventory.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 227 | The BLM erroneously excludes a small parcel of land in the Coal Canyon area (~142 acres as shown on accompanying map) by not going to the boundary of naturalness.  There was no on the ground inventory of this area.  This excludes lands from wilderness characteristics. | As described in the 2003 revision document, BLM field checks subsequent to the 1999 inventory added several hundred acres to the Coal Canyon Wilderness Inventory Area (WIA).  Extensive fieldwork led the BLM to conclude that the resulting WIA boundary, drawn "point-to-point" in this area, was an appropriate boundary of naturalness designed to exclude impacts from oil and gas exploration and development.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 228 | The BLM erroneously excludes lands from wilderness characteristics units in the Coal Canyon area by not going to the boundary of naturalness, but instead uses a "point-to-point" feature.  There was no on the ground inventory of this area. | As explained in the Diamond Canyon wilderness characteristics review for Unit 5, the area in question is characterized by a large number of impacts from past minerals exploration and development.  These are clearly identifiable from high-resolution aerial photos.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 229 | The BLM erroneously excludes lands from a wilderness character (sic) unit in the Coal Canyon area by not going to the boundary of naturalness, but instead uses arbitrary legal lines. | The area in question is separated from the larger wilderness characteristics area by a combination of lands found to lack wilderness characteristics in the 1999-2003 inventory, and by verified constructed vehicle routes.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 230 | The BLM uses arbitrary boundaries to separate out lands in Diamond Canyon Unit 8 from lands found to have wilderness characteristics.  The BLM should exclude a few of the significant impacts in the area by using cherry-stems to include the complete areas with wilderness characteristics.  The BLM fails to include the full extent of wilderness characteristics lands in this area. | The concept of "cherry-stems" is irrelevant to the DRMP/EIS, since this is a term applicable to the creation and mapping of new Wilderness Study Areas.  The creation of new Wilderness Study Areas is beyond the scope of the land use planning process.  To remove the impacts from wilderness characteristics in this area would require several long cherry-stems, resulting in a convoluted management landscape.  Rather than do a tree-by-tree boundary exercise, the BLM looked at the |

BLM_0012878

| | | | | area as a whole, concluding that the impacts present were sufficient to disqualify the area in question from wilderness characteristics. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 231 | The BLM arbitrarily excludes an area possessing wilderness characteristics in the Coal Canyon area. There are no significant impacts within this area that warrants the BLM's arbitrary section line boundaries. By using section lines as boundaries of impacts, areas with wilderness characteristics were excluded. | The area in question is not free of impacts. County GIS data, as well as aerial photography review indicates several obvious vehicle routes. The upper half of this area is almost completely encircled by visible routes. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 232 | The BLM should extend the boundary of wilderness characteristics in the Coal Canyon area to the major road to the south as the area to the north possesses wilderness characteristics. | This very small area is bisected by routes clearly visible from aerial photos. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 233 | The BLM arbitrarily excludes an area in Coal Canyon possessing wilderness characteristics by using legal lines as boundaries. | This appears to be a mapping error and has been corrected. About 338 acres has been added to the non-WSA lands with wilderness characteristics in Alt B. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 234 | The BLM arbitrarily excludes an area in Coal Canyon possessing wilderness and fails to provide justification. | This appears to be a mapping error and has been corrected. About 165 acres has been added to the non-WSA lands with wilderness characteristics in Alt B. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 235 | The BLM uses a section line boundary in the Coal Canyon Area to separate out an area with natural character from the larger wilderness character unit. | As clearly indicated by GIS data and aerial photography verification, the area in question is completely encircled by routes, and is of insufficient size to possess wilderness characteristics as a stand-alone unit. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 236 | The BLM does not identify any of this remote and wild area (Coyote Wash) as having retained or possessing wilderness character. The BLM should identify the "core" of Coyote Wash as possessing opportunities for solitude and primitive recreation. Additionally, this acreage abuts wilderness quality lands in Colorado which the BLM did not consider. | It is worth noting that the map provided by the commentor in its comment on the DRMP/EIS shows "wilderness quality" lands in the core of Coyote Wash at only about 40 per cent of SUWA's original proposal, despite the commentor's assertion that they did "detailed evaluation and inventory on the ground". The "core" the commentor refers to is too small (under 5,000 acres) to possess wilderness characteristics as a stand-alone unit. Whether or not any part of the unit abuts "wilderness quality" lands |

BLM_0012879

| | | | | |
|---|---|---|---|---|
| | | | | in Colorado is irrelevant, since the adjoining lands have never been determined to possess wilderness characteristics by any state or federal agency. Additionally, a constructed route runs the entire length of the unit on the Utah side of the state line.  The BLM stands by the findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 237 | The BLM uses an arbitrary route in the Dead Horse Cliffs area as the boundary of naturalness.  The wilderness characteristics do not end at the Canyonlands National Park boundary, but instead extend onto Park Service lands. | The area in question was determined to lack wilderness characteristics in the 1999 Wilderness Inventory and its 2003 revision.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 238 | The BLM arbitrarily excludes lands between the Dead Horse Point basin overlooks which for many visitors are some of the most natural landscape views anywhere. The BLM arbitrarily excludes these lands that proceed up a natural cliff face that retain natural characteristics. | As described in the Dead Horse Cliffs wilderness characteristics review document, these lands are too small to be managed for wilderness characteristics as a stand-alone unit.  This comment seems to be directed against the BLM's finding of non wilderness character for the lands to the south in its 1999-2003 wilderness inventory.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 239 | The BLM arbitrarily excludes lands in the Dome Plateau area with outstanding natural character north of the BLM's wilderness character boundary. | In a signed Reasonable Probability Determination, and based on an extensive on-the-ground inventory, the BLM concluded that the lands in question lacked wilderness character.  The BLM stands by its conclusion. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 240 | SUWA has provided BLM with supplemental wilderness character information both within the Dome Plateau submission (January 2002) and recently within the Arches Adjacent submission (June 2007). | See responses to comments 124- 213, 124-214 and 124-215. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 241 | In the Fisher Towers Wilderness Character Unit, wilderness character exists beyond BLM's arbitrary line. The boundary used to separate lands retaining wilderness character from lands that lack wilderness character does not follow a human impact at all, but rather utilizes straight and arbitrary lines crossing the natural landscape.  This arbitrary placement excludes wilderness characteristics in the area. | The area to which the commentor refers has not been presented to the BLM as an area possessing wilderness characteristics until the date that this comment was received (11-30-2007).  It was not part of the lands proposed for wilderness in HR 1500 and assessed in the 1999-2003 reinventory.  It was not part of the new proposals analyzed in the 2007 wilderness characteristics review.  It is not included in the map of lands in the Red |

BLM_0012880