| | | | | |
|---|---|---|---|---|
| | | | | Rock Wilderness Act which is on SUWA's website.  The commentor provides no information other than a low-resolution aerial photo to support its assertion that previous inventories were in error.  The BLM stands by the findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 242 | SUWA questions the findings of the 1999-2003 wilderness inventory in the Beaver Creek/Granite Creek area. The BLM identifies the route at the bottom of Granite Creek as a significant feature;   it does not diminish the natural characteristics of the landscape adjacent to and north of this route along the canyon wall.  This natural and impressive area is not impacted or effected by human impacts and retains its natural character. | See response to comment 124-216. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 243 | The BLM has not identified the full extent of wilderness character (WC) north of the current WC Hatch/Harts/Lockhart Basin boundary.  The BLM's current boundary uses an old seismic line. | The area in question was determined to lack WC in the 1999 inventory and 2003 revision.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 244 | The Moab Field Office has failed to identify lands with wilderness character (WC) in the Lockhart Basin area adjoining similar lands in the Monticello Field Office, who also did not find wilderness characteristics in this area.  The Dripping Spring valley retains an overwhelming natural appearance and is free of human impacts; those that do remain are minimal in context.  The BLM only manages the high benches over the valley and Moab BLM will have to coordinate with Monticello BLM. | The area in question (both within the Moab and Monticello Field Offices) was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision. These efforts by BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions.<br><br>The Dripping Spring valley is not within the boundaries of the Moab Field Office.  This valley is administered by the Monticello BLM. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 245 | The BLM did an inadequate wilderness characteristics determination on much of the bench lands above Lockhart Basin. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning |

876

| | | | | website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 246 | The BLM Monticello Field Office did not include the full extent of wilderness characteristics in the Lockhart Basin area, which affects adjoining lands in the Moab Field Office. | This comment is directed towards the Monticello DRMP/EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 247 | SUWA disputes the findings of non wilderness characteristics from the 1999-2003 reinventory for Harts Draw area.  The BLM utilizes the natural cliff band and a section line to eliminate wilderness values. The wilderness quality and values of the landscape do not end at these arbitrary features. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision. These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 248 | The BLM uses arbitrary legal boundaries in the Horsethief Point area to exclude areas of wilderness characteristics.  That boundary crosses the natural terrain and does not separate lands accurate.  This may be due to BLM not performing on the ground evaluation | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 249 | The BLM uses arbitrary legal boundaries to exclude areas of wilderness characteristics in the Horsethief Point area.  SUWA's inventories show that the area remains generally natural in appearance and possesses natural character.  The utilization of a section line inappropriately separates the lands that are natural in appearance | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process.  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness | 124 | 250 | A small area of Horsethief Point adjoins the Park (Canyonlands National Park), with no physical impact or | This appears to be a mapping error and has been corrected.  About 24 acres has been added to the non- |

BLM_0012882

| | | | | |
|---|---|---|---|---|
| Alliance (SUWA) | | | separation and has wilderness character. | WSA lands with wilderness characteristics in Alt B. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 251 | A small area adjoining the Park (Canyonlands National Park) and endorsed by the Park Service for wilderness has wilderness characteristics and has been excluded. There is no physical impact separating this area from the park. | The area to which the commentor refers has not been presented to the BLM as an area possessing wilderness characteristics until the date this comment was received (11-30-2007). It was not part of the lands proposed for wilderness in HR 1500 and assessed in the 1999-2003 reinventory. It was not part of the new proposals analyzed in the 2007 wilderness characteristics review. It is net included in the Red Rock Wilderness Act map accessed from SUWA's website. The commentor provides no information other than a low-resolution aerial photo to support its assertion that previous inventories were in error. The BLM stands by the findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 252 | The current Hunter Canyon wilderness characteristics boundary excludes areas with wilderness characteristics on the cliffs above Kane Creek. | A portion of this area was reevaluated in the 1999-2003 reinventory and found to lack wilderness characteristics. Most of the area to which the commentor refers has not been presented to the BLM as an area possessing wilderness characteristics until the date this comment was received (11-30-2007). The area was not part of the lands proposed for wilderness in HR 1500 and assessed in the 1999-2003 reinventory. It was not part of the new proposals analyzed in the 2007 wildereness characteristics review. It is not included in the Red Rock Wilderness Act map accessed from SUWA's website. The commentor provides no information other than a low-resolution aerial photo to support its assertion that previous inventories were in error. The BLM stands by the findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 253 | The Labyrinth Canyon area has taken the biggest hit of eliminating wilderness character by BLM's needed lack of off road vehicle management. The area south of Spring Canyon is one which retains a significant natural appearance "yet remains to be fully identified by the BLM". | The area in question was determined to lack wilderness character in the 1999 inventory and 2003 revision. These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |

BLM_0012883

| Southern Utah Wilderness Alliance (SUWA) | 124 | 254 | The BLM overly states the impacts to naturalness on the south rim of Hell Roaring Canyon (in Labyrinth Canyon).  By far, there is more landscape here that does not have a human impact than does. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision. These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 255 | The BLM overly states the impacts to naturalness on the north rim of Hell Roaring Canyon (Labyrinth Canyon).  The BLM must end the arbitrary utilization of the natural rim and include the full range of lands to the south that continue to have natural values in its inventory of wilderness characteristics. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision. These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 256 | The BLM arbitrarily excludes from wilderness characteristics a small area on the southwest corner of the Hell Roaring Canyon Rim (Labyrinth Canyon). | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record.   The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 257 | Whatever wilderness characteristics are no longer present in the Labyrinth Canyon area is due to BLM's failure to restrict OHV activity.  The BLM arbitrarily excludes some lands that retain their natural character from the Labyrinth Unit. | The BLM agrees with the commentor's characterization of the area as lacking wilderness characteristics.  The remainder of the area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 258 | An area of the Mary Jane Canyon unit which adjoins roadless areas in the National Forest has been omitted from BLM's inventory of wilderness characteristics. This area is natural in appearance, and possesses wilderness character in association with National Forest Service lands. | The area to which the commentor refers has not been presented to the BLM as an area possessing wilderness characteristics until the date this comment was received (11-30-2007).  It was not part of the lands proposed for wilderness in HR 1500 and assessed in the 1999-2003 reinventory.  It was not part of the new proposals analyzed in the 2007 wilderness characteristics review.  It is not included in the Red Rock Wilderness Act map |

BLM_0012884

| | | | | |
|---|---|---|---|---|
| | | | | accessed from SUWA's website.  The commentor provides no information other than a low-resolution aerial photo to support its assertion that previous inventories were in error.  The BLM stands by the findings of its wilderness characteristics inventory maintenance.  The National Forest Service area in question has not been determined by that agency to possess wilderness characteristics (itself a BLM term), and its adjacency is irrelevant. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 259 | The BLM should include the small acreage south of the creek in the Mary Jane Canyon unit as having wilderness characteristics.  SUWA's on the ground evaluations found that the area on the south side of the river outside of the camping area and north of the powerline remain overwhelmingly natural. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process.  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 260 | Lands in the Mary Jane unit are excluded from wilderness characteristics due to multiple vehicle routes and ORV disturbance.  SUWA agrees with the BLM that this area has seen ORV use, but the lands continue to have natural characteristics north of this ORV use area. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 261 | The BLM arbitrarily excluded natural lands by using a section line as a boundary.  As a result of the arbitrary boundary, wilderness values end along the natural terrain, opposed to using the edge of a natural disturbance that exists to the west.  The BLM fails to use the edge of significant impact as a boundary of wilderness characteristics in the Mexico Point unit. | As clearly depicted on the wilderness characteristics review map for Mexico Point (available on the BLM planning website and in the administrative record), almost all of the lands in question lie on BLM lands administered by the Vernal Field Office. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 262 | Areas adjacent to the Wilderness Study Area retain their wilderness character and should be included within the larger Mill Creek Canyon unit. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision.  These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |

BLM_0012885

| Southern Utah Wilderness Alliance (SUWA) | 124 | 263 | SUWA disagrees with the BLM on its finding of non wilderness characteristics for the lands south of the Mill Creek Canyon wilderness characteristics area. The BLM's wilderness character boundary continues to utilize natural features and a section line to identify the full extent of wilderness resources. These arbitrary boundaries do not reflect the separation of lands with and without wilderness character. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs. The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| --- | --- | --- | --- | --- |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 264 | Lands on the rims adjacent to Negro Bill Canyon Wilderness Study Area retain their natural character, and should be added to the larger Negro Bill Canyon unit. | A portion of the area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision. These efforts by BLM took place shortly before beginning the current plan revision, and BLM stands by its conclusions. The remainder of the area to which the commentor refers has not been presented to BLM as an area possessing wilderness characteristics until the date this comment was received (11-30-2007). It was not part of the lands proposed for wilderness in HR 1500 and assessed in the 1999-2003 reinventory. It was not part of the new proposals analyzed in the 2007 wilderness characteristics review. It is not included in the Red Rock Wilderness Act map accessed from SUWA's website. The commentor provides no information other than a low-resolution aerial photo to support its assertion that previous inventories were in error. The BLM stands by the findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 265 | The BLM's evaluation of the Mat Martin Point area (Porcupine Rim) is that the few routes on top are so impacted that they deter from the naturalness of the entire landscape. This area appears free of significant impacts and retains its wilderness values and characteristics. The BLM should add this area to lands with wilderness characteristics. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision. These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah | 124 | 266 | SUWA has submitted significant new information on the | As noted on the Moab BLM planning website, the BLM |

BLM_0012886

| | | | | |
|---|---|---|---|---|
| Wilderness Alliance (SUWA) | | | Renegade Point area, demonstrating that it has wilderness characteristics.  Without justification, the BLM divided the Renegade Point unit, stating that routes are substantially noticeable. | reviewed this new information (received in June, 2007), and found no reason to change its wilderness characteristics review conclusions. As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process.  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 267 | The BLM found unit 4 of Renegade Point wilderness character unit natural.  Had the BLM reviewed the Renegade Point unit in conjunction with lands with wilderness characteristics in Colorado, the WCR finding would have had a different outcome. | The Colorado lands to which the commentor refers have not been found to possess wilderness characteristics by any federal or state agency, but only by the Colorado Environmental Coalition.  It is beyond the scope of the Moab DRMP/EIS to evaluate wilderness characteristics beyond the field office boundary. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 268 | The BLM states that areas in Unit 5 of Renegade Point have been chained and the area is unnatural.  SUWA asserts that by viewing these areas on the ground, the area appears "generally natural". | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The review included reviewing GIS data on vegetative treatments, including chaining.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process .  These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings   of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 269 | The routes used by the BLM to separate out wilderness character Units 2 and 3 of Renegade Point are not significant impacts. | The commentor does not dispute the existence of these routes.  As part of its wilderness characteristics inventory maintenance,  the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  BLM's findings are described in the 1999- |

BLM_0012887

| | | | | 2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 270 | A small omission of wilderness characteristics in Westwater Canyon is located adjacent to the private land holding. | This very small area (approximately 10 acres) has not been presented to BLM as an area possessing wilderness characteristics until the date this comment was received (11-30-2007). It was not part of the lands proposed for wilderness in HR 1500 and assessed in the 1999-2003 reinventory. It was not part of the new proposals analyzed in the 2007 wilderness characteristics review. It is not included in the Red Rock Wilderness Act map (or is too small to see) accessed from SUWA's website. The commentor provides no information other than a low-resolution aerial photo to support its assertion that previous inventories were in error. The BLM stands by the findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 271 | SUWA disputes the BLM's finding that vegetative manipulation has rendered a small area on the east side of the Westwater Wilderness Study Area unnatural. | The area in question was determined to lack wilderness characteristics in the 1999 inventory and 2003 revision. These efforts by the BLM took place shortly before beginning the current plan revision, and the BLM stands by its conclusions. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 272 | The BLM excludes lands north of the motorcycle trail in the Westwater wilderness characteristics area, which is not a significant impact. | The commentor does not dispute the existence of this route. This route marks the boundary of naturalness. As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs. The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record. The BLM stands by its findings  of its wilderness characteristics |

BLM_0012888

| | | | | inventory maintenance. |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 273 | The BLM uses an arbitrary boundary to exclude lands with wilderness characteristics in the Yellow Bird area. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 274 | The BLM characterizes this area by stating that it has a large number of substantially noticeable routes.  If BLM had performed an on the ground inventory, it would have noted that the boundary does not accurately separate lands with and without wilderness characteristics. The BLM uses an arbitrary boundary to exclude lands with wilderness characteristics in the Yellow Bird area. | As part of its wilderness characteristics inventory maintenance, the BLM used a combination of field checks, ID team review, BLM and county GIS data, range files, and review of high resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation as well as the 2007 wilderness characteristics review process. These findings are available on the MFO planning website, and in the administrative record.  The BLM stands by its findings of its wilderness characteristics inventory maintenance. |
| Independent Petroleum Assoc. of Mountain States | 203 | 2 | Many of the decisions or possible decisions in this document involve taking large amounts of land that are prospective for development or have development and effectively removing these lands from multiple uses. Lands with so-called wilderness characteristics that receive protection exceed the BLM's authority under FLPMA.  In addition, many of these decisions that remove lands from mineral leasing require the BLM to follow FLPMA's withdrawal procedures under 43 USC § 1714.  Some of these decisions may exceed the authority granted BLM under its organic act. | The FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ."(FLPMA, Secton 103© (43 U.S.C. §1702©)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>Refer to response to comment 214-7 for discussion on |

BLM_0012889

| | | | | withdrawals. |
|---|---|---|---|---|
| Independent Petroleum Assoc. of Mountain States | 203 | 3 | While the BLM has a duty under section 201 to inventory lands, including those that may contain "wilderness characteristics," BLM may not unlawfully apply the WSA non-impairment standard too any of those lands found to contain wilderness characteristics. | The BLM has not and will not impose the WSA non-impairment standard to any of those lands found to contain wilderness characteristics. |
| Independent Petroleum Assoc. of Mountain States | 203 | 5 | The DRMP/EIS proposes thirty three non-WSA lands with wilderness characteristics areas.  In Alternative B, all thirty three areas would be managed to preserve their wilderness characteristics values.   As the maps in the IPAMS Ajppendix A attached to the comments show, many of the non-WSA lands that supposedly have wilderness characterisitcs do not meet the criteria for wilderness, and  should not be managed as wilderness and closed to oil and gas development..  Human impacts can be seen throughout the areas, including active wells, plugged and abandoned wells, roads,and other imprints of human activity. | Refer to response to comment 124-54 and 121-71. |
| Independent Petroleum Assoc. of Mountain States | 203 | 6 | The BLM received new information regarding non-WSA lands with wildemess characteristics from the Southern Utah Wilderness Alliance (SUWA), but doesn not specify what that new information was.  That information should be readily available to the public in order to assess the qulaity of the information. | Information was received from the Southern Utah Wilderness Alliance regarding wilderness proposals both prior to, and during scoping.  A reference to this information is made in Appendix P in the DRMP/EIS.  This information is part of the adminstrative record for the land use planning process and is available to the public upon request. |
| Independent Petroleum Assoc. of Mountain States | 203 | 7 | On page 4-130 it states "Although small acreages may be lost in some of the non-WSA lands with wilderness characteristics, it is not predicted that any of the areas would lose the wilderness characteristics value in whole."  IPAMS strongly objects to the characteization of land being "lost" due to oil and gas activitiy.  IPAMS would like to remind the BLM that the impacts of oil and gas activity are small and temporary, and hence, there is no need for locking away large amounts of land from energy development. | Any surface disturbing activity, including oil and gas development, results in a loss of the natural character of the land.  The degree of the disturbance and the length of time needed for reclamation determine how long the natural character is lost. |
| Red Rock 4- | 206 | 6 | We think that identification of Non-WSA lands with | See response to comment 121-10. |

BLM_0012890

| | | | | |
|---|---|---|---|---|
| Wheelers, Inc. | | | Wilderness Characteristics was outside the scope of analysis for an RMP.  The time has long since passed that for WSA analysis, a point recent decisions in lawsuits concerning this matter reinforce.  These areas should not have been isolated for special management, and therefore 0 acres should be selected under this heading, just like in Alternative A.  Existing management would appear to be adequate if they were selected as areas of naturalness, solitude, and areas for primitive and unconfined recreation.  Keep up the good work and manage them as you do now. | |
| Glen Canyon Group | 209 | 11 | …it is not clear how the final acreage and boundaries were determined for: Behind the Rocks, Coal Canyon, Fisher Towers, Goldbar, Gooseneck, and Westwater Creek. | Table P-1 refers exclusively to areas inventoried during the 1999-2003 Utah Wilderness Inventory, the processes and results for which are fully described in the 1999 publication and the 2003 revision document, both of which have been publicly available for several years. Table P-2 refers exclusively to new wilderness proposals submitted to the BLM by external groups; none of these were included in the 1999-2003 inventory.  Maps for each of these areas, as well as the decision process undertaken by the BLM for each of these areas, are available on the Moab BLM's planning website. |
| Glen Canyon Group | 209 | 12 | Above all, it is not explained how the title "Non-WSA Lands with Wilderness Characteristics" was arrived at. Wilderness Character is a stronger term than Wilderness Characteristics and is preferable. Most if these lands disappear partially or entirely into SMRA's, ERMA's, and/or ACEC's and the management protocols of these areas do not explain how their wilderness character/characteristics will be preserved, as required by the Handbook, I.e., "avoid or minimize impacts to wilderness characteristics". | Wilderness character is a term which applies to Wilderness Study Areas and designated wilderness, both of which must be managed to maintain wilderness character.  The term "Non-WSA Lands with Wilderness Characteristics" was an attempt by the state-wide Utah planning team to aggregate, for clarity, the various categories of lands found to possess wilderness characteristics (Wilderness Inventory Areas, external wilderness proposals, Reasonable Probability Determinations). These lands are then distinguished from Wilderness Study Areas, whose management is beyond the scope of the current planning effort.<br><br>Those lands which have overlapping management protocols will be managed under the most restrictive |

BLM_0012891

| | | | | |
|---|---|---|---|---|
| | | | | protocol, should the various protocols be in conflict. Thus, lands being managed to protect wilderness characteristics will have the necessary protocols to accomplish that objective, regardless of overlapping planning decisions.<br><br>Under at least one alternative in the DRMP/DEIS, all lands identified by BLM as having wilderness characteristics would be managed to protect the naturalness of the areas and the opportunities for solitude and primitive recreation.  Protecting the wilderness characteristics would include, among other restrictive management prescriptions, making them unavailable for oil and gas leasing and closing the area to OHV use.  The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  However, the BLM may manage the lands to protect and/or preserve some or all of those characteristics through the land use planning process.  In addition, under the land use planning process, the BLM must consider a range of alternatives for the lands identified with wilderness characteristics. This gives the public the ability to fully compare the consequences of protecting or not protecting the wilderness characteristics on these Non-WSA lands. |
| Glen Canyon Group | 209 | 13 | Map 2-24-B Volume 3 shows WSA's in faint dots and Areas with Wilderness Characteristics in brighter dots and bold outlines. But they are not identified. It would have been easy to put the names of the designated areas on the map, as was done with other maps. (See, for example, Map 2-4 Grazing Allotments.) This very important map must be printed on an 11x14 inch page with all the areas clearly identified. | Detailed maps of each area are available either in the 1999 Utah Wilderness Inventory or (for areas proposed since 1999) on the Moab BLM's planning website.  The level of detail suggested by the commentor would be so great as to make any printed map smaller than plotter size almost unreadable.  This is because many of the areas in question are quite small "add-ons" to existing Wilderness Study Areas or National Park Service areas that are administratively endorsed for wilderness. |
| Glen Canyon | 209 | 14 | …there should be individual maps of each Non-WSA | The GIS data underlying this request is available to the |

BLM_0012892

| Group | | | Land with Wilderness Characteristics showing their boundaries and the portions of each which would be covered by SMRA's, ERMA's, and ACEC's, and clearly showing the overlaps, as well as portions which are outside these proposed management designations. Include them in the Final RMP/EIS. | public upon request. |
|---|---|---|---|---|
| Glen Canyon Group | 209 | 15 | RE: Impact of Lands and Realty Management Decisions – Section 4.3.8.2.3, Pages 4-113 to 4-117, Table 4.48, Pages 4-114 and 4-115 <br>     Table 4.48 makes it clear that Alternative B would exclude all 32 areas from Rights of Way (ROW) being established under the rubric of Lands and Realty Management Decisions. Under Alternative C, however, only a fourth of the Beaver Creek area would be excluded from ROWs. The rest of Beaver Creek and all of the remaining areas would be ROW "avoidance." In all areas except Gooseneck, Mill Creek Canyon, and Shafer Canyon, the number of acres of avoidance is less than the total acreage with wilderness characteristics. The text does a poor job of explaining what happens to the remaining acreage which would presumably be open to powerlines, pipelines, and othe utility corridors. | On non-WSA lands with wilderness characteristics that are not in avoidance or exclusion areas for rights-of-way, all applications for rights-of-way would be considered on a case-by-case basis and the project would be analyzed in an appropriate NEPA document  to determine if the project would be authorized and under what conditions. |
| Glen Canyon Group | 209 | 17 | Impacts of Mineral Resources: Oil and Gas – Section 4.3.8.2.5.1 Pages 4-117 to 4-129. <br>     Table 4.53 on pages 4-120 through 4-123 of Leasing Stipulations is very misleading in that it lists all non-WSA areas as "closed" under Alternative B. However, quite a few of these areas contain portions which are currently leased – Arches Adjacent, Coal Canyon, Dead Horse Cliffs, Dome Plateau, Floy Canyon, Flume Canyon, Goldbar, Hatch Wash, Hatch/Lockhart/Hart, Hells' Hole, Hideout Canyon, Horsethief Point, Hunter Canyon, Labyrinth Canyon, Lost Spring Canyon, Mexico Point, Shafer Canyon, Spruce Canyon, Westwater Creek, and Yellow Bird. The Plan should include the number of leases per area | The land use plan makes decisions for new leasing actions.  Valid existing rights (previous leases) are recognized regardless of plan decisions. |

BLM_0012893

| | | | | |
|---|---|---|---|---|
| | | | and just the acreage. | |
| Glen Canyon Group | 209 | 18 | Impacts of Mineral Resources: Oil and Gas – Section 4.3.8.2.5.1 Pages 4-117 to 4-129. It is good to know that leases that are not developed or held in production will expire after 10 years under Alternative B. Presuming that the 10-year "clock" began running at the time of initial lease, the plan should include information on each current lease in each of the areas listed above, and the year that lease was granted. | The commentor's suggestion to close all areas currently not leased to new leasing "now" would require a plan amendment to the Grand RMP.  The current planning effort is a revision of the Grand RMP. What the commentor requests is basically adopting Alternative B without completing the planning process and proceeding to the Record of Decision, which the BLM clearly cannot do.  See also response to comment 124-98. |
| Glen Canyon Group | 209 | 19 | Impacts of Mineral Resources: Oil and Gas – Section 4.3.8.2.5.1 Pages 4-117 to 4-129. BLM should improve their "Preferred Alternative" by reducing the acreage designated Standard stipulation and increasing or stipulating No Surface Occupancy in Coal Canyon, Desolation Canyon, Dome Plateau, Floy Canyon, Hatch Wash, and Lost Spring Canyon. We would like to see Behind the Rocks, Fisher Towers, Goldbar, Hunter Canyon, Labyrinth Canyon, Mary Jane Canyon, Mill Creek Canyon, Negro Bill Canyon, and Shafer Canyon closed to leasing. (We have noted that some of the areas which should be closed are projected by BLM to be low productivity for drilling, but when these leases expire, no new leases should be granted in these sensitive and popular areas.) | Some of the areas mentioned by the commentor would be managed as no surface occupancy for oil and gas leasing in Alt C, the preferred alternative.

The BLM must manage for multiple uses, only one of which is the protection of wilderness characteristics. |
| Glen Canyon Group | 209 | 20 | Impacts of Mineral Resources: Oil and Gas – Section 4.3.8.2.5.1 Pages 4-117 to 4-129. Since BLM cannot predict the invention of new techniques for extraction of oil, gas and minerals, areas which do not have existing leases should be closed now, while there is no interest in them, to protect them in the future. | The commentor's suggestion to close all areas currently not leased to new leasing "now" would require a plan amendment.  What the commentor requests is basically adopting Alternative B without completing the planning process and proceeding to the Record of Decision, which the BLM clearly cannot do.  See also response to comment 124-98. |
| Glen Canyon Group | 209 | 21 | Bottom third of page 4-129 and first paragraph on page 4-130 Comment: We cannot determine where this summary referring to Oil and Gas (Section 4.3.8.2.5.1) belongs. If it is intended to come before, not after Section 4.3.8.2.5.2 Coal-bed Methane, then the numbers of | The wells referred to for coal-bed methane are included in the projection of oil and gas wells in general on pg. 4-119.

The Behind the Rocks area would be managed as no surface occupancy in Alt C, thus prohibiting the disposal of salable minerals.  The Horsethief Point area would be |

BLM_0012894

| | | | | |
|---|---|---|---|---|
| | | | wells to be drilled in one and 15 years under each alternative, and the amount of acreage disturbed do not correspond with Table 4.52 on page 4-119. This should be corrected or clarified in the Final RMP.<br><br>Alternative C should echo Alternative B and limit development of salable materials sites in Horsethief Point and Behind the Rocks. | managed as open with timing limitations, allowing the disposal of saleable minerals within certain time frames. |
| Glen Canyon Group | 209 | 24 | Re: 4.3.8.2.6 Impacts of Decisions, 4.3.8.2.6.2 Alternative B, and 4.3.8.2.6.3 Alternative C, Pages 4-132 to 4-133<br>Eight prescriptions are provided. The first should be "Visual resource management (VRM) no lower than Class II (see comments regarding Table 4.55 on pages 4-154 through 4-156).<br><br>These prescriptions should also apply to other popular hiking attractions for local residents and tourists alike. To decrease avoidable impacts, Alternative C should specify ROW exclusion, not just avoidance. | To even recommend that all areas with wilderness characteristics across all alternatives be managed as VRM II would essentially carry the major management decisions of Alternative B across all alternatives.  This would overly reduce the range of options for analysis across the action alternatives.<br><br>See response to comment 209-15 for a discussion of avoidance areas. |
| Glen Canyon Group | 209 | 45 | Re: 4.3.8.2.15 Visual Resource Management Pages 4-154 thru 4-158, Table 4.55<br>Regarding VRM decisions reflected in Table 4.55, we reiterate that the Non-WSA Lands with Wilderness Characteristics must be protected to permit future Congressional consideration as designated wilderness; this means that the preferred alternative should re-designate all areas as VRM I or II, allowing no more than minor changes to landforms and vegetation. Permitting major modifications (VRM IV) in Coal Canyon, Floy Canyon and Flume Canyon is clearly incompatible with Handbook dictates. | The commentor is essentially asking the BLM to manage all of these areas to protect wilderness characteristics in Alternative C, and to basically the same degree as in Alternative B. The commentor also asks the BLM to manage these lands in such a way as "to permit future Congressional consideration as designated wilderness." This is essentially the non-impairment standard applicable only to Wilderness Study Areas.  See response to comment 124-53 for a discussion of BLM's obligation to manage lands for wilderness characteristics. |
| Glen Canyon Group | 209 | 46 | Re: Summary Pages 4-162 thru 4-168<br>Summary tables 4.57 through 4.60 cover some, but not all, aspects of such surface disturbing activities affecting the 266,485 acres. Examples of these activities under BLM's preferred alternative: 1) 160,599 | See response to comment 124-53.<br><br>The fourth sentence in paragraph 1 of page 4-143 has been changed to state:  "...same as in Alternative B." |

BLM_0012895

| | | | | |
|---|---|---|---|---|
| | | | acres – 60%, of Non-WSA Lands with Wilderness Characteristics would be open for ROW's (pages 4-114 and 4-115, Table 4.48); 2) 225 acres would be open to coal bed methane development (page 4-129); 3) Horsethief Point and Behind the Rocks would be vulnerable to mining of salable minerals (sand and gravel, building stone) (page 4-131); 4) No portions of ten areas would be designated SRMA's, and four would not be covered by either SRMA's or ERMA's (pages 4-136 and 4-137); and 5) most would not be within designated ACEC's (pages 4-140 thru' 4-144). (Incidentally, there appear to be errors and/or muddied discussion in the first paragraph, sentences 3 and 4, of page 4-143 attributing to Alternative C comments which apparently refer to another alternative.) | |
| Glen Canyon Group | 209 | 47 | Re: Summary Pages 4-162 thru 4-168 The VRM table (Table 4.58) is incorrect in showing 0% Class I in Alternative B, while Table 4.55 designates some Class I in Beaver Creek, Behind the Rocks, Dead Horse Cliffs, Dome Plateau, Goldbar, Gooseneck, Horsethief Point, Hunter Canyon, Labyrinth Canyon, Mary Jane Canyon, Mill Creek Canyon, Negro Bill Canyon, and Westwater. | The commentor is correct.  There are 45,048 acres of non-WSA lands with wilderness characteristics that are designated as VRM Class I in Alt B.  The designation is for other reasons, usually the establishment of an ACEC. Table 4.58 has been corrected to show that 45,048 acres are VRM Class I (17%) in Alt. B, while 221,437 acres are VRM Class II (83%) in Class B. |
| Glen Canyon Group | 209 | 48 | Re: Summary Pages 4-162 thru 4-168 Finally, in regard to Table 4.60 which lists 161,327 acres or 61% of woodland acres open to harvest under C, we direct BLM to correct errors on page 4-162 noting that "in the 165,984 acres that remain open for wood-cutting (and where the resource exists), wilderness characteristics may be compromised by surface disturbing activities such as driving cross-country to the trees…" | Driving cross-country in pursuit of wood-cutting activities would be illegal under all action alternatives except in areas designated as "open to OHV use".  The areas the commentor describes are all in the "limited to designated routes" category under all action alternatives.  See response to comment 209-43. |
| Glen Canyon Group | 209 | 53 | Re: 4.3.22.8 Non-WSA Lands with Wilderness Characteristics Pages 4-494 and 4-495 This section portends many more "costs" than "benefits", especially in the long-term, which is defined as the 15-20 year life of the Plan. Only prescribed fire | The BLM does not deny the negative impacts to these lands under certain alternatives.  These impacts are stated explicitly in the section to which the commentor refers.  The negative impacts are also included in the discussion of the impacts to wilderness characteristics |

BLM_0012896

| | | | | |
|---|---|---|---|---|
| | | | for vegetation treatments, and construction of riparian fences or new water developments would enhance the natural character of Non-WSA lands in the long-term. All other uses would "degrade" – in BLM's terms, wilderness characteristics. To be honest, BLM should admit that these developments/uses would destroy wilderness characteristics, making them ineligible for wilderness designation, not just in the long term, but forever. | from the various alternatives throughout Chapter 4.  The BLM is not required to manage these lands under all alternatives to protect wilderness characteristics, let alone manage then according to the non-impairment standard required for Wilderness Study areas.<br><br>See also response to comment 124-53. |
| Glen Canyon Group | 209 | 54 | Re: 4.3.23.6 Non-WSA Lands with Wilderness Characteristics, Page 4-504<br>According to this section, the analysis of Cumulative Impacts "includes all Federal with wilderness characteristics in Utah that are currently being managed for management of wilderness characteristics to protect those values." That is, it includes designated wilderness, WSAs and Non-WSA lands with wilderness characteristics, all of which are protected by law or administrative decision. Alternative B would protect a total of 5,932,521 acres or about 4.5% of the statewide total. Alternative C by contrast would protect only 0.8% - less than one per cent of the statewide total acres which are, in BLM's words quoted above, currently being managed for management of wilderness characteristics. The Interim Management Plan for Lands Under Wilderness Review (IMP) should thus govern all of these areas under all – or at least all action, alternatives. As stated in Appendix P, the current Land Use Planning Handbook (H-1601-1, 2005) BLM land use plans must avoid or minimize impacts to wilderness characteristics. Alternative C is incompatible with this charge. | The commentor's assertion that the referred quote includes non-WSA lands with wilderness characteristics is incorrect.  The BLM is unaware of any law or administrative action that that requires this type of management.  See also responses to comments 209-53 and 124-53. |
| Questar Exploration and Production Company | 210 | 6 | Non-Wilderness Study Area (WSA) Lands with Wilderness Characteristics. The DRMP/EIS proposes 33 non-WSA lands with wilderness characteristics within the Moab planning area. The Preferred Alternative proposes to manage 47,761 acres to | See response to comments 203-5, 203-6 and 203-7. |

BLM_0012897

| | | | | |
|---|---|---|---|---|
| | | | preserve wilderness characteristics. It appears that many of these areas do not meet the criteria for wilderness as described in the DRMP/EIS. Human impacts, primarily consisting of oil and gas development, are evident throughout the proposed areas. IPAMS has submitted information depicting existing human activity within the proposals for wilderness characteristics protection should preclude such a designation. It is interesting to note that BLM's consideration of these as wilderness characteristics areas demonstrates that energy development is temporary and that reclaimed energy development sites can be considered to possess wilderness characteristics.<br>Recommendation: The basis for wilderness-like protections seems tenuous. BLM must disclose the information used to determine that these lands meet the wilderness criteria and how the boundaries were designated. Management of non-WSA lands should continue current practices without additional restrictions to preserve "wilderness characteristics." The document should acknowledge that impacts of energy development are temporary and reclamation technology has progressed to a point that the footprint is imperceptible in later years. | |
| Bill Barrett Corporation | 214 | 2 | There is no justification and no mandate in the Federal Land Policy and Management Act of 1976 (FLPMA) and no process requirement for engaging in an ongoing Wilderness Inventory and review. | The BLM's authority for managing lands to protect or enhance wilderness characteristics comes directly from FLPMA Section 202 (43 U.S.C. §1712). This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield. Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences." (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2)).) Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and |

BLM_0012898

| | | | | |
|---|---|---|---|---|
| | | | | that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ." (FLPMA, section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.

In addition, the BLM's Land Use Planning Handbook (H-1601-1) directs BLM to "identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation). Include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives.  For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics." |
| Bill Barrett Corporation | 214 | 17 | The BLM has not adequately justified managing areas which were not included in the original Wilderness Study Areas (WSAs) for wilderness qualities. | The BLM's authority for managing lands to protect or enhance wilderness characteristics comes directly from FLPMA Section 202 (43 U.S.C. §1712).  This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield.  Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences."  (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2)).)  Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ."  (FLPMA, |

894

BLM_0012899

| | | | | |
|---|---|---|---|---|
| | | | | section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>In addition, the BLM's Land Use Planning Handbook (H-1601-1) directs BLM to "identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation).  Include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives.  For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics." |
| Bill Barrett Corporation | 214 | 18 | The BLM received new information from the Southern Utah Wilderness Alliance (SUWA), but does not specify what that new information was.  That information should be readily available to the public in order to assess the quality of the information. | Information was received from the Southern Utah Wilderness Alliance regarding wilderness proposals both prior to, and during scoping.  A reference to this information is made in Appendix P in the DRMP/EIS. This information is part of the adminstrative record for the land use planning process and is available to the public upon request. |
| Bill Barrett Corporation | 214 | 19 | Many of the non-WSA lands that supposedly have wilderness characteristics do not meet the criteria for wilderness, and should not be managed as wilderness and closed to oil  and gas development.  Human impacts can be seen throughout the areas, including active wells, plugged and abandoned wells, pipeline ROWs, roads, structures, and other imprints of human activitiy.  This arbitrary drawing of boundaries enables the designation of wilderness in land that reallly by any common sense analysis does not meet the criterio of undisturbed land. | Refer to response to comment 124-54 and 121-71. |
| San Juan Public Entry | 267 | 2 | We do not agree with BLM's position on pursuing more wilderness. FLPMA provided a time frame for BLM to | See response to comments 121-10, 120-8, 120-9, 121-61, 121-71 and 121-58. |

895

BLM_0012900

| and Access Rights | | | inventory wilderness. That time frame has long ago come and gone. BLM was forced to rescind their Wilderness Inventory and Study Procedures Handbook because it was inappropriate. In Oct 2003, BLM came out with an instruction memo 2003-275 Change 1 that says BLM may consider wilderness characteristics in preparing their RMPs. This sounds almost like abuse of Congress intent of FLPMA. | |
|---|---|---|---|---|
| | 269 | 1 | Management objective that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character to create a de-facto Wilderness management is unlawful. Congress put a deadline on inventory and study for Wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 271 | 17 | Management objectives that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto wilderness management is unlawful. Congress put a deadline on inventory and study for wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 276 | | Management objectives that use such things as primitive recreation zones, area of critical environmental concern, and "areas with wilderness character" to create de-facto Wilderness management is unlawful. Congress put a deadline on inventory and study for Wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 277 | 4 | "Lands with wilderness Character." This issues should have been dropped from BLM planning in 1991! | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 278 | 1 | Management objectives that use primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto wilderness management is unlawful. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 279 | 1 | Management objectives that use primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto wilderness management is unlawful. Congress put a deadline on inventory for Wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |

BLM_0012901

| | | | | |
|---|---|---|---|---|
| Grand County Backcountry Council | 289 | 11 | Alternative C identifies only 47,761 acres of roadless backcountry that should be managed to preserve wilderness character while 266,485 acres of wilderness-quality land are identified in the RMP. Why should over 200,000 acres with wilderness character be sacrificed? | Chapter 4 of the DRMP/EIS points out that, of the 266,485 acres of wilderness characteristics lands, over 40% of these are protected through no surface occupancy stipulations in the Preferred Alternative.  For instance, while Gooseneck and Shafer are not labeled "WC" in the preferred alternative, they are protected through ACEC designation, managed as no surface occupancy for oil and gas leasing and all other surface disturbing activities, and thus are not "sacrificed" in Alt. C. |
| | 290 | 1 | The Congressional mandate to manage BLM land pursuant to the Multiple Use/Sustained Yield paradigm described in law. Congress put a deadline on inventory and study for Wilderness and the BLM should no longer be allowed to manage solely for "wilderness character." | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 293 | 1 | Management objectives that use primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto wilderness management is unlawful. Congress put a deadline on inventory for Wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 294 | 3 | Management objectives that use primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto wilderness management is unlawful. Congress put a deadline on inventory for Wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 300 | 1 | The Congressional deadline on inventory and study for "wilderness" must be acknowledged as unacceptable and unlawful. The BLM cannot and should not manage for "wilderness" character" to create more de-facto "wilderness areas." | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 310 | 24 | Congress gave very specific instructions to the BLM regarding Wilderness or Lands with Wilderness Character. Those instructions are contained in Section 603 of FLPMA. Congress instructed the agency to inventory all of their lands, identify which were definitely not of wilderness quality and then to begin an intensive inventory and analysis to determine which of the remaining lands would be recommended for inclusion | See response to comments 120-8, 121-10, 121-58, and 121-61. |

BLM_0012902

| | | | | |
|---|---|---|---|---|
| | | | into the National Wilderness Preservation System.<br><br>There is no justification, no mandate in FLPMA and no process requirement for engaging in an ongoing Wilderness inventory and review. Once the "603" process was completed, the agency was done with its Wilderness Review.<br><br>Other than the management of existing WSAs, the BLM should have no part in this issue. TO do so is a tragic loss of management resources. When formulating land use plans and considering opportunites for solitude and unconfined recreation, the BLM must consider all other resource values and uses and attempt to balance the competing uses and values using the Multiple Use/Sustained Yield paradigm. | |
| | 328 | 1 | I believe it is unlawful to go backwards and create wilderness areas where the BLM so chooses to appease other groups. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 332 | 1 | The preferred alternative fails to provide adequate protection for lands of wilderness character. Too often, especially in the transportation plan, the allowed uses are seen as balancing the claims of different recreation communities while actually it's a question of maintaining the natural character of the land. The most glaring example is the inclusion of only 18% of the land with wilderness character outside WSAs as AWCs. | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-0550-1; BLM 1995). However, the BLM may manage the lands to protect and/or preserve some of all of those characteristics through the land use planning process. In addition, under the land use planning process, the BLM must consider a range of alternatives for the lands identified with wilderness characteristics. This gives the public the ability to fully compare the consequences of protecting or not protecting the wilderness characteristics on these Non-WSA lands. If all alternatives contained comparable protections of the Non-WSA lands with wilderness characteristics, the alternatives would have substantially similar consequences and would not be significantly distinguishable. |
| | 334 | 2 | The preferred alternative has eliminated areas | The management and level of protection of the wilderness |

BLM_0012903

| | | | | |
|---|---|---|---|---|
| | | | identified, by the BLM as having wilderness characteristics. These areas are to be managed as wilderness and protected until congress decides on their management. Turning them into motorized recreation is in direct conflict with the BLM mission and makes it impossible for these lands to be maintained with wilderness values. All areas identified by the BLM as having wilderness character need to be restored to that designation. | characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  However, the BLM may manage the lands to protect and/or preserve some or all of those characteristics through the land use planning process.  In addition, under the land use planning process, the BLM must consider a range of alternatives for the lands identified with wilderness characteristics.  This gives the public the ability to fully compare the consequences of protecting or not protecting the wilderness characteristics on these Non-WSA lands.  If all alternatives contained comparable protections of the Non-WSA lands with wilderness characteristics, the alternatives would have substantially similar consequences and would not be significantly distinguishable. |
| | 338 | 1 | Places that have been open to vehicle traffic for decades are now being called Wilderness by people that most certainly don't travel through the area other than on the dirt roads. | Not a comment; no response required. |
| Dolar Energy | 423 | 3 | Alternative B is very restrictive for human use, and I am very concerned about the proposal to manage so-called "non-Wilderness Study Area (WSA) lands with wilderness characteristics" to maintain wilderness. There is no justification and no mandate in the Federal Land Policy and Management Act (FLPMA) and no process requirement for engaging in an ongoing Wilderness inventory and review. Once the "603 Process" was completed, the agency was done with its Wilderness Review. The question of which lands should be included in the National Wilderness Preservation System will be a decision of Congress. Other than the management of existing WSAs, the BLM should have no part of this issue. To do so would obviate that FLPMA mandate, USC § 1702 (c) ("Section 103(c)"), of multiple use and result in a loss of economic development in the local community and a denial of | See response to comments 214-17, 214-18, 214-19, 120-8 and 121-10. |

BLM_0012904

| | | | | |
|---|---|---|---|---|
| | | | energy resources for the state and nation. | |
| | 424 | 1 | See Appendix P "The current BLM Land Use Planning Handbook (H-1601-1, 2005) states that land use plans must: "Identify decisions to protect or preserve wilderness characteristics…" By losing the identity of 82% of the land that BLM recognized had WC, please explain how BLM is following the dictates of this handbook. Certainly the 366,485 acres determined to have WC are "sliced and diced" in so many ways under the various other resource allocations, that this land will first lose its WC label and then lose it on the ground as it becomes just a part of a SRMA, IRMA, VRM category, grazing allotment, oil and gas exploration area etc. | See response to comment 124-53. |
| | 424 | 2 | I recommend that the following areas be managed for wilderness characteristics: Hunter Canyon<br>Hatch Wash<br>Fisher Towers (alt C shows 5,540, however there are 17,235 acres with WC)<br>Mary Jane (alt C shows 16,499 acres, however there are 24,779 acres with WC)<br>Big Triangle<br>Behind the Rocks<br>Mill Creek (3,388 acres adjacent to Mill Creek WSA)<br>Gooseneck<br>Shafer<br>Horsethief<br>Labyrinth<br>Westwater Canyon | The management and level of protection of the wilderness characteristics on non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995). Any non-WSA lands found either to have wilderness characteristics or likely to have wilderness characteristics will be managed according to the management prescriptions established in the RMP. These Non-WSA lands have many resource values and use in addition to wilderness characteristics. The DRMP/DEIS considered all available information and a range of alternative prescriptions for how these values and uses would be managed.<br><br>See response to comment 124-53. |
| | 424 | 3 | Since there do not appear to be any maps in the entire document to show the boundaries that MFO has decided to protect as WC and the areas that will not be retained as WC, I cannot determine reviewing the information provided whether there are any other user conflicts. | Volume 3 of the DEIS/RMP provides maps of non-WSA lands with wilderness characteristics (Maps 2-24-B and 2-24-C). Any areas not on the maps were judged by the BLM not to possess wilderness characteristics. Detailed maps of each of these areas are available on the Moab BLM planning website, under "background documents". |
| | 426 | 1 | The BLM is no longer allowed to manage solely for supposed "wilderness characteristics." | See response to comments 120-8, 121-10, 121-58, and 121-61. |

BLM_0012905

| | 431 | 1 | Management objectives that use such things as primitive recreation zones. Areas of critical concern, and so-called "areas with wilderness character create a de-facto Wilderness management is unlawful. Congress put a dead line on inventory and study for wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
|---|---|---|---|---|
| | 432 | 1 | Management objectives that use such things as primitive recreation zones. Areas of critical concern, and so-called "areas with wilderness character create a de-facto Wilderness management is unlawful. Congress put a dead line on inventory and study for wilderness. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Intrepid Potash | 435 | 2 | There is no justification and no mandate in the Federal Land Policy and Management Act (FLPMA)  and no process requirement for engaging in an ongoing Wilderness inventory and review. Once the "603 Process" was completed, the agency was done with its Wilderness Review. The question of which lands should be included in the National Wilderness Preservation System is now between Congress and the American people. Other than the management of existing WSAs, the BLM should have no part in this issue. To do so would obviate the FLPMA mandate, USC § 1702 (c) ("Section 103(c)"), of multiple use and result in a loss of economic development in the local community and a denial of mineral resources for the state and nation. | See response to comments 120-8 and 121-10. |
| | 441 | 2 | The wilderness issue has been addressed and identified, it is time to move on and not create a subclass wilderness designation as proposed. What is the legal basis for continuing to designate new wilderness areas? | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 442 | 1 | Let's stick to the criteria that defined "wilderness" when the bill was passed years ago. The BLM should not be revising or altering this. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 457 | 1 | Management objectives that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create a de-facto Wilderness management are unlawful. Congress put a deadline on | See response to comments 120-8, 121-10, 121-58, and 121-61. |

BLM_0012906

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  | inventory and study for wilderness. |  |
|  | 467 | 1 | Management objectives that use such things as primitive recreation zones, areas of critical environmental concern, an so-called areas with wilderness character to create a de-facto wilderness management is unlawful. Congress put a deadline on inventory and study for wilderness. The BLM should no longer be allowed to manage solely for wilderness character. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
|  | 474 | 1 | Travel plan says BLM is required to follow a non-impairment standards with regard to management of WSA tracts. The preferred alternative proposes managing roughly 20% of the areas acknowledged as having wilderness character. This seems out of line with the expressed non impairment mandate. | The non-impairment mandate applies only to WSAs, and not to non-WSA lands identified as possessing wilderness characteristics. |
|  | 474 | 3 | Allowing too many OHV routes in tracts that BLM has inventoried and acknowledged to possess wilderness characteristic  would undermine active Congressional legislation  to formally designate and permanently protect portions of BLM areas within the Red Rock Wildness. | See response to comment 124-53. |
| Environmental Protection Agency | 479 | 15 | The EPA supports the management of Beaver Creek, Mary Jane Canyon, and Fisher Towers to protect their wilderness characteristics (WC).  The EPA believes that additional WC lands or portions of WC lands need to be managed for wilderness characteristics.  These include those areas of WC that are within ACEC designations recommended above: Negro Bill Canyon (9 acres), portions of Goldbar (35 acres), Gooseneck (843 acres), portions of Labyrinth Canyon (5,436 acres) and portions of Mill Creek Canyon (2,335 acres) | All areas determined to have wilderness characteristics are managed to protect these resources in Alt B.  The additional areas suggested by the commentor for protection of wilderness characteristics in the preferred alternative (Alt C) are proposed for no surface occupancy because of other resource values.  This proposed management would also protect the wilderness values of these areas. |
| Coconino Trail Riders | 488 | 1 | The DRMP departs from the "Multiple Use/Sustained Yield" mandate imposed on the BLM by Congress and the Congressional time limit for Wilderness inventory has passed. The designation of quasi-wilderness areas through this planning process is inappropriate and | See responses to comments 121-10, 120-8 and 121-63. |

BLM_0012907

| | | | unlawful. | |
|---|---|---|---|---|
| Outward Bound Wilderness | 630 | 1 | I feel that it is important for our organization and many other commercial and private users to create a management plan for the Labyrinth Canyon area that ensures future users can enjoy the river corridor. Outward Bound brings students from all over the country and parts of the world to Labyrinth Canyon for its quiet and subtle beauty that is a crucial river corridor classroom for our students. Allowing the management plan to change in such a way that will allow more motorized users to be in the area and not protect the wilderness characteristics will impact (audibly and visually) the current quality of Labyrinth Canyon in a negative way. | The DRMP?EIS proposes to manage the entire Green river corridor as no surface occupancy for oil and gas and all other surface disturbing activities.  That portion of the Green River from the San Rafael River to Canyonlands National Park is recommended for Wild and Scenic River status.  Many routes along or near the Green river have not been designated for motorized travel to protect riparian resources.  The management of the Green River is more restricted under the new Moab RMP than under the old Grand RMP. |
| Outward Bound Wilderness | 630 | 2 | How is the BLM ensuring that areas with Documented Wilderness Characteristics are being appropriately monitored and preserved? How is the BLM ensuring that new routes are not being established? How is the BLM taking into account noise from these new routes and how they may audibly and visually affect the non-motorized users of Labyrinth Canyon? | Those areas of Wilderness Characteristics that the BLM choses to manage for are being managed as no surface occupancy in the preferred alterantive.  No new routes would be authorized in areas managed as No surface occcopancy.

BLM does not manage the noise of motor vehicles.  This is a matter of state law. |
| Outward Bound Wilderness | 630 | 3 | The BLM preferred alternative in the Moab RMP seems to favor designation and opening of more motorized routes yet downgrades and eliminates many Wilderness Characteristic areas, often in the same area. In lands administered by the Moab Field Office, a large amount of land with Wilderness Characteristics is adjacent to the Green River – why is it that the BLM finds it necessary to designate and open more routes in these areas vs. designating other areas as recreation areas for OHV users? | The DRMP/EIS drops approximately 2,500 miles of route from motorized travel, including many near or along the Green River.  No new motorized routes are proposed in the preferred alternative. |
| Outward Bound Wilderness | 630 | 4 | The BLM should consider blocking roads and/or making trailheads on each road ½ - 1 mile up each canyon before it opens to the Green River corridor. This would allow for both user groups and still allow foot access to motorized users. (This approach works well for Range | In some of the canyons approaching the Green River, the route actually starts on the river and moves up the canyon (e.g. Mineral, Hell Roaring and Spring canyons).  This approach would thus not work in these canyons. |

BLM_0012908

| | | | | |
|---|---|---|---|---|
| | | | Creek Canyon in Desolation Canyon and could be applied here) | |
| | 639 | 1 | I strongly object to management of so called "wilderness areas" as de facto wilderness study areas. The Federal Land Policy and Management Act provided a mechanism for the designation of wilderness study areas and that congressionally designated process should not be evaded through the land management process. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 823 | 4 | The second issue is the continuing and never-ending poush for more (and more inappropriate) wilderness designations. The BLM was given a very clear mandate in FLPMA regarding the inventory of wilderness-quality lands. This clearly mandated process was completed over 15 years ago. There is no justification, no mandate in FLPMA and no process requirement for engaging in an ongoing Wilderness inventory and review. The question of which lands should be included in the National Wilderness Preservation System is now between Congress and the American people. Other than the management of existing WSA's, the BLM should have no further part in this issue. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 824 | 1 | Since these lands have been recognized as having wilderness potential by the BLM (and many other individuals and organizations, of course) they should be managed as wilderness until final decisions are made regarding their inclusion in formally designated wilderness areas. Therefore, they should be closed entirely to (1) motorized vehicle use on or off existing roads/routes; 2) minerals, oil and gas exploration/development; and 3) livestock grazing. | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  Any Non-WSA lands found either to have wilderness characteristics or likely to have wilderness characteristics will be managed according to the management prescriptions established in the RMP. These Non-WSA lands have many resource values and use in addition to wilderness characteristics.  The DRMP/DEIS considered all available information and a range of alternative prescriptions for how these values and uses would be managed.<br><br>For example, in Alternative B, most of the Non-WSA |

BLM_0012909

| | | | | |
|---|---|---|---|---|
| | | | | lands are open to oil and gas leasing subject to standard lease terms and conditions. While Alternative C is designed to provide maximum conservation and protection of natural resources from resource development and use. Under Alternative C, some Non-WSA lands with wilderness characteristics would be closed to leasing and most Non-WSA lands with wilderness characteristics would be leased subject to either minor operational constraints like timing limitations or controls on surface use, or major constraints like no surface occupancy. Alternative D reflects existing management direction, and Alternative A (the Preferred Alternative in the DRMP/DEIS) is designed to provide for a wide variety of resource needs, including mineral resource development and some level of protection of natural resources. |
| | 829 | 1 | In addition, you should treat wilderness eligible lands as designated wilderness, until a decision is made to take those lands off the wilderness eligible listing. | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995). Any Non-WSA lands found either to have wilderness characteristics or likely to have wilderness characteristics will be managed according to the management prescriptions established in the RMP. These Non-WSA lands have many resource values and use in addition to wilderness characteristics. The DRMP/DEIS considered all available information and a range of alternative prescriptions for how these values and uses would be managed. |
| | 929 | 1 | Wilderness areas in southeastern Utah do not work because of the travel problems on foot or horse back and carrying enough water- thus the lands will become areas of NO USE. | See response to comment 121-71. The 1990 Utah BLM Statewide Wilderness Environmental Impact Statement (EIS) assessed the relative uses to which the areas now known as Wilderness Study Areas (WSAs) could be put to use. The EIS proposed a range of alternatives, from no wilderness to all wilderness, for the lands in question. The EIS was never acted upon by Congress, and they continue to be managed by the BLM |

BLM_0012910

| | | | | | |
|---|---|---|---|---|---|
| | | | | | under the non-impairment standard until Congress takes action. |
| | 934 | 16 | We strongly oppose the inclusion of "Land with Wilderness Character" issues in this document. The designation of wilderness study areas was completed in 1991 and there is no plausible reason for reopening that issue in this RMP. The BLM would be in conflict with the direction that congress gave in section 603 of FLPMA, since there has been no statement by congress that the BLM should open this discussion again. Inclusion of "Lands with Wilderness Character" in this document will surly lead to lawsuits. | | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 935 | 1 | The preferred alternative fails to provide adequate protection for lands of wilderness character. Too often, especially in the transportation plan, the allowed uses are seen as balancing the claims of different recreation communities while actually it's a question of maintaining the natural character of the land. The most glaring example is the inclusion of only 18% of land with wilderness character outside WSAs as AWCs. | | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-0550-1; BLM 1995). However, the BLM may manage the lands to protect and/or preserve some of all of those characteristics through the land use planning process. In addition, under the land use planning process, the BLM must consider a range of alternatives for the lands identified with wilderness characteristics. This gives the public the ability to fully compare the consequences of protecting or not protecting the wilderness characteristics on these Non-WSA lands. If all alternatives contained comparable protections of the Non-WSA lands with wilderness characteristics, the alternatives would have substantially similar consequences and would not be significantly distinguishable. |
| | 935 | 2 | The whole route from the mouth of Spring Canyon to the Hey Joe Mine should be closed to preserve the natural character of the _____ corridor and prevent conflict with recreation not at odds with that character. Additionally, the route extends degradation of actual qualities on the floor of Hey Joe Canyon well above the mine and turn-around by offering access to ATVs. | | Although this issue was raised during scoping, the application in the DRMP/DEIS is limited.  Under Management Actions Common to All Alternatives, travel routes can be added or deleted from the Travel Plan based on public demand or unacceptable impacts to resources.  This action would be based on monitoring and site specific NEPA analysis. |
| | 937 | 2 | Fully protect all wild places around Moab such as | | The management and level of protection of the wilderness |

BLM_0012911

| | | | | |
|---|---|---|---|---|
| | | | Fisher Towers, Goldbar Rim, Labyrinth Canyon, and certainly the vast entire viewsheds of Arches and Canyonlands National Parks from oil and gas development and ORV use. | characteristics on non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  Any non-WSA lands found either to have wilderness characteristics or likely to have wilderness characteristics will be managed according to the management prescriptions established in the RMP.  These Non-WSA lands have many resource values and use in addition to wilderness characteristics.  The DRMP/DEIS considered all available information and a range of alternative prescriptions for how these values and uses would be managed.<br><br>See response to comment 124-53. |
| | 939 | 2 | Second, I'm concerned about the non-WSA lands with Wilderness Characteristics. It scares me to read that Alt. C abandons all but three of these areas and protects a paltry 48,000 acres out of the potential 266,000 acres. I find that incredibly disturbing. How can you possibly consider that to be balanced? It's a giveaway. It's immoral. It worries me to think about what other 'uses' in our irreplaceably beautiful lands may have to endure. They must be protected. Do not allow the despoilation of the few undisturbed places we have left. | See response to comment 124-53. |
| Great Old Broads for Wilderness | 941 | 3 | BLM proposes to designate 2,642 miles of ORV routes, many on lands within America's Red Rock Wilderness Act, including many which the BLM previously recognized as wilderness-quality. Damage from ORV use will be widespread. And peace and quiet will be extremely difficult to find: BLM's proposal will result in 84% of public lands near Moab (those south of I-70 which attract most of the areas visitors) being within 1/2mile of a designated ORV route. Where are we non-motorized folks to go to escape these machines? | See response to comment 124-53. The Moab Field Office manages over 350,000 acres as Wilderness Study Areas, in which only primitive recreation is allowed.  In addition, the DRMP/EIS designates lands as non-motorized (hiking) focus areas.  Non-motorized recreation is to be emphasized in these areas. |
| | 944 | 2 | Your alternatives slash Proposed Wilderness Areas. The BLM is the one that actually concluded these | See response to comment 124-53. |

BLM_0012912

| | | | places have wilderness character. How could they completely reverse their position? There should be NO motorized access in these areas. | |
|---|---|---|---|---|
| | 945 | 1 | after reviewing the entire Moab RMP, I have some serious concerns about your management plans. I do not agree that  any of the Alternatives go far enough in protecting the wilderness, wildlife, wildlife habitat and cultural values (archaeological sites) in the WSA lands and on the non-WSA lands with wilderness characteristics. Since these lands have been recognized as having wilderness potential by the BLM (and many other individuals and organizations, of course), they should be managed as wilderness until final decisions are made regarding their inclusion in normally designated wilderness areas. Therefore, they should be closed entirely to (1) motorized vehicle use on or off existing roads/ routes; (2) minerals, oil and gas exploration/ development; and (3) livestock grazing. These land with wilderness potential make up only a small part of the Moab BLM area--- there is plenty of land reamining available for properly-managed vehicle use, livestock grazing, and mining/oil & gas exploration. | The management and level of protection of the wilderness characteristics on Non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  Any Non-WSA lands found either to have wilderness characteristics or likely to have wilderness characteristics will be managed according to the management prescriptions established in the RMP.  These Non-WSA lands have many resource values and use in addition to wilderness characteristics.  The DRMP/DEIS considered all available information and a range of alternative prescriptions for how these values and uses would be managed.

For example, in Alternative B, most of the Non-WSA lands are open to oil and gas leasing subject to standard lease terms and conditions.  While Alternative C is designed to provide maximum conservation and protection of natural resources from resource development and use.  Under Alternative C, some Non-WSA lands with wilderness characteristics would be closed to leasing and most Non-WSA lands with wilderness characteristics would be leased subject to either minor operational constraints like timing limitations or controls on surface use, or major constraints like no surface occupancy.  Alternative D reflects existing management direction, and Alternative A (the Preferred Alternative in the DRMP/DEIS) is designed to provide for a wide variety of resource needs, including mineral resource development and some level of protection of natural resources |
| | 951 | 8 | How do you monitor noise levels in WSAS? | Noise levels in WSAs are not monitored on a routine basis.  Since WSAs are closed to motorized travel and other surface disturbance, any noise is likely to be from |

BLM_0012913

| | | | | |
|---|---|---|---|---|
| | | | | outside the WSA boundaries.  WSAs must provide either outstanding opportunities for solitude or primitive and unconfined recreation, but such opportunities need be present only somewhere within the WSA, and not necessarily everywhere. |
| | 951 | 9 | How do you monitor people who violate WSAs while driving in closed areas? | Enforcement actions are administrative and do not require land use planning decisions. |
| | 951 | 10 | What are the projections for use in wilderness? How do you measure the intrinsic and spiritual value of sacred lands? | See response to comment 121-71. |
| Californians For Western Wilderness | 952 | 4 | Thus it is inexplicable that the Plan fails to offer protections to those areas that both citizens of Utah and BLM itself have identified as having wilderness character. These include Labyrinth Canyon, areas near Fisher Towers, and the Dome Plateau. | The DRMP/EIS provides protections to many lands in the Moab planning area.  The prime mechanism for doing this is the imposition of a no surface occupancy stipulation for oil and gas leasing and other surface disturbing activities. Areas that are protected in this fashion include Labyrinth Canyon of the Green River, the entire area near Fisher Towers and the riverside portions of the Dome Plateau.<br><br>In Alt C, Fisher Towers is proposed to be managed to protect its wilderness characteristics. |
| Californians For Western Wilderness | 952 | 6 | Back when the lawsuit settlement was enterend into between then- Secretary Gale Norton and the State of Utah regarding BLM's wilderness inventories it was widely stated by officials at the Interior Departement and in the BLM tha the settlement did not preclude protecting areas with wilderness character. So far, BLM has ____ itself of doing that, and this plan reinforces that perception. Lands in the Moab district with wilderness character and that are included in America's Red Rock Widerness Act should be protected as such until Congress decides to act. | The BLM has chosen to protect some of the lands referred to by the commentor.  Some of these lands are protected by managing them for wilderness characteristics;  others are protected through ACEC designation, and others are protected by imposing a no surface occupancy stipulation in Alt. C.  See Chapter 4 of the DRMP/EIS for an analysis of the impacts to lands with wilderness characteristics from the varying alternatives. |
| | 954 | 1 | We have greatly enjoyed the time we have spent there and are very disturbed at the plans you are attempting to set forth there. This area is not a national park and should not be treated as such. These areas have along history of mining and ranching with many established access routes. They are the epitome of the Multiple | The BLM's authority for managing lands to protect or enhance wilderness characteristics comes directly from FLPMA Section 202 (43 U.S.C. §1712).  This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield.  Nothing in this section constrains the |

BLM_0012914

| | | | | |
|---|---|---|---|---|
| | | | Use/ Sustained yeild principal that has successfully guided the decision making process for the BLM for many years. The Wilderness Study areas and areas with wilderness character are just plain wrong. They are de-facto wilderness. Wilderness areas must meet specific criteria to be designated as wilderness by congress. Either these areas fit the criteria or they don't. Those that do not should be released back to general use immediately. I am strongly opposed to the proposal set forth by the Southern Utah Wilderness Association. | Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences."  (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2)).)  Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . . ."  (FLPMA, section 103(c) (43 U.S.C. §1702(c)).)  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>In addition, the BLM's Land Use Planning Handbook (H-1601-1) directs BLM to "identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation). Include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives.  For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics."<br><br>See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 956 | 3 | The BLM should be keeping ORVs out of WSAs as well. The long term values of the canyon country are in its natural state- the spectacular scenery, solitude and serenity provide refuge from the misery of modern times. | The preferred alternative designates only 1.7 miles of route within over 350,000 acres of Wilderness Study Area. |
| | 957 | 2 | Allowing too many OHV routes in tracts that the BLM has inventoried and acknowledged to possess | See response to comment 124-53. See also response to comment 124-48 concerning cultural conflicts. |

BLM_0012915

| | | | | |
|---|---|---|---|---|
| | | | wilderness characteristics could place at risk a rapidly vanishing national resource-- roadless and primitive areas. In addition, such actions would undermine active congressional legislation to formally designate and permanently protect portions of BLM areas within the Red Rock Wilderness. Allowing OHV routes within areas of wilderness character will also put irreplaceable cultural resources at risk of distruction and looting. The clear mandate to the agency is to protect and preserve these resources for future generations. | |
| | 968 | 1 | Management objectives that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called "areas with wilderness character" to create de-facto Wilderness management is unlawful. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| Howard County Bird Club | 972 | 2 | We compliment BLM for reviewing wilderness characteristics of the areas proposed in America's Red Rock Wilderness Act, although we may disagree with some of BLM's conclusion. We urge that all the areas proposed in that bill be held under protection until Congress has made decisions on wilderness designation. It is unfortunate that the Department of the Interior still clings to the unreasonable policy that no more areas will be recommended for wilderness stattus. That will change, and BLM will again be able to support deserving lands for protection as wilderness. In the final plan BLM should add protection for wilderness character of all qualifying. | The BLM chooses to manage three of the non-WSA areas with wilderness characteristics to protect those characteristics in Alt. C.  However, of the 266,485 acres of non-WSA lands that were found to have wilderness characteristics, 105,963 acres (40%) are either closed to leasing or have a no surface occupancy stipulation on the leases.  Four of these areas would be protected, in whole, from all surface disturbing activities: Beaver Creek, Gooseneck, Mill Creek Canyon, and Shafer Canyon.<br><br>The BLM has no obligation to protect all lands that it has inventoried as having wilderness characteristics.  See also response to comment 124-53. |
| | 975 | 2 | The preferred alternative, and indeed, none of the other alternatives, adequately protect wilderness study areas. These areas were selected and set aside for study because they exhibit wilderness characteristics. Trails have been illegally etched onto the landscape in these areas by OHVs. Illegal activities should not disqualify these lands from wilderness designation, and by proposing to drop them as wilderness study areas, the BLM is condoning illegal activity which it failed to | Wilderness Study Areas cannot be released by the land use planning process.  The Moab DRMP/EIS states that if these lands are released by congress (at some point in the future), they will be subject to a plan amendment before actions can be authorized. The Moab BLM has over 350,000 acres of Wilderness Study Area.  These areas are monitored monthly; their suitability for wilderness has not been impaired. |

BLM_0012916

| | | | | |
|---|---|---|---|---|
| | | | adequately curtail. | As described in Chapter 1, pg. 1-11 of the DRMP/DEIS under the title "Issues Addressed Through Policy or Administrative Action," WSAs are managed in accordance with the Interim Management Policy for Lands Under Wilderness Review (IMP, H-8550-1; BLM 1995).  The WSAs are statutorily required, pursuant to FLPMA Section 603(c), to be managed to protect their suitability for Congressional designation.  Applying a visual resource management objective of Class I and managing the WSA as either limited to designated ways or closed to OHVs are the only two decisions that this land use planning effort has authority to make.  All other decisions for the management of WSAs are outside the scope of this RMP/EIS process. |
| | 976 | 3 | "Map 2-24-C Areas with Wilderness Characteristics Alternative C" is even more shocking since the BLM preferred Alternative C proposes eliminating conservation management for nearly all the areas that are identified as having Wilderness Characteristics in Map 2-24-B. Page 2-5 suggests that it is somehow a reasonable "balance" to slash 33 non- WSA areas with wilderness characteristics (266, 485 acres) to 3 (47, 761). True balance would mean protecting every single one of those 266, 485 natural acres. Given how much of the Moab area is already roaded, or susceptible to commodity development and how little of the Moab area is still "natural" and considering how central the area has become as a destination for adventure tourism it is clearly urgent to maximize protection for WSAs, areas with wilderness characteristics, areas that qualify as Wild and Scenic Rivers, and all river corridors and riparian areas while there is still something to save. | See response to comment 124-53.

As described in Chapter 1, pg. 1-11 of the DRMP/DEIS under the title "Issues Addressed Through Policy or Administrative Action," WSAs are managed in accordance with the Interim Management Policy for Lands Under Wilderness Review (IMP, H-8550-1; BLM 1995).  The WSAs are statutorily required, pursuant to FLPMA Section 603(c), to be managed to protect their suitability for Congressional designation.  Applying a visual resource management objective of Class I and managing the WSA as either limited to designated ways or closed to OHVs are the only two decisions that this land use planning effort has authority to make.  All other decisions for the management of WSAs are outside the scope of this RMP/EIS process.

In addition, the preferred alternative of the DRMP/EIS proposed that the Green, Dolores and Colorado Rivers be managed as Wild and Scenic Rivers.  These river corridors are to be managed as no surface occupancy for oil and gas leasing and all other surface disturbing activities. |

BLM_0012917

| | 1030 | 6 | P 2-5, section 2.1.1.7....all of them would be protected and managed to preserve their wilderness characteristics and values in Alternatives B. Or maybe you just want to say "to preserve their wilderness characteristics"? | The word "value" was chosen deliberately. |
|---|---|---|---|---|

## Wildlife

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| ECOS Consulting | 9 | 11 | Where there are healthy populations of top predators, like mountain lions, bobcats, bears, foxes, and coyotes; the prey species, such as mule deer, pronghorn antelope, bighorn sheep, and elk, must also live in abundance.  Where prey populations are healthy, there must be sufficient forage for them, therefore the protection of areas large enough to support populations of predators can result in the preservation of the whole range of species, both animals and plants, as well as the integrity of the complex ecosystem they inhabit.  The management of habitat to ensure healthy populations of predators must be the goal of the BLM in its future management of public lands, in order to obtain ecosystem balance and manage according to its own "ecosystem management" commitment. | The BLM has worked with the Utah Division of Wildlife Resources (UDWR) to delineate important habitats for big game species of wildlife upon which predators depend. Proposed management decisions in the alternatives for the DRMMP/EIS to protect wildlife habitat include restrictions to oil and gas leasing and other surface disturbing activities, the removal of grazing in high value wildlife allotments (Cottonwood, Diamond, Bogart, Pear Park, North and South Sandflats, and Between the Creeks allotments).  Predators are managed by UDWR. |
| ECOS Consulting | 9 | 14 | The BLM must plan for the protection of migratory birds by listing and mapping important habitat types, and keeping designated "D Roads" and other activities to a minimum in these areas.  None of this type of planning is evident in this document. | On pg. 4-252 of the DRMP/EIS there are six decisions common to all alternatives that provide protection for migratory birds.  The needs of wildlife including migratory birds were considered during the travel plan process. |
| ECOS Consulting | 9 | 16 | The DRMP fails to adequately assess and disclose the direct, indirect, and cumulative effects of designating the White Wash Dunes Area "open" to cross-country OHV use.  I have been to this area numerous times in the past two years and have documented extensive and continuing damage to the dunes, vegetation, and the | Throughout Chapter 4 of the DRMP/EIS the BLM discloses the impacts to the White Wash open area to natural resources.

The BLM proposes management actions in Alt C of the DRMP/EIS that close by fencing the dune field |

BLM_0012918

| | | | | |
|---|---|---|---|---|
| | | | riparian areas in and surrounding the dunes due to OHV use.  I have also witnessed increased erosion and the loss of surface water due to the impacts of OHV use.  The OHV's have elimitated the vegetation and widened the channels in the riparian areas, making them susceptible to erosion and higher rates of evaporation, thus, destroying wildlife habitat for a range of large and small species from macro-invertebrets, to amphibians, to migratory birds, to Desert Bighorn Sheep, to possibly Mexican Spotted Owls. It is recommended that the riparian area should be down-listed to a "Non Functional" rating due to continued soil compaction and incremental loss of riparian vegetation.<br><br>There is a known group of Desert Bighorn Sheep that live in and around the White Wash Sand Dune area and although it may appear that the OHV's do not disturb them, how do we know what level of physiological stress is occurring? Could the disturbance heighten their susceptibility to disease, or lower their ability to reproduce? Have these questions been addressed and if so, what are the results? Are there any reports on this? What are the results of monitoring the Desert Bighorn Sheep in the area? What are the direct, indirect, and cumulative impacts of OHV's in the White Wash Sand Dune area on the local wildlife populations? | Cottonwood trees and White Wash water sources thus protecting vegetation and riparian areas.<br><br>The degree of specificity of information desired by the commentor is not availablle.<br><br>In Alt C (preferred alternative) of the DRMP/EIS, the BLM has closed inventoried routes in bighorn sheep escape terrain and has limited the open area to exclude this terrain. |
| ECOS Consulting | 9 | 58 | Page 4-442, Table 4.138, 4.3.19: This table is missing a number of very important wildlife associations that must be considered by the BLM in its analyses of impacts in this Moab RMP/EIS.  Add the wildlife association " aquatic macro-invertebrates" with the Aquatic habitat type.  These are extremely important "indicators" of water quality and aquatic habitat conditions and there has been a commitment by the BLM to monitor these. In the Conifer / Mountain Shrub habitat add the following important wildlife types: Raptors, bobcats, wolves, and coyotes.  In desert shrub add, mountain | The tables referred to have been modified as suggested by the commentor in the PRMP/FEIS. |

BLM_0012919

| | | | | |
|---|---|---|---|---|
| | | | lion, bobcat, fox, and coyote. In Pinyon-Juniper add bobcat, weasels, and raptors.  In Riparian / wetland add raptors, bobcat, river otter, beaver, fox, and coyote. | |
| ECOS Consulting | 9 | 61 | Page 4-444, Section 4.3.19.2.2: The adverse effects on aquatic and amphibious species are serious impacts that could eliminate certain species if not managed well. What safeguards does the BLM have in place that will minimize these serious impacts?  Aquatic species, including fish, macro-invertebrates, and amphibians, are the rarest and most sensitive wildlife species in this desert environment.  Thus, it is extremely important for the BLM to manage lands so that these impacts are absolutely minimal.<br><br>This section is not an analysis of impacts, as it is supposed to be, it is just a series of statements stating the obvious. What is the extent of the direct, indirect, and cumulative impacts on these species if fire suppression and management plans are enacted?  What percentage of aquatic habitat will be affected by the various Alternatives?  How much adjacent land will be affected by indirect and cumulative impacts?  Where are the analyses of these impacts, and what are the reasoned conclusions? | See response to comment 9-39. |
| ECOS Consulting | 9 | 67 | Page 4-454, Alternatives, 4.3.19.6.1-4: None of the four Alternatives provide adequate viable habitat for large wildlife within the Moab Planning Area.  In the analysis in this section only direct effects, and only the estimated number of directly disturbed acres, are considered in the impact analysis.  This is a violation of NEPA.  The BLM is required to analyze the indirect and cumulative impacts of these disturbances.  In the Moab Planning Area in particular, downstream and wind erosion effects can be widespread and particularly harmful to soils, vegetation, and water.  The BLM is well aware of these impacts because of the data from their water monitoring program, and because of the many accidents that have | Chapter 2 of the DRMP/EIS identifies management protections for all the big game species habitats  identified in the Moab Field Office.  These habitats were delineated through coordination with the Utah Division of Wildlife Resources.  The management include protections for pronghorn habitat, desert bighorn sheep habitat, Rocky Mountain bighorn sheep habitat, and deer/elk habitat.<br><br>Throughout Chapter 4 of the DRMP/EIS the BLM discloses the impacts to wildlife resulting from the management actions in the different alternatives.<br><br>See response to comment 124-7. |

BLM_0012920

| | | | | |
|---|---|---|---|---|
| | | | occurred on Interstate 70 due to increase in dust and sand storms in the Moab Planning Area.  These storms have been directly related to surface disturbance and the loss of viable biological soil crust within the Moab Planning Area.  These indirect and cumulative effects must be analyzed in the area, including NSO and closed areas, adjacent to impacted sites. This applies particularly to the loss if viable predator habitat for elk, mule deer, pronghorn, desert bighorn, and Rocky Mountain Bighorn sheep. | See response to comment 9-11. |
| ECOS Consulting | 9 | 68 | Page 4-464, 1st paragraph, 4.3.19.8:  This analysis does not consider the effect of roads and 4-wheel drive routes on wildlife habitat fragmentation.  Habitat fragmentation is a primary cause of the loss of many wildlife populations and habitat throughout the world, in particular large mammals: predators and ungulates.  It is recommended that the BLM analyze the direct, indirect, and cumulative effects of the density of roads it is recommending for each Alternative throughout the 1,800,000 acres of the Moab Planning Area. It is also recommended that many of these roads/routes be closed and restored in order to provide habitat large enough to sustain viable populations of our large predators and hoofed mammals. These large areas must also provide migration routes and connectivity among sub-populations, unencumbered by the fragmentation effects of roads or 4-wheel drive routes, in order to ensure genetic mixing and species hardiness. | See response to comment 124-39, 124-140, 1025-14, and 1025-15. |
| ECOS Consulting | 9 | 70 | Page 4-484, 3rd and 4th paragraphs, 4.3.19.18.2.3:  Here is where the habitat fragmentation by roads/OHV routes has the highest impacts as far as the effect on a single significant species, the Desert bighorn sheep. From the BLM's own analysis, although there is at least 128,832 acres of Desert bighorn sheep habitat, there is no place within the entire Moab Planning Area that meets the required minimum habitat patch size of 159 | See response to comment 124-39, 124-140, 1025-14, and 1025-15.

The imposition of a No Surface Occupancy stipulation on bighorn sheep habitat in Alt C is intended to improve bighorn habitat by decreasing the amount of new habitat fragmentation.  Over 100,000 acres are in the No Surface Occupancy category solely for the protection of this |

BLM_0012921

| | | | [square] km or about 62,000 acres (Singer et al. 2001). In patches smaller than 159 [square] km, Singer showed that sheep will not stay in the area, it is unsuitable habitat. The BLM attempts to downgrade these results by quoting anecdotal information from a BLM employee, saying not many vehicles go out into these areas. Has the BLM ever set up vehicle counters to measure how much visitation there is? If so, can we see the data? Does the BLM really know how much visitation is out there, or is it all an estimate, based on a couple of visits to the area? Does the BLM know how much disturbance, in the form of number of vehicles, is required for the disturbance to be negligible?

Many of these "roads/OHV routes" go nowhere in particular, and are redundant relative to nearby roads/routes. It is recommended that the BLM act wisely and in the spirit of its mandates and commitments to maintain healthy wildlife populations, by eliminating and restoring many of these useless roads/routes. In Desert bighorn sheep habitat, it is recommended that the BLM eliminate 80% of all roads/routes that are ranked as "D roads". This will open up the habitat for viable populations of desert bighorn sheep and other wildlife species, and it would continue to provide access to much of the area by OHV and other users through the use of the "B roads" and state highways.

If these roads/OHV routes are truly rarely used, and if they fragment and degrade wildlife habitat, and if the BLM is committed to providing suitable habitat for fish, wildlife, and special status species of plants and animals, then it is logical and reasonable for the BLM to close most of the "D roads" that are in crucial wildlife habitat. A management action of this type is a win-win situation: re creationists will not be disappointed | species. |

917

BLM_0012922

| | | | | |
|---|---|---|---|---|
| | | | because these routes are so little used, and wildlife habitat will be in a functioning condition and managed properly. However, if the roads/OHV routes are not closed and restored, wildlife habitat will continue to degrade and remain fragmented, and the ecosystem will continue disintegrate in the future. Is this the future vision of this Moab RMP? | |
| ECOS Consulting | 9 | 71 | Page 4-483, Analysis of Impacts on Wildlife, 4.3.19.18.2.1: It appears that the roads/OHV routes planned in all Alternatives of the Travel Management Plan will also have a serious impact on Pronghorn antelope habitat.  Causes of decline in pronghorn herds across the Southwest are numerous, but generally consistent.  Paramount to the persistence of any wildlife species is the presence of quality un-fragemented habitat. The direct, indirect, and cumulative impacts of the "D roads" in particular, must be analyzed for this species. | the Moab Field Office manages over 353,000 acres of Wilderness Study Area.  The routes in these WSAs have been closed to motorized travel in the Travel Plan accompanying the PRMP/FEIS. The WSAs provide large patches of unfragmented habitat within the planning areas.

Many miles of route in pronghorn habitat have been closed in the Travel Plan accompanying the PRMP/FEIS. This action has reduced pronhorn habitat fragmentation in the Moab BLM planning area. |
| ECOS Consulting | 9 | 81 | Protect Wildlife Habitat by precluding roads and OHV routes that effect and Fragment Wildlife Habitat. For many of the large mammals, there is no place within the entire Moab Planning Area that meets the required minimum habitat patch size. The BLM can remedy this and much of the projected 60-80% migratory bird habitat loss by closing and restoring many of the roads/OHV routes that are not necessary. It is recommended that the BLM analyze each and every "D Road" planned in the various Alternatives. Each of these "D Roads" should have a specific purpose that is stated supported in the Moab RMP, and must minimize impacts to wildlife, including migratory birds, and their habitat. If the proposed OHV routes do not minimize the impacts or if there is no overwhelming reason that the route should ne used by OHV's, the route should be closed and restored. Many of these wildlife habitat-destroying roads have no real purpose. Thus, the BLM should scale back its intended extent of | See response to comment 9-71.

See response to comments 124-39, 124-40, 1025-14, and 1025-15. |

BLM_0012923

| | | | "D Roads" in all the Alternatives, and rely on the "B roads" for access to most areas. The "B Roads" go practically everywhere in the Moab Planning Area, so closing "D Roads" should not inhibit access to most areas. This strategy would eliminate much of the wildlife habitat fragmentation and destruction that is currently occurring in the Moab Planning Area. | |
| Foundation for North American Wild Sheep | 11 | 1 | The UFNAWS is deeply concerned that the proposed RMP does NOT adequately protect the Rattlesnake and Range Creek Bighorn herds from potential domestic sheep disease tranmission. UFNAWS has been involved with the BLM in converting three domestic allotments to cattle in this areas, and there are still at least two more allotments east of Floy Wash that currently have domestic sheep on BLM lands. This herd continues to expland to the east, and this RMP is supposed to be a futuristic plan. | The DRMP/EIS would not allow the reconversion of cattle allotments to sheep in bighorn habitat.

Type of livestock is an issue that is usually addressed at the allotment permit renewal level.  As these allotments are renewed, using Standards for Rangeland Health and Guidelines for Grazing Management, the class of livestock will be addressed. |
| State of Utah - Public Lands Policy Coordination | 120 | 7 | The State believes the BLM should only employ the term "critical habitat" when referring to the legal habitat desigantions for endangered and threatened speicies under the Endangered Species Act.  The State requests that the BLM use the "crucial habitat" designations mapped by the UDWR. | The term critical has been reserved to Threatened and Endangered (T &E) species.  Corrections in the text have been made in the PRMP/FEIS.  For non-T&E species the BLM relied on the UDWR crucial habitat designations. |
| State of Utah - Public Lands Policy Coordination | 120 | 19 | The proper description of deer and elk crucial winter habitats and Rocky Mountain bighorn habitat should occur regardless of the alternative. | As required by NEPA, the BLM considered a range of alternatives.  For non-special status species the alternatives varied by the size of the habitat and the timing restrictions.  The management of habitat is consistent with the goals and objectives of each alternative.

In the Draft RMP/EIS, Alt B has a timing limitation for what is referred to as "winter habitat."  This habitat actually includes both crucial and high value winter habitats (635,774 acres). These habitats, although not separated in the draft,  have been properly described in the PRMP/FEIS. |

919

| | | | | |
|---|---|---|---|---|
| | | | | Alts C and D provide timing limitations for crucial winter habitat only (349,955 acres), not for both crucial and high value habitats.  The text has been changed to correct the error of confusing crucial and high value winter habitats. |
| State of Utah - Public Lands Policy Coordination | 120 | 20 | None of the alternatives address the fact that desert bighorn sheep wander between Crystal Geyser, Duma Point, and the Blue Hills.  This migration corridor should be recognized in the final RMP. | Duma Point and Blue Hills habitat and migration corridors are recognized in the Draft RMP/EIS.  Crystal Geyser is a small satellite population of recognized habitat located more than 10 miles across flat terrain from Duma Point. Defining a migration corridor across this flat terrain is unknown at this time.  No known habitat exists between Duma Point and Crystal Geyser.  Current studies are underway that may identify a migration corridor. |
| State of Utah - Public Lands Policy Coordination | 120 | 21 | The estimate of disturbed acreage to white-tailed prairie dogs as identified on page 4-315 is under estimated. Increased volume and speed of traffic, frequent road upgrades, and construction of utility poles and storage tanks, noise from wells and compressors, and increased recreational use will negatively impact prairie dogs. | Table 4.91 (pg. 4-315) has been changed to clarify that the acreage of disturbance from oil and gas development includes ancillary facilities such as roads, pipelines, and powerlines.  The BLM acknowledges in the impact analysis that there may be additional loss of individuals due to increased volume and speed of traffic. |
| State of Utah - Public Lands Policy Coordination | 120 | 23 | Surveys for wildlife are not considered to be a vaild form of compensatory mitigation. | The language on pg. 4-315 has been clarified to state: "The results of these surveys will be used for avoidance and other mitigating measures." |
| State of Utah - Public Lands Policy Coordination | 120 | 24 | The BLM should recognize that prairie dogs create important habitat for many other wildlife species.  There is room to enhance the discussion in the Proposed RMP/Final EIS. | The Proposed RMP/Final EIS (pg. 4-314) includes discussion about the benefits provided by prairie dog habitat to other important habitat. |
| State of Utah - Public Lands Policy Coordination | 120 | 25 | The BLM should only allow the use of  utility poles in areas where underground conduits are not practical. Raptor excluders should be placed on utility poles where needed. | Upon receipt for proposed development, the BLM will analyze the impacts to prairie dogs and other wildlife as part of the NEPA process and would apply the appropriate mitigation measures as necessary.  This may include underground conduits and raptor excluders. |
| State of Utah - Public Lands Policy Coordination | 120 | 26 | The BLM should work with the U.S. Department of Agriculture Wildlife Services to reduce nesting by ravens on storage tanks and other oil and gas infrastructure (i.e. design structures to be less suitable for nests). | Refer to comment 120-25. |

BLM_0012925

| State of Utah - Public Lands Policy Coordination | 120 | 27 | Enforce a 45 mile-per hour speed limit on secondary roads in oil and gas development areas from July through September to prevent deaths of young hawks and owls due to vehicle impact. | The speed limit on secondary roads is 25 mph unless otherwise posted. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 28 | When existing roads in raptor areas where they are likely to experience greatly increased trafffic due to oil and gas well development, roads should be relocated as far as practical from the raptor nests regardless of whether or not the wells themselves are within a nest buffer. | Refer to comment 120-25. |
| State of Utah - Public Lands Policy Coordination | 120 | 29 | On pg. 3-143, the RMP states "the planning area is not considered a suitable reintroduction area for black-footed ferrets due to dramatic declines in prairie dog populations". DWR considers the Cisco Desert the number 2 priority for black-footed ferret reintroduction in Utah and request that this language be removed from the RMP/EIS | The language in the text  (pg. 3-143) of the Proposed RMP/Final EIS that states "the planning area is not considered a suitable reintorduction area for black footed ferrets" has been deleted . |
| State of Utah - Public Lands Policy Coordination | 120 | 30 | The BLM should consider including the parcel surrounding the Gunnison's prairie dog habitat northwest of Bridger Jack Mesa as part of the Behind the Rocks ACEC. | When the BLM developed alternatives, the commentor did not identify this area as Gunnison's prairie dog habitat.  Furthermore, most of the area referred to is State land. |
| State of Utah - Public Lands Policy Coordination | 120 | 31 | Parcel R-11 which is identified for disposal under all alternatives contains Gunnison's prairie dog habitat. The State urges caution regarding the disposal of this land because the Gunnison's prairie dog may become petitioned for listing under ESA. | Parcel R-11 has been dropped from the disposal list (Appendix D, pg. D-3). |
| State of Utah - Public Lands Policy Coordination | 120 | 32 | Map 2-25  does not delineate pronghorn fawning habitat south of I-70 in the Cisco Desert. | Although pronghorn habitat is identified south of I-70, the BLM and UDWR agreed that the majority of fawning occurs north of I-70 due high population densities. UDWR habitat data from 2003 does not identify any pronghorn habitat south of I-70.  Pronghorn habitat south of I-70 was added by BLM due to known and potential occupancy. |
| State of Utah - Public Lands Policy Coordination | 120 | 33 | Fragmentation of crucial big game winter habitat due to oil and gas development should be mitigated through restoration at 4 acres for every 1 acre disturbed. | According to Washington Office Instruction Memorandum 2005-069, the BLM may identify off-site mitigation opportunities to address impacts of the project proposal, but is not to carry them forward for detailed analysis |

BLM_0012926

| | | | | unless volunteered by the applicant. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 34 | Reference the Utah Comprehensive Wildlife Strategy as the Utah Wildlife Action Plan. | This reference has been changed on pg. 2-44. |
| State of Utah - Public Lands Policy Coordination | 120 | 36 | The State recommends a 2 mile buffer within active sage grouse leks. The habitat reclamation ratio should be 4:1. There are currently no alternatives or reparations known to suitably replace a sage grouse lek. | There are currently no active Gunnison or greater sage-grouse leks in the Moab Field Office.<br><br>In 2005, the BLM and UDWR signed the Gunnison Sage-grouse Rangewide Conversation Plan. One of the conservation measures identified in the plan to minimize impacts from mineral development was "apply a lease stipulation of No Surface Occupancy within 0.5 miles of occupied lek sites year round". Since the Moab Field Office currently has no active leks a Controlled Surface Use/Timing Limitation stipulation of 2.0 miles was applied so that any leks discovered in the future could be protected. This stipulation also precludes permanent surface occupancy within 2.0 mile of an active lek and no surface disturbing activities allowed within 0.5 miles year round.<br><br>To be consistent with the Utah State Sage-grouse strategy, the controlled surface use/timing limitation lek buffer for greater sage-grouse has been changed from 0.5 mile to 2.0 mile in the Preferred Alternative (Alt C).<br><br>The BLM agrees that sage-grouse leks are irreplaceable, and Alts B and C offer the greatest degree of protection for them (2 mile lek buffer). Alt B, if selected in the final decision document, would provide the greatest level of protection for any leks identified, while Alt D would provide the least amount of protection.<br><br>See the response to comment 120-33. |
| State of Utah - | 120 | 38 | Seasonal restrictions and spatial buffers should be | On pg. 2-53 it is specified that raptors are to be managed |

922

| | | | | |
|---|---|---|---|---|
| Public Lands Policy Coordination | | | required of energy development.  Use the U.S. Fish and Wildlife Services Raptor Protection Guidelines. | in accordance with the Best Management Practices (BMPs) included in Appendix O.  These BM's implement the Utah Field Office Guidelines For Raptor Protection From Human and Land Use Disturbances (F&WS, 2002) and provide for modifications of spatial or temporal raptor nest buffers, if an established set of criteria can be met.

The document specifies that the BMPs, or specific elements of the BMPs, which pertain to the proposal, should be attached as Conditions of Approval to all BLM use authorizations that have the potential to adversely affect nesting raptors, or would cause occupied nest sites to become unsuitable for nesting in subsequent years. Therefore, the raptor BMPs can be applied to any surface disturbing action, including energy development activities, where raptor nesting may be affected.

As specified in the U.S. Fish and Wildlife Service "Guidelines" document, modifications of spatial and seasonal buffers for BLM-authorized actions would be permitted, so long as protection of nesting raptors is ensured.  State and/or Federally-listed, proposed, and candidate raptor species, as well as BLM State-sensitive raptor species, should be afforded the highest level of protection through this BMP process; however, all raptor species would continue to receive protection under the Migratory Bird Treaty Act.  Modification of the buffers for threatened or endangered species would be considered pending results of Section 7 Consultation with U. S. Fish and Wildlife Service. |
| San Juan County | 121 | 8 | BLM erroneously uses the term critical habitat (defined as applicable only to threatened and endangered species).  This error occurs on Maps 2-27 B and C/D, on pages 3-169 and 3-171 and on page N-6. The term crucial habitat is used too loosely; UDWR uses crucial habitat as descriptive designations.  They are not intended to mislabel resource concerns and result in a | Maps 2-27B and C/D refer to the term crucial winter range and the term critical is not used.  The term critical is used erroneously on pgs. 3-32, 3-38, 3-39, 3-40, 3-125, 3-127, 3-169, 3-171, 3-174, 3-177, and N-6.  This term will be changed to crucial in the final RMP/EIS.

The UDWR is the jurisdictional agency for wildlife |

BLM_0012928

| | | | | |
|---|---|---|---|---|
| | | | limitation of compatible uses.  San Juan County disputes the acreage identified for crucial elk and deer winter range in San Juan County and submits information from Dr. Charles Kay in that regard. | management within the State.  The BLM relied on the expertise of this agency for delineating wildlife habitats, estimating population numbers, and recommending wildlife restrictions.

Also, refer to comment response 121-39. |
| San Juan County | 121 | 28 | San Juan County disputes the acreage identified for crucial elk and deer winter range in San Juan County. San Juan County asks that Alt. A coverage be used for deer and elk winter range.  Prescriptions should be added to the alternatives to allow for collaborative monitoring and studies conducted that will allow for habitat designations to be biologically and scientifically based. | The BLM relied on UDWR, the agency with jurisdictional expertise regarding deer and elk.  In the 1985 Grand RMP, the BLM did not impose restrictions on the entire deer and/or elk habitat (approximately 110,000 acres) delineated by UDWR within San Juan County. Restrictions were only imposed on about 4,000 acres of this habitat.  A prescription in the alternatives is not necessary in order to allow for collaborative monitoring and studies. |
| San Juan County | 121 | 29 | The term "critical" is used inappropriately for wildlife habitats on the following pages:  p. 3-38, 3-39, 3-169 (in Table 3.52), 3-171. Critical is used only for 'sensitive species' habitat. | These terms have been corrected in Chapter 3 of the PRMP/FEIS. |
| San Juan County | 121 | 32 | There is a discrepancy between Tables 3.56 and 3.57 on DWR population objectives for elk.  BLM should clarify or correct this.  San Juan County questions the accuracy of DWR's elk counts. | Tables 3.56 and 3.57 have been changed to correct the discrepancies. |
| San Juan County | 121 | 33 | BLM should remove the crucial winter range for elk in San Juan County, including all prescriptions, impacts, environmental consequences, etc. from the DRMP (pg. 3-173). | Throughout the DRMP/EIS, the reference to "deer and elk habitat" has been replaced with "deer and/or elk" habitat. Since the prescriptions and environmental consequences for the two animals are very similar, the habitats were considered together. |
| San Juan County | 121 | 34 | Pronghorn do not use pinyon juniper habitat.  Correct this inconsistency in Table 4.138 on page 4-442. | Pronghorn do utilize pinyon juniper habitat occassionally but their primary habitat is sagebrush/perennial grass. This has been corrected in Table 4.138. |
| San Juan County | 121 | 35 | BLM has presented no data that would justify range extensions for mule deer, elk, bighorn sheep or antelope.  BLM assumes that habitat is the most important factor limiting ungulate popularions, but data from studies indicate that numbers are limited by predation. | UDWR is the agency with jurisdictional authority for mule deer, bighorn sheep, elk, and antelope.  The BLM relies on the UDWR for their expertise regarding habitats.  The BLM does not have any authority to regulate predation. |

BLM_0012929

| | | | | |
|---|---|---|---|---|
| San Juan County | 121 | 36 | Much of the area listed as antelope/kidding habitat on Map 2-25 is seldom actually used by antelope.  The failure of antelope to increase in numbers are due to factors other than habitat , such as low fences in the southern end of the area and predation.  Unless BLM can produce data showing that the area is heavily used by antelope, multiple use activities should not be restricted. | The BLM has not restricted multiple use activities due to the existence of antelope habitat in San Juan County.  A minor timing restriction (45 days) for surface disturbing activities is imposed on antelope habitat during kidding periods.  This timing restriction is within the standard operating procedures for oil and gas activities.  UDWR is the agency with jurisditional authority for predator control.  The DRMP/EIS states on pg. 2-53 "Construct fences that allow for pronghorn passage and dismantle uneeded fences" in pronghorn habitat. |
| San Juan County | 121 | 37 | BLM proposes an increase in bighorn sheep habitat over that proposed in the 1985 RMP.  Much of the area proposed is seldom visited by bighorns, as they are never far from escape terrain.  Studies have shown that hikers have a greater negative impact on desert bighorns than do motorized users.  Predation is the key limiting factor on bighorn, an issue not addressed in the DEIS. | Only the Shafer Basin (within San Juan County) was proposed as bighorn habitat in 1985.  The addition of bighorn habitat delineated by UDWR within San Juan County is along the rims of Canyon Rims, and in the Hatch Wash area.  The majority of the bighorn habitat is within 0.5 to 1 mile from escape terrain.  The BLM is aware of the studies that document the impact of hikers on bighorn sheep.  Permitted hiking is restricted on a case by case basis within bighorn habitat under the issuance of Special Receration Permits as stated on pg. 2-30 of the DRMP/EIS.  UDWR is the agency with jurisditional authority for predator control. |
| San Juan County | 121 | 38 | BLM has combined deer and elk habitat throughout the analysis.  This should be corrected for the following reasons:  habitat manipulations that favor elk do not benefit mule deer;  elk are above herd objective and need to be reduced; combining habitats is a way to increase elk numbers; BLM ignores the fact that elk will displace mule deer; elk and deer respond differently to development and human use, with elk being more easily displaced than deer; Monticello BLM maps deer and elk habitat spearately; there is no elk use on BLM land that BLM wants to classify as "crucial habitat" in San Juan County | The BLM combined deer and elk habitat for the purposes of analysis.  On pg. 4-442, the DRMP/EIS states "Mule deer and elk habitat have been combined in an attempt to simplify the management of their closely overlapping ranges…Further discussions and analyses will consider the two species together".  The BLM chose to map deer and/or elk habitat on the same map to simplify readibility.  In the PRMP/FEIS the habitats will be delineated separately on a map.<br><br>However, throughout the PRMP/EIS the wording has been changed from "deer and elk" to "deer and/or elk".  The BLM acknowledges that elk are not found on every acre of deer habitat. |

BLM_0012930

| | | | | |
|---|---|---|---|---|
| | | | | The land use plan provides for broad landscape level planning prescriptions.  These habitats will be separated for analyses on a site specific project level.<br><br>UDWR has the jurisdictional authority for population objectives of big game species. |
| San Juan County | 121 | 39 | The 1985 Grand RMP designated only a small area near the LaSal Mountains as habitat for mule deer. The BLM wants to propose an increase with no justification. San Juan County's study (undertaken in the Spring of 2006) found little mule deer use south of East Coyote Wash.  BLM ignored these data.  Additionally, there is virtually no elk use, except at Lackey Fan and on Three Step Hill.  Calling the area deer and elk winter range is without merit. BLM should produce data south of East Coyote Wash to show that this is crucial deer or elk winter range. | UDWR has the jurisdictional authority for the identification of deer and elk habitat.  The BLM relied on this expertise.  As stated in response to comment 121-38, the BLM has corrected the wording of the habitats to read "deer and/or elk habitats". |
| San Juan County | 121 | 40 | BLM should not use the phrase "a thriving natural ecological balance" because it does not know what "natural" is (p. 2-5).  On Map 2-20, "historic habitat" for sage grouse is identified as "pre-setttlement" habitat. San Juan county has been settled for 10,000 years. | The statement on pg. 2-5 is a simple statement directed to the general public that the BLM attempts to develop management prescriptions on a landscape level which will support and protect wildlife habitats while allowing for multiple use.<br><br>Presettlement habitat of sage grouse is defined on pg. 34 of the Gunnison Sage Grouse Range Wide Conservation Plan.  The term presettlement in this document refers to the early 19th century. |
| San Juan County | 121 | 41 | Page 2-50:  BLM says it will "work in coordination with UDWR to reduce wildlife numbers as necessary to restore sagebrush habitat."  BLM does not do this.  The factor most responsible for the decline of sagebrush is browsing by mule deer, not drought. | UDWR is the agency with jurisdictional authority for wildlife population numbers.  The DRMP/EIS states that BLM will work with UDWR to achieve the UDWR goals. |
| San Juan County | 121 | 42 | Page 3-168.  The species name for elk is cervus elaphus, not cervus canadenisis. | UDWR lists elk as cervus canadenisis and this nomenclature was adopted by the BLM in the DRMP/EIS. |
| San Juan County | 121 | 43 | Page 3-169 - 171.  Mule deer do not eat dry and dead grass during the winter. Predation, not drought, is the | The BLM stands by the statement on pg. 3-169 that mule deer will eat dead grass during the winter. |

BLM_0012931

| | | | | |
|---|---|---|---|---|
| | | | reason for reduced mule deer numbers.  ATV's, oil and gas development, mining, livestock grazing do not have the impact that predators have had on mule deer populations.  Predation must be discussed in the Draft RMP/EIS. | Predation, although not within the BLM's jurisdiction, can also contribute to mule deer population declines.  This has been added to chapter 3 of the PRMP/FEIS. |
| San Juan County | 121 | 44 | Page 3-171.  BLM states that 90% of the local deer and elk population is located on BLM during an average of five winters out of ten.  These data must be produced.  On p. 3-172, DWR herd objectives and population estimates for elk are listed.  These are imaginary numbers.  DWR's elk population estimates are consistently 30-40% low because the agency ignores scientific studies.  BLM should acknowledge the error of DWR's estimates. | The BLM has relied on information provided by the UDWR for elk and deer populations and habitat in the DRMP/EIS.  UDWR is the agency with juridictional authority on these matters. |
| San Juan County | 121 | 45 | Page 3-173.  BLM states that "livestock competition for forage is increasing as the elk herd numbers continue to grow."  Forage was allocated to livestock when the allotments were adjudicated;  thus, the problem is the increasing elk herd. | The BLM has reworded the sentence on pg. 3-173 to state that forage competition between livestock, other wildlife, and elk is increasing in the Cisco desert. |
| San Juan County | 121 | 46 | Page 3-173.  Elk use in Hatch Point is zero, in Lisbon Valley and on most of Black Ridge it is near zero.  The agency has no data to support its assertions. | Deer and elk habitats were combined for mapping purposes.  As stated in response to comment 121-38, these habitats have been delineated separately on a map. |
| San Juan County | 121 | 47 | Table 3.58.  BLM's age objectives for antelope make no sense.  Antelope do not normally live to 14, and an age objective of 2 means the herd is under extreme harvest pressure, which is not the case. | This information was provided by the UDWR which is the agency with jurisdictional authority. |
| San Juan County | 121 | 48 | What evidence is there that desert bighorns actually use the Redd Sheep Trail? | Pellets from bighorn have been gathered from the Redd Sheep Trail;  tracks have also been seen on it, as well as extensively along the rims accessed by this trail. |
| San Juan County | 121 | 49 | Mule deer, elk and pronghorn do not utilize pinyon-juniper habitat, as is asserted in the DEIS.  There is no need to protect pinyon or juniper;  there is the need to clear them to restore natural conditions.  Maintenance of chainings must specifically be addressed in the RMP. | See response to comment 121-34.  Pronghorn use has been noted in areas where pinyon-juniper interfaces with shrub-steppe/grasslands.  These pinyon-juniper areas are utilized for thermal protection.<br><br>The DRMP/EIS (pg. 2-14) recognizes the need for maintaining vegetation treatments to increase the availabilty of forage.  Many of these treatments involved |

BLM_0012932

| | | | | |
|---|---|---|---|---|
| | | | | the removal of pinyon-juniper. |
| San Juan County | 121 | 50 | Page 4-449. Cattle do not eat sagebrush; cattle grazing at the proper time of year can improve sagebrush habitat for mule deer. Livestock do not compete for escape terrain or thermal cover with deer and elk. | Although cattle prefer grass, they will eat sagebrush when necessary. For example, during severe winters cattle may not be able to access grass and as a result they are forced to eat sage brush.<br><br>During summer months cattle will seek the shade along the edge of pinyon-juniper interfaces with sagebrush/grassland. These are areas that deer typically occupy for thermal protection and escape terrain. |
| San Juan County | 121 | 51 | Page 4-452. BLM mentions that elk are intolerant of cattle, which is true, but the BLM fails to mention that mule deer are intolerant of elk. The DEIS needs to discuss elk-deer competition. BLM needs to discuss the negative impact deer browsing has on sagebrush. | UDWR is the agency with jurisdictional authority for big game populations. Elk and deer competition must be addressed by UDWR population objectives.<br><br>Sagebrush communities across the west have been in decline from a myriad of reasons. The BLM Sagebrush Conservation Gidance is prescribed as management common to all action alternatives on pg. 2-50 of the DRMP/EIS. UDWR has not identified overpopulation issues among local deer herds utilizing sagebrush communities. |
| San Juan County | 121 | 52 | Pages 4-483 and 4-484. Sections 4.3.19.18.2.1 and 4.3.19.18.2.2 erroneously assess the impact of habitat fragmentation on mule deer and elk. BLM's analyses are flawed and should be corrected or removed. Sawyer's 2006 study is not applicable to San Juan County. DWR's study plots are near roads and DWR would not locate its plots close to roads if mule deer and elk use was reduced near roads as claimed by BLM. | The fragmentation analyses in the referenced sections are not an attempt to quantify specific impacts from site specific projects but are presented to analyze the degree of habitat fragmentation under each alternative. GIS models were based on the BLM's best available data. These models address fragmentation differences between alternatives on a landscape level. Habitat fragmentation is one of many factors that play an important role in land management decisions. |
| San Juan County | 121 | 53 | Pages 4-484 ti 4-485. BLM's analysis of bighorn sheep fragmentation is flawed (p. 4-484- 4-485). BLM fails to mention that hikers disturb sheep more than do vehicles. Predation should also be mentioned, as should the dense growth of non-native woody riparian vegetation found along the Colorado River. | As stated in response to comment 121-52, the analysis of habitat fragmentation for bighorn sheep is a tool to understand the differences in fragmentation among alternatives.<br><br>See response to comment 121-37 for a discussion of hikers on bighorn sheep. |

BLM_0012933

| | | | | Predation is under the jurisdiction of UDWR.<br><br>Tamarisk encroachment along the Colorado River was not raised as an issue in the Draft RMP/EIS. However, the BLM recognizes the need for bighorn watering catchments, and has an active program of wildlife watering projects. |
|---|---|---|---|---|
| San Juan County | 121 | 54 | Page G-25 (last paragraph). What reduces the survival rate of fawns and calves is predation. | BLM does not manage predation efforts; UDWR is the agency with jurisdicational authority over predation. |
| San Juan County | 121 | 55 | Page N-5. BLM's 1989 RMP amendment gave 1,440 as the "prior stable number" of desert bighorn sheep. On p. 3-176, it states that the DWR's population objective for the Moab area is 450 desert bighorn sheep. Why are these numbers different? | The number of 1,440 was used in the 1989 RMP amendment. The number 450 is an updated number utilzed in the DRMP/EIS (2007). The difference is a refliction of the number of years between the two documents (18 years). |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 57 | Page 4-464 – It is stated that, "short term adverse impacts include human presence and noise disturbances (though some species can become habituated to certain noises). Long-term adverse impacts include habitat fragmentation from roads and cross-country riding, soil compaction, increase erosion and reduced air quality". It has been demonstrated by wildlife themselves just how adaptable they are and how readily they habituate to the presence of motorized activity. When there are repetitive human activities they can and do adjust to these activities and use habitat adjacent to these areas. Habitat fragmentation is always an issue. All too often the argument is made that trails will fragment habitat. In reality, the animals may move away from the trail when there is human activity, but will move back into the area when, in this case, the rider moves out of the area. Also trails and roads do not serve as barriers to movement. | Designated routes will be utilized by motorized users although the level of use is impossible to determine. The statememnt on 4-464 acknowledges the impacts to wildlife from use of the routes. Use of the routes results in short term habitat fragmenation. The BLM stands by the statement on the impacts to wildlife.<br><br>The BLM assumes that designated routes will be utilized by motorized users. During times of use, the animals will move away. The BLM does not claim that the animals will not move back when the use passes. |
| Colorado Off-Highway Vehicle Coalition | 123 | 60 | This is an area [White Wash Sand Dunes] utilized by a small herd of desert big horn sheep. There is no lambing or rutting habitat shown for this area, but there are migration routes n the area. The existing motorized | The bighorn sheep herd around Crystal Geyser was recently relocated to Johns Canyon in San Juan County, Utah. The Utah Division of Wildlife Resources does not intend to relocate the herd from the Duma Point area. |

BLM_0012934

| | | | | |
|---|---|---|---|---|
| (COHVCO) | | | trail system and open area in the dunes area is not known to be adversely affecting the big horns.  There are areas nearby where motorized traffic is lacking that provides suitable habitat for the sheep.  Closing the Duma Point trail and not allowing motorized use in an area encompassed by Brian's Trail, the Dee Flat/Dee Pass Road and the Balanced Rock Trail to the Duma Rim Trail would provide an area where big horns would have escape cover and secure areas.  The BLM has indicated they will close the Duma Point Trail to provide escape cover for the sheep.  However, in a conversation with Bill Bates (UDWR) it was learned that the division has plans to relocate this herd to another area of the state that provides better habitat conditions and will help insure the viability of this small herd.  With the relocation of this herd potential impacts to this small population will be eliminated.<br><br>If the big horns are relocated then the entire area proposed by BRC as shown on Figure 1 would be open to motorized use.  Other than in the immediate sand dunes area, motorized use would still be limited to existing trails or slick rock areas, which would result in no additional impacts to habitat in the area. | The need to provide escape terrain to the Duma Point bighorn herd has resulted in the non-designation of several miles of user-made motorcycle trails in the Duma Point area.  The user made trails that are below the crucial bighorn habitat in the Duma Point area have been designated. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 62 | There are opportunities in this area [White Wash Sand Dunes] to enhance water sources for all wildlife.  Providing additional water sources in areas away from where motorized traffic occurs would reduces the changes of species being adversely affected as motorized activity increased in the area.  Fencing riparian areas to exclude livestock and motorized traffic there would be an increase in suitable habitat that would benefit a number of species. Other efforts to improve riparian conditions such as supplemental plantings would also benefit wildlife and compensate for potential impacts from OHV activities. | Wildlife improvements are not a resource allocation that requires a land use planning decision.  Alt C and Alt D in the DRMP/EIS propose to protect White Wash water sources which would benefit wildlife.  The BLM will seek to improve wildlife habitat in the White Wash area on a site-specific, case by case basis. |
| Colorado Off- | 123 | 64 | The desert big horns using this area [Dee Pass] would | The Utah Division of Wildlife Resources has no plans to |

BLM_0012935

| | | | | |
|---|---|---|---|---|
| Highway Vehicle Coalition (COHVCO) | | | be the same herd that is found in the White Wash area. Relocation of the herd would result in there being no issues with these animals in this area. | relocate the bighorn sheep herd in the Duma Point and Dee Pass area. Relocating sheep from Dee Pass would not be advantageous because other sheep from adjacent areas would emigrate into the Dee Pass area. The BLM's travel plan has allowed public use of the Dee Pass area with the closure of only a few of the user-made motorcycle trails that are within the area. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 75 | The area [Thompson Trail] has been mapped by the UDWR as antelope year around and kidding habitat. Given the low numbers of antelope found in the area it is doubtful use of the single-track trail will affect these animals at the individual or population level. During the winter there is little dirt bike use of the trail, which further minimizes the chances for impacting the antelope utilizing the area during the winter. | According to aerial surveys by the Utah Division of Wildlife Resources, large concentrations of antelope occupy areas along the Thompson Trail. The BLM agrees that use of the trail during the winter would have minimal impacts; however, impacts would increase during the fawning season. No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with antelope habitat. Establishment of new routes would require site specific NEPA analysis before they are considered for inclusion in the Travel Plan. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 76 | The area [Thompson Trail] is shown as being deer and elk habitat. However, none of the area is mapped as crucial wintering habitat or as calving and fawning area. It must be assumed there is little deer and elk use of habitat along the single-track route. Continued use of the route would have little or no affect on these animals. | The BLM agrees that there is minimal use of the deer and elk habitat in this area. Deer and elk habitat is not an issue in the non-designation of the Thompson Trail in Alt. C. No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with deer and elk habitat. Establishment of new routes would require site specific NEPA analysis before they are considered for inclusion in the Travel Plan. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 82 | The area [Pole Canyon/Black Ridge] is mapped as crucial deer and elk winter range. In a conversation with Bill Bates, biologist with UDWR, he stressed that the Black Ridge area is critical to wintering deer and elk also use the area. To a lesser degree they use sagebrush areas found in the Pole Canyon area. They have many years of data to support their observations about winter use by these big game species. There are already a number of roads and trails that are frequently used in this area. When conditions permit this area is used on a year around basis. How much effect this has | The BLM agrees that this area is crucial deer and elk winter range. This resource is one of the reasons that travel has been limited to designated routes within this area.

No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with deer and elk habitat. Establishment of new routes would require site specific NEPA analysis before they are considered for inclusion in the Travel Plan. |

931

BLM_0012936

| | | | | |
|---|---|---|---|---|
| | | | on winter use of the area by deer and elk is unknown. | |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 83 | If activities [in Pole Canyon/Black Ridge] as proposed by RwR are implemented motorized and mountain bike activity would be limited to specific areas.  Within these specified areas mitigation measures could be imposed that would greatly reduce potential impacts on wintering deer and elk.  These could include closure of the areas during the winter months to eliminate disturbance of wintering animals by human activity.  As a mitigation measure habitat improvement work could be implemented in portions of the areas to provide better winter forage conditions for the animals.<br>Use of the area as proposed by RwR would be limited to areas that do not provide good winter range for big game. Trails bike, rock crawling, and mountain bike preferred areas of use do not include the better wintering habitat areas.  No new trails would be established and old trails closed in areas providing good winter habitat.  Habitat improvement by brush hogging and other activities could be implemented to further improve habitat conditions for wintering animals. Those off road user groups that utilize the area could fund habitat improvement work.<br>In addition to these measures there would be timing limitations on use of the area by OHVs and mountain bikes.<br>Bates indicated that if the area were closed to all of the above mentioned activities from April 15 through November 1 each year and habitat improvement measures implemented, the UDWR could support use of the area. | No existing routes were closed in any of the alternatives for the Travel Plan in the DRMP/EIS due to conflicts with deer and elk habitat.  Establishment of new routes would require site specific NEPA analysis before they are considered for inclusion in the Travel Plan.  The mitigation measures suggested by the commentor would be considered during the site specific NEPA analysis for new routes.<br><br>The activities in the Pole Canyon and Black Ridge area proposed by Ride with Respect were not considered in the DRMP/EIS because many of them were not suggested during the scoping period and were not analyzed as part of this EIS. |
| Colorado Off-Highway Vehicle Coalition (COHVCO) | 123 | 85 | Prior to making final decision on whether some routes should be in or out, there is a need to conduct site-specific surveys to evaluate habitat conditions. Generally eliminating routes without these surveys is not warranted. Unless it can be proven that OHV use is causing a decline in habitat quality with a resulting | In general, no routes were eliminated in the alternatives for the Travel Plan in the DRMP/EIS solely for wildlife conflicts.  A few routes were eliminated from the alternatives for the Travel Plan due to specific conflicts with bighorn sheep habitat.  Extensive research using data collected from radio transmitted collars supports |

BLM_0012937

| | | | impact on wildlife justification for elimination of a route would not be warranted. | these travel management decisions regarding bighorn sheep.

Establishment of new routes would require site specific NEPA analysis before they are considered for inclusion in the Travel Plan.  The NEPA analysis may require wildlife surveys.

Section 202(c)(4) of the Federal Land Policy and Management Act directs the BLM "to rely to the extent it is available on the inventory of public lands, their resources, and other values" in the development or revision of land use plans. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 139 | The Draft RMP does not present alternatives that would provide sufficient unfragmented habitat for wildlife. The Draft RMP should not only analyze the impacts of habitat fragmentation, but also consider and adopt a management alternative that substantially reduces the levels of fragmentation in the planning area.

Under the preferred alternative, 74% of Gunnison sage grouse and 35% of greater sage grouse habitat remain affected. Even under the most protective alternative, Alt B, 69% of Gunnison sage grouse and 33% of greater sage grouse habitat remain impacted by fragmentation. Unde rall of the alternatives, there is no unfragmented or favorable habitat for desert bighorn sheep within the entire planning area. | DRMP/EIS provides a range of alternatives for the protection of wildlife habitats.  Though fragmentation has been widely documented as causing an array of impacts to wildlife and their habitats, an alternative designed to provide totally unfragmented habitat is not a feasible and reasonable alternative. Fragmentation is an existing condition of wildlife habitat.

To ensure that all federally listed, state sensitive, and big game species received adequate protective measures  to protect  habitats used for breeding, migration and the rearing of young, the BLM worked closely with the United States Fish and Wildlife Service and the Utah Division of Wildlife Resources to developed controlled surface use stipulations, seasonal and spatial buffers, habitat restoration plans and other measures that support Recovery Plans, Conservation Agreements, Conservation Plans and Recommendations, and Herd Management Plans.  Other wildlife species, though not specifically addressed in the DRMP/EIS, will also benefit from the many management prescriptions in the preferred alternative.

There are currently no active sage grouse leks within the |

933

BLM_0012938

| | | | | |
|---|---|---|---|---|
| | | | | Moab planning area. The DRMP/EIS on pg. 4-373 states that the planning area condition includes a large proportion of fragmented habitat.  Of the action alternatives, Alt B would result in the least amount of additional fragmentation and its attendant impacts, followed by C, D and A in ascending order.<br><br>Chapter 4 of the DRMP/EIS provides analysis of the impacts of habitat fragmentation on seveal wildlife species, including desert bighorn sheep on pgs. 4-482-486.  The analysis concludes that Alt B results in the least amount of new habitat fragmentation.  The DRMPEIS on pg. 4-484 recognizes that under all alternatives, "no unfragmented or favorable habitat exists within the Moab planning area." |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 140 | The Draft RMP improperly underestimates the impacts of habitat fragmentation. | The fragmentation analysis is not an attempt to quantify the specific impacts from the fragmentation that has or will result from existing or new road use and energy exploration and development, but is rather a tool  to understand the differing impacts among alternatives for future habitat fragmentation. The BLM has used the best available data to make an analysis of fragmentation differences among alternatives on a landscape level.  Habitat fragmentation is one of many factors that play an important role in wildlife management decisions.  Site specific impacts from future activities will be analyzed and when applicable, stipulations and mitigation measures may be implemented. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 141 | Managing lands to protect their wilderness characteristics reduces fragmentation and provides better habitat;  the Draft RMP should acknowledge these benefits and consider more alternatives to protect habitat. | Chapter 4 of the DRMP/EIS on pgs. 4-379-380 and 4-463 acknowledges the benefits of management to protect wilderness characteristics.  Alt B manages all non-WSA lands with wilderness characteristics to protect their natural values, including wildlife habitat. The DRMP/EIS provides a reasonable range of alternatives to protect habitat.<br><br>In addition to those lands managed for wilderness |

BLM_0012939

| | | | | characteristics, the Moab planning area includes designated wilderness and WSAs, which also provide unfragmented habitats for wildlife species. |
|---|---|---|---|---|
| Samson | 201 | 18 | On page 2-54 the BLM indicates that it will be increasing the timing limitation for pronghorn habitat by two weeks by changing the stipulation from May 15 - June 15 to May 1 to June 15 of each year. The BLM must ensure that this change in the timing stipulation is not imposed on existing leases through COAs on individual well activities. Further, the BLM cannot adjust Operators valid and existing rights. Congress made it clear when it enacted FLPMA that nothing therein, or in the land use plans developed thereunder, was intended to terminate, modify, or alter any valid or existing property rights. See 43 U.S.C. § 1701 note (2006). Because the authority conferred in FLPMA is expressly made subject to valid existing rights, 43 U.S.C. § 1701 note, an RMP prepared pursuant to FLPMA, after lease execution and after drilling and production has commenced, is likewise subject to existing rights. See Colovado Envivonmental Coal, et al., 165 IBLA 221,228 (2005). | See response to comment 214-4. |
| Cabot Oil and Gas Corporation | 202 | 18 | On page 2-54 the BLM indicates that it will be increasing the timing limitation for pronghorn habitat by two weeks by changing the stipulation from May 15 - June 15 to May 1 to June 15 of each year. The BLM must ensure that this change in the timing stipulation is not imposed on existing leases through COAs on individual well activities. The BLM cannot adjust Cabot's valid and existing rights. Congress made it clear when it enacted FLPMA that nothing therein, or in the land use plans developed thereunder, was intended to terminate, modify, or alter any valid or existing property rights. See 43 U.S.C. § 1701 note (2006). Because the authority conferred in FLPMA is expressly made subject to valid existing rights, 43 U.S.C. § 1701 note, an RMP prepared pursuant to FLPMA, after lease execution and | See response to  comment 214-4. |

BLM_0012940

| | | | after drilling and production has commenced, is likewise subject to existing rights. See Colorado Environmental Coal, et al., 165 IBLA 221,228 (2005). | |
|---|---|---|---|---|
| Colorado Division of Wildlife | 218 | 1 | Closing many of the spur roads that have no destination will also be of great benefit to wildlife.  There is one road that is identified to be closed under preferred alternative C in the travel management plan that concerns us, as we would like to have this road remain open.<br><br>In the Dolores River Triangle there is a road starting in Township 21S Range 26E Section 32 SW 1/4 (state school section) that heads south for approximately one mile before it braches; both branches head southeast up different forks of spring Canyon along Spring Creek before entering into Colorado.  This road provides the only public access into BLM land on the Colorado side of the border.  Closing this road to motorized use will have large impacts on hunger opportunity and harvest in Colorado's Game Management Unit 40.  Our elk herd in GMU 40 is currently well over it's population objective and helping hunters achieve success is of great importance to us.  Due to the large amount of private ground on the Colorado side and the difficulty in getting hunters onto private ground, public opportunity in this unit is limited.  The Spring Creek area is a popular spot for GMU 40 hunters to go, particularly in the later rifle seasons.  It is one of the most consistent locations in GMU 40 for hunters restricted to public land to harvest cow elk during this time period.  If this road is closed to motor vehicle access, it would greatly decrease hunter opportunity and success in this area, potentially leading to even higher elk population numbers in the unit.  A large number of the elk in this unit winter across the boarder in Utah and left unchecked will have significant impacts to habitat on both sides of the border | As this route provides the only public access to public lands in Colorado, it has been added to the preferred alternative.  The route has been designated in Alternatives C and D. |
| San Juan | 267 | 5 | Do you have scientific data to support the large deer | BLM has utilized data from the Utah Division of Wildlife |

BLM_0012941

| | | | | |
|---|---|---|---|---|
| Public Entry and Access Rights | | | and elk habitat areas? We do not think so. We had a member of our organization accompany the wildlife biologist (Charles Kay), hired by San Juan County to look at your proposed habitat areas in San Juan County. We observed that he found no scientific data or need for these large habitat areas. Studies paid for by San Juan County, and done by Charles Kay supports this statement. | Resources, the state agency with jurisdictional authority on wildlife. |
| Theodore Roosevelt Conservation Partnership | 288 | 3 | Upfront Commitment of Funds for Management, Monitoring and Restoration: The DEIS fails to provide a commitment to adequate funding of wildlife management, monitoring, and restoration for oil and gas development projects. In times of increasing pressure from energy development on our public lands – fish and wildlife management needs more funding, not less. Funds targeted for fish and wildlife are being redirected to the processing of permits for expanded energy development or planning for large scale energy projects. Providing long-term funding to monitor, evaluate and protect fish and wildlife populations influenced by energy development through post-development habitat and population restoration is essential. Funding appropriated for fish and wildlife management should be used to proactively manage habitats and populations, not just mitigate damage, process energy permits or plan for energy projects. Funding increases for energy development must be matched by increases for fish and wildlife management. Funding assurances should be given for the duration of the development and subsequent restoration. Included with increases in funding should be provisions for ongoing, intensive monitoring of fish and wildlife species and their habitats to facilitate alterations in development if unintended adverse impacts occur. | Funding for various projects is not an objective for the Resource Management Plan. The RMP is not a funding tool.  The RMP assumes that the BLM will have the funding and personnel necessary to undertake the actions mandated by the decisions in the RMP. |
| Theodore Roosevelt Conservation | 288 | 4 | Mitigation Plan: Given the nature of leasing and the need for upfront comprehensive planning, it needs to be known during the RMP process how the Moab FO will | The RMP is landscape level planning tool to which site-specific proposals are tiered.  There must first be a proposed project prior to developing site specific |

BLM_0012942

| | | | | |
|---|---|---|---|---|
| Partnership | | | establish plans for mitigation, including detailed monitoring and the use of adaptive management strategies to prevent, minimize or mitigate impacts of oil and/or gas exploration and development for future parcels offered for leasing. It needs to be known what the BLM will do to ensure that the areas that are developed get restored so that they can be hunted again during the lifetime of Utah hunters and anglers Prior to leasing, it needs to be known how long these potential energy developments will take to be implemented, recovered, and mitigated. The Moab FO also needs to know how the amount of money suggested for mitigation will relate to the revenues that will come from the developed area, and how it relates to the habitat base and to the biological needs of wildlife populations being affected. Under the current practice of leasing prior to planning, the Moab FO is sacrificing their ability to adequately plan energy development and accomplish the mitigation tactics of avoiding, minimizing, and reducing impacts on the public's fish and wildlife habitat. | mitigation.  Leasing itself is not a proposed action with a purpose and need, therefore, developing mitigation is not within the scope of this document. Site specific mitigation is developed at the time of the oil and gas development project, which is subject to site-specific NEPA analysis. |
| Theodore Roosevelt Conservation Partnership | 288 | 6 | Commitment to UT Division of Wildlife Resource's Management Objectives: The BLM fails to show how it will work to maintain wildlife objectives set by the UT Division of Wildlife Resources (UT DWR). Any determination of areas available for leasing and the appropriate development of these leases should be done with careful consideration of wildlife management objectives set by the UT DWR. All important habitat areas should not be opened for leasing until the Moab FO develops a plan for development that uses science based measurable benchmarks to allow the development to take place in a way that will not considerably impact UT DWR's ability to meet management objectives for fish and wildlife and provide public opportunities for hunting and fishing. This planning should incorporate a specific conservation | The Moab BLM has worked with the Utah Division of Wildlife Resources (UDWR) throughout the development of this RMP.

A specific plan of development is required once exploration determines the need for oil or gas field development.  The plan of development is not developed at the leasing stage, as at this time, there is no 'purpose or need' for field development.  All leases are offered with stipulations to protect known resource values.  Upon exploration, an environmental analysis is conducted to determine the specific impacts of the project.  Also taken into consideration at this time is any new information that has developed since the time of the RMP.  This new information will also be analyzed, and mitigation measure will be developed.  Once field development needs have |

BLM_0012943

| | | | | |
|---|---|---|---|---|
| | | | strategy in concert with UT DWR on how to maintain current big game and upland game-bird population objective in the areas that will become available for leasing. | been established, the Plan of Development further addresses impacts, mitigation and cumulative effects on a site-specific level. |
| Theodore Roosevelt Conservation Partnership | 288 | 7 | The BLM fails to correctly acknowledge crucial wildlife habitats that UT DWR has developed based on more than 20 years of data collection and wildlife observations by field biologists. These data are available to the public on the UT DWR website (http://dwrcdc.nr.utah.gov/ucdc/DownloadGIS/disclaim.htm) and should be considered under all RMP alternatives. Failure to consider these data and potential impacts to crucial deer and elk habitat under all alternatives will result in an incomplete NEPA analysis.

Alternative B is the only alternative that correctly acknowledges crucial mule deer and elk winter ranges. The proper description of crucial winter habitats should occur regardless of alternatives. The removal of habitats based on alternative is arbitrary – habitat either is crucial or isn't.

Rocky Mountain bighorn sheep habitat differs among the alternatives. Crucial sheep habitat identification is based on years of observational data by UT DWR and should not be subject to an administrative decision that could be altered by mapping. There currently are no bighorn sheep inhabiting the easternmost portion of the Book cliffs, due to the presence of domestic sheep. However, adequate bighorn sheep habitat exists along the entire Book Cliffs face, and alternative B is the only alternative which correctly describes this information. UT DWR recommends that BLM utilize the best information available to describe the wildlife occurring within the resource area. Therefore, the wildlife habitat data should be presented consistently within the given | The BLM has worked closely with Utah Division of Wildlife Resource (UDWR) biologists in developing and correctly mapping ALL big games habitats, especially deer & elk winter ranges.  This cooperation resulted in the BLM using the exact habitat coverages recommended by UDWR.  Many UDWR habitat areas have been expanded as a result of BLM wildlife biologist recommendations.  RMP decisions were made that protected these habitats.  Alternatives C & D propose seasonal restrictions on winter ranges that were rated by UDWR as "crucial", whereas the 'high value' winter habitats are only restricted in Alternative B.  Most of these 'high value' winter habitats are protected by seasonal restrictions (winter) for wet soils, steep slopes, or are in areas that are virtually inaccessible in winter months.

The BLM worked closely with UDWR on Rocky Mountain Bighorn Sheep habitat.  The BLM took full advantage of the decades of information and knowledge gathered by UDWR.   Much of this habitat is within a Wilderness Study Area, and is completely protected from all surface disturbing activities.  Rocky Mountain Bighorn are moving eastward.  The habitat the BLM has defined in Alternative C represents 100% of the UDWRs designated 'crucial habitat' as well as a large portion of UDWR's 'substantial habitat'.   Before we can even consider the eastern portion of the Bookcliffs as potentially suitable habitat for bighorn occupation, the domestic sheep conflicts must be removed or the entire bighorn population may be at risk.  This conflict is being addressed; however, it will take time to resolve this issue. Until the issue is resolve, the main focus for both the BLM and the UDWR is the habitat proposed in Alternative C. |

BLM_0012944

| | | | | |
|---|---|---|---|---|
| | | | Alternatives and only the differing impact scenarios will differ among alternatives. | |
| Theodore Roosevelt Conservation Partnership | 288 | 9 | Under CEQ NEPA regulations, BLM must make use of all the best available scientific information to assess the effects of land management actions, including cumulative effects from existing, proposed, or foreseeable development projects in the resource management area. Referenced below are peer-reviewed scientific studies on the impacts on sage grouse, elk, and mule deer from vehicle traffic, roads, and oil and gas development. The information from these studies should be incorporated into the FEIS.<br><br>Big Game:<br><br>Rowland, M. M., M. J. Wisdom, B.K. Johnson, and M.A. Penninger 2005. Effects of roads on elk: Implications for management in forested ecosystems. March 20, 2004. Transactions of the North American Wildlife and Natural Resources Conference 69.<br><br>http://www.fs.fed.us/pnw/lagrande/starkey_na/PDFs_Preprints/ms-04_Rowland.pdf<br><br>Sawyer, H., R. Nielson, F. Lindzey, and L. McDonald. 2006. Winter habitat selection of mule deer before and during development of a natural gas field. Journal of Wildlife Management 70:396-403.<br><br>http://www.bioone.org/perlserv/?request=get-abstract&doi=10.2193%2F0022-541X(2006)70%5B369%3AWHSOMD%5D2.CO%3B2<br><br>Sawyer, H., R. Nielson, D. Strickland, and L. McDonald. 2005. Annual Report, Sublette Mule Deer Study (Phase II): Long-term monitoring plan to assess potential impacts of energy development on mule deer in the | There is a great amount of data available that presents the best scientific information concerning the impacts of oil and gas development on wildlife. ALthough the BLM may not have used the specific article listed by the commentor in development of the DRMP/EIS, the BLM appreciates the commentor supplying the recommended articles. The BLM will review them and use them as needed in the development of oil and gas NEPA analyses. |

940

Pinedale Anticline Project Area. Western Ecosystems Technology, Inc. Cheyenne, WY.

http://www.lst-inc.com/PAPA_2005_report_med.pdf

Sawyer, H., and F. Lindzey. 2001. Sublette Mule Deer Study. Wyoming Cooperative Fish and Wildlife Research Unit, University of Wyoming, Laramie. 51 pp.

http://www.uppergreen.org/library/docs/Muledeerstudy1.pdf

Wisdom, M.J., N.J. Cimon, B.K. Johnson, E.O. Garton, and J.W. Thomas 2005. Spatial partitioning by mule deer and elk in relation to traffic. March 20, 2004. Transactions of the North American Wildlife and Natural Resources Conference 69.

http://www.fs.fed.us/pnw/lagrande/starkey_na/PDFs_Preprints/ms-05_Wisdom.pdf

Sage Grouse:

Holloran, Matt J. 2005. Greater sage-grouse (Centrocercus urophaisianus) population response to natural gas field development in Western Wyoming. PhD Dissertation, Univ. of Wyoming. Laramie, WY. 211 pp.

Available at: http://www.sagebrushsea.org

In Press. Walker, B.L., D.E. Naugle, and K.E. Doherty. Greater sage-grouse population response to energy development and habitat loss. Journal of Wildlife Management. Available at: http://www.forestry.umt.edu/personnel/faculty/dnaugle/pdfs/Sage-

BLM_0012946

| | | | | |
|---|---|---|---|---|
| | | | grouse%20Lek%20Analysis_JWM(in_press).pdf<br><br>In Press. Doherty, K.E., D.E. Naugle, B.L. Walker, and J.M. Graham. Greater sage-grouse winter habitat selection and energy development. Journal of Wildlife Management. Available at: http://www.forestry.umt.edu/personnel/faculty/dnaugle/pdfs/Sagegrouse%20winter%20habitat%20and%20energy_JWM(in_press).pdf | |
| Sportsmen for Fish and Wildlife | 296 | 1 | The bighorn herd in the "Rattlesnake herd" is expanding east past Hay Canyon and Cottonwood Canyon, and this RMP does not adequately address the current and future expansion of this bighorn herd, east to the Colorado Border, nor does this proposed alternative adequately prevent the potential destructive loss of the entire herd of 250 plus bighorns. The BLM has specific guidelines requiring the separation of wild sheep and domestic sheep, and there are at least two domestic sheep allotments in the ledges and bighorn habitat that must be addressed, that the current RMP fails to address. | The DRMP/EIS encourages the conversion of sheep allotments to cattle allotments. Furthermore, at the time of the permit renewal, the issue of livestock class may be addressed. It would be consistent with the RMP to convert these allotments to cattle allotments. |
| Sportsmen for Fish and Wildlife | 296 | 4 | The Utah DWR and Utah Wildlife Board will most likely approve a Bison Management plan for the Book Cliffs on Nov. 28, 2007, and this RMP must recognize this new addition of an animal on these lands and assure adequate forage for Bison in the future. | The DRMP/EIS states that the BLM would work with the UDWR on plans for reintroductions. |
| Sportsmen for Fish and Wildlife | 296 | 5 | Since the last RMP, the Utah DWR and BLM have approved a plan for dramatic expansion of the elk and deer herds, along with flocks of turkey and Bison in the South Book Cliffs portion of the RMP area. This RMP needs to ensure that sufficient forage is made available for such herd expansion. | Forage allocation decisions are made using Standards for Rangeland Health and Guidelines for Grazing Management at an allotment level. |
| Public Lands Equal Access Alliance | 346 | 9 | Page G11, 7.1 OHV Designation Criteria, 2. Wildlife: Does the reference to wildlife habitat include habitat for all species or is it intended to apply to habitat for more significant species or groups of species? This should be clarified. | This wording is contained in the Federal regulations at 43 CFR 8342.1. The Moab Field Office has no authority to clarify the wording of federal regulations. |

BLM_0012947

| | | | | |
|---|---|---|---|---|
| Environment Preservation Foundation | 478 | 1 | ...the Draft RMP/EIS completely overlooks the growing body of research completed in neighboring Wyoming that demonstrates unequivocally that impacts go way beyond just the surface of roads, utility corridors, and well pads.  As an example, the studies show that a single 10 acre well pad will result in significant "avoidance behavior" for a radius of nearly 1 mile around the pad by a variety of wildlife species.  Linear impacts from recreation trails, OHV trails, mineral development access roads and utility corridors, and grazing activities have the same effect.  Computations of lost habitat based only on direct surface disturbance are completely inadequate when considering the altered behavior brought about by these developments and the loss of critical habitat is far greater than suggested in the various tables. | See respone to comment 124-39, 124-40, 1025-14, and 1025-15.<br><br>The commentor has not provided the specific study mentioned in the comment. |
| Environment Preservation Foundation | 478 | 3 | When any project is approved and carried out, the impact is immediate, the habitat lost.  It takes years to replace or restore lost habitat but the impact on the wildlife is immediate.  Loss of habitat from direct impact and avoidance behavior result in concentrated competition in restricted habitat by more wildlife. Timing Limitations and long-term vegetation manipulation have not proven to be effective in addressing the "immediate" impact to wildlife and the BLM needs to give consideration in the RMP/EIS to other mitigation measures such as permanent off-site habitat development in conjunction with and prior to project approvals to off-set the immediate and understated impacts from those developments. | See response to comment 120-33. |
| Public Lands Advocacy | 491 | 14 | Pronghorn Antelope:  BLM proposes in Alternative to extend the timing limitation stipulations by two weeks. Comment and Recommendation: No scientific justification for this extension is provided. Absent justification, this seemingly arbitrary restriction must be returned to its original time frame. | The timing limitation for pronghorn is during the kidding season.  Although Alt A is two weeks shorter than the action alternatives, the proposed timing limitation is based on recommendations by UDWR, the agency with jurisdictional authority on pronghorn. |
| U.S. Fish and | 586 | 33 | page 4-486, Table 4.152 This habitat fragmentation | The habitat fragmentation analysis in Chapter 4 is |

BLM_0012948

| | | | | |
|---|---|---|---|---|
| Wildlife Service | | | analysis is a worthwhile and commendable effort.  The table begs several question given, for example, that 64% of sagebrush/grassland habitats (and 54% of riparian and wetland habitat) will be "impacted" by habitat fragmentation caused by roads:  1) What will be the associated effects to these avian species?  2) Which of these species will be affected the greatest and to what degree (could it contribute to the listing of a species)?  3) How much of an increase is this from the baseline (existing condition)?  4) What are the cumulative effects on a regional scale (i.e. across the State of Utah, across the Intermountain West)?  5) What mitigating measures will be taken? We recommend that regional cumulative effects be evaluated, and species-specific evaluation be made to determine, to the extent possible, if future actions taken under direction of this RMP will be likely to significantly impact a species. | intended to provide broad comparisons of the impacts of the four alternatives on wildlife habitat.  It is not intended for specific comparisons or analyses.  The analysis suggested by the commentor is not feasible in a broad document such as a land use plan. |
| | 945 | 3 | _____  appropriate wildlife habitat improvements, such as non-native vegetation control, guzzler construction, and depleted rangeland restoration as needed throughout the Moab BLM area. | The commentor's desire for the BLM to undertake wildlife habitat improvements throughout the MPA is noted. |
| | 989 | 1 | As I understand it, some habitats would be protected from construction during vulnerable times for wildlife during the year they drill or roads are constructed. However, as I understand it, no such protection continues after construction. Drills and pumps are not shut down and roads are not closed to traffic in future years, when the animals are no less vulnerable during the designated times; ie, the animals' critical habitats are still destroyed—it just takes longer. If I'm right in this interpretation, I hope that the BLM will rewrite the restrictions on all of these areas to ensure that the habitat remains viable in perpetuity. | Timing restrictions for oil and gas development are for construction activities (road building, well drilling, pipeline construction, etc.). Once wells are drilled and roads and pipelines are constructed ongoing resource extraction can occur during the periods when construction activities are prohibited. These timing stipulations for well drilling, pipeline construction, and road construction are in accordance with UDWR BMPs for protection of big game and other species. UDWR is the agency with jurisdictional authority over wildlife in Utah. These stipulations have been crafted in cooperation with UDWR. UDWR has indicated that these stipulations are sufficient to protect the animals in question. |
| | 993 | 3 | We request that you remove the closure of Gemini Bridges area on the basis of migratory and bedding | The commentor's desire to keep Gemini Bridges open to motorized travel  under all alternatives is noted. The |

944

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | | | sheep. The reason this should be removed is from your own data concerning water. There is no water listed in that area in your own hydrological study. For this reason the sheep will not bed in this area. It does not take an expert in animal behavior to figure this out. Please remove any closure for the Gemini Bridges in all Alternatives. | Gemini Bridges route was not closed due to conflicts with bighorn sheep. The conflicts were with other recreationists. Gemini Bridges is a highly used area, and driving over the Bridges is not appropriate at such a crowded location. See also response to comment 206-14. |
| Western Watersheds Project | 1025 | 8 | The DEIS/RMP failed to analyze the role and values of predators in controlling rodent populations and fulfilling their role in a healthy ecosystem. | This was not an issue brought up during the scoping process and was therefore not analyzed in the DRMP/EIS. The commentor has not provided any information or demonstated a need to conduct this level of analysis. |
| Western Watersheds Project | 1025 | 14 | Road densities have not been analyzed nor have their effects on wildlife been analyzed. A recent publication by the National Park Service discussed the effects of snowmobiles on wildlife. | An analysis of habitat fragmentation due to roads is found on pgs. 4-482 through 4-486 of the DRMP/EIS. |
| Western Watersheds Project | 1025 | 33 | Consideration of habitat banking for compenstaion of wildlife habitat loss should be considered only when it involves parcels which enhance wildlife or ecological resources. | The section referred to is under Chapter 2 of the DRMP/EIS for wildlife and the habitat banking referes to wildlife. |

## Wilderness Study Areas

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| ECOS Consulting | 9 | 30 | OHV routes have immediate and direct adverse impacts on wildlife, the appearance of naturalness, primitive recreation, and solitude. They abolish any semblance of undeveloped character for these areas. How will the BLM be able to attain its goals and objectives if it allows OHV routes into these areas? The Moab DRMP should provide a list of Non-WSA lands with Wilderness Characteristics that will contain designated OHV routes. This will help tremendously in assessing impacts. From what can be gleaned from the attached maps, it appears that over 90% of these wilderness characteristic areas will contain OHV routes if | The management of non-WSA lands with wilderness characteristics (WC) is discretionary. Under Alt C, about 18% of the lands determined to have WC would be managed to protect wilderness values.<br><br>See response to comment 124-7. |

945

BLM_0012950

| | | | | |
|---|---|---|---|---|
| | | | Alternative C, the preferred alternative, is selected. How many of these designated OHV routes will be in riparian areas, wetlands, and/or floodplains? The cumulative impacts of these OHV routes could be excessive and lead to the degregation of water quality and quanity, and the destruction of riparian habitat and all the ecological value it contains. These OHV routes within Non-WSA lands with Wilderness Characteristics make up less than 5% of the proposed designated OHV routes within the Moab Planning Area.<br><br>It is highly recommended that the BLM remove any OHV routes from Non-WSA lands with Wilderness Characteristics in order to attain the BLM goals and objectives of maintaining wilderness characteristics of these lands to assist in bringing the scarce riparian areas into Proper Functioning Condition. | |
| ECOS Consulting | 9 | 76 | Protect Areas with Wilderness Characteristics Exceptional protection and preservation efforts must be focused on riparian areas in "Non-WSA lands with Wilderness Characteristics", in "proposed wilderness" areas and in proposed "Wild and Scenic River" areas within the Moab Planning Area.  These areas make up such a small fraction of the Moab Planning Area, yet are extremely important in maintaining the ecological integrity of these specially designated lands and their adjacent habitats.<br><br>In particular, the BLM must protect the following riparian resources that are within "Non-WSA lands with Wilderness Characteristics" and in "proposed wilderness":<br>1) Beaver Creek<br>2) Cottonwood Canyon (Books) and tributaries<br>3) Cottonwood Canyon (Delores River)<br>4) Delores River<br>5) Diamond Canyon and tributaries | See response to comment 124-53. |

BLM_0012951

| | | | | |
|---|---|---|---|---|
| | | | 6) Fisher Creek<br>7) Granite Creek<br>8) Hatch Wash<br>9) Hell Roaring<br>10) Kane Creek<br>11) Kane Springs / Hunter<br>12) Kane Springs<br>13) Mill Creek and tributaries<br>14) Mineral Canyon<br>15) Nash Wash and tributaries<br>16) Negro Bill Creek<br>17) Onion Creek<br>18) Pritchett<br>19) Professor Creek<br>20) Rattlesnake Canyon and tributaries<br>21) Srping Canyon<br>22) Sections of the Colorado River<br>23) Sections of the Green River<br>24) Ten Mile Canyon<br>25) Tusher (Books)<br>26) White Wash<br>These areas are all know for their regional superlative scenic, geologic, ecological, wildlife, fish, historic, cultural and recreational values. | |
| San Juan County | 121 | 72 | Comment Analysis on the 1999 Wilderness Inventory found that those supporting wilderness were from out of state.  Those supporting wilderness that were from Utah were from Salt Lake, Ogden and Logan.  San Juan County residents were clearly opposed to any action by BLM to designate more land for WSAs.  Native American comment letters were opposed to wilderness designation. Local comments are more impassioned, knowledgeable and we believe warrant more weight being placed on them.  Unit specific comments follow. The 1999 inventory was not really field truthed and there is a lack of consistency between field personnel. In this (1999) inventory, the BLM has developed their | 1Considering lands for WSA or wilderness designation is beyond the scope of BLM's land use planning effort, as identified on pg. 1-2 of the DRMP/DEIS.<br><br>Under FLMPA, multiple use is defined as the management of public lands and their various resource values so they are used the combination that will best meet the present and future needs of all the American people.<br><br>As part of BLM's wilderness characteristics inventory maintenance, BLM performed a combination of data and on-site reviews.  This included specific field inspections, |

BLM_0012952

| | | | | |
|---|---|---|---|---|
| | | | own set of rules and definitions as to what constitutes wilderness.  BLM has not followed the direction of Congress in defining wilderness. | Interdisciplinary team review of data such as range files, County and BLM GIS data, and high-resolution 2006 aerial photographs.  The BLM's findings are described in the 1999-2003 wilderness reinventory documentation, as well as the 2007 wilderness characteristics review process (findings from this review are available on the Moab Field Office planning website, and in the Administrative Record).  The BLM is confident of high-standard approach used to inventory the public lands and stands by its findings, particularly the findings which involved wilderness characteristics inventory maintenance. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 39 | Management of Wilderness Study Areas is also considered outside the scope of the plan.  However, BLM should have a plan for management of these lands, which should include prescriptions for protecting WSA lands if they are released by Congress. | The DRMP/EIS states on pg. 2-43 that should WSA lands be released by Congress a plan amendment would be required prior to any actions.  Therefore, specific decisions for released WSA lands are not detailed in the DRMP/EIS. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 41 | The Moab Draft RMP should have fully analyzed an alternative designating new Wilderness Study Areas. SUWA maintains that BLM has the authority and the responsibility pursuant to FLPMA at Section 202 to fully analyze an alternative that would designate new wilderness study areas. | The BLM does not have the authority to designate new WSAs under the land use planning process.<br><br>The BLM's authority for managing lands to protect or enhance wilderness characteristics is derived directly from FLPMA Section 202 (43 U.S.C. §1712).<br><br>This section of BLM's organic statute gives the Secretary of the Interior authority to manage public lands for multiple use and sustained yield.  Nothing in this section constrains the Secretary's authority to manage lands as necessary to "achieve integrated consideration of physical, biological, economic, and other sciences." (FLPMA, Section 202(c)(2) (43 U.S.C. §1712(c)(2))) Further, FLPMA makes it clear that the term "multiple use" means that not every use is appropriate for every acre of public land, and that the Secretary can "make the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use. . |

BLM_0012953

| | | | | |
|---|---|---|---|---|
| | | | | . . ." (FLPMA, Section 103(c) (43 U.S.C. §1702(c)))  The FLPMA intended for the Secretary of the Interior to use land use planning as a mechanism for allocating resource use, including wilderness character management, amongst the various resources in a way that provides uses for current and future generations.<br><br>The BLM has long acknowledged that FLPMA Section 603 (43 U.S.C. §1782) requiring a one-time wilderness review has expired.  All current inventory of public lands is authorized by FLPMA Section 201 (43 U.S.C. §1711).  In September 2006, the Utah District Court affirmed that the BLM retained authority to protect lands it determined to have wilderness characteristics in a manner substantially similar to the manner in which such lands are protected as WSAs. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 52 | By excluding desingnation of new WSAs from the Draft RMP it risks violating FLPMA and NEPA and jeopardizes the validity of the entire planning process. | See response to comment 124-41. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 113 | Transportation management within WSAs must minimize ORV motorized routes, which can impair wilderness characteristics. | Chapter 2, pgs, 2-43 and 2-44 summarizes travel management decisions with WSAs under the various alternatives.  Alternative B does not identify any motorized routes with WSAs (termed "ways" in WSAs, as "roads" by definition are outside the boundaries of wilderness character), because this alternative closes all WSAs to OHV use.  Alternative C identifies 2.55 miles of motorized routes in WSAs; these routes would be managed under Interim Management Policy for Lands Under Wilderness Review (IMP), and would be available only if they continued to meet the non-impairment standard imposed by IMP.  Alternative D closes most WSA acreage to OHV use, but those areas not closed would be in the limited OHV category. |
| Southern Utah Wilderness Alliance | 124 | 114 | If released by Congress, BLM should manage WSAs to protect their wilderness characteristics (sic), rather than examine management of these areas on a case-by- | Chapter 2, pg. 2-43 states: "Only Congress can release a WSA from wilderness consideration.  Should any WSA, in part or in whole, be released from wilderness |

BLM_0012954

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | case basis for consistency with the goals and objectives of the RMP. | consideration, proposals in the released area would be examined on a case-by-case basis. All proposals inconsistent with the Interim Management Policy for Lands Under Wilderness Review would be deferred until completion of requisite plan amendments.  Because a plan amendement would be required, there is no separate analysis in this Land Use Plan to address resource impacts if any WSAs are released."

If WSAs lands are released by Congress, those lands would be managed to protect the wilderness characteristic until a plan amendment is prepared.  At such a time, there would be opportunity for full public participation and input.  The amendment would require a formulation of alternatives and environmental analysis similar to that of an RMP.

See also response to comment 124-39. |
| Samson | 201 | 2 | Operators are also concerned about the BLM's proposal to manage so-called "non- Wilderness Study Area (WSA) lands with wilderness characteristics" to maintain wilderness values. There is no justification and no mandate in the Federal Land Policy and Management Act of 1976 (FLPMA), and no process requirement for engaging in an ongoing Wilderness inventory and review. Once the wilderness evaluation process required by Section 603 of FLPMA was complete in the early 1990's, the BLM and the Department of the Interior were not required to conduct further wilderness inventories. 43 U.S.C. § 1782; State of Utah v. Norton, 2006 WL 2711798, Civ No. 96-CV-0870, *2, *8 (Sept. 20, 2006). The question of which lands should be included in the National Wilderness Preservation System is now reserved solely to Congress. State of Utah v. Norton, at *8. The BLM has not explained the need for managing additional lands for wilderness qualities. | See response to comment 214-2. |

BLM_0012955

| Cabot Oil and Gas Corporation | 202 | 2 | Cabot is also concerned about the BLM's proposal to manage so-called "non- Wilderness Study Area (WSA) lands with wilderness characteristics" to maintain wilderness values. There is no justification and no mandate in the Federal Land Policy and Management Act of 1976 (FLPMA), and no process requirement for engaging in an ongoing Wilderness inventory and review. Once the wilderness evaluation process required by Section 603 of FLPMA was complete in the early 1990's, the BLM and the Department of the Interior were not required to conduct further wilderness inventories. 43 U.S.C. § 1782; State of Utah v. Norton, 2006 WL 2711798, Civ No. 96-CV-0870, *2, *8 (Sept. 20, 2006). The question of which lands should be included in the National Wilderness Preservation System is now reserved solely to Congress. Id. at *8. The BLM has not justified the need for managing additional lands for wilderness qualities. | See response to comment 214-2. |
| NOLS/ Outdoor Industry Association | 487 | 5 | Ideally, a preferred alternative demonstrates a balance between issues in the conservation alternative and the development alternative. In many cases it seems that the MFO worked hard to find a good balance between various needs. When considering wilderness characteristics, however, the preferred alternative seems less balanced. Alternative B identifies 266,485 acres that have wilderness characteristics, and proposes managing these acres in a fashion that would maintain those wilderness characteristics. Alternative D opts to manage zero acres for wilderness characteristics outside of WSAs. Alternative C, which should provide a balance between B and D, purports to manage only 47,761 acres to maintain wilderness characteristics, less than 1/5 of potential acreage.

Managing for wilderness characteristics does not preclude motorized travel. It merely confines motorized travel to designated routes. According to the Moab | While only 47,000 of the 266,000 acres of lands with wilderness characteristics are to be managed to protect these characteristics in the preferred alternative, over 40% of such lands are managed as no surface occupancy fo roil and gas development and other surface disturbing acitivies.  This management prescription will preclude development.  It should be noted that the entire Green River corridor is to be managed in this manner.

All lands in the Moab field Office, with the exception of around 2,000 acres near the White Wash Sand Dunes, are to be managed as limited to designated routes.  This is intended to stop the cross country travel that currently occurs. |

BLM_0012956

| | | | | |
|---|---|---|---|---|
| | | | DEIS Table 2.1, on Non-WSA Lands with Wilderness Characteristics, the BLM purports to, "Manage these primitive lands and backcountry landscapes for their undeveloped character, and to provide opportunities for primitive recreational activities and experiences of solitude, as appropriate" (p. 2-16).<br><br>A better balance can be found, and lands near Desolation Canyon and Labyrinth Canyon provide an excellent opportunity to find that balance. According to Table P1 (P-3) in the Moab DEIS, Non-WSA Lands with Wilderness Characteristics in Desolation Canyon and Labyrinth Canyon would add 35,330 acres to wilderness characteristics currently being considered in Alternative C. This would almost double the land being managed to preserve wilderness characteristics. Additionally, such an addition in the Final RMP would do much to protect the river corridor, which deserves protection until Congress has an opportunity to weight the merit of designating stretches of the Green River as Wild, Scenic, or Recreational. | |
| | 490 | 1 | BLM's analysis does not adequately account for its treatment of non-WSA lands with "wilderness characteristics" (Sections 3.9, 3.11, 3.15, 4.3.84.3.10, and 4.3.14). BLM's preferred Alternative C, thus, does not comply with FLPMA's multiple use principle. As explained in further detail below, protection of ACECs and non-WSA lands with "wilderness characteristics" for alleged wilderness properties violates "multiple use." BLM should select portions of alternatives that protect the environment, yet fully comply with the development of resources under multiple use principles. | See response to comments 120-8, 121-10, 121-58, and 121-61. |
| | 490 | 2 | Wilderness Inventories Under FLPMA – The Moab RMP contains analysis of non-WSA lands with "wilderness characteristics: although the lands are neither defined in FLPMA nor given any definition in any federal statute or regulation. BLM has no formal | See response to comments 120-8, 121-10, 121-58, and 121-61. |

BLM_0012957

guidance of these areas. BLM is under no duty to protect these lands or provide them with special protections beyond any other public lands. The RMP/EIS should explain under what specific authority BLM is using to provide specific protection for non-WSA lands with "wilderness characteristics," because I am unaware of any. BLM's statements regarding SUWA v. Norton decision are of no support because that was purely NEPA supplementation issue.

From the EIS, it appears that BLM accepted submissions from the Southern Utah Wilderness Alliance and accepted their assertions regarding whether lands contained wilderness characteristics. If BLM intends to protect these areas as if they were WSAs, those decisions should be done through the public process as was the WSA process completed in the 1980s and 1990s. BLM did not take into account existing oil and gas leases, grazing allotments, and other factors that would impact so called "wilderness characteristics." If BLM plans to restrict multiple use of these non-WSA lands with "wilderness characteristics," it must make the decisions of which areas are so designated available to public scrutiny and comment.

FLPMA directed the Secretary of the Interior to inventory roadless lands of 5,000 acres or more for their wilderness characteristics within 15 years from October 21, 1976. 43 USC § 1782. The Secretary was to recommend to the President which areas should be studied for protection as wilderness by July 1, 1980. These "wilderness study areas" ("WSA") would be managed so as not to impair their suitability as wilderness pending further action by Congress. Following his study, the Secretary was to submit his recommendations to the President, who in turn would submit recommendations to Congress. Id.

BLM_0012958

The process of designating WSAs in Utah had three parts. First, BLM conducted an initial inventory to decide which areas would be fully reviewed for their wilderness values. BLM published its findings in the BLM Utah Initial Wilderness Inventory. Utah; Initial Wilderness Inventory, Final Decisions and Official Start of Intensive Inventory, 44 Fed. Reg. 4651 (Aug. 8, 1979). Second, BLM conducted a more intensive review of the lands that it included in the initial inventory to "determine whether they are in fact of wilderness character." Id. at i. This intensive inventory resulted in the determination of what land should be studied as WSAs. Utah Final Wilderness Inventory Decision, 45 Fed. Reg. 75602 (Nov. 14, 1980). Third, in 1991, Secretary Lujan recommended that approximately 1.9 million acres in Utah should be included as part of the National Wilderness Preservation System. Utah Statewide Wilderness Study Report at 3. On June 29, 1992, President Bush presented this recommendation to Congress. See Letter to Congressional Leaders Transmitting Proposed Legislation on Utah Public Lands Wilderness Designation.

In the late 1970s, as part of the first step, BLM initially inventoried the areas in the Moab Resource Area that now include the WIAs and citizen wilderness proposals. BLM determined that several of these areas would not be inventoried any further. Utah Final Wilderness Inventory Decision at 35-41. 1 Second, after a further inventory, BLM decided not to include 24 areas in the Moab resources area as WSAs. BLM Intensive Wilderness Inventory, Final Decision on Wilderness Study Areas at 223-349 (Utah 1980). 2 The IBLA affirmed BLM's decisions and consistently held that these decisions are administratively final and that BLM's authority to establish new WSAs has expired.

954

BLM_0012959

| | | | | |
|---|---|---|---|---|
| | | | SUWA, 151 IBLA 338, 342 (2000); SUWA, 128 IBLA 52, 65-66 (1992) ("final administrative decisions relating to the designation of lands as WSAs in Utah were completed in the 1980s...the lands in question were not included in a WSA. Therefore, BLM may administer them for other purposes, including the approval of drilling for oil and gas.") (internal citations omitted).<br><br>Furthermore, the Board has also held that BLM need not protect these areas as if they are WSAs of give them any added protections. See SUWA, 163 IBLA 142 (2004) (BLM approval of EA/FONSI for ROW and approximately 60 acres of surface disturbance in Desolation Canyon WIA affirmed). Any protections of these areas under the non-impairment standard violates BLM's multiple use mandate. See 43 USC § 1701 (a)(7), (8) & (12); 43 USC § 1732 (a) & (b); 43 CFR § 1610.5-3. | |
| | 490 | 3 | Continuing Inventory Requirement for Land Use Planning – I am very concerned about the proposal to manage so-called "non-Wilderness Study Area (WSA) lands with wilderness characteristics" to maintain those "wilderness" values. There is no justification and no mandate in the FLPMA and no process requirement for engaging in an ongoing Wilderness inventory and review. Once the "603 Process" was completed, the agency was done with its Wilderness review. The question of which lands should be included in the National Wilderness Preservation System is now between Congress and the American people. Other than the management of existing WSAs, the BLM should have no part in this issue. To do so would obviate the FLPMA mandate, USC § 1702 (c) ("Section 103(c)"), of multiple use and result in a loss of economic development in the local community and a denial of energy resources for the state and nation. | See response to comments 120-8, 121-10, 121-58, and 121-61. |

BLM_0012960

Section 201(a) of FLPMA provides that "the Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values…" 43 USC § 1711 (a). The purpose of keeping this inventory current is "to reflect changes in conditions and to identify new and emerging resources and other values." Id.

While BLM has a duty under section 201 to inventory lands, including those that may contain "wilderness characteristics," BLM may not unlawfully apply the WSA non-impairment standard to any of those lands found to contain wilderness characteristics. State of Utah v. Norton, 96-cv-870, (D. Utah), Stipulated Settlement at ¶¶13, 17. The requirements to inventory and protect are distinct. BLM must still provide for multiple use even if certain lands contain what BLM considers to be the elements of "wilderness." Furthermore, containing elements and properties of "wilderness" is entirely distinct from meeting the statutory definition of wildnerss under the Wilderness Act. The decision to designate WSAs, the treatment of land s under the non-impairment standard, and designation of lands to include in the National Wilderness Preservations System are not proper decisions that BLM can make during the land use process. BLM must continue to provide for multiple use for lands outside WSAs.

BLM should strike the wilderness characteristics areas as unlawful and abide by the final agency decisions made during the FLPMA wilderness inventory process, explained above, and completed in the 1990s. These 1996-1999 Re-inventories were not made as part of section 201 of FLPMA and were designed to create new WSAs. Any creation of new WSAs, the treatment of lands under the non-impairment standard, or creation of de facto wilderness areas through the RMP process

956

BLM_0012961

| | | | | |
|---|---|---|---|---|
| | | | is unlawful.<br><br>BLM has failed to provide any data or information on the "wilderness characteristics" areas and how many people actually use these areas for these purposes. It is one thing to claim that an area has "outstanding opportunities for primitive and unconfined recreation," but it these places are not actually seeing recreation, why designate them as such. If BLM is going to protect non-WSA areas for their alleged wilderness characteristics—which as explained above is unlawful and in violation of multiple use—it must provide specific information on why these lands are of "wilderness character." BLM originally determined that they were not eligible for consideration to be included in the National Wilderness Preservation System, so any further management of these areas for the sole protection of "wilderness characteristics," must provide specific reasons for such. | |
| | 490 | 4 | BLM has already agreed through the settlement of the lawsuit brought by the State of Utah over the 1999 Unlawful Re-inventory that it will not create any new WSAs or protect any areas under the non-impairment standard. By closing all or part of Mary Jane Canyon, Fisher Towers, and Beaver Creek areas to oil and gas, grazing and other types of development, BLM is violating its FLPMA obligation of multiple use. BLM proposes to create three wilderness characteristics areas (Mary Jane Canyon, Fisher Towers, and Beaver Creek) that would be almost entirely closed to oil and gas leasing. These three "wilderness characteristic" areas were originally citizen wilderness proposals and were part of BLM's 1996-1999 reinventory.<br><br>Additionally, BLM's use of cherry-stems to exclude man-made imprints to establish "wilderness characteristics" areas violates the purpose of The | See response to comments 120-8, 121-10, 121-58, and 121-61. |

BLM_0012962

| | | | | |
|---|---|---|---|---|
| | | | Wilderness Act and restrictions of access and multiple use of these areas violates FLPMA's principles. While cherry-stemming is a practice long recognized by the BLM, it truly contradicts the spirit of the Wilderness Act. BLM's use of cherry-stems to gerrymander the boundaries of wilderness areas-exclusion of roads, fences, well-pads and other human imprints—in establishing non-WSA areas that do or may contain wilderness characteristics undermines the purpose of the Wilderness Act and the National Preservation Wilderness System. It is hard t imagine how one could truly feel alone and in an area "untrampled by man," when you have your back to a road, well-pad or other intrusion that has been "cherry-stemmed" from a "wilderness area." Wilderness areas and any other area that BLM considers that possess "wilderness characteristics" should truly be 5000 acres of continuous lands and not areas that are cherry-stemmed on all sides. | |
| Public Lands Advocacy | 491 | 9 | We can find no legal basis for BLM to preserve purported wilderness values on lands not designated as wilderness or wilderness study areas.  BLM completed its Wilderness Study Process under Section 603 of FLPMA when it forwarded its recommendations to the President in 1991 and eliminated the lands in question from further wilderness consideration.  To date, no provisions exist for BLM to further evaluate or preserve lands for their wilderness characteristics.  In fact, new wilderness inventories are prevented under the settlement in State of Utah v. Norton, 2006.  It is now up to Congress to make the final decision on which land should be protected to preserve their wilderness character.  We recommend that BLM discard this proposed management in favor of multiple use management. | See response to comment 214-2. |
| | 631 | 1 | While not all of the listed WSA lands may become designated wilderness in the future, managing as many | The commenter is confusing Wilderness Study Areas (WSAs) with non-WSA lands with Wilderness |

BLM_0012340

| | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|
| | | | as feasible now will leave more options for future land managers and public users. While I commend the BLM for picking a Preferred Alternative that protects Beaver Creek, Fischer Towers, and Mary Jane Canyon, I implore you to take a further look at protecting Desolation Canyon, Goldbar, Granite Creek, Hatch Wash, Hunter Canyon, Shafer Canyon, Westwater Canyon, and Coyote Wash as WSAs. The Preferred Alternative C protects three (3) of these areas compared with Alternative B's thirty-three (33). For trying to be a "balanced approach of protection/preservation" and "commodity production and extraction" this does not seem like a fair compromise. | Characteristics.  All WSAs are managed to preserve their suitability for wilderness designation. The management and level of protection of the wilderness characteristics on non-WSA lands is discretionary and not bound by requirements of the Wilderness Act of 1964 or the WSA Interim Management Policy (IMP, H-8550-1; BLM 1995).  Any non-WSA lands found either to have wilderness characteristics or likely to have wilderness characteristics will be managed according to the management prescriptions established in the RMP. These Non-WSA lands have many resource values and use in addition to wilderness characteristics.  The DRMP/DEIS considered all available information and a range of alternative prescriptions for how these values and uses would be managed. See response to comment 124-53. |
| | 818 | 1 | No roads are included in WSA's. Shouldn't plans consider the event that some WSA's may be "released" rather than "designated"? | Should WSAs be released from such status, a plan amendment would have to be prepared.  At that time, routes available for motorized use would be identified. |
| | 1026 | 11 | PDF pg 81 pg 1-11 Section 1.3.2.3 Sixth Bullet down says there348,800 acres of WSA in 11 areas however PDF pg 64 ES.5 says there are 348,815 in 11 WSA locations. Which is correct? | Acreage data may vary slightly due to the mathematical algorithms utilized in GIS software.  The final plan will use one figure consistently. |
| | 3 | 1 | Management objectives that use such things as primitive recreation zones, Areas of Critical Environmental Concern, and so-called areas with "wilderness characteristics" to create a de-facto Wilderness maangement is unlawful. Congress put a deadline on inventory and study for Wilderness. The BLM should no longer be allowed to manage solely for "wilderness character". | See response to comments 120-8, 121-10, 121-58, and 121-61. |

## Wild and Scenic Rivers

| Organization | Record ID & Comment Number | | Comment Text | Response to Comment |
|---|---|---|---|---|

BLM_0012964

| | | | | |
|---|---|---|---|---|
| Tag a Long | 10 | 1 | The entire Green River is suitable and should be designated as a Wild and Scenic River in order to maintain the connectivity and ecology of the Green River Corridor. | The section of the Green River from Swasey's Rapid to the San Rafael River contains large percentages of private and state land.  It is for this reason that that section of the Green River is not proposed for Wild and Scenic River designation. |
| State of Utah - Public Lands Policy Coordination | 120 | 2 | Utah State law indicates that river segments proposed for Wild and Scenic designation should contain water at all times. | According to the "Wild and Scenic River Review in the State of Utah Process and Criteria for Interagency Use" (July 1996), "there are no specific requirements concerning minimum flow for an eligible segment".  The BLM is aware that there are specific State laws relevant to aspects of public land management that are discrete from, and independent of, Federal law.  However, BLM is bound by Federal law.  As a consequence, there may be inconsistencies that cannot be reconciled.  The FLPMA requires that BLM's land use plans be consistent with State and local plans "to the extent practical" where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved.  The BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options. |
| State of Utah - Public Lands Policy Coordination | 120 | 3 | The state is concerned about suitability findings for those streams where there are significant water diversions upstream. | According the "Wild and Scenic River Review in the State of Utah Process and Criteria for Interagency Use" (July 1996), Congress has allowed for the existence of some human modification of a riverway, the presence of impoundments or major dams above or below a segment under review (including those that may regulate the flow regime through the segment).  The existence of minor dams, diversion structures, and rip-rap within the segment shall not by themselves render a reach ineligible. |
| State of Utah - Public Lands Policy Coordination | 120 | 4 | The state contends that while federal reserve water rights are not asserted prior to designation, those stream reaches found suitable are managed as if they were designated. | Barring congressional action, there is no effect on water rights or instream flows related to suitability findings made in a land use plan decision.  Even if Congress were to designate rivers into the National Wild and Scenic Rivers System, any such designation would have no effect on existing water rights.  Section 13(b) of the Wild and |

960

BLM_0012965

| | | | | |
|---|---|---|---|---|
| | | | | Scenic River Act states that jurisdiction over waters is determined by established principles of law.  In Utah, the State has jurisdiction over water.  Although the Wild and Scenic Rivers Act implies a federal reserved water right for designated rivers, it does not require or specify any amount, and as noted above, confirms that Utah has jurisdiction over water rights.  The BLM would be required to adjudicate the water right, in the same manner as any other entity, by application through state processes.  Thus, for congressionally designated rivers, BLM may assert a federal reserved water right for appurtenant and unappropriated water with a priority date as of the date of designation (junior to all existing rights), but only in the minimum amount necessary to fulfill the primary purpose of the reservation.<br><br>The Draft RMP/EIS states (pg. 2-39) that the BLM would not seek water rights as part of a suitability determination made in the Record of Decision for the RMP. |
| State of Utah - Public Lands Policy Coordination | 120 | 71 | The State is concerned that Wild and Scenic River designations may limit water development  by communities for future growth, limit industrial and agricultruval growth, and reduce funding for the Colorado River Salinity Control program. | TThe Wild and Scenic Rivers Act implies a Federal reserved water right; however, it must be the minimal amount necessary for purposes of the Act, it must be adjudicated through State processes, and it would be junior to existing water rights.  The amount of Federal water right will vary from river to river, depending on the river's flows, the un-appropriated quantities in the river, and the values for which the river is being protected.  There is no effect whatsoever on water rights on in-stream flows related to suitability findings made in a land use plan decision, barring Congressional action.  Even if Congress were to designate rivers in the National Wild and Scenic Rivers System, any such designation would have no affect on existing, valid water rights.  Section 13 (b) of the Wild and Scenic Rivers Act states that jurisdiction over waters is determined by established principles of law.  In Utah, the State has jurisdiction over water.  Although the Wild and Scenic Rivers Act implies a |

BLM_0012966

Federal reserved water right for designated rivers, it does not require or specify any amount, and instead establishes that only the minimum amount for purpose of the Act can be acquired.  Because the State of Utah has jurisdiction over water, BLM would be required to adjudicate the right as would any other entity, by application through State processes.  Thus, for Congressionally designated rivers, BLM may assert a Federal reserved water right to appurtenant and unappropriated water with a priority date as of the date of designation (junior to all existing rights), but only in the minimum amount necessary to fulfill the primary purpose of the reservation.

During the suitability phase of the Wild and Scenic River process, both Grand and San Juan Counties, as well as the State of Utah and SITLA, were asked to supply information on uses, "including reasonably foreseeable potential uses of the area and related waters, which would be enhanced, foreclosed, or curtailed if the area were included in the national system of rivers, and the values which could be foreclosed or diminished if the area is not protected as part of the national system." (Appendix J-12).  Attachment 4 of Appendix J summarizes suitability input by the public as well as local communities.  Suitability decisions were made considering the results of this input.  For example, the agricultural, residential, commercial and municipal development in and around the town of Green River was cited as a reason that segments 3 and 4 of the Green River were not suitable for consideration.

In 1994, Public Law 98-569 amended the Colorado River Basin Salinity Control Act and directed the Secretary to develop a comprehensive program for minimizing salt contributions from lands administered by BLM and to provide a report on this program to the Congress and the

BLM_0012967

| | | | | Advisory Council. The BLM's Colorado River Basin Salinity Control program is designed to provide the best management practices (BMP) of the basic resource base. Successes with the resource base will translate to improved vegetation cover, better use of onsite precipitation, and stronger plant root systems.  In turn, a more stable runoff regime and reduced soil loss should result, thus benefiting water quality of the streams in the Colorado River Basin including the Green River and San Rafael River.  In Section 1(b) of the Wild and Scenic Rivers Act, Congress states that one of the objectives of the Act is to protect the water quality of designated rivers. Congress further specified that the river-administering agencies cooperate with the EPA and State water pollution control agencies to eliminate or diminish water pollution (Section 2(c)). Comparing the two, it is clear that the Wild and Scenic Rivers Act and the Colorado River Basin Salinity Control Act are not only complementary of one another, but share the same objective with regard to water quality. The Wild and Scenic Rivers Act directs the Secretary of the Interior or any government agency to prohibit any loan, grant, license, or otherwise construction of any water resources project that would have a direct effect on the values for which such river designation was established.  The law also states that it cannot preclude licensing of, or assistance to, developments below or above a wild, scenic, or recreational river area or on any stream tributary thereto that will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area on the date of designation of a river as a component of the National Wild and Scenic Rivers System. However, projects intended to comply with the Colorado River Salinity Control Act are those that would generally benefit stream segments instead of affecting or unreasonably diminishing its values including water quality. |
| State of Utah - | 120 | 72 | The State believes that the BLM should disclose the | Appendix J of the DRMP/DEIS details the steps |

BLM_0012968

| Public Lands Policy Coordination | | | reasons and rationale for determinations of eligibility and suitability for proposed additions to the National Wild and Scenic River System, and to fully meet the requirements of state and federal law in doing so. | undertaken in the eligibility review process including the identification of outstandingly remarkable values as well as the Suitability Considerations by eligible river segments. The BLM complied with all applicable Federal laws, regulations, and policies in the Wild and Scenic Rivers Study Process.<br><br>The BLM is aware that there are specific State laws relevant to aspects of public land management that are discrete from, and independent of, Federal law. However, BLM is bound by Federal law. As a consequence, there may be inconsistencies that cannot be reconciled. The FLPMA requires that BLM's land use plans be consistent with State and local plans "to the extent practical" where State and local plans conflict with Federal law there will be an inconsistency that cannot be resolved. The BLM will identify these conflicts in the FEIS/PRMP so that the State and local governments have a complete understanding of the impacts of the PRMP on State and local management options. |
| State of Utah - Public Lands Policy Coordination | 120 | 73 | The State is concerned that the Draft RMP/EIS does not state the authority for protection of river segments while studies are underway. | Section 5(d) of the Wild and Scenic Rivers Act requires that Federal land management agencies make wild and scenic river considerations during land use planning. Two stages of review are involved. Eligibility is an inventory, solely involving river values. Suitability involves consideration of manageability and resource conflicts.<br><br>As per BLM Manual 8351-Wild and Scenic Rivers-Policy and Program, Section .32C, all eligible rivers are considered in the EIS for the planning effort as to their suitability for congressional designation into the National Wild and Scenic Rivers System. With any suitability determination made in the ROD for the PRMP/FEIS, the free-flowing, outstandingly remarkable values, and tentative classification of rivers would continue to be protected until Congress makes a decision on designation. |

964

BLM_0012969

Appendix J describes the process and authority for the Wild and Scenic Rivers Study.

The FLPMA gives the BLM broad authority to manage the public lands, including management of eligible and suitable river segments. For eligible rivers, it is BLM's policy to protect certain values identified in the eligibility determination process to ensure that a decision on suitability can be made. To accomplish this objective, the BLM's management prescriptions must protect the free-flowing character, tentative classifications, and identify outstandingly remarkable values of eligible rivers according to the prescriptions and directions of the current, applicable land use plan per BLM Manual Section 8351.32C. The BLM Manual further states that should a determination on suitability not be made during the planning process, "the RMP must prescribe protective management measures to ensure protection shall be afforded the river and adjacent public land area pending the suitability determination" (Section 8351.33A).

The NEPA specifies that while work on the EIS is in progress, BLM cannot undertake or authorize any actions in the interim that would prejudice the RMP decision or, in this case, the suitability determination (40 CFR 1505.1 (c)(3)). A case-by-case evaluation of potential impacts resulting from a proposed action must be made to ensure that all eligible rivers are not limited from being considered for suitability among the range of RMP alternatives, thus eliminating the opportunity to prejudice the decision. Implementation of the interim management to protect eligible rivers, therefore, is applied through site-specific NEPA analysis of environmental impacts on a case-by-case basis. The NEPA compliance, required for all Federal actions that could significantly affect the environment, ensures that BLM consider alternatives to the proposed action and provides BLM an opportunity to

965

BLM_0012970

| | | | | apply mitigation measures that will reduce impacts on a given resource such as an eligible stream. This mechanism of applying management must be in conformance with the current land use plan. Protective prescriptions would be applied to rivers determined suitable in the ROD for the Field Office RMP. Resource allocations (such as those for visual resources, OHV use, and mineral leasing) compatible with protecting river values would be prescribed for suitable river corridors as part of the decision. In addition, no special management objectives would be applied to eligible rivers determined not to be suitable in the ROD. Instead, they would be managed without additional consideration according to the provisions of the plan. |
|---|---|---|---|---|
| State of Utah - Public Lands Policy Coordination | 120 | 74 | The BLM has not sufficiently divulged the proposed management prescriptions for river segments identified in the Draft RMP/EIS. | Table 4.102, Management Proposed for River Segments Considered for WSR Designation by Alternative, details these management prescriptions. The Oil and Gas Leasing Stipulations detailed in Table 4.102 by river segment are applicable to all surface disturbing activities authorized in the plan as explained in Appendix C. These prescriptions have been moved to the Wild and Scenic River section of Chapter 2. |
| State of Utah - Public Lands Policy Coordination | 120 | 75 | Reference is made to 29 eligible segments that will be further reviewed for suitability; however, at several places, including pages 2-4, ES-5 and ES-6, 28 eligible sements are indicated. The Draft RMP/EIS identifies the number of eligible rivers as 13 at several places and 12 at many other locations. | There are 29 eligible river segments. On Salt Wash, which adjoins Arches National Park, the suitability determination has been delayed pending Park Service action. Therefore, 28 river segments were found suitable in one or more of the alternatives. This has resulted in some inconsistencies in the text which have been corrected. The same reasoning applies to the number of rivers which has also be corrected. |
| State of Utah - Public Lands Policy Coordination | 120 | 76 | The term "designation" in place of "classification" on pgs 2-4 and 2-91, is inappropriate. | The term "designation" has been changed to "determine" in accordance with the BLM Land Use Planning Handbook (H 1601-1). |
| Southern Utah Wilderness Alliance | 124 | 88 | Generally, the suitability and classifications expressed for Wild and Scenic Rivers by the BLM in the Moab RMP/DEIS in Alternative B are supported by SUWA. | Alternative B emphasizes the protection/preservation of natural resources, thereby analyzing the impacts of finding all eligible river segments as suitable. Alternative |

BLM_0012971

| | | | | |
|---|---|---|---|---|
| (SUWA) | | | SUWA strongly disagrees with the suitability findings and tentative classifications presented in Alternative C. All streams except the main stem rivers are dropped from suitability, and the tentative classifications for the main stem rivers are all downgraded to less protective classifications.  There is no basis for downgrading suitability except attempts to make the preferred alternative more politically acceptable. | C is the preferred alternative because it provides a balanced approach of protection/preservation of natural resources while providing for commodity production and extraction.  As a result, Alternative B includes all eligible river segments as suitable with maximum protection provided for these segments.  Alternative C provides for Wild and Scenic River suitability with less management restrictions to allow for more flexibility in considering other land uses.  The BLM's Wild and Scenic River Manual (8351.33C) states "Alternatives may be formulated for any combination of designations or classifications.  Reasons for considering alternative tentative classifications include resolving conflicts with other management objectives, continuity of management prescriptions, or other management considerations."  Appendix J fully discloses the review and evaluation process for determining which river segments are eligible and suitable for such designation. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 89 | Colorado River - The BLM suitability considerations in Appendix J suggest that suitability and classification on certain segments should be changed to reflect anticipated actions by private land owners included in the segment.  However, the BLM does not have the jurisdiction over these private parcels and future possible actions by private landowners are not specified in the Wild and Scenic Rivers Act as justification for lower protective classification.  Segment 1 should be suitable and classified as scenic.  Segment 3 should be scenic for the entire stretch instead of recreational.  Segment 5 should be scenic or wild.  Segment 6 should be wild. | Of the total river miles in Segment 1 of the Colorado River (6.7 miles) only 1 mile is administered by the BLM.  The lands are either privately owned or State administered.  The suitability finding concluded that BLM could not properly manage this segment of the river for Wild and Scenic River consideration due to the large amount of non-Federal property.

The classification of a portion of Segment 3 was changed from scenic in Alt B to recreational in Alt C.  This segment, which extends from Cisco Wash to the Dolores River confluence, contains large amounts of private lands.  The classification change was intended to accommodate the potential for development on the private lands.  This development could require rights-of way from the BLM for roads, power, and other infrastructure.

The classification of Segment 5 was changed from scenic in Alt B to recreational in Alt C.  Upon closer review, it |

BLM_0012972

| | | | | |
|---|---|---|---|---|
| | | | | was determined that the classification in Alt C should be changed to scenic in order to match the classification of scenic on the other side of the river in the Monticello Fiedl Office.  This change has been made in the PRMP/FEIS.<br><br>The classification of Segment 6 was changed from wild in Alt B to scenic Alt C due to evidence of past human activities. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 90 | Dolores River - Segments 1 & 2 should be classified as scenic and wild in the preferred alternative as they are in Alternative B.  Segment 3 should be classified as scenic in the preferred alternaitve.  There is no rationale for the recreational classification. | The tentative classification was established along each river segment during the eligibility review.  This tentative classification is based on an inventory of existing characteristics of a river resulting from human caused change or level of development.  The tentative classification is considered in Alternative B.  However, because a river's tentative classification provides a framework for the management prescriptions applied within the area, some flexibility is allowed to consider a range of tentative classifications in the alternatives.  Alternative C provides for a balance between protection and other land uses.  Therefore, the classifications in Alternative C have been adjusted to provide for a wider range of alternatives (Manual 8351.32). |
| Southern Utah Wildernerss Alliance (SUWA) | 124 | 91 | Green River - The preferred alternative of the MFO does not match the preferred alternative of Price. | The Moab Field Office (MFO) has coordinated with the Price Field Office (PFO) to ensure that the suitability determination for this segment of the Green River in the preferred alternative is consistent on both sides of the river.   It was determined that the PFO would change their suitability findings to match that of the MFO. |
| Southern Utah Wildernerss Alliance (SUWA) | 124 | 92 | Green River - Segment 2 (Alt B) should be classified as scenic.  Although a route is visible it is primitive.  Segment 4 should begin at Crystal Geyser and not the I-70 bridge and be classified as wild.  There are no developments until Ruby Ranch.  Segment 6 should be classified as wild to Mineral Canyon and as scenic from Mineral Canyon to Canyonlands National Park.  The ORV route to Hey Joe should be closed.  The route along the river north of Mineral Bottom should be | The BLM stands by its inventory on tentative classification for the Green River.  The level of development along this river includes roads, and past human activitiy including mining and agriculture.  The roads mentioned in the comment are part of the existing inventory of impacts for tentative classification regardless of whether they are designated or not for travel.  Segment 4 would be classified as scenic in Alt B.  There is evidence of human activity throughout the segment. |

BLM_0012973

| | | | closed. | |
|---|---|---|---|---|
| Southern Utah Wilderness Alliance (SUWA) | 124 | 93 | All rivers found suitable in B should be carried forward to the preferred alternative for the following reasons:  1) Wild and Scenic protections aid watersheds, 2) perennial streams are a rarity, and 3) these streams are popular destinations for hikers and should be recognized for the outstanding recreational opportunities. | Refer to response to comment 124-88. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 94 | Tenmile Canyon should be found eligible and suitable for inclusion in the Wild and Scenic River System and should be classified as wild.  The outstanding remarkable features are a rare perennial stream and riparian ecosystem and nationally significant cultural resource. | A review of all the rivers within the Moab Field Office was undertaken to determine which ones were eligible.  Eligibility is an inventory step for agency planning.  An interdisciplinary team determined that Ten Mile Canyon did not meet the eligibiliy standard.  This documentation is available in the Administrative Record. |
| Southern Utah Wilderness Alliance (SUWA) | 124 | 196 | The entire Green River should be found suitable for inclusion in the Wild and Scenic River System.  Green River State Park to Crystal Geyser should be recreational.  Crystal Geyser to Ruby Rach should be wild.  Ruby Ranch to Mineral Canyon should be wild. Mineral Canyon to Canyonlands National Park should be scenic.

Tenmile Canyon should be found eligible and suitable as wild. | For the Green River, see response to comments 124-91 and 124-92.  For Tenmile Canyon, see response to comment 124-94. |
| Outward Bound Wilderness | 197 | 1 | Protect Labyrinth as a wild and scenic river (which it is!), do not let oil companies intrude their presence on its shores. | The PRMP/EIS proposes that Labyrinth Canyon be managed as suitable as a Wild and Scenic River from Ruby Ranch to the National Park Service boundary.  In Alt C, the entire Green River corridor is managed as no surface occupancy for oil and gas leasing and other surface disturbing activities.  This management action is intended to protect the values of the entire Green River corridor. |
| Canyonlands Field Institute | 199 | 2 | Special Designations - Wild and Scenic Rivers - All sections as outlined, support Alternative B.  NOTE:  1) We believe the river segments should maintain the classifications they received in the eligibilty study.  2) | See response to comments 124-88 and 120-72.

The Price and Moab Field Offices have worked together to resolve the discrepancy regarding the section of the |

BLM_0012974

| | | | We request that the Green River from Swasey's Beach to San Rafael River be included as "scenic" stretch. The Price BLM released draft RMP in 2004 that presented a preferred alternative in which the entire river from Swasey's to River Mile 97 to be "suitable". We support the Moab plan being consistent with the Price plan. 3) We are especially concerned that the upper Professor Creek (headwaters to diversion) is not found "suitable" for wild status in the preferred Alternative C. We are familiar with that stretch and it does meet criteria and should be protected. We would request involvement with any proposed management plan. | Green River from Swasey's Beach to the Sand Rafael River.<br><br>The upper portion of Professor Creek, while not managed as a WSR in Alt C, is protected by other means, including the imposition of NSO or closed for oil and gas leasing and all other surface disturbing activities. |
|---|---|---|---|---|
| Utah Rivers Council | 213 | 1 | …a pending or potential water resource development project on an eligible river would in fact make it that much more important to include the river in the National Wild and Scenic River System because without such protection the values of the river may be lost forever or be negatively impacted by the project.  In other words, eligible rivers upon which there is a pending or potential water resource development or other project definitely and clearly make said river suitable to become a Wild and Scenic River.  Therefore, a pending or potential water resource development or other project leads towards a positive suitability finding.  Actual case examples back this up.  For example, in 1993 in Arizona the Santa Maria River was evaluated for suitability by the BLM Phoenix District.  The rational for finding the segment suitable states, "The downstream terminus of this segment coincides with an existing Corps of Engineers withdrawal for the floodwaters of the Alamo Dam.  If the spillway height of Alamo Dam were ever significantly raised, the newly created floodwaters would inundate the stream's important riparian values (one of the outstanding remarkable values of this river)." This same discussion on a potential water resource development project leading to a positive suitability finding can be applied to other | The BLM did not remove any rivers from a suitability determination based on any pending or potential water resource projects, potentail projects, or any other developments. |

BLM_0012975

| | | | | |
|---|---|---|---|---|
| | | | suitability factors with potential development projects, potential transportation projects, and facilities or other developments such as a nuclear power plant that will take water out of the river since they would irreparably harm the values of the eligible river.  The Council urges the Moab F.O. to consider eligible rivers upon which there is a pending or potential water resource development project, potential development project, potential transportation project or other developments as suitable to become a Wild and Scenic River under all alternatives.  At the very least, potential projects can not be used as a reason to find a river segment not suitable. | |
| Utah Rivers Council | 213 | 2 | The preferred alternative in the Draft on page 2-41 changes the classification of one segment of the Green River, from Coal Creek to Nefertiti from its original classification of 'Wild' in the eligibility study to 'Scenic' under the preferred alternative.  There is no basis for such a change due to a manageability issue. The Council urges the Moab F.O. to find the Coal Creek to Nefertiti segment of the Green River as a 'Wild' river in the preferred alternative, as it was in the eligibility study and in Alternative B.<br><br>        There is nothing in the Wild and Scenic Rivers Act nor the BLM guidelines that state it is impossible to have a 'Wild' segment located adjacent to a 'Recreational' segment.  These different classifications are based on the current development and accessibility to the particular river segment. While one segment may have a paved road paralleling it, the next segment may have no roads and no development. The different segments qualify for these classifications because of the development and accessibility in the different river segments. These segments have been managed with these differences in the past and designating adjacent segments as 'Wild' and 'Recreational' does not present any management issues. | The BLM has reevaluated the determination of the classification of the Green River from Coal Creek to Nefertiti.  The classification of this segment in the proposed alternative for this river segment has been changed to "wild". |

BLM_0012976

| | | | | |
|---|---|---|---|---|
| | | | Several rivers in the National Wild and Scenic System do consist of a 'Wild' segment adjacent to a 'Recreational' segment. For example, on the North Fork of the Kern River (CA) there is a 13.2 mile 'wild' segment adjacent to a 17.8 mile 'recreational' segment. Also, the South Fork of Kern River (CA) has a 27 mile 'wild' segment adjacent to a 3 mile 'recreational' segment, which is then bordered by a 14.3 mile 'wild' segment, and the Wilson River (North Carolina) has a 4.6 mile 'wild' segment adjacent to a 15.8 mile 'recreational' segment.<br><br>Therefore, the Council urges the Moab F.O. to find the Coal Creek to Nefertiti segment of the Green River as a 'Wild' river in the preferred alternative, as it was in the eligibility study and in Alternative B. | |
| Utah Rivers Council | 213 | 3 | Classification of River Segments Should Not be Downgraded from Eligibility Study to Sustainability Study.<br><br>The classification of several river segments in the preferred alternative was downgraded from the original classifications given to them in the eligibility study. In Table 2.1 pages 2-39 to 2-42 of the Draft the following segments were downgraded in the preferred alternative from the classifications given in the eligibility study (J-67 to J-68): Colorado River – Segment 5: 'Scenic' in eligibility study to 'Recreational' in preferred alternative; Segment 6: 'Wild' in eligibility study to 'Scenic' in preferred alternative; Dolores River – Segment 1: 'Scenic' in eligibility study to 'Recreational' in preferred alternative; Segment 2: 'Wild' in eligibility study to 'Scenic' in preferred alternative; Segment 3: 'Scenic' in eligibility study to 'Recreational' in preferred alternative; Green River – Coal Creek to Nefertiti: 'Wild' in eligibility study to 'Scenic' in preferred alternative.<br><br>The Council urges the Moab F.O. to give all of these segments the classification that they were given in the eligibility study, which is the same as that given in | According to the Wild and Scenic Rivers - Policy and Program Direction for Identification, Evaluation, and Management (BLM Manual 8351) at least one alternative analyzed in detail shall provide for designation of those eligible river segments in accordance with the tentative classifications which have been made.  Another alternative shall provide for no designation.  The no-action alternative, i.e., a suitability determination is not made, should provide for on-going management, including continuation of protective management of eligible segments.  Additional alternatives may be formulated for any combination of designations and/or classifications.<br><br>Under Alt B of the DRMP/EIS, all eligible river segments were determined suitable in accordance with the tentative classifications.  Under Alt C, the classification along the Colorado River for segment 6 was downgraded to a classification of scenic from its tentative classification in Alt B as wild.  This classification in Alt C was in line with the theme of the alternative and would provide more flexibility in considering future uses in comparison to Alt B while still providing a wild and scenic river designation |

972

BLM_0012977

| | | | Alternative B on pages 2-39 to 2-41. | proposal. Segment 5 along the Colorado River was classified as recreational in Alt C of the DRMP/EIS. This classification has been changed to scenic in the PRMP/FEIS to be consistent with the classification proposed by the BLM Monticello Field Office.<br><br>See response to comment 124-88. |
|---|---|---|---|---|
| | | | Classification of rivers as wild, scenic, or recreational is an assessment of the degree of development in the river corridor. The Draft acknowledges this reality in Appendix J where it states "Tentative classifications are based on the type and degree of human evaluation." But then the Draft goes on to muddle the clear language of the Wild and Scenic Rivers Act by finding segment 1 of the Green River "wild" in alternative B and "scenic" in Alternative C. Similarly, segments 5 and 6 of the Colorado River are found to be "scenic" and "wild" respectively in Alternative B and "recreational" and "scenic" in alternative C. All of these segments are downgraded in the preferred alternative, Alternative C. | |
| | | | Classification is a relatively straightforward review of the degree of development in the river corridor, and not open to the degree of interpretation exercised here by the BLM Moab F.O. There is no basis in statute for the alternative classification schemes proposed under different Alternatives in the Draft. The classifications in Alternative C – the preferred alternative – are particularly ill founded and not at all based in the reality of development on the ground. Much of the Green River area is undeveloped and primitive as references time and again throughout the Draft itself. Classification is not to be used to address political concerns or other factors – it is simply a way of representing the extent of development in the river corridor. | |
| | | | Downgrading the classification of river segments simply opens up these sections that are being downgraded to further developments or threats that are not in existence today. The entire point of the Wild and Scenic Rivers Act is to preserve certain select rivers as they are today. The tentative classification given to these segments is based on the actual | |

BLM_0012978

| | | | | |
|---|---|---|---|---|
| | | | development and accessibility to the river at the current time.  Thus, this is the classification that these segments should be given in the suitability determination.  Downgrading the classification of these segments is not consistent with the current development of these rivers and simply opens them up to future threats that may negatively harm the outstanding values of these rivers.<br><br>We respectfully request that the Moab F.O. use the classifications documented in Attachment 3 of Appendix J, pages J-67 to J-68, for the various segments listed above of the Green, Colorado, and Dolores Rivers. | |
| Utah Rivers Council | 213 | 4 | Existence of Road Affects Classification of River Segment Rather than Suitability<br><br>The Council would like to stress that the presence of a paved or dirt road affects the classification of a segment rather than the suitability of a segment.  The preferred alternative finds two segments of the Green River as not suitable: from Swasey's to I-70 and from I-70 down to River Mile 91.  There are paved or dirt roads along sections of both of these segments.  However, the mere presence of these roads does not make these segments not suitable.  The Council urges the Moab F.O. to find these two segments suitable with a 'Recreational' classification for the segment from Swasey's to I-70 and 'Scenic' for the segment from I-70 down to River Mile 91.<br><br>The existence of a paved or dirt road along the river segment or in a river corridor is something that must be considered when studying the potential for a river to be added to the National Wild and Scenic River System.  However, it is important to note that the mere existence of a paved or dirt road does not disqualify a river segment from becoming a Wild and Scenic River.  In other words a river segment that has a road adjacent to or in the corridor is not automatically determined to | The Moab Field Office (MFO) has coordinated with the Price Field Office (PFO) to ensure that the suitability determination for this segment of the Green River in the preferred alternative is consistent on both sides of the river.   It was determined that the PFO would change their suitability findings to match that of the MFO.<br><br>The Green River between Swasey's Rapid and river mile 91 contain a large amount of private land.   This large amount of private ownereship along these river segments would make manageability difficult.  The roads along the Green River were not a factor in this suitability decision.  The presence of roads affects the classification but not the suitability. |

BLM_0012979

| | | | | |
|---|---|---|---|---|
| | | | be not suitable. Instead the presence of a road or dirt road would affect the classification of the river segment.<br><br>        Table 2 in Appendix J, page J-10, the classification criteria for Wild, Scenic, and Recreational River Areas, makes it very clear that a road simply affects the classification and has nothing to do with the suitability of a segment. In the row 'accessibility' the table states under 'Wild', "No roads, railroads or other provisions for vehicular travel within the river area." Then in the next column, 'Scenic', it states, "Roads may occasionally reach or bridge the river. The existence of short stretches of conspicuous or longer stretches of inconspicuous roads or railroads is acceptable." In the final column, 'Recreational', it states, "The existence of parallel roads or railroads on one or both banks as well as bridge crossings and other river access points is acceptable." This table lays out clear standards as to how an eligible river should be classified based on the accessibility.<br><br>        The Moab F.O. has no justification based on the Wild and Scenic Rivers Act and its own documents to determine a river segment not suitable based on the presence of a paved or dirt road. Therefore, the Council urges the Moab F.O. to find the segment from Swasey's to I-70 suitable with a 'Recreational' classification and the segment from I-70 down to River Mile 91 suitable with a 'Scenic' classification. | |
| Utah Rivers Council | 213 | 5 | Coal Creek to Nefertiti should be classified as 'Wild'. This segment of the Green River is not paralleled by any roads (see map 2-11-C Designated Routes Alternative C) nor is there any development in the river corridor. Additionally, this area is proposed to be closed to OHVs in the preferred alternative (Map 2-10-C Off Highway Vehicle Categories – Alternative C). Therefore, this segment should keep its wild classification in order to maintain the river corridor in its current state and because a wild classification is | The classification of the Green River from Coal Creek to Nefertiti has been changed to wild in Alt C.  The classification of wild is consistent with the management objectives for this alternative. |

BLM_0012980

| | | | | |
|---|---|---|---|---|
| | | | consistent with other management objectives. | |
| Utah Rivers Council | 213 | 6 | River mile 91 to Hey Joe Canyon segment should be classified as 'Wild'. This segment is also not paralleled by any roads nor is there any development corridor. There is a dirt road that heads up Hey Joe Canyon. his dirt road does not go into this segment, but heads south from Hey Joe Canyon. However, there are a few roads that lead to the boundary of the river area, but do not actually lead all the way to the river (see map 2-11-C Designated Routes Alternative C). As Table 2: Classification Criteria for Wild, Scenic, and Recreational River Areas on page J-10 states regarding a Wild river, "A few existing roads leading to the boundary of the river area is acceptable." Therefore, this segment should keep its 'Wild' classification in order to protect the river corridor as it currently exists today. | The BLM has determined that the Green River is suitable for designation in Alt C from River Mile 97 (the confluence of the San Rafael River) downstream to Canyonlands National Park.<br><br>The classification of the Green River from River Mile 97 to Canyonlands National Park is scenic throughout the entire segment in Alt C.   The classification of the entire segment as Scenic is compatible with the other management objectives along the river in Alt C.  These include travel limited to designated routes, and no surface occupancy for oil and gas leasing and other surface disturbing activities.  The Green River is within the Labyrinth Rims/Gemini Bridges SRMA and the Labyrinth River Canoe Focus Area.<br><br>The BLM asserts that the Green River from River Mile 97 to the Canyonlands National Park boundary is more manageable with a consistent classification throughout. The BLM does not see the need to further segment this portion of the Green River so that small reaches can be classified as "wild". |
| Utah Rivers Council | 213 | 7 | Majority of land in Green River corridor from I-70 bridge to River Mile 91 is public land.<br>As stated earlier, this segment of the Green River is part of the incredible Green River corridor and should be found suitable as a Wild and Scenic River with a Scenic classification.  Discussions with the various BLM Moab F.O. point out that one of the reasons this section was found not suitable in the preferred alternative was the amount of private land in the corridor complicating manageability of the segment.<br>However, a careful analysis of the amount of private land versus public land shows that by far the majority of the land in the river corridor between river mile 119 and 99 (Ruby Ranch property) is public land. | See response to comment 213-4.<br><br>The BLM stands by its assessment that the mix of private and public lands creates a manageabilty problem. |

BLM_0012981

| | | | Based on a review of the map provided in the Moab Draft, 18 of the 28 miles or 64% is public land and only 10 miles or 36% of the land is private.  This clearly shows that the majority of the land in the corridor is public, the manageability of this section of the corridor should not be an issue, especially considering that some of the private landowners support the river being designated as a Wild and Scenic River.<br><br>Furthermore, the Wild and Scenic Rivers Act provides for collaboration between public agencies and state and local governments in order to manage the river. Thus, the issue of manageability of the river is simply not an over-riding concern because the Moab F.O. can collaborate with the private land owners (through the form of the local government or even via a resource advisory committee) in the area to best manage the Wild and Scenic Green River. Section 11 (b)(1) of the Wild and Scenic Rivers Act specifically allows any Federal agency to cooperate with state and local governments to plan, protect, and manage river resources.<br><br>Therefore, the Moab F.O. should find the segment of the Green River from I-70 bridge down to River Mile 91 suitable to become a Wild and Scenic River with a scenic classification. | |
| Utah Rivers Council | 213 | 8 | It simply does not make any sense to protect the upper and lower sections of the Green River in the Moab F.O. and not include the middle section.  Failing to include this section opens the Green River up to possible threats that would then impact and harm all other stretches of the river.  Furthermore, anything that happened on this unprotected stretch of the Green River would impact any suitable or designated sections of the Green or Colorado Rivers downstream and possibly upstream.<br><br>Giving these river segments a positive suitability factor for their contribution to the river system | See response to comment 213-7. |

977

BLM_0012982

and river basin integrity is consistent with the goals of the Wild and Scenic Rivers Act – to preserve select rivers in their free-flowing condition.  River systems are interconnected wholes. Main stems of rivers can provide habitat for core populations of aquatic organisms. Migration of organisms up and down stream along this river is often critical for the persistence of these populations, many of which on the Green River are now endangered species.  The core populations serve as stable sources of dispersers that can recolonize habitats (such as after flood or drying events) and help to maintain genetic diversity.

River are the circulatory system of landscapes. They filter and distribute nutrients, as well as pollutants, as they transport water throughout the river network. Degradation in one location can adversely affect habitat or populations of organisms downstream.  For example, in-stream gravel mining can increase turbidity downstream of mining operations.  Also, the loss of riparian vegetation in headwater streams due to overgrazing or development can lead to an increase in nutrients, pollutants, and sediment entering streams and rivers. All of these effects reduce water quality and are detrimental to the health of many aquatic organisms.

Finally, it is vital to find every river segment suitable along the river system due to the importance of an interconnected river system and adverse effects that could arise due to fragmentation of a river. For example, finding one segment of the Green suitable and another not suitable could allow a dam or other project to be built on the non-suitable segment in the future. Dams are known to have adverse effects in downstream locations via changes in the timing, magnitude, duration, and frequency of flood events. Thus, a future dam or diversion on the Green River could present a significant threat to the integrity of a

BLM_0012983

| | | | | |
|---|---|---|---|---|
| | | | downstream segment designated as a Wild and Scenic River. This would be counter to the purposes of the Wild and Scenic River Act by destroying the natural character of the designated river.<br><br>      This demonstrates the importance of designating all eligible components of the Green River as suitable to become a Wild and Scenic River in order to maintain the connectivity if the river system and to protect and maintain the integrity of the river system with its myriad values. Without this Wild and Scenic River designation it is impossible to guarantee the future of the Green River and to guarantee the protection of these outstanding values, such as scenic, recreation, and endangered fish species. | |
| Utah Rivers Council | 213 | 9 | The list of eligible segments of the Green River and the segments that are analyzed for suitability are inconsistent.  In Appendix J, seven suitability factors were considered for each of the different rivers, including the Green River.  Attachment 2 in Appendix J, pages J-61 to J-64, shows that 6 segments of the Green River are eligible to become a Wild and Scenic River.  However, attachment 4, pages J-81 and J-82, lists the suitability considerations for the, "Green River – Segments 1 through 5".  Thus, the suitability analysis fails to even include all 6 eligible segments in the analysis.  It is impossible to determine which of the 6 eligible river segments were not included in the analysis because they are not listed nor mentioned. | There are 6 river segments along the Green River and this error has been corrected in the PRMP/FEIS.  The heading on pg. J-81 of the DRMP/EIS has been changed to "Green River segments 1 through 6". |
| Utah Rivers Council | 213 | 10 | The suitability analysis of the Green River includes segments 1 through 5 together. The response to each of the seven suitability factors does not make it clear which of the segments the response applies to.  This completely muddles the entire suitability analysis as it is impossible to determine why some segments were found suitable and others were found not suitable. | There are 6 river segments along the Green River and this error has been corrected in the PRMP/FEIS. Attachment 4, Suitability Considerations by Eligible River Segment, has been augmented for the Green River and this augmentation makes the suitability determinations more clear. |
| Utah Rivers Council | 213 | 11 | There is a paucity of information included in the suitability analysis in Attachment 4 on pages J-81 to J- | See response to comment 213-10. |

BLM_0012984

82.  A total of 7 factors are listed. T he only response to a factor that has some decent information in the response for land ownership and current use. However, even this response does not provide enough information to make a decision regarding the suitability of these five segments.

For example, one of the responses to the suitability factors is not included in Attachment 4 on page J-81.  The response to the factor – Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated, states, "Uses and values affected will be addressed in the impact analysis for the Price RMP/EIS." This provides absolutely no information to a reader and does not adequately address the suitability factor, which therefore provides no indication if this leads to a finding of suitable or not suitable for each of the different eligible segments of the Green River.  At a minimum the response to this factor should at least include a summary of the referenced impact analysis so that the Moab F.O. can make an informed decision and so that a reader may understand the justification for the decision reached.

For the factor – the estimated costs of administering the river, including costs for acquiring lands, the response has no information. It simply is a blank space. This is yet another example of the paucity of information and demonstrates the incomplete and inconclusive suitability analysis.

Additionally, the response to the factor – Characteristics which would or would not make it suitable, is not understandable. The statement lists, "These values are listed in detail in Table 3." Table 3 in Appendix J is on page J-13. This table, Suitability Study Interdisciplinary Meetings, has nothing to do with the values of the Green River.  This is yet another example

980

BLM_0012985

| | | | | |
|---|---|---|---|---|
| | | | of the incomplete nature of the suitability analysis.<br><br>In other words the suitability analysis in the Draft fails to provide accurate information for 2 of the 7 suitability factors, and does not include any information on 1 of the 7 factors.  In addition, the seven factors that were considered are incomplete.  For example, it does not appear that the Moab F.O. considered the support of the public for designation nor is there any sign that the contribution of the river segment to the overall integrity of the river system was considered.  This is an excellent example of the incomplete and confusing nature of the suitability analysis.  The suitability recommendations reached from an incomplete and confusing suitability analysis are not justified. | |
| Utah Rivers Council | 213 | 12 | Nowhere in the draft document does the Moab F.O. share how they evaluated the factors in order to come to a decision about suitability.  Nowhere in the Draft does it state how each of the seven suitability factors were evaluated.  It is impossible to determine why the Moab F.O. determined that certain segments of the Green River were suitable and other segments of the Green River were not suitable.<br><br>For example, how does the Moab F.O. interpret the response on page J-81 that states, "Uses and values affected will be addressed in the impact analysis for the Price RMP/EIS."  What does that actually mean in terms the suitability of the different segments of the Green River? Does that lead to or against a suitable finding for segments of the Green River?<br><br>Another example of the vagueness in interpreting the suitability factors relates to the response on page J-81, "State and local governments are unsupportive of any determination of suitable. There is likely support from the environmental community for determinations of suitability."  What does that mean for the suitability of these different segments of the Green River?  Does that lead towards or away from a suitable | According to the Wild and Scenic Rivers - Policy and Program Direction for Identification, Evaluation, and Management (BLM Manual 8351) at least one alternative analyzed in detail shall provide for designation of those eligible river segments in accordance with the tentative classifications which have been made.  Another alternative shall provide for no designation.  The no-action alternative, i.e., a suitability determination is not made, should provide for on-going management, including continuation of protective management of eligible segments.  Additional alternatives may be formulated for any combination of designations and/or classifications.<br><br>Under Alt B of the DRMP/EIS, all eligible river segments were determined suitable in accordnace with the tentative classifications.  Under Alt Ct the classification are in line with the theme of the alternative and would provide more flexibility in considering future uses in comparison to Alt B while still providing a wild and scenic river designation proposal.<br><br>Appendix J of the DRMP/EIS provides the BLM's Suitability Study.  This study was completed in |

BLM_0012986

| | | | | |
|---|---|---|---|---|
| | | | finding?<br><br>Despite the confusion and lack of information in the suitability analysis the Draft includes recommendations for which segments are suitable under the different alternatives in Table 2.1, page 2-41 of the Draft.  These recommendations for suitable and non suitable segments are given no justification based on the documentation in the Draft.<br><br>Therefore, it appears that the Moab Field Office's suitability recommendations are completely arbitrary in nature.  Because of this disconnect, the Draft RMP's suitability determinations are not supported by substantial evidence on the record and so are not defensible.  Furthermore, the public has not been given a meaningful opportunity to provide substantive comments on the suitability analysis due to the paucity of information in the Draft and the vagueness in terms of interpreting the different factors.  The public would simply be taking a shot in the dark due to the confusing and incomplete nature of the suitability analysis in the Draft. | accordance with BLM Manual 8351.  The study is explained on pg. J-11 and is attached in its entirety on pgs. J-69 through J-82. |
| Utah Rivers Council | 213 | 13 | Table 2.1, page 2-41, creates new segments for the Green River.  This further confuses the suitability analysis. These new segments are not consistent with either the six eligible segments of the Green River (J-61 to J-64) nor to the five segments of the Green River that were included in the mixed up suitability analysis (J-81 to J-82).  These new segments of the Green River are not consistent with the segmentation of the Green River in the Price Draft RMP. Therefore, any justification for creating new segments for the Green River does not exist nor does the suitability analysis cover these new segments. This is yet another example of the incomplete and inconclusive nature of the suitability analysis preformed by the Moab F.O.<br><br>In conclusion, we respectfully request that the Moab F.O. conduct in depth suitability analysis of all | The reference to 5 river segments along the Green River was in error and has been corrected in the PRMP/FEIS to 6 segments.   The Price and Moab PRMP/FEIS's are now consistent in  proposed management for Wild and Scenic Rivers.  The suitability analysis for all segments of the Green River has been augmented and information added to the PRMP/FEIS. |

BLM_0012987

| | | | | |
|---|---|---|---|---|
| | | | segments of the Green River found eligible for protection using the approach recommended by the Interagency Wild and Scenic Rivers Coordinating Council (page 17 of "The Wild and Scenic River Study Process") and involving the public throughout the process. | |
| Utah Rivers Council | 213 | 14 | The resegmentation of the Green River in the Draft RMP is not justified, explained, and is inconsistent with the segmentation of the Green River in the Price Draft RMP.<br>     The Moab Draft resegments the Green River in the preferred alternative (see Table 2.1 page 2-41_. The rationale for this resegmentation is not explained nor justified anywhere in the Draft. Appendix J of the Draft documents the Wild and Scenic River Study process, including eligibility, tentative classifications, and the suitability study. Attachments 2 and 3 in Appendix J both have 6 segments of the Green River. These segments are consistent with the segments of the Green River in the Price Draft RMP.<br>     We urge the Moab Field Office to change the resegmentation of the Green River in the preferred Alternative in Table 2.1 back to the original segments identified in the eligibility study (attachments 2 and 3 in Appendix J) and in alternatives B and D in Table 2.1. | See response to comments 213-12 and 213-13. |
| Utah Rivers Council | 213 | 15 | Inconsistency with Price BLM Draft RMP<br>     The West side of the Green River is managed by the Price F.O. an the East side is managed by the Moab F.O. It is important that the decisions reached by the two offices regarding the Green River are consistent. The Price F.O. released its draft RMP in July 2004, in which recommendations were made regarding the Green River as suitable to become a Wild and Scenic River. Unfortunately, the Moab Draft and the Price Draft differ in their preferred alternative. It is vital that both sides of the Green river are managed in the same manner so as to ensure cohesion and | See response to comments 213-12 and 213-13. |

BLM_0012988

| | | | consistency. The table below summarizes the discrepancies between the two field offices Draft RMP for the Green River. (See Comparison of Price Draft RMP and Moab Draft RMP table included in the Utah Rivers Council comments, page 15.) | |
|---|---|---|---|---|
| | | | It is vital that the two BLM field offices are consistent in terms of their recommendations for the Green River as a Wild and Scenic River. We have taken this into account in our recommendations for the Green River. Please see our recommendations for a Wild and Scenic Green River above to see a consistent approach between the two field offices for a suitable Wild and Scenic Green River. | |
| Utah Rivers Council | 213 | 16 | We are extremely concerned with the approach to suitability reviews provided in the Draft for these segments (from page 22: Mill Creek – National Forest Boundary to private property below diversion: Recreational, Mill Creek – T26S, R23E, Section 19 to Power Dam: Scenic, Onion Creek – Source to Onion Creek Road: Wild, Onion Creek – Beginning of Onion Creek Road to Colorado River: Recreational, Professor Creek – National Forest and state land boundary to diversion near private land: Wild, Beaver Creek – Forest Service boundary to one mile from Dolores River: Wild, Beaver Creek – One mile to Dolores River: Scenic, Negro Bill Canyon – from state land below rim to ¼ mile from Colorado River: Wild, Negro Bill Canyon – last ¼ mile to Colorado River: Recreational) due to the paucity of information provided in the suitability analysis, lack of justification for the conclusions reached regarding the suitability of the different segments, and vagueness in interpretation of each suitability factor. Based on these the Moab Draft does not provide adequate justification for finding these segments not suitable and we are at a loss as to how to refute the conclusion that these segments are not suitable. Therefore, the Moab F.O. should find all of these | See response to comment 124-88, 213-12 and 213-17. |

BLM_0012989

suitable under the preferred alternative with the classifications listed above.

First, nowhere in the draft documents does the Moab F.O. share how they evaluated each of the seven listed suitability factors in order to come to a decision about suitability of the segment. It is impossible to determine why the Moab F.O. determined that these rivers were not suitable.

For example, how does the Moab F.O. interpret the response on page J-75 regarding Negro Bill Canyon for the factor, 'Land ownership status and current use of the area', which states – 100% BLM? Does that lead to or against a suitable finding for segments of the Green River? This response appears to lead toward a positive suitability finding.

Another example of the vagueness in interpreting the suitability factors relates to the response on page J-76, "Interest/Support from some local residents, and environmental organizations." What does that mean for the suitability of these segments of Mill Creek? Does that lead towards or away from a suitable finding? This response appears to lead towards a positive suitability finding.

Despite the lack of information and vagueness in interpretation of the suitability factors in the suitability analysis the Draft recommends that all of these river segments are not suitable in the preferred alternative in Table 2.1, page 2-41 of the Draft. These recommendations for non suitable segments are given no justification based on the documentation in the Draft.

In fact, a review of the limited information presented on these segments in Appendix J Attachment 4 argues FOR suitability, rather than against it. For all of the segments we listed above, the only information listed in Appendix J that could possibly be interpreted as negatives is the occurrence of grazing on some stretches and the fact that some of the segments are

985

BLM_0012990

| | | | | |
|---|---|---|---|---|
| | | | open to mineral leasing and/or oil and gas leasing. Grazing or some oil and gas leasing are not a bar to suitability, nor would Wild and Scenic status necessarily harm those activities (for example, grazing can continue on Wild and Scenic stretches as long as the ORVs are protected). Most of the presented information actually argues in favor of suitability for the stretches, including the descriptions of the values, the public (particularly the local) support described, and even the lack of acquisition costs associated with the stretches. So, even with the extremely limited data presented in the Draft, the evidence argues for suitability.<br><br>     Therefore, it appears that the Moab Field Office's suitability recommendations are completely arbitrary in nature. Because of this disconnect, the Draft RMP's suitability determinations are not supported by substantial evidence on the record and so are not defensible. The Council urges the Moab F.O. to find all of these segments suitable to become a Wild and Scenic under the preferred alternative with the classifications listed above. | |
| Utah Rivers Council | 213 | 17 | Finding these segments suitable is consistent with other management objectives<br>     These river segments all have other protective measures that are consistent with being found suitable to become a Wild and Scenic River. Therefore, all of these segments should be found suitable with the classifications listed above.<br>     First, the preferred alternative on page 2-16 recommends that nearly 26,000 acres in Beaver Creek, Fisher Towers and Mary Jane Canyon be managed as non WSA lands with wilderness characteristics. Beaver Creek, Professor Creek, and Onion Creek all fall within these areas. Therefore, managing Beaver Creek, Professor Creek, and Onion Creek as a Wild and Scenic River is consistent with managing the area as a non WSA land with wilderness characteristic. | The segments mentioned by the commentor are managed in the preferred alternative with other protective measures in place.  It is because of these protective measures (WSA, ACEC or wilderness characteristics) that the BLM chose not to find these streams as suitable.<br><br>Only rivers having a Recreation ORV which included boating and rafting were placed in Alt.C. Only a Wild and Scenic River proposed designation can protect a river from upstream federally-funded damming.  Wild and Scenic  River designation, in assuring downstream flows, would protect the Recreation ORV of floating and rafting by assuring instream flows.<br><br>The streams mentioned by the commentor do have non-boating Recreation ORVs.  These Recreation ORVs |

BLM_0012991

| | | | | |
|---|---|---|---|---|
| | | | Secondly, the preferred alternative on page 2-36 to 2-37 recommends a Mill Creek Canyon ACEC. Such management is consistent with managing Mill Creek as a Wild and Scenic River. Therefore, Mill Creek should be found suitable as a Wild and Scenic River,<br><br>Third, the preferred alternative on page 2-43 recommends that both Mill Creek Canyon and Negro Bill Canyon should be managed as wilderness study areas, which closes the area off to OHVs. Therefore, managing Mill Creek and Negro Bill Canyon as Wild and Scenic Rivers is consistent with this type of management.<br><br>In summary, all of these segments are being recommended under the preferred alternative to be managed with these different types of protections. Therefore, this type of management is consistent with finding all of these rivers suitable to become Wild and Scenic Rivers. | involve hiking in riparian areas.   The Recreation ORVs in these smaller streams can be protected by the imposition of other management actions. |
| | 257 | 1 | The entire Green River is suitable for Wild and Scenic Designation. The entire river corridor supports a diversity of habitat and wildlife, from its headwaters in CO  to the Town of Green River and is an outstandign value for Utah. | See response to comment 124-88. |
| Red River Canoe Company | 283 | 5 | Routes to the Labyrinth Canyon area also conflicts with current river management and use. The Price FO wrote the plan for the river and found it to have Wild and Scenic values, but such values are blatantly ignored by the Moab FO which plans to designate routes along the river, from Mineral Bottom upstream. Nothing precludes motorized recreationalists from camping on the river – a direct conflict with existing river use – and motorists aren't required to follow the same rules as river users (like using fire pans, hauling out trash, collecting human waste, etc). | Should vehicle camping along the Green River be deemed a resource conflict, this type of camping can be curtailed without a plan amendment being required.  The instances of camping use from the Mineral  Bottom boat ramp upstream to Hell Roaring Canyon are not common, nor has a conflict been reported to the BLM from this type of activity. |
| Grand County Backcountry Council | 289 | 7 | Routes to the Labyrinth Canyon area also conflict with current river management and use. The Price FO wrote the plan for the river and found it to have Wild and | The Green River in Desolation and Gray Canyons, as well as from the San Rafael River to Canyonlands National Park, has been determined to be suitable for Wild and |

BLM_0012992

| | | | | |
|---|---|---|---|---|
| | | | Scenic Values, but such values are blatantly ignored by the Moab FO which plans to designate routes along the river, from Mineral Bottom upstream. Nothing precludes motorized recreationalists from camping on the river — in direct conflict with existing river use — and motorists aren't required to follow the same rules as river users. | Scenic River status in the preferred alternative.  The existence of routes along the Green River does not disqualify the river for Wild and Scenic status.

The route from the Mineral Bottom boat ramp upstream to Hell Roaring Canyon was constructed in the 1950's.  If vehicle camping should prove to be a problem in this section, it could be restricted.  In the BLm's experience, very few people (either in vehicles or in boats) camp just upstream from the Mineral bottom boat ramp. |
| Grand County Backcountry Council | 289 | 12 | Mill Creek is not recognized as eligible for Wild and Scenic Designation. This is a popular gem close to town that deserves recognition and protection. | Both the North and South Forks of Mill Creek are proposed to be managed as an ACEC, and as no surface occupancy for oil and gas leasing and other surface disturbing activities.  In addition, portions of the North Fork of Mill Creek are contained within the Mill Creek WSA.  These two designations are sufficient to protect the resources of Mill Creek in the preferred alternative. |
| | 305 | 1 | All 66.5 miles of the Colorado River proposed in Alternative B should be included as wild/scenic. | See response to comment 124-88. |
| | 309 | 7 | I ask you to incorporate the recommendations and justification provided by the Utah Rivers Council and Holiday Expeditions that addresses designations for segments of the Green River. | See response to comment 124-88. |
| Western Wildlife Conservancy | 311 | 2 | WWC recommends that the entire length of the Green River within the Moab BLM District be granted wild or scenic status, including Labyrinth Canyon and the entire stretch between Swasey's and the Colorado influence. | Large portions of the Green River within the Moab planning area have been found suitable for Wild and Scenic River designation in the preferred alternative.  The portion between Swasey's Rapid and the San Rafael River confluence were not found suitable in Alt C because of the conflicts with private land.

It should be noted that throughout its length, the Green River will be managed as No Surface Occupancy for oil and gas in the preferred alternative, thus protecting many of the outstandingly remarkable values. |
| Western Wildlife Conservancy | 311 | 3 | We wish to point out that the Moab RMP is inconsistent with the Price RMP with respect to this section of the Green River: The Price RMP recommends the west | The Moab BLM is aware of the inconsistency with the Price RMP.  This inconsistency has been resolved as both plans move toward their final formulation. |

988

BLM_0012993

| | | | | |
|---|---|---|---|---|
| | | | bank of the river for inclusion within the wild and scenic rivers system, while the Moab RMP does not. There is no significant difference between the east and west side of this river segment that would warrant this difference in status. Furthermore, the mere existence of a paved road or dirt road along a river segment or in a river corridor does not disqualify that river segment from being included in the wild and scenic river system. The presence of the road potentially affects only the classification of the river segment. (see Table 2, Appendix J, page J-10 of the classification criteria for Wild, Scenic, and Recreational River Areas.) Again, BLM seems to misunderstand this point. | |
| | 333 | 1 | The status of the rivers and streams on the Green River: I support the dropping of the Swasey's to Ruby Ranch section. This stretch is highly impacted by road, highway, city (Green River), a low head dam, the boat ramp, a highway bridge, areas of historic use and then private land with structures (large homes) of Ruby Ranch area. | See response to comments 124-88,  124-91 and 407-3. |
| | 334 | 1 | The Price Field Office did the draft for the Green River in Grand County while the Moab Field Office did the land portion in Grand County. The two offices did their work at different times and did not consult during the process. Price has found wild and scenic values for the river corridor while the Moab office wants to open the river corridor to 4x4, ATV, and motorcycle travel both on the rim and in the river corridor. The Moab plan will diminish, if not ruin, the experience of those who float the river and enjoy its wild and scenic values. | See response to comment 124-91. |
| Businesses/Orgs in Support of the Green River | 407 | 1 | The resegmentation of the Green River in the Moab Draft is not justified, explained, and is inconsistent with the segmentation of the Green River in the Price Draft RMP.<br><br>The Moab Draft resegments the Green River in the preferred alternative (see Table 2.1 page 2-41). The | The resegmentation of the Green River was done in order to find the proper river segments suitable that matched the goal of each alternative.<br><br>The Moab and Price Field Offices will work toward consistency regarding the segment of the Green River from Swasey's Beach to the San Rafael River confluence. |

BLM_0012994

| | | | | |
|---|---|---|---|---|
| | | | rationale for this resegmentation is not explained nor justified anywhere in the Draft. Appendix J of the Draft documents the Wild and Scenic River Study process, including eligibility, tentative classifications, and the suitability study. Attachments 2 and 3 in Appendix J both have 6 segments of the Green River. These segments are consistent with the segments of the Green River in the Price Draft RMP.<br>We urge the Moab Field Office to change the resegmentation of the Green River in the preferred alternative in Table 2.1 back to the original segments identified in the eligibility study (attachments 2 and 3 in Appendix J) and in alternatives B and D in Table 2.1. | |
| Businesses/Orgs in Support of the Green River | 407 | 2 | We are extremely concerned with the approach to suitability reviews provided in the Draft, due to the paucity of information provided in the suitability analysis, lack of justification for the conclusions reached regarding the suitability of the different segments, inaccuracies, and the failure to analyze the suitability of each segment independently. | See responses to 124-8 and 124-9.  The administrative record (available upon request) provides additional information regarding suitability reviews |
| Businesses/Orgs in Support of the Green River | 407 | 3 | The West side of the Green River is managed by the Price Field Office and the East side is managed by the Moab Field Office. It is important that the decisions reached by the two offices regarding the Green river are consistent. The Price Field Office released its Draft RMP in July 2004, in which it recommended all segments of the Green River as suitable as Scenic or Recreational under the preferred alternative (See the Price Draft RMP for the complete recommendations). Unfortunately, the Moab Draft recommended that the stretch of the Green River from Swasey's to River Mile 97 is not suitable as a Wild and Scenic River. It is vital that the two BLM field offices are consistent in terms of their recommendations for the Green River as a Wild and Scenic River.<br>The Moab Field Office must correct this inconsistency with the preferred alternative in the Price Draft and | The Moab and Price Field Offices will work toward consistency regarding the segment of the Green River from Swasey's Beach to the San Rafael River confluence. The PRMP/FEISs for each office will be in congruence. |

BLM_0012995

| | | | recommend that the entire Green River is suitable as Wild and Scenic River in the preferred alternative of the Draft. | |
|---|---|---|---|---|
| Businesses/Or gs in Support of the Green River | 407 | 4 | The Green River qualifies for protection under the fishery and wildlife ORVs, the ecological ORV, the historic and cultural ORVs, the recreational ORV, and the geologic and scenic ORVs. | The BLM recognizes the outstandingly remarkable values of the Green River.  The majority of the Green River is recommended for WSR status in Alt C.  Those portions of the Green River that are not recommended are those with multiple private/state land use conflicts.  The entire Green River is to be managed as No Surface Occupancy under the preferred alternative, regardless of whether or not it is found suitable for Wild and Scenic River status. |
| | 429 | 3 | Our first concern is the designation of the Green River (Segment 5: Mile 91 below Ruby Ranch to Hey Joe Canyon) as a wild river. Our concern is that this designation opens the door to manage this short section of river differently from the rest of the Green River (I-70 Bridge to the National Park). We are greatly concerned that this will bottleneck or remove accessibility by imposing recreational use sanctions. This could wind up much like the Westwater Canyon Wild and Scenic River section. The Guides and Outfitters will have 90% of the access (Commercial interests) and the public gets access by lottery. Jet Boat use and travel up and down stream could be restricted. That could effectively eliminate open public access under the guise of "Wild River Management."  We don't see the "Wild" river designation based on the number of traditional uses by recreational and commercial boaters, the historic road build into June's bottom, the trails into the river bluffs, and River Register Rock with all its inscriptions, etc. Segmented classification is unacceptable. This is a navigable river by law. It needs to me managed as such. | See response to comment 124-88. |
| Center for Water Advocacy | 481 | 1 | The federal Wild and Scenic Rivers Act requires the BLM to either list as eligible or make suitablitlity recommendations as part of the RMP process | The DRMP/EIS lists 14 rivers that were found eligible for Wild and Scenic river status.  Alt. C proposes that the Dolores, Colorado and portions of the Green River are |

BLM_0012996

| | | | | |
|---|---|---|---|---|
| | | | regarding the above rivers and river sections before further development and impacts from man irretrievable eliminates the suitability criteria for such water bodies. In addition, during the September forum on Wild and Scenic Rivers, the BLM also told CWA that the agency will not make a recommendation in favor of suitability without local support. *Mill Creek Canyon Upper and Middle Sections, Green River through Labyrinth Canyon, Colorado and Dolores River, Onion Creek and Professor Creek, Beaver Creek all meet the eligibility requirements. | suitable for wild and scenic river status.   The BLM has completed its suitability recommendations as part of this RMP process.<br><br>Beaver Creek, Professor Creek and Onion Creek are all within areas that are to be managed to protect their wilderness charactersitics, thus affording protection to these streams.  For a discussion of Mill Creek, see response to comment 289-12. |
| American Rivers | 483 | 1 | I was surprised to note the following:<br><br>A lack of consistency between the Price and Moab decisions on suitability. Does the BLM seriously believe that one side of the Green River can be suitable for Wild and Scenic designation and the other side not? This oversight must be corrected, or clearly explained. At the very least, the BLM needs to address how it will manage one side of the Green River to protect Outstandingly Remarkable Values, yet not the other. | The Price and the Moab field Offices have coordinated on management of the Green River for suitability. |
| American Rivers | 483 | 2 | I was surprised to note the following:<br><br>The BLM seems to misunderstand the W&S river evaluation process with regards to classification of the river segments under study. The "classification" of a river is a fact based on current river conditions: an eligible segment is "recreational," "scenic," or "wild." Once an agency has made a determination that a river segment is eligible and a classification has been determined, the BLM's Manual directs that the agency has an obligation to manage the river segment to maintain that level of classification until the status of the river is resolved. A segment's classification should not vary between one alternative and another. The classification should not be "downgraded between the eligibility study and the preferred alternative unless the | The tentative classification was established along each river segment during the eligibility review.  This tentative classification is based on an inventory of existing characteristics of a river resulting from human caused change or level of development.  The tentative classification is considered in Alternative B.  However, because a river's tentative classification provides a framework for the management prescriptions applied within the area, some flexibility is allowed to consider a range of tentative classifications in the alternatives. Alternative C provides for a balance between protection and other land uses.  Therefore, the classifications in Alternative C have been adjusted to provide for a wider range of alternatives (Manual 8351.32).<br><br>The tentative classification established through inventory |

BLM_0012997

| | | | | |
|---|---|---|---|---|
| | | | BLM can demonstrate that the quality of the river has changed to justify this downgrading, and explain how they failed to manage the river to maintain the previously determined classification. | for an eligible river will be considered in at least one alternative; however, because a river's tentative classification provides a framework for the management prescriptions applied within a river area, some flexibility is allowed to consider a range of tentative classifications in the alternatives.  The BLM's Wild and Scenic River Manual (Section 8351.33C) states: "Additional alternatives may be formulated for any combination of designations and/or classifications.  Whenever an eligible river segment has been tentatively classified, e.g. as a wild river area, other appropriate alternatives may provide for designation at another classification level (scenic or recreational)." Reasons for considering alternative tentative classifications include resolving conflicts with other management objectives (whether BLM's or those of another official entity), continuity of management prescriptions, or other management considerations. |
| American Rivers | 483 | 3 | I was surprised to note the following:<br><br>The RMP finds any eligible river in an area of proposed development to be unsuitable, essentially claiming that this foreseen development precludes designation. This is an erroneous interpretation of the Wild and Scenic Rivers Act. The reason for including rivers in the National Wild and Scenic Rivers System (NWSRS) is to protect them before development occurs – to protect outstanding rivers that are threatened by development. See 16 USC § 1271 (purposes); § 1275 (only if development was undertaken (as opposed to threatened) would river be deemed unsuitable); HR Rep 90-1623 at 3808 ("priority shall be given to studying rivers that are most threatened by developments which, if they materialize, would render the rivers unsuitable for inclusion in the [NWSRS]"). | The eligibility study undertaken by the Moab Field Office is described in Appendix J.  Remarkably Outstanding Values were identified for each segment of river that was found eligible. |
| American Rivers | 483 | 4 | We are concerned by the process undertaken by the BLM to determine suitability for the Moab area. In the WSRA, the Secretary of the Interior (or where National | The BLM has followed the procedures outlined in the "Wild and Scenic river review in the State of utah, Process and Criteria for Interagency Use" (July 1996), as |

BLM_0012998

Forest lands are involved the Secretary of Agriculture) "shall study and submit to the President on the suitability or nonsuitability for addition to the [NWSRS] of rivers which are designated herein or hereafter by the Congress as potential additions to such system." 16 USC § 1275 (a) (emphasis added). The President "shall report to the Congress his recommendations and proposals with respect to the designation of each river or section thereof under this chapter…In conducting these studies the Secretary of the Interior and the Secretary of the Agriculture shall give priority to those rivers (i) with respect to which there is the greatest likelihood of developments which, if undertaken, would render the rivers unsuitable for inclusion in the [NWSRS]." Id. (emphasis added).

In terms of the content Congress stated that each suitability report, including maps and illustrations, shall show, among other things: (1) the area included within the report; (2) the characteristics that do or do not make the area a worthy addition to the NWSRS (i.e., the eligibility criteria); (3) the current status of land ownership and use in the area; (4) the reasonably foreseeable potential uses of the land and water which would be enhanced, foreclosed, or curtailed if the area where included in the NWSRS; (5) the Federal agency administering the area; (6) the extent to which it is proposed that such costs of administration be shared by State and local agencies; (7) the estimated cost to the United States of acquiring necessary lands and interests in land and of administering the area should it be added to the NWSRS; and (8) a determination of the degree to which the State might participate in the preservation and administration of the river should it be proposed for inclusion in the NWSRS. 16 USC § 1275 (a) ; § 1276 (c) (hereinafter "the eight suitability factors").

well as the congressional legislative direction for Wild and Scenic river planning.  The BLM recognizes that congressional discretion is up to Congress itself.

All streams in the Moab Field Office were given consideration (including riparian areas) for their potential designation as a Wild and Scenic River.  Appendix J fully discloses the review and evaluation process for determining which are eligible and suitable for such designation. Designation of any streams and tributaries or drainage areas used as a municipal water source as Wild and Scenic Rivers could result in assertions of minimum water flows, which could affect the water rights and water flows to the communities.

The BLM has worked with cooperators to ensure that any effects of decisions regarding Wild and Scenic Rivers are considered. Barring congressional action, there is no effect on water rights or instream flows related to suitability findings made in a land use plan decision. Even if Congress were to designate rivers into the National Wild and Scenic Rivers System, any such designation would have no effect on existing water rights. Section 13(b) of the Wild and Scenic River Act states that jurisdiction over waters is determined by established principles of law. In Utah, the State has jurisdiction over water.  Although the Wild and Scenic Rivers Act implies a Federal reserved water right for designated rivers, it does not require or specify any amount, and instead establishes that only the minimum amount for purposes of the Act can be acquired. Because the State of Utah has jurisdiction over water, the BLM would be required to adjudicate the right, as would any other entity, by application through State processes. Thus, for congressionally designated rivers, the BLM may assert a Federal reserved water right for appurtenant and unappropriated water with a priority date as of the date of

994

BLM_0012999

In the WSRA, Congress explicitly limited the suitability study to the eight factors. See 16 USC § 1275 (a); § 1276 (c). Once the suitability report is completed, and submitted to various officials for review and comment, it is submitted to the President who must then "report to the Congress his recommendations and proposals with respect to the designation of each such river." 16 USC § 1275 (a).

Here the BLM's application of the suitability standard is arbitrary because 1) it lacks a clear presentation of the decision-making process and ultimate unsuitability determination for the rivers, and 2) it appears to consider factors well beyond the 9 enumerated in the WSRA. The BLM repeatedly contends that the suitability determination is simply an analysis of whether they "should" designate the rivers. By adopting this vague approach the BLM is transforming the straightforward objective suitability standard outline in the WSRA (8 factors to be considered) into an amalgam of subjective criteria. The BLM is standing in Congress' shoes, seemingly rejecting rivers as unsuitable on purely political grounds. While it is true that factor number 4 of section 4 (a) of the WSRA does open the door to some balancing of competing uses by allowing consideration of "the reasonably foreseeable potential uses of the land and water which would be enhanced, foreclosed, or curtailed" if included in the NWSRS, the BLM is taking it too far. Putting together an objective list of uses that will be enhanced or foreclosed (the good and the bad) does not equate to a river being deemed "unsuitable" because the BLM thinks other uses are more important than river protection or because the river is already "provided protection" by other management prescriptions. Indeed, any interpretation to the contrary would undermine the very purposes of the

designation (junior to all existing rights), but only in the minimum amount necessary to fulfill the primary purpose of the reservation. In practice, however, Federal reserved water rights have not always been claimed if alternative means of ensuring sufficient flows are adequate to sustain the outstandingly remarkable values.

BLM_0013000

| | | | | |
|---|---|---|---|---|
| | | | WSRA to preserve the Nation's outstanding rivers under the threat of development and regardless of their location.<br><br>In fact, the plain language of section 4 (a) of the WSRA., the legislative history, the 1982 43 Guidelines, and express policy goals of the WSRA suggest that some threat of future development does not, and should not, render a river "unsuitable." See 16 USC § 1275 (a)(i) (only those "developments which, if undertaken, would render the rivers unsuitable."); see also HR Rep No 90-1623 at 3808 (seeking to protect rivers that "are the most threatened by developments which, if they materialize, would render the rivers unsuitable"). White it is Congress' prerogative to make purely political decisions – as it has in the past with respect to various rivers (i.e., the Snake in Idaho) – it is not the Federal agencies' prerogative under the WSRA.<br><br>Moreover, any final suitability decision at this early stage in the NEPA/RMP process is premature. Pursuant to the BLM's own policies, final suitability determinations can only be made after completing the NEPA process and receiving and considering public input on the matter. See BLM Manual 8351 §§ .33 (A), .34 (B), and .42.<br><br>We strongly urge the BLM to reconsider the suitability findings and issue a revised Draft RMP to address the concerns raised by American Rivers and the Utah Rivers Council. | |
| NOLS/ Outdoor Industry Association | 487 | 2 | Permanent protection of the Green river corridor is both urgent and appropriate. Floating through the arid desert ecosystem between the breathtaking 5,000 foot walls of Desolation Canyon, out Gray Canyon, and through Labyrinth Canyon, our students gain invaluable insight into the diverse biology, geology, and cultural history of | The Green River in its entirety is proposed to be managed as no surface occupancy for oil and gas and all other surface disturbing activities in the preferred alternative. The entire river (except for the portion between Swasey's Rapid and the San Rafael River confluence) is suitable for Wild and Scenic river designation.  (The portion |

BLM_0013001

| | | | the American West against the backdrop of a historic and free-flowing wild river. For several years NOLS and other concerned outfitters have been protesting potential oil and gas leases that threaten to encroach on scenic vistas and wildlife habitat, and diminish the river experience of our customers and students. Preserving the wild character of the Green is critical not only to the health of outdoor education programs and outfitting businesses, but also to the long-term viability of river-related businesses in the area.<br><br>Economically speaking, the Green river is an asset for surrounding communities. NOLS alone teaches more than 20 courses per year, averaging over 2,400 user-days. A Wild and Scenic designation would preserve the outstanding and remarkable values of this free-flowing river and bolster the regional recreation and tourism economies. Given the overwhelming evidence qualifying the Green River as suitable, and given our school's desire to continue to operate courses in an ecologically, geologically, and cultural diverse landscape, we strongly support designating the Green a Wild and Scenic River in its entirety. NOLS and OIA are comfortable with the Wild, Scenic, and Recreational designations for which the entirety of the river is found eligible in Alternative B, and ask the MFO to retain these designations in its suitability that will accompany the Final EIS. | mentioned has a preponderance of private and state land along the shore). |
| | 633 | 1 | Please consider both hands of Millcreek to be designated as Wild and Scenic River sections. They both contain historical and cultural artifacts. They both have fish and wildlife. They both offer recreation to many people, especially the tourists who keep this local economy alive. And not to mention the biological, botanical and ecological systems are extremely diverse and thriving. I hope that this area continues to thrive and I feel this would be achievable if these special river | See response to comment 124-88. |

BLM_0013002

| | | | | |
|---|---|---|---|---|
| | | | systems were protected by the Wild and Scenic River policy. | |
| | 642 | 1 | I believe your office underestimated the value and suitability of some of these rivers, only preferring three of the studied rivers to be suitable for this [WSR] designation. I encourage you to take a second look at the rivers not found suitable. I'm particularly bothered by the segmenting of the Green River into suitable and non-suitable areas. This goes against the basic theme of watershed management- dividing up the river into discrete unrelated sections. Protection will clearly be strengthened by including the segment around the town of Green River and management will be easier. I can just imagine future land managers rolling their eyes at the difficult situation you are about to deed them. Please if you err, err on the side of conservation and long-term sustainability. | See response to comment 124-88. |
| | 666 | 1 | I do not feel that the 10 areas designated in Alternative C for Wild and Scenic Rivers is sufficient. Since none of the rivers in Utah have yet achieved this designation I feel that the proposal for 24 areas in Plan B, to be designated as Wild and Scenic Rivers are a more appropriate number. Water is becoming a more precious commodity as global warming continues to bring more droughts to the area. We need to protect our waterways. | See response to comment 124-88. |
| | 673 | 4 | Professor Creek: Your preferred alternative drops Professor Creek from Wild and Scenic designation even though it is eligible. Professor Creek / Mary Jane Canyon is quite a popular hike and a real favorite of mine – with canyon narrows, a waterfall, waterslides, and pools. Please reconsider your preferred alternative so that it will include Wild and Scenic designation for Professor Creek, in order to protect the creek from future water diversions. | See response to comment 124-88. |
| | 673 | 5 | Onion Creek – Your preferred alternative drops Onion Creek from Wild and Scenic designation even thought it | See response to comment 124-88. |

BLM_0013003

| | | | | |
|---|---|---|---|---|
| | | | is eligible. Onion Creek is no less deserving of protection than its neighbor, Professor Creek. | |
| | 673 | 6 | Beaver Creek – Your preferred alternative drops Beaver Creek from Wild an Scenic designation even though it is eligible. I have hiked into this remote creek only once and was very impressed by its vibrant riparian zone, seemingly untouched by human impacts. It is very rare to find such an intact riparian zone in southeastern Utah. Please reconsider your preferred alternative so that it will keep this area closed to grazing and bestow upon it the status it deserves – for it is both truly wild and highly scenic. | See response to comment 124-88. |
| | 691 | 1 | I support all of the following rivers being found suitable to become Wild and Scenic Rivers – Green, Colorado, Dolores, Mill Creek, Professor Creek, Onion Creek, Negro Bill Canyon, and Beaver Creek. The entire Green River is suitable as a Wild and Scenic River. It is vital that the entire Green River be found suitable. The segment from Swasey's down to the confluence of the San Rafael River is spectacular and as the BLM Moab FO has found, possesses outstanding values. | See response to comments 124-88 and 124-91, as well as response to comments 213-12 and 213-13. |
| | 821 | 1 | I understand all of the Green River is suitable as Wild and Scenic. Apparently there is some discrepancy about the suitability (from Swasy's to River Mile 97) between the BLM Price Field Office Draft and the BLM Moab FO Draft. The Moab FO should support the decision of the Price FO. | See response to comment 124-91. |
| | 831 | 1 | The preferred alternative in the BLM Moab FO DRMP is inconsistent with the BLM Price FO DRMP for the suitability of the Green River. | See response to comment 124-91. |
| | 945 | 4 | Regarding the Wild & Scenic Rivers designation, I would agree with Alternative B but with the strong recommendation that all motorized vehicle and mining activities be kept outside of corridor along both sides of the rivers so that those floating the rivers cannot hear or see these activities, and so that wildlife dependant on these riparian areas are not disturbed. | See response to comment 124-88. |

BLM_0013004

| | 950 | 2 | I would like to see the Green, Colorado, Dolores, Mill Creek, and Negro Bill Canyonas suitable to become Wild and Senic Rivers. I am especially concerned about the Colorado and even more so about the Green River. All the Green River needs is to be declared suitable, including the section from Swasey to river mile 97 as was seen in the Price Office preferred draft in 2004. To leave out this section would endanger the rest of the river system. All of the suitable river segments should maintain their stattus. These rivers offer unparalleled opportunities to enjoy flowing waters in a wilderness setting. They are also the backbone of a significant part of our tourist industry, and if they are denigrated people will not come. This is already happening to the biking industry as more areas are opened to up to motorized vehicles. | See response to comments 124-88 and 124-91. |
| Howard County Bird Club | 972 | 5 | The Green River is a major axis of wildlife habitat, serving as an interstatehighway for migrant birds and a home for resident species of birds and mammals. It is mostly wild, flowing through Dinosaur National Monument, Ouray National Wildlife Refuge, Desolation Canyon, Gray Canyon, Labyrinth Canyon and into Canyonlands National Park, where it joins the Colorado River. The Moab plan addresses the segment from Gray Canyon to the boundary of Canyonlands. BLM should be giving better protection to the Green Corridor as a highly valuable area for wildlife and natural landscape. | The BLM has imposed a no surface occupancy stipulation for the entire Green River within the Moab Field Office. This stipulation states: "There would be no surface disturbing activities within the area of the Three Rivers and Westwater mineral withdrawals (which includes the Green River)" (pg. C-5 of the DRMP/EIS).  This restriction applies to all surface disturbing activities, including oil and gas development.  These stipulation will provide protection for wildlife along the Green River. |
| | 975 | 3 | I have rafted and canoed Labyrinth and Stillwater Canyons several times, most recently on a family trip in 2005. The development proposed for theses canyons-particularly the designated trails and proposed oil development- are not at all consistant with the reason that I have floated there. This is one of the few stretches of river in Utah that is easily accessible, is not difficult (class II) and thus allows trips with young children, and is not permitted. This stretch is a perfect | See response to comment 124-88. |

BLM_0013005

| | | | introduction to calm, scenic whitewater. It would be irreparably damaged by the establishment of permanent trails and oil development in the area. I suggest that the area be designated as off limits to OHV and oil development, and proposed for Wild and Senic designation. | |
| | 1030 | 9 | P 2-90, table 2.2, column for Alternative C/WSR segments. Duplicate text appears in this column | Duplicate text has been deleted from the PRMP/FEIS. |

BLM_0013006

# APPENDIX A.
## LAND TENURE ADJUSTMENT AND WITHDRAWAL CRITERIA

## A.1 LAND TENURE ADJUSTMENT CRITERIA

### A.1.1 DISPOSAL CRITERIA (GENERAL)

1. Lands can be considered for disposal if they meet criteria described in Sections 203 & 206 of the Federal Lands Policy and Management Act of 1976 (FLPMA).

2. Lands with mining claims can be considered for disposal if the following apply: (a) the new surface owner is the mining claimant, or (b) the new surface owner agrees to accept the surface with the claim encumbrance.

3. Lands can be considered for disposal that are not encumbered by a withdrawal or other special designation.

4. Lands can be considered for disposal if disposal would not adversely impact National Register–eligible cultural sites unless mitigated.

5. Lands can be considered for disposal if they are not suitable for management by another Federal department or agency.

6. Lands in floodplains or containing wetlands can be considered for disposal if the BLM would acquire more or higher quality floodplains, wetlands, or riparian areas.

7. Lands listed in Appendix D and other lands not within specially designated areas can be considered for disposal, as necessary, to facilitate an exchange.

8. Lands will not be considered for disposal if they have: (a) any habitat for listed, endangered or special status species or (b) any habitat for any non-listed species if such action could lead to the need to list any species as threatened or endangered.

9. Lands in WSAs, ACECs, and SRMAs and other designated areas will be retained.

10. Lands identified for disposal that meet FLPMA Sec. 203 criteria are listed by tract in Appendix D, and are shown on Map 2-3.

### A.1.2 ACQUISITION CRITERIA (GENERAL)

1. Acquired lands would meet program objectives for management of recreation resources, wilderness, cultural resources, wildlife habitat, riparian or wetland areas, or threatened or endangered species.

2. Acquisition would result in better Federal land management.

3. Where possible, acquisition would provide access to public lands.

4. Acquisitions through purchase or donation should meet general acquisition criteria.

### A.1.3 EXCHANGES

To be in conformance with the plan, lands considered for disposal through FLPMA Section 206 must

1. be shown to be in the public interest and
2. meet general disposal and acquisition criteria shown above.

Further, the resource values of acquisition must outweigh the resource values of disposal.

### A.1.4 RECREATION AND PUBLIC PURPOSES (R&PP) ACT DISPOSALS

1. Lands are needed for community expansion.
2. Lands are needed for a public facility that cannot be accommodated on non-federal land.

## A.2 WITHDRAWAL CRITERIA

### A.2.1 NEW WITHDRAWALS

New withdrawals would be considered if

1. other methods are not available to protect valuable resources or
2. a withdrawal is necessary to transfer jurisdiction of lands to another federal agency.

### A.2.2 WITHDRAWAL REVIEW

Review existing withdrawals on a case-by-case basis. Determine whether the use is consistent with the intent of the withdrawal and whether the withdrawal should be continued, modified, revoked or terminated. If it is determined by a withdrawal review that a withdrawal should be revoked or terminated, or a withdrawal expires, the land does not automatically open to operation of the law(s) to which the land was closed. An opening order will be published to notify the public when and to what extent the land will be opened. An opening order may be incorporated in a public land order or termination order that revokes or terminates a withdrawal or may be published in the Federal Register as a separate document. Any land becoming unencumbered by withdrawals will be managed in a manner consistent with adjacent or comparable public land within the planning area.

### A.2.3 WITHDRAWAL REVOCATION

Following revocation of a withdrawal, the lands would be managed according to other provisions for these lands as specified in this RMP.

BLM_0013008

# APPENDIX B.
## FILM PERMITS: MINIMUM IMPACT CRITERIA

Filming is allowed in all areas provided the following criteria are met:

## B.1 MINIMUM-IMPACT CRITERIA FOR ALL BLM LANDS

1. Project would not adversely impact sensitive habitat or species.

2. Project would not adversely impact Native American sacred site(s) and/or National Register eligible sites.

3. Project does not involve use of pyrotechnics more than a campfire in an appropriate setting.

4. Filming allowed in all areas, provided impacts to land, air, or water can be avoided, mitigated, or reclaimed.

5. Project does not involve use of explosives.

6. Project, involving use of exotic animal species, includes provisions for containment and/or capture of animals.

7. Project does not involve extensive restriction of public access.

8. Limited filming would be allowed in areas with the following sensitive resources provided that impacts to these sensitive resources can be avoided, mitigated, or reclaimed:
   a. Historic, Cultural or Paleontological sites
   b. Sensitive soils (see chapter 3 Soils section for definition of these soils)
   c. Relict environments
   d. Wetlands, floodplains, or riparian areas
   e. Water quality
   f. Wildlife habitat

9. Use of heavy equipment would be allowed provided that any resource damage can be avoided, mitigated, or reclaimed.

10. Criteria for use of aircraft (helicopter, fixed wing, hot air balloons):
   a. No refueling requested within WSAs and Designated Wilderness Areas.
   b. Use of aircraft in an area with wildlife concerns would be allowed if a survey or inventory by an approved biologist demonstrates that animals are not present, or, if animals are present, aircraft use is not proposed for more than one day and does not exceed the frequency of 2 projects per 30-day period.
   c. Use of aircraft in areas with outstanding recreational opportunities, Wilderness Study Areas, designated Wilderness, or close to residential areas is proposed for no more than 2 days and does not exceed the frequency of 3 two-day projects per 30-day period.

BLM_0013009

d.  Aircraft use proposed within ½ mile of any designated campground would be during low-use times (i.e. weekdays and not during major holidays between 8:00 a.m. and 6:00 p.m.)

## B.2 ADDITIONAL MINIMUM-IMPACT CRITERIA FOR THE FOLLOWING AREAS: DESIGNATED WILDERNESS, WSAS

1.  Project does not involve use of more than 20 livestock in these locations. Impacts from livestock can be avoided, mitigated, or reclaimed.

2.  Project does not involve 15 or more production vehicles. Vehicles would only be allowed on Wilderness Study Areas or designated Wilderness boundary roads.

3.  Project does not involve 50 or more people within these areas.

4.  The activity within these areas would not continue in excess of 10 days.

If filming projects do not meet the criteria listed above, site-specific NEPA will be required.

BLM_0013010

# APPENDIX C.
## STIPULATIONS AND ENVIRONMENTAL BEST PRACTICES APPLICABLE TO OIL AND GAS LEASING AND OTHER SURFACE-DISTURBING ACTIVITIES

## C.1 STIPULATIONS APPLICABLE TO OIL AND GAS LEASING AND OTHER SURFACE-DISTURBING ACTIVITIES

This appendix lists by alternative the stipulations for oil and gas leasing referred to throughout this Proposed RMP and Final EIS. These stipulations would also apply, where appropriate and practical, to other surface-disturbing activities (and occupancy) associated with land-use authorizations, permits, and leases issued on BLM lands. The stipulations would not apply to activities and uses where they are contrary to laws, regulations, or specific program guidance. The intent is to maintain consistency, to the extent possible, in applying stipulations to all surface-disturbing activities.

Surface-disturbing activities are those that normally result in more than negligible disturbance to public lands and accelerate the natural erosive process. Surface disturbance may, but does not always, require reclamation. These activities normally involve use and/or occupancy of the surface, cause disturbance to soils and vegetation, and are usually caused by motorized or mechanical actions. They include, but are not limited to: the use of mechanized earth-moving equipment; truck-mounted drilling and geophysical exploration equipment; off-road vehicle travel in areas designated as limited or closed to off-road vehicle use; vegetation treatments; construction of facilities such as power lines, pipelines, oil and gas wells; recreation sites, improvements for range and wildlife; new road construction; and use of pyrotechnics and explosives. Surface disturbance is not normally caused by casual-use activities. Activities that are not considered surface-disturbing include, but are not limited to: livestock grazing, cross-country hiking, minimum impact filming, and vehicular travel on designated routes.

### C.1.1 DESCRIPTION OF STIPULATIONS

The following tables show resources of concern and stipulations including exceptions, modifications, and waivers by alternative. Three types of stipulations could be applied to land-use authorizations: 1) no surface occupancy (NSO), 2) timing limitations (TL), and 3) controlled surface use (CSU). Although not a stipulation, areas that are closed to oil and gas leasing and other surface-disturbing activities are also identified in the tables. All other areas are open to oil and gas leasing subject to standard terms and conditions.

Areas identified as NSO are open to oil and gas leasing but surface-disturbing activities can not be conducted on the surface of the land. Access to oil and gas deposits would require horizontal drilling from outside the boundaries of the NSO areas. NSO areas are avoidance areas for rights-of-way; no rights-of-ways would be granted in NSO areas unless there are no feasible alternatives. Where necessary in the future, NSO areas could be recommended for withdrawal from operations conducted under the mining laws (locatable minerals) if unacceptable resource

impacts are occurring or could occur. A NSO stipulation cannot be applied to operations conducted under the mining laws without a withdrawal. A withdrawal is not a land-use planning decision because it must be approved by the Secretary of Interior. Therefore, unless withdrawn, areas identified as NSO are open to operations conducted under the mining laws subject only to TL and CSU stipulations, which are consistent with the rights granted under the mining laws.

Areas identified as TL are open to oil and gas leasing but would be closed to surface-disturbing activities during identified time frames. This stipulation would not apply to operation and maintenance activities, including associated vehicle travel, unless otherwise specified.

Areas identified as CSU are open to oil and gas leasing but would require proposals for surface-disturbing activities to be authorized only according to the controls or constraints specified.

Areas identified as closed are not open to oil and gas leasing. Exceptions, modifications, and waivers do not apply to closed areas. Closed areas are exclusion areas for rights-of-way. WSAs and wilderness areas are closed to oil and gas leasing by the regulations found at 43 CFR 3100.0-3(a)(2)viii and xi. Also, areas identified with wilderness characteristics are closed in Alternative B. Other areas are partially closed to oil and gas leasing where it is not reasonable to apply a NSO stipulation across the entire area. This includes areas where the oil and gas resources are physically inaccessible by current directional drilling technology (1 mile) from outside the NSO area. These lands closed to oil and gas leasing are retained with a NSO stipulation for all other surface-disturbing activities and exceptions, modifications, and waivers apply to these activities. Closed areas identified with wilderness characteristics in Alternative B could be recommended for withdrawal of operations conducted under the mining laws. WSAs and wilderness areas are already protected from these activities by withdrawal or existing laws, regulations, and policies.

## C.1.2 EXCEPTIONS, MODIFICATIONS, AND WAIVERS

Stipulations could be excepted, modified, or waived by the authorized officer. An exception exempts the holder of the land-use authorization document from the stipulation on a one-time basis. A modification changes the language or provisions of a surface stipulation, either temporarily or permanently. A waiver permanently exempts the surface stipulation. The environmental analysis document prepared for site specific proposals such as oil and gas development (i.e., APDs, sundry notices) also would need to address proposals to exempt, modify, or waive a surface stipulation.

## C.1.3 STANDARD TERMS AND CONDITIONS

All surface-disturbing activities are subject to standard terms and conditions. These include the restrictions that are required for proposed actions in order to protect special status species and to comply with the Endangered Species Act. The requirements for individual species are found at the end of Table C.1. Standard terms and conditions for oil and gas leasing provide for relocation of proposed operations up to 200 meters, and provide for prohibiting surface-disturbing operations for a period not exceeding 60 days. The stipulations addressed in the table that are within the parameters of 200 meters and 60 days are considered open to oil and gas leasing subject to standard terms and conditions.

BLM_0013012

The placement of production facilities on hilltops and ridgelines will be prohibited where they are highly visible.

## C.1.4 ENVIRONMENTAL BEST MANAGEMENT PRACTICES (BMP) FOR OIL AND GAS OPERATIONS

Best Management Practices (BMP) are state-of-the-art mitigation measures applied on a site-specific basis to reduce, prevent, or avoid adverse environmental or social impacts. BMPs are applied to management actions to aid in achieving desired outcomes for safe, environmentally sound, resource development by preventing, minimizing, or mitigating adverse impacts and reducing conflicts. For each proposed action, a number of BMPs may be applied as necessary to mitigate expected impacts. The following typical environmental BMPs will be applied on individual Applications for Permit to Drill and associated rights-of-way in the Moab Field Office. These procedures are consistent with current national guidance and the Surface Operating Standards and Guidelines for Oil and Gas Development (Gold Book), 2007. This list is not comprehensive and may be modified over time as conditions change and new practices are identified.

- Interim reclamation of the well and access road will begin as soon as practicable after a well is placed in production. Facilities will be grouped on the pads to allow for maximum interim reclamation. Interim reclamation will include road cuts and fills and will extend to within close proximity of the wellhead and production facilities.

- All aboveground facilities including power boxes, building doors, roofs, and any visible equipment will be painted a color selected from the latest national color charts that best allows the facility to blend into the background.

- All new roads will be designed and constructed to a safe and appropriate standard, "no higher than necessary" to accommodate intended vehicular use. Roads will follow the contour of the land where practical. Existing oil and gas roads that are in eroded condition or contribute to other resource concerns will be brought to BLM standards within a reasonable period of time.

- Final reclamation of all oil and gas disturbance will involve re-contouring of all disturbed areas, including access roads, to the original contour or a contour that blends with the surrounding topography and revegetating all disturbed areas.

- Raptor perch avoidance devices will be installed on all new power lines and existing lines that present a potential hazard to raptors.

- All power lines to individual well locations (excluding major power source lines to the operating oil or gas field) and all flow lines will be buried in or immediately adjacent to the access roads.

- In developing oil and gas fields, all production facilities will be centralized to avoid tanks and associated facilities on each well pad.

- The use of submersible pumps will be strongly encouraged, especially in VRM Class I, II or III areas or any area visible by the visiting public.

BLM_0013013

- The use of partial or completely below-grade wellheads will be strongly encouraged in high visibility areas as well as VRM Class I, II or III areas.

- Multiple wells will be drilled from a single well pad wherever feasible.

- Noise reduction techniques and designs will be used to reduce noise from compressors or other motorized equipment.

- Seasonal restrictions on public vehicular access will be evaluated where there are wildlife conflict or road damage/maintenance issues.

- The placement of production facilities on hilltops and ridgelines will be prohibited where they are highly visible.

- Monitoring of wildlife will occur to evaluate the effects of oil and gas development.

- The placement of production facilities on hilltops and ridgelines will be avoided.

- Facilities will be screened from view.

- Oil field wastes and spills will be bio-remediated.

- Common utility or right-of-way corridors containing roads, power lines, and pipelines will be used.

BLM_0013014

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
| --- | --- | --- | --- | --- | --- | --- |
| | | | B | PROPOSED PLAN | D | |
| Floodplains, Riparian Areas, Springs, and Public Water Reserves | Planning Area | CSU<br><br>Open with standard terms for oil and gas leasing. The 200 meter rule would apply. | X | X | X | Allow no surface-disturbing activities within 100 year floodplains or within 100 meters of riparian areas. Also, no surface-disturbing activities within public water reserves or within 100 meters of springs.<br><br>**Purpose:** To protect floodplains, riparian areas, springs, and public water reserves.<br><br>**Exception:** An exception could be authorized if: (a) there are no practical alternatives, (b) impacts could be fully mitigated, or (c) the action is designed to benefit and enhance the resource values.<br><br>**Modification:** None<br><br>**Waiver:** None |
| River Corridors | Green, , Colorado, and Dolores, Rivers<br><br>65,037 acres | NSO | X | X | X | There would be no surface-disturbing activities within the area of the Three Rivers and Westwater mineral withdrawals. Where the NSO area is physically inaccessible to oil and gas drilling by current directional drilling technology (1 mile from outside the NSO area), it would be closed to oil and gas leasing. However, these lands remain NSO for all other surface-disturbing activities.<br><br>**Purpose:** To protect riparian, wildlife, scenic, and recreational values along the major river corridors.<br><br>**Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of the applicable resources. No exception for oil and gas leasing.<br><br>Exceptions could be made on the Colorado River along Highways 128 and 279, along Kane Creek Road, along the Green River from Swasey's Rapid to Ruby Ranch, and along the Dolores River from Entrada Ranch to the Colorado River confluence to maintain or improve infrastructure. These exceptions (subject to appropriate mitigation to minimize impacts to the applicable resources) could include minor rights-of-way to service private land and temporary use authorizations. |

BLM_0013015

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |
| Wild and Scenic Rivers | Planning Area (266 river miles) | NSO | X | | | All river corridors recommended as Wild and Scenic would be NSO for oil and gas leasing. All other surface-disturbing activities would be precluded. (Those rivers in WSAs remain closed to oil and gas leasing and other surface-disturbing activities)

**Purpose:** To protect riparian, wildlife, scenic, and recreational values along the major river corridors.

**Exception:** An exception could be authorized (outside of WSAs) if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of the applicable resources. No exception for oil and gas leasing. |
| Wild and Scenic Rivers | Planning Area (127.3 river miles suitable along the Colorado, Green, and Dolores rivers) | NSO | | X | | All river corridors recommended as Wild and Scenic would be NSO for oil and gas leasing. All other surface-disturbing activities would be precluded

**Purpose:** To protect riparian, wildlife, scenic, and recreational values along the major river corridors.

**Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of the applicable resources. No exception for oil and gas leasing. |
| Sensitive Soils/Slopes | Planning Area | CSU | X | X | X | Surface-disturbing proposals involving construction on slopes greater than 30% would be avoided. If the action cannot be avoided, rerouted, or relocated, then a proposal would include: an erosion control strategy, reclamation and a site plan with a detailed survey and design completed by a certified engineer. This proposal must be approved by the BLM prior to construction and maintenance.

**Purpose:** To protect fragile soils on slopes.

**Exception:** None |

BLM_0013016

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |
| Sensitive Soils/Slopes | Bookcliffs | TL | X | X | X | Where slopes are greater than 30% in the Bookcliffs, BLM approved surface-disturbing activities would not be allowed from November 1 to April 30. This restriction includes heavy equipment traffic on existing roads associated with drilling operations. |
| | | | | | | **Purpose:** To minimize watershed damage in fragile soils on steep slopes. |
| | | | | | | **Exception:** An exception could be granted if the operator can provide a plan of development demonstrating that the proposed action would be properly designed and constructed to support the anticipated types and levels of use. Roads must be designed to meet BLM road standards for drainage control and surfaced to support heavy equipment and tractor trailers. Adjustments to the timing restriction could be considered by the Field Manager on a case-by-case basis, depending on current soil and weather conditions. |
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |

BLM_0013017

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative B | Alternative PROPOSED PLAN | Alternative D | Stipulation Description |
|---|---|---|---|---|---|---|
| Fragile Soils/Slopes | Saline Soils in the Mancos Shale 330,142 acres | TL | X | X | | No surface-disturbing activities would be allowed during the period from December 1 to May 31. This restriction includes heavy equipment traffic on existing roads associated with drilling operations. **Purpose:** To minimize watershed damage including compaction, rutting, and topsoil loss on saline soils derived from the Mancos Shale. **Exception:** An exception could be granted if the operator can provide a plan of development demonstrating that the proposed action would be properly designed and constructed to support the anticipated types and levels of use. Roads must be designed to meet BLM road standards for drainage control and surfaced to support heavy equipment and tractor trailers. Adjustments to the timing restriction could be considered by the Field Manager on a case-by-case basis, depending on current soil and weather conditions. **Modification:** None **Waiver:** None |
| Visual Resources | VRM II Areas | CSU | X 364,189 acres | X 349,683 acres | X 240,486 acres | Surface-disturbing activities must meet the objectives of VRM II class objectives. **Purpose:** To protect high quality visual resources. **Exception:** The level of change to the landscape should be low; management activities may be seen, but should not attract attention of the casual observer. Any change to the landscape must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape. Surface-disturbing activities that are determined to be compatible and consistent with the protection or enhancement of the resource values are exempted. Also, recognized utility corridors are exempted only for utility projects which would be managed according to VRM III objectives. **Modification:** None **Waiver:** None |

BLM_0013018

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and
Gas Leasing and Other Surface-disturbing Activities*

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative B | Alternative PROPOSED PLAN | Alternative D | Stipulation Description |
|---|---|---|---|---|---|---|
| Visual Resources | Scenic Driving Corridors<br><br>Highways 128, 279, 313, north U.S. 191; Needles, Anticline and Kane Creek Roads | NSO | X<br>1 mile from cent | | | No surface-disturbing activities would be allowed within scenic driving corridors. The width of the corridor varies by alternative.<br><br>**Purpose:** To protect the visual resources along scenic corridors.<br><br>**Exception:** An exception could be granted if: (a) a view shed analysis indicates no impairment of the visual resources from the driving corridor or (b) the action is determined to be consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources.<br><br>**Modification:** None<br><br>**Waiver:** None |
| Visual Resources | Scenic Driving Corridors<br><br>Highways 128, 279, 313, north U.S. 191; Needles, Anticline and Kane Creek Roads | CSU | | X<br>0.5 mile from cent | X<br>0.25 mile from cent | Surface-disturbing activities within the corridor must meet VRM II class objectives.<br><br>**Purpose:** To protect the visual resources along scenic corridors.<br><br>**Exception:** An exception could be granted if: (a) a view shed analysis indicates no impairment of the visual resources from the driving corridor or (b) the action is determined to be consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources.<br><br>**Modification:** None<br><br>**Waiver:** None |
| Visual Resources and Recreation | Sand Flats SRMA<br><br>6,246 acres | NSO | X | X | | No surface-disturbing activities would be allowed within the Sand Flats SRMA.<br><br>**Purpose:** To protect recreation and scenic values.<br><br>**Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of the applicable resources. No exception for oil and gas leasing. |

BLM_0013019

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and
Gas Leasing and Other Surface-disturbing Activities

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | B | PROPOSED PLAN | D | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |
| Visual Resources and Recreation | Goldbar/Corona Arch Focus Area | NSO | X 4,781 acres | X 4,191 acres | | No surface-disturbing activities would be allowed in the Goldbar/Corona Arch area. The acreage changes by alternative. |
| | | | | | | **Purpose:** To protect primitive hiking opportunities and scenic values. |
| | | | | | | **Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of the applicable resources. No exception for oil and gas leasing. |
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |
| Developed Recreation Sites | Planning Area | NSO | X | X | X | No surface-disturbing activities would be allowed within 0.5 miles of developed recreation sites (current and planned). |
| | | | | | | **Purpose:** To protect federal investment in facilities, to provide for recreational use, and to protect the view shed from the facility. |
| | | | | | | **Exception:** An exception could be granted if a view shed analysis indicates no impairment of the visual resources from the recreation site. Also, an exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of the applicable resources. No exception for oil and gas leasing. |
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |
| Private Property with Federal Minerals | Areas within Spanish Valley | NSO | X | X | X | No surface-disturbing activities would be allowed on private surface/Federal minerals within unincorporated areas of Spanish Valley. |
| | | | | | | **Purpose:** To reduce potential surface use conflicts with homes |

BLM_0013020

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and
Gas Leasing and Other Surface-disturbing Activities

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| | | | | | | and viewsheds. |
| | | | | | | **Exception:** An exception could be granted if it can be demonstrated that the action would not result in any surface use conflicts. |
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |
| Private Property with Federal Minerals | City of Moab and Town of Castle Valley (Incorporated Areas totaling 2,540 acres) | Closed | X | X | X | The incorporated areas of the City of Moab and the Town of Castle Valley would be closed to mineral leasing (oil and gas, potash). |
| | | | | | | **Purpose:** Incorporated cities and towns are closed to oil and gas leasing by Federal regulation at 43 CFR 3100.0-3(a)(2)(iii). |
| | | | | | | **Exception:** None. |
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |
| Moab Airport | Moab Airport | NSO | X | X | X | No surface-disturbing activities would be allowed within the Moab Airport area. |
| | | | | | | **Purpose:** To eliminate potential safety issues and surface use conflicts. |
| | | | | | | **Exception:** An exception could be granted if it can be demonstrated that the action would not result in any surface use conflicts. |
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |
| Moab Landfill | Moab Landfill | NSO | X | X | X | No surface-disturbing activities would be allowed within the Moab landfill area. |
| | | | | | | **Purpose:** To eliminate potential safety issues and surface use conflicts. |
| | | | | | | **Exception:** An exception could be granted if it can be demonstrated that the action would not result in any surface use conflicts. |

BLM_0013021

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative B | Alternative PROPOSED PLAN | Alternative D | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |
| Dead Horse Point State Park | Dead Horse Point State Park (Split estate with Federal minerals) | NSO | X | X | X | No surface occupancy would be allowed within Dead Horse Point State Park. |
| | | | | | | **Purpose:** To protect visual resources and to facilitate management of the State Park. |
| | | | | | | **Exception:** None. |
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |
| Mayberry Orchard | Split estate with Federal minerals along the Colorado River, | NSO | X | X | X | No surface occupancy would be allowed on private surface/Federal minerals within Mayberry Orchard. |
| | | | | | | **Purpose:** To reduce potential surface use conflicts with homes and view sheds. |
| | | | | | | **Exception:** An exception could be granted if it can be demonstrated that the action would not result in any surface use conflicts. |
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |
| Thompson Springs | Thompson Springs (Split estate with Federal minerals) | NSO | X | X | X | No surface occupancy would be allowed on private surface/Federal minerals within Thompson Springs. |
| | | | | | | **Purpose:** To reduce potential surface use conflicts with homes. |
| | | | | | | **Exception:** An exception could be granted if it can be demonstrated that the action would not result in any surface use conflicts. |
| | | | | | | **Modification:** None |
| | | | | | | **Waiver:** None |
| Castle Valley Municipal Watershed | BLM lands within the watershed. Includes split estate (private | Closed | X 10,321 acres | | | The Castle Valley watershed would be closed to oil and gas leasing and other surface-disturbing activities. |
| | | | | | | **Purpose**: To protect the sole source, unconfined, surficial aquifer of Castle Valley. |

BLM_0013022

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | B | PROPOSED PLAN | D | Stipulation Description |
|---|---|---|---|---|---|---|
| | surface/Federal minerals) within Castle Valley | | | | | **Exception**: None<br><br>**Modification**: None<br><br>**Waiver**: None |
| Castle Valley Municipal Watershed | BLM lands within the watershed. Includes split estate lands (private surface/Federal minerals) within Castle Valley | NSO | | X<br>10,321 acres | | No surface-disturbing activities would be allowed within the Castle Valley watershed.<br><br>**Purpose:** To protect the sole source, unconfined, surficial aquifer of Castle Valley.<br><br>**Exception**: An exception could be granted for activities where it can be demonstrated that the proposed action would not result in a negative impact to the aquifer. No exception for oil and gas leasing.<br><br>**Modification**: None<br><br>**Waiver**: None |
| Mill Creek-Spanish Valley Watershed<br><br>(Moab area aquifer excluding the watershed within the WSA) | BLM lands within the watershed. Includes split estate lands (private surface/Federal minerals). | Closed | X<br>9,667 acres | | | The Mill Creek-Spanish Valley watershed would be closed to oil and gas leasing and other surface-disturbing activities.<br><br>**Purpose:** To protect the Moab area aquifer.<br><br>**Exception**: None<br><br>**Modification**: None<br><br>**Waiver**: None |
| Mill Creek-Spanish Valley Watershed<br><br>(Moab area aquifer excluding the watershed within the WSA) | BLM lands within the watershed. Includes split estate lands (private surface/Federal minerals). | NSO | | X<br>9,667 acres | | No surface-disturbing activities would be allowed within the Mill Creek-Spanish Valley watershed.<br><br>**Purpose:** To protect the Moab area aquifer.<br><br>**Exception**: An exception could be granted for activities where it can be demonstrated that the proposed action would not result in a negative impact to the aquifer. No exception for oil and gas leasing.<br><br>**Modification**: None<br><br>**Waiver:** None |
| Moab Canyon Utility Corridor | Highway 191 Utility Corridor | NSO | X | X | X | No surface-disturbing activities would be allowed within the utility corridor other than those associated with utilities. |

BLM_0013023

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| | within Moab Canyon | | | | | **Purpose:** To prevent future surface use conflicts along Highway 191 and within the utility corridor.<br><br>**Exception:** An exception could be granted if it can be demonstrated that the action would not result in any surface use conflicts with utilities.<br><br>**Modification:** None<br><br>**Waiver:** None |
| Areas with Wilderness Characteristics (non-WSA lands). | Beaver Creek, Fisher Towers, and Mary Jane Canyon | NSO | . | X<br>47,761 acres | | No surface-disturbing activities would be allowed. Certain lands within the Fisher Towers, Mary Jane, and Beaver Creek areas would be physically inaccessible to oil and gas drilling operations under a NSO stipulation and therefore would be closed to oil and gas leasing. These lands remain NSO for all other surface-disturbing activities.<br><br>**Purpose:** To protect areas with wilderness characteristics.<br><br>**Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of the applicable resources. No exception for oil and gas leasing.<br><br>**Modification:** None<br><br>**Waiver:** None |
| Potential ACEC | Behind the Rocks<br><br>17,836 acres in Alt B; 5,201 acres of designated ACEC in the Proposed Plan.<br><br>For Alt. B, 12,635 acres are within the Behind the Rocks WSA and are closed to | NSO | X<br>5,201 acres | X<br>5,201 acres | | No surface-disturbing activities would be allowed in the Behind the Rocks ACEC (outside of the WSA).<br><br>**Purpose:** To protect scenic values, cultural resources, and sensitive plants.<br><br>**Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or if the use would provide a public benefit or the use would provide suitable opportunities for public enjoyment of the resources. No exception for oil and gas leasing.<br><br>**Modification:** None |

BLM_0013024

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative B | PROPOSED PLAN | D | Stipulation Description |
|---|---|---|---|---|---|---|
| | leasing | | | | | **Waiver:** None |
| Potential ACEC | Bookcliffs 304,252 acres (Approximately 290,544 acres are within WSAs and are closed to leasing) | NSO | X 14,708 acres | | | No surface-disturbing activities would be allowed in the Bookcliffs ACEC. **Purpose:** To protect wildlife values. **Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources. No exception for oil and gas leasing. **Modification:** None **Wavier:** None |
| No exception for oil and gas leasing. Potential ACEC | Canyon Rims 23,400 acres | NSO | X | | | No surface-disturbing activities would be allowed in the Canyon Rims ACEC. Certain lands within the ACEC would be physically inaccessible to oil and gas drilling operations under a NSO stipulation and therefore would be closed to oil and gas leasing. These lands remain NSO for all other surface-disturbing activities. **Purpose:** To protect scenic values. **Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources. No exception for oil and gas leasing. **Modification:** None **Waiver:** None |
| Potential ACEC | Cisco White-tailed Prairie Dog Complex 117,481 acres | NSO | X | | | Allow no surface-disturbing activities that would result in a permanent, aboveground facility (construct or place structures, roads, facilities) within the Cisco White-tailed Prairie Dog Complex. **Purpose:** To protect prairie dog habitat, colonies, and potential expansion areas. **Exception:** An exception could be granted if it is determined |

BLM_0013025

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative B | PROPOSED PLAN | D | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | | | | that the habitat is not occupied. **Modification:** The Field Manager may modify the boundaries of the stipulation area if it is determined that portions of the area do not include prairie dog habitat. **Waiver:** May be granted if it is determined that habitat no long exists or has been destroyed. |
| Potential ACEC | Colorado River, Corridor 50,483 acres (2,751 acres are within the Negro Bill Canyon WSA and are closed to leasing) | NSO | X 47,737 acres | | | No surface-disturbing activities would be allowed in the Colorado River Corridor ACEC. **Purpose:** To protect scenic and wildlife values. **Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources. Additional exceptions could be made for actions to maintain or improve infrastructure on the Colorado River along Highways 128. These exceptions (subject to appropriate mitigation to minimize impacts to the applicable resources) could include minor rights-of-way to service private land and temporary use authorizations. No exception for oil and gas leasing. **Modification:** None **Wavier:** None |
| Potential ACEC | Cottonwood-Diamond Watershed 35,830 acres (34,005 acres are within a WSA and are closed to leasing) | NSO | X 1,825 acres | X 1,825 acres | | No surface-disturbing activities would be allowed within the Cottonwood-Diamond Watershed ACEC. **Purpose:** To provide for public safety and watershed stabilization. **Exception:** When the hazard is no longer present, manage according to the other management provisions for the area. **Modification:** None **Wavier:** None |
| Potential ACEC | Highway 279/Shafer Basin/Long | NSO | X | X | | No surface-disturbing activities would be allowed in the Highway 279/Shafer Basin/Long Canyon ACEC, |

BLM_0013026

Case No. 1:20-cv-02484-MSK   Document 29-11   filed 04/27/21   USDC Colorado   pg 147 of 367

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| | Canyon 13,500 acres | | | | | **Purpose:** To protect rare plants, scenic, wildlife, and cultural resources. **Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources. No exception for oil and gas leasing. **Modification:** None **Waiver:** None |
| Potential ACEC | Labyrinth Canyon 8,528 acres | NSO | X | | | No surface-disturbing activities would be allowed in the Labyrinth Canyon ACEC. **Purpose:** To protect scenic and wildlife values. **Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources. No exception for oil and gas leasing. **Modification:** None **Waiver:** None |
| Potential ACEC | Mill Creek Canyon 13,501 acres in Alt B; 3,721 acres of designated ACEC in Proposed Plan. Within Alt B, 9,780 acres are within the Mill Creek Canyon WSA and are closed to leasing. | NSO | X 3,721 acres | X 3,721 acres | | No surface-disturbing activities would be allowed in the Mill Creek Canyon ACEC. **Purpose:** To protect scenic, cultural, wildlife, and riparian values. **Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources. No exception for oil and gas leasing. **Modification:** None **Waiver:** None |

BLM_0013027

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| Potential ACEC | Ten Mile Wash 4,980 acres | NSO | X | X | | No surface-disturbing activities would be allowed within the Ten Mile ACEC. **Purpose:** To protect cultural and riparian values. **Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources. No exception for oil and gas leasing. **Modification:** None **Wavier:** None |
| Potential ACEC | Upper Courthouse 11,529 acres | NSO | X | | | No surface-disturbing activities would be allowed within the Upper Courthouse ACEC. **Purpose:** To protect historic/cultural/paleontological resources and rare plants. **Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources. No exception for oil and gas leasing. **Modification:** None **Waiver:** None |
| Mesa-top Relict Vegetation | Upper Courthouse Wash Area 3,162 acres | NSO | | X | | No surface-disturbing activities would be allowed on the mesa-tops in the upper Courthouse Wash area. **Purpose:** To protect relict vegetation. **Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources. No exception for oil and gas leasing. **Modification:** None **Waiver:** None |

BLM_0013028

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| Potential ACEC | Westwater Canyon 5,069 acres | Closed | X | | | The potential ACEC is entirely within the Westwater Canyon WSA which is closed to oil and gas leasing. **Purpose:** To protect scenic values. **Exception:** None **Modification:** None **Wavier:** None |
| Potential ACEC | White Wash 2,988 acres | NSO | X | | | No surface-disturbing activities would be allowed within the White Wash ACEC. **Purpose:** To protect dunefield riparian values. **Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources. No exception for oil and gas leasing. **Modification:** None **Waiver:** None |
| Potential ACEC | Wilson Arch 3,700 acres | NSO | X | | | No surface-disturbing activities would be allowed in the Wilson Arch ACEC. **Purpose:** To protect scenic values. **Exception:** An exception could be authorized if the use is consistent and compatible with protection or enhancement of the resource values or the use would provide suitable opportunities for public enjoyment of these resources. No exception for oil and gas leasing. **Modification:** None **Wavier:** None |
| Special Status Species: Greater Sage-grouse | Lek Sites | CSU/TL | X 12,850 acres 2 mi. | X 3,068 acres mi. radius 2 & 0.5 | X 1,986 acres 0.25 | If Greater Sage-grouse leks are discovered,  no surface-disturbing activities would be allowed (1) within 2 miles, 0.5 miles, or 0.25 miles of a lek (depending on selected alternative) from March 1st through May 15th, and (2) no permanent aboveground facilities would be allowed within the selected |

BLM_0013029

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and
Gas Leasing and Other Surface-disturbing Activities

## Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative B | Alternative PROPOSED PLAN | Alternative D | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | radius | | mi. radius | buffer on a year-round basis.<br><br>**Purpose:** To protect occupied lek sites within Greater sage-grouse habitat.<br><br>**Exception:** An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated.<br><br>**Modification:** The Field Manager may modify the boundaries of the stipulation area if (1) portions of the area do not include lek sites, or (2) the lek site(s) have been completely abandoned or destroyed, or (3) occupied lek site(s) occur outside the current defined area; as determined by the BLM.<br><br>**Waiver:** A waiver may be granted if there are no active lek site(s) in the leasehold and it is determined the site(s) have been completely abandoned or destroyed or occur outside current defined area, as determined by the BLM. |
| Special Status Species: Greater Sage-grouse | Nesting and Brood Rearing Habitat | TL | X 12,850 acres | X 3,068 acres | X 1,986 acres | Allow no surface-disturbing activities in occupied nesting and brood rearing habitat from March 15th to July 15th.<br><br>**Purpose:** To protect occupied nesting and brood rearing habitat for the Greater sage-grouse.<br><br>**Exception:** An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated or it is determined the brooding/nesting habitat is not active.<br><br>**Modification:** The Field Manager may modify the boundaries of the stipulation area if (1) portions of the area do not include brooding/nesting habitat, or (2) the brooding/nesting habitat has been completely abandoned or destroyed, or (3) occupied brooding/nesting habitat occurs outside the current defined area; as determined by the BLM.<br><br>**Waiver**: A waiver may be granted if there is no active brooding/nesting habitat in the leasehold and it is determined the habitat has been completely abandoned or destroyed or occurs outside the current defined area, as determined by the BLM. |

BLM_0013030

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | **B** | **PROPOSED PLAN** | **D** | |
| Special Status Species: Greater Sage-grouse | Winter Habitat | TL | X 12,850 acres | X 3,068 acres | X 1,986 acres | Allow no surface-disturbing activities in occupied winter habitat from November 15th to March 14th. **Purpose:** To protect occupied winter habitat for the Greater sage-grouse. **Exception:** An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated or it is determined the habitat is not occupied during the winter season. **Modification:** The Field Manager may modify the boundaries of the stipulation area if (1) portions of the area do not include winter habitat, or (2) the brooding/nesting habitat has been completely abandoned or destroyed, or (3) occupied winter activity occurs outside the current defined area; as determined by the BLM. **Waiver:** A waiver may be granted if the winter habitat in the leasehold has been completely abandoned or destroyed or occurs outside the current defined area, as determined by the BLM. |
| Special Status Species: Gunnison Sage-grouse | Lek Sites | CSU/TL | X 246,107acres 2 mi. radius | X 175,727 acres 2 & 0.5 mi. radius | X 41,620 acres 0.25 mi. radius | If Gunnison sage-grouse leks are discovered, no surface-disturbing activities will be allowed (1) within 2 miles, 0.5 miles, or 0.25 miles of a lek (depending on selected alternative) from March 20th through May 15th, and (2)  no permanent aboveground facilities would be allowed within the selected buffer on a year-round basis. **Purpose:** To protect occupied lek sites within Gunnison sage-grouse habitat. **Exception:** An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated. **Modification:** The Field Manager may modify the boundaries of the stipulation area if (1) portions of the area do not include lek sites, or (2) the lek site(s) have been completely abandoned or destroyed, or (3) occupied lek site(s) occur outside the current defined area; as determined by the BLM. |

BLM_0013031

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative B | Alternative PROPOSED PLAN | Alternative D | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | | | | **Waiver**: A waiver may be granted if there are no active lek site(s) in the leasehold and it is determined the site(s) have been completely abandoned or destroyed or occur outside current defined area, as determined by the BLM. |
| Special Status Species: Sagebrush/sage-grouse habitat | Planning area | CSU | X 2:1 ratio 258,957 acres | X 1:1 ratio 178,975 acres | X 1:1 ratio 43,606 acres | There will be no net loss of sagebrush/steppe habitat from federal actions. Loss of sagebrush/steppe habitat essential to wildlife (i.e., sage-grouse and other sagebrush obligate species) will be reclaimed or enhanced at the ratio established by the alternative. **Purpose:** To protect sagebrush/sage steppe communities. **Exception:** An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the action would not result in any net loss of habitat. **Modification:** The Field Manager may modify the boundaries of the stipulation area if portions of the area do not include habitat or are outside the current defined area, as determined by the BLM. **Waiver:** May be granted to the stipulation area if it is determined the habitat no longer exists or has been destroyed. |
| Special Status Species: White-tailed Prairie Dog | White-tailed prairie dog habitat | CSU | X 199,505 acres Incl. 117,481acres of ACEC | | | Do not allow surface-disturbing activities within 1300 feet of prairie dog colonies identified within prairie dog habitat (the size of the habitat varies by alternative). No permanent aboveground facilities would be allowed within the 1300 feet buffer. The ACEC acreage included in Alternative B would be managed according to the stipulation for the Cisco White-tailed Prairie Dog Complex ACEC). **Purpose:** To protect white-tailed prairie dog habitat. **Exception:** An exception may be granted if the applicant submits a plan that indicates that impacts of the proposed action can be adequately mitigated or, if due to the size of the town, there is no reasonable location to develop a lease and avoid colonies the Field Manager will allow for loss of prairie dog colonies and/or habitat to satisfy terms and conditions of the lease. |

BLM_0013032

## Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| | | | | | | **Modification:** The Field Manager may modify the boundaries of the stipulation area if portions of the area does not include prairie dog habitat or _active_ colonies are found outside current defined area, as determined by BLM. <br><br> **Waiver:** May be granted if in the leasehold if is determined that habitat no longer exists or has been destroyed. |
| Special Status Species: White-tailed Prairie Dog | White-tailed prairie dog habitat | CSU <br><br> Open with standard terms for oil and gas leasing. The 200 meter rule can be applied. | | X <br> 117,481 acres | X <br> 31,186 acres | Do not allow surface-disturbing activities within 660 feet of prairie dog colonies identified within prairie dog habitat (the size of the habitat varies by alternative). No permanent aboveground facilities would be allowed within the 660 feet buffer. <br><br> **Purpose:** To protect white-tailed prairie dog habitat. <br><br> **Exception:** An exception may be granted if the applicant submits a plan that indicates that impacts of the proposed action can be adequately mitigated or, if due to the size of the town, there is no reasonable location to develop a lease and avoid colonies the Field Manager will allow for loss of prairie dog colonies and/or habitat to satisfy terms and conditions of the lease. <br><br> **Modification:** The Field Manager may modify the boundaries of the stipulation area if portions of the area does not include prairie dog habitat or _active_ colonies are found outside current defined area, as determined by BLM. <br><br> **Waiver:** May be granted if in the leasehold if is determined that habitat no longer exists or has been destroyed. |
| Special Status Species: Gunnison Prairie Dog | Gunnison prairie dog habitat | CSU | X <br> 10,740 acres | | | Do not allow surface-disturbing activities within 1300 feet of active prairie dog colonies identified within prairie dog habitat. No permanent aboveground facilities would be allowed within the 1300 feet buffer. <br><br> **Purpose:** To protect Gunnison prairie dog habitat. <br><br> **Exception:** An exception may be granted if the applicant submits a plan that indicates that impacts of the proposed action can be adequately mitigated or, if due to the size of the town, there is no reasonable location to develop a lease and avoid colonies the Field Manager will allow for loss of prairie |

BLM_0013033

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

## Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
| --- | --- | --- | --- | --- | --- | --- |
| | | | B | PROPOSED PLAN | D | |
| | | | | | | dog colonies and/or habitat to satisfy terms and conditions of the lease. |
| | | | | | | **Modification:** The Field Manager may modify the boundaries of the stipulation area if portions of the area does not include prairie dog habitat or _active_ colonies are found outside current defined area, as determined by BLM. |
| | | | | | | **Waiver:** May be granted if it is determined that the habitat no longer exists or has been destroyed within the leasehold. |
| Special Status Species: Gunnison Prairie Dog | Gunnison prairie dog habitat | CSU  Open with standard terms for oil and gas leasing. The 200 meter rule can be applied. | | X  10, 740 acres | | Do not allow surface-disturbing activities within 660 feet of active prairie dog colonies identified within prairie dog habitat. No permanent aboveground facilities would be allowed within the 660 feet buffer.  **Purpose:** To protect Gunnison prairie dog habitat.  **Exception:** An exception may be granted if the applicant submits a plan that indicates that impacts of the proposed action can be adequately mitigated or, if due to the size of the town, there is no reasonable location to develop a lease and avoid colonies the Field Manager will allow for loss of prairie dog colonies and/or habitat to satisfy terms and conditions of the lease.  **Modification:** The Field Manager may modify the boundaries of the stipulation area if portions of the area does not include prairie dog habitat or _active_ colonies are found outside current defined area, as determined by BLM.  **Waiver:** May be granted if it is determined that the habitat no longer exists or has been destroyed within the leasehold. |
| Wildlife: Desert Bighorn Sheep | Desert Bighorn Lambing Grounds and Migration Corridors | NSO | X  130,41 9 acres | | | No surface-disturbing activities would be allowed within desert bighorn lambing grounds and migration corridors. Certain lands within the habitat would be physically inaccessible to oil and gas drilling operations under a NSO stipulation and therefore would be closed to oil and gas leasing. These lands remain NSO for all other surface-disturbing activities.  **Purpose:** To minimize disturbance within desert bighorn lambing grounds and migration corridors. |

BLM_0013034

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| | | | | | | **Exception:** The Field Manager may grant an exception if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated. **Modification:** The Field Manager may modify the boundaries of the stipulation area if a portion of the area is (1) not being used as desert bighorn lambing grounds or migration corridors (2) if habitat is being utilized outside of stipulation boundaries for and needs to be protected. **Waiver:** A waiver may be granted if the habitat is determined as unsuitable for lambing or migration and there is no reasonable likelihood of future use as desert bighorn lambing grounds and migration corridors. |
| Wildlife – Desert Bighorn Sheep | Desert Bighorn Lambing Grounds and Migration Corridors | NSO | | X 101,897 acres | | No surface-disturbing activities would be allowed within desert bighorn lambing grounds and migration corridors. **Purpose:** To minimize disturbance within desert bighorn lambing grounds and migration corridors. **Exception:** Within migration corridors, pipeline and road construction and geophysical exploration for oil and gas development would be allowed from June 16th through October 14th and from December 16th through March 31st. The Field Manager may also grant an exception if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated. **Modification:** The Field Manager may modify the boundaries of the stipulation area if a portion of the area is (1) not being used as desert bighorn lambing grounds or migration corridors (2) if habitat is being utilized outside of stipulation boundaries for and needs to be protected. **Waiver:** A waiver may be granted if the habitat is determined as unsuitable for lambing or migration and there is no reasonable likelihood of future use as desert bighorn lambing and/or rutting grounds and migration corridors. |
| Wildlife – Desert Bighorn | Desert Bighorn Lambing and | TL | | | X 46,31 | No surface-disturbing activities would be allowed from April 1 to June 15 and from October 15 to December 15 within desert |

BLM_0013035

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

## Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| Sheep | Rutting Grounds | | | | 9 acres | bighorn lambing and rutting grounds.<br><br>**Purpose:** To minimize disturbance within bighorn lambing grounds.<br><br>**Exception:** None<br><br>**Modification:** The Field Manager may modify the boundaries of the stipulation area if a portion of the area is (1) not being used as desert bighorn lambing grounds or (2) if habitat is being utilized outside of stipulation boundaries and needs to be protected<br><br>**Waiver:** A waiver may be granted if the habitat is determined as unsuitable for lambing and there is no reasonable likelihood of future use as desert bighorn lambing grounds. |
| Wildlife – Pronghorn | Pronghorn Fawning Grounds within Cisco Desert & Hatch Point<br><br>(LaSal Wildlife Management Units) | TL<br><br>Open with standard terms for oil and gas leasing. The 60 day rule can be applied | X<br><br>882,001 acres | X<br><br>293,741 acres | X<br><br>78,477 acres | Allow no surface-disturbing activities from May 1 to June 15 within fawning grounds. The acreage of habitat varies by alternative.<br><br>**Purpose:** To minimize stress and disturbance during critical antelope birthing time.<br><br>**Exception:** May be granted to these dates by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated or if it is determined the habitat is not being utilized for fawning in any given year.<br><br>**Modification:** The Field Manager may modify the boundaries of the stipulation area if a portion of the area is not being used as fawning grounds or if habitat is being utilized outside of stipulation boundaries as crucial fawning grounds and needs to be protected.<br><br>**Waiver:** May be granted if the fawning grounds are determined to be unsuitable or unoccupied and there is no reasonable likelihood of future use of the fawning grounds. |
| Wildlife – Deer & Elk | Deer and Elk Winter Range | TL | X<br><br>635,774 acres | X<br><br>349,955acres | X<br><br>349,955 | Do not allow surface-disturbing activities from November 1 to May 15 (Alt B), from November 15 to April 15 (Proposed Plan), and from December 1 to April 15 (Alt D). The acreage of habitat |

BLM_0013036

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| | | | | | acres | varies by alternative. |
| | | | | | | **Purpose:** To minimize stress and disturbance to deer and elk during critical winter months. |
| | | | | | | **Exception:** This stipulation does not apply to the maintenance and operation of existing and ongoing facilities. An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated or it is determined the habitat is not being utilized during the winter period for any given year. |
| | | | | | | **Modification:** The Field Manager may modify the boundaries of the stipulation area (1) if a portion of the area is not being used as winter range by deer/elk or (2) if habitat is being utilized outside of stipulation boundaries as winter range and needs to be protected or (3) if the migration patterns have changed causing a difference in the season of use. |
| | | | | | | **Waiver:** May be granted if the winter range habitat is unsuitable or unoccupied during winter months by deer/elk and there is no reasonable likelihood of future winter range use. |

BLM_0013037

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

**Table C.1 Resources of Concern and Stipulations Including Exceptions, Modifications, and Waivers by Alternative**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| Wildlife – Deer & Elk | Deer and Elk Fawning and Calving Habitat (Bookcliffs and La Sal Wildlife Management Units) | TL<br><br>Open with standard terms for oil and gas leasing. The 60 day rule can be applied | X 105,636 acres | X 105,636 acres | X 105,636 acres | Allow no surface-disturbing activities in deer and elk fawning and calving habitat from May 15 to June 30.<br><br>**Purpose:** To minimize stress and disturbance during this critical period.<br><br>**Exception:** This stipulation does not apply to the maintenance and operation of existing and ongoing facilities. An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated or it is determined the habitat is not being utilized during the critical period for any given year.<br><br>**Modification:** The Field Manager may modify the boundaries of the stipulation area (1) if a portion of the area is not being used as fawning and calving habitat or (2) if the habitat is being utilized outside of stipulation boundaries and needs to be protected or (3) if the migration patterns have changed causing a difference in the season of use.<br><br>**Waiver:** May be granted if the fawning and calving habitat is unsuitable or unoccupied during winter months by deer/elk and there is no reasonable likelihood of future winter range use. |

BLM_0013038

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.2. Closed Areas (Nondiscretionary)**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative B | Alternative PROPOSED PLAN | Alternative D | Stipulation Description |
|---|---|---|---|---|---|---|
| Wilderness Study Areas | Behind The Rocks (12,635 acres), Black Ridge (52 acres), Coal Canyon (64,546 acres), Desolation Canyon (81,603 acres), Floy Canyon (72,605 acres, Flume Canyon (50,800 acres), Lost Spring Canyon (1,624 acres), Mill Creek Canyon (9,780 acres), Negro Bill Canyon (7,820 acres), Spruce Canyon (20,990 acres), West Water Canyon (31,160 acres). Total = 353,606 acres | Closed | X | X | X | Areas within Wilderness Study Areas are closed to oil and gas leasing and other surface-disturbing activities.<br><br>**Purpose:** To protect wilderness values.<br><br>**Exception:** None<br><br>**Modification:** None<br><br>**Waiver:** None |
| Designated wilderness | Black Ridge (5,200 acres) | Closed | X | X | X | The designated Black Ridge Wilderness is closed to oil and gas leasing and other surface-disturbing activities.<br><br>**Purpose:** To protect wilderness values.<br><br>**Exception:** None<br><br>**Modification:** None<br><br>**Waiver:** None |

BLM_0013039

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.3. Closed Areas Applicable Only to Oil and Gas Leasing (Discretionary)**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | Stipulation Description |
|---|---|---|---|---|---|---|
| | | | B | PROPOSED PLAN | D | |
| Areas with Wilderness Characteristics | Arches Adjacent, Beaver Creek, Behind the Rocks, Big Triangle, Coal Canyon, Dead Horse Cliffs, Desolation Canyon, Diamond Canyon, Dome Plateau, Fisher Towers, Goldbar, Gooseneck, Granite Creek, Harts Point, Hatch Wash, Hells Hole, Hideout Canyon, Horsethief Point, Hunter Canyon, Labyrinth Canyon, Lockhart/Hatch/Harts, Lost Spring Canyon, Mary Jane Canyon, Mexico Point, Mill Creek Canyon, Negro Bill Canyon (including Morning Glory and Porcupine Rim), Shafer Canyon, Spruce Canyon, Westwater Canyon, Westwater Creek, Yellow Bird<br><br>Total = 265,485 acres | Closed | X | | | Areas identified with wilderness characteristics are closed to oil and gas leasing and other surface-disturbing activities.<br><br>**Purpose:** To protect the resource values associated with wilderness characteristics.<br><br>**Exception:** None<br><br>**Modification:** None<br><br>**Waiver:** None |

BLM_0013040

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.3. Closed Areas Applicable Only to Oil and Gas Leasing (Discretionary)**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative B | Alternative PROPOSED PLAN | Alternative D | Stipulation Description |
|---|---|---|---|---|---|---|
| Lands where a NSO stipulation is not reasonable because they would be physically inaccessible to oil and gas directional drilling operations | Within areas of Big Horn Sheep Habitat and Canyon Rims ACEC. | Closed | X | | | The lands identified would be closed to oil and gas leasing because they would be physically inaccessible by directional drilling operations using current technology if a NSO stipulation were to be applied. These areas remain NSO for all other surface-disturbing activities. **Purpose:** To protect the resource values within the areas identified. **Exception:** None **Modification:** None **Waiver:** None |
| Lands where a NSO stipulation is not reasonable because they would be physically inaccessible to oil and gas directional drilling operations. | Within areas of the Three Rivers Withdrawal, and within the Beaver Creek, Fisher Towers and Mary Jane areas with wilderness characteristics (25,306 acres). | Closed | | X | | The lands identified would be closed to oil and gas leasing because they would be physically inaccessible by directional drilling operations using current technology if a NSO stipulation were to be applied. These areas remain NSO for all other surface-disturbing activities. **Purpose:** To protect the resource values within the areas identified. **Exception:** None **Modification:** None **Waiver:** None |

BLM_0013041

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| Special Status Species:<br><br>Mexican Spotted Owl (MSO) | MSO Habitat and Nest Sites<br><br>121,686 acres | CSU/TL | X | X | X | X | In areas that contain suitable habitat for MSO or designated Critical Habitat, actions would be avoided or restricted that may cause stress and disturbance during nesting and rearing of their young. Appropriate measures would depend on whether the action is temporary or permanent and whether it occurs within or outside the owl nesting season. A temporary action is completed prior to the following breeding season leaving no permanent structures and resulting in no permanent habitat loss. A permanent action continues for more than one breeding season and/or causes a loss of owl habitat or displaces owls through disturbances, i.e., creation of a permanent structure. Current avoidance and minimization measures include the following:<br><br>Surveys will be required prior to implementation of the proposed action. All surveys must be conducted by qualified individual(s) acceptable to the BLM.<br><br>Assess habitat suitability for both nesting and foraging using accepted habitat models in conjunction with field reviews. Apply the conservation measures below if project activities occur within 0.5 mile of suitable owl habitat. Determine potential effects of actions to owls and their habitat.<br><br> Document type of activity, acreage and location of direct habitat impacts, type and extent of indirect impacts relative to location of suitable owl habitat.<br><br> Document if action is temporary or permanent.<br><br>Activities may require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated, and, if necessary, Section 7 consultation |

BLM_0013042

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | reinitiated. |
| | | | | | | | Any activity that includes water production should be managed to ensure maintenance of enhancement of riparian habitat. |
| | | | | | | | Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in canyon habitat suitable for MSO nesting. |
| | | | | | | | For all temporary actions that may impact owls or suitable habitat: |
| | | | | | | | a.  If the action occurs entirely outside of the owl breeding season from **March 1 through August 31**, and leaves no permanent structure or permanent habitat disturbance, the action can proceed without an occupancy survey. |
| | | | | | | | b.  If the action will occur during a breeding season, a survey for owls is required prior to commencing the activity. If owls are found, the activity should be delayed until outside of the breeding season. |
| | | | | | | | c.  Rehabilitate access routes created by the project through such means as raking out scars, re-vegetation, gating access points, etc. |
| | | | | | | | For all permanent actions that may impact owls or suitable habitat: |
| | | | | | | | a.  Survey two consecutive years for owls according to accepted protocol prior to commencing activities. |
| | | | | | | | b.  If owls are found, no disturbing actions will occur within 0.5 mile of an identified site. If nest site is unknown, no activity will occur within the designated current and historic Protected Activity |

BLM_0013043

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | Center (PAC). |
| | | | | | | | c.  Avoid permanent structures within 0.5 mile of suitable habitat unless surveyed and not occupied. |
| | | | | | | | d.  Reduce noise emissions (e.g., use hospital-grade mufflers) to 45 dBA at 0.5 mile from suitable habitat, including canyon rims. Placement of permanent noise-generating facilities should be contingent upon a noise analysis to ensure noise does not encroach upon a 0.5 mile buffer for suitable habitat, including canyon rims. |
| | | | | | | | e.  Limit disturbances to and within suitable habitat by staying on designated and/or approved routes. |
| | | | | | | | f.  Limit new access routes created by the project. |
| | | | | | | | Modifications to the Surface Use Plan of Operations may be required in order to protect the MSO and/or habitat in accordance with Section 6 of the lease terms, the Endangered Species Act, and the regulations at 43 CFR 3101.1-2. |
| | | | | | | | **Purpose:** To protect MSO habitat. |
| | | | | | | | **Exception:** An exception may be granted by the Field Manager if authorization is obtained from USFWS (through applicable provisions of the ESA). The Field Manager may also grant an exception if an environmental analysis indicates that the nature or the conduct of the actions would not impair the primary constituent element determined necessary for the survival and recovery of the MSO and USFWS concurs with this determination. |
| | | | | | | | **Modification:** The Field Manager may modify the boundaries of the stipulation area if an environmental analysis indicates and USFWS (through applicable |

BLM_0013044

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and
Gas Leasing and Other Surface-disturbing Activities

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities
Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered
Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | provisions of the ESA) determines a portion of the area is not being used as Critical Habitat. **Waiver:** A waiver may be granted if the MSO is de-listed and the Critical Habitat is determined by USFWS as not necessary for the survival and recovery of the MSO. |
| Federally Protected Species. Bald Eagles | Nest sites and winter roost areas within habitat for Bald Eagles 143,421 acres | CSU/TL | X | X | X | X | In areas that contain habitat for the bald eagle, actions would be avoided or restricted that may cause stress and disturbance during nesting and rearing of their young. Appropriate measures will depend on whether the action is temporary or permanent, and whether it occurs within or outside the bald eagle breeding or roosting season. A temporary action is completed prior to the following breeding or roosting season leaving no permanent structures and resulting in no permanent habitat loss. A permanent action continues for more than one breeding or roosting season and/or causes a loss of eagle habitat or displaces eagles through disturbances, i.e., creation of a permanent structure. Current avoidance and minimization measures include the following: 1. Surveys would be required prior to operations unless species occupancy and distribution information is complete and available. All surveys must be conducted by qualified individual(s), and be conducted according to protocol. 2. Lease activities would require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures would be evaluated. 3. Water production would be managed to ensure maintenance or enhancement of riparian habitat. |

BLM_0013045

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and
Gas Leasing and Other Surface-disturbing Activities*

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities
Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered
Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | 4. Temporary activities within 1.0 mile of nest sites would not occur during the breeding season of **January 1 to August 31**, unless the area has been surveyed according to protocol and determined to be unoccupied. |
| | | | | | | | 5. Temporary activities within 0.5 miles of winter roost areas, e.g., cottonwood galleries, would not occur during the winter roost season of **November 1 to March 31**, unless the area has been surveyed according to protocol and determined to be unoccupied. |
| | | | | | | | 6. No permanent infrastructure would be placed within 1.0 mile of nest sites. |
| | | | | | | | 7. No permanent infrastructure would be placed within 0.5 miles of winter roost areas. |
| | | | | | | | 8. Remove big game carrion to 100 feet from on lease roadways occurring within bald eagle foraging range. |
| | | | | | | | 9. Avoid loss or disturbance to large cottonwood gallery riparian habitats. |
| | | | | | | | 10. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable habitat. Utilize direction drilling to avoid direct impacts to large cottonwood gallery riparian habitats. Ensure that such direction drilling does not intercept or degrade alluvial aquifers. |
| | | | | | | | 11. All areas of surface disturbance within riparian areas and/or adjacent uplands should be re-vegetated with native species. |

BLM_0013046

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | A | B | PROPOSED PLAN | D | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | | | | | Additional measures may also be employed to avoid or minimize effects to the species between the lease stage and lease development stage.<br><br>**Purpose:** To protect bald eagle habitat.<br><br>**Exception:** An exception may be granted by the Field Manager if authorization is obtained from USFWS (through applicable provisions of the ESA). The Field Manager may also grant an exception if an environmental analysis indicates that the nature of the conduct of the actions, as proposed or conditioned, would not impair the primary constituent element determined necessary for the survival and recovery of the Bald Eagles and USFWS and UDWR concur with this determination.<br><br>**Modification:** The Field Manager may modify the boundaries of the stipulation area if an environmental analysis indicates, and USFWS and UDWR (through applicable provisions of the ESA) determines that a portion of the area is not being used as Bald Eagle nesting territories.<br><br>**Waiver:** May be granted if Bald Eagles are de-listed and if USFWS and UDWR determine it is not necessary to protect nesting territories according to the Endangered Species Act and The Bald Eagle Protection Act or if there is no reasonable likelihood of site occupancy over a minimum 10 year period. |
| Federally Protected Species: Golden Eagle | Golden Eagle nest sites and territories 12,902 acres | CSU/TL | X | X | X | X | No surface-disturbing activities will be allowed within a 0.5 miles radius of documented Golden Eagle nest sites within nesting territories from **February 1 to July 15th** or until fledgling and dispersal of young. Any access created by the action will be outside of nesting season and will be eliminated once action is complete. |

BLM_0013047

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | **Purpose:** To protect Golden Eagle nest sites and nesting territories. |
| | | | | | | | **Exception**: An exception may be granted by the Field Manager if authorization is obtained from USFWS and UDWR. The Field Manager may also grant an exception if an environmental analysis indicates that the nature or the conduct of the actions, as proposed or conditioned, would not impair the primary constituent element determined necessary for the survival and recovery of the Golden Eagle. |
| | | | | | | | **Modification:** The Field Manager may modify the boundaries of the stipulation area if an environmental analysis indicates and USFWS and UDWR determine a portion of the area is not being used as Golden Eagle nesting territories. |
| | | | | | | | **Waiver:** A waiver may be granted if an individual Golden Eagle nest has been inactive (unoccupied) for at least a period of 3 years. Nest-monitoring data for a 3-year period would be required before the waiver could be granted. |
| Special Status Species: Southwestern Willow Flycatcher | Southwestern Willow Flycatcher Habitat | CSU/TL | X | X | X | X | In areas that contain riparian habitat within the range for the Southwestern willow flycatcher, actions would be avoided or restricted that may cause stress and disturbance during nesting and rearing of their young. Appropriate measures will depend on whether the action is temporary or permanent, and whether it occurs within or outside the nesting season. A temporary action is completed prior to the following breeding season leaving no permanent structures and resulting in no permanent habitat loss. A permanent action continues for more than one breeding season and/or causes a loss of habitat or displaces flycatchers through disturbances, i.e., creation of a |

BLM_0013048

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and
Gas Leasing and Other Surface-disturbing Activities

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | permanent structure. Current avoidance and minimization measures include the following:<br><br>1. Surveys would be required prior to operations unless species occupancy and distribution information is complete and available. All surveys must be conducted by qualified individual(s) and be conducted according to protocol.<br><br>2. Activities would require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures would be evaluated and, if necessary, Section 7 consultation reinitiated.<br><br>3. Water production would be managed to ensure maintenance or enhancement of riparian habitat.<br><br>4. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable riparian habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers.<br><br>5. Activities would maintain a 300 feet buffer from suitable riparian habitat year long.<br><br>6. Activities within 0.25 mile of occupied breeding habitat would not occur during the breeding season of **May 1 to August 15**<br><br>7. Ensure that water extraction or disposal practices do not result in change of hydrologic regime that would result in loss or degradation of riparian habitat.<br><br>8. Re-vegetate with native species all areas of surface disturbance within riparian areas and/or |

BLM_0013049

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | adjacent land. |
| | | | | | | | Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the USFWS between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |
| | | | | | | | **Purpose:** To protect southwestern willow flycatcher habitat. |
| | | | | | | | **Exception:** An exception may be granted by the Field Manager if authorization is obtained from USFWS (through applicable provisions of the ESA). The Field Manager may also grant an exception if an environmental analysis indicates that the nature of the conduct of the actions, as proposed or conditioned, would not impair the primary constituent element determined necessary for the survival and recovery of the southwestern willow flycatcher and USFWS concurs with this determination. |
| | | | | | | | **Modification:** The Field Manager may modify the boundaries of the stipulation area if an environmental analysis indicates, and USFWS (through applicable provisions of the ESA) determines that a portion of the area is not being used as southwestern willow flycatcher habitat. |
| | | | | | | | **Waiver:** May be granted if the southwestern willow flycatcher is de-listed and if USFWS determines it is not necessary for the survival and recovery of the southwestern willow flycatcher. |
| Special Status Species: Yellow-billed Cuckoo | Yellow-billed Cuckoo Habitat | CSU/TL | X | X | X | X | No surface-disturbing activities would be conducted within 100 meters of Yellow-billed Cuckoo habitat (riparian areas) from May 15th through July 20th. |
| | | | | | | | **Purpose:** To manage Yellow-billed Cuckoo habitat. |

BLM_0013050

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | A | B | PROPOSED PLAN | D | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | | | | | **Exception:** An exception may be granted by the Field Manager if authorization is obtained from USFWS (through applicable provisions of the ESA). The Field Manager may also grant an exception if an environmental analysis indicates that the nature of the conduct of the actions, as proposed or conditioned, would not impair the primary constituent element determined necessary for the survival and recovery of the Yellow-billed Cuckoo and USFWS concurs with this determination. |
| | | | | | | | **Modification:** The Field Manager may modify the boundaries of the stipulation area if an environmental analysis indicates, and USFWS (through applicable provisions of the ESA) determines that a portion of the area is not being used as Yellow-billed Cuckoo habitat. |
| | | | | | | | **Waiver:** May be granted if the Yellow-billed Cuckoo is de-listed and if USFWS determines it is not necessary for the survival and recovery of the Yellow-billed Cuckoo. |
| Special Status Species–Sensitive Raptor Species: Ferruginous Hawk and Burrowing Owl | Raptor Habitat Ferruginous Hawk (158,928 acres) Burrowing Owl (1,652, 024 acres) | CSU/TL | X | X | X | X | In habitat for raptor species, no surface disturbances or occupancy would be conducted during the breeding and nesting season (March 1 to August 31 for burrowing owl and March 1 – August 1 for ferruginous hawk) within spatial buffers (0.25 mile for burrowing owl and 0.5 mile for ferruginous hawk) of known nesting sites. |
| | | | | | | | **Purpose:** To protect raptor habitat. |
| | | | | | | | **Exception:** An exception would be granted if protocol surveys determine that nesting sites, breeding territories, and winter roosting areas are not occupied. |
| | | | | | | | **Modification:** The Field Manager may modify the |

BLM_0013051

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and
Gas Leasing and Other Surface-disturbing Activities*

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities
Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered
Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | boundaries of the stipulation area if portions of the area do not include habitat or are outside the current defined area, as determined by the BLM. **Waiver:** May be granted if it is determined the habitat no longer exists or has been destroyed. |
| Special Status Species: Critical Habitat of the Endangered Colorado River Fishes | Colorado River, , Green River, , Colorado River and Dolores River, Confluence, and all associated back waters 48,513 acres | NSO | X | X | X | X | Surface-disturbing activities within the 100 year floodplain of the Colorado River, Green River, and at the Dolores/Colorado River confluence would not be allowed. Other avoidance and minimization measures include: <ul><li>Surveys will be required prior to operations unless species occupancy and distribution information is complete and available. All surveys must be conducted by qualified individuals.</li><li>Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated.</li><li>Water production will be managed to ensure maintenance or enhancement of riparian habitat.</li><li>Avoid loss or disturbance of riparian habitats.</li><li>Conduct watershed analysis for leases in designated critical habitat and overlapping major tributaries in order to determine toxicity risk from permanent facilities</li><li>Implement the Utah Oil and Gas Pipeline Crossing Guidance.</li><li>In areas adjacent to 100 year floodplains, particularly in systems prone to flash floods, analyze the risk for flash floods to impact facilities,</li></ul> |

BLM_0013052

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and
Gas Leasing and Other Surface-disturbing Activities

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | and use closed loop drilling, and pipeline burial or suspension according to the Utah Oil and Gas Pipeline Crossing Guidance, to minimize the potential for equipment damage and resulting leaks or spills. |
| | | | | | | | **Purpose:** To protect critical habitat of the endangered Colorado River fishes. |
| | | | | | | | **Exception:** An exception may be granted by the Field Manager if: |
| | | | | | | | 1) There is no practical alternative, and 2) the development would enhance riparian/aquatic values. This exception would require consultation with the USFWS. The Field Manager may also grant an exception if an environmental analysis indicates that the nature or the conduct of the actions, as proposed or conditioned, would not impair the primary constituent element determined necessary for the survival and recovery of the Endangered Colorado River , fishes. |
| | | | | | | | **Modification:** The Field Manager may modify the boundaries of the stipulation area if an environmental analysis indicates, and USFWS (through applicable provisions of the ESA) determines a portion of the area is not being used as Critical Habitat. |
| | | | | | | | **Waiver:** A waiver may be granted if the Endangered Colorado River Fishes are de-listed and the Critical Habitat is determined by USFWS as not necessary for the survival and recovery of the Endangered Colorado River fishes. |
| Special Status Species: Kit Fox | Kit Fox Habitat | CSU | X | X | X | X | In Kit Fox habitat, allow no surface disturbances within 200 meters of a kit fox den. |
| | | | | | | | **Purpose:** To protect Kit Fox habitat. |

BLM_0013053

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | **Exception:** An exception would be granted if protocol surveys determine that Kit Fox dens are not present. **Modification:** The Field Manager may modify the stipulation area if portions of the area do not contain habitat. **Waiver:** A waiver may be granted if it is determined that the habitat no longer exists. |
| Special Status Species: California Condor | California Condor Potential Habitat | CSU/TL | X | X | X | X | Avoidance or use restrictions may be placed on portions on areas known or suspected to be used by condors.  Application of appropriate measures will depend on whether the action is temporary or permanent, and whether it occurs within or outside potential habitat.  A temporary  action is completed prior to the following important season of use, leaving for habitat functionality.  A permanent action continues for more than one season of habitat use, and/or causes a loss of condor habitat function or displaces condors through continued disturbance (i.e. creation of a permanent structure requiring repetitious maintenance, or emits disruptive levels of noise).  Current avoidance and minimization measures include the following: Surveys will be required prior to operations unless species occupancy and distribution information is complete and available.  All Surveys must be conducted by qualified individual(s) approved by the BLM, and must be conducted according to approved protocol. If surveys result in positive identification of condor use, all lease activities will require monitoring throughout the duration of the project to ensure desired results of applied mitigation and protection.  Minimization |

BLM_0013054

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and
Gas Leasing and Other Surface-disturbing Activities

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | measures will be evaluated during development and, if necessary, Section 7 consultation may be reinitiated. |
| | | | | | | | Temporary activities within 1.0 mile of nest sites will not occur during the breeding season. |
| | | | | | | | Temporary activities within 0.5 miles of established roosting sites or areas will not occur during the season of use, August 1 to November 31, unless the area has been surveyed according to protocol and determined to be unoccupied. |
| | | | | | | | No permanent infrastructure will be placed within 1.0 mile of nest sites. |
| | | | | | | | No permanent infrastructure will be placed within 0.5 miles of established roosting sites or areas. |
| | | | | | | | Remove big game carrion to 100 feet from on lease roadways occurring within foraging range. |
| | | | | | | | Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable habitat. Utilize directional drilling to avoid direct impacts to large cottonwood gallery riparian habitats. Ensure that such directional drilling does not intercept or degrade alluvial aquifers. |
| | | | | | | | Reinitiation of section 7 consultation with the Service will be sought immediately if mortality or disturbance to California condors is anticipated as a result of project activities. Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA. |
| | | | | | | | Additional measures may also be employed to avoid |

BLM_0013055

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | or minimize effects to the species between the lease sale and lease development stages.  These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the Endangered Species Act. |
| Jones cycladenia (*C. humilis var. jonesii*) | Potential, suitable, and occupied habitat | TL/CSU | X | X | X | X | Potential, suitable, and occupied habitat are defined as follows:<br><br>*Potential habitat* is defined as areas which satisfy the broad criteria of the species habitat description; usually<br><br>determined by preliminary, in-house assessment.<br><br>*Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for<br><br>plant persistence; determined by field inspection and/or surveys; may or may not contain clay reed-mustard; habitat descriptions can be found in Federal Register Notice and species recovery plan links at <http://www.fws.gov/endangered/wildlife.html>.<br><br>*Occupied habitat* is defined as areas currently or historically known to support clay reed-mustard; synonymous with "known habitat."<br><br>Current avoidance and minimization measures include the following:<br><br>1.   Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat prior to any ground disturbing activities to determine if suitable Jones cycladenia habitat is present.<br><br>2.   Site inventories will be conducted within suitable |

BLM_0013056

Moab PRMP/FEIS

Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and
Gas Leasing and Other Surface-disturbing Activities

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities
Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered
Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | habitat to determine occupancy. Where standard surveys are technically infeasible and otherwise hazardous due to topography, slope, etc., suitable habitat will be assessed and mapped for avoidance (hereafter, "avoidance areas"); in such cases, in general, 300' buffers will be maintained between surface disturbance and avoidance areas. However, site specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat. Where conditions allow, inventories: |
| | | | | | | | a. Must be conducted by qualified individual(s) and according to BLM and Service accepted survey protocols, |
| | | | | | | | b. Will be conducted in suitable and occupied habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (usually May 15st to June 30th, however, surveyors should verify that the plant is flowering by contacting a BLM or FWS botanist or demonstrating that the nearest known population is in flower.), |
| | | | | | | | c. Will occur within 300' from the centerline of the proposed right-of-way for surface pipelines or roads; and within 300' from the perimeter of disturbance for the proposed well pad including the well pad, |
| | | | | | | | d. Will include, but not be limited to, plant species lists and habitat characteristics, and |
| | | | | | | | e. Will be valid until May 1st the following year. |
| | | | | | | | 3. Design project infrastructure to minimize impacts within suitable habitat: |
| | | | | | | | a. Where standard surveys are technically infeasible, infrastructure and activities will avoid all suitable |

BLM_0013057

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | habitat (avoidance areas) and incorporate 300' buffers, in general; however, site specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat. |
| | | | | | | | b. Reduce well pad size to the minimum needed, without compromising safety. |
| | | | | | | | c. Where technically and economically feasible, use directional drilling or multiple wells from the same pad. |
| | | | | | | | d. Limit new access routes created by the project. |
| | | | | | | | e. Roads and utilities should share common right-of-ways where possible. |
| | | | | | | | f. Reduce the width of right-of-ways and minimize the depth of excavation needed for the road bed; where feasible, use the natural ground surface for the road within habitat. |
| | | | | | | | g. Place signing to limit off-road travel in sensitive areas, and |
| | | | | | | | h. Stay on designated routes and other cleared/approved areas. |
| | | | | | | | i. All disturbed areas will be revegetated with native species comprised of species indigenous to the area and non-native species that are not likely to invade other areas. |
| | | | | | | | 4.   Within occupied habitat, project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants. |
| | | | | | | | a. Follow the above recommendations (#3) for project design within suitable habitats. |
| | | | | | | | b. To avoid water flow and/or sedimentation into occupied habitat and avoidance areas, silt fences, hay |

BLM_0013058

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | bales, and similar structures or practices will be incorporated into the project design; appropriate placement of fill is encouraged. |
| | | | | | | | d. Construction of roads will occur such that the edge of the right of way is at least 300' from any plant and 300' from avoidance areas. |
| | | | | | | | e. Roads will be graveled within occupied habitat; the operator is encouraged to apply water for dust abatement to such areas from May 15th to June 30th (flowering period); dust abatement applications will be comprised of water only. |
| | | | | | | | f. The edge of the well pad should be located at least 300' away from plants and avoidance areas; in general, however, site specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat. |
| | | | | | | | g. Surface pipelines will be laid such that a 300' buffer exists between the edge of the right of way and plants and 300' between the edge of right of way and avoidance areas; use stabilizing and anchoring techniques when the pipeline crosses suitable habitat to ensure pipelines don't move towards the population; site specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat. |
| | | | | | | | h. Construction activities will not occur from May 15th through June 30th within occupied habitat. |
| | | | | | | | i. Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging, temporary fencing, rebar, etc. |
| | | | | | | | j. Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and |

BLM_0013059

*Moab PRMP/FEIS*

*Appendix C: Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities*

**Table C.4. Standard Terms and Conditions (Oil and Gas Lease Notices) Applicable to all Surface-disturbing activities Which are Required to Protect Special Status and Federally Protected Species and to Comply with the Endangered Species Act**

| Resource Of Concern | Applicable Area | Stipulation Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | PROPOSED PLAN | D | |
| | | | | | | | k. Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible.

5. Occupied Jones cycladenia habitats within 300' of the edge of the surface pipelines' right of ways, 300' of the edge of the roads' right of ways, and 300' from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities. Annual reports shall be provided to the BLM and the Service. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service.

6. Reinitiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the Jones cycladenia is anticipated as a result of project activities. Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA. |

BLM_0013060

# APPENDIX D.
## LANDS IDENTIFIED FOR DISPOSAL IN REVISED MOAB RMP

## D.1 INTRODUCTION

The parcels listed below meet FLPMA Section 203 criteria for disposal by sale. These lands can also be considered for disposal under FLMPA Section 206 exchange or under the Recreation and Public Purposes Act (R&PP). However, Section 206 exchanges and R&PP disposals are not limited to this list if they meet the criteria for disposal outlined in Appendix A of this plan.

| Parcel #* | Legal Description | | Acres |
|---|---|---|---|
| R-1 | T. 20 S., R. 16 E. | sec. 21, SE¼SW¼ | 40.00 |
| | | sec. 23, SW¼NW¼ | 40.00 |
| | | sec. 25, All | 640.00 |
| | | sec. 26, SW¼SW¼, W½SW¼, SE¼ | 280.00 |
| | | sec. 27, SE¼SE¼ | 40.00 |
| | | sec. 28, lot 2, E½NW¼, S½ | 439.84 |
| | | sec. 33, lots 1-3, NE¼, E½NW¼, NE¼SW¼, N½SE¼ | 488.70 |
| | | sec. 34, W½NW¼ | 80.00 |
| | T. 21 S., R. 16 E. | sec. 1, lots 1, 4, 5, 8, 9, 12, 13, 16 | 263.00 |
| | | sec. 3, lot 25 | 70.16 |
| | | sec. 12, S½SE¼ | 80.00 |
| | | sec. 13, NE¼NE¼ | 40.00 |
| | T. 21 S., R. 17 E. | sec. 4, lots 11-14, N½SW¼, SW¼SW¼, NW¼SE¼, SE¼SE¼ | 360.00 |
| | | sec. 5, E½SE¼ | 80.00 |
| | | sec. 6, lots 2, 3, 4, 5, 7, 10 | 271.73 |
| | | sec. 7, lot 4, SE¼SW¼, SE¼ | 233.94 |
| | | sec. 8, NW¼SW¼, SE¼SW¼, SE¼ | 240.00 |
| | | sec. 9, NE¼, N½NW¼, SW¼NW¼, S½ | 600.00 |
| | | sec. 17, N½, N½S½, S½SW¼ | 560.00 |
| | | sec. 18, lots 1-4, E½W½, E½ | 615.60 |
| | | sec. 19, lot 1, E½NW¼, E½ | 434.03 |
| | | secs. 20, 21, All | 1280.00 |
| | | sec. 22, N½NE¼, SW¼NW¼, E½SW¼, SE¼SW¼, S½SE¼ | 320.00 |
| R-2 | T. 21 S., R. 16 E. | sec. 22, NE¼SE¼ | 40.00 |
| | | sec. 23, SW¼, W½SE¼, SE¼SE¼ | 280.00 |
| | | sec. 25, NW¼, S½ | 480.00 |
| | | sec. 26, All | 640.00 |
| | | sec. 35, N½, E½SW¼, SE¼ | 560.00 |
| | T. 21 S., R. 17 E. | sec. 30, lot 4 | 35.40 |

| | | | |
|---|---|---|---|
| R-3 | T. 21 S., R. 20 E., | sec. 21, N½NE¼ | 20.00 |
| R-4 | T. 19 S., R. 23 E., | sec. 7, SW¼NE¼SW¼ | 10.00 |
| R-5 | T. 20 S., R. 24 E., | sec. 18, SW¼NE¼, W½SE¼, SE¼SE¼ | 160.00 |
| R-6 | T. 21 S., R. 23 E., | sec. 23, NE¼SE¼ | 40.00 |
| R-7 | T. 21 S., R. 24 E., | sec. 27, E½NW¼SE¼, NE¼SW¼SE¼ | 30.00 |
| | | sec. 34, NE¼NE¼NE¼NE¼ | 2.50 |
| | | sec. 35, NE¼NW¼NW¼, N½NW¼NW¼NW¼, SE¼NW¼NW¼NW¼ | 17.50 |
| R-8 | T. 23 S., R. 19 E., | sec. 14, N½NW¼, SW¼, E½ | 560.00 |
| | | sec. 15, All | 640.00 |
| | | sec. 22, All | 640.00 |
| | | sec. 23, All | 640.00 |
| R-9 | T. 24 S., R. 23 E., | sec. 21, within SE¼SE¼ | 3.51 |
| | | sec. 22, within NE¼SW¼, SW¼SE¼ | 3.85 |
| | | sec. 27, within NE¼NW¼NW¼ | 2.58 |
| | | NE¼NW¼SW¼NE¼, N½NE¼SW¼NE¼ | 7.43 |
| R-10 | T. 26 S., R. 21 E | sec. 12, lots 2, 6, NE¼ of lot 11, 12 | 129.25 |
| | | sec. 13, lot 1 | 22.47 |
| | T. 26 S., R. 22 E | sec. 18, lot 1 | 39.23 |
| | | sec. 20, lot 1 | 39.47 |
| | | lot 89 (excluding the W½NW¼, SE¼NW¼, SW¼, and W½SE¼ of the lot) | 17.12 |
| | | lot 8 (NE¼) | 10.00 |
| | | NE¼NW¼NW¼, N½NW¼NW¼NW¼ | 15.00 |
| | | sec. 27, NW¼SW¼, N½SW¼SW¼, N½SW¼SW¼SW¼ SE¼SW¼SW¼SW¼, SE¼SW¼SW¼ | 77.50 |
| | | sec. 28, lot 6, | 9.36 |
| | | SE¼NE¼, NE¼SW¼NE¼, E½NE¼SE¼ | 70.00 |
| | | sec. 34, W½NE¼, E½NE¼NW¼, NW¼NE¼NW¼ N½SW¼NE¼NW¼, N½NE¼NW¼NW¼ SE¼NE¼NW¼NW¼, E½NE¼SE¼NW¼ NE¼NW¼SE¼, NE¼NW¼NW¼SE¼ N½SE¼NW¼SE¼, SE¼SE¼NW¼SE¼ N½SE¼SE¼, N½SW¼SE¼SE¼ SE¼SW¼SE¼SE¼, SE¼SE¼SE¼ | 185.00 |
| | | sec. 35, SW¼SW¼ | 40.00 |
| | T. 27 S., R. 22 E | sec. 2, lots 3 and 4, SE¼NW¼ | 126.82 |
| | | sec. 11, N½NE¼NE¼, N½SW¼NE¼NE¼ SE¼SW¼NE¼NE¼, SE¼NE¼NE¼ | 37.50 |
| | | sec. 12, SW¼NW¼ | 40.00 |

BLM_0013062

*Moab PRMP/FEIS*                                      *Appendix D: Lands Identified For Disposal In Revised Moab RMP*

R-11          (deleted)

R-12          T. 28 S., R. 23 E        sec. 31,  SE¼NW¼                                              40.00

R-13          T. 23 S., R. 17 E., sec. 31, NW¼NE¼, S½NE¼, E½SE¼                        200.00

*D-3*

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0013064

# APPENDIX E.
## MOAB FIELD OFFICE RECREATION RULES

## E.1 CAMPING

### E.1.1 CAMPING IN RESTRICTED AREAS

Camping is restricted to improved recreation sites (i.e., campgrounds or camping areas) with facilities managed for overnight use. Fires are restricted to metal fire grills provided at the campgrounds. When camping in areas with developed facilities, camping is restricted to designated sites. Collection of firewood is prohibited (Colorado Riverway, Sand Flats, Ken's Lake/Flat Pass *Highway 313 corridor, including road to Canyonlands National Park).* Where indicated, camping in areas without developed facilities is restricted to designated, undeveloped campsites. Campers are required to carry out solid human body waste (unless toilets are provided), and must possess and utilize a toilet system that allows for the disposal of such waste through authorized sewage systems. *Fires are restricted to the designated site,* and collection of firewood is prohibited. The controlled camping areas (some of which may have zero sites designated) are: *Bartlett/Courthouse/Dubinky area, Long Canyon road corridor, Gemini Bridges road corridor and within Little Canyon, Seven Mile Canyon, the BLM land west of Arches National Park, Blue Hill-Black Ridge area, Utah Rims, White Wash Sand Dunes, Ten Mile Canyon (Dripping Spring Area), Mill Creek Canyon Management Area, areas within Spanish Valley, Kane Creek Crossing, land surrounding developed recreation areas in the Canyon Rims Recreation Area, the corridor of the Green River "Daily").* As campgrounds are constructed in the above or in other areas, camping would be restricted to improved recreation sites (i.e., campgrounds or camping areas) with facilities managed for overnight use.

### E.1.2 DISPERSED CAMPING

In all other locations, dispersed camping is permitted on public land. Vehicles associated with such camping are restricted to the designated road system. Campers are required to clean up their campsites. When damage to an area from dispersed camping becomes obtrusive, that area would be added to the "controlled camping" category, where camping is restricted to designated, undeveloped campsites with rules as outlined above. Obtrusive can refer to any or all of the following problems: human sanitation, trash, hacked trees, trampled vegetation and fire danger from excessive campfires.

### E.1.3 RIVER-TRIP CAMPING

Campers on all overnight river trips (Colorado, Green and Dolores Rivers) must carry out all solid human waste, campfire ash, and charcoal and dispose of them properly. Solid human body waste must be disposed of in authorized sewage systems. All overnight boating trips must possess a durable metal fire pan at least 12 inches wide with a 1.5-inch lip, and restrict all fires to this fire pan. Collection of firewood is prohibited, except for driftwood. Campers in Westwater Canyon are restricted to designated sites, which are assigned at the Ranger Station. In addition,

BLM_0013065

no camping is allowed for a distance of two miles below Cisco Landing. Campers on the Colorado River "Daily" must camp in the campgrounds provided if camping on the south side of the river.

## E.2 CAMPSITE USE LIMITATIONS

Campsite occupancy is limited to posted numbers of vehicles and persons within campgrounds, camping areas, and controlled camping areas.

## E.3 FEES

Fees may be charged for any and all campgrounds on BLM administered land, and within the following areas: Colorado Riverway, Sand Flats, Westwater Canyon of the Colorado River, the Green River, the Dolores River, and on the Kokopelli's Trail.

## E.4 OCCUPANCY STAY LIMITATION

No person may occupy public lands for more than 14 days within a consecutive 28-day interval. Beyond the 14-day period, occupation of another site shall not be within a 30 mile air radius of the heretofore occupied location. When the 14 days have been reached, site occupation shall not reoccur until at least 14 days have expired from the last day of use.

Unattended personal property shall not be kept on public lands for a period of more than 48 hours, with the exception that vehicles may be parked in designated parking areas for up to 14 consecutive days.

## E.5 FIRES

In addition to the campfire restrictions above, fires are also prohibited in the following areas: *Mill Creek Canyon Management Area and Negro Bill Canyon.*

## E.6 FIREWOOD CUTTING AND GATHERING

Where indicated (Canyon Rims, Sand Flats, Green River "Daily" corridor, Colorado Riverway, Highway 313 corridor including Canyonlands National Park entrance road, Gemini Bridges Road corridor, Long Canyon road corridor, Black Ridge road corridor, Blue Hill road corridor, Ken's Lake, Mill Creek Canyon Management Area, Behind the Rocks, and Negro Bill) firewood cutting and gathering, Christmas tree cutting and firewood permits are prohibited, except for traditional and historic uses by Native Americans, BLM official uses, or military, fire, emergency or law enforcement actions.

If conditions warrant, areas of restricted firewood cutting and gathering may be enlarged.

BLM_0013066

## E.7 FIREARMS DISCHARGE

The discharge of firearms for all purposes is prohibited at improved recreation sites. Discharge of firearms for non-hunting purposes is prohibited in the Colorado Riverway SRMA, along the Green River "Daily" section, in the Mill Creek Planning Area, and in the Sand Flats Recreation Management Area. As numbers of visitors increase to any area, discharge of firearms restrictions may be extended to these areas to protect human life and safety.

## E.8 SPARK ARRESTORS

Spark arrestors are required on all public lands in the Moab Field Office as per CFR 8343.1(c).

## E.9 POSSESSION OF ALCOHOL BY MINORS

Persons under 21 years of age are prohibited from possessing alcoholic beverages consistent with State law.

## E.10 RIVER USE

### E.10.1 BOATING PERMITS

Noncommercial float trip permits are required for the Colorado River in Westwater Canyon, on the Dolores River from the Utah line to the Colorado River confluence, and on the Green River within Labyrinth Canyon. These permits require the possession of first aid kits, air pumps, repair kits, portable toilet systems, and fire-pans. In addition, boaters may not gather firewood (except driftwood), must dispose of trash properly, must use biodegradable soap, may not bathe with any soap in tributary streams, and may not remove, damage or destroy any archaeological, historical or ecological resource.

### E.10.2 MOTORIZED BOAT TRAVEL

No boats may be launched for upstream motorized travel at the Westwater Ranger Station from February 1 through October 15 for protection of bald eagle nests.

No boats may be launched for upstream or downstream motorized travel at Cisco Landing from February 1 through October 15 for protection of bald eagle nests.

## E.11 ADDITIONAL SPECIAL RULES

No casting of dinosaur tracks without a permit issued through the BLM Utah State Office.

No glass containers at the Moab Canyon Sand Hill and at the Powerhouse Lane Trailhead and lower Mill Creek for a distance of 1 mile from the trailhead.

No burning of wood pallets on public lands within the Moab Field Office.

BLM_0013067

No camping with vehicles within 200 feet of isolated springs and potholes to allow space for wildlife access to water.

No commercial or private equestrian use in Negro Bill Canyon. Commercial equestrian use in Mill Creek Canyon would only be allowed on the Steelbender Road.

BLM_0013068

# APPENDIX F.
## SPECIAL RECREATION MANAGEMENT AREAS: GOALS, SETTINGS, OUTCOMES, AND MANAGEMENT PRESCRIPTIONS

## F.1 DEFINITIONS

These definitions are used throughout this Appendix:

### Physical – Land & Facilities: The Character of the Natural Landscape

| Primitive | Back Country | Middle Country | Front Country | Rural |
|---|---|---|---|---|
| Undisturbed natural landscape | Naturally appearing landscape having modifications not readily noticeable; primitive roads made of native materials | Naturally appearing landscape except for obvious primitive roads; maintained and marked trails; simple trailhead developments, improved signs, and very basic toilets | Landscape partially modified by roads, utility lines, etc., but none overpower natural landscape features; improved yet modest; rustic facilities such as campsites, restrooms, trails, and interpretive signs | Natural landscape substantially modified by agriculture or industrial development; modern facilities such as campgrounds and boat launches |

### Social – Visitor Use & Users: The Character of Recreation and Tourism Use

| Primitive | Back Country | Middle Country | Front Country | Rural |
|---|---|---|---|---|
| Fewer than 3 encounters/day on travel routes; only footprints observed; no noise or litter | 3-6 encounters per day; footprints and bicycle tracks observed; noise and litter infrequent; slight soil and vegetation disturbance at campsites and popular areas | 7-14 encounters/day on travel routes; vehicle tracks observed; occasional noise and litter; vegetation and soils becoming worn at campsites and high-use areas | 15-29 encounters/day on travel routes; vehicle tracks common; some noise and litter; vegetation and soils commonly worn at campsites, along travel routes, and at popular areas | People seem to be generally everywhere; frequent noise and litter; large but localized areas with vegetation damage and soil compaction |

*F-1*

BLM_0013069

**Administrative – Administration and Services**

| Primitive | Back Country | Middle Country | Front Country | Rural |
|---|---|---|---|---|
| No mechanized use; no visitor services available; no visitor controls apparent; no use limits; enforcement presence very rare | Mountain bikes; and mechanized use; basic maps, but area personnel seldom available to provide on-site assistance; signs at key access points on basic user ethics; may have back country use restrictions; enforcement presence rare | OHVs/mechanized use; area brochures and maps, area personnel occasionally present to provide on-site assistance; occasional regulatory signing; motorized and mechanized use restrictions; random enforcement presence | Two-wheeled drive vehicles predominant, but also OHV and mechanized use; information materials describe recreation areas and activities; area personnel are periodically available; rules clearly posted; periodic enforcement presence | Highway auto and truck traffic is characteristic; informational materials describe recreation areas and activities plus experience and benefit descriptions; area personnel do on-site education; regulations prominent; enforcement presence |

BLM_0013070

## F.2 SPECIAL RECREATION MANAGEMENT AREAS

**Bookcliffs Special Recreation Management Area (nndeveloped SRMA)**
**357,070 acres in Alternative B**

| Description |
| --- |
| The Bookcliffs are located north of I-70 and extend the entire width of the Moab Field Office from the Green River to the Colorado state line. The SRMA is concentrated in the central and eastern portions, and much of the area is within Wilderness Study Areas (WSA). The area has a limited number of roads, making motorized access difficult. Recreation use of this area is very light, with hunting being the most common activity. The only current infrastructure consists of directional signs. |

| Management Goals |
| --- |
| For a variety of visitor benefits, provide opportunities for hiking, backpacking, equestrian and primitive hunting in the mostly undeveloped areas of the Bookcliffs. For specific recreation management prescriptions, see Chapter 2. |

| Setting |
| --- |
| Maintain the backcountry character and primarily undisturbed natural landscape to allow visitors to enjoy opportunities for solitude. Provide a very low level of facilities and management presence. |
| Physical: Back country; Social: Primitive; Administrative: Primitive. |

| Targeted Outcomes | | |
| --- | --- | --- |
| **Activity** | **Experience** | **Benefit** |
| Hiking and backpacking | Savoring the total sensory experience of a natural landscape | Improved outdoor knowledge and self-confidence; closer relationship with the natural world |
| Equestrian | Developing your skills and abilities | Improved skills for outdoor enjoyment; improved outdoor knowledge and self-confidence. |
| Primitive hunting | Experiencing a greater sense of independence | Improved skills for outdoor enjoyment; Improved outdoor recreation skills |

| Management Prescriptions from Other Programs |
| --- |
| Travel Management: Primarily Closed, with remainder Limited to Designated Roads (See Map 2-11 for Designated Routes) |
| Visual Resource Management (VRM): Primarily VRM I (see map 2-23) |
| Oil and Gas Leasing: Primarily closed, with remainder Open to Leasing with Special Stipulations (see map 2-5) |

BLM_0013071

**Cameo Cliffs Special Recreation Management Area (Destination SRMA)**
**15,597 acres in Alternatives B, D and Proposed Plan**

| Description |
|---|
| Cameo Cliffs is located east of U.S. Highway 191 and south of Moab near Hook and Ladder Gulch. The SRMA has an OHV trailhead, an information kiosk; the SRMA is riddled with a series of old mining exploration roads. These roads are lightly marked for OHV travel. Recreation use of this area is very light, with ATV'ing, hiking and horseback riding occurring. |

| Management Goals |
|---|
| For a variety of visitor benefits, provide opportunities for ATV'ing and other motorized travel on old mining exploration roads; provide opportunities for equestrian use on the Old Spanish Trail and in other non-roaded locations; provide opportunities for hiking in Hook and Ladder Gulch. |

| Setting |
|---|
| Maintain the scenic qualities of the area to allow visitors to enjoy an uncrowded experience. Provide information and a management presence sufficient to ensure that travel occurs only on the designated route system. |
| Physical: Middle Country: Social: Middle Country; Administrative: Middle Country. |

| Targeted Outcomes | | |
|---|---|---|
| **Activity** | **Experience** | **Benefit** |
| ATV Riding | Enjoying having easy access to natural landscapes | Positive contributions to local economic stability |
| Horseback riding | Adventure and exploration on a National Historic trail | Increased sense of adventure and appreciation for history<br><br>Increased local tourism revenue |
| Hiking | Enjoying an escape from crowds of people | Greater sense of adventure<br><br>Increased local tourism revenue |

| Management Prescriptions from Other Programs |
|---|
| <u>Travel Management</u>: Limited to Designated Roads in all Alternatives (see Map 2-11 for Designated Routes) |
| <u>Visual Resource Management:</u> Alternative B: VRM I, II, III and IV; Proposed Plan: VRM II, III, IV; Alternative D: VRM III and IV (see Map 2-23) |
| <u>Oil and Gas Leasing</u>: Primarily Open to Leasing with Special Stipulations (see Map 2-5) |

BLM_0013072

**Canyon Rims Special Recreation Management Area (Destination SRMA)**
**101,531 acres in Alternative B, D and Proposed Plan**

| DESCRIPTION |
| --- |
| Canyon Rims is located west of U.S. Highway 191 and south of Moab on a large plateau overlooking the Colorado River. The SRMA has three developed overlooks of the Colorado River, a scenic byway, two developed campgrounds, and a network of backcountry roads. Use includes scenic driving to the overlooks, camping, hiking and backcountry driving. Use levels are currently moderate. |

| MANAGEMENT GOALS |
| --- |
| For a variety of visitor benefits, 1) Provide scenic driving opportunities on the Scenic Byway and on the backcountry road system; 2) provide facilities at the scenic overlooks to enhance visitor experience; 3) provide quality camping experiences in two developed campgrounds; 4) provide hiking and backpacking opportunities, especially in Hatch Wash. For specific recreation management prescriptions, see Chapter 2 of the RMP. |

| SETTING |
| --- |
| Maintain the scenic character and open spaces of Canyon Rims to allow visitors to enjoy an uncrowded experience. Provide information and a management presence sufficient to protect these scenic values. |
| Physical: Middle Country; Social: Middle Country; Administrative: Front Country. |

| TARGETED OUTCOMES | | |
| --- | --- | --- |
| **Activity** | **Experience** | **Benefit** |
| Visiting overlooks and scenic driving | Enjoying having easy access to natural landscapes | Increased local tourism revenue<br><br>Improved appreciation of nature's splendor |
| Hiking and backpacking | Enjoying escape from crowds of people | Improved capacity for outdoor physical activity<br><br>Increased local tourism revenue |
| Camping at developed campgrounds | Savoring the sensory experience of the natural landscape | Greater family bonding<br><br>Increased local tourism revenue |

| Management Prescriptions from other Programs |
| --- |
| <u>Travel Management</u>: Limited to Designated Roads in all Alternatives (See Map 2-11 for Designated Routes) |
| <u>Visual Resource Management (VRM)</u>: Alternatives B, D and Proposed Plan: VRM II and III; percentage of VRM II is greatest in Alternative B, and least in Alternative D (see Map 2-23 for VRM Classes) |
| <u>Oil and Gas Leasing</u>: Alternatives B, D and Proposed Plan: Open to Leasing with Special Stipulations; No Surface Occupancy near the Scenic Byway and in Hatch Wash in all Alternatives (widths vary), and No Surface Occupancy on the western rim of the plateau in Alternative B only. (See Map 2-5 for Oil and Gas Leasing) |

BLM_0013073

**Colorado Riverway Special Recreation Management Area (Destination SRMA) 103,466 acres in Alternative B, 89,935 acres in Proposed Plan, and 79,102 acres in Alternative D**

| Description |
|---|
| The Colorado Riverway consists of the lands accessed by Utah Highways 128 and 279 and Kane Creek, Entrada Bluffs, Onion Creek, Castle Valley and Potash Roads. The SRMA has 19 developed campgrounds, 6 boat ramps, and 7 developed hiking trails. The Riverway has a very high level of use, with at least 600,000 visitors per year. Recreation use includes driving for pleasure, camping, hiking, boating, BASE jumping, climbing and equestrian use. |

| Management Goals |
|---|
| For a variety of visitor benefits, 1) provide scenic driving opportunities on the scenic byways, as well as on the non-paved roads; 2) provide quality camping experiences in the developed campgrounds; 3) provide non-motorized opportunities, including hiking, boating, climbing, equestrian use and BASE jumping. For specific recreation management prescriptions, see Chapter 2. |

| Setting |
|---|
| Maintain the scenic character and important vistas of the Colorado Riverway to allow visitors to enjoy the unsurpassed visual resources. Provide information and a regular and continuous management presence to allow the large numbers of visitors to enjoy the area while protecting its natural resources. |
| Physical: Middle Country; Social: Middle Country; Administrative: Front Country. |

| Targeted Outcomes | | |
|---|---|---|
| **Activity** | **Experience** | **Benefit** |
| Scenic driving | Enjoying having easy access to natural landscapes | Increased tourism revenue<br>Improved appreciation of nature's splendor |
| Camping at developed campgrounds | Savoring the sensory experience of the natural landscape | Great family bonding<br>Increased tourism revenue |
| Boating | Enjoying unique outdoor opportunities | Greater sense of adventure<br>Improved local economy |
| Hiking/equestrian | Enjoying physical activity in a scenic setting | Enhanced awareness and understanding of nature |
| Climbing/BASE jumping | Enjoying risk taking and adventures | Improved skills for outdoor adventure |

| Management Prescriptions from Other Programs |
|---|
| <u>Travel Management</u>: Limited to Designated Roads in all Alternatives ( Map 2-11) |
| <u>Visual Resource Management (VRM):</u> Alternatives B, D and Proposed Plan: VRM I and II; percentage of VRM I is greatest in Alternative B, and least in Alternative D (see Map 2-23 for VRM Classes) |
| <u>Oil and Gas Leasing</u>: No Surface Occupancy along the rivers (Alternatives B, D and Proposed Plan) and in the Richardson Amphitheater (Alternatives B and Proposed Plan). Remainder of SRMA is Open to Leasing with Special Stipulations. (See Map 2-5) |

BLM_0013074

**Dee Pass Special Recreation Management Area (Destination SRMA)**
**60,939 acres in Alternative D (Dee Pass is a subset of the Labyrinth SRMA for this alternative)**

| Description |
|---|
| Dee Pass SRMA is located south of I-70 and east of the Green River, about 40 miles northwest of Moab. The SRMA contains a great number of roads, user-made dirt bike trails and a sand dune area (White Wash Sand Dunes). The area is currently used primarily by dirt bikers and other motorized recreationists. Current use levels are light to moderate. There are no recreation facilities in the SRMA at the present time. |

| Management Goals |
|---|
| For a variety of visitor benefits, provide motorized trail riding opportunities on a series of designated roads and dirt bike trails in the majority of the SRMA. Provide a 3000 acre open OHV area centered around the White Wash Sand Dunes. Establish motorized staging areas near the Sand Dunes, with trails emanating from these staging areas. For specific recreation management prescriptions, see Chapter 2. |

| Setting |
|---|
| Maintain the backcountry setting and preserve the scenic values for the enjoyment of the motorized recreating public. Provide information and a management presence sufficient to maintain scenic designated trail riding opportunities. Provide facilities to promote responsible use of the area. |
| Physical: Middle Country; Social: Middle Country; Administrative: Front Country. |

| Targeted Outcomes | | |
|---|---|---|
| **Activity** | **Experience** | **Benefit** |
| Dirt bike and ATV riding on designated trails<br><br>Open riding on sand dunes | Adventure and exploration<br><br>Exhilaration and excitement | Improved skills for outdoor enjoyment with others<br><br>Greater freedom from urban living |

| Management Prescriptions from Other Programs |
|---|
| Visual Resource Management: VRM Class III and IV (See Map 2-24-D) |
| Travel Management: Limited to designated roads and trails, with the exception of the White Wash Sand Dunes area, which is open to cross country travel (See Map 2-10-D for map of open area; see Map 2-11-D for designated roads and trails) |
| Oil and Gas Leasing: Primarily open to leasing with standard stipulations (See Map 2-5) |

BLM_0013075

**Dolores River Canyons Special Recreation Management Area (Undeveloped SRMA)**
**31,661 acres in Alternatives B and Proposed Plan**

| Description |
|---|
| The Dolores River Canyons SRMA is located about 25 miles east and south of Moab. The area has a limited number of roads, making motorized access difficult. Recreation use of this area is very light, with rafting and hiking being the most common activities. The only current infrastructure consists of directional signs. |

| Management Goals |
|---|
| For a variety of visitor benefits, provide opportunities for non-motorized boating, hiking and backpacking in the mostly undeveloped areas of the SRMA. For specific recreation management prescriptions, see Chapter 2 of the RMP. |

| Setting |
|---|
| Maintain the backcountry character and primarily undisturbed natural landscape to allow visitors to enjoy opportunities for solitude. Provide a very low level of facilities and management presence. |
| Physical: Back country; Social: Primitive; Administrative: Primitive. |

| Targeted Outcomes | | |
|---|---|---|
| **Activity** | **Experience** | **Benefit** |
| Non-motorized boating | Enjoying/going exploring on my/our own; enjoying an escape from crowds of people | Greater sense of adventure |
| Hiking and backpacking | Savoring the total sensory experience of a natural landscape | Improved outdoor knowledge and self-confidence; closer relationship with the natural world |

| Management Prescriptions from Other Programs |
|---|
| <u>Visual Resource Management:</u> Primarily VRM II in both B and Proposed Plan Alternatives (See Map 2-23) |
| <u>Travel Management</u>: Limited to Designated Roads in all Alternatives (See Map 2-11 for map of designated roads) |
| <u>Oil and Gas Leasing</u>: Primarily Open to Leasing with No Surface Occupancy in both the B and Proposed Plan Alternatives (See Map 2-5) |

BLM_0013076

**Extensive Recreation Management Area**
**792,131 acres in Alternative B; 1,162,732 acres in Proposed Plan; and 1,543,903 acres in Alternative D**

| Description |
|---|
| The Moab Extensive Recreation Management Area (ERMA) consists of the acreage of the Moab Field Office that is **not** managed as a Special Recreation Management Area. In all alternatives, Lisbon Valley, Black Ridge, Yellow Cat, the Dolores Triangle and the Cisco Desert are in the ERMA. In Alternatives C and D, the Bookcliffs are also in the ERMA. In Alternative D, South Moab, Utah Rims, the Labyrinth Rims/Gemini Bridges area, the Entrada Bluffs area, the Dolores River Canyons, the Westwater uplands and Lower Gray Canyon are all within the ERMA. |

| Management Goals |
|---|
| ERMAs are utilized for recreation management only where recreation use is very low. While BLM may manage the ERMA for low visitation, visitation numbers are often established regardless of BLM actions. That is, visitors may "discover" a portion of public lands, and recreation numbers may increase with no input from the BLM. This increase in visitation may be fueled by magazine articles, tourism promotion or simple word of mouth. However, ERMAs are to be managed for very low visitation, and to this end, the goal of the ERMA is to provide custodial management only for recreation use. The ERMA will allow recreation activities while protecting other resources. Facilities are to be provided only for public safety. |

| Setting |
|---|
| Maintain the public lands for other uses while allowing recreation to continue. Provide no information and minimal management presence. |

| Targeted Outcomes | | |
|---|---|---|
| **Activity** | **Experience** | **Benefit** |
| Backcountry driving | Adventure and exploration | Improved skills for outdoor enjoyment |
| Primitive hiking, backpacking and equestrian use | Backcountry exploration | Improved opportunity to get away from the everyday world |

| Management Prescriptions from Other Programs |
|---|
| <u>Travel Management</u>: Limited to Designated Roads in all Alternatives (See Map 2-11 for Designated Routes)<br><br><u>Visual Resource Management (VRM)</u>: All 4 VRM Classes are managed for in the ERMA (see Map 2-23 for VRM Classes)<br><br><u>Oil and Gas Leasing</u>: A combination of open with standard stipulations, open with special stipulations, open with no surface occupancy and closed; varies by alternative (See Map 2-5 for Oil and Gas Leasing) |

BLM_0013077

**Labyrinth Special Recreation Management Area (Destination SRMA)**
**300,650 acres in Alternatives B and Proposed Plan**

| Description |
|---|
| Labyrinth SRMA includes the area between Labyrinth Canyon of the Green River, Highway 191, and the southwestern boundary of the field office. Scenic Byway 313 is within the SRMA. The SRMA has one developed campground and multiple designated campsites, multiple day use areas and numerous popular backcountry routes. Use includes river recreation, camping, hiking, scenic driving, mountain biking and backcountry driving. Use levels are moderate overall with some areas receiving heavy seasonal use. |

| Management Goals |
|---|
| For a variety of visitor benefits, provide opportunities for 1) quality river recreation experiences on Labyrinth Canyon; 2) quality camping experiences in one developed campground and other designated sites; 3) quality hiking experiences on- and off-trail; 4) quality scenic driving experiences on Highway 313; 5) quality on-route mountain biking and backcountry driving experiences on established routes throughout the SRMA. For specific recreation management prescriptions, see Chapter 2 of the RMP. |

| Setting |
|---|
| Maintain the scenic character of Labyrinth SRMA to allow visitors to enjoy an unconfined experience. Provide information and a management presence sufficient to protect these scenic values. |
| Physical: Middle – Front Country; Social: Middle – Front Country; Administrative: Front Country. |

| Targeted Outcomes | | |
|---|---|---|
| **Activity** | **Experience** | **Benefit** |
| River recreation | Enjoying an escape from crowds of people | A more outdoor-oriented lifestyle |
| Scenic Driving | Learning more about things here | Greater sense of adventure |
| Mountain Biking | Enjoying/going exploring on my/our own | Restored mind from unwanted stress |
| Backcountry Driving | Developing your skills and abilities | Improved skills for outdoor enjoyment |
| BASE jumping | Enjoying outdoor challenge | Improved skills |

| Management Prescriptions from Other Programs |
|---|
| Travel Management: Limited to Designated Roads in all Alternatives (See Map 2-11 for Designated Routes), |
| Visual Resource Management (VRM): Alternative B: VRM I, II, III. Proposed Plan: VRM II, III, IV (See Map 2-23 for VRM Classes) |
| Oil and Gas Leasing: Alternative B: Open to Leasing with Special Stipulations, No Surface Occupancy. Proposed Plan: Open with Standard Stipulations, No Surface Occupancy. (See Map 2-5 for Oil and Gas Leasing) |

BLM_0013078

**Lower Gray Canyon Special Recreation Management Area (Destination SRMA)
3,760 acres in Alternatives B and Proposed Plan**

| Description |
|---|
| Lower Gray Canyon SRMA is located along the east side of the Green River near the City of Green River. The SRMA has one developed campground, two day use areas, and hiking/equestrian trails. Use includes whitewater boating, camping, hiking and horseback riding. Use levels are currently moderate. |

| Management Goals |
|---|
| For a variety of visitor benefits, provide opportunities for 1) scenic river recreation opportunities on the Green River Daily; 2) quality camping experiences in one developed campground and other designated sites; 3) quality hiking and horseback riding experiences on existing trails. For specific recreation management prescriptions, see Chapter 2 of the RMP. |

| Setting |
|---|
| Maintain the scenic character of Lower Gray Canyon to allow visitors to enjoy an unconfined experience. Provide information and a management presence sufficient to protect these scenic values. |
| Physical: Middle Country; Social: Middle Country; Administrative: Front Country. |

| Targeted Outcomes | | |
|---|---|---|
| **Activity** | **Experience** | **Benefit** |
| Whitewater boating | Enjoying having easy access to natural landscapes | Improved outdoor recreation skills and increased local tourism revenue |
| Camping | Enjoying the closeness of family | Stronger ties with my family and friends |
| Hiking | Enjoying an escape from crowds of people | Restored mind from unwanted stress |
| Horseback riding | Learning more about things here | Improved appreciation of nature's splendor |

| Management Prescriptions From Other Programs |
|---|
| Travel Management: Limited to Designated Roads in all Alternatives (See Map 2-11 for Designated Routes) |
| Visual Resource Management (VRM): Alternatives B and Proposed Plan: VRM I and II. (See Map 2-23 for VRM Classes) |
| Oil and Gas Leasing: Alternatives B and Proposed Plan: No Surface Occupancy and Closed (predominantly Closed). (See Map 2-5 for Oil and Gas Leasing) |

BLM_0013079

**Sand Flats Special Recreation Management Area (Destination SRMA)**
**6,246 acres in Alternatives B, D and Proposed Plan**

| Description |
|---|
| Sand Flats SRMA is located two miles east of the city of Moab. The area has 9 campgrounds with 120 sites, the Slickrock Bike Trail, the Porcupine Rim Trail and two well known jeep routes, Hell's Revenge and Fins and Things. Recreation use averages 100,000 visitors per year. Use includes camping, mountain biking, four wheel driving (including ATV's and dirt bikes), and hiking. |

| Management Goals |
|---|
| For a variety of visitor benefits, 1) provide facilities for quality camping experiences; 2) provide the unique experience of biking the Slickrock Trail; 3) provide four wheel drive challenge routes; 4) provide opportunities for hiking. Continue the partnership between Grand County and the BLM. For specific recreation management prescriptions, see Chapter 2 of the RMP. |

| Setting |
|---|
| Maintain the scenic character of Sand Flats to allow visitors to enjoy an outdoor adventure experience. Provide information and a high degree of management presence to protect the scenic values and to allow for a large number of visitors.<br><br>Physical: Front Country; Social: Front Country; Administrative: Front Country. |

| Targeted Outcomes | | |
|---|---|---|
| **Activity** | **Experience** | **Benefit** |
| Mountain Biking | Enjoying a physical challenge | Improved skills for outdoor enjoyment and physical activity<br><br>Increased local tourism revenue |
| Motorized touring | Enjoying the great outdoors and testing one's skills | Greater sense of adventure<br><br>Increased local tourism revenue |
| Camping in Developed Sites | Enjoying time with family and friends in an outdoor setting | Greater freedom from urban living<br><br>Greater family bonding |

| Management Prescriptions from other Programs |
|---|
| Travel Management : Limited to Designated Roads in all Alternatives (See Map 2-11 for Designated Routes)<br><br>Visual Resource Management (VRM): All Alternatives: VRM II (see Map 2-23 for VRM Classes)<br><br>Oil and Gas Leasing: Alternatives B and Proposed Plan: No Surface Occupancy; Alternative D: Open to Leasing with Special Stipulations (See Map 2-5 for Oil and Gas Leasing) |

BLM_0013080

## South Moab Special Recreation Management Area (Destination SRMA)
## 63,999 acres in Alternatives B and Proposed Plan

| Description |
| --- |
| The South Moab Special Recreation Management Area is located south of Moab, with US 191 being an approximate bisection. It includes popular day use areas such as Ken's Lake, as well as portions of the Mill Creek Canyon WSA. Most of the area is easily accessible from Moab, and receives moderate to heavy recreation use, both motorized and non-motorized. Infrastructure ranges from developed campgrounds to directional signing only. |

| Management Goals |
| --- |
| For a variety of visitor benefits, provide opportunities for hiking, camping, motorized and mechanized touring. For specific recreation management prescriptions, see Chapter 2 of the RMP. |

| Setting |
| --- |
| Maintain the mainly front country character to allow visitors to enjoy hiking, camping and scenic touring activities. |
| Physical: Front country; Social: Front country: Administrative: Front country. |

| Targeted Outcomes | | |
| --- | --- | --- |
| **Activity** | **Experience** | **Benefit** |
| Hiking | Enjoying having easy access to natural landscapes; enjoying getting some needed physical exercise | A more outdoor-oriented lifestyle |
| Camping | Experiencing a greater sense of independence; enjoying the closeness of family | Improved outdoor knowledge and self-confidence |
| Motorized touring | Developing your skills and abilities; enjoying having easy access to natural landscapes | Enlarged sense of community dependency on public lands |
| Mechanized touring | Enjoying strenuous physical exercise; experiencing a greater sense of independence | Improved physical capacity to do my favorite recreation activities |

| Management Prescriptions from Other Programs |
| --- |
| Visual Resource Management: A combination of VRM I, II and III (See Map 2-23) |
| Travel Management: Limited to Designated Roads in all Alternatives (See Map 2-11 for map of designated roads) |
| Oil and Gas Leasing: A combination of Open, Open with Special Stipulations, Open with No Surface Occupancy Stipulation and Closed (WSA's) (See Map 2-5) |

BLM_0013081

**Two Rivers Special Recreation Management Area (Destination SRMA**
**29,838 acres in Alternatives B and Proposed Plan; 14,056 acres in Alternative D**

| Description |
| --- |
| Two Rivers SRMA is located along the Colorado River (from the Colorado/Utah state line to Dewey Bridge) and the Dolores River. The SRMA contains river sections very popular for scenic floating and/or whitewater boating, including the lower portion of the Ruby/Horsethief Canyon trip and Westwater Canyon. Use includes river running, camping, and hiking. Use levels are moderate to high. |

| Management Goals |
| --- |
| For a variety of visitor benefits, provide opportunities for 1) high quality river running opportunities on the Colorado and Dolores Rivers; 2) high quality camping experiences along the river corridors; 3) high quality hiking opportunities in proximity to the river. For specific recreation management prescriptions, see Chapter 2 of the RMP. |

| Setting |
| --- |
| Maintain the scenic character of Two Rivers SRMA to allow visitors to enjoy a backcountry experience. Provide information and a management presence sufficient to protect this type of experience.<br><br>Physical: Back Country; Social: Back Country – Middle Country; Administrative: Middle Country. |

| Targeted Outcomes | | |
| --- | --- | --- |
| **Activity** | **Experience** | **Benefit** |
| River Recreation | Savoring the total sensory experience of a natural landscape | Closer relationship with the natural world |
| Camping | Escaping everyday responsibilities for a while | A more outdoor-oriented lifestyle |
| Hiking | Enjoying an escape from crowds of people | Restored mind from unwanted stress |

| Management Prescriptions From Other Programs |
| --- |
| <u>Travel Management</u>: Limited to Designated Roads and Closed in all Alternatives (See Map 2-11 for Designated Routes)<br><br><u>Visual Resource Management (VRM)</u>: Alternatives B, D and Proposed Plan: VRM I and II. (See Map 2-23 for VRM Classes)<br><br><u>Oil and Gas Leasing</u>: Alternatives B, D and Proposed Plan: Open to Leasing with Special Stipulations, No Surface Occupancy and Closed. (See Map 2-5 for Oil and Gas Leasing). |

BLM_0013082

**Utah Rims Special Recreation Management Area (Community SRMA)**
**15,424 acres in Alternatives B and Proposed Plan**

| Description |
| --- |
| Utah Rims is located south of Interstate 70 adjacent to the Colorado/Utah border and near the Colorado River. The SRMA has one developed camping area, and a network of backcountry routes. Use includes trail-based motorcycle and mountain bike riding, camping and horseback riding. Use levels are currently low. |

| Management Goals |
| --- |
| For a variety of visitor benefits, provide opportunities for 1) quality scenic trail-based motorcycling and mountain biking experiences on the backcountry route system; 2) quality camping experiences in one developed camping area; 3) quality horseback riding experiences on existing routes and in non-roaded locations. For specific recreation management prescriptions, see Chapter 2 of the RMP. |

| Setting |
| --- |
| Maintain the scenic character and wide open spaces of Utah Rims to allow visitors to enjoy an uncrowded experience. Provide information and a management presence sufficient to protect these scenic values. |
| Physical: Middle Country; Social: Middle Country; Administrative: Middle Country. |

| Targeted Outcomes | | |
| --- | --- | --- |
| **Activity** | **Experience** | **Benefit** |
| Motorcycling | Enjoying being able to frequently participate in desired activities and settings | Increased desirability as a place to live or retire |
| Mountain biking | Enjoying strenuous physical exercise | Improved skills for outdoor enjoyment |
| Horseback riding | Developing your skills and abilities | Greater sense of adventure |
| Camping | Enjoying an escape from crowds of people | Restored mind from unwanted stress |

| Management Prescriptions From Other Programs |
| --- |
| Travel Management: Limited to Designated Roads in all Alternatives (See Map 2-11 for Designated Routes) |
| Visual Resource Management (VRM): Alternatives B and Proposed Plan: VRM II and III (predominantly VRM III). (See Map 2-23 for VRM Classes) |
| Oil and Gas Leasing: Alternatives B and Proposed Plan: Open to Leasing with Standard Stipulations and Open to Leasing with Special Stipulations. (See Map 2-5 for Oil and Gas Leasing) |

BLM_0013083

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0013084

# APPENDIX G.
## TRAVEL PLAN DEVELOPMENT

## G.1 INTRODUCTION

Travel management is the process of planning for and managing access and travel systems on the public lands. Comprehensive travel management planning should address all resource use aspects, such as recreational, traditional, casual, agricultural, commercial, and educational, and accompanying modes and conditions of travel on public lands, not just motorized or off-highway vehicle activities (BLM Land-use Planning Handbook 1601-1). This includes travel needs for all resource management programs administered by the BLM, including but not limited to the mineral industry, livestock grazing, and recreation.

Though historically focused on motor vehicle use, comprehensive travel management also encompasses all forms of transportation including travel by mechanized vehicles such as bicycles, as well as the numerous forms of motorized vehicles from two-wheeled (motorcycles) and four-wheeled such as all-terrain vehicles (ATVs) to cars and trucks.

The term off-road vehicle (ORV) is an outdated term that has the same meaning as off-highway vehicle (OHV), which is currently in use. The term off-highway vehicle (OHV) refers to the latter group noted above – "any motorized vehicle capable of, or designated for, travel on or immediately over land, water, or other natural terrain," as defined in the National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands, finalized by the Bureau of Land Management (BLM) in January 2001. The intent of the National Strategy was to update and revitalize management of off-highway motor vehicle use on BLM administered lands. The national strategy provides guidance and recommendations to accomplish that purpose.

The process of development and content of the draft Moab travel plan are described in this document.

## G.2 HOW TO READ/USE THIS DOCUMENT

This document addresses the process by which the BLM Moab Field Office Interdisciplinary (ID) Team and its cooperating agencies have developed the Draft Environmental Impact Statement (DEIS)/Resource Management Plan (RMP) alternatives for motorized and mechanized use in the Moab Field Office. This document takes the reader through the process of travel planning within the Moab Field Office and addresses the following issues and concerns.

- The Land-use Planning decisions of the travel plan define the areas within the field office that are determined to be Open, Limited, or Closed, and the number of miles of designated routes under the Limited category.
- The Implementation decisions of the travel plan include the designation of routes within areas delineated as Limited to Designated Roads and Trails. Other implementation actions include signage, maps, public information, kiosks, monitoring, and working with partners. Enforcement of OHV designations should be clear once routes are signed. An implementation plan will be prepared at a later time with details regarding these actions.
- Issues identified during public scoping for this travel plan process are described in Section 6.

- The planning criteria, data collection, and alternatives development by which the BLM and its cooperating agencies arrived at the routes designated for the alternatives in the DEIS/RMP are outlined in Sections 7, 8 and 9. Lists of routes for non-motorized, equestrian/stock, and foot travel are also provided in Secti 9.
- Future changes to route designations are addressed in Section 10.
- The cooperating agencies involved with developing the travel plan are identified in Section 11. Other coordination is also included.
- The analysis of impacts for the travel plan will be completed within the DEIS/RMP.
- Definitions commonly used in addressing off-road vehicle use are found in Appendix A. Route by route information can be found in the GIS records accompanying the plan. These are available upon request. Maps 2-11-A through D display the designated routes by alternative.

## G.3 SUMMARY

<u>Land-use Planning Decisions</u> – The Federal Regulations at 43 CFR Part 8340 and Executive Order 12608 require BLM to designate all public lands as Open, Limited, or Closed for OHV use. These designations are made in the Resource Management Plans (RMPs) or in plan amendments. Additionally, the criteria for route designation are established in the RMP.

Table 1 lists the lands within the Open, Limited, and Closed OHV categories within the Moab Field Office as determined by the ID Team. These acreages are subject to change depending on any changes made during the on-going alternative evaluation process. The acreages exclude BLM lands within the MFO boundary, but managed by the Vernal FO.

**Table 1. OHV Categories (acreage) by Alternative**

| Category | Alternative A[1] | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|
| Closed | 29,654 | 358,126 | 349,843 | 29,654 |
| Limited to Existing | 1,065,683 | 0 | 0 | 0 |
| Limited to Designated | 47,787 | 1,463,248 | 1,469,665 | 1,788,372 |
| Open | 678,250 | 0 | 1,866 | 3,348 |
| Totals[2] | 1,821,374 | 1,821,374 | 1,821,374 | 1,821,374 |
| [1] No Action takes as baseline the 1985 Grand RMP and subsequent Federal Register actions. [2]Excludes lands in the Moab Field Office managed by the BLM Vernal Field Office. | | | | |

<u>Implementation Decisions</u> – The designation of routes within the areas specified as "Limited to Designated" is an implementation decision. Designation involves the selection and identification of roads and trails to be included in a travel plan system.

Table 2 and Table 3 provide a summary of the miles of designated routes (full sized) by alternative for Grand County and San Juan County, respectively.

BLM_0013086

**Table 2. Designated Routes (miles) by Alternative for Grand County**

| Road Type | Grand Co Inventory (all lands) | Grand Co Inventory (BLM lands) | Grand Co Proposed Travel Plan[1] | Grand Co Proposed Travel Plan (BLM lands) | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|---|---|
| "A" roads | 280 | 184 | 280 | 184 | 184 | 184 | 184 |
| "B" roads | 1441 | 995 | 1441 | 995 | 995 | 995 | 995 |
| "D" roads/other[2] | 5544 | 4171 | 2940 | 1898 | 1417 | 1703 | 1831 |
| Total miles | 7265 | 5350 | 4661 | 3077 | 2596 | 2882 | 3010 |

[1] Includes routes recommended by Grand County for designation as motorized as well as a number of "undetermined" routes. Some of these are outside of the County 's jurisdiction (e.g. tribal, USFS), or left to the BLM 's discretion.
[2] "Other" consists primarily of old railroad grades and mapped pack trails totaling 86.4 miles.

**Table 3. Designated Routes (miles) by Alternative for San Juan County**

| Road Type | San Juan Co Travel Plan | San Juan Co Travel Plan/BLM | Alternative B | PROPOSED PLAN | Alternative D |
|---|---|---|---|---|---|
| "A" roads | 51 | 20 | 20 | 20 | 20 |
| "B" roads | 343 | 171 | 171 | 171 | 171 |
| "D" roads | 1246 | 862 | 745 | 824 | 858 |
| Total miles | 1640 | 1053 | 936 | 1015 | 1049 |

Table 4 summarizes the miles of designated routes (motorcycle) on BLM lands which are entirely within Grand County. This Table also includes Grand County roads which are part of the motorcycle trail system.

**Table 4. Designated Motorcycle Routes (miles) by Alternative.**

| Route | Inventory | Alternative B | Proposed Plan | Alternative D |
|---|---|---|---|---|
| On existing Grand Co roads | 142 | 122 | 163 | 151 |
| Single-track | 129 | 0 | 150 | 196 |
| Total | 271 | 122 | 313 | 347 |

Management common to all action alternatives include the following, as developed by the ID Team in preliminary alternative development meetings:

- In areas limited to designated routes, only designated routes are open to motorized use.
- Off-highway vehicle use includes *motorized* (e.g., autos, trucks, ATVs, motorcycles, dirt bikes, 4x4s); and *mechanized* (e.g., bicycles).
- There will be no cross-country travel for game retrieval or antler gathering in areas designated as limited or closed. This policy is consistent with the policies of the National Forest Service in Utah.

BLM_0013087

- No cross-country travel associated with dispersed camping is allowed.
- Any fire, military, emergency or law enforcement vehicle when used for emergency purposes is exempted from OHV decisions.
- Wilderness Study Areas are to be either designated as limited or closed to OHV use, and must be managed and monitored to comply with the interim management policy non-impairment standard.
- As required in 43 CFR Sec. 8342.3 (Designation changes): "The authorized officer shall monitor effects of the use of off-road vehicles. On the basis of information so obtained, and whenever the authorized officer deems it necessary to carry out the objectives of this part, designations may be amended, revised, revoked, or other actions taken pursuant to the regulations in this part."

## G.4 AUTHORITY AND GUIDANCE

- Federal Land Policy and Management Act (FLPMA), 43 U.S.C 1701 – Land-use plans and revision should be based on principles of multiple use and sustained yield.
- National Environmental Policy Act, (NEPA), 42 U.S.C. 4321.
- Executive Order No. 11644, Feb 8, 1972 - This order established criteria by which federal agencies were to develop regulations for the management of OHVs on lands under their management. Agencies are to "monitor the effects" of OHV use on their public lands and, "on the basis of the information gathered, they shall from time to time amend or rescind designation of areas for OHV use "as necessary to further" its policy.
- Executive Order No. 11989, May 25, 1977 – This order modified ED 11644 – This order authorized agencies to adopt a policy that particular lands can be considered closed to OHVs once it is determined that OHV use "will cause or is causing considerable adverse effects" to particular resources.
- Executive Order No. 12898, 1994 – Indicates that Federal planning efforts should give consideration to how plans will affect local economies.
- 43 C.F.R. Part 8340 – the OHV Regulations – Establish criteria for designating lands as open, limited, or closed to the use of OHVs.
- Archeological Resources Protection Act (ARPA), 1979, as amended. And other Cultural protection laws and regulations.
- Taylor Grazing Act, 43 U.S.C. 315a.
- Endangered Species Act, 16 U.S.C. 1531 – Federal agencies shall give consideration to ensure agency actions do not jeopardize the continued existence of any endangered species.
- Land and Water Conservation Fund Act, 16 U.S.C. 460 1-6a.
- National Historic Preservation Act, as amended, 1966.
- Wild and Scenic Rivers Act, 16 U.S.C. 1281c.
- National Trails System Act, 16 U.S.C. 1241.
- U.S. Department of the Interior, BLM, Interim Management Policy for Lands Under Wilderness Review, H-8559-1.
- Resource Management Plan, BLM San Juan Resource Area, March 1991.
- IB 99-181, OHV Use in Wilderness Study Areas (WSAs).

BLM_0013088

- IM UT 2001-090, Implementation of Utah Recreation Guidelines.
- IM [WO] No. 2004 – Clarification of Cultural Resource Considerations for Off-Highway (OHV) Route Designation and Travel Management.
- IM 2004-005, Clarification of OHV Designations and Travel Management in the BLM Land-use Planning Process.
- IM UT 2004-008, Clarification of OHV Designations and Travel Management in the BLM Land-use Planning Process.
- IM UT 2004-061, Designating Off Highway Vehicle Routes in the Land-use Planning Process.
- OHV – National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands, USDI, BLM, January 2001.
- Standards for Public Land Health and Guidelines for Recreation Management for BLM Lands in Utah, 2001.

## G.5 TRAVEL PLAN DESIGNATION PROCESS

A goal of the BLM Moab Field Office planning process is to develop, with its cooperators, a travel plan that provides access to public lands. The goals and objectives of this travel plan apply to all areas of travel management including access to resources, appropriate recreation opportunities that at the same time protect public land resources, ensuring public safety, minimizing conflicts among the various public land-uses, and providing for support of the local economy.

### G.5.1 BACKGROUND

Areas designated as "open" are open to cross-country motorized travel. Areas designated as "closed" are entirely closed to motorized travel. Areas designated as "limited" restrict motorized travel to either existing or designated routes.

The 1985 Grand Resource Area RMP included designations for Open, Closed, and Limited OHV areas with limited applying to both existing and designated roads and trails. Since 1992, the Moab Field Office has instituted several revisions to the original RMP (through plan amendments) as well as Federal Register notices regarding OHV use. These changes have resulted in changes from Open to Limited to Existing Roads and Trails, and in some cases from Open to Limited to Designated Routes. These changes attempted to reduce damage resulting from unrestricted cross-country travel.

In the current RMP process, state and national guidance for the OHV Limited category designation has changed. Designating Open, Closed, and Limited areas for OHV use continues to be mandated, but under the Limited category only the "Limited to Designated Roads and Trails" sub-category is recommended. The designation of the sub-category "Existing Roads and Trails" is no longer a recommended option. Eliminating the "Existing Roads and Trails" sub-category prevents confusion and enforcement problems concerning new unauthorized routes being created and then used by the public because they are then "existing". By policy (IM No. 2004-005) BLM discourages of the use of the "Limited to Existing" category.

BLM_0013089

## G.5.2 INTERDISCIPLINARY (ID) TEAM PROCESS

Guidance for developing a Travel Plan includes utilizing the ID Team approach (8342.21A and 43 CFR 1601.1-3). The individuals who participated in the completion of the plan are listed in Table 5.

**Table 5: Moab FO Interdisciplinary (ID) Team Members and Cooperators**

| Name | Resource /Organization |
|------|------------------------|
| Maggie Wyatt | Field Office Manager |
| Eric Jones | Acting Associate Field Office Manager, Petroleum Engineer |
| Lynn Jackson | Acting Associate Field Office Manager, RA/Science and Outreach |
| Brent Northrup | RMP Planning Coordinator, RA/Lands and Minerals |
| Russ von Koch | Branch Chief, Recreation |
| Bill Stevens | Travel Plan Lead, Recreation Planner |
| Doug Wight | GIS Coordinator |
| Jean Carson | GIS Specialist |
| Rob Sweeten | Landscape Architect/VRM |
| Ann Marie Aubry | Hydrologist |
| Stephanie Ellingham | Natural Resources Specialist |
| Donna Jordan | Resource Clerk |
| Pam Riddle | Wildlife Biologist |
| Daryl Trotter | Environmental Protection Specialist/NEPA Coordinator |
| Donna Turnipseed | Cultural, Paleontology |
| Mary von Koch | Realty Specialist |
| Chad Niehaus | Recreation Planner |
| Katie Stevens | Recreation Planner |
| Jon Sering | BLM Law Enforcement Ranger |
| James Ward | BLM Law Enforcement Ranger |
| Alex VanHemert | Recreation Planner |
| Jerry McNeely | Chair, Grand County Council |
| Dave Vaughn | Grand County Assistant Road Supervisor/GIS Specialist |
| Evan Lowry | San Juan County, Planner |
| Ben Nielson | San Juan County, Assistant Planner |

Between October, 2004 and September, 2005, the ID Team held 21 meetings specifically concerning the travel plan [meeting minutes are in the RMP Administrative Record]. In addition, BLM staff met with representatives of the National Park Service, Utah State Parks, and Utah School and Institutional Trust Lands Administration, to determine what concerns they might have with the travel planning process. BLM staff also contacted adjacent BLM offices to ensure that Moab's travel planning did not conflict with theirs. BLM also used the Manti-LaSal National Forest route designation map to ensure proper route continuity. Finally, Moab BLM staff was in constant contact with the Monticello Field Office, to provide as much consistency as possible in

BLM_0013090

travel planning. This was especially important for routes in San Juan County, as this county lies within both BLM offices.

## G.6 IDENTIFICATION OF ISSUES

OHV/Travel issues were identified by BLM resource specialists in the pre-plan, through the Public Scoping process for the Monticello/Moab Field Offices RMP, by input from the public in response to Planning Bulletin #3 -- Request for Route Data, and through proposals for travel routes presented to BLM from organizations.

BLM staff identified the following issues concerning travel in the field office.

- Route designations in the current RMP are outdated and do not address the current level of use.
- OHV designations need to be reviewed and revised as necessary to protect other resources.
- Maps need to be developed to identify uses of competing resources, and to show the public where OHV use is allowed.
- Implementing designated routes on-the-ground through signing and maps.
- OHV designations must be consistent with Wilderness Study Areas (WSAs).
- Dependence of local industry on public lands (including the recreation industry).
- Increased recreation use and demand.
- Conflicts between OHV use and other resources including riparian, wildlife, sensitive soils, visual, vegetation, and cultural. Conflicts also exist between OHV use and resource uses such as grazing and oil and gas activities.
- Conflicts between user groups such as non-motorized and motorized users, between river runners and OHV users, between commercial and private users, and OHV use associated with unregulated camping.

Comments received from public scoping were placed in one of three categories:

- Issues to be addressed in the resource management plan (RMP). Specific to this travel plan, these are the OHV/Travel issues considered in the Moab Field Office;
- Issues that can be addressed through policy or administrative actions; or
- Issues beyond the scope of the plan (e.g., RS 2477 claims, new wilderness proposals).

Comments from the six public scoping meetings included 440 comments on recreation and OHV/Travel or 35% of the total 1,250 comments. Comments received in letters concerning the Moab Field Office OHV and Travel program totaled 4,134 or 39% of the total comments, with the remaining 61% of the comments addressing the 14 remaining resource or planning categories (Moab and Monticello RMP Revisions, Scoping Summary, July 2004). Of all the written comments received regarding the Moab RMP, 92.9% commented on OHV use to one degree or another.

Input from Public Scoping both through the public meetings (June 4, 2003 through December 31, 2004), and through input responses to Planning Bulletin # 3, identified the following issues, many of which are similar to those noted above:

- How can increased recreation use, especially motorized vehicle use, be managed while protecting natural resource values?
- Which areas should be designated as open, limited or closed to OHV use, and which routes should be designated within the limited category?
- What types of recreation travel should be available on designated routes and under what limitations?
- Where could adaptive management be applied in response to unacceptable resource impacts?
- How should recreational uses be managed to limit conflicts with other recreational users?
- How should camping, hunting access, human waste, fires, and wood collection be managed [in terms of OHVs]?
- How should conflicts with other resource uses be reduced?
- What management actions should be implemented to mitigate damage caused by recreational uses, including vehicles, on other resources and sensitive areas, especially riparian areas?
- How should recreation in the planning areas be managed to ensure public health and safety?

## G.7 DEVELOPING PLANNING CRITERIA

Considerations of both social and physical elements help define the criteria for a travel plan. The social aspects include public demands, historical uses, existing rights-of-way, permitted uses, public access, resource development, law enforcement and safety, conflicts between existing or potential uses, recreation opportunities, local uses, cultural and economic issues. Physical aspects include the terrain, soils, water, vegetation, and watersheds, connectedness of routes, special designations such as WSAs, demands for specific types of vehicle use, and manageability considerations.

General planning criteria for the Resource Management Plan (RMP) process includes:

- Decisions - All decisions made in the RMP will only apply to public lands managed by the BLM.
- Existing Rights – The plan recognizes current, valid existing rights.

Specific to the travel plan, the criteria include:

- National OHV Policy - Decisions regarding OHV travel will be consistent with the BLM's National OHV Strategy.
- R.S. 2477 - No regulations to either assert or recognize R.S. 2477 rights-of-way currently exist. While R.S. 2477 claims have been asserted by Grand and San Juan Counties, it is beyond the scope of this document to recognize or reject R.S. 2477 assertions, and this issue is not addressed further in this Travel Plan. Nothing in this document is intended to provide evidence bearing on or addressing the validity of any R.S. 2477 assertions. At such time as a decision is made of R.S. 2477 assertions, BLM will adjust travel routes accordingly, where necessary.

BLM_0013092

- Access to Utah School and Institutional Trust Lands Administration (SITLA) State Sections - BLM is required to provide access to State lands, as requested.

## G.7.1 OHV DESIGNATION CRITERIA

The guidance found at 8342.1 lists the following criteria that must be met by BLM in the travel planning process:

*Protection Requirements* – the following resource protection criteria must be met:

1. Cultural and Natural Resources – Designations must minimize damage to all cultural and natural resources. Examples of these include, but are not limited to, the following: historical and archeological sites, soil, water, air, vegetation, and scenic values.
2. Wildlife – Designations must minimize harassment of wildlife and/or significant disruption of wildlife habitat.
3. Endangered Species – Special attention must be given to protect endangered or threatened species and their habitat.
4. Wilderness – Designations must not impair the wilderness suitability of lands under consideration for inclusion in the wilderness system.

*User Access Requirements* – the following criteria are used to assure adequate consideration for the requirements for each resource activity (i.e., minerals, range, forestry, recreation, etc.) as they relate to access needs:

1. Operational needs – designations must consider user access requirements for inventory, exploration, use supervision, maintenance, development, and extraction of public land resources as well as maintenance of facilities on public lands.
2. State and Private Land – designations must consider the access and use needs for areas and routes located within intermingled State and private land.

*Public Safety* – The designation of areas and routes for OHV use must be completed so as to promote public safety, recognizing that challenge and risk are desirable factors for some uses.

1. Hazards – Designations must minimize or eliminate OHV use in areas of extreme natural or man-made hazards unless such hazards can be mitigated.
2. Safety Factors – Designations must separate uses in situations where public safety factors present unacceptable risks (e.g., rifle ranges, children's play areas, mines, etc.)

*Conflict Resolution* – The designation of areas and routes for OHV use must assure full consideration of the multiple-use values of public lands consistent with the following criteria:

1. Balanced Approach – Designations must provide as wide and as balanced an approach to public land access as possible to protect public land resource values while at the same time meeting user access needs.
2. Other Uses – Designations must minimize conflicts between OHV use and other existing or proposed uses of the public lands.
3. Compatibility – Designations must ensure the compatibility of OHV uses with existing conditions in populated and other sensitive areas by taking into account noise, air pollution, and other factors of the human environment.

BLM_0013093

## G.7.2 MOAB FIELD OFFICE CRITERIA FOR TRAVEL PLAN

Criteria for travel planning include Standards for Rangeland Health; establishing purpose and need (P/N) for routes per above mentioned guidance; defining conflicts between resources; defining conflicts among users; evaluation and consideration of routes in terms of WSAs; administration and emergency uses, and access to private and SITLA lands.

Standards for Rangeland Health of BLM land in Utah relate to all uses of public land, including recreation, and describe natural resource conditions that are needed to sustain public land health. The Standards encompass upland soils; riparian systems; plant and animal communities; special, threatened, and endangered species; and water quality. The Rangeland Health Standards provide guidance for management of resources.

### G.7.2.1 PURPOSE AND NEED

The methodology used during the route designation ID Team meetings to develop a well-designed travel network was a mix between guidance received from the State Office and guidance from the Washington Office:

- IM UT 2004-061, from the UTSO, states that Field Offices should begin the route designation process with existing inventory and data, and then determine purpose and need for the existing routes.
- IM 2004-005, from the WO, recommends choosing individual roads and trails for designation, "rather than using inherited roads and trails", because most existing roads "were created by use over time, rather than planned and constructed for specific activities and needs".

The purpose and need for travel routes are examined in terms of the existing situation on-the-ground in terms of why the route is currently utilized. The Moab Field Office considered the following criteria for routes in the travel plan:

- Desired future conditions
  - Potential for adverse or positive economic impacts
  - Resource and use conflicts
  - Standards for Public Land Health and Guidelines for Recreation
  - Management for BLM Lands in Utah
- Public health and safety
  - Abandoned Mine Lands
  - Hazardous Materials
- Access
  - Routes identified in guide books, including popular routes used in the Easter Jeep Safari event
  - Scenic overlooks
  - Access to private and SITLA lands
  - Elimination of route redundancy
  - Special Recreation Management Areas

BLM_0013094

- o   Special designation prescriptions including Areas of Critical Environmental Concern (ACECs), Wilderness Study Areas (WSAs), and Wild and Scenic Rivers (WSRs)
- Cultural and paleontological resources
- Fire considerations
- Mineral resources/energy development
- Rangeland standards
- Recreation opportunities and experiences
- Watershed resources
  - o   Erosive soils
  - o   Saline soils
  - o   Municipal watersheds
- Vegetative resources including relict vegetation
- Wildlife resources
  - o   Special Status Species
  - o   Crucial winter habitats
  - o   Rutting, calving, kidding, lambing, and fawning habitat
  - o   Raptor nesting locations
- Woodlands resources
- Visual resources

### G.7.2.2 MITIGATIONS

Mitigations that can be utilized to address conflicts could include:

1. Non-designation;
2. The season and timing of use;
3. The types of vehicle use, motorized and non-motorized;
4. Re-routing of segments; and
5. Other methods of travel.

### G.7.2.3 ROUTE NUMBERS

Grand County has unique identifiers for each of the route segments in its inventory, with segments usually defined between intersections. San Juan County also has route numbers for each road in its inventory, although these numbers tend to correspond to an entire route, rather than a route segment. The Moab Field Office uses the same route numbers as the counties in the travel plan analysis.

In collaboration with the Manti-LaSal National Forest, which has its own numbering system, BLM and San Juan County have suggested that the BLM provide its joint numbering system with the county as an adjunct to that of the Forest for signing routes on-the-ground. It is possible that routes on the National Forest will bear two different numbered signs, one for the forest and one denoting the route number of the county route on a separate post. These two systems will be incorporated into the implementation plan in mapping and written public information.

BLM_0013095

### G.7.2.4 ROUTE DESIGNATIONS IN WILDERNESS STUDY AREAS (WSAs)

Information Bulletin No. 99-181 (BLM) directs BLM to comply with the wilderness 'non-impairment' mandate (FLPMA, Section 603(c)). BLM must monitor and regulate the activities of off-highway vehicles in the Wilderness Study Areas to assure that their use does not compromise these areas by impairing their suitability for designation as wilderness.

The BLM's Off Road Vehicle Regulations (43 CFR 8342.1) require that BLM establish off-road vehicle designations of areas and routes that meet the non-impairment mandate. It is the BLM's policy that cross-country vehicle use in the WSAs does cause the impairment of wilderness suitability. Thus, the BLM should establish off-road vehicle designations in WSAs that limit vehicular access to boundary roads, or "ways" existing inside a WSA that were identified during the inventory phase of the wilderness review.

### G.7.2.5 ADMINISTRATIVE ACCESS AND USE

Routes considered for Administrative Use Only were discussed by the ID Team. These administrative categories could include routes to stock ponds and other range improvements, guzzlers, and BLM facilities. The Moab Field Office reserves the right to allow travel on these routes to permittees, BLM employees, or whomever it deems appropriate on a case-by-case basis.

### G.7.2.6 EMERGENCY USES

By regulation, any fire, military, emergency or law enforcement vehicle when used for emergency purposes is exempted from OHV decisions. Emergency uses in WSAs are covered under the IMP, Section I.B.11 and 12.

### G.7.2.7 EMERGENCY LIMITATION OR CLOSURE

Whenever the authorized officer determines that OHV use will cause or is causing considerable adverse effects on resources (i.e., soil, vegetation, wildlife, wildlife habitat, cultural, historic, scenic, recreation, or other resources), the area must be immediately closed to the type of use causing the adverse effects (43 CFR 8341.2). Such limitation or closures are not OHV designations.

## G.8 MOAB FIELD OFFICE TRAVEL PLAN -DATA COLLECTION

### *G.8.1 INTRODUCTION*

As part of the BLM's RMP process, a travel plan has been prepared for the Moab Field Office. This process includes preparing a range of alternatives for inclusion in the Draft Environmental Impact Statement (DEIS). The BLM will provide a range of alternatives as to which areas of the Field Office will be *open* to OHV travel, which areas will be *closed* to OHV travel, and which areas will be *limited* to designated routes. Within the limited areas, BLM will provide a range of alternatives by varying miles of designated routes. An initial step was to verify the road maps submitted to the BLM by Grand and San Juan Counties (and also routes submitted by private parties, discussed later). The maps and associated GIS data encompass tens of thousands of road segments in an area covering more than 1.8 million acres. This makes an on the ground

BLM_0013096

verification of each road segment impractical; fortunately, methods exist which can greatly reduce the road verification workload and still achieve satisfactory results.

For road verification in Grand County, BLM relied on statistical sampling and aerial photography wherever possible for road verification. The purpose of the study is not to draw conclusions as to the condition, extent of use or function of these road segments, but simply to verify that they exist. Details of the study are described below.

For road verification in San Juan County, BLM replicated the procedures described above for Grand County. In addition, an on the ground verification of all road segments within a limited area was also undertaken. This latter approach simply provided a different mechanism for accomplishing the same overall goal. Details of both approaches are described below.

## G.8.2 GRAND COUNTY ROAD VERIFICATION

Verification of Grand County road data encompassed the following steps:

1. Grand County provided the BLM with GIS data (as of May 8, 2003) of all County-documented road segments within Grand County. The data includes not only roads on BLM, but also private roads, National Park Service Roads, and some road data in those parts of San Juan County in close proximity to Grand County. BLM used ArcView 3.3 GIS software to export to MS Excel only those road segments identified as being in Grand County and being part of the "D" road system (maintained "A" and "B" roads were not part of the road verification analysis). This process resulted in a selection of 21,285 road segments. Grand County submitted additional data (as of November 12, 2003), resulting in an additional 1167 segments which consisted of 1082 "D" roads as well as a few private roads. These additional segments totaled 787 miles.

2. BLM used commonly available statistics software[1] to determine how many road segments would need verification in order to establish at a 95% confidence level that the Grand County road data was accurate. This step produced a sample size of 377 segments for the May 2003 data, and 208 segments for the additional November 2003 data.

3. The above step assumes that the segments selected are chosen randomly. To accomplish this, BLM assigned (using MS Excel) a unique random number to each of the 21,285 segments identified in step 1. These segments were then sorted in random number order, with the first 377 segments brought forward for verification. A similar process was applied to the November 2003 data.

4. BLM next used ArcView 3.3 to display the road segments chosen in step 3, but now overlaid with digital aerial photographs taken in 2001-2002. In most cases, the road segment in question was easily recognized on the digitized aerial photo. In a few cases, the photo resolution was insufficient for positive verification. In those cases, BLM examined the original hard copy of the photo. If the segment could not be verified in this manner, BLM undertook a field trip to conduct on the ground verification.

Using the above steps, BLM was able to positively verify the existence of 376 of the 377 (or 99.7%) May 2003 segment sample. The one segment not verifiable by aerial photograph analysis was visited by BLM personnel, but could not be found (see map and photos in the RMP administrative record). The segment in question lies on the edge of the White Wash Sand Dunes,

---

[1] A good website for this is www.pearsonncs.com/research-notes/sample-calc.htm

BLM_0013097

an area characterized by blowing and drifting sand, adding to the difficulty of finding routes on the ground. Since the segments examined were a true random sample of the population of interest, BLM can be at least 95% confident that the May 2003 data provided by Grand County is 99.7% accurate.

The sample derived from the additional November 2003 data, in general, provided more of a verification challenge. Most of these routes were very faint in aerial photographs; nonetheless, all but three were identifiable in this manner. BLM undertook field verification of the remaining three segments. Combining the results of the two samples, and from aerial photography alone, BLM was thus able to verify 581 of 585 segments, or 99.3%.

In July, 2004, Grand County provided BLM, as part of RMP scoping, a travel plan for the County, which divided their original inventory into routes recommended for motorized use, routes preferred for such use, routes recommended for non-motorized use, and undetermined (mainly roads in Moab City and San Juan County, over which Grand County lacks jurisdiction). The net result of this plan was to recommend 2273 miles of the original inventory (on BLM) for non-motorized use. Table 6 summarizes the Grand County road inventory and its proposed travel plan data, both in total miles within Grand County and on BLM lands within Grand County:

**Table 6. Road Inventory and Proposed Travel Plan provided by Grand County (miles)**

| Road Type | Grand Co Inventory (all lands) | Grand Co Inventory (BLM lands) | Grand Co Proposed Travel Plan[1] (all lands) | Grand Co Proposed Travel Plan (BLM lands) |
|---|---|---|---|---|
| "A" roads | 280 | 184 | 280 | 184 |
| "B" roads | 1441 | 995 | 1441 | 995 |
| "D" roads/other[2] | 5544 | 4171 | 2940 | 1898 |
| Total miles | 7265 | 5350 | 4661 | 3077 |

[1] Includes routes recommended by Grand County for designation as open to motorized, as well as a number of "undetermined" routes. Some of these are outside Grand County 's jurisdiction (e.g., tribal, USFS), or left to the BLM 's "discretion".

[2] "other" consists primarily of old railroad grade and mapped pack trails, totaling 86.4 miles

Trail Mix, an entity established by Grand County, submitted data to BLM on December 15, 2004. Trail Mix represents various groups of generally non-motorized trail users (hikers, mountain bikers, equestrians) from Grand County, with some input as well from motorcycle users. Trail Mix's proposal, summarized in Table 7, pertains to designation of various routes for specific uses (the last two categories contain recommendations which conflicted with the Grand County Travel Plan, discussed earlier).

**Table 7. Trail Mix Route Proposal**

| Route | Miles (BLM) |
|---|---|
| Proposed mechanized (both new single-track and existing, unmapped routes) | 22.3 |
| Proposed motorcycle | 4.1 |
| Proposed conversion of motorized to mechanized | 15.9 |
| Proposed conversion of motorized to non-mechanized | 1.36 |

BLM_0013098

### G.8.3 SAN JUAN COUNTY ROAD VERIFICATION

As discussed above, Grand County first presented BLM with an *inventory* of all routes mapped by the County. Grand County followed this with a travel *plan*, comprising far fewer routes than had been inventoried. In contrast, San Juan County did its inventory and travel plan simultaneously while in the field. This was accomplished, basically, by noticing that a route in question was receiving regular use, thus establishing that it had a purpose and need. Routes receiving no obvious use were seen, generally, as lacking purpose and need. Unlike Grand County, San Juan County did not inventory numerous routes visible on the ground.

The verification process for San Juan County (within the Moab Field Office boundary) consisted of two distinct step. For the first step, BLM undertook an on the ground verification of all routes in the County's database within a limited geographical area. BLM undertook this approach because of the availability of manpower in the area of interest, and also to compare and contrast the results from the two verification approaches. The area chosen for analysis was the Canyon Rims Recreation Area, and encompasses all San Juan road data west of Hatch Wash to the Moab Field Office boundary. The current on-site verification excluded those road segments already verified as part of the 1999 BLM Wilderness Inventory (located primarily near the western rim of Hatch Wash).

BLM personnel used hard copies of maps depicting San Juan County road data to locate and photograph each route so depicted. This process produced 322 Class D road segments[2] to verify, of which 317 were positively verified on the ground. Virtually all of the routes on the west rim of Hatch Wash had been documented in conjunction with the 1999 BLM Utah Wilderness Inventory. Field personnel were able to verify all but five of the remaining routes in late summer, 2003. As part of the 2003 process, BLM personnel prepared detailed logs of each road verified, accompanied by 215 digital photographs. The remaining 5 segments (inadvertently missed by field personnel) were easily identified from digital aerial photographs, using ArcView 3.3 GIS software.

The roads selected for verification in the process described above are not a random sample of all San Juan County road data within the boundaries of the Moab Field Office. To complete the road verification process, BLM performed a statistical analysis similar to that done for Grand County:

1. Using ArcView 3.3 GIS software and road data provided by San Juan County, BLM personnel segregated all "D" roads within the Moab Field Office boundary. This process produces 1576 road segments.
2. Using the same statistics software outlined earlier, BLM was able to determine that a random sample of 309 road segments would provide a 95% confidence level.
3. Using an ArcView extension, a random sample of 309 road segments was drawn from the original 1576 segment population.
4. BLM personnel used a variety of techniques to verify the existence of the sample segments, including on-site verification and use of digitized aerial photographs from 2001. Of the 309 segments sampled, 40 were verified using the data from step 1; nine were verified using data from the 1999 Utah Wilderness Inventory; and 259 were verified from digitized aerial photographs in GIS.

---

[2] Road segments ranged from 2.2 to 2733.1 meters in length, with typically many smaller segments comprising one "road". Thus, the number of "roads" which the typical observer might count is greater than the sum of the segments comprising these roads.

BLM_0013099

In March, 2005, BLM received information on 54 additional segments in the Moab Field Office
from San Juan County. These routes totaled 50.8 miles, and were all verified using aerial
photographs in GIS. As was the case with the additional data provided by Grand County, the data
provided by San Juan County was generally fainter than their original data, but still definitely in
existence.

### G.8.4 ROAD DATA RECEIVED FROM PRIVATE SOURCES

On December 29, 2003, BLM received a communication from Ber Knight to the effect that he
had GPS data on routes in San Juan County within the Moab Field Office that were not included
in the San Juan County database. No information was provided on purpose and need for these
routes, but simply on their existence. BLM has most (perhaps all) of this data in GIS. BLM
initially attempted to verify this data with the same sampling techniques outlined above. It
quickly became apparent that this approach would not be viable for this data, since a relatively
large number of route segments could not be found. If any of these routes were to become part of
the MFO transportation plan, it would be necessary to map and verify all of the new data.

To verify the Knight data, BLM started with the ArcView data in GIS. This data was then
segregated to include only those routes that met the following criteria:

1. The route had to be in San Juan County, within the boundaries of the Moab Field Office, and
   at least a portion of it on public lands.
2. All routes lying entirely within the Canyon Rims Recreation Area (CRRA) were initially
   excluded. This is because San Juan County and BLM recently had reached agreement on a
   travel route designation plan for this area.

This process produced a population of 322 distinct route segments for verification. The segments
had a mean length of 694 feet, with a range of less than 3 to more than 3700 feet. The
verification process itself posed significantly greater challenges than had been posed for the
Grand and San Juan County databases. Much of the Knight data had been gathered in an era
when GPS technology was less advanced than today. This resulted in many route segments being
discontinuous or poorly aligned with the (presumed) route being mapped. In many cases, it was
difficult to determine which of several routes present in an aerial photograph was being mapped.
In other cases, no route at all was visible, either due to GPS errors, or to the passage of time
since the original measurement, during which the route may have become overgrown and
difficult to locate. In still other cases, a Knight route turned out to be a "floating" segment,
unconnected to any other route in the database. The great majority of routes (with the exception
of those identical to routes in the San Juan County inventory) were very faint in aerial
photographs, especially when compared to County data. Generally, routes which are difficult to
locate on such photos are even more difficult to locate on the ground.

Despite these difficulties, BLM was able to locate 289 of the 322 segments. To give these data
the benefit of the doubt (and to recognize the inherent measurement error in older GPS
technology), BLM considered a route "verified" if it lay within at least 100 feet of a visible route,
and had the same approximate configuration.

Although BLM has reached agreement with San Juan County on travel routes within the Canyon
Rims Recreation Area (CRRA), BLM felt it advisable to verify the Knight routes that lay within
CRRA boundaries. Many of these routes are the same as San Juan County road data, and did not

BLM_0013100

needed additional verification. Others, however, are not part of the County inventory, and thus need additional verification. Using the same techniques as discussed above, BLM was able to verify through aerial photography all but 35 of 787 Knight routes in CRRA (keeping in mind that many of these 787 routes coincided with San Juan County inventory data). Most of the routes which are not part of the County inventory are extremely faint seismic routes, and would likely be difficult for the average traveler to locate on the ground (most of these were GPS 'd some time ago, and may have been more visible at that time).

The purpose of the BLM road verification process was not to judge the condition, degree of maintenance, extent of use, or function of these routes, but simply to verify their physical existence.

The RMP administrative record contains maps of the road segments verified, photo and route logs, and photos.

In addition to the Ber Knight submission, discussed above, BLM received data from a variety of private sources as part of its scoping process. Table 8 summarizes the data received, and how it has been incorporated into the travel planning process.

**Table 8. Routes Submitted by Private Sources**

| Submitted by: | Submission | Action |
|---|---|---|
| Book Cliff Rattlers | OHV routes | Routes not part of Grand County road inventory were added to the GIS travel plan database. These routes were verified through a series of field trips (discussion follows later in this document). |
| Dale Parriott | Motorcycle routes | Routes not part of Grand County road inventory were added to the GIS travel plan database. Some routes appear to be nearly identical to Rattler routes. Through a series of field trips, BLM was only able to find clear evidence of one of these routes ("Mel's Loop South"); with the remaining routes either not fully identified or identified for only a short segment. |
| Red Rock 4Wheelers (several identical requests from others) | Several Jeep routes | Routes not part of Grand County road inventory were added to the GIS travel plan database. Verified by field checks. |
| Jim Bulkeley | Two jeep routes | One route similar to above, but with non-existent connection (at least for full-size vehicles) to Cliffhanger route. Almost the entire first route is on State land. Second route (Devil's Slide off Hell's Revenge) not accompanied by maps, and therefore not analyzed. |
| Robert Telepak | Numerous routes | All routes (except one) seem to already be included in County or Red Rock 4 Wheelers road inventory data. "Missing" route added to the GIS travel plan database and verified from aerial photo. |
| Jeff Stevens | Two segments of a Jeep Safari route | In GIS travel plan database. |
| Robert Norton | Numerous routes | All MFO routes (for which data provided) in GIS travel plan database. |

BLM_0013101

**Table 8. Routes Submitted by Private Sources**

| Submitted by: | Submission | Action |
|---|---|---|
| Ber Knight | Numerous routes in San Juan Co/MFO but not on SJ Co road map | Verified using same approach as for Grand and San Juan inventory data. See discussion above. |
| SULU/SPEAR | ATV trail recommendations, including approximately 32 miles of San Juan County "D" roads in MFO | Verified; proposal also suggests (as yet) unmapped additional routes not on San Juan inventory. |
| Jeremy Parriott | Short route in wash from private property to San Juan road | Proposed for inclusion in travel plan; added to the GIS travel plan database for consideration |
| Red Rock Heritage | Comprehensive travel plan for MFO | All routes based on Grand and San Juan road inventories. Excludes numerous routes included in both inventories, in order to enhance non-motorized recreation opportunities. Update received September 7, 2004, including rationale for previously provided map. Most, but not all, closure recommendations lie within areas proposed by the group for wilderness (see "Alternatives Eliminated from Further Analysis" in Chapter 2 of the Draft RMP/EIS for more information). |
| Moab Trail Alliance (MTA) | Mountain bike and equestrian routes | MTA provided BLM with a table and GIS data recommending a variety of new single track mountain biking trails, and one equestrian route. Additionally, MTA provided recommendations on converting several Grand County roads to mountain bike use. The new trail proposals were forwarded for consideration in the Recreation section of the RMP, while the recommendations for changes from motorized to non-motorized status were added to the GIS travel plan database for consideration. |

BLM_0013102

**Table 8. Routes Submitted by Private Sources**

| Submitted by: | Submission | Action |
|---|---|---|
| Rory Tyler | OHV use in Hell-Roaring Canyon and in the Mill Creek WSA off the Steelbender 4WD route | On December 3, 2004, BLM received two maps and attached narratives outlining OHV damage in these two areas. Tyler specifically recommended that several spurs off the Steelbender route into the WSA be closed to motorized use, and that the upper reaches of Hell-Roaring Canyon also be closed to motorized use.<br><br>Both problem areas addressed by Mr. Tyler are in areas currently closed to motorized travel (Mill Creek WSA), or limited to existing roads and trails (Hell Roaring Canyon). The Grand County inventory indicates no "claimed" spur at the Steelbender intersection referenced, and thus will not likely be part of the BLM travel plan under any alternative. The Grand County travel plan indicates a route up Hell-Roaring Canyon, which will be considered as part of BLM's alternative development. This route, however, does not go as far as the problem spots identified by Mr. Tyler. Should this area become closed or limited to designated routes, the travel observed by Mr. Tyler will become a law enforcement, rather than a travel plan, issue. |

# G.9 MOAB FIELD OFFICE TRAVEL PLAN - ALTERNATIVES DEVELOPMENT

## G.9.1 GOAL

The goal of the travel plan is to provide opportunities for a range of motorized access and recreation experiences on public lands while protecting sensitive resources and minimizing conflicts among various users.

## G.9.2 BLM POLICY: OHV DESIGNATIONS

OHV Designation Categories – BLM National Strategy mandates that all public lands administered by the BLM must be designated as Open, Limited, or Closed.

- Open – The BLM designates areas as "open" for intensive OHV use where there are no compelling resource protection needs, user conflicts, or public safety issues to warrant limiting cross-country travel. However, motor vehicles may not be operated in a manner causing or likely to cause significant, undue damage to or disturbance of the soil, wildlife, wildlife habitat improvements, cultural or vegetative resources or other authorized uses of the public lands (See 43 CFR 8341).

- Limited – The "limited" designation is used where OHV use must be restricted to meet specific resource management objectives. In the current guidance context, this means limited to designated roads and trails, i.e., a route network designated by the BLM in its RMP. These routes may also be limited to:

- o A time or season of use depending on the resources in the area (i.e., Threatened and Endangered Species' habitat or nesting areas, crucial winter ranges, etc.); and/or
- o Type of vehicle use (ATV, Motorcycle, four-wheel vehicle, etc.)
- Closed – The BLM designates areas as "closed" if closure to all vehicular use is necessary to protect resources, ensure visitor safety, or reduce resource or use conflicts. Access by means other than motor vehicle access is generally allowed. The Field Office Manager may allow motor vehicle access on a case-by-case basis or for emergencies.

A summary of the OHV designation categories (acreages) developed for the alternatives in the travel plan is provided in Table 9.

**Table 9. Open, Limited and Closed Areas (acreages) for the Moab Field Office**

| Category | Alt A No Action[1] | Alt B Conservation | PROPOSED PLAN Balanced | Alt D Commodity |
|---|---|---|---|---|
| Closed | 29,654 | 358,126 | 349,843 | 29,654 |
| Limited to Existing | 1,065,683 | 0 | 0 | 0 |
| Limited to Designated | 47,787 | 1,463,248 | 1,469,665 | 1,788,372 |
| Open | 678,250 | 0 | 1,866 | 3,348 |
| Totals[2] | 1,821,374 | 1,821,374 | 1,821,374 | 1,821,374 |

[1]No Action takes as baseline the 1985 Grand RMP and subsequent Federal Register actions.

[2]Excludes lands in the Moab Field Office managed by the BLM Vernal Field Office.

### G.9.3 ROUTE DESIGNATION AND ID TEAM MEETINGS

Twenty-one ID team meetings to address route/resource conflicts and route designations were held from October 2004 through September 2005. The Field Office Manager conducted each meeting (except one), and every route proposed for designation in either Grand or San Juan County 's travel plans was evaluated. Additionally, the ID team evaluated whether there were routes not recommended for designation by either of the Counties that had a purpose and need requiring designation. The purpose of the route designation ID Team meetings was three-fold:

- Gather input from ID team on conflicts identified and mitigation proposed by each resource specialist. Identify (where known) the purpose and need for the route in question. Where conflicts with resources existed, these conflicts were discussed and resolved during the meeting, and final proposals for the various alternatives were established.
- Formulate three action alternatives for the travel plan. The Conservation alternative emphasizes resource conflicts over the purpose and need for the route. The Commodity alternative emphasizes the purpose and need for the route over resource conflicts. The Balanced alternative weighs both resource conflicts and the purpose and need.
- Develop a designed system of designated routes that fulfills the management goal for the planning area.

The RMP administrative record contains details of the conflicts identified for each route or route segment and BLM's conclusions as to designation, by alternative.

BLM_0013104

The ID team process was as follows. The Field Office Manager conducted all but one meeting. Each county's road inventory and travel recommendations were examined area by area, usually by USGS quad. In addition to County inventories, proposals by private groups were examined in the same fashion. Grand County, in its travel plan, had proposed that a large number of "D" roads in its inventory not be designated for motorized travel. In these cases, the County had been unable to identify a purpose and need for the routes in question. Many of these routes were considered redundant, in that other routes existed in the vicinity that were more suitable for motorized travel. In most cases, BLM agreed with the County's characterization of these routes, and did not include these in any of the action alternatives for designation. These routes were 2,594.8 miles in total. Routes proposed by either County for motorized designation were evaluated by the ID team for purpose and need (in consultation with the Counties), as well as potential resource concerns.

As discussed above, resource specialists identified potential conflicts with proposed routes, and characterized the severity of the conflict. In general, routes with serious resource conflicts (or less severe, but multiple conflicts), and no obvious purpose and need, were recommended for non-designation. There were many routes where resource concerns conflicted with established purpose and need. These routes typically were recommended for non designation in the Conservation alternative, but were designated in the Commodity alternative. Whether or not to designate a route in the Balanced alternative was decided by a weighing of the route's importance against the severity of the identified resource conflicts. In many cases, the potential conflict was resolved by reducing the number of parallel and redundant routes. Throughout the process, representatives of Grand and San Juan Counties were involved, and, in general, concurred with staff recommendations. The GIS data identifies those route segments which are recommended for non-designation, by alternative, and the principal resource concern(s) identified. These GIS files identify conflicts as cultural, riparian, recreation, soils, wilderness, and/or wildlife. The following sections explain the conflicts that existing routes could pose to these resources. In addition to resource issues identified through the ID team process, there is a large body of literature identifying potential impacts from OHV travel on a variety of resources.

The United States Geologic Survey (USGS) has compiled an extensive review of the available literature on the effects of OHV travel on public lands[3]. Their literature and Internet searches yielded approximately 700 peer-reviewed papers, magazine articles, agency and non-governmental reports, and internet websites regarding effects of OHV use as they relate to the Bureau of Land Management's (BLM) standards of land health. In its Executive Summary, the USGS summarized their finding for a variety of natural resources and also socioeconomic implications as follows:

## G.9.3.1 SOILS AND WATERSHED

The primary effects of OHV activity on soils and overall watershed function include altered soil structure (soil compaction in particular), destruction of soil crusts (biotic and abiotic) and desert pavement (fine gravel surfaces) that would otherwise stabilize soils, and soil erosion. Indicators of soil compaction discussed in the OHV effects literature include soil bulk density (weight per unit of volume), soil strength (the soil's resistance to deforming forces), and soil permeability

---

[3] *Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources,* Douglas S. Ouren et al., United States Geological Survey, Department of the Interior, 2007.

BLM_0013105

(the rate at which water or air infiltrate soil). Generally, soil bulk density and strength increase with compaction, whereas permeability decreases with compaction. As soil compaction increases, the soil's ability to support vegetation diminishes because the resulting increases in soil strength and changes in soil structure (loss of porosity) inhibit the growth of root systems and reduce infiltration of water. As vegetative cover, water infiltration, and soil stabilizing crusts are diminished or disrupted, the precipitation runoff rates increase, further accelerating rates of soil erosion.

### G.9.3.2 VEGETATION

Plants are affected by OHV activities in several ways. As stated above, soil compaction affects plant growth by reducing moisture availability and precluding adequate taproot penetration to deeper soil horizons. In turn, the size and abundance of native plants may be reduced. Above-ground portions of plants also may be reduced through breakage or crushing, potentially leading to reductions in photosynthetic capacity, poor reproduction, and diminished litter cover. Likewise, blankets of fugitive dust raised by OHV traffic can disrupt photosynthetic processes, thereby suppressing plant growth and vigor, especially along OHV routes. In turn, reduced vegetation cover may permit invasive and/or non-native plants—particularly shallow rooted annual grasses and early successional species capable of rapid establishment and growth—to spread and dominate the plant community, thus diminishing overall endemic biodiversity.

### G.9.3.3 WILDLIFE AND HABITAT

Habitats for native plants and animals, including endangered and threatened species, are impacted by OHVs in several ways. A salient effect is habitat fragmentation and reduced habitat connectivity as OHV roads and trails proliferate across the landscape. Reduced habitat connectivity may disrupt plant and animal movement and dispersal, resulting in altered population dynamics and reduced potential for recolonization if a species is extirpated from a given habitat fragment. Wildlife is also directly affected by excessive noise (decibel levels/noise durations well above those of typical background noise) and other perturbations associated with OHV activities. Disturbance effects range from physiological impacts—including stress and mortality due to breakage of nest-supporting vegetation, collapsed burrows, inner ear bleeding, and vehicle-animal collisions—to altered behaviors and population distribution/dispersal patterns, which can lead to declines in local population size, survivorship, and productivity.

### G.9.3.4 WATER QUALITY

The effects of OHV activities on water quality can include sedimentation (deposited solids), turbidity (suspended solids), and pollutants within affected watersheds. Sedimentation increases because compacted soils, disrupted soil crusts, and reduced vegetation cover can lead to increased amounts and velocities of runoff; in turn, this accelerates the rates at which sediments and other debris are eroded from OHV-use areas and flushed to aquatic systems downslope. Pollutants associated with deposition of OHV emissions and spills of petroleum products may be adsorbed to sediments, absorbed by plant material, or dissolved in runoff; once mobilized, these contaminants may enter aquatic systems.

BLM_0013106

### G.9.3.5 AIR QUALITY

Air quality is affected when OHV traffic raises fugitive dust and emits by-products of combustion. Because wind can disperse suspended particulates over long distances, dust raised by OHV traffic can blanket plant foliage and disperse dust-adsorbed contaminants well beyond a given OHV-use area. Primary combustion by-products potentially affecting air quality in OHV use areas include (but are not limited to) polycyclic aromatic hydrocarbons, sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), and ozone ($O_3$). Although leaded gasoline has not been used in the United States since 1996, lead emissions deposited prior to the ban on leaded gasoline may persist for decades and continue impacting ecosystems as wind and water erosion continue to mobilize lead and other contaminants downwind (or downslope) of contaminated soils.

### G.9.3.6 SOCIOECONOMIC IMPLICATIONS

Although not one of BLM's land health considerations, the socioeconomic implications of OHV use have significant direct and indirect effects on land health. As the popularity of OHV recreation increases, socioeconomic factors become increasingly important considerations in understanding and mitigating the overall effects of OHV use on land health. OHV recreation can have significant economic value to local communities where and when OHV use is popular; however, the economic costs to those communities remain unknown. OHV use also can lead to conflicts among different land-users—both OHV users and people seeking non-motorized forms of recreation—within OHV-use areas and nearby areas. Crowding of designated OHV areas may encourage unauthorized use in closed areas, and adjacent or overlapping use types may cause dissatisfaction or discourage recreation altogether, which can diminish public support for land management programs.

The report goes on for approximately 60 pages summarizing relevant literature. The references cited section runs 150 pages. The USGS concludes that the impacts of OHV use on a variety of resources are diverse and potentially profound. They argue that the results of impacts studies in the immediate vicinity of single trails and OHV sites have been reasonably consistent in documenting potentially negative impacts. They conclude that the results are less conclusive for wildlife, air and water quality than for the other resources examined. They emphasize the need for additional research on the cumulative effects on natural resources of OHV use, but speculate that the impacts could be greater in a network of OHV routes than for a single route.

### G.9.3.7 CULTURAL

Existing routes may go through identified cultural or paleontological sites. Use of these routes may hasten erosion, exposing more of the site to natural or human-caused damage. Cross-country travel in particular can exacerbate this problem. Site densities may be such that any access to the area could put such resources at risk. Routes identified with cultural conflicts totaled 136.9 miles.

### G.9.3.8 RECREATION

Scoping has shown a desire on the part of some publics for more areas to be managed for non-motorized recreation. In response to this, BLM may decide to manage certain areas for more primitive forms of recreation, or to reduce user conflicts between motorized and non-motorized users. In such areas, and under different plan alternatives, the existence of certain roads (or a

BLM_0013107

redundancy of such) may pose a conflict with underlying recreation management goals and objectives. Routes identified with recreation conflicts totaled 88.3 miles.

### G.9.3.9 RIPARIAN

There are numerous streams, rivers, and other watercourses that run through the "limited" OHV category area. Routes are often located in riparian areas in canyons and drainage bottoms to avoid the more difficult uplands. Use of these routes can contribute to loss of riparian vegetation, degrade stream banks, and lead to erosion problems. There are also numerous washes within the "limited" OHV category area that do not support riparian vegetation, and merely provide a channel for water during storm events. Compaction of soils in these washes can lead to accelerated flood velocity, further contributing to erosion and sedimentary transfer. Routes identified with riparian conflicts totaled 118.9 miles; routes identified with floodplain conflicts totaled 230.2 miles.

### G.9.3.10 SOILS

The primary watershed concern identified in the RMP (1985) was the prevention and reduction of salinity and sedimentation from public lands. Any surface disturbing activity, including routes, on sensitive soils will cause increases in salinity and sedimentation levels.

Roads and off-road travel can cause impacts to watersheds by impacting soil health and water quality. Impacts can include soil compaction, decreased soil stability, loss of vegetation and biotic soil crusts, loss of functioning floodplains, accelerated erosion, water quality degradation, and increased salinity contributions.

In order to meet Utah Rangeland Health Standards, surface disturbing activities, including roads, should be limited on highly saline soils, highly erodible soils, steep slopes, and drought intolerant soils. Routes identified with soils conflicts of all types totaled 662.5 miles.

### G.9.3.11 WILDERNESS

Wilderness study areas (WSA) are managed under the BLM's Interim Management Policy and Guidelines for Lands Under Wilderness Review (IMP) so as not to impair their suitability for preservation as wilderness. Each of these WSAs has wilderness characteristics. They are greater than 5,000 acres in size, natural in appearance, and provide outstanding opportunities for solitude and/or primitive recreation. Many also possess supplemental wilderness values including cultural resources and wildlife values.

The IMP specifies that, at a minimum, motorized vehicles are only allowed on pre-existing inventoried ways in WSAs. Use of vehicles off boundary routes and on these ways is permitted only for emergencies, search and rescue operations, official purposes for the protection of human life, safety, and property; protection of lands and their resources, and to build and maintain structures and installations permitted under the IMP.

Today's OHVs are more varied, powerful machines capable of accessing steeper and rougher terrain than was possible over 20 years ago when the WSAs were designated. Motorized use in and around certain WSAs has increased dramatically, and involves sports utility vehicles (SUVs), trucks, all terrain vehicles (ATVs), and motorcycles. As discussed earlier, designating motorized routes within WSAs can lead to the impairment of wilderness character, whether

through increased risks of off-road travel or intruding upon the solitude that wilderness users seek (See also 7.2.4). Routes identified with wilderness conflicts totaled 51.5 miles.

## G.9.3.12 WILDLIFE

In general, roads can produce threats to wildlife populations due to habitat fragmentation, stress caused by human activities at critical times such as lambing, and impacts to resources (e.g., water, vegetation) upon which wildlife depend. Off-road travel can exacerbate these effects. Several species in the Moab Field Office may be particularly susceptible to human disturbance.

Big Game (bighorn sheep, deer, elk, pronghorn)

Disturbance from human activity can cause increased stress, making animals more susceptible to disease and parasites, and leading to habitat abandonment and fragmentation of habitat. Within bighorn sheep habitat, the Range-wide Plan for Managing Habitat for Desert Bighorn Sheep on Public Lands (U.S. Department of the Interior, BLM, undated) recommends that new road construction be minimized and roads no longer serving a definite purpose be closed. The Plan further recommends that off-road vehicles be limited to existing roads and trails.

Birthing grounds are, by far, the most crucial habitat. Additional stress and pressure from human activities can deplete energy reserves, as well as disease and parasite resistance in pregnant and lactating animals with young at their sides. This reduces the survival rate of newborns.

White-tailed and Gunnison Prairie Dogs

Populations have been decimated by sylvan plague, and restoration of habitat is required for re-colonization. Limiting new roadways and decommissioning unnecessary roads, as well as reclaiming illegal trails, will help to lessen the impacts to prairie dog habitat fragmentation.

Greater and Gunnison Sage-grouse

Within the Moab FO, reduction of human disturbance and fragmentation is needed to protect remaining sage-grouse habitat. Limiting new roadways, decommissioning unnecessary roads and reclaiming illegal trails will help reduce habitat fragmentation and protect the birds and their habitat from human disturbance.

Routes identified with wildlife conflicts totaled 129.9 miles, of which 52.6 miles conflicted with bighorn sheep habitat.

## Table 10. Miles of Route Designated/not designated for Motorized Travel Due To Resource Conflicts, By Alternative

| Resource Conflicts | | Alternatives | | | |
|---|---|---|---|---|---|
| | | A | B | PROPOSED PLAN | D |
| Cultural | Designated | 148.2 | 101.7 | 131.6 | 144.6 |
| | Not Designated | | 46.5 | 16.6 | 3.6 |
| Recreation | Designated | 178.2 | 57.6 | 118.4 | 148.5 |
| | Not Designated | | 120.6 | 59.8 | 29.7 |

BLM_0013109

| | | | | | |
|---|---|---|---|---|---|
| Riparian | Designated | 321.9 | 110.3 | 269.8 | 305.2 |
| | Not Designated | | 179.6 | 50.1 | 14.7 |
| Soils | Designated | 960.3 | 622.7 | 792.8 | 909.3 |
| | Not Designated | | 337.6 | 167.5 | 51.0 |
| Wilderness | Designated | 82.5 | 0.0 | 1.7 | 16.0 |
| | Not Designated | | 82.5 | 80.8 | 66.5 |
| Wildlife | Designated | 367.4 | 235.1 | 315.6 | 356.3 |
| | Not Designated | | 132.3 | 51.8 | 11.1 |

## G.9.4. MECHANIZED ROUTES (SEE MAPS OF MECHANIZED ROUTES)

Mechanized use includes mechanical devices such as bicycles that are not motorized. Moab BLM concluded that routes not designated for motorized travel generally would be available for mechanized, foot, and equestrian travel. As with all designations in the travel plan, BLM reserves the right to change designations in the future, should resource issues warrant such action. Exceptions to permitting mechanized use on routes not designated for motorized use are "ways" in WSAs. In those cases where motorized use on such routes is prohibited, the same prescriptions would apply to mechanized use, as a means of enhancing wilderness values. The same would apply to routes not designated for motorized use in those areas the BLM chooses to manage to preserve wilderness characteristics (in those alternatives of the DEIS containing such areas). In addition, routes not designated for motorized use will not be available for mechanized use in areas identified as hiking or other non-mechanized focus areas.

Exceptions to the non-mechanized policy in WSAs include the Hidden Valley trail and the Porcupine Rim trail (single-track portion). Under IMP, BLM reserves the right to close these trails to mechanized use, should such use lead to degradation of resource values.

## G.9.5 FOOT AND EQUESTRIAN TRAVEL

Foot and equestrian travel would continue to be allowed in all areas of the Field Office, except as specifically prohibited. Under all alternatives, the following trails would be open to foot traffic only:

- Negro Bill Canyon Trail
- Hunter Canyon Trail
- Fisher Towers Trail
- Amphitheater Loop Trail
- Mill Canyon Dinosaur Trail
- Copper Ridge Sauropod Trail
- Corona Arch Trail
- Windwhistle Nature Trail

BLM_0013110

Under all alternatives, the following trails would be open to foot and equestrian traffic only:

- Trough Springs Trail
- Onion Creek Benches Trail
- Ida/Stearns Gulch Equestrian Trail System
- Castle Creek Equestrian Trail
- Rattlesnake Trail above Nefertiti Boat Launch
- Upper portions of Seven Mile Canyons
- Red Rock Horse Trails (near Ken 's Lake)

## G.10 PLAN MAINTENANCE AND CHANGES TO ROUTE DESIGNATIONS

The RMP must include indicators to guide future plan maintenance, amendments, or revisions related to OHV area designations or the approved road and trail system within "Limited" areas. Indicators could include results of monitoring data, new information, or changed circumstances (IM 04-005, Attachment 2). Actual route designations within the "Limited" category can be modified without completing a plan amendment, although NEPA compliance is still required. The Federal regulations at 43 CFR 8342.3 state:

> The authorized officer shall monitor effect of the use of off-road vehicles. On the basis of information so obtained, and whenever the authorized officer deems it necessary to carry out the objectives of this part, designations may be amended, revised, revoked, or other action taken pursuant to the regulation in this part.

Within the RMP, Field Offices must establish procedures for making modifications to their designated route networks. Because future conditions may require the designation or construction of new routes or closure of routes in order to better address resources and resource use conflicts, a Field Office will expressly state how modification would be evaluated. As noted in IM 2004-061, plan maintenance can be accomplished through additional analysis and land-use planning, e.g., activity level planning. BLM will collaborate with affected and interested parties in evaluating the designated road and trail network for suitability for active OHV management and envisioning potential changes in the existing system or adding new trails that would help meet current and future demands. In conducting such evaluations, the following factors would be considered:

- Routes suitable for different categories of OHVs including dirt bikes, ATVs, dune buggies, and 4-wheel drive touring vehicles, as well as opportunities for joint trail use;
- Needs for parking, trailheads, informational and directional signs, mapping and profiling, and development of brochures or other materials for public dissemination;
- Opportunities to tie into existing or planned route networks;
- Measures needed to avoid onsite and offsite impacts to current and future land-uses and important natural resources; among others, issues include noise and air pollution, erodible soils, stream sedimentation, non-point source water pollutions, listed and sensitive species' habitats, historic and archeological sites, wildlife, special management areas, grazing operations, fence and gate security, needs of non-motorized recreationists, and recognition of property rights for adjacent landowners;

BLM_0013111

- Public land roads or trails determined to cause considerable adverse effects or to constitute a nuisance or threat to public safety would be considered for relocation or closure and rehabilitation after appropriate coordination with applicable agencies and partners.
- Those areas managed as Closed will not be available for new motorized or mechanized route designation or construction.

Regulations at 43 CFR 8342.2 require BLM to monitor the effects of OHV use. Changes should be made to the Travel Plan based on the information obtained through monitoring. Procedures for making changes to route designations after the ROD is signed are established in the RMP. Site specific NEPA documentation is required in order to change the route designations in this Travel Plan.

## G.11 COOPERATING AGENCIES AND OTHER COORDINATION

A Cooperating Agency is an agency other than the lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a major federal action.

### G.11.1 COOPERATING AGENCIES

Copies of meeting minutes are found in the BLM Moab Field Office Administrative Record.

*Grand and San Juan Counties.* As described in this document, both counties have played integral roles in the Moab Field Office's travel plan development.

*State of Utah, State Parks.* Meetings were held with State Parks personnel regarding the travel plan.

*State of Utah, School Institutional Trust Land Administration (SITLA).* A meeting with SITLA representatives held was at the Moab Field Office. On-going consultations continue to address BLM and SITLA management concerns.

*State of Utah, Department of Wildlife Resources (DWR).* DWR provided input to the draft alternatives matrix.

*State of Utah, State Historic Preservation Office (SHPO).* The USHPO is consulted on cultural aspects both through the RMP process and for all pertinent activity level, site-specific NEPA where cultural resources are concerned.

*U.S. Fish and Wildlife Service (USFWS).* Letters from the USFWS concerning on-going issues with sensitive species are the basis for choices made by the ID team in evaluating wildlife conflicts.

*National Forest Service, Manti La Sal National Forest.*

*National Park Service, Arches and Canyonlands National Parks.*

### G.11.2 OTHER COORDINATION

*Native American Tribes.* Native American Tribes are consulted on all site-specific NEPA where there are cultural concerns.

BLM_0013112

*BLM Monticello Field Office.* Coordination with the Monticello FO has been consistent from the outset of travel planning and the RMP process. Edge matching of boundaries has been accomplished.

*Other Adjoining BLM Field Offices.* The Moab Field Office has contacted the Vernal, Grand Junction, Montrose and Durango Field offices in the course of travel plan development (with the exception of Vernal, these Field Offices' adjoining areas are currently Open to OHV travel).

## G.12 IMPLEMENTATION PROCESS

Implementation decisions are actions to implement land-use plans and generally constitute BLM's final approval allowing on-the-ground actions to proceed. These types of decisions are based on site-specific planning and NEPA analyses and are subject to the administrative remedies set forth in the regulations that apply to each resource management program of the BLM. Implementation decisions are not subject to protest under the planning regulations. Instead, implementation decisions are subject to various administrative remedies. Where implementation decisions are made as part of the land-use planning process, they are still subject to the appeals process of other administrative review as prescribed by specific resource program regulations after BLM resolves the protests to land-use plan decisions and make a decision to adopt or amend the RMP.

Travel planning and implementation process includes the following:

- A map of roads and trails for all travel modes.
- Notations of any limitation for specific roads and trails.
- Criteria to select or reject roads and trails in the final travel management network, add new roads or trails, and to specify limitations.
- Guidelines for management, monitoring, and maintenance of the system.
- Needed easements and rights-of-ways (to be issued to the BLM or others) to maintain the existing road and trail network providing public land access.

In addition, travel management networks should be reviewed periodically to ensure that current resource and travel management objectives are being met (43 CFR 8342.3).

In the final RMP decisions, designated OHV routes will be portrayed by a map entitled "Field Office Travel Plan and Map". This map will be the basis for signing and enforcement. The Field Office will prioritize actions, resources, and geographic areas for implementation. The implementation goals include completing signage, maps, public information, kiosks, and working with partners.

## G.13 REFERENCES

- 43 C.F.R. Part 8340
- BLM Moab and Monticello Field Office, Planning Bulletin #3 – Request for Route Data, November 1, 2003
- BLM Moab and Monticello RMP Revisions, Scoping Summary, July 2004
- BLM Moab Field Office, Analysis of Management Situation (AMS), January 2005
- BLM Land-use Planning Handbook 1601

BLM_0013113

- NRCC Technical Team, State-wide OHV Trail Signing Standards (from Utah BLM State Office, September 5, 2001
- Natural Resource Coordinating Council (NRCC) Utah Interagency OHV Steering Committee, Final Report, April 1, 2004
- Standards for Rangeland Health of BLM Land in Utah, May 1997
- U.S. Department of the Interior, BLM, Interim Management Policy for Lands Under Wilderness Review, H-8559-1
- U.S. Department of the Interior, BLM, National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands, January 2001
- Utah OHV Transactions by County and Fiscal Year, 2005

BLM_0013114

## ATTACHMENT A: DEFINITIONS

**All-Terrain Vehicle (ATV)** – A wheeled or tracked vehicle, other than a snowmobile or work vehicle, designed primarily for recreational use of the transportation of property or equipment exclusively on undeveloped road rights of way, marshland, open country or other unprepared surfaces. (BLM, National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands, January 2001)

**Closed Designations** – Areas or trails are designated closed if closure to all vehicular use is necessary to protect resources, promote visitor safety, or reduce use conflicts. (8342.06 E)

**Considerable Adverse Impacts** – Any OHV related adverse environmental impact that causes: (a) significant damage to cultural or natural resources, including but not limited to historic, archaeological, soil, water, air, vegetation and scenic values, or (b) significant harassment of wildlife and/or significant disruption of wildlife habitats; or (c) significant damage to endangered or threatened species or their habitat, or (d) impairment of wilderness suitability; *and* is irreparable due to the impossibility or impracticality of performing corrective or remedial actions. The significance of these damages is determined on a case-by-case basis by BLM's authorized officers in the field (normally District [Field Office] Managers) in the context of local conditions. (8341.05)

**Designation** – The formal identification of public land areas and trails where off-road vehicles use has been authorized, limited, or prohibited through publication in the *Federal Register*. The types of designation used by the BLM are open, limited, or closed to off-road vehicle use. (8342.05)

**Emergency Limitations or closures** – Limiting use or closing areas and trails on public lands to ORV use under the authority of 43 CFR 8341.2. Such limitations or closures are not OHV designations. (8341.05)

**Implementation Plan** - A site-specific plan written to implement decisions made in the land-use plan. An implementation plan usually selects and applies best management practices (BMP) to meet land-use plan objectives. Implementation plans are synonymous with "activity" plans. Examples of implementation plans include interdisciplinary management plans, habitat management plans, and allotment management plans. (BLM, National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands, January 2001)

**Land-use Plan**: A set of decisions that establish management direction for land within an administrative areas, as prescribed under the planning provisions of FLPMA; and assimilation of land-use plan-level; decisions developed through the planning process outlines in 43 CFR 1600, regardless of the scale at which the decisions were developed. (BLM, National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands, January 2001)

**Limited Designations** – The limited designation is used where OHV use must be restricted to meet specific resource management objectives. Examples of limitations include: number or types of vehicles; time or season of use; permitted or licensed use only; use limited to designated roads and trails; or other limitations if restrictions are necessary to meet resource management objectives including certain competitive or intensive use areas which have special limitations. (8342.06 F)

BLM_0013115

**Mechanized Travel** – Moving by a mechanical device such as a bicycle, not powered by a motor

**Minimize OHV Damage** – To reduce ORV effects to the maximum extent feasible short of eliminating ORV use, consistent with established land management objectives as determined by economic, legal, environmental, and technological factors. (8342.05)

**Motorized Travel** – Moving by means of vehicles that are propelled by motors such as cars, trucks, OHVs, motorcycles, etc.

**Non-Motorized Travel** – Moving by foot, stock or pack animal, boat, or mechanized vehicle such as a bicycle

**Off-Highway Vehicle (OHV):** OHV is synonymous with, and the more current term for, Off-Road Vehicles (ORV). ORV is defined in 43 CFR 8340.0-5(a): Off-road vehicle means any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: 1) Any non-amphibious registered motorboat; 2) Any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; 3) Any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; 4) Vehicles in official use; and 5) Any combat or combat support vehicle when used in times of national defense emergencies.

**OHV area designations:** Refers to the land-use plan decisions that permit, establish conditions, or prohibit OHV designations (43 CFR 8342.1). The CFR requires all BLM-managed public lands to be designated as open, limited, or closed to off-road vehicles, and provides guidelines for designation. The definitions of open, limited, and closed are provided in 43 CFR 8340-5 (f), (g), and (h), respectively.

**Open Designations** – Open designations are used for intensive ORV use areas where there are no special restrictions or where there are no compelling resource protection needs, user conflicts, or public safety issues to warrant limiting cross-country travel. (8342.06 D)

**RMP area -** Most RMPs cover a large planning and management area. As a result, the planning area may be divided into smaller areas, each with differing values, issues, needs and opportunities that may warrant differing management prescriptions. (Attachment to IM 2004-005)

BLM_0013116

**Road Definitions (State of Utah Highway Codes 27-12-21, 22, 23):**

Class A: State Highways

Class B: County roads constructed and maintained from the state road fund.

Class C: City streets within the corporate limits of the cities and towns of the state that are not class A or class B roads.

Class D (27-15-1): Any road, way, or other land surface route that has been or in established by use or constructed and is maintained (passable for vehicles with four or more wheels) to proved usage by the public that is neither a class A, class B, or class C road.

**Road and Trail Selection -** For each limited area, the BLM should choose a network of roads and trails that are available for motorized use, and other access needs including non-motorized and non-mechanized use, consistent with the goals and objectives and other consideration described in the plan. (Attachment to IM 2004-005)

**Road and Trail Identification:** For the purposes of this guidance, road and trail identification refers to the on-the-ground process (including signs, maps and other means of informing the public about requirements) of implementing the road and trail network selected in the land-use plan or implementation plan. Guidance on the identification requirements is in 43 CFR 9342.2©. (Attachment to IM 2004-005)

**"Ways"** - See pp 11-12 Section 7.2.4 – Route Designations in Wilderness Study Areas.

BLM_0013117

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0013118

# APPENDIX H.
## HYDRAULIC CONSIDERATIONS FOR PIPELINES CROSSING STREAM CHANNELS; TECHNICAL NOTE 423

### TABLE OF CONTENTS

Abstract ........................................................................................................................... H-2

Introduction ..................................................................................................................... H-2

Surface Crossings ........................................................................................................... H-4

    Reconnaissance Method ............................................................................................. H-5

    Physiographic Method ................................................................................................ H-7

    Analytical Method ...................................................................................................... H-8

    Detailed Method ......................................................................................................... H-9

Subsurface (Buried) Crossings ..................................................................................... H-10

    Channel Degradation ............................................................................................... H-11

    Channel Scour ........................................................................................................... H-15

Conclusion ..................................................................................................................... H-17

Literature Cited ............................................................................................................. H-18

**Suggested citations:**

Fogg, J. and H. Hadley. 2007. Hydraulic considerations for pipelines crossing stream channels. Technical Note 423. BLM/ST/ST-07/007+2880. U.S. Department of the Interior, Bureau of Land Management, National Science and Technology Center, Denver, CO. 18 pp. *http://www.blm.gov/nstc/library/techno2.htm.*

U.S. Department of the Interior. 2007. Hydraulic considerations for pipelines crossing stream channels. Technical Note 423. BLM/ST/ST-07/007+2880. Bureau of Land Management, National Science and Technology Center, Denver, CO. 18 pp. *http://www.blm.gov/nstc/library/techno2.htm.*

# ABSTRACT

High flow events have the potential to damage pipelines that cross stream channels, possibly contaminating runoff. A hydrologic analysis conducted during the design of the pipeline can help determine proper placement. Flood frequency and magnitude evaluations are required for pipelines that cross at the surface. There are several methods that can be used, including reconnaissance, physiographic, analytical, and detailed methods. The method used must be appropriate for the site's characteristics and the objectives of the analysis. Channel degradation and scour evaluations are required for pipelines crossing below the surface. Proper analysis and design can prevent future pipeline damage and reduce repair and replacement costs.

**Production services provided by:**

Bureau of Land Management
National Science and Technology Center
Branch of Publishing Services
P.O. Box 25047
Denver, CO 80225

**Copies available online at:**

*www.blm.gov/nstc/library/techno2.htm*

BLM_0013120

## INTRODUCTION

In 2002, the U.S. Fish and Wildlife Service raised concerns about the potential for flash floods in ephemeral stream channels to rupture natural-gas pipelines and carry toxic condensates to the Green River, which would have deleterious effects on numerous special-status fish species (Figure 1). In November of the same year, BLM hydrologists visited the Uinta Basin in Utah to survey stream channels and compute flood magnitudes and depths to better understand possible flooding scenarios. From this they developed construction guidance for pipelines crossing streams in Utah. This guidance was later modified so that it was generally applicable to the arid and semiarid lands of the intermountain west. It may also have general applicability in other areas of the western United States. The purpose of this document is to present the modified guidance for placement of pipelines crossing above or below the surface of stream channels to prevent inundation or exposure of the pipe to the hydraulic forces of flood events.



**Figure 1. Pipeline breaks during flooding can release condensate toxic to sensitive fish species.**

BLM_0013121

## SURFACE CROSSINGS

Pipelines that cross stream channels on the surface should be located above all possible floodflows that may occur at the site. At a minimum, pipelines must be located above the 100-year flood elevation and preferably above the 500-year flood elevation. Two sets of relationships are available for estimating flood frequencies at ungaged sites in Utah. Thomas and Lindskov (1983) use drainage basin area and mean basin elevation for flood estimates for six Utah regions stratified by location and basin elevation (Table 1). Thomas et al. (1997) also use drainage area and mean basin elevation to estimate magnitude and frequency of floods throughout the southwestern U.S., including seven regions that cover the entire State of Utah. Results from both sets of equations should be examined to estimate the 100- and 500-year floods, since either of the relations may provide questionable results if the pipeline crosses a stream near the boundary of a flood region or if the drainage area or mean basin elevation for the crossing exceed the limits of the data set used to develop the equations.

**Table 1. Examples of Flood Frequency Equations for Ungaged Sites in Utah**

| Regression equations for peak discharges for Uinta Basin (from Thomas and Lindskov 1983) | | | |
|---|---|---|---|
| Discharge Q in cubic feet per second, Area in square miles, Elevation in thousands of feet | | | |
| Recurrence interval (yrs) | Equation | Number of stations used in analysis | Average standard error of estimate (%) |
| 2 | $Q = 1{,}500\, A^{0.403}\, E^{-1.90}$ | 25 | 82 |
| 5 | $Q = 143{,}000\, A^{0.374}\, E^{-3.66}$ | 25 | 66 |
| 10 | $Q = 1.28 \times 10^{6}\, A^{0.362}\, E^{-4.50}$ | 25 | 64 |
| 25 | $Q = 1.16 \times 10^{7}\, A^{0.352}\, E^{-5.32}$ | 25 | 66 |
| 50 | $Q = 4.47 \times 10^{7}\, A^{0.347}\, E^{-5.85}$ | 25 | 70 |
| 100 | $Q = 1.45 \times 10^{8}\, A^{0.343}\, E^{-6.29}$ | 25 | 74 |

Procedures for estimating 100-year and 500-year flood magnitudes for other States are described in the U.S. Geological Survey's National Flood Frequency Program (Ries and Crouse 2002) (Figure 2). Full documentation of the equations and information necessary to solve them is provided in individual reports for each State. The National Flood Frequency (NFF) Website (http://water.usgs.gov/software/nff.html) provides State summaries of the equations in NFF, links to online reports for many States, and factsheets summarizing reports for States with new or corrected equations. Background information in each State's flood frequency reports should be checked to ensure that application of the equations is not attempted for sites with independent variables outside the range used to develop the predictive equations.

BLM_0013122

*Moab PRMP/FEIS*              *Appendix H: Hydraulic Considerations for Pipelines Crossing Stream Channels*



**Figure 2. View of the output from NFF.**

Once the flood frequency for a site has been estimated, determining the depth of flow associated with an extreme flood (i.e., the elevation of the pipeline at the crossing) may be approached in a number of ways. Procedures for estimating depth of flow for extreme floods in Utah are presented in Thomas and Lindskov (1983). Similar procedures presented in Burkham (1977, 1988) are generally applicable for locations throughout the Great Basin and elsewhere. The reconnaissance, physiographic, analytical, and detailed methods described in those reports will be summarized briefly in this paper. Burkham (1988) describes an additional method (historical method) not presented here, since the data for its use (high-water marks for an extreme historical flood with known discharge and recurrence interval) are rarely available in public land situations for which this guidance is intended.

### RECONNAISSANCE METHOD

The reconnaissance method (as the name implies) is a fairly rough and imprecise method for delineating flood-prone areas (Burkham 1988; Thomas and Lindskov 1983). It is most applicable to stable or degrading alluvial channels with multiple terrace surfaces, although such terraces may be difficult to detect on severely degrading streams. In this procedure, the channel of interest is examined to approximate the area that would be inundated by a large flood. A geomorphic reconnaissance of the site is conducted, and it may be supplemented with aerial photos, maps, and historical information available for the reach of interest. In addition to the

BLM_0013123

morphology of the channel, floodplain, and terraces, information on vegetation (e.g., species, flood tolerance, drought tolerance) and soils (e.g., development, stratification, and drainage) can be helpful for identifying flood-prone areas (Burkham 1988). For best results, the geomorphic analysis should include reaches upstream and downstream of the site and should attempt to determine the general state of the stream channel as aggrading, degrading, or stable. (Additional guidance on detection of stream degradation is presented in the section on subsurface crossings).

In the reconnaissance method, identification of bankfull elevation and the active floodplain (i.e., floodplain formed by the present flow regime) provides **inadequate** conveyance for extreme flood events (Figure 3). Past floodplains or present terraces also must be identified, since these surfaces may be inundated by extreme floods in the present flow regime, especially in arid and semiarid environments. Pipelines should be constructed so that they cross at or above the elevation of the highest and outermost terrace (Figure 4). The highest terrace is unlikely to be accessed in the modern flow regime by any but the most extreme floods.

Practitioners of the reconnaissance method need considerable experience in geomorphology, sedimentation, hydraulics, soil science, and botany. Also, since this method is based on a geomorphic reconnaissance of the site, no flood frequency analysis is required and no recurrence interval can be assigned to the design elevation. An additional drawback to the method is that the accuracy of the results is unknown. However, the reconnaissance method may be the most rational one for delineating flood-prone areas on some alluvial fans and valley floors where channels become discontinuous (Burkham 1988). While this is the quickest approach to designing a pipeline that crosses a channel, it likely will result in the most conservative estimate (i.e., highest elevation and greatest construction cost) for suspension of the pipeline.



**Figure 3. Although this pipeline crossed above the bankfull channel indicators, it was not high enough to escape more extreme floods.**

BLM_0013124



**Figure 4. This New Mexico pipeline crosses the channel near the elevation of the highest terrace, which places it above even the most extreme flood events.**

## PHYSIOGRAPHIC METHOD

A slightly more intensive approach to designing pipelines that cross streams is based on the physiographic method for estimating flood depths at ungaged sites described by Thomas and Lindskov (1983) and Burkham (1988). The procedure uses regional regression equations (similar to the flood frequency equations described above) to estimate **maximum** depth of flow associated with a specified recurrence-interval flood (Table 2). Flood depth is then added to a longitudinal survey of the channel **thalweg** in the vicinity of the crossing (10 to 20 channel widths in length), resulting in a longitudinal profile of the specified flood. Elevation of the flood profile at the point of pipeline crossing is the elevation above which the pipeline must be suspended. The method is generally applicable where 1) the project site is physiographically similar to the drainage basins used to develop the regression equations and 2) soil characteristics are the same at the project site as in the basins where the regression equations were developed. While this procedure requires a field survey and calculation of flood depths at points along the channel, it may result in a lower crossing elevation (and possibly lower costs) for the pipeline. Also, since the regional regression equations estimate flood depths for specific recurrence-interval floods, it is possible to place a recurrence interval on the crossing design for risk calculations. However, regional regression equations linking depth of flood to recurrence interval have not been developed for many areas. In States where they have been developed (e.g., Alabama, Colorado, Illinois, Kansas, and Oklahoma), standard errors of the estimates have ranged from 17 to 28 percent, with an average standard error of 23 percent (Burkham 1988).

BLM_0013125

**Table 2. Examples of Depth Frequency Equations for Ungaged Sites in Utah**

| Regression equations for flood depths for Uinta Basin (from Thomas and Lindskov 1983) | | | |
|---|---|---|---|
| Flood depth <u>D</u> in feet, <u>A</u>rea in square miles, <u>E</u>levation in thousands of feet | | | |
| Recurrence interval (yrs) | Equation | Number of stations used in analysis | Average standard error of estimate (%) |
| 2 | $D = 1.03\ A^{0.159}$ | 16 | 30 |
| 5 | $D = 13.3\ A^{0.148}E^{-1.03}$ | 16 | 28 |
| 10 | $D = 68.6\ A^{0.131}\ E^{-1.69}$ | 16 | 26 |
| 25 | $D = 556\ A^{0.128}\ E^{-2.59}$ | 16 | 24 |
| 50 | $D = 1330\ A^{0.123}\ E^{-2.95}$ | 15 | 24 |
| 100 | $D = 1210\ A^{0.130}\ E^{-2.86}$ | 14 | 22 |

## ANALYTICAL METHOD

The analytical method described by Burkham (1988) uses uniform flow equations to estimate depth of flow associated with a particular magnitude and frequency of discharge. Typically, a trial-and-error procedure is used to solve the Manning uniform flow equation for depth of flow, given a design discharge (i.e., a flood of specified recurrence interval), a field-surveyed cross section and channel slope, and an estimate of the Manning roughness coefficient ($n$). Numerous software packages are available to facilitate the trial-and-error solution procedure (e.g., WinXSPRO). Since the Manning formula is linear with respect to the roughness coefficient, estimating this coefficient can be a significant source of error and is likely the most significant weakness in this approach. Estimating roughness coefficients ($n$ values) for ungaged sites is a matter of engineering judgment, but $n$ values typically are a function of slope, depth of flow, bed-material particle size, and bedforms present during the passage of the flood wave. Guidance is available in many hydraulic references (e.g., Chow 1959). Selecting $n$ values for flows above the bankfull stage is particularly difficult, since vegetation plays a major role in determining resistance to flow. Barnes (1967) presents photographic examples of field-verified $n$ values, and Arcement and Schneider (1989) present comprehensive guidance for calculating $n$ values for both channels and vegetated overbank areas (i.e., floodplains). Depth of flow determined with uniform flow equations, such as the Manning equation, represents **mean** depth of flow to be added to the **cross section** at the site of the pipeline crossing.

Burkham (1977, 1988) also presented a simplified technique for estimating depth of flow, making use of the general equation for the depth-discharge relation:

$$d = C\ Q^{f}$$

Values of $f$ (the slope of the relationship when plotted on logarithmic graph paper) can be determined from "at-station" hydraulic geometry relationships at gaging stations in the region. Only the upper portion of the gaging-station ratings should be used to derive the slope ($f$ value) for application to extreme floods, since a substantial portion of the flow may be conveyed in the

overbank area. Alternatively, Burkham (1977, 1988) presents a simplified procedure for estimating $f$ that requires only a factor for channel shape. Leopold and Langbein (1962) computed a theoretical value of 0.42 for natural channels, while Burkham (1988) computed a theoretical value of 0.46 for parabolic cross sections. Burkham (1977) earlier reported an average $f$ value of 0.42 from 539 gaging stations scattered along the eastern seaboard and upper Midwest, while Leopold and Maddock (1953) reported an average $f$ value of 0.40 for 20 river cross sections in the Great Plains and the Southwest. Park (1977) summarized $f$ values from 139 sites around the world and found most values occurred in the range of 0.3 to 0.4. Additional assumptions in Burkham (1977, 1988) enable an estimate of the coefficient $C$ in the depth-discharge relationship with only a single field measurement of width and maximum depth at some reference level in the channel (e.g., bankfull stage) (Burkham 1977, 1988). Depth of flow determined from Burkham's simplified technique represents **maximum** depth of flow to be added to the **thalweg** at the cross section.

The analytical methods described by Burkham (1977, 1988) generally will be more accurate than the physiographic and reconnaissance methods described previously; thus, they may result in lower pipeline elevations and construction costs than the previous methods. However, analysis of flood elevations for the most sensitive situations should probably be conducted with the detailed method described below.

## DETAILED METHOD

Additional savings in construction costs for pipelines crossing channels may be realized by applying a detailed water-surface-profile model of flow through the crossing site. The water-surface-profile model requires a detailed survey of both the longitudinal channel profile (at least 20 channel widths in length) and several cross sections along the stream (Figure 5). Design flows (e.g., 100-year and 500-year floods) are calculated for the channel at the crossing with the regional regression equations described above and routed through the surveyed channel reach using a step-backwater analysis. The step-backwater analysis uses the principles of conservation of mass and conservation of energy to calculate water-surface elevations at each surveyed cross section. Computed water-surface elevations at successive cross sections are linked to provide a water-surface profile for the flood of interest through the reach of interest. The computations are routinely accomplished in standard software, such as the U.S. Army Corps of Engineers' HEC-RAS model. Whereas the analytical methods described previously assume steady, uniform flow conditions through the reach, a detailed water-surface-profile model is capable of handling both gradually and (to some extent) rapidly varied flow conditions. Since the computation uses a detailed channel survey, it is the most accurate method to use; however, it is likely the most expensive method for the same reason. Burkham (1988) indicates that the error in flood depths predicted from step-backwater analysis can be expected to be less than 20 percent. The step-backwater computations require an estimate of the Manning roughness coefficient ($n$) as an indicator of resistance to flow and assume fairly stable channel boundaries. Estimation of the roughness coefficient ($n$) includes the same considerations discussed previously for the analytical methods. The assumption of fairly stable channel boundaries is not always met with sand-bed channels and is an issue of considerable importance for designing subsurface pipeline crossings as well.

BLM_0013127



**Figure 5. Application of a water-surface-profile model requires both a longitudinal channel profile and several surveyed cross sections (Federal Interagency Stream Restoration Working Group 1998).**

Of the methods presented for determining elevation of floods for pipelines crossing channels, the detailed method is the most accurate and should be used for situations with high resource values, infrastructure investment, construction costs, or liabilities in downstream areas. In undeveloped areas, the physiographic and analytical methods may be used to provide quick estimates of flood elevations for sites with fewer downstream concerns. The reconnaissance method provides the roughest estimates but may be all that is warranted in very unstable areas, such as alluvial fans or low relief valley floors (e.g., near playas). The detailed, analytical, and physiographic methods all assume relatively stable channel boundaries but may be used on sand channels with an accompanying loss of accuracy. In very sandy channels, the accuracy of results from the detailed method may not be significantly better than the results from one of the intermediate methods unless a mobile-boundary model is used (Burkham 1988).

## SUBSURFACE (BURIED) CROSSINGS

Since many of the pipelines are small and most of the channels are ephemeral, it is commonplace to bury the pipelines rather than suspending them above the streams. The practice of burying pipelines at channel crossings likely is both cheaper and easier than suspending them above all floodflows; however, an analysis of channel degradation and scour should be completed to ensure the pipelines are not exposed and broken during extreme runoff events (Figure 6). Without such an analysis, channels should be excavated to bedrock and pipelines placed beneath all alluvial material.

BLM_0013128



**Figure 6. Channel degradation or scour during flash-flood events may expose buried pipelines, resulting in costly breaks.**

Buried pipelines may be exposed by streambed lowering resulting from channel degradation, channel scour, or a combination of the two. Channel degradation occurs over a long stream reach or even the entire drainage network and is generally associated with the overall lowering of the landscape. Degradation also may be associated with changes in upstream watershed or channel conditions that alter the water and sediment yield of the basin. Channel scour is a local phenomenon associated with passage of one or more flood events or site-specific hydraulic conditions that may be natural or human-caused in origin. Either process can expose buried pipelines to excessive forces associated with extreme flow events, and an analysis of each is required to ensure integrity of the crossing.

## CHANNEL DEGRADATION

Detection of long-term channel degradation must be attempted, even if there is no indication of local scour. Conceptual models of channel evolution (e.g., Simon 1989) have been proposed to describe a more-or-less predictable sequence of channel changes that a stream undergoes in response to disturbance in the channel or the watershed. Many of these models are based on a "space for time" substitution, whereby downstream conditions are interpreted as preceding (in time) the immediate location of interest, and upstream conditions are interpreted as following (in time) the immediate location of interest. Thus, a reach in the middle of the watershed that

BLM_0013129

previously looked like the channel upstream will evolve to look like the channel downstream (Federal Interagency Stream Restoration Working Group 1998). Since channel evolution models can help predict current trends where a pipeline crosses a channel, they may indicate areas to be avoided when relocation of the crossing is an option. Most conceptual models of channel evolution have been developed for landscapes dominated by streams with cohesive banks; however, the same processes occur in streams with noncohesive banks, with somewhat less well-defined stages.

Geomorphic indicators of recent channel incision (e.g., obligate and facultative riparian species on present-day stream terraces elevated above the water table) also may be helpful for diagnosing channel conditions. However, long-term trends in channel evolution are often reversed during major flood events, especially for intermittent and ephemeral channels in arid and semiarid environments. Thus, a stream that is degrading during annual and intermediate flood events may be filled with sediment (i.e., it may aggrade) from tributary inputs during a major flood, and channels that are associated with sediment storage (i.e., aggrading) during the majority of runoff events may be "blown out" with major degradation during unusual and extreme large floods.

In some situations, a quantitative analysis of channel degradation may be warranted. Plots of streambed elevation against time permit evaluation of bed-level adjustment and indicate whether a major phase of channel incision has passed or is ongoing. However, comparative channel survey data are rarely available for the proposed location for a pipeline to cross a channel. In instances where a gaging station is operated at or near the crossing, it is usually possible to determine long-term aggradation or degradation by plotting the change in stage through time for one or more selected discharges. The procedure is called a specific-gage analysis (Figure 7) and is described in detail in *Stream Corridor Restoration: Principles, Processes, and Practices* (Federal Interagency Stream Restoration Working Group 1998). When there is no gaging station near the proposed channel crossing, nearby locations on the same stream or in the same river basin may provide a regional perspective on long-term channel adjustments. However, specific-gage records indicate only the conditions in the vicinity of the particular gaging station and do not necessarily reflect river response farther upstream or downstream of the gage. Therefore, it is advisable to investigate other data in order to make predictions about potential channel degradation at a site.

BLM_0013130

*Moab PRMP/FEIS*                    *Appendix H: Hydraulic Considerations for Pipelines Crossing Stream Channels*



**Figure 7. Specific-gage plots of the gage heights associated with index flows through time may indicate general channel lowering in the drainage basin (Federal Interagency Stream Restoration Working Group 1998; Biedenharn et al. 1997).**

Other sources of information include the biannual bridge inspection reports required in all States for bridge maintenance. In most States, these reports include channel cross sections or bed elevations under the bridge, and a procedure similar to specific gage analysis may be attempted (Figure 8). Simon (1989, 1992) presents mathematical functions for describing bed-level adjustments through time, fitting elevation data at a site to either a power function or an exponential function of time. Successive cross sections from a series of bridges in a basin also may be used to construct a longitudinal profile of the channel network; sequential profiles so constructed may be used to document channel adjustments through time (Figure 9). Again, bridge inspection reports so used indicate only the conditions in the vicinity of those particular bridges (where local scour may be present) and must be interpreted judiciously for sites upstream, downstream, or between the bridges used in the analysis.

BLM_0013131

*Moab PRMP/FEIS*          *Appendix H: Hydraulic Considerations for Pipelines Crossing Stream Channels*



**Figure 8. Plots of bed elevation versus time may be developed from biannual bridge inspection reports to document systemwide degradation or aggradation (Federal Interagency Stream Restoration Working Group 1998).**

BLM_0013132



**Figure 9. Sequential longitudinal profiles also may be used to document channel lowering through time (Federal Interagency Stream Restoration Working Group 1988; Biedenharn et al. 1997).**

In the absence of channel surveys, gaging stations, and bridge inspection reports (or other records of structural repairs along a channel), it may be necessary to investigate channel aggradation and degradation using quantitative techniques described in Richardson et al. (2001) and Lagasse et al. (2001). Techniques for assessing vertical stability of the channel include incipient motion analysis, analysis of armoring potential, equilibrium slope analysis, and sediment continuity analysis. Incipient motion analysis and analysis of armoring potential are equally applicable to both long-term degradation and short-term scour and fill processes, while equilibrium-slope and sediment-continuity analyses are more closely tied to long-term channel processes (i.e., degradation and aggradation).

## CHANNEL SCOUR

In addition to long-term channel degradation at subsurface crossings, general channel scour must be addressed to ensure safety of the pipeline. General scour is different from long-term degradation in that general scour may be cyclic or related to the passing of a flood (Richardson and Davis 2001). Channel scour and fill processes occur naturally along a given channel, and both reflect the redistribution of sediment and short-term adjustments that enable the channel to maintain a quasi-equilibrium form. In other words, channels in dynamic equilibrium experience various depths of scour during the rising stages of a flood that frequently correspond to equal amounts of fill during the falling stages, resulting in minimal changes in channel-bed elevation. Where pipelines cross channels, it is important to determine the potential maximum depth of scour so that the pipeline is buried to a sufficient depth and does not become exposed when bed scour occurs during a flood.

General scour occurs when sediment transport through a stream reach is greater than the sediment load being supplied from upstream and is usually associated with changes in the channel cross section. General scour can occur in natural channels wherever a pipeline crosses a

BLM_0013133

constriction in the channel cross section (contraction scour). Equations for calculating contraction scour generally fall into two categories, depending on the inflow of bed-material sediment from upstream. In situations where there is little to no bed-material transport from upstream (generally coarse-bed streams with gravel and larger bed materials), contraction scour should be estimated using clear-water scour equations. In situations where there is considerable bed-material transport into the constricted section (i.e., for most sand-bed streams), contraction scour should be estimated using live-bed scour equations. Live-bed and clear-water scour equations can be found in many hydraulic references (e.g., Richardson and Davis 2001). In either case, estimates of general scour in the vicinity of the pipeline crossing must be added to the assessment of channel degradation for estimating the depth of burial for the crossing.

Other components of general scour can result from placement of subsurface crossings relative to the alignment of the stream channel. Pipelines crossing at bends in the channel are particularly troublesome, since bends are naturally unstable and tend to collect both ice and debris (which can cause additional constrictions in the flow). Channel-bottom elevations are usually lower on the outside of meander bends and may be more than twice as deep as the average depth in straighter portions of the channel. Crossings in the vicinity of stream confluences also create difficulties, since flood stages and hydraulic forces may be strongly influenced by backwater conditions at the downstream confluence. For example, sediment deposits from tributary inputs may induce contraction scour opposite or downstream of the deposit. Additional complications are introduced where pipelines are located near other obstructions in the channel. Channel-spanning obstructions (e.g., beaver dams or large wood) may induce plunge-pool scour downstream of the structure, and individual obstructions in the channel induce local scour akin to pier scour characteristic of bridge piers at highway crossings.

Even in the absence of contraction scour, general scour will still occur in most sand-bed channels during the passage of major floods. Since sand is easily eroded and transported, interaction between the flow of water and the sand bed results in different configurations of the stream bed with varying conditions of flow. The average height of dune bedforms is roughly one-third to one-half the mean flow depth, and the maximum height of dunes may nearly equal the mean flow depth. Thus, if the mean depth of flow in a channel was 5 feet, maximum dune height could also approach 5 feet, half of which would be below the mean elevation of the stream bed (Lagasse et al. 2001). Similarly, Simons, Li, and Associates (1982) present equations for antidune height as a function of mean velocity, but limit maximum antidune height to mean flow depth. Consequently, formation of antidunes during high flows not only increases mean water-surface elevation by one-half the wave height, it also reduces the mean bed elevation by one-half the wave height. Richardson and Davis (2001) reported maximum general scour of one to two times the average flow depth where two channels come together in a braided stream.

Pipeline crossings that are buried rather than suspended above all major flow events should address all of the components of degradation, scour, and channel-lowering due to bedforms described above. In addition, once a determination is made on how deep to bury the pipeline at the stream crossing, the elevation of the pipe should be held constant across the floodplain. If the line is placed at shallower depths beneath the floodplain, channel migration may expose the line where it is not designed to pass beneath the channel (Figure 10).

BLM_0013134



**Figure 10. Lateral migration of this stream channel during high water excavated a section of pipeline under the floodplain that was several feet shallower than at the original stream crossing.**

In complex situations or where consequences of pipeline failure are significant, consideration should be given to modeling the mobile-bed hydraulics with a numerical model such as HEC-6 (U.S. Army Corps of Engineers 1993) or BRI-STARS (Molinas 1990). The Federal Interagency Stream Restoration Working Group (1998) summarizes the capabilities of these and other models and provides references for model operation and user guides where available.

## CONCLUSION

Pipelines that cross perennial, intermittent, and ephemeral stream channels should be constructed to withstand floods of extreme magnitude to prevent rupture and accidental contamination of runoff during high flow events. Pipelines crossing at the surface must be constructed high enough to remain above the highest possible floodflows at each crossing, and pipelines crossing below the surface must be buried deep enough to remain undisturbed by scour and fill processes typically associated with passage of peak flows. A hydraulic analysis should be completed during the pipeline design phase to avoid repeated maintenance of such crossings and eliminate costly repairs and potential environmental degradation associated with pipeline breaks at stream crossings.

BLM_0013135

## LITERATURE CITED

Arcement, G.J., Jr. and V.R. Schneider. 1989. Guide for selecting Manning's roughness coefficients for natural channels and flood plains. U.S. Geological Survey Water-Supply Paper 2339. 38 pp.

Barnes, H.H., Jr. 1967. Roughness characteristics of natural channels. U.S. Geological Survey Water-Supply Paper 1849. 213 pp.

Biedenharn, D.S., C.M. Elliott, and C.C. Watson. 1997. The WES stream investigation and streambank stabilization handbook. Prepared for the U.S. Environmental Protection Agency by the U.S. Army Corps of Engineers Waterways Experiment Station. Vicksburg, MS.

Burkam, D.E. 1977. A technique for determining depths for T-year discharges in rigid boundary channels. U.S. Geological Survey Water-Resources Investigations 77-83. 38 pp.

Burkham, D.E. 1988. Methods for delineating flood-prone areas in the Great Basin of Nevada and adjacent states. U.S. Geological Survey Water-Supply Paper 2316. 20 pp.

Chow, V.T. 1959. Open-channel hydraulics. McGraw Hill, New York. 680 pp.

Federal Interagency Stream Restoration Working Group. 1998. Stream corridor restoration: Principles, processes, and practices. National Technical Information Service, Order No. PB98-158348INQ, Washington, DC.

Lagasse, P.F., J.D. Schall, and E.V. Richardson. 2001. Stream stability at highway structures. Hydraulic Engineering Circular No. 20, Third Edition, FHWA NHI 01-002. Federal Highway Administration, Washington, DC.

Leopold, L.B. and W.B. Langbein. 1962. The concept of entropy in landscape evolution. U.S. Geological Survey Professional Paper 500-A. 20 pp.

Leopold, L.B. and T. Maddock, Jr. 1953. The hydraulic geometry of stream channels and some physiographic implications. U.S. Geological Survey Professional Paper 252. 57 pp.

Molinas, A. 1990. Bridge stream tube model for alluvial river simulation (BRI-STARS), user's manual. National Cooperative Highway Research Program, Project No. HR 15-11. Transportation Research Board, Washington, DC.

Park, C.C. 1977. World-wide variations in hydraulic geometry exponents of stream channels: An analysis and some observations. Journal of Hydrology 33:133-146.

Richardson, E.V. and S.R. Davis. 2001. Evaluating scour at bridges. Hydraulic Engineering Circular No. 18, Fourth Edition, FHWA NHI 01-001. Federal Highway Administration, Washington, DC.

BLM_0013136

Richardson, E.V., D.B. Simons, and P.F. Lagasse. 2001. Highways in the river environment. Report FHWA NHI 01-004, Hydraulic Design Series No. 6. Federal Highway Administration, Washington, DC.

Ries, K.G., III and M.Y. Crouse. 2002. The National Flood Frequency Program, version 3: A computer program for estimating magnitude and frequency of floods for ungaged sites. U.S. Geological Survey Water-Resources Investigations Report 02-4168. 42 pp.

Simon, A. 1989. A model of channel response in distributed alluvial channels. Earth Surface Processes and Landforms 14(1): 11-26.

Simon, A. 1992, Energy, time and channel evolution in catastrophically disturbed fluvial systems. In Phillips, J.D. and W.H. Renwick (eds.). Geomorphic systems: geomorphology. Vol. 5. pp. 345-372.

Simons, Li, and Associates. 1982. Engineering analysis of fluvial systems. Fort Collins, CO.

Thomas, B.E. and K.L. Lindskov. 1983. Methods for estimating peak discharge and flood boundaries of stream in Utah. U.S. Geological Survey Water-Resources Investigations Report 83-4129. 77 pp.

Thomas, B.E., H.W. Hjalmarson, and S.D. Waltemeyer. 1997. Methods for estimating magnitude and frequency of floods in the southwestern United States. U.S. Geological Survey Water-Supply Paper 2433. 195 pp.

U.S. Army Corps of Engineers. 1993. HEC-6 scour and deposition in rivers and reservoirs: Users manual. Hydrologic Engineering Center, Davis, CA.

The mention of company names, trade names, or commercial products does not constitute endorsement or recommendation for use by the Federal Government.

BLM_0013137

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0013138

# APPENDIX I.
## RELEVANCE AND IMPORTANCE EVALUATIONS OF AREA OF CRITICAL ENVIRONMENTAL CONCERN (ACEC) NOMINATIONS

## I.1 INTRODUCTION

The Federal Land Policy and Management Act (FLPMA) states that the Bureau of Land Management (BLM) will give priority to the designation and protection of Areas of Critical Environmental Concern (ACECs) in the development and revision of land-use plans. Land-use plans in the BLM are known as Resource Management Plans (RMPs) and the Moab BLM is currently in the multi-year process of developing such a plan. This RMP will replace an RMP that was approved in 1985.

The 1985 Grand RMP did not consider any ACECs. As a part of this new planning cycle for the RMP, the BLM accepted ACEC nominations (including three that had been proposed in 1999 and one proposed in January of 2003) and evaluated all nominations that had been received by March 30, 2004.

This report summarizes the relevance and importance evaluations for 35 nominated ACECs located on lands administered by the BLM's Moab Field Office (MFO). Many of the nominations covered similar geographical areas, although each nomination proposed a unique boundary. These evaluations have been completed in accordance with guidance provided in BLM regulations at 43 CFR part 1610.7-2 and *BLM Manual 1613-Areas of Critical Environmental Concern*, which identify relevance and importance criteria that must be met for a nominated area to be considered as a potential ACEC. After reviewing the 37 nominations, BLM has determined that 14 areas meet the relevance and importance criteria. These 14 potential ACECs (which are oftentimes compilations of various ACEC nominations) will be studied further in the RMP to determine whether they warrant designation as an ACEC.

## I.2 WHAT IS AN ACEC?

FLPMA defines an ACEC as an area "within the public lands where special management attention is required to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and safety from natural hazards." Therefore, private lands and lands administered by other agencies are not included in the boundaries of ACECs.

ACECs differ from some other special management designations in that designation by itself does not automatically prohibit or restrict other uses in the area. The special management attention is designed specifically for the relevant and important values, and therefore varies from area to area. The one exception is that a mining plan of operation is required for any proposed mining activity that would create surface disturbance greater than casual use within a designated ACEC (43 CFR 3809 Regulations). The ACEC designation is an administrative designation that is accomplished through the land-use planning process. It is unique to BLM in that no other

BLM_0013139

agency uses this form of designation. The intent of Congress in mandating the designation of ACECs through FLPMA was to give priority to the designation and protection of areas containing unique and significant resource values.

## I.3 THE ACEC DESIGNATION PROCESS

There are several steps in the identification and evaluation of ACECs. These steps include the nomination of areas that may meet the relevance and importance criteria, evaluation of the nominated areas to determine if they meet the criteria, and consideration of the potential ACECs in alternative management scenarios which are formulated and effects analyzed in the Draft RMP/EIS. When released, the preferred alternative of the Draft RMP/EIS indicates which potential ACECs are proposed by BLM for designation. Public comment is requested. Public comments are reviewed and considered and adjustments are made as necessary before the Proposed RMP/Final EIS is released. Designation of ACECs then occurs in the Record of Decision approving the RMP. Each of these steps is briefly described below.

### I.3.1 IDENTIFICATION/NOMINATION

ACECs can be nominated at anytime, but are only designated through the BLM's land-use planning process. Nominations from the public are generally solicited as part of the scoping process during development of a land-use plan for a particular area. BLM requested that ACEC nominations to be considered in the Moab planning process be submitted by December 30, 2003. However, ACEC nominations continued to be submitted after this deadline and those received early enough in the process were also reviewed.

### I.3.2 EVALUATIONS OF NOMINATIONS FOR RELEVANCE AND IMPORTANCE

Nominations are evaluated to determine whether they meet the relevance and importance criteria. The relevance and importance criteria are detailed in Appendix A. A nomination must meet one or more of the relevance and importance criteria to be considered a potential ACEC. Potential ACECs are then considered further in the planning process.

### I.3.3 CONSIDERATION OF POTENTIAL ACECs

Potential ACECs are considered as RMP alternatives are developed. Each potential ACEC is proposed for designation in at least one of the management alternatives. The need for special management and the resulting effects from applying such management are assessed in the associated environmental analysis. The Preferred Alternative identifies which potential ACECs are proposed by BLM for designation.

### I.3.4 COMMENT ON PROPOSED ACECs

A notice of any areas proposed for ACEC designation is published in the Federal Register along with a Notice of Availability of the Draft RMP/EIS requesting public comment. The public may comment on any aspect of the ACEC analysis at this point in the process. These comments are

BLM_0013140

then considered in preparation of the Proposed RMP/Final EIS. After a 30-day protest period, a Record of Decision is prepared and the plan is approved.

## I.3.5 DESIGNATION

In order to be designated as an ACEC, a potential ACEC requires special management attention in order to prevent irreparable damage to the relevant and important values. The need for special management attention may vary by alternative, depending upon what other types of management schemes or resource allocations are being considered for that alternative. Special management attention refers to management prescriptions designed expressly to protect or manage the relevant and important values of an area that would not be necessary and prescribed if the relevant and important values did not exist. These prescriptions are unique to the area involved, outside of standard or routine practices, usually more detailed than prescriptions contained within the plan for other areas, and establish priority for implementation. If analysis determines that special management attention is required, the area may be designated as an ACEC. Designation occurs when the Record of Decision is signed approving the RMP.

## I.4 BACKGROUND – MOAB ACEC PROCESS

The Moab Field Office received four ACEC nominations prior to the initiation of the current RMP revision. Three of these were received in 1999, and one was received early in 2003. In addition, ACEC nominations were solicited as part of scoping for the current RMP effort. Scoping for the Moab RMP was initiated with publication of the Notice of Intent in the Federal Register on June 4, 2003. In the Fall of 2003, mailings and public meetings were used to solicit ACEC nominations and comments from the public.

Nominators were asked to include a boundary of the nominated area, and information and rationale as to why they believe the area meets the relevance and importance criteria. Written comments were requested by December 30, 2003 for full consideration in the planning process. However, in an effort to be inclusive and to produce a comprehensive plan, nominations that were received early enough in the planning process were also reviewed. As part of the Analysis of the Management Situation, members of the BLM's planning team were also requested to submit internal information for consideration by February 28, 2004.

In all, 35 ACEC nominations were evaluated for relevance and importance. It is important to note that many of these nominations were for essentially similar areas, although various proposals from various groups had differing boundaries. Each proposal was reviewed by a BLM interdisciplinary team in conjunction with the cooperating agencies. Where appropriate, nominations were combined and boundaries drawn that best reflect the area where relevant and important values exist. The complete list of nominations is summarized in Appendix B.

## I.5 THE ACEC TEAM

Nominations were evaluated for relevance and importance by Moab BLM interdisciplinary staff, with assistance from cooperators, including representatives of Grand and San Juan Counties, as

BLM_0013141

well as of the State of Utah. The BLM review team was comprised of the following planning team members and management staff:

- Maggie Wyatt, Field Office Manager
- Brent Northrup, RMP Planning Coordinator
- Pam Riddle, Wildlife Biologist
- Rob Sweeten, VRM Coordinator
- Daryl Trotter, Botanist/Environmental Protection Specialist
- Donna Turnipseed, Archaeologist
- Katie Stevens, Outdoor Recreation Planner/ACEC Coordinator

The following BLM staff members also assisted in the effort:

- Stephanie Ellingham, Riparian Specialist
- Russ von Koch, Recreation Branch Chief
- Bill Stevens, Outdoor Recreation Planner
- Ann Marie Aubry, Hydrologist

Cooperating agencies were represented by the following individuals:

- Ed Scherick, San Juan County Planner
- Evan Lowry, San Juan County Planner
- Jerry McNeely, Grand County Councilman
- Al McLeod, Grand County Councilman
- Judy Bane, Grand County Administrator
- Dave Vaughn, Grand County Road Department
- Val Payne, State of Utah Department of Natural Resources
- Bill Stokes, State of Utah School and Institutional Trust Lands
- Lavonne Garrison, State of Utah School and Institutional Trust Lands

The ACEC review team met on February 9, 2004, March 1, 2004, March 4, 2004 and April 19, 2004. Discussion concerning the relevance and importance of resources within the various ACEC nominations occurred at these meetings.

## I.6 RELEVANCE AND IMPORTANCE EVALUATIONS

The information provided below is organized in alphabetical order by name of the nominated area. There were 35 nominations, although many of the areas overlap one another. The nominations are listed below in alphabetical order by name of the nominated area. ACECs are depicted on Map 2-14-B for the 14 areas moving forward as potential ACECs. It should be noted that boundaries of these potential ACECs are compilations of the various boundaries proposed by the nominators, and thus vary from what was nominated.

BLM_0013142

The entire list of nominations includes:

1. Behind the Rocks (The Nature Conservancy)
2. Behind the Rocks (Moab Field Office Internal Nomination)
3. Big Triangle (Southern Utah Wilderness Alliance)
4. Book Cliffs Wildlife Area (Moab Field Office Internal Nomination)
5. Book Cliffs Wildlife (Southern Utah Wilderness Alliance)
6. Canyon Rims (Moab Field Office Internal Nomination)
7. Castle Valley Critical Deer Winter Range (Grand Canyon Trust)
8. Cisco White-tailed Prairie Dog Complex (Center for Native Ecosystems et al.)
9. Colorado River Corridor-Richardson Amphitheater (The Nature Conservancy)
10. Colorado River Corridor-Negro Bill (Stolfa)
11. Colorado River Corridor-Richardson Amphitheater (Carlson)
12. Colorado River Corridor-Cache Valley (MFO Internal Nomination)
13. Colorado River Corridor-Negro Bill and Sand Flats (MFO Internal Nomination)
14. Colorado River Corridor-Fisher Towers (Southern Utah Wilderness Alliance)
15. Colorado River Corridor – Arches (Southern Utah Wilderness Alliance)
16. Cottonwood-Diamond Watershed (MFO Internal Nomination)
17. Dead Horse Point, including Shafer Basin (Southern Utah Wilderness Alliance)
18. Dolores Triangle (Southern Utah Wilderness Alliance)
19. Gemini Bridges/Poison Spider (Carlson)
20. Greater Moab: Behind the Rocks/Negro Bill/Mill Creek (Southern Utah Wilderness Alliance)
21. Hatch Wash (Southern Utah Wilderness Alliance)
22. Highway 279 Corridor/Shafer Basin/Long Canyon (MFO Internal Nomination)
23. Labyrinth/Horsethief (Southern Utah Wilderness Alliance)
24. Labyrinth Canyon (MFO Internal Nomination)
25. Mill Creek Canyon (Mill Creek Partnership)
26. Mill Creek Canyon (MFO Internal Nomination)
27. Ten Mile Wash (Carlson)
28. Ten Mile Wash (MFO Internal Nomination)
29. Upper Courthouse (The Nature Conservancy)
30. Upper Courthouse (MFO Internal Nomination)
31. Westwater (Southern Utah Wilderness Alliance)
32. Westwater Canyon (MFO Internal Nomination)
33. White Wash (MFO Internal Nomination)
34. White Wash (Southern Utah Wilderness Alliance)

BLM_0013143

35. Wilson Arch (MFO Internal Nomination)
36. Highway 313 (Southern Utah Wilderness Alliance)
37. Upper Labyrinth (Southern Utah Wilderness Alliance)

The 14 areas that were found to meet the relevance and importance criteria and will go forward as potential ACECs are:

1. Behind the Rocks
2. Book Cliffs Wildlife Area
3. Canyon Rims
4. Cisco White-tailed Prairie Dog Complex
5. Colorado River Corridor
6. Cottonwood Diamond Watershed
7. Highway 279 Corridor/ Shafer Basin/Long Canyon
8. Labyrinth Canyon
9. Mill Creek Canyon
10. Ten Mile Wash
11. Upper Courthouse
12. Westwater Canyon
13. White Wash
14. Wilson Arch

The 37 nominations have been organized into 21 nominated areas which are discussed in turn below. Note that multiple nominations were often received for a particular area. Size calculations were made only for those areas or portions of areas that were determined by BLM to meet the relevance and importance criteria, and are thus potential ACECs.

## I.6.1 BEHIND THE ROCKS

(Nominated by Nature Conservancy and BLM staff; also included in SUWA's "Greater Moab")

Description of Area: Behind the Rocks is located west of the city of Moab and east of Kane Creek Canyon. It is an area of sandstone fins and deeply entrenched canyons, with arches and other features. Various boundaries were proposed by the several nominators. From these, BLM crafted the boundary of the potential ACEC to include all of the relevant and important cultural, wildlife, plant and scenic resources of the area.

Size: 17,836 acres (approximate)

Relevance Criteria: The area contains significant cultural resources, including rock art and habitation sites. The scenic values are outstanding in the area, with slickrock domes and fins present on a grander scale than in Arches National Park. There are also several large natural arches in the area. The area contains habitat for several special-status wildlife species, including

BLM_0013144

the peregrine falcon, southwest willow flycatcher, spotted bat and big free-tailed bat. Three special-status plant species occur in the area: the Canyonlands biscuitroot, alcove rock daisy and alcove bog orchid. The area is one of only three major population centers (and of these, the least imperiled) for the Canyonlands biscuitroot. Two narrowly distributed plants, the western hop-hornbeam and alcove death camas also occur. In addition, there are relict plant communities within the area which are valuable for scientific study.

Importance Criteria: Within the area, cultural sites are distinctive and of special worth. Scenic values are nationally significant; Behind the Rocks is the best example of Navajo sandstone fins in the world, and provides the scenic backdrop to the town of Moab. The rare and endemic plants are fragile, rare and irreplaceable. Behind the Rocks is one of only 12 known areas with occurrences of the alcove rock daisy, and one of three areas in which the Canyonlands biscuitroot is found. The area also contains plant communities and soils that have been little disturbed or altered, providing an uncommon remnant of the presettlement landscape.

Findings: This nomination meets both the relevance and importance criteria for threatened and endangered plants, scenery and cultural values. It will be carried forward as a potential ACEC.

## I.6.2 BIG TRIANGLE

(Nominated by Southern Utah Wilderness Alliance)

Description of Area: The area is commonly called the Dolores Triangle, and includes Coates Creek, Renegade Creek, and Ryan Creek

Size: Not calculated

Relevance Criteria: Big Triangle does meet relevance criteria in that it is important wildlife habitat, and has riparian natural systems.

Importance Criteria: This nomination does not meet the importance criteria for wildlife or riparian resources. The area does contain wildlife and riparian habitats, but they are not more than locally significant when taken in the context of the entire region. While the area is crucial deer and/or elk winter range, there are other instances of winter range throughout the Field Office. The bat habitats in the Big Triangle are widespread throughout the Field Office. There are no inventoried populations of TES (Threatened, Endangered or Sensitive) species in the area; the TES habitat is merely potential habitat. While there were some historical sage-grouse populations, there are currently no permanent populations of sage-grouse.

Findings: This nomination meets the relevance criteria for wildlife and riparian resources. This nomination does not meet the importance criteria for either of these values. This nomination will not be carried forward as a potential ACEC.

BLM_0013145

## I.6.3 BOOK CLIFFS WILDLIFE AREA

(Nominated by Moab Field Office staff and Southern Utah Wilderness Alliance)

Description of Area: The Book Cliffs Wildlife Area ACEC is located on the southern flanks of the Book Cliffs from the Green River to Hay Canyon and from the Book Cliffs terraces north to the Moab Field Office boundary. (The boundary proposed by the Southern Utah Wilderness Alliance differed from that of BLM staff. BLM staff adjusted the boundary of the area with the assistance of data from the Utah Division of Wildlife Resources).

Size: 304,252 acres (approximate)

Relevance Criteria: The Book Cliffs Wildlife Area nomination meets the relevance criteria for wildlife and cultural values. The Book Cliffs area contains habitat essential for maintaining species diversity, including that of endangered, threatened and Utah sensitive animal species. In addition, the Book Cliffs provides important habitat for the following big game species: Rocky Mountain bighorn sheep, mule deer, Rocky Mountain elk, mountain lion and black bear. Crucial fawning and calving grounds and critical winter ranges for elk and deer are within the area. The Book Cliffs are essentially a natural system with riparian systems encompassing unfragmented, contiguous habitat for a great diversity of plant and animal communities. The area is also rich in cultural resources, and includes rock art, camp sites, cave excavations and brush structures.

Importance Criteria: The Book Cliffs wildlife habitat is of more than local significance. There are no areas in the Western United States (outside of Alaska) that offer such a large, contiguous, unfragmented, and undisturbed habitat for such a large variety of animal species. This extensive habitat promotes biological and genetic diversity that is unavailable in most wildlife habitat areas. The remote areas of the Book Cliffs are important scientific reference sites. Human disturbance and/or development would permanently alter the unfragmented, remote and undisturbed nature of this wildlife habitat. This makes the Book Cliffs proposed ACEC highly vulnerable to adverse change. The habitat is also irreplaceable, exemplary and unique due to the rareness of large, unfragmented and undisturbed habitat for both plants and animals.

In addition, cultural sites within the Book Cliffs have special worth because their remoteness has left them largely undisturbed, and thus of great importance to scientific study.

Findings: This nomination meets the relevance and importance criteria for wildlife, natural systems (riparian plant communities), and cultural values and will be carried forward as a potential ACEC.

## I.6.4 CANYON RIMS

(Nominated by Moab Field Office staff)

Description of Area: The Canyon Rims ACEC nomination consists of the western rims of the Canyon Rims Recreation Area. This encompasses Needles, Anticline, Canyonlands and Minor Overlooks, which are developed recreation sites within the recreation area.

BLM_0013146

<u>Size</u>: 23,400 acres (approximate)

<u>Relevance Criteria</u>: The scenic values of the western portions of the Canyon Rims Recreation Area are outstanding in quality and due to location, highly visible to the recreating public.

<u>Importance Criteria</u>: The scenic values of the western portions of Canyon Rims are important to regional, national, and international visitors who view this area from developed overlooks. The Canyon Rims views are some of the most spectacular in the Western United States. They have special worth and consequence to many visitors, many of whom comment that the views are "more spectacular than the Grand Canyon".

The threats to these scenic resources include oil and gas development and off highway vehicle use, making them subject to adverse change.

<u>Findings</u>: The rims of Canyon Rims Recreation Area meet the relevance and importance criteria for scenic values, and will be carried forward as a potential ACEC.

## I.6.5 CASTLE VALLEY CRITICAL DEER WINTER RANGE

(Nominated by Grand Canyon Trust)

<u>Description of Area</u>: The area is located in the upper portion of Castle Valley, 20 miles east of Moab, Utah.

<u>Size</u>: Not calculated

<u>Relevance Criteria</u>: The area nominated is important deer winter range for the LaSal mountain herd, and thus meets the relevance criterion for wildlife values.

<u>Importance Criteria</u>: The nomination does not meet the importance criterion for the wildlife values, because the area is of no more than local significance for wintering deer. The nominated area is only a very small portion of the LaSal mule deer herd's winter range. Protecting this area would not improve overall winter range conditions for this one deer herd (which is only locally significant).

<u>Findings</u>: The nomination meets the relevance, but not the importance criteria for wildlife values. It will not go forward as a potential ACEC.

## I.6.6 CISCO WHITE-TAILED PRAIRIE DOG COMPLEX

(Nominated by Center for Native Ecosystems et al.)

<u>Description of Area</u>: The ACEC boundary proposal from the Center for Native Ecosystems has been refined with the help of the Utah Division of Wildlife Resources data to include public lands on both sides of I-70 from the Colorado State Line to the Cisco area.

BLM_0013147

<u>Size</u>: 125,620 acres (approximate)

<u>Relevance Criteria</u>: The area meets the relevance criterion for wildlife values. White-tailed prairie dog is a Utah sensitive species, and has been nominated as threatened under the Endangered Species Act. UDWR has mapped historic and current prairie dog towns and their habitat. The habitat within this area is essential for maintaining this species.

<u>Importance Criteria</u>: White-tailed prairie dogs are a Utah sensitive species (a decision on whether to list this species will be made by the U.S. Fish and Wildlife Service by October, 2004.) The population of this candidate species is declining throughout the West, including the area managed by the Moab Field Office. Large tracts of land are needed to maintain populations of this animal and of the predator species which depend on it. White-tailed prairie dog habitat is fragile and very sensitive to OHV abuse, overgrazing, drought and oil and gas disturbance.

<u>Findings:</u> The nomination meets the relevance and importance criteria for wildlife values and will be carried forward as a potential ACEC.

## I.6.7 COLORADO RIVER CORRIDOR (INCLUDING RICHARDSON AMPHITHEATER, NEGRO BILL, CACHE VALLEY, GREATER MOAB, FISHER TOWERS AND ARCHES AREA)

(Nominated in parts by The Nature Conservancy, Stolfa, Carlson, Southern Utah Wilderness Alliance and Moab Field Office staff)

<u>Description of Area</u>: The Colorado River Corridor area lies along Utah Highway 128 east of Moab, Utah. It includes the entire Richardson Amphitheater (including Fisher Towers, Onion Creek and Castle Rock), the canyon of Negro Bill and the Slickrock Bike Trail on the south side of the Colorado River. On the north side of the river, Dry Mesa, Cache Valley and other lands east of Arches National Park are included. (Boundary proposals by various nominators were adjusted by BLM staff and cooperators to determine the potential ACEC boundary.)

<u>Size</u>: 50,483 acres (approximate)

<u>Relevance Criteria</u>: This area meets the relevance criteria for scenic, fish and wildlife, and rare and endangered plants. The scenery in the area is of outstanding quality, and as it is traversed by Utah State Scenic Byway 128, the scenery is accessible to all types of visitors. The area contains such scenic western icons as Fisher Towers, the Colorado River and Castle Rock.

The potential ACEC includes critical habitat for mule deer and desert bighorn sheep. It includes critical bighorn lambing and rutting areas for desert bighorn sheep (particularly in the lands east of Arches National Park). The Colorado River is home to the razorback sucker, bonytail chub, humpback chub and the Colorado pikeminnow, all endangered species. Several birds on the state sensitive list, including yellow-breasted chats and Lewis woodpeckers, have known occurrences within the potential ACEC. State sensitive animals occurring in the area include river otter, spotted bat and big free-tailed bat.

BLM_0013148

Three rare plants occur within the Richardson Amphitheater section of the area: the Jones cycladenia (Threatened), the Shultz stickleaf (Sensitive), and the Dolores rushpink (Sensitive). Relict plant communities also occur in the proposed ACEC. Two state sensitive rare plants (cave primrose and alcove bog orchid) occur in Negro Bill Canyon. The Alcove rock daisy (listed) has also been found in this canyon. In addition, the endemic alcove columbine is also found. The hanging gardens of Negro Bill in which these plants are found range in size from a few meters square to huge classic alcoves. The Colorado River corridor is rich in rare and endangered plants.

Importance Criteria: This area meets the importance criteria for scenic, fish and wildlife and rare and threatened plants. The entire area possesses Class A scenery of widely recognized value. It is internationally renowned for scenery, and has been the location site for 88 film permits from 1998-2002. This area has some of the most significant, internationally recognized scenery in the Western United States. People throughout the world recognize the scenic resources contained within the area. The visual resources in this area are very rare, and do not exist anywhere else in the world. At the same time, the area is subject to intense visitation, making the area susceptible to inadvertent damage.

The wildlife habitat in the area is of more than local significance, and is rare and irreplaceable. The very presence of the Colorado River provides wildlife habitat that is unique in the arid West. The rare and endangered fish in the Colorado River (razorback sucker, bonytail chub, humpback chub and the Colorado pikeminnow) are unique and irreplaceable. Lands crucial to desert bighorn sheep lambing and rutting (in Cache Valley east of Arches National Park) are similarly unique and vulnerable to adverse change. Several birds on the state sensitive list, including yellow-breasted chats and Lewis woodpeckers, have known occurrences within the proposed ACEC. State sensitive animals occurring in the area include river otter, spotted bat and big free-tailed bat.

The potential ACEC contains the only known location in the world of the sensitive Schultz stickleaf. Although only on the BLM state sensitive plant list (and not on the endangered species list), the Schultz stickleaf grows no where else in the entire world but in the proposed ACEC because of the special combination of soils in the area. The potential ACEC also contains about one quarter of all threatened Jones cycladenia plants. This makes the area of special worth and consequence to these rare species. Although it is only listed as sensitive, the population of Shultz stickleaf plants is unique and irreplaceable as it is known to grow nowhere else in the world; the presence of other special species, both plant and animal, make the area unique and exemplary.

The rare plants found in the hanging gardens of Negro Bill Canyon area also rare, fragile and exemplary. The cave primrose, alcove bog orchid, alcove columbine and alcove rock daisy are of far more than local significance, given their rarity.

The heart of Negro Bill Canyon was designated an Outstanding Natural Area in the 1985 Grand RMP to protect both scenery and these sensitive plants. The scenery is of more than local significance, both in the canyon, and from the Slickrock and Porcupine Rim Trails above it.

BLM_0013149

<u>Findings</u>: This nomination meets the relevance and importance criteria for scenery, fish and wildlife and natural systems: rare plants resources. It will be carried forward as a potential ACEC.

## I.6.8 COTTONWOOD-DIAMOND WATERSHED

(Nominated MFO Staff)

<u>Description of Area</u>: This area is located in the Cottonwood-Diamond drainage of the Book Cliffs area. The area to be considered in this ACEC proposal is the area that was severely burned in 2002.

<u>Size</u>: 35,830 acres

<u>Relevance Criteria</u>: The area meets the relevance criteria for natural processes and for natural hazards. Due to severe fire damage in 2002, the functioning of the natural system is at risk. Riparian areas and stable stream channels are the most at risk. The combination of hydrophobic soils and bare, steep uplands make for extreme levels of storm-water runoff. Restoring vegetation is crucial to a functioning natural process. Watershed health is not expected to return for 4 – 10 years, requiring special management in the interim. This area is extremely susceptible to (and has experienced) dangerous flooding and landslides as a result of the large fire of July, 2002. Because of major vegetation loss and damage to soils (hydrophobic), storm runoff is at extreme levels and is causing peak flood levels and massive erosion. This area was identified by the Burned Area Emergency Rehabilitation (BAER) team in 2002 as posing significant hazards to life and property.

<u>Importance Criteria</u>: The area meets the importance criteria for natural hazards and natural processes. The Burned Area Emergency Rehabilitation report (BAER, 2002) highlights significant hazards from floods, mudflows, and landslides which have already occurred, and are expected to reoccur. The severely burned area has qualities which warrant highlighting in order to satisfy concerns about human life and safety. BLM has spent significant amounts of money to date on emergency stabilization (reseeding hydro-mulching and monitoring) to help restabililize the area to reduce these threats to human life and safety.

<u>Findings</u>: This nomination meets the relevance and importance criteria for natural processes and natural hazards and will be carried forward as a potential ACEC.

## I.6.9 DOLORES DRAINAGE

(Nominated by Southern Utah Wilderness Alliance)

<u>Description of Area</u>: The area is composed of two widely separated parcels: the Beaver Creek/Dolores River/Granite Creek area east of the LaSal Mountains, and the East Coyote Creek drainage east of Lisbon Valley.

<u>Size</u>: Not calculated

BLM_0013150

Relevance Criteria: The area meets the relevance criteria for scenery and wildlife habitat. Scenic values are found in the area, especially along the Dolores River. The area is valuable wildlife habitat, especially for wintering deer and/or elk.

Importance Criteria: The area does not meet the importance criteria for scenery nor for wildlife habitat. These areas are of no more than local significance for either wildlife or scenery. The scenery, while attractive, is duplicated in numerous places within the Colorado Plateau, and is not fragile or vulnerable. The wildlife habitat includes crucial elk and/or mule deer range, but these ranges are not unique, or rare, nor are they sensitive or fragile. Habitat found in the Dolores Drainage nomination is duplicated in many other areas of the state of Utah.

Findings: This nomination meets the relevance criteria, but does not meet the importance criteria. This nomination will not be carried forward as a potential ACEC.

### I.6.10 GEMINI BRIDGES/POISON SPIDER

(Nominated by Carlson and by SUWA as part of "Greater Moab")

Description of Area: This area includes Gemini Bridges, Poison Spider, and the area to the north of Highway 279.

Size: Not calculated

Relevance Criteria: This area meets the relevance criterion for scenery, as there are many scenic views of redrock, the LaSal Mountains, arches and cliffs. This area is included in most of the guide books for the area. It also meets the relevance criterion for wildlife; desert bighorn sheep inhabit this area.

Importance Criteria: The scenery in the area is attractive, but is of no more than local significance. Similar scenery is found throughout the Colorado Plateau region. The wildlife values are of no more than local significance, as these species are found elsewhere.

Findings: This nomination will not be carried forward as a potential ACEC.

### I.6.11 HATCH WASH

(Nominated by Southern Utah Wilderness Alliance)

Description of Area: The area includes Hatch Wash and its associated uplands. This area is located within the Canyon Rims Recreation Area in northern San Juan County.

Size: Not calculated

Relevance Criteria: The area meets the relevance criteria for scenery and for wildlife resources. Hatch Wash is a very scenic riparian canyon, surrounded by scenic cliffs. Many wildlife species utilize Hatch Wash for habitat.

BLM_0013151

Importance Criteria: The area does not meet the importance criteria for either scenery or wildlife resources. Neither value is of more than local significance, nor is the area fragile, sensitive or rare. The scenery in Hatch Wash is found in many of the riparian canyons on the Colorado Plateau. The wildlife habitat is neither rare, irreplaceable nor exemplary; such habitat is found throughout the region.

Findings: The nomination does not meet the importance criteria for ACEC nomination and will not be carried forward as a potential ACEC.

## I.6.12 HIGHWAY 279 CORRIDOR/SHAFER BASIN/LONG CANYON

(Nominated by MFO Staff, and by Southern Utah Wilderness Alliance as "Dead Horse Point")

Description of Area: The area is a corridor along Utah Highway 279, including the extension of that road into the Shafer Basin. The Shafer Basin provides the viewshed from Dead Horse Point State Park. In addition, Long Canyon to the Dead Horse Mesa is included in this proposal. BLM has modified the boundary of the SUWA nomination to better incorporate the resource values that were found relevant and important in this area.

Size: 13,500 acres

Relevance Criteria: The area meets the relevance criteria for scenic, cultural, plant and wildlife resources. Utah Highway 279 is a state scenic byway; its scenery and ancient rock art is enjoyed by thousands of visitors per year as they drive along the Colorado River. The Shafer Basin provides the spectacular foreground scenery as viewed from the road and from Dead Horse Point State Park. Long Canyon also provides a scenic backcountry drive just off Utah Highway 279. The scenery is classified as Class A.

A Utah BLM sensitive plant, Jane's globemallow, is found in the Shafer Basin. In addition, both the Shafer Basin and Long Canyon are important habitat to the desert bighorn sheep. As a result, the uplands north of Dead Horse Point State Park were found to have relevant values for wildlife and plants.

Importance Criteria: The nomination meets the importance criteria for scenery, cultural, plant and for wildlife values only within the modified boundary. The stunning scenery within Shafer Basin and Long Canyon as viewed from State Scenic Byway 279 and Dead Horse Point State Park is internationally renowned. Highway 279, Shafer Basin and Long Canyon are also venues for many film permits, due to their spectacular scenic backdrops. Thus, these portions of the nominated area were found to meet the importance criterion for scenery and cultural as they have more than local significance.

Jane's globemallow, a BLM sensitive plant species, is rare and unique and is susceptible to harm. The presence of this plant in the Shafer Basin area meets the importance criteria.

The wildlife values within the adjusted boundary also meet the importance criteria as the Shafer Basin is primary habitat for desert bighorn sheep, which also utilize Long Canyon. These

BLM_0013152

distinctive animals are unique and of more than local significance. Indeed, it is the Shafer Basin habitat which enabled the dwindling desert bighorn herd to survive. This bighorn herd is one of only two indigenous native desert bighorn herds in the state of Utah, and the Shafer Basin herd has provided stock for restoring desert bighorns to other environments. The wildlife values in the uplands portion (north of Dead Horse Point) were not found to be of more than local significance, and thus did not meet the importance criterion.

Findings:  This nomination, with a modified boundary, meets the relevance and importance criteria for scenic, cultural, plant and wildlife resources and will be carried forward as a potential ACEC.

## I.6.13 HIGHWAY 313

(Nominated by Southern Utah Wilderness Alliance)

Description of Area:   The area of the Highway 313 proposal is a corridor along Utah Highway 313.  Utah Highway 313 is State of Utah Scenic Byway, and is renowned for its scenic values and cultural resources (Seven Mile Canyon).   Highway 313 is the entrance road to Dead Horse Point State Park and Canyonlands National Park.

Size:  24,859 acres

Relevance Criteria:  The area meets the relevance criteria for scenery.  The scenic values viewed from this Highway corridor have regional significance.  This road is the highly scenic gateway to two destination parks. Countless visitors experience this area as part of a larger southern Utah driving and windshield tour to enjoy the exceptional scenery of the landscape.  In addition, the area meets the relevance criteria for cultural resources.

Importance Criteria:   The nomination does not meet the importance criteria for scenery and cultural resources.  Although a scenic drive, the views are largely of distant vistas, which would not be protected by ACEC designation.  The cultural resources, while relevant, are not unique within the region, and thus do not meet the importance criterion.  Highway 313 is of no more than local significance, and is neither fragile, sensitive, rare, irreplaceable, exemplary, unique nor vulnerable to adverse change.

Findings:   This nomination meets the relevance, but not the importance criteria for scenery and cultural values.  It will not go forward as a potential ACEC.

## I.6.14 LABYRINTH CANYON

(Nominated by Southern Utah Wilderness Alliance and by BLM staff)

Description of Area: Labyrinth Canyon is located along the Green River, and extends from Ruby Ranch to the border of Canyonlands National Park. This proposal is for the eastern side of that canyon. It complements that of the Price Field Office, which has an ACEC proposal for the western side of Labyrinth Canyon. BLM staff has modified the boundary to better incorporate those resource values identified as both relevant and important.

BLM_0013153

Size: 8,528 acres (approximate)

Relevance Criteria: This nomination meets the relevance criteria for scenic, historic, fish and natural processes. The scenery in Labyrinth Canyon is outstanding, and is enjoyed by many river runners. Historic sites are prevalent along the Green River, and these meet the historic criterion. The Green River is home to four endangered fish species: Colorado pikeminnow, razorback chub, bonytail chub and humpback chub. The upland regions east of the river corridor do not meet the relevance criteria for scenic, historic, fish or natural processes. The wildlife relevance criterion is met for these upland regions, as the area is habitat to many animals, including desert bighorn sheep.

Importance Criteria: The nomination meets the importance criteria for scenery values only in the Green River Canyon corridor. The scenery along the river is of far more than local significance, which give it special worth and meaning. The Green River is nationally and internationally famous for its high cliff walls and outstanding scenery. It is an internationally recognized destination for canoe touring. The importance criterion is also met for fish resources, as the endangered fish species live only in the Colorado River system, and are rare, irreplaceable and unique. The importance criteria for terrestrial wildlife values involving the upland regions east of the river corridor are not met, as these wildlife values are only of local significance. While the river corridor is a unique resource for endangered fish species, the upland regions are duplicated in many places across the Colorado Plateau.

Findings: The portion of the nominated area that meets the relevance and importance criteria for scenery, and for fish resources will be carried forward as a potential ACEC.

## I.6.15 MILL CREEK CANYON

(Nominated by the Mill Creek Partnership, BLM staff and SUWA as part of "Greater Moab")

Description of Area: Mill Creek Canyon is located directly east of Moab. It consists of both the North Fork and South Fork drainages of Mill Creek from the National Forest boundary to Spanish Valley.

Size: 13,501 acres (approximate)

Relevance Criteria: This nomination meets the relevance criteria for scenery, cultural values, fish and wildlife resources and natural systems. Mill Creek Canyon has significant scenic values, with Class A scenery and high sensitivity. The outstanding visual resources of the canyon are stunning, and of rare scenic quality.

Cultural resources (including rock art, campsites, rock shelters, alcoves and special activity areas) are exceptional in the forks of Mill Creek, and have been the subject of several scientific studies. Mill Creek is one of five coldwater trout fisheries in the Colorado River system. Due to its perennial water, many wildlife species depend on Mill Creek. A rare and especially high quality riparian area, Mill Creek's ecological condition requires special management. The Mill

BLM_0013154

Creek watershed is the lifeblood of Moab and Grand County, providing water that sustains the human population.

Importance Criteria: Mill Creek Canyon meets the importance criteria for scenery, cultural resources, natural riparian systems and fish and wildlife values. The scenery in Mill Creek Canyon is of national quality, and is far more than locally significant. Cultural resources are extensive and span the entire prehistoric context, giving these resources special worth and consequence. Both the scenic and cultural values in Mill Creek Canyon are easily damaged and in need of protection. Cultural resources are especially sensitive, irreplaceable and exemplary; similar cultural resources exist no where else. Mill Creek Canyon's cultural resources have also been identified as being of exceptional importance to Native Americans. Protection of these rich archeological areas is a national priority concern. The proximity of Mill Creek to Moab makes the drainage particularly vulnerable to adverse change.

Fish and wildlife values meet the importance criteria, as the stream is one of the few cold water fisheries in the region. The wildlife importance criterion is met, as Mill Creek Canyon provides a migration corridor from the mountain range to the desert; the richness of the Mill Creek riparian habitat provides for a diversity of species not often found in a desert environment. The rarity of this type of habitat gives importance to this value.

The water resource is a significant factor in the municipal water supply; the watershed is crucial to the public welfare of Moab and Grand County.

Findings: This nomination meets the relevance and importance criteria for cultural, scenic, fish and wildlife and natural systems and will be carried forward as a potential ACEC.

## I.6.16 TEN MILE WASH

(Nominated by Carlson, by BLM staff, and by SUWA as part of both White Wash and Labyrinth/Horsethief)

Description of Area: Ten Mile Wash is located northwest of Moab; it drains into the Green River just downstream of White Wash and upstream of Spring Canyon. The nominated area is composed of the Ten Mile drainage from the Green River to two miles upstream of Dripping Spring.

Size: 4,980 acres

Relevance Criteria: Ten Mile Wash meets the relevance criteria for scenic, cultural, wildlife, natural processes and natural hazards. Ten Mile Wash contains high quality scenery related to sandstone buttes, cliffs, side canyons and alcoves; the scenery is enhanced by the presence of a riparian greenbelt. Ten Mile Wash contains significant cultural resources, including important habitation sites and unusual artifacts.

Ten Mile Wash contains perennial and intermittent flows which maintain ecological diversity in upland and riparian/wetlands-dependent wildlife within extremely arid portions of the basin. Ten

BLM_0013155

Mile Wash contains a rich mixture of riparian, wetland and hydrologic resources. Perennial segments support well-developed wetlands which are rare and unusual in arid regions. Ten Mile Wash is subject to extreme flooding, increasing potential safety hazards to vehicle and camping activities. The potential for flooding is great because the Ten Mile Wash watershed basin drains 175,185 acres, making it the second largest tributary drainage in the Moab Field Office.

Importance Criteria: This nomination meets the importance criteria for cultural, wildlife values, natural systems and natural hazards. Cultural resources in Ten Mile Wash are of more than local significance, and are fragile, rare and exemplary. Ten Mile Wash is wildlife habitat of extremely important consequence in the driest portion of the Moab Field Office, because it provides water and habitat to wildlife from a large geographic area.

Riparian/wetland resources comprise less than 1% of the 22 million acres of public land within Utah. Within the Moab Field Office area, just over 1,000 acres have been identified with wetland potential, of which Ten Mile Wash contains textbook examples. Riparian/wetland ecosystems in Ten Mile Wash are rare, sensitive resources vulnerable to degradation from surface disturbances. These wetland ecosystems are exemplary and rare; they serve as attractors for wildlife and for human activities, making the wash extremely susceptible to adverse impact. Riparian/wetland ecosystems are a national priority concern, and are managed for health and diversity as required by the Clean Water Act, Floodplain and Wetland Executive Orders, Rangeland Standards and Guidelines, and the National Riparian Area Policy. Ten Mile Wash contains extreme seasonal flooding potentials which warrant special management regarding public access and camping within the drainage.

Findings: This nomination meets the relevance and importance criteria for cultural, wildlife, natural systems and natural hazards, and will be carried forward as a potential ACEC.

## I.6.17 UPPER COURTHOUSE

(Nominated by The Nature Conservancy and by BLM staff)

Description of Area: The area of the Upper Courthouse proposal is immediately south of the Blue Hills Road, 16 miles north of Moab. It includes Courthouse, Mill, Tusher and Bartlett Canyons, as well as the tops of various isolated mesas, including Big Mesa.

Size: 11,529 acres (approximate)

Relevance Criteria: This nomination meets the relevance criteria for historic, cultural, paleontological, natural systems, riparian, and rare plants. Courthouse Springs is a known location on the Old Spanish Trail, a National Historic Trail. This location later became the Halfway Stage Station, a significant historic resource. The area contains significant paleontological resources, and includes deposits of surface dinosaur bone

Two rare plants occur within the area: the stage station milkvetch and Trotter oreoxis, both of which are on the state sensitive list. In addition, several of the mesa tops within the proposed ACEC have been little altered by direct human influences and thus support relict plant

BLM_0013156

communities and well-developed, mature cryptobiotic soil crusts. Big Mesa is the largest of these untouched areas. It has never been grazed, nor has it been driven upon.

Importance Criteria: This nomination meets the importance criteria for historic, rare plant and natural systems. The area has special worth due to the rare plant species and relict plant communities. The area contains almost all of the stage station milkvetch plants known in the entire world. This stage station milkvetch population is unique and irreplaceable, as is that of the Trotter oreoxis. Areas of relict vegetation on the mesa tops are representative of conditions on surrounding lands; these uncommon remnants of the presettlement landscape are extremely vulnerable and valuable for scientific study.

Historical resources in the area (including a known watering spot on the Old Spanish Trail) are distinctive and irreplaceable. Increasing recreation activity in the area makes these resources vulnerable to adverse change. The richness of its paleontological resources are of more than local significance, as the variety of dinosaur bone in the area rivals that found in Dinosaur National Park.

Findings: This nomination meets the relevance and importance criteria for historic, cultural, paleontological, and natural systems: rare plants. Upper Courthouse will be carried forward as a potential ACEC.

## *I.6.18 UPPER LABYRINTH*

(Nominated by Southern Utah Wilderness Alliance)

Description of Area:  The area of the Upper Labyrinth proposal is along the Green River from the town of Green River downstream to Ruby Ranch.

Size:  3,836 acres

Relevance Criteria:  The area meets the relevance criteria for scenery, fish, and natural processes. The area is rated as VRM II, endangered fish inhabit its waters, and the river provides natural processes in riparian habitat.  The area does not meet the relevance criterion for history; although the Powell expedition boated this stretch of the river, there were no historical events recorded for his trip along this stretch.

Importance:  The area does not meet the importance criteria for scenery, fish and natural processes.  The scenery does not compare to other drainages of the Colorado River system.  This stretch of the river does not have the outstanding scenery associated with the deep canyons of Labyrinth, Stillwater or Desolation canyons of the Green River.  Although the river has endangered fish, there is no special habitat for these fish along this portion of the river.  This portion of the Green River is of no more than local significance regarding its natural processes.

The Price Field Office has proposed a potential ACEC on the west side of the river.  The Lower Green River ACEC (proposed in Conservation alternative of the Price DRMP/EIS) encompasses the entire Lower Green River corridor from the town of Green River to Canyonlands National

BLM_0013157

Park. The Moab Field Office has proposed a potential ACEC (Labyrinth ACEC) only from Ruby Ranch downstream along the Green River in the Conservation alternative. The listed relevant values of the Price ACEC, which are found along the entire Green River, include rare plants, migratory birds, wildlife and riparian values. The discontinuity mentioned by the nominator between Price and Moab's proposals does not exist. The west side of the river contains rare plants not found on the east side of the river. The east side of the river has more past impacts, including roads and mining. The Price office mentions recreation as the important value. Recreation is not an importance criterion in the ACEC process.

Upper Labyrinth is of no more than local significance, and is neither fragile, sensitive, rare, irreplaceable, exemplary, unique nor vulnerable to adverse change.

Findings: This nomination meets the relevance, but not the importance criteria for scenery, fish and natural processes. It does not meet the relevance criterion for historical values. It will not go forward as a potential ACEC.

## *I.6.19 W*ESTWATER *C*ANYON

(Nominated by BLM staff and by Southern Utah Wilderness Alliance)

Description of Area: Westwater Canyon is along the Colorado River six miles downstream from the Colorado border.

Size: 5,000 acres (approximate)

Relevance Criteria: This nomination meets the relevance criteria for scenery and for endangered fish. The dramatic, scenic canyon is rated as Class A scenery, as well as VRM inventory Class I. Visiting the canyon and viewing the scenery is a highly sought experience. The most dramatic scenery within the canyon is the contrast of jet black Precambrian rock with the red sandstones above. These two rock layers are in rare juxtaposition in Westwater, making the scenic experience unique. In addition, four endangered fish inhabit the Colorado River, the Colorado pikeminnow, humpback chub, razorback sucker and bonytail chub. The upland regions surrounding Westwater Canyon do not meet the relevance criteria, as they do not have significant values.

Importance Criteria: This nomination meets the importance criteria for scenery and for endangered fish. The inner gorge of Westwater Canyon is visually unique, with the primordial black Precambrian schist layer overlain by the red rocks of the Wingate sandstone. This irreplaceable canyon is a one-of-a-kind visual experience, which visitors from all over the world vie to enjoy. Westwater Canyon is rare, exemplary and unique in terms of its scenic values. Westwater Canyon has been described as the most scenic one day river trip in the entire United States (*Currents* -- magazine of the National Outdoor River Sports organization). The endangered fish which inhabit its waters are also unique and found only in the Colorado River system.

BLM_0013158

<u>Findings:</u> This nomination meets the relevance and importance criteria for scenery and for endangered fish. Westwater Canyon will be carried forward as a potential ACEC.

## I.6.20 WHITE WASH

(Nominated by BLM staff and by SUWA)

<u>Description of area:</u> White Wash is located 30 miles northwest of Moab. It consists of active sand dunes interspersed with cottonwood trees, surrounded by a intermittent wash that drains to the Green River.

<u>Size</u>: 2,988 acres (approximate)

<u>Relevance criteria:</u> White Wash meets the relevance criteria for scenery, wildlife and natural systems. The high quality scenery is related to the active sand dunes, Entrada sandstone buttes and a unique cottonwood riparian ecosystem. White Wash also contains significant sensitive cultural resources.

White Wash contains intermittent and ephemeral flows vitally important to support wildlife diversity within this extremely arid region. A small resident desert bighorn sheep population relies on upper White Wash for habitat and for water. White Wash contains a unique ecological/geological system related to cottonwood riparian woodlands located within the active dune field and supported by localized subsurface moisture. This population of cottonwoods represents a relict ecosystem and is a rare riparian feature.

<u>Importance criteria:</u> This nomination meets the importance criteria for natural systems. Riparian resources comprise less than 1% of the 22 million acres of BLM land within Utah. Riparian resources in similar combination are not known elsewhere within the region. The White Wash Sand Dunes is a unique ecosystem with sensitive soils which are highly mobile and active. This ecosystem is highly unusual, rare, sensitive and vulnerable to degradation from surface disturbances, especially OHV riders using the cottonwood trees as slalom poles, adversely impacting soil and moisture patterns which support the reproduction and sustainability of the riparian ecosystem.

Riparian/wetland ecosystems are national priority concerns and are managed for health and diversity as mandated by the Clean Water Act, Floodplain and Wetland Executive Orders, Rangeland Standards and Guidelines, and the National Riparian Area Policy.

The area does not meet the importance criterion for cultural, scenery or for wildlife. Cultural sites in the area are not unique; similar wildlife habitat is available across the Colorado Plateau.

<u>Findings:</u> This nomination does not meet the relevance criteria for scenery, cultural, wildlife and natural systems. It meets the importance criterion for natural systems. It will be carried forward as a potential ACEC.

BLM_0013159

## *I.6.21 WILSON ARCH*

(Nominated by BLM staff)

<u>Description of Area</u>: Wilson Arch is located approximately 25 miles south of Moab on the east side of U.S. Highway 191. The nominated area includes the red rock basin that contains Wilson Arch.

<u>Size</u>: 3,700 acres (approximate)

<u>Relevance criteria</u>: Wilson Arch has significant scenic value.

<u>Importance criteria</u>: Located immediately adjacent to U.S. Highway 191, Wilson Arch is viewed and photographed by many visitors to the Colorado Plateau. This makes the scenic value of the arch more than locally significant, due to its extreme visibility.

<u>Findings</u>: The nomination meets the relevance and importance criteria for scenery and will be carried forward as a potential ACEC.

## I.7 SUMMARY AND CONCLUSIONS

A total of 37 nominated areas (many of which were overlapping with each other in area) were evaluated for relevance and importance as part of the Moab land-use planning process. The boundaries of what were to become potential ACECs were crafted by the BLM interdisciplinary team and its cooperators to best incorporate the relevant and important values of each nomination. The proposals included areas previously nominated, nominations received from the public as part of scoping, and areas nominated, refined, or expanded by BLM staff specialists. As a result of work completed by the BLM ACEC interdisciplinary team and its cooperating agencies, 14 potential ACECs that meet both the relevance and importance criteria have been identified, and will move forward for additional consideration as alternatives for the RMP are developed and analyzed. These 14 potential ACECs are listed in Table 1. Potential ACECs may be designated in the Record of Decision for the RMP if special management is required to protect the relevant and important values.

**Table 1. Potential Areas of Critical Environmental Concern**

| Area Name | Values of Concern | Acres |
|---|---|---|
| Behind the Rocks (e.g.) | Scenic values, Natural systems: Threatened and Endangered Plants, cultural | 17,836 |
| Book Cliffs Wildlife Area | Wildlife values, cultural and natural systems | 304,252 |
| Canyon Rims | Scenic values | 23,400 |
| Cisco White-tailed Prairie Dog Complex | Wildlife values | 125,620 |

BLM_0013160

**Table 1. Potential Areas of Critical Environmental Concern**

| Area Name | Values of Concern | Acres |
|---|---|---|
| Colorado River Corridor | Scenic, cultural, wildlife, fish, natural systems: rare plants | 50,483 |
| Cottonwood-Diamond Watershed | Natural hazards and natural systems | 35,830 |
| Highway 279 Corridor/ Shafer Basin/ Long Canyon | Scenery, wildlife, cultural and rare plants | 13,500 |
| Labyrinth Canyon | Scenery and fish | 8,528 |
| Mill Creek Canyon | Scenery, cultural, wildlife, natural systems, fish | 13,501 |
| Ten Mile Wash | Cultural, wildlife, natural systems, natural hazards | 4,980 |
| Upper Courthouse | Historic, cultural and paleontological, natural systems, rare plants | 11,529 |
| Westwater Canyon | Scenery and fish | 5,069 |
| White Wash | Natural systems | 2,988 |
| Wilson Arch | Scenery | 3,700 |

BLM_0013161

# ADDENDUM A: RELEVANCE AND IMPORTANCE CRITERIA

## RELEVANCE

An area meets the "relevance" criterion if it contains one or more of the following:

1. A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans)

2. A fish and wildlife resource (including but not limited to habitat for endangered, sensitive or threatened species, or habitat essential for maintaining species diversity)

3. A natural process or system (including but not limited to endangered, sensitive or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features)

4. Natural hazards (including but not limited to areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or other dangers that have been determined through the resource management planning process to have become part of a natural process.

## IMPORTANCE

The value, resource, system, process or hazard described above must have substantial significance and values in order to satisfy the "importance" criteria. This generally means that the value, resource, system, process or hazard is characterized by one or more of the following:

1. Has more than locally significant qualities which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.

2. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.

3. Has been recognized as warranting protection in order to satisfy national priority concerns or to carry out the mandates of FLPMA.

4. Has qualities which warrant highlighting in order to satisfy public or management concerns about safety and public welfare.

5. Poses a significant threat to human life and safety or to property.

BLM_0013162

# ADDENDUM B

## Table 2. List of ACEC Nominations in Alphabetical Order– Moab RMP

| Nomination | Nominator(s) | Acres of Public Land in Proposed Boundary | Potential ACEC (Yes/No) | Comments |
|---|---|---|---|---|
| Behind the Rocks | The Nature Conservancy, BLM staff, SUWA | 17,836 | Yes | Compilation of boundary proposals |
| Big Triangle | SUWA | Not calculated | No | |
| Book Cliffs Wildlife Area | BLM Staff, SUWA | 304,252 | Yes | Compilation of boundary proposals |
| Canyon Rims | BLM Staff | 23,400 | Yes | |
| Castle Valley Critical Deer Winter Range | Grand Canyon Trust | Not calculated | No | |
| Cisco White-tailed Prairie Dog Complex | Center for Native Ecosystems et al. | 125,620 | Yes | |
| Colorado River Corridor, including Richardson Amphitheater, Negro Bill, Cache Valley and Arches East, Sand Flats, Fisher Towers | The Nature Conservancy, BLM Staff, SUWA, Stolfa, Carlson | 50,483 | Yes | Compilation of boundary proposals |
| Cottonwood Diamond Watershed | BLM Staff | 35,830 | Yes | |
| Dolores Triangle | SUWA | Not calculated | No | |
| Gemini Bridges/Poison Spider | Carlson, SUWA | Not calculated | No | |
| Hatch Wash | SUWA | Not calculated | No | |
| Highway 279 Corridor/Shafer Basin/Long Canyon | BLM Staff, SUWA | 13,500 | Yes | Compilation of boundary proposals |
| Highway 313 | SUWA | 24,859 | No | |
| Labyrinth Canyon | BLM Staff, SUWA | 8,528 | Yes | Compilation of boundary proposals |
| Mill Creek Canyon | Mill Creek Partnership, SUWA, BLM Staff | 13,501 | Yes | Compilation of boundary proposals |

BLM_0013163

**Table 2. List of ACEC Nominations in Alphabetical Order– Moab RMP**

| Nomination | Nominator(s) | Acres of Public Land in Proposed Boundary | Potential ACEC (Yes/No) | Comments |
|---|---|---|---|---|
| Ten Mile Wash | Carlson, SUWA, BLM Staff | 4,980 | Yes | Compilation of boundary proposals |
| Upper Courthouse | The Nature Conservancy, BLM Staff | 11,529 | Yes | Compilation of boundary proposals |
| Upper Labyrinth | SUWA | 3,836 | No | |
| Westwater Canyon | BLM Staff, SUWA | 5,069 | Yes | Compilation of boundary proposals |
| White Wash | BLM Staff, SUWA | 2,988 | Yes | Compilation of boundary proposals |
| Wilson Arch | BLM Staff | 3,700 | Yes | |
| Nominations Combined by Geographical Areas and vary in acreage. | | | | |

**Table 3. List of Threats, by Potential ACEC**

| Name of Potential ACEC | Threats |
|---|---|
| Behind the Rocks | Increased motorized recreation use |
| | Utility corridors |
| | Infrastructure needs, such as cell towers |
| | Mineral development |
| | Oil and gas development |
| Bookcliffs Wildlife Area | Oil and gas development |
| | Utility corridors and Rights of Way |
| | Increased motorized recreation use |
| Canyon Rims | Oil and gas development |
| | Increased motorized recreation use |
| Cisco White-tailed Prairie Dog Complex | Oil and gas development |
| | Increased motorized recreation use |
| | Shooting/poisoning of prairie dogs |
| | Spread of noxious weeds through surface-disturbing activity |
| | Overgrazing of prairie dog habitat |

BLM_0013164

**Table 3. List of Threats, by Potential ACEC**

| Name of Potential ACEC | Threats |
|---|---|
| Colorado River Corridor | Increased motorized recreation use |
| | Increased recreation use |
| | Oil and gas exploration and production |
| | Utility corridors |
| | Mineral development |
| Cottonwood-Diamond Watershed | OHV activity |
| | Surface disturbance from utility corridors, or from mineral activity |
| | Lack of restriction on commercial recreation users |
| Highway 279 Corridor/Shafer Basin/Long Canyon | Oil and gas development |
| | Increased motorized recreation use |
| | Utility corridor development |
| | Mineral development |
| Labyrinth Canyon | Increased motorized recreation use |
| | Oil and gas exploration and production |
| | Surface mineral activity |
| Mill Creek Canyon | Increased motorized recreation use |
| | Utility corridors/cell towers |
| | Oil and gas development |
| | Mineral development |
| Ten Mile Wash | Increased motorized recreation use |
| | Oil and gas development |
| Upper Courthouse | Increased motorized recreation use |
| | Utility corridors |
| | Oil and gas development |
| | Mineral development |
| Westwater Canyon | Surface mineral exploration |
| | Increased motorized recreation use |
| White Wash | Increased motorized recreation use |
| | Oil and gas development |
| Wilson Arch | Increased motorized recreation use |
| | Oil and gas development |
| | Utility corridors |

BLM_0013165

**Table 4. Rationale for Designating or Not Designating in the Preferred Alternative, by Potential ACEC**

| Name of Potential ACEC | Rationale for Designating (or not) as an ACEC in the Preferred Alternative |
|---|---|
| Behind the Rocks | Designated in the Preferred Alternative |
| Bookcliffs Wildlife Area | The Bookcliffs Wildlife Area was not proposed in the preferred alternative. Routine management prescriptions are sufficient to protect the resource or value from risks or threats of damage/degradation.  The following standard management prescriptions will be utilized to protect the wildlife, cultural and natural system values from threats of damage or degradation: |
| | 1) A Herd Management Plan will be prepared to protect the unfragmented wildlife habitat in the Bookcliffs |
| | 2) Stipulations will be placed on oil and gas development to protect wildlife values. |
| | 3) Motorized activity will be allowed on designated routes only |
| | 4) The Bookcliffs will be managed as a Special Recreation Management Area to protect primitive recreation values. |
| Canyon Rims | The Canyon Rims was not proposed in the preferred alternative. Routine management prescriptions are sufficient to protect the resource or value from risks or threats of damage/degradation The following standard management prescriptions will be utilized to protect the scenic values from threats of damage or degradation: |
| | 1) Canyon Rims will be managed as a Special Recreation Management Area with special emphasis given to its scenic values. |
| | 2) Stipulations will be placed on oil and gas development to protect scenic values. |
| | 3) Motorized activity will be allowed on designated routes only. |
| Cisco White-tailed Prairie Dog Complex | The Cisco White-tailed Prairie Dog Complex was not proposed in the preferred alternative.  Routine management prescriptions are sufficient to protect the resource or value from risks or threats of damage/degradation The following standard management prescriptions will be utilized to protect the wildlife values from threats of damage or degradation: |
| | Motorized activity will be allowed on designated routes only. |
| | Stipulations will be placed on Oil and gas development to protect prairie dog habitat. Five hundred meter buffer zones of no surface development will be placed around prairie dog colonies. |
| | BLM will work with UDWR to prohibit shooting/poisoning of prairie dogs |
| | Recognize current prairie dog habitat as the Cisco Desert Wildlife Area |
| | Manage grazing to allow for adequate recovery of seed dispersal and plant growth |

BLM_0013166

**Table 4. Rationale for Designating or Not Designating in the Preferred Alternative, by Potential ACEC**

| Name of Potential ACEC | Rationale for Designating (or not) as an ACEC in the Preferred Alternative |
|---|---|
| Colorado River Corridor | The Colorado River Corridor was not proposed in the preferred alternative. Routine management prescriptions are sufficient to protect the resources or values from risks or threats of damage/degradation. The Colorado River Corridor will be managed as the Colorado Riverway SRMA, and the following management prescriptions will be utilized to protect the scenic, fish and wildlife and natural systems: rare plants resources: Stipulations will be placed on oil, gas and mineral development to protect the above values. These stipulations may include no surface occupancy. <br><br> Motorized activity will be allowed only on designated routes. <br><br> The Endangered Species Act will be employed to protect the endangered fish. <br><br> Visual Resource Management will include Class I and II VRM within the area to protect the unique scenic values of the area. <br><br> Recreation activities such as camping will be limited to campgrounds in order to avoid unacceptable impacts to the resources. |
| Cottonwood-Diamond Watershed | Designated in the Preferred Alternative. |
| Highway 279 Corridor/Shafer Basin/Long Canyon | Designated in the Preferred Alternative. |
| Labyrinth Canyon | Labyrinth Canyon was not proposed in the preferred alternative. Routine management prescriptions are sufficient to protect the resource or value from risks or threats of damage/degradation. Labyrinth Canyon will be managed as the Labyrinth Canyon Focus Area within the Labyrinth/Gemini SRMA, and the following management prescriptions will be utilized to protect the scenic and fish values from the threats of damage or degradation: <br><br> Stipulations will be placed on oil, gas and mineral development to protect scenic values. <br><br> Motorized activity will be allowed only on designated routes. <br><br> The Endangered Species Act will be employed to protect the endangered fish. |
| Mill Creek Canyon | Designated in the Preferred Alternative. |
| Ten Mile Wash | Designated in the Preferred Alternative. |
| Upper Courthouse | Upper Courthouse was not proposed in the preferred alternative. Routine management prescriptions are sufficient to protect the resource or value from risks or threats of damage/degradation. Upper Courthouse will be managed within the Labyrinth/Gemini SRMA, and as the Mill Canyon/Upper Courthouse Mountain Biking Focus Area. Special attention will be given to protecting the rare plants found in the area. The following management prescriptions will be utilized to protect the cultural, natural systems and rare plant values from the threats of damage or degradation: <br><br> Stipulations will be placed on oil and gas development <br><br> Motorized activity will be allowed on designated routes only. |

BLM_0013167

**Table 4. Rationale for Designating or Not Designating in the Preferred Alternative, by Potential ACEC**

| Name of Potential ACEC | Rationale for Designating (or not) as an ACEC in the Preferred Alternative |
|---|---|
| Westwater Canyon | Westwater Canyon was not proposed in the preferred alternative. Routine management prescriptions are sufficient to protect the resource or value from risks or threats of damage/degradation. Westwater Canyon will be managed as part of the Two Rivers SRMA, and the following management prescriptions will be utilized to protect the scenic and fish values from threats of damage or degradation:<br><br>Stipulations will be placed on oil, gas and mineral development to protect scenic values.<br><br>Motorized activity will be allowed only on designated routes.<br><br>The Endangered Species Act will be employed to protect the endangered fish. |
| White Wash | White Wash Sand Dunes was not proposed in the preferred alternative. Routine management prescriptions are sufficient to protect the resource or value from risks or threats of damage/degradation. The following standard management prescriptions will be utilized to protect the natural systems values from threats of damage or degradation:<br><br>Vehicles will be limited to designated roads outside the dune area. |
| Wilson Arch | Wilson Arch was not proposed in the preferred alternative. Routine management prescriptions are sufficient to protect the resource or value from risks or threats of damage/degradation.  The following standard management prescriptions will be utilized to protect the scenic values from threats of damage or degradation:<br><br>Stipulations will be placed on oil and gas development to protect scenic values.<br><br>Motorized activity will be allowed on designated routes only. |

BLM_0013168

# APPENDIX J.
## WILD AND SCENIC RIVERS STUDY PROCESS

### TABLE OF CONTENTS

J.1 Introduction ................................................................................................................J-3

J.2 History of Wild and Scenic River Process – Moab Field Office Area ..............................J-4

J.3 Eligibility and Tentative Classifications ..........................................................................J-5

   J.3.1 Summary of the Review Process.................................................................................J-5

   J.3.2 Steps in the Eligibility Review Process.......................................................................J-6
      J.3.2.1 Identification of Potentially Eligible Rivers......................................................J-6
      J.3.2.2 Consideration of Free-flowing Character..........................................................J-6
      J.3.2.3 Identification of Outstandingly Remarkable Values (ORVs) ..............................J-6
      J.3.2.4 Tentative Classification.....................................................................................J-8
         J.3.2.4.1 Wild River Areas ................................................................................ J-9
         J.3.2.4.2 Scenic River Areas ............................................................................. J-9
         J.3.2.4.3 Recreational River Areas..................................................................... J-9
      J.3.2.5 Coordination with Local Governments, Agencies, Tribes, Organizations,
         and the Public..........................................................................................J-11
      J.3.2.6 Eligibility of River(s)/Segments Evaluated.......................................................J-11

   J.4 Suitability Study ........................................................................................................J-11

### LIST OF TABLES

Table 1. Moab Field Office Interdisciplinary Team Members................................................... J-5
Table 2. Classification Criteria for Wild, Scenic, and Recreational River Areas...................... J-10
Table 3. Suitability Study Interdisciplinary Meetings............................................................ J-13

### LIST OF ATTACHMENTS

Attachment 1. Major Drainages Reviewed, Moab Field Office ................................................ J-17
Attachment 2. Outstandingly Remarkable Values Of Eligible Rivers ...................................... J-25
Attachment 3. Eligible River/Segments and Their Tentative Classification, Moab Field
      Office ...................................................................................................................J-67
Attachment 4: Suitability Considerations by Eligible River Segment...................................... J-69

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0013170

## J.1 INTRODUCTION

The Wild and Scenic Rivers Act, P.L. 90-542, became law on October 2, 1968. It preserves "certain selected rivers" that "possess outstandingly remarkable scenic, recreational, geologic, fish, wildlife, historic, cultural, or other similar values… in their free-flowing condition… for the benefit and enjoyment of present and future generations." Eight rivers or river segments were included as initial components in the National Wild and Scenic Rivers System (National System). Congress and /or the Secretary of the Interior have added 155 rivers or river segments to the National System since then.

Section 5(d)(1) of the Wild and Scenic Rivers Act directs federal agencies to consider the potential for national wild, scenic, and recreational river areas in all planning for the use and development of water and related resources. This review is being conducted as part of the Resource Management Plan (RMP) preparation in the Moab Field Office.

The following documents were utilized in guiding the WSR planning process through the Eligibility/Tentative Classification phase:

- **Interagency Wild and Scenic Rivers Coordination Council**. 1982. Contains various technical papers relating to evaluation of Wild and Scenic Rivers. (See website at: www.nps.gov/rivers/publications.html)
- **Interagency Agreement.** On December 13, 1994, the Bureau of Land Management (Utah State Office), the USDA Forest Service (Intermountain Region), and the National Park Service (Rocky Mountain Region) signed an Interagency Agreement. The agreement calls for the three agencies to work cooperatively to define common criteria and processes for use in determining the eligibility and suitability of Utah Rivers for potential inclusion by Congress in the National Wild and Scenic Rivers System. As a result of this agreement, guidance was developed to provide a uniform methodology to be used by the three agencies to obtain consistent results in the wild and scenic eligibility assessments made during planning efforts in the state of Utah. The guidance is titled *Wild and Scenic River Review in the State of Utah, Process and Criteria for Interagency Use* (This document is known as the "Blue Book", due to its blue cover).
- **Wild and Scenic River Review in the State of Utah, Process and Criteria for Interagency Use**. July 1996.
- **Wild and Scenic Rivers Act, P.L. 90-542, as amended**. Congressional legislative direction for Wild and Scenic River planning.
- **Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, and Management, Bureau of Land Management Manual – 8351.** 1992 and changes as of 1993. Establishes BLM policy, program direction, and procedural standards for fulfilling requirements of the Wild and Scenic Rivers Act.

BLM_0013171

## J.2 HISTORY OF WILD AND SCENIC RIVER PROCESS – MOAB FIELD OFFICE AREA

P.L. 90-542 also authorized 27 rivers for study as potential components of the National System. Amendments to the law have brought the total number of studies authorized to 138. One of the studies included the Colorado River segment, from its confluence with the Dolores River, Utah, upstream to a point 19.5 miles from the Utah-Colorado border in Colorado. The Utah portion of the "Study River" falls within the Moab Field Office Area. On December 17, 1976, the Dolores River from its confluence with the Colorado River upstream to Gateway, Colorado was added to the study. This was at the request of Governor Rampton of Utah and Governor Lamm of Colorado, and agreed to by the Secretary of the Interior. The Utah portion of the Dolores River also falls within the Moab Field Office area. The study concluded that the river areas contained outstandingly remarkable scenic, geologic, recreational, and wildlife values. Various segments of the rivers were classified as qualifying for wild, scenic, and recreational designation.

In 1979, the State of Utah conducted an inventory and analysis of the portions of the "Study Rivers" within its boundaries, and deferred making its recommendations regarding designation to the study team. The State of Colorado supported designation of the rivers within its borders. The Bureau of Outdoor Recreation/NPS submitted the 1979 study findings to the Department of Interior. Secretary Watt sent a negative recommendation to President Reagan based upon the cost of scenic easement acquisition and lack of public support for designation, and in 1985, President Reagan sent a negative recommendation for all river segments considered by the study to Congress.

Congressman Howard Nielson of Utah hosted a fact-finding trip in 1987 through Westwater Canyon on the Colorado River. Letters supporting the designation of Westwater Canyon into the National System were submitted to Congressman Nielson by the Western River Guides Association, the Utah Guides and Outfitters, the BLM Multiple-use Advisory Council, the Grand County Travel Council, the Utah Travel Council, the Grand County Commission, the City of Moab, and the Moab Chamber of Commerce. In 1988, The Department of Interior withdrew 4,707.44 acres within Westwater Canyon from surface entry and mining for a period of 5 years to protect recreational, scenic and cultural values. This withdrawal covered the main portion of Westwater Canyon.

That same year, Congress authorized funding under the Land and Water Conservation Act for acquisition of additional land adjacent to the Westwater Ranger Station and for acquisition of land at the Cisco Take-out to provide for public access. However, the Grand County Commission withdrew its support for designation of Westwater Canyon and Governor Bangerter (in a letter to the Grand County Travel Council) deferred taking a position on the designation of Westwater Canyon into the National System until there was local agreement on the issue.

In 1989, The Grand County Commission requested members of the Utah Congressional delegation to designate the 12 miles of the Colorado River within Westwater Canyon into the National System as a Wild River. The Commission letter of support stated that: "There is no doubt that this section of the river more than satisfies the necessary characteristics of this designation and we all feel that you should proceed with all haste."

BLM_0013172

Congressman Nielson and Senator Garn introduced legislation in 1990 to designate 12 miles of the Colorado River within Westwater Canyon as a Wild River. The bills passed both houses near the end of the 101st Congress with the Senate bill including an additional unrelated provision about minerals on public lands. However, as the Senate bill passed only 4 days before the end of the Congress, it was not possible to schedule a conference committee meeting and the legislation died. Congressman Nielson retired at the end of the 101st Congress.

In 1995, The Department of Interior withdrew the above-mentioned 4,707.44 acres within Westwater Canyon from surface entry and mining for 50 years, and in 1998, withdrew an additional 3,385.9 acres covering side drainages in Westwater Canyon from surface entry and mining for 20 years.

## J.3 ELIGIBILITY AND TENTATIVE CLASSIFICATIONS

### J.3.1 SUMMARY OF THE REVIEW PROCESS

A team of specialists from the Moab Field Office, listed below in Table 1, began the Wild and Scenic review process in August of 2002. Team members agreed to use the *Ecological Subregions* (USFS ECOMAP, 1993; as adapted from Ecoregions of the United States, R.G. Bailey, 1994). The data was organized according to 4th level of Hydrologic Unit Codes (HUC). In order to assure that all potentially eligible rivers were considered, all streams found on 1:100,000 scale maps were reviewed. The rivers from the 1979 study (Colorado and Lower Dolores Rivers) were looked at again in the planning process. Team members used the *Wild and Scenic River Review in the State of Utah, Process and Criteria for Interagency Use,* (July 1996), to guide them through the eligibility process.

**Table 1. Moab Field Office Interdisciplinary Team Members**

| Name | Title | Team Responsibility |
|------|-------|---------------------|
| Marilyn Peterson | Outdoor Recreation Planner | Team Coordinator |
| Katie Stevens | Outdoor Recreation Planner | Scenery, Recreation, Fish, Wildlife |
| Bill Stevens | Outdoor Recreation Planner | Scenery, Recreation |
| Rob Sweeten | Landscape Architect | Scenery |
| Denice Swanke | Physical Scientist | Geology |
| Stephanie Ellingham | Natural Resource Specialist | Ecology, riparian |
| Ann Marie Aubry | Hydrologist | Hydrology, riparian |
| Donna Turnipseed | Archaeologist | Historic, Cultural |
| Daryl Trotter | Environmental Protection Spec. | Native Plants, and Ecology |
| Brent Northrup | Resource Advisor, Lands/Minerals | Planning Coordinator |
| Russ von Koch | Branch Chief, Recreation | Recreation |
| Pam Riddle | Biologist | Fish , Wildlife |
| Raymon Carling | Natural Resource Specialist | Knowledge of Resource Area |

BLM_0013173

Streams were grouped by drainage within each HUC, and evaluated to see if they were free-flowing or not. The next step was to analyze free-flowing drainages for significant river-related resource values or features. These values were compared with values present in similar streams within the Ecological Subregion/sections. Streams or portions of streams with the most significant values, and those with multiple significant values rated the highest for "outstandingly remarkable values" (ORVs). Free-flowing streams with ORVs were given a tentative classification based on the criteria from the *Wild and Scenic River Review in the State of Utah, Process and Criteria for Interagency Use*. These criteria are included in Section J.3.2.4 of this document.

## J.3.2 STEPS IN THE ELIGIBILITY REVIEW PROCESS

### J.3.2.1 IDENTIFICATION OF POTENTIALLY ELIGIBLE RIVERS

Rivers to consider were identified from the following sources:

- Nationwide Rivers Inventory (NRI) list, NPS 1995, (Utah modified Oct. 5, 2001)
- American Rivers Outstanding List, May 1991
- American Whitewater Affiliation Nationwide Whitewater Inventory
- 1970 USDA/USDI list, and 1972 list
- A Citizen's Proposal to Protect the Wild Rivers of Utah, 1997
- Those identified in public scoping during RMP process
- Those identified by Federal Agencies, State of Utah, Indian Tribes, local governments, and professional specialists within the BLM Moab Field Office.

The Moab ID Team reviewed all streams found on 1:100,000 maps. A list of the major drainages reviewed is shown in Attachment 1 of this document.

### J.3.2.2 CONSIDERATION OF FREE-FLOWING CHARACTER

All rivers in the Moab Field Office area are free-flowing. Free-flowing is defined [in the Wild and Scenic Rivers Act Section 16(b)] "as applied to any river of section of a river, means existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway. The existence, however, of low dams, diversion works, and other minor structures at the time any river is proposed for inclusion in the national wild and scenic rivers system shall not automatically bar its consideration for such inclusion: *Provided*, That this shall not be construed to authorize, intend, or encourage future construction of such structures within the components of the national wild and scenic rivers system."

### J.3.2.3 IDENTIFICATION OF OUTSTANDINGLY REMARKABLE VALUES (ORVS)

For a river to be eligible for inclusion in the National System it must possess one or more Outstandingly Remarkable Values (ORVs). To be determined outstandingly remarkable, resources should be river-related and at least regional in significance. Rare, unique, or exemplary river-related resources are considered. Criteria to use are discussed in the *Wild and Scenic River*

BLM_0013174

*Review in the State of Utah, Process and Criteria for Interagency Use*, and can be summarized as follows:

- **Scenery**: Diversity of view, Special Features, Seasonal Variations, Cultural Modifications
- **Fish:** Habitat Quality, Diversity of Species, Value of Species, Abundance of fish, Natural Reproduction, Size and Vigor of Fish, Cultural/Historic Importance, Recreational Importance, Access
- **Recreation-Water Oriented**: Length of Season, Diversity of Use, Flow, Character of Run, Scenery/Naturalness, Access, Level of Use, Associated Opportunities, and Attraction.
- **Recreation-General:** Length of Season, Diversity of Use, Experience Quality, Scenery/Naturalness, Access, Level of Use, Associated Opportunities, Attraction, Sites and Facilities
- **Wildlife:** Habitat Quality, Diversity of Species, Abundance of Species, Natural Reproduction, Size and Vigor of Species, Cultural/Historic Importance, Recreational Importance, Access
- **Geologic:** Feature Abundance, Diversity of Features, Educational/Scientific
- **Historic:** Significance, Site Integrity, Educational/Interpretation, Listing/Eligibility
- **Cultural:** Significance, Current Uses, Number of Cultures, Site Integrity, Education/ Interpretation, Listing/ Eligibility
- **Ecological:** Species Diversity, Ecological Function, Rare Communities, Education/Scientific

Each resource was compared by the interdisciplinary team to other such resources within the region of comparison, using the criteria identified in the *Wild and Scenic River Review in the State of Utah, Process and Criteria for Interagency Use*, and considering the exemplary, rare or unique qualities of each resource, in order to determine regional (or national) significance. Those river segments deemed to have insufficient value were dropped from further consideration.

Ecological Subregions (USFS ECOMAP 1993; as adapted from *Ecoregions of the United States*, R.G. Bailey 1994) are subregions of the physiographic provinces, and were identified as generally well-suited for use as Region(s) of Comparison in Utah (Utah BLM and Forest Service concurrence, May 2002)**,** and were used as the framework for the Moab eligibility review.

According to this classification**,** *Ecological Sections* define broad areas of similar ecological systems based on regional climate, geomorphology, geology, and drainage networks. These *Ecological Sections* were selected as the reference unit for wild and scenic river evaluations because they provide visible breaks on the landscape and a context for relative consistency in regional comparison of scenic and other resource values. The overall region of comparison used by the Moab Field Office is comprised of the fifteen *Ecological Sections* listed below.

BLM_0013175

Ecological Section: (Subregion 36:Colorado Semi-Desert)
- Grand Canyon            (313A)
- Navajo Canyonlands      (313B)
- Painted Desert          (313D)

Ecological Section: (Subregion 38: Arizona-New Mexico Mountains Semi-Desert-Open Woodland-
                    Coniferous Forest-Alpine Meadow)
- White Mountain – San Francisco Peaks-Mogollon Rim        (M313A)

Ecological Section: (Subregion 43: Southern Rocky Mtn Steppe-Open Woodland Coniferous Forest
                    Alpine Meadow)
- Overthrust Mountains                        (M331D)
- Uinta Mountains                    (M332E)
- South Central Highlands                (M331G)
- Northern Central Highland and Rock Mtns    (M331H)

Ecological Section: (Subregion 47: Intermountain Semi-Desert and Desert)
- Bonneville Basin         (341A)
- Northern Canyon Lands            (341B)
- Uinta Basin              (341C)

Ecological Section: (Subregion 48: Intermountain Semi-Desert)
- Bear Lake            (342E)
- Green River Basin   (342G)

Ecological Section: (Subregion 49: Nevada-Utah Mountains Semi-Desert- Coniferous Forest–Alpine
                    Meadow)
- Tavaputs Plateau           (M341B)
- Utah High Plateaus Mountains       (M341C)

The Interdisciplinary (ID) Team subject matter specialists evaluated the ORVs for each of the 248 river segments. Attachment 2 of this document provides the specific ORV descriptions prepared by the ID team specialists for the 29 eligible segments (including 6 segments of the Green River, found eligible by the Price Field Office during its RMP review.)

The ID Team found the remaining 225 river segments to not have outstandingly remarkable river-related values when values were compared regionally or nationally.

## J.3.2.4 TENTATIVE CLASSIFICATION

A "Tentative Classification" of Wild, Scenic, or Recreational was determined for all eligible rivers/segments. Tentative classifications are based on the type and degree of human development associated with the river and adjacent land, as they exist at the time of the evaluation. The four key elements are:

1. Water Resources Development
2. Shoreline Development
3. Accessibility
4. Water Quality

Eligible rivers are classified Wild, Scenic, or Recreational based on man's activities. The following sections provide additional information about the character of wild, scenic and recreational river areas.

BLM_0013176

### J.3.2.4.1 WILD RIVER AREAS

Wild River Areas are defined by the WSRA to include: "Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watershed or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America."

Management of wild river areas give primary emphasis to protecting the values that make it outstandingly remarkable while providing river-related outdoor recreation opportunities in a primitive setting.

### J.3.2.4.2 SCENIC RIVER AREAS

Scenic river areas are defined by the WSRA to include: "Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads."

Management of scenic river areas should maintain and provide outdoor recreation opportunities in a near-natural setting. The basic distinctions between a "wild" and a "scenic" river area are the degree of development, types of land use, and road accessibility. In general, a wide range of agricultural, water management, silvicultural, and other practices or structures could be compatible with scenic river values, providing such practices or structures are carried on in such a way that there is not substantial adverse effect the river and its immediate environment. .

### J.3.2.4.3 RECREATIONAL RIVER AREAS

Recreational river areas are defined by the WSRA to include: "Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past."

Management of recreational river areas gives primary emphasis to protecting the values that make it outstandingly remarkable while providing river-related outdoor recreation opportunities in a recreational setting.

Recreational classification is a determination of the level of development and does not prescribe or assume recreation development or enhancement. Management of recreational river areas can and should maintain and provide outdoor recreation opportunities. The basic distinctions between a "scenic" and a "recreational" river area are the degree of access, extent of shoreline development, historical impoundment or diversion, and types of land use. In general a variety of agricultural, water management, silvicultural, recreational, and other practices or structures are compatible with recreational river values, providing such practices or structure are carried on in such a way that there is not substantial adverse effect on the river and its immediate environment.

Criteria for the classification of river areas as wild, scenic and recreational are summarized in Table 2.

BLM_0013177

**Table 2. Classification Criteria for Wild, Scenic, and Recreational River Areas**

| Attribute | Wild | Scenic | Recreational |
|---|---|---|---|
| Water Resources Development | Free of impoundment. | Free of impoundment. | Some existing impoundment or diversion. The existence of low dams, diversions, or other modifications of the waterway is acceptable, provided the waterway remains generally natural and riverine in appearance. |
| Shoreline Development | Essentially primitive. Little or no evidence of human activity. The presence of a few inconspicuous structures, particularly those of historic or cultural value, is acceptable. A limited amount of domestic livestock grazing or hay production is acceptable. Little or no evidence of past timber harvest. No ongoing timber harvest. | Largely primitive and undeveloped. No substantial evidence of human activity. The presence of small communities or dispersed dwellings or farm structures is acceptable. The presence of grazing, hay production, or row crops is acceptable. Evidence of past or ongoing timber harvest is acceptable, provided the forest appears natural from the riverbank. | Some development. Substantial evidence of human activity. The presence of extensive residential development and a few commercial structures is acceptable. Lands may have been developed for the full range of agricultural and forestry uses. May show evidence of past and ongoing timber harvest. |
| Accessibility | Generally inaccessible except by trail. No roads, railroads or other provision for vehicular travel within the river area. A few existing roads leading to the boundary of the river area is acceptable. | Accessible in places by road. Roads may occasionally reach or bridge the river. The existence of short stretches of conspicuous or longer stretches of inconspicuous roads or railroads is acceptable. | Readily accessible by road or railroad. The existence of parallel roads or railroads on one or both banks as well as bridge crossings and other river access points is acceptable. |
| Water Quality | Meets or exceeds federal criteria for federally approved state standards for aesthetics, for propagation of fish and wildlife normally adapted to the habitat of the river, and for primary contact recreation (swimming), except where exceeded by natural conditions. | No criteria prescribed by the Act. The Federal Water Pollution Control Act Amendments of 1972 have made it a national goal that all waters of the United States be made fishable and swimmable. Therefore, rivers will not be precluded from scenic or recreational classification because of poor water quality at the time of their study, provided a water quality improvement plan exists or is being developed in compliance with applicable federal and state laws. ||

BLM_0013178

### J.3.2.5 Coordination with Local Governments, Agencies, Tribes, Organizations, and the Public

In keeping with the coordinating MOU, a wild and scenic river presentation was made by the governor's representative to the Grand County Council and the San Juan County Commission on September 27, 2002 in conjunction with the Manti-La Sal National Forest WSR eligibility process. The San Juan County Public Lands Council held a meeting at the San Juan County Courthouse on August 20, 2003. At that meeting, BLM Moab presented preliminary eligibility findings on segments in the Moab Field Office within San Juan County. The Grand County Council held a meeting on September 10, 2003. At that meeting, the BLM Moab presented preliminary eligibility findings on segments within Grand County to the Council.

Preliminary eligibility findings for the Moab Field Office were made available for public review and comment in September 2003. State and local governments, Native American Tribes, organizations, cooperating federal agencies, and members of the public were asked to review the preliminary findings, provide comments related to the findings, and to identify any potentially eligible rivers or information that had been overlooked.

All comments received were carefully reviewed. Documentation of the BLM response to comments is on file at the BLM Moab Field Office.

On February 23, 2004 a team meeting was held to make final determination on eligibility in light of the review comments that were received. Representatives from the State of Utah, Grand and San Juan Counties participated in the meeting.

### J.3.2.6 Eligibility of River(s)/Segments Evaluated

Attachment 3 of this document identifies the 13 rivers (29 segments) within the Moab Field Office area determined to be eligible, i.e., free-flowing with at least one river-related ORV.

## J.4 Suitability Study

The 29 eligible segments will be further reviewed as to their suitability for congressional designation into the National System. This will be done within the framework of the ongoing planning process for the Moab Resource Management Plan (RMP), including the development of an Environmental Impact Statement.

The purpose of the suitability step of the study process is to determine whether eligible rivers would be appropriate additions to the national system by considering tradeoffs between corridor development and river protection. Suitability considerations include the environment and economic consequences of designation and the manageability of a river if it were designated by Congress.

The Wild and Scenic River Suitability evaluation is designed to answer the following questions:

BLM_0013179

- Should the river's free-flowing character, water quality, and outstandingly remarkable values (ORVs) be protected? OR, are one or more other uses important enough to warrant doing otherwise?

- Will the river's free-flowing character, water quality, and ORVs be protected through designation? And, is wild and scenic river designation the best method for protecting the river corridor and its values?

In answering these questions, the benefits and impacts of WSR designation must be evaluated, and alternative protection methods considered.

The environmental impact statement for the resource management plan evaluates impacts that would result if the eligible rivers were determined suitable and managed to protect their free-flowing nature, tentative classification, and outstandingly remarkable values. It also addresses impacts that would result if the eligible rivers are not determined suitable and their values are not provided protective management. The range of alternatives include the No Action alternative A, which does not address suitability and leaves rivers eligible, and Alternative B, which finds all eligible rivers suitable. Alternatives C, and D may find some of eligible rivers as suitable.

Alternative tentative classifications are also evaluated. "Whenever an eligible river segment has been tentatively classified, e.g., as wild, other appropriate alternatives may provide for designation at another classification level (scenic or recreational). There is not another classification alternative for rivers tentatively classified as recreational. As long as a river segment is under study, it must be afforded protection at the tentative classification level it was given when determined eligible, even if another classification is considered as an alternative in the RMP" (BLM Manual 8351.33). For river segments determined nonsuitable in the RMP, the river shall be managed in accordance with the management objectives as outlined in the RMP.

In addition to the impact analysis addressed by alternative, the following suitability considerations are applied to each eligible river listed in Attachment 3.

- Characteristics which do or do not make the area a worthy addition to the national system

- Status of land ownership and use in the area

- Uses, including reasonably foreseeable potential uses, of the area and related waters, which would be enhanced, foreclosed, or curtailed if the area were included in the national system of rivers; and the values which could be foreclosed or diminished if the area is not protected as part of the national system.

- Interest by federal, tribal, state, local, and other public entities in designation or non-designation of a river, including the extent to which the administration of the river, including the costs thereof, can be shared by the above mentioned entities.

- Ability of the agency to manage and protect the values of a river if it were designated, and other mechanisms to protect identified values other than Wild and Scenic Rivers designation.

- The estimated cost, if necessary, of acquiring lands, interests in lands, and administering the area if it were included in the national system.

- The extent to which administration costs will be shared by local and state governments.

The following table lists the interdisciplinary meetings held during the suitability step of this study process.

**Table 3. Suitability Study Interdisciplinary Meetings**

| Date | Attending | |
|---|---|---|
| August 30, 2004 | Evan Lowry, San Juan County | Marilyn Peterson, Recreation |
| | Will Stokes, School Trust Lands | Katie Stevens, Recreation |
| | Val Payne, State of Utah | Stephanie Ellingham, Riparian |
| | Bill Stevens, Recreation | Dave Vaughn, Grand County |
| | Maggie Wyatt, Moab Field Office Mgr. | |

Public comment received on the Draft EIS/RMP will be used to improve the documentation of the suitability considerations presented in Attachment 4 of this document, as well as the documentation of impacts that would result from the various alternatives. The actual determination of whether or not each eligible river segment is suitable is a decision that will be made in the Record of Decision for the Moab RMP.

BLM_0013181

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0013182

# WILD AND SCENIC RIVER STUDY PROCESS
# ATTACHMENTS

BLM_0013183

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0013184

## Attachment 1. Major Drainages Reviewed, Moab Field Office

| Drainage Name | HUC Number and Nam |
|---|---|
| **GREEN RIVER DRAINAGES** | |
| | **14060005** |
| | **Lower Green - Desolation Canyon. Utah** |
| Green River (Coal Creek to Canyonlands National Park Boundary) reviewed by the Price Field Office | |
| Coal Creek | |
| Poverty Canyon | |
| Rattlesnake Canyon | |
|    Flat Nose George Canyon | |
|       Horse Canyon | |
|    Black Canyon | |
|    Trail Canyon | |
| | **14060008** |
| | **Lower Green. Utah** |
| Butler Canyon | |
| Three unnamed drainages (east side of river below Butler) | |
| Tusher Canyon | |
|    Lefthand Tusher | |
|       Winter Camp Canyon | |
|       Bobby Canyon | |
|       Naylon Canyon | |
|          Left and Right Fork | |
|       Wild Cow Canyon | |
|    Righthand Tusher | |
|       Ute Canyon | |
|       Shower Bath Canyon | |
| Browns Wash | |
|    Coal Canyon | |
|    Horse Canyon | |
|    Right Hand Horse Canyon | |
|       Middle Horse Canyon | |
| Little Grand Wash | |
|    Solitude Wash | |
|    Floy Wash (Floy Canyon) | |
|       Dry | |
|       Left-hand Three-forks | |
|       Right-hand Three-forks | |
|    Corral Wash | |
|       Crooked Wash | |
| Salt Wash | |
| White Wash | |

BLM_0013185

## Attachment 1. Major Drainages Reviewed, Moab Field Office

| Drainage Name | HUC Number and Name |
|---|---|
| Red Wash | |
| Ten-Mile Canyon | |
|    Trail Canyon | |
|   Crescent Wash | |
|     Crescent Canyon | |
|     Right-hand Crescent Canyon | |
|   Thompson Wash | |
|     Blaze Canyon | |
|    Sego Canyon | |
|    Right-hand Thompson | |
| Spring Canyon | |
| Hell Roaring Canyon | |
|   Dubinky Wash | |
| Mineral Canyon | |
|   North Fork | |
|   South Fork | |
| Taylor Canyon (NPS) | |
|   Unnamed tributary (North of Park) | |
|    The Big Draw (NPS & BLM in upper end) | |
|   Rough Canyon | |
| **COLORADO RIVER DRAINAGES** | |
| | **14010005** |
| | **Colorado Headwaters-Plateau. Utah** |
| Salt Creek (in Colorado) | |
|   Prairie Canyon (in Colorado) | |
|     Hells Hole Canyon (mostly on State Land) | |
|    Cottonwood Canyon | |
|   Jim Canyon | |
| | **14030001** |
| | **Westwater Canyon. Colorado, Utah** |
| Colorado River (state line to Dolores River) | |
| Bitter Creek | |
|   Bryson Wash - Bryson Canyon | |
|   San Arroyo Wash | |
|     Winter Camp Draw | |
|    San Arroyo Canyon | |
|    Trap Canyon | |
|   Bar X Wash - Bar X Canyon | |
|    Wild Cow Wash | |
|   Middle Fork | |

BLM_0013186

### Attachment 1. Major Drainages Reviewed, Moab Field Office

| Drainage Name | HUC Number and Name |
|---|---|
| East Fork | |
| Jones Canyon (Utah, Colorado) | |
| Westwater Creek (Top end of Westwater is at WW point The top of this drainage has Ten Mile Creek which flows north to Willow Creek and into the Green River downstream of where the White River enters the Green. Most of this area is State lands or another Resource area.) | |
| Coal Draw | |
| Sulphur Creek - Sulphur Canyon | |
| Antone Wash | |
| Dry Canyon | |
| East Canyon | |
| Hideout Canyon | |
| Brusher Canyon | |
| Middle Canyon | |
| Bull Canyon | |
| Dark Canyon | |
| Maverick Canyon | |
| Rough Canyon | |
| Hay Canyon | |
| Horse Canyon | |
| Preacher Canyon | |
| Hunt Canyon | |
| Pipeline Canyon | |
| Little Hole | |
| Little Dolores River | |
| Marble Canyon | |
| Star Canyon | |
| Cottonwood Wash | |
| Buck Canyon Wash - Buck Canyon | |
| Long Canyon Wash - Long Canyon | |
| Spring Canyon | |
| Coal Canyon | |
| Diamond Canyon | |
| Flume Canyon | |
| Bull Canyon | |
| Horse Canyon | |
| Lower Twin Canyon | |
| Spruce Canyon | |
| Upper Twin Canyon | |
| Tepee Canyon | |
| Cherry Canyon | |
| Bear Canyon | |

BLM_0013187

## Attachment 1. Major Drainages Reviewed, Moab Field Office

| Drainage Name | HUC Number and Name |
|---|---|
| | **14030001** |
| | **Westwater Canyon. Colorado, Utah** |
| Agate Wash (100% private land) | |
| Danish Wash | |
| Dry Gulch | |
| Coates Creek | |
|    Spring Canyon | |
|    Renegade Creek - Triangle Canyon | |
|    Ryan Creek | |
| Cisco Wash | |
|    Corral Canyon Wash | |
|    Big Hole Wash | |
|    Strychnine Wash | |
|    Dry Canyon | |
| Sagers Wash | |
|    Owl Draw | |
|    San Arroyo | |
|    Nash Wash | |
|      Calf Canyon | |
|      Bull Canyon | |
|        Right-hand | |
|        Left-hand | |
|      Left-hand Nash | |
|      Pinto Wash | |
|        Saleratus Wash | |
|    Dugout Wash | |
|    Monument Wash | |
|    Bootlegger Wash | |
| | **14030005** |
| | **Upper Colorado - Kane Springs. Colorado, Utah** |
| Colorado River (Dolores River to Canyonlands NP) | |
| Yellow Jacket Canyon (Bull Canyon) | |
|    Trail Canyon | |
|    Tub Canyon | |
| Onion Creek | |
| Professor Creek - Mary Jane Canyon (FS & BLM) | |
|    Bunchground Canyon (FS) | |
| Stearns Gulch | |
| Ida Gulch | |
| Castle Creek (FS & BLM) | |

BLM_0013188

## Attachment 1. Major Drainages Reviewed, Moab Field Office

| Drainage Name | HUC Number and Nam |
|---|---|
|     Placer Creek (FS & BLM) | |
|         Porcupine Draw (Private Land & FS, no BLM) | |
|         Pinhook Creek (Private Land & FS) | |
|     Spring Branch (Private Land & FS) | |
| Salt Wash (Arches NP & BLM) | |
|     Salt Valley Wash (NPS) | |
|     Cache Valley Wash (NPS & BLM) | |
|     Winter Camp Wash (NPS & BLM) | |
|     Lost Spring Canyon (NPS - BLM) | |
|         Fish Seep Draw | |
|     Clover Canyon (NPS) | |
|     Yellow Cat Wash (BLM) | |
|         Fin Canyon (NPS & BLM) | |
|     Cottonwood Wash (BLM) | |
|     Mine Draw (BLM) | |
| Jackass Canyon | |
| Unnamed Canyon near Big Bend Campground | |
| Negro Bill Canyon | |
| Courthouse Wash (NPS & BLM) | |
|     Seven Mile Canyon (BLM) | |
|         South Fork of Seven Mile | |
|     Klondike Wash | |
|     Bartlett Wash | |
|     Tusher Canyon | |
|     Mill Canyon | |
| Mill Creek (becomes South Fork of Mill Creek) | |
|     South Fork Mill Creek (Private, State, BLM, FS) (also Mill Creek Gorge on Forest) | |
|         Horse Creek (FS) | |
|         Wet Fork (FS) (05) | |
|         Dry Fork (FS) | |
|     Pack Creek (Private, State, BLM, FS) | |
|     Brumley Creek (BLM & FS) | |
|         Dorry Canyon (FS) (no BLM) | |
|     Hell Canyon (FS) (no BLM) | |
|     North Fork Mill Creek (BLM, State, Private, FS) | |
|     Rill Creek (BLM) | |
|         Burkholder Draw (BLM & FS) | |
| Pritchett Canyon | |
| Kane Springs (West Pole Canyon) (BLM & FS) | |
|     Hunters Canyon (BLM) | |

BLM_0013189

## Attachment 1. Major Drainages Reviewed, Moab Field Office

| Drainage Name | HUC Number and Nam |
|---|---|
| Trough Springs Canyon (BLM) | |
| Hatch Wash (BLM) | |
| Trout Water Canyon (BLM) | |
| West Coyote Creek (to Pole Canyon & Coyote Springs on Forest) | |
| West Coyote Wash (BLM) | |
| Lacky Basin (FS) | |
| Three Mile Creek | |
| Little Water Creek | |
| Hatch Ranch Canyon (BLM & Private) | |
| Windwhistle Draw | |
| Joe Wilson Canyon | |
| Hook and Ladder Gulch | |
| Mail Station Wash (Monticello FO) | |
| Lopez Gulch | |
| Sandstone Draw | |
| Big Indian Dry Wash (Monticello FO) | |
| Big Indian Wash | |
| Mule Shoe Canyon (BLM) | |
| Black Canyon (BLM & FS) | |
| Cottonwood Canyon (BLM & FS) | |
| Buck Hollow (BLM & FS) | |
| Gold Bar Canyon | |
| Little Canyon | |
| Day Canyon | |
| Bull Canyon | |
| Dry Fork Bull Canyon | |
| Long Canyon | |
| Shafer Canyon (NPS & BLM) | |
| East-fork Shafer Canyon | |
| **DOLORES RIVER DRAINAGES** | |
| | **14030004** |
| | **Lower Dolores. Colorado, Utah** |
| Dolores River (state line to Colorado River) | |
| Waring Canyon | |
| Cowskin Canyon | |
| Buckhorn Draw | |
| Cottonwood Canyon | |
| Line Canyon | |
| Bridge Canyon | |

BLM_0013190

## Attachment 1. Major Drainages Reviewed, Moab Field Office

| Drainage Name | HUC Number and Name |
|---|---|
| | **14030004** |
| | **Lower Dolores. Colorado, Utah** |
| Granite Creek | |
|     Fisher Creek (and Cottonwood Canyon of Fisher Creek) | |
|         Burro Canyon (BLM) | |
|         Thompson Canyon (BLM) | |
|         Hideout Canyon (BLM, State, & headwaters on FS) | |
|         Unnamed fork opposite Hideout Cyn (BLM & FS) | |
|         Bull Canyon (FS & BLM) | |
| Beaver Creek (BLM & FS) | |
|     Sids Draw (FS) | |
|     Bear Creek (FS) | |
| Lumsden Canyon (2 miie of headwaters in Utah, majority in Coiorado where it flows into the Doiores River) | |
| **DOLORES RIVER DRAINAGES**<br>**(SOUTH OF LA SAL MTNS. - FLOW INTO THE DOLORES RIVER IN COLORADO)** | |
| | **14030002** |
| | **Upper Dolores. Colorado, Utah** |
| La Sal Creek (FS, BLM, State) | |
|     Three unnamed tributaries (originate on Ray Mesa) | |
|     Poie Springs Canyon (FS) | |
|         Hangdog Creek (FS) | |
|         Two Miie Creek (FS) | |
|     Trough Draw & Hop Creek (FS) | |
| Note: The drainages listed above are near Vanadium Queen Mine, very little on BLM in Utah. | |
|     Lion Canyon (BLM [Colorado & Utah], FS) less than ¼ miles in Utah BLM. FS no ORVs. | |
| East Coyote Wash (Utah and Colorado) [Greasewood Canyon] | |
|     isiand Canyon (BLM) | |
|     Snyder Water Canyon (BLM) | |
|     Horsethief Canyon (BLM) | |
|     Spring Canyon (BLM) | |
|     Lisbon Canyon (BLM) | |
|     Unnamed tributaries of Coyote Wash (BLM) (headwaters FS, Pine Ridge) | |
| McIntyre Canyon (Utah & Colorado) [flows to Dolores River through Colorado] | |
|     Little Indian Canyon | |

BLM_0013191

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0013192

**Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers**

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **COLORADO RIVER SEGMENT (1)**<br><br>**CO/UT state-line to Westwater Canyon (river mile 125)**<br><br>**Tentative Classification:**<br>Scenic<br><br>**Reason for Tentative Classification:**<br>Occasional road, farm and ranch development present.<br><br>**BLM Free-flowing River Miles:**<br>1<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br><br>Scenery is regionally significant. At the state line, the Chinle, Wingate, Kayenta, Entrada and the Summerville formations begin to dip below the Colorado River. By the time the Colorado River reaches the Westwater Ranger Station, it flows through a valley formed by the Morrison formation. The views along the river are some of the longest available in all of Utah. Beyond the stark rolling brown hills developed on the Morrison Formation are distant vistas east towards the Uncompahgre Plateau, whose dark-green forest of pinyon and juniper are interrupted by pink bands of rock. To the west, the barren hills interrupt the view in only a few miles. Downstream, through the green of the cottonwoods, is the imposing up fault cliff front that marks the beginning of Westwater Canyon. This adds an element of distance to the visual experience. There are a variety of shapes and patterns that are interesting, and compared to other sections of the river, the open nature is a dominant feature. The water adds motion and a variety of lines and surface textures. The color is focused on the riparian vegetation in contrast with the soils of the riverbank and the formations in the middle ground and background. The adjacent scenery greatly enhances the experience along this stretch of river. The area is distinctive. All of these elements combined add up to make this segment of the river visually outstanding and remarkable within the Colorado Plateau.<br><br>**Recreation**<br><br>Recreation is regionally significant. Westwater Ranger station is the conclusion of a two or three day flat-water boating trip on the Colorado River. The absence of rapids makes this trip a popular choice for boaters of all experience levels. Camping and hiking opportunities add to the variety offered for this trip. Restrictions on river use commence at the Westwater Ranger station, but the peaceful flat-water continues from the ranger station to the gates of Westwater Canyon proper. This stretch is boatable by most types of craft year round. Large numbers of recreationists enjoy this highly accessible floating opportunity. The flat-water stretches of the Colorado River are an outstanding and remarkable recreation opportunity, rare in this region, and very popular with the visitors.<br><br>**Wildlife**<br><br>Wildlife is regionally significant and nationally significant. Only a major drainage corridor such as the Colorado River can provide a rich variety of habitat for many types of wildlife species including, avian, terrestrial and aquatic. It is important habitat for ungulates such as mule deer and elk. This reach of the Colorado River Corridor provides habitat for the Mexican spotted owl and Southwestern willow flycatcher, both federally listed on the Endangered Species List. The Southwestern willow flycatcher is directly reliant on habitat that offers free standing water, riparian plant species, vegetative cover, and water related insects to nest and raise their young. In addition, many other types of raptors, including peregrine falcon, wintering bald eagles, and golden eagle, utilize the riverine corridor. Shorebirds and songbirds depend on the |

**Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers**

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | river, and it is vitally important to neotropical migrants. The importance of the Colorado River to animals of many species cannot be overestimated. Within the arid southwest all riparian habitat is vital to all forms of wildlife, due to the lack of available free water. Water availability and the vegetative cover within this riparian area offer needed drinking water, microclimates, food, and cover to wildlife and the various life stages of many species. The Colorado River, the lifeblood of the region, offers the finest riparian habitat in the entire area. |
| | This reach of the Colorado River contains 1 of only 4 known nesting sites for the Bald Eagle (*Haliaeetus leucocephalus*) within the entire State of Utah. (Two of these four nests are along the Westwater corridor of the Colorado River.) Nesting bald eagles are a rare occurrence in the State of Utah and are afforded federal protection under the Bald Eagle Act. Nesting bald eagles are reliant on riparian corridors to nest and raise their young, making these nesting sites river related. This bald eagle nest site is monitored by both state and federal agencies annually and has been active for over 15 years. This reach of the river is regionally and nationally significant, as a rare and unique occurrence of this federally protected bird can be found. |
| | **Fish** |
| | Fish are regionally and nationally significant. The Colorado River is the home of four endangered fish species, the Colorado Pikeminnow, the Razorback Sucker, the Humpback Chub, and the Bonytail Chub. It is considered Critical Habitat by U.S. Fish and Wildlife Service for these endangered species. This reach of the Colorado also offers habitat and spawning grounds for the Colorado Pikeminnow and Humpback Chub, making this reach of the river nationally important, as these fish are endemic to the Colorado River System. Due to the limited development through this reach of the river, these rare fish species are able to spawn and reproduce, allowing for recovery of these endemic, unique species. The habitat condition and lack of development is important to species recovery of this river related resource. |
| | Utah Sensitive Species identified in this segment include the Flannelmouth Sucker and the Roundtail Chub, making this reach of the river regionally important, as it provides sensitive habitat to these declining species. |
| | **Cultural** |
| | Historical events are significant on a regional and national level. The Colorado River has evidence of significant occupation and use by both prehistoric and historic peoples. Native Americans consider the Colorado River and its major flowing tributaries as sacred places making it nationally significant to native peoples. Archaeological sites have the potential to provide information concerning the use of the river corridor by prehistoric groups as well as homestead and railroad construction activities. The variety and number of archaeological and historical sites include alcoves, rock shelters, lithic scatters, rock art, and open campsites, as well as European homesteads and railroad camps and grades. The Denver and Rio Grande Western Railroad segment from |

BLM_0013194

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | the Utah state-line to the settlement of the community of Westwater (contained in this segment) and beyond was completed in 1883. The opening of the railroad line caused a flurry of growth in Utah. Placer mining also left its mark on the Westwater segment of the Colorado River in the late twentieth century.<br><br>**Ecological**<br><br>Ecologically, the Colorado River is the fifth longest river system in the nation (approximately 1,400 miles long) and drains approximately 242,000 square miles of watershed. The Colorado River Basin includes portions of seven states and Mexico and provides water to millions of people. The Colorado River is adjacent to the Pacific Flyway and provides important habitat for many migrating neo-tropical, shorebird, and waterfowl species. The aquatic, wetland and riparian habitats that are found in the Colorado River corridor provide for the existence of many wildlife species. The river corridor contains vegetative islands that serve as important refuge and nesting habitats for many migrant waterfowl species including the Canada goose, plovers, etc. The river corridor contains some of the last remnant populations of river otters, as well as nesting and forage habitat for endangered bald eagle, endangered Mexican spotted owl, endangered Southwestern willow flycatcher, sensitive bats, as well as 4 species of endangered native fish endemic only to the Colorado River system. While ecologically important, the Colorado River is not in high quality condition due to channel morphology, exotic/invasive species (tamarisk, Russian olive, Russian knapweed). Even with reduced health and diversity of the system, the ecological resources of the Colorado River are outstandingly remarkable on an international, national and regional basis. |
| **COLORADO RIVER SEGMENT (2)**<br><br>**River mile 125 (Westwater Canyon) to river mile 112**<br><br>**Tentative Classification:**<br>Wild<br><br>**Reason for Tentative Classification:**<br>No roads or development present.<br><br>**BLM Free-flowing River** | **Scenery**<br><br>Westwater Canyon is the most scenic, dramatic, and untouched portion of the Colorado River within the entire Colorado Plateau, making scenery an outstanding remarkable value of regional and national significance. The extremely hard rock through which the river flows has a number of effects. It narrows the upper stretch of the river, which is only about 35 feet wide in places. The resulting rapids contribute to Westwater Canyon's international reputation. This constriction has led to a variety of different polished and fluted rock formations up to the high water line. Above that, the rock is angular and interpenetrated by light colored dikes. It has been cut to a depth of about 200 feet in the vicinity of Marble and Star Canyons, creating an extremely narrow, claustrophobic gorge that lies within an outer gorge of flaring red sandstone walls stained with long black streamers of desert varnish. In places these upper walls have been covered by mudflows from the infrequent rains, leaving a braided pattern.<br><br>Near Skull Rapid the characteristic impression of Westwater Canyon is strongest. Such is the roar of the river in the time of high water that conversation must be carried on by shouting. The red rocks, hundreds of feet above the river contrast dramatically with the black rocks of its inner gorge. There is almost no shore but for occasional spills of |

BLM_0013195

**Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers**

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **Miles:**<br><br>11.8<br><br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | massive talus boulders. In contrast to the rapids on other large western rivers, those of Westwater have curious fountains, boils, and whirlpools caused by the narrowness, depth, and wall projection. At its lower end, the river is again lined by Wingate Sandstone, Entrada, and then by the slopes and scattered spall of the Morrison Formation.<br><br>The landform of this segment is exceptional and full of detail and variety. The reduction of vegetation is a stark contrast to other segments of the river. The water is the most dominant feature in the landscape. The color is dominated by the black rock in the canyon and its intensity and polished nature are distinctive. This is definitely a unique and memorable view.<br><br>**Recreation**<br><br>Recreation is regionally significant. A trip through Westwater Canyon of the Colorado River is a premier one or two-day whitewater boating experience in a Wilderness Study Area. Other recreational opportunities provided on this stretch of river include viewing unique and beautiful scenery, hiking side canyons (especially the Little Dolores hike to the waterfall), and wilderness camping. Self-outfitted users must obtain a permit, and a limited number of boaters are allowed to launch each day. Eighteen commercial outfitters market trips both nationally and internationally. This stretch is boatable by most types of whitewater craft year round. Limited access adds to the primitive character of this stretch of river, enhancing its recreational and economic values. Westwater Canyon is one of the premier recreation experiences available within the Colorado Plateau and is marketed as such.<br><br>**Wildlife**<br><br>Only along the Colorado River is there such a rich variety of habitat for many types of wildlife species including, avian, terrestrial and aquatic. It is important habitat for ungulates such as mule deer and elk. This reach of the Colorado River Corridor offers habitat for the Mexican spotted owl and Southwestern willow flycatcher, both federally listed on the Endangered Species List. The Southwestern willow flycatcher is directly reliant on habitat that offers free standing water, riparian plant species, vegetative cover, and water related insects to nest and raise their young. Many types of raptors, including peregrine falcons, ferruginous hawks, wintering bald eagles, and golden eagles, utilize the riverine corridor. Shorebirds and songbirds depend on the river, and it is important to neotropical migrants. Northern river otter also depend on the river. The importance of the Colorado River habitat to animals of many species cannot be overestimated. In addition to the above mentioned fowl, snowy egrets are a common sight in the fall and turkey vultures in the spring. Within the arid southwest all riparian habitat is vital to all forms of wildlife, due to the lack of available free water. Water availability and the vegetative cover available within riparian areas offer needed drinking water, microclimates, food, and cover to wildlife and the various life stages of many species. The Colorado River is a regionally significant resource to many wildlife species.<br><br>This reach of the Colorado River is adjacent to 2 of only 4 known |

BLM_0013196

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | nesting sites for the Bald Eagle (*Haliaeetus leucocephalus*) within the entire State of Utah. (Two of these four nests are in segments one and three of the Colorado River Corridor.) The proximity of this river segment to both of these nests makes this reach an important hunting territory for the eagles. Nesting bald eagles are a rare occurrence in the State of Utah and are afforded federal protection under the Bald Eagle Act. Nesting bald eagles are reliant on riparian corridors to nest and raise their young, making these nesting sites river related. This reach of the river is regionally and nationally significant, as a rare and unique occurrence of this federally protected bird can be found.<br><br>**Fish**<br><br>The Colorado River is the home of four endangered fish species, the Colorado Pikeminnow, the Razorback Sucker, the Humpback Chub, and the Bonytail Chub. It is spawning ground for both the Colorado Pikeminnow and the Humpback Chub. It is considered Critical Habitat by U.S. Fish and Wildlife Service for these endangered species and makes this river nationally important, as these fish are endemic to the Colorado River System. Lack of development throughout this reach of the river offers these rare fish species prime habitat for spawning, reproduction, and larval development, allowing for recovery of these endemic, unique species. The habitat condition and lack of development is important to species recovery of this river related resource. Utah Sensitive species identified here include the Flannelmouth Sucker, the Bluehead Sucker and the Roundtail Chub. This reach of the river is regionally and nationally important, as it provides excellent quality habitat for these declining species.<br><br>**Cultural**<br><br>This segment of the Colorado River is culturally significant at both regional and national levels. There is evidence of significant occupation and use by both prehistoric and historic peoples.<br><br>Native Americans consider the Colorado River and its major flowing tributaries as sacred spaces, making it nationally significant to native peoples. During prehistoric times Archaic peoples occupied the Colorado River Corridor, utilizing the available resources for food, clothing, shelter, and art. A wide variety of sites attest to this long-term occupation including alcoves, rock shelters, lithic scatters, rock art, and open campsites. Prehistoric sites have the potential to provide information concerning the use of the river corridor by Archaic and Fremont Culture.<br><br>European homesteads and mining operations have also left a legacy in this section of the canyon. Because of the multitude of human activities that have taken place in the canyon, this section is historically significant on a regional basis.<br><br>**Geology/Hydrology**<br><br>The geology/hydrology component is of regional significance. A small section of the Uncompahgre Plateau extends westward as the downward-plunging nose of the ancient Uncompahgre Uplift, one of the |

BLM_0013197

**Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers**

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
|  | most significant contributors to current Colorado Plateau topography. Here the Colorado River has down cut several hundred feet to create magnificent Westwater Canyon, where the geologic processes are interesting, highly visible, and outstandingly remarkable. The rock sequence runs from Precambrian (1.7 billion years old) to Cretaceous (150 million years old), with a 1.5 billion year nonconformity. Westwater and the inner gorge of the Grand Canyon are the only places on the Colorado Plateau where Precambrian rocks are exposed. From the Little Dolores River, the view upriver to the northwest is, in ascending order: Precambrian granites, Triassic Chinle Formation and Wingate Sandstone, Jurassic Kayenta Formation, Entrada Sandstone and Morrison Formation. From the same position looking upriver to the southeast, the strata are more steeply dipped and the deposits above the Kayenta have been eroded away. |
|  | At the head of Westwater Canyon, the Little Dolores fault is a textbook example of a reverse fault where Jurassic Entrada Sandstone overlies Precambrian crystalline rocks, with a 500 foot displacement. In the narrow, polished inner gorge where the river encounters the resistant black rock of the Uncompahgre Complex, the Precambrian rock weathers extremely slowly and the growth of vegetation is restricted to benches and to small cracks and depressions where sandy soil has been deposited by wind or water. In the heart of Westwater Canyon where hard bedrock is not scoured during run-off events, the river may rise 10-15 feet with huge increases in velocity. Individual rapids lengthen and sometimes merge, with waves often reaching 8 feet high. The high water period of May-June produces the greatest range in monthly flows. |
|  | Geologic sights of interest include the 200 foot gneiss cliffs above Skull Rapid and an abandoned meander at Big Hole where the river shortened its course by 2 miles, and down cut an additional 300 feet. Between Big Hole and Cottonwood Wash the Precambrian rocks pass under the river which then makes a gradual return to a meandering stream with large floodplains dominated by stands of tamarisk, cottonwood and willow. Chinle, then Wingate, Kayenta and eventually the Morrison are exposed at river level. |
|  | **Ecological** |
|  | The ecological values within this segment of the Colorado River are the same as described for Segment 1, and are of international, national and regional importance. |
| **COLORADO RIVER SEGMENT (3)** **River mile 112 to confluence with the Dolores River** **Tentative Classification:** | **Recreation** Recreation opportunities are regionally and nationally significant on this river segment. The terrain through which the Colorado River flows opens up into a broader valley at Rose Ranch. The slow moving water in this short stretch of river allows boaters to reflect on their trip through Westwater before taking out at Cisco. This stretch is boatable by most types of whitewater craft year round. The majority of use on this stretch is from those boaters finishing a Westwater trip. Some choose to extend their trip on the flat-water. This flat-water section is popular with commercial trips catering to national and international visitors, due to the |

BLM_0013198

**Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers**

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| Scenic<br><br>**Reason for Tentative Classification:**<br>Occasional roads, farm and ranch development present.<br><br>**BLM Free-flowing River Miles:**<br>11.2<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | pleasant scenery, lack of crowds, and wildlife viewing opportunities.<br><br>Below Cisco this peaceful stretch of river is characterized by broad open expanses and long views, with the dark blue and snow-capped La Sals providing a scenic contrast to the arid bluffs and dense riparian vegetation along the stream. It is popular with boaters using small capacity vessels, beginning paddlers, and with those looking for solitude. Camping, hunting, hiking, wildlife viewing and fishing are other outstanding recreational opportunities available on this stretch of river. The Colorado River, the signature feature of the Colorado Plateau, provides outstanding and remarkable recreation in this stretch of the river. This section is boatable by most types of craft year round. It is particularly popular with youth groups, due to its non-technical nature. In addition, Utah State Highway 128 (a Utah Scenic Byway and part of the Prehistoric Highway National Scenic Byway) parallels the last three miles of this segment, providing a high quality scenic driving recreation opportunity.<br><br>**Wildlife**<br><br>Only the Colorado River provides such a rich variety of habitat for many types of wildlife species, both avian and terrestrial. It is important habitat on a regional basis for ungulates such as mule deer and elk. This reach of the Colorado River Corridor provides habitat for the Southwestern willow flycatcher, a federally listed species on the Endangered Species List. The Southwestern willow flycatcher is directly reliant on habitat that offers free standing water, riparian plant species, vegetative cover, and water related insects to nest and raise their young. Many types of raptors, including peregrine falcons, ferruginous hawks, Swainson's hawks, wintering bald eagles, and golden eagles, utilize the riverine corridor. Shorebirds and songbirds depend on the river, and it is important to neotropical migrants. All migrant birds that utilize this reach of the river are afforded federal protection under the Migratory Bird Treaty Act. The importance of the Colorado River to animals of many species cannot be overestimated. Within the arid southwest all riparian habitat is vital to all forms of wildlife, due to the lack of available free water. Water and the vegetative cover available within riparian areas offers needed drinking water, microclimates, food, and cover to wildlife and the various life stages of many species. The Colorado River is the ultimate example of a riparian area providing the lifeblood to a diversity of species.<br><br>This reach of the Colorado River contains 1 of only 4 known nesting sites for the Bald Eagle (*Haliaeetus leucocephalus*) within the entire State of Utah. (Two of these four nests are within segments one and three of the Colorado River Corridor.) Nesting bald eagles are a rare occurrence in the State of Utah and are afforded federal protection under the Bald Eagle Act. Nesting bald eagles are reliant on riparian corridors to nest and raise their young, making these nesting sites river related. These two bald eagle nest sites are monitored by both state and federal agencies annually and have been active for over 15 years. This reach of the river is regionally and nationally significant, as a rare and unique occurrence of this federally protected bird can be found. |

BLM_0013199

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | **Fish**<br><br>The Colorado River is the home of four endangered fish species, the Colorado Pikeminnow, the Razorback Sucker, the Humpback Chub, and the Bonytail Chub. It is spawning grounds for the Colorado Pikeminnow and the Humpback Chub making this river nationally important, as these fish are endemic to the Colorado River System. It is considered Critical Habitat by U.S. Fish and Wildlife Service for these endangered species. Due to the limited development through this reach of the river, these rare fish species are able to spawn and reproduce, allowing for recovery of these endemic, unique species. The habitat condition and lack of development is important to species recovery of this river related resource. Utah Sensitive species identified here include the Flannelmouth Sucker, the Bluehead Sucker and the Roundtail Chub, making this reach of the river regionally important, as it provides sensitive habitat to these declining species.<br><br>**Cultural**<br><br>Human occupation of this section of the Colorado River extends from the early Archaic to Numic speaking populations. Native Americans consider the Colorado River and its major flowing tributaries as sacred places. The variety and number of archaeological and historical sites adjacent to the river embrace the occupation of prehistoric and historic peoples. Sites include alcoves, rock shelters, lithic scatters, rock art, and open campsites. Prehistoric sites have the potential to provide information concerning the use of the river corridor by Archaic and Formative Cultures. Likewise, historic people capitalized on the river's water resources by constructing ditches to feed agricultural fields and budding homesteads. A major water pumping station was built in this stretch of river in order to transport water from the river to the station at Cisco for the Denver and Rio Grande Railroad. The Colorado River has been the focus of human habitation from prehistoric to historic times, making it the cultural hub of this region.<br><br>**Ecological**<br><br>The ecological values within this segment of the Colorado River are the same as described for Segment 1, and are of international, national and regional importance. |
| **COLORADO RIVER SEGMENT (4)**<br><br>**Confluence with the Dolores River to river mile 49 near Potash Plant**<br><br>**Tentative Classification:**<br>Recreational | **Scenery**<br><br>This segment of the river is a very popular scenic float, as well as a beautiful scenic drive. Visitors from all over the nation, as well as from all over the world, consider it one of the most scenic resources in the entire United States. It contains some of the most outstanding scenery in the region. There are several signs of human habitation including State Highway 128 (a Utah Scenic Byway and part of the Prehistoric Highway National Scenic Byway), several ranches and agricultural treatments, and the historic Dewey Bridge, constructed in 1916. Sheer cliffs dominate, and gradually rise on each side. The Entrada formation appears, and is topped with Morrison formation deposits. The rock at river level is Navajo Sandstone. The rock formations become |

BLM_0013200

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **Reason for Tentative Classification:**<br><br>Substantial evidence of human activity, roads, farm and ranch development present.<br><br>**BLM Free-flowing River Miles:**<br>32.6<br><br>**Reason for Free-flowing Determination**:<br>Natural Flow | increasingly detailed and striking. The river enters the Richardson Amphitheater and internationally recognized formations such as Fisher Towers, The Titan, The Rectory, The Priest and the Nuns, Castle Rock, and many unnamed spires and formations come into view. The river enters a tight canyon where the Moenkopi Formation is exposed. The river winds through large boulders and steep cliffs and the immense meander of Big Bend is very prominent. The geologic strata once again descend, with the Moenkopi going underground and the Wingate Sandstone cliffs dropping to a lower level, and dominating the view. The river is now bordered by Arches National Park on the north and the Sand Flats Recreation Area on the south. The steep sheer cliffs on the south with prominent displays of desert varnish, and the outstanding petrified dunes and spires of Arches National Park on the north dominate the formations from Negro Bill Canyon to U. S. Highway 191.<br><br>The landform of this segment is the most diverse display of outstanding geology along the river, as well as one of the most remarkable displays in the entire world. The open valleys and tight canyons and rock formations make this area outstanding and remarkable based on the geology and landform alone. The vegetation is richly riparian and the water is a dominant feature. The color of this segment is rich with pleasing contrasts between the varied colors of red and brown in the landform, and the green and gold of the vegetation, which change colors with the seasons. This segment of the Colorado River is truly outstanding and remarkable on a national level; its scenery is internationally recognized.<br><br>At "The Portal" the river cuts through the Wingate Sandstone. At this point the river canyon narrows and the banks become heavily vegetated. The cliffs along this section are massive and imposing. The Navajo Sandstone at river level on both sides of the river has eroded into near vertical cliffs. On the south side of the river are the fins and domes of Navajo Sandstone. The Kayenta Sandstone appears at river level with the Wingate Sandstone disappearing. The outstanding geology of this segment adds greatly to the visual quality and several arches and prominent features are visible from the river.<br><br>**Recreation**<br><br>This stretch of the Colorado River is popular for flat water boating as well as mild whitewater boating. It is floatable year round, but most boaters make use from May to mid-September. Outfitters market this trip both nationally and internationally. Youth and family groups enjoy this stretch of river due to the mild character and great views. Most of this stretch is flat with a ten-mile stretch of class II-III rapids. Views vary from the wide valley near Castle Valley to the tight red Wingate canyon. State Highway 128 parallels the river but does not detract from the float trip. Camping, fishing, hiking, climbing, and horseback riding are popular activities in the river corridor. The BLM has developed campgrounds along the river, and private landowners have built resorts along the river. The recreation opportunities are enjoyed by one half million people per year.<br><br>Downstream from Moab the Colorado River is popular for flat-water |

BLM_0013201

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
| --- | --- |
|  | boaters, motorized and non-motorized. Jet boats shuttle canoe trips from the confluence of the Green and Colorado River in Canyonlands National Park back to Moab using this stretch. Some boaters canoe to the confluence, and are motored back to Moab. It is floatable year round, but most boaters make use from May to mid-September. Outfitters market this trip both nationally and internationally. This spectacular Wingate canyon is the gateway to Canyonlands National Park. Roads parallel both sides of this stretch of river but do not detract from the float trip. Camping, fishing, climbing, and hiking are popular activities in the river corridor. The recreation opportunities are outstanding and remarkable within the region, as well as nationally. The BLM has developed campgrounds along the river.<br><br>**Wildlife**<br><br>Only the Colorado River has important wildlife habitat for a variety and diversity of species, both avian and terrestrial. The Colorado provides crucial habitat for raptors, including the bald eagle and the peregrine falcon. Wintering geese and ducks depend on the Colorado, as do all types of shorebirds and songbirds. Great Blue Herons are commonly seen. All migrant birds that utilize this reach of the river are afforded federal protection under the Migratory Bird Protection Act. This reach of the Colorado River Corridor offers habitat for Mexican spotted owl and Southwestern willow flycatcher, both federally listed on the Endangered Species List. The Southwestern willow flycatcher is directly reliant on habitat that offers free standing water, riparian plant species, vegetative cover, and water related insects to nest and raise their young.<br><br>Only along the Colorado River, can as great a diversity of terrestrial species survive. The river corridor supports diverse species such as deer, coyote, beaver, river otter, and desert bighorn sheep. This segment of the Colorado is particularly important habitat for the survival of the desert bighorn sheep. The importance of the Colorado River corridor as wildlife habitat within this region cannot be underestimated. Within the arid southwest all riparian habitat is vital to all forms of wildlife, due to the lack of available free water. Water and the vegetative cover available within riparian areas offer needed drinking water, microclimates, food, and cover to wildlife and the various life stages of many species. There is no more important riparian habitat within the region than the Colorado River corridor.<br><br>The proximity of this stretch to the Nature Conservancy's Matheson Wetlands adds to its habitat value by offering protected wildlife corridors and reducing habitat fragmentation. Within the arid southwest all riparian habitat is vital to all forms of wildlife, due to the lack of available free water. Only the Colorado River can offer this quality of habitat.<br><br>**Fish**<br><br>The Colorado River is the home of four endangered fish species, the Colorado Pikeminnow, the Razorback Sucker, the Humpback Chub, and the Bonytail Chub. This reach of the Colorado is spawning grounds for the Colorado Pikeminnow, and the Razorback Sucker, and possibly the Bonytail. It is considered Critical Habitat by U.S. Fish and Wildlife |

BLM_0013202

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | Service for these endangered species, making this river nationally important, as these fish are endemic to the Colorado River System. Lack of development throughout this reach of the river offers these rare fish species prime habitat for spawning, reproduction, and larval development, allowing for recovery of these endemic, unique species. The habitat condition and lack of development is important to species recovery of this river related resource. Utah sensitive species identified here include the Flannelmouth Sucker, the Bluehead Sucker and the Roundtail Chub, making this reach of the river regionally important, as it provides sensitive habitat to these declining species.<br><br>**Cultural**<br><br>The Colorado River has evidence of significant occupation and use by both prehistoric and historic peoples. Native Americans consider the Colorado River and its major flowing tributaries as sacred places making it nationally significant to native peoples. The variety and number of archaeological and historical sites adjacent to the river embrace the occupation of prehistoric and historic peoples. Sites include alcoves, rock shelters, lithic scatters, rock art, and open campsites, as well as European homesteads. Prehistoric sites have the potential to provide information concerning the use of the river corridor by Archaic, Fremont and Anasazi Cultures as well as Numic speaking peoples.<br><br>As travel between the southwest and the Pacific coast increased, early travelers and traders utilized fords and crossings along the Colorado River. The Dewey Bridge, completed in 1916, opened up both sides of the Colorado River to private and commercial traffic. The road up the Colorado River, including the Dewey Bridge, later became the basis for State Highway 128. The Dewey Bridge is unique in that it is the longest suspension bridge in Utah and was listed on the National Register of Historic Places on July 12, 1984.<br><br>**Geology**<br><br>Geology is on display along the Colorado River corridor, because nowhere are rocks better exposed than along its sheer, bare walls. It is here that geologists come to see evidence of the principle of uniformitarianism; that the processes of erosion and deposition that are active on the surface of the earth today have also been active in the geologic past. Unique to the Colorado Plateau is the lack of a marked unconformity at the systemic boundary between rocks of the Paleozoic and Mesozoic Eras; the uppermost of the former, of Permian age, and the lowermost of the latter, of Triassic Age, are structurally conformable. Also unique to this part of the Colorado Plateau are structural features known as collapsed salt anticlines. When under differential pressure, evaporite minerals flow toward the crests of anticlines, which are parts of folds first susceptible to ground water. The minerals are dissolved and the overlying rocks collapse along gravity faults. Such faults occur and can be seen at Salt Wash, Cache Valley, Castle Valley and Fisher Valley all located along this segment. In the area of Salt Wash a conglomerate anomaly occurs which some have correlated to the Shinarump Conglomerate of the Chinle Formation. The origin of this conglomerate is not well understood. Unusual sedimentary structures |

BLM_0013203

**Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers**

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
|  | may be observed in the Dewey Bridge Member of the Entrada Sandstone whose type locality is where Dewey Bridge crosses the Colorado River. The intricate crenulations in this unit are neither the result of movements in the earth's crust nor do they correspond with folds in the underlying and overlying formations, but rather they were formed because they were saturated with water and were not lithified when the overlying sands were deposited. Throughout this corridor several seeps, alcoves and arches of varying sizes can be seen and excellent examples of entrenched meanders abound. This geologic process is uniquely exposed along the Colorado River.<br><br>As the Colorado River flows downstream from US Highway 191 it crosses the collapsed Moab Valley salt anticline and the Moab fault zone. The crossing is a paradox in that the river cuts across the valley rather than flowing through it - this indicates that the pattern of the Colorado River and its meanders were established before the valley existed. The core of the anticline is represented by an exposure of the Paradox Formation as a punky residue of gypsum and anhydrite from which soluble salts have been leached near the Portal, where the river enters another canyon. The extensive low area beside the river, the Matheson Wetlands, occurs because of the subterranean solution of salt. Vertical displacement along the Moab fault zone is several thousand feet. Traveling downstream is at first like traveling forward in time, as younger and younger rocks reach river level, abruptly at first and then more gradually after the Navajo Sandstone appears. About 3 river miles downstream from the Portal, the river crosses the axis of the Kings Bottom Syncline and the rock sequence is reversed as if traveling backward in time through the Kayenta Formation, Wingate Sandstone, Chinle, Mossback and Moenkopi Formations, which rise gently on the side of the Kane Creek Anticline to Jackson Bottom. Many cliffs in this river corridor are covered with desert varnish, a complex patina of clay, iron hydroxide and manganese oxide deposited by bacterial action.<br><br>Jackson Hole is a classic textbook example of an abandoned meander. The river course was shortened by about 3 miles when the Jackson Hole meander was abandoned. The Permian Lower Cutler Beds (once reported as the type locality for the no-longer recognized Elephant Canyon Formation) are exposed at river level. Petrified wood, fossil corals, bryozoans, brachiopods and fusilinids occur with great frequency in this formation. Chinle and Wingate sandstones overlie the Cutler.<br><br>Due to the diversity and abundance of features, the educational and scientific values described above, the values found along segment 4 of the Colorado River were found to be outstanding regionally and nationally.<br><br>**Ecological**<br>The ecological values within this segment of the Colorado River are the same as described for Segment 1, and are of international, national and regional importance. |

BLM_0013204

**Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers**

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **COLORADO RIVER SEGMENT (5)**<br><br>**River mile 44.5 to mile 38.5 at State land boundary**<br><br>**Tentative Classification:**<br>Scenic<br><br>**Reason for Tentative Classification:**<br>Primitive roads and some evidence of mining activity present within ¼ mile river corridor. (This development is not visible from the river).<br><br>**BLM Free-flowing River Miles:**<br>6.1<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br>The Colorado River cuts through the Kane Creek Anticline, and the colors and layering of the sedimentary rocks are outstanding. The landform in this section is outstanding within the Colorado Plateau, with vertical cliffs and prominent features such as arches and spires adding to the already rich rock strata. The water is a dominant feature and adds motion and a variety of surfaces. The color of the area is rich in contrast and the adjacent scenery greatly enhances the visual quality. This segment is distinctive and the addition of arches and other outstanding features adds to the scarcity of this section. The river flows through the outstanding geology at the base of Dead Horse Point State Park. The large meander of the river at this point has been the focus of many a post card and scenic photo as the river carves through multiple layers of geology that has cut into the Wingate, Kayenta, and Navajo Sandstone. The river continues in this outstanding vein all the way to Canyonlands National Park boundary. The vegetation is a variety of riparian species that create interesting forms and patterns. The water is a dominant feature, and adds motion and a variety of surfaces. The color contrasts are strong, and the effects of the adjacent scenery are high. All of these elements when combined make the values in this section outstanding and remarkable within the physiographic region. The scenery in this segment is internationally recognized as unique and outstanding. The Colorado River is the signature feature of the region known as the Colorado Plateau, and is nationally significant.<br><br>**Recreation**<br>Downstream from Moab the Colorado River is popular for flat-water boaters, motorized and non-motorized. Jet boats shuttle canoe trips from the confluence of the Green and Colorado River in Canyonlands National Park back to Moab using this stretch. Some boaters canoe to the confluence, and are motored back to Moab. It is floatable year round, but most boaters make use from May to mid-September. Outfitters market this section as part of a Cataract Canyon trip both nationally and internationally. This spectacular Wingate canyon is the gateway to Canyonlands National Park. Camping, fishing, and hiking are popular activities in the river corridor. Below the Potash Plant, the Wingate cliffs give way to a broad view of the Shafer Basin. A few primitive roads are present within the river corridor but are not very noticeable from the river. .<br><br>**Wildlife**<br>Only the Colorado River has such important wildlife habitat for a variety and diversity of species, both avian and terrestrial. The Colorado provides crucial habitat for raptors, including the bald eagle and the peregrine falcon. Wintering geese and ducks depend on the Colorado, as do all types of shorebirds and songbirds. Great Blue Herons are commonly seen. All migrant birds that utilize this reach of the river are afforded federal protection under the Migratory Bird Treaty Act. This reach of the Colorado River Corridor offers habitat for Mexican spotted owl and Southwestern willow flycatcher, both federally listed on the |

BLM_0013205

**Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers**

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
|  | Endangered Species List. The Southwestern willow flycatcher is directly reliant on habitat that offers free standing water, riparian plant species, vegetative cover, and water related insects to nest and raise their young. |
|  | Only along the Colorado River, can as great a diversity of terrestrial species survive. The river corridor supports diverse species such as deer, coyote, beaver, river otter, and desert bighorn sheep. This segment of the Colorado is particularly important habitat for the survival of the desert bighorn sheep. The importance of the Colorado River corridor as wildlife habitat within this region cannot be underestimated. Within the arid southwest all riparian habitat is vital to all forms of wildlife, due to the lack of available free water. Water and the vegetative cover available within riparian areas offer needed drinking water, microclimates, food, and cover to wildlife and the various life stages of many species. There is no more important riparian habitat within the region than the Colorado River corridor. |
|  | **Fish** |
|  | The Colorado River is the home of four endangered fish species, the Colorado Pikeminnow, the Razorback Sucker, the Humpback Chub, and the Bonytail Chub. This reach of the Colorado includes spawning grounds for the Colorado Pikeminnow, and the Razorback Sucker, and possibly the Bonytail. It is considered Critical Habitat by U.S. Fish and Wildlife Service for these endangered species, making this river nationally important, as these fish are endemic to the Colorado River System. Lack of development throughout this reach of the river offers these rare fish species prime habitat for spawning, reproduction, and larval development, allowing for recovery of these endemic, unique species. The habitat condition and lack of development is important to species recovery of this river related resource. Utah sensitive species identified here include the Flannelmouth Sucker, the Bluehead Sucker and the Roundtail Chub, making this reach of the river regionally important, as it provides sensitive habitat to these declining species. |
|  | **Cultural** |
|  | The Colorado River has evidence of significant occupation and use by both prehistoric and historic peoples. Native Americans consider the Colorado River and its major flowing tributaries as sacred places, making it nationally significant to native peoples. The variety and number of archaeological and historical sites adjacent to the river embrace the occupation of prehistoric and historic peoples. Sites include alcoves, rock shelters, lithic scatters, rock art, and open campsites, as well as European homesteads. Prehistoric sites have the potential to provide information concerning the use of the river corridor by Archaic, Fremont and Anasazi Cultures as well as Numic speaking peoples. |
|  | **Ecological** |
|  | The ecological values within this segment of the Colorado River are the same as described for Segment 1, and are of international, national and regional importance. |

BLM_0013206

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **COLORADO RIVER SEGMENT (6)**<br><br>**From State land at river mile 37.5 to mile 34 at Canyonlands National Park boundary**<br><br>**Tentative Classification:**<br>Wild<br><br>**Reason for Tentative Classification:**<br>No development present within the river corridor.<br><br>**BLM Free-flowing River Miles:**<br>3.8<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br>The Colorado River cuts through the Kane Creek Anticline, and the colors and layering of the sedimentary rocks are outstanding. The landform in this section is outstanding within the Colorado Plateau, with vertical cliffs and prominent features such as arches and spires adding to the already rich rock strata. The water is a dominant feature and adds motion and a variety of surfaces. The color of the area is rich in contrast and the adjacent scenery greatly enhances the visual quality. This segment is distinctive and the addition of arches and other outstanding features adds to the scarcity of this section. The river flows through the outstanding geology at the base of Dead Horse Point State Park. The large meander of the river at this point has been the focus of many a post card and scenic photo as the river carves through multiple layers of geology that has cut into the Wingate, Kayenta, and Navajo Sandstone. The river continues in this outstanding vein all the way to Canyonlands National Park boundary. The vegetation is a variety of riparian species that create interesting forms and patterns. The water is a dominant feature, and adds motion and a variety of surfaces. The color contrasts are strong, and the effects of the adjacent scenery are high. All of these elements when combined make the values in this section outstanding and remarkable within the physiographic region. The scenery in this segment is internationally recognized as unique and outstanding. The Colorado River is the signature feature of the region known as the Colorado Plateau, and is nationally significant.<br><br>**Recreation**<br>Downstream from mile 37.5, the Colorado River is popular for flat-water boaters, motorized and non-motorized. Jet boats shuttle canoe trips from the confluence of the Green and Colorado River in Canyonlands National Park back to Moab using this stretch. Some boaters canoe to the confluence, and are motored back to Moab. It is floatable year round, but most boaters make use from May to mid-September. Outfitters market this trip both nationally and internationally. This spectacular Wingate canyon is the gateway to Canyonlands National Park. Camping, fishing, and hiking are popular activities in the river corridor. Below the Potash Plant, the Wingate cliffs give way to a broad view of the Shafer Basin. No roads dissect this peaceful stretch of the Colorado. Outfitters market this section as part of a Cataract Canyon trip both nationally and internationally.<br><br>**Wildlife**<br>Only the Colorado River has such important wildlife habitat for a variety and diversity of species, both avian and terrestrial. The Colorado provides crucial habitat for raptors, including the bald eagle and the peregrine falcon. Wintering geese and ducks depend on the Colorado, as do all types of shorebirds and songbirds. Great Blue Herons are commonly seen. All migrant birds that utilize this reach of the river are afforded federal protection under the Migratory Bird Treaty Act. This reach of the Colorado River Corridor offers habitat for Mexican spotted owl and Southwestern willow flycatcher, both federally listed on the |

BLM_0013207

### Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
|  | Endangered Species List. The Southwestern willow flycatcher is directly reliant on habitat that offers free standing water, riparian plant species, vegetative cover, and water related insects to nest and raise their young. |
|  | Only along the Colorado River, can as great a diversity of terrestrial species survive. The river corridor supports diverse species such as deer, coyote, beaver, river otter, and desert bighorn sheep. This segment of the Colorado is particularly important habitat for the survival of the desert bighorn sheep. The importance of the Colorado River corridor as wildlife habitat within this region cannot be underestimated. Within the arid southwest all riparian habitat is vital to all forms of wildlife, due to the lack of available free water. Water and the vegetative cover available within riparian areas offer needed drinking water, microclimates, food, and cover to wildlife and the various life stages of many species. There is no more important riparian habitat within the region than the Colorado River corridor. |
|  | **Fish**<br><br>The Colorado River is the home of four endangered fish species, the Colorado Pikeminnow, the Razorback Sucker, the Humpback Chub, and the Bonytail Chub. This reach of the Colorado includes spawning grounds for the Colorado Pikeminnow, and the Razorback Sucker, and possibly the Bonytail. It is considered Critical Habitat by U.S. Fish and Wildlife Service for these endangered species, making this river nationally important, as these fish are endemic to the Colorado River System. Lack of development throughout this reach of the river offers these rare fish species prime habitat for spawning, reproduction, and larval development, allowing for recovery of these endemic, unique species. The habitat condition and lack of development is important to species recovery of this river related resource. Utah sensitive species identified here include the Flannelmouth Sucker, the Bluehead Sucker and the Roundtail Chub, making this reach of the river regionally important, as it provides sensitive habitat to these declining species. |
|  | **Cultural**<br><br>The Colorado River has evidence of significant occupation and use by both prehistoric and historic peoples. Native Americans consider the Colorado River and its major flowing tributaries as sacred places making it nationally significant to native peoples. The variety and number of archaeological and historical sites adjacent to the river embrace the occupation of prehistoric and historic peoples. Sites include alcoves, rock shelters, lithic scatters, rock art, and open campsites, as well as European homesteads. Prehistoric sites have the potential to provide information concerning the use of the river corridor by Archaic, Fremont and Anasazi Cultures as well as Numic speaking peoples. |
|  | **Ecological**<br><br>The ecological values within this segment of the Colorado River are the same as described for Segment 1, and are of international, national and regional importance. |

BLM_0013208

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **UPPER COTTONWOOD CANYON**<br><br>**Source near Cottonwood Point to private land boundary, including the first half mile of Horse Canyon.**<br><br>**Tentative Classification:**<br>Scenic<br><br>**Reason for Tentative Classification:**<br>Occasional road present.<br><br>**BLM Free-flowing River Miles:**<br>10.4<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br>Cottonwood Canyon and its tributaries support richly scenic riparian vegetation. Although the canyon suffered a large fire in 2002, the stands of vegetation in the canyon bottom were largely unburned. Beaver ponds abound in the canyon; the resulting bodies of water become focal viewing points. The canyon walls provide high relief and rich color combinations, especially when combined with the riparian ribbon in the canyon bottom. Cottonwood Canyon and tributaries support diversity of vegetation types, resulting in interesting patterns, textures, color and contrast. Cottonwood Canyon has remarkable and outstanding scenery within the Tavaputs Plateau region. It is the most scenic of all the Book Cliffs Canyons, and is regionally significant.<br><br>**Wildlife**<br>Cottonwood Wash and its tributaries provide rich wildlife habitat, diversity and abundance for a variety of species. Located within the Book Cliffs, the primitive and remote nature of these canyons provides for rare enjoyment of natural wildlife ecosystems. Richly riparian, this perennial system supported (pre-fire) an extensive network of beaver ponds, which create habitat for many other types of wildlife, including neo-tropical migrants such as special status Southwestern willow flycatcher, blue grosbeak, common yellow-throat, and numerous bats. The system is home to large numbers of predators including mountain lion and bear, as well as game species such as elk and deer, all of which are strong attractors for hunting and commercial guiding activities. Grazing permits in the canyons were purchased by the Rocky Mountain Elk Foundation to protect elk and mule deer winter range, offering winter and birthing grounds that provide excellent vegetation for high quality forage and escape cover. These canyons are also proximal to breeding habitat for Gunnison sage-grouse, a Utah Species of Concern, now extirpated in the area. Lack of grazing is an important criterion for repairing damaged and abandoned breeding grounds for this species. The extent, diversity, abundance, and recreational importance of wildlife species and habitats existing within Cottonwood Wash and its tributaries provides for Outstandingly Remarkable wildlife values within the region. Cottonwood Wash is an outstanding wildlife resource within the lower 48 states within the most important contiguous wildlife habitat, the Book Cliffs.<br><br>**Ecological**<br>Cottonwood Wash is a major tributary to the Colorado River, which contains a watershed of approximately 131,000 acres. The headwaters include a network of tributary drainages that originate in the upper plateaus of the Book Cliffs at elevations near 11,000 feet above sea level. Prior to the summer of 2002, the stream system was characterized by a series of beaver ponds that created lush high-quality wetlands, unique within the Colorado Plateau region due to their excellent condition and extent. Over 10 miles and 600 acres of wetland marshes developed within Cottonwood Wash and its major tributary, Diamond Creek, serve to create and recharge perennial flows within the system. |

BLM_0013209

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
|  | Mature overstory cottonwood, willow and box elder communities formed a riparian corridor along extensive cattail and sedge marshes. While the condition of the aquatic habitat improved during late-seral development of wetland marsh sites, fish diversity remained low due to fragmentation from other stream sources. The stream system was identified as a potential refuge site for re-establishment as a native fishery. The ecological diversity of Cottonwood Wash provides for diversity of wildlife, including common occurrence of bear, mountain lion, deer, elk, wild turkey and beaver, as well as non-game birds and bats. During 2002, a catastrophic wildfire scorched most of the upper canyon system; however remnant riparian resources and capabilities remain to re-establish a high quality ecological ecosystem. Cottonwood Wash contains Outstandingly Remarkable wetlands and ecological diversity within the region. |
| **ONION CREEK SEGMENT (1)**<br><br>**Source to Onion Creek Road**<br><br>**Tentative Classification:**<br>Wild<br><br>**Reason for Tentative Classification:**<br>No roads or development present.<br><br>**BLM Free-flowing River Miles:**<br>3.5<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br><br>This drainage flows through some of the most spectacular and fascinating rock formations found anywhere in the United States. Onion Creek originates in a hilly maze of springs that create a stunning wetland filled with an outstanding diversity of vegetation that contrasts with the multi colored landscape. It flows through Paradox salts at the upper end of the Fisher Valley, and the relatively flat meadowlands of upper Fisher Valley. As the water cuts through the red hued Cutler sediment it contrasts with the gray of the Paradox salts. The lofty rim land of Fisher Mesa dominates the southwestern skyline, and the high plateau above Fisher Valley is one arm of the immense North Beaver Mesa. Onion Creek exits from the cut in the Paradox salt extrusion and continues in the dark red Cutler formation. Narrow grottoes and side canyons invite exploration. The landform of this segment is outstanding. The presence of water is a dominant element. The color contrasts are vivid and change at all times of the day, and during each season of use. The adjacent scenery greatly enhances the visual quality, and this is a one of a kind, and memorable area. Onion Creek is remarkable and outstanding among the tributaries of the Colorado River.<br><br>**Geology**<br><br>Onion Creek is uniquely entrenched in a canyon surrounded by steep canyon walls eroded back from the drainage. The dissected and rugged landscape between Onion Creek and the canyon walls is comprised of the Permian Cutler Formation. The Triassic Moenkopi and Chinle Formations form the slopes at the base of the cliffs. Jurassic Wingate and Kayenta form the canyon walls. Above the canyon walls the terrain consists of broad benches which slope to the northeast and are incised by the Waring Canyon and Cottonwood Canyon drainages. The northeast rim of Onion Creek, at an elevation of about 6800', is the highest canyon wall in the vicinity. There is about 1800' of relief between the bottom of Onion Creek and the canyon rim. Onion Creek flows along the axis of a collapsed salt anticline, and the sedimentary rocks dip to the northeast along the flank of the anticline. The Onion Creek anticline is part of a large diapiric salt structure in which the Salt Valley, Cache Valley, Fisher Valley and Sinbad Valley anticlines are also uplifted by |

BLM_0013210

**Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers**

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | salt doming. This is significant in that it is the longest anticline in the Paradox Basin, with a greater number of structural variations than other regional anticlines. This makes Onion Creek a regionally significant example of geological processes.<br><br>**Ecological**<br><br>The headwaters of Onion Creek emerge from a large wetland meadow along the base of Fisher Valley. Dense and diverse wetland meadow vegetation and large scattered cottonwoods line the headwater drainages and provide recharge for perennial flow through the lower canyon. The meadow remains largely undisturbed and provides a diverse natural high elevation meadow site rare in the region. The meadow ecology provides for uncommon native wildlife habitat. The rarity of this site provides for Outstandingly Remarkable ecological values within the region. |
| **ONION CREEK: SEGMENT (2)**<br><br>**Beginning of Onion Creek Road to Colorado River**<br><br>**Tentative Classification:**<br>Recreational<br><br>**Reason for Tentative Classification:**<br>Road parallels and crosses segment many times.<br><br>**BLM Free-flowing River Miles:**<br>9<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br><br>This segment of Onion Creek is dominated by massive faulting activity and a large anticline that creates a wonderful combination of light red and brick red outcrops of the Chinle Formation topped with yellowish sandstone rubble. The massive rock formations and the outstanding examples of erosion and landmark features, make this section exceptionally scenic. In fact the distinctive nature of this segment gives the visitor the impression that they have left this world and entered a different planet. As the creek continues to flow to the Colorado River, it enters a region of Cutler Sandstone bluffs, and low cliffs forming interesting spires, balanced rocks, and small arches that are highly eroded and ornate. As the creek continues, the formations of Castle Valley become prominent, and Castle Rock, the Priest and the Nuns, and Fisher Towers, add to the visual quality of the drainage. The Creek then enters the Colorado River cutting through the large alluvial deposits of decomposed Cutler Sandstone. The landform of this segment is outstanding. The water is a dominant feature, and the influence of the adjacent scenery greatly enhances the visual quality. This is definitely a one of a kind experience, and the quality of the visual experience is very rare to this region. All of these elements add up to make this segment of Onion Creek one of the most scenic drainages in the region and outstanding and remarkable even within the wonderland of the Colorado Plateau.<br><br>**Geology**<br><br>This segment of Onion Creek is dominated by massive faulting activity and a large anticline that creates a wonderful combination of light red and brick red outcrops of the Chinle Formation topped with yellowish sandstone rubble. The sulfur content of the creek from this point has limited the growth of riparian vegetation and has created an unusual circumstance where the creek is completely visible to the viewer. The road parallels the creek and crosses many times, but the massive rock formations and the outstanding examples of erosion and landmark features, make the road a minimal feature. As the creek continues to flow to the Colorado it enters a region of Cutler Sandstone bluffs, and |

BLM_0013211

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
|  | low cliffs forming interesting spires, balanced rocks, and small arches that are highly eroded and ornate. The dominant feature of the Titan and many unusual landforms with local names such as The Poodle, The Camel, Donald Duck, Mr. Magoo, The Chess Men, and Grandma and Little Red Riding Hood, attract the attention of the visitor. As the creek continues, the nationally renowned landforms of Castle Valley become prominent, and Castle Tower, the Priest and the Nuns, and Fisher Towers, add to the geologic uniqueness of the drainage. The Creek then enters the Colorado River cutting through the large alluvial deposits of decomposed Cutler Sandstone. The landform of this segment is outstanding. All of these elements add up to make this segment of Onion Creek one of the most unique drainages in the region and its values outstanding and remarkable. |
| **PROFESSOR CREEK (MARY JANE CANYON):**<br><br>**FS & State land boundary to diversion near private land**<br><br>**Tentative Classification:**<br>Wild<br><br>**Reason for Tentative Classification:**<br>No roads or development present.<br><br>**BLM Free-flowing River Miles:**<br>7.4<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br>Professor Creek drops 3000 feet in four miles as it cuts through a variety of sandstone layers. Most visually striking is its canyon through the Moenkopi sandstone, which results in narrow, twisting passages of dark colored rock. The perennial stream adds movement and sparkle to the scene, enhancing the visual quality of the canyon. Professor Creek combines sculpted topography, riparian vegetation, high relief and vivid colors. The occasional views of Castle Rock enhance the scenery, providing a visually striking focal point for the lower part of the canyon. Professor Creek is one of the most visually stunning canyons within the Colorado Plateau.<br><br>**Recreation**<br>This drainage provides outstanding hiking opportunities, especially for the first four miles above the diversion near private land. The canyon is one of the few which provides outstanding "narrows" hiking with a perennial stream. The canyon hike is described in several publications, and is a common field trip for Canyonlands Field Institute, which maintains a semi-primitive facility just south of this segment. The canyon possesses outstanding opportunities for primitive and unconfined recreation within easy reach of Moab. It is an outstanding and remarkable recreation opportunity within the ecological region. |
| **SALT WASH**<br><br>**Arches NP boundary to Colorado River** | Outstandingly remarkable values are the same as those found within the boundary of Arches National Park. BLM finds this segment eligible only if connected to the segment within the park. Outstandingly Remarkable Values identified by NPS include: scenery, recreation, geology, wildlife and fish.<br><br>**Scenery**<br>Kayenta Sandstone cliffs are prominent at the mouth of Salt Wash. The |

BLM_0013212

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **Tentative Classification**: Wild<br><br>**Reason for Tentative Classification:** Road present across Colorado River.<br><br>**BLM Free-flowing River Miles:** 0.3<br><br>NPS Miles: 6<br><br>**Reason for Free-flowing Determination:** Natural Flow | desert varnish and outstanding alcoves add a great degree of contrast and form to this segment. The vegetation is lush and gives a variety of colors and textures, along with a strong riparian line. The colors are outstanding, and change drastically from morning to night. The adjacent scenery adds to the visual quality, and the drainage is distinctive. All of these elements make the values in this segment outstanding and remarkable within the region.<br><br>**Recreation**<br><br>Salt Wash is a popular hike for boaters on Colorado River trips. Boaters have the opportunity, just a short distance from the river, to access proposed wilderness areas inside Arches National Park. This segment does not receive heavy visitation. This provides the recreationist with an opportunity to enjoy the scenery without crowds. Access is limited to boaters from the river or via a trailhead six miles upstream inside Arches National Park. The elements listed above make the values in this segment outstanding and remarkable within the region.<br><br>**Wildlife**<br><br>Salt Wash provides lush riparian habitat serving as home range for mountain lion, mule deer, and a multitude of other wildlife. This is regionally significant habitat due to the lack of roads, development, and protection provided by being connected to Arches National Park.<br><br>**Fish**<br><br>This segment is possible spawning habitat for endangered Colorado Pikeminnow, as well as for the species mentioned for the Colorado River corridor. This reach of the river is regionally important, as it provides sensitive habitat to these declining species.<br><br>**Geology**<br><br>Kayenta Sandstone cliffs are prominent here. The Salt Wash syncline is present. In Arches and at the mouth of Salt Wash, and is an excellent example of the variety of geologic forces shaping the land by underlying salt formations prevalent to this region. |
| **Negro Bill Canyon: Segment (1)**<br><br>Source below rim to ¼ mile from Colorado River<br><br>**Tentative Classification:** Segment (1): Wild<br><br>**Reason for Tentative Classification:** No roads or development | **Scenery**<br><br>This drainage starts in the foothills of the La Sal Mountains and flows through the Kayenta and Navajo Sandstone cliffs that line it. The upper portion of the creek is rugged and the landforms are outstanding. Access to the creek is by a primitive foot trail that crosses the creek and allows for outstanding views of the La Sals and the wonderful riparian vegetation. As the creek flows to the Colorado several spring fed side canyons feed into it. One of these canyons contains Morning Glory Natural Bridge, which is the sixth largest natural bridge in the world, and is a popular destination for hikers. The colors of red and green make for a pleasing contrast and the addition of the water adds motion, noise and a variety of surfaces to the view. This canyon is quite distinctive. These elements add up to the values in this drainage being outstanding and remarkable, one of the jewels of the Colorado Plateau. |

BLM_0013213

**Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers**

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| present.<br><br>**BLM Free-flowing River Miles:**<br><br>Segment (1): 7.2<br><br><br>**Reason for Free-flowing Determination:**<br><br>Natural Flow | One-half mile before reaching the Colorado River, the canyon gets deeper and the Kayenta Sandstone cliffs become more prominent. The desert varnish and outstanding alcoves add a great degree of contrast and form to this segment. The vegetation is lush and gives a variety of colors and textures, along with a strong riparian line. The colors are outstanding, and change drastically from morning to night. The adjacent scenery adds to the visual quality, and the drainage is distinctive. All of these elements make the values in this segment outstanding and remarkable. Negro Bill Canyon has some of the most regionally outstanding scenery within the Colorado Plateau.<br><br>**Recreation**<br><br>Negro Bill Canyon is a world-class hiking destination, and one of the most popular trails in the Moab area. It offers a wonderful combination of a clear perennial stream within spectacular narrow sandstone walls. Although popular with all types of hikers, the canyon is particularly popular with families. The trail provides relatively easy hiking, with numerous opportunities for wading and water play. A special feature of the Negro Bill Canyon Trail is the access it provides to Morning Glory Natural Bridge, the sixth largest natural span in the United States. The visitor register indicates a diverse national and international visitor base, with numerous comments comparing Negro Bill Canyon favorably with hikes in the nearby National Parks. Hikes in the Canyon are described in numerous recreation-oriented publications. The drainage is at the heart of the Negro Bill Canyon Wilderness Study Area (WSA), an area set aside for, among other things, its outstanding opportunities for primitive and unconfined recreation.<br><br>**Ecological**<br><br>Negro Bill Canyon, named after an early settler of Moab, is a small perennial stream that directly enters the Colorado River. Set in a narrow canyon between towering sandstone cliffs, this lush stream reflects a remnant riparian ecosystem within the basin. Native riparian vegetation such as Gooding willows, hackberry, and cottonwoods dominate the corridor. The ecological values in Negro Bill Canyon represent a near natural perennial stream system, where other similar tributary streams have been heavily encroached by exotic species such as Russian Olive or tamarisk. Sensitive hanging garden ecosystems (maidenhair ferns, columbines) can be found associated with seeps along canyon walls and slickrock alcoves. Due to its proximity to the Colorado River flyway, Negro Bill Canyon provides diverse habitat for wildlife including neo-tropical birds, bats, beavers and other water dependent species. The stream is accessible by foot or horseback only, though proximal to State Hwy 128. Negro Bill contains a popular recreation trail within the canyon that crosses and parallels the stream numerous times. The ecological condition and diversity of Negro Bill Canyon provide for outstandingly remarkable values within the region. |

BLM_0013214

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **NEGRO BILL CANYON: SEGMENT (2)**<br><br>Last ¼ mile to Colorado River<br><br>**Tentative Classification:**<br>Segment (1): Recreational<br><br>**Reason for Tentative Classification:**<br>Hwy 128 is present near the Colorado River.<br><br>**BLM Free-flowing River Miles:**<br>.25<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br>Kayenta Sandstone cliffs are prominent in this segment of Negro Bill Canyon. The desert varnish and outstanding alcoves add a great degree of contrast and form to this segment. The vegetation is lush and gives a variety of colors and textures, along with a strong riparian line. The colors are outstanding, and change drastically from morning to night. The adjacent scenery adds to the visual quality, and the drainage is distinctive. All of these elements make the values in this segment outstanding and remarkable. Negro Bill Canyon has some of the most regionally outstanding scenery within the Colorado Plateau.<br><br>**Recreation**<br>Negro Bill Canyon is a world-class hiking destination, and one of the most popular trails in the Moab area. It offers a wonderful combination of a clear perennial stream within spectacular narrow sandstone walls. Although popular with all types of hikers, the canyon is particularly popular with families. The trail provides relatively easy hiking, with numerous opportunities for wading and water play. Due to its easy access, wading and water play is prevalent in this portion of Negro Bill Canyon. Hikes in the Canyon are described in numerous recreation-oriented publications.<br><br>**Ecological**<br>Negro Bill Canyon, named after an early settler of Moab, is a small perennial stream that directly enters the Colorado River. Set in a narrow canyon between towering sandstone cliffs, this lush stream reflects a remnant riparian ecosystem within the basin. Native riparian vegetation such as Gooding willows, hackberry, and cottonwoods dominate the corridor. The ecological values in Negro Bill Canyon represent a near natural perennial stream system, where other similar tributary streams have been heavily encroached by exotic species such as Russian Olive or tamarisk. Sensitive hanging garden ecosystems (maidenhair ferns, columbines) can be found associated with seeps along canyon walls and slickrock alcoves. Due to its proximity to the Colorado River flyway, Negro Bill Canyon provides diverse habitat for wildlife including neo-tropical birds, bats, beavers and other water dependent species. The stream is accessible by foot or horseback only, though proximal to State Hwy 128. Negro Bill contains a popular recreation trail within the canyon that crosses and parallels the stream numerous times. The ecological condition and diversity of Negro Bill Canyon provide for outstandingly remarkable values within the region. |
| **MILL CREEK (UPPER): SEGMENT (1)**<br><br>**BLM lands from FS boundary to private property below the Sheley diversion at Flat** | **Scenery**<br>The upper portion of Mill Creek starts in the benches of the La Sal Mountains and quickly cuts into a narrow deep canyon that is outstanding in its visual quality. As the creek flows toward the drainage diversion it cuts through Kayenta and Navajo Sandstone and exposes impressive fins and ridges that are outstanding in their form and color. The riparian vegetation adds to the view, and the water, is a dominant feature. The deep red colors, in contrast with the green vegetation, add |

BLM_0013215

**Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers**

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **Pass.**<br><br>**Tentative Classification:**<br>Recreational<br><br>**Reason for Tentative Classification:**<br>Road parallels and crosses stream, and water diversion present.<br><br>**BLM Free-flowing River Miles:**<br>1.4<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow and riparian character retained despite diversion. | a pleasant contrast, and the peaks of the La Sal Mountains add greatly to the visual quality. This area is distinctive to the region and is regionally significant for scenic values. These elements add up to make the values in this segment outstanding and remarkable within the Colorado Plateau.<br><br>**Recreation**<br>Upper Mill Creek is a perennial stream flowing through a wonderland of sandstone fins, with the panoramic backdrop of the La Sal Mountains. The creek is used by recreationists for hiking, horseback riding, backpacking, fishing, photography and picnicking. Easily accessed by a graveled road, the area attracts both local and out-of-town visitors. Mill Creek is a unique recreational experience, outstanding and remarkable even within the Colorado Plateau.<br><br>**Fish**<br>Mill Creek Canyon provides one of only five available coldwater trout fisheries along upper portions of the Colorado River main stem. While the stream largely supports non-native recreational trout populations, Mill Creek Canyon provides easily accessible sports fisheries opportunities. Upper reaches of the stream contain nearly natural cold-water fisheries habitat and spawning areas. Trout species spawn in fast flowing gravel substrates during spring and early summer. Small trout rely upon insects for food sources, where larger trout primarily eat smaller fish, including native species common to the stream. Mill Creek Canyon provides Outstandingly Remarkable Values with respect to regional recreational cold-water sport fisheries opportunities, access and quality of a highly scenic stream experience.<br><br>**Cultural**<br>Mill Creek Canyon is significant in the fact that it contains a myriad of cultural resources that range from rock art, open campsites, rock shelters, alcoves, and special activity areas. The presence of such a wide variety of site types indicates that Mill Creek Canyon has the potential to yield significant amounts of information concerning subsistence, settlement patterns, technological and artistic developments. The prehistoric use represents more than one cultural period ranging from Archaic, Fremont to Numic. The sites are somewhat isolated and retain integrity and significance. They are important for interpreting regional prehistory and many are eligible for the National Register of Historic Places. Additionally, historic populations capitalized upon the year-round water in Mill Creek by establishing several homesteads in the confines of the canyon. The scientific study of these historic sites may provide additional information concerning the broad patterns, of our more recent history in the region. Mill Creek is of national cultural significance.<br><br>**Ecological**<br>Mill Creek Canyon is a tributary of the Colorado River that contains a watershed of approximately 93,000 acres. Despite the existence of water diversions along portions of Mill Creek Canyon, perennial springs |

BLM_0013216

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | and tributary flows provide a series of cascading pools, slickrock slides, riffles and waterfalls unique to the region. The watershed provides important recharge functions to the municipal water sources of Moab, Utah and to the Scott Matheson Wetlands which exist downstream near its confluence with the Colorado River. The stream supports one of the largest mature cottonwood-willow galleries along upper portions of the Colorado River basin providing for ecological diversity among arid cold-desert environments. The dramatic setting of a lush stream corridor at the base of sheer sandstone canyon walls is important for scenic and recreational enjoyment, as well as supporting diverse habitat for riparian dependent species such as high occurrences of song-birds, bats, beavers, deer, bear, and other wildlife. The riparian corridor within Mill Creek Canyon provides potential habitat for special status species such as Southwestern willow flycatcher (Empidonax traillii extimus, endangered 1995), Mexican spotted owl (Strix occidentalis lucida, threatened 1993), Yellow-billed cuckoo (Coccyzus americanus, occidentalis) threatened), Smith's black-headed snake (Tantilla hobartsmithi, Utah Species of Concern), and the rare spotted bat (Euderma maculatum, Utah Species of Concern), many of which are riparian obligates which rely on the presence of water. High concentrations of cultural sites and rock art panels exist along the stream corridor and canyon walls making the area important with respect to scientific, educational and recreational resources. While stream health, diversity, and condition are reduced with the diversion of flows and the encroachment of exotic vegetative species, the ecological communities, functions, and resources, which support scenery, recreation, and wildlife and fishery values in Mill Creek drainage, are Outstandingly Remarkable in the region.<br><br>Upper reaches of Mill Creek remain undiverted near the headwaters of the stream. Sandstone walls rise dramatically above pinyon-juniper and sage canyon bottoms. The stream is lined with cottonwood, willow, water birch, hackberry, juncus and other native riparian species including encroaching exotic vegetation (Russian Olive and tamarisk). Upper portions of Mill Creek provide the best habitat for cold-water trout fisheries. Portions of a county maintained road run parallel to the stream, crossing the stream or perennial tributaries approximately 2-3 times. The Sheley diversion structure exists within the segment, where irrigation water is diverted from the stream. A minimum stream flow of 3 cfs has been established below the diversion as a condition to the diversion right-of-way. |
| **MILL CREEK (MIDDLE): SEGMENT (2)**<br><br>**State land upstream from Hidden Valley (T.26 S., R. 23 E., section 19) to Power Dam** | **Scenery**<br><br>The stream corridor below Flat Pass is similar to the upper section. Downstream the creek contains outstanding natural features and the colors and landforms contrast with the lush riparian vegetation. The formations continue to add to the view as deep alcoves, fins, spires, and rock formations add to the visual variety. The water adds motion and a variety of surfaces. This area is distinctive to the region. The viewing of the La Sal Mountains adds to the visual quality of the canyon. Mill Creek has some of the most stunning scenery in the Colorado Plateau. The combination of these elements makes the values in this segment |

BLM_0013217

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **Tentative Classification:**<br>Scenic<br><br>**Reason for Tentative Classification:**<br>Minor development and occasional road present.<br><br>**BLM Free-flowing River Miles:**<br>4.6<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow and riparian character | outstanding and remarkable within the Colorado Plateau.<br><br>**Recreation**<br>Mill Creek downstream from Flat Pass provides a unique hiking and horseback riding opportunity. Recreationists are able to enjoy non-motorized travel along a perennial stream in a desert environment. Sandstone fins tower above the canyon, and rock art sites abound in this section of Mill Creek. Popular with both local and out of town visitors, Middle Mill Creek is a unique recreational experience, outstanding and remarkable even within the Colorado Plateau.<br><br>**Fish**<br>Mill Creek Canyon provides one of only five available coldwater trout fisheries along upper portions of the Colorado River main stem. While the stream largely supports non-native recreational trout populations, Mill Creek Canyon provides easily accessible sports fisheries opportunities. Upper reaches of the stream contain nearly natural cold-water fisheries habitat and spawning areas. Trout species spawn in fast flowing gravel substrates during spring and early summer. Small trout rely upon insects for food sources, where larger trout primarily eat smaller fish, including native species common to the stream. Mill Creek Canyon provides Outstandingly Remarkable Values with respect to regional recreational cold-water sport fisheries opportunities, access and quality of a highly scenic stream experience.<br><br>**Cultural**<br>Mill Creek Canyon is significant in the fact that it contains a myriad of cultural resources that range from rock art, open campsites, rock shelters, alcoves, and special activity areas. The presence of such a wide variety of site types indicates that Mill Creek Canyon has the potential to yield significant amounts of information concerning subsistence, settlement patterns, technological and artistic developments. The prehistoric use represents more than one cultural period ranging from Archaic, Fremont to Numic. The sites are somewhat isolated and retain integrity and significance. They are important for interpreting regional prehistory and many are eligible for the National Register of Historic Places. Additionally, historic populations capitalized upon the year-round water in Mill Creek by establishing several homesteads in the confines of the canyon. The scientific study of these historic sites may provide additional information concerning the broad patterns, of our more recent history in the region. Mill Creek is of national cultural significance.<br><br>**Ecological**<br>Mill Creek Canyon is a tributary of the Colorado River that contains a watershed of approximately 93,000 acres. Despite the existence of water diversions along portions of Mill Creek Canyon, perennial springs and tributary flows provide a series of cascading pools, slickrock slides, riffles and waterfalls unique to the region. The watershed provides important recharge functions to the municipal water sources of Moab, Utah and to the Scott Matheson Wetlands which exist downstream near |

BLM_0013218

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | its confluence with the Colorado River. The stream supports one of the largest mature cottonwood-willow galleries along upper portions of the Colorado River basin providing for ecological diversity among arid cold-desert environments. The dramatic setting of a lush stream corridor at the base of sheer sandstone canyon walls is important for scenic and recreational enjoyment, as well as supporting diverse habitat for riparian dependent species such as high occurrences of song-birds, bats, beavers, deer, bear, and other wildlife. The riparian corridor within Mill Creek Canyon provides potential habitat for special status species such as Southwestern willow flycatcher (Empidonax traillii extimus, endangered 1995), Mexican spotted owl (Strix occidentalis lucida, threatened 1993), Yellow-billed cuckoo (Coccyzus americanus, occidentalis) threatened), Smith's black-headed snake (Tantilla hobartsmithi, Utah Species of Concern), and the rare spotted bat (Euderma maculatum, Utah Species of Concern), many of which are riparian obligates which rely on the presence of water. High concentrations of cultural sites and rock art panels exist along the stream corridor and canyon walls making the area important with respect to scientific, educational and recreational resources. While stream health, diversity, and condition are reduced with the diversion of flows and the encroachment of exotic vegetative species, the ecological communities, functions, and resources, which support scenery, recreation, and wildlife and fishery values in Mill Creek drainage, are Outstandingly Remarkable in the region.

Wetland marshes, beaver ponds, slick rock runs, cascading waterfalls and pools dominate this portion of the Canyon. This segment contains public lands downstream of the private parcels at Flat Pass, and includes similar values within a large block of State land proposed for exchange to the BLM. Stream flows within the segment are reduced from diversions associated with Sheley diversion. A minimum stream flow of 3 cfs has been established for release below the diversion as a condition of the right-of-way. Perennial springs and tributary inflows, particularly from North Fork, provide a series of cascading pools, slickrock slides, riffles and waterfalls unique to the region. Public land portions are accessible only by foot or horseback, providing remote and primitive recreational opportunity. |
| **MILL CREEK (STATE LAND SEGMENTS):**<br><br>(3.5 Miles)<br><br>**Located between segments 1 and 2.** | BLM may acquire these lands through a land exchange therefore this area has been included in the review for Wild and Scenic eligibility.

The free-flowing character, and outstandingly remarkable values listed for Mill Creek segments 1 & 2 are present here. The upstream portion of the state land between the two private land holdings should be included with segment 1 and would have a tentative classification of "recreational". The state land portion downstream of the segment just described should be included with segment 2 and have a tentative classification of "scenic". |
| **NORTH FORK MILL CREEK** | **Scenery**<br><br>The North Fork of Mill Creek has incomparable scenic value. As it cuts through 600 feet of Navajo sandstone, the canyon displays high relief, pleasing colors, and sculptured landforms. The highly riparian corridor |

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **Forest boundary near Wilson Mesa to Mill Creek**<br><br>**Tentative Classification:**<br>Wild<br><br>**Reason for Tentative Classification:**<br>No roads or development present.<br><br>**BLM Free-flowing River Miles:**<br>11.2<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | supports a green swath of vegetation that provides great contrast to the dominant oranges and reds of the canyon walls. The perennial water adds movement and serenity to the scene, with numerous small cascades and pools. Spectacular displays of fall color turn cottonwoods yellow, adding diversity and variety to the views. The North Fork of Mill Creek has outstanding and remarkable scenery even within the Colorado Plateau.<br><br>**Recreation**<br><br>The North Fork of Mill Creek provides hiking, horseback riding and backpacking opportunities that are difficult to find and extremely rare in this region. The North Fork is a perennial stream flowing through a desert environment, with rich riparian resources that non-motorized travelers enjoy. It is within a Wilderness Study Area, and has a high level of remoteness. The North Fork of Mill Creek provides an outstanding and remarkable recreational experience within the Colorado Plateau.<br><br>**Cultural**<br><br>The North Fork of Mill Creek Canyon is significant in the fact that it contains a myriad of cultural resources that range from rock art, open campsites, rock shelters, alcoves, special activity areas. The presence of such a wide variety of site types indicates that Mill Creek Canyon has the potential to yield significant amounts of information concerning subsistence, settlement patterns, and technological developments. The prehistoric use represents more than one cultural period ranging from Archaic, Fremont to Numic. The sites are somewhat isolated and retain integrity and significance. They are important for interpreting regional prehistory and many are eligible for the National Register of Historic Places. The cultural resources of the North Fork of Mill Creek are outstanding and remarkable within the Colorado Plateau.<br><br>**Ecological**<br><br>The North Fork of Mill Creek Canyon drainage system includes the tributaries Rill Creek and Burkholder Draw. Seasonal runoff and large springs support perennial to intermittent flows. Collectively, the N. Fork stream system provides additional quantities of critical surface flow to lower portions of Mill Creek; a high-quality water source; thermal mitigation (cooler water temperatures important for trout fisheries as identified in TMDL/water quality report); provides recharge to Moab Municipal aquifer and TNC Scott Matheson Wetlands; and provides remote and undisturbed ecological stream-dependent resources (riparian, wildlife, scenic, cultural, recreational values). The North Fork system supports diverse wildlife species and habitat including important mule deer winter range, predators such as bear and mountain lion, riparian dependent and special status species such as neo-tropical birds, beaver, bats, cold-water trout fisheries, amphibians, and potential habitat for endangered Mexican spotted owl, Southwestern willow flycatcher, and Southwestern black-headed snake. The riparian corridor provides an excellent example of a narrow, deep, boulder and pool stream, with diverse woody native species such as cottonwood, willows, |

BLM_0013220

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | water birch, and herbaceous wetland marshes including horsetail and maidenhair ferns. Near its confluence with Mill Creek, the North Fork contains unique bedrock cascading pools and large waterfalls picturesque enough to be included in several recreational guidebooks. The values described above are Outstanding and Remarkable within the region. |
| **DOLORES RIVER: SEGMENT (1)**<br><br>**CO-UT state-line to Fisher Creek**<br><br>**Tentative Classification:**<br>Scenic<br><br>**Reason for Tentative Classification:**<br>Primitive road, and fields present.<br><br>**BLM Free-flowing River Miles:**<br>5.9<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br>This section of the Dolores River is characterized by an increase in vertical relief from the segment in Colorado. The canyon narrows to about one-quarter mile wide with sheer walls of Wingate Sandstone almost 500 feet high lining the river's course. The few low vistas available in this narrow canyon reveal the colorful strata above the Wingate, the Kayenta, the Navajo (which makes a distinctive beige cliff), the pink band of the Entrada and the ledgey Morrison Formation. Cottonwoods, willows, and tamarisk, as well as a variety of desert shrubs and grasses characterize the vegetation. The flow of this reach is relatively quick, with several rapids. The presence of the river adds motion and a variety of surface, as well as a gathering place for wildlife. The rich color combinations of the geology, vegetation, and water makes for a pleasing contrast which changes with the season. This segment is quite distinctive, and only segments of the Colorado River would be comparable. The combination of these elements along with the recreational use of the river by boaters, make these segments of the river outstanding and remarkable even within the Colorado Plateau.<br><br>**Recreation**<br>A float trip on the Dolores River offers spectacular views, camping, scenic hiking opportunities, and whitewater boating challenges for boaters who like technical rivers. The Dolores River attracts boaters from all over the intermountain west; it also attracts international visitors. The Dolores River is floatable by rafts, kayaks, and other whitewater craft during spring runoff, usually during the last part of April, May, and beginning of June. The season length varies with the snow pack, and releases from McPhee Reservoir. Opportunities for solitude abound. Hunting and horseback riding are also popular along the river corridor. A primitive road parallels the river upstream from Fisher Creek but sees little use. All this combines to make the Dolores River a regionally significant recreation opportunity.<br><br>**Wildlife**<br>This segment of the Dolores River is vitally important mule deer and elk winter range. In addition, the canyon is important to a diversity of avian and terrestrial wildlife. It is particularly crucial to raptor species, as it provides excellent habitat for them. The Dolores offers habitat for the Southwestern willow flycatcher, a federally listed species on the Endangered Species List. The Southwestern willow flycatcher is directly reliant on habitat that offers free standing water, riparian plant species, vegetative cover, and water related insects to nest and raise their young. The Dolores River corridor also provides important habitat for neotropical migrants. The Southwestern blackheaded snake is found in |

BLM_0013221

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | this canyon. Bear and mountain lion also inhabit this river segment. Due to limited development, this reach of the river offers wildlife low levels of fragmentation, resulting in a diverse, vigorous and self-sustaining wildlife population. Within the arid southwest all riparian habitat is vital to all forms of wildlife, due to the lack of available free water. Water and the vegetative cover available within riparian areas offer needed drinking water, microclimates, food, and cover to wildlife and the various life stages of many species. The Dolores River corridor is regionally significant for wildlife values.<br><br>**Fish**<br>Utah Division of Wildlife Resources has determined that two Utah Sensitive species, the Bluehead Sucker and the Roundtail Chub inhabit the Dolores River. This area provides needed habitat for these native fish, making this reach of the river regionally important, as it provides sensitive habitat to these declining sensitive species.<br><br>**Geology/Hydrology**<br>Segment one begins at the most impressive rapid on the Dolores, known as Stateline Rapid. Outwash from a gully on the north bank created the rapid, and cliff fall from the southern walls of Wingate Sandstone has increased the difficulty of it. Upstream of the Utah-Colorado state line, strata generally dip toward the northwest, in the direction of river flow, and gradually pass beneath the river. As they dip under the river in the area of the Stateline rapid, the canyon narrows. Steep Cutler, Moenkopi and Chinle bluffs slope about 800 feet up from the river to meet vertical Wingate cliffs that rise up to 2,500 feet above the valley floor. Below Stateline rapid lie others, also complicated by fallen boulders of Wingate Sandstone. The north (right) shore grows steeper and its angular talus slopes impinge on the river. The rivers course is in the upper Moenkopi or lower Chinle, but these red shales are generally covered by fan-shaped talus slopes and detritus accumulations, which support vegetation. Below the Chinle, in the area of the Dolores, are the three shaley members of the Moenkopi Formation, and the Cutler Formation of purple arkosic sandstone and conglomerate. High above it, atop the Kayenta, are exposures of buff Navajo Sandstone. In addition the canyon displays excellent visibility of the geologic process and an unusually long sequence of Colorado Plateau stratigraphy. The Dolores River canyon is an important key to the Uncompahgre Uplift and to understanding the stream piracy of the ancestral Gunnison and Colorado rivers. The geology within the river corridor as described above; shows diversity and abundance of geologic features. In addition, the educational and scientific values make this river outstanding in the region.<br><br>**Ecological**<br>The Dolores River supports river-related values including fisheries, wildlife, scenic, and recreational resources found important within the region. The Dolores River provides stream flows to maintain picturesque cottonwood galleries and wetlands, State sensitive fisheries and wildlife habitats, and recreational river running. The Dolores River is a large |

BLM_0013222

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | tributary to the Upper Colorado River which contributes seasonal inflow important to the Colorado River and creates important endangered fish rearing habitat at the Confluence. Although the Dolores River ecosystem is severely altered and controlled by water diversions, including McPhee Dam within the state of Colorado, surface flows and riverine conditions are present to be determined free-flowing. Ecological conditions are also degraded with respect to encroachment of noxious weeds and invasive exotic species (Russian knapweed, Russian olive, tamarisk etc). While ecological values are diminished within the Dolores River, they remain important in supporting other river-related resources which have been determined outstandingly remarkable. |
| **DOLORES RIVER: SEGMENT (2)**<br><br>**Fisher Creek to Bridge Canyon**<br><br>**Tentative Classification:**<br>Wild<br><br>**Reason for Tentative Classification:**<br>No roads or development present.<br><br>**BLM Free-flowing River Miles:**<br>6.2<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br><br>This section of the Dolores River is characterized by a narrow canyon that is about one-quarter mile wide with sheer walls of Wingate Sandstone almost 500 feet high lining the river's course. The few long vistas available in this narrow canyon reveal the colorful strata above the Wingate, the Kayenta, the Navajo (which makes a distinctive beige cliff), the pink band of the Entrada and the ledgey Morrison Formation. Cottonwoods, willows, and tamarisk, as well as a variety of desert shrubs and grasses characterize the vegetation. The flow of this reach is relatively quick, with several rapids. The presence of the river adds motion and a variety of surface, as well as a gathering place for wildlife. The rich color combinations of the geology, vegetation, and water makes for a pleasing contrast which changes with the season. This segment is quite distinctive, and only segments of the Colorado River would be comparable. The combination of these elements along with the recreational use of the river by boaters, make these segments of the river outstanding and remarkable even within the Colorado Plateau.<br><br>**Recreation**<br><br>A float trip on the Dolores River offers spectacular views, camping, scenic hiking opportunities, and whitewater boating challenges for boaters who like technical rivers. The Dolores River attracts boaters from all over the intermountain west; it also attracts international visitors. The Dolores River is floatable by rafts, kayaks, and other whitewater craft during spring runoff, usually during the last part of April, May, and beginning of June. The season length varies with the snow pack, and releases from McPhee Reservoir. Opportunities for solitude abound. Hunting and horseback riding are also popular along the river corridor. The Dolores from Fisher Creek to Bridge Canyon has no road access. All this combines to make the Dolores River a regionally significant recreation opportunity.<br><br>**Wildlife**<br><br>This segment of the Dolores River is vitally important mule deer and elk winter range. In addition, the canyon is important to a diversity of avian and terrestrial wildlife. It is particularly crucial to raptor species, as it provides excellent habitat for them. The Dolores offers habitat for the Southwestern willow flycatcher, a federally listed species on the Endangered Species List. The Southwestern willow flycatcher is directly |

BLM_0013223

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
|  | reliant on habitat that offers free standing water, riparian plant species, vegetative cover, and water related insects to nest and raise their young. The Dolores River corridor also provides important habitat for neotropical migrants. The Southwestern blackheaded snake is found in this canyon. Bear and mountain lion also inhabit this river segment. Due to limited development, this reach of the river offers wildlife low levels of fragmentation, resulting in a diverse, vigorous and self-sustaining wildlife population. Within the arid southwest all riparian habitat is vital to all forms of wildlife, due to the lack of available free water. Water and the vegetative cover available within riparian areas offer needed drinking water, microclimates, food, and cover to wildlife and the various life stages of many species. The Dolores River corridor is regionally significant for wildlife values. **Fish** Utah Division of Wildlife Resources has determined that two Utah Sensitive species, the Bluehead Sucker and the Roundtail Chub inhabit the Dolores River. This area provides needed habitat for these native fish, making this reach of the river regionally important, as it provides sensitive habitat to these declining sensitive species. **Geology/Hydrology** Segment two of the Dolores River is characterized by steep Cutler, Moenkopi and Chinle bluffs which slope about 800 feet up from the river to meet vertical Wingate cliffs that rise up to 2,500 feet above the valley floor. The river's course is in the upper Moenkopi or lower Chinle, but these red shales are generally covered by fan-shaped talus slopes and detritus accumulations, which support vegetation. Below the Chinle, in the area of the Dolores, are the three shaley members of the Moenkopi Formation, and the Cutler Formation of purple arkosic sandstone and conglomerate. High above it, atop the Kayenta, are exposures of buff Navajo Sandstone. The Dolores has spectacularly variable flows, even as compared to other rivers throughout the desert southwest, which makes it remarkable. In addition the canyon displays excellent visibility of the geologic process and an unusually long sequence of Colorado Plateau stratigraphy. The Dolores River canyon is an important key to the Uncompahgre Uplift and to understanding the stream piracy of the ancestral Gunnison and Colorado rivers. The geology within the river corridor as described above shows diversity and abundance of geologic features. In addition, the educational and scientific values make this river outstanding in the region. **Ecological** The Dolores River supports river-related values including fisheries, wildlife, scenic, and recreational resources found important within the region. The Dolores River provides stream flows to maintain picturesque cottonwood galleries and wetlands, State sensitive fisheries and wildlife habitats, and recreational river running. The Dolores River is a large tributary to the Upper Colorado River which contributes seasonal inflow important to the Colorado River and creates important endangered fish rearing habitat at the Confluence. Although the Dolores River ecosystem |

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | is severely altered and controlled by water diversions, including McPhee Dam within the state of Colorado, surface flows and riverine conditions are present to be determined free-flowing. Ecological conditions are also degraded with respect to encroachment of noxious weeds and invasive exotic species (Russian knapweed, Russian olive, tamarisk etc). While ecological values are diminished within the Dolores River, they remain important in supporting other river-related resources which have been determined outstandingly remarkable. |
| **DOLORES RIVER: SEGMENT (3)**<br><br>**Bridge Canyon to the Colorado River**<br><br>**Tentative Classification:**<br>Scenic<br><br>**Reason for Tentative Classification:**<br>Occasional road access and evidence of past mining activity present.<br><br>**BLM Free-flowing River Miles:**<br>9.9<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Recreation**<br>A trip on the Dolores River offers spectacular views, camping, scenic hiking opportunities, and whitewater boating challenges. This stretch is popular with youth groups, due to the ease of getting permits. The Dolores River attracts boaters from the intermountain west, as well as international visitors. It is floatable by rafts, kayaks, and other whitewater craft during spring runoff, usually during the last part of April, May, and beginning of June. The season length varies with the snow pack, and releases from McPhee Reservoir. Opportunities for solitude abound. There is primitive road access to this stretch. It has remarkable and outstanding recreation values within the Colorado Plateau.<br><br>**Wildlife**<br>This segment of the Dolores River is vitally important mule deer and elk winter range. In addition, the canyon is important to a diversity of avian and terrestrial wildlife. The Dolores River corridor is the second richest riparian area in the Colorado Plateau and as such, is crucial to raptor species such as the peregrine falcon, as it provides excellent habitat for them. The Dolores offers habitat for the Southwestern willow flycatcher, a federally listed species on the Endangered Species List. The Southwestern willow flycatcher is directly reliant on habitat that offers free standing water, riparian plant species, vegetative cover, and water related insects to nest and raise their young. The Dolores River corridor also provides habitat for neotropical migrants. The Southwestern blackheaded snake is found in this canyon. Bear and mountain lion also inhabit this river segment. Many species of bats are found in this stretch of the Dolores, of which several are listed on the Utah Sensitive Species List. The Northern River Otter has been identified as utilizing this stretch of the Dolores. Due to limited development, this reach of the river offers wildlife low levels of fragmentation, resulting in a diverse, vigorous and self-sustaining wildlife population. Within the arid southwest all riparian habitat is vital to all forms of wildlife, due to the lack of available free water. Water and the vegetative cover available within riparian areas offers needed drinking water, microclimates, food, and cover to wildlife and the various life stages of many species. The Dolores River has remarkable and outstanding wildlife values.<br><br>**Fish**<br>The confluence of the Dolores and the Colorado River provides habitat for the endangered Colorado Pikeminnow, making this river nationally important, as these fish are endemic to the Colorado River System. Due to the limited development through this reach of the river, this rare fish |

BLM_0013225

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
|  | species is able to spawn and reproduce, allowing for recovery of this endemic, unique species. Utah Division of Wildlife Resources has determined that two Utah Sensitive species, the Bluehead Sucker and the Roundtail Chub live in the Dolores Rivers. This area provides needed habitat for these native fish, making this reach of the river regionally important, as it provides sensitive habitat to these declining species. |
|  | **Geology** |
|  | In the area of Utah Bottom, the axis of the Sagers Wash Syncline crosses the river, replacing the general southwestern dip of the rock off the Uncompahgre Plateau with a northeasterly dip, the result of the Yellow Cat dome that lies west of the Colorado River. Perhaps the most striking geologic feature in the Utah Bottom area is the Entrada sandstone with its distinctive cross-hatching. An oxbow in the Lake Bottom area marks a change to rising strata and the river re-encounters Entrada Sandstone at its confluence with the Colorado. This is a unique geologic process for the region. |
|  | **Ecological** |
|  | The Dolores River supports river-related values including fisheries, wildlife, scenic, and recreational resources found important within the region. The Dolores River provides stream flows to maintain picturesque cottonwood galleries and wetlands, State sensitive fisheries and wildlife habitats, and recreational river running. The Dolores River is a large tributary to the Upper Colorado River which contributes seasonal inflow important to the Colorado River and creates important endangered fish rearing habitat at the Confluence. Although the Dolores River ecosystem is severely altered and controlled by water diversions, including McPhee Dam within the state of Colorado, surface flows and riverine conditions are present to be determined free-flowing. Ecological conditions are also degraded with respect to encroachment of noxious weeds and invasive exotic species (Russian knapweed, Russian olive, tamarisk etc). While ecological values are diminished within the Dolores River, they remain important in providing the basis for and supporting other river-related resources which have been determined outstandingly remarkable. |
| **THOMPSON CANYON**<br><br>**Source to Fisher Creek (Cottonwood Canyon)**<br><br>**Tentative Classification:**<br>Wild<br><br>**Reason for Tentative Classification:** | **Scenery**<br><br>Thompson Canyon, a tributary of Fisher Creek, drops 1500 feet in its four mile run. Richly riparian, this perennial stream supports a variety of vegetation. This vegetation provides a strong contrast with the towering red walls of the canyon. Thompson Canyon contains several hanging gardens of vegetation, which is a scarce resource in this arid region. The Thompson Canyon gorge is visually striking, and is unique in the Colorado Plateau.<br><br>**Ecological**<br><br>Portions of Thompson Canyon contain intermittent flows that support a high quality riparian ecosystem. Stream flows periodically surface and subsurface along a bedrock channel within a highly picturesque grotto canyon. Mature narrow leaf cottonwoods and willows line the stream |

BLM_0013226

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| No roads or development present.<br><br>**BLM Free-flowing River Miles:**<br>5.5<br><br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | channel within a deep narrow winding canyon, which scours during large flood events. Hanging gardens are present among seeps located in the canyon walls. Silver-colored canyon tree frogs are often observed within the canyon. The remote pristine nature and ecological diversity within Thompson Canyon are Outstandingly Remarkable within the region. |
| **BEAVER CREEK: SEGMENT (1)**<br><br><br>**Forest Service boundary to one mile from the Dolores River**<br><br><br>**Tentative Classification:**<br>Wild<br><br><br>**Reason for Tentative Classification:**<br>No roads or development present.<br><br><br>**BLM Free-flowing River Miles:**<br>6.7<br><br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br>Beaver Creek is a perennial stream, supporting a rich riparian zone. In this green ribbon grow cottonwoods, alders, and other herbaceous vegetation. The flowing water and green vegetation contrast with the multi-hued pink sandstone cliffs of the canyon walls. These pink to orange walls rise 1200 feet; the width of the canyon varies between 100 and 1000 feet. Beaver Creek is highly scenic with a great diversity of views. It has remarkable and outstanding scenery, even by the standards of the Colorado Plateau.<br><br>**Recreation**<br>Beaver Creek is one of the principal tributaries of the Dolores River, and shares many of its recreational opportunities. The canyon provides outstanding opportunity for solitude due to its remoteness, especially for hiking and backpacking. Despite its isolation, several commercial backpacking outfitters find the area remarkable enough to offer guided trips. Were it not for its remoteness from population centers, Beaver Creek undoubtedly would attract significant visitation for its combination of scenery and canyon hiking opportunities. The recreation opportunities found in Beaver Creek are remarkable and outstanding within the Colorado Plateau.<br><br>**Fish**<br>Large plunge pools, providing desirable coldwater trout fisheries, dominate the upper 2 miles of Beaver Creek. Native cutthroat trout and other sport trout species have been documented within the drainage. Upper portions of Beaver Creek have been identified as suitable habitat in a regional plan to conserve the rare Colorado River cutthroat trout, a native Utah Conservation Species (Oncorhynchus clarki pleuriticus). Fisheries values contained within the upper portions of Beaver Creek are outstandingly remarkable with respect to providing remote habitat for the recovery of rare native fish species.<br><br>**Ecological**<br>Beaver Creek is one of three perennial tributaries to the Dolores River. The upper 2 miles of Beaver Creek (BLM land below the USFS boundary) cut through steep canyon walls in excess of 500 feet tall. |

BLM_0013227

**Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers**

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
|  | Access is difficult due to the remote location and character of the canyon. Cascading waterfalls with heights of 3 to 12 feet are common, created by large boulders and talus rubble. Large plunge pools dominate the stream, providing desirable coldwater trout fisheries. The riparian corridor contains willows, cottonwoods, and horsetails, with ponderosa pine and pinyon-juniper forests along canyon walls. Headwaters of the drainage contain water diversions for irrigation purposes, but the river remains riverine in appearance. The ecological diversity and values associated with Beaver Creek are outstandingly remarkable within the region. |
| **Beaver Creek: Segment (2)**<br><br>**Forest Service boundary to one mile from the Dolores River**<br><br>**Tentative Classification:**<br>Scenic<br><br>**Reason for Tentative Classification:**<br>Dirt road present.<br><br>**BLM Free-flowing River Miles:**<br>1<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br>Beaver Creek is a perennial stream, supporting a rich riparian zone. In this green ribbon grow cottonwoods, alders, and other herbaceous vegetation. The flowing water and green vegetation contrast with the multi-hued pink sandstone cliffs of the canyon walls. These pink to orange walls rise 1200 feet; the width of the canyon varies between 100 and 1000 feet. Beaver Creek is highly scenic with a great diversity of views. It has remarkable and outstanding scenery, even by the standards of the Colorado Plateau.<br><br>**Recreation**<br>Beaver Creek is one of the principal tributaries of the Dolores River, and shares many of its recreational opportunities. The canyon provides outstanding opportunity for solitude due to its remoteness, especially for hiking and backpacking. Despite its isolation, several commercial backpacking outfitters find the area remarkable enough to offer guided trips. Were it not for its remoteness from population centers, Beaver Creek undoubtedly would attract significant visitation for its combination of scenery and canyon hiking opportunities. The recreation opportunities found in Beaver Creek are remarkable and outstanding within the Colorado Plateau.<br><br>**Geology**<br>Beaver Creek is a major drainage off the northeastern flank of the La Sal Mountains that has incised a deep canyon in to sedimentary rocks as it runs between North and South Beaver Mesas down to the Dolores River. The main and side canyons exhibit as much as 1000 feet of relief between the canyon rim and the creek bottom. Rock exposures in the area consist, in ascending order, of the Permian Cutler Formation, the Triassic Moenkopi and Chinle Formations, the Jurassic: Wingate, Kayenta, Navajo, Entrada, Summerville and Morrison Formations. The last ¼ mile lies within the Dolores River canyon which is an important key to the Uncompahgre Uplift and to understanding the stream piracy of the ancestral Gunnison and Colorado rivers. The geology within the river corridor as described above; shows diversity and abundance of geologic features. In addition, the educational and scientific values make the values along Beaver Creek outstanding in the region. |

BLM_0013228

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **GREEN RIVER DRAINAGES: The Price Field Office (in coordination with the Moab Field Office) reviewed segments 1 through 6 of the Green River as part of the Price Field Office RMP. The Moab RMP will carry forward eligibility findings for the Moab side of the Green River.** | |
| **GREEN RIVER: TAVAPUTS PLATEAU (DESOLATION CANYON)**<br><br>**Segment (1): Coal Creek to Nefertiti Boat Ramp**<br><br>**Segment (2): Nefertiti Boat Ramp to Swasey's Boat Ramp**<br><br>**Segment (3): Swasey's Boat Ramp to I-70 bridge**<br><br>**Tentative Classification:**<br><br>Segment (1): Wild<br><br>Segment (2): Recreational<br><br>Segment (3): Recreational<br><br>**Reason for Tentative Classification:**<br><br>Segment (1): No development present<br><br>Segments (2) & (3): Roads and ranch development present.<br><br>**Total River Miles:**<br><br>Segment (1): 6<br><br>Segment (2): 8<br><br>Segment (3): 13 | **Cultural**<br>This area has evidence of significant occupation and use by prehistoric peoples. It includes rock art and other features that remain significant to some Native American populations today. It also includes some of area of study used by Noel Morss in defining of the Fremont Culture. The prehistoric use represents more than one cultural period (Archaic, Fremont and Numic). The sites have been largely isolated and retain integrity. They are important for interpreting regional prehistory. Many sites are eligible for the National Register of Historic Places. Flat Canyon Archaeological District, within Desolation Canyon, is listed on this register.<br><br>**Historic**<br>Much of this river corridor is a National Historic Landmark because of its recognition as the least changed of the river corridors associated with John Wesley Powell and the exploration of the Green and Colorado Rivers. Other historic values are associated with settlement, farming/ranching, mining, prohibition, recreational river running, waterworks and reclamation. Sites have been largely isolated and therefore retain their original character.<br><br>**Recreation**<br>A trip though Desolation and Gray Canyons of the Green River, consecutive canyons within the Tavaputs Plateau, is a premier, wilderness recreation experience. The 84-mile trip from Sand Wash to Swasey's Beach is world renown. Located in Utah's deepest canyon and largest WSA, Desolation and Gray Canyons offer outstanding white water boating with approximately 60 rapids and riffles. There is also ample opportunity for land-based activity like hiking in the more than 60 side canyons. The BLM receives over 3,000 applications per year for the 450 available trip permits issued to self-outfitted users. Eighteen commercial outfitters market trips through these canyons both nationally and internationally.<br><br>**Scenic**<br>At over one mile deep, Desolation Canyon is Utah's deepest canyon, cutting through the youngest exposed strata on the Colorado Plateau. Desolation and Gray Canyons consist of complexes of many canyons draining to the Green River. Outstanding scenic values are dictated primarily by the domination of geologic features. In addition to canyon walls rising thousands of feet, there are also many interesting rock formations such as arches and hoodoos. Though the landscape is mostly dry and austere, pleasing contrasts are found in the green ribbon of life along the river, as well as the hanging gardens and pockets of huge fir trees scattered within the cliffs. |

BLM_0013229

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| **Reason for Free-flowing Determination:**<br><br>(All segments)<br>Natural Flow | **Geology**<br>These segments of the Green River offer an outstanding example of an antecedent river cutting through structural geology that should have been impassable to it. As the land surface rises towards the south, the Green River continues to flow to the south and hence decreases in elevation despite the trend of the surrounding landscape. This results in the deepest canyon in Utah, Desolation Canyon. The corridor of the Green in this stretch also provides the region's best examples of reattachment bars and separation bars formed by the processes of fluvial geomorphology in bedrock canyons.<br><br>**Fish**<br>This portion of the Green River provides habitat for four Federally listed fish species: Colorado Pikeminnow, Humpback Chub, Bonytail Chub, and Razorback Sucker. Of notable significance, this river contains designated critical habitat for the pikeminnow. Spawning areas for this species have been confirmed within this river, which is also considered important for young of the year pikeminnows.<br><br>Known populations of Humpback Chub and Razorback Sucker have been confirmed within this river, while Bonytail Chubs are suspected to occur. This river is considered regionally important for the recovery of these four Federally listed species.<br><br>**Wildlife**<br>This portion of the Green River is considered to have remarkable value for both avian and terrestrial wildlife populations. With regard to avian species, this river corridor is regionally significant, both for its diversity of avian species and for supporting habitats for Federally listed and BLM sensitive avian species.<br><br>Confirmed Federally listed species present include Bald Eagle, Mexican Spotted Owl and Southwestern Willow Flycatcher. BLM sensitive species known to occur include Peregrine Falcon, Yellow-breasted Chat, Yellow-billed Cuckoo. The river corridor is presently used by Bald Eagles during the winter, but is also considered potential nesting habitat. Mexican Spotted Owl have been verified nesting within this river corridor. The corridor, designated critical habitat for Mexican Spotted Owl, is believed to be significant for their expansion.<br><br>The Green River segment is also important for Rocky Mountain Bighorn Sheep, mule deer and elk. The entire corridor is regionally significant as lambing habitat for the Rocky Mountain bighorn and considered important winter range for mule deer and elk.<br><br>**Ecological**<br>The Green River hosts a variety of avian, terrestrial, and aquatic species populations. The river and its properly functioning riparian area provide a corridor of habitat through an otherwise arid region for many sensitive and Federally listed species of birds and fish, as well as populations of bighorn sheep, deer, elk, black bear, mountain lion, and beaver. The corridor supports rare plant species including a recently discovered |

BLM_0013230

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | species of columbine. The stability of this ecosystem, largely unchanged from the passage of John Wesley Powell, contributed to the designation of Desolation Canyon National Historic Landmark. |
| **Green River: Labyrinth Canyon**<br><br>**Segment (4):**<br>I-70 bridge to river mile 91 below Ruby Ranch<br><br>**Segment (5):**<br>Mile 91 below Ruby Ranch to Hey Joe Canyon<br><br>**Segment (6):**<br>Hey Joe Canyon to Canyonlands NP boundary<br><br>**Tentative Classification:**<br><br>Segment (4):<br>Scenic<br><br>Segment (5):<br>Wild<br><br>Segment (6):<br>Scenic<br><br>**Reason for Tentative Classification:**<br><br>Segment (4):<br>Road access and ranch development<br><br>Segment (5):<br>No development present<br><br>Segment (6):<br>Dirt road present.<br><br>**Total River Miles:**<br><br>Segment (4): 28<br><br>Segment (5): 15 | **Cultural**<br><br>This area has evidence of significant occupation and use by prehistoric peoples and includes some of the area of study used by Noel Morss in definition of the Fremont Culture. Its rock art and other features remain significant to some Native American populations today. The prehistoric use represent more than one cultural period (Archaic, Fremont and Numic). The sites have been largely isolated and retain integrity and are important for interpreting regional prehistory. Many sites are eligible for the National Register of Historic Places.<br><br>**Recreation**<br><br>Labyrinth Canyon of the Green River is approximately 68 miles in length. The character of this canyon is completely different from that of Desolation Canyon. This stretch of river has no rapids, making it an excellent experience for canoe paddlers of all abilities. It provides a four to seven day backcountry paddling experience. There are also great opportunities for dispersed camping and hiking to cultural sites, unique geologic features and other attractions. Approximately 7,000 people per year enjoy this popular trip. The section is also suitable for powerboat use at some water levels and provides for much of the annual Friendship Cruise route, a decades-long running powerboat event. This section of the Green River has been widely reported on in newspapers from coast to coast as well as in specialty publications such as Paddler Magazine.<br><br>**Scenic**<br><br>Scenic values are largely a product of the geology. The Green River meanders through a deeply incised canyon. Explorer John Wesley Powell named the canyon for its many intricate twists and turns. At Bowknot Bend, one travels a distance of seven river miles to end up within a quarter mile of one's start. Varnished cliffs are cut in places by the narrow mouths of shaded side canyons where mature cottonwood trees are harbored. In the lower parts of the canyon, vertical cliffs of Wingate sandstone rise 1,000 feet above the river.<br><br>**Fish**<br><br>This portion of the Green River provides habitat for four endangered fish: the Colorado Pikeminnow, Humpback Chub, Bonytail Chub, and Razorback Sucker. The Green River provides spawning habitat for the Colorado Pikeminnow. The river contains critical habitat as designated by U.S. Fish and Wildlife Service for these species.<br><br>**Paleontology**<br><br>Fossilized dinosaur bones visible in Morrison Formation outcrop have been reported by reliable sources (Dr. Paul Bybee, geology professor at Utah Valley State College in Orem, UT). These fossils are visible from the river. |

BLM_0013231

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| Segment (6): 29<br><br>**Reason for Free-flowing Determination:**<br>(All segments)<br>Natural Flow | |
| **RATTLESNAKE CANYON**<br><br>**Source to Green River (including Flat Nose George Tributary)**<br><br>**Tentative Classification:**<br>Wild<br><br>**Reason for Tentative Classification:**<br>No roads or development present.<br><br>**BLM Free-flowing River Miles:**<br>31.6<br><br>**Reason for Free-flowing Determination:**<br>Natural Flow | **Scenery**<br>The Rattlesnake Canyon system cuts deeply into the Book Cliffs, providing great topographical relief with sheer canyons. Green riparian vegetation contrasts with the gray-yellow of the surrounding cliffs. The Rattlesnake Canyon system is one of the many complexes of canyons that form Desolation/Gray Canyon, Utah's deepest canyon. It is a remarkable and outstanding scenic resource within the entire Tavaputs Plateau.<br><br>**Wildlife**<br>Rattlesnake and its associated canyons have remarkable value to both avian and terrestrial wildlife populations. These canyons are important for Rocky mountain bighorn sheep, mule deer and elk. These segments are vitally significant as lambing habitat for the Rocky Mountain bighorn and considered important winter range for mule deer and elk. In addition, predators, such as lion and bear inhabit these canyons. Raptors, including the peregrine falcon and golden eagle, also depend on the canyons for habitat and nesting and roosting sites. These canyons are important habitat for neotropical migrants, and possible habitat for southwestern willow flycatcher and Mexican spotted owl, both federally listed on the Endangered Species List. Here, riparian areas and steep canyons offer these two rare species of birds optimum nesting and foraging habitat , with the Southwestern willow flycatcher being directly reliant on habitat that offers free standing water, riparian plant species, vegetative cover, and water related insects to nest and raise their young. Rattlesnake Canyon has a great variety of wildlife species, due to the limited development of this area which offers wildlife low levels of fragmentation and disturbances, resulting in diverse, vigorous, and self-sustaining wildlife populations. Within the arid southwest all riparian habitat is vital to all forms of wildlife, due to the lack of available free water. Water and the vegetative cover available within riparian areas offers needed drinking water, microclimates, food, and cover to wildlife and the varies life stages of many species. Rattlesnake Canyon is vital wildlife habitat within the larger Book Cliffs wildlife habitat.<br><br>**Geology**<br>Rattlesnake Canyon provides an outstanding example of one of the most rugged areas in Utah known as the Book Cliffs, where strata of Cretaceous and Tertiary ages form massive linear cliffs and sloping pediments. This canyon provides an opportunity to study the inter-fingering of offshore and onshore sedimentary rocks that were deposited |

BLM_0013232

## Attachment 2: Outstandingly Remarkable Values Of Eligible Rivers

| River/Segment Name and Other Information | Description Of Values Present |
|---|---|
| | during the advance and retreat of Cretaceous seas. |
| | The Book Cliffs retreat northward through erosion, and run at right angles to the Cretaceous shore, as represented by the fine gray Mancos Shale. These cliffs are composed of the freshwater deposits of the Mesa Verde Group, primarily light brown sandstones that form terraced cliffs several hundred feet high, as well as shale and coal beds, which were deposited as plant matter in lagoons and swamps along Cretaceous shores. Some geologists differentiate a Tusher deposit above the Mesa Verde while others include it in the Mesa Verde Group. Above are the Wasatch and Green River Formations. This is a unique geologic resource.<br><br>**Ecological**<br><br>Rattlesnake Canyon is a large tributary to the Green River. Rattlesnake Canyon and its tributaries represent a wide range of ecological communities ranging from arid desert Mancos shale badlands along the Green River near 4,000 feet to alpine Douglas fir and spruce communities in the Book Cliffs near 9,200 feet elevation. The majority of the canyon system is extremely rugged and remote, with access only by foot and horse, or from boat along the Green River. The area contains mature old growth forests, which provide textbook examples of remote inaccessible high mountain elevations. Upper portions of Rattlesnake and its tributaries contain lush, wetland marshes and riparian resources of unusually high quality and distribution. Upper portions of the canyon system are generally perennial, with lower elevations containing intermittent flow supported by springs and seeps. The ecological diversity of the canyons provides excellent remote habitat for other wildlife species including moose, bear, elk, mountain lion and beaver. The stream canyon provides habitat for a population of Rocky Mountain bighorn sheep which were reintroduced into the canyons in the early 1970s. Nearly 250 species of birds can be found near the Green River portions of the canyon, as well as others throughout the diverse mountain habitats. The ecologically diverse nature and extent of Rattlesnake Canyon, particularly its headwaters that support remote, mountain and wetlands habitats, provides Outstandingly Remarkable ecological values within the region. |

BLM_0013233

**THIS PAGE INTENTIONALLY LEFT BLANK**

BLM_0013234

**Attachment 3. Eligible River/Segments and Their Tentative Classification, Moab Field Office**

| River/ Segment Name | Segment Description and Approximate Length in Free-Flowing BLM River Miles (BLMRM), Total River Miles (TRM)[1] | Outstandingly Remarkable Value(s) | Tentative Classification |
|---|---|---|---|
| Colorado River<br><br>TRM segments 1-6 is 99.5 | (1) Colorado/Utah Stateline to Westwater Canyon (BLMRM 1)(TRM 6.7) | Scenery, recreation, wildlife, fish, cultural, ecological | Scenic |
| | (2) Westwater Canyon, Mile 125, to River Mile 112 (BLMRM 11.8)(TRM 13) | Scenery, recreation, wildlife, fish, cultural, geology, ecological | Wild |
| | (3) River Mile 112 to confluence with the Dolores River (BLMRM 11.2)(TRM 15.7) | Recreation, wildlife, fish, cultural, ecological | Scenic |
| | (4) Confluence with the Dolores River to mile 49 near Potash (BLMRM 32.6)(TRM 53.5) | Scenery, recreation, wildlife, fish, cultural, geology, ecological | Recreational |
| | (5) River Mile 44.5 to Mile 38.5 State land boundary (BLMRM 6.1)(TRM 6.8) | Scenery, recreation, wildlife, fish, cultural, ecological | Scenic |
| | (6) River Mile 37.5 State land to Mile 34 Canyonlands NP (BLMRM 3.8) (TRM 3.8) | Scenery, recreation, wildlife, fish, cultural, ecological | Wild |
| Cottonwood Canyon | Source near Cottonwood Point to Private land boundary including the first half mile of Horse Canyon (BLMRM 10.4)(TRM 13.6) | Scenery, wildlife, ecological | Scenic |
| Onion Creek<br><br>(TRM 13.22) | (1) Source to Onion Creek Road (BLMRM 3.5) | Scenery, geology, ecological | Wild |
| | (2) Beginning of Onion Creek Rd to Colorado River (BLMRM 9) | Scenery, geology | Recreational |
| Professor Creek (Mary Jane Canyon) | Forest Service and State land boundary to Diversion near private land (BLMRM 7.4) (TRM 7.7) | Scenery, recreation | Wild |
| Salt Wash | Arches NP boundary to the Colorado River (BLMRM .33) (TRM 6.33) | Scenery, recreation, wildlife, fish, geology | Wild |
| Negro Bill Canyon<br><br>(TRM 7.45) | (1) From state land below rim to ¼ mile from Colorado River (BLMRM 7.2) | Scenery, recreation, ecological | Wild |
| | (2) Last ¼ mile to Colorado River (BLMRM .25) | Scenery, recreation, ecological | Recreational |
| Mill Creek<br><br>(1-Upper)<br><br>(2-Middle)<br><br>(TRM 12.6) | (1) Forest boundary to private property below the diversion (BLMRM 1.4) | Scenery, recreation, fish, cultural, ecological | Recreational |
| | (2) T.26 S. R. 23 E., Sec. 19 to Power Dam (BLMRM 4.6) | Scenery, recreation, fish, cultural, ecological | Scenic |
| North Fork Mill Creek | Forest boundary near Wilson Mesa to Mill Creek (BLMRM 11.2)(TRM 11.7) | Scenery, recreation, cultural, ecological | Wild |

BLM_0013235

**Attachment 3. Eligible River/Segments and Their Tentative Classification, Moab Field Office**

| River/ Segment Name | Segment Description and Approximate Length in Free-Flowing BLM River Miles (BLMRM), Total River Miles (TRM)[1] | Outstandingly Remarkable Value(s) | Tentative Classification |
|---|---|---|---|
| Dolores River (TRM 23.63) | (1) Colorado-Utah Stateline to Fisher Creek (BLMRM 5.9) | Scenery, recreation, wildlife, fish, geology, ecological | Scenic |
| | (2) Fisher Creek to Bridge Canyon (BLMRM 6.2) | Scenery, recreation, wildlife, fish, geology, ecological | Wild |
| | (3) Bridge Canyon to Colorado River (BLMRM 9.9) | Recreation, wildlife, fish, geology, ecological | Scenic |
| Beaver Creek (TRM 9) | (1) FS boundary to 1 mile from Dolores River (BLMRM 6.7) | Scenery, recreation, fish, ecological | Wild |
| | (2) One mile to Dolores River (BLMRM 1) | Scenery, recreation, geology | Scenic |
| Thompson Canyon | Source of Thompson to Fisher Creek (Cottonwood Cyn) (BLMRM 5.5)(TRM 5.5) | Scenery, ecological | Wild |
| Green River[2] | (1)   Coal Creek to Nefertiti Boat Ramp (TRM 6) | Scenery, recreation, wildlife, fish, cultural/historic, geology, ecological | Wild |
| | (2)   Nefertiti Boat Ramp to Swasey's Boat Ramp (TRM 8) | Scenery, recreation, wildlife, fish, cultural/historic, geology, ecological | Recreational |
| | (3)   Swasey's Boat Ramp to I-70 bridge (TRM 13) | Scenery, recreation, wildlife, fish, cultural/historic, geology, ecological | Recreational |
| | (4)   I-70 Bridge to river mile 91 below Ruby Ranch (TRM 28) | Scenery, recreation, fish, cultural/historic, paleontology | Scenic |
| | (5)   Mile 91 below Ruby Ranch to Hey Joe Canyon (TRM 15) | Scenery, recreation, fish, cultural/historic | Wild |
| | (6)   Hey Joe Canyon to Canyonlands NP boundary (TRM 29) | Scenery, recreation, fish, cultural/historic | Scenic |
| Rattlesnake Canyon | Source to Green River (including Flat Nose George Trib) (BLMRM 31.6) (TRM 36) | Scenery, wildlife, geology, ecological | Wild |

[1]Total River Miles (TRMs) are estimated.  Segment 4 of the Colorado River TRM includes river along the Potash Plant.

[2]The Price Field Office (in coordination with the Moab Field Office) reviewed the Green River as part of the Price Field Office RMP.  The Moab RMP will carry forward eligibility findings for the Moab side of the Green River.

BLM_0013236

## Attachment 4: Suitability Considerations by Eligible River Segment

| Suitability Considerations | Consideration Applied to Eligible River |
|---|---|
| **Colorado River – Segments 1, 2, and 3** | |
| Characteristics which would or would not make it suitable | The Colorado River possesses outstandingly remarkable scenic, fish, recreation, geologic, wildlife, cultural and ecological values. |
| Land ownership status and current use of the area. | • Segment 1 is adjacent to private land and downstream from BLM land managed by the Grand Junction Field Office<br>• Segment 2 is 100% BLM, is in a WSA and all minerals have been withdrawn.<br>• Segment 3 is approximately 60% BLM and 30% private land<br>• Recreational water related activities, boating, rafting, fishing, sight-seeing, and hunting.<br>• Segment 1 would be difficult to manage due to the block of private land with which it is surrounded.<br>• Segment 3 may need to have tentative classification changed from scenic to recreational to accommodate possible development on private lands. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated. | • Interstate [water] compacts are not affected by WSR [WSRA, Sec 13: Jurisdiction of the States]<br>• There are withdrawals in the area including the Three Rivers Withdrawal.<br>• Recreation: no difference if designated or not; BLM Moab FO issues permits on Westwater Canyon portion of the Colorado R; Moab FO patrols segments 1-3.<br>• Riparian / Vegetative / Wildlife: enhancement or protective mgmt are available under law/policy.<br>• Grazing: most occurs on mesas outside ¼ mile; however, some within ¼ mile at river edge<br>• WSA/Wilderness: 1 WSA (Westwater WSA) is within the Colorado River area of the Moab FO<br>• Segment 2 may be designated as wilderness, Wild and Scenic River (WSR) designation would enhance this. WSR designation would enhance recreational opportunities including commercial river trips.<br>• SITLA – although the Moab FO RMP management decisions will not be binding upon trust lands, development of trust land can be drastically affected by management prescriptions applied to adjacent public lands.<br>• Mining – Wild segments would be withdrawn. Hard rock mining (locatable minerals) would be curtailed under segment 2 although it is already withdrawn.<br>• Segment 3 - mineral development could be diminished. |
| Interest of federal, public, state, tribal, local, or other public entity in designation of non-designation, including administration sharing. | • Interest/Support: high from national River groups, NPS, some local residents, rafting companies, and environmental organizations; American Rivers, Utah River Council, and NRI listing.<br>• Participation: other federal agencies are actively participating in WSR process<br>• NPS: no eligible river/segments on Colorado river segments 1-3<br>• USFS: no eligible river/segments on Colorado River<br>• Other BLM Areas: eligibility determination and tentative classification levels are the same as those determined by the BLM Grand Junction FO for the Loma segment which is |

**Attachment 4: Suitability Considerations by Eligible River Segment**

| Suitability Considerations | Consideration Applied to Eligible River |
|---|---|
| | adjacent to segment 1.<br>• Cost sharing – BLM only. No monetary contribution from counties, state or outfitters can be expected.<br>• Interest/Support: No support from Grand County government.<br>• Participation: None from Grand County or SITLA |
| Manageability of the river if designated and other means of protecting values. | BLM uses management prescriptions and applicable laws / policies to protect the river and its ORVs. Currently, recreational for Westwater (segment 2) use is under a permit system administered by the BLM. Westwater WSA protection overlays in segment 2 no other management protection overlays segments 1 and 3. Segment 1 has a high percentage of non-federal land.<br><br>Segment 1 & 3 zoned R & G.<br><br>Withdrawn from mining.<br><br>The county has ability to manage through zoning ordinances. Zoning ordinances protect and address natural resource concerns.<br><br>Potential tools already available can protect river related values.<br><br>NEPA, ESA, ARPA, FLPMA give tools to protect some of the river related values (SJ). |
| The estimated costs of administering the river, including costs for acquiring lands. | Administration costs for segments 1-3 would include staff / time to develop and complete study and management reports. Current management protects Wild and Scenic values and would not change.<br>• Segment 1 – Acquisitions or easements could be costly due to the high percentage of non-federal lands present.<br>• Segment 2 – No non-federal lands and no acquisition costs.<br>• Segment 3 – Private lands on this segment not necessary for designation. |
| The extent to which administration costs will be shared by local and state governments. | No monetary contribution from counties or state can be expected. |
| **Colorado River – Segments 4, 5, and 6** | |
| Characteristics which would or would not make it suitable | The Colorado River possesses outstandingly remarkable scenic, fish, recreation, geologic, wildlife, cultural and ecological values. |
| Land ownership status and current use of the area. | Moab FO ownership for segment 4 is approx. 80% BLM and 20% private land. Segments 5 and 6 are downstream and share a boundary with Monticello FO.<br><br>Ownership along the Monticello Field Office administered [the east/south side of the river; Moab FO administers the west/north side] portion of the river is 73%; the remaining 27% is in state ownership (SITLA).<br>• Recreational water related activities, boating, rafting, fishing, sight-seeing<br>• Available for grazing<br>• OHV use limited to designated roads and trails |
| Uses, including reasonably foreseeable uses, that would be | • The Colorado River segments 5, 6, and a portion of segment 4 are navigable, thus much of the water is controlled by the State of Utah [The privately owned Potash facility is located on the |

BLM_0013238

**Attachment 4: Suitability Considerations by Eligible River Segment**

| Suitability Considerations | Consideration Applied to Eligible River |
|---|---|
| enhanced or curtailed if designated; and values that would be diminished if not designated. | west side within the Moab FO segment 4, and leases are issued by the State of Utah].<br>• Interstate [water] compacts are not affected by WSR [WSRA, Sec 13: Jurisdiction of the States].<br>• Segment 4 within Grand County is in the Three Rivers Withdrawal.<br>• There are power site withdrawals in the area.<br>• On the lower 12 mile segment (segments 5 & 6) mineral leasing is currently Category 1, surface use with standard conditions apply for approximately the first 4 miles of land adjacent to the river. Below approximately river mile 40 to the Canyonlands NP boundary, mineral leasing is Category 2, special conditions apply.<br>• Recreation: no difference if designated or not; NPS issues permits on Colorado River downstream from segment 6; Moab FO patrols segments 4-6.<br>• Geology: is millions of years old and will not change except for natural weathering/erosion.<br>• Riparian/Vegetative/Wildlife: enhancement or protective mgmt are available under law/policy.<br>• Grazing: most occurs on mesas outside ¼ mile; however, some within ¼ mile at river edge.<br>• WSAs/Wilderness: no WSAs along Colorado River segments 4-6.<br>• SITLA – although the Moab and Monticello FO RMP management decisions will not be binding upon trust lands, development of trust land can be drastically affected by management prescriptions applied to adjacent public lands. |
| Interest of federal, public, state, tribal, local, or other public entity in designation of non-designation, including administration sharing. | • Interest/Support: high from national River groups, rafting companies, NPS, some local residents, and environmental organizations; American Rivers, Utah River Council, and NRI listing.<br>• Participation: other federal agencies are actively participating in WSR process, and currently (NPS and BLM Moab FO) partner with administration of river, and carry costs associated with permit process.<br>• NPS: eligibility for lower portion of the Monticello FO Colorado River segment as it flows into Canyonlands NP shows same tentative classification as determined by NPS: Wild<br>• USFS: no eligible river/segments on Colorado River<br>• Other BLM Areas: eligibility determination and tentative classification levels are the same as those determined by the BLM Moab FO for the Colorado River.<br>• Interest/Support: low or negative interests or support from local people and from the San Juan County government.<br>• Participation: San Juan County notes they do not have the staff or financial ability to participate, share, nor help administer or manage values on a WSR. … San Juan County will not share in either the administration or the cost of WSR designation of the Colorado River. … The State or its political subdivisions will not participate in the preservation and administration of lands or rivers which are located on federal lands [stated by San Juan |

BLM_0013239

## Attachment 4: Suitability Considerations by Eligible River Segment

| Suitability Considerations | Consideration Applied to Eligible River |
|---|---|
| | County]. |
| Manageability of the river if designated and other means of protecting values. | BLM uses management prescriptions and applicable laws / policies to protect the river and its ORVs. Currently, recreational use is under a permit system administered by the National Park Service (Canyonlands NP). There are no other current management / protection overlays along segments 4-6 of the Colorado River. |
| | Portions of segment 4 and all of segments 5 and 6 are navigable stretches of river, and the bed and banks under the jurisdiction of the state of Utah. |
| | SITLA - The presence of trust lands along the WSR corridor could encumber the manageability of the WSR system by over segmentation or by development that is inconsistent with the purpose of the WSRA. |
| The estimated costs of administering the river, including costs for acquiring lands. | There should be no acquisition costs involved in the potential designation of the Colorado River as a WSR. Administration costs would include staff / time to develop and complete study and management reports |
| The extent to which administration costs will be shared by local and state governments. | San Juan County: "Considering the budget status of the State and County, it seems highly unlikely that either would put much priority in managing and/or protecting the non-federal lands in the area". |
| **Cottonwood Canyon (Book Cliffs)** | |
| Characteristics which would or would not make it suitable | Cottonwood Canyon possesses outstandingly remarkable scenery, wildlife, and ecological values. |
| Land ownership status and current use of the area. | The 13.6 mile eligible segment of Cottonwood Canyon crosses 3 state sections of land.<br>• Recreational activities including sight-seeing, hiking, hunting, and horseback riding.<br>• Available for grazing<br>• OHV use limited to inventoried vehicle ways. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated. | • Interstate [water] compacts are not affected by WSR [WSRA, Sec 13: Jurisdiction of the States]<br>• There are no withdrawals.<br>• Area is open to mineral leasing.<br>• Oil and Gas category is open with special stipulations.<br>• Recreation: no difference if designated or not; BLM Moab FO-<br>• Riparian / Vegetative / Wildlife: enhancement or protective mgmt are available under law/policy.<br>• Grazing: occurs in this canyon<br>• WSA/Wilderness: Cottonwood Canyon falls within the Spruce Canyon WSA. |
| Interest of federal, public, state, tribal, local, or other public entity in designation of non-designation, including administration sharing. | • Interest/Support: high from some local residents, and environmental organizations; American Rivers, Utah River Council, and NRI listing.<br>• Participation: other federal agencies are actively participating in WSR process but none adjacent to this river segment.<br>• NPS: none<br>• USFS: none<br>• Other BLM Areas: none |

BLM_0013240

## Attachment 4: Suitability Considerations by Eligible River Segment

| Suitability Considerations | Consideration Applied to Eligible River |
|---|---|
| Manageability of the river if designated and other means of protecting values. | BLM uses management prescriptions and applicable laws / policies to protect the river and its ORVs. Currently Cottonwood Canyon is in a WSA and is protected by interim management policy. No other management overlays are in this location. SITLA intermixed with public lands may affect management. |
| The estimated costs of administering the river, including costs for acquiring lands. | There should be no acquisition costs involved in the potential designation of the Cottonwood Canyon as a WSR. Administration costs would include staff / time to develop and complete study and management reports<br><br>SITLA easements may be necessary. |
| The extent to which administration costs will be shared by local and state governments. | No support from state or local governments. |
| **Onion Creek – Segments 1 and 2** | |
| Characteristics which would or would not make it suitable | Onion Creek possesses outstandingly remarkable scenery, geology, and ecological values. |
| Land ownership status and current use of the area. | 96% BLM, 4% private land<br>• Recreational activities including sight-seeing, hiking, and horseback riding.<br>• Available for grazing<br>• OHV use limited to designated roads and trails. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated. | • Interstate [water] compacts are not affected by WSR [WSRA, Sec 13: Jurisdiction of the States]<br>• There are no withdrawals<br>• Mineral leasing is open.<br>• Oil and gas lease category is open with special stipulations.<br>• Recreation: no difference if designated or not; current restrictions exist for vehicle use in the streambed.<br>• Geology: is millions of years old and will not change except for natural weathering / erosion<br>• Riparian / Vegetative / Wildlife: enhancement or protective mgmt are available under law/policy.<br>• Grazing: occurs next to stream<br>• WSA/Wilderness: No WSAs in this area. |
| Interest of federal, public, state, tribal, local, or other public entity in designation of non-designation, including administration sharing. | • Interest/Support: high from some local residents, and environmental organizations<br>• Participation: other federal agencies are actively participating in WSR process<br>• NPS: none<br>• USFS: none<br>• Other BLM Areas: none |
| Manageability of the river if designated and other means of protecting values. | BLM uses management prescriptions and applicable laws / policies to protect the river and its ORVs. Currently Onion Creek has no management overlays. Road issues in and near Onion Creek could affect management. |
| The estimated costs of administering the river, including costs for acquiring lands. | There should be no acquisition costs involved in the potential designation of the Onion Creek as a WSR. Administration costs would include staff / time to develop and complete study and |

BLM_0013241

## Attachment 4: Suitability Considerations by Eligible River Segment

| Suitability Considerations | Consideration Applied to Eligible River |
|---|---|
| | management reports. |
| The extent to which administration costs will be shared by local and state governments. | No support from state or local governments. |
| **Professor Creek** | |
| Characteristics which would or would not make it suitable | Professor Creek possesses outstandingly remarkable scenery and recreation. |
| Land ownership status and current use of the area. | 99.5% BLM, .5% private land<br>• Recreational activities including sight-seeing, hiking, and horseback riding.<br>• Available for grazing<br>• OHV use limited to designated roads and trails. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated. | • Interstate [water] compacts are not affected by WSR [WSRA, Sec 13: Jurisdiction of the States]<br>• There are no withdrawals<br>• Open to mineral leasing.<br>• Oil and gas category is open with special stipulations.<br>• Recreation: no difference if designated or not<br>• Riparian / Vegetative / Wildlife: enhancement or protective mgmt are available under law/policy.<br>• Grazing: occurs in this area<br>• WSA/Wilderness: No WSAs in area. |
| Interest of federal, public, state, tribal, local, or other public entity in designation of non-designation, including administration sharing. | • Interest/Support: high from some local residents, and environmental organizations<br>• Participation: other federal agencies are actively participating in WSR process<br>• NPS: none<br>• USFS: none<br>• Other BLM Areas: none |
| Manageability of the river if designated and other means of protecting values. | BLM uses management prescriptions and applicable laws / policies to protect the river and its ORVs. Currently Professor Creek has no management overlays. |
| The estimated costs of administering the river, including costs for acquiring lands. | There should be no acquisition costs involved in the potential designation of the Professor Creek as a WSR. Administration costs would include staff / time to develop and complete study and management reports. |
| The extent to which administration costs will be shared by local and state governments. | No support from state or local governments. |
| **Salt Wash** | |
| Characteristics which would or would not make it suitable | Salt Wash possesses outstandingly remarkable scenery, fish, recreation, geology, and wildlife. |
| Land ownership status and current use of the area. | 8% BLM, 92% National Park Service in Arches NP<br>• Recreational activities including sight-seeing, hiking.<br>• OHV use limited to designated roads and trails on BLM (no OHV allowed in Arches NP) BLM portion is inaccessible to |

BLM_0013242

## Attachment 4: Suitability Considerations by Eligible River Segment

| Suitability Considerations | Consideration Applied to Eligible River |
|---|---|
| | OHV's. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated. | • Interstate [water] compacts are not affected by WSR [WSRA, Sec 13: Jurisdiction of the States]<br>• The 6 miles in Arches NP is withdrawn<br>• Falls within the boundary of the three rivers withdrawal.<br>• Mineral leasing: This area is no surface occupancy due to being within ¼ mile of the Colorado River.<br>• Recreation: no difference if designated or not Geology: is millions of years old and will not change except for natural weathering / erosion<br>• Riparian / Vegetative / Wildlife: enhancement or protective mgmt are available under law/policy.<br>• Grazing: no grazing occurs here.<br>• WSA/Wilderness: No BLM WSA present. (proposed wilderness within Arches NP) |
| Interest of federal, public, state, tribal, local, or other public entity in designation of non-designation, including administration sharing. | • Interest/Support: high from NPS, some local residents, and environmental organizations; Participation: other federal agencies are actively participating in WSR process<br>• NPS: found 6 miles of Salt Wash inside Arches NP as eligible and classified as wild. Arches NP is not doing suitability at this time.<br>• USFS: none<br>• Other BLM Areas: none |
| Manageability of the river if designated and other means of protecting values. | BLM uses management prescriptions and applicable laws / policies to protect the river and its ORVs. The majority of Salt Wash is managed by Arches National Park. |
| The estimated costs of administering the river, including costs for acquiring lands. | There should be no acquisition costs involved in the potential designation of the Salt Wash as a WSR. Administration costs would include staff / time to develop and complete study and management reports. (BLM and NPS staff time) |
| The extent to which administration costs will be shared by local and state governments. | No support from state or local governments. |
| **Negro Bill Canyon – Segments 1 and 2** | |
| Characteristics which would or would not make it suitable | Negro Bill Canyon possesses outstandingly remarkable scenery, recreation, and ecology. |
| Land ownership status and current use of the area. | 100% BLM<br>• Recreational activities including sight-seeing, hiking, swimming and wading.<br>• No grazing for first 2 miles from river.<br>• OHV use closed. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated. | • Interstate [water] compacts are not affected by WSR [WSRA, Sec 13: Jurisdiction of the States]<br>• Segment 1 falls within the Three Rives Withdrawal. Segment 2 has not been withdrawn.<br>• Segments 1 and 2 are closed to oil and gas leasing. This area is in a WSA.<br>• Recreation: no difference if designated or not<br>• Riparian / Vegetative / Wildlife: enhancement or protective |

BLM_0013243

## Attachment 4: Suitability Considerations by Eligible River Segment

| Suitability Considerations | Consideration Applied to Eligible River |
|---|---|
| | mgmt are available under law/policy. <br>• Grazing: excluded for the first two miles from Colorado River <br>• WSA/Wilderness: Negro Bill Canyon is in the Negro Bill Canyon WSA |
| Interest of federal, public, state, tribal, local, or other public entity in designation of non-designation, including administration sharing. | • Interest/Support: some local residents, and environmental organizations <br>• Participation: other federal agencies are actively participating in WSR process <br>• NPS: none <br>• USFS: none <br>• Other BLM Areas: none |
| Manageability of the river if designated and other means of protecting values. | BLM uses management prescriptions and applicable laws / policies to protect the river and its ORVs. Currently Negro Bill Canyon is protected by interim management for the Negro Bill WSA. |
| The estimated costs of administering the river, including costs for acquiring lands. | There should be no acquisition costs involved in the potential designation of the Negro Bill Canyon as a WSR. Administration costs would include staff / time to develop and complete study and management reports |
| The extent to which administration costs will be shared by local and state governments. | No support from state or local governments. |
| **Mill Creek – Segments 1 and 2** | |
| Characteristics which would or would not make it suitable | Mill Creek Canyon possesses outstandingly remarkable scenery, recreation, fish, cultural and ecology. |
| Land ownership status and current use of the area. | 50% BLM, 22% private land, 28% SITLA (BLM may acquire SITLA through a land exchange) <br>• Recreational activities including sight-seeing, rock-art viewing, hiking, water-play and horseback riding. <br>• No grazing <br>• OHV use limited to designated roads and trails. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated. | • Interstate [water] compacts are not affected by WSR [WSRA, Sec 13: Jurisdiction of the States] <br>• There are no withdrawals. <br>• Open to mineral leasing. <br>• Oil and gas category is open with no surface occupancy. <br>• Recreation: no difference if designated or not <br>• Riparian / Vegetative / Wildlife: enhancement or protective mgmt are available under law/policy. <br>• Cultural: could be protected under ARPA. <br>• Grazing: most occurs on mesas outside ¼ mile; <br>• WSA/Wilderness: Mill Creek Canyon falls within the Mill Creek Canyon WSA |
| Interest of federal, public, state, tribal, local, or other public entity in designation of non-designation, including administration sharing. | • Interest/Support: from some local residents, and environmental organizations <br>• Participation: other federal agencies are actively participating in WSR process <br>• NPS: none <br>• USFS: Mill Creek Gorge was found to be eligible with a tentative classification of wild on Manti La Sal National Forest |

BLM_0013244

*Moab PRMP/FEIS*                                    *Appendix J: Wild and Scenic Rivers Study Process*

## Attachment 4: Suitability Considerations by Eligible River Segment

| Suitability Considerations | Consideration Applied to Eligible River |
|---|---|
| | ⬥ Other BLM Areas: none |
| Manageability of the river if designated and other means of protecting values. | BLM uses management prescriptions and applicable laws / policies to protect the river and its ORVs. Currently Mill Creek is protected by interim management for the Mill Creek WSA. |
| The estimated costs of administering the river, including costs for acquiring lands. | There should be no acquisition costs involved in the potential designation of the Mill Creek as a WSR. Administration costs would include staff / time to develop and complete study and management reports. |
| The extent to which administration costs will be shared by local and state governments. | No support from state or local governments. |
| **North Fork Mill Creek** | |
| Characteristics which would or would not make it suitable | Mill Creek Canyon possesses outstandingly remarkable scenery, recreation, cultural and ecology. |
| Land ownership status and current use of the area. | 99% BLM, 1% private land<br>⬥ Recreational activities including sight-seeing, hiking, and horseback riding.<br>⬥ Available for grazing<br>⬥ OHV use limited to designated roads and trails. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated. | ⬥ Interstate [water] compacts are not affected by WSR [WSRA, Sec 13: Jurisdiction of the States]<br>⬥ There are no withdrawals.<br>⬥ Open to mineral leasing.<br>⬥ Oil and gas category is open with no surface occupancy.<br>⬥ Recreation: no difference if designated or not<br>⬥ Riparian / Vegetative / Wildlife: enhancement or protective mgmt are available under law/policy.<br>⬥ Cultural: would be protected by ARPA<br>⬥ Grazing: occurs in this area<br>⬥ WSA/Wilderness: Falls within Mill Creek Canyon WSA |
| Interest of federal, public, state, tribal, local, or other public entity in designation of non-designation, including administration sharing. | ⬥ Interest/Support: from some local residents, and environmental organizations<br>⬥ Participation: other federal agencies are actively participating in WSR process<br>⬥ NPS: none<br>⬥ USFS: none<br>⬥ Other BLM Areas: none |
| Manageability of the river if designated and other means of protecting values. | BLM uses management prescriptions and applicable laws / policies to protect the river and its ORVs. Currently North Fork Mill Creek is protected by interim management for the Mill Creek WSA. |
| The estimated costs of administering the river, including costs for acquiring lands. | There should be no acquisition costs involved in the potential designation of the North Fork of Mill Creek as a WSR. Administration costs would include staff / time to develop and complete study and management reports. |
| The extent to which administration costs will be shared by local and state governments. | No support from state or local governments. |

BLM_0013245

Case No. 1:20-cv-02484-MSK   Document 29-11   filed 04/27/21   USDC Colorado   pg 366 of 367

*Moab PRMP/FEIS*                                          *Appendix J: Wild and Scenic Rivers Study Process*

**Attachment 4: Suitability Considerations by Eligible River Segment**

| Suitability Considerations | Consideration Applied to Eligible River |
|---|---|
| **Dolores River – Segments 1, 2, and 3** | |
| Characteristics which would or would not make it suitable | The Dolores River possesses outstandingly remarkable scenery, recreation, wildlife, fish, geology and ecology. |
| Land ownership status and current use of the area. | 93% BLM, 7% private land<br>• Recreational water related activities include, sight-seeing, boating, rafting, fishing, and hiking.<br>• Available for grazing<br>• OHV use limited to existing roads and trails. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated. | • Interstate [water] compacts are not affected by WSR [WSRA, Sec 13: Jurisdiction of the States]<br>• There are power site withdrawals in place.<br>• Falls within the Three Rivers Withdrawal.<br>• Oil and gas category is open with no surface occupancy.<br>• Recreation: no difference if designated or not; BLM Moab FO issues permits on the Dolores River; Moab FO patrols segments 1-3.<br>• Geology: is millions of years old and will not change except for natural weathering / erosion<br>• Riparian / Vegetative / Wildlife: enhancement or protective mgmt are available under law/policy.<br>• Grazing: most occurs on mesas outside ¼ mile; however, some within ¼ mile at river edge<br>• WSA/Wilderness: No WSAs in area |
| Interest of federal, public, state, tribal, local, or other public entity in designation of non-designation, including administration sharing. | • Interest/Support: high from national River groups, some local residents, rafting companies, and environmental organizations; American Rivers, Utah River Council, and NRI listing.<br>• Participation: other federal agencies are actively participating in WSR process<br>• NPS: none<br>• USFS: none<br>• Other BLM Areas: eligibility determination and tentative classification levels are the same as those determined by the BLM Grand Junction FO for the segment of the Dolores River in Colorado which is upstream from segment 1. |
| Manageability of the river if designated and other means of protecting values. | BLM uses management prescriptions and applicable laws / policies to protect the river and its ORVs. The Dolores River has no management overlays. |
| The estimated costs of administering the river, including costs for acquiring lands. | There should be no acquisition costs involved in the potential designation of the Dolores River as a WSR. Administration costs would include staff / time to develop and complete study and management reports. Possible costs of acquiring easements from private landowners, but not necessary for designation. |
| The extent to which administration costs will be shared by local and state governments. | No support from state or local governments. |
| **Beaver Creek – Segments 1 and 2** | |
| Characteristics which would or would not make it suitable | Beaver Creek possesses outstandingly remarkable scenery, recreation, fish, geology and ecology. |

*J-78*

BLM_0013246

**Attachment 4: Suitability Considerations by Eligible River Segment**

| Suitability Considerations | Consideration Applied to Eligible River |
|---|---|
| Land ownership status and current use of the area. | 86% BLM, 14% SITLA<br>• Recreational activities including sight-seeing, hiking, and horseback riding.<br>• Available for grazing<br>• OHV use limited to designated roads and trails. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not designated. | • Interstate [water] compacts are not affected by WSR [WSRA, Sec 13: Jurisdiction of the States]<br>• There are no withdrawals in the area.<br>• Open to mineral leasing.<br>• Oil and gas category is open.<br>• Recreation: no difference if designated or not<br>• Geology: is millions of years old and will not change except for natural weathering / erosion<br>• Riparian / Vegetative / Wildlife: enhancement or protective mgmt are available under law/policy.<br>• Grazing: occurs in areas<br>• WSA/Wilderness: No WSAs |
| Interest of federal, public, state, tribal, local, or other public entity in designation of non-designation, including administration sharing. | • Interest/Support: from some local residents, and environmental organizations<br>• Participation: other federal agencies are actively participating in WSR process<br>• NPS: none<br>• USFS: none<br>• Other BLM Areas: none |
| Manageability of the river if designated and other means of protecting values. | BLM uses management prescriptions and applicable laws / policies to protect the river and its ORVs. Beaver Creek has no management overlays. |
| The estimated costs of administering the river, including costs for acquiring lands. | There should be no acquisition costs involved in the potential designation of the Beaver Creek as a WSR. Administration costs would include staff / time to develop and complete study and management reports. Possible cost of acquiring easement for SITLA. |
| The extent to which administration costs will be shared by local and state governments. | No support from state or local governments. |
| **Thompson Canyon** | |
| Characteristics which would or would not make it suitable | Thompson Canyon possesses outstandingly remarkable scenery and ecology. |
| Land ownership status and current use of the area. | 100% BLM<br>• Recreational activities including sight-seeing, hiking, and horseback riding.<br>• Available for grazing<br>• OHV use limited to existing roads and trails. |
| Uses, including reasonably foreseeable uses, that would be enhanced or curtailed if designated; and values that would be diminished if not | • Interstate [water] compacts are not affected by WSR [WSRA, Sec 13: Jurisdiction of the States]<br>• There are no withdrawals in the area.<br>• Open to mineral leasing.<br>• Oil and gas category open. |

BLM_0013247