Map 16 Non-WSA Lands Managed for Wilderness Characteristics - Moab RMP

Moab Field Office
Bureau of Land Management

**Areas Managed for Wilderness Characteristics**

— Main Roads
–·–· County Boundary
▭ Moab Field Office Boundary
▨ Administered by Vernal Field Office
▦ Wilderness Study Areas
▩ Areas Managed for Wilderness Characteristics

Grid: 50,000 meter
UTM Zone 12 NAD 83

0  2.5  5   10   15   20 Miles

Location Map

BLM_0013635



Map 17 Special Recreation Management Areas - Moab RMP

Moab Field Office
Bureau of Land Management

## Special Recreation Management Areas

— Main Roads

—·—·— County Boundary

☐ Moab Field Office Boundary

▨ Administered by Vernal Field Office

▨ SRMA Boundaries
(Color variation indicates different SRMAs)

▨ Extensive Recreation Management Area (ERMA)

Grid: 50,000 meter
UTM Zone 12 NAD 83

0  2.5  5      10      15      20
Miles

BLM_0013636



# Map 18 Recreation Focus Areas - Moab RMP
## Moab Field Office
## Bureau of Land Management

Uintah and Ouray
Indian Reservation

Westwater Canyon River Use and Hiking Area

Crescent
Junction

Thompson
Springs

Dee Pass Motorized Trail Area

Scenic Driving Corridor

Scenic Driving Corridor

Klondike Bluffs Mountain Biking Area

Arches
National
Park

Richardson Armphitheater/Castle Rock
Hiking and Climbing Area

White Wash Sand Dunes Open OHV Area

Airport Hills Moto Cross Area

Mill Canyon/Upper Courthouse
Mountain Biking Area

Tusher Slickrock Mountain Bike Area

Klondike Bluffs Mountain Biking Area

Bartlett Slickrock Free Ride Area

Spring Canyon Hiking Area

Bar M Mountain Biking Area

Sevenmile Canyons Equestrian Area

Gemini Bridges/Poison Spider Mesa
Motorized Backcountry Touring Area

Labyrinth Canyon Canoe Area

Castle
Valley

Goldbar/Corona Arch Hiking Area

Negro Bill Hiking and Ecological Study Area

Wall Street Sport Climbing Area

Mill Creek Canyon Hiking Area

Scenic Driving Corridor

Scenic Driving Corridor

Tombstone Competitive BASE Jumping Area

Mineral Canyon/Horseshoe Point
Competitive BASE Jumping Area

Behind the Rocks Hiking Area

Manti-LaSal
National
Forest

Upper Spanish Valley Mountain Biking Area

24 Hours of Moab Area

Hatch Wash Hiking and Backpacking Area

LaSal

Scenic Driving Corridor

## Recreation Focus Areas

— Main Roads
–·–·– County Boundary
▢ Moab Field Office Boundary
▨ Administered by Vernal Field Office
▨ Managed Open OHV Area
▨ Mechanized Backcountry Touring
▨ Motorized Backcountry Touring
▨ Non-Mechanized Recreation
▨ Specialized Sport Venue - Motorized
▨ Specialized Sport Venue - Non-Motorized
▨ Scenic Driving Corridor

Grid: 50,000 meter
UTM Zone 12 NAD 83

0  2.5  5    10    15    20
Miles

Location Map

BLM_0013637



Map 19 Steep Slopes (over 30 Percent) in Bookcliffs - Moab RMP

Moab Field Office
Bureau of Land Management

**Steep Slopes (greater than 30%) in Bookcliffs**

— Main Roads

—·—·— County Boundary

☐ Moab Field Office Boundary

▨ Administered by Vernal Field Office

▨ Area Containing High Concentration of Slopes over 30%

Grid: 50,000 meter
UTM Zone 12 NAD 83

0  2.5  5      10      15      20  Miles

BLM_0013638



Map 20 Moderate to High Saline Soils - Moab RMP

Moab Field Office
Bureau of Land Management

**Moderate to High Saline Soils**

— Main Roads

-·-·- County Boundary

▢ Moab Field Office Boundary

▨ Administered by Vernal Field Office

▨ Moderate to High Saline Soils

Grid:  50,000 meter
UTM Zone 12 NAD 83

0   2.5   5        10        15        20
Miles

Location Map

BLM_0013639



Map 21 Areas of Critical Environmental Concern - Moab RMP

Moab Field Office
Bureau of Land Management

Cottonwood/Diamond Watershed ACEC

Uintah and Ouray
Indian Reservation

Ten Mile Wash ACEC

Thompson
Springs

Crescent
Junction

Arches
National
Park

Castle
Valley

Mill Creek Canyon ACEC

Highway 279 Corridor/
Shafer Basin/
Long Canyon ACEC

Moab

Manti-LaSal
National
Forest

Behind the Rocks ACEC

LaSal

**ACECs**

———— Main Roads

—·—·— County Roads

☐ Moab Field Office Boundary

▨ Administered by Vernal Field Office

▦ Areas of Critical Environmental Concern

Grid: 50,000 meter
UTM Zone 12 NAD 83

0  2.5  5      10      15      20
                              Miles

Location Map

BLM_0013640



# Map 22 Suitable Wild and Scenic Rivers - Moab RMP

Moab Field Office
Bureau of Land Management

## Suitable Wild and Scenic Rivers

—— Main Roads

—·—·— County Boundary

☐ Moab Field Office Boundary

▨ Administered by Vernal Field Office

▨ Suitable Segments - Proposed Plan

Grid: 50,000 meter
UTM Zone 12 NAD 83

0  2.5  5  10  15  20 Miles

Location Map

BLM_0013641



Map 23 Wilderness Areas and Wilderness Study Areas - Moab RMP

Moab Field Office
Bureau of Land Management

BLM_0013642



# Map 24 Endangered Colorado River Fish Critical Habitat - Moab RMP

Moab Field Office
Bureau of Land Management

### Endangered Colorado River Fish Critical Habitat

—————— Main Roads

–·–·–·– County Boundary

▭ Moab Field Office Boundary

▨ Administered by Vernal Field Office

▮ Endangered Colorado River Fish Critical Habitat
(Includes habitat for Colorado Pikeminnow,
Humpback Chub, Bonytail Chub, and Razorback Sucker)

—————— Current Cutthroat Trout Habitat

—————— Historic Cutthroat Trout Habitat

Grid:  50,000 meter
UTM Zone 12 NAD 83

0   2.5   5        10        15        20
Miles

Location Map

BLM_0013643



Map 25 Mexican Spotted Owl Habitat - Moab RMP
Moab Field Office
Bureau of Land Management

**Mexican Spotted Owl Habitat**

— Main Roads
—·—· County Boundary
☐ Moab Field Office Boundary
▨ Administered by Vernal Field Office
■ Potential Canyon Nesting (Data Model)
■ Potential Foraging (Data Model)
■ Potential Breeding (Data Model)
▨ USFWS Designated Critical Habitat

Grid: 50,000 meter
UTM Zone 12 NAD 83

0  2.5  5    10    15    20
Miles

Location Map

BLM_0013644



Map 26 Bald and Golden Eagle Habitat - Moab RMP

Moab Field Office
Bureau of Land Management

**Bald and Golden Eagle Habitat**

—————— Main Roads

—·—·—· County Boundary

Moab Field Office Boundary

Administered by Vernal Field Office

Potential Eagle Winter Habitat

Bald Eagle Summer Foraging Habitat

Bald Eagle Nesting Territories

Golden Eagle Nesting Territories

Grid:  50,000 meter
UTM Zone 12 NAD 83

0  2.5  5       10      15      20
Miles

Location Map

BLM_0013645



Map 27 Sage Grouse Habitat - Moab RMP

Moab Field Office
Bureau of Land Management

Uintah and Ouray
Indian Reservation

Greater Sage Grouse
(North of I-70)

Thompson
Springs

Crescent
Junction

Gunnison Sage Grouse
(South of I-70)

Arches
National
Park

Castle
Valley

Moab

Manti-LaSal
National
Forest

LaSal

**Sage Grouse Habitat**

——— Main Roads

—·—·— County Boundary

☐ Moab Field Office Boundary

▨ Administered by Vernal Field Office

▨ Current Potential Habitat

Grid:  50,000 meter
UTM Zone 12 NAD 83

0  2.5  5      10      15      20
Miles

Location Map

BLM_0013646



Map 28 Prairie Dog Sensitive Species Habitat - Moab RMP

Moab Field Office
Bureau of Land Management

Uintah and Ouray
Indian Reservation

Crescent
Junction

Thompson
Springs

Arches
National
Park

Castle
Valley

Manti-LaSal
National
Forest

Moab

LaSal

**Prairie Dog Sensitive Species Habitat**

— Main Roads
—·— County Boundary
☐ Moab Field Office Boundary
▨ Administered by Vernal Field Office
▨ Whitetailed Prairie Dog Habitat
▨ Gunnison Prairie Dog Habitat

Grid:  50,000 meter
UTM Zone 12 NAD 83

0  2.5  5       10        15        20
Miles

Location Map

BLM_0013647



Map 29 Ferruginous Hawk and Burrowing Owl Habitat - Moab RMP

Moab Field Office
Bureau of Land Management

**Ferruginous Hawk and Burrowing Owl Habitat**

Main Roads
County Boundary
Moab Field Office Boundary
Administered by Vernal Field Office
Ferruginous Hawk Habitat
Burrowing Owl Habitat

Grid: 50,000 meter
UTM Zone 12 NAD 83

Miles
0  2.5  5    10    15    20

Location Map

BLM_0013648



## Map 30 Off Highway Vehicle Designations - Moab RMP

Moab Field Office
Bureau of Land Management

**Off Highway Vehicle Designations**

— Main Roads
–·–·– County Boundary
☐ Moab Field Office Boundary
▨ Administered by Vernal Field Office
▩ OHV Closed
▨ OHV Limited to Designated
▨ OHV Open

Grid: 50,000 meter
UTM Zone 12 NAD 83

0  2.5  5        10        15        20
Miles

BLM_0013649



Map 31 Visual Resource Management - Moab RMP

Moab Field Office
Bureau of Land Management

**Visual Resource Management**

Main Roads
County Boundary
Moab Field Office Boundary
Administered by Vernal Field Office
VRM Class I
VRM Class II
VRM Class III
VRM Class IV

Grid: 50,000 meter
UTM Zone 12 NAD 83

0   2.5   5   10   15   20   Miles

Location Map

BLM_0013650



BLM_0013651



Map 33 Deer and/or Elk Habitat - Moab RMP

Moab Field Office
Bureau of Land Management

**Deer and/or Elk Habitat**

— Main Roads

—·—·— County Boundary

☐ Moab Field Office Boundary

▨ Administered by Vernal Field Office

▨ Deer and/or Elk Crucial Winter Range

▨ Fawning and/or Calving Grounds

▨ Deer and/or Elk Habitat

UDWR Data - 2006
Grid: 50,000 meter
UTM Zone 12 NAD 83

0   2.5   5   10   15   20   Miles

Surface disturbing activities are not excluded in these areas.
All timing and controlled surface use limitations are subject to
waivers, exceptions and/or modifications identified in Appendix C.

BLM_0013652

Map 34  Areas not available for Woodland Harvest and Wood Cutting - Moab RMP

Moab Field Office
Bureau of Land Management

**Woodland Product Areas**

— Main Roads
-··-··- County Boundary
☐ Moab Field Office Boundary
▨ Administered by Vernal Field Office
▨ No firewood cutting or gathering

Grid: 50,000 meter
UTM Zone 12 NAD 83

Miles
0  2.5  5    10    15    20

Location Map

BLM_0013653



# Bureau of Land Mangagement
## MOAB FIELD OFFICE

BLM

AND **Record of Decision**
**Approved Resource Management Plan**

OCTOBER 2008

BLM_0013654

# BLM Mission

To sustain the health, diversity, and productivity of the public lands
for the use and enjoyment of present and future generations.



Bureau of Land Management

BLM-UT-PL-09-001-1610

UT-060-2007-04

BLM_0013655



# United States Department of the Interior

### BUREAU OF LAND MANAGEMENT

Utah State Office
P.O. Box 45155
Salt Lake City, UT 84145-0155
http://www.blm.gov



IN REPLY REFER TO:
1610
(UT-935)

Dear Reader/Interested Party:

I am pleased to announce that, after several years of hard work and collaborative efforts, the Moab Field Office Resource Management Plan (Approved RMP) is complete. This document will provide guidance for the management of over 1,821,000 acres of public land and 1,850,000 acres of Federal mineral estate administered by the Bureau of Land Management (BLM) in Grand and San Juan Counties in southeastern Utah.

The attached Record of Decision (ROD) and Approved RMP have been prepared in accordance with the Federal Land Policy and Management Act (FLPMA) and the National Environmental Policy Act (NEPA). The ROD/Approved RMP is available to members of the public and copies will be sent to pertinent local, State, Tribal, and Federal government entities. The Approved RMP finalizes the proposed decisions presented in the Proposed RMP/Final Environmental Impact Statement (FEIS) that was released on August 1, 2008 and subject to a 30-day protest period that ended on September 1, 2008. Twenty-one protest letters with standing were received. The protests were reviewed by the BLM Director in Washington, D.C. After careful consideration of all points raised in these protests, the Director concluded the responsible planning team and decision makers followed all applicable laws, regulations, policies, and pertinent resource considerations in developing the Proposed RMP/Final EIS. Minor adjustments or points of clarification are incorporated into the Approved RMP in response to issues raised in the protest process and final BLM review. These minor changes are discussed in the ROD under the section titled *Notice of Modifications and Clarifications*, but the protest review did not result in any significant changes from the Proposed RMP.

The approval of this ROD by the Department of the Interior (DOI) Assistant Secretary for Land and Minerals Management serves as the final decision by the DOI for all land use planning and implementation-level decisions described in the attached Approved RMP. Implementation of land use plan decisions (e.g., coal leasing, oil and gas development, and land and realty decisions) will not be undertaken without suitable further NEPA analysis, including all appropriate public involvement and any hearings available to the public.

Notification of the approval of this ROD/Approved RMP will be announced via local news releases and on the Moab Field Office website at:

http://www.blm.gov/ut/st/en/fo/moab.html

Hard copies and CD-ROM versions of the ROD and Approved RMP may be obtained by contacting the Moab Field Office by phone at (435) 259-2100, or at the following address:

> Moab Field Office
> 82 East Dogwood
> Moab, Utah, 84532

The BLM is pleased to provide this copy of the Moab Field Office ROD/Approved RMP for your reference. We greatly appreciate all who contributed to the completion of this Approved RMP, including the State of Utah and Grand and San Juan County governments who were our Cooperating Agencies on this plan over the years, as well as other Federal agencies that worked closely with us to complete this important effort. We also appreciate the extensive public involvement during this time by groups, organizations, and individuals. Public input informed and improved the planning documents and we hope you will continue to work with us as we implement the decisions in this Approved RMP.

Sincerely,

Selma Sierra
Utah State Director

# MOAB FIELD OFFICE
# RECORD OF DECISION
# AND
# APPROVED
# RESOURCE MANAGEMENT PLAN

## October 2008

*Prepared by:*
U.S. Department of the Interior
Bureau of Land Management
Moab Field Office
Moab, Utah

*Cooperating Agencies:*
State of Utah
Grand County
San Juan County

BLM_0013658

BLM_0013659

*Moab Field Office Record of Decision and Approved Resource Management Plan*

# TABLE OF CONTENTS

LIST OF ACRONYMS ......................................................................................................... iii

# RECORD OF DECISION ................................................................................... 1

A.    INTRODUCTION ........................................................................................... 1
    Purpose and Need for the Plan .................................................................................... 1
    Moab Planning Area ...................................................................................................... 2
B.    OVERVIEW OF ALTERNATIVES ................................................................. 3
    Alternatives Considered in Detail ................................................................................. 4
    Alternatives Considered but Eliminated from Analysis ................................................ 9
C.    RESULTS OF PROTEST PERIOD ............................................................. 14
D.    THE DECISION ......................................................................................... 15
    What the Decision/RMP Provides ............................................................................... 16
    What the Decision/RMP Does Not Provide ................................................................ 17
    Implementation Decisions .......................................................................................... 18
E.    NOTICE OF MODIFICATIONS AND CLARIFICATIONS ...................................... 20
    Modifications ............................................................................................................... 20
    Clarifications ............................................................................................................... 21
F.    MANAGEMENT CONSIDERATIONS IN SELECTING THE APPROVED RMP .. 22
    All Surface Disturbing Activities ................................................................................. 22
    Air Quality .................................................................................................................. 23
    Cultural Resources ..................................................................................................... 23
    Lands and Realty ....................................................................................................... 24
    Livestock Grazing ...................................................................................................... 25
    Minerals ..................................................................................................................... 25
    Non-WSA Lands with Wilderness Characteristics ..................................................... 27
    Recreation .................................................................................................................. 29
    Soil and Water ........................................................................................................... 30
    Special Designations:  Areas of Critical Environmental Concern ............................... 30
    Special Designations:  Wild and Scenic Rivers ......................................................... 34
    Travel Management .................................................................................................... 36
    Vegetation (including Riparian, Noxious, and Invasive Plants) .................................. 37
    Visual Resource Management .................................................................................... 37
    Wildlife ....................................................................................................................... 37
G.    CONSISTENCY AND CONSULTATION REVIEW ...................................... 39
    Governor's Consistency ............................................................................................. 39
    NHPA Section 106 Consultation ................................................................................ 39
    Native American Consultation .................................................................................... 39
    Section 7 Consultation under the Endangered Species Act ....................................... 40
H.    MITIGATION MEASURES ......................................................................... 40
I.    PLAN MONITORING AND EVALUATION .................................................. 40
J.    PUBLIC INVOLVEMENT ............................................................................ 41
K.    AVAILABILITY OF THE PLAN .................................................................. 42

# APPROVED RESOURCE MANAGEMENT PLAN ............................... 45

A.    INTRODUCTION ......................................................................................... 45
B.    CONSIDERATION OF OTHER PLANS AND POLICIES ..................................... 45

BLM_0013660

*Moab Field Office Record of Decision and Approved Resource Management Plan*

State of Utah ..................................................................................................45
County Land Use Plans...................................................................................45
Other Federal Plans .......................................................................................45
Endangered Species Recovery Plans.............................................................46
Energy Policy and Conservation Act (EPCA) ..................................................46
Energy Policy Act of 2005 and the Western Energy Corridor Programmatic EIS (PEIS).......46
Memorandum of Understanding (MOU) Between the U.S. Department of the Interior; the
Bureau of Land Management (BLM); and the U.S Department of Agriculture, U.S. Forest
Service concerning Oil and Gas Leasing Operations .......................................46
Other BLM Plans and Policies.........................................................................47
Habitat Management Plans (HMP)...................................................................47
C.      PLAN IMPLEMENTATION ............................................................................48
General Implementation Schedule of "One-Time" Actions..............................49
Maintaining the Plan.......................................................................................49
Changing the Plan..........................................................................................50
D.      PLAN EVALUATION ....................................................................................50
E.      MANAGEMENT DECISIONS ........................................................................51
Air Quality (AQ) ..............................................................................................52
Cultural Resources (CUL) ...............................................................................54
Fire Management (FIRE)..................................................................................58
Health And Safety (HAZ).................................................................................63
Lands And Realty (LAR)..................................................................................65
Livestock Grazing (GRA).................................................................................68
Minerals (MIN) ................................................................................................73
Non-Wsa Lands With Wilderness Characteristics (WC) ..................................78
Paleontology (PAL) .........................................................................................79
Recreation (REC) ...........................................................................................81
Riparian (RIP).................................................................................................99
Soil And Water (SOL-WAT).............................................................................102
Special Designation:  Areas Of Critical Environmental Concern (ACEC) ...........106
Special Designations:   National Trails And Backways (TRA)............................110
Special Designations:  Wild And Scenic Rivers (WSR)....................................111
Special Designations:  Designated Wilderness (DW) .......................................115
Special Designations:  Wilderness Study Areas (WSA)....................................116
Special Status Species (SSS) .........................................................................118
Travel Management (TRV)...............................................................................127
Vegetation (VEG) ...........................................................................................132
Visual Resources Management (VRM)............................................................135
Wildlife And Fisheries (WL).............................................................................137
Woodlands (FOR) ...........................................................................................145
REFERENCES...............................................................................................147
GLOSSARY ..................................................................................................154
LIST OF PREPARERS ...................................................................................168
LIST OF TABLES ...........................................................................................169
LIST OF APPENDICES...................................................................................170

Appendix A:    Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities
Appendix B:    U.S. Fish and Wildlife Service Biological Opinion Memorandum

BLM_0013661

*Moab Field Office Record of Decision and Approved Resource Management Plan*

Appendix C:      State Historic Preservation Office Letter of Concurrence
Appendix D:      Utah Standards for Rangeland Health and Guidelines for Grazing Management
Appendix E:      Moab RMP Monitoring Plan
Appendix F:      Tentative Implementation Schedule
Appendix G:      Land Tenure Adjustments and Withdrawal Criteria
Appendix H:      Film Permits: Minimum Impact Criteria
Appendix I:      Lands Identified for Disposal in the Moab RMP
Appendix J:      Letter from the State of Utah Regarding Air Quality Mitigation Strategies
Appendix K:       Identification of Wilderness Characteristics on Non-WSA Lands Managed by the Moab BLM
Appendix L:      Moab Field Office Recreation Rules
Appendix M:      Special Recreation Management Areas: Goals, Settings, Outcomes, and Management Prescriptions
Appendix N:      Travel Plan Development
Appendix O:      Hydraulic Considerations for Pipelines Crossing Stream Channels Tech Note 423
Appendix P:      Wild and Scenic Rivers Study Process
Appendix Q:      Conservation Measures for Threatened and Endangered Species of Utah from the Use Plan Programmatic BAs and Section 7 Consultation
Appendix R:      Best Management Practices for Raptors and their Associated Habitats in Utah
Appendix S:      Desired Future Conditions for Vegetation
Appendix T:      Drought Classification System
Appendix U:      Additional Wildlife Information

## LIST OF MAPS .......................................................................................................... 171

Map 1:      Moab Planning Area
Map 2:      Designated Routes
Map 3:      Designated Motorcycle/ATV Routes
Map 4:      Designated Mountain Bike Single Track Trails
Map 5:      Existing Withdrawals from Mineral Entry
Map 6:      Utility Corridors
Map 7:      Lands Identified for Disposal
Map 8:      Grazing Allotments
Map 9:      Desert Bighorn Sheep Lambing, Rutting and Migration Habitat
Map 10:      Rocky Mountain Bighorn Sheep Habitat
Map 11:      Areas Not Available for Livestock Grazing
Map 12:      Oil and Gas Leasing Stipulations
Map 13:      Known Potash Leasing Areas
Map 14:      Salable Minerals Sites
Map 15:      Non-WSA Lands Inventoried for Wilderness Characteristics
Map 16:      Non-WSA Lands Managed for Wilderness Characteristics
Map 17:      Special Recreation Management Areas
Map 18:      Recreation Focus Areas
Map 19:      Steep Slopes (over 30 Percent) in Bookcliffs
Map 20:      Moderate to High Saline Soils
Map 21:      Areas of Critical Environmental Concern
Map 22:      Suitable Wild and Scenic Rivers
Map 23:      Wilderness Areas and Wilderness Study Areas
Map 24:      Endangered Colorado River Fish Critical Habitat
Map 25:      Mexican Spotted Owl Habitat
Map 26:      Bald and Golden Eagle Habitat
Map 27:      Sage Grouse Habitat
Map 28:      Prairie Dog Sensitive Species Habitat
Map 29:      Ferruginous Hawk and Burrowing Owl Habitat
Map 30:      Off Highway Vehicle Designations
Map 31:      Visual Resource Management
Map 32:      Pronghorn Habitat
Map 33:      Deer and/or Elk Habitat
Map 34:      Areas Not Available for Woodland Harvest and Wood Cutting

BLM_0013662

# LIST OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| AML | Abandoned mine lands |
| AMP | Allotment Management Plan |
| AMR | Appropriate Management Response |
| AMS | Analysis of the Management Situation |
| APE | Area of Potential Effect |
| ARPA | Archeological Resource Protection Act (of 1979) |
| AUM | Animal Unit Month |
| BA | Biological Assessment |
| BIA | Bureau of Indian Affairs |
| BLM | Bureau of Land Management |
| BMP | Best Management Practice |
| BO | Biological Opinion |
| CAA | Clean Air Act (of 1970) |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| CFS | Cubic Feet Per Second (a unit of water flow) |
| COA | Conditions of Approval |
| CSU | Controlled Surface Use |
| DEIS | Draft Environmental Impact Statement |
| DFC | Desired Future Condition |
| DOGM | (Utah) Division of Oil, Gas and Mining |
| DOI | (United States) Department of the Interior |
| DPC | Desired Plant Community |
| DWFC | Desired Wildland Fire Conditions |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| EPCA | Energy Policy and Conservation Act (of 1975) |
| ERMA | Extended Recreation Management Area |
| ESA | Endangered Species Act (of 1973) |
| ESR | Emergency Stabilization and Rehabilitation |
| FEIS | Final Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| FLPMA | Federal Land Policy and Management Act (of 1976) |
| FMP | Fire Management Plan |
| FMZ | Fire Management Zone |
| FO | Field Office |
| FR | Federal Register |
| GIS | Geographic Information Systems |
| HMA | Herd Management Area |
| HMP | Habitat Management Plan |
| HUC | Hydrologic Unit Code |
| IBLA | Interior Board of Land Appeals |

BLM_0013663

| | |
|---|---|
| IMP | Interim Management Policy |
| IR | Indian Reservation |
| KPLA | Known Potash Leasing Areas |
| LTA | Land Tenure Agreement |
| LUP | Land Use Plan |
| LWCF | Land and Water Conservation Fund |
| MOU | Memorandum of Understanding |
| MFO | Moab Field Office |
| MPA | Moab Planning Area |
| NAAQS | National Ambient Air Quality Standards |
| NAGPRA | Native American Graves Protection and Repatriation Act (of 1990) |
| NEPA | National Environmental Policy Act (of 1969) |
| NHPA | National Historic Preservation Act |
| NOA | Notice of Availability (published in the Federal Register) |
| NOI | Notice of Intent (published in the Federal Register) |
| NPS | National Park Service |
| NRHP | National Register of Historic Places |
| NSO | No Surface Occupancy (a stipulation on an oil and gas lease) |
| NWSRS | National Wild and Scenic River System |
| OHV | Off-Highway Vehicle |
| ORV | Outstandingly Remarkable Value |
| PFC | Proper Functioning Condition (of riparian/wetland areas) |
| R&I | Relevance and Importance |
| R&PP | Recreation and Public Purposes (Act of 1926) |
| RAMP | Recreation Area Management Plan |
| RDCC | (Utah) Resource Development and Coordinating Committee |
| RFD | Reasonably Foreseeable Development |
| RHS | Rangeland Health Standards |
| RMP | Resource Management Plan (BLM land use plan under FLPMA) |
| RMZ | Recreation Management Zone |
| ROD | Record of Decision |
| ROS | Recreation Opportunity Spectrum |
| ROW | Right of Way |
| SHPO | State Historic Preservation Officer |
| SITLA | (Utah) School and Institutional Trust Lands Administration |
| SMA | Surface Management Agency |
| SRMA | Special Recreation Management Area |
| SRP | Special Recreation Permit |
| TCP | Traditional Cultural Property |
| T&E | Threatened and/or Endangered (species as per ESA of 1973) |
| UAAQS | Utah Ambient Air Quality Standards |
| UAC | Utah Administrative Code |
| UDAQ | Utah Department of Air Quality |
| UDEQ | Utah Division of Environmental Quality |
| UDOGM | Utah Division of Oil, Gas, and Mining |

BLM_0013664

| | |
|---|---|
| UDOT | Utah Department of Transportation |
| UDWQ | Utah Division of Water Quality |
| UDWR | Utah Division of Wildlife Resources |
| UGS | Utah Geological Survey |
| USFWS | United States Fish and Wildlife Service |
| USC | United States Code |
| VRM | Visual Resource Management |
| WSA | Wilderness Study Area |
| WSR | Wild and Scenic River(s) (Act of 1973) |
| WUI | Wildland Urban Interface |

BLM_0013665

# RECORD OF DECISION

## A.   INTRODUCTION

This Record of Decision (ROD) approves the Bureau of Land Management's (BLM's) proposal to manage the public lands within the Moab Field Office as presented in the attached Resource Management Plan (RMP).  This RMP was described as the Proposed Plan in the August 2008 Proposed Moab RMP and Final Environmental Impact Statement (EIS) [USDI-BLM-2008] – with minor adjustments and clarifications which are explained later in this ROD.  This ROD provides the background on development of the plan and rationale for approving the decisions contained in the Proposed Plan, and describes the clarifications and modifications made to address protests received on the plan.  The attached Moab Field Office RMP (also referred to as the Approved RMP) includes the actual decisions.

### *Purpose and Need for the Plan*

#### Purpose

The Federal Land Policy and Management Act (FLPMA) requires that the BLM "develop, maintain, and when appropriate, revise land-use plans" (43 United States Code [USC] 1712 [a]). The BLM has determined it is necessary to revise the existing land-use plan (LUPs) and prepare a new RMP for the Moab Field Office (MFO) based on a number of new issues that have arisen since preparation of the existing plans.  In general, the purpose of this RMP is to provide a comprehensive framework for public land management within the MFO and its allocation of resources pursuant to the multiple-use and sustained yield mandate of FLPMA.  In addition, the purpose of this plan revision is as follows:

- To consolidate the existing LUP and its amendments.
- To reevaluate, with public involvement, existing conditions, resources, and uses, and reconsider the mix of resource allocations and management decisions designed to balance uses and the protection of resources pursuant to FLPMA and applicable law.
- To resolve multiple-use conflicts or issues between resource values and resource uses.  The resulting Approved RMP will establish consolidated guidance and updated goals, objectives, and management actions for the public lands in the decision area.  The Approved RMP will be comprehensive in nature and will address issues that have been identified through agency, interagency, and public scoping efforts.
- To disclose and assess the direct, indirect, and cumulative impacts of the reasonably foreseeable future actions resulting from the management actions in the Approved RMP and draft alternatives pursuant to the requirements of the National Environmental Policy Act (NEPA), its implementing regulations, and other applicable laws.

#### Need

A revision to the *1985 Grand RMP* is necessary because there have been many shifts in resources, health and demand, as well as modifications to policy since 1985.  Circumstances and policies relevant to the future management of public lands and allocation of resources under the multiple-use and sustained yield mandate are of particular importance.  The BLM completed detailed

BLM_0013666

evaluations of the *1985 Grand RMP* in 2002 and determined the plan needed revision (BLM 2002).

Changes in the laws, policies, and regulations directing public land resource management and new information and resource data need to be considered to better manage the public lands. Visitation to the region has grown. Population demographics have changed, as have public awareness and use of lands within the planning area. Specifically, there is a need to evaluate management prescriptions and resource allocations to address the increases in recreation and visitor use, including scenic quality and open spaces, as well as the increased interest in oil and gas development. Land use plan decisions may be changed only through the amendment or revision process.

## *Moab Planning Area*

The Moab planning area (MPA) is situated in the canyon, plateau, and desert areas of the Colorado Plateau physiographic province (Map 1). It is located in southeastern Utah and includes all of Grand County and the northern third of San Juan County. Geographically, the MPA is bounded by the Book Cliffs to the north, the Utah-Colorado state line to the east, Harts Point and Lisbon Valley to the south, and the Green River to the west. Major waterways within the MPA include the Colorado River, the Dolores River, and the Green River. Elevations within the MPA range from approximately 13,000 feet above mean sea level in the La Sal Mountains to approximately 3,900 feet above mean sea level at Mineral Bottom along the Green River.

The MPA encompasses Arches National Park, Dead Horse Point State Park, the La Sal Mountains of the Manti-La Sal National Forest, and abuts the Uintah/Ouray Indian Reservation. The MPA shares boundaries with lands administered by the BLM Richfield, Vernal, Monticello, Grand Junction, Uncompahgre, Dolores, and Price Field Offices, as well as with Canyonlands National Park.

The MPA comprises approximately 2,756,065 acres of land, of which approximately 1,822,562 acres is public land administered by the BLM (Table 1). In addition, the Moab Field Office also manages approximately 29,680 acres of subsurface mineral estate within the MPA and manages leasable minerals on 141,250 acres under U.S. Forest Service lands on the Manti-La Sal National Forest. The BLM Vernal FO presently manages 33,331 acres of public land at the top of the Book Cliffs along the northern portion of the MPA because access is easier to this area from the Vernal FO. Decisions for these 33,331 acres are contained in the Vernal RMP.

BLM_0013667

*Moab Field Office Record of Decision*

**Table 1.  Surface Ownership/Administration of Lands within the MPA (acres)**

| Ownership/Administration | Grand County | San Juan County | Total |
|---|---|---|---|
| BLM | 1,529,390[*] | 293,172 | 1,822,562[*] |
| Indian Lands | 197,992 | 0 | 197,992 |
| Department of Defense | 1,631 | 0 | 1,631 |
| National Park Service | 76,396 | 0 | 76,396 |
| Private | 101,976 | 56,294 | 158,270 |
| State Trust Lands | 283,613 | 56,608 | 340,221 |
| State Parks, County, City, Wildlife, and Outdoor Recreation Areas | 16,339 | 1,068 | 17,407 |
| USDA Forest Service | 57,298 | 83,942 | 141,240 |
| Acreage of Water | 168 | 178 | 346 |
| **Total** | **2,264,803** | **491,262** | **2,756,065** |

[*]This total includes the 33,331 acres managed by the BLM Vernal FO.

Also contained within the MPA are several communities, diverse terrain, and scenic landscapes that figure prominently in the settlement, history, culture, and recreational enjoyment of southern Utah.  Many occupational pursuits historically associated with this region of the Intermountain West-including farming, ranching, mining, tourism, retail trade, transportation, and construction-are still practiced by residents within the MPA.  Major communities in the MPA are Moab, La Sal, Castle Valley, Thompson, Crescent Junction, and Elgin.  Major transportation routes include Interstate 70 (I-70), U.S. Highway 191, and State Routes 279 (Potash State Scenic Byway), 128 (Colorado River State Scenic Byway), and 313 (Dead Horse Mesa State Scenic Byway).

## B.    OVERVIEW OF ALTERNATIVES

Four alternatives, including a No Action Alternative, were analyzed in detail in the Moab Draft RMP/EIS (USDI-BLM 2007) and in the Proposed RMP/FEIS (USDI-BLM 2008).   The alternatives were developed to address major planning issues and to provide direction for resource programs influencing land management.   All alternatives incorporated the *Utah Standards for Rangeland Health and Guidelines for Grazing Management* developed in conjunction with the Utah Resource Advisory Council (RAC) as base standards for assessing land health.   All management under any of the alternatives would comply with federal laws, rules, regulations, and policies.   Mitigation has been incorporated in the development of all alternatives.

Each alternative emphasized a different combination of resource users, allocations, and restoration measures to address issues and resolve conflicts among users, so program goals were met using a variety of approaches across the alternatives.  Each alternative allowed some support of all resources present in the planning area.   The alternatives differed in how fast the goals would be met, the degree to which they would be met, the emphasis placed on certain programs and activities, and whether active or passive management would occur.  Management scenarios for programs not tied to major planning issues and/or mandated by law often contain minor or no differences in management between alternatives.

BLM_0013668

Alternative A (the No Action Alternative) is the continuation of the *1985 Grand RMP* (as amended) and is provided as a baseline for comparison. Alternative B is considered the environmentally preferable alternative, offering the most intensive, active management for protection of the area's natural and biological values and favors natural systems over commodities development, including protecting all non-WSA lands BLM found to have wilderness characteristics. Alternative D emphasizes commodity development and provides the greatest economic benefit from mineral development, and imposes the fewest restrictions on public land uses. Alternative C, (the Preferred Alternative in the Draft RMP/EIS and largely the baseline for the Proposed Plan in the PRMP/FEIS) best achieves a balance between environmental protection and use of public land resources. General overviews of these alternatives and comparisons among them are provided below.

### *Alternatives Considered in Detail*

**Alternative A** is referred to as the No Action Alternative. This alternative would have continued present management practices defined in the existing land use plan. Direction contained in existing laws, regulations, and policies would have continued to be implemented, sometimes superseding provisions of the *Grand RMP*. Alternative A was not selected because it does not meet the purpose and need for the management of public lands in the MPA. The decisions in the 1985 RMP are largely based on outdated information. Equally important, these decisions do not meet changing uses, trends, and conditions that have occurred since that time. The *1985 Grand RMP* does not address many recent issues, nor does it address the increased levels of controversy some existing resource issues are facing. Special status species, including threatened and endangered species, are not fully addressed within the parameters of Alternative A. Alternative A designates 1,183,660 acres as open to OHV use. This large open acreage within the planning area (which now receives close to 2 million visitors) results in unacceptable resource damage which is contrary to BLM policy. In addition, the No Action Alternative does not designate ACECs, recommend suitable Wild and Scenic River segments, or consider natural areas to protect and preserve their wilderness characteristics.

**Alternative B** emphasizes protection of wildlife habitats, natural resources, ecosystems, and landscapes. Commodity production and human activities would be more constrained than in other alternatives. This alternative provides more opportunities for non-motorized recreation. Compared to all alternatives, Alternative B protects the most land area for sensitive resources, designates all potential Areas of Critical Environmental Concern (ACECs), makes all eligible river segments suitable for inclusion into the National Wild and Scenic River system, and protects, preserves and maintains all non-WSA lands with wilderness characteristics. It is also the most restrictive to OHV use and all surface disturbing activities (including oil and gas leasing). Although Alternative B is the environmentally preferable alternative, there are many uses that are overly restricted by the decisions in this alternative. The rationale for not selecting Alternative B is outlined below for the major management actions.

### *Lands and Realty - Utility Corridors:* Alternative B provides a 100 foot wide utility corridor. The narrow width of this corridor provides maximum protection for resources such as soils, vegetation, and wildlife habitat but limits utility development and expansion. The opportunities and flexibility for the upgrading, addition, and expansion of utility needs are severely restricted by the narrow width of the utility corridor in this alternative.

BLM_0013669

In Alternative B, 671,444 acres are managed as exclusion areas for rights-of-way and 342,931 acres are managed as avoidance areas for rights of way. Managing 55 percent of the planning area with major restrictions on BLM rights-of-way for pipelines, roads and powerlines could severely limit development of and access to oil and gas leases as well as restricting the development of other necessary infrastructure.

***Livestock Grazing:*** Alternative B removes the entire Professor Valley allotment from grazing in order to address a safety issue along Highway 128. Over 300,000 vehicles per year travel this stretch of highway and this volume of traffic is not compatible with open grazing. However, removing the entire allotment to solve the highway safety issue is unnecessarily restrictive.

***Minerals:*** Alternative B manages oil and gas leasing and other surface disturbing activities with the following stipulations: Closed - 671,444 acres; No Surface Occupancy (NSO) - 342,931 acres; Timing Limitations/Controlled Surface Use - 543,751 acres; Open (subject to standard terms and conditions) - 264,344 acres. Alternative B is overly restrictive to oil and gas development and other surface disturbing activities, especially in areas with high development potential for oil and gas. It has the least amount of acreage open to oil and gas leasing. The acreage included in the Closed and No Surface Occupancy stipulation totals 55 percent of the acreage in the planning area and this acreage would be essentially unavailable to oil and gas development and other surface disturbing activities. The timing and controlled surface use stipulations in Alternative B would add another 30 percent of the planning area in which oil and gas development would be prohibited during certain times and subject to specified conditions for construction. Timing and controlled surface use restrictions add to the cost of development. In total, about 85 percent of the planning area would be subject to restrictions above standard terms and conditions for development. The Energy Policy and Conservation Act provides policy directing BLM to minimize impediments to oil and gas leasing and development, and this alternative does not meet these policy objectives as directed by Congress.

Alternative B provides the least amount of mineral royalty revenue ($1,037,540) and the least amount of mineral property taxes ($321,440) because of these restrictions on mineral development.

***Non-WSA Lands with Wilderness Characteristics:*** Alternative B manages 266,471 acres to protect, preserve, and maintain their wilderness characteristics. These acres are closed to mineral leasing and development, rights-of-way, woodcutting, and all other surface disturbing activities. In addition, management of non-WSA lands to preserve their wilderness characteristics would preclude potentially beneficial actions such as fuels and vegetation treatments and other healthy land initiatives, wildlife and range improvements, and the construction of recreation facilities. Many of the areas managed to protect wilderness characteristics in Alternative B have conflicts with high development potential areas for oil and gas. Some of this acreage is also currently leased for oil and gas, making it impractical to protect wilderness characteristics values. The management of all the non-WSA lands with wilderness characteristics in Alternative B is overly restrictive on other resources and uses on the public lands.

***Recreation:*** Alternative B establishes 11 Special Recreation Management Areas (SRMAs) which are managed to highlight non-motorized activities, generally. In addition, 20 Recreation

BLM_0013670

Management Zones (Focus Areas) within these SRMAs emphasize various types of non-motorized recreation. The Moab planning area is known for a multitude of recreational activities, attracting about 2 million visitors a year. These visitors engage in numerous activities not provided for in Alternative B, such as many forms of motorized activity (jeeping, dirt biking, ATVing) and specialized sports such as mountain bike freeriding and BASEjumping. Alternative B does not provide for the full range of recreational activities known to occur in the planning area or for the businesses that depend upon these activities.

***Special Designations – Areas of Critical Environmental Concern:*** Alternative B designates all 14 areas determined to have relevant and important values as Areas of Critical Environmental Concern (ACECs). Management of 9 of these potential ACECs in Alternative B is unnecessary to protect the relevant and important values. For example, the relevant and important value of wildlife in the Cisco White-tailed Prairie Dog potential ACEC is protected in Alternative B by applying a no surface occupancy stipulation for oil and gas leasing and other surface disturbing activities on 117,481 acres of prairie dog habitat. Prairie dogs can be adequately safeguarded by using a protective buffer around identified prairie dog colonies. Another example of overly restrictive management in Alternative B is applying a no surface occupancy stipulation for oil and gas leasing and other surface disturbing activities to protect the scenic values in the Canyon Rims potential ACEC. Scenic values in this area can be sufficiently protected by the application of a controlled surface use stipulation that would mitigate visual impacts. In addition, many ACECs overlap WSAs where the relevant and important values are already protected through Interim Management Policy management. The multiple special designation layering is duplicative and unnecessary where relevant and important values are protected through Interim Management Policy management.

***Special Designations – Wild and Scenic Rivers:*** Alternative B recommends as suitable all 29 river segments found eligible for potential designation as Wild and Scenic Rivers. Many of the river segments found suitable in Alternative B include scenery and river related non-motorized recreation as outstandingly remarkable values (ORVs). Scenery and non-motorized recreational activities, especially non-boating activities, are more amenable for management by other means, such as SRMAs, WSAs and management for non-WSA lands with wilderness characteristics. As a consequence, Alternative B would impose unnecessary restrictions that provide no additional management protections that are not otherwise available through existing or alternative management options.

***Travel Management:*** Alternative B specifies the following OHV designations: 347,424 acres closed; 1,475,074 acres limited to designated routes and 0 acres for open OHV use. Although Alternative B provides for primitive recreation opportunities, it does not meet the needs of all recreational users. There are no open OHV areas provided for cross country motorized travel. In areas where OHV use is limited to designated roads and trails, there are no designated dirt bike routes, no new mountain bike singletrack trails, and new construction of mountain bike routes would not be allowed. In addition, Alternative B does not provide access to many popular recreational destinations and facilities. Therefore, Alternative B does not provide a travel plan that meets the needs of all recreational users. For details about route designations, see the Implementation Decisions, Section D, of the ROD.

BLM_0013671

***Wildlife:*** Alternative B provides the maximum protection for wildlife habitats by considering the most broadly defined habitats for various species. In addition, Alternative B is the most restrictive to uses within these broader habitats. The timing limitations imposed in Alternative B are longer and cover larger acreages than are necessary for sustaining the species.

In summary, Alternative B would not provide adequate or balanced consideration of existing uses such as motorized recreational activities, economic land uses such as rights-of-way, energy corridors, or access to mineral development. Adoption of this alternative could also preclude the consideration of possible future development of renewable energy resources. Alternative B is inconsistent with existing state and local plans; conflicts with the intent of federal legislation including the Energy Policy and Conservation Act and the Energy Policy Act, and it does not give adequate accommodation of local needs, customs and culture.

**Alternative C** was selected as the BLM's Preferred Alternative in the Moab Draft RMP/EIS. This alternative represents the mix and variety of management actions, based on BLM's analysis and judgment, which best resolve the resource issues and management concerns while accommodating laws, regulations and policies pertaining to BLM managment. As a result of public comment, internal review, and cooperating agency coordination on the Draft RMP/EIS, Alternative C was modified to become the Proposed Plan and analyzed in the Final EIS. With minor adjustments and clarification, upon signature of this Record of Decision, it becomes the Approved RMP.

**Alternative D** emphasizes commodity production and human activities. Commodity production and human activities would be less constrained in Alternative D. Alternative D, like Alternative A, designates no areas as ACECs, no suitable Wild and Scenic River segments, and no acres managed as non-WSA lands with wilderness characteristics. Other than Alternative A, Alternative D provides more opportunities for motorized recreation, and is the least restrictive to OHV use and all surface disturbing activities (including oil and gas leasing). Alternative D does not provide sufficient restrictions on uses to protect important natural resources. For these reasons, this alternative did not achieve the balance between resource protection and resource use that provided enhancement of resource use and conditions. The rationale for not selecting Alternative D is outlined below for the major management actions.

***Lands and Realty - Utility Corridors:*** Alternative D provides a 5,280 foot wide utility corridor. The width of this corridor provides maximum flexibility for utility companies but could result in extensive potential impacts to resources such as soils, vegetation, and wildlife habitat as a result of utility development.

In Alternative D, 350,219 acres (all within WSAs) are managed as exclusion areas for rights-of-way and 84,772 acres are managed as avoidance areas for rights of way. The exclusion areas for WSAs are non-discretionary, and the 84,772 acres of avoidance areas are not sufficient to adequately protect the important natural resources that have been identified within the planning area. In particular, the exclusion and avoidance areas in Alternative D are not sufficient to protect the municipal watersheds of Moab and Castle Valley, highly sensitive visual resources, heavily used recreation areas, bighorn sheep migration, lambing, and rutting habitats, and the relevant and important values in potential ACECs.

7

***Livestock Grazing:*** Alternative D allows grazing on 79,833 acres that have been identified as having conflicts with wildlife, special status species, riparian habitat, watershed health and recreation. Alternative D was not selected because, under this alternative, these issues would remain unresolved.

***Minerals:*** Alternative D manages oil and gas leasing and other surface disturbing activities with the following stipulations: Closed – 350,219 acres (all non-discretionary since it is entirely within WSAs); No Surface Occupancy – 84,772 acres; Timing Limitations/Controlled Surface Use -590,442 acres; Open (subject to standard terms and conditions) - 797,031 acres. Alternative D is the least restrictive to oil and gas leasing and other surface disturbing activities. Alternative D has the most acreage open subject to standard terms and conditions. Although the oil and gas restrictions are more conducive to development, they are not sufficient to protect the important resources identified within the planning area. In particular, the NSO acreage in Alternative D is not sufficient to protect the municipal watersheds of Moab and Castle Valley, highly sensitive visual resources, heavily used recreation areas, bighorn sheep migration, lambing, and rutting habitats, and the relevant and important values in potential ACECs.

***Non-WSA Lands with Wilderness Characteristics:*** Alternative D does not manage any non-WSA lands to protect, preserve, and maintain their wilderness characteristics. Therefore, all the wilderness values identified in these areas could be potentially adversely affected.

***Recreation:*** Alternative D establishes six SRMAs which are managed to emphasize motorized activities. The Moab planning area is known for a multitude of recreational activities, attracting about 2 million visitors a year. These visitors engage in numerous non-motorized activities not specifically provided for in Alternative D such as hiking, rafting, horseback riding, backpacking, and mountain biking. The seven recreation focus areas managed under Alternative D do not provide sufficient opportunities for these popular non-motorized activities.

In Alternative D, in many heavily used recreation areas such as Labyrinth Rims/Gemini Bridges, the Dolores River Canyons, Lower Gray Canyon, and the South Moab area there is no SRMA management, and consequently no focus areas. As a result, recreation use and opportunities would not be proactively or adequately managed resulting in continued degradation of the resources in these areas. Alternative D does not provide for the full range of recreational activities known to occur in the planning area or for the businesses that depend upon these activities.

***Special Designations – ACECs:*** Alternative D does not designate any of the 14 areas determined to have relevant and important values as ACECs. The management prescriptions detailed under Alternative D are not sufficient to protect the majority of the relevant and important values of these potential ACECs. For example the relevant and important value of scenery in the Shafer Canyon ACEC is managed as VRM Class III under Alternative D. This visual management class is not sufficient to protect the scenic values of one of the most photographed landscapes in the state of Utah, the lands below Dead Horse Point State Park.

BLM_0013673

***Special Designations – Wild and Scenic Rivers:*** Alternative D recommends none of the eligible river segments as suitable for potential designation as Wild and Scenic Rivers. As a result, Alternative D would not provide adequate protection to many of the eligible river segments. The free-flowing nature of the eligible river segments could be jeopardized and the outstandingly remarkable values identified for many of these segments could be subject to adverse impacts from oil and gas development and other surface disturbing activities.

***Travel Management:*** Alternative D specifies the following OHV designations: 57,351 acres closed, 1,762,083 acres limited to designated routes, and 3,064 acres open to cross country OHV use. The open cross country OHV acreage in the White Wash Sand Dune area extends beyond the unvegetated sand dunes and would result in degradation to soils, vegetation, visual, and wildlife resources. Alternative D designates user-made dirt bike and mountain bike trails in areas with sensitive natural resources. In addition, it designates routes that intrude upon primitive recreational opportunities in both WSAs and other areas used heavily by hikers. While this alternative accommodates many motorized travel opportunities, it conflicts with areas used for primitive recreation and thus does not provide a Travel Plan that meets the needs of all recreational users. For details about route designations, see the Implementation Decisions in Section D of the ROD.

***Wildlife:*** Alternative D provides the least protection for wildlife habitats by considering the smallest acreages as habitat for various species and the minimum in timing limitations. The timing limitations imposed in Alternative D are shorter and cover less acreage than necessary for sustaining the species. For example, 46,319 acres of the 130,419 acres identified by the Utah Division of Wildlife Resources and the BLM as desert bighorn sheep habitat are protected in Alternative D with a minimal timing limitation. Alternative D does not provide sufficient protection for wildlife habitats.

In summary, Alternative D was not selected primarily because it does not best achieve the mix of multiple uses necessary to fully implement the mandate of FLPMA. Adoption of this alternative would result in adverse impacts to wildlife, loss of primitive recreation opportunities, and would have reduced management flexibility by foregoing a number of special designations such as ACECs, and WSRs. In addition, recreational opportunities provided through SRMA-focused management and the management of non-WSA lands with wilderness characteristics would be foregone.

### Alternatives Considered but Eliminated from Analysis

**Livestock Grazing Adjustments Alternative**
During scoping and public comment on the Draft EIS, it was suggested that BLM consider adjustments to livestock numbers, livestock management practices, and the kind of livestock grazed on allotments within the Moab Field Office to benefit wildlife and protect and promote land health including soils, hydrologic cycles and biotic integrity.

BLM policy regarding adjustments to the levels of livestock use authorized is to monitor and inventory range conditions under existing stocking levels and make adjustments to livestock use as indicated by this data to help assure that Rangeland Health Standards (RHS) and resource objectives are met. Regulations at 43 CFR 4130.3 require that the terms and conditions under

BLM_0013674

which livestock are authorized "ensure conformance with the provisions of subpart 4180" (Standards for Rangeland Health) and further that "livestock grazing use shall not exceed the livestock carrying capacity of the allotment." It would be inappropriate and unfeasible to estimate and allocate the available forage, design specific management practices and determine if changes to the kind of livestock are necessary for each allotment in the Moab Field Office or in the area as a whole in the RMP/EIS. Such changes would not be supportable considering the type and amount of data required and the analysis necessary to make such changes.

According to BLM policy, decisions regarding authorized livestock use levels and the terms and conditions under which they are managed are implementation decisions (H-1610-1, Appendix A, page 15). BLM assesses RHS, conducts monitoring and inventories, and evaluates these data on a periodic basis, normally on an allotment and/or watershed basis. After NEPA analysis, necessary changes to livestock management and implementation of Utah's Guidelines for Rangeland Management are implemented through a proposed decision in accordance with 43 CFR 4160. These decisions determine the exact levels of use by livestock in conformance with the LUP and to meet resource objectives and maintain or enhance land health. For these reasons this alternative has been dismissed from further consideration in this land use plan revision.

## No Grazing Alternative

An alternative that proposes to make the entire planning area unavailable for grazing would not meet the purpose and need of this Approved RMP. The National Environmental Policy Act (NEPA) requires that agencies study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. No issues or conflicts have been identified during this land-use planning effort which requires the complete elimination of grazing within the planning area for their resolution. Where appropriate, removal of livestock and adjustments to livestock use have been incorporated into the alternatives on an allotment or area basis to address issues identified in this planning effort. Since the BLM has considerable discretion through its grazing regulations to determine and adjust stocking levels, seasons-of-use, and grazing management activities, and to allocate forage to uses of the public lands in RMPs, the analysis of an alternative to entirely eliminate grazing is not needed.

An alternative that proposes to make the entire planning area unavailable for grazing would also be inconsistent with the intent of the Taylor Grazing Act, which directs the BLM to provide for livestock use of BLM lands, to adequately safeguard grazing privileges, to provide for the orderly use, improvement, and development of the range, and to stabilize the livestock industry dependent upon the public range.

The Federal Land Policy and Management Act (FLPMA) requires that public lands be managed on a "multiple use and sustained yield basis" (FLPMA Sec. 302(a) and Sec. 102(7)) and includes livestock grazing as a principal or major use of public lands. While multiple use does not require that all lands be used for livestock grazing, complete removal of livestock grazing on the entire planning area would be arbitrary and would not meet the principle of multiple use and sustained yield.

BLM_0013675

Livestock grazing is and has been an important use of the public lands in the planning area for many years and is a continuing government program. Although the Council on Environmental Quality (CEQ) guidelines for compliance with NEPA requires that agencies analyze the No Action Alternative in all EISs, for purposes of this NEPA analysis, the No Action Alternative is to continue the status quo, which includes livestock grazing (CEQ Forty Most Asked Questions, Question 3). For this reason and those stated above, a no grazing alternative for the entire planning area has been dismissed from further consideration in this RMP/EIS.

## No Leasing Alternative
During scoping and/or the comment period for the DRMP/EIS, it was suggested that BLM should address a "No Leasing Alternative" because the "No Leasing Alternative" is the equivalent of the "No Action Alternative" that must be analyzed in all EISs.

The "No Leasing Alternative" in an RMP revision is actually an action alternative because where lands have already been leased, the no action for NEPA purposes continues to allow for (honor) valid existing rights. Proposing a "No Leasing Alternative" would require revisiting existing leases and either buying them back from the lessee, or allowing them to expire on their own terms. The first option (buying back), is outside the scope of any RMP. This is a political decision that BLM has no authority to undertake in planning. As a result, BLM does not regularly include a "No Leasing Alternative."

The purpose and need for the land use plan is to identify and resolve potential conflicts between competing resource uses rather than to eliminate a principle use of the public lands in the Moab Field Office area. Leasing of the public lands for oil and gas exploration and production is required by the Mineral Leasing Act of 1920, as amended, and BLM's current policy is to apply the least restrictive management constraints to the principal uses of the public lands necessary to achieve resource goals and objectives. A field office-wide "No Leasing Alternative" would be an unnecessarily restrictive alternative for mineral exploration and production on the public lands.

The National Environmental Policy Act (NEPA Section 102 (E)) requires that agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternatives uses of available resources." No issue or conflicts have been identified during this land use planning effort which requires the complete elimination of oil and gas leasing within the planning area for their resolution. The BLM's Land use Planning Handbook (BLM Manual Rel. 1-1693), Appendix C, item H, requires that land use plans identify areas as open or unavailable for leasing.

Given the potential range of decisions available in the DRMP/DEIS, the analyzed alternatives include no leasing for certain areas; but a field office-wide "No Leasing Alternative" is not necessary in order to resolve issues and protect other resource values and uses.

As mentioned in the no grazing discussion, a "No Leasing Alternative" should not be confused with the "No Action Alternative" for purposes of NEPA compliance. Leasing and No Leasing on the public lands has previously been analyzed in several NEPA documents. In 1973, the Department of Interior published the Final Environmental Impact Statement on the Federal Upland Oil and Gas Leasing Program (USDI, 1973). The proposed action was to lease Federal

BLM_0013676

lands for production of oil and natural gas resources. Alternatives included in the No Action Alternative, which at initiation of the program was "No Leasing." To supplement that EIS, the BLM prepared a series of Environmental Assessments (then titled "Environmental Analysis Records or EARs") including the Grand Resource Area Oil and Gas Program Environmental Analysis Record (EAR), 1988 which addressed oil and gas leasing for the public lands in the Moab Field Office area. Alternatives again included the No Action or "No Leasing" alternative. The outcome was a category system for leasing which categorized all public and Forest Service lands into four groups: 1) open to leasing with standard lease stipulation, 2) special stipulations to address special concerns, 3) no surface occupancy and 4) no leasing. Since completion of the EAR in 1988, oil and gas leasing in the Moab Field Office area has been an ongoing federal program under the established categories.

The Council on Environmental Quality (Section 1502.14(d) of NEPA) requires the alternatives analysis in an EIS to "include the alternative of no action," but explains that there are two distinct interpretations of "no action" that must be considered, depending on the nature of the proposal being evaluated. "The first situation might involve an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed. In these cases "no action" is "no change" from current management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. Therefore, the "no action" alternative may be thought of in terms of continuing with the present course of action until that action is changed." (CEQ Forty Most Asked Questions, Question 3). Therefore, for the MFO DRMP/DEIS, the "No Action Alternative" continues the *status quo* which is to lease under the oil and gas stipulations (formerly categories) established in the Grand Resource Area RMP.

**The Red Rock Heritage Travel Plan Alternative**
An alternative that proposes to remove nearly all travel routes from areas proposed for wilderness by external groups from the Travel Plan that would accompany this RMP would not meet the purpose and need of the Approved RMP. NEPA requires that agencies study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

On September 7, 2004, BLM received a Travel Plan alternative from Red Rock Heritage (RRH). The narrative explains the philosophy and objectives underlying its plan and offers rationale for not designating specific routes for motorized travel within the BLM Travel Plan. RRH emphasizes that the primary objective of its plan is a "fair allocation of recreational opportunities" between motorized and non-motorized uses. RRH specifically states that the best practical alternative for comparing travel plans on this dimension is by "measuring the percentage of the field office area within various distances of the nearest motorized trail." RRH suggests that the appropriate percentage to achieve this goal is approximately 25 percent.

Near the end of the narrative, RRH provides data with such computations at varying distances from motorized routes, contrasting its plan with the BLM-verified Grand County inventory. The Grand County inventory has 2,000 more miles of routes identified than is in the Grand County

BLM_0013677

Travel Plan. BLM adopted the Grand County Travel Plan as its baseline for this land use planning effort, and it is used as the comparison for RRH.

The BLM agrees with RRH that an equitable allocation between non-motorized and motorized recreation is a desirable outcome of the BLM Travel Plan. BLM believes, however, that the RRH plan is not a viable alternative, for several reasons:

The RRH plan's roadless polygons match almost identically with wilderness proposals submitted by Southern Utah Wilderness Alliance (SUWA) and/or other interest groups. To achieve this "roadlessness," RRH has recommended for closure virtually all roads within these proposed wilderness polygons, without specific mention or regard for purpose and need.[1] This results in several hundred miles of County "B" roads being recommended for closure. BLM has determined that these roads, which are constructed, regularly maintained by mechanical means, and serve specific purposes and needs, should be included in all alternatives of the BLM Travel Plan.

RRH includes School & Institutional Trust Lands Administration (SITLA) in all its analyses. BLM cannot mange travel on SITLA lands, and BLM confines its analysis to public lands managed by the MFO.

RRH focuses its analyses on lands south of I-70, which leaves out those portions of the MPA where opportunities for non-motorized recreation are most available. BLM believes this division is arbitrary, and will focus its analyses on the entire MPA.

RRH analyses are done only in comparison to the Grand County route inventory. BLM's analyses will encompass the travel plans carried forward under the alternatives considered in the Draft EIS.

RRH states that any travel plan presented as an alternative to its plan should "achieve the same degree of balance (i.e., 25 percent of the MPA more than a mile from a road, 12 percent more than two miles, etc.)." BLM agrees that an equitable allocation between motorized and non-motorized use is a desirable outcome of the BLM travel plan. However, the BLM cannot justify using an arbitrary percentage to achieve this goal.

RRH uses only a portion of what is commonly referred to as the Recreation Opportunity Spectrum (ROS). RRH limits its ROS analysis to physical separation, but ROS also looks at such facets as topography and social interactions (e.g., likelihood of meeting others) within the broader analysis. The MFO chose not to use ROS as a management tool for decision making in this RMP because the varied topography of the MPA results in ROS analysis, using physical separation only, misrepresenting opportunities for primitive, non-motorized recreation. The RRH Travel Plan mirrors the Red Rock Wilderness proposal, which encompasses over 46 percent of public lands in the MPA. RRH assumes that if currently available motorized routes were eliminated, these areas would be eligible for the protection of their wilderness characteristics.

---

[1] Per BLM Instruction Memorandum 275, Change 1 (9/29/03), BLM is prohibited from establishing new wilderness areas. BLM *may* choose to manage certain areas to protect wilderness characteristics, but is not required to do so.

BLM_0013678

*Moab Field Office Record of Decision*

In its narrative, RRH discusses numerous specific routes, as well as areas, that it recommends that BLM not designate as available for motorized travel. Rather than discuss each route or area individually, several general comments are appropriate:

- Almost all of these routes and areas lie within RRH wilderness proposals. In its comments, there is repeated emphasis on the need to set aside areas for non-motorized recreation and, if necessary, to "create a rare remote and wild area." Current BLM policy prohibits the creation of new wilderness study areas, although it does allow managing areas to protect wilderness characteristics. Several of the areas cited in RRH's proposal were found by BLM in 1999 to lack wilderness character. Many of the specific routes identified by RRH were either described as roads in the BLM 1999 inventory or described as roads at the time of the establishment of the original WSAs. Roads, by definition, are an impact on wilderness characteristics.
- Other resource concerns are usually mentioned (e.g., wildlife, sensitive soils, riparian), but no specific data is presented to support the contention (unstated) that a particular existing route is causing the problem cited.
- Several of the routes specified are county B roads, which are constructed and maintained and receive regular use.

For the reasons outlined above, the RRH Travel Plan in total is eliminated from further analysis.

## C.   RESULTS OF PROTEST PERIOD

The BLM received 21 protest letters with standing during the 30-day protest period provided on the proposed land use plan decisions contained in the Moab Proposed RMP/Final EIS in accordance with 43 CFR Part 1610.5-2. Of these, 13 letters from organizations presented valid protest points. Protesting parties with valid protests included:

> San Juan County Commission; Utah Rivers Council; Western Watersheds Project, Inc.; Colorado 500 Legal Defense Fund and Colorado Off-Highway Vehicle Coalition; The Center for Water Advocacy; Colorado Plateau Archaeological Alliance; ECOS Consulting; Campbell Hansmire Sheep Akbash Dogs; Blue Ribbon Coalition, Inc.; Independent Petroleum Association of Mountain States; Sierra Club Utah Chapter; Gurney & Gurney, LLC; Southern Utah Wilderness Alliance (SUWA), Center for Native Ecosystems, The Wilderness Society (TWS), Grand Canyon Trust,  Red Rock Forests, Sierra Club - Utah Chapter, Great Old Broads for Wilderness, Public Employees for Environmental Responsibility (PEER) - Southwest Chapter.

Protest issues were varied.  Numerous protests centered on whether or not BLM followed the NEPA regulations in completing the land use planning effort.  Issues specifically related to a lack of detailed impact analysis for numerous resources, lack of an adequate range of alternatives, and a lack of opportunities for public involvement.  Other issues identified that the land use plan did not meet FLPMA's multiple use mandate or give priority to the designation of ACECs.  In addition, protests declared that BLM did not adequately analyze effects of planning actions on air quality or appropriately analyze impacts of climate change. Some protestors did not feel that their comments and/or submitted information provided on the Draft RMP/Draft EIS were satisfactorily responded to in the Proposed Plan/Final EIS.

BLM_0013679

Detailed information on protest response can be found on the BLM Washington Office Website at: http://www.blm.gov/wo/st/en/prog/planning/protest_resolution.html

The BLM Director addressed all protests without making significant changes to the Proposed RMP/Final EIS. One protest was granted in part, resulting in modifications to the decisions in the Approved RMP. In addition, minor adjustments and clarifications were made and have been explained in the *Notice of Minor Modification and Clarification* section later in this ROD.

## D.    THE DECISION

The decision is hereby made to approve the attached plan as the Approved Resource Management Plan (RMP) for management of public lands that are administered by the BLM's Moab Field Office (see Approved RMP). The Approved RMP replaces public land decisions in the *Grand Resource Area Resource Management Plan* approved in 1985, and amendments thereto (USDI, BLM 1985).

The Approved RMP was prepared under the authorities of the Federal Land Policy and Management Act (FLPMA) of 1976 in accordance with the BLM planning regulations (43 CFR Par 1600). An Environmental Impact Statement (EIS) was prepared for this RMP in compliance with the National Environmental Policy Act (NEPA) of 1969.

The Approved RMP is nearly identical to the Proposed Plan presented in the Proposed RMP/Final EIS. Management decisions and guidance for public lands under the jurisdiction of the Moab Field Office are presented in the Approved RMP. All decisions covered by the ROD are either land use planning decisions or implementation decisions, and are effective upon signature of the ROD.

The Approved RMP emphasizes an appropriate multiple-use balance of protection and restoration of the natural and cultural resources while providing for resource use, extraction, and enjoyment. The Approved RMP is considered the appropriate plan of action when taking into consideration the social, economic and natural environments. The Approved RMP supports the six broad policy goals for all Federal plans, programs, and policies:

1. Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
2. Assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings;
3. Attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
4. Preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;
5. Achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

BLM_0013680

6.  Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

### *What the Decision/RMP Provides*

Land use plan decisions include:

- Goals
- Objectives (Desired Future Conditions)
- Land Use Allocations
- Management Actions

**Goals** are the broad statements of desired outcomes, and are usually not quantifiable.

**Objectives** are specific desired conditions, usually quantifiable and measurable, and may have timeframes for achievement.

**Land use allocations** specify locations within the planning area that are available or not available for certain uses.  These include decisions such as what lands are available for livestock grazing, mineral material use, oil and gas leasing, and locatable mineral development, what lands many be available for disposal via exchange and/or sale, and what lands are open, closed, or limited to motorized travel (please note that all acreages presented in the Approved RMP are estimations even when presented to the nearest acre).

**Management actions** include those provisions that help in meeting the established goals and objectives and include measures that will be applied to guide day-to-day activities on public lands, including but not limited to stipulations, guidelines, best management practices (BMPs), and design features.

The primary management decisions in the Approved RMP are to:

- Designate five Areas of Critical Environmental Concern (ACECs) and manage them according to the special management prescriptions identified for each area.
- Designate 11 river segments as suitable for consideration as part of the National Wild and Scenic River system and manage such segments to protect the free flowing nature and outstandingly remarkable values.
- Protect, preserve, and maintain the wilderness characteristics on non-WSA lands for 47,761 acres in three areas.
- Manage 11 Wilderness Study Areas as VRM Class I and either closed or limited to designated ways for OHV use.
- Conduct proactive cultural inventories under Section 110 of the National Historic Preservation Act.
- Place BLM-administered lands in fire management categories.
- Designate areas as Limited, Closed, or Open to off-highway vehicle use:
    - Designate 1,481,334 acres as limited to off-highway vehicle use,
    - Designate 339,298 acres as closed to off-highway vehicle use,
    - Designate 1,866 acres in 1 area as open to cross country off-highway vehicle use.

BLM_0013681

- Designate 10 Special Recreation Management Areas (SRMAs) and identify 30 recreation management zones (Focus Areas).
- Establish which lands are available or unavailable to mineral leasing:
  - ◆ Make an estimated 1.45 million acres of the 2.76 million acres of the federal mineral estate available for oil and gas leasing.
  - ◆ Make an estimated 427,273 acres available for oil and gas leasing under standard lease terms; an estimated 806,994 acres are available subject to Controlled Surface Use or Timing Limitation stipulations; and an estimated 217,480 acres are available subject to a No Surface Occupancy (NSO) stipulation.
  - ◆ Make approximately 370,250 acres unavailable for oil and gas leasing.
- Designate 370,250 acres as exclusion areas for rights-of-way and 217,480 acres as avoidance areas for rights-of-way.
- Designate the I-70 and Moab Canyon utility corridors. Combine the two corridors south of Spanish Valley into a single corridor.
- Continue the existing withdrawal of approximately 78,333 acres from locatable mineral entry.
- Establish which areas are available or unavailable to livestock grazing:
  - ◆ Make an estimated 1,690,481 acres available to livestock grazing and an estimated 132,047 acres not available to livestock grazing.
- Protect the Castle Valley (10,321 acres) and Mill Creek-Spanish Valley (9,667 acres) watersheds by precluding surface disturbing activities.
- Minimize watershed damage to sensitive soils in the Mancos Shale (330,142 acres) by applying timing limitations on surface disturbing activities.
- Protect the special status species habitats of the Greater sage-grouse (3,068 acres), Gunnison sage-grouse (175,727 acres), white-tailed prairie dog (117,481 acres), and Gunnison prairie dog (10,700 acres).
- Protect the big game habitats of pronghorn (293,741 acres), desert bighorn sheep (101,897 acres), Rocky Mountain bighorn sheep (194,560 acres), and deer and/or elk (349,955 acres).
- Designate the following VRM management classes:
  - ◆ Designate 358,911 acres as VRM Class I,
  - ◆ Designate 365,566 acres as VRM Class II,
  - ◆ Designate 829,158 acres as VRM Class III,
  - ◆ Designate 268,133 acres as VRM Class IV.
- Prohibit wood harvest and wood gathering on 652,386 acres to protect resource values.

## *What the Decision/RMP Does Not Provide*

The Approved RMP does not contain decisions for the mineral estates of land administered by the BLM Moab Field Office for Forest Service lands located in the planning area, for lands under the jurisdiction of other Federal agencies, or for private or State-owned lands and minerals.

RMP decisions for the surface estate only apply to BLM managed lands, even where these private or state lands are shown on a map included in the RMP.

- The Approved RMP does not affect valid existing rights.

BLM_0013682

- It does not create new wilderness or Wilderness Study Areas (WSAs). Existing WSAs continue to be managed under the *Interim Management Policy for Lands under Wilderness Review*.
- The existing Three Rivers Withdrawal continues under the Approved RMP.
- "Closed routes" are not closed for administratively approved activities.
- The Approved RMP does not adjudicate, analyze, or otherwise determine the validity of claimed rights-of-way. However, the State of Utah's statutory policy is to "use reasonable administrative and legal measures to protect and preserve valid existing rights-of way granted by Congress under R.S. 2477," (Utah Code 63J-4-401(7)(b)). The BLM is committed to working with the State to employ potential options to recognize existing rights-of-way in accordance with Washington Office Instruction Memorandum 2008-174 and 2008-175. BLM recognizes that it would be beneficial to meet and discuss Non-Binding Determinations and Recordable Disclaimer of Interest options which would result in the BLM documenting its position in its official records, after public notification and involvement. BLM will work with the State and counties to set priorities for specific roads. It is BLM's intent to work toward an outcome that is in the interest of the general public and the State of Utah.
- The Approved RMP does not affect terms of existing leases, commercial recreation permits, or other permits issued by the BLM.

In addition, many decisions are not appropriate at this level of planning and are not included in the ROD. Examples of these types of decisions include:

**Statutory requirements:** The Approved RMP will not change the BLM's responsibility to comply with applicable laws, rules, and regulations.

**National policy:** The Approved RMP will not change BLM's obligation to conform with current or future national policy.

**Funding levels and budget allocations:** These are determined annually at the national level and are beyond the control of the Field Office.

## *Implementation Decisions*

While the designation of <u>areas</u> as Open, Closed, or Limited to off-highway vehicle use is a land use planning decision, the proposed <u>route designations</u> for motorized wheeled travel in the planning area (included the Proposed RMP/Final EIS) are implementation decisions.

The route designations described in the *Travel Management* section of the Approved RMP and identified on Map 2, Map 3 and Map 4 are effective upon issuance of this Record of Decision (ROD). All area designations are complete upon signature of the ROD in accordance with 43 CFR 8342.3(b).

Designation of specific vehicle routes for the Approved RMP was undertaken addressing each route's purpose and need and weighing the purpose and need against potential resource conflicts. Routes were not designated in the Approved RMP where it was determined that the routes have no purpose and need or where resource conflicts outweighed the purpose and need. Twenty one interdisciplinary team meetings were held and included representatives of Grand and San Juan

BLM_0013683

Counties, to evaluate all the routes inventoried within the planning area. About 6,199 miles of routes were inventoried as baseline and considered for designation. Each route segment was evaluated for purpose and need and resource conflicts. A total of 2,079 miles of routes were determined to have no purpose and need and are not designated for motorized travel. An additional 427 miles of routes were determined to have resource conflicts that outweighed the purpose and need for the route. Therefore, these 427 miles of routes are not designated for motorized travel. The identified resource conflicts and the miles of routes not designated in the Approved RMP are as follows:  cultural – 16.6 miles; non-motorized recreation – 59.8 miles; riparian – 50.1 miles; soils – 167.5 miles; wilderness values - 80.8 miles; wildlife – 51.8 miles. The route evaluation process resulted in the designation of 3,693 miles of full sized vehicle routes in the Approved RMP. The same process was followed for routes submitted by the public for motorcycles, All Terrain Vehicles (ATVs), and bicycles resulting in the designation of 313 miles of routes for motorcycles (and in some cases ATVs) and 22.5 miles of bicycle singletrack trails in the Approved RMP.

Some routes designated in the Approved RMP are disputed by groups favoring non-motorized recreation. The most controversial route is the 18 mile long Ten Mile Wash route, which is a designated route in the Approved RMP. Although very popular with motorized users, the route poses potential resource conflicts with cultural resources, wildlife, and riparian resources. The area has experienced off-route vehicle travel in the past which has resulted in impacts primarily to riparian and vegetation resources. The BLM has found that the resource impacts can be mitigated by clearly signing and flagging the desired route on the ground. Other controversial routes that are designated in the Approved RMP include the Hey Joe route along the Green River and a route within Hellroaring Canyon. These two routes pose potential resource conflicts with non-motorized recreationists and riparian areas. However, the routes were determined to have an overriding purpose and need in that they are identified in guidebooks or are part of the Moab Jeep Safari route system. External groups also dispute the BLM's designation of routes in areas such as Deadman Point and Mineral Point, citing conflicts with non-motorized recreation and wilderness characteristics. In the Approved RMP, the BLM has chosen not to manage for these values which essentially remove the resource conflicts.

There are routes not designated in the Approved RMP which are disputed by groups favoring motorized recreation. One route crosses over the top of the Gemini Bridges. Motorized travel to and over the natural bridges has resulted in resource damage to vegetation, soils, and visual resources as well as in conflicts with non-motorized users. The BLM has designated the route as non-motorized and non-mechanized in order to mitigate these resource conflicts. Other controversial routes not designated in the Approved RMP include the user-made motorcycle routes on Duma Point and Hidden Canyon Rim. The former route has wildlife resource conflicts with bighorn sheep escape terrain and the latter route has cultural resource conflicts.

Inventoried routes within the 11 existing Wilderness Study Areas (349,824 acres) total 82.5 miles. Out of these miles, 80.8 miles are not designated for motorized travel in the Approved RMP. The remaining 1.7 miles of inventoried routes, consisting of 2 ways in 2 different Wilderness Study Areas (WSAs), are designated in the Approved RMP because they were considered to have an overriding purpose and need. The first route (0.9 miles on the southeast corner of the Behind the Rocks WSA) provides access to two named arches which are popular

*Moab Field Office Record of Decision*

destination points.  The second route (0.8 miles on the west side of the Lost Spring Canyon WSA) is a permitted Jeep Safari route.  These two routes have not resulted in threats to wilderness values and are continually monitored.  They will continue to be monitored to ensure that impairment of wilderness values does not occur.

In the Approved RMP, a total of about 8 miles of routes are designated within areas specified as non-WSA lands with wilderness characteristics.  These routes provide access to destination points which include overlooks and the confluence of Fisher Creek and the Dolores River.  These routes were found not to have a negative effect on the wilderness characteristics in the area because travel on them is very light and the topographical relief found in the area makes them largely unnoticeable.

Many comments were submitted on the Draft RMP/EIS that suggested additions, deletions, and modifications to the proposed route system for the Preferred Alternative.  The Approved RMP identifies that specific designated routes may be modified through subsequent implementation planning and project planning on a case-by-case basis and based on site specific analysis in conformance  with the National Environmental Policy Act.  However, the route designation process entailed the analysis of thousands of route segments covering over 1.8 million acres.  Due to the magnitude of this effort, it is not reasonable to begin immediately making modifications to the route system.  Modifications to the route system in the Approved RMP will not be considered until implementation of the travel portion of the plan has been substantially completed which includes mapping, signing, monitoring, and evaluation. The process for considering route modifications will be detailed in the Implementation Plan being developed for the RMP.

## E.    NOTICE OF MODIFICATIONS AND CLARIFICATIONS

Modifications and clarifications were made to the Approved RMP based on the review and resolution of the protest letters, as well as from internal review by the BLM.  The modifications or clarifications to the decisions are provided below.

### *Modifications*

As a result of protests on the Proposed Plan and continued internal review, the BLM made three modifications to the Proposed Plan.  As described below, these modifications are not considered significant changes.  The Management Decisions section of the attached Approved RMP includes these modifications:

1.   **Greater sage-grouse:** The timing limitation stipulation applied within 2 miles of active leks has been changed from March 1 to May 15 (Proposed Plan) to March 15 to July 15 (Approved RMP.)  The oil and gas leasing stipulation has been changed in the Approved RMP and in Appendix A to reflect this modification.  This change makes the Moab planning decision consistent with UDWR state policy, BLM conservation strategies and plans, and Greater sage-grouse land use plan decisions statewide (see Management Decision SSS-23).

BLM_0013685

2.  **Gunnison sage-grouse:**  In the Approved RMP, all surface disturbing activities will be prohibited within 0.6 mile of Gunnison sage-grouse leks on a year-round basis. This is a change from the Proposed Plan which specified a year-round prohibition of surface disturbing activities within 0.5 miles of a lek and a timing limitation stipulation within 2 miles of a lek.  In the Approved RMP, the 0.5 mile restriction has been changed to 0.6 miles and the 2 mile restriction surrounding a lek has been removed.  The oil and gas leasing stipulation has been changed in the Approved RMP and in Appendix A to reflect this modification. These changes make the Moab planning decisions consistent with BLM conservation strategies and plans and Gunnison sage-grouse land use plan decisions with the Monticello field office (see Management Decision SSS-24).

3.  **Livestock Grazing:**  Livestock grazing will be allowed on a limited basis in the Ten Mile Canyon ACEC downstream from Dripping Springs, with grazing changes subject to future monitoring and conformance with Rangeland Health Standards. This change allows the permittee (who filed a protest on the plan decision) to continue his operations on a limited basis. In addition, the BLM has determined that allowing limited grazing in Ten Mile Canyon will not result in detrimental impacts to the relevant and important values identified in the ACEC.  This change also rectifies the discrepancy between the grazing decision in the "Livestock Grazing" section where Ten Mile Canyon is not listed as unavailable to livestock grazing and the decision for the "Ten Mile Canyon ACEC" where livestock grazing is excluded from Ten Mile Canyon  (see Management Decision ACEC-7).

## *Clarifications*

The following clarifications and minor corrections made to the information included in the Proposed RMP/Final EIS are reflected in the attached Approved RMP.

1.  The motorcycle route map in the Proposed Plan (Map 2-11-E-C) showed Tusher-Bartlett Wash as available for motorcycle use. The motorcycle map in the Approved RMP (Map 3) has been clarified to show that this route is no longer available for any type of motorized or mechanized use ,including motorcycles
2.  The motorcycle route map in the Proposed Plan (Map 2-11-E-C) showed routes that were available to full sized vehicles as well as to motorcycles.  The motorcycle map in the Approved RMP (Map 3) has been clarified to show which of the routes are only available for motorcycles and ATVs (mapping clarification).
3.  The Proposed Plan did not explain the process for providing for parking for dispersed camping.  The Approved RMP has been clarified by specifying that parking for dispersed camping will be considered as part of implementation of the Travel Plan (see Management Decision TRV-6).
4.  The Proposed Plan stated that "Should any Wilderness Study Area (WSA), in part or in whole, be released from wilderness consideration, proposals in the released area would be examined on a case by case basis.  All proposals inconsistent with Interim Management Policy (IMP) would be deferred until completion of requisite plan amendments."  This language is changed in the Approved RMP to state that "All proposals inconsistent with the goals and objectives of the Approved RMP will be deferred until completion of requisite plan

BLM_0013686

amendments." This change was necessary because if an area is released as a WSA, IMP no longer applies (see Management Decision WSA-3).

# F.   MANAGEMENT CONSIDERATIONS IN SELECTING THE APPROVED RMP

The BLM is tasked to provide multiple use management for public lands by the Federal Land Policy and Management Act and numerous other laws and regulations that govern the management of public lands. Due to the diversity of community needs and stakeholders affected by management of BLM lands, there has been both support and opposition to certain components of the Proposed Plan. BLM's objective in choosing Alternative C as the Preferred Alternative, and later using it as the base for the Proposed Plan (with minor modifications selected from the range of alternatives) was to address these diverse needs and concerns in a balanced manner and provide a practical and workable framework for management of public lands. The BLM is ultimately responsible for preparing a plan consistent with its legal mandates, which reflects its collective professional judgment, incorporating the best from competing viewpoints and ideas. The Approved RMP (the Proposed Plan as clarified and modified in consideration of public comments and internal review) provides a balance between those reasonable measures necessary to protect the existing resource values and the continued public need for use of the public lands within the planning area. Both local and national interests were taken into account in arriving at this balance. The practical application of decisions was considered in light of land ownership patterns and the degree of Federal control over the resources in a given area.

Approval of a plan that provides a balance to meet both resource concerns and social and economic concerns in the planning area was a major factor in its selection. The Proposed Plan was selected because it proposed management that will improve and sustain properly functioning resource conditions while considering needs and demands for existing or potential resource commodities and values. In the end, resource use is managed by integrating ecological, economic, and social principles in a manner that safeguards the long term sustainability, diversity, and productivity of the land.

## *All Surface Disturbing Activities*

Stipulations for oil and gas leasing and other surface disturbing activities are referred to throughout the Approved RMP and provide protection to resource values and land uses by establishing authority for delay, site changes, or the denial of operations. The stipulations apply, where appropriate and practical, to all surface-disturbing activities associated with land-use authorizations, permits, and leases issued on BLM lands. As a result, protections for resource values are applied in a consistent manner to all activities. The stipulations are subject to exceptions, modifications, and waivers that are a means of adapting the stipulations to meet changing circumstances. The stipulations in the Approved RMP, along with the exceptions, modifications, and waivers, are provided in Appendix A.

BLM_0013687

## *Air Quality*

The BLM does not have regulatory control over air quality issues, either on public lands or on Tribal or state lands.  The BLM relies on the agency with jurisdiction over air quality to set regulatory standards and criteria to protect the air quality in a particular area.   Once these standards are established, the BLM references them in its permitting documents and ensures that all permitted activities on public lands refer to the appropriate agency's standard.   With this regulatory framework in place the Approved RMP, by necessity, does not make any air quality decisions.  Where the State of Utah standards are inapplicable (e.g. over Tribal lands), the BLM will work with the Environmental Protection Agency (EPA) to ensure that the appropriate federal standards are included or referenced in permitting documents.   Finally, the Approved RMP established goals and objectives for air quality.

The Approved RMP allows the Moab FO to ensure that authorizations granted to use public lands and the BLM's own management programs comply with and support applicable local, state, and federal laws, regulations, and implementation plans pertaining to air quality.

## *Cultural Resources*

The BLM has completed the formal Section 106 consultation with the Utah State Historic Preservation Office (SHPO).   The July 17, 2008, letter from the SHPO concurred with the BLM's recommendation of No Adverse Effect from the decisions in the PRMP/FEIS (see Appendix C).  The Approved RMP will reduce imminent threats to significant cultural resources from natural and human-caused deterioration and reduce potential conflicts with other resources.

Native American organizations were invited to participate at all levels of the planning process for the Moab RMP.  As part of the RMP/EIS scoping process, by letter dated August 1, 2003, the Utah State Director initiated consultation for land-use planning with 34 tribal organizations.  In the letter, the BLM requested information regarding any concerns the tribal organizations might have within the planning areas, specifically requested input concerning the identification and protection of culturally significant areas and resources located on lands managed by the Moab Field Office, and offered the opportunity for meetings. Between November 2003 and May 2004, all 34 tribal organizations were contacted to determine the need for additional or future consultation for the study areas identified in the consultation letter.   Meetings were arranged when requested.

In consulting with tribes or tribal entities, the BLM emphasized the importance of identifying historic properties having cultural significance to tribes (commonly referred to as Traditional Cultural Properties (TCPs).   The BLM held meetings with 12 tribal organizations between December 2003 and May 2004.   The BLM was represented at most of these meetings by the Field Office manager and archaeologist.   During these meetings, tribal organizations were invited to be a cooperating agency in the development of the land-use plan; however, none of the tribal organizations requested to be a cooperating agency.

Several tribal organizations requested that an additional meeting be held after the DRMP/EIS alternatives were prepared.  The Moab FO mailed a draft copy of the range of alternatives to 12

BLM_0013688

tribal organizations in December 2005. In 2006 and 2007, the Moab FO manager and archaeologist participated in a second round of meetings with the five tribes who so requested. At these meetings, the draft RMP/EIS alternatives were discussed with special emphasis on cultural resource issues. A copy of the Moab Draft RMP/EIS was mailed in August 2007 to 12 tribal organizations. In April 2008, the BLM extended an invitation to meet with tribal organizations regarding the PRMP/FEIS. Two tribes accepted this invitation.

## *Lands and Realty*

The Approved RMP allows a 2,640 foot wide utility corridor which provides ample opportunities and flexibility for the upgrading, addition, and expansion of utility needs. The Approved RMP provides a viable energy corridor for oil, gas, and hydrogen pipelines as well as electricity transmission and distribution facilities as specified by the West-Wide Energy Corridor Programmatic EIS and the Energy Policy Act of 2005. At the same time, the decision still affords protection for natural resources by limiting surface disturbance to within the 2,640 foot corridor width.

The Approved RMP designates 370,250 acres as exclusion areas (of which about 350,000 acres are within WSAs, and thus is a non-discretionary decision) and 217,480 acres as avoidance areas for rights-of-way. These exclusion and avoidance areas are in lands with sensitive natural resources such as wilderness values, municipal watersheds, relict vegetation, high quality scenery, and crucial desert bighorn sheep habitat. These areas include Fisher Towers, Mill Creek, Beaver Creek, Mary Jane Canyon, Castle Valley, Shafer Basin, Long Canyon, and lands along the Green, Colorado, and Dolores Rivers. The designation of exclusion and avoidance areas in the Approved RMP provides a balance between granting rights-of-way and protecting important natural resources.

According to Section 102 (a) of FLPMA, all public lands will be retained in Federal ownership unless it is determined that disposal of a particular parcel will serve the national interest. Furthermore, Section 203 (a) of FLPMA provides for sale of public lands if one of the following criteria is met: (1) the tract is difficult and uneconomic to manage as part of the public lands and is not suitable for management by another Federal agency; (2) such tract was acquired for a specific purpose and the tract is no longer required for that or any other Federal purpose; or (3) disposal of such tract will serve important public objectives, including but not limited to, expansion of communities and economic development that cannot be achieved prudently or feasibly on land other than public land. The public lands in the Moab Field Office that have been identified for consideration for disposal by sale in the Approved RMP meet one or more of these criteria.

A prerequisite for entering into the exchange of Federal for non-Federal lands is the BLM determination that such an exchange is in the public interest. To make this determination, general criteria have been developed in the Approved RMP for both disposal of Federal lands and acquisition of non-Federal lands. Every exchange proposal during the life of the Approved RMP will meet the criteria for disposal and acquisition. The value(s) of acquisition must outweigh the value(s) of disposal for the proposal to be in the public interest and an exchange to be considered.

BLM_0013689

### *Livestock Grazing*

The Approved RMP responds to issues related to managing for healthy rangelands and riparian and upland vegetation while still providing for livestock grazing and fish and wildlife habitat by making most of the planning area available for livestock grazing, as long as Standards for Rangeland Health continue to be met. This resulted in a limited set of decisions that were considered in the land use planning process.

According to BLM policy, decisions about season of use, stocking densities, forage allocation, and utilization are made using Standards for Rangeland Health and Guidelines for Grazing Management during the grazing permit renewal process. These are implementation-level decisions based on monitoring and inventory of range conditions and evaluation of such data. Changes in specific livestock management practices are, therefore, minimal in the Approved RMP.

The decisions made in the Approved RMP are limited to whether an allotment is available or not available for grazing during the life of the plan. The Approved RMP makes 1,690,481 acres (93 percent) available for grazing and 132,047 acres (7 percent) not available for grazing. The Approved RMP includes making livestock grazing unavailable in the Cottonwood, Diamond, Bogart, and Pear Park allotments based on prior written agreements with the Utah Division of Wildlife Resources (UDWR). Other allotments such as Between the Creeks, North Sand Flats, South Sand Flats, Ida Gulch, and Mill Creek are unavailable to livestock grazing because of conflicts with recreation use, municipal watersheds, threatened and endangered plants, riparian, wildlife, and cultural resources.

The Approved RMP also specifies building a fence along the south side of Highway 128, removing the conflict with vehicles and cattle. The Approved RMP addresses the safety issue while still allowing the majority of the Professor Valley allotment to be grazed. The Approved RMP eliminates the grazing of domestic sheep in desert bighorn sheep habitat as specified by BLM policy.

The Approved RMP provides the best balance in allowing grazing to occur while protecting important natural and cultural resources.

### *Minerals*

The Approved RMP specifies restrictions for permitted activities to resolve concerns regarding the impacts of these uses. These conditions apply not only to oil and gas leasing, but also apply, where appropriate, to all other surface disturbing activities associated with land-use authorizations, permits, and leases, including other mineral resources. For example, rights-of-way exclusion and avoidance areas are consistent with areas closed to oil and gas leasing and with a no surface occupancy stipulation, respectively.

The Approved RMP manages oil and gas leasing and other surface disturbing activities with the following stipulations: Closed - 370,250 acres; No Surface Occupancy – 217,480 acres; Timing Limitations/Controlled Surface Use Stipulations - 806,994 acres. The Moab planning area is

BLM_0013690

entirely within two sedimentary basins (Paradox and Uinta Basins) recognized nationally for oil and gas resources. As specified in the Energy Policy Conservation Act and BLM policy, the oil and gas leasing stipulations in the Approved RMP are the least restrictive necessary to protect sensitive resource values while allowing for development.

Of the 370,250 acres that are closed to oil and gas leasing, only 25,306 acres are outside Wilderness or Wilderness Study Areas and therefore constitute a planning decision. Wilderness and Wilderness Study Areas are closed to oil and gas leasing by law and constitute a non-discretionary decision. The 25,306 acres are closed to oil and gas leasing by a discretionary decision because it is not reasonable to apply a no surface occupancy (NSO) stipulation. These discretionarily closed areas involve blocks of land so large that oil and gas resources are physically inaccessible by current directional drilling technology from outside the boundaries of the NSO areas.

Sensitive resources protected by the application of a no surface occupancy stipulation in the Approved RMP include the major river corridors of the Colorado Plateau (Green, Colorado, and Dolores Rivers), high use recreation areas such as the Slickrock Trail, popular campgrounds such as Horsethief and Ken's Lake, municipal watersheds (Castle Valley and Mill Creek/Spanish Valley), non-WSA lands managed to protect, preserve and maintain their wilderness characteristics (Beaver Creek, Fisher Towers, and Mary Jane Canyon), Areas of Critical Environmental Concern (Behind the Rocks, Mill Creek, Ten Mile, Highway 279/Shafer Basin/Long Canyon, and a portion of Cottonwood/Diamond Watershed), and crucial desert bighorn habitats, including migration corridors. These NSO areas (217,480 acres) include many of the landscapes for which Moab is nationally and internationally renowned. They are the landscape jewels of the Moab planning area. A NSO stipulation is indeed the least restrictive approach necessary to protect the important resources within these iconic areas from surface disturbing activities.

Those resources that can be protected by timing limitations or controlled surface use stipulations in the Approved RMP include wildlife habitat, sensitive soils, and visual resources. Timing limitation and controlled surface use stipulations are also applied in the Approved RMP to protect special status species. The stipulations for special status species were developed in cooperation with the U.S. Fish and Wildlife Service and are non-discretionary based on law and policy.

The timing limitation stipulations in the Approved RMP are applied to crucial big game wildlife habitats identified by the BLM and the Utah Division of Wildlife Resources. The areas with timing limitations are open to oil and gas leasing and other surface disturbing activities but would be closed during identified timeframes that are important to the health of the species such as during winter and birthing periods, unless a waiver, exception, or modification to the stipulation applies.

Timing limitation stipulations have also been applied in the Approved RMP to protect sensitive soils from surface disturbing activities during times when these soils are susceptible to erosion. Surface disturbing activities in sensitive soils during wet periods can cause deep rutting and runoff problems which lead to increased erosion. Surface disturbing activities in sensitive soils

BLM_0013691

during the windy, dry spring months can result in windblown dust that has caused blackouts along Interstate 70, an obvious safety problem. In addition, a controlled surface use stipulation is applied in the Approved RMP to protect fragile soils on steep slopes from erosion. This stipulation prohibits construction on slopes greater than 30% unless an engineering plan can demonstrate that erosion on these slopes would be prevented.

A controlled surface use stipulation in the Approved RMP is applied to areas managed with VRM Class II objectives. This stipulation protects high quality visual resources, including scenic driving corridors such as Utah Scenic Byways 128, 313, and 279, the rims of Canyon Rims SRMA, Wilson Arch, the Kane Creek Corridor, and the Gemini Bridges area. A controlled surface use stipulation is also applied to the lands surrounding Arches National Park to protect viewsheds from key observation points within the Park. The controlled surface use stipulation for VRM II areas requires that the level of change to the landscape be low. Activities can be seen, but should not attract the attention of the casual observer.

The timing limitation and controlled surface use stipulations in the Approved RMP allow for oil and gas development and other surface disturbing activities while providing protection for wildlife habitats, sensitive soils, and high quality visual resources. These stipulations are the least restrictive necessary for the protection of these resources.

The Approved RMP provides opportunity for a substantial amount of mineral revenue based on estimated oil and gas production while protecting the most important resources within the planning area. Additionally, the stipulations imposed in the Approved RMP would not unreasonably interfere with the potential development of mineral resources. High development potential areas for mineral resources are generally not located in areas with sensitive resources which are managed as NSO or closed. Therefore, the Approved RMP provides a balance between protection of resources and commodity use and development.

### *Non-WSA Lands with Wilderness Characteristics*

Impacts on uses as a result of discretionary focused management, such as the protection, preservation and maintenance of non-WSA lands with wilderness characteristics, were disclosed in the Proposed RMP/Final EIS, and considered in conjunction with impacts to resource values. There are 47,761 acres within 3 areas (Beaver Creek, Fisher Towers, and Mary Jane Canyon) that are carried forward in the Approved RMP for protection of their wilderness characteristics. They are managed primarily with a no surface occupancy stipulation for oil and gas leasing and all other surface disturbing activities, and as an avoidance area for rights-of-way.

Beaver Creek, Fisher Towers, and Mary Jane Canyon are the largest stand-alone blocks of undeveloped land of all the areas inventoried for wilderness characteristics in the planning area. Mary Jane Canyon and Fisher Towers are contiguous (separated only by the road) and thus create an even larger expanse. The size of all three areas makes them more suitable for effectively protecting, preserving, and maintaining their wilderness characteristics. In addition, managing these areas for wilderness characteristics is compatible with other management actions in the Approved RMP. Beaver Creek is entirely within the Dolores River Canyons SRMA, an *undeveloped* SRMA, which is managed for primitive recreation opportunities. Fisher Towers

BLM_0013692

and Mary Jane Canyon are within the Richardson Amphitheater/Castle Rock Hiking, Climbing and Equestrian Focus Area (part of the Colorado Riverway SRMA) which is managed to enhance non-motorized opportunities. Thus, all three areas are managed for primitive recreation opportunities which coincide with managing these areas for wilderness characteristics. The management of the Beaver Creek area for wilderness characteristics is in conformance with the Grand County Master Plan.

Beaver Creek, Fisher Towers, and Mary Jane Canyon have only moderate development potential for oil and gas. There are no existing oil and gas leases or other known valid existing rights, such as mining claims, within these three areas. Furthermore, these three areas do not conflict with the development potential for any of the other mineral resources identified within the planning area.

There were 218,724 acres found during the inventory reviews to have wilderness characteristics which were not selected for management of those characteristics in the Approved RMP. The reasons for this decision were varied and complex. Many of the inventoried areas were small, dissected, had irregular land ownership patterns, or qualified only because they were attached to another management unit.

Out of these 218,724 acres, about 138,483 acres were found to have other important resources or resource uses that would conflict with protection, preservation, or maintenance of the wilderness characteristics. Many of the areas have high oil and gas development potential and over one-third of this acreage is already leased. In other areas, ongoing and future range improvements and vegetative treatments conflict with the protection of wilderness values.

Of the remaining 80,241 acres, wilderness characteristics are protected by a no surface occupancy stipulation applied to manage for an array of other resource values. For example, some of this acreage (Shafer, Gooseneck, Behind the Rocks, and Mill Creek Canyon) is managed as Areas of Critical Environmental Concern. An ACEC designation is considered the most appropriate mechanism for management because it recognizes and gives priority to the relevant and important values identified in these areas. Other acreage (out of the 80,241 acres) is managed to recognize the riverine and scenic values as well as the recreational uses along the major river corridors. In addition, the important water resources associated with municipal watersheds are recognized and given priority for management.

The Approved RMP provides the best balance in allowing for uses to occur while providing for protection of non-WSA lands with wilderness characteristics.

In future references, lands managed in the Approved RMP as non-WSA lands with wilderness characteristics will be referred to as BLM natural areas. This change does not represent a new designation or a new decision. Rather, BLM wants to recognize these discretionary decisions with a better, simpler reference. Wilderness Areas and Wilderness Study Areas are formal designations that are managed in a prescribed manner. To avoid confusing these official designations with discretionary agency decisions, BLM has chosen a new reference to distinguish between formal designations (e.g., Wilderness Areas) and a discretionary management category (BLM natural areas). According to the Approved RMP, BLM natural

BLM_0013693

areas will be managed to protect, preserve, and maintain values of primitive recreation, the appearance of naturalness and solitude.

## *Recreation*

The Approved RMP responds to recreation issues by providing Special Recreation Management Areas and Recreation Management Zones (Focus Areas) to manage for a variety of recreational experiences for approximately 2 million yearly visitors to the Moab planning area. These visitors come from all over the nation, as well as the world, to specifically enjoy the attractions in the planning area. These visitors engage in an array of non-motorized and motorized recreation activities, many of which conflict with each other. Recreational activities include camping, scenic driving, enjoying natural and cultural features, hiking, backpacking, canyoneering, mountain biking, horseback riding, hunting, rock climbing, BASEjumping, boating (rafting, canoeing, and kayaking), four-wheel driving, rockcrawling, ATVing, and dirt biking, among others.

The Moab economy is heavily dependent upon recreation-based businesses. In 2006, travelers spent about $265 million in Moab, generating $9 million in tax revenue (67 percent of the total tax revenue). Over 58% of the employment in Moab is directly related to tourism and recreation, with 5,055 jobs in that sector (State of Utah, Governor's Office of Economic Development). Commercial outfitters operating on BLM lands generated $6,270,676 in revenues in 2006. These outfitters provide services for many activities including rafting, hiking, climbing, four wheel driving, ATVing, photography tours, horseback riding, ballooning, hunting, canyoneering, and mountain biking. Maintaining a wide variety of recreational opportunities is important to the Moab economy and the businesses that are dependent upon them.

The ten Special Recreation Management Areas (SRMA) designated in the Approved RMP are in areas where high recreation use is currently occurring. Each SRMA allows for a set of distinct recreation uses as well as a specific recreation management strategy. In addition, each SRMA provides management direction for recreation uses as well as protection of the cultural and natural resources found in the SRMA. For example, the Colorado Riverway SRMA manages the half million visitors to this area by designating campgrounds, hiking trails and routes, and by applying recreation rules such as limiting campfires. The Two Rivers SRMA manages the popular Westwater Canyon float trip by imposing launch limits. The Utah Rims SRMA is established near the Utah-Colorado border to manage the motorized activities emanating from the rapidly growing Grand Junction area. The SRMAs designated in the Approved RMP enable the BLM to more actively manage for the intensity, diversity, and compatibility of recreation uses while protecting the resources that visitors come to enjoy.

The 30 Focus Areas (Recreation Management Zones or RMZs) designated in the Approved RMP are necessary to successfully manage the diversity of recreational activities that occur in the Moab planning area. Focus Areas are established to emphasize a specific recreation use and provide a specific set of recreation opportunities and facilities. For example, the Klondike Bluffs Mountain Bike Focus Area is designated in the Approved RMP as an area for new mountain bike trail development and continued mountain bike use. As another example, the Dee Pass Motorized Trail Focus Area is established for motorcycle and ATV use. All competitive

BLM_0013694

*Moab Field Office Record of Decision*

motorized events would be directed to this area. By emphasizing and managing for specific recreation activities in these Focus Areas, recreation conflicts are reduced. Focus Areas set visitor expectations for a specific type of recreation experience, thereby reducing potential conflict. Those who choose to hike in a motorized Focus Area should not be surprised by the amount of motorized activity. Focus Areas in the Approved RMP provide opportunities for the widest range of recreational activities and attendant business opportunities.

The Approved RMP provides the greatest range of recreational opportunities while still reducing user conflicts, providing recreation business opportunities, and protecting resources.

### *Soil and Water*

See Minerals portion of this section.

### *Special Designations:  Areas of Critical Environmental Concern*

Concerns about specific resource values are addressed throughout the Approved RMP, and eliminated the need to designate some areas as Areas of Critical Environmental Concern (ACECs) since other resource decisions in the Approved RMP provide adequate protection. In many instances, WSAs overlay many of the potential ACECs and management under the *Interim Management Policy for Lands under Wilderness Review* (IMP) more than adequately protects the relevant and important values.  If Congress releases the WSAs from wilderness consideration, the Approved RMP states that all activities inconsistent with the goals and objectives of the Approved RMP would be deferred until a plan amendment is completed.  Any plan amendment would have to provide protection to the relevant and important values identified.

Since management decisions contained in the Approved RMP protect many of the relevant and important values in the planning area, only five areas were designated as ACECs in the Approved RMP, where additional special management is necessary.  These five areas were designated because ACEC management is the most appropriate for protecting the identified relevant and important values in these five areas.

Table 2 provides a list of the potential ACECs that were not designated in the Approved RMP, their relevance and importance values, and planning decisions carried forward that protect those values.

**Table 2. Management Protection Provided to Potential ACECs Not Designated in the Approved RMP**

| Potential ACEC Not Designated in Approved RMP | Relevant and Important Value(s) | Management Protection Provided in Approved RMP |
|---|---|---|
| Bookcliffs Wildlife Area (304,252 acres) | Wildlife<br><br>Natural systems | In the Approved RMP, 250,078 acres of the Bookcliffs potential ACEC is within five Wilderness Study Areas and are managed under IMP.  This acreage is managed as closed to oil and gas leasing and all other surface disturbing activities.  This acreage is also closed to travel. |

BLM_0013695

*Moab Field Office Record of Decision*

| | Cultural resources | These two actions protect the relevant and important values.<br><br>In the Approved RMP, the 54,174 acres outside the WSA are managed with a timing limitation stipulation to protect the wildlife values. All motorized travel is on designated routes only. Riparian areas are managed to preclude surface disturbing activities which would protect natural systems. Cultural resources are protected by law, policy, and procedure.<br><br>Thus, the relevant and important values would continue to be protected. |
|---|---|---|
| Canyon Rims (23,400 acres) | Scenery | In the Approved RMP, the Canyon Rims potential ACEC is managed as VRM Class II to protect scenic values. Oil and gas leasing and other surface disturbing activities are managed with a controlled surface use stipulation to protect scenic values. Canyon Rims is managed as a Special Recreation Management Area with special emphasis given to these scenic values. Motorized activity is allowed only on designated routes to protect scenic values.<br><br>Thus, the relevant and important values would continue to be protected. |
| Cisco White Tailed Prairie Dog Complex (117,481 acres) | Wildlife | In the Approved RMP, the Cisco White Tailed Prairie Dog Complex potential ACEC would be managed with a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities within 660 feet of active prairie dog colonies. No permanent above ground facilities would be allowed within the 660 foot buffer. In addition, motorized activity is only allowed on designated routes, protecting wildlife values.<br><br>Using Standards for Rangeland Health and Guidelines for Grazing Management, the grazing season of use would be managed to allow for adequate vegetative seed production to support prairie dog habitat.<br><br>Thus, the relevant and important value would continue to be protected. |
| Colorado River Corridor (50,483 acres) | Scenery<br><br>Cultural Resources | In the Approved RMP, the Colorado River Corridor potential ACEC is managed as the Colorado Riverway SRMA. Recreation activities are restricted (including limiting camping to campgrounds) in order to avoid unacceptable impacts to the relevant and important values. |

31

|  |  |  |
|---|---|---|
|  | Wildlife<br><br>Fish<br><br>Rare Plants | Motorized activity is restricted to designated routes, also protecting these values. The Colorado River Corridor is managed as VRM Classes I and II to protect the unique scenic values of the area.<br><br>In the Approved RMP, the area is managed as either closed or with a no surface occupancy stipulation for oil and gas leasing and all other surface disturbing activities. This prohibition of surface disturbing activities protects scenery, cultural resources, rare plants, wildlife, and fish. In addition, the Endangered Species Act will protect the endangered fish.<br><br>Thus, the relevant and important values would continue to be protected. |
| Labyrinth Canyon (8,528 acres) | Scenery<br><br>Fish | In the Approved RMP, Labyrinth Canyon potential ACEC is managed as the Labyrinth Canyon Focus Area within the Labyrinth Rims/Gemini Bridges SRMA to control recreation impacts to relevant and important values. Labyrinth Canyon is managed with a no surface occupancy stipulation for oil and gas leasing and all other surface disturbing activities, protecting scenic values. The area is managed as VRM Class II and motorized activity will be allowed only on designated routes.<br><br>The Endangered Species Act will protect the endangered fish.<br><br>Thus, the relevant and important values would continue to be protected. |
| Upper Courthouse (11,529 acres) | Historic, paleontological and cultural resources<br><br>Natural systems<br><br>Rare plants | In the Approved RMP, Upper Courthouse potential ACEC will be managed within the Labyrinth Rims/Gemini Bridges SRMA and as the Mill Canyon/Upper Courthouse Mountain Biking Focus Area. Restrictions on recreation protect the relevant and important values. Motorized and mechanized travel is allowed on designated routes only, protecting these values. Mesa top relict plant communities are managed with a no surface occupancy stipulation for oil and gas leasing and other surface disturbing activities which protect rare plants.<br><br>Thus, the relevant and important values would continue to be protected. |
| Westwater Canyon (5,069 acres) | Scenery<br><br>Fish | In the Approved RMP, Westwater Canyon potential ACEC is within a WSA and is managed under IMP. The area is managed as VRM Class I to protect scenic values. |

BLM_0013697

| | | |
|---|---|---|
| | | The area is closed to oil and gas leasing and all other surface disturbing activities, and is closed to motorized travel. These decisions protect the relevant and important values.<br><br>In addition, Westwater Canyon will be managed as part of the Two Rivers SRMA which will minimize recreation impacts on the scenic values.<br><br>The Endangered Species Act will protect the endangered fish.<br><br>Thus, the relevant and important values would continue to be protected. |
| White Wash (2,988 acres) | Natural systems | In the Approved RMP, White Wash potential ACEC is managed as part of the Labyrinth Rims/Gemini Bridges SRMA. About 1,866 acres are managed as open to cross country travel with management prescriptions in place to protect the relevant and important values of the dunefield cottonwood trees and water sources.  These resources would be fenced and closed to motorized travel.  Camping would be limited to designated sites in the White Wash area.<br><br>In the 1,122 acres outside the dunes, vehicles are limited to designated roads. These actions protect the relevant and important values.<br><br>Thus, the relevant and important values would continue to be protected. |
| Wilson Arch (3,700 acres) | Scenery | In the Approved RMP, Wilson Arch potential ACEC is managed as VRM Class II to protect its scenic values. Motorized activity is allowed on designated routes only, also protecting scenic values.  The area is managed with a controlled surface use stipulation on oil and gas leasing and other surface disturbing activities to protect scenic values.<br><br>Thus, the relevant and important values would continue to be protected. |

In addition, the Mill Creek Canyon ACEC and the Behind the Rocks ACEC designated in the Approved RMP do not include the acreage within the Mill Creek Canyon WSA and the Behind the Rocks WSA, respectively.  The acreage within these two WSAs is managed under the *Interim Policy for Lands under Wilderness Review*, protecting the relevant and important values found in that part of the Potential ACECs.

BLM_0013698

Five ACECs are designated in the Approved Plan:  Behind the Rocks (5,201 acres), Cottonwood-Diamond Watershed (34,027 acres), Highway 279/Shafer Basin/Long Canyon (13,500 acres), Mill Creek Canyon (3,721 acres) and Ten Mile Wash (4,980 acres).  These five ACECs designated in the Approved Plan are in areas where special management was required to protect the relevant and important values of the potential ACEC.  Management actions are outlined in the Approved RMP to protect these values.  For example, management actions are tailored for the Ten Mile Wash ACEC to protect the relevant and important values of natural systems, wildlife, cultural resources, and natural hazards.  Management actions include a no surface occupancy stipulation for oil and gas leasing and other surface disturbing activities, restricting grazing, no competitive events, no woodcutting, restrictions on camping and the establishment of a speed limit.  These special management actions are necessary to protect the relevant and important values.  The establishment of Ten Mile as an ACEC gives priority to the management of the resource values identified in this area.

### *Special Designations:  Wild and Scenic Rivers*

There are 11 eligible river segments that are carried forward as suitable for inclusion into the National Wild and Scenic River system in the Approved RMP to protect the free-flowing nature and outstandingly remarkable values associated with the river segments. These 11 segments are located along the Green, Colorado, and Dolores Rivers and include well-known sections such as Westwater Canyon, the Colorado "Daily", Labyrinth Canyon, and Desolation Canyon.

All river segments found suitable in the Approved RMP are those in which recreation is a key outstandingly remarkable value (ORV), particularly dependent on the free-flowing nature of these river segments.  The unique nature of this recreation ORV centers around regionally, nationally, and internationally significant private and commercial river running opportunities. These river running opportunities constitute premier whitewater and flatwater trips which are highly sought after. For example, the BLM receives over 3,000 applications per year for the 450 available trip permits on the Desolation Canyon segment of the Green River.  River running activities are an important component of the local economies in the planning area.  River running companies are highly capitalized and valuable businesses that depend on these suitable river segments. In addition, private river runners add substantial revenue to the local economy.  The imposition of dams along these segments would eliminate these important river running opportunities and the commercial enterprises which depend upon them.

BLM made tentative river segment classifications in 2003 as part of the Wild and Scenic River eligibility study conducted as part of the Moab planning process.  River segments were tentatively classified as "wild," "scenic" or "recreational."  Alternatives in the Draft and Proposed RMP provided a range of potential classifications for analysis purposes. The proposed plan chose to change the original classification to meet resource objectives.  This was carried forward into the Approved Plan.

In the Approved Plan, segments of the Colorado and Green Rivers that are in WSAs are classified as "wild", while all other segments are classified as either "scenic" or "recreational." BLM Manual 8351.33C states that "Alternatives may be formulated for any combination of

designations and classifications.   Reasons for considering alternative tentative classifications include resolving conflicts with other management objectives, continuity of management prescriptions, or other management considerations."  In some cases, the tentative classification of a river segment was changed in the Approved RMP in order to accommodate other management considerations and to provide more management flexibility as necessary.

Colorado River segment 3 (from Cisco to the Dolores River confluence) was resegmented and the downstream portion of that segment (3b) was inventoried with a tentative classification of "scenic" and is designated as "recreational" in the Approved RMP. This segment contains large amounts of private lands. The development of these lands could require rights of way from the BLM for roads, power, and other infrastructure. A "recreational" classification would provide more flexibility to consider granting these rights-of-way. Colorado River segment 6 (from state land to the Canyonlands National Park boundary) was inventoried with a tentative classification of "wild" and designated as "scenic" in the Approved RMP because the heavily travelled road paralleling the river may require maintenance and to allow for the continuation of the heavy filming activity which occurs in the area.

Dolores River segment 1 (from the state line to Fisher Creek) was inventoried with a tentative classification of "scenic" and is designated as "recreational" in the Approved RMP to accommodate the recreational facilities (including a boat ramp) along the river as specified in the decisions for the Dolores River Canyons SRMA. In addition, the agricultural lease lands in this area will require extensive vegetative treatments to remove knapweed and to restore these lands to health.   A "recreational" classification allows for a full range of agricultural and livestock uses, including land treatments.

Dolores River segment 2 (from Fisher Creek to Bridge Canyon) was inventoried with a tentative classification of "wild" and is designated as "scenic" in the Approved RMP to accommodate the University of Utah Entrada Field Station and Education Center located along the Dolores River. The Field Station is entirely surrounded by public lands. The University plans extensive research projects and courses utilizing these adjacent public lands.  Research projects include vegetative treatments, range studies, wildlife studies, hydrology, geology, mechanical engineering, water use policies, and other long term research projects. The "wild" classification would not allow the flexibility for these intended uses.

Dolores River segment 3 (from Bridge Canyon to the confluence) was inventoried with a tentative classification of "scenic" and is designated as "recreational" in the Approved RMP. This "recreational" classification allows for a full range of agricultural and livestock uses, including the extensive control of exotic plants at Roberts Bottom.

Green River segment 4(a) (from Mile 97 to Canyonlands National Park boundary) is classified as "scenic" in the Approved RMP.  Segment 4(a) includes the portion of segment 4 from Mile 97 to Mile 91, and all of segment 5 (Ruby Ranch at Mile 91 to Hey Joe) and segment 6 (Hey Joe to Canyonlands National Park).  Segment 5 was inventoried with a tentative classification of "wild" and is designated as "scenic" (as part of segment 4(a)) in the Approved RMP.  This portion contains a section of SITLA land as well as some private land. Management of this segment as

BLM_0013700

"wild" could preclude access and water developments on SITLA and private lands. In addition, the "wild" classification would remove opportunities for motorized travel.

Eligible river segments that were not carried forward as suitable in the Approved RMP are protected by various other management decisions. Many of these river segments include scenery and non-motorized recreation as Outstandingly Remarkable Values (ORVs). Scenery and non-motorized recreational activities, especially non-boating activities, are more amenable for management by other means such as WSAs, non-WSA lands with wilderness characteristics, and SRMAs. For example, Cottonwood Canyon, Mill Creek, Negro Bill Canyon, and Rattlesnake Canyon are within WSAs and are closed to surface disturbing activities. Thompson Canyon, Beaver Creek, Onion Creek, and Professor Creek are within non-WSA lands managed to preserve, protect, and maintain their wilderness characteristics in the Approved RMP and are managed with a no surface occupancy stipulation for oil and gas leasing and other surface disturbing activities. The ORVs along these eligible segments are protected by other management actions in the Approved RMP.

In addition, BLM looks forward to working with the State of Utah, local and tribal governments, and other federal agencies during the next phase of the Wild and Scenic River process. BLM will work cooperatively with the above entities in a statewide study to reach consensus regarding recommendations to Congress for the inclusion of rivers into the NWSR system. BLM will also continue to work with affected local, state, federal, and tribal partners to identify in-stream flows necessary to meet critical resource needs, including values related to the subject segments, so that they may be identified for inclusion into future recommendations to Congress.

### *Travel Management*

The Approved RMP responds to the issue of OHV use by designating all BLM lands as open, closed, or limited. Out of about 1.82 million acres within the planning area, 1,866 acres are open to cross-country travel, 339,298 acres are closed to motorized travel, and 1,481,334 acres are limited to designated routes.

The open area (1,866 acres) in the Approved RMP encompasses the White Wash Sand Dunes which is currently a popular area for cross-country OHV use. The sand dunes were found to be acceptable for cross country OHV use because they lack soil and vegetation development and the shifting sands quickly eliminate the visible impacts of such use. In addition, the Approved RMP specifies that the important resources within the sand dunes consisting of cottonwood trees and water sources (springs) would be protected by closures and fencing. The Approved RMP significantly reduces the acreage currently open to cross-country travel within the planning area. However, the Approved RMP still provides some opportunities for Open OHV use to accommodate that activity.

The closed area (339,298 acres) in the Approved RMP applies to the existing Wilderness Study Areas (WSAs). Almost all of the inventoried routes within the WSAs would be closed to motorized travel. As a result, the opportunities for solitude and primitive recreation would be enhanced and the potential for impairment of wilderness values by motorized activities is eliminated.

BLM_0013701

The limited area (1,481,334 acres) in the Approved RMP pertains to the majority of the planning area. The Approved RMP responds to travel management and access issues by providing a network of transportation routes within the limited designation that tie into roads administered by the counties, National Park Service, the Forest Service, and the State of Utah. The process for designating routes within the limited designation is detailed in Section D under Implementation Decisions. The limited designation in the Approved RMP replaces the large amount of area currently available for cross country travel within the planning area. As a result, the Approved RMP provides a substantial amount of protection to natural (vegetation, soils, scenery, riparian, and wildlife) and cultural resources by eliminating cross-country travel which can be detrimental to these resources. The Approved RMP allows for motorized access and opportunities within the limited designation while still providing protection for sensitive resources and non-motorized recreation users.

The areas designated in the Approved RMP as open, limited, and closed provide the best balance between OHV opportunities and access and protection of sensitive resources.

### *Vegetation (including Riparian, Noxious, and Invasive Plants)*

The Approved RMP gives priority to riparian vegetation by making some riparian areas unavailable for livestock grazing. In addition, surface disturbing activities are precluded within 100 meters of riparian areas. The Approved RMP provides specifications for Desired Future Conditions for vegetation resources to ensure ecological diversity, stability, and sustainability. Due to the persistent drought conditions in this region over the past several years, criteria for restricting activities during drought conditions are provided in the Approved RMP. The Approved RMP reiterates the BLM's policy to control noxious weed species and to prevent the infestation and spread of invasive species. The Approved RMP emphasizes the reestablishment and restoration of vegetated areas during project activities using native seed mixes wherever possible. The requirements of related Executive Orders, regulation, and policy would be met in the Approved RMP regarding noxious weeds and invasive plants.

### *Visual Resource Management*

The Moab Field Office is home to some of the most iconic scenery on the Colorado Plateau. These settings attract up to 2 million visitors a year who come to Moab to enjoy the scenery. These scenic settings are also the reason that filming companies choose the Moab area for still advertisement, commercials and motion picture filming. Scenic attractions in the Moab planning area include such well-known locations as Fisher Towers, Castle Rock, Wilson Arch, Looking Glass Rock, Determination Towers, Gemini Bridges, Fossil Point, and the entire Colorado River corridor. The Approved RMP provides protection for these and other scenic attractions, thus safeguarding the visitation and tourism industry which is the backbone of the Moab economy.

### *Wildlife*

The Approved RMP responds to issues regarding wildlife by providing restrictions to uses in crucial wildlife habitat areas. BLM uses the State UDWR crucial habitat boundaries to apply these restrictions because UDWR is the entity with jurisdiction and expertise over wildlife in

BLM_0013702

Utah. The crucial habitat identified in the Approved RMP for deer, elk, bighorn sheep and other big game species is the result of the State's combination of two previous UDWR categories of habitat – "critical" and "high value." The State uses the term "crucial" habitat as a trigger to initiate a close examination of proposed projects in order to determine the appropriate management response. To protect desert bighorn lambing and rutting grounds and to protect bighorn migration corridors, a no surface occupancy stipulation was imposed on about 101,897 acres. Furthermore, timing limitation stipulations have been placed on about 349,955 acres of deer and/or elk winter habitat, and on about 293,741 acres of pronghorn fawning habitat. BLM and the State recognize that some of the land within the defined area, depending on season and timing, may not support the respective species for various reasons. The BLM will coordinate with the State on issues related to crucial habitat to determine stipulations necessary to address impacts to the subject wildlife species. Following consultation, the BLM may grant an exception, modification, or waiver. BLM and the State will execute a protocol to implement this provision. Additional details about management restrictions to benefit wildlife are found in the "Minerals" portion of this section.

In addition, protective management measures have been developed in coordination with the U.S. Fish and Wildlife Service and the UDWR to protect all the special status species within the planning area, including those that are threatened or endangered.

Informal Section 7 consultation, as directed by the Endangered Species Act, subsequent regulations, and BLM policy, was conducted with the U.S. Fish and Wildlife Service (USFWS) throughout the development of the RMP. The BLM submitted a Biological Assessment (BA) and requested initiation of formal consultation on July 18, 2008. The USFWS responded with a Biological Opinion (BO) on October 16, 2008 completing the formal Section 7 consultation process. The BO concurred with the determinations made in the BA regarding potential effects on listed, threatened, and endangered species located within the Moab planning area. The entire BO is attached to this Record of Decision (ROD) (as a CD-ROM). The BA and the BO contain committed conservation measures that have been incorporated into the ROD and that will be a part of the implementation of the Approved RMP. These are committed measures that will be included as part of the proposed action of any subsequent site specific activities authorized by the RMP. Should any changes be made to any of the conservation measures identified in the BA and BO, Section 7 consultation with USFWS will be re-initiated.

The BLM, in coordination with the USFWS developed the majority of these committed conservation measures as part of a programmatic Section 7 consultation that was completed in 2007. Some modifications and additional measures were developed during the consultation process specific to the Moab RMP. All site specific level actions potentially impacting listed species or their critical habitat will implement these measures. Incorporating these measures will ensure that the BLM is in compliance with the Endangered Species Act and will meet necessary management and recovery goals. If the BLM determines that any deviations, modifications, or waivers of these conservation measures may be necessary, BLM will re-initiate of Section 7 consultation with USFWS. BLM notes that the Biological Opinion (Appendix B and CD-ROM) provides a number of recommended conservation measures that are beyond the scope of this Approved RMP, but may be considered in tiered consultation with this programmatic opinion when project-specific analysis is conducted in the future. These recommended conservation measures are optional measures, additional to the committed mitigation contained in the

BLM_0013703

Approved RMP, that BLM will consider at the appropriate time and as deemed necessary to manage and recover listed and candidate plant and animal species occurring within the planning area.

The Approved RMP also incorporates resource protection measures and recommended Best Management Practices to maintain, protect, and enhance habitats that will support a diversity of non-listed sensitive fish, wildlife, and plant species. The intent of these measures is to achieve and maintain suitable habitat for desired population levels and distribution within the area covered by the RMP. The BLM will continue to work cooperatively with UDWR (which has jurisdiction over sensitive wildlife species) to maintain and establish crucial habitat management strategies as reflected in the Approved RMP. These species are managed as necessary to protect the species and their habitat from loss in accordance with the Federal Land Policy and Management Act (FLPMA), the BLM management guidelines and policy contained in BLM's Manual 6840.

The Approved RMP provides the least restrictive stipulations necessary to protect wildlife species while still allowing for resource uses.

## G.    CONSISTENCY AND CONSULTATION REVIEW

Consistency of the Approved RMP with other local, State, Tribal and federal plans and policies (which sometimes conflict amongst themselves) was also considered as a factor in selection of the Approved RMP. The Approved RMP is consistent with plans and policies of the Department of the Interior and Bureau of Land Management, other federal agencies, state government, and local governments to the extent that the guidance and local plans are also consistent with the purposes, policies, and programs of federal law and regulation applicable to public lands. Chapter 5 of the Proposed RMP/Final EIS provides a full discussion of consistency with all involved entities.

### *Governor's Consistency*

The Governor's Office did not identify any inconsistencies concerning state or local plans, policies, and programs following the 60-day Governor's Consistency Review of the Proposed RMP/Final EIS (initiated August 1, 2008, in accordance with planning regulations at 43 CFR Part 1610.3- 2(e), and concluded on September 30, 2008).

### *NHPA Section 106 Consultation*

A letter was received from the Utah SHPO on July 17, 2008, after reviewing BLM's decisions in the Proposed RMP/Final EIS. In the letter, the SHPO concluded that the decisions in the Proposed RMP will have no adverse affects on historic properties. Because there has been no appreciable change between the Proposed RMP and the Approved RMP, no further SHPO consultation is required and all decisions in the Approved RMP will have no adverse affects on historic properties. The letter of concurrence from the SHPO is found in Appendix C.

### *Native American Consultation*

Consultation with Native Americans on the RMP has been ongoing since 2003. A thorough discussion of Native American Consultation in included under "Cultural Resources" in Section F of this ROD.

BLM_0013704

### *Section 7 Consultation under the Endangered Species Act*

Informal Section 7 consultation, as directed by the Endangered Species Act (ESA), subsequent regulations, and BLM policy, was conducted with the U.S. Fish and Wildlife Service (USFWS) throughout the development of the RMP. Formal consultation with the USFWS was initiated on July 18, 2008. As required by Section 7(a) of the ESA, the Moab Field Office prepared a Biological Assessment (BA) to evaluate the listed species in its planning area. The BA analyzed the potential impacts on the endangered and threatened species which could result from implementing management actions authorized under the proposed land use plan for the Field Office. The Moab Field Office determined that some of the proposed actions "may affect, and are likely to adversely affect" the listed species and "may affect" designated critical habitat. The USFWS prepared a Biological Opinion (BO), in which they concurred with BLM's determination on October 16, 2008, and is included in Appendix B. The USFWS further determined that implementation of the RMP, including committed mitigation measures, would not jeopardize the existence of any of the listed species.

## H.   MITIGATION MEASURES

Measures to avoid or minimize environmental harm were built into the Approved RMP where practicable. Many of the standard management provisions will minimize impacts when applied to activities proposed in the planning area. The *Utah Standards and Guidelines for Rangeland Health* (see Appendix D) will be used as the base standards to assess the health of BLM lands in the planning area. Best management practices (BMPs) will be used (when applicable) for a number of uses including livestock grazing, forest activities, mining, oil and gas development, and other surface disturbing activities (see Appendix A). Additional measures to mitigate environmental impacts may also be developed during subsequent NEPA analysis at the activity level planning and project stages. All practicable means to avoid or minimize environmental harm are incorporated into the Approved Plan.

## I.   PLAN MONITORING AND EVALUATION

Monitoring is the repeated measurement of activities and conditions over time. Evaluation is a process in which the plan and monitoring data are reviewed to see if management goals and objectives are being met and if management direction is sound. Monitoring data gathered over time is examined and used to draw conclusions on whether management actions are meeting stated objectives, and if not, why. Conclusions are then used to make recommendations on whether to continue current management or change management practices to meet objectives.

The two types of monitoring that are tied to the planning process include implementation and effectiveness monitoring. Land use plan monitoring is the process of (1) tracking the implementation of land use planning decisions and (2) collecting and assessing data/information necessary to evaluate the effectiveness of land use planning decisions. The two types of monitoring are described below.

**Implementation Monitoring:** Implementation monitoring is the most basic type of monitoring and simply determines whether planned activities have been implemented in the manner

BLM_0013705

prescribed by the plan. Some agencies call this compliance monitoring. This monitoring documents BLM's progress toward full implementation of the land use plan decision. There are no specific thresholds or indicators required for this type of monitoring.

**Effectiveness Monitoring:**   Effectiveness monitoring is aimed at determining if the implementation of activities has achieved the desired goals and objectives. Effectiveness monitoring asks the question:   Was the specified activity successful in achieving the objective? This requires knowledge of the objectives established in the RMP as well as indicators that can be measured. Indicators are established by technical specialists to address specific questions, and thus avoid collection of unnecessary data. Success is measured against the benchmark of achieving desired future conditions established by the plan.

Regulations at 43 CFR 1610.4-9 require that the proposed plan establish intervals and standards, as appropriate, for monitoring and evaluation of the plan, based on the sensitivity of the resources involved. Progress in meeting the plan objectives and adherence to the management framework established by the plan is reviewed periodically.   CEQ regulations implementing NEPA state that agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases (40 CFR 1505.2(c)).   To meet these requirements, the BLM will review the plan on a regular schedule in order to provide consistent tracking of accomplishments and provide information that can be used to develop annual budget requests to continue implementation.

Land use plan evaluations will be used by BLM to determine if the decisions in the RMP, supported by the accompanying NEPA analysis, are still valid.   Evaluation of the RMP will generally be conducted every five years per BLM policy, unless unexpected actions, new information, or significant changes in other plans, legislation, or litigation triggers an evaluation earlier than the five year interval. Land use plan evaluations determine if decisions are being implemented, whether mitigation measures are satisfactory, whether there are significant changes in the related plans of other entities, whether there is new data of significance to the plan, and if decisions should be changed through amendment or revision.   Evaluations will follow the protocols established by the BLM Land Use Planning Handbook H-1601-1 in effect at the time the evaluation is initiated.   Specific monitoring and evaluation needs are identified by resource/uses throughout the Approved RMP.

See MFO monitoring plan in Appendix E.

## J.   PUBLIC INVOLVEMENT

One of BLM's primary objectives during development of the Moab RMP was to understand the views of various publics by providing opportunities for meaningful participation in the resource management planning process. To achieve this, the BLM published a Notice of Intent to Plan in the *Federal Register* on June 4, 2003.   The formal scoping period begin on that date, and ended on January 31, 2004.   News releases, website information, a mailing list, and planning bulletins informed the public of the scoping period. Six public scoping meetings and two socio-economic workshops were held during this period.   In addition, a mobile "Comment Cruiser" elicited scoping comments from the public at various locations.   A Final Scoping Summary was issued

BLM_0013706

summarizing the comments obtained through the scoping process. The scoping comments raised issues that were taken into consideration in preparation of the alternatives developed for the Draft RMP/EIS.

On August 24, 2007, the BLM and the Environmental Protection Agency published a Notice of Availability in the *Federal Register* which marked the beginning of the formal 90-day public comment period on the Draft RMP/Environmental Impact Statement (EIS). The public was informed of the availability of the Draft RMP/EIS via news releases, the planning website, and the RMP mailing list. The Draft RMP/EIS as well as all the background documents and reports were available on the Moab RMP planning website. Both electronic and hard copies of the Draft RMP/EIS were made available to the public. Five open houses were held during the 90 day comment period. The Moab Field Office received over 33,000 comment submissions on the Draft RMP/EIS. These comments were considered in the preparation of the Proposed RMP/Final EIS.

On August 1, 2008, the BLM and the Environmental Protection Agency published of Notice of Availability in the *Federal Register* which announced the publication of the Proposed RMP/Final EIS. The public was informed of the availability of the Proposed RMP/FEIS via news releases, the planning website and the RMP mailing list. The Proposed RMP/FEIS as well as all the background documents were available on the Moab RMP planning website. A 30 day protest period commenced on August 1, 2008 and ended on September 2, 2008. In addition, a 60-day Governor's Consistency Review period began when the protest period commenced.

In-depth information on these efforts is included in both the Moab Draft RMP/EIS and Moab Proposed RMP/Final EIS in Chapter 5, *Consultation and Coordination.*

The BLM will continue to actively seek the views of the public using techniques such as news releases and web-sites (including the Electronic Notification Bulletin Board) to ask for participation and inform the public of new and ongoing project proposals, site-specific planning, and opportunities and timeframes for comment. The BLM will also continue to coordinate, both formally and informally, with the numerous state, federal, tribal, and local agencies and officials interested and involved in the management of public lands in Grand and San Juan Counties.

# K.  AVAILABILITY OF THE PLAN

Copies of the Record of Decision and the Moab Field Office Approved Resource Management Plan are available by request from the following locations: BLM Moab Field Office, 82 East Dogwood, Moab, Utah 84532 (435)-259-2100, and on the Moab Field Office website at www.blm.gov/ut/st/en/fo/moab.html.

BLM_0013707

BLM_0013708

**APPROVAL**

In consideration of the foregoing, I approve the Record of Decision for the Moab Field Office Resource Management Plan.

OCT 3 1 2008

C. Stephen Allred
Assistant Secretary – Land and Minerals Management
Department of the Interior

Date

BLM_0013709

# APPROVED RESOURCE MANAGEMENT PLAN

## A.    INTRODUCTION

This Approved RMP replaces the Grand Resource Area Resource Management Plan approved in 1985 and is now the base land use plan for public lands administered by the BLM's Moab Field Office. The Approved RMP adopts the management described in Proposed Plan and the Management Common to All Alternatives section presented in the Proposed Moab RMP/Final EIS (USDI-BLM 2008), with adjustments as described in the *Notice of Modifications and Clarifications Made to the Approved RMP* section of the ROD.

## B.    CONSIDERATION OF OTHER PLANS AND POLICIES

The BLM has considered the following plans and policies in formulating the Approved RMP:

### *State of Utah*

- Dead Horse Point State Park Resource Management Plan
- Plans of the Utah School and Institutional Trust Lands Administration (SITLA)
- Regional plans of the Utah Department of Transportation (UDOT)
- State of Utah plans relating to water management, water quality, nonpoint source pollution, watershed management, and air quality
- Utah's State Comprehensive Outdoor Recreation Plan (SCORP)

### *County Land Use Plans*

- San Juan County, Utah: San Juan County Master Plan (1996)
- Grand County, Utah: Grand County General Plan Update (2004)

### *Other Federal Plans*

- Canyonlands National Park Natural Resource Management Plan
- Canyonlands National Park general management plans (NPS 1974, 2003, 2006)
- Canyonlands National Park backcountry management plan (1984, 1995)
- Land and Resource Management Plan, Manti–La Sal National Forest (USDA [USFS] 1986)
- General Management Plan and Development Concept Plan: Arches National Park (NPS 1989)
- RMPs for the BLM Vernal, Grand Junction, Uncompahgre, Dolores, and Price field offices (BLM 1985b, 1985c, 1985d, 1987, 1989a, 1993a)
- McInnis Canyons National Conservation Area Management Plan (BLM 2003a)
- Remediation of the Moab Uranium Tailings, Grand and San Juan Counties, Utah EIS (DOE 2005);

BLM_0013710

*Moab Field Office Approved Resource Management Plan*

### *Endangered Species Recovery Plans*

- Endangered species recovery plans are prepared by the U.S. Fish and Wildlife Service to promote the recovery of threatened and endangered species
- Colorado Pikeminnow Recovery Plan (USFWS 1978, 1990, 1991, 2002a)
- Humpback Chub Recovery Plan (USFWS 1979, 1990a, 2002b)
- Northern States Bald Eagle Recovery Plan (USFWS 1983)
- Bonytail Chub Recovery Plan (USFWS 1984, 1990b, 2002c)
- Recovery Implementation Program EA for the Endangered Fish Species in the Upper Colorado River Basin (USFWS 1987)
- Black-footed Ferret Recovery Plan (USFWS 1988)
- Mexican Spotted Owl Recovery Plan (USFWS 1995)
- Razorback Sucker Recovery Plan (USFWS 1999, 2002d)
- Final Recovery Plan for the Southwestern Willow Flycatcher (USFWS 2002e)

### *Energy Policy and Conservation Act (EPCA)*

Under this directive, the Assistant Secretary of the Interior for Land and Minerals Management delivered to Congress an inventory of U.S. oil and gas resources in five western basins, as well as the extent and nature of any restrictions or impediments to their development. This report was prepared at the request of Congress under the provisions of the 2000 Energy Policy and Conservation Act (EPCA).

In April 2003, the BLM specified four EPCA integration principles, as follows:

- Environmental protection and energy production are both desirable and necessary objectives of sound land management practices and are not to be considered mutually exclusive priorities.
- The BLM must ensure appropriate accessibility to energy resources necessary for the nation's security, while recognizing that special and unique non-energy resources can be preserved.
- Sound planning will weigh the relative resource values, consistent with the multiple use and sustained yield mandates required by FLPMA.
- All resource impacts, including those associated with energy development and transmission, will be mitigated to prevent unnecessary or undue degradation.

### *Energy Policy Act of 2005 and the Western Energy Corridor Programmatic EIS (PEIS)*

Section 368 of the Energy Policy Act of 2005 (designation of West-wide energy corridors) is being implemented via the current development of an interagency, Programmatic EIS (PEIS).

### *Memorandum of Understanding (MOU) Between the U.S. Department of the Interior; the Bureau of Land Management (BLM); and the U.S Department of Agriculture, U.S. Forest Service concerning Oil and Gas Leasing Operations*

The purpose of this Memorandum of Understanding (MOU) is to establish joint BLM and Forest Service policies and procedures for managing oil and gas leasing and operational activities pursuant to oil and gas leases on National Forest Service (NFS) lands, consistent with applicable

BLM_0013711

law and policy. The MOU was signed in 2006 for the purpose of efficient, effective compliance with statutory and regulatory requirements. The MOU establishes the roles of the Forest Service and the BLM in processing Applications for Permits to Drill and review of subsequent operations.

## *Other BLM Plans and Policies*

Other BLM plans and policies considered in formulating the Approved RMP are listed below:

- Grazing Amendment to RMP (Livestock conversions) (1988); (changed by the Approved RMP)
- Grand Resource Area RMP Oil and Gas Supplemental Environmental Assessment (1988); (changed by the Approved RMP)
- Bighorn Sheep Amendment (1990, 1993b)
- Colorado Riverway Recreation Area Management Plan (1992a)
- Sand Flats Recreation Management Plan (1994a)
- Livestock Grazing Use Adjustments (1996)
- Ken's Lake Recreation Plan (2007)
- Utah's Colorado Riverway Special Management Recreation Area Amendment (2001a)
- Mill Creek Canyon Management Plan (2001b)
- Canyon Rims Recreation Area Management Plan (2003b)
- Three Rivers Withdrawal (2004b)
- Cameo Cliffs Special Recreation Management Area Plan (2005b)
- Normal Year Fire Rehabilitation and Stabilization Plan (2006a)
- Moab District Fire Management Plan (2006b)
- Interim Policy for Lands Under Wilderness Review, (IMP; USDI-BLM 1995)
- Utah BLM Statewide Wilderness EIS (1990)
- Wild and Scenic River Study Colorado and Lower Dolores Rivers EIS (NPS 1979)
- Lisbon Valley Copper Project EIS (BLM 1997)
- Questar Williams and Kern River Pipeline Project EIS (BLM 2001c)
- Vegetation Treatment on BLM Lands in Thirteen Western States (1991a)
- Final Vegetation Treatments on Bureau of Land Management Lands in 17 Western States
- Programmatic Environmental Impact Statement and Associated Record of Decision, USDI, Bureau of Land Management, 2007 (FES 07-21)

## *Habitat Management Plans (HMP)*

A Habitat Management Plan (HMP) provides guidance for the management of a defined habitat for a target wildlife species, protecting and improving habitat for that species and for other species utilizing the habitat. These plans are usually written in coordination with the Utah Division of Wildlife Resources and those pertaining to the Moab planning area are as follows:

- Cisco Desert HMP (1985a)
- Hatch Point HMP (1985b)
- Dolores Triangle HMP (1985c)
- The Potash-Confluence HMP (1986)

BLM_0013712

In the event there are inconsistencies or discrepancies between previously Approved RMPs and this Approved RMP, the decisions contained in the Approved RMP will be followed. The Moab Field Office will continue to tier to statewide, national, and programmatic EISs and other NEPA and planning documents, as well as consider and apply Best Management Practices or other management protocols contained in other planning documents after appropriate site-specific analysis.

All future resource authorizations and actions will conform to, or be consistent with the decisions contained in this Approved RMP. All existing operations and activities authorized under permits, contracts, cooperative agreements or other authorizations will be modified, as necessary, to conform with this plan within a reasonable timeframe. However, this plan does not repeal valid existing rights on public lands. A valid existing right is a claim or authorization that takes precedence over the decisions developed in this plan. If such authorizations come up for review and can be modified, they will also be brought into conformance with the plan.

While the Final EIS for the Moab RMP constitutes compliance with NEPA for the broad-scale decisions made in this Approved RMP, the BLM will continue to prepare Environmental Assessments (EAs) and Environmental Impacts Statements (EISs) where appropriate as part of implementation level planning and decision-making.

## C. PLAN IMPLEMENTATION

Plan implementation is a continuous and active process. Decisions presented in the *Management Decisions* section of this Approved RMP are of three types: Immediate, One-Time, and Long-Term.

**_Immediate Decisions:_**  These decisions go into effect upon signature of the Record of Decision and Approved RMP. These include decisions such as the allocation of lands as available or unavailable for oil and gas leasing, ACEC designations, and OHV designations. Immediate decisions require no additional analysis and provide the framework for any subsequent activities proposed in the planning area. Proposals for actions such as oil and gas leasing, land adjustments, and other allocation-based actions will be reviewed against these decisions/allocations to deter-mine if the proposal is in conformance with the plan.

**_One-Time Decisions:_**  These types of decisions include those that are implemented after additional site-specific analysis is completed. Examples are implementation of the recommendations to withdraw lands from locatable mineral entry or development of a habitat management plan or a special recreation management area plan. One-time decisions usually require additional analysis and are prioritized as part of the BLM budget process.

**_Long-Term Guidance/Life of Plan Direction:_**  These decisions include the goals, objectives, and management actions established by the plan that are applied during site-specific analyses and activity planning. This guidance is applied whether the action is initiated by the BLM or by a non-BLM project proponent. Long- term guidance and plan direction is incorporated into BLM management as implementation level planning and project analysis occurs (for example, as a result of the watershed assessment process or receipt of a land use application).

BLM_0013713

Priorities for implementation of "one-time" RMP decisions will be based on several criteria, including:

- Current and projected resource needs and demands
- National and Statewide BLM management direction and program emphasis and
- Funding

### *General Implementation Schedule of "One-Time" Actions*

Decisions in this plan will be implemented over a period of years depending on budget and staff availability. After issuing the ROD/Approved Plan, BLM will prepare an implementation plan that establishes tentative timeframes for competition of "one-time" actions identified in the Approved RMP. Most of these actions require additional analysis and site specific activity planning. This schedule does not include the decisions which are effective immediately upon approval of the plan (usually allocations), or the actions which describe the ongoing management that will be incorporated and applied as site-specific proposals are analyzed on an ongoing basis. This schedule will assist BLM managers and staff in preparing budget requests and in scheduling work. However, the proposed schedule must be considered tentative and will be affected by future funding, changing program priorities, non-discretionary workloads, and cooperation by partners and external publics. Periodic review of the plan will provide consistent tracking of accomplishments and provide information that can be used to develop annual budget requests to continue implementation.

### *Maintaining the Plan*

Land use plan decisions and supporting information can be maintained to reflect minor changes in data, but maintenance is limited to refining, documenting, and/or clarifying previously approved decisions. Some examples of maintenance actions include:

- Correcting minor data, typographical, mapping, or tabular data errors
- Refining baseline information as a result of new inventory data (e.g., changing the boundary of an archaeological district, refining the known habitat of special status species or big game crucial winter ranges, or adjusting the boundary of a fire management unit based on updated fire regime condition class inventory, fire occurrence, monitoring data, and/or demographic changes)
- Applying an existing oil and gas lease stipulation to a new area prior to the lease sale based on new inventory data (e.g., apply an existing protective stipulation for sage-grouse to a newly discovered sage-grouse lek.)

The BLM expects that new information gathered from field inventories and assessments, research, other agency studies, and other sources will update baseline data and/or support new management techniques, best management practices, and scientific principles. Where monitoring shows land use plan actions or best management practices are not effective, minor modifications or adjustments may occur without amendment or revision of the plan as long as assumptions and

BLM_0013714

impacts disclosed in the analysis remain valid and broad-scale goals and objectives are not changed.

Plan maintenance will be documented in supporting records. Plan maintenance does not require formal public involvement, interagency coordination, or the NEPA analysis required for making new land use plan decisions.

### *Changing the Plan*

The Approved RMP may be changed, should conditions warrant, through a plan amendment or plan revision process. A plan amendment may become necessary if major changes are needed or to consider a proposal or action that is not in conformance with the plan. The results of monitoring, evaluation of new data, or policy changes and changing public needs might also provide the impetus for an amendment. Generally, an amendment is issue-specific. If several areas of the plan become outdated or otherwise obsolete, a plan revision may become necessary. Plan amendments and revisions are accomplished with public input and the appropriate level of environmental analysis conducted according to the Council on Environmental Policy procedure for implementation of the National Environmental Policy Act.

## D.   PLAN EVALUATION

Evaluation is a process in which the plan and monitoring data are reviewed to see if management goals and objectives are being met and if management direction is sound. Land use plan evaluations determine if decisions are being implemented, whether mitigation measures are satisfactory, whether there are significant changes in the related plans of other entities, whether there is new data of significance to the plan, and if decisions should be changed through amendment or revision. Monitoring data gathered over time is examined and used to draw conclusions on whether management actions are meeting stated objectives, and if not, why. Conclusions are then used to make recommendations on whether to continue current management or to identify what changes need to be made in management practices to meet objectives.

BLM will use land use plan evaluations to determine if the decisions in the RMP, supported by the accompanying NEPA analysis, are still valid in light of new information and monitoring data. Evaluation of the RMP will generally be conducted every five years, unless unexpected actions, new information, or significant changes in other plans, legislation, or litigation triggers an evaluation. The following estimated evaluation schedule will be followed for the Moab RMP:

*   September 2013
*   September 2018
*   September 2023
*   September 2028

Evaluations will follow the protocols established by the BLM Land Use Planning Handbook (H-1601-1) or other appropriate guidance in effect at the time the evaluation is initiated.

BLM_0013715

## E.     MANAGEMENT DECISIONS

This section of the Approved RMP presents the goals and objectives, land use allocations, and management actions established for public lands managed by the BLM's Moab Field Office. These management decisions are presented by program area. Not all types of decisions were identified for each program. A *Monitoring* section is also included for each program (in Appendix E) to describe how the program decisions will be tracked to ensure implementation.

Data used in development of the Approved RMP are dynamic. The data and maps used throughout the Approved RMP are for land use planning purposes and will be refined as site-specific planning and on-the-ground implementation occurs. Updating data is considered plan maintenance which will occur over time as the RMP is implemented (see the section on *Plan Implementation*). Please note that all acreages presented in the Approved RMP are estimations, even when presented to the nearest acre.

This section is organized alphabetically by program area with the following titles.  For ease of identification into the future, each program area has an identified abbreviation (see below) and each decision in that program is numbered in coordination with the abbreviation:

- Air Quality—**AQ**
- Cultural Resources—**CUL**
- Fire and Fuels Management—**FIRE**
- Health and Safety—**HAZ**
- Lands and Realty—**LAR**
- Livestock Grazing—**GRA**
- Minerals—**MIN**
- Non-WSA Lands with Wilderness Characteristics—**WC**
- Paleontological Resources—**PAL**
- Riparian—**RIP**
- Recreation—**REC**
- Soil and Water Resources—**SOL/WAT**
- Special Designations: Areas of Critical Environmental Concern—**ACEC**
- Special Designations: Wild and Scenic Rivers—**WSR**
- Special Designations: National Trails and Backways—**TRA**
- Special Designations:  Designated Wilderness—**DW**
- Special Designations:  Wilderness Study Areas—**WSA**
- Special Status Species—**SSS**
- Travel Management—**TRV**
- Vegetation—**VEG**
- Visual Resources—**VRM**
- Wildlife and Fish—**WL**
- Woodland and Forestry Products—**FOR**

Maps depicting the management decisions are provided at the back of the Approved RMP for easy reference.

BLM_0013716

## *AIR QUALITY (AQ)*

### Goals and Objectives:

Maintain existing air quality and air quality related values (e.g., visibility) by ensuring that all authorized uses on public lands comply with and support Federal, State, and local laws and regulations for protecting air quality.

### Management Decisions:

### AQ-1

As appropriate, quantitative analysis of potential Air Quality impacts will be conducted for project-specific developments.

### AQ-2

Prescribed burns will be consistent with the State of Utah Division of Environmental Quality (UDEQ) permitting process and timed so as to minimize smoke impacts.

### AQ-3

Comply with Utah Air Conservation (UAC) Regulation R446-1. The best air quality control technology, as per guidance from the Utah Division of Air Quality (UDAQ), will be applied to actions on public lands as needed to meet air quality standards.

### AQ-4

Comply with UAC Regulation R446-1-4.5.3, which prohibits the use, maintenance, or construction of roadways without taking appropriate dust abatement measures. Compliance will be obtained through special stipulations as a requirement on new projects and through the use of dust abatement control techniques in problem areas.

### AQ-5

Manage all BLM and BLM-authorized activities to maintain air quality within the thresholds established by the State of Utah Ambient Air Quality Standards and to ensure that those activities continue to keep the area as attainment, meet prevention of significant deterioration (PSD) Class II standards, and protect the Class I air shed of the National Parks (e.g., Arches and Canyonlands National Parks).

### AQ-6

Comply with the current Smoke Management Memorandum of Agreement (MOU) between BLM, USFS, and UDAQ. The MOU, in accordance with UAC regulation R446-1-2.4.4, requires reporting size, date of burn, fuel type, and estimated air emissions from each prescribed burn.

### AQ-7

BLM will continue to work cooperatively with state, federal, and tribal entities in developing air quality assessment protocols to address cumulative impacts and regional air quality issues.

BLM_0013717

**AQ-8**

BLM will continue to work cooperatively with the Utah Airshed Group to manage emissions from wildland and prescribed fire activities.

**AQ-9**

National Ambient Air Quality Standards are enforced by the Utah Department of Environmental Quality, Division of Air Quality (UDEA-DAQ), with EPA oversight.  Special requirements to reduce potential air quality impacts will be considered on a case-by-case basis in process land use authorizations.

**AQ-10**

BLM will utilize BMPs and site specific mitigation measures, when appropriate, based on site specific conditions, to reduce emissions and enhance air quality.  Examples of these types of measures can be found in the Four Corners Air Quality Task Force Report of Mitigation Options, November 1, 2007.

**AQ-11**

Project specific analyses will consider use of quantitative air quality analysis methods (i.e. modeling), when appropriate as determined by BLM, in consultation with state, federal and tribal entities.

BLM_0013718

## CULTURAL RESOURCES (CUL)

### Goals and Objectives:

Identify, preserve and protect significant cultural resources and ensure that they are available for appropriate uses by present and future generations (FLPMA, Section 103(c), 201(a) and (c); National Historic Preservation Act, Section 110(a); Archaeological Resources Protection Act, Section 14(a)).

Seek to reduce imminent threats and resolve potential conflicts from natural or human-caused deterioration, or potential conflict with other resource uses (FLPMA, Section 103(c), National Historic Preservation Act, Sections 106, 110(a)(2)) by ensuring that all authorizations for land use and resource use will comply with the NHPA Section 106.

### Management Decisions:

### CUL -1
The BLM will comply with all pertinent statutes, regulations, formal agreements, Executive Orders, and policy as it applies to cultural resource management for all actions resulting from decisions in this land-use plan.

### CUL-2
Protect burial sites, associated burial goods, and sacred items in accordance with the Native American Graves Protection and Repatriation Act and the Archaeological Resources Protection Act.

### CUL-3
Native American requests to practice traditional activities on public lands will be considered on a case-by-case basis and will be allowed where practical and appropriate. Reasonable access to specific sacred sites will be allowed under the American Indian Religious Freedom Act.

### CUL-4
All treaty and trust responsibilities as they apply to public lands within the resource area will be honored.

### CUL-5
All land-disturbing activities within Traditional Cultural Properties will be designed to avoid or minimize impacts, where reasonable. Proposed projects or actions will be modified to avoid the area or site, avoid time of use by Native American groups, or will be eliminated altogether. Cultural sites may be closed to visitation when it is determined that this visitation is endangering site integrity.

### CUL-6
Camping will be prohibited and posted within or on archaeological and historic sites eligible for listing on the National Register of Historic Places.

BLM_0013719

## CUL-7

Class III inventory is not required prior to designations that allow continued use of an existing route, impose new limitations on an existing route, close an open area or travel route, keep a closed area closed, or keep an open area open.

## CUL-8

Class III cultural resources inventory will be conducted on newly designated ATV, motorcycle and mountain bike routes (48" wide or less) based on potential resource conflicts. Routes identified for survey will be prioritized based on landscape level overviews, cultural resource predictive models, and available site location, environmental, and contextual information. If eligible archaeological sites along these routes are being adversely impacted by continued route use, impacts will be mitigated. "New routes" are defined as those designated in the Travel Plan accompanying this RMP.

## CUL-9

Where there is a reasonable expectation that a proposed route designation would shift, concentrate or expand travel into areas where historic properties are likely to be adversely affected, Class III inventory and compliance with Section 106, focused on areas where adverse effects are likely to occur, is required prior to designation.

## CUL-10

Proposed designations of new routes will require Class III inventory of the Area of Potential Effect (APE) and compliance with Section 106 prior to designation. Class III inventory of the APE and compliance with Section 106 will also be required prior to identifying new locations proposed as staging areas or similar areas of concentrated OHV use.

## CUL-11

Eligible cultural sites will be protected and impacts mitigated when it is determined that they are being impacted from grazing activities.

## CUL-12

New field inventories will be prioritized in areas of special cultural designation (e.g., ACECs, National Historic Trails, National Historic Landmarks) that have not been fully inventoried.

## CUL-13

Sego Rock Art Site and Wall Street/Colorado River Rock Art District, which have educational and recreational values, will be developed for public visitation and interpretation as long as such work does not contribute to the deterioration or destruction of the resources being interpreted. Work will be conducted in partnership with universities, museums, Tribes, and interested site stewards for the creation of interpretive materials on the archaeology of the Moab Planning Area.

## CUL-14

Specific management plans will be developed for up to seven culturally sensitive areas unless integrated into other activity plans. These plans will also include, but will not be limited to, developing a site monitoring system; identifying sites in need of stabilization, restoration, and protective measures (e.g., fences, surveillance equipment); developing research designs for selected sites/areas; and developing specific mitigation measures.

BLM_0013720

## CUL-15

Cooperate with counties to ensure county road and trail construction and maintenance activities avoid or minimize impacts to cultural resources.

## CUL-16

Cultural plants, once identified by interested tribes, will be managed to insure that ground-disturbing activities on the land do not contribute to the decline of cultural sensitive plant communities. Collection of plant resources will be considered on a case-by-case basis and will be allowed where practical and appropriate.

## CUL-17

Cultural resource management priority for the Ten Mile Wash and Mill Creek Canyon will be scientific research of prehistoric sites and cultural landscapes. Manage the Mill Creek planning area in accordance with the Mill Creek Management Plan (2001b).

## CUL-18

Continue to allocate cultural sites, including ethnographic properties, to one of six management categories: a) scientific use; b) conservation for future use; c) traditional use; d) public use; e) experimental use; and f) discharged from management.

## CUL-19

Alternative management strategies for cultural resources are disclosed in the Special Designations sections. This section identifies areas with substantial cultural resources and alternative management prescriptions to protect these resources. These areas include the Behind the Rocks, Ten Mile Wash, and Mill Creek Canyon ACECs, and the Wall Street portion of Highway 279/Shafer Basin/Long Canyon proposed ACEC.

## CUL-20

Cultural use allocations will be made at the time of site documentation; allocations can be changed as new information or management direction becomes available, subject to consistency with the approved plan.

## CUL-21

Cultural management plans will be a component of the implementation plans for the Labyrinth Canyons, Colorado Riverway and South Moab SRMAs.  Heritage tourism may be considered in these cultural management plans.

## CUL-22

Priority for new field inventory will be a 0.50-mile vulnerability zone surrounding cities and towns.

## CUL-23

Prioritize for Class II and Class III surveys a total of 30,000 acres within the following areas: Bookcliffs, Dolores Triangle, North Fork of Mill Creek, South Fork of Mill Creek, Seven Mile, and Ten Mile Wash and its tributaries.

BLM_0013721

**CUL-24**

To prevent further degradation from occurring, target the following areas for restoration of damaged cultural resources: South and North Forks of Mill Creek, Bartlett/Hidden Canyon, Hell Roaring uplands, Ten Mile Wash and Wall Street Rock Art District.

**CUL-25**

The following sites will be hardened and interpreted for public use: one site in Lower Kane Springs Canyon, and 3 sites in the Wall Street Rock Art District.

BLM_0013722

## FIRE MANAGEMENT (FIRE)

### Goal s and Objectives:

Fire management will adopt the comprehensive Utah Land-use Plan Amendment for Fire and Fuels Management, September 2005 (LUP Amendment; BLM 2005c). This document may be found at www.ut.blm.gov/fireplanning/index/htm. Direction and guidance approved by the LUP Amendment is carried forward under all alternatives and incorporated by reference into this PRMP/FEIS. The content and purpose of the LUP Amendment is summarized as follows:

• Establishes landscape-level, fire management goals and objectives.
• Describes Desired Wildland Fire Conditions (DWFC) and the management strategies and actions to meet DWFC goals.
• Describes areas where fire may be restored to the ecosystem through wildland fire use for resource benefit and areas where wildland fire use is not appropriate.
• Identifies Resource Protection Measures (RPMs) for fire management practices to protect natural and cultural resource values.
• Identifies criteria used to establish fire management priorities.

### Management Decisions:

### FIRE-1
The Moab Fire District Fire Management Plan (FMP) will be updated and amended to meet the direction and objectives of the RMP.

### FIRE-2
Firefighter and public safety are the primary goals in all fire management decisions and actions.

### FIRE-3
Wildland fire will be utilized to protect, maintain and enhance resources and, when possible, will be allowed to function in its natural ecological role.

### FIRE-4
Hazardous fuels reduction treatments will be used to restore ecosystems; protect human, natural and cultural resources; and reduce the threat of wildfire to communities.

### FIRE-5
Fires will be suppressed at minimum cost, taking into account firefighter and public safety as well as benefits and values to be protected that are consistent with resource objectives.

### FIRE-6
The BLM will implement a consistent, safe and cost-effective fire management program through appropriate planning, staffing, training, and equipment.

BLM_0013723

**FIRE-7**

Fire management objectives will be established for every area with burnable vegetation, based on sound science and consideration of other resource objectives.

**FIRE-8**

Emergency stabilization, rehabilitation, and restoration efforts will be implemented to protect and sustain resources, public health and safety, and community infrastructure.

**FIRE-9**

The BLM will work together with partners and other affected groups and individuals to reduce risks to communities and to restore ecosystems.

**FIRE-10**

The Reasonable and Prudent Measures and Terms and Conditions identified in consultation with the USFWS for the LUP Amendment will be implemented in fire-related actions.

**FIRE-11**

**Criteria for Establishing Fire Management Priorities:** Protection of human life is the primary fire management priority. Establishing a priority among protecting human communities and community infrastructure, other property and improvements, and natural and cultural resources is based on human health and safety, the values to be protected, and the costs of protection. When firefighters and other personnel have been committed to an incident, these human resources become the highest values to be protected. Priorities for all aspects of fire management decisions and actions are based on the following:

• Protecting the Wildland-Urban Interface (WUI; including At-risk Communities and At-risk Watersheds).
• Maintaining existing healthy ecosystems.
• High priority sub-basins (HUC-4) or watersheds (HUC-5).
• Threatened, endangered, or special species.
• Cultural resources and/or cultural landscapes.

**FIRE-12**

**Suppression:** An "Appropriate Management Response" (AMR) procedure is required for every wildland fire that is not a prescribed fire. In all fire management decisions, strategies and actions, firefighter and public safety are the highest priority followed by consideration of benefits and values to be protected as well as suppression costs. The AMR can range from full suppression to managing fire for resource benefit (wildland fire use). Resource goals and objectives outlined in the RMP guide the development and implementation of AMR fire management activities in regard to the accomplishment of those objectives. The FMP establishes fire suppression objectives with minimum and maximum suppression targets for each Fire Management Unit (FMU) within the MPA. While firefighter and public safety are the first priority, considerations for suppression activities also include fire intensity, acreage, and spread potential, threats to life and property, potential to impact high-value resources such as critical habitat for threatened, endangered and sensitive species, crucial wildlife habitat, cultural resources and/or riparian

BLM_0013724

areas, historic fire regimes, and other special considerations such as wilderness and/or adjacent agency lands.

## FIRE-13

**Wildland Fire Use for Resource Benefit:** Wildland fire is authorized as a tool, when appropriate, to allow naturally ignited wildland fire to accomplish specific resource management objectives. Due to existing resource conditions and proximity to values at risk, fire cannot be allowed to resume its natural role on all BLM lands in the MPA. Consideration of ongoing management actions and other natural changes will direct periodical reassessment of DWFC and determination of potential areas for wildland fire use. Operational management of wildland fire use is described in the Wildland Fire Implementation Plan (WFIP).

The FMP identifies areas (FMUs) that may have the potential for wildland fire use. Wildland fire use may be authorized for all areas, except when the following resources and values may be negatively impacted and there are no reasonable Resource Protection Measures to protect such resources and values:

- WUI areas.
- Areas that are known to be highly susceptible to post-fire cheatgrass or invasive weed invasion.
- Important terrestrial and aquatic habitats.
- Non-fire-adapted vegetation communities.
- Sensitive cultural resources.
- Areas of soil with high or very high erosion hazard.
- Class I air attainment areas and PM-10 non-attainment areas.
- Administrative sites.
- Developed recreation sites.
- Communication sites.
- Oil, gas and mining facilities.
- Above-ground utility corridors.
- High-use travel corridors, such as interstates, railroads, and/or highways.

## FIRE-14

**Fuels Treatment:** Fuels management activities outlined in the FMP will be consistent with the resource goals and objectives contained in the RMP. To reduce hazards and to restore ecosystems, authorized fuels management actions include wildland fire use, prescribed fire, and mechanical, manual, chemical, biological, and seeding treatments. The FMP describes fuels management goals and objectives and the full range of fuels management strategies and actions authorized for fuels reduction. Fuels treatments are focused on the DWFC of restoring historic fire regimes to ecosystems when feasible, so that future wildland fire use actions can be more easily implemented. Fuels management actions may include but are not limited to the following activities:

- Mechanical treatments such as mowing, chopping, or chipping/grinding (brush cutter), chaining, tilling, or cutting.
- Manual treatments such as hand-cutting (chainsaw or handsaw) and hand-piling.

BLM_0013725

- Prescribed fire including broadcast, underburn, and hand-pile burning.
- Chemical spraying or biological treatments such as insects or goats/sheep.
- Seeding including aerial or ground application (manual or mechanical).

Targeted areas may be treated in phases over a period of several years and may involve multiple and varied treatments.

Estimated fuels reduction treatments of 5,000 to 10,000 acres/year are targeted dependent on budgetary and time constraints. These treatments are in addition to those to be accomplished under the Utah Watershed Restoration Initiative and the National Healthy Lands Initiative.

Implementation of fuels management actions will be prioritized using the following criteria:

- WUI areas.
- Areas with fuel loading that could potentially result in the loss of ecosystem components following wildland fire.
- Resource management goals and objectives.

## FIRE-15

**Prevention and Mitigation:** Prevention and mitigation goals target a reduction in unauthorized wildland fire ignitions. Goals include coordination with partners and affected groups and individuals, and a wide range of prevention and mitigation activities such as personal contacts, mass media, signing, and defensible space education. Implementation of fire prevention activities will be prioritized using the following criteria:

- WUI areas.
- Major travel corridors.
- Recreation sites.
- Public lands as a whole.

## FIRE-16

**Emergency Stabilization and Rehabilitation (ESR):** A Normal Year Fire Stabilization and Rehabilitation Plan (NFRP) is in place to meet emergency stabilization and rehabilitation (ESR) needs and to comply with up-to-date ESR policy and guidance. The NFRP is a programmatic implementation plan authorizing treatment options specific to vegetative communities and dependent upon post-wildland fire conditions and other site-specific considerations. Treatment actions are designed according to the type and severity of wildfire impacts and priorities include, but are not limited to, areas where the following criteria apply:

- It is necessary to protect human life and safety as well as property.
- Unique or critical cultural and/or historical resources are at risk.
- It is determined soils are highly susceptible to accelerated erosion.
- Perennial grasses and forbs (fire-tolerant plants) are not expected to provide soil and watershed protection within two years.
- There is a need to establish a vegetative fuel break of less flammable species (greenstrips).

BLM_0013726

- Unacceptable vegetation, such as noxious weeds, may readily invade and become established.
- Shrubs and forbs are a crucial habitat component for wintering mule deer, pronghorn, sage-grouse, or other special status species.
- Stabilization and rehabilitation are necessary to meet RMP resource objectives, including rangeland seedings.
- It is necessary to protect water quality.
- It is necessary to quickly restore threatened, endangered, or special species habitat populations to prevent adverse impacts.

BLM_0013727

## HEALTH AND SAFETY (HAZ)

### Goals and Objectives:

BLM will strive to ensure that human health and safety concerns on public lands remain a major priority.

### Management Decisions:

### HAZ-1
Comply with all applicable Abandoned Mine Lands (AML) policies.

### HAZ-2
In conformance with BLM's long-term strategies and national policies regarding Abandoned Mine Lands (AML), this RMP recognizes the need to work with our partners toward identifying and addressing physical safety and environmental hazards at all AML sites on public lands. In order to achieve this goal, a State strategy has been written. National program criteria for determining site priorities were used to develop the work plan. This State strategy is entitled "Utah's Abandoned Mine Land Multi Year Work Plan."

### HAZ-3
The criteria that will be used to establish physical safety hazard program priorities are:

• The AML physical safety program's highest priority will be the cleaning up of those AML sites where (a) a death or injury has occurred, (b) the site is situated on or in immediate proximity to developed recreation sites and areas with high visitor use, and (c) upon formal risk assessment, a high or extremely high risk level is indicated.
• AML will be factored into future recreation management area designations, land-use planning assessments, and all applicable use authorizations.
• The site is presently listed or is eligible for listing in the Abandoned Mines Module of Protection and Response Information System.
• AML hazards should be, to the extent practicable, mitigated or remediated on the ground during site development.

### HAZ-4
The criteria used to establish water quality-based AML program priorities are:

• The State has identified the watershed as a priority based on (a) one or more water laws or regulations; (b) threat to public health or safety; and (c) threat to the environment.
• The project reflects a collaborative effort with other land managing agencies.
• The site is presently listed or is eligible for listing in the Abandoned Mines Site Cleanup Module of Protection and Response Information System.
• The project will be funded by contributions from collaborating agencies.

### HAZ-5
Identify and clean up unauthorized dumping sites and hazardous materials spills in the MPA as required to comply with applicable State, local, and Federal regulations.

BLM_0013728

**HAZ-6**

The State Multi Year Work Plan will be maintained and updated as needed to reflect current policy for identifying program physical safety and water quality AML sites priorities for reclamation and remediation.

BLM_0013729

## LANDS AND REALTY (LAR)

### Goals and Objectives:

Retain lands within its administration except where necessary to accomplish resource goals and objectives outlined in the Plan. BLM would transfer lands out of Federal ownership or acquire non-Federal lands where needed to accomplish resource goals and objectives, improve administration of public lands, or meet essential community needs.

Meet public needs for use authorizations such as rights-of-way (ROWs), alternative energy sources, and permits while minimizing adverse impacts to resource values.

Using the Visual Resource Management (VRM) system, maintain generally undeveloped landscapes in the backgrounds of popular filming locations.

### Management Decisions:

### LAR-1

Under IMP and Congressional action, Wilderness Study Areas and Wilderness Areas will be exclusion areas for any ROWs (Section 501(a) FLPMA).

### LAR-2

Continue the withdrawal of lands along the Colorado, Dolores and Green Rivers (totaling 65,037 acres within the MPA) from mineral entry (Three Rivers Withdrawal, October 6, 2004). In addition, continue the Westwater (8,096 acres) and Black Ridge Wilderness (5,200 acres) withdrawals (see Map 5).

### LAR-3

Give land exchanges with the State of Utah priority consideration to resolve inholding issues.

### LAR-4

Areas of Critical Environmental Concern (ACECs) will be avoidance areas for any new ROWs (including communication sites and wind and solar sites).

### LAR-5

Decisions on Land Tenure Adjustments and withdrawals will be made in accordance with the criteria contained in Appendix G.

### LAR-6

Determinations on authorizing commercial filming in the MPA will be made in accordance with the criteria outlined in Appendix H.

### LAR-7

Right-of-way (ROW) avoidance and exclusion areas will be consistent with the stipulations identified in Appendix A for oil and gas leasing and other surface-disturbing activities. These stipulations have been developed to protect important resource values.

BLM_0013730

**LAR-8**

As per the State of Utah v. Andrus, Oct. 1, 1979 (Cotter Decision), the BLM will grant the State of Utah reasonable access to State lands for economic purposes, on a case-by-case basis.

**LAR-9**

To reduce surface use conflicts along the U.S. Highway 191 utility corridor within Moab Canyon, apply a no surface occupancy stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix A), except those associated with utility ROWs.

**LAR-10**

Authorization of any ROW for wind or solar energy development will incorporate best management practices including the USFWS's "Guidelines for Wind Power" and provisions contained in the Final Wind Energy Programmatic EIS (June 24, 2005; BLM 2005d).

**LAR-11**

Both wind and solar energy development (renewable energy) can be considered wherever ROWs could be authorized.

**LAR-12**

To be consistent with the existing withdrawals from mineral entry, apply a no surface occupancy stipulation for oil and gas leasing and other surface-disturbing activities within the area of the Three Rivers and Westwater Mineral Withdrawals. This action will further protect the riparian, wildlife, scenic, and recreation values addressed in these withdrawals. Applying a no surface occupancy stipulation for oil and gas leasing to lands within the Three Rivers Withdrawal, in combination with other areas where a no surface occupancy stipulation is applied, results in tracts of land that are physically inaccessible to oil and gas operations. For this reason, portions of the lands within the Three Rivers Withdrawal (e.g., along the Colorado River near the Richardson Amphitheater and along the Dolores River near Beaver Creek) will be closed to oil and gas leasing. These areas will be managed as no surface occupancy for other surface-disturbing activities (see Appendix A).

**LAR-13**

Lands and/or interest in lands (such as minerals and conservation easements) acquired through future LTA will take on the management of the surrounding area. Land acquisitions will be pursued if they meet the criteria in Appendix G.

**LAR-14**

Designate an I-70 utility corridor that includes all major existing ROWs as identified in the RMP with a 1/2-mile width on each side of the widest ROW corridor. Designate the existing Moab Canyon utility corridor (Map 6).

**LAR-15**

Combine the two corridors south of Spanish Valley into a single corridor (Map 6). The corridor will include the approximately 2 to 3 miles separating the two segments.

BLM_0013731

**LAR-16**

About 370,250 acres will be exclusion areas for ROWs. About 217,480 acres will be avoidance areas for ROWs.

**LAR-17**

Parcels identified for disposal total 14,961 acres and are shown on Map 7 and in Appendix I.

BLM_0013732

## *LIVESTOCK GRAZING (GRA)*

### Goals and Objectives:

Achieve the attainment of Standards for Rangeland Health and other desired resource conditions by maintaining appropriate utilization levels of the range through management prescriptions and administrative adjustments of grazing permits.

Achieve healthy, sustainable rangeland ecosystems that support the livestock industry while providing for other resource values such as wildlife habitat, recreation opportunities, clean water, and functional watersheds.

### Management Decisions:

### GRA-1

Grazing will be managed according to the *Guidelines for Livestock Grazing Management* to meet the Standards for Rangeland Health, including adjustment in seasons of use.

### GRA-2

On all allotments, allow allotment boundaries adjustments, joining and splitting, and modification of grazing season subject to appropriate NEPA review and analysis (see Map 8 for a map of grazing allotments).

### GRA-3

Continue to authorize grazing at the current preference levels (as per ten-year grazing permits) and adjust, if necessary to meet Standards for Rangeland Health.

### GRA-4

As amended in previous planning documents (the 1985 Grand RMP and a Plan Amendment analyzed in EA#068-94-047), grazing use will continue to not be authorized on the following allotments/areas (or portions of allotments/areas):

- Between The Creeks with 3,960 acres and 221 AUMs, to protect municipal watersheds, improve mule deer winter range, improve riparian habitat, and reduce recreation conflict.
- North Sand Flats with 18,246 acres and 798 AUMs, to reduce recreation conflict, improve mule deer winter range, and improve riparian habitat.
- South Sand Flats with 10,209 acres and 592 AUMs, to reduce recreation conflict, improve mule deer winter range, and improve riparian habitat.
- A portion of Arth's Pasture Allotment (Poison Spider area) with approximately 7,634 acres and 425 AUMs, to improve desert bighorn sheep habitat and reduce recreation conflict.
- Castle Valley with 6,074 acres and 190 AUMs, to protect the Castle Valley sole source aquifer, to improve mule deer winter range, and to reduce recreation conflict.
  Along Highway 128 from U.S. 191 to the Castle Valley Road, along U.S. 191 from Highway 313 to Moab, and along Highway 279 with 1,139 acres, to reduce recreation traffic conflict (no reduction in AUMs).

68

BLM_0013733

- A portion of the Kane Spring Allotment (that portion in Kane Spring Canyon between the open valley and the river; 558 acres and no reduction in AUMs), to reduce recreation traffic conflict and to enhance riparian species' habitat.
- An area along the Colorado River between Hittle Bottom and north of Dewey Bridge (400 acres and no reduction in AUMs), to reduce recreation traffic conflict and to enhance riparian species' habitat.

See also decisions at GRA-16

## GRA-5
Develop AMPs on seven allotments (Agate, Cisco, Cisco Mesa, Harley Dome, Highlands, Monument Wash, and San Arroyo) and on any additional allotments if resource issues are identified to benefit vegetation, wildlife, livestock grazing and soils.

## GRA-6
Identify appropriate utilization levels based on allotment or site-specific management practices, such as season-of-use, grazing intensity and duration, and utilization patterns, as well as vegetative conditions, the presence or absence of range improvements, and resource issues or concerns. Use utilization levels as an indicator to evaluate if current grazing use is appropriate to meet resource objectives for the area. Generally moderate utilization levels (40–60%) will be used to indicate if general management objectives can be met. Utilization levels above those identified as appropriate will be used to adjust livestock use on a yearly basis through pasture and possible early removal from allotments as needed. Utilization levels may be especially important during periods of drought. Long-term adjustments to livestock use (term permits adjustments) require the evaluation of monitoring data including climate, actual grazing use, current or historic impacts, utilization mapping, and long-term trend data, as well as utilization levels.

## GRA-7
Follow the recommendations of the National Sage-grouse Habitat Conservation Strategy (BLM 2004c) and the Strategic Management Plan for Sage-grouse (UDWR 2002) where applicable.

## GRA-8
Conversion of allotments from cattle to domestic sheep will not be considered in recognized bighorn sheep habitat (see Maps 9 and 10).

## GRA-9
Collect monitoring data, including trend, utilization, actual use, and climate data to determine if existing livestock management practices are meeting land-use planning and resource objectives.

## GRA-10
Change class of livestock from sheep to cattle on the Hatch Point Allotment (96,951 acres) to benefit wildlife.

## GRA-11
Rangelands that have been burned, reseeded, or otherwise treated to alter vegetative composition will have livestock grazing use temporarily suspended as follows: (1) burned rangelands,

BLM_0013734

whether by wildfire or prescribed burning, will be ungrazed for a minimum of one complete growing season following the burn; (2) rangelands that have been reseeded, or otherwise mechanically treated will be ungrazed for a minimum of two complete growing seasons following treatment.

## GRA-12

**Relinquishment of Preference:** Voluntary relinquishments of grazing permits and preference, in whole or in part, submitted by a permittee in writing to the BLM, will be handled on a case-by-case basis. BLM will not recognize as valid, relinquishments which are conditional on specific BLM actions and BLM will not be bound by them. Relinquished permits and the associated preference will remain available for application by qualified applicants after BLM considers if such action will meet rangeland health standards and is compatible with achieving land-use plan goals and objectives. Prior to re-issuance of the relinquished permit, the terms and conditions may be modified to meet RMP goals and objectives and/or site-specific resource objectives. However, upon relinquishment, BLM may determine through a site-specific evaluation and associated NEPA analysis that the public lands involved are better used for other purposes. Grazing may then be discontinued on the allotment through an amendment to the existing RMP or a new RMP effort. Any decision issued concerning discontinuance of livestock grazing is not permanent and may be reconsidered and changed through future LUP Amendments and updates.

## GRA-13

AUMs allotted to livestock: 106,479.

## GRA-14

Acres available for grazing: 1,690,481 acres.

## GRA-15

Acres not available for grazing: 132,047 acres (see Map 11).

## GRA-16

**Allotments Not Available for Grazing:**

- Bogart with 14,744 acres and 209 AUMs (to benefit wildlife especially mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils).
- Cottonwood with 27,193 acres and 900 AUMs (to benefit wildlife especially mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils).
- Diamond with 18,620 acres and 588 AUMs (to benefit wildlife especially mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils).
- Pear Park, with 14,201 acres and 200 AUMs (to benefit wildlife especially mule deer and/or elk habitat, riparian habitat, watershed health and erosive soils).
- Ida Gulch, with 3,612 acres 112 AUMs (to recreation conflict and enhance riparian habitat). Mill Creek with 3,921 acres and 137 AUMs (to reduce recreation and cultural conflict and to protect municipal watershed).
- Portions of Professor Valley and River along Highway 128**, with 1,467 acres and 0 AUMs (to reduce recreation conflict and enhance riparian habitat).

BLM_0013735

**A fence will be constructed along the southeast side of Highway 128 (set back to protect the scenic resources of the National Scenic Highway). This will result in all BLM lands between the Colorado River and Highway 128 being unavailable for grazing. This will reduce acreage in the allotments, but it will not reduce the AUMs, because the quality of the forage is low due to heavy use by motorists and other recreationists.

## GRA-17

**Allotments Currently Not Available for Grazing that will be Available for Grazing:**

- After allotment specific evaluation to assure resource objectives are met, Spring Creek Allotment will be available for livestock grazing.

## GRA-18

**Allotments Currently Not Available for Grazing that are to be Reconsidered for Allocation:**

- Beaver Creek with 1,351 acres and 0 AUMs.

## GRA-19

**Grazing in Saline Soils:** Use grazing systems and develop AMPs to minimize impacts to saline soils and reduce salinity in the Colorado River drainage in the following allotments: Agate, Athena, Big Flat-Ten Mile, Cisco, Cisco Mesa, Coal Canyon, Crescent Canyon, Floy Creek, Harley Dome, Highlands, Horse Canyon, Little Grand, Lone Cone, Monument, and San Arroyo.

## GRA-20

**Grazing in Riparian Areas:** Evaluate non-functioning and functioning-at-risk riparian areas using Standards for Rangeland Health and Guidelines for Livestock Grazing Management to determine if restriction from grazing will improve riparian functioning condition. The following riparian areas will be given priority for evaluation: Ten Mile from Dripping Spring to the Green River, Mill Creek, Day Canyon, Seven Mile Canyon, and East Coyote (a total of 1,169 acres).

## GRA-21

**Vegetation Treatments:** Maintain the existing vegetation treatments (46,307 acres) to increase available forage within the following allotments. These areas have been treated over the past 50 years and consist primarily of pinyon-juniper woodlands. These areas will be treated by prescribed fire, chemical or mechanical or other means in accordance with BLM sagebrush conservation guidance and other applicable resource goals. The improved forage will benefit multiple use objectives including livestock and wildlife use. Allotments: Adobe Mesa, Big Triangle, Black Ridge, Buckhorn, Cisco, East Coyote, Fisher Valley, Granite Creek, Hatch Point, Lisbon, Lower Lisbon, Mountain Island, Rattlesnake South, Scharf Mesa, Spring Creek, Steamboat Mesa, Taylor, Windwhistle. (a total of 46,307 acres).

## GRA-22

Conduct new vegetation treatments (6,900 acres) for increased forage in the following allotments with prescribed fire, chemical, mechanical or other means: Floy Canyon, Hatch Point, Lisbon, and Showerbath. Other vegetation treatments will be considered to benefit other resource values such as wildlife or watershed.

BLM_0013736

### GRA-23

Implement Range Projects to Help Maintain Rangeland Health Standards:

• Implement range projects that will equally benefit livestock grazing and other resource values.

### GRA-24

Grazing will be allowed on a limited basis in Ten Mile Canyon downstream from Dripping Springs, with changes subject to future monitoring.

BLM_0013737

## <u>MINERALS (MIN)</u>

### Goals and Objectives:

Provide opportunities for environmentally responsible exploration and development of mineral and energy resources subject to appropriate BLM policies, laws and regulations.

Establish conditions of use through land-use planning to protect other resource values.

### Management Decisions:

### MIN-1
Continue the withdrawal of lands along the Colorado, Dolores, and Green Rivers, totaling 65,037 acres within the MPA, from mineral entry (Three Rivers Withdrawal, October 6, 2004). In addition, continue the Westwater (8,096 acres) withdrawal. Black Ridge Wilderness (5,200 acres) will remain closed, by law, to entry under the mining law.

### MIN-2
Wilderness Study Areas and designated Wilderness (358,806 acres) will remain closed, by law, to mineral leasing and development.

### MIN-3
Where public lands are sold or exchanged under 43 U.S.C. 682(B)(Small Tracts Act), 43 U.S.C. 869 (Recreation and Public Purposes Act), 43 U.S. C. 1718 (Sales) or 43 U.S. C. 1716 (Exchanges), the minerals reserved to the United States will continue to be removed from the operation of the mining laws unless a subsequent land-use planning decision expressly recommends restoring the land to mineral entry.

### MIN-4
**Leasable Minerals:** Split-estate lands (private surface/Federal minerals) and lands administered by other Federal agencies are not managed by the BLM. The lands include about 29,678 acres of split-estate lands and the lands administered by the Manti-LaSal National Forest (141,241 acres). The surface owner or surface management agency (SMA) manages the surface. BLM administers the operational aspects of mineral leases. On lands administered by other Federal agencies, lease stipulations will include those required by the SMA. On 20,061 acres of split-estate lands, the BLM will apply the same lease stipulations as those applied to surrounding lands with Federal surface. BLM will close or impose a no surface occupancy stipulation on 9,617 acres of split-estate lands (see Appendix A). Mitigation measures to protect other resource values will be developed during the appropriate site-specific environmental analysis and will be attached as conditions of approval to permits in consultation with the surface owner or SMA.

### MIN-5
**Coal:** The coal resources within the MPA include the Sego and the La Sal coal fields. Approximately 80% of the Sego coal field is within Wilderness Study Areas and is not available for development. For the remaining coal resources, no interest has been expressed for coal leasing and the potential for development of coal resources is low (see Mineral Potential Report). At such time as interest is expressed in coal leasing, the RMP will be amended as appropriate

BLM_0013738

and mining unsuitability criteria (43 CFR 3461) will be applied by the MFO before any coal leases are issued. If coal leases are issued, they will be subject to special conditions developed in the RMP and the unsuitability assessment. This may restrict all or certain types of mining techniques. Before any coal could be removed, MFO will have to approve the mining permit application package, incorporating stipulations developed in the RMP.

## MIN-6

**Locatable Minerals:** Existing operations will continue to be subject to the stipulations developed for the notice or the plan of operations. The BLM will evaluate all operations authorized by the mining laws in the context of its requirement to prevent unnecessary and undue degradation of Federal lands and resources. Consistent with the rights afforded claimants under the mining laws, operations conducted after this RMP will be required to conform to the surface disturbing stipulations developed in this RMP.

## MIN-7

**Locatable Minerals:**  Operations on BLM-administered lands open to mineral entry must be conducted in compliance with BLM's surface management regulations (43 CFR 3715, 3802, 3809, and 3814). BLM surface management regulations do not apply to operations on other Federal lands but do apply to split-estate lands.

## MIN-8

**Locatable Minerals:** To be consistent with the existing withdrawals from mineral entry, apply a no surface occupancy stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix A) within the area of the Three Rivers and Westwater Mineral Withdrawals. This action will further protect the riparian, wildlife, scenic, and recreation values addressed in these withdrawals.

## MIN-9

**Locatable Minerals:** To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable). These stipulations are found in Appendix A. Leasable minerals include oil and gas, coal, and potash. Locatable minerals include gold, copper, and uranium. Salable minerals include sand and gravel, clay, and building stone.

## MIN-10

**Locatable Minerals:** In areas where mineral activities would be incompatible with existing surface use, apply a no surface occupancy stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix A). These areas are as follows: Moab and Spanish Valley, Castle Valley (including Mayberry Orchard), Thompson Springs, Moab Landfill, Moab Airport, and Dead Horse Point State Park.

## MIN-11

The Federal minerals within the incorporated city of Moab and town of Castle Valley are closed to oil and gas leasing by Federal regulation at 43 CFR 3100.0-3 (a)(2)(iii).

BLM_0013739

**MIN-12**
**Leasable Minerals:** The plan will recognize and be consistent with the National Energy Policy Act and related BLM policy by adopting the following objectives: recognizing the need for diversity in obtaining energy supplies; encouraging conservation of sensitive resource values; improving energy distribution opportunities.

**MIN-13**
**Leasable Minerals:** In accordance with an UDEQ-DAQ letter dated June 6, 2008 (See Appendix J) requesting implementation of interim nitrogen oxide control measures for compressor engines; BLM will require the following as a Lease Stipulation and a Condition of Approval for Applications for Permit to Drill: (1) All new and replacement internal combustion oil and gas field engines of less than or equal to 300 design-rated horsepower must not emit more than 2 gms of NOx per horsepower-hour.  This requirement does not apply to oil and gas field engines of less than or equal to 40 design-rated horsepower;  (2) All new and replacement internal combustion oil and gas field engines of greater than 300 design rated horsepower must not emit more than 1.0 gms of NOx per horsepower-hour.

**MIN-14**
**Leasable Minerals:** Lease stipulations have been developed to mitigate the impacts of oil and gas activity (see Appendix A and Map 12). The stipulations  adhere to the Uniform Format prepared by the Rocky Mountain Regional Coordinating Committee in March 1989. Stipulations reflect the minimum requirements necessary to accomplish the desired resource protection and contain provisions/criteria to allow for exception, waiver and modification if warranted. Stipulations would be determined unnecessary if duplicative of Section 6 of the Standard Lease Terms. The BLM has identified Land-use Plan leasing allocations for all lands within the Moab Field Office.  In addition, the Approved RMP describes specific lease stipulations and program-related Best Management Practices (both found in Appendix A: Stipulations and Environmental Best Practices Application to Oil and Gas Leasing and Other Surface Disturbing Activities) that apply to a variety of different resources.

**MIN-15**
**Leasable Minerals:** Oil and gas leases issued prior to the RMP will continue to be managed under the stipulations in effect when issued. Those issued subsequent to the plan will be subject to the stipulations developed in the plan. Environmental best management practices will be incorporated into subsequent permits and authorizations to mitigate impacts and conflicts with other uses and resource values (see Appendix A).

**MIN-16**
**Leasable Minerals (Potash and Salt: Non-energy Leasable):**  Within the MPA, three areas fall within known potash leasing areas (KPLAs). KPLA designations, based on known geologic data, will remain in place until potash resources are depleted. In KPLAs, potash leases are acquired through competitive bidding. In areas where potash values are not known, MFO could issue prospecting permits, which could lead to issuance of a preference right lease. There are currently 8 leases and numerous pending prospecting permit applications within the MPA (Map 13). Additional KPLAs could be designated, based on geologic data, if interest warranted. Potash leasing and prospecting permits issued prior to the RMP will continue to be managed under the

BLM_0013740

stipulations in effect when issued. Those leases issued subsequent to the RMP will be consistent with the oil and gas leasing stipulations developed in the RMP (see Appendix A).

## MIN-17

**Locatable Minerals:** A no surface occupancy stipulation cannot be applied to locatable minerals without a withdrawal. All public lands overlying Federal minerals are open to mining claim location unless specifically withdrawn from mineral entry by Secretarial order or by a public land law. Therefore, other than the existing withdrawals (Three Rivers, Westwater, and Black Ridge Wilderness), all public lands with the MPA remain open under the mining laws. Future withdrawals may be recommended in areas identified as closed or with a no surface occupancy stipulation if it becomes necessary to prevent unacceptable resource impacts.

## MIN-18

**Salable Minerals:** There are currently 12 community pits totaling about 2,693 acres designated in the MPA (Map 14). Existing mineral material sale contracts, free use permits, and material sites, including community pits, will continue to be subject to the permit stipulation conditions. Sales, permits, community pits or common use areas issued or designated after the RMP will be subject to permit stipulations developed in the RMP. These stipulations will be the same as those stipulations for oil and gas leasing except that areas with a no surface occupancy stipulation and closed will be closed to the disposal of salable minerals.

## MIN-19

**Leasable Minerals:** Oil and Gas Leasing stipulations (see Map 12):

• Approximately 427,273 acres will be open to oil and gas leasing, subject to standard terms and conditions.
• Approximately 806,994 acres will be open to oil and gas leasing subject to CSU and TL stipulations.
• Approximately 217,480 acres will be open to oil and gas leasing subject to an NSO stipulation.
• Approximately 370,250 acres will be closed to oil and gas leasing, of which 25,306 acres are outside Wilderness or Wilderness Study Areas. About 25,306 acres are closed to oil and gas leasing because it is not reasonable to apply an NSO stipulation. This includes areas where the oil and gas resources are physically inaccessible by current directional drilling technology from outside the boundaries of the NSO areas. (These lands closed to oil and gas leasing will be managed to preclude all other surface-disturbing activities.) Should technology change, a Plan Amendment will be initiated to place these 25,306 acres under an NSO stipulation for oil and gas leasing.
• In addition, 8,078 acres of Federal minerals (split-estate lands) will be managed as open to oil and gas leasing with an NSO stipulation, and 1,539 acres of Federal minerals (split-estate lands) will be closed to oil and gas leasing (see Appendix A).

BLM_0013741

*Moab Approved Resource Management Plan – Minerals*

**MIN-20**
**Saleable Minerals (see Map 12):**

- Approximately 427,273 acres will be open to the disposal of salable minerals subject to standard terms and conditions.
- Approximately 806,994 acres will be open to the disposal of salable minerals subject to CSU and TL stipulations.
- Approximately 217,480 acres will not be open to the disposal of salable minerals (in those areas subject to an NSO stipulation for oil and gas leasing).
- Approximately 370,250 acres will be closed to the disposal of salable minerals. In addition, 8,078 acres of Federal minerals (split-estate lands) will not be open to the disposal of salable minerals in those lands subject to an NSO stipulation for oil and gas, and 1,539 acres of Federal minerals (split-estate lands) will be closed to the disposal of salable minerals (see Appendix A).

**MIN-21**
**Locatable Minerals:**

- Approximately 427,273 acres are open to operations for locatable minerals subject to standard terms and conditions.
- Approximately 962,258 acres are open to operations for locatable minerals subject to CSU and TL stipulations.
- Approximately 78,333 acres are withdrawn from operations to locatable minerals.
- Approximately 353,510 acres within WSAs are open to operations for locatable minerals subject to the IMP (1650-1).

BLM_0013742

## *NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS (WC)*

**Goals and Objectives:**

BLM has identified non-WSA lands with wilderness characteristics for management consideration in this planning effort. Wilderness characteristics include the appearance of naturalness and outstanding opportunities for solitude or primitive and unconfined recreation (see Appendix K and Map 15 for more information).

Protect, preserve, and maintain wilderness characteristics of non-WSA lands with wilderness characteristics as appropriate, considering manageability and the context of competing resource demands. Manage these primitive lands and backcountry landscapes for their undeveloped character, and to provide opportunities for primitive recreational activities and experiences of solitude, as appropriate.

**Management Decisions:**

**WC-1**

Manage 47,761 acres of non-WSA lands (see Map 16) to protect, preserve, and maintain wilderness characteristics by applying the following prescriptions:

- Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix A). Applying a no surface occupancy stipulation for oil and gas leasing to non-WSA lands with wilderness characteristics, in combination with the no surface occupancy applied because of the Three Rivers Withdrawal, results in tracts of land which are physically inaccessible to oil and gas operations within the Fisher Towers, Mary Jane Canyon, and Beaver Creek areas. For this reason, portions of non-WSA lands with wilderness characteristics in these areas will be closed to oil and gas leasing.
- These areas will be managed to preclude other surface-disturbing activities (see Appendix A) including mineral material sales.
  - Retain public lands in Federal ownership.
  - Prohibit woodland harvest.
  - Manage vehicle use as limited to designated roads.
  - Designate as VRM Class II.
  - Manage as avoidance areas for ROWs.

**WC-2**

Non-WSA lands to be managed for wilderness characteristics include: Beaver Creek (25,722 acres), Fisher Towers (5,540 acres within the Richardson Amphitheater), and Mary Jane Canyon (16,499 acres within the Richardson Amphitheater).

BLM_0013743

## PALEONTOLOGY (PAL)

### Goals and Objectives:

Protect paleontological resources from surface-disturbing activities. Promote the scientific, educational, and recreational uses of fossils.

Foster public awareness and appreciation of the MPA's paleontological heritage.

Promote and facilitate scientific investigation of fossil resources.

### Management Decisions:

### PAL-1

Vertebrate fossils may be collected only by qualified individuals under a permit issued by the BLM Utah State Office. Vertebrate fossils include bones, teeth, eggs, and other body parts of animals with backbones such as dinosaurs, fish, turtles, and mammals. Vertebrate fossils also include trace fossils, such as footprints, burrows, gizzard stones, and dung.

### PAL-2

Fossils collected under a permit remain the property of the Federal government and must be placed in an approved repository (such as a museum or university) identified at the time of permit issuance.

### PAL-3

Locate, evaluate, and protect significant paleontological resources. Provide for public visitation and education opportunities while simultaneously protecting and supporting the scientific and research value of paleontological resources in the MPA.

### PAL-4

Recreational collectors may collect and retain reasonable amounts of common invertebrate and plant fossils for personal, non-commercial use. Surface disturbance must be negligible, and collectors may only use non-power hand tools.

### PAL-5

Casting of vertebrate fossils, including dinosaur tracks, is prohibited unless allowed under a scientific/research permit issued by the BLM Utah State Office.

### PAL-6

Lands identified for disposal will be evaluated to determine whether such actions would remove significant fossils (see Appendix I) from Federal ownership.

### PAL-7

Recognize and protect paleontological resources identified as part of the Dinosaur Diamond National Prehistoric Byway.

BLM_0013744

**PAL-8**

Prohibit petrified wood gathering within the Colorado Riverway Special Recreation Management Area (SRMA) to protect these paleontological resources for future public enjoyment. Prohibit private petrified wood collection only near high visitation sites within the Labyrinth Rims/Gemini Bridges SRMA. Manage petrified wood gathering outside these two SRMAs to allow for private collection of petrified wood (43 CFR 3620).

**PAL-9**

Prohibit commercial sales of petrified wood products due to limited availability of such resources.

**PAL-10**

Attach lease notices, stipulations, and other requirements to permitted activities to prevent damage to paleontological resources.

**PAL-11**

Manage Mill Canyon Dinosaur Trail, Copper Ridge Sauropod Trackway, and Poison Spider Track Site as important scientific and public education resources as guided by future SRMA activity-level plans.

**PAL-12**

Personal collection of a reasonable amount of invertebrate and plant fossils will be allowed throughout the MPA. Where areas with rare and significant invertebrate and plant fossils are identified, these areas will be closed to personal collection.

BLM_0013745

## *RECREATION (REC)*

### Goals and Objectives:

To provide for multiple recreational uses of the public lands and sustain a wide-range of recreation opportunities and potential experiences for visitors and residents, while supporting local economic stability and sustaining the recreation resource base and sensitive resource values.

### Management Decisions:

### REC-1

Management of recreation will be generally guided by the Utah Standards for Public Land Health and Guidelines for Recreation Management. The guidelines describe in a broad sense the conditions to be maintained or achieved for rangeland health within the recreation program.

### REC-2

Where unacceptable damage to natural or cultural resources by recreational use is anticipated or observed, BLM will seek to limit or control activities by managing the nature and extent of the activity or by providing site improvements that make the activity more sustainable or by a combination of management controls and facility development. Such management actions will seek to reduce or eliminate the adverse impact while maintaining the economic benefits associated with a wide range of recreation uses.

### REC-3

BLM will consider and, where appropriate, implement management methods to protect riparian resources, special status species, and wildlife habitat while enhancing recreation opportunities. Management methods may include limitation of visitor numbers, camping and travel controls, implementation of fees, alteration of when use takes place, and other similar actions to be approved through normal BLM procedures.

### REC-4

BLM will coordinate management of recreation use with other agencies, State and local government and tribal units to provide public benefits.

### REC-5

Recreational off-highway vehicle (OHV) and mechanized travel will be consistent with area and route designations described in the travel management plan. BLM will work with agency and government officials and permit holders to develop procedures, protocols, permits or other types of authorization, as appropriate, to provide reasonable access for non-recreational use of OHVs for military, search and rescue, emergency, administrative, and permitted uses.

### REC-6

Dispersed camping is allowed where not specifically restricted. Dispersed camping may be closed seasonally or as impacts or environmental conditions warrant. All vehicle use associated with dispersed camping activities is required to stay on designated routes.

BLM_0013746

## REC-7

Management actions limiting camping, wood gathering, firewood cutting, and requiring use of fire pans and portable toilets implemented through published closures limitations, restrictions, or special rules applicable to specific land areas within the MPA are carried forward in all alternatives (see Moab Field Office Recreation Rules in Appendix L).

## REC-8

Lands acquired within a management area through future land tenure adjustment will take on the management of the surrounding area.

## REC-9

Provide visitor information and outreach programs that emphasize the value of public land resources and low impact recreation techniques while also providing information about recreation activities, experiences and benefits.

## REC-10

Provide public information concerning the prevention of the spread of invasive and exotic weeds, and about wildlife species and their habitat especially in riparian areas.

## REC-11

Continue to manage the Slickrock Bike Trail and Fisher Towers Trail as a National Recreation Trails consistent with their current secretarial designation.  National Trails designation will be consistent with this plan.

## REC-12

Continue supporting public use and enjoyment of the Prehistoric Highway National Scenic Byway. Assist with the development and implementation of a management plan.

## REC-13

Support Grand County's efforts to obtain approval of corridor management plans for Utah Scenic Byways (Utah Highways 128, 313, and 279) and provide assistance, where feasible, in the development of byway facilities consistent with other decisions of the RMP.

## REC-14

Continue to manage Kane Creek Road to Hurrah Pass and the roads to Needles, Anticline, and Minor overlooks as Utah Scenic Backways.

## REC-15

BLM Back Country Byways and National Recreation Trails may be designated in the future as deemed appropriate with site-specific environmental analysis.

## REC-16

Continue managing Kokopelli's Trail to facilitate its use as a potential segment of the American Discovery Trail. Seek to acquire public access along the entire route to facilitate potential designation as a National Recreation Trail.

BLM_0013747

**REC-17**

Criteria for establishment of SRMAs, or adding or revising SRMA boundaries (using the Plan Amendment process, where appropriate) include:

- Recreation use requires intensive management strategies to provide recreation opportunities or maintain resource values.
- A recreation area management plan or interdisciplinary plan with intensive and specific recreation management actions is approved.
- BLM announces the management plan and plan approval through media.

See Map 17 and Appendix M for SRMA goals, settings, outcomes and management prescriptions.

**REC-18**

Generally, where SRMA boundaries are revised, management actions applicable to the original SRMA will also apply to the revised area.

**REC-19**

Manage all public lands within SRMAs for retention in Federal ownership consistent with the MFO exchange criteria and acquire high value non-Federal lands from willing sellers where such acquisition will further the purposes of each SRMA.

**REC-20**

Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix A) within 0.5 miles of developed recreation sites (current and planned as Potential Future Facilities; see each SRMA).

**REC-21**

Manage all SRMAs for sustainable camping opportunities. Camping may be restricted to designated sites if use and conditions warrant.

**REC-22**

Manage all SRMAs according to the Visual Resource Management Class to protect scenic values and settings important to recreation.

**REC-23**

Approved recreation facilities supporting recreation area management objectives will be planned and designed to reduce visual impacts where feasible (see Visual Resource Management).

**REC-24**

Replace The Colorado River SRMA (24,124 acres) with the Two Rivers, Colorado Riverway and Dolores River Canyons SRMAs (Map 17) to provide for more focused management.

**REC-25**

Provide general recreation management guidance and subsequent implementation of management actions for activity plan level actions for SRMAs through continuation and

modification of approved recreation area management plans (RAMPs) and development of new RAMPs for all SRMAs.

## REC-26

A River Management Plan for the Colorado River from the Colorado State Line to Castle Creek, and for the Dolores River, will be completed.

## REC-27

Designate SRMAs as either Destination SRMAs (majority of visitation from outside the area), Community SRMAs (the majority of visitation is from the local community), or Undeveloped SRMAs (the focus of the SRMA is to maintain the backcountry setting.

## REC-28

**Facilities:** Build and maintain additional recreation facilities consistent with the guidance provided in RAMPs and in the various Focus Areas as established in the RMP (Map 18). In the absence of a RAMP, facilities may be considered through the NEPA process where they support the objectives of the SRMA.

## REC-29

**Facilities:** Campground facilities may be constructed; however, they will be located to avoid wetland, riparian, cultural resources, floodplains, and special status plant and animal species habitats. If avoidance is not possible, mitigation will be implemented to augment the values affected by the construction (MCA and Executive Orders).

## REC-30

**Facilities:** Continue to manage and maintain for recreation use all existing developed recreation sites. Follow site management guidance contained in RAMPs.

## REC-31

**Facilities:** Continue existing ROWs issued to BLM for all existing developed recreation sites and facilities. Issue similar protective ROWs for all new recreation facilities.

## REC-32

**Facilities:** Manage developed sites as necessary under the authority of 43 CFR Part 8360, inclusive of published closures, restrictions, and supplemental rules developed for the public lands within the MPA (see above), to protect visitor health and safety, reduce visitor conflicts, and provide for the protection of government property and resources.

## REC-33

Focus Areas are Recreation Management Zones (RMZ) for emphasizing particular types of recreation activities while still allowing for other uses in accordance with the Travel Plan. As RMZs, Focus Areas (Map 18) are established as a mechanism for enhancing specific recreation opportunities through facilities and education such as route marking, parking, camping, and information. Where a single focus SRMA or a specific RMZ (Focus Area) is not identified, the default focus of that area is motorized, backcountry touring on designated roads. The roads are those identified in the Travel Plan accompanying this RMP.

BLM_0013749

## REC-34

The types of Focus Areas are: Non-mechanized Recreation, Mountain Bike Backcountry Touring, Motorized Backcountry Touring, Scenic Driving Corridors, Specialized Sport Venue Non-motorized, Specialized Sport Venue Motorized, and Managed Open OHV Area.

## REC-35

**Cameo Cliffs SRMA:** Manage the Cameo Cliffs area as a Destination SRMA (15,597 acres) under the Cameo Cliffs Recreation Area Management Plan. The Cameo Cliffs SRMA will provide sustainable opportunities for road-related motorized and mechanized outdoor recreation on a marked route system, and provide a non-mechanized hiking and equestrian area in Hook and Ladder Gulch and along the route of the Old Spanish Trail, while protecting and maintaining resource values including range, wildlife habitat, scenic, cultural, historical, recreational, and riparian values in current or improved condition. To facilitate use of the area for touring purposes, no motorized competitive events will be authorized.

Work with San Juan County to further implement the Cameo Cliffs portion of the San Juan County All-terrain Vehicle Plan, and to protect and manage wildlife, vegetation, and cultural resources.

Implement camping management rules as use levels and resource impacts warrant.

**Facilities:** Install Cameo Cliffs OHV Trailhead toilet.

## REC-36

**Canyon Rims SRMA:** Manage the Canyon Rims SRMA (101,531 acres) as a Destination SRMA to protect, manage and improve the natural resources of the area while allowing for recreation activities such as developed camping, visiting scenic overlooks, auto touring on the primary road system, touring the secondary road system by motorized vehicle and mountain bike, and hiking and backpacking the canyons (in accordance with the ROS classes) utilizing interpretive and educational opportunities to realize the potential of the area. Major management actions in the Canyon Rims SRMA include:

- Manage the area as open to mineral leasing with controlled surface occupancy except for developed recreation sites, which will be managed as open to leasing with no surface occupancy.
- Manage the area to maintain ROS classes as inventoried.
- Acquire or exchange private and State lands from willing landowners.
- Manage the entire area as OHV travel limited to designated roads.
- Manage the western rim land areas of Hatch Point as VRM Class II and the remainder of the area as VRM Class III.
- Maintain and/or improve all existing developed recreation sites as specified in the Canyon Rims Recreation Area Management Plan.
- Restrict camping near developed recreation sites.
- Close the entire recreation area to wood cutting and gathering.
- Manage Hatch Wash and the lower section of West Coyote Creek for primitive, non-motorized recreation.

BLM_0013750

*Moab Approved Resource Management Plan – Recreation*

- Restrict backcountry motorized events to commercial and non-race special events on the Flat Iron Mesa Jeep Safari route only.
- Manage the Windwhistle Nature Trail, Anticline Overlook Trail, Needles Overlook Trail, and Trough Spring Canyon Trail for hiking use only
- Consider development of additional trails and recreation facilities only as necessary.

**Focus Area -- Non-mechanized Recreation (3,642 acres):** Hatch Wash Hiking and Backpacking Focus Area inclusive of the area from Goodman Canyon to the confluence of Hatch Wash with Kane Creek Canyon including the lower section of West Coyote Creek (from private land west to confluence with Hatch Wash) and the lower section of Troutwater Canyon.

- New motorized routes will not be considered in the Hatch Wash Hiking and Backpacking Focus Area.

**Focus Area –Scenic Driving Corridors:** Needles and Anticline Roads – Utah Scenic Backways. Manage for scenic driving enjoyment. The corridor is defined as having a width of 1/2 mile from centerline (or to border of adjoining Focus Area).

## REC-37
**Colorado Riverway SRMA** will be established as a Destination SRMA at 89,936 acres. Management will be the same as the Colorado Riverway Recreation Management Area which was established in 1992 and extended in 2001. Management has focused on providing improvements to sites to facilitate recreation use and protection of scenic and other resource values. Subsequent recreation plan amendments have addressed camping in the Onion Creek area, the construction of a bike lane along SR-128 from the Porcupine Rim Trail to Lion's Park, the construction of a non-motorized bridge on non-Federal land at Lion's Park, and the establishment of a non-mechanized route system in the area between Onion and Professor Creeks.   Major management actions in the Colorado Riverway SRMA include:

- Expand the boundary of the Colorado Riverway SRMA to include the lands north of the Entrada Bluffs Road to the boundary of the Two Rivers SRMA, as well as lands south of the Entrada Bluffs Road (one mile corridor).
- Manage the Colorado Riverway as a Destination SRMA to manage camping, boating, river access, trail, and interpretive facilities in popular areas along or near the Colorado River and to protect the outstanding resource values of the area. Guidance for management is included in the Colorado Riverway Recreation Area Management Plan.
- Manage the Dewey Bridge to Castle Creek portion of the Colorado River to provide opportunities for high use boating in a scenic setting (see Boating Management below).
- Manage south shore recreation sites (from Dewey Bridge to Lion's Park) under the Colorado Riverway RAMP.
- Manage the north shore to provide quality undeveloped designated camping and hiking opportunities while assuring protection of high quality habitat for bighorn sheep as well as for other resource values.
- Manage the Kane Creek Crossing area to emphasize responsible designated camping and scenic touring.
- Manage the Entrada Bluffs Road area to emphasize designated camping opportunities, and scenic touring.

BLM_0013751

- Manage the Shafer Basin addition to emphasize scenic backcountry driving opportunities (no camping allowed in this area).
- Manage the Amphitheater Loop, Fisher Towers, Negro Bill Canyon, Hunter Canyon, and Corona Arch trails and Professor Creek to provide high quality hiking-only opportunities while preserving ecological resources.
- Provide for parking and manage the Kings Bench route (above the Kane Creek Road near the Kings Bottom camping area) as a hiking route. Obtain public access from a willing seller across the short section of private land that is located along the route.
- Manage the seldom-used 1.5-mile long route (that spurs left from the Poison Spider Mesa Road) on the intermediate bench between the Colorado River and Poison Spider Mesa for hiking use. If future use levels warrant, develop a return hiking trail loop on the river side of the road bed.
- Establish the proposed Pothole Arch and Rockstacker trails on Amasa Back (Kane Creek) as mountain bike routes. Work with Monticello Field Office to designate the Jackson's Ladder historic horse trail as a mountain bike trail from Jackson's Hole to the Amasa Back Jeep Road. Work with private land owners to secure non-motorized access to the bottom of this route.
- Manage the Portal Trail to provide both hiking and mountain bike opportunities.
- Manage the Kane Creek Road to Amasa Back Jeep Road section of the Historic Jackson's Ladder trail as hiking and biking only.
- Acquire specific tracts of State land.
- Acquire private lands or scenic easements from willing sellers.
- Restrict motorized and mechanized travel to designated routes.
- Limit camping and camp fires to designated sites.
- Close the area to firewood cutting and limiting firewood gathering to riverside driftwood.
- Limit use of the Fisher Towers, Negro Bill Canyon, Hunter Canyon, and Corona Arch trails to foot travel.
- Lands along the Colorado River within the Riverway are withdrawn from mineral entry through the Three Rivers Withdrawal.

**Future Facilities within the Colorado River SRMA:**

- Castle Valley Interpretive Site.
- Entrada Bluffs Camping Area; camping in this area will be limited to this campground.
- Hittle Bottom Group Campsites.
- Kane Creek Crossing Camping Area. Work with SITLA to implement joint camping management in this area.
- Kane Creek Road Riverway Information Area
- Lower Castle Creek Trail Access.
- Poison Spider Dinosaur Track Trail.
- Utah Highway 128 Bike Lane.
- Utah Highway 279 Riverway Information Area.
- Wall Street climbing area toilet.

**Focus Area -- Negro Bill Hiking and Ecological Study Focus Area**: (8,684 acres) inclusive of Negro Bill Canyon between the Sand Flats Recreation Area and the Porcupine Rim Trail.

BLM_0013752

*Moab Approved Resource Management Plan – Recreation*

Manage for recreational mechanized use on the main portion of the Porcupine Rim Trail from the junction approximately 1.55 miles east of Little Spring (upper exit to Sand Flats Road) to Highway 128 (with the exception of the Porcupine Rim Trail to Coffeepot Rock which will be managed for motorized use.)

- Manage the Negro Bill Canyon Trail for hiking use only. Equestrian use of Negro Bill Canyon will be prohibited.
- Manage the Porcupine Rim Trail to provide only hiking and mountain biking opportunities. Management of this trail may change pending resolution of wilderness designation for the Negro Bill Canyon WSA.
- No new motorized routes will be considered.

**Focus Area -- Richardson Amphitheater/Castle Rock, Hiking, Climbing and Equestrian Focus Area:** (24,767 acres) bounded by Fisher Valley, the rim of "Top of the World" escarpment, Highway 128, and non-Federal lands along the east side of the Castle Valley Road. Motorized use allowed on the Fisher Towers Road, the Onion Creek Road, roads serving private ranches and water developments in the Professor Valley area, and the motorized access route to the viewpoint of Professor Valley (the saddle between Adobe Mesa and Castle Rock) and the road to designated undeveloped campsites below Castle Rock. Work with Utah Open Lands (a private land conservation organization) to establish a semi-developed camping area to serve rock climbers.

- The Onion Creek Benches equestrian trail system between Onion and Professor Creeks will be managed to provide opportunities for equestrian trail riding. An equestrian-oriented reservable camping area will be managed in Onion Creek upstream from Highway 128. Up to 30 miles of equestrian trails will be marked within this Focus Area.
- Manage the Amphitheater Loop and Fisher Tower Trails for hiking only.
- Consider connecting hiking trails between Onion Creek and the Amphitheater Loop Trail.

**Focus Areas -- Scenic Driving Corridors:** These corridors include Highways 128 and 279 (which are both designated Utah Scenic Byways), as well as the Kane Creek/Hurrah Pass portion of the Lockhart Basin Scenic Backway and the BLM portion of the LaSal Mountain Loop Road Scenic Backway. Manage for scenic driving enjoyment. The corridor is defined as having a width of 1/2 mile from centerline, or line of sight or to border of adjoining Focus Area (whichever is shorter; see VRM for management prescriptions).

**Focus Areas -- Specialized Sport Venue, Non-motorized: Tombstone Competitive BASE Jumping Focus Area (42 acres):**

- Manage Tombstone area to provide BASE jumping opportunities along the Kane Creek Road. BASE jumping will not be allowed in developed recreation sites.

**Focus Areas -- Specialized Sport Venue, Non-motorized Wall Street Sport Climbing Focus Area (44 acres) (with special protective measures taken for rock art):**

- Manage Wall Street area to provide rock climbing opportunities along the Potash Road.

BLM_0013753

**Boating Management:** Dewey to Castle Creek: Manage to provide an opportunity for scenic, mild whitewater boating. No restrictions on amount of private use will be established unless unacceptable resource impacts occur. Permit 22 unallocated commercial permits. No further restrictions on amount of commercial use will be established.

- Camping will be restricted to designated campsites along the north side of the Colorado River and existing campgrounds on the south side of the Colorado River.

## REC-38
**Dolores River Canyons SRMA (Map 17):**

- Manage as an undeveloped SRMA (31,661 acres)
- Maintain high quality opportunities for non-motorized boating and day hiking or backpacking in a remote setting supported by basic trailheads, trails, and car camping facilities that support primitive, non-motorized use of the canyon system.
- Major management actions will include prohibition of motorized and mechanized recreation use within the Dolores River's tributary canyons consistent with the Travel Plan.
- No new motorized routes will be considered.

**Boating Management:** Colorado State Line to Bridge Canyon: Manage to provide opportunities for scenic whitewater boating trips. Permits required for private and commercial use. Establish maximum group size of 25 (excluding guides on commercial trips). Do not establish daily launch limits. Permit 14 unallocated commercial outfitters.

## REC-39
**Labyrinth Rims/Gemini Bridges SRMA (Map 17):**

- Manage the Labyrinth Rims/Gemini Bridges area (Map 17) as a Destination SRMA (300,650 acres)
- BLM manages private boating use in Labyrinth Canyon in conjunction with the Utah Divisions of State Parks and Recreation and Fire, Forestry and State Lands under the terms of a cooperative agreement. The agreement establishes an interagency river permit system and coordinates implementation of common river protection rules including group size and use of fire pans and portable toilets. BLM also issues permits for shoreline use related commercial river trips.
- Lands along the Green River in Labyrinth Canyon were withdrawn from new entry under the mining laws through the Three Rivers Withdrawal.
- Front country type use takes place along SR 313 and the Island in the Sky Road. This highway was designated the Dead Horse Mesa Scenic Byway by the State of Utah in the early 2000s. To manage dispersed camping and protect scenic values, BLM establishes a 1-mile-wide corridor along SR 313 and the Island in the Sky Entrance Road where camping is limited to designated sites, wood cutting and firewood gathering are prohibited, and portable toilets are required. BLM currently limits camping in the corridor to the Horsethief Campground, the Lone Mesa, and Cowboy Camp camping areas. BLM also limits camping and prohibits woodcutting and firewood gathering in a one- mile-wide corridor along the

BLM_0013754

Gemini Bridges Road. Manage the small Cowboy Camp for tent camping and manage the Lone Mesa area for group use.

- In addition to the Mineral Bottom Takeout, BLM manages several additional facilities in the area including the Mill Canyon Dinosaur Interpretive Trail, the Halfway Stage Station Interpretive Site, and the Copper Ridge Sauropod Trackway Interpretive site. BLM also manages and maintains route markings (with user group assistance) on the Monitor and Merrimac, Seven Mile Rim, Poison Spider Mesa, Golden Spike, Goldbar Rim, Gemini Bridges, Lower Monitor and Merrimac, Bar M, and Klondike Bluffs routes which are used by both motorized and non-motorized visitors. The 3-D, Crystal Geyser, Hellroaring Rim, Secret Spire, and Wipeout Hill routes are authorized for Jeep Safari and other uses.
- Continue issuing permits, for both private and commercial users, with common river protection rules for Labyrinth Rims/Gemini Bridges SRMA and consider extending the BLM/State cooperative agreement for management of non-commercial use to include management of commercial river use. If future use levels warrant, relocate the Mineral Bottom Takeout to a more suitable location and initiate cooperative site operations with the National Park Service.
- Limit camping to designated sites in high-use areas including the Scenic Driving Corridors and all areas east of the Dubinky Well Road as well as along Ten Mile Wash.
- Manage backcountry areas to facilitate scenic motorized touring on designated routes with special emphasis upon establishment of low-development, end of route parking areas and route signing.
- Improve the road to the Mill Canyon Dinosaur Trailhead to accommodate passenger car traffic.
- Consider development of an alternative single-track mountain bike route on Poison Spider Mesa across the mesa top to the top of the Portal Trail.

**Future Facilities:**

- Bartlett Campground: camping in this area will be restricted to this campground.
- Big Mesa Campground: camping in this area will be restricted to this campground.
- Blue Hills Road OHV Trailhead.
- Courthouse Rock Campground, camping in this area will be restricted to the campground.
- Cowboy Camp Campground, camping in this area will be restricted to this campground.
- White Wash Sand Dunes OHV Parking and Camping Area.
- Gemini Bridges Parking Area and Trailhead.

**Focus Area -- Scenic Driving Corridors:** Highway 313 and the Island in the Sky Road (Utah Scenic Byway): Manage for scenic driving enjoyment. The corridor is defined as having a width of 1/2 mile from centerline (or to border of adjoining Focus Area; see Appendix A).

**Focus Areas -- Non-Mechanized Recreation:**

- Goldbar/Corona Arch Hiking Focus Area (4,191 acres) covers the lands below the Golden Spike OHV route inclusive of the Culvert Canyon drainage to the northern rim of Long Canyon exclusive of the main stem of the Day Point Road. Manage the Corona Arch Trail for hiking only. Develop a hiking loop route in Culvert Canyon from the canyon bottom up to Jeep Arch and back on the western bench of Culvert Canyon to the canyon to just up

BLM_0013755

canyon from the railroad spur. Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix A) to protect primitive hiking opportunities and scenic values. No new motorized routes will be considered.

- Spring Canyon Hiking Focus Area (457 acres) will be established upstream from the Spring Canyon Bottom Road. No new motorized routes will be considered.
- Labyrinth Canyon Canoe Focus Area (7,709 acres) inclusive of the rims along the east side of Labyrinth Canyon from Placer Bottom to Mineral Bottom exclusive of the Hey Joe Mine OHV and mountain bike route. No new motorized routes will be considered.
- Seven Mile Canyons Equestrian Focus Area (1,026 acres) inclusive of the north and south forks of Seven Mile Canyon westward from the junction of the two canyons. Equestrian use in this area will be restricted to private (non-commercial) horse use. No new motorized routes will be considered.

**Focus Areas -- Mountain Bike Backcountry Touring:**

- Klondike Bluffs Mountain Biking Focus Area (14,626 acres) between Arches National Park and U.S. 191. Work with Grand County and SITLA to establish mountain-bike only opportunities in the Klondike area. Manage the Copper Ridge Sauropod Trackway Interpretive Trail for hiking only.
- Bar M Mountain Biking Focus Area (2,904 acres) between Arches National Park, U.S. Highway 191, and the Bar M area state lands, exclusive of motorized access for the Copper Ridge Jeep Safari Route and the 191 rock quarry access road. Convert existing routes to mechanized use and provide for a limited number of new and connecting routes to support use of area as the destination for the 191 bike lane. Recommend that the old highway route in Moab Canyon be managed for non-motorized use to facilitate use of the route as part of the 191 bike lane.
- Tusher Slickrock Mountain Biking Focus Area (428 acres) on slickrock between Bartlett and Tusher Washes with main access from Bartlett Wash to reduce traffic in Tusher   Canyon. Manage the Tusher Canyon slickrock and Bartlett slickrock areas for mountain bike and hiking use only.  Cross-country mountain biking across slick rock will be allowed throughout this area.
- Mill Canyon/Upper Courthouse Mountain Biking Focus Area (5,744 acres) inclusive of areas within the Mill Canyon and upper Courthouse drainages with continued use of the Seven Mile Rim Jeep Safari route for motorized use, with non-motorized trailheads near the Mill Canyon Dinosaur Trail and the Halfway Stage Station. Manage the Mill Canyon Dinosaur Trail for hiking only (35 miles of road designated for motorized travel; 23 miles of route managed for mechanized use only).

**Focus Area -- Motorized Backcountry Touring:**

- Gemini Bridges/Poison Spider Mesa Focus Area (16,299 acres) for multiple use, including full-size OHV, ATV, and motorcycle use with consideration given to managing routes suitable for each vehicle type. Travel will be intensively managed on designated routes only. Close the spur route to Gemini Bridges to facilitate public use and help restore damaged lands along the spur route. Construct a parking area near the bridges.

BLM_0013756

**Focus Areas -- Specialized Sport Venue (Non-motorized):**

• Mineral Canyon/Horsethief Point Competitive BASE Jumping Focus Area (762 acres) is established.
• Bartlett Slickrock Freeride Focus Area (166 acres) is established. No man-made structures will be added to facilitate "stunt riding."

**Focus Areas – Specialized Sport Venue (Motorized):**

• Dee Pass Motorized Trail Focus Area (35,290 acres) for motorcycle and ATV use: This is the area for competitive motorized events. Competitive routes within this area will be identified based on site-specific NEPA analysis. All routes designated for motorized use in the accompanying Travel Plan will remain open while Section 106 cultural resource inventories are conducted. If these inventories indicate the presence of eligible sites within the travel corridor, the route will be altered or closed. All new routes will require Section 106 cultural resource inventory prior to designation. Establish a managed OHV route system with provision for ongoing management of existing single-track routes to maintain their single-track character.
• Airport Hills Motocross Focus Area (285 acres): Manage the Focus Area for motocross use in partnership with local government under the Recreation and Public Purposes Act. A patent will be issued to local government.

**Focus Area – Managed OHV area (cross country travel allowed):**

• White Wash Sand Dunes Open OHV Focus Area, (1,866 acres) encompassing the area around the dunes themselves. Manage the central portion of the White Wash Sand Dunes for motorized sand play with exception of the dune field cottonwood trees and White Wash water sources which will be closed to motorized travel and fenced.
• Limit camping use in the White Wash Sand Dunes area to designated sites and establish basic camping facilities on the bench on the north side of White Wash.
• Implement a fee system, under the guidelines of the Federal Land Recreation Enhancement Act, to help fund cost of intensive management of the White Wash Sand Dunes area.

## REC-40
**Lower Gray Canyon SRMA (Map17):**

• Manage as a Destination SRMA in coordination with the Price Field Office.
• Manage river recreation in accordance with the Desolation-Gray Canyons Management Plan.
• Manage the existing riverside and the parallel bench route loop trails from Nefertiti Rapid to Rattlesnake Canyon for hiking and equestrian use.
• Vehicle camping limited to designated sites

BLM_0013757

## REC-41
**Sand Flats Area SRMA (Map 17):**

- Manage as a Destination SRMA (6,246 acres). Guidance for management is included in the Sand Flats RAMP, which was approved in August of 1994, and is supported by the June 1994 Cooperative Agreement with Grand County, which authorizes the county to collect fees for the benefit of the recreation area and participate in the operational management of the area to help implement the recreation area management plan. The following decisions are carried forward from these plans:

  - Acquisition of State lands through exchange.
  - OHV travel limited to designated roads and trails.
  - Provision for entrance and use fees.
  - Development of campgrounds.
  - Potential development of a drinking water source.
  - Provision for parking lots at the Slickrock and Little Spring trailheads.
  - Installation of toilets.
  - Development of an entrance station.
  - Provision for visitor protection.
  - Information and various services.
  - Limit camping to designated sites.
  - Limit OHV and mountain bike travel to designated routes.
  - Prohibit wood collecting and gathering.
  - Close the Moab Slickrock Bike Trail to four-wheeled vehicles and ATV use for safety purposes.
  - The Slickrock Bike Trail is open to motorcycles and mountain bikes only.
  - Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix A) to protect recreation and scenic values.

## REC-42
**Moab SRMA (Map 17):**

- Manage the South Moab SRMA (Map 17) as a Destination SRMA (63,999 acres).
- Provide emphasis upon development of non-motorized trails through agreements with neighboring land owners through preparation of management guidance covering the Ken's Lake area.
- Work with Grand and San Juan counties to establish the New Spanish Trail Bicycle Lane to provide safe bicycle access from Canyonlands Field to the Pack Creek Picnic Area.
- Work with Moab City and Grand County to extend the Mill Creek Parkway to the Power Dam trailhead to provide safe access for cyclists and hikers.
- Formalize and continue the existing partnership with the water district to share management expenses at Ken's Lake.
- Manage the Mill Creek Power Dam hiking trailhead, the Ken's Lake Recreation Site, the Hidden Valley hiking trailhead and the Blue Hill multi-use trailhead and undeveloped camping area as recreation sites. Continue to manage the Mill Creek Canyon hiking trails, the Ken's Lake hiking trail system, the Hidden Valley Hiking trail, the Steelbender/Flat Pass

BLM_0013758

OHV/ mountain bike route, the Behind the Rocks OHV route, the Strike Ravine OHV route, and the Kane Creek Canyon Rim OHV/mountain bike route as recreation routes.

- Limit camping to designated sites and prohibit wood gathering and cutting along the Black Ridge Road, the Pack Creek Road, the LaSal Mountain Loop Road and the Kane Creek Canyon Rim Road out to the Picture Frame Arch area. Prohibit camping on the west side of Spanish Valley, and in Mill Creek.
- Manage Ken's Lake as a developed recreation site in partnership with the holders of the ROW for Ken's Lake (Spanish Valley Water and Sewer District).
- Manage the Mill Creek Canyon planning area in accordance with the approved interdisciplinary Mill Creek Canyon Management Plan.
- Work with Grand County, SITLA, and private land owners to establish the "Power line" trail along the west side of Moab and Spanish Valleys from Kane Creek Road near the river portal south via the Hidden Valley Trailhead to the southern end of the Behind the Rocks area.
- Work with San Juan and Grand Counties, SITLA, and private land owners to establish the Red Rock Horse Trail along the east side of Spanish Valley via Ken's Lake from the Johnson's Up-on-Top Road to the Loop Road/Pack Creek junction area.
- Work with the Backcountry Horsemen, SITLA and San Juan County to establish equestrian riding loop routes south from the Ken's Lake Trailhead.

**Focus Area -- Scenic Driving Corridors:**

- LaSal Mountain Loop Road Scenic Backway. Manage for scenic driving enjoyment. The corridor is defined as: having a width of 1/2 mile from centerline (or to border of adjoining Focus Area) (see Appendix A).

**Focus Areas -- Non-mechanized Recreation:**

- Mill Creek Canyon Hiking Focus Area (16,950 acres) inclusive of the north and south forks of Mill Creek, Rill Creek, and Burkholder Draw south to the LaSal Mountain Loop Road with motorized use limited to the Steelbender OHV route and routes identified in the Travel Plan for this alternative. Emphasize management of the core area of Mill Creek to provide primitive hiking opportunities. Commercial equestrian use of Mill Creek Canyon and its tributaries will be prohibited except for use along the Steelbender/Flat Pass OHV/mountain bike route. No new motorized routes will be considered.
- Behind the Rocks Hiking Focus Area (17,536 acres) inclusive of the area currently closed to motorized use in the 1985 RMP and the Hunter Canyon area between Pritchett Canyon and the eastern rim of Kane Creek Canyon exclusive of the Pritchett Canyon and Behind the Rocks OHV route. Manage the Hunter Canyon trail for hiking only. Emphasize management of the core area of Behind the Rocks to provide primitive hiking opportunities. No new motorized routes will be considered.

**Focus Area -- Mountain Bike Backcountry Touring:**

- Upper Spanish Valley Mountain Biking Focus Area (2,255 acres; Mud Spring Area) for development of a beginner to intermediate skill level mountain bike trail system through

BLM_0013759

conversion of existing routes and development of new routes. Work with SITLA to expand route system on adjacent state lands.

**Focus Area -- Specialized Sport Venue (Non-motorized):**

- 24 Hours of Moab Focus Area (2,905 acres) will be established to facilitate mountain bike speed-related events.

**Focus Area -- Specialized Sport Venue (Motorized):**

- Potato Salad Hill Climbing Focus Area (41 acres) will be established within the boundary of the fenced areas emphasizing hill climbing events. Parking limitations will be established to limit vehicle group size.

## REC-43
**Two Rivers SRMA (Map 17):**

- Manage the Two Rivers SRMA (29,839 acres) as a Destination SRMA with the objective of continuing to provide distinct, high quality opportunities for recreational boating and camping, and to protect the outstanding resource values. Use launch systems and campsite assignments to reduce inter-party contacts.

**Boating Management -- State Line to Westwater Ranger Station:** Manage for relatively high use flat water boating in conjunction with the Ruby/Horsethief Canyons section in Colorado. Co-administer a private boating or parking permit system and user limitations and fees in conjunction with Colorado BLM as a means of providing for adequate take-out.

**Boating Management -- Westwater Canyon:** Manage to provide an opportunity for whitewater boating in a primitive and remote setting. Permits required for private and commercial use. Distribute potential use levels equally from May 1 to September 30 (allocation season) between private and commercial sectors (including guides). Establish maximum private group size of 25 people and a daily launch limit of 75 people. For commercial use, establish a maximum trip size of 25 passengers, plus one crew member per passenger carrying craft, plus two additional crew. Establish a commercial daily launch limit of 75 passengers. Permit 18 commercial outfitters.

**Boating Management -- Cisco Landing to Dewey Bridge:** Manage to provide an opportunity for scenic flat water boating or as an extension of Westwater Canyon trips. For private use, no restrictions on amount of use will be established. Permit 22 unallocated commercial permits. No further restrictions on amount of commercial use will be established. Manage the Dewey Bridge Recreation Site under the Colorado Riverway RAMP.

**Boating Management -- Dolores River from Bridge Canyon to its confluence with the Colorado River:** Manage to provide opportunity for scenic whitewater boating trips. Permits required for private and commercial use. Establish maximum group size of 25 (excluding guides on commercial trips). Do not establish daily launch limits. Permit 14 unallocated commercial outfitters.

BLM_0013760

**Future Facilities:** Acquire additional lands at the Westwater Ranger Station to include additional camping, parking and launch facilities. Seek to develop a take-out facility separate from the Westwater Ranger Station launch ramp to reduce congestion at the ranger station. Seek opportunities to expand legal and physical access to facilitate camping at the Ranger Station.

**Focus Area -- Non-mechanized Recreation:**

• Establish the Westwater Canyon River Use and Hiking Focus Area (23,479 acres) inclusive of Westwater Canyon along the Colorado River between Westwater Ranch and Rose Ranch and the surrounding uplands.
• New motorized routes will not be considered.

## REC-44
**Utah Rims SRMA (Map 17):**

Manage Utah Rims as a Community SRMA (15,424 acres) to provide sustainable opportunities for motorized, mechanized and non-motorized route related recreation while protecting and maintaining resource values including range, wildlife habitat, scenic, cultural, recreational, and riparian values in current or improved condition. Work with Colorado BLM to coordinate management of the Utah Rims and Rabbit Valley Colorado areas. Management actions will include:

• Manage the Kokopelli's Trail for recreation use.
• Manage Bitter Creek Campsite for camping.
• Limit motorized and mechanized travel to a designated road and route system, including where feasible, the establishment and management of a network of single-track routes.
• Acquisition of public access across non-Federal lands for the route system.
• Development of a staging area.
• Potential separation of types of single-track route use by time period.
• Limited provision of camping facilities.
• Prohibition of competitive, motorized events on the single-track route system to maintain its single-track nature.
• Add single-track routes to the route system on a case-by-case basis pending resolution of resource concerns.

## REC-45
**Extensive Recreation Management Area:** Manage all lands within the MPA not within an SRMA as the Moab Extensive Recreation Management Area (ERMA; see Map 17 and Appendix M).

ERMA lands may be designated as SRMAs in the future based on intensity of use and will be analyzed through the plan amendment process.

Minimal facilities may be constructed in the ERMA as needed to insure visitor health and safety, reduce user conflict, and protect resources.

BLM_0013761

Provide general recreation management guidance and subsequent implementation of management actions for activity plan level actions for the Moab ERMA through development of a Recreation Area Management Plan (RAMP). Address both site-related issues (development and management in response to user demand and changing conditions) and backcountry management issues (the retention of backcountry characteristics, e.g., low level of development, relative lack of crowding, and feeling of remoteness).

Amend the RMP, as necessary, for RMP level recreation and non-recreation actions proposed through the RAMP developed subsequent to RMP approval.

Manage OHV travel as limited to designated routes or closed, depending on the specific area (see Travel Management section, beginning on page 2-47).

Monitor recreation activity in the Moab ERMA to maintain recreation opportunities and protect resource values.
Continue making improvements to sites and areas as necessary and supported by activity and project level planning to balance demand for recreation opportunities and protection of the recreation resource base.

Continue to manage the Utah portion of the Kokopelli's Trail as a multi-day mountain bike and vehicle route (in part) with associated camping areas.

Develop basic camping and trailhead facilities to serve the Lost Spring Canyon area should use levels and impacts warrant.

Construct information boards at the main exits along I-70 to inform visitors about recreation opportunities, travel management, low impact recreation techniques, and visitor safety issues.

Upper Fisher Mesa (1,365 acres) will be managed to emphasize mountain biking. BLM will convert existing roads and provide new connecting routes for bicycle use in conjunction with the existing bike route within the Manti-LaSal National Forest. Motorized access will be retained along the main existing Fisher Mesa access road.

Manage the Bookcliffs area (335,457 acres) for non-mechanized recreation, especially equestrian use, hiking, backpacking and big game hunting. It will be managed for low frequency of visitor interaction by not establishing new motorized or mechanized recreation routes, no commercial motorized permits will be issued, and competitive events will not be allowed.

Manage the Sego Canyon Rock Art Site as a day use recreation area. Consider acquisition of the adjacent private rock art area north of the interpretive site to expand interpretive opportunities.

## REC-46
**Special Recreation Permits (SRPs):** SRPs are issued as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources,

BLM_0013762

and provide for the health and safety of visitors. Cost recovery procedures for issuing SRPs will be applied where appropriate.

## REC-47

Priority for authorization of new SRPs for events are given to applicants proposing uses that: do not duplicate existing events; take place outside of March, April, May, and October; make use of less-crowded weekdays; utilize facilities off public lands for overnight accommodation of guests; display and communicate the Canyon Country Minimum Impact Practices; and focus visitation on sites and areas capable of withstanding repeated use.

## REC-48

All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns.

## REC-49

There will be no competitive mechanized or motorized events in Wilderness Study Areas while these areas are managed under the IMP.

## REC-50

Issue and manage special recreation permits for a wide variety of uses to enhance outdoor recreational opportunities, provide opportunities for private enterprise, manage user-group interaction, and limit the impacts of such uses upon natural and cultural resources. Organized group permits required for groups with 25 or more vehicles (one driver/vehicle).

BLM_0013763

## *RIPARIAN (RIP)*

### Goals and Objectives:

Manage riparian areas for properly functioning condition (PFC) and ensure stream channel morphology and functions are appropriate for local soil type, climate, and landform.

Avoid or minimize the disturbance, loss, or degradation of riparian, wetland, and associated floodplains; preserve and enhance natural and beneficial values; and provide for fish, wildlife and special status species habitats.

### Management Decisions:

### RIP-1

Manage riparian resources for PFC, which is described as the presence of adequate vegetation, landforms, or large woody debris, in accordance with the Utah Standards for Public Rangeland Health and Guidelines for Recreation Management for BLM Lands in Utah and with the Grazing Guidelines for Grazing Management.

### RIP-2

Retain the Between the Creeks, North Sand Flats, and South Sand Flats Allotments as not available for grazing to benefit riparian resources. These allotments include the following streams: Negro Bill Canyon, portions of Mill Creek, and Rill Creek.

### RIP-3

Mitigation to reduce impacts to floodplains and riparian areas include (from Standards for Public Land Health and Guidelines for Recreation Management for BLM Lands in Utah and BLM Riparian Manual 1737):

- Where feasible and consistent with user safety, developed travel routes will be located/relocated away from sensitive riparian/wetland areas.
- Camping in riparian areas will be avoided and must be managed, monitored, and modified as conditions dictate to reduce vegetation disturbance and sedimentation.
- Stream crossings will be limited in number dictated by the topography, geology, and soil type. Design any necessary stream crossings to minimize sedimentation, soil erosion and compaction (minimize longitudinal routes along stream banks, design crossings perpendicular to the stream).
- Where necessary, control recreational use by changing location or kind of activity, season, intensity, distribution and/or duration.
- Grazing actions to meet riparian objectives include vegetation use limits, fencing, herding, change of livestock class, temporary closures, change of season, and/or alternate development or relocation of water sources.
- Any water diversions from riparian areas by BLM or non-BLM entities will be designed and constructed to protect ecological processes and functions.
- Implement weed management stipulations and education to reduce spread of noxious weeds along stream corridors.

BLM_0013764

**RIP-4**

To the extent possible, mineral removal and lease development (including placer mining) must be located away from water's edge and outside of riparian/wetland zones.

**RIP-5**

Limit activities in riparian areas, as necessary, to achieve and maintain PFC.

**RIP-6**

Grazing actions to meet riparian objectives can include fencing, herding, change of livestock class, temporary closures, and/or change of livestock season of use.

**RIP-7**

Preclude surface-disturbing activities within 100-year floodplains and within 100 meters of riparian areas, public water reserves, and springs.

**RIP-8**

Prioritize restoration activities in riparian systems that are Functioning at Risk or Non-functioning.

**RIP-9**

Continue to apply integrated species management to accomplish riparian restoration through biological, chemical, mechanical, and manual methods (e.g., tamarisk control, willow plantings).

**RIP-10**

Acquire riparian lands and water resources (from willing sellers) to preserve and maintain riparian habitat and instream flow.

**RIP-11**

Do not dispose of riparian or wetland resources unless resource loss is mitigated.

**RIP-12**

Develop watershed management plans for impaired systems as identified in current TMDL reports (e.g., Onion Creek, Mill Creek, and Castle Creek).

**RIP-13**

Close riparian areas to woodcutting, except where permitted for traditional cultural practices identified for Native Americans or for restoration to benefit riparian values.

**RIP-14**

Establish Lower South Fork of Seven Mile Canyon as a Riparian/Wetland Demonstration Area for the improvement and restoration of riparian, wetland and wildlife resources.

**RIP-15**

Grazing will not be authorized on portions of the following streams (listed with affected allotments): the Colorado River from Dewey Bridge to Hittle Bottom (Professor Valley), and Lower Kane Creek (Kane Creek Springs).

BLM_0013765

**RIP-16**

Management strategies will be implemented to restore degraded riparian communities, protect natural flow requirements, protect water quality, and manage for year-round flow.

**RIP-17**

**Grazing Actions:** Evaluate non-functioning and functioning at risk riparian areas using Standards for Rangeland Health and Guidelines for Livestock Grazing Management to determine if restriction from grazing will improve riparian functioning condition. The following riparian areas will be given priority for evaluation: Ten Mile from Dripping Spring to the Green River, Mill Creek, Seven Mile Canyon, and East Coyote (totaling 1,420 acres).

**RIP-18**

**Grazing Actions:** Cottonwood, Bogart, Pear Park and Diamond Allotments (which include Cottonwood and Diamond Canyons) will continue to be not available to grazing to benefit riparian resources. Castle Valley will also not be available for grazing. Spring Creek will be available for grazing.

**RIP-19**

**Season-of-Use:** Season of use adjustments will be made on a case-by-case basis to achieve PFC.

**RIP-20**

**Watershed Management Plans:** Prioritize development and implementation of the Watershed Management Plans and riparian studies for the following areas: Ten Mile Wash, Kane Springs, Bartlett Wash, Tusher Wash, Mill Canyon, Courthouse Wash, Cottonwood-Diamond, and Onion Creek.

BLM_0013766

## SOIL AND WATER (SOL-WAT)

### Goals and Objectives:

Manage watersheds to enhance ecosystem health and provide for public uses.

Maintain and improve existing water quality by ensuring that all authorized uses on public lands comply with State water quality standards and with the Colorado River Basin Salinity Control Act.

Manage watersheds to maintain or improve soil quality and long-term productivity.

### Management Decisions:

### SOL-WAT-1
Comply with all State, Federal and local laws to protect municipal watersheds (Thompson, Moab, and Castle Valley), and watersheds of any public or private water supply such as Windwhistle Campground, Westwater Ranger Station, La Sal Creek, and Browns Hole.

### SOL-WAT-2
Coordinate with Utah Division of Oil, Gas, and Mining to remediate existing Abandoned Mine Lands sites.

### SOL-WAT-3
Comply with Floodplain Executive Order 11988.

### SOL-WAT-4
BLM will work with partners to implement Best Management Practices (BMPs) and continue BLM's cooperative work with the Utah Divisions of Water Rights and Water Quality in accordance with the administrative memorandum of understanding (MOU) and the cooperative agreement addressing water quality monitoring.

### SOL-WAT-5
Allow no surface occupancy and preclude surface-disturbing activities (see Appendix A) within 100-year floodplains, within 100 meters of a natural spring, or within public water reserves.

### SOL-WAT-6
In cooperation with Grand and San Juan Counties, develop BMPs for road maintenance and construction in high risk areas (e.g., floodplains, riparian zones, and areas with sensitive soils).

### SOL-WAT-7
Continue management of the Mill Creek planning area in accordance with the Mill Creek Management Plan (2001).

### SOL-WAT-8
Develop watershed management plans for municipal watersheds to ensure water sources are protected adequately. Monitor municipal water quality/watershed conditions.

BLM_0013767

## SOL-WAT-9

To protect sensitive soils on slopes, apply a timing limitation stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix A) prohibiting surface-disturbing activities on slopes in the Bookcliffs (see Map 19) greater than 30% from November 1 to April 30. This restriction includes road construction and traffic on existing roads associated with initial drilling operations. In addition, apply a controlled surface use stipulation for oil and gas and other surface-disturbing activities (see Appendix A) on slopes greater than 30% throughout the MPA.

## SOL-WAT-10

Follow Total Maximum Daily Load (TMDL) recommendations on 303(d) listed streams, currently Mill, Castle, and Onion Creeks.

## SOL-WAT-11

Minimize surface disturbance in areas identified as having "sensitive soils" unless long-term impacts can be mitigated.

## SOL-WAT-12

Maintain vegetation based on desired future condition to provide adequate ground cover to prevent accelerated erosion in wind erodible soils.

## SOL-WAT-13

Apply environmental BMPs to all oil and gas authorizations in accordance to WO IM 2007-021 and the most current version of the "Goldbook."

## SOL-WAT-14

Develop BMPs to address health and safety concerns associated with blowing dust along U.S. 191 and I-70.

## SOL-WAT-15

Maintain or improve soil quality and long-term soil productivity through the implementation of Standards for Rangeland Health and other soil protection measures.

## SOL-WAT-16

Manage uses to minimize and mitigate damage to soils.

## SOL-WAT-17

Maintain and/or restore overall watershed health and reduce erosion, stream sedimentation, and salinization of water.

## SOL-WAT-18

Coordinate with Grand Water and Sewer Service Agency to ensure required minimum instream flow of 3.0 cfs in Mill Creek below the Sheley diversion.

## SOL-WAT-19

Implement portions of Greater Sagers Wash Watershed Management Plan that pertain to surface disturbance.

BLM_0013768

**SOL-WAT-20**

No additional OHV routes will be allowed in saline soils other than those already designated in the Travel Plan accompanying this RMP (see Appendix N). An exception will be considered on a case-by-case basis for proposed routes in the Dee Pass Motorized Focus Area and in the Utah Rims SRMA. Exceptions could also be considered on a case-by-case basis outside these two areas if potential impacts could be mitigated and if the action will benefit other natural and cultural resources.

**SOL-WAT-21**

Develop BMPs for activities on saline and other sensitive soils.

**SOL-WAT-22**

Specific recommendations regarding surface and subsurface pipeline crossings found in Guidance for Pipeline Crossings (see Appendix O) will be implemented to prevent breakage and subsequent contamination.

**SOL-WAT-23**

Implement guidelines from Technical Reference 1730-2, where feasible, to protect or restore the functions of biological soil crusts.

**SOL-WAT-24**

Manage public lands in a manner consistent with the Colorado River Salinity Control Program, implementing BMPs and watershed restoration projects to reduce salinity contributions to the Colorado River system.

**SOL-WAT-25**

**Aquifers/Watersheds:** Apply a no surface occupancy stipulation to oil and gas leasing and preclude other surface-disturbing activities in the Castle Valley watershed in order to protect the sole source, unconfined, surficial aquifer.

**SOL-WAT-26**

Apply a no surface occupancy stipulation to oil and gas leasing and preclude other surface-disturbing activities in the Mill Creek-Spanish Valley watershed in order to protect the aquifer for the Moab area.

**SOL-WAT-27**

**Saline Soils in Mancos Shale:** To minimize watershed damage on saline soils in the Mancos Shale, apply a timing limitation stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix A) prohibiting surface-disturbing activities on 330,142 acres of moderately to highly saline soils in the Mancos Shale (see Map 20) from December 1 to May 31. This restriction includes road construction and traffic on existing roads associated with drilling operations

**SOL-WAT-28**

**Grazing:** Use grazing systems and develop AMPs to minimize impacts to saline Soils.

BLM_0013769

**SOL-WAT-29**
**Watershed Management Plans:** Prioritize development and implementation of the Watershed Management Plans for the following areas: Ten Mile Wash, Kane Springs, Bartlett Wash, Tusher Wash, Mill Canyon, Courthouse Wash, Cottonwood-Diamond, and Onion Creek.

BLM_0013770

## SPECIAL DESIGNATION:  AREAS OF CRITICAL ENVIRONMENTAL CONCERN (ACEC)

### Goals and Objectives:

The term "Area of Critical Environmental Concern" means areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and safety from natural hazards (FLPMA, 43 U.S.C. 1702(a)).

### Management Decisions:

### ACEC-1

Designate, modify and manage areas as ACECs (see Map 21) where special management attention is required to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and safety from natural hazards. In those areas where ACECs overlap with WSAs, the WSA management prescriptions, as stipulated in the Interim Management Policy for Lands Under Wilderness Review (IMP), will take precedence.

### ACEC-2

ACECs will be avoidance areas for all ROWs, including wind, solar energy and communication sites.

### ACEC-3

Behind the Rocks (5,201 acres) will be designated as an ACEC. This area excludes the Behind the Rocks WSA, which will be managed according to the IMP to protect wilderness values.

**Special Management:** To protect the relevant and important values of natural systems (threatened, sensitive and endangered plants), cultural resources and scenery, the following management prescriptions will apply:

- Designate as VRM Class II.
- No vegetation treatments (except for exotic/noxious weeds).
- Cultural resources in Behind the Rocks ACEC will be prioritized for Class III inventory.
- Vehicle-based camping only in campgrounds. No campfires outside of campgrounds.
- No new motorized or mechanized routes, motorized/mechanized travel limited to designated routes.
- Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix A).
- No commercial or private use of woodland products.
- There are approximately 12,635 acres of this potential ACEC proposed for designation under another statutory authority (Wilderness Study Area) and no further management attention is required.

BLM_0013771

## ACEC-4

Cottonwood-Diamond Watershed (35,830 acres) will be designated as an ACEC.

**Special Management:** To protect the relevant and important values of natural systems, and to mitigate the natural hazards due to fire, the following management prescriptions will apply:

- Continue to keep area not available to livestock grazing.
- Close to vehicle use at the end of the Class B-road system, except for administrative access.
- No new mechanized or motorized routes. Motorized and mechanized travel limited to designated routes outside the WSA, and closed in the WSA.
- No competitive events.
- Suspend commercial permits (guiding or special groups).
- ACEC will only be designated until hazard is no longer present. At that point, management will revert to the IMP.
- About 34,027 acres within the WSA are closed to oil and gas leasing, and the remaining 1,804 acres will be managed as no surface occupancy for oil and gas leasing. Other surface-disturbing activities will be precluded (see Appendix A).

## ACEC-5

Highway 279/Shafer Basin/Long Canyon (13,500 acres) will be designated as an ACEC.

**Special Management:** To protect the relevant and important values of scenery, wildlife, natural systems (threatened, sensitive, and endangered plants), and cultural resources, the following management prescriptions will apply:

- Designate Highway 279 and Long Canyon as VRM Class II; manage the remainder of the ACEC as VRM I.
- Permitted activities will be confined to main roads within crucial bighorn lambing habitat from April 1 through June 15. This restriction will not apply to filming if the filming meets the minimum impact criteria (see Appendix H).
- Wall Street rock art sites will be managed for public use with the emphasis on interpretation.
- Motorized and mechanized travel limited to designated routes.
- Vehicle-based camping only in designated campgrounds.
- No campfires except in campgrounds.
- Retain ACEC in public ownership except for the previously initiated Moab Salt Exchange Parcel (635 acres). Manage the entire area as no surface occupancy for oil and gas leasing and preclude other surface-disturbing activities.

## ACEC-6

Mill Creek Canyon (3,721 acres) will be designated as an ACEC. This area excludes the Mill Creek Canyon WSA. The Mill Creek Canyon WSA (9,780 acres) will be managed according to the IMP to protect wilderness values.

BLM_0013772

**Special Management:** To protect the relevant and important values of cultural resources, scenery, natural systems: (cold water fishery/riparian/watershed and wildlife), the following management prescriptions will apply to 3,721 acres in the ACEC:

- Recreation activities will be managed according to the South Moab SRMA.
- Prioritize Mill Creek for Class III cultural inventory.
- Protect Native American traditional cultural places.
- Designate as VRM Class II.
- Livestock grazing will not be available.
- No vehicle-based camping.
- No campfires in riparian areas.
- Motorized competitive events will be prohibited.
- No new mechanized or motorized routes. Motorized and mechanized travel limited to designated routes.
- All recreational events will be confined to the designated roads in the ACEC.
- Limit recreation facility development to day-use only.
- Acquire state land within ACEC as the opportunity arises.
- Maintain 3 cfs in the South Fork of Mill Creek below the Sheley diversion.
- Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix A).
- No recreational mining will be allowed.
- No fuel wood harvesting permits will be issued.
- Private wood gathering for backpacking campfires will be allowed in the uplands only.

## ACEC-7
Ten Mile Wash (4,980 acres) will be designated as an ACEC.

**Special Management:** To protect the relevant and important values of natural systems (riparian/wetlands), wildlife, cultural resources and natural hazards, the following management prescriptions will apply:

- Prioritize Ten Mile for Class III cultural inventory.
- Prioritize Ten Mile as a scientific research area.
- Grazing will be allowed on a limited basis in Ten Mile Canyon downstream from Dripping Springs, with changes subject to future monitoring and conformance with Standards for Rangeland Health.
- Prioritize area for riparian restoration.
- Restrict camping and campfires to designated sites at Dripping Spring.
- Motorized and mechanized travel limited to designated routes.
- No competitive events.
- Establish speed limits.
- Reroute designated road around the wetlands south of the cattle guard near Dripping Springs.
- Restrict vehicle access at the Green River; designate a parking area at the Green River.
- Permits for motorized recreational use may be required if monitoring indicates long-term damage.
- Require permits for groups greater than 25 vehicles.

BLM_0013773

- Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix A).
- No commercial or private collection of woodland products.

BLM_0013774

## SPECIAL DESIGNATIONS:   NATIONAL TRAILS AND BACKWAYS (TRA)

## Management Decisions:

*National Historic Trail – Old Spanish Trail*

**TRA-1**

Segments of the Old Spanish Trail will be identified and classified for historic integrity and condition. These segments will then be designated for appropriate types of management and travel.

**TRA-2**

Landmarks along the Old Spanish Trail will be identified for historic integrity and interpreted only if the action will not impact the values at the site. All interpretation projects will be done in consultation with Native Americans and other interested parties including the Old Spanish Trail Association and National Park Service.

**TRA-3**

Consider plan amendment, as necessary, to incorporate provisions of the forthcoming Old Spanish Trail Comprehensive Management Plan.

**TRA-4**

Participate in the development of the management plan for the Old Spanish Trail Comprehensive Management Plan and assist with its implementation as opportunities arise, consistent with other decisions of the RMP.

**TRA-5**

Support protective management, interpretation, and public enjoyment and understanding of the National Historic Old Spanish Trail, consistent with the Old Spanish Trail Comprehensive Management Plan.

**TRA-6**

Seek to acquire public access to the site of the Old Spanish Trail ford of the Green River, upstream from the town of Green River, Utah, for the purpose of developing an interpretive site.

**TRA-7**

Consistent with the Cameo Cliffs and Canyon Rims Recreation Area Management Plans (RAMPs), consider developing and managing a section of the Old Spanish Trail for equestrian use.

BLM_0013775

## SPECIAL DESIGNATIONS:  WILD AND SCENIC RIVERS (WSR)

### Goals and Objectives:

Review all eligible rivers to determine suitability for Congressional designation into the National Wild and Scenic River System (NWSRS).

To the extent of the BLM's authority (limited to BLM lands within the river corridor), maintain and enhance the free flowing character, preserve and enhance the outstandingly remarkable values, and allow no activities within the river corridor that will alter the classification of those river segments determined suitable for congressional designation in the NWSRS until Congress acts.

### Management Decisions:

### WSR-1
River segments found suitable and recommended for designation will be managed to protect their free-flowing condition and to protect the outstandingly remarkable values and maintain the tentative classification within line-of-sight up to 1/4 mile (1/3 miles on the Colorado and Dolores Rivers) from the high water mark on each bank of the river (not to exceed 320 acres per mile). Management that will apply should any rivers be designated by Congress is identified in BLM Manual 8351.51 (see Appendix P and Map 22 for river segments found suitable for WSR designation).

### WSR-2
BLM will not seek water rights as part of a suitability decision made in the Record of Decision for this RMP.

### WSR-3
WSR segments recommended as suitable for Wild will be designated as VRM Class I, closed to oil and gas leasing and closed to motorized travel; Scenic and Recreational segments will be designated as VRM Class II, managed with a no surface occupancy for oil and gas leasing and other surface disturbing activities, and managed with  travel limited to designated routes.

### WSR-4
OHV travel will be limited to designated routes or closed, depending on the river segment.

### WSR-5
The stipulations that will be applied to oil and gas leasing and other surface-disturbing activities within suitable river segments have been developed based on other resource values such as scenery, wildlife and fisheries, riparian, and recreation. In all cases, these stipulations are sufficient to protect the outstandingly remarkable values. All suitable segments will be managed with a no surface occupancy stipulation for oil and gas leasing as well as all other surface-disturbing activities, or as closed to oil and gas leasing (see Appendix A and Map 12 for the surface stipulations application to oil and gas leasing and other surface-disturbing activities).

BLM_0013776

## WSR-6

BLM will work with the State of Utah, local and tribal governments, and other federal agencies, in a state-wide study, to reach consensus regarding recommendations to Congress for the inclusion of rivers in the National Wild and Scenic Rivers System.  Besides applying consistent criteria across agency jurisdictions, the joint study will avoid piecemealing of river segments in logical watershed units in the state.  The study will evaluate, in detail, the possible benefits and effects of designation on the local and state economies, agricultural and industrial operations and interests, outdoor recreation, natural resources (including the outstandingly remarkable values for which the river was deemed suitable), water rights, water quality, water resource planning, and access to and across river corridors within, and upstream and downstream from the proposed segment(s).  Actual designation of river segments will only occur through congressional action or as a result of Secretarial decision at the request of the Governor in accordance with provisions of the Wild and Scenic Rivers Act (the Act).  BLM will work with the State, local and tribal governments, and the agencies involved, to coordinate its decision making on wild and scenic river issues and to achieve consistency wherever possible.

## WSR-7

BLM recognizes that water resources on most river and stream segments within the State of Utah are already fully allocated.  Before stream segments that have been recommended as suitable under this Approved RMP are recommended to Congress for designation, BLM will continue to work with affected local, state, federal and tribal partners to identify in-stream flows necessary to meet critical resource needs, including values related to the subject segment(s).  Such quantifications will be included in any recommendation for designation.

## WSR-8

BLM will then seek to jointly promote innovative strategies, community-based planning, and voluntary agreements with water users, under State law, to address those needs.

## WSR-9

Should designations occur on any river segment as a result of Secretarial or congressional action, existing rights, privileges, and contracts will be protected.  Under Section 12 of the Act, termination of such rights, privileges, and contracts may happen only with the consent of the affected non-federal party.  A determination by the BLM of eligibility and suitability for the inclusion of rivers on public lands to the Wild and Scenic Rivers System does not create new water rights for the BLM.  Federal reserved water rights for new components of the Wild and Scenic Rivers System are established at the discretion of Congress.  If water is reserved by Congress when a river component is added to the Wild and Scenic rivers System, it will come from water that is not appropriated at the time of designation, in the amount necessary to protect features which led to the river's inclusion into the system.  BLM's intent will be leave existing water rights undisturbed and to recognize the lawful rights of private, municipal and state entities to manage water resources under state law to meet the needs of the community.  Federal law, including Section 13 of the Act and the McCarren Amendment (43 U.S.C. 666), recognizes state jurisdiction over water allocation in designated streams.  Thus, it is BLM's position that existing water rights, including flow apportioned to the State of Utah interstate agreements and compacts, including the Upper Colorado River Compact, and developments of such rights will not be

BLM_0013777

affected by designation or the creation of the possible federal reserved water right. BLM will seek to work with upstream and downstream water users and applicable agencies to ensure that water flows are maintained at a level sufficient to sustain the values for which affected river segments were designated.

## WSR-10

Designate Colorado River Segment 2 – (Westwater Canyon from Mile 125 to River Mile 112) as suitable for recommendation into the National Wild and Scenic Rivers System with a classification of "Wild".

## WSR-11

Designate Colorado River Segment 3(a) – (River Mile 112 to Cisco Wash) as suitable for recommendation into the National Wild and Scenic Rivers System with a classification of "Scenic".

## WSR-12

Designate Colorado River Segment 3(b) – (Cisco Wash to the confluence of the Colorado with the Dolores River) as suitable for recommendation into the National Wild and Scenic Rivers System with a classification of "Recreational".

## WSR-13

Designate Colorado River Segment 4 – (Confluence of the Colorado with the Dolores River to Mile 49 near Potash) as suitable for recommendation into the Wild and Scenic Rivers System with a classification of "Recreational".

## WSR-14

Designate Colorado River Segment 5 – (Mile 44.5 to Mile 38.5) as suitable for recommendation into the Wild and Scenic Rivers System with a classification of "Scenic".

## WSR-15

Designate Colorado River Segment 6 – (Mile 37.5 to 34 at the Canyonlands National Park boundary) as suitable for recommendation into the Wild and Scenic Rivers System with a classification of "Scenic".

## WSR-16

Designate Dolores River Segment 1 – (Colorado State line to Fisher Creek) as suitable for recommendation into the Wild and Scenic Rivers System with a classification of "Recreational".

## WSR-17

Designate Dolores River Segment 2 – (Fisher Creek to Bridge Canyon) as suitable for recommendation into the Wild and Scenic Rivers System with a classification of "Scenic".

## WSR-18

Designate Dolores River Segment 3 – (Bridge Canyon to the Colorado River) as suitable for recommendation into the Wild and Scenic Rivers System with a classification of "Recreational".

BLM_0013778

**WSR-19**

Designate Green River Segment 1 – (Coal Creek to Nefertiti Boat Ramp) as suitable for recommendation into the Wild and Scenic Rivers System with a classification "Wild".

**WSR-20**

Designate Green River Segment 2 – (Nefertiti Boat Ramp to Swasey's Boat Ramp) as suitable for recommendation into the Wild and Scenic Rivers System with a classification of "Recreational".

**WSR-21**

Designate Green River Segment 4(a) – (Mile 97 at the confluence with the San Rafael River to Canyonlands National Park boundary) as suitable for recommendation into the Wild and Scenic Rivers System with a classification of "Scenic".

**WSR-22**

The suitability of Salt Wash is deferred until the National Park Service does its suitability study on the portion of Salt Wash that is within Arches National Park. Salt Wash remains eligible and is managed to protect its outstandingly remarkable values, free-flowing nature, and tentative classification. By default, the lower 0.25 miles of this 0.3 mile segment is within Segment 4 of the Colorado River. Consequently, it is managed as suitable with a "recreation" classification.

BLM_0013779

## *SPECIAL DESIGNATIONS:  DESIGNATED WILDERNESS (DW)*

### Goals and Objectives:

Manage the Black Ridge Wilderness Area to provide for the protection of wilderness character and for the use and enjoyment of visitors in a manner that leaves it unimpaired for future use (43 CFR 8560).

### Management Decisions:

### DW-1
Manage Black Ridge Wilderness Area (5,200 acres; part of the McInnis Canyon National Conservation Area) in accordance with applicable law, regulation, policy, and management for the area (see Map 23).

### DW-2
For designated Wilderness, any new development or surface disturbance is for wilderness purposes, and the lands are closed to mineral leasing and location. These are non-discretionary, non-planning decisions.

### DW-3
Designate Black Ridge Wilderness Area as VRM I.

### DW-4
Manage Black Ridge Wilderness Area as closed to motorized travel.

BLM_0013780

## SPECIAL DESIGNATIONS:  WILDERNESS STUDY AREAS (WSA)

### Goals and Objectives:

Preserve the wilderness character of Wilderness Study Areas (WSAs) until Congress designates
them wilderness or releases them.

### Management Decisions:

### WSA-1
Manage WSAs under the Interim Management Policy for Lands Under Wilderness Review
(IMP; USDI-BLM 1995; see Map 23). Manage for the continued preservation of each WSA's
wilderness character.

### WSA-2
For WSAs, no surface disturbance, permanent new development, or ROWs are allowed, and the
lands are closed to oil and gas leasing (see Appendix A).

### WSA-3
Only Congress can release a WSA from wilderness consideration. Should any WSA, in part or in
whole, be released from wilderness consideration, proposals in the released area will be
examined on a case-by-case basis. All proposals inconsistent with the goals and objectives of the
Approved RMP will be deferred until completion of requisite plan amendments. Because a plan
amendment will be required, there is no separate analysis in this Land-use Plan to address
resource impacts if any WSAs are released.

### WSA-4
Fire activities and projects in WSAs will follow the IMP.

### WSA-5
Designate WSAs as VRM Class I.

### WSA-6
Under the Approved RMP, where routes will remain available for motorized use within WSAs,
such use could continue on a conditional basis. Use of the existing routes in the WSAs ("ways"
when located within WSAs – see Glossary) could continue as long as use of these routes does
not impair wilderness suitability, as provided by the Interim Management Policy for Lands
Under Wilderness Review (BLM 7/5/95). The miles of motorized routes in WSAs (see below for
miles of route per WSA) are only conditionally open to vehicle use. If Congress designates the
area as wilderness, the routes will be closed. In the interim, if use and/or non-compliance are
found through monitoring efforts to impair the area's suitability for wilderness designation, BLM
will take further action to limit use of the routes, or close them. The continued use of these
routes, therefore, is based on user compliance and non-impairment of wilderness values.

BLM_0013781

## WSA-7
**Travel Management within WSAs:**

- Behind the Rocks WSA (12,635 acres): Designate a portion of the Behind the Rocks WSA as closed to OHV use (11,822 acres). Designate OHV use in the remainder of the WSA as limited to designated routes (813 acres, with 0.9 miles of designated route).
- Black Ridge (52 acres) and Lost Spring Canyon (1,624 acres) WSAs Designate Black Ridge and Lost Spring Canyon WSAs as limited to designated routes, with 0.8 miles of route designated in Lost Spring Canyon WSA and 0 miles of route designated in Black Ridge WSA.
- Desolation Canyon (81,603 acres), Floy Canyon (72,605 acres), Flume Canyon (50,800 acres), Coal Canyon (60,755 acres), Mill Creek Canyon (9,780 acres), Negro Bill Canyon (7,820 acres), and Spruce Canyon (20,990 acres) WSAs: (Acreage of Desolation Canyon WSA is for the MPA portion only. Remainder of this WSA is managed by the Price Field Office. Acreage of Flume Canyon WSA includes 2,750 acres in areas administered by the Vernal Field Office.): Designate these WSAs as closed to OHV. No miles of route are designated.
- Westwater Canyon WSA (31,160 acres): Designate a portion of the Westwater Canyon WSA as closed to OHV (23,690 acres). Designate the remainder of the WSA as limited to designated routes, with no miles of route designated.

BLM_0013782

## <u>SPECIAL STATUS SPECIES (SSS)</u>

### Goals and Objectives:

Maintain, protect, and enhance habitats (including but not limited to designated critical habitat) of Federally listed threatened, endangered, or candidate plant or animal species to actively promote recovery to the point that they no longer need protection under the Endangered Species Act.

Maintain, protect, and enhance habitats of BLM (State) Sensitive plant and animal species to prevent the listing of these species under the Endangered Species Act.

Implement management strategies that restore degraded riparian communities; protect natural flow requirements; protect water quality; manage for stable, non-eroding banks; and manage for year-round flows where applicable.

Allow or participate in research of threatened and endangered (T&E) and Sensitive species and their habitats.

Avoid practices that permanently convert sagebrush shrubland to invasive species.

### Management Decisions:

### SSS-1
As required by the Endangered Species Act, implement recovery actions identified in Recovery Plans and in Conservation Agreements, Plans and Strategies in coordination with U.S. Fish and Wildlife Service (USFWS), Utah Division of Wildlife Resources (UDWR), and other interested entities. The BLM will be an active participant in all recovery implementation teams.

### SSS-2
As required by the Endangered Species Act, the protection of habitat for listed and non-listed plant and animal species will be considered prior to authorizing any actions that could alter or disturb such habitat.

### SSS-3
As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E.

### SSS-4
As required by the Endangered Species Act, surveys of habitat or potential habitat for special status species (including any sensitive species under consideration for formal designation as T&E) will be made prior to taking any action that could affect these species. Surveys will be conducted using protocols established for potentially affected species.

BLM_0013783

## SSS-5

As required by the Endangered Species Act, BLM will conduct or cooperate in surveys to determine the extent of listed and non-listed plant and animal species and their habitat or potential habitat. Any listed or non-listed special status species survey must be conducted by qualified biologists, botanists, or ecologists that have been approved by the BLM.

## SSS-6

As required by the Endangered Species Act, monitoring, using approved protocol, will be required on listed and non-listed special status species habitat that may be affected by BLM authorization of any activities within that habitat.

## SSS-7

As required by the Endangered Species Act, follow current and future recovery plans and manage habitat for T&E and BLM Sensitive species:

- Colorado Squawfish Recovery Plan.
- Colorado Pikeminnow Recovery Goals: amendment and supplement to the Colorado Squawfish Recovery Plan.
- Humpback Recovery Plan.
- Humpback Chub Recovery Goals: amendment and supplement to the Humpback Recovery Plan.
- Bonytail Recovery Plan.
- Bonytail Recovery Goals: amendment and supplement to the Bonytail Recovery Plan.
- Razorback Sucker Recovery Plan.
- Razorback Recovery Goals: amendment and supplement to the Razorback Sucker Recovery Plan.
- Black-footed Ferret Recovery Plan.
- Northern States Bald Eagle Recovery Plan.
- Recovery Plan for the Mexican Spotted Owl.
- Recovery Plan Southwestern Willow Flycatcher.

## SSS-8

As required by the Endangered Species Act, support and implement special status plant and animal Species Management Plans. Coordinate actions with UDWR and other involved entities. Support population and habitat monitoring.

## SSS-9

As required by the Endangered Species Act, support and implement current and future special status plant and animal species Conservation Plans, Strategies, and Agreements. Coordinate actions with USFWS and other involved entities. Support population and habitat monitoring. As of 2005, Conservation Plans Strategies and Agreements include:

- Colorado River Cutthroat Trout Conservation Agreement and Strategy Conservation Agreement for the Roundtail Chub, Bluehead Sucker and Flannelmouth Sucker (see Map 24).
- Follow current and future Conservation Measures and Best Management Practices (BMP) for Federally Listed Species (see Appendix R). Species include but are not limited to: Jones

BLM_0013784

*Cycladenia*, Mexican Spotted Owl, Southwestern Willow Flycatcher, Bald Eagle, and the Endangered Fish of the Colorado River.

## SSS-10

As required by the Endangered Species Act, work with UDWR to implement the Utah Wildlife Action Plan (UDWR 2005a) to coordinate management actions that will conserve native species and prevent the need for additional listings.

## SSS-11

As required by the Endangered Species Act, mitigate all unavoidable habitat losses for special status species as required by policy or law.

## SSS-12

As required by the Endangered Species Act, avoid construction of new roads within listed and non-listed special status plant and animal species habitats.

## SSS-13

As required by the Endangered Species Act, apply lease notices for listed plant and animal species as determined by Section 7 consultation between BLM and USFWS. Apply appropriate lease notices for any non-listed special status plant and animal species that occur or could potential occur applicable proposed lease areas.

## SSS-14

As required by the Endangered Species Act, develop cooperative agreements with other agencies or entities to inventory and/or monitor existing or potential habitat for listed and non-listed special status plant and animal species.

## SSS-15

As required by the Endangered Species Act, plan and implement assessment and monitoring plans for T&E and BLM Sensitive species.

## SSS-16

As required by the Endangered Species Act, participate in the Colorado River Fishes Recovery and Implementation Program.

## SSS-17

As required by the Endangered Species Act, coordinate with USFWS and UDWR to allow for the reintroduction of T&E and BLM Sensitive species into historic or suitable range. These reintroductions will be analyzed with site-specific NEPA.

## SSS-18

As required by the Endangered Species Act, allow translocations and population augmentation of special status species to aid in conservation and recovery efforts. Implement necessary habitat manipulations and monitoring to ensure successful translocation efforts.

BLM_0013785

## SSS-19

As required by the Endangered Species Act, apply environmental best management practices (BMPs) to all oil and gas operations in accordance with WO IM 2007-021 and the latest version of the "Goldbook" (see Appendix A).

## SSS-20
**Mexican Spotted Owl (MSO):**

- If BLM determines that a proposed action may affect MSO or its habitat, consultation with the USFWS will be initiated (see Map 25).
- Monitor and protect known Protected Activity Center (PAC) sites according to USFWS recommendations and MSO Recovery Plan.
- Manage habitat for MSO according to USFWS and UDWR recommendations and recovery plans.
- Develop cooperative agreements with other agencies and entities to inventory and monitor existing potential habitat and annually schedule assessment plans of MSO habitat to determine quality of habitat and presence of species.
- Protect occupied and potential habitat, including designated critical habitat for the MSO, by applying the standard terms and conditions developed in consultation with the USFWS for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix A). These stipulations will preclude temporary activities within designated critical habitat from March 1 through August 31. Permanent actions are prohibited year-round within 0.5 miles of a PAC.

## SSS-21
**Southwestern Willow Flycatcher (SWFL):**

- If BLM determines that a proposed action may affect SWFL or its habitat, consultation with the USFWS will be initiated.
- Monitor and protect known nesting sites according to USFWS recommendations and SWFL Recovery Plan.
- Manage habitat for SWFL according to USFWS and UDWR recommendations and recovery plans; avoid loss or disturbance of suitable riparian habitat.
- Develop cooperative agreements with other agencies and entities to inventory and monitor existing potential habitat and annually schedule assessment plans of SWFL habitat to determine quality of habitat and presence of species.
- Protect SWFL and their habitat by applying the standard terms and conditions developed in consultation with the USFWS for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix A) within suitable habitat. These stipulations will preclude activities within a 100-m buffer of suitable habitat year long. Activities within 0.25 miles of occupied breeding habitat will not occur during the breeding season, May 1 through August 15.

BLM_0013786

## SSS-22
**Bald Eagle:**

- Acquire lands with roost and nest sites through land exchange, purchase or donation. Conduct assessments of wintering bald eagle habitat to delineate essential winter habitat and to develop necessary protective measures.
- Monitor nesting territories annually during breeding season (generally January 1 through August 31).
- Protect bald eagle nest sites by applying the standard terms and conditions developed in consultation with the USFWS for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix A) within 1.0 mile of documented nest sites (2,439 acres). These stipulations will preclude surface-disturbing activities within a 1.0 mile radius of nest sites from January 1 through August 31 (see Map 26). No permanent structures will be allowed within 0.5 miles of known bald eagle nest sites year-round. Deviations may be allowed only after appropriate levels of consultation and coordination with the USFWS.
- Protect bald eagle winter habitat by applying the standard terms and conditions developed in consultation with the USFWS for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix A) within 0.5 mile of winter roost areas. These stipulations will preclude activities and permanent structures within a 0.5 mile radius of winter roost sites from November 1through March 31 (see Map 26). No permanent structures will be allowed within 0.5 mile of winter roost sites, if the structure will result in the habitat becoming unsuitable for future winter roosting by bald eagles.

## SSS-23
**Greater Sage-grouse:**

- Implement the most current UDWR Strategic Management Plan for Sage-Grouse (UDWR, 2002 and its future revisions), the BLM National Sage-Grouse Habitat Conservation Strategy (BLM, 2004) and recommendations from local sage grouse working groups to protect, maintain, enhance, and restore Greater sage-grouse populations and habitat.  About 3,068 acres of potential habitat has been identified within the Moab planning area.  There is no sage grouse occupation at this time.  However, if occupation is identified, through coordination with UDWR, the following decisions will apply:

  - All surface disturbing activities will be prohibited within 0.5 miles of Greater sage-grouse leks on a year-round basis
  - Allow no surface disturbing or otherwise disruptive activities within two miles of Greater sage-grouse leks from March 15 to July 15 to protect nesting and brood rearing habitat.
  - Allow no surface disturbing or otherwise disruptive activities within Greater sgae-grouse winter habitat (3,058 acres) from November 15 to March 14.

See Appendix A for oil and gas leasing stipulations, along with exceptions, modifications, or waivers.

BLM_0013787

## SSS-24
**Gunnison sage-grouse habitats:**

- Implement the most current UDWR Strategic Management Plan for Sage-Grouse (UDWR, 2002 and its future revisions), the Gunnison Sage-grouse Range-wide Conservation Plan (2005, as amended) and recommendations from local sage-grouse working groups to protect, maintain, enhance, and restore Gunnison sage-grouse populations and habitat. About 175,727 acres of potential habitat has been identified within the Moab planning area. There is no Gunnison sage grouse occupation at this time. However, if occupation is identified, through cooperation with UDWR, the following decisions will apply:

  - All surface disturbing activities will be prohibited within 0.6 miles of Gunnison sage grouse leks on a year-round basis. Within the 0.6 mile buffer, allow no permanent above-ground facilities or powerlines; prohibit or limit year-round construction of fences and where opportunity exists, remove existing fences.
  - Within four miles of a lek, avoid fence construction, overhead powerline construction, and aboveground structures that provide raptor hunting perches. Where fences are necessary, increase their visibility. Modify or remove fences to minimize sage-grouse mortality.

  See Appendix A for oil and gas leasing stipulations, along with exceptions, modifications, or waivers.

## SSS-25
**White-tailed and Gunnison Prairie Dogs:**

- The White-tailed prairie dog and the Gunnison prairie dog are BLM and State sensitive species; translocations of these species will be considered in suitable unoccupied habitats (see Map 28).
- Manage both prairie dog species and their habitats in coordination with the UDWR. Apply habitat management guidance and population monitoring strategies as recommended in the newly developed multi-agency White-tailed and Gunnison's Prairie Dog Management Plan.
- Develop cooperative agreements with other agencies to inventory prairie dog densities and identify suitable habitat for expansion.

## SSS-26
**White-tailed Prairie Dog Habitat:**

- Manage the contiguous 117,481 acres of historic habitat designated by UDWR. Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix A) within 660 feet of active prairie dog colonies. This stipulation will preclude surface-disturbing activities within 660 feet of these colonies. No permanent above-ground facilities will be allowed within the 660-foot buffer.

BLM_0013788

## SSS-27
**Gunnison Prairie Dog Habitat:**

- Manage 10,700 acres of habitat designated by UDWR for Gunnison prairie dogs. Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix A) within 660 feet of active prairie dog colonies. This stipulation will preclude surface-disturbing activities within 660 feet of these colonies. No permanent above-ground facilities will be allowed within 660 feet of prairie dog colonies. Power lines will be avoided within prairie dog colonies; however in the event that power lines are required within colonies, raptor anti-perch devices will be required.

## SSS-28
**Colorado River Endangered Fish:**

- No surface-disturbing activities within the 100-year floodplain of the Colorado River, Green River, and at the confluence of the Dolores and Colorado Rivers will be allowed. Any exceptions to this requirement will require consultation with the USFWS. Restrictions on surface disturbance within this critical habitat will be developed through this consultation process (see Map 24).

## SSS-29
**Golden Eagle:**

- Known golden eagle nest sites will be protected according to the Bald and Golden Eagle Protection Act amended in 1978.
- Acquire lands with nest and roost sites through land exchange or acquisition.
- Conduct assessments of wintering golden eagle habitat.
- Protect golden eagle nest sites and habitat (12,902 acres) by applying the standard terms and conditions developed in consultation with the USFWS for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix A). These stipulations will preclude surface-disturbing activities within 0.5 miles of documented nest sites from February 1 to July 15 (see Map 26).

## SSS-30
**Burrowing Owl:**

- Protect burrowing owls by applying the standard terms and conditions developed in consultation with the USFWS (see Appendix R) for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix A) by precluding surface-disturbing activities within 0.25 miles of known nests from March 1 through August 31 (see Map 29).
- Domestic sheep camps, temporary watering sites, and salt and mineral blocks will not be located within 0.25 miles of occupied burrowing owl nests from March 1 through August 31.

BLM_0013789

- Maintain ground squirrel and prairie dog colonies to provide habitat and nesting burrows for burrowing owls.
- The species will be managed under the guidance provided by the Raptor Best Management Practices (BMPs; see Appendix R), which includes implementation of spatial and seasonal buffers to protect nesting raptors and their habitats.

## SSS-31
### Kit Fox:

- Protect kit fox by precluding surface-disturbing activities within 200 m of a kit fox den.

## SSS-32
### Ferruginous Hawk:

- Manage ferruginous hawk nesting and foraging habitat by applying the standard terms and conditions developed in consultation with the USFWS (see Appendix R) for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix A) precluding surface-disturbing activities within 0.5 miles of active nests from March 1 through August 1 (see Map 29).
- Domestic sheep camps, temporary watering sites, and salt and mineral blocks will not be located within 0.5 miles of occupied ferruginous hawk nests from March 1 through Aug. 1.
- The species will be managed under the guidance provided by the Raptor BMPs (see Appendix R), which includes implementation of spatial and seasonal buffers to protect nesting raptors and their habitats.

## SSS-33
### Yellow-billed Cuckoo:

- Avoid loss or disturbance of yellow-billed cuckoo habitat and manage yellow-billed cuckoo nesting and foraging habitat by applying the standard terms and conditions developed in consultation with the USFWS for oil and gas leasing and other surface-disturbing activities (see Standard Terms and Conditions [Lease Notices] which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix A). These stipulations preclude surface-disturbing activities within 100 m of yellow-billed cuckoo habitat within riparian areas from May 15 through July 20.
- Compliance with BLM Riparian Policy will restrict surface disturbance within 100 m of riparian habitat and will therefore protect nesting habitat for yellow-billed cuckoo.

## SSS-34
### Jones *Cycladenia (Cycladenia humilis* var. *jonesii)*:

- Require specific site inventories for all surface disturbing projects in areas with suitable *Cycladenia humilis* var. *jonesii* habitat.
- BLM will restrict activities, in suitable *Cycladenia humilis* var. *jonesii* habitat. Restrictions include limiting motorized travel to designated routes, precluding surface disturbing

BLM_0013790

activities within 300 feet of plants and suitable habitat, and precluding construction activities from May 15th through June 30th within occupied habitat (see Standard Terms and Conditions (Lease Notices) which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix A).   Other restrictions include avoiding road construction, land disposal, and utilities in this habitat, as well as avoiding grazing activities such as trailing, salting, watering and herding.

## SSS-35
**California Condor:**

- Within potential habitat for the California Condor, surveys will be required prior to operations unless species occupancy and distribution information is complete and available.
- Surface disturbing activities will not occur within 1.0 miles of nest sites during the breeding season of August 1 to November 30 or within 0.5 miles of established roosting sites (see Standard Terms and Conditions (Lease Notices) which are Required to Protect Special Status Species and to Comply with the Endangered Species Act, Appendix A).
- No permanent infrastructure will be placed with 1.0 mile of nest sites and within 0.5 miles of established roosting sites.

BLM_0013791

## TRAVEL MANAGEMENT (TRV)

### Management Decisions:

*Motorized Travel*

### TRV-1

Where routes will remain available for motorized use within WSAs, such use could continue on a conditional basis. Use of the existing routes in the WSAs ("ways" when located within WSAs – see Glossary) could continue as long as use of these routes does not impair wilderness suitability, as provided by the Interim Management Policy for Lands Under Wilderness Review (BLM 7/5/95). The 1.7 miles of motorized routes in WSAs are only conditionally open to vehicle use. If Congress designates the area as wilderness, the routes will be closed. In the interim, if use and/or non-compliance are found through monitoring efforts to impair the area's suitability for wilderness designation, BLM will take further action to limit use of the routes, or close them. The continued use of these routes, therefore, is based on user compliance and non-impairment of wilderness values.

### TRV-2

BLM, in preparing its RMP designations and its implementation-level travel management plans, is following policy and regulation authority found at: 43 CFR Part 8340; 43 CFR Subpart 8364; and 43 CFR Subpart 9268.

### TRV-3

Provide opportunities for a range of motorized recreation experiences on public lands while protecting sensitive resources and minimizing conflicts among various users. Identification of specific designated routes will be initially established through the chosen Travel Plan accompanying this RMP (see Appendix N) and may be modified through subsequent implementation planning and project planning on a case-by-case basis. These identified routes will be available regardless of other management actions. These adjustments will occur only in areas with limited route designations and will be analyzed at the implementation planning level. These adjustments will be done through a collaborative process with local government and will include public review of proposed route changes. Site-specific NEPA documentation will be required for changes to the route designation system.

### TRV-4

All areas are limited, open, or closed to motorized travel. Limit travel by motorized vehicle on all lands administered by the MFO to designated routes, except for Managed Open Areas, and for areas that are closed to motorized travel (see Map 30; see Appendix N for Travel Plan development).

### TRV-5

BLM could impose limitations on types of vehicle allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated roads.

BLM_0013792

## TRV-6

OHV access for game retrieval, antler collection and dispersed camping will only be allowed on designated routes (designated routes/spurs and have been identified specifically for dispersed camping; parking areas associated with dispersed campsites will be marked during travel plan implementation). Adherence to the Travel Plan is required for all activities, except where otherwise explicitly permitted.

## TRV-7

Only designated roads and managed open areas are available for motorized commercial and organized group use (see Maps 2 and 3 for route designations).

## TRV-8

Where the authorized officer determines that off-road vehicles are causing or will cause considerable adverse impacts, the authorized officer shall close or restrict such areas. The public will be notified as to these closures and restrictions.

## TRV-9

Any routes that are not baseline routes will be signed "Closed" on the ground. Such routes will be considered as impacts to the area's natural character, and use of such routes will be considered cross country use and not allowed. Non-inventoried routes should be rehabilitated.

## TRV-10
**OHV Designations:**

- About 339,298 acres will be closed to OHV travel.
- About 1,481,334 acres will be limited to designated routes.
- Approximately 2,000 acres (White Wash Sand Dunes) will be open to cross country travel (see Map 30).

## TRV-11
**Designated Routes – Motorized:**

- Designate 3,693 miles of motorized routes.
  Designate 313 miles for motorcycles (163 miles on inventoried routes and 150 miles on inventoried single-track).
- Designate a dirt bike route from Colorado State Line to Thompson (see Map 3), utilizing 9 miles of single-track designated above and 22 miles of inventoried Grand County roads.

These totals are reflected in the mileage under "designated routes."

*Mountain Bike Travel*
## TRV-12

Provide opportunities for mechanized (mountain bike) travel on all routes open to motorized use.

BLM_0013793

## TRV-13

Prohibit new bike routes within non-WSA lands managed for wilderness characteristics or within hiking Focus Areas.

## TRV-14

Limit mechanized (mountain bike) travel to designated trails and managed routes for resource protection purposes. Routes that are no longer available for motorized travel may be converted to bike routes upon application of site-specific NEPA analysis.

## TRV-15

Manage approximately 11.2 miles of routes on the following trails for non-motorized use only: Jackson Trail, "Baby Steps," Hunter Canyon Rim, Portal Trail, Hidden Valley, and Porcupine Rim single-track section (Hidden Valley and Porcupine Rim Trails are subject to IMP).

## TRV-16

Identification of specific designated mountain bike routes will be initially established through the RMP process and may be modified through subsequent planning at the activity plan and project plan levels on a case-by-case basis. These modifications will be analyzed through site-specific NEPA.

## TRV-17

Design and implement up to 150 new miles of managed mechanized (mountain bike) trails. In addition, convert existing inventoried routes not designated for motorized travel to non-motorized use, where appropriate, and install appropriate support facilities such as trailheads and route signage.

## TRV-18

Initially designate the following existing trails for mechanized (mountain bike) use totaling 11.3 miles; see Map 4):

- Fisher Mesa (in conjunction with USFS; 5.8 miles)
- Pothole (on Amasa Back; 1.2 miles)
- Rockstacker (on Amasa Back; 0.9 miles)
- Lower Porcupine Singletrack ("LPS"; 1.4 miles)
- Power line Trail (0.07 miles on public land)
- Mill Creek Parkway Extension (0.16 miles on public land)

*Non- Mechanized Travel (Hiking and Equestrian)*
## TRV-19

Non-mechanized travel is not restricted on public lands except where limited or prohibited to protect specific resource values, provide for public safety or maintain an identified opportunity.

BLM_0013794

## TRV-20

Provide opportunities for non-mechanized travel on all routes open to motorized or mechanized use and manage routes identified to exclude motorized and mechanized use and provide opportunities for non-mechanized travel independent of motorized and mechanized routes.

## TRV-21

Limit non-mechanized travel on specific lands to designated trails and managed routes for resource protection purposes.

## TRV-22

Manage 17 miles of routes on the following trails for non-mechanized use:

- Amphitheater Loop
- Fisher Towers
- Negro Bill - There is no equestrian use allowed on the Negro Bill trail.
- Corona Arch
- Trough Spring Canyon
- Anticline Overlook
- Needles Overlook
- Windwhistle Nature Trail
- Mill Canyon Dinosaur Interpretive Trail
- Copper Ridge Sauropod Interpretive Trail
- Sego Canyon Interpretive Trail

## TRV-23

Identify specific routes through the RMP process. These routes may be modified through subsequent planning at the RMP, activity plan, and project plan levels on a case-by-case basis.

## TRV-24

Work with equestrian groups to identify additional trails for equestrian and hiker use only. These trails will be designated based on site-specific NEPA analysis.

## TRV-25

Design and implement up to 50 miles of managed non-mechanized trail system consistent with the Travel Plan. Implement these new system routes largely by converting existing, low utilization roads to non-mechanized use and installing appropriate support facilities such as trailheads and route signage.

## TRV-26

Mark the following existing hiking trails: Castleton, Culvert-Goldbar Loop. Mark a new trail from Onion Creek to Amphitheater Loop.

## TRV-27

The following trails will be managed for equestrian use. Hikers will also be allowed on these trails, but there will be no motorized or mechanized vehicles allowed:

BLM_0013795

- Onion Creek Benches (Colorado Riverway SRMA)
- Ida/Stearns Gulch Equestrian Trail System
- Castle Creek Equestrian Trail
- Rattlesnake Trail above Nefertiti Boat Launch
- Seven Mile Canyons
- Red Rock Horse Trail (Ken's Lake to Johnson's Up-on-Top)

BLM_0013796

## *VEGETATION (VEG)*

## Goals and Objectives:

Manage vegetation resources for desired future conditions (DFC) ensuring ecological diversity, stability, and sustainability, including the desired mix of vegetation types, structural stages, and landscape/riparian function and provide for livestock grazing and for native plant, fish, and wildlife habitats (see Appendix S for Desired Future Conditions for Vegetation).

Maintain existing vegetation treatment areas as appropriate.

Control invasive and non-native weed species and prevent the introduction of new invasive species by implementing a comprehensive weed program (as per national guidance and local weed management plans in cooperation with state, federal affected counties), including: coordination with partners; prevention and early detection; education; inventory and monitoring; and using principles of integrated weed management.

Manage for vegetation restoration, including control of weed infestations and control of invasive and undesirable nonnative species.

Maintain, protect and enhance special status plant and animal habitats in such manner that the potential need to consider any of these species for listing as threatened or endangered under the Endangered Species Act does not arise.

Develop management prescriptions for all surface-disturbing resource uses during times of extended drought (see description of Adaptive Drought Management, below).

Maintain or enhance the integrity of current sagebrush and sage steppe communities and identify areas in need of restoration. Initiate restoration and/or rehabilitation efforts to ensure sustainable populations of sage-grouse, mule deer and other sagebrush obligate species.

## Management Decisions:

## VEG-1

Utilize the BLM National Sage-grouse Conservation Strategy – Guidance for Management of Sagebrush Plant Communities for Sage-Grouse Conservation, when applicable, in the development and implementation of vegetation and land treatments, livestock manipulation techniques, fire projects, energy exploration and development and any surface-disturbing activity within sagebrush and sage steppe communities.

## VEG-2

Sagebrush/steppe communities will be a high priority for wildfire suppression, emergency stabilization and fuel reduction to avoid catastrophic fires in these communities.

BLM_0013797

## VEG-3

Reclaim and restore up to 257,809 acres of sagebrush habitat and shrub-steppe ecosystems where appropriate in accordance with the BLM sagebrush conservation guidance. Reclamation/restoration will be undertaken in cooperation with the Utah Partners for Conservation and Development (UPCD) and may include removing surface material, re-contouring, spreading topsoil, seeding or planting seedlings, and/or changing livestock grazing strategies, such as, changing season of use, type of use, removing or reducing spring grazing, reducing livestock numbers, reducing grazing intensity, improving distribution, requiring rest rotation practices, or exclusion. Work in coordination with UDWR to reduce wildlife numbers, as necessary, to restore sagebrush habitat.

## VEG-4

Provide opportunities for seed gathering of various vegetation types while protecting other resources.

## VEG-5

Restoration and rehabilitation will use native seed-mixes wherever possible. Non-native species may be used as necessary for stabilization or to prevent invasion of noxious or invasive weed species.

## VEG-6

Gather necessary vegetation information and continue monitoring to assess if planning objectives are being met.

## VEG-7

Utilize the techniques and methods for vegetation treatments identified in the Utah ROD for Vegetation Treatments using Herbicides on Bureau of land Management Lands in Seventeen Western States (2007).

## VEG-8

Control noxious weed species and prevent the infestation and spread of invasive species. Develop cooperating agreements with other Federal, State, local and private organizations to control invasive and noxious weed species.

## VEG-9

Reduce tamarisk and Russian olive where appropriate using allowable vegetation treatments. Restore riparian habitat to native willow and cottonwood communities.

## VEG-10

Where appropriate, replant cottonwoods and willow subsequent to wildland fire or other disturbance in riparian areas.

## VEG-11

Promote science and research opportunities in the San Arroyo Area/Exclosures, Sagers Watershed Area/Exclosures and Big Flat Area/Exclosures (approximately 300 acres each).

BLM_0013798

## VEG-12

Establish Lower South Fork of Seven Mile Canyon as a Riparian/Wetland Demonstration Area for the improvement and restoration of the riparian area.

## VEG-13

Insect pests will be treated in coordination with the State of Utah, other Federal agencies, affected counties, adjoining private land owners and other directly affected interests.

## VEG-14

See Livestock Grazing for other vegetation treatments.

## VEG-15

**Adaptive Drought Management:** Establish criteria for restricting activities during drought (see Appendix T for Drought Classification System) based on the following measures/parameters:

Severe (D2):
- Send drought letters.
- UDWR coordination for big game herd control.
- Prepare local seasonal precipitation graphs.
- Suspend or limit seed collecting activities.

Extreme (D3):
- No new surface-disturbing activities in areas with sensitive soils (subject to valid existing rights or actions associated with other valid permitted activities; see oil and gas Appendix A for definition of surface-disturbing activities).
- Changes in livestock use will be based on site-specific data on those allotments that are affected by drought.
- OHV use and competitive motorized events will be confined to designated roads and routes within the open OHV area.
- Require additional erosion-control techniques/BMPs for surface-disturbing activities (e.g., hydromulching).
- Limit prescribed burns and vegetation treatments.

Exceptional (D4):
- Changes in livestock use will be based on site-specific data on those allotments that are affected by drought.
- No new surface-disturbing activities (subject to valid existing rights or actions associated with other valid permitted activities).
- Consider closing areas to public entry.

## VEG-16

Avoid or minimize to the extent possible the loss of sagebrush/steppe habitat from BLM-initiated or authorized actions. The BLM recommends that loss of sagebrush/steppe habitat essential to wildlife (e.g., sage-grouse, mule deer, and sagebrush obligate species) be reclaimed or mitigated off-site.

BLM_0013799

## *VISUAL RESOURCES MANAGEMENT (VRM)*

### Goals and Objectives:

Manage public lands in a manner that protects the quality of scenic values.

Recognize and manage visual resources for overall multiple use, filming, and recreational opportunities for visitors to public lands.

Manage BLM actions to preserve those scenic vistas that are most important.

### Management Decisions:

### VRM-1
WSAs and designated wilderness are designated as VRM Class I.

### VRM-2
Wild and Scenic River (WSR) segments recommended as suitable for Wild are designated as VRM Class I, Scenic segments are designated as VRM Class II, and Recreational segments are managed the same as the underlying VRM management class.

### VRM-3
For all VRM classes, all resource uses and management activities are required to meet VRM objectives. However, recreation developments in the immediate foreground of Key Observation Points (KOPs) in VRM Class I and II areas require special consideration to meet both recreational and VRM objectives. These facilities often create more contrast than would be acceptable; however this contrast is allowed if the facilities are part of the expected image held by the public being served. The contrast should be allowed only to the extent needed for the function of the facility, which should reflect design excellence and be a positive element of the built environment. Structures should blend into the landscape while retaining functionality.

### VRM-4
Apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix A) in all areas designated as VRM Class I.

### VRM-5
Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix A) to all areas designated as VRM Class II. This requires surface-disturbing activities to meet the objectives of VRM Class II.

### VRM-6
Designated utility corridors within VRM Class II areas are designated as VRM Class III only for utility projects.

### VRM-7
Necessary road maintenance could occur regardless of VRM class.

BLM_0013800

**VRM-8**
Public lands within the viewshed of Arches National Park are designated as VRM Class II.

**VRM-9**
Designated VRM management classes are displayed on Map 31.

**VRM-10**
Areas with high potential for development of oil and gas (Big Flat/Hatch Point/Lisbon Valley, and Eastern Bookcliffs/Greater Cisco) will be designated as VRM Class III with the exception of those portions of SRMAs and ACECS that have more stringent VRM classifications.

**VRM-11**
Manage the Shafer Basin portion of the Highway 279/Shafer Basin/Long Canyon ACEC as VRM Class I.

**VRM-12**
Scenic driving corridors will be designated as VRM Class II within a specified viewshed not to exceed 0.5 mile from centerline. Apply a controlled surface use stipulation for oil and gas leasing and other surface-disturbing activities (see Appendix A) within 0.5 mile of scenic driving corridors.

**VRM-13**
Manage the following areas with high-quality visual resources as VRM Class II (see Map 31):

- Sand Flats
- Gemini Bridges/Monitor and Merrimac/Poison Spider/Goldbar/ Corona Arch area
- The Colorado, Dolores and Green River corridors
- Tusher Canyon (Bookcliffs)
- The Colorado Riverway
- Matt Martin Point
- Areas bordering Arches National Park
- Kane Creek
- Hatch Wash
- The rims of Canyon Rims
- The Mill Creek and Behind the Rocks ACECs
- Beaver Creek
- Long Canyon

**VRM-14**
- Designate 358,911 acres as VRM Class I.
- Designate 365,566 acres as VRM Class II.
- Designate 829,158 acres as VRM Class III.
- Designate 268,133 acres as VRM Class IV.

BLM_0013801

## *WILDLIFE AND FISHERIES (WL)*

### Goals and Objectives:

Maintain, protect, and enhance habitats to support natural wildlife diversity, reproductive capability, and a healthy, self-sustaining population of wildlife and fish species.

Manage crucial, high-value, and unfragmented habitats as management priorities.

### Management Decisions:

### WL-1
**Habitat Management Plans:** Continue to implement and modify three Habitat Management Plans (HMPs) summarized in Appendix U: Hatch Point HMP, Dolores Triangle HMP, and the Potash-Confluence HMP.

- The Hatch Point HMP: Manage to benefit pronghorn and improve sagebrush habitat for sage-grouse and other wildlife species. Emphasize habitat management, change in livestock class from sheep to cattle, and maintenance of land treatments.
- Potash-Confluence HMP: Manage to benefit desert bighorn sheep, but also include guidance for chukar partridge, bald eagle, and peregrine falcon. Water developments to benefit desert bighorn are to be maintained; under this HMP, 278,000 acres of land administered by the BLM are to be maintained in good condition and habitat is to be improved where needed. Eight specific management objectives were established (see Appendix U for details).
- The Dolores Triangle HMP: Manage to benefit deer, elk, and bighorn sheep. Improve bald eagle, riparian and native and naturalized fish habitat through the installation of fencing and enclosures in Granite, Coates, Ryan, and Renegade Creeks by installing six in-stream structures (see Appendix U for details).

### WL-2
Livestock grazing will not be authorized on the following allotments/areas (or portions of allotments/areas) in order to benefit wildlife resources:

- A portion of the Kane Spring Allotment (that portion in Kane Spring Canyon between the open valley and the river; 558 acres and 0 AUMs)
- An area along the Colorado River between Hittle and north of Dewey Bridge (400 acres, AUMs will remain the same)
- Between The Creeks with 3,960 acres and 221 AUMs
- North Sand Flats with 5,860 acres and 798 AUMs
- South Sand Flats with 10,209 acres and 592 AUMs
- A portion of Arth's Pasture Allotment (Poison Spider area; approximately 6,200 acres and 425 AUMs).

### WL-3
Support and implement current and future animal species Conservation Plans, Strategies and Agreements. Coordinate actions with UDWR and other involved entities. Support population and habitat monitoring.

BLM_0013802

## WL-4

**Migratory Birds:** Executive Order 13186, "Responsibilities of Federal Agencies to Protect Migratory Birds," will be integrated into all activities with potential adverse impacts, wildlife management programs, and other resources including but not limited to riparian-wetland habitat, rangeland health standards and guidelines raptor protection, fire, special status species, off-site mitigation and habitat enhancement. Management actions will emphasize birds listed on the current USFWS "Birds of Conservation Concern" (2002f or as updated) and Utah Partners-in-Flight priority species. Habitats that will be emphasized are the Cisco Desert Bird Habitat Conservation Area, Colorado and Dolores River Bird Habitat Conservation Area, Green River Bird Habitat Conservation Area, and the Cottonwood and Willow Creek Bird Habitat Conservation Area (see Appendix U). As a supplement to complying with Executive Order 13186, the Bird Habitat Conservation Areas identified in the Coordinated Implementation Plan for Bird Conservation in Utah (Martinsen et al. 2005 or as updated), will receive priority for conducting bird habitat conservation projects, through cooperative funding initiatives such as the Intermountain West Joint Venture.

## WL-5

**Migratory Birds:** Implement Executive Order 13186, "Responsibilities of Federal Agencies to Protect Migratory Birds" during all activities to protect habitat for migratory birds. Management will emphasize birds listed on the current USFWS "Birds of Conservation Concern" (2002 or as updated) and Partners-in-Flight priority species (as updated).

## WL-6

**Migratory Birds:** As specific habitat needs and population distribution to "Birds of Conservation Concern" and Partners-in-Flight priority species are identified, BLM will use adaptive management strategies to further conserve habitat and avoid impacts to these species.

## WL-7

**Migratory Birds:** Prioritize the maintenance and/or improvement of lowland riparian, wetlands, and low and high desert scrub communities which are the four most important and used habitat types by migratory birds in MPA.

## WL-8

**Migratory Birds:** Prevent the spread of invasive and non-native plants, especially cheatgrass, tamarisk, and Russian olive. Strive for a dense under story of native species in riparian areas with a reduction in tamarisk and improvement of cottonwood and willow regeneration.

## WL-9

**Migratory Birds:** During nesting season for migratory birds (May 1 – July 31), avoid surface-disturbing activities and vegetative-altering projects and broad-scale use of pesticides in identified occupied migratory bird habitat.

## WL-10

Coordinate with UDWR and other partners to help accomplish the population and habitat goals and objectives of big game Herd Management Plans that are consistent with and meet the goals and objectives of this land-use plan.

BLM_0013803

## WL-11

The BLM will approach compensatory mitigation on an "as appropriate" basis where it can be performed onsite, and on a voluntary basis where it is performed offsite, or, in accordance with current guidance.

## WL-12

Restrict dispersed camping in riparian areas to protect riparian wildlife habitat. Restrictions could include limiting camping to designated sites or prohibiting camping.

## WL-13

Implement a limited fire suppression policy and initiate prescribed fires where treatment by fire will increase vegetation productivity and increase forage for wildlife.

## WL-14

Modify the grazing season of use or change class of livestock for individual allotments as necessary to accommodate forage needs for wildlife.

## WL-15

Predator management will continue to be coordinated with Animal and Plant Health Inspection Service (APHIS)-Wildlife Services and UDWR and will be conducted utilizing the guidance provided by the existing MOU with APHIS-Wildlife Services.

## WL-16

BLM will continue to coordinate with, and provide support to UDWR for introduction/reintroduction of native or naturalized fish or wildlife species into historic or suitable habitats as determined appropriate.

## WL-17

Introduction, transplantation, augmentation and re-establishment of both naturalized and native species will be considered and will include, but may not be limited to, pronghorn, desert bighorn sheep, wild turkey, bison, beaver, chukar, otter, and Colorado River cutthroat trout and other native and naturalized fish species, pursuant to guidance and direction provided in BLM's 1745 Manual.

## WL-18

Raptors will be managed under the auspices of Best Management Practices (BMPs; see Appendix R), which will include implementation of spatial and seasonal buffers. These BMPs implement the USFWS's Guidelines for Raptor Protection From Human and Land-use Disturbances, with modifications allowed as long as protection of nests is ensured. Seasonal and spatial buffers are also listed in Appendix R. Cooperate with utility companies to prevent electrocution of raptors. Temporarily close areas (amount of time depends on the species) near raptor nest to rock climbers or other activities if the activity could result in nest abandonment.

## WL-19

Support and implement where possible the Northern River Otter Management Plan; coordinate with UDWR to determine potential release sites; support population monitoring.

BLM_0013804

*Moab Approved Resource Management Plan – Wildlife and Fisheries*

## WL-20

Manage riparian areas to ensure a multi-aged, multi-layered structure, allowing for retention of snags and diseased trees. Provide multiple layers of vegetation (vertical structure) within 10 feet of the ground.

## WL-21

Minor adjustments to crucial wildlife habitat boundaries periodically made by the Utah Division of Wildlife Resources (UDWR) will be accommodated through plan maintenance.

## WL-22

**Pronghorn Habitat:** Manage 78,476 acres of current pronghorn habitat that UDWR has designated in the La Sal (Hatch Point Herd) Wildlife Management Unit. Implement the Hatch Point HMP. Manage 743,524 acres of pronghorn habitat that UDWR has designated in the Cisco Desert and on the following allotments (see Map 32):

- Cisco
- Cisco Mesa
- Harley Dome
- San Arroyo
- Horse Canyon
- Pipeline
- Floy Creek
- Athena
- Little Grand
- Corral Wash Canyon
- Agate, Little Hole
- Monument Wash
- Highlands
- 10-Mile Point
- Big Flat
- Ruby Ranch
- Bar-X
- Crescent Canyon
- Squaw Park
- San Arroyo

## WL-23

**Pronghorn Habitat:** Management of pronghorn habitat (see Map 32) will be done in coordination with UDWR and may include (but will not be limited to) the following actions:

- Install and improve year-round water resources within the La Sal Management Unit and the Cisco Desert Herd unit.
- Support a change in class of livestock from sheep to cattle on the Hatch Point area.
- Change in class of livestock from cattle to sheep will not be allowed within pronghorn habitat.
- Install water developments every 2 square miles on summer and fawning areas.

BLM_0013805

- Construct fences that allow for pronghorn passage.
- Dismantle un-needed fences.
- Install restrictive fencing to stop pronghorn passage onto highways.
- Increase forage through vegetation treatments on approximately 4,400 acres.

## WL-24
**Pronghorn Habitat:** Protect pronghorn fawning habitat (293,741 acres) within Cisco Desert and on Hatch Point (the La Sal Wildlife Management Units) by applying a timing limitation stipulation that will preclude surface-disturbing activities from May 1 to June 15 (see Appendix A).

## WL-25
**Pronghorn Habitat:** Spring grazing will be adjusted on a case-by-case basis on 188,975 acres on allotments within crucial pronghorn habitat in the Cisco Desert to encourage forb production. These allotments include Athena, Cisco, Cisco Mesa, Harley Dome, and San Arroyo.

## WL 26
**Pronghorn Habitat:** Develop, where applicable, a rest/rotation of pasture or other grazing management systems within allotments that have crucial pronghorn habitat to encourage forb production prior to fawning. Change in livestock class from sheep to cattle, fencing, seeding and rest/rotation to improve habitat will be encouraged.

## WL-27
**Bighorn Sheep Habitat:** Film permits will comply with minimum impact criteria (see Appendix H) from April 1 through June 15 and from October 15 through December 15 within 123,490 acres of crucial bighorn sheep habitat (see Map 9).

## WL-28
**Bighorn Sheep Habitat:** No change in class of livestock from cattle to sheep conversions are to be considered in recognized bighorn habitat. (see Maps 9 and 10).

## WL-29
**Bighorn Sheep Habitat:** Follow the recommendations found in the BLM Bighorn Sheep Rangeland Management Plan, as revised (1993b); the Utah BLM Statewide Desert Bighorn Sheep Management Plan, as revised (1986a); and the Revised Guidelines for the Management of Domestic Sheep and Goats in Native Wild Sheep Habitats (BLM 1998a).

## WL-30
**Bighorn Sheep Habitat:** Support the current bighorn sheep population and manage to increase desert bighorn population (prior stable numbers) on 330,892 acres. Population goals will be reached by releases, by reestablishment, and through change of livestock class and installation of new water facilities (see Appendix U for details).

## WL-31
**Bighorn Sheep Habitat:** Management of bighorn sheep habitat in coordination with UDWR will include: installing water developments every 5 square miles in or within 2 miles of escape

BLM_0013806

terrain, precluding exotic ungulate, wild horses or burros within 10 miles of habitat, and constructing fences that allow for bighorn sheep passage (3 strands with bottom wire smooth) and dismantling un-needed fences.

## WL-32

**Bighorn Sheep Habitat:** Manage 9,278 acres along the rim of Hatch Point as part of the Lockhart Bighorn Sheep habitat areas. Apply a timing limitation stipulation to oil and gas leases and other permitted uses, which will restrict surface-disturbing activities from April 1 through June 15 for lambing and from October 15 through December 15 for rutting (see Appendix A).

## WL-33

**Bighorn Sheep Habitat:** Manage 317,523 acres of total desert bighorn sheep habitat on the following grazing allotments:

- Buckhorn
- North River
- Little Grand
- Taylor
- Ten Mile Point
- Arth's Pasture
- Spring Canyon Bottom
- Big Flat
- Kane Springs
- Potash
- Horsethief
- Behind the Rocks
- Ruby Ranch

## WL-34

**Bighorn Sheep Habitat:** Support conversion of sheep AUMs to cattle on Hatch Point Allotment.

## WL-35

**Bighorn Sheep Habitat:** Improve desert bighorn habitat by installing and improving year-round water resources within all desert bighorn habitat and provide additional water sources at a minimum spacing of one water development in each 2 square mile area on lambing grounds.

## WL-36

**Bighorn Sheep Habitat:** To protect lambing, rutting, and migration habitat (101,897 acres), apply a no surface occupancy stipulation for oil and gas leasing and preclude other surface-disturbing activities (see Appendix A). Within migration corridors pipeline construction and geophysical exploration for oil and gas development will be allowed outside lambing and rutting periods from June 16 through October 14 and from December 15 through March 31, respectively.

BLM_0013807

**WL- 37**
**Bighorn Sheep Habitat:** Manage lambing areas (46,319 acres - see Map 9) with the following prescriptions:

• Camping is allowed only in designated campsites except for areas within the Green River riparian corridor, which remain open to unrestricted camping.
• No camping in Shafer Basin and Long Canyon.
• Livestock use will be adjusted on North River and, Taylor Allotments (Dry Mesa Pasture).

**WL- 38**
**Bighorn Sheep Habitat:** Manage 310,726 acres of currently occupied Rocky Mountain bighorn habitat from the Green River to Pipeline Canyon according to stipulations described in management common to all. This management includes improving or maintaining habitat and vegetative conditions to benefit bighorn sheep while maintaining or improving the ecological condition of rangelands (see Map 10).

**WL- 39**
**Bighorn Sheep Habitat:** Support conversion of sheep to cattle on allotments that are within nine miles of the 310,726 acres of managed Rocky Mountain bighorn habitat. Once conversion occurs, do not allow re-conversion (from cattle to sheep). This includes the Cisco and Cisco Mesa Allotments, San Arroyo, Winter Camp and Harley Dome.

**WL- 40**
**Deer and Elk Habitat:** Manage UDWR current deer habitat of 534,329 acres in the Bookcliffs and 313,551 acres on the La Sal Mountains as mule deer habitat by improving or maintaining vegetative conditions to benefit both livestock and wildlife and by maintaining or improving the ecological condition of rangelands.

**WL-41**
**Deer and Elk Habitat:** Increase elk forage through vegetation treatments such as chemical, mechanical, and prescribed fire on approximately 40,000 acres of elk winter range (see Livestock Grazing).

**WL-42**
**Deer and Elk Habitat:** Manage crucial and high value deer and/or elk summer range (105,636 acres) within the Bookcliffs and La Sal Wildlife Management Unit by applying a timing limitation stipulation that will preclude surface-disturbing activities from May 15 to June 30 (see Appendix A; see Map 33).

**WL-43**
**Deer and Elk Habitat:** All forage on acquired state lands in upper Castle Valley within crucial deer winter range will be allocated to deer.

**WL-44**
**Deer and Elk Habitat:** Protect deer and/or elk crucial winter habitat (349,955 acres) by applying a timing limitation stipulation for oil and gas leasing as well as other surface-disturbing

BLM_0013808

activities (see Appendix A). (This includes 73,160 acres in WSAs, which are already closed to leasing.) This limitation will preclude surface-disturbing activities from November 15 through April 15.

## WL-45
**Allotments not available for grazing to benefit wildlife:**

- Bogart with 14,751 acres and 209 AUMs
- Cottonwood with 27,193 acres and 900 AUMs
- Diamond with 19,112 acres and 588 AUMs
- Ida Gulch with 3,624 acres and 112 AUMs
- Pear Park with 14,202 acres
- Mill Creek with 3,922 acres and 137 AUMs
- Portions of Professor Valley along Highway 128

BLM_0013809

## WOODLANDS (FOR)

### Goals and Objectives:

Manage forests and woodlands for healthy conditions that contribute to healthy habitat for animal and plant species, proper watershed functioning conditions, and riparian restoration and enhancement.

Provide woodland products on a sustainable basis consistent with maintaining ecosystem health and other resource management objectives to meet local needs where such use does not limit the accomplishment of goals for the management of other important resources.

Encourage, where feasible, the harvest of forest products in areas of proposed or existing vegetation treatments to lessen the need for additional treatment or land disturbance, and in areas that need restoration for ecological benefits.

Identify, maintain, and restore forests with late successional characteristics to a pre-fire suppression condition. The MFO will adopt the USFS old-growth definitions and identification standards as per the USFS document "Characteristics of Old-Growth Forests in the Intermountain Region (April 1993)." In instances where the area of application in the previous document does not apply (e.g., *Pinus edulis*), use the document "Recommended Old-Growth Definitions and Descriptions, USDA Forest Service Southwestern Region (Sept. 1992)."

### Management Decisions:

### FOR-1
Permits for harvest of woodland products will continue to be sold to the public, consistent with the availability of woodland products and the protection of sensitive resource values.

### FOR-2
As needed, designate private and commercial wood gathering areas for the following uses:

- Firewood
- Fence posts
- Christmas tree cutting
- Green wood cutting
- Plant gathering for landscaping

### FOR-3
Use woodland harvest to assist in managing woodlands to accomplish goals outlined in the Fire Management Plan.

### FOR-4
Prohibit public fuel wood gathering in riparian areas.

BLM_0013810

## FOR-5

Permit sustainable harvest (including cutting of green willows, squawbush, and cottonwoods) for Native American traditional ceremonial use. Additional areas may be closed to wood gathering and wood harvest as needed to protect sensitive resources.

## FOR-6

Follow national BLM Forest Health and Forest Management Standards and Guidelines to assess conditions and guide management actions for the forest and woodland resource.

## FOR-7

Provide for salvage harvest of wood in beetle-kill areas, when compatible with other resource objectives.

## FOR-8

Provide 1,168,988 acres for woodland harvest and wood gathering. See Map 34 for areas in which woodland harvest and wood gathering is prohibited (652,386 acres) to protect resource values.

BLM_0013811

# REFERENCES

BLM. 1982. Management Situation Analysis for the Grand Resource Area. Bureau of Land Management, Grand Resource Area, Moab District, Moab, Utah.

BLM. 1985a. Grand Resource Area Resource Management Plan. Bureau of Land Management, Moab District, Moab, Utah.

BLM. 1986a. Statewide Desert Bighorn Sheep Management Plan. Bureau of Land Management, Utah State Office, Salt Lake City.

BLM. 1989b. Planning Criteria for Land Tenure Adjustments, Exchanges, Acquisitions, and Disposals: An Amendment to the 1985 Grand Resource Area Resource Management Plan. Bureau of Land Management. Moab District, Moab, Utah. February.

BLM. 1990. Utah BLM Statewide Wilderness Environmental Impact Statement. Bureau of Land Management, Utah State Office, Salt Lake City.

BLM. 1991a. Final Environmental Impact Statement: Vegetation Treatment on BLM Lands in Thirteen Western States. BLM-WY-91-022-4320. Bureau of Land Management, Wyoming State Office, Cheyenne. May.

BLM. 1991c. Utah Statewide Wilderness Study Report. Bureau of Land Management, Utah State Office, Salt Lake City. October.

BLM. 1992a. Environmental Assessment: Utah's Colorado Riverway Recreation Area Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 1993b. Bighorn Sheep Rangeland Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 1993d. Greater Sagers Wash Watershed Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 1994a. Sand Flats Recreation Area Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 1995. Interim Management Policy for Lands Under Wilderness Review. BLM Handbook H-8550-1. Bureau of Land Management, California State Office, Sacramento.

BLM. 1997a. Standards for Rangeland Health and Guidelines for Grazing Management of BLM Lands in Utah. BLM-UT-GI-97-001-4000. Bureau of Land Management, Utah State Office, Salt Lake City. May.

BLM. 1997b. Environmental Impact Statement for Lisbon Valley Copper Project, San Juan County, Utah. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 1999. Utah Wilderness Inventory. Bureau of Land Management, Utah State Office, Salt Lake City.

BLM. 2001a. Colorado Riverway Special Recreation Area Management Plan Amendment. EA # UT-062-99-151. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM_0013812

BLM. 2001b. Mill Creek Canyon Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2001c. Questar, Williams and Kern River Pipeline Draft Environmental Impact Statement. State # 01-533. Bureau of Land Management, Utah State Office, Salt Lake City.

BLM. 2001d. Biological Soil Crusts: Ecology and Management. TR 1730-2. Bureau of Land Management, National Science and Technology Center, Denver.

BLM. 2002a. Preparation Plan for the Moab Field Office Resource Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2002b. Standards for Public Land Health and Guidelines for Recreation Management for BLM Lands in Utah [online publication]. Bureau of Land Management, Utah State Office, Salt Lake City. [Last Accessed June 15, 2007]. Available at http://www.ut.blm.gov/Recreation/recstandards.html.

BLM. 2003a. Resource Management Plan and Environmental Impact Statement for the Colorado Canyons National Conservation Area and Black Ridge Canyons Wilderness. Bureau of Land Management, Grand Junction Field Office, Grand Junction, Colorado.

BLM. 2003b. Canyon Rims Recreation Area Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2003c. Moab Field Office Visual Resource Inventory Map. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2004b. Three Rivers Withdrawal. Bureau of Land Management, Moab Field Office, Moab, Utah and Price Field Office, Price, Utah.

BLM. 2004c. National Sage-grouse Habitat Conservation Strategy. Bureau of Land Management, Washington, D.C. November.

BLM. 2004d. Moab Field Office Analysis of Management Situation. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2004e. Moab Field Office Social and Economic Baseline Study. Bureau of Land Management, Moab Field Office, Moab, Utah. April.

BLM. 2004f. Relevance and Importance Evaluations of Area of Critical Environmental Concern (ACEC) Nominations. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2004g. Wild and Scenic Rivers Review Eligibility Determination, Moab Field Office. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2005a. Land Use Planning Handbook. BLM Handbook H-1601-1. Bureau of Land Management, Washington, D.C.

BLM. 2005b. Cameo Cliffs Special Recreation Management Area Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM_0013813

BLM. 2005c. Utah Land Use Plan Amendment for Fire and Fuels Management, September. UT-USO-04-01 [online publication]. Bureau of Land Management, Utah State Office, Salt Lake City. [Last Accessed June 15, 2007]. Available at http://www.ut.blm.gov/fireplanning/ LUPEAFire92605FINAL.pdf

BLM. 2005d. Final Programmatic Environmental Impact Statement for Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments. Bureau of Land Management, Washington, D.C. June.

BLM. 2005e. Mineral Potential Report for the Moab Planning Area, Grand and San Juan Counties, Utah. Bureau of Land Management, Moab Field Office, Moab, Utah. August.

BLM. 2005f. Reasonable Foreseeable Development Scenario for Oil and Gas. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2005i. Summary Data for Bureau of Land Management. Appendix D in Recreational Fee Demonstration Program Annual Report, FY 2003. Department of the Interior and Department of Agriculture, Washington, D.C.

BLM. 2006a. Normal Year Fire Rehabilitation and Stabilization Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM. 2006b. Moab Fire District Fire Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.

BLM 2007. Final Vegetation Treatments on BLM Lands in 17 Western States Programmatic Environmental Impact Statement and Associated Record of Decision. USDI BLM. FES 07-21.

BLM 2007b. Final Vegetation Treatments on BLM Lands in 17 Western States Programmatic Environmental Report. USDI BLM. FES 0721.

Connelly, John W., Michael A. Schroeder, Alan R. Sands, and Clait E. Braun. 2000. Guidelines to Manage Sage Grouse Populations and Their Habitats. *Wildlife Society Bulletin* 28(4): 967–985.

Connelly, John W., Steven T. Knick, Michael A. Schroeder, and San J. Stiver. 2004. Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats. Western Association of Fish and Wildlife Agencies, Cheyenne, Wyoming.

Cowardin, L. W., V. Carter, F. C. Golet, and E. T. LaRoe. 1979. Classification of Wetlands and Deepwater Habitats of the United States. FWS/OBS-79/31. U.S. Fish and Wildlife Service, Office of Biological Services, Washington, D.C.

CRCT Task Force. 2001. Conservation agreement and strategy for Colorado River cutthroat trout (*Oncorhynchus clarki pleuriticus*) in the States of Colorado, Utah, and Wyoming. Colorado Division of Wildlife, Fort Collins.

DOE. 2005. Remediation of the Moab Uranium Mill Tailings, Grand and San Juan Counties, Utah, Final Environmental Impact Statement. DOE/EIS-0355. Department of Energy, Office of Environmental Management, Grand Junction, Colorado.

BLM_0013814

Department of Energy and Bureau of Land Management (DOE and BLM). 2006. West-wide Energy Corridor Programmatic EIS Information Center: "Programmatic Environmental Impact Statement for Designation of Energy Corridors on Federal Land in 11 Western States." DOE/EIS-0386 [internet website]. Department of Energy and Bureau of Land Management, Washington, D.C. [Last Accessed June 15, 2007]. Available at http://corridoreis.anl.gov/index.cfm.

Edwards, T. C., Jr., C. G. Homer, S. D. Bassett, A. Falconer, R. D. Ramsey, and D. W. Wight. 1995. Utah Gap Analysis: An Environmental Information System. Final Project Report 95-1. Utah Cooperative Fish and Wildlife Research Unit, Utah State University, Logan.

Grand County. 2004. Grand County General Plan Update. Prepared by Grand County, Moab, Utah.

Gunnison Sage-grouse Rangewide Steering Committee (GSRSC). 2005. Gunnison Sage-grouse Rangewide Conservation Plan. Colorado Division of Wildlife, Denver. April.

Haug, E. A., B. A. Millsap, and M. S. Martell. 1993. Burrowing Owl (*Speotyto cunicularia*). In *The Birds of North America*, No. 61, edited by A. Poole and F. Gill. Philadelphia: The Academy of Natural Sciences, and Washington, D.C.: The American Ornithologists' Union.

Lentsch, L., and Y. Converse. 1997. Conservation Agreement and Strategy for Colorado River Cutthroat Trout (*Oncorhynchus clarki pleuriticus*) in the State of Utah. Publication Number 97-20. Utah Division of Wildlife Resources, Salt Lake City.

Lowry Jr., J. H., R. D. Ramsey, K. Boykin, D. Bradford, P. Comer, S. Falzarano, W. Kepner, J. Kirby, L. Langs, J. Prior-Magee, G. Manis, L. O'Brien, T. Sajwaj, K. A. Thomas, W. Rieth, S. Schrader, D. Schrupp, K. Schulz, B. Thompson, C. Velasquez, C. Wallace, E. Waller and B. Wolk. 2005. Southwest Regional Gap Analysis Project: Final Report on Land Cover Mapping Methods. RS/GIS Laboratory, Utah State University, Logan.

National Park Service (NPS). 1974. Canyonlands National Park General Management Plan. National Park Service, Canyonlands National Park, Moab, Utah.

NPS. 1979. Wild and Scenic River Study Final Environmental Statement, Colorado and Lower Dolores Wild and Scenic Rivers. National Park Service, Denver Service Center, Denver, Colorado. September.

NPS. 1989. General Management Plan, Development Concept Plan: Arches National Park, Utah. National Park Service, Arches National Park, Moab, Utah.

NPS. 1995. Canyonlands National Park and Orange Cliffs Unit of Glen Canyon National Recreation Area Backcountry Management Plan. National Park Service, Canyonlands National Park, Moab, Utah.

NPS. 2003. Canyonlands National Park Long-range Interpretive Plan. National Park Service, Canyonlands National Park, Moab, Utah.

NPS. 2006. Superintendent's Orders Established for Canyonlands National Park. Compendium on 36 CFR 1.7(b). National Park Service, Canyonlands National Park, Moab, Utah.

BLM_0013815

Natural Resources Conservation Service (NRCS). 1981. Soil Survey of Grand County, Utah. U.S. Department of Agriculture, Natural Resources Conservation Service, Washington, D.C.

Parrish, J. R., F. P. Howe, and R. Norvell. 2002. The Utah avian conservation strategy, version 2.0. UDWR Publication No. 02-27. Utah Partners in Flight Program, Utah Division of Wildlife Resources, Salt Lake City.

Romin, L. A., and J. A. Muck. 2002. Utah Field Office Guidelines for Raptor Protection from Human and Land Use Disturbances. U.S. Fish and Wildlife Service, Utah Field Office, Salt Lake City.

San Juan County. 1996. San Juan County Master Plan. Prepared by San Juan County, Monticello, Utah.

Sogge, M. K., R. M. Marshall, S. J. Sferra, and T. J. Tibbitts. 1997. A Southwestern Willow Flycatcher Natural History Summary and Survey Protocol. Technical Report NPS/ NAUCPRS/NRTR-97/12. U.S. Geological Survey Biological Resources Division, Colorado Plateau Field Station, Northern Arizona University, Flagstaff.

Stiver, S. J., A. D. Apa, J. R. Bohne, S. D. Bunnell, P. A. Deibert, S. C. Gardner, M. A. Hilliard, C. W. McCarthy, and M. A. Schroeder. 2006. Greater Sage-grouse Comprehensive Conservation Strategy. Western Association of Fish and Wildlife Agencies, Cheyenne, Wyoming. December.

USDA, Forest Service (USFS). 1986. Land and Resource Management Plan, Manti-La Sal National Forest. USDA Forest Service, Manti-La Sal National Forest, Price, Utah.

USFS, BLM, and NPS. 1996. Wild and Scenic River Review in the State of Utah, Process and Criteria for Interagency Use. Available at Bureau of Land Management, Utah State Office, Salt Lake City.

U.S. Fish and Wildlife Service (USFWS). 1983. Northern States Bald Eagle Recovery Plan. U.S. Fish and Wildlife Service, Denver.

USFWS. 1987. Environmental Assessment for the Upper Colorado River Endangered Fish Recovery Program. U.S. Fish and Wildlife Service, Upper Colorado River Endangered Fish Recovery Program, Lakewood, Colorado.

USFWS. 1988. Black-footed Ferret Recovery Plan. U.S. Fish and Wildlife Service, Denver.

USFWS. 1990a. Humpback Chub (*Gila cypha*) Recovery Plan, 2nd Revised. U.S. Fish and Wildlife Service, Denver.

USFWS. 1990b. Bonytail Chub Recovery Plan. Prepared by the Colorado River Fishes Recovery Team, Denver. Prepared for Region 6, U.S. Fish and Wildlife Service, Washington, D.C.

USFWS. 1991. Colorado Pikeminnow Recovery Plan. Prepared by the Colorado River Fishes Recovery Team, Denver. Prepared for Region 6, U.S. Fish and Wildlife Service, Washington, D.C.

BLM_0013816

USFWS. 1995. Mexican Spotted Owl (*Strix occidentalis lucida*) Recovery Plan. U.S. Fish and Wildlife Service, Denver.

USFWS. 1999. Razorback Sucker Recovery Plan. Prepared by the Colorado River Fishes Recovery Team, Denver. Prepared for Region 6, U.S. Fish and Wildlife Service, Washington, D.C.

USFWS. 2002a. Colorado Pikeminnow (*Ptychocheilus lucius*) Recovery Plan (Amendment and Supplement for Recovery Goals), Final Revision 2. U.S. Fish and Wildlife Service, Utah Field Office, Salt Lake City.

USFWS. 2002b. Humpback Chub (*Gila cypha*) Recovery Goals: amendment and supplement to the Humpback Chub Recovery Plan. U.S. Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

USFWS. 2002c. Bonytail (*Gila elegans*) Recovery Goals, Amendment and Supplement to the Bonytail Chub Recovery Plan, Final Revision 2. U.S. Fish and Wildlife Service, Denver.

USFWS. 2002d. Razorback Sucker (*Xyrauchen fexanus*) Recovery Plan, Amendment and Supplement for Recovery Goals, Final Revision 1. U.S. Fish and Wildlife Service, Denver.

USFWS. 2002e. Final Recovery Plan for the Southwestern Willow Flycatcher (*Empidonax traillii extimus*). U.S. Fish and Wildlife Service, Albuquerque.

USFWS. 2002f. Birds of Conservation Concern, 2002. U.S. Fish and Wildlife Service, Division of Migratory Bird Management, Arlington, Virginia.

USFWS. 2005. Designation of Critical Habitat for the Southwestern Willow Flycatcher (*Empidonax traillii extimus*). U.S. Fish and Wildlife Service, Washington, D.C.

U.S. Geological Survey (USGS), 2007.  Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands:  A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies and Internet Resources.

UDEQ. 2002. Utah's 2002 303(d) List of Waters. Utah Department of Environmental Quality, Salt Lake City.

Utah Division of Air Quality and Environmental Protection Agency (UDAQ and EPA). 2006. US EPA Air Data Mapping and Emissions Tool, Nonattainment Areas Maps for Utah [online database]. Utah Division of Air Quality, Salt Lake City. [Last Accessed June 18, 2007]. Available at http://www.airmonitoring.utah.gov/ and http://www.epa.gov/air/data/nonat.html?st%7EUT%7EUtah.

Utah Division of Water Resources (UDWRe). 2000. Utah State Water Plan, Southeast Colorado River Basin. Utah Division of Water Resources, Salt Lake City.

Utah Division of Water Rights (UDWRi). 2003. Water Use Records Application [application download]. Utah Division of Water Rights, Salt Lake City. [Last Accessed June 18, 2007]. Available at http://waterrights.utah.gov/cgi-bin/wuseview.exe.

BLM_0013817

Utah Division of Wildlife Resources (UDWR). 1985a. Cisco Desert Habitat Management Plan. Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 1985b. Hatch Point Habitat Management Plan. Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 1985c. Dolores Triangle Habitat Management Plan. Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 1986. The Potash-Confluence Habitat Management Plan. Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 1999. Statewide Management Plan for Bighorn Sheep. Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 2000a. Utah Upland Game Annual Report, 1999. Publication 00-27. Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 2000b. Utah Black Bear Management Plan. Publication 00-23. Utah Division of Wildlife Resources, Salt Lake City. June 27.

UDWR. 2002. Strategic Management Plan for Sage-grouse. Publication 02-20. Utah Division of Wildlife Resources, Salt Lake City. June.

UDWR. 2005a. Utah Comprehensive Wildlife Conservation Strategy. Publication Number 05-19. Utah Division of Wildlife Resources, Salt Lake City. September.

UDWR. 2005b. Utah Sensitive Species List. Unpublished document, Utah Division of Wildlife Resources, Salt Lake City.

UDWR. 2006. Utah Big Game Annual Report, 2005. Publication 06-21. Utah Division of Wildlife Resources, Salt Lake City.

UDWR, 2007. Aerial Survey Counts (Pronghorn). Utah Division of Wildlife Resources. Salt Lake City.

UDWR, 2007. Utah Bighorn Sheep State-wide Management Plan. Utah Division of Wildlife Resources. Salt Lake City.

UDWR, 2008. 2008 Antlerless Deer Permit Summary and Recommendations. Utah Division of Wildlife Resources. Salt Lake City.

UDWR, 2008. 2008 Antlerless Elk Permit Summary and Recommendations. Utah Division of Wildlife Resources. Salt Lake City.

BLM_0013818

# GLOSSARY

**Activity Plan:** Site-specific plan which precedes actual development. This is the most detailed level of BLM planning.

**All-Terrain Vehicle (ATV)**: A wheeled or tracked vehicle, other than a snowmobile or work vehicle, designed primarily for recreational use or for the transportation of property or equipment exclusively on undeveloped road rights of way, open country or other unprepared surfaces.

**Allotment**: An area of land where one or more livestock operators graze their livestock. Allotments generally consist of BLM lands but may also include other federally managed, state owned, and private lands. An allotment may include one or more separate pastures. Livestock numbers and periods of use are specified for each allotment.

**Animal Unit Month (AUM)**: A standardized measurement of the amount of forage necessary for the sustenance of one cow unit or its equivalent for 1 month. Approximately 800 pounds of forage.

**Area of Critical Environmental Concern (ACEC)**: Areas within the public lands where special management attention is required to: (1) protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or (2) protect life and safety from natural hazards.

**Authorized Officer**: The Federal employee who has the delegated authority to make a specific decision.

**Avoidance Areas**: Areas with sensitive resource values where rights-of-way leases, and easements would be strongly discouraged. Authorization made in avoidance areas would have to be compatible with the purpose for which the area was designated and not is otherwise feasible on lands outside the avoidance area.

**Best Management Practices (BMPs)**: A suite of techniques that guide, or may be applied to, management actions to aid in achieving desired outcomes. Best management practices are often developed in conjunction with land use plans, but they are not considered a land use plan decision unless the land use plan specifies that they are mandatory. They may be updated or modified without a plan amendment if they are not mandatory.

**Big Game**: Large species of wildlife that are hunted, such as elk, deer, bighorn sheep, and pronghorn antelope.

**Candidate Species**: Any species included in the Federal Register notice of review that are being considered for listing as threatened or endangered by the U.S. Fish and Wildlife Service.

**Casual Use**: Mining activities that only negligibly disturb federal lands and resources. Casual use generally includes the collecting of geochemical, rock, soil, or mineral specimens using hand tools, hand panning, and non-motorized sluicing. It also generally includes use of metal detectors, gold spears, and other battery-operated devices for sensing the presence of minerals, and hand battery-operated dry washers. Casual use does not include use of mechanized earth-moving equipment, truck-mounted drilling equipment, suction dredges, motorized vehicles in areas

BLM_0013819

designated as closed to off-road vehicles, chemicals, or explosives. It also does not include occupancy or operations where the cumulative effects of the activities result in more than negligible disturbance.

**Closed**: Generally denotes that an area is not available for a particular use or uses; refer to specific definitions found in law, regulations, or policy guidance for application to individual programs.

**Code of Federal Regulations (CFR)**: The official, legal tabulation or regulations directing federal government activities.

**Conditions of Approval**: Conditions or provisions (requirements) under which an Application for a Permit to Drill or a Sundry Notice is approved.

**Conformance**: That a proposed action shall be specifically provided for in the land use plan or, if not specifically mentioned, shall be clearly consistent with the goals, objectives, or standards of the approved land use plan.

**Conservation Agreement**: A formal signed agreement between the U.S. Fish and Wildlife Service or National Marine Fisheries Service and other parties that implements specific actions, activities, or programs designed to eliminate or reduce threats or otherwise improve the status of a species. CA's can be developed at a State, regional, or national level and generally include multiple agencies at both the State and Federal level, as well as tribes. Depending on the types of commitments the BLM makes in a CA and the level of signatory authority, plan revisions or amendments may be required prior to signing the CA, or subsequently in order to implement the CA.

**Conservation Strategy**: A Strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats. Conservation strategies are generally developed for species of plants and animals that are designated as BLM Sensitive species or that have been determined by the Fish and Wildlife Service or National Marine Fisheries Service to be Federal candidates under the Endangered Species Act.

**Contiguous**: Lands or legal subdivisions having a common boundary; lands having only a common corner are not contiguous.

**Cooperating Agency**: Assists the lead Federal agency in developing an Environmental Analysis or Environmental Impact Statement. The Council on Environmental Quality regulations implementing NEPA defines a cooperating agency as any agency that has jurisdiction by law or special expertise for proposals covered by NEPA. Any tribe of Federal, State, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**Corridor**: A wide strip of land within which a proposed linear facility could be located.

**Council on Environmental Quality (CEQ)**: An advisory council to the President of the United States established by the national Environmental Policy Act of 1969. It reviews Federal programs for their effect on the environment, conducts environmental studies, and advises the president on environmental matters.

**Critical Habitat. For listed species**:  Consists of 1) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of the Endangered Species Act, on which are found those physical or biological features (constituent elements) a) essential to the conservation of the species and b) which may require special management considerations or protection; and 2) specific areas outside the geographical are occupied by the species at the time it is listed in accordance with the provisions of section 4 of the Endangered Species Act upon a determination by the Secretary that such areas are essential for the conservation of the species. Designated critical habitats are described in 50 CFR§ 17 and 226.

**Crucial Habitat**. Habitat on which a species depends for survival because there are no alternative ranges or habitats available.

**Crucial Winter Habitat (Range)**: Parts of the habitat necessary to sustain a wildlife population at critical periods of its life cycle. This is often a limiting factor on the populations, such as breeding habitat, winter habitat, etc.

**Cryptobiotic (Cryptogrammic) Soils**: Biological communities that form a surface layer or crust on some soils. These communities consist of cyanobacteria (blue-green bacteria), micro fungi, mosses, lichens, and green algae and perform many important functions, including fixing nitrogen and carbon, maintaining soil surface stability, and preventing erosion. Crypto biotic crusts also influence the nutrient levels of soils and the status and germination of plants in the desert. These crusts are slow to recover after severe disturbance, requiring 40 years of more to recolonize even small areas.

**Cultural Resources**: Nonrenewable elements of the physical and human environment including archeological remains (evidence of prehistoric or historic human activities) and sociocultural values traditionally held by ethnic groups (sacred places, traditionally utilized raw materials, etc.).

**Cultural Site**: Any location that includes prehistoric and/or historic evidence of human use or that has important sociocultural value.

**Cumulative Impact**: The impact on the environment that results from the incremental impact of the action when added to other past, present, or reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**Current Habitat**: habitat currently occupied by a species during the development of the plan.

**Desired Condition**: Description of those factors, which should exist within ecosystems both to maintain their survival and to meet social and economic needs.

**Discretionary Closure**: Those lands where the BLM has determined that fluid minerals leasing, even with the most restrictive stipulations, would not adequately protect other resources, values, or land uses.

**Dispersed/Extensive Recreation**: Recreation activities of an unstructured type, which are not confined to specific locations such as recreation sites. Example of these activities may be hunting, fishing, off-road vehicle use, hiking, and sightseeing.

BLM_0013821

**Disturbance Area**: Area of influence around a disturbance causing a change in animal behavior such as: leaving the area, increased stress, abandoning young, not breeding, and aberrant behavior.

**Drought**: Drought is a protracted period of deficient precipitation resulting in extensive damage to crops, resulting in loss of yield.

**Easement**: A right afforded a person or agency to make limited use of another's real property for access or other purposes.

**Endangered Species**: A plant or animal species whose prospects for survival and reproduction are in immediate jeopardy, as designated by the Secretary of the Interior, and as is further defined by the Endangered Species Act.

**Environmental Assessment (EA)**: A concise public document that analyzes the environmental impacts of a proposed federal action and provides sufficient evidence to determine the level of significance of the impacts.

**Environmental Impact Statement (EIS)**: A detailed written statement required by the National Environmental Policy Act when an agency proposes a major federal action significantly affecting the quality of the human environment.

**Erosion**: The wearing away of the land surface by running water, wind, ice, or other geological agents.

**Exclusion Area**: Areas with sensitive resource values where rights-of-way , leases, and easements would not be authorized.

**Extensive Recreation Management Area (ERMA)**: An area where significant recreation opportunities and problems are limited and explicit recreation management is not required. Minimal management actions related to the BLM's stewardship responsibilities are adequate in these areas.

**Fawning Habitat**: an area where big game animals usually give birth during a specific time of year.

**Federal Land Policy and Management Act of 1976 (FLPMA)**: Public Law 94-579. October 21, 1976, often referred to as the BLM's "Organic Act," which provides the majority of the BLM's legislated authority, direction, policy, and basic management guidance.

**Federal Register**: A daily publication, which reports Presidential and Federal Agency documents.

**Fire Management Plan**: A strategic plan that defines a program to manage wild land and prescribed fires and documents the fire management program in the approved land use plan; the plan is supplemented by operational procedures such as preparedness plans, preplanned dispatch plans, prescribed fire plans, and prevention plans.

**Floodplain**: The relatively flat area or lowlands adjoining a body of standing or flowing water, which has been or might be covered by floodwater.

**Fluid Minerals**: Oil and gas resources.

BLM_0013822

**Focus Area**: A recreation management zone that emphasizes particular types of recreation activities.

**Fossil**: Mineralized or petrified form from a past geologic age, especially from previously living things.

**Geographic Information System (GIS)**: A computer system capable of storing, analyzing, and displaying data and describing places on the earth's surface.

**Goal**: A broad statement of a desired outcome. Goals are usually not quantifiable and may not have established time frames for achievement.

**Grandfather (to)**: To exempt groups or individuals from provisions of laws or regulations because of preexisting conditions, such as exempting mining operations existing before new mining regulations are implemented from provisions of those new regulations.

**Grazing System**: The manipulation of livestock grazing to accomplish a desired result.

**Guidelines**: Actions or management practices that may be used to achieve desired outcomes, sometimes expressed as best management practices. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory.

**Habitat**: A specific set of physical conditions that surround a species, group of species, or a large community. In wildlife management, the major constituents of habitat are considered to be food, water, cover, and living space.

**Habitat Fragmentation**: The disruption (by division) of extensive habitats into smaller habitat patches. The effects of habitat fragmentation include loss of habitat area and the creation of smaller, more isolated patches of remaining habitat.

**Historic Habitat**: habitat occupied by a species prior to the development of this plan.

**Impact**: A modification of the existing environment caused by an action. These environmental consequences are the scientific and analytical basis for comparison of alternatives. Effects may be either direct, which are caused by the action and occur at the same time and place, or indirect, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable, or cumulative.

Implementation Decisions: Decisions that take action to implement land use plan decisions. They are generally appealable to Interior Board of Land Appeals.

**Implementation Plan**: A site-specific plan written to implement decisions made in a land use plan. An implementation plan usually selects and applies best management practices to meet land use plan objectives. Implementation plans are synonymous with "activity" plans. Examples of implementation plans include interdisciplinary management plans, habitat management plans, and allotment management plans.

**Indian Tribe**: Any Indian group in the conterminous United States that the Secretary of the Interior recognizes as possessing tribal status.

**Interdisciplinary Team**: A group of individuals with different training, representing the physical sciences, social sciences, and environmental design arts, assembles to solve a problem

BLM_0013823

or perform a task. The members of the team proceed to a solution with frequent interaction so that each discipline may provide insights to any stage of the problem and disciplines may combine to provide new solutions. The number and disciplines of the members preparing the plan vary with circumstances. A member may represent one or more disciplines or BLM program interests.

**Lambing Habitat**: An area where bighorn sheep deliver and nurse young during a specific time of year.

**Land Use Allocation**: The identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions.

**Land Use Plan**: A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land-use-plan-level decisions developed through the planning process, regardless of the scale at which the decisions were developed.

**Land Use Plan Decision**: Establishes desired outcomes and the actions needed to achieve them. Decisions are reached using the BLM planning process. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to Interior Board of Land Appeals.

**Leasable Minerals**: Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. They include coal, phosphate, sulphur, potassium, and sodium minerals, and oil, gas, and geothermal.

**Lease**: (1) A legal document that conveys to an operator the right to drill for oil, gas; (2) the tract of land, on which a lease has been obtained, where producing wells and production equipment are located.

**Lease Notice**: Provides more detailed information concerning limitations that already exist in law, lease terms, regulations, and operational orders. A Lease Notice also addresses special items the lessee would consider when planning operations, but does not impose new or additional restrictions.

**Lease Stipulation**: A modification of the terms and conditions on a standard lease form at the time of the lease sale.

**Lek**: An assembly area where birds, especially sage grouse, carry on display and courtship behavior.

**Limited Roads and Trails Designation**: Designated areas where the use of off-road vehicles is subject to restrictions, such as limiting the number or types or vehicles allowed, dates and times of use (seasonal restrictions), and limiting all use to designated roads and trails. Under the designated roads and trails designation, use would be allowed only on roads and trails that are signed for use. Combinations of restrictions are possible, such as limiting use to certain types of vehicles during certain times of the year.

**Locatable Minerals**: Minerals subject to exploration, development, and disposal by staking mining claims as authorized by the Mining Law of 1872, as amended. This includes deposits of gold, silver, and other uncommon minerals not subject to lease or sale.

BLM_0013824

**Management Decision**: A decision made by the BLM to manage public lands. Management decisions are made on both land use plan decisions and implementation decisions.

**Management Opportunities**: A component of the analysis of the management situation; actions or management directions that could be taken to resolve issues or management concerns.

**Mechanized Travel**: Travel by use of a machine, either motorized or non-motorized.

**Mineral Entry**: The filing of a claim on public land to obtain the right to any minerals it may contain.

**Mineral Estate**: The ownership of minerals, including rights necessary for access, exploration, development, mining, ore dressing, and transportation operations.

**Mineral Materials**: Materials such as common varieties of sand, stone, building stone, gravel, and clay that are not obtainable under the mining or leasing laws but that can be acquired under the Mineral Materials Act of 1947, as amended. These are also called salable minerals.

**Mineral Reserves**: Known mineral deposits that are recoverable under present conditions but are as yet undeveloped.

**Mineral Withdrawal**: A formal order that withholds federal lands and minerals from entry under the Mining Law of 1872 and closes the area to mineral location (staking mining claims) and development.

**Mining Claim**: A parcel of land that a miner takes and holds for mining purposes, having acquired the right of possession by complying with the Mining Law of 1872, as amended, and local laws and rules. A single mining claim may contain as many adjoining locations as the locator may make or buy.

**Mitigation Measures**: Methods or procedures that reduce or lessen the impacts of an action.

**Multiple Use**: The management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the lands for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some lands for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and nonrenewable resources, including but not limited to, recreation, range, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the lands and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or greatest unit output.

**National Environmental Policy Act of 1969 (NEPA)**: An act that encourages productive and enjoyable harmony between man and his environment and promotes efforts to prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; enriches the understanding or the ecological systems and natural resources important to the Nation, and establishes the Council on Environmental Quality.

BLM_0013825

**National Wild and Scenic Rivers System**: A system of nationally designated rivers and their immediate environments that have outstanding scenic, recreational, geologic, fish and wildlife, historic, cultural, and other similar values and are preserved in a free-flowing condition. The system consists of three river classifications: (1) recreation-rivers or sections of rivers that are readily accessible by road or railroad and that may have some development along their shorelines and may have undergone some impoundments or diversion in the past, (2) scenic-rivers or sections of rivers free of impoundments with shorelines or watersheds still largely undeveloped but accessible in places by roads, and (3) wild-rivers or sections of rivers free of impoundments and generally inaccessible except by trails, with watersheds or shorelines essentially primitive and waters unpolluted.

**Neotropical Migratory Birds**: Birds that travel to Central America, South America, the Caribbean, and Mexico during the fall to spend the winter and then return to the United States and Canada During the spring to breed. These birds include almost half of the bird species that breed in the United States and Canada.

**No Surface Occupancy (NSO)**: A fluid minerals leasing constraint that prohibits occupancy or disturbance on all or part of the lease surface to protect special values or uses. Lessees may exploit the fluid mineral resources under the leases restricted by this constraint through use of directional drilling from sites outside the area.

**Non-mechanized Travel**: Travel by foot or on an animal.

**Non-WSA Lands with Wilderness Characteristics**: Undeveloped federal land that has been inventoried and/or reviewed by a BLM interdisciplinary team and determined to possess wilderness characteristics such as those listed in section 2(c) of the Wilderness Act of 1964. These lands do not possess special management designations like WSAs or protective management measures such as the IMP.

**Noxious Weeds**: A plant species designated by Federal of State law as generally possessing one or more of the following characteristics: aggressive and difficult to manage; parasitic; a carrier or host of serious insects or disease; or nonnative, new, or not common to the United States.

**Objective**: A description of a desired condition for a resource. Objectives can be quantified and measured and, where possible, have established time frames for achievement.

**Occupied Habitat**: An area occupied by a species during the development of this plan.

**Open**: Generally denotes that an area is available for a particular use or uses. Refer to specific program definitions found in law, regulations, or policy guidance for application to individual programs.

**Off-Highway Vehicle (OHV)**: Any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: (1) any nonamphibious registered motorboat; (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used in times of national defense emergencies.

**One-Hundred-Year Flood**: A hydrologic event with a magnitude that has a recurrence interval of 100 years.

BLM_0013826

**Open OHV Areas**: Designated areas where off-road vehicles may engage in cross country travel.

**Operator**: Any person who has taken formal responsibility for the operations conducted on the leased lands.

**Outstandingly Remarkable River Values**: Values between those listed in Section 1(b) of the Wild and Scenic Rivers Act are "scenic, recreational, geological, fish and wildlife, historical, cultural, or other similar values…" Other similar values, which may be considered, include botanical, hydrological, paleontological, or scientific. Professional judgment is used to determine whether values exist to an outstandingly remarkable degree.

**Paleontological Resources (Fossils)**: The physical remains of plants and animals preserved in soils and sedimentary rock formations. Paleontological resources are important for understanding past environments, environmental change, and the evolution of life.

**Paleontology**: A science dealing with the life forms of past geological periods as known from fossil remains.

**Plan of Development**: A mandatory plan, developed by an applicant of a mining operation or construction project that specifies the techniques and measures to be used during construction and operation of all project facilities on public land. The plan is submitted for approval to the appropriate Federal agency before any construction begins.

**Plan of Operations**: A plan for mining exploration and development that an operation must submit to BLM for approval when more than 5 acres a year will be disturbed or when an operator plans to work in an area of critical environmental concern or a wilderness area. A plan of Operations must document in detail all actions that the operator plans to take from exploration through reclamation.

**Planning Area**: A geographical area, including all land ownerships, for which BLM land use and resource management plans are developed and maintained for the BLM-administered lands within that geographical area.

**Planning Criteria**: The standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning. Planning criteria streamline and simplify the resource management planning actions.

**Prescribed Fire**: The introduction of fire to an area under regulated conditions for specific management purposes.

**Primitive and Unconfined Recreation**: Non-motorized, non-mechanized and undeveloped types of recreational activities.

**Project Area**: The area of land upon which an operator conducts mining operations, including the area needed for building or maintaining of roads, transmission lines, pipelines, or other means of access.

**Public Land**: Land or interest in land owned by the United States and administered by the Secretary of the Interior through the BLM, except lands located on the Outer Continental Shelf, and land held for the benefit of Indians, Aleuts, and Eskimos.

BLM_0013827

**Quarry**: An open or surface working, usually for the extraction of stone, slate, limestone, etc.

**Range Development**: A structure, excavation, treatment or development to rehabilitate, protect, or improve lands to advance range betterment.

**Rangeland**: Land used for grazing by livestock and big game animals on which vegetation is dominated by grasses, grass-like plants, forbs, or shrubs.

**Raptor**: Bird of prey with sharp talons and strongly curved beaks such as hawks, owls, vultures, and eagles.

**Reasonably Foreseeable Development Scenario (RFD)**: The prediction of the type and amount of oil, gas and other mineral activity that would occur in a given area. The prediction is based on geologic factors, past history of drilling, projected demand for oil and gas, and industry interest.

**Record of Decision (ROD)**: A document signed by a responsible official recording a decision that was preceded by the preparing of an environmental impact statement.

**Recreational River**: A wild and scenic river classification that identifies those rivers are river segments that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

**Relict**: A remnant or fragment of the vegetation of an area that remains from a former period when the vegetation was more widely distributed.

**Resource Management Plan (RMP)**: A land use plan as prescribed by the Federal Land Policy and Management Act which establishes, for a given area of land, land-use allocations, coordination guidelines for multiple-use, objectives and actions to be achieved.

**Right-of-Way (ROW)**: A ROW grant is an authorization to use a specific piece of public land for a specific project, such as roads, pipelines, transmission lines, and renewable energy and communication sites. The grant authorizes rights and privileges for a specific use of the land for a specific period of time.

**Riparian Area**: A form of wetland transition between permanently saturated wetlands and upland areas. Riparian areas exhibit vegetation or physical characteristics that reflect the influence of permanent surface or subsurface water. Typical riparian areas include lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels. Excluded are ephemeral streams or washes that lack vegetation and depend on free water in the soil.

**Riparian-Functioning at Risk (FAR)**: Riparian-wetland areas are considered to be in functioning condition, but an existing soil, water, or vegetation attribute makes them susceptible to degradation.

**Riparian-Non-Functioning (NF)**: Riparian-wetland areas that are clearly not providing adequate vegetation, landform, or large wood debris to dissipate stream energy associated with high flows, and thus are not reducing erosion, improving water quality, etc.

**Riparian-Properly Functioning Condition (PFC)**: Riparian/wetland areas are in PFC when adequate vegetation, landform, or woody debris is present to: dissipate high-energy water flow, filter sediment, capture bedload, and aid floodplain development; improve floodwater retention and groundwater recharge; develop root masses that stabilize streambanks; develop diverse

163

fluvial geomorphology (pool and channel complexes) to provide habitat for wildlife and support greater biodiversity

**Rock Art**: Petroglyphs or pictographs.

**Route:**  A linear line for motorized travel.

**Rutting Habitat**: An area where big game species engage in breeding activities during specific times of the year.

**Salable Minerals**: Common variety minerals on the public lands, such as sand and gravel, which are used mainly for construction and are disposed of by sales or special permits to local governments. Also referred to as mineral materials.

**Scenic Byways**: Highway routes, which have roadsides or corridors of special aesthetic, cultural, or historic value. An essential part of the highway is its scenic corridor. The corridor may contain outstanding scenic vistas, unusual geologic features, or other natural elements.

**Scoping**: The process of identifying the range of issues, management concerns, preliminary alternatives, and other components of an environmental impact statement or land-use planning document. It involves both internal and public viewpoints.

**Section 7 Consultation**: The requirement of Section 7 of the Endangered Species Act that all federal agencies consult with the U.S. Fish and Wildlife Service or the National Marine Fisheries Service if a proposed action might affect a federally listed species or its critical habitat.

**Section 106 Compliance**: The requirement of Section 106 of the National Historic Preservation Act that any project funded, licensed, permitted, or assisted by the Federal Government by reviewed for impacts to significant historic properties and that the State Historic Preservation Officer and the Advisory Council on Historic Preservation be allowed to comment on a project.

**Sensitive Species**: All species that are under status review, have small or declining populations, live in unique habitats, or need special management. Sensitive species include threatened, endangered, and proposed species as classified by the Fish and Wildlife Service and National Marine Fisheries Service.

**Significant**: An effect that is analyzed in the context of the proposed action to determine the degree or magnitude of importance of the effect, wither beneficial or adverse. The degree of significance can be related to other actions with individually insignificant but cumulatively significant impacts.

**Special Recreation Management Area (SRMA)**: Areas, which require explicit recreation management to achieve recreation objectives and provide specific recreation opportunities.

**Special Status Species**: Includes proposed species, listed species, and candidate species under the Endangered Species Act; State-listed species; and BLM State Director-designated sensitive species (see BLM Manual 6840-Special Status Species Policy).

**Stipulations**: Requirements that are part of the terms of a mineral lease. Some stipulations are standard on all Federal leases. Other stipulations may be applied to the lease at the discretion of the surface management agency to protect valuable surface resources and uses.

BLM_0013829

**Surface Disturbance**: activities that normally result in more than negligible disturbance to public lands and that accelerate the natural erosive process. These activities normally involve use and/or occupancy of the surface, cause disturbance to soils and vegetation, and are usually caused by motorized or mechanical actions. Surface disturbance may result from activities using earth-moving and drilling equipment; geophysical exploration; off road vehicle travel; vegetation treatments; the use of pyrotechnics and explosives; and construction of facilities like powerlines, pipelines, oil and gas wells, recreation sites, livestock facilities, wildlife waters, or new roads. Surface disturbance is not normally caused by casual use. Activities that are not typically surface disturbing include, but are not limited to, proper livestock grazing, cross-country hiking, minimum impact filming and vehicle travel on designated routes.

**Sustainability**: The ability of an ecosystem to maintain ecological processes and functions, biological diversity, and productivity over time.

**Threatened Species**: Any plant or animal species defined under the Endangered Species Act as likely to become endangered within the foreseeable future throughout all or a significant portion of its range; listings are published in the Federal Register.

**Timing Limitation Stipulation**: A fluid minerals leasing constraint that prohibits surface use during specified time periods to protect identified resource values. The constraint does not apply to the operation and maintenance of production facilities unless analysis demonstrates that such constraints are needed and that less stringent, project-specific constraints would be insufficient.

**Undertaking:** (16 USC Sec. 470w(7)) A project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; those requiring a Federal permit, license or approval; and those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

**Utility Corridor**: A parcel of land that has been identified by law, Secretarial order, through a land use plan or by other management decision as being the preferred location for existing and future right-of-way grants and suitable to accommodate one type of right-of-way or one or more rights-of-way which are similar, identical or compatible.

**Valid Existing Rights**: Valid existing rights are legal rights to use the land that were in existence prior to implementation of the decisions in the RMP. The most significant types of valid existing rights are oil and gas leases, potash and salt leases, mining claims, and right-of-way authorizations. The oil and gas leasing stipulations specified for specific areas in the RMP would not apply to existing leases. These existing leases would be subject to the specific lease stipulations that were applied under the previous land use plan. Mining claims that exist on the effective day of a withdrawal may still be valid if they can meet the test of discovery of a valuable mineral required under the Mining Laws. An existing right-of-way would only be subject to the specific terms and conditions that were applied when it was authorized even if it is located within a right-of-way exclusion or avoidance area specified under the RMP.

**Vegetation Manipulation**: Alteration of vegetation by using fire, plowing, or other means.

**Vegetation Type**: A plant community with distinguishable characteristics described by the dominant vegetation present.

BLM_0013830

**Visual Resources**: The visible physical features of a landscape (topography, water, vegetation, animals, structures, and other features) that constitute the scenery of an area.

**Waiver**: Permanent exemption from a lease stipulation. The stipulation no longer applies anywhere within the leasehold.

**Water Quality**: The chemical, physical, and biological characteristics of water with respect to its suitability for a particular use.

**Watershed**: All lands, which are enclosed by a continuous hydrologic drainage, divide and lay upslope from a specified point on a stream.

**Way**: A vehicle route within a wilderness study area that was in existence and identified during the FLPMA Section 603-mandated wilderness inventory. The *Interim Management Policy for Lands under Wilderness Review (H-8550-1)* defines a way as "a trace maintained solely by the passage of vehicles which has not been improved and/or maintained by mechanical means to ensure relatively regular and continuous use." The term is also used during wilderness inventory to identify routes that are not roads. The term developed from the definition of the term "roadless" provided in the *Wilderness Inventory Handbook* (September 27, 1978), as follows: "roadless: refers to the absence of roads which have been improved and maintained by mechanical means to insure relatively regular and continuous use. A way maintained solely by the passage of vehicles does not constitute a road."

**Wild, Scenic or Recreational River**: The three classes of what is traditionally referred to as a "Wild and Scenic River." Designated river segments are classified as wild, scenic and/or recreational, but the segments cannot overlap.

**Wild, and Scenic River Study**: Rivers identified in Section 5 of the Wild and Scenic Rivers Act for study as potential additions to the National Wild and Scenic Rivers System. The rivers shall be studied under the provisions of Section 4 of the Wild and Scenic Rivers Act.

**Wilderness Study Area**:   A roadless area or island of undeveloped federal land that has been inventoried and found to possess wilderness characteristics described under Title VI, Section 603 of FLPMA and Section 2C of the Wilderness Act of 1964.   These characteristics are: (1) generally appears to have been affected mainly by the forces of nature, with human imprints substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least 5,000 acres or is large enough to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historic value.

**Wilderness:** A congressionally designated area of undeveloped federal land retaining its primeval character and influence, without permanent improvements or human habitation that is protected and managed to preserve its natural conditions as described in Section 2A of the Wilderness Act of 1964.

**Wilderness Characteristics**: Features of the land associated with the concept of wilderness that specifically deal with naturalness and opportunities for solitude and primitive and unconfined recreation.  These characteristics may be considered in land use planning when BLM determines that those characteristics are reasonably present, of sufficient value (condition, uniqueness, relevance, importance), and need (trend, risk), and are practical to manage (from IM-2003-275, Change 1, Considerations of Wilderness Characteristics in LUP, Attachment 1). Key

BLM_0013831

characteristics of wilderness listed in section 2 (c) of the Wilderness Act of 1964 were used by BLM in conducting wilderness inventories.  These characteristics are features of land associated with the concept of wilderness.

**Wildfire**: Any unwanted wild land fire.

**Wildland Fire**: Any nonstructural fire, other than prescribed fire, that occurs in the wild land.

**Winter Range**. The portion of the winter range to which a wildlife species is confined during periods of heaviest snow cover.

**Withdrawal**: An action that restricts the use of public lands by removing them from the operation of some or all of the public land or mining laws.

**Woodland**: A forest community occupied primarily by noncommercial species such as juniper, mountain mahogany, or quaking aspen groves; all western juniper forestlands are classified as woodlands, since juniper is classified as a noncommercial species.

BLM_0013832

# LIST OF PREPARERS

The BLM Moab Field Office Record of Decision and Approved RMP was written and produced by a team composed of interdisciplinary resource specialists. The table below lists the name, position, and planning role of the team members associated with preparation of these documents.

**List of Preparers**

| Name | Position | Planning Role |
|---|---|---|
| Jean Carson | GIS Specialist | GIS Mapping |
| Brent Northrup | Resource Advisor | RMP Project Manager, Minerals, Health and Safety |
| Pam Riddle | Wildlife Biologist | Wildlife and Fisheries, Special Status Animal Species |
| Bill Stevens | Planning Specialist | Wilderness, Socioeconomics, Travel |
| Katie Stevens | Outdoor Recreation Planner | Areas of Critical Environmental Concern, Recreation, Wild and Scenic Rivers |
| Doug Wight | GIS Coordinator | GIS Mapping |
| Dave Williams | Range Conservationist | Livestock Grazing |
| Shelley Smith | Canyon Country District Manager | Management |
| Ron Bolander | Wildlife Biologist | Special Status Animal Species |
| Steve Madsen | Wildlife Biologist | Wildlife and Fisheries |

BLM_0013833

# LIST OF TABLES

Table 1.     Surface Ownership/Administration of Lands within the MPA (acres)
Table 2.     Management Protection Provided to Potential ACECs Not Designated in the Approved RMP

BLM_0013834

# LIST OF APPENDICES

Appendix A:      Stipulations and Environmental Best Practices Applicable to Oil and Gas Leasing and Other Surface-disturbing Activities

Appendix B:      U.S. Fish and Wildlife Service Biological Opinion Memorandum

Appendix C:      State Historic Preservation Office Letter of Concurrence

Appendix D:      Utah Standards for Rangeland Health and Guidelines for Grazing Management

Appendix E:      Moab RMP Monitoring Plan

Appendix F:      Tentative Implementation Schedule

Appendix G:      Land Tenure Adjustments and Withdrawal Criteria

Appendix H:      Film Permits: Minimum Impact Criteria

Appendix I:      Lands Identified for Disposal in the Moab RMP

Appendix J:      Letter from the State of Utah Regarding Air Quality Mitigation Strategies

Appendix K:      Identification of Wilderness Characteristics on Non-WSA Lands Managed by the Moab BLM

Appendix L:      Moab Field Office Recreation Rules

Appendix M:      Special Recreation Management Areas: Goals, Settings, Outcomes, and Management Prescriptions

Appendix N:      Travel Plan Development

Appendix O:      Hydraulic Considerations for Pipelines Crossing Stream Channels Tech Note 423

Appendix P:      Wild and Scenic Rivers Study Process

Appendix Q:      Conservation Measures for Threatened and Endangered Species of Utah from the Use Plan Programmatic BAs and Section 7 Consultation

Appendix R:      Best Management Practices for Raptors and their Associated Habitats in Utah

Appendix S:      Desired Future Conditions for Vegetation

Appendix T:      Drought Classification System

Appendix U:       Additional Wildlife Information

BLM_0013835

# LIST OF MAPS

Map 1:          Moab Planning Area
Map 2:          Designated Routes
Map 3:          Designated Motorcycle/ATV Routes
Map 4:          Designated Mountain Bike Single Track Trails
Map 5:          Existing Withdrawals from Mineral Entry
Map 6:          Utility Corridors
Map 7:          Lands Identified for Disposal
Map 8:          Grazing Allotments
Map 9:          Desert Bighorn Sheep Lambing, Rutting and Migration Habitat
Map 10:         Rocky Mountain Bighorn Sheep Habitat
Map 11:         Areas Not Available for Livestock Grazing
Map 12:         Oil and Gas Leasing Stipulations
Map 13:         Known Potash Leasing Areas
Map 14:         Salable Minerals Sites
Map 15:         Non-WSA Lands Inventoried for Wilderness Characteristics
Map 16:         Non-WSA Lands Managed for Wilderness Characteristics
Map 17:         Special Recreation Management Areas
Map 18:         Recreation Focus Areas
Map 19:         Steep Slopes (over 30 Percent) in Bookcliffs
Map 20:         Moderate to High Saline Soils
Map 21:         Areas of Critical Environmental Concern
Map 22:         Suitable Wild and Scenic Rivers
Map 23:         Wilderness Areas and Wilderness Study Areas
Map 24:         Endangered Colorado River Fish Critical Habitat
Map 25:         Mexican Spotted Owl Habitat
Map 26:         Bald and Golden Eagle Habitat
Map 27:         Sage Grouse Habitat
Map 28:         Prairie Dog Sensitive Species Habitat
Map 29:         Ferruginous Hawk and Burrowing Owl Habitat
Map 30:         Off Highway Vehicle Designations
Map 31:         Visual Resource Management
Map 32:         Pronghorn Habitat
Map 33:         Deer and/or Elk Habitat
Map 34:         Areas Not Available for Woodland Harvest and Wood Cutting

BLM_0013836



Bureau of Land Management
BLM-UT-PL-09-001-1610

BLM_0013837



# Bureau of Land Management
## MONTICELLO FIELD OFFICE

BLM



AND Record of Decision
Approved Resource Management Plan

NOVEMBER 2008

BLM_0013838

# BLM Mission

To sustain the health, diversity, and productivity of the public lands
for the use and enjoyment of present and future generations.



Bureau of Land Management

BLM-UT-PL-09-004-1610

UT-090-2007-40



**United States Department of the Interior**

BUREAU OF LAND MANAGEMENT
Utah State Office
P.O. Box 45155
Salt Lake City, UT 84145-0155
http://www.blm.gov



IN REPLY REFER TO:
1610
(UT-935)

Dear Reader/Interested Party:

I am pleased to announce that, after several years of hard work and collaborative efforts, the Monticello Field Office Resource Management Plan (Approved RMP) is complete. This document will provide guidance for the management of about 1,800,000 acres of federal surface estate and 2,500,000 acres of federal mineral estate administered by the Bureau of Land Management (BLM) in San Juan County and a small portion of Grand County in south-east Utah.

The attached Record of Decision (ROD) and Approved RMP have been prepared in accordance with the Federal Land Policy and Management Act (FLPMA) and the National Environmental Policy Act (NEPA). The ROD/Approved RMP is available to members of the public and will be sent to pertinent local, state, tribal, and federal government entities. The Approved RMP finalizes the proposed decisions presented in the Proposed RMP/Final Environmental Impact Statement (EIS) that was released on September 5, 2008 and subject to a 30-day protest period that ended on October 6, 2008. Twenty protest letters with standing were received. The protests were reviewed by the BLM Director in Washington, D.C. After careful consideration of all points raised in these protests, the Director concluded the responsible planning team and decision makers followed all applicable laws, regulations, policies, and pertinent resource considerations in developing the Proposed RMP/Final EIS. Minor adjustments or points of clarification are incorporated into the Approved RMP in response to issues raised in the protest process and final BLM review. These minor changes are discussed in the ROD under the section titled *Notice of Modifications and Clarifications*, but the protest review did not result in any significant changes from the Proposed RMP.

The approval of this ROD by the Department of the Interior (DOI) Assistant Secretary for Land and Minerals Management serves as the final decision by the DOI for all land use planning and implementation-level decisions described in the attached Approved RMP. Implementation of land use plan decisions (e.g., coal leasing, oil and gas development, and land and realty decisions) will not be undertaken without suitable further NEPA analysis, including all appropriate public involvement and any hearings available to the public.

Notification of the approval of this ROD/Approved RMP will be announced via local news releases and on the Monticello Field Office website at:

http://www.blm.gov/ut/st/en/fo/monticello.html

BLM_0013840

Hard copies and CD-ROM versions of the ROD/Approved RMP may be obtained by contacting the Monticello Field Office by phone at (435) 587-1500, or at the following address:

> Monticello Field Office
> 365 North Main
> Monticello, Utah, 84535

The BLM is pleased to provide this copy of the Monticello Field Office ROD/Approved RMP for your reference.  We greatly appreciate all who contributed to the completion of this Approved RMP, including the State of Utah and San Juan County who were our Cooperating Agencies on this plan over the years, as well as other federal agencies that worked closely with us to complete this important effort.  We also appreciate the extensive public involvement during this time by groups, organizations, and individuals.  Public input informed and improved the planning documents and we hope you will continue to work with us as we implement the decisions in this Approved RMP.

Sincerely,

Selma Sierra
Utah State Director

BLM_0013841

# MONTICELLO FIELD OFFICE
# RECORD OF DECISION
# AND
# APPROVED
# RESOURCE MANAGEMENT PLAN

## November 2008

*Prepared by:*
U.S. Department of the Interior
Bureau of Land Management
Monticello Field Office
Monticello, Utah

*Cooperating Agencies:*
State of Utah
San Juan County

BLM_0013842

THIS PAGE INTENTIONALLY LEFT BLANK.

BLM_0013843

*Monticello Record of Decision and Approved Resource Management Plan - Table of Contents*

# TABLE OF CONTENTS

## RECORD OF DECISION            1

**A. INTRODUCTION**         **1**
Purpose and Need for the Plan        1
Monticello Planning Area        2
**B. OVERVIEW OF THE ALTERNATIVES**     **3**
Alternative A        4
Alternative B        4
Alternative C        6
Alternative D        6
Alternative E        8
Alternatives Considered But Eliminated From Analysis    10
**C. RESULTS OF PROTEST PERIOD**     **13**
**D. THE DECISION**     **14**
What the Decision/RMP Provides    15
What the Decision/RMP Does Not Provide    17
Implementation Decisions    18
    *Travel Management*    18
    *Livestock Grazing*    19
**E. NOTICE OF MODIFICATIONS AND CLARIFICATIONS**     **20**
Minor Modifications    20
Clarifications    21
Errata to the Proposed RMP/Final EIS    23
**F. MANAGEMENT CONSIDERATIONS IN SELECTING THE APPROVED RMP**     **23**
All Surface Disturbing Activities    24
Air Quality    24
Cultural Resources    24
Fire Management    25
Lands and Realty    25
Livestock Grazing    27
Mineral Resources    27
Recreation    29
Riparian    30
Soil and Water    30
Special Designations - Areas of Critical Environmental Concern    31
Special Designations - Wild and Scenic Rivers    34
Special Designations – Historic Trails    37
Non-WSA Lands with Wilderness Characteristics    37
Travel Management    38
Vegetation    39
Visual Resource Management    39
Wildlife and Fisheries    40
Special Status Species    40
Woodlands    41

BLM_0013844

**G. CONSISTENCY AND CONSULTATION REVIEW**    **42**
Governor's Consistency    42
NHPA Section 106 Consultation    42
Native American Consultation    42
Section 7 Consultation Under the Endangered Species Act    43
**H. MITIGATION MEASURES**    **43**
**I. PLAN MONITORING AND EVALUATION**    **43**
**J. PUBLIC INVOLVEMENT**    **44**
**K. AVAILABILITY OF THE PLAN**    **45**

**APPROVED RESOURCE MANAGEMENT PLAN**    **47**

**A. INTRODUCTION**    **47**
**B. CONSIDERATION OF OTHER BLM PLANS AND POLICIES**    **47**
**C. PLAN IMPLEMENTATION**    **51**
General Implementation Schedule of "One-Time" Actions    52
Maintaining the Plan    52
Changing the Plan    53
**D. PLAN EVALUATION**    **53**
**E. MANAGEMENT DECISIONS**    **54**
Management Common To All Resources (MCA)    55
Air Quality (AQ)    57
Cultural Resources (CUL)    59
Fire Management (FIRE)    62
Health and Safety (HAZ)    67
Lands and Realty (LAR)    69
Livestock Grazing (GRA)    75
Mineral Resources (MIN)    79
Non-WSA Lands with Wilderness Characteristics (WC)    85
Paleontology (PAL)    86
Recreation (REC)    88
Riparian Resources (RIP)    113
Soil and Water Resources (SOLW)    116
Special Designations:  Areas of Critical Environmental Concern (ACEC)    118
Special Designations:  Wild and Scenic Rivers (WSR)    128
Special Designations:  Wilderness Study Areas (WSA)    133
Special Designations:  Historic Trails (HT)    135
Special Status Species (SSP)    136
Travel Management (TM)    141
Vegetation (VEG)    146
Visual Resource Management (VRM)    149
Wildlife And Fisheries Resources (FWL)    152
Woodlands (FOR)    157
**REFERENCES**    **161**
**GLOSSARY**    **164**

BLM_0013845

**LIST OF PREPARERS**       **181**

**LIST OF APPENDICES**       **182**

BLM_0013846

# LIST OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| AMP | Allotment Management Plan |
| APD | Application for Permit to Drill (an oil or gas well) |
| APHIS | Animal and Plant Health Inspection Service (USDA) |
| ARPA | Archeological Resource Protection Act (of 1979) |
| ATV | All-Terrain Vehicle |
| AUM | Animal unit month |
| BA | Biological Assessment |
| BCC | Birds of Conservation Concern |
| BIA | Bureau of Indian Affairs |
| BLM | Bureau of Land Management |
| BMP | Best Management Practice |
| BO | Biological Opinion |
| CAA | Clean Air Act (of 1970) |
| CEQ | Council on Environmental Quality |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act (of 1980) |
| CFR | Code of Federal Regulations |
| COA | Conditions of Approval |
| CRMP | Cultural Resource Management Plan |
| CSU | Controlled Surface Use |
| DEIS | Draft Environmental Impact Statement |
| DFC | Desired Future Condition |
| DPC | Desired Plant Community |
| EIS | Environmental Impact Statement |
| EPCA | Energy Policy and Conservation Act (of 1975) |
| ERMA | Extended Recreation Management Area |
| ESA | Endangered Species Act (of 1973) |
| ESR | Emergency Stabilization and Rehabilitation |
| FEIS | Final Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| FLPMA | Federal Land Policy and Management Act (of 1976) |
| FMP | Fire Management Plan |
| FMZ | Fire Management Zone |
| FO | Field Office |
| FR | Federal Register |
| GIS | Geographic Information Systems |
| HMP | Habitat Management Plan |
| IBLA | Interior Board of Land Appeals |
| IMP | Interim Management Policy |
| LTA | Land Tenure Agreement |
| LUP | Land Use Plan |
| LWCF | Land and Water Conservation Fund |
| MBTA | Migratory Bird Treaty Act (of 1918) |
| MOU | Memorandum of Understanding |

BLM_0013847

| | |
|---|---|
| MFO | Monticello Field Office |
| MPA | Monticello Planning Area |
| MZ | Management Zone |
| NAAQS | National Ambient Air Quality Standards |
| NAGPRA | Native American Graves Protection and Repatriation Act (of 1990) |
| NEPA | National Environmental Policy Act (of 1969) |
| NHPA | National Historic Preservation Act |
| NOA | Notice of Availability (published in the Federal Register) |
| NOI | Notice of Intent (published in the Federal Register) |
| NPS | National Park Service |
| NRA | National Recreation Area |
| NRHP | National Register of Historic Places |
| NSO | No Surface Occupancy (a stipulation on an oil and gas lease) |
| NW&SR system | National Wild and Scenic River System |
| OHV | Off-Highway Vehicle |
| ORV | Off Road Vehicle (an older acronym, replaced by OHV) |
| P | Primitive Recreation Opportunity Spectrum Class |
| PFC | Proper Functioning Condition (of riparian/wetland areas) |
| PM | Particulate Matter |
| R&I | Relevant and Important |
| R&PP | Recreation and Public Purposes (Act of 1926) |
| RAMP | Recreation Area Management Plan |
| RDCC | (Utah) Resource Development and Coordinating Committee |
| RFD | Reasonably Foreseeable Development |
| RHS | Rangeland Health Standards |
| RMIS | Recreation Management Information System |
| RMZ | Recreation Management Zone |
| ROD | Record of Decision |
| ROS | Recreation Opportunity Spectrum |
| ROW | Right of Way |
| S&G | Standards & Guidelines |
| SHPO | State Historic Preservation Officer |
| SITLA | (Utah) School and Institutional Trust Lands Administration |
| SPM | Semiprimitive Motorized Recreation Opportunity Spectrum Class |
| SPNM | Semiprimitive Nonmotorized Recreation Opportunity Spectrum Class |
| SRMA | Special Recreation Management Area |
| SRP | Special Recreation Permit |
| T&E | Threatened and/or Endangered (species as per ESA of 1973) |
| UAAQS | Utah Ambient Air Quality Standards |
| UAC | Utah Administrative Code |
| UDEQ | Utah Division of Environmental Quality |
| UDWR | Utah Division of Wildlife Resources |
| USFWS | United States Fish and Wildlife Service |
| USDA | United States Department of Agriculture |
| USFS | United States Forest Service |
| VRM | Visual Resource Management |

BLM_0013848

| | |
|---|---|
| WAFWA | Western Association for Fish and Wildlife Agencies |
| WFIP | Wildland Fire Implementation Plan |
| WSA | Wilderness Study Area |
| WSR | Wild and Scenic River(s) (Act of 1973) |
| WUI | Wildland Urban Interface |

BLM_0013849

# RECORD OF DECISION

## A.    INTRODUCTION

This Record of Decision (ROD) approves the Bureau of Land Management's (BLM's) proposal to manage the public lands within the Monticello Field Office (FO) as presented in the attached Approved Resource Management Plan (RMP).   The Approved RMP was described as the Proposed Plan in the September 2008 Monticello Proposed RMP and Final Environmental Impact Statement (EIS) (USDI-BLM 2008) with minor adjustments and clarifications which are explained later in this ROD.  This ROD provides the background on development of the plan and rationale for approving the decisions contained in the Proposed Plan, and describes the clarification and/or modifications made to address protests received on the plan.  The attached Monticello Field Office RMP (also referred to as the Approved RMP) includes the decisions themselves.

### *Purpose and Need for the Plan*

#### Purpose

The Federal Land Policy and Management Act (FLPMA) requires that the BLM "develop, maintain, and when appropriate, revise land use plans" (43 United States Code [U.S.C.] 1712 [a]). The BLM has determined it is necessary to revise the existing land-use plan (LUP) (1991 San Juan Resource Management Plan) and prepare a new RMP for the Monticello Planning Area (PA) based on a number of new issues that have arisen since preparation of the existing plan. In general, the purpose of this Approved RMP is to provide a comprehensive framework for BLM's management of the public lands within the Monticello PA and its allocation of resources pursuant to the multiple-use and sustained-yield mandate of FLPMA. In addition, the purpose of this plan revision was to:

- Re-evaluate, with public involvement, existing conditions, resources, and uses, and reconsider the mix of resource allocations and management decisions designed to balance uses and the protection of resources pursuant to FLPMA and applicable law.
- Resolve multiple-use conflicts or issues between resource values and resource uses. The resulting Monticello RMP will establish consolidated guidance and updated goals, objectives, and management actions for the public lands in the decision area. The RMP will be comprehensive in nature and will address issues that have been identified through agency, interagency, and public scoping efforts.
- Disclose and assess the direct, indirect, and cumulative impacts of the reasonably foreseeable future actions resulting from the management actions in each alternative pursuant to the requirements of the National Environmental Policy Act (NEPA), its implementing regulations, and other applicable laws.

#### Need

A revision to the 1991 San Juan RMP is necessary because there have been significant alterations in the Monticello PA; specifically new information and changed resources, circumstances, and policies that may be relevant to the future management of public lands and allocation of resources under the multiple-use and sustained yield mandate. This determination is further corroborated by a Special Evaluation Report, completed in 2002 by the Monticello FO,

BLM_0013850

*Monticello Approved Resource Management Plan - Record of Decision*

which concluded that some of the decisions within the 1991 San Juan RMP are in need of revision.

There have been changes in the laws, policies, and regulations that direct the management of the resources on Monticello PA public lands. There has also been an increase in the amount of new information and resource data that need to be considered to better manage the public lands. Visitation to the region has grown, and population demographics have changed, as have public awareness and use of lands within the Monticello PA. Specifically, there is a need to evaluate management prescriptions and resource allocations to address the increases in recreation and visitor use, including scenic quality and open spaces, as well as the increased interest in oil and gas development. Land use plan decisions may be changed only through the amendment or revision process.

## *Monticello Planning Area*

Of the approximate 4.5 million acres in the Monticello PA in southeastern Utah, the Monticello FO administers nearly 1.8 million surface acres of public lands (Appendix A, Map 1) and around 2.5 million subsurface acres. The Monticello PA lies primarily within San Juan County, although a small portion extends into Grand County to the north. The Monticello PA includes within its boundaries a number of National Park Service (NPS) units, as well as lands administered by the U.S. Forest Service (USFS). Canyonlands National Park lies along the northwestern portion of the PA boundary; Glen Canyon National Recreation Area lies along the western and southwestern parts; Natural Bridges National Monument lies in its southwestern part; Hovenweep National Monument lies in the southeastern part and a large unit of the Manti–La Sal National Forest lies in the center. Land ownership within the PA consists primarily of large blocks of BLM-administered public land interspersed with smaller, privately owned tracts and land owned by the State of Utah School and Institutional Trust Lands Administration (SITLA). The McCracken Split Estate is jointly administered by the BLM and the Bureau of Indian Affairs (BIA), and all of the land south of the San Juan River is Navajo Nation Reservation. Table 1 shows land ownership and corresponding acreages within the Monticello PA (USDI-BLM 2004).

Table 1: Land Ownership within the Monticello PA

| Ownership | Acres |
|---|---|
| BLM | 1,785,127 |
| Navajo Nation Reservation | 1,270,060 |
| Ute Reservation * | 8,416 |
| National Park Service (NPS) | 528,565 |
| Private | 353,516 |
| SITLA | 202,318 |
| USFS | 319,933 |
| **Total** | **4,467,935** |

*This acreage does not include Ute allotments or interspersed tribal lands in the South Cottonwood or Allen Canyon area. These acreages are included in the private land total.

The Monticello PA is known for its topographic diversity, extraordinarily striking landforms, and scenic attractions. It contains a wide variety of cultural and paleontological resources with numbers and concentrations of sites exceeding those found elsewhere in the region. The

BLM_0013851

topography is defined largely by high mountains, steep escarpments and ridges, and incised canyons, which are primarily a product of eroded sandstones and exposed igneous intrusions, such as the Abajo and La Sal Mountains. Elevations vary from 3,700 feet above sea level near Lake Powell to over 11,000 feet in the Abajo Mountains. Much of the Monticello PA provides habitat for desert bighorn sheep, pronghorn antelope, Rocky Mountain elk, and mule deer. Numerous raptor species, including bald eagles and peregrine falcons, also live in the area. Fish species that inhabit the rivers and waterways include humpback chub, bonytail, Colorado pikeminnow, and razorback sucker.

Historical and traditional land uses within the Monticello PA, such as livestock grazing, hard-rock mining, and energy and mineral development, continue to be widely practiced. Energy and mineral resources include oil, natural gas, uranium, vanadium, and building stone. However, recreational activities, such as backpacking, off-highway vehicle (OHV) use, and sightseeing, are becoming increasingly popular within the PA. Recreational resources provide opportunities for public enjoyment as well as revenue for businesses in and adjacent to the Monticello PA.

# B.   OVERVIEW OF THE ALTERNATIVES

Five alternatives, including a No Action Alternative, were analyzed in detail in the Monticello Draft RMP/Draft EIS (USDI-BLM 2007) and in the Proposed RMP/Final EIS (USDI-BLM 2008). The alternatives were developed to address major planning issues and to provide direction for resource programs influencing land management. All alternatives incorporated the Utah Standards for Rangeland Health and Guidelines for Grazing Management developed in conjunction with the Utah Resource Advisory Council (RAC) as base standards for assessing land health. All management under any of the alternatives would comply with federal laws, rules, regulations, and policies. Mitigation has been incorporated in the development of all alternatives.

Each alternative emphasizes a different combination of resource uses, allocations, and restoration measures to address issues and resolve conflicts among uses, so program goals were met using a variety of approaches in the alternatives. However, each alternative allowed for some level of support of all resources present in the planning area. The alternatives differed in how quickly the goals would be met, the degree to which they would be met, the emphasis placed on certain programs and activities, and whether active or passive management would occur. Management decisions for programs not tied to major planning issues and/or mandated by law often contain minor or no differences in management direction between alternatives.

Alternative A (the No Action Alternative) is the continuation of the 1991 San Juan Resource Management Plan and is provided as a baseline for comparison. Alternative E is considered the environmentally preferable alternative, offering the most intensive, active management for protection of the area's natural and biological values and favors natural systems over commodities development, including protecting all non-WSA lands BLM found to have wilderness characteristics. Alternative B is similar to Alternative E, but does not offer specific management to protect non-WSA lands with wilderness characteristics. Alternative D emphasizes commodity development and provides the greatest economic benefit from mineral development, and imposes the fewest restrictions on public land uses.

Alternative C, (the Preferred Alternative in the Draft RMP/EIS and largely the baseline for the Proposed RMP/Final EIS) best achieves a balance between environmental protection and use of

BLM_0013852

public land resources.   General overviews of these alternatives and comparisons among them are provided below.

## *Alternative A*

Alternative A is referred to as the No Action Alternative.  This alternative would have continued present management practices defined in the existing land use plan.   Direction contained in existing laws, regulations, and policies would have continued to be implemented, and sometimes supersede provisions of the *San Juan RMP*.  Alternative A was not selected because it does not meet the purpose and need for the management of public lands under the jurisdiction of the Monticello Field Office.   The decisions in the *San Juan RMP* are largely based on outdated information.   Equally as important, these decisions do not meet changing uses, trends, and conditions that have occurred since that time.   The existing plan does not address many recent issues, nor does it address the increased levels of controversy some existing issues are facing.   This alternative also does not contain adequate management guidelines to prevent adverse impacts associated with these changes in use.   Special status species, including threatened and endangered species, are not fully addressed within the parameters of Alternative A.   Alternative A designates 611,310 acres as open to OHV use.   This large open acreage within the planning area results in the occurrence of unacceptable resource damage and is contrary to BLM policy.  The No Action Alternative would continue the designation of ten existing ACECs, but would not consider or evaluate new ACECs.   In addition, this alternative does not recommend suitable wild and scenic river segments, or consider non-WSA lands with wilderness characteristics to protect and preserve their wilderness characteristics.

## *Alternative B*

Alternative B emphasizes protection of wildlife habitats, natural resources, ecosystems, and landscapes.   Commodity production and human activities would be more constrained than in other alternatives.   This alternative provides more opportunities for non-motorized recreation than other alternatives.  With the exception of Alternative E, Alternative B protects the most land area for sensitive resources.   It designates all potential Areas of Critical Environmental Concern (ACECs), and finds all the eligible segments suitable for inclusion in the National Wild and Scenic River system.   It also restricts OHV use and surface disturbing activities (including oil and gas leasing).   There are many uses that are overly restricted by the decisions in this alternative and are not necessary to protect sensitive resources.   The rationale for not selecting Alternative B is outlined below for the major management actions.

*Travel Management:*  Alternative B limits OHV use to designated roads and trails on 1,359,417 acres and closes it in 423,698 acres.  This would close 24 percent of the field office to OHV use and access.   There are no areas designated open to cross country OHV use.    This alternative does not meet the needs of all public land users because it would unnecessarily limit access by closing about a quarter of the public lands to off highway vehicle use and motorized access.  Closure is unnecessary in some of these areas, such as the Castle Creek and Steer Pasture Canyon, which can be adequately protected under a designated roads and trails category.

*Recreation:*  Alternative B establishes five Special Recreation Management Areas (SRMAs), (four SRMAs and one Cultural Special Recreation Management Area (CSRMA)) as well as four Cultural Special Management Areas (CSMAs).   The CSRMA and CSMA designations are new naming conventions (unique to the Monticello RMP) which were created to protect cultural

BLM_0013853

*Monticello Approved Resource Management Plan - Record of Decision*

resources by managing visitors, and have proven to be confusing to the general public. Alternative B does not provide for the full range of recreational activities known to occur in the planning area or for the businesses that depend upon these activities. As an example, rafting permits on the San Juan River would be limited, resulting in 25 percent less visitation on the river, which would also result in economic impacts for local businesses. This alternative provides for fewer permits and fewer people allowed under each permit to visit special recreation permit areas such as Cedar Mesa SRMA where private and commercial visitation would be decreased by 16 percent. These reductions are unnecessarily restrictive and are not needed to protect sensitive resources.

***Minerals:*** Alternative B manages oil and gas leasing and other surface disturbing activities with the following stipulations: Closed - 416,612 acres; No Surface Occupancy (NSO) - 125,105 acres; Timing Limitations/Controlled Surface Use - 876,740 acres; Open (subject to standard terms and conditions) - 365,170 acres. Mineral entry is available on 1,533,413 acres and recommended for withdrawal on 251,710 acres. In addition, mineral material disposal is available on 365,168 acres, available with special stipulations on 879,736 acres and unavailable on 542,402 acres. Alternative B is overly restrictive to oil and gas development and other surface disturbing activities, especially in areas with high development potential for oil and gas where this restrictive management is not necessary. In total, about 80 percent of the planning area would be subject to restrictions above standard terms and conditions for development. The Energy Policy and Conservation Act provides policy directing BLM to provide reasonable access and minimize impediments to oil and gas leasing and development. This alternative does not meet these policy objectives.

***Non-WSA Lands with Wilderness Characteristics:*** Under Alternative B there are no non-WSA lands managed to protect, preserve, and maintain their wilderness characteristics. Therefore, all the wilderness values identified in these areas could be potentially adversely affected.

***Lands and Realty:*** In Alternative B, 416,612 acres are managed as exclusion areas for rights-of-way and 125,105 acres are managed as avoidance areas for rights-of-way. Approximately 251,710 acres are recommended for withdrawal from mineral entry. Managing 30 percent of the planning area with major restrictions on BLM rights-of-way for pipelines, roads and powerlines could severely, and often unnecessarily, limit development of and access to existing oil and gas leases as well as restrict development of other necessary infrastructure.

***Special Designations – Areas of Critical Environmental Concern:*** Alternative B designates 12 areas (521,141 acres) determined to have relevant and important values as Areas of Critical Environmental Concern (ACECs). Designation of some of these potential ACECs in Alternative B is unnecessary to protect the relevant and important values. For example, Butler Wash, and Dark Canyon ACECs have relevant and important scenic values, and Bridger Jack Mesa has near-relict vegetation values which can be adequately protected by Interim Management Policy for Lands under Wilderness Review (IMP) since all of these areas are also overlain by WSA designations. Much of the Cedar Mesa ACEC is overlain by WSA designation and management under IMP would adequately protect its cultural and scenic values. Management of the area as an SRMA with restrictions on visitation would help to protect the cultural values of the area. The scenic values of the potential Lockhart Basin ACEC were originally inventoried as VRM II, but would be managed as VRM I under this alternative. Continuing to manage this ACEC as a

BLM_0013854

VRM I is overly restrictive and could be maintained by management under VRM II class objectives.

***Special Designations – Wild and Scenic Rivers:***  Alternative B recommends as suitable all 12 river segments found eligible for designation as Wild and Scenic Rivers.  Many of the river segments found suitable in Alternative B include scenery, recreation, cultural and wildlife as outstandingly remarkable values (outstandingly remarkable values).  Scenery, cultural, wildlife and river related recreational activities, especially non-boating activities, are more amenable for management by other means, such as SRMAs in order to manage river-related visitation.  As a consequence, Alternative B would impose unnecessary restrictions that provide no additional management protections that are not otherwise available through existing or alternative management options.

***Woodland Harvest:***  Alternative B closes 59 percent of the area to woodland harvest.  Included in the closed areas are the non-WSA areas of Cedar Mesa, an important area for fuelwood collection by Native Americans, particularly residents of the Navajo Reservation who depend on fuelwood to heat their homes.  Fuelwood collection off the reservation is important because most, if not all, of the Navajo Reservation is closed to such use.  Closure of these areas on Cedar Mesa is overly restrictive and would result in extra hardship to reservation residents having to travel much greater distances to access other fuelwood collection areas.

In summary, Alternative B was not selected as the Proposed Plan primarily because it does not best achieve the mix of multiple uses necessary to fully implement the mandate of FLPMA.  This alternative would not provide adequate or balanced consideration of existing uses such as certain motorized recreation activities, woodland harvest, economic land uses such as rights-of-way, energy corridors, or access to mineral development.  Adoption of this alternative could also preclude the consideration of possible future development of renewable energy resources.  This alternative is inconsistent with existing state and local plans; conflicts with the intent of federal legislation including the Energy Policy and Conservation Act and the Energy Policy Act; and it does not give adequate consideration to local needs, customs and culture.

## Alternative C

Alternative C was selected as the BLM's Preferred Alternative in the Monticello Draft RMP/DEIS.  This alternative represents the mix and variety of management actions, based on BLM's analysis and judgment, which best resolve the resource issues and management concerns while accommodating BLM's values, programs, and policy.  As a result of public comment, internal review, and cooperating agency coordination on the Draft RMP/DEIS, Alternative C was modified to become the Proposed RMP and analyzed in the Final EIS.  With minor adjustments and clarification, and upon signature of this Record of Decision, it becomes the Approved RMP.

## Alternative D

Alternative D emphasizes commodity production and human activities.  Commodity production and human activities would be less constrained in Alternative D than in other alternatives.  Protection of wildlife habitat was minimized to that required by law, regulation, or policy.  Alternative D, like Alternative A, designates no areas as ACECs, designates no eligible Wild and Scenic River segments as suitable, and manages no acres as non-WSA lands with wilderness characteristics.  Other than Alternative A, Alternative D provides more opportunities for motorized recreation, is the least restrictive to OHV use and all surface disturbing activities

*Monticello Approved Resource Management Plan - Record of Decision*

(including oil and gas leasing). Alternative D does not provide sufficient restrictions on uses to protect important natural and cultural resources. For these reasons, this alternative did not achieve the balance between resource protection and resource use that provided enhancement of resource use and conditions. The rationale for not selecting Alternative D is outlined below for the major management actions.

***Travel Management:*** Alternative D opens 2,311 acres to cross country OHV use and limits OHV use to designated routes in the remainder of the planning area. Access was maximized, as no acres were closed to OHV travel and almost the entire area was designated as limited to OHV travel. While this alternative accommodates many motorized travel opportunities, it conflicts with areas used for primitive recreation such as Cedar Mesa and Mancos Mesa and thus does not provide a travel plan that meets the needs of all recreational users.

***Recreation:*** Alternative D establishes five Special Recreation Management Areas (SRMAs) (four SRMAs and one Cultural Special Recreation Management Area (CSRMA)), as well as one Cultural Special Recreation Management Area (CSMA). The CSRMA and CSMA designations are new naming conventions (unique to the Monticello RMP) which were created to protect cultural resources by managing visitors, and have proven to be confusing to the general public. While Alternative D provides for a range of recreational activities, it emphasizes commercial use. For example, Alternative D allows for 10 percent more user days per year and 10 percent more commercial use on the San Juan River than the Proposed RMP. In addition, Alternative D sets no limit on Cedar Mesa SRMA mesa top camping and allows 20 percent more overnight use than the Proposed RMP. In the Dark Canyon SRMA, decisions under this alternative allow two and a half times more commercial trips per week than the Proposed RMP. This increased use favors the commercial outfitter at the expense of private users. Carrying forward this alternative could result in resource impacts and user conflicts in several known areas of cultural resource significance (Comb Ridge, Tank Bench, Beef Basin).

***Minerals:*** Alternative D manages oil and gas leasing and other surface disturbing activities with the following stipulations: Closed – 386,853 acres; No Surface Occupancy – 14,175 acres; Timing Limitations/Controlled Surface Use – 421,000 acres; Open (subject to standard terms and conditions) – 962,283 acres. Mineral entry is available on 1,738,492 acres and recommended for withdrawal on 46,131 acres. In addition, mineral material disposal is available on 962,279 acres, available with special stipulations on 420,998 acres and unavailable on 401,026 acres. Alternative D is the least restrictive to oil and gas leasing and other surface disturbing activities. Alternative D has the most acreage open subject to standard terms and conditions. Although the oil and gas restrictions are more conducive to development, they are not sufficient to protect all the important and sensitive resources identified within the planning area.

***Non-WSA Lands with Wilderness Characteristics:*** Under Alternative D there are no non-WSA lands managed to protect, preserve, and maintain their wilderness characteristics. Therefore, all the wilderness values identified in these areas could be potentially adversely affected.

***Lands and Realty:*** In Alternative D, 386,853 acres are managed as exclusion areas for rights-of-way and 14,175 acres are managed as avoidance areas for rights-of-way. Approximately 46,131 acres are recommended for withdrawal from mineral entry. This alternative allows the greatest amount of acreage to be available for ROWs but does not provide protection for certain sensitive areas such as the Comb Ridge Recreation Management Zone within the Cedar Mesa SRMA,

BLM_0013856

Indian Creek and Valley of the Gods ACECs, or any non-WSA lands with wilderness characteristics.

***Special Designations – Areas of Critical Environmental Concern:***  Alternative D does not designate any of the 13 areas determined to have relevant and important values as ACECs.  The management prescriptions detailed under Alternative D are not sufficient to protect the majority of the relevant and important values of these potential ACECs.

***Special Designations – Wild and Scenic Rivers:***  Alternative D recommends none of the eligible river segments as suitable for potential designation as Wild and Scenic Rivers.  As a result, Alternative D would not provide sufficient protection to many of the river segments found to have outstandingly remarkable values (outstandingly remarkable values).  For example, the outstandingly remarkable values of scenic, fish, recreation, wildlife, cultural and ecological in Colorado River Segment #2 would not be protected without the management prescriptions provided by a suitability recommendation.

***Woodland Harvest:***  Alternative D closes 53 percent of the area to woodland harvest, the same amount as in the Proposed RMP.  However, fewer restrictions are placed on OHV use in gathering fuelwood than in the Proposed RMP so the potential for adverse impacts to cultural and natural resources would be greater.

In summary, Alternative D was not selected primarily because it does not best achieve the mix of multiple uses necessary to fully implement the mandate of FLPMA.  Adoption of this alternative would result in adverse impacts to wildlife, loss of primitive recreation opportunities, and would have reduced management flexibility by foregoing a number of special designations such as ACECs and WSRs.  In addition, recreational opportunities provided through SRMA focused management and the management of non-WSA lands with wilderness characteristics would be foregone.

## Alternative E

Alternative E includes the same management prescriptions as Alternative B except that 582,360 acres of non-Wilderness Study Area (WSA) lands would be managed to preserve, protect, and maintain their wilderness characteristics. Other activities consistent with that emphasis would be allowed.  Large areas on the west side of the Monticello FO would be difficult to access or to conduct activities involving surface disturbance.  Wilderness characteristics would be enhanced as would adjacent wilderness values found in WSAs.  The rationale for not selecting Alternative E is outlined below for the major management actions.

***Travel Management:***  Alternative E limits OHV use and access to designated roads and trails on 812,679 acres and closes 970,436 acres (54 percent of the field office area).  There are no areas designated open to cross country OHV travel.   This alternative does not meet the needs of all public land users because it would unnecessarily limit access by closing more than half of the public lands to off highway vehicle use and motorized access.

***Recreation:***  Alternative E establishes four Special Recreation Management Areas (SRMAs), one Cultural Special Recreation Management Area (CSRMA) and four Cultural Special Management Areas (CSMAs).   These management areas focus on primitive recreation opportunities and do not provide a full spectrum of other opportunities for managing developed or motorized recreational uses.  As a result, this alternative does not provide for the full range of

BLM_0013857

*Monticello Approved Resource Management Plan - Record of Decision*

recreational activities known to occur in the planning area or for the businesses that depend upon these activities. The CSRMA and CSMA designations are new naming conventions (unique to the Monticello RMP) which were created to protect cultural resources by managing visitors, and have proven to be confusing to the general public. As in Alternative B, rafting permits on the San Juan River would be limited, resulting in 25 percent less visitation on the river, which would also result in economic impacts for local businesses. This alternative, like Alternative B, provides for fewer recreation permits and fewer people allowed under each permit to visit special recreation permit areas such as Cedar Mesa SRMA where private and commercial visitation would be decreased by 16 percent. These reductions are unnecessarily restrictive to protect sensitive resources.

***Minerals:*** Alternative E manages oil and gas leasing and other surface disturbing activities with the following stipulations: Closed – 971,463 acres; No Surface Occupancy – 53,915 acres; Timing Limitations/Controlled Surface Use – 545,641 acres; Open (subject to standard terms and conditions) – 213,288 acres. Mineral entry is available on 951,053 acres and recommended for withdrawal on 834,070 acres. In addition, mineral material disposal is available on 213,290 acres, available with special stipulations on 545,641 acres and unavailable on 1,025,378 acres. Alternative E is overly restrictive to oil and gas development and other surface disturbing activities, especially in areas with high development potential for oil and gas. It has the least amount of acreage open to oil and gas leasing under standard terms and conditions. The acreage included in the Closed and No Surface Occupancy stipulations totals 58 percent of the acreage in the planning area that would be essentially unavailable to oil and gas development and other surface disturbing activities. These restrictions are not needed in this large percentage of lands to protect sensitive resources. The timing and controlled surface use stipulations in Alternative E would add another 30 percent of the planning area in which oil and gas development would be prohibited during certain times and subject to specified conditions for construction. Timing and controlled surface use restrictions add to the cost of development. In total, about 88 percent of the planning area would be subject to restrictions above standard terms and conditions for development. The Energy Policy and Conservation Act provides policy directing BLM to give reasonable access and minimize impediments to oil and gas leasing and development. This alternative does not meet these policy objectives.

***Non-WSA Lands with Wilderness Characteristics:*** Alternative E manages 582,360 acres to protect, preserve, and maintain their wilderness characteristics. These acres are closed to mineral leasing and development, rights-of-way, woodcutting, and all other surface disturbing activities. Management of non-WSA lands to preserve their wilderness characteristics would preclude potentially beneficial actions such as fuels and vegetation treatments and other healthy land initiatives, wildlife and range improvements, and the construction of recreation facilities. Many of the areas managed to protect wilderness characteristics in Alternative E have conflicts with high development potential areas for oil and gas and associated infrastructure. Some of this acreage is also currently leased for oil and gas, thereby making it impractical to protect the wilderness characteristics values. The management of all the non-WSA lands with wilderness characteristics in Alternative E is overly restrictive on other resources and uses of the public lands.

***Lands and Realty:*** In Alternative E, 971,463 acres are managed as exclusion areas for rights-of-way and 53,915 acres are managed as avoidance areas for rights-of-way. Approximately 834,070 acres are recommended for withdrawal from mineral entry. Managing 58 percent of the planning

BLM_0013858

area with major restrictions on BLM rights-of-way for pipelines, roads and powerlines could severely, and unnecessarily, limit development of and access to existing oil and gas leases as well as restrict development of other necessary infrastructure.

***Special Designations – Areas of Critical Environmental Concern:***  Alternative E designates all 12 areas (521,141 acres) determined to have relevant and important values as Areas of Critical Environmental Concern (ACECs).  As in Alternative B, designation of some of these potential ACECs is unnecessary to protect the relevant and important values.  Many of them are overlain by WSAs and the relevant and important values are already protected by IMP, VRM management or management under SRMA designation.

***Special Designations – Wild and Scenic Rivers:***  Alternative E recommends as suitable all 12 river segments found eligible for potential designation as Wild and Scenic Rivers in the National Wild & Scenic River system.  As a consequence; Alternative E would impose unnecessary restrictions that provide no additional management protections that are not otherwise available through existing or alternative management options.

***Woodland Harvest:***  Alternative E closes all non-WSA areas with wilderness characteristics as well as all areas closed in Alternative B.  This amounts to 69 percent of the field office area. Like Alternative B, this would be an even greater unnecessary restriction on fuelwood harvest, especially to Native Americans who depend on fuelwood for heating as well as cooking in their homes.

In summary, Alternative E was not selected as the Proposed RMP primarily because it does not best achieve the mix of multiple uses necessary to fully implement the mandate of FLPMA.  This alternative would not provide adequate or balanced consideration of existing uses such as certain motorized recreation activities, woodland harvest, economic land uses such as rights-of-way, energy corridors, or access to mineral development.  Adoption of this alternative could also preclude the consideration of possible future development of renewable energy resources.  This alternative is inconsistent with existing state and local plans; conflicts with the intent of federal legislation including Energy Policy and Conservation Act and the Energy Policy Act, and it does not give adequate consideration to local needs, customs and culture.

## *Alternatives Considered But Eliminated From Analysis*

### No Grazing Alternative

***Rationale for Elimination:***  An alternative that proposes to close the entire PA to grazing would not meet the purposes and needs of this Approved RMP. NEPA requires that agencies study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources. No issues or conflicts have been identified during this land-use planning effort, which requires the complete elimination of grazing within the PA for their resolution. Where appropriate, closures and adjustments to livestock use have been incorporated into the alternatives on an allotment or area basis to address issues identified in the LUP.  Since the BLM has considerable discretion, through its grazing regulations, to determine and adjust stocking levels, seasons-of-use, and grazing management activities, and to allocate forage to uses of the public lands in LUPs, the analysis of an alternative to entirely eliminate grazing is not needed. An alternative that proposes to close the entire PA to grazing would also be inconsistent with the intent of the Taylor Grazing Act (TGA), which directs the BLM to provide for livestock use of BLM lands, to adequately

BLM_0013859

safeguard grazing privileges, to provide for the orderly use, improvement, and development of the range, and to stabilize the livestock industry dependent upon the public range. The FLPMA requires that public lands be managed on a "multiple use and sustained yield basis" (FLPMA Section 302 [a] and Section 102 [7]) and includes livestock grazing as a principal or major use of public lands. While multiple use does not require that all lands be used for livestock grazing, complete removal of livestock grazing on the entire PA would be arbitrary and would not meet the principle of multiple use and sustained yield. Livestock grazing is and has been an important use of the public lands in the PA for many years, and is a continuing government program. Although the Council on Environmental Quality (CEQ) guidelines for compliance with NEPA require that agencies analyze Alternative A (the No Action Alternative) in all EISs, for the purposes of this NEPA analysis, Alternative A is to continue the status quo, which includes livestock grazing (CEQ Forty Most Asked Questions, Question 3). For this reason and those stated above, a no-grazing alternative for the entire PA has been dismissed from further consideration in this LUP.

## Model Distances from Roads Alternative

***Rationale for Elimination:*** An alternative that proposes to close the roads based on a model that eliminates travel based on distances from roads in order to protect solitude and remoteness in the PA would not meet the purposes and needs of this Approved RMP. No issues or conflicts have been identified during this land-use planning effort that require this particular method for determining which roads would be designated and which areas would remain open, limited, or closed to cross-country travel. Since the BLM has considerable discretion through its regulations, the analysis of an alternative to close roads based on this model is not needed. The BLM did consider the idea of remoteness and solitude and provided protection for these values in a reasonable range of alternatives. Alternative E protects non-WSA lands with wilderness characteristics by closing these lands motorized uses. Additionally, Alternative B and the Approved RMP close all WSAs to motorized use. Instead, the BLM chose to take a hard look at each route and measure the purpose and need for that particular route against resource conflicts. This methodology was presented in the travel report and was the basis for the range of alternatives for travel management.

## Enlarge Canyonlands National Park Alterative

***Rationale for Elimination:*** An alternative that proposes to enlarge Canyonlands National Park to include Lockhart Basin has been proposed many times in the media and discussion with interested groups. However, no complete serious proposal has ever been brought forward. This would not meet the purposes and needs of this Approved RMP. No issues or conflicts have been identified during this land-use planning effort that requires this particular method for determining which roads would be designated and which areas would remain open, limited, or closed to cross country travel.

## No Leasing Alternative

***Rationale for Elimination:*** The "No-Leasing Alternative" in an RMP revision is actually an action alternative because where lands have already been leased, the no-action for NEPA purposes continues to allow for (honor) valid existing rights. Proposing a "No-Leasing Alternative" would require revisiting existing leases and either buying them back from the lessee, or allowing them to expire on their own terms. The first option (buying back), is outside

BLM_0013860

the scope of any RMP. This is a political decision that the BLM has no authority to undertake in planning. As a result, the BLM does not regularly include a "No-Leasing Alternative." The purpose and need for the LUP is to identify and resolve potential conflicts between competing resource uses rather than to eliminate a principle use of the public lands in the Monticello FO Area. Leasing of the public lands for oil and gas exploration and production is required by the Mineral Leasing Act of 1920, as amended, and the BLM's current policy is to apply the least restrictive management constraints to the principal uses of the public lands necessary to achieve resource goals and objectives. A field office-wide "No-Leasing Alternative" would be an unnecessarily restrictive alternative for mineral exploration and production on the public lands.

The National Environmental Policy Act (NEPA Section 102 [E]) requires that agencies *"study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."* No issues or conflicts have been identified during this land-use planning effort, which would require the complete elimination of oil and gas leasing within the planning area. The BLM's Land Use Planning Handbook (BLM MANUAL Rel. 1-1693 Appendix C) requires that LUPs identify areas as open or unavailable for leasing. Given the potential range of decisions available in the Draft RMP/Draft EIS, the analyzed alternatives include no leasing for certain areas; but a field office-wide "No-Leasing Alternative" is not necessary in order to resolve issues and protect other resource values and uses.

As mentioned in the "No Grazing Alternative" discussion a "No-Leasing Alternative" should not be confused with the "No Action Alternative" for purposes of NEPA compliance. Leasing and No Leasing on the public lands has previously been analyzed in several NEPA documents. In 1973, the Department of the Interior published the Final Environmental Impact Statement on the Federal Upland Oil and Gas Leasing Program (USDI, 1973). The proposed action was to lease Federal lands for production of oil and natural gas resources. Alternatives included the No Action Alternative, which at initiation of the program was "No Leasing." To supplement that EIS, the BLM prepared a series of Environmental Assessments (then titled "Environmental Analysis Records or EARs") including the 1975 Oil and Gas Program Environmental Analysis Record (EAR), 1975 which addressed oil and gas leasing for the public lands in the Monticello FO area. Alternatives again included the No Action or "No Leasing" alternative. The outcome was a category system for leasing which categorized all public and USFS lands into four groups:

1) Open to leasing with standard lease stipulations
2) Special Stipulations to address special concerns
3) No surface occupancy
4) No Leasing

Since completion of the EAR in 1975 oil and gas leasing in the Monticello FO Area has been an ongoing federal program under the established categories.

The Council on Environmental Quality (Section 1502.14[d] of NEPA) requires the alternatives analysis in an EIS to "include the alternative of no action", but explains that there are two distinct interpretations of "no action" that must be considered, depending on the nature of the proposal being evaluated. "The first situation might involve an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed. In these cases "no action" is "no change" from current

BLM_0013861

management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. Therefore, the "no action" alternative may be thought of in terms of continuing with the present course of action until that action is changed." (CEQ Forty Most Asked Questions, Question 3). Therefore, the "No-Action Alternative" is to continue the status quo, which is to lease under the oil and gas stipulations (formerly categories) established in the San Juan RMP.

**Livestock Adjustments Alternative**

***Rationale for Elimination:*** BLM policy regarding adjustments to the levels of livestock use authorized is to monitor and inventory range conditions under existing stocking levels and make adjustments to livestock use as indicated by this data to help assure that Rangeland Health Standards (RHS) and resource objectives are met. Regulations at 43 CFR 4130.3 require that the terms and conditions under which livestock are authorized "ensure conformance with the provisions of subpart 4180" (Standards for Rangeland Health) and further that "livestock grazing use shall not exceed the livestock carrying capacity of the allotment." It would be inappropriate and unfeasible to estimate and allocate the available forage, design specific management practices and determine if changes to the kind of livestock are necessary for each allotment in the Monticello FO or in the area as a whole in the RMP/EIS. Such changes would not be supportable considering the type and amount of data required and the analysis necessary to make such changes. According to BLM policy decisions regarding authorized livestock use levels and the terms and conditions under which they are managed are implementation decisions (H-1610-1, Appendix C, page 15). The BLM assesses RHS, conducts monitoring and inventories, and evaluates this data on a periodic basis, normally on an allotment and/or watershed basis. After NEPA analysis, necessary changes to livestock management and implementation of Utah's Guidelines for Grazing Management are implemented through a decision process in accordance with 43CFR 4160. These decisions determine the exact levels of use by livestock in conformance with the LUP and to meet resource objectives and maintain or enhancing land health. For these reasons this alternative has been dismissed from further consideration in this land use plan revision.

## C.    RESULTS OF PROTEST PERIOD

The BLM received 20 protest letters with standing during the 30-day protest period provided for the proposed land use plan decisions contained in the Monticello Proposed RMP/Final EIS in accordance with 43 CFR Part 1610.5-2.  Of these, 14 presented valid protest points. Protesting parties with valid protests included:

*Twelve Letters from Organizations*:  Western Watersheds Project, Inc.; Outdoor Industry Association (letter included National Outdoor Leadership School Rocky Mountain); Wild Rivers Expeditions; Utah Rock Art Research Association; Colorado Plateau Archaeological Alliance; ECOS Consulting; Great Old Broads for Wilderness; San Juan County; Independent Petroleum Association of Mountain States; National Trust for Historic Preservation; Utah Rivers Council; Southern Utah Wilderness Alliance (letter included The Wilderness Society; Grand Canyon Trust; Sierra Club, Utah Chapter; Public Employees for Environmental Responsibility; Center for Native Ecosystems; Glen Canyon Institute; Red Rock Forests;  and Great Old Broads for Wilderness.)

*Two Letters from Individuals*: Patty McCourt; and Owen Severence.

BLM_0013862

Protest issues were varied. Numerous protests centered on whether or not BLM followed the NEPA regulations in completing the land use planning effort. Issues specifically related to a lack of detailed impact analysis for numerous resources, lack of an adequate range of alternatives, and a lack of opportunities for public involvement. Other issues identified that the land use plan did not meet FLPMA's multiple use mandate or give priority to the designation of ACECs. In addition, protests declared that BLM did not adequately analyze effects of planning actions on air quality or appropriately analyze impacts of climate change. Some protestors did not feel that their comments and/or submitted information provided on the Draft RMP/Draft EIS were satisfactorily responded to in the Proposed Plan/Final EIS.

Detailed information on protest responses is contained in the Director's Protest Resolution Report, Monticello Resource Management Plan (USDI-BLM 2008). This document can be found on the BLM Washington Office Website at:

http://www.blm.gov/wo/st/en/prog/planning/protest_resolution.html

The BLM Director addressed all protests without making significant changes to the Proposed RMP/Final EIS. Some of the protest letters resulted in modifications to the decisions in the Approved RMP, and, minor adjustments and clarifications were made and have been explained in the *Notice of Minor Modification and Clarification* section later in this ROD.

## D.    THE DECISION

The decision is hereby made to approve the attached plan as the Approved Resource Management Plan (RMP) for management of public lands that are administered by the BLM's Monticello Field Office. The Approved RMP replaces public land decisions in the San Juan RMP approved in 1991, as amended.

The Approved RMP was prepared under the authorities of the Federal Land Policy and Management Act (FLPMA) of 1976 in accordance with BLM planning regulations (43 CFR Part 1600). An Environmental Impact Statement (EIS) was prepared for this RMP in compliance with the National Environmental Policy Act (NEPA) of 1969.

The Approved RMP is nearly identical to the Proposed RMP that was presented in the Proposed RMP/Final EIS on September 5, 2008. Management decisions and guidance for public lands under the jurisdiction of the Monticello FO are presented in the Approved RMP. All decisions covered by the ROD are either land use planning decisions or implementation decisions.

The Approved RMP emphasizes an appropriate multiple-use balance of protection and restoration of the natural and cultural resources while providing for resource use, extraction, and enjoyment. The Approved RMP is considered the appropriate plan of action when taking into consideration the social, economic and natural environment. The Approved RMP supports the six broad policy goals for all Federal plans, programs, and policies:

1.  Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
2.  Assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings;
3.  Attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

BLM_0013863

4. Preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

5. Achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

6. Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

## *What the Decision/RMP Provides*

Land use plan decisions include:

- Goals
- Objectives (Desired Future Conditions)
- Land Use Allocations
- Management Actions

**GOALS** are the broad statements of desired outcomes, and are usually not quantifiable.

**OBJECTIVES** are specific desired conditions, usually quantifiable and measurable, and may have timeframes for achievement.

**LAND USE ALLOCATIONS** specify locations within the planning area that are available or not for certain uses. These include decisions such as what lands are available for livestock grazing, mineral material use, oil and gas leasing, and locatable mineral development, what lands may be available for disposal via exchange and/ or sale, and what lands are open, closed, or limited to motorized travel (please note that all acreages presented in the Approved RMP are estimations even when presented to the nearest acre).

**MANAGEMENT ACTIONS** include those provisions that help in meeting the established goals and objectives and include measures that will be applied to guide day-to-day activities on public lands, including but not limited to stipulations, guidelines, best management practices (BMPs), and design features.

The primary RMP management decisions in the Approved RMP are:

- Cultural Resources: Conduct proactive cultural inventories under Section 110 of the National Historic Preservation Act.

- Fire Management: Adopt the comprehensive Utah LUP amendment for fire and fuels management of September 2005, which addresses activities associated with ESR, prevention/mitigation, fuels treatment, wildfire use, suppression, and priorities. Place BLM-administered lands in fire management categories.

- Lands and Realty: Manage 416,115 acres as exclusion areas and 133,293 acres as avoidance areas for ROWs. Outline processes for filming, Recreation and Public Purposes (R&PP), trespass resolution, access, easements, land tenure adjustments, transportation, and utility corridors and withdrawals.

- Livestock Grazing: Manage grazing according to *Utah Standards for Rangeland Health and Guidelines for Grazing Management*. Maintain lands currently unavailable for livestock grazing (due to vegetation, recreation, wildlife, or other concerns) and existing land

BLM_0013864

*Monticello Approved Resource Management Plan - Record of Decision*

treatments. Make 1,621,515 acres available to grazing, 133,318 acres unavailable to grazing, and 6,518 acres restricted to livestock trailing only.

- Mineral Withdrawal: Recommend 50,665 acres for withdrawal from mineral entry.

- Mineral Disposal: Make 624,734 acres available with standard terms and conditions and 724,234 acres available with special conditions.

- Oil and Gas Leasing: Open with standard terms and conditions - 484,217 acres; open with moderate constraints (controlled surface use and timing limitations) - 740,594 acres; open with no surface occupancy - 66,108 acres; and unavailable to leasing - 493,400 acres.

- Non-WSA Lands with Wilderness Characteristics: Protect, preserve and maintain 88,871 acres for wilderness characteristics in Dark Canyon (11,540 acres), Mancos Mesa (30,068 acres), Nokai Dome West (14,988 acres), Nokai Dome East (18,618 acres), and Grand Gulch (13,657 acres).

- Recreation: Outline guidelines, general decisions, existing/future facilities, launch limits, commercial/private allocations, visitor services, campsites, campfires, wood collection, non-boating use, grazing, watershed, pet/stock animals and general policies regarding special recreation permits (SRPs) (commercial and competitive). Approximately 562,824 acres are included within seven SRMAs: San Juan River (9,859 acres); Dark Canyon (30,820 acres); White Canyon (2,828 acres); Tank Bench (2,646 acres); Beef Basin (20,302 acres); Indian Creek (89,271 acres); and Cedar Mesa (407,098 acres), which includes management zones for Grand Gulch NHL (37,388 acres), Comb Ridge (30,752 acres), and McLoyd Canyon–Moon House (1,607 acres).

- Special Designations – Areas of Critical Environmental Concern (ACECs): Designate areas as ACECs where special management attention is required to prevent irreparable harm to important historic, cultural, or scenic values, fish and wildlife resources, other natural systems or processes, or to protect life and safety from natural hazards. Approximately 73,492 acres within seven ACECs: 1) Alkali Ridge (Cultural) 39,196 acres; 2) Hovenweep (Cultural) 2,439 acres; 3) Indian Creek (Scenic) 3,905; 4) Lavender Mesa (Relic Vegetation) 649 acres; 5) San Juan River (Scenic, Cultural, Wildlife, & Natural Systems) 4,321 acres; 6) Shay Canyon (Cultural) 119 acres; and 7) Valley of the Gods (Scenic) 22,863 acres would be designated.

- Special Designations – Wild and Scenic Rivers (WSRs): Manage 35.7 miles of suitable river segments (four segments) for consideration of inclusion into the National Wild and Scenic River system.  The four suitable WSR segments include: Colorado River Segment 2 (5.5 miles/880 acres); Colorado River Segment 3 (6.5 miles/1,040 acres); Dark Canyon (6.4 miles/2,048 acres); and San Juan River Segment 5 (17.3 miles/2,768 acres).

- Special Designations – Wilderness Study Areas (WSAs):  Manage 13 WSAs (389,444 acres) as VRM Class I and closed to OHV use (with exception of .08 miles of a way in Fish Creek WSA to access the Moon House ruin.)

- Travel Management: Designate 1,388,191 acres as "limited to designated routes," and 393,895 acres as closed to OHV use.  Special seasonal stipulations are applied to the Arch Canyon route.

- Visual Resource Management: Manage VRM to the following objectives:  Class I - 422,989 acres; Class II - 262,256 acres; Class III- 473,368 acres; and Class IV- 623,002 acres.

BLM_0013865

- Wildlife and Fisheries: Discuss and implement protocols for introduction, transplantation, augmentation, reestablishment, animal damage control, habitat improvement/protection, seasonal areas, off-site mitigation and habitat boundaries.
- Woodlands: Identify zones for private/commercial use of woodland products, prioritize treatments in high value/risk areas and continue permitting process.

This ROD serves as the final decision establishing the land use plan decisions outlined in the Approved RMP and is effective on the date it is signed. No further administrative remedies are available for these land use plan decisions.

## *What the Decision/RMP Does Not Provide*

The Approved RMP does not contain decisions for the mineral estate administered by the BLM Monticello Field Office for Forest Service lands located in the planning area, for lands under the jurisdiction of other Federal agencies, or for private or State-owned lands and minerals.

The RMP decisions for surface estate only apply to BLM managed lands, even where these private or state lands are shown on a map included in the RMP.

- The Approved RMP does not affect valid existing rights, existing Memorandum of Understanding, existing habitat management plans (HMPs), or existing cultural resource management plans (CRMP).
- The Approved RMP does not create new wilderness or WSAs.
- The Approved RMP does not affect previous withdrawals.
- The Approved RMP does not make withdrawal recommendations effective. Withdrawal recommendations are not effective until Congress or the Secretary of the Interior takes action.
- "Closed routes" are not necessarily closed for administratively approved activities.
- The Approved RMP does not adjudicate, analyze, or otherwise determine the validity of claimed rights-of-way. However, the State of Utah's statutory policy is to "use reasonable administrative and legal measures to protect and preserve valid existing rights-of-way granted by Congress under R.S. 2477," (Utah Code 63J-4-401(7)(b)). The BLM is committed to working with the State to employ potential options to recognize existing rights-of-way in accordance with Washington Office Instruction Memorandum 2008-174 and 2008-175. BLM recognizes that it would be beneficial to meet and discuss Non-Binding Determinations and Recordable Disclaimer of Interest options which would result in the BLM documenting its position in its official records, after public notification and involvement. BLM will work with the State and counties to set priorities for specific roads. It is BLM's intent to work toward an outcome that is in the interest of the general public and the State of Utah.
- The Approved RMP does not affect terms of existing leases; existing special recreation permits, or other existing permits issued by the BLM.

In addition, many decisions are not appropriate at this level of planning and are not included in the ROD. Examples of these types of decisions include:

- *Statutory requirements:* The Approved RMP will not change the BLM's responsibility to comply with applicable laws, rules, and regulations.

BLM_0013866

*Monticello Approved Resource Management Plan - Record of Decision*

- *National policy:* The Approved RMP will not change BLM's obligation to conform with current or future national policy.
- *Funding levels and budget allocations:* These are determined annually at the national level and are beyond the control of the field office.

## Implementation Decisions

While the designation of areas as open, closed, or limited to off-highway vehicle use is a land use planning decision, the proposed route designations for motorized wheeled travel in the planning area included in the Approved RMP are implementation decisions. Likewise, land use plan decisions include identifying which areas are available and unavailable to livestock grazing. Establishing grazing management practices such as season of use or grazing systems are implementation level decisions.

### Travel Management

The route designations described in the *Travel Management* section of the Approved RMP and identified on Map 2 (Appendix A) are effective upon issuance of this Record of Decision. All area designations are complete upon signature of the ROD in accordance with 43 CFR Part 8342.2(b). Public notice was provided for both the area designation decisions and the route decision upon publication of the Federal Register Notice of Availability of the Proposed RMP/Final EIS on September 5, 2008.

The methodology used by the interdisciplinary team to develop a travel plan network was a combination of guidance from the BLM Utah State Office and Washington Office. This guidance stated that the route designation process should begin with existing inventory and data and then determine the purpose and need for existing routes. BLM determined it would be beneficial to use San Juan County's route inventory as the baseline because the county's inventory was the most complete for the field office area. Monticello FO used a random sampling of the San Juan County route data to verify the validity of the inventory. BLM staff verified the existence of 99.7 percent of the random sample of route segments (344 total segments). This high level of verification established the validity of the County's inventory. In addition, MFO requested that the public submit verifiable information on routes additional to those on the San Juan County inventory. Information was submitted by three individuals and two citizen groups. This information was evaluated by BLM staff who determined that these routes were either included on the inventory or that the roads existed, but had no purpose or need.

After establishing a road network inventory, designation of specific vehicle routes for the Approved RMP was undertaken addressing each route's purpose and need and weighing the purpose and need against potential resource conflicts. Six interdisciplinary team meetings were held, including representatives of San Juan County, to evaluate all the routes inventoried within the planning area. Routes were not designated in the Approved RMP where it was determined that the routes had no purpose and need or where resource conflicts outweighed the purpose and need. Thirty-one additional ID Team and coordination meetings were held concerning route selection for the range of alternatives in the Draft RMP.

The Approved RMP designates a total of 0.5 miles of limited seasonal restrictions and 1,947 miles of designated routes. The rationale for closures of routes not carried forward includes crucial wildlife habitat conflicts, WSA intrusions, other resource conflicts, inadequate purpose

BLM_0013867

and need, and closure or designation for administrative use only. With exception of the .08 miles of a way in Fish Creek WSA to access the Moon House ruin, no ways have been designated in WSAs nor have any routes been designated in the five areas selected to protect, preserve and maintain their wilderness characteristics outside of designated WSAs.

In Arch Canyon, OHV use will be limited to the designated route up to the National Forest boundary, a total of 8 miles one-way. Organized and commercial groups will be required to obtain a Special Recreation Use Permit. This permit will allow access on the designated route up to the National Forest boundary, except from March 1 through August 31. During this period, access will be limited to 7.5 miles of the designated route and access will not be allowed on the last half mile immediately before the National Forest Service boundary. This decision was based on the fact that all of the riparian areas in Arch Canyon are in properly functioning condition and this condition has not been affected by existing OHV use. In addition, by limiting OHV travel to the designated route, any potential impacts to cultural resources will be minimized. Excluding travel in the upper 0.5 mile of the route during the period March 1 through August 31 would mitigate any impacts of noise disturbance on Mexican spotted owls during the breeding season.

Harts Canyon is closed from the private land (Seeps) to Yancy's Fence (T30S, R22E, Section 8) to OHV and mechanized use. This route did not meet the purpose and need test, and closure to OHV and mechanized use would help maintain and improve riparian functioning condition.

Mountain bike use will be limited to the same designated routes as OHV travel; bicycle use can have some of the same impacts on sensitive resources as motorized OHV use.

No routes have been designated in the Recapture Canyon area which has previously been closed to OHV use through an emergency closure order. Consideration of such designation will be made in a future NEPA document specific to that area.

Comments were submitted on the Draft RMP/EIS which suggested additions, deletions, and modifications to the proposed route system be made in the Approved RMP. The Approved RMP specifies that modifications to the designated route network may be made without completing a plan amendment. Such modification (plan maintenance) may be based on monitoring and/or site specific documentation in accordance with NEPA. The process for considering route modifications will be detailed in the Implementation Plan developed for the RMP after completion of the ROD.

### *Livestock Grazing*

For allotments identified on Map 3 (Appendix A), the seasons of use described in the Grazing Management section of the Approved RMP will be as follows:

- Church Rock season of use is December 1–May 31
- Indian Rock season of use is November 15–April 15
- Owens Dugout season of use is February 1–April 30
- Laws season of use is April 16–November 15
- Bear Trap season of use is September 1–December 12
- Monument Canyon season of use is December 1–May 31
- South Vega season of use is January 6–February 28

BLM_0013868

*Monticello Approved Resource Management Plan - Record of Decision*

- Upper Mail Station season of use is November 14–February 28
- Big Westwater season of use is April 1–May 31 or October 15–December 15
- These seasons of use match the seasons of use on current term grazing permits. These seasons of use were established consistent with *Utah Standards for Rangeland Health and Guidelines for Grazing Management*. In the Perkins Brothers, East League, and McCracken Wash allotments, seasons of use in riparian areas are limited to October 1 through May 31 in order to eliminate disturbance to nesting migratory birds and allow growth of riparian vegetation important for migratory bird habitat. Gunnison sage-grouse nesting is protected in the Sage Flat, Upper East Canyon, Sage-grouse and Dry Farm allotments by precluding use from March 20 to May 15 on these allotments.

# E.   NOTICE OF MODIFICATIONS AND CLARIFICATIONS

Minor modifications and clarifications were made to the Approved RMP based on the review and resolution of the protest letters, as well as from internal review by the BLM. The agreed upon minor modifications or clarifications to the decisions are provided below.

## *Minor Modifications*

As a result of protests on the Proposed Plan and continued internal review, BLM made six minor modifications to the Proposed Plan. As described below, these minor modifications are not considered significant changes. The *Management Decisions* sections of the Approved RMP include these minor modifications:

1. San Juan River SRMA:  In response to protest and further internal review, the commercial group size limit has been changed to 33 people (25 passengers plus 8 guides) (REC-61) in the Approved RMP from a total of 25 people (total) per launch in the Proposed Plan.  All changes were analyzed within the range of alternatives.
2. San Juan River SRMA:  The number of commercial daily launches has been changed to two per day (one launch of 25 passengers and one launch of 10 passengers) in the Approved RMP (REC-62) from a single launch per day of 25 passengers in the Proposed Plan.  All changes were analyzed within the range of alternatives.
3. Lockhart Basin Proposed ACEC (ACEC-52 and VRM-2):  The area managed as VRM Class III in the Proposed RMP/Final EIS has been changed to VRM Class II in the Approved RMP to be consistent with the inventoried VRM class and better manage the scenic qualities of the area. This change was made in response to protest and further internal review, and was analyzed within the range of alternatives.  This changed the total VRM Class II and Class III acreages under decisions VRM-2 and VRM-3 in the Approved RMP.
4. Hovenweep ACEC, at page 2-56 of the Proposed RMP/Final EIS:  The following decision has been deleted: "Within Hovenweep ACEC, cultural properties eligible for the National Register would be avoided by 100 feet."  This was incorrectly included from the 1991 RMP which has been replaced by other language in the Proposed RMP/Final EIS and carried forward into the Approved RMP on right-of-way avoidance areas included in LAR-14 and ACEC-48.
5. Decisions WSA-8, WSA-11, TM-9 and TM-14 have been modified to clarify that a 0.08 mile way to access the Moon House trailhead in Fish Creek WSA will remain open consistent with an agreement between BLM and San Juan County.  The other ways will remain open only to provide administrative access and are as follows:

BLM_0013869

*Monticello Approved Resource Management Plan - Record of Decision*

     a.  Two ways in Grand Gulch ISA – Pine Canyon and Slickhorn units; totaling 3.1 miles and located east of Pine Canyon and Point Lookout areas.

     b.  One way in Fish Creek WSA – Lower Baullies Mesa; totaling 4.93 miles.

     c.  One way in Road Canyon WSA – Perkins Point; totaling 2.67 miles.

No motorized/mechanized recreation use will be allowed on any of these administrative access ways.  The Travel Plan (Appendix O) also reflects this modification at page 12.

6.  The Monticello RMP/EIS failed to analyze the impacts of remote airstrips in the Monticello planning area on WSAs and non-WSAs with wilderness characteristics, recreationists, natural and cultural resources.   Because BLM did not analyze such impacts, the BLM Monticello FO is required to withdraw the decision in Appendix N of the Proposed RMP/Final EIS.  In response to a protest, and in order remedy this oversight, the impacts of these numerous airstrips on the resources in the planning area will be considered at the earliest opportunity as part of the next planning process conducted by the field office.  The BLM will delineate travel management areas for remote airstrips and determine which of these will be open or closed in compliance with the NEPA, Appendix C of the BLM Planning Handbook (H-1601-1) and Public Law 106-291, Section 345.

## *Clarifications*

The following clarifications and minor corrections made to the information included in the Proposed RMP/Final EIS are reflected in the attached Approved RMP:

1.  The OHV route Map 63 (Proposed RMP/Final EIS) was corrected to remove routes illustrated within the Park Service and Forest Service boundaries.  BLM has no jurisdiction within those boundaries.  Changes have been made on Map 2 in the Approved RMP.

2.  Acreage discrepancies for the right-of-way avoidance and exclusion areas occurred in Table 2.1 and Table 4-8 of the Proposed RMP/Final EIS.  The Approved RMP has corrected this discrepancy.  Decision LAR-14 clearly states that avoidance areas cover 133,293 acres and exclusion areas include 416,115 acres (Map 4).  These lands are also shown on Map 4 in the Approved RMP.

3.  Acreage discrepancies for areas unavailable and available for livestock grazing have been corrected in the Approved RMP (GRA-17).  Areas unavailable to livestock grazing are changed to 133,318 acres from 134,277 acres.  These changes resulted from better GIS data and correction of previous miscalculations.

4.  The Indian Creek ACEC was incorrectly stated to be recommended for withdrawal from mineral entry in the Proposed RMP/Final EIS.  Decision ACEC-50 no longer recommends this ACEC for withdrawal.  The EIS analyzed not proposing this ACEC for withdrawal within the range of alternatives.  This area has also been removed from Map 6 in the Approved RMP.

5.  Decision WC-1 has been clarified to include that there are no routes designated within the 88,871 acres protected for wilderness characteristics.

6.  Management prescriptions for Gunnison sage-grouse habitat within 4 miles of active strutting grounds have been clarified in the Approved RMP to be in effect year-round (Decision SSP-24).  The reference "May 16-March 19" in the Proposed RMP/Final EIS has been deleted because it is year round habitat.

7.  The management prescriptions for sage-grouse lek habitat (Decision SSP-23) which restrict permitted activities from sunset the evening before to three hours after sunrise the next

BLM_0013870

morning has been corrected to be two hours after sunrise. This is consistent with the Gunnison Sage-grouse Rangewide Conservation Plan (the GSRCP).

8. The Goals and Objectives for the Management Common to All Resources (MCA) and the Recreation Section contain definitions in the Proposed RMP/Final EIS that are more appropriately included in a glossary. As such, the definitions or corresponding language was moved to the glossary for: designated routes, SRMAs, and the Extensive Recreation Management Area (ERMA). Definitions that were redundant to those already in the glossary were deleted from the program goals and objectives for OHVs.

9. A new map (Map 20) was created for the Approved RMP to combine the various cultural features and management areas onto one map as a reference tool for resource specialists and visitors to the planning area. This map is introduced in the Goals and Objectives for the Cultural Resource section in the Approved RMP.

10. Some decisions were edited to correct grammar, sentence structure and improve the logical sequence appropriate for the Approved RMP. This also included reorganization and compacting of maps and appendices to account for those not needed from the Proposed RMP/Final EIS. Although an edit made an adjustment, it does not change the intent or content of the decision. For example decisions associated with special recreation permits were moved from their location in the Proposed RMP/Final EIS to just before SRMA discussions for logical flow and understanding. The background information associated with the 1991 San Juan RMP for the Indian Creek, Dark Canyon and Cedar Mesa ACEC were deleted, as it does not apply to this Approved RMP.

11. Some Goals and Objectives were more appropriately moved to the Management Actions in the respective resource sections. These moves include: MCA-1 through MCA-6, RIP-1, RIP-2, REC-147, ACEC-77 and TM-1.

12. The Recreation decision in the Proposed RMP/Final EIS at page 2-46 which stated "Special OHV events are limited to 350 total vehicles and approved OHV event routes" has been deleted. This was an error. Proposed events of this size are unlikely and special OHV events would be analyzed on a case-by-case basis to determine limits.

13. The Proposed RMP/Final EIS Travel Management section referenced Class B and Class D roads. This reference to road classification has been deleted in the Approved RMP because it may lead to confusion and has no bearing on the Travel Management Plan.

14. In response to a protest, clarification has been made to the Approved RMP (Decision ACEC-31) that the 641 acres east of Hovenweep National Monument continues to be included within the ACEC.

15. In response to a protest, Decision ACEC-2 in the Approved RMP has been clarified to reflect that BLM will comply with all laws, rules, regulations and policies related to the management of cultural resources.

16. In response to a protest, the total acres for the seven SRMAs designated in the Approved RMP are 562,824 acres (Record of Decision, p.16, p. 29 and Approved RMP).

17. Decision REC-69 has been clarified by describing the camping closure area and explaining that 122 acres of the restrictive camping is within the Extensive Recreation Management Area (ERMA).

18. The stipulations for East Canyon and NE Monticello and South Canyon woodland harvest zones (FOR-12 and FOR-13) were modified in the Approved RMP. A cross-tracked decision from REC-149 to allow off-road travel within 150 feet of designated routes to collect wood was carried into these two forestry decisions. This was done to be consistent with the

BLM_0013871

stipulations for vehicle camping in the ERMA.  Vehicle camping in the ERMA was restricted to previously disturbed areas to within 150 feet of designated routes.

19. Decision ACEC-53 has been clarified to denote that the San Juan River eligible segments (Segments 1-4) are no longer an appropriate reference for the right-of-way avoidance areas. Instead, areas within the ACEC intersected by the San Juan River SRMA are the right-of-way avoidance areas.  Both references encompass the same areas, nomenclature has changed due to the final decision.

### *Errata to the Proposed RMP/Final EIS*

1. In response to a protest, Chapter 3; Section 3.20.2.1:  delete the redundant sentence which states: "Winter range habitat primarily consists of shrub-covered, south facing slopes."
2. In response to a protest, the discussion in Chapter 3 on page 3-178 is hereby clarified to state that the effects of overgrazing are due to livestock as well as wildlife browsing.
3. At the request of the State of Utah and San Juan County, Evan Lowry, Ed Scherick and Ben Nielson were removed from the list of interdisciplinary team members who worked on the Travel Management Plan (Appendix N in Proposed RMP/Final EIS; Appendix O Approved RMP).

## F.    MANAGEMENT CONSIDERATIONS IN SELECTING THE APPROVED RMP

The BLM is tasked to provide multiple use management for public lands by Federal Land Policy and Management Act (FLPMA) and numerous other laws and regulations that govern public lands management. Due to the diversity of community needs and stakeholders affected by management of BLM lands, there has been both support and opposition to certain components of the Proposed Plan. BLM's objective in choosing Alternative C as the Preferred Alternative, and later using it as the base for the Proposed Plan (with minor modifications selected from the range of alternatives) was to address these diverse needs and concerns in a balanced manner and provide a practical and workable framework for management of public lands. The BLM is ultimately responsible for preparing a plan consistent with its legal mandates that reflects its collective professional judgment incorporating the best from competing viewpoints and ideas. The Approved RMP (the Proposed Plan as clarified and modified in consideration of public protests and internal review) provides a balance between those reasonable measures necessary to protect the existing resource values and the continued public need for use of the public lands within the planning area. Both local and national interests were taken into account in arriving at this balance.  The practical application of decisions was considered in light of land ownership patterns and the degree of Federal control over the resources in a given area.

Approval of a plan that provides a balance to meet both resource concerns and social and economic concerns in the planning area was a major factor in its selection.  The Proposed Plan was selected because it incorporates management that will improve and sustain properly functioning resource conditions while considering needs and demands for existing or potential resource commodities and values. In the end, resource use is managed by integrating ecological, economic, and social principles in a manner that safeguards the long term sustainability, diversity and productivity of the land.

BLM_0013872

## *All Surface Disturbing Activities*

Stipulations for oil and gas leasing and other surface disturbing activities are referred to throughout the Approved RMP and provide protection to resource values or land uses by establishing authority for delay, site changes, or the denial of operations. The stipulations apply, where appropriate and practical, to all surface-disturbing activities associated with land-use authorizations, permits, and leases issued on BLM lands. As a result, protections for resource values are applied in a consistent manner to all activities. The stipulations are subject to exceptions, modifications, and waivers that are a means of adapting the stipulations to meet changing circumstances. The stipulations in the Approved RMP, along with the exceptions, modifications, and waivers, are provided in Appendix B.

## *Air Quality*

BLM does not have regulatory control over air quality issues on public lands, Tribal or state lands. BLM relies on the agency with jurisdiction over air quality to set regulatory standards and criteria to protect the air quality in a particular area. Once these standards are established, BLM references them in its permitting documents and ensures that all permitted activities on public lands refer to the appropriate agency's standard. With this regulatory framework in place the Approved RMP, by necessity, does not make any air quality decisions. Instead, the Approved RMP references standards set by the State of Utah (Appendix C). Where the State of Utah standards are inapplicable (e.g. over Tribal lands), BLM will work with the Environmental Protection Agency (EPA) to ensure that the appropriate federal standards are included or referenced in permitting documents. Finally, the Approved RMP established goals and objectives for air quality that reflect the standards set by the State or the EPA.

The Approved RMP allows the Monticello FO to ensure that authorizations granted to use public lands and the BLM's own management programs comply with and support applicable local, state, and federal laws, regulations, and implementation plans pertaining to air quality.

## *Cultural Resources*

BLM has completed the formal Section 106 consultation with the Utah State Historic Preservation Office (SHPO). The August 25, 2008, letter from the SHPO concurred with BLM's recommendation of No Adverse Effect from any actions proposed in the Proposed RMP/Final EIS (Appendix D). The Approved RMP will reduce imminent threats to significant cultural resources from natural and human-caused deterioration or potential conflicts with other resources.

The Approved RMP establishes goals, objectives, and management actions that provide for identification, protection, preservation, and use of cultural resources. It ensures that all authorizations for land and resource use will comply with Section 106 of the National Historic Preservation Act (NHPA) and 36 CFR 800. Identification of cultural resources would be enhanced through proactive cultural resources inventories conducted in compliance with Section 110 of NHPA and Section 14 of the Archaeological Resources Protection Act (ARPA). Cultural resource sites and areas would be nominated for listing on the National Register of Historic Places, and sites would continue to be allocated to appropriate uses.

The Approved RMP continues consultation with Native American Tribes to address management concerns, to identify, protect and maintain access to sites and areas for traditional and religious

BLM_0013873

*Monticello Approved Resource Management Plan - Record of Decision*

uses, and to protect burials, burial sites, and sacred items pursuant to the Native American Graves Protection and Repatriation Act (NAGPRA). It also provides for consultations with local communities, and other communities and individuals with traditional linkages to cultural resources on identification and protection of resources. It encourages the development of partnerships to meet management goals, and provides for legitimate research and cooperation with local communities and interested groups to foster heritage tourism.

For law enforcement purposes, the Approved RMP also aligns closely with statute, regulation and policy, such as restricting domestic pets and pack stock from inside important cultural sites, not allowing ropes or other climbing aids to access a cultural site, not allowing camping in a cultural site and closing sites when visitation is risking the integrity of a site or has become a safety hazard.

Management of National Historic sites, districts, landmarks, ACEC's with cultural values, and other culturally sensitive areas as identified as Special Recreation Management Areas (SRMAs) in the Approved RMP, will be facilitated by adopting a variety of specific management actions developed for those areas. One of the outstanding features of the Monticello Field Office is its internationally-known cultural resources. Managing recreation and visitation is the first line of defense in protecting the wealth of cultural resources in the field office. To that end, the Approved RMP creates focal points for recreation and visitation management which will encourage responsible recreation in the area, and respect for the archeological treasures. Monticello has taken a novel approach by imposing recreation and visitor management decisions. Cultural resource management plans (CRMPs) will be developed to define future management. The Approved RMP contains additional management actions designed to protect cultural resources such as implementing cultural resource inventories for designated travel routes. In summary, the cultural resource decisions in the Approved RMP provide the best mix of management actions to identify, protect, preserve and use cultural resources.

## *Fire Management*

The Approved RMP adopts the comprehensive Utah Land Use Plan Amendment for Fire and Fuels Management (9/2005). The Approved RMP establishes criteria for priorities, suppression, wildland fire use, fuels treatments, prevention and mitigation, and emergency stabilization and rehabilitation. The Approved RMP provides for an estimated 5,000 to 10,000 acres of fuels reduction treatments each year.

## *Lands and Realty*

The Approved RMP makes public land available to a variety of rights-of-way (ROWs), permits and alternative energy sources where it is consistent with resource goals and objects and the provisions of the Energy Policy Act and West-Wide Energy Corridor Programmatic EIS. Land tenure adjustments, withdrawal processing, filming permits, trespass resolution, access, easements, rights-of-way, wind and solar development, sale disposal criteria, and transportation and utility corridor procedures are identified and have a variety of management decisions applied to them.

Right-of-way avoidance and exclusion areas are generally consistent with the stipulations identified for oil and gas leasing and other surface-disturbing activities. No surface occupancy (NSO) stipulations are avoidance areas for ROWs; no ROW would be granted in NSO areas unless there are no feasible alternatives. Areas unavailable for oil and gas leasing are generally

BLM_0013874

exclusion areas for ROWs; no ROW would be granted in these areas. Avoidance (133,293 acres) and exclusion (416,115 acres) areas are based on resource needs and policy. These areas encompass lands with sensitive natural resources such as wilderness values, cultural resources, riparian and relict vegetation, and high quality scenery. Some of these areas include the 13 WSAs, riparian habitat, public water reserves, Colorado River Wild and Scenic River (WSR) Suitable Segments 2 & 3, San Juan River Suitable Segment 5, San Juan River SRMA, Hovenweep ACEC, Valley of the Gods ACEC, Shay Canyon ACEC, five non-WSA areas with wilderness characteristics, and Alkali Ridge National Historic Landmark. There are impacts associated with these exclusion/avoidance areas which include restricting the placement of ROWs and facilities, limiting future access, delaying or increasing the cost of energy supplies, and creating communications dead zones or delaying the availability of communications services, among others. However, the designation of exclusion and avoidance areas in the Approved RMP provides a balance between granting rights-of-way and protecting important natural resources.

According to Section 102 (a) of FLPMA, all public lands will be retained in Federal ownership unless it is determined that disposal of a particular parcel will serve the national interest. Furthermore, Section 203 (a) of FLPMA provides for sale of public lands if one of the following criteria is met: (1) the tract is difficult and uneconomic to manage as part of the public lands and is not suitable for management by another Federal agency; (2) such tract was acquired for a specific purpose and the tract is no longer required for that or any other Federal purpose; or (3) disposal of such tract will serve important public objectives, including but not limited to, expansion of communities and economic development that cannot be achieved prudently or feasibly on land other than public land. The public lands in the Monticello Field Office that have been identified for consideration for disposal by sale in the Approved RMP would have to meet one or more of these criteria before they could go out of public ownership.

A prerequisite for entering into the exchange of Federal for non-Federal lands is the BLM determination that such an exchange is in the public interest. To make this determination, general criteria have been developed in the Approved RMP for both disposal of Federal lands and acquisition of non-Federal lands. Every exchange proposal during the life of the Approved RMP will meet the criteria for disposal and acquisition. The value(s) of acquisition must outweigh the value(s) of disposal for the proposal to be in the public interest and an exchange to be considered. The disposal list consists of tracts uneconomic to manage, acquired tracts or public objective tracts suitable for sale under authority of Section 203(a) or 206(a) of FLPMA. It includes tracts suitable for recreation and public purpose (R&PP) patent under authority of the R&PP Act of 1926 and Section 212 of FLPMA. Nominations from the public which met the 203 analysis and made subsequent to the 1991 RMP are also included on the list.

Consistent with the intent of protecting, preserving and maintaining wilderness characteristics of these five areas, lands managed for their wilderness characteristics in the Approved RMP would remain in federal ownership and not be considered for land disposal actions.

Land tenure adjustments (LTAs) (disposals, access, easements, transportation and utility corridors, withdrawals, acquisitions) identified in the Approved RMP would facilitate access within the Monticello PA and adjoining properties, improve the BLM's management ability, reduce conflicts with adjoining landowners and surrounding communities, and accommodate surrounding community needs.

BLM_0013875

In order to preserve sensitive environmental values and protect federal facilities associated with Grand Gulch National Historic District (37,388 acres), all developed recreation sites (232 acres), San Juan River SRMA (9,859 acres), Alkali Ridge National Historic Landmark (2,146 acres), and Colorado River WSR Segment 3 (1,040 acres), the Approved RMP recommends these areas for withdrawal from mineral entry. In summary, the lands and realty decisions in the Approved RMP provide for the best mix of allowable uses and resource protection.

## *Livestock Grazing*

The Approved RMP responds to issues related to managing for sustainable rangelands, functioning riparian areas, and healthy upland vegetation while providing for livestock grazing, fish habitat, and wildlife habitat. The majority of the planning area is made available for livestock grazing, as long as the Standards for Rangeland Health continue to be met. Managing for these Standards on grazing allotments helps ensure for biotic integrity, soil stability, and proper hydrologic functions.

The Approved RMP makes 1,621,515 acres available to grazing, 133,318 acres unavailable to grazing and 6,518 acres restricted to livestock trailing only. This includes making livestock grazing unavailable in the Comb Wash side canyons (Arch, Fish and Owl, Mule, and Road Canyons) in response to a previous Court Order. Other areas such as Bridger Jack Mesa, Lavendar Mesa, Grand Gulch, White Canyon mesa tops, Pearson Canyon, Butler Wash side canyons, Dark Canyon area, Horsehead Canyon, Rone Bailey Mesa, Dodge Canyon, Slickhorn Canyon, and the benches of East and Peters Canyons are unavailable to livestock grazing because of conflicts with recreation uses, ACEC relevant and import values, riparian, relict vegetation conditions, wildlife, and/or cultural resources.

According to BLM policy, decisions regarding authorized livestock use levels and the terms and conditions under which they are managed is an implementation-level decision based on site specific monitoring and inventory of range conditions and evaluation of such data. Therefore, changes in livestock management from the RMP planning level are minimal. Season of use changes within Church Rock, Indian Rock, Owens Dugout, Laws, Bear Trap and Monument Canyon allotments facilitate grazing management and maintain rangeland health standards.

The Approved RMP provides the best balance in authorizing livestock grazing with a sustainable forage source while ensuring the Standards for Rangeland Health are met and protecting important natural and cultural resources.

## *Mineral Resources*

The Approved RMP provides for a variety of mineral exploration and development activities and specifies restrictions for permitted activities to resolve concerns regarding the impacts of these uses. These conditions apply not only to oil and gas leasing, but also to all other surface disturbing activities associated with land-use authorizations, permits, and leases, including other mineral resources, when appropriate. For example, rights-of-way exclusion and avoidance areas are consistent with areas closed to oil and gas leasing and with a no surface occupancy stipulation, respectively.

The Approved RMP manages oil and gas leasing and other surface disturbing activities with the following stipulations: open with standard terms and conditions 484,217 acres; open with moderate terms and conditions (controlled surface use and timing limitations) 740,594 acres;

BLM_0013876

open with no surface occupancy 66,108 acres; and closed to leasing 493,400 acres. As specified in the Energy Policy and Conservation Act and BLM policy, the oil and gas leasing stipulations in the Approved RMP are the least restrictive necessary to protect sensitive resource values while providing for mineral development.

Wilderness Study Areas (WSA) total approximately 389,444 acres within the planning area and are unavailable for leasing by law. WSAs represent nearly 80 percent of the total area closed to leasing and surface disturbing activity. The following areas are unavailable to leasing to protect sensitive resource values: WSAs; certain values associated with Wild and Scenic Rivers; most non-WSA lands with wilderness characteristics (77,534 acres); Valley of the Gods ACEC (22,863 acres); and suitable wild and scenic river segments of the Colorado and San Juan Rivers (3,168 acres). These lands are closed to protect extremely sensitive resources from impacts associated with oil and gas development. Although protection of these values could also be accomplished by a no surface occupancy stipulation, many of the blocks of land were too large to accommodate directional drilling with current technology, and were, therefore, closed. Most of these lands are not in high oil and gas potential areas.

Sensitive resources protected by applying a no surface occupancy (NSO) stipulation in the Approved RMP include riparian areas, soils and vegetation, sensitive visual resource areas, cultural resources, wilderness characteristics, and Gunnison sage-grouse habitat. A no surface occupancy stipulation would apply in the following areas: Dark Canyon non-WSA lands with wilderness characteristics; certain ACECs (Shay Canyon, San Juan River, Lavendar Mesa, Hovenweep [Visual Emphasis Zone] and Indian Creek); Alkali Ridge NHL; Cedar Mesa SRMA-Comb Ridge recreation management zone (RMZ); San Juan River SRMA; floodplains and riparian areas, Gunnison sage-grouse strutting grounds and slopes greater than 40 percent.

Those resources which can be protected by timing limitations (TL) or controlled surface use (CSU) stipulations in the Approved RMP include crucial big game habitat, sensitive soils, and visual resources. Timing limitations and controlled surface use stipulations are also applied in the Approved RMP to special status species and their habitats. The timing limitation stipulations in the Approved RMP are applied to crucial big game habitats identified by the BLM and the Utah Division of Wildlife Resources. The areas with timing limitations are open to oil and gas leasing and other surface disturbing activities but would be closed during identified timeframes that are important to the health of the species such as during winter and birthing periods. Under certain conditions, a waiver, exception or modification may be applied to the stipulation.

A controlled surface use stipulation is applied in the Approved RMP to protect fragile soils on steep slopes from erosion. This stipulation requires a BLM-approved site plan be prepared for any surface-disturbing or construction activity. This plan would include an erosion control strategy, survey and design, and a reclamation plan. In addition, a controlled surface use stipulation in the Approved RMP is often applied to areas managed with VRM Class II objectives. Activities can be seen, but should not attract the attention of the casual observer. The timing limitation and controlled surface use stipulations in the Approved RMP allow for oil and gas development and other surface disturbing activities while providing protection for wildlife habitats, sensitive soils, and high quality visual resources. These stipulations are the least restrictive necessary for the protection of these resources.

The Approved RMP provides for a substantial amount of mineral development within the planning area while protecting the other important resources with the least restrictions necessary.

BLM_0013877

The stipulations imposed in the Approved RMP would not unreasonably interfere with the development of mineral resources. This is because the high development potential areas for mineral resources are generally not located where development is precluded (NSO and Closed areas). Therefore, the Approved RMP provides the best balance between protection of resources and commodity use and development.

## *Recreation*

The Approved RMP responds to recreation issues by providing Special Recreation Management Areas (SRMAs) and Recreation Management Zones (RMZs) to manage visitors. These visitors engage in a variety of non-motorized and motorized recreation activities, many of which conflict with each other. Recreational activities include camping, scenic driving, enjoying natural and cultural features, hiking, backpacking, canyoneering, mountain biking, horseback riding, hunting, rock climbing, BASEjumping, boating (rafting, canoeing, and kayaking), four-wheel driving, rockcrawling, ATVing, and dirt biking.

The San Juan County economy is dependent upon recreation-based businesses. Commercial outfitters operating on BLM lands provide services for many activities including rafting, hiking, climbing, four wheel driving, ATVing, photography tours, horseback riding, ballooning, hunting, canyoneering, and mountain biking. Maintaining a wide variety of recreational opportunities is important to the local economy and the businesses that are dependent upon them and the Approved RMP provides these opportunities.

The seven Special Recreation Management Areas (SRMAs totaling 562,824 acres) designated in the Approved RMP are in areas where high recreation use is currently occurring and focuses on cultural resource protection. Each SRMA allows for distinct recreation uses as well as a specific recreation management strategy. In addition, each SRMA provides management direction for recreation uses as well as protection of the cultural and natural resources found in the SRMA. Establishing recreation management zones (RMZs) in the Cedar Mesa SRMA is necessary to emphasize cultural resource protection, recreation use, and provide a specific set of recreation opportunities. Visitor expectations for specialized recreation experiences are emphasized, thereby reducing potential conflict and resource impacts.

Management prescriptions in the Cedar Mesa SRMA are a combination of the Cultural-SRMA and the ACEC identified and analyzed under other alternatives in the Draft and Proposed RMP and associated EISs. These management prescriptions provide for recreation use as well as resource protection. The recreational use of this SRMA is managed by a permit system in the Cedar Mesa Area. This permit system was established to manage visitation and provide for resource protection, especially for cultural resources. Recreational management zones are established in areas with concentrated visitation and the need for site specific cultural resource protection measures. As an example, the McLoyd Canyon-Moon House Recreation Management Zone establishes a permit system with daily visitor number restrictions and closes some areas of the Moon House cultural site to visitation. This management strategy allows for visitation but greatly reduces the potential conflicts with cultural resources. Other restrictions designed to protect both natural and cultural resources include the requirement for permit holders to view a cultural site visitation video, designation of campsites and hiking trails in certain areas, closure of the canyons to campfires, a carry out human waste policy in the canyons to prevent disturbance to cultural sites, and limits on OHV use (some areas closed and the remainder as designated road/trail areas).

BLM_0013878

The San Juan River SRMA establishes management prescriptions for visitor use while protecting the visitor experience and resources. Visitation to this SRMA is managed through a permit system and averages 40,000 visitor use days annually.

Indian Creek SRMA, an area with increasing visitation from OHV users and rock climbers, is an area that attracts users from around the world. The SRMA management balances use in the corridor while protecting cultural resources. Examples include the closing of climbing routes that are in conflict with cultural or wildlife resources and limiting camping to avoid conflicts with cultural resources and visitor safety.

Areas not included within a SRMA are part of the Extensive Recreation Management Area (ERMA). ERMA management provides for recreation in an undeveloped setting where visitors can experience dispersed opportunities. SRMAs enable the BLM to more actively manage the intensity, diversity, and potential incompatibility of recreation uses while protecting the resources that visitors come to enjoy. The Approved RMP provides the greatest range of recreational opportunities while still reducing user conflicts, providing recreation business opportunities, and protecting resources.

## *Riparian*

The Approved RMP protects riparian and floodplain resources by limiting new surface disturbance and following appropriate management as defined by Bureau policy and guidance such as Utah Riparian Management Policy and technical references. It allows for vegetation and watershed improvements to proactively achieve Utah's Standards for Rangeland Health and riparian/wetland proper functioning condition. Cottonwood and willow communities will continue to be available to Native Americans for harvest.

## *Soil and Water*

The Approved RMP maintains and restores watershed health and function by emphasizing the role of soil and water interactions with public land uses. Compliance with the State of Utah's water quality standards and the Colorado River Salinity Control Act is also ensured by the application of best management practices. Partnerships with the State of Utah, tribal governments and local municipalities will ensure quality water sources for local residents and visitors.

Surface disturbance includes activities that normally result in more than negligible disturbance to public lands and that accelerate the natural erosive process. These activities normally involve use and/or occupancy of the surface, cause disturbance to soils and vegetation, and are usually caused by motorized or mechanical actions. Surface disturbance may result from activities using earth-moving and drilling equipment; geophysical exploration; off road vehicle travel; vegetation treatments; the use of pyrotechnics and explosives; and construction of facilities like powerlines, pipelines, oil and gas wells, recreation sites, livestock facilities, wildlife waters, or new roads. Surface disturbance is not normally caused by casual use. Activities that are not typically surface disturbing include, but are not limited to, proper livestock grazing, cross-country hiking, minimum impact filming and vehicle travel on designated routes.

Waivers, exceptions and modifications apply to all surface disturbing activities including oil and gas. Applying best management practices and standard operating procedures also contribute to proper management of resource values and land uses.

BLM_0013879

## *Special Designations - Areas of Critical Environmental Concern*

Concerns about specific resource values are addressed throughout the Approved RMP, and eliminated the need to designate some areas as Areas of Critical Environmental Concern (ACECs) since the proposed management provides adequate protection. In some instances, WSAs overlay many of the potential ACECs and management under Interim Management Policy for Lands Under Wilderness Review (IMP) more than adequately protected the relevant and important values. If the WSAs are released from wilderness consideration, the Approved RMP states that all activities inconsistent with the goals and objectives of the Approved RMP would be deferred until a plan amendment is completed. Any plan amendment would consider management options for the relevant and important values identified.

Seven ACECs (approximately 73,492 acres) are designated in the Approved RMP: 1) Alkali Ridge (Cultural) 39,196 acres; 2) Hovenweep (Cultural) 2,439 acres; 3) Indian Creek (Scenic) 3,905; 4) Lavender Mesa (Relict Vegetation) 649 acres; 5) San Juan River (Scenic, Cultural, Wildlife, & Natural Systems) 4,321 acres; 6) Shay Canyon (Cultural) 119 acres; and 7) Valley of the Gods (Scenic) 22,863 acres. These ACECs occur in areas where special management is required to protect the relevant and important values of the Potential ACEC. Management actions are detailed in the Approved RMP to protect these values. Establishing these areas as ACECs gives priority to the management of the identified resource values. Since standard management contained in the Approved RMP protects the relevant and important values in the planning area, only seven areas were designated as ACECs where additional special management is necessary. The following table (Table 2) identifies acreage balances (remaining) and subsequent management protections for areas not carried forward into the Approved RMP for the selected ACECs:

**Table 2: Relevance & Importance Criteria and Management Prescriptions for Potential ACEC Acreages Not Designated**

| Potential ACEC Acreages Not Designated | Relevant & Important Criteria | Management Protection for Relevant and Important Values |
|---|---|---|
| Alkali Ridge (6 Acres) | Cultural | This acreage difference is associated with mapping precision associated with GIS technology. The 1991 RMP data were estimated and the current data are based on GIS calculations. Cultural resources will continue to be protected by existing laws, rules, regulations and policies. Thus relevant and important values will continue to be protected. |
| Indian Creek (4,602 Acres) | Scenic | The original ACEC included the Indian Creek WSA. The WSA portion has been excluded from the ACEC and will be managed according to IMP which includes VRM I management. Thus relevant and important values will continue to be protected. |
| San Juan River (3,269 Acres) | Scenic, Cultural, Wildlife & Natural Systems | Segment #5 was recommended as suitable for WSR designation and the ACEC designation was removed. The SRMA designation is retained for this segment. Management prescriptions include VRM I, closed to oil and gas leasing and OHV use, recommended for withdrawal and excluded from ROWs. Cultural resources will continue to be protected by existing laws, rules, regulations and policies. These prescriptions will provide continued protection for the relevant and important values. |
| Shay Canyon (3,442 Acres) | Cultural | This area will be managed under prescriptions which include VRM II, designated roads/trails for OHV use, controlled surface use for oil and gas leasing, closure of rock climbing routes that impact cultural sites and prohibition of camping and surface disturbing activities in the Indian Creek riparian zone. Cultural |

BLM_0013880

| | | resources will continue to be protected by existing laws, rules, regulations and policies. These prescriptions will continue to protect the relevant and important values. |
|---|---|---|
| Valley of the Gods (8,524 Acres) | Scenic | The Valley of the Gods Special Emphasis Area of the Cedar Mesa ACEC included part of the Road Canyon WSA. The boundary of the new ACEC was redrawn to match the boundary of the WSA and thereby exclude any portion of the WSA. Since management of the new ACEC and existing WSA are both VRM Class I, there is no change in visual management for the excluded area. Thus relevant and important values will continue to be protected. |

The following table (Table 3) provides a list of the potential ACECs that were not designated in the Approved RMP, their relevant and important criteria, and planning decisions carried forward that protect those criteria.

**Table 3: Relevant & Important Criteria and Management Prescriptions for Potential ACECs Not Designated**

| Potential ACEC Not Designated | Relevant & Important Criteria | Management Protection for Relevant and Important Values |
|---|---|---|
| Bridger Jack Mesa | Near Relict Vegetation | The area lies entirely within the Bridger Jack Mesa WSA and will be managed according to IMP. It is unavailable for livestock grazing and private/commercial use of woodland products. Campfires are restricted to fire rings. Recreation use is subject to the Indian Creek SRMA provisions. Thus relevant and important values will continue to be protected. |
| Butler Wash North | Scenic | The area lies entirely within a WSA and will be managed according to the IMP. It is unavailable for private and commercial use of woodland products, except for limited onsite collection for campfires. Livestock grazing may be limited if cultural resources are being impacted. It is closed to OHV use and will be managed to meet VRM Class I objectives. Thus relevant and important values will continue to be protected. |
| Cedar Mesa | Fish and Wildlife, Cultural and Scenic | Cedar Mesa will be managed as a SRMA with three specific recreational management zones created to protect cultural resources by managing visitors. Although the former Cedar Mesa ACEC is not carried forward, the area is now included in the larger Cedar Mesa SRMA in the Approved RMP. Management prescriptions that were listed for the ACEC and the proposed C-SRMA have been added to the SRMA in their entirety and these management prescriptions are sufficient to protect cultural resources. Protective management that addresses cultural resources include:

WSAs make up 71 percent of the former Cedar Mesa ACEC. These WSAs are managed under the IMP which includes closure to oil and gas leasing and OHV use and management as VRM I. These management prescriptions provide protection for cultural resources and scenic values.

The area that is currently managed for its scenic resources outside the WSAs in the previous Cedar Mesa ACEC was the Valley of the Gods. This area is carried forward as its own ACEC in the Approved RMP and will be managed as VRM I, which provides the same NSO provisions. These prescriptions will protect the visual resources of the area.

The McLoyd Canyon-Moon House RMZ establishes a user permit system, limits the number of visitors and closes portions of the Moon House site to entry to protect cultural resources.

Recreational Management Zones (RMZ) are established in the SRMA to manage visitation and establish site specific cultural |

BLM_0013881

*Monticello Approved Resource Management Plan - Record of Decision*

| | | |
|---|---|---|
| | | resource protection measures. These zones include: the Grand Gulch NHD RMZ, Comb Ridge RMZ and McLoyd Canyon-Moon House RMZ.

Recreation use in the Cedar Mesa Grand Gulch NHD RMZ continues to be managed by a permit system for backcountry use.  Without the permit system, overuse of the area has the potential to impact high density, world-renowned cultural resources. Restrictions and management prescriptions are intended to minimize impacts from this recreation use on cultural resources.  In addition to the management prescriptions for this zone, the Grand Gulch NHD has additional cultural resource protective measures to reduce impacts from recreational users on cultural resources.

Cultural resources will continue to be protected through existing laws, rules, regulations and policies.

Wildlife relevant and important values in the previous ACEC were confined to Arch Canyon.  There were no special conditions in that ACEC specific to the wildlife species recognized.  New management prescriptions in the SRMA include restrictions on organized and commercial OHV groups preventing OHV travel in the upper ½ mile of the canyon during the breeding and nesting season for Mexican spotted owls.  Thus relevant and important values will continue to be protected. |
| Dark Canyon | Scenic and Fish and Wildlife | Dark Canyon (61,660 acres) is not carried forward as an ACEC but will be managed under IMP as the entire proposed ACEC is within the Dark Canyon WSA.  Management under IMP includes closure to oil and gas leasing and OHV use. Other management prescriptions, such as VRM I maintain the natural character of the landscape.  Scenic qualities will be adequately protected. These management prescriptions will also protect wildlife values for the Mexican spotted owl, an endangered species and the peregrine falcon.  In addition, the canyons of this area occur within the Dark Canyon SRMA.   Limits on recreation group sizes and trip numbers will minimize disturbance to these wildlife species.  Furthermore, Dark Canyon is carried forward as suitable for wild and scenic river designation as wild.  Management prescriptions for this river segment are the same or similar to those listed above.   Thus relevant and important values will continue to be protected. |
| Lockhart Basin | Scenic and Cultural | Lockhart Basin is not carried forward as an ACEC but relevant and important values will be protected.  The area will be managed under VRM Class I and II designations to protect or minimize impacts to visual resources. VRM Class I areas within the area include: the Indian Creek WSA (6,870 acres), Indian Creek ACEC (3,908 acres) and Colorado River segment #3 (1,040 acres) managed as suitable for wild and scenic river designation. The remainder of the area in the proposed ACEC (44,475 acres) will be managed as VRM II.  Additionally, the oil and gas leasing categories of closed in the WSA and Colorado River segment #3, and NSO in the Indian Creek ACEC will also protect visual values on 21 percent of the potential ACEC. Cultural resources will be protected with these same closed and NSO lease categories as well as the controlled surface use category which provides for avoidance of cultural sites in the remainder of the area.  Cultural resources will continue to be protected by managing OHV use through route designation in the majority of the area, and through existing laws, rules, regulations and policies.  Prior to approval of actions which may |

BLM_0013882

*Monticello Approved Resource Management Plan - Record of Decision*

| | | |
|---|---|---|
| | | affect cultural resources, Class III inventories and consultation with SHPO will occur. |
| Scenic Highway Corridor | Scenic | In reevaluating the previous ACEC for this planning effort, BLM determined that the scenic qualities along the highway corridors do not meet the ACEC criteria.  BLM determined that the viewsheds along the corridors are not uncommon and are typical of those found throughout the Colorado Plateau.  Therefore, this ACEC will not be carried forward. |

## *Special Designations - Wild and Scenic Rivers*

There are four eligible river segments (Colorado River Segments 2 & 3, Dark Canyon, and San Juan River Segment 5) that are carried forward as suitable for inclusion into the National Wild and Scenic River (NW&SR) system.  These areas are included in the Approved RMP to protect the free-flowing nature and outstandingly remarkable values associated with the river segments.

Eligible river segments that were not carried forward as suitable in the Approved RMP are generally protected by various other management decisions.  Many of these river segments include scenery, cultural, ecological, fish, wildlife and non-motorized recreation as outstandingly remarkable values (outstandingly remarkable values).

River segments are classified as "wild," "scenic" or "recreational."  BLM Manual 8351.33C states that "Alternatives may be formulated for any combination of designations and classifications.  Reasons for considering alternative tentative classifications include resolving conflicts with other management objectives, continuity of management prescriptions, or other management considerations."  In some cases, the tentative classification of a river segment was changed in order to accommodate other management considerations and to provide more management flexibility, as necessary.

Colorado River Segments 2 and 3 are recommended as scenic segments suitable for inclusion into the NW&SR system.  Segment 3 was originally inventoried with a tentative classification of wild in the DRMP/DEIS, but this was changed to a scenic classification due to the presence of motorized use on the river and to provide consistency in management with the Moab Field Office's management of the north side in their Approved RMP.  Outstandingly remarkable values (ORVs) include scenic, fish, recreation, wildlife, cultural and ecological values.  These segments are some of the most scenic river segments in the nation and are commonly used by motorized and non motorized boaters as a destination or on their way to Canyonlands National Park.  Internationally known, these segments attract approximately 12,000 boaters per year.  National river organizations and the National Park Service support including these segments in the NW&SR system.

Dark Canyon is recommended as a wild segment suitable for inclusion into the NWSR system and this designation would highlight and protect one of the most outstanding stream corridors in the region.  Outstandingly remarkable values include scenic, recreation and wildlife values.  A truly wild segment, it receives less than 1,000 visitors a year.  This segment is an internationally recognized area known for rugged terrain, primitive recreation, and habitat supporting a broad array of wildlife.  Ownership within the corridor is 100 percent BLM and support is high from national river organizations and other agencies to include this in the NW&SR system.

San Juan River Segment 5 is recommended as a wild segment suitable for inclusion into the NW&SR system, and this designation would highlight and protect the outstandingly remarkable

BLM_0013883

values of one of the most outstanding river corridors in the nation. Outstandingly remarkable values include scenic, fish, recreation, geologic, wildlife and ecological values. The segment is classified as wild because it is free of impoundments and the shoreline is primitive with no or few human intrusions. With canyon walls over 1,200 feet high, this segment is one of the deepest canyons in the region. Internationally known, this segment has approximately 6000 visitors a year. Support to include this in the NW&SR system is high from national river organizations and the National Park Service.

### *Segments not recommended for inclusion into the National Wild and Scenic River System*

The eligible river segments not carried forward as suitable into the Approved RMP will not be protected as eligible river segments. The free flowing character and outstandingly remarkable values associated with these eligible segments will not be considered in the context of the National Wild & Scenic River system.

#### *Colorado River Segment 1*

The tentative classification for this eligible segment was recreational and the outstandingly remarkable values include scenic, fish, recreation, wildlife, cultural and ecological values. This segment was not selected for inclusion in the NW&SR system since only 35 percent of this segment is BLM administered land and half of the side of the river opposite to the BLM managed lands is private land. Directly across the river from this segment is a large industrial development that decreases the value of this segment as a wild and scenic river.

This land ownership pattern was considered problematic to effective management of this section of the river as a WSR. BLM's riparian management policy and threatened and endangered species conservation measures will afford protection of many of the outstandingly remarkable values. Management under controlled surface use stipulation will also help protect these values.

#### *Indian Creek*

The tentative classification for this eligible segment was recreational and the outstandingly remarkable value includes cultural. This segment was not selected for inclusion in the NW&SR system and will be managed by other management tools. Those include restrictive visual resource management objectives, OHV travel limited to designated roads and trails, special stipulations for oil and gas leasing, and limits on surface disturbing activities, camping and woodland harvest. This segment is 6.5 miles with 4.8 administered by the BLM. Management for this segment as a wild and scenic segment would be complicated by the land ownership pattern.

#### *Fable Valley*

The tentative classification for this eligible segment was scenic and the outstandingly remarkable values include wildlife and ecological values. This segment was not selected for inclusion in the NW&SR system as it is within the Dark Canyon WSA and SRMA and the outstandingly remarkable values can be adequately protected under IMP and SRMA management. These include VRM Class I, closure to OHV use and oil and gas leasing, livestock grazing restrictions, limits on recreational group size, and prohibition of campfires.

#### *San Juan River Segment 1*

BLM_0013884

*Monticello Approved Resource Management Plan - Record of Decision*

Tentative classification for this eligible segment was recreational and outstandingly remarkable values include fish, wildlife, historical and cultural values. This segment was not selected for inclusion in the NW&SR system and will be managed by other management tools. Those include VRM and the management prescription found in the designated SRMA and ACEC. Protection for the outstandingly remarkable values was considered to be more appropriately managed under an SRMA and ACEC designation. Management prescriptions for these designations include limits on rafting, restrictions on oil and gas leasing, limits on recreation use if wildlife are being impacted and protection of cultural sites through restrictions on recreation use. These designations generally apply to a larger area than would be possible to protect under a WSR designation. This segment is 15.3 miles with 8.5 administered by the BLM. Management for this segment as a wild and scenic river would be complicated by the land ownership pattern.

### *San Juan River Segment 2*

Tentative classification for this eligible segment was recreational and outstandingly remarkable values include scenic, fish, recreation, wildlife, historical, cultural and ecological values. This segment was not selected for inclusion in the NW&SR system and will be managed by other management tools. Those include restrictive VRM objectives and the management prescriptions found in the designated SRMA and ACEC. Protection for the outstandingly remarkable values was considered to be more appropriately managed under an SRMA and ACEC designation. Management prescriptions for these designations include limits on rafting, restrictions on oil and gas leasing, limits on recreation use if wildlife are being impacted and protection of cultural sites through restrictions on recreation use. These designations generally apply to a larger area than would be possible to protect under a WSR designation.

### *San Juan River Segment 3*

Tentative classification for this eligible segment was wild and outstandingly remarkable values include scenic, fish, recreation, geologic, wildlife, and ecological values. This segment was not selected for inclusion in the NW&SR system and will be managed by other management tools. Those include restrictive VRM objectives and the management prescriptions found in the designated SRMA and ACEC. Protection for the outstandingly remarkable values was considered to be more appropriately managed under an SRMA and ACEC designation. Management prescriptions for these designations include limits on rafting, restrictions on oil and gas leasing, limits on recreation use if wildlife are being impacted and protection of cultural sites through restrictions on recreation use. These designations generally apply to a larger area than would be possible to protect under a WSR designation.

### *San Juan River Segment 4*

Tentative classification for this eligible segment was recreational and outstandingly remarkable values include scenic, fish, recreation, wildlife, and ecological values. This segment was not selected for inclusion in the NW&SR system and will be managed by other management tools. Those include restrictive VRM objective and the management prescriptions found in the designated SRMA and ACEC. Protection for the outstandingly remarkable values was considered to be more appropriately managed under an SRMA and ACEC designation. Management prescriptions for these designations include limits on rafting, restrictions on oil and gas leasing, limits on recreation use if wildlife are being impacted and protection of cultural sites

BLM_0013885

through restrictions on recreation use.  These designations generally apply to a larger area than would be possible to protect under a WSR designation.  This segment is 5.3 miles with 4.2 administered by the BLM.  Management for this segment as a Wild and Scenic Segment would be complicated by the land ownership pattern.

*Arch Canyon*

The tentative classification for this eligible segment was recreational and the outstandingly remarkable values include wildlife, fish, cultural, ecological and recreation.  This segment was not selected for inclusion in the NW&SR system and will be managed by other management tools.  Those include VRM, travel restrictions (designation of one OHV route), camping restrictions, closure to campfires, closed to livestock grazing and the management prescriptions that are outlined in the Cedar Mesa SRMA which includes Arch Canyon.  This segment is 7.7 miles with 6.9 administered by the BLM.  Management for this segment as a Wild and Scenic Segment would be complicated by the land ownership pattern.

BLM looks forward to working with the State of Utah, local and tribal governments, and other federal agencies during the next phase of the Wild and Scenic River process.  BLM will work cooperatively with the above entities in a statewide study to reach consensus regarding recommendations to Congress for the inclusion of rivers into the NWSR system.  BLM will also continue to work with affected local, state, federal, and tribal partners to identify in-stream flows necessary to meet critical resource needs, including values related to the subject segments, so that they may be identified for inclusion into future recommendations to Congress.

## Special Designations – Historic Trails

The Approved RMP continues management and coordination with NPS and other managing agencies on the Old Spanish National Historic Trail, as well as, efforts among the SHPO, Native American Tribes on the Hole in the Rock Trail.  Landmarks or features on segments of each trail would be identified and classified for historic integrity and condition.  Interpretation would only be implemented if it maintains the trail's integrity.

## Non-WSA Lands with Wilderness Characteristics

Impacts on uses as a result of focused management, such as the protection, preservation and maintenance of non-WSA lands with wilderness characteristics, were disclosed in the Proposed RMP/Final EIS, and considered in conjunction with impacts to resource values.  There are 88,871 acres within 5 areas (Dark Canyon, Mancos Mesa, Nokai Dome West, Nokai Dome East and Grand Gulch) that are carried forward in the Approved RMP for protection of their wilderness characteristics.  Mancos Mesa, Nokai Dome West, Nokai Dome East and Grand Gulch are unavailable for oil and gas leasing.  Dark Canyon is available subject to a no surface occupancy stipulation that cannot be waived, excepted or modified.  All 88,871 acres will be managed as avoidance areas for rights-of-way.

Areas selected for management of wilderness characteristics have a lower potential for mineral development than other areas in the Monticello Field Office as well as limited conflict with other resources.  These areas are without roads which makes them more suitable for effectively protecting, preserving, and maintaining their wilderness character.  Grand Gulch is managed as part of the Cedar Mesa SRMA for primitive recreation and coincides perfectly with managing this area for wilderness characteristics.

BLM_0013886

There were many areas found to have wilderness characteristics during the inventory reviews and not selected for management of those characteristics in the Approved RMP. The reasons for this decision were varied and complex. In most cases it was because those lands were found to have other important resources or resource uses that conflict with protection, preservation, or maintenance of the wilderness characteristics. For example, some lands have existing leases that may be developed in the near future, or there may be mining claims that could be developed. In other instances, even though no valid existing rights encumbered these lands, potential for future development led to a different conclusion. Areas were not selected because they contained valid and existing rights, high mineral potential, were being managed for other uses such as right-of-way corridors, contained mechanical vegetation treatments, or are left open for firewood collection. These uses were considered as the priority when compared to protection, preservation and maintenance of the wilderness characteristics. The Approved RMP provided the best balance in allowing for uses to occur while providing for protection of resource values and public health and safety.

In future references, lands managed in the Approved RMP as non-WSA lands with wilderness characteristics will be referred to as BLM natural areas. This change does not represent a new designation or a new decision. Rather, BLM wants to recognize these discretionary decisions with a better, simpler reference. Wilderness Areas and Wilderness Study Areas are formal designations that are managed in a prescribed manner. To avoid confusing these official designations with discretionary agency decisions, BLM has chosen a new reference to distinguish between formal designations (e.g., Wilderness Areas) and a discretionary management category (BLM natural areas). According to the Approved RMP, BLM natural areas will be managed to protect, preserve, and maintain values of primitive recreation, the appearance of naturalness and solitude.

## *Travel Management*

The Approved RMP responds to the issue of OHV use by designating all BLM lands as closed or limited to off highway vehicle use. Within the planning area, 1,388,191 acres will be limited to designated routes, and 393,895 acres as closed to motorized travel. There are no acres open to cross-country travel. The Approved RMP designates 2,820 miles of routes open to vehicle use and closes 316 miles of routes to recreational vehicle use.

The limited area designation (1,388,191 acres) in the Approved RMP applies to the majority of the planning area. The Approved RMP responds to travel management and access issues by providing a network of transportation routes within the limited designation that tie into roads administered by the counties, National Park Service, the Forest Service, and the State of Utah. The process for designating routes within the Limited designation is detailed in Section D under Implementation Decisions. The limited designation in the Approved RMP replaces the large amount of area currently available for cross country travel within the planning area. As a result, the Approved RMP provides a substantial amount of protection to natural (vegetation, soils, scenery, riparian, and wildlife) and cultural resources by eliminating cross-country travel which is detrimental to these resources. The Approved RMP allows for motorized access and opportunities within the limited designation while providing protection for sensitive resources and non-motorized recreation users.

The closed areas (393,895 acres) in the Approved RMP apply primarily to the existing Wilderness Study Areas (WSAs), Lavender Mesa and Indian Creek ACECs, and portions of the

BLM_0013887

*Monticello Approved Resource Management Plan - Record of Decision*

San Juan River and Tank Bench SRMAs. All of the inventoried routes within the WSAs would be closed to recreational motorized travel, with the exception of .08 miles of a route in Fish Creek WSA that accesses the Moon House ruin. This way would remain available for motorized use on a conditional basis. As a result, the opportunities for solitude and primitive recreation would be enhanced and the potential for impairment of wilderness values by motorized activities is eliminated. In addition, by closing the two ACECs and portions of the two SRMAs, relict vegetation, sensational scenic values, and high density and unique cultural resources would be protected. In summary, the areas designated in the Approved RMP as limited and closed to OHV use provide the best balance between OHV opportunities and protection of sensitive resources.

## *Vegetation*

The Approved RMP responds to issues regarding noxious weeds and invasive species by utilizing BLM's integrated pest management strategies (combined use of mechanical, cultural, chemical, manual, biological, and preventative measures). This decision to control invasive, non-native plant species through a comprehensive weed management program will aid in the reduction of vegetative degradation that result from accelerated establishment of noxious and invasive species. The BLM emphasis on re-establishment and restoration of vegetated areas during surface disturbing project activities will assist in the control of non-native, invasive plant species. Also, the commitment to the management of landscapes as outlined in the *Standards for Rangeland Health and Guidelines for Grazing Management* will further ensure biotic integrity and enhanced competitive interaction against undesired invasive plants. Vegetative treatments will be focused where objectives of enhanced ecological condition and stability can best be met. The RMP also manages for plant communities that provide a sustainable forage base.

## *Visual Resource Management*

The Approved RMP establishes VRM management class designations that are the result of a synthesis and balance of other proposed resource and land management actions with the visual resource inventory of scenic quality, visual resource values and viewer sensitivity. For visual resources, VRM Class I objectives are the most restrictive and protective of these resources. To protect scenic values, WSAs, some ACECs and wild sections of wild and scenic rivers are managed for protection of visual resources. There is an expectation from visitors that these scenic qualities of a primarily pristine and undeveloped landscape will be maintained through appropriate management. All WSAs, Valley of the Gods and Indian Creek ACECs are examples of areas which are managed as VRM I. Such management is compatible with retention of naturalness in WSAs and outstanding scenery in such high visitation areas as Valley of the Gods and certain segments of the Colorado and San Juan Rivers.

Areas designated to be managed under VRM II objectives would also retain scenic quality but would allow minor changes to the landscape. Examples include the Indian Creek Corridor and Comb Ridge Management Zone of the Cedar Mesa SRMA. Both of these areas are popular with car-camping and/or day-hiking recreationists. Such activities are compatible with VRM II management.

Areas to be managed under VRM III or IV objectives include: Montezuma Canyon basin, Dry Valley and Red Canyon. These areas have important utility developments, oil and gas or other

BLM_0013888

mineral developments and potential for further development of these resources. Many of these surface disturbing developments would not be possible under more restrictive VRM classes.

## *Wildlife and Fisheries*

The Approved RMP responds to issues regarding wildlife by providing restrictions to uses in crucial wildlife habitat areas. BLM uses the UDWR crucial habitat boundaries to apply these restrictions because UDWR is the entity with jurisdiction and expertise over wildlife in Utah. The crucial habitat identified in the Approved RMP for deer, elk, bighorn sheep and pronghorn antelope is the result of the state's combination of two previous UDWR categories of habitat – "critical" and "high value". The state uses the term "crucial" habitat as a trigger to initiate a close examination of proposed projects in order to determine the appropriate management response. Timing limitations on surface disturbing activities are prescribed for 453,388 acres of desert bighorn sheep habitat, 29,365 acres of pronghorn habitat 383,098 acres of deer habitat and 97,471 acres of elk habitat. BLM and the state recognize that some of the land within the defined area, depending on season and timing, may not support the respective species for various reasons. The BLM will coordinate with the state on issues related to crucial habitat to determine stipulations necessary to address impacts to the subject wildlife species. Following consultation, the BLM may grant an exception, modification, or waiver. BLM and the state will execute a protocol to implement this provision.

The Approved RMP maintains and enhances aquatic and terrestrial habitats that support numerous species. Land use authorizations would be required to conform to seasonal, noise and disturbance restrictions as well as reclamation of disturbance where applicable. The Approved RMP provides restrictive stipulations necessary to protect wildlife and fisheries while still allowing for resource uses. In addition, the Approved RMP provides for construction and/or implementation of habitat improvements. The RMP also provides for the continued cooperation and support to UDWR for introduction, transplantation, augmentation and reestablishment of native and naturalized wildlife species.

## *Special Status Species*

Protective management measures have been developed in coordination with the U.S. Fish and Wildlife Service and the UDWR to protect special status species within the planning area, including those that are threatened or endangered. Informal Section 7 consultation, as directed by the Endangered Species Act, subsequent regulations, and BLM policy, was conducted with the U.S. Fish and Wildlife Service (USFWS) throughout the development of the RMP. The BLM submitted a Biological Assessment (BA) and requested initiation of formal consultation on September 30, 2008. On October 27, 2008, a letter was sent to the USFWS, which constituted an amendment to the BA. The amendment included minor modifications and clarifications to the proposed plan as a result of protests, continued internal review, and acreage corrections. The USFWS responded with a Biological Opinion (BO) on October 29, 2008 completing the formal section 7 consultation process. The BO concurred with the determinations made in the BA regarding potential effects on listed threatened and endangered species located within the planning area. The BO is part of the Approved RMP as Appendix E and on the attached CD-ROM. The BA and the BO contain committed conservation measures that have been incorporated into the ROD and will be a part of the implementation of the Approved RMP. These are committed measures that will be included within special status species habitat or potentially suitable habitat as part of the proposed action of any subsequent site specific activities

BLM_0013889

authorized by the RMP. Should any changes be made in any of the conservation measures identified in the BA and BO, Section 7 consultation with USFWS will be re-initiated.

The BLM, in coordination with the USFWS developed the majority of these committed conservation measures as part of a programmatic Section 7 consultation that was completed in 2007. Some modifications and additional measures were developed during the consultation process specific to the Monticello RMP. All site specific level actions potentially impacting listed species or their critical, suitable or potentially suitable habitat will implement these measures. Incorporating these measures will ensure that the BLM is in compliance with the Endangered Species Act and will meet necessary management and recovery goals. If BLM determines that any deviations, modifications, or waiver of these conservation measures may be necessary on a given project, re-initiation of Section 7 consultation with USFWS will be necessary. BLM notes that the Biological Opinion (Appendix E and attached CD-ROM), provides a number of recommended conservation measures that are beyond the scope of this Approved RMP, but may be considered in tiered consultation with this programmatic opinion when project-specific analysis is conducted in the future. These recommended conservation measures are optional measures, additional to the committed conservation measures contained in the Approved RMP that BLM will consider at the appropriate time and as deemed necessary to manage and recover listed and candidate plant and animal species occurring within the planning area.

The approved RMP also incorporates resource protection measures and recommended Best Management Practices to maintain, protect, and enhance habitats that will support a diversity of non-listed sensitive fish, wildlife, and plant species. The intent of these measures is to achieve and maintain suitable habitat for desired population levels and distribution within the area covered by the RMP. The BLM will continue to work cooperatively with UDWR (which has jurisdiction over sensitive wildlife species) to maintain and establish crucial habitat management strategies as reflected in the approved RMP. These species are managed as necessary to protect them and their habitat from loss in accordance with the FLPMA, BLM management guidelines, and policy contained in the BLM 6840 Manual.

## *Woodlands*

The Approved RMP addresses issues regarding management of forest and woodland products to provide for sustainable personal and commercial harvesting opportunities, maintain woodland integrity, fish and wildlife habitat, biotic health, and reduced fuel load. Management of woodlands is focused where treatments and harvesting assists in ensuring ecological diversity, stability, and sustainability. The Approved RMP provides for use of forest and woodland product resources and ensures public safety in high value and/or high risk situations. Management decisions also allow for traditional Native American firewood harvesting opportunities within a reasonable range of the Navajo Reservation, as well as for collection of cottonwood and willow for ceremonial purposes. For these reasons, the forest and woodland harvest decisions in the Approved RMP allow for the most appropriate mix of uses while protecting sensitive resources.

BLM_0013890

*Monticello Approved Resource Management Plan - Record of Decision*

## G.   CONSISTENCY AND CONSULTATION REVIEW

Consistency of the Approved RMP with other local, State, Tribal and federal plans and policies (which sometimes conflict amongst themselves) was also considered as a factor in selection of the Approved RMP.  The Approved RMP is consistent with plans and policies of the Department of the Interior and Bureau of Land Management, other federal agencies, state government, and local governments to the extent that the guidance and local plans are also consistent with the purposes, policies, and programs of federal law and regulation applicable to public lands. Chapter 5 of the Proposed RMP/Final EIS provides a full discussion of consistency with all involved entities.

### *Governor's Consistency*

The Governor's Office did not identify any inconsistencies concerning state or local plans, policies, and programs following the 60-day Governor's Consistency Review of the Proposed RMP/Final EIS (initiated September 5, 2008, in accordance with planning regulations at 43 CFR Part 1610.3- 2(e), and concluded on November 4, 2008).

### *NHPA Section 106 Consultation*

The Utah State Historic Preservation Office (SHPO) provided comments on the Draft DRMP/EIS that were contained in the comment letter from the State of Utah.   These comments were considered in developing the Proposed RMP/Final EIS, and additional coordination and consultation with the SHPO ensued.  A letter was received from the Utah SHPO on August 25, 2008, after reviewing BLM's decisions in the Proposed RMP/Final EIS.  In the letter, the SHPO concluded that the decisions in the Proposed RMP will have no adverse affects on historic properties.  Because there has been no appreciable change between the Proposed RMP and the Approved RMP, no further SHPO consultation is required and all decisions in the Approved RMP will have no adverse affects on historic properties.   The letter of concurrence from the SHPO is found in Appendix D.

### *Native American Consultation*

Consultations with Native Americans on the plan have been ongoing since 2003.  Consultations conducted prior to release of the DRMP/EIS for public review are described in detail in Chapter 5 (5.2.1) of the DRMP/EIS and will not be repeated here.  The DRMP/EIS was sent to the tribes for review and comment on November 5, 2007.  Monticello FO received comments from three tribes, the Hopi Tribe, the Navajo Nation, and the Ute Mountain Ute Tribe.  Tribal concerns related to the DRMP/EIS were focused on the following:

1.  Maintaining access for collection of plants for medicinal, spiritual, and sustenance uses,
2.  Protection of the cultural resources in the Allen and Cottonwood Canyon areas which are important to the culture and history of the White Mesa Utes.
3.  Allocation of sites for scientific use.
4.  Ongoing consultation on selection and allocation of sites for interpretive development, educational, public, and scientific uses.
5.  Inadvertant discoveries.

BLM provided additional clarification or modifications in developing the PRMP to address these concerns.  None of the tribes filed a protest.

BLM_0013891

### *Section 7 Consultation Under the Endangered Species Act*

Informal Section 7 consultation, as directed by the Endangered Species Act (ESA), subsequent regulations, and BLM policy, was conducted with the U.S. Fish and Wildlife Service (USFWS) throughout the development of the RMP. Formal consultation with the USFWS was initiated on September 30, 2008. As required by Section 7(a) of the ESA, the Monticello Field Office prepared a Biological Assessment (BA) to evaluate the listed species in its planning area. The BA analyzed the potential impacts on six endangered, two threatened, and one candidate species which could result from implementing management actions authorized under the proposed land use plan for the Field Office. The Monticello Field Office determined that some of the proposed actions "may affect, and are likely to adversely affect" the listed species and "may affect" designated critical habitat. On October 27, 2008, a letter was sent to the USFWS, which constituted an amendment to the BA. The amendment included minor modifications and clarifications to the proposed plan as a result of protests, continued internal review, and acreage corrections. After the review of the BA and associated amendment, the USFWS prepared a Biological Opinion (BO), in which they concurred with BLM's determination on October 29, 2008, and is included in Appendix E and the attached CD-ROM. The USFWS further determined that implementation of the RMP, including committed mitigation measures, would not jeopardize the existence of any of the listed species.

## H.   MITIGATION MEASURES

Measures to avoid or minimize environmental harm were built into the Approved RMP where practicable. Many of the standard management provisions will minimize impacts when applied to activities proposed in the planning area. The *Utah Standards and Guidelines for Rangeland Health* (Appendix F) will be used as the base standards to assess the health of BLM lands in the planning area. Best management practices (BMPs) will be used (when applicable) for a number of uses including livestock grazing, forest activities, mining, oil and gas development, and other surface disturbing activities (Appendix G). Additional measures to mitigate environmental impacts may also be developed during subsequent NEPA analysis at the activity level planning and project stages. Throughout the decisions in the Approved RMP, mitigation was used as a means to avoid and minimize environmental harm.

## I.   PLAN MONITORING AND EVALUATION

Monitoring is the repeated measurement of activities and conditions over time. Evaluation is a process in which the plan and monitoring data are reviewed to see if management goals and objectives are being met and if management direction is sound. Monitoring data gathered over time is examined and used to draw conclusions on whether management actions are meeting stated objectives, and if not, why. Conclusions are then used to make recommendations on whether to continue current management or what changes need to be made in management practices to meet objectives.

The two types of monitoring that are tied to the planning process include implementation and effectiveness monitoring. Land use plan monitoring is the process of (1) tracking the implementation of land use planning decisions and (2) collecting and assessing data/information necessary to evaluate the effectiveness of land use planning decisions. The two types of monitoring are described below.

BLM_0013892

*Monticello Approved Resource Management Plan - Record of Decision*

***Implementation Monitoring:*** Implementation monitoring is the most basic type of monitoring and simply determines whether planned activities have been implemented in the manner prescribed by the plan. Some agencies call this compliance monitoring. This monitoring documents BLM's progress toward full implementation of the land use plan decision. There are no specific thresholds or indicators required for this type of monitoring.

***Effectiveness Monitoring:*** Effectiveness monitoring is aimed at determining if the implementation of activities has achieved the desired goals and objectives. Effectiveness monitoring asks the question: Was the specified activity successful in achieving the objective? This requires knowledge of the objectives established in the RMP as well as indicators that can be measured. Indicators are established by technical specialists in order to address specific questions, and thus avoid collection of unnecessary data. Success is measured against the benchmark of achieving desired future conditions established by the plan.

Regulations at 43 CFR 1610.4-9 require that the proposed plan establish intervals and standards, as appropriate, for monitoring and evaluation of the plan, based on the sensitivity of the resource decisions involved. Progress in meeting the plan objectives and adherence to the management framework established by the plan is reviewed periodically. CEQ regulations implementing NEPA state that agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases (40 CFR 1505.2(c)). To meet these requirements, the BLM will review the plan on a regular schedule in order to provide consistent tracking of accomplishments and provide information that can be used to develop annual budget requests to continue implementation.

Land use plan evaluations will be used by BLM to determine if the decisions in the RMP, supported by the accompanying NEPA analysis, are still valid. Evaluation of the RMP will generally be conducted every five years per BLM policy, unless unexpected actions, new information, or significant changes in other plans, legislation, or litigation triggers an evaluation. Land use plan evaluations determine if decisions are being implemented, whether mitigation measures are satisfactory, whether there are significant changes in the related plans of other entities, whether there is new data of significance to the plan, and if decisions should be changed through amendment or revision. Evaluations will follow the protocols established by the BLM Land Use Planning Handbook H-1601-1 in effect at the time the evaluation is initiated. Specific monitoring and evaluation needs are identified by resource/uses throughout the Approved RMP and in Appendix H.

## J.   PUBLIC INVOLVEMENT

One of BLM's primary objectives during development of the Monticello RMP was to understand the views of various publics by providing opportunities for meaningful participation in the resource management planning process. To achieve this, the BLM published a Notice of Intent to Plan in the *Federal Register* on June 4, 2003. The formal scoping period begin on that date, and ended on January 31, 2004. News releases, website information, a mailing list, and planning bulletins informed the public of the scoping period. Six public scoping meetings and a socio-economic workshop were held during this period. In addition, a mobile "Comment Cruiser" elicited scoping comments from the public at various locations. A Final Scoping Summary was issued summarizing the comments obtained through the scoping process. The scoping comments raised issues that were taken into consideration in preparation of the alternatives developed for the Draft RMP/EIS.

BLM_0013893

*Monticello Approved Resource Management Plan - Record of Decision*

On November 2, 2007, the BLM and the Environmental Protection Agency published a Notice of Availability in the *Federal Register* which marked the beginning of the formal 90-day public comment period on the Draft RMP/Environmental Impact Statement (EIS). The public was informed of the availability of the Draft RMP/EIS via news releases, the planning website, and the RMP mailing list. The Draft RMP/EIS as well as all the background documents and reports were available on the Monticello RMP planning website. Both electronic and hard copies of the Draft RMP/EIS were made available to the public. Five open houses were held during the 90 day comment period. The Monticello Field Office received over 19,000 comment submissions on the Draft RMP/EIS. These comments were considered in the preparation of the Proposed RMP/Final EIS.

On September 5, 2008, the BLM and the Environmental Protection Agency published of Notice of Availability in the *Federal Register* which announced the publication of the Proposed RMP/Final EIS. The public was informed of the availability of the Proposed RMP/Final EIS via news releases, the planning website and the RMP mailing list. The Proposed RMP/Final EIS as well as all the background documents were available on the Monticello RMP planning website. A 30 day protest period commenced on September 5, 2008, and ended on October 6, 2008. In addition, a 60-day Governor's Consistency Review period ran concurrently with the first half of the protest period. In-depth information on these efforts is included in both the Monticello Draft RMP/EIS and Monticello Proposed RMP/Final EIS in Chapter 5, *Consultation and Coordination.*

The BLM will continue to actively seek the views of the public using techniques such as news releases and web-site information to ask for participation and inform the public of new and ongoing project proposals, site-specific planning, and opportunities and timeframes for comment. The BLM will also continue to coordinate, both formally and informally, with the numerous state, federal, tribal, and local agencies and officials interested and involved in the management of public lands in Grand and San Juan Counties within the planning area.

# K.   AVAILABILITY OF THE PLAN

Copies of the Record of Decision and the Monticello Approved Resource Management Plan are available by request from the following locations: BLM Monticello Field Office, 365 North Main Street, Monticello, Utah, 84535, 435-587-1500, and on the Monticello Field Office website at http://www.blm.gov/ut/st/en/fo/monticello/planning.html.

BLM_0013894

**APPROVAL**

In consideration of the foregoing, I approve the Record of Decision for the Monticello Field
Office Resource Management Plan.

_____

C. Stephen Allred
Assistant Secretary – Land and Minerals Management
Department of the Interior

Date   2008 NOV 17 PM 12:55

BLM_0013895

# APPROVED RESOURCE MANAGEMENT PLAN

## A.    INTRODUCTION

This Approved Resource Management Plan (RMP) replaces the 1991 San Juan RMP and is now the base land use plan for public lands administered by the BLM's Monticello Field Office. The Approved RMP adopts the management described in Proposed Plan and the Management Common to All Alternatives section presented in the Proposed Monticello RMP/Final EIS (USDI-BLM 2008), with adjustments as described in the *Notice of Minor Modification* and *Clarification* section of the ROD.

## B.   CONSIDERATION OF OTHER BLM PLANS AND POLICIES

This Plan recognizes the many ongoing programs, plans, and policies that are being implemented in the Monticello PA by other land managers and government agencies. The BLM seeks to be consistent or complementary with other management actions whenever possible. Plans and policies that need to be considered are outlined below.

### *State of Utah Plans*

- SITLA cooperative agreement and other plans
- Canyonlands Natural History Association cooperative agreement
- Regional plans of the Utah Department of Transportation (UDOT)
- State of Utah plans relating to wildlife habitat and watershed management
- Utah's State Comprehensive Outdoor Recreation Plan (SCORP)
- Utah's Smoke Management Plan
- Utah's State Implementation Plan
- Utah's Nonpoint Source Management Plan
- Utah's Sensitive Species List
- Utah's List of Impaired Waters (303 d)
- Utah's Water Resources Planning for the Future
- Utah's Water Plan: Southeast Colorado River Basin
- Utah's Rules for Edge of the Cedars State Park Museum and Gooseneck State Park
- Utah's Bighorn Sheep Statewide Management Plan
- San Juan Elk Management Plan
- Statewide Management Plan for Elk

### *County Land-Use Plans*

- San Juan County, Utah: San Juan County Master Plan (2008)
- Grand County, Utah: Grand County General Plan Update (2004)

### *Other Federal Plans*

- Canyonlands National Park Natural Resource Management Plan (1994)
- Canyonlands National Park General Management Plan (1974)
- Canyonlands National Park Backcountry Management Plan (1984, 1995)
- Manti–La Sal National Forest Land and Resource Management Plan (1986)

BLM_0013896

*Monticello Approved Resource Management Plan*

- Strategic Plans for Glen Canyon National Recreation Area and Rainbow Bridge National Monument (2005, 2007)
- Hovenweep National Monument Plan (draft)
- Glen Canyon NRA Grazing Management Plan (1999)
- Glen Canyon NRA Minerals Management Plan (1980)
- Cooperative Management Strategies: Hovenweep National Monument, Colorado–Utah (1987)
- Canyon of the Ancients Monument-Resource Management Plan (draft)
- San Juan–San Miguel Resource Management Plan (1986)
- Moab Resource Management Plan (2008)

**Energy Policy and Conservation Act (EPCA)**

In May 2001, the Comprehensive National Energy Policy was issued, which directed the secretary of the interior to "…examine land status and lease stipulation impediments to federal oil and gas leasing, and review and modify those where opportunities exist (consistent with the law, good environmental practice and balanced use of other resources)" (NEPDG 2001).

Under this directive, the assistant secretary of the Interior for Lands and Minerals Management delivered to Congress an inventory of U.S. oil and gas resources in five western basins, as well as the extent and nature of any restrictions or impediments to their development. This report was prepared at the request of Congress under the provisions of the 2000 Energy Policy and Conservation Act (EPCA) (BLM 2003a).

In April 2003, the BLM specified four EPCA integration principles, as follows:

- Environmental protection and energy production are both desirable and necessary objectives of sound land management and are not to be considered mutually exclusive priorities.
- The BLM must ensure appropriate accessibility to energy resources necessary for the nation's security while recognizing that special and unique non-energy resources can be preserved.
- Sound planning will weigh relative resource values, consistent with the FLPMA.
- All resource impacts, including those associated with energy development and transmission will be mitigated to prevent unnecessary or undue degradation (BLM 2003a).

**Memorandum of Understanding (MOU) between the U.S. Dept. of the Interior and U.S. Dept. of Agriculture: Implementation of Section 225 of the Energy Policy Act of 2005 Regarding Geothermal Leasing and Permitting**

The purpose of this MOU is to facilitate interagency coordination and establish policies and procedures to implement Section 225 of the Energy Policy Act of 2005, Public Law 109-58 (hereinafter, the Act). Section 225 requires the coordination of geothermal leasing and permitting on public lands and National Forest Service (NFS) lands between the secretaries of the interior and agriculture.

**Memorandum of Understanding (MOU) between the U.S. Dept. of the Interior Bureau of Land Management and U.S. Dept. of Agriculture Forest Service**

The purpose of this MOU is to establish joint BLM and USFS policies and procedures for managing oil and gas leasing and operational activities pursuant to oil and gas leases on NFS lands, consistent with applicable law and policy. The MOU was signed in 2006 for the purpose

BLM_0013897

of efficient, effective compliance with statutory and regulatory requirements. The MOU establishes the roles of the USFS and the BLM in processing applications for permits to drill and review of subsequent operations.

**Memorandum of Understanding (MOU) between the U.S. Dept. of the Interior Bureau of Land Management and National Park Service**

The purpose of this MOU is to establish joint BLM and National Park Service policies and procedures for administer livestock grazing leases, subject to the values and purposes of Glen Canyon NRA lands.

**Oil Shale and Tar Sands Leasing Programmatic EIS (PEIS)**

The Monticello Field Office contains areas of tar sands resources. This resource has been, and currently is, available for lease under the Combined Hydrocarbon Leasing Act of 1981 and in accordance with the decisions in the existing BLM land use plans/plan amendments.

In Utah, the major tar sand resources lie within 11 designated Special Tar Sands Areas (STSAs) managed by the BLM Vernal, Price, Richfield, and Monticello Field Offices. One of these STSAs lies within the Grand Staircase-Escalante National Monument where leasing is prohibited. The Monticello Field Office manages one of the remaining 10 STSAs.

When the Monticello Resource Management Plan Revision (revision) was initiated in 2003, there was no reasonable foreseeable development expectation for tar sands over the life of the plan. The mineral report identified this resource, but did not foresee any leasing or development due to prevailing and anticipated economic factors.

Since the start of this RMP (revision), Congress enacted the Energy Policy Act of 2005. Section 369 of the Energy Policy Act requires the Secretary of Interior to "complete a programmatic environmental impact statement for a commercial leasing program for oil shale and tar sands resources on public lands, with an emphasis on the most geologically prospective lands within each of the States of Colorado, Utah, and Wyoming." On December 13, 2005, the BLM published a Notice of Intent in the <u>Federal Register</u> initiating a Programmatic Environmental Impact Statement (PEIS) to support a commercial oil shale and tar sands leasing program on federal lands in these three states. Since that time, the scope of the PEIS has been revised. The BLM is no longer using the PEIS as the document that supports the National Environmental Policy Act (NEPA) requirements for leasing. Given that the development technologies for in-situ production of oil shale are just emerging, there is a lack of information regarding resource use and associated impacts. Consequently, the BLM has changed this document to a resource allocation document that identifies the BLM-managed lands for which applications to lease oil shale and tar sands resources would be accepted in the future. However although applications would be accepted, additional NEPA analysis would be performed before any leasing of the area would be considered.

All decisions related to land use planning decisions (areas open to application for potential leasing) for tar sands resources in this Resource Management Plan will be made by the ongoing PEIS for Oil Shale and Tar Sands Resources. The Record of Decision on the final PEIS will amend the existing 1991 San Juan RMP or Monticello RMP by making land use planning decisions on whether or not lands will be available for future application, leasing and development of tar sands on public lands for those areas where the resource is present.

BLM_0013898

Additional site-specific NEPA analysis will be completed on each lease application before any leases would be issued.

As part of the site-specific NEPA analysis, the environmental consequences to specific resource values and uses within the areas and any alternative actions would be analyzed. Any decision to offer the lands for lease would be made based on a full disclosure of the impacts. If a decision is made to offer the lands for lease, specific mitigation measures will be developed to ensure that the commercial operations use practices that minimize or mitigate impacts.

This pre-leasing NEPA analysis would include the same opportunities for public involvement and comment that are part of this PEIS process and every other land use planning and NEPA process the BLM undertakes. The decisions associated with the PEIS will be incorporated into the Monticello RMP as it is finalized, or the Monticello RMP will be amended. Additional opportunities for public involvement and comment will occur when the Proposed RMP Amendment/ Final PEIS is available.

This Resource Management Plan will, however, develop allocation decisions for conventional oil and gas leasing and the Combined Hydocarbon Leases in the STSAs.

**The Energy Policy Act of 2005 and the Westwide Energy Corridor PEIS**

An interagency Westwide Energy Corridor PEIS is currently being developed to implement Section 368 of the Energy Policy Act of 2005 (Energy Right-of-way Corridors on federal land). The final Westwide Energy Corridor PEIS will amend RMPs in the western U.S., providing decisions to address numerous energy corridor issues, including the utilization of existing corridors (with enhancements and upgrades) and the identification of new ones, supply and demand considerations, and compatibility with other corridor and project-planning efforts. It is likely that the identification of corridors in the Westwide Energy Corridor PEIS will affect the Monticello PA. Consequently, the decisions in the ROD on the final Westwide Energy Corridor PEIS will be incorporated into the Monticello RMP.

**Endangered Species Recovery Plans**

- The Recovery Implementation Plan for the Endangered Fish Species in the Upper Colorado River Basin (USFWS 1987)
- Bonytail Chub Recovery Plan (USFWS 1984, 1990a, 2002a)
- Humpback Chub Recovery Plan (USFWS 1979, 1990a, 2002b)
- Colorado Pikeminnow Recovery Plan (USFWS 1978, 1990, 1991, 2002c)
- Razorback Sucker Recovery Plan (USFWS 1999, 2002d)
- Mexican Spotted Owl Recovery Plan (USFWS 1995)
- Final Recovery Plan for the Southwestern Willow Flycatcher (USFWS 2002e)

**Existing EISs**

- Utah Combined Hydrocarbon Leasing Regional Final EIS (1984)
- Utah BLM Statewide Wilderness EIS (1990)
- Programmatic EIS on Wind Energy Development on BLM-administered Lands in the Western United States (BLM 2005f)
- Final Environmental Impact Statement Vegetation Treatment on BLM Lands in Thirteen Western States and associated Records of Decision (1991).

BLM_0013899

- Final Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement and Associated Record of Decision (2007).
- Final Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Report (2007).

**Other BLM Plans**

- Red Canyon/White Canyon Habitat Management Plan (1990)
- Beef Basin Habitat Management Plan (1992)
- Hatch Point Habitat Management Plan (1976)
- Fire Management Plan Amendment (2005)
- San Juan County Landfill Plan Amendment (1995)
- Montezuma Creek River Basin Study (1992)
- Grand Gulch Plateau Cultural and Recreation Area Management Plan (1993)
- Indian Creek Corridor Plan (2005)
- East Canyon Allotment Management Plan (1993)
- Tank Draw Allotment Management Plan (1993)
- Gunnison Sage-grouse Range-wide Conservation Plan (2005)

In the event there are inconsistencies or discrepancies between previously Approved RMPs and this Approved RMP, the decisions contained in the Approved RMP will be followed. The Monticello Field Office will continue to tier to statewide, national, and programmatic EISs and other NEPA and planning documents, as well as consider and apply Best Management Practices or other management protocols contained in other planning documents after appropriate site-specific analysis.

All future resource authorizations and actions will conform to, or be consistent with the decisions contained in this Approved RMP. All existing operations and activities authorized under permits, contracts, cooperative agreements or other authorizations will be modified, as necessary, to conform with this plan within a reasonable timeframe. However, this plan does not repeal valid existing rights on public lands. A valid existing right is a claim or authorization that takes precedence over the decisions developed in this plan. If such authorizations come up for review and can be modified, they will also be brought into conformance with the plan.

While the Final EIS for the Monticello RMP constitutes compliance with NEPA for the broad-scale decisions made in this Approved RMP, BLM will continue to prepare Environmental Assessments (EAs) and Environmental Impact Statements (EISs) where appropriate as part of implementation level planning and decision-making.

# C.   PLAN IMPLEMENTATION

Plan implementation is a continuous and active process. Decisions presented in the *Management Decisions* section of this Approved RMP are of three types: Immediate, One-Time, and Long-Term.

***Immediate Decisions:*** These decisions go into effect upon signature of the Record of Decision and Approved RMP. These include decisions such as the allocation of lands as available or unavailable for oil and gas leasing, ACEC designations, and OHV designations. Immediate decisions require no additional analysis and provide the framework for any subsequent activities

BLM_0013900

proposed in the planning area. Proposals for actions such as oil and gas leasing, land adjustments, and other allocation-based actions will be reviewed against these decisions/allocations to determine if the proposal is in conformance with the plan.

***One-Time Decisions:*** These types of decisions include those that are implemented after additional site-specific analysis is completed. Examples are implementation of the recommendations to withdraw lands from locatable mineral entry or development of a habitat management plan or a special recreation management area plan. One-time decisions usually require additional analysis and are prioritized as part of the BLM budget process.

***Long-Term Guidance/Life of Plan Direction:*** These decisions include the goals, objectives, and management actions established by the plan that are applied during site-specific analyses and activity planning. This guidance is applied whether the action is initiated by the BLM or by a non-BLM project proponent. Long- term guidance and plan direction is incorporated into BLM management as implementation level planning and project analysis occurs (for example, as a result of the watershed assessment process or receipt of a land use application).

Priorities for implementation of "one-time" RMP decisions will be based on several criteria, including:

- Current and projected resource needs and demands;
- National and Statewide BLM management direction and program emphasis; and funding.

## *General Implementation Schedule of "One-Time" Actions*

Decisions in this plan will be implemented over a period of years depending on budget and staff availability. After issuing the ROD/Approved RMP, BLM will prepare an Implementation Plan that establishes tentative timeframes for completion of "one-time" actions identified in the Approved RMP.  Most of these actions require additional analysis and site specific activity planning. This schedule does not include the decisions which are effective immediately upon approval of the plan (usually allocations), or the actions which describe the ongoing management that will be incorporated and applied as site-specific proposals are analyzed on an ongoing basis. This schedule will assist BLM managers and staff in preparing budget requests and in scheduling work.  However, the proposed schedule must be considered tentative and will be affected by future funding, changing program priorities, non-discretionary workloads, and cooperation by partners and external publics.  Periodic review of the plan will provide consistent tracking of accomplishments and provide information that can be used to develop annual budget requests to continue implementation.

## *Maintaining the Plan*

Land use plan decisions and supporting information can be maintained to reflect minor changes in data, but maintenance is limited to refining, documenting, and/or clarifying previously approved decisions. Some examples of maintenance actions include:

- Correcting minor data, typographical, mapping, or tabular data errors.
- Refining baseline information as a result of new inventory data (e.g., changing the boundary of an archaeological district, refining the known habitat of special status species or big game crucial ranges, or adjusting the boundary of a fire management unit based on updated fire

BLM_0013901

regime condition class inventory, fire occurrence, monitoring data, and/or demographic changes).

- Applying an existing oil and gas lease stipulation to a new area prior to the lease sale based on new inventory data (e.g., apply an existing protective stipulation for sage-grouse to a newly discovered sage-grouse lek).

The BLM expects that new information gathered from field inventories and assessments, research, other agency studies, and other sources will update baseline data and/or support new management techniques, best management practices, and scientific principles. Where monitoring shows land use plan actions or best management practices are not effective, modifications or adjustments may occur without amendment or revision of the plan as long as assumptions and impacts disclosed in the analysis remain valid and broad-scale goals and objectives are not changed.

Plan maintenance will be documented in supporting records. Plan maintenance does not require formal public involvement, interagency coordination, or the NEPA analysis required for making new land use plan decisions.

### *Changing the Plan*

The Approved RMP may be changed, should conditions warrant, through a plan amendment or plan revision process. A plan amendment may become necessary if major changes are needed or to consider a proposal or action that is not in conformance with the plan. The results of monitoring, evaluation of new data, or policy changes and changing public needs might also provide the impetus for an amendment. Generally, an amendment is issue-specific. If several areas of the plan become outdated or otherwise obsolete, a plan revision may become necessary. Plan amendments and revisions are accomplished with public input and the appropriate level of environmental analysis conducted according to the Council on Environmental Policy procedure for implementation of the National Environmental Policy Act.

## D.    PLAN EVALUATION

Evaluation is a process in which the plan and monitoring data are reviewed to see if management goals and objectives are being met and if management direction is sound. Land use plan evaluations determine if decisions are being implemented, whether mitigation measures are satisfactory, whether there are significant changes in the related plans of other entities, whether there is new data of significance to the plan, and if decisions should be changed through amendment or revision. Monitoring data gathered over time is examined and used to draw conclusions on whether management actions are meeting stated objectives, and if not, why. Conclusions are then used to make recommendations on whether to continue current management or to identify what changes need to be made in management practices to meet objectives.

BLM will use land use plan evaluations to determine if the decisions in the RMP, supported by the accompanying NEPA analysis, are still valid in light of new information and monitoring data. Evaluation of the RMP will generally be conducted every five years, unless unexpected actions, new information or significant changes in other plans, legislation, or litigation triggers an evaluation. The following estimated evaluation schedule will be followed for the Monticello RMP:

BLM_0013902

- September 2013
- September 2018
- September 2023
- September 2028

Evaluations will follow the protocols established by the BLM Land Use Planning Handbook (H-1601-1) or other appropriate guidance in effect at the time the evaluation is initiated.

# E.   MANAGEMENT DECISIONS

This section of the Approved RMP presents the goals and objectives, land use allocations, and management actions established for public lands managed by the BLM's Monticello Field Office. These management decisions are presented by program area. Not all types of decisions were identified for each program. For instance, only *Goals* and *Objectives* were identified in the *Air Quality* section, and thus only *Goals* and *Objectives* are described in that section. A *Monitoring* section (Appendix H) is also included for each program to describe how the program decisions will be evaluated to determine effectiveness in achieving RMP objectives or making progress toward them.

Data used in development of the Approved RMP are dynamic. The data and maps used throughout the Approved RMP are for land use planning purposes and will be refined as site-specific planning and on-the-ground implementation occurs. Updating data is considered plan maintenance which will occur over time as the RMP is implemented (Section C *Plan Implementation*). Please note that all acreages presented in the Approved RMP are estimations, even when presented to the nearest acre.

The management actions are organized alphabetically by program area with the following titles. For ease of identification into the future, each program area has an identified abbreviation and each decision in that program is numbered in coordination with the abbreviation:

Management Common to All Decisions—**MCA**
Air Quality—**AQ**
Cultural Resources—**CUL**
Fire Management—**FIRE**
Health and Safety—**HAZ**
Lands and Realty—**LAR**
Livestock and Grazing—**GRA**
Mineral Resources—**MIN**
Non-WSA Lands with Wilderness Characteristics—**WC**
Paleontology—**PAL**
Recreation—**REC**

Riparian—**RIP**
Soil and Water Resources—**SOLW**
Areas of Critical Environmental Concern—**ACEC**
Wild and Scenic Rivers—**WSR**
Historic Trails—**HT**
Special Status Species—**SSP**
Travel Management—**TM**
Vegetation—**VEG**
Visual Resource Management—**VRM**
Wildlife and Fisheries Resources—**FWL**
Woodlands—**FOR**

BLM_0013903

# *MANAGEMENT COMMON TO ALL RESOURCES (MCA)*

## *Special Designations*

## MCA-1

Wilderness Study Areas will be managed according to the Interim Management Policy and Guidelines for Lands under Wilderness Review (IMP).

## MCA-2

All Areas of Critical Environmental Concern (ACECs) will be retained in public ownership, will be subject to appropriate fire management response, and will have travel limited to designated routes unless otherwise noted.

## *Education and Interpretation*

## MCA-3

The BLM will work with its partners, including local school districts and universities, to develop a variety of opportunities to promote education, research, and interpretation on public lands.

## *Fire, Drought, and Natural Disasters*

## MCA-4

The BLM will coordinate actions with affected parties where natural resources may be impacted by fire, drought, insects and diseases, or natural disasters.

## *Monitoring*

## MCA-5

The BLM will conduct monitoring for all resources to determine the effectiveness of management prescriptions in achieving RMP objectives or making progress toward them.

## *Utah Standards for Rangeland Health*

## MCA-6

BLM lands will be managed and uses will be authorized in a manner consistent with meeting or moving toward meeting Utah's Standards for Rangeland Health (BLM 1997). The current Utah Standards for Rangeland Health (as revised), augmented with ecological condition and trend objectives, will be incorporated across all resource programs as a minimum management objective. Management prescriptions in the form of constraints to use, terms and conditions, and stipulations may be needed to meet resource objectives and/or to comply with current regulations. Management prescriptions may consider, but will not be limited to, the following:

- Surface-disturbing activities: These will be closely monitored to ensure compliance with authorizations/permits, conditions of approval, or terms and conditions. Actions minimizing new surface disturbance, as well as actions insuring successful reclamation, will be of paramount concern. During periods of drought, the BLM could require additional actions such as changes to standard seed mix compositions, amounts of seed, and method of application. Methods to ensure successful revegetation following disturbance could include hydromulching, installation of drip irrigation, and/or temporary fencing to exclude ungulate grazing/browsing.
- Livestock Grazing: Active livestock use will be authorized in animal unit months (AUMs), season, and duration to meet static (no apparent trend) to upward trends towards achieving

site-specific resource objectives. In the case of fire, drought, insects and diseases, or other natural disasters, the BLM will work cooperatively to implement a grazing strategy on an individual grazing allotment basis and make changes to the annual grazing authorizations as appropriate within the limits of the existing permit and in accordance with the grazing regulations. The BLM may temporarily close allotments or portions of allotments to grazing where it is determined that other, less drastic measures will not avoid degradation of vegetative resources. Temporary changes to active permitted use or grazing practices, or non-use may also be implemented voluntarily by the permittee with BLM consent.

- Wildlife Management: During periods of prolonged dryness or drought or other natural disaster, to the extent that wildlife grazing ungulate populations may not be sustainable and/or impacts to the resource habitats may occur due to competition for water and/or available forage and/or overall animal health is compromised, the BLM may enter into discussions with the Utah Division of Wildlife Resources (UDWR) regarding temporary adjustments in herd numbers and overall management options to address the effects of drought.

- Recreation: During periods of prolonged dryness or drought, the BLM, in cooperation with local and state fire management agencies, may limit campfires to established fire rings or fully contained fires. The last resort will be to close the public lands to campfires of any kind.

- OHV Use: OHV use during periods of prolonged dryness could be further restricted to designated routes. If site-specific conditions warrant, closure to OHVs could be implemented to minimize vehicle-induced injury or damage to rangeland and/or woodland resources, and to minimize the potential of spark caused fires.

- Standard Operating Procedures (SOPs): These will be implemented as described in Appendix G.

BLM_0013905

## *AIR QUALITY (AQ)*

**Goals and Objectives:**

- Ensure that authorized uses on public lands meet or comply with and support federal, state, and local laws and regulations.

**Management Actions:**

**AQ-1**

The best available control technology, recommended by the Utah Division of Air Quality (UDAQ), will be applied as needed to meet air quality standards.

**AQ-2**

Prescribed burns will be consistent with the State of Utah Division of Environmental Quality (UDEQ) permitting process and timed in conjunction with meteorological conditions so as to minimize smoke impacts.

**AQ-3**

The BLM will comply with Utah Air Conservation (UAC) Regulation R307–205, which prohibits the use, maintenance, or construction of roadways without taking appropriate dust abatement measures.

**AQ-4**

The BLM will comply with the current Smoke Management Memorandum of Agreement (MOA) between the BLM, the U.S. Forest Service (USFS), and UDAQ. The MOA, in accordance with UAC regulation R301-204, requires reporting size, date of burn, fuel type, and estimated air emissions from each prescribed burn.

**AQ-5**

The BLM will manage emissions to prevent deterioration to air quality in Class I Airsheds.

**AQ-6**

The BLM will continue to work cooperatively with state, federal, and tribal entities in developing air quality assessment protocols to address cumulative impacts and regional air quality issues.

**AQ-7**

The BLM will continue to work cooperatively with the Utah Airshed Group to manage emissions from wildland and prescribed fire activities.

**AQ-8**

National Ambient Air Quality Standards are enforced by the Utah Department of Environmental Quality, Division of Air Quality (UDEQ-DAQ), with EPA oversight. Special requirements to

BLM_0013906

reduce potential air quality impacts will be considered on a case-by-case basis in processing land-use authorizations.

## AQ-9

The BLM will utilize best management practices (BMPs) and site-specific mitigation measures, when appropriate, based on site-specific conditions, to reduce emissions and enhance air quality. Examples of these types of measures can be found in the Four Corners Air Quality Task Force Report of Mitigation Options, November 1, 2007.

## AQ-10

Project specific analyses will consider use of quantitative air quality analysis methods (i.e., modeling), when appropriate as determined by the BLM, in consultation with state, federal, and tribal entities.

BLM_0013907

## CULTURAL RESOURCES (CUL)

### Goals and Objectives:

Identify, preserve, and protect important cultural resources (Map 20) and ensure that they are available for appropriate uses by present and future generations (FLPMA, Section 103[c], 201 [a] and [c]; National Historic Preservation Act, Section 110 [a]; Archaeological Resources Protection Act, Section 14 [a]).

Seek to reduce imminent threats and resolve potential conflicts from natural- or human-caused deterioration, or potential conflict with other resource uses (FLPMA, Section 103 [c], NHPA 106, 110 [a][2]) by ensuring that all authorizations for land use and resource use comply with the NHPA Section 106.

### Management Actions:

### CUL-1

The BLM will nominate appropriate cultural resource objects, sites, districts, and multiple listings to the National Register of Historic Places (NRHP).

### CUL-2

Priority geographic areas for new field inventory pursuant to Section 110 of the National Historic Preservation Act (NHPA) and Section 14 of the Archaeological Resources Protection Act (ARPA) will be identified based upon a probability for unrecorded important resources. These inventories will be conducted as funding is available and as opportunities arise.

### CUL-3

The BLM will ensure that all authorizations for land and resource use will comply with Section 106 of the National Historic Preservation Act (NHPA), consistent with and subject to the objectives established in the RMP for the proactive use of cultural properties in the public interest.

### CUL-4

Impacts to any NRHP-listed or eligible cultural resource sites, objects, or districts will be mitigated in accordance with 36 CFR 800, generally through avoidance of cultural sites. Should it be determined that cultural resources eligible or listed on the NRHP cannot be avoided, consultation with the State Historic Preservation Officer (SHPO) will be initiated and the procedures identified in the National Programmatic Agreement and the Utah State BLM Protocol for meeting the BLM's responsibilities under the NHPA will be followed.

### CUL-5

The BLM will consult with Native American tribes to identify, protect, and maintain access for areas of traditional and religious use that includes but is not limited to burials, rock art, traditional use areas, religiously active areas, and sacred sites.

BLM_0013908

## CUL-6

Burial sites, associated burial goods, and sacred items will be protected in accordance with the Native American Graves Protection and Repatriation Act (NAGPRA) and the Archaeological Resources Protection Act.

## CUL-7

Cultural resources will be evaluated according to National Register criteria (36 CFR Part 60.4) and assigned to appropriate use categories as the basis for management decisions.

## CUL-8

Cultural sites, including ethnographic properties, will continue to be allocated to one of six management use categories: experimental, discharged from management, public, scientific, traditional, and conservation.

## CUL-9

The BLM will conduct a consultation process to identify both the resource management concerns and the strategies for addressing them through an interactive dialogue with appropriate Native American communities.

## CUL-10

The BLM will work with tribes and other communities with traditional linkage to public lands to identify places of traditional cultural and religious importance. To the extent allowed by statute, regulation, and policy, such locations will be managed to minimize impacts to important values and to allow continued access for traditional purposes.

## CUL-11

When new sites are discovered, interim protection may be applied until Section 106 consultation and NAGPRA (CFR 10) processes are completed, if warranted.

## CUL-12

The BLM will provide for legitimate field research by qualified scientists and institutions.

## CUL-13

The BLM will work with local communities and other groups to foster heritage tourism throughout the Monticello PA.

## CUL-14

Protective measures will be established and implemented for sites, structures, objects, and traditional use areas that are important to tribes with historical and cultural connections to the land, in order to maintain the view shed and intrinsic values, as well as the auditory, visual, and esthetic settings of the resources. Protection measures for undisturbed cultural resources and their natural settings will be developed in compliance with regulatory mandates and Native American consultation.

BLM_0013909

**CUL-15**

Cultural resource management plans (CRMPs) will be developed for culturally sensitive areas unless included in other integrated activity plans. The CRMP would not require an amendment to the Monticello RMP if it is consistent with the goals and objectives of this RMP. Such plans will include protective measures such as restrictions and limitations on recreation around cultural at-risk areas and sites, Native American consultation, and regulatory compliance. These plans will also include but not be limited to developing cultural monitoring systems; identifying sites and areas in need of stabilization and protective measures (e.g., fences, surveillance equipment); developing research designs for selected sites/areas; designating sites/areas for interpretive and educational development; identifying areas for cultural inventory where federal undertakings are expected to occur; and developing specific mitigation measures. The plan will designate sites, districts, landmarks, and landscapes that will be nominated for inclusion on the NRHP.

**CUL-16**

The BLM will proactively reduce hazardous fuels or mitigate the potential hazard around archaeological and cultural sites that are susceptible to destruction by fire from prescribed or wildland fire. Management response to fire will follow the guidelines in the Moab District Fire Management Plan.

**CUL-17**

The BLM will promote collaborative partnerships to assist in meeting management goals and objectives for cultural resources.

**CUL-18**

Domestic pets and pack animals will not be allowed in cultural sites or on archaeological resources as defined in ARPA.

**CUL-19**

Ropes and other climbing aids will not be allowed for access to cultural sites or archaeological resources as defined in ARPA, except for emergencies or administrative needs.

**CUL-20**

Camping will not be allowed within cultural sites or archaeological resources as defined in ARPA.

**CUL-21**

Cultural sites may be closed to visitation when they are determined to be at risk or pose visitor safety hazards.

BLM_0013910

*Monticello Approved RMP—Fire Management*

## FIRE MANAGEMENT (FIRE)

**Goals and Objectives:**

- Firefighter and public safety are the primary goals in all fire management decisions and actions. The BLM will implement a consistent, safe, and cost-effective fire management program through appropriate planning, staffing, training, and equipment.
- Fires will be suppressed at minimum cost, taking into account firefighter and public safety as well as benefits and values to be protected that are consistent with resource objectives.
- Fire management objectives will be established for every area with burnable vegetation, based on sound science and consideration of other resource objectives.
- Emergency stabilization, rehabilitation, and restoration efforts will be implemented to protect and sustain resources, public health and safety, and community infrastructure.
- The BLM will work together with partners and other impacted groups and individuals to reduce risks to communities and to restore ecosystems.
- Appendix I, Desired Wildland Fire Condition and Condition Class, shows the different responses allowed for the planning area (PA).
- The Reasonable and Prudent Measures and Terms and Conditions identified in consultation with the USFWS for the LUP Amendment will be implemented in fire-related actions.

**Management Actions:**

### FIRE-1

Fire management will adopt the comprehensive Utah Land Use Plan Amendment for Fire and Fuels Management, September 2005 (LUP Amendment; BLM 2005c). This document may be found at www.ut.blm.gov/fireplanning/index/htm. Direction and guidance approved by the LUP Amendment is incorporated by reference into this RMP. Specific decisions for other resources that could impact fire management are found throughout the Approved RMP. However, the content and purpose of the LUP Amendment is adopted and is summarized as follows:

- Establishes landscape-level fire management goals and objectives.
- Describes Desired Wildland Fire Conditions (DWFC) and the management strategies and actions to meet DWFC goals.
- Describes areas where fire may be restored to the ecosystem through wildland fire use for resource benefit and areas where wildland fire use is not appropriate.
- Identifies Resource Protection Measures (RPMs) for fire management practices to protect natural and cultural resource values.
- Identifies criteria used to establish fire management priorities.

### FIRE-2

Wildland fire will be utilized to protect, maintain and enhance resources and, when possible, will be allowed to function in its natural ecological role.

BLM_0013911

**FIRE-3**

Hazardous fuels reduction treatments will be used to restore ecosystems; protect human, natural and cultural resources; and reduce the threat of wildfire to communities.

**FIRE-4**

The BLM will work together with Native Americans to provide for their use of woodland products as associated with fire, fuels, and emergency stabilization and rehabilitation (ES&R) actions.

### *Criteria for Establishing Fire Management Priorities*
**FIRE-5**

Protection of human life is the primary fire management priority. Establishing a priority among protecting human communities and community infrastructure, other property and improvements, and natural and cultural resources is based on human health and safety, the values to be protected, and the costs of protection. When firefighters and other personnel have been committed to an incident, these human resources become the highest values to be protected. Priorities for all aspects of fire management decisions and actions are based on the following:

- Protection of the Wildland-Urban Interface (WUI) (including At-Risk Communities and At-Risk Watersheds)
- Maintaining existing healthy ecosystems
- High priority subbasins or watersheds
- Threatened, endangered, or special status species
- Cultural resources and/or cultural landscapes

### *Suppression*
**FIRE-6**

An Appropriate Management Response (AMR) procedure is required for every wildland fire that is not a prescribed fire. In all fire management decisions, strategies, and actions, firefighter and public safety are the highest priority followed by consideration of benefits and values to be protected as well as suppression costs. The AMR can range from full suppression to managing fire for resource benefit (wildland fire use). Resource goals and objectives outlined in the RMP guide the development and implementation of AMR fire management activities in regard to the accomplishment of those objectives. The FMP establishes fire suppression objectives with minimum and maximum suppression targets for each Fire Management Unit (FMU) within the PA. While firefighter and public safety are the first priority, considerations for suppression activities also include fire intensity, acreage, and spread potential; threats to life and property; potential to impact high-value resources such as critical habitat for threatened, endangered, and sensitive species; crucial wildlife habitat; cultural resources and/or riparian areas; historic fire regimes; and other special considerations such as wilderness and/or adjacent agency lands.

### *Wildland Fire Use for Resource Benefit*
**FIRE-7**

Wildland fire is authorized as a tool, when appropriate, to allow naturally ignited wildland fire to accomplish specific resource management objectives. Due to existing resource conditions and

BLM_0013912

proximity to values at risk, fire cannot be allowed to resume its natural role on all BLM lands in the FO. Consideration of ongoing management decisions and other natural changes will direct periodical reassessment of DWFC and determination of potential areas for wildland fire use. Operational management of wildland fire use is described in the Wildland Fire Implementation Plan (WFIP). The FMP identifies FMUs that may have the potential for wildland fire use. Wildland fire use may be authorized for all areas, except when the following resources and values may be negatively impacted and there are no reasonable Resource Protection Measures to protect such resources and values:

- WUI areas
- Areas known to be highly susceptible to post-fire cheatgrass or invasive weed invasion
- Important terrestrial and aquatic habitats
- Non–fire-adapted vegetation communities
- Sensitive cultural resources
- Areas of soil with high or very high erosion hazard
- Class I areas and $PM_{10}$ nonattainment areas
- Administrative sites
- Developed recreation sites
- Communication sites
- Oil, gas, and mining facilities
- Aboveground utility corridors
- High-use travel corridors, such as interstates, railroads, and/or highways

### *Fuels Treatment*
**FIRE-8**

Fuels management activities outlined in the FMP will be consistent with the resource goals and objectives contained in the RMP. To reduce hazards and to restore ecosystems, authorized fuels management decisions include wildland fire use, prescribed fire, and mechanical, manual, chemical, biological, and seeding treatments. The FMP describes fuels management goals and objectives, and the full range of fuels management strategies and actions authorized for fuels reduction. Fuels treatments are focused on the DWFC of restoring historic fire regimes to ecosystems when feasible, so that future wildland fire use actions can be more easily implemented.

**FIRE-9**

Fuels management decisions may include but are not limited to the following activities:

- Mechanical treatments such as mowing, chopping, or chipping/grinding (brush cutter), chaining, tilling, or cutting
- Manual treatments such as handcutting (chainsaw or handsaw) and handpiling
- Prescribed fire, including broadcast, underburn, and handpile burning
- Chemical spraying or biological treatments such as insects or goats/sheep
- Seeding including aerial or ground application (manual or mechanical)

BLM_0013913

**FIRE-10**

Targeted areas may be treated in phases over a period of several years and may involve multiple and varied treatments. Estimated fuels reduction treatments of 5,000 to 10,000 acres/year are targeted dependent on budgetary and time constraints.

**FIRE-11**

Implementation of fuels management decisions will be prioritized using the following criteria:

- WUI areas
- Areas with fuel loading that could potentially result in the loss of ecosystem components following wildland fire
- Resource management goals and objectives

*Prevention and Mitigation*

**FIRE-12**

Prevention and mitigation goals target a reduction in unauthorized wildland fire ignitions. Goals include coordination with partners and affected groups and individuals, and a wide range of prevention and mitigation activities such as personal contacts, mass media, signing, and defensible space education.

**FIRE-13**

Implementation of fire prevention activities will be prioritized using the following criteria:

- WUI areas
- Major travel corridors
- Recreation sites
- Public lands as a whole

*Emergency Stabilization and Rehabilitation (ES&R)*

**FIRE-14**

A Normal Year Fire Stabilization and Rehabilitation Plan (NFRP) is in place to meet ES&R needs and to comply with up-to-date ES&R policy and guidance. The NFRP is a programmatic implementation plan authorizing treatment options specific to vegetative communities and dependent upon post-wildland fire conditions and other site-specific considerations. Treatment actions that are designed according to the type and severity of wildfire impacts and priorities include but are not limited to areas where the following criteria apply:

- It is necessary to protect human life and safety as well as property.
- Unique or critical cultural and/or historical resources are at risk.
- It is determined soils are highly susceptible to accelerated erosion.
- Perennial grasses and forbs (fire-tolerant plants) are not expected to provide soil and watershed protection within two years.
- There is a need to establish a vegetative fuel break of less flammable species (greenstrips).
- Unacceptable vegetation, such as noxious weeds, may readily invade and become established.

BLM_0013914

- Shrubs and forbs are a crucial habitat component for wintering mule deer, antelope, sage-grouse, or other special status species.
- Stabilization and rehabilitation are necessary to meet RMP resource objectives, including rangeland seedings.
- It is necessary to protect water quality.
- It is necessary to quickly restore threatened, endangered, or special status species habitat populations to prevent negative impacts.

**FIRE-15**

Fire suppression on non-WSA lands with wilderness characteristics will be through "light-on-the-land" techniques.

**FIRE-16**

The Moab Fire District Fire Management Plan (FMP) will be updated and amended to meet the direction and objectives of the RMP.

BLM_0013915

## *HEALTH AND SAFETY (HAZ)*

### Goals and Objectives:

Effectively manage hazardous risks on public lands to protect the health and safety of public land users and stewards; protect the natural and environmental resources; minimize future hazardous and related risks, costs, and liabilities; and mitigate physical hazards in compliance with all applicable laws, regulations, and policies.

### Management Actions:

### *Human Health and Safety*
### HAZ-1

The BLM will strive to ensure that human health and safety concerns on the public lands it manages are appropriately mitigated if determined hazardous.

### *Abandoned Mine Lands*
### HAZ-2

In conformance with the BLM's long-term strategies and National Policies regarding Abandoned Mine Lands (AMLs), this RMP recognizes the need to work with our partners toward identifying and addressing physical safety and environmental hazards at all AML sites on public lands. In order to achieve this goal, a state strategy has been written. National program criteria for determining site priorities were used to develop the work plan. This state strategy is entitled "Utah Abandoned Mine Land Multi -Year Work Plan." The following criteria will be established to assist in determining priorities for site and area mitigation and reclamation.

### HAZ-3

AML physical safety program priorities:

- Highest priority will be cleaning up AML sites where (a) a death or injury has occurred, (b) the site is situated on or in immediate proximity to developed recreation sites and areas with high visitor use, or (c) upon formal risk assessment, a high or extremely high risk level is indicated;
- AML will be factored into future recreation management area designations, land-use planning assessments, and all applicable use authorizations;
- The site is presently listed or is eligible for listing in the Abandoned Mines and Site Cleanup Module;
- AML hazards should be, to the extent practicable, mitigated or remediated on the ground during site development.
- AML water-quality program priorities are ones where the state has identified the watershed as a priority based on 1) one or more water laws or regulations; 2) threat to public health or safety; 3) threat to the environment; 4) the project reflects a collaborative effort with other land managing agencies; 5) the site is presently listed or is eligible for listing in the Abandoned Mines and Site Cleanup Module; and 6) the project will be funded by contributions from collaborating agencies.

BLM_0013916

*Acquisitions/Exchanges*
## HAZ-4
These priorities will be maintained and updated as needed in the state AML strategy.

## HAZ-5
The BLM will identify and clean up unauthorized dumping and shooting areas in the PA as required to comply with applicable state, local, and federal regulations. These will include areas such as the unauthorized shooting range west of Blanding, dumps near Hovenweep, the Monticello Airport, and Paiute Knoll.

*Hazardous Materials*
## HAZ-6
Use, transportation, storage and disposal of hazardous materials shall comply with the applicable Federal and State laws. Use of pesticides and herbicides shall be used only in accordance with their registered uses and within limitations imposed by the Secretary of the Interior.

*Hazardous Waste*
## HAZ-7
The BLM will respond to releases as appropriate.

BLM_0013917

## *LANDS AND REALTY (LAR)*

### Goals and Objectives:

- The BLM will retain lands within its administration except where necessary to accomplish resource goals and objectives outlined in the plan. The BLM will transfer lands out of federal ownership or acquire non-federal lands or conservation easements where needed to accomplish resource goals and objectives, improve administration of public lands, or to meet essential community needs.
- Make public land available for a variety of ROWs, alternative energy sources, and permits where consistent with resource goals, objectives, and prescriptions.

### Management Actions:

### LAR-1

The BLM will not transfer out of federal ownership any habitat for listed threatened or endangered species or any habitat for non-listed special status species if it could be determined that such an action will lead to the need to list any species as threatened or endangered. Acquisition of potential/occupied special status species habitat will be high priority. These acquired/exchanged lands will be managed according to BLM land management prescriptions for special status species.

### LAR-2

Under IMP and Congressional action, WSAs and Wilderness Areas will be exclusion areas for any ROWs (Section 501[a] FLPMA).

### *Land Tenure Adjustments*
### LAR-3

Lands will be considered for disposal or acquisition if the changes are in accordance with resource management objectives and other RMP decisions, and will meet one or more of the following criteria as outlined by BLM Land Tenure Adjustment criteria:

- Such changes are determined to be in the public interest and will accommodate the needs of local and state governments, including needs for the economy, public purposes, and community growth.
- Such changes will result in a net gain of important and manageable resources on public lands such as crucial wildlife habitat, important cultural sites, quality riparian areas, live water, listed species habitat, or areas key to productive ecosystems.
- Such changes will ensure public access to lands in areas where access is needed and cannot otherwise be obtained.
- Such changes will promote effective management and meet essential resource objectives through land ownership consolidation.
- Such changes will result in acquisition of lands that serve regional or national priorities identified in applicable policy directives.

BLM_0013918

- Such changes have been identified in existing activity plans (i.e., habitat management plans, etc.).

## LAR-4

Acquisitions will be managed in the same manner as adjoining lands unless they are acquired for a specific purpose (i.e., wildlife habitat, buffer zones near other federal lands, etc.).

A priority section for acquisition will be Utah State Section 2, Township 39S Range 19E to acquire culturally sensitive lands in the McLoyd Canyon–Moon House area.

## LAR-5

Give land exchanges with the State of Utah priority consideration to resolve in-holdings issues. The BLM will recognize the mission, goals, and objectives of the State of Utah as they relate to the values and resources of state-owned lands. The Monticello FO will work cooperatively with the State of Utah in identifying opportunities for Land Tenure Agreements (LTAs) that may assist the state in furthering its mission. These agreements must comply with applicable law and policy; consider fair market values; consider LTA criteria; and comply with goals and objectives for resource management prescribed in the RMP. They will be processed on a case-by-case basis, with consideration given to the goals, objectives, and decisions of this RMP.

## *Filming Permits*
## LAR-6

Filming permit authorizations are subject to Public Law 106-206.  Applications for filming permits in the Monticello PA will be limited to existing highways, roads, and pullouts and previously disturbed or cleared areas throughout the Field Office (including Valley of the Gods, Moki Dugway, Highway 211, Newspaper Rock, and Highway 95) and will have to meet the following criteria of minimal impact to be approved without any NEPA analysis. Filming projects that do not meet these criteria will be subject to site-specific NEPA analysis prior to permit approval or use of programmatic NEPA documents including EAs, on BLM-managed lands in Utah within WSAs (EA USO-06-004), or other programmatic NEPA documents that may be developed on a local, state or bureau basis.

- Project will not impact sensitive habitat or species.
- Project will not impact cultural resources or Native American sacred sites.
- Project will not involve use of pyrotechnics or explosives.
- Project will not involve more than minimum impacts to land, air, or water. (Minimum is defined as temporary impact only; no permanent impacts; no surface disturbance allowed that can't be raked out or rehabbed so that there is no sign of activity at the end of the filming).
- Project will not involve use of exotic plant or animal species that could cause danger of introduction into the area.
- Project will not involve WSAs, non-WSA lands with wilderness characteristics, WSR corridors, National Register Eligible Sites, and Native American Sacred Sites.
- Project will not involve adverse impacts to sensitive surface resource values including: historic, cultural or paleontological sites; sensitive soils; relict environments; wetlands or riparian areas; ACECs.

BLM_0013919

- Project does not involve substantial restriction of public access.
- Project does not involve substantial use of domestic livestock.
- Project does not involve 15 or more production vehicles within sensitive area.
- Project does not involve 75 or more people within sensitive area.
- The activity within the sensitive area will not continue in excess of 10 days.
- No refueling allowed within sensitive areas.
- Aircraft use in area with wildlife concerns is not proposed during crucial wildlife period for more than 1 day and does not exceed frequency of 2 projects per 30-day period.
- Aircraft use in area with no wildlife concerns is proposed for no more than 2 days and does not exceed frequency of 3 projects per 30-day period.
- Use of aircraft is not proposed within 0.5 mile of a designated campground located within a sensitive area and the number of low-elevation passes will not exceed 4 passes per day.

### *Recreation and Public Purpose Act (R&PP) and Other Authorizations for Disposal*
### LAR-7
Lands conveyed to state or local governments or non-profit organizations under the R&PP Act may include those identified in LTAs. In addition, requests for lands other than those identified could be considered for disposal provided the proposed use will provide a greater public benefit than that which the current management provides, and that the action is otherwise consistent with this RMP. Examples may include but are not limited to local government or non-profit recreational and public purposes facilities such as public shooting ranges, landfills, motocross tracks, racetracks, etc. Other authorizations for disposal include the Airport and Airway Improvement Act, state selections under the Enabling Act, and other authorities.

### *Trespass Resolution*
### LAR-8
Resolution of intentional trespass will be limited to removal and/or restoration as appropriate. Resolution of unintentional trespass may include authorization under ROW grant, commercial/agricultural lease, or permit; disposal of the impacted land through sale or exchange; or removal, depending on the nature of the trespass. In all such trespass cases, administrative costs incurred by the BLM for investigating and resolving trespasses will be collected. All trespass incidents resolved by issuance of ROW grants, leases, or permits will be subject to payment by the holder/lessee/permittee of rent based on market value. Trespass cases resolved by land sales will be based on fair market value, and land exchanges will be completed on an equal value basis.

### *Access*
### LAR-9
ROWs for state and private in-holdings, in-field oil and gas leases, and pipelines for producing oil and gas wells will be approved subject to a determination of "reasonable" access for the "intended purpose" and they are processed and issued upon application.

### LAR-10
As per the State of Utah v. Andrus, October 1, 1979 (Cotter Decision), the BLM will grant the State of Utah reasonable access to state lands for economic purposes, on a case by case basis.

BLM_0013920

### *Easements*
### LAR-11

Easements will be acquired from willing landowners and the State of Utah to gain access to public lands or placement of facilities on non-public lands, and acquire easements to accomplish resource objectives.

### *Rights-of-Way (ROW)*
### LAR-12

Rights-of-Way (ROW) avoidance and exclusion areas will generally be consistent with the stipulations identified in Appendix B for oil and gas leasing and other surface-disturbing activities. These stipulations have been developed to protect important resource values. Areas identified as NSO are open to oil and gas leasing but surface-disturbing activities cannot be conducted on the surface of the land. Access to oil and gas deposits will require directional drilling from outside the boundaries of the NSO areas. NSO areas are avoidance areas for ROWs; no ROW will be granted in NSO areas unless there are no feasible alternatives.

### LAR-13

Applications for new ROW on public lands will be considered and analyzed on a case-by-case basis, taking into consideration areas identified for avoidance and exclusion. Proposals will be reviewed for consistency with planning decisions and evaluated under requirements of applicable laws for resource protection.

### LAR-14

Consider lands available for ROWs except for exclusion and avoidance areas (Map 4):

### *Exclusion Areas: 416,115 acres*

- WSAs 389,444 acres (Mancos Mesa, Grand Gulch ISA Complex, Road Canyon, Fish Creek Canyon, Mule Canyon, Cheesebox Canyon, Dark Canyon ISA Complex, Butler Wash, Bridger Jack Mesa, Indian Creek, South Needles, Squaw and Papoose Canyons, and Cross Canyon
- Lands administratively endorsed for wilderness by Butler Wash North WSA
- Valley of the Gods ACEC (22,863 acres)
- San Juan River Segment 5
- Colorado River Segment 3

### *Avoidance Areas: 133,293 acres*

- Indian Creek ACEC (3,908 acres)
- Shay Canyon ACEC (119 acres)
- Lavender Mesa ACEC (649 acres)
- Hovenweep ACEC (880-acre Visual Emphasis Zone)
- Alkali Ridge National Historic Landmark (2,146)

BLM_0013921

- non-WSA with wilderness characteristics 88, 871 acres: (Dark Canyon, Nokai Dome East, Nokai Dome West, Grand Gulch, and Mancos Mesa),
- Comb Ridge Recreation Management Zone of Cedar Mesa SRMA (30,752 acres)
- San Juan River SRMA (except for Wild & Scenic River Segment 5 which is an exclusion area)
- Colorado River Segment 2
- developed recreation sites
- floodplains
- riparian areas and springs
- public water reserves.

### *Wind and Solar Development*
### LAR-15

ROW applications for wind or solar energy development will incorporate best management practices (BMPs) and provisions contained in the Wind Energy or Solar Programmatic EIS documents.  Both wind and solar energy development are authorized by ROW grants.

### *Sale Disposal Criteria*
### LAR-16

As described under Sections 203 (a) of FLPMA (43 United States Code [U.S.C.] 1713; 1716), public lands have potential for disposal by sale when they are isolated and/or difficult to manage.

### LAR-17

Dispose of approximately 6,760 acres of lands identified in Appendix J.  These lands need to be screened on a case-by-case basis to assure that they meet FLPMA disposal criteria.

### *Transportation and Utility Corridors*
### LAR-18

This RMP will adopt the existing designated ROW corridors from the 1991 San Juan RMP including the Western Utility Group (WUG) updates to the Western Regional Corridor Study (Map 5), Section 368 Energy Policy Act of 2005, Westwide Energy Corridor PEIS.  Designate additional corridors as needed subject to physical barriers and sensitive resource values. Designated transportation and utility corridors include existing groupings of ROWs for electric transmission facilities, pipelines 16 inches and larger, communication lines, federal and state highways, and major county road systems.

### *Withdrawal Processing and Review*
### LAR-19

Review agency withdrawals and prior Classification and Multiple Use Act (C&MU) classifications according to schedules prepared by USO or upon special BLM or agency request. Review other-agency withdrawals (24,140 acres) and withdrawals found to be obsolete can be removed. New withdrawal applications are processed upon request from the BLM or other federal agencies but withdrawals can be made only by the Secretary or Congress.

BLM_0013922

**LAR-20**

Support from Utah State Office and Washington Office will be needed for requests for withdrawal. Interdisciplinary staff support will be needed for coordination and development of site-specific mitigation. Coordination with surface owners, surface-administering agencies, or the State of Utah may also be required. Coordination with the U.S. Fish and Wildlife Service will be required where threatened or endangered species are involved.

**LAR-21**

Initiate withdrawal processing on areas recommended for withdrawal from mineral entry (50,665 acres) (Map 6):

- Grand Gulch National Historic District (37,388 acres)
- All developed recreation sites (232 acres)
- San Juan River SRMA (9,859 acres)
- Alkali Ridge National Historic Landmark (2,146 acres)
- Colorado River Segment 3 (1,040 acres)

BLM_0013923

## *LIVESTOCK GRAZING (GRA)*

### Goals and Objectives:

Achieve Rangeland Health Standards (BLM 1997) and other desired resource conditions.

### Management Actions:

### GRA-1

Manage grazing according to Standards for Rangeland Health and Guidelines for Grazing Management (BLM 1997) (Appendix F).

### GRA-2

Maintain lands currently unavailable (128,098 acres) for livestock grazing (due to vegetation, recreation, wildlife, or other concerns). These areas are included in GRA-17.

### GRA-3

Maintain existing land treatments, to meet RMP objectives and Standards for Rangeland Health (BLM 1997). Any new land treatments developed in addition to those listed will also be maintained as necessary to meet RMP objectives and Standards for Rangeland Health.

### GRA-4

Modify and implement existing (Tank Draw and East Canyon) and new Allotment Management Plans (AMPs) as necessary to meet RMP objectives and Standards for Rangeland Health (BLM 1997). Develop and implement 29 new AMPs and others identified on a site-specific basis, for which resource concerns develop that require such action.

### GRA-5

Continue to authorize current active permitted grazing use unless monitoring data or other factors indicate a need for change (e.g., change in federal land ownership, etc.).

### GRA-6

Continue to categorize allotments in accordance with BLM policy.

### GRA-7

Manage allotments towards mid- to late-seral ecological condition that meet other goals and objectives of this RMP until replaced by a more specific allotment objective classification such as Desired Future Condition (DFC).

### *Forage, Livestock/Wildlife*
### GRA-8

Coordinate with UDWR and grazing permittees to manage for long-term forage and habitat and/or ecological condition requirements or needs for livestock and wildlife, consistent with grazing allotment and herd management unit objectives.

BLM_0013924

### *Seasons of Use*
### GRA-9

Changes in livestock season of use will be made by the FO on an allotment-specific basis to meet RMP objectives or Standards for Rangeland Health (BLM 1997), as shown by monitoring data, and to provide flexibility in management of livestock grazing.

### GRA-10

Allotment seasons of use, subject to the statement above, will be as identified in Appendix F (Utah Standards and Guidelines for Rangeland Health).

### GRA-11

Season of Use Changes (modified to match grazing permits as currently authorized, yet altered from the 1991 San Juan RMP):

- Church Rock season of use is December 1 - May 31.
- Indian Rock season of use is November 15 - April 15.
- Owens Dugout season of use is February 1 - April 30.
- Laws season of use will be April 16–November 15.
- Bear Trap Season of use will be September 1–December 12.
- Monument Canyon season of use will be December 1–May 31.

### GRA-12

New Allotments—Established Since 1991 San Juan RMP (grazing permits as currently authorized):

- South Vega season of use will be January 6–February 28.
- Upper Mail Station season of use will be November 14–February 28.
- Big Westwater season of use will be April 1–May 31 or October 15–December 15.

### *Glen Canyon NRA*
### GRA-13

Specific management direction for livestock grazing is provided for under the Glen Canyon NRA 1999 Grazing Management Plan.

### *Utilization*
### GRA-14

Desired utilization levels as management guidelines for key forage species will be identified as needed to monitor use levels on an allotment specific basis to achieve Desired Future Condition (DFC). Where utilization levels have not been established, a use level of 50% will be the management guideline. Utilization is the proportion or degree of current year's forage production that is consumed or removed by animals (including insects). Utilization data should be analyzed in conjunction with climate, actual grazing use, current or historic impacts (wildfire, livestock, wildlife, insects, etc.), and long-term trend data to help evaluate existing and design future management to meet LUP objectives.

BLM_0013925

### *Relinquishment of Preference*
## GRA-15

Voluntary relinquishments of grazing permits and preference, in whole or in part, by a permittee in writing to the BLM will be handled on a case by case basis. The BLM will not recognize relinquishments that are conditional on specific BLM actions as valid, and the BLM will not be bound by them. Relinquished permits and the associated preference will remain available for application by qualified applicants after BLM considers if such action will meet rangeland health standards and is compatible with achieving LUP goals and objectives. Prior to re-issuance of the relinquished permit the terms and conditions may be modified to meet LUP goals and objectives and/or site-specific resource objectives.

## GRA-16

However, upon relinquishment, BLM may determine through a site-specific evaluation and associated NEPA analysis that the public lands involved are better used for other purposes. Grazing may then be discontinued on the allotment through an amendment to the existing LUP or a new LUP effort. Any decision issued concerning discontinuance of livestock grazing is not permanent and may be reconsidered and changed through future LUP amendments and updates.

### *Areas Unavailable for Grazing*
## GRA-17

Make 133,318 acres unavailable for grazing as follows (Map 7):

- Comb Wash side canyons (Mule Canyon south of U-95, Arch, Fish, Owl, and Road). These areas were made unavailable to grazing by court decision and are also made unavailable to grazing in this RMP.
- Bridger Jack Mesa (near relict vegetation)
- Grand Gulch area (within the canyon) of Cedar Mesa
- Lavender Mesa (relict vegetation)
- Five identified mesa tops (White Canyon area)
- Pearson Canyon (hiking area boundary)
- Developed recreation sites (currently developed and proposed and listed in the recreation section. Any sites additional to those listed may be unavailable for grazing without a plan amendment and will be analyzed with site-specific NEPA).
- Parts of the slopes of Peter's Canyon and East Canyon (15,720 acres of wildlife habitat)
- Slickhorn Canyon (within Perkins Brother's Allotment).
- Rone Bailey Mesa (within Upper Mail Station Allotment)
- Dodge Canyon Allotment
- Rogers Allotment
- Portions of West Butler Wash Canyons
- Horsehead Canyon (within Montezuma Canyon allotment)
- Dark Canyon Area with the exception of 962 acres in Fable Valley that is limited to trailing on an annual basis and grazing use under emergency conditions.

BLM_0013926

## GRA-18

Areas made unavailable for grazing or restricted to trailing only may be reconsidered as available for grazing during subsequent revision or amendment of the RMP.

### *Other Grazing Management*

## GRA-19

Restrict 6,518 acres to livestock trailing only, no grazing in the following areas (may only include a portion of the area): Dark Canyon area (Fable Valley), Harts Canyon, Shay Canyon ACEC, and Indian Creek from Kelly Ranch vicinity to USFS boundary.

## GRA-20

Moki Canyon and Lake Canyon will be restricted to trailing only except in the spring and fall for up to 1 to 2 weeks for gathering livestock prior to moving to and from these areas.

## GRA-21

Moki Canyon is open to grazing above the fence northeast of Harrison Spring and below the fence downstream from the sand slide road access to Moki Canyon.

## GRA-22

The BLM will develop seasonal restrictions, closures, and/or forage utilization limits on grazing in riparian areas deemed Functioning at Risk and/or Non-functional.

## GRA-23

Grazing in the riparian area of the San Juan River SRMA will be restricted to October 1–May 31 and must meet or exceed PFC, and incorporate rest-rotation and/or deferment systems. This will include Perkins Brothers, East League, and McCracken Wash Allotments.

## GRA-24

Sage Flat, Upper East Canyon, Sage-grouse and Dry Farm allotments will not be grazed from March 20 to May 15 (Gunnison Sage-grouse nesting season).

BLM_0013927

## MINERAL RESOURCES (MIN)

### Goals and Objectives:

- Continue to meet local and national energy and other public mineral needs to the extent possible. Provide opportunities for environmentally responsible exploration and development of mineral and energy resources subject to appropriate BLM policies, laws, and regulations.
- Ensure a viable long-term industry related to leasable, locatable, and salable mineral development while providing reasonable and necessary protections to other resources. Establish conditions of use through land-use planning to protect other resource values.
- The following principles will be applied:

    - Encourage and facilitate the development by private industry of public land mineral resources in a manner that satisfies national and local needs and provides for economical and environmentally sound exploration, extraction and reclamation practices;

    - Process applications, permits, operating plans, mineral exchanges, leases, and other use authorizations for public lands in accordance with policy and guidance; and

    - Monitor salable and leasable mineral operations to ensure proper resource recovery and evaluation, production verification, diligence and inspection, and enforcement of the lease, sale, or permit terms.

### Management Actions:

#### MIN-1

The plan will provide for a variety of mineral exploration and development activities. These activities will be allowed in the PA unless precluded by other program prescriptions. The stipulations identified in Appendix B will apply to these activities where they are applicable. Seasonal wildlife conditions will not apply to maintenance and operation activities for mineral production (see also Wildlife).

#### MIN-2

WSAs and designated Wilderness will remain closed, by law, to mineral leasing and development.

#### MIN-3

The MFO is available for geophysical work unless stated otherwise.

#### MIN-4

The MFO will be open for mineral entry unless specifically withdrawn by Secretarial Order, public law or segregated from mineral entry under specific reservations, such as an R&PP lease.

#### MIN-5

In areas where the No Surface Occupancy (NSO) stipulation for oil and gas leasing is applied, the same restriction will also, where appropriate and practical, apply to other surface-disturbing activities (and occupancy) associated with land-use authorizations, permits, and leases issued on

BLM_0013928

BLM lands. The restrictions will not apply to activities and uses where they are contrary to laws, regulations or specific program guidance. The intent is to maintain consistency to the extent possible in applying stipulations/restrictions to all surface-disturbing activities.

### *Leasable Minerals*
#### *Oil and Gas*

**MIN-6**

The plan will recognize and be consistent with the National Energy Policy Act and related BLM policy by adopting the following objectives:

- recognizing the need for diversity in obtaining energy supplies;
- encouraging conservation of sensitive resource values; and
- improving energy distribution opportunities.

**MIN-7**

All lands are available for leasing subject to standard lease terms, unless otherwise specified in the plan. Lease stipulations have been developed, where necessary, to mitigate the impacts of oil and gas activity (Appendix B). These stipulations adhere to the Uniform Format prepared by the Rocky Mountain Regional Coordinating Committee in March 1989. Stipulations reflect the minimum requirements necessary to accomplish the desired resource protection and contain provisions and criteria to allow for exception, waiver, and modification if warranted. Stipulations from Section 6 of the Standard Lease Terms are incorporated for all leases. Best Management Practices (BMP) will be applied on individual Applications for Permit to Drill (APD) and associated ROWs. These procedures are based on WO IM 2007-021 and the *Surface Operating Standards and Guidelines for Oil and Gas Development (Gold Book), 2006.*

**MIN-8**

Oil and gas leases issued prior to the plan will continue to be managed under the stipulations in effect when issued. Those issued subsequent to this plan will be subject to the stipulations developed in this plan.

**MIN-9**

Certain federal oil and gas resources within the Monticello PA underlie lands not administered by the BLM. The BLM administers the federal leases on these lands. These lands include:

- 101,720 acres within the Glen Canyon National Recreation Area (NRA) (see Glen Canyon NRA Minerals Management Plan)
- 366,850 acres within the Manti–La Sal National Forest (NF), Monticello Ranger District
- 51,610 acres within the Navajo Indian Reservation
- 1,080 acres within Indian Trust lands
- 55,390 acres on split-estate lands

BLM_0013929

**MIN-10**

Split-estate lands (private surface/federal minerals) and lands administered by other federal agencies are not managed by the BLM. The surface owner or surface management agency (SMA) manages the surface. The BLM administers the operational aspects of oil and gas leases. On lands administered by other federal agencies, lease stipulations will include those required by the SMA. On split-estate lands, lease stipulations will consist of those necessary to comply with non-discretionary federal laws, such as the Endangered Species Act. The one exception to this will be the stipulations developed for Gunnison Sage-grouse as identified in Appendix B. Mitigation measures will also be applied to protect other resource values such as VRM class, recreation, and non-federally protected fish and wildlife species consistent with Section 6 of the standard lease terms. These mitigation measures will be developed during site-specific environmental analysis and will be attached as conditions of approval (COA) in consultation with the surface owner or SMA.

**MIN-11**

In accordance with an UDEQ-DAQ letter dated June 6, 2008, (Appendix C) requesting implementation of interim nitrogen oxide control measures for compressor engines; the BLM will require the following as a Lease Stipulation and a Condition of Approval for Applications for Permit to Drill:

- All new and replacement internal combustion oil and gas field engines of less than or equal to 300 design-rated horsepower must not emit more than 2 gms of $NO_x$ per horsepower-hour. This requirement does not apply to oil and gas field engines of less than or equal to 40 design-rated horsepower.
- All new and replacement internal combustion oil and gas field engines of greater than 300 design rated horsepower must not emit more than 1.0 gms of $NO_x$ per horsepower-hour.

*Coal*
**MIN-12**

The coal resources within the Monticello PA are limited to the San Juan Coal Field, totaling about 530,000 acres. Approximately 60% of this field is under private ownership (both surface and mineral estate), and about 212,000 acres of federal surface and federal minerals in the coal field are administered by the Monticello FO. The potential for development of coal resources is low (see Mineral Potential Report and RFD [BLM 2005]). The public has expressed no interest in coal leasing. The RMP does not establish conditions for coal leasing or exploration requirements. This will be done through a plan amendment, should sufficient interest warrant. At such time as interest is expressed in coal leasing, the RMP will be amended and mining unsuitability criteria (43 CFR 3461) will be applied by the Monticello FO before any coal leases are issued. If coal leases are issued, they will be subject to special conditions developed in the RMP amendment and the unsuitability assessment. This may restrict all or certain types of mining techniques. Before any coal could be removed, Monticello FO will have to approve the mining permit application package, incorporating stipulations developed in the RMP

*Tar Sands*
**MIN-13**

An Oil Shale and Tar Sands Leasing Programmatic Environmental Impact Statement (PEIS) is being prepared for oil shale and tar sands resources leasing on lands administered by the U.S.

BLM_0013930

Department of the Interior, Bureau of Land Management (BLM) in Colorado, Utah, and Wyoming. Based upon the information and analyses developed in this PEIS, the BLM will amend LUPs for these areas.

## *Potash (Non-energy Leasable)*

### MIN-14

Within the Monticello PA, two areas fall within Known Potash Leasing Areas (KPLAs). KPLA designations, based on known geologic data, will remain in place until potash resources are depleted. In KPLAs, potash leases are acquired through competitive bidding. In areas where potash values are not known, the Monticello PA could issue prospecting permits, which could lead to issuance of a preference right lease. The RMP establishes stipulations that will apply to prospecting permits and leases. The KPLAs are available for leasing subject to the same lease stipulations developed in the RMP for oil and gas. Additional KPLAs could be designated, based on geologic data, if interest warranted. This will be an administrative action. Exploration and mining operations for potash are conducted in accordance with the regulations at 43 CFR 3590.

## *Leasable Minerals: Geothermal*

### MIN-15

A portion of the Warm Springs Canyon geothermal area (approximately 16,320 acres) extends into the Monticello PA. Low temperature geothermal waters have been recorded from springs. Because the Monticello PA is situated within the Colorado Plateau geologic province, where heat flow through the earth's crust is generally low, no high-temperature geothermal resources are expected at reasonable drilling depths. Therefore, development potential is low (see Mineral Potential Report and RFD [BLM 2005]). The public has expressed no interest in geothermal leasing. The RMP does not establish conditions for geothermal leasing or exploration requirements. This will be done through a plan amendment should sufficient interest warrant.

## *Locatable Minerals*

### MIN-16

All public domain lands overlying federal minerals are available for mining claim location unless specifically withdrawn from mineral entry by Secretarial Order or public law or segregated from mineral entry under specific reservations, such as an R&PP lease.

### MIN-17

The RMP recommends certain lands to be withdrawn from mineral entry. Claims located on these areas prior to withdrawal will not be impacted. Operations on BLM-administered lands available for mineral entry must be conducted in compliance with the BLM's surface management regulations (43 CFR Subparts 3802, 3809, 3715 and 3814). BLM surface management regulations do not apply to operations on other federal lands but do apply to all operations authorized by the mining laws on public lands where the mineral interest is reserved to the United States, including Stock Raising Homestead lands.

### MIN-18

The BLM will evaluate all operations authorized by the mining laws in the context of its requirement to prevent unnecessary and undue degradation of Federal lands and resources.

BLM_0013931

Consistent with the rights afforded claimants under the mining laws, operations will conform to the management prescriptions in the plan.

## MIN-19

Federally owned locatable minerals underlying federal lands administered by the NPS are not generally available for mineral entry. However, locatable minerals under Glen Canyon NRA may be leased under Title 43 of the Code of Federal Regulations, part 3500 (43 CFR 3500) in accordance with the Mineral Management Plan for the NRA.

### *Salable Minerals*
## MIN-20

All BLM-administered lands in the MFO are placed in one of the following three categories:

- Available for disposal of mineral material subject to standard conditions.
- Available for disposal of mineral material subject to special conditions.
- Unavailable for disposal of mineral material.

## MIN-21

Management conditions for disposal of mineral materials under each category correspond respectively to the oil and gas leasing stipulations developed in the RMP, as follows:

- Standard lease terms
- TL and CSU
- NSO and closed

## MIN-22

There are 16 community pits, totaling about 5,505 acres.

### *Lands Available for Oil and Gas Leasing (Map 18)*
## MIN-23

Approximately 484,217 acres are administratively available for oil and gas leasing, subject to standard lease terms.

## MIN-24

Timing Limitations: Approximately 594,469 acres are administratively available for oil and gas leasing subject to timing limitations.

## MIN-25

Controlled Surface Use: Approximately 60,741 acres are administratively available for oil and gas leasing subject to controlled surface use.

BLM_0013932

*Monticello Approved RMP—Mineral Resources*

**MIN-26**

Controlled Surface Use and Timing Limitations: Approximately 85,384 acres are administratively available for oil and gas leasing subject to timing limitations and controlled surface use.

**MIN-27**

No Surface Occupancy: Approximately 66,108 acres are administratively available for oil and gas leasing subject to no surface occupancy.

**MIN-28**

Dark Canyon (11,619 acres) non-WSA lands with wilderness characteristics are available for oil and gas leasing subject to no surface occupancy.

**MIN-29**

Approximately 493,400 acres are unavailable for leasing.

**MIN-30**

Mancos Mesa, Nokai Dome West, Nokai Dome East and Grand Gulch non-WSA lands with wilderness characteristics are unavailable for oil and gas leasing.

*__Lands Available for Mineral Entry__*
**MIN-31**

Approximately 1,734,458 acres are available for mineral entry.

**MIN-32**

Approximately 50,665 acres are recommended for withdrawal from locatable mineral entry (Map 6).

*__Lands Available for Mineral Material Disposal__ (Map 19)*
**MIN-33**

Approximately 624,734 acres are available for disposal of mineral materials subject to standard terms and conditions.

**MIN-34**

Approximately 724,234 acres are available for disposal of mineral materials subject to special conditions.

**MIN-35**

Approximately 435,338 acres are unavailable for disposal of mineral materials.

BLM_0013933

## NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS (WC)

**Goals and Objectives:**

Protect, maintain and preserve wilderness characteristics (appearance of naturalness and outstanding opportunities for primitive and unconfined recreation or solitude) of non-WSA lands with wilderness characteristics as appropriate, considering manageability and the context of competing resource demands. Manage these primitive lands and backcountry landscapes for their undeveloped character, and to provide opportunities for primitive recreational activities and experiences of solitude, as appropriate.

**Management Actions:**

**WC-1**

Manage 88,871 acres of non-WSA lands with wilderness characteristics for their wilderness characteristics (Map 8) in 5 individual areas: Dark Canyon (11,540 acres), Mancos Mesa (30,068 acres), Nokai Dome West (14,988 acres), Nokai Dome East (18,618 acres) and Grand Gulch (13,657 acres). The following management will apply:

- Unavailable for mineral leasing in Mancos Mesa, Nokai Dome West, Nokai Dome East and Grand Gulch; no surface occupancy for mineral leasing (NSO) in Dark Canyon
- OHV travel limited to designated roads and trails. There are no routes designated within the 88,871 acres protected for their wilderness characteristics.
- ROW avoidance areas
- Closed to disposal of mineral materials
- Unavailable for private and commercial woodland harvest except for on-site collection of dead wood for campfires
- Available for range, watershed or habitat improvements and vegetation treatments if beneficial or non-impairing to wilderness characteristics and will meet VRM Class II objectives
- VRM Class II for surface-disturbing activities
- All existing improvements could be maintained at their current level
- Unavailable for coal leasing
- Unavailable for geothermal leasing
- Fire suppression will be through light on the land techniques

BLM_0013934

## PALEONTOLOGY (PAL)

### Goals and Objectives:

Identify area-wide criteria or site-specific use restrictions where necessary to protect paleontological resources from surface-disturbing activities and to promote the scientific, educational, and recreational uses of fossils. Foster public awareness and appreciation of the paleontological heritage.

### Management Actions:

### PAL-1

Recreational collectors may collect and retain reasonable amounts of common invertebrate and plant fossils for personal, noncommercial use. Surface disturbance must be negligible, and mechanized tools may not be used.

### PAL-2

Petrified wood collection will be limited to amounts mandated in BLM regulations.

### PAL-3

Collection of scientifically noteworthy and/or uncommon invertebrate and plant fossils may require a permit.

### PAL-4

Vertebrate fossils may be collected only under a permit issued by the authorized officer to qualified individuals. Vertebrate fossils include bones, teeth, eggs, and other body parts of animals with backbones such as dinosaurs, fish, turtles, and mammals. Vertebrate fossils also include trace fossils such as footprints, burrows, and dung.

### PAL-5

Casting of vertebrate fossils, including dinosaur tracks, will be prohibited unless allowed under a scientific/research permit issued by the Utah State BLM Office.

### PAL-6

Fossils collected under a permit remain the property of the federal government and must be placed in a suitable repository (such as a museum or university) identified at the time of permit issuance.

### PAL-7

Lands identified for disposal or exchange will be evaluated to determine whether such actions will remove important fossils from federal ownership.

BLM_0013935

**PAL-8**

In areas where surface disturbance, either initiated by the BLM or by other land users, may threaten substantial or noteworthy fossils, the BLM will follow its policy per Paleontology Resources Management Manual and Handbook 8370-1 (BLM 1998a) to assess any threat and mitigate damage.

**PAL-9**

Where scientifically noteworthy fossils are threatened by natural hazards or unauthorized collection, the BLM will work with permittees and other partners to salvage specimens and reduce future threats to resources at risk.

**PAL-10**

Conduct on-site evaluation of surface-disturbing activities for all Class 5 areas and minimize impacts to paleontological resources to the degree practicable. Evaluation will consider the type of surface disturbance proposed and mitigation will be developed based on site-specific information.

BLM_0013936

## *RECREATION (REC)*

### Goals and Objectives:

To provide for multiple recreational uses of the public lands and to sustain a wide range of recreation opportunities and potential experiences for visitors and residents while supporting local economic stability and sustaining the recreation resource base and other sensitive resource values.

### Management Actions:

### REC-1

Continue existing reservations issued to the BLM for all existing developed recreation sites and facilities. Issue similar protective reservations for all new recreation facilities.

### REC-2

Manage recreation to meet Utah's Rangeland Health Standards guided by the Standards for Public Land Health and Guidelines for Recreation Management (Appendix K). The guidelines describe the procedures that should be applied to achieve standards for rangeland health within the recreation program.

- Recognize that various levels of regulations and limits are necessary. Restrictions and limitations on public uses should be as minimal as possible without compromising the primary goal.
- Use on-the-ground presence (BLM, site stewards, volunteers) as a tool to protect public lands.
- Limit or control activities where long-term damage by recreational uses is observed or anticipated through specialized management tools such as designated campsites, permits, area closures, and limitations on number of users and duration of use. Revise recreation area management plans (RAMP) as necessary to maintain public land health.
- Coordinate with federal and state agencies, county and local governments, and tribal nations in recreation planning and managing traffic, search and rescue operations, trash control and removal, and public safety.
- Consider and, where appropriate, implement management methods to protect the resource, as well as maintain the quality of experience of the various user groups. These methods could include limitation of numbers, types, timing, and duration of use.
- Encourage the location of public land recreational activities near population centers and highway corridors by placement of appropriate visitor-use infrastructure. Provide restrooms and other facilities that will be adequate for anticipated uses at designated campgrounds, trailheads, and other areas where there is a concentration of recreational users.
- Emphasize "Leave No Trace" camping and travel techniques throughout the Monticello PA.
- Consider and, where appropriate, implement management methods to protect natural and cultural resources and while giving consideration to community and economic impacts, implement management methods to maintain or enhance recreation opportunities. Management methods may include limitation of visitor numbers, camping and travel

BLM_0013937

controls, implementation of fees, alteration of when use takes place, and other similar actions as they are approved through normal BLM procedures.

- Coordinate management of recreation use with other agencies, state and local government, and tribal units to provide public benefits, help assure public safety, and make effective use of staff and budget resources.
- Recreational OHV and mechanized travel will be consistent with route and area designations described in the travel management decisions. The BLM will work with agency and government officials and permit holders to develop procedures, protocols, permits or other types of authorization, as appropriate, to provide reasonable access for non-recreational use of OHVs for military, search and rescue, emergency, administrative, and permitted uses.
- OHV access for game retrieval will follow all area and route designations. (There will be no off-road retrieval.)
- Dispersed camping, where allowed when not specifically restricted, may be closed seasonally or as impacts or environmental conditions warrant.

### *General Recreation Management*
### REC-3

Allow development of hiking paths and trails within the PA subject to site-specific NEPA.


### REC-4

The following actions require a signed agreement with the specified agency:

- Manage the BLM portion of the Colorado River in coordination with Canyonlands National Park and the Moab BLM FO.
- Manage the BLM portion of the San Juan River in coordination with Glen Canyon National Recreation Area and the Navajo Nation.
- Manage the BLM portion of Dark Canyon Complex in coordination with Manti–La Sal National Forest and Glen Canyon National Recreation Area.
- Manage the BLM portion of the Keeley Trail in coordination with Hovenweep National Monument.

### *Management of Existing and Development of Future Recreation Facilities*
### REC-5

Existing developed recreation sites will be maintained. New sites/facilities/trails will be developed in response to user demand, amenity value, and critical resource protection needs.


### REC-6

All developed recreation sites are recommended for withdrawal from locatable mineral entry.


### REC-7

Recreation facilities will be closed to disposal of mineral materials.

BLM_0013938

## REC-8

Developed recreation sites are available for oil and gas leasing subject to NSO. NSO boundaries around developed recreation sites are defined as one quarter mile from the perimeter of campgrounds and 200 meters from the perimeter of other developed recreation sites.

## REC-9

These sites are also available for oil and gas leasing subject to NSO and unavailable for disposal of mineral materials.

## REC-10

Grazing is excluded from developed recreation sites.

## REC-11

Developed recreation facilities are unavailable for private and/or commercial use of woodland products including on-site collection of dead wood for campfires.

### *General Recreation Management*

## REC-12

Benefits Based Management Goals and Objectives (BBMs) have been written for most SRMAs. (Appendix K)

## REC-13

No camping within 200 feet of isolated springs to allow space for wildlife to access water.

## REC-14

No camping is allowed within cultural sites or archaeological resources as defined in ARPA.

### *Management of Existing and Development of Future Recreation Facilities*

## REC-15

Develop or improve development of recreation sites as prioritized below:

- Kane Gulch Ranger Station (40 acres)
- Sand Island Campground (21 acres)
- Mexican Hat Launch site (20 acres)
- Hamburger Rock Campground (20 acres)
- Comb Wash Campground (10 acres)
- Butler Wash Ruin (60 acres)
- Mule Canyon Ruin (10 acres)
- Three Kiva Pueblo (10 acres)
- Shay Mountain Vista Campground (20 acres)
- Indian Creek Recreational and Camping Facilities as outlined in the Indian Creek Recreation Corridor Plan (BLM 2005).

BLM_0013939

- The BLM will work with Natural Bridges National Monument to develop an overflow camping area. No campfires will be allowed in these overflow camping areas.
- The BLM will work with Canyonlands National Park Needles District to develop an overflow camping area.

### *Special Recreation Permits (SRPs)*
### REC-16

There will be no competitive mechanized or motorized events in WSAs in accordance with IMP.

### REC-17

SRPs will be issued as a discretionary action as a means to help meet management objectives, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors.

### REC-18

All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations (Appendix K) necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns.

### REC-19

SRPs will be used to manage different types of recreation associated with commercial uses, competitive events, organized groups, vending, and special areas. These recreation uses can include, for example, large group events, river guide services, and commercial recreation activities.

### REC-20

The BLM will follow the 43 CFR 2930, October 1, 2004, the National Guidelines on Cost Recovery (Federal Register, Volume 67, October 1, 2002), and the Utah Special Recreation Permit Cost Recovery Policy (Utah IM 2004-036).

### REC-21

In accordance with the BLM's Priorities for Recreation and Visitor Services Work Plan (May 2003, as amended), commercial SRPs will also be issued as a mechanism to provide a fair return for the commercial use of public lands.

### *Criteria for Requiring an SRP*
### REC-22

The criteria for requiring an SRP include the following:

- Any commercial use.
- Non-mechanized/non-stock day use organized group or event of more than 50 people in ERMA.
- Non-mechanized/non-stock overnight with group or event of more than 25 people in ERMA.

BLM_0013940

- More than 25 motorized vehicles/OHVs on designated routes (does not include County B Roads or state and federal highways).
- More than 25 nonmotorized mechanized vehicles on designated routes (does not include County B Roads or state and federal highways).
- A group size of more than 15 riding and/or pack animals.
- Car camping with more than 15 vehicles or more than 50 people.
- Activities or events with the potential to conflict with existing resource management guidelines/prescriptions.
- Events with the potential for user conflict.
- Events that could impact public health and safety.

### *Commercial*

### REC-23

Commercial motorized/mechanized events/tours are allowed on designated routes, except in WSAs.

### REC-24

Commercial use permits are authorized in conjunction with organized events or when the use supports resource protection and management.

### REC-25

In Arch Canyon, OHV use is limited to the designated route up to the National Forest boundary, a total of 8 miles one way. Organized and commercial groups will be required to obtain a Special Recreation Use Permit. This permit will allow access on the designated route up to the National Forest boundary, except from March 1 through August 31. During this period, access will be limited to 7.5 miles of the designated route. Therefore, during this period motorized access will not be allowed within .5 miles of the National Forest boundary.

### REC-26

Commercial motorized or mechanized events or tours in crucial bighorn sheep lambing and rutting areas may be limited in number of participants and duration (depending on the event) from April 1 to June 15 (lambing) and from October 15–December 15 (rutting), unless it can be shown that the animals are not present in a specific project location or the activity can be conducted so the animals are not adversely impacted.

### REC-27

Commercial motorized or mechanized events or tours in crucial antelope habitat may be limited in number of participants and duration (depending on the event) from May 1–June 15.

### REC-28

Commercial motorized or mechanized events or tours in crucial deer and elk winter range may be limited in number of participants and duration (depending on the event) from November 15–April 15.

BLM_0013941

## REC-29

Group sizes for commercial motorized events/tours are limited to 2 groups of 12 vehicles per route per day.

## REC-30

Balloon festivals are limited to 35 balloons with their associated support vehicles.

## REC-31

Commercial hiking tours in Comb Wash and Butler Wash are limited to 12 individuals. A permit system will be established for commercial day and overnight use.

## REC-32

Commercial camping is limited to designated areas.

## REC-33

Commercial hiking to cultural sites is limited to designated trails and human waste must be packed out.

## REC-34

Ropes and other climbing aides are not allowed to access cultural sites.

## REC-35

Commercial guides using dogs to hunt/pursue mountain lion and black bear will not operate in areas where dogs are prohibited.

## REC-36

Commercial motorized or mechanized cross country use is not allowed in the Cedar Mesa SRMA.

### *Competitive Events*

## REC-37

Motorized/mechanized competitive events will be authorized consistent with OHV designations.

## REC-38

Motorized and mechanized competitive events are not permitted in WSAs.

### *Special Recreation Management Areas (SRMA- seven areas, 562,824 acres)*

## REC-39

BLM_0013942

Provide general recreation management guidance and subsequent implementation of management decisions for activity plan–level actions for SRMAs through continuation of approved Recreation Area Management Plans (RAMPs) and development of new RAMPs for all SRMAs.

## REC-40

If necessary, activity plans will be written for SRMAs.

## REC-41

Review and update RAMPS as necessary to make adjustments for changing conditions and opportunities.

## REC-42

Domestic pets and pack animals are not allowed in cultural sites or on archaeological resources as defined in ARPA.

## REC-43

Ropes and other climbing aids are not allowed for access to cultural sites or archaeological resources as defined in ARPA, except for emergencies or administrative needs.

## REC-44

Camping is not allowed within cultural sites or archaeological resources as defined in ARPA.

## REC-45

Cultural sites may be closed to visitation when they are determined to be at risk or pose visitor safety hazards.

### *General SRMA Guidelines*

## REC-46

Identify additional SRMAs or add areas to SRMAs as necessary to respond to changing management circumstances. Establishment of post-RMP SRMAs or revision of SRMA boundaries will require a plan amendment. The criteria for establishment of post-RMP SRMAs or revising SRMA boundaries include:

- Recreation use requires intensive management to provide recreation opportunities or maintain resource values.
- A recreation area management plan or interdisciplinary plan with intensive recreation management decisions is approved.
- The BLM announces designation and plan approval through media.

## REC-47

BLM_0013943

All recreation management activities and developments in the SRMA will be in support of the individual SRMA goals and objectives.

## REC-48

All SRMAs will be designated as special areas under the Land and Water Conservation Fund (LWCF) definition. As per the Land and Water Conservation Fund Act and the Federal Lands Recreation Enhancement Act, this could require permits and payment of fees for recreation use.

### *San Juan River SRMA*

### Goals and Objectives:

- Provide outstanding river related recreational opportunities and visitor experiences while protecting natural and cultural resource values with integrated management between the BLM, NPS, and the Navajo Nation.
- Allow for boating and rafting activities regulated through permit issuance.

By the year 2012, manage this SRMA to provide opportunities for visitors to realize personal development and growth, enhanced lifestyle increased local tourism revenue and maintenance of distinct recreation setting character, providing no fewer than 80% of responding visitors and impacted community residents at least a moderate realization of these benefits: (i.e., 3.0 on a probability scale where 1 = not at all, 2 = somewhat, 3 = moderate, 4 = total realization).

## REC-49

Permits will be issued to commercial companies on a five-year designated basis. They will also be issued to private users through an annual lottery system.

## REC-50

River trips on the San Juan River require a special use permit.

## REC-51

Unavailable for woodland product use, except for limited on-site collection of dead wood for campfires. Woodland use within the floodplain is limited to collection of driftwood for campfires.

## REC-52

Cottonwood and willow harvest is allowed for Native American ceremonial uses only by permit. Restrictions on this permitted harvest will be implemented as necessary to achieve or maintain Proper Functioning Condition (PFC), and to maintain or improve threatened and endangered species/special status species (TES/SSS) habitat.

## REC-53

Backpackers in Slickhorn Canyon and Grand Gulch are not allowed to camp within 1 mile of the river.

BLM_0013944

**REC-54**

Campfires allowed only with a fire pan.

**REC-55**

The bench above Sand Island Campground (256 acres) is closed to camping.

**REC-56**

The San Juan River is managed as an SRMA (9,859 acres) (Map 9). The boundary remains as in the previous RMP with the exception of State Section 16 or the Holliday Pit Quarry on Lime Ridge.

**REC-57**

The SRMA boundary east of existing oil and gas leasing category NSO is below the bench, thereby allowing access to high-quality gravel.

*Motorized Boating*

**REC-58**

Downstream travel is allowed at low, wakeless speed. Upstream travel is prohibited, except for emergency purposes (SPM).

*Launch Limits*

**REC-60**

Launch limits allow approximately 40,000 user/days per year.

**REC-61**

Trip size is limited to 25 people total (including crew) for private trips. Commercial group size limits on the San Juan River will remain at 33 people (25 passengers plus 8 guides) per trip.

*Commercial/Private Allocations*

**REC-62**

Commercial use is allowed up to 40% of total use. Two commercial day trips per day (one launch of 25 passengers and one launch of ten passengers) are allowed and are not included in the launch limits.

*Administrative/Research Use*

**REC-63**

Administrative and research use will be authorized on a case-by-case review and determination.

*Visitor Services*

**REC-64**

Minimal visitor services at Sand Island and Mexican Hat ramp areas will be provided for visitor health and safety and resource protection.

*Designated Campsites*

**REC-65**

BLM_0013945

An MOU will be signed between the NPS/GCNRA and the Navajo Nation. This memorandum will include details on numbers of campsites and their associated permit restrictions.

### *Non-Boating Use*
### REC-66

With the exceptions of along Lime Creek Road, the Mexican Hat Rock area and Mexican Hat Boat Ramp, vehicle camping is allowed within the San Juan SRMA only upstream of Comb Wash. In this area, dispersed vehicle camping is allowed in previously disturbed areas within 150 feet of designated routes.

### REC-67

Lime Creek campsite is reserved for river runners only.

### REC-68

All campers (including backpackers) must have carry-out toilets.

### REC-69

The bench above Sand Island Recreation Area is closed to camping, including 122 acres outside of the SRMA which fall within the Extensive Recreation Management Area (ERMA).  The closure area boundary is described as:

a.  US Highway 191 on the north
b.  The edge of the bench to the south
c.  The private land on the west
d.  The edge of the bench on the east

### REC-70

Area wide, camping will be closed within 0.5 mile of designated campsites.

### *Minerals*
### REC-71

Available for oil and gas leasing subject to NSO and recommended for withdrawal from locatable mineral entry and unavailable for disposal of mineral materials.

### *Grazing*
### REC-72

Grazing in the riparian area is restricted to October 1–May 31 and must meet or exceed PFC, and incorporate rest-rotation and/or deferment systems. This includes Perkins Brothers (outside Slickhorn Canyon), East League, and McCracken Wash Allotments.

### *Watershed*
### REC-73

Watershed control structures are subject to surface restrictions and seasonal restrictions to protect bighorn sheep lambing and rutting areas.

BLM_0013946

## REC-74

Vehicle access in other areas within the SRMA is limited to designated routes.

## REC-75

Area is subject to fire suppression to protect riparian habitat.

### *Other*
## REC-76

Manage San Juan SRMA to maintain an environment of isolation insofar as allowed by river permit and patrol system.

## REC-77

Surface disturbance from mining activities on existing claims will be limited to the extent possible without unnecessary impact to valid existing rights.

## REC-78

No vehicle access or mechanized travel is allowed from Comb Wash downstream to Lime Creek and below Mexican Hat Bridge (except for motorized boat use on the river).

## REC-79

Mechanized/motorized travel is limited to designated routes.

### *Cedar Mesa SRMA*

### Goals and Objectives:

- Provide outstanding recreational opportunities and visitor experiences while protecting natural and cultural resource values through integrated management between the BLM and NPS.
- Provide a safe, natural well-designed accessible recreational experience for all visitors to enjoy the world renowned cultural resources and scenic values. Use visitor information and interpretation as a primary tool to protect sensitive resources, discourage vandalism, and encourage visitor appreciation of public lands.

By the year 2012, manage this SRMA to provide opportunities for visitors to realize personal development and growth, enhanced lifestyle increased local tourism revenue and maintenance of distinct recreation setting character, providing no fewer than 80% of responding visitors and impacted community residents at least a moderate realization of these benefits (i.e., 3.0 on a probability scale where 1 = not at all, 2 = somewhat, 3 = moderate, 4 = total realization).

## REC-80

Portions of the Cedar Mesa SRMA overlay four existing WSAs (Grand Gulch ISA Complex, Fish Creek Canyon, Mule Canyon and Road Canyon, Map 10) and the Valley of the Gods ACEC (Map 11). WSAs will be managed according to the IMP and Valley of the Gods ACEC will be

BLM_0013947

managed as VRM Class I, unavailable for private and commercial use of woodland products, campfires are not allowed, among other restrictions (see the Valley of the Gods ACEC section in this Chapter under Special Designations).

## REC-81

A joint recreation/cultural resources management plan (CRMP) will be written for this area based on the RMP.

## REC-82

The Cedar Mesa SRMA (407,098 acres) (Map 9), formerly the Grand Gulch Plateau SRMA, includes three Recreation Management Zones (RMZs) focused on more intense recreational use; Grand Gulch National Historic District Recreation Management Zone (37,388), Comb Ridge Recreation Management Zone (38,012 acres) and the McLoyd-Moon House Recreation Management Zone (1,607 acres). More specific or restrictive management is outlined under these three management zones and presented below. Generally, this SRMA is managed according to the following prescriptions:

- Where livestock grazing is permitted mitigation activities may be implemented if cultural resources are determined to be at risk.
- Available for watershed, range, and wildlife improvements and vegetation treatments.
- Campfires allowed on mesa tops only; fire pan required.
- Available for private and/or commercial use of woodland products including on-site collection of dead wood for campfires. Access to available areas will be limited to designated roads and trails, dependent on cultural Class III surveys and occur outside WSAs and canyon bottoms. Traditional cultural use by Native Americans of woodland products is allowed as long as other resource values are not adversely affected.
- Open to dispersed camping except in areas where cultural resources are at risk.
- Managed as VRM Class II, III and IV outside of WSAs and Valley of the Gods ACEC, which are managed as VRM Class I.

### *Pets and Stock*
## REC-83

If resources or the visitors' experiences are adversely impacted, pets and or stock animals may be limited or prohibited in canyons requiring permits.

## REC-84

No unauthorized use of existing corrals.

### *Areas for Day Stock Use Only*
## REC-85

Bullet Canyon from Grand Gulch to Jailhouse Ruin. Two miles upstream Fish Canyon from the confluence with Owl Canyon, McLoyd Canyon to impassable pour-off, and Owl Canyon to Nevill's Arch.

### *Pets*
## REC-86

BLM_0013948

No limit or fees for pets. All pets must be collared, leashed, and under human control at all times. No pets are allowed in Slickhorn Canyon or below Collins Canyon in Grand Gulch. Pets are not allowed in or at any alcoves, rock art sites, or ruins. Pets must not harass or harm wildlife. Pets must not harass visitors and other visitors' pets. Pets are not allowed to swim in springs, pot holes, or other natural water sources. Pet waste must be buried in a shallow hole away from trails, campsites, cultural sites, and natural water sources.

### *Stock (horses, llamas, goats, etc.)*
### REC-87

All commercial and private stock use requires a permit. Within the Grand Gulch NHD 1 stock trip at any one time will be allowed in the area, including day use. Other Cedar Mesa canyons allow 1 overnight stock trip at any one time, and unlimited day use.

### *Overnight Stock Use Areas*
### REC-88

Kane Gulch, Collins Canyon, Government Trail, Grand Gulch from Kane Gulch to Collins Canyon, Fish Creek Canyon from Comb Wash to confluence with Owl Canyon, Mule Canyon South of U-95, Road Canyon, Lime Creek Canyon, Johns Canyon, and Arch Canyon.

### *Areas Closed to Stock Use*
### REC-89

Grand Gulch below Collins Canyon, all the Slickhorn Canyons, Mule Canyons north of U-95, Bullet Canyon above Jailhouse Ruin, Fish Creek Canyon from 2 miles upstream from Fish Creek and Owl Creek confluence, and Owl Canyon above Nevill's Arch.

### *Use Limitations*
### REC-90

Stock use, both day and overnight, is subject to the provisions of the Grand Gulch Plateau Cultural and Recreation Management Plan, which allows for no more than 1 overnight stock party at a time in any canyon on Cedar Mesa. However, Grand Gulch is limited to only one stock trip at any time, day or overnight. Stock day use will be limited to 1 party per day per trailhead in all canyons requiring permits (except Grand Gulch and McLoyd). The BLM will monitor day use, and reserves the right to implement a day-use allocation and reservation system at a future date, if the impacts of day-use visitation warrant.

### *Group Size*
### REC-91

Overnight and day use in the Grand Gulch Primitive area and other Cedar Mesa Canyons is restricted to 12 individuals and 8 animals (pack and/or saddle).

### *Feed*
### REC-92

BLM_0013949

Stock users are required to take all feed (non-germinating, certified weed free) necessary to sustain their animals while on the trip.

### *Loose Herding*
**REC-93**

Loose herding of pack and saddle stock is prohibited. All stock must be under physical control. When tethered, all stock must be at least 200 feet away from any water source and archaeological sites and their surrounding benches.

### *No New Trails*
**REC-94**

In permitted canyons, no new trails will be established for stock use. Use is restricted to existing trails and routes in areas open to recreational stock use.

### *Mesa Top Camping*
**REC-98**

Vehicle camping is limited along designated routes to designated primitive vehicle campsites.

**REC-99**

Designated campsites for large groups (20 to 24 people).

**REC-100**

Group size is limited to 24 people for both private and commercial use.

**REC-101**

Closure of campsites impacting cultural sites.

**REC-103**

14-day camping limit within any 28 consecutive days, with the options of reducing the number of days or closing campsites if impacts occur.

### *In Canyon Private/Commercial Day Use*
**REC-104**

### *Private*
- Limit of 12 people per day per trailhead.
- Group size limited to 12.
- A limited day use permit system will be implemented as necessary to protect cultural and other resources.

**REC-105**

### *Commercial*

BLM_0013950

- Group size limited to 12.
- One commercial group per day per trailhead.
- Implement additional restrictions on group size and visitor frequency (based on monitoring of impact) as necessary to protect cultural or other resources.
- Advanced permit required through Monticello PA.

## REC-106
### *In Canyon Overnight Camping*
- Pack it in, pack it out. All cans, trash, organic garbage, and burnable refuse including toilet paper must be carried out. Liquid garbage may be discarded 200 feet away from water sources. Dish water must be strained and discarded 200 feet from camps, trails, and water sources.
- No swimming or bathing is allowed in the pools.
- Commercial allocation is 30% of the Cedar Mesa permitted use.
- Designated campsites for large groups of 8–12 people, and for groups with stock animals.
- Groups of 1–7 people will not have designated campsites and will camp in dispersed campsites.
- In canyon camping could be limited to certain designated areas if resource or cultural damage occurs.
- If human waste becomes a problem, a requirement to carry out waste may be implemented.
- Total caps on visitor numbers for each trailhead are shown below. Caps on visitor numbers or group size may be modified as necessary to protect resources.

## REC-107
### *Private*
- Private group size limited to 8 people per day per trailhead for overnight trips.

## REC-108
### *Commercial*
- Commercial group size limited to 12 people per day per trailhead.
- One commercial group per trailhead per day.
- Commercial guides are required to meet all pertinent state guidelines.

## REC-109
### *Trailhead Allocations*
Total overnight visitors per day:

- Kane             20
- Bullet           20
- Government       20
- Collins          20
- Fish/Owl         20
- Road Canyon      20
- Lime Creek       20
- Mule Canyons     20

BLM_0013951

- Slickhorn Canyons    20

If commercial cap limits are not met on a given day, additional private visitors will be allowed provided the overall cap of 20 people per trailhead is not exceeded.

### *Cedar Mesa SRMA Grand Gulch NHD Recreation Management Zone (RMZ)*
### REC-110

This area is a RMZ within the SRMA due to its high level of backcountry use and the potential to impact the high density world renowned cultural resources in this area. Restrictions and management prescriptions are intended to minimize conflict between this use and cultural resources. The following management prescriptions apply in this RMZ:

- Grand Gulch National Historic District is within a WSA and is managed under the IMP.
- In addition to the management prescriptions described above for the Cedar Mesa SRMA, Grand Gulch National Historic District (37,388 acres) is managed with the following prescriptions:
  - Unavailable for geophysical activities.
  - Recommended for withdrawal from locatable mineral entry.
  - Unavailable for private and/or commercial use of woodland products, except for limited on-site collection of dead wood for campfires.
  - Campfires limited to mesa tops only (no campfires in the canyon).
  - Available for livestock grazing, except Grand Gulch Canyon and associated tributaries, below Kane Gulch fence to the confluence with the San Juan River (approximately 16,316 acres).
  - Closed to OHV use.
  - Designate trails and camping areas as necessary to protect cultural resources.
  - If cultural or natural resources or the visitors' experiences are impacted, pets and or stock animals may be limited or prohibited in canyons requiring permits.
  - Non-motorized habitat improvements, watershed improvements, vegetation treatments, including aerial seeding, hand reseeding, planting seedlings, and control of invasive non-native species are allowed as long as they will not impact cultural resources based on a site-specific analysis, and are consistent with the IMP.
  - Limitations on numbers of trips may be implemented if cultural resources are impacted.

### *Cedar Mesa SRMA Comb Ridge Recreation Management Zone*
### REC-111

This area is a RMZ within the SRMA due to easy vehicular accessibility, high level of visitation and popularity, and density of significant cultural ruins and rock art. Specific management is needed to resolve conflicts between recreation use and protection of cultural resources. The objective is to manage for heritage tourism and traditional cultural values in a regulated manner.

### REC-112

The Cedar Mesa SRMA limitations described above for Mesa Top Day Use, Mesa Top Camping, In Canyon Private/Commercial Day Use, and In Canyon Permitted Overnight Camping do not apply to the Comb Ridge RMZ.

BLM_0013952

## REC-113

The following management prescriptions apply in this RMZ:

- Manage as VRM Class II
- Unavailable for geophysical exploration
- Oil and gas leasing subject to NSO
- Closed to disposal of mineral materials
- ROW avoidance area
- OHVs limited to designated routes
- Campfires allowed at designated sites only
- Private and commercial group size limited to 12 people
- Comb Wash campground will be developed
- In camp areas without toilets, human waste must be packed out
- Closed to dispersed camping
- Camping limited to designated camp areas and campgrounds, with designated access routes and parking
- A permit system will be established for day and overnight use if necessary to protect cultural resources
- Trails from parking areas to cultural sites will be designated and signed
- Parking for day use is limited to designated areas
- In the Butler Wash area, overnight private group size is limited to 8 people and primitive camp sites will be designated

## REC-114

Butler Wash, if necessary, will be managed as part of the existing Cedar Mesa permits and regulation system, including regulations and permit fees. Groups will view a low impact video at Kane Gulch or Sand Island Ranger Stations when obtaining a permit.

### *Cedar Mesa SRMA McLoyd Canyon–Moon House Recreation Management Zone*

## REC-115

McLoyd Canyon–Moon House (1,607 acres) is a RMZ within the SRMA due to its accessibility and the unique architecture of the Moon House ruin. From a scientific perspective, Moon House ruin is world renowned, unique to the region, and is a significant cultural treasure. Restrictions and management prescriptions are intended to minimize conflict between recreational use and cultural resources.

## REC-116

The Cedar Mesa SRMA limitations described above for Mesa Top Day Use, Mesa Top Camping, In Canyon Private/Commercial Day Use, and In Canyon Permitted Overnight Camping will not be applied to the McLoyd Canyon–Moon House RMZ.

## REC-117

This RMZ occurs within the Fish Creek Canyon WSA and is managed under the IMP. In addition to this management, the following prescriptions will apply:

BLM_0013953

- Closed to OHV use.
- Develop a cultural resource management plan (CRMP) for McLoyd Canyon–Moon House.
- Public access limited via a permit system for day visits.
- No more than 36 people allowed to visit Moon House per day. Limitations on visitation may change based on site monitoring of impacts of visitation.
- One commercial group per day. The number of people is included in the day use number of 36.
- Access to the interior corridor of Moon House ruin is limited to 4 people at any one time.
- Visitors are be allowed to enter the Moon Room and adjoining rooms within Moon House ruin.
- Human waste must be packed out.
- Camping limited only to the designated primitive camp and park area south of the Snow Flat Road. Camping prohibited outside of this primitive camp area.
- Hiking to Moon House site is limited to the designated trail. Hiking to other sites in the RMZ may also be limited to designated trails if determined necessary.
- RMZ is closed to pack animals and pets.
- Campfires are not allowed.
- Unavailable for private and/or commercial use of woodland products, including on-site collection of dead wood for campfires.
- McLoyd Canyon is closed to overnight use from the head of the canyon to UTM: 607100E, 4143495N.
- Acquire Utah State Section Township 39S Range 19E, Section 2.
- Develop a site stewardship program to monitor site and possibly develop guided tours.


### *Dark Canyon SRMA*

**Goals and Objectives:**

- Provide outstanding recreational opportunities and visitor experiences, while protecting natural and cultural resource values through integrated management between the BLM, USFS and NPS.
- Provide a primitive, roadless, and undeveloped recreational experience in an essentially unmodified natural environment. Continue to provide a scenic backcountry experience of expansive views from within one of the deepest canyon systems in the region.

By the year 2012, manage this SRMA to provide opportunities for visitors to realize personal development and growth, enhanced lifestyle increased local tourism revenue and maintenance of distinct recreation setting character, providing no fewer than 80% of responding visitors and impacted community residents at least a moderate realization of these benefits: (i.e., 3.0 on a probability scale where 1 = not at all, 2 = somewhat, 3 = moderate, 4 = total realization).

## REC-118
Create and allocate an interagency permit and fee system for these canyons as necessary to preserve resources and the visitor experience.

BLM_0013954

## REC-119

The 1991 Canyon Basins SRMA is dissolved and three new SRMAs are created:

- Dark Canyon SRMA
- Indian Creek SRMA
- Beef Basin SRMA.

## REC-120

The Dark Canyon SRMA (Map 9) includes canyon rims and bottoms for Dark Canyon, Gypsum Canyon, Bowdie Canyon, Lean To Canyon, Palmer Canyon, Lost Canyon, Black Steer Canyon, Young's Canyon, and Fable Valley Canyon. Trailheads and associated parking/camping areas are included within the SRMA boundaries where the canyons are specified as the SRMA.

## REC-121

The Dark Canyon WSA overlays the SRMA and will be managed according to the IMP.

## REC-122

The SRMA is unavailable for livestock grazing in the canyons and available to livestock grazing on mesa tops.

## REC-123

An Interagency Management Plan will be written in coordination with the contiguous NPS and USFS agencies.

## REC-124

Dark Canyon SRMA (30,820 acres) (Map 9) is managed with the following prescriptions:

- Group size is limited to 18 people for private and commercial.
- Three commercial trips are allowed per week.
- Up to twenty total private users allowed per day. This number may be altered depending upon future visitor impacts.
- If and where necessary, camping will be restricted to designated sites only.
- Campfires are allowed on mesa tops. Cook stoves only in canyons.
- Unavailable for private and/or commercial collection of woodland product use, except for the on-site collection of dead wood for campfires on mesa tops.
- If human waste becomes a problem, carrying out waste may be implemented in canyon.
- Pets are allowed on leash and under physical control.
- Closed to OHV use.

### *Indian Creek SRMA*

### Goals and Objectives:

BLM_0013955

- Provide outstanding recreational opportunities and visitor experiences while protecting natural and cultural resource values through integrated management between the BLM, NPS, State of Utah, and the Nature Conservancy
- Provide for premier rock climbing experiences, outstanding OHV opportunities, scenic vistas, cultural site interpretation at Newspaper Rock, destination camping areas, and a gateway to Canyonlands National Park.

By the year 2012, manage this SRMA to provide opportunities for visitors to realize personal development and growth, enhanced lifestyle increased local tourism revenue and maintenance of distinct recreation setting character, providing no fewer than 80% of responding visitors and impacted community residents at least a moderate realization of these benefits: (i.e., 3.0 on a probability scale where 1 = not at all, 2 = somewhat, 3 = moderate, 4 = total realization).

## REC-125

The 1991 Canyon Basins SRMA is dissolved and three new SRMAs are created: the Indian Creek SRMA, the Dark Canyon SRMA, and the Beef Basin SRMA. Management prescriptions for the Indian Creek SRMA.

## REC-127

Indian Creek SRMA (Map 9) matches the boundary of the Indian Creek Corridor Plan (EA UT – 090-00-47, 2005) and includes all of the Indian Creek and Bridger Jack Mesa WSAs and Shay Canyon, Lavender Mesa and Indian Creek ACECs. WSAs are managed under the IMP and ACECs and remaining areas will be managed in accordance with management prescriptions outlined below.

## REC-128

Indian Creek SRMA boundary matches the boundary for the Indian Creek Corridor Plan (EA UT-090-00-47, BLM 2005). Management of the Indian Creek Corridor will be in conformance with the decisions outlined in the Indian Creek Corridor Plan, which includes the following guidelines:

- Camping is prohibited in the Indian Creek riparian corridor from Newspaper Rock to approximately 1 mile downstream of the Dugout Ranch.
- Camp sites will be removed from the Newspaper Rock area and rehabilitated.
- A picnic area will be constructed adjacent to the Newspaper Rock parking area.
- Camping along the Bridger Jack Mesa Bench is limited to designated sites.
- A new campground called Shay Mountain Vista Campground will be constructed.
- The area is unavailable for private and/or commercial use of woodland products, including on-site collection of dead wood for campfires. Campers must bring in their own wood for campfires.
- Campfires are restricted to fire rings where fire rings are available. In dispersed camping areas, where fire rings are not available, campfires are subject to "Leave No Trace" standards. No campfires are allowed in the Lavender Mesa ACEC.
- Rock-climbing routes in conflict with cultural sites will be closed.
- Camping fees will be charged if deemed necessary to provide needed facilities and services.
- Parking areas will be developed.

BLM_0013956

- Additional camping stipulations and regulations could be implemented if monitoring data shows this is necessary.
- If new climbing routes are established, the BLM may designate a footpath to access the base of the climb to protect wildlife/raptors.

## REC-129

Dispersed camping is allowed in the Indian Creek Corridor, except within the established designated camping zones: Bridger Jack Mesa, Indian Creek Falls, and Creek Pasture. Camping within these zones is limited to designated sites.

## REC-130

Where dispersed vehicle camping is allowed, it is restricted to previously disturbed areas within 150 feet of designated routes.

## REC-131

Within the Shay Canyon ACEC portion of the SRMA, the ACEC prescriptions require that hiking be limited to designated trails, except within the side canyons, and camping and campfires are not allowed.

### *White Canyon SRMA*

**Goals and Objectives:**

- Provide outstanding recreational opportunities and visitor experiences, while protecting natural and cultural resource values through integrated management between the BLM and NPS (including the Glen Canyon National Recreation Area and Natural Bridges National Monument).
- Provide a spectacular canyoneering recreational experience in a popular, world renowned and easily accessible slot canyon; including backcountry hiking and backpacking, remote camping, cultural site visitation and exploration.

By the year 2012, manage this SRMA to provide opportunities for visitors to realize personal development and growth, enhanced lifestyle increased local tourism revenue and maintenance of distinct recreation setting character, providing no fewer than 80% of responding visitors and impacted community residents at least a moderate realization of these benefits: (i.e., 3.0 on a probability scale where 1 = not at all, 2 = somewhat, 3 = moderate, 4 = total realization).

## REC-132

White Canyon SRMA (2,828 acres) (Map 9) is managed with the following management prescriptions:

- A backcountry allocated permit system will be established as necessary to protect resources.
- If human waste becomes a problem, carrying out waste may be implemented in the canyon.
- Campfires are not allowed in the canyons.  Cook stoves only in canyons.

BLM_0013957

- Managed as VRM Class I and II.

- OHV use closed and limited to designated routes

- Unavailable and CSU (site-specific) for oil and gas leasing.

## REC-133

Trailheads and associated parking/camping areas are included within the SRMA boundary where the canyons are specified as the SRMA. The White Canyon SRMA is defined as from rim to rim.

## REC-134

Canyons are excluded from woodland product use including on-site collection of dead wood for campfires.

## REC-135

The Cheesebox Canyon WSA overlays a portion of the White Canyon SRMA; this area is managed in accordance with the IMP.

### *Tank Bench SRMA*

## Goals and Objectives:

- Provide outstanding recreational opportunities and visitor experiences while protecting natural and cultural resource values.
- Tank Bench SRMA provides easy access to a spectacular complex of cultural sites. Provide a safe, natural, well-designed accessible recreational experience for all visitors to enjoy the world renowned cultural resources and scenic values. Use visitor information and interpretation as a primary tool to protect sensitive resources, discourage vandalism, and encourage visitor appreciation of public lands.

## REC-136

Tank Bench SRMA (2,646 acres) (Map 9) is managed with the following prescriptions:

- Dispersed hiking allowed; not limited to designated trails.
- Area will remain open to domestic pets and pack animals but use may be limited if damage is occurring to cultural resources.
- Commercial group size limited to 12 people.
- Closed to OHV use.
- Livestock use will continue but it may be limited if cultural resources are impacted.
- Available for range, wildlife habitat, watershed improvements, vegetation treatments, and other surface-disturbing land treatments if consistent with management plan objectives.
- Campfires allowed.
- Closed to private and/or commercial use of woodland products (including on-site collection of dead wood for campfires) with the exception of traditional Native American cultural uses, as long as they do not adversely impact other resource values.
- Open to disposal of mineral materials and geophysical work.

BLM_0013958

- Available for oil and gas leasing, subject to standard lease terms.
- Manage as VRM Class III and IV.

## REC-137

The BLM will complete a joint recreation/cultural resources management plan (CRMP) for this area based on the RMP.

### *Beef Basin SRMA*

## Goals and Objectives:

- Provide outstanding recreational opportunities and visitor experiences while protecting natural and cultural resource values.
- Provides a popular, remote, backcountry driving experience with primitive camping and cultural site exploration opportunities. Management focus for the SRMA is heritage tourism, traditional cultural values, and scientific research of prehistoric cultural landscapes.
- Provide a semi-primitive recreational experience for visitors to enjoy the world renowned cultural resources and scenic values. Use visitor information and interpretation as a primary tool to protect sensitive resources, discourage vandalism, and encourage visitor appreciation of public lands.

## REC-138

Beef Basin SRMA (20,302 acres) (Map 9) is managed with the following prescriptions:

- Available for private and/or commercial use of woodland products (including on-site collection of dead wood for campfires).
- Open to disposal of mineral materials under special conditions.
- Available for oil and gas leasing subject to timing limitations.
- Livestock use will continue but may be limited if cultural resources are impacted.
- Available for range, wildlife habitat, watershed improvements, vegetation treatments and other surface-disturbing land treatments if consistent with management plan objectives.
- OHV use limited to designated routes.
- A car campground will be developed in Ruin Park for primitive camping.
- Primitive car camping areas will be designated in Middle Park, House Park, and along Beef Basin Loop Road, as well as other areas as necessary to control impacts to cultural resources.
- Until primitive camping areas are designated in this area, dispersed vehicle camping will be allowed in previously disturbed areas within 150 feet of designated routes.
- Campfires are allowed and are restricted to fire rings where fire rings are available. In dispersed camping areas, where fire rings are not available, campfires are subject to "Leave No Trace" standards.
- Dispersed campsites that impact archaeological sites will be closed.
- Cultural site visitation limited to designated trails.
- Groups larger than 20 people total are required to camp in designated areas. Human waste must be packed out.
- Manage as VRM Class III.

## REC-139

BLM_0013959

The BLM will work with the USFS and NPS to develop interagency recreation commercial permits.

## REC-140

The BLM will complete a joint recreation/cultural resources management plan (CRMP) for the area based on the RMP.

### *Extensive Recreation Management Areas (ERMA)*

### Goals and Objectives:

- Provide dispersed recreational opportunities consistent with other resource objectives.

## REC-141

ERMA lands are managed to provide an undeveloped setting where visitors can disperse and recreate in a generally unregulated manner, as long as the use is consistent with other resource values.

## REC-142

Manage all lands within the PA, not within an SRMA (either initially or through subsequent action as described above) as the Monticello Extensive Recreation Management Area

## REC-143

Any portions of an ERMA subject to other management prescriptions (i.e., ACEC, WSA, etc.) will be managed according to those prescriptions.

## REC-144

Monitor the ERMA to determine if more intensive recreational management is required to protect resource values and preserve the recreational experience.

## REC-145

Encourage "Leave No Trace" and "Tread Lightly" principles throughout the ERMA.

## REC-146

ERMA lands may be designated as SRMAs in the future based on intensity of use and will be analyzed through the plan amendment process.

## REC-147

Minimal facilities may be constructed in the ERMA as needed to insure visitor health and safety, reduce user conflict, and protect resources.

## REC-148

Mesa Top Camping (other than Cedar Mesa):

BLM_0013960

- Limit the Bears Ears Road to designated camping only from the intersection of Highway 275 to the USFS boundary.

- Limit the Deer Flat Road to designated camping only for the first 4 miles from Highway 275.

- Coordinate with Glen Canyon National Recreation Area on building a campground at Muley Point or pursue a land exchange for Muley Point in order to develop a campground.

## REC-149

Within the ERMA, dispersed vehicle camping is allowed only in previously disturbed areas within 150 feet of designated routes (on each side of a centerline). If use is such that undue environmental impacts are taking place, BLM will close and rehabilitate damaged areas. This use will not include areas within WSAs (389,444 acres) or non-WSA areas with wilderness characteristics (88,871 acres), WSR corridors, ACECs, or T&E/special status species habitats. Where monitoring identifies resource impacts, future implementation level plans could consider designation of specific camp sites.

BLM_0013961

## RIPARIAN RESOURCES (RIP)

### Goals and Objectives:

- Manage riparian resources for desired future conditions, ensuring ecological diversity, stability, and sustainability, including the desired mix of vegetation types, structural stages, and landscape/riparian/watershed function and provide for native and special status plant, fish, and wildlife habitats.

- Manage riparian areas for properly functioning condition (PFC) and ensure stream channel morphology and functions are appropriate to the local soil type, climate, and landform.

- Avoid or minimize the destruction, loss or degradation of riparian, wetland and associated floodplains, and preserve and enhance natural and beneficial values.

### Management Actions:

### RIP-1

Public lands are managed in accordance with laws, executive orders, and regulations on floodplain and wetland areas to reduce resource loss from floods and erosion.

### RIP-2

The BLM will take appropriate actions to maintain water quality in streams within Monticello PA to meet state and federal water quality standards, including designated beneficial uses and anti-degradation requirements.

### RIP-3

Oil and gas leasing is NSO in riparian areas. Although oil and gas activity must also meet this standard, an NSO lease stipulation is not necessary since this can be accomplished under the terms of the standard lease form because of the 200 meter/60-day rule.  (The 200 meter/60-day rule is the BLM regulation at 43 CFR 3101.1-2 that allows, at a minimum, for the relocation of proposed oil and gas leasing operations up to 200 meters and/or timing limitations up to 60 days to provide additional protection to ensure that proposed operations minimize adverse impacts to resources, uses, and users.)

### RIP-4

The BLM will follow Utah's Standards for Rangeland Health and Guidelines for Grazing and Recreation Management (BLM 1997) to achieve riparian PFC.

### RIP-5

No new surface-disturbing activities are allowed within active floodplains or within 100 meters of riparian areas unless it can be shown that: a) there are no practical alternatives or, b) all long-term impacts can be fully mitigated or, c) the activity will benefit and enhance the riparian area.

BLM_0013962

**RIP-6**

BLM guidelines will be followed as appropriate for managing riparian areas (See Technical Reference 1737-6: Riparian Area Management as amended) and Utah Riparian Management Policy.

**RIP-7**

All floodplains and riparian/aquatic areas are managed in accordance with Executive Orders 11988 and 11990, Sections 303 and 404 of the Clean Water Act, the Endangered Species Act, the BLM Riparian Area Management Policy, and the Utah guidelines for implementing BLM riparian area management policy.

**RIP-8**

Floodplains and riparian/aquatic areas are:

- Subject to fire suppression to protect riparian habitat.
- Excluded from private and/or commercial use of woodland products, except for Native American traditional purposes as determined on a site-specific basis; limited on-site collection of dead wood for campfires is allowed as per Woodlands section.
- Available for habitat, range, and watershed improvements and vegetation treatments described in 2007 Vegetation EIS.
- Excluded from surface disturbance by mechanized or motorized equipment (except as allowed above) and from structural development (unless there is no practical alternative or the development will enhance riparian/aquatic values).

**RIP-9**

Unnecessary multiple social foot trails in riparian/floodplain areas will be minimized. Social foot trails in Road Canyon, Fish Creek, and Mule Canyon will be closed to protect riparian resources.

**RIP-10**

The BLM will follow/implement the Southwest Willow Flycatcher Recovery Plan as appropriate.

**RIP-11**

Monitoring and management strategies and restrictions will be developed as necessary to meet or maintain PFC.

**RIP-12**

Cottonwood and willow harvest are allowed for Native American ceremonial uses only, through a permit system. Restrictions on this harvest will be implemented as necessary to achieve or maintain PFC.

BLM_0013963

**RIP-13**

No camping is allowed within 200 feet of isolated springs or water sources.

**RIP-14**

Close Harts Canyon from private land (Seeps) to Yancy's Fence (T30S, R22E, Section 8) to OHV and mechanized use. Close routes in other selected riparian areas considered Functioning at Risk if site-specific analysis determines that OHV use is contributing to riparian degradation.

**RIP-15**

Restrict Harts Canyon, Shay Canyon ACEC and Indian Creek from Kelly Ranch vicinity to Forest Service to livestock trailing only, no grazing. Moki Canyon and Lake Canyon are restricted to trailing only, except in the spring and fall for up to 1 to 2 weeks to gather livestock prior to moving to and from these areas.

**RIP-16**

Develop seasonal restrictions, closures, and/or forage utilization limits on grazing in riparian areas considered Functioning at Risk.

**RIP-17**

Temporarily close riparian areas considered Functioning at Risk to dispersed motorized camping until PFC is restored.

***Pipeline Crossings***
**RIP-18**

Pipeline crossings of perennial, intermittent, and ephemeral stream channels should be constructed to withstand 100-year floods to prevent breakage and subsequent accidental contamination of runoff during high-flow events. Surface crossings must be constructed high enough to remain above stream flows at each crossing, and subsurface crossings must be buried deep enough to remain undisturbed by scour throughout passage of the peak flow. Hydraulic analysis will be completed in the design phase by the project proponent to eliminate potential environmental degradation associated with pipeline breaks at stream crossings to avoid repeated maintenance of such crossings. Specific recommendations regarding surface and subsurface crossings are found in guidance for pipeline crossings (Appendix L).

BLM_0013964

# SOIL AND WATER RESOURCES (SOLW)

## Goals and Objectives:

- Manage soils and water resources to maintain watershed health, thereby insuring ecological diversity and sustainability.
- Provide for favorable conditions of water flow (quality, quantity, and timing), and maintain stable and efficient stream channels as required and provide for fish and wildlife habitat, recreation, and livestock.

## Management Actions:

### SOLW-1

Manage all floodplains and riparian/wetlands in accordance with Executive Orders 11988 and 11990, Sections 303 and 404 of the Clean Water Act, and the Endangered Species Act.

### SOLW-2

Maintain satisfactory watershed conditions as indicated by maintenance of riparian PFC and Utah Standards and Guidelines for Rangeland Health (BLM 1991) (Appendix F) and Guidelines for Recreation Management for BLM Lands in Utah (Appendix K).

### SOLW-3

Manage public lands consistent with the Colorado River Salinity Control Act.

### SOLW-4

Comply with Utah's state water quality standards.

### SOLW-5

Collaborate with San Juan County, the State of Utah, tribal governments, and local municipalities on management of municipal watersheds to meet local needs.

### SOLW-6

Maintain or improve soil quality and long-term soil productivity through the implementation of Standards for Rangeland Health and Guidelines for Grazing Management (BLM 1997) and other soil protection measures.

### SOLW-7

Manage uses to minimize and mitigate damage to soils.

### SOLW-8

Maintain and/or restore overall watershed health and reduce erosion, stream sedimentation, and salinization of water.

BLM_0013965

### *Watershed Health*

### SOLW-9

Modify the BMPs and vegetation management as appropriate to meet water quality standards and maintain watershed function (Montezuma Creek, Indian Creek [the USFS boundary to Newspaper Rock], Johnson Creek [and tributaries from confluence with Recapture Creek to headwaters], and Recapture Reservoir).

### SOLW-10

Assess watershed function using Utah's Standards for Rangeland Health, riparian PFC, and state water quality standards.

### SOLW-11

Where Utah's Standards for Rangeland Health are not met due to the impairment of biological soil crusts, apply guidelines from Biological Soil Crusts: Ecology and Management (BLM 2001b, as revised), if consistent with the management decisions of this plan.

### SOLW-12

Reduce tamarisk where appropriate using allowable vegetation treatments (refer to vegetation section for treatment acreages).

### *Sensitive Soils*

### SOLW-13

Any proposed activities that will be located in sensitive soils (e.g., hydric, saline, gypsiferous, or highly erodible soils), will incorporate BMPs and other mitigation measures to minimize soil erosion and maintain soil stability. Site-specific mitigation measures and other additional mitigation measures required to protect soil resources and maintain soil productivity, will be determined in site-specific NEPA analysis.

### *Steep Slopes*

### SOLW-14

If surface-disturbing activities cannot be avoided on slopes between 21% and 40%, an erosion control plan will be required. The plan must be approved by the BLM prior to construction and maintenance and include the following:

- An erosion control strategy
- The BLM accepted and/or approved survey and design

### SOLW-15

For slopes greater than 40%, no surface disturbance is allowed unless it is determined that it will cause undue or unnecessary degradation to pursue other placement alternatives. An erosion control plan is required.

BLM_0013966

# *SPECIAL DESIGNATIONS:  AREAS OF CRITICAL ENVIRONMENTAL CONCERN (ACEC)*

## Goals and Objectives:

Designate, modify, and manage areas as ACECs where special management attention is required to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, other natural systems or processes, or to protect life and safety from natural hazards.

## Management Actions:

### *ALKALI RIDGE ACEC—Relevant and Important Value: Cultural Resources*

## ACEC-1

Alkali Ridge is designated as an ACEC (39,196 acres) (Map 11).

## ACEC-2

Where the BLM authorized officer determines that avoidance of direct and indirect impacts to historic properties is not feasible (e.g., avoidance may cause unacceptable damage to other public land resources or affect valid existing rights) and adverse effects may occur, the BLM will resolve those effects through development of appropriate mitigation measures and consultation under Section 106 of the National Historic Preservation Act as outlined in the regulations at 36 CFR 800.  Regardless of the situation, BLM will comply with laws, rules and regulations related to the management of cultural resources.

## ACEC-3

Additional measures such as fencing, camouflaging, sound muffling, etc. may be necessary to further avoid indirect and direct impacts caused by surface-disturbing activities.

Management will emphasize maintaining the relevant and important cultural and historic values within the ACEC. When siting facilities, the primary objective will be avoidance of direct and indirect impacts to resources on, or eligible for listing on, the NRHP (historic properties). Avoidance may require that a facility be moved farther than allowed under standard lease terms and conditions. Siting may require coordination among the BLM, State Historic Preservation Officer, and Utah Division of Oil Gas and Mining to ensure consistency with all applicable well spacing requirements.

## ACEC-4

All cultural properties eligible for the NRHP will be surrounded by an avoidance area sufficient to allow permanent protection.

## ACEC-5

In any given situation, mitigation will be designed to fit the specific circumstances and reviewed by the SHPO and if necessary, the Advisory Council on Historic Preservation.

BLM_0013967

**ACEC-6**

The area is available for geophysical exploration.

**ACEC-7**

The area is available for the disposal of mineral materials.

**ACEC-8**

The area is available for locatable mineral entry with an approved plan of operations.

**ACEC-9**

The area will be retained in public ownership and not classified, segregated, or withdrawn from entry.

**ACEC-10**

Campfires are allowed.

**ACEC-11**

The area is available for wildlife habitat improvements.

**ACEC-12**

A Cultural CRMP consistent with the goals and objectives of this RMP will be written for Alkali Ridge ACEC and will not require a plan amendment to the RMP.

**ACEC-13**

The area is available for watershed improvements.

**ACEC-14**

The area is available for private and/or commercial use of woodland products, of which access will be limited only to designated routes. If woodland product use is impacting cultural resources, woodland product use may be confined to specific areas within Alkali Ridge.

**ACEC-15**

Livestock may be restricted if cultural resources are being impacted.

**ACEC-16**

The area is managed as VRM Class III.

**ACEC-17**

The area is available for mineral leasing under controlled surface use.

BLM_0013968

**ACEC-18**

The area is available for vegetation treatments. Access routes used for vegetation treatments will be reclaimed to prevent future use. Non–surface-disturbing treatments will be preferred.

**ACEC-19**

The appropriate management response for wildland fire will be in accordance with the Moab District Fire Plan.

**ACEC-20**

OHV use is limited to designated roads and trails.

*Alkali Ridge National Historic Landmark*

**ACEC-21**

Alkali Ridge National Historic Landmark (contained within the Alkali Ridge ACEC) (2,146 acres), is managed according to the following:

- Available for oil and gas leasing subject to NSO.
- All mechanized/motorized traffic limited to designated routes.
- Campfires not allowed.
- Unavailable for private and/or commercial use of woodland products including on-site collection of dead wood for campfires.
- Available for watershed improvements.
- Appropriate Management Response to fire in accordance with the Moab District Fire Plan.
- Open to livestock use with restrictions if cultural resources become impacted.
- No surface-disturbing vegetation treatments are allowed. Any treatment must avoid cultural sites by sufficient margin as to have no adverse impact.
- Available for geophysical exploration that meets the definition of "casual use" as defined 43 CFR 3150.b) *Casual use* means activities that involve practices which do not ordinarily lead to any appreciable disturbance or damage to lands, resources and improvements. For example, activities which do not involve use of heavy equipment or explosives and which do not involve vehicular movement, except over established roads and trails are casual use.
- Unavailable for disposal of mineral materials.
- Recommended for withdrawal from locatable mineral entry.
- Surface disturbance allowed for emergency fire suppression.
- Recreation use limited if cultural resources become impacted.
- Climbing aids such as ropes are not allowed for access into cultural sites/ruins.
- ROW avoidance area.
- Managed as VRM Class III.

BLM_0013969

## *BRIDGER JACK MESA (Mesa Top Only) ACEC – Relevant and Important Value: Near Relict Vegetation*

### ACEC-22

Bridger Jack Mesa ACEC lies entirely within a WSA and is managed under the IMP, unless more restrictive management is prescribed. Management under the IMP will provide for the protection for near-relict vegetation.

### ACEC-23

Bridger Jack Mesa is not designated as an ACEC. Bridger Jack Mesa WSA is managed according to the IMP, except for the following:

- Unavailable for livestock grazing, including grazing by saddle stock and pack animals allowed for access.
- Unavailable for private and/or commercial use of woodland products, including on-site collection of dead wood for campfires.
- Campfires are restricted to fire rings, where available. If not available, subject to "Leave No Trace" principles.
- Bridger Jack Mesa area is managed as part of the Indian Creek Special Recreation Management Area (SRMA) described in the Recreation section of this Chapter.

## *BUTLER WASH NORTH ACEC – Relevant and Important Value: Scenic*

### ACEC-24

Butler Wash North ACEC lies within the Butler Wash WSA and is managed under the IMP, unless more restrictive management is prescribed. Management under the IMP will provide for the protection of scenic values.

### ACEC-25

Butler Wash North area is not designated as an ACEC but is managed under the IMP. Management prescriptions include:

- Retained in public ownership.
- Unavailable for private and/or commercial use of woodland products, with the exception of limited on-site collection of dead wood for campfires.
- Available for livestock use but may be limited if cultural resources are impacted.
- Closed to OHV use.
- Managed as VRM Class I.

## *CEDAR MESA ACEC – Relevant and Import Values: Fish and Wildlife, Cultural and Scenic*

### ACEC-27

Cedar Mesa area will not be designated as an ACEC.

### ACEC-28

The area will be managed as a Special Recreation Management Area (SRMA) (407,098 acres) (Map 9) described in the Recreation section of this Chapter. It will include three Recreation

BLM_0013970

Management Zones (RMZs) (Grand Gulch NHD, McLoyd Canyon- Moon House and Comb Ridge) that emphasize management of recreation users for the protection of cultural resources.

### *DARK CANYON ACEC – Relevant and Important Values: Scenic and Fish and Wildlife*

**ACEC-29**

Dark Canyon ACEC lies entirely within the Dark Canyon WSA (Map 10) and partially within the Dark Canyon SRMA (Map 9). WSAs are managed under the IMP, unless more restrictive management is prescribed.

**ACEC-30**

Dark Canyon is not managed as an ACEC. The ACEC lies entirely within the Dark Canyon WSA (Map 10) and is managed according to the IMP and the Dark Canyon SRMA management prescriptions outlined in the Recreation section of this chapter. The WSA and SRMA are closed to OHV use.

### *HOVENWEEP ACEC – Relevant and Important Values: Scenic, Habitat, and Cultural*

**ACEC-31**

Hovenweep is designated as an ACEC (2,439 acres) (Map 11) with two special emphasis zones (Visual and Cajon Pond). This includes the 641 acres east of Hovenweep National Monument.

### *General Area Exclusive of Special Emphasis Zones*
**ACEC-32**

Management will emphasize maintaining the relevant and important cultural and historic values. When siting facilities, the primary objective will be avoidance of direct and indirect impacts to resources on or eligible for listing on the NRHP (historic properties). Avoidance may require that a facility be moved farther than allowed under standard lease terms and conditions. Siting may require coordination among BLM, State Historic Preservation Officer, and Utah Division of Oil Gas and Mining to ensure consistency with all applicable well spacing requirements.

**ACEC-33**

Where the BLM authorized officer determines that avoidance of direct and indirect impacts to historic properties is not feasible (e.g., avoidance may cause unacceptable damage to other public land resources or affect valid existing rights) and adverse effects may occur, the BLM will resolve those effects through development of appropriate mitigation measures and consultation under Section 106 of the National Historic Preservation Act as outlined in the regulations as 36 CFR 800.

**ACEC-34**

Additional measures such as fencing, camouflaging, sound muffling, etc. may be necessary to further avoid indirect and direct impacts caused by surface-disturbing activities.

**ACEC-35**

BLM_0013971

Cultural properties eligible for the NRHP will be surrounded by an avoidance area sufficient to allow permanent protection.

## ACEC-36

In any given case, mitigation will be designed to fit the specific circumstances and reviewed by the SHPO, and if necessary, the Advisory Council on Historic Preservation. A Hovenweep National Monument Cooperative Management Strategy (1987) helps to guide site protection, data recovery, and all other necessary cultural management activities.

## ACEC-37

A Cultural CRMP consistent with the goals and objectives of this RMP will be written for Hovenweep ACEC, if necessary, and will not require a plan amendment to the RMP.

## ACEC-38

The area is available for mineral leasing subject to moderate constraints (CSU).

## ACEC-39

The area is available for geophysical exploration.

## ACEC-40

The area is unavailable for disposal of mineral materials.

## ACEC-41

The appropriate management response for wildland fire will be in accordance with the Moab District Fire Plan.

## ACEC-42

The area is available for mineral entry with an approved plan of operation.

## ACEC-43

OHV use is limited to designated roads/trails.

## ACEC-44

The area is excluded from private or commercial use of woodland products, except for limited on-site collection of dead wood for campfires.

## ACEC-45

Improvements for habitat, watershed and vegetation treatments could be considered.

## ACEC-46

Livestock use may be restricted if cultural resources are impacted.

BLM_0013972

**ACEC-47**

The area is managed as VRM Class III.

### *Visual Emphasis Zone (880 acres)*
**ACEC-48**

The Visual Emphasis Zone which surrounds the west, south, and east sides of Hovenweep National Monument, is managed in accordance with the general prescriptions and with the following special prescriptions:

- NSO for mineral leasing.
- Excluded from watershed and vegetative treatments.
- ROW avoidance area.
- Managed as VRM Class II.
- Livestock use may be restricted if cultural resources are impacted.

### *Cajon Pond Emphasis Zone (Habitat)*
**ACEC-49**

The Cajon Pond Emphasis Zone is approximately 1 acre within a fenced exclusion area in the northern part of the ACEC. It is managed in accordance with the general prescriptions and with the following special prescriptions:

- Mineral leasing will also be in accordance with a controlled timing stipulation during the shorebird and waterfowl courtship and nesting season of March 1–June 30.
- Excluded from livestock use.

### *INDIAN CREEK ACEC – Relevant and Important Value: Scenic*

**ACEC-50**

Indian Creek (3,908 acres) (Map 11) is designated as an ACEC and is managed with the following prescriptions:

- Managed as VRM Class I.
- Available for mineral leasing subject to No Surface Occupancy (NSO).
- Unavailable for disposal of mineral materials.
- Available for geophysical work if VRM Class I can be met.
- Unavailable for private and/or commercial use of woodland products, except for limited on-site collection of dead wood for campfires.
- Available for livestock use.
- Closed to OHV use.
- All revegetation must be with native species naturally occurring in the vicinity.
- Managed to limit recreation use if scenic values are being damaged.
- Retained in public ownership.
- ROW avoidance area.

### *LAVENDER MESA (Mesa Top Only) ACEC – Relevant and Important Value: Relict Vegetation*

BLM_0013973

## ACEC-51

Lavender Mesa (649 acres) (Map 11) will continue to be designated as an ACEC and will be managed with the following management prescriptions:

- Managed to provide a baseline for rangeland studies through research and experiments.
- Excluded from land treatments or other improvements, except for test plots and facilities necessary for study of the plant communities, and restoration/reclamation activities.
- Managed as NSO for oil and gas leasing.
- Closed to disposal of mineral materials
- Available for locatable mineral entry with an approved plan of operations, subject to stipulations protecting vegetation on the mesa top.
- No campfires allowed.
- Managed to limit recreation use if vegetation communities are being adversely impacted.
- Geophysical exploration allowed if it does not adversely impact vegetation communities.
- Managed as VRM Class II.
- Helicopter access allowed for scientific study and heliportable equipment.
- ROW avoidance area.
- Retained in public ownership.
- Excluded from private or commercial use of woodland products, including limited on-site collection of dead wood for campfires.
- Unavailable for livestock grazing, including grazing by saddle stock and pack animals allowed for access.
- Excluded from wildlife habitat improvements.
- Excluded from watershed control structures.
- Appropriate management response to wildland fire in accordance with the Moab District Fire Plan.
- Closed to OHV use.
- Managed to limit recreation use if cultural resources or scenic values are being damaged.

## ACEC-52

Lockhart Basin is not designated as an ACEC. It is managed with the following prescriptions:

- Available for mineral leasing subject to timing limitations and controlled surface use in Bighorn Sheep area, and Standard lease terms in remaining area.
- Retained in public ownership.
- Available for livestock use.
- Managed as VRM Class I and II.
- OHV use limited to designated roads and trails.
- Open for campfires.
- Unavailable for woodland product use except for limited on-site collection of dead wood for campfires.
- Where the ACEC intersects with the Colorado River Segment 2, it will be managed as VRM Class II, NSO for mineral leasing.
- Where the ACEC intersects Colorado River Segment 3, it will be managed as VRM II, unavailable for mineral leasing, closed to OHV use, and recommended for withdrawal from locatable mineral entry.

BLM_0013974

***SAN JUAN RIVER ACEC – Relevant and Important Values: Scenic, Cultural, Fish and Wildlife, Natural Systems and Processes, and Geologic Features***

**ACEC-53**

The San Juan River (4,321 acres) (Map 11) is designated as an ACEC. The acreage has been reduced to exclude San Juan River Segment 5 area, which was determined suitable for inclusion into the Wild and Scenic River system (see Wild and Scenic River section of this Chapter for management prescriptions.) The ACEC will be managed with the following prescriptions:

- Vehicle access, including OHVs/mechanized, limited to designated routes.
- Unavailable for private and/or commercial use of woodland products except for limited on-site collection of dead wood for campfires; woodland use within the floodplain will be limited to collection of driftwood for campfires.
- Available for livestock use October 1–May 31. Grazing must incorporate rest-rotation and/or deferred management systems. Riparian areas must meet or exceed PFC to the extent affected by grazing.
- Available for watershed, range, wildlife habitat improvements and vegetation treatments.
- West Montezuma Creek to Private land managed as VRM Class II.
- West of accreted land at Town of Bluff to River mile 9 managed as VRM Class III.
- River mile 9 to river mile 23 (above Mexican Hat formation) managed as VRM Class I.
- River mile 23.8 to river mile 28 managed as VRM Class III.
- Available for oil and gas leasing subject to NSO.
- Unavailable for mineral material disposal.
- Recommended for withdrawal from locatable mineral entry.
- Managed to limit recreation use if wildlife values are being adversely impacted.
- Camping closed in areas as necessary to protect cultural, wildlife, and natural processes.
- Designated access trails to cultural sites as necessary to protect cultural resources.
- No camping in cultural sites.
- Ropes and other climbing aids not allowed for access to ruins, cultural sites, and nesting raptors.
- All areas intersected by the San Juan River SRMA are ROW avoidance areas.
- Recreation management prescriptions identified under the San Juan River SRMA in the Recreation Section of this Chapter will also be followed and is consistent with the management outlined above.

**ACEC-54**

A Cultural Resources Management Plan will be written for the San Juan River.

***SCENIC HIGHWAY CORRIDOR ACEC – Relevant and Important Value: Scenic***

**ACEC-55**

The Scenic Highway Corridor is not designated as an ACEC.

**ACEC-56**

The scenic values will be protected throughout this linear feature through management prescriptions for the overlying SRMAs, WSAs, and ACECs among others.

BLM_0013975

## *SHAY CANYON ACEC – Relevant and Important Value: Cultural*

### ACEC-57

Shay Canyon (119 acres) (Map 11) is designated as an ACEC and is managed with the following prescriptions:

- OHV and mechanized travel limited to designated routes.
- No surface disturbance for vegetation, watershed, or wildlife treatments/improvements.
- NSO for oil and gas.
- Open to geophysical exploration as long as it is consistent with the objectives of the ACEC.
- Grazing restricted to trailing only.
- With the exception of side canyons, hiking limited to designated trails.
- Open to mineral entry with an approved plan of operations to avoid impacts to cultural and paleontological resources.
- Closed to disposal of mineral materials.
- Campfires not allowed.
- Unavailable for private or commercial use of woodland products including on-site collection of dead wood for campfires.
- Recreation use may be limited if cultural and paleontological resources are impacted.
- Managed as VRM Class II.
- Closed to camping.
- ROW avoidance area.
- A Cultural CRMP consistent with the goals and objectives of this RMP will be written for Shay Canyon ACEC and will not require a plan amendment to the RMP.

## *VALLEY OF THE GODS ACEC – Relevant and Important Value: Scenic*

### ACEC-58

Valley of the Gods (22,863 acres) (Map 11) is designated as an ACEC and is managed with the following prescriptions:
- Managed as VRM Class I.
- Unavailable for mineral leasing.
- Closed to the disposal of mineral materials.
- Available for mineral entry with an approved plan of operations.
- Available for vegetation treatments when consistent with VRM Class 1.
- Unavailable for private and/or commercial use of woodland products.
- The BLM will pursue acquisition of state in-holdings in this ACEC.
- OHV use limited to designated roads and trails
- ROW exclusion area.
- No campfires allowed.

BLM_0013976

## *SPECIAL DESIGNATIONS:  WILD AND SCENIC RIVERS (WSR)*

### Goals and Objectives:

- To the extent of the BLM's authority (limited to BLM lands within the river corridor), maintain and enhance the free-flowing character, preserve and enhance the ORVs, and allow no activities within the river corridor that will alter the tentative classification of those river segments determined suitable for congressional designation into the NW&SR system until Congress acts on the designation.

- Protect the free-flowing nature of the river/segment, the tentative classification level, and to prevent impairment of the outstandingly remarkable values within 0.25 mile from high water mark on each side of the river not to exceed 320 acres per mile. On the San Juan River the area will be 0.25 mile from high water mark on the north side not to exceed 160 acres per mile. On the San Juan River, the BLM has jurisdiction on the lands north of the river; and the Navajo Nation has jurisdiction on the southern side of the river. The BLM will coordinate with the Navajo Nation in developing consistent management of the river.

- The White Canyon had a river segment found eligible in the 1991 San Juan Resource Management Plan. There were 30 miles from the Manti-La Sal National Forest boundary to the Glen Canyon National Recreation Area that were studied at that time. A new eligibility evaluation was conducted in 2004 which determined this segment did not meet the eligibility criteria outlined in BLM policy due to a lack of intermittent or perennial flow. For this reason it was not carried forward for suitability study into this RMP revision.

- Management prescriptions for designated WSRs are listed in the BLM Manual 8351, WSRs – Policy and Program Direction for Identification, Evaluation, and Management (BLM 1993b) by tentative classification: wild, scenic, and recreational.

- Appendix P outlines the suitability study process to determine whether eligible rivers would be appropriate additions to the National River System.

### Management Actions:

### WSR-1

The BLM will work with state, local, and tribal governments, and other federal agencies, in a state-wide study, to reach consensus regarding recommendations to Congress for the inclusion of rivers in the National Wild and Scenic Rivers System. Besides applying consistent criteria across agency jurisdictions, the joint study will avoid piecemealing of river segments in logical watershed units in the state. The study will evaluate, in detail, the possible benefits and effects of designation on the local and state economies, agricultural and industrial operations and interests, outdoor recreation, natural resources (including the outstandingly remarkable values for which the river was deemed suitable), water rights, water quality, water resource planning, and access to and across river corridors within, and upstream and downstream from the proposed segment(s). Actual designation of river segments will only occur through congressional action or as a result of Secretarial decision at the request of the governor in accordance with provisions of the Wild and Scenic Rivers Act (the Act). The BLM will work with the state, local, and tribal

BLM_0013977

governments, and the agencies involved to coordinate its decision making on WSR issues and to
achieve consistency wherever possible.

## WSR-2

The BLM recognizes that water resources on most river and stream segments within the State of
Utah are already fully allocated. Before stream segments that have been recommended as
suitable under this approved RMP are recommended to Congress for designation, the BLM will
continue to work with affected local, state, federal, and tribal partners to identify in-stream flows
necessary to meet critical resource needs, including values related to the subject segment(s).
Such quantifications will be included in any recommendation for designation. The BLM will
then seek to jointly promote innovative strategies, community-based planning, and voluntary
agreements with water users, under State law, to address those needs.

## WSR-3

Should designations occur on any river segment as a result of Secretarial or congressional action,
existing rights, privileges, and contracts will be protected. Under Section 12 of the Act,
termination of such rights, privileges, and contracts may happen only with the consent of the
affected non-federal party. A determination by the BLM of eligibility and suitability for the
inclusion of rivers on public lands to the National Wild and Scenic Rivers System does not create
new water rights for the BLM. Federal reserved water rights for new components of the Wild
and Scenic Rivers System are established at the discretion of Congress. If water is reserved by
Congress when a river component is added to the National Wild and Scenic Rivers System, it
will come from water that is not appropriated at the time of designation, in the amount necessary
to protect features, which led to the river's inclusion into the system. The BLM's intent will be to
leave existing water rights undisturbed and to recognize the lawful rights of private, municipal,
and state entities to manage water resources under state law to meet the needs of the community.
Federal law, including Section 13 of the Act and the McCarren Amendment (43 United States
Code [U.S.C.] 666), recognizes state jurisdiction over water allocation in designated streams.

Thus, it is the BLM's position that existing water rights, including flows apportioned to the State
of Utah interstate agreements and compacts, including the Upper Colorado River Compact, and
developments of such rights will not be affected by designation or the creation of the possible
federal reserved water right. The BLM will seek to work with upstream and downstream water
users and applicable agencies to ensure that water flows are maintained at a level sufficient to
sustain the values for which affected river segments were designated.

### *Colorado River Segment 1*

## WSR-4

The Colorado River Segment 1 is not identified as suitable for designation into the National Wild
and Scenic River System.

### *Colorado River Segment 2 (Map 12)*

## WSR-5

The Colorado River Segment 2 is identified as suitable for designation into the National Wild
and Scenic River System.  The Segment specifics include:

- Recommendation: Suitable—Scenic

BLM_0013978

- Size: 880 acres
- Location: State lands near river mile 44 to approximately river mile 38.5 (5.5 miles).
- Total river miles: 6.8
- BLM river miles: 6.8

## WSR-6

This segment is managed with the following prescriptions:

- VRM Class II.
- Available for oil and gas leasing subject to NSO.
- Motorized boat use allowed on the river.
- ROW avoidance area.

### *Colorado River Segment 3 (Map 12)*

## WSR-7

The Colorado River Segment 3 is identified as suitable for designation into the National Wild and Scenic River System.  The Segment specifics include:

- Recommendation: Suitable—Scenic
- Size: 1,040 acres
- Location: From approximately river mile 37.5 at state land to boundary of Canyonlands National Park near river mile 31 (6.5 miles).
- Total river miles: 6.5
- BLM river miles: 6.5

## WSR-8

This segment is managed with the following prescriptions:

- VRM Class I
- Unavailable for oil and gas leasing.
- Closed to OHV use.
- Recommended for withdrawal from locatable mineral entry.
- Motorized boat use allowed on the river
- ROW exclusion area.

### *Indian Creek*
## WSR-9

The Indian Creek Segment is not identified as suitable for designation into the National Wild and Scenic River System.

### *Fable Valley*
## WSR-10

The Fable Valley Segment is not identified as suitable for designation into the National Wild and Scenic River System.

BLM_0013979

### *Dark Canyon (Map 12)*
**WSR-11**

The Dark Canyon Segment is identified as suitable for designation into the National Wild and Scenic River System. The Segment specifics include:

- <u>Recommendation</u>: Suitable—Wild.
- <u>Size</u>: 2,048 acres
- <u>Location</u>: Forest boundary to Glen Canyon NRA below Young's Canyon.
- <u>Total river miles</u>: 13.6
- <u>BLM river miles</u>: 6.4

**WSR-12**

This segment is managed with the following prescriptions:

- VRM Class I.
- Unavailable for oil and gas leasing.
- Closed to OHV use.
- Recommended for withdrawal from locatable mineral entry.

### *San Juan River Segment 1*
**WSR-13**

The San Juan River Segment 1 is not identified as suitable for designation into the National Wild and Scenic River System

### *San Juan River Segment 2*
**WSR-14**

The San Juan River Segment 2 is not identified as suitable for designation into the National Wild and Scenic River System.

### *San Juan River Segment 3*
**WSR-15**

The San Juan River Segment 3 is not identified as suitable for designation into the National Wild and Scenic River System.

### *San Juan River Segment 4*
**WSR-16**

The San Juan River Segment 4 is not identified as suitable for designation into the National Wild and Scenic River System.

### *San Juan River Segment 5 (Map 12)*
**WSR-17**

The San Juan River Segment 5 is identified as suitable for designation into the National Wild and Scenic River System. The Segment specifics include:

- <u>Recommendation</u>: Suitable—Wild.
- <u>Size</u>: 2,768 acres
- <u>Location</u>: River mile 28 to Glen Canyon NRA at river mile 45.

BLM_0013980

- <u>Total river miles</u>: 17.3
- <u>BLM river miles</u>: 17.3

## WSR-18

This segment is managed with the following prescriptions:

- VRM Class I.
- Closed to oil and gas leasing
- Closed to OHV use.
- Recommended for withdrawal from locatable mineral entry.
- ROW exclusion area.

### *Arch Canyon*
### WSR-19

The Arch Canyon Segment is not identified as suitable for designation into the National Wild and Scenic River System.

BLM_0013981

## *SPECIAL DESIGNATIONS:  WILDERNESS STUDY AREAS (WSA)*

### Goals and Objectives:

Manage FLPMA Section 603 WSAs in a manner that does not impair their suitability for congressional designation into the National Wilderness Preservation System.

### Management Actions:

### WSA-1

WSAs will continue to be managed in a manner that does not impair their suitability for congressional designation in accordance with FLPMA Section 603(c), subject to valid existing rights. Actions may be allowed on a case-by-case basis only where the BLM determines that such action will not impair the lands' wilderness suitability.

### WSA-2

The Monticello FO manages 13 WSAs (Map 10) [389,444 acres as identified in the Statewide Report to Congress and (386,027 GIS acres)]: Mancos Mesa (51,440 acres), Grand Gulch ISA Complex (105,520), Road Canyon (52,420), Fish Creek Canyon (46,440), Mule Canyon (5,990), Cheesebox Canyon (15,410), Dark Canyon ISA Complex (68,030), Butler Wash (24,190), Bridger Jack Mesa (5,290), Indian Creek (6,870), South Needles (160), Squaw and Papoose Canyons (6,676), and Cross Canyon (1,008).

### WSA-3

Only Congress can release a WSA from wilderness consideration. Should any WSA, in part or in whole, be released from wilderness consideration, examine proposals in the released area on a case-by-case basis for consistency with the goals and objectives of the RMP decisions. Actions inconsistent with RMP goals and objectives will be deferred until completion of requisite plan amendments. Because the management direction of the released land will continue in accordance with the goals and objectives established in the RMP, no separate analysis is required in this LUP to address resource impacts if any WSAs are released by Congress.

### WSA-4

Within the area managed by the Monticello FO, there is an area totaling 2,155 acres contiguous to the Butler Wash WSA that was studied as a boundary variation during the wilderness review mandated by Congress in FLPMA Sections 603(a) and (b). These lands were addressed in the Utah BLM Statewide Wilderness Final EIS (November, 1990) and were recommended for congressional wilderness designation in the Utah Statewide Wilderness Study Reports (October, 1991). This recommendation was forwarded by the President of the United States to Congress in 1993. The lands will continue to be managed in a manner that does not impair their suitability for congressional designation in accordance with FLPMA Section 603(c). Subject to valid existing rights, the only case-by-case actions that will be considered will be those where it is determined that wilderness suitability will not be adversely impacted. Lands within this administratively endorsed area are not under IMP management. RMP decisions protect those lands until Congress acts.

133

BLM_0013982

## WSA-5

WSAs are managed in a manner consistent with the Interim Management Policy for Lands Under Wilderness Review (IMP) (BLM 1995). The only decisions related to WSA management that will be made in this plan are VRM, OHV designations, and conditional use of specific ways. Any ways established for use through this planning effort must have been previously identified during the initial wilderness inventory.

## WSA-6

WSA management prescriptions, as stipulated in the IMP, will take precedence over other management prescriptions throughout this RMP, unless the other management prescriptions are more restrictive.

## WSA-8

Where vehicle ways will remain available for motorized use within WSAs, such use could continue on a conditional basis. Use of the existing routes in the WSAs ("ways" when located within WSAs—see Glossary) could continue as long as the use of these ways does not impair wilderness suitability, as provided by the IMP. If Congress designates the area as wilderness, the routes will be closed. In the interim, if use and/or noncompliance are found through monitoring efforts to impair the area's suitability for wilderness designation, the BLM will take further action to limit use of the ways or close them. The continued use of these ways, therefore, is based on user compliance and non-impairment of wilderness values. This applies to the 0.08 miles open to motorized recreation use to the Moon House ruin. This can also be applied to administrative access.

## WSA-9

WSAs are managed as VRM Class I.

## WSA-10

WSAs including the Butler Wash administratively endorsed lands are closed to OHV use.

## WSA-11

One way in Fish Creek WSA totaling 0.08 miles will remain conditionally open to motorized recreation use in order to access the Moon House ruin. In addition, four ways will remain available for administrative access only and are not available for motorized recreation use:

- Two ways in Grand Gulch ISA-Pine Canyon and Slickhorn units: totaling 3.1 miles and located east of Pine Canyon and Point Lookout areas.
- One way in Fish Creek WSA-Lower Baullies Mesa; totaling 4.93 miles.
- One way in Road Canyon WSA-Perkins Point; totaling 2.67 miles.

BLM_0013983

## *SPECIAL DESIGNATIONS:  HISTORIC TRAILS (HT)*

### Management Actions:

### HT-1

The designated Old Spanish National Historic Trail is managed to protect the resource values for which it was designated (Public Law 107-325).

### HT-2

Hole in the Rock Trail is managed for Heritage Tourism in consultation with Utah State Historic Preservation Office and Native American tribes, as well as interested stakeholder groups.

### HT-3

The BLM will coordinate with the NPS and other managing agencies in management of the Old Spanish National Historic Trail.

### HT-4

All interpretation projects will be done in consultation with Native Americans and other interested parties including the Old Spanish Trail Association and NPS.

### HT-5

Segments (linear) of the Old Spanish National Historic Trail (Map 11) will be identified and classified for historic integrity and condition. These segments will then be designated for appropriate types of travel.

### HT-6

Special Recreation Permits (SRPs) on the Old Spanish National Historic Trail will be authorized only for heritage tours and reenactments.

### HT-7

Landmarks (structures) along the Old Spanish National Historic Trail will be identified for historic integrity and interpreted only if the action will not impact the values at the site.

### HT-8

Segments of the Hole in the Rock Trail will be identified and evaluated for historic integrity and appropriate use (Map 11).

### HT-9

Landmark (structures, features) will be interpreted only if the action will not impact the values of the site/landmark.

BLM_0013984

# SPECIAL STATUS SPECIES (SSP)

## Goals and Objectives:

- Maintain, protect, and enhance habitats (including but not limited to designated critical habitat) of federally listed Threatened, Endangered, or Candidate plant or animal species to actively promote recovery to the point that they no longer need protection or prevent the listing of species under the Endangered Species Act.
- Maintain, protect, and enhance habitats of the BLM State Director's sensitive plant and animal species to ensure that actions requiring authorization or approval by the BLM are consistent with the conservation needs of special status species and do not contribute to the need to list any special status species, either under provisions of ESA or other provisions in the BLM Manual 6840 (BLM 2001c).
- Develop and implement conservation measures to minimize long-term habitat fragmentation through avoidance and site-specific reclamation to provide habitat quality and quantity adequate to fulfill the life history requirements and to support a natural diversity of species.

## Management Actions:

### SSP-1

Threatened and Endangered species conservation measures and lease notices will be used for all surface-disturbing activities to comply with the Endangered Species Act, and the BLM Manual 6840, Special Status Species Management (Appendix B, E, I, and M). These species include: California condor, Mexican spotted owl, Southwestern willow flycatcher, Yellow-billed cuckoo, Bonytail, Colorado pikeminnow, Humpback chub, Razorback sucker, and Navajo sedge.

- Appendix B includes stipulations applicable to Oil and Gas leasing and other surface-disturbing activities regarding the 10 listed and candidate species.
- Appendix E includes USFWS correspondence.
- Appendix I provides wildland fire protection/management measures for special status species.
- Appendix M provides the finalized conservation measures and BMPs for T&E species resulting from programmatic Section 7 Consultation with USFWS (2007).

### SSP-2

Oil and gas and mineral development BMPs will be used, including minimizing roadbed width and footprint size, co-location of facilities, etc., to minimize habitat fragmentation.

### SSP-4

Inventories and monitoring studies will be conducted in order to determine special status plant and animal species locations, potential habitat, population dynamics, and existing and potential threats.

### SSP-5

BLM_0013985

The protection of species and potential and/or occupied habitat for special status species will be considered and implemented prior to any authorization or action by the BLM that could alter or disturb such habitat.

## SSP-6

No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act.

## SSP-7

The BLM will follow and implement the guidelines and management recommendations presented in species recovery or conservation plans (as updated), or alternative management strategies developed in consultation with USFWS.

## SSP-8

The BLM will support and implement where possible current and future sensitive species Conservation Agreements, including the Colorado River Cutthroat Trout Conservation Agreement and Strategy and Conservation Agreement for the roundtail chub, bluehead sucker, and flannelmouth sucker.

## SSP-9

The BLM will continue to work with USFWS and others to ensure that plans and agreements are updated to reflect the latest scientific data.

## SSP-10

The BLM will work cooperatively with USFWS and UDWR to obtain and/or maintain maps of current occupied and potential habitats for special status species.

## SSP-11

The BLM will work with the UDWR to implement the Utah Wildlife Action Plan (UDWR 2005) to coordinate management decisions that will conserve native species and prevent the need for additional listings.

## SSP-12

Translocations of population augmentation of special status species will be allowed to aid in conservation and recovery efforts. Necessary habitat manipulations and monitoring will be implemented to ensure successful translocation efforts.

## SSP-13

The BLM will implement and follow the guidelines in the Colorado River Fishes Recovery and Implementation Program (as updated).

## SSP-14

BLM_0013986

Implement the BLM's Guidance for the Management of Sagebrush Plant Communities for Sage-grouse Conservation and the BLM's National Sage-grouse Habitat Conservation Strategy.

## SSP-15

Consistent with RMP goals and objectives, the following plans or best available scientific information will be utilized and applied, as needed, as part of implementing the BLM's National Sage-grouse Habitat Conservation Strategy: Strategic Management Plan for Sage-grouse (BLM 2004d), WAFWA Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats (Connelly et al. 2004), and the Gunnison Sage-grouse Rangewide Conservation Plan (2005, as revised).

## SSP-16

The Gunnison Sage-grouse Conservation Easement (320 acres) will be managed as outlined in the easement to protect and enhance habitat for sage-grouse. The easement is in perpetuity, even as ownership changes.

## SSP-17

Retain potential/occupied special status species habitat in federal ownership. Acquisition of potential/occupied special status species habitat will be high priority. These acquired/exchanged lands will be managed according to BLM land management prescriptions for special status species.

## SSP-18

Any nonessential routes developed for a project located in special status species habitat will be closed and rehabilitated when the project is complete.

## SSP-19

Raptor management will be guided by the use of Best Management Practices for Raptors and Their Associated Habitats in Utah (Appendix N), utilizing seasonal and spatial buffers, as well as mitigation, to maintain and enhance raptor nesting and foraging habitat, while allowing other resource uses.

## SSP-20

The BLM will implement and follow the Finalized Conservation Measures and Best Management Practices for Bald Eagle and Threatened and Endangered Species of Utah from the Land Use Plan Programmatic BAs and Section 7 Consultation (2007, as revised) (Appendix M).

## *Gunnison Prairie Dogs*

## SSP-21

Site-specific analysis will be conducted to determine presence or absence of prairie-dog colonies within potential/occupied habitat (Map 14). Colonies will be protected from surface-disturbing activities with the use of Best Management Practices, standard oil and gas lease terms (60

days/200 meters rule), Conditions of Approval, and Standard Operating Procedures. Site-specific analysis will mitigate impacts from other BLM-authorized activities.

### *Gunnison Sage-Grouse*

## SSP-22

The following prescriptions apply to crucial Gunnison Sage-grouse habitat (145,583 acres of which 4,884 acres are on BLM lands) on BLM lands and/or BLM-permitted activities associated with the administration of federal minerals on split-estate lands. See Appendix B, Stipulations Applicable to Oil and Gas Leasing and Other Surface Disturbing Activities, for exceptions, modifications and waivers that can be applied by the Authorized Officer, on a case-by-case basis for reasons outlined in the appendix.

## SSP-23

Lek habitat (within 0.6 miles of active strutting ground):

- Prohibit year-round construction of fences. Retrofit visual devices on existing fences to prevent collisions. Where opportunity exists, remove existing fences.
- Prohibit construction of power lines or permanent aboveground structures year-round.
- NSO for oil and gas leasing activities.
- Unavailable for non–ground-disturbing geophysical work from March 20 to May 15.
- Prohibit construction of roads year-round.
- Prohibit construction of wind power turbines year-round.
- Avoid all permitted activities from March 20 to May 15. If impractical to avoid all permitted activities, then no activity from sunset the evening before to 2 hours after sunrise the next morning.

## SSP-24

Year-round habitat (within 4 miles of active strutting ground):

- Sagebrush treatments must have recovery objectives that meet the habitat objectives listed in the Gunnison Sage-grouse Rangewide Conservation Plan (2005, as amended). Any variance from these recovery objectives will be subject to site-specific NEPA, including collaboration with stakeholder groups.
- Avoid construction of new fences. If impracticable, increase the visibility of the fences (flagging, white-tipped T-posts, etc.) and monitor effectiveness of visual devices and modify or remove fences if necessary to minimize sage-grouse mortality.
- Leasing will be available with standard stipulations for oil and gas development. Follow Suggested Management Practices, where applicable, for oil and gas development listed in the Gunnison Sage-grouse Rangewide Conservation Plan (2005, as amended).
- Avoid the construction of power lines, wind power turbines, or other aboveground structures. If impractical, bury power lines or retrofit them to prevent perching by raptors. Follow Suggested Management Practices for wind power turbines or other aboveground structures as listed in the Gunnison Sage-grouse Rangewide Conservation Plan (2005, as amended).
- Limit grazing use levels as necessary to maintain and/or improve sage-grouse habitat.

BLM_0013988

**SSP-25**

The following grazing allotments will not be grazed from March 20 to May 15:

- Sage Flat
- Upper East Canyon
- Sage-grouse
- Dry Farm.

### *Habitat for Mexican Spotted Owl and Flannelmouth Sucker (Arch Canyon)*
**SSP-26**

In Arch Canyon, OHV use is limited to the designated route up to the national forest boundary, a total of 8 miles one way. Organized and commercial groups will be required to obtain a Special Recreation Use Permit. This permit will allow access on the designated route up to the National Forest boundary except from March 1 through August 31. During this period, access will be limited to 7.5 miles of the designated route. Therefore, during this period motorized access will not be allowed within 0.5 miles of the National Forest boundary.

BLM_0013989

## TRAVEL MANAGEMENT (TM)

### Goals and Objectives:

- The BLM will provide opportunities for a range of motorized recreation experiences on public lands while protecting resources and minimizing conflicts among various users.
- All BLM lands are designated as open, limited, or closed. Seasonal restrictions can be applied to the limited category.
- Any fire, military, emergency, or law enforcement vehicle being used for emergency or administrative purposes is exempt from OHV decisions.

### Management Actions:

### TM-1

OHV vehicle use is managed in accordance with the BLM's National OHV strategy.

### TM-2

Through future implementation level planning, designated routes will be categorized as mechanized only (bicycles), single-track motorized (dirt bikes), or two-track motorized (four-wheelers, jeeps), or available to all vehicles, or any combination of these categories. Adjustments of these categories will be made based on recreational demand and potential conflict. All non-motorized travel is allowed on designated routes unless otherwise prohibited.

### TM-3

Mechanized travel (bicycles) is limited to designated roads and trails.

### TM-4

There are no exceptions that allow for cross-country travel for game retrieval or antler gathering in areas designated as limited or closed. OHV use for game retrieval will adhere to all OHV classifications.

### TM-5

BLM Back Country Byways and National Recreation Trails may be designated in the future, as deemed appropriate, with site-specific environmental analysis.

### TM-6

Appendix O outlines the processes and procedures for making modifications to the travel plan designated route network.

### TM-7

The BLM, in preparing its RMP designations and its implementation-level travel management plans, is following policy and regulation authority found at: 43 CFR Part 8340; 43 CFR Subpart 8364; and 43 CFR Subpart 9268.

BLM_0013990

**TM-8**

Where the authorized officer determines that OHVs are causing or will cause considerable adverse impacts, the authorized officer shall close or restrict such areas. The public will be notified. The BLM could impose limitations on types of vehicles allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated routes.

**TM-9**

Where routes remain available for motorized use within WSAs, such use could continue on a conditional basis. Use of the existing routes in the WSAs ("ways" when located within WSAs – see Glossary) could continue as long as the use of these routes does not impair wilderness suitability, as provided by the IMP (BLM 1995). If Congress designates the area as wilderness, the routes will be closed. In the interim, if use and/or noncompliance are found through monitoring efforts to impair the area's suitability for wilderness designation, the BLM will take further action to limit use of the routes, or close them. The continued use of these routes, therefore, is based on user compliance and non-impairment of wilderness values. This applies to the 0.08 miles open to motorized recreation use to the Moon House ruin. This can also be applied to administrative access.

### *OHV Area Designations (Map 13)*

**TM-10**

Open to OHV use: 0 acres

**TM-11**

Limited to designated routes: 1,388,191 acres

**TM-12**

Mountain bike use is limited to the same designated routes as OHV travel.

**TM-13**

Closed to OHV Use: 393,895 acres

To protect the following vegetation study areas:

- Bridger Jack Mesa WSA
- Lavender Mesa ACEC

To protect the following scenic values:

- Indian Creek ACEC

To protect the following cultural, scenic, and recreational values:

- A portion of the San Juan River SRMA

To protect the following cultural values:

- Tank Bench SRMA, Outlaw Canyon

---

142

BLM_0013991

- Tank Bench SRMA, South Cottonwood Wash

To protect the wilderness character of the following:

- Cross Canyon WSA
- Squaw and Papoose WSA
- Mule Canyon WSA
- Fish Creek WSA
- Grand Gulch WSA ISA Complex
- Road Canyon WSA
- Dark Canyon WSA
- Indian Creek WSA
- Bridger Jack Mesa WSA
- Butler Wash WSA
- Mancos Mesa WSA
- Cheesebox Canyon WSA
- South Needles WSA and the Administratively Endorsed Lands that are contiguous to Butler Wash WSA.

## TM-14

One way in Fish Creek WSA totaling 0.08 miles remains conditionally open to motorized recreation use in order to access the Moon House ruin. In addition, four ways remain available for administrative access only and are not available for motorized recreation use:

a. Two ways in Grand Gulch ISA-Pine Canyon and Slickhorn units: totaling 3.1 miles and located east of Pine Canyon and Point Lookout areas.
b. One way in Fish Creek WSA-Lower Baullies Mesa; totaling 4.93 miles.
c. One way in Road Canyon WSA-Perkins Point; totaling 2.67 miles.

*Miles of Designated and Non-Designated Routes on Public Lands within the Monticello PA*

## TM-15

Open 2,820 miles
Closed 316 miles

*Special Stipulation Areas within the Limited to Designated Routes Category*
*Arch Canyon (to protect wildlife)*

## TM-16

OHV use is limited to the designated route up to the USFS boundary year-round, a total of 8 miles one way.

## TM-17

Organized and commercial groups are required to obtain a Special Recreation Use Permit. This permit will allow access on the designated route up to the National Forest boundary except

BLM_0013992

March 1–August 31. During this period, access will be 7.5 miles of the designated route. Motorized access will not be allowed within 0.5 miles of the national forest boundary.

## *McLoyd Canyon–Moon House (for Cultural Protection)*

### TM-18

No motorized travel is allowed on the northern section of road (approximately 500 feet) D4798, which crosses onto BLM land (and lies within Fish Creek WSA) at the northern State Section boundary.

## *Non-mechanized (e.g., Hiking, Equestrian, and Backpacking)*

### TM-19

Nonmechanized travel is not restricted on public lands except where limited or prohibited to protect specific resource values, provide for public safety, or maintain an identified opportunity.

### TM-20

Provide opportunities for non-mechanized travel (hiking) on all routes open to mechanized use. Manage routes to exclude motorized and mechanized use and provide opportunities for non-mechanized travel independent of motorized and mechanized routes.

### TM-21

Limit non-mechanized travel on specific lands to designated routes for resource protection purposes.

### TM-22

Manage the following trails for non-mechanized use:

- <u>Open to Foot Travel</u>: Kane Gulch, Todie Canyon, Bullet Canyon, Shieks Canyon, Government Trail, Collins Canyon, Slickhorn Canyon, Point Lookout Canyon, Grand Gulch (from junction to San Juan River), Fish Canyon, Owl Canyon, Road Canyon, McLoyd Canyon, Lime Creek Canyon, North Mule Canyon, South Mule Canyon, Lower Mule Canyon from Comb Wash, Mule Canyon or Cave Canyon Towers, Arch Canyon, Johns Canyon, Honaker Trail, Keeley Trail, Dark Canyon (Sundance Trail), Fable Valley Trail, Salt Creek Mesa Trail, Butler Ruin Interpretative Trail, Sand Island Petroglyph Trail, Shay Canyon Petroglyph Trail, Newspaper Rock Trail, Salvation Knoll Trail, Monarch Cave Trail, Fish Mouth Trail, Cold Springs Trail, Procession Panel Trail, Wolf Man Panel Trail, Moon House Trail, Ball Room Cave Trail.
- <u>Open for Stock Overnight Use</u>: Kane Gulch, Government Trail, Collins Canyon, Grand Gulch (from Kane Gulch to the junction of Collins Canyon; no stock below Collins Canyon), Fish Canyon (from Comb Wash to confluence with Owl Canyon), Road Canyon, Lime Creek Canyon, Lower Mule Canyon from Comb Wash, Arch Canyon, Johns Canyon, Salt Creek Mesa Trail.
- <u>Open for Stock Day Use</u>: Bullet Canyon (from Grand Gulch to Jailhouse Ruin), Fish Canyon (2 miles above the confluence with Owl Canyon), Owl Canyon (to Neville's Arch), Road Canyon, McLoyd Canyon (to the impassible pour-off), Lime Creek Canyon, Salt Creek Mesa Trail, Monarch Cave Trail, Fish Mouth Trail, Cold Springs Trail, and Procession Panel Trail.

### TM-23

BLM_0013993

Non-mechanized routes may be added through subsequent planning at the activity plan level on a case by case basis.

**TM-24**

Indian Creek Climbing Trails include the following: Bridger Jack Mesa, Super Crack Buttress, Cat Wall, Broken Tooth Wall, Scarface, and Battle of the Bulge.

BLM_0013994

## *VEGETATION (VEG)*

### Goals and Objectives:

- Manage vegetation resources for desired future conditions, as determined by site-specific BLM objectives and rangeland functionality and health, thereby ensuring ecological diversity, stability, and sustainability, including the desired mix of vegetation types, structural stages, and landscape/riparian/watershed function, and provide for native plant, fish, and wildlife habitats.
- Provide sustainable forage for livestock and wildlife with a plant community that incorporates and meets the standards for rangeland health.
- Provide opportunities for plant material gathering (seed collection, plant collection, etc.) of various vegetation types while protecting other resources.
- Maintain existing vegetative treatment areas as appropriate.
- Sustain the integrity of the sagebrush steppe community type to provide the amount, continuity, and quality of habitat that is necessary to maintain sustainable populations of sage-grouse and other sagebrush obligate species.
- Control invasive and non-native weed species and prevent the introduction of new invasive species through the implementation of a comprehensive weed program, including coordination with partners; prevention and early detection; education; inventory and monitoring; and principles of integrated weed management.
- Control invasive and non-native weed species and prevent the introduction of new invasive species through the implementation of the BLM National Strategy and Action Plan as outlined in documents such as, "Pulling Together: National Strategy for Invasive Plant Management Initiative" and "Partners Against Weeds" (1994).
- Control insect pest species as necessary to protect vegetation resources in conjunction with Animal and Plant Health Inspection Service (APHIS).

### Management Actions:

### VEG-1

Areas that meet Utah's Rangeland Health Standards are open to seed gathering and plant collection, including commercial seed gathering. The entire field office or certain localities may be closed to seed gathering dependent upon annual seed production of native plants in relation to sustainable landscapes.

### VEG-2

Seed gathering is managed according to Utah BLM guidance for Seed Collection Policy and Pricing (as amended).

### VEG-3

Implement Guidance for Addressing Sagebrush Habitat Conservation (November, 2004) as described in the BLM's National Sage-grouse Habitat Conservation Strategy (WO-IM-2005-024).

BLM_0013995

## VEG-4

Necessary vegetation information will be gathered and monitoring continued to assess if planning objectives are being met.

## VEG-5

Invasive and non-native weed species (as identified in Table 3.59 of the PRMP, Invasive and Noxious Weeds of San Juan County) will be controlled, and the infestation and spread of new invasive species prevented through cooperative agreements and implementation of the principles in BLM weed management policies and action plans.

## VEG-6

Poisonous plant species will be controlled as necessary based on site-specific needs.

## VEG-7

Cooperating agreements with other federal, state, local, and private organizations will be developed to control invasive non-native species, control insect pest species, and implement fuels vegetation treatments and WUI risk assessments and management.

## VEG-8

Prevention measures (SOPs and mitigation measures) from the 2007 ROD Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States PEIS (and associated document] are incorporated. Those BMPs are located in Appendix B and mitigation measures in Table 2 of that ROD.

## VEG-9

Upland areas are managed to achieve DFC.

## VEG-10

Unnecessary social footpath trails will be minimized throughout the PA.

## VEG-11

Pack stock and riding stock users on BLM-administered land are required to use certified weed-free feed.

## VEG-12

Restoration/rehabilitation activities are required to use certified weed-free seed mixes, mulch, fill, etc.

## VEG-13

The power washing of equipment used for permitted uses may be required to help control noxious weeds.

BLM_0013996

## VEG-14

Continue implementation of noxious weed and invasive species control actions as per affected counties, adjoining private land owners and other partners or interests directly affected.

## VEG-15

Implement 30,000 to 50,000 acres of vegetation treatments in Fire Regime Condition Class III areas over a 15-year period.

## VEG-16

The following sagebrush communities are prioritized for treatment: Harts Draw, Beef Basin, Black Mesa, Alkali, Mustang, Cedar Point, Shay Mesa, and all areas with Gunnison Sage-grouse habitat.

## VEG-17

Treat greasewood in Comb Wash, Butler Wash, Montezuma, East Canyon, Indian Creek, South and North Cottonwood Wash, and Cross Canyon to improve ground cover, biodiversity, and water quality.

## VEG-18

Maintain an estimated 1,500 acres/year of existing land treatments and implement new vegetation treatments to restore ecosystem health, functioning condition, etc. in the following vegetation cover types (Map 15):

- sagebrush 1,500 acres/year
- weed treatments 3,000 acres/year
- pinyon-juniper 3,000 acres/year
- riparian 100 acres/year
- greasewood 200 acres/year

BLM_0013997

## VISUAL RESOURCE MANAGEMENT (VRM)

### Goals and Objectives:

- All permitted activities must comply with VRM management class objectives, unless a waiver, exemption, or modification is granted by the Authorized Officer.
- WSAs are managed as VRM Class I.
- Allow for recreational viewing platforms and special recreation facilities in all high scenic areas.
- VRM classifications must match Minimum Impact Criteria.
- Visual resources are managed as the VRM inventory class (Map 16) unless specified otherwise in the management prescriptions.
- In areas available for oil and gas leasing subject to standard lease terms or available to oil and gas leasing subject to Timing and CSU, visual resources are managed as VRM Class III or IV (depending on inventory) unless otherwise specified in the management prescriptions.
- Areas that inventory as VRM Class II but are in areas that are available for oil and gas leasing subject to standard lease terms or available to oil and gas leasing subject to Timing and Controlled Surface Use are managed as VRM Class III unless otherwise specified in the management prescriptions below.
- Wild segments of a WSR are managed as VRM Class I.
- Scenic segments of a WSR are managed as VRM Class II.
- Visual Impact analysis will use GIS technology.

### Management Actions:

#### VRM-1

422,989 acres are managed as VRM Class I (Map 16).  These areas include:

WSAs:

13 WSAs (389,440 acres): Mancos Mesa (51,440 acres), Grand Gulch ISA Complex (37,810), Road Canyon (52,420), Fish Creek Canyon (46,440), Mule Canyon (5,990), Cheesebox Canyon (15,410), Dark Canyon ISA Complex (62,040), Butler Wash (22,030), Bridger Jack Mesa (5,290), Indian Creek (6,870), South Needles (160), Squaw and Papoose Canyons (6,560), Cross Canyon (1,008), and the Butler Wash lands administratively endorsed for wilderness.

ACECs:

- Valley of the Gods
- Indian Creek

WSRs:

- Dark Canyon Suitable River Segment
- Colorado River Suitable Segment 3
- San Juan River Suitable Section 3

BLM_0013998

- San Juan River Suitable Segment 5

## VRM-2

262,256 acres aree managed as VRM Class II including but not limited to the following (Map 16):

ACECs:

- Lavender Mesa
- Shay Canyon
- San Juan River (portions)
- Hovenweep Visual Emphasis Zone

WSRs:

- Colorado River Suitable Segment 2


Other Areas:
- Mesa tops for Tables of the Sun
- Comb Ridge Management Zone of Cedar Mesa SRMA
- Indian Creek SRMA from Indian Creek ACEC south to USFS boundary and Davis and Lavender Canyons
- Harmony Flat
- White Canyon area
- Dripping Canyon/Chicken Corners area
- Non-WSA areas with wilderness characteristics (Dark Canyon, Mancos Mesa, Grand Gulch, Nokai Dome East and Nokai Dome West)
- Lockhart Basin

## VRM-3

473,368 acres are managed as VRM Class III including but not limited to the following (Map 16):

ACECs:

- Hovenweep (outside of Visual Emphasis Zone)
- Alkali Ridge
- San Juan River Sections 2 and 4

Other Areas:

- Cedar Mesa SRMA (portions)
- Moqui Canyon
- North Cottonwood area
- North of Highway 95 in the South Cottonwood area

BLM_0013999

- Grand Flat area
- Upper Montezuma Creek Watershed
- Dry Valley – Upper Hart Draw
- Beef Basin (portions)
- Gravel, Long and Short Canyon areas
- Cal Black Airport east area
- Other areas illustrated on Map 16

**VRM-4**

623,002 acres will be managed as VRM Class IV, as illustrated on Map 16.

BLM_0014000

# WILDLIFE AND FISHERIES RESOURCES (FWL)

## Goals and Objectives:

- Maintain, protect, and enhance habitats to support natural wildlife diversity, reproductive capability, and a healthy, self-sustaining population of wildlife and fish species.
- Recognize crucial and non-fragmented habitats as management priorities.
- Maintain or improve vegetation condition and/or avoid long-term disturbance in habitat sites for wildlife and fish species.
- Minimize long-term habitat fragmentation as much as possible through avoidance and site-specific reclamation to provide habitat quality and quantity adequate to fulfill the life history requirements and to support a natural diversity of species.
- Maintain and enhance aquatic and wildlife resources, and provide for biological diversity of plants and wildlife resources while ensuring healthy ecosystems.

## Management Actions:

### *Migratory Birds*
### FWL-1

Comply with the Migratory Bird Treaty Act (MBTA) and implement Executive Order 13186 ("Responsibilities of Federal Agencies to Protect Migratory Birds") during all activities to protect habitat for migratory birds. Management will emphasize birds listed on the current USFWS "Birds of Conservation Concern" (BCC) (2002 or as updated), and Partners-in-Flight priority species (as updated). As specific habitat needs and population distribution to Birds of Conservation Concern and Partners-in-Flight priority species the Partners-In-Flight Avian Conservation Strategy (UDWR, 2000, as updated) priority species are identified, the BLM will use adaptive management strategies to further conserve habitat and avoid impacts to these species.

### FWL-2

During nesting season for migratory birds (May 1–July 30), avoid or minimize surface-disturbing activities and vegetative-altering projects and broad-scale use of pesticides in identified occupied priority migratory bird habitat.

### FWL-3

Prioritize the maintenance and/or improvement of lowland riparian, wetlands, and low and high desert shrub communities, which are the four most important and used habitat types by migratory birds in the Monticello PA.

### FWL-4

Prevent the spread of invasive and non-native plants, especially cheatgrass, salt cedar, and Russian olive. Strive for a dense understory of native species with a reduction in salt cedar and improvement of cottonwood and willow regeneration.

BLM_0014001

## FWL-5

As a supplement to comply with Executive Order 13186, the Bird Habitat Conservation Areas identified in the Coordinated Implementation Plan for Bird Conservation in Utah (2005, or as updated), will receive priority for conducting bird habitat conservation projects through cooperative funding initiatives such as the Intermountain West Joint Venture.

## FWL-6

Land-use decisions that contain migratory birds and their habitats will consider the goals and objectives established in respective bird conservation strategies: bird conservation plans and Utah wildlife action plan.

## FWL-7

Management of habitat for species conservation will incorporate statewide conservation strategies.

### *Raptors*
## FWL-8

Raptor management will be guided by the use of Best Management Practices for Raptors and Their Associated Habitats in Utah (Utah BLM 2006, Appendix N), utilizing seasonal and spatial buffers, as well as mitigation, to maintain and enhance raptor nesting and foraging habitat, while allowing other resource uses.

## FWL-9

Cooperate with utility companies, UDWR, and USFWS to prevent electrocution of raptors.

## FWL-10

Temporarily close areas (amount of time depends on species) near raptor nests to rock climbers or other activities if activity may result in nest abandonment.

### *Bighorn Sheep*
## FWL-11

Five mesa tops (56,740 acres) within the crucial bighorn sheep habitat have been identified as areas of potential conflict between bighorn and activities that cause surface disturbance resulting in permanent loss of bighorn sheep habitat. Bighorn sheep habitat improvement projects will be prioritized in these areas.

## FWL-12

Livestock grazing and associated range improvement projects are not allowed on the five mesa tops.

BLM_0014002

**FWL-13**

Any future proposal for a change in kind of livestock from cattle to sheep in crucial desert bighorn sheep habitat will be denied in order to prevent competition for forage and the transmission of disease from domestic to wild sheep.

**FWL-14**

Adhere to the recommendations in the BLM Bighorn Sheep Rangeland Management Plan (BLM 1993c, as revised); and the Utah BLM Statewide Desert Bighorn Sheep Management Plan, 1996 (as revised), where practicable.

### *Introduction, Transplantation, Augmentation, and Reestablishment*
**FWL-15**

The BLM will continue to cooperate with and provide support to UDWR in reintroducing native fish and wildlife species into historic or suitable ranges, as determined appropriate through case-by-case NEPA analysis.

**FWL-16**

Introduction, transplantation, augmentation, and re-establishment of both native and naturalized species will be considered and will include but may not be limited to pronghorn, desert bighorn sheep, wild turkey, beaver, chukar, Colorado River cutthroat trout, and Endangered Colorado River fish species.

### *Animal Damage Control*
**FWL-17**

Predator management will continue to be coordinated with APHIS and UDWR, and will be conducted utilizing the guidance provided by the existing MOU with APHIS.

### *Habitat Improvements and Protection*
**FWL-18**

In areas lacking proper water distribution or natural water sources, allow for installation of precipitation catchments (guzzlers) or the development of springs on rangelands.

**FWL-19**

Adhere to BLM fence standards to allow wildlife movement when fences are being developed or maintained.

**FWL-20**

Wildlife habitat objectives will be considered in all reclamation activity. Priority will be given to meeting Standards for Rangeland Health and Guidelines for Grazing Management (BLM 1997).

**FWL-21**

BLM_0014003

Adhere to the recommendations in the BLM Habitat Management Guides for the American Pronghorn Antelope (1980 as revised), wherever practicable.

## FWL-22

Ground-disturbing and permitted activities carried out in all seasonal wildlife protection areas will be subject to special conditions regulating use during certain seasons. These seasonal conditions will not impact maintenance and operation activities for mineral production or hunting during a recognized hunting season established by the UDWR.

## FWL-23

Recognize 17,300 acres as allotted to wildlife (parts of the slopes of Peter's Canyon and East Canyon).

## FWL-24

Ground-disturbing actions in crucial habitats will be avoided where practical. Where unavoidable disturbances are required, the BLM will follow BLM Washington Office Guidance (IM 2005-069) on application of compensatory measures.

### *Off-site Mitigation*
## FWL-27

The BLM will approach compensatory mitigation on an "as appropriate" basis where it can be performed on site, and on a voluntary basis where it is performed off-site, or, in accordance with current guidance.

### *Habitat Boundaries*
## FWL-28

Minor adjustments to crucial wildlife habitat boundaries periodically made by the UDWR will be accommodated through plan maintenance.

### *Seasonal Wildlife Protection Areas*
## FWL-25

In addition to any other special conditions that may be in effect, crucial big game habitats are subject to special conditions regulating use during certain seasons. These seasonal conditions will not impact maintenance and operation activities for mineral production or hunting during a recognized hunting season established by the UDWR.

## FWL-26

See Appendix B, Stipulations Applicable to Oil and Gas Leasing and Other Surface Disturbing Activities, for exceptions, modifications and waivers that can be applied by the Authorized Officer, on a case-by-case basis for a myriad of reasons outlined in the appendix.

BLM_0014004

## FWL-29

Special conditions for the seasonal wildlife protection areas include the following for all land-use authorizations, with the exception of private woodland harvest:

- No use of low-flying aircraft.
- Closed to the following uses, among others, (refer to Appendix B) during the established season:
- No oil and gas exploration, drilling and production activities or geophysical work.
- Permitted or commercial OHV use may be limited in number of participants and duration depending on the event.
- No use of pyrotechnics, shooting, etc. during permitted filming because of noise impacts.

### *Bighorn Sheep Lambing and Rutting Areas*
### FWL-30

Adhere to special conditions (FWL-29 and Appendix B) on 453,388 acres (Map 14) from April 1 to June 15 for lambing, and from October 15 to December 15 for rutting.

### *Pronghorn Fawning Area*
### FWL-31

Adhere to special conditions (FWL-29 and Appendix B) on 29,365 acres (Map 14) from May 1 to June 15.

### *Grazing Management in Pronghorn Ranges*
### FWL-32

Current livestock-grazing prescriptions will continue and, where opportunities exist, will be adjusted to enhance forb production on pronghorn ranges. This will include the following grazing allotments: Mail Station, Upper Mail Station, Dry Valley/Deer Neck, Lone Cedar, Tank Draw, and Hart Draw.

### *Deer Winter Range*
### FWL-33

Adhere to special conditions (FWL-29 and Appendix B) on 383,098 acres (Map 14) from November 15 to April 15.

### *Elk Winter Range*
### FWL-34

Adhere to special conditions (FWL-29 and Appendix B) on 97,471 acres (Map 14) from November 15 to April 15.

BLM_0014005

# WOODLANDS (FOR)

## Goals and Objectives:

- Manage woodlands for Desired Future Condition (DFC), ensuring ecological diversity, stability, and sustainability (including the desired mix of structural stages and landscape/watershed functions), and provide for native plant and wildlife habitats (Map 17).
- Provide woodland products on a sustainable basis to meet local needs where such use does not limit the accomplishment of goals for the management of other resources.
- Provide opportunities for pine nut gathering on a sustainable basis while protecting other resources.
- Encourage, where feasible, the harvest of woodland products in areas of proposed or existing vegetative treatments to lessen the need for additional treatment or land disturbance, and in areas that need restoration for ecological benefits (for example, *Pinus edulis*). Use the document, "Recommended Old-Growth Definitions and Description, USDA Forest Service Southwestern Region (Sept. 1992)."
- Identify, maintain, and restore forest and woodland old-growth stands to a pre-fire suppression condition. The Monticello FO will adopt the USFS old growth definitions and identification standards as per the USFS document "Characteristics of Old-Growth Forests in the Intermountain Region (April 1993)" in instances where the area of application in the previous document doesn't apply (for example, pinyon pine).

## Management Actions:

### FOR-1

Implement the Healthy Forest Initiative and the Healthy Forest Restoration Act of 2003.

### FOR-2

Follow National BLM Forest Health and Forest Management Standards and Guidelines to assess conditions and guide management decisions for woodland resources.

### FOR-3

Prioritize treatment in high-value/high-risk areas (WUI, developed recreation facilities including campgrounds, FRCC III).

### FOR-4

Allow live woodland harvest in areas with pinyon pine and juniper encroachment with focus on the restoration of the sagebrush steppe community.

### FOR-5

Fuel treatment projects will allow for harvest of woodland products.

BLM_0014006

**FOR-6**

Permits for private and/or commercial use of woodland products will continue to be issued to the public, consistent with the availability of woodland products and the protection of other resource values.

**FOR-7**

Cottonwood and willow harvest will be allowed for Native American ceremonial uses only by permit. Restrictions on this permitted harvest will be implemented as necessary to achieve or maintain Proper Functioning Condition (PFC), and to maintain or improve threatened and endangered species/special status species (TES/SSS) habitat.

**FOR-8**

Harvesting of woodland products is subject to the following exceptions:

- Exclude from woodland product use except for limited on-site collection of dead wood for campfires in all WSAs, Arch Canyon, Alkali Ridge NHL, Grand Gulch NHD (mesa top), Beef Basin, Fable Valley, Comb Ridge SRMA (south of Highway 95), San Juan River SRMA and the 5 non-WSA areas with wilderness characteristics (Map 8) (Dark Canyon, Mancos Mesa, Nokai Dome West, Nokai Dome East and Grand Gulch).
- Exclude from all woodland product use, including on-site collection of dead wood for campfires, all developed recreation sites, livestock/wildlife exclosures, cultural sites, Indian Creek SRMA, McLoyd Canyon–Moon House Ruin, Cedar Mesa SRMA (in-canyon), and Grand Gulch NHD (in canyon).
- Exclude floodplains, riparian/aquatic areas from woodland product use except for limited on-site collection of driftwood for campfires, and uses for Native American ceremonial purposes as determined on a site-specific basis.
- Limitations on off-road travel for wood gathering will be modified as necessary to maintain long-term sustainability or facilitate wood gathering where resource impacts are not a concern.

**FOR-9**

Permits will be limited and/or areas closed, as necessary, to maintain sustainability and protect resources.

**FOR-10**

Zones in the Field Office considered for private and/or commercial use of woodland products: East Canyon; Harts Draw; Salt Creek Mesa; Dark Canyon Plateau; White Canyon; Cedar Mesa; North Comb Ridge; South Cottonwood; and Montezuma Watershed (Map 17).

**FOR-11**

Areas not identified in zones below, or not restricted as defined in this plan, will be available for private use of woodland products limited to designated routes and available to pinyon pine nut gathering.

BLM_0014007

East Canyon (64,559 acres)

(Including Peter's Point Big Indian, East Canyon, Peters Canyon, NE of Monticello, and South Canyon)

**FOR-12**

Available to private and/or commercial use of woodland products with permitted off-road travel within 150 feet of designated routes to collect wood.

NE of Monticello, South Canyon

(Part of East Canyon Zone)

**FOR-13**

Available to private and/or commercial use of woodland products with permitted off-road travel within 150 feet of designated routes to collect wood.

Harts Point, Harts Draw, Shay Mesa, Photograph Gap/Lone Cedar (64,671 acres)

**FOR-14**

Available to private and/or commercial use of woodland products with permitted off-road travel within 150 feet of designated routes to collect wood.

Salt Creek Mesa (5,271 acres)

**FOR-15**

Available to private and/or commercial use of woodland products with permitted off-road travel in chained areas to collect wood.

Dark Canyon Plateau (23,288 acres)

**FOR-16**

Available to private and/or commercial use of woodland products with permitted off-road travel within 150 feet of designated routes and permitted off-road travel in chained areas to collect wood.

White Canyon (255,267 acres) Wooden Shoe, Deer Flat, Horse Flat (extending out toward Jacob's Chair, Pinyon Point)

**FOR-17**

Available to private and/or commercial use of woodland products with permitted off-road travel within 150 feet of designated routes and permitted off-road travel in chained areas to collect wood.

Moss Back and Grand Flats (Part of the White Canyon Zone)

**FOR-18**

Available to private and/or commercial use of woodland products with permitted off-road travel within 150 feet of designated routes to collect wood.

Cedar Mesa (outside of WSAs) (65,807 acres)

**FOR-19**

BLM_0014008

Available to private and/or commercial use of woodland products, however, vehicles must remain on designated routes (no cross county travel).

## FOR-20

Additional routes may be identified for wood harvest dependent on cultural Class III surveys. In the interim of designating woodland harvest areas and completing associated cultural surveys, woodland harvest is allowed and travel is limited to designated routes.

North Comb Ridge (North of Highway 95) (5,833 acres)
## FOR-21

Available to private and/or commercial use of woodland products, however, vehicles must remain on designated routes (no cross county travel).

## FOR-22

Additional routes may be identified for wood harvest dependent on cultural Class III surveys. In the interim of designating woodland harvest areas and completing associated cultural surveys, woodland harvest is allowed and travel is limited to designated routes.

South Cottonwood (117,399 acres)
*Texas Flat*
## FOR-23

Available to private and/or commercial use of woodland products with permitted off-road travel within 150 feet of designated routes and permitted off-road travel in chained areas to collect wood.

South Cottonwood (117,399 acres)
*Brushy Basin, Black Mesa, Little Baullies, Upper South Cottonwood*
## FOR-24

Available to private and/or commercial use of woodland products with permitted off-road travel within 150 feet of designated routes and permitted off-road travel in chained areas to collect wood.

Montezuma Watershed (239,841 acres)
## FOR-25

Available to private and/or commercial use of woodland products, however, vehicles must remain on designated routes (no cross county travel).

## FOR-26

Additional routes may be identified for wood harvest dependent on cultural Class III surveys. In the interim of designating woodland harvest areas and completing associated cultural surveys, woodland harvest is allowed and travel is limited to designated/existing routes.

As appropriate, maps depicting the management decisions are provided in Appendix A.

BLM_0014009

# REFERENCES

BLM. 1985. Management Situation Analysis for the San Juan Resource Management Plan, 4111-4142. Bureau of Land Management, Moab District, Moab, Utah.

BLM. 1990. Utah BLM Statewide Wilderness Environmental Impact Statement (EIS). Bureau of Land Management, Utah State Office, Salt Lake City.

BLM. 1991 Final Environmental Impact Statement Vegetation Treatment on BLM Lands in Thirteen Western States and associated Records of Decision. BLM Wyoming State Office, Casper, Wyoming. (BLM-WY-ES-91-036-4320)

BLM. 1991a. Resource Management Plan Record of Decision and Rangeland Program Summary for the San Juan Resource Area, Moab District, Utah. March.

BLM. 1991b. Final Environmental Impact Statement and Record of Decision (Utah) Vegetation Treatment on BLM Lands in Thirteen Western States.

BLM. 1991c. Utah Statewide Wilderness Study Report, Volume IIB, Summary Analysis of Study Area Recommendations, USDOI, Bureau of Land Management, Utah State Office, Salt Lake City. October.

BLM. 1993a. Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, and Management. BLM Manual 8351. Bureau of Land Management, Washington, D.C. December 22.

BLM. 1993b. Bighorn Sheep Rangeland Management Plan. Bureau of Land Management, Moab Field Office, Moab, Utah.C

BLM. 1993c. Grand Gulch Plateau Cultural and Recreation Area Management Plan. Monticello BLM Field Office, Monticello, Utah.

BLM. 1993d. Process for Assessing Proper Functioning Condition. BLM, Proper Functioning Condition Work Group, TR 1737-9. 51 pp.

BLM. 1995. Manual Handbook H-8550-1, Interim Management Policy and Guidelines for Lands Under Wilderness Review. U.S. Department of the Interior, Bureau of Land Management, Washington D.C.

BLM 1996. Utah BLM Statewide Desert Bighorn Sheep Management Plan.

BLM 1997. Standards for Rangeland Health and Guidelines for Grazing Management on BLM Lands in Utah. US Department of the Interior, Bureau of Land Management. Washington. D.C. May 20.

BLM. 1998b. A User Guide to Assessing Proper Functioning Condition and the Supporting Science for Lotic Areas. BLM, USDA-FS, and USDA-NRCS, TR 1737-15. 126 pp.

BLM. 1999a. Emergency Fire Rehabilitation Handbook. BLM Manual Handbook H-1742-1. Available at http://www.blm.gov/nhp/efoia/wo/handbook/h1742-1.pdf -3.7M. Accessed 8/9/06.

BLM. 2002d. Draft BLM Sensitive Plant Species List. Utah State Office, Salt Lake City, Utah.

BLM_0014010

BLM 2003b. as amended Priorities for Recreation and Visitor Services Work Plan. May .

BLM 2004b. Scoping Report. Bureau of Land Management, Moab and Monticello Field Offices, Utah. June.

BLM. 2004c. Monticello Field Office Final Eligibility Report, Wild and Scenic River Eligible WSR Segments, Monticello Field Office, Monticello, Utah.

BLM. 2004d. National Sage-grouse Habitat Conservation Strategy. Bureau of Land Management, Washington, D.C. November.

BLM. 2004e. Monticello Field Office. San Juan County, Utah Social and Economic Baseline Study. April.

BLM. 2004g. Pinyon-Juniper Treatment Inventory, Monticello Field Office. Monticello, Utah.

BLM. 2005. Finding of No Significant Impact and Decision Record Environmental Assessment. UT-090-00-47 Indian Creek Corridor Plan and EA, BLM Monticello Field Office.

BLM. 2005a. Land Use Planning Handbook. BLM Handbook H-1601-1. Department of the Interior, Bureau of Land Management, Washington, D.C.

BLM. 2005b. Monticello FO. *Mineral Potential Report for the Monticello Planning Area.* Monticello, Utah. July 2005

BLM. 2005c. Analysis of Management Situation (AMS) for the Monticello Planning Area. Bureau of Land Management, Monticello Field Office, Monticello, Utah. January

BLM. 2005d. Reasonable Foreseeable Development Scenario for Oil and Gas. Bureau of Land Management, Monticello Field Office, Monticello, Utah.

BLM. 2005e. ACEC Evaluations. Bureau of Land Management, Monticello Field Office, Monticello, Utah. July.

BLM. 2005f. Programmatic EIS on Wind Energy Development on BLM-Administered Lands in the Western United States. U.S. Department of the Interior, Bureau of Land Management, Washington, D.C. June.

BLM. 2005g. Utah Land Use Plan Amendment for Fire and Fuels Management. UT-USO-04-01; BLM U.S. Bureau of Land Management, Utah State Office, Salt Lake City. September

BLM. 2005h. Land and Mineral Records – LR2000 System Data [online database]. Bureau of Land Management, Washington, D.C. [Accessed January 15, 2005]. http://www.blm.gov/lr2000/.

BLM. 2005k. *Moab Fire District Fire Management Plan Environmental Assessment.* Bureau of Land Management, Utah State Office, Salt Lake City.

BLM. 2005l. Suggested Management Practices in the Gunnison Sage-grouse Rangewide Conservation Plan. Prepared by Bureau of Land Management, Washington, D.C. minerals

BLM, 2005m. Indian Creek Corridor Plan and and Environment Assessment UT- 090-00-47, BLM Monticello Field  Office, Monticello, Utah. October.

BLM_0014011

BLM. 2006c. Best Management Practices for Raptors and Their Associated Habitats in Utah. Vernal Field Office, Vernal, Utah.

BLM. 2007. Final Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement and associated Record of Decision. USDI, BLM (FES 07-21)

BLM 2007a. Non-WSA Lands with Wilderness Characteristics Evaluations, BLM Monticello Field Office, Monticello, Utah.

BLM 2007b Vegetation Treatments Using Herbicides on BLM lands in 17 Western States Programmatic Environmental Report

National Park Service (NPS). 1991.  Final Environmental Impact Statement Vegetation Treatment on BLM Lands in Thirteen Western States and associated Records of Decision. BLM Wyoming State Office, Casper Wyoming. 1991. (BLM-WY-ES-91-036-4320)

National Park Service. Glenn Canyon National Recreation Area. 1999. Grazing Management Plan.

San Juan County. 2008. San Juan County Community Development Department. San Juan County Master Plan.

U.S. Census Bureau. 2006. Webpage: http://www.census.gov/hhes/www/poverty/poverty.html Accessed: January 30, 2006.

Utah Administrative Code (UAC). 2006. Utah Administrative Code (UAC) R307-204 Smoke Management and Utah Administrative Code (UAC) R307-205 Fugitive Emissions and Fugitive Dust. Aug 01. Available for download from the State of Utah, Division of Administrative Rules Homepage under: Title R307. Environmental Quality, Air Quality at: http://www.rules.utah.gov/publicat/code/r307/r307.htm

Utah Department of Community and Culture, Division of Housing and Community Development. 2005. Legislative Report of the Permanent Community Impact Fund.

Utah Department of Environmental Quality (UDEQ). 2000a. Southeast Colorado Watershed Management Water Quality Assessment Report.

UDEQ. 2000b. Utah Nonpoint Source Pollution Management Plan. Prepared by the Utah Department of Environmental Quality in cooperation with the Utah Nonpoint Source Task Force. October. Available at: http://www.waterquality.utah.gov/documents/NPS_Mgmt_Plan_2001.pdf

UDEQ. 2002. Utah's 2002 303(d) List of Waters. Utah Department of Environmental Quality, Salt Lake City.

BLM_0014012

# GLOSSARY

**Activity Plan**: Site-specific plan which precedes actual development. This is the most detailed level of BLM planning.

**All-Terrain Vehicle (ATV)**: A wheeled or tracked vehicle, other than a snowmobile or work vehicle, designed primarily for recreational use or for the transportation of property or equipment exclusively on undeveloped road rights-of-way, open country or other unprepared surfaces.

**Allotment**: An area of land where one or more livestock operators graze their livestock. Allotments generally consist of BLM lands but may also include other federally managed, state owned, and private lands. An allotment may include one or more separate pastures. Livestock numbers and periods of use are specified for each allotment.

**Allotment Categorization**: Grazing allotments and rangeland areas used for livestock grazing are assigned to an allotment category during resource management planning. Allotment categorization is used to establish priorities for distributing available funds and personnel during plan implementation to achieve cost-effective improvement of rangeland resources. Categorization is also used to organize allotments into similar groups for purposes of developing multiple use prescriptions, analyzing site-specific and cumulative impacts, and determining trade-offs.

**Animal Unit Month (AUM)**: A standardized measurement of the amount of forage necessary for the sustenance of one cow unit or its equivalent for 1 month. Approximately 800 pounds of forage.

**Area of Critical Environmental Concern (ACEC)**: Areas within the public lands where special management attention is required to: (1) protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or (2) protect life and safety from natural hazards.

**Authorized Officer**: The Federal employee who has the delegated authority to make a specific decision.

**Avoidance Areas**: Areas with sensitive resource values where rights-of-way leases, and easements would be strongly discouraged. Authorization made in avoidance areas would have to be compatible with the purpose for which the area was designated and not is otherwise feasible on lands outside the avoidance area.

**Best Management Practices (BMPs)**: A suite of techniques that guide, or may be applied to, management actions to aid in achieving desired outcomes. Best management practices are often developed in conjunction with land use plans, but they are not considered a land use plan decision unless the land use plan specifies that they are mandatory. They may be updated or modified without a plan amendment if they are not mandatory.

**Big Game**: Large species of wildlife that are hunted, such as elk, deer, bighorn sheep, and pronghorn antelope.

**Browse**: To browse (verb) is to graze; also, browse (noun) is the tender shoots, twigs, and leaves and shrubs often used as food by livestock and wildlife.

BLM_0014013

**Candidate Species**: Any species included in the Federal Register notice of review that are being considered for listing as threatened or endangered by the U.S. Fish and Wildlife Service.

**Casual Use**: Mining activities that only negligibly disturb federal lands and resources. Casual use generally includes the collecting of geochemical, rock, soil, or mineral specimens using hand tools, hand panning, and nonmotorized sluicing. It also generally includes use of metal detectors, gold spears, and other battery-operated devices for sensing the presence of minerals, and hand battery-operated dry washers. Casual use does not include use of mechanized earth-moving equipment, truck-mounted drilling equipment, suction dredges, motorized vehicles in areas designated as closed to off-road vehicles, chemicals, or explosives. It also does not include occupancy or operations where the cumulative effects of the activities result in more than negligible disturbance.

**Closed**: Generally denotes that an area is not available for a particular use or uses; refer to specific definitions found in law, regulations, or policy guidance for application to individual programs.

**Code of Federal Regulations (CFR)**: The official, legal tabulation or regulations directing federal government activities.

**Collaboration**: A cooperative process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing public and other lands. This may or may not involve an agency as a cooperating agency.

**Competitive Forage**: Those forage species utilized by two or more animal species.

**Conditions of Approval**: Conditions or provisions (requirements) under which an Application for a Permit to Drill or a Sundry Notice is approved.

**Conformance**: That a proposed action shall be specifically provided for in the land use plan or, if not specifically mentioned, shall be clearly consistent with the goals, objectives, or standards of the approved land use plan.

**Conservation Agreement**: A formal signed agreement between the U.S. Fish and Wildlife Service or National Marine Fisheries Service and other parties that implements specific actions, activities, or programs designed to eliminate or reduce threats or otherwise improve the status of a species. CA's can be developed at a State, regional, or national level and generally include multiple agencies at both the State and Federal level, as well as tribes. Depending on the types of commitments the BLM makes in a CA and the level of signatory authority, plan revisions or amendments may be required prior to signing the CA, or subsequently in order to implement the CA.

**Conservation Strategy**: A Strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats. Conservation strategies are generally developed for species of plants and animals that are designated as BLM Sensitive species or that have been determined by the Fish and Wildlife Service or National Marine Fisheries Service to be Federal candidates under the Endangered Species Act.

**Contiguous**: Lands or legal subdivisions having a common boundary; lands having only a common corner are not contiguous.

BLM_0014014

**Cooperating Agency**: Assists the lead Federal agency in developing an Environmental Analysis or Environmental Impact Statement. The Council on Environmental Quality regulations implementing NEPA defines a cooperating agency as any agency that has jurisdiction by law or special expertise for proposals covered by NEPA. Any tribe of Federal, State, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**Corridor**: A wide strip of land within which a proposed linear facility could be located.

**Council on Environmental Quality (CEQ)**: An advisory council to the President of the United States established by the national Environmental Policy Act of 1969. It reviews Federal programs for their effect on the environment, conducts environmental studies, and advises the president on environmental matters.

**Critical Habitat**. For listed species. Consists of 1) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of the Endangered Species Act, on which are found those physical or biological features (constituent elements) a) essential to the conservation of the species and b) which may require special management considerations or protection; and 2) specific areas outside the geographical are occupied by the species at the time it is listed in accordance with the provisions of section 4 of the Endangered Species Act upon a determination by the Secretary that such areas are essential for the conservation of the species. Designated critical habitats are described in 50 CFR§ 17 and 226.

**Crucial Habitat**. Habitat on which a species depends for survival because there are no alternative ranges or habitats available.

**Crucial Winter Habitat (Range)**: Parts of the habitat necessary to sustain a wildlife population at critical periods of its life cycle. This is often a limiting factor on the populations, such as breeding habitat, winter habitat, etc.

**Cryptobiotic (Cryptogammic) Soils**: Biological communities that form a surface layer or crust on some soils. These communities consist of cyanobacteria (blue-green bacteria), micro fungi, mosses, lichens, and green algae and perform many important functions, including fixing nitrogen and carbon, maintaining soil surface stability, and preventing erosion. Cryptobiotic crusts also influence the nutrient levels of soils and the status and germination of plants in the desert. These crusts are slow to recover after severe disturbance, requiring 40 years of more to recolonize even small areas.

**Cultural Resources**: Nonrenewable elements of the physical and human environment including archeological remains (evidence of prehistoric or historic human activities) and sociocultural values traditionally held by ethnic groups (sacred places, traditionally utilized raw materials, etc.).

**Cultural Site**: Any location that includes prehistoric and/or historic evidence of human use or that has important sociocultural value.

**Cumulative Impact**: The impact on the environment that results from the incremental impact of the action when added to other past, present, or reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other

BLM_0014015

actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**Current Habitat**: habitat currently occupied by a species during the development of the plan.

**Desired Condition**: Description of those factors, which should exist within ecosystems both to maintain their survival and to meet social and economic needs.

**Desired Future Condition**: The desired mix of vegetation types, structural stages, and landscape/riparian/watershed function, as determined by management objectives and rangeland functionality and health, that ensures ecological diversity, stability and sustainability to provide for plant, fish and wildlife habitats.

**Designated Routes**: Designated routes can be categorized as mechanized only (bicycles), single-track motorized (dirt bikes), two-track motorized (four-wheelers, jeeps), available to all vehicles, or any combination of these categories.

**Development Well**: A well drilled within the known or proven productive area of an oil field with expectation of producing oil or gas from the producing reservoir.

**Discretionary Closure**: Those lands where the BLM has determined that fluid minerals leasing, even with the most restrictive stipulations, would not adequately protect other resources, values, or land uses.

**Dispersed/Extensive Recreation**: Recreation activities of an unstructured type, which are not confined to specific locations such as recreation sites. Example of these activities may be hunting, fishing, off-road vehicle use, hiking, and sightseeing.

**Disturbance Area**: Area of influence around a disturbance causing a change in animal behavior such as: leaving the area, increased stress, abandoning young, not breeding, and aberrant behavior.

**Drought**: Drought is a protracted period of deficient precipitation resulting in extensive damage to crops, resulting in loss of yield.

**Easement**: A right afforded a person or agency to make limited use of another's real property for access or other purposes.

**Endangered Species**: A plant or animal species whose prospects for survival and reproduction are in immediate jeopardy, as designated by the Secretary of the Interior, and as is further defined by the Endangered Species Act.

**Environmental Assessment (EA)**: A concise public document that analyzes the environmental impacts of a proposed federal action and provides sufficient evidence to determine the level of significance of the impacts.

**Environmental Impact Statement (EIS)**: A detailed written statement required by the National Environmental Policy Act when an agency proposes a major federal action significantly affecting the quality of the human environment.

**Erosion**: The wearing away of the land surface by running water, wind, ice, or other geological agents.

**Exception**: Exemption from a stipulation of a land use authorization on a one-time basis.

BLM_0014016

**Exclusion Area**: Areas with sensitive resource values where rights-of-way, leases, and easements would not be authorized.

**Extensive Recreation Management Area (ERMA)**: An area where significant recreation opportunities and problems are limited and explicit recreation management is not required. Minimal management actions related to the BLM's stewardship responsibilities are adequate in these areas. The LUP Handbook Appendix C, Recreation and Visitor Services, defines an extensive recreation management area (ERMA) as an areas not delineated as an SRMA. Management within all ERMAs is restricted to custodial actions only

**Fawning Habitat**: an area where big game animals usually give birth during a specific time of year.

**Federal Land Policy and Management Act of 1976 (FLPMA)**: Public Law 94-579. October 21, 1976, often referred to as the BLM's "Organic Act," which provides the majority of the BLM's legislated authority, direction, policy, and basic management guidance.

**Federal Register**: A daily publication, which reports Presidential and Federal Agency documents.

**Fire Management Plan**: A strategic plan that defines a program to manage wild land and prescribed fires and documents the fire management program in the approved land use plan; the plan is supplemented by operational procedures such as preparedness plans, preplanned dispatch plans, prescribed fire plans, and prevention plans.

**Floodplain**: The relatively flat area or lowlands adjoining a body of standing or flowing water, which has been or might be covered by floodwater.

**Fluid Minerals**: Oil and gas resources.

**Focus Area**: A recreation management zone that emphasizes particular types of recreation activities.

**Fossil**: Mineralized or petrified form from a past geologic age, especially from previously living things.

**Geographic Information System (GIS)**: A computer system capable of storing, analyzing, and displaying data and describing places on the earth's surface.

**Goal**: A broad statement of a desired outcome. Goals are usually not quantifiable and may not have established time frames for achievement.

**Grandfather (to)**: To exempt groups or individuals from provisions of laws or regulations because of preexisting conditions, such as exempting mining operations existing before new mining regulations are implemented from provisions of those new regulations.

**Grazing System**: The manipulation of livestock grazing to accomplish a desired result.

**Guidelines**: Actions or management practices that may be used to achieve desired outcomes, sometimes expressed as best management practices. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory.

BLM_0014017

**Habitat**: A specific set of physical conditions that surround a species, group of species, or a large community. In wildlife management, the major constituents of habitat are considered to be food, water, cover, and living space.

**Habitat Fragmentation**: The disruption (by division) of extensive habitats into smaller habitat patches. The effects of habitat fragmentation include loss of habitat area and the creation of smaller, more isolated patches of remaining habitat.

**Historic Habitat**: habitat occupied by a species prior to the development of this plan.

**Impact**: A modification of the existing environment caused by an action. These environmental consequences are the scientific and analytical basis for comparison of alternatives. Effects may be either direct, which are caused by the action and occur at the same time and place, or indirect, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable, or cumulative.

**Implementation Decisions**: Decisions that take action to implement land use plan decisions. They are generally appealable to Interior Board of Land Appeals.

**Implementation Plan**: A site-specific plan written to implement decisions made in a land use plan. An implementation plan usually selects and applies best management practices to meet land use plan objectives. Implementation plans are synonymous with "activity" plans. Examples of implementation plans include interdisciplinary management plans, habitat management plans, and allotment management plans.

**Indian Tribe**: Any Indian group in the conterminous United States that the Secretary of the Interior recognizes as possessing tribal status.

**Instant Study Area:** A natural area formally identified by BLM for accelerated wilderness review by notice published before October 21, 1975.

**Interdisciplinary Team:** A group of individuals with different training, representing the physical sciences, social sciences, and environmental design arts, assembles to solve a problem or perform a task. The members of the team proceed to a solution with frequent interaction so that each discipline may provide insights to any stage of the problem and disciplines may combine to provide new solutions. The number and disciplines of the members preparing the plan vary with circumstances. A member may represent one or more disciplines or BLM program interests.

**Interim Management Policy (IMP)**: The policy, under which the Bureau of Land Management (BLM) manages wilderness study areas (WSAs), to protect their wilderness characteristics, as required by Section 603(c) of the Federal Land Policy and Management Act (FLPMA). This policy requires BLM to manage WSAs so as not to impair their suitability for preservation as wilderness, until Congress either designates them wilderness or releases them for management of other values and uses.

**Irretrievable**: An environmental effect caused by an action, or series of actions, that cannot be reversed or undone, until or unless the cause of the effect is removed or the effect is restored or rehabilitated (e.g., inundating a river canyon by construction of a dam, clear cut logging a forest). The loss of production of renewable resources during the life of a land use plan.

BLM_0014018

**Irreversible**: An environmental effect caused by an action, or series of actions, that can never be reversed or undone (e.g., removal of minerals from the ground, extinction of a plant or animal species, loss of a cultural resource).

**Lambing Habitat**: An area where bighorn sheep deliver and nurse young during a specific time of year.

**Land Use Allocation**: The identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions.

**Land Use Plan**: A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land-use-plan-level decisions developed through the planning process, regardless of the scale at which the decisions were developed.

**Land Use Plan Decision**: Establishes desired outcomes and the actions needed to achieve them. Decisions are reached using the BLM planning process. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to Interior Board of Land Appeals.

**Leasable Minerals**: Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. They include coal, phosphate, sulfur, potassium, and sodium minerals, and oil, gas, and geothermal.

**Lease**: (1) A legal document that conveys to an operator the right to drill for or develop oil, gas, or other leasable mineral; (2) the tract of land, on which a lease has been obtained, where producing wells and production equipment are located.

**Lease Notice**: Provides more detailed information concerning limitations that already exist in law, lease terms, regulations, and operational orders. A Lease Notice also addresses special items the lessee would consider when planning operations, but does not impose new or additional restrictions.

**Lease Stipulation**: A modification of the terms and conditions on a standard lease form at the time of the lease sale.

**Lek**: An assembly area where birds, especially sage grouse, carry on display and courtship behavior.

**Limited Roads and Trails Designation**: Designated areas where the use of off-road vehicles is subject to restrictions, such as limiting the number or types or vehicles allowed, dates and times of use (seasonal restrictions), and limiting all use to designated roads and trails. Under the designated roads and trails designation, use would be allowed only on roads and trails that are signed for use. Combinations of restrictions are possible, such as limiting use to certain types of vehicles during certain times of the year.

**Locatable Minerals**: Minerals subject to exploration, development, and disposal by staking mining claims as authorized by the Mining Law of 1872, as amended. This includes deposits of gold, silver, and other uncommon minerals not subject to lease or sale.

BLM_0014019

**Management Decision**: A decision made by the BLM to manage public lands. Management decisions are made on both land use plan decisions and implementation decisions.

**Management Opportunities**: A component of the analysis of the management situation; actions or management directions that could be taken to resolve issues or management concerns.

**Management Zone (MZ):** Area of special management within a SRMA that may include additional stipulations**.**

**Mechanized Travel**: Travel by use of a machine either motorized or non-motorized.

**Mineral Entry**: The filing of a claim on public land to obtain the right to any minerals it may contain.

**Mineral Estate**: The ownership of minerals, including rights necessary for access, exploration, development, mining, ore dressing, and transportation operations.

**Mineral Materials**: Materials such as common varieties of sand, stone, building stone, gravel, and clay that are not obtainable under the mining or leasing laws but that can be acquired under the Mineral Materials Act of 1947, as amended. These are also called salable minerals.

**Mineral Reserves**: Known mineral deposits that are recoverable under present conditions but are as yet undeveloped.

**Mineral Withdrawal**: A formal order that withholds federal lands and minerals from entry under the Mining Law of 1872 and closes the area to mineral location (staking mining claims) and development.

**Minimize**: To reduce the adverse impact of an operation to the lowest practical level.

**Mining Claim**: A parcel of land that a miner takes and holds for mining purposes, having acquired the right of possession by complying with the Mining Law of 1872, as amended, and local laws and rules. A single mining claim may contain as many adjoining locations as the locator may make or buy.

**Mitigation Measures**: Methods or procedures that reduce or lessen the impacts of an action.

**Modification**: Changes in the language or provisions of a surface stipulation, either temporarily or permanently.

**Multiple Use**: The management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the lands for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some lands for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and nonrenewable resources, including but not limited to, recreation, range, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the lands and the quality of the environment with

BLM_0014020

consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or greatest unit output.

**National Environmental Policy Act of 1969 (NEPA)**: An act that encourages productive and enjoyable harmony between man and his environment and promotes efforts to prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; enriches the understanding or the ecological systems and natural resources important to the Nation, and establishes the Council on Environmental Quality.

**National Wild and Scenic Rivers System**: A system of nationally designated rivers and their immediate environments that have outstanding scenic, recreational, geologic, fish and wildlife, historic, cultural, and other similar values and are preserved in a free-flowing condition. The system consists of three types of river classifications: (1) recreation-rivers or sections of rivers that are readily accessible by road or railroad and that may have some development along their shorelines and may have undergone some impoundments or diversion in the past, (2) scenic-rivers or sections of rivers free of impoundments with shorelines or watersheds still largely undeveloped but accessible in places by roads, and (3) wild-rivers or sections of rivers free of impoundments and generally inaccessible except by trails, with watersheds or shorelines essentially primitive and waters unpolluted.

**Non-mechanized Travel:** Travel by foot or on an animal.

**Neotropical Migratory Birds**: Birds that travel to Central America, South America, the Caribbean, and Mexico during the fall to spend the winter and then return to the United States and Canada During the spring to breed. These birds include almost half of the bird species that breed in the United States and Canada.

**No Surface Occupancy (NSO)**: A leasing use constraint that prohibits occupancy or disturbance on all or part of the lease surface to protect special values or uses. Lessees may exploit the fluid mineral resources under the leases restricted by this constraint through use of directional drilling from sites outside the area.

**Non-WSA Lands with Wilderness Characteristics**: Undeveloped federal land that has been inventoried and/or reviewed by a BLM interdisciplinary team and determined to possess wilderness characteristics such as those listed in section 2(c) of the Wilderness Act of 1964. (See also definition of "Wilderness Characteristics", below) These lands do not possess special management designations like WSAs or protective management measures such as the IMP.

**Noxious Weeds**: A plant species designated by Federal of State law as generally possessing one or more of the following characteristics: aggressive and difficult to manage; parasitic; a carrier or host of serious insects or disease; or nonnative, new, or not common to the United States.

**Objective**: A description of a desired condition for a resource. Objectives can be quantified and measured and, where possible, have established time frames for achievement.

**Occupied Habitat**: An area occupied by a species during the development of this plan.

BLM_0014021

**Open**: Generally denotes that an area is available for a particular use or uses. Refer to specific program definitions found in law, regulations, or policy guidance for application to individual programs.

**Off-Highway Vehicle (OHV)**: Any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: (1) any nonamphibious registered motorboat; (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used in times of national defense emergencies.

**One-Hundred-Year Flood**: A hydrologic event with a magnitude that has a recurrence interval of 100 years.

**Open OHV Areas**: Designated areas where off-road vehicles may engage in cross country travel.

**Operator**: Any person who has taken formal responsibility for the operations conducted on the leased lands.

**Outstandingly Remarkable River Values**: Values between those listed in Section 1(b) of the Wild and Scenic Rivers Act are "scenic, recreational, geological, fish and wildlife, historical, cultural, or other similar values…" Other similar values, which may be considered, include botanical, hydrological, paleontological, or scientific. Professional judgment is used to determine whether values exist to an outstandingly remarkable degree.

**Paleontological Resources (Fossils)**: The physical remains of plants and animals preserved in soils and sedimentary rock formations. Paleontological resources are important for understanding past environments, environmental change, and the evolution of life.

**Paleontology**: A science dealing with the life forms of past geological periods as known from fossil remains.

**Plan of Development**: A mandatory plan, developed by an applicant of a mining operation or construction project that specifies the techniques and measures to be used during construction and operation of all project facilities on public land. The plan is submitted for approval to the appropriate Federal agency before any construction begins.

**Plan of Operations**: A plan for mining exploration and development that an operation must submit to BLM for approval when more than 5 acres a year will be disturbed or when an operator plans to work in an area of critical environmental concern or a wilderness area. A plan of Operations must document in detail all actions that the operator plans to take from exploration through reclamation.

**Planning Area**: A geographical area, including all land ownerships, for which BLM land use and resource management plans are developed and maintained for the BLM-administered lands within that geographical area.

**Planning Criteria**: The standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making,

BLM_0014022

analysis, and data collection during planning. Planning criteria streamline and simplify the resource management planning actions.

**Potential Wild and Scenic River**: A flowing body of water or estuary or a section, portion, or tributary thereof, including rivers, streams, creeks, runs, rills, and small lakes.

**Prescribed Fire**: The introduction of fire to an area under regulated conditions for specific management purposes.

**Primitive and Unconfined Recreation**: Non-motorized, non-mechanized and undeveloped types of recreational activities.

**Production Well**: A well drilled in a known field that produces oil or gas.

**Project Area**: The area of land upon which an operator conducts mining operations, including the area needed for building or maintaining of roads, transmission lines, pipelines, or other means of access.

**Project Plan**: Detailed survey and design plan.

**Public Land**: Land or interest in land owned by the United States and administered by the Secretary of the Interior through the BLM, except lands located on the Outer Continental Shelf, and land held for the benefit of Indians, Aleuts, and Eskimos.

**Quarry**: An open or surface working, usually for the extraction of stone, slate, limestone, etc.

**Range Development**: A structure, excavation, treatment or development to rehabilitate, protect, or improve lands to advance range betterment.

**Rangeland**: Land used for grazing by livestock and big game animals on which vegetation is dominated by grasses, grass-like plants, forbs, or shrubs.

**Raptor**: Bird of prey with sharp talons and strongly curved beaks such as hawks, owls, vultures, and eagles.

**Reasonably Foreseeable Development Scenario (RFD)**: The prediction of the type and amount of oil, gas and other mineral activity that would occur in a given area. The prediction is based on geologic factors, past history of drilling, projected demand for oil and gas, and industry interest.

**Record of Decision (ROD)**: A document signed by a responsible official recording a decision that was preceded by the preparing of an environmental impact statement.

**Recreation Opportunity Spectrum:** A recreation management tool used to identify existing outdoor recreational opportunities and management potential, based on a combination of three criteria: recreational activity, setting and experience. Although used in the development of the 1991 San Juan RMP, it is not used in the current Monticello RMP.

**Recreational River**: A wild and scenic river classification that identifies those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

BLM_0014023

**Relict**: A remnant or fragment of the vegetation of an area that remains from a former period when the vegetation was more widely distributed.

**Resource**: The natural, biological, and cultural components of the environment, including air, soil, water, vegetation, wildlife, minerals, historic and prehistoric (cultural) sites and features, and fossils. Land use plans set goals and objectives for desired outcomes for management of the various resources in a planning area.

**Resource Use**: Human uses of resources for the social and economic benefit of society, including mining, energy production, livestock production (grazing), recreation (motorized, non-motorized), forest production (timber, fire wood, fence posts), utility corridors (power lines, pipelines, roads), and communication sites. Land use plans identify allowable uses of the public lands and set goals and objectives for desired outcomes for resource uses.

**Resource Management Plan (RMP)**: A land use plan as prescribed by the Federal Land Policy and Management Act which establishes, for a given area of land, land-use allocations, coordination guidelines for multiple-use, objectives and actions to be achieved.

**Right-of-Way (ROW)**: A ROW grant is an authorization to use a specific piece of public land for a specific project, such as roads, pipelines, transmission lines, and renewable energy and communication sites. The grant authorizes rights and privileges for a specific use of the land for a specific period of time.

**Riparian Area**: A form of wetland transition between permanently saturated wetlands and upland areas. Riparian areas exhibit vegetation or physical characteristics that reflect the influence of permanent water or subsurface water. Typical riparian areas include lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels. Excluded are ephemeral streams or washes that lack vegetation and depend on free water in the soil.

**Riparian-Functioning at Risk (FAR)**: Riparian-wetland areas are considered to be in functioning condition, but an existing soil, water, or vegetation attribute makes them susceptible to degradation.

**Riparian-Non-Functioning (NF)**: Riparian-wetland areas that are clearly not providing adequate vegetation, landform, or large wood debris to dissipate stream energy associated with high flows, and thus are not reducing erosion, improving water quality, etc.

**Riparian-Properly Functioning Condition (PFC)**: Riparian/wetland areas are in PFC when adequate vegetation, landform, or woody debris is present to: dissipate high-energy water flow, filter sediment, capture bedload, and aid floodplain development; improve floodwater retention and groundwater recharge; develop root masses that stabilize streambanks; develop diverse fluvial geomorphology (pool and channel complexes) to provide habitat for wildlife and support greater biodiversity

**Rock Art**: Petroglyphs or pictographs.

**Route:** Linear line for motorized travel.

BLM_0014024

**Rutting Habitat**: An area where big game species engage in breeding activities during specific times of the year.

**Salable Minerals**: Common variety minerals on the public lands, such as sand and gravel, which are used mainly for construction and are disposed of by sales or special permits to local governments. Also referred to as mineral materials.

**Scenic Byways**: Highway routes, which have roadsides or corridors of special aesthetic, cultural, or historic value. An essential part of the highway is its scenic corridor. The corridor may contain outstanding scenic vistas, unusual geologic features, or other natural elements.

**Scoping**: The process of identifying the range of issues, management concerns, preliminary alternatives, and other components of an environmental impact statement or land-use planning document. It involves both internal and public viewpoints.

**Section 7 Consultation**: The requirement of Section 7 of the Endangered Species Act that all federal agencies consult with the U.S. Fish and Wildlife Service or the National Marine Fisheries Service if a proposed action might affect a federally listed species or its critical habitat.

**Section 106 Compliance**: The requirement of Section 106 of the National Historic Preservation Act that any project funded, licensed, permitted, or assisted by the Federal Government by reviewed for impacts to significant historic properties and that the State Historic Preservation Officer and the Advisory Council on Historic Preservation be allowed to comment on a project.

**Sediment Yield**: The amount of sediment produced in a watershed, expressed in tons, acre feet, or cubic yards, of sediment per unit of drainage are per year.

**Sensitive Soils**: Sensitive soils" are those identified as having characteristics that make them extremely susceptible to impacts or they may be more difficult to restore or reclaim after disturbance -- characteristics such as high wind or water erosion hazard (steep slopes), moderate to high salinity, low nutrient levels, low water holding capacity (droughty), or high water table (wetland/riparian soils). Information used to identify sensitive soils includes NRCS published soil surveys, ecological site descriptions, local monitoring records and research studies.

**Sensitive Species**: All species that are under status review, have small or declining populations, live in unique habitats, or need special management. Sensitive species include threatened, endangered, and proposed species as classified by the Fish and Wildlife Service and National Marine Fisheries Service.

**Significant**: An effect that is analyzed in the context of the proposed action to determine the degree or magnitude of importance of the effect, wither beneficial or adverse. The degree of significance can be related to other actions with individually insignificant but cumulatively significant impacts.

**Slope**: The degree of deviation of a surface from the horizontal.

**Special Recreation Management Area (SRMA)**: Areas, which require explicit recreation management to achieve recreation objectives and provide specific recreation opportunities. They are defined under Planning Handbook Appendix C, Recreation and

BLM_0014025

Visitor Services, as "… having a distinct, primary recreation-tourism market as well as a corresponding and distinguishing recreation management strategy…" For each SRMA identified, delineate discrete recreation management zone (RMZ) boundaries. Each RMZ has four defining characteristics; it: 1) serves a different recreation niche within the primary recreation market; 2) produces a different set of recreation opportunities and facilitates the attainment of different experience and benefit outcomes (to individuals, households and communities, economies, and the environment; 3) has distinctive recreation setting character; and 4) requires a different set of recreation provider actions to meet the strategically targeted primary recreation market demand." SRMAs are designated to meet the goals and objectives of the recreation program and to adhere to agency guidance.

**Special Status Species**: Includes proposed species, listed species, and candidate species under the Endangered Species Act; State-listed species; and BLM State Director-designated sensitive species (see BLM Manual 6840-Special Status Species Policy).

**Stipulations**: Requirements that are part of the terms of a mineral lease. Some stipulations are standard on all Federal leases. Other stipulations may be applied to the lease at the discretion of the surface management agency to protect valuable surface resources and uses.

**Strategic Plan**: A plan that establishes the overall direction for the BLM. This plan is guided by the requirements of the Government Performance and Results Act or 1993, covers a 5-year period, and is updated every 3 years. It is consistent with FLPMA and other laws affecting the public lands.

**Surface Disturbance**: activities that normally result in more than negligible disturbance to public lands and that accelerate the natural erosive process. These activities normally involve use and/or occupancy of the surface, cause disturbance to soils and vegetation, and are usually caused by motorized or mechanical actions. Surface disturbance may result from activities using earth-moving and drilling equipment; geophysical exploration; off road vehicle travel; vegetation treatments; the use of pyrotechnics and explosives; and construction of facilities like powerlines, pipelines, oil and gas wells, recreation sites, livestock facilities, wildlife waters, or new roads. Surface disturbance is not normally caused by casual use. Activities that are not typically surface disturbing include, but are not limited to, proper livestock grazing, cross-country hiking, minimum impact filming and vehicle travel on designated routes.

**Sustainability**: The ability of an ecosystem to maintain ecological processes and functions, biological diversity, and productivity over time.

**Threatened Species**: Any plant or animal species defined under the Endangered Species Act as likely to become endangered within the foreseeable future throughout all or a significant portion of its range; listings are published in the Federal Register.

**Timing Limitation Stipulation**: A fluid minerals leasing constraint that prohibits surface use during specified time periods to protect identified resource values. The constraint does not apply to the operation and maintenance of production facilities unless analysis demonstrates that such constraints are needed and that less stringent, project-specific constraints would be insufficient.

BLM_0014026

**Undertaking:** A project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; those requiring a Federal permit, license or approval; and those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

**User Day**: Any calendar day, or portion thereof, for each individual accompanied or serviced by an operator or permittee on the public lands of related waters; synonymous with passenger day or participant day.

**Utility Corridor**: A parcel of land that has been identified by law, Secretarial order, through a land use plan or by other management decision as being the preferred location for existing and future right-of-way grants and suitable to accommodate one type of right-of-way or one or more rights-of-way which are similar, identical or compatible.

**Valid Existing Rights**: Valid existing rights are legal rights to use the land that were in existence prior to implementation of the decisions in the RMP. The most significant types of valid existing rights are oil and gas leases, potash and salt leases, mining claims, and right-of-way authorizations. Examples of how BLM views valid existing rights including oil and gas leasing stipulations specified for specific areas in this new RMP would not apply to existing leases. These existing leases would be subject to the specific lease stipulations that were applied under the previous land use plan. Mining claims that exist on the effective day of a withdrawal may still be valid if they can meet the test of discovery of a valuable mineral required under the Mining Laws. An existing right-of-way would only be subject to the specific terms and conditions that were applied when it was authorized even if it is located within a right-of-way exclusion or avoidance area specified under the RMP.

**Vegetation Manipulation**: Alteration of vegetation by using fire, plowing, or other means.

**Vegetation Type**: A plant community with distinguishable characteristics described by the dominant vegetation present.

**Visual Resources**: The visible physical features of a landscape (topography, water, vegetation, animals, structures, and other features) that constitute the scenery of an area.

**Waiver**: Permanent exemption from a lease stipulation. The stipulation no longer applies anywhere within the leasehold. See also *Exception* and *Modification*.

**Water Quality**: The chemical, physical, and biological characteristics of water with respect to its suitability for a particular use.

**Watershed**: All lands, which are enclosed by a continuous hydrologic drainage, divide and lay upslope from a specified point on a stream.

**Way**: A vehicle route within a wilderness study area that was in existence and identified during the FLPMA Section 603-mandated wilderness inventory. The *Interim Management Policy for Lands under Wilderness Review (H-8550-1)* defines a way as "a trace maintained solely by the passage of vehicles which has not been improved and/or maintained by mechanical means to ensure relatively regular and continuous use." The term is also used during wilderness inventory to identify routes that are not roads. The

BLM_0014027

term developed from the definition of the term "roadless" provided in the *Wilderness Inventory Handbook* (September 27, 1978), as follows: "roadless: refers to the absence of roads which have been improved and maintained by mechanical means to insure relatively regular and continuous use. A way maintained solely by the passage of vehicles does not constitute a road."

**Wild, Scenic or Recreational River**: The three classes of what is traditionally referred to as a "Wild and Scenic River." Designated river segments are classified as wild, scenic and/or recreational, but the segments cannot overlap.

**Wild, and Scenic River Study**: Rivers identified in Section 5 of the Wild and Scenic Rivers Act for study as potential additions to the National Wild and Scenic Rivers System. The rivers shall be studied under the provisions of Section 4 of the Wild and Scenic Rivers Act.

**Wilderness Study Area:** A roadless area or island of undeveloped federal land that has been inventoried and found to possess wilderness characteristics described under Title VI, Section 603 of FLPMA and Section 2C of the Wilderness Act of 1964. These characteristics are: (1) generally appears to have been affected mainly by the forces of nature, with human imprints substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least 5,000 acres or is large enough to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historic value.

**Wilderness**: A congressionally designated area of undeveloped federal land retaining its primeval character and influence, without permanent improvements or human habitation that is protected and managed to preserve its natural conditions as described in Section 2A of the Wilderness Act of 1964.

**Wilderness Characteristics**: Key characteristics of wilderness listed in section 2 (c) of the Wilderness Act of 1964 and used by BLM in conducting wilderness inventories. These characteristics are features of the land associated with the concept of wilderness that specifically deal with naturalness and opportunities for solitude and primitive and unconfined recreation. These characteristics may be considered in land use planning when BLM determines that those characteristics are reasonably present, of sufficient value (condition, uniqueness, relevance, importance), and need (trend, risk), and are practical to manage (from IM-2003-275, Change 1, Considerations of Wilderness Characteristics in LUP, Attachment 1).

**Wildfire**: Any unwanted wild land fire.

**Wildland Fire**: Any nonstructural fire, other than prescribed fire, that occurs in the wild land.

**Winter Range**. The portion of the winter range to which a wildlife species is confined during periods of heaviest snow cover.

**Withdrawal**: An action that restricts the use of public lands by removing them from the operation of some or all of the public land or mining laws.

BLM_0014028

**Woodland**: A forest community occupied primarily by noncommercial species such as juniper, mountain mahogany, or quaking aspen groves; all western juniper forestlands are classified as woodlands, since juniper is classified as a noncommercial species.

BLM_0014029

# LIST OF PREPARERS

| Name | Position | Planning Role |
|---|---|---|
| Jed Carling, B.S. | Rangeland Management Specialist | Vegetation & Woodlands |
| Paul Curtis, B.S. | Range Management Specialist | Soils, Livestock & Riparian |
| Maxine Deeter, B.A. | Lands and Realty Specialist | Lands and Realty, Visual Resources and Travel |
| Laura Kochanski, B.A. | Archeologist | Cultural, Paleontology, Native American |
| Paul Leatherbury, B.S. | GIS | Mapping |
| Ted McDougall, B.S. | Geologist | Minerals |
| Brian Quigley, B.S. | Recreation Specialist | Recreation, Wilderness, Wild and Scenic Rivers and Travel |
| Nick Sandberg, B.S. | Assistant Field Office Manager | Livestock and Special Designations |
| Pam Schuller, B.S. | Planning NEPA Lead | NEPA |
| Tammy Wallace, M.A. | Wildlife Biologist | Water, Wildlife and Special Status Species |
| Lisa Bryant , M.S. | Soil Scientist | Air Quality & Weeds |
| Jeff Brown | Petroleum Engineer Technician | Health and Safety |
| Katie Juenger | Planning Coordinator, Fire | Fire |
| Susan Caplan, M.S. (reviewer) | Physical Scientist | Air Quality (NOC) |

BLM_0014030

# LIST OF APPENDICES

Appendix A        Maps
Appendix B        Stipulations Applicable to Oil and Gas Leasing and Other Surface-
                  Disturbing Activities
Appendix C        State of Utah Air Quality Monitoring
Appendix D        SHPO Correspondence
Appendix E        USFWS Correspondence
Appendix F        Utah Standards and Guidelines for Rangeland Health
Appendix G        Best Management Practices and Standard Operating Procedures
                  Applicable to Oil and Gas Appendix Operations and Other Public Land-
                  Use Authorizations
Appendix H        Monitoring
Appendix I        Fire Management
Appendix J        Tracts Identified for Disposal
Appendix K        Recreation Management Guidelines
Appendix L        Guidance for Pipeline Crossings
Appendix M        Finalized Conservation Measures and Best Management Practices for
                  T&E Species of Utah from the Land Use Plan Programmatic BAs and
                  Section 7 Consultations
Appendix N        Best Management Practices for Raptors and Their Associated Habitats in
                  Utah
Appendix O        Travel Plan
Appendix P        Wild and Scenic Rivers

BLM_0014031



# United States Department of the Interior
## FISH AND WILDLIFE SERVICE
UTAH FIELD OFFICE
2369 WEST ORTON CIRCLE, SUITE 50
WEST VALLEY CITY, UTAH 84119

October 29, 2008

In Reply Refer To
FWS/R6
ES/UT
08-F-0068
6-UT-08-F-024

Memorandum

To:         Field Office Manager, Bureau of Land Management, Monticello Field Office,
            P.O. Box 7, Monticello, Utah 84535

From:       Utah Field Supervisor, U.S. Fish and Wildlife Service, Ecological Services, West
            Valley City, Utah

Subject:    Biological Opinion for BLM Resource Management Plan, Monticello Field Office

This document transmits the U.S. Fish and Wildlife Service's (Service) biological opinion based on our review of potential activities described and authorized under the Resource Management Plan (RMP) for the Bureau of Land Management's (BLM) Monticello Field Office (MFO) and their potential effects on the federally threatened Mexican spotted owl (*Strix occidentalis lucida*), Navajo sedge (*Carex specuicola*), and federally endangered southwestern willow flycatcher (*Empidonax traillii extimus*), California condor (*Gymnogyps californianus*), Colorado pikeminnow (*Ptychocheilus lucius*), humpback chub (*Gila cypha*), bonytail (*Gila elegans*), and razorback sucker (*Xyrauchen texanus*) in accordance with Section 7 of the Endangered Species Act (Act) of 1973, as amended (16 U.S.C. 1531 et seq.). In addition, this document includes the Conference Opinion for the candidate species yellow-billed cuckoo (*Coccyzus americanus*), and the experimental, non-essential population of the endangered California condor (*Gymnogyps californianus*). Critical habitat designated for the Mexican spotted owl on February 01, 2001 was re-designated on August 31, 2004 (66 FR 8530, 69 FR 53181). Critical habitat was designated for the listed Colorado fish (Colorado pikeminnow, humpback chub, bonytail, and razorback sucker) on March 21, 1994 (59 FR 13374). Critical habitat was designated for the southwestern willow flycatcher on October 12, 2004 (69 FR 60705); critical habitat for this species does not occur within the MFO planning area. Your request for initiation of formal consultation for all aforementioned species was received on September 30, 2008.

Proposed activities identified in the proposed Monticello RMP are categorized into 19 programs, as follows:

> Air Quality
> Cultural Resource Management
> Paleontological Resources Management
> Fire Management
> Healthy and Safety Management
> Lands and Realty Management
> Livestock Grazing Management
> Minerals Management
> Non-WSA Lands with Wilderness Characteristics Management
> Recreation Management
> Riparian Area Management
> Soils and Watershed Management
> Special Designations Management
> Special Status Species Management
> Travel Management
> Vegetation Management
> Visual Resource Management
> Wildlife and Fisheries Management
> Woodland Resources Management

This biological opinion is based on information provided in the September 30th Biological Assessment, personal communications between the Service's biologists and the BLM's biologists, telephone conversations, e-mail correspondence, conference calls, planning meetings, and other sources of information. A complete administrative record of this consultation is on file at this office.

**Consultation History**

This section summarizes significant steps in the consultation process. Additional correspondence, email transmissions, telephone conversation records, and conference calls that occurred between December 15, 2004, and October 31, 2008 are documented in the administrative record for this consultation.

Previous Section 7 consultations have been conducted for activities located within the Monticello planning area that have resulted in the development of the terms and conditions and conservation measures that will be a part of the committed mitigation of the proposed plan. These consultations include the following:

- Programmatic Section 7 Consultation on Existing Land Use Plans. A biological opinion was received from USFWS on June 19, 2007 (USFWS 2007). Finalized Conservation Measures and Best Management Practices for T&E Species of Utah were developed and are included in the current land use plan revisions effort.

BLM_0014033

- Programmatic Section 7 Consultation on the oil and gas leasing program (USFWS 2004, BLM 2005). This consultation has been updated from time to time and the latest lease notices have also been included in the current revision effort.

- Consultation on the Fire Management Land Use Amendment (UFWS 2005a; USFW 2005b). Fire Management Resource Protection Measures were developed and are included in Appendix C.

Consultation activities specific to the current RMP revision effort include the following:

- March 18, 2008: The BLM electronically sent a draft Biological Assessment to determine impacts from the new Monticello Resource Management Plan.

- March 18 – May 21, 2008: The Service reviewed and provided comments on the draft Biological Assessment;

- August 8, 2008: The BLM electronically sent a second draft Biological Assessment to the Service;

- August 26, 2008: The Service reviewed and provided more comments on the draft Biological Assessment;

- September 30, 2008: We received the final version of the Biological Assessment and initiated formal consultation.

BLM_0014034

# PROGRAMMATIC BIOLOGICAL OPINION

## TABLE OF CONTENTS

**DESCRIPTION OF THE PROPOSED ACTION** ................................................................ 6

DESCRIPTION OF ACTIVITIES AND MANAGEMENT PRESCRIPTIONS UNDER THE MONTICELLO RMP .................... 9
  *Air Quality* ........................................................................................ 9
  *Cultural Resources* ........................................................................... 9
  *Paleontological Resources* .............................................................. 10
  *Fire Management* ............................................................................ 10
  *Health and Safety Management* ....................................................... 11
  *Lands and Realty Management* ........................................................ 12
  *Livestock Grazing Management* ....................................................... 13
  *Energy and Mineral Resource Management* ..................................... 14
  *Non-WSA Lands with Wilderness Characteristics* ............................ 16
  *Recreation Management* .................................................................. 16
  *Riparian Management* ..................................................................... 17
  *Soils and Watershed Resources* ...................................................... 17
  *Special Designations* ...................................................................... 18
  *Special Status Species Management* ............................................... 20
  *Travel Management* ......................................................................... 20
  *Vegetation Management* ................................................................. 21
  *Visual Resource Management* .......................................................... 21
  *Wildlife and Fisheries Resource Management* .................................. 22
  *Woodlands Management* ................................................................. 22
  CONSERVATION MEASURES ..................................................................... 23

**SPECIES ACCOUNTS, EFFECTS, AND CONCLUSIONS** ........................................ 24

  MEXICAN SPOTTED OWL (*STRIX OCCIDENTALIS LUCIDA*) ............................ 24
  SOUTHWESTERN WILLOW FLYCATCHER (*EMPIDONAX TRAILLII EXTIMUS*) ........ 37
  NAVAJO SEDGE (*CAREX SPECUICOLA*) ................................................... 51
  BONYTAIL (*GILA ELEGANS*) ................................................................. 55
  COLORADO PIKEMINNOW (*PTYCHOCHEILUS LUCIUS*) ................................. 58
  HUMPBACK CHUB (*GILA CYPHA*) ........................................................... 63
  RAZORBACK SUCKER (*XYRAUCHEN TEXANUS*) .......................................... 68

**EXPERIMENTAL POPULATIONS SPECIES FOUND IN THE ACTION AREA** ........... 81

  CALIFORNIA CONDOR (*GYMNOGYPS CALIFORNIANUS*) ................................. 81

**CANDIDATE SPECIES FOUND IN THE ACTION AREA** ..................................... 90

  WESTERN YELLOW-BILLED CUCKOO (*COCCYZUS AMERICANUS*) ...................... 90

**INCIDENTAL TAKE STATEMENT** ............................................................. 100

**REASONABLE AND PRUDENT MEASURES / TERMS AND CONDITIONS** .............. 101

BLM_0014035

RECOMMENDED CONSERVATION MEASURES ........................................................... 101

RE-INITIATION STATEMENT ......................................................................... 106

LITERATURE CITED ............................................................................. 107

APPENDIX A .................................................................................... 134

# LIST OF TABLES

TABLE 1.  FEDERALLY PROTECTED UTAH SPECIES ON BLM LANDS ANALYZED IN THIS BIOLOGICAL OPINION (BO) FOR THE PROPOSED MONTICELLO RESOURCE MANAGEMENT PLAN ............................................................ 8

BLM_0014036

# DESCRIPTION OF THE PROPOSED ACTION

The proposed action examined in this consultation is the implementation of land management activities described and authorized by the revised Monticello Resource Management Plan (RMP). The RMP and the Environmental Impact Statement (EIS) would provide planning guidance for public lands managed by the Monticello FO in San Juan and Grand Counties in southeastern Utah for the next 15 to 20 years. RMPs are used by the BLM to guide and manage future actions and set standards upon which future decisions on site-specific activities will be based. RMPs only establish general management policy on a broad scale. They are not used to make site specific decisions that commit resources on a small scale such as on specific parcels of land. RMPs also identify desired outcomes, also known as "desired future conditions". These outcomes are expressed in the RMPs as goals, standards, objectives, and allowable uses and actions needed to achieve desired outcomes. These are often referred to as RMP decisions or resource allocations. It is upon these RMP decisions or resource allocations that the effects determinations in this Biological Opinion are based for:

- Mexican spotted owl (*Strix occidentalis lucida*)
- Southwestern willow flycatcher (*Empidonax traillii extimus*)
- Navajo sedge (*Carex specuicola*)
- Colorado pikeminnow (*Ptychocheilus lucius*)
- Humpback chub (*Gila cypha*)
- Bonytail chub (*Gila elegans*)
- Razorback sucker (*Xyrauchen texanus*)
- California condor (*Gymnogyps californianus*)

In addition, our Conference Opinion considers the effects for the following experimental, non-essential and candidate species:

- California condor (*Gymnogyps californianus*) (south of I-70 and west of Highway 191)
- Yellow-billed cuckoo *(Coccyzus americanus )*

The Monticello planning area includes approximately 4.5 million acres of private land. State of Utah, Navajo Nation, national forest, national park, and BLM administered public lands located in San Juan and Grand counties in southeastern Utah. BLM manages some 1.8 million surface acres and nearly 2.5 million sub-surface acres. The planning area lies almost entirely within San Juan County, with a small portion in southern Grand County., State lands, privately owned lands, Natural Bridges National Monument, Hovenweep National Monument, Canyonlands National Park, Glen Canyon National Recreation Area, Manti-La Sal National Forest, and Navajo Nation are all located in or adjacent to lands administered by the MFO. Therefore, federally listed species and their habitat located on these lands could be indirectly affected by resource management decisions made in the RMP. In addition, segments of the Colorado and San Juan Rivers located adjacent to the planning area are included in this analysis because of the potential impact of water withdrawals and habitat modification identified in the proposed plan on the four endangered fish species and their habitat downstream.

BLM_0014037

The BA identified the Monticello planning area as potential habitat for the black-footed ferret. However, no known populations of the ferret are known to occur within the planning area boundaries. No reintroductions are currently planned. Therefore, the BA did not analyze potential impacts to the ferret and it will not be further discussed in this document.

BLM_0014038

**Table 1. Federally Protected Utah Species on BLM Lands Analyzed in this Biological Opinion (BO) for the Proposed Monticello Resource Management Plan.** "Likely to adversely affect" determinations (LAA) are used if a program may have any direct or indirect adverse effect to a threatened or endangered species. "May affect, not likely to adversely affect" (NLAA) determinations conclude that activities occurring under the program are either insignificant or beneficial. "No effect" (NE) determinations conclude that the species and critical habitat will be unaffected by the proposed activities under the program. "Not likely to contribute to Federal listing" (NCFL) are listed for candidate species if the program was determined not to contribute to its listing as a threatened or endangered species. "No Jeopardy" (NJ) are listed if the program was determined not to jeopardize an experimental, non-essential population.

| Programs / Common Name (Scientific Name) | Cultural Resources | Fire Management | Health and Safety | Lands and Realty | Livestock Grazing | Minerals and Energy | Non-WAS lands with Wilderness Characteristics | Paleontological Resources | Recreation Areas | Riparian | Soils and Watershed | Special Designations | Special Status Species Management | Travel Management | Vegetation Management | Visual Resources | Wildlife and Fisheries Management | Woodland Resources |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mexican spotted owl** (*Strix occidentalis lucida*) | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | NLAA | LAA | LAA |
| **Southwestern willow Flycatcher** (*Empidonax traillii extimus*) | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA |
| **Navajo sedge** (*Carex specuicola*) | NLAA | NLAA | NLAA | NLAA | LAA | LAA | NLAA | NLAA | NLAA | NLAA | NLAA | NLAA | NLAA | NLAA | NLAA | LAA | LAA | NLAA |
| **Bonytail** (*Gila elegans*) | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | NLAA | LAA | LAA |
| **Colorado pikeminnow** (*Ptychocheilus lucius*) | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | NLAA | LAA | LAA |
| **Humpback chub** (*Gila cypha*) | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | NLAA | LAA | LAA |
| **Razorback sucker** (*Xyrauchen texanus*) | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | NLAA | LAA | LAA |
| **California condor** (*Gymnogyps californianus*) (experimental, non-essential) | NJ | NJ | NJ | NJ | NJ | NJ | NJ | NJ | NJ | NJ | NJ | NJ | NJ | NJ | NJ | NJ | NJ | NJ |
| **California condor** (*Gymnogyps californianus*) | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | LAA | LAA | LAA | NLAA | LAA | LAA | NLAA | LAA | LAA |
| **Western yellow-billed cuckoo** (*Coccyzus americanus occidentalis*) | NCFL | NCFL | NCFL | NCFL | NCFL | NCFL | NCFL | NCFL | NCFL | NLCN | NCFL | NCFL | NCFL | NCFL | NCFL | NCFL | NCFL | NCFL |

BLM_0014039

## Description of Activities and Management Prescriptions under the Monticello RMP

Air Quality

The primary objective of air quality management within the Monticello planning area is to maintain air quality in accordance with standards prescribed by federal and state laws and regulations. The air quality program does not consider potential impacts to fish and wildlife resources beyond the standards set forth by EPA and the Utah Department of Environmental Quality. Air quality management actions include managing air quality in accordance with standards provided by federal, state and local laws and regulations, compliance of the Clean Air Act, mitigation of actions that compromise ambient air quality standards or visibility within the Class I air areas, and compliance with Utah Administrative Code Regulation R307-205, which prohibits the use, maintenance, or construction of roadways and disturbed areas without taking appropriate dust abatement measures. Compliance would be obtained through special stipulations as a requirement on new projects and through the use of dust abatement control techniques in problem areas.

Cultural Resources

The objective of the cultural resource management program is to protect, preserve, interpret, and manage significant cultural resources for their informational, educational, recreational, and scientific values. Site-specific inventories for cultural resources are required before the start of surface disturbance or if BLM-administered lands were proposed for transfer out of federal ownership.

The BLM performs inventories as well as land management. During inventory activities, the BLM inventories, categorizes, and preserves cultural resources, conducts field activities, performs excavations; maps and collects surface materials, researches records, and photographs sites and cultural resources. Inventory data collection is used for documentation and development of mitigation plans before other resource program surface disturbance. Inventory activities commonly entail the use of hand tools, power tools, or heavy machinery. Survey intensity varies among inventories and may last from one day to several weeks.

Cultural resource land management may involve: developing interpretive sites; authorizing installation of protective fencing; stabilizing deteriorating buildings; performing certain surface-disturbing activities; pursuing land withdrawals; designating avoidance areas; pursuing cooperative agreements; and identifying and interpreting historic trails. Cultural resource management may restrict certain land uses, close certain areas to exploration and prohibit some surface-disturbing activities.

Other cultural resource decisions under the Proposed Plan include provisions for developing cultural plans at appropriate cultural resource sites or areas in a manner that does not adversely impact the resource. Such plans would include protective measures such as restriction and limitations on recreation around cultural at-risk areas and sites, Native American consultation, and regulatory compliance, including Section 7 consultation. These plans would also include but not be limited to developing cultural monitoring systems, identifying sites and areas in need of

BLM_0014040

stabilization and protective measures (e.g., fences, surveillance equipment); developing research designs for selected sites/areas; designating sites/areas for interpretive and educational development (e.g., signs, kiosks) identifying areas for cultural inventory where federal undertakings are expected to occur; and developing specific mitigation measures.

Reasonable access to specific sacred sites would be allowed under the American Indian Religious Freedom Act. Cultural plants, once identified by interested tribes, would be managed to insure that ground-disturbing activities on the land do not contribute to the decline of cultural sensitive plant communities. Collection of plant resources would be considered on a case-by-case basis and would be allowed where practical and appropriate.

Surface disturbance is generally avoided near significant cultural resource sites and within ¼ mile of the visual horizon of significant segments of historic trails and canals. Sites listed on, or eligible for, the National Register for Historic Places (NRHP) are protected and would be managed for their local and national significance in compliance with the National Historic Preservation Act, the Archaeological Resources Protection Act, the American Indians Religious Freedom Act, and the Native American Graves Protection and Repatriation Act, as appropriate.

Paleontological Resources

The objective of the paleontological resource management program is to protect, preserve, interpret, and manage significant paleontological resources for their informational, educational, recreational, and scientific values. Site-specific inventories for paleontological resources are required before the start of surface disturbance or if BLM-administered lands were proposed for transfer out of federal ownership.

During inventory activities, the BLM inventories, categorizes, and preserves paleontological resources, conducts field activities, performs excavations; maps and collects surface materials, researches records, and photographs sites and paleontological resources. Inventory data collection is used for documentation and development of mitigation plans before other resource program surface disturbance. Inventory activities commonly entail the use of hand tools, power tools, or heavy machinery.

Paleontological resource land management may involve: developing interpretive sites; authorizing installation of protective fencing; performing certain surface-disturbing activities; pursuing land withdrawals; designating avoidance areas; pursuing cooperative agreements; and identifying and interpreting historic trails. Paleontological resource management may restrict certain land uses, close certain areas to exploration and prohibit some surface-disturbing activities. This program also allows the collection of any fossil vertebrates, significant fossil invertebrates, and plants in all areas except in specified areas with a required paleontological collecting permit. Archeological collections are authorized through a permit system. Recreational permitting is allowed for common invertebrate and plant fossils.

Fire Management

Objectives of fire management are to protect life, property, and resource values from wildfire and to restore the natural role of fire in the ecosystem. The major activities involved with the BLM fire management program include: wildfire suppression, managing natural ignitions as

BLM_0014041

wildland fire use for resource benefit, prescribed burning, non-fire fuels treatment for hazardous fuels reduction, and emergency stabilization and rehabilitation following wildfires.

Wildfires are suppressed when they threaten values and resources, such as: wildland urban interface areas, developed recreation sites, areas that are unlikely to recover following fire (i.e., areas of noxious weeds or invasive species), sensitive soils, critical TES habitat, or fires with potential to spread to private, state, or other federal lands. Fire suppression methods vary with the intensity of the wildfire and are conducted on an emergency basis. Firelines may be constructed by hand or by heavy equipment to contain the wildfire. Water may be withdrawn from nearby sources to suppress fires. Chemical fire suppression agents and retardants may be used, if necessary. The use of aerial fire retardant is restricted near water resources. After a fire is extinguished, the BLM may use emergency stabilization and rehabilitation techniques, such as seeding and soil stabilization actions, to restore a burned or suppressed area to its previous vegetation cover. These suppression and post-suppression activities often employ the use of off-road vehicles, hand tools, and heavy equipment such as bulldozers.

Wildland fire use is implemented in areas that would benefit from the reintroduction of fire. Some suppression techniques, as described above, may be used to keep the fire within pre-determined boundaries, but no emergency stabilization and rehabilitation actions are taken following wildland fire use.

Prescribed fire and non-fire fuels treatment objectives are to restore natural fire regimes, reduce hazardous fuel loading, and enhance resources such as wildlife habitat. Prescribed fires follow a pre-determined prescription and include activities such as broadcast burning or pile burning following manual or mechanical fuel treatments. Under the proposed plan, fuels management actions include surface-disturbing treatments on 5,000 to 10,000 acres annually. The majority of these treatments would likely be concentrated in the pinyon-juniper vegetation type, including historical sagebrush/grassland that has been encroached upon by pinyon-juniper (BLM 2005). Approximately 92% of this vegetation type is in fire regime/condition class (FRCC) 3, which indicates that it suffers high departure (>66% variation) from historical fire return interval and/or vegetation condition/fuel loading. The main reasons the majority of the pinyon-juniper in the planning area falls within this FRCC are 1) loss of native understory of pinyon-juniper stands; 2) cheatgrass invasion of disturbed pinyon-juniper stands; and 3) fuel loading in uncharacteristically thick pinyon-juniper stands (BLM 2005). Impacts would be analyzed under site-specific NEPA once it is determined where individual treatments would occur. These actions include mechanical and manual treatments, prescribed fire, chemical or biological vegetation control, and aerial/ground seeding.

Health and Safety Management

The primary objective of health and safety management is to protect public and environmental health and safety on lands administered by BLM. Hazardous materials and waste management policies are integrated into all BLM programs. Several federal, state, and local laws overlap in their requirement of BLM to identify and remediate contaminated sites on public lands. Besides managing pre-existing contamination, BLM seeks to prevent or minimize contamination caused by BLM authorized actions.

BLM_0014042

State Office and field office contingency plans specify how personnel are supposed to respond to a hazardous substance incident, such as hazard recognition, retreating procedures, record keeping, and reporting. Contingency plans recommend using signs, fencing, and/or barricades for site security, unless such actions would create an attractive nuisance. Emergency spill response may necessitate containment measures such as building dikes, or overland vehicle and equipment travel.

Removal and remedial actions taken under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) as amended 42 U.S.C. § 9601 et seq. must follow the National Contingency Plan (NCP). Proposed CERCLA removal or remedial actions must address Applicable or Relevant and Appropriate Requirements (ARARs), which include all necessary Endangered Species Act considerations. Non-CERCLA removal and remedial actions, such as RCRA actions, would be reviewed under the NEPA process.

The abandoned mine lands program addresses the environmental and safety hazards associated with AML sites on public lands. Once the site are identified, they are prioritized, and appropriate actions are taken on those historic mine sites that pose health and safety risks. The BLM will identify and clean up unauthorized dumping sites and hazardous materials spills in the MFO as required to comply with applicable State, local, and Federal regulations. The priority for the reclamation of environmentally contaminated sites is based on risk assessments that address threats to human health and threats to the environment. For example, abandoned mine land sites that impact water quality are usually a greater concern and receive a higher priority for reclamation than those that do not impact water quality. As part of the Proposed Action, abandoned mine lands would be prioritized for area reclamation and mitigation. All applicable AML regulations would be complied with, and site-specific NEPA analysis would be required on all potential sites.

Lands and Realty Management

The objectives of the lands and realty management program are to support multiple-use management goals of other BLM resource programs; respond to public requests for land use authorizations, sales, and exchanges; and acquire and designate right-of-way access to serve administrative and public needs.

Public land tracts that are not critical to current management objectives will be disposed of through the realty management program (reviewed on a case-by-case basis). Non-federal lands may be acquired through exchange in areas with potential for recreation development or in areas containing important wildlife, cultural, scenic, natural, open space, or other resource values. Protective withdrawals may be established to protect and preserve important resource values, but require extensive mineral investigations.

Realty management authorizes occupancy of public lands for roads, power lines, pipelines, communication sites, and irrigation ditches authorized by granting rights-of-way. Rights-of-way management actions respond to public requests for access, land authorizations, sales, and exchanges. These rights-of-way may be temporary or extend up to 30 years, or in perpetuity. BLM also pursues access across private lands, rehabilitates access roads that are no longer needed, and proposes easement negotiations. The Proposed Plan would include the authorization

---

BLM_0014043

of ROW development except in wilderness study areas, wilderness areas, threatened and endangered species habitat, avoidance areas (133,293 acres), and exclusion areas (416,115 acres). Applications for filming permits would only be granted if site-specific NEPA analysis showed that federally listed and sensitive species would not be impacted. Filming permits would be granted in previously disturbed areas (i.e. existing roads and pullouts) without site-specific analysis. Under the Proposed Plan, 50,665 acres would be recommended for withdrawal from mineral entry, including Grand Gulch National Historic District, all developed recreation sites, San Juan River SRMA, Colorado River Segment 3, and Alkali Ridge National Historic Landmark.

The program pursues cooperative agreements, develops recreation site facilities, considers offsite mitigation, minimizes access in wildlife habitat, fences revegetation sites, blocks linear rights-of-way to vehicle use, considers temporary-use permits, considers new withdrawals, and identifies parcels for landfills under the Recreation & Public Purposes Act. Areas with important resource values will be avoided where possible when planning routes and installation of new facilities. Effects will be mitigated if it becomes necessary to place facilities within avoidance areas.

<u>Livestock Grazing Management</u>

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base, while improving wildlife habitat and watershed condition and meeting Utah's Rangeland Health Standards. Grazing allotments are prioritized by and classified into one of three management categories: maintain (M), improve (I), and custodial (C).

Not all BLM lands are open to livestock grazing due to conflicts with other resource uses. Grazing in portions of allotments would be manipulated to reduce impacts on highly saline soils and to reduce salinity in the Colorado River drainage. Under the Proposed Plan, grazing would be excluded from 134,277 acres in the Monticello PA (BLM 2008). Approximately 962 acres in the Dark Canyon area, Moki Canyon, and Lake Canyon are limited to livestock trailing to help protect sensitive species. Approximately 15,720 acres within East Canyon and Peter's Canyon would be excluded from livestock grazing to protect wildlife habitat. New allotments would be added in South Vega, Upper Mail Station, and Big Westwater, while allotments would be taken out of other areas, which include Dodge Canyon and Rogers Allotments. In addition, the Proposed Plan would include the closure of five Comb Wash side canyons. Under the Proposed Plan, grazing would be reduced in areas where the native vegetation appears to be overburdened. Additionally, the BLM would develop seasonal restrictions, closures, and/or forage utilization limits on grazing in riparian areas that are determined to be Functioning at Risk and/or Non-functional. These determinations would be made through monitoring activities involving vegetation trend and forage utilization measurements and riparian health assessments.

Range management activities may include vegetation treatments such as prescribed fire or mechanical and chemical control of noxious weeds, sagebrush, and other target species. The determinations and effects analyses associated with the potential impacts of these treatments can be located under the other appropriate program headings (i.e., fire treatments – see Fire Management, or vegetative treatments – see Vegetation Management)

BLM_0014044

Other range improvements authorized by the livestock grazing management program may include fence construction, water developments, exclosures, and livestock handling facilities. Salt or mineral supplements may be approved to help manage livestock distribution. These projects are designed and constructed to implement grazing systems that are designed to meet Rangeland Health Standards and improve watersheds conditions, wildlife habitat, riparian proper functioning conditions, and forage production. The administration of the range program includes the issuance of grazing permits, monitoring key areas within allotments, developing management plans and agreements, and use supervision to assure compliance with the terms and conditions of the grazing permits.

Energy and Mineral Resource Management

Mineral development is subject to leasing, location, or sale based on the Federal mineral law covering that particular commodity. The planning area will be open to consideration for exploration, leasing, and development of leasable minerals including oil, gas, coal, oil shale, and geothermal. The minerals program is divided into the three categories of salable, leasable, or locatable minerals.

*Salable Minerals*

Salable minerals anticipated for development in the project area include sand, gravel, building stone, and clay. Before issuing contracts or free use permits for salable minerals, the BLM conducts the appropriate environmental analyses including special studies or inventories of cultural resource values, threatened or endangered plant and wildlife species, and other resources. Stipulations or conditions may be included in the terms of the contract to ensure protection of the natural resources and reclamation of the land following project completion. Site reclamation is required following any surface-disturbing activity by mining for salable minerals. Reclamation includes removing surface debris, recontouring, reducing steep slopes, and planting vegetation. All reclamation proposals must conform to federal and state agency requirements.

*Leasable Minerals*

Leasable minerals anticipated for development include fluid (oil, and gas) and solid minerals such as coal, sodium, potash, and tar sands. There would be a total of 484,217 acres of land open for oil and gas leasing-standard stipulations, 66,108 open to oil and gas leasing subject to No Surface Occupancy (NSO), and 740,594 acres open for oil and gas leasing with special conditions (these include timing limitations, controlled surface use, or a combination of the two). Under the Proposed Plan, 493,400 acres would be unavailable for oil and gas leasing. In Utah, coal is generally extracted using underground mining methods although surface coal mine operations and methods are likely to be proposed for some future operations. Surface facilities include truck/train loadouts, offices, maintenance facilities, change house, electrical substations, and roads. Total surface disturbance is usually less than 20 acres.

Surface coal mining involves the use of draglines, shovels, and haul trucks and results in large areas of surface disturbance from road construction; topsoil and overburden removal; and stock piling of these materials. Reclamation includes recontouring as closely to the original landscape as possible, reconstruction of drainages, reseeding, and monitoring.

---

BLM_0014045

Fluid leasable minerals include oil, gas, and geothermal steam. In areas where development of
oil and gas resources would conflict with the protection or management of other resources or
public land uses, mitigation measures are identified and may appear on the leases as either
stipulations to uses, or as restrictions on surface occupancy. Once the parcel is sold, it matures
into a lease and is authorized for a 10 year period.

Initial geophysical exploration involves use of ATVs and vehicles to lay the geophones and drill
the shot holes for charges, or "thumpers" to create the sound waves. Exploration for oil and coal
bed natural gas may also include drilling more than one well. Surface disturbance during the
exploration phase of drilling includes the construction of roads, well pads, reserve pits, and other
facilities.

Development of oil and gas fields includes construction pads, storage tanks, storage tank
batteries, oil and gas processing facilities and necessary pipeline, compressor engines and power
lines right-of-ways. Generally, each drill site includes a 3 acre pad, 1 mile of road, and 1 mile of
pipeline. Directional drilling requires a larger pad size and is dependent on the number of wells
drilled from each pad.

Methods to dispose of residual water from oil and gas production include: subsurface re-
injection, direct surface discharge, and discharge into a containment pond or pit. Chemically
polluted water may be treated before surface discharge or may be reinjected. Geothermal
resources are available for exploration, development, and production and are subject to the same
surface disturbance restrictions and other stipulations applied to oil and gas exploration,
development, and production.

*Locatable Minerals*

Locatable metallic minerals in the project area include copper, uranium-vanadium, placer gold
and limestone. Under the Proposed Plan, 50,665 acres would be recommended for withdrawal
from locatable mineral entry and 1,734,458 acres would be available for mineral entry. Also
under the Proposed Plan, 435,338 acres would be unavailable for mineral disposal, 624,734 acres
would be open to mineral disposal subject to standard terms and conditions, and 724,234 acres
would be open to mineral disposal subject to special conditions.

Minerals that are normally locatable may be leasable on acquired lands. Minerals are locatable
under the 1872 Mining Law. Most public lands are open to location with the exception of
withdrawn lands. The Mining Law of 1872 sets the requirements for lode claims, placer claims,
and mill sites as well as discovery, location, annual filings, assessment work, and mineral
examinations to establish validity. Mining law allows for individuals and corporations to
prospect for minerals on public domain lands, and upon making a discovery, to stake (or
"locate") a claim on that deposit. A claim gives the holder the right to develop the minerals and
may be "patented" to convey full title to the claimant. This law is under constant scrutiny, and a
continuing issue is whether this law should be reformed, and if so, how to balance mineral
development with competing land uses. Since October 1, 1994, Congress has imposed a budget
moratorium on BLM acceptance of any new mineral patent applications. Until the moratorium is
lifted, the BLM will not accept any new applications.

BLM_0014046

Surface disturbance for uranium extraction includes processing plants, equipment maintenance buildings and offices, or other various extraction support facilities disturbing approximately 5-15 acres.

Potential impacts of locatable mineral developments include increased soil erosion resulting in increased sedimentation, some potential for release or exposure to toxic chemicals and wastes, individual mortality, localized population mortality, habitat loss/fragmentation, and reduction of reproductive success.

Non-WSA Lands with Wilderness Characteristics

The BLM has identified non-WSA lands with wilderness characteristics for management consideration under the RMP. Wilderness characteristics include the appearance of naturalness and outstanding opportunities for solitude or unconfined recreation. Primitive lands and backcountry landscapes would be managed for their undeveloped character, and to provide opportunities for primitive recreational activities and experiences of solitude, as appropriate. Under the Proposed Plan, 88,871 acres of non-WSA lands would be managed to protect, preserve, and maintain wilderness characteristics. An NSO stipulation would be applied to oil and gas leasing in Dark Canyon (11,540 acres), and Mancos Mesa (30,068 acres), Nokai Dome West (14,988 acres), Nokai Dome East (18,618 acres), and Grand Gulch (13,657 acres) would be unavailable to oil and gas leasing. Also, non-WSA lands with wilderness characteristics would be managed to preclude other surface-disturbing activities including mineral materials sales. These areas would be managed as VRM Class II, woodland harvest would be prohibited, vehicle use would be limited to designated roads, and development of ROWs would be avoided.

Recreation Management

The objectives of recreation management are to identify recreation values on public lands and make decisions which will ensure that these values are maintained on a long-term sustained yield basis to meet the recreational needs of the using public. Recreation management includes allowing recreational access by the public, developing and maintaining recreation areas, issuing special recreation permits for organized groups, competitive events and commercial outfitters and guides, acquiring recreational access, providing information to the public about recreation resources and assessing effects of recreational use to the environment. The BLM monitors recreational use, develops management plans, and evaluates recreational potential.

Through the land use planning process BLM identifies and designates special recreation management areas. These include areas which require greater recreation investment, where more intensive recreation management is needed and recreation is a principal management objective. Recreational activities may include hiking, hunting, mountain biking, boating, and fishing, OHV use (including snowmobiles), horseback riding, and camping.

Backcountry roads and trails provide a wide range of recreation opportunities for Off Highway Vehicle (OHV) users on public lands. These opportunities range from vehicle touring to vehicle access for hiking, hunting, fishing, and other numerous public land uses, as well as unconfined vehicle use at designated open areas.

BLM_0014047

Riparian Management

The objective of riparian management in Utah is to establish an aggressive riparian area management program that will identify, maintain, restore, and/or improve riparian values to achieve a healthy and productive ecological condition for maximum long-term benefits in order to provide watershed protection while still preserving quality riparian dependent aquatic and terrestrial species habitats and, as appropriate, allow for reasonable resource uses. Priority for riparian area management will be given to areas identified as habitat for aquatic species with signed Conservation Agreements and Strategies.

Riparian area management is an integral part of all resources and related management programs. Management actions may include reductions in livestock numbers, adjustments in grazing distribution patterns, fencing, herding, livestock conversions, vegetation treatments, monitoring, and recontouring streambanks. In addition, restrictions are placed on other resource programs that are meant to protect riparian areas including, development restrictions on time, space, and placement, and appropriate buffers. Those activities that affect or are affected by riparian values will account for the riparian areas management objectives and direction. Resource values and uses that affect or are affected by riparian values include wildlife and fisheries habitat, forest resources, livestock grazing, OHV use, visual resources, cultural and historical resources, minerals exploration and development, lands and realty activities, watershed and soils resources, recreation uses, fire management, and access.

Soils and Watershed Resources

The objectives for the soil and watershed resources management program are to maintain and improve soil integrity, and long-term soil productivity through implementation of rangeland health standards and other soil protection measures, as well as to protect, maintain or improve surface and groundwater quality consistent with existing and anticipated uses and applicable state and federal water quality standards and to provide for availability of water to facilitate authorized uses.

Best Management Practices (BMPs) are incorporated into project level documents and are designed to reduce sedimentation and protect water quality. BMPs are also designed to benefit soil productivity by minimizing erosion. Examples of soil protection measures implemented under this program include seasonal or weather restrictions for use of heavy equipment on moist soils or slope limitations for mechanical harvest equipment. Soil protection measures are often identified in site-specific environmental analyses. Examples of water quality protection measures include identification of heavy sediment loads, monitoring and treating soil erosion, evaluating and restricting surface development, and monitoring water quality. Watershed management activities include some of these same activities through the evaluation of projects, application of seasonal closures, monitoring of public drinking water, and completion of groundwater studies. Some of the field activities involve the use of heavy machinery and hand tools to develop riparian/wetland exclosures and stream improvements. Management of water resources may include the imposition of restrictions on activities such as development, in order to maintain water, and watershed quality. Generally, the program provides information in support of other resource objectives and goals.

BLM_0014048

Generally, on-the-ground activities are carried out under other programs and their impacts are discussed in the appropriate sections. Restrictions may include but are not limited to the modification of construction design in order to accommodate the preservation of physical and biological soil integrity, timing restrictions to reduce impacts to soils, or use of sediment and salt reducing measures during construction activities. Activity plans will address site-specific problems and include monitoring for salt and sediment loading.

Special Designations

The following describes special designations, including Areas of Critical Environmental Concern (ACEC); Wild and Scenic Rivers (WSR); and Wilderness Resources which include Wilderness Study Areas (WSAs), and congressionally designated Wilderness.

Areas of Critical Environmental Concern (ACECs) - An ACEC is the principal BLM designation for public lands where special management attention is required to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes; or to protect life and safety from natural hazards. ACECs in the MFO include:

- *Alkali Ridge (39,196 acres)* – This ACEC would be managed to protect cultural resources. In the Proposed Plan, this area would be open for mineral leasing with controlled surface use and would be available for vegetation treatments, livestock grazing, and OHV use and woodland harvest limited to designated roads. Within the Alkali Ridge ACEC, there is the Alkali Ridge National Historic Landmark (2,146 acres). This area would be managed as unavailable for disposal of mineral materials, NSO for oil and gas leasing, no surface-disturbing vegetation treatments, and a Right of Way (ROW) avoidance area. All travel limited to designated routes, no campfires, and unavailable for private and/or commercial use of woodland products.
- *Hovenweep (2,439 acres)* - This ACEC would be managed to protect the important cultural and historic values. The area would also be managed as VRM III, available for mineral leasing with controlled surface use, available for livestock use, and available for watershed improvements and vegetation treatments. This area would be excluded from private or commercial use of woodland products, unavailable for disposal of mineral materials, and OHV use limited to designated roads/trails. There would be a Visual Emphasis Zone (880 acres) that surrounds the west, south, and east sides of Hovenweep National Monument and would be managed as NSO for mineral leasing, excluded from watershed and vegetative treatments, ROW avoidance area, and managed as VRM Class II. In the northern part of the ACEC is a Cajon Pond Emphasis Zone (one acre). It is a fenced exclusion area that would be open for mineral leasing with a controlled timing stipulation to protect shorebird and waterfowl courtship and nesting season. This area is also excluded from livestock use.
- *Indian Creek (3,908 acres)* - This ACEC would be managed for the scenic values as VRM I. The area would be open for mineral leasing subject to NSO, unavailable for disposal of mineral materials, available for livestock use, closed to OHV use, ROW avoidance area, and unavailable for use of woodland products.
- *Lavender Mesa (649 acres)* - This ACEC would be managed to protect the relict vegetation. The area would be managed as VRM II, it would be open to for oil and gas

BLM_0014049

leasing with NSO, and open to locatable mineral entry. In addition, this ACEC would be excluded from livestock grazing, wildlife habitat improvements, watershed control structures, and land treatments or other improvements, except for test plots and facilities necessary for study of the plant communities, and restoration/reclamation activities. This ACEC would be subject to conditional fire suppression, closed to OHV use, no campfires, ROW avoidance area, and excluded from surface disturbance by mechanized or motorized equipment.

- *San Juan River (4,321 acres)* – The San Juan River would be designated as a Scenic, Cultural, Wildlife, Natural System Processes, and Geologic Features ACEC and would be managed with the following prescriptions: available for oil and gas leasing subject to NSO, available for OHV use limited to designated routes, unavailable for private and/or commercial use of woodland products, available for livestock use October 1 – May 31 with a rest-rotation and/or deferred management system, available for watershed, range, and wildlife habitat improvements and vegetation treatments, and unavailable for mineral material disposal.
- *Shay Canyon (119 acres)* - This ACEC would be managed to protect its cultural values. The area would be managed as VRM II, with no surface-disturbing vegetation, wildlife, or watershed treatments/improvements, NSO for oil and gas, grazing restricted to trailing only, and closed to mineral materials disposal. In addition, hiking would be limited to designated routes, ROW avoidance area, closed to camping and campfires, and closed to private or commercial use of woodland products.
- *Valley of the Gods (22,863)* - This ACEC would be designated for its scenic values and managed as VRM I. The area would be available for livestock use and vegetation treatments, OHV use limited to designated roads and trails, ROW exclusion area, no campfires allowed, and unavailable for mineral leasing and disposal of mineral materials.
- *Bridger Jack Mesa, Butler Wash North, Dark Canyon* – Under the Proposed Plan, these areas would be managed as Wilderness Study Areas.
- *Cedar Mesa* - Under the Proposed Plan, this area would be managed as a SRMA (see Recreation).

Wild and Scenic Rivers - Congress designates rivers into the National Wild and Scenic Rivers system. These can include scenic, wildlife, fish, cultural and recreational values among others. Eligible/suitable rivers are given a tentative classification of wild, scenic, or recreational based upon the amount of disturbance within the river corridor. Both congressionally designated rivers and eligible/suitable segments are managed to protect the free-flowing nature of the river, the tentative classification, and the outstandingly remarkable values.

*Colorado River* - Segment 1 (352 acres) would not be suitable for designation into the NWSRS. Segment 2 (880 acres) would be designated as suitable with the classification of Scenic, and would be managed as VRM II, open to oil and gas leasing subject to NSO, ROW avoidance area, and motorized boat use would be allowed. Segment 3 (1,040 acres) would be designated as suitable Scenic, and would be managed as VRM I, unavailable for oil and gas leasing, closed to OHV use, recommended for withdrawal from mineral entry, ROW exclusion area, and motorized boat use would be allowed.

BLM_0014050

***Dark Canyon (2,048 acres)*** – Designated as suitable with a classification of Wild, and managed as VRM I. This river would be closed to oil and gas leasing, closed to OHV use, and recommended for withdrawal from mineral entry.

***San Juan River*** – Under the Proposed Plan, Segments 1-4 (5760 acres) would not be suitable for designation into the NWSRS. Segment 5 (2,768 acres) would be designated as suitable with the classification of Wild, and would be managed as VRM Class I, closed to oil and gas leasing, closed to OHV use, ROW exclusion area, and recommended for withdrawal from locatable mineral entry.

Wilderness Resources - There are two types of special designations in this category: wilderness study areas, and congressionally designated wilderness. In general this means that there can be no new permanent structures or new disturbance that would require reclamation in order for the area to appear natural. The lands are closed to mineral leasing. With very few exceptions, there can be no new permanent structures or new disturbance, and no motorized or mechanized transport. The lands are closed to mineral leasing and mineral location under the mining laws. Management actions include limiting visitor use, restoration of ecological integrity and functions, limit change in the landscape, and manage natural sound-scapes by prohibiting all motorized vehicles. The Monticello FO manages 13 WSAs: Mancos Mesa (51,440 acres), Grand Gulch ISA Complex (105,520 acres), Road Canyon (52,420 acres), Fish Creek Canyon (46,440 acres), Mule Canyon (5,990 acres), Cheesebox Canyon (15,410 acres), Dark Canyon ISA Complex (68,030 acres), Butler Wash (24,190 acres), Bridger Jack Mesa (5,290 acres), Indian Creek (6,970 acres), South Needles (160 acres), Squaw and Papoose Canyons (6,676 acres), and Cross Canyon (1,008 acres). This is a total of 389,444 acres as identified in the Statewide Report to Congress. All WSAs would be VRM I management class and are exclusion areas for ROWs.

Special Status Species Management

The objectives of the special status species program include maintenance of biological diversity of plant and animal (terrestrial and aquatic) species by supporting the State Division of Wildlife Resources' strategic plans for wildlife population objectives to the extent practical and consistent with BLM multiple-use management requirements. Another main objective includes the development of protective measures for federally listed species and other special status species that require special consideration under BLM policy.

In addition, the special status species management program often includes the enforcement of timing restrictions, completion of surveys, and development of conservation measures and best management practices for the mitigation of effects of development deemed to be discretionary actions of the BLM. Activities implemented under this program may include identification and enforcement of timing stipulations; completion of species surveys; and closure of areas containing sensitive species populations or habitat.

Travel Management

The objectives of the transportation management program include maintenance of access for public and administrative needs; establishment of a route system that contributes to protection of sensitive resources; accommodates a variety of uses and minimizes user conflicts; and coordination of OHV management.

BLM_0014051

Activities included under this program include planning and decision making for roads and road
designations. Under the Proposed Plan, 0 acres would be open to OHV use, 1,388,191 acres
would be limited to designated routes, and 393,895 acres would be closed to OHV use. The
number of miles of designated roads on public lands within the Monticello PA consists of 873
miles of open B-Class roads, 1,947 miles of open D-Class roads, and 316 miles of closed D-
Class roads.

Vegetation Management

Objectives of the vegetation resource management program are to maintain or improve the
diversity of plant communities to support livestock needs, wildlife habitat, watershed protection,
and acceptable visual resources. Vegetation treatments, (e.g., timber harvest, sagebrush spraying
or burning, chaining, etc.) will be designed to meet overall resource management objectives,
which include the protection of listed plant and animal species. The four types of vegetation
control methods include chemical, biological, and mechanical, and cultural practices. Biological
control can involve the use of weevils, beetles, or goats. Mechanical methods include dozing,
cutting, chopping, and pulling. Cultural controls include education and public awareness
campaigns, use of weed free forage, and changes in grazing practices to increase health and vigor
of plant communities so that they are more resistant to invasion. Herbicides are often applied in
situations where other means are not as effective or cost efficient. Depending on the site and
circumstances, these methods can be used individually or in combination. Sagebrush control
measures are also implemented by the BLM. These control methods may be chemical or
mechanical. Fire is used to improve range forage production, wildlife habitat, timber stands, sale
debris disposal, and to reduce hazardous fuel buildup.

Under the Proposed Action, seed gathering and plant collection would be permitted in all areas
meeting Utah's Rangeland Health Standards. The spread of noxious, invasive, and non-native
weed species would be controlled through implementation of the BLM weed management
policies and action plans (BLM 1991 and 2006). Under the Proposed Plan, there would be up to
4,833 acres of vegetation treatments in fire Regime Condition Class III areas and other
vegetation cover types per year in the Monticello PA.

Visual Resource Management

The objective of visual resource management (VRM) is to manage public lands in a manner that
will protect the quality of the scenic (visual) values of the landscape. To accomplish this
objective, BLM establishes visual resource management priorities while giving consideration to
other resource values and uses. Visual resources are managed in accordance with objectives
classes that have been assigned to all public lands in each FO.

All WSAs and Wild and Scenic River segments would be managed as VRM I or II. Limited and
very limited management activities would be allowed in areas designated as VRM classes I or II.
Short-term vegetation treatments, and other surface-disturbing activities designed to enhance
native vegetation, would be allowed in VRM classes I or II areas.

In areas designated as VRM classes III or IV, changes to the landscape would be moderate or
high. Most types of surface-disturbing activities and human visitation would be allowed in VRM

BLM_0014052

classes III or IV areas.   Under the Proposed Plan, 685,245 acres would be subject to VRM class I or II restrictions, and 1,096,370 acres would be subject to VRM class III or IV restrictions.

Wildlife and Fisheries Resource Management

The BLM works closely with the UDWR to manage habitat for fish and wildlife (including big game, upland game, waterfowl, neo-tropical migratory birds, small mammals, amphibians, and reptiles) to achieve and maintain suitable habitat for desired population levels and distribution within the decision area. The UDWR is responsible for managing wildlife population levels; the BLM is responsible for managing wildlife and fisheries habitat in a condition that will support desired levels of species. The BLM works cooperatively with the UDWR to maintain and reestablish populations of native species that have used the historic range located within the planning area through habitat management and restoration.

Objectives of the fish and wildlife resource management program include maintenance of habitat quantity, quality, and connectivity to sustain diverse wildlife populations; maintenance and improvement of aquatic habitats to sustain diverse fisheries and aquatic populations; and conservation of migratory bird habitat as directed by Executive Order 13186 (Responsibilities of Federal Agencies to Protect Migratory Birds) and the Migratory Bird Treaty Act and emphasize management of migratory birds listed on the USFWS current list of Birds of Conservation Concern and the Partners-in-Flight priority species.

Fish and Wildlife and Fisheries Management actions may include surveying; habitat monitoring; habitat and species inventories, habitat improvement, habitat restoration, water developments, riparian habitat improvements, etc., as well as development of habitat management plans.

The BLM develops stipulations and conservation measures to both protect and enhance wildlife and fisheries habitats. These stipulations and conservation measures may include such things as: recommending withdrawal of some areas from mineral entry; limiting access to specific areas by OHVs and pedestrians; and minimizing the impacts of surface development. The BLM may acquire crucial wildlife habitats or easements and conduct inventories of potential habitats for occurrences of threatened, endangered, and sensitive species or their habitat.

Woodlands Management

Woodlands management objectives are to maintain and enhance the health, productivity, sustainability, and biological diversity of forest and woodland ecosystems and to provide a balance of natural resource benefits and uses, including opportunities non-commercial harvest of forest and woodland products on a sustainable basis. The BLM manages forests for multiple uses, such as recreation, livestock grazing, wildlife habitat.

Under this alternative, all 841,936 acres would be available for woodland harvesting (i.e. collection of standing and downed trees). Within the areas open to harvesting, there would be 597,086 acres of actual woodland habitat that would be available.

BLM_0014053

## Conservation Measures

As part of the proposed action, in order to minimize the effects of the above management programs, the Monticello BLM Field Office has committed to a variety of species-specific conservation measures and, in conjunction with USFWS, developed species-specific lease notices for leases permitted under the Minerals and Energy Program.  For a complete listing of the BLM committed conservation measures, lease notices, and Best Management Practices (BMPs), please refer to Appendix A.

BLM_0014054

# SPECIES ACCOUNTS, EFFECTS, AND CONCLUSIONS

The following section includes species-specific information pertaining to the status and
distribution of each species, the environmental baseline, and programmatic-level effects of the
proposed action.

Regulations implementing the Act (50 CFR 402.02) define the environmental baseline as the past
and present impacts of all Federal, State, or private actions and other human activities in the
action area, the anticipated impacts of all proposed State or Federal projects in the action area
that have already undergone formal or early Section 7 consultation, and the impact of State or
private actions which are contemporaneous with the consultation process.

"Effects of the action" refers to the direct and indirect effects of an action on the species or
critical habitat, together with the effects of other activities that are interrelated or interdependent
with that action, which will be added to the environmental baseline. Direct effects encompass
the immediate, often obvious effect of the proposed action on a species or its habitat. Indirect
effects are caused by, or result from the proposed action, are later in time, and are reasonably
certain to occur. In contrast to direct effects, indirect effects may be more subtle, and may affect
species' populations and habitat quality over an extended period of time, long after RMP
activities have been completed.

Interrelated actions are those that are part of a larger action and depend upon the larger action for
their justification. Interdependent actions are those that have no independent utility apart from
the action under consultation. Interdependent actions are those that have no independent utility
apart from the action under consideration. Indirect effects are those that are caused by the
proposed action and are later in time, but are still reasonably certain to occur.

## Mexican spotted owl (*Strix occidentalis lucida*)

### Status of the Species

*Species / Critical Habitat Description*

The Mexican spotted owl (*Strix occidentalis lucida*) is one of three subspecies of spotted owl
recognized by the American Ornithologists' Union (AOU 1957:285). The other two subspecies
are the northern (*S. o. caurina*) and the California spotted owl (*S. o. occidentalis*). The Mexican
subspecies is geographically isolated from both the California and northern subspecies.

The spotted owl is mottled in appearance with irregular white and brown spots on its abdomen,
back and head. Several thin white bands mark an otherwise brown tail. The spots of the
Mexican spotted owl are larger and more numerous than in the other two subspecies, giving it a
lighter appearance. *Strix occidentalis* translates as "owl of the west"; *lucida* means "light" or
"bright." Unlike most owls, spotted owls have dark eyes.

Adult male and female spotted owls have similar plumage. However, the sexes can be identified
by voice and size differentiation. Juveniles, subadults, and adults can be distinguished by
plumage characteristics (Forsman 1981; Moen et al. 1991). Juvenile spotted owls (hatchling to
approximately five months) have a downy appearance. Subadults (5 to 26 months) have pointed

BLM_0014055

rectrices with white tips (Forsman 1981, Moen et al. 1991). Rectrices of adult (>27 months)
feathers have rounded, mottled tips.

Although the spotted owl is often referred to as a medium-sized owl, it ranks among the largest
owls in North America. Of the 19 species of owls that occur in North America, only 4 are larger
than the spotted owl (Johnsgard 1988). As a species, the spotted owl averages 41-48 cm (16-19
inches) long (Earhart and Johnson 1970), 107-114 cm (42-45 inches) across the spread wings
(Walker 1974), and weighs 547-647 grams (19.5-23 ounces). These measures are expressed as
ranges because, similar to other owl species, spotted owls exhibit reversed sexual dimorphism
(i.e., females are larger than males).

*Life History and Population Dynamics*

Spotted owls have one of the lowest clutch sizes among North American owls (Johnsgard 1988);
females lay one to three eggs, two being the most common. Mexican spotted owls breed
sporadically and do not nest every year (Ganey 1988). In good years, most of the population will
nest, whereas in other years only a small proportion of pairs will nest successfully (Fletcher and
Hollis 1994).

Courtship begins in March and eggs are laid in late March or, more typically, early April.
Incubation begins shortly after the first egg is laid, and is performed entirely by the female.
Female spotted owls generally incubate for approximately 30 days. During incubation, the
female leaves the nest only to defecate, regurgitate pellets, or receive prey delivered by the male,
who does most or all of the foraging. The eggs usually hatch in early May (Ganey 1988).
Females brood their young almost constantly, leaving their nests for only brief periods during the
night. Nestling owls fledge from four to five weeks after hatching, from early to mid-June in
most cases (Ganey 1988). Owlets often leave the nest before they can fly, simply jumping from
the nest onto surrounding tree branches or the ground. Within a week after leaving the nest,
most owlets can make short, clumsy flights. Three weeks after leaving the nest owlets can hold
and tear up prey on their own, and by late July most have become proficient at pouncing on
crawling insects (Forsman et al. 1984). The young depend on their parents for food during the
summer and will eventually disperse out of the natal area in the fall. Reproductive output varies
both spatially and temporally (White et al. 1995), but may be higher than the California and the
Northern spotted owl (Verner et al. 1992, Thomas et al. 1993).

Forsman et al. (1976) described spotted owls as "perch and pounce" predators. They typically
locate prey from an elevated perch by sight or sound, then pounce on the prey and capture it with
their talons. Spotted owls have also been observed capturing flying prey such as birds and
insects (Verner et al. 1992). Specific prey groups include: woodrats, mice, voles, rabbits,
gophers, bats, birds, reptiles, and arthropods. Spotted owls dwelling in canyons of the Colorado
Plateau take more woodrats, and fewer birds, than do spotted owls from other areas.

Mortality factors include predation, starvation, and accidents. Little is known about how disease
and parasites contribute to mortality of spotted owls. Avian predators include great horned owls,
northern goshawks, red-tailed hawks, and golden eagles. The extent of predation is unknown;
however both juveniles and adults are preyed upon (Willey 1993). Starvation may result from
low abundance or availability of prey. Most instances of starvation occurred from late fall

BLM_0014056

through winter when prey resources were reduced in abundance and availability (Willey 1993, Block and Ganey, unpub. data). Starvation may also predispose individuals to increased predation. Little data is available on frequency of accidents, and subsequent mortality. Instances of spotted owls being hit by cars have been documented. Owls may also collide with power lines or other obstacles (USFWS 1995).

Based on limited study information, annual survival rates of adult Mexican spotted owls is 0.8-0.9 and juvenile survival is 0.06-0.29 (USFWS 1995). Survival estimates may be biased low, but conclude higher survival of adults than juveniles. Available data is either insufficient or has not been analyzed to estimate population trends.

*Status and Distribution*

The Mexican spotted owl (*Strix occidentalis lucida*) was listed as a threatened species on March 16, 1993 (58 FR 14248). The primary threats to the species were cited as even-aged timber harvest and catastrophic wildfire, although grazing, recreation, and other land uses were also mentioned as possible factors influencing the Mexican spotted owl population. The Fish and Wildlife Service appointed the Mexican Spotted Owl Recovery Team in 1993, which produced the Recovery Plan for the Mexican Spotted Owl (Recovery Plan) in 1995 (USFWS 1995).

On August 31, 2004, the USFWS designated approximately 8.6 million acres of critical habitat for the Mexican spotted owl in Arizona, Colorado, New Mexico, and Utah, on Federal lands (69 FR 53181). There are approximately 447,988 acres of designated critical habitat in the planning area including habitat in the northwestern quarter of the field office boundary and a small portion in the southwest portion. However, not all of these acres contain the primary constituent characteristics essential to the conservation of the species. Some of the primary constituent elements for the Mexican spotted owl include: (1) cooler and often more humid conditions than the surrounding area, (2) clumps or stringers of trees and/or canyon walls with crevices, ledges or caves, (3) high percent of ground litter and woody debris, and (4) riparian or woody vegetation. The primary constituent elements related to forest structure include (1) a range of tree species, (2) a shade canopy created by the tree branches covering 40 percent or more of the ground, and (3) large dead trees with a trunk diameter of at least 12 inches (69 Federal Register 53181-5398).

The primary constituent elements of the critical habitat designation include those physical and biological features that support nesting, roosting, and foraging. Vegetation communities and structural attributes used by the owl vary across the range of the subspecies, but consist primarily of mixed conifer forests or canyons. The mixed-conifer, pine-oak communities and canyon habitat appear to be the most frequently used communities throughout most portions of the subspecies' range (Skaggs and Raitt 1988; Ganey and Balda 1989, 1994; Gutierrez and Rinkevich 1991; USFWS 1995). In Utah, owls utilize canyon habitats (Willey 1998).

Primary constituent elements related to critical habitat in Utah include one or more of the following: (1) presence of water (often providing cooler temperatures and higher humidity than the surrounding areas); (2) clumps or stringers of mixed conifer, pine-oak, pinyon-juniper, and/or riparian vegetation; (3) canyon walls containing crevices, ledges, or caves; and (4) high percent of ground litter and woody debris. The primary constituent elements provide a qualitative

BLM_0014057

description of those physical and biological features necessary to ensure the conservation of the owl in Utah (69 FR 53181).

Although the Mexican spotted owl's entire range covers a broad area of the southwestern United States and Mexico, the Mexican spotted owl does not occur uniformly throughout its range. Instead, it occurs in disjunct localities that correspond to isolated forested mountain systems, canyons, and in some cases steep, rocky canyon lands. Surveys have revealed that the species has an affinity for older uneven-aged forests but also is known to inhabit a physically diverse landscape in the southwestern United States and Mexico. Owls can be found in forested mountains and canyons from southern Utah and Colorado to the mountains of Arizona, New Mexico, western Texas, and into the mountains of northern and central Mexico.

Steep-walled rocky canyonlands provide typical owl habitat within the Utah portion of the Colorado Plateau Recovery Unit. Canyon habitat is used by owls for nesting, roosting, and foraging and includes landscapes dominated by vertical walled rocky cliffs within complex watersheds, including many tributary side canyons. Rock walls must include caves, ledges, and fracture zones that provide protection for nesting and roosting sites. Breeding sites are located below canyon rims; however, it is known that owls use areas outside of the canyons (i.e., rims and mesa tops). Owls nest and roost primarily on cliff faces using protected caves and ledges, and forage in canyon bottoms, on cliff faces and benches, and along canyon rims and adjacent lands. Although it is difficult to rely upon vegetation alone to identify canyon habitat, these areas frequently contain small clumps or stringers of mixed-conifer, ponderosa pine, pine-oak, pinyon-juniper, and/or riparian vegetation (69 FR 53181). Little is known about patterns of habitat use by foraging owls. Willey (1998) documented owl use in Utah to include canyon bottoms and adjacent rims.

Colorado Plateau canyon habitats in Utah are naturally discontinuous and may explain the patchy locations of owls in the region. A study conducted in Zion National Park found owls nesting and roosting in humid, narrow canyons with dense understories (Rinkevich 1991). These canyons provide large cliffs with escape cover to avoid predation, shaded roost sites to avoid high summer temperatures, patches of forest vegetation, and availability of suitable prey.

Historic population size estimates and range of the Mexican spotted owl are unknown; however present population size and distribution are thought to be similar (USFWS 1995). Ninety-one percent of known owls in 1990-1993 occurred on U.S. Forest Service lands, primarily in Arizona and New Mexico. It is unknown why there are fewer owls in Utah and Colorado, but that may be a function of habitat type. Total range wide population estimates are 1,176 to 2,352 owls (69FR 53181, August 31, 2004). Seamans et al. 1999 reported 10 percent or greater population declines and low survival rates in central Arizona and west-central New Mexico. Gutierrez et al. (2003) documented that the decline in New Mexico was continuing, whereas the decline in Arizona appeared to have stabilized. Wide population fluctuations may be common for Mexican spotted owls (Gutierrez et al. 2003).

BLM_0014058

**Environmental Baseline**

*Status of the Species within the Action Area*

Dr. David Willey and Dan Spotskey modeled Mexican spotted owl habitat based on vegetation type, slope, elevation, aspect, and other factors in 1997 and 2000 (Willey and Spotskey 1997, 2000). Both the 1997 model and the 2000 model are used within Utah to identify potential habitat. Any projects that occur within the modeled potential habitat should be field-verified for actual habitat suitability and, if appropriate, surveys according to protocol should be conducted to determine if Mexican spotted owls occupy the area. The Mexican spotted owl occurs in the eastern and southern thirds of Utah, including San Juan and Grand counties (UDWR 2003).

The Mexican Spotted Owl Recovery Plan was finalized in 1995. Six Recovery Units in the United States were identified based on similarities, or obvious dividing lines, between the following: physiographic provinces, biotic regimes, perceived threats to habitat or individual birds, administrative boundaries, and owl distribution. Suitable habitat and designated critical habitat on public lands managed by the BLM in Utah are within the Colorado Plateau Recovery Unit (USFWS 1995). Five critical habitat units have been delineated in Utah, including the following units which are located in or adjacent to the planning area:

> *Unit CP–11.* This unit is located in Iron, Washington, and Kane Counties in southwest Utah, approximately 22 mi (35 km) northeast of St. George. About half of the unit is on BLM owned lands; Zion National Park is the other land owner.

> *Unit CP–12.* This Unit is in the vicinity of the Kaiparowits Plateau and the Cockscomb, in Kane and Garfield Counties. This unit is primarily on the Grand Staircase-Escalante National Monument, which is owned and managed by the BLM. The other land owner is the Forest Service (Dixie National Forest).

> *Unit CP–13.* This unit occurs in Wayne, Garfield, Kane, and San Juan Counties, Utah. It is primarily in the Waterpocket Fold landform extending to Lake Powell. The primary land owner in this Unit is the National Park Service (Capitol Reef National Park and Glen Canyon National Recreation Area). The BLM owns and manages lands within this unit primarily on the Grand Staircase-Escalante National Monument and along the eastern edge of the Unit. The Forest Service (Fishlake National Forest) also owns land, but to a much lesser extent.

> *Unit CP–14.* This Unit lies in Wayne, Garfield, San Juan, and Grand Counties, Utah. It includes the Dark Canyon Primitive and Wilderness areas of the BLM and FS, respectively. This Unit has lands owned and managed by the National Park Service (Canyonlands National Park and Glen Canyon National Recreation Area), the BLM, and the Forest Service (Manti La-Sal National Forest).

> *Unit CP–15.* This unit is located approximately 30 mi (48 km) east of Price, in Carbon and Emery Counties. Situated in the West Tavaputs Plateau, it is located largely along the Desolation Canyon area of the Green River. The BLM is the primary owner and manager of land within this unit.

BLM_0014059

It is important to note that critical habitat is not the only suitable or occupied habitat available for owls. Critical habitat is only a regulatory delineation of habitat meeting primary constituent elements, and was defined based largely on known localities of nest sites (Protected Activity Centers; PACs) at the time of designation. There is substantial suitable habitat that occurs outside of the designated critical habitat boundaries and these should be assessed using the models and field evaluations as previously described.

The Monticello planning area contains two MSO protected activity centers (PACs). PACs are areas (at least 600 acres in size) around a known nest or roost site in which minimal management is permitted. Owls may also occur in other areas within or near the planning area.

Designated critical habitat for this species occurs within the planning area. The USFWS designates critical habitat for threatened or endangered species to protect occupied habitat and to protect suitable but unoccupied habitat to allow for expansion of populations and recovery of the species. There are approximately 10,571 acres in Unit CP-13 and 437,417 acres in Unit CP-14 of designated critical habitat located within the planning area.

*Factors Affecting Species Environment within the Action Area*

Threats to this species and its habitat include recreation, grazing, oil and gas exploration and development, and road improvement and development within canyons; loss, fragmentation, or modification of habitat from catastrophic fire and timber harvest within upland forests potentially used for foraging, dispersal, and wintering; and increased predation associated with habitat fragmentation (USFWS 1995).

**Effects of the Action**

Cultural Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for cultural resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities occurring under this program may increase human presence; equipment and vehicle use; and surface disturbance in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of spotted owls during breeding, nesting, roosting, or foraging efforts. Vegetation disturbances or removal associated with cultural resources excavations may reduce availability of prey habitat and prey abundance, at least in the short term. As a result, there may be site-specific decreases in nest initiation or nesting success, and displacement. These effects are likely to be short-term and relatively small scale due to the type of activity.

Paleontological Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up

to several weeks. Inventories for paleontological resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities occurring under this program may increase human presence; equipment and vehicle use; and surface disturbance in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of spotted owls during breeding, nesting, roosting, or foraging efforts. Vegetation disturbances or removal associated with paleontological resources excavations may reduce availability of prey habitat and prey abundance, at least in the short term. As a result, there may be site-specific decreases in nest initiation or nesting success, and displacement. These effects are likely to be short-term and relatively small scale due to the type of activity.

Fire Management

Objectives of fire management are to protect life, property, and resources values from wildfire and restore the natural role of fire in the ecosystem. Major activities associated with the BLM's fire management program include: wildfire suppression, wildland fire use, prescribed burning, non-fire fuels treatments (mechanical and chemical), and emergency stabilization and rehabilitation following wildfires. Fire suppression methods may involve: fireline construction, use of fire suppression agents and retardants, and water withdrawals.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance; and decrease local air quality in Mexican spotted owl habitats. Associated visual and noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, roosting, or foraging activities. Vegetation disturbances or vegetation removal may decrease prey habitat and prey abundance. Soil disturbances and increased erosion may indirectly decrease abundance of prey. Localized effects from smoke may adversely affect owlets or displace owls. As a result of these impacts, there may be site-specific decreases in nest initiation or nesting success, increased potential for displacement, and increased owlet and adult mortality.

Potential impacts from wildland fire use and prescribed fire would be similar to those from wildfire suppression. Non-fire fuels treatments and emergency stabilization and rehabilitation following wildfires may be used to retain or improve range conditions and maintain lower fuel loads in grassland and sagebrush habitats. Negative short term impacts include harassment or displacement; or immediate post-project alteration of key prey habitat components from surface disturbance. Fire management activities could benefit prey populations of Mexican spotted owls in the long-term due to improved forage quality and quantity.

Health and Safety Management

Activities conducted under the health and safety program include providing warnings, securing and disposing of hazardous waste discharged on public lands, establishing precautions, and responding to emergencies. Activities may involve increased human presence, use of heavy equipment, and removal of contaminated soils. These activities have the potential to occur in locations where mineral development or transport occurs.

BLM_0014061

Mineral developments, pipelines, and roads occur within all of the planning areas analyzed in this document, and have some potential to occur in Mexican spotted owl habitat. Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance in Mexican spotted owl habitat. Associated noise and visual disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may decrease the availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and adversely impact prey habitat. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and owlet fitness.

## Lands and Realty Management

Objectives of the lands and realty management program are to support multiple-use management goals of the BLM resource programs; respond to public requests for land use authorizations, sales, and exchanges; and acquire and designate rights of way access to serve administrative and public needs. Realty management authorizes occupancy of public lands for roads, power lines, pipelines, communication sites, and irrigation ditches authorized by granting rights of way. Rights of way management actions respond to public requests for access, land authorizations, sales, and exchanges. These rights of way may be temporary or extend up to 30 years, or even in perpetuity.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation disturbance; and surface disturbance in Mexican spotted owl habitat. Associated noise and visual disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Construction of power lines or other infrastructure may result in electrocutions, entanglements, or collisions with flying birds, resulting in possible mortality. Vegetation disturbances or vegetation removal may adversely affect availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and adversely affect prey habitat. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for Mexican spotted owl prey species. Exchange or sales of lands may lead to habitat fragmentation and loss. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and owlet fitness.

## Livestock Grazing Management

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base for livestock grazing on BLM land. Livestock management includes designating the kind and class of livestock, seasons of use, locations of use and the numbers of livestock that are permitted to use BLM lands.

Range management activities may include vegetation treatments such as prescribed fire, mechanical and chemical control of noxious weeds, sagebrush and other target species. The determinations and effects analyses associated with the potential impacts of these treatments can be located under the other appropriate program headings (i.e., fire treatments – see Fire and Fuels Management, or vegetative treatments – see Vegetation Management). Other range

BLM_0014062

improvements authorized by the livestock grazing management program may include fence construction, water developments, exclosures, and livestock handling facilities.

There are four primary ways livestock manipulate habitats to favor/hinder wildlife species: 1) alteration of vegetation composition, 2) cause increased/decreased productivity of selected plant species, 3) increase/decrease the nutritive quality of available forage, and/or 4) increase/decrease the diversity of habitats by altering structure (Severson and Urness 1994).

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation disturbance; and minor surface disturbance in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances, vegetation removal, or vegetation alteration may result in less dense vegetation, more invasive plant species, fragmented prey habitat and adverse affects to availability of prey habitat and prey abundance. Soil disturbances may increase erosion, adversely affect soil stability, and adversely affect prey habitat. As a result, there may be decreases in nest initiation or nesting success, and increased adult and owlet mortality.

## Minerals Management

The planning area will be open to consideration for exploration, leasing, and development of leasable minerals (oil, gas, coal, tar sands), salable minerals (sand, gravel, clay, and stone) and locatable materials (uranium, gold, copper, and limestone). Although stipulations or conditions may be included in the terms of these mineral contracts, there are potential impacts associated with these various activities. Mineral exploration and extraction often results in surface disturbance from road and facility construction, removal of topsoil and overburden, stock piling of these materials, and post-mining reclamation and recontouring.

These occurrences may increase human presence; equipment and vehicle use; vegetation disturbance or removal; soil disturbances; invasive plant species; and pollutants in Mexican spotted owl habitat. Associated noise and visual disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may adversely affect availability of quality and quantity of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and decrease prey habitat. Some ancillary equipment associated with energy development (e.g., transmission lines, oil pits) may result in direct mortality of owls if they become impinged on the lines or caught in the pits. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for Mexican spotted owl prey species. Pollutants in the area may affect Mexican spotted owls through adverse effects to prey populations. As a result of these impacts, there may be decreases in nest initiation or nesting success, and decreased adult or owlet fitness.

## Recreation Management

The recreation program includes providing for and managing recreational access, developing and maintaining recreation areas, issuing special recreation permits, providing information to the public about recreational resources, and assessing effects of recreational use on the natural

BLM_0014063

resources. Under this program, OHV use, camping, rafting, hiking, fishing, boating, swimming, and other activities are allowed in designated areas.

Authorized activities under this program have the potential to increase human presence; equipment and vehicle use; vegetation disturbance; and surface disturbance in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may adversely affect the availability and quality of prey habitat and prey abundance. Soil disturbances may increase erosion, adversely affect soil stability, and adversely affect prey habitat. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for Mexican spotted owl prey species. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and owlet fitness.

Riparian Management

The objective of riparian management in Utah is to establish an aggressive riparian area management program that will identify, maintain, restore, and/or improve riparian values to achieve a healthy and productive ecological condition for maximum long-term benefits in order to provide watershed protection while still preserving quality riparian dependent aquatic and terrestrial species habitats and, as appropriate, allow for reasonable resource uses. Priority for riparian area management will be given to areas identified as habitat for aquatic species with signed Conservation Agreements and Strategies.

Activities occurring under this program may increase human presence, equipment and vehicle use (including associated noise disturbances), vegetation disturbance, and surface disturbance in Mexican spotted owl habitat. Associated noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may adversely affect availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and adversely affect prey habitat. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for Mexican spotted owl prey species. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and owlet fitness.

Soils and Watershed Resources

The objectives for the soil and watershed resources management program are to maintain and improve soil integrity, and long-term soil productivity through implementation of rangeland health standards and other soil protection measures, as well as to protect, maintain or improve surface and groundwater quality consistent with existing and anticipated uses and applicable state and federal water quality standards and to provide for availability of water to facilitate authorized uses.

Potential adverse impacts to Mexican spotted owl suitable and designated critical habitat may result from land treatments occurring within watersheds. Many of these activities are meant to benefit soil resources and watersheds by reducing soil loss and reclaiming surface disturbances or unnecessary roads. However, activities occurring under this program may also increase human presence; equipment and vehicle use; vegetation manipulation; and surface disturbance in Mexican spotted owl habitat. Short-term adverse impacts may include, but not be limited to:

BLM_0014064

disruption of normal breeding, nesting, foraging, and roosting behaviors (associated with noise and visual disturbances); decreased nesting habitat; and decreased prey habitat. Long-term benefits may include increased nesting success, increased prey abundance, and increased survival.

Special Designations

This program is responsible for the management of special designated areas including Areas of Critical Environmental Concern (ACEC); Wild and Scenic Rivers (WSR); and Wilderness Resources which include Wilderness Study Areas (WSAs), and congressionally designated Wilderness. Generally, designation of an area results in implementation of conservation measures and timing stipulations that are beneficial to wildlife species.

Activities occurring under this program may increase human presence, equipment and vehicle use (including associated noise disturbances), and surface disturbance in Mexican spotted owl habitat. Associated noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits, and decrease prey habitat quality. Short-term, site-specific adverse impacts may include, but not be limited to: disruption of normal breeding, nesting, and foraging behaviors; decreased nesting success; and decreased insect prey habitat and prey abundance for Mexican spotted owls.

Travel Management

The objectives of the transportation management program include maintenance of access for public and administrative needs; establishment of a route system that contributes to protection of sensitive resources; accommodates a variety of uses and minimizes user conflicts; and coordination of OHV management.

Authorized activities under this program have the potential to increase human presence; equipment and vehicle use; vegetation disturbance; and surface disturbance in Mexican spotted owl habitat. Associated noise and visual disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may adversely affect the availability and quality of prey habitat and prey abundance. Soil disturbances may increase erosion, adversely affect soil stability, and adversely affect prey habitat. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for Mexican spotted owl prey species. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and owlet fitness. There is some potential for owls to be killed in vehicle collisions on roadways.

Vegetation Management

Program objectives are to maintain or improve the diversity of plant communities to support timber production, livestock needs, wildlife habitat, watershed protection, and acceptable visual resources. Therefore, this program includes mechanical, chemical, biological, cultural vegetation management methodologies. These management methodologies may result in ground disturbing activities, chemical impacts, human disturbances, and impacts to vegetation from biological management techniques.

BLM_0014065

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance (mechanical, chemical, biological); and surface disturbance in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation alteration, removal, or inadvertent chemical treatment may adversely affect availability and quality of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and adversely affect prey species habitat. As a result, there may be site-specific decreases in nest initiation or nesting success, and decreased owl fitness. Long-term benefits may include increased nesting success, increased prey abundance, and increased survival.

Wildlife and Fisheries Management

This program aims to maintain biological diversity, improve habitat for wildlife and fisheries, and provide habitats for threatened and endangered species.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may adversely affect availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, increase sediment deposits, and habitat for prey species. Short-term adverse impacts may include, but not be limited to: fragmentation of prey habitat; decreased nest initiation or nesting success; decreased adult and owlet fitness; and alterations of water distribution within occupied habitat of the Mexican spotted owl. In general, long-term efforts to improve the health of riparian habitats may benefit Mexican spotted owls by increasing prey abundance.

Woodlands Management

Woodlands management objectives are to maintain and enhance the health, productivity, sustainability, and biological diversity of forest and woodland ecosystems and to provide a balance of natural resource benefits and uses, including opportunities non-commercial harvest of forest and woodland products on a sustainable basis. The BLM manages forests for multiple uses, such as recreation, livestock grazing, wildlife habitat.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance near or in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances, vegetation removal, or chemical treatment of vegetation may adversely affect prey habitat and prey availability, and therefore, adversely affect Mexican spotted owls and their young. Soil disturbances may increase erosion, adversely affect soil stability, and adversely affect prey habitat and prey abundance. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for Mexican spotted owl prey species. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and owlet fitness.

BLM_0014066

**Cumulative Effects**

Cumulative effects include the effects of future State, Tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to Section 7 of the Act.

Cumulative effects to the Mexican spotted owl and designated critical habitat under the Proposed Actions would include, but are not limited to, the following broad types of impacts:

- Changes in land use patterns or practices that adversely affect a species' critical, suitable, or potential habitat.
- Encroachment of human development into a species' critical, suitable, or potential habitat.
- Fire management actions by some, or all, of the following groups, on lands adjoining or upstream of BLM-administered lands:
  o State of Utah
  o County Governments in Utah
  o Local Governments in Utah
  o Private landholders in Utah

Mexican spotted owls occur throughout the action area, generally as year-around residents (Ganey and Block 2005). In these areas, Mexican spotted owls locations are surrounded by a checkerboard pattern of land ownership including Federal, State, and private landowners. Mexican spotted owls are susceptible to activities on State and private lands. Many of these activities, such as livestock grazing, oil and gas exploration and development, human population expansion and associated infrastructure (increased trails and roads) development, research, and recreation activities (including OHV use and any activities that increase human presence), are expected to continue on State and private lands within the Mexican spotted owl's range. Contributing as cumulative effects to the proposed action, these activities will continue to affect Mexican spotted owls' productivity with disturbances to breeding, nesting, and foraging behaviors and further fragmenting habitat of prey populations.

**Conclusion**

The conclusions of this biological opinion are based on full implementation of the project as described in the "Description of the Proposed Action" section of this document, including the resource protection measures that were incorporated into the project design.

After reviewing the current status of the Mexican spotted owl and its critical habitat, the environmental baseline for the action area, the effects of the proposed project, and the cumulative effects, it is the Service's biological opinion that the Monticello BLM Field Office Resource Management Plan, as proposed, is not likely to jeopardize the continued existence of the Mexican spotted owl, and is not likely to destroy or adversely modify designated critical habitat. We base our conclusion on the following:

BLM_0014067

1. The applicant committed resource protection measures will be incorporated into site-specific projects designed under the BLM Resource Management Plan. If project design cannot adhere to all applicant committed resource protection measures, consultation under Section 7 of the Endangered Species Act will be initiated.

2. All site-specific projects designed under the proposed BLM Resource Management Plan would be subject to consultation requirements under Section 7 of the Endangered Species Act.

## Southwestern willow flycatcher (*Empidonax traillii extimus*)

### Status of Species

*Species/Critical Habitat Description*

The southwestern willow flycatcher (*Empidonax traillii extimus*) is a small passerine bird associated with riparian habitats and a subspecies of *Empidonax traillii*. This species was listed as endangered under the Endangered Species Act of 1973, as amended (ESA), on February 27, 1995 (USFWS 1995). On October 19, 2005, 120,824 acres of critical habitat were designated for southwestern willow flycatchers across Arizona, New Mexico, California, Nevada, and Utah (USFWS 2005). Within Utah, critical habitat was only designated along the Virgin River in Washington County, an area not part of this consultation. Therefore, there will not be any further mention of critical habitat for southwestern willow flycatchers in this consultation.

The southwestern willow flycatcher is a small bird, approximately 15 centimeters (cm) (5.75 inches) long. It has a grayish-green back and wings, whitish throat, light grey-olive breast, and pale yellowish belly. Two wing bars are visible; the eye ring is faint or absent. The upper mandible is dark, the lower is light. The southwestern willow flycatcher is one of four currently recognized subspecies of the willow flycatcher (*E. traillii*) (Hubbard 1987; Unitt 1987; Sogge 2000; USFWS 2001 and 2002). The *E. t. extimus* subspecies was first described by Phillips (1948) and later re-evaluated and accepted as a subspecies by Unitt (1987) and Browning (1993).

The *E. t. extimus* is paler than the other willow flycatcher subspecies and also differs in morphological characteristics: e.g., wing: tail ratio, wing formula; and bill length (Unitt 1987 and 1997; Browning 1993; USFWS 2001 and 2002). These differences are difficult to distinguish and are not reliable characteristics for field identification. The characteristic song of willow flycatcher species is often referred to as a *"fitz-bew"*. Travis (1996) and Sedgwick (1998 and 2001) suggest that clinal variations in willow flycatcher songs also serve to distinguish between subspecies, but this too is unreliable as a definitive field identification tool. In southern Utah, southwestern Colorado, and perhaps New Mexico, clinal gradations of the *E. t. extimus* and Great Basin/Rocky Mountain willow flycatcher (*E. t. adastus*) are thought to occur (USFWS 2002). Phillips et al. (1964) suggested that the *E. t. extimus* may be typical of lower elevations, and in northern parts of its range (including Utah), clinal gradation with the Great Basin subspecies may exist with increasing elevation and latitude. Recent research (Paxton 2000) concluded that the *E. t. extimus* is genetically distinct from the other willow flycatcher species. However, clinal gradation increases the difficulty of subspecies identification without genetic testing.

*Life History and Population Dynamics*

Male southwestern willow flycatchers generally arrive at breeding grounds first, with females typically arriving a week or two later. Males are usually monogamous, but polygamy has been recorded (Sogge et al. 1997). Nests are usually built within a week of pair formation. Egg-laying begins as early as May but typically occurs in mid-June. The female provides initial care of the nestlings, the role of the male increases with the age and size of the young. Young typically fledge at 12 to 15 days of age, usually between June and mid-August. Second clutches are common if the first attempt is unsuccessful. Territory size varies among the southwestern willow flycatcher, probably due to differences in population density, habitat quality, and nesting stage.

Open, cup-shaped nests are typically constructed in the fork of a branch. Historically, most southwestern willow flycatcher nests (75-80%) were constructed in willows. Currently, the species nests in a variety of plant species, including exotic species such as tamarisk.

Information on breeding site fidelity and persistence is limited. Studies of banded birds (Whitfield and Strong 1995; Whitfield and Enos 1996) report varying rates of nestlings returning to study sites to breed. Sogge and Tibbits (1994) reported the return of breeding populations to sites that had been unoccupied for several years, indicating that a habitat cannot be assumed unsuitable or unoccupied in the long term based on absence of southwestern willow flycatchers during a single year.

The southwestern willow flycatcher breeds in different types of dense riparian habitats across a large elevational and geographic area. Although the other willow flycatcher subspecies may breed in shrubby habitats away from water, the southwestern willow flycatcher breeds in patchy to dense riparian habitats along streams or other wetlands, near or adjacent to surface water or underlain by saturated soil. Occupied southwestern willow flycatcher sites consist of dense vegetation in the patch interior that is generally 3 to 4 m (10 to 13 ft) above ground, or in aggregates of dense patches interspersed with openings. Saturated soil is present at or near the breeding site during wet or non-drought years (Sogge et al. 1997, Sogge and Marshall 2000, USFWS 2001 and 2002). Rangewide, common tree and shrub species comprising nesting habitat include willows (*Salix* spp.), seepwillow or mulefat (*Baccaharis* spp.), box elder (*Acer negundo*), stinging nettle (*Urtica* spp.), blackberry (*Rubus* spp.) cottonwood (*Populus* spp.) arrowweed (*Tessaria sericea*), tamarisk or saltcedar (*Tamarix ramosissima*), and Russian olive (*Elaeagnus angustifolia*). Dominant plant species, size and shape of habitat patch, canopy structure, vegetation height, etc., vary widely across the *E. t. extimus*'s range. In Utah, the southwestern willow flycatcher is typically found in mixed native and exotic riparian species habitats, generally dominated by coyote willow, tamarisk and Russian olive (Johnson et al. 1999a and 1999b).

Little specific information is known about migration and wintering ecology of the southwestern willow flycatcher (Yong and Finch 1997, Finch et al. 2000). Willow flycatchers (all subspecies) breed in North America, but winter in Mexico, Central America, and possibly northern South America (Phillips 1948, Stiles and Skutch 1989, Ridgely and Tudor 1994, Howell and Webb 1995, Sogge et al. 1997).

BLM_0014069

*Status and Distribution*

The historical breeding range of the southwestern willow flycatcher included southern California, southern Nevada, southern Utah, Arizona, New Mexico, western Texas, southwestern Colorado, and extreme northwestern Mexico (Hubbard 1987; Unitt 1987; Browning 1993; USFWS 2002). The flycatcher's current range is similar to the historical range, but the quantity of suitable habitat within that range is much reduced from historical levels. The flycatcher occurs from near sea level to over 2600 m (8500 ft), but is primarily found in lower elevation riparian habitats (USFWS 2002). Throughout its range, the flycatcher's distribution follows that of its riparian habitat; relatively small, isolated, widely dispersed locales in a vast arid region (USFWS 2002). Surveys for the southwestern willow flycatcher have been conducted by the UDWR.

The Recovery Plan (USFWS 2002) divides the southwestern willow flycatcher's breeding range into six Recovery Units, which are subdivided into Management Units. Recovery Units are defined based on large watershed and hydrologic units; standardized boundaries of river basin units within the U.S. Within each of the six Recovery Units, multiple Management Units are delineated based on a geographic area representing all or part of a surface drainage basin, a combination of drainage basins, or a distinct hydrologic feature. The outer limits of both the Recovery Unit and Management Unit boundaries are defined by the southwestern willow flycatchers' range (USFWS 2001 and 2002).

The State of Utah falls within the Lower Colorado and Upper Colorado Recovery Units. The Upper Colorado Recovery Unit covers much of the four-corners area of southern Utah, southwestern Colorado, northeastern Arizona, and northwestern New Mexico. The northern boundary of the Upper Colorado Recovery Unit is delineated by the northern range boundary of the southwestern willow flycatcher. Ecologically, this region may be an area of clinal gradation between the southwestern willow flycatcher and the Great Basin willow flycatcher. The Lower Colorado Recovery Unit is a geographically large and ecologically diverse Recovery Unit, encompassing the Colorado River and its major tributaries, from Glen Canyon Dam downstream to the Mexico border (USFWS 2001 and 2002).

As previously discussed, recent genetic work (Paxton 2000) verified *E. t. extimus* genetic stock in the San Luis Valley of south-central Colorado and the Virgin River in Utah. Paxton's (2000; as cited in USFWS 2002) research showed that the northern boundary for southwestern willow flycatchers was generally consistent with that proposed by Unitt (1987) and Browning (1993), and subsequently used in the Final Recovery Plan (USFWS 2002). Paxton's (2000) research further illustrated that the willow flycatcher in central Utah does not have the genetic markers of *E. t. extimus* and is more closely related to *E. t. adastus*. However, because of the absence of flycatchers in the lower- to mid-elevations of the Colorado Plateau in southern Utah and southwestern Colorado, Paxton (2000; as cited in USFWS 2002) did not address potential sub-specific differences resulting from elevation or habitat differences and watershed boundaries. Analysis of willow flycatcher vocalizations in central Utah also suggests association with *E. t. adastus*. The Final Recovery Plan (USFWS 2002) adopts a range boundary that reflects Paxton's (2000) and Sedgwick's (2001) results; the northern extent of southwestern willow flycatchers is confined to the southern portions of Utah. In the Recovery Plan, the USFWS acknowledges that new data may result in refinements to the northern range boundary currently

BLM_0014070

recognized (USFWS 2002). This is based on the limited genetic information in portions of central and eastern Utah, particularly along major drainages including the Colorado and Green Rivers. Therefore, the USFWS Utah Field Office considers potential distribution for southwestern willow flycatchers to possibly extend further north than the Recovery Plan boundary.

The reasons for the decline of the southwestern willow flycatcher and current threats to its conservation are numerous, complex and inter-related (USFWS 2001, 2002). The major factors threatening the species include habitat loss and modification; invasion of breeding habitats by exotic plant species; brood parasitism by brown-headed cowbirds; the vulnerability of small southwestern willow flycatcher population numbers; and stresses that occur to the species during migration and in wintering habitats. These factors vary in severity over the southwestern willow flycatcher's range, and several are likely to have cumulative and synergistic effects (USFWS 1997).

For more information regarding the life history and population dynamics, see the Final Recovery Plan for the southwestern willow flycatcher (USFWS 2002).

**Environmental Baseline**

*Status of the Species within the Action Area*

The north-central limit of breeding southwestern willow flycatchers is in southern and possibly central Utah. *E. t. extimus* may have always been rare in these areas (Behle pers. comm. cited in Unitt 1987). However where habitat existed along the Colorado River and its tributaries in southeastern Utah, it was thought to be a locally common breeding and migratory resident (Behle and Higgins 1959). Few data are available on population trends in southern Utah. However, loss and modification of habitat is likely to have reduced populations on the Virgin, Colorado, and San Juan Rivers. These losses have been due to suburban expansion and habitat changes along the Virgin River, inundation by Lake Powell on the Colorado and San Juan Rivers, and encroachment of tamarisk throughout the region (Unitt 1987; BLM unpublished data).

Historically, the southwestern willow flycatcher occurred in the following river systems: Colorado, Monticello Creek, San Juan, Virgin, and perhaps Paria (Phillips 1948, Behle et al. 1958, Behle and Higgins 1959, Wauer and Carter 1965, Behle 1985, Browning 1993, USFWS 2002).

Suitable habitat or potentially suitable habitat exists for the flycatcher in larger riparian areas throughout the Monticello Planning Area. Southwestern willow flycatchers are known to use the planning area during migration. Birds have been documented migrating along the San Juan River, in Comb Wash, and within the Cross Canyon area. There is some potential that nesting has occurred in the Cross Canyon area; however this is unsubstantiated. Other than the potential in Cross Canyon, no nesting populations of the southwestern willow flycatcher are known to occur in the action area, however it does contain suitable habitat for nesting (Johnson 2004, UDWR 2007).

BLM_0014071

*Factors Affecting Species Environment within the Action Area*

Where habitat existed along the Colorado River and its tributaries in southeastern Utah, it was thought to be a locally common breeding and migratory resident (Behle and Higgins 1959). Recent surveys conducted by Sogge et al. (2003) and Durst et al. (2005) have found a few breeding locations and territories in southern Utah. Little population trend data are available in Utah. However, loss and modification of habitat is likely to have reduced populations on the Colorado and San Juan Rivers.

The main threats to the species have been attributed to loss, modification, and fragmentation of riparian breeding habitat, loss of wintering habitat, and brood parasitism by the brown-headed cowbird (Whitfield 1990; Sferra et al. 1995; Sogge et al. 1997; McCarthey et al. 1998; USFWS 2002). The southwestern willow flycatcher and its habitat are threatened by urban, recreational, and agricultural development, water diversion and groundwater pumping, channelization, dams, and livestock grazing (USFWS 2002). Fire is an increasing threat to southwestern willow flycatcher habitat (Paxton et al. 1996), especially in monotypic salt cedar vegetation (DeLoach 1991) and where water diversions and/or groundwater pumping desiccates riparian vegetation (Sogge et al. 1997).

Floodplains and associated riparian vegetation were once dominated by a wide band of trees, principally cottonwood and willows (Horton 1977). Arrowweed and mesquite were dominant in many upland areas (Horton 1977). Graf (1982) reports that tamarisk was introduced into the United States in the early 1800s and into the American Southwest by 1856. From 1925 through 1960, tamarisk rapidly spread throughout Utah with the greatest degree of invasion occurring from 1935 to 1955 (Christensen 1962). Tamarisk changes channel morphology from braided, shallow systems to ones that are constrained, centralized, and deeper. Dense tamarisk vegetation reduces the channel capacities of normal flow events and has been cited as the cause of disastrous flooding (Graf 1982). Southwestern willow flycatcher habitat may be very vulnerable to the changes tamarisk invasion brings about in stream morphology and ecology. The effects of tamarisk to breeding southwestern willow flycatchers may not be as apparent as the effects to their habitat. Owen and Sogge (2002) studied 12 parameters of physiological condition of 130 southwestern willow flycatchers in native vegetation and tamarisk and found no evidence that flycatchers breeding in tamarisk exhibit poorer nutritional condition or are suffering negative physiological affects. However, breeding success and the number of species supported within a tamarisk stand is reduced (Anderson et al. 1977).

**Effects of the Action**

Cultural Resources

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for cultural resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities occurring under this program may increase human presence; equipment and vehicle use; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during

BLM_0014072

breeding, nesting, or foraging efforts. Vegetation disturbances or removal may decrease the availability of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. As a result, there may be decreases in nest initiation or nesting success. There is some potential for vegetation removal to result in nestling mortality.

## Paleontological Resources

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for paleontological resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities occurring under this program may increase human presence; equipment and vehicle use; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging efforts. Vegetation disturbances or removal may decrease the availability of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. As a result, there may be decreases in nest initiation or nesting success. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential.

## Fire Management

Objectives of fire management are to protect life, property, and resources values from wildfire and restore the natural role of fire in the ecosystem. Major activities associated with the fire management program include: wildfire suppression, wildland fire use, prescribed burning, non-fire fuels treatments (mechanical and chemical), and emergency stabilization and rehabilitation following wildfires. Fire suppression methods may involve fireline construction, use of fire suppression agents and retardants, and water withdrawals.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal decrease availability of nesting habitat; decrease cover from predators and increase predation; and decrease prey habitat. As a result, there may be decreases in nest initiation or nesting success, and decreased adult or nestling/fledgling fitness. There is some potential for fire management activities to result in adult or nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential.

Potential impacts from wildland fire use and prescribed fire would be similar to those from wildfire suppression. Non-fire fuels treatments and emergency stabilization and rehabilitation following wildfires may be used to retain or improve range conditions and maintain lower fuel loads in grassland and sagebrush habitats. Negative impacts include harassment or displacement; or immediate post-project alteration of adjacent habitat from surface disturbance.

BLM_0014073

Long-term benefits of this program, as vegetation is reestablished, may include increased nesting success, increased insect prey abundance, and decreased predation.

Health and Safety Management

The primary objective of health and safety management is to protect public and environmental health and safety on lands administered by BLM. Hazardous materials and waste management policies are integrated into all BLM programs. Several federal, state, and local laws overlap in their requirement of BLM to identify and remediate contaminated sites on public lands. Besides managing pre-existing contamination, BLM seeks to prevent or minimize contamination caused by BLM authorized actions.

Activities conducted under the health and safety program include providing warnings, securing and disposing of hazardous waste discharged on public lands, establishing precautions, and responding to emergencies. Activities may involve increased human presence, use of heavy equipment, and removal of contaminated soils. These activities have the potential to occur in locations where mineral development or transport occurs.

Mineral developments, pipelines, roads, and railroad transportation systems occur within all of the planning areas analyzed in this document, and have the potential to occur in southwestern willow flycatcher habitat. Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may decrease the availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. As a result of these impacts, there may be decreases in nest initiation or nesting success, and decreased adult and nestling/fledgling fitness. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential.

Lands and Realty Management

Objectives of the lands and realty management program are to support multiple-use management goals of the BLM resource programs; respond to public requests for land use authorizations, sales, and exchanges; and acquire and designate rights of way access to serve administrative and public needs. Realty management authorizes occupancy of public lands for roads, power lines, pipelines, communication sites, and irrigation ditches authorized by granting rights of way. Rights of way management actions respond to public requests for access, land authorizations, sales, and exchanges. These rights of way may be temporary or extend up to 30 years, or even in perpetuity.

Activities occurring under this program may increase human presence, equipment and vehicle use (including associated noise disturbances), vegetation disturbance, and surface disturbance in southwestern willow flycatcher habitat. Associated noise disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities.

BLM_0014074

Vegetation disturbances or vegetation removal may decrease the availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for southwestern willow flycatchers and their prey species. Exchange or sales of lands may lead to fragmentation and loss of the species suitable habitat. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and nestling fitness. There is some potential for activities authorized under this program to result in bird mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential.

Livestock Grazing Management

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base for livestock grazing on BLM land. Livestock management includes designating the kind and class of livestock, seasons of use, locations of use and the numbers of livestock that are permitted to use BLM lands.

Range management activities may include vegetation treatments such as prescribed fire, mechanical and chemical control of noxious weeds, sagebrush and other target species. The determinations and effects analyses associated with the potential impacts of these treatments can be located under the other appropriate program headings (i.e., fire treatments – see Fire Management, or vegetative treatments – see Vegetation Management). Other range improvements authorized by the livestock grazing management program may include fence construction, water developments, exclosures, and livestock handling facilities.

There are four primary ways livestock manipulate habitats to favor/hinder some wildlife species: 1) alteration of vegetation composition, 2) cause increased/decreased productivity of selected plant species, 3) increase/decrease the nutritive quality of available forage, and/or 4) increase/decrease the diversity of habitats by altering structure (Severson and Urness 1994).

Activities occurring under this program may increase human presence; vegetation disturbance; and minor surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances, vegetation removal, or vegetation alteration may result in less dense vegetation; an increase in invasive plant species; increased fragmented habitat; reduced availability of nesting habitat; decreased cover from predators and increased predation; and decreased availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. As a result, there may be decreases in nest initiation or nesting success, and decreased adult or nestling/fledgling fitness. There is some potential for vegetation removal, particularly prescribed fire, to result in nestling or adult mortality; however implementation of the applicant committed conservation measures should minimize this potential.

Minerals Management

The planning area will be open to consideration for exploration; leasing, and development of leasable minerals (oil, gas, coal, tar sands), salable minerals (sand, gravel, clay, and stone) and

BLM_0014075

locatable materials (uranium, gold, copper, and limestone). Although stipulations or conditions
may be included in the terms of these mineral contracts, there are potential impacts associated
with these various activities. Mineral exploration and extraction often results in surface
disturbance from road and facility construction, removal of topsoil and overburden, stock piling
of these materials, and post-mining reclamation and recontouring.

Activities occurring under this program may increase human presence; equipment and vehicle
use; surface disturbance; and increased occurrence of chemical leaks in southwestern willow
flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of
southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation
disturbances or vegetation removal may decrease the availability and quality of nesting habitat;
decrease cover from predators and increase predation; and decrease the availability of prey
habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase
sediment deposits. Increased occurrence of invasive plants species may change the vegetation
community and change the habitat for southwestern willow flycatcher and their prey species.
Pollutants in the area may affect southwestern willow flycatchers, prey populations, and
vegetation. As a result of these impacts, there may be decreases in nest initiation or nesting
success and decreased adult and nestling/fledgling fitness. There is some potential for vegetation
removal to result in nestling mortality; however implementation of the applicant committed
conservation measures should greatly minimize this potential. Ancillary facilities such as oil pits
may result in direct mortality of birds if they forage over or become trapped in the pits.

Recreation Management

The recreation program includes providing for and managing recreational access, developing and
maintaining recreation areas, issuing special recreation permits, providing information to the
public about BLM's recreational resources, and assessing effects of recreational use on the
natural resources. Under this program, OHV use, camping, rafting, hiking, fishing, boating,
swimming, and other activities are allowed in designated areas.

Authorized activities under this program have the potential to increase human presence;
equipment and vehicle use; vegetation disturbance; and surface disturbance in southwestern
willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the
behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities.
Vegetation disturbances or vegetation removal may decrease the availability and quality of
nesting habitat; decrease cover from predators and increase predation; and decrease the
availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil
stability, and increase sediment deposits. Increased occurrence of invasive plants species may
change the vegetation community and change the habitat for southwestern willow flycatchers
and their prey species. As a result, there may be decreases in nest initiation or nesting success,
and decreased adult or nestling/fledgling fitness. There is some potential for vegetation removal
to result in nestling mortality; however implementation of the applicant committed conservation
measures should greatly minimize this potential.

Riparian Management

The objective of riparian management in Utah is to establish an aggressive riparian area
management program that will identify, maintain, restore, and/or improve riparian values to

BLM_0014076

achieve a healthy and productive ecological condition for maximum long-term benefits in order to provide watershed protection while still preserving quality riparian dependent aquatic and terrestrial species habitats and, as appropriate, allow for reasonable resource uses. Priority for riparian area management will be given to areas identified as habitat for aquatic species with signed Conservation Agreements and Strategies.

Activities occurring under this program may increase human presence, equipment and vehicle use (including associated noise disturbances), vegetation treatment or disturbance (mechanical, chemical, biological), and surface disturbance in southwestern willow flycatcher habitat. Associated noise disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation alteration, removal, or inadvertent chemical treatment may adversely affect availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease insect prey populations. Soil disturbances may increase erosion, adversely affect soil stability, increase sediment deposits, and alter channel morphology. There is some potential for vegetation removal to result in nestling or adult mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential. There may also be decreases in nest initiation or nesting success, and decreased adult and nestling fitness. Long-term benefits may include: increased nesting success, increased insect prey abundance, and decreased predation.

Soils and Watershed Resources

The objectives for the soil and watershed resources management program are to maintain and improve soil integrity, and long-term soil productivity through implementation of rangeland health standards and other soil protection measures, as well as to protect, maintain or improve surface and groundwater quality consistent with existing and anticipated uses and applicable state and federal water quality standards and to provide for availability of water to facilitate authorized uses.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation manipulation; stream alteration; and minor surface disturbance in southwestern willow flycatcher habitat. Short-term adverse impacts may include, but not be limited to: disruption of normal breeding, nesting, and foraging behaviors (associated with noise and visual disturbances); decreased nesting habitat; decreased cover from predators and increased predation; insect prey habitat; and alterations of water distribution within occupied habitat for southwestern willow flycatchers. There is some potential that work in riparian areas could result in mortality of nestlings; however implementation of the applicant committed conservation measures should greatly minimize this potential. Long-term benefits may include: increased nesting success, increased insect prey abundance, and decreased predation.

Special Designations

This program is responsible for the management of special designated areas including Areas of Critical Environmental Concern (ACEC); Wild and Scenic Rivers (WSR); and Wilderness Resources which include Wilderness Study Areas (WSAs), and congressionally designated Wilderness. Generally, designation of an area results in implementation of conservation measures and timing stipulations that are beneficial to wildlife species.

---

BLM_0014077

Activities occurring under this program may increase human presence, equipment and vehicle use (including associated noise disturbances), vegetation treatment or disturbance (mechanical, chemical, biological), and surface disturbance in southwestern willow flycatcher habitat. Associated noise disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation alteration, removal, or inadvertent chemical treatment may adversely affect availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease insect prey populations. Soil disturbances may increase erosion, adversely affect soil stability, increase sediment deposits, and alter channel morphology. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential. There may also be decreases in nest initiation or nesting success, and decreased adult and nestling fitness. Long-term benefits may include: increased nesting success, increased insect prey abundance, and decreased predation.

Special Status Species Management

Objectives of the special status species program include maintenance of biological diversity of plant and animal (terrestrial and aquatic) species by supporting the State Division of Wildlife Resources' strategic plans for wildlife population objectives to the extent practical and consistent with BLM multiple-use management requirements. Other objectives include the development of protective measures for federally listed species and other special status species; cooperation with other agencies in managing listed species; facilitation of scientific research of special status species and their habitats; and to the extent possible, avoidance of habitat fragmentation.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance (mechanical, chemical, biological); and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation alteration, removal, or inadvertent chemical treatment may adversely affect availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease insect prey populations. Soil disturbances may increase erosion, adversely affect soil stability, increase sediment deposits, and alter channel morphology. As a result, there may be decreases in nest initiation or nesting success, and decreased adult or nestling/fledgling fitness. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential. Long-term benefits may include: increased nesting success, increased insect prey abundance, and decreased predation.

Travel Management

The objectives of the transportation management program include maintenance of access for public and administrative needs; establishment of a route system that contributes to protection of sensitive resources; accommodates a variety of uses and minimizes user conflicts; and coordination of OHV management.

Activities occurring under this program may increase human presence; equipment and vehicle use; surface disturbance; and increased occurrence of chemical leaks in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of

BLM_0014078

southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may decrease the availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for southwestern willow flycatcher and their prey species. As a result of these impacts, there may be decreases in nest initiation or nesting success, and decreased adult and nestling/fledgling fitness. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential.

Vegetation Resources

Program objectives are to maintain or improve the diversity of plant communities to support timber production, livestock needs, wildlife habitat, watershed protection, and acceptable visual resources. Therefore, this program includes mechanical, chemical, biological, cultural vegetation management methodologies. These management methodologies may result in ground disturbing activities, chemical impacts, human disturbances, and impacts to vegetation from biological management techniques.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance (mechanical, chemical, biological); and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation alteration, removal, or inadvertent chemical treatment may adversely affect availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease insect prey populations. Release of biological control agents may have site-specific and wide ranging effects that may need to be further considered (refer to the Reinitiation Section of this BO) dependent in part on the release organism, e.g., salt cedar leaf beetle. Soil disturbances may increase erosion, adversely affect soil stability, increase sediment deposits, and alter channel morphology. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and nestling/fledgling fitness. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential. Long-term benefits may include: increased nesting success, increased insect prey abundance, and decreased predation.

Wildlife and Fisheries Management

This program aims to maintain biological diversity, improve habitat on for wildlife and fisheries, and provide habitats for threatened and endangered species.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may adversely affect availability of nesting habitat, cover from predators, and insect prey habitat. Soil disturbances may increase erosion, adversely affect

BLM_0014079

soil stability, and increase sediment deposits. Short-term adverse impacts may include, but not be limited to: disruption of normal breeding, nesting, foraging, and roosting behaviors; decreased nesting habitat; decreased cover from predators and increased predation; decreased insect prey habitat; and alterations of water distribution within occupied habitat for southwestern willow flycatchers. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential. In some cases, management activities beneficial for one species may be detrimental to another species. In general, long-term efforts to improve the health of riparian habitats may benefit southwestern willow flycatchers by increasing nesting success, increasing insect prey abundance, and decreasing predation.

Woodlands Management

Woodlands management objectives are to maintain and enhance the health, productivity, sustainability, and biological diversity of forest and woodland ecosystems and to provide a balance of natural resource benefits and uses, including opportunities non-commercial harvest of forest and woodland products on a sustainable basis. The BLM manages forests for multiple uses, such as recreation, livestock grazing, wildlife habitat.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances, vegetation removal, or chemical treatment of vegetation decrease availability of nesting habitat; decrease cover from predators and increase predation; and decrease prey populations and prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for southwestern willow flycatchers and their prey species. As a result, there may be decreases in nest initiation or nesting success, and decreased adult fitness. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential.

**Cumulative Effects**

Cumulative effects include the effects of future State, Tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to Section 7 of the Act.

Cumulative effects to federally protected southwestern willow flycatchers under the Proposed Actions would include, but are not limited to, the following broad types of impacts:

- Changes in land use patterns or practices that adversely affect a species' suitable or potential habitat.
- Encroachment of human development into a species' suitable or potential habitat.

BLM_0014080

- Fire management actions by some, or all, of the following groups, on lands adjoining or upstream of BLM-administered lands:
  - o   State of Utah
  - o   County Governments in Utah
  - o   Local Governments in Utah
  - o   Private landholders in Utah

Few southwestern willow flycatcher breeding sites and territories have been found in Utah. However, potential and suitable habitat occurs within the jurisdictional management boundaries of BLM in the Monticello Field Office area. In these areas, southwestern willow flycatcher habitat areas are surrounded by a checkerboard pattern of land ownership including Federal, State, and private landowners. Southwestern willow flycatchers are susceptible to activities on State and private lands. Many of these activities, such as urban growth and development; construction and operation of dams along major waterways; water retention, diversion, or dewatering of springs, wetlands, or streams; recreation; road construction; fuels-reduction treatments; research; grazing activities (including alteration or clearing of native habitats for domestic animals); oil and gas exploration and development; introduction of non-native plant or wildlife species (which can alter native habitats and alter prey populations); and other associated actions. Increases or changes in cowbird foraging areas (construction of corrals, grazing of domestic stock, placement of bird feeders) and habitat fragmentation may increase the parasitism rate and decrease southwestern willow flycatcher reproduction. Continued and future conversion of floodplain and near shore lands will likely eliminate opportunities to restore floodplains to develop willow flycatcher habitat. Increased recreation, camping, off-road vehicle use, and river trips may harass and disturb breeding birds or impact nesting habitats. Contributing as cumulative effects to the proposed action, these activities may affect southwestern willow flycatcher productivity with disturbances to breeding, nesting, and foraging behaviors and habitat (including areas of designated critical habitat), and result in fragmented habitat.

**Conclusion**

The conclusions of this biological opinion are based on full implementation of the programs as described in the "Description of the Proposed Action" section of this document, including the conservation measures that were incorporated into the project design.

After reviewing the status of the southwestern willow flycatcher, the environmental baseline for the action area, the effects of the proposed project, and the cumulative effects, it is the Service's biological opinion that the Monticello BLM Field Office Resource Management Plan, as proposed, is not likely to jeopardize the continued existence of the southwestern willow flycatcher, and is not likely to destroy or adversely modify designated critical habitat. We base our conclusion on the following

1. The applicant committed resource protection measures will be incorporated into site-specific projects designed under the BLM Resource Management Plan. If project design cannot adhere to all applicant committed resource protection measures, consultation under Section 7 of the Endangered Species Act will be initiated.

BLM_0014081

2. All site-specific projects designed under the proposed BLM Resource Management Plan would be subject to consultation requirements under Section 7 of the Endangered Species Act.

# Navajo Sedge (*Carex specuicola*)

## Status of Species

*Species Description*

The Navajo sedge was listed as a threatened species on June 7, 1985. It occurs in wet seeps, springs, and hanging gardens on vertical cliffs of pink-red Navajo sandstone or other similar eolian sandstone formations (Natureserve 2006). Navajo sedge is endemic to San Juan County, Utah and Coconino County, Arizona on Navajo land at elevations from 3,770 to 5,980 feet. There is no designated critical habitat for this species in Utah. Existing threats to this species include grazing and groundwater pumping (Natureserve 2006, USFWS 1987).

Navajo sedge is a slender, perennial 10 to 18 inches high. The triangular stem extends from an elongate, slender rhizome. The leaves are pale green and clustered near the base of the plant. This species is unusual in having both two-branched styles with lenticular achenes, and three-branched styles with trigonous achenes. Flowers are concentrated in 2 to 4 groups or spikes. The terminal spike has both male and female flowers, with the female flowers situated above the male. The flowers are reduced and inconspicuous; they consist of small green-brown, scale-like parts 2 to 3 mm long and 1 to 1.5 mm wide.

*Life History and Population Dynamics*

Flowering and fruit set occur from spring through summer, but most reproduction appears to be vegetative (USFWS 1987).

*Status and Distribution*

Navajo sedge is restricted to moist sand to silty soils of shady seep-spring pockets or alcoves with somewhat limited soil development. It is limited to only a few known sites on Navajo Nation lands in northeastern Arizona and southwestern Utah (Natureserve 2006).

Critical habitat has been designated for this species, including the entire areas occupied by the three known populations of the plant. The locations are on the Navajo Indian Reservation in

Coconino County, Arizona, and are 40 x 5 meter rectangular with their long axes in the direction of seepspring flow, The total area designated comprises about 809 square meters (about 0.15 acres), and contains all habitat known to be occupied by the species when it was listed in 1985. Constituent elements are moist sandy to silty soils at shady seep-springs within the Navajo Sandstone Formation.

BLM_0014082

**Environmental Baseline**

*Status of the Species within the Action Area*

The only known population of this species in San Juan County is located on Navajo tribal land (phone call from Susan Martin, SWCA to Ben Franklin and UDWR on February 14, 2007) south of the Monticello planning area. There is suitable habitat for this species on BLM land within the planning area (Phone call from Ron Bolander, BLM to Susan Martin, SWCA; August 5, 2008). While no formal surveys for this plant have been performed in the action area, plant inventories have not found any evidence of this species.

*Factors Affecting Species Environment within the Action Area*

Factors that could affect the sedge include natural or human-directed disturbances, such as the modification of hydrology, increased recreation and OHV use, introduction or proliferation of invasive species, and livestock grazing.

**Effects of the Action**

There are no known populations of this species on BLM lands. However, suitable habitat exists. Because the PFO RMP is a long-range planning document, this effects analysis was conducted to determine potential effects should the species be found on BLM lands during the life of the RMP. Effects will only be realized if the plant is located; however, conservation measures would also be implemented to minimize such effect.

Livestock Grazing

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base for livestock grazing on BLM land. Livestock management includes designating the kind and class of livestock, seasons of use, locations of use and the numbers of livestock that are permitted to use BLM lands.

Range management activities may include vegetation treatments such as prescribed fire, mechanical and chemical control of noxious weeds, sagebrush and other target species. The determinations and effects analyses associated with the potential impacts of these treatments can be located under the other appropriate program headings (i.e., fire treatments – see Fire Management, or vegetative treatments – see Vegetation Management). Other range improvements authorized by the livestock grazing management program may include fence construction, water developments, exclosures, and livestock handling facilities.

There are four primary ways livestock manipulate habitats to favor/hinder other species within the habitat: 1) alteration of vegetation composition, 2) cause increased/decreased productivity of selected plant species, 3) increase/decrease the nutritive quality of available forage, and/or 4) increase/decrease the diversity of habitats by altering structure (Severson and Urness 1994).

Activities occurring under this program may increase and concentrate domestic ungulate presence, increase motorized traffic, and increase surface disturbance from fence and livestock pond construction in Navajo sedge suitable habitat. Associated impacts include: trampling or

crushing of individuals, modification or degradation to suitable habitat, and removal of suitable habitat. As a result, there may be increased occurrence of plant damage or individual mortality.

Minerals Management

The planning area will be open to consideration for exploration, leasing, and development of leasable minerals (oil, gas, coal, tar sands), salable minerals (sand, gravel, clay, and stone) and locatable materials (uranium, gold, copper, and limestone). Although stipulations or conditions may be included in the terms of these mineral contracts, there are potential impacts associated with these various activities. Mineral exploration and extraction often results in surface disturbance from road and facility construction, removal of topsoil and overburden, stock piling of these materials, and post-mining reclamation and recontouring.

Activities occurring under this program in the Monticello Field Office may increase foot traffic, motorized traffic, and significant soil disturbance in Navajo sedge habitats. Associated impacts include: trampling or crushing of individuals, removal of suitable habitat, modification or degradation to suitable habitat, disturbance to species' pollinators, and increased occurrences and competition from invasive plant species. As a result, there may be decreased recruitment, and increased occurrence of plant damage or individual mortality.

Recreation Management

The recreation program includes providing for and managing recreational access, developing and maintaining recreation areas, issuing special recreation permits, providing information to the public about BLM's recreational resources, and assessing effects of recreational use on the natural resources. Under this program, OHV use, camping, rafting, hiking, fishing, boating, swimming, and other activities are allowed in designated areas.

Activities occurring under this program may increase human, horse, and motorized traffic in Navajo sedge suitable habitat. Associated impacts include: trampling or crushing of individuals, collection of individuals, modification or degradation to suitable habitat, and increased occurrences of invasive plant species. As a result, there may be decreased recruitment and increased occurrence of plant damage or individual mortality.

Wildlife and Fisheries Resource Management

This program aims to maintain biological diversity, support UDWR Herd Management Plans, improve habitat on for wildlife and fisheries, and provide habitats for threatened and endangered species.

Activities occurring under this program may increase foot traffic, motorized traffic, and/or significant soil disturbance in Navajo sedge suitable habitat. Associated impacts include: trampling or crushing of individuals, removal of suitable habitat, modification or degradation to suitable habitat, disturbance to species' pollinators, and increased occurrences of invasive plant species. As a result, there may be decreased recruitment and increased occurrence of plant damage or individual mortality.

BLM_0014084

**Cumulative Effects**

Cumulative effects include the effects of future State, Tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to Section 7 of the Act.

Cumulative effects to the Navajo sedge under the Proposed Actions would include, but are not limited to, the following broad types of impacts:

- Changes in land use patterns or practices that adversely affect a species' critical, suitable, or potential habitat.
- Program management actions by some, or all, of the following groups, on lands adjoining or upstream of BLM-administered lands:
  - State of Utah
  - County Governments in Utah
  - Local Governments in Utah
  - Private landholders in Utah

The Navajo sedge occurs primarily within tribal management boundaries. The Navajo sedge is susceptible to activities on these lands. Many of these activities, such as grazing, recreation activities (e.g. off-road vehicles), and cultural use are expected to continue on lands within the Navajo sedge's range. Contributing as cumulative effects to the proposed action, all these activities will continue to affect Navajo sedge populations by increasing mortalities, injuring plants, and further adversely impacting occupied and suitable habitat.

**Conclusion**

The conclusions of this biological opinion are based on full implementation of the project as described in the "Description of the Proposed Action" section of this document, including the resource protection measures that were incorporated into the project design.

After reviewing the current status of the Navajo sedge, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the USFWS's biological opinion that the Monticello Field Office's Resource Management Plan, as proposed, is not likely to jeopardize the continued existence of the Navajo sedge, and is not likely to destroy or adversely modify designated critical habitat. We base our conclusion on the following:

1. The applicant committed resource protection measures will be incorporated into site-specific projects designed under the BLM Resource Management Plan. If project design cannot adhere to all applicant committed resource protection measures, consultation under Section 7 of the Endangered Species Act will be initiated

2. All site-specific projects designed under the proposed BLM Resource Management Plan would be subject to consultation requirements under Section 7 of the Endangered Species Act.

BLM_0014085

# COLORADO RIVER FISH

## Bonytail (*Gila elegans*)

### Status of the Species

*Species / Critical Habitat Description*

Bonytail (*Gila elegans*) are medium-sized (less than 600 mm) fish in the minnow family. Adult bonytail are gray or olive colored on the back with silvery sides and a white belly. The adult bonytail have an elongated body with a long, thin caudal peduncle. The head is small and compressed compared to the rest of the body. The mouth is slightly overhung by the snout and there is a smooth low hump behind the head that is not as pronounced as the hump on a humpback chub. The bonytail chub was first listed on April 23, 1980 (45 FR 27710). It is currently designated as endangered throughout its entire range.

A total of 499 km (312 miles) of river has been designated as critical habitat for the bonytail in the Colorado River Basin, representing about 14% of the species' historic range (59 FR 13374). The USFWS has identified water, physical habitat, and the biological environment as the primary constituent elements of critical habitat (59 FR 13374). Water includes a quantity of water of sufficient quality delivered to a specific location in accordance with a hydrologic regime required for the particular life stage for each species. The physical habitat includes areas of the Colorado River system that are inhabited or potentially habitable for use in spawning and feeding, as a nursery, or serve as corridors between these areas. In addition, oxbows, backwaters, and other areas in the 100-year floodplain, when inundated, provide access to spawning, nursery, feeding, and rearing habitats. Food supply, predation, and competition are important elements of the biological environment.

River reaches that have been designated as critical habitat within the State of Utah include (59 FR 13374):

> Utah, Uintah County; and Colorado, Moffat County. The Green River from the confluence with the Yampa River in T. 7 N., R. 103 W., section 28 (6th Principal Meridian) to the boundary of Dinosaur National Monument in T. 6 N., R. 24 E., section 30 (Salt Lake Meridian).

> Utah, Uintah and Grand Counties. The Green River (Desolation and Gray Canyons) from Sumner's Amphitheater in T. 12 S., R. 18 E., section 5 (Salt Lake Meridian) to Swasey's Rapid (river mile 12) in T. 20 S., R. 16 E., section 3 (Salt Lake Meridian).

> Utah, Grand County; and Colorado, Mesa County. The Colorado River from Black Rocks in T.10S., R.104W., sec. 25 (6th Principal Meridian) to Fish Ford in T.21S., R.24E., sec. 35 (Salt Lake Meridian).

> Utah, Garfield and San Juan Counties. The Colorado River from Brown Betty Rapid in T.30S., R.18E., sec. 34 (Salt Lake Meridian) to Imperial Canyon in T.31S., R.17E., sec. 28 (Salt Lake Meridian).

BLM_0014086

*Life History and Population Dynamics*

The bonytail are considered a species that is adapted to mainstem rivers, where it has been observed in pools and eddies (Vanicek 1967, Minckley 1973). Spawning of bonytail has never been observed in a river, but ripe fish were collected in Dinosaur National Monument during late June and early July suggesting that spawning occurred at water temperatures of about 18□C (Vanicek and Kramer 1969). Similar to other closely related *Gila* species, bonytail probably spawn in rivers in spring over rocky substrates; spawning has been observed in reservoirs over rocky shoals and shorelines. It has been recently hypothesized that flooded bottomlands may provide important bonytail nursery habitat. Of five specimens captured most recently in the upper basin, four were captured in deep, swift, rocky canyons (Yampa Canyon, Black Rocks, Cataract Canyon, and Coal Creek Rapid), but the fifth was taken in Lake Powell. Since 1974, all bonytails captured in the lower basin have been caught in reservoirs. The diets of bonytail are presumed similar to that of the humpback chub (USFWS 2002a).

*Status and Distribution*

Bonytail are endemic to the Colorado River Basin and was historically common to abundant in warm-water reaches of larger rivers of the basin from Mexico to Wyoming. The species experienced a dramatic, but poorly documented, decline starting in about 1950, following construction of several mainstem dams, introduction of nonnative fishes, poor land-use practices, and degraded water quality (USFWS 2002a).

Currently, no self-sustaining populations of bonytail are known to exist in the wild, and very few individuals have been caught anywhere within the basin. An unknown, but small number of wild adults exist in Lake Mohave on the mainstem Colorado River. Since 1977, only 11 wild adults have been reported from the upper basin (Valdez et al. 1994).

Bonytail are the rarest native fish in the Colorado River. Little is known about its specific habitat requirements or cause of decline, because the bonytail was extirpated from most of its historic range prior to extensive fishery surveys. It was listed as endangered on April 23, 1980. Currently, no documented self-sustaining populations exist in the wild. Formerly reported as widespread and abundant in mainstem rivers (Jordan and Evermann 1896), its populations have been greatly reduced. Remnant populations presently occur in the wild in low numbers in Lake Mohave and several fish have been captured in Lake Powell and Lake Havasu (USFWS 2002a). The last known riverine area where bonytail were common was the Green River in Dinosaur National Monument, where Vanicek (1967) and Holden and Stalnaker (1970) collected 91 specimens during 1962-1966. From 1977 to 1983, no bonytail were collected from the Colorado or Gunnison rivers in Colorado or Utah (Wick et al. 1979, 1981; Valdez et al. 1982; Miller et al. 1984). However, in 1984, a single bonytail was collected from Black Rocks on the Colorado River (Kaeding et al. 1986). Several suspected bonytail were captured in Cataract Canyon in 1985-1987 (Valdez 1990). Current stocking plans are planned to continue for at least two more years, however, catch rates indicate stocking will continue until at least 2010 and probably longer (Thomas Czapla, personal communication).

BLM_0014087

**Environmental Baseline**

*Status of the Species within the Action Area*

Bonytail were once widespread in the large rivers of the Colorado River Basin (Cope and Yarrow 1875, Jordan 1891, Jordan and Evermann 1896, Gilbert and Scofield 1898, Kirsch 1889, Chamberlain 1904). The species experienced a dramatic, but poorly documented, decline starting in about 1950, following construction of mainstem dams, introduction of nonnative fishes, poor land-use practices, and degraded water quality (Miller 1961, Ono et al. 1983). A stocking program is being implemented to reestablish populations in the upper Colorado River basin.

The Monticello planning area contains both populations and designated critical habitat for the bonytail. Historically the bonytail was once widespread throughout the Colorado River Basin. Today it is thought to be found in large river reaches of the Colorado and Green Rivers (USFWS 2002b). Recruitment in the natural environment is apparently nonexistent or extremely low. Existing threats to this species include streamflow regulations, competition and predation by non-native fish species, and reduction in water levels associated with urban and energy development withdrawals (USFWS 2002b).

A Recovery Plan was completed for this species in 1990 and revised in 2002 (USFWS 1990b; USFWS 2002b). In addition, the BLM is party to the Upper Colorado River Endangered Fish Recovery Program (UCRRP), a Cooperative Agreement with other federal agencies, water users, energy distributors, and environmental groups to recover the bonytail and other fish in the upper Colorado River Basin (USFWS 2002b). This agreement includes provisions for instream flow protection, habitat restoration, reduction of nonnative fish species, research, monitoring, and management (USFWS 2002b). Under the authority of current Utah BLM LUPs, the BLM provides species-specific guidance, intended to avoid, minimize, or reduce the potential adverse impacts from implementation of BLM actions on the bonytail (USFWS 2006a).

*Factors Affecting Species Environment within the Action Area*

The primary threats to bonytail are stream flow regulation and habitat modification; competition with and predation by nonnative fishes; hybridization with other native *Gila* species; and pesticides and pollutants (USFWS 2002a). The existing habitat, altered by these threats, has been modified to the extent that it impairs essential behavior patterns, such as breeding, feeding, and sheltering. The threats to bonytail in relation to flow regulation and habitat modification, predation by nonnative fishes, and pesticides and pollutants are essentially the same threats identified for Colorado pikeminnow. Threats to bonytail in relation to hybridization are essentially the same threats identified for humpback chub.

Management actions identified in the recovery goals for bonytail (USFWS 2002a) to minimize or remove threats to the species include:

- provide and legally protect habitat (including flow regimes necessary to restore and maintain required environmental conditions) necessary to provide adequate habitat and sufficient range for all life stages to support recovered populations;

BLM_0014088

- provide passage over barriers within occupied habitat to allow unimpeded movement and, potentially, range expansion;
- investigate options for providing appropriate water temperatures in the Gunnison River;
- minimize entrainment of subadults and adults at diversion/out-take structures;
- investigate habitat requirements for all life stages and provide those habitats;
- ensure adequate protection from overutilization;
- ensure adequate protection from diseases and parasites;
- regulate nonnative fish releases and escapement into the main river, floodplain, and tributaries;
- control problematic nonnative fishes as needed;
- minimize the risk of increased hybridization among *Gila* spp.;
- minimize the risk of hazardous-materials spills in critical habitat; and
- remediate water-quality problems.

## Colorado pikeminnow (*Ptychocheilus lucius*)

### Status of the Species

*Species / Critical Habitat Description*

The Colorado pikeminnow (*Ptychocheilus lucius*) are the largest cyprinid fish (minnow family) native to North America and it evolved as the main predator in the Colorado River system. It is an elongated pike-like fish that during predevelopment times may have grown as large as 6 feet in length and weighed nearly 100 pounds (Behnke and Benson 1983). Today, Colorado pikeminnow rarely exceed 3 feet in length or weigh more than 18 pounds; such fish are estimated to be 45-55 years old (Osmundson et al. 1997). The mouth of this species is large and nearly horizontal with long slender pharyngeal teeth (located in the throat), adapted for grasping and holding prey. The diet of Colorado pikeminnow longer than 3 or 4 inches consists almost entirely of other fishes (Vanicek and Kramer 1969). Males become sexually mature earlier and at a smaller size than do females, though all are mature by about age 7 and 500 mm (20 inches) in length (Vanicek and Kramer 1969, Seethaler 1978, Hamman 1981). Adults are strongly countershaded with a dark, olive back, and a white belly. Young are silvery and usually have a dark, wedge-shaped spot at the base of the caudal fin.

The Colorado pikeminnow was first listed on March 11, 1967 (32 FR 4001). It is currently designated as endangered throughout its range, except in the Salt and Verde River drainages in Arizona.

The USFWS designated six reaches of the Colorado River System as critical habitat for the Colorado pikeminnow on March 21, 1994 (59 FR 13374). These reaches total 1,848 km (1,148 mi) as measured along the center line of each reach. Designated critical habitat makes up about 29% of the species' original range and occurs exclusively in the Upper Colorado River Basin. Critical habitat is designated in portions of the Colorado, Green, Yampa, White, and San Juan Rivers in the Upper Basin.

The USFWS has identified water, physical habitat, and the biological environment as the primary constituent elements of critical habitat (59 FR 13374). Water includes a quantity of

BLM_0014089

water of sufficient quality delivered to a specific location in accordance with a hydrologic regime required for the particular life stage for each species. The physical habitat includes areas of the Colorado River system that are inhabited or potentially habitable for use in spawning and feeding, as a nursery, or serve as corridors between these areas. In addition, oxbows, backwaters, and other areas in the 100-year floodplain, when inundated, provide access to spawning, nursery, feeding, and rearing habitats. Food supply, predation, and competition are important elements of the biological environment.

*Life History and Population Dynamics*

The Colorado pikeminnow are long-distance migrators; adults move hundreds of miles to and from spawning areas, and require long sections of river with unimpeded passage. Adults require pools, deep runs, and eddy habitats maintained by high spring flows. These high spring flows maintain channel and habitat diversity, flush sediments from spawning areas, rejuvenate food production, form gravel and cobble deposits used for spawning, and rejuvenate backwater nursery habitats. Spawning occurs after spring runoff at water temperatures typically between 18 and 23 □C. Spawning has occurred as early as June 15th in some years and as late as August 15th. After hatching and emerging from spawning substrate, larvae drift downstream to nursery backwaters that are restructured by high spring flows and maintained by relatively stable base flows. Flow recommendations have been developed that specifically consider flow-habitat relationships in habitats occupied by Colorado pikeminnow in the upper basin, and were designed to enhance habitat complexity and to restore and maintain ecological processes. The following is a description of observed habitat uses in the Upper Colorado River Basin.

Colorado pikeminnow live in warm-water reaches of the Colorado River mainstem and larger tributaries, and require uninterrupted stream passage for spawning migrations and dispersal of young. The species is adapted to a hydrologic cycle characterized by large spring peaks of snow-melt runoff and low, relatively stable base flows. High spring flows create and maintain in-channel habitats, and reconnect floodplain and riverine habitats, a phenomenon described as the spring flood-pulse (Junk et al. 1989, Johnson et al. 1995). Throughout most of the year, juvenile, subadult, and adult Colorado pikeminnow use relatively deep, low-velocity eddies, pools, and runs that occur in near-shore areas of main river channels (Tyus and McAda 1984; Valdez and Masslich 1989; Tyus 1990, 1991; Osmundson et al. 1995). In spring, however, Colorado pikeminnow adults use floodplain habitats, flooded tributary mouths, flooded side canyons, and eddies that are available only during high flows (Tyus 1990, 1991; Osmundson et al. 1995). Such environments may be particularly beneficial for Colorado pikeminnow because other riverine fishes gather in floodplain habitats to exploit food and temperature resources, and may serve as prey. Such low-velocity environments also may serve as resting areas for Colorado pikeminnow. River reaches of high habitat complexity appear to be preferred.

Because of their mobility and environmental tolerances, adult Colorado pikeminnow are more widely distributed than other life stages. Distribution patterns of adults are stable during most of the year (Tyus 1990, 1991; Irving and Modde 2000), but distribution of adults changes in late spring and early summer, when most mature fish migrate to spawning areas (Tyus and McAda 1984; Tyus 1985, 1990, 1991; Irving and Modde 2000). High spring flows provide an important cue to prepare adults for migration and also ensure that conditions at spawning areas are suitable for reproduction once adults arrive. Specifically, bankfull or much larger floods mobilize coarse

BLM_0014090

sediment to build or reshape cobble bars, and they create side channels that Colorado pikeminnow sometimes use for spawning (Harvey et al. 1993).

Colorado pikeminnow spawning sites in the Green River subbasin have been well documented. The two principal locations are in Yampa Canyon on the lower Yampa River and in Gray Canyon on the lower Green River (Tyus 1990 and 1991). These reaches are 42 and 72 km long, respectively, but most spawning is believed to occur at one or two short segments within each of the two reaches. Another spawning area may occur in Desolation Canyon on the lower Green River (Irving and Modde 2000), but the location and importance of this area has not been verified. Although direct observation of Colorado pikeminnow spawning was not possible because of high turbidity, radiotelemetry indicated spawning occurred over cobble-bottomed riffles (Tyus 1990). High spring flows and subsequent post-peak summer flows are important for construction and maintenance of spawning substrates (Harvey et al. 1993). In contrast with the Green River subbasin, where known spawning sites are in canyon-bound reaches, currently suspected spawning sites in the upper Colorado River subbasin are at six locations in meandering, alluvial reaches (McAda 2000).

After hatching and emerging from the spawning substrate, Colorado pikeminnow larvae drift downstream to backwaters in sandy, alluvial regions, where they remain through most of their first year of life (Holden 1977, Tyus and Haines 1991, Muth and Snyder 1995). Backwaters and the physical factors that create them are vital to successful recruitment of early life stages of Colorado pikeminnow, and age-0 Colorado pikeminnow in backwaters have received much research attention (e.g., Tyus and Karp 1989, Haines and Tyus 1990, Tyus 1991, Tyus and Haines 1991, Bestgen et al. 1997). It is important to note that these backwaters are formed after cessation of spring runoff within the active channel and are not floodplain features. Colorado pikeminnow larvae occupy these in-channel backwaters soon after hatching. They tend to occur in backwaters that are large, warm, deep (average, about 0.3 m in the Green River), and turbid (Tyus and Haines 1991). Recent research (Day et al. 1999a and 1999b; Trammell and Chart 1999) has confirmed these preferences and suggested that a particular type of backwater is preferred by Colorado pikeminnow larvae and juveniles. Such backwaters are created when a secondary channel is cut off at the upper end, but remains connected to the river at the downstream end. These chute channels are deep and may persist even when discharge levels change dramatically. An optimal river-reach environment for growth and survival of early life stages of Colorado pikeminnow have warm, relatively stable backwaters, warm river channels, and abundant food (Muth et al. 2000).

*Status and Distribution*

Based on early fish collection records, archaeological finds, and other observations, the Colorado pikeminnow was once found throughout warm water reaches of the entire Colorado River Basin down to the Gulf of California, and including reaches of the upper Colorado River and its major tributaries, the Green River and its major tributaries, and the Gila River system in Arizona (Seethaler 1978). Colorado pikeminnow apparently were never found in colder, headwater areas. The species was abundant in suitable habitat throughout the entire Colorado River Basin prior to the 1850s (Seethaler 1978). By the 1970s they were extirpated from the entire lower basin (downstream of Glen Canyon Dam) and portions of the upper basin as a result of major alterations to the riverine environment. Having lost some 75 to 80 percent of its former range

---

BLM_0014091

due to habitat loss, the Colorado pikeminnow was federally listed as an endangered species in 1967 (Miller 1961, Moyle 1976, Tyus 1991, Osmundson and Burnham 1998). Full protection under the Act of 1973 occurred on January 4, 1974.

Colorado pikeminnow are presently restricted to the Upper Colorado River Basin and inhabit warm water reaches of the Colorado, Green, and San Juan rivers and associated tributaries (Figure 5). The Colorado pikeminnow recovery goals (USFWS 2002a) identify occupied habitat of wild Colorado pikeminnow as follows: the Green River from Lodore Canyon to the confluence of the Colorado River; the Yampa River downstream of Craig, Colorado; the Little Snake River from its confluence with the Yampa River upstream into Wyoming; the White River downstream of Taylor Draw Dam; the lower 89 miles of the Price River; the lower Duchesne River; the upper Colorado River from Palisade, Colorado, to Lake Powell; the lower 34 miles of the Gunnison River; the lower mile of the Dolores River; and 150 miles of the San Juan River downstream from Shiprock, New Mexico, to Lake Powell. Colorado pikeminnow have been stocked in recent years, changes to the stocking plan are awaiting population estimates. In recent years the pikeminnow has been increasing the Colorado river but decreasing in the Green river (Thomas Czapla, personal communication).

**Environmental Baseline**

*Status of the Species within the Action Area*

Preliminary population estimates presented in the Recovery Goals (USFWS 2002) for the three Colorado pikeminnow populations ranged from approximately 6,600 to 8,900 wild adults: Green River Subbasin, 6,000–8,000 (Nesler 2000, USFWS 2002); Upper Colorado River Subbasin, 600–900 (Nesler 2000, Osmundson 2002 [includes some subadults]); and San Juan River Subbasin, 19–50 (Holden 1999, USFWS 2002). These numbers provided a general indication of the total wild adult population size at the time the Recovery Goals were developed, however, it was also recognized that the accuracy of the estimates vary among populations. Monitoring of Colorado pikeminnow populations is ongoing and sampling protocols and the reliability of the population estimates are being assessed by the Service and cooperating entities.

The Monticello planning area contains populations and designated critical habitat for the Colorado pikeminnow. Natural populations of this species are restricted to the upper Colorado River Basin in Wyoming, Colorado, Utah, and New Mexico (USFWS 2002c). The main stem of the Colorado River from Palisade, Colorado to Lake Powell has known population within this region. A small reproducing population exists in the San Juan River. According to the Colorado pikeminnow recovery goals, these fish can be found in the San Juan River from Shiprock, New Mexico to the inflow of Lake Powell (USFWS 2002c). Flow regulations, migration barriers, habitat loss/alteration, and introduced non-native fish have all been identified as causes for population decline.

A Recovery Plan for the Colorado pikeminnow was completed in 1990 and revised in 2002 (USFWS 2002c; USFWS 1990a). In addition, the BLM is party to the Upper Colorado River Endangered Fish Recovery Program (UCRRP), a Cooperative Agreement with other federal agencies, water users, energy distributors, and environmental groups to recover the Colorado pikeminnow and other fish in the Upper Colorado River Basin (USFWS 2002c). This agreement includes provisions for instream flow protection, habitat restoration, reduction of nonnative fish

BLM_0014092

species, research, monitoring, and management (USFWS 2002c). Under the authority of current Utah BLM LUPs, the USFWS provides species-specific guidance, intended to avoid, minimize, or reduce the potential adverse impacts from implementation of BLM actions on the pikeminnow (USFWS 2006a).

*Factors Affecting Species Environment within the Action Area*

The primary threats to Colorado pikeminnow are stream flow regulation and habitat modification; competition with and predation by nonnative fishes; and pesticides and pollutants (USFWS 2002a). The existing habitat, altered by these threats, has been modified to the extent that it impairs essential behavior patterns, such as breeding, feeding, and sheltering. These impairments are described in further detail below.

Stream flow regulation includes mainstem dams that cause the following adverse effects to Colorado pikeminnow and its habitat:

- block migration corridors,
- changes in flow patterns, reduced peak flows and increased base flows,
- release cold water, making temperature regimes less than optimal,
- change river habitat into lake habitat, and
- retain sediment that is important for forming and maintaining backwater habitats.

Cold water releases from dams eliminate suitable habitat for native fishes, including Colorado pikeminnow, from river reaches downstream for approximately 50 miles. In addition to main stem dams, many dams and water diversion structures occur in and upstream from critical habitat that reduce flows and alter flow patterns, which adversely affect critical habitat. Diversion structures in critical habitat divert fish into canals and pipes where the fish are permanently lost to the river system. It is unknown how many endangered fish are lost in irrigation systems, but in some years, in some river reaches, majority of the river flow is diverted into unscreened canals. High spring flows maintain habitat diversity, flush sediments from spawning habitat, increase invertebrate food production, form gravel and cobble deposits important for spawning, and maintain backwater nursery habitats (McAda 2000, Muth et al. 2000).

Predation and competition from nonnative fishes have been clearly implicated in the population reductions or elimination of native fishes in the Colorado River Basin (Dill 1944, Osmundson and Kaeding 1989, Behnke 1980, Joseph et al. 1977, Lanigan and Berry 1979, Minckley and Deacon 1968, Meffe 1985, Propst and Bestgen 1991, Rinne 1991). Data collected by Osmundson and Kaeding (1991) indicated that during low water years, nonnative minnows capable of preying on or competing with larval endangered fishes greatly increased in numbers.

More than 50 nonnative fish species were intentionally introduced in the Colorado River Basin prior to 1980 for sportfishing, forage fish, biological control and ornamental purposes (Minckley 1982, Tyus et al. 1982, Carlson and Muth 1989). Nonnative fishes compete with native fishes in several ways. The capacity of a particular area to support aquatic life is limited by physical habitat conditions. Increasing the number of species in an area usually results in a smaller population of most species. The size of each species population is controlled by the ability of each life stage to compete for space and food resources and to avoid predation. Some life stages

BLM_0014093

of nonnative fishes appear to have a greater ability to compete for space and food and to avoid predation in the existing altered habitat than do some life stages of native fishes. Tyus and Saunders (1996) cite numerous examples of both indirect and direct evidence of predation on razorback sucker eggs and larvae by nonnative species.

Threats from pesticides and pollutants include accidental spills of petroleum products and hazardous materials; discharge of pollutants from uranium mill tailings; and high selenium concentration in the water and food chain (USFWS 2002a). Accidental spills of hazardous material into critical habitat can cause immediate mortality when lethal toxicity levels are exceeded. Pollutants from uranium mill tailings cause high levels of ammonia that exceed water quality standards. High selenium levels may adversely affect reproduction and recruitment (Hamilton and Wiedmeyer 1990, Stephens et al. 1992, Hamilton and Waddell 1994, Hamilton et al. 1996, Stephens and Waddell 1998, Osmundson et al. 2000).

## Humpback chub (*Gila cypha*)

### Status of the Species

*Species / Critical Habitat Description*

The humpback chub (*Gila cypha*) are a medium-sized freshwater fish (less than 500 mm) of the minnow family. The adults have a pronounced dorsal hump, a narrow flattened head, a fleshy snout with an inferior-subterminal mouth, and small eyes. It has silvery sides with a brown or olive colored back. The humpback chub are endemic to the Colorado River Basin and is part of a native fish fauna traced to the Miocene epoch in fossil records (Miller 1946, Minckley et al. 1986). Humpback chub remains have been dated to about 4000 B.C., but the fish was not described as a species until the 1940s (Miller 1946), presumably because of its restricted distribution in remote white water canyons (USFWS 1990). Because of this, its original distribution is not known. The humpback chub was listed as endangered on March 11, 1967.

Until the 1950s, the humpback chub was known only from Grand Canyon. During surveys in the 1950s and 1960s humpback chub were found in the upper Green River including specimens from Echo Park, Island Park, and Swallow Canyon (Smith 1960, Vanicek et al. 1970). Individuals were also reported from the lower Yampa River (Holden and Stalnaker 1975), the White River in Utah (Sigler and Miller 1963), Desolation Canyon of the Green River (Holden and Stalnaker 1970) and the Colorado River near Moab (Sigler and Miller 1963).

The USFWS designated seven reaches of the Colorado River system as critical habitat for the humpback chub on March 21, 1994 (59 FR 13374). These reaches total 610 km (379 mi) as measured along the center line of the subject reaches. Designated critical habitat makes up about 28% of the species' original range and occurs in both the Upper and Lower Colorado River Basins. Critical habitat for the humpback chub are designated for portions of the Colorado, Green, and Yampa Rivers in the Upper Basin and the Colorado and Little Colorado Rivers in the Lower Basin. The primary constituent elements are the same as those described for Colorado pikeminnow.

BLM_0014094

*Life History and Population Dynamics*

Unlike Colorado pikeminnow and razorback sucker, which are known to make extended migrations of up to several hundred miles to spawning areas, humpback chubs do not appear to make extensive migrations (Karp and Tyus 1990). Generally, humpback chub show fidelity for canyon reaches and move very little (Miller et al. 1982; Archer et al. 1985; Burdick and Kaeding 1985, Kaeding et al. 1990). Humpback chubs in Black Rocks (Valdez and Clemmer 1982), Westwater Canyon (Chart and Lentsch 1999a), and Desolation and Gray Canyons (Chart and Lentsch 1999b) do not migrate to spawn and movements of adult humpback chub in Black Rocks on the Colorado River were essentially restricted to a 1-mile reach. These results were based on the recapture of Carlin-tagged fish and radiotelemetry studies conducted from 1979 to 1981 (Valdez et al. 1982) and 1983 to 1985 (Archer et al. 1985, USFWS 1986, Kaeding et al. 1990).

In the Green River and upper Colorado River, humpback chubs spawned in spring and summer as flows declined shortly after the spring peak (Valdez and Clemmer 1982, Valdez et al. 1982, Kaeding and Zimmerman 1983, Tyus and Karp 1989, Karp and Tyus 1990, Chart and Lentsch 1999a and 1999b). Similar spawning periods were reported from Grand Canyon (Kaeding and Zimmerman 1983; Valdez and Ryel 1995, 1997). Although humpback chub are believed to broadcast eggs over mid-channel cobble and gravel bars, spawning in the wild has not been observed for this species. Gorman and Stone (1999) reported that ripe male humpback chubs in the Little Colorado River (LCR) aggregated in areas of complex habitat structure (i.e., matrix of large boulders and travertine masses combined with chutes, runs, and eddies, 0.5–2.0 m deep) and were associated with deposits of clean gravel.

Chart and Lentsch (1999b) estimated hatching dates for young *Gila* collected from Desolation and Gray Canyons between 1992 and 1995. They determined that hatching occurred on the descending limb of the hydrograph as early as 9 June 1992 at a flow of 139 $m^3$/s and as late as 1 July 1995 at a flow of 731 $m^3$/s. Instantaneous daily river temperatures on hatching dates over all years ranged from 20 to 22°C.

Newly hatched larvae average 6.3–7.5 mm TL (Holden 1973, Suttkus and Clemmer 1977, Minckley 1973, Snyder 1981, Hamman 1982, Behnke and Benson 1983, Muth 1990), and 1-month-old fish are approximately 20 mm long (Hamman 1982). Unlike Colorado pikeminnow and razorback sucker, no evidence exists of long-distance larval drift (Miller and Hubert 1990, Robinson et al. 1998). Upon emergence from spawning gravels, humpback chub larvae remain in the vicinity of bottom surfaces (Marsh 1985) near spawning areas (Chart and Lentsch 1999a).

Backwaters, eddies, and runs have been reported as common capture locations for young-of-year humpback chub (Valdez and Clemmer 1982). These data indicate that in Black Rocks and Westwater Canyon, young utilize shallow areas. Habitat suitability index curves developed by Valdez et al. (1990) indicate young-of-year prefer average depths of 2.1 feet with a maximum of 5.1 feet. Average velocities were reported at 0.2 feet per second.

Valdez et al. (1982), Wick et al. (1979), and Wick et al. (1981) found adult humpback chub in Black Rocks and Westwater Canyons in water averaging 50 feet in depth with a maximum depth

BLM_0014095

of 92 feet. In these localities, humpback chub were associated with large boulders and steep cliffs.

*Status and Distribution*

Historic abundance of the humpback chub are unknown, and historic distribution is surmised from various reports and collections that indicate the species presently occupies about 68% of its historic habitat and is restricted to about 756 km of river. The species exists primarily in relatively inaccessible canyons of the Colorado River Basin and was rare in early collections (Tyus 1998). Common use of the name "bonytail" for all six Colorado River species or subspecies of the genus *Gila* confounded an accurate early assessment of distribution and abundance (Holden and Stalnaker 1975, Valdez and Clemmer 1982, Minckley 1996). Of three closely related and sympatric *Gila* species, the roundtail chub (*G. robusta*) and bonytail (*G. elegans*) were described in 1853 by Baird and Girard (Sitgreaves 1853, Girard 1856), but the humpback chub was the last big-river fish species to be described from the Colorado River Basin in 1946 (Miller 1946). Also, extensive human alterations throughout the basin prior to faunal surveys may have depleted or eliminated the species from some river reaches before its occurrence was documented.

It is surmised that the humpback chub speciated from a *G. robusta*-like form in canyons of northern Arizona (i.e., Grand Canyon) about 3–5 million years ago (Miller 1946, Uyeno and Miller 1965, Holden 1968, Minckley et al. 1986) during the mid-Pliocene and early Pleistocene epochs. Earliest evidence of the species are skeletal remains from 4,000-year old flood deposits in Stanton's Cave in Grand Canyon (Miller 1955, Euler 1978, Miller and Smith 1984), from a 750–1,100-year old archeological site in Catclaw Cave near present-day Hoover Dam (Miller 1955, Jones 1985), and from 1,000-year old archeological sites in Dinosaur National Monument, Colorado (Tyus 1998).

Earliest collections of humpback chub are anecdotal and related to early explorations of the Colorado River Basin that pre-date the species description in 1946. In 1911, Elsworth and Emory Kolb (Kolb and Kolb 1914) reported a large aggregation of *"bony tail"* in the lower Little Colorado River (LCR) in Grand Canyon; photographs show that the fish were humpback chub. A specimen in the fish collection at Grand Canyon National Park, caught in 1932 by angler N.N. Dodge at Bright Angel Creek, was examined in fall 1942 and used as the holotype for the species description (Miller 1946), along with a second specimen of unknown origin. In the 1940's, five specimens of humpback chub were collected from the Grand Canyon region along with 16 specimens of *G. elegans* and six *G. robusta* (Miller 1944, Bookstein et al.1985). In 1950, juvenile humpback chub were reported from Spencer Creek in lower Grand Canyon (Wallis 1951, Kubly 1990), but icthyofaunal surveys in 1958–1959 (McDonald and Dotson 1960) failed to find humpback chub immediately upstream in the gentle meandering reaches of Glen Canyon.

Following completion of Glen Canyon Dam in 1963, humpback chub were consistently reported by Arizona Game and Fish Department creel surveys from Lee Ferry during 1963–1968 (Stone 1964 and 1966, Stone and Queenan 1967, Stone and Rathbun 1968). However, Stone and Rathbun (1968) failed to find humpback chub in seven tributaries sampled between Lee Ferry and Lake Mead in 1968, excluding the LCR. Humpback chub were captured in July 1967 and August 1970 (Holden and Stalnaker 1975), all within *"...a few hundred meters downstream of*

BLM_0014096

*Glen Canyon Dam"* (personal communication, P. Holden, Bio/West, Inc.). Humpback chub have not been captured in this reach since the dam began releasing cold hypolimnetic waters in about 1970. Humpback chub have consistently been reported in the LCR and Colorado River in Grand Canyon since 1967 as a result of better sampling gear and a better understanding of the life history of the species (Stone and Rathbun 1968, Miller and Smith 1972, Holden and Stalnaker 1975, Suttkus 1976, Minckley and Blinn 1976, Suttkus and Clemmer 1977, Kaeding and Zimmerman 1983, Maddux et al. 1987, Valdez and Ryel 1995, Arizona Game and Fish Department 1996, Douglas and Marsh 1996).

Five specimens were reported from Lake Powell in the late 1960's (Holden and Stalnaker 1970) following completion of Glen Canyon Dam in 1963 and impoundment of the upper Colorado River through Glen, Narrow, and Cataract canyons. Reproducing populations of humpback chub were first reported from Black Rocks, Colorado in 1977 (Kidd 1977), and from Westwater and Cataract canyons, Utah, in 1979 (Valdez et al. 1982, Valdez and Clemmer 1982).

Humpback chub were first reported in the Upper Colorado River Basin in the 1940's from Castle Park, Yampa River, Colorado, in June and July 1948 (Tyus 1998). Pre-impoundment surveys of Flaming Gorge Dam on the Green River in 1958–1959 (Bosley 1960, Gaufin et al. 1960, McDonald and Dotson 1960) treated all *Gila* as *"bonytail"*, which were common downstream of Green River, Wyoming. Humpback chub were reported from Hideout Canyon in the upper Green River (Smith 1960), although a checklist of fish killed by a massive rotenone operation from Hideout Canyon to Brown's Park in September 1962 stated that "...no humpback chub were collected..." (Binns 1967). Post-impoundment investigations (Vanicek et al. 1970) reported three humpback chub from the Green River downstream of Flaming Gorge Dam; one each from Echo Park, Island Park, and Swallow Canyon. Specimens were collected in Desolation Canyon on the Green River in 1967 (Holden and Stalnaker 1970), in Yampa Canyon in 1969 (Holden and Stalnaker 1975), in Cross Mountain Canyon of the Yampa River in the 1970's, and an individual specimen was reported from the White River in Utah in the 1950's (Sigler and Miller 1963). Seven suspected humpback chub were captured in the Little Snake River, a tributary of the Yampa River in 1988 (Wick et al. 1991). Surveys downstream of Flaming Gorge Dam, including Lodore Canyon, have not yielded humpback chub in that region of the Green River, despite warmer dam releases (Holden and Crist 1981, Bestgen and Crist 2000).

Six humpback chub populations are currently identified: (1) Black Rocks, Colorado; (2) Westwater Canyon, Utah; (3) Lower Colorado Region and Colorado rivers in Grand Canyon, Arizona; (4) Yampa Canyon, Colorado; (5) Desolation/Gray Canyons, Utah; and (6) Cataract Canyon, Utah (see Figure 1 in section 3.1.2; Valdez and Clemmer 1982, USFWS 1990a). Each population consists of a discrete group of fish, geographically separated from the other populations, but with some exchange of individuals. River length occupied by each population varies from 3.7 km in Black Rocks to 73.6 km in Yampa Canyon. Humpback chub have yet to be stocked, however, the Fish and Wildlife Service Hatchery system is collecting Yampa Canyon individuals for captivity to preserve their unique genetics (Thomas Czapla, personal communication)

Recovery goals for the humpback chub (USFWS 2002) were approved on August 1, 2002. According to these recovery goals, downlisting can be considered if, over a 5-year period:

---

BLM_0014097

- the trend in adult (age 4+; > 200 mm total length) point estimates for each of the six extant populations does not decline significantly; and
- mean estimated recruitment of age-3 (150–199 mm total length) naturally produced fish equals or exceeds mean annual adult mortality for each of the six extant populations; and
- two genetically and demographically viable, self-sustaining core populations are maintained, such that each point estimate for each core population exceeds 2,100 adults (2,100 is the estimated minimum viable population needed to ensure long-term genetic and demographic viability); and
- certain site-specific management tasks to minimize or remove threats have been identified, developed, and implemented.

## Environmental Baseline

*Status of the Species within the Action Area*

The Monticello planning area contains both populations and USFWS designated Critical Habitat for the humpback chub (see map in Appendix A). The humpback chub is endemic to warm water river systems in the Colorado River Basin. Populations of humpback chub have been identified in the Upper Colorado River Basin with the highest concentrations found in the Black Rocks and Westwater Canyon reaches of the Colorado River near the Colorado/Utah state line (USFWS 1990c). The presence of juvenile populations suggests spawning may occur in the Upper Colorado River at Black Rock, Westwater Canyon, Cataract Canyon, and Desolation/Gray Canyon. Flow alterations have been identified as a significant cause of decline.

A Recovery Plan was completed for this species in 1979 and revised in 1984 (USFWS 1990c). In addition, the BLM is party to the UCRRP, a Cooperative Agreement with other federal agencies, water users, energy distributors, and environmental groups to recover the humpback chub and other fishes in the Upper Colorado River Basin (USFWS 1990c). This agreement includes provisions for instream flow protection, habitat restoration, reduction of nonnative fish species, research, monitoring, and management (USFWS 1990c). Under the authority of current Utah BLM LUPs, the USFWS provides species-specific guidance, intended to avoid, minimize, or reduce the potential adverse impacts from implementation of BLM actions on the humpback chub (USFWS 2006a).

*Factors Affecting Species Environment within the Action Area*

Although historic data are limited, the apparent range-wide decline in humpback chubs is likely due to a combination of factors including alteration of river habitats by reservoir inundation, changes in stream discharge and temperature, competition with and predation by introduced fish species, and other factors such as changes in food resources resulting from stream alterations (USFWS 1990).

The primary threats to humpback chub are stream flow regulation and habitat modification; competition with and predation by nonnative fishes; parasitism; hybridization with other native *Gila* species; and pesticides and pollutants (USFWS 2002). The existing habitat, altered by these threats, has been modified to the extent that it impairs essential behavior patterns, such as breeding, feeding, and sheltering. The threats to humpback chub in relation to flow regulation

BLM_0014098

and habitat modification, predation by nonnative fishes, and pesticides and pollutants are essentially the same threats identified for Colorado pikeminnow.

Hybridization with roundtail chub (*Gila robusta*) and bonytail, where they occur with humpback chub, is recognized as a threat to humpback chub. A larger proportion of roundtail chub have been found in Black Rocks and Westwater Canyon during low flow years (Kaeding et al. 1990, Chart and Lentsch 2000), which increase the chances for hybridization.

Management actions identified in the recovery goals for humpback chub (USFWS 2002) to minimize or remove threats to the species included:

- provide and legally protect habitat (including flow regimes necessary to restore and maintain required environmental conditions) necessary to provide adequate habitat and sufficient range for all life stages to support recovered populations,
- investigate the role of the mainstem Colorado River in maintaining the Grand Canyon population,
- investigate the anticipated effects of and options for providing warmer water temperatures in the mainstem Colorado River through Grand Canyon,
- ensure adequate protection from overutilization,
- ensure adequate protection from diseases and parasites,
- regulate nonnative fish releases and escapement into the main river, floodplain, and tributaries,
- control problematic nonnative fishes as needed,
- minimize the risk of increased hybridization among *Gila* spp., and
- minimize the risk of hazardous-materials spills in critical habitat.

## Razorback sucker (*Xyrauchen texanus*)

### Status of the Species

*Species / Critical Habitat Description*

Like all suckers (family Catostomidae, meaning "down mouth"), the razorback sucker (*Xyrauchen texanus*) have ventral mouths with thick lips covered with papillae and no scales on its head. In general, suckers are bottom browsers, sucking up or scraping off small invertebrates, algae, and organic matter with their fleshy, protrusible lips (Moyle 1976). The razorback suckers are the only sucker with an abrupt sharp-edged dorsal keel behind its head. The keel becomes more massive with age. The head and keel are dark, the back is olive-colored, the sides are brownish or reddish, and the abdomen is yellowish white (Sublette et al.. 1990). Adults often exceed 3 kg (6 pounds) in weight and 600 mm (2 feet) in length. Like Colorado pikeminnow, razorback suckers are long-lived, living 40-plus years. The razorback sucker was first listed on October 23, 1991 (56 FR 54957). It is currently designated as endangered throughout the entire range.

The USFWS designated 15 reaches of the Colorado River system as critical habitat for the razorback sucker. These reaches total 2,776 km (1,724 mi) as measured along the center line of the river within the subject reaches. Designated critical habitat makes up about 49% of the

BLM_0014099

species' original range and occurs in both the Upper and Lower Colorado River Basins (USFWS 1994). In the Upper Basin, critical habitat is designated for portions of the Green, Yampa, Duchesne, Colorado, White, Gunnison, and San Juan Rivers. Portions of the Colorado, Gila, Salt, and Verde Rivers are designated in the Lower Basin. Critical habitat was designated for razorback sucker on March 21, 1994 (59 FR 13374). The primary constituent elements are the same as those described for Colorado pikeminnow.

*Life History and Population Dynamics*

McAda and Wydoski (1980) and Tyus (1987) reported springtime aggregations of razorback suckers in off-channel habitats and tributaries; such aggregations are believed to be associated with reproductive activities. Tyus and Karp (1990) and Osmundson and Kaeding (1991) reported off-channel habitats to be much warmer than the mainstem river and that razorback suckers presumably moved to these areas for feeding, resting, sexual maturation, spawning, and other activities associated with their reproductive cycle. Prior to construction of large mainstem dams and the suppression of spring peak flows, low velocity, off-channel habitats (seasonally flooded bottomlands and shorelines) were commonly available throughout the Upper Basin (Tyus and Karp 1989, Osmundson and Kaeding 1991). Dams changed riverine ecosystems into lakes by impounding water, which eliminated these off-channel habitats in reservoirs. Reduction in spring peak flows eliminates or reduces the frequency of inundation of off-channel habitats. The absence of these seasonally flooded riverine habitats is believed to be a limiting factor in the successful recruitment of razorback suckers in their native environment (Tyus and Karp 1989, Osmundson and Kaeding 1991). Wydoski and Wick (1998) identified starvation of larval razorback suckers due to low zooplankton densities in the main channel and loss of floodplain habitats which provide adequate zooplankton densities for larval food as one of the most important factors limiting recruitment.

These fish can spawn as early as age 3 or 4, when they are 14 or more inches long. Depending on water temperature, spawning can take place as early as November or as late as June. In the upper Colorado River basin, razorbacks typically spawn between mid-April and mid-June. These fish reportedly migrate long distances to spawn, congregating in large numbers in spawning areas. While razorback suckers have never been directly observed spawning in turbid riverine environments within the Upper Basin, captures of ripe specimens (in spawning condition), both males and females, have been recorded (Valdez et al. 1982, McAda and Wydoski 1980, Tyus 1987, Osmundson and Kaeding 1989, Tyus and Karp 1989, Tyus and Karp 1990, Osmundson and Kaeding 1991, Platania 1990) in the Yampa, Green, Colorado, and San Juan rivers. Sexually mature razorback suckers are generally collected on the ascending limb of the hydrograph from mid-April through June and are associated with coarse gravel substrates (depending on the specific location).

Outside of the spawning season, adult razorback suckers occupy a variety of shoreline and main channel habitats including slow runs, shallow to deep pools, backwaters, eddies, and other relatively slow velocity areas associated with sand substrates (Tyus 1987, Tyus and Karp 1989, Osmundson and Kaeding 1989, Valdez and Masslich 1989, Osmundson and Kaeding 1991, Tyus and Karp 1990).

BLM_0014100

Habitat requirements of young and juvenile razorback suckers in the wild are not well known, particularly in native riverine environments. Prior to 1991, the last confirmed documentation of a razorback sucker juvenile in the Upper Basin was a capture in the Colorado River near Moab, Utah (Taba et al. 1965). In 1991, two early juvenile (36.6 and 39.3 mm total length (TL)) razorback suckers were collected in the lower Green River near Hell Roaring Canyon (Gutermuth et al. 1994). Juvenile razorback suckers have been collected in recent years from Old Charley Wash, a wetland adjacent to the Green River (Modde 1996). Between 1992 and 1995 larval razorback suckers were collected in the middle and lower Green River and within the Colorado River inflow to Lake Powell (Muth 1995). In 2002, eight larval razorback suckers were collected in the Gunnison River (Osmundson 2002). No young razorback suckers have been collected in recent times in the Colorado River.

The razorback suckers are adapted to the widely fluctuating physical environment of the historical Colorado River. Adults can live 44-50 years and, once reaching maturity between two and seven years of age (Minckley 1983), apparently produce viable gametes even when quite old. Survival adaptations included the ability to spawn in a variety of habitats and flows regimes, and over a long season. In the event of several consecutive years with little or no recruitment (due to either too much or too little water), the demographics of the population as a whole might shift, but future reproduction would not be compromised. Average fecundity recorded in studies ranged from 100,800 to 46,740 eggs per female (Bestgen 1990). With varying age of maturity and the fecundity of the species, historically it would have been possible to quickly repopulate after a catastrophic loss of adults.

*Status and Distribution*

On March 14, 1989, the USFWS was petitioned to conduct a status review of the razorback sucker. Subsequently, the razorback sucker was designated as endangered under a final rule published on October 23, 1991 (56 FR 54957). The final rule stated "Little evidence of natural recruitment has been found in the past 30 years, and numbers of adult fish captured in the last 10 years demonstrate a downward trend relative to historic abundance. Significant changes have occurred in razorback sucker habitat through diversion and depletion of water, introduction of nonnative fishes, and construction and operation of dams" (56 FR 54957). Recruitment of razorback suckers to the population continues to be a problem.

Historically, razorback suckers were found in the mainstem Colorado River and major tributaries in Arizona, California, Colorado, Nevada, New Mexico, Utah, Wyoming, and in Mexico (Ellis 1914, Minckley 1983). Bestgen (1990) reported that this species was once so numerous that it was commonly used as food by early settlers and, further, that commercially marketable quantities were caught in Arizona as recently as 1949. In the Upper Basin, razorback suckers were reported in the Green River to be very abundant near Green River, Utah, in the late 1800s (Jordan 1891). An account in Osmundson and Kaeding (1989) reported that residents living along the Colorado River near Clifton, Colorado, observed several thousand razorback suckers during spring runoff in the 1930s and early 1940s. In the San Juan River drainage, Platania and Young (1989) relayed historical accounts of razorback suckers ascending the Animas River to Durango, Colorado, around the turn of the century.

BLM_0014101

Currently, the largest concentration of razorback sucker remaining in the Colorado River Basin is in Lake Mohave on the border of Arizona and California. Estimates of the wild stock in Lake Mohave have fallen precipitously in recent years from 60,000 as late as 1991, to 25,000 in 1993 (Marsh 1993, Holden 1994), to about 9,000 in 2000 (USFWS 2002b). Until recently, efforts to introduce young razorback sucker into Lake Mohave have failed because of predation by non-native species (Minckley et al. 1991, Clarkson et al. 1993, Burke 1994). While limited numbers of razorback suckers persist in other locations in the Lower Colorado River, they are considered rare or incidental and may be continuing to decline.

In the Upper Colorado River Basin, above Glen Canyon Dam, razorback suckers are found in limited numbers in both lentic (lake-like) and riverine environments. The largest populations of razorback suckers in the upper basin are found in the upper Green and lower Yampa rivers (Tyus 1987). In the Colorado River, most razorback suckers occur in the Grand Valley area near Grand Junction, Colorado; however, they are increasingly rare. Osmundson and Kaeding (1991) reported that the number of razorback sucker captures in the Grand Junction area has declined dramatically since 1974. Between 1984 and 1990, intensive collecting effort captured only 12 individuals in the Grand Valley (Osmundson and Kaeding 1991). The wild razorback sucker population is considered extirpated from the Gunnison River (Burdick and Bonar 1997).

Razorback suckers are in imminent danger of extirpation in the wild. The virtual absence of any recruitment suggests a combination of biological, physical, and/or chemical factors that may be affecting the survival and recruitment of early life stages of razorback suckers. Within the Upper Basin, recovery efforts endorsed by the Recovery Program include the capture and removal of razorback suckers from all known locations for genetic analyses and development of discrete brood stocks. These measures have been undertaken to develop refugia populations of the razorback sucker from the same genetic parentage as their wild counterparts such that, if these fish are genetically unique by subbasin or individual population, then separate stocks will be available for future augmentation. Such augmentation may be a necessary step to prevent the extinction of razorback suckers in the Upper Basin. Razorback suckers will be stocked until at least 2010, current population estimates that stocking will likely continue after that date as well (Thomas Czapla, personal communication).

**Environmental Baseline**

*Status of the Species within the Action Area*

Within or near the Monticello planning area, the razorback sucker currently occupies parts of the Green River Subbasin and the Upper Colorado River Subbasin (Upper Colorado River), and the San Juan River Subbasin (San Juan River) (USFWS 2002; 54 FR 54967; 54 FR 13374).

In the Upper Colorado River subbasin, the number of razorback sucker captured has decreased dramatically since 1974. There are only a few scattered adults in the mainstem Colorado River (Osmundson and Kaeding 1991). During a 2-year study (1979–1981), Valdez et al. (1982) captured only 52 individuals, all old adults, in a 465–km reach of the Colorado River from Rifle, Colorado, to Hite, Utah. No young razorback sucker have been captured anywhere in the upper Colorado River since the mid-1960s (Osmundson and Kaeding 1991).

BLM_0014102

The Monticello planning area contains both populations and USFWS designated critical habitat for the razorback sucker. This species is endemic to the Colorado River basin. Populations have been identified in the Colorado River from Rifle, Colorado to Lee's Ferry, Arizona and also in the San Juan River from Shiprock, New Mexico, to the inflow of Lake Powell because populations are being re-established through stocking. The natural populations of these fish are mostly aged adults with little or no recruitment.

A Recovery Plan for this species was completed in 1998 and amended in 2002 (USFWS 1998b, 2002d). In addition, the BLM is party to the UCRRP, a Cooperative Agreement with other federal and state agencies, water users, energy distributors, and environmental groups to recover the razorback sucker and other fish in the Upper Colorado River Basin (USFWS 2002d). This agreement includes provisions for protection of instream flow protection, habitat restoration, reduction of nonnative fish species, research, monitoring, and management (USFWS 2002d). Under the authority of current Utah BLM LUPs, the BLM provides species-specific guidance, intended to avoid, minimize, or reduce the potential adverse impacts from implementation of BLM actions on the razorback sucker (USFWS 2006a).

*Factors Affecting Species Environment within the Action Area*

The primary threats to razorback sucker are stream flow regulation and habitat modification; competition with and predation by nonnative fishes; and pesticides and pollutants (USFWS 2002b). The existing habitat, altered by these threats, has been modified to the extent that it impairs essential behavior patterns, such as breeding, feeding, and sheltering. The threats to razorback sucker are essentially the same threats identified for Colorado pikeminnow.

Management actions identified in the recovery goals for razorback sucker (USFWS 2002b) to minimize or remove threats to the species included:

- provide and legally protect habitat (including flow regimes necessary to restore and maintain required environmental conditions) necessary to provide adequate habitat and sufficient range for all life stages to support recovered populations;
- provide passage over barriers within occupied habitat to allow unimpeded movement and, potentially, range expansion;
- investigate options for providing appropriate water temperatures in the Gunnison River;
- minimize entrainment of subadults and adults in diversion/out-take structures;
- ensure adequate protection from overutilization;
- ensure adequate protection from diseases and parasites;
- regulate nonnative fish releases and escapement into the main river, floodplain, and tributaries;
- control problematic nonnative fishes as needed;
- minimize the risk of hazardous-materials spills in critical habitat;
- remediate water-quality problems; and
- minimize the threat of hybridization with white sucker.

BLM_0014103

**Effects of the Action**

Cultural Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for cultural resources commonly entail the use of hand tools, power tools, or heavy machinery.

Surface-disturbing actions under this program could result in soil erosion and removal of upland vegetation within watersheds containing listed fish species could result in increased erosion and sediment that degrade water quantity (reducing ground water discharge into the stream, river, or lake) and water quality (changes in water chemistry, such as pH and dissolved oxygen; temperature; sediment loads; and nutrient availability). These changes in water quantity or quality can directly or indirectly affect listed fish species. Cultural resource activities may negatively affect the primary constituent elements for the Colorado River fish species designated critical habitat. Increased erosion may degrade water quality and increase sediment in the water. This could increase water temperature, decrease food supply, increase turbidity, and deplete oxygen. This could alter a specific hydraulic water regime which is required by a particular life stage for each species. In doing so, there may be decreases in quantity and quality of breeding, spawning, and nursery habitats and degradation of foraging habitats. As a result, there may be decreases in reproductive success, and decreases in survival at all life stages (egg, larval, young of year, juvenile, and adult).

Paleontological Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for paleontological resources commonly entail the use of hand tools, power tools, or heavy machinery.

Surface-disturbing actions under this program could result in soil erosion and removal of upland vegetation within watersheds containing listed fish species could result in increased erosion and sediment that degrade water quantity (reducing ground water discharge into the stream, river, or lake) and water quality (changes in water chemistry, such as pH and dissolved oxygen; temperature; sediment loads; and nutrient availability). These changes in water quantity or quality can directly or indirectly affect listed fish species. Cultural resource activities may negatively affect the primary constituent elements for the Colorado River fish species designated critical habitat. Increased erosion may degrade water quality and increase sediment in the water. This could increase water temperature, decrease food supply, increase turbidity, and deplete oxygen. This could alter a specific hydraulic water regime which is required by a particular life stage for each species. In doing so, there may be decreases in quantity and quality of breeding, spawning, and nursery habitats and degradation of foraging habitats. As a result, there may be decreases in reproductive success, and decreases in survival at all life stages (egg, larval, young of year, juvenile, and adult).

BLM_0014104

Fire Management

Objectives of fire management are to protect life, property, and resources values from wildfire and restore the natural role of fire in the ecosystem. Major activities associated with the BLM's fire management program include: wildfire suppression, wildland fire use, prescribed burning, non-fire fuels treatments (mechanical and chemical), and emergency stabilization and rehabilitation following wildfires. Fire suppression methods may involve: fireline construction, use of fire suppression agents and retardants, and water withdrawals.

Increased vegetation disturbance or vegetation removal to support fire suppression activities or fires (wildland or prescribed), fire retardant or chemical treatment to vegetation, soil disturbance, and water removal may adversely impact Colorado fish. Associated impacts may include loss of vegetation cover, soil stability and forage base; and changes to water chemistry, water temperature, and nutrient levels, negatively affecting the primary constituent elements for Colorado fish species. As a result, there may be decreases in reproductive success, and decreases in survival at all life stages (egg, larval, young of year, juvenile, and adult).

Health and Safety Management

The primary objective of health and safety management is to protect public and environmental health and safety on lands administered by BLM. Hazardous materials and waste management policies are integrated into all programs. Several federal, state, and local laws overlap in their requirement of BLM to identify and remediate contaminated sites on public lands. Besides managing pre-existing contamination, BLM seeks to prevent or minimize contamination caused by authorized actions.

Activities conducted under the health and safety program include providing warnings, securing and disposing of hazardous waste discharged on public lands, establishing precautions, and responding to emergencies. Activities may involve increased human presence, use of heavy equipment, and removal of contaminated soils. These activities have the potential to occur in locations where mineral development or transport occurs.

Activities occurring under this program may increase human presence, equipment and vehicle use, vegetation treatment or disturbance, and surface disturbance in drainages of Colorado River fish habitat. Associated impacts from vegetation disturbances or vegetation removal (including chemical treatment of vegetation) include: increased invasive plant species, adversely affects on: cover, soil stability, forage base, water chemistry, water temperature, and nutrient levels. Pollutants in the area may decrease water quality and adversely impact the forage base. As a result, there may be decreases in reproductive success, and decreases in survival at all life stages (egg, larval, young of year, juvenile, and adult). Other indirect, adverse effects to special status fish species and their habitat include temporary, localized, and downstream water quality degradation, while indirect, beneficial effects of health and safety management decisions include the reduction of water toxicants and sediment over time. Health and safety management decisions may negatively affect the primary constituent elements for the Colorado River fish species designated critical habitat. Increased erosion associated with surface disturbance may degrade water quality and increase sediment in the water. This could increase water temperature, decrease food supply, increase turbidity, and deplete oxygen. This could alter a specific hydraulic water regime which is required by a particular life stage for each species. As a result

BLM_0014105

there may be decreases in quantity and quality of breeding, spawning, and nursery habitats and degradation of foraging habitats. In consequence, there may be decreases in reproductive success, and decreases in survival at all life stages (egg, larval, young of year, juvenile, and adult).

Lands and Realty Management

Objectives of the lands and realty management program are to support multiple-use management goals of the BLM resource programs; respond to public requests for land use authorizations, sales, and exchanges; and acquire and designate rights of way access to serve administrative and public needs. Realty management authorizes occupancy of public lands for roads, power lines, pipelines, communication sites, and irrigation ditches authorized by granting rights of way. Rights of way management actions respond to public requests for access, land authorizations, sales, and exchanges. These rights of way may be temporary or extend up to 30 years, or even in perpetuity.

Activities occurring under this program may increase human presence, equipment and vehicle use, vegetation disturbance, and surface disturbance in the drainages of Colorado River fish habitats. These activities may result in direct water channel disturbance, vegetation disturbance or removal, increased occurrence of invasive plant species, and soil disturbance. Lands and realty management decisions may negatively affect the primary constituent elements for the Colorado River fish species designated critical habitat. Direct stream disturbances may adversely change the water channel morphology, structure, and water quality. Vegetation disturbances or removal (including chemical treatment of vegetation), may adversely affect cover, soil stability, forage base, water chemistry, water temperature, and nutrient levels. Pollutants in the area may decrease water quality and adversely impact the forage base. Land exchanges or disposals may fragment the watersheds in the action area, increasing the previously mentioned impacts. As a result, there may be decreases in reproductive success, and decreases in survival at all life stages (egg, larval, young of year, juvenile, and adult).

Livestock Grazing Management

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base for livestock grazing on BLM land. Livestock management includes designating the kind and class of livestock, seasons of use, locations of use and the numbers of livestock that are permitted to use BLM lands.

Activities occurring under this program may increase equipment and vehicle use, vegetation disturbance, and surface disturbance in the drainages of Colorado River fish habitats. These activities may result in vegetation disturbance, removal, alteration; and soil disturbance. Vegetation alteration or removal may decrease: cover, soil stability, stream morphology, forage base, water chemistry, water temperature, and nutrient levels. Livestock management decisions may negatively affect the primary constituent elements for the Colorado River fish species designated critical habitat. Increased erosion associated with surface disturbance may degrade water quality and increase sediment in the water. This could increase water temperature, decrease food supply, increase turbidity, and deplete oxygen. This could alter a specific hydraulic water regime which is required by a particular life stage for each species. As a result,

BLM_0014106

there may be decreases in reproductive success, and decreases in survival at all life stages (egg, larval, young of year, juvenile, and adult).

## Minerals Management

The planning area will be open to consideration for exploration, leasing, and development of leasable minerals (oil, gas, coal, tar sands), salable minerals (sand, gravel, clay, and stone) and locatable materials (uranium, gold, copper, and limestone). Although stipulations or conditions may be included in the terms of these mineral contracts, there are potential impacts associated with these various activities. Mineral exploration and extraction often results in surface disturbance from road and facility construction, removal of topsoil and overburden, stock piling of these materials, and post-mining reclamation and recontouring.

Activities occurring under this program may increase human presence, equipment use, and surface disturbance in Colorado River fish habitat. These actions may increase the occurrence of chemical leaks into drainages, vegetation disturbances or removal, soil disturbances, increased occurrence of invasive plant species, and pollutants in drainages of Colorado fish habitat. Vegetation disturbances or vegetation removal (including chemical treatment of vegetation), and increased invasive plant species may adversely affect cover, soil stability, forage base, water chemistry, water temperature, and nutrient levels. Pollutants in the area may affect Colorado River fish by decreasing water quality and impacting the forage base. Lethal and sublethal impacts may result from chemical spills. There may be decreases in reproductive success, and decreases in survival at all life stages (egg, larval, young of year, juvenile, and adult).

## Recreation Management

The recreation program includes providing for and managing recreational access, developing and maintaining recreation areas, issuing special recreation permits, providing information to the public about recreational resources, and assessing effects of recreational use on the natural resources. Under this program, OHV use, camping, rafting, hiking, fishing, boating, swimming, and other activities are allowed in designated areas.

Activities occurring under this program may increase human presence, equipment and vehicle use, vegetation disturbance, and surface disturbance in the drainages of Colorado River fish habitats. These activities may result in direct water channel disturbance, vegetation disturbance or removal, increased occurrence of invasive plant species, and soil disturbance. Direct stream disturbances may adversely change the water channel morphology, structure, and water quality. Vegetation disturbances or removal (including chemical treatment of vegetation), may adversely affect: cover, soil stability, forage base, water chemistry, water temperature, and nutrient levels. Pollutants in the area may decrease water quality and adversely impact the forage base. As a result, there may be decreases in reproductive success, and decreases in survival at all life stages (egg, larval, young of year, juvenile, and adult).

## Riparian Management

The objective of riparian management in Utah is to establish an aggressive riparian area management program that will identify, maintain, restore, and/or improve riparian values to achieve a healthy and productive ecological condition for maximum long-term benefits in order

BLM_0014107