# Monticello Field Office Resource Management Plan Woodlands

## Map 17

**Woodland Harvest Boundaries**
- Cedar Mesa
- Dark Canyon Plateau
- East Canyon
- Harts Draw
- Montezuma Watershed
- North Comb Ridge
- Salt Creek Mesa
- South Cottonwood
- White Canyon

1 : 950,000




Miles

0   5   10   15   20   25   30

No warranty is made by the BLM for use of the data for purposes not intended by the BLM.

This product may not meet BLM standards for accuracy and content. Different data sources and input scales may cause some misalignment of data layers.

Monticello

Blanding

Bluff

Montezuma Creek

Mexican Hat

Moki Canyon

November 2008

BLM

Monticello Field Office / Canyon Country District / Utah BLM

BLM_0014383



Monticello Field Office
Resource Management Plan
Oil and Gas Leasing

Map 18

**Oil & Gas Leasing Stipulations**
- Standard
- Closed
- NSO
- Timing
- CSU
- CSU / Timing

1 : 950,000

Miles
0   5   10   15   20   25   30

No warranty is made by the BLM for
use of the data for purposes not intended
by the BLM.

This product may not meet BLM
standards for accuracy and content
Different data sources and input scales
may cause some misalignment of data layers.

November 2008

BLM

Monticello Field Office / Canyon Country District / Utah BLM

BLM_0014384



**Monticello Field Office
Resource Management Plan
Mineral Material Disposal**

Map 19

**Disposal Category**
- Closed
- Standard
- Special Conditions

1 : 950,000

Miles
0   5   10   15   20   25   30

No warranty is made by the BLM for
use of the data for purposes not intended
by the BLM.

This product may not meet BLM
standards for accuracy and content
Different data sources and input scales
may cause some misalignment of data layers.

November 2008

BLM

Monticello Field Office / Canyon Country District / Utah BLM

BLM_0014385



Monticello Field Office
Resource Management Plan
Cultural Management Areas, Developed Sites,
and Historic Trails

Map 20

Shay Canyon

Newspaper Rock

Butler Wash NHD

Big Westwater Ruin

Butler Wash Ruin

Three Kiva Pueblo

Mule Canyon Ruin

Hovenweep

Sand Island

**Legend:**
- Hole-in-the-Rock Trail
- Old Spanish Trail
- Developed Cultural Sites
- Butler Wash NHD
- Alkali Ridge NHL
- Beef Basin SRMA
- Grand Gulch NHD
- Tank Bench SRMA
- Alkali Ridge ACEC
- Hovenweep ACEC
- Shay Canyon ACEC
- Cedar Mesa SRMA

1 : 950,000

Miles
0   5   10   15   20   25   30

No warranty is made by the BLM for
use of the data for purposes not intended
by the BLM.

This product may not meet BLM
standards for accuracy and content
Different data sources and input scales
may cause some misalignment of data layers.

November 2008

BLM

Monticello Field Office / Canyon Country District / Utah BLM

BLM_0014386

U.S. DEPARTMENT OF THE INTERIOR  **BUREAU O**

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
http://www.blm.gov

October 9, 2008

In Reply Refer To:
3200 (310) P

EMS TRANSMISSION 11/07/2008
Instruction Memorandum No. 2009-022
Expires: 09/30/2010

To:         All State Directors

From:       Assistant Director, Minerals and Realty Management

Subject:    Geothermal Leasing under the Energy Policy Act of 2005 (EPAct)

**Program Area:** Geothermal Program

**Purpose:** This Instruction Memorandum (IM) provides guidance for geothermal leasing.

**Policy/Action:** State Offices that received nominations or expressions of interest filed before August 8, 2005, (the "date of enac
those lands, if available, for competitive leasing under the revised geothermal regulations (see 72 FR 24358, May 2, 2007). The E
(BLM) may also include lands in a competitive lease sale on its own initiative. Offices are encouraged to hold geothermal lease sa
quarterly oil and gas lease sales.

Attachment 1 describes the process for competitive lease sales under the revised geothermal regulations, including the nominatio
nomination form to be used for competitive leasing, Form 3203-1 (2008). Attachment 3 describes the noncompetitive leasing pro
Offer to Lease, Form 3200-42a (2007), which is also used for noncompetitive lease applications.

**Time Frame:** This IM is effective immediately.

**Budget Impact**: Implementation of the policies outlined in this IM can be accomplished under existing budget allocations.

**Background:** The final rulemaking for 43 CFR Parts 3200 and 3280 was published in the Federal Register on May 2, 2007, and b
2007. The final rule revised the existing regulations governing Geothermal Resource Leasing and Geothermal Resources Unit Agre
EPAct's geothermal provisions. The EPAct eliminated the previous two-tier leasing program and replaced it with a competitive leas
and gas leasing system. In addition, the EPAct provides for four circumstances where noncompetitive leasing is permitted. See 43
3 and 4, including noncompetitive "direct use" leases in areas determined to be appropriate for exclusive direct use, without sale,
commercial generation of electricity.

In contrast to the previous limitation that competitive leasing occur only in Known Geothermal Leasing Areas, the EPAct requires
geothermal leasing first be offered competitively to the highest qualified bidder, with the following exceptions: (1) Those parcels
available noncompetitively for a period of two years following the competitive lease sale, and (2) Lands designated for (a) direct u
which grandfathered noncompetitive lease applications were pending on August 8, 2005; and (c) under certain circumstances, lan
claims are not subject to the competitive lease process.

Noncompetitive direct use leases may be issued in areas designated by the BLM as being appropriate for direct uses only (for exa
unsuitable in that location due to unacceptable impacts on other resource uses or users). A noncompetitive direct use lease may
determines that there is no competitive interest. If there is competitive interest in an area otherwise deemed appropriate for excl
be offered at the next competitive lease sale as a standard geothermal lease, but with a stipulation restricting operations to direc
direct use areas in response to an application.

**Manual/Handbook Sections Affected:** This guidance will be incorporated into the BLM Manual Handbooks in the 3200 series v

**Coordination:** This guidance was coordinated with the Land and Resources Project Office Project Manager, the National Lease Sa
and senior field office geothermal program managers and adjudicators.

**Contact:** If you have questions or concerns, please contact me at 202-208-4201, or by e-mail at Mike_Nedd@blm.gov, or your s
Witherbee, National Geothermal Program Manager, at 202-452-0385, or by e-mail at Kermit_Witherbee@blm.gov.

Signed by:                          Authenticated by:
Michael Nedd                     Robert M. Williams

BLM_0014387

Case No. 1:20-cv-02484-MSK   Document 30   filed 04/27/21   USDC Colorado   pg 6 of 212

Assistant Director                           Division of IRM Governance,WO-560
Minerals and Realty Management

4 Attachments
    1 – Competitive Geothermal Lease Process (3 pp)
    2 – Competitive Lease Nomination Form 3203-1 (2 pp)
    3 – Noncompetitive Geothermal Leasing (3 pp)
    4 – Offer to Lease and Lease for Geothermal Resources (for new Leases Issued under the
       Energy Policy Act of 2005 with noncompetitive leasing application -Form 3200-24a          (3 pp)

Last updated: 10-20-2009

BLM_0014388

# COMPETITIVE GEOTHERMAL LEASE PROCESS

**Competitive Geothermal Lease Sale Nomination Process (43 CFR 3203)**

The Bureau of Land Management (BLM) will accept nominations to include certain described lands in its next geothermal lease sale at the appropriate BLM State Office.

Nominations must be submitted in writing on Form 3203-10 (2008), Nomination of Lands for Competitive Geothermal Leasing (attachment 2). Lands surveyed under the public land survey system are to be described to the nearest aliquot part. Each nomination is to be no larger than 5,120 acres, unless the area includes one or more irregular subdivisions.

A nominator may submit more than one nomination. Each nomination requires a nonrefundable filing fee (see 43 CFR 3203.12), currently $100 plus $0.10 per acre, rounded up to the nearest acre. The fee is updated annually.

Collecting the Nomination Fee:
A fee of $100 plus $0.10 per acre must accompany the nomination filing. This fee will be receipted into the following Commodity, Subject, Action (CSA) in the Collections & Billing System (CBS).

> C: Geothermal
> S: Competitive
> A: Nomination Fee (5104)
>
> Project Code: GEOT
> **Note:** The Project Code is hard-coded within CBS so no entry is necessary.
>
> Authorization Number: The Serial Number associated with the nominated lands must be entered into the Authorization Number Field.
>
> The funds received for the Nomination will interface to case information in LR2000 Case Recordation via LR2000 Action Code 035 (Nomination Fee Received).

Expending the Fees:
Funds receipted into Sub-activity 5104 may be used for adjudicative actions associated with the lands nominated for leasing. These funds may be expended immediately upon receipt without further appropriation. However, expenditures must not exceed the collected amount. Use Program Element (PE) EI and Project Code when coding expenditures.

A nominator may request that lands be offered as a block, or the BLM may offer leases as a block on its own initiative for competitive sale. The block request must specify that the lands will be associated with a project or unit and include information to support the request. The BLM may require the nominator to submit additional information to support the request.

Attachment 1-1

**Geothermal Lease Sale Process (43 CFR 3203)**

<u>Sale Frequency</u>:  The EPAct requires that a sale be held at least every 2 years when parcels are available.  The requirement that lands be "available" means both that the lands are open to geothermal leasing consistent with the terms of the applicable land use plan, and also that adequate pre-leasing National Environmental Protection Act (NEPA) compliance has been completed.  Nominated lands cannot be included in a lease sale until the BLM confirms that leasing conforms to the land use plan and all NEPA requirements have been met.

Offices are encouraged to hold geothermal lease sales in conjunction with quarterly oil and gas lease sales when lands are available.  The BLM may include lands in a competitive lease sale on its own initiative.

<u>Sale Notice</u>:  The BLM will post a notice of the parcels to be included in the sale, with appropriate stipulations or restrictions on use, along with the time, date, location, and sale format and procedures.

<u>Parcel withdrawal or sale cancellation</u>:  The BLM may withdraw parcels before the sale begins.  If parcels are withdrawn, a notice will be posted in the State Office Information Access Center (Public Room) before the day of the sale.  Withdrawn parcels will be announced before the sale begins.

<u>Payment due</u>:  A bidder may not withdraw a bid, since the bid is a legally binding commitment.  A successful bidder is legally obligated to sign the bid form if one has not already been submitted, accept the lease, and pay the money due on the day of the sale.  Payment due by close of business on the day of the sale includes the following:  (1) 20 percent of the bid; (2) the total amount of the first year rental (currently $2 per acre); and (3) the competitive lease application processing fee.  The lease application processing fee is currently $140,  updated annually (see 43 CFR 3000.12).  All payments must be paid by close of official business hours on the day of the sale unless the BLM specifies another time.  Within 15 calendar days after the day of the sale, the balance of the bid must be submitted to either the BLM office that conducted the sale or the office serving those lands nominated, as specified in the sale notice.

<u>Forms of payment</u>:  Payment must be by personal check, cashier's check, certified check, bank draft, money order, wire transfer, or credit card (Discover, Visa, American Express, or MasterCard only), subject to the limitations below.  Checks must be made payable to:  The U.S. Department of the Interior, Bureau of Land Management.  Cash will not be accepted.  A certified check may be required if a check received in the past has been returned for insufficient funds.  If payment is by credit card, the bidder must remain available until the BLM has determined that the transaction is accepted.  If the transaction is refused, the bidder must pay by another means and an extension of time to pay the money will not be granted.

<u>Limitations on Credit Cards and Debit Payments</u>:  In accordance with National Business Center Instruction Memorandum No. 2005-008, Change 1, dated December 13, 2004, effective February 1, 2005, credit or debit cards cannot be used for any amount in excess of $99,999.99 for any purpose.

Attachment 1-2

<u>Bid Form</u>:  On the day of the sale, the successful bidder must give the BLM a properly completed and signed Competitive Bid Form 3000-2, (2007) with the payment.  This form is a legally binding offer by the prospective lessee to accept a lease and all its terms and conditions.  Once the form is signed, it is binding and cannot be changed.  A bid form that has information crossed out or is otherwise altered will not be accepted.

<u>Lease Issuance</u>:  Once a bid form has been accepted and all the monies due have been paid, the lease Form 3200-24a may be issued.  The lease is effective the first day of the month following the month in which it is signed by the authorized officer.

Attachment 1-3

BLM_0014391

Form 3203-1
(September  2008)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**NOMINATION OF LANDS FOR COMPETITIVE GEOTHERMAL LEASING**

## *READ INSTRUCTIONS BEFORE COMPLETING*

| 1.  Name | 1a.  Street | |
|---|---|---|
| 1b. City | 1c.  State | 1d.  Zip Code |

2.  Surface managing agency if other than BLM:_____Unit/Project:_____ _____

Legal description of land requested (segregate by public domain and acquired lands):

| T. | R. | Section | Meridian | State | County |
|---|---|---|---|---|---|

| 3.  ☐  Check if this nomination is part of a block nomination.  Include supporting information (see instructions). | 3a.  Total Acres Nominated: _____ |
|---|---|

4.  Amount Remitted (43 CFR 3203.12):   Filing Fee:  $_____   + Acres x $0.10:  $_____   = Total:  $ _____

5.  Nominated lands cannot be included in a lease sale until BLM confirms that leasing conforms to the land use plan and all National Environmental Policy Act requirements have been met.

_____        _____        _____
(Printed Name of Nominator or Attorney-in-Fact)        ( Signature of Nominator or Attorney-in-Fact)        (Date)

Title 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

(Continued on page 2)

BLM_0014392

# INSTRUCTIONS

**A.    General**

1.    Entries must be typed or printed plainly in ink.  The nominator must sign the form (item 5) in ink.

2.    This offer must be filed in the proper BLM State Office serving the nominated lands.  See regulations at 43 CFR 1821.10 for office locations.

3.    Submit only one nomination per form.

4.    If more space is needed, additional sheets must be attached to each copy of the form submitted.

5.    Two or more nominations may be requested to be sold as a block (43 CFR 3203.11).  Check the box in Item 3.  Block nominations must include information to support your request and whether the lands requested will be identified with a project or unit.

**B.    Specific**

Item 1—Enter the nominator's name and billing address.

Item 2—Indicate the agency managing the surface use of the land and, for a block nomination, the name of the unit or project of which the land is a part. The nominator may also provide other information that will assist in establishing status of the lands being nominated.  The description of land must conform to 43 CFR 3203.10.  Each nomination may not exceed 5,120 acres, unless the area to be leased includes an irregular subdivision (43 CFR 3203.10).

Payments:  Each nomination must include a filling fee that is found in the fee schedule at 43 CFR 3000.12.  If the total acreage nominated contains fractional acreage, the per-acre fee must be rounded up to the next whole acre.


# NOTICE

The Privacy Act of 1974 and the regulation at 43 CFR 2.48(d) provide that you be furnished with the following information in connection with information required by this geothermal lease nomination.
AUTHORITY:  30 U.S.C. 1000 et seq.
PRINCIPAL PURPOSE—The information is to be used to process geothermal lease nominations.
ROUTINE USES:  (1)  The adjudication of the nomination for leasing of geothermal resources. (2)  Documentation for public information in support of notations made on land status records for the management, disposal, and use of public lands and resources. (3)  Transfer to appropriate Federal agencies when concurrence is required prior to granting uses or rights in public lands or resources.  (4)  Transfer to the appropriate Federal, State, local, or foreign agencies, when relevant to civil, criminal, or regulatory investigations or prosecutions.

EFFECT OF NOT PROVIDING INFORMATION—If all the information is not provided, the nomination may be rejected.  See regulations at 43 CFR Part 3200.

BLM_0014393

## NONCOMPETITIVE GEOTHERMAL LEASING

### Two-Year Window Noncompetitive Leasing (43 CFR 3204.5, .10, and .11)

Lands that do not receive a bid at a competitive lease sale are available on a first-come, first-served basis for a two-year period beginning the day after the sale.

An Offer to Lease, Form 3200-24a (2008), must be properly completed and signed. **Note:** The lease form may be copied; however, the document's first two pages are required to be on one page, double-sided. If the form's first two pages are not on a double-sided single page, or if an obsolete lease form is used, the offer will be rejected.

A payment consisting of the filing fee, currently $360 and updated annually as provided in 43 CFR 3000.12, and the advance first year rental of $1 per acre (rounded up to the nearest acre) must be submitted with the Offer to Lease.

Multiple applications filed on the same parcel the day after the competitive lease sale will be considered simultaneously filed, and the winner will be picked at random at the close of business that day.

A parcel will maintain its integrity for a period of 30 days following the sale. After the 30-day period, the lands may be reconfigured provided they are reasonably compact.

### Noncompetitive Leasing for Lands Subject to a Mining Claim (43 CFR 3204.12)

A noncompetitive geothermal lease may be issued to a mining claimant who has a current approved plan of operations. Lands available are limited to those described in 43 CFR 3204.12, that is, lands "within" a mining claim. Lode claimants whose claims are described in metes-and-bounds may be asked to submit additional information, such as a plat map with information to tie monuments identified on the plat to the nearest surveyed corner or aliquot corner. The applicant must submit two executed copies of the lease application Form 3200-24a, the filing fee, first-year rental, documentation of mining claim ownership, and the current approved plan of operations for the mine. For this type of noncompetitive lease, there are no restrictions on utilization of the resource which may be used directly, sold to a purchaser, or used for the commercial generation of electricity.

### Direct Use Leasing (43 CFR 3205)

A direct use lease is a lease that is issued noncompetitively in an area that the Bureau of Land Management (BLM) determines is appropriate for exclusive direct use of the geothermal resources. The lease is for direct use operations, without sale of the resource or any resulting electricity, and is to be used for purposes other than commercial generation of electricity. Generation of electricity for use on the lease is permitted. The area of land applied for may not be greater than what is reasonably necessary for the proposed direct use.

Attachment 3-1

The BLM may consider a noncompetitive direct use lease application regardless of whether the lands covered by the application are in an area that the BLM has already designated as appropriate for exclusive direct use.  However, the BLM must ensure that all of the conditions listed at 43 CFR 3205.6 are met, in addition to confirming land use plan conformance and pre-leasing National Environmental Policy Act compliance, before the BLM may issue a direct use lease.  These conditions include:

- The lands applied for are open for geothermal leasing;

- The BLM determines (after appropriate consultation if other surface management agencies are involved) that the lands are appropriate for exclusive direct use, without sale, for purposes other than commercial generation of electricity;

- The acreage does not exceed the quantity of acreage reasonably necessary for the proposed use;

- The BLM publishes a notice of the land proposed for a direct use for 90 days before issuing the lease;

- During the 90-day period beginning on the date of publication, BLM does not receive a nomination to include the land in a future competitive lease sale;

- The BLM determines there is no competitive interest in the resource; and

- The applicant is the first qualified applicant.

If the BLM has determined that the lands are appropriate for exclusive direct use and there is competitive interest, the lands may be offered at a competitive lease sale.  The successful bidder will then be offered a competitive geothermal lease that is limited to direct use.  Unlike a direct use lease, the resources may be sold, but the resource may not be used by the operator or a purchaser for the commercial generation of electricity.  The acreage limitation for this type of lease is the same as a standard lease.

**Noncompetitive Lease Applications Pending on August 8, 2005 (43 CFR 3204.13)**

Noncompetitive lease applications pending on August 8, 2005, (grandfathered) will be processed under policies and procedures existing on that date unless the applicant notifies the BLM in writing that the applicant elects to convert the application to the competitive leasing process specified in the new regulations.  This election will be considered a nomination for future competitive sale offerings.  The $75 fee previously submitted with the lease application will be retained by the BLM and no nomination fee will be required.  Use action code AC103, Additional Info Rec'd, with an entry in action remarks, "conversion rqst recd."

Grandfathered lease applications may be issued using the lease Form 3200-024 (2001) and will be subject to the regulations in effect on August 8, 2005.  A lessee whose lease was issued on or after August 8, 2005, but before June 1, 2007, may elect to convert the lease or royalty rate by

Attachment 3-2

December 1, 2008 (see 43 CFR 3200.8).  The election to convert for leases issued on or after June 1, 2007, must be made prior to lease issuance (see 43 CFR 3200.8).

**Note Regarding Oil and Gas Lessees:**

Oil and gas lessees must have a competitive geothermal lease in order to use geothermal resources unless the lease was issued under one of the above leasing provisions.

Attachment 3-3

BLM_0014396

Print    Reset

Form 3200-24a
(September 2008)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**OFFER TO LEASE AND LEASE FOR GEOTHERMAL RESOURCES**
**(For New Leases Issued Under the Energy Policy Act of 2005 [August 5, 2005])**

Serial No.

The undersigned (see page 2) offers to lease all or any of the lands in item 2 that are available for lease pursuant to the Geothermal Steam Act of 1970, as amended (30 U.S.C. 1001-1025).

**READ INSTRUCTIONS BEFORE COMPLETING**

| 1. Name | 1a. Street | |
|---|---|---|
| 1b. City | 1c. State | 1d. Zip Code |

2. Surface managing agency if other than BLM: _____    Unit/Project: _____

Legal description of land requested (segregate by public domain and acquired lands):  Enter T., R., Meridian, State and County

Total Acres Applied for _____

Percent U.S. interest _____

Amount remitted:    Processing Fee  $ _____    Rental Fee  $ _____    Total  $ _____

**DO NOT WRITE BELOW THIS LINE**

3.  Land included in lease:  Enter T., R., Meridian, State and County

Total Acres in Lease _____

Rental Retained  $ _____

In accordance with the above offer, or the previously submitted competitive bid, this lease is issued granting the exclusive right to drill for, extract, produce, remove, utilize, sell, and dispose of all the geothermal resources in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, for a primary term of 10 years and subsequent extensions thereof in accordance with 43 CFR subpart 3207. Rights granted are subject to: applicable laws; the terms, conditions, and attached stipulations of this lease; the Secretary of the Interior's regulations and formal orders in effect as of lease issuance; and, when not inconsistent with the provisions of this lease, regulations and formal orders hereafter promulgated.

Type of Lease:

☐ Competitive

☐ Noncompetitive

☐ Noncompetitive direct use (43 CFR subpart 3205)

Comments:

THE UNITED STATES OF AMERICA

BY _____
(Signing Official)

_____
(Printed Name)

_____    _____
(Title)                          (Date)

EFFECTIVE DATE OF LEASE _____

Check if this is a converted lease ☐

EFFECTIVE DATE OF LEASE CONVERSION _____

(Continued on page 2)

BLM_0014397

4. (a)  The undersigned certifies that:

(1) The offeror is a citizen of the United States; an association of such citizens;  a municipality; or a corporation organized under the laws of the United States, any State or the District of Columbia; (2)  All parties holding an interest in the offer are in compliance with 43 CFR part 3200 and the authorizing Act; (3)  The offeror's chargeable interests, direct and indirect, do not exceed those allowed under the Act; and (4)  The offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b)  The undersigned agrees that signing this offer constitutes acceptance of this lease, including all terms, conditions and stipulations of which the offeror has been given notice.  The offeror further agrees that this offer cannot be withdrawn, either in whole or part, unless the withdrawal is received by the proper BLM State Office before this lease, an amendment to this lease, or a separate lease, whichever covers the land described in the withdrawal, has been signed on behalf of the United States.

This offer will be rejected and will afford the offeror no priority if it is not properly completed and executed in accordance with the regulations or if it is not accompanied by the required payments. Title 18 U.S.C. § 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

Duly executed this _____ day of _____, 20____.

| (Printed Name of Lessee or Attorney-in-fact) | (Signature of Lessee or Attorney-in-fact) |

## LEASE TERMS

Sec. 1. Rentals—Rentals must be paid to the proper office of the lessor in advance of each lease year. Annual rental rates per acre or fraction thereof, as applicable, are:

(a)  Noncompetitive lease (includes post-sale parcels not receiving bids, a direct use lease or a lease issued to a mining claimant): $1.00 for the first 10 years, thereafter $5.00; or

(b) Competitive lease: $2.00 for the first year; $3.00 for the second through tenth year; thereafter $5.00.

Annual rental is always due by the anniversary date of this lease (43 CFR 3211.13), regardless of whether the lease is in a unit or outside of a unit, and in production or not, or royalties or direct use fees apply to the production.

Rental may only be credited toward royalty under 43 CFR 3211.15 and 30 CFR 218.303.  Rental may not be credited against direct use fees.  Failure to pay annual rental timely will result in late fees and will make the lease subject to termination in accordance with 43 CFR 3213.14.

Sec. 2. (a) Royalties—Royalties must be paid to the proper office of the lessor. Royalties are due on the last day of the month following the month of production. Royalties will be computed in accordance with applicable regulations and orders. Royalty rates for geothermal resources produced for the commercial generation of electricity but not sold in an arm's length transaction are: 1.75 percent for the first 10 years of production and 3.5 percent after the first 10 years.  The royalty rate is to be applied to the gross proceeds derived from the sale of electricity in accordance with 30 CFR part 206 subpart H.

The royalty rate for byproducts derived from geothermal resource production that are minerals specified in section 1 of the Mineral Leasing Act (MLA), as amended (30 U.S.C. 181), is 5 percent, except for sodium compounds, produced between September 29, 2006 and September 29, 2011 (Pub. L. No. 109-338, §102; note to 30 U.S.C. 362) for which the royalty rate is 2 percent.  No royalty is due on byproducts that are not specified in 30 U.S.C. § 181.  (43 CFR 3211.19.)

If this lease or a portion thereof is committed to an approved communitization or unit agreement and the agreement contains a provision for allocation of production, royalties must be paid on the production allocated to this lease.

(b) Arm's length transactions—The royalty rate for geothermal resources sold by you or your affiliate at arm's length to a purchaser is 10 percent of the gross proceeds derived from the arm's-length sale (43 CFR 3211.17, 3211.18).

(c) Advanced royalties—In the absence of a suspension, if you cease production for more than one calendar month on a lease that is subject to royalties and that has achieved commercial production, your lease will remain in effect only if you make advanced royalty payments in accordance with 43 CFR 3212.15(a) and 30 CFR 218.305.

(d) Direct use fees—Direct use fees must be paid in lieu of royalties for geothermal resources that are utilized for commercial, residential, agricultural, or other energy needs that are not for the commercial production or generation of electricity, but not sold in an arm's length transaction (43 CFR 3211.18; 30 CFR 206.356). This requirement applies to any direct use of federal geothermal resources (unless the resource is exempted as described in 30 CFR 202.351(b) or the lessee is covered by paragraph (e), below) and is not limited to direct use leases.  Direct use fees are due on the last day of the month following the month of production. (e) If the lessee is a State, tribal, or local government covered by 43 CFR 3211.18(a)(3) and 30 CFR 206.366, check here: ☐.  A lessee under this paragraph is not subject to paragraph (d), above.  In lieu of royalties, the lessee under this paragraph must pay a nominal fee of
$_____.

Sec. 3. Bonds—A bond must be filed and maintained for lease operations as required by applicable regulations.

Sec. 4. Work requirements, rate of development, unitization, and drainage—Lessee must perform work requirements in accordance with applicable regulations (43 CFR 3207.11, 3207.12), and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessee reserves the right to specify rates of development and production and to require lessee to commit to a communitization or unit agreement, within 30 days of notice, if in the public interest.  Lessee must drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in the amount determined by lessor.  Lessor will exempt lessee from work requirements only where the lease overlies a mining claim that has an approved plan of operations and where BLM determines that the development of the geothermal resource on the lease would interfere with the mining operation (43 CFR 3207.13).

Sec. 5. Documents, evidence, and inspection—Lessee must file with the proper office of the lessor, not later than (30) days after the effective date thereof, any contract or evidence of other arrangement for the sale, use, or disposal of geothermal resources, byproducts produced, or for the sale of electricity generated using geothermal resources produced from the lease. At such times and in such form as lessor may prescribe, lessee must furnish detailed statements and all documents showing (a) amounts and quality of geothermal resources produced and used (either for commercial production or generation of electricity, or in a direct use operation) or sold; (b) proceeds derived therefrom or from the sale of electricity generated using such resources; (c) amounts that are unavoidably lost or reinjected before use, used to generate plant parasitic electricity (as defined in 30 CFR 206.351) or electricity for lease operations, or otherwise used for lease operations related to the commercial production or generation of electricity; and (d) amounts and quality of all byproducts produced and proceeds derived from the sale or disposition thereof. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest.

In a format and manner approved by lessor, lessee must keep a daily drilling record, a log, and complete information on well surveys and tests; keep a record of subsurface investigations; and furnish copies to lessor when required.

Lessee must keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee must maintain copies of all contracts, sales agreements, accounting records, billing records, invoices, gross proceeds and payment data regarding the sale, disposition, or use of geothermal resources, byproducts produced, and the sale of electricity generated using resources produced from the lease, and all other information relevant to determining royalties or direct use fees. All such records must be maintained in lessee's accounting offices for future audit by lessor and produced upon request by lessor or lessor's authorized representative or agent. Lessee must maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor.

Sec. 6. Conduct of operations—Lessee must conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. Lessee must take reasonable measures deemed necessary by lessor to accomplish the intent of this section. To the extent consistent with leased rights granted, such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the approval of easements or rights-of-way. Such uses will be conditioned so as to prevent unnecessary or unreasonable interference with rights of lessee.  Prior to disturbing the surface of the leased lands, lessee must contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessor may require lessee to complete minor inventories or short term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee must immediately contact lessor. Lessee must cease any operations that are likely to affect or take such species, or result in the modification, damage or destruction of such habitats or objects.

Sec. 7. Production of byproducts—If the production, use, or conversion of geothermal resources from these leased lands is susceptible of producing a valuable byproduct or byproducts, including commercially demineralized water for beneficial uses in accordance with applicable State water laws, lessor may require substantial beneficial production or use thereof by lessee.

Sec. 8. Damages to property—Lessee must pay lessor for damage to lessor's improvements, and must save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9. Protection of diverse interests and equal opportunity—Lessee must maintain a safe working environment in accordance with applicable regulations and standard industry practices, and take measures necessary to protect public health and safety. Lessee reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. Lessee must comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractor may maintain segregated facilities.

Sec. 10. Transfer of lease interests and relinquishment of lease—As required by regulations, lessee must file with lessor any assignment or other transfer of an interest in this lease. Subject to the requirements of 43 CFR subpart 3213, lessee may relinquish this lease or any legal subdivision by filing in the proper office a written relinquishment, which will be effective as of the date BLM receives it, subject to the continued obligation of the lessee and surety to be responsible for:  paying all accrued rentals and royalties; plugging and abandoning all wells on the relinquished land; restoring and reclaiming the surface and other resources; and complying with 43 CFR 3204.4.

Sec. 11. Delivery of premises—At such time as all or portions of this lease are returned to lessor, lessee must place all wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells or continued protection of the environment.

Sec. 12. Proceedings in case of default—If lessee fails to comply with any provisions of this lease or other applicable requirements under 43 CFR 3200.4, and the noncompliance continues for 30 days after written notice thereof, this lease will be subject to termination in accordance with the Act and 43 CFR 3213. This provision will not be construed to prevent the exercise by lessor of any other legal and equitable remedy or action, including waiver of the default. Any such remedy, waiver, or action will not prevent later termination for the same default occurring at any other time. Whenever the lessee fails to comply in a timely manner with any of the provisions of the Act, this lease, the regulations, or other applicable requirements under 43 CFR 3200.4, and immediate action is required, the lessor may enter on the leased lands and take actions deemed necessary to correct the failure at the lessee's expense.

Sec. 13. Heirs and successors-in-interest—Each obligation of this lease will extend to and be binding upon, and every benefit hereof will inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

(Continued on page 3)                                                                 (Form 3200-24a, page 2)

BLM_0014398

## INSTRUCTIONS

A.  General

1.   Items 1 and 2 need to be completed only by parties filing for a noncompetitive lease.  The BLM will complete the front of the form for other types of leases.  The BLM may use the "Comments" space under Item 3 to identify when:  the lessee has elected to make all lease terms subject to the Energy Policy Act of 2005 under 43 CFR 3200.7(a)(2) or 43 CFR 3200.8(b) (box labeled "converted lease" must also be checked); the lease is being issued noncompetitively to a party who holds a mining claim on the same lands as is covered by the lease under 43 CFR 3204.12; the lease is a direct use lease issued to a State, local, or tribal government (box at section 2(e) under Lease Terms must also be checked); the lease is a competitive lease with direct-use-only stipulations attached; or other special circumstances exist.  A lessee who seeks to convert only the royalty rate of a lease under 43 CFR 3212.25 or who qualifies for a case-by-case royalty rate determination under 43 CFR 3211.17(b)(1)(i) should not use this form, but should instead use an addendum to the existing lease.

2.   Entries must be typed or printed plainly in ink.  The offeror must sign the form (Item 4) in ink.

3.   An original and two copies of this offer must be prepared and filed in the proper BLM State Office.  See regulations at 43 CFR 1821.10 for office locations.

4.   If more space is needed, additional sheets must be attached to each copy of the form submitted.

B.  Specific

Item 1—Enter the offeror's name and billing address.

Item 2—Indicate the agency managing the surface use of the land and the name of the unit or project of which the land is a part.  The offeror may also provide other information that will assist in establishing status of the lands.  The description of land must conform to 43 CFR 3203.10.  Total acres applied for must not exceed that allowed by regulations (43 CFR 3203.10; 43 CFR 3206.12).

Payments:  For noncompetitive leases, the amount remitted must include the processing fee for noncompetitive lease applications (43 CFR 3204.10; 43 CFR 3000.12) and the first year's rental at the rate of $1 per acre or fraction thereof.  If the United States owns only a fractional interest in the geothermal resources, you must pay a prorated rental under 43 CFR 3211.11(d).  The BLM will retain the processing fee even if the offer is completely rejected or withdrawn.  To maintain the offeror's priority, the offeror must submit rental sufficient to cover all the land requested.  If the land requested includes lots or irregular quarter-quarter sections, the exact acreage of which is not known to the offeror, rental should be submitted on the assumption that each such lot or quarter-quarter section contains 40 acres.  If the offer is withdrawn or rejected in whole or in part before a lease issues, the BLM will return the rental remitted for the parts withdrawn or rejected.

The BLM will fill in the processing fee for competitive lease applications (43 CFR 3203.17; 43 CFR 3000.12) and the first year's rental at the rate of $2 per acre or fraction thereof.

Item 3—The BLM will complete this space.

## NOTICES

The Privacy Act of 1974 and the regulation at 43 CFR 2.48(d) provide that you be furnished with the following information in connection with information required by this geothermal lease application.
AUTHORITY:  30 U.S.C. 1000 et seq.
PRINCIPAL PURPOSE—The information is to be used to process geothermal lease applications.
ROUTINE USES:  (1) The adjudication of the lessee's rights to the land or resources.  (2) Documentation for public information in support of notations made on land status records for the management, disposal, and use of public lands and resources.  (3) Transfer to appropriate Federal agencies when concurrence is required prior to granting uses or rights in public lands or resources.  (4)  Transfer to the appropriate Federal, State, local, or foreign agencies, when relevant to civil, criminal, or regulatory investigations or prosecutions.

BLM_0014399

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
http://www.blm.gov

December 19, 2008

In Reply Refer To:
2800 (350) P

EMS TRANSMISSION 12/22/2008
Instruction Memorandum No. 2009-043
Expires: 09/30/2010

To:             All Field Officials

From:           Director

Subject:        Wind Energy Development Policy

**Program Area:** Right-of-Way Management, Wind Energy.

**Purpose:** This Instruction Memorandum (IM) provides updated guidance on processing right-of-way applications for wind energy projects on public lands administered by the Bureau of Land Management (BLM).

**Policy/Action:** This IM updates and replaces the Wind Energy Development Policy (IM 2006-216), issued August 24, 2006, and the Interim Wind Energy Development Policy (IM 2003-020), issued October 16, 2002. In addition, this IM further clarifies the BLM Wind Energy Development policies and best management practices (BMPs) provided in the Wind Energy Development Programmatic Environmental Impact Statement (EIS) of June 2005. Issuance of this IM ensures BLM-wide consistency in the processing of right-of-way applications and the management of authorizations for wind energy site testing and development on the public lands. The initiation of any new planning effort to create, revise, or amend a BLM land use plan will comply with policy provided in this IM. Land use planning efforts already underway will be assessed on a case-by-case basis to determine any necessary modifications or amendments.

**Inventory and Planning:** The BLM Land Use Planning Handbook (H-1601-1) requires that land use planning efforts address existing and potential development areas for renewable energy projects, including wind energy (see H-1601-1, Appendix C, II. Resource Uses, Section E. Lands and Realty). The BLM encourages the development of wind energy within acceptable areas, consistent with the Energy Policy Act of 2005 and the BLM Energy and Mineral Policy (August 26, 2008).

In October 2003, the BLM initiated the preparation of a Wind Energy Development Programmatic EIS to address the impacts of the future development of wind energy resources on public lands. The Department of Energy's (DOE) National Renewable Energy Laboratory (NREL) assisted the BLM in the preparation of the Programmatic EIS and provided an inventory assessment of wind energy resources on public lands in the Western United States. Appendix B of the Programmatic EIS includes wind resource potential maps for each BLM field office. The Programmatic EIS Record of Decision (ROD) addressed the amendment of individual BLM land use plans and established both policies and BMPs regarding the development of wind energy resources on BLM-administered public lands. The revised BLM wind energy policies and BMPs are included as Attachment 1 to this IM. Wind energy site testing and monitoring activities are typically in conformance with existing land use plans and, therefore, a land use plan amendment to address these activities is not likely to be necessary.

In cases where wind energy development proposals are not in conformance with an existing land use plan, it may be appropriate to amend the land use plan concurrently using the same analysis for the wind energy development proposal. Field offices with land use plans that were not amended by the Programmatic EIS Record of Decision may amend their plans at anytime by following the requirements under 43 CFR 1610.5-5. When considering a proposed plan amendment, field offices will tier to, or incorporate analysis from, the Programmatic EIS as appropriate under Chapter V of the BLM National Environmental Policy Act (NEPA) Handbook (H-1790-1).

All land use planning efforts initiated after the issuance of this IM will address wind resource potential, public concerns, and opportunities for wind energy development within the land use planning area consistent with

BLM_0014400

the BLM Land Use Planning Handbook (appendix C). Field offices will incorporate wind energy resource development potential in these planning efforts to facilitate the processing of future wind energy applications. The land use plan revision process will address the environmental and public concern issues associated with commercial wind energy development. This will provide an opportunity to potentially reduce the amount of additional environmental review and documentation required to process a specific application in the future.

Information on wind energy resources is available at www.energyatlas.org. In addition, wind resources information is also available from the Department of Energy site at www.eere.energy.gov/windandhydro/windpoweringamerica/wind_maps.asp. Field offices are encouraged to use this information as the inventory base for land use planning.

Visual Resource Management (VRM)

The BLM Land Use Planning Handbook requires that VRM management classes be identified in land use plans based on inventories of visual resources as well as management considerations for other potential land uses (e. g., wind energy development). The VRM management classes may differ from VRM inventory classes based on the management priorities for land uses in an area. The VRM management classes are intended to establish landscape management objectives for a variety of surface disturbing activities. The VRM management classes are not intended to be used to exclude or preclude land uses, including opportunities for development of wind energy in areas with high wind energy resource potential.

Therefore, it is critical that when the BLM makes land use decisions it considers the attainability and manageability of VRM objectives relative to the wind energy resources and development potential and is consistent with our national energy priorities.

The VRM management class designations must be carefully considered in areas with high wind energy resource potential (wind power class 5 and above). This is especially important when considering the differences in resource management constraints relative to VRM Class II and Class III management classes in a planning area. The goal of the VRM program is to apply the basic principles of design of wind energy projects at the site-specific project level to mitigate or minimize visual resource impacts and meet VRM objectives established in the land use plan. In many cases, VRM management objectives designated at the land use planning level can be met through strategic placement of facilities and thoughtful design treatments that visually integrate the facilities into the landscape setting, thereby avoiding unnecessary land use plan restrictions. Performing Geographic Information Systems-based (GIS) viewshed analyses in areas of high wind energy resource potential and high visual resource values during land use planning can assist in determining suitability and compatibility between these resources, promote more integrated resource management, and avoid unwarranted exclusion and avoidance designations. Application of state-of-the-art digital terrain modeling and visual simulations as well as an integrated environmental design approach to project planning will go far to successfully integrate wind energy projects into the visual landscape. Conducting such analyses will provide the BLM with more objective criteria and defensible analysis to base VRM management class designations in the future. The BLM and wind energy operators will work collaboratively to seek creative ways to provide for renewable energy development while protecting visual resource values on the public lands.

Wildlife and Migratory Birds

In July 2003, the Fish and Wildlife Service (FWS) issued "Voluntary Interim Guidelines to Avoid and Minimize Wildlife Impacts from Wind Turbines." The guidelines are currently being reviewed by a Wind Turbine Guidelines Advisory Committee established under the Federal Advisory Committee Act (FACA) to provide further advice and recommendations to the Secretary of the Interior (Secretary) on effective measures to avoid or minimize impacts to wildlife and their habitats from wind energy facilities. The voluntary interim guidelines are not mandatory requirements in BLM land use plan decisions. Until the Secretary determines the applicability of final guidelines for the Department of the Interior (DOI) agencies, the FWS interim guidelines should only be used as a general guide to assist the BLM in siting decisions and the design of pre-development surveys, mitigation measures, and post-construction monitoring for site-specific projects.

The BLM Washington Office IM 2008-050 (December 18, 2007) provides interim guidance for Federal responsibilities under the Migratory Bird Treaty Act. This guidance addresses analysis of BLM land use planning decisions to avoid or minimize measurable negative impacts to migratory bird populations. The BLM guidance on migratory birds and the FWS guidelines may be used for site-specific wind energy projects to assist in developing mitigation measures for avoiding or minimizing impacts to wildlife and avoiding or minimizing measurable negative impacts to

BLM_0014401

migratory birds. The BLM 6840 Manual also provides guidance on Special Status Species Management.

Areas of Critical Environmental Concern (ACEC)

The BLM will not issue right-of-way authorizations for wind energy development for areas in which wind energy development is incompatible with specific resource values. Specific lands excluded from wind energy site testing and monitoring and wind energy development include designated areas that are part of the National Landscape Conservation System (NLCS) (e.g., Wilderness Areas, Wilderness Study Areas, National Monuments, National Conservation Areas, Wild and Scenic Rivers, and National Historic and Scenic Trails). Wind energy development is permitted in one National Conservation Area, the California Desert Conservation Area (CDCA), in accordance with the provisions of the *California Desert Conservation Area Plan 1980*.

The Wind Energy Programmatic EIS established the previous policy that all ACECs were to be excluded from wind development. This IM changes this policy to ensure consideration of the purpose and specific environmental sensitivities for which the area was designated. All new, revised, or amended land use planning efforts will address and analyze ACEC land use restrictions individually, including restrictions to wind energy development. For future land use planning efforts, ACECs will not universally be excluded from wind energy site testing and monitoring or wind energy development but will be managed consistent with the management prescriptions for the individual ACEC. Existing land use plans and planning efforts may be amended as necessary, with appropriate level of NEPA analysis and decision, to address this change in wind energy and ACEC policy, consistent with the procedures of 43 CFR 1610.5.5. A site-specific land use plan amendment to address this change in policy may be addressed concurrently with the processing of a wind energy application. This revised policy will continue to provide protection of sensitive resource values in ACECs consistent with the management prescriptions for the individual ACEC.

Avoidance and Exclusion Areas

Land use plans may identify right-of-way avoidance areas or exclusion areas under the BLM land use planning guidelines (see Appendix C of the BLM Land Use Planning Handbook H-1601-1). Avoidance areas, as defined by the land use planning guidelines, do not preclude the issuance of rights-of-way for wind energy site testing and monitoring activities or wind energy development or preclude the issuance of permits, leases, or easements under Section 302 of the Federal Land Policy and Management Act (FLPMA). These uses in avoidance areas may be available with special stipulations or mitigation measures. For such authorizations, the area's environmental sensitivity and other feasible alternatives will be strongly considered.

**Applications:** All wind energy and wind energy-related facilities will be applied for under Title V of the FLPMA and Title 43, Part 2800 of the Code of Federal Regulations. The regulations cited in this IM refer to the right-of-way regulations which were published in the *Federal Register* on April 22, 2005, and became effective on June 21, 2005.
Wind energy site testing and monitoring facilities (meteorological towers) will not be authorized by a land use permit under the 43 CFR 2920 regulations but will be authorized as FLPMA rights-of-way. Geotechnical testing activities for foundation designs or other purposes will be authorized, however, by a land use permit under the 43 CFR 2920 regulations.

Applications for a wind energy right-of-way grant may be submitted for one of the following three types of wind energy projects:

1. A site-specific grant for individual meteorological towers and instrumentation facilities with a term that is limited to 3 years;
2. A project area grant for a larger site testing and monitoring area, with a term of 3 years that may be renewed consistent with 43 CFR 2807.22 and the provisions of this IM beyond the initial term of the grant; or
3. A development grant with a term that is not limited by the regulations, but will generally be for a term of 30 years.

Preapplication

Applications for any of the above projects will be submitted using Form SF-299, Application for Transportation and Utility Systems and Facilities on Federal Land, consistent with the requirements of 43 CFR 2804.12. The BLM authorized officer will encourage wind energy applicants to schedule preapplication meetings (43 CFR 2804.10) with the BLM to:

- Assist in the preparation and processing of applications,

BLM_0014402

- Identify potential issues and conflict areas,
- Identify visual resource issues and define the viewshed area of the proposed project for visual resources modeling,
- Identify any environmental or cultural resource studies that may be needed,
- Assess public interest and concerns,
- Identify other authorized uses,
- Identify other general recreation and public uses in the area,
- Discuss potential alternative site locations, and
- Discuss potential financial obligations (cost recovery fees, rental, and bonding) that the applicant must be willing to assume.

Coordination

Early informal public contacts with local community leaders and other interested parties are important in increasing public awareness and avoiding potential conflicts, especially in areas where other uses exist on the public lands. The applicant is encouraged to meet jointly with the BLM and the state wildlife agency early in the process to facilitate coordination on potential wildlife issues. Upon determining that the application is complete, the BLM field office will initiate consultation with the Department of Defense (DOD) on potential military airspace conflicts for both site testing and monitoring applications and for wind development projects, consistent with interagency protocol procedures. The military protocol procedures and a listing of DOD points-of-contact (Regional Environmental Coordinators) for consultation purposes are provided at www. blm.gov/wo/st/en/prog/energy/wind_energy.html. The BLM will initiate the consultation with the DOD within 30 days after receipt of a complete wind energy right-of-way application. In addition, the applicant is encouraged to submit the required filings with the Federal Aviation Administration (FAA) as early in the application process as possible to identify any air safety and lighting measures that will be required for the project. In addition, after meteorological towers are authorized and constructed, the BLM will ensure the location of these towers are noted on aerial navigation hazard maps for low-level flight operations that may be undertaken by the BLM and other Federal or state agencies for fire operations, wild horse and burro census and gathers, wildlife inventories, facility maintenance, or other activities.

Fees

All wind energy right-of-way applications and authorizations are subject to appropriate cost recovery fees for processing and monitoring as well as rental fees as required by 43 CFR 2804.14, 43 CFR 2805.16, and 43 CFR 2806.10. The policy guidance on rental fees contained in this IM is based on comparable payment practices for existing wind energy right-of-way authorizations on Federal and non-Federal lands. Wind energy right-of-way authorizations are considered non-linear right-of-way grants and, therefore, are not subject to the requirements of 43 CFR 2806.23 regarding multiyear rental payments. However, by policy, the holder of a wind energy site testing and monitoring right-of-way grant may pay the required rental fee for the entire term of the grant in advance.

Processing Timeframes

Right-of-way applications for wind energy site testing and monitoring or wind energy development projects will be identified as a priority field office workload and will be processed in as timely a manner as possible. The processing time frames for right-of-way applications as required by 43 CFR 2804.25 will be followed for all wind energy applications. Site testing and monitoring right-of-way applications should be processed within a 60-day time frame, consistent with the requirements of 43 CFR 2804.25. The regulations require that the authorized officer notify the right-of-way applicant in writing if processing will take longer than 60 days, the reasons for the delay, and an estimate of the time frame for processing the application. The BLM Washington Office, Land, Realty and Cadastral Survey Division (WO-350) may be able to assign a right-of-way project manager, if requested by the state director, to coordinate the processing of any major wind energy development right-of-way application.

**Authorizations:**

**1. Site-specific Grant for Testing and Monitoring:**

A site-specific FLPMA right-of-way grant (Form 2800-14) will be used to authorize individual meteorological towers and instrumentation facilities. The area authorized for these facilities will be the minimum necessary for construction and maintenance of the temporary facility and any access required to the site. The term of a site-specific right-of-way grant will be limited to 3 years from the date of issuance. A site-specific right-of-way grant will not be renewed beyond this term. A new right-of-way application will be required if the holder of the site-specific right-of-way grant wishes to

BLM_0014403

continue monitoring at the site. Numerous site-specific right-of-way grants for wind energy site testing and monitoring may be issued to various right-of-way holders in the same area and do not establish any exclusive or preferential rights regarding future wind energy development. In addition, the BLM retains the right to authorize other compatible uses of the public lands in the area.

Rent: The rental fee for a site-specific right-of-way grant for wind energy site testing and monitoring will be a minimum of $100 per year for each meteorological tower or instrumentation facility location and includes no additional rental fee for the acreage of each site location. Some BLM field offices have existing site-location rental fees for temporary facilities on the public lands that can be used for wind energy site testing and monitoring facilities. In some cases these fees will exceed the minimum $100 per year fee. The rental fee for a site testing and monitoring right-of-way grant is paid annually, in advance, on a calendar-year basis consistent with the regulations (43 CFR 2806.12). However, by policy, the holder of a site-specific right-of-way grant may pay the required rental fee for the entire term of the grant in advance.

Grant Administration: Each site-specific site testing and monitoring authorization will contain appropriate BMPs and may contain appropriate site-specific stipulations, including but not limited to road construction and maintenance, vegetation removal, and number and location of wind monitoring sites. A bond will be required for site testing and monitoring authorizations to ensure compliance with the terms and conditions of the authorization. A minimum bond in the amount of $2,000 per meteorological tower will be required for all authorizations. The amount of the reclamation bond may include potential reclamation and administrative costs to the BLM.

The wind inventory data collected and held by the right-of-way grant holder is proprietary information, will be protected by the Privacy Act, and may be withheld under the Freedom of Information Act to the extent allowed by Federal law.

Site testing and monitoring authorizations may be assigned consistent with the provisions of the regulations (43 CFR 2807.21). However, all assignments must be approved by the BLM authorized officer and the qualifications of all assignees must comply with the Due Diligence section of this IM and the requirements of the regulations (43 CFR 2804.12(a)(5) and 43 CFR 2804.26(a)(5)).

## 2. Project Area Grant for Testing and Monitoring:

A FLPMA right-of-way grant (Form 2800-14) that includes provisions for renewal beyond the 3-year term (43 CFR 2807.22) will be used to authorize wind energy site testing and monitoring facilities for a project area and the access required to the project area and facilities. A project area as used in this IM describes an area of land where wind resource information is being collected to determine the wind energy resource potential of the area. The holder of the project area grant retains an interest in the site testing and monitoring project area, but will be required to submit a separate right-of-way application (43 CFR 2807.20) and Plan of Development (POD) to the BLM for review, analysis, and separate approval for any future wind energy development proposal. The interest retained by the holder of the project area grant is only an interest to preclude other wind energy right-of-way applications during the 3-year term of the grant. The lands within the grant area will not be available for other wind energy right-of-way applications. The holder of the project area grant establishes no right to development and is required to submit a separate right-of-way application for wind energy development to the BLM for analysis, review, and decision. The BLM retains the right to authorize other compatible uses of the public lands.

Acreage: The lands involved in the project area grant will be defined by aliquot legal land descriptions and configured to involve a reasonable amount of land to support a possible right-of-way application for a wind energy development project in the future. There are no statutory or regulatory limits on the acreage of a site testing and monitoring right-of-way application; however, the BLM may request additional information from the applicant to determine if the project area is a reasonable size for a potential wind energy development project in the area. The BLM may request general information on the potential wind resources of the area, the potential project size and megawatt capacity of the area, and the potential project development configuration and limitations to assist in determining whether the application is of a reasonable size. Applicants seeking large acreage sites should be advised that the BLM will require those applicants to provide rationale describing how they would potentially develop such large acreage. The BLM is not required to accept applications that are not in the public interest; however, BLM field offices will not inappropriately limit the size of project areas that may be needed to evaluate an area for potential wind energy development. Any amendments to site testing and monitoring right-of-way authorizations that would add additional acreage to the authorization would still be limited to the 3-year term of the initial grant.

Site Testing: To assess the wind resource development potential of a project area, an applicant is not required to place site testing and monitoring facilities (meteorological towers) on every parcel of public land involved in

BLM_0014404

a project area in order to adequately assess the wind resources of a project area on public lands. In some cases, an applicant may propose to place meteorological towers on adjacent private, state, or other land without any meteorological towers on public land.

The BLM Washington Office has a funding agreement with the DOE's NREL. Any BLM field office may request the NREL to assist in evaluating the applicant's proposal for the siting and number of meteorological towers. In order for NREL to evaluate the proposal, the field office must submit the following information to NREL: a topographic map of the area showing the boundary of the proposed project area, land ownership, proposed location and height of the meteorological towers, and proposed access roads. The BLM Land, Realty and Cadastral Survey Division (WO-350) can provide the point-of-contact at NREL for these evaluations.

If the evaluation determines that the meteorological tower placement on adjacent non-Federal land is capable of characterizing the wind patterns on public lands, then a NEPA document will be prepared describing the Federal action as the issuance of a right-of-way grant with limited activities on the public land. If the evaluation concludes that the proposal cannot adequately assess the wind patterns on public lands or the project area proposed is not consistent with good wind testing techniques, then the applicant will be notified of this finding and given the opportunity to amend the proposal. If the proponent does not amend the application, the BLM authorized officer may reject the application.

In cases where a right-of-way grant is issued for a project area and no meteorological towers are installed on public lands, the Due Diligence section of this IM requires the proponent to install the meteorological towers on the non-Federal land within 12 months from the effective date of authorization. The holder will provide the BLM with good cause as to the nature of any delay. The purpose of the Due Diligence provisions of the IM are to preclude land speculators from obtaining a right-of-way grant for a project area with valuable wind energy resources that would preclude other applicants with serious interests in the potential development of wind energy on the public lands.

Renewal: The right-of-way grant for a project area is issued for an initial term of 3 years from the date of issuance. This term can be renewed (43 CFR 2807.22) for a term not to exceed 3 years if a separate right‐of‐way application and POD is submitted for a wind energy development project prior to the end of the initial term of the site testing and monitoring grant. A request for renewal authorization must be submitted 120 days before the end of the term of the grant (43 CFR 2807.22). However, the development right-of-way application and POD are not required to be submitted until just prior to the end of the term of the site testing and monitoring authorization. The request for renewal should be carefully reviewed to determine if the acreage requested may be reduced to reflect the area proposed for the wind energy development project.

The holder of the site testing and monitoring right-of-way grant should be advised that appropriate environmental and geotechnical studies and inventory information should be collected in conjunction with the wind energy site testing and monitoring studies during the 3-year term of the initial grant. The grant holder is required to submit a study design strategy to the BLM for review and comment in advance to ensure the environmental studies are of sufficient detail and scope for the project area. The data gathered is an integral part of preparing the initial POD for a proposed wind energy development if an application is submitted in the future. Developers should begin the required environmental studies during the initial grant period and not wait until they submit an application for renewal of the site testing and monitoring authorization.

Plan of Development: The grant holder is required to submit, prior to the end of the initial term of the site testing and monitoring grant, a separate right-of-way development application and POD to retain the interest in the project area. The applicant is encouraged to schedule a preapplication meeting with the BLM prior to submittal. The pre-application meeting will provide an opportunity to discuss the environmental and sensitive issues that may be associated with the proposed wind energy development project, processing timeframes and environmental analysis and review procedures, cost recovery requirements, and potential mitigation measures that could be included in the POD.

Concurrent submittal of a POD with the right-of-way application for the wind energy development project is consistent with the provisions of 43 CFR 2804.25. The BLM will not accept a POD that is simply a conceptual plan of development and must be of sufficient detail to provide the basic information necessary to begin the environmental analysis and review process for the proposed wind energy development project. Attachment 2 provides an outline of the minimum requirements for the initial POD.

The initial wind energy POD must be submitted prior to the end of the 3-year term of a site testing and

BLM_0014405

monitoring authorization. If the initial POD is incomplete, the wind energy right-of-way applicant will be contacted by letter and must provide a complete POD consistent with the POD requirements to the BLM within 90 days. If the applicant has not responded within
90 days, or if the applicant has responded and the information provided is not sufficient, the BLM will send a 30-day show-cause letter to the applicant prior to issuing any decision to reject the application for failure to respond pursuant to the regulations (43 CFR 2804.25(b) and 2804.26(a)(6)). During the NEPA review process, additional information may be requested of the applicant. The BLM will provide the applicant reasonable periods of time to respond to these requests for additional information.

Rent: The rental fee for a project area grant will be based on the total public land acreage of the project area included in the right-of-way grant. The rental fee for the total public land acreage of the grant will be $1,000 per year or $1 per acre per year, whichever is greater. This rental fee is based on comparable fees on non-Federal lands and is consistent with the limited use of the land. There is no additional fee for the installation of each meteorological tower or instrumentation facility located within the site testing and monitoring project area. This rental fee is based on the value of the use of the area for site testing and monitoring and the value of the option held by the holder that precludes other wind energy right-of-way applications during the 3-year term of the grant, comparable to similar option payments on private lands. The rental fee for a site testing and monitoring right-of-way grant is paid annually, in advance, on a calendar-year basis consistent with the regulations (43 CFR 2806.12). However, by policy, the holder of a site testing and monitoring right-of-way grant may pay the required rental fee for the entire term of the grant in advance.

Grant Administration: Each project area grant will contain appropriate BMPs and may contain appropriate site-specific stipulations, including but not limited to road construction and maintenance, vegetation removal, and number and location of wind monitoring sites. A bond will be required for site testing and monitoring authorizations to ensure compliance with the terms and conditions of the authorization. A minimum bond in the amount of $2,000 per meteorological tower will be required for all authorizations. The amount of the reclamation bond may include potential reclamation and administrative costs to the BLM.

The wind inventory data collected and held by the right-of-way grant holder is proprietary information, will be protected by the Privacy Act, and may be withheld under the Freedom of Information Act to the extent allowed by Federal law. However, general wind resource information must be provided to the BLM, at the time a separate right-of-way application for development is submitted, to support the environmental analysis and review of the proposed development. This information becomes public information to the extent allowed by Federal law and will be used for analysis and decision-making purposes related to the processing of the right-of-way application for a wind energy development project. Biological and cultural resource studies and data collected by the right-of-way grant holder and provided to the BLM will become public information to the extent allowed by Federal law.

Site testing and monitoring authorizations may be assigned consistent with the provisions of the regulations (43 CFR 2807.21). However, all assignments must be approved by the BLM authorized officer and the qualifications of all assignees must comply with the Due Diligence
section of this IM and the requirements of the regulations (43 CFR 2804.12(a)(5) and 43 CFR 2804.26(a)(5)). A partial assignment of a site testing and monitoring authorization will not be approved if such action would hinder the BLM management of the authorization or the associated public lands.

## 3. Development Grant:

A FLPMA right-of-way grant (Form 2800-14) will be used to authorize all facilities held by the holder of the grant on the public lands related to a commercial wind energy development project. This authorization will include the wind turbine facilities as well as the onsite access roads, electrical and distribution facilities, and other support facilities authorized by the wind energy development right-of-way grant. Other offsite facilities, such as electrical transmission and additional access roads, may require a separate linear right-of-way authorization. The lands involved in the development grant will be defined by aliquot legal land descriptions and be configured to minimize the amount of land involved, while still allowing an adequate distance between turbine positions and reasonable right-of-way boundaries. In the absence of any specific local zoning and management issues, no turbine will be positioned closer than 5 rotor-diameters from the center of the wind turbine to the right-of-way boundary in the dominant upwind or downwind direction to avoid potential wind turbulence interference issues with adjacent wind energy facilities unless it can be demonstrated that site conditions, such as topography, natural features, or other conditions such as offsets of turbine locations, warrant a lesser distance. Further, for safety reasons, no turbine on public land will be positioned closer than 1.5 times the total height of the wind turbine to the right-of-way boundary. In cases where the applicant holds a long-term lease right on adjacent Federal or non-Federal lands for wind energy development or the adjacent non-Federal landowner provides a setback waiver, these minimum setbacks may be eliminated, allowing turbines to be placed closer to the right-of-way boundary.

BLM_0014406

The right-of-way holder should be encouraged, through terms and conditions of the right-of-way authorization, to work with the BLM to increase the public awareness of the benefits of wind energy development by providing information and public points-of-access near the development where safe and appropriate. These measures may include onsite interpretive resources and photo locations. The BLM and right-of-way holder may provide a positive message on the responsible use of renewable resources and the multiple resource uses of the public lands.

Rent: The rental fee for a development grant has been updated from the fee originally established by the Interim Wind Energy Development Policy in October 2002. The new rental fee established by this IM is $4,155 per megawatt of the total anticipated installed capacity of the wind energy project on public land based on the approved POD, a capacity factor of 30 percent, a Federal rate of return of 5.27 percent, and an average purchase price of $0.03 per kilowatt hour. The Federal rate of return is based on the 10-year average of the 30-year Treasury bond yield (January 1998 to January 2008).  The rental fee is a fixed annual BLM-wide rent based on the following formula:

Annual rent = (Anticipated total installed capacity in kilowatts on public land as identified in the approved POD) x (8760 hours per year) x (30 percent capacity factor) x (5.27 percent federal rate of return) x ($0.03 average price per kilowatt hour).

Example for one megawatt (1,000 kW) of anticipated total installed capacity on public land:

Annual rent = (1,000 kW) x (8760 hours) x (0.30 capacity) x (0.0527 rate of return) x ($0.03 per kWh) or $4,155 per megawatt of anticipated total installed capacity on public land.

The annual rental fee will be phased in as follows:

| | | |
|---|---|---|
| First year | - | 25 percent of the total rental fee or $1,039 per megawatt |
| Second year | - | 50 percent of the total rental fee or $2,078 per megawatt |
| Third year | - | 100 percent of the total rental fee or $4,155 per megawatt |

The full annual rental fee will apply at any time prior to 3 years upon the start of commercial operations of the project. The rental fee is paid annually, in advance, on a calendar-year basis consistent with the regulations (43 CFR 2806.12). The BLM will not assess a separate turbine installation fee (an additional one-time payment for each turbine installation), a production rental fee, or other fees as part of the wind energy rental fee. Any separate linear right-of-way authorizations issued for offsite facilities to support the wind energy project, such as electrical transmission lines, will be subject to the linear right-of-way rental provisions of 43 CFR 2806.20.

All wind energy right-of-way holders are subject to rent in accordance with this IM, unless they are specifically exempt from rent by statute or regulation. Some holders or facilities may be exempt from rent pursuant to the Rural Electrification Act of 1936, as amended (43 CFR 2806.14(d)).

Grant Administration: The term of a development grant is not limited by the regulations; however, the terms of most existing grants for major wind energy development projects recognize the overall costs and useful life of wind energy facilities and are generally for a term of 30 years. The grant may be renewed for additional terms, consistent with the provisions of the regulations (43 CFR 2807.22). The BLM also retains the right to authorize other compatible uses of the public lands within the right-of-way grant during the term of the grant.

A bond will be required for all development grants to ensure compliance with the terms and conditions of the right-of-way authorization and the requirements of applicable regulatory requirements. The amount of the bond may include potential reclamation and administrative costs to BLM. A minimum bond in the amount of $10,000 per wind turbine, considering salvage values of turbines and towers, will be required for all wind energy development projects on public lands. However, the amount of the required bond will be determined during the right-of-way authorization process on the basis of site-specific and project-specific factors. Acceptable bond instruments include cash, cashier's or certified check, certificate or book entry deposits, negotiable U. S. Treasury bonds equal in value to the bond amount, or surety bonds from the approved list of sureties (U. S. Treasury Circular 570) payable to the Bureau of Land Management. A letter of credit is not an acceptable form of bond. All bonds will be periodically reviewed (at least every 5 years) by the BLM authorized officer to ensure adequacy of the bond.

The development grant may be assigned consistent with the provisions of the regulations (43 CFR 2807.21). However, all assignments must be approved by the BLM authorized officer and the qualifications of all assignees must comply with the Due Diligence section of this IM and the requirements of the regulations (43 CFR 2804.12(a)(5) and 43 CFR 2804.26(a)(5)). A partial assignment of the grant will not be approved if such

BLM_0014407

action would hinder the BLM management of the authorization or the associated public lands.

All final decisions issued by the authorized officer in connection with the authorization of any of the above described wind energy projects are appealable under 43 CFR Part 4 (43 CFR 2801.10). It should also be noted that right-of-way grants are issued as full force and effect decisions (43 CFR 2801.10(b)) and will remain effective during any appeal period, unless stayed by the Interior Board of Land Appeals (IBLA).

**Competitive Interest:** The right-of-way regulations (43 CFR 2804.23(c)) provide authority for identifying public lands under competitive bidding procedures for wind energy right-of-way authorizations. However, the BLM will only initiate a competitive process if a land use planning decision has specifically identified an area for competitive wind energy leasing. The Programmatic EIS and associated ROD did not identify any competitive wind energy leasing areas for any BLM land use plans; therefore, any competitive leasing areas would need to be identified through a local land use planning process. Site testing and monitoring or wind energy development right-of-way applications will be processed, therefore, on a first-come basis. The BLM will encourage applicants who may have an interest in a common area to establish a partnership or cooperative agreement that establishes compatible use of the site among the applicants. If the applicants choose not to form a partnership or cooperative agreement, the BLM will proceed to process the first complete application with attached cost recovery fees required by 43 CFR 2804.14.

**Due Diligence:** There are some concerns regarding the potential for land speculators to obtain right-of-way grants and control valuable wind energy resource areas that would preclude other applicants with serious interests in the potential development of wind energy on the public lands. These concerns can be mitigated by applying the applicant qualification requirements of the regulations (43 CFR 2804.12(a)(5) and 43 CFR 2804.26(a)(5)) and requiring certain due diligence provisions in the right-of-way authorization for site testing and monitoring or wind energy development.

Technical and Financial Capability

The regulations provide authority to require the application to include information on the applicant's technical capability to construct, operate, and maintain the wind energy facilities and associated transmission facilities (43 CFR 2804.12(a)(5)). This technical capability can be demonstrated by international or domestic experience with wind energy projects or other types of electric energy-related projects on either Federal or non-Federal lands. The applicant should provide information on the availability of sufficient capitalization to carry out development, including the preliminary study phase of the project, as well as the site testing and monitoring activities. Actual development or ownership of similarly-sized wind energy facilities or other types of electric energy-related facilities within the last 5 years by the applicant would generally constitute evidence of financial capability. However, applicants in bankruptcy or other related financial difficulties may not be able to meet the due diligence provisions of the right-of-way authorization. Attachment 2 provides an outline of the information to include in the POD, which requires the submittal of information on the financial and technical capability of the applicant. The regulations provide the authority to deny the application if the applicant cannot demonstrate adequate technical ability to construct, operate, and maintain the wind energy facilities (43 CFR 2804.26(a)(5)).

Terms and Conditions

Due diligence is encouraged by the limited 3-year term of the site testing and monitoring right-of-way authorization. The project area grant can only be renewed if a separate right-of-way application and POD is submitted for a wind energy development project prior to the end of the initial term of the project area grant. In addition, the site testing and monitoring authorization and the wind energy development authorization will include a due diligence requirement for installation of facilities consistent with an approved POD.

The following due diligence requirements must be included in the terms and conditions of either the site testing and monitoring authorization or the wind energy development authorization:

- If monitoring facilities under a site testing and monitoring right-of-way authorization have not been installed within 12 months after the effective date of the authorization or consistent with the timeframe of the approved POD, the holder will provide the BLM good cause as to the nature of any delay, the anticipated date of installation of facilities, and evidence of progress toward site monitoring activities.
- 
- If construction of wind energy facilities under a wind energy development authorization has not commenced within 2 years after the effective date of the grant or consistent with the timeframe of the approved POD, the right-of-way holder will provide the BLM good cause as to the nature of any delay, the anticipated date of construction, and evidence of progress toward commencement of construction.

BLM_0014408

Failure of the holder to comply with the due diligence terms and conditions of either the site testing and monitoring authorization or the wind energy development authorization provides the authorized officer the authority to terminate the authorization (43 CFR 2807.17). The rental fee provisions outlined in this IM also mitigate, to some extent, the concerns regarding due diligence.

**Environmental Review:** The Programmatic EIS addressed a range of alternatives including the proposed action that would implement a wind energy development program with the establishment of a set of policies and BMPs for wind energy development on the public lands. In accordance with this IM, the BLM is clarifying some of the policies and BMPs established in the Programmatic EIS. In particular, ACECs will not be universally excluded from wind energy site testing and monitoring or wind energy development but will be managed consistent with the management prescriptions for the individual ACEC. Consistent with the analysis in the Programmatic EIS, this revised policy will continue to provide protection of sensitive resource values in ACEC areas and will not result in effects outside the range of effects analyzed in the Programmatic EIS.

The revised policies and BMPs are included in attachment 1 of this IM and are applicable to all wind energy activities on BLM-administered public lands. The BMPs establish environmentally sound and economically feasible mechanisms to protect and enhance natural and cultural resources. They identify the issues and concerns that need to be addressed by project-specific plans. Mitigation measures protecting these resources will be required to be incorporated into the project POD. These mitigation measures will include the specific programmatic BMPs as well as additional mitigation measures contained in other existing and relevant BLM guidance or stipulations developed to address site-specific or species-specific concerns through project-level analysis.

To the extent that the Programmatic EIS addresses anticipated issues and concerns associated with an individual wind energy project, including potential cumulative impacts, the BLM will, by policy, tier off of the analysis in the Programmatic EIS and limit the scope of additional project-specific NEPA analyses. The site-specific NEPA analyses will include analysis of project site configuration and micrositing considerations, monitoring program requirements, and appropriate site-specific stipulations. In addition, offsite compensatory mitigation may be appropriate to consider for some projects consistent with BLM offsite mitigation policies (see IM 2008-204 dated September 30, 2008).

**1) Site-specific or Project Area Applications:** The scope of the environmental analysis required for either a site-specific application or a project area application includes direct, indirect, and cumulative effects of the proposed site testing and monitoring-related facilities. The site testing and monitoring right-of-way authorization is for a limited term (3 years) and usually includes only a few wind monitoring towers with instruments attached to measure various meteorological parameters such as wind speed, wind direction, and temperature at various heights above the ground. The footprint for each monitoring tower is small and the need for site clearances should be limited to the areas of proposed surface disturbance and associated areas of potential effect. Some newer technologies using sonar equipment are also being used to collect wind data. This type of equipment also has a small footprint and requires little or no surface disturbance.

The environmental review should not address wind energy development facilities, as the installation of wind turbines are not proposed during site testing and monitoring. The environmental review of wind energy development facilities will occur at the point in time when a wind energy development application is submitted. The reasonably foreseeable development discussions in the environmental analysis for a site testing and monitoring right-of-way application should focus on anticipated installation of additional wind monitoring facilities during the term of the right-of-way grant. Typically only a small number of wind energy site testing and monitoring authorizations ever lead to actual wind energy development projects. Therefore, the reasonably foreseeable development discussion should not focus on uncertain future development scenarios. However, the cumulative impacts of other wind energy site testing activities and any other reasonably foreseeable activities that potentially impact the same environmental resources in the area are required to be addressed in the environmental analysis.

Categorical Exclusion: The use of a Categorical Exclusion (CX) for the issuance of short-term right-of-way authorizations may be applicable to site testing and monitoring activities or sites. The relevant CX as identified by the BLM NEPA Handbook, H-1790-1, Appendix 4, Section E. 19 (January 30, 2008), encompasses "issuance of short-term (3 years or less) rights-of-way or land use authorizations for such uses as storage sites, apiary sites, and construction sites where the proposal includes rehabilitation to restore the land to its natural or original condition." Although the authorization is for a project area, the use is limited to a small site with potentially short-term minimal impacts. The CX for "nondestructive data collection, inventory (including field, aerial, and satellite surveying and mapping), study, research and monitoring activities" may also be applicable to wind energy site testing and monitoring activities. However, these site testing and monitoring activities must be subject to sufficient review to determine if any of the extraordinary circumstances identified in the guidelines apply.

BLM_0014409

A project area authorization is limited in term to 3 years. Although a project area authorization may be renewed, the holder is required to submit a separate right-of-way application for any wind energy development project. The right-of-way regulations (43 CFR 2807.20) require that the application be submitted and processed consistent with the provisions of 43 CFR Subpart 2804 as a separate and distinct application. The right-of-way grant holder has established no right to development and is required to submit a separate application to BLM for analysis, review, and decision. The proposed wind energy development project will be evaluated upon the submittal of an actual application for the development project. *Alliance to Protect Nantucket Sound, Inc. v. United States Department of the Army*, 288 F. Supp.2d 64, 80 (D. Mass. 2003), *affd*, 398 F.3d 105 (1st Cir. 2005), supports the proposition that an authorization to collect wind data and an authorization to develop a wind energy development project are not "connected actions," as that term is defined at 40 CFR 1508.25. The court held that the Army's authorization of a data tower in Nantucket Sound does not automatically trigger the authorization for a wind energy project; that information from the data tower was not required for the wind energy project but may be used if available and relevant; and that the data tower's utility does not depend on the ultimate authorization of the wind energy project. A contrary decision was reached in *Blue Ocean Preservation Society v. Secretary of Energy*, 754 F. Supp. 1450 (D. Hawaii 1991), so it is advisable to consult with the Solicitor's Office in complex cases.

**2) Development Application:** The scope of the NEPA analysis and the compliance requirements with the Endangered Species Act, the National Historic Preservation Act, and other laws for a wind energy development right-of-way application will be broader than a site testing and monitoring application as the installation of wind turbines, access roads, and electrical transmission facilities will be addressed in the wind energy development NEPA analysis. However, the footprint of wind energy facilities is typically smaller than other types of energy production facilities. The level of site clearances should be limited to the areas of proposed surface disturbances and associated areas of potential effect, including the access roads to wind turbine locations as well as the electrical transmission and other support facilities. The wind energy development facilities, however, may extend over a large geographic area and have a broad area of influence. The potential impact from these facilities may, therefore, extend beyond the small footprint of the individual wind turbine locations and it may be necessary to provide setbacks from important natural resource areas.

The reasonably foreseeable development discussion in the environmental analysis for a wind energy development project should focus on the potential for installation of additional wind turbines and increased production and electrical transmission from the project area. In addition, the cumulative impacts of other wind energy projects and any other reasonably foreseeable projects that potentially impact the same environmental resources in the area are required to be addressed in the environmental analysis. Project-specific environmental analyses for wind energy development tiered to the analyses conducted in the Programmatic EIS allow the project-specific analyses to focus just on the critical, site-specific issues of concern. For this reason, tiering to the Programmatic EIS is the preferred approach when appropriate. Tiering to the Programmatic EIS would allow for the preparation of an Environmental Assessment (EA) for an individual action as long as the remaining effects of the individual action are not significant. The level of NEPA documentation necessary will be determined based on the context and intensity of the proposed action and how much analysis may be tiered to the Programmatic EIS. It may also be possible to combine the required environmental review process for a wind energy development project with applicable state or local environmental procedures for energy facility siting. This would both streamline the process and be consistent with Departmental policy on intergovernmental cooperation.

**LR 2000 Data Entry:** Commodity code 974 (Wind Energy Facilities) will generally be used with case type 285003 to identify wind energy site testing and development right-of-way applications and authorizations, and ancillary facilities that are authorized with the same grant as the wind facility. Commodity code 974 will not be used for ancillary rights-of-way (transmission lines and roads) that are authorized as separate grants. Action codes were also established in LR 2000 in September 2005 to track compliance with the customer service standards of the right-of-way regulations. These Action codes also apply to wind energy applications and authorizations. The Remarks section of LR 2000 for a wind energy site testing and monitoring case is required to identify the number of meteorological towers authorized and located on the public land. In addition, the Remarks section for a wind energy development case is required to identify the number of turbines and total MW capacity authorized and located on the public land.

**Timeframe:** This IM is effective immediately upon receipt. Pending applications will be processed consistent with the provisions of this IM. Existing wind energy right-of-way authorizations requiring amendments may include provisions of this IM. Any amendment of an existing wind energy right-of-way grant that includes an adjustment of rental provisions consistent with this IM will be effective at the next billing date after

BLM_0014410

the amendment is made.

**Budget Impact:** The application of this policy will have some impact on budget. However, wind energy right-of-way applications are subject to the cost recovery provisions of the regulations and most applications for a wind energy development right-of-way will probably meet the criteria for full reasonable costs (43 CFR 2804.14(b)). In addition, BLM monitoring activities are also subject to the cost recovery provisions of the regulations. Workload impacts should be clarified through the streamlined procedures identified by this IM and by the priority established for processing wind energy right-of-way applications.   There is also a positive impact through the implementation of consistent procedures in the processing of wind right‑ofâ€'way applications.

**Background:** As part of an overall strategy to develop a diverse portfolio of domestic energy supplies for our future, the National Energy Policy of 2001 and the Energy Policy Act of 2005 (Public Law 109-58, August 8, 2005) encourage the development of renewable energy resources, including wind energy. Section 211 of the Energy Policy Act established a goal that the BLM would approve 10,000 megawatts of non-hydropower renewable energy projects on the public lands by 2015. The development of wind energy will be an important contribution to that goal. The BLM Energy and Mineral Policy, signed by the Director on August 26, 2008, also recognizes that the public lands are an important source of the Nation's renewable energy resources, including wind energy.

The United States has significant potential for wind energy development, especially on Federal lands in the West. The Federal wind energy production tax credit, stateâ€'level tax credits, and other incentives, including renewable energy portfolio standards in several states, have generated a strong interest in commercial wind energy projects on BLM-administered public lands. Project proposals on public land will create a workload that demands a commitment of resources and a priority to the timely and consistent processing of right-of-way applications for wind energy site testing and monitoring activities and for commercial wind energy development.

**Manual/Handbook Sections Affected:**  This Instruction Memorandum and policy amends BLM Right-of-Way Management Manual 2801 and Handbook H-2801-1.

**Coordination:**  This IM incorporates the policies and BMPs established by the Programmatic EIS and associated ROD. Preparation of the Programmatic EIS provided an opportunity for public comment and input on the proposed BLM wind energy program, policies, and BMPs as well as land use plan amendments. Preparation of this IM was coordinated with the Division of Decision Support, Planning and NEPA (WO-210), the Division of Fish, Wildlife and Plant Conservation (WO-230), and the Division of Recreation and Visitor Services (WO-250). The BLM state offices were also provided an opportunity to review the IM and provide input prior to finalization.

**Contact:**  If you have any questions concerning the content of this IM, please contact Michael D. Nedd, Assistant Director, Minerals and Realty Management, at 202-208-4201, or your staff may contact the BLM Land, Realty and Cadastral Survey Division (WO-350). Points of contact for wind energy right-of-way questions include Rick Stamm, Realty Specialist, at 202-452-5185 and Ray Brady, Energy Policy Lead, at 202-557-3378.

Signed by:                                  Authenticated by:
Henri R. Bisson                             Robert M. Williams
Acting, Director                            Division of IRM Governance,WO-560


2 Attachments
        1 – BLM Wind Energy Program – Policies and Best Management Practices (19 pp)
        2 – Wind Energy Plan of Development (4 pp)

BLM_0014411

**BLM WIND ENERGY PROGRAM**
**POLICIES AND BEST MANAGEMENT PRACTICES (BMPS)**

The BLM has established a number of policies and BMPs, provided below, regarding the development of wind energy resources on BLM-administered public lands. The policies and BMPs are applicable to all wind energy development projects on BLM-administered public lands. The policies address the administration of wind energy development activities, and the BMPs identify required mitigation measures that will be incorporated into project-specific Plans of Development (PODs) and right-of-way (ROW) authorization stipulations. Additional mitigation measures will be applied to individual projects, in the form of stipulations in the ROW authorization as appropriate, to address site-specific and species-specific issues.

**Policies**

- The BLM will not issue ROW authorizations for wind energy development for areas in which wind energy development is incompatible with specific resource values. Specific lands excluded from wind energy site monitoring and testing and wind energy development include designated areas that are part of the National Landscape Conservation System (NLCS) (e.g., Wilderness Areas, Wilderness Study Areas, National Monuments, National Conservation Areas[1], Wild and Scenic Rivers, and National Historic and Scenic Trails). Additional areas may be excluded from wind energy development based on resource impacts that cannot be mitigated and/or conflict with existing and multiple-use activities or land use plans. Areas of Critical Environmental Concern (ACEC) are not universally excluded from wind energy site monitoring and testing or wind energy development, but will be managed consistent with the management prescriptions for the individual ACEC.

- To the extent possible, wind energy projects shall be developed in a manner that will not prevent other land uses, including minerals extraction, livestock grazing, recreational use, and other ROW uses.

- Entities seeking to develop a wind energy project on BLM-administered lands shall consult with appropriate Federal, State, and local agencies regarding specific projects as early in the planning process as appropriate to ensure that all potential construction, operation, and decommissioning issues and concerns are identified and adequately addressed.

- The BLM will initiate government-to-government consultation with Indian tribal governments whose interests might be directly and substantially affected

---

[1]      Wind energy development is permitted in one NCA, the California Desert Conservation Area (CDCA), in accordance with the provisions of the *California Desert Conservation Area Plan 1980, as Amended.*

Attachment 1 - 1

by activities on BLM-administered lands as early in the planning process as appropriate to ensure that construction, operation, and decommissioning issues and concerns are identified and adequately addressed.

• Entities seeking to develop a wind energy project on BLM-administered lands shall consult with the U.S. Department of Defense (DOD), in conjunction with BLM Washington Office and Field Office staff, regarding the location of wind power projects and turbine siting as early in the planning process as appropriate. This consultation shall occur concurrently at both the installation/field level and the Pentagon/BLM Washington Office level. The consultation process is outlined in an interagency protocol agreement.

• The BLM will consult with the U.S. Fish and Wildlife Service (USFWS) as required by Section 7 of the Endangered Species Act of 1973 (ESA). The specific consultation requirements will be determined on a project-by-project basis.

• The BLM will consult with the State Historic Preservation Office (SHPO) as required by Section 106 of the National Historic Preservation Act of 1966 (NHPA). The specific consultation requirements will be determined on a project-by-project basis. If programmatic section 106 consultations have been conducted and are adequate to cover a proposed project, additional consultation may not be needed.

• Existing land use plans will be amended, as appropriate, to (1) adopt provisions of the BLM's Wind Energy Development Program, (2) identify land considered available for wind energy development, and (3) identify land that will not be available for wind energy development.

• The level of environmental analysis to be required under the National Environmental Policy Act (NEPA) for individual wind power projects will be determined at the field office level. For many projects, it may be determined that a tiered environmental assessment (EA) is appropriate in lieu of an Environmental Impact Statement (EIS). To the extent that the Programmatic EIS (PEIS) addresses anticipated issues and concerns associated with an individual project, including potential cumulative impacts, the BLM will tier based on the decisions embedded in the PEIS and limit the scope of additional project-specific NEPA analyses. The site-specific NEPA analyses will include analyses of project site configuration and micrositing considerations, monitoring program requirements, and appropriate mitigation measures. In particular, the mitigation measures discussed in chapter 5 of the PEIS may be consulted in determining site-specific requirements. Public involvement will be incorporated into all wind energy development projects to ensure that all concerns and issues are identified and adequately addressed. In general, the scope of the NEPA analyses will be limited to the proposed action on BLM-administered public lands; however, if access to proposed development

Attachment 1 - 2

on adjacent non-BLM-administered lands is entirely dependent on obtaining ROW access across BLM-administered public lands and there are no alternatives to that access, the NEPA analysis for the proposed ROW may need to assess the environmental effects from that proposed development. The BLM's analyses of ROW access projects may tier based on the PEIS to the extent that the proposed project falls within the scope of the PEIS analyses.

- Site-specific environmental analyses will tier from the PEIS and identify and assess any cumulative impacts that are beyond the scope of the cumulative impacts addressed in the PEIS.

- The Categorical Exclusion (CX) applicable to the issuance of short-term ROWs or land use authorizations may be applicable to some site monitoring and testing activities. The relevant CX, established in the BLM NEPA Handbook, H-1790-1, Appendix 4, Section E. 19 (January 30, 2008), encompasses "issuance of short-term (3 years or less) rights-of-way or land use authorizations for such uses as storage sites, apiary sites, and construction sites where the proposal includes rehabilitation to restore the land to its natural or original condition." The CX for "nondestructive data collection, inventory, study, research, and monitoring activities" may also be applicable to wind energy site testing and monitoring activities.

- The BLM will require financial bonds for all wind energy development projects on BLM-administered public lands to ensure compliance with the terms and conditions of the rights-of-way authorization and the requirements of applicable regulatory requirements, including reclamation costs. The amount of the required bond will be determined during the rights-of-way authorization process on the basis of site-specific and project-specific factors. A minimum bond will be required for site monitoring and testing authorizations.

- Entities seeking to develop a wind energy project on BLM-administered public lands shall develop a project-specific Plan of Development (POD) that incorporates all BMPs and, as appropriate, the requirements of other existing and relevant BLM mitigation guidance, including the BLM's offsite mitigation guidance. Additional mitigation measures will be incorporated into the POD and into the ROW authorization as project stipulations, as needed, to address site-specific and species-specific issues. The POD will include a site plan showing the locations of turbines, roads, power lines, other infrastructure, and other areas of short- and long-term disturbance.

- The BLM will incorporate management goals and objectives specific to habitat conservation for species of concern (e.g., sage-grouse, raptors, bats), as appropriate, into the POD for proposed wind energy projects.

Attachment 1 - 3

BLM_0014414

- The BLM will consider the visual resource values of the public lands involved in proposed wind energy development projects, consistent with BLM Visual Resource Management (VRM) policies and guidance. The BLM will work with the ROW applicant to incorporate visual design considerations into the planning and design of the project to minimize potential visual impacts of the proposal and to meet the VRM objectives of the area.

- Operators of wind power facilities on BLM-administered public lands shall consult with the BLM and other appropriate Federal, State, and local agencies regarding any planned upgrades or changes to the wind facility design or operation. Proposed changes of this nature may require additional environmental analysis and/or revision of the POD.

- The BLM's Wind Energy Development Program will incorporate adaptive management strategies to ensure that potential adverse impacts of wind energy development are avoided if possible, minimized, or mitigated to acceptable levels. The programmatic policies and BMPs will be updated and revised as new data regarding the impacts of wind power projects become available. At the project-level, operators will be required to develop monitoring programs to evaluate the environmental conditions at the site through all phases of development, establish metrics against which monitoring observations can be measured, identify potential mitigation measures, and establish protocols for incorporating monitoring observations and additional mitigation measures into standard operating procedures and project-specific stipulations.

**Best Management Practices (BMPs)**

The following BMPs will be adopted as required elements of project-specific PODs and/or as ROW authorization stipulations. They are categorized by development activity: site monitoring and testing, development of the POD, construction, operation, and decommissioning. The BMPs for development of the POD identify required elements of the POD needed to address potential impacts associated with subsequent phases of development.

**1. Site Monitoring and Testing**

- The area disturbed by installation of meteorological towers (i.e., footprint) shall be kept to a minimum.

- Existing roads shall be used to the maximum extent feasible. If new roads are necessary, they shall be designed and constructed to the appropriate BLM road design standards.

- Meteorological towers shall be located to avoid sensitive habitats or areas where ecological resources known to be sensitive to human activities (e.g., prairie grouse) are present. Installation of towers shall be scheduled to

Attachment 1 - 4

avoid disruption of wildlife reproductive activities or other important behaviors, and shall be consistent with sage grouse management strategies.

- Guy wires on permanent meteorological towers shall be avoided, however, may be necessary on temporary meteorological towers installed during site monitoring and testing. If guy wires are necessary, the meteorological towers shall be periodically inspected to determine whether permanent markers (bird flight diverters) attached to the guy wires are necessary to increase visibility.

- Meteorological towers installed for site monitoring and testing shall be inspected periodically (at least every 6 months) for structural integrity.

- A study design strategy shall be required for any environmental studies initiated or baseline data collected during the site testing and monitoring period. The operator shall submit the study design strategy to the BLM authorized officer for review.

## 2. Plan of Development Preparation

### *General*

- The BLM and operators shall contact appropriate agencies, property owners, and other stakeholders early in the planning process to identify potentially sensitive land uses and issues, rules that govern wind energy development locally, and land use concerns specific to the region.

- Available information describing the environmental and sociocultural conditions in the vicinity of the proposed project shall be collected and reviewed as needed to predict potential impacts of the project.

- The Federal Aviation Administration (FAA)-required notice of proposed construction shall be made as early as possible to identify any required air safety measures.

- To plan for efficient use of the land, necessary infrastructure requirements shall be consolidated wherever possible, and current transmission and market access shall be evaluated carefully.

- The project shall be planned to utilize existing roads and utility corridors to the maximum extent feasible and to minimize the number and length/size of new roads, lay-down areas, and borrow areas.

- A monitoring program shall be developed to ensure that environmental conditions are monitored during the construction, operation, and decommissioning phases. The monitoring program requirements, including adaptive management strategies, shall be established at the project level to

Attachment 1 - 5

BLM_0014416

ensure that potential adverse impacts of wind energy development are mitigated.  The monitoring program shall identify the monitoring requirements for each environmental resource present at the site, establish metrics against which monitoring observations can be measured, identify potential mitigation measures, and establish protocols for incorporating monitoring observations and additional mitigation measures into standard operating procedures and BMPs.

- "Good housekeeping" procedures shall be developed to ensure that during operation the site will be kept clean of debris, garbage, fugitive trash or waste, and graffiti; to prohibit scrap heaps and dumps; and to minimize storage yards.

### Wildlife and Other Ecological Resources

- Operators shall review existing information on species and habitats in the vicinity of the project area to identify potential concerns.

- Operators shall conduct surveys for Federal and/or State-protected species and other species of concern (including priority wildlife and special status plant and animal species) within the project area and design the project to avoid, minimize, or mitigate impacts to these resources.

- Operators shall identify important, sensitive, or unique habitats in the vicinity of the project and design the project to avoid, minimize, or mitigate impacts to these habitats (e.g., locate the turbines, roads, and ancillary facilities in the least environmentally sensitive areas; i.e., away from riparian habitats, streams, wetlands, drainages, or critical wildlife habitats).

- The BLM will prohibit the disturbance of any population of federally listed plant species under the Endangered Species Act.

- Operators shall evaluate avian and bat use of the project area and design the project to minimize or mitigate the potential for bird and bat strikes (e.g., development shall not occur in riparian habitats and wetlands).  Avian and bat use surveys consistent with current methodologies and standards shall be conducted; the amount and extent of ecological baseline data required shall be determined on a project basis.

- Turbines shall be configured to avoid landscape features known to attract raptors if site studies show that placing turbines there would pose a significant risk to raptors.

- Operators shall determine the presence of bat colonies and avoid placing turbines near known bat hibernation, breeding, and maternity/nursery colonies; in known migration corridors; or in known flight paths between colonies and feeding areas.

Attachment 1 - 6

- Operators shall determine the presence of active raptor nests (i.e., raptor nests used during the breeding season) and design the project to provide for spatial buffers and timing restrictions for surface disturbing activities. Measures to reduce raptor use at a project site (e.g., minimize road cuts, maintain either no vegetation or plant species that are unattractive to raptors around the turbines) shall also be identified.

- A habitat restoration plan shall be developed to avoid, minimize, or mitigate negative impacts on vulnerable wildlife while maintaining or enhancing habitat values for other species. The plan shall identify reclamation, soil stabilization, and erosion reduction measures that shall be implemented to ensure that all temporary use areas are restored. The plan shall require that restoration occur as soon as possible after completion of activities to reduce the amount of habitat converted at any one time and to speed up the recovery to natural habitats.

- Procedures shall be developed to mitigate potential impacts to special status species and other priority wildlife species. Such measures may include avoidance, relocation of project facilities or lay-down areas, and/or relocation of biota.

- Facilities shall be designed to discourage their use as perching or nesting substrates by birds. For example, power lines and poles shall be configured to minimize raptor electrocutions and discourage raptor and raven nesting and perching.

### *Visual Resources*

- The public shall be involved and informed about the visual site design elements of the proposed wind energy facilities. Possible approaches include conducting public forums for disseminating information, offering organized tours of operating wind developments, and using computer and visualization simulations in public presentations.

- Visual resource management (VRM) considerations shall take place early in the project planning phase in accordance with BLM VRM manual and handbooks. Operators shall utilize digital terrain mapping tools at a landscape/viewshed scale for site planning and design, visual impact analysis, and visual impact mitigation planning and design. Visual mitigation planning and design shall be performed through field assessments, applied GPS technology, photo documentation, use of computer-aided design and development software, and visual simulations to reflect a full range of visual resource best management practices. The digital terrain mapping tools shall be at a resolution and contour interval suitable for site design and accurate placement of proposed developments into the digital viewshed. Visual

Attachment 1 - 7

BLM_0014418

simulations shall be prepared and evaluated in accordance with BLM Handbook H-8432-1, or other agency requirements, to create spatially accurate depictions of the appearance of proposed facilities. Simulations shall depict proposed project facilities from Key Observation Points and other visual resource sensitive locations.

- Turbine arrays and turbine design shall be integrated with the surrounding landscape. Design elements to be addressed include visual uniformity, use of tubular towers, proportion and color of turbines, nonreflective paints, and prohibition of commercial messages on turbines.

- Other site design elements shall be integrated with the surrounding landscape. Elements to address include minimizing the profile of the ancillary structures, burial of cables, prohibition of commercial symbols, and lighting. Regarding lighting, efforts shall be made to minimize the need for and amount of lighting on ancillary structures.

### Roads

- An access road siting and management plan shall be prepared incorporating existing BLM standards regarding road design, construction, and maintenance such as those described in the BLM 9113 Manual and the *Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development* (revised 2007).

### Ground Transportation

- A transportation plan shall be developed, particularly for the transport of turbine components, main assembly cranes, and other large pieces of equipment. The plan shall consider specific object sizes, weights, origin, destination, and unique handling requirements and shall evaluate alternative transportation approaches. In addition, the process to be used to comply with unique state requirements and to obtain all necessary permits shall be clearly identified.

- A traffic management plan shall be prepared for the site access roads to ensure that no hazards would result from increased truck traffic and that traffic flow would not be adversely impacted. This plan shall incorporate measures such as informational signs, flaggers when equipment may result in blocked throughways, and traffic cones to identify any necessary changes in temporary lane configuration.

Attachment 1 - 8

*Noise*

- Proponents of a wind energy development project shall take measurements to assess the existing background noise levels at a given site and compare them to the anticipated noise levels associated with the proposed project.

*Noxious Weeds and Pesticides*

- Operators shall develop a plan for control of noxious weeds and invasive species, which could occur as a result of new surface disturbance activities at the site. The plan shall address monitoring, education of personnel on weed identification, the manner in which weeds spread, and methods for treating infestations. The use of certified weed-free mulch and certified weed-free seed shall be required. If trucks and construction equipment are arriving from locations with known invasive vegetation problems, a controlled inspection and cleaning area shall be established to visually inspect construction equipment arriving at the project area and to remove and collect seeds that may be adhering to tires and other equipment surfaces.

- If pesticides are used on the site, an integrated pest management plan shall be developed to ensure that applications will be conducted within the framework of BLM and DOI policies and entail only the use of EPA-registered pesticides. Pesticide use shall be limited to nonpersistent, immobile pesticides and shall only be applied in accordance with label and application permit directions and stipulations for terrestrial and aquatic applications. Any applications of herbicides will be subject to BLM herbicide treatment standard operating procedures. Only herbicides on the list of approved herbicide formulations (updated annually) will be used on public lands.

*Cultural/Historic Resources*

- The BLM will consult with Indian tribal governments early in the planning process to identify issues regarding the proposed wind energy development, including issues related to the presence of cultural properties, access rights, disruption to traditional cultural practices, and impacts to visual resources important to the tribe(s).

- The presence of archaeological sites and historic properties in the area of potential effect shall be determined on the basis of a records search of recorded sites and properties in the area and/or, depending on the extent and reliability of existing information, an archaeological survey. Archaeological sites and historic properties present in the area of potential effect shall be reviewed to determine whether they meet the criteria of eligibility for listing on the *National Register of Historic Places* (NRHP).

Attachment 1 - 9

- When any right-of-way application includes remnants of a National Historic Trail, is located within the viewshed of a National Historic Trail's designated centerline, or includes or is within the viewshed of a trail eligible for listing on the NRHP, the operator shall evaluate the potential visual impacts to the trail associated with the proposed project and identify appropriate mitigation measures for inclusion as stipulations in the POD.

- If cultural resources are present at the site, or if areas with a high potential to contain cultural material have been identified, a cultural resources management plan (CRMP) shall be developed. This plan shall address mitigation activities to be taken for cultural resources found at the site. Avoidance of the area is always the preferred mitigation option. Other mitigation options include archaeological survey and excavation, and monitoring. If an area exhibits a high potential, but no artifacts were observed during an archaeological survey, monitoring by a qualified archaeologist may be required during all excavation and earthmoving in the high-potential area. A report shall be prepared documenting these activities. The CRMP also shall (1) establish a monitoring program, (2) identify measures to prevent potential looting/vandalism or erosion impacts, and (3) address the education of workers and the public to make them aware of the consequences of unauthorized collection of artifacts and destruction of property on public land.

*Paleontological Resources*

- Operators shall determine whether paleontological resources exist in a project area on the basis of the sedimentary context of the area, a records search for past paleontological finds in the area, and/or, depending on the extent of existing information, a paleontological survey.

- If paleontological resources are present at the site, or if areas with a high potential to contain paleontological material have been identified, a paleontological resources management plan shall be developed. This plan shall include a mitigation plan for collection of the fossils; mitigation may include avoidance, removal of fossils, or monitoring. If an area exhibits a high potential but no fossils were observed during survey, monitoring by a qualified paleontologist may be required during all excavation and earthmoving in the sensitive area. A report shall be prepared documenting these activities. The paleontological resources management plan also shall (1) establish a monitoring program, (2) identify measures to prevent potential looting/vandalism or erosion impacts, and (3) address the education of workers and the public to make them aware of the consequences of unauthorized collection of fossils on public land.

Attachment 1 - 10

BLM_0014421

*Hazardous Materials and Waste Management*

- Operators shall develop a hazardous materials management plan addressing storage, use, transportation, and disposal of each hazardous material anticipated to be used at the site. The plan shall identify all hazardous materials that would be used, stored, or transported at the site. It shall establish inspection procedures, storage requirements, storage quantity limits, inventory control, nonhazardous product substitutes, and disposition of excess materials. The plan shall also identify requirements for notices to Federal and local emergency response authorities and include emergency response plans.

- Operators shall develop a waste management plan identifying the waste streams that are expected to be generated at the site and addressing hazardous waste determination procedures, waste storage locations, waste-specific management and disposal requirements, inspection procedures, and waste minimization procedures. This plan shall address all solid and liquid wastes that may be generated at the site.

- Operators shall develop a spill prevention and response plan identifying where hazardous materials and wastes are stored on site, spill prevention measures to be implemented, training requirements, appropriate spill response actions for each material or waste, the locations of spill response kits on site, a procedure for ensuring that the spill response kits are adequately stocked at all times, and procedures for making timely notifications to authorities.

*Storm Water*

- Operators shall develop a storm water management plan for the site to ensure compliance with applicable regulations and prevent offsite migration of contaminated storm water or increased soil erosion.

*Human Health and Safety*

- A safety assessment shall be conducted to describe potential safety issues and the means that would be taken to mitigate them, including issues such as site access, construction, safe work practices, security, heavy equipment transportation, traffic management, emergency procedures, and fire control.

- A health and safety program shall be developed to protect both workers and the general public during construction, operation, and decommissioning of a wind energy project. Regarding occupational health and safety, the program shall identify all applicable Federal and State occupational safety standards; establish safe work practices for each task (e.g., requirements for personal protective equipment and safety harnesses; Occupational Safety and Health Administration (OSHA) standard practices for safe use of explosives and blasting agents; and measures for reducing occupational electric and magnetic

BLM_0014422

fields (EMF) exposures); establish fire safety evacuation procedures; and define safety performance standards (e.g., electrical system standards and lightning protection standards). The program shall include a training program to identify hazard training requirements for workers for each task and establish procedures for providing required training to all workers. Documentation of training and a mechanism for reporting serious accidents to appropriate agencies shall be established.

- Regarding public health and safety, the health and safety program shall establish a safety zone or setback for wind turbine generators from residences and occupied buildings, roads, rights-of-ways, and other public access areas that is sufficient to prevent accidents resulting from the operation of wind turbine generators. It shall identify requirements for temporary fencing around staging areas, storage yards, and excavations during construction or decommissioning activities. It shall also identify measures to be taken during the operation phase to limit public access to hazardous facilities (e.g., permanent fencing installed only around electrical substations, and turbine tower access doors locked).

- Operators shall consult with local planning authorities regarding increased traffic during the construction phase, including an assessment of the number of vehicles per day, their size, and type. Specific issues of concern (e.g., location of school bus routes and stops) shall be identified and addressed in the traffic management plan.

- If operation of the wind turbines is expected to cause significant adverse impacts to nearby residences and occupied buildings from shadow flicker, low-frequency sound, or EMF, site-specific recommendations for addressing these concerns shall be incorporated into the project design (e.g., establishing a sufficient setback from turbines).

- The project shall be planned to minimize electromagnetic interference (EMI) (e.g., impacts to radar, microwave, television, and radio transmissions) and comply with Federal Communications Commission (FCC) regulations. Signal strength studies shall be conducted when proposed locations have the potential to impact transmissions. Potential interference with public safety communication systems (e.g., radio traffic related to emergency activities) shall be avoided.

- The project shall be planned to comply with Federal Aviation Administration (FAA) regulations, including lighting regulations, and to avoid potential safety issues associated with proximity to airports, military bases or training areas, or landing strips.

Attachment 1 - 12

BLM_0014423

- Operators shall develop a fire management strategy to implement measures to minimize the potential for a human-caused fire and respond to natural fire situations.

## 3. Construction

### *General*

- All control and mitigation measures established for the project in the POD and the resource-specific management plans that are part of the POD shall be maintained and implemented throughout the construction phase, as appropriate.

- The area disturbed by construction and operation of a wind energy development project (i.e., footprint) shall be kept to a minimum.

- The number and size/length of roads, temporary fences, lay-down areas, and borrow areas shall be minimized.

- Topsoil from all excavations and construction activities shall be salvaged and reapplied during reclamation.

- All areas of disturbed soil shall be reclaimed using weed-free native grasses, forbs, and shrubs. Reclamation activities shall be undertaken as early as possible on disturbed areas.

- All electrical collector lines shall be buried in a manner that minimizes additional surface disturbance (e.g., along roads or other paths of surface disturbance). Overhead lines may be used in cases where burial of lines would result in further habitat disturbance.

- Operators shall identify unstable slopes and local factors that can induce slope instability (such as groundwater conditions, precipitation, earthquake activities, slope angles, and the dip angles of geologic strata). Operators also shall avoid creating excessive slopes during excavation and blasting operations. Special construction techniques shall be used where applicable in areas of steep slopes, erodible soil, and stream channel crossings.

- Erosion controls that comply with county, State, and Federal standards shall be applied. Practices such as jute netting, silt fences, and check dams shall be applied near disturbed areas.

### *Wildlife*

- Timing restrictions for construction activities may be implemented to minimize impacts to wildlife.

Attachment 1 - 13

- In accordance with the habitat restoration plan, restoration shall be undertaken as soon as possible after completion of construction activities to reduce the amount of habitat converted at any one time and to speed up the recovery to natural habitats.

- All construction employees shall be instructed to avoid harassment and disturbance of wildlife, especially during reproductive (e.g., courtship and nesting) seasons. In addition, pets shall not be permitted on site during construction.

### Visual Resources

- Operators shall reduce visual impacts during construction by clearly delineating construction boundaries and minimizing areas of surface disturbance; preserving vegetation to the greatest extent possible; utilizing undulating surface disturbance edges; stripping, salvaging and replacing topsoil; contoured grading; controlling erosion; using dust suppression techniques; and restoring exposed soils as closely as possible to their original contour and vegetation.

### Roads

- Existing roads shall be used, but only if in safe and environmentally sound locations. If new roads are necessary, they shall be designed and constructed to the appropriate BLM road design standards and be no higher than necessary to accommodate their intended functions (e.g., traffic volume and weight of vehicles). Excessive grades on roads, road embankments, ditches, and drainages shall be avoided, especially in areas with erodible soils. Special construction techniques shall be used, where applicable. Abandoned roads and roads that are no longer needed shall be recontoured and revegetated.

- Access roads and on-site roads shall be surfaced with aggregate materials, wherever appropriate.

- Access roads shall be located to follow natural contours and minimize side hill cuts.

- Roads shall be located away from drainage bottoms and avoid wetlands, if practicable.

- Roads shall be designed so that changes to surface water runoff are avoided and erosion is not initiated.

- Access roads shall be located to minimize stream crossings. All structures crossing streams shall be located and constructed so that they do not decrease

Attachment 1 - 14

channel stability or increase water velocity.  Operators shall obtain all applicable Federal and State permits.

- Existing drainage systems shall not be altered, especially in sensitive areas such as erodible soils or steep slopes.  Potential soil erosion shall be controlled at culvert outlets with appropriate structures. Catch basins, roadway ditches, and culverts shall be cleaned and maintained regularly.

### Ground Transportation

- Project personnel and contractors shall be instructed and required to adhere to speed limits commensurate with road types, traffic volumes, vehicle types, and site-specific conditions, to ensure safe and efficient traffic flow and to reduce wildlife collisions and disturbance and airborne dust.

- Traffic shall be restricted to the roads developed for the project. Use of other unimproved roads shall be restricted to emergency situations.

- Signs shall be placed along construction roads to identify speed limits, travel restrictions, and other standard traffic control information.  To minimize impacts on local commuters, consideration shall be given to limiting construction vehicles traveling on public roadways during the morning and late afternoon commute time.  Consideration shall also be given to opportunities for busing of construction workers to the job site to reduce traffic volumes.

### Air Emissions

- Dust abatement techniques shall be used on unpaved, unvegetated surfaces to minimize airborne dust.

- Speed limits (e.g., 25 mph [40 km/h]) shall be posted and enforced to reduce airborne fugitive dust.

- Construction materials and stockpiled soils shall be covered if they are a source of fugitive dust.

- Dust abatement techniques shall be used before and during surface clearing, excavation, or blasting activities.

### Excavation and Blasting Activities

- Operators shall gain a clear understanding of the local hydrogeology.  Areas of groundwater discharge and recharge and their potential relationships with surface water bodies shall be identified.

Attachment 1 - 15

BLM_0014426

- Operators shall avoid creating hydrologic conduits between two aquifers during foundation excavation and other activities.

- Foundations and trenches shall be backfilled with originally excavated material as much as possible.  Excess excavation materials shall be disposed of only in approved areas or, if suitable, stockpiled for use in reclamation activities.

- Borrow material shall be obtained only from authorized and permitted sites. Existing sites shall be used in preference to new sites.

- Explosives shall be used only within specified times and at specified distances from sensitive wildlife or streams and lakes, as established by the BLM or other Federal and State agencies.

*Noise*

- Noisy construction activities (including blasting) shall be limited to the least noise-sensitive times of day (i.e., daylight hours only or specified times) and weekdays.

- All equipment shall have sound-control devices no less effective than those provided on the original equipment.  All construction equipment used shall be adequately muffled and maintained.

- All stationary construction equipment (i.e., compressors and generators) shall be located as far as practicable from nearby residences.

- If blasting or other noisy activities are required during the construction period, nearby residents shall be notified in advance.

### Cultural and Paleontological Resources

- Unexpected discovery of cultural or paleontological resources during construction shall be brought to the attention of the responsible BLM authorized officer immediately.  Work shall be halted in the vicinity of the find to avoid further disturbance to the resources while they are being evaluated and appropriate mitigation measures are being developed.

### Hazardous Materials and Waste Management

- Secondary containment shall be provided for all onsite hazardous materials and waste storage, including fuel.  In particular, fuel storage (for construction vehicles and equipment) shall be a temporary activity occurring only for as long as is needed to support construction activities.

Attachment 1 - 16

BLM_0014427

- Wastes shall be properly containerized and removed periodically for disposal at appropriate offsite-permitted disposal facilities.

- In the event of an accidental release of hazardous materials to the environment, the operator shall document the event, including a root cause analysis, appropriate corrective actions taken, and a characterization of the resulting environmental or health and safety impacts.  Documentation of the event shall be provided to the BLM authorized officer and other Federal and State agencies, as required.

- Any wastewater generated in association with temporary, portable sanitary facilities shall be periodically removed by a licensed hauler and introduced into an existing municipal sewage treatment facility.  Temporary, portable sanitary facilities provided for construction crews shall be adequate to support expected onsite personnel and shall be removed at completion of construction activities.

### Public Health and Safety

- Temporary fencing shall be installed around staging areas, storage yards, and excavations during construction to limit public access.

## 4.  Operation

### General

- All control and mitigation measures established for the project in the POD and the resource-specific management plans that are part of the POD shall be maintained and implemented throughout the operational phase, as appropriate. These control and mitigation measures shall be reviewed and revised, as needed, to address changing conditions or requirements at the site throughout the operational phase.  This adaptive management approach will help ensure that impacts from operations are kept to a minimum.

- Inoperative turbines shall be repaired, replaced, or removed in a timely manner.  Requirements to do so shall be incorporated into the due diligence provisions of the rights-of-way authorization.  Operators will be required to demonstrate due diligence in the repair, replacement, or removal of turbines; failure to do so may result in termination of the right-of-way authorization.

### Wildlife

- Employees, contractors, and site visitors shall be instructed to avoid harassment and disturbance of wildlife, especially during reproductive (e.g., courtship and nesting) seasons.  In addition, any pets shall be controlled to avoid harassment and disturbance of wildlife.

Attachment 1 - 17

- Observations of potential wildlife impacts, including wildlife mortality, shall be reported to the BLM authorized officer immediately.

### *Visual Resources*

- Operators shall monitor and maintain visual mitigation measures for the approved project in accordance with a visual monitoring and compliance plan. The operator shall maintain revegetated surfaces until a self-sustaining stand of vegetation is reestablished and visually adapted to the undisturbed surrounding vegetation. No new disturbance shall be created during operations without completion of a VRM analysis and approval by the authorized officer.

### *Ground Transportation*

- Ongoing ground transportation planning shall be conducted to evaluate road use, minimize traffic volume, and ensure that roads are maintained adequately to minimize associated impacts.

### *Monitoring Program*

- Site monitoring protocols defined in the POD shall be implemented. These will incorporate monitoring program observations and additional mitigation measures into standard operating procedures and BMPs to minimize future environmental impacts.

- Results of monitoring program efforts shall be provided to the BLM authorized officer.

### *Public Health and Safety*

- Permanent fencing shall be installed and maintained around electrical substations, and turbine tower access doors shall be locked to limit public access.

- In the event an installed wind energy development project results in electromagnetic interference (EMI), the operator shall work with the owner of the impacted communications system to resolve the problem. Additional warning information may also need to be conveyed to aircraft with onboard radar systems so that echoes from wind turbines can be quickly recognized.

Attachment 1 - 18

BLM_0014429

## 5. Decommissioning

### *General*

- Prior to the termination of the right-of-way authorization, a decommissioning plan shall be developed and approved by the BLM. The decommissioning plan shall include a site reclamation plan and monitoring program.

- All management plans, BMPs, and stipulations developed for the construction phase shall be applied to similar activities during the decommissioning phase.

- All turbines and ancillary structures shall be removed from the site.

- Topsoil from all decommissioning activities shall be salvaged and reapplied during final reclamation.

- All areas of disturbed soil shall be reclaimed using weed-free native shrubs, grasses, and forbs.

- The vegetation cover, composition, and diversity shall be restored to values commensurate with the ecological setting.

BLM_0014430

## WIND ENERGY PLAN OF DEVELOPMENT

The following outline identifies the minimum requirements for an initial wind energy Plan of Development (POD) to be submitted prior to the end of the 3-year term of a site testing and monitoring authorization. These minimum requirements provide the basic information necessary to begin the National Environmental Policy Act (NEPA) analysis and review process for a wind energy development project. The specific outline format and title for each section of the POD does not have to be consistent with this template; however, the content of the POD needs to include these minimum requirements.

The wind energy POD is a dynamic document that may require additional information during the NEPA review and analysis process. The initial POD template is just that, initial. It may require different information from the applicant depending upon the environmental resources that may be impacted, the location of the proposed project, and the timing of the project. There may be information required from one applicant that is not required by another applicant because of the issues or resources involved.

**Wind Energy Plan of Development Outline**

1. Project Description
   a. Introduction
       - Describe type of facility and generation capacity (Federal and non-Federal lands)
       - Applicants proposed schedule for project, including anticipated timelines for permitting, construction and operation, and any phased development as appropriate
   b. Proponent's Purpose and Need for the Project
   c. General Facility Description, Design, and Operation
       -Project location, land ownership, and jurisdiction
       -Legal land description of facility (Federal and non-Federal lands)
       -Total acreage and general dimensions of all facilities and components
       -Number and size of wind turbines (Federal and non-Federal lands)
       -Wind turbine configuration and layout (Federal and non-Federal land)
       -Substations, transmission lines, access roads, buildings, parking areas
       -Ancillary facilities (administrative and maintenance facilities and storage sites)
       -Temporary construction workspace, yards, staging areas
       -Water usage, amounts, sources (during construction and operations)
       -Erosion control and stormwater drainage
       -Vegetation treatment, weed management, and any proposed use of herbicides
       -Waste and hazardous materials management
       -Fire protection
       -Site security and fencing proposed (during construction and operations)
       -Electrical components, new equipment and existing system upgrades
       -Interconnection to electrical grid
       -Spill prevention and containment for construction and operation of facility
       -Health and safety program

Attachment 2 -1

    d.  Other Federal, State and Local Agency Permit Requirements
        -Identify required permits (entire project area on both Federal and non-Federal lands)
        -Status of permits
    e.  Financial and Technical Capability of Applicant

2.  Construction of Facilities
    a.  Wind turbine design, layout, installation, and construction processes including timetable and sequence of construction
    b.  Geotechnical studies that may be planned
    c.  Phased projects, describe approach to construction and operations
    d.  Access and transportation system, component delivery, worker access
    e.  Construction work force numbers, vehicles, equipment, timeframes
    f.  Site preparation, surveying, and staking
    g.  Site preparation, vegetation removal, and treatment
    h.  Site clearing, grading, and excavation
    i.  Gravel, aggregate, concrete needs and sources
    j.  Wind turbine assembly and construction
    k.  Electrical construction activities
    l.  Aviation lighting (wind turbines, transmission)
    m. Site stabilization, protection, and reclamation practices

3.  Related Facilities and Systems
    a.  Transmission System Interconnect
        -Existing and proposed transmission system
        -Ancillary facilities and substations
        -Status of Power Purchase Agreements
        -Status of Interconnect Agreement
        -General design and construction standards
    b.  Meteorological Towers
    c.  Other Related Systems
        -Communications system requirements (microwave, fiber optics, hard wire, wireless) during construction and operation

4.  Operations and Maintenance
    a.  Operation and facility maintenance needs
    b.  Maintenance activities, including road maintenance
    c.  Operations workforce, equipment, and ground transportation

5.  Environmental Considerations
    a.  General description of site characteristics and potential environmental issues (existing information)
        -Special or sensitive species and habitats
        -Special land use designations
        -Cultural and historic resource sites and values
        -Native American Tribal concerns

Attachment 2 -2

BLM_0014432

-Recreation and OHV conflicts
-Visual Resource Management (VRM) designations
-Aviation and/or military conflicts
-Other environmental considerations
   b.  Design criteria (mitigation measures) proposed by applicant and included in POD

6.  Maps and Drawings
   a.  Maps with footprint of wind facility (7.5 min topographic maps or equivalent to include references to Public Land Survey system)
   b.  Initial design drawings of wind facility layout and installation, electrical facilities, and ancillary facilities.  These initial design drawings will typically be a 30% Engineering and Civil Design package to adequately describe the proposed project and evaluate the design considerations for soils, drainage, and watershed management.
   c.  Initial site grading plan
   d.  Maps with transmission facilities, substations, distribution, communications
   e.  Access and transportation maps
   f.  Preliminary visual resource evaluation and visual resource simulations

**Supplementary Information**

Additional supplementary information will be required from the applicant in order to prepare the NEPA analysis and complete the review process but is not required to be submitted with the initial POD.  This information is developed as further data is gathered onsite and as alternative designs and mitigation measures are incorporated into a final POD.  Other environmental data and inventory information (including but not limited to cultural resources, sensitive species, and other biological data) will also be required to be collected by the applicant in order to prepare the NEPA analysis.

1.  Engineering and Civil Design
   a.  Facility survey and design drawing standards
   b.  Final engineering and civil design packages for all wind energy facilities, electrical facilities, and ancillary facilities that incorporate all mitigation measures developed in the NEPA analysis and incorporated into the final POD
   c.  Aviation lighting plan
   d.  Watershed protection and erosion control design drawings
   e.  Final site grading plans
   f.  Visual resource evaluation, final simulations, and mitigation strategy

2.  Alternatives Considered by the Applicant
   a.  Alternative site evaluation criteria
   b.  Alternatives considered but not carried forward by proponent
   c.  Comparative analysis of proponents alternatives
   d.  Alternative site configurations

3.  Facility Management Plans
   a.  Stormwater Pollution Prevention and Protection Plan
   b.  Hazardous Materials Management Plan

Attachment 2 -3

BLM_0014433

    c.  Waste Management Plan
    d.  Invasive Species and Noxious Weed Management Plan
    e.  Health and Safety Plan (meeting OSHA requirements)
    f.  Environmental Inspection and Compliance Monitoring Plan

4.  Facility Decommissioning
    a.  Reclamation and site stabilization planning
    b.  Temporary reclamation of disturbed areas
    c.  Removal of wind turbines and substation facilities
    d.  Removal of other ancillary facilities

Attachment 2 -4

BLM_0014434

Form 1221-2
(June 1969)



| | | Release |
|---|---|---|
| **UNITED STATES** | | 6-125 |
| **DEPARTMENT OF THE INTERIOR** | | |
| **BUREAU OF LAND MANAGEMENT** | | |
| | | **Date** |
| **MANUAL TRANSMITTAL SHEET** | | 12/12/2008 |

**Subject**

### 6840 – Special Status Species Management

1. **Explanation of Materials Transmitted:  This release transmits a complete revision of Manual 6840, the Special Status Species Management Manual for the Bureau of Land Management.  This manual establishes policy for management of species listed or proposed for listing pursuant to the Endangered Species Act and Bureau sensitive species which are found on BLM-administered lands.**

2. **Reports Required:  None**

3. **Materials Superseded:  Manual pages superseded by this release are listed under "REMOVE" below.  No other directives are superseded.**

4. **Filing Instructions:  File as directed below**

| REMOVE | INSERT |
|---|---|
| **All of 6840 (Rels. 6-121)** | **6840** |
| **(Total: 26 Sheets)** | **(Total: 24 Sheets)** |

/s/ James Caswell
      Director

Case No. 1:20-cv-02484-MSK   Document 30   filed 04/27/21   USDC Colorado   pg 54 of 212

## Table of Contents

.01   Purpose
.02   Objectives
.03   Authority
.04   Responsibility
.05   References
.06   Policy

.1 Administration of the ESA
   A.  Section 2 (Findings, purposes, and policy)
   B.  Section 4 (Determination of endangered species and threatened species, designation of critical habitat, and development of recovery plans)
   C.  Section 5 (Land Acquisition)
   D.  Section 6 (Cooperation with States)
   E.  Section 7 (a)(1) (Conservation Programs)
   F.  Section 7 (a)(2) (Consultation)
   G.  Section 9 (Prohibited Acts)
   H.  Section 10 (Exceptions to the ESA)
   I.   Section 11 (Penalties and Enforcement)
   J.   Section 18 (Annual Cost Analysis by the U.S. Fish and Wildlife Service)

.2 Administration of Bureau Sensitive Species
   A.  Designation of Bureau Sensitive Species
   B.  Planning
   C.  Implementation
   D.  Agreements, Assessments, and Cooperative Strategies for Conservation
   E.  Management of Bureau Sensitive Species with the Oregon and California Lands Act

.3 General Cooperation for BLM Special Status Species
   A. Coordination and Cooperation with Tribes
   B. Other Cooperation and Coordination

Glossary of Terms

BLM_0014436

.01          6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

.01     <u>Purpose</u>.  The purpose of this manual is to provide policy and guidance for the conservation of BLM special status species and the ecosystems upon which they depend on BLM-administered lands.  BLM special status species are: (1) species listed or proposed for listing under the Endangered Species Act (ESA), and (2) species requiring special management consideration to promote their conservation and reduce the likelihood and need for future listing under the ESA, which are designated as Bureau sensitive by the State Director(s).  All Federal candidate species, proposed species, and delisted species in the 5 years following delisting will be conserved as Bureau sensitive species.

.02     <u>Objectives</u>.  The objectives of the BLM special status species policy are:

   A.  To conserve and/or recover ESA-listed species and the ecosystems on which they depend so that ESA protections are no longer needed for these species.

   B.  To initiate proactive conservation measures that reduce or eliminate threats to Bureau sensitive species to minimize the likelihood of and need for listing of these species under the ESA.

.03     <u>Authority</u>.

   A.  Endangered Species Act of 1973 (16 U.S.C. 1531 <u>et seq</u>.), as amended.

   B.  Sikes Act, Title II (16 U.S.C. 670g <u>et seq</u>.), as amended.

   C.  Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 <u>et seq</u>.), as amended (FLPMA).

   D.  Departmental Manual 235.1.1.A, General Program Delegation, Director, Bureau of Land Management.

   E.  Departmental Manual 632.1.1-1.6, Endangered Species Management.

   F.  Secretarial Order 3206 (American Indian Tribal Rights, Federal– Tribal Trust   Responsibilities, and the Endangered Species Act).

   G.  Information Quality Act (44 U.S.C 3504(d)(1) and 3516).

   H.  Oregon and California Lands Act (43 U.S.C. 1181a, <u>et seq</u>.).

.04     <u>Responsibility.</u>

   A.  The <u>Director</u> is responsible for overseeing implementation of Special Status species policies on BLM-administered lands, coordinating as needed with State Directors on select, multi-State species conservation issues, and making any

BLM_0014437

applications for project exemptions under Section 7(g) of the ESA to the Secretary of the Interior.

B. The Assistant Director for Renewable Resources and Planning is responsible for the timely development, approval, and implementation of procedures for carrying out the BLM special status species policies.

C.  The Chief, Division of Fish Wildlife and Plant Conservation, is responsible for initiating and recommending policies, objectives, general procedures, and priorities relating to Bureau sensitive species, federally proposed and listed species, federally proposed and designated critical habitat, and overall coordination of the special status species policies.  The Division Chief is also responsible for designating a National Program Lead whose responsibilities are:

1.  Developing and maintaining up-to-date policies pertaining to management of special status species on BLM lands.

2.  Developing agency budget documents pertaining to special status species management, and determining funding allocations to States.

3.  Coordinating with State program leads in all phases of implementation of the Bureau special status species program.

4.  Providing technical assistance and guidance to other BLM Washington Office programs to ensure proper consideration of BLM special status species matters in those programs.

5.  Maintaining appropriate interactions with the headquarters of other Federal agencies and bureaus, national conservation organizations, international conservation groups, and individual authorities to advance the objectives of the BLM special status species program.

6.  Maintaining a thorough knowledge of the legislation, regulations, court rulings, and litigation actions relative to Bureau sensitive species, federally proposed and listed species, and proposed and designated critical habitat, and communicating the implications of these actions to BLM decision makers and staff.

7.  Working with the National Training Center and other agencies to develop training and orientation materials relevant to this policy.

D.  The State Directors are responsible for:

1.  Developing and implementing procedures for the conservation of special status species on BLM-administered lands within their States.

BLM_0014438

2.   Coordinating the BLM special status species conservation efforts with adjoining BLM State Offices, State and other Federal agencies, various private organizations, and BLM stakeholders.

3.   Inventorying BLM lands to determine which BLM special status species occur on public lands, the condition of the populations and their habitats, and how discretionary BLM actions affect those species and their habitats.

4.   Designating Bureau sensitive species within their respective jurisdictions and, at least once every 5 years, reviewing and updating the Bureau sensitive species list in coordination with State agencies that are responsible for fisheries, wildlife, and botanical resources.

5.   Ensuring that when BLM engages in the planning process, land use plans and subsequent implementation-level plans identify appropriate outcomes, strategies, restoration opportunities, use restrictions, and management actions necessary to conserve and/or recover listed species, as well as provisions for the conservation of Bureau sensitive species.  In particular, such plans should address any approved recovery plans and conservation agreements.

6.   Ensuring that all actions comply with the ESA, its implementing regulations, and other directives associated with ESA-listed and proposed species, including compliance with Section 7 consultations and conferences with the U.S. Fish and Wildlife Service (FWS) and National Marine Fisheries Service (NMFS).

7.   Providing an annual summary of ESA-related expenditures, and other program performance and related information to the Washington Office on an as-needed basis.

8.   Designating State Program Leads, whose responsibilities are to:

a.   Initiate and provide technical support to other BLM personnel in the development of conservation strategies for special status species on BLM lands.

b.   Monitor implementation of Bureau sensitive species activities and policies within the state, and develop state level policies as needed to ensure program objectives are met.

c.   Collaborate with other program leads at the state level to ensure objectives of the BLM special status species program are integrated in those programs as appropriate.

d.   Maintain a cooperative working relationship with State and Federal agencies and local conservation groups, especially their respective state agencies with authority for listed species, wildlife, fish, and plants, and the

BLM_0014439

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .04D8e

regional and local offices of the FWS and NMFS.

e.   Recommend funding allocations that will best achieve the objectives of this policy and track expenditures to determine if the allocated funds have been appropriately expended.

f.   Recommend and develop training material to keep field and district offices current on policies and direction changes.

E.  <u>District Managers and Field Managers</u> are responsible for implementing the BLM special status species policies and program within their area of jurisdiction by:

1.   Implementing conservation strategies for BLM special status species as contained in approved recovery plans, cooperative agreements, and other instruments the BLM has cooperatively participated in the development of.

2.   Conducting and maintaining current inventories of BLM special status species on BLM-administered lands.

3.   Ensuring that all actions undertaken comply with the ESA, its implementing regulations, and other directives associated with ESA-listed and proposed species.

4.   Ensuring that the results of formal Section 7 consultations, including mandatory terms and conditions in incidental take statements that are consistent with 50 CFR 402 regulations, are implemented and documented in the administrative record.

5.   Coordinating field office activities with Federal, State, and local groups to ensure the most effective program for BLM special status species.

6.   Ensuring that land use and implementation plans fully address appropriate conservation of BLM special status species.

7.   Monitoring populations of Bureau special status species to determine whether management objectives are being met.  Records of monitoring activities are to be maintained and used to evaluate progress relative to such objectives.  Monitoring shall be conducted consistent with the principles of adaptive management as defined in Department of the Interior policy, as appropriate.

.05   <u>References</u>.

A.  50 CFR Part 17—<u>Endangered and Threatened Wildlife and Plants</u>.

B.  50 CFR Part 17—Subpart H—<u>Experimental Population</u>.

BLM_0014440

C.  50 CFR Part 226—<u>Designated Critical Habitat</u>.

D.  50 CFR Part 402—<u>Interagency Coordination—Endangered Species Act of 1973,</u> as amended.

E.  50 CFR Part 424—<u>Listing Endangered and Threatened Species and Designating Critical Habitat</u>.

F.  50 CFR Part 451—<u>Application Procedure</u>.

G.  43 CFR 4180—<u>Fundamentals of Rangeland Health and Standards and Guidelines for Grazing Administration</u>.

H.  68 FR 68255 (December 8, 2003)—<u>Joint Counterpart Endangered Species Act Section7 Consultation Regulations.</u>

I.  BLM Manual Section1601—<u>Land Use Planning</u>.

J.  BLM Handbook H-1601—<u>Land Use Planning Handbook</u>.

K.  BLM Manual 1745—<u>Introduction, Transplant, Augmentation, and Reestablishment of Fish, Wildlife, and Plants</u>.

L.  BLM Manual 1740—<u>Renewable Resource Improvements and Treatments</u>.

M.  BLM Handbook H-1740-2—<u>Integrated Vegetation Management Handbook.</u>

N.  BLM Handbook H-4180-1—<u>Rangeland Health Standards Handbook.</u>

O.  FWS and NMFS Endangered Species Consultation Handbook (March 1998).

P.  FWS Director, June 25, 2002, Memorandum on Arizona Cattle Growers Decision and Solicitor's opinion.

Q.  <u>Norton v SUWA,</u> 542 US 55 (2004).

R.  <u>National Association of Homebuilders v Defenders of Wildlife,</u> 127 S. Ct. 2518 (2007).

S.  <u>Forest Guardians v Forsgren,</u> 478 F.3d 1149 (10th Cir 2007).

T.  <u>Western Watersheds Project v Bureau of Land Management</u>, 552 F. Supp. 2d 1113 (D. N.V. 2008).

U.  <u>Western Watersheds Project v Matejko,</u> 468 F.3d 1099 (9th Cir 2006).

BLM_0014441

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .05V

V.  <u>Arizona Cattle Growers Association v Fish and Wildlife Service</u>, 273 F.3d 1229
(9th Cir 2004).

W.  <u>Gifford Pinchot Task Force v Fish and Wildlife Service</u>, 378 F.3d 1059
(9th Cir 2004).

X.  Application of the Endangered Species Act to proposals for access to non-Federal
lands across lands administered by the Bureau of Land Management and the U.S.
Forest Service, signed January 2003.

.06  <u>Policy</u>.  Actions authorized by the BLM shall further the conservation and/or recovery of
federally listed species and conservation of Bureau sensitive species.  Note that
"conservation" has a different meaning depending on whether it is referring to ESA listed
species or Bureau sensitive species.  See glossary.  Bureau sensitive species will be
managed consistent with species and habitat management objectives in land use and
implementation plans to promote their conservation and to minimize the likelihood and
need for listing under the ESA.

The BLM shall retain in Federal ownership those habitats essential for the
conservation of any listed species, particularly those that are part of a broader, logical
public land ownership management unit.  The BLM may dispose of lands providing
habitat for listed species, including critical habitat, only following consultation with
the FWS or NMFS and upon a determination that such action is consistent with
relevant law.  This policy does not apply to any lands conveyed pursuant to the Alaska
Native Claim Settlement Act.

.1  <u>Administration of the ESA</u>.  The administration portion of this manual is divided into three
separate parts: (1) species and habitats listed under the ESA, (2) species identified by BLM as
Bureau sensitive and (3) general cooperation on BLM special status species management.
The BLM shall conserve federally listed species by fulfilling the requirements of the ESA as
described in this section.  The Bureau sensitive species shall be conserved through the use of
management practices as described in Section .2.

Various provisions of the ESA, as amended, apply to plants and animals that have been listed
as endangered or threatened, those proposed for being listed, and designated and proposed
critical habitat.  The BLM shall conserve listed species through administration of the various
sections of the ESA that apply to Federal agencies.  When administering the ESA, the BLM
shall use the best scientific and commercial data available.  The BLM shall comply with all
applicable sections of the ESA as follows:

A.  <u>Section 2 (Findings, purposes, and policy)</u>.  The BLM shall, consistent with
Section 2 of the ESA, seek to conserve endangered and threatened species and shall
utilize its authorities in furtherance of the purposes of the ESA.  In addition:

1.  Federal Agency Cooperation.  The BLM will cooperate with other Federal
agencies as follows:

BLM_0014442

a.  Seek to improve efficiency by combining efforts with other Federal agencies  to foster better working relationships and promote the conservation of listed species.

b.  Establish or participate in existing regional interagency working groups that identify geographic areas within which the groups will coordinate agency actions, create opportunities, and overcome barriers to conserve listed species and the ecosystems upon which they depend.

c.  Participate in national ESA working groups to coordinate the implementation of the ESA.

2.  State and Local Agency Cooperation.  As specifically addressed in Section 2 of the ESA, the BLM shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.  The BLM should:

a.  Participate on watershed councils.

b.  Provide technical assistance to State and local agencies on species, critical habitats, and resources.

c.  Actively engage in the Federal Energy Regulatory Commission licensing and relicensing process for hydropower projects affecting ESA-listed and proposed species on BLM-administered lands.

B.  <u>Section 4 (Determination of endangered species and threatened species, designation of critical habitat and development of recovery plans)</u>.  While it is the responsibility of the FWS and/or NMFS to list threatened or endangered species and designate critical habitat, the BLM should provide relevant information to the FWS and/or NMFS on species or habitats proposed for listing and may petition to add a species to, or to remove a species from, the threatened or endangered species list.  In addition, the BLM should provide information to the FWS and/or NMFS on proposed critical habitat for BLM-administered lands as per the policy at .1.B.3 of this Manual, and cooperate, as appropriate, with the FWS and/or NMFS in developing recovery plans for listed species that occur on BLM-administered lands. In the development of BLM comments on recovery plans, listing proposals, or critical habitat proposals involving species distributed across more than one state, the BLM will consider designation of a lead State Office or the Washington Office to prepare consolidated agency comments.  The decision on preparation of such comments will be jointly agreed to among the affected State Offices and the Washington Office.

1.  <u>Determination of endangered or threatened status</u>.  Determination of endangered or threatened status of species by the FWS and/or NMFS is provided

BLM_0014443

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)      .1B1a

for in Section 4 of the Endangered Species Act and the procedures in 50 CFR Part 424.  BLM should provide assistance to the FWS and/or NMFS for actions that affect BLM-administered land, including as follows:

a.  Responsibilities.  The BLM is responsible for preparing and maintaining, on a continuing basis, a current inventory of the public land and its resources (FLPMA, 43 U.S.C. 1701 Sec.201 (a)).  This inventory information, along with monitoring data collected under a variety of programs, shall be used to evaluate the current status and trends of plants and animals and their habitats on BLM-administered lands, and to respond to FWS and/or NMFS *Federal Register* Notices of species status review (e.g., 90-day, 12-month, 5-year, and annual candidate reviews).

b.  Petitions.  When conditions warrant, the BLM Director may petition the FWS and/or NMFS to change the status of any species or revise critical habitat.  These petitions shall contain appropriate biological evidence to substantiate any proposed change.

(1)  A petition to delist a species or downlist a species from endangered to threatened must demonstrate clearly that the recovery plan objectives have been met or that there is new evidence to show that the conditions on which the initial listing was based no longer exist.  Petitions to delist should also include a statement on how the BLM intends to manage the species to ensure that the provisions of the ESA will not be required in the future.

(2)  Petitions to list or delist a species must be based solely on substantial scientific information for the species and its habitat, and must address the five factors for listing included in Section 4 of the ESA.

(3)  All petitions shall be coordinated with the appropriate State agency having responsibility for the species involved.

2.  Recovery plans.  Recovery plans are prepared by the FWS and/or NMFS and establish recovery objectives for a species, provide a listing of tasks necessary to achieve those objectives, and recommend assignments to involved agencies to carry out these tasks.  A primary function of recovery plans is to combine programs of all agencies involved in managing a species into a coordinated management effort.  The BLM will incorporate objectives and actions identified in recovery plans into BLM documents, as appropriate.  Examples of such documents include land use plans, implementation level plans, and species conservation plans or agreements.

a. Recovery Teams.  The FWS and/or NMFS often request that the BLM provide representatives to serve as members on recovery teams to assist in preparation of recovery plans for species where public land has a significant

BLM_0014444

role in recovery.  These requests usually include a suggestion for a particular employee with special qualifications.

(1)  State Directors should make employees with special expertise available and provide support as appropriate to help ensure timely completion of recovery plans.

(2)  BLM employees should accept these nominations.  The role of the team member is to be a technical expert and advisor, to provide biological input for the species and its habitat, and to inform the recovery team of BLM policies, programs, and procedures.

(3)  For species that range across multiple states, the BLM employee on the recovery team shall coordinate with the other affected BLM State Offices.

(4)  BLM employee participation in recovery plan preparation does not indicate BLM Director or State Director endorsement of the plan.

b.  Technical Review Drafts.  The appropriate State Office or selected BLM representative should review technical review drafts of recovery plans to ensure that the information is biologically correct and complete.  This review and input represents State Director formal response to the review draft.

c.  Agency Review Drafts.  All BLM offices that will be involved in implementation of a particular recovery plan should review draft plans.  The State Director(s) in the affected State(s) shall designate a BLM lead office to complete the following analysis using field office input:

(1)  Determine whether measurable objectives are stated clearly.

(2)  Identify any conflicts with other laws, regulations, and policies governing BLM programs and activities.

(3)  Identify constraints on other BLM programs, activities, or practices mentioned or implied in the plan.

(4)  Evaluate the effects of planned actions carried out by other cooperators on BLM programs.

(5)  Identify any inconsistencies with other BLM plans, ongoing programs, or ongoing practices.  Initiate efforts to make appropriate adjustments to meet recovery needs.

(6)  Check accuracy of cost estimates for BLM tasks, and evaluate economic feasibility of accomplishing the assigned tasks within existing

BLM_0014445

and prospective staffing and budgetary constraints.

3. <u>Critical Habitat Proposals on BLM-administered Lands</u>. Whenever the FWS and/or NMFS propose to designate critical habitat on BLM-administered lands, the State Director(s) should provide a written response to the *Federal Register* notice that identifies any special management considerations that are in place on BLM lands. Where the State Director determines that adequate conservation measures are in place, and that the benefits, including economic benefits, of excluding BLM lands from critical habitat designation exceed the benefits of inclusion of BLM lands, the State Director shall request exclusion of BLM lands from the critical habitat designation pursuant to Section 4(b)(2) and/or Section 3(5)(A) of the ESA. For proposals across multiple States, the Director will coordinate with the States and submit such information.

4. <u>Delisted Species.</u> The objectives of recovery plans and actions should ultimately be species recovery and removal from the Federal threatened or endangered species list (delisting). Pursuant to the ESA, FWS and/or NMFS are required to monitor delisted species for a minimum of 5 years. The BLM shall work with partners such as the FWS, NMFS, State agencies, and others, as appropriate, to monitor delisted species.

C. <u>Section 5 (Land Acquisition)</u>. This section authorizes the Secretary of the Interior to use Land and Water Conservation funds to acquire lands to conserve fish, wildlife, and plants, including those that are listed as endangered species or threatened species. When the BLM engages in the land use planning process, it will identify appropriate opportunities for acquisition by purchase, donation, land exchange, conservation easement, or other means, of land, water, or interests therein for the purpose of conserving fish, wildlife and plants, including listed species.

D. <u>Section 6 (Cooperation with States)</u>. This section authorizes the Secretary to cooperate to the maximum extent practicable with States, including entering into management agreements and cooperative agreements for the conservation of threatened and endangered species. The BLM should implement this section through a State level memorandum of understanding by providing technical assistance to, and coordinating with, State agencies responsible for the conservation of endangered and threatened species.

E. <u>Section 7(a)(1) (Conservation Programs)</u>. Section 7(a)(1) requires the BLM to use its authorities to further the purposes of the ESA by implementing programs for the conservation of threatened and endangered species and the ecosystems upon which they depend. Ways in which the BLM can carry out these responsibilities include, but are not limited to:

1. Developing and implementing activities that provide for the conservation and recovery of species listed pursuant to the ESA.

BLM_0014446

.1E2          6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

2.  Undertaking actions designed to maintain the integrity of the primary constituent elements of federally designated critical habitat on BLM-administered lands.

3.  Ensuring that BLM actions are not likely to jeopardize the continued existence of any endangered species or threatened species or destroy or adversely modify designated critical habitat.

4.  Determining, to the extent practicable, the occurrence, distribution, population, and habitat condition of all ESA-listed species on BLM-administered lands, and evaluating the significance of BLM-administered lands in the conservation of those species.

5.  Developing and implementing agency land use plans, implementation plans, and actions in a manner consistent with conservation and/or recovery of listed species.

6.  Monitoring and evaluating ongoing management activities to ensure conservation objectives for listed species are being met.

7.  Cooperating with the FWS and/or NMFS and other interested parties in species recovery and conservation as provided in species recovery plans.  Such actions may include species reintroductions, which shall be carried out in conformance with BLM Manual 1745.

8.  Implementing conservation recommendations included in biological opinions if they are consistent with relevant law and policy and are technologically and economically feasible.

F.  Section 7(a)(2) (Consultation).  The procedures for carrying out Section 7(a)(2) are included in 50 CFR Part 402, Interagency Cooperation and the counterpart regulations developed for National Fire Plan projects (50 CFR Part 402.30-34).  Whenever the BLM is considering a discretionary action that may affect a listed or proposed species or designated or proposed critical habitat, the BLM should consider engaging the FWS and/or NMFS early in the project development process and seek recommendations designed to minimize or avoid potential adverse affects to resources protected under the ESA.

1.  Discretionary and Nondiscretionary Agency Actions.  Section 7(a)(2) applies to affirmative "agency actions" that are authorized, funded, or carried out by the BLM.  The BLM must also have discretion to undertake the action.  See Part b, below.  Illegal and prohibited actions (e.g., trespass grazing) are not Federal actions and therefore do not require consultation.

a.  Consultation requirements apply to all discretionary actions that are

BLM_0014447

authorized, funded, or carried out by the BLM, whether or not:

(1)  The species or critical habitat occurs on BLM-managed lands.

(2)  The proposed action occurs, either wholly or in part, on BLM-managed lands.

(3)  The BLM itself carries out the proposed action.

(4)  The species occurs on non-Federal surface lands and the BLM manages the subsurface mineral estate (split-estate lands).

b.  Determining if an Action is Discretionary or Nondiscretionary.

(1)  Generally, actions that the BLM is statutorily required to perform, with no discretion to take an action to inure to the benefit of, including limiting the impacts of action on, a listed species or designated critical habitat, are not discretionary, and therefore initiation of consultation is not required.  Reinitiation of consultation is slightly different and is discussed in section .1.F.5.h.  However, if the BLM's discretion is constrained by its own regulation or otherwise, initiation of consultation is generally still required.  Examples of statutory nondiscretionary activities include patenting of mining claims and land conveyances pursuant to the Alaska Native Claims Settlement Act.  When field managers are uncertain whether particular actions are nondiscretionary for purposes of ESA consultation, they should seek guidance from their respective State Office.

(2)  Pre-ESA authorizations to Private Parties.  When the BLM has authorized actions by private parties on public lands before the enactment of the ESA, it only has to consult on post-ESA activities conducted by those private parties if it retains discretionary involvement or control over those private actions sufficient to take some action to inure to the benefit of, including limiting the impacts of action on, a listed species or designated critical habitat.  If the BLM did not retain such discretionary involvement or control, consultation on further BLM action is not required.  For example, the BLM need not consult on activities conducted by private parties on BLM rights-of-way granted before the ESA if the right-of-way does not grant it sufficient discretionary control to take actions that inure to the benefit of, or limit the impacts of action on, a listed species or designated critical habitat.

c.  Even if an action is determined to be nondiscretionary on behalf of the BLM, provisions of the ESA may be applicable to the outside entity involved with the activity.  In such situations, the BLM's responsibilities are as follows:

(1)  If the BLM has reason to believe a nondiscretionary action involving

BLM_0014448

BLM-administered lands may affect listed species or designated critical habitat, the BLM shall provide written notification to any person or persons involved that ESA-listed species or designated critical habitat are present.

(2)  If the outside entity involved with the nondiscretionary action wishes to develop measures that would eliminate effects on listed species or designated critical habitat, the BLM shall arrange for the participation of BLM specialists and, if needed, specialists from the FWS and/or NMFS during the process of developing such measures.

2.  <u>Characterizing the Proposed Action, Action Area, Interrelated and Interdependent Actions, Effects of an Action, and the Environmental Baseline.</u> When the BLM is carrying out its consultation and conference responsibilities under Section 7(a)(2) (see Sections 3, 4, and 5), it is critical to properly characterize the proposed action, the action area, the environmental baseline, and effects.  Cumulative effects are considered in relation to the requirements of the ESA only during the formal consultation process and are discussed in Section .1.F.2.e.(3).

a.  Proposed Action.  The proposed action includes any species conservation measures.  These actions can include both on-site actions to minimize or avoid effects to listed species or critical habitat and off-site conservation actions for the benefit of listed species.  Although off-site compensatory mitigation may not be used as a means of reducing the effects on the listed species at the site, such actions can be used by the BLM as a means of furthering its conservation objectives under Section 7(a)(1) of the ESA and as a means of meeting resource objectives under land use plans.

b.  Action Area.  The action area includes those areas affected directly or indirectly by the action, not merely the footprint of the action.  For example, noise disturbance resulting from the action that may be transmitted beyond the immediate project area must be assessed as part of the proposed action.

c.  Interrelated and Interdependent Actions.  Interrelated actions are those actions that are part of a larger action and depend on the larger action for their justification.  Interdependent actions are those that have no independent utility apart from the action under consideration.  The "but for" test should be used to assess whether an action is interrelated or interdependent to the proposed Federal action.  If the activity would not occur "but for" the proposed Federal action, then the activity is interrelated or interdependent and must be considered during consultation on the proposed Federal action.  If the Federal action merely facilitates the implementation of a subsequent action that may cause an effect on a listed species, those subsequent effects are not effects of the Federal action and are not subject to consultation.  If however, the Federal action is essential for implementing a subsequent action, the effects of both

BLM_0014449

the Federal action and subsequent action need to be analyzed in the consultation.

(1)  Rights-of-Way.  If the Federal action is an authorization for a right-of-way to private land, yet there is alternative access for the project proponent, only effects from the Federal right-of-way need to be analyzed. If there is no alternative access, effects from both the Federal action and private action need to be analyzed in the consultation.  Unless otherwise requested by an applicant (see section .1F.8.), the consultation process associated with the Federal action can only be used to condition activities on Federal lands.

(2)  Split-Estate Federal Minerals.  When necessary to comply with the ESA, the BLM or project proponent shall collect information to support an analysis of the effects to listed and proposed species as part of an effect determination for the proposed action in a biological assessment.  This may include the need for conducting inventory of either ESA listed or proposed species on private surface lands.  The BLM or the Federal mineral lessee has the right to enter the property for this purpose, since it is a necessary prerequisite to development of the dominant mineral estate. When sufficient information already exists, the BLM may proceed through the Section 7 consultation process using the existing information and determine appropriate measures to avoid and minimize effects on listed species and their habitats.

The BLM will take the lead in completing consultation on the proposed action unless the surface estate is administered by another Federal agency that elects to serve as the lead for consultation, or the project proponent is designated as the non-Federal representative by the Federal agency managing the surface or by the BLM (see section .1.F.8).

d.  Environmental Baseline.   The environmental baseline is the condition of a species or critical habitat at a specified time within the action area.  The baseline does not include effects of the action under review for consultation. It does include the Federal, tribal, State, local, and private actions already affecting a species or critical habitat, or those that will occur while the consultation is in progress.  Federal actions unrelated to the action under consultation that have affected or are affecting the species or critical habitat and have a completed formal, informal, or early consultation are part of the baseline.

e.  Types of Effects.  There are three types of effects that are considered under Section 7(a)(2) of the ESA: direct effects, indirect effects, and cumulative effects.  Each type of effect is described below.  In addition, when considering the effects of a proposed action under Section 7(a)(2), the BLM is required to consider the effects of interrelated or interdependent actions.

BLM_0014450

.1F2e(1)          6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

(1) Direct Effects.  Those effects caused by the action and that occur in the same time and place.  Direct effects are immediate, natural causes of taking the proposed action.  Effects of future federal actions cannot be direct effects.

(2)  Indirect Effects.  Those effects caused by the action that are later in time, but reasonably certain to occur.

> (a) "Caused by."  For a particular effect on a species or critical habitat to be caused by a particular action, there must be a close causal connection between the action and the effect.  This means that the particular effect must not be able to occur "but for" the action under consultation.  Thus, if the effect may occur without the action under consultation taking place, the "but for" portion of the test is not met and the effect need not be considered.

> (b) "Reasonably Certain to Occur."  For a particular effect to be an effect subject to consultation, it must be reasonably certain to occur.  This determination cannot be based on speculation or the mere possibility of an effect on a listed species or critical habitat.  In the context of indirect effects, "reasonably certain to occur" may be evidenced by appropriations, work plans, permits issued, or budgeting; they follow a pattern of activity undertaken in the action area; or they are the logical extensions of the proposed action.

(3)  Cumulative Effects.  In accordance with Section 7 regulations, the FWS and/or NMFS is required to consider cumulative effects in formal consultation when determining whether or not an action is likely to jeopardize the continued existence of a species.  The regulations require the BLM to provide an analysis of cumulative effects for projects entering formal consultation.  Cumulative effects, as defined for the purposes of the ESA, involve those effects from future non-Federal actions (tribal, State, local, private and other entities) that are reasonably certain to occur within the action area.  See the discussion under indirect effects for an explanation of "reasonably certain to occur."  Future Federal actions are not considered as they will be subject to consultation when they are proposed.  When making the "reasonably certain to occur" determination in the context of cumulative effects, the BLM must examine the effects of these actions that are likely to occur, bearing in mind the economic, administrative, or legal hurdles that remain to be cleared.  Indications of this likelihood include approval of the action by the appropriate government unit(s), evidence of funding having been obtained by project sponsors, or the initiation of contracts.  These future non-Federal actions are reasonably certain to occur if approval by all non-Federal agencies or governments granting authority for the action is reasonably certain and

BLM_0014451

economically viable. Past and ongoing effects are considered part of the environmental baseline and are not considered cumulative effects.

(4) Distinguishing between National Environmental Policy Act (NEPA) effects and ESA effects. NEPA and the ESA have different purposes and impose different analytical standards. While the NEPA and ESA standards for direct effects are very similar, there is an important difference between the acts regarding the standards for indirect and cumulative effects. Under NEPA, indirect or cumulative effects must be reasonably foreseeable. In contrast, the ESA and its regulations require that such effects be reasonably certain to occur. Thus, effects that may be required to be considered under the NEPA analysis standard may not necessarily require consideration under the ESA. In addition, under NEPA, cumulative effects include the effects of both Federal and non-Federal actions, whereas under ESA, cumulative effects do not include Federal actions.

3. "May Affect" Determination. If the BLM is taking a discretionary agency action, it must determine if the action "may affect" a listed species or designated critical habitat. If the BLM determines that ESA-listed species or designated critical habitat may be affected by an action, either positively or negatively, then the BLM must engage in either informal or formal consultation. In addition, the FWS and/or NMFS may request that the BLM enter into consultation if they identify an action for which there has been no consultation that may affect a listed species or designated critical habitat. If the BLM determines, after a review of the project and any interrelated or interdependent actions, that there is no reasonable likelihood that listed species are in the action area, or that there will be no direct or indirect effects to the species in the action area, the action is determined to have "no effect" on listed species or critical habitat. No consultation is required under these circumstances. The administrative record should document these conclusions.

4. Informal Consultation. Informal consultation is a process that includes all discussions and correspondence between the FWS and/or NMFS and the BLM or its designated non-Federal representative. Its purpose is to assist the BLM in determining if formal consultation is required.

If the BLM determines that its particular discretionary agency action "may affect" a listed species or designated critical habitat, it must then determine whether the action is likely to adversely affect (LAA) any listed species or designated critical habitat or not likely to adversely affect (NLAA) such resources.

The consultation regulations at 50 CFR 402.12 only require preparation of a biological assessment (BA) when an action agency proposes a "major construction activity," which is defined as an action requiring preparation of an

BLM_0014452

environmental impact statement pursuant to the National Environmental Policy Act. However, the BLM will prepare a BA for submittal to FWS and/or NMFS when seeking concurrence on an NLAA determination. The scope and content of a BA prepared by the BLM shall be directly related to the level of potential effect on listed species or designated critical habitat. See Section .1F.5.a.(2) for guidance on the preparation of a BA.

Not likely to adversely affect (NLAA) is the appropriate conclusion when a causal mechanism for creating an effect exists, and the effect is 1) discountable, 2) insignificant, or 3) completely beneficial. These effects have an extremely low probability of occurrence (discountable); cannot be translated into any significant measurable effect on the species even when effects on habitat can be measured (insignificant); or are completely beneficial. For discountable and insignificant, the risk of harm or harassment is so low that a reasonable person would not consider it a factor in making a decision on the proposed action.

Likely to adversely affect (LAA) is the appropriate conclusion if a causal mechanism exists within the action area that creates a direct or indirect effect, or an effect from an interrelated or interdependent activity, that is not discountable, insignificant, or completely beneficial. Adverse effects are those where the likelihood of "take" resulting from the action is not insignificant, and evidence is present in a logical analysis to support this determination to the extent that a reasonable person would agree with the determination.

If the BLM determines that the action is LAA, formal consultation is required. If the BLM determines a proposed action is NLAA a listed species or designated critical habitat, the agency must request that the FWS and/or NMFS concur in that determination. If the FWS and/or NMFS indicate they are unlikely to support an NLAA determination, the BLM should consider further discussion with the Services directed at resolution of outstanding questions and possible development of additional measures to reduce potential effects on listed species or designated critical habitat. If the FWS and/or NMFS refuse to concur in a BLM determination that an action is NLAA, formal consultation is required. Similarly, if the BLM determines that an action is LAA, formal consultation is required.

Informal consultation does not conclude until the BLM has written concurrence of its determination from the FWS and/or NMFS, until the procedures specified under counterpart regulations at 50 CFR 402.34 have been fulfilled, the BLM makes a determination of no effect, or until the BLM enters formal consultation with the FWS and/or NMFS.

5. Formal Consultation. Formal consultation is required on all actions that may affect a listed species, or any designated critical habitat, unless written concurrence that an action is not likely to adversely affect the species is received from FWS and/or NMFS, or the action qualifies for an alternative consultation

BLM_0014453

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)                    .1F5a

under an alternative consultation agreement pursuant to the counterpart regulations for national fire plan projects. When it is determined by the BLM that a proposed action may affect and is likely to adversely affect a listed species or designated critical habitat, the BLM shall initiate formal consultation. Formal consultation is conducted to determine if the proposed action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of designated critical habitat. Formal consultation is initiated with submission of a completed biological assessment and a written request to initiate formal consultation.

   a. Providing Information. During formal consultation, the BLM shall provide the FWS and/or NMFS with the best scientific and commercial information available for an adequate review of the effects that a proposed action may have on a listed species or designated critical habitat. If information is lacking, the FWS and/or NMFS can request that the BLM conduct additional surveys or studies to better address listed species issues. Although additional surveys or studies are not required by the ESA, and in many situations may not be practicable, they can be in the BLM's best interest, as the FWS and/or NMFS generally err on the side of conserving listed species when rendering a biological opinion based on limited information. In some situations, it may be necessary to enter consultation with the presently available best scientific and commercial data.

      (1) The BLM shall request in writing a list from the FWS and/or NMFS of listed species and designated critical habitat in the action area of a major construction activity. The BLM may request in writing from FWS and/or NMFS a list of species or designated critical habitat for any other agency action. In lieu of requesting such a list, the BLM may determine the presence of listed species or designated critical habitat within the action area and request concurrence from the FWS and/or NMFS.

      (2) The BLM shall prepare a biological assessment (BA), as described in 50 CFR 402.12 and 402.14, as the means of providing the best scientific and commercial information available to the FWS and/or NMFS.

         (a) When to prepare a BA. A biological assessment shall be prepared for all actions on which formal consultation is necessary. In some instances, the BLM may satisfy the requirement to prepare a BA by incorporating by reference material from a previous biological assessment pertaining to a similar action or through preparation of an environmental assessment or environmental impact statement.

         (b) BA contents. By regulation, the contents of a BA are at the discretion of the Federal action agency; however, they shall be based on the best available scientific and commercial data, and shall clearly document the logic used by BLM in reaching its determination of

BLM_0014454

.1F5b        6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

effects.  The consultation regulations (50 CFR 402.12.j) contain recommended contents of a BA.  The content of a BA prepared by the BLM for either informal or formal consultation will contain the same information, except that a BA prepared for informal consultation will not include a discussion of cumulative effects.  BAs prepared by the BLM will contain the following information:

(i)  A clear, thorough description of the action, including any actions to minimize or avoid adverse effects on listed species or designated critical habitat.

(ii)  A description of the area that may be directly or indirectly affected by the action.

(iii)  Identification of any interrelated or interdependent actions.

(iv)  A description of any listed species or designated critical habitat that may be affected, including the results of any on-site inspection(s) of the action area to determine if listed or proposed species are present or occur seasonally.

(v)  A review of the literature, and any other pertinent information, including available views of recognized experts on the species at issue.

(vi)  An analysis of the direct and indirect effects of the action and any interrelated or interdependent actions on the listed species and critical habitat.

(vii)  A determination of effects that is clearly supported by the analysis of effects.

(viii)  Identification of any alternate actions considered by the Federal agency for the proposed action.

(ix)  For formal consultation only, an analysis of cumulative effects.

While it is important to analyze and document the effects of actions on Bureau sensitive species and "no effect" determinations for listed species in NEPA documents, these analyses will not be included in BAs provided to the FWS and/or NMFS.

b.  Irreversible and Irretrievable Commitment of Resources.  Under Section 7(d) of the Act, once a request for formal consultation is made or consultation is reinitiated and until the requirements of Section 7(a)(2) are satisfied, the

BLM_0014455

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)        .1F5c

BLM shall ensure that the agency and any of its applicants do not make any irreversible or irretrievable commitments of resources on agency land with respect to the agency action that have the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives that could avoid jeopardy to listed species or destruction or adverse modification of designated critical habitat. For ongoing actions subject to formal consultation, the BLM shall conduct and document an analysis pursuant to Section 7(d) of the ESA pertaining to agency actions to determine if there will be any such irreversible or irretrievable commitments of resources. Any BLM discretionary actions with such irreversible or irretrievable commitments of resources shall be immediately suspended until consultation has concluded.

c. Reasonable and Prudent Alternatives. If the FWS and/or NMFS conclude that an action is likely to jeopardize the continued existence of a listed species or is likely to result in the destruction or adverse modification of designated critical habitat, it will prepare a biological opinion that identifies any reasonable and prudent alternatives needed to avoid jeopardy or destruction or adverse modification of critical habitat. Reasonable and prudent alternatives are those that can be implemented in a manner consistent with the intended purpose of the action, can be implemented consistent with the scope of the action agency's legal authority and jurisdiction, are economically and technologically feasible, and would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of designated critical habitat. As the development of reasonable and prudent alternatives is necessitated when the FWS and/or NMFS concludes that an agency action is likely to cause jeopardy or adverse critical habitat modification, the scope of recommended alternatives will be based on the full range of discretion available to the agency.

d. Draft biological opinion. During formal consultation, the BLM should request a draft copy of the biological opinion and incidental take statement (ITS) (if applicable) for review. In any instance involving a potential jeopardy opinion, this review should include an analysis to determine whether any reasonable and prudent alternative is within the scope of the BLM's authority, can be implemented in a manner consistent with the intended purpose of the proposed action, and is economically and technically feasible. The BLM review should also evaluate whether any reasonable and prudent measures, and their implementing terms and conditions, contained in any ITS do not cause more than a minor change to the proposed Federal action. Minor changes cannot alter the basic design, location, scope, duration, or timing of the action. The ITS provided with a draft biological opinion does not constitute a statement of anticipated take under Section 10 of the ESA unless it is confirmed by the FWS and/or NMFS as the final biological opinion.

(1) The BLM should provide expertise to the FWS and/or NMFS in determining the availability and development of reasonable and prudent

BLM_0014456

alternatives, although the FWS and/or NMFS retains the final decision on which alternatives are included in the biological opinion. The BLM should encourage applicant participation in the development of reasonable and prudent alternatives.

(2) The BLM should forward a copy of the draft biological opinion to applicants upon their request, and inform them that any comments they may have for the FWS and/or NMFS must go through the BLM, although they may provide copies to the FWS and/or NMFS directly.

(3) The BLM should forward applicant comments to the FWS and/or NMFS.

(4) The BLM should ensure that any ITS with reasonable and prudent measures and mandatory terms and conditions provides the agency protection from any and all prohibited takings under Section 9 of the Act that are reasonably certain to occur. Reasonable and prudent measures imposed by the FWS and/or NMFS can include only actions that occur within the action area, and are consistent with a project's basic design, location, scope, duration, and timing. Since the FWS and/or NMFS have determined that any take associated with the agency action will not result in jeopardy, any changes to the project as a result of reasonable and prudent measures imposed by FWS and/or NMFS must be minor and directly related to reduction in the level of take. For example, it would be inappropriate for the FWS and/or NMFS to recommend relocation of a project as a reasonable and prudent measure. Incidental take statements should comport with the Department of the Interior policy, specifically:

(a) If there is no reasonable certainty of take, there should be no ITS and no reasonable and prudent measures with terms and conditions. Terms and conditions must have an articulated, rational connection to the taking of a species.

(b) Terms and conditions must give clear guidance to the holder of the ITS of what is expected of him or her and how the condition can be met, and must provide a clear standard for determining when the authorized level of take has been exceeded.

(5) By regulation, incidental take statements and associated reasonable and prudent measures with accompanying terms and conditions do not apply to, nor are they issued for, ESA-listed plant species.

e. Termination of the Consultation Procedures. Formal consultation may terminate as follows:

(1) The FWS and/or NMFS issues a biological opinion.

BLM_0014457

(2)  During any stage of consultation, the BLM notifies the FWS and/or NMFS in writing that the proposed action is not likely to occur.

(3)  During any stage of consultation, the BLM determines, with the written concurrence of the FWS and/or NMFS, that the proposed action is not likely to adversely affect any listed species or critical habitat.

f.  Consultation Timelines.  Consultation regulations require that formal consultation be concluded 90 days after it is initiated, unless otherwise agreed to between the FWS and/or NMFS and the BLM.  However, the FWS and/or NMFS does not consider the consultation process initiated until it determines that information provided by the BLM represents the best scientific and commercial data available.  The regulations provide that the biological opinion is to be transmitted to the Federal agency no later than 45 days after the conclusion of consultation.  As consultation deadlines approach, the BLM should contact the FWS and/or NMFS to determine whether consultation deadlines will be met.

g.  BLM responsibility after issuance of the biological opinion.  After the FWS and/or NMFS issues the biological opinion, the BLM determines how it will proceed.

(1)  The BLM shall notify the FWS and/or NMFS in writing of its final decision on any proposed actions that receive a jeopardy or adverse modification of critical habitat determination in the biological opinion.  If the BLM determines that it cannot comply with the requirements of Section 7(a)(2) (no jeopardy) of the ESA, it may apply for an exemption, as outlined in .1.F.10.

(2)  After acceptance of the biological opinion, the BLM shall implement the proposed action or reasonable and prudent alternative as described, and shall implement all mandatory terms and conditions identified in the ITS.  The exemption from listed species take prohibitions, as specified in Section 9 of the ESA, are only valid on the basis of full implementation of these requirements.  The BLM shall review conservation recommendations in biological opinions and implement them if they are consistent with BLM land use planning and policy and if they are technologically and economically feasible.

(3)  The ITS will specify the effect (i.e., the amount or extent of such incidental take); specify those reasonable and prudent measures that the FWS and/or NMFS considers necessary or appropriate to minimize such effect; set forth implementing terms and conditions (including reporting requirements) that must be complied with by the BLM or any applicant; specify procedures to be used to handle or dispose of any individuals of

BLM_0014458

a species actually taken; and outline the required monitoring and reporting requirements to be implemented over the life of the action. The responsible BLM line officer will ensure these reporting requirements are documented in the administrative record.

(4)  Biological opinions for plants will not have an accompanying ITS, but may contain conservation recommendations.  The BLM shall review such conservation recommendations and implement them if they are consistent with BLM land use plans and policy and if they are technologically and economically feasible.

(5)  An ITS provided with a conference opinion does not become effective unless the FWS and/or NMFS adopts the conference opinion as the final biological opinion once the species listing is final.  The BLM must request in writing that a conference opinion be adopted as a biological opinion once a proposed species has been listed.

h.  Reinitiation.  Reinitiation of formal consultation is required and shall be requested by the BLM or the FWS and/or NMFS where discretionary control over the action has been retained and (1) the amount or extent of incidental taking specified in the ITS is exceeded, (2) new information reveals that effects of the action may affect listed species or designated critical habitat in a manner or extent not previously considered, (3) the action is modified in a way that may affect listed species or critical habitat in a way not considered in the biological opinion, and/or (4) a new species is listed or critical habitat is designated that may be affected by the action.  The appropriate line officer shall monitor the amount or extent of authorized incidental take and should reinitiate consultation in a timely way if it appears that the level of take will be exceeded over the life of the action.  If the amount or extent of incidental take is met or exceeded, the activity must be terminated until additional consultation is concluded.  The State Director or Field Manager of the administrative unit that received the biological opinion shall also determine if any other reinitiation condition has occurred and, if so, shall reinitiate the consultation with the appropriate FWS and/or NMFS office.

There is no duty to reinitiate consultation unless there is an ongoing agency action.  In the context of a land use plan, the agency action of approving a plan is complete upon approval and a plan is therefore not an ongoing action over the life of the plan.  For this reason, reinitiation of consultation is not required if, for example, a new species is listed or critical habitat is designated after a plan is approved.

i.  Incremental Step Consultation.  The BLM may request that the FWS and/or NMFS conduct consultation in incremental steps when by statute the BLM is allowed to take incremental steps toward completion of the action (e.g.,

BLM_0014459

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)        .1F5i(1)

issuance of oil and gas or geothermal leases that involve subsequent permitting processes). The biological opinion will include the FWS and/or NMFS views on the entire action (50 CFR Part 402.14(k)).

(1) The initial consultation using the incremental step approach must be formal (see .1.F.5).

(2) The BLM may proceed with the incremental step provided that the FWS and/or NMFS finding for the incremental step is not a jeopardy opinion; the BLM continues consultation with respect to the entire action and obtains biological opinions, as required, for each incremental step; the BLM fulfills its obligation to obtain sufficient data upon which to base the final biological opinion on the entire action; the incremental step does not result in the irreversible or irretrievable commitment of resources; and there is reasonable likelihood that the entire action will not result in jeopardizing the continued existence of a listed species or destruction or adverse modification of designated critical habitat.

6. <u>Conference on Proposed Species and Proposed Critical Habitat.</u>  Section 402.10 of 50 CFR provides the procedures necessary for compliance with Section 7(a)(4) of the ESA, which establishes requirements for conferencing on proposed species and proposed critical habitat.

a. The ESA requires BLM to conference with the FWS and/or NMFS on actions that are likely to jeopardize a proposed species or cause destruction or adverse modification to proposed critical habitat. Since the BLM is generally not in a position to determine jeopardy, BLM policy is to confer on all discretionary actions that are determined to be May Affect, Likely to Adversely Affect. Conversely, BLM policy is to not confer on actions determined Not Likely to Adversely Affect.

b. For proposed species, the BLM should request conference in anticipation of future listing. The BLM should request that the conference follow the procedures for formal consultation when deemed advantageous to the agency. The conference opinion issued at the conclusion of a conference may be adopted as the biological opinion if the species or critical habitat is listed or designated, provided the project proposal has not changed and no new pertinent information exists. The FWS and NMFS usually provide advisory recommendations on ways to avoid or minimize adverse effects.

c. The BLM should consider the advisory recommendations for minimizing or avoiding adverse effects to proposed species or proposed critical habitat that are provided by the FWS and/or NMFS in the conference report or conference opinion. Implementation of recommendations is at the discretion of the BLM.

BLM_0014460

.1F7        6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

7.  Programmatic and Plan Level Consultations.   The BLM should  invite the FWS and/or NMFS to participate early in the planning process to ensure that effective, agreed on conservation measures are included in the design of any plan to improve the efficiency of the Section 7 consultation process and to assist BLM in meeting its objectives under section 7(a)(1) of the ESA.

The adoption, revision, or amendment of a land use plan is an agency action subject to Section 7(a)(2) of the ESA.  Thus, for new land use plans, plan revisions, or plan amendments, the BLM must determine whether the plan "may affect" listed species or designated critical habitat.  If the BLM determines that the plan may affect listed species or critical habitat, then the BLM must engage in either informal or formal consultation with the FWS and/or NMFS.  When determining whether a plan may affect listed species or critical habitat, the BLM must carefully evaluate whether any effects of the actions, as defined by the ESA, are caused by the adoption, revision, or amendment of the land use plan and are reasonably certain to occur.  This analysis should be rigorously documented in the administrative record.

There is no duty to reinitiate consultation unless there is an ongoing agency action.  In the context of a land use plan, the agency action of approving a plan is complete upon approval and a plan is therefore not an ongoing action over the life of the plan.  For this reason, reinitiation of consultation is not required if, for example, a new species is listed or critical habitat is designated after a plan is approved.

8.  Applicants, Designation of non-Federal Representatives, and Early Consultation.

a.  Applicant.  An applicant is defined as any person who requires formal approval or authorization (such as for permits, licenses, leases, or letters of authorization or approval) from the BLM as a prerequisite to conducting an action.  An applicant can be an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.  The applicant is involved in the ESA conference or consultation process if the applicant's specific action that requires approval or authorization by the BLM may affect a federally threatened, endangered, or proposed species.

(1)  The BLM shall identify and determine who is an applicant for the purposes of ESA consultation.  The BLM does not typically identify applicants in association with programmatic consultations, (e.g., land use plan-level consultation) because no specific action that may require authorization or approval is involved.  Under programmatic consultations,

BLM_0014461

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .1F8a(2)

the BLM usually retains the discretion to provide formal authorization or approval for more specific actions.  If consultation for a more specific action is required, applicants for that specific action will be identified at that time.

(2)  The BLM shall promptly inform FWS and/or NMFS if there is an applicant identified for a project that has been or will be submitted for consultation.

(3)  The BLM shall notify known applicants promptly of their opportunities for participation in the consultation and/or conference process.

   (a)  The BLM shall provide any applicant the opportunity to submit information for consideration during the consultation process and should provide the same opportunity during the conference process.

   (b)  If, after receipt of or concurrence with the species list received from the FWS and/or NMFS, a required BA will not be completed within the 180-day period, the BLM shall provide the applicant with a written statement setting forth the estimated length of the proposed extension and the reasons why such an extension is necessary.  An extension is not allowed unless the BLM notifies the applicant before the 180-day deadline.

   Once initiated, consultation involving an applicant must be concluded within 90 days, unless the FWS and/or NMFS and the BLM mutually agree to extend the consultation, provided that the FWS and/or NMFS submits to the applicant, before the close of the 90 days, a written statement setting forth:  (1) the reasons why a longer period is required, (2) the information that is required to complete the consultation, and (3) the estimated date on which the consultation will be completed.  A consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant.

   (c)  If requested by the applicant, the BLM should request a copy of the draft biological opinion from the FWS and/or NMFS, provide a copy to the applicant, and forward any applicant comments to the FWS and/or NMFS.

   (d)  The BLM should encourage the FWS and/or NMFS to discuss the basis for the biological determination in the biological opinion to enhance the applicant's understanding of the outcome.  The BLM may also involve the applicant in discussions with the FWS and/or NMFS to develop reasonable and prudent alternatives to the proposed action

BLM_0014462

in instances where a proposed action is determined to be likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of designated critical habitat.

b.  Designation of non-Federal Representative.  For each consultation involving an applicant, the appropriate BLM line manager will consider designating the applicant as the non-Federal Representative for purposes of conducting informal consultation and/or preparing a biological assessment under 50 CFR Part 402.08.  In making this determination, the line manager should evaluate (1) whether the applicant has sufficient expertise to prepare a biological assessment, or can reasonably secure such expertise, and (2) whether such designation is advantageous to the government.

The BLM can assign the non-Federal representative to prepare the biological assessment, conduct informal consultation, or both.  The non-Federal representative may be an applicant, contractor or other party as appropriate.  The non-Federal Representative is not permitted to conduct formal consultation beyond preparation of a biological assessment, and shall not subject the BLM to any obligation without specific consent of the agency.  The BLM shall furnish available information pertaining to the consultation, guidance, and supervision to the extent required, and must independently review and evaluate the scope and contents of the biological assessment prepared by the non-Federal Representative.

Even with designation of a non-Federal Representative, the ultimate responsibility for compliance with Section 7 of the ESA remains with the BLM.  Although there are similarities, a non-Federal representative is not the same as an applicant.  Whereas an applicant has the opportunity to participate in consultation alongside the BLM, a non-Federal representative acts in the BLM's place to prepare the BA and/or conduct informal consultation.

(1) The BLM shall provide written notice to the FWS and/or NMFS if it designates a non-Federal representative.

(2)  An applicant may be designated as the non-Federal representative.  If an applicant is involved and is not the designated non-Federal representative, then the applicant and the BLM must agree on the choice of the designated non-Federal representative.

(3)  The BLM shall furnish guidance and supervision and shall independently review and evaluate the scope and contents of the BA prepared by the designated non-Federal representative.  If the BLM review finds the BA prepared by a non-Federal representative is inadequate, it should either be returned to the preparer for corrections, or revised by the

BLM_0014463

BLM before submission to the FWS and/or NMFS.

(4)  Written correspondence requesting concurrence or formal consultation shall be prepared by the appropriate BLM official.

c.  Early Consultation.  Section 7(a)(3) of the ESA and implementing regulations provide the means (referred to as "early consultation") for a prospective applicant for public land use to request an early consultation if the prospective applicant has reason to believe that the prospective action may affect listed species or designated critical habitat (50 CFR Part 402.11).  For early consultation, the BLM shall:

(1)  Receive in writing the prospective applicant's certification that it has a definitive proposal outlining the action and its effects, and that it intends to implement its proposal, if authorized.

(2)  Upon receipt of the prospective applicant's certification, initiate early consultation in writing with the FWS and/or NMFS and provide all of the information required under initiation of formal consultation (50 CFR Part 402.14(c)).

(3)  For a major construction activity, include a BA at the time early consultation is initiated.

(4)  Provide any prospective applicant with the opportunity to submit information for consideration during early consultation.

(5)  If the prospective applicant requests through the BLM a copy of the draft preliminary biological opinion, forward the request and the prospective applicant's comments on the draft preliminary biological opinion to the FWS and/or NMFS.

(6)  Not consider the ITS of the preliminary biological opinion as authority to take listed species.

(7)  Request in writing to the FWS and/or NMFS confirmation of the preliminary biological opinion as the final biological opinion if the BLM believes that there have been no significant changes in the action as planned or in the information used during the early consultation.  If the FWS and/or NMFS do not confirm the preliminary biological opinion, they must request that the BLM initiate formal consultation.

9.  Counterpart Regulations.  Counterpart regulations provide the BLM an alternative approach for completing informal Section 7 consultation on actions that qualify for use under an ACA and are determined to be NLAA.  Presently, such regulations have only been adopted for use on National Fire Plan projects.

BLM_0014464

.1F10          6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

Qualifying projects include prescribed fire (including naturally occurring wildland fires managed to benefit resources), mechanical fuels treatments (thinning and removal of fuels to prescribed objectives), emergency stabilization, burned area rehabilitation, road maintenance and operation activities, ecosystem restoration, and culvert replacement actions.  State Offices will periodically review the administrative records of proposed actions to ensure conformance with the ACA.

10.  Exemption.  The ESA allows opportunity to apply for an exemption from the requirements of Section 7(a)(2) if, after consultation, the FWS and/or NMFS determines an agency action would jeopardize the continued existence of a listed species or result in the adverse modification of critical habitat.  Procedures for applications for exemption are found in 50 CFR Part 451.  Use of the exemption process is rare.

a.  The Director has sole authority to make an application for exemption under Section 7(g) of the ESA on behalf of BLM.  If any State Director has reason to believe a project deserves consideration for an exemption, a complete briefing package shall be presented to the Director for a final decision.

b.  The application for an exemption shall be submitted to the Secretary of the Interior or Secretary of Commerce, as appropriate, within 90 days following the termination of the consultation process.

11.  Emergency Consultation.  In certain emergency circumstances, special consultation procedures apply.  These emergency circumstances are typified by natural disasters, the most common of which on BLM lands is wildfire.  When a wildfire occurs on BLM-administered lands, the BLM is responsible for conducting any necessary emergency consultation.  In these situations, agency actions must be immediately undertaken to protect life and property, thereby precluding the typical consultation approach in which consultation is concluded in advance of an agency undertaking, which may affect listed species or critical habitats.  The first step in emergency consultation is to contact the FWS and/or NMFS by telephone or facsimile to explain the nature of the emergency.  The BLM will make every attempt to contact the FWS and/or NMFS within 3 days of onset of an emergency.  During this initial contact, the FWS and/or NMFS may suggest conservation recommendations to avoid or reduce potential effects on listed species or critical habitat.  The BLM will implement any conservation recommendations that do not substantially interfere with the execution of emergency operations.

As soon as practicable after the emergency is under control, the BLM will initiate consultation with the FWS and/or NMFS if there is reason to believe that a listed species or critical habitat has been adversely affected.  In addition to the information normally contained in a biological assessment, the BLM will provide the following information: (1) a description of the emergency, (2) a justification

BLM_0014465

for the expedited consultation, and (3) an evaluation of the response to and the effects of the emergency on the listed species and critical habitat, including documentation of how the FWS and/or NMFS recommendations were implemented.  The ITS prepared by the FWS and/or NMFS will not include reasonable and prudent measures or terms and conditions unless the BLM has an ongoing action related to the emergency.

12.  Consultation and Conference Approaches.  A number of approaches for improving the efficiency and effectiveness of Section 7 consultation and conference have been taken by various BLM offices.  The overall goal is to enhance compliance with Section 7(a)(1) and 7(a)(2).  The Director, State Directors, District Managers, and Field Managers, in cooperation with other Federal agencies, should develop and use techniques to further the consultation and conference process.  Examples of these approaches are:

a.  Contacting and engaging, where possible, the FWS and/or NMFS reviewing office(s) early in the project development process.  Experience has shown that, in general, the earlier in the processes the FWS and/or NMFS are engaged, the easier it is to accommodate listed species needs into project design.  Similarly, early dialog and exchange of information on project design and components has made it easier to communicate to the FWS and/or NMFS the specific purposes and needs for individual projects, and those areas where flexibility does or does not exist.  That is, the earlier project designers become aware of listed species associated needs and issues, the easier it is to address those needs and issues, thereby shortening the consultation process and even potentially avoiding the need for formal consultation.

b.  Completing and using national, ecosystem, or regional level programmatic consultations and conferences that address broad-scale programs or wide-ranging species or critical habitats.  The BLM should tier to and use the information, analysis, and determinations of the effects of these consultations and conferences to the greatest extent practicable when consulting or conferring at more local or project-specific levels.

c.  Consulting and conferring jointly with other Federal agencies on programs or actions affecting the same species or critical habitats in the same project or geographic area.

d.  Designating the applicant as the non-Federal representative for preparation of biological assessments, rather than relying on cost recovery to prepare the document in-house, allows limited biological staff time to be directed toward species recovery and other higher priority work.

e.  Completing combined consultations and conferences with the FWS and NMFS together when programs or actions include effects on species or critical habitats under both agencies' jurisdictions (e.g., an action affects both listed

BLM_0014466

.1F12f        6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

plants and anadromous fish).

f.  When programmatic consultation results in biological opinions that provide conservation recommendations or design criteria for future agency proposals, considering these recommendations or design criteria in the development of future proposals.  If these future proposals are designed to be consistent with these recommendations or criteria, consultation will be facilitated and compliance with Sections 7(a)(1) and 7(a)(2) furthered.

g.  Completing batched consultations or conferences on logical groupings of activities or programs of a similar nature.  Typically, these batched actions would be in the same geographic area (watershed or administrative unit).  Batched consultations can be conducted on a quarterly or annual basis, or longer.

h.  Using streamlined processes.  Streamlining agreements provide the BLM with alternative ways of meeting their Section 7 consultation obligations.  Streamlining may provide expedited consultation times for completing consultation.  While streamlining is not intended for use at the project level, other multi-State Memoranda of Understanding (MOUs) have been developed to address streamlining processes at this scale.  The use of streamlining processes is designed to make the consultation process more efficient.  In instances where the intended benefits of streamlining are not being (or are unlikely to be) realized, the streamlining process should not be used, and the BLM should follow the standard consultation process.

i.  For large or complex actions (e.g., energy corridor, promulgation of regulations) use consultation agreements to define agency roles, responsibilities, timeframes, and information requirements needed to complete consultation on the proposed action.

j.  It is not necessary to consult or confer on candidate or Bureau sensitive species.  However, States or offices may wish to seek technical assistance from the FWS and/or NMFS when it is determined to be advantageous to a species' conservation or BLM management options.

k.  When new or novel effective approaches to consultation and conference are developed at the field and State levels, those approaches should be shared with State and national program leads.  Similarly, when State and national program leads become aware of new or novel approaches being employed at the Field Office level, they should share those effective approaches with other State and Field Offices.

G.  Section 9 (Prohibited Acts).  The BLM shall not allow actions that result in take of endangered  animals or threatened animals that have take prohibitions established under Section 4(d) of the Act, or the removal or possession of endangered plants,

BLM_0014467

except as provided for under Section 7(o) or Section 10(a) of the ESA.

Section 9 of the ESA prohibits take of all individuals of listed fish or wildlife.  For plants, there is no "take" prohibition, but Section 9 makes it unlawful for anyone to remove and reduce to possession any endangered plant species; maliciously damage or destroy any endangered plant species on Federal lands; remove, cut, dig up, or damage or destroy any such species from any other area in knowing violation of any law or regulation of any State or in the course of any violation of a State criminal trespass law; or violate any regulations pertaining to threatened plants.

H.  Section 10 (Exceptions to the ESA).  Section 10 of the ESA provides for exceptions to the requirements and prohibited acts of other sections of the ESA.

1.  Take of listed species.  Section 10 (a)(1)(A) of the ESA provides exceptions for activities otherwise prohibited.  The BLM shall obtain Section 10 permits from the FWS and/or NMFS if take of listed fish or wildlife species or the removal or reduction to possession of listed plants is anticipated for scientific purposes or to enhance the propagation or survival of the affected species. Authorization for take can occur in several ways.  The exceptions to the requirement of permission for take are as follows and shall be reported to the FWS and/or NMFS as described in 50 CFR Part 17.21(4):

a. Any BLM employee may take endangered wildlife in defense of his or her own life or the lives of others.

b. Any BLM employee may, when acting in the course of his or her official duties, take endangered wildlife without a permit if such action is necessary to: (1) aid a sick, injured, or orphaned specimen; or (2) dispose of a dead specimen; or (3) salvage a dead specimen that may be useful for scientific study; or (4) remove specimens that constitute a demonstrable but non-immediate threat to human safety, provided that the taking is done in a humane manner; the taking may involve killing or injuring only if it has not been reasonably possible to eliminate such threat by live-capturing and releasing the specimen unharmed, in a remote area.

c. Any BLM employee may, when acting in the course of his or her official duties, remove and reduce to possession a federally endangered plant without a permit if such action is necessary to (1) care for a damaged or diseased specimen; (2) dispose of a dead specimen; or (3) salvage a dead specimen that may be useful for scientific study.

2.  Experimental Populations.

a.  General.  The FWS and/or NMFS can designate experimental populations of listed plants and animals.  With rare exceptions, these populations can only be released outside the species' current range, but within its probable

BLM_0014468

historical range if the Secretary determines that such release will further the conservation of the species.  The intent is to ensure separation between experimental and natural populations.  The Secretary of the Interior or Commerce must determine whether the experimental population is:

> (1) "Essential"—Necessary for the continued existence of a listed species in the wild.

> (2) "Nonessential"—Not necessary for the continued existence of a listed species.

b.  Management.  The BLM shall cooperate and assist in establishing experimental populations of listed species on BLM-managed lands when such establishment is consistent with BLM land use plans and policy and is technologically and economically feasible.  The BLM shall treat essential experimental populations as threatened species and nonessential experimental populations as proposed species for purposes of Section 7 (other than subsection 7(a)(1)).  For nonessential experimental populations, this means:

> (1) Incidental take can occur without specific authorization by the FWS and/or NMFS.

> (2) Conferencing is required if the action is determined to be Likely to Adversely Affect (LAA).

> (3) As required by Section 7(a)(1), the BLM shall use its authorities to conserve these populations.

c.  Planning.  Planning efforts must reflect those actions necessary for the recovery of species to the extent that BLM management can influence recovery, including the establishment of experimental populations of listed species when appropriate.  State Directors and Field Managers shall:

> (1) Keep informed on recovery plan development so needs can be addressed during planning.

> (2) Ensure participation with the FWS and/or NMFS in developing recovery needs for species that may have experimental population designation.

d.  Reintroduction of Listed Species into Congressionally Designated Areas.  In some instances, it is appropriate to transplant and reintroduce listed species into their historical ranges within designated wilderness, wilderness study areas, or other congressionally designated areas.  The BLM shall use only the minimum actions necessary and the methods most appropriate to protect and enhance the values for which the areas are identified or designated.  Further

BLM_0014469

information on guidelines for fish and wildlife transplantation are contained in BLM Manual 1745 and in the 2006 Association of Fish and Wildlife Agencies, BLM and Forest Service Fish and Wildlife Management Policy in Designated Wilderness MOA, and in the 2005 BLM Interim Management Guidelines for Fish and Wildlife Management in Wilderness Study Areas.

I. <u>Section 11 (Penalties and Enforcement)</u>.   The BLM shall exercise all of its authorities to ensure compliance with the ESA.  Within its authority, BLM shall modify, suspend or revoke the lease, license, permit or other agreement authorizing the use of BLM-managed lands, of any person who is convicted of a criminal violation of the ESA or any regulation, permit, or certificate issued pursuant to the ESA.

J. <u>Section 18 (Annual Cost Analysis by the U.S. Fish and Wildlife Service)</u>.  Upon request of the FWS, the BLM shall provide to the FWS a species-by-species summary of its expenditures on the conservation of listed species for the FWS annual expenditure report to Congress.

.2  <u>Administration of Bureau Sensitive Species</u>.  This section establishes procedures for the management of species designated as BLM sensitive, and their habitat.  It is in the interest of the BLM to undertake conservation actions for such species before listing is warranted.  It is also in the interest of the public for the BLM to undertake conservation actions that improve the status of such species so that their Bureau sensitive recognition is no longer warranted.  By doing so, the BLM will have greater flexibility in managing the public lands to accomplish native species conservation objectives and other legal mandates.  When administering the Bureau sensitive species program, all information shall conform to the standards and guidelines established under the Information Quality Act.

In compliance with existing laws, including the BLM multiple use mission as specified in the FLPMA, the BLM shall designate Bureau sensitive species and implement measures to conserve these species and their habitats, including ESA proposed critical habitat, to promote their conservation and reduce the likelihood and need for such species to be listed pursuant to the ESA.  Any obligation to conserve proposed critical habitat under this section is terminated at the time the proposal becomes final or the habitat is no longer proposed for listing.  All federally designated candidate species, proposed species, and delisted species in the 5 years following their delisting shall be conserved as Bureau sensitive species.

A. <u>Designation of Bureau Sensitive Species.</u> State Directors shall designate species within their respective States as Bureau sensitive by using the following criteria.  For species inhabiting multiple States, State Directors shall coordinate with one another in the designation of Bureau sensitive species so that species status is consistent across the species' range on BLM-administered lands, where appropriate.  Species designated as Bureau sensitive must be native species found on BLM-administered lands for which the BLM has the capability to significantly affect the conservation status of the species through management, and either:

BLM_0014470

1.  There is information that a species has recently undergone, is undergoing, or is predicted to undergo a downward trend such that the viability of the species or a distinct population segment of the species is at risk across all or a significant portion of the species range, or

2.  The species depends on ecological refugia or specialized or unique habitats on BLM-administered lands, and there is evidence that such areas are threatened with alteration such that the continued viability of the species in that area would be at risk.

B.  Planning.  When BLM engages in the planning process, it shall address Bureau sensitive species and their habitats in land use plans and associated NEPA documents (as per BLM 1610 Planning Manual and Handbook, Appendix C).   When appropriate, land use plans shall be sufficiently detailed to identify and resolve significant land use conflicts with Bureau sensitive species without deferring conflict resolution to implementation-level planning.  Implementation-level planning should consider all site-specific methods and procedures needed to bring species and their habitats to the condition under which management under the Bureau sensitive species policies would no longer be necessary.

C.  Implementation.  On BLM-administered lands, the BLM shall manage Bureau sensitive species and their habitats to minimize or eliminate threats affecting the status of the species or to improve the condition of the species habitat, by:

1.  Determining, to the extent practicable, the distribution, abundance, population condition, current threats, and habitat needs for sensitive species, and evaluating the significance of BLM-administered lands and actions undertaken by the BLM in conserving those species.

2.  Ensuring that BLM activities affecting Bureau sensitive species are carried out in a way that is consistent with its objectives for managing those species and their habitats at the appropriate spatial scale.

3.  Monitoring populations and habitats of Bureau sensitive species to determine whether species management objectives are being met.

4.  Working with partners and stakeholders to develop species-specific or ecosystem-based conservation strategies (see .2D Agreements, Assessments and Cooperative Strategies for Conservation).

5. Prioritizing Bureau sensitive species and their habitats for conservation action based on considerations such as human and financial resource availability, immediacy of threats, and relationship to other BLM priority programs and activities.

6. Using Land and Water Conservation Funds, as well as other land tenure

BLM_0014471

adjustment tools, to acquire habitats for Bureau sensitive species, as appropriate.

7. Considering ecosystem management and the conservation of native biodiversity to reduce the likelihood that any native species will require Bureau sensitive species status.

8. In the absence of conservation strategies, incorporate best management practices, standard operating procedures, conservation measures, and design criteria to mitigate specific threats to Bureau sensitive species during the planning of activities and projects. Land Health Standards should be used for managing Bureau sensitive species habitats until range-wide or site-specific management plans or conservation strategies are developed. Off-site mitigation may be used to reduce potential effects on Bureau sensitive species.

D. <u>Agreements, Assessments, and Cooperative Strategies for Conservation</u>. The BLM should work cooperatively with other agencies, organizations, governments, and interested parties for the conservation of sensitive species and their habitats to meet agreed on species and habitat management goals. Cooperative efforts are important for conservation based on an ecosystem management approach and will improve efficiency by combining efforts and fostering better working relationships. Addressing species' habitat management needs before a species is listed under the ESA will allow more management flexibility, reduce conflicts, and reduce the cost of conservation.

1. The FWS, NMFS, State agencies, universities, or others may have additional information on Bureau sensitive species. To help ensure that the best information is available in the BLM decision-making process, the BLM should request species information from these agencies as needed.

2. State Directors and line managers should make available employees with appropriate skills and expertise to support cooperative efforts for the development and implementation of habitat conservation assessments, strategies, and agreements.

3. State Directors and line managers should initiate the development of these conservation assessments, strategies, and agreements for the purpose of furthering the conservation of the subject species on BLM-administered lands where significant conservation benefits can be achieved through such an effort. Strategies and agreements should identify the role of the BLM and be proportionate to the resource values on BLM-administered lands.

4. The BLM should use habitat conservation assessments based on regional ecosystem assessments, where available, to develop conservation strategies and agreements that outline the program of work necessary to reduce, eliminate, or mitigate specific threats to sensitive species; to develop an ecosystem management approach to conservation on BLM-administered lands; and to

BLM_0014472

.2D5          6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

facilitate coordination and cooperation with others, such as States and private entities, to achieve species and habitat conservation across the range of the species.

5.  The BLM should be signatory to conservation strategies and agreements if public land or BLM authorization is involved.

6.  Habitat and species conservation assessments, strategies, and agreements should be consistent with existing BLM land use plans and describe in sufficient detail management objectives, treatments, and means for assessing accomplishment.  Where existing land use plans are not adequate, use plan maintenance, plan conformance reviews, or plan amendments as a means of integrating conservation strategies into existing land use plans.

7.  The BLM should consider successful implementation of the program in evaluating line officer performance.  Key leaders who contribute to notable successes should be recognized on a continuing basis.

8.  The BLM should participate in and coordinate with State natural heritage programs and State comprehensive wildlife management plans as per the Sikes Act (16 U.S.C. 670g et seq.), Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.), and 43 CFR parts 24.1-4.  Detailed guidance for management of species identified in State comprehensive wildlife management plans, which are not designated by the Bureau as special status species, is contained in BLM Manual 6500.

E.  Management of Bureau Sensitive Species with the Oregon and California Lands Act.

In Headwaters v. BLM (1990), the Ninth Circuit held that, under the Oregon and California Sustained Yield Act (O&C Act), former Oregon and California Railroad Company Lands in western Oregon are assigned timber production as a dominant use. The application of the special status species policy to provide specific protection to species that are listed by the BLM as sensitive on lands governed by the O&C Act must be consistent with timber production as the dominant use of those lands. Subsequent litigation on O&C lands regarding timber production and endangered species establishes that timber production actions are still subject to the provisions of the Endangered Species Act, including consultation under Section 7.

.3  General Cooperation for BLM Special Status Species.  The BLM shall cooperate with other government and nongovernment agencies to further the conservation of federally proposed and listed species, and will coordinate with the appropriate agencies on conservation of Bureau sensitive species.  Specifically:

A.  Coordination and Cooperation with Tribes.  The relationship between the United States and Indian Tribes is defined by treaties, statutes, executive orders, judicial

BLM_0014473

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)          .3A1

decisions, and agreements and differentiates Tribes from other entities that deal with, or are affected by, the Federal government.  Tribes are self-governing with fundamental rights to set their own priorities and make decisions affecting their resources and distinctive ways of life.  However, as with other entities, coordination on the conservation and management of resources would benefit the tribal resources and public resources as they relate to Bureau sensitive species and federally proposed and listed species.

   1.  <u>Secretarial Order 3206 on American Indian Tribal Rights, Federal–Tribal Trust Responsibilities, and the ESA</u>.  The Secretarial Order, signed on June 5, 1997, by the Secretary of the Interior and Secretary of Commerce clarifies the responsibilities of agencies of the Department of the Interior and Department of Commerce when actions taken under the authority of the ESA and associated implementing regulations affect, or may affect, Indian land, tribal trust resources, or the exercise of American Indian tribal rights.  The Secretarial Order does not apply to Alaska.  In addition to BLM Policy 8160, the BLM shall administer the conservation provisions of the Secretarial Order as follows:

      a.  Whenever the BLM is aware that its actions planned under the ESA may affect tribal trust resources, the exercise of tribal rights, or Indian lands, the BLM shall consult (as defined in BLM Handbook H8160-1 and distinct from ESA consultation procedure) with the Tribes that are affected and seek their participation to the maximum extent practicable.  This shall include providing affected Tribes adequate opportunities to participate in data collection, consensus seeking, and associated processes.

      b. The BLM shall assist Indian Tribes in developing and expanding tribal programs that promote the health of ecosystems upon which Bureau sensitive species and federally proposed and listed species depend.  This includes:

         (1)  Offering and providing such scientific and technical assistance and information as may be available for the development of tribal conservation and management plans to promote the maintenance, restoration, enhancement, and health of the ecosystems upon which Bureau sensitive species and federally proposed and listed species depend.

         (2)  Cooperatively identifying appropriate management measures to address concerns for such species and their habitats.

      c. The BLM shall give deference to tribal conservation and management plans for tribal trust resources that govern activities on Indian lands and that address the conservation needs of listed species.

      d.  At the earliest indication that it is considering management actions that may be restrictive to Tribes, for the conservation of any species, the BLM shall promptly notify all potentially affected Tribes, and assist Tribes in

BLM_0014474

.3A1e       6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)

identifying and implementing tribal conservation and other measures necessary to protect such species.

e. The BLM should assist the FWS and/or NMFS and other Federal agencies with their required actions under the Secretarial Order regarding the conservation of species.

f. The BLM shall coordinate with the affected Tribes and the Bureau of Indian Affairs on BLM Section 7 consultations of which it is aware that tribal rights or tribal trust resources may be affected.

g.  To the extent consistent with the provisions of the Privacy Act, the Freedom of Information Act (FOIA), and the Department's ability to continue to assert FOIA exemptions, the BLM shall make available to a Tribe all information held by the BLM that is related to a Tribe's Indian lands and tribal trust resources.

h. The BLM shall, when appropriate and at the request of a Tribe, pursue intergovernmental agreements to formalize arrangements involving Bureau sensitive species and federally proposed and listed species.

2.  BLM 8160 Policy.  The BLM should use any opportunity available under its 8160 Policy to seek coordinated conservation activities with Tribes.

B.  Other Cooperation and Coordination.  Conservation activities in general would benefit from cooperation and coordination with other agencies, organizations, governments, and interested parties.

1.  The BLM, in coordination with the FWS and/or NMFS and other interested entities, should develop habitat conservation assessments and conservation agreements for any BLM special status species that the BLM believes would benefit from such an agreement.

2.  The BLM should provide technical assistance to, and coordinate with, appropriate state agencies and other agencies, organizations, or private landowners developing and implementing conservation plans.

3.  The BLM should seek partnerships and cooperative relationships with other agencies, organizations, governments, and interested parties for the purposes of conservation of sensitive species and compliance with the ESA.  The BLM already has MOUs with several agencies and organizations.  Partnerships beyond existing MOUs are encouraged.  Partnerships and cooperative relationships should be sought with agencies that include the following:

a.  Other resource management and regulatory agencies, such as the Natural Resource Conservation Service, State fish and wildlife agencies, State forestry

BLM_0014475

6840 – SPECIAL STATUS SPECIES MANAGEMENT – (Public)                    .3B3b

agencies, State water quality agencies, and municipal parks and recreation agencies.

b. State and local governments, such as governor's offices, County commissioners, and City councils; County extension units, watershed councils, and resource conservation districts; and interested landowners.

c. Federal advisory groups, such as the Sporting Conservation Council, resource advisory councils, and provincial advisory boards.

d. Research entities, such as the Biological Resource Division of the U.S. Geological Survey, U.S. Forest Service, Agricultural Research Service, Cooperative Ecosystem Studies Units, and university researchers.

e. Professional societies, such as The Wildlife Society, the American Fisheries Society, Society for Range Management and the Botanical Society of America.

f. Groups representing private sector interest in resources and resource uses, such as Trout Unlimited, Center for Plant Conservation, National Audubon Society, The Nature Conservancy, National Cattlemen's Beef Association, and American Sports Tackle Manufacturers.

4. The BLM's role in partnerships and cooperative relationships should include developing conservation programs based on ecosystem management, providing expertise for programs affecting lands outside of the public land when benefits to BLM-managed resources are expected to result, and developing grant and cost-shared (e.g., challenge cost-share) projects to support conservation activities.

BLM_0014476

Glossary of Terms

This glossary is provided for the convenience of the reader and the terms are defined for the purpose of this manual only.

**-A-**

action:  all discretionary activities or programs of any kind authorized, funded, or carried out by the BLM in whole or in part.  Examples include (1) projects intended to conserve Bureau sensitive species and federally proposed and listed species or their habitat; (2) the promulgation of regulations; (3) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (4) projects directly or indirectly causing modifications to the land, water, or air.

animals:  any member of the animal kingdom, including without limitation any mammal, fish, bird, amphibian, reptile, mollusk, crustacean, arthropod, or other invertebrate, and any part, product, egg, or offspring thereof, or the dead body or parts thereof.  As used here, the words "animals," "fish or wildlife," and "wildlife" are interchangeable.

**-B-**

biological assessment (BA):  information prepared by, or under the direction of, a Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and may be affected by the proposed action.  A biological assessment presents the BLM's determination of whether any such species or habitat is likely to be adversely affected by the action.

biological opinion (BO):  document that includes (1) the opinion of the FWS and/or NMFS as to whether or not a Federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; (2) a summary of the information on which the opinion is based; and (3) a detailed discussion of the effects of the action on listed species or designated critical habitat.  A BO may be accompanied by an incidental take statement.

BLM-administered lands:  collectively, BLM-managed lands and split-estate lands.

**-C-**

candidate species:  plant and animal taxa considered for possible addition to the list of endangered and threatened species under the Endangered Species Act.  These are taxa for which the FWS or NMFS has on file sufficient information on biological vulnerability and threat(s) to support issuance of a proposal to list, but issuance of a proposed rule is presently precluded by higher priority listing actions.  Separate lists for plants, vertebrate animals, and invertebrate animals are published periodically in the *Federal Register*.  Candidate species and their habitats are managed as Bureau sensitive species.

BLM_0014477

conservation (also conserve and conserving):  1) definition from ESA Section 3(3) and as applied to threatened, endangered, and proposed species in this policy: to use, and the use of, all methods and procedures that are necessary to bring a listed species to the point at which the measures provided pursuant to the ESA are no longer necessary.  Methods and procedures of conservation include all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transportation; 2) as applied to Bureau sensitive species, the use of programs, plans, and management practices to reduce or eliminate threats affecting the status of the species, or improve the condition of the species' habitat on BLM-administered lands.

conservation agreement or strategy:  formal, written document agreed to by the FWS and/or NMFS or another Federal agency, State agency, local government, or the private sector to achieve the conservation of Bureau sensitive species and federally proposed, listed, and candidate species through voluntary cooperation.  It documents the specific actions and responsibilities for which each party agrees to be accountable.  The objective of a conservation agreement or strategy is to reduce threats to a Bureau sensitive species and federally proposed and listed species or its habitat.  An effective conservation agreement or strategy may lower species' listing priority or eliminate the need for listing.

conservation recommendations:  suggestions of the FWS and/or NMFS regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information.

critical habitat (CH):  (1) the specific areas within the geographical area currently occupied by a species, at the time it is listed in accordance with the ESA, on which are found those physical or biological features (i) essential to the conservation of the species and (ii) that may require special management considerations or protection, and (2) specific areas outside the geographical area occupied by a species at the time it is listed upon determination by the FWS and/or NMFS that such areas are essential for the conservation of the species.  Critical habitats are designated in 50 CFR Parts 17 and 226. The constituent elements of critical habitat are those physical and biological features of designated or proposed critical habitat essential to the conservation of the species, including, but not limited to: (1) space for individual and population growth, and for normal behavior; (2) food, water, air, light, minerals, or other nutritional or physiological requirements; (3) cover or shelter; (4) sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and (5) habitats that are protected from disturbance or are representative of the historical geographic and ecological distributions of a species.

**-D-**

distinct population segment (DPS):  subdivision of a vertebrate species (excluding Pacific salmon stock, see definition of evolutionarily significant unit) that is treated as a species for purposes of listing under the Endangered Species Act.  To be so recognized, a potential distinct population segment must satisfy standards specified in a FWS or NMFS policy statement (see the February 7, 1996, *Federal Register*, pages 4722–4725).  The standards require it to be separable from the remainder of and significant to the species to which it belongs.

BLM_0014478

**-E-**

endangered species:  any species that is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta, determined by the Secretary to constitute a pest whose protection under the provisions of this Act would present an overwhelming and overriding risk to man.

evolutionarily significant unit (ESU):  a Pacific salmonid stock that is substantially reproductively isolated from other stocks of the same species and that represents an important part of the evolutionary legacy of the species.  Life history, ecological, genetic, and other information can be used to determine whether a stock meets these two criteria.  The NMFS uses this designation.

**-F-**

fish or wildlife:  see animals.

formal consultation:  a component of the consultation process under Section 7 of the ESA that commences with the BLM's written request for consultation after it has determined that its action may affect and is likely to adversely affect listed species or designated critical habitats and concludes with the issuance of biological opinion.

**-H-**

habitat conservation assessment:  a comprehensive, state-of-knowledge technical document that describes life history, habitat requirements, and management considerations for a species or group of species throughout its occupied range on the lands managed by the cooperating agencies.  Habitat conservation assessments are often made as a forerunner to preparation of a conservation strategy or agreement.

**-I-**

implementation plan:  a site-specific plan written to implement decisions made in a land use plan.  An implementation plan usually selects and applies best management practices to meet land use plan objectives and is synonymous with an activity plan.  Examples of implementation plans include habitat management plans and allotment management plans.

incidental take:  see take.

incidental take statement (ITS):  under the ESA, a document that accompanies a biological opinion in which some incidental take of listed species is reasonably certain to occur.  Such take would not rise to a level that would jeopardize the listed species.  An ITS exempts a specific level of take associated with the action from the prohibitions on take under Section 9 of the ESA. An ITS often includes reasonable and prudent measures and their implementing terms and conditions, which are intended to reduce or minimize the take associated with the action or monitor the progress of the action and associated take.  A biological opinion will not have an ITS

BLM_0014479

if no take is reasonably certain to occur.

informal consultation:  a component of the consultation process that includes all discussions, correspondence, or other contact between the FWS and/or NMFS and the BLM or the designated non-Federal representative, prior to formal consultation, to determine if a proposed action may affect listed species or critical habitat and to use FWS and/or NMFS expertise, if necessary, to modify the proposed action to avoid potential adverse effects.

**-J-**

jeopardize the continued existence of (also jeopardize, cause jeopardy to):  engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of listed species in the wild by reducing the recruitment, numbers, or distribution of a listed species.

**-L-**

listed species:  species that are designated under the ESA as either threatened or endangered, which may include members of the Plant, Animal or Fungi–Lichen Kingdoms.

**-M-**

multiple use:  a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific, and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment, with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output (FLPMA).

**-N-**

native species:  as per February 3, 1999, Executive Order 13112 (Invasive Species), native species means, with respect to a particular ecosystem, a species that, other than as a result of an introduction, historically occurred or presently occurs in that ecosystem.

**-P-**

plant:  any member of the plant kingdom, including seeds, roots, flowers, and other parts thereof.

**-R-**

recovery:  improvement in the status of listed species to the point at which listing is no longer appropriate under the ESA.

BLM_0014480

request for technical assistance:  communication with the FWS and/or NMFS concerning actions that will potentially have an adverse effect on a BLM special status species or its habitat.  The objectives of these requests are to obtain as much biological information as possible about the species involved and its habitat and the FWS and/or NMFS recommendations on how the proposed management action might be carried out without contributing to the further deterioration of the species or its habitat.

**-S-**

species:  any species or subspecies (and regarding plants, any varieties), and any distinct population segment or evolutionarily significant unit of any species of vertebrate, fish, or wildlife that interbreeds when mature.

   (A)  Federally listed endangered—an animal or plant species in danger of extinction throughout all or a significant portion of its range.

   (B)  Federally listed threatened—an animal or plant species likely to become endangered within the foreseeable future throughout all or a significant portion of its range.

   (C)  Federally proposed—a species of animal or plant that is proposed in the *Federal Register* to be listed under Section 4 of the Endangered Species Act.

   (D)  Federal candidate species—a plant or animal species for which FWS or NMFS has on file sufficient information on biological vulnerability and threats to support a proposal to list as endangered or threatened.  All Federal candidates shall be included in the Bureau sensitive species category.

   (E)  Bureau sensitive species—species that require special management consideration to avoid potential future listing under the ESA and that have been identified in accordance with procedures set forth in this manual

special status species:  collectively, federally listed or proposed and Bureau sensitive species, which include both Federal candidate species and delisted species within 5 years of delisting.

split-estate:  subsurface mineral resources managed by the BLM where the surface resource is managed by a different public or private entity, as opposed to BLM-managed lands.

status review:  process of examination by FWS and/or NMFS to determine if a species situation warrants protection under the ESA.  Results of a status review are published in the *Federal Register*.

survival:  for determination of jeopardy or adverse modification, the species' persistence as listed or as a subset identified by the FWS and/or NMFS for recovery management purposes, beyond the conditions leading to its endangerment, with sufficient resilience to allow for the potential recovery from endangerment.  It is the condition in which a species continues to exist into the future while retaining the potential for recovery.  This condition is characterized by a

BLM_0014481

species with a sufficient population, represented by all necessary age classes, genetic heterogeneity, and number of sexually mature individuals producing viable offspring, which exists in an environment providing all requirements for completion of the species' entire life cycle, including reproduction, sustenance, and shelter.

**-T-**

take:  harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.  The term applies only to fish and wildlife.

(A)  incidental take:  take of listed fish or wildlife species that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by a Federal agency or applicant. [50 CFR §402.02]  Incidental take of listed plant species is neither defined nor prohibited by the Act.

(B)  harm:  as defined by the FWS, harm includes significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns such as breeding, feeding, or sheltering.  As defined by the NMFS, harm means an act that actually kills or injures fish or wildlife.  Such an act may include significant habitat modification or degradation that actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding, or sheltering.

(C)  harass:  defined as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns that include breeding, feeding, or sheltering Tribes (Indian Tribes):  any federally recognized Indian Tribe, band, nation, pueblo, community, or other organized group within the United States that the Secretary of the Interior has identified on the most recent list of federally recognized Tribes maintained by the Bureau of Indian Affairs.

**-W-**

wildlife:  see animals.

BLM_0014482

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
http://www.blm.gov/

February 21, 2008

In Reply Refer To:
1760 (350/250) I

EMS TRANSMISSION 03/03/2008
Instruction Memorandum No. 2008-074
Expires: 09/30/2009

**To:**     All Field Officials

**From:**   Assistant Director, Minerals, Realty, and Resource Protection

**Subject:**   Methods for Authorizing Shooting Range Areas on Public Lands

**Program Areas**:  Lands and Realty – Authorizations and Disposals
                    Recreation and Visitor Services – Shooting Sports

**Purpose:** Clarification of policy and guidance and alternative methods for authorizing proposed shooting sports areas on public lands.

**Policy/Action:** The Bureau of Land Management (BLM) may authorize shooting sports areas such as target ranges on public lands where they are consistent with the goals and objectives in the applicable resource management plan and would enhance public land management by improving public safety, providing recreational opportunities, providing firearms or archery safety and hunter education training for the community, or consolidating opportunities for dispersed target shooting.

The methods for allocating public land for shooting sports areas and related facilities are through direct sale under Section 203 of the Federal Land Policy and Management Act (FLPMA), or through patents issued under the Recreation and Public Purposes Act of 1926 (R&PP). The preferred method is by the use of direct sales under the FLPMA.

### Section 203 FLPMA Direct Sale

If it is determined a direct sale is the most effective conveyance method, the land is sold at the appraised value. The advantages are that the Federal government receives market value for the land, there are no reverters attached to the conveyance, both private entities and for-profit corporations qualify to buy the land, and the title conveyance transfers responsibility of all management, operation, and remedial actions to the patentee. The disadvantage to the patentee is that no reduction of the purchase fee (like that offered

BLM_0014483

under the R&PP Act) is allowed. In summary, a FLPMA Section 203 sale is a complete severance of surface estate of public lands without any reversionary clauses attached.

**Recreation and Public Purposes (R&PP) Act Patents**

Patents issued under the R&PP Act, as amended (U.S.C. 869, et seq.) are another method of authorizing shooting sports facilities. The R&PP Act provides for the patenting of public lands for recreational and public purposes to States or their political subdivisions, and to non profit corporations and associations. Lands must be for an established or definite proposed project with a reasonable timetable of development and management. Patents carry a limited reverter clause and if the patentee attempts to transfer title, use the land for another purpose, or discriminates against potential users, title reverts to the United States.

The advantage to the patentee is the lands are conveyed at less than fair market value, with government entities qualifying for a significant reduction in the conveyance price, while non profit entities may receive a discount up to 50 percent of the market value of the property. The disadvantage is that the R&PP conveyance requires periodic monitoring and evaluation to ensure that the patentee is conforming to the plan of development.

**Timeframe:** This Instruction Memorandum (IM) is effective upon receipt.

**Budget Impact:** This is a clarification of existing policy and suggestions for use of alternative methods to authorize shooting sports facilities. The result should have minimal impact on the budget and may possibly save costs by transferring monitoring, compliance, and remedial actions to the patentee.

**Background:** There is an increased demand for shooting sports opportunities and growing concern by communities, organizations, and interest groups about the availability of public lands for shooting sports authorizations and activities. National organizations promote the construction and operation of shooting ranges according to national standards and guidelines. Residential, business, community and national interests are concerned about existing and proposed ranges on public lands in terms of public health and safety, associated noise, lead accumulation and migration, lead collection and proper disposal, and the need for operator vigilance to staff and monitor use and resource conditions.

The BLM supports establishing new sites that are designed, constructed, and operated according to established national standards. Guidance to support these standards can be found at United States Environmental Protection Agency, EPA-902-B-01-001, Revised June 2005, Region 2, Best Management Practices for Lead at Outdoor Shooting Ranges.

**Manual/Handbook Sections Affected:** This IM clarifies policy guidance contained in the following BLM Manuals and Handbooks:

BLM_0014484

Manual/Handbook 2720 Public Sales
Manual 2740, Recreation and Public Purposes
Handbook 2740-1, Recreation and Public Purposes

**Coordination:** This guidance was coordinated with the Field and State Office staffs involved in the Lands and Realty and the Recreation and Visitor Services Programs.

**Contact:** Please contact me at 202-208-4201 if you have any questions regarding this policy, or you may contact Ed Ruda, Division of Lands, Realty and Cadastral Survey (WO -350) at 202-452-7778.

Signed by:                          Authenticated by:
Bob Anderson                        Robert M. Williams
Assistant Director                  Division of IRM Governance, WO-560
Minerals, Realty and Resource Protection

BLM_0014485

BLM

# U.S. Department of the Interior
# Bureau of Land Management

---

### Environmental Assessment CO-150-2008-33
### April 2009

# Resource Management Plan
# Amendment/Environmental Assessment
# For the Uncompahgre Field Office Dry Creek
# Travel Management Plan

***Location:*** This project is located within T. 47 N., R. 9 W, 10 W, and 11W.;  T. 48 N., R. 10 W., 11 W., and 12 W.; T. 49 N., R. 10 W., 11 W., and 12 W.; T. 50 N., R. 10 W., 11 W., 11 W., and 12 W.; T. 51 N., R. 11 W. and 12 W.

***Project Name:*** Uncompahgre Field Office Resource Management Plan Amendment of OHV Designations and Travel Management Plan in the Dry Creek Travel Management Plan Area

***Planning Unit:*** Uncompahgre Field Office/Uncompahgre Basin

***Applicant:*** BLM

### U.S. Department of the Interior
### Bureau of Land Management
### Uncompahgre Field Office
### 2465 S. Townsend Ave.
### Montrose, CO  81401
### Phone: 970-240-5300
### FAX: 970-240-5368



BLM_0014487



[3]

BLM_0014488

[4]

BLM_0014489

## SUMMARY

The Dry Creek planning area has 110,500 acres of public land, and is within the 1989 Uncompahgre Basin Resource Management Plan (RMP).  Close proximity to Montrose and Delta makes the Dry Creek area increasingly utilized for dispersed recreational opportunities.  The area is commonly used by residents of Montrose and Delta Counties, but is also experiencing increased visitation from throughout the region and out of state, as regional recreational opportunities are increasingly publicized.

The current Off-Highway Vehicle (OHV) designations include Open, Limited and Closed.  The goal of the management direction presented in this plan is to afford protection to the resources present in the Dry Creek area while still allowing for a variety of recreational and commercial opportunities.  In order to do this, the Uncompahgre Field Office needs to amend the current RMP and analyze several options for a comprehensive travel management plan for the area.

The Uncompahgre Field Office began work in March of 2007.  A Federal Register notice was published and the UFO proceeded with a scoping/comment period.  During the scoping/comment period, the UFO held three public meetings; one each in Montrose, Delta and Nucla.  Comments were analyzed and taken into consideration during the initial phase of the plan.  In November 2007, the UFO held a second 30-day comment period concerning the sub-region boundaries, desired future conditions and possible options for the alternatives and proposed action.  Comments were taken into consideration and the UFO staff proceeded to complete the environmental assessment and identify the preferred alternative.  Another 30-day comment period (which was extended an extra week due to holidays) was held in mid-December 2008; this third comment period allowed the public and the BLM Colorado State Office to review the entire document with the preferred alternative.  Comments were considered and changes made as necessary (see comments and response in Appendix 9).  The revised EA was sent to the BLM Colorado State Office for another review prior to finalizing the document.

This travel management plan was prepared by an interdisciplinary team comprised of a wildlife biologist, recreation planner, hydrologist, ecologist, range specialists, hydrologist, soil scientist, GIS specialist, and environmental coordinator, with additional input from a lands and mineral specialist, archaeologist, law enforcement officer, fire specialist, forester, and the BLM Colorado State Office program leads.

BLM_0014490

## TABLE OF CONTENTS

*SUMMARY* ........................................................................................................................... 5

*ACRONYMS USED IN THIS DOCUMENT* ........................................................................... 8

*INTRODUCTION* ................................................................................................................. 9

*BACKGROUND* ................................................................................................................. 10

*NEED AND PURPOSE FOR THE ACTION* ........................................................................ 10

Need for the Action .......................................................................................................... 10

Purpose for the Action ..................................................................................................... 11

Decisions that will be Considered .................................................................................... 13

*ISSUES AND CONCERNS* ................................................................................................. 13

*DESCRIPTION OF THE ALTERNATIVES* ........................................................................... 14

Management Common to All Alternatives ........................................................................ 17

Management Common to Alternatives 2 (Proposed) Action, 3, and 4 ............................. 19

Alternative 1 – No Action ................................................................................................ 25

Alternative 2 – Proposed Action ...................................................................................... 26

Alternative 3 .................................................................................................................... 28

Alternative 4 .................................................................................................................... 30

*SUMMARY & COMPARISON OF ALTERNATIVES* ............................................................ 31

*IMPLEMENTATION AND MONITORING* ........................................................................ 33

*ADAPTIVE MANAGEMENT* ............................................................................................. 33

*ALTERNATIVES CONSIDERED BUT NOT BROUGHT FORWARD* ..................................... 33

*PLAN CONFORMANCE REVIEW* ..................................................................................... 34

*RELATIONSHIP TO STATUTES, REGULATIONS OR OTHER PLANS* .................................. 34

*AFFECTED ENVIRONMENT / ENVIRONMENTAL CONSEQUENCES:* ................................. 35

CRITICAL ELEMENTS ........................................................................................................ 50

OTHER ELEMENTS .......................................................................................................... 164

*CUMULATIVE EFFECTS SUMMARY* .............................................................................. 199

*PERSONS / AGENCIES CONSULTED* .............................................................................. 207

*LITERATURE CITED* ....................................................................................................... 207

*INTERDISCIPLINARY TEAM* ........................................................................................... 210

*GLOSSARY* .................................................................................................................... 211

BLM_0014491

**APPENDIX INDEX**.............................................................................................................................. *A-1*

Appendix 1 ............................................................................................................................................. A-2

Appendix 2 ............................................................................................................................................. A-4

Appendix 3 ............................................................................................................................................. A-5

Appendix 4 ........................................................................................................................................... A-12

Appendix 5 ........................................................................................................................................... A-13

Appendix 6 ........................................................................................................................................... A-17

Appendix 7 ........................................................................................................................................... A-21

Appendix 8 ........................................................................................................................................... A-25

Appendix 9 ........................................................................................................................................... A-34

BLM_0014492

# Acronyms

## ACRONYMS USED IN THIS DOCUMENT

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| ATV | All Terrain Vehicle |
| BLM | Bureau of Land Management |
| BSC | Biological Soil Crust |
| CDOW | Colorado Division of Wildlife |
| CFR | Code of Federal Regulation |
| CNHP | Colorado Natural Heritage Program |
| CR | County Road |
| DFC | Desired Future Condition |
| DOW | Colorado Division of Wildlife |
| DR | Decision Record |
| EA | Environmental Assessment |
| 4WD | Four-wheel drive |
| GIS | Geographic Information System |
| GPS | Global Positioning Satellite |
| NEPA | National Environmental Policy Act |
| OHV | Off-Highway Vehicle |
| ORV | Off-Road Vehicle |
| PA | Planning Area |
| RIZ | Road Influence Zone |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| ROS | Recreation Opportunity Spectrum |
| ROW | Rights-of-Way |
| SHPO | State Historic Preservation Office |
| TMPA | Travel Management Planning Area |
| TMP | Travel Management Plan |
| T&E | Threatened & Endangered Species |
| UFO | Uncompahgre Field Office |
| USFS | United States Forest Service |
| WAPA | Western Area Power Administration |
| WIZ | Water Influence Zone |

[8]

BLM_0014493

# Introduction

## INTRODUCTION

This Resource Management Plan Amendment/Environmental Assessment analyzes the environmental and other impacts of implementing four different alternatives to address issues relative to land health and the use of the public lands in the Dry Creek Travel Management Planning Area, as well as the need for motorized and non-motorized travel (see glossary for definitions) for a variety of purposes, including land management-related and recreational activities. The alternatives are the No Action Alternative (Alternative 1) and three action alternatives (Alternative 2 – Proposed Action, and Alternatives 3 and 4). The three action alternatives would affect existing off-highway vehicle (OHV) designations and travel management decisions on Public Lands within the Planning Area managed by the BLM, within Delta and Montrose County near the communities of Montrose, Olathe and Delta.

None of the alternatives or their management recommendations would be made for or on private lands in the area. The planning area contains approximately 110,500 acres of Public Land and approximately 4,500 acres of private land.

The existing 1989 Uncompahgre Basin Resource Management Plan (RMP) contains three categories of OHV designations: Open, Limited, and Closed. These designations are used by BLM to establish where and to what extent motorized uses may occur on public lands. Open designations are locations on public lands with no limitations or restrictions to cross-country travel. Closed designations are locations on public lands where absolutely no motorized travel is allowed. Limited designations are locations where motorized travel is limited to designated routes only, and may have seasonal or other conditional use limitations. There are no "Limited to Existing Routes" Designation Areas in the RMP.

The Uncompahgre Basin RMP was amended to include "Colorado Public Land Health Standards" in 1997 and the "Recreation Guidelines to Meet Public Land Health Standards on Bureau of Land Management Managed Lands" in 2000. This amendment requires BLM to manage public lands to meet land health standards, which describe minimum functional levels for healthy soils, riparian areas, native plant and animal communities, threatened, endangered and sensitive species, and water quality. Land health assessments have identified areas in the planning area where existing travel practices are contributing to public lands not meeting health standards.

The goals of this travel management plan are to: maintain, protect, and improve public land health; maintain appropriate, sustainable, and reasonable access; enhance motorized and non-motorized recreation opportunities; and improve natural values (see Appendix 3 for a detailed descriptions).

The Uncompahgre Basin RMP is scheduled to be revised beginning in the spring of 2009. The actions taken as a result of the analysis in this document would be considered in the RMP revision. If special designations regarding the Dry Creek Planning Area are identified as an issue or concern in the revision process, those concerns would be addressed in that process.

[9]

BLM_0014494

## BACKGROUND

The Dry Creek Travel Management Planning Area is approximately 115,000 acres bounded on the north by 25 Mesa Road (known as Delta-Nucla Road), on the south by Dave Wood Road, on the west by the National Forest Service Boundary, and the east by private lands in the Uncompahgre Valley. The terrain of the area generally consists of steep drainages, long and deep canyons, and narrow ridges and mesa tops. See Appendix 8 for a climate summary for the area. The area is within easy traveling distance from the cities of Montrose and Delta, the town of Olathe, and other nearby communities. It is affected by the associated urban interface, pressures, and issues. The sights and sounds of human activity from towns, airports, highways, railroads, agricultural uses, residential subdivisions, power lines, and motorized recreation uses are evident throughout a great deal of the area.

The planning area has become a destination site for many recreational users who use motorized and mechanized vehicles. There are even some routes publicized on several websites. Most of the BLM lands are heavily utilized areas with easy public access.

The area is easily accessed nearly year round for a variety of purposes. Uses of the area include sightseeing, photography, hunting, hiking, cross-country skiing, camping, horseback riding, mountain bike riding, ATV riding, technical four-wheel driving, motorcycle riding, snowmobiling, livestock grazing management, decorative rock gathering, Christmas tree cutting, firewood gathering, rights of way management/operation/maintenance, BLM and Forest Service administrative purposes, and other uses. Much of the travel is heavily influenced by the regional population growth and nearby private land development.

Dave Wood Road and 25 Mesa Road are major county-maintained routes that connect the communities on the east side of the Uncompahgre Plateau to the communities on the west side of the Plateau, and are also key access to the Uncompahgre National Forest. Highway 90 and Transfer Road are also county-maintained routes within the heart of the planning area, and provide key access to public lands including the Uncompahgre National Forest.

## NEED AND PURPOSE FOR THE ACTION

### Need for the Action

The Affected Environment/Environmental Consequences section references data from the Escalante (1998) and Roubideau (2005) Land Health Assessments (LHA). The LHAs show that existing routes are contributing to land health concerns. Land health concerns, combined with population growth and a proliferation of user-created routes have driven the need to create a travel management plan that addresses resource management, access and transportation.

Residents and visitors are utilizing, and discovering new opportunities on, public lands managed by the Uncompahgre Field Office (UFO). This has placed an increasing demand on resources, resulting in user conflicts and impacts to vegetation, soils, cultural sites, wildlife habitat, and other natural and sensitive resources. The recreation industry has also contributed to the observed increase in use and level of impacts by introducing new technical advancements in modes of travel.

[10]

# Need and Purpose

The OHV area designations in the 1989 RMP that apply to the planning area consist of Open, Limited, and Closed.  The Open designations permit cross-country travel using motorized, mechanized, and all other forms of travel anywhere.  The existing Limited designation restricts motorized travel in certain parts of the planning area to designated routes from December 1 through April 30 annually.  The Closed designation applies to the Camel Back Wilderness Study Area (WSA), which was closed to motorized travel in the 1989 RMP.  See Appendix 2 and the 1989 RMP (Appendix C of the RMP, Maps 1 and 2 on pages 49 and 50) for more information on these designations.  Since the RMP has been in effect, travel management planning has been under-implemented in the planning area, resulting in on-route and cross-country motorized and mechanized travel occurring yearlong except within the WSA.  New user-created routes established since the 1989 RMP have increased to the point that over 700 miles of routes of all kinds now exist on public lands within the planning area.

Montrose and the surrounding counties (San Miguel, Ouray, Delta, Mesa, and Gunnison) are seeing an increase in population and destination tourism due to year-round access to public lands and the availability of a wide array of recreational opportunities.  Montrose alone is expanding at an approximate rate of 6% per year and the Uncompahgre Field Office reported 346,744 visitor days; a 9% increase from FY2005.  The Uncompahgre Field Office has also seen an increase in requests for commercial, competitive, organized and event use Special Recreation Permits (SRPs) over the past several years.

Due to increasing demands and impacts, BLM has determined that the current OHV designations and the current management practices are out-of-date.  This has resulted in land health impacts that need to be addressed to provide active management and encourage responsible use.  BLM has a responsibility to conform to the directions contained in Appendix 7.

## Purpose for the Action

The purpose of the action is to

1) Present and analyze alternative travel management plans with a motorized and non-motorized designated route system* and other sets of related actions to address:

   a. Land Health concerns expressed in the Escalante and Roubideau Land Health Assessments (available at the Uncompahgre Field Office)

   b. appropriate actions to meet or maintain public land health standards, including the clear delineation of designated routes

   c. the many public and internal issues and concerns regarding travel management

   d. the need to follow up on the 1989 RMP Off Road Vehicle decisions and implement travel management planning within this part of the Uncompahgre Field Office

2) Analyze changing the existing "Open" and "Limited" OHV designations to "Limited to

[11]

BLM_0014496

# Need and Purpose

Designated Routes Seasonally or Yearlong" on approximately 99,900 acres in order to respond to the identified need of the public and BLM, and specific long-standing recommendations to the BLM from the Southwest Resource Advisory Council.

3) Consider travel management support facilities to compliment the motorized and non-motorized travel management plans in each of the alternatives identified. Planned parking areas, staging areas, hardened camping areas and trailheads would help distribute travel, thereby avoiding conflicts, resource impacts and overuse of areas. The lack of these facilities is currently resulting in user-created areas.

It is important for the BLM to maintain a balance of quality recreation with other resources and uses in a sustainable way that maintains the health of the land by designing travel systems that direct travel away from sensitive areas yet maintain adequate transportation opportunities that meet BLM and the public needs. Several individuals, groups and organizations, including the Southwest Resource Advisory Council (SWRAC), have expressed concern over the current situation and feel that updated and additional resource and travel management is necessary to maintain the opportunities they benefit from the area.

The Dry Creek Travel Plan will result in positive changes to the existing and future land health concerns and help resolve the many public and internal issues and concerns regarding OHV management for a variety of uses and purposes. Issues and concerns to be resolved include impacts to sensitive resources, user conflicts, historical use on routes, environmental impacts, conditions of use on routes, additional access needs, loop opportunities, quiet recreation, trail relocations, safety, and proliferation of user-created routes caused by cross-country travel. Travel related support facilities were not addressed in the 1989 RMP; some of the greatest user-created surface disturbing activities occur due to a lack of these facilities. The plan would also provide up to date information and management guidelines which will allow for better service, education and compliance, reducing resource impacts and conflicts through appropriate and informed decisions.

BLM policy for managing public lands is based on the BLM Colorado Standards for Public Land Health and the Colorado Recreation Management Guidelines to Meet Public Land Health Standards on BLM Lands. Under this policy, BLM is charged to manage the public lands in conformance with the standards and guidelines outlined in these documents, and must take appropriate actions when public land health standards are not being met.

*Designated route system refers to the method of managing a motorized and non-motorized transportation network in which the individual routes are limited to specific modes of travel, and are identified on travel maps and posted on the ground with signs. Under the current designation, motorized and mechanized travel is permitted to operate cross-county except for those routes that have been posted as closed. Under a designated route system, motorized and mechanized travel would be limited to routes that are identified on travel maps and posted as routes on the ground that are available for specified types of uses.*

[12]

BLM_0014497

# Need and Purpose

**Decisions that will be Considered**

In order to meet the purpose and need for this action, decisions that will be considered in the Dry Creek Travel Management Plan (TMP) and the subsequent Resource Management Plan Amendment are:

1. What changes would be made to existing Off-Highway Vehicle (OHV) area designations?
2. If travel using motorized or mechanized modes of travel, including snow machines, bicycles, wheeled, muscle-powered big game carts or wagons, would be limited to use on or from designated routes only, on which routes would use restrictions apply? For example such restrictions could include seasonal use limitations and/ or limitations on vehicular parking adjacent to routes, off-route travel for camping, use of motorized or mechanized modes of travel for game retrieval, other vehicle limitations, including for snow machines and bicycles, and routes for administrative use of motorized vehicles only?
3. Where would support facilities, such as staging areas, trailheads, and camping areas be established or upgraded?
4. What following action plans would need to be prepared in order to fully implement the approved TMP?

## ISSUES AND CONCERNS

The Bureau of Land Management Uncompahgre Field Office began work on the Uncompahgre Travel Management Plan (TMP) in March 2007. The public scoping process was initiated at that time, with the public notified through press releases, web site postings, and letters sent to approximately 650 individuals and groups who had expressed an interest in participating in the travel management planning effort. Public meetings were held in late March and early April 2007. The Uncompahgre Field Office received comments from 74 individuals and organizations in response to the request for public input.

The public and internal agency comments were placed into subject categories and summarized. These categories were determined to be the issues and concerns to be addressed in the different alternatives:

- Access and Transportation
- Cultural and Historic Resource Management
- Land Health and Threats
- Reality Authorizations
- Law Enforcement and Public Safety
- Multiple Use Management

- Noise
- Recreation
- Socioeconomics
- Soils
- Vegetation
- Water Resources
- Wildlife

See Appendix 5 for a general summary of the comments.

After identifying the agency and stakeholder group issues and concerns, the BLM Travel Management Planning team began working on defining the boundaries and goals and objectives for the travel management plan and for the individual planning area sub-regions.

[13]

BLM_0014498

# Issues and Concerns

The goals and objectives were written in the form of "Desired Future Conditions" (DFCs), which are brief statements that describe the physical, biological, social and management conditions that are expected to be achieved when the travel management plan has been implemented (see Appendix 3).

Stakeholder and internal agency comments were an important part of the planning process, especially for identifying social component issues, which were considered by the team when fine-tuning the DFCs for this plan.  The DFCs then guided the analysis of the routes within the draft alternative travel network systems.

## DESCRIPTION OF THE ALTERNATIVES

Four alternatives were developed.  See Appendix 4 for maps that illustrate each alternative and Table 4 for a summary and comparison of the major elements of each alternative.  Alternatives were developed considering the existing OHV designations and conditions on the ground, impacts to sensitive resources, public input, existing recreational uses, route density, route condition, and the need for administrative access.  These alternatives were also developed to address the issues and concerns. Decisions will be for public lands only; decisions will not be made for or on private lands, but may have some indirect effects.

Alternative 1 is the No Action Alternative (current management).  Alternatives 2, 3 and 4 would affect existing OHV area designations and existing travel management.  For purposes of describing the proposed differences in management and changes in the action alternatives, the area has been delineated into seven unique geographic Sub-Regions.

Appendix 2 shows acres in each of the existing OHV designation categories for each alternative and for each Sub-Region.  Table 1 shows the miles of routes and their uses that would be designated in each of several Travel Use Categories in each alternative.  Table 2 shows the same information by Sub-Region for each alternative.  Mileages shown in all tables are approximate, and are for the primary uses in each Travel Use Category.  These Travel Use Categories will be the foundation of the TMP in Alternatives 2, 3, and 4.   The Travel Use Categories are also color-coded on alternative maps located in Appendix 4 for each of the alternatives. See Appendix 1 for detailed definitions of the Categories.  Table 3 shows the total miles of designated routes subject to seasonal closures and the routes that would be available for use yearlong in each Sub-Region in each alternative.

Each Travel Use Category is named for the type of use that it is primarily suited to accommodate (bold in Table 1).  The other travel uses included in the category should be considered as secondary uses. Although other use(s) might be allowed on a particular route, this descriptor does not mean that a specific route in the Category would be suitable for the allowed use(s).  For example, routes included in the "Motorized Single Track" Category are primarily suited for or intended for motorcycle use, but the routes would also be available for the other uses listed, including bicycling, hiking and horseback riding.

[14]

BLM_0014499

| Table 1 Miles of Routes in Travel Use Categories by Alternative | | | | | |
|---|---|---|---|---|---|
| Travel Use Category (see Appendix 1 for detailed definitions) | **Primary** *and Secondary* Permitted Uses | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 |
| Non-Motorized/Non-Mechanized Single Track | **Equestrian, foot** | 15.6 | 43.4 | 47.0 | 29.0 |
| Non-Motorized Single Track | **Bicycles,** *equestrian, foot* | 8.9 | 22.5 | 39.8 | 16.8 |
| Motorized Single Track | **Motorcycles,** *bicycles, equestrian, foot* | 0 | 42.2 | 11.8 | 67.2 |
| ATV 2-Track | **ATVs,** *snow machines, motorcycles, bicycles, equestrian, foot* | 0 | 40.7 | 13.3 | 29.3 |
| 4WD/2WD - Open | **All modes of transportation (Full-sized vehicles – 4WD/2WD),** *ATV, motorcycle, bicycles, equestrian, and foot* | 645 | 230.3 | 123.2 | 422.2 |
| Specialized Trails – Technical 4WD and Mechanized and Motorized Trial Bikes | **Modified high clearance 4-wheeled vehicles and mechanized and motorized trials bikes only** | 0 | 8.6 | 3.4 | 8.5 |
| Administrative Uses Only (AU)* | **Authorized uses only** | 0 | 42.3 | 65.0 | 11.8 |
| Non-BLM Routes | **Street legal motorized vehicles and other mechanized and non-motorized uses** (County jurisdiction) | 32.3 | 32.3 | 32.3 | 32.3 |
| Closed (CL)* | **Closed** | 0 | 258.7 | 368.7 | 118.2 |

*\* Routes included in the Administrative Use Only (AU) category are not available to the general public for motorized or mechanized uses. AU routes provide administrative access for BLM personnel and authorized holders of permits, such as right-of-way and grazing permits, and will continue to be used for administrative purposes. The routes included in the AU category are not managed for specific recreation uses but, as long as the routes are legally accessible (not blocked by private lands), they are available to the public for foot and equestrian travel in most cases. "Legally Accessible" implies that a route can be legally accessed from public lands or without trespassing over private lands; i.e., a route is on public lands or access is provided from county, state, or federal highways or via roads where the BLM has obtained public easements. Routes included in the CL category are also not available to the general public for motorized or mechanized uses; they are available to the public for foot and equestrian travel in most cases. In some cases the CL routes may be identified for mechanical reclamation while others may be closed and allowed to reclaim naturally.*

[15]

BLM_0014500

# Description of the Alternatives

| Travel Use Category | Sub-Regions | | | | | | | Alt. Total Miles | Alter-natives |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | | |
| Non-Motorized/Non-Mechanized Single Track | 0 | 15.6 | 0 | 0 | 0 | 0 | 0 | 15.6 | 1 |
| | 19.6 | 16.9 | 3.1 | 0.5 | 0 | 0.8 | 2.5 | 43.4 | 2 |
| | 26.5 | 12.2 | 4.0 | 4.2 | 0 | 0 | 0 | 46.9 | 3 |
| | 0 | 25.7 | 2.2 | 0.5 | 0.3 | 0.1 | 0 | 28.8 | 4 |
| Non-Motorized Single Track | 8.9 | 0 | 0 | 0 | 0 | 0 | 0 | 8.9 | 1 |
| | 0 | 0 | 0 | 4.1 | 0 | 12.1 | 6.3 | 22.5 | 2 |
| | 4.1 | 0 | 14.7 | 0.4 | 0.8 | 7.8 | 12 | 39.8 | 3 |
| | 8.9 | 0 | 3.7 | 3.3 | 0 | 0.9 | 0 | 16.8 | 4 |
| Motorized Single Track | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 0 | 0 | 0 | 34.6 | 1.2 | 0.1 | 6.3 | 42.2 | 2 |
| | 0 | 0 | 0 | 11.8 | 0 | 0 | 0 | 11.8 | 3 |
| | 7.0 | 0 | 0 | 39.8 | 0.8 | 7.7 | 11.9 | 67.2 | 4 |
| ATV 2-Track | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 1.7 | 0 | 5.4 | 8.5 | 0 | 12.3 | 12.8 | 40.7 | 2 |
| | 0 | 0 | 13.0 | 0.3 | 0 | 0 | 0 | 13.3 | 3 |
| | 8.2 | 0 | 1.0 | 6.6 | 0 | 13.5 | 0 | 29.3 | 4 |
| 4WD/2WD - Open* | 79.4 | 0 | 169.1 | 163.4 | 55.7 | 108.7 | 67.9 | 644.2 | 1 |
| | 29.2 | 0 | 85.7 | 45.8 | 20.2 | 30.3 | 19.0 | 230.3 | 2 |
| | 12.9 | 0 | 41.8 | 25.8 | 7.6 | 16.9 | 17.4 | 122.4 | 3 |
| | 46.7 | 0 | 140.4 | 84.3 | 34.1 | 69.0 | 46.8 | 421.4 | 4 |
| Specialized Routes – Technical 4WD and Mechanized and Motorized Trial Bikes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 0 | 0 | 0 | 6.6 | 1.1 | 0.9 | 0 | 8.6 | 2 |
| | 0 | 0 | 0 | 3.2 | 0 | 0.2 | 0 | 3.4 | 3 |
| | 0 | 0 | 0 | 6.0 | 1.6 | 0.9 | 0 | 8.5 | 4 |
| Administrative Uses Only | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 3.5 | 0 | 7.5 | 9.2 | 6.3 | 15.7 | 4.8 | 42.3 | 2 |
| | 2.7 | 0.4 | 9.8 | 16.5 | 12.5 | 21.9 | 1.3 | 65.0 | 3 |
| | 1.5 | 0 | 2.2 | 1.2 | 5.6 | 1.3 | 0 | 11.8 | 4 |
| Non-BLM Routes | 5.2 | 0 | 0 | 14.7 | 4.4 | 8.0 | 0 | 32.3 | 1 |
| | 5.2 | 0 | 0 | 14.7 | 4.4 | 8.0 | 0 | 32.3 | 2 |
| | 5.2 | 0 | 0 | 14.7 | 4.4 | 8.0 | 0 | 32.3 | 3 |
| | 5.2 | 0 | 0 | 14.7 | 4.4 | 8.0 | 0 | 32.3 | 4 |
| Closed Routes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 35.1 | 3.6 | 68.3 | 58.3 | 27.7 | 44.2 | 21.5 | 258.7 | 2 |
| | 42.1 | 5.1 | 86.0 | 101.8 | 35.7 | 61.5 | 36.4 | 368.7 | 3 |
| | 18.1 | 1.5 | 24.2 | 26.2 | 14.1 | 23.4 | 10.7 | 118.2 | 4 |

**Table 2
Miles of Designated Routes in Travel Use Categories by Sub-Regions, by Alternative***

\* Numbers include routes that have been proposed within each alternative

[16]

# Description of the Alternatives

| Table 3 Miles of Designated Routes by Sub-Region in Each Alternative Sub-Region B, Camel Back WSA, would be closed to motorized & mechanized travel, all alternatives | | | | |
|---|---|---|---|---|
| Sub-Region | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 4 |
| Miles of Designated Routes Subject to Seasonal Closures from 12/1 to 4/30 | | | | |
| A | Although the 1989 Resource Management Plan designated areas as "Limited to Designated Seasonally" those route designations are still to be determined. | | | |
| C | | | | |
| D | | | | |
| E | | | | |
| F | | | | |
| G | | | | |
| Miles of Designated Routes Subject to Seasonal Closures from 12/1 to 4/15 or 12/1 to 3/31 | | | | |
| A | | 2.1 | 0 | 0 |
| C | | 29.6 | 0 | 0 |
| D | | 7.3 | 4.0 | 0 |
| E | | 0.1 | 0.1 | 0 |
| F | | 23.7 | 10.4 | 0 |
| G | | 0 | 0 | 0 |
| Miles of Designated Routes Available Yearlong | | | | |
| A | 91.8 | 89.7 | 91.8 | 91.8 |
| B | 32.0 | 31.2 | 32.0 | 32.0 |
| C | 173.8 | 144.2 | 173.8 | 173.8 |
| D | 182.7 | 175.3 | 178.6 | 182.7 |
| E | 61.0 | 60.9 | 60.9 | 61.0 |
| F | 125.8 | 102.1 | 115.4 | 125.8 |
| G | 69.5 | 69.5 | 69.5 | 69.5 |

## Management Common to All Alternatives

### OHV Designations
The existing Camel Back Wilderness Study Area contains 10,668 acres of Public Land. It is currently designated as "Closed", and would remain designated as "Closed" to motorized and mechanized use.

### Travel Use Conditions
Travel use conditions describe allowed, restricted or limited travel uses on motorized or non-motorized designated routes. These conditions are as follows:

In each alternative, motorized access in Camel Back WSA for emergency and administrative activities would comply with guidance provided under Wilderness Study Area Interim Management Plan guidance. An emergency situation is defined as one where there is a threat to human life, property (including livestock) or public land resources. Emergency activities

[17]

BLM_0014502

# Description of the Alternatives

utilized, such as for law enforcement, would be the minimum necessary to address the situation and rehabilitation and restoration work would follow where needed.

Any emergency or administrative motorized vehicle or equipment use off authorized routes on Public Lands administered by the BLM would require prior notification and approval by the authorized BLM official.  Should prior notification not be possible, contact would be made with the authorized BLM official within 72 hours following emergency entry.

All public lands would be available for horseback riding and hiking on routes or cross-country.

**Design Features**
Project based consultation regarding traditional cultural properties, "intangible spiritual attributes", and contemporary use areas with Ute tribal officials would be implemented, and the appropriate mitigation would be agreed upon with the Ute Tribe and State Historical Preservation Office (SHPO).

**Follow-on Actions**
The actions below would be implemented:

Maps, brochures, and educational material would be developed and made available for the public, in print and on the internet.

Public access would be pursued in the Dry Creek Travel Management Planning area as opportunities arise.

**Existing Laws, Regulations, Policy, Guidance, Land Use Authorizations, and Valid Existing Rights**
The BLM would manage the public lands in accordance with applicable laws and regulations, and BLM policy and guidance. Implementation of any of these alternatives would be subject to all valid existing rights at the time of the signing of the decisions relative to the Resource Management Plan Amendment and Travel Management Plan.

Addendum I to the Colorado Protocol: Section 106 Requirements for Comprehensive Travel and Transportation Management Planning dated October 26, 2006, the 1997 National Programmatic Agreement and the 1998 Colorado State Protocol regarding the protection of cultural and historical resources would be applied to known and discovered historic properties.

The use of motorized or mechanized modes of travel, including snow machines during the execution of a land use authorization or permit, such as rights-of-way construction, fuel wood and decorative rock gathering, or operations under a grazing permit, would be subject to the terms and conditions of each individual authorization. Additional environmental documentation and analysis would be required in some cases for these authorizations.

Any existing or future road use or maintenance agreements with counties would continue according to the terms and conditions of those agreements.

[18]

# Description of the Alternatives

## Management Common to Alternatives 2 (Proposed) Action, 3, and 4

### Management Objectives
Maintain and Improve Land Health
Maintain or improve land health to meet Colorado Public Land Health Standards through eliminating off-route mechanized and motorized travel, and through limiting motorized and mechanized travel to designated routes.  Closures and rehabilitation of some routes would also be used to meet land health standards along with establishing and following all the best management practices.

Enhance motorized and non-motorized recreation
Users would achieve balance in the availability of different types of trails and transportation route access across multiple types of travel modes (see Table 1).  BLM would achieve this result by 2015 so that affected users will have sustained access to these routes as planned, will observe and respect the appropriate route designations, and be able to report that they exist.  BLM would install signing at trailheads and at points wherever allowable travel modes change and provide maps, brochures, and educational material that would be made available for the public, in print and on the internet by 2012.  These tools will enable recreationists to choose where to go and what to do based on route designations.  Management of the area will sustain the undeveloped character of the Dry Creek area's wide-open spaces for diverse, dispersed recreation use and enjoyment – protecting and rehabilitating the distinctive and productive capacity of its biophysical resources.  By 2015, BLM will ensure that 75% of responding recreationists in a user satisfaction study would report that  their recreation experience was "Good" (i.e., on a five-point rating scale: 1–Very Good, 2–Good, 3–Fair, 4–Poor, and 5–Very Poor.

Access
Maintain Appropriate, Sustainable, and Reasonable Access for visitors, authorized users, and private landowners within the planning area.

Desired Future Conditions for each sub-region can be found in Appendix 3.

### OHV Designation Changes
Existing OHV designations on Public Lands categorized as "Open" and "Limited" would be changed to "Limited to designated routes" yearlong or with seasonal restrictions.  To prevent disturbance to wintering big game, some routes will be closed annually to motorized and mechanized modes of travel on a seasonal basis.  These routes would be available for motorized and mechanized travel the remainder of the year.  Any exceptions to the listed dates would be made by the authorizing officer and would be implemented according to appropriate notification and posting, and or according to other appropriate regulations.  See Appendix 4 for the maps showing routes and restrictions in each alternative. The OHV designations and acreages on Public Land would be:

- Closed (to motorized and mechanized use) – 10,668 acres
- Limited to Designated Routes Yearlong or Seasonally – 99,896 acres.
- There would be no Public Lands with the area designation of Open.

See Appendix 2 for existing OHV Designations and those OHV Designations to be changed in Alternatives 2, 3, and 4, along with acreages by Sub-Region and totals.

[19]

# Description of the Alternatives

**Travel Management Plan**

Alternatives 2 (Proposed Action), 3, and 4 consist of:

1. Proposed OHV designation changes,
2. Selected routes and uses, proposed new routes and routes to be closed to certain or all uses ("travel network system"),
3. Conditions of use and seasonal or travel type restrictions, such as seasonal closures to prevent disturbance to wintering big game, and
4. Proposed travel management support facilities.

No new routes, except for the proposed ones authorized by this Travel Management Plan, would be permitted to be constructed or established unless reviewed, analyzed and authorized by the BLM. User created routes not identified in the Dry Creek TMP will be closed upon discovery.

**Travel Use Conditions**

Travel use conditions describe allowed, restricted or limited travel uses on motorized or non-motorized designated routes. These conditions are:

Each alternative identifies mileages of proposed selected routes, travel use categories, types of uses allowed, and the locations and choices of existing routes that would be designated and available for a variety travel opportunities. In the alternative descriptions, the term "available" is meant to imply a route where certain travel or uses would be allowed, seasonally or yearlong.

Motorized and non-motorized travel off designated routes would not be authorized or permitted except as noted in each of the alternative descriptions.

**Advanced Technology**

Any advanced technology in regards to motorized or mechanized vehicles would adhere to the specified route width restrictions mentioned within the Definitions of Travel Use Categories found in Appendix 1.

**Game Retrieval**

The use of wheeled, muscle-powered game carts or wagons would be permitted off designated routes to retrieve big game, except within the Camel Back WSA (Sub-Region B), only during Colorado Division of Wildlife (CDOW) authorized big game and mountain lion hunting seasons. Motorized vehicles would not be permitted off designated routes to retrieve big game.

**Parking**

In order to limit resource impacts and help prevent new user-created routes, users would be allowed to park motorized or mechanized modes of travel immediately adjacent and parallel to available designated routes for any purpose. Parking would be limited to one vehicle-width from the edge of the route. Users would be encouraged to park motorized or mechanized modes of travel in already disturbed areas where possible, consider safety and keep routes passable for other users.

[20]

# Description of the Alternatives

**Camping**
Some existing short spur routes that lead to popular dispersed campsites would be designated and identified.  Dispersed camping would be allowed in the planning area, consistent with parking requirements described above.

**Travel Management Support Facilities**
Proposed facilities to support the travel management plan include staging areas, hardened camping areas, trailheads, and portal signs.  These facilities could consist of a maximum of three acres of disturbed surface.  Facilities could include restrooms, loading and unloading ramps, kiosks, hardened graveled parking areas and camping spurs, fencing, hitching rails, picnic tables and cabanas, vehicular control devices, native landscape islands, erosion and drainage control devices, hardened access trails, and limited hardened egress and ingress points for all technical four-wheel drive routes.

**Access onto Public Lands from Private Lands**
Motorized and mechanized travel onto public lands from adjacent private lands would be limited to the public access points and designated routes provided in the alternatives (that is, if there is not a designated route, motorized or mechanized travel would not be permitted).   User created or constructed hiking or horseback riding trails would not be allowed off private lands onto public lands without the appropriate environmental documentation and assessment.

**Design Features**
Many of the design features below that would be implemented as management actions/guidelines have been developed from mitigation measures that would reduce or eliminate impacts to certain resources.

BLM re-routes or re-locations needed for erosion or other mitigation would be limited to a corridor 25 feet wide on either side of the centerline of all designated routes.  This corridor is assumed as a potential area for future BLM re-routes only and in the foreseeable future this corridor would be seldom used.

Proposed routes would be designed and located such that Visual Resource Management Class Objectives would be met in order to reduce visual contrast and impacts.  They would also be located away from riparian and wetland areas.   Surface disturbance would be kept to a minimum in order to maintain sufficient vegetation to protect soils, and the number of stream crossings would be kept to a minimum, in order to reduce impacts to wetlands and riparian areas.

Ingress and egress locations for specialized routes as defined in Appendix 1 would be kept to the minimum and constructed to reduce sediment to the greatest extent possible.

Restoring natural drainage patterns, surface topography, and vegetation would be considered and implemented as needed during rehabilitation of routes to be relocated or closed to travel.

Improvements would be implemented at stream crossings to reduce channel and riparian impacts.

[21]

BLM_0014506

# Description of the Alternatives

If necessary, as use increases, dust generated in localized areas and from specific uses, seasons, or events would be reduced by either hardening surfaces on certain high use routes, watering or treating routes during certain times with approved dust abatement chemicals, or installing speed bumps or obstacles in certain locations in a safe manner to reduce speeds and resultant dust.

Impacts to currently known eligible cultural properties would be avoided, minimized or mitigated in consultation with State Historical Preservation Office (SHPO). Where National Register eligible sites are known to be in danger or are currently being impacted by travel activities, routes would be closed to travel if necessary until the appropriate mitigation has been implemented. Proposed routes, parking areas and other facilities to be constructed under these alternatives would be intensively inventoried prior to construction or use. Where existing inventories are sufficient, standard discovery stipulations would apply.

Stipulations contained in applicable existing laws and protocols would be applied to known Sacred Sites and Traditional Cultural Properties. Where such properties are known to be in danger or are currently being impacted by travel activities, routes would be closed to travel until the appropriate mitigation has been implemented. Proposed routes, parking areas and other facilities to be constructed under these alternatives would be intensively inventoried prior to construction or use. Where existing inventories are sufficient, standard discovery stipulations would apply.

Informational/Directional signs will be installed where needed throughout the planning area, which would include kiosks on entry routes into Sub-Regions as appropriate. Signing for designated routes would be implemented by BLM over time and as funding allows.

All routes would be appropriately signed with allowed uses and seasons of use. Because signs are at times vandalized or removed, the user is responsible for determining the correct mode of travel based on official maps. Official maps would be made available to the public.

Design, construction and maintenance work for routes would be subject to the conditions and guidelines that create sustainable, low maintenance routes and maintain quality recreation. Maintenance of routes would be performed according to the Implementation and Monitoring Plan to be prepared, BLM annual work plans, and as funding permits.

Closures, rehabilitation and/or re-vegetation of routes would be performed according to the Implementation and Monitoring Plan to be prepared, BLM annual work plans, and as funding permits. This could include reseeding, planting vegetation, such as willows, and/or constructing barriers. If any ground disturbance is required, such as ripping existing routes, digging post holes for fences, or using rangeland drills, the appropriate clearances will be conducted prior to implementation.

## Maintenance
Any existing or future road use or maintenance agreements with Montrose County would continue according to the terms and conditions of those agreements.

Designated routes will be incorporated into the scheduled maintenance plan and have maintenance

[22]

BLM_0014507

# Description of the Alternatives

completed as needed.

**Monitoring & Implementation**
An Implementation and Monitoring Plan would be prepared; it would include measures for route closures or rehabilitation of impacted areas, as well as route signing, trailhead construction, and other implementation activities. Levels and types of uses, and natural resource conditions such as soil erosion, spread of noxious weeds, and impacts to vegetation, would be monitored. Monitoring baseline conditions would determine if recreation, protection of sensitive resources and land health are being achieved in order to meet desired future conditions (see Appendix 3). Monitoring tools would include traffic counter data, on-site patrols, surveys, and analysis of use occurring.

**Follow-on Actions**
The actions below would be implemented:

BLM administrative functions related to a variety of natural resource management objectives (e.g., wildlife habitat and species monitoring and management, noxious weed eradication, resource enhancement and restoration, and fence repair) that could potentially require cross-country travel using motorized vehicles or equipment off designated routes would be addressed at the project level on a case-by-case basis and with appropriate project specific and site specific environmental documentation and assessment.

Applications for Special Recreation Permits (SRPs) would be considered, subject to the approved Travel Management Plan designated route system, the existing approved Resource Management Plan and Amendments, and appropriate environmental documentation and stipulations that would be developed during the processing of these applications.

All proposed routes in the approved Travel Management Plan would have the appropriate level of environmental analysis and documentation prepared, required clearances, and any necessary mitigation completed for cultural resources and special status plant/animal species and habitat before construction starts. Construction and maintenance work would be subject to the conditions and guidelines that create sustainable, low maintenance routes. These conditions would apply to any proposed route, regardless of the purpose of the route, and would help:
   o   Ensure that the designated routes in the approved Travel Management Plan would be considered in planning for new additional routes,
   o   Prevent impacts to public lands and resources, and
   o   Ensure that routes would be located properly and constructed with good design and planning.

A weed management plan would be prepared and implemented that would identify all weed infestations and concerns on all routes and an action plan to eliminate or reduce noxious weeds.

BLM would develop and maintain partnerships with key stakeholders to assist with managing and implementing travel decisions.

The BLM, in cooperation with other agencies and organizations, would prepare and implement a public education program in a variety of formats to promote wise use on public land, and would

[23]

BLM_0014508

# Description of the Alternatives

include information regarding controlling noise levels while recreating on public lands. Colorado noise level standards pertaining to the operation of motor vehicles, including provisions in Colorado Senate Bill 08-063, and any pertinent regulations that would be promulgated would be incorporated. Accurate maps and other information relevant to travel management for public land visitors as well as contacting visitors on-site by BLM staff, volunteers, and partners would be a part of this program.

**Adaptive Management**
BLM would reserve the option to further restrict travel and use, by mode of transportation or season, on any route to protect resources (natural or other) or infrastructure from being impacted from vehicular use in the event of extreme winters, wet conditions, to reduce safety hazards, or in other unforeseeable situations, or to better manage and protect sensitive resources or other values, such as big game or nesting raptors. These actions could include emergency closures of routes, permanent or seasonal closures of routes, or relocation of routes. These actions would be taken following appropriate emergency closure or after appropriate site-specific NEPA analysis.

Over time, changes may need to be made to the approved and adopted Travel Management Plan in terms of adding, re-designating, relocating, or closing certain routes, maintenance needs, and seasonal or other use restrictions on routes. These changes would be documented using appropriate BLM Land Use Planning regulations and National Environmental Policy Act (NEPA) procedures. Persons or organizations can request the BLM to make route status changes based on route condition, maintenance needs, resource conditions, existing uses, historical information, changing needs, cultural information, economic information, ecological issues, and use types and levels, etc.

**Enforcement**
Resource staff including recreation personnel and volunteers will be assigned to patrol, contact, educate and inform the public of the new changes in route designations. BLM law enforcement personnel are assigned to actively patrol and enforce route designations.

The official agency map made available to the public showing designated routes would be used to determine if travel is permitted and authorized on a particular route during any part of the year. Signs may be posted on routes that provide information as to whether travel on a particular route is permitted. However, users would be responsible for understanding and following the restrictions on the map(s). Implementation of the approved travel management plan would include a strategy of educating users, utilizing law enforcement efficiently, developing maps for the public, and other tools to communicate that driving off of designated routes for motorized or mechanized uses is not permitted.

**Existing Laws, Regulations, Policy, Guidance, Land Use Authorizations, and Valid Existing Rights**
The use of motorized or mechanized modes of travel, including snow machines, during the execution of a land use authorization or permit, such as rights-of-way construction, fuel wood and decorative rock gathering, or operations under a grazing permit, would be subject to the terms and conditions of each individual authorization and the travel management plans being considered in these alternatives. Additional environmental documentation and analysis would be required in some cases for these authorizations.

[24]

BLM_0014509

# Description of the Alternatives

## Alternative 1 – No Action

### Management Objectives
Maintain and Improve Land Health
The Management Objectives of Alternative 1 would be to continue existing management and priorities wherever possible. Lands that do not meet land health standards, where travel is a causal factor, would be evaluated on a case-by-case basis. Where lands meet standards or meet with problems, BLM would continue the same level of resource management and protection. Management of the routes would continue to emphasize "shared use" travel opportunities along with adequate and appropriate public access.

### OHV Designation Changes
Public lands would retain current OHV designations. These designations and acreages are as follows:

- Closed – 10,664 acres (Camel Back Wilderness Study Area);
- Open – 28,557 acres;
- Limited to Designated Routes Yearlong – 1,964 acres; and
- Limited to Designated Routes Seasonally (12/1 to 4/30) – 69,375 acres.

The Camel Back WSA would continue to be closed to motorized and mechanized travel.

See Appendix 2 for acres of OHV designations in each Sub-Region by alternative.

### Travel Management Plan
Decisions in the current 1989 Resource Management Plan/Record of Decision restrict motorized travel in certain parts of the area to designated routes from December 1 through April 30 annually or yearlong. See Appendix C, Maps 1 and 2, pages 49 and 50, Uncompahgre Basin Resource Management Plan (RMP). However, since the RMP has been in effect, there has been little travel management planning to implement these seasonal or yearlong route designations and restriction decisions. In this alternative, these decisions would continue to be under-implemented until further travel planning could be completed, resulting in continued, yearlong, on-route and cross-country travel on approximately 676 miles of existing motorized and non-motorized routes. All modes of travel would continue to be allowed to go off routes yearlong on public lands designated as either "Limited seasonally or yearlong" or "Open", resulting in a possible increase in single and two-track routes being established by users traveling off existing routes. Table 1 shows the number of miles in each Travel Use Category for this alternative.

### Travel Use Conditions
Travel use conditions describe allowed, restricted or limited travel uses on motorized or non-motorized designated routes. These conditions are as follows:

There would continue to be a lack of specific route restrictions or designations, travel management analysis or plan preparation, and route rehabilitation efforts, leaving the area susceptible to route proliferation due to cross-country travel. Visitor use levels and resource concerns would continue to increase, as is the current trend. Management to address route rehabilitation, public and administrative access needs, protect sensitive resources, promote public

[25]

BLM_0014510

# Description of the Alternatives

safety and minimize conflicts among various uses of public lands would continue to be under-implemented.  See Appendix 4 for a map of Alternative 1 for existing inventoried routes.

Except as otherwise noted, travel on horse, by foot, or by any type of motorized or mechanized modes of travel would continue to be permitted on routes or cross-country.

Existing policies pertaining to motorized and mechanized travel and the distance vehicles are permitted to travel off existing routes for any purpose, including driving, parking, camping, and retrieving game, would remain unchanged.  Currently, these activities can occur anywhere in the planning area except the Camelback Wilderness Study Area. All Public Lands and uses on Public Lands would continue to be managed according to new BLM policies or regulations as they become effective.

**Travel Management Support Facilities**
Facilities to support travel management would be considered on a case-by-case basis in this alternative.

**Access onto Public Lands from Private Lands**
Motorized and non-motorized entry onto public lands from adjacent private lands would continue to be permitted.  No public access onto Public Lands within the Camel Back WSA using motorized or mechanized modes of travel would be permitted, unless noted otherwise.

**Follow-on Actions**
The actions below would be implemented:

Special Recreation Permits would be considered, subject to appropriate environmental documentation and stipulations that would be developed during the processing of these applications.

## Alternative 2 – Proposed Action

**This alternative includes the actions in the section above headed "Management Common to All Alternatives and Management Common to Alternatives 2, 3, and 4".**

**Management Objectives**
The objective of Alternative 2 (Proposed Action) is to manage travel to meet Land Health Standards, minimize the areas that meet standards with problems, improve resource protection, and minimize impacts to sensitive resources while maintaining quality travel opportunities along with adequate and appropriate public access.  The OHV designation changes and travel management plan in this alternative along with the accompanying management actions below would accomplish this objective.

This Travel Management Plan and alternative was developed after considering the environmental consequences of implementing the other alternatives; issues raised throughout the planning process; specific resource and environmental values and resource uses; conflict resolution; public input; and laws, guidance, policies, and regulations. The alternative was developed with public input by the

[26]

BLM_0014511

# Description of the Alternatives

Uncompahgre Field Office manager and interdisciplinary team members. It represents the mix and variety of proposed designated routes, uses, and other actions that, in the opinion of the preparers, best resolve the issues and management concerns identified at scoping and follow up meetings that drove preparation of this document. See Appendix 4 for a map of designated routes in Alternative 2.

**OHV Designation Changes**
Within the project area, the Proposed Action would examine, analyze and amend land use plan decisions in the existing RMP related to OHV designations and transportation to change all current "Open" and "Limited to Designated Routes-Seasonally/Yearlong" OHV designations to the "Limited to Designated Routes-Yearlong/Seasonally" category. To prevent disturbance to wintering big game, some routes will be closed annually to motorized and mechanized modes of travel on a seasonal basis.  Routes limited seasonally in the southeastern half of the Dry Creek Area would be closed from December 1 to April 15 and routes limited seasonally in the northwestern half would be closed from December 1 to March 31. These routes would be available for motorized and mechanized travel the remainder of the year.  See Appendix 4 for maps showing routes and seasonally restricted routes in each alternative. The Proposed Action would result in no acres being designated as "Open" and no additional acres being designated as "Closed". The existing 10,668 acre Camel Back Wilderness Study Area (WSA) would remain designated as "Closed" to motorized and mechanized travel (i.e., mountain bikes and wheeled, muscle-powered game carts or wagons). See Appendix 2 for acres of OHV designations in each Sub-Region by alternative.

**Travel Management Plan**
The Proposed Action would adopt this comprehensive Travel Management Plan (TMP) for the Dry Creek Planning Area, which is an extensive route system and identifies travel management support facilities for most forms of travel.  The TMP is a transportation system on public lands for managing and supporting all modes of travel. Uses of the routes would include general access to public lands and resources for multiple uses while protecting sensitive natural and cultural resources.  These uses include, but are not limited to, recreation, fuel wood gathering, hunting, mineral activities, and BLM and other authorized administrative and program management, such as weed control, livestock grazing management, wildlife habitat management, rights-of-way maintenance and operation.

The TMP would identify and/or designate:

- 317 miles of routes in the Motorized Single-Track, ATV-2-Track, and 4WD-2WD travel use categories for motorized and non-motorized travel.

- 32 miles of non-BLM routes that would be available for authorized and legally permitted motorized and non-motorized uses that are not affected by decisions made in this TMP. These include County and private roads.

- 9 miles of routes in the Specialized Trails travel use category for Technical 4WD and Motorized and Mechanized Trials bike uses.

- 67 miles of non-motorized routes consisting of 44 miles in the Non-Motorized & Non-Mechanized, Single Track travel use category for hiking and horseback riding, and 23

[27]

# Description of the Alternatives

miles in the Non-Motorized Single-Track travel use category for hiking, horseback riding, and mechanized use.

- 42 miles of routes in the Administrative Uses Only category that would be available for hiking and horseback riding, but not for motorized or mechanized uses by the public.

- 8 miles of certain designated routes would allow users to travel off-route a distance no greater than 300 feet to camp or park. The centerline of these routes would be the point from which the 300 feet would be measured. See Appendix 4 for a map of locations of these routes in Alternative 4.

- 258 miles of routes to be closed to all motorized and mechanized travel.

- Approximately 16 miles of proposed route construction would occur.

- Selected routes, identified on the map, would be closed to motorized and mechanized travel (see glossary for definitions) from December 1 to April 15 **or** December 1 to March 31 to prevent disturbance to wintering big game. Any exceptions to the listed dates would be made by the authorizing officer and would be implemented according to appropriate notification and posting, and or according to other appropriate regulations.  See Appendix 4 for a map of locations of these routes and the corresponding dates in Alternative 2.

**Travel Management Support Facilities**
The travel management support facilities would be implemented in selected Sub-Regions in this Alternative to support the travel management plan described above and help ensure its success in meeting the alternative objections, desired future conditions, and land health standards. See Appendix 6 for a list of these facilities and the Sub-Regions they would be located in, and Appendix 4 for a map of locations of these facilities.

## Alternative 3

**This alternative includes the actions in the section above headed "Management Common to All Alternatives and Management Common to Alternatives 2, 3, and 4".**

### Management Objectives
The objectives for this Alternative are to exceed Land Health Standards where possible, and maximize resource protection while providing a minimal level of travel opportunities and public access.  Implementing the travel management support facilities in this alternative and the actions and design features in "Management Common to Alternatives 2, 3, and 4 would help achieve these objectives.  Identified issues and concerns would be resolved with a focus on conserving natural values.  Opportunities for motorized and mechanized travel would have greater restrictions and would be managed to meet the objectives for this alternative.  Non-motorized/non-mechanized travel opportunities and quiet recreation would be emphasized with more comprehensive restrictions and conditions on motorized and mechanized activities.  See Appendix 4 for a map of designated routes in Alternative 3.

[28]

BLM_0014513

# Description of the Alternatives

**OHV Designation Changes**
Implementing this alternative would result in the same changes to existing OHV designations as
Alternative 2.  See Appendix 2 for OHV designation acreages for this alternative.

**Travel Management Plan**
  This alternative would identify and designate:

- 148 miles of routes in the Motorized Single-Track, ATV-2-Track, and 4WD-2WD travel
  use categories for motorized and non-motorized travel

- 3.4 miles of routes in the Specialized Trails travel use category for Technical 4WD and
  Motorized and Mechanized Trials bike uses

- 32 miles of Non-BLM routes would be available for authorized and legally permitted
  motorized and non-motorized travel that is not affected by decisions made in this TMP.
  These routes include County roads

- 87 miles of restricted non-motorized routes, consisting of 47 miles in the Non-Motorized
  & Non-Mechanical, Single Track travel use category for hiking and horseback riding,
  and 40 miles in the Non-Motorized Single-Track travel use category for hiking,
  horseback riding, and bicycle use

- 65 miles of routes in the Administrative Uses Only category that would be available for
  hiking and horseback riding, but not for motorized or mechanized uses by the public

- 369 miles of routes that would be closed to all motorized and mechanized modes of travel

- 14.5 miles of routes would not be available for use by any motorized or mechanized travel
  (see glossary for definitions) from December 1 through April 15, to decrease disturbance
  to wintering big game

- Approximately 3 miles of proposed route construction would occur.

See Table 2 for mileages in each Sub-Region for each of the Travel Use Categories.  See
Appendix 4 for a map of designated routes in Alternative 3.

**Travel Management Support Facilities**
The travel management support facilities would be implemented in selected Sub-Regions in this
Alternative to support the travel management plan described above and help ensure its success in
meeting the alternative objectives, desired future conditions, and land health standards. See
Appendix 6 for a list of these facilities and the Sub-Regions they would be located in, for all
alternatives and see Appendix 4 for a map of locations of these facilities.

[29]

BLM_0014514

# Description of the Alternatives

### Alternative 4

**This alternative includes the actions in the section above headed "Management Common to All Alternatives and Management Common to Alternatives 2, 3, and 4".**

**Management Objective**
The objectives for this alternative are to manage travel to meet Land Health Standards on Public Lands with the minimum required resource protection and an emphasis on multiple-use travel opportunities and public access. Identified issues and concerns would be resolved with a focus on providing motorized recreational activities. Increased motorized and mechanized travel opportunities would be an important consideration when actions are implemented. Overall, restrictions on route usage would be less than any of the other alternatives. See Appendix 4 for a map of designated routes in Alternative 4.

**OHV Designation Changes**
Implementing this alternative would result in the same changes to existing OHV designations as Alternative 2. See Appendix 2 for OHV designation acreages for this alternative.

**Travel Management Plan**
 This alternative would identify and designate:

- 519 miles of routes in the Motorized Single-Track, ATV-2-Track, and 4WD-2WD travel use categories for motorized and non-motorized travel

- 9 miles of routes in the Specialized Trails travel use category for Technical 4WD and Motorized and Mechanized Trials bike uses

- 32 miles of Non-BLM routes would be available for authorized and legally permitted motorized and non-motorized travel that is not affected by decisions made in this TMP.

- 46 miles of restricted non-motorized routes consisting of 29 miles in the Non-Motorized & Non-Mechanical, Single Track travel use category for hiking and horseback riding, and 17 miles in the Non-Motorized Single-Track travel use category for hiking, horseback riding, and bicycle use.

- 11.8 miles of routes in the Administrative Uses Only category that would be available for hiking and horseback riding, but not for motorized or mechanized uses, by the public.

- 118 miles of routes to be closed to all motorized and mechanized modes of travel.

- 8 miles of certain designated routes users would be permitted to travel off-route a distance no greater than 300 feet to camp or park. The centerline of these routes would be the point from which the 300 feet would be measured. See Appendix 4 for a map of locations of these routes in Alternative 4.

- Approximately 34 miles of proposed route construction would occur.

See Table 2 for mileages in each Sub-Region for each of the Travel Use Categories. See Appendix 4 for a map of designated routes in Alternative 4.

[30]

# Description of the Alternatives

**Travel Management Support Facilities**

The travel management support facilities would be implemented in selected Sub-Regions in this Alternative to support the travel management plan described above and help ensure its success in meeting the alternative objections, desired future conditions, and land health standards. See Appendix 6 for a list of these facilities and the Sub-Regions they would be located in, for all alternatives and see Appendix 4 for a map of locations of these facilities.

## SUMMARY & COMPARISON OF ALTERNATIVES

Table 4 below shows a comparison of the major travel management elements of each alternative.

| Table 4 Summary & Comparison of Alternatives | | | | |
|---|---|---|---|---|
| **Actions** | **Alternative 1 - No Action** | **Alternative 2 - Proposed Action** | **Alternative 3** | **Alternative 4** |
| **OHV Designation Changes** | | | | |
| **Open acres (Change from Alt. 1)** | 28,557 acres - See Footnote 1 | 0 acres (-28,557 acres) | | |
| **Closed** | 10,664 | 10,664 | 10,664 | 10,664 |
| **Limited to Designated Routes Yearlong (Change from Alt. 1)[1]** | 1,964 acres - See Footnote 1 | 0 acres (See Limited Designation Below) | | |
| **Limited to Designated Routes 4/30 to 12/1 (Change from Alt. 1)[1]** | 69,375 acres - See Footnote 1 | 0 acres (-69,375 acres) | | |
| **Designation Change – Limited to Designated Routes Yearlong or from 4/15 to 12/1 (Change from Alt. 1)** | 0 acres –not applicable to this alternative | 99,896 acres (+99,896 acres) | | |
| **Miles of Designated Routes/Trails Each Travel Use Category[5]** | | | | |
| **Non-Motorized/ Non-Mechanized Single Track** | 15.6 | 43.4 | 47 | 29 |
| **Non-Motorized Single Track** | 8.9 | 22.5 | 39.8 | 16.8 |
| **Motorized Single Track** | See Footnote 1 | 42.2 | 11.8 | 67.2 |
| **ATV 2-Track** | See Footnote 1 | 40.7 | 13.3 | 29.3 |
| **4WD/2WD - Open** | 645 | 230.3 | 123.2 | 422.2 |
| **Designated Specialized Routes – Technical 4WD and Mechanized and Motorized Trial Bikes** | See Footnote 1 | 8.6 | 3.4 | 8.5 |
| **Designated Routes - Administrative Uses[2]** | See Footnote 1 | 21 | 34 | 11 |
| **Designated Routes - Administrative Uses Only[3]** | See Footnote 1 | 42.3 | 65 | 11.8 |
| **Designated Routes - Non-BLM Routes** | 32.3 | 32.3 | 32.3 | 32.3 |
| **Designated Routes - Closed** | See Footnote 1 | 258.7 | 368.7 | 118.2 |
| **Total Miles all Routes Available to Public[4]** | 701.8 | 418.7 | 270.8 | 605.3 |

[31]

BLM_0014516

# Summary and Comparison of Alternatives

| Other Actions | | | | |
|---|---|---|---|---|
| **Proposed Designated Routes[6]** | None | 16.3 miles | 2.7 miles | 33.6 miles |
| **Restrictions - Seasonal Closures from 12/1 to 4/15** | None | 63 miles[5] | 14.5 miles[5] | 0 miles |
| **Use of Motorized Vehicles, such as 2 & 4-wheel drive passenger vehicles, ATVs, motorcycles, technical 4WD vehicles, or snow machines** | Authorized Yearlong except Camel Back WSA | Would be limited to designated routes[5], and identified on maps.  Camel Back WSA would be closed to these modes of travel. | | |
| **Use of Mechanized Modes of Travel** | Authorized Yearlong except Camel Back WSA | Would be limited to designated routes[5], and identified on maps.  Camel Back WSA would be closed to these modes of travel. | | |
| **Cross-Country Travel Using Motorized or Mechanized Modes of Travel** | Permitted throughout Planning Area except Camel Back WSA | Would not be authorized or permitted in Planning Area | | |
| **Use of Motorized Vehicles for Retrieving Game** | Authorized cross-country travel yearlong except Camel Back WSA | Only authorized on designated routes. | | |
| **Use of Muscle-Powered Wheeled Carts or Wagons for Retrieving Game** | Authorized yearlong, for any purpose, except in Camel Back WSA | Would be permissible only for retrieving downed big game from appropriate designated routes[5], & only during CDOW big game and mountain lion hunting seasons. Camel Back WSA would be closed to these modes of travel. | | |
| **Consideration of Special Recreation Use Permit applications** | Yes | Would be considered, subject to approved TMP, designated routes, approved RMP, & appropriate environmental documentation. | | |
| **Parking** | Authorized in all areas yearlong except Camel Back WSA | Allowed to park motorized or mechanized modes of travel immediately adjacent and parallel to available designated routes for any purpose. Parking would be limited to one vehicle-width from the edge of the designated route. | | |
| **Dispersed Camping** | Authorized cross-country travel yearlong except Camel Back WSA | Some existing short spur routes that lead to popular dispersed campsites would be designated and identified.  Dispersed camping would also be allowed in other areas, consistent with parking requirements. | | |
| Proposed Travel Management Support Facilities | | | | |
| **Staging Areas** | 0 | 7 | 5 | 8 |
| **Upgrade Existing Staging Areas** | 0 | 1 | 1 | 1 |
| **Trailheads** | 0 | 8 | 5 | 4 |
| **Hardened Camping Areas** | 0 | 3 | 0 | 2 |
| **Interpretive Sites** | 0 | 0 | 0 | 1 |
| **Portal Signs** | None | Yes | Yes | Yes |

1. Route designations are still to be determined.
2. These routes would be available for motorized administrative use and to the public for a variety of other designated modes of travel (see maps in Appendix 4 for details)

BLM_0014517

# Summary and Comparison of Alternatives

3. These routes would be available for hiking and horseback riding only by the public but available for motorized admin. use
4. Mileages for Alternatives 2, 3, and 4 are for Primary uses in each Travel Use Category
5. Routes designated would be available either yearlong or seasonally
6. Mileages are included in travel use categories

## IMPLEMENTATION AND MONITORING

A detailed, decision-specific implementation and monitoring plan would be completed following approval of the Dry Creek Resource Management Plan (RMP) Amendment and Travel Management Plan (TMP). The implementation and monitoring plan would contain detailed schedules and frequencies necessary to monitor and implement all decisions in the RMP amendment and TMP. Cost estimates for the implementation of decisions would also be included. Several follow-on activity plans for the planning area would be prepared during implementation of the Dry Creek RMP amendment and TMP, such as a weed management plan.

Monitoring data is used to assess resource conditions, identify resource conflicts, determine if resource objectives including land health standards are being met and to periodically refine and update desired future conditions and specific management actions in a process known as adaptive management. .

## ADAPTIVE MANAGEMENT

As the Resource Management Plan (RMP) amendment and Travel Management Plan (TMP) decisions begin to be implemented and monitored, each one would be observed as to whether the desired future outcomes or outputs are being achieved over time. Determinations would be made based on monitoring results, and adjustments in implementation or monitoring would be made as needed in order to assure that desired future outcomes are being achieved. Adaptive management would be applied as the RMP amendment and TMP is being implemented. Monitoring is an essential component of the adaptive management strategy. Adaptive management also recognizes that sometimes there is incomplete data when managing natural resources and that through continued research and monitoring of the effects of implementing decisions and actions, new information will be developed. This information can be reevaluated and incorporated into the management plan, and practices can be adjusted accordingly.

## ALTERNATIVES CONSIDERED BUT NOT BROUGHT FORWARD

Other alternatives considered but not brought forward for analysis are listed below with rational for their not being considered.

1. <u>An alternative with Open OHV designations</u>. This alternative was not brought forward because a) in consultation with stakeholders, it was concluded that the desired future conditions (see Appendix 3) and purpose of the Dry Creek TMP and RMP Amendment could not be met, b) the terrain of the planning area would not be conducive for Open areas, and c) because three existing Open areas are located on public lands less than an hour from the planning area. The existing Open area locations are: one is adjacent to the Gunnison Gorge National Conservation Area (NCA) near Montrose, one is within the NCA near Olathe, and one is near the City of Delta.

[33]

BLM_0014518

# Alternatives Considered

These existing Open areas are considered to be premier OHV riding areas and all three are located near the same population concentrations as the planning area.

2. <u>An alternative with Limited to All Existing Routes OHV designations.</u>  Many of the existing routes in the planning area are contributing to ongoing impacts that contribute to land health concerns, such as parallel routes with the same destination, the location of routes on unsuitable terrain and routes located near or on sensitive resources.  Routes would potentially continue to be expanded in length and width beyond existing routes resulting in the potential for more resource impacts.  This alternative was not brought forward because the purpose and desired future conditions for the Dry Creek TMP and RMP Amendment would not be met, even though the proliferation of additional user-created routes would be prohibited.  Moreover, the Alternative 1 (No Action) analyzes the impacts of continuing to permit travel on all existing routes, as well as the potential increase in user-created routes.

Numerous other alternatives could have been developed for this Travel Management Plan because of the large number of existing routes.  The three action alternatives, however, adequately address a range of alternatives, as required by NEPA.  In addition, the alternatives brought forward in this Environmental Assessment (EA) cover a wide variety of options for many of the routes.

## PLAN CONFORMANCE REVIEW

The alternatives are subject to and have been reviewed for conformance with the following plan (43 CFR 1610.5, BLM 1617.3):

Name of Plan: Uncompahgre Basin Resource Management Plan

Date Approved: July 26, 1989

Decisions:  Amendment for the Standards for Public Land Health -- In January 1997, Colorado BLM approved the Standards for Public Land Health.  These standards cover upland soils, riparian systems, plant and animal communities, threatened and endangered species, and water quality.  Standards describe conditions needed to sustain public land health and relate to all uses of the public lands.  Because a standard exists for these five categories, a finding must be made for each of them in an environmental analysis.  These findings are located in specific elements listed below.

## RELATIONSHIP TO STATUTES, REGULATIONS OR OTHER PLANS

This RMP Amendment is being conducted in order to help meet *Standards for Public Land Health* within the Planning Area and to comply with the *Federal Land Policy and Management Act*.  The Uncompahgre Field Office coordinated with the US Forest Service to ensure consistency with travel management on adjacent lands managed by the Uncompahgre National Forest.  In addition, the field office coordinated with the US Fish and Wildlife Service and Colorado Division of Wildlife (CDOW), as well as consulted with the State Historical Preservation Office (SHPO) and the Southern Ute Tribal Council and the Ute Mountain Ute Tribal Council.

[34]

# Statutes, Regulations or Other Plans

Other statutes, regulations and plans were identified and reviewed for consistency with this RMP Amendment, including: Federal Land Policy and Management Act, National Environmental Policy Act, BLM NEPA Handbook, H-1790, Standards for Public Land Health in Colorado; Recreation Management Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado; National Highway Safety Act of 1966 (23 USC 402, P.L. 89-564); Surface Transportation Assistance Act of 1978 as amended (23 USC 101a, 201-205, P.L. 95-599 and 97-424); Executive Order 11644 – Use of off-road vehicles on public lands; Code of Federal Regulations , including but not limited to 43 CFR Part 8340; H-1601-1, Land Use Planning Handbook – Appendix C, Section D; National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands; National Mountain Bicycling Strategic Action Plan; Colorado BLM Travel Management Guidance; and 8550-Interim Management Policy and Guidelines For Lands Under Wilderness  Review & BLM Handbook 8550-1, Interim Management Policy For Lands Under Wilderness Review as well as other direction contained in Appendix 7.

## AFFECTED ENVIRONMENT / ENVIRONMENTAL CONSEQUENCES:

This section summarizes the physical, biological, social, and economic environments of the planning area and the nearby lands and the effects of implementing each alternative on that environment.  It also presents the scientific and analytical basis for the comparison of alternatives.  The Uncompahgre Field Office has inventoried and mapped all existing routes for consideration.  These include routes constructed by the BLM, and all motorized and non-motorized routes that have been created through public use.  Also considered are public roads not under BLM jurisdiction, such County roads, although actions would not affect these roads.

Within the analysis of the travel management plan, "long-term" effects mean greater than 5 years and "short-term" effects mean within 5 years.  These time frames were used to allow elements such as vegetation, riparian areas and soils to respond to the alternatives, while considering for the variability of the climate in the area.

Table 5 displays a brief summary and comparison of the impacts that would potentially occur as a result of implementing the alternatives.  Detailed information for impacts is discussed under each resource following the summary table.

[35]

BLM_0014520

# Summary Comparison of Environment Consequences

| Table 5 Summary Comparison of Environmental Consequences | | | | |
|---|---|---|---|---|
| **Resource or Resource Use** | **Alternative 1 No Action** | **Alternative 2 Proposed Action** | **Alternative 3** | **Alternative 4** |
| **Impacts on Transportation & Access** | Existing environmental impacts, increasing maintenance and reconstruction needs, impacts to the management of the transportation system, user conflicts, and growing levels of motorized activity from increased use of poorly located and designed routes would steadily grow over time; Access to public lands would continue at current levels. A high potential would continue for new user-created routes to be developed by management policy of permitting continued yearlong, on-route and cross-country travel by all types of vehicles; The closure and rehabilitation of some routes would be required to mitigate severe resource impacts or conflicts with other uses. | Adopting this Travel Management Plan (TMP) and limiting travel to designated routes seasonally or yearlong would result in a reduction in environmental impacts by closing or reconstructing many poorly planned and located existing routes, or designating some existing routes for uses that are less impacting and planned regular maintenance, reconstruction, and new route construction as needed over time; An immediate need for additional route maintenance/improvements, more regulation enforcement, and additional recreation facilities would result to accommodate the TMP and increased recreation usage; outreach efforts would potentially result in partnerships with volunteers and user groups to help with managing, planning, constructing, and maintaining routes. Access to public lands would be somewhat reduced. 290 fewer miles of routes would be managed for motorized use and 41 more miles of routes would be managed for non-motorized use than under Alternative 1. | The TMP in this alternative would result in impacts similar to Alternative 2, but with more potential for reduction of existing environmental impacts as a result of no new route reconstruction, more route relocation, closing or changing uses on nearly all existing routes that would be designated and that are causing or have the potential to cause environmental impacts, and managing and designating 518 fewer miles of routes or motorized uses and 62 more miles of routes for non-motorized uses than under Alternative 1. Access to public lands would be reduced to a greater extent than Alternatives 1, 2, or 4. | The TMP in this alternative would result in impacts similar to Alternative 2, but with less potential for reduction of existing planned and newly constructed routes and designating more motorized routes, and permitting motorized uses on, but not closing, most of the existing poorly planned and located routes that are causing or have the potential to cause environmental impacts; potential for continued conflict would continue between users and incompatible uses. 152 fewer miles of routes would be managed for motorized use and 21 more miles of routes would be managed for non-motorized use than under Alternative 1. Access to public lands would be similar to that in Alternative 1. |
| **Impacts on Air Quality** | Unrestricted use on about 700 miles of existing motorized and non-motorized routes (848 acres of existing soil disturbance), cross-country travel on all public lands & from additional unplanned and undersigned routes would cause fugitive dust and pollution that would potentially adversely impact air quality on or as seen from neighboring private and BLM & NPS managed lands. Risk of adverse impacts is increased due to greater cross country travel and disturbed soils. | Risk of adverse air quality impacts is greatly reduced as result of prohibition on cross country travel & closing some existing routes. Closing 290 miles of routes would result in 350 fewer acres of disturbed soils and faster rehabilitation and re-vegetation, resulting in less fugitive dust | Risk of adverse air quality impacts is greatly reduced. Same as for Alternative 2, except closing 428 miles of routes would result in 518 fewer acres of soils disturbed and faster rehabilitation and re-vegetation, resulting in less fugitive dust | Risk of adverse air quality impacts is greatly reduced. Same as for Alternative 2, except closing 128 miles of routes would result in 128 fewer acres of soils disturbed and faster rehabilitation and re-vegetation, resulting in less fugitive dust |

[36]

BLM_0014521

# Summary Comparison of Environment Consequences

| Table 5 | | | | |
|---|---|---|---|---|
| Summary Comparison of Environmental Consequences | | | | |
| **Resource or Resource Use** | **Alternative 1 No Action** | **Alternative 2 Proposed Action** | **Alternative 3** | **Alternative 4** |
| **Impacts on Cultural Resources** | Existing vehicular and other access availability, impacts, and potential impacts to historic properties would continue with unlimited and increasing off road & cross - country use that creates new routes that would continue to have a high potential to greatly impact known sites in existing roads & other eligible properties resulting in degradation of the resource value, loss of information, and long term irreversible, irretrievable impacts to major archaeological sites. | Major reduction of potential impacts to recorded and undocumented historic properties & previously un-impacted properties would occur by prohibiting all cross country vehicular travel, limiting travel to designated routes seasonally or yearlong, limiting use by vehicle types, & closure of 259 miles of existing routes.   As a result there would be 36% fewer routes than Alternative 1, and no cross country travel by motorized or mechanized means. | Same as for Alternative 2, except 369 miles of existing routes would be closed, increasing the significance of the changes that would occur.  As a result there would be 52% fewer routes than Alternative 1. | Similar to Alternative 2, except that approximately 118 miles of existing routes would be closed.  As a result there would be 17% fewer routes than Alternative 1. |
| **Impacts on Environmental Justice** | Demands and impacts would continue to increase, but would not result in a disproportionate impact on minority or low income populations. This alternative would not change existing uses. | None of these alternatives would have a disproportionate impact on minority or low income populations because opportunities have been maintained for both non-motorized and motorized travel; horse riding and hiking would be allowed on any trail or cross country. | | |
| **Impacts on Farmlands (Prime and Unique)** | More soil surface & stream channel disturbance & accelerated storm runoff and sediment yield would potentially affect some downstream & off-site farmlands and irrigation facilities as a result of increases in travel volume of use, unrestricted continued cross-country travel creating new routes and disturbance, about 700 miles of existing motorized and non-motorized routes that occupy about 848 acres of disturbed surface) , 73 miles of existing  routes within 100 feet of stream channels (or 88 acres of existing soil and vegetation disturbance), 877 stream crossings on all types of existing routes, 572 miles of  routes on soils that have either a moderate or severe potential for erosion.  Routine trail maintenance and other measures, such as seasonal and weather related route closures would not occur, causing further deterioration of routes and continued impacts. | Amount of existing storm runoff and sediment production would be greatly reduced, & less erosion would occur on about 312 fewer disturbed acres from closing about 259 miles of all types of existing routes and 32 miles of existing routes within 100 feet of stream channels (results in  35 fewer existing acres of existing soil and vegetation disturbance,  facilitating re-vegetation and rehabilitation), 389 fewer existing stream crossings on all types of existing routes, and 206 fewer miles of existing motorized and non-motorized routes, or 250 fewer acres, on soils that have either a moderate or potential for erosion. Accelerated sediment yield and storm runoff would be reduced with the prohibition of all off route travel and the implementation of the measures in this alternative. | Similar to Alternative 2 except: less erosion would occur from closing 369 miles  of all types of existing routes (results in 447 fewer acres of existing disturbed surface) and 39  miles of existing  routes within 100 feet of stream channels (results in 47 fewer acres of existing soil and vegetation disturbance), 492 fewer stream crossings on all types of  routes, and closing 354  miles  of existing motorized and non-motorized routes , resulting in  430 fewer acres of disturbance on soils that have either a moderate or potential for erosion, further reducing the potential affect on some downstream & off-site farmlands and irrigation facilities. | Similar to Alternative 2, with somewhat less potential for reductions in amount of existing storm runoff and sediment production, & erosion from closing  118 miles of all types of existing  routes (143 fewer acres of existing disturbed surface) . An increase of 1 more mile of route (1 more acre of potentially disturbed surface) within 100 feet of stream channels and 54 more stream crossings along proposed Roubideau hiking and horse trail would result in minimal impacts to farmlands. 68 fewer miles of existing motorized and non-motorized routes, or 82 fewer acres, on soils that have either a moderate or potential for erosion would reduce impacts on these sensitive resources.  Minimal impacts to farmlands adjacent to the area could potentially occur along Roubideau Creek horse trail in Camel Back WSA. |
| **Impacts on Floodplains** | Impacts from about 700 miles of existing motorized and non-motorized routes that occupy about 848 acres of disturbed surface) would be the same as for *Impacts of* | Potential for floodplain disturbance would be greatly reduced by prohibiting all cross country travel, closing about 258 miles of existing | Similar to those in Alternative 2, except compared to Alternative 1, less erosion would occur from closing 369 miles of existing routes (about 447 fewer acres of | Similar to Alternative 2except compared to Alternative 1, existing disturbance to floodplains would be reduced by closing 118 miles of all types of existing routes |

[37]

BLM_0014522

# Summary Comparison of Environment Consequences

| | Table 5 Summary Comparison of Environmental Consequences | | | |
|---|---|---|---|---|
| **Resource or Resource Use** | **Alternative 1 No Action** | **Alternative 2 Proposed Action** | **Alternative 3** | **Alternative 4** |
| | *on Farmlands* above. Potential impacts would increase as more user-created routes and increases in volume of travel use in this sensitive resource occur. 73 miles of existing routes (or about 88 existing acres of soil and vegetation disturbance) within 100 feet of sensitive stream channels, 877 stream crossings on routes, and existing routes and new user created routes in sensitive floodplains would continue to affect these sensitive resources by removing vegetation and the soil surface & encroaching on active stream channels, restricting channel dynamics and migration. Loss of vegetation cover to prevent downstream erosion and sedimentation could occur from little or no routine trail maintenance, application of mitigation such as seasonal and weather related route closures, increases in new user created routes & incidental spills of petroleum-related products where motorized travel occurs. | routes (results in about 312 fewer disturbed acres) of all types of routes, 32 fewer miles of existing routes within 100 feet of stream channels (or 35 fewer acres of existing soil and vegetation disturbance, facilitating re-vegetation and rehabilitation), and 389 fewer stream crossings on all types of existing routes in the WIZ. Slight potential to alter the floodplain function of these drainages through physical disturbance to alluvial soils and the stabilizing vegetation from 8.6 miles of rock crawling trails in the WIZ, with 102 stream crossings located primarily in ephemeral drainage channels. The impacts from this use would be minimized by implementing the measures in this alternative. | soil disturbance) of all types of routes, closing 39 miles of existing routes within 100 feet of stream channels (results in 47 fewer acres of existing soil and vegetation disturbance), and 492 fewer stream crossings on all types of existing routes in the WIZ. There would be a lower potential for vegetation and soils to be altered in or on local floodplains, from fewer miles of routes and lower probability of petroleum contaminant spills. There would be less potential for alteration of floodplain functions through physical disturbance to alluvial soils and the stabilizing vegetation on about 3.4 miles of existing rock crawling trails in the WIZ, which includes 56 stream crossings, located primarily in ephemeral drainage channels. The impacts from this use would be minimized by implementing the measures in this alternative. | (results in 143 fewer acres of existing disturbed surface). An increase of 1 more mile (1.2 more acres) of route within 100 feet of stream channels and 54 more stream crossings along proposed Roubideau hiking and horse trail would potentially minimally impact floodplain functions in the planning area. There would be potential to alter the floodplain function of drainages containing rock climbing trails similar to that in Alternative 2. |
| **Impacts on Invasive, Non-Native Species** | Noxious weeds would continue to spread beyond the approximately 1,575 acres of existing infested public land in the area (about 10% of public land acres) as a result of motorized and non-motorized cross-country travel, new user-created routes, and over 700 miles of existing routes that would continue to be available for all motorized and non-motorized travel. All weeds on the state "A" and "B" lists, along with BLM species of concern, would be treated to keep them in containment, with spotted knapweed (800 acres along HWY 90), hoary cress (throughout PA), and Russian knapweed (Roubideau Canyon riparian area) being priorities. BLM would continue to partner with others to treat spotted knapweed to keep the infestation contained with a goal of shrinking the infestation. This alternative would not meet or be moving towards meeting Land Health | The spread of noxious weeds would be slowed, weed surveys and treatments for existing infestations would be easier, and the likelihood of future infestations would be less by eliminating cross-country travel, preventing the creation of new, unplanned routes, and by the 37% reduction in total miles of existing routes being available and designated for motorized and non-motorized travel, and reduced route density. This alternative would be moving toward meeting Land Health Standard 2 for healthy plant and animal communities regarding noxious weed establishment and treatment. | Similar to Alternative 2, except that locating noxious weeds, keeping up treatments along routes, and re-surveying after treatment, would be easier and more efficient because of the 53% reduction in total miles of existing routes that would be available and designated for this alternative, and reduced route density. This alternative would be moving toward meeting Land Health Standard 2 for healthy plant and animal communities regarding noxious weed establishment and treatment. | Similar to Alternative 2 except that only a 17% reduction in total miles of existing and inventoried routes would occur. This alternative would not result in or assist in the reduction of noxious weeds, but it would allow for containment and control strategies to be put into place and for noxious weed advancement to be curbed. Trailheads and critical noxious weed species that impact economic and ecological factors of rangelands and that have the potential to spread or be easily transported to private and other public lands would be treated earlier by implementing a containment and control strategy and locating noxious weeds, keeping up treatments along routes, and re-surveying after treatment. This alternative would not meet or be moving towards meeting Land Health Standard 2 for healthy plant and animal communities regarding noxious |

[38]

BLM_0014523

# Summary Comparison of Environment Consequences

| Table 5 Summary Comparison of Environmental Consequences | | | | |
|---|---|---|---|---|
| **Resource or Resource Use** | **Alternative 1 No Action** | **Alternative 2 Proposed Action** | **Alternative 3** | **Alternative 4** |
| | Standard 2 for healthy plant and animal communities regarding noxious weed establishment and treatment. | | | weed establishment and treatment. |
| **Impacts on Migratory Birds** | Travel on about 700 miles of existing motorized and non-motorized routes may continue to have effects on18 potential migratory bird populations that could be present at varying seasons, and their associated habitat, similar to the effects on threatened and endangered species, aquatic wildlife, and terrestrial wildlife. These routes result in about 848 acres of disturbed surface in all types of this sensitive resource.  Routes would continue to cut through migratory species habitat, especially sagebrush, pinyon-juniper and grassland habitat types, further increasing the potential for these impacts to occur. | Impacts to migratory bird habitat and to the key factors important for migratory bird species, especially by reducing destruction of nests of ground-nesting birds, would be reduced by a 37% reduction in the number of total miles of existing motorized and non-motorized  routes, or about 258 fewer miles of motorized and non-motorized  routes (& 312 fewer existing disturbed acres), that would be designated in this alternative, changing the existing OHV designations to "Limited to Designated Routes Seasonally or Yearlong", and by preventing new routes to be pioneered by cross-country travel. Large potential reductions in affects on migratory bird habitat and to the key factors important for migratory bird species would occur as a result of about 234 fewer miles of existing motorized and non-motorized routes traversing sagebrush, pinyon-juniper and grassland bird habitat in this alternative. | Similar to Alternative 2 except that there would be a about 53% fewer total miles of existing motorized and non-motorized routes, or about 369  fewer miles of routes (& 447 fewer existing disturbed acres), that would affect migratory bird habitat that would be designated in this alternative. About 360 fewer miles of existing motorized and non-motorized routes traversing sagebrush, pinyon-juniper and grassland bird habitat would be designated in this alternative. | Similar to Alternative 1, except that there would only be about 17% fewer total miles of existing motorized and non-motorized routes, or about 118 fewer miles of routes (& 143 fewer existing disturbed acres), that would affect migratory bird habitat that would be designated in this alternative. About 60 fewer miles of existing motorized and non-motorized routes traversing sagebrush, pinyon-juniper and grassland bird habitat would be designated in this alternative. |
| **Impacts on Native American Religious Concerns** | Some degree of unknown impacts would continue to traditional cultural properties (TCP) and sacred sites (SS), depending on their proximity to existing routes and available access, and no inventories would be conducted to identify and/or mitigate potential impacts. | Similar to those from No Action, except that the access and impacts to TCP and SS would be restricted to designated routes, and the potential impacts to both documented and undocumented TCP and SS would be decreased due to about 258 fewer miles of existing non-motorized and motorized routes designated, and the closure of some routes into sensitive areas, in this alternative. Prohibiting cross-country travel would reduce the potential for impacts to previously un-impacted properties, and reduce the | Similar to Alternative 2, except that about 369 fewer miles of existing routes would be available for motorized and non-motorized use and limiting travel to designated routes, thereby eliminating some access to these sites and preventing cross-country travel. | Similar to Alternative 2, except that some level of reduction in access and impacts would be realized even with only about 118 fewer miles of existing routes that would be available for motorized and non-motorized use and limiting travel to designated routes, thereby eliminating some access to these sites and preventing cross-country travel. |

[39]

BLM_0014524

# Summary Comparison of Environment Consequences

| Table 5 |
| --- |
| Summary Comparison of Environmental Consequences |

| Resource or Resource Use | Alternative 1 No Action | Alternative 2 Proposed Action | Alternative 3 | Alternative 4 |
| --- | --- | --- | --- | --- |
| | | impacts to sites currently being impacted. Under this alternative, some segments of some existing routes would remain available for motorized and non-motorized use, and impacts currently occurring would continue at current levels. | | |
| Impacts on Threatened, Endangered, and Sensitive Species | New, unplanned, and poorly located cross country routes would potentially further impact sensitive habitat and/or the species in Table 13, relative to habitat fragmentation, patch size, edge to interior ratio, barriers to movement, facilitation of invasions of non-native and/or opportunistic species, mortality rates, noise and other disturbance factors. 151 miles of existing routes in federally listed species habitat is resulting in about 183 acres of existing disturbance in these sensitive resources. | Changing the existing designation to "Limited to Designated Routes Seasonally or Yearlong", would reduce potential impacts to wildlife and their habitat and to plant species (Federally listed and sensitive species), existing levels of disturbance and habitat fragmentation, and incidental crushing of sensitive plants adjacent to existing routes in varying degrees because of about 53 fewer miles of existing motorized and non-motorized routes (& 64 fewer existing disturbed acres) through Federally listed species, and many more through sensitive species habitat that would be designated and available for motorized and non-motorized travel, limiting travel to designated routes seasonally or yearlong, and preventing cross-country travel. | Similar to Alternative 2, except that more potential reductions in impacts to these species and their habitat would occur from a reduction of about 80 miles of existing routes (97 fewer existing disturbed acres) through Federally listed species, and many more fewer miles through sensitive species habitat. | Similar to Alternative 2, except that fewer potential reductions in impacts to these species and their habitat would occur from a reduction of about 22 miles of existing motorized and non-motorized routes (27 fewer existing disturbed acres) that would be located in Federally listed species habitat. |
| Impacts on Wastes, Hazardous or Solid | Motorized cross-country travel that results in the additional user-created routes would create more opportunity for dumping to occur. Enforcement demands would continue to grow with the growing population and increase in motorized use. Opportunities for dumping materials on public lands would increase incrementally as the number of miles of new routes being established increases. | New and existing opportunities for dumping of materials on Public Lands would be greatly decreased by eliminating all cross country travel with motorized vehicles, closing some routes and implementing conditions of use on some routes, such as limiting some existing routes to non-motorized vehicles. Enforcement demands would decrease as a result. Eliminating cross country travel should also make it easier for law enforcement to recognized illegal activities, i.e. a vehicle off route is immediately in violation. | | |
| Impacts on Water Quality-Hydrology | Factors that result in impacts from miles of existing and potential routes, and from disturbed soils and vegetation on water quality and hydrology are essentially those that impact Farmlands, Floodplains, | Existing levels of sediment yield and potential contamination from petroleum products would be greatly less and associated existing impacts would be reduced as a result of all off- | Similar to Alternative 2, but major improvement would be expected than from implementing Alternative 2 as a result of about 369 fewer miles of existing motorized and non-motorized | Similar to Alternative 2, but somewhat more greater in degree that from implementing alternative 2 as a result of only about 118 fewer miles of existing motorized and non-motorized routes (143 |

[40]

## Summary Comparison of Environment Consequences

| | Table 5 Summary Comparison of Environmental Consequences | | | |
|---|---|---|---|---|
| **Resource or Resource Use** | **Alternative 1 No Action** | **Alternative 2 Proposed Action** | **Alternative 3** | **Alternative 4** |
| | Riparian and Wetland areas, Aquatic Wildlife, and Soils in terms of mileages and acreages, Refer to those impacts in this table for acreage and mileage impacts. The continued use on 700 miles of existing routes and the incremental increase in new user created routes would continue to contribute to the effects on water quality. . These 700 miles of existing routes result in about 848 acres of disturbed surface in the planning area, which contribute directly to impacts on water quality.  To further describe these impacts, natural drainage patterns would continue to be altered, concentration and collection of water runoff would continue, potential addition of petroleum based contaminants from motorized forms of travel would continue, water runoff and sediment yield would continue to be accelerated with on-site and off-site impacts, in amounts depending on route location, existing vegetation, soil type, erodability, and degree of soil compaction on the route surface, and route design and maintenance. Impacts in the form of riparian and other vegetation removal, loss of aquatic life habitat in perennial streams, travel on soils with a severe erosion potential, potential impacts to farm or irrigation facilities, sediment flows potentially affecting downstream domestic and municipal water users and facilities, and more frequent maintenance of livestock water impoundments would continue Impacts affecting the Uncompahgre River would be added to the lower Gunnison River. This alternative would not meet Land Health Standard 5. | route travel being eliminated, about 259 fewer miles of existing motorized and non-motorized routes, being available and designated in this alternative (312 fewer existing disturbed acres), preventing cross-country travel, and restricting travel to designated motorized and non-motorized routes seasonally or yearlong. Implementing this alternative would result in the same decreases in disturbed acres to the same analysis factors as shown for Farmlands, Floodplains, Riparian and Wetland areas, Aquatic Wildlife, and Soils.  This alternative would meet the intent of Land Health Standard 5. | routes (results in about 447 fewer existing disturbed acres) being available and designated in this alternative, 492 fewer stream crossings in the WIZ, and 39 fewer miles of routes (47 fewer disturbed acres) affecting streams in the WIZ. This alternative would meet the intent of Land Health Standard 5. | fewer existing disturbed acres) being available and designated in this alternative, and only about 54 more stream crossings in the WIZ, and increase of 54 more miles of routes affecting streams in the WIZ.  This alternative would meet the intent of Land Health Standard 5. |
| **Impacts on Wetlands & Riparian Zones** | Major impacts to this sensitive resource would continue as a result of new cross country travel on public lands and continuing use on 700 miles of existing routes. The number of acres of riparian | Major reduction in potential impacts to Wetlands & Riparian Zones would occur by eliminating all cross country travel from sedimentation, erosion, and channel alteration,  and as a result | Similar to Alternative 2, except that 14 fewer acres of disturbed riparian vegetation and soils would result overall Alternative is consistent with the intent of Standard 2 of managing for streams in | Similar to Alternative 2, except that 1.7 fewer acres of disturbed riparian vegetation and soils would result overall. Overall, small improvements to riparian areas are anticipated from this alternative. Alternative |

BLM_0014526

## Summary Comparison of Environment Consequences

| | | | | |
|---|---|---|---|---|
| **Table 5**<br>**Summary Comparison of Environmental Consequences** | | | | |
| **Resource or Resource Use** | **Alternative 1**<br>**No Action** | **Alternative 2**<br>**Proposed Action** | **Alternative 3** | **Alternative 4** |
| | habitat currently being affected by existing and potential motorized or non-motorized routes (estimated 23 acres existing), weeds, livestock grazing channel alteration, sediment deposits onto vegetation, and increased erosion would likely increase, with increased severity. 9.4 miles of existing routes in riparian areas create 20.5 acres of disturbed soil and vegetation associated impacts. Some riparian reaches would potentially move from fully Meeting to Meeting with Problems, or even to Not Meeting Land Health Standard 2. | of closing routes, route maintenance, parking, camping, and game retrieval limitations, preventing cross-country travel, and restricting travel to designated motorized and non-motorized routes seasonally or yearlong. 11.1 fewer acres of disturbed riparian vegetation and soils would result. Travel imitations on 82%, or 7.5 miles (16 disturbed riparian acres) of the existing routes in the riparian RIZ would reduce impacts to soils and vegetation in this sensitive zone. Limitations on travel would potentially reduce the amount of vehicular use on some routes, and would potentially result in the narrowing of the width of some of these routes from 10 or more feet to 5 feet or less, improving riparian habitat recovery. Riparian habitat and hydrologic functions recovery would be improved on closed routes and habitat would be sufficiently re-vegetated within 5 years. Compared with Alternative 1 these road closures, in combination with the prohibition of all cross country travel, and newly constructed, better designed routes would still represent a 3% reduction in route mileage, or 0.3 fewer miles, that pass through the riparian RIZ. When combined with the major reductions in existing and potential impacts to Farmlands, Floodplains, Aquatic habitat, and Soils, by prohibiting all cross country travel, and closing routes, impacts would be expected to be greatly improved within these sensitive resources.<br><br>Alternative 2 is consistent with the intent of Standard 2 of managing for | proper functioning condition. . Travel imitations on 98%, or 9.0 miles (19 disturbed riparian acres) of the existing routes in the riparian RIZ would reduce impacts to soils and vegetation in this sensitive zone.<br><br>Alternative 3 is consistent with the intent of Standard 2 of managing for streams in proper functioning condition. | 4 should improve ratings for Land Health Standard 2 for riparian health. These changes from current management represent an overall reduction of 4WD and 2WD routes in riparian areas with land health problems on routes that pass through the riparian RIZ.<br><br>Alternative 4 is consistent with the intent of Standard 2 of managing for streams in proper functioning condition. |

[42]

BLM_0014527

## Summary Comparison of Environment Consequences

| Table 5 Summary Comparison of Environmental Consequences | | | | |
|---|---|---|---|---|
| **Resource or Resource Use** | **Alternative 1 No Action** | **Alternative 2 Proposed Action** | **Alternative 3** | **Alternative 4** |
| | | streams in proper functioning condition. | | |
| **Impacts on Wild and Scenic Rivers** | ORVs would be managed and protected to the extent possible until a suitability determination is made on the segments. Identified Outstandingly Remarkable Values (ORVs) could be degraded or impacted as a result of impacts or changes from existing OHV designations of "Open" and "Limited to Designated Routes from 12/1 to 4/30" and current unrestricted cross country vehicular travel. | ORVs would be managed and protected until a suitability determination is made on the segments. Major reduction in the likelihood that ORVs would be impacted by eliminating all cross-country travel. Specific route designations would not adversely affect identified ORVs. Overall, there would be no short term, long term or cumulative impacts to existing ORVs. | Same as Alternative 2. | Same as Alternative 2. Long term and cumulative impacts would include a higher risk of introduction and infestation of noxious weeds within Monitor Creek but mitigation would prevent long term and cumulative impacts. |
| **Impacts on Wilderness** | In the Camel Back WSA, 15.6 miles of routes, inc. a 6 mile motorized administrative use only route, would continue to be managed so as to comply with BLM's *Interim Management Policy for Lands Under Wilderness Review* and the Sub-Region B Desired Future Conditions. No public motorized vehicles or mountain bikes would be permitted. There would be no short term, long term or cumulative impacts to wilderness values | Same as Alternative 1, except that the WSA would contain a net 2.3 fewer miles of existing routes that could be rehabilitated. Approximately 12 miles of existing trail would be designated in the WSA for non-motorized, non-mechanized travel, five miles of hiking-horse trail would be constructed, using the minimum tool concept, and approximately three and one half miles of hiking trail would be closed. These changes would help reduce impacts and help enhance and protect wilderness values | Same as Alternative 2 except that in the WSA there would be a net 3.6 fewer miles of existing routes. , approximately 10.5 miles of existing trail would be designated for non-motorized/non-mechanized travel, one and one half miles of new trail would be built using the minimum tool concept, and about five miles of existing routes would be closed. | Same as Alternative 2 except that the WSA would contain a net 8.6 more miles of hiking or horse trails that would meet existing WSA management guidelines. Approximately 14 miles of existing trail would be designated for non-motorized/non-mechanized travel, 11.5 miles of trail would be constructed, using the minimum tool concept, and approximately one and one half miles of existing routes would be closed. |
| **Impacts on Soils** | Major and increasing impacts would continue as a result of off-route motorized travel continuing to be permitted in most of the area, 440 miles of existing routes on soils with a high potential to support Biological Soil Crusts, and 372 and 199 existing miles of routes or on soils having a moderate or severe potential for erosion, respectively. More soil erosion and sediment yield would occur overtime, with a decline in soil surface health with the soil being able to support less vegetation and BSC, and an increase of invasive plant species would occur on additional disturbed soils. This alternative would not meet the intent of Public Land Health Standard 1 | Major reduction in additional potential impacts to soils with high potential for BSC and moderate or severe erosion potential by eliminating all cross country travel. Major reduction in soil erosion and sediment yield overtime, and fewer instances of invasive plant species would occur as a result of off-route travel being eliminated, 169 fewer miles of routes on BSC soils (205 fewer acres BSC soils disturbed), 205 fewer miles of routes on soils having a moderate or severe potential for erosion, respectively or 248 fewer acres of moderate or severe erosion soils disturbed, and implementing the | Similar to Alternative 2, except that 250 fewer miles of routes on soils with a high potential for supporting BSC (303 fewer acres of disturbance and 312 fewer miles of routes on soils having a moderate or severe potential for erosion, respectively, or 378 fewer acres of disturbance.. Implementation of this alternative would meet the intent of Public Land Health Standard 1 for soils. | Similar to Alternative 2, except 60 fewer miles of routes on soils with a high potential for supporting BSC (73 fewer acres of disturbance and 61 fewer miles of routes on soils having a moderate or severe potential for erosion, respectively, or 73 fewer acres of disturbance Implementation of this alternative of disturbance Implementation of this alternative would meet the intent of Public Land Health Standard 1 for soils. |

[43]

BLM_0014528

# Summary Comparison of Environment Consequences

| Table 5 Summary Comparison of Environmental Consequences | | | | |
|---|---|---|---|---|
| **Resource or Resource Use** | **Alternative 1 No Action** | **Alternative 2 Proposed Action** | **Alternative 3** | **Alternative 4** |
| | regarding soils. | measures in this alternative. This alternative would meet the intent of Public Land Health Standard 1 for soils. | | |
| **Impacts on Vegetation** | Alternative 1 is not consistent with lands moving toward meeting Land Health Standard 3. Increases in vegetation impacts or removal from new user-created routes would add to the existing 1,661 acres of existing vegetation occupied by routes, resulting in more weed infestations and dominance, depressed vigor of vegetation adjacent to the route, and more impacts to route-side vegetation. Potential Conservation Area (PCAs) objectives for protecting these plant communities would continue to be a challenge to meet and vegetation impacts in all but one of these areas would increase from new user-created routes and cross-country travel.<br><br>These levels of vegetation impacts from indirect route impacts would not be consistent with improving vegetation conditions and Land Health Standard 3 ratings, particularly since many of the problems relate to exotic species. | Alternative 2 is consistent with and complementary to other actions being taken to ensure lands meet Land Health Standard 3. Reductions in route density, closing and rehabilitating routes, restrictions on seasons of use and vehicular uses, eliminating motorized and mechanical cross-country travel for any purpose, reducing over time some route widths, would result in result in 312 fewer existing disturbed acres of vegetation, recovery of vegetation over time, less sediment deposition, erosion, maintenance impacts, human-related vegetation destruction, weed introduction and spread, and substantial reductions of route-related impacts of vegetation in all of the PCAs except for one. These reductions are consistent with PCA objectives of protecting these plant communities.<br>The reduced impacts and disturbance of vegetation and vegetation recovery in this alternative is consistent with and would support other actions being taken to improve vegetation conditions and Standard 3 ratings, particularly since many of the problems relate to exotic species. | Alternative 3 is consistent with and complementary to other actions being taken to ensure lands meet Land Health Standard 3. Similar impacts as with Alternative 2 are anticipated, except that greater reductions in vegetation impacts (results in about 447 fewer existing disturbed acres of vegetation) would occur, reducing all associated impacts. | Similar impacts as with Alternative 2 are anticipated, except that Alternative 4 would result in minimal improvements to Land Health Standard 3 ratings, but is not fully consistent with lands meeting Land Health Standard 3. |
| **Impacts on Wildlife, Aquatic** | New, unplanned, and poorly located routes that result from continuing cross-country travel would potentially greatly increase impacts on habitat and/or the species in Table 13. Existing levels of travel on about 700 total route miles would continue to result in resource disturbance and habitat fragmentation, and to affect native fish habitat in perennial streams at 84 crossings | Restricting travel to designated routes would greatly reduce potential impacts to aquatic habitat & species by prohibiting new user-created routes and potential new crossings and disturbances on 70 miles of perennial streams. There would be major reductions in existing levels of associated soils, floodplains, water | Similar to Alternative 2, except that levels of disturbance and habitat impact would be reduced further by 619 fewer stream crossings in amphibian habitat (a 70% reduction) and 16 fewer crossings (19% reduction) in Native fish habitat from motorized use. | Similar to Alternative 2, except that levels of disturbance and habitat impact would not be as much due to a reduction in existing stream crossings of 92 fewer motorized use crossings in amphibian habitat (10% reduction) and an increase of 49 more non-motorized crossings in Native fish habitat (58% increase) from motorized use routes. |

BLM_0014529

# Summary Comparison of Environment Consequences

| Table 5 Summary Comparison of Environmental Consequences | | | | |
|---|---|---|---|---|
| Resource or Resource Use | Alternative 1 No Action | Alternative 2 Proposed Action | Alternative 3 | Alternative 4 |
| | and amphibian habitat in perennial and intermittent streams at 881 crossings. See Water Quality section for potential effects to sediment loads. | quality, riparian and other resource disturbance and habitat fragmentation, to amphibian habitat and Native fish habitat as a result of 461 fewer stream crossings in amphibian habitat (a 52% reduction) and 3 more crossings in Native fish habitat from motorized routes. See Water Quality section for potential additional reductions to these habitats regarding sediment loads. | | |
| Impacts on Wildlife, Terrestrial | Cross-country travel would continue to cut new routes resulting in major increases to habitat and species, including additional wintertime stress. Existing levels of travel on about 700 total route miles and 484 miles of existing motorized routes and 587 acres of disturbed vegetation in important habitat types would continue to result in resource disturbance and habitat fragmentation, and to affect species. This could result in increased winter mortality for some species and decreased species reproduction in the spring. | Restricting travel to designated routes would greatly reduce potential impacts to species and habitat by prohibiting new user created routes and potential new fragmentation. Existing levels of wildlife species & habitat disturbance and fragmentation would be reduced by closing 255 miles of 484 existing miles in wildlife habitat types, a 53% reduction, or 309 fewer acres of existing disturbance. Seasonal closures of 63 miles of routes would result in major reductions in wintering wildlife species disturbance and stress. | Similar to Alternative 2, except that implementing this alternative would result in the closure of about 353 of 484 miles of existing motorized routes in these habitat types, a 73% reduction, which would result in about 428 fewer acres of existing disturbed and fragmented wildlife habitat. Seasonal closures of 14.5 miles of routes would result in major reductions in wintering wildlife species disturbance and stress | Similar to Alternative 2, except that Implementing this alternative would result in the closure of about 65 of 484 miles of existing motorized routes in these habitat types, a 13% reduction, which would result in about 79 fewer acres of existing disturbed and fragmented wildlife habitat. |
| Impacts on Fire Management | Current ability of fire management personnel to access mechanical and prescribed fire projects, to patrol for, locate, and manage fire incidents, access private property and improvements and infrastructure, and to use routes as control lines that act as fuel breaks and engine positioning locations to improve control of burns would continue. | Locating and accessing ignitions may be slowed in areas that are more remote, supporting fires logistically would be more challenging due to decreased ability to move equipment and supplies into remote fires, and prescribed burns may be more difficult to manage due to the reduction of existing routes that would limit road access and subsequent inability to utilize engines for control on routes. The current limited number of human ignitions should be further reduced, or at a minimum, may become more concentrated in areas in which the public has access or is concentrated in, as a result of a nearly 50% reduction in existing routes that would be designated in this | Similar to Alternative 2, except that greatly less access would be available and would make management of any fire more difficult both operationally and logistically, especially  concerning private property, improvements, and infrastructure. | Similar to Alternative 2, except that more available and intensive access and management of fires would be possible. |

[45]

BLM_0014530

# Summary Comparison of Environment Consequences

| Table 5 Summary Comparison of Environmental Consequences | | | | |
|---|---|---|---|---|
| **Resource or Resource Use** | **Alternative 1 No Action** | **Alternative 2 Proposed Action** | **Alternative 3** | **Alternative 4** |
| | | alternative. Because 85-90% of the area is available for Wildland Fire Use, the need and desire to manage fires more as natural processes on the landscape may be increased as a result of fewer miles of existing routes that would be available for travel. Prescribed burn plans would need to be more closely planned to adjust to available routes. | | |
| **Impacts on Forest Management** | The public would not be affected regarding forest product gathering. Vehicular access for these purposes would be according to BLM issued authorizations. | Similar to Alternative 1, and this alternative would only slightly affect the public's ability to gather forest products. If future forestry needs are considered after travel management has been implemented, Alternative 2 should have little impact on future treatments. | Similar to Alternative 1, except that a large number of existing routes would not be designated, and even fewer opportunities for gathering forest products would exist. | Similar to Alternative 1, and would maintain the most opportunities for gathering forest products, due to the fact that most forest products are gathered close to open routes. |
| **Impacts on Geology and Minerals** | Current levels of soil erosion, compaction, and the pioneering of new unplanned and poorly located routes and trails would continue as a result of cross-country travel for miscellaneous rock collection. | Current levels of soil erosion, compaction, and the pioneering of new unplanned and poorly located routes and trails would be greatly reduced by implementing this alternative. | Similar to Alternative 2, except that the current levels of soil erosion, compaction, and the pioneering of new unplanned and poorly located routes and trails would be reduced further by the reduction in the number of existing motorized routes that would be designated. | Similar to Alternative 2. |
| **Impacts on Hydrology / Water Rights** | Vehicular travel on 700 miles of existing routes, continued cross-country travel on most public lands & additional user created routes would increase soil disturbance in sensitive areas such as the Water Influence Zone and on erodible soils. Many existing and anticipated future routes would receive little maintenance to ensure adequate drainage and minimize soil erosion. Accelerated sediment production and potential contaminant spills could impact fisheries presently protected with instream flow water rights as a result of motorized use on 10 miles of routes along perennial streams within the WIZ, and at 83 associated stream crossings. | The potential for impacts (sediment and contaminant spills) to riverene values protected with instream flow water rights would be reduced because of closing about 259 miles of existing routes, limiting vehicular travel to designated routes, prohibiting or restricting all off-route vehicular travel, a 38% reduction in the number of existing perennial stream crossings (36 fewer crossings), and a 50% reduction in existing miles of routes in the WIZ along perennial streams, or 5 fewer miles, primarily in Sub-Regions A-D.<br><br>Across the area the sediment yield potentially intercepted by livestock | Similar to Alternative 2, except that impacts (sediment and contaminant spills) to riverene values protected with instream flow water rights would be reduced further in this travel management plan by closing about 369 miles of existing vehicular routes, reductions in the number of existing perennial stream crossings (-18% or 15 fewer crossings) and 2 fewer miles of routes affecting perennial stream WIZs. Sediment yield potentially intercepted by livestock ponds would be reduced because of a 67% reduction in the number of existing miles of OVH routes that would be designated on soils with a severe erosion potential (0.4 fewer miles) and a 56% reduction (249 fewer miles) | Similar to Alternative 2, except that about 118 miles of existing vehicular routes would be closed, the number of perennial stream crossings and miles of routes affecting the WIZ along perennial streams would be increased by 59% (49 more crossings) and 30% (3 more miles), as the result of the Roubideau Creek horse trail, resulting in limited impacts to riverene values. |

BLM_0014531

## Summary Comparison of Environment Consequences

| Table 5 Summary Comparison of Environmental Consequences | | | | |
|---|---|---|---|---|
| Resource or Resource Use | Alternative 1 No Action | Alternative 2 Proposed Action | Alternative 3 | Alternative 4 |
| | Accelerated sediment production potential spillages could impact fisheries presently protected with instream flow water rights. Anticipated increases in soil surface disturbance as a result of 200 miles of existing routes on soils with a severe potential for erosion, 440 miles of routes on soils with a high potential for supporting biological soil crusts, and the high likelihood of new user-created routes would potentially accelerate sediment production and increase maintenance requirements for livestock watering ponds. | ponds would be reduced by a 30% reduction in the number of miles of routes on soils having a severe erosion potential, or 60 fewer miles, a 38% reduction in routes on soils with a high potential for supporting biological soil crusts, or 167 fewer miles, by implementing the measures in this alternative. prohibiting | of route miles on soils with a high potential for supporting biological soils crusts. | |
| Impacts on Law Enforcement | Existing travel management policy and regulations create difficulties for the public and Rangers in enforcing user compliance and in court proceedings and limits BLM's ability to effectively enforce the closures of user-created routes. | Ability of law enforcement personnel to enforce regulations and restrictions would be improved. This alternative would result in a greater need for user education, and more compliance and law enforcement actions, but would improve over time. | Similar to Alternative 2. | Similar to Alternative 2, but would require more law enforcement and compliance personnel initially due to the larger number of existing routes that would be designated in this alternative. |
| Impacts on Paleontology | The current level of potential impacts to important paleontological resources, and secondary impacts from fossil collection and erosion, would continue as a result of the current level of travel and management policies, especially from motorcycle and ATV use on steep clay slopes where fossils are eroding from the shale layers. Major impacts to irreplaceable fossil resources could result from increasing numbers of miles of routes which potentially make these resources more accessible. | Fossils and historic dinosaur quarries would be better protected as a result of more presence of regulatory enforcement personnel, and travel limitations, especially from restricting travel to designated routes, prohibiting cross-country motorized travel, and prohibiting the pioneering of new user created routes. Relocation and rehabilitation could assist further in preventing further erosion and disturbance on some routes. | Similar to Alternative 2, except that potential existing impacts to paleontological resources would be lessened to a greater degree because of the increased reduction of existing routes that would be designated in this alternative. | Similar to Alternative 2, except that slightly less protection would be afforded to paleontological resources from more existing routes being designated in this alternative. |
| Impacts on Noise | Noise levels could slowly but gradually increase throughout the planning area as a result of recreational motorized vehicle use and increasing development on adjacent private lands. The levels of noise from target shooting would generally remain the same but could slightly increase from increased levels of recreational use in some areas. | Noise levels would be reduced sharply in Sub-Regions A and E from decreased route mileage and associated motorized vehicle use and noise. Overall, there would be an increase in the number and size of areas where low levels of noise are found, as well as some localized areas where noise levels would increase. | Noise levels in Sub-Region E, D, G, and F would drop sharply from decreased route mileage and associated motorized vehicle use and noise. Noise levels in Sub-Regions A and C would drop moderately. The anticipated overall increase in visitors could result in a moderate to high increase in noise levels on those routes that remain available for use and on adjacent Federal, State, and local roads. | Similar to Alternative 1. |

[47]

# Summary Comparison of Environment Consequences

| Table 5 Summary Comparison of Environmental Consequences | | | | |
|---|---|---|---|---|
| **Resource or Resource Use** | **Alternative 1 No Action** | **Alternative 2 Proposed Action** | **Alternative 3** | **Alternative 4** |
| **Impacts on Range Management** | No change would occur to existing routes and user-created routes would continue to be pioneered, resulting in more livestock harassment and fewer areas being available for livestock. Potential for vandalism and human disturbance to sheep camps in fall and winter would increase as additional user-created routes are developed, and the number of potential sheep camp locations would decrease. | Livestock and recreational user conflicts would be decreased as a result of implementing this travel management plan with designated routes that enhance recreation opportunities while eliminating the availability of some routes for motorized uses. Human pressure and associated vehicular and other noises near livestock during the calving seasons would be decreased, potential sheep dog and route and trail user conflicts in the fall would be reduced and the likelihood of human vandalism and disturbance at sheep camps would be reduced as a result of the reduction in the number of existing miles of routes that would be designated and available. | Similar to Alternative 2. | Similar to Alternative 1. |
| **Impacts on Realty Authorizations** | There would be no impact on existing private or public land status, realty authorizations, or access to public lands. The uses of existing routes and cross-country travel within the area would not be affected. Existing rights-of-way (ROW) uses, terms, and conditions, and the permitted access to authorized existing ROWs would not be affected. | | | |
| **Impacts on Recreation Management** | Existing travel issues would not be resolved, recreation settings, and opportunities would not be enhanced, recreation support facilities would not be built, desirable recreation destinations and other features would not be marketed or advertised, the current imbalance of routes for motorized and non-motorized uses would continue, user conflicts would continue, unrestricted cross-country motorized and non-motorized travel for all purposes would continue on most public lands, all available and existing routes would continue to be used for most types of vehicular use, and poorly located and planned existing routes would continue to be used as well as the new user-created routes, resulting in a continuation of associated impacts such as noise, and user conflict and safety concerns. Events currently authorized by Special Recreation Permits (SRPs) would continue, assuming renewal of permits, opportunities for | With this travel management plan and system of planned and designated routes, existing travel issues would be resolved, recreation settings, targeted recreation opportunities would be enhanced and sustained, and user conflicts would potentially be reduced. Impacts to soils, animals, and vegetation, and from littering, dumping and other illegal activities, and other impacts, such as noise, would be reduced. A balance of non-motorized and motorized recreation opportunities fully complying with BLM recreation guidelines would result. Opportunities would potentially be available for commercial and non-commercial SRPs for motorized and non-motorized activities such as hunting, mountain biking, horseback riding, and hiking. DFCs and niche characteristics for all Sub-Regions would be achieved. These changes | Similar to Alternative 2 except that not all targeted recreation opportunities and benefits would be enhanced or sustained as a result of fewer miles of motorized and non-motorized routes being designated, fewer newer routes and recreation facilities being built, and an imbalance between available non-motorized and motorized uses. The recreational opportunity goals in the DFCs would potentially be harder to achieve in Sub-Regions C, D, and E. | Similar to Alternative 2 except that not all targeted recreation opportunities and benefits would be enhanced or sustained, the factors that make a good travel plan and route system would only partially be incorporated, there would be an route and use imbalance favorable to all forms of motorized recreation opportunities and settings than providing a balance with non-motorized recreation opportunities and quieter activities, such as hiking, horseback riding, and dispersed back-country activities, more user facilities would be constructed, and opportunities for dispersed car-camping, touring, and other vehicle-related recreation activities would be greater. Alternative 4 would reduce the miles of routes that would be available for motorized recreation compared to Alternative 1 but increase the miles of motorized compared to Alternative 2. This alternative would be compatible with all Sub-Region DFCs except in Sub-Regions A and E. |

BLM_0014533

# Summary Comparison of Environment Consequences

| Table 5<br>Summary Comparison of Environmental Consequences | | | | |
|---|---|---|---|---|
| **Resource or Resource Use** | **Alternative 1**<br>**No Action** | **Alternative 2**<br>**Proposed Action** | **Alternative 3** | **Alternative 4** |
| | commercial outfitters offering motorized recreation activities would be potentially enhanced, but not for commercial non-motorized activities such as hunting, mountain biking, horseback riding, and hiking, as a result of the continuation of current management policies. The Desired Future Conditions for the Sub-Regions would not be achieved except in Sub-Region B (Camel Back WSA), and BLM recreation guidelines would not be adequately complied with. | would occur by implementing the actions and measures in this alternative. | | Summary: Alternative 4 would moderately improve the transportation system for motorized and non-motorized recreation. Even considering the number of miles of routes would be designated and available, and the increased scope of recreation facility construction to support the proposed increase in routes, this alternative only partially incorporates those factors that make a good travel plan and route system. See Recreation Management and Implementation in the Affected Environment section above. This alternative would result in recreational opportunity goals potentially not being achieved in the DFCs for Sub-Regions A and E. |
| **Impacts on Socio-Economics** | No changes to local or regional population, employment, and income would result; Cross-country use, trespass onto private lands from public lands, creation of new routes, and uncontrolled motorized/mechanized play user conflicts, would increase as a result of continued management policies and few travel restrictions. | The local economy in Montrose County and particularly the City of Montrose, and in surrounding counties to some degree, would benefit from additional routes designated and managed for technical four wheel driving, ATV, mountain biking and hiking uses. Trespass onto private lands from public lands, new user-created routes, and unrestricted motorized and mechanized travel would be decreased under more intensive management and fewer miles of available routes, and travel restrictions that would mitigate existing levels of cross-country use. | Similar to Alternative 2, except that less beneficial impacts to the economy of Montrose County, particularly the City of Montrose, would occur as a result of many fewer existing routes being designated and available for technical four wheel driving, ATV, and mountain biking use. | Same as Alternative 2. |
| **Impacts on Visual Resources** | Over time existing VRM Class III objectives would not be met as a result of new and existing routes dominating many foreground and middle ground landscapes. | All VRM objectives would be met; visual impacts would be reduced in PA and scenic quality enhanced by about 259 fewer miles of existing routes and closing many routes. Scenic quality would be maintained by regular maintenance of and reconstruction of portions of many existing routes that would be designated under this alternative. | Same as Alternative 2 with more potential for reduction in visual impacts and enhanced scenic quality by eliminating and rehabilitating about 369 miles of existing routes and conducting reconstruction and regular maintenance. | Same as Alternative 2, but somewhat reduced potential for would for reduction in visual impacts and enhanced scenic quality by eliminating and rehabilitating only about 118 miles of existing routes and conducting reconstruction and regular maintenance. |

[49]

BLM_0014534

# Transportation and Access

## CRITICAL ELEMENTS

Elements specified by statute, regulation, executive order, or the Standards for Public Land Health are described and analyzed in this section.

The following critical elements are considered. Those that could be impacted are brought forward for analysis. Any element not affected by the proposed action or alternatives will not be analyzed in this document; the reasons for no impact will be stated.

| Element | Not Present and Not Impacted | Present and Analyzed |
|---|---|---|
| Transportation and Access | | X |
| Air Quality | | X |
| ACEC | X | |
| Cultural Resources | | X |
| Environmental Justice | | X |
| Farmland, Prime or Unique | | X |
| Floodplains | | X |
| Invasive, Non-Native Species | | X |
| Migratory Birds | | X |
| Native American Religious Concerns | | X |
| Threatened, Endangered, and Sensitive Species | | X |
| Wastes, Hazardous and Solid | | X |
| Water Quality, Hydrology | | X |
| Wetlands and Riparian Zones | | X |
| Wild and Scenic Rivers | | X |
| Wilderness | | X |
| Soils | | X |
| Vegetation | | X |
| Wildlife, Aquatic | | X |
| Wildlife, Terrestrial | | X |

## TRANSPORTATION AND ACCESS

Within the planning area the existing BLM road network consists primarily of low standard dirt routes that are linked to county roads. Many of the BLM routes were developed to serve needs for temporary or intermittent access and were not designed to serve sustained high levels of use. Most of the routes were developed to provide access for specific activities, such as: livestock grazing, harvesting forest products, constructing power transmission and telephone lines, constructing flood control "check dams", constructing irrigation ditches and pipelines, performing "chaining" operations, and suppressing wildfires.

In today's environment, BLM routes are needed to serve both functional and recreational needs. Over the years, some routes have been improved to accommodate changes in the types of vehicles using them and to respond to the growing use of the public lands for recreational activities. Routes are still needed for

BLM_0014535

# Transportation and Access

such purposes as access for power line maintenance, and building and maintaining fences for grazing, but they are also needed for serving a wide variety of recreational uses as well.

In preparing for this Travel Management Plan (TMP), one of the first tasks was to conduct an inventory of the existing routes.  Whenever possible, the inventory utilized global positioning satellite (GPS) and geographic information system (GIS) technologies to accurately locate and accumulate information about the routes.  In areas that could not be physically reached for utilizing GPS, other means were used to capture the routes, including aerial photo interpretation and the transference of existing transportation data from other reliable sources.  Most routes included in the inventory were recorded using GPS.

The inventory identified a total of 701.8 miles of existing routes on BLM-managed public lands, which does not include routes on surrounding private lands or other ownerships that lead onto BLM lands.  The total mileage includes 32.3 miles of non-BLM-managed roads that are managed under county jurisdiction, and which are not affected by decisions made in this plan and would remain open to the public under all of the alternatives and usage would be according to county statutes.  Subtracting the non-BLM-managed mileage from the total miles leaves a balance of 669.5 miles of routes and trails managed by BLM on public lands.  Certain routes have been temporarily closed to the public for motorized or mechanized use.  These closures are located within Sub-regions D, E and F.  These routes would be examined to determine if they would remain closed or if they would be made available for public use, and any applicable restrictions.

The mileages of existing routes by travel use categories are summarized in Table 1. The locations of the routes are displayed on maps in Appendix 4 and the definitions of the travel use categories are located in Appendix 1.  When interpreting Table 1 it is important to understand that each Travel Use Category is named for the type of use that it is primarily suited to accommodate.  The other travel uses included in the category should be considered as secondary uses.  This distinction is important so that it is recognized that just because secondary uses are allowed does not mean that all of the routes in the category are necessarily suitable for those uses.  For example, routes included in the 4WD/2WD (Open) category are primarily intended for use with full-size motorized vehicles but they are also available for all other uses; including hiking and horseback riding.  Many hikers and equestrians, however, would not consider these routes to be suitable for hiking and horseback riding because sharing routes with motorized vehicles does not offer the type of recreation that they would normally seek.

Routes impact soils, vegetation, water, air quality, wildlife habitat and facilitate the dispersal of noxious weeds.  Poorly designed and improperly maintained routes promote erosion that degrades streams and wetlands.  The construction of new routes increases the impacts to soils and watersheds by exposing more areas of bare soil that are subject to erosion.

The monetary costs associated with maintaining a given road or trail is directly related to the overall physical makeup of the route (soil type, slope, vegetative cover, aspect, etc.), as well as to the amount and type of traffic that occurs on it.  Routes with high levels of traffic, and routes that are used for high-speed modes of travel that cause higher amounts of disturbance to traveling surfaces, require more maintenance than routes with low levels of use and that are used for slow- speed, low impact modes of travel.

[51]

BLM_0014536

# Transportation and Access

## Environmental Consequences

### Impacts from Alternative 1

Under Alternative 1, the existing BLM transportation system would be unaltered. Use and travel, on-routes and cross-country, by motorized and non-motorized vehicles, such as mountain bikes, and horseback and foot travel would be allowed in all the Sub-Regions except, where motorized and non-motorized travel would not continue to be permitted. Decisions in the current Resource Management Plan for the Uncompahgre Field Office restrict motorized travel in certain parts of the area to designated routes from December 1 through April 30 annually or yearlong. See Appendix C, Maps 1 and 2, pages 49 and 50, RMP. However, no routes have been designated on the ground via travel management planning, which would implement these seasonal or yearlong route designations and restriction decisions. In this alternative, these decisions would continue to not be implemented until further travel management planning was completed, resulting in continued, yearlong, on-route and cross-country travel. A high potential exists for new user-created routes to be developed through use by visitors and others.

The "Open" OHV designations on approximately 28,731 acres of public land, which would allow for cross country travel using all modes of travel and the "Limited" designations on 71,544 acres of public land would also continue, being managed primarily as lands open to OHV use. The current policies allowing the use of bicycles and other mechanized vehicles off existing routes and driving motorized vehicles off routes to park, camp, or retrieve game would be unchanged.

Currently 701.8 miles of motorized and non-motorized routes are located in the area that is recognized as existing, legal routes. Approximately 645 miles of these are managed for motorized use, and 24.5 miles are managed for non-motorized use. For a complete summary of the mileages by the individual travel use categories for each alternative, see Table 1 and Table 2 located at the front of this document.

Under Alternative 1, the environmental impacts from the increased use of poorly located and designed routes would steadily grow over time. Conflicts resulting from the incompatible uses of routes would also steadily increase. Existing routes that currently have low levels of motorized and mechanized use could steadily experience growing levels of activity, resulting in greater impacts to the resources and an increase in user created routes will continue to increase over time.

Under Alternative 1, the impacts to the management of the transportation system would also steadily grow over time. A need for route maintenance would result from this alternative. However, as recreation uses on Public Lands increase with frequency, the number of miles of routes that would require regular maintenance would also gradually increase. Increased reconstruction and maintenance efforts would be needed to mitigate the deterioration of routes that were not designed for sustained or high levels of use, but experience increased amounts of traffic. The closure and rehabilitation of some routes would also be required where severe resource impacts or conflicts with other uses occur.

### Impacts from Alternative 2

The implementation of Alternative 2 would establish a travel management plan with a system of routes with designated travel uses and seasons of use that would generally benefit the overall management of

[52]

# Transportation and Access

the transportation system for planning construction and maintenance needs. All existing OHV designations in the RMP would be changed to "Limited to Designated Routes Either Seasonally or Yearlong". The existing BLM transportation system would be modified with additional routes and closures. The use of motorized and mechanized modes of travel would be limited to designated routes. Camel Back WSA would continue to be closed to motorized and mechanized vehicles and devices.

Under Alternative 2, 418.8 miles of motorized and non-motorized routes would be designated, available, and managed for public use. Of these, approximately 354 miles would be available for motorized use, and 67 miles for non-motorized use only. Under Alternative 2, 290 fewer miles of routes would be managed for motorized use and 41 more miles of routes would be managed for non-motorized use than under Alternative 1. For a complete summary of the mileages by the individual travel use categories for each alternative, see Table 1 and Table 2 located at the front of this document.

Under Alternative 2 many of the existing routes that are causing or have the potential to cause environmental impacts because they are poorly located and designed, would either be closed, reconstructed, or designated for travel uses that are less impacting to the environment.

Most of the existing routes with user conflicts or the potential for user conflicts would also be closed or be designated for the appropriate uses. Many existing routes that are experiencing or that would potentially experience environmental impacts from increasing recreation use would be designated for the appropriate uses. New trails would be constructed as to not negatively impact the resources in the affected areas.

The impacts to some aspects of transportation management would increase under Alternative 2, including the construction of several new routes and the closure or restriction of motorized travel uses on many existing routes. Alternative 2 would generate the immediate need for additional maintenance and improvements to support the designated travel management system. Additional signage would be needed to designate the allowable travel uses on most designated routes, excluding Non-BLM routes. The installation of gates, barricades, and other closure devices would be needed to reinforce the travel restrictions. The construction of user facilities, such as parking areas, staging areas, camping areas, and trailhead facilities would be made to accommodate increased recreation usage.

In the short term, the management of the designated routes planned in Alternative 2 would require additional maintenance efforts, particularly for replacing signs that are likely to be removed or vandalized during the first few years after it has been implemented. In the long term, however, the removal and vandalism of signs should decrease as users become familiar with the new system. Also, one of the positive outcomes of a designated travel management system is that specialized user groups are generally willing to adopt routes that identify with their own interests. Thus, as various user groups develop a sense of ownership for their favorite routes and volunteer to adopt and maintain them, the need to utilize BLM funds for maintaining many of these routes could decline over time.

The scheduled maintenance of BLM routes with heavy equipment would be slightly affected by this alternative. Most of the new routes that are proposed for construction under this alternative are trails. Also, none of the routes that are currently being maintained would be closed or restricted by Alternative 2 but would continue to be included in the scheduled road maintenance program.

[53]

BLM_0014538

# Transportation and Access

## Impacts from Alternative 3

By implementing this alternative, a travel management plan with a system of routes with designated travel uses that would generally benefit the overall management of the transportation system for planning construction and maintenance needs would be adopted.  All existing OHV designations in the RMP would be changed to "Limited to Designated Routes Either Seasonally or Yearlong".  The existing BLM transportation system would not be modified by additional routes, but there would be some closures and the use of motorized vehicles would be limited to designated routes.  In addition, the use of bicycles and other mechanized vehicles would be limited to designated routes.

Under Alternative 3, 270.8 miles of motorized and non-motorized routes would be designated, available, and managed for public use.  Of these, approximately 184 miles would be available for motorized use and 86.8 miles for non-motorized use.  Under Alternative 3, 493 fewer miles of routes would be managed for motorized use and 62 more miles of routes would be managed for non-motorized use than under Alternative 1.  For a complete summary of the mileages by the individual travel use categories for each alternative, see Table 1 and Table 2 located at the front of this document.

Under Alternative 3 nearly all of the existing routes that are causing or have the potential to cause environmental impacts to resources because they are poorly located and designed, would either be closed or designated for travel uses that are less impacting to the environment.  Most of the existing routes with user conflicts or the potential for user conflicts would also be closed or be designated for the appropriate uses.  Many existing routes that are experiencing or that would potentially experience environmental impacts from increasing recreation use would be designated for the appropriate uses.  New trails would be constructed as to not negatively impact the resources in the affected areas.

Of the three action alternatives (2, 3, and 4), the impacts to transportation management would increase the least under Alternative 3.  The impacts to some aspects of transportation management, however, would increase under Alternative 3, in that many more existing routes would have restricted travel conditions, and more would be closed to travel.  Alternative 3 would generate the immediate need for additional signage to designate the allowable travel uses on most designated routes.   The installation of gates, barricades, and other closure devices would be needed to reinforce the travel restrictions.

In the short term, the management of the designated routes proposed in Alternative 3 would require additional maintenance efforts, particularly for replacing signs that are likely to be removed or vandalized during the first few years after it has been implemented.  In the long term, however, the removal and vandalism of signs should decrease as users become familiar with the new system.  Also, as various user groups develop a sense of ownership for their favorite routes and volunteer to adopt and maintain them, the need to utilize BLM funds for maintaining many of the routes could decline over time.

The need for scheduled maintenance of BLM routes with heavy equipment would be reduced by this alternative.

BLM_0014539

# Transportation and Access

## Impacts from Alternative 4

The implementation of Alternative 4 would establish a travel management plan with a system of routes with designated travel uses that would generally benefit the overall management of the transportation system for planning construction and maintenance needs. All existing OHV designations in the RMP would be changed to "Limited to Designated Routes Either Seasonally or Yearlong". Under Alternative 4 the existing BLM transportation system would be modified by additional routes and closures. The use of motor vehicles and mechanized vehicles and devices would be limited to designated routes, seasonally or yearlong.

Under Alternative 4, 605 miles of motorized and non-motorized routes would be designated, available, and managed for public use. Of these, approximately 560 miles would be available for motorized use and 46 miles for non-motorized use. Under Alternative 4, 118 fewer miles of routes would be managed for motorized use and 21 more miles of routes would be managed for non-motorized use than under Alternative 1. For a complete summary of the mileages by the individual travel use categories for each alternative, see Table 1 and Table 2 located at the front of this document.

Under Alternative 4 most of the existing routes that are causing or have the potential to cause environmental impacts to resources because they are poorly located and designed, would be designated for motorized travel uses that would result in fewer impacts to the environment. Most of the existing routes with user conflicts or the potential for user conflicts would also be closed or be designated for the appropriate uses. Many existing routes that are experiencing or that would potentially experience environmental impacts from increasing recreation use would be designated for the appropriate uses. New trails would be constructed as to not negatively impact the resources in the affected areas.

This alternative, however, includes the construction of many new routes and allows motorized travel uses on the most miles of existing and additional routes. Consequently, of the three action alternatives, Alternative 4 would have the greatest impact on the management of the transportation system. Alternative 4 would generate the immediate need for additional maintenance and improvements to support the designated travel management system. Additional signage would be needed to designate the allowable travel uses on most designated routes. The installation of gates, barricades, and other closure devices would be needed to reinforce the travel restrictions. The construction of user facilities, such as staging areas, parking areas, and other trailhead facilities would be needed to accommodate increased recreation usage.

In the short term, the management of the designated routes planned in Alternative 4 would require additional maintenance efforts, particularly for replacing signs that are likely to be removed or vandalized during the first few years after it has been implemented. In the long term, however, the removal and vandalism of signs should decrease as users become familiar with the new system. Also, as various user groups develop a sense of ownership for their favorite routes and volunteer to adopt and maintain them, the need to utilize BLM funds for maintaining many of the routes could decline over time.

The need for scheduled maintenance of BLM routes with heavy equipment would be increased by this alternative.

[55]

BLM_0014540

# Transportation and Access

## Cumulative Effects

In addition to growth in recreational travel, reasonably foreseeable actions that may affect transportation over the next 10 years on private and public lands include continued residential growth, mechanical and prescribed fire fuels reduction/habitat projects, county road maintenance and upgrades, utility corridor maintenance and upgrades, and new road rights-of-way. Other future activities on public lands in the travel planning area that could also potentially impact transportation and require mitigation include Forest Service planning and projects, Uncompahgre Plateau Project activities, local land use planning, soil research, BLM Uncompahgre Field Office Resource Management Plan revision, vegetation treatments, county road upgrades, special recreation permits and activities, and utility rights of way and corridors. The cumulative impacts to transportation from all action alternatives would be dispersed and long-term and require on-going monitoring and mitigation by BLM and partners.

## AIR QUALITY

The quality and condition of the air within the planning area and as seen from nearby lands is governed primarily at any one time by the amount and intensity of vehicular traffic on dry, un-surfaced routes or those that do not receive dust abatement treatment. Wildfires also contribute to the quality and condition of the air quality. During winters with enough snowfall, motorized snow machines and other winter vehicle recreation use results in emissions such as nitrogen oxides, hydrocarbons, fine particulate matter, and carbon monoxide. Conflicts arise when this recreation use occurs alongside non-motorized recreation pursuits, where clean-smelling air is desirable. As more people venture onto the forest during winter months, air quality may become a localized issue where concentrated motorized use conflicts with non-motorized uses.

Air quality is defined by ambient air concentrations of specific pollutants determined to be of concern with respect to the health and welfare of the general public. Under the Clean Air Act Amendments of 1990, the US EPA-established National Ambient Air Quality Standard's six "criteria pollutants" are lead, ozone, sulfur dioxide, oxides of nitrogen, carbon monoxide, and particulate matter. Areas that exceed a federal air quality standard are designated as non-attainment areas. Air quality monitoring data for some pollutants are available for Montrose and Delta. Delta and Montrose counties are in attainment with the National Ambient Air Quality Standards (EPA 2002a). The Colorado Department of Health and Environment maintains a PM10 monitor in Delta, and the monitoring data states that currently the area is well within the particulate matter standards (www.colorado.gov/airquality).

The air quality of the planning area is good and is believed to be typical of undeveloped regions in the western US; ambient pollutant levels are usually near or below measurable limits. Locations vulnerable to decreasing air quality from development include the location population centers Montrose and Delta. Emissions from vehicle use and small engines used in a variety of construction, industrial and farm applications affect local air quality. On an individual basis off-road engines and OHV equipment emit much higher levels of criteria pollutants than passenger vehicles. Standards have been adopted to reduce the emissions from newly manufactured small non-road engines and OHV equipment (EPA 2002b, 2002c).

Montrose County treats the three main County roads that carry the highest amount of traffic within and

[56]

BLM_0014541

# Air Quality

through the planning area with magnesium chloride to prevent excessive dust and to help prevent deterioration and wear and tear on the roads. This has had a positive effect on the amount of fugitive dust and particulates coming from the planning area.

Vehicle emissions include nitrogen oxides, hydrocarbons, fine particulate matter, and carbon monoxide. Travel on un-surfaced routes in the planning area, the focus of the analysis, does increase concentrations of fine particulate matter in the air. Vehicle emissions and fine particulate matter stirred up by vehicle travel over unpaved road surfaces have not been identified as a major air quality issue in the planning area. To date, overall air quality, visibility, or fine particulate matter in Camel Back WSA or nearby sensitive areas or population centers has not been affected as a result of vehicle emissions, or by dust created by travel on unpaved routes.

Road dust typically becomes an issue related to on-route motorized vehicular travel through the planning area to access Forest Service-managed or private lands on three main routes, or during agency resource management activities, land use permit implementation, mineral material and forest product gathering, livestock grazing management, hunting, or recreational uses, and especially when there is concentrated travel by large vehicles on unpaved roads. These situations conducted under agency permits or land use authorizations can be remedied through project-specified mitigation under the terms and conditions of permits.

Particulate matter concentrations are expected to be higher near towns because of local combustion sources and unpaved routes. Suspended particles are probably due to fugitive dust that is primarily windblown. Although there is no gaseous pollutant monitoring in the planning area, levels are estimated to be low and within standards. Ozone levels in the Rocky Mountain West are relatively high but of unknown origin. Occasional peak concentrations of carbon monoxide and oxides of nitrogen may be found in the immediate vicinity of combustion equipment. When prescribed burns or wild fires are burning in the vicinity of the planning area, air quality could be decreased during the short term.

## Environmental Consequences

Mileage figures used in impact analyses are approximate. Different route types and the uses and combinations of uses that could occur on different route types may impact resources differently. As a result, mileages shown that depict relative mileage impacts from the same route type(s) may vary from resource to resource. For instance, motorized routes could include all motorized uses, or ATV use only, or full-size passenger vehicle uses, or all of these uses.

## Impacts Common to All Alternatives

Magnesium chloride or other environmentally acceptable dust abatement chemicals would continue to be applied to major County roads in the planning area, helping maintain the air quality in the planning area.

Most effects of wintertime motorized recreation would be localized and temporary. Because of the anticipated limited change in winter motorized recreation between the alternatives, overall air quality impacts of winter-motorized recreation would not change by alternative.

[57]

BLM_0014542

# Air Quality

**Impacts from Alternative 1**

The impacts of road dust from unpaved roads depend on factors such as the amount of travel, size and speed of the vehicle, climatic conditions, and geology. Compared to all other alternatives, the No Action alternative would account for the greatest density and mileage of motorized routes and trails (700 existing miles of motorized routes and an estimated 870 acres of existing soil disturbance*), as well as the highest amount of traffic. Anticipated increases in motorized and mechanized cross-country travel would create new user created routes, and the growth in unrestricted cross-country traffic on all dry soils could eventually result in generation of PM10 that could be seen from the Black Canyon National Park. Given the unconfined and incrementally increasing extent of user-created routes, and assuming growth in recreational use over a 5-10 year period, the risk of adverse impacts is increased due to greater cross country travel and disturbed soils. This is because of the immediate short-term nature of the activities that would have a high potential for generating increasing amounts of fugitive dust and adversely impacting air quality over the entire planning area for part of the year. Under Alternative 1, fugitive dust and pollution would be expected to increase in all Sub-Regions and could potentially reach intensities that impact air quality on or as seen from neighboring private, BLM-managed lands, and other federal lands in the immediate short-term.

> * 870 acres estimate is calculated as follows: 700 miles X 5,280 ft/Mile X 10 feet average width of all routes ÷ 43,560 sq. ft./acre

Urbanization and resort development near the planning area bring additional impacts on localized air pollution, such as wood-burning stoves and de-icing of winter roads. Wildfires, fire management activities on public lands, and private landowners burning fields and ditch vegetation in the spring would also affect air quality in the immediate short-term when their smoke inundates communities and other sensitive areas.

**Impacts Common to Alternatives 2, 3, and 4**

These alternatives would greatly reduce from current conditions the risk of adverse air quality impacts from motorized and mechanized travel in the planning area. The greatest decrease in this risk would come from the banning of all cross-country travel that would incrementally reduce the amount of surface disturbed that could result in fugitive dust. The next greatest decrease in the risk would occur from closing some existing routes in these alternatives. Air quality impacts from roads and motorized trails are based not only on miles but also on the amount of traffic each receives, surface composition, and moisture content of each route. Closing routes would result in faster rehabilitation of soils and vegetation, resulting in less fugitive dust. When compared to Alternative 1, Alternatives 2, 3, and 4 would all result in some level of route and vegetation recovery and greatly reduced fugitive dust to localized areas as motorized travel is restricted to designated routes and cross-country travel is prohibited. The greatest reduction in existing traffic and resulting fugitive dust emissions, compared to Alternative 1, would occur in Alternative 3 (428 fewer miles of motorized routes and 518 acres of disturbed soils), the next comparative reduction would occur by implementing Alternative 2 (decrease of 290 miles of motorized routes and 351 acres of disturbed soils), and the least reduction would occur by implementing Alternative 4 (decrease of 106 miles of motorized routes and 128 acres of disturbed soils). However, the routes selected for designation in each of these alternatives includes some of the most heavily traveled and popular routes in the planning area.

[58]

# Air Quality

Alternatives 2 and 4 are most similar in their total motorized mile figures compared to alternative 3, which has the fewest miles available for motorized travel. These alternatives would greatly reduce the risk of short-term or long-term adverse air quality impacts from road travel, compared to Alternative 1. When comparing impacts to air quality between Alternatives 2, 3, and 4, total acreage of surface disturbance from motorized use, geographic reach of traffic and density of routes, and planning area distribution of fugitive dust would be expected to be greatest in Alternative 4 and very similar for Alternatives 2 and 3. These differences would result from the difference in the number of miles of motorized routes that would be available in these alternatives. However, air quality impacts from roads and motorized trails would be based not only on miles of motorized routes, but also on the amount of traffic each receives, surface conditions, and moisture content of each route.

**Cumulative Effects**

In addition to growth in recreational travel, reasonably foreseeable actions that may affect air quality over the next 10 years on private and public lands including continued residential growth, mechanical and prescribed fire fuels reduction/habitat projects, county road maintenance and upgrades, utility corridor maintenance and upgrades, and new road rights-of-way. Future activities on public lands that could also potentially impact air quality, require mitigation, but cannot be specified in terms of time and place in current analysis include special recreation events and vegetation treatments. Over the next 10 years, dust, smoke, and pollution from these and other sources, including local industries and from traffic on county roads, cumulative to recreational travel on BLM routes, are expected to have long-term, low intensity/impact to air quality.

## AREAS OF CRITICAL ENVIRONMENTAL CONCERN

There are currently no areas of critical environmental concern within the project area and none proposed or considered in this EA.

**Environmental Consequences**

There would be no environmental impacts resulting from implementing any alternative in this EA.

## CULTURAL RESOURCES

The Dry Creek Travel Management Planning Area is located on the east side of the Uncompahgre Plateau. The Dry Creek Basin, located within the planning area, is contained within the larger Uncompahgre Plateau archaeological context, as delineated and studied by the UPP project (Reed and Gebauer 2004). The Dry Creek Basin is known for its high concentrations of recorded archaeological sites, with some of the highest concentrations seen in the entire larger Uncompahgre Plateau. Over 1200 individual cultural sites are known with roughly 88% of the known sites represented as open artifact scatters. Aboriginal site types include, but are not limited to, open camps, chipped stone manufacturing and processing sites, open and sheltered architectural locales, and isolated artifacts and features. The density of National Register Eligible properties varies from less than one site per section in the upland

BLM_0014544

# Cultural Resources

areas to a high of over 10 sites per section in the canyon areas. Eligible historic properties include sheltered occupations, rock art, lithic procurement sites and historic Ute encampments. Sites that date to the historic period include mines, homesteads and ranches, as well as many other locations of past human activity. Routes themselves are often of historic age and are occasionally eligible for nomination to the National Register of Historic Places.

Historically, unregulated travel has left National Register and register Eligible sites vulnerable to impacts. Cross-country travel has, in many known cases, compromised the National Register character of sites, leading to irreversible, irretrievable loss of integrity and the destruction of valuable scientific data concerning the human past of the area. Route proliferation occurs as part of current management. The amount of cross-country travel will almost certainly increase and would continue into less accessible areas.

Information on archeological sites including location of sites is confidential and cannot be made public. There are known National Register- Eligible sites within existing routes, but the actual number is unknown since, a) there are still at least 300 miles of un-evaluated routes and, b) there are more known sites in routes that still need a National Register evaluation. Known sites within current travel corridors, routes are found in all studied sub-areas, with the highest densities being found in sub-regions C and D though these sites densities may be artificially high since those regions have received the most inventory. Site conditions within existing routes are deteriorating due to continued use of the routes.

Authority for the methodology used herein is contained in Addendum 1 to the Colorado protocol executed on October 26, 2006. The protocol amendment allows BLM to use a phased approach to complete our Section 106 responsibilities, in which BLM addresses the most pressing issues at the earlier stages of planning. This approach allows BLM to schedule intensive inventory in heavily used areas first, and to defer inventory of those roads where resource degradation is less severe, decreasing, or where management decisions themselves will reduce impacts, without slowing or halting the management planning and environmental analysis process. Under the protocol amendment, any designations that allow continued use of existing routes and provide for open travel may require some degree of Class III inventory, depending on such factors as limitations to travel, degree of potential for National register eligible sites, increase in travel usage, etc. Any designations that impose limitations on travel, close an open area or close a route are unlikely to adversely affect cultural resources, and field inventory of such undertakings is not required or may be limited. In this planning process inventory was completed in areas of high archaeological probability, where use was expected to increase the potential for resource impacts, where new routes have historically proliferated, and in randomly chosen segments of low-use routes. BLM archaeologists made the decision as to where intensive inventory was and is necessary based on information collected during literature reviews focused on the vicinity of the routes in question, on topographic factors, on the knowledge of the staff, and on research questions formulated in the most current statewide historic context documents. Where BLM determined that Class III inventory is not necessary, Class II (reconnaissance) inventories have been and would continue to be conducted and documented.

Cultural Resource inventories of the existing routes have not yet been completed. Of the more than 700 miles of known routes, over 50% (about 400 miles of routes) have been inventoried at a hundred percent. There are many hundreds of archaeological sites in the vicinity of the known/existing routes. There are also some known sites which may be susceptible to secondary impacts arising from

[60]

# Cultural Resources

accessibility. Any or all of these sites may be evaluated for National Register eligibility, and a recommendation would be made as to the potential for secondary impacts. BLM's preferred option, as recommended by the Colorado Handbook of Guidelines and Procedures for Inventory, Evaluation, and Mitigation of Cultural Resources 2007 and SHPO, is to avoid continued impacts to cultural sites by designating routes as closed to vehicular traffic in order to protect and preserve cultural resource values. In those cases where road closures are impractical or undesirable, BLM would implement the appropriate mitigation measures after consultation with SHPO and Ute Tribal authorities.

When determining the order of future inventories, BLM would place the greatest emphasis on the routes for which the type of use is most likely to adversely affect historic properties. For example, if the use of a particular road in an area of known site concentration might greatly increase as a result of other routes nearby being closed, it would receive greater attention than a road or trail in a remote location, for which use is already limited and would not change.

## Environmental Consequences

## Common to All Alternatives

Routes would be closed, if necessary, to help prevent impacts to known eligible archeological sites.

## Impacts from Alternative 1

In addition to known sites in existing roads, the continuation in the increase in the rate of unlimited off road travel, resulting in the potential for even more user created routes, has a high potential for impacting other sensitive resources, including historic properties situated in previously untraveled areas resulting in degradation of the resource value and long term irreversible, irretrievable impacts to major archaeological sites. Route proliferation would continue due to the population growth and increase in the rate of recreational OHV travel into less accessible areas, leading to potential secondary impacts to eligible archaeological sites. Under this alternative there would be continued increase in the amount of cross-county travel and no reduction of the existing impacts and potential impacts that could occur on or along some of the 700 miles of existing routes to historic properties. More intensive inventories would likely be required.

## Impacts from Alternative 2

Overall, fewer historic properties would be impacted under this alternative than under Alternative 1 due to all cross-country travel being prohibited, limiting all motorized and mechanized travel to designated routes, and closing some routes. Prohibiting all cross-country motorized and mechanized travel would result in major increases in the potential for the preservation of the National Register character of some sites, prevent irreversible and irretrievable loss of integrity and the destruction of valuable scientific data concerning the human past of the area, and greatly reduce the potential impacts to recorded and undocumented historic properties. Restricting and limiting motorized and non-motorized mechanized travel to 375 miles of non-administrative routes (See Table 1), and closing 259 miles of existing routes would greatly reduce the level of anticipated impacts to these sensitive resources from OHV travel. This alternative would result in the elimination of all cross-country travel to or near these resources, and is a reduction of 53% in the number of miles of existing non-administrative routes that would be available

[61]

BLM_0014546

# Cultural Resources

for motorized or mechanized travel.  Limiting travel to designated routes seasonally or yearlong would reduce the potential for impacts to previously un-impacted properties, and limiting travel on some routes to specific types of travel would reduce the impacts to sites currently being impacted.  Continued impacts to currently impacted sites would be reduced or eliminated.

**Impacts from Alternative 3**

The potential impacts to historic properties from implementing this alternative would be similar to Alternative 2 but greatly  fewer than those from implementing Alternative 1, due to the fewer  number of miles of motorized and mechanized designated routes in this alternative (224 miles, 486 fewer miles than Alternative 1, and 111  fewer miles than Alternative 2).  Approximately 369 miles of existing routes would be closed in this alternative.  The routes selected for closure are those in the least desirable locations or those that are parallel routes to other routes.  Fewer intensive inventories would likely be required as a result of less traffic and travel.

**Impacts from Alternative 4**

The potential impacts from implementing this alternative would be similar to Alternative 2 and greatly less than those from implementing Alternative 1, due to the number of miles of motorized and mechanized designated routes in this alternative (576 miles, 124 fewer miles than Alternative 1, and 201 more miles than Alternative 2).  Approximately 118 miles of existing routes would be closed in this alternative.  The routes selected for closure are those in the least desirable locations or those that are parallel routes to other routes.  More intensive inventories and site specific mitigation would likely be required.

**Cumulative Effects**

Cumulative effects on historic properties cannot be specifically identified until cultural resources inventories are completed and historic properties have been identified. In general, however, erosion caused by vehicle travel, depending on its proximity to a site, could have long-term negative impacts on both buried sites as well as those with standing structures.  Failure to regulate off-road travel is likely to result in a cumulative effect of long term, irreversible, irretrievable adverse effects to cultural resources.

## ENVIRONMENTAL JUSTICE

Presidential Executive Order 12898 mandates that high and/or adverse environmental impacts resulting from federal actions will not be disproportionately borne by minority or low income populations. Disproportionate impacts are those that would affect minority or low-income populations at levels appreciably higher than effects to non-minority or non-low income groups.  Minority populations include those of Hispanic or Native American ethnicity.

Census data from 2006 shows that non-Hispanic whites comprised 83.1% of the population in Montrose, San Miguel, Ouray, and Delta counties, which is higher than the Colorado average of 72%.  Native Americans represented 1.1% of the populations in the same counties, the same as the Colorado average of 1.1%.  The Hispanic population represented 13.9% of the counties, below the Colorado average of

[62]

BLM_0014547

# Environmental Justice

19.7%.

In 2004, 10.7% of the populations in Montrose, San Miguel, Ouray, and Delta counties earned incomes below the federal poverty level compared to a Colorado average of 10.2% (U.S. Census Bureau, 2007).

## Environmental Consequences

### Impacts from Alternative 1

This alternative would not change existing uses within the planning area. OHV designations would remain the same therefore recreational uses would not be altered. Although demands and impacts would continue to increase, it is not anticipated this alternative would result in a disproportionate impact on minority or low income populations.

### Impacts from Alternatives 2, 3, and 4

These alternatives were developed based on resource conditions and increasing demands and impacts; each designated routes and uses, using different restrictions and protections. The entire area would be open to horse riding and hiking. Although dispersed camping and overnight camping in proposed developed sites is included in these alternatives, these activities would not be in competition with other existing camping opportunities in the planning area or nearby communities. None of these alternatives would have a disproportionate impact on minority or low income populations because opportunities have still been maintained for both non-motorized and motorized travel. Horse riding and hiking is allowed on any route and cross-country. There are also additional BLM public lands surrounding the planning area that allow for a variety of recreational activities.

### Cumulative Effects

Cumulative impacts that would be measurable would not likely occur as a result of implementation of any alternative.

## FARMLANDS, PRIME OR UNIQUE

There are no Prime or Unique Farmlands within the planning area. However, much of the land along the northeastern boundary of the planning area in Shavano Valley, and between Dry Creek and Roubideau Creek have been determined to be Prime Irrigated or Irrigated (Not Prime) Lands of statewide importance (USDA Soil Conservation Service 1980). Additionally, many of the ephemeral drainages that drain on to these lands headwater on the planning area. Historically, flood events originating on public lands within the planning area have resulted in impacts to farmland and associated facilities (canals and laterals operated by the Uncompahgre Valley Water Users Association). Two flood control retention structures, one in Shavano Valley and the other on the Roatcap Drainage west of Olathe, presently function within the planning area to help mitigate flood impacts to the valley bottom farmland. Although these two facilities provide flood protection from their respective drainages, several drainages on the plan area remain free flowing. The hydrologic condition of these watersheds within the planning area does influence the amount of runoff and sediment produced from flood events. Soil surface

[63]

BLM_0014548

# Farmlands, Prime or Unique

disturbance from existing travel routes and off route travel, especially in close proximity to drainage channels or located on erodible soils has the potential to accelerate the levels of runoff and sediment produced during storm events. Additionally, many of the exiting travel routes receive little or no maintenance to ensure adequate drainage occurs.

At present, the planning area has 73 miles of routes that occur within 100 feet of stream channels, including 877 stream crossings (Table 17). The 73 existing miles of routes is estimated to equate to 88 acres of soil and vegetation disturbance within this sensitive zone.

**Environmental Consequences**

Please see the impacts on Floodplains for estimates of acreage impact figures that are relative to the impacts from Alternative 1.

**Impacts from Alternative 1**

At present the area contains 73 miles of routes within 100 feet of stream channels, and 877 stream crossings (Table 17). The 73 existing miles of routes is estimated to equate to 88 acres of soil and vegetation disturbance within this sensitive stream zone. There are 572 miles of routes that occur on soils that have either a moderate (372 miles) or severe (200 miles) potential for erosion (Table 17). Under Alternative 1, motorized and mechanized vehicle travel on all routes and cross-country, except within Sub-Region B, would continue. Consequently, additional user created routes would become established and more soil surface and stream channel disturbance would occur due to the unrestricted travel. Additionally, routine trail maintenance and other mitigation such as seasonal and weather related route closures would not occur. Thus, both accelerated storm runoff and sediment yield could affect some of the off-site farmlands and irrigation facilities that receive drainage from the subject public lands.

**Impacts from Alternative 2**

All cross country off route travel would be prohibited except for horseback or foot travel, resulting in a major decrease in the potential downstream farmland sedimentation impacts and for soil erosion and surface runoff, especially on routes located on soils with moderate and severe erosion potential. The potential for this reduction in accelerated sediment yield and storm runoff would be due to the combination of prohibiting all cross country motorized and mechanized travel and by closing and rehabilitating 258 miles of existing routes. The closures would result in a 44% reduction in the number of existing route stream crossings, or 389 fewer crossings, and a 44% reduction in existing miles of routes in the WIZ, or 32 fewer miles, which would reduce the amount of existing storm runoff and sediment production. This reduction in the number of miles of routes in this sensitive resource would eliminate use and further disturbance on approximately 35 acres of the approximate 88 acres of existing soil and vegetation disturbance within the zone, facilitating agency and natural floodplain re-vegetation and rehabilitation. Closing routes would also result in a 40% and 30% reduction in miles of routes on soils with moderate and severe erosion potential, or a total of 206 fewer miles (about 250 fewer acres) which would result in less soil erosion, runoff and sedimentation.

[64]

BLM_0014549

# Farmlands, Prime or Unique

### Impacts from Alternative 3

Impacts to Prime or Unique Farmlands from implementing this alternative would be similar to Alternative 2. Compared to Alternative 1, this alternative would result in a major potential to reduce accelerated sediment yield and storm runoff, especially on soils with moderate and severe erosion potential, due to the combination of prohibiting all cross country motorized and mechanized travel, and by closing and rehabilitating 369 miles of existing routes. The route closures would result in a 56% reduction in the number of route stream crossings (492 fewer crossings), and a 53% reduction in miles of routes in the WIZ, or 39 miles, which would reduce the storm runoff and sediment production, similar to Alternative 2. The reduction and rehabilitation of routes in the floodplains would eliminate use and further disturbance on approximately 47 acres of the approximate 88 acres of existing soil and vegetation disturbance within the zone, approximately 12 more acres than in Alternative 2, which would facilitate rehabilitation. By closing routes and allowing rehabilitation to occur, there would also be a 59% and 67% reduction in miles of routes on soils with moderate and severe erosion potential, or a total of 354 fewer miles (about 430 fewer acres) which would result in less soil erosion, runoff and sedimentation. Other impacts would be similar to those in Alternative 2.

### Impacts from Alternative 4

All cross country off route travel would be prohibited except for horseback or foot travel, resulting in a major decrease in the potential downstream farmland sedimentation impacts and for soil erosion and surface runoff, especially on routes located on soils with moderate and severe erosion potential. The potential for this reduction in accelerated sediment yield and storm runoff would be due to the combination of prohibiting all cross country motorized and mechanized travel and by closing and rehabilitating 118 miles of existing routes. Compared to Alternative 1, the impacts to Prime or Unique Farmlands from implementing Alternative 4 would be similar to Alternative 2, but with a somewhat lower potential for reducing accelerated sediment yield and storm runoff .

Route designations under Alternative 4 would result in a 6% increase in the total number of route stream crossings, or 54 more crossings, and a 1% increase in miles of routes in the WIZ, or one more mile, compared to Alternative 1. This increase is primarily a result of the Roubideau Creek horse and hiking trail, which increases the miles of WIZ and perennial stream crossings in the Camel Back Wilderness Study Area (Sub-Region B) by 133% and 144%, respectively (see Table 22). Since this trail is limited to horse and foot traffic, impacts to farmlands adjacent to the area would be minimal. There would be a 17% and 2% reduction in miles of routes on soils with moderate and severe erosion potential, or 68 fewer miles (about 80 fewer acres) total. Because of motorized and mechanical vehicle travel being limited to designated to designated routes either seasonally or yearlong, accelerated sediment yield and storm runoff would be reduced from the existing situation, even considering the increases in the number of stream crossings and miles of routes in the WIZ in this alternative, compared to Alternative 1. Other impacts would be similar to those in Alternative 2.

### Cumulative Effects

Cumulative impacts that would be measurable would not likely occur as a result of implementation of any alternative.

[65]

BLM_0014550

# Floodplains

## FLOODPLAINS

The streams in the planning area are mostly low order and ephemeral or intermittently flowing. The few higher order perennially flowing streams include Roubideau, Potter, Dry, and Spring Creeks. Stream order is a measure of the position of a stream in the hierarchy of tributaries within a watershed. First order streams have no tributaries.

Floodplains associated with the higher order channels are more developed than the lower order channels, and commonly are defined by the extent of the riparian zone bordering the channel, in reaches that are not incised. The floodplain width on these stream systems is partially determined by the degree of valley confinement, but even at the downstream locations within the planning area, floodplains typically extend less than 50 feet from the active channel banks. The typical, first and second order channels have little to no defined floodplain, are highly confined and commonly incised. None of the floodplains on the planning area's streams have been delineated as such.

At present, the planning area has 73 miles of routes that occur within 100 feet of stream channels, including 877 stream crossings (Table 17). The 73 existing miles of routes is estimated to equate to 88 acres of soil and vegetation disturbance within this sensitive zone.

## Environmental Consequences

### Impacts from the Alternative 1

Under the No Action Alternative additional numbers of user-created routes would continue to be established, especially since the volume and rate of cross country travel on public lands throughout the planning area would continue, and some of this travel and these new routes would occur in the floodplain influence zone (e.g. technical 4WD routes and motorcycle use). At present, the area has 73 miles of routes that occur within 100 feet of stream channels, including 877 stream crossings (Table 17). The 73 existing miles of routes is estimated to equate to 88 acres of soil and vegetation disturbance within this sensitive zone. Over the life of the analysis period, a major increase in soil disturbance and vegetation disturbance and or removal in this zone would occur due to the anticipated increase in population growth and OHV use in the planning area. Motorized or non-motorized mechanized routes poorly located and established in these locations affect the functionality of floodplains and stream channels by physically disturbing vegetation and the soil surface. Routes in floodplains can also encroach on active stream channels, restricting the natural processes of channel dynamics and migration. Since floodplains dissipate stream flow energy during high flows, floodplain function can be compromised when routes encroach or isolate floodplains. Disturbance to vegetation within floodplains could also occur from spills of petroleum related products where motorized travel occurs, potentially resulting in less vegetation to prevent downstream erosion and sedimentation. Additionally, routine trail maintenance and other mitigation such as seasonal and weather related route closures would not occur with frequency. Thus, the potential impacts to floodplains described above would be expected to increase over time due to the existing routes in this sensitive area and the high potential for additional increases in OHV use and the creation of more user created routes as more travel use occur.

[66]

BLM_0014551

# Floodplains

**Impacts Alternative 2**

Overall, the disturbances to sensitive floodplains would be greatly reduced in this alternative, compared to the No Action alternative, because of the prohibition of off-route travel which would result in no additional user created routes in the WIZ.  Closing and rehabilitating 258 miles of existing routes would result in a 44% reduction in the number of existing route stream crossings, or 389 fewer crossings, and a 44% reduction in miles of routes in the WIZ, or 32 fewer miles, which would reduce the potential for floodplain disturbance.  This reduction in the number of miles of routes in this sensitive resource would eliminate use and further disturbance on approximately 35 acres of the approximate 88 acres of existing soil and vegetation disturbance within the zone, facilitating agency and natural floodplain re-vegetation and rehabilitation.  Approximately 8.7 miles of technical 4WD trails primarily in ephemeral stream WIZ and drainage channels would have the potential to slightly alter the floodplain function of these drainages through physical disturbance to alluvial soils and the stabilizing vegetation.

**Impacts from Alternative 3**

Overall, the disturbances to sensitive floodplains would be greatly reduced in this alternative, compared to the No Action alternative, because of the prohibition of all cross country travel on public lands in the planning area.  Impacts within this sensitive resource from implementing Alternative 3 on public lands in the planning area, compared to Alternative 1, would be greatly reduced.  The impacts from Alternative 3 would be very similar to those in Alternative 2, but with more  potential for reducing or eliminating disturbances to the function of sensitive floodplains by eliminating all cross-country motorized and non-motorized mechanized travel and by closing and rehabilitating 369 miles of existing routes.  These actions  would result in a 56% reduction in the number of route stream crossings (492 fewer crossings), and a 53% reduction in miles of routes in the WIZ, or 39 fewer miles, which would reduce disturbance to floodplains somewhat more than Alternative 2, and to a much greater extent than with Alternative 1.  The reduction and rehabilitation of routes in the floodplains would eliminate use and further disturbance on approximately 47 acres of the approximate 88 acres of existing soil and vegetation disturbance within the zone, approximately 12 more acres than in Alternative 2, which would facilitate rehabilitation.  The elimination of all cross country motorized and/or mechanized travel and the reduction in the number of miles of existing routes would lower the probability of contaminant spills that could alter both vegetation and soils on local sensitive floodplains. Approximately 3.4 miles of technical 4WD trails in the WIZ, which includes 56 ephemeral stream crossings and drainage channels would have the potential to slightly alter the floodplain function of these drainages through physical disturbance to alluvial soils and the stabilizing vegetation.

**Impacts from Alternative 4**

Overall, even with increases in the number of stream crossings and miles of routes in the sensitive WIZ, disturbance to floodplains would be greatly reduced in this alternative, compared to the No Action alternative, because of the prohibition of off- route travel and the implementation of measures in this alternative.  Compared to Alternative 1, implementing this alternative in the planning area would result in a 6% increase in the number of existing route stream crossings (54 more crossings), and an overall 1% increase in miles of existing routes in the WIZ (one more mile).  This increase in stream crossings and mileages, as compared to Alternative 1, is primarily a result of the proposed Roubideau Creek horse and hiking trail in Sub-Region B, which would increase the density of routes in the WIZ and the density

BLM_0014552

# Floodplains

of the existing perennial stream crossings in the WIZ in the Camel Back Wilderness Study Area by 133% (four more miles of routes) and 124% (51 more perennial stream crossings), respectively (see Table 22). These density values above and in Table 22 are expressed as the percentage change between this alternative and Alternative 1 for the number of perennial stream crossings per square mile of area in the WIZ, and miles of routes affecting perennial streams in the WIZ per square mile of area in the WIZ. This trail would be located on the ground so as to minimize the number of actual stream crossings, and since this trail would be limited to horse and foot traffic, impacts to floodplain function would be minimal. Implementing Alternative 4 would result in impacts similar to those in Alternative 2, but with more potential for disturbing the function of local floodplains, because of the fewer number of routes that would be closed and rehabilitated (118 miles). The closure and rehabilitation of routes in this sensitive zone would eliminate use and further disturbance on approximately 47 acres of the approximate 88 acres of existing soil and vegetation disturbance within the zone, approximately 12 more acres than in Alternative 2, which would facilitate rehabilitation. Approximately 8.5 miles of proposed technical 4WD trails in the ephemeral WIZ and drainage channels would have identical impacts as in Alternative 2.

## Cumulative Effects

Population growth and residential development of surrounding private lands, along with other resource impacting trends, will occur throughout the greater region that will result in increased amounts of recreational usage on public lands. The cumulative effects of providing a high number of additional routes to meet growing recreational demands would add to very predictable impacts to the watersheds within the Dry Creek TMP. Increases in the miles of routes would create additional acres of semi-permeable and non-permeable surfaces that would result in increased amounts of runoff, erosion, and drainage changes.

## INVASIVE, NON-NATIVE SPECIES (includes findings on Standard 3)

Invasive Species are considered to be "any species of insects, animals, plants and pathogens, including its seeds, eggs, spores, or other biological material capable of propagating that species, that is not native to that ecosystem; and whose introduction does or is likely to cause economic or environmental harm or harm to human health" (http://weeds.hotmeal.net/). Some, if not all, weeds are transported and spread by a number of means, including with equipment, companion animals, recreational vehicles, and clothing.

The planning area encompasses approximately 110,500 acres of public land. In 2002-2004 a systematic weed survey was completed of the existing routes, trailheads, vegetation manipulations, range improvements, and other high use areas. The results of the survey showed that approximately 1,575 acres were infested with noxious weeds, a conservative estimate because not all drainages and trails were completely surveyed, and four years have passed since the survey was completed. Weeds were classified into linear infestations (isolated, patchy, scattered, continuous), points (isolated patches less than 1/10 of an acre), and polygons (for areas greater than 1/10 of an acre). The following table depicts the miles of routes, number of points (each point is not considered one acre), acres of polygons infested and total number of acres infested with noxious weeds by Sub-Region.

[68]

BLM_0014553

# Invasive, Non-Native Species

| Table 6 Weed Infestations by Sub-Region in the Dry Creek Travel Management Planning Area | | | | |
|---|---|---|---|---|
| *Sub-Region* | Miles of Routes | Points | Polygon Acres | Grand Total of Acres Infested |
| A | 26 | 39 | 81.4 | 113.9 |
| B | 3.4 | 6 | 258.2 | 261.7 |
| C | 52.6 | 106 | 143.6 | 211.9 |
| D | 45.1 | 108 | 439 | 476.6 |
| E | 19.1 | 2 | 11.4 | 33 |
| F | 11.1 | 109 | 459.4 | 427 |
| G | 2.6 | 375 | 17.5 | 50.3 |
| Grand Total | 745 | 160 | 1,410.50 | 1,574.4 |

*Note: points and polygons will not add up to the total acres because of the buffering effect of points and linear infestations. This table is for comparison purposes and may not representative of the total number of noxious weed infestations in the planning region.

The Colorado Noxious Weed Act (Colorado Statutes §§35-5.5-101 through 119, C.R.S. (2003)) categorizes weeds into three separate lists, A, B, and C. List "A" weeds are designated for elimination on all lands. List "B" weeds include plants whose continued spread will be stopped. List "C" weeds are those selected or recommended for control/containment methods. This list along with the BLM noxious weed species of concern, Uncompahgre Field Office (UFO), Gunnison Gorge National Conservation Area (GGNCA) Weed management Strategy completed in 2007, the Programmatic Environmental Impact Statement - Vegetation Treatments on Bureau of Land Management Lands in 17 Western States, guide the way in which the UFO/GGNCA prioritizes and treats weed infestations.

In the Dry Creek Planning region there are several high priority weeds that are on the state list and the BLM noxious weed species of concern along with the local office plan. These weeds are listed below by Sub-Region.

| Table 7 Noxious Weeds present by Sub-Region | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | Potential | Summary |
| Russian knapweed | X | X | X | X | X | X | X | | Spread throughout PA, various size infestations |
| Burdock | X | | X | X | X | X | X | | Light infestations throughout especially around water. |
| Whitetop | X | X | X | X | X | X | X | | Very small amount in Sub-Region B, spread throughout other Sub-Regions in varying sizes of infestations |
| Plumeless thistle | X | | X | X | X | X | X | | Small isolated infestations, most likely through all Sub-Regions |
| Spotted knapweed | | | | X | | X | X | | The main infestation is ~ 800 acres with varies densities of polygons. Field office actively treating. |
| Canada thistle | X | X | X | X | X | X | X | | Small infestations around water commonly associated with wetter areas and can be associated with disturbances in drier areas such as vegetation treatments, and woodcuts. |
| Halogeton | X | | X | X | X | | | | Associated with routes and disturbed areas in the lower elevations. |
| Tamarisk | X | X | X | X | X | X | X | | Associated with drainages and around |

BLM_0014554

# Invasive, Non-Native Species

| Table 7 Noxious Weeds present by Sub-Region | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | Potential | Summary |
| | | | | | | | | | water sources. |
| Cocklebur | X | | X | | | | X | | Associated with water sources, more than likely small infestation throughout Sub-Regions |
| Diffuse knapweed | | | X | X | | X | | | These small infestations have not been verified. |
| Oxeye daisy | | | | X | | X | | X | This is an Early Detection Rapid Response (EDRR) species for all Sub-Regions. There is an infestation of this on the forest above Escalante creek. |
| Hounds tongue | | | | X | | X | | | Usually seen at higher elevations, but have small infestations throughout all Sub-Regions. An Early Detection Rapid Response species. |
| Bull thistle | X | X | X | X | X | X | X | | Throughout Sub-Regions, especially associated with disturbance, treatments and higher precipitation areas. Has had the potential to cycle out, but treated when necessary. |
| Musk thistle | X | X | X | X | X | X | X | | Throughout Sub-Regions, especially associated with disturbance, treatments and higher precipitation areas. Has the potential to cycle out. |
| Jointed goatgrass | | | | | | | | X | This grass has been on the increase. Early Detection Rapid Response for all Sub-Regions. Disturbed areas especially along routes. |
| Common mullein | | | | X | | | X | | This plant is seen throughout all Sub-Regions, usually not a problem, except in disturbed areas. |
| Russian knapweed | X | X | X | X | X | X | X | | Associated with routes, disturbed areas, and water sources. |
| Yellow toadflax | | | | | | | | X | Seeing this plant pop-up in several areas. Infestation on forest off 25 Mesa Rd. Early Detection Rapid Response Species in all Sub-Regions. Associated with higher water requirements. |
| Purple loosestrife | | | | | | | | X | Wetland plant not in the Sub-Regions as far as we know. Early Detection Rapid Response species. |
| Sulfur cinquefoil | | | | | | | | X | Not in the Sub-Regions as far as we know. Infestations on the forest around planning region. Early Detection Rapid Response species for all Sub-Regions. |
| Russian olive | | | X | X | X | X | | | More than likely throughout all Sub-Regions, associated with water sources. |

*Note this is not a complete list of species, or all the EDRR species.

Spotted knapweed is on the state "B" list, and a management goal for this species is to stop the continued spread of this plant. It is on the BLM species of concern list and is one of the top priorities in the UFO. Spotted knapweed has infested approximately 800 acres along HWY 90 and the rim road.

[70]

BLM_0014555

# Invasive, Non-Native Species

The infestations have reached the containment stage with eradication almost impossible. The BLM is actively partnering with Montrose County, WAPA, Tri-State and the Palisade Insectary to treat this infestation and will keep it contained with a goal of shrinking the infestation. There are several routes through this infestation and education will be critical in the reduction of its spread. Whitetop, a.k.a. hoary cress, is also on the state "B" list and is another UFO priority. The plant is found in small infestations throughout the area. Russian knapweed is another state "B" listed species and is another top priority. It is found with a high water table and where disturbance has occurred, including in several riparian and pond areas. The Roubideau Canyon riparian area is one of riparian area being affected. The BLM is and has been actively treating this weed not only in the Roubideau Canyon riparian area but throughout the planning area. All weeds on the state "A" and "B" lists, along with BLM species of concern, will be actively treated, with the above mentioned three species being priorities. Monitoring and inventory include an early detection and rapid response strategy aimed at the eradication of small infestations of new and established weeds before they reach the stage where only containment is possible and treatment costs go up substantially.

## Environmental Consequences

### Impacts Common to All Alternatives

There would continue to be existing routes at varying levels in all alternatives. Thus, all alternatives would continue to spread weeds from motorized and non-motorized activities. All alternatives except Alternative 1 would help to decrease the spread of noxious weeds, not only in the Planning Area, but on and to other public and private lands through reductions in the number of miles of routes.

### Impacts from Alternative 1

About 700 miles of routes would continue to be available for motorized and mechanized travel. In addition, this alternative does not address the proliferation of user-created routes in the future, leaving the area open and limited to existing routes, from a growing urban area where the population is encouraged to enjoy their public lands. Thus, under this alternative weeds would have the opportunity to spread without checks and balances. In the United States there is about 3,310 non-native species occurring in natural areas (Duncan and Clark, 2005). Of these, there are approximately 60 species that are considered a major economic and ecological threat to rangelands (Duncan and Clark, 2005). In this planning region we have approximately 6 of the 60 that would have detrimental impacts to rangeland, with more species on the periphery of the Planning Area. This alternative would not meet or be moving towards meeting Standard 2 for healthy plant and animal communities.

### Impacts from Alternative 2

Major reductions would occur in the potential for new weed invasions as a result of prohibiting all cross country travel. The outcome of Alternative 2 is to implement the Travel Management Plan and a designated route system described in the Description of the Alternatives. This alternative leaves approximately 60% of the routes, or 420 miles, available for motorized and non-motorized travel. This represents a 40% reduction of available route miles, or 281 miles and a large difference in route densities. This alternative would greatly reduce the spread of noxious weeds by preventing the creation of new user created routes that are unplanned routes and by decreasing the number and mileage of

[71]

# Invasive, Non-Native Species

existing routes available.  In addition, limiting travel to designated routes would decrease the potential for future establishment of noxious weeds.  This alternative would be moving toward Standard 2 for healthy plant and animal communities in terms of noxious weed establishment and treatment.

## Impacts from Alternative 3

Major reductions would occur in the potential for new weed invasions as a result of prohibiting all cross country travel.  This alternative leaves approximately 39% of the routes, or 270 miles, available for motorized and non-motorized travel.  The limitations on these designated routes would be identified by different travel use categories.  This alternative is the most restrictive in terms of route densities and has a 61% reduction in routes from alternative 1, or 431 fewer miles.  Early Detection - Rapid Response which includes locating noxious weeds, keeping up treatments along routes, and re-surveying in subsequent years, would be easier and more efficient because of the reduction in miles of routes and route density.  Thus, this alternative would be best suited for weed management.  This alternative would be moving toward Standard 2 for healthy plant and animal communities in terms of noxious weed establishment and treatment.

## Impacts from Alternative 4

Some reduction would occur in the potential for new weed invasions as a result of prohibiting all cross country travel.  Alternative 4 designates 605 miles of routes for motorized and mechanized travel, or 86% of the existing inventoried routes, compared to 96% of existing routes being available for travel in Alternative 1, and 60% in alternative 2.  This is a reduction of 13%, or 96 miles, when compared to alternative 1.  Compared to Alternative 1, route densities would be decreased, and measures in Alternative 4 would be implemented to curb noxious weed advancement.  This alternative would not result in or assist in the reduction of noxious weeds, but it would allow for containment and control strategies to be put into place.  The containment and control strategy would focus mainly on treating trail head areas and Early Detection Rapid - Response of critical noxious weed species that play a major role in the economic and ecological demise of rangelands, and that have the potential to spread or be easily transported to private and other public lands.  This alternative would marginally move toward meeting Standard 2 for healthy plant and animal communities.

Finding on the Public Land Health Standard for plant and animal communities (partial, see also impacts on Wildlife, Aquatic and Wildlife, Terrestrial; and Vegetation): This alternative would marginally move toward meeting Standard 2 for healthy plant and animal communities.

## Cumulative Effects

In addition to growth in recreational travel, reasonably foreseeable actions that may affect invasive and noxious weed spread over the next 10 years on private and public lands include livestock grazing, residential growth, new road construction on private lands, fuels reduction projects, utility corridor maintenance and upgrades, and new buried utility rights-of-way. Other future activities on public lands in the travel planning area that could also potentially impact the occurrence and spread of noxious weeds and require mitigation include special recreation events, and Forest Service planning and projects, Uncompahgre Plateau Project activities, local land use planning, soil research, BLM Uncompahgre Field Office Resource Management Plan revision, continued population growth, vegetation treatments, county

[72]

BLM_0014557

# Invasive, Non-Native Species

road upgrades, special recreation permits and activities, and utility rights of way and corridors. The cumulative impacts to noxious weed spread from all action alternatives will be dispersed and long-term and require on-going monitoring and mitigation by BLM and partners.

## MIGRATORY BIRDS

The plant communities in the planning area provide a variety of nesting habitats for a large number of different migratory bird species. For the purposes of this analysis, the U.S. Fish and Wildlife Service list of Birds of Conservation Concern was used as a tool to complete the analysis for this EA (USFWS 2002, Table 16, pg 39 BCR 16 [Southern Rockies/Colorado Plateau]).

Table 8 below contains the bird species used for this analysis, their habitat within the area, and their status (resident, breeding, wintering or not present) within the Uncompahgre Field Office (UFO), and whether they are expected within the Planning Area.

| Table 8 USFWS list of Birds of Conservation Concern for the Uncompahgre Field Office and the Dry Creek Travel Management Planning Area | | | | |
|---|---|---|---|---|
| Common Name | Scientific Name | Habitat | Range within UFO | May be Present in Planning Area |
| Northern Harrier | *Circus cyaneus* | Agriculture, grassland and wetland areas | Resident | Yes |
| Swainson's Hawk | *Buteo swainsoni* | Agriculture, grassland, lowland riparian woodland and cultivated land | Breeding | Yes |
| Ferruginous Hawk | *Buteo regalis* | Grassland, shrub-steppe | Winter | Yes |
| Golden Eagle | *Aquila chrysaetos* | Open woodland, nests in both trees and on cliffs, in most habitat types in W. CO | Resident | Yes |
| Peregrine Falcon | *Falco peregrinus* | Generalist but pure cliff nester, mostly associated with pinyon-juniper woodland and ponderosa pine habitat types | Breeding | Yes |
| Prairie Falcon | *Falco mexicanus* | Annual, grassland; Also a pure cliff nester, in open country below 10,000 ft. | Resident | Yes |
| Gunnison Sage-Grouse | *Centrocercus minimus* | Sagebrush obligate species, also uses mountain shrub, and grassland areas | Resident | Yes |
| Snowy Plover | *Charadrius alexandrinus* | Range does not extend to the UFO. | -- | -- |
| Mountain Plover | *Charadrius montanus* | Range does not extend to the UFO. | -- | -- |
| Solitary Sandpiper | *Tringa solitaria* | Range does not extend to the UFO. | Migration | -- |
| Marbled Godwit | *Limosa fedoa* | Riparian | Migration | -- |
| Wilson's Phalarope | *Phalaropus tricolor* | Riparian | Breeding | Yes |
| Yellow-billed Cuckoo | *Coccyzus americanus* | Riparian lowlands or agricultural areas, esp. with hardwoods | Breeding (unconfirmed) | Yes |
| Flammulated Owl | *Otus flammeolus* | Open ponderosa pine, aspen, also Douglas fir, lodgepole, and some mountain shrub | Breeding | No |
| Burrowing Owl | *Athene cunicularia* | Grassland, an open country obligate, associated with prairie dogs, short vegetation | Breeding | Yes |
| Short-eared Owl | *Asio flammeus* | Generalist | Winter | Yes |

[73]

# Migratory Birds

| Table 8 | | | | |
|---|---|---|---|---|
| USFWS list of Birds of Conservation Concern for the Uncompahgre Field Office and the Dry Creek Travel Management Planning Area | | | | |
| Common Name | Scientific Name | Habitat | Range within UFO | May be Present in Planning Area |
| Black Swift | *Crypseloides niger* | Nests behind or next to waterfalls and wet cliffs and occasionally in limestone caves. Nest site persistence and tenacity almost absolute | Breeding | No |
| Lewis's Woodpecker | *Melanerpes lewis* | Open woodland;  open pine forests, burned over areas, pinyon-juniper woodland, and riparian areas with decadent cottonwoods | Resident | Yes |
| Williamson's Sapsucker | *Sphyrapicus thyroideus* | Mixed woodland, ponderosa pine, conifer and aspen habitats | Breeding | Yes |
| Gray Vireo | *Vireo vicinior* | Pinyon juniper, open juniper/grassland areas | Breeding | Yes |
| Pinyon Jay | *Gymnorhinus cyanocephalus* | Pinyon juniper woodland | Resident | Yes |
| Bendire's Thrasher | *Toxostoma bendirei* | Range does not extend to the UFO. | -- | -- |
| Crissal Thrasher | *Toxostoma crissale* | Range does not extend to the UFO. | -- | -- |
| Sprague's Pipit | *Anthus spragueii* | Range does not extend to the UFO. | -- | -- |
| Virginia's Warbler | *Vermivora virginiae* | Breeding, dry woodland, oak, followed by mountain shrub, pinyon-juniper woodland, and ponderosa pine | Breeding | Yes |
| Black-throated Gray Warbler | *Dendroica nigrescens* | Prefers mature pinyon-juniper woodland; may be in adjacent oak or sagebrush | Breeding | Yes |
| Grace's Warbler | *Dendroica graciae* | Mixed woodland; prefers ponderosa with oak understory | Breeding | No |
| Sage Sparrow | *Amphispiza belli* | Shrub steppe; low elevation big sagebrush or big sagebrush-greasewood | Breeding | No |
| Chestnut-collared Longspur | *Calcarius ornatus* | Annual, grassland | Migration | Yes |

Table 9 below shows the number of miles of various kinds of routes within 12 habitat types important to migratory birds, in each alternative.  Table 41, in the Vegetation section, shows essentially these same habitat types expressed as existing vegetation types, the existing acreages within each habitat type, and the acreages in these habitat types affected by existing routes (acreages shown in Table 41 were calculated assuming a width of 6 meters for all route types).  Table 41 shows that a total of approximately 100,402 acres of important migratory bird habitat - almost all the public lands – are located within the planning area.  Approximately 1,523 acres of these habitat types are currently occupied by motorized or non-motorized mechanized routes throughout the planning area, which has resulted in the removal of vegetation and the disturbance or movement of soils on these acres.  The disturbed acreage represents about 1.5 % of the total acreage of migratory bird habitat in the planning area.

The Planning Area contains the Roubideau Landscape Health Assessment (LHA) area (approx. 104,000 acres), a small portion (7264.7 acres) of the Escalante LHA area (Monitor Creek and the ridge between Cottonwood and Monitor creeks) and a very small portion (137.3 acres) of the Colona LHA area.  The Roubideau Landscape Health Assessment analysis (2006) indicated that several neo-tropical migratory bird species showed population trend declines, or data is not available for making trend determinations in the Western Colorado region (Kingery, H.E. ed. 1998 *in* BLM 1995) based on National Breeding Bird Survey information.  Fourteen species show population trend declines in both the 10 and 26 year

[74]

BLM_0014559

# Migratory Birds

population trend Breeding Bird Survey datasets.   All of these species have high "importance of area" (IA) rankings; indicating a high proportion of their habitat in this region provides essential breeding habitats.

Five of these species, Vesper Sparrow, Swainson's Hawk, Say's Phoebe, Rock Wren, and Loggerhead Shrike have very low abundance ratings, indicating they are the species' of highest concern and associated landscapes.  The nine remaining species, Horned Lark, Common Nighthawk, Killdeer, Northern Flicker, Western Wood-Pewee, Chipping Sparrow, Sage Thrasher, Brewer's Sparrow and Mourning dove have moderate to good abundance ratings, making them species of second highest concern.  Species for which inadequate data are available to make status determinations with a high degree of certainty are considered third priority species (northern harrier, savannah sparrow, common poorwill, gray flycatcher, gray vireo, long-eared owl, bank swallow, Swainson's thrush).  The Escalante (1999) and Colona (2008) Landscape Health Assessments show similar results.  The Planning Area is part of the larger overall landscape that provides habitat for all these species, which is important for their long-term sustainability.

## Environmental Consequences

Analysis of effects to migratory birds is handled in a similar manner as explained in the Threatened, Endangered, and Sensitive Species (TES) section.  See the TES section for general discussion of OHV-related effects to terrestrial and aquatic wildlife, fish, and plants.  See the Wetlands and Riparian Zones section for effects on habitat for riparian migratory bird species.

OHV activities may have effects to migratory bird populations similar to those described in the TES, Aquatic Wildlife, and Terrestrial Wildlife sections of this document.   Measuring indicators of all these factors for the numerous species of interest would be an excessively difficult task.  In addition, for most of the species of interest, the relationships between these factors and population dynamics are not well understood.   Because of these difficulty in measuring potential impacts to migratory bird populations, BLM assumes that any reduction in existing routes, or a reduction in the level or class of vehicular use (i.e., from motorized to non-motorized use) would, in general, improve migratory bird habitats.

As described above, migratory birds utilize many habitats for their life functions.  Changes and differences in proposed actions among the four alternatives result in changes in the miles of routes that would be ultimately available for various uses in various wildlife habitats, and thus in the degree to which these habitats would be affected. Each alternative, because of the different actions regarding travel use conditions and routes that would be available for motorized and non-motorized mechanized travel, also directly affects the amount of disturbed soil and vegetation in these habitat types, resulting in varying degrees of impacts or removal of important migratory bird habitat.

[75]

BLM_0014560

# Migratory Birds

| Wildlife Habitats | Route Types | Alternative 1 (Miles of Existing Routes) | Alternative 2 Desig. Routes (Miles) | Δ1³ % | Δ1³ Miles | Alternative 3 Desig. Routes (Miles) | Δ2⁴ % | Δ2⁴ Miles | Δ1³ % | Δ1³ Miles | Alternative 4 Desig. Routes (Miles) | Δ2⁴ % | Δ2⁴ Miles | Δ1³ % | Δ1³ Miles |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Agriculture | All[1] | 5.7 | 3.8 | -34% | -1.9 | 3.3 | -12% | -0.5 | -42% | -2.4 | 5.2 | +37% | +1.4 | -10% | -0.5 |
| | Motorized Only[2] | 4.5 | 2.2 | -51% | -2.3 | 1.7 | -23% | -0.5 | -62% | -2.8 | 3.1 | +41% | +0.9 | -31% | -1.4 |
| Aspen | All[1] | 0.1 | 0.1 | 0% | 0.0 | 0.1 | 0% | 0.0 | 0% | 0.0 | 0.1 | 0% | 0.0 | 0% | 0.0 |
| | Motorized Only[2] | 0.1 | 0.1 | 0% | 0.0 | 0.1 | 0% | 0.0 | 0% | 0.0 | 0.1 | 0% | 0.0 | 0% | 0.0 |
| Barren and Rock | All[1] | 2.5 | 1.7 | -35% | -0.8 | 1.5 | -10% | -0.2 | -40% | -1.0 | 2.3 | +36% | +0.6 | -11% | -0.2 |
| | Motorized Only[2] | 2.2 | 1.3 | -41% | -0.9 | 0.9 | -31% | -0.4 | -59% | -1.3 | 1.6 | +23% | +0.3 | -27% | -0.6 |
| Desert Shrub | All[1] | 92.7 | 53.3 | -43% | -39.4 | 36.0 | -32% | -17.3 | -61% | -56.7 | 78.8 | +48% | +25.5 | -15% | -13.9 |
| | Motorized Only[2] | 92.0 | 50.7 | -45% | -41.3 | 25.9 | -49% | -24.8 | -72% | -66.1 | 74.7 | +47% | +24.0 | -19% | -17.3 |
| Grassland | All[1] | 114.7 | 60.5 | -47% | -54.2 | 44.9 | -26% | -15.6 | -61% | -69.8 | 98.6 | +63% | +38.1 | -14% | -16.1 |
| | Motorized Only[2] | 110.6 | 54.2 | -51% | -56.4 | 30.2 | -44% | -24.0 | -73% | -80.4 | 91.0 | +68% | +36.8 | -18% | -19.6 |
| Mountain Shrub | All[1] | 3.3 | 2.5 | -25% | -0.8 | 1.4 | -46% | -1.1 | -58% | -1.9 | 3.0 | +20% | +0.5 | -10% | -0.3 |
| | Motorized Only[2] | 3.2 | 2.1 | -34% | -1.1 | 1.0 | -52% | -1.1 | -69% | -2.2 | 2.8 | +33% | +0.7 | -13% | -0.4 |
| Pinyon-Juniper | All[1] | 194.7 | 131.4 | -33% | -63.3 | 85.5 | -35% | -45.9 | -56% | -109.2 | 178.7 | +36% | +47.3 | -8% | -16.0 |
| | Motorized Only[2] | 181.0 | 95.4 | -47% | -85.6 | 44.9 | -53% | -50.5 | -75% | -136.1 | 156.8 | +64% | +61.4 | -13% | -24.2 |
| Ponderosa pine | All[1] | 0.3 | 0.2 | -6% | -0.1 | 0.2 | -19% | 0.0 | -33% | -0.1 | 0.2 | 0% | 0.0 | -6% | -0.1 |
| | Motorized Only[2] | 0.3 | 0.1 | -67% | -0.2 | 0.1 | 0% | 0.0 | -67% | -0.2 | 0.2 | +100% | +0.1 | -33% | -0.1 |
| Rangeland | All[1] | 1.0 | 0.7 | -29% | -0.3 | 0.4 | -42% | -0.3 | -60% | -0.6 | 1.0 | +40% | +0.3 | 0% | 0.0 |
| | Motorized Only[2] | 1.0 | 0.6 | -40% | -0.4 | 0.3 | -50% | -0.3 | -70% | -0.7 | 0.9 | +50% | +0.3 | -10% | -0.1 |
| Riparian | All[1] | 3.9 | 3.7 | -4% | -0.2 | 3.2 | -15% | -0.5 | -18% | -0.7 | 4.5 | +20% | +0.8 | +15% | 0.6 |
| | Motorized Only[2] | 1.8 | 0.9 | -50% | -0.9 | 0.7 | -22% | -0.2 | -61% | -1.1 | 1.7 | +89% | +0.8 | -6% | -0.1 |
| Sagebrush | All[1] | 276.0 | 158.6 | -43% | -117.4 | 92.8 | -41% | -65.8 | -66% | -183.2 | 229.9 | +45% | +71.3 | -17% | -46.1 |
| | Motorized Only[2] | 273.9 | 137.0 | -50% | -136.9 | 76.9 | -44% | -60.1 | -72% | -197.0 | 223.7 | +63% | +86.7 | -18% | -50.2 |
| Shrub/Grass/Forb | All[1] | 2.0 | 1.0 | -49% | -1.0 | 0.3 | -73% | -0.7 | -85% | -1.7 | 1.6 | +53% | +0.6 | -22% | -0.4 |
| | Motorized Only[2] | 2.0 | 1.0 | -50% | -1.0 | 0.2 | -80% | -0.8 | -90% | -1.8 | 1.5 | +50% | +0.5 | -25% | -0.5 |
| Grand Totals | All[1] | 696.8 | 417.4 | -40% | -279.5 | 269.5 | -35% | -147.9 | -61% | -427.4 | 603.8 | +45% | +186.4 | -13% | -93.1 |
| | Motorized Only[2] | 672.5 | 345.6 | -49% | -327.0 | 182.9 | -47% | -162.7 | -73% | -489.7 | 558.1 | +61% | +212.5 | -17% | -114.5 |

Table 9
Miles of Routes Affecting Wildlife Species Habitat, by Alternative, Within the Planning Area

[1] Miles of routes available to the public for all types of vehicles, & hiking & horseback travel, & includes county roads
[2] Miles of motorized routes only that would be available
[3] Change from Alternative 1 in routes that would be available
[4] Change from Alternative 2 in routes that would be available

BLM_0014561

# Migratory Birds

**Impacts Common to all Alternatives**

There would continue to be routes of all types at varying levels in all alternatives.  Thus, implementing any alternative would continue to have some degree of impacts to migratory bird populations and habitat from motorized and non-motorized mechanized travel, in the form of habitat fragmentation, changes to patch size, edge to interior ratio, and barriers to movement, the facilitation of invasions of non-native and/or opportunistic species, species or habitat mortality rates, noise, and other disturbance factors.

**Impacts Common to Alternatives 2, 3 and 4**

Changing the existing OHV designations in Alternative 1 to "Limited to Designated Routes Seasonally or Yearlong" would prohibit all cross-country travel within the planning area, eliminating additional user created routes, and greatly reducing impacts to migratory bird species and habitat, especially by largely eliminating additional destruction of ground nesting bird nests and soil and vegetation disturbances to the migratory bird habitat types in Table 9 and Table 41.  Implementing the travel management plans in Alternatives 2, 3, and 4 would also enhance these habitats for migratory birds by proposing varying degrees of closures and rehabilitation of existing routes through migratory bird habitat types, as well as from other actions that would be taken, such as implementing conditions of use on travel.  The proposals in these alternatives would result in large improvements to migratory bird species and habitat types by reducing habitat fragmentation, improving patch size, edge to interior ratios, and barriers to movement, the facilitation of invasions of non-native and/or opportunistic species, species or habitat mortality rates, noise, and other disturbance factors.   Administrative routes were not considered in the analysis of impacts because of the infrequency of use that would occur.

**Impacts from Alternative 1**

Implementing this alternative would result in the continuation of additional user created routes being created throughout the planning area, due to the anticipated population growth and increase in the demand for access to public lands in the planning area by motorized and non-motorized uses.  Combined with the existing levels of soil and vegetation disturbance (approximately 1,523 acres), the incremental increase in the number of  miles of routes in this alternative would result in major effects over the life of this analysis period to migratory bird habitat by increasing or worsening current habitat fragmentation,  patch size differences, changes in edge to interior ratios and barriers to movement, the facilitation of invasions of non-native and/or opportunistic species, species or habitat mortality rates, noise, and other disturbance factors.

**Impacts from Alternative 2**

Impacts to migratory birds and their habitat would be greatly reduced in this alternative by changing OHV designations, eliminating all cross country, off-route, motorized and non-motorized mechanized travel, closing and rehabilitating routes, limiting this travel to specific designated routes seasonally or yearlong, and implementing the other actions in this alternative.

The primary benefit of this alternative would occur by the prohibition on all cross country travel using

[77]

BLM_0014562

# Migratory Birds

motorized vehicles or mechanized vehicles, which would eliminate the creation of new user created routes throughout the planning area. This action would prevent the incremental increase in new disturbances to soils and vegetation in migratory bird habitat. The 1,523 acres of soil and vegetation disturbance occurring from existing routes within all migratory bird habitat types would be reduced by approximately 40%, or approximately 608 acres, by closing 279.5 miles of existing routes (40% of existing mileage) and permitting rehabilitation to occur.   See Table 9 for more detail.  Overall, compared to the approximately 700 miles of existing routes currently available for all forms of travel in Alternative 1, Alternative 2 reduces the total number of miles that would be designated and available for motorized and non-motorized mechanized travel by 325 miles, a 46% reduction.  The number of miles that would be available in this alternative for motorized travel only across all habitats would be reduced by 49%, or 327.0 fewer miles than in Alternative 1.  The greatest proportion of all designated routes in this alternative would traverse the sagebrush, pinyon-juniper and grassland habitat types.  Reductions in this alternative in the number of miles of all types of existing routes in the sagebrush habitat would be 43%, or 117.4 miles; reductions of 33%, or 63.3 miles in the pinyon-juniper habitat, and reductions of 47%, or 54.2 miles, in the grassland habitat. When considering only the number of fewer miles of motorized routes in this alternative, compared to Alternative 1, the following reductions of miles would occur in certain habitat types:  sagebrush -50%, or 136.9 fewer miles; pinyon-juniper -47%, or 85.6 fewer miles; and grassland -51%, or 56.4 fewer miles).

In this alternative, major improvements in land health and all disturbance factors affecting migratory bird species and habitat would occur (habitat fragmentation, patch size, edge to interior ratio, barriers to movement, facilitation of invasions of non-native and/or opportunistic species, mortality rates, and noise and other disturbance factors).  The improvements would occur as the result of changing existing OHV designations, prohibiting all cross country motorized and mechanized travel, closing some routes,  implementing conditions of use on routes, such as limiting travel to hiking or horseback use on some routes, and implementing the other actions in this alternative.

**Impacts from Alternative 3**

Impacts from implementing this alternative would be major and very similar in nature and degree to those in Alternative 2.

The 1,523 acres of soil and vegetation disturbance occurring from existing routes within all migratory bird habitat types would be reduced by approximately 53%, or approximately 800 acres, by closing approximately 369 miles of existing routes (53% of existing mileage) and permitting rehabilitation to occur. The total number of miles that would be designated and available for motorized and non-motorized mechanized travel would be reduced by 477 miles, a 68% reduction.  Compared to Alternative 1 (Table 9), implementing this alternative would result in a reduction in available miles of all route types of 61%, or 427.4 miles, and a general decrease in levels of disturbance and habitat fragmentation to migratory bird species and their habitat. Similar to the reductions in Alternative 2, the greatest proportion of all designated routes in this alternative would traverse the sagebrush, pinyon-juniper and grassland habitat types.  Reductions in the number of miles of all designated route types in the sagebrush habitat would be 66%, or 183.2 fewer miles; reductions of 56% or 109.2 fewer miles in the pinyon-juniper habitat, and reductions of 61%, or 69.8 fewer miles, would occur in the grassland habitat. The greatest changes in the number of miles of available designated motorized and mechanized routes between Alternative 2 and Alternative 3 occurred in shrub/grass/forb (-73%, 0.7

[78]

BLM_0014563

# Migratory Birds

fewer miles), mountain shrub (-46%, 1.1 fewer miles) and rangeland (-42%, 0.3 fewer miles) habitat types. Considering designated motorized routes only, the greatest changes would occur in shrub/grass/forb (-80%, 0.8 fewer miles), pinyon-juniper (-53%, 50.5 fewer miles), and mountain shrub (-52%, 1.1 fewer miles) habitat types.

**Impacts from Alternative 4**

Impacts from implementing this alternative would be very similar in nature and degree to those in Alternative 2 as a result of prohibiting all cross country motorized and non motorized mechanized travel, even considering the differences in the number of miles of designated routes in this alternative.

The 1,523 acres of soil and vegetation disturbance occurring from existing routes within all migratory bird habitat types would be reduced by approximately 37%, or approximately 260 acres, by closing 118 miles of existing routes (17% of existing mileage) and permitting rehabilitation to occur. In general, existing levels of soil and vegetation disturbance and habitat fragmentation from implementing this alternative would be much less than those from Alternative 1 and more than in Alternative 2 (45% more available miles of all types of routes, or, 186.4 more miles). See Table 9 for more detail.

The greatest decreases in the total number of miles of existing routes between Alternatives 1 and 4 are within shrub/grass/forb (-22%, 0.4 fewer miles), sagebrush (-17%, 46.1 fewer miles) and desert shrub (-15% 13.9 fewer miles) habitat types. In this alternative, for designated motorized routes only, the greatest decreases in the number of existing miles in Alternative 1 would occur within the ponderosa pine (-33%, 0.1 fewer miles), agriculture (-31%, 1.4 fewer miles) and barren/rock (-27% 0.6 fewer miles) habitat types.

Comparing Alternative 4 to Alternative 2, increases in the number of miles of available, existing routes would occur within the grassland (+63%, +38.1 miles), shrub/grass/forb (+53%, +0.6 miles), and desert shrub (+48%, +25.5 miles) habitat types. Comparing Alternatives 4 and 2, for motorized routes only, the greatest increases in the number of miles of available designated routes would occur within the ponderosa pine (+100%, +0.1 miles), riparian (+89%, +0.8 miles) and grassland (+68%, +36.8 miles) habitat types.

Impacts to Migratory Bird species and habitats from implementing Alternative 4 would generally be less than those from implementing Alternative 1. However, more miles of routes would be available to the public for all types of vehicles, hiking & horseback travel within and through the riparian habitat type. This would occur as a result of the proposed Roubideau hiking and horseback trail in the Camel Back Wilderness Study Area.

**Cumulative Effects**

In addition to growth in recreational travel, other reasonably foreseeable actions that could affect migratory bird habitat over the next 10 years on private and public lands include residential growth, new road construction on private lands, fuels reduction projects, utility corridor maintenance and upgrades, and new buried utility rights-of-way. Activities on public lands in the travel planning area that could also potentially impact migratory bird habitat include Forest Service planning and projects,

[79]

BLM_0014564

# Migratory Birds

Uncompahgre Plateau Project activities, local land use planning, soil research, BLM Uncompahgre Field Office Resource Management Plan revision, vegetation treatments, continued population growth, county road upgrades, special recreation permits and activities, and utility rights of way and corridors. Some of these activities may benefit migratory birds and their habitat. Cumulative impacts from these activities to migratory bird habitat from all action alternatives will be long-term. Cumulative impacts would be most adverse in Alternatives 1, followed by alternative 4. Cumulative impacts would be dispersed and long-term in Alternatives 2 and 3.

## NATIVE AMERICAN RELIGIOUS CONCERNS

Native American religious concerns center around the landscape concept and traditional cultural property, defined as:

"....one that is eligible for inclusion in the National Register because of its association with cultural practices or beliefs of a living community that (a) are rooted in the community's history, and (b) are important in maintaining the continuing cultural identity of the community" (NRB 38:1).

McBeth (1999) identifies traditional cultural properties (TCPs) as locations where wild foods or medicines are gathered, or are landforms associated with aboriginal traditions or beliefs. She also notes that locations with "intangible spiritual attributes" and contemporary use areas are known in Colorado.

Unless specifically identified by Native Americans, many TCPs are extremely difficult or impossible for a field archaeologist to recognize. Such sites, often considered sacred, include mountain tops, waterfalls, river and trail confluences, the headwaters of streams, ecotones, clay sources, "origin places", anthropomorphic and zoomorphic rock formations and springs. More readily identifiable are rock art, sweat baths, battle sites, sun dance arbors, vision quest sites, and medicine wheels (McBeth 1999: 342-345).

In compliance with regulations interpreting the National Historic Preservation Act of 1966, amended 1992, specifically 36 CFR 800.2(c)(3)(i)-(vi), BLM consulted Indian tribes that have a cultural and historic interest in the planning area including the Northern Ute Tribe, the Southern Ute Tribe and the Ute Mountain Ute Tribe. Officials from the Northern Ute Tribe have an expressed interest in the Uncompahgre area, and the tribe's cultural office has been engaged in ongoing conversation and consultation. In addition, the tribe will assist the BLM in determining appropriate mitigation and treatment procedures for adversely affected historic and traditional cultural properties. Routes closed as a result of the identification of traditional cultural properties may not be disclosed due to the level of sensitivity.

## Environmental Consequences

## Impacts from Alternative 1

Sites of Native American Religious Concern are impacted in many different ways depending on their

[80]

BLM_0014565

# Native American Religious Concerns

proximity to existing routes.  In some cases, these properties correspond with known historic and prehistoric sites, though this correlation is by no means automatic.  Until site specific surveys are completed, the extent of TCP's and impacts would remain unknown.  Under this alternative, impacts to TCPs and Sacred sites would continue at current levels.  Inventory work would be scheduled to identify and/or mitigate potential impacts on project-specific NEPA analysis.

**Impacts from Alternative 2**

The impacts from implementing this alternative would be similar to those from implementing Alternative 1, except that the impacts would be restricted to designated routes, and the potential impacts to both documented and undocumented TCP's and Sacred Sites would be decreased due to the lower number of available designated routes and the closure of certain routes into sensitive areas. Prohibiting cross-country travel would greatly reduce the potential for impacts to previously un-impacted properties, and reduce the impacts to sites currently being impacted.  Under this alternative, some segments of some existing routes would remain available for motorized and mechanized use, and impacts currently occurring would continue at current levels.

Overall, under Alternative 2, the potential impacts to sites of Native American Religious Concern would be lessened due to the lesser number of available routes and the closure of some routes into sensitive areas.

**Impacts from Alternative 3**

The potential impacts from implementing this alternative to eligible properties would be considerably fewer than from implementing Alternative 1, and would be somewhat fewer than under Alternative 2 , due to the smaller number of designated routes and limitation of routes to specialized or permitted travel.  Continued impacts to currently impacted sites would be reduced or eliminated.

**Impacts from Alternative 4**

The potential impacts would be higher than Alternative 2 due to the greater number of designated routes.  Some level of reduction in impacts would be realized due to restriction on types of travel allowed on certain designated routes.  Overall, greatly fewer properties would be impacted under this alternative than under the current conditions due to the designation of the area as closed to cross-country travel and limiting all travel to existing routes.

**Cumulative Effects**

Cumulative effects on sites of Native American religious concern cannot be specifically identified until cultural resources inventories and Native American consultations are completed and such locales have been identified. In general, however, erosion caused by vehicle travel, depending on its proximity to a site, could have long-term negative impacts on both buried sites as well as those with surface phenomena. The introduction of routes into an area might also increase the potential for vandalism and looting.

[81]

BLM_0014566

# Threatened, Endangered, and Sensitive Species

**THREATENED, ENDANGERED, AND SENSITIVE SPECIES** (includes finding on Standard 4)

Within the planning area, there are several species listed as threatened or endangered, as well as species that are candidates for listing under the Endangered Species Act (as amended). A list of those federally listed species evaluated for this document, is located in the Uncompahgre Field Office (UFO). Based on this list, the inventory data maintained by the UFO, Colorado Division of Wildlife Natural Diversity Information Source (NDIS) and inventory data available from the Colorado Natural Heritage Program (CNHP), the special status species shown in Table 10 below are found or are potentially found within the analysis area.

| Table 10 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Potential Special Status Species - Dry Creek Travel Management Planning Area** | | | | | | | |
| *Common Name* | Scientific Name | Status[1] | Occurrence | Within Species Range | Occupied or Potential Habitat | Designated Critical habitat | Species Present |
| Clay-Loving Wild Buckwheat | *Eriogonum pelinophilum* | FE | Not known in the area, confined to nearby Mancos Shale badlands. | Y | N | N | N |
| Black-footed Ferret | *Mustela nigripes* | FE, SE | Not known to occur, but prairie dog host is present in the analysis area. | Y | N | N | N |
| Bonytail Chub | *Gila elegans* | FE, SE | Occupied and critical habitat downstream of analysis area in Colorado R. | Y | Y | N | N |
| Razorback Sucker | *Xyrauchen texanus* | FE, SE | Occupied and critical habitat downstream of analysis area in the lower Gunnison River. | Y | Y | N | N |
| Colorado Pikeminnow | *Ptychocheilus lucius* | FE, ST | Occupied and critical habitat downstream of analysis area in the lower Gunnison River. | Y | Y | N | N |
| Humpback Chub | *Gila cypha* | FE, ST | Occupied and critical habitat downstream of analysis area in Colorado R. | Y | Y | N | N |
| Canada Lynx | *Lynx canadensis* | FT | Not known to occur, but LAU exists and habitat is adjacent. | Y | Y | N | N |
| Uinta Basin Hookless Cactus | *Sclerocactus glaucus* | FT | Present within the area at the northern end (Sub-Region A), usually in salt desert shrub communities | Y | Y | N | Y |

BLM_0014567

## Threatened, Endangered, and Sensitive Species

| Table 10 Potential Special Status Species - Dry Creek Travel Management Planning Area | | | | | | | |
|---|---|---|---|---|---|---|---|
| Common Name | Scientific Name | Status[1] | Occurrence | Within Species Range | Occupied or Potential Habitat | Designated Critical habitat | Species Present |
| Mexican Spotted Owl | Strix occidentalis | FT, ST | Not known to occur in the area. | Y | N | N | N |
| Yellow-billed Cuckoo | Coccyzus Americanus | FC, BLMS | Potential habitat along the lower elevation cottonwood gallery riparian communities. | Y | Y | N | P |
| Gunnison prairie dog[3] | Cynomys gunnisoni | FC, BLMS | Montane habitats not found | Y | Y | -- | N |
| *Sensitive Birds* | | | | | | | |
| Bald Eagle | Haliaeetus leucocephalus | BLMS[2] | Winter foraging and some concentrations along the Uncompahgre River. | Y | W, F | N | W |
| Peregrine Falcon | Falco peregrinus anatum | BLMS | Known to breed in Roubideau Canyon. | Y | Y | -- | Y |
| Ferruginous Hawk | Buteo regalis | BLMS | Present during migration, no nesting. | Y | M,W, F | -- | M, W, F |
| Gunnison Sage Grouse | Centrocercus minimus | BLMS | May occur in the extreme southeastern end of this area on Sims Mesa.  Elsewhere in the area, historic habitat is possible | Y | Y | N | H |
| *Sensitive Mammals* | | | | | | | |
| River Otter | Lutra canadensis | BLMS | Not known to occur within the area. | Y | N | -- | N |
| Townsend's Big Eared Bat | Corynorhinus townsendii | BLMS | May roost in cliffs in the area; forage throughout the area. | Y | Y | -- | P |
| Spotted bat | Euderma maculatum | BLMS | May roost in cliffs in the area; forage throughout the area. | Y | Y | -- | P |
| Big Free-tailed Bat | Nyctinomops macrotis | BLMS | PA outside of the known range of the species. | N | N | -- | N |
| Fringed Myotis | Myotis thysanodes | BLMS | May roost in cliffs in the area; forage throughout the area. | Y | Y | -- | P |
| Yuma Myotis | Myotis yumanensis | BLMS | PA outside of the known range of the species. | N | N | -- | N |
| *Sensitive Fish* | | | | | | | |

[83]

BLM_0014568

## Threatened, Endangered, and Sensitive Species

| Table 10 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Potential Special Status Species - Dry Creek Travel Management Planning Area** | | | | | | | |
| *Common Name* | **Scientific Name** | **Status[1]** | **Occurrence** | **Within Species Range** | **Occupied or Potential Habitat** | **Designated Critical habitat** | **Species Present** |
| Flannelmouth Sucker | *Catostomus latipinnis* | BLMS | Found in the Uncompahgre River and some tributary streams. | Y | P | -- | P |
| Roundtail Chub | *Gila robusta* | BLMS | Found in the Uncompahgre River and some tributary streams. | Y | P | -- | P |
| Bluehead Sucker | *Catostomus discobolus* | BLMS | Found in the Uncompahgre River and some tributary streams. | Y | P | -- | P |
| Trout, Colorado River cutthroat | *Oncorhynchus clarki pleuriticus* | BLMS | Found in the Uncompahgre River and some tributary streams. | Y | P | -- | P |
| *Sensitive Herps* | | | | | | | |
| Midget Faded Rattlesnake | *Crotalus verities concolor* | BLMS | Present in PJ, rocky areas, greasewood/sage and sagebrush/rabbitbrush | Y | P | -- | P |
| Northern Leopard Frog | *Rana pipiens* | BLMS | Ponds and irrigation canals. | Y | Y | -- | P |
| Canyon Tree Frog | *Hyla arenicolor* | BLMS | Major canyon bottoms | Y | Y | -- | P |
| *Sensitive Invertebrates* | | | | | | | |
| Great basin silverspot | *Speyeria nokomis nokomis* | BLMS | Found in streamside meadows and open seepage areas with an abundance of violets (*Viola nephrophylla*) in generally desert landscapes. | Y | Y | -- | P |
| *Sensitive Plants* | | | | | | | |
| Grand Junction milkvetch | *Astragalus linifolius* | BLMS | Sparsely vegetated habitats. Known occurances in Sub-Regions A and B. | Y | Y | -- | Y |
| San Rafael milkvetch | *Astragalus rafaelensis* | BLMS | Not known in the area, but potential habitat is present. Known occurrence in adjacent area to the southeast. | Y | Y | -- | P |
| Rocky Mountain thistle | *Cirsium perplexans* | BLMS | Not known in the area, but potential habitat is present. Known occurrences | Y | Y | -- | P |

[84]

BLM_0014569

# Threatened, Endangered, and Sensitive Species

| | | | | Within Species Range | Occupied or Potential Habitat | Designated Critical habitat | Species Present |
|---|---|---|---|---|---|---|---|
| **Table 10** | | | | | | | |
| **Potential Special Status Species - Dry Creek Travel Management Planning Area** | | | | | | | |
| *Common Name* | **Scientific Name** | **Status[1]** | **Occurrence** | | | | |
| | | | to the east | | | | |
| Montrose bladderpod | *Lesquerella vicina* | BLMS | Known occurrences in the southern portion of the area. | Y | Y | -- | Y |
| Colorado desert parsley | *Lomatium concinnum* | BLMS | Not known in the area, but potential habitat is present. Known occurrences to the east | Y | Y | -- | P |
| Eastwood monkey-flower | *Mimulus eastwoodiea* | BLMS | Not known in the area, but potential habitat is present. Known occurrences to the northeast | Y | Y | -- | P |

Y = yes; N = no; A = adjacent; F = foraging habitat; M = Migratory; W = winter; P = possible; H = historically present, current status uncertain

1 Status is as follows: FE = Federally Endangered; FT = Federally Threatened; FP = Federal Proposed for listing; FC = Federal Candidate for listing; BLMS = BLM Sensitive Species
2 On June 28, 2007, Secretary of the Interior Dirk Kempthorne announced the removal of the bald eagle from the list of threatened and endangered species.
3 Gunnison prairie dogs are not currently classified as sensitive by the BLM.  However, on February 5, 2008, U.S. Fish and Wildlife Service announced a 12-month finding on a petition to list the Gunnison's prairie dog that determined that montane populations are warranted for listing under the Act but precluded by higher priority actions.

## United States Fish & Wildlife Service Species

Six Endangered, three Threatened, and two Candidate species occur on the United States Fish & Wildlife Service (USFWS) list of potential species for Montrose County, Colorado (USFWS 2008) (Table 10).  Of the federally listed species, only the Uinta basin hookless cactus is known to occur or is likely to occur.  Canada lynx (Threatened), and yellow-billed cuckoo (Candidate) habitat occurs within the area.

**Uinta basin hookless cactus** is found in the northern portion of the planning area in Sub-Region A.  Currently there are approximately 30 miles of routes in Sub-Region A and 2 miles of routes in Sub-Region C that are within ½ mile of known cactus locations (Table 11).

**Canada lynx** Lynx Analysis Units (LAU) intersect with 25 Mesa, Traver Mesa and Spring Creek LAUs for a total of 596 acres of LAU (Table 11).  The Spring Creek LAU contains 50.2 acres of non-habitat at the very southern end of Sub-Region G and none is found in the planning area.  The closest denning, winter, or linkage habitat in these two LAUs is greater than 1.5 miles away.  Denning/wintering habitat is found adjacent to the area (Sub-Region G) on National Forest lands.  25 Mesa LAU is adjacent to and to the south of Sub-Region A, and Traver Mesa LAU is adjacent to and to the south of Sub-Region B.  Neither 25 Mesa nor Traver Mesa LAUs have denning, winter, or linkage habitats within or adjacent to the area.    There is no suitable lynx habitat within the planning area.

BLM_0014570

# Threatened, Endangered, and Sensitive Species

**Yellow-billed cuckoos** have been reported in the nearby North Fork and Nucla areas on several occasions during the last 5 years, but breeding has not been confirmed (Rocky Mountain Bird Observatory data). Surveys of the lower Gunnison and Uncompahgre Rivers did not find any breeding individuals. Breeding bird surveys also did not confirm breeding in this area. Although the riparian corridor of Roubideau Creek and Dry Creek provides suitable habitat for yellow-billed cuckoo, the species has not been confirmed to nest in the area (Colorado Breeding Bird Atlas, 1998). The planning area does contain potential habitat adjacent to many of the existing routes (Table 11).

**White-Tailed Prairie Dogs** Although white-tailed prairie dogs are known to occur (see terrestrial wildlife section below), Gunnison's prairie dogs have not been confirmed here from past surveys, and are not believed to be in the area (A. Segland, CDOW, personal communication). Gunnison's prairie dog montane population segments are currently under consideration for listing (i.e., a candidate species) under the Endangered Species Act. Listing at this time is "warranted but precluded" by higher priority actions to amend the lists of endangered and threatened wildlife and plants (USFWS 2008a; Federal Register 2008). Portions of the area have been classified by the USFWS as "montane habitat" for Gunnison's prairie dog. However, this mapping, as intended by USFWS, represents species and population ranges and was not designed for project-level analysis (personal communication with Al Pfister, USFWS). In other words, areas which occur within the mapped montane habitat are not necessarily occupied by Gunnison's prairie dogs. There are three historic prairie dog towns (active 1976; approx. 140 acres) located in Sub-Region E. It appears that fluctuations in prairie dog numbers have resulted in abandonment of historical colonies, and that there has likely been a general reduction in the total number of prairie dogs living in the area. This perception is based on biologist observations and a re-inventory of prairie dog colonies on BLM which were first inventoried in the 1970s and 1980s. This showed most of the original colonies had been abandoned, although no quantitative data analysis has been carried out. It is likely that much of this apparent trend is due to bubonic plague, although other factors such as shooting and habitat fragmentation and development may also have contributed.

| Table 11 Potential habitat for Federally Listed species in the Dry Creek Travel Management Planning Area by Sub-Region | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Sub-Region | | | | | | |
| **Species** | | A | B | C | D | E | F | G |
| Uinta Basin Hookless Cactus | Potential Habitat (acres) | 19,448.6 | 10,830.4 | 8,817.5 | | | | |
| Canada Lynx | LAU (acres) | 7.2 | 0.6 | 0.0 | 0.0 | 0.0 | 50.2 | 538.0 |
| | Non-habitat (acres) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 66.3 |
| Yellow-billed Cuckoo | Potential habitat (acres) within 1/2 mile of road | | 60.2 | 1,797.6 | 7,637.9 | 414.0 | 1,805.2 | 3,043.8 |

No other Threatened, Endangered or Candidate species or suitable habitats were detected or known within the area. While the planning area does contain approximately 70 miles of perennial streams, none of the listed fish are expected to be present in these smaller tributaries of the Gunnison River. Bonytail, humpback chub, Colorado pikeminnow and razorback sucker

[86]

# Threatened, Endangered, and Sensitive Species

may be found downstream in the Uncompahgre and lower Gunnison Rivers.

**Black-footed ferrets** depend on prairie dogs for food and shelter. For the UFO, this includes Gunnison's and white-tailed prairie dogs. Based on bioenergetics, the basic requirements for suitable ferret habitat include prairie dog towns 200 acres or greater in size with an average density of 8 active burrows/acre. Some white-tailed prairie dog populations on private lands in the vicinity of the area appear to be thriving, but not on public lands. In general, prairie dog communities have either been abandoned or reduced in size in or in the vicinity of the area over the past 10 years. There have been no recorded black-footed ferret sightings anywhere in the general area since 1988 when one was reported north of Ridgway (CNHP data). It is unlikely black-footed ferrets could survive due to the small size of extant prairie dog locations. The black-footed ferret is believed to have been extirpated from the nearby area.

No habitat exists for the **Mexican spotted owl** or the **clay-loving wild buckwheat**; therefore this species will not be addressed.

**BLM Sensitive Species**

From early December through early April, wintering **bald eagles** forage throughout the region. Helicopter and ground surveys, conducted by BLM in the early 1980's, did not locate communal night roost sites within this area. There are no known nest sites on public land. Winter range for the bald eagle is essentially the entire area. There is no winter concentration or communal roost habitat.

Two **peregrine falcon** nest sites exist in lower Roubideau Canyon. These nests are the only known nests in the region; however, there is additional suitable habitat in other portions of the canyon. It is possible that more nest sites are located in Roubideau Canyon, but have not yet been detected. There are currently approximately 4 miles of routes within ½ mile of the known peregrine sites, and approximately 9.4 miles of routes within ½ mile of potential cliff habitat.

**Ferruginous hawks** are known to occur in the region during migration, but there is no evidence that this species nests or over-winters here. Ferruginous hawks forage in open country, primarily prairies, plains and badlands; sagebrush, saltbush-greasewood shrubland, periphery of pinyon-juniper and other woodland, desert.

Historic and potential habitat for the **Gunnison sage grouse** exists. Sage grouse habitat is located in the Sims Mesa area, in the southern portion of the planning area. Sims Mesa was historically active habitat for the sage grouse, but the current status in unknown. Very little to no current use by grouse is suspected based on recent work by CDOW. There are approximately 380.3 acres of potential Gunnison sage grouse habitat within Sub-Region F.

Sensitive bat species, **Townsend's big-eared bat**, **spotted bat** and **fringed myotis**, are expected to roost in the cliffs and forage broadly feeding on insects and utilizing the existing water resources of the area.

**Roundtail chub** is the only sensitive fish species known within the area (Roubideau Creek).

[87]

# Threatened, Endangered, and Sensitive Species

**Flannelmouth sucker**, **bluehead sucker** and **Colorado River cutthroat trout** may also be present but have not been confirmed. There are potentially 70 miles of perennial stream habitat available for sensitive fish habitat (Table 12). Non-native fish are present in Roubideau Creek and the East and West forks of Dry Creek, and may impact the ability of special status fish to utilize this river system. Roundtail chub has been negatively impacted by the incision of stream channels in the area, and the establishment of tamarisk and Russian knapweed. Upstream water diversions and livestock grazing impacts on the lower portion of Roubideau Creek are potentially impacting sensitive fish (BLM 1995).

| Table 12. Miles of stream by Sub-Region in the Dry Creek Travel area | | | | |
|---|---|---|---|---|
| *Sub-Region* | *Intermittent* | *Perennial* | *Artificial\** | *Grand Total* |
| A | 76.9 | 22.8 | 0.5 | 100.2 |
| B | 22.4 | 18.8 | 0.04 | 41.2 |
| C | 159.8 | | 1.0 | 160.7 |
| D | 85.1 | 21.8 | 0.3 | 107.2 |
| E | 27.0 | 0.3 | | 27.3 |
| F | 55.6 | | 0.4 | 55.9 |
| G | 28.9 | 6.6 | 0.1 | 35.6 |
| **Grand Total** | 455.6 | 70.2 | 2.3 | 528.2 |

\*(e.g., flowline thru river)

**Midget faded rattlesnakes**, **canyon tree frogs**, **northern leopard frogs** and **Great Basin silverspot butterfly** may be present, but no population health or trend data is available. The distribution of midget faded rattlesnakes is uncertain and may or may not be present. There is potentially 70 miles of perennial and 455 miles of intermittent stream habitat available for canyon tree frog, northern leopard frog and Great Basin silverspot butterfly habitat (Table 12)

**San Rafael milkvetch** may only be found in the southern portion in Sub-Regions C-G). **Grand Junction milkvetch** and **Eastwood monkey-flower** may only be found in the northern portion in Sub-Regions A and B. **Rocky Mountain thistle, Montrose bladderpod,** and **Colorado desert parsley** are expected. There are 21 known locations of Grand Junction milkvetch within Sub-Regions A and B.

## Environmental Consequences

## Impacts Common to All Alternatives

Ecosystems of the west are especially vulnerable to OHV-related activities on unpaved (gravel or dirt) routes due to the travel effects on soils and vegetation, which may take centuries to recover (Webb, 1982; Lovich and Bainbridge, 1999). Impacts of OHV activities on wildlife and their habitats are numerous and well documented (Ouren 2007). Networks of routes fragment habitat, reduce patch size, and increase the ratio of edge to interior. This may have serious consequences for sensitive species (those that cannot carry out certain aspects of their life cycles without large blocks of habitat or corridors linking habitat patches), predator-prey relationships, and overall population dynamics. In particular, fragmentation and edges created by OHV routes may have strong effects on animal movement patterns. Precluding or inhibiting animal movements

[88]

BLM_0014573

# Threatened, Endangered, and Sensitive Species

effectively diminishes dispersal to and re-colonization in other areas, thus increasing the likelihood of local extirpations. Overall, studies demonstrate that even narrow routes (paved and unpaved) can represent major barriers to movement of animals. Reluctance to cross even narrow trails similar in width to routes created by OHV travel may alter or preclude the movements of various species. The cumulative effects of OHV-route networks proliferating across the landscapes may have serious ecological consequences for species reluctant to cross OHV routes.

OHV routes also generate conditions unlikely to occur in environments unaffected by OHV activity; in turn, these conditions can facilitate range extensions and invasions of non-native and/or opportunistic species. OHVs can contribute directly to mortality (and possible population declines) of wildlife species through direct collisions with vehicles, nest destruction, and collapsing of burrows. Noise generated by OHVs may alter animal behaviors, breeding populations, the abilities of some species to detect predators (through auditory cues), and can stimulate estimating animals to emerge from their underground burrows at inappropriate times. Noise, lights, and other disturbances associated with OHV activities also have the potential for eliciting stress responses from a broad spectrum of wildlife taxa. Indeed, studies have shown that ungulates, birds, and reptiles all experience accelerated heart rates and metabolic function during disturbance events; in turn, animals may be displaced and experience reproductive failure and reduced survivorship.

Direct wildlife mortality can result from vehicular impact, removing individuals from populations; thus, habitats containing routes may represent population sinks for any species that commonly attempts to move from one habitat fragment to another by crossing routes. If mortality rates exceed rates of reproduction and immigration, wildlife populations decline (Beier, 1993; Bruinderink and Hazebrook, 1996; Moore and Mangel, 1996; Forman and Alexander, 1998). Mortality rates vary widely according to habitat and road or route characteristics. Even where the frequency of wildlife mortality is relatively low most of the year, it may increase during certain seasons or when traffic frequency increases. Furthermore, population dynamics can be altered if low mortality rates nonetheless cause disproportionate mortality among specific sex and/or age classes. Another indirect effect of OHV activity on wildlife mortality is the proliferation of routes that provide greater access to remote places by hunters, poachers, and people seeking several forms of non-consumptive recreation, including flushing animals off nests; unnecessary energy expenditures; and displacement of animals from food, shelter, and other vital resources.

In summary, OHV activities may have effects to wildlife, fish and plant populations in the following areas: habitat fragmentation, patch size, edge to interior ratio, barriers to movement, facilitation of invasions of non-native and/or opportunistic species, mortality rates, noise and other disturbance factors. Measuring indicators of all these factors for the numerous species of interest would be an excessively difficult task. In addition, for most of the species of interest, the relationships between these factors and population dynamics are not well understood. Because of these difficult to measure potential impacts to sensitive wildlife and plant populations, we assume that any reduction in routes, or reduction in class of use (from motorized to non-motorized) would in general improve wildlife, fish and plant habitats in the area.

Because distributions of sensitive plants are poorly understood, BLM has made the assumption,

[89]

BLM_0014574

## Threatened, Endangered, and Sensitive Species

based on CNHP data, that San Rafael milkvetch may be found within Sub-Regions C, D, E, F and G, Grand Junction milkvetch and Eastwood monkey flower may be found within Sub-Regions A and B; and Rocky Mountain thistle, Montrose bladderpod, and Colorado desert parsley may be found throughout the Dry Creek area.  For this analysis BLM quantified and compared the change in miles of routes between Alternative 1 and Alternative 2, between Alternative 2 and Alternatives 3 and 4 (see Table 13).  To look at impacts to native fish, BLM quantified changes in number of stream crossings by alternative.

[90]

BLM_0014575

# Threatened, Endangered, and Sensitive Species

| Species and Units of Measure | Route Types | Alternative 1 Desig. Routes[3] | Alternative 2 Desig. Routes[3] | Δ I[4] % | Δ I[4] Miles | Alternative 3 Desig. Routes[3] | Δ 2[5] % | Δ 2[5] Miles | Δ I[4] % | Δ I[4] Miles | Alternative 4 Desig. Routes[3] | Δ 2[5] % | Δ 2[5] Miles | Δ I[4] % | Δ I[4] Miles |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Uinta Basin Hookless Cactus known occurrences (miles) | All[1] | 52.6 | 31.9 | -39% | -20.7 | 31.0 | -3% | -0.9 | -41% | -21.6 | 42.1 | +32% | +10.2 | -20% | -10.5 |
| | Motorized Only[2] | 52.6 | 29.0 | -45% | -23.6 | 19.8 | -32% | -9.2 | -62% | -32.8 | 36.9 | +27% | +7.9 | -30% | -15.7 |
| Canada Lynx LAU (miles) | All[1] | 1.26 | 1.25 | -1% | -0.01 | 1.25 | 0% | 0 | -1% | -0.01 | 1.25 | 0% | 0 | -1% | -0.01 |
| | Motorized Only[2] | 1.25 | 0.92 | -26% | -0.33 | 0.02 | -98% | -0.9 | -98% | -1.23 | 1.25 | +36% | +0.33 | 0% | 0 |
| Yellow-billed Cuckoo potential habitat (miles) | All[1] | 97.0 | 64.7 | -33% | -32.3 | 38.3 | -41% | -26.4 | -61% | -58.7 | 85.5 | +32% | +20.8 | -12% | -11.5 |
| | Motorized Only[2] | 97.0 | 54.8 | -43% | -42.2 | 26.3 | -52% | -28.5 | -73% | -70.7 | 82.9 | +51% | +28.1 | -14% | -14.1 |
| Peregrine Falcon known sites (miles of routes w/in ½ mile of known sites) | All[1] | 4.0 | 2.8 | -30% | -1.2 | 2.7 | -5% | -0.1 | -33% | -1.3 | 4.4 | +56% | +1.6 | +8% | +0.4 |
| | Motorized Only[2] | 2.1 | 1.2 | -43% | -0.9 | 0.0 | -100% | -1.2 | -100% | -2.1 | 1.8 | +47% | +0.6 | -16% | -0.3 |
| Peregrine Falcon potential habitat (miles of routes w/in ½ mile of habitat) | All[1] | 8.6 | 7.2 | -16% | -1.4 | 6.8 | -7% | -0.4 | -21% | -1.8 | 8.8 | +22% | +1.6 | +3% | +0.2 |
| | Motorized Only[2] | 7.2 | 4.0 | -45% | -3.2 | 1.5 | -61% | -2.5 | -79% | -5.7 | 6.9 | +75% | +2.9 | -4% | -0.3 |
| Gunnison Sage Grouse potential habitat (miles) | All[1] | 2.9 | 2.2 | -23% | -0.7 | 2.4 | +12% | +0.2 | -17% | -0.5 | 2.6 | +20% | +0.4 | -10% | -0.3 |
| | Motorized Only[2] | 2.9 | 0.1 | -97% | -2.8 | 0.1 | 0% | 0.0 | -97% | -2.8 | 2.6 | +2600% | +2.5 | -10% | -0.3 |
| Cutthroat Trout (HUC) (miles) | All[1] | 698.9 | 418.7 | -40% | -280.2 | 270.7 | -35% | -148.0 | -61% | -428.2 | 605.3 | +45% | +186.6 | -13% | -93.6 |
| | Motorized Only[2] | 674.5 | 347.1 | -49% | -327.4 | 183.9 | -47% | -163.2 | -73% | -490.5 | 559.5 | +61% | +212.4 | -17% | -115.0 |
| Native Fish Units are number of perennial stream crossings | All[1] | 84 | 87 | +4% | +3 | 68 | -22% | -19 | -19% | -16 | 133 | +53% | +46 | +58% | +49 |
| | Motorized Only[2] | 24 | 10 | -58% | -14 | 6 | -40% | -4 | -75% | -18 | 22 | +120% | +12 | -8% | -2 |
| Amphibians (Units are number of intermittent and perennial stream crossings | All[1] | 881 | 420 | -52% | -461 | 262 | -38% | -158 | -70% | -619 | 789 | +88% | +369 | -10% | -92 |
| | Motorized Only[2] | 799 | 348 | -56% | -451 | 158 | -55% | -190 | -80% | -641 | 666 | +91% | +318 | -17% | -133 |
| San Rafael milkvetch in Sub-Regions C, D, E, F, & G (miles) | All[1] | 589.3 | 346.2 | -41% | -243.1 | 209.1 | -40% | -137.1 | -65% | -380.2 | 502.9 | +85% | +156.7 | -15% | -86.4 |
| | Motorized Only[2] | 589.2 | 311.0 | -47% | -278.2 | 165.1 | -47% | -145.9 | -72% | -424.1 | 491.6 | +105% | +180.6 | -17% | -97.6 |
| Grand Junction | All[1] | 109.5 | 72.6 | -34% | -36.9 | 61.6 | -15% | -11.0 | -44% | -47.9 | 102.6 | +56% | +30.0 | -6% | -6.9 |

Table 13
Change in Route Densities by Alternative for Threatened, Endangered, Candidate or Sensitive Species

[91]

# Threatened, Endangered, and Sensitive Species

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| milkvetch, Eastwood monkey flower in Sub-Regions A and B (miles) | Motorized Only[2] | 85.3 | 36.0 | -58% | -49.3 | 18.8 | -48% | -17.2 | -78% | -66.5 | 67.9 | +136% | +31.9 | -20% | -17.4 |
| Rocky Mountain thistle, Montrose bladderpod, Colorado desert parsley throughout PA, no routes for this category (miles) | All[1] | 698.9 | 418.7 | -40% | -280.2 | 270.7 | -35% | -148.0 | -61% | -428.2 | 605.3 | +80% | +186.6 | -13% | -93.6 |
| | Motorized Only[2] | 674.5 | 347.1 | -49% | -327.4 | 183.9 | -47% | -163.2 | -73% | -490.6 | 559.5 | +108% | +212.4 | -17% | -115.0 |

[1] Routes available for motorized and non-motorized uses located within 1/4 mile of species, habitat, or occurrences

[2] Routes available for motorized use only

[3] Miles of designated routes or other units of measure (see units under "Species" column) - includes county roads

[4] Percent change from Alternative 1.  Units are either miles or stream crossings

[5] Percent change from Alternative.  Units are either miles or stream crossings

[92]

BLM_0014577

# Threatened, Endangered, and Sensitive Species

**Impacts Common to Alternatives 2, 3, and 4**

Changing the existing OHV designation to "Limited to Designated Routes Seasonally or Yearlong", thereby eliminating all cross country vehicular travel by restricting motorized and non-motorized travel to specific designated routes, and adopting a plan for travel management, would greatly reduce existing and potential impacts to these sensitive resources. Sensitive plants are generally not located on existing routes. By limiting travel to specific, designated routes, incidental crushing of sensitive plants adjacent to existing routes would be greatly reduced.

**Impacts from Alternative 1**

Existing routes and management would continue along with existing levels of associated resource disturbance and habitat fragmentation. New user-created routes would continue to potentially further impact habitat and/or the species in Table 13 relative to habitat fragmentation, patch size, edge to interior ratio, barriers to movement, facilitation of invasions of non-native and/or opportunistic species, mortality rates, noise and other disturbance factors. Routes would continue to cross perennial streams at 84 stream crossings (See Water Quality section for potential effects to sediment loads).

In addition, increased travel routes may improve predator efficiency or increased opportunistic predation. This could lead to potential increased indirect mortality or increased competition for the same prey resources.

*Federally Listed Species*:
Motorized and non-motorized uses would continue on public lands, on routes and cross-country, that cut through Federally listed Uinta Basin hookless cactus (52.6 existing miles), Canada lynx (1.26 existing miles), and yellow-billed cuckoo (97 existing miles) habitat.

*Sensitive Species*:
The current motorized and non-motorized activity would also affect peregrine falcon known (4 miles of existing, affecting routes) and potential cliff habitat (8.6 miles of existing, affecting routes), Gunnison sage grouse (2.9 existing miles in potential habitat), and cutthroat trout (698.9 existing miles of affecting routes) habitat (Table 13). Existing routes would continue to affect native fish habitat in perennial streams at 84 crossings and amphibian habitat in perennial and intermittent streams at 881 crossings. See Water Quality section for potential effects to sediment loads.

Existing motorized and non-motorized routes would continue to cross or traverse San Rafael milkvetch (589.3 existing miles), Grand Junction milkvetch/Eastwood monkey flower (109.5 existing miles), and Rocky Mountain thistle/Montrose bladderpod/Colorado desert parsley (698.9 existing miles) habitat.

**Impacts from Alternative 2**

Existing levels of disturbance and habitat fragmentation would be reduced in varying degrees, because of the large reductions in miles of existing routes through listed and sensitive species

[93]

BLM_0014578

# Threatened, Endangered, and Sensitive Species

habitat that would be designated and available for motorized and non-motorized travel. By reducing overall motorized and non-motorized route mileages, limiting use to designated routes, and changing permitted uses on some routes to non-motorized travel only, effects from habitat fragmentation, patch size, edge to interior ratio, barriers to movement, facilitation of invasions of non-native and/or opportunistic species, mortality rates, noise and other disturbance factors would reduce impacts to wildlife, fish and plants (Table 13).

*Federally Listed Species*:
New routes would not be established or constructed through habitat for federally listed species. Implementing the travel management plan in this alternative would have no adverse effect on the Threatened Uinta hookless cactus, or Canada lynx, and would not contribute toward the need to list the Candidate yellow-billed cuckoo. Reducing the number of existing motorized and non-motorized routes by a total of approximately 80 miles or an average of 47%, through habitat for these three listed species would result in a large reduction in potential impacts from OHV activities.

Compared to Alternative 1 – No Acton, Alternative 2 would result in large reductions in the number of miles of existing routes that pass through Uinta Basin hookless cactus (-39% or 20.7 fewer miles), Canada lynx LAU (-1%, or 0.01 fewer miles), and yellow-billed cuckoo (-33% or 32.3 fewer miles) habitat (Table 13). Considering only the number of miles of motorized routes that would be designated in this alternative, there would be even larger reductions in the number of miles of existing routes that would be available for travel through Uinta Basin hookless cactus (-45%, 23.6 fewer miles), Canada lynx LAU (-26%, 0.33 fewer miles), and yellow-billed cuckoo (-43%, 42.2 fewer miles) habitat.

*Sensitive Species*:
Alternative 2 would generally have a beneficial impact on BLM Sensitive species. There may still be impacts to individual BLM Sensitive species, but implementing this alternative would not likely result in a trend toward federal listing or loss of viability, or would not greatly or adversely impact the continued existence of a BLM Sensitive species.

Compared to Alternative 1 – No Acton, Alternative 2 would result in reductions in the number of miles of existing routes that pass through peregrine falcon known (-30%, or 1.2 fewer miles) and potential (-16%, or 1.4 fewer miles) habitat, Gunnison sage grouse (-25%, or 0.7 fewer miles), Cutthroat trout (-40%, or 280.2 fewer miles), and amphibian (-52%, or 461 fewer stream crossings) habitat (Table 13). This alternative would result in slight increases in the number of stream crossings in native fish habitat, compared to Alternative 1 (+4%, or 3 more stream crossings); however when considering stream crossings along motorized routes only, there would be a large decrease in the number of crossings (-58%, or 14 fewer crossings) from Alternative 1 to Alternative 2 (See Water Quality section for potential effects to sediment loads).

Compared to Alternative 1 – No Acton, Alternative 2 would result in reductions in the number of miles of existing routes that pass through San Rafael milkvetch (-41%, or 243.1 fewer miles), Grand Junction milkvetch/Eastwood monkey flower (-34%, or 36.9 fewer miles), and Rocky Mountain thistle/Montrose bladderpod/Colorado desert parsley (-40%, or 280.2 fewer miles) habitat from Alternative 1. In this alternative, there would be even larger reductions in the number of existing miles of motorized routes that would be available and designated and that

[94]

BLM_0014579

# Threatened, Endangered, and Sensitive Species

would pass through San Rafael milkvetch (-47%, or 278.2 fewer miles), Grand Junction milkvetch/Eastwood monkey flower (-58%, or 49.3 fewer miles) and Rocky Mountain thistle/Montrose bladderpod/Colorado desert parsley (-49%, or 327.4 fewer miles) habitat types.

## Impacts from Alternative 3

By implementing this alternative, the types of disturbance and habitat fragmentation regarding threatened, endangered, and sensitive species would be similar to those from implementing Alternative 2; however, by implementing the Travel Management Plan in this alternative, the adverse impacts to the described species and habitat would be reduced to a greater degree to some species and habitat than from implementing any of the other alternative. The reduction in impacts would result in fewer effects from habitat fragmentation, patch size, edge to interior ratio, barriers to movement, facilitation of invasions of non-native and/or opportunistic species, mortality rates, noise and other disturbance factors would reduce impacts to wildlife, fish and plants.

*Federally Listed Species*:
Compared to Alternative 1 – No Acton, implementing Alternative 3 would result in large reductions in the number of miles of existing motorized and non-motorized routes that would pass through Uinta Basin hookless cactus (-41%, or 21.6 fewer miles), Canada lynx LAU (-1%, or 1.23 fewer miles), and yellow-billed cuckoo (-61%, or 58.7 fewer miles) habitat. Considering only the number of miles of motorized routes that would be designated in this alternative, there would be even larger reductions in the number of miles of existing routes that would be available for travel through Uinta Basin hookless cactus (-62%, or 32.8 fewer miles), Canada lynx LAU (-98%, or 1.23 fewer miles), and yellow-billed cuckoo (-73%, or 70.7 fewer miles) habitat (Table 13).

Compared to Alternative 2 – Proposed Acton, implementing Alternative 3 would result in no change to Canada lynx LAU (0%, or 0 fewer miles), however would result in additional reductions in the number of miles of motorized and non-motorized routes that would be designated and pass through Uinta Basin hookless cactus (-3%, or 0.9 fewer miles), and yellow-billed cuckoo (-41%, or 26.4 fewer miles) habitat (Table 13). Considering only the number of miles of motorized routes that would be designated in this alternative, there would be even larger reductions in the number of miles of existing routes that would be available for travel through Uinta Basin hookless cactus (-32%, or 9.2 fewer miles), Canada lynx LAU (-98%, or 0.9 fewer miles), and yellow-billed cuckoo (-52%, or 28.5 fewer miles)

*Sensitive Species*:
Compared to Alternative 1 – No Acton, implementing Alternative 3 would result in reductions in the number of miles of existing motorized and non-motorized routes that pass through peregrine falcon known (-33%, or 1.3 fewer miles) and potential (-21%, or 1.8 fewer miles) habitat, Gunnison sage grouse (-17%, or 0.5 fewer miles), Cutthroat trout (-61%, or 428.2 fewer miles), native fish (19%, or 16 fewer stream crossings), and amphibian (-70%, or 619 fewer stream crossings) habitat. Compared to Alternative 1 – No Acton, implementing Alternative 3 would result in reductions in the number of miles of existing motorized only routes that pass through peregrine falcon known (-100%, or 2.1 fewer miles) and potential (-79%, or 5.7 fewer miles), Gunnison sage grouse (-97%, or 2.8 fewer miles), Cutthroat trout (-73%, or 490.5 fewer miles),

[95]

# Threatened, Endangered, and Sensitive Species

native fish (75%, or 18 fewer crossings), amphibian (-80%, or 641 fewer stream crossings) habitat.

Compared to Alternative 1, implementing Alternative 3 would result in reductions in the number of miles of existing motorized and non-motorized routes that would pass through San Rafael milkvetch (-65%, or 380.2 fewer miles), Grand Junction milkvetch/Eastwood monkey flower (-44%, or 47.9 fewer miles), and Rocky Mountain thistle/Montrose bladderpod/Colorado desert parsley (-61%, or 428.2 fewer miles) habitat. In this alternative, there would be large reductions in the number of existing miles of routes in Alternative 1, that would be available and designated for motorized use only and that would pass through San Rafael milkvetch (-72%, or 424.1 fewer miles), Grand Junction milkvetch/Eastwood monkey flower (-78%, or 66.5 fewer miles) and Rocky Mountain thistle/Montrose bladderpod/Colorado desert parsley (-73%, or 490.6 fewer miles) habitat types.

Implementing Alternative 3 would have similar effects to BLM sensitive species as those from implementing Alternative 2. There would be varying changes in the number of miles of designated and available motorized and non-motorized routes that would pass through peregrine falcon known (-5%, or 0.1 fewer miles) and potential (-7%, or 0.4 fewer miles), Gunnison sage grouse (+12%, or 0.2 more miles), Cutthroat trout (-35%, or 148.0 fewer miles), native fish (-22%, or 19 fewer stream crossings) and amphibian (-38%, or 158 fewer stream crossings). The slight increase in the number of miles of routes in sage grouse habitat would slightly increase the potential disturbance effects for this species for this alternative. In this alternative, compared to Alternative 2, there would be larger reductions in the number of miles of routes that would be available and designated for motorized use only and that would pass through peregrine falcon known (-100%, or 1.2 fewer miles) and potential (-61%, or 2.5 fewer miles), Cutthroat trout (-47%, or 163.2 fewer miles), native fish (-40%, or 4 fewer stream crossings), and amphibian (-55%, or 190 fewer stream crossings) habitat (Table 13).

Compared to Alternative 2, Alternative 3 would result in additional reductions in the number of miles of designated routes that pass through San Rafael milkvetch (-40%, or 137.1 fewer miles), Grand Junction milkvetch/Eastwood monkey flower (-15%, 11.0 fewer miles), and Rocky Mountain thistle/Montrose bladderpod/Colorado desert parsley (-35%, 148.0 fewer miles) habitat. In this alternative, compared to Alternative 2, there would be even larger reductions in the number of miles of routes that would be available and designated for motorized use only and that would pass through San Rafael milkvetch (-47%, or 145.9 fewer miles), Grand Junction milkvetch/Eastwood monkey flower (-48%, or 7.2 fewer miles) and Rocky Mountain thistle/Montrose bladderpod/Colorado desert parsley (-47%, or 163.2 fewer miles) habitat (Table 13).

Compared to Alternative 1, implementing Alternative 3 would result in a reduction of 16 stream crossings affecting native fish habitat, which is three more crossings than would result if Alternative 2 were implemented.

**Impacts from Alternative 4**

Implementing Alternative 2 would result in far fewer potential impacts to most species and habitat types when comparing Alternative 4 to Alternative 2 and Alternative 1. By implementing

[96]

BLM_0014581

# Threatened, Endangered, and Sensitive Species

Alternative 4, the types of disturbance and habitat fragmentation regarding threatened, endangered, and sensitive species would be much less overall than that from implementing Alternative 1, and greater in most respects than those from implementing Alternatives 2 and Alternative 3. Implementing the Travel Management Plan in this alternative, compared with implementing Alternative 1, would result in many more non-motorized stream crossings affecting native fish habitat, slightly more miles of routes potentially affecting peregrine falcon nests or potential peregrine falcon habitat, and slightly fewer miles of motorized and non-motorized routes within Gunnison sage grouse habitat. Compared to implementing Alternative 2, impacts to all habitat types would be greater in this alternative in varying amounts and degrees. These differences in impacts would result in more effects to wildlife, fish and plant species and habitat from habitat fragmentation, patch size, edge to interior ratio, barriers to movement, facilitation of invasions of non-native and/or opportunistic species, mortality rates, noise and other disturbance factors.

*Federally Listed Species*:
Compared to Alternative 1, implementing Alternative 4 would result in varying degrees of reductions in the number of miles of existing motorized and non-motorized routes that would pass through Uinta Basin hookless cactus (-20%, or 10.5 fewer miles), Canada lynx LAU (-1%, or 0.01 fewer miles), and yellow-billed cuckoo (-12%, or 11.5 fewer miles) habitat. Considering only the number of miles of motorized routes that would be designated in this alternative, compared to the miles of existing routes in Alternative 1, there would be no change in Canada lynx LAU (0%, or 0 fewer miles), however there would be larger reductions in the number of miles of existing routes that would be available for travel through Uinta Basin hookless cactus (-30%, or 15.7 fewer miles), and yellow-billed cuckoo (-14%, or 14.1 fewer miles) habitat (Table 13).

Compared to Alternative 2, implementing Alternative 4 would result in increases in the number of miles of designated motorized and non-motorized routes that would pass through Uinta Basin hookless cactus (+32%, or 10.2 more miles), Canada lynx LAU (+45%, or 186.6 more miles), and yellow-billed cuckoo (+32%, or 20.8 more miles) habitat. Compared to Alternative 2 , implementing Alternative 4 would result in varying degrees of increases in the number of miles of motorized only routes that would be designated and pass through Uinta Basin hookless cactus (+27%, or 7.9 more miles), Canada lynx LAU (+61%, or 212.4 more miles), and yellow-billed cuckoo (+51%, or 28.1 more miles) habitat (Table 13). Some of these increases could result in more impacts to listed plant and wildlife habitat and species.

*Sensitive Species*:
Compared to Alternative 1, implementing Alternative 4 would result in increases in or decreases in the impacts from motorized and non-motorized travel through peregrine falcon known (+8%, or 0.4 more miles), peregrine falcon potential habitat (+3%, or 0.2 more miles), native fish (+58%, or 49 more perennial stream crossings), amphibian (-10%, or 92 fewer perennial and intermittent stream crossing), Cutthroat trout (-13%, or 93.6 fewer affecting miles) sensitive species habitat. These mileage increases would consist of more non-motorized routes for hiking, horseback and bicycle uses that would be designated in these habitat types (See Water Quality section for potential effects to sediment loads). These differences, overall, would result in fewer potential impacts to all habitat types, comparing these two alternatives. Compared to Alternative 1, implementing Alternative 4 would result in reductions of the number of miles of motorized

[97]

BLM_0014582

# Threatened, Endangered, and Sensitive Species

routes passing through peregrine falcon known (-16%, or 0.3 fewer miles), peregrine falcon potential (-4%, or 0.3 fewer miles), Gunnison sage grouse (-10%, or 0.3 fewer miles), Cutthroat trout (-17%, or 115.0 fewer affecting miles), native fish (-8%, or 2 fewer perennial stream crossings), and amphibian (-17%, or 133 fewer perennial stream crossings) habitat (Table 13).

Compared to Alternative 1, implementing Alternative 4 would result in reductions in the number of miles of existing motorized and non-motorized routes that would be designated and that would pass through San Rafael milkvetch (-15%, or 86.4 fewer miles), Grand Junction milkvetch/Eastwood monkey flower (-6%, or 6.9 fewer miles), and Rocky Mountain thistle/Montrose bladderpod/Colorado desert parsley habitat (-13%, or 93.6 fewer miles) sensitive species habitat. Compared to Alternative 1, implementing Alternative 4 would result in reductions in the number of miles of existing motorized only routes that would be designated and pass through San Rafael milkvetch (-17%, or 97.6 fewer miles), Grand Junction milkvetch/Eastwood monkey flower (-20%, or 17.4 fewer miles), and Rocky Mountain thistle/Montrose bladderpod/Colorado desert parsley (-17%, or 115.0 fewer miles) habitat (Table 13).

Compared to implementing Alternative 2, implementing Alternative 4 would result in varying degrees of increases in the number of miles of designated and available motorized and non-motorized routes that would pass through peregrine falcon known (+56%, or 1.6 more miles), potential peregrine falcon (+22%, or 1.6 more miles), Gunnison sage grouse (+20%, or 0.4 more miles), Cutthroat trout (+45%, or 186.6 more affecting miles), native fish (+53%, or 46 more perennial stream crossing), and amphibian (+88%, or 369 more perennial and intermittent stream crossings) sensitive species habitat (Table 13). Compared to implementing Alternative 2, implementing Alternative 4 would result in varying and larger increases in the number of miles of routes that would be available and designated for motorized use only that would pass through peregrine falcon known (+47%, or 0.6 more miles), peregrine falcon potential (+75%, or 2.9 more miles), Gunnison sage grouse (+2600%, or 2.5 more miles), cutthroat trout (+61%, or 212.4 more affecting miles), native fish (+120%, or 12 more perennial stream crossings), and amphibian (+91%, or 318 more stream perennial and intermittent crossing) sensitive species habitat (Table 13).

Compared to Alternative 2, implementing Alternative 4 would result in increases in the number of miles of existing motorized and non-motorized routes that would be designated and pass through San Rafael milkvetch (+85%, or 156.7 more miles), Grand Junction milkvetch/Eastwood monkey flower (+56%, or 30 more miles), and Rocky Mountain thistle/Montrose bladderpod/Colorado desert parsley (+80%, or 186.6 more miles) sensitive species habitat. Compared to Alternative 2, implementing Alternative 4 would result in larger increases in the number of miles of existing motorized only routes that would be designated and pass through San Rafael milkvetch (+105%, or 180.6 more miles), Grand Junction milkvetch/Eastwood monkey flower (+136%, or 31.9 more miles) and Rocky Mountain thistle/Montrose bladderpod/Colorado desert parsley (+108%, or 212.4 more miles) sensitive species habitat (Table 13).

**Finding on the Public Land Health Standard for Threatened & Endangered species:**
OHV-related activities have impacts to a wide variety of wildlife, fish and plant species. Networks of routes fragment habitat, reduce habitat patch size, increase the ratio of edge to

[98]

# Threatened, Endangered, and Sensitive Species

interior habitat, create barriers to movement of animals, facilitation range extensions and invasions of non-native and/or opportunistic species, and can contribute directly to mortality. Noise generated by OHVs may alter animal behaviors, breeding populations, and abilities of some species to detect predators.  Any reduction in routes, especially motorized routes, would improve habitat conditions for many wildlife species.  However, because endemic and special status wildlife are typically restricted in their range and have more specific habitat requirements, route reductions in these habitats could have major effects in facilitating the continued existence of these species.  The habitat types described in the Affected Environment section of this EA and currently being impacted would be expected to improve under Alternative 2 and Alternative 3.

Generally, Alternative 3, compared to all alternatives, would result in the greatest decrease in number of affecting route miles and densities of all types of routes, for most species types and habitats.

Alternative 4, compared to Alternatives 2 and 3, would result in the fewest reductions in the number of affecting route miles and densities of all types of routes, for most species types and habitats.  Comparing Alternatives 2, 3, and 4, Alternative 4 would result in the least amount of potential improvement in species and habitat conditions.  Compared to Alternative 2, Alternative 4 would result in greater increases in route miles and density within Gunnison sage grouse, native fish, and sensitive plant habitats. Implementing Alternative 4 would also result in increases in the number of existing route miles and route density within peregrine falcon and native fish habitat.

Under Alternative 1, the opportunity to improve habitat conditions for TES species would be minimal, and these species may continue to decline.

**Cumulative Effects**

In addition to growth in recreational travel, other reasonably foreseeable actions that could effect T&E habitat over the next 10 years on private and public lands include residential growth, new road construction on private lands, fuels reduction projects, utility corridor maintenance and upgrades, and new buried utility rights-of-way. Activities on public lands in the travel planning area that could also potentially impact T&E habitat and require mitigation include, Forest Service planning and projects, Uncompahgre Plateau Project activities, local land use planning, soil research, BLM Uncompahgre Field Office Resource Management Plan revision, continued population growth, vegetation treatments, county road upgrades, special recreation permits and activities, and utility rights of way and corridors. Some of these activities may benefit special status wildlife, plants, and habitat. Refer to the main Cumulative Impacts section of this document for a more detailed description of these activities and their potential impacts. The cumulative impacts from these activities to T&E habitat from all action alternatives will be long-term and most adverse in Alternative 1 and 4, dispersed and long-term in Alternatives 2 and 3.

## WASTES, HAZARDOUS OR SOLIDS

Easy access to Public Lands from Montrose, Delta, Olathe, and other communities and tipping fees charged at legal disposal sites result in some dumping of materials on Public Lands.  The

[99]

BLM_0014584

# Wastes, Hazardous or Solids

dumping is serious in localized areas near population centers but minor in isolated areas, although there is some evidence that frequency of dumping may be increasing. The increase in dumping is probably related more to a growing population in the area than to any other factor. Dumping is typically exempt household solid waste consisting of building materials, furniture, appliances and yard waste. Dumping of hazardous materials occurs less commonly. Dumped materials that may include hazardous waste are typically oil products and remnants of methamphetamine labs. Both types of wastes are cleaned up and properly disposed of as an ongoing part of Public Land management.

## Environmental Consequences

### Impacts Common to All Alternatives

Hazardous and solid waste dumping, including incidental littering, & incidental spills would continue to occur to varying degrees and would be cleaned up & properly disposed of as an ongoing part of BLM land management.

### Impacts from Alternative 1

Cross-country travel using motorized vehicles that results in the additional user-created routes would permit more opportunity for this unauthorized activity to occur in the planning area. Enforcement demands would continue to grow with the growing population and increase in motorized use. Opportunities for dumping these materials on public lands would increase incrementally as the number of miles of new routes being established increases.

### Impacts from Alternatives 2, 3, and 4

New and existing opportunities for dumping of materials on Public Lands would be greatly decreased by eliminating all cross country travel with motorized vehicles, closing some routes and implementing conditions of use on some routes, such as limiting some existing routes to non-motorized vehicles. Enforcement demands would decrease as a result.

See Table 4 for the number of available route miles proposed in each of these alternatives.

### Cumulative Effects

Other activities that could add cumulatively to hazardous or solid a waste include construction on private lands, fuels reduction projects, vegetation treatments, and continued population growth. Cumulatively, impacts associated with dumping would be greatest with alternative1, since offenders would be allowed to travel off-route, out of sight of other users. Alternative 2 and 3, with the most routes closed, would have the fewest cumulative impacts. Alternative 4 would be slightly better than 1, but not as less impacting as alternatives 2 and 3.

## WATER QUALITY/ HYDROLOGY (includes information related to Standard 5)

The Dry Creek Travel area drains to both the Uncompahgre and Lower Gunnison Rivers. Table

[100]

BLM_0014585

# Water Quality/Hydrology

14 shows the watershed structure by three hydrologic unit or watershed scale levels, with the 4th level being the largest.  Fifth (5th) level watersheds are drainage divisions within 4th level watersheds, as 6th level watersheds are drainage divisions within 5th level watersheds.  Additionally, the area is divided into 7 planning Sub-Regions A-G, with each unit having a unique management emphasis. T he boundaries of the planning Sub-Regions cross watershed divides, in some cases down to 4th level, as shown in Table 14.

The planning area is located on the eastern flank of the Uncompahgre Plateau, which is characterized by gently sloping (approximately 4%) mesas, dissected by deeply incised canyons.  The watershed areas are typically elongated along the main stem channel axis having relatively narrow valley widths.  Drainages commonly flow in a northeasterly direction before entering either the Lower Gunnison or Uncompahgre Rivers.  Most of the areas streams exhibit intermittent or ephemeral flow regimes due to the semi-arid climate. The few main stem drainages that headwater at high elevations on the Uncompahgre Plateau and have perennial flow, include: Roubideau, Potter, Dry, and Spring Creeks.

The annual precipitation varies from about 10 inches at the lower elevations along the northeastern boundary to more than 16 inches at the higher elevations along the southwestern area boundary.  The larger drainages that headwater at higher elevations, experience high flows from the spring season snowmelt, which can last for several weeks.  Base flow in these drainages occurs from late summer through February or March.  In all of the areas drainages, high magnitude, short duration flood flows occur in the summer months from localized, high intensity, short duration precipitation events associated with southwest monsoonal air flow.  The frequency and magnitude of these events is highly variable from year to year.  Because the typical northeast drainage orientation is the same direction as storm travel, and the common watershed size and shape allows for rapid runoff concentration, flood peaks are often amplified.

At present, the planning area has 73 miles of routes that occur within 100 feet of sensitive stream channels and floodplains (the Water Influence Zone), including 877 stream crossings (Table 17).  The 73 existing miles of routes is estimated to equate to 88 acres of soil and vegetation disturbance within this sensitive zone.    The planning area contains 200 total miles of routes on soils with a severe erosion potential (about 242 acres of disturbed soil).  About 34% of the planning area drains to the lower Gunnison River via Roubideau Creek (Table 14), which presently has 249 route channel crossings, 28 miles of routes in the Water Influence Zone (WIZ) (34 acres of disturbance), and 59 miles (72 acres of disturbed soil) of routes on soils with a severe erosion potential.  The remaining 66% of the area drains to the Uncompahgre River, which presently has 628 route channel crossings, 45 miles of routes (55 acres of disturbed soil) in the WIZ and 141  miles (171 acres of disturbed soil) of routes on soils with a severe erosion potential. The Uncompahgre River joins the lower Gunnison River at Delta, Colorado.

[101]

BLM_0014586

# Water Quality/Hydrology

| 4th Level Watershed | 5th Level Watershed (acres)** | 6th Level Watershed (acres)** | Acres in Sub-Regions (acres)** |
|---|---|---|---|
| **Lower Gunnison River ( HUC – 14020005)\*** | Roubideau Creek (37,527) | Cottonwood Creek (443) | A (443) |
| | | Potter Creek (13,603) | A (12,051) |
| | | | B (1,552) |
| | | Roubideau Creek (9,140) | A (74) |
| | | | B (8,706) |
| | | | C (360) |
| | | Unnamed Drainage (14,341) | A (5,476) |
| | | | B (411) |
| | | | C (8,454) |
| **Uncompahgre River (HUC – 14020006)** | Dry Creek (63,481) | Coalbank/Big Sandy (14,692) | C (11,967) |
| | | | D (446) |
| | | | E (2,279) |
| | | East Fork Dry Creek (22,978) | C (93) |
| | | | D (22,481) |
| | | | E (258) |
| | | | F (146) |
| | | Roatcap Gulch (5,758) | B (1) |
| | | | C (5,757) |
| | | Unnamed Drainage (20,053) | D (5,212) |
| | | | E (4,315) |
| | | | F (9,099) |
| | | | G (1,427) |
| | Spring Creek/Happy Canyon (9,556) | Spring Creek (9,556) | F (2,289) |
| | | | G (7,267) |

Table 14
Watershed Level Structure and Sub-Region Public Land Acreage by 6th Level Watershed

\* HUC – Hydrologic Unit Code developed and used by the US Water Resources Council
\*\* Acres of public land managed by the Bureau of Land Management.

Water quality standards are set by the Colorado Water Quality Control Commission (CWQCC) and are applicable to all surface water drainages, including intermittent and ephemeral streams. The water quality classifications and standards applicable to the areas surface waters and downstream receiving streams are contained in the CWQCC's Regulation No. 35 Classifications and Numeric Standards for Gunnison and Lower Dolores River Basins (Colorado Water Quality Control Commission, July 2007) and summarized in Table 15.

BLM_0014587

# Water Quality/Hydrology

| Table 15 — Water Quality Designations and Classifications for Surface Waters and Major Receiving Streams | | | |
|---|---|---|---|
| 4th Level Watershed | Stream Segment | Stream Designation 3 | Stream Classification 2-5 |
| Uncompahgre River Watershed | Main stem of Dry Creek below forks to Coalbank Canyon | Use Protected | Aquatic Life Warm 2 Recreation E Agriculture |
| | East and West Forks of Dry Creek and Spring Creek | | Aquatic Life Cold 1 Recreation E Agriculture |
| | All other tributaries to the Uncompahgre River not listed above, and the Uncompahgre River from LaSalle Road to Confluence park | Use Protected | Aquatic Life Warm 2 Recreation N Agriculture |
| | Uncompahgre River from Confluence park to mouth | Use Protected | Aquatic Life Warm 2 Recreation E Agriculture |
| Lower Gunnison River Watershed | Monitor and Roubideau Creeks form the National Forest bdny. to the confluence with Potter Creek | | Aquatic Life Cold 1 Recreation E Water Supply Agriculture |
| | Roubideau Creek from Potter Creek to the mouth | | Aquatic Life Cold 1 Recreation E Agriculture |
| | Other tributaries to the Lower Gunnison not listed above | Use Protected | Aquatic Life Warm 2 Recreation N Water Supply Agriculture |
| | Gunnison River from the confluence with the Uncompahgre River to the mouth | | Aquatic Life Warm 1 Recreation E Water Supply Agriculture |

1  The Colorado Water Quality Control Commission designates waters of the state, "Use Protected" if they do not warrant special protection provided by the outstanding waters designation or the anti-degradation review process.
2  Waters are designated either warm or cold based on water temperature regime. Class 1 water's are capable of sustaining a wide variety of cold or warm water biota, while class 2 waters are not.
3  Recreation E waters are used for primary contact recreation. Recreation N waters that are not suitable for primary contact recreation.
4  Waters that are suitable for irrigating crops usually grown in Colorado.
5  Waters that are suitable or intended to become suitable for potable water supplies.

In addition to the state's water quality classifications and numeric standards, all surface waters of the state are subject to the State of Colorado Basic Standards (Colorado Water Quality Control Commission, December, 2007), which in part reads: "*state surface waters shall be free from substances attributable to human-caused point or nonpoint source discharge in amounts, concentrations or combinations that:*

[103]

BLM_0014588

# Water Quality/Hydrology

*1. Can settle to form bottom deposits detrimental to the beneficial uses (e.g. silt and mud).*
*2. Are harmful to the beneficial uses or toxic to humans, animals, plants, or aquatic life.*
*3. Produce a predominance of aquatic life."*

The intention of the above standard is to address and prohibit water quality degradation from excessive sediment, nutrients, or toxic compounds.

Because of the uniform and primarily Dakota and Morrison formations, the sedimentary geology of the area, chemical water quality is consistent in the areas streams. Typically, the dominant cation/anion concentration during high flow conditions is calcium-bicarbonate, which tends to shift towards sodium-bicarbonate during the base flow season. The fine sandy soils derived from the sedimentary geology are typically low in salinity, which is also reflected in the area's water quality. Increasing salinity to the Colorado River is not an issue as it relates to the Colorado River Basin Salinity Control Act.

The sediment yield of the area's streams is largely associated with episodic, high flow events, resulting from intense precipitation events during the summer season. Sediment supplied to streams during these events is from a variety of sources, including both in and near channel, and upland sources. The existing network of routes in the area has the potential to intercept and concentrate storm runoff, which increases the sediment yield. High flow from snowmelt on the larger streams does transport sediment, but is mostly limited by the sediment supply in or near the channel.

The transport and fate of sediment produced, especially in the ephemeral channels, is difficult to predict. Some of the areas smaller drainages discharge into irrigation ditches and canals along the northeast area boundary. Several livestock watering ponds are also located on small ephemeral channels (see the Hydrology and Water Rights Section). However, eventually, all drainage from the area has the potential to be received by either the Uncompahgre or lower Gunnison Rivers both of which are on the Colorado State Monitoring and Evaluation List (Colorado Water Quality Control Commission April, 2006) for suspected water quality impairment from excessive sediment. Dry Creek is also on this list for suspected impairment from excessive sediment, which receives drainage from most of sub region D. Additionally, the Uncompahgre and Lower Gunnison Rivers (state identified river reaches: COGUUN04b and COGULG02) and tributary streams to the Uncompahgre River are on the Colorado State 303(d) list (Colorado Water Quality Control Commission February, 2008) for impaired water quality due to excessive levels of Selenium.

The area presently supports an extensive network of routes that vary in uses, density, and topographic position across and between Sub-Regions. See Appendix 4 for maps of each alternative in this EA and the routes for each alternative. Table 16 and Table 17 present route metrics commonly used to evaluate the influence to water resources from such a travel network. More specific rationale for using these metrics and presenting the data both on a 4th level watershed and Sub-Region basis is provided in the Water Quality Impacts Common to All Alternatives section below. Many of these existing routes are user created, poorly designed and located, and commonly not maintained (Photo 1 and Photo 2).

[104]

BLM_0014589

# Water Quality/Hydrology

| Table 16 Existing Route Hydrologic Analysis Metrics by PA Sub-Region | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sub-Region | Route Drainage Crossings by Stream Type | | | | Routes in WIZ by Stream Type[2] | | | |
| | Intermittent and Ephemeral (Number of Drainage Crossings) | Intermittent and Ephemeral (density)[1] | Perennial (Number of Drainage Crossings) | Perennial (density)[1] | Intermittent and Ephemeral (miles) | Intermittent and Ephemeral (density)[1] | Perennial (miles) | Perennial (density)[1] |
| A | 105 | 3.7 | 29 | 1.0 | 10 | 0.4 | 5 | 0.2 |
| B | 17 | 1.0 | 41 | 2.5 | 2 | 0.1 | 3 | 0.2 |
| C | 206 | 5.0 | 3 | 0.1 | 18 | 0.4 | 1 | 0.0 |
| D | 256 | 5.8 | 10 | 0.2 | 16 | 0.4 | 1 | 0.0 |
| E | 89 | 8.3 | 0 | 0 | 5 | 0.5 | 0 | 0.0 |
| F | 101 | 5.6 | 0 | 0.0 | 10 | 0.6 | 0 | 0.0 |
| G | 20 | 1.5 | 0 | 0.0 | 2 | 0.1 | 0 | 0.0 |
| Total | 794 | 4.6 | 83 | 0.5 | 63 | 0.4 | 10 | 0.1 |

1. Density values are expressed in number per square mile for drainage crossings and miles per square mile for WIZ. The total Sub-Region acreage is used as a basis for calculating density values.

2. Water Influence Zone (WIZ) cumulative linear distance of routes within 100 feet of a drainage channel by planning Sub-Region.

| Table 17 Existing Situation – Route Hydrologic Analysis Metrics by 4th Level Watershed | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 4th Level Watershed (HUC)[1] | Route Drainage Crossings[2] | | Routes in WIZ[3] | | Routes by Soil Erosion Potential | | | |
| | Number of Crossings | Crossing Density[4] | Miles in WIZ | WIZ Density[4] | Moderate[5] (miles) | Moderate Density[4] | Severe[6] (miles) | Severe Density[4] |
| Lower Gunnison River (HUC - 14020005) | 249 | 4.2 | 28 | 0.5 | 76 | 1.3 | 59 | 1.0 |
| Uncompahgre River (HUC - 14020006) | 628 | 5.5 | 45 | 0.4 | 296 | 2.6 | 141 | 1.2 |
| Total | 877 | 5.1 | 73 | 0.4 | 372 | 2.2 | 200 | 1.2 |

1   US Water Resources Council- Hydrologic Unit Code
2   Includes ephemeral, intermittent, and perennial streams
3   Water Influence Zone (WIZ) cumulative linear distance of routes within 100 horizontal feet of a drainage channel (ephemeral, intermittent, and perennial streams)
4   Density values are calculated by number or miles per square mile of total unit area
5   Some accelerated erosion likely, occasional route maintenance needed.
6   Major accelerated erosion expected, frequent route maintenance needed.

BLM_0014590

# Water Quality/Hydrology



Photo 1: Route in Ephemeral Wash in Sub-Region E, Showing Pulverized Channel Substrate, Ready for Mobilization with next Runoff Event.



Photo 2: Ingress and Egress Point to Access Channel Route in Sub-Region E, Showing Signs of Accelerated Erosion and Fine Material on Surface Likely to be Mobilized During Next Runoff Event

[106]

BLM_0014591

# Water Quality/Hydrology

Ground water occurs in limited, unconsolidated surface deposits, and in portions of the Dakota and Morrison sedimentary units. The semi-arid climate limits water availability for groundwater recharge, and the deeply incised surface topography is not conducive for the occurrence of extensive, continuous groundwater aquifers. Past inventories have identified 27 springs or seeps, most of which are associated with discharge from either the Dakota or Morrison formations at impervious contact zones. The recharge area for these aquifers is up dip (southwest) on the higher elevations of the Uncompahgre Plateau.

**Environmental Consequences**

**Impacts Common to all Alternatives**

Please refer to the impacts discussion in Farmlands, Prime or Unique, Riparian/Wetlands, Aquatic Wildlife, Soils, and Floodplains for acreage impact figures. The primary effects to this resource are fully discussed in those sections.

Few, if any, hydrologic (water quality, quantity, and timing of flow) benefits occur from un-surfaced routes. Commonly, routes alter natural drainage patterns, collect and concentrate runoff, and accelerate both runoff and sediment yield. However, the route location on the landscape, soil erodability and degree of soil compaction on the route surface, and route design and maintenance all factor into the magnitude that hydrologic function and water quality is influenced. Routes located in lower topographic positions, in close proximity to, or in drainages, would have the greatest potential impact on drainage channel stability and water quality. Following are some of the more common impacts that occur when routes are located within or close to stream channels.

- At route/stream crossings, channel geometry is altered, affecting floodplain function and channel stability, resulting in accelerated sediment yield.

- Routes parallel to stream channels often disturb riparian vegetation, which is needed for channel stability and proper floodplain function. Routes within close proximity to streams also have a shorter flow path to deliver concentrated runoff and sediment to the receiving drainage channel.

- Routes in or close to channels can more easily convey chemical contaminants (e.g., motor and hydraulic oils, grease, fuel, antifreeze, and heavy metals from tire wear) to the water course.

- Routes close to channels also have the potential to intercept surface runoff from the land area upslope, concentrating the runoff and routing it to locations less capable of conveying the flow without eroding.

- Routes in channels diminish bank stabilizing vegetation, shear channel banks, and pulverize channel bed substrate (Photos 1 and 2), decreasing the substrate particle size and increasing the transportability of these materials, which increases downstream sediment yield.

Routes located on the upper portion of watersheds have less direct influence on drainage channels, but still have the potential to capture, redirect, and concentrate runoff from upslope,

[107]

BLM_0014592

# Water Quality/Hydrology

often onto the road or trail surface. Surface runoff captured and concentrated on route surfaces can augment high flow peaks in receiving streams. Concentrated flow on routes located on soils that have a high capacity to erode, results in accelerated soil erosion and a higher sediment yield to local surface water ways.

Recreation Guidelines developed by the BLM (USDI, Bureau of land Management 2000) which are intended to minimize soil erosion and subsequent water quality impacts, include the following: plan routes and trails away from riparian and wetland areas, minimize surface disturbance to maintain sufficient vegetation to protect soils (especially highly erodible and fragile soils), and reduce the number of stream crossings where possible.

Based in part on BLM's Recreation Guidelines, the Public Land Health Standards, and the potential impacts described above, the following metrics are used to compare hydrologic impacts between the alternatives presented, including Alternative 2: number of stream channel (perennial, intermittent, and ephemeral) crossings by routes, miles of routes within 100 feet of stream channels (Water Influence Zone), and miles of routes located on soils having a moderate or severe potential for erosion.

The boundaries of the Sub-Regions cross watershed boundaries, in some cases down to 4th level watersheds as shown in Table 14. Impacts to water quality could occur downstream, and are most easily assessed on a watershed unit (4th level Hydrologic Unit Code) basis. Other potential impacts, such as the hydrologic function of stream channels, riparian areas, and uplands, could occur on site, or within a Sub-Region. Additionally, other resource analyses are mostly on a PA Sub-Region basis. Thus, in order to compare the level of impacts across the various resources analyzed, and also assess off site, downstream impacts, the water quality analysis is evaluated both by PA Sub-Region and watershed unit.

**Impacts from Alternative 1**

Major impacts would occur to water quality/hydrology within perennial streams as a result of the entire area being available for continued cross country travel and the creation of new user created routes and stream crossings, combined with the impacts that would continue to occur from 700 miles of existing routes. Alternative 1 would essentially leave the existing routes and all the public lands in the current status of being open to all forms of motorized and non-motorized travel. Over time the area would be expected to experience a progressive increase in the volume of on-route and off-route travel and the number of user created routes. User-created routes are often poorly located and designed and receive little or no drainage maintenance. Indiscriminant off route use disturbs soil surface, vegetation cover, and biological soil crust. The resultant water quality and quantity impacts would be accelerated sediment yield, the potential addition of petroleum based contaminants from motorized forms of travel, and augmented high flows from concentrated runoff. Accelerated sediment production could have both on and off site impacts. On site sediment impacts include excess deposition in stream channels, loss of aquatic life habitat in perennial streams, and more frequent maintenance of livestock water impoundments. Impacts to water quality/hydrology would continue in the planning area at 877 existing route channel/drainage crossings (83 of which are on perennial streams), and on, and from 73 miles of routes in the WIZ (10 miles of which are along perennial streams). Currently, although not designated as such, there are approximately 10 miles of technical 4WD routes. These routes are

[108]

BLM_0014593

# Water Quality/Hydrology

commonly located in ephemeral drainage channels and are only suitable for use by modified 4 wheel drive vehicles and motorized and mechanized trials bikes. Because the ground surface disturbance from using these routes is in or near the channel, sediment available for transport in episodic channel flow is maximized. Overall, the number of both stream crossings and miles of routes in the WIZ would be expected to increase over time, along with a corresponding increase in sediment production.

Off site sediment impacts from existing and potential new disturbed area include potential impacts to farm or irrigation facilities that receive drainage (see Farmlands, Prime and Unique) and accelerated sediment delivery to the Uncompahgre and lower Gunnison Rivers, both of which are on the Colorado Monitoring and Evaluation List for suspected impairment from excessive sediment. About 34% of the area drains to the lower Gunnison River via Roubideau Creek (Table 14), which presently has 249 route channel crossings, 28 miles of routes in the WIZ, and 59 miles of routes on soils with a severe erosion potential. The remaining 66% of the area drains to the Uncompahgre River, which presently has 628 route channel crossings, 45 miles or routes in the WIZ and 141 miles of routes on soils with severe erosion. The Uncompahgre River joins the lower Gunnison River at Delta, Colorado, at which point the impacts described above for the Uncompahgre River would be added to the lower Gunnison River.

**Finding on the Public Land Health Standard for Water Quality:**  As a result of the disturbances from existing routes and the high potential for increases in the number of miles new of user created routes, the potential exists for an accelerated and progressive increase in levels of sediment to be transported and discharged into waters that are presently on the Colorado Monitoring and Evaluation List for excessive sediment concentration. Lastly, leaving public lands open to all forms of motorized and non-motorized travel would potentially result in more sensitive riparian areas not meeting the rating of "Proper Functioning Condition". For the reasons stated above, Alternative 1 would not meet the Water Quality, Public Land Health Standard #5.

**Impacts from Alternative 2**

Major improvements to water quality/hydrology would be expected in this alternative. Under Alternative 2 by prohibiting all cross country travel, except for horseback or foot travel, and limiting other travel to designated routes seasonally or yearlong and closing 258 total miles of existing routes, the number of stream crossings and miles of routes affecting all stream types in the WIZ would be reduced by 45%, or 389 fewer crossings, and 44%, or 32 fewer affecting miles, respectively, compared to Alternative 1 (Table 19). This would include 43%, or 36 fewer perennial stream crossings and 50%, or 5 fewer miles of travels routes affecting the WIZ, on perennial streams (Table 18). Technical 4WD routes would be reduced to a total of 8.6 miles, all of which would be in the Uncompahgre River Watershed. There would also be a reduction of 30%, or 59 fewer route miles on soils with a severe erosion potential (Table 19). With reductions in routes and off route travel prohibited, especially in the water quality sensitive areas described above, the sediment yield and potential contamination from petroleum products would be less than Alternative 1. The offsite water quality benefits from implementing this alternative would be slightly greater for the Lower Gunnison River Watershed compared to the Uncompahgre River Watershed (Table 19 – compare stream crossing and WIZ density between drainage basins).

[109]

BLM_0014594