# Water Quality/Hydrology

**Finding on the Public Land Health Standard for Water Quality:**  Under this alternative, prohibiting all cross country travel, except for horseback or foot travel, and limiting other travel to designated routes seasonally or yearlong and closing existing routes would greatly improve the water quality (reduced yield of sediment and potential petroleum based contaminants) over time as the alternative is implemented, and as selected, existing routes are closed and rehabilitated.  Thus, implementation of this alternative would meet the intent of Public Land Health Standard #5 by protecting the stream classifications listed in Table 15.

| Table 18 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Route Hydrologic Analysis Metrics by PA Sub-Region, Alternative 2** | | | | | | | |
| **Sub-Region** | **Route Drainage Crossings** | | | | **Routes in WIZ[2]** | | | |
| | Intermittent and Ephemeral (number of stream crossings) | Intermittent and Ephemeral (density)[1] | Perennial (number of stream crossings) | Perennial (density)[1] | Intermittent and Ephemeral (miles) | Intermittent and Ephemeral (density)[1] | Perennial (miles) | Perennial (density)[1] |
| **A** | 43 | 1.5 (-59%) | 24 | 0.9 (-17%) | 5 | 0.2 (-50%) | 4 | 0.1 (-20%) |
| **B** | 13 | 0.8 (-24%) | 15 | 0.9 (-63%) | 1 | 0.1 (-50%) | 0 | 0.0 (-100%) |
| **C** | 81 | 1.9 (-61%) | 1 | 0.0 (-67%) | 6 | 0.1 (-67%) | 0 | 0.0 (-100%) |
| **D** | 168 | 3.8 (-34%) | 6 | 0.1 (-40%) | 12 | 0.3 (-25%) | 1 | 0.0 (0%) |
| **E** | 31 | 2.9 (-65%) | 0 | 0.0 (0%) | 2 | 0.2 (-60%) | 0 | 0.0 (0%) |
| **F** | 88 | 4.9 (-13%) | 0 | 0.0 (0%) | 7 | 0.4 (-30%) | 0 | 0.0 (-100%) |
| **G** | 17 | 1.3 (-15%) | 1 | 0.1 (0%) | 2 | 0.1 (0%) | 0 | 0.0 (0%) |
| **Total** | **441** | **2.6 (-44%)** | **47** | **0.3 (-38%)** | **35** | **0.2 (-44%)** | **5** | **0.1 (-50%)** |

1. Density values are expressed in number per square mile for drainage crossings and miles per square mile for WIZ. The total Sub-Region acreage is used as a basis for calculating density values. Percent values in parenthesis are the change from Alternative 1.
2. Water Influence Zone (WIZ) cumulative linear distance of routes within 100 feet of a drainage channel by Sub-Region.

| Table 19 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Route Hydrologic Analysis Metrics by 4th Level Watershed, Alternative 2** | | | | | | | | |
| **4th Level Watershed (HUC)[1]** | **Route Drainage Crossings[2]** | | **Routes in WIZ[3]** | | **Routes by Soil Erosion Potential** | | | |
| | Crossings Number | Crossing Density[4] | Miles in WIZ | WIZ Density[4] | Moderate[5] (miles) | Moderate Density[4] | Severe[6] (miles) | Severe Density[4] |
| **Lower Gunnison River (HUC - 14020005)** | 124 | 2.1 (-51%) | 13 | 0.2 (-58%) | 43 | 0.7 (-43%) | 42 | 0.7 (-29%) |
| **Uncompahgre River** | 364 | 3.2 (-42%) | 28 | 0.2 (-38%) | 182 | 1.6 (-39%) | 99 | 0.9 (-30%) |

BLM_0014595

# Water Quality/Hydrology

| 4th Level Watershed (HUC)[1] | Route Drainage Crossings[2] | | Routes in WIZ[3] | | Routes by Soil Erosion Potential | | | |
|---|---|---|---|---|---|---|---|---|
| | Crossings Number | Crossing Density[4] | Miles in WIZ | WIZ Density[4] | Moderate[5] (miles) | Moderate Density[4] | Severe[6] (miles) | Severe Density[4] |
| (HUC - 14020006) | | | | | | | | |
| Total | 488 | 2.8 (-45%) | 41 | 0.2 (-55%) | 225 | 1.3 (-40%) | 141 | 0.8 (-30%) |

Table 19
Route Hydrologic Analysis Metrics by 4th Level Watershed, Alternative 2

1   US Water Resources Council- Hydrologic Unit Code
2   Includes ephemeral, intermittent, and perennial streams
3   Water Influence Zone (WIZ) cumulative linear distance of routes within 100 horizontal feet of a drainage channel (ephemeral, intermittent, and perennial streams).
4   Density values are calculated by number or miles per square mile of total unit area. The total Sub-Region acreage is used as a basis for calculating density values.  Percent values in parenthesis are the change from the existing situation (Alternative 1).
5   Some accelerated erosion likely, occasional route maintenance needed.
6   Major accelerated erosion expected, frequent route maintenance needed.

## Impacts from Alternative 3

Major improvements to water quality/hydrology would be expected in this alternative. Water quality improvements from implementing Alternative 3 would be similar to but greater in degree than from implementing Alternative 2, primarily from eliminating all cross country travel and closing routes.

With 369 miles of existing routes targeted for closure under this alternative, the number of all stream crossings and miles of routes affecting all stream types in the WIZ would be reduced by 56%, or 492 fewer crossings, and 53%, or 39 fewer miles affecting the WIZ, respectively, compared to Alternative 1 (Table 21).  This would include -18%, or 20 fewer perennial stream crossings and -20%, or two fewer miles of travels routes affecting the WIZ (Table 20). Technical 4WD routes would be reduced to a total of 3.4 miles, all of which would be in the Uncompahgre River Watershed.  There would also be -67%, or 133 fewer route miles on soils with a severe erosion potential (Table 21).  With reductions in routes and off route travel prohibited, the sediment yield and potential contamination from petroleum products would be less than Alternative 1.  Benefits to water quality would occur in both the Lower Gunnison and Uncompahgre Rivers from a reduced number stream crossings, fewer miles of routes in the WIZ, and less route disturbance on soils with a severe erosion potential, see Table 21.

**Finding on the Public Land Health Standard for Water Quality:** Under this alternative, prohibiting all cross country travel, except for horseback or foot travel, and limiting other travel to designated routes seasonally or yearlong and closing existing routes would greatly improve the water quality (reduced yield of sediment and potential petroleum based contaminants) over time as selected, existing routes are closed and rehabilitated, and mitigation measures are implemented.  Thus, implementation of this alternative would meet the intent of Public Land Health Standard #5 by protecting the stream classifications listed in Table 15.

[111]

BLM_0014596

# Water Quality/Hydrology

| Table 20 | | | | | | | |
| :-- | :-- | :-- | :-- | :-- | :-- | :-- | :-- |
| **Route Hydrologic Analysis Metrics by PA Sub-Region, Alternative 3** | | | | | | | |
| Sub-Region | Route Drainage Crossings | | | | Routes in WIZ[2] | | |
| | Intermittent and Ephemeral (number) | Intermittent and Ephemeral (density)[1] | Perennial (number) | Perennial (density)[1] | Intermittent and Ephemeral (miles) | Intermittent and Ephemeral (density)[1] | Perennial (miles) | Perennial (density)[1] |
| **A** | 73 | 2.6 (-30%) | 22 | 0.8 (-24%) | 6 | 0.2 (-40%) | 4 | 0.1 (-20%) |
| **B** | 11 | 0.7 (-35%) | 41 | 2.5 (0%) | 1 | 0.1 (-50%) | 3 | 0.2 (0%) |
| **C** | 64 | 1.5 (-69%) | 0 | 0.0 (-100%) | 5 | 0.1 (-72%) | 0 | 0.0 (-100%) |
| **D** | 98 | 2.2 (-62%) | 5 | 0.1 (-50%) | 7 | 0.2 (-56%) | 1 | 0.0 (0%) |
| **E** | 12 | 1.1 (-87%) | 0 | 0.0 (0%) | 1 | 0.1 (-80%) | 0 | 0.0 (0%) |
| **F** | 50 | 2.8 (-50%) | 0 | 0.0 (0%) | 5 | 0.3 (-50%) | 0 | 0.0 (0%) |
| **G** | 9 | 0.7 (-55%) | 0 | 0.0 (0%) | 1 | 0.1 (-50%) | 0 | 0.0 (0%) |
| **Total** | **317** | **1.8 (-60%)** | **68** | **0.4 (-18%)** | **26** | **0.2 (-59%)** | **8** | **0.0 (-20%)** |

1. Density values are expressed in number per square mile for drainage crossings and miles per square mile for WIZ. The total Sub-Region acreage is used as a basis for calculating density values. Percent values in parenthesis are the change from the existing situation (Alternative 1).
2. Water Influence Zone (WIZ) cumulative linear distance of routes within 100 feet of a drainage channel by planning Sub-Region.

| Table 21 | | | | | | | |
| :-- | :-- | :-- | :-- | :-- | :-- | :-- | :-- |
| **Route Hydrologic Analysis Metrics by 4th Level Watershed, Alternative 3** | | | | | | | |
| 4th Level Watershed (HUC)[1] | Route Drainage Crossings[2] | | Routes in WIZ[3] | | Routes by Soil Erosion Potential | | | |
| | Crossings Number | Crossings Density[4] | Miles in WIZ | WIZ Density[4] | Moderate[5] (miles) | Moderate Density[4] | Severe[6] (miles) | Severe Density[4] |
| **Lower Gunnison River (HUC - 14020005)** | 170 | 2.9 (-32%) | 17 | 0.3 (-39%) | 23 | 0.4 (-70%) | 12 | 0.2 (-80%) |
| **Uncompahgre River (HUC - 14020006)** | 215 | 1.9 (-66%) | 17 | 0.1 (-62%) | 128 | 1.1 (-57%) | 55 | 0.5 (-61%) |
| **Total** | **385** | **2.2 (-56%)** | **34** | **0.2 (-53%)** | **151** | **0.9 (-59%)** | **67** | **0.4 (-67%)** |

1   US Water Resources Council- Hydrologic Unit Code
2   Includes ephemeral, intermittent, and perennial streams
3   Water Influence Zone (WIZ) cumulative linear distance of routes within 100 horizontal feet of a drainage channel (ephemeral, intermittent, and perennial streams).
4   Density values are calculated by number or miles per square mile of total unit area. Percent values in parenthesis are the change from the existing situation (Alternative 1).

BLM_0014597

# Water Quality/Hydrology

5    Some accelerated erosion likely, occasional route maintenance needed.

6    Major accelerated erosion expected, frequent route maintenance needed.

**Impacts from Alternative 4**

Water quality impacts from implementing Alternative 4 would be-moderate due to the elimination of all cross country motorized and non motorized mechanized travel and new, user created routes, and would be similar to but somewhat more  in degree that from implementing alternative 2. The primary differences between Alternatives 1 and 4 for water quality impacts would be that under Alternative 4, user created trail proliferation would not occur, and implementing this alternative would have overall Planning area-wide benefits to water quality.

The number of all types of stream crossings and miles of routes in the WIZ would be increased by 6%, or and 1%, or fewer miles, respectively, compared to Alternative 1 (Table 21), primarily due to the proposed hiking and horse trail in the bottom of Roubideau Canyon.

The Roubideau horse trail would result in an increase in the density of perennial stream crossings by 124%, or 3 more drainage crossings per square mile, and the same for miles affecting the WIZ (133%, or 4 more miles), compared to Alternative 1.  Since this trail is limited to horse and foot traffic, impacts to water quality would be minimal.

Technical 4WD routes would be reduced to a total of 8.5 miles, all of which would be in the Uncompahgre River Watershed.

There would also be a slight reduction of 2%, or 0.1 miles of routes per square mile in the number of miles of routes on soils with a severe erosion potential, compared to Alternative 1 (Table 23).  The route density in Alternative 4 would be more similar to that in Alternative 1, than either Alternative 2 or Alternative 3.

**Finding on the Public Land Health Standard for Water Quality:**  Under this alternative, prohibiting all cross country travel, except for horseback or foot travel, and limiting other travel to designated routes seasonally or yearlong and closing existing routes would greatly improve water quality, although under Alternative 4 the density of route stream crossings and miles in the WIZ would slightly increase from Alternative 1.  Thus, implementation of this alternative would meet the intent of Public Land Health Standard #5 by protecting the stream classifications listed in Table 15.

| | Table 22 Route Hydrologic Analysis Metrics by PA Sub-Region, Alternative 4 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sub-Region | Route Drainage Crossings | | | | Routes in WIZ[2] | | | |
| | Intermittent and Ephemeral (number) | Intermittent and Ephemeral (density)[1] | Perennial (number) | Perennial (density)[1] | Intermittent and Ephemeral (miles) | Intermittent and Ephemeral (density)[1] | Perennial (miles) | Perennial (density)[1] |
| A | 98 | 3.5 (-7%) | 27 | 1.0 (-7%) | 8 | 0.3 (-20%) | 4 | 0.1 (-20%) |
| B | 19 | 1.1 (12%) | 92 | 5.5 (124%) | 2 | 0.1 (0%) | 7 | 0.4 (133%) |

[113]

BLM_0014598

# Water Quality/Hydrology

| | Table 22 Route Hydrologic Analysis Metrics by PA Sub-Region, Alternative 4 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Sub-Region** | **Route Drainage Crossings** | | | | **Routes in WIZ[2]** | | | |
| | Intermittent and Ephemeral (number) | Intermittent and Ephemeral (density)[1] | Perennial (number) | Perennial (density)[1] | Intermittent and Ephemeral (miles) | Intermittent and Ephemeral (density)[1] | Perennial (miles) | Perennial (density)[1] |
| **C** | 225 | 5.4 (9%) | 3 | 0.1 (0%) | 17 | 0.4 (-6%) | 1 | 0.0 (0%) |
| **D** | 248 | 5.6 (-3%) | 9 | 0.2 (10%) | 16 | 0.4 (0%) | 1 | 0.0 (0%) |
| **E** | 79 | 7.4 (-11) | 0 | 0.0 (0%) | 4 | 0.4 (-20%) | 0 | 0.0 (0%) |
| **F** | 110 | 6.1 (9%) | 0 | 0.0 (0%) | 10 | 0.6 (0%) | 0 | 0.0 (0%) |
| **G** | 20 | 1.5 (0%) | 1 | 0.1 (0%) | 2 | 0.1 (0%) | 0 | 0.0 (0%) |
| **Total** | **799** | **4.6 (1%)** | **132** | **0.8 (59%)** | **59** | **0.3 (-6%)** | **13** | **0.1 (30%)** |

1. Density values are expressed in number per square mile for drainage crossings and miles per square mile for WIZ. The total Sub-Region acreage is used as a basis for calculating density values. Percent values in parenthesis are the change from the existing situation (Alternative 1).
2. Water Influence Zone (WIZ) cumulative linear distance of routes within 100 feet of a drainage channel by planning Sub-Region.

| | Table 23 Route Hydrologic Analysis Metrics by 4th Level Watershed, Alternative 4 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **4th Level Watershed (HUC)[1]** | **Route Drainage Crossings[2]** | | **Routes in WIZ[3]** | | **Routes by Soil Erosion Potential** | | | |
| | Crossings Number | Crossing Density[4] | Miles in WIZ | WIZ Density[4] | Moderate[5] (miles) | Moderate Density[4] | Severe[6] (miles) | Severe Density[4] |
| **Lower Gunnison River (HUC - 14020005)** | 340 | 5.8 (37%) | 31 | 0.5 (11%) | 63 | 1.1 (-17%) | 65 | 1.1 (10%) |
| **Uncompahgre River (HUC - 14020006)** | 591 | 5.2 (-6%) | 43 | 0.4 (-4%) | 246 | 2.2 (-17%) | 130 | 1.1 (-8%) |
| **Total** | **931** | **5.4 (6%)** | **74** | **0.4 (1%)** | **309** | **1.8 (-17%)** | **195** | **1.1 (-2%)** |

1. US Water Resources Council- Hydrologic Unit Code
2. Includes ephemeral, intermittent, and perennial streams
3. Water Influence Zone (WIZ) cumulative linear distance of routes within 100 horizontal feet of a drainage channel (ephemeral, intermittent, and perennial streams).
4. Density values are calculated by number or miles per square mile of total unit area. Percent values in parenthesis are the change from the existing situation (Alternative 1).
5. Some accelerated erosion likely, occasional route maintenance needed.
6. Major accelerated erosion expected, frequent route maintenance needed.

[114]

BLM_0014599

# Water Quality/Hydrology

**Cumulative Effects**

There are many factors affecting the water quality and hydrology. Much of the surrounding private land in this area is being subdivided and becoming increasingly developed with new routes and home sites, potentially adding to accelerated levels of sediment yield in these watersheds.

Along with the impacts caused by the development of new routes and home sites, there are impacts associated with historic livestock grazing that continue to influence the water quality with excessive sediment concentrations in the waters of the Dry Creek travel planning area and downstream users. The Dry Creek TMP is an important piece of the watershed management equation. It will determine the kinds and amounts of travel uses that will be allowed on the Public Lands within the affected watersheds. As the development of private lands for residential homes, and the demand for recreational uses on Public Lands continue to increase, the decisions made in the Dry Creek TMP will play an important role in determining the overall health of these watersheds.

**WETLANDS AND RIPARIAN ZONES** (includes a finding on Standard 2)

There are 73 miles of perennial and intermittent streams on public lands. The majority of these streams area perennial (65.2 miles), while the remainder are intermittent in flow but still have enough water to support riparian vegetation in major amounts. The 73 miles is estimated to support 1,783 acres of riparian habitat. The major stream systems are the Roubideau, Dry and Spring Creek drainages.

These drainages contain riparian vegetation which can be subdivided into shrub-dominated, cottonwood and evergreen dominated communities. The cottonwood vegetation class includes Rio Grande cottonwood trees (*Populus deltoides ssp. Wislizenii*) at lower elevations and narrowleaf cottonwood (*Populus angustifolia*) at higher elevations with occasional hybrids between these two occurring in small stands. Sandbar willow (*Salix exigua*), thinleaf alder (*Alnus tenuifolia*), and water birch (*Betula occidentalis*) are the main shrub species near the water's edge. On higher terraces, skunkbush sumac (*Rhus aromatica*), silver buffaloberry (*Shepherdia argentea*), wood rose (*Rosa woodsii*), seep willow *(Baccharis salicina*) and clematis (*Clematis ligusticifolia*) are the most common species. Common reed grass (*Phragmites australis*) is present in some areas. Riparian vegetation at the highest elevations includes evergreens such as Douglas fir (*Pseudotsuga menzieseii*) and blue spruce (*Picea pungens*), often mixed with alder, dogwood, or higher elevation willow species. Ephemeral drainages are often dominated by tamarisk (*Tamarix chinensis*) and seep willow. Weeds are common in some of the riparian areas. Russian knapweed (*Acroptilon repens*), tamarisk, Russian olive (*Eleagnus angustifolia*), hoary cress (*Cardaria draba*) and Canada thistle (*Cirsium arvensis*) have invaded riparian communities in many areas resulting in degraded riparian habitat and community quality.

A major amount of the riparian area is associated with narrow, V-shaped valleys located at the bottom of steep canyons. This is particularly true of the higher elevation streams, where

[115]

BLM_0014600

# Wetlands and Riparian Zones

topography has isolated and protected them from route development and proliferation, and other direct human associated disturbances. Lower elevation streams tend to be in wider, flatter canyon bottoms which have traditionally served as access ways up onto the Uncompahgre Plateau. See Table 24 for estimates of acreages of existing routes on BLM land that are in the riparian zone. Estimates were derived from assuming a riparian corridor width of 60 meters.

| Table 24 Riparian Zones Directly Affected by Existing Routes | | |
|---|---|---|
| **Stream Name** | **Total Acres** | **Acres Affected by Existing Routes**[1] |
| Cottonwood Creek | 9.3 | 0 |
| Criswell Creek | 117.3 | 0 |
| Cushman Creek | 197.6 | 2.6 |
| Dry Creek | 257.9 | 1.6 |
| East Fork Dry Creek | 126.2 | 0.7 |
| West Fork Dry Creek | 98.8 | 0 |
| Monitor Creek | 231.9 | 1.1 |
| Little Monitor Creek | 35.2 | 0 |
| Potter Creek | 210.3 | 11.4 |
| Roubideau Creek | 314.1 | 5.3 |
| Spring Creek | 130.8 | 0.01 |
| East Fork Spring Creek | 16.1 | 0 |
| Middle Fork Spring Creek | 19.6 | 0 |
| West Fork Spring Creek | 18.4 | 0 |
| **Totals** | 1,784 | 23 |

1    Assuming average route width of six meters and riparian corridor width of 60 meters

Nearly all of the streams were assessed for Land Health in 2004-2005. At that time, no major large scale problems were found on reaches of the following streams and they are rated as Meeting Standard 2: Criswell Creek, Cushman Creek, portions of Dry Creek, East Fork Dry Creek, West Fork Dry Creek, portions of Monitor Creek, Little Monitor Creek, Potter Creek, portions of Roubideau Creek, Spring Creek, East Fork Spring Creek, West Fork Spring Creek, and Middle Fork Spring Creek.

Some Land Health problems were found with reaches of the following creeks, which were rated as Meeting Standard 2 with Problems: portions of Dry Creek, portions of Monitor Creek (evaluated in 1996), and portions of Roubideau Creek. These problems included channel sinuosity and width to depth ratios, exotic plant and noxious weed prevalence, inadequate vegetation and roots to protect streambanks, poor riparian plant vigor, riparian areas not reaching their potential extent, lack of riparian species where they would be expected, poor upland watershed condition affecting the riparian area, lack of diversity in vegetation age classes, and an

[116]

BLM_0014601

# Wetlands and Riparian Zones

imbalance between water and sediment.  No riparian zones had problems serious enough to necessitate a rating of Not Meeting Standard 2.  At the time of the Land Health evaluation, the problems were attributed to the following causes: current and historic grazing, drought, invasive and noxious plants, and upland erosion and water diversions.  Since the Land Health evaluation, extensive weed control efforts have taken place in the Roubideau drainage to control Russian knapweed and to a lesser extent tamarisk.

There are 4 lentic wetlands which have been inventoried.  They total 3.8 acres, and are all associated with stock ponds.  These are low quality wetlands with little obligate wetland vegetation, and problems related to dewatering, irregular flow from irrigation water, and heavy livestock use.  The ponds generally reflect the condition of most of the many developed ponds.  Most of these ponds have associated routes to, across, or around and sometimes even OHV play areas within these when they are dry.  It is likely that there are additional small naturally occurring wetlands associated with seeps.  However these have not been inventoried for wetland condition, and are not notable within the area, nor evident from the existing route network.

## Environmental Consequences

## Impacts Common to all Alternatives

Routes generally degrade riparian and wetland areas.  This has been well documented by numerous researchers in many locations (Forman 2008, Jones et al 2008, Trombulak and Frissell 2008).  In addition to direct destruction of and impacts to riparian vegetation for the width of the route (estimated here as 6 meters in width including shoulder area), off-route impacts often extend up to many feet on either side of a route in an effect researchers have termed the "road influence zone" (RIZ).  Riparian vegetation in this zone is at a greater risk of being degraded.  Degradation includes weeds invading undisturbed riparian vegetation, overgrazing because of increased access for livestock and other grazers, sediment deposits onto the riparian vegetation, and increased erosion within the riparian zone.  The amount of degradation varies depending on different route characteristics.  These characteristics include the route's orientation within the riparian zone, its proximity to the stream, the substrate the route passes over, route width and the type and the level of use the route receives.  The impacts of these characteristics are described as follows:

Orientation:   Routes which are oriented perpendicular to the stream course generally remove and impact less riparian vegetation than those which parallel the stream course.

Proximity:   Routes which travel through the riparian zone have a direct impact on riparian vegetation by destroying it.  Routes located adjacent to riparian areas generate reduced off-route impacts, compared to routes within the riparian area, and these impacts generally decline with increasing distance between the route and the riparian zone.

Substrate:   Routes which pass over soft substrates and mud generally cause more impacts to riparian vegetation than those which pass over rocks.

[117]

BLM_0014602

# Wetlands and Riparian Zones

| | |
|---|---|
| Use Level: | Heavily used routes introduce more weeds, generate more dust, and require more road maintenance, creating more off-route impacts to riparian vegetation than less heavily travelled routes. |
| Use Type: | When routes exclude some users, they generally have lower use levels with fewer off-route impacts to riparian habitat than routes which have multiple uses.  In some cases limiting motorized travel and other uses may draw more users for the specialized opportunity, but for the purpose of this analysis BLM assumes that limited use routes would have lower use levels than unrestricted routes. |
| Route Width: | Wider routes remove and destroy more riparian vegetation than narrower routes. |

In general, these impacts are additive, so that an area with more routes in and near riparian vegetation and wetlands would have more degraded riparian systems than similar areas with fewer routes.

Based on BLM's Recreation Guidelines, the Public Land Health Standards, and the potential impacts described above, the mileage of routes passing through the riparian zone is used as the primary measure to assess impact to the riparian zone.  These are in turn evaluated by vehicular use type on routes (which encompasses route widths), and riparian health Standard 2 ratings. There are no instances where routes pass through riparian areas in Sub-Regions C, E, or F, so these Sub-Regions do not appear in the tables below, and there are no differences in riparian impacts between the alternatives in these Sub-Regions.

**Impacts from Alternative 1**

Major impacts could be expected to occur to wetlands and riparian zones due to the unrestricted cross country travel that would continue anywhere on public lands, including within riparian areas.  In addition, the existing 700 miles of routes would be available for use with any type of vehicle.  This alternative continues current travel management, which has contributed to the riparian conditions in place today.  Currently, an estimated 1.3%, or 23 acres, of the 1,784 total acres of riparian acreage would continue to be directly affected by routes (Table 24).  Table 25 shows that a total of 9.4 miles of existing routes currently create associated impacts (20.5 acres of disturbed soil and vegetation) in riparian habitats, including 6.3 miles of unrestricted motorized routes, or about 13 acres of disturbance. The 3.1 miles of hiking and horseback routes and trails in Table 25 are within the Camel Back WSA, Sub-Region B, which is closed to the use of motorized vehicles and mountain bikes.  Because nearly all other routes in the planning area that affect riparian areas are currently available to all uses under this alternative, including motorized, mechanized, and non-motorized uses, BLM cannot identify route differences due to use type, use level, or route width.  Under current management, a great number of these existing routes could be widened by vehicular use to accommodate full size vehicles and the full array of transportation modes, with the exception of routes in the Camel Back WSA.  In addition, new user-created routes would likely be developed and existing routes could become wider.

[118]

BLM_0014603

# Wetlands and Riparian Zones

| Table 25<br>Mileage of Routes in Riparian Areas"<br>by Sub-Region for Alternative 1 – No Acton | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Sub-Region** | **Existing  Route Type** | | | | | | | |
| | **All Routes** | **4-WD & 2 WD Routes** | **ATV** | **Motorized Single Track** | **Non-motorized Single Track** | **Closed** | **Admin Only** | **Horse and Foot** |
| **A** | 4.3 | **These categories are not applicable for this alternative** | | | | | | NA |
| **B** | 3.1 | | | | | | | 3.1 |
| **D** | 2.0 | | | | | | | NA |
| **G** | 0.03 | | | | | | | NA |
| **Totals** | 9.4 | | | | | | | 3.1 |

If existing trends in community population growth,  recreational use and increasing numbers of public land visitors continue, it is likely that there would be additional riparian acreage affected, and increased severity of impacts to the existing affected area.  This would arise from additional user-created routes, and deteriorating condition of existing routes as use levels increase.  Impacts would be more weed infestations, loss of additional riparian vegetation, increased sedimentation onto riparian vegetation, and in some places increased erosion within the riparian zone.  In some cases, channel alteration would be expected, which could further degrade riparian vegetation and function.  Anticipated incremental and major impacts would be localized, minor to moderate in a few places, and long term.  These impacts would only occur in Sub-Regions A, B, D, and G, where riparian areas are present.

Table 26 shows Land Health Assessment data for Standard 2-Healthy Riparian Systems relative to existing routes.  There are presently 2.2 miles of routes in riparian areas that meet Standard 2 with problems.  An additional 7.23 miles of routes pass through riparian areas which presently fully meet Standard 2.  About 2.7 of these miles are horse and hiking routes in the WSA.  Under current management, it is conceivable that riparian conditions near these routes would degrade enough to cause some riparian reaches to move from fully Meeting to Meeting with Problems, or even to Not Meeting Standard 2, especially if new user-created routes become established in riparian habitats.

| Table 26<br>Riparian Health Standard 2 Ratings: Mileage of Routes in Riparian Areas by Sub-Region for Alternative 1 | | |
|---|---|---|
| **Riparian Health Standard 2 Rating** | | |
| **Sub-Region** | **Meeting Standard 2** | **Meeting Standard 2 with Problems** |
| | **Existing Routes** | |
| | **All Available  Routes[1]** | **All Available Routes[1]** |
| **A** | 2.6 | 1.7 |
| **B** | 2.7 | 0.4 |
| **D** | 1.9 | 0.1 |
| **G** | 0.03 | 0 |
| **TOTALS** | 7.23 | 2.2 |

1 Including county roads & horseback and hiking routes in the WSA

[119]

BLM_0014604

# Wetlands and Riparian Zones

**Impacts from Alternative 2**

This alternative represents a major change from existing route management in Alternative 1 that would affect the riparian zones in Sub-Regions A, B, D and G. First, compared to Alternative 1, no additional user-created and unplanned, poorly located routes would be allowed, so there would be no additional destruction and impacts to riparian vegetation or soils from the establishment and use of such routes, a major improvement in management and riparian impacts. Second, route management and improvements identified in this alternative (including hardening or rerouting of stream crossings and improving road drainage, and designing and constructing new routes considering slope, soils, vegetation, and location) would also further reduce both direct and indirect riparian impacts from sedimentation, erosion, and channel alteration. Limits on driving and parking off-road in order to retrieve game or to camp would also further reduce impacts to riparian areas as compared with Alternative 1.

Compared to Alternative 1, this alternative would result in a nearly 60% reduction in the number of miles of motorized routes, or 3.7 fewer miles, or about 8 fewer acres, within the riparian area (Table 27). A total of 1.5 miles of existing routes in the riparian RIZ would be closed, resulting in about 3.3 acres either recovering naturally or being rehabilitated. This is a total of 11.1 fewer acres of disturbed vegetation and soils in this sensitive zone. Because of the availability of moisture and resilience of the riparian plant community, BLM anticipates that closed routes would be sufficiently re-vegetated within 5 years and would recover many of their habitat and hydrologic functions. However, approximately 1.2 miles of new route construction is proposed for this alternative. Compared with Alternative 1, these road closures, in combination with the newly constructed routes would still represent a 3% reduction in total route mileage, or 0.3 fewer miles, that pass through riparian areas. In addition, non-motorized mechanized travel would be limited to using 2.7 miles of routes in riparian areas, while 8.9 miles of routes would be available for hiking and horseback travel, a decrease of 0.5 miles, compared with Alternative 1. These limitations on travel in the riparian RIZ, although not large numbers, would result in proportionately major reductions in existing impacts to riparian areas, and they would probably reduce the amount of use, and potentially result in the narrowing of the width of some of these routes, from 10 or more feet to 5 feet or less, further reducing impacts. Overall, this alternative places travel limitations on 82%, or 7.5 miles (about 16 acres) of the existing routes in riparian zones. Sub-Region B would undergo increases in riparian route mileage, compared to Alternative 1, as a result of trail construction for foot and horse travel along the upper reach of Roubideau Creek. This may increase the use levels in the riparian zone, but it would be mitigated by careful trail placement outside the sensitive riparian area. In addition it would reduce use of dispersed, informal trails which can be damaging to the riparian area. Sub-Region G would also have a small increase (0.17 miles) in routes in the riparian zone as a result of proposed non-motorized single track crossings of Spring Creek to create a larger recreational loop.

[120]

BLM_0014605

# Wetlands and Riparian Zones

| Sub-Region | Table 27 Mileage of Designated Routes in Riparian Areas by Sub-Region for Alternative 2 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Designated  Route Type | | | | | | | |
| | All Routes[1] | 4WD & 2WD Routes-Open | ATV | Motorized Single Track | Non-motorized Single Track | Horse and Foot | Closed | Admin Only |
| A | 3.7 | 1.3 | 0 | 0 | 0 | 2.4 | 0.6 | 0 |
| B | 3.7 | 0 | 0 | 0 | 0 | 3.7 | 0.4 | 0 |
| D | 1.6 | 0.1 | 0.2 | 1.0 | 0 | 0.1 | 0.5 | 0 |
| G | 0.1 | 0 | 0 | 0 | 0.1 | 0 | 0 | 0 |
| Totals | 9.1 | 1.4 | 0.2 | 1 | 0.1 | 6.2 | 1.5 | 0 |

1 Excludes closed routes

Moderate long term improvements to existing impacts occurring in riparian areas are anticipated from this alternative as compared with Alternative 1. In addition, prohibiting all cross country travel with motorized or mechanized uses would result in major reductions in potential additional impacts in riparian or wetland areas. Reductions in total route miles and in road widths in the riparian RIZ would allow the impacted vegetation to return over a five year time-frame on closed and narrowed routes. Reductions in user numbers on the limited routes would reduce the amount of weed seed transported in and soil disturbance associated with route use. This would result in modest reductions of indirect riparian impacts. Route maintenance, parking, camping, and game retrieval limitations would also result in less impacts to riparian areas as compared with Alternative 1, even considering the impacts associated with Alternative 2 campground and trailhead construction.

Implementing this alternative, compared with implementing Alternative 1, would improve ratings for Land Health Standard 2 for riparian health. Table 28 shows Land Health Assessment data for Standard 2-Healthy Riparian Systems relative to routes which pass through the riparian zone and are designated in the Travel Management Plan for this alternative. Sub-Regions A, B, and D would still have routes which pass through riparian areas which meet Standard 2 with problems. However, this alternative also proposes route closures on 0.8 miles and use limitations on 1.34 miles, leaving only 1.3 miles of designated, full sized motorized routes in problem riparian areas, and only in Sub-Region A. Where possible, these routes would be mitigated with stream crossing improvements, which would reduce potential channel and riparian impacts. These changes from Alternative 1 represent an overall reduction of nearly 40% of full size motorized routes, and a shift to limited use on 39% of total routes occurring in riparian areas with land health problems. Limiting vehicular use in the riparian zone on public lands which currently meet Standard 2 with problems would reduce both direct and indirect riparian impacts, and it is possible that some of the riparian areas would change in status from a "meeting with problems" to a "meeting" rating.

BLM_0014606

# Wetlands and Riparian Zones

| Table 28<br>Riparian Health Standard 2 Ratings: Mileage of Designated Routes in Riparian Areas by Sub-Region for Alternative 2 | | | | | | |
|---|---|---|---|---|---|---|
| **Sub-Region** | **Riparian Health Standard 2 Rating** | | | | | |
| | **Meeting** | | | **Meeting with Problems** | | |
| | **Designated Route Types** | | | **Designated Route Types** | | |
| | **All 4WD & 2WD Motorized Routes-Open[1]** | **Limited Use[2]** | **Closed** | **All 4WD & 2WD-Open Motorized Routes-Open[1]** | **Limited Use[2]** | **Closed** |
| **A** | 0 | 2.2 | 0.3 | 1.3 | 0.2 | 0.3 |
| **B** | 0 | 2.7 | 0 | 0 | 1.1 | 0.4 |
| **D** | 0.3 | 1.2 | 0.4 | 0 | 0.04 | 0.1 |
| **G** | 0 | 0.1 | 0 | 0 | 0 | 0 |
| **Totals** | 0.3 | 6.2 | 0.7 | 1.3 | 1.34 | 0.8 |

1 Includes county roads
2 Includes ATV, Motorized Single Track,, Non-motorized Single Track,, Horse and Foot, and Admin designations

**Impacts from Alternative 3**

Many of the riparian habitat impacts from implementing this alternative would be similar or result in slightly more improvements to riparian areas, compared with those under Alternative 2 (see Table 29 for details).

Compared to all alternatives, the Travel Management Plan in this alternative would result in the fewest miles of designated routes of all types in riparian areas.  Compared to Alternative 1, reductions in negative impacts to riparian habitat would be major and much less due to the elimination of all cross country travel and implementing this travel plan.  In all Sub-Regions with public lands that meet Land Health Standard 2, there would be 1.2 fewer miles of routes of all types and 2.6 fewer acres of disturbance in the RIZ.  In all Sub-Regions with lands that meet Land Health Standard 2 with Problems, there would be 1.7 fewer miles (3.7 fewer acres disturbed) of routes of all types in the RIZ.  Limiting all travel to designated routes on public lands, proposed route maintenance, parking, camping and game retrieval limitations and designing and constructing new routes considering slope, soils, vegetation, and location would result in less impacts to riparian areas as compared with Alternative 1, even considering the impacts associated with trailhead construction proposed in this alternative.  As in Alternative 1, no impacts from new trail construction would occur in the riparian zone.  Compared to Alternative 1, this alternative would result in a nearly 60% reduction in the number of miles of motorized routes, or 4.9 fewer miles, or 10.7 fewer acres of disturbed soil and vegetation within the riparian area.  A total of 1.6 miles of existing routes, or 3.5 fewer acres of disturbance, in the riparian zone would be closed.  These routes would then either be rehabilitated, or allowed to recover naturally, as in Alternative 2.  Approximately 1.2 miles of new route construction is proposed for this alternative.  In addition, motorized and non-motorized vehicular travel on the public lands riparian zone would be limited to using 1.3 miles of designated routes, about seven fewer miles than in Alternative 1; designated routes open to horse and foot travel would be limited to 7.1 miles of routes in riparian areas.  An additional 0.5 miles of route would be limited to administrative motorized use and public horse and foot travel use.  These limitations on travel

[122]

BLM_0014607

# Wetlands and Riparian Zones

in the riparian area would probably result in reduced impacts to riparian areas, through likely reductions in the amount of use, and potential route narrowing, as in Alternative 2.

| Table 29 Mileage of Routes in Riparian Areas by Sub-Region for Alternative 3 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Sub-Region** | **Designated Route Type** | | | | | | | |
| | **All Routes[1]** | **4WD & 2WD Routes-Open** | **ATV** | **Motorized Single Track** | **Non-motorized Single Track** | **Horse and Foot** | **Closed** | **Admin Only** |
| **A** | 3.5 | 1.1 | 0 | 0 | 0 | 2.4 | 0.8 | 0.01 |
| **B** | 3.1 | 0 | 0 | 0 | 0 | 2.7 | 0.02 | 0.4 |
| **D** | 1.3 | 0.1 | 0.1 | 0 | 0 | 0.7 | 0.7 | 0.1 |
| **G** | 0 | 0 | 0 | 0 | 0 | 0 | 0.03 | 0 |
| **Totals** | 7.9 | 1.2 | 0.1 | 0 | 0 | 5.8 | 1.6 | 0.5 |

1 Excludes closed routes

Alternative 3 should improve ratings for Land Health Standard 2 for riparian health to a similar degree as Alternative 2 (See Table 30 for specifics). This alternative proposes closing 0.5 miles of existing routes in riparian areas which currently have problems meeting Standard 2.  Only 1.1 miles of motorized routes would be available for use in  Sub-Region A (slightly less than in Alternative 2), with mitigation of constructing stream crossing improvements to reduce channel and riparian impacts.  These changes from Alternative 1 represent an overall reduction of 50% of unlimited, motorized routes that would be designated in riparian areas with land health problems. There would also be an assumed reduction in use on an additional 27% of the existing routes in riparian areas having land health problems.  These changes would reduce both direct and indirect riparian impacts, and it is possible that some of the riparian areas would change in status from a "meeting with problems" to a "meeting" rating, similar to the results from Alternative 2.

| Table 30 Riparian Health Standard 2 Rating: Mileage of Routes in Riparian Areas by Sub-Region for Alternative 3 | | | | | | |
|---|---|---|---|---|---|---|
| **Sub-Region** | **Meeting** | | | **Meeting with Problems** | | |
| | **Designated Route Types** | | | **Designated Route Types** | | |
| | **4WD & 2WD Motorized Routes - Open[1]** | **Limited Use[2]** | **Closed** | **4WD & 2WD Motorized Routes - Open[1]** | **Limited Use[2]** | **Closed** |
| **A** | 0 | 2.2 | 0.3 | 1.1 | 0.2 | 0.4 |
| **B** | 0 | 2.6 | 0 | 0 | 0.4 | 0.02 |
| **D** | 0.3 | 0.9 | 0.6 | 0 | 0 | 0.1 |
| **G** | 0 | 0 | 0.3 | 0 | 0 | 0 |
| **Totals** | 0.3 | 5.7 | 1.2 | 1.1 | 0.6 | 0.52 |

1 Includes county roads

2 Includes ATV, Motorized Single Track, Non-motorized Single Track, Horse and Foot, and Admin Only designations

BLM_0014608

# Wetlands and Riparian Zones

**Impacts from Alternative 4**

Prohibiting all cross country travel within riparian areas and the proliferation of user created routes would greatly reduce potential impacts and disturbance in this sensitive zone. Overall, other improvements to riparian areas are anticipated from implementing this alternative, as compared with implementing Alternative 1. Route maintenance, parking, camping, and game retrieval limitations would result in fewer impacts to riparian areas as compared with Alternative 1, even when the impacts associated with proposed campground and trailhead construction are included. Many of the improvements to riparian impacts from this alternative would be relatively similar to or slightly less as compared with impacts from Alternative 2. There would be 0.8 fewer miles of routes in the riparian area closed, or 1.7 acres of fewer disturbances, so less riparian vegetation recovery would be expected, as compared with Alternative 2. There would be 0.4 more miles (0.9 acres more disturbance) of designated routes available for 4WD & 2WD motorized vehicular travel in the riparian zone, which would result in slightly more effects on riparian areas than in Alternative 2, through more use on routes and wider routes. Compared to Alternative 2 there would be 0.2 more miles (0,4 acres more disturbance) of limited use, motorized routes designated in the riparian zone, which would result in slightly more impacts to riparian areas through more vehicular use on routes. There would also be an increase of 4.8 miles of non-motorized, mechanized routes (2.9 acres more disturbance – hiking, horseback, mountain bikes) in this alternative as compared to Alternative 2, also causing more short term impacts to riparian vegetation. The long term riparian impacts associated with these routes would be mitigated by constructing stream crossing improvements to reduce channel and riparian impacts, and implementing other design features.

| Table 31 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Mileage of Routes in Riparian Areas by Sub-Region for Alternative 4** | | | | | | | | |
| **Sub-Region** | **Designated  Route Types** | | | | | | | |
| | **All Routes[1]** | **4WD & 2WD Routes - Open** | **ATV** | **Motorized Single Track** | **Non-motorized Single Track** | **Horse and foot** | **Closed** | **Admin Only** |
| **A** | 3.9 | 1.4 | 0.2 | 0 | 2.2 | 0.01 | 0.4 | 0 |
| **B** | 6.9 | 0 | 0 | 0 | 2.7 | 4.2 | 0 | 0 |
| **D** | 1.8 | 0.4 | 0.9 | 0.3 | 0 | 0.1 | 0.3 | 0 |
| **G** | 0.1 | 0 | 0 | 0.1 | 0 | 0 | 0 | 0 |
| **Totals** | 12.7 | 1.8 | 1.1 | 0.4 | 4.9 | 4.3 | 0.7 | 0 |

1 Excludes closed routes

Alternative 4 should improve ratings for Land Health Standard 2 for riparian health as compared with Alternative 1. Alternative 4 will improve riparian health to a slightly lesser degree than Alternative 2. See Table 32 for specifics in riparian areas with land health problems. This alternative proposes fewer route closures or use limitations for these 4 Sub-Regions as Compared with Alternative 2, leaving 1.5 miles of designated routes (3.3 acres of disturbance) available for full-size motorized uses and 3 miles of limited use routes for ATV, motorcycle, mountain bike, horse, hiking and administrative uses in riparian areas (1.8 acres of disturbance) with land health problems [a total of 1.9 more miles (5.3 acres of disturbance) of routes than with Alternative 2]. Some of the riparian impacts associated with these routes would be mitigated by constructing

[124]

BLM_0014609

# Wetlands and Riparian Zones

stream crossing improvements to reduce channel and riparian impacts.

In addition, modestly limiting vehicular use on public land riparian areas which currently meet Standard 2 or meet Standard 2 with problems would reduce both direct and indirect riparian impacts, and it is possible that some of the riparian areas would change in status from a "meeting with problems" to a "meeting" rating over time, as compared with Alternative 1.

| Table 32 | | | | | |
|---|---|---|---|---|---|
| **Riparian Health Standard 2 Ratings: Mileage of Routes in Riparian Areas by Sub-Region for Alternative 4** | | | | | |
| | **Riparian Health Standard 2 Rating** | | | | |
| **Sub-Region** | **Meeting** | | | **Meeting with Problems** | |
| | Proposed Route Management | | | Proposed Route Management | | |
| | **4WD & 2WD Motorized Routes - Open[1]** | **Limited Use[2]** | **Closed** | **4WD & 2WD Motorized Routes- Open[1]** | **Limited Use[2]** | **Closed** |
| **A** | 0 | 2.4 | 0.2 | 1.4 | 0.1 | 0.3 |
| **B** | 0 | 4.1 | 0 | 0 | 2.9 | 0 |
| **D** | 0.5 | 1.3 | 0.2 | 0.1 | 0 | 0.1 |
| **G** | 0 | 0.1 | 0 | 0 | 0 | 0 |
| **Totals** | 0.5 | 7.8 | 0.4 | 1.5 | 3.0 | 0.4 |

1 Includes county roads
2 Includes ATV, Motorized Single Track, Non-motorized Single Track, Horse and Foot, and Admin designations

**Finding on the Public Land Health Standard for riparian systems**: Because of the prohibition of all cross country travel on public lands and implementing the travel plans in Alternatives 2, 3 and 4, major reductions in disturbances to soils and vegetation, and improvements in land health ratings for Standard 2 on 14 streams, in varying degrees, from no changes to modest changes. These alternatives are consistent with the intent of Standard 2 of managing for streams in proper functioning condition. Alternative 1 would result in no changes to modest declines in land health ratings for Standard 2, particularly on lower elevation streams. This is not consistent with the intent of Standard 2.

**Cumulative Effects**

Population growth and residential development of surrounding private lands, increasing infrastructure development and right of way approvals on BLM, would continue to occur throughout the greater region if past trends continue. This will result in increased amounts of recreational and other types of usage and disturbance on public lands, including riparian areas and wetlands in and around the Dry Creek TMP area. In addition, as large scale and regional events like climate change and weed invasions occur, the riparian and wetland areas could expect to degrade. The cumulative effects of designating routes to mitigate growing recreational and other demands will help alleviate impacts from the pressure of existing and new users. Past impacts would be remediated in many riparian/wetland areas from closures, reroutes or use restrictions on many routes. Measures such as maps, informational kiosks, regulations and

[125]

BLM_0014610

# Wetlands and Riparian Zones

enforcement will help educate the public land users about their travel-related impacts, and may lead many to adopt better travel practices in the Dry Creek area and in other areas as well, which would reduce riparian and wetland impacts.  On the other hand, increasing numbers of users on the designated routes may cause the routes to deteriorate more rapidly and require more frequent maintenance or hardening to avoid impacts to riparian/wetland areas.  If this maintenance cannot be regularly carried out, there would be fewer, but larger instances of riparian impacts from routes as compared with the current situation.  Increases in the miles of routes from additional permitted activities would be analyzed in separate Environmental Assessments; however they would be expected to incrementally degrade riparian areas where they pass through or near to them.  Route designations, closures and limitations will help mitigate weed spread and improve riparian connectivity, which will be important for riparian/wetland areas to be resilient to climate change.  Overall cumulative impacts from the proposed action are expected to result in improvements to riparian wetland areas in the planning area, and be neutral to riparian/wetland areas in other parts of the region.


## WILD AND SCENIC RIVERS

The Wild and Scenic Rivers Act (Public Law 90-542; 16 US Code 1271-1287) directs federal agencies to consider potential wild and scenic rivers in their land and water planning processes. A UFO area wide review of streams and rivers for potential inclusion in to the National Wild and Scenic Rivers System (NWSRS) is ongoing, and will be completed as part of the Resource Management Plan revision.

A wild and scenic rivers study process is composed of two main components: the eligibility phase and the suitability phase. The eligibility phase evaluates a stream's flow regime, free flowing character, and any river or stream associated resource values (Outstandingly Remarkable Values (ORVs)) that are exemplary examples or rare within a defined region of comparison. Rivers and streams found to be free flowing and having at least one ORV are then tentatively classified in to one of three categories; Recreation, Scenic, or Wild, which are based on the level of development in and adjacent to the stream segment.  The suitability phase is only applied to streams that are found to be eligible, and makes determinations on a stream's manageability to protect its free flowing character and ORVs.

At present, the UFO has a candidate list of streams in the field office area that have the potential to be determined as "eligible" in accordance with the Wild and Scenic Rivers Act after additional review and study.  Some streams in the Dry Creek Travel Plan area are included on the list of potentially eligible streams.  Streams determined to be eligible will be detailed in the final Eligibility Study Report.  Protective management, once a river segment is determined eligible and given a tentative classification, shall provide adequate protection, subject to valid and existing rights, and until the eligibility determination is superseded, to not adversely affect either eligibility or the tentative classification.

[126]

BLM_0014611

# Wild and Scenic Rivers

**Environmental Consequences:**

**Impacts Common to All Alternatives**

All stream segments within the plan area determined to be eligible in the final "Eligibility Study Report" would be managed to not adversely affect the eligibility or the tentative classification. To achieve this level of protective management may require some modification to the travel routes as proposed under each alternative.

**Impacts from Alternative 1**

Under Alternative 1, leaving the area open to off route travel and experiencing a potential increase in user created routes that receive little or no maintenance increases the risk of impacts to ORV's associated with potentially "eligible" stream segments.

**Impacts from Alternative 2**

Under Alternative 2, protection of ORVs on potentially eligible stream segments would be sustained or enhanced by eliminating all cross country motorized and mechanized modes of travel, and implemented maintenance on designated travel routes. Potentially eligible stream segments would be managed and protected by specific route designations that would not adversely affect identified ORVs.

**Impacts from Alternative 3**

The impacts to potentially eligible stream segments would be similar to those in Alternative 2, and possibly even more protective of the ORV's, due to fewer designated routes that could result in unanticipated impacts.

**Impacts from Alternative 4**

The impacts to potentially eligible stream segments would be similar to those in Alternative 2, but possibly, slightly less protective of the ORV's, due to more designated routes that could result in unanticipated impacts.

**Cumulative Effects**

There would be no short term, long term or cumulative impacts to existing ORVs or Wild and Scenic Rivers.

# WILDERNESS

Camel Back Wilderness Study Area (WSA) is located 9 miles southwest of Delta and 20 miles northwest of Montrose in Montrose County adjacent to the Uncompahgre National Forest. This WSA encompasses approximately 10,866 acres of public land. The wilderness characteristics identified for the Camel Back area consisted of naturalness such as the topography, vegetation

[127]

BLM_0014612

# Wilderness

variation, and unnoticeable imprints of man, opportunities for solitude, opportunities for primitive and unconfined recreation, and supplemental values such as unique flora, fauna, geological features and expansive vistas.  Descriptions and analysis of these areas are found in the *BLM Colorado State Office Intensive Wilderness Inventory* (November 1980), *Uncompahgre Basin Wilderness Final Environmental Impact Statement* (December 1989), and *BLM Colorado State Office Wilderness Study Report* (October 1991).

Management of WSAs is guided by BLM's *Interim Management Policy for Lands under Wilderness Review* (IMP). The IMP provides direction to BLM to maintain the wilderness values of these areas until Congress either designates these lands as wilderness or releases them for other purposes.

Areas outside of the Camel Back WSA that were identified in the Colorado Canyon Country Wilderness Proposal are located within Sub-region A.  Travel decisions will be based off of the desired future conditions (see Appendix 3) set forth for the sub-region within this travel management plan.  Starting in 2009, the Uncompahgre Field Office will be revising its Resource Management Plan and as a part of the process BLM will address wilderness characteristics at that time.

Approximately 15.6 miles of non-motorized, non-motorized mechanized (hiking and horse) trails now occur in the WSA, and six miles of this total are routes that would continue to be used for motorized administrative use by BLM or permittees only and according to existing authorizations.

## Environmental Consequences

### Impacts from Alternative 1

Under this alternative, only non-motorized/non-mechanized recreation travel is allowed within the WSA.  Existing routes would remain and be maintained at a level not to impair wilderness values.  The six mile route that accesses Winter Mesa in the WSA would remain available for motorized BLM and permittee administrative/authorized use, and non-motorized/non-mechanized public use. The grandfathered BLM and permittee administrative/authorized use is allowed and consistent with the *Uncompahgre Basin Wilderness Final Environmental Impact Statement*.  This alternative is consistent with BLM's *Interim Management Policy for Lands under Wilderness Review* and the Sub-Region B desired future conditions.  There would be no short term, long term or cumulative impacts to wilderness values.

### Impacts from Alternative 2

Same as under Alternative 1, except that approximately 17 miles of existing trail would be designated for non-motorized, non-mechanized travel. Five of the 17 miles would be new miles which would be constructed to enhance primitive recreation opportunities through providing access and protect wilderness values through defining travel routes where BLM would encourage users to travel.  During construction, BLM would use the minimum tool concept.  Also approximately three and one-half miles would be closed.  This represents a net change of 2.3 fewer miles of existing routes in the WSA that would be rehabilitated.  These changes would

[128]

# Wilderness

help enhance the naturalness and supplemental values identified as wilderness values for the area. This alternative is consistent with BLM's *Interim Management Policy for Lands under Wilderness Review* and the Sub-Region B desired future conditions. There would be no short term, long term or cumulative impacts to wilderness values.

**Impacts from Alternative 3**

Alternative 3 is essentially the same as Alternative 2 except approximately 10.5 miles of existing trail would be designated for non-motorized/non-mechanized travel, one and one-half miles of new hiking and horse trail would be constructed using the minimum tool concept, and approximately five miles of existing routes would be closed. This represents a net change of 3.6 fewer miles of existing routes in the WSA that would be rehabilitated.

**Impacts from Alternative 4**

Alternative 4 impacts would be essentially the same as those in Alternative 2 except approximately 14 miles of existing trail would be designated for non-motorized/non-mechanized travel, 11.5 miles of trail would be constructed, using the minimum tool concept, and approximately one and one-half miles would be closed. This represents a net change of 8.6 more miles of routes in the WSA, compared to Alternative 1, all of which would be hiking and horse trails constructed to meet existing guidelines for WSAs.

**Cumulative Effects**

There would be no short term, long term or cumulative impacts to wilderness values.

**SOILS** (includes findings on Standard 1)

The soils on the area are largely a product of the local geologic parent material, climatic conditions, and the soils topographic position on the landscape. The sedimentary sandstone and shale units of the Dakota and Morrison formations dominate the surface geology of the area and when weathered, produce soils having textures dominated by sandy and fine sandy loams. The deeper soils with little rock content are mostly found on the interior portions of mesa tops and terraces adjacent to drainage channels. The shallower, rocky soils are found along mesa rims and canyon side slopes. The soils in the lower and more arid portions of the area are mostly classified in the soil orders; Aridisols (soils of dry climate regimes) and Entisols (very limited soil development), and have little organic matter throughout their vertical profile. At the higher elevations, soils are commonly in the soil orders; Alfisols (high level of subsoil development) and Mollisols (soils having darkened, organic matter enriched surfaces). The soils on the area are more specifically described in the Soil Surveys for Ridgway Area, Colorado and Paonia Area, Colorado (USDA, Natural Resources Conservation Service).

The vegetation cover over most of the area is either dominated by Pinon-juniper woodland or sagebrush/grass communities. Another important soil cover component is Biological Soil Crust , an important component of arid soils that are comprised of a complex mosaic of cyanobacteria, green algae, lichens and mosses, and other bacteria (Photo 3). These soil crusts serve many,

[129]

BLM_0014614

# Soils

beneficial functions to protect and enhance soil productivity, including acting as a soil surface stabilizer to protect soils from erosive forces, and are most prevalent on the more arid portions of the area, receiving below 14 inches of annual precipitation, and on slopes less than 25%. These soil crusts occur in both the Pinon-juniper and sagebrush plant communities with the higher potential for occurrence being in the areas dominated by Wyoming big sagebrush and black sagebrush (USDI, Bureau of Land Management, 2001). Table 33 shows the existing route metrics on soils with a high potential to support soil crusts. A total of about 60,000 acres of soils in the planning area with a high potential for BSC contain 440 miles of all types of routes (about 530 miles of disturbed soils), and on average have a density of 4.7 miles of routes per square mile of public land.



Photo 3 - Biological Soil Crust near Lower Dry Creek Rim Road (T. 49 N., R 11 W., Section 24, NMPM). The roughened surface is formed by cyanobacteria filaments that act to stabilize this fine sandy soil.

| Table 33 | | | |
|---|---|---|---|
| **Route Metrics for Soils with a High Potential of Supporting Biological Soil Crusts (BSC), Existing Situation.** | | | |
| **Sub-Region** | **Area with High Potential for BSC (acres)** | **Miles of Routes on Soils with High Potential for BSC** | **Density of Routes on Soils with High Potential for BSC (miles/square mile)** |
| A | 10,124 (52%)[1] | 62 | 3.90 |
| B | 5,496 (51%) | 13 | 1.51 |
| C | 20,059 (72%) | 142 | 4.53 |
| D | 10,549 (56%) | 94 | 5.70 |
| E | 6,602 (96%) | 54 | 5.23 |
| F | 6,261 (53%) | 66 | 6.74 |
| G | 894 (10%) | 9 | 6.44 |
| **Total** | **59,985** | **440** | **4.69** |

1 Percent of total Sub-Region

Erosion of soils occurs from energy generated by blowing wind and/or moving water. The potential for wind erosion on these soils is mostly in the moderate category with a few soil units having a low potential. See Table 33. The soil erosion potential from water across the area is variable, and is dependent on the physical and chemical properties of the soil, land slope and

[130]

# Soils

topographic position, and rock fragment content in the soil matrix. Specifically for un-surfaced routes, a soil's erosion potential (slight, moderate, severe) is commonly estimated using a combination of the soil erodability potential (K Factor), degree of land slope, and volume of rock fragments greater than 75 mm in the top 30 cm of soil (USDA Forest Service). Table 34 shows the acreage of three erosion categories by management Sub-Region, and the existing route metrics by erosion category. The planning area contains about 51,900 acres and 51,300 acres of soils with a moderate or severe potential for erosion, respectively, with 372 and 199 miles of routes, respectively. These miles of routes equate to about 690 total acres of disturbance on these 103,300 acres of soil, or about 0.6% disturbed.

| | Table 34 Route Metrics for Soil Erosion Potential, Existing Situation. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sub-Region | Soil Erosion Potential | | | | | | | | |
| | Slight[2] | | | Moderate[3] | | | Severe[4] | | |
| | Total acres | Route Miles | Route Density[1] | Total acres | Route Miles | Route Density[1] | Total acres | Route Miles | Route Density[1] |
| A | 1,616 | 12 | 4.75 | 5,886 | 36 | 3.91 | 11,229 | 34 | 1.94 |
| B | 330 | 1 | 1.94 | 2,431 | 7 | 1.84 | 8,069 | 12 | 0.95 |
| C | 4,027 | 38 | 6.03 | 15,976 | 100 | 4.01 | 7,815 | 31 | 2.54 |
| D | 1,907 | 11 | 3.69 | 13,879 | 91 | 4.20 | 13,616 | 61 | 2.87 |
| E | 2,209 | 17 | 4.93 | 3,682 | 32 | 5.56 | 947 | 6 | 4.53 |
| F | 506 | 6 | 7.58 | 5,939 | 63 | 6.79 | 5,368 | 38 | 4.53 |
| G | 290 | 17 | 37.50 | 4,110 | 43 | 6.70 | 4,289 | 17 | 2.54 |
| Total | 10,885 | 102 | 6.00 | 51,903 | 372 | 4.59 | 51,333 | 199 | 2.48 |

1. Route miles per square mile of soil erosion category.
2. Little accelerated erosion likely.
3. Some accelerated erosion likely, occasional route maintenance needed.
4. Major accelerated erosion expected, frequent route maintenance needed.

The area presently supports an extensive network of routes that vary in density and topographic position. Many of the existing routes are user created (Photo 4), are poorly designed and located, and commonly not maintained to ensure adequate drainage and minimize erosion.

[131]

# Soils



Photo 4 - User created trail showing impacts to vegetation and pulverized soil, easily transported by wind and water.

**Environmental Consequences**

**Impacts Common to all Alternatives**

Soil resources rarely benefit from un-surfaced routes. Routes alter and expand drainage patterns, collect and concentrate runoff which can accelerate erosion rates above natural conditions. Route locations across the area include locations in both uplands and channel bottoms, with variable soil conditions. Routes on areas dominated by either rock outcrop or high rock content in the soil matrix are somewhat resilient to surface impacts, while the finer textured soils containing little rock in the near surface horizons are more prone to accelerated erosion when disturbed. Soil impacts from routes commonly include an increase in the soils bulk density from compaction, loss of vegetation and BSC, and destabilization of physical soil surface crusts and aggregates, all of which can accelerate soil loss from erosion. See Photo 3.

Overall, surface erosion from routes is dependent on physical soil factors, route grade and position on the landscape, traffic type and volumes, and the effectiveness of drainage maintenance. Since assessing some of these factors is beyond the scope of this document or data is lacking, all routes were considered equal when assessed against the soil metrics described below.

Recreation Guidelines developed by the BLM (USDI, Bureau of land Management 2000) which are intended to achieve and sustain healthy soil resources include managing public lands to minimize ground surface disturbance to maintain sufficient vegetation to protect soils. Of

[132]

BLM_0014617

# Soils

special importance are highly erodible and fragile soils, including soils having high densities of biological soil crusts. Based in part on these guidelines and the Public Land Health Standards, the soil metrics used to assess impacts between alternatives are the miles of routes and route density located on severe and moderate erosion potential soils, and on soils having a high potential of supporting biological soil crusts.

**Impacts Common to Alternatives 2, 3, and 4**

Major reductions in impacts now occurring on soils with a high potential for biological soil crusts and with a moderate or severe erosion potential would occur, since all motorized and non-motorized mechanized off route, cross-country travel would be prohibited, routes would be closed, most travel would be restricted to designated routes, except for horseback or foot travel, and other actions would be implemented to prevent erosion.

**Impacts from Alternative 1**

Under Alternative 1, about 700 miles of existing routes would remain available for motorized and non-motorized uses, and cross-country travel of any kind would be permitted to continue on all public lands, except for Sub-Region B, Camel Back Wilderness. These factors would result in current levels of impacts continuing, and a major increase in the rate of new routes being created, an increase of acres of disturbed soils with potential for BSC and high and severe erosion potential, and increases in removal of vegetation in the planning area. At present, the Planning area has 440 miles (4.69 miles per square mile) of routes that occur on soils with a high potential to support Biological Soil Crusts (Table 33). This equates to about 530 acres of sensitive soils that would continue to be disturbed. The route density on biological soil crust soils varies from 1.51 miles per square mile in Sub-Region B to 6.74 miles per square mile in Sub-Region F. The higher the route density on these soils, the greater the disturbance per unit area, and potentially, the higher the accelerated soil erosion and sediment yield. The same relationship occurs with route density on soils having a moderate or severe erosion potential. Currently, there are 372 and 199 miles of routes on soils having a moderate or severe potential for erosion, respectively. The acreages in these two categories of erosion potential are 51,903acres and 51,333 acres respectively. Route density on soils with a severe erosion potential varies from 0.95 miles per square mile in Sub-Region B to 4.53 miles per square mile in Sub-Regions E and F (Table 34). With the existing travel management designations and management, under this alternative the anticipated future increase in use on public lands would result in additional user-created routes in more locations and diffuse off route, cross-country use. This combined with no planned mitigation (i.e. route maintenance and seasonal and weather related closures) would result in a progressive increase in the amount and severity of soil disturbance, resulting in more soil erosion and sediment yield over time. Soil surface health would also decline, since the soils would not be able to support as much vegetation and biological soil crusts. An increase of invasive plant species would potentially occur, as they commonly establish on disturbed soils.

**Standard 1 finding:** Under this alternative, soil productivity would be expected to decline over time as a result of the existing number of miles of existing routes in locations affecting sensitive soils, and the high potential for more user created routes being created in inappropriate locations. The lack of proposed measures to keep route erosion at a minimum would also add to the decline

[133]

BLM_0014618

## Soils

of soil productivity. Consequently, ground surface disturbance would increase, decreasing the potential for healthy native vegetation communities and accelerating soil erosion. Thus, this alternative would not meet the intent of Public Land Health Standard #1.

**Impacts from Alternative 2**

Compared to Alternative 1, major reductions in impacts would occur due to the elimination of routes on sensitive soils and the prohibition of all cross-country motorized and mechanized travel in this alternative. Approximately 169 miles of existing motorized and non-motorized routes, on soils with a high potential to support biological soil crusts, would be closed under this alternative so rehabilitation could occur, which would result in about 205 fewer acres of this sensitive soil type being disturbed, or a 38% reduction in the overall route density on biological soil crust soils, (Table 35). Closing these routes would permit rehabilitation to occur on these acres. Additionally there would be a 40% and 29% reduction in the overall density of routes on soils with moderate and severe erosion potential, respectively (Table 36), or about 205 total miles. This reduction equates to about 248 fewer acres of this sensitive resource that would be impacted.

**Standard 1 finding:** Under this alternative, soil productivity and soil surface conditions would improve over time as selected, existing routes are closed and rehabilitated, no additional user created routes are established by use, and the measures in this alternative are implemented. Thus, implementation of this alternative would meet the intent of Public Land Health Standard #1.

| Table 35 Route Metrics for Soils with a High Potential for Supporting Biological Soil Crusts (BSC), Alternative 2. | | | |
|---|---|---|---|
| Sub-Region | Miles of Routes on Soils with High Potential for BSC | Density of Routes on Soils with High Potential for BSC | Change from the Existing Situation (miles/square mile) |
| A | 38 | 2.40 | -39% |
| B | 13 | 1.51 | 0% |
| C | 86 | 2.74 | -39% |
| D | 61 | 3.70 | -35% |
| E | 27 | 2.62 | -50% |
| F | 40 | 4.09 | -39% |
| G | 6 | 2.93 | -33% |
| Total | 271 | 2.89 | -38% |

| Table 36 Route Metrics for Soil Erosion Potential, Alternative 2. | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Soil Erosion Potential | | | | | | | | |
| | Slight[2] | | | Moderate[3] | | | Severe[4] | | |
| Sub-Region | Route Miles | Route Density[1] | Change from Existing Condition | Route Miles | Route Density[1] | Change from Existing Condition | Route Miles | Route Density[1] | Change from Existing Condition |
| A | 7 | 2.77 | -42% | 20 | 2.17 | -44% | 22 | 1.25 | -35% |

BLM_0014619

## Soils

| | Table 36 Route Metrics for Soil Erosion Potential, Alternative 2. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sub-Region | Soil Erosion Potential | | | | | | | | |
| | Slight[2] | | | Moderate[3] | | | Severe[4] | | |
| | Route Miles | Route Density[1] | Change from Existing Condition | Route Miles | Route Density[1] | Change from Existing Condition | Route Miles | Route Density[1] | Change from Existing Condition |
| B | 1 | 1.93 | 0% | 6 | 1.58 | -14% | 14 | 1.11 | -17% |
| C | 25 | 3.97 | -34% | 61 | 2.44 | -39% | 16 | 1.31 | -48% |
| D | 9 | 3.02 | -18% | 56 | 2.58 | -38% | 45 | 2.12 | -26% |
| E | 8 | 2.32 | -53% | 17 | 2.95 | -47% | 4 | 2.70 | -33% |
| F | 4 | 5.06 | -33% | 39 | 4.20 | -38% | 26 | 3.10 | -32% |
| G | 5 | 11.03 | -71% | 26 | 4.05 | -40% | 15 | 2.24 | -12% |
| Total | 59 | 3.47 | -42% | 225 | 2.77 | -40% | 142 | 1.77 | -29% |

1. Route miles per square mile of soil erosion category.
2. Little accelerated erosion likely.
3. Some accelerated erosion likely, occasional route maintenance needed.
4. Major accelerated erosion expected, frequent route maintenance needed.

**Impacts from Alternative 3**

Major reductions in existing and likely impacts would occur due to the elimination of routes on sensitive soils and the prohibition of all cross-country motorized and mechanized travel. With approximately 249 motorized and non-motorized routes targeted for closure under this alternative, there would be a 57% reduction in the overall route density on soils with a high potential for supporting biological soil crusts, compared to Alternative 1 (Table 37). Additionally, there would be a 56% and 52% reduction in the overall density of these routes on soils with moderate and severe erosion potential, respectively (Table 38), or about 378 fewer acres of this sensitive resource that would be disturbed. This alternative would result in the most major reduction in existing and potential impacts to these sensitive soils, compared to Alternative 1.

**Standard 1 finding:** Under this alternative, soil productivity and soil surface conditions would improve over time as selected, existing routes are closed and rehabilitated, and as measures in this alternative are implemented. Thus, implementation of this alternative would meet the intent of Public Land Health Standard #1.

| | Table 37 Route Metrics for Soils with a High Potential for Supporting Biological Soil Crusts (BSC), Alternative 3 | | |
|---|---|---|---|
| Sub-Region | Miles of Routes on Soils with High Potential for BSC | Density of Routes on Soils with High Potential for BSC | Change from the Existing Situation (miles/square mile) |
| A | 33 | 2.09 | -47% |
| B | 10 | 1.63 | -18% |
| C | 69 | 2.20 | -51% |
| D | 30 | 1.82 | -68% |

BLM_0014620

# Soils

| Table 37 | | | |
|---|---|---|---|
| **Route Metrics for Soils with a High Potential for Supporting Biological Soil Crusts (BSC), Alternative 3** | | | |
| **Sub-Region** | **Miles of Routes on Soils with High Potential for BSC** | **Density of Routes on Soils with High Potential for BSC** | **Change from the Existing Situation (miles/square mile)** |
| E | 20 | 1.94 | -63% |
| F | 25 | 2.56 | -62% |
| G | 4 | 2.86 | -56% |
| **Total** | **191** | **2.03** | **-57%** |

| Table 38 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Route Metrics for Soil Erosion Potential, Alternative 3** | | | | | | | | | |
| **Sub-Region** | **Soil Erosion Potential** | | | | | | | | |
| | **Slight[2]** | | | **Moderate[3]** | | | **Severe[4]** | | |
| | **Route Miles** | **Route Density[1]** | **Change from Existing Condition** | **Route Miles** | **Route Density[1]** | **Change from Existing Condition** | **Route Miles** | **Route Density[1]** | **Change from Existing Condition** |
| A | 7 | 2.77 | -42% | 14 | 1.52 | -6% | 21 | 1.20 | -38% |
| B | 1 | 1.94 | 0% | 5 | 1.32 | -29% | 11 | 0.87 | -8% |
| C | 21 | 3.33 | -45% | 51 | 2.04 | -49% | 11 | 0.90 | -65% |
| D | 5 | 1.68 | -55% | 35 | 1.61 | -62% | 23 | 1.08 | -62% |
| E | 4 | 1.16 | -76% | 14 | 2.43 | -56% | 3 | 2.03 | -50% |
| F | 3 | 3.79 | -50% | 28 | 3.02 | -56% | 16 | 1.91 | -58% |
| G | 2 | 4.41 | -88% | 17 | 2.65 | -60% | 11 | 1.64 | -35% |
| **Total** | **43** | **2.53** | **-58%** | **164** | **2.02** | **-56%** | **96** | **1.20** | **-52%** |

1. Route miles per square mile of soil erosion category.
2. Little accelerated erosion likely.
3. Some accelerated erosion likely, occasional route maintenance needed.
4. Major accelerated erosion expected, frequent route maintenance needed.

**Impacts from Alternative 4**

Major reductions in impacts would occur due to the elimination of routes on sensitive soils and the prohibition of all cross-country motorized and mechanized travel. Approximately 60 miles of motorized and non-motorized routes on soils with a high potential to support biological soil crusts would be targeted for closure under this alternative, which would result in a 14% reduction in the overall route density on these soils with a high potential for crusts being impacted, compared to Alternative 1 (Table 39). Additionally, there would be a 17% and a 1% reduction respectively, in the overall density of these routes on soils with moderate and severe erosion potential, respectively (Table 40), or about 73 fewer acres of this sensitive resource that would be impacted. With this alternative, the soil metrics evaluated show the Travel Management Plan in this alternative most similar to Alternative 1.

**Standard 1 finding:** Under this alternative, soil productivity and soil surface conditions would improve over time as selected, existing routes are closed and rehabilitated, no additional user created routes are established by use, and measures in this alternative are implemented. Thus, implementation of this alternative would meet the intent of Public Land Health Standard #1.

[136]

# Soils

| Table 39 Route Metrics for Soils with a High Potential for Supporting Biological Soil Crusts (BSC), Alternative 4 | | | |
|---|---|---|---|
| Sub-Region | Miles of Routes on Soils with High Potential for BSC | Density of Routes on Soils with High Potential for BSC | Change from the Existing Situation (miles/square mile) |
| A | 54 | 3.41 | -13% |
| B | 16 | 1.86 | 23% |
| C | 128 | 4.08 | -10% |
| D | 79 | 4.79 | -16% |
| E | 40 | 3.88 | -26% |
| F | 54 | 5.52 | -18% |
| G | 9 | 3.94 | 0% |
| Total | 380 | 4.05 | -14% |

| Table 40 Route Metrics for Soil Erosion Potential, Alternative 4 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sub-Region | Soil Erosion Potential | | | | | | | | |
| | Slight[2] | | | Moderate[3] | | | Severe[4] | | |
| | Route Miles | Route Density[1] | Change from Existing Condition | Route Miles | Route Density[1] | Change from Existing Condition | Route Miles | Route Density[1] | Change from Existing Condition |
| A | 9 | 3.56 | -25% | 28 | 3.04 | -22% | 29 | 1.65 | -15% |
| B | 2 | 3.88 | 100% | 7 | 1.84 | 0% | 22 | 1.74 | 84% |
| C | 33 | 5.24 | -13% | 86 | 3.45 | -14% | 30 | 2.46 | -3% |
| D | 9 | 3.02 | -18% | 76 | 3.50 | -16% | 56 | 2.63 | -8% |
| E | 14 | 4.06 | -18% | 24 | 4.17 | -25% | 5 | 3.38 | -17% |
| F | 5 | 6.32 | -17% | 52 | 5.60 | -17% | 35 | 4.17 | -8% |
| G | 7 | 15.44 | -58% | 34 | 5.29 | -21% | 17 | 2.54 | 0% |
| Total | 79 | 4.64 | -23% | 307 | 3.79 | -17% | 204 | 2.54 | 1% |

1. Route miles per square mile of soil erosion category.
2. Little accelerated erosion likely.
3. Some erosion likely, occasional route maintenance needed.
4. Major erosion expected, frequent route maintenance needed.

**Cumulative Effects**

The lands surrounding the Dry Creek travel planning area are rapidly changing. In looking at the entire area, there are many factors affecting the soils. Much of the surrounding private land in this area is being subdivided and becoming increasingly developed with new routes and home sites, adding to the soil surface impacts in the watersheds.

Along with the impacts caused by the development of new routes and home sites, there are impacts associated with grazing that continue to influence the soils of the Dry Creek travel planning area. The Dry Creek TMP is an important piece of the watershed and soils management

[137]

BLM_0014622

# Soils

equation. It will determine the kinds and amounts of travel uses that will be allowed on the public lands within the affected watersheds. As the development of private lands for residential homes and the demand for recreational uses on public lands continue to increase, the decisions made in the Dry Creek TMP will play an important role in determining the overall health of these watersheds.

**VEGETATION** (includes a finding on Standard 3)

Upland vegetation is varied, and includes at least 20 distinct vegetation classes. A detailed description of these vegetation classes can be found in the Roubideau Land Health Assessment (Uncompahgre Field Office 2004-2005). The following table presents the acreage of each upland vegetation type on BLM lands along with the acreage occupied by existing routes.

| Table 41 Existing vegetation classes in PA and areas affected by routes | | |
|---|---|---|
| Vegetation Class Name | Acreage in Plan Area | Acreage Occupied by Existing Routes[1] |
| Agriculture | 251 | 6 |
| Barren Land | 857 | 8 |
| Douglas Fir | 21 | 0 |
| Douglas Fir/Aspen Mix | 6 | 0 |
| Gambel Oak | 73 | 0.2 |
| Grass Dominated | 5,343 | 112 |
| Grass/Forb Rangeland | 11,334 | 132 |
| Greasewood | 235 | 3 |
| Mesic Mountain Shrub Mix | 786 | 7 |
| Ponderosa/Oak Mix | 105 | 1 |
| Pinyon-Juniper/Mountain Shrub Mix | 6,073 | 77 |
| Pinyon-Juniper/Oak Mix | 1,784 | 25 |
| Pinyon-Juniper/Sagebrush Mix | 15,774 | 245 |
| Pinyon-Juniper Woodland | 17,003 | 126 |
| Ponderosa Pine | 10 | 0.3 |
| Ponderosa Pine-Aspen Mix | 1 | 0 |
| Sagebrush Community | 10,814 | 192 |
| Sagebrush-Gambel Oak Mix | 302 | 5 |
| Sagebrush/Grass Mix | 20,688 | 449 |
| Sagebrush-Mesic Mountain Shrub Mix | 466 | 6 |
| Salt Desert Shrub Community | 2,921 | 62 |
| Saltbush Community | 8,048 | 139 |
| Shrub/Grass/Forb Mix | 301 | 6 |
| Snakeweed | 970 | 16 |
| Sparse Pinyon-Juniper/Shrub/Rock Mix | 3,805 | 43 |
| Totals | 107,971 | 1,661 |

1    Assumes average width of 6 meters for each route

[138]

BLM_0014623

# Vegetation

The current state of vegetation health has been determined by the Roubideau Land Health Assessment (2004-2005). Vegetation across the area was subdivided according to soil types and grazing allotment boundaries, and then rated as meeting, meeting with problems, or not meeting Standard 3 for healthy plant and animal communities. The ratings for Standard 3 are shown in Table 42 by total acreage, then by acreage occupied by the existing routes.

| Table 42 Standard 3 ratings for healthy plant communities | | |
|---|---|---|
| Std 3 Rating for Healthy Plant Communities | Total Acreage in Plan Area | Acreage occupied by Existing Routes[1] |
| Meeting | 19,278 | 192 |
| Meeting with Problems | 67,884 | 1,036 |
| Not Meeting | 19,442 | 382 |
| Unknown or Not Upland | 3,360 | 71 |

1   Assumes average width of 6 meters for each route

Vegetation problems identified in the Land Health Assessment includes low levels of perennial grasses, low perennial forb cover, poor shrub vigor and heavy hedging on shrubs, exotic plants, noxious weeds, and low vegetation diversity. These problems typically occur in some areas and not others. The most widespread factors contributing to these conditions are historic livestock grazing, routes, vegetation serial stage, past vegetation treatments, historic deer use, motorized use, drought, nearby private lands with the associated disturbance and weeds from these, and heavy wildlife use. Less frequent causes of problems include recreation impacts, poor management of rights-of-ways, current livestock grazing, woodcutting, heavy browse use, and pond development.

The Colorado Natural Heritage Program (Lyon, et.al.1999) has identified five potential conservation areas identified by the Colorado Natural Heritage Program CA (PCA) sites that contain high quality plant communities or assemblages of rare plants that they feel warrant protection and management (Table 43). The values in the four sites are primarily plant communities although some also protect sensitive plant habitat.

| Table 43 Colorado Natural Heritage Program Potential Conservation Areas in the Dry Creek Planning Area | | | |
|---|---|---|---|
| PCA Name | Resource Values | Biodiversity Rank[1] | Management Urgency Rank[2] |
| Dry Creek | Saline bottomland shrublands, and Narrowleaf Cottonwood/Skunkbrush riparian forests | B3 | M3 |
| Rim Road | Xeric pinyon/juniper woodland, Sage sparrow, Black-throated sparrow, Northern harrier, White-tailed antelope ground squirrel | B3 | M3 |
| Roubideau Creek | Narrowleaf cottonwood riparian forest, | B2 | M2 |

[139]

BLM_0014624

# Vegetation

| Table 43 Colorado Natural Heritage Program Potential Conservation Areas in the Dry Creek Planning Area | | | |
|---|---|---|---|
| PCA Name | Resource Values | Biodiversity Rank [1] | Management Urgency Rank [2] |
| | Grand Junction milkvetch, Good neighbor bladderpod, Foothills riparian shrubland, Narrowleaf cottonwood/skunkbrush riparian forest, Montane riparian forest, Lower montane riparian forest, Xeric pinyon-juniper woodland, Coyote willow/mesic graminoid, Northern leopard frog | | |
| Temple Park | Good neighbor bladderpod | B4 | M3 |

[1] Biodiversity Rank:  B1= Outstanding significance such as the only known site for a globally species.  B2= Very high significance, such as one of the best examples of a community type, or good occurrence of a globally imperiled species or a species with very restricted range.  B3= High significance, such as an excellent example of any community type or a good occurrence of any species with very restricted range or a good occurrence of a state rare species.

[2] Management Urgency Rank:  M1=Management action required at once to prevent the loss or irreversible degradation of one or more of the species or communities for which the PCA was identified.   M2= Management action required within 5 years to prevent the loss of one of the items for which the PCA was identified.   M3= Management action needed within 5 years to maintain the current quality of identified resources.   M4= Management actions may be needed in the future to maintain the quality of the identified resources.   M5= No serious management needs identified.

The following table shows the acreage of each PCA, and the estimated acreage overlain by existing routes (assuming routes average 6 meters in width.)

| Table 44 Potential Conservation Areas and area affected by routes | | | |
|---|---|---|---|
| PCA Name | Sub-Region | Total Acreage | Acreage Occupied by Existing Routes [1] |
| Dry Creek | D | 1,760 | 33 |
| Rim Road | E | 6,829 | 152 |
| Roubideau Creek | A, B | 9,231 | 66 |
| Temple Park | F | 351 | 14 |
| Totals | | 18,210 | 265 |

1 Assumes average width of 6 meters for each route

## Environmental Consequences

Routes generally degrade native vegetation.  This has been well documented by numerous researchers in many locations (Forman and Alexander, 1998, Walker and Everett, 1987, Jones et al 2008, Trombulak and Frissell 2008).  On Public Lands, vegetation degradation ranges from complete destruction on the route surface to impacts of the adjacent plant community.  This impact includes erosion and sedimentation associated with routes, introduction of weeds, production and deposition of dust, increased grazing levels from enhanced livestock and grazing animal access, and destruction or impacts from increased human presence, such as woodcutting,

[140]

BLM_0014625

# Vegetation

human-caused fires, dumping, and other activities. These off-route impacts often extend up to many feet on either side of a route in an effect researchers have termed "the road influence zone" (RIZ). In general, an area with more routes (expressed as higher route density) would have more degraded vegetation than an area with lower route density, if all other factors are equal. A route density of one route mile per square mile of land area is estimated to directly or indirectly impact approximately 1% of the vegetation within that square mile.

The amount of degradation can vary depending on different route characteristics. These characteristics include the route width, the type and level of use the route receives, the type of vegetation the route passes through, and the substrate the route passes over. The impacts of these characteristics are described as follows:

| | |
|---|---|
| Route Width: | Wider routes remove and destroy more vegetation than narrower routes. |
| Use Level: | Heavily used routes introduce more weeds, generate more dust and erosion, and require more road maintenance, creating more off-route impacts to vegetation than less heavily travelled routes. |
| Use Type: | BLM assumes for this analysis that routes with limited uses generally have fewer off-route impacts to vegetation than routes which have less limitations because of lower use levels as a result of excluding some uses (there are some exceptions to this). |
| Vegetation Type: | Tall, impenetrable, or sprouting vegetation is more likely to resist route widening and reduce the width of the RIZ for sediment transport, dust spread, and off-route grazing or human disturbance. Low, non-sprouting, semidesert vegetation generally does not present as much of a barrier, and as a result has a wider RIZ for these types of degradation. |
| Substrate: | Routes which pass over soft substrates and mud generally cause more impacts to vegetation than those which pass over rocks or sandy soils. |

Limitations of use on routes, such as seasonal restrictions or vehicle types, either can help to modify and reduce the impacts of route density. Use limitations include seasonal closures and restrictions on the types of use that can occur on a route. Recreation Guidelines developed by the BLM (USDI, Bureau of land Management 2000) which are intended to minimize natural resource impacts include the following: Protect plant and animal communities by limiting recreational use by type, season, intensity, distribution, or duration; and protect against the establishment or spread of noxious weeds.

The density of routes passing through the various planning Sub-Regions is used as the primary measure to assess impact on upland vegetation. This is in turn evaluated by use type (which encompasses route widths), route density in PCAs, and Land Health Standard 3 ratings for healthy native plant communities. See Table 45 for route impacts to vegetation in PCAs. The

[141]

BLM_0014626

# Vegetation

impacts will be discussed in more detail under evaluation of the different alternatives.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Table 45** **Potential Conservation Areas and Route Densities by Alternative** **(miles of route per square mile of public land)** | | | | | | | | |
| | Alternative 1 | | Alternative 2 | | Alternative 3 | | Alternative 4 | |
| PCA Name | Existing 4WD & 2WD Routes-Open[2] | Existing Routes With Uses Limited[1] | Designated 4WD & 2WD Routes-Open | Designated Routes With Uses Limited[3] | Designated 4WD & 2WD Routes-Open | Designated Routes With Uses Limited[3] | Designated 4WD & 2WD Routes-Open | Density of Designated Routes With Uses Limited[3] |
| Dry Creek | 5.2 | 0 | 0.9 | 3.1 | 0.5 | 1.7 | 2.2 | 3.2 |
| East Fork Spring Creek | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rim Road | 5.6 | 0 | 2.3 | 0.8 | 1.2 | 1.2 | 3.7 | 0.8 |
| Roubideau Creek[1] | 0.8[1] | 0.7[1] | 0.3[1] | 1.1[1] | 0.2[1] | 1.0[1] | 0.4[1] | 1.6[1] |
| Temple Park | 10.2 | 0 | 5.5 | 2.4 | 2.9 | 2.5 | 7.5 | 1.9 |

1   All routes in Roubideau Creek PCA – limited to hiking and horseback uses only
2   Existing routes are available for all types of vehicular use except in Roubideau Creek PCA
3   Includes ATV, Motorized Single Track, Non-motorized Single Track, Horse and Foot, and Admin Only designations

**Impacts from Alternative 1**

This alternative continues current travel management, which has contributed to the upland vegetation conditions in place today.  Currently, an estimated 1,661 acres of existing vegetation, or 1.5% of the acreage is directly impacted by routes.  An additional 3% of the vegetation can be considered to be in the RIZ and affected by sedimentation, erosion, dust deposition, increased grazing and human disturbances, and subject to or already invaded by nonnative weedy plants. Table 46 shows the route density in each Sub-Region.  Because all existing routes are currently available for all vehicles and users, BLM cannot calculate density differences by use type, use level, or route width.  Under this alternative, many of these existing routes could be user-developed to accommodate full size vehicles and the array of transportation modes, with the exception of Sub-Region B in the Camel Back WSA, which is closed to motorized and mechanized vehicles. In addition, new routes could be informally developed.

| | | | |
|---|---|---|---|
| **Table 46** **Density of Existing Routes by Sub-Region for Alternative 1** **(miles of route per square mile of public land)** | | | |
| Sub-Region | Route Type | | |
| | All ExistingRoutes[1] | Horse and Foot | Closed |
| A | 3.2 | NA | 0 |
| B[2] | 1.2 | 1.2 | 0 |
| C | 4.1 | NA | 0 |
| D | 4.1 | NA | 0.01 |
| E | 5.6 | NA | 0.1 |
| F | 6.4 | NA | 0.04 |

BLM_0014627

# Vegetation

| Table 46 Density of Existing Routes by Sub-Region for Alternative 1 (miles of route per square mile of public land) | | | |
|---|---|---|---|
| Sub-Region | Route Type | | |
| | All ExistingRoutes[1] | Horse and Foot | Closed |
| G | 5.0 | NA | 0 |
| All Sub- Regions | 3.9 | 1.2 | 0.15 |

1 Excludes closed routes; includes county roads
2 Sub-Region B (Camel Back WSA) – closed to motorized and mechanized vehicle use except for administrative uses

If existing trends in community population growth, recreational use and increasing numbers of public land visitors continue, it is likely that there would be additional vegetation destroyed, impacted, or reduced in quality under this alternative.  This impact would occur as a result from additional user-created routes, off-route driving and parking for camping, game retrieval, or many other purposes, and the deteriorating condition of existing routes as use levels increase. Impacts would be more weed infestations and dominance of those weeds in the community, depressed vigor of vegetation adjacent to the route, and more impacts to route-side vegetation. Anticipated impacts would be widespread, moderate and long term.  These impacts would occur in all of the Sub-Regions.

Under this alternative, route densities for 3 of the 5 PCAs—Temple Park, Rim Road, and Dry Creek—are already affecting between 5 and 10% of the PCA area.  This current level of impact is not consistent with PCA objectives of protecting these plant communities.  Long term, widespread direct and indirect impacts to vegetation in these areas would be anticipated and increase over time with new user-created routes, off road driving, and increased use levels, and overall quality of vegetation in these PCAs (with the exception of East Fork of Spring Creek) would deteriorate.

Table 47 shows Land Health Assessment data for Standard 3-Healthy Plant Communities relative to existing route density.  In this alternative, the majority of these existing routes are available for use with all vehicle types except for Sub-Region B, Camel Back WSA.  For all Sub-Regions except Sub-Region B, routes affect from 4.4 to 6.4% of the vegetation in polygons which presently do not meet Land Health Standard 3.  Route densities are of similar magnitude in areas which meet Standard 3 with problems.  These levels of vegetation destruction and impacts from indirect route impacts would not be consistent with improving vegetation conditions and Standard 3 ratings, particularly since many of the problems relate to exotic species.

| Table 47 Plant Community Health Standard 3 Ratings Density of Existing Routes (miles of route per square mile of public land) in areas meeting, meeting with problems, and not meeting Standard 3 for Alternative 1 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Plant Community Health Standard 3 Rating | | | | | | | | |
| | Meeting | | | Meeting with Problems | | | Not Meeting | | |
| | Existing Route Types | | | Existing Route Types | | | Existing Route Types | | |
| Sub-Region | Open[1] | Limited Use[2] | Closed | Open[1] | Limited Use[2] | Closed | Open[1] | Limited Use[2] | Closed |

[143]

BLM_0014628

# Vegetation

| | Plant Community Health Standard 3 Rating | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Table 47**<br>**Plant Community Health Standard 3 Ratings**<br>**Density of Existing Routes (miles of route per square mile of public land) in areas**<br>**meeting, meeting with problems, and not meeting Standard 3 for Alternative 1** | | | | | | | | | |
| | Meeting | | | Meeting with Problems | | | Not Meeting | | |
| | Existing Route Types | | | Existing Route Types | | | Existing Route Types | | |
| Sub-Region | Open[1] | Limited Use[2] | Closed | Open[1] | Limited Use[2] | Closed | Open[1] | Limited Use[2] | Closed |
| A | 1.6 | 0.07 | 0 | 2.6 | 0.1 | 0 | 4.8 | 0 | 0 |
| B[3] | 0.1[3] | 1.2[3] | 0 | 0.04[3] | 1.0[3] | 0 | 0 | 1.5[3] | 0 |
| C | 3.7 | 0.01 | 0 | 4.0 | 0 | 0 | 6.4 | 0 | 0 |
| D | 2.4 | 0 | 0 | 4.5 | 0 | 0.01 | 4.4 | 0 | 0.04 |
| E | 7.9 | 0 | 0 | 5.4 | 0 | 0.2 | 5.8 | 0 | 0.1 |
| F | 4.9 | 0 | 0 | 6.6 | 0 | 0.1 | 6.2 | 0 | 0.1 |
| G | 2.1 | 0 | 0 | 5.9 | 0 | 0 | 6.3 | 0 | 0 |

1 2WD & 4WD routes and those which were not evaluated. Includes county roads
2 All other routes, incl. for ATV, Motorized Single Track, Non-motorized Single Track, Horse and Foot, and Admin uses or designations.
3 Sub-Region B (Camel Back WSA) - closed to motorized and mechanized vehicular use, except for administrative uses

**Impacts from Alternative 2**

This alternative represents a change from existing route management that would affect vegetation in each of the Sub-Regions.  First, no additional unplanned or user-created routes would be allowed, so there would be no additional destruction and impacts to vegetation from such routes.  Second, route maintenance and measures identified in this alternative would reduce sediment and erosion that degrades vegetation in the RIZ.  Third, limits on driving and parking off-road in order to retrieve game or to camp, and restricting all motorized and non-motorized travel to designated routes would also reduce impacts to vegetation as compared with Alternative 1.  This alternative meets the public demand for these uses by development of hardened staging, trailhead, and camping areas which would impact vegetation.  However, the impacts from new recreation facility construction would be mitigated by selecting sites already impacted by informal uses wherever possible, and by using best management construction techniques.

Alternative 2 represents a reduction in overall route density of 33% as compared with Alternative 1 (Table 48).  Comparatively, when route use limitations are included, the density of existing routes available for use only with 4WD and 2WD vehicles declines by 66%.  Closed routes in this alternative would either be actively rehabilitated or allowed to recover naturally.  Because of the varying availability of moisture and resilience of the plant communities across the area, BLM anticipates that it would take closed routes from 3 to 10 years to be sufficiently re-vegetated to recover many of their habitat and ecologic functions.  Route closures that would reduce route density to a sizable extent are proposed in Sub-Regions A, C, D, E, F, and G in this alternative, as compared with Alternative 1.  Alternative 2 also proposes route designations and limitations for many of the existing routes that would affect user numbers and in many cases reduce route widths.  Reduced route width would allow some vegetation to recover along the edges of the route over an anticipated 5-10 year time frame (longer than on closed routes because of adjacent ongoing disturbance).  Reduced route use would result in less sediment deposition, erosion, maintenance impacts, human-related vegetation destruction, and instances of weed introduction

[144]

# Vegetation

and spread.  Alternative 2 proposes use limitations that would affect a substantial number of the routes in Sub-Regions A, D, E, F, and G as compared with Alternative 1.  This further reduces the vegetation impacts of route density associated with the total route network as compared with Alternative 1.

| Sub-Region | Route Type | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | All Routes[1] | 2WD & 4WD Routes- Open | Technical 4WD | ATV | Motorized Single Track | Non-motorized Single Track | Horse and Foot | Admin Only | Closed |
| A | 1.9 | 1.0 | 0 | 0.1 | 0 | 0 | 0.6 | 0.1 | 1.25 |
| B[2] | 1.3 | 0.1 | 0 | 0 | 0 | 0 | 1.3 | 0 | 0.2 |
| C | 2.4 | 2.1 | 0 | 0.1 | 0 | 0 | 0.07 | 0.2 | 1.6 |
| D | 2.8 | 1.0 | 0.2 | 0.2 | 0.8 | 0.1 | 0.01 | 0.2 | 1.3 |
| E | 3.1 | 1.9 | 0.1 | 0 | 0.1 | 0 | 0 | 0.6 | 2.6 |
| F | 4.3 | 1.7 | 0.1 | 0.3 | 0.01 | 1.0 | 0.04 | 0.8 | 2.5 |
| G | 3.5 | 1.4 | 0 | 0.9 | 0.5 | 0.5 | 0.2 | 0 | 1.6 |
| All Sub-Regions | 2.6 | 1.3 | 0.05 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.4 |

**Table 48**
**Density of Designated Routes by Planning Area Sub-Region for Alternative 2**
**(miles of route per square mile of public land)**

1 Excludes closed routes
2 Sub-Region B (Camel Back WSA)  closed to motorized and mechanical vehicular travel, except for administrative use

Under this alternative, total route densities for 4 of the 5 PCAs—Temple Park, Rim Road, Roubideau Creek and Dry Creek—would be reduced from 7 to 45% as compared with Alternative 1.  There would be further reductions in vegetation impact from route use limitations and in some cases route narrowing of 14-60% for these PCAs.  In this alternative, there would be some route construction in the Roubideau Creek PCA, but impacts to the important vegetation in this PCA would be mitigated by using best management practices and avoiding the plant communities of concern.  These changes from Alternative 1 represent a substantial overall reduction of route-related destruction and impacts of vegetation in all of the PCAs except for East Fork of Spring Creek, which would be the same as Alternative 1.  These reductions are consistent with PCA objectives of protecting these plant communities.

Table 49 shows Land Health Assessment data for Standard 3-Healthy Plant Communities relative to existing route density. This alternative represents a change from Alternative 1 with the majority of the routes either closed or limited in use in areas not meeting Standard 3.  The same change generally applies to routes in areas currently meeting Standard 3 with problems.  With the exception of Sub-Region B, route closures would allow from 1.4 to 3.6% of the area to recover from route impacts in polygons currently not meeting Standard 3, and route limitations would reduce the level of impact on another 0.4-2.7% of the area.  Changes would be of a similar magnitude in areas which meet Standard 3 with problems.  In addition, impacts associated with off road driving would be reduced.  The reduced impacts, destruction and disturbance of vegetation in this alternative is consistent with and would support other actions being taken to improve vegetation conditions and Standard 3 ratings, particularly since many of the problems relate to exotic species.

[145]

BLM_0014630

# Vegetation

| Table 49 Plant Community Health Standard 2 Ratings: Density of Designated Routes (miles of route per square mile of public land) in areas meeting, meeting with problems, and not meeting Standard 3 for Alternative 2 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Plant Community Health Standard 3 Rating | | | | | | | | |
| | Meeting | | | Meeting with Problems | | | Not Meeting | | |
| | Designated Route Types | | | Designated Route Types | | | Designated Route Types | | |
| Sub-Region | 2WD & 4WD Routes - Open[1] | Limited Use[2] | Closed | 2WD & 4WD Routes- Open[1] | Limited Use[2] | Closed | 2WD & 4WD Routes - Open[1] | Limited Use[2] | Closed |
| A | 0.2 | 0.7 | 0.8 | 1.2 | 0.7 | 0.8 | 1.7 | 0.4 | 2.7 |
| B | 0.1 | 1.5 | 0.5 | 0.04 | 0.9 | 0.1 | 0 | 3.0 | 0 |
| C | 2.1 | 0.2 | 1.5 | 2.0 | 0.4 | 1.5 | 2.2 | 0.7 | 3.6 |
| D | 0.3 | 1.1 | 1.0 | 1.5 | 1.7 | 1.4 | 2.1 | 1.1 | 1.4 |
| E | 3.6 | 4.1 | 0.2 | 2.3 | 0.5 | 2.8 | 2.2 | 1.2 | 2.5 |
| F | 1.6 | 1.7 | 2.0 | 3.1 | 1.8 | 2.1 | 1.2 | 2.7 | 2.7 |
| G | 0.5 | 1.3 | 0.3 | 1.8 | 2.3 | 2.0 | 1.5 | 2.3 | 2.6 |

1 Includes county roads
2 Includes ATV, Motorized Single Track, Non-motorized Single Track, Horse and Foot, and Admin designations
3 Sub-Region B (Camel Back WSA) - closed to motorized and mechanized vehicular use, except for administrative uses

## Impacts from Alternative 3

This alternative represents a change from existing route management that would affect vegetation in each of the Sub-Regions. Similar impacts as with Alternative 2 are anticipated from the prevention of additional user-created routes, from the proposed route maintenance and mitigation, and from the limits on driving and parking off-road in order to retrieve game or to camp. This alternative also addresses the public demand for these uses by development of a few hardened staging, trailhead, and camping areas which would impact vegetation, but to a lesser extent than Alternative 2. Although these impacts are to be mitigated by selecting sites already impacted by informal uses wherever possible, and by using best management construction techniques, overall vegetation disturbance and impacts from these activities should be somewhat less than under Alternative 2.

Alternative 3 represents a reduction in overall route density of 70% as compared with Alternative 1 (Table 50). When designated route limitations are included, the density of existing 2WD and 4WD only route designation declines by 82%. For the planning area as a whole and for each of the Sub-Regions individually, Alternative 3 proposes more reductions in route density and use restrictions for the remaining routes than Alternative 2.

| Table 50 Density of Designated Routes by Planning Area Sub-Region for Alternative 3 (miles of route per square mile of public land) | |
|---|---|
| Sub- | Route Type |

[146]

BLM_0014631

# Vegetation

| Region | All Routes[1] | 2WD & 4WD Routes - Open | Technical 4WD | ATV | Motorized Single Track | Non-motorized Single Track | Horse and Foot | Admin Only | Closed |
|--------|--------------|------------------------|---------------|-----|------------------------|---------------------------|----------------|-----------|--------|
| A | 1.7 | 0.5 | 0 | 0 | 0 | 0.2 | 0.8 | 0.1 | 1.5 |
| B | 1.0 | 0.1 | 0 | 0 | 0 | 0 | 1.0 | 0.02 | 0.3 |
| C | 2.0 | 1.0 | 0 | 0.3 | 0 | 0.4 | 0.1 | 0.2 | 2.1 |
| D | 1.8 | 0.6 | 0.1 | 0.01 | 0.3 | 0.01 | 0.1 | 0.4 | 2.3 |
| E | 2.4 | 0.7 | 0 | 0 | 0 | 0.1 | 0 | 1.2 | 3.3 |
| F | 3.0 | 0.9 | 0.01 | 0 | 0 | 0.4 | 0 | 1.2 | 3.4 |
| G | 2.3 | 1.3 | 0 | 0 | 0 | 0.9 | 0 | 0.1 | 2.7 |
| All Sub-Regions | 1.2 | 0.7 | 0.02 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 2.1 |

1 Excludes closed routes

Under this alternative, total route densities for 4 of the 5 PCAs—Temple Park, Rim Road, Roubideau Creek and Dry Creek—would be reduced from 20 to 80% as compared with Alternative 1. There would be further reductions in vegetation impact from route use limitations and in some cases route narrowing of 21-33% for these PCAs. These changes are somewhat larger in magnitude than under Alternative 2, and would allow for somewhat more vegetation recovery. In this alternative, no additional trail construction would occur in the Roubideau Creek PCA, so vegetation impacts to important plant communities would be somewhat less than under Alternative 2. As with Alternative 2, these changes represent a substantial overall reduction from Alternative 1 regarding route-related destruction and impacts of vegetation in all of the PCAs except for East Fork of Spring Creek. These reductions are consistent with PCA objectives of protecting these plant communities.

Table 51 shows Land Health Assessment data for Standard 3-Healthy Plant Communities relative to existing route density. This alternative represents a change from Alternative 1 with the majority of the routes either closed or limited in use in areas not meeting Standard 3. The same generally applies to routes in areas currently meeting Standard 3 with problems. With the exception of Sub-Region B, route closures would allow from 2.4 to 5% of the area to recover from route impacts in PA locations currently not meeting Standard 3, and route limitations would reduce the level of impact on another 0.5-1.9%. Changes would be of a similar magnitude in areas which meet Standard 3 with problems. These changes would increase the level of vegetation that is allowed to recover as compared with Alternative 2. Similar to Alternative 2, impacts associated with off road driving would be reduced. The reduced impacts, destruction and disturbance of vegetation in this alternative is consistent with and would support other actions being taken to improve vegetation conditions and Standard 3 ratings, particularly since many of the problems relate to exotic species.

[147]

BLM_0014632

# Vegetation

| Table 51 Plant Community Health Standard 2 Ratings: Density of Designated Routes (miles of route per square mile of public land) in areas meeting, meeting with problems, and not meeting Standard 3 for Alternative 3 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Plant Community Health Standard 3 Rating | | | | | | | | |
| | Meeting | | | Meeting with Problems | | | Not Meeting | | |
| | Designated Route Types | | | Designated Route Types | | | Designated Route Types | | |
| Sub-Region | 2WD & 4WD Routes -Open[1] | Limited Use[2] | Closed | 2WD & 4WD Routes-Open[1] | Limited Use[2] | Closed | 2WD & 4WD Routes -Open[1] | Limited Use[2] | Closed |
| A | 0.2 | 0.7 | 0.8 | 0.6 | 1.1 | 1.0 | 0.7 | 0.7 | 3.5 |
| B[3] | 0.1 | 0.7 | 0.8 | 0.04 | 0.8 | 0.2 | 0 | 3.1 | 0 |
| C | 1.0 | 0.7 | 2.1 | 1.0 | 1.1 | 1.9 | 0.9 | 0.5 | 5.0 |
| D | 0.2 | 0.6 | 1.6 | 1.0 | 0.9 | 2.6 | 1.4 | 0.6 | 2.4 |
| E | 2.8 | 4.8 | 0.3 | 0.9 | 1.0 | 3.7 | 1.4 | 1.5 | 3.0 |
| F | 1.6 | 0.8 | 2.4 | 1.8 | 1.6 | 3.3 | 0.8 | 1.9 | 3.5 |
| G | 0.4 | 0.7 | 1.0 | 1.7 | 1.1 | 3.1 | 0.4 | 1.0 | 5.0 |

1 Includes county roads
2 Includes ATV, Motorized Single Track, Non-motorized Single Track, Horse and Foot, and Admin designations
3 Sub-Region B (Camel Back WSA) - closed to motorized and mechanized vehicular use, except for administrative uses

**Impacts from Alternative 4**

This alternative represents a change from existing route management that would affect vegetation in each of the Sub-Regions. Similar impacts as with Alternative 2 are anticipated from the prevention of additional user-created routes, from the proposed route maintenance and mitigation, and from the limits on driving and parking off-road in order to retrieve game or to camp. This alternative also addresses the public demand for these uses by development of hardened staging, trailhead, and camping areas which would impact vegetation to a similar extent as Alternative 2.

Alternative 4 represents a reduction in overall route density of 13% as compared with Alternative 1 (Table 52). When route use limitations are included, the density of 'open" route designation declines by 38%. For the Dry Creek Area as a whole, and for each of the Sub-Regions individually, Alternative 4 proposes fewer reductions in route density and use restrictions for the remaining routes than Alternative 2 proposes.

| Table 52 Density of Designated Routes by Planning Area Sub-Region for Alternative 4 (miles of route per square mile of public land) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sub-Region | Route Type | | | | | | | | |
| | All Routes* | 2WD & 4WD Routes | Technical 4WD | ATV | Motorized Single Track | Non-motorized Single Track | Horse and Foot | Admin Only | Closed |
| A | 2.6 | 1.7 | 0 | 0.3 | 0.3 | 0.2 | 0 | 0.1 | 0.6 |
| B | 1.8 | 0.1 | 0 | 0 | 0 | 0.2 | 1.5 | 0 | 0.1 |

[148]

BLM_0014633

# Vegetation

| Sub-Region | Route Type | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | All Routes* | 2WD & 4WD Routes | Technical 4WD | ATV | Motorized Single Track | Non-motorized Single Track | Horse and Foot | Admin Only | Closed |
| C | 3.6 | 3.4 | 0 | 0.02 | 0 | 0.1 | 0.1 | 0.05 | 0.6 |
| D | 3.6 | 1.9 | 0.1 | 0.2 | 0.9 | 0.1 | 0.01 | 0.03 | 0.6 |
| E | 4.4 | 3.2 | 0.2 | 0 | 0.1 | 0 | 0.03 | 0.5 | 1.3 |
| F | 5.6 | 3.8 | 0.1 | 0.8 | 0.4 | 0.1 | 0 | 0.1 | 1.3 |
| G | 4.3 | 3.5 | 0 | 0 | 0.9 | 0 | 0 | 0 | 0.8 |
| All Sub-Regions | 3.4 | 2.4 | 0.1 | 0.2 | 0.4 | 0.1 | 0.2 | 0.1 | 0.7 |

**Table 52**
**Density of Designated Routes by Planning Area Sub-Region for Alternative 4**
**(miles of route per square mile of public land)**

*Excludes closed routes

Under this alternative, total route densities for 4 of the 5 PCAs—Temple Park, Rim Road, Roubideau Creek and Dry Creek—would change somewhere within a range of a 20% reduction to a 25% increase as compared with Alternative 1. In Temple Park and Rim Road, there would be overall reductions in potential impacts to vegetation as a result of decreased overall route density, but increases in impacts in Dry Creek and Roubideau PCAs because of increased route density. This increase of potential impact would be modified somewhat as each of the four PCA's would undergo some reduction in vegetation impacts from route use restrictions (ranging from 14-62% percent of total existing route density). The reduction in route density and route restrictions is smaller in magnitude than under Alternative 2, and would allow for less vegetation recovery for Rim Road and Temple Park PCAs. In the case of Dry Creek and Roubideau Creek PCAs, route density increases would likely be offset by route use limitations and reductions in impacts from off-road driving, resulting in similar to slightly less damaging impacts to vegetation as compared with Alternative 1. The reductions in Temple Park and Rim Road PCA's, while an improvement to vegetation, are probably not adequate to be consistent with PCA objectives of protecting these plant communities. The overall lack of improvement for the Dry Creek and Roubideau PCA's as compared with Alternative 1 is not consistent with the objective of protecting vegetation for these areas.

Table 53 shows Land Health Assessment data for Standard 3-Healthy Plant Communities relative to existing route density. This alternative represents a change from Alternative 1 with less than half of the routes either closed or limited in use in areas not meeting Standard 3. The same generally applies to routes in areas currently meeting Standard 3 with problems. With the exception of Sub-Region B, route closures would allow from 1.2 to 1.7% of the area to recover from route impacts in polygons currently not meeting Standard 3, and route use limitations would reduce the level of impact on another 0.04-1.9% of the area. Changes would be of a similar magnitude in areas which meet Standard 3 with problems. These changes would substantially reduce the amount of vegetation that is allowed to recover as compared with Alternative 2. Similar to Alternative 2, impacts associated with off road driving would be reduced. The reduced impacts, destruction and disturbance of vegetation in this alternative, while likely to minimally improve conditions compared with Alternative 1, is not likely to be fully

[149]

BLM_0014634

# Vegetation

consistent with or complimentary to other actions being taken to improve vegetation conditions and Standard 3 ratings, particularly since many of the problems relate to exotic species.

| | Table 53 — Plant Community Health Standard 2 Ratings: Density of Designated Routes (miles of route per square mile of public land) in areas meeting, meeting with problems, and not meeting Standard 3 for Alternative 4 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Plant Community Health Standard 3 Rating | | | | | | | | |
| | Meeting | | | Meeting with Problems | | | Not Meeting | | |
| | Designated Route Types | | | Designated Route Types | | | Designated Route Types | | |
| Sub-Region | 2WD & 4WD Routes-Open[1] | Limited Use[2] | Closed | 2WD & 4WD Routes -Open[1] | Limited Use[2] | Closed | 2WD & 4WD Routes -Open[1] | Limited Use[2] | Closed |
| A | 0.3 | 0.9 | 0.6 | 1.7 | 0.8 | 0.3 | 3.1 | 0.2 | 1.7 |
| B[3] | 0.1 | 1.9 | 0.1 | 0.04 | 1.3 | 0.1 | 0 | 3.0 | 0 |
| C | 3.2 | 0.2 | 0.3 | 3.3 | 0.2 | 0.6 | 4.6 | 0.3 | 1.7 |
| D | 0.8 | 1.4 | 0.3 | 2.4 | 1.5 | 0.7 | 3.2 | 0.8 | 0.7 |
| E | 5.4 | 2.3 | 0.2 | 3.5 | 0.6 | 1.4 | 3.8 | 1.0 | 1.2 |
| F | 2.7 | 2.1 | 0.8 | 5.2 | 0.8 | 1.2 | 3.5 | 1.9 | 1.3 |
| G | 1.2 | 0.8 | 0.2 | 4.1 | 1.0 | 1.1 | 6.3 | 0.04 | 0 |

1 Includes county roads
2 Includes ATV, Motorized Single Track, Non-motorized Single Track, Horse and Foot, and Admin designations
3 Sub-Region B (Camel Back WSA) - closed to motorized and mechanized vehicular use, except for administrative uses

**Finding on the Public Land Health Standard for plant and animal communities (partial, see also Wildlife, Aquatic; Wildlife, Terrestrial; and Invasive, Non-native Species):**
Alternative 1 is not consistent with lands moving toward meeting Standard 3. Alternatives 2 and 3 are consistent with and complementary to other actions being taken to ensure lands meet Standard 3. Alternative 4 would result in minimal improvements to Land Health Standard 3 ratings, but is not fully consistent with lands meeting Standard 3.

## Cumulative Effects

Population growth and residential development of surrounding private lands, increasing infrastructure development and right of way approvals on BLM, will continue to occur throughout the greater region if past trends continue. This will result in increased amounts of recreational and other types of usage and disturbance on public lands in and around the Dry Creek TMP area. Other activities that may contribute to cumulative impacts include Forest Service planning and projects, Uncompahgre Plateau Project activities, local land use planning, the BLM Uncompahgre Field Office Resource Management Plan revision, vegetation treatments, weed control, grazing, fire suppression activities, county road upgrades, special recreation permits and activities, and utility rights of way and corridors. In addition, as large scale and regional events like climate change and weed invasions occur, the vegetation community is expected to degrade. The cumulative effects of designating routes to mitigate growing recreational and other demands will help alleviate impacts from the pressure of existing and new users. Past impacts to vegetation would be remediated in many areas from closures, reroutes or

[150]

# Vegetation

use restrictions on many routes.  Measures such as maps, informational kiosks, regulations and enforcement will help educate the public land users about their travel-related impacts, and may lead many to adopt better travel practices in the Dry Creek area and in other areas as well, which would reduce vegetation impacts.  On the other hand, increasing numbers of users on the designated routes may cause the routes to deteriorate more rapidly and require more frequent maintenance or hardening to avoid impacts to vegetation.  If this maintenance cannot be regularly carried out, there would be fewer, but larger instances of vegetation impacts from routes as compared with the current situation.  Increases in the miles of routes from additional permitted activities would be analyzed in separate Environmental Assessments; however they would be expected to incrementally degrade vegetation.  Some of these would be offset by efforts directed at restoring vegetation health, such as the UP Project, weed control, and some vegetation treatments.  Route designations, closures and limitations will help mitigate weed spread and improve landscape and vegetation connectivity, which will be important for vegetation communities to be resilient to climate change.  Overall cumulative impacts from the proposed action are expected to result in improvements to vegetation in the planning area, and be neutral to vegetation in other parts of the region.

**WILDLIFE, AQUATIC** (includes a finding on Standard 3)

Aquatic wildlife species and their habitats are limited to perennial streams and some intermittent streams.  The planning area has approximately 700 miles of existing routes available to most forms of motorized and non-motorized travel, 70 miles of perennial and 455 miles of intermittent streams (see Table 12 in Threatened, Endangered and Sensitive Species section).  Native fish species including white sucker, speckled dace, and longnose sucker are known to be present in Roubideau Creek.  The speckled dace is also found in Potter Creek. The non-native brown trout, rainbow trout and brook trout are found in Roubideau Creek.  In the East fork of Dry Creek brown trout are present and in the West fork of Dry Creek rainbow trout are present.  Some frogs, including northern leopard frogs, toads, and snakes are known to be present, but their status is unknown.  No Federally listed fish are expected to be present in the streams.

Riparian habitat is present along the perennial and intermittent streams (See Riparian/Wetland section), and is extremely important for many aquatic wildlife species.   However, the status of most of these species is unknown.  Most public land riparian systems are in fair condition, but flow alterations, along with the invasions of salt cedar and Russian knapweed have degraded the usability of some areas for native wildlife.  Most tributary streams are also incised--likely due to historic events--and many of them are still in the process of maturing and establishing a wider flood plain and riparian system.

The limited amount of ponds and open water area limits the potential for waterfowl production.  There are small numbers of waterfowl, including mergansers, Canada geese, mallards, green wing teal, etc. that utilize the area seasonally, and some nesting may occur along major streams.

**Environmental Consequences:**

Impacts to aquatic wildlife and habitat would be some of the most acute because of this resource's susceptibility to such impacts.  Analysis of effects to aquatic wildlife and habitat are

[151]

BLM_0014636

# Wildlife, Aquatic

similar to and somewhat a result of the impacts to soils, threatened and endangered species (TES) and habitat (especially for native fish and amphibian habitat types), water quality, floodplains, wetland and riparian habitat, and prime farmlands.  See the TES section for general discussion of OHV-related activity effects to wildlife, fish and plants.  Also see Water Quality section for potential effects to sediment loads and Riparian/Wetland section for potential effects to aquatic habitat.

Most motorized vehicular and mountain bike travel activities within the planning area may have effects to aquatic wildlife populations and habitat.  Measuring indicators of all these factors for the numerous species of interest would be an excessively difficult task.  In addition, for most of the species of interest, the relationships between these factors and population dynamics are not well understood.   An increase or reduction in miles of routes, changes in the class of route use (i.e., from motorized to non-motorized), or other activities that would increase or decrease soil and vegetation disturbance, would, in general, affect aquatic habitat or aquatic wildlife species.  See the Water Quality section for potential effects regarding sediment loads.

**Impacts from Alternative 1**

700 miles of existing routes would continue to affect aquatic species and habitat, including native fish species and add to the existing disturbances occurring in 70 miles of existing perennial streams at 84 crossings and amphibian habitat in perennial and intermittent streams at 881 crossings (Table 27).  Additional likely new established crossings in perennial streams from user created routes would continue to create significant increases in this sensitive habitat.  Impacts that would occur to soils, water quality, floodplains, riparian and wetland habitat, prime farmland outside the planning area, and special status aquatic species and habitat in this alternative would also affect aquatic habitat and species.  Refer to those sections for acreage and mileage impacts that are relative to impacts to aquatic habitat.  Existing routes and management would continue, along with existing levels of associated resource disturbance and habitat fragmentation.  New, unplanned, and poorly located routes would continue to be created, potentially further impacting habitat and/or the species in Table 13.

**Impacts from Alternative 2**

Implementing Alternative 2 would result in significant reductions in potential impacts to this sensitive resource from new user created routes and perennial stream crossings by eliminating all cross country motorized vehicular and mountain bike travel and limiting this travel to designated routes.  Implementing this travel plan would result in a decrease in the number of miles of existing vehicular routes, which would  in turn result in fewer stream crossings within amphibian (-52%, or 461 fewer intermittent and perennial stream crossings) habitat as compared to Alternative 1 (Table 13).  Implementing Alternative 2 would result in a slight increase in the number of steam crossings within Native fish (+4%, or 3 more crossings).   Mitigation and design features would mitigate impacts from these crossings.

Considering only the number of miles of designated motorized routes, there would be even larger reductions in the number of existing stream crossings within amphibian (-56%, or 451 fewer intermittent and perennial stream crossings) and Native fish (-58%, or 14 fewer perennial stream crossings) habitats, as compared to Alternative 1 (Table 27).

[152]

# Wildlife, Aquatic

**Impacts from the Alternative 3**

By eliminating all cross country motorized vehicular and mountain bike travel major decreases in new potential impacts to aquatic habitat in 70 miles of perennial streams would occur. Implementing Alternative 3 compared to Alternative 1 would result fewer stream crossings within native fish (-19% or 16 fewer crossings), and amphibian (-70% or 619 fewer crossings) habitats. Considering only the number of miles of designated motorized routes, there would be even larger reductions in the number of stream crossings within native fish (-75%, or 18 fewer crossings) and amphibian (-80% or 641 fewer crossings) habitats, as compared to Alternative 1 (Table 27) by eliminating all cross country motorized vehicular and mechanized travel.

Compared to implementing Alternative 2, implementing Alternative 3 would result in a greater decrease in the total number of miles of existing vehicular routes, which would  in turn result in fewer stream crossings within native fish (-22%, or 19 fewer crossings) and amphibian (-38%, or 158 fewer crossings) habitats, as compared to Alterative 2  (Table 27).  Considering only the number of miles of designated motorized routes, there would be even larger reductions in the number of stream crossings within native fish (-40% or 4 fewer crossings), and amphibian (-55% or 190 fewer crossings) habitat as compared to Alternative 2 (Table 27).

**Impacts from the Alternative 4**

By eliminating all cross country motorized vehicular and mountain bike travel significant decreases in new potential impacts to aquatic habitat in 70 miles of perennial streams would occur.  Implementing Alternative 4, as compared to Alternative 1, would result in increases or decreases in the number of stream crossings within native fish (+58%, or 49 more crossings) and amphibian (-10%, -92 fewer crossings) habitats.  The increases within Native fish habitat can all be attributed to non-motorized routes, since changes in the number of miles of designated motorized routes in this alternative show slight show decreases as compared to Alternative 1. Considering only the number of miles of designated motorized routes, there would be additional decreases in the number of stream crossings within native fish (-8% or 2 fewer crossings) and amphibian (-17% or 133 fewer crossings) habitats, as compared to implementing Alternative 1 (Table 27).

Implementing Alternative 4, as compared to implementing Alternative 2, would result in increases in the number of miles of existing travel  routes, which would in turn result in an increase in the number of stream crossings within native fish (+53%, or 46 more stream crossings) and amphibian (+88%, or369 more crossings) habitats. (Table 13). Considering only the number of miles of designated motorized routes, there would be increases in stream crossings in amphibian (+91%, or 318 more crossings) and native fish (+120%, or 12 more crossings) habitat, as compared to implementing Alternative 2, and primarily within intermittent streams. Mitigation and design features would be applied to these routes and stream crossings which would limit the degree of impact to aquatic habitat in the long term.

[153]

BLM_0014638

# Wildlife, Aquatic

**Finding on the Public Land Health Standard for plant and animal communities (partial, see also Vegetation; Wildlife, Terrestrial; and Invasive, Non-native Species):** Eliminating all cross country travel by motorized and non motorized mechanized uses would greatly contribute to land health standards being met. See the Threatened and Endangered Species section. Based on findings in several biological resource sections, aquatic wildlife habitats would be expected to improve by implementing Alternatives 2, 3, and 4. Generally, Alternative 3 goes farther to decrease route densities (overall and motorized) for aquatic wildlife species. Alternative 4 would result in the least amount of change compared to Alternative 1 in improving habitat conditions, and would result in increases in the number of stream crossings within native fish habitats. However, mitigation applied would limit the effects of this change. Under Alternative 1, the opportunity to improve habitat conditions for aquatic wildlife species is lost, and these species may decline (Table 27).

## Cumulative Effects

Population growth and residential development of surrounding private lands, along with other resource impacting trends, will occur throughout the greater region that will result in increased amounts of recreational usage on public lands. The cumulative effects of providing a high number of additional routes to meet growing recreational demands would add to very predictable impacts to the watersheds within the Dry Creek TMP. Increases in the miles of routes would create additional acres of semi-permeable and non-permeable surfaces that would result in increased amounts of runoff, erosion, and drainage changes. Other activities that may contribute to cumulative impacts include Forest Service planning and projects, Uncompahgre Plateau Project activities, local land use planning, soil research, continued population growth, BLM Uncompahgre Field Office Resource Management Plan revision, continued population growth, vegetation treatments, county road upgrades, special recreation permits and activities, and utility rights of way and corridors. Some of these activities may benefit aquatic species and habitats. Refer to the main Cumulative Impacts section of this document for a more detailed description of these activities and their potential impacts.

## WILDLIFE, TERRESTRIAL (includes findings on Standard 3)

The Dry Creek Travel Management area supports a large variety of upland, riparian, and aquatic wildlife species. Table 54 below shows a list of the most common or noted wildlife species, their occurrence, and the basic habitat types in which they are found. Some species are year-long residents, while others are migrants. A variety of small mammal, bird, and reptile species are scattered throughout the area where their specific habitats are present. Habitat variety is great, and is created by diversity in topography, slope, aspect, vegetation, soils, and climate. The description of the existing vegetation in the vegetation section provides a good description of most wildlife habitats that occur.

[154]

BLM_0014639

# Wildlife, Terrestrial

| Species (Common Name) | Habitat Type | Occurrence |
|---|---|---|
| **Table 54** **Most Common or Noted Terrestrial Wildlife Species, Groups of Species, Their Occurrence, and Basic Habitat Types in the Planning Area (Roubideau Land Health Assessment, BLM 2006)** | | |
| Mule deer | Pinyon-juniper, oak-mountain shrub, riparian, sagebrush, grassland. | Common, year long, mostly during winter |
| Elk | Pinyon-juniper, oak-mountain shrub, riparian, sagebrush, grassland. | Common, mostly during winter. |
| Desert Bighorn Sheep | Canyon benches, mesa tops, and valley bottoms | Uncommon, present in the Roubideau Creek drainage |
| Cougar | All types, mostly along rim-rock areas. | Common, year long |
| Bobcat | All types | Uncommon, year long |
| Coyote | All types | Common, year long |
| Cottontail rabbit | All types | Common, year long |
| Porcupine | Pinyon-juniper, riparian | Common, year long |
| Prairie dog (white-tailed) | Sagebrush, desert shrub | Common, year long |
| Raptor; Eagles, Hawks, Falcons. | All types | Common, year long |
| Merriam's Turkey | Riparian forests, Pinyon-juniper, Oak-mountain shrub | Riparian communities and PJ in the winter and oak-mountain shrub spring and fall. |
| Blue grouse | Oak/Serviceberry | Common, year long |
| Gunnison sage grouse | Sagebrush; sagebrush/grass | Uncommon, year long |
| Chukar | Salt desert | Uncommon, year long |
| Neo-tropical birds | All types | Common, warm season |
| Small mammals | All types | Common, year long |
| Amphibians-Reptiles | All types | Common year long |

Mule deer and elk are probably the most noted wildlife species that occur due to their historic prominence in the ecosystem and their high social and economic value to the area and region. Both species use the area year long, but primarily they use it as winter range, coming from higher elevation summer ranges on the Uncompahgre Plateau.  The intensity of use by each species varies widely from year to year, and is controlled primarily by population size, and the variation in timing and amount of snowfall.  During most winters there is a high degree of overlap in mule deer and elk use on winter ranges, however, the extent of competition is unknown.  The Colorado Division of Wildlife has classified nearly all the area as winter range for mule deer and more than two thirds of the area as winter range for elk (Table 55). The severe winter range and winter concentration areas constitute BLM's crucial winter range.

| Species | Habitat | Sub-Region (acres and % of Sub-Region) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C | D | E | F | G | Total |
| **Table 55** **Big Game habitat within the Dry Creek Travel Management Planning Area** | | | | | | | | | |
| Bighorn Sheep | Production | 597.8 | 1100.8 | -- | -- | -- | -- | -- | 1698.6 |
| | | 3% | 10% | -- | -- | -- | -- | -- | 1% |
| | Winter/ Summer Range | 8325.4 | 9964.5 | 1603.1 | -- | -- | -- | -- | 19893.1 |
| | | 43% | 93% | 6% | -- | -- | -- | -- | 17% |
| Elk | Severe Winter | 5452.5 | 4254.3 | 9591.6 | 14869.6 | -- | 8468.2 | 3398.3 | 46034.6 |

[155]

# Wildlife, Terrestrial

| Species | Habitat | Sub-Region (acres and % of Sub-Region) | | | | | | | |
|---------|---------|------|------|------|------|------|------|------|------|
| | | A | B | C | D | E | F | G | Total |
| | | 28% | 40% | 34% | 50% | -- | 72% | 39% | 40% |
| | Winter Concentration | 919.1 | 896.2 | -- | 194.9 | -- | 87.2 | 1350.3 | 3447.7 |
| | | 5% | 8% | -- | 1% | -- | 1% | 16% | 3% |
| Mule Deer | Severe Winter | 19194.2 | 10830.9 | 25584.6 | 17247.4 | 6869.6 | 8430.1 | 3468.3 | 91625.1 |
| | | 99% | 102% | 92% | 58% | 100% | 71% | 40% | 80% |
| | Winter Concentration | -- | 0.1 | 10987.4 | 4543.8 | 49.5 | 7088.1 | 1269.5 | 23938.4 |
| | | -- | 0% | 39% | 15% | 1% | 60% | 15% | 21% |
| | Winter Range | 19194.2 | 10830.9 | 27826.5 | 29171.1 | 6869.6 | 11823.6 | 8222.7 | 113938.6 |
| | | 99% | 102% | 100% | 98% | 100% | 100% | 95% | 99% |
| Pronghorn | Range | 3785.7 | -- | 41.4 | -- | -- | -- | -- | 3827.2 |
| | | 19% | -- | 0% | -- | -- | -- | -- | 3% |

**Table 55**
**Big Game habitat within the Dry Creek Travel Management Planning Area**

Bighorn sheep habitat encompasses almost all of Sub-Region B, and more than two-thirds of Sub-Region A (Table 55).  At the present time there is an established desert bighorn sheep population in Roubideau Canyon.  It is unknown whether this population is interacting with the desert sheep in the Escalante Canyon area, but it is highly probable.  To date, in spite of the close proximity of domestic sheep, there have been no known cases of pneumonia, scapies, blue tongue, and other pathogens in this population.

Merriam turkey habitat is limited mostly to the higher elevations along the west side of the area, and along the major stream drainages.  They use the larger canyon bottoms at lower elevations as winter range and the pinyon-juniper, oak/serviceberry areas at higher elevations for breeding, nesting, and brood rearing.  Since the 1880's there has been a long history of great fluctuations in turkey numbers on the Uncompahgre Plateau.  Turkeys were reported to be plentiful before settlement, but disappeared in the mid 1880's from several hard winters in a row, and disease contracted from domestic fowl.  In the 1930's, turkeys were re-introduced, and did well until the mid 1960's, when again a major decline occurred.  And, again the cause of decline was hard winters and "micoplasma" a bacterial disease causing respiratory problems, and which is passed from hens to their eggs, or through direct contact with other birds.   In the 1980's turkeys were again transplanted, which have resulted in the current recurring high population.  No specific mapping of seasonal use areas or assessment of habitat quality is available for this species at this time.

Large predators, such as coyotes, cougars, and black bears use the area regularly as parts of their larger overall ranges.  Of the predators, coyotes are the most numerous and widespread.  Black bear primarily use the major drainages with well developed riparian vegetation, and the higher elevation oak/serviceberry areas, especially during spring, late summer, and fall for feeding.  About 1,330 acres of black bear fall concentration habitat is found at the southwestern border with the Forest Service in Sub-Regions D (1291.2 acres), F (10.9 acres) and G (28.3 acres).  Black bear densities and total numbers on the Uncompahgre Plateau may be the highest in Colorado.  Mountain lion probably use nearly all of the area at some time or another while hunting, or raising young.  The number of mountain lion present is probably very low, limited mostly to the ones who have established their territories, or parts of their territories in this area.

[156]

BLM_0014641

# Wildlife, Terrestrial

There appears to be suitable denning habitat in the rocky cliffs and drainages that are distributed throughout the area. While the exact status of these predator populations are unknown, they are all believed to be doing well.

Prairie dogs are found in the lower elevation areas. It is assumed at this time that they are white-tailed prairie dogs (See TES section). Prairie dogs potentially may occur anywhere there is open grassland, grass/sagebrush or salt desert shrub areas. BLM mapped some of the prairie dog colonies in the 1980s, but there has been no follow-up mapping. Plague-caused fluctuations in the prairie dog populations have resulted in some of the previously mapped sites being abandoned. It also appears that there has been a general reduction in the total number of prairie dogs living, but there is no quantified data to support this observation.

## Environmental Consequences

Analyses of effects to terrestrial wildlife are handled in a similar manner as explained in the Threatened and Endangered Species section. See the TES section for a general discussion of the potential effects to wildlife from recreational and other vehicular travel-related activities.

Recreational and other travel activities may have effects to wildlife populations similar to those described in the TES, Migratory Bird and Aquatic Wildlife sections of this document. Measuring indicators of all these factors for the numerous species of interest would be an excessively difficult task. In addition, for most of the species of interest, the relationships between these factors and population dynamics are not well understood. Because of these difficult to measure potential impacts to wildlife populations, BLM assumes that any reduction in routes, or reduction in class of use (i.e., from motorized to non-motorized) would in general improve wildlife habitats.

[157]

# Wildlife, Terrestrial

**Table 56**
**Change in miles of routes by Alternative for selected wildlife species**

| Species | Type | Alt 1 | Alt 2 Open* | Δ1 % | Δ1 miles | Alt 3 Open* | Δ2 % | Δ2 miles | Δ1 % | Δ1 miles | Alt 4 Open* | Δ2 % | Δ2 miles | Δ1 % | Δ1 miles |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bighorn Habitat (miles) | Public | 25.0 | 21.8 | -13% | -3.2 | 16.6 | -20% | -5.2 | -34% | -8.4 | 29.4 | +35% | +7.6 | +18% | +4.4 |
| | Admin | 25.0 | 22.7 | -9% | -2.3 | 17.5 | -23% | -5.2 | -30% | -7.5 | 29.4 | +30% | +6.7 | +18% | +4.4 |
| | Motorized | 19.0 | 8.6 | -86% | -10.4 | 3.5 | -59% | -5.1 | -82% | -15.5 | 17.7 | +105% | +9.1 | -7% | -1.3 |
| Elk Habitat (Winter Concentration) (miles) | Public | 11.9 | 9.3 | -22% | -2.6 | 7.3 | -21% | -2.0 | -39% | -4.6 | 11.9 | +28% | +2.6 | 0% | 0.0 |
| | Motorized | 7.3 | 3.9 | -108% | -3.4 | 1.5 | -63% | -2.4 | -79% | -5.8 | 6.0 | +52% | +2.1 | -18% | -1.3 |
| | Seasonal | 0.0 | 1.5 | ↑ | 1.5 | 0.0 | -100% | -1.5 | 0% | 0.0 | 0.0 | -100% | -1.5 | 0% | 0.0 |
| Elk Habitat (Severe Winter) (miles) | Public | 277.9 | 167.2 | -40% | -110.7 | 101.8 | -39% | -65.4 | -63% | -176.1 | 247.5 | +48% | +80.3 | -11% | -30.4 |
| | Admin | 277.9 | 186.4 | -33% | -91.5 | 129.3 | -31% | -57.1 | -53% | -148.6 | 248.9 | +34% | +62.5 | -10% | -29.0 |
| | Motorized | 268.0 | 131.2 | -55% | -136.8 | 76.3 | -42% | -54.9 | -72% | -191.7 | 233.0 | +78% | +101.8 | -13% | -35.0 |
| | Seasonal | 0.0 | 42.8 | ↑ | 42.8 | 11.2 | -74% | -31.6 | ↑ | +11.2 | 0.0 | -100% | -42.8 | 0% | 0.0 |
| Mule Deer Habitat (Winter Concentration) (miles) | Public | 163.0 | 95.1 | -42% | -67.9 | 55.5 | -42% | -39.6 | -66% | -107.5 | 141.9 | +49% | +46.8 | -13% | -21.1 |
| | Admin | 163.0 | 107.8 | -34% | -55.2 | 76.8 | -29% | -31.0 | -53% | -86.2 | 143.2 | +35% | +35.4 | -12% | -19.8 |
| | Motorized | 163.0 | 74.5 | -54% | -88.5 | 42.1 | -43% | -32.4 | -74% | -120.9 | 139.2 | +87% | +64.7 | -15% | -23.8 |
| | Seasonal | 0.0 | 45.2 | ↑ | 45.2 | 8.3 | -82% | -36.9 | ↑ | +8.3 | 0.0 | -100% | -45.2 | 0% | 0.0 |
| Pronghorn Habitat (miles) | Public | 20.3 | 9.5 | -53% | -10.8 | 10.4 | +9% | +0.9 | -49% | -9.9 | 18.1 | +91% | +8.6 | -11% | -2.2 |
| | Admin | 20.3 | 10.9 | -46% | -9.4 | 11.1 | +2% | +0.2 | -45% | -9.2 | 18.3 | +68% | +7.4 | -10% | -2.0 |
| | Motorized | 20.3 | 8.3 | -59% | -12.0 | 4.9 | -41% | -3.4 | -76% | -15.4 | 18.1 | +118% | +9.8 | -11% | -2.2 |
| Black Bear Habitat (miles) | Public | 6.3 | 3.4 | -46% | -2.9 | 3.0 | -11% | -0.4 | -52% | -3.3 | 5.1 | +50% | +1.7 | -19% | -1.2 |
| | Admin | 6.3 | 3.9 | -38% | -2.4 | 3.5 | -9% | -0.4 | -44% | -2.8 | 5.3 | +35% | +1.4 | -16% | -1.0 |
| | Motorized | 6.3 | 3.4 | -46% | -2.9 | 3.0 | -11% | -0.4 | -52% | -3.3 | 5.1 | +50% | +1.7 | -19% | -1.2 |

Footnotes: Δ 1 – Percent change from Alternative 1; Δ 2 – Percent change from Alternative 2; *Includes routes designated as open and those which were not evaluated, including county roads; Public – routes open for public use. Includes motorized and non-motorized uses; Admin – total including routes open for Administrative use; Motorized – routes open for public motorized use; Seasonal – Seasonal closures of routes; -- no routes for category; ↑ – increase from zero. Cannot calculate percentage

BLM_0014643

# Wildlife, Terrestrial

**Impacts Common to All Alternatives**

There would continue to be routes at varying levels in all alternatives. Thus, all alternatives continue to have impacts to wildlife populations from activities relative to habitat fragmentation, patch size, edge to interior ratio, barriers to movement, facilitation of invasions of non-native and/or opportunistic species, mortality rates, noise and other disturbance factors.

**Impacts from Alternative 1**

Yearlong existing levels of use on 700 miles of existing routes would continue to result in major disturbances to wildlife species and their habitat, and result in wildlife habitat fragmentation. Cross-country travel would continue to cut new routes through big game (bighorn, elk, mule deer and pronghorn) and other wildlife species habitat (Table 56 and Table 9- Migratory Bird Section), resulting in major increases to habitat and species. This alternative would continue to not have seasonal closures of routes, since no routes have been designated. Without these seasonal closures, winter travel through these areas would continue to create additional stress to big game species during a time period of high energy demands and stress for these and other wildlife species. This could result in increased winter wildlife mortality and decreased reproduction in the spring.

Existing habitat types would continue to be impacted by habitat fragmentation and other disturbance factors from about 484 miles of existing motorized routes that have removed approximately 587 acres of various types of vegetation.

*Big Game Species:*
Alternative 1 would have motorized and non-motorized routes that would pass through bighorn (25.0 miles all routes; 19.0 miles motorized), elk (winter concentration [11.9 miles all routes; 7.3 miles motorized]; severe winter [277.9 miles all routes; 268.0 miles motorized]), mule deer (winter concentration [163.0 miles all routes, all motorized]) and pronghorn (20.3 miles all routes, all motorized) habitat (Table 56).

*Predator Species:*
Effects on predators and their habitat would be similar to that described for other wildlife species and habitat. Alternative 1 would have 6.3 miles of motorized routes that would pass through 1,330 acres of black bear habitat (Table 56).

**Impacts from Alternative 2**

Major reductions in potential impacts to these habitat types and species would occur as the result of restricting travel to designated routes and preventing the creation of new user created routes. Existing levels of disturbance and habitat fragmentation would be reduced through implementation of Alternative 2 as a result of closing and rehabilitating approximately total 259 miles of existing motorized and non-motorized routes. This would result in large decreases in the number of miles of routes through wildlife species habitat (Table 56 and Table 9). Administrative routes are included in this alternative and these routes would only have occasional motorized use as compared to public access routes. If administrative roads would be

[159]

BLM_0014644

# Wildlife, Terrestrial

included, the number of miles of routes potentially affecting wildlife species or habitat increases, but would be less compared to Alternative 1.

Implementing this alternative would result in the closure of about 255 of 484 miles of existing motorized routes in these habitat types, a 53% reduction, which would result in about 309 fewer acres of disturbed and fragmented wildlife habitat.

*Big Game Species*:
Alternative 2, compared to Alternative 1, would have fewer miles of motorized and non-motorized routes that would pass through bighorn (-13%, or 3.2 fewer miles), elk winter concentration -22%, or 2.6 fewer miles; severe winter -40%, or 110.7 fewer miles), mule deer (winter concentration -42%, or 67.9 fewer miles) and pronghorn (-53%, or 10.8 fewer miles) habitat from Alternative 1 (Table 56). Alternative 2, compared to Alternative 1, would have fewer miles of motorized routes only that would pass through bighorn (-86%, or 10.4 fewer miles), elk (winter concentration -108%, or3.4 fewer miles); severe winter -55%, or 136.8 fewer miles), mule deer (winter concentration -54%, or 88.5 fewer miles) and pronghorn (-59%, or 12.0 fewer miles) habitat.

Compared to Alternative 1, which contains no seasonal route closures, in this alternative seasonal closures from December 1 through April 15 would be in effect on designated motorized and non-motorized routes that pass through elk winter concentration (1.47 miles); severe winter (42.8 miles), and mule deer winter concentration (45.2 miles) habitat.

*Predator Species*:
Effects on predators and their habitat would be similar to that described for other wildlife species and habitat. Alternative 2, compared to Alternative 1, would have nearly 3.0 fewer miles of motorized routes that would pass through 1,330 acres of black bear habitat, a 46% reduction. This reduction would help prevent further disturbance to black bear and their habitat. Seasonal closures of about 7.3 miles of motorized routes in Sub-Region D may provide for fewer disturbances to black bear and their habitat from December 1 through April 15 (Table 3).

*Other Wildlife Species*:
Other wildlife species would have similar effects to what is described in the Migratory Bird section and Table 9, and the TES Section and Table 12 of this document.

By reducing the number of miles of overall routes and changing some routes to non-motorized uses, and prohibiting cross-country travel, impacts to wildlife species should reduce effects from habitat fragmentation, patch size, edge to interior ratio, barriers to movement, facilitation of invasions of non-native and/or opportunistic species, mortality rates, noise and other disturbance factors.

**Impacts from Alternative 3**

Major reductions in potential impacts to these habitat types and species would occur as the result of restricting travel to designated routes and preventing the creation of new user created routes. Effects from this alternative would be similar to Alternative 2. Impacts and levels of disturbance

[160]

# Wildlife, Terrestrial

and habitat fragmentation would be reduced as a result of closing and rehabilitating approximately 369 total miles of existing motorized and non-motorized routes, closing some routes seasonally, restricting travel to designated routes, preventing the creation of new user created routes, and by implementing measures in Alternative 3 (Table 56 and Table 9).

Implementing this alternative would result in the closure of about 353 of 484 miles of existing motorized routes in these habitat types, a 73% reduction, which would result in about 428 fewer acres of disturbed and fragmented wildlife habitat.

*Big Game Species:*

Compared to Alternative 1, Alternative 3 contains reductions in the number of miles of motorized and non-motorized routes that pass through bighorn (-34%, or 8.4 fewer miles), elk (winter concentration -39%, or 4.6 fewer miles; severe winter -63%, or 176.1 fewer miles), mule deer (winter concentration -66%, or 107.5 fewer miles) and pronghorn (-49%, or 9.9 fewer miles) habitat (Table 56).

Compared to Alternative 1, Alternative 3 would contain even larger reductions in the number of miles of motorized routes through bighorn (-82%, or 15.5 fewer miles), elk winter concentration (-79%, or 5.8 fewer miles); elk severe winter (-72%, or 191.7 fewer miles), mule deer winter concentration (-74%, or 120.9 fewer miles) and pronghorn (-76%, or 15.4 fewer miles) habitat.

Compared to Alternative 1, which contains no seasonal route closures of any kind, seasonal closures in this alternative would be in effect from December 1 through April 15 for motorized and non-motorized vehicles on routes that pass through elk severe winter (11.2 miles), and mule deer winter concentration (8.3 miles) habitat.

Compared to Alternative 2, Alternative 3 contains additional reductions in the number of miles of motorized and non-motorized routes that pass through  bighorn (-20%, or 5.2 fewer miles), elk winter concentration (-21%, or 2.0 fewer  miles); severe winter (-39%, or 65.4 fewer miles), and mule deer (winter concentration -42%, -39.6 fewer miles).  However, this alternative increases the number of miles of routes that would pass through pronghorn (+9%, 0.9 more miles) habitat. Compared to Alternative 2, Alternative 3 contains additional reductions in the number of miles of motorized routes only that pass through bighorn (-59%, or 5.1 fewer miles), elk winter concentration (-63%, or 2.4 fewer miles); severe winter (-42%, or 54.9 fewer miles), mule deer (winter concentration (-43%, or 32.4 fewer miles) and pronghorn (-41%, or 3.4 fewer miles) of habitat.  Comparing this alternative with Alternative 2, seasonal closures from December 1 through April 15 would be in effect for motorized and non-motorized vehicles on routes that pass through some elk and mule deer habitat, but the number of miles affected would be greatly reduced.  There would be no seasonal route closures in elk winter concentration habitat (-100%, or 1.5 fewer miles restricted than in Alternative 2), and large decreases in seasonal route closures in  elk severe winter (-74%, or 31.6 fewer miles restricted that in Alternative 2), and mule deer winter concentration (-82%, or 36.9 fewer miles restricted than in Alternative 2).  These fewer number of miles of routes categorized for seasonal closures would be attributed to the routes being closed to use yearlong in this alternative, resulting in fewer impacts to wildlife habitat and species.

[161]

BLM_0014646

# Wildlife, Terrestrial

*Predator Species:*

Effects on predators and their habitat would be similar to that described for predators in Alternative 2. Alternative 3, compared to Alternative 1, would have nearly 3.3 fewer miles of motorized routes that would pass through 1,330 acres of black bear habitat, a 46% reduction. This reduction would help prevent further disturbance to black bear and their habitat. Compared to Alternative 2, this alternative would provide for 0.4 less miles of motorized routes that would pass through black bear (fall concentration) habitat, an 11% reduction from Alternative 2. Seasonal closures of about 4.0 miles of motorized routes in Sub-Region D may provide for fewer disturbances to black bear and their habitat from December 1 through April 15 (Table 3).

*Other Wildlife Species:*

Effects on other wildlife species would be similar to those described in the Migratory Bird section and Table 9, and the TES Section and Table 12 of this document.

## Impacts from the Alternative 4

Major reductions in potential impacts to these habitat types and species would occur as the result of restricting travel to designated routes and preventing the creation of new user created routes. Effects from this alternative would be similar to Alternative 2. In general, impacts and levels of disturbance and habitat fragmentation would be reduced as a result of closing and rehabilitating approximately 118 miles of existing motorized and non-motorized routes, restricting travel to designated routes, preventing the creation of future new user-created routes, and by implementing measures in Alternative 4 (Table 56 and Table 9).

Implementing this alternative would result in the closure of about 65 of 484 miles of existing motorized routes in these habitat types, a 13% reduction, which would result in about 79 fewer acres of disturbed and fragmented wildlife habitat.

*Big Game Species:*

Compared to Alternative 1, Alternative 4 contains increases or reductions in the number of miles of motorized and non-motorized routes that pass through bighorn (+18%, or 4.4 more miles), elk severe winter (-11%, or 30.4 fewer miles), mule deer winter concentration (-11%, or 2.2 fewer miles), and pronghorn (-49%, or 9.9 fewer miles) habitat (Table 56). The 1.5 miles of routes that affect elk winter concentration habitat in Alternative 1, would be either designated for non-motorized uses or would be closed to all travel yearlong in this alternative, resulting in less impact to wildlife and wildlife habitat.

Compared to Alternative 1, Alternative 4 would contain reductions in the number of miles of motorized routes only through bighorn (-7%, or 1.3 fewer miles), elk winter concentration (-18%, or 1.3 fewer miles), elk severe winter (-13%, or 35.0 fewer miles), mule deer winter concentration (-15%, or 23.8 fewer miles) and pronghorn (-11%, or 2.2 fewer miles) habitat. Increases in the number of miles of routes through bighorn habitat from Alternative 1 to Alternative 4 can all be attributed to limiting use on those routes in this alternative to non-

[162]

motorized travel.

Compared to Alternative 2, Alternative 4 contains additional miles of existing motorized and non-motorized routes that pass through bighorn (+35%, or 7.6 more miles), elk winter concentration (+28%, or 2.6 more miles); severe winter (+48%, or 80.3 more miles), and mule deer (winter concentration +49%, or 46.8 more miles), and pronghorn (+91%, or 8.6 more miles) habitat.

Compared to Alternative 2, Alternative 4 contains an increase in the number of miles of motorized routes only that pass through bighorn (+105%, or 9.1 more miles), elk winter concentration (+52%, or 2.1 more miles); elk severe winter (+78%, or 101.8 more miles), mule deer (winter concentration +87%, or 64.7 more miles) and pronghorn (+118%, or 9.8 more miles) habitat.

There would be no seasonal closures for travel through elk or mule deer habitat in this alternative. Most of the miles of routes that currently pass through big game habitat would, in this alternative, be designated for administrative uses only, closed, or for ATV use and single track vehicle use. These changes, although not resulting in closing routes seasonally, would result in fewer impacts to big game species and habitat than in Alternative 1. Without these seasonal closures, winter travel through big game habitat on those routes where motorized travel would be available yearlong, may create stress to big game species during a time period of high energy demands and stress for these and other wildlife species. This could result in increased winter mortality and decreased reproduction in the spring.

*Predator Species*:
Effects on predators and their habitat would be similar to that described for other wildlife species and habitat. Alternative 4, compared to Alternative 1, would have 1.2 fewer miles of motorized routes that would pass through 1,330 acres of black bear habitat, a 19% reduction. This reduction would help prevent further disturbance to black bear and their habitat. Compared to Alternative 2, this alternative would provide an additional 1.7 more miles of motorized routes that would pass through black bear (fall concentration) habitat, a +50% increase over Alternative 2.

*Other Wildlife Species*:
Other wildlife species would have similar effects to that described in the Migratory Bird section and Table 9, and the TES Section and Table 12 of this document.

**Finding on the Public Land Health Standard for plant and animal communities (partial, see also Vegetation):** Eliminating all cross country travel by motorized and non motorized mechanized uses would greatly contribute to land health standards being met. See the Vegetation section. Based on findings in several biological resource sections, aquatic wildlife habitats would be expected to improve by implementing Alternatives 2, 3, and 4. Generally, Alternative 3 goes farther to decrease route densities (overall and motorized) for terrestrial wildlife species. Alternative 4 would result in the least amount of change compared to Alternative 1 in improving fragmentation and other habitat conditions. Under Alternative 1, the opportunity to improve habitat conditions for terrestrial wildlife species is lost, and these species

[163]

BLM_0014648

# Wildlife, Terrestrial

may decline in health and numbers.

## Cumulative Effects

In addition to growth in recreational travel, other reasonably foreseeable actions that could affect terrestrial wildlife habitat over the next 10 years on private and public lands include residential growth, new road construction on private lands, fuels reduction projects, utility corridor maintenance and upgrades, and new buried utility rights-of-way. Activities on public lands in the travel planning area that could also potentially impact terrestrial wildlife habitat and require mitigation include Forest Service planning and projects, Uncompahgre Plateau Project activities, local land use planning, soil research, BLM Uncompahgre Field Office Resource Management Plan revision, continued population growth, vegetation treatments, county road upgrades, special recreation permits and activities, and utility rights of way and corridors. Some of these activities may benefit terrestrial wildlife and habitats. Refer to the main Cumulative Impacts section of this document for a more detailed description of these activities and their potential impacts. The cumulative impacts from these activities to terrestrial habitat from all action alternatives will be long-term and most adverse in Alternative 1 and 4, dispersed and long-term in Alternatives 2 and 3.

## <u>OTHER ELEMENTS</u>

The following are other elements that were considered and either had no impact or were brought forward for analysis.

| Non-Critical Element | NA or Not Present | Applicable or Present, No Impact | Applicable & Present and Brought Forward for Analysis |
|---|---|---|---|
| Access | | | X |
| Cadastral Survey | | X | |
| Fire Management | | | X |
| Forest Management | | | X |
| Geology and Minerals | | | X |
| Hydrology/Water Rights | | | X |
| Law Enforcement | | | X |
| Paleontology | | | X |
| Noise | | | X |
| Range Management | | | X |
| Realty Authorizations | | | X |
| Recreation | | | X |
| Socio-Economics | | | X |
| Transportation | | | X |
| Visual Resources | | | X |

[164]

# Fire Management

**FIRE MANAGEMENT**

The Public Lands addressed in the proposed Travel Management Plan are within portions of the Roubideau Fire Management Unit (FMU) and the Uncompahgre Valley FMU. These FMUs consist primarily of pinyon, juniper, sagebrush and grass/desert shrub fuel types and fire is managed in these areas using an Appropriate Management Response, ie, fires are either suppressed or managed for resource benefits depending on site specific resource/social constraints and/or opportunities to receive benefits from the fire event. Prescribed fire is also a valuable tool that is being used to manage vegetation and fuels across portions of the area. Mechanical fuels reduction treatments have been implemented and will continue to be implemented in this area over the foreseeable future as well. The Uncompahgre Field Office Fire Management Plan is the guiding document for all fire and fuels management activities in this area.

The two FMUs are further subdivided into areas in which 1) fire needs to be suppressed and mechanical treatments are needed due to valued private property, improvements and infrastructure, 2) fire and mechanical treatments are valuable tools to utilize to manage wildlife habitat with some constraints, and 3) fire can be allowed to function as a more natural process to maintain natural vegetation mosaics on the landscape. In the Dry Creek Travel Management area approximately 10-15% of the area requires suppression action on all fires as well as mechanical treatments to reduce hazards to private property, improvements, and infrastructure, while the remaining 85-90% can best be described as 'fire use areas' in which a combination of mechanical treatment, prescribed fire, and wildland fire use fires can be utilized to improve wildlife habitat and maintain natural processes and natural vegetative mosaics.

Greater than 95% of the ignitions that occur within this area are from lightning so human caused fires are not a major problem. The few human caused fires that have occurred consist primarily of camp fires associated with party spots and hunting or heavy equipment/roadside fires.

**Environmental Consequences**

**Impacts Common to All Alternatives**
When planning and analyzing prescribed burns, the use of motorized vehicles on routes where this use would normally not be permitted would be analyzed in the subject NEPA document for that project and either approved, modified, or denied. In those situations where the use of motorized vehicles would be unacceptable the prescribed burn itself may be modified to take advantage of natural barriers, available designated routes, or in rare instances, the burn could be cancelled.

Fire suppression would be conducted according to the current fire management plan for these lands.

Implementing either alternative would not result in major impacts to fire management or suppression activities.

[165]

BLM_0014650

# Fire Management

**Impacts from Alternative 1**

Currently fire management activities can utilize all existing routes to access mechanical and prescribed fire projects and to patrol for, locate, and manage fire incidents. Most fires, since they are lightning caused, are not usually located near a vehicle access point and subsequently require a hike from the nearest route to locate and manage the fire. Prescribed burns in the area often utilize routes as control lines due both to the route acting as a fuel break and the ability of fire engines to be positioned on the route to improve control of the burn. Under the No Action Alternative these techniques for fire management activities would continue in the same manner that they are currently occurring. There would be no reduction in the available access routes for these activities.

**Impacts from Alternative 2**

Implementing this alternative would result in 324 miles of routes for full-size motorized vehicles being available for fire management activities. In addition, there would be 34 miles of ATV routes available for fire management activities in this alternative, for a total of 358 miles of available motorized routes for these activities, 342 fewer total miles than would be available in Alternative 1. These miles include access on all administrative routes in Alternatives 1 and 2, and the mileages include the routes that would be closed in Alternatives 2 (259 miles). Thus, planning for and implementing fire management activities would be somewhat more difficult in this alternative than in Alternative 1. This would have some impact on fire management actions as follows: 1) locating and accessing ignitions may be slowed in areas that are more remote due to less road coverage, 2) supporting fires logistically would be more challenging due to decreased ability to move equipment and supplies into remote fires, 3) prescribed burns may be more difficult to manage due to limited road access and subsequent inability to utilize engines for control on routes.

With nearly a 50% reduction in routes, the already limited number of human ignitions should be further reduced, or at a minimum, may become more concentrated in areas in which the public has access or is concentrated in.

Because 85-90% of the area is available for Wildland Fire Use the closure of routes in the area may increase both the need and desire to manage fires more as natural processes on the landscape. A primary objective of fire management within the UFO is to utilize natural ignitions to achieve natural vegetation and fuels mosaics. By limiting the ability of fire personnel to access and intensively manage fires the expectation could be that the fire program may manage fires with a slightly more hands off approach within portions of this area; this would be in line with the intent of the fire management plan to utilize fire for resource benefits across 85-90% of the area.

Access into areas containing private property, improvements, and infrastructure to manage or quickly control fires in those locations should not be greatly reduced since most of these access points are across County or subdivision roads or other rights-of ways which would not be greatly impacted with Alternative 2.

[166]

BLM_0014651

# Fire Management

When planning and analyzing prescribed burns, the use of ATVs and UTVs in areas closed to travel or on closed routes as an administrative use would be analyzed in the subject NEPA document for that project and either approved, modified, or denied. In those situations where the use of ATVs or UTVs is unacceptable the prescribed burn itself may be modified to take advantage of natural barriers, open routes, or in rare instances, the burn could be cancelled.

## Impacts from Alternative 3

Implementing this alternative would result in a total of 267 miles of motorized routes for full-size vehicles and ATVs (13 miles) being available for fire management activities, 433 fewer miles than in Alternative 1 and 91 fewer miles than in Alternative 2, the Proposed Action. These miles include access on all administrative routes in Alternatives 1, 2, and 3, and the mileages include the routes that would be closed in Alternatives 2 and 3. Thus, planning for and implementing fire management activities would be somewhat more difficult in this alternative than in Alternative 1 and 2. This would have the greatest impact on fire management activities due to greatly less access into the planning area and would make management of any fires more difficult both operationally and logistically. This concern would be especially prevalent in areas containing private property, improvements, and infrastructure.

## Impacts from Alternative 4

Implementing this alternative would result in 506 total miles of routes for full-size motorized vehicles and ATVs (32 miles) being available for fire management activities, 194 fewer miles than in Alternative 1 and 148 more miles than in Alternative 2, the Proposed Action. These miles include access on all administrative routes in Alternatives 1, 2, and 4, and the mileages include the routes that would be closed in Alternatives 2 and 4. Thus, planning for and implementing fire management activities would be somewhat more difficult in this alternative than in Alternative 1, and would be made slightly easier and more flexible as compared to Alternative 2. This would allow for more intensive access and management of fires than with the proposed action, though less intensive than under the No Action Alternative.

## Cumulative Effects

As mentioned under each of the alternative analysis above, with the emphasis of the Montrose Interagency Fire Management Unit fire program to manage fire over much of this landscape as a natural process, ie, Wildland Fire Use, the closure of varying levels of routes in the area will influence that emphasis due to decreased access for initial attack and logistical support. This could increase the amount of fire that occurs as a natural process within this area by 10-20% or more. Additionally, over time, as closed routes in the area become re-vegetated there will be fewer 'natural' fire breaks across the landscape and fire, whether they are suppression fires or fires for resource benefits, could become larger due to a reduced number of barriers to fire spread on the landscape. This will probably not be a major issue for 1-2 decades or more until roads begin to re-vegetate over time, and even after 10-20 years the impact may be minimal.

[167]

BLM_0014652

## FOREST MANAGEMENT

The planning area includes some of the forest types found throughout the Uncompahgre Field Office (UFO). The dominant forest type in the planning area is Piñon and juniper and Piñon and juniper mixed woodlands.

Ponderosa pine and Douglas fir are found in the planning area, but not in commercial quantities. The entire planning area, except for the Camel Back Wilderness Study Area, is available for firewood and post and rail cutting and gathering by individuals. The BLM conducts no commercial sales of forest products in the planning area. Non-commercial Christmas tree and transplant harvesting occurs in designated locations within the area. Personal use firewood gathering is authorized by permit. Approximately 64 personal use firewood permits, 7 rail post permits, and 1 bough permit were issued in 2007. Stipulations for minimizing resource impacts are attached to each permit that is issued, including permitted off-route use of motorized vehicles. Forest product permits that are issued to the general public currently include a stipulation that limits parking to within 10 feet of existing open routes. Because of the close proximity of the planning area to the City of Montrose and the town of Olathe, firewood cutting is a fairly important use of resources on public lands.

Some unauthorized firewood cutting and harvesting does occur in the planning area.

Very little recent forest management activity has been accomplished in the planning area on public lands. Some pinon-juniper chainings were conducted in the past on the narrow ridges east of Dry Creek Rim Road. These chained areas are being re-vegetated naturally with shrubs and some scattered pinon communities.

There are approximately 40,700 acres of Piñon-juniper communities within the planning area (Table 41). Approximately 30,000 acres of these communities do not meet health standards (Roubideau Land Health Assessment, available in Uncompahgre Field Office).

Historic photos and tree stand structure indicate that in some areas in the planning area piñon-juniper woodlands are becoming denser than they were in the past and are expanding into other plant communities. Recent long-term drought has brought on an Ips beetle epidemic in much of southwestern Colorado. Many other pinyon pathogens have also combined with these to create "piñon decline" which kills the piñon trees. Because piñon are such an important part of the plant communities in the Roubideau unit, piñon decline was used as an indicator of health during the Roubideau Land Health Assessment, and captured by evaluating the vigor or piñon trees. Piñon decline was observed at many sites across the unit, and is especially prevalent in the southern part of the unit.

Approximately 475 miles of existing routes and trails in all travel use categories traverse the Piñon-juniper woodlands, and all the routes are available for motorized use. The more accessible routes are used to gather and cut firewood using full-size pickup trucks and small utility trailers. All the available public lands are available for motorized, cross-country access for this activity.

[168]

BLM_0014653

# Forest Management

**Environmental Consequences**

**Impacts Common to All Alternatives:**

Existing and future individual firewood permits and permits for gathering other forest products would be issued, with stipulations that address motorized vehicular access. Permits could contain stipulations regarding resource impacts or limiting the activity in wet weather. Public lands could be closed to the gathering of forest products in the event of fire danger or other safety concerns.

**Impacts Common to Alternatives 2, 3, and 4**

Closing some routes would limit the public's ability to access forest products in some areas. Closing routes that lead onto public lands from private lands with exclusive private landowner access might actually help to reduce unauthorized firewood or forest product gathering.

Restricting motorized use and prohibiting motorized use on some routes, or limiting some routes to ATV or motorcycle use could increase the costs of future forest management. Limiting use on some routes to ATVs or single-track activities such as hiking, motorcycle use, or mountain bikes could restrict access if forest management activities require the use of motorized, full-size vehicles.

Limiting all motorized travel for forest management activities to designated routes would not greatly affect the implementation of these programs.

Closing routes with gates would allow easy access for future forest health and fuels reduction projects. Permanent closures by mechanical means with boulders and tank traps could result in higher future costs for forest management activities.

**Impacts from Alternative 1**

Growing demands for forest product gathering or cutting would result in continued loss of vegetation and more soil disturbance and an increase in the rate of creation of new routes from cross-country travel for this activity.

**Impacts from Alternative 2**

Implementing this alternative would result in 230 miles of routes for full-size motorized vehicles being available for forest product gathering. In addition, there would be 34 miles of ATV routes available for this activity, for a total of 264 miles of available motorized routes, 334 fewer total miles than would be available in Alternative 1. These miles do not include access on any administrative routes, and the mileages include the routes that would be closed in Alternatives 2 (259 miles). Closing approximately 259 miles of routes would, to some degree, create an inconvenience to the public in gathering forest products, since the products would need to be carried further where those routes provided access. A decrease in the loss of roadside vegetation and soil impacts would occur because no use would occur on those routes. The conditions of

[169]

BLM_0014654

# Forest Management

use on travel in this alternative would result in decreased off-route travel to gather or cut products, and the proliferation of new user-created routes would decrease significantly. This would prevent further vegetation loss and soil and water impacts. The closure of routes and the travel conditions of use could also deter unauthorized gathering because of this inconvenience.

An additional 61 miles of administrative routes would be available for planning for and implementing forestry management activities for a total of 324 miles of motorized routes. Forest management implementation would be slightly more difficult in this alternative than in Alternative 1, because locating, accessing, and implementing activities may be slowed in areas that are more remote due to less road coverage and subsequent inability to utilize motorized vehicles everywhere for needed uses.

**Impacts from Alternative 3**

These impacts would be similar to forest product gathering as those in Alternative 2, except that implementing this alternative would result in a total of 123 miles of motorized routes for full-size vehicles and ATVs (13 miles) being available, for a total of 136 miles of motorized routes for access, 554 fewer miles than in Alternative 1 and 128 fewer miles than in Alternative 2, the Proposed Action. These miles do not include access on administrative routes in Alternatives 2, and 3, and the mileages include the routes that would be closed in Alternatives 2 and 3 (369 miles closed in Alternative 3). Thus, forest product gathering activities would be somewhat more difficult in this alternative than in Alternative 1 and 2.

An additional 99 miles of administrative routes would be available for planning for and implementing forestry management activities for a total of 222 miles of motorized routes, about 100 fewer miles than in Alternative 2 and 480 fewer than in Alternative 1. This alternative would have the greatest impact on implementing forest management activities due to greatly less access into the public lands in the planning.

The decreases in vegetation loss and soil impacts would be greater in this alternative than in any alternative.

**Impacts from Alternative 4**

Implementing this alternative would result in 422 miles of routes for full-size motorized vehicles being available for forest product gathering. In addition, there would be 29 miles of ATV routes available for this activity, for a total of 451 miles of available motorized routes, 249 fewer total miles than would be available in Alternative 1 and 187 more miles than in Alternative 2. These miles do not include access on any administrative routes, and the mileages include the routes that would be closed in Alternatives 2 (118 miles). Closing approximately 118 miles of routes would, to some degree, create an inconvenience to the public in gathering forest products, since the products would need to be carried further where those routes provided access. A decrease in the loss of roadside vegetation and soil impacts would occur because no use would occur on those routes. The conditions of use on travel in this alternative would result in decreased off-route travel to gather or cut products, and the proliferation of new user-created routes would decrease significantly. This would prevent further vegetation loss and soil and water impacts.

[170]

# Forest Management

The closure of routes and the travel conditions of use could also deter unauthorized gathering because of this inconvenience.

An additional 12 miles of administrative routes would be available for planning for and implementing forestry management activities for a total of 463 miles of motorized routes. Forest management implementation would be slightly more difficult in this alternative than in Alternative 1, because locating, accessing, and implementing activities may be slowed in areas that are more remote due to less road coverage and subsequent inability to utilize motorized vehicles everywhere for needed uses.

## Cumulative Effects

The alternatives under consideration create no long-term adverse or beneficial cumulative effects to forest management in the travel planning area when considered with other reasonably foreseeable actions.

## GEOLOGY AND MINERALS

The Planning area is located in the Colorado Plateau geomorphic province. It is on the northeastern flank of the Uncompahgre uplift. The Uncompahgre uplift is a broad upwarping of Precambrian rock overlain by Mesozoic sediments. The formations overlying the project area include Precambrian age formations and the Chinle, Entrada and Morrison formations located in drainages, and the Dakota and Mancos shale formations located on the mesa tops.

Leasable Minerals: There are no oil and gas leases at this time. Any leases issued would contain stipulations for oil and gas operation activities contained in the current resource management plan for the Uncompahgre Field Office. Much of the public land is available for oil and gas leasing, either yearlong or with seasonal restrictions to prevent disturbance to wintering big game. The Camel Back WSA is closed to oil and gas leasing, as well as to other mineral leasing.

No other energy leasable minerals and no non-energy leasable minerals are known to exist at this time.

Saleable Minerals: Motorized access is important for the mineral program, especially for saleable minerals. Valid existing rights associated with the minerals program and permits issued to the public in the FO include vehicular access.

Saleable mineral activities in the area primarily include rock collection for landscape purposes. No commercial rock collecting occurs in the area. Individuals with permits can collect moss rock using equipment such as wheel barrows, ATVs, pickup trucks, and small trailers. Approximately 160 individual rock-collecting permits were issued by BLM in 2008. Authorized types of vehicles can be taken cross-country if a valid permit authorizing this use has been issued. These permits include measures for rehabilitation and other mitigation and are designed to minimize cross-country impacts. With the exception of the Camel Back Wilderness Study Area (WSA), the public land is available for collection and sale of saleable minerals, primarily

[171]

BLM_0014656

# Geology and Minerals

moss and decorative rock. The Colorado Department of Transportation (CDOT) holds a permit for a mineral material storage site located in Sub-Region C in Sec. 27, T50N, R11W, NMPM. This permit is a free-use permit to the CDOT, and is used for storage and extraction of large rocks for road or other construction purposes.

Locatable Minerals: Several mining claims are located in the area, but none are actively being developed. There has been little past production and no recent production of locatable minerals within the area. There are some abandoned mines from past mining activities. Much of the public land is open to mining claim location yearlong. The Camel Back WSA is withdrawn from the staking of mining claims.

## Environmental Consequences

Overall, in all alternatives, a large number of miles of existing routes would be available for motorized and non-motorized access for minerals management purposes, and all public lands, except for public lands within the WSA, would remain available for leasable, locatable, and saleable minerals, including collection of moss rock or decorative rock. Mineral material activities, such as moss rock collection, would be conducted according to BLM authorizations and subject to stipulations included in the authorizations.

### Impacts from Alternative 1

There are approximately 700 miles of existing, available motorized and non-motorized routes. About 96%, or 677 miles, of this total would be available for use with motorized vehicles in this alternative. The public lands, with the exception of the Camel Back WSA, would continue to be available for collection of moss or decorative rock, and all existing routes would be available for access. Mineral material activities, such as moss rock collection, would be conducted according to BLM issued permits and stipulations included in permits. Cross-country travel for miscellaneous rock collection would continue to occur, resulting in soil erosion, compaction, and the creation of new, user-established routes and trails. Existing policies for the management of use would continue, and probable expansion and proliferation of unplanned and poorly located routes by all users would occur.

### Impacts from Alternative 2

Approximately 66% of the existing routes and trails, or 460 miles, would be designated as being available for access for minerals management purposes, including for moss or decorative rock, using motorized and non-motorized travel. Compared to Alternative 1, implementing the travel management plan in this alternative would result in fewer miles of access routes being available for access to use for minerals management purposes, including collecting moss or decorative rock, or in exercising mineral material permits. Mineral related activities, such as moss rock collection, would be conducted according to BLM issued permits and stipulations included in permits. During part of the year, some of these routes would not be available for use in order to prevent disturbance to wintering big game. See Appendix 4 for routes that would be closed seasonally in this alternative. Some existing routes would be closed, which could limit vehicular access to some public lands.

[172]

BLM_0014657

# Geology and Minerals

**Impacts from Alternative 3**

The impacts from implementing this alternative are similar to those in Alternative 2, the difference being that approximately 48% of the existing routes and trails, or 336 miles, would be designated as being available for motorized and non-motorized access for mineral related activities.  Mineral material activities, such as moss rock collection, would be conducted according to BLM issued permits and stipulations included in permits.

**Impacts from Alternative 4**

In Alternative 4, approximately 88% of the miles of existing routes, or 617 miles, would be available for motorized and non-motorized access for mineral related activities.  Most of the existing routes would be available yearlong for mineral material access.   Mineral material activities, such as moss rock collection, would be conducted according to BLM issued permits and stipulations included in permits.

**Cumulative Effects**

Cumulative impacts particularly for saleable minerals (moss rock and decorative rock collecting) would be measurable by the miles of roads proposed to be closed by each alternative, ie fewer miles of roads results in less areas of public land that would be accessible.


## HYDROLOGY/WATER RIGHTS

Refer to the Water Quality section for a description of the areas hydrologic function.

There are several water sources across the planning area that has associated water rights or permits.  The Colorado Water Conservation Board holds instream flow water rights on Roubideau, Potter, Dry and Spring Creeks, for the protection of existing fisheries and other, natural attributes of the riverene environment.  Additionally, these creeks as well as the East and West Forks of Dry Creek, and Criswell and Monitor Creeks, have federal appropriative water rights for instream diversions to benefit, livestock, wildlife, recreation, and fire suppression.  Approximately 65 livestock watering ponds are located throughout the area.  Most of these ponds are permitted through the Colorado Division of Water Resources, and have storage capacities less than 1 acre-foot.  For the most part, the ponds are seasonally functional, containing water only after snowmelt or large precipitation events.  There are also about 27 spring or seep sources across the planning unit, many of which have been developed for sources of livestock water.  Twelve of the 27 springs have federal reserved water rights under the authority of Federal Executive Order - Public Water Reserves #107. The remaining 15 water sources have state adjudicated water rights.

**Impacts Common to all Alternatives**

With water sources needing routing maintenance such as livestock ponds and spring

[173]

BLM_0014658

# Hydrology/Water Rights

developments, authorized access, including off route travel if needed, is allowed under all alternatives for the party responsible for conducting the maintenance.

## Impacts from the Alternative 1

Under Alternative 1, travel on over 700 miles of existing routes, and cross-country travel on all public lands would continue to be available. In the future, additional user created routes would become established, increasing soil disturbance in sensitive areas such as the WIZ and on erodible soils. Many of the existing and anticipated future routes would receive little maintenance to ensure adequate drainage and minimize erosion. Accelerated sediment production and potential contaminant spills from motorized use could continue to occur on or along 10 miles of routes along perennial streams within the WIZ, and 83 perennial stream crossings, within Sub-Regions A, B, C, and D (Table 16). This sediment production and potential spillages could impact fisheries presently protected with instream flow water rights. At present there are 200 miles of routes that occur on soils that have a severe potential for erosion (Table 17), and 440miles of routes on soils with a high potential for supporting biological soil crusts (Table 33). This, added to anticipate increases in soil surface disturbance from future user created trails, would accelerate sediment production, potentially increasing the maintenance requirements for the livestock watering ponds within the planning area.

## Impacts Alternative 2

Compared to Alternative 1, in this alternative travel would be restricted to approximately 420 miles of designated motorized and non-motorized routes, or 259 fewer miles than in Alternative 1, and all off-route travel would be prohibited except for horseback or foot travel. With approximately 259 miles of existing routes targeted for closure under this alternative, there would be a 38% reduction in the number of perennial stream crossings, or 36 fewer crossings, and a 50% reduction in miles of routes in the WIZ along perennial streams, or 5 fewer miles, which would reduce the potential for impacts (sediment and contaminant spills) to riverene values protected with instream flow water rights. Most of these benefits would occur in Sub-Regions A through D. However, across the planning area there would be a 30% reduction in the number of miles of routes crossing soils having a severe erosion potential, or 60 fewer miles, and a 38% reduction in the number of miles of routes crossing soils with a high potential for supporting biological soil crusts, or 167 fewer miles. These actions along with implementing the proposed measures in this alternative, such as prohibiting off-route travel would reduce the sediment yield potentially intercepted by livestock ponds.

## Impacts from Alternative 3

Compared to Alternative 1, in this alternative travel would be restricted to approximately 271 miles of designated motorized and non-motorized routes, or 369 fewer miles than in Alternative 1. Perennial stream crossings and miles of WIZ would be reduced by -18% (15 fewer crossings) and -20% (2 fewer miles) from the existing situation, respectively, about half of the reduction of Alternative 2. Routes crossing soils with a severe erosion potential or a high potential for supporting biological soils crusts would be reduced by 67% (0.4 fewer miles) and 56% (249 fewer miles), respectively. The measures in this alternative, such as the prohibition of all off

[174]

BLM_0014659

# Hydrology/Water Rights

route travel, would benefit livestock watering facilities and instream flow water rights. Potential impacts to riverine values supported by instream flow water rights and livestock ponds under Alternative 3 would trend similar to Alternative 2.

**Impacts from Alternative 4**

Compared to Alternative 1, in this alternative travel would be restricted to approximately 606 miles of designated motorized and non-motorized routes, or 118 fewer miles than in Alternative 1. Potential impacts to riverine values supported by instream flow water rights and livestock ponds under Alternative 4 would trend similar to Alternative 2 but to varying degrees. Perennial stream crossings and miles of WIZ would be increased by 59% (49 more crossings) and 30% (3 more miles) from the existing situation, respectively (Table 22). This increase is primarily a result of the Roubideau Creek horse trail, which increases the miles of WIZ and perennial stream crossings in Sub-Region B by 133% and 144% from the existing situation, respectively (see Table 22). Since this trail is limited to horse and foot traffic, impacts to riverine values would be limited. The remainder of the Sub-Regions would see little or no change in the miles of WIZ and stream crossings. Compared to Alternative 1, the number of miles of routes crossing soils having severe erosion potential would be increased by 2% or 5 miles, and the number of miles of routes crossing soils having a high potential for supporting biological soils crusts would be reduced by 14% or 60 fewer miles, from the existing situation. As with Alternative 2, measures in this alternative, such as prohibiting all off-route travel, would benefit livestock watering facilities and instream flow water rights.

**Cumulative Effects**

There are many factors affecting the water quality and hydrology. Much of the surrounding private land in this area is being subdivided and becoming increasingly developed with new routes and home sites, potentially adding to accelerated levels of sediment yield in these watersheds.

Along with the impacts caused by the development of new routes and home sites, there are impacts associated with historic livestock grazing that continue to influence the water quality with excessive sediment concentrations in the waters of the Dry Creek travel planning area and downstream users. The Dry Creek TMP is an important piece of the watershed management equation. It will determine the kinds and amounts of travel uses that will be allowed on the Public Lands within the affected watersheds. As the development of private lands for residential homes, and the demand for recreational uses on Public Lands continue to increase, the decisions made in the Dry Creek TMP will play an important role in determining the overall health of these watersheds.


# LAW ENFORCEMENT

Problems with unauthorized or illegal use on public lands are numerous and growing. In addressing these problems the Law Enforcement program focuses on education, compliance checks, and issuing written warnings and violation notices. The ability of the Law Enforcement

[175]

BLM_0014660

# Law Enforcement

program to increase compliance with existing use regulations is comprised of three main problems:

Manpower Limitations:  At present only two law enforcement officers (Rangers) are stationed in the Uncompahgre Field Office (UFO), which cover the UFO and Gunnison Gorge National Conservation Area (GGNCA).  The Rangers are responsible for enforcement activities on all public lands.  In addition to enforcing use violations, the Rangers must also handle mineral, land and realty, grazing, recreation, and other program violations.  Also, one of these two Rangers is responsible for the Law Enforcement program in the Gunnison Field Office (GFO).

Current Travel Management Policy: Under the BLM's current OHV regulations, motorized travel is limited to three categories of OHV designations: Open, Limited or Closed.  This current OHV designation system is difficult for the public to understand and for the BLM to enforce.  Although the current regulations prohibit the operation of OHV's in a closed area or trail or in a manner causing resource impacts, the planning area is not adequately signed to relay to the public which areas are Open, Limited or Closed.  Many unauthorized "user created" routes have been developed over the years that visitors now regard as existing motorized routes.  The creation of such routes often conflicts with other users.  Unauthorized extreme jeep trails have been illegally constructed within the Dry Creek Travel Management Plan Area.  Signs are posted on some "user created" routes indicating that they are closed to motorized use, but many of the signs are ignored or do not stay up for very long.

## Environmental Consequences

## Impacts Common to All Alternatives

In accordance with 43 CFR 8340.0-5, motorized travel within the planning area would not be affected for the following uses: fire management or suppression activities emergencies, or law enforcement vehicles being used for emergency purposes, as well as any vehicle whose use is expressly authorized by the Authorized Officer (permitted/authorized use).  Law enforcement personnel would be permitted to use motorized vehicles in the planning area on designated routes, closed routes, and cross-country during official law enforcement or investigative events.

## Impacts Common to Alternatives 2, 3, and 4

Implementation of a designated route system will have a positive impact and benefit for law enforcement in adopting and essentially switching to a designated route system.   By providing clear direction with maps and signs, most people will abide by the route designations.  Also, public participation and support from stakeholders will form partnerships to educate the public and increase peer pressure.  This will assist Rangers in enforcing user compliance and in court proceedings.

## Impacts from Alternative 1

Under Alternative 1, law enforcement personnel would continue to operate under current travel management regulations that are difficult for the public to understand and for the BLM to enforce.  This alternative also limits the ability to effectively enforce the closures of user created

[176]

# Law Enforcement

routes.

**Impacts from Alternative 2**

Alternative 2 would implement a travel management plan with a designated route management system that would improve the ability of law enforcement personnel to enforce OHV regulations and OHV restrictions.  Alternative 2 would initially create a greater need for education with the users, and compliance and law enforcement actions, but this would improve over time as users become familiar with the new travel management plan and route system.  The seasonal closures of some routes to prevent disturbance to wintering big game would, over time, assist law enforcement by providing fewer routes during the closure period to patrol.

**Impacts from Alternative 3**

Alternative 3 would also implement a travel management plan with a designated route management system that would improve the ability of law enforcement personnel to enforce OHV restrictions.  This alternative would, however, require the most law enforcement presence, since the number of road and trails that would be designated for seasonal and yearlong use would be substantially reduced.  This could lead to overcrowding and increased user conflicts in some areas, increased violations of OHV use on non-motorized routes, and increased attempts to establish user-created routes.

**Impacts from Alternative 4**

Alternative 4 would also implement a travel management plan with a designated route management system that would improve the ability of law enforcement personnel to enforce restrictions.  Alternative 4 would initially create a greater need for education with the users, and compliance and law enforcement actions, but this would improve over time as users become familiar with the new travel management system.  Since more routes would be available for OHV use, in the long term, and users would be distributed over more miles of routes, potentially a lower level of law enforcement presence could possibly be required.

**Cumulative Effects**

Cumulative impacts that would be measurable would not likely occur as a result of implementation of any alternative.

**PALEONTOLOGY**

The planning area spans at least three distinctive Potential Fossil Yield Classification (PFYC) areas -3, 4 and 5.  Most of the area is contained in PFYC 4 (moderate to high potential), while Dry Creek and tributary drainages are in PFYC 5 areas, known to contain important fossil specimens.

Several notable paleontological locations occur within the area.  These include the Burro Canyon

[177]

BLM_0014662

# Paleontology

formation and large areas of the Morrison formation found in Dry Creek itself, in Roubidoux Canyon, and outcroppings in various areas throughout the area. Scientific paleontological quarrying has been accomplished in many localities in the area. Continued paleontological resource inventories are being conducted and project-specific inventory would be required on those areas which rank in the Potential Fossil Yield Class (PFYC) 4 or higher. These inventories would identify those areas that require special attention or mitigation.

## Environmental Consequences

### Impacts from Alternative 1

Current levels of travel may impact some important paleontological localities, and secondary impacts from fossil collection and erosion may also occur due to current management policies. This alternative would allow the current level of potential impacts to continue. The most serious type of impacts would be caused by dirt bikes and ATV's traveling over steep clay slopes where fossils are eroding from the shale layers. The potential for illegal digging is high due to the high number of routes, and could result in major impacts to irreplaceable fossil resources.

### Impacts from Alternative 2

Compared to Alternative 1, Alternative 2 would result in an improvement to the protection of fossils and historic dinosaur quarries. Elimination of off road driving would stop prevent the use of cross-country motorcycle and ATV use on the steep clay slopes where fossils may be exposed and disturbed by the resulting erosion. Relocation and rehabilitation of some routes could assist in preventing further erosion and disturbance on some routes.

### Impacts from Alternative 3

Compared to Alternative 1, this Alternative would reduce impacts to fossils due to a major reduction in the number of available designated motorized routes and the restriction of travel to existing routes and tracks. The reduction of motorized travel would decrease the impacts caused by cross-country travel and those activities associated with motorized use. It would also reduce potential impacts to both known and unknown fossil sites.

### Impacts from Alternative 4

Compared to Alternative 1, Alternative 4 would reduce impacts to fossils due to the elimination of off road travel in known fossil localities. In addition, the impacts would be moderately reduced due to fewer motorized routes in known fossil locations than under the Current Use Alternative.

### Cumulative Effects

Cumulative effects on paleontological resources cannot be specifically identified until inventories are completed and paleontological resources have been identified.

[178]

BLM_0014663

# Noise

## NOISE

Ambient sound and noise levels vary greatly throughout the area. Ambient sound includes the wind and noise originating from vehicle traffic on Montrose County roads and privately owned lands. Other noise sources include industrial activities, farming and ranching activities, aircraft over-flights, recreational target shooting, and activities related to uses around residential areas. Many areas within the planning area are, however, relatively quiet. The preponderance of these quiet areas is found on public lands.

Vehicles on county roads are the largest noise contributors to public lands. Most of the public lands are more influenced by the noise from motor vehicles on routes than from other sources. Those Sub-Regions that border county roads are exposed to continuous high levels of traffic noise from cars and large trucks. The level of noise generated by car and truck traffic generally lessens with increased distance from the county road but the sounds of traffic can often be heard from many miles away. The degree to which the sounds of traffic noise can be heard away from the county roads is dependent on the nature of the local terrain and wind direction. Noise can be blocked or muted by the surrounding vegetation and topography.

The use of recreational vehicles on BLM routes is another major source of noise in portions of the area. As a general rule, ATVs and motorcycles produce more noise than full-size 4WDs and SUVs. ATVs and motorcycles produce more noise because their exhaust systems are not as effective at muffling noise and the machines are often operated at high rpms, whereas full-size vehicles are usually equipped with effective muffling systems and are operated at slower speeds. Consequently, the Sub-Regions with the highest noise levels are those that contain numerous routes that attract high amounts of ATV and dirt bike use.

Under Colorado State Law 08-063, state and federal agencies have the ability to educate and enforce state sound limits. The law sets a limit of 96 decibels on most OHVs and authorizes the use of the Society of Automotive Engineers 20 inch sound test. This test makes it possible to field test OHVs for sound education and enforcement purposes. BLM OHV crews and Law Enforcement personnel will be trained in test procedures. Education and enforcement of sound limits can have a significant effect on noise emissions throughout the planning area.

Other than implementing the state sound emission limits, the BLM has very little ability to change the noise patterns on the non-federal lands in the planning area. The noise on and from these non-federal lands can also be expected to increase as new subdivisions are created and as traffic on the major local routes increases. These increases are fueled primarily by increasing rural residential development and recreational uses.

Currently, visitors to the public lands can find a variety of areas that vary with the amount of noise that may or may not affect them.

[179]

BLM_0014664

# Noise

**Environmental Consequences**

**Impacts from Alternative 1**

Noise levels under this alternative would change in a variety of ways. In most areas, noise levels would increase, varying from slight increases in some areas (the less roaded Sub-Regions) to major increases in others. Though some increases in noise levels would come from increasing development on adjacent private lands, most of the increases on Public Lands would come from recreational motorized vehicle use. Overall, under this alternative, as use levels increase, noise levels could slowly but gradual increase throughout the planning area. A variety of noise levels would still be able to be found, as not all Sub-Regions would experience the same levels and types of increases in noise. The levels of noise from target shooting would generally remain the same but could slightly increase from increased levels of recreational use in some areas. Disturbance to other recreation users, adjacent private property owners, and wildlife would continue to result from the use and policies.

**Impacts from Alternative 2**

Compared to Alternative 1, Alternative 2, which limits motorized use to designated routes, noise levels can be expected to decrease in some Sub-Regions, while remaining the same or increasing in others. Lower levels of noise are anticipated in areas where routes are closed or are converted from motorized to non-motorized use. Sharp decreases in noise levels resulting from decreased amounts of motorized vehicle use would be found in Sub-Regions A and E. The remaining Sub-Regions would generally retain current noise levels, with some road closures offset by overall increases in use levels. Overall, the proposed closure of certain routes would result in decreased noise levels in the immediate geographic vicinity of the closed road. Conversely, those routes that remain available for motorized use or the new routes to be constructed would lead to increases in noise levels originating from these routes. In the planning area as a whole, there would be an increase in the number and size of areas where low levels of noise are found, as well as some localized areas where noise levels would increase. Less disturbance to wildlife, adjacent property owners, and other recreation users would occur in some Sub-Regions.

**Impacts from Alternative 3**

Compared to Alternative 1, under this alternative, which limits motorized use to many fewer, designated routes, noise levels would be expected to decrease. The decrease would be slight in areas that are currently relatively quiet and greater in those Sub-Regions with the largest amount of road closures. Under this alternative, noise levels in Sub-Region E, D, G, and F would drop sharply. Noise levels in Sub-Regions A and C would drop moderately. The overall increase in visitors would probably result in a moderate to high increase in noise levels on those Public Land routes that remain available for motorized use and on adjacent Federal, state, and local roads. This would be caused by users of motorized vehicles shifting their use to those routes that remain open. Less disturbance to wildlife, adjacent property owners, and other recreation users would occur in some Sub-Regions.

[180]

BLM_0014665

# Noise

**Impacts from Alternative 4**

Compared to Alternative 1, under this alternative, which limits motorized use to slightly fewer, designated routes, noise levels would be expected not to be at the same levels as those under Alternative 1. This increase would be slight in areas that are currently relatively quiet and greater in those Sub-Regions that currently receive a moderate to high amount of motorized use. This increase in noise levels would come from the continuation of use on some routes, the addition of new routes in certain areas, and the overall gradual increase in use throughout the planning area. The overall increase in visitors would probably result in low to moderate increases in noise levels on those Public Land routes that remain open and on adjacent Federal, state and local roads. This increase is mostly based on the greater availability of motorized routes on Public Lands than under Alternative 2. Overall, less disturbance to wildlife, adjacent property owners, and other recreation users would occur in some Sub-Regions.

**Cumulative Effects**

In addition to growth in recreational travel, other reasonably foreseeable actions that could affect regional ambient sound and noise levels over the next 10 years on private and public lands include residential growth, new road construction on private lands, fuels reduction projects, utility corridor maintenance and upgrades, and new buried utility rights-of-way. Activities on public lands in the travel planning area that could also potentially impact ambient sound and noise levels and require mitigation include, Forest Service planning and projects, Uncompahgre Plateau Project activities, local land use planning, soil research, BLM Uncompahgre Field Office Resource Management Plan revision, continued population growth, vegetation treatments, county road upgrades, special recreation permits and activities, and utility rights of way and corridors. The cumulative effects to ambient sound from these activities in addition to noise from all action alternatives will be long-term and most adverse and dispersed in Alternative 1 and 4, contained and long-term in Alternatives 2 and 3.

# RANGE MANAGEMENT

There are 23 grazing allotments in the planning area. The allotments range from an elevation of 5,040 feet in the north to 8,000 feet along the southern portion. The allotments are comprised of gently sloping mesa tops dissected with deep canyons draining from southwest to northeast. The vegetation is consists of cool and warm season grasses, shrubs, and forbs. The riparian areas support a variety of native riparian vegetation with conservative grazing prescriptions, usually associated with larger grazing allotments. Allotments are used by either sheep or cattle and season of use on allotments varies from fall, winter and/or spring use.

The Dry Creek Travel Management Plan (TMP) would have some affect on the grazing permittees. There would be a need for permittees to work closely with Field Office Rangeland Management Specialists (RMS) in terms of where to put camps and livestock supplements. Cleaning of ponds, mending of fences, and maintenance of range improvements will still be incorporated into ranching operations regardless of route closures. Use of the allotment during the permittees permitted use period would continue in all alternatives whether the area was

[181]

# Range Management

closed for wildlife protection to the general public or not. Motorized vehicular access by permittees for allotment and livestock management will continue to occur according to the terms and conditions authorized, in the CFR and valid grazing permits. Cross country motorized vehicular travel usually does not occur by ranchers unless authorized by BLM, or during extreme emergencies such as calving difficulty or livestock injury or death.

## Environmental Consequences

### Impacts from Alternative 1

There are approximately 700 miles of routes available for recreational and other uses. Of these 700 miles or routes, approximately 677 miles, or 96%, are available for travel using most types of motorized and mechanical vehicles. In Alternative 1, the public lands, with the exception of the Camel Back Wilderness Study Area (WSA) would continue to be managed such that unplanned and poorly located routes would continue to be developed by cross-country vehicular use. In this alternative routes would continue to proliferate and livestock would have fewer areas to go for calving and caring for young without large amounts of potential activity or harassment from travel. Permittees locating sheep camps in the fall/winter would have a greater challenge in finding areas where these camps would not be as accessible to the general public, potentially resulting in more vandalism and human disturbance to these camp areas. Although most camps are usually not vandalized, some in high use areas have been broken into. The potential for additional vehicular access, combined with the available existing routes, could increase livestock and recreational user conflicts in this alternative. Within sheep camps there are typically sheepdogs, and in locations where sheep camps and grazing cannot be placed away from concentrated recreational trails use, conflicts are more likely to occur.

### Impacts from Alternative 2

Approximately 60% of the total existing routes, or 420 miles, would be designated and available for a variety of uses and vehicles in this alternative, compared to Alternative 1. However, not all these routes would be available for travel or use by all uses and by all vehicle types. The route network in this alternative was proposed with quality recreational opportunities in mind while maintaining open mesa tops for wildlife and livestock purposes. Quality recreation routes that enhance recreation opportunities while eliminating the availability of some routes would tend to decrease livestock and recreational user conflicts. This reduction in the number of miles of available routes would result in decreased human pressure noise near livestock during the calving seasons, reduce the potential sheep dog and route and trail user conflicts in the fall, and help reduce the likelihood of human vandalism and disturbance at sheep camps. This would occur due to the ability of livestock to more likely find lower traffic use areas and through the potential for permittees to place sheep camps away from higher use areas. This alternative would also potentially have positive influences on the ranching community who use the area as part of their viable economic base of operation.

### Impacts from Alternative 3

Compared to all alternatives, implementing this alternative would result in fewer miles of

[182]

BLM_0014667

# Range Management

available designated routes for motorized and mechanical vehicle uses. Approximately 45%, or 336 miles of the total existing routes would be designated and available for a variety of uses and vehicles in this alternative, compared to Alternative 1. However, not all these routes would be available for travel or use by all uses and by all vehicle types. Quality recreation routes that enhance recreation opportunities while eliminating the availability of some routes would tend to decrease livestock and recreational user conflicts. This is the most livestock-friendly option with large areas where livestock and sheep grazing could occur with little user conflict while still providing quality recreational opportunities, even though less than in Alternative 1. This reduction in the number of miles of available routes would result in decreased human pressure noise near livestock during the calving seasons, reduce the potential sheep dog and route and trail user conflicts in the fall, and help reduce the likelihood of human vandalism and disturbance at sheep camps. This would occur due to the ability of livestock to more likely find lower traffic use areas and through the potential for permittees to place sheep camps away from higher use areas. Designated routes that have been planned with BLM and community involvement usually maintains a more acceptable array of recreational activities. This alternative would also potentially have positive influences on the ranching community who use the area as part of their viable economic base of operation.

## Impacts from Alternative 4

Approximately 83%, or 617 miles of the total existing routes would be designated and available for a variety of uses and vehicles in this alternative, compared to Alternative 1. However, not all these routes would be available for travel or use by all uses and by all vehicle types. This alternative would result in a higher route density (miles of routes per square mile of public land) than Alternatives 2 or 3. The route network in this alternative would result in nearly the same mileage of routes located on large open mesa tops or valleys as in Alternative 1, and potential conflicts between recreation trail users and livestock grazing or wildlife and habitat use would continue. This is the next-to-least livestock-friendly alternative being considered, with very few or no large areas where livestock and sheep grazing could occur with little user conflict. This alternative would not reduce livestock and recreational user conflicts and potential vandalism at sheep camps, but rather has the potential to increase the occurrences.

## Cumulative Effects

In addition to growth in recreational travel, other reasonably foreseeable actions that could affect range management over the next 10 years on private and public lands include residential growth, fuels reduction projects, utility corridor maintenance and upgrades, and new buried utility rights-of-way. Activities on public lands in the travel planning area that could also potentially impact range management include, Forest Service planning and projects, Uncompahgre Plateau Project activities, local land use planning, soil research, BLM Uncompahgre Field Office Resource Management Plan revision, continued population growth, vegetation treatments, county road upgrades, special recreation permits and activities, and utility rights of way and corridors. The cumulative effects to range management will be long-term and most adverse and dispersed in the Alternative 1 and 4, limited and long-term in Alternatives 2 and 3.

[183]

BLM_0014668

# Realty Authorizations

## REALTY AUTHORIZATIONS

Land status in the planning area consists of mostly large tracts of public lands and smaller tracts of private land that are within the area or on the perimeter. South and west of the area are lands administered by the United States Forest Service (USFS).

There are several rights-of-way (ROWs) within the planning area, including 115kV power transmission lines in Sub-Regions A, C, E, D, and F. TransColorado Gas Transmission Company holds a BLM ROW for a 22" gas pipeline that crosses into or is adjacent to Sub-Regions C, D, and E. Power transmission lines include high-voltage lines operated by Western Area Power Administration (WAPA) and by Tri-State Generation and Transmission Association (Tri-State). Each ROW holder is responsible for maintaining BLM ROWs, including routes, according to stipulations in each grant. The BLM has had discussions with WAPA and Tri-State to jointly reduce the amount of potential wildfire fuels within and outside their electrical transmission ROWs to protect major transmission lines from the impacts of wildfire. Treatments would be scheduled on a periodic basis, as needed, and affected ROW holders would be contacted as treatments are scheduled. Access for maintenance of these facilities is currently available, and most existing routes are available for use by the public. Avoidance of ROW facilities and yearly coordination with ROW holders would be the techniques utilized to reduce conflicts on and adjacent to ROWs. Many transmission facilities were constructed as many as 50 years ago, and significant repair and/or replacement would be necessary. Continuous and uninterrupted access to each of these facilities is currently available.

The use of existing, designated routes when possible would be encouraged by BLM rather than constructing new routes for access needs for existing and proposed ROW construction, maintenance, or associated resource management. Future realty program access needs would be evaluated using travel management plans in place and existing road networks. Before construction occurs, environmental assessments are prepared for future routes for authorized activities, and mitigation developed as necessary on a case by case basis.

No existing utility corridors are located in the area, however, there is a proposed ROW corridor, the West-wide Energy Corridor that would parallel and follow the TransColorado gas pipeline ROW. The corridor is proposed to be 3,500 feet wide, with the existing pipeline being the centerline of the corridor. If the corridor is approved, any entities proposing linear utilities in the general area would be required to first consider and examine this corridor.

Public access will be pursued into the Dry Creek Travel Management Planning area as opportunities arise. For private in-holding landowners, BLM must provide access as is adequate to secure the reasonable use and enjoyment of their property.

## Environmental Consequences

## Impacts to All Alternatives

Continuous and uninterrupted access to all authorized facilities would be required. The existing ROWs, their permitted uses, terms and conditions, and the permitted access to authorized ROWs would not be affected by any alternative.

[184]

BLM_0014669

# Realty Authorizations

Under Alternative 1, there would be no impact on existing land status, realty authorizations, or access. The uses of existing routes and cross-country travel would not be affected by this alternative. Under Alternative 1, there would be no change to the existing situation in that all existing routes would be available for use for realty authorizations.

Under Alternatives 2, 3 and 4, access would be along designated routes only, and depending on the alternative, would vary in the degree of impact based on the number of miles of routes available. See Appendix 4 for maps of routes for each alternative. New routes for uses on public lands may be authorized in rights-of-way grants or other authorizations on a case-by-case basis after appropriate environmental analysis. Access along the potentially resulting new routes may be limited to the realty authorization holder, or these routes could be available for public use. For landowners with private in-holdings, BLM will coordinate with the landowner to provide a reasonable level of access to their property.

## Cumulative Effects

Considering the cumulative effects, population growth and nearby development of private lands would result in more requests for services needing utility extensions or utility corridors in the planning area, which would increase effects to soils, visual resources, vegetation, and water resources for all alternatives. However, effects would be mitigated in Alternatives 2, 3, and 4 by limiting access to only what is absolutely needed by the companies to service their facilities and limiting those access routes to administrative use only as needed rather than leaving them open to the general public.

## RECREATION

Federal agencies are major contributors to the recreation amenities in Colorado's southwest region, managing over 66% of the entire land base, of which two million acres are managed by the Bureau of Land Management (BLM). The Uncompahgre Field Office (UFO) manages approximately half of those acres and approximately 110,000 acres would be affected by the alternatives and travel management plans presented in this document.

Recreational use has increased significantly over the last fifteen years. This increase can be attributed to population growth in Colorado (30.6% increase in population from 1990 to 2000; 13% increase from 2000 to 2007). Approximately a million Colorado residents live within a three hour drive of the area. Population growth within Delta, Montrose and surrounding counties (i.e. Mesa County) also has a direct impact on recreation use because many residents and their families and friends recreate on public lands near their homes. Montrose County population increased by approximately 62% from 1990-2007. For the same period, Mesa County and Delta County populations increased by 49% and 45%, respectively.

*Colorado Travel Year 2006 Longwoods International Report* (*Longwoods International, 2006*) on overnight travel and tourism, which recorded why people visit Colorado, illustrates the importance of the outdoors and public lands to the Colorado visitor who cite mountains, wilderness, and natural environment as important elements of their vacation. The Montrose area

[185]

# Recreation

and the Black Canyon of the Gunnison National Park are among the most popular destinations for overnight pleasure trips within Colorado's Southwest Travel Region. The Uncompahgre Plateau is a regional and national recreation destination for many off-highway vehicle enthusiasts– primarily because of the popularity, scenery, and year round availability and variety of recreational and technical four wheel-drive riding opportunities.

Statewide, OHV sales have increased approximately 28% from 2000 to 2005. In the local area, businesses selling OHVs actively market the public lands to their customers.

There is currently only one developed staging area, located at the beginning of Rim Road/Tabeguache Trail. Staging areas give users a location to meet, unload and load vehicles, and begin rides. Visitor data for the majority of the public lands is very limited. Traffic counter data is available only along the Rim Road and adjoining routes within the area which accounted for approximately 20,000 of the estimated 346,744 visits reported for the 2006 fiscal year for the Uncompahgre Field Office.

The increase in recreation use of the public lands in and adjacent to the area has had a direct effect on the condition of the existing routes. Many routes were constructed for or developed for specific uses such as timber cutting, range improvements, utility corridors, and access to Forest Service. Most of these routes were not designed for the type and amount of use that they are receiving from the recreating public. In popular areas, the rapid increase in use has lead to an increase in user created routes, most of which are not planned or designed, and many are poorly located on the land. Without a designated, identified, advertised, and mapped system of routes, visitors are uncertain about what routes are available for their use and are more likely to develop additional user created routes and continue to use new user-created routes created by others. The substantial increase in use on public lands has impacted both resources and recreation settings. The increase in recreation use is complimented by the "urban interface", or the close proximity of public lands to private lands and the local communities and amenities. In addition, the use season has been extended on much of the public land, which is snow free for most of the year, increasing year-round recreation use. Increased residential subdivision development adjacent to and near the area has contributed to the growing use on public lands.

## Activities and Opportunities in the Planning Area

The planning area, divided into seven Sub-Regions, maintains a wide variety of recreation settings and activities for visitors, communities, and the environment. Proposed travel management decisions must be evaluated for their impacts in achieving or sustaining recreation settings and activities to visitors, communities, and the environment.

The Camel Back Wilderness Study Area (WSA) (Sub-Region B) has a predominantly naturally appearing landscape. The WSA provides visitors with activities for non-motorized/non-mechanized activities in a backcountry setting – hiking, backpacking, hunting, fishing, and wildlife observation. Contacts with other people tend to be infrequent and group sizes small. Evidence of use such as fire rings and dispersed campsites can be found intermittently throughout the Sub-Region. Big game hunting in this area provides economic benefits to local communities.

[186]

BLM_0014671

# Recreation

Semi-primitive areas exist in most of the Sub-Regions. These areas are located farther from local communities and urban interface areas. These areas have a naturally-appearing landscape except for primitive routes. Recreation activities consist of motorized and non- motorized modes of travel such as technical and non-technical four wheeling, ATV, motorcycle, trials bike, mountain bike, and horseback riding, hiking, camping, hunting, and wildlife observation. Contacts with other people are more frequent and group size may be larger. High use areas (such as campsites, trailheads) show signs of frequent use. Facilities may include maintained and marked trails, simple trailhead developments, signs, and basic toilets. These semi-primitive areas provide direct and substantial economic benefits to local communities because of their importance and array of activities for recreational tourism. Sub-Region D specifically provides local economic benefits related to motorized recreation. Big game hunting also provides economic benefits to local businesses and communities.

Roaded natural areas dominate the area. These areas on public lands are often adjacent to communities, rural residential subdivisions and along improved routes. These areas have natural landscapes that are partially modified by routes and utility lines. Recreation activities consist of motorized and non-motorized activities in a front country setting. Contacts with other people are common, and large groups may be present. Improved facilities such as developed campsites and restrooms may be present. High use areas, such as routes, campsites, and trailheads, show signs of frequent use. These public lands provide benefits to local communities because they are easily accessible to residents for recreation. These are often areas with the highest levels of user conflict and resource impacts.

<u>Commercial and Special Recreation Uses</u>

BLM evaluates issues, manages, and monitors Special Recreation Permits (SRPs) for commercial and competitive recreation uses and organized group events on public lands and waters. The impacts of these activities are evaluated by BLM through the NEPA process when permit applications are received. In FY2007, approximately 11 SRPs were being used and active. These permits were issued for a variety of activities and events including Land Rover tours, hunting (big game and mountain lion), and a mountain bike event. In the past, there have also been technical four wheel-drive and motorcycle events.

The recreation opportunities provided by commercial and special recreation uses produce important benefits for visitors, businesses, communities, and the environment. The route system on public lands is essential to all of these commercial and special recreation uses, and the impacts of travel management decisions to these activities was considered in developing the alternatives. Each of the alternatives would allow the activities and events currently authorized by SRPs to continue. New SRP applications would be evaluated through the NEPA process to determine conformance with travel management decisions and to develop potential stipulations for SRP operations.

BLM_0014672

# Recreation

Other Important Recreation Planning Considerations: In addition to the above, the following would be considered.

Road and Trail Assessment:  During the route inventory process for this travel planning effort, BLM learned that many of the parallel routes, spur routes leading to private lands, and spur routes leading to range improvements were of little or no recreation value and could be considered for possible elimination and closure in the eventual route network to be designated through this travel planning effort, with probable minimal impacts to recreation users.

Recreation Management and Implementation:  Appropriate recreation management is essential to adequately develop and implement the decisions made in any travel management plan.  The recreation guidelines and BLM's OHV National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands provide direction for proper management.  Some of the more important points include: educating recreationists; providing clear and consistent maps; signing routes; developing brochures; increasing partnerships with user groups and volunteer efforts; increasing on-the-ground presence; developing support facilities in appropriate locations; developing an inventory and monitoring of recreational uses; and developing recreation plans, capacity models, and adaptive management that would ensure that the DFC goals and the Standards for Public Land Health are achieved.

Important characteristics for designing, implementing, and managing a good travel plan and route system for recreationists includes: developing user facilities, such as appropriate staging areas, parking lots, and trailheads; locating routes that access desirable features, overlooks, and recreation areas; providing loop opportunities rather than routes that dead-end; locating routes so that they are easily constructed, maintained, and sustained; and providing routes that allow for different types of activities.

Off-Route Parking, Camping, and Game Retrieval Policy: For BLM Public Lands and National Forests the distance that OHVs are currently permitted to drive off existing or designated routes for parking, camping and game retrieval is 300 feet. This regulation applies generally to most BLM and Forest Service-managed lands, with the exception of developed recreation facilities and other areas of concentrated use where parking or camping is restricted to designated parking areas and camping spurs.

Due to higher levels of public use on the Public Lands and National Forests, BLM and Forest Service managers are concerned that the long-standing 300 foot regulation is outdated and no longer provides adequate protection of vegetation and other resources. One of the major concerns with the 300 foot regulation is that new routes are often created through repeated use, and these new routes in turn become the starting points for additional 300-foot long or longer extensions.  As a result of these concerns, both the Forest Service and BLM are revising their regulations to decrease or eliminate the distance that motor vehicles can legally drive off routes to park, camp, and retrieve game.

[188]

# Recreation

**Environmental Consequences**

**Impacts from Alternative 1**

The Planning Area currently contains approximately 700 miles of existing routes.  These routes and the public lands offer a great deal of varying levels of motorized and non-motorized recreational activities and access.  These routes would continue to be available for all forms of motorized and non-motorized uses.  Decisions in the current RMP/Record Of Decision for the Uncompahgre Field Office restrict motorized travel in certain parts of the area to designated routes from December 1 through April 30 either annually or yearlong.  See Appendix C, Maps 1 and 2, pages 49 and 50, Uncompahgre Basin Resource Management Plan.  However, no routes have been designated on the ground via travel management planning, which would implement these seasonal or yearlong route designations and restriction decisions.  In this alternative, these decisions would continue to be under implemented until further travel management planning is completed, resulting in continued, yearlong, on-route and cross-country travel.  A high potential exists for new user-created routes to be developed through use by visitors and others.

Although this alternative provides a high number of motorized access routes, it does not constitute a travel management plan or route system that would resolve of the existing issues, nor does it consider good recreation planning and design factors that could enhance recreation activities and reduce user conflicts and impacts.  Loop routes, adequate parking, staging areas and other user facilities, and adequate public information would not be developed and made available. Poorly located and planned existing routes would continue to be used, resulting in a continuation of impacts associated with this use, including more user-created routes that would not be placed in sustainable locations, and desirable destinations and other features would not get incorporated into the travel system for the public.

Alternative 1 would provide only a limited number of non-motorized routes for long distance horseback riding, mountain biking, and hiking.  Alternative 1 would not adequately respond to the needs and issues identified by non-motorized recreation users.

For recreation uses authorized by SRPs, the activities and events currently authorized would continue, assuming renewal of permitted activities.  This alternative would provide the highest level of motorized access and would enhance activities for commercial outfitters offering motorized recreation.  It would not enhance activities for commercial outfitters seeking to offer non-motorized recreation (hunting, mountain biking, horseback riding, and hiking).

Off-Route Parking, Camping, and Game Retrieval Policy:  Under this alternative, the distance and location that motorized and mechanized travel could be driven off existing routes for parking, camping and game retrieval would remain unrestricted.  This would continue to result in continued and increased impacts to soils, vegetation and other impacts, such as increased litter, dumping, and other illegal activities.

Summary:  Alternative 1 would not provide a planned transportation system that would adequately address user conflicts or enhance recreational activities.  This alternative would not respond to the issues and concerns related to off-route parking and off-route motorized or

[189]

BLM_0014674

# Recreation

mechanized use identified by the public.  Alternative 1 would not be compatible with the desired future conditions for all of the Sub-Regions except for Sub-Region B, and it does not adequately comply with the consideration and importance of BLM recreation guidelines. Cumulative impacts concerning noise, route proliferation, resource impacts, safety, and user conflicts would continue or increase as a result of implementing this alternative.

**Impacts from Alternative 2**

Approximately 419 miles of motorized and non-motorized routes would be available for use in this alternative, or 283 fewer miles than would be available in Alternative 1. This alternative would result in the adoption of a travel management plan that would create a system of planned and designated routes more favorable to sustaining recreation settings and providing enhanced recreational activities than Alternative 1.  There would no longer be OHV designated "Open" areas where cross-country motorized travel would be permitted.  Mechanized modes of travel such as bicycles would be restricted to designated routes as well as traveling off-route to park and camp.  This alternative would improve new, motorized and non-motorized recreational activities by providing the construction of new routes and by the development of loop routes.

Routes that would not be included in this alternative or designated for motorized or mechanized modes of travel include those that would not enhance recreational activities, such as:  short spurs, parallel routes, poorly located routes, and routes to range improvements.  Compared to Alternative 1, much of the difference in available miles of routes in Alternative 2 would be offset by improvements to the travel system (connecting routes, new routes, and route conversions) and, in turn, would improve recreation overall for motorized and non-motorized users, such as the potential for reduced user conflicts.  Overall, the alternative includes loop routes, adequate parking and staging areas, and better route location for motorized and non-motorized travel.

For recreation uses authorized by SRPs, Alternative 2 would allow the activities and events currently authorized to continue.  It would enhance activities for commercial outfitters because new routes would be planned, designed, designated and developed over time.  It would benefit commercial big game (elk and deer) outfitters by somewhat reducing human contact with these species and potentially increase success in tracking and hunting.

Off-Route Parking, Camping, and Game Retrieval:  Under this alternative, the distance that vehicles would be permitted to travel off most designated routes for parking would be changed from 300 feet to a distance of one vehicle width from the edge of the route, and in such a manner so as to be safe and not interfere with other traffic.

However, specific areas would be identified where vehicles would be permitted to travel a distance of 300 feet from specific, designated routes to a campsite to car-camp and park.

Short spur routes would also be designated that would allow for car camping opportunities.

Dispersed camping, or camping in other than developed campgrounds or sites, would continue to be allowed in most of the area, but users would be required to park adjacent to and at a safe distance (one car-width) off designated routes, and then walk to the campsite.

[190]

BLM_0014675

# Recreation

Big game retrieval would continue to be allowed using wheeled, muscle-powered game carts or wagons only to retrieve big game from all available designated routes only during Colorado Division of Wildlife (CDOW) authorized big game hunting seasons. The use of wheeled, muscle-powered game retrieval devices would not be permitted within the Camel Back WSA (Sub-Region B). Motorized vehicles will not be permitted to retrieve big game off of designated routes.

Summary: Alternative 2 would restrict vehicular access off-routes for dispersed car-camping and other vehicle-related recreation activities; however impacts to soils and vegetation, and other impacts, such as increased litter, dumping, and other illegal activities would be reduced as a result of this change. Alternative 2 would improve the overall transportation system for motorized and non-motorized recreation and would result in decreased short term, long term, and cumulative impacts. Alternative 2 would meet the desired future conditions for all Sub-Regions.

**Impacts from Alternative 3**

Approximately 271 miles of routes would be available for use in this alternative, or 431 fewer miles than would be available in Alternative 1. This alternative would result in the adoption of a travel management plan that would create a system of planned and designated routes more favorable to non-motorized recreation activities and settings and would minimally enhance the overall recreation compared to Alternative 1and Alternative 2. Potential environmental impacts would be much less than those from implementing Alternative 1. Fewer overall motorized and non-motorized vehicle travel opportunities, fewer new routes and user facilities would be constructed, and fewer loop opportunities would be available to the public than either in Alternative 2 or Alternative 1.

For recreation uses authorized by SRPs, compared to Alternative 1, Alternative 3 would potentially impact mountain lion outfitters and their clients because of the decrease in miles of available routes for deploying hunters and convenient tracking points. However, all public lands would continue to be available for hunting on foot.

Summary: Overall, this alternative would result in greatly increased short term, long term, and cumulative impacts to recreation uses and users, and result in a travel management plan that would not take advantage of the many recreational activities the community seeks out. Implementing this alternative would mean that the desired future conditions would potentially be harder to achieve in Sub-Regions C, D, and E.

**Impacts from Alternative 4**

Approximately 605 miles of routes would be available for use in this alternative, or 97 fewer miles than in Alternative 1. Potential impacts from Alternative 4 would be less than those from implementing Alternative 1. This alternative would result in the adoption of a travel management plan that would create a system of planned and designated routes more favorable to all forms of motorized recreation activities and settings than providing a balance between non-motorized and motorized activities, such as hiking, horseback riding, and dispersed back-country

[191]

# Recreation

activities. More user facilities would be constructed. This alternative would minimally enhance recreational activities compared to Alternative 2 or Alternative 3. This alternative would allow for dispersed car-camping, touring, and other vehicle-related recreation activities. This alternative would be compatible with the Sub-Regions desired future conditions except for Sub-Regions A and E.

Summary: Alternative 4 would moderately improve the transportation system for motorized and non-motorized recreation. Although the miles of available routes are increased compared to Alternatives 2 and 3, this alternative only partially incorporates those factors that make a good travel plan and route system. See Recreation Management and Implementation in the Affected Environment section above. This alternative would move the recreational opportunities away from being achieved in Sub-Regions A and E.

## Cumulative Effects

Population growth and residential development of surrounding private lands, along with other resource impacting trends, will occur throughout the greater region that will result in increased amounts of recreational usage on public lands. Activities on public lands in the travel planning area that could also potentially impact recreation and require mitigation include, Forest Service planning and projects, Uncompahgre Plateau Project activities, local land use planning, soil research, BLM Uncompahgre Field Office Resource Management Plan revision, continued population growth, vegetation treatments, county road upgrades, special recreation permits and activities, utility rights of way and corridors, fuels reduction projects, and utility corridor maintenance and upgrades. The cumulative effects to recreation from these activities in addition to action alternatives will be long-term and most adverse and dispersed in Alternative 3 and 1, contained and long-term in Alternatives 2 and 4.

## SOCIO-ECONOMICS

The planning area includes parts of Delta and Montrose counties.

Population:

| Table 57 Population Growth between 1990 and 2007 | | | |
|---|---|---|---|
| Area | 1990 | 2007 | 1990-2007 Percent Change |
| Colorado | 3,294,394 | 4,861,515 | 47.6% |
| Delta County | 20,980 | 30,334 | 44.6% |
| Montrose County | 24,423 | 39,527 | 61.8% |

Source: U.S. Census Bureau, 2007 Population Estimates, Census 2000, 1990 Census

Between 2005 and 2025, the population within Delta County is projected to grow 72% and 77% within Montrose County. The state as a whole is projected to grow 45 % for the same period. (From State of Colorado Population Projections, State Demography Office). Part of this growth

[192]

BLM_0014677

# Socio-Economics

can be attributed to the abundance of nearby public lands managed by the BLM and the US Forest Service.

Employment and Economy:  Between 1991 and 2001, the total number of employed people increased by 48.6% in Delta County and 49% in Montrose County (See Table 58).  The greatest increase in employment occurred under the Construction sector in both counties (136% increase in Delta County, 232% increase in Montrose County).  The percentage of total employment growth for Delta and Montrose Counties between 1991 and 2001 was greater than total employment growth for the state.  Employment in Colorado between 1990 and 2025 is expected to increase 27 %.

| Table 58 | | | | | | |
|---|---|---|---|---|---|---|
| Sector Employment - Numbers of Jobs | | | | | | |
| Sector | Colorado | | Delta County | | Montrose County | |
| | 1991 | 2001 | 1991 | 2001 | 1991 | 2001 |
| Agricultural | 56,730 | 81,702 | 1,503 | 1,904 | 1584 | 1913 |
| Mining | 23,215 | 17,321 | 106 | 220 | 167 | 147 |
| Construction | 89,072 | 221,880 | 305 | 720 | 587 | 1949 |
| Manufacturing | 192,836 | 207,198 | 381 | 587 | 1114 | 1696 |
| Transportation, Communications and Utilities | 109,129 | 160,336 | 318 | 345 | 919 | 945 |
| Wholesale and Retail Trade | 424,411 | 594,903 | 1,621 | 2,463 | 2641 | 4005 |
| Finance, Insurance and Real Estate | 144,911 | 207,012 | 326 | 482 | 604 | 765 |
| Services | 554,359 | 880,204 | 1,850 | 3,077 | 2720 | 4319 |
| Government | 338,302 | 391,563 | 1,628 | 2,146 | 2177 | 2870 |
| Total Employment | 1,932,965 | 2,762,119 | 8,038 | 11,944 | 12,513 | 18,609 |

Source: State of Colorado Jobs by Sector (SIC based), State Demography Office

According to a 1999 model of the distribution of tourism employment, 8% of total employment was generated by tourism in Delta County, and 9% of total employment was generated by tourism in Montrose County.  About 8% of total employment in Colorado was reported to tourism (Tourism Jobs Gain Ground in Colorado page 3, Center for Business and Economic Forecasting, Inc., April 27, 2001).

Income: Between 1990 and 2005, total per capita personal income for the state increased 92%.  During this same period, total per capita personal income increased 84% in Delta County, and 91% in Montrose County (From US Department of Commerce, Bureau of Economic Analysis), probably due to increases in number of jobs related to the Services and Construction Sectors.

As shown in Table 59, the per capita personal income for Delta County in 2005 was $23,612, an increase of 84% over the 1990 income but $13,898 below the state average.  Delta County's

[193]

BLM_0014678

# Socio-Economics

2007 cost of living index, according to Colorado State University's Extension's County Information Service, and Colorado State Demographer, was categorized as low for the State of Colorado.  For Montrose County in 2004 the per capita personal income was $27,402, an increase of 91% since 1990 but $10,108 below the state average and the county was categorized into the mid-range for the 2007 cost of living index in the State of Colorado.  The cost of living index measures included: housing, goods and services, transportation, health care and other expenditures.

| Table 59 Per Capita Personal Income for 1990 and 2005 | | |
|---|---|---|
| | 1990 | 2005 |
| Colorado | 19,575 | 37,510 |
| Delta County | 12,843 | 23,612 |
| Montrose County | 14,393 | 27,402 |

Source: US BEA 2007

The *Longwoods International Colorado Travel Year 2006* report stated that Colorado is ranked 9th in the country for outdoor trips  and that outdoor trips now comprise the largest segment among those visiting Colorado on marketable leisure trips.  The report illustrates the importance of the outdoors and public lands to the Colorado visitors who cite mountains, wilderness, and lakes/rivers as important elements of their vacation.  Montrose, the Gunnison Gorge National Conservation Area (NCA), and the Black Canyon of the Gunnison National Park are among the most popular destinations for overnight pleasure trips within the locale of the area.  The Gunnison River and Gunnison Gorge in the NCA are regional and national recreation destinations – primarily because of the popularity and variety of the heavily marketed whitewater boating opportunities and gold medal trout stream fishing.  In addition to these major tourist attractions, the routes on the public lands also enhance recreation for various types of motorized and non-motorized uses.   Certain locations in the planning area have become a destination site for recreational users who use motorized and mechanized vehicles.  There are even some routes publicized on several websites.

Off-highway vehicle (OHV) use, which includes all-terrain vehicles (ATVs), dirt or dual purpose motorcycles, snowmobiles, and 4-wheel drive vehicles, has increased 58% since 1995 (*Colorado and the Colorado Market Region, July 2007*) and the economic contribution of OHV use in Colorado is estimated to be between $204 million and $231 million, according to the Colorado Off-highway Vehicle Coalition (COHVCO).

Tourism has grown in the Southwest Region fairly steadily since 2000 based on total travel impacts as measured by direct travel spending, tourism-related employment wages, and state and local taxes.

**Environmental Consequences**

**Impacts from Alternative 1**

Population increases in and around the planning area would result in more demand for public

[194]

# Socio-Economics

land access for a variety of purposes, both motorized and non motorized.  As motorized, mechanized, and quiet recreation demand escalates and increases, there would be more requests for routes throughout the planning area, and perhaps displacement of non-motorized users to already restricted areas.  This would lead to widespread on-site and off-site impacts on nearby federal lands and private lands and potentially a loss of the values for which visitors come to the area to seek.  Recreation behaviors, however, would evolve under less intensive management and travel restrictions, such as cross-country use, trespass, creation of new routes, and uncontrolled motorized/mechanized play would increase in intensity and scale.

**Impacts from Alternative 2**

Alternative 2 would maintain about 242 fewer miles of motorized and non-motorized routes than Alternative 1 however Alternative 2 would also allow for the development of new routes.  Under Alternative 2, the local economy in Montrose County, and particularly the City of Montrose, is expected to benefit economically by being able to market the area to a wider range of recreationist. By having a plan in place the local economy would be able to market the opportunities for a variety of users.  The economic benefits could come from a number of reasons such as more loop opportunities, better signage of trails, better education and maps being provided, and overall an area that will appeal to a wider range of recreationists.  In addition, Alternative 2 has maintained several technical motorized and mechanized trails and other well known trails (e.g. Tabeguache Trail) that have become destination sites in the area.  BLM expects Alternative 2 to improve recreation overall, which would have a positive effect on the social component of recreation and travel.

Recreation behaviors, however, would evolve under more intensive management and travel restrictions that would mitigate increased cross-country use, trespass, creation of new routes, and uncontrolled motorized/mechanized play.

**Impacts from Alternative 3**

Alternative 3 would maintain about 271 miles of designated motorized and non-motorized routes, about 366 fewer miles of existing routes than in Alternative 1.  Under Alternative 3, numerous motorized and mechanized routes would be proposed to be closed including the reduction of about six miles of technical 4WD vehicle routes that have currently become a destination site. This would result in greater dissatisfaction among motorized users which could have negative implications for the local economy as fewer users would travel to the area.  However, an increase in non-motorized travel may entice more non-motorized users to the area, thereby mitigating some of the anticipated negative economic effects.  Recreation behaviors, however, would evolve under more intensive management and travel restrictions that would mitigate increased cross-country use, trespass, creation of new routes, and uncontrolled motorized/mechanized play.

**Impacts from Alternative 4**

Impacts would be similar to those from implementing Alternative 2, in that about 606 miles of designated routes would be maintained, about 85 fewer miles of existing routes than in Alternative 1.  Alternative 4 would have a positive impact on the local economy because of the

[195]

# Socio-Economics

designation and legitimizing of technical 4X4 routes along with additional motorized routes which could lead to increased visitation by motorized enthusiasts however user conflicts could increase and the ability for the local economy to market to an array of users would be very limited. Alternative 2 would appeal to the motorized community as well as non-motorized recreationist therefore attracting a wider range of recreationists and potentially more economic benefits. Recreation behaviors, however, would evolve under more intensive management and travel restrictions that would mitigate increased cross-country use, trespass, creation of new routes, and uncontrolled motorized/mechanized play.

**Cumulative Effects**

Population growth and residential development of surrounding private lands, along with other resource impacting trends, will occur throughout the greater region that will result in increased amounts of recreational usage on public lands therefore increasing the potential for increasing economic benefits. Activities on public lands in the travel planning area that could also potentially impact (positively or negatively) socio-economic and require possible mitigation include, Forest Service planning and projects, Uncompahgre Plateau Project activities, local land use planning, soil research, BLM Uncompahgre Field Office Resource Management Plan revision, continued population growth, vegetation treatments, county road upgrades, special recreation permits and activities, utility rights of way and corridors, fuels reduction projects, and utility corridor maintenance and upgrades. The cumulative effects to socio-economic from these activities in addition to action alternatives that would be measurable would not likely occur as a result of implementation of any alternative

**VISUAL RESOURCES**

The BLM visual resource management system and process was designed and is used to help ensure that as man-made features or surface-disturbing activities are proposed and constructed on public lands, existing landscape character and the visual resources are considered. The BLM Manual 8410-1 Visual Resource Management defines and categorizes visual resource management (VRM) classes that provide objectives for these resources as projects are proposed and implemented in the landscape. These VRM classes are determined through an inventory process described in the manual mentioned above, and are used to provide guidance to BLM and project proponents when contemplating proposed surface disturbing activities. Class I areas are intended to protect an area from visible change, Class II areas allow for visible changes that do not attract attention, Class III areas allow for visible changes that attract attention but are not dominant, and Class IV areas allow for visible changes that can dominate the landscape.

The planning area offers a great diversity of landforms and vegetation. The area is highly valued by the public and local communities for its scenic quality. The area contains rugged canyons and opens onto mesa tops that provide 380 degree scenic vistas of the Grand Mesa, San Juan, West Elk and Sawatch mountain ranges. The public lands have been inventoried for their visual characteristics, and were classified as Visual Resource Management (VRM) Class III in the current RMP. This means that planning for and implementation of man-made features on public lands would consider these objectives and projects would be designed such that visible changes that attract attention could occur, but would not be so intrusive as to dominate the landscape.

[196]

BLM_0014681

# Visual Resources

Typically, a land use allocation such as the Camel Back Wilderness Study Area (WSA) would be classified as VRM I which would afford the highest degree of protection for visual resources. However, the WSA was designated after the original VRM inventory was completed in the current RMP, and thus is also classified as VRM Class III. However, the WSA is being managed according to the Interim Management Policy for Lands under Wilderness Review and other policies, therefore it is being protected and managed as Class I. The VRM classification for the WSA, along with all public lands in the planning area, would be re-examined during the update of the current RMP Revision.

On public lands, the existing man-made features not considered part of a natural landscape include routes, fences, structures, utility lines and rights-of-way, and land treatments (vegetative chaining, roller chopping, etc.). On private lands, most of the same features exist, in addition to residential and commercial development. Routes, as well as other man-made features are considered to be visual intrusions but they also provide a means for the public to enjoy the outstanding scenery. These features have become part of the existing landscape character. Many of the routes have been in existence for decades and were developed by ranchers and loggers.

The VRM class and management objectives were considered along with many other resource values, such as soil and water values, wildlife and wildlife habitat, vegetation conditions, duplicated routes, safety, and cultural resources during this planning and analysis process. Some existing routes were chosen to be closed and rehabilitated or relocated in order to better meet objectives for land health and other resource management objectives, including for the visual resources. VRM Class III and Class I, within the Camel Back WSA, objectives were considered during the planning and analysis process for new proposed or relocated routes to ensure VRM objectives were achieved.

## Environmental Consequences

### Impacts Common to All Alternatives

Existing man-made features, including fences, routes, vegetation manipulations, routes, and utility facilities would continue to result in visual impacts in the landscapes. Most of the features have been in place for a number of years, and have become part of the characteristic landscape.

### Impacts Common to Alternatives 2, 3, and 4

Some existing routes and disturbed areas would be closed and rehabilitated, resulting in a decrease in visual impacts, and VRM Class III and VRM Class I within the WSA management objectives being met on those landscapes.

Vegetation along those routes lending themselves to providing outstanding viewing opportunities to middle and back ground landscapes would be treated to maintain viewing opportunities in a safe and environmentally acceptable manner.

Changing existing OHV designations to "Limited to Designated Routes Either Seasonally or

[197]

BLM_0014682

# Visual Resources

Yearlong", and restricting all OHV travel to designated routes either seasonally or yearlong would result in a decrease or elimination of new user-created routes, preventing future visual impacts from occurring. Restricting cross-country vehicular usage for camping or other activities would prevent future surface disturbances and associated visual impacts from occurring.

Potential visual impacts from new routes or travel management support facilities would not exceed visual resource management objectives as a result of good design and site location.

The management objectives for these VRM Class I and III public lands would be met.

**Impacts from Alternative 1**

This alternative maintains 702 miles of existing motorized public and administrative routes in a variety of locations, terrain, and soils). Over time, because of the increase in travel use anticipated for all purposes, the associated visual impacts from these routes would exceed that allowable on these VRM Class III lands, as the routes would begin to dominate the landscapes. The VRM Class I within the Camel Back WSA however would continue to be managed to prevent impairment of wilderness values under the existing "Closed" designation.

New user-created routes and soil and vegetation disturbances related to OHV use, including parallel routes, multiplicity of routes going to one destination, and routes that serve no known purpose, would continue to be established through vehicular or other uses, resulting in more visual contrast or impacts in some landscapes and terrain types that offer visual exposure over a wide area. Many existing routes would continue to be widened by the usage of larger vehicles on narrow routes, such as single track or ATV two-track routes, resulting in additional vegetation removal and soil disturbances

**Impacts from Alternative 4**

This alternative would maintain 617 miles of routes, only about 118 fewer miles of routes than Alternative 1, and thus there would be less reduction in mitigating existing visual intrusions. The resultant impacts to the visual resource would be very similar to Alternative 2.

**Cumulative Effects**

In addition to growth in recreational travel, other reasonably foreseeable actions that could affect visual resources over the next 10 years on private and public lands include residential growth, new road construction on private lands, fuels reduction projects, utility corridor maintenance and upgrades, and new buried utility rights-of-way. Activities on public lands in the travel planning area that could also potentially impact visual resources and require mitigation include, Forest Service planning and projects, Uncompahgre Plateau Project activities, local land use planning, soil research, BLM Uncompahgre Field Office Resource Management Plan revision, continued population growth, vegetation treatments, county road upgrades, special recreation permits and activities, and utility rights of way and corridors. The cumulative effects to visual resources from these activities in addition to action alternatives will be long-term and most adverse and dispersed in Alternative 1 and 4, contained and long-term in Alternatives 2 and 3.

[198]

BLM_0014683

## CUMULATIVE EFFECTS SUMMARY

### Introduction

This section discloses the cumulative effects from all alternatives. Cumulative effects were analyzed above for each resource. This section will analyze additional known cumulative impacts that may not have been identified above.

The Council on Environmental Quality (CEQ) regulations defines cumulative effects as "...the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions". The cumulative effects are the direct and indirect incremental effects of the impacts from implementing the proposed changes and projects in each of the alternatives, when added to other past, present, and reasonably foreseeable actions (40 CFR Part 1508.7). Past activities are those activities whose effects are still present on the landscape. These activities will continue into the future. Future activities are those reasonably foreseeable actions that may add to the cumulative effects on resources and social impacts. Guidance for implementing NEPA (Public Law 91-190, 1970) requires that federal agencies identify the timeframe and geographic boundaries within which they will evaluate potential cumulative effects of an action and the specific past, present, and reasonably foreseeable projects that will be analyzed. For this EA, the timeframe is five to 10 years, from approximately 2009 to 2020. This encompasses a range within which data are reasonably available and forecasts can be reasonably made. The geographic boundary of the analysis area is the planning area and the surrounding Forest Service-managed and private lands, and the nearby communities.

Major specific actions and activities with the potential to cumulatively affect the resources evaluated in this document are identified below. These actions are generally summarized in the narrative following the table below. Some resources would be affected by several or all of the described activities, while others would be affected very little or not at all.

Alternative 2, 3 and 4 are action alternatives and each prohibit all cross country motorized and non motorized vehicular travel, propose changing all existing OHV designations such that all motorized and mechanized travel would be limited to designated routes except for hiking and horseback riding, and implementing unique and different travel plans with different sets of selected routes that would be available, travel use conditions and design features, and travel management support facilities. These three alternatives would be nearly identical in the degree and nature of cumulative effects that would occur as a result of prohibiting all cross country motorized and non motorized travel in order to prevent new, user created routes on public lands. By implementing a travel plan the public would be aware of the routes that would be available for use and which routes would not be available, and fewer conflicts would occur. Reductions of cumulative impacts would occur throughout the entire planning area as a result of this prohibition. In this manner, the three action alternatives are very similar.

[199]

BLM_0014684

# Cumulative Effects Summary

The cumulative effects from Alternatives 3 and 4 would differ from Alternative 2 only in the degree of the reduction of effects that would occur to the resources. Alternative 3 would close more existing routes and apply different conditions of use on routes than Alternative 2, and Alternative 4 would close fewer routes than Alternative 2, and apply somewhat different conditions of use on travel. Closing more routes would result in incrementally fewer effects than closing fewer routes.

**Past, Present, and Reasonably Foreseeable Actions Considered in Determining Cumulative Effects**

| Past, Present, and Reasonably Foreseeable Actions | Past | Present | Future |
|---|:---:|:---:|:---:|
| Forest Service Planning | ✓ | ✓ | ✓ |
| Uncompahgre Plateau Project | ✓ | ✓ | ✓ |
| Local Land Use Planning | ✓ | ✓ | ✓ |
| BLM-USGS Soil Research | ✓ | ✓ | ✓ |
| BLM Uncompahgre Field Office Resource Management Plan and Revision | | | ✓ |
| Continued population growth | | ✓ | ✓ |
| Uncompahgre Field Office Vegetation Treatments | ✓ | ✓ | ✓ |
| Possible Upgrading Of Some Major County Roads In Or Through The Planning Area | | | ✓ |
| BLM Special Recreation Permits | ✓ | ✓ | ✓ |

Planned BLM vegetation treatments, UP biological treatments, upgrading some county roads, and the growth in applications for rights of way and special recreation use permits could add to impacts from the demand of access onto or through public lands, along with potential transportation elements to facilitate implementation of local master plans.

**Forest Service Planning**

Resumption of the US Forest Service Grand Mesa, Uncompahgre, and Gunnison National Forests Forest Plan Revision has been delayed until at least early 2009. Their plan is being revised as part of a public process, including an EIS. The Uncompahgre National Forest Travel Management Plan was completed in 2000. It was the result of extensive collaboration with many users of the Forest. The Uncompahgre Travel Management EIS and decision maps provide detailed information on Forest Service-managed lands and the travel management decisions adjacent to the planning area. The planning area is adjacent to a portion of the Uncompahgre National Forest, and planning was coordinated with their office in Montrose and Delta.

Coordination of BLM activities sometimes results in BLM adopting standards or specifications that match with Forest Service guidelines, and vice-versa. An example would be having conditions of use on routes that are consistent when routes cross common jurisdictional lines. Alternative 1 would result in continued inconsistency with potential continued resource damage with proliferation of new routes. Alternative 2, 3, and 4 would maintain consistency in route designation as BLM collaborated closely with the Forest Service. Thus the cumulative impacts would be dramatically decreased for sensitive biological soil crusts and erosive soils, in streams, riparian and wetland habitat, vegetation types, on visual resources, to terrestrial and

[200]

BLM_0014685

# Cumulative Effects Summary

aquatic wildlife species and habitat, special status plants and animals and their existing and potential habitat, migratory bird habitat, and other related resources, and increased for all resources for Alternative 1.

## The Uncompahgre Plateau Project

The Uncompahgre Plateau Project (UP) was formalized in 2001 by the Public Lands Partnership (PLP), Bureau of Land Management (BLM), Colorado Division of Wildlife (CDOW) and U.S. Forest Service (USFS). The Uncompahgre Plateau Project is a joint land management effort between the Public Lands Partnership (representing Delta, Montrose, Ouray, and San Miguel counties) and the other partners. These organizations formed this partnership to restore and sustain the ecological, social, cultural and economic values of the Uncompahgre Plateau. The project area, located in Southwest Colorado, comprises over 1.5 million acres of private, state and federal lands. The overarching goal of the project is to improve the ecosystem health and natural functions of the landscape across the Uncompahgre Plateau through active restoration projects. The planning area for the Dry Creek Travel Management Plan is within the project area.

Implementation of treatments can affect wildlife solitude and habitat forage, fragment migration routes, and add sediment to waterways on a short term basis, and require more temporary new routes, but mitigation and design features in UP plans would mitigate these impacts to vegetation (wildlife habitat, sensitive species and habitat, potentially more weeds introduced), soils, and potentially to water courses. Therefore cumulative effects for Alternatives 2, 3, and 4 would again be decreased as compared to Alternative 1 which is the existing situation.

## Local Land Use Planning

Delta County completed its current master plan in October 1996. The city of Delta completed a comprehensive plan in March 1997, the city of Montrose completed a comprehensive plan update in March 2008, and Montrose County has an update of their master plan underway. These plans will continue to provide tools for growth and outline management direction for projected land use, transportation planning and elements, planning policies, and zoning surrounding the majority of the planning area. The Town of Olathe has discussed updating their Master Plan.

Local master plans could impact public lands by authorizing new subdivisions, open space identification, needs for travel element updates, relocations, or new construction. The cumulative impacts of combining additional new uses on private land and open OHV designations as written in Alternative 1 is major. As a result of local land use planning, cumulative impacts to all resources will also increase for Alternatives 2, 3, and 4 due to the increased number of people and vehicles accessing private lands but will be mitigated by designating and signing roads and trails and closing areas seasonally to protect wildlife.

[201]

BLM_0014686

# Cumulative Effects Summary

**BLM-USGS Soil Research**

The BLM is working with the USGS on Mancos soil research on public lands east of Montrose and other similar adobe watershed areas.

They are analyzing impacts from surface-disturbing activities on the adobe hills and the alluvial bottoms in the Mancos Shale areas. The studies are intended to provide information on how OHV use, grazing, and other surface-disturbing activities on these highly erosive soils need to be managed to meet the BLM's public land health standards.

Research could result in improvements in outcomes for projects that otherwise would create undesirable effects to sensitive resources, such as soil and water, and could hasten rehabilitation.

**BLM Uncompahgre Field Office Resource Management Plan and Revision**

The existing Field Office Resource Management Plan/Record of Decision (RMP) was signed in 1989. The issues addressed in the RMP were coal leasing, salinity, forestry, recreation, cross-country vehicles, wilderness, and lands. Decisions were made in most resource management programs that affected travel management in the planning area. Over time, several amendments have been made to the existing RMP, including for fire management, lands management, and the Gunnison Gorge NCA land use plan. The RMP and amendments include many actions that have already been implemented, some of which have taken place within the planning area, and also decisions that have not been implemented. Route by route travel analysis has not been done for the area. The BLM Uncompahgre Field Office plans to revise its 1989 Resource Management Plan beginning in the spring of 2009.

Not conducting travel planning as a follow up to implement OHV decisions regarding limiting travel to designated routes has resulted in cumulative impacts. A large number of the existing routes were established as a result of the under-management of OHV travel. Therefore, it can be assumed that cumulative impacts for Alternative 1 would also continue to increase. The next revision will set schedules for travel planning in the adjacent public lands, which will contribute long term improvements in Alternatives 2, 3, and 4.

**Continued Population Growth**

Between 2005 and 2025, the population within Delta County is projected to grow 72%, and 77% within Montrose County. This growth is expected to result in more private agricultural or undeveloped land being converted into residential or commercial uses. The entire eastern, southern, and southwestern edged of the planning area are in private ownership. Most of the private land on the eastern edge is irrigated agricultural land, with mixed residential development. With this growth, new management challenges including travel management will face the land management agencies surrounding the communities, and the nearby communities themselves.

Population increases in and around the planning area would result in more demand for public land access for a variety of purposes, both motorized and non motorized. As motorized,

[202]

BLM_0014687

# Cumulative Effects Summary

mechanized, and quiet recreation demand escalates and increases, there would be more requests for routes throughout the planning area, and perhaps displacement of non-motorized users to already restricted areas. This would lead to widespread on-site and off-site impacts on nearby federal lands and private lands and potentially a loss of the values for which visitors come to the area to seek.

Routes established as a result of increased population growth and increases in volume of motorized uses contribute to surface runoff which ultimately reaches perennial and intermittent steams, ponds, riparian habitat, and wetlands and affects the physical and biological components of these areas. Urbanization near the planning area has contributed in the development of user created routes that contributes to cumulative soils, vegetation, and watershed impacts. Cumulative effects on aquatic and riparian resources can be mitigated through the application of watershed conservation practices to all well-designed and located agency routes during their construction, reconstruction, and maintenance as outlined in Alternatives 2, 3, and 4.

Cumulative actions considered include regional and local growth entailing additional vehicle traffic within and through the planning area. Although vehicular travel on unpaved roads can be heavy during the late spring, summer, and the fall, the most heavily used major county roads receive magnesium chloride treatments which "holds" soils and road base in place and abates erosion and fugitive dust. Sustained and heavy traffic use on the approximately 670 miles of remaining dirt routes and trails in the planning area does create erosion and fugitive dust, noise, and other major disturbance factors throughout the planning area.

Population growth, private land development adjacent to or near the planning area, and the increase in popularity of recreational vehicle riding, combined with the extremely high number of existing route miles in the planning area and the likelihood of the continuation of user created routes being created, incremental increases in impacts would occur to soils, cultural properties, water quality, air resources, floodplain functions, riparian and wetland habitat, sensitive plant and animal species and habitat, vegetation (removal, impacts, or weed invasion increases), and aquatic and terrestrial species and habitat. At the heart of these impacts is the likelihood of an exponential increase in the rate of establishment of new, user created routes from the 700 miles of current existing routes as discussed in Alternative 1. Any additional limitations to the transportation system could cause crowding of users and may increase safety concerns and conflicts as discussed in Alternatives 2, 3, and 4.

As considered in this analysis under Alternative 1, the risk of adverse impacts is increased due to greater cross country travel and disturbed soils during the next five to 10 years due to the continuation of new user created routes and the increase in use volume as a result of population growth.

## Uncompahgre Field Office Fuel Reduction Projects

Several projects have been implemented in the past, and several projects have been proposed and evaluated in the Field Office that have or would reduce the amount of standing and downed

[203]

BLM_0014688

# Cumulative Effects Summary

wildfire fuel in the planning area. These projects have and would make the public lands, where this activity occurs, less likely to incur wildfires, and land health conditions could be improved. Use of roads or need to travel cross country with motorized vehicles to accomplish projects would be analyzed for each case however cumulative use of roads to accomplish projects would be negligible. Overall land health conditions could be improved.

Implementation of treatments can affect wildlife solitude and habitat forage, fragment migration routes, and add sediment to waterways on a short term basis, and require more temporary new routes, but mitigation and design features in project plans would mitigate these impacts to vegetation (wildlife habitat, sensitive species and habitat, potentially more weeds introduced), soils, and potentially to water courses.

Cumulative effects for implementing the projects would be similar for Alternatives 1, 2, 3, and 4 but with the additional mitigation outlined for Alternatives 2, 3, and 4 effects would be minimized through rehabilitation of roads and trails that are needed for the project but are not part of the transportation plan.

**Possible Upgrading of Some Major County Roads in or Through the Planning area**

At least two, and perhaps three major county graveled roads located within and that pass through the planning area could be upgraded, partially relocated, and or paved during the next 10-15 years in order to provide better and quicker access to private and public lands. Private high-scale developments on the Ouray and Montrose County lines have generated increased traffic by construction, visitor, and resident uses. Property owners and users are requesting the counties to pave and improve the roads. This upgrading could require some BLM right of way actions or modifications, reconstruction, and relocating in segments to eliminate dangerous curves or poorly located segments, which could also directly impact public lands adjacent to these roads.

Routes established as a result of increased population growth and increases in volume of motorized uses contribute to surface runoff which ultimately reaches perennial and intermittent steams, ponds, riparian habitat, and wetlands and affects the physical and biological components of these areas. Urbanization near the planning area has contributed in the development of user created routes that contributes to cumulative soils, vegetation, and watershed impacts. If county roads passing through the planning area or within the planning area are upgraded in the life of this analysis, easier and quicker access to the lands in the planning area would be available, adding to the cumulative effects from increases in use of motorized vehicles for all alternatives but especially Alternative 1. Cumulative effects on aquatic and riparian resources would be mitigated through the application of watershed conservation practices to all well-designed and located routes during their construction, reconstruction, and maintenance as outlined in Alternatives 2, 3, and 4.

**BLM Special Recreation Permits**

BLM issues and manages Special Recreation Permits to groups or individuals for organized, commercial, or competitive purposes and events. The BLM has had a growing number of requests for consideration of all types of Special Recreation Permits. In FY2007, approximately

[204]

BLM_0014689

# Cumulative Effects Summary

11 SRPs were being used and active. These permits were issued for a variety of activities and events including 4-WD vehicle tours, hunting (big game and mountain lion), and a mountain bike event. In the past, there have also been technical four wheel-drive and motorcycle events permitted. The recreational activities provided by commercial and special recreation uses enhance recreation for visitors, businesses, communities, and the environment. The route system on public lands is essential to all of these commercial and special recreation uses, and the impacts of travel management decisions to these activities was considered in developing the alternatives. Each of the alternatives would allow the activities and events currently authorized by Special Recreation Permits to be considered in the future, under certain circumstances. New applications would be evaluated through the NEPA process and with public input to determine conformance with travel management decisions and to develop potential stipulations for operation, maintenance, and monitoring of permitted activities.

In Alternative 1, requests for these permits for competitive, commercial, or organized events would continue, possibly resulting in more disturbances in the planning area to soils, water, vegetation and opportunities for solitude due to the fact that areas would be designated as open. While SRP requests will probably increase in the next 15 – 20 years for Alternatives 2, 3, and 4. Decisions will conform to the travel management plan thus mitigating cumulative effects from this activity.

## Proposed Action – Alternative 2

Alternative 2 would result in reductions in the incremental cumulative effect that would occur from continuing with Alternative 1. This alternative would result in incremental decreases in existing and potential effects by closing routes, rehabilitating routes, and implementing the conditions of use and other measures in this alternative. The land health of the planning area would be improved, air quality standards would not be violated, and other resources would realize the benefits of this alternative.

Effects include reductions in impacts from applying conditions of use, selecting appropriate locations for travel management support facilities, closing existing routes and prohibiting potential new cross country routes. Cumulative physical effects from past, present, and future action relative to Alternative 1 would be reduced on sensitive biological soil crusts and erosive soils, in streams, riparian and wetland habitat, vegetation types, on visual resources, to terrestrial and aquatic wildlife species and habitat, special status plants and animals and their existing and potential habitat, migratory bird habitat, and other related resources.

The cumulative effects from reasonably foreseeable actions above and the effects of Alternative 2 would, when combined, not result in adverse impacts to those resources managed by BLM in the planning area.

[205]

BLM_0014690

# Cumulative Effects Summary

## Irreversible and Irretrievable Commitments of Resources

Irreversible commitments of resources are those that cannot be regained, such as the extinction of a species or the removal of mined ore. Irretrievable commitments are those that are lost for a period of time such as the temporary loss of wildlife habitat in a right of way linear clearing.

The implementation of any of the alternatives, including the no-action alternative, would have no irreversible commitment of resources. The alternatives define the road and trail system, and propose closing of some routes not needed or that would be closed for other reasons. Some limited new route construction and the construction of some new travel management support facilities would be implemented, all of which could be rehabilitated if necessary.

Irretrievable commitment of resources would occur under all alternatives, which would be considered temporary in nature. Irretrievable commitments of resources from roads and trails exist because the travel-way changes the natural landscape to a non-natural, out-of-vegetative-production landscape. The road and trail designations of Alternatives 2, 3, or 4 would create temporary losses associated with maintenance of roads and trails or new support facilities. Resources affected would be scenery, vegetation (including rangeland, riparian area vegetation, and woodland stands of pinyon and juniper, and associated wildlife or other animal or plant habitats. Implementation of any of the alternatives would commit these resources over the life of the road or trail.

The alternative with the highest number of miles of designated roads and trails would also cause irretrievable commitments of the most resources. The alternatives ranked from most to least for irretrievable commitment of resources are alternatives 1, 4, 2, and 3.

## Short-Term Uses of Man's Environment and the Maintenance and Enhancement of Long-Term Productivity

The National Environmental Policy Act (NEPA) requires the consideration of the relationship between the short-term uses of man's environment and the maintenance and enhancement of long-term productivity which would be involved in implementing any of the alternatives being considered in an environmental document. As declared by Congress, this includes using all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans (NEPA Section 101).

Alternatives 3, 2, 4, and 1, from most to least, have the potential to improve long-term productivity by reducing the number of existing miles and trails on the landscape. Once closed, these areas will have the potential to revert to vegetated conditions.

[206]

BLM_0014691

**Persons/Agencies Consulted**

## PERSONS / AGENCIES CONSULTED

Southwest Resource Advisory Council (SWRAC)
U.S. Fish and Wildlife Service
Colorado State Historical Preservation Office
Southern Ute Tribal Council and the Ute Mountain Ute Tribal Council
Colorado Division of Wildlife (CDOW)
USFS Ouray Ranger District
Montrose and Delta County Commissioners
State Historic Preservation Office (SHPO)

## LITERATURE CITED

Beier, P., 1993, Determining minimum habitat areas and habitat corridors for cougars:
Conservation Biology, v. 7, no. 11, p. 94–108.

BLM. 1999. Escalante Landscape Health Assessment, Uncompahgre Field Office, Bureau of
Land Management, Montrose, CO.

BLM. 2006. Roubideau Landscape Health Assessment. Uncompahgre Field Office, Montrose,
CO.

BLM. 2008. Colona Landscape Health Assessment, Uncompahgre Field Office, Bureau of
Land Management, Montrose, CO.

BLM (Bureau of Land Management). 1986. Visual Resource Contrast Rating Handbook.
BLM/H/8410/1. Washington, D.C.: U.S. Department of the Interior, BLM

Bruinderink, G.W.T.A., and Hazebroek, E., 1996, Ungulate traffic collisions in Europe:
Conservation Biology, v. 10, no. 4, p. 1059–1067.

Clean Water Action Plan 1998. Federal Multi-Agency Source Water Agreement, November, 13,
1998

Cole, Franklyn W., 1975. Introduction to Meteorology, second edition, John Wiley and Sons,
Inc. New York, London, Sydney, and Toronto.

Colorado State Parks, 2008. Colorado's Statewide Comprehensive Outdoor Recreation Plan
(Draft).

Colorado State University, Colorado Climate Center, Department of Atmospheric Sciences,
website: http://ccc.atmos.colostate.edu/

Colorado Water Quality Control Commission, April, 2006. Colorado Monitoring and Evaluation
List – Regulation # 94 (5CCR 1002- 94)

[207]

# Literature Cited

Colorado Water Quality Control Commission, December, 2007. The Basic standards and Methodologies for Surface Water – Regulation # 31 (5CCR – 1002-31)

Colorado Water Quality Control Commission, February, 2008. Water Quality Limited Segments Requiring Total Maximum Daily Load (TMDL's), Regulation # 93(5CCR 1002-93)

Colorado Water Quality Control Commission, July, 2007. Classification and Numeric Standards for Gunnison and Lower Dolores Basins – Regulation # 35 (5CCR-1002-35)

Forman, R.T.T., and Alexander, L.E., 1998, Roads and their major ecological effects: Annual Review of Ecology and Systematics, v. 29, p. 207–231.

Forman, R. T. T. In press. The ecological road-effect zone of a Massachusetts (USA) suburban highway. Conservation Biology .

Green, Gary T., Gosnell, William, Betz, Carter J., and Cordell, Ken. July 2007. Colorado and the Colorado Market Region: A Report Submitted to the State of Colorado by the Pioneering Research Group, Southern Research Station, USDA Forest Service, Athens, GA.

Hazen and Sawyer. July 2001. Analysis of the Economic Contribution of Off-Highway Vehicle Use in Colorado, Colorado Off-Highway Vehicle Coalition.

Jones, J. A., F. J. Swanson, B. C. Wemple and K. U. Snyder. In press. A perspective on road effects on hydrology, geomorphology, and disturbance patches in stream networks. Conservation Biology.

Kingery, H.E. ed. 1998. Colorado Breeding Bird Atlas. Colorado Bird Atlas Partnership and Colorado Division of Wildlife. Denver, CO.

Lovich, J.E., and Bainbridge, D., 1999, Anthropogenic degradation of the southern California desert ecosystem and prospects for natural recovery and restoration: Environmental Management, v. 24, no. 3, p. 309–326.

Lyon, Peggy, Tom Stephens, Jeremy Siemers, Denise Culver, Phyllis Pineda, and Jenifer Zoerner. 1999. The Uncompahgre River Basin, A Natural Heritage Assessment, Colorado Natural Heritage Program. Ft. Collins, CO.

Moore, T.G., and Mangel, M., 1996, Traffic related mortality and the effects on local populations of barn owls *Tyto alba*, *in* Evink, G.L., Garrett, P., Zeigler, D., and Barry, J., eds., Trends in addressing transportation related wildlife mortality—Proceedings of the transportation related wildlife mortality seminar, Orlando, Florida, April 30–May 2, 1996: Tallahassee, Florida, State Department of Transportation, Report no. FL-ER-58-96, *http://www.icoet.net/ICOWET/96proceedings.asp.*

Ouren, D.S., Haas, Christopher, Melcher, C.P., Stewart, S.C., Ponds, P.D., Sexton, N.R., Burris,

[208]

# Literature Cited

Lucy, Fancher, Tammy, and Bowen, Z.H., 2007, Environmental effects of off-highway vehicles on Bureau of Land Management lands: A literature synthesis, annotated bibliographies, extensive bibliographies, and internet resources: U.S. Geological Survey, Open-File Report 2007-1353, 225 p.

Sullins, M and Garner, E. 2007. Cost of Living Differentials in Colorado. Coordinator of CSU-Extension's County Information Service, and Colorado State Demographer.

Trombulak, S. C. and C. A. Frissell. In press. Review of ecological effects of roads on terrestrial and aquatic communities. Conservation Biology.

USDA, Forest Service, Rocky Mountain Region, Soils Group, Interpretations Rating Guide, page 66.

USDA, Natural Resources Conservation Service, Soil Surveys of: Paonia Area, Colorado (Parts of Delta, Gunnison, and Montrose Counties), and Ridgway Area, Colorado (Parts of Delta, Montrose, Gunnison and Ouray Counties)

USDA, Soil Conservation Service 1980. Important Farmlands of Colorado State Summary Map. USDA, Soil Conservation Service and Colorado State University, Special Series 17, 1980

USDI, Bureau of Land Management 1997. Colorado Public Land Health Standards, January, 1997.

USDI, Bureau of land Management 1998. Riparian Area Management, Process for Assessing Proper Functioning Condition, Tech. Reference 1737-9, 1998.

USDI, Bureau of land Management 2000. Recreation Guidelines to Meet Public Land Health Standards on Bureau of Land Management Managed Lands, Colorado December 20, 2000.

USDI, Bureau of Land Management 2001. Biological Soil Crusts: Ecology and Management, Technical Reference 1730-2, 2001.

USDI, Bureau of Land Management 2004-2005. Roubideau Land Health Assessment. Uncompahgre Field Office.

USFWS 2002. Birds of conservation. Migratory Bird Management, Arlington, Virginia. 99 pp. [Available: http://migratorybirds.fws.gov/reports/bcc2002.pdf]

USFWS. 2008. Species list for Uncompahgre Field Office. Letter from A. Pfister, February 7, 2008.

USGS Open-file Report 2007-1353, USDI, US Geological Survey, Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources. By: D. Ouren, C. Hass, C. Melcher, S. Stewart, P. Ponds, N. Sexton, L. Burris, T. Fancher, and Z. Bowen.

[209]

# Literature Cited

Walker, D.A. and K.R. Everett. 1987. Road Dust and Its Environmental Impact on Alaskan Taiga and Tundra. *Arctic and Alpine Research* 19: 479-489

Webb, R.H., 1982, Off-road motorcycle effects on a desert soil: Environmental Conservation, v. 9, no. 3, p. 197–208.

## INTERDISCIPLINARY TEAM

| Areas of Responsibility | Preparers |
|---|---|
| Air Quality and Climate | Dennis Murphy |
| ACEC | ** NA |
| Cultural Resources, Paleontology | Glade Hadden |
| Environmental Justice | Bruce Krickbaum |
| Farmlands (Prime and Unique) | Dennis Murphy |
| Floodplains | Dennis Murphy |
| Invasive, Non-Native Species and Range Management | Lynae Rogers |
| Migratory Birds | Missy Siders, |
| Native American Religious Concerns | Glade Hadden |
| Threatened, Endangered, and Sensitive Species, Wildlife (Aquatic and Terrestrial) | Missy Siders |
| Wastes, Hazardous or Solid | Allen Kraus |
| Water Quality, Surface and Ground, Soils, Hydrology/Water Rights | Dennis Murphy |
| Wetlands & Riparian Zones, Vegetation | Amanda Clements |
| Wild and Scenic Rivers and Wilderness, Access and Transportation, Recreation, and Visual Resources | Julie Jackson |
| Realty Authorizations and Geology and Minerals | Teresa Pfifer and Rob Ernst |
| Fire | Dan Huisjen |
| Law Enforcement | Jim Maloney |
| Forest Management, Socio-Economics and Noise | Bruce Krickbaum |

BLM_0014695

Glossary

# GLOSSARY

Activity plan: A detailed, site specific plan for management of one or more resource programs. An activity plan provides additional specificity needed to implement RMP decisions. Activity plans are completed only if necessary. When multiple programs are addressed, activity plans may be called Integrated Activity Plans or Coordinated RMPs.

Dispersed camping: Camping on public land in locations that are not formally developed and that do not contain camping facilities, such as graveled roads, utilities, toilets, or picnic tables.

Ephemeral streams: Flow generally occurs for a short time after extreme storms. The channel is usually not well defined.

Intermittent streams: Flow generally occurs only during the wet season (50 percent of the time or less).

Landscape: A defined land area that forms a management unit or basis of analysis.

Long-term effects: Indicated effects to be greater than 5 years.

Mechanized Travel: Moving by means of mechanical devices such as a bicycle; not powered by a motor

Motorized Vehicle: Moving by means of vehicles that are propelled by motors such as but not limited to cars, trucks, all-terrain vehicles (ATV), Sport Utility Vehicles (SUV), motorboats, and snow machines which include snowmobiles and snow bikes. Synonymous with off-road vehicle.

Non-Motorized Use: Moving by foot, stock or pack animal, boat, or mechanized vehicle such as a bicycle.

Off-Highway Vehicle: This term is synonymous with the term off-road vehicle (or ORV). Whereas off-road vehicle is used in the regulations and includes any motorized vehicle (see definition above), the term off-highway vehicle (OHV) is a more contemporary term.

Off-Road Vehicle: Any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain, excluding: (1) any non-amphibious registered motorboat: (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used in times of national defense emergencies.

OHV Area Designations:
    •Open area means an area where all types of vehicle use is permitted at all times, anywhere in the area subject to the operating regulations and vehicle standards set forth in subpart 8341 and 8342 of this title.
    •Limited area means an area restricted at certain times, in certain areas, and/or to certain

[211]

BLM_0014696

# Glossary

vehicular use. These restrictions may be of any type, but can generally be accommodated within the following type of categories: Numbers of vehicles; types of vehicles; time of season of vehicles use; permitted or licensed use only; use on existing routes; use on designated routes; and other restrictions.

•Closed area means an area where off-road vehicle use is prohibited. Use of off-road vehicles in closed areas may be allowed for certain reasons; however, such use shall be made only with the approval of the authorized officer.

Perennial streams:  Water flows in the stream at least 90 percent of the time in a well defined channel.

Quiet Recreation: Outdoor recreation enthusiasts such as hikers, skiers, mountain bikers, equestrians, bird watchers, hunters and anglers who seek the opportunity to enjoy natural soundscapes.

Short-term effects:  Indicated effects to be within 5 years.

Standards for Public Land Health: A description of conditions needed to sustain public land health; the standards relate to all uses of the public lands in Colorado.

Resource Management Plan (RMP): A BLM multiple use planning document, prepared in accordance with Section 202 of the Federal Land Policy and Management Act, that
  a. establishes resource conditions goals and objectives to be attained;
  b. allocates resources and identifies allowable uses;
  c. identifies land areas for limited, restrictive, or exclusive uses; and
  d. provides guidance for implementation of the decisions made in the plan.

Routes:  Multiple roads, trails, and primitive roads; a group or set of roads, trails, and primitive roads that represents less than 100% of the BLM transportation system. Generically, components of the transportation system are described as "routes".

Transportation Management Plan:  A document that focuses on all aspects of transportation in a land area. Transportation planning can also be accomplished within Integrated Activity Plans, or Coordinated RMPs where multiple resource programs are planned for concurrently.

[212]

BLM_0014697

# Appendices

# APPENDIX INDEX

Definitions of Travel Use Categories ............................................................................................. A-2

Acres in OHV Designations by Sub-Regions for Each Alternative in Planning Area ........................ A-4

Sub-Region General Settings and Desired Future Conditions ....................................................... A-5

Maps of the Alternatives............................................................................................................... A-12

Issues and Concerns for the Dry Creek Travel Management Planning Area ................................. A-13

List of Travel Management Support Facilities within each Alternative and Sub-Region............... A-17

Laws and Policies which guide BLM's Travel Management Planning Process .............................. A-21

Climate Summary.......................................................................................................................... A-25

Responses for Comments Received ............................................................................................. A-34

[A-1]

BLM_0014698

# Appendices

## Appendix 1

## Definitions of Travel Use Categories

The Travel Use Categories define the individual routes in terms of the types of uses that are permitted on them. There are 9 categories, of which the first 6 represent the types of designated travel uses that apply to those routes that are available for use by the public and that are controlled by BLM. The 7th category, Non-BLM, are available to use by the public but are controlled by other jurisdictions that regulate use of the roads. The other two categories are routes that are controlled by BLM but that are not available for public use with motorized or mechanized vehicles.

It is important to understand that each Travel Use Category is named for the type of use that it is primarily suited to accommodate. The other travel uses included in the category should be considered as secondary uses. This distinction is important so that it is recognized that just because secondary uses are allowed does not mean that all of the routes in the category are suitable for those uses. All the Travel Use Categories are shown with symbols and/or color codes on the maps of alternatives.

The most inclusive travel uses class is the **4WD/2WD (Open)** category, including all of the various types of routes commonly found on public lands, ranging from maintained dirt and graveled routes to low standard primitive four-wheel drive routes. These routes are designed to accommodate conventional size motor vehicles but are also available for use by ATVs, motorcycles, bicycles, horses, and foot travel.

The **Specialized Routes** category includes routes that are intended for use by modified high clearance 4x4 technical 4WD vehicles and motorized and mechanized trials bikes only.

The **ATV 2-Track** category includes routes that are intended for use by motorized modes of transportation 50 inches or less in width and weighing no more than 800 pounds, but are also available for motorcycles, bicycles, horses, and foot travel.

The **Motorized Single Track** category includes routes that are intended for motorized modes of transportation 36 inches or less in width but are also available for use by bicycles, horses, and foot travel.

The **Non-Motorized Single Track** category includes routes that are intended for mechanized modes of transportation 36 inches or less in width but are also available for use by horses and foot travel.

The **Non-Motorized/Non-Mechanized Single Track** category includes routes intended to accommodate horseback riding but are also available for foot travel.

[A-2]

BLM_0014699

# Appendices

The **"Non-BLM"** category includes county, state, and Federal highways and roads. As a general rule most of the Non-BLM roads are public roads limited to use with street-legal vehicles and are not open to ATVs or other unlicensed motorized vehicles. Most are paved or graveled roads designed to accommodate high-speed traffic. There are, however, a few county roads that are low standard dirt roads. The BLM does not have jurisdiction over these roads and is not proposing any travel management designations, or restrictions, for these routes in this plan.

The **"Administrative Access Only"** category consists of existing routes that are not designated for specific recreational travel uses, and are not available to the public for motorized or mechanized travel. Many Administrative Access routes, however, will remain available for administrative uses by authorized personnel and permit holders with motorized or mechanical vehicles, and where legal public access exists are also available to the public for foot and horse travel.

The last category includes the **"Closed"** routes. These Closed routes are those that are neither available for use by the public nor needed for administrative uses.

[A-3]

BLM_0014700

# Appendices

## Appendix 2

## Acres in OHV Designations by Sub-Regions for Each Alternative in Planning Area

| OHV Designations on Public Lands in Planning Area | SUB-REGIONS | Alternative 1 (Acres) | Alternative 2 (Acres) | Alternative 3 (Acres) | Alternative 4 (Acres) |
|---|---|---|---|---|---|
| **TOTAL LDR-Y/S (12/1-** | | | | | |
| Limited to Designated Routes – Yearlong/ Seasonally 12/1-4/15 (LDR-Y/S 12/1 to 4/15) by Sub-Region.<br><br>See Appendix 4 for maps of routes in Alts. 2, 3, & 4 that would be subject to these seasonal closures – all other routes would be available yearlong unless noted otherwise | A | 0<br>This OHV Designation is not applicable to this alternative in Planning Area | 18,045 | Same as Alternative 2 | Same as Alternative 2 |
| | C | | 26,632 | | |
| | D | | 28,139 | | |
| | E | | 6,851 | | |
| | F | | 11,535 | | |
| | G | | 8,694 | | |
| **TOTAL OPEN** | | **28,557** | | | |
| Open by Sub-Region | A | 13,271 | 0<br>This OHV Designation is not applicable to this alternative in Planning Area | | |
| | C | 8,362 | | | |
| | D | 6,923 | | | |
| | E | 0 | | | |
| | F | 0 | | | |
| | G | 0 | | | |
| **TOTAL LDRY** | | **1,964** | | | |
| Limited to Designated Routes Yearlong by Sub-Region | A | 1,328 | 0<br>This OHV Designation is not applicable to this alternative in Planning Area | | |
| | C | 0 | | | |
| | D | 0 | | | |
| | E | 0 | | | |
| | F | 0 | | | |
| | G | 636 | | | |
| **TOTAL LDRS – 12/1 - 4/30** | | **69,375** | | | |
| Limited to Designated Routes 12/1-4/30 by Sub-Region | A | 3,446 | 0<br>This OHV Designation is not applicable to this alternative in Planning Area | | |
| | C | 18,270 | | | |
| | D | 21,216 | | | |
| | E | 6,851 | | | |
| | F | 11,535 | | | |
| | G | 8,058 | | | |
| **TOTAL CLOSED (in all Alternatives – Existing Camel Back WSA-Sub-Region B)** | **B - Closed in all Alternatives** | **10,668** Camel Back WSA | **10,668** Camel Back WSA | **10,668** Camel Back WSA | **10,668** Camel Back WSA |

[A-4]

# Appendices

## Appendix 3

## Sub-Region General Settings and Desired Future Conditions

An important initial step in this planning process was to divide the area into somewhat homogenous and unique geographic divisions called Sub-Regions. These divisions were helpful in describing common values, resources, and features, and ensuring that the special qualities and travel opportunities that exist in different portions of the planning area were considered. Additional factors that were considered were existing route density, access availability, limitations and issues, Camel Back Wilderness Study Area (WSA) boundary, logical topographic or administrative features, important or sensitive natural and biological resources, and well-established recreational uses.

A total of seven Sub-Regions were defined for the area. Issues and concerns for all seven Sub-Regions are included and grouped in the discussion of issues in Appendix 5. Although the public lands in the Sub-Regions currently contain OHV designations of Open, Closed, or Limited to Designated Routes Either Seasonally or Yearlong, no routes have been designated on the ground via travel management planning, RMP decisions or RMP amendments. Except for public lands in the Camel Back Wilderness Study Area, which is designated as Closed, motorized and non-motorized travel currently travel on-route and cross-country yearlong.

Desired Future Conditions (DFC) are vision statements that describe the major goals and objectives of the TMP and that directly respond to the major issues and concerns that were identified through public involvement. The DFCs provide a snapshot of what the area would be like and represent once the TMP is implemented and issues and concerns are addressed. The following DFCs define the overall goals and objectives:

> MAINTAIN AND IMPROVE LAND HEALTH – Public land health would be maintained or improved to meet Colorado Public Land Health Standards through eliminating off-route mechanized and motorized travel, and through limiting motorized and mechanized travel to designated routes. Closures and rehabilitation of some routes would also be used to meet land health standards along with establishing and following all the best management practices.

> ENHANCE MOTORIZED AND NON-MOTORIZED RECREATION – Users would achieve balance in the availability of different types of trails and transportation route access across multiple types of travel modes (see Table 1). BLM would achieve this result by 2015 so that affected users will have sustained access to these routes as planned, will observe and respect the appropriate route designations, and be able to report that they exist. BLM would install signing at trailheads and at points wherever allowable travel modes change and provide maps, brochures, and

[A-5]

BLM_0014702

# Appendices

educational material that would be made available for the public, in print and on the internet by 2012.  These tools will enable recreationists to choose where to go and what to do based on route designations.  Management of the area will sustain the undeveloped character of the Dry Creek area's wide-open spaces for diverse, dispersed recreation use and enjoyment – protecting and rehabilitating the distinctive and productive capacity of its biophysical resources.  By 2015, BLM will ensure that 75% of responding recreationists in a user satisfaction study would report that  their recreation experience was "Good" (i.e., on a five-point rating scale: 1–Very Good, 2–Good, 3–Fair, 4–Poor, and 5–Very Poor.

MAINTAIN APPROPRIATE, SUSTAINABLE, AND REASONABLE ACCESS – The planning area receives a high amount of route use, due in part to the location of the area in relation to Montrose and Olathe, and in part due to the regional use the area receives.  The Public Lands are served by an effectively and efficiently managed and maintained system of routes that maintains access and travel activities to visitors for authorized uses for motorized and non-motorized travel.  Safe and reasonable recreational and administrative access uses would be maintained using public input.  Maintenance would be conducted to help achieve this and other desired future conditions.

IMPROVE NATURAL VALUES – Some areas would be managed to achieve higher standards than others, as they are special landscapes and possess unique values that require these higher standards.

Descriptions of General Settings and Desired Future Conditions of each Sub-Region are below. See Table 2 for the existing inventoried miles of various types of routes within each Sub-Region. See Appendix 2 for acres of existing OHV designations in each Sub-Region. All acre and mileage figures are approximate.

## SUB-REGION A

General Setting:
Sub-Region A contains a total of 19,471 acres of public lands and 1403.5 acres of private lands. The Sub-Region is characterized by two long mesas or ridges and associated steep drainages.  Monitor Mesa is the predominant landscape feature. Portions of Roubideau, Potter, and Monitor Creeks are within the Sub-Region. Existing OHV designations in the Sub-Region are:  13,271 acres "Open", 3,466 acres "Limited Seasonally", and 1,328 acres "Limited" year-long.  Uses occurring within the Sub-Region are cattle ranching (grazing), wood collecting, utility right-of-ways, walking/running, hiking, mountain bike riding, horseback riding, hunting, fishing, picnicking, camping, viewing scenery, wildlife watching/birding, four-wheel driving, and ATV riding. The southern boundary of the Sub-Region is adjacent to the Uncompahgre National Forest. The northwestern boundary is 25-Mesa Road, and the eastern boundary is adjacent to private lands on California Mesa, the Sub-Region B -

[A-6]

BLM_0014703

# Appendices

Camelback Wilderness Study Area (WSA), and Potter Creek. Major access into the Sub-Region is via 25-Mesa Road, and A-49 Road that parallels Roubideau Creek. Approximately 90 miles of routes are located in the Sub-Region.

Desired Future Conditions:
Protect and improve elk, deer, bighorn sheep and special status plant and animals' habitat, and preserve riparian habitat while maintaining appropriate and adequate access for public and/or administrative uses.

## SUB-REGION B

General Setting:
This Sub-Region contains the 10,668 acre Camel Back Wilderness Study Area (WSA), and 161 acres of private land on the southern boundary of the Sub-Region, and is located between Sub-Regions A and C. The Sub-Region is characterized by a series of deep canyons and long mesas and buttes. The largest mesa is Winter Mesa, at an elevation of about 7,000 feet. Camelback ridge is a large, isolated mesa between Roubideau Creek and Criswell Creek. The Public Lands in the WSA are currently designated "Closed" to all motorized travel. Mechanized travel using mountain bikes, and the use of other mechanical devices, such as muscle-powered big game wheeled game carts or wagons, is also prohibited in the WSA under the guidance and policy in BLM Handbook 8550-1, *Interim Management Policy for Lands Under Wilderness Review*, Chapter I.B.11, pages 15 and 16. The southern boundary of the Sub-Region is the Uncompahgre National Forest and the eastern boundary is generally the top of the eastern slope above Roubideau Creek. Approximately 20 miles of routes are available for hiking or horseback riding by the public in the Sub-Region. There is one existing route approximately 5 miles long where motorized travel is authorized only for BLM and grazing permittee administrative purposes to maintain rangeland improvements. The western boundary is primarily Potter Creek. Public recreation use occurring in the Sub-Region consists of hiking, horseback riding, mountain bike riding, hunting, sightseeing, photography, and miscellaneous non-motorized overnight and day-use recreation activity. The Camel Back WSA under all alternatives would be managed in accordance with the BLM Handbook 8550-1.

Desired Future Conditions:
Maintain Camel Back Wilderness Study Area values and qualities for which the lands were designated.

## SUB-REGION C

General Setting:
Sub-Region C is located adjacent to and between Sub-Regions A, B, and D, and contains a total of 27,882 acres of public lands and 1191.3 acres of private land. The

[A-7]

BLM_0014704

# Appendices

Sub-Region is characterized by long canyons, narrow ridge and mesa tops, and steep drainages. Roatcap Gulch, Middle Fork, East Fork, Big Sandy Wash, and Coalbank Canyon are major drainages in the Sub-Region. Existing OHV designations in the Sub-Region are:  8,362 acres "Open" and 18,270 acres "Limited Seasonally". The western boundary is the Sub-Region B - Camelback Wilderness Study Area (WSA) boundary and the Uncompahgre National Forest. The northern boundary is Sub-Region A, the eastern boundary is private land on the southern end of California Mesa, and the southern boundary is Sub-Region D and Transfer Road.  Major access into the Sub-Region is via Transfer and West Transfer Roads. The TransColorado gas pipeline and a 115 kV Western Power Administration electrical transmission line meander in and out of the Sub-Region on its eastern edge. The TransColorado gas pipeline is also adjacent to the southern boundary of the Sub-Region paralleling Transfer Road. TransColorado's Olathe Pumping Station, associated with the gas pipeline, is on the southern boundary of Sub-Region C. Other uses occurring within the Sub-Region are cattle and sheep ranching (grazing), utility right-of-ways, walking/running, hiking, mountain bike riding, horseback riding, hunting, fishing, picnicking, camping, viewing scenery, wildlife watching/birding, four-wheel driving, ATV riding, motorcycle riding. Approximately 169 miles of routes are located in the Sub-Region.

Desired Future Conditions:
Protect and improve livestock forage conditions and crucial big game winter range habitat in the Sub-Region while allowing suitable recreational opportunities, and maintain appropriate and adequate access for public and/or administrative uses.

## SUB-REGION D

General Setting:
Sub-Region D is adjacent to and between Sub-Regions C, E, and F1, and contains a total of  29,660 acres of public lands and 1496.8 acres of private lands.  Cushman Creek, Piney Creek, and Dry Creek, all steep drainages, are located in the Sub-Region.  The Dry Creek Basin, which varies in topography, bisects the Sub-Region generally from north to south.  Existing OHV designations in the Sub-Region are: 6,923 acres "Open" and 21,216 acres "Limited Seasonally". The western boundary is the Uncompahgre National Forest and private land.  The northern boundary is Sub-Region C and Transfer Road. The eastern boundary is Sub-Regions E and F. Major access into the Sub-Region is via the Rim Road, Colorado Highway 90, and Transfer Road. The TransColorado gas pipeline is adjacent to the northern boundary of the Sub-Region paralleling Transfer Road. TransColorado's Olathe Pumping Station, associated with the gas pipeline, is on the northern boundary of Sub-Region D. Sub-Region D has become a popular destination area for technical four-wheel driving, two-wheel motorized and mechanized trials bikes, and motorcycle and mountain bike riding. The Tabeguache Trail, a nationally known 142 mile trail that connects Montrose to Grand Junction, runs through the Sub-Region onto the Uncompahgre

[A-8]

BLM_0014705

# Appendices

National Forest. Other popular activities include walking/running, hiking, rock climbing, horseback riding, hunting, fishing, picnicking, camping, viewing scenery, wildlife watching/birding, four-wheel driving, and ATV riding.  Approximately 178 miles of routes are located in the Sub-Region.

Desired Future Conditions:
Manage for a range of shared-use quality recreational activities for all users, balanced with resource protection, while maintaining appropriate and adequate access for public and/or administrative uses.

## SUB-REGION E

General Setting:
Sub-Region E is adjacent to Sub-Regions D and F1, and contains a total of 6,879 acres of public land, and 17.6 acres of private land. The Sub-Region is characterized by fairly gentle terrain with a few drainages.  All the Public Lands in the Sub-Region are designated as "Limited Seasonally". The western boundary is Sub-Regions D and F. The eastern boundary is private land in the Shavano Valley.  Major access into the Sub-Region is via the Rim Road and Transfer Road. The TransColorado gas pipeline is adjacent to the northern boundary of the Sub-Region paralleling Transfer Road. The Western Area Power Administration 115 kV electrical line diagonally bisects the Sub-Region. In addition to Sub-Region D, Sub-Region E has also become a popular destination area for technical four-wheel driving and two-wheel motorized and mechanized trials bikes. The Tabeguache Trail, a nationally known 142 mile trail that connects Montrose to Grand Junction, starts and runs through the Sub-Region continuing on to Sub-Region D. At the beginning of the trail, which is Rim Road, BLM has provided a parking area for all users. Other popular activities include walking/running, hiking, mountain bike riding, rock climbing, horseback riding, hunting, fishing, picnicking, camping, viewing scenery, wildlife watching/birding, four-wheel driving, ATV riding, and motorcycle riding. Approximately 60 miles of routes are located in the Sub-Region.

Desired Future Conditions:
Protect sensitive plant communities and associated wildlife while providing a range of quality and suitable recreational opportunities and maintaining adequate access for public and/or administrative use as appropriate.

## SUB-REGION F

Sub-Region F consists of three separate polygons or areas, F1-F3, with Sub-Region G in between.  The reason for three separate areas is the common traditional uses that occur in these three polygons, the high amount of use occurring there, and the common urban interface that influences these three areas. In contrast, Sub-Region G contains no direct access from high use public roads, nor some of the other

[A-9]

BLM_0014706

# Appendices

specialized recreation uses that occur in Sub-Region F. This Sub-Region contains 11,832 acres of public land and 308.5 acres of private land. Approximately 117 miles of routes are located in the three polygons of Sub-Region F. Existing OHV designations in this Sub-Region are portion are 11,535 acres "Limited Seasonally".

General Setting:
Portion North of Sub-Region G (F1): The portion of this Sub-Region north of Sub-Region G is adjacent to and between Sub-Regions D and G, and is dissected by several drainages and contains many long, narrow, and flat mesas. Colorado Highway 90 and a 115 kV electrical transmission line are located in this portion, and parallel each other. The western boundary is Sub-Region D. The northeastern boundary is private land in Shavano Valley. The southern boundary is Sub-Region G and Linscott Canyon. Major access into this portion is via Colorado Highway 90, a major access route to the Uncompahgre Plateau. A route approximately one mile long extends onto public land southwesterly from the lower switchback on Colorado Highway 90, and was used by technical, full-size four-wheel drive vehicles designed especially for travel on and over very steep and rough terrain and large rocks, and motorized and mechanized technical, two-wheel trials bikes. Other popular activities include walking/running, hiking, mountain bike riding, horseback riding, hunting, picnicking, camping, viewing scenery, wildlife watching/birding, four-wheel driving, ATV riding, and motorcycle riding.

Portions South of Sub-Region D (F2 & F3): These two polygons are located adjacent to and south of Sub-Region G and are located on a long, wide mesa with varying terrain, but no major drainages. The majority of the eastern boundary is private land and Dave Wood Road. The northwestern boundary is Sub-Region G and private land along the rim of Spring Creek. The southern boundary is the planning area, private land near the Montrose-Ouray County lines, and the Uncompahgre National Forest. Major access is via Dave Wood Road, an important access route to the Uncompahgre Plateau. Numerous routes enter the Sub-Region from Dave Wood Road.

Desired Future Conditions (entire Sub-Region F):
Sustain multiple uses through traditional means of travel, while providing appropriate and suitable recreational opportunities and access for public and/or administrative uses, without compromising wildlife habitat values on mesa tops and private land boundaries. Traditional means of travel include hiking, horseback riding, mountain bike riding, motorcycle riding, ATV riding, and 4-wheel driving.

**SUB-REGION G**

General Setting:
Sub-Region G is adjacent to and between the two portions of Sub-Region F and contains a total of 8,616 acres of public land and 1 acre of private land. Sub-Region

[A-10]

# Appendices

G is characterized by long unaltered canyons, narrow ridge and mesa tops with wide open views and various native vegetation, and steep drainages. Access routes leading into the Sub-Region are not very numerous. Major drainages in the Sub-Region are Lindsay Canyon, Devinney Canyon, and Spring Creek, a major tributary of the Uncompahgre River. Existing OHV designations are: 8,058 acres "Limited Seasonally" and 636 acres "Limited Year-long". The northwestern and southeastern boundary is Sub-Region F, the northern boundary is private land above Beaver Hill subdivision, and the southwestern boundary is private land along the Montrose-Ouray County lines. The southern boundary is the Uncompahgre National Forest. Sub-Region G contains no direct access from high use public roads. Approximately 68 miles of routes are located in the Sub-Region.

Desired Future Conditions:
Preserve the diversity of the natural character and scenic qualities within the Sub-Region, as expressed by open views, long unaltered canyon expanses, higher elevations, and varying vegetation communities, while providing quality and appropriate recreational opportunities and access for public and/or administrative uses.

[A-11]

BLM_0014708

# Appendices

## Appendix 4

## Maps of the Alternatives
(Maps are located on CD as separate PDFs if reviewing the document electronically)

[A-12]

# Appendices

## Appendix 5

## Issues and Concerns for the Dry Creek Travel Management Planning Area

**Background**
The Bureau of Land Management Uncompahgre Field Office began work on the Dry Creek Travel Management Plan (TMP) in March 2007.  The public scoping process was initiated at that time, with the public notified through press releases, web site postings, and letters sent to approximately 650 individuals and groups who had expressed an interest in participating in the travel management planning effort. Public meetings were then held in late March and early April.

At the close of the public scoping period, the Uncompahgre Field Office had received comments from 74 individuals and organizations in response to the request for public input relating to the Dry Creek Travel Management Planning Area.  These comments were placed into subject categories and summarized by members of the Dry Creek Travel Management Planning Team.  This document contains a general summary of the comments.

**How the Stakeholder Comments were used**
The BLM Travel Management Planning Team first identified the issues and concerns of stakeholder groups. Then the team began working on defining the boundaries and goals for the travel management plan and for the individual planning area sub-regions.

For the Dry Creek Travel Management Plan, the goals were written in the form of "Desired Future Conditions" (DFCs), which are brief statements that describe the physical, biological, social and management conditions that are expected to be achieved when the travel management plan has been implemented.

The purpose of DFCs is to define the kinds and amounts of activities or uses (social component) that a given land area can sustain while maintaining the area's health (physical and biological components) and complying with any special management requirements (management component) that may apply in the area.

Stakeholder comments were an important part of the planning process, especially for identifying social component issues, which were considered by the team when drafting the DFCs for this plan.  The DFCs then guided the analysis of the routes within the draft alternative travel network systems.

**Summary of Comments—Issues and Concerns**

### Access and Transportation
- Increased use of roads and trails off of Dave Wood Road and Hwy 90.

[A-13]

BLM_0014710

# Appendices

- Route proliferation in the past ten years, with a road up every mesa and pull-offs to canyon rims.
- High cost of fuel requires people to stay closer to home, which means using public lands.
- Support the change from open to limited to existing trails for motorized use.
- Support most of BLM's emergency closures and, if after proper review, those areas are shown to have suffered resource impacts, we fully support those areas to remain closed.
- Opposed to the closing of additional trails to motorized traffic in the Dry Creek Areas.
- Some of the trails have not been used by some and could be closed as a result of the travel planning process, which is not okay.
- Eliminating dead-end trails, along with other through trails, could result in hundreds of users at a time on the few trails left.
- Closing trails would create more user conflict.
- Access closed due to private land owners complaining about trails being too close to their property.
- Outfitters who try to convince federal agencies to close trails for authorized uses only.
- Do not want to have access to nearby areas restricted for those of us who use the land gently, and who try to leave sites better than we found them.
- Off-road travel is promoted through firewood cutting and by individuals without permits seeking Christmas trees, firewood or to collect rocks.
- Major increase in off-road travel in just the past 2-3 years.
- Adjacent property owners would like access to public lands.

**Cultural and Historic Resources**
- Historical and cultural areas need to be protected from resource impacts.

**Land Health and Threats**
- Land is increasingly trashed—even with large household appliances—and eroded over the past several years, reflecting disrespect for themselves and abuse of what belongs to all of us.
- Huge amount of dumping and trash from vehicles being allowed to drive into the Linscott Canyon area.
- Mining trash is left behind.
- Beautiful areas with great ecosystems deserve to be passed on to future generations in good health.
- Concerns with rapid expansion of noxious and invasive weeds and the effects on fire and runoff patterns.

[A-14]

BLM_0014711

# Appendices

**Lands, Rights-of-Way, and Withdrawals**
- Many facilities were constructed as many as 50 years ago, and major repair and/or replacement would be necessary.  Continuous and uninterrupted access to each of these facilities would be required.

**Law Enforcement and Public Safety**
- Implementing designated routes requires larger staffing and funding commitments.
- Any new plan would be ineffective without increased funding for enforcement and education.
- Regulations are not enforced now.
- Lack of enforcement for a travel plan doesn't seem to be much deterrence for people who respect decisions.
- Regulations and restrictions needed due to the increase in use and the projected future growth of the surrounding area.

**Multiple Use**
- Public lands should be managed to benefit all users.
- There is a delicate balance evident here between use and abuse, as a result of human activities and numbers of human visits/uses.

**Noise**
- Increased traffic is causing noise pollution.

**Recreation**
- Quiet use opportunities are nonexistent, especially on weekends, and the current uncontrolled access must be halted.
- Allowing dispersed motorized use for camping on both sides of routes would encourage further route proliferation (especially short spur routes) and related impacts, including weed expansion.
- Allowing dispersed ORV use for camping may violate Section 106 of the National Historic Preservation Act because ground-disturbing activity would occur without the federal agency's ability to first inventory those locations for the presence of potentially major cultural resources.
- Hikers and horseback riders have access to roads and trails that motorized vehicles cannot go to, even if wanted or allowed.
- Concerns over motorized events.
- Potential loss of existing motorized recreation opportunities might result from the travel management plan.
- Increased use and impact of user-created routes.
- New machines are capable of traveling in amazingly difficult places. This increased capability has led to increased resource impacts.
- Maintain primitive four-wheeling opportunities.

[A-15]

# Appendices

**Socioeconomics**
- Continuing regional growth would put additional pressure on public lands to provide mixed uses expected by public.
- The proximity of the area to Montrose with its large population means that there is constant pressure, not just to use the existing travel routes but to expand them.
- The Uncompahgre Plateau has become an increasingly popular destination.
- Additional closings could have an economic impact on the local economy because of the huge OHV community that uses the area for recreation (buy supplies, gas, food, etc. from the Montrose-area merchants).
- Need more environmental education and stewardship programs in schools.

**Soils**
- Route proliferation is causing increased soil erosion.
- Vehicles traveling the Plateau in muddy conditions cause impacts to the soil and encourage erosion.

**Vegetation**
- Reclamation/restoration is much more difficult and costly than preservation.
- Weed control.
- Preservation of plant habitat.

**Water Resources**
- Increase in motorized use may impact water quality.

**Wildlife**
- Preserve wildlife habitat and corridors.
- Increased traffic, increased speeds, and roadway improvements are problematic for wildlife.

[A-16]

BLM_0014713

# Appendices

## Appendix 6

## List of Travel Management Support Facilities within each Alternative and Sub-Region

(All facility locations are indicated on maps in Appendix 4)

### ALTERNATIVE 2

Sub-Region A

Kiosks\Informational signs would be installed at entry routes into this Sub- Region.

3 Staging areas would be designed and constructed.

1 Hardened camping area would be delineated near the riparian zone of Roubideau creek.

1 Trailhead would be designed and constructed.

Sub-Region C

Kiosks\Informational signs would be installed at entry routes into this Sub-Region.

4 Trailheads would be designed and constructed.

2 Delineated camping areas to allow motorized and non-motorized travel 300 feet off-route from centerline of designated routes for camping.

2 Staging areas for all users would be designed and constructed, one of which would be located on the boundary of Sub-Regions C and D.

Sub-Region D

Kiosks\Informational signs would be installed at entry routes into this Sub-Region.

1 Delineated camping area to allow motorized and non-motorized travel 300 feet off-route from centerline of designated routes for camping.

Sub-Region E

Kiosks\Informational signs would be installed at entry routes into this Sub-Region.

Existing staging area, known at the Tabeguache Trailhead, located on Rim Road would be upgraded as appropriate.

2 Hardened camping areas would be designed and constructed.

[A-17]

# Appendices

Sub-Region F

Kiosks\Informational signs would be installed at entry routes into this Sub- Region

1 Staging area would be designed and constructed.

3 Trailheads would be designed and constructed.

2 Delineated camping areas to allow motorized and non-motorized travel 300 feet off-route from centerline of designated routes for camping.

Sub-Region G

Kiosks\Informational signs would be installed at entry routes into this Sub-Region.

2 Staging areas would be designed and constructed.

1 Trailhead would be designed and constructed.

## ALTERNATIVE 3

Sub-Region A

Kiosks\Informational signs would be installed at entry routes into this Sub- Region.

1 Staging area would be designed and constructed.

Sub-Region C

Kiosks\Informational signs would be installed at entry routes into this Sub- Region.

2 Trailheads would be designed and constructed.

2 Staging areas would be designed and constructed.

Sub-Region E

Kiosks\Informational signs would be installed at entry routes into this Sub- Region.

The existing staging area, known at the Tabeguache Trailhead, located on Rim Road would be upgraded as appropriate.

Sub-Region F

Kiosks\Informational signs would be installed at entry routes into this Sub- Region.

[A-18]

BLM_0014715

# Appendices

2 Trailheads would be designed and constructed.

1 Staging area would be designed and constructed.

Sub-Region G

Kiosks\Informational signs would be installed at entry routes into this Sub- Region.

1 Staging area would be designed and constructed.

1 Trailhead would be designed and constructed.

## ALTERNATIVE 4

Sub-Region A

Kiosks\Informational signs would be installed at entry routes into this Sub- Region.

3 Staging areas would be designed and constructed.

Sub-Region C

Kiosks\Informational signs would be installed at entry routes into this Sub- Region.

2 Delineated camping areas to allow motorized and non-motorized travel 300 feet off-route from centerline of designated routes for camping.

2 Trailheads would be designed and constructed.

2 Staging areas would be designed and constructed.

Sub-Region D

Kiosks\Informational signs would be installed at entry routes into this Sub- Region.

1 Delineated camping area to allow motorized and non-motorized travel 300 feet off-route from centerline of designated routes for camping.

Sub-Region E

Kiosks\Informational signs would be installed at entry routes into this Sub- Region.

2 Hardened camping areas would be designed and constructed.

The existing staging area, known at the Tabeguache Trailhead, located on Rim Road would be upgraded as appropriate.

[A-19]

BLM_0014716

# Appendices

1 Cultural interpretive site would be designed and installed.

Sub-Region F

Kiosks\Informational signs would be installed at entry routes into this Sub- Region.

2 Delineated camping areas to allow motorized and non-motorized travel 300 feet off-route from centerline of designated routes for camping.

1 Staging area would be designed and constructed.

1 Trailhead would be designed and constructed.

Sub-Region G

Kiosks\Informational signs would be installed at entry routes into this Sub- Region.

2 Staging areas would be designed and constructed.

1 Trailhead would be designed and constructed.

[A-20]

BLM_0014717

# Appendices

## Appendix 7

## Laws and Policies which guide BLM's Travel Management Planning Process

# LAWS

**General Authorizing Legislation -** The following authorize the general activities of the Bureau of Land Management or govern the manner in which BLM's activities are conducted.

*Federal Land Policy and Management Act of 1976, as amended (43 U.S.C.1701 et seq.)*
- Outlines functions of the BLM Directorate, provides for administration of public lands through the BLM, provides for management of the public lands on a multiple-use basis, and requires land-use planning including public involvement and a continuing inventory of resources.

*National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.)*
- Section 102(2)(C) of the National Environmental Policy Act of 1969 requires federal agencies to prepare a "detailed statement" for proposed major actions which greatly affect the quality of the human environment. The statement must include the environmental impacts of the proposed action, alternatives to the proposed action, and any adverse environmental impacts which cannot be avoided should the proposal be implemented. In 1978 the CEQ issued binding regulations which implement the procedural provisions of NEPA.

*The Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.)*
- Directs Federal agencies to ensure that their actions do not jeopardize threatened and endangered species and that through their authority they help bring about the recovery of these species.

**Specific Authorizing Legislation -** In addition to the above laws that provide general authorization and parameters, a number of laws authorize specific program activities, or activities in specific or designated areas.

*Soil and Water Resources Conservation Act of 1977(16 U.S.C. 2001)*
- Provides for conservation, protection and enhancement of soil, water, and related resources.

[A-21]

# Appendices

***The Clean Air Act of 1990, as amended (42 U.S.C. 7401, 7642)***
- Requires BLM to protect air quality, maintain Federal and State designated air quality standards, and abide by the requirements of the State implementation plans.

***The Clean Water Act of 1987, as amended (33 U.S.C. 1251)***
- Establishes objectives to restore and maintain the chemical, physical and biological integrity of the nation's water.

***Taylor Grazing Act of 1934 (43 U.S.C. 315), as amended by the Act of August 28, 1937 (43 U.S.C. 1181d)***
- Authorizes the establishment of grazing districts, regulation and administration of grazing on the public lands, and improvement of the public rangelands. It also authorizes the Secretary to accept contributions for the administration, protection, and improvement of grazing lands, and establishment of a trust fund to be used for these purposes.

***The Federal Noxious Weed Act of 1974, as amended (7 U.S.C. 2814)***
- Provides for the designation of a lead office and a person trained in the management of undesirable plants; establishment and funding of an undesirable plant management program; completion and implementation of cooperative agreements with State agencies; and establishment of integrated management systems to control undesirable plant species.

***Noxious Weed Control Act of 2004 (P.L. 108-412)***
- Establishes a program to provide assistance through States to eligible weed management entities to control or eradicate harmful, nonnative weeds on public and private lands.

***The National Historic Preservation Act of 1966, as amended (16 U.S.C. 470)***
- Expands protection of historic and archaeological properties to include those of national, State and local significance. It also directs Federal agencies to consider the effects of proposed actions on properties eligible for or included in the National Register of Historic Places.

***The Archaeological Resources Protection Act of 1979, as amended (16 U.S.C. 470a, 470cc and 470ee)***
- Requires permits for the excavation or removal of Federally administered archaeological resources, encourages increased cooperation among Federal agencies and private individuals, provides stringent criminal and civil penalties for violations, and requires Federal agencies to identify important resources vulnerable to looting and to develop a tracking system for violations.

[A-22]

BLM_0014719

# Appendices

***The Migratory Bird Conservation Act of 1929, as amended (16 U.S.C. 715) and treaties pertaining thereto***
- Provides for habitat protection and enhancement of protected migratory birds.

***The Sikes Act of 1974, as amended (16 U.S.C. 670 et seq.)***
- Provides for the conservation, restoration, and management of species and their habitats in cooperation with State wildlife agencies.

***Migratory Bird Treaty Act of 1918(16 U.S.C. 703-712; Ch. 128; July 13, 1918; 40 Stat. 755) as amended by: Chapter 634; June 20, 1936; 49 Stat. 1556; P.L. 86-732; September 8, 1960; 74 Stat. 866; P.L. 90-578; October 17, 1968; 82 Stat. 1118; P.L. 91-135; December 5, 1969; 83 Stat. 282; P.L. 93-300; June 1, 1974; 88 Stat. 190; P.L. 95-616; November 8, 1978; 92 Stat. 3111; P.L. 99-645; November 10, 1986; 100 Stat. 3590 and P.L. 105-312; October 30, 1998; 112 Stat. 2956)***
- Establishment of a Federal prohibition, unless permitted by regulations, to "pursue, hunt, take, capture, kill, attempt to take, capture or kill, possess, offer for sale, sell, offer to purchase, purchase, deliver for shipment, ship, cause to be shipped, deliver for transportation, transport, cause to be transported, carry, or cause to be carried by any means whatever, receive for shipment, transportation or carriage, or export, at any time, or in any manner, any migratory bird, included in the terms of this Convention . . . for the protection of migratory birds . . . or any part, nest, or egg of any such bird." (16 U.S.C. 703)

***Executive Order 13186 on Protecting Migratory Birds -- Responsibilities of Federal Agencies To Protect Migratory Birds***
- These migratory bird conventions impose substantive obligations on the United States for the conservation of migratory birds and their habitats, and through the Migratory Bird Treaty Act (Act), the United States has implemented these migratory bird conventions with respect to the United States. This Executive Order directs executive departments and agencies to take certain actions to further implement the Act.

***The Bald and Golden Eagle Protection Act of 1940 as amended (16 U.S.C. 668-668c)***
- Prohibits anyone, without a permit issued by the Secretary of the Interior, from "taking" bald eagles, including their parts, nests, or eggs. The Act provides criminal penalties for persons who "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or any manner, any bald eagle ... [or any golden eagle], alive or dead, or any part, nest, or egg thereof." The Act defines "take" as "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb."

[A-23]

BLM_0014720

# Appendices

## **Policies**

- Addendum I to the Colorado Protocol: Section 106 Requirements for Comprehensive Travel and Transportation Management Planning dated October 26, 2006
- Instruction Memorandum No. CO-2007-020 Comprehensive Travel Management Planning and OHV Designations
- BLM Colorado - IB-2003-020 Travel Management Guidelines
- Instruction Memorandum No. 2008-014 - Clarification of Guidance and Integration of Comprehensive Travel and Transportation Management Planning into the Land Use Planning
- Presidential Executive Order 11644
- Colorado Public Land Health Standards
- Wilderness Study Area Interim Management Policy
- Colorado Recreation Management Guidelines to meet Public Land Health Standards
- National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands
- National Mountain Bicycling Strategic Action Plan
- BLM's Unified Strategy for Implementing the BLM's Priorities for Recreation and Visitor Services (WO IM 2007-043)
- 8300 – Recreation Management policy manual (Release 8-59, 3/30/90)
- Appendix C of the 1601 Land User Planning Handbook (Release 1-1693, 3/11/05)
- Incorporating Benefits-Based Management within Recreation and Visitor Services Program Policy Changes (WO IM 2006-060)
- Colorado's – A Recreation and Visitor Services Strategy

[A-24]

# Appendices

### Appendix 8

## Climate Summary

The planning area is located on the eastern slope of the Uncompahgre Plateau which is characterized by gently sloping mesas and deeply dissected canyons. The area dips to the northeast on an average slope of about 4 percent. This results in an elevational change in the planning area from about 5,000 ft. to 8,225 ft. (Figure 1). This change in elevation is the dominant factor for the variation in both temperature and precipitation of the area.  There are 3 climate stations that bracket the area and their data are summarized in Tables 1-3 below. The Delta and Montrose stations are east of the area at 4,930 ft. and 5,830 ft. respectively, and are more representative of the lower elevations of the planning area. The Columbine Pass Station is on the top of the Uncompahgre Plateau at 9,400 feet, and is located west of the plan area. This station is more representative of the highest elevations of the planning area.

Precipitation across the area is typified by frontal type storms for most of the year, except for the mid to late summer months when moisture laden southwest monsoonal air masses commonly result in short duration, high intensity storm activity. These events occasionally result in localized flooding and debris flows along the northeastern boundary of the planning area. At the higher elevations the snowpack accumulates from late fall and in to spring, when snowmelt results in elevated stream flow on the larger drainages. However the extent and duration of the snowpack varies significantly with winter temperature and precipitation amounts.

Table 1.  MONTROSE 2, CO (Elevation 5,830')
1971-2000 Monthly Climate Summary[1]

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Max. Temperature (F) | 38.0 | 45.1 | 54.1 | 62.2 | 72.0 | 82.6 | 87.7 | 85.4 | 77.4 | 65.1 | 48.1 | 38.8 | 63.2 |
| Average Min. Temperature (F) | 14.8 | 20.6 | 27.9 | 34.3 | 42.8 | 51.0 | 56.4 | 54.9 | 46.6 | 35.6 | 24.3 | 16.1 | 35.5 |
| Average Temperature (F) | 26.4 | 32.9 | 41.0 | 48.3 | 57.4 | 66.8 | 72.1 | 70.2 | 62.0 | 50.4 | 36.2 | 27.5 | 49.4 |
| Average Total Precipitation (in.) | 0.52 | 0.44 | 0.70 | 0.79 | 1.00 | 0.65 | 0.91 | 1.14 | 1.11 | 1.06 | 0.88 | 0.60 | 9.78 |

1    Climate data obtained from the Western Regional Climate Center at
     http://www.wrcc.dri.edu/summary/climsmco.html.

Unofficial values based on averages/sums of smoothed daily data. Information is computed from available daily data during the 1971-2000 period. Smoothing, missing data and observation-time changes may cause these 1971-2000 values to differ from official NCDC values. This table is presented for use at locations that don't have official NCDC data. No adjustments are made for missing data or time of observation. Check NCDC normals table for official data.

[A-25]

# Appendices

Table 2.  DELTA, CO (Elevation 4,930')
1971-2000 Monthly Climate Summary[1]

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Max. Temperature (F) | 40.1 | 48.9 | 58.7 | 66.8 | 76.2 | 87.2 | 91.9 | 89.3 | 81.5 | 69.4 | 51.8 | 42.0 | 67.2 |
| Average Min. Temperature (F) | 13.7 | 19.9 | 27.2 | 34.1 | 42.3 | 49.4 | 54.6 | 52.9 | 44.3 | 33.8 | 23.5 | 15.8 | 34.4 |
| Average Temperature (F) | 26.9 | 34.4 | 43.0 | 50.5 | 59.3 | 68.3 | 73.3 | 71.1 | 62.9 | 51.6 | 37.7 | 28.9 | 50.8 |
| Average Total Precipitation (in.) | 0.51 | 0.37 | 0.59 | 0.59 | 0.71 | 0.48 | 0.74 | 0.84 | 0.97 | 1.00 | 0.70 | 0.47 | 7.97 |

1.   Climate data obtained from the Western regional Climate Center at
     http://www.wrcc.dri.edu/summary/climsmco.html.

Unofficial values based on averages/sums of smoothed daily data. Information is computed from available daily data during the 1971-2000 period. Smoothing, missing data and observation-time changes may cause these 1971-2000 values to differ from official NCDC values. This table is presented for use at locations that don't have official NCDC data. No adjustments are made for missing data or time of observation. Check NCDC normals table for official data.

Table 3.  Columbine Pass (Elevation 9,400') (Snotel Station)
Monthly Climate Summary[1]

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Temperature (F) | 21.63 | 24.47 | 31.02 | 37.24 | 45.46 | 54.97 | 60.20 | 57.71 | 50.86 | 40.92 | 28.32 | 21.53 | 39.53 |
| Average Total Precipitation (in.) | 4.20 | 3.80 | 4.30 | 3.50 | 2.10 | 0.90 | 1.80 | 1.90 | 2.00 | 2.90 | 3.30 | 3.50 | 34.2 |

1.   Snotel climate station data obtained from the USDA, Natural Resource Conservation Service website, at:
     http://www.wcc.nrcs.usda.gov/snow/update.html

To better define the variation in precipitation across the plan area, BLM precipitation monitoring data collected in the 1980s were reviewed. Four monitoring locations (Figure 1) in or close to the plan area had at least two, twelve consecutive month, precipitation totals, and these data are summarized in Table 4. Since the data were from storage type precipitation gages, the distribution of precipitation can only be assessed as totals in the time interval between gage readings. In most cases, the period of record is short of a full year by a few days, but after assessing daily precipitation data for Montrose for these short data gaps, no significant changes (>0.10") in precipitation averages resulted. Additionally, the data are not on a calendar or water year basis, but data is available from the Montrose Climate Station (Colorado State University) for the same monthly periods, that allowed the data to be normalized with this station (the Delta climate station had several periods of missing data and could not be used for this analysis). Each station's normalized twelve month precipitation amounts were then averaged and are summarized in the last column of Table 4.

[A-26]

BLM_0014723

# Appendices



Figure 1. Elevation Map of Plan Area and Climate Station Locations

[A-27]

BLM_0014724

# Appendices

Table 4. Historic Precipitation Record for Dry Creek Travel Plan Area[1] Normalized with Montrose, Colorado Precipitation Data

| Site | Location | Period of Record | Elevation Feet | Precipitation Inches | Montrose % of Normal | Normalized Totals | Normalized Average |
|---|---|---|---|---|---|---|---|
| Dry Creek | T48N, R11W, SESE Sec. 17 | 5/6/1980-4/24/1981 | 7285 | 11.80 | 80 | 14.75 | |
| | | 8/20/1982-8/3/1983 | 7285 | 20.80 | 135 | 15.41 | |
| | | 8/29/1984-8/20/1985 | 7285 | 22.86 | 119 | 19.21 | 16.46 |
| Lower Roubideau | T51N, R12W, NENW Sec. 24 | 5/11/1983-5/7/1984 | 5300 | 7.15 | 139 | 5.14 | |
| | | 5/7/1984-5/9/1985 | 5300 | 7.75 | 144 | 5.38 | |
| | | 5/9/1985-5/13/1986 | 5300 | 5.65 | 96 | 5.89 | |
| | | 5/13/1986-5/7/1987 | 5300 | 8.41 | 162 | 5.19 | |
| | | 5/7/1987-5/11/1988 | 5300 | 6.90 | 103 | 6.70 | 5.66 |
| 25 Mesa Road | T50N, R13W, NWNE Sec. 25 | 5/11/1983-5/7/1984 | 7200 | 16.50 | 139 | 11.87 | |
| | | 5/16/1985-5/13/1986 | 7200 | 13.85 | 96 | 14.43 | |
| | | 5/7/1987-5/11/1988 | 7200 | 12.00 | 103 | 11.65 | 12.65 |
| Potter Basin | T49N, R13W, SWNW Sec. 27 | 8/12/1985-8/21/1986 | 8000 | 28.19 | 127 | 22.20 | |
| | | 8/21/1986-8/26/1987 | 8000 | 29.06 | 140 | 20.76 | 21.48 |

1.   Precipitation Data on file at the BLM-Uncompahgre Field Office.

The normalized, average precipitation totals in Table 4 and the corresponding precipitation averages from the three long term climate stations (Delta, Montrose, and Columbine Pass) were then plotted against station elevation (Figure 2). A trend line was established that produced an R squared of 0.8973, which implies that 90% of the variation in precipitation is explained by elevation. Using the power line function, estimated average annual precipitation and the corresponding acreage in the planning area is presented in 500 feet elevation intervals in Table 5.

[A-28]

BLM_0014725

## Appendices



Figure 2.  Annual Precipitation Variation with Elevation

Table 5. Mean Annual Precipitation Variation with Elevation, Estimated with Power Line Function in Figure 2, and the Corresponding Plan Area

| Elevation ft. | Mean Annual Precipitation (in.) | Plan Area Acres |
|---|---|---|
| 5000-5500 | 8 | 4,109 |
| 5500-6000 | 9 | 19,861 |
| 6000-6500 | 12 | 29,452 |
| 6500-7000 | 14 | 26,021 |
| 7000-7500 | 17 | 24,657 |
| 7500-8000 | 20 | 10,615 |
| 8000-8225 | 22 | 465 |

Monthly temperature averages are presented in Tables 1-3 for the three long term climate stations that bracket the area (Montrose, Delta, and Columbine Pass). Air temperatures vary with elevation as can be observed when comparing the data from these three stations. Another data set valuable to assess the plan area, air temperature, are from an Onset Corporation Hobo, air temperature data logger installed near the intersection of Highway 90 and the Dry Creek Rim Road from 2007 to present. The logger records temperature hourly and the summarized data are presented with other station temperature data in Figure 3. The difference between mean daily temperatures at these stations were assessed and averaged - 3

[A-29]

BLM_0014726

## Appendices

degrees F per 1,000 foot elevational increase. According to Cole, Franklyn W., 1975 a reasonable average temperature lapse rate in the atmosphere is 3.5 degrees F/1000 feet elevational change, although several conditions such as inversions, and humidity can result in deviations from this value.



Figure 3. Mean Daily Temperature (F) Values from March 26 to December 31, 2008. (some data missing-e.g. Montrose for the month of August, and Columbine Pass missing the last three months). Temperature data on file at BLM Uncompahgre Field Office.

Air temperature across the plan area is typically the coldest during the month of January and warmest in July. Figures 3 and 4 present temperature values for Delta, Montrose, and Rim Road and Highway 90 (at 7,509 feet within the Dry Creek Plan Area, see Figure 1). The July, 2008 temperature values in Figure 3 are maximum daily values, and for this month, both Delta and Montrose temperatures averaged 2.1 and 1.9 degrees above normal, respectively. The January, 2007 temperature values in Figure 4 are minimum daily values, and for this month, both Delta and Montrose temperatures averaged -2.4 and -2.0 degrees below normal, respectively.

[A-30]

# Appendices



Figure 4. Maximum Daily Air Temperature during July, 2008. Temperature data on File at BLM, Uncompahgre Field Office. (temperature during July, 2008 from BLM Uncompahgre FO files and the Colorado Climate Center)



[A-31]

BLM_0014728

# Appendices

Figure 5. Minimum Daily Air Temperature during January, 2007. Temperature Data on file at the BLM, Uncompahgre Field Office (temperature during January, 2007 from BLM Uncompahgre FO files and the Colorado Climate Center)

Table 6 and Figure 6 summarize the average wind direction and speed from 1991 to 2008 for the Cottonwood Basin (RAWS) Station located in the northwestern portion of the plan area, in the vicinity of the 25 Mesa, BLM precipitation monitoring site, see Figure 1.



Figure 6. Wind Rose for Cottonwood Basin RAWS Station (data source: http://www.raws.dri.edu/)

| Range (mph) | Direction (wind blows from) | | | | | | | | | | | | | | | | All |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | N | NNE | NE | ENE | E | ESE | SE | SSE | S | SSW | SW | WSW | W | WNW | NW | NNW | Total |
| 1.3 - 4 | 1.0 | 1.0 | 1.4 | 1.4 | 2.2 | 1.9 | 1.8 | 1.7 | 1.9 | 1.9 | 1.7 | 1.8 | 1.7 | 1.2 | 1.0 | 0.9 | 24.3 |
| 4 - 8 | 1.9 | 1.8 | 2.3 | 2.5 | 3.1 | 1.5 | 0.8 | 0.9 | 1.5 | 2.9 | 4.9 | 4.2 | 2.3 | 1.4 | 1.5 | 1.6 | 34.8 |
| 8 - 13 | 1.0 | 0.5 | 0.4 | 0.3 | 0.2 | 0.1 | 0.0 | 0.2 | 0.5 | 1.7 | 5.9 | 2.4 | 1.1 | 0.7 | 0.9 | 1.1 | 17.0 |
| 13 - 19 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 | 0.8 | 3.8 | 0.9 | 0.4 | 0.2 | 0.2 | 0.3 | 7.2 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.3 | 1.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 1.8 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |

BLM_0014729

# Appendices

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| > 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total (%) | 4.0 | 3.2 | 4.0 | 4.2 | 5.5 | 3.5 | 2.7 | 2.9 | 4.1 | 7.5 | 17.9 | 9.4 | 5.5 | 3.5 | 3.6 | 3.8 | 85.4 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | 14.5 |
| Avg Speed | 6.0 | 5.2 | 4.8 | 4.8 | 4.4 | 3.9 | 3.9 | 4.3 | 5.2 | 7.4 | 10.3 | 7.1 | 6.2 | 5.9 | 6.3 | 6.7 | 5.7 |

Table 6. Wind Range (mph) - Greater than or equal to initial interval value and Less than ending interval value (data source: http://www.raws.dri.edu/).

[A-33]

BLM_0014730

# Appendices

### Appendix 9

### Responses for Comments Received

| Comment # | Affiliation |
|---|---|
| 145 | Colorado Division of Wildlife |

COMMENT:
CDOW appreciates the BLM's efforts and supports Alternative 2 however would like to call attention to the following points:
Rock Crawling trail on Hwy 90
At a minimum it should be a part of the seasonal closure but overall does not support introducing or encouraging rock crawling to this area

RESPONSE:
After reviewing the comment, changes have been made on the Hwy 90 rock crawling trail. It will be seasonally closed from 12/1 to 4/15.

COMMENT:
Roubideau Canyon and proposed 4WD/2WD open road along the south rim. Recognizes that use on this trail is light at present however it seems likely that recreational use will increase and have a negative effect on the wild sheep herd.

RESPONSE:
After considering the comment, BLM feels that adequate protection has been maintained for the wild sheep herd. A rim route was closed in the area and several miles of routes have been limited to non-motorized/non-mechanized to the north and west. If monitoring shows that additional protection is needed, BLM would change travel and/or use (see EA, Adaptive Management). Changes to the transportation network (new routes, reroutes, or closures) in "limited" areas may be made through activity level planning or with site-specific National Environmental Policy Act (NEPA) analysis (WO IM 2008-14).

| 146 | Quiet Use Coalition |
|---|---|

Same as comment #164

| 147 | Colorado Off-Highway Vehicle Coalition |
|---|---|

COMMENT:
The following comments are submitted to support our request that the FONSI be revised as described in the maps we submitted earlier today. This letter is being submitted via email. Our interest is in preserving sustainable motorized access to our public lands. We want to

[A-34]

# Appendices

ensure that the full range of motorized recreation opportunities remain available for our members to enjoy, including 4WD touring, rock crawls, ATV trails, and singletrack motorcycle trails.

This comment is very specific and we are critical of the way the information is presented, in that it seems a bit disingenuous in some categories, and in others, perhaps it is simply honest mistakes. We had time to examine only a few areas of importance, but a quick review of the areas we could not examine in detail show they have similar problems with lack of factual information about actual effects, and lack of knowledge of the activities under analysis.

In the spirit of remaining cooperators, we have worked hard to blend a modified Alternative 2, which incorporates only elements analyzed in the present document. In this way we want to avoid any extra analysis, and the decision can be made timely.

RESPONSE:

After considering this comment, the document has not been changed to adopt the alternative map mentioned in this comment.  Certain changes have been made in the document, as shown in the responses to other comments.  The Proposed Action maintains sustainable motorized access to the public lands in the planning area for a variety of users, including for motorized recreation opportunities in the form of 4WD touring, rock crawls, ATV trails, single track motorcycle riding, hiking, horseback riding, and other uses.

COMMENT:
Introduction
Page 7:Paragraph 4
The goal of maintaining, protecting, and improving public land health is the job of BLM. "Land Health" as a task has agreed-upon and measurable standards. Providing access and enhancing recreation opportunities also have some statutory or regulatory guidelines to direct the agency toward objective and professional goals. The goal of improving natural values has no agreed-upon standards. "Natural Values" means different things to different people. We have no way of knowing which or whose values will be applied. Decisions based on "natural values" can too easily be construed as arbitrary. Further, the statement in paragraph 4 implies that "natural values" are at risk, which has not been confirmed by this analysis. Therefore, we would like you to remove "improving natural values" as one of the goals of this Plan.

RESPONSE:

After considering the comment, no change was made to the document. The publication titled National Management Strategy For Motorized Off-Highway Vehicle Use On Public Lands (U.S. Department of the Interior Bureau of Land Management, January 2001), as well as the policy outlined in BLM Manual 8340 (May 25, 1982), states that off-road vehicle use is an "acceptable use of public land wherever it is compatible with established resource management objectives." As established by the Federal Land Policy and Management Act of 1976, the BLM is required to manage the public lands on the basis of multiple use and sustained yield, while protecting natural values. Also, in the National Environmental Policy

[A-35]

BLM_0014732

# Appendices

Act, TITLE I,  CONGRESSIONAL DECLARATION OF NATIONAL ENVIRONMENTAL POLICY, Sec. 101 [42 USC § 4331], (b) 4., a clear mandate is given to federal agencies to preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity, and variety of individual choice.


COMMENT:
Background
From Page 8 paragraph 3:
"Uses of the area include sightseeing, photography, hunting, hiking, cross-country skiing, camping, horseback riding, mountain bike riding, ATV riding, technical four-wheel driving, motorcycle riding, snowmobiling, livestock grazing management, decorative rock gathering..."
However, in paragraph 2 BLM says:
"Mild winter conditions sometimes allow year-round access for a variety of motorized and non-motorized recreational uses."
If we turn to page 54, Air Quality, we learn that motorized snowmobile use contributes to undesirable emissions. These claims are in rather a serious conflict: if the winters are mild, does that mean there is no snow? Temperatures remain warm? If so, how is it possible that people go snowmobiling there?

RESPONSE:
Please see the added Appendix 8 that contains climatic information for the planning area.


COMMENT:
Yet BLM has left out of the analysis any information on the climate of the area. This is a stunning omission in light of many of the claims made. The first claim that conflicts with the evidence omitted is the snowmobiles use in the area, because the National Weather Service data for Montrose CO (the closest RAWS station to the study area at similar elevation) reports that the annual precipitation average for 1971 to 2000 was 9.71 inches. The average daily snowfall averaged about 1/4 of one inch, on the days when any snow fell at all. Because BLM doesn't tell us this, we can only assume that this is why the area is accessible almost year round. However, no reasonable reviewer will be convinced that snowmobiling is a common recreation activity.

RESPONSE:
Please see the added Appendix 8 that contains climatic information for the planning area.


COMMENT:
In fact, 9.71 inches of precipitation annually tells us that the study area is a desert. It may be accessible year round, but it is not a desirable place to be year round. The annual average

[A-36]

# Appendices

summertime temperature is 106 degrees Fahrenheit. The average winter low is 17.3 degrees
Fahrenheit.

If the climate data is included, which it should be in the chapter called "affected
environment," no reasonable reviewer would agree that hiking, mountain biking, equestrian
use or snowmobiling is a common activity in the study area "almost year round."

In other words, BLM has omitted the fact that this is a desert, and the most notable
characteristic of deserts is the absence of water. A study of the area reveals that there is no
permanent water outside the three perennial streams that cross the study area. Only Potter
Creek, Roubideau Creek, and Dry Creek appear to be true perennials. Time prevents a close
study, but the total reach of these streams is only 206,210 meters, or just under 12 miles.
According to page 7 the study area is 115,000 acres. By comparison, the claimed route
mileage is 669 miles.

RESPONSE:
Most desert classifications rely on some combination of the number of days of rainfall, the
total amount of annual rainfall, temperature, humidity, or other factors. In a widely accepted
classification system developed by Peveril Meigs in 1953, extremely arid lands have at least
12 consecutive months without rainfall, arid lands have less than 250 millimeters (9.8
inches) of annual rainfall, and semiarid lands have a mean annual precipitation of between
250 and 500 millimeters (9.8 to 19.7 inches). Only arid and extremely arid lands are
considered deserts. (http://pubs.usgs.gov/gip/deserts/what/)
Using the above definition, only a portion of the lowest elevations of the planning area
would be classified as a desert; most of the remainder of the lands in the planning area
would be semiarid. The added Appendix 8 adequately articulates both the temperature and
precipitation regime of the area, regardless of the desert classification. Additionally, other
sections of the Draft document articulate the resource values the BLM has responsibility for
managing in accordance with Colorado's Public Land Health Standards and Recreation
Guidelines (USDI Bureau of Land Management 2000).


COMMENT:
"The "wet season," in this study area, is not very wet (10 inches of precipitation per year).
This means that years pass with any water flowing in the ephemerals at all---remember, the
definitions are taken from forest hydrology. That is very likely because "desert hydrology."
is quite a different subject."

RESPONSE:
There are no RAWS (Remote Automated Weather Stations) weather stations in Montrose,
Colorado. The closest RAWS station is the "Cottonwood Station" off 25 Mesa Road on the
Uncompahgre Plateau. Additionally, RAWS stations use tipping bucket rain gages which
cannot measure snowfall accurately, only rain, so annual totals are not accurate. The 30 year
average for the National Weather Service's Cooperative Climate Station at Montrose,

[A-37]

BLM_0014734

# Appendices

Colorado has an average annual precipitation of 9.78 inches. An appendix with climatic information has been added to the document that presents more detailed climate conditions (temperature and precipitation) for the travel planning area.

COMMENT:
BLM has omitted a key combination of information about recreational use from this plan:
1. No visitor use data.
2. 9.71 inches of rainfall annually.
3. Summertime highs of over 100 degrees.
4. Wintertime lows averaging 17 degrees.
5. No permanent water throughout the vast majority of the 115,000 acres.

To keep this brief, the only recreationists who access this area year round must use motor vehicles or they will not survive. The claims that the needs of muscle-powered recreationists can be met in this area are simply not credible. In combination with the fact that BLM omitted the most basic information about the area from this analysis, causes a very serious credibility problem for this analysis.

RESPONSE:
Thank you for the comment. Many types of users visit the public lands and use routes in the planning area for a variety of purposes, including hiking, camping, horseback riding, viewing scenery, and motorized and non-motorized vehicular recreation pursuits.

COMMENT:
Need and Purpose for the action Page 8 Paragraph 5
"User conflicts" is cited as one of the results of increasing demand, yet BLM has not told us what this is. of what this is. Resolving philosophical differences between individuals pursuing lawful activities on public lands is not a task identified in NEPA, FLPMA or any other authorizing legislation pertinent to this EA. "User conflict" is ephemeral; its occurrence is hearsay, and it has no evidence. There are no standards by which public land visitors can reliably gauge their behavior such that the BLM does not construe more, or less, "user conflict." If there is property damage or personal injury resulting from any interactions between visitors, these conflicts are the responsibility of the state. if "user conflict" is to be an element in formulating the Decision, please add an objective and lawful definition of "user conflict " to this analysis. Please provide incident reports or other written documentation to substantiate the definition. If no lawful definition can be provided, and no documented incidents are on record, but the BLM still wants to include this task as part of the need for the Plan, please add to the Purpose and Need the following statement: "While it is one of the stated goals of this Plan, BLM has uncovered no evidence and no documented incidents of user conflict in the study area. The reason for this information gap is the absence of a lawful standard which visitors can use to adjust their behavior such that their behavior is in compliance with the BLM requirement."

[A-38]

# Appendices

RESPONSE:
After considering this comment, no change was made to the document. The text the comment addresses is on page 8 in the section NEED AND PURPOSE FOR THE ACTION, Need for the Action:

"Residents and visitors are discovering new opportunities on public lands managed by the Bureau of Land Management (BLM) Uncompahgre Field Office.  This has placed an increasing demand on resources, resulting in user conflicts and impacts to vegetation, soils, cultural sites, wildlife habitat, and other natural and sensitive resources.  The recreation industry has also contributed to this observed increase in use and level of impacts by introducing new technical advancements in modes of travel".

The subject text in the document points out that new opportunities on public lands are being discovered by the public in a variety of ways, including the many multiple uses that occur on public lands. These multiple uses are for such activities as energy development, utilities, livestock grazing, and wildlife habitat management.  These uses also take in recreation activities that are occurring in the planning area, including motorized 4WD touring, rock crawls, ATV trails, single track motorcycle riding, hiking, horseback riding, camping, sightseeing, and other uses. User conflicts have been observed by BLM employees and the public in the planning area as a result of this increasing use and have been reported verbally.

COMMENT:
Page 9
The term "internal issues" is used in the outline on page 9 under "Purpose of the action." The reviewers of this document cannot tell what this is. Is this internal scoping? Or does this refer to differing values between BLM staff and various publics? Please clarify the term "internal issues." The term appears again on page 10, paragraph 1. The phrase "...and help resolve the many public and internal issues and concerns regarding OHV management for a variety of uses and purposes" reads as philosophical differences between BLM staff, and is only obscured by the additional phrase "...variety of uses and purposes." What are you folks talking about, and why is it repeated in this document? It adds no new information to the analysis; in fact, it is extremely unclear, and it sounds secretive. Please tell us what the internal issues are, and what they have to do with this analysis, or leave them out.

RESPONSE:
The internal issues referred to in the comment are very similar to the issues identified during public scoping and public outreach, since the BLM is responsible for dealing with all issues that occur relative to public land management.  For instance, issues discussed and identified internally on December 13, 2007 at a BLM meeting concerning the planning area included recreation, specifically dispersed use, placement of staging areas, placement of hardened camping areas, and miles of trails. The issues were combined in the document.

[A-39]

BLM_0014736

# Appendices

COMMENT:
Page 9 paragraph 3, 4
This portion of the document does not establish a need for any action. No monitoring data from the study area is documented in the EA. No science-based observations from the study area (i.e. visitor surveys of people when they are in the study area) are presented in this EA.

RESPONSE:
After considering this comment, the document has been changed.  The information in the referenced section in the comment (Need for the Action) clearly shows that a need exists for the action addressed in the document. See paragraph 2 under the Need for the Action section beginning on page 8. Text has been added in the section Need for the Action, page 9 that refers the reader to the science-based Roubideau Land Health Assessment, available in the Uncompahgre Field Office. This assessment is also mentioned in numbered paragraph 1) a on page 9 under Purpose for the Action.

COMMENT:
From p. 9:
Montrose alone is expanding at an approximate rate of 6% per year and the Uncompahgre Field Office (UFO) reported a 9% increase in visitor days in Fiscal Year 2006.
Without any baseline visitor use data, reviewers cannot tell how many more visits a 9% increase might actually be. Is that 9% of 1,500? 15,000? 150,000? The EA is silent.

RESPONSE:
After considering the comment, the base line data was added to the document (see Need for Action section)

COMMENT:
The connection between the population growth of the adjoining counties has not been successfully linked to the land health in the study area. Reviewers cannot determine whether the study area is of local, regional or national significance, or if it is simply desert land of low productivity. .
By the same token, BLM seems to want this both ways: population explosion is the reason for the plan, yet the solution to increasing demand is reduced opportunity. No rational service provider reduces supply when there is a manifested increase in demand. Or, as CEQ puts it, we expect to find an identifiably rational connection between the conclusions drawn and the evidence before the agency.

RESPONSE:
After considering the comment, the following information is supplied to explain the connection between increases in population and land health concerns. The planning area is fully described in the Roubideau Land Health Assessment, which has a complete citation in the Literature Cited. This document is available for review from BLM upon request. This

[A-40]

BLM_0014737

# Appendices

document describes the various values in the planning area, and indicates the level of significance of some of the areas within it. This document provides resource information that shows the planning area is very diverse in makeup, including soils, water resources, vegetation, livestock forage, wildlife habitat and species, slope, and riparian habitat.  The Land Health Analysis includes an analysis of the causes for land health problems. While population growth has not been identified as a direct cause, causes such as OHV use, dispersed recreation impacts and impacts from existing routes and roads are identified. The BLM has observed that as local and regional population increases, more visitation, including by OHV users, occurs. The BLM has thus concluded that current growing populations will engage in more OHV use, dispersed recreation, and more user created routes would potentially occur.

COMMENT:
Page 10 Paragraph 1
Managing for quiet uses is mentioned as a need and purpose for this Plan. No definition of quiet use is provided in this EA.  Because BLM has not been assigned the authority to create this condition by Congress (see Appendix 7), the public has no way of adjusting its behavior such that BLM does not perceive that we have sufficient or insufficient quiet use opportunities. Would a troop of bagpipe players hiking in time to their very brash and noisy instruments violate this condition? Loud laughter? A high school marching band practicing in the desert where they perceive they are not bothering anyone? The only clear and lawful definition of this quiet use condition is already found in the Wilderness Act. Attempts to apply an undefined standard outside of Wilderness will cause visitor expectations to be left unmet, because the study area is not Wilderness nor is it a WSA. If BLM has studied the literature on user conflicts, BLM will know that unmet expectations are the single most-cited cause of "unsatisfied" responses to visitor surveys and the single most-cited cause of user conflict. Thus, as we have no lawful definition of quiet use, please remove quiet use as an element that is used to n formulate the FONSI.  If BLM insists on keeping quiet use as a condition to be met somewhere in the study area, please add the following caveat: " Although BLM intends to try to create this condition in some places in the study area, BLM has no lawful definition of what exactly "quiet use" is, outside of Congressionally designated Wilderness areas."

RESPONSE:
After considering the comment, the following definition of Quiet Recreation from the BLM publication A Recreation and Visitor Services Strategy (United States. Bureau Of Land Management. Colorado State Office, 2007, Bureau of Land Management, Colorado State Office) has been inserted into the glossary in the document:  Quiet Recreation: Outdoor recreation enthusiasts such as hikers, skiers, mountain bikers, equestrians, bird watchers, hunters and anglers who seek the opportunity to enjoy natural soundscapes. Executive Order 11644 requires federal agencies to locate routes and trails to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in

[A-41]

BLM_0014738

# Appendices

populated areas, taking into account noise and other factors. In the publication "A Recreation and Visitors Services Strategy" (Bureau of Land Management, Colorado State Office) BLM planners and managers, in collaboration with communities and constituencies, are required to manage public lands to maintain a diversity of settings across the entire spectrum of recreation opportunities, which include motorized uses such as motorcycling, four-wheeling, ATVing, snowmobiling and driving for pleasure; mechanized uses such as road biking and mountain biking; and quiet recreation opportunities.

COMMENT:

Also on page 10 is a description of what a designated route system refers to. This definition is incorrect. "Designating" routes is one action. Separating uses is not an integral part of route designation. The simplest form of a designated route system is, all visitors must travel on the designated routes. Segregation of uses or modes of travel is secondary to route designation. Many BLM Field Offices, National Forests, and state recreation authorities have designated the routes, but do not segregate users. Please correct the description on page 10.

RESPONSE:

After considering the comment, no change was made to the document. Comprehensive Travel Management is the proactive planning and on-the-ground management of road and trail travel networks. This includes route planning, inventory and evaluation, innovative partnerships, user education, mapping, monitoring, signing, field presence and law enforcement. It addresses all resource aspects (recreational, traditional, casual, agricultural, industrial, educational, cultural, etc.) and accompanying modes and conditions of travel on the public lands, including motorized, mechanized, and non-motorized/mechanized uses. Planning for designated routes and the conditions of use or limitations that would apply to these routes is done at the same time in the planning process, or at least considered at the same time. The document text referred to in the comment is shown below.

<u>Purpose for the Action</u>

The purpose of the action is to 1) Present and analyze alternative travel management plans with a motorized and non-motorized designated route system* and other sets…"

*Designated route system refers to the method of managing a motorized and non-motorized transportation network in which the individual routes are limited to specific modes of travel, and are identified on travel maps and posted on the ground with signs. Under the current designation, motorized and mechanized travel is permitted to operate cross-county except for those routes that have been posted as closed. Under a designated route system, motorized and mechanized travel would be limited to routes that are identified on travel maps and posted as routes on the ground that are available for specified types of uses.

[A-42]

BLM_0014739

# Appendices

COMMENT:
Route density is identified as an issue to be evaluated. The scoping record does not mention route density. The calculation of route density is entirely arbitrary. Why? The density of routes in an area is dependent upon the boundaries of the area under study. The boundaries can be set so that any result can be reported. Further, the calculation does not take into account the zones within the boundaries that do not have routes, their conductivity or geomorphic features that define undisturbed zones. There is no standard for route density and the effect on land health, and the BLM has not successfully linked route density with any land health issues. Page 136 lists routes twice in one paragraph as detrimental, yet, if the average route width is ten feet, and there are 669 miles, we have 810 acres actually disturbed, which amounts to 7/10ths of one percent of the land base. This belies any connection between route density and land health. We want the BLM to abandon "route density" as a criteria in the decision.

RESPONSE:
After considering the comment(s), the following information is provided to explain how route density relates to the alternatives in the document.  The BLM has not used route density as a criterion for recommendations in any of the alternatives. It has used route density as an analysis tool and basis for comparison between alternatives. The calculation of route density for analysis purposes is based on the sub-regions which were identified at the beginning of the planning process. Route density was used to analyze whether the different route networks in each alternative contribute to meeting sub-region Desired Future Conditions. Overall route density for the entire planning area has also been calculated to help the reader gage the overall picture for the planning area and to contrast between alternatives. In the Roubideau Land Health Assessment (available at the Uncompahgre Field Office), BLM has linked land health issues to roads and OHV use as contributing factors. The Land Health Assessment also includes a discussion relating to the "dense road network" and weed spread.  The following text from p. 138 in this document, under the subtitle "Impacts from Alternative 1", shows the degree of impact now occurring to vegetation from existing routes: "Currently, an estimated 1,661 acres of existing vegetation, or 1.5% of the acreage is directly impacted by routes.  An additional 3% of the vegetation can be considered to be in the RIZ and affected by sedimentation, erosion, dust deposition, increased grazing and human disturbances, and subject to or already invaded by nonnative weedy plants."   About 4.5% of the existing vegetation in the planning area is currently impacted by travel routes and travel in a combination of impacts immediately in the area occupied and disturbed by routes and adjacent areas that also get impacted. The three factors noted above indicate the connection between existing routes and land health. BLM recognizes that route density is a useful parameter for assessing and communicating about routes, just as total route mileage is a useful parameter. The BLM has used route density in this document as one analysis tool among many, based on this logic.

[A-43]

# Appendices

COMMENT:
Transportation Page 48
The issue of transportation is not analyzed in this EA.

RESPONSE:
After considering the comment, no change was made to the document. A thorough presentation of the route elements in the travel management plans for each alternative is shown in Table 1, 2, 3, and 5. The components addressed in the AFFECTED ENVIRONMENT/ENVIRONMENTAL CONSEQUENCES analyze the effects of implementing each of the alternatives and their associated miles of various routes.

COMMENT:
The explanation beginning on page 48 is a good guide to how to do a transportation analysis. It does not actually analyze the access issues and limitations that will result from the various alternatives. The alternatives provide vague comparisons of tiny differences---three miles of route in a dry wash instead of five miles? When the total surface area of the existing 667 miles of routes is only 7/10ths of one percent? This goes straight to the need for this plan. BLM has correctly selected an EA to support it because there are obviously no unresolved conflicts 40 CFR 1500.4 (q)

RESPONSE:
Thank you for the comment. The referenced section in 40 CFR is shown here for the convenience of the reader.

§1500.4 Reducing paperwork. Agencies shall reduce excessive paperwork by: q) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment and is therefore exempt from requirements to prepare an environmental impact statement (§1508.13).

COMMENT:
Benefits
No mention is made of any benefits that might be realized from the alternatives. Although the routes being analyzed are used for both commercial and recreational purposes, no analyses are provided to determine if the alternatives will provide adequate access to meet to public demand.
There is no description of the motorized recreational activities that BLM wants to provide for in spite of the claims of degradation. With no description of any of the activities, how can the resource specialist accurately analyze the effects? The answer is, he/she cannot. The result is speculation and conjecture. This does not meet CEQ standards for an environmental analysis.

[A-44]

BLM_0014741

# Appendices

RESPONSE:
After consideration of the comment, no change has been made to the document.   Please refer to Table 1 which shows the miles of routes that would be available for various motorized and non-motorized uses in each alternative.  Please also refer to the section titled AFFECTED ENVIRONMENT/ENVIRONMENTAL CONSEQUENCES section for the changes that would occur under each alternative.  The BLM considered the existing effects in Alternative 1, and the effects of implementing each of the other 3 alternatives.


COMMENT:
Conductivity of the transportation system has been poorly managed. This makes trip planning for the visitor very difficult. In other words, can a law abiding visitor using his preferred mode of travel to get from one point to another? Can the grazing permittee reach the cows? Can a jeeper get from the trailhead to a desirable activity site and return via a loop route?
One specific example: in sub region G the Spring Creek trail has a very step and winding switchback section at its eastern end. Even an expert rider will be reluctant to
go up, because of the soil disturbance that would result. The rider would call this "tearing up the trail." If the expert has less skilled riders, the BLM's proposed action will cause the people to either attempt to go up the trail, and damaging it, or, to operate illegally. This is because the BLM trail ends at an ATV trail in the National Forest, which continues to other destinations, but there is no return trail to the proposed BLM trailhead. To return to the starting point, the BLM will force riders to drive on Dave Wood Road, or to cross Spring Creek and travel on a non-motorized route. In other words, the BLM is causing either a law enforcement problem or a resource damage problem with this Plan, when at this time, neither of those problems are occurring.
The above issues must be resolved prior to the decision in order to adequately balance the social and economic needs of the community with the land health issues.

RESPONSE:
After considering the comment, certain changes have been made in the document, as shown in the responses to other comments.  The trail designations in Alternative 2 meet the Desired Future Conditions set forth for the sub-regions and the proposed action maintains sustainable motorized activities for a variety of uses in the form of 4WD, technical riding, ATVs, and single track riding.  As stated in the EA, an Implementation and Monitoring plan will be developed and if monitoring shows that changes are needed, BLM would document the changes using appropriate BLM Land Use Planning regulations and NEPA procedures (see EA, Adaptive Management).
For the Spring Creek trail, please see response in comment #150


COMMENT:
Page 128 paragraph 2
Overall, surface erosion from routes is dependent on physical soil factors, route grade and

[A-45]

# Appendices

position on the landscape, traffic type and volumes, and the effectiveness of drainage maintenance. Since assessing some of these factors is beyond the scope of this document or data is lacking, all routes were considered equal when assessed against the soil metrics described below.

RESPONSE:
Please refer to page 126 of the document to see information as to how the soil metrics were calculated and used. A soil erosion model from the US Forest Service, Rocky Mountain Region, Soils Group, Interpretations Rating Guide was used (Figure 1 below) to assess site suitability for un-surfaced roads and trails. This model uses land slope, soil erodibility (Kw factor), and rock content of the surface soils to predict a soils susceptibility rating for erosion on un-surfaced roads and trails with an added rating of needed maintenance. BLMs Recreation Management Guidelines (USDI, Bureau of Land Management 2000) state that routes and trails should be planned to protect fragile soils and prevent water erosion. Thus, the use of this soil model is a reasonable approach to make potential soil impact comparisons between alternatives. The BLM acknowledges in the Environmental Assessment that other site specific factors can influence the erosion rates on roads and trails, while at the same time recognizing that soil attributes (Kw Factor), rock content and slope are the basic foundation upon which travel routes are constructed, and all other factors being equal, the higher the Kw Factor and slope, and lower fraction of surface soil rock the more susceptible the soil is to sheet and rill erosion by water. Referring to the Soil Impact sections of the Environmental Assessment , for alternatives 2, 3, and 4. It is stated that soil conditions would improve as measures such as route maintenance were implemented, again acknowledging factors other than soils, slope and rock content factor in to the overall condition of travel routes.
To clarify the output from the soil erosion model, footnotes have been added to the tables in the Water Quality/Hydrology Section of the Environmental Assessment, similar to the tables in the Soils section.

The inputs to this model are widely used in other erosion models such as the Universal Soil Loss Equation, and influence erosion as defined below:

Slope Gradient - Slope gradient influences the retention and movement of water, the potential for soil slippage and accelerated erosion.

K Factor, Whole Soil (Kw) - Erosion factor K indicates the susceptibility of a soil to sheet and rill erosion by water. Factor K is one of six factors used in the Universal Soil Loss Equation (USLE) and the Revised Universal Soil Loss Equation (RUSLE) to predict the average annual rate of soil loss by sheet and rill erosion in tons per acre per year. The estimates are based primarily on percentage of silt, sand, and organic matter and on soil structure and saturated hydraulic conductivity. Values of K range from 0.02 to 0.69. Other factors being equal, the higher the value, the more susceptible the soil is to sheet and rill erosion by water. "Erosion factor Kw (whole soil)" indicates the erodibility of the whole soil. The estimates are modified by the presence of rock fragments.

[A-46]

BLM_0014743

# Appendices

The soil units in the Dry Creek Planning area are shown in Table 1 below, along with the associated erosion model input parameters. Figure 2 below is a map of the plan area showing the erosion model results with the existing road and trail network. A GIS based digital elevation model (DEM) was used to calculate land slope on 30 by 30 meter pixel sizes.

POTENTIAL EROSION HAZARD (Road/Trail)

Description - The hazard or risk of soil loss from unsurfaced roads/trails.
Considerations
*Ratings assess:*
- The force that natural precipitation events have to dislodge and move soil materials on roads, trails and firebreaks.
- Activities on roads and trails that result in bare ground, compaction, and reshaping of the soil surface.
- Use by trucks, skidders, off-road vehicles, and other similar equipment.
- The impact on compacted, bare road, trail surface using the representative value for slope gradient of the soil component.

*Ratings assume:*
- Roads and trails are generally linear, continuous, and narrow ranging up to 7.5 meters in width.

*Ratings do not assess:*
- Frozen or snow-covered soil.

Ratings
*Slight*—Little or no erosion is likely.
*Moderate*—Some erosion is likely; occasional maintenance may be needed; simple erosion control measures needed.
*Severe*—Significant erosion can be expected; roads require frequent maintenance; costly erosion control measures are needed.

Table 28  Potential Erosion Hazard (Road/Trail)

| FACTOR | SLOPE % | | | FEATURE | IMPACT |
|---|---|---|---|---|---|
| | SLIGHT | MODERATE | SEVERE | | |
| Soil Erodibility Factor $K_w < .22$ (thickest mineral horizon 0-15cm) | | | | Slope; erodibility | Erosion and sedimentation; increased maintenance; land base loss |
| Rock Fragments (weighted average for layers 0-30cm by volume) | | | | | |
| >75mm in size, <15% | <5 | 5-15 | >15 | | |
| >75mm in size, ≥15% | <10 | 10-25 | >25 | | |
| Soil Erodibility Factor $K_w > .22$ (thickest mineral horizon 0-15cm) | | | | | |
| Rock Fragments (weighted average for layers 0-30cm by volume) | | | | | |
| >75mm in size, <15% | <3 | 3-8 | >8 | | |
| >75mm in size, ≥15% | <5 | 5-15 | >15 | | |

*Criteria Notes:* Certain parent materials (e.g., decomposed granite), high R factors (e.g., >200), snowmelt influences during Spring thaw and other factors may require changes to slope values in the table or adjustment of ratings to one class more limiting.

Figure 3. Soil Erosion Model from US Forest Service, Rocky Mountain Region, Soils Group, Interpretations Rating Guide (page 66)

[A-47]

BLM_0014744

# Appendices

Table 1. Soil Units in the Dry Creek Planning Area, Stratified by Input Parameters for the USFS Soil Erosion Model - Potential Erosion Hazard (road/trail)

| Soil Unit | Summary by Map Unit - Ridgway and Paonia Area Soil Survey, Colorado, Parts of Delta, Gunnison, Montrose, and Ouray Counties[1] | | |
|---|---|---|---|
| | Soil Unit Name | Kw | %Rock Fragments > 75 mm in top 30 cm of soil |
| | | | |
| | | | |
| | Kw< 0.22 and Rock Fragments <15% | | |
| 130 | Shavano-Ustic Torrifluvents complex | 0.18 | 14 |
| | | | |
| | Kw< 0.22 and Rock Fragments >15% | | |
| 600 | Beje-Moento complex | 0.20 | 16 |
| 111 | Roatcap-Hoovers complex | 0.15 | 33 |
| R3 | Rock outcrop, Ustic Torriorthents, and Aridic Haplustepts soils | 0.16 | 38 |
| X31M | Walknolls-Rock outcrop complex | 0.10 | 43 |
| 75 | Torriorthents (60%)-Rock outcrop (30%), sandstone, complex | 0.17 | 46 |
| | | | |
| | Kw> 0.22 and Rock Fragments <15% | | |
| 34D | Blancot fine sandy loam | 0.28 | 0 |
| 4 | Aridic Ustifluvents | 0.28 | 0 |
| X62 | Moento-Ohwiler complex | 0.37 | 0 |
| B31 | Mags-Lazear-Rock outcrop complex | 0.28 | 3 |
| X61 | Moento-Beje-Rock outcrop complex | 0.28 | 6 |
| 160 | Arabrab fine sandy loam | 0.28 | 6 |
| X31B | Lazear-Blancot-Rock outcrop complex | 0.28 | 6 |
| X30 | Barboncito-Gapmesa complex | 0.30 | 6 |
| 30 | Barboncito-Rock outcrop complex | 0.32 | 6 |
| 90 | Sneffels loam | 0.37 | 8 |
| 262 | Arabrab-Evpark-Parkelei complex | 0.26 | 10 |
| X32 | Blancot-Gapmesa complex | 0.32 | 10 |

[A-48]

BLM_0014745

# Appendices

| 32D | Barx-Samala complex | 0.30 | 11 |
|---|---|---|---|
| 3 | Lazear-Ustic Torrifluvents | 0.28 | 13 |
| 73 | Shavano(40%)-Lazear(40%) complex | 0.26 | 9 |
| 49 | Lazear (50%)-rock outcrop (20%) complex, 3 to 30 percent slopes | 0.28 | 9 |
| 42 | Glenton fine sandy loam, 0 to 3 percent slopes | 0.32 | 10 |
| | | | |
| | Kw> 0.22 and Rock Fragments >15% | | |
| X14 | Twentyfive-Gapmesa-Rock outcrop complex, 3 to 25 percent slopes | 0.30 | 15 |
| 24 | Cliffdown gravelly loam, 0 to 12 percent slopes | 0.32 | 16 |

Soil Surveys prepared by the United States Department of Agriculture, Natural Resources Conservation Service. Copies available at the BLM – Uncompahgre Field Office.

[A-49]

BLM_0014746

# Appendices



Figure 4. Mapped results of the Soil Erosion Potential Modeling, showing the existing network of roads and trails

BLM_0014747

# Appendices

COMMENT:
Two troubles here: This is an analysis, and solid data such as route grade and position on the landscape, traffic type and volumes, is exactly what is supposed to be analyzed, and it should especially be analyzed if the BLM claims (as it does elsewhere in this analysis) that the routes are degrading the environment but the BLM is obliged to provide access and recreation anyway.

RESPONSE:
The BLM uses the best available information in preparing documents such as these.  The Roubideau Land Health Assessment (available in the Uncompahgre Field Office provides a great deal of scientific information regarding land health in the planning area. The BLM's purpose does include providing recreation opportunities, and other purposes are to ensure that undue and unnecessary damage does not occur to natural resources on public lands, among which are soils, vegetation, water quality, and scenery. Route grade and pitch, position on the landscape, traffic type and volumes, and public input, along with land health concerns, were considered during scoping and document preparation. Also see soil model comments above.

COMMENT:
The second trouble here is that the above excerpt appears to say that all routes are evaluated in the same way regardless of width, slope, drainage, outslope, type of use, frequency of use, season of use, soil type or aspect.

RESPONSE:
See soil model comments above

COMMENT:
If this is the case, then all segregation is to satisfy philosophical differences between users, for which there is no statutory support. BLM has omitted the actual data about these erosion and soil factors, such as rain on bare soil causes erosion -, total footprint of route surface 7/10ths of one percent of the land base.

RESPONSE:
Soil erosion factors are presented in Table 1.  Scientific literature (USGS Open file report 2007-1353) well supports that the less soil surface protection (vegetation, rock, biological soil crusts, and plant litter cover) a soil has the more vulnerable it is to water erosion. That is precisely the reason unsurfaced travel routes can cause accelerated erosion (erosion beyond the limits of natural erosion rates), as they typically have much less cover and are more physically disturbed than adjacent soils. Travel routes often capture runoff from upslope areas that tends to concentrate and channelize on the travel surface adding to erosion rates (channelized flow has more erosive energy than diffuse surface runoff). Additionally, the slope below the travel route can be deprived of the runoff it would receive without the route,

[A-51]

BLM_0014748

# Appendices

and could have been used for plant growth (watershed cover). The case could be made that the overall influence of some travels route goes beyond the total, physical footprint of the route surface.  To better illustrate these points, Photo 1 below is an ephemeral channel crossing off the Lower Dry Creek Rim Road in Sub Region E (UTM 12S 758576, 4266170) in the planning area.



Photo 1.  Ephemeral Channel Crossing in Dry Creek Area, Subregion E. Black lines follow surface erosion channels on the road surface, while the red lined area is the runoff production zone that supplies water to the road surface. Runoff collecting on the road surface routes to receiving channels faster than diffuse surface runoff, increasing channel flow rates.  Not much sediment accumulation in the channel bottom, as signs of a recent runoff event (flood debris line observed) moved it downstream. The results of the soil erosion potential modeling shows this area as having a "moderate" soil erosion potential (Figure 2). Drainage maintenance on the route surface would improve this situation.

[A-52]

# Appendices

Literature Cited:

USGS Open-file Report 2007-1353, USDI, US Geological Survey, Environmental Effects of Off Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources. By: D. Ouren, C. Hass, C. Melcher, S. Stewart, P. Ponds, N. Sexton, L. Burris, T. Fancher, and Z. Bowen.

COMMENT:
According to the NRCS Watershed Boundary Dataset,
Hydrologic units are only synonymous with classic watersheds when their boundaries include all the source area contributing surface water to a single defined outlet point. The BLM study area does not contain any of the source areas contributing surface water. The source area is the National Forest, adjacent to the study area.

RESPONSE:
According to the Source Water Assessment Methodology (CDPHE, 2004), for public water systems using surface water sources or ground water sources under the direct influence of surface water, the source water assessment area essentially includes the watershed drainage area above the intake (including perennial, intermittent, and ephemeral streams). The GIS dataset the BLM received from the Colorado Water Quality Control Division does show the Dry Creek Travel Plan area to be included as part of the source water assessment area for Public Water Supply ID # 139321. However, the BLM has leaned that this water supply has since completed a Protection Plan that has eliminated the Uncompahgre and portions of the Lower Gunnison Basins from it source water area (including the entire Dry Creek Travel Plan Area). Thus, all references to source water areas are removed in the EA. This omission in no way affects the listing of both the Lower Gunnison and the Uncompahgre Rivers on the state's Monitoring and Evaluation List for suspected impairment from sediment. (CDPHE, 2004 Source Water Assessment Methodology for Surface Water Sources and Ground Water Sources, Under the Direct Influence of Surface Water November 2004 Prepared For: Colorado Department of Public Health and Environment Water Quality Control Division Source Water Assessment and Protection Program Prepared By: Eneco Tech Inc. 1580 Lincoln Street, Suite 1000 Denver, Colorado 80203-1512. Available at: http://www.cdphe.state.co.us/wq/sw/swapmethodology.html)

COMMENT:
The 4th level watersheds named on page 104 table 17 are not in the study area.

RESPONSE:
Hydrologic unit codes were initiated by the United States Geological Survey's (USGS) Office of Water Data in the fall of 1972 in cooperation with the U.S. Water Resources Council and supported by the USGS's Resources and Land Information program.

[A-53]

BLM_0014750

# Appendices

The HUC codes have created a unified system between agencies and water-resource planners, and a standard for the data collection, storage, and manipulation of files associated with particular river basins.

The first level of classification divides the Nation into 21 major geographic areas, or regions. These geographic areas contain either the drainage area of a major river, such as the Missouri region, or the combined drainage areas of a series of rivers, such as the Texas-Gulf region, which includes a number of rivers draining into the Gulf of Mexico.

The second level of classification divides the 21 regions into 221 subregions. A subregion includes the area drained by a river system, a reach of a river and its tributaries in that reach.

The third level of classification subdivides many of the subregions into accounting units. These 378 hydrologic accounting units nest within, or are equivalent to, the subregions.

The fourth level of classification is the cataloging unit. These units subdivide the subregions and accounting units into smaller areas. In many areas of the United States further subdivisions of drainage basins have been delineated. In Colorado basins are mapped down to the 6th level, which were used to develop Table 17 in the Dry Creek Travel Management Plan EA. All land area in Colorado is included in these drainage delineations. A streams flow regime is not a factor in HUC delineations. All drainages, perennial, intermittent, and ephemeral are included in HUC delineations.

The BLM maintains that the HUC delineations in the Dry Creek Travel Management Plan EA are accurate and suitable for the intended purpose. The northern portion of the planning area drains into Roubideau Creek, which drains in to the Lower Gunnison River, just below Delta CO. Thus, Roubideau Creek and its tributaries are part of the Lower Gunnison River Basin. The southern portion of the area drains to Spring Creek, and Dry Creek/Happy Canyon Creeks which are tributary to the Uncompahgre River, thus are part of the Uncompahgre Basin (Figure 4). On a larger watershed scale, both the Uncompahgre Basin and Lower Gunnison Basin are part of the Colorado River Basin.


COMMENT:
Page 105 displays a photo of a man standing in what BLM says is an ephemeral wash. Yet the analysis omits the definitions of these terms

RESPONSE:
Please see the added definition of ephemeral in the glossary.


COMMENT:
Table 16 claims a substantial number of ephemeral and intermittent stream crossings.

RESPONSE:
Figure 3 below shows the existing travel route, channel crossings in the plan area for all stream types: perennial, intermittent, and ephemeral. Photo 1 above, and Photos 2 and 4 in the Environmental Assessment are represented by points located in Sub-Region E on Figure 3 below. Note that many of the ephemeral channels that headwater on the planning area

[A-54]

BLM_0014751

# Appendices

contribute to debris flow hazard zones (Montrose County) downstream on private land. The Montrose County Planning Commission is presently considering special zoning regulations for development on these debris flow hazard areas. And the BLM has a responsibility to ensure that management of the public lands in the planning area does not exacerbate debris flow events, which would be in accordance with Colorado's Public Land Health Standards and Recreation Guidelines (USDI Bureau of Land Management 2000).

Where travel routes are located in stream channel corridors (e.g. rock crawling routes), scale limitations of the spatial dataset tend to over predict the number of stream crossings. This limitation in the dataset is known and considered during the analysis of the alternatives.

(Montrose County, Geologic Hazards Mapping Project for Montrose County, Colorado. By: Jonathan L. White, TC Wait and Matthew L. Morgan, Colorado Geological Survey, Department of Natural Resources, Denver, Colorado, 2008.)

[A-55]

BLM_0014752

# Appendices



Figure 5. Existing Travel Route Channel Crossings and Debris Flow Hazard Areas

[A-56]

BLM_0014753

# Appendices



Figure 6. Hydrologic Unit Code delineations for the Dry Creek Travel Plan Area.

[A-57]

BLM_0014754

# Appendices

COMMENT:
Page 105 displays a photo of a man standing in what BLM says is an ephemeral wash. Yet the analysis omits the definitions of these terms

According to Principles of Forest Hydrology, Hewlitt J.D., There are three types of streams: "Perennial streams
Water flows in the stream at least 90 percent of the time in a well defined channel.
Intermittent streams
Flow generally occurs only during the wet season (50 percent of the time or less). Ephemeral streams
Flow generally occurs for a short time after extreme storms. The channel is usually not well defined. "

RESPONSE:
Although definitions of stream flow regimes vary slightly by author, the definitions above are adequate to describe the streams on the plan area. Please see the glossary for this added definition.

COMMENT:
The "wet season," in this study area, is not very wet (10 inches of precipitation per year). This means that years pass with any water flowing in the ephemerals at all---remember, the definitions are taken from forest hydrology. That is very likely because "desert hydrology." is quite a different subject.

RESPONSE:
See added Appendix 8 on climate. It could be true that years pass without any water flowing in ephemeral channels, but it could also be just days, weeks, or months between flow events, as flow in ephemeral channels is very uncertain and unpredictable. The ephemeral channels in the planning area are typically in the more arid portions of the unit, which commonly have less dense watershed cover (vegetation, plant litter, etc.) on the soil surface. Consequently, the magnitude of runoff events is higher than if the area had denser watershed cover, as is typical of the higher elevation areas. This accelerated hydrologic response can be clearly demonstrated by flow estimates, using WRIR 99-4190 or Technical Release No. 55(cited below). Flow estimates made with both of these publications are very sensitive to watershed cover, as well as many other runoff models (e.g. Army Corps of Engineers HEC-RAS and HEC-1, single storm runoff models). Additionally, there are two large flood control, retention facilities in the planning area: Shavano (latitude 38 27 43.48 N, longitude 108 01 13.49W) and Roatcap (latitude 38 34 59.87 N, longitude 108 05 36.49W). These retain flood flows generated from Subregions C and G, and several mapped debris flow hazard areas (see Figure 3), which imply these channels flow enough to be an impact to downstream lands. According to Levick, L. et. al. ephemeral and intermittent streams make up over 80% of the

[A-58]

# Appendices

streams in arid and semiarid Southwest. They provide the same functions as perennial streams by moving water, nutrients and sediment through a watershed. When functioning properly, these streams provide landscape hydrologic connections, and stream energy dissipation during high-water flows to reduce erosion and improve water quality.

USDI, US Geologic Survey. Analysis of the Magnitude and Frequency of Floods in Colorado. Water Resources Investigations Report 099-4190.

USDA, Soil Conservation Service, 1980. Procedure for Determining Peak Flows in Colorado, Technical release No. 55, March 1980.

Levick, L., J. Fonseca, D. Goodrich, M. Hernandez, D. Semmens, J. Stromberg, R. Leidy, M.
Scianni, D. P. Guertin, M. Tluczek, and W. Kepner. 2008. The Ecological and Hydrological Significance of Ephemeral and Intermittent Streams in the Arid and Semi-arid American Southwest. U.S. Environmental Protection Agency and USDA/ARS Southwest Watershed Research Center, EPA/600/R-08/134, ARS/233046, 116 pp.


COMMENT:
From "Desert Hydrology," Water. Science and Issues, (2003) N. Weisbroad:
"Hydrologic Aspects of Deserts.
Several basic conditions distinguish between desert regions and others from a hydrological point of view.
A few, often intensive, rain events with a low amount of overall precipitation, which causes most of the small rivers to be active only a few months every year, and sometimes only once every few years. "
In other words, the gentleman in the photo will be waiting a long time for any water to run in that "ephemeral" wash.

RESPONSE:
See response above in regard to ephemeral channel flow.


COMMENT:
Page 132 Paragraph 1
Cumulative effects simply confirms that the major factors influencing land health in the analysis area have no connection to any decisions made by this EA. The shifts in population and demand are not within the authority of the agency. BLM must react to the changing local issues by providing adequate access and management to accommodate the public demand.

RESPONSE:
After considering the comment, no change has been made to the document. Please see the

[A-59]

# Appendices

response the comment for Page 9 paragraph 3, 4 above in this letter which addresses a similar comment about land health in the planning area. The BLM feels that the Proposed Action maintains adequate public access and protection of the values in the planning area. The alternative was developed with public input by the Uncompahgre Field Office manager and interdisciplinary team members. It represents the mix and variety of proposed designated routes, uses, and other actions that, in the opinion of the preparers, best resolve the issues and management concerns identified at scoping and follow up meetings that drove preparation of this document.


COMMENT:
Cumulative Effects soils
The lands surrounding the Dry Creek travel planning area are rapidly changing. In looking at the entire area, there are many factors affecting the soils. Much of the surrounding private land in this area is being subdivided and becoming increasingly developed with new routes and homesites, adding to the soil surface impacts in the watersheds. Along with the impacts caused by the development of new routes and home sites, there are impacts associated with grazing that continue to influence the soils of the Dry Creek travel planning area. The Dry Creek TMP is an important piece of the watershed and soils management equation. It will determine the kinds and amounts of travel uses that will be allowed on the public lands within the affected watersheds. As the development of private lands for residential homes and the demand for recreational uses on public lands continue to increase, the decisions made in the Dry Creek TMP will play an important role in determining the overall health of these watersheds."
Yes: population change is the problem. If the BLM had studied the trails in the extreme southeast corner of the study area, BLM would know that the new residents of the homesites made the ATV trails that BLM now wants to restrict to bicycles only. BLM fails to accept and mange the change.


RESPONSE:
After considering the comment, no change was made to the document.  Please refer to the NEED AND PURPOSE FOR THE ACTION section, in which the current situation with OHV route management is discussed. The Proposed Action is how the BLM would implement change in order to correct past management practices regarding OHV use.


COMMENT:
User made trails are a manifestation of demand. What kind of trails are in the study area? ATV trails, motorcycle trails, and 4WD trails. None of these trails are suitable for hiking or equestrian use because the type of challenge that the makers of these trails want are too difficult for muscle-powered activities (and it is a desert, no permanent water, 107 degrees in summer and 20 degrees in winter).

[A-60]

# Appendices

RESPONSE:
Thank you for the comment. Many types of users visit the public lands and use routes in the planning area for a variety of purposes, Including hiking, camping, horseback riding, viewing scenery, and motorized and non-motorized vehicular recreation pursuits. Also see the added Appendix on climate.

COMMENT:
Table 5 Summary Comparison of Environmental Consequences
Table # 5 beginning on page 33 shows that the relative environmental consequences for each resource are similar between Alternative # 2 (preferred) and Alternative #4. Alternative #4 as described in both the transportation and recreation sections of the EA,
provides a better social and commercial setting for the public. In addition, Alternative #4 better meets the foreseeable future needs as described in the Background section. For these reasons we recommend that the FONSI be rewritten to incorporate the best
features of Alternative #2 and #4. We have provided a map and a PDF file of our proposal. The BLM solution to increased demand is to reduce supply, even when there is no rational connection between that decision and the evidence in front of the agency.

RESPONSE:
After considering this comment, the document has not been changed to adopt the alternative map mentioned in this comment. Certain changes have been made in the document, as shown in the responses to other comments. The Proposed Action maintains sustainable motorized access to the public lands in the planning area for a variety of users, including for motorized recreation opportunities in the form of 4WD touring, rock crawls, ATV trails, single track motorcycle riding, hiking, horseback riding, and other uses.

COMMENT:
Hydrology
page 103, paragraph 3:
The sediment yield of the area's streams is largely associated with episodic, high flow events, resulting from intense precipitation events during the summer season. Sediment supplied to
streams during these events is from a variety of sources, including both in and near channel, and upland sources. The existing network of routes in the area has the potential to intercept and concentrate stolin runoff, which increases the sediment yield. High flow from snowmelt on the larger streams does transport sediment, but is mostly limited by the sediment supply in or near the channel.
Several troubles with this. One, the specialist has no dear description of the activity under analysis (motorcycle trail, rock crawl, etc), and no factual data about the resource
(such as the actual sediment yield or water quality monitoring data). As we noted above this produces speculation, not analysis. The speculative part of this is the word "potential."

[A-61]

BLM_0014758

# Appendices

RESPONSE:
See response on soil model.


COMMENT:
Why are we skeptical? Because the annual precipitation in the study area is only 9.7 inches per year. (page 107 claims 10 to 16 inches, yet no source is cited. Given the other troubles with the analysis, we now demand a reliable source, cited in the text).

RESPONSE:
Text on page 100 of the document states" The annual precipitation varies from about 10 inches at the lower elevations along the northeastern boundary to more than 16 inches at the higher elevations along the southwestern boundary".  This statement is in the Water Quality section of the document to provide a general hydrologic characterization of the area, and was obtained from an isohyet map of Colorado that shows average annual precipitation for the period from 1951- 1980 (Colorado State University-citation below) in lines of equal precipitation.  Since the lines of equal precipitation on the map do not directly overly the plan area boundary, some visual interpretation was made.  Thus, the statement "about 10 inches…. and more than16 inches" was stated to imply these values were not strictly intended.  The added climate Appendix demonstrates that the range in annual precipitation over the planning area is greater than 10 to 16 inches.
Colorado State University, Colorado Climate Center, Department of Atmospheric Sciences, Map of Colorado- Average Annual Precipitation 1951-1980. Climatology Report 84-4. Published by the Colorado Climate Center and funded by the National Oceanic and Atmospheric Administration, National Climate Program Office. (copy on file at the BLM-Uncompahgre Field Office)


COMMENT:
The BLM uses a confusing and disingenuous method to display where the water does come from--and it is not the study area. Recall, as noted above: "Hydrologic units are only synonymous with classic watersheds when their boundaries include all the source area contributing surface water to a single defined outlet point."

RESPONSE:
See previous responses to Hydrologic Unit Codes (drainage basin structure of the plan area) and ephemeral flowing channels.


COMMENT:
Page 103 tells us the "intention of the above standard is to address and prohibit water quality degradation from excessive sediment..." yet the BLM has omitted any data, such as a water quality monitoring program, or even occasional sampling, that connects any road or trail to any water quality issues. Again, because of other inaccuracies, we will demand factual

[A-62]

# Appendices

evidence. None is provided.

RESPONSE:
This comment is addressing a Colorado State Water Quality Narrative Standard for sediment in the affected environment section of the EA, where all other applicable water quality standards were also listed or described. The intention here was not to imply the planning area is in jeopardy with this standard due to travel routes, although there are several locations throughout the area where travel routes show obvious signs of erosion, and some material will be transported to downstream surface water systems. The BLM has soil erosion monitoring data for sites within Sub-Region E that shows evidence of soil movement between September 2005 to September 2006. The data is on file at the BLM, Uncompahgre Field Office – "Close Range Photographic Monitoring" (Power point and supporting document).

Additionally, the BLM Recreation Management Guidelines (USDI, Bureau of Land Management 2000) direct the management of recreational activities including the location of routes and trails to protect soils from water erosion and reduce stream crossings to the minimal number dictated by the topography, to reduce sedimentation and compaction. Water quality monitoring in ephemeral channels is both dangerous and impracticable. Surrogate indicators such as signs of accelerated soil surface erosion in or routed to stream channels are standard methods used to assess sediment yields (e.g. Photos 1, 2 and 4 in the document and Photo 1 in these comments).

COMMENT:
Page181 para. #4
(1) Traffic counter data is available only along the Rim Road and adjoining routes within the area. (2) In 2006, BLM estimated 212,338 visits for all recreational purposes to public lands. Placing these two sentences together is a mistake. The reason is, the second statement has nothing to do with the first statement. That is, BLM says the traffic counter data is available only along Rim Road. Following that with a statement about "all public lands visitors" tells us nothing about the visitorship to the study area. What "public lands" is the BLM referring to? How many hits did the counters along Rim Road and the adjoining routes receive? The BLM is silent, and, BLM does not reveal the objectives for this silence. If the BLM wishes to keep that combination of statements as it is, please add the following: "The actual data from the traffic counters along Rim Road and adjoining routes is                                        " If BLM declines to fill in this data, then we want BLM to remove the two statements. As presented, these two statements together can too easily be construed as dishonest.
No history of traffic counter numbers or any other monitoring data is supplied by this document. In addition, no estimates or monitoring data is supplied to quantify the number or proportion of visitors engaged in any specific activity. This makes the allocation of recreation opportunities by visitor activity appear to be arbitrary.

[A-63]

# Appendices

RESPONSE:
After considering the comment, changes were made to the document (see Recreation section).


COMMENT:
From Page 183
Other Important Recreation Considerations
Key elements in Recreation Opportunity Spectrum classifications are frequency of encounters and group size. Because of the absence of this kind of data in the EA the segregation of visitors by activity appears to have no analytical basis.

RESPONSE:
After considering the comment, no change was made in the document.  The discussion on page 182 of the document regarding the characteristics of the planning area, along with the detailed information in Appendix 3, Sub-Region General Settings and Desired Future Conditions, provide the reader with a good baseline of the social, physical, and administrative settings in the planning area


COMMENT:
Page 188 Socio-Economics
No analysis is made of the social benefits to the public by alternative with the variations in administrative, social, and recreational settings. BLM Planning handbook (1601 appendix C&D) This is a critical omission. BLM policy requires that social science should be a factor in making NEPA planning decisions. Please analyze the social impacts of the proposed action in order to provide the decision maker with the required information to make an informed decision.

RESPONSE:
After considering the comment, no changes were made to the document.  The topics in the referenced BLM Handbook are addressed in the Affected Environment and the Environmental Consequences sections for each alternative for the Socio-Economics component.

Economic data is not available in regards to the actual impacts of any alternative.  It is neither feasible nor practical to commission a study to obtain the economic reports of potential impacts.

Alternative 1 would not change the existing social or economic impacts in the area.

Alternative 2:  Anticipated to improve the social satisfaction for those who want to reduce conflicts with other types of users as well as for those who want to know where they can go.

[A-64]

# Appendices

With use in the Dry Creek area continuing to increase, the potential for continued and increased user conflict will also grow.  This alternative may decrease the satisfaction of a faction of users who want to use any route for any mode of travel.

BLM expects alternative 2 to improve recreation overall, which would have a positive effect on the social component of recreation and travel.

It is anticipated that alternative 2 would have a positive impact on the local economy. Designated routes, are not anticipated to discourage use as a whole; improved recreational opportunities overall may discourage some users that want the entire area open, but is expected to result in increased satisfaction overall - which would only be positive for the local economy.

Alternative 3:  Alternative 3 would close several routes, and restrict more trails to horseback, foot, and bicycles.  This would reduce the miles of routes for other uses.  This would result in greater dissatisfaction among motorized users.  This in turn could have negative implications for the local economy as fewer users would travel to the area.

Alternative 4:  Alternative 4 would improve the social satisfaction of those who want more designated trails for use by a greater mode of travel.  For instance, alternative 4 has more miles of full size vehicle routes available (all modes of travel).  This alternative would do little to reduce user conflict.

Alternative 4 would have a slightly positive impact on the local economy because of the designation and legitimizing of technical 4X4 routes and additional motorized routes which could lead to increase visitation by motorized enthusiasts however Alternative 2 would also appeal to the motorized community as well as non-motorized recreationist therefore attracting a wider range of recreationists and potentially more economic benefit.


COMMENT:
Cumulative effects
The cumulative effects summaries at the end of each resource analysis are very similar. They all say that the biggest impacts to the study area will be from changes that are outside BLM's control. Population growth and increased demand for urban interface recreation are the major factors. With these assumptions in mind the logical decision is to provide for the maximum amount of route opportunities in the initial phase of planning. This will better accommodate the increasing public demand in the future by providing adequate opportunity that anticipates future anticipated demand.

RESPONSE:
After considering this comment no change was made to the document. Population growth is outside the control of the BLM, and will, over the life of the RMP Amendment, impact the planning area to some unknown extent. Many of the major specific actions and activities

[A-65]

BLM_0014762

# Appendices

identified beginning on page 194 of the document with the potential to cumulatively affect the resources evaluated in this document are also beyond the control of the BLM. To assume that the appropriate BLM response to these changes is to maintain the maximum amount of routes in the planning would not be in keeping with the identified desirable future conditions and General Settings within the Sub-Regions identified in Appendix A.

COMMENT:
Irreversible and Irretrievable Commitments of Resources
BLM has correctly selected an EA to support this plan. According to CEQ, an EA will suffice when no unresolved conflicts have been identified. Thus, it is impossible that there will be any irretrievable losses. The discussion on page 201 is inaccurate. The routes under consideration already exist. They are already part of the habitat. The effects have occurred, years ago. Paragraph 4 is especially egregious in this way. To leave in place the existing situation, or, freeze, if you will, the number of routes at the present levels, will result in no losses whatsoever. The change has already occurred.

RESPONSE:
After considering the comment, no changes were made to the document. Irretrievable commitments are those that are lost for a period of time such as the temporary loss of wildlife habitat in a right of way linear clearing. The existing routes and all other existing surface disturbance resulting in removal of vegetation or soil or other impacts are already resulting in irretrievable commitments of resources. New rights-of-way and new routes that may be constructed in the future would also result in these commitments.

COMMENT:
In an effort to resolve the issues cited above TPA and COHVCO have crafted an alternative for consideration by the decision maker. The proposal is a blend of alternatives #2 and #4. It incorporates the land health benefits of alternative #2 with the recreation and access opportunities of alternative #4.

RESPONSE:
After considering this comment, the document has not been changed to adopt the alternative map mentioned in this comment. Certain changes have been made in the document, as shown in the responses to other comments. The Proposed Action maintains sustainable motorized access to the public lands in the planning area for a variety of users, including for motorized recreation opportunities in the form of 4WD touring, rock crawls, ATV trails, single track motorcycle riding, hiking, horseback riding, and other use.

| 148 | Trails Preservation Alliance (TPA) |
|-----|-------------------------------------|

Same as 147

[A-66]

BLM_0014763

# Appendices

| 149 | San Juan Corridors Coalition |
| --- | --- |

COMMENT:
Particularly concerned about wildlife impacts in the Dave Wood Road area due to anticipated growth and increased traffic. The following comments are directed to sub-regions G and F of the Dry Creek area:

Hope BLM will provide clear signage and vigorous enforcement. Worried about Spring Creek and intersections of motorized and non-motorized trails

RESPONSE:
After considering the comment, BLM has full intentions of signing and providing maps to the public as well as working with volunteers and the BLM law enforcement officers to help monitor and enforce the final travel management plan (see Description of Alternatives; Follow-on Actions under Management Common to All Alternatives and Enforcement and Design Features under Management Common to Alternatives 2 (Proposed) Action, 3 and 4 in EA). Additional direction will be incorporated in the Implementation and Monitoring Plan for the Dry Creek area.

COMMENT:
Dave Wood Rd. and Hwy 90 provide convenient access to the G and F sub-regions and the expected heavier use in these areas would benefit from increased monitoring. Encourage interagency cooperation with the Division of Wildlife to protect these habitat areas for continued wildlife health and biodiversity.

RESPONSE:
Thank you for the comment, the BLM will consider these comments during the preparation of the implementation plan.

| 150 | RMTA |
| --- | --- |

COMMENT:
Parking and dispersed camping:
Will not allow for removing vehicles a safe distance from routes
Most people recreating in this area are looking for privacy that can't be found in a designated parking area or camp sight.
Have adverse consequences when trying to turn around on the trail, move off the trail to let another user pass, make minor detours to avoid route hazards, or make minor deviations from the route to use natural terrain features for the challenge factor needed by some uses.
Want to have a designate 300 ft. wide corridor

RESPONSE:
After considering the comment, no changes were made to the document. The Forest Service standard for this provision on the lands managed by that agency is 300 feet either side of a route. The BLM is aware that this difference between the agency standards might confuse some users. The BLM is concerned with the proliferation of new user created routes that would continue to

[A-67]

BLM_0014764

# Appendices

occur if a 300 foot corridor was established either side of routes or even a 300 foot wide corridor in total for these purposes.  Proper signing at the Forest Service boundaries will help alleviate the potential confusion. Also, please see the comments from the Forest Service Ouray District Ranger in letter number 159.

COMMENT:
Want a designation of a trials riding area in the vicinity of Scratch and Dent jeep trail.

RESPONSE:
After considering the comment, no changes were made.  Alternative 2 maintains opportunities for trials bikes on the Scratch and Dent trail as well as the Calamity trail.

COMMENT:
Most important designation change is to the loop trail that crosses Spring Creek, parallels the west side of the creek, then crosses back to Spring Creek motorcycle trail. This loop needs to be designated for motorcycle use.

RESPONSE:
After considering the comment, no changes were made.  The trail designations in Alternative 2 meet the Desired Future Conditions set forth for Sub-Region G (see Appendix 3) as well as staying consistent with the U.S. Forest Service travel management plan.  As stated in the EA, a Monitoring and Implementation plan will be developed and if monitoring shows that changes are needed, BLM would document the changes using appropriate BLM Land Use Planning regulations and NEPA procedures (see EA, Adaptive Management).

COMMENT:
Second most important change is to the short route out of Linscott Canyon to the mesa next to Lindsay Canyon. This route is shown as bicycle and administrative, but needs to be left open to as many users as possible.

RESPONSE:
After considering the comment, no changes were made.  The route in question is a route that is extremely steep and requires a lot of maintenance for erosion so there was another route proposed in Alternative 2 to allow access to the same area as well as leaving the existing southwest access open

COMMENT:
Third, Coyote Canyon north of the extreme jeep trails. This wash is a unique opportunity for the not quite so extreme jeeping community. This route is designated closed but needs to be open to full size vehicles.

[A-68]

BLM_0014765

# Appendices

RESPONSE:

After considering the comment, no changes were made.  The route in question is a route that follows a sandy wash and is susceptible to water erosion and has existing bank/channel stabilization concerns and is located in an area with sensitive resources.

COMMENT:

Fourth, concerned about the road paralleling Dry Creek from Transfer Road to Rim Road. This is a historic route for full size vehicles and should remain open to full size use.

RESPONSE:

After considering the comment, no changes were made.  The route in question is a route that has sensitive resource concerns as well as maintenance concerns.

COMMENT:

My last comment is that I believe seasonal closures are confusing and frustrating for users. Seasonal closures would be better suited to emergency situations and need to be reviewed annually.

RESPONSE:

The current Resource Management Plan (RMP; 1989) "..restricts motorized travel in certain parts of the planning area to designated routes from December 1 through April 30 annually (See the EA, NEED AND PURPOSE FOR THE ACTION). In addition, the EA continues with: "Due to increasing demands and impacts, BLM has determined that the current OHV designations and the current management practices are out-of-date.  This has resulted in land health impacts that need to be addressed to provide active management and encourage responsible use." Seasonal route closures for the Dry Creek Travel Plan were developed with input from the Colorado Division of Wildlife to reduce human impacts to big game species during critical time periods and locations while balancing other uses.  Despite the existing RMP seasonal closures from December 1 through April 30, the BLM, with input from CDOW, felt that a slightly shorter season would provide adequate protection to big game species (see below).  "Motorized and mechanized routes limited seasonally would be closed to all motorized and mechanized travel from December 1 to April 15 annually in order to prevent disturbance to wintering big game (see EA, Description of Alternatives)". The proposed seasonal closures are 15 days earlier than the current limitations in the RMP.  The Dry Creek Travel plans also states that "Any exceptions to the listed dates would be made by the authorizing officer and would be implemented according to appropriate notification and posting, and or according to other appropriate regulations".  This would allow for alternative proposed closure dates (longer or shorter), if the authorizing officer felt that the situation was warranted.  (See also response to comment #184).  CDOW has a long-term study in the Dry Creek area indicating that seasonal closures are needed during this time period to reduce big game winter mortality and impacts to fawn production.  Studies by CDOW indicate (DelPiccolo 2009):

1) Mule deer are in their worst body condition of the year in the spring.  They are recovering

[A-69]

# Appendices

from the demands of winter survival and do have additional energy demands in preparing to fawn. Overwinter survival is often determined by the duration and severity of winter, which affects the rate at which fat and lean body stores are utilized (Watkins et al. 2007, pg 11). Disturbance from motorized vehicles puts a further strain on already-stressed animals.

2) The area immediately to the west of Shavano Valley, proposed for seasonal closures, holds the highest concentration of wintering deer in the Dry Creek travel management area. The area between Roatcap and Coalbank, also proposed for seasonal closures, houses wintering mule deer and elk well into spring, some remaining to fawn and calve in the mountain shrub community above the pinyon-juniper habitat. However, CDOW wintering densities in the Roatcap/Coalbank area are limited at this time.

3) Due to its proximity to Montrose, the area west of Shavano Valley is quickly accessible to recreationist, thereby increasing the likelihood that motorized vehicles will be in the area proposed for seasonal closures, if no closure is in place.

4) CDOW biologists and researchers have said that they and their seasonal workers have encountered persistent snow and deer and elk into April at lower elevations in the Dry Creek Travel area. Research in the Shavano Valley area shows that mule deer are concentrated and remain on their winter ground well into April. Migratory deer use these areas while waiting for higher elevation vegetation to emerge and bud. Most deer and elk start moving to higher elevations (out of these closure areas) by late April and early May. Generally, elevations and the winter precipitation for the Shavano Valley and the Roatcap/Coalbank seasonal closure areas are very similar. However, Shavano Valley is slightly higher in elevation (+386 ft minimum elevation; +239 ft maximum elevation; +70 ft average elevation), which could result in slightly greater precipitation. Also see response in comment #147.

Comparison of elevation for the Seasonally Closed Routes:
Rotcap/Coalbank (Area), 5704.1 (Minimum Elevation (ft)), 7567.6 (Maximum Elevation (ft)), 784.8 (Average (ft)), 465.6 (St. Dev. (ft));

Shavano Valley (Area), 6090.9 (Minimum Elevation (ft)), 7807.4 (Maximum Elevation (ft)), 855.3 (Average (ft)), 497.7 (St. Dev. (ft))

Originally these closures were developed for both the Shavano Valley and Roatcap/Coalbank areas using the same time frames in both areas to reduce confusion for visitors and increase ease in enforcement. Generally, the highest densities of wintering deer are found in the southern portion of the Dry Creek area (i.e. Shavano Valley). Wintering mule deer densities generally decrease toward the northern end of the Dry Creek area (i.e. Roatcap/Coalbank) (Matheson, pers comm.). With further input from the public, CDOW, and further analysis, the seasonal closure for the Roatcap/Coalbank areas could be changed to December 1 through March 31, annually. This is based on the lack of detailed information on wintering big game populations in the Roatcap/Coalbank area, and that big game numbers are less concentrated in the area. Through Adaptive Management and monitoring of our seasonal closures, if additional protections were needed, BLM would make changes to travel and/or use in these areas (see EA, Adaptive Management). Changes to the transportation network (new routes, reroutes, or closures) in

BLM_0014767

# Appendices

"limited" areas may be made through activity level planning or with site-specific National Environmental Policy Act (NEPA) analysis (WO IM 2008-014).

Citations:
DelPiccolo, R. 2009.  Seasonal Closure dates for Dry Creek Management Plan, letter to Uncompahgre Field Office, February 2, 2009.

Matheson, T. 2009.  Mule deer densities on Winter Range Memo to Barb Sharrow. February 12, 2009.

Watkins, B.E., C.J. Bishop, E.J. Bergman, A. Bronson, B. Hale, B.F. Wakeling, L.H. Carpenter, and D.W. Lutz. 2007. Habitat Guidelines for Mule Deer:  Colorado Plateau Shrubland and Forest Ecoregion.  Mule Deer Working Group, Western Association of Fish and Wildlife Agencies.

| 151 |
| --- |

COMMENT:
Alternative 2 has too many routes and trails closed to motorized travel and gives them to the hikers and horseback riders.

RESPONSE:
Thank you for the comment.  Table 1 provides information on the miles of existing routes and the route mileage that would be designated and limited for uses in Alternatives 2 (Proposed Action), 3, and 4. All of the 645 miles of existing routes are currently available for travel on foot or horseback, or using any type of motorized or mechanical vehicle.  The table shows that 344 miles of routes would be closed to motorized and mechanized uses in Alternative 2 that 322 miles of routes would be available for motorized travel, 344 miles would be available for mechanized travel, and 43.4 miles would be available for hiking or horseback travel only. The Proposed Action is an alternative that the BLM chose that maintains ample route mileage and area for all users. Hikers and horseback riders would be permitted to travel anywhere on public lands and on all available routes, as is the current policy.


COMMENT:
If the trails "on the ground" are being used by the motorized community, then there is a need for them to stay open. If they're not being used, then close them.

RESPONSE:
After considering the comment, no changes were made in the document.  Please refer to the Need and Purpose for the Action section for the reasons for the proposed action.  Many of the existing trails and routes in the planning area being used are poorly located on steep terrain or in sensitive areas, and have contributed to less than desirable land health conditions, or are duplicative routes leading to the same, or to near the same location.

BLM_0014768

# Appendices

COMMENT:
Proposed seasonal closures don't seem to have any facts or data to justify the dates listed or the reasons for.

RESPONSE:
See response in comment #150

COMMENT:
The BLM should do a study to see who the majority of the users are on the Dry Creek Area and base a travel plan around that.

RESPONSE:
The Proposed Action maintains a variety of routes for all the current users in the planning area. The Proposed Action was developed after an intensive route inventory, and while considering a balance of types of uses and the land health concerns shown in the Roubideau Land Health Assessment, available in the Uncompahgre Field Office.

| 152 |
| --- |

COMMENT:
Alternative 2 does not fully take into consideration the increased use of OHV's or the traditional uses and nature of this area.

RESPONSE:
The Proposed Action considers and recognizes the current uses and the increasing population growth and uses on the public land in the planning area from a variety of users, including a mix of recreation users and those using the planning area for other uses, such as for rights-of-way, mineral development, livestock grazing, and wildlife habitat management.  Many of the routes that would be available in the Proposed Action are long-established routes.  The Affected Environment/Environmental Consequences section provides a good description of the nature of the lands in the planning area.

COMMENT:
Reducing or closing these roads and trails unnecessarily will be to the detriment of the local communities that utilize this area.

RESPONSE:
The Proposed Action would result in some existing routes being closed to motorized and mechanized uses. Many of these existing routes are poorly located on steep terrain or in sensitive areas, and have contributed to less than desirable land health conditions, or are duplicative routes leading to the same, or to near the same location. The BLM has selected routes to be closed to these uses in order to improve land health conditions, to eliminate duplicate unnecessary routes, or to improve potential safety or hazardous situations.

[A-72]

# Appendices

Under Alternative 2, the local economy in Montrose County, and particularly the City of Montrose, is expected to benefit economically by being able to market the area to a wider range of recreationist. By having a plan in place the local economy would be able to market the opportunities for a variety of users.  The economic benefits could come from a number of reasons such as more loop opportunities, better signage of trails, better education and maps being provided, and overall an area that will appeal to a wider range of recreationists.  In addition, Alternative 2 has maintained several technical motorized and mechanized trails and other well known trails (e.g. Tabeguache Trail) that have become destination sites in the area.  BLM expects Alternative 2 to improve recreation overall, which would have a positive effect on the social component of recreation and travel (See socio-economic section and analysis in EA).

COMMENT:
The Needs and Purpose section of the Travel Management Plan does not justify this much limitation or closure of areas. The Needs and Purpose section also does not match the proposed Alternatives. It looks like an arbitrary decision made to change the dynamics of the Alternatives.

RESPONSE:
Please see text on page 9-10 of the document, which explains the overall purpose of the RMP Amendment.

It is important for the BLM to maintain a balance of quality recreational activities with other resources and uses in a sustainable way that maintains the health of the land by designing travel systems that direct travel away from sensitive areas yet maintain adequate transportation opportunities that meet BLM and the public needs.  Several individuals, groups and organizations, including the Southwest Resource Advisory Council (SWRAC), have expressed concern over the current situation and feel that updated and additional resource and travel management is necessary to maintain the opportunities .  The Dry Creek Travel Plan will result in positive changes to the existing and future land health concerns and help resolve the many public and internal issues and concerns regarding OHV management for a variety of uses and purposes.

COMMENT:
Some specifics identified and commented on:
1.  Seasonal closures are not based on any science or facts. This area is usually empty of wintering animals by late March as feed is scarce and water is drying up. Also closing an area to some users but letting others still have access is not backed up with the research that has been done on Human/Animal conflicts.

RESPONSE:
See response in comment #150

COMMENT:
2.  The Alternatives have not tried to implement any cohesive plan that would address the 14+

BLM_0014770

# Appendices

percentage increase in OHV registrations yearly and use of those OHV's in recreational areas such as Dry Creek. We need an increase in miles available to ride, not a decrease. Elements that are most effective in stopping rogue trails, is a trail loop system.

RESPONSE:
The Proposed Action considers and recognizes the current uses and the increasing population growth and uses on the public land in the planning area from a variety of users, including a mix of recreation users and those using the planning area for other uses, such as for rights-of-way, mineral development, livestock grazing, and wildlife habitat management. Many of the routes that would be available in the Proposed Action are long-established routes. The Affected Environment/Environmental Consequences section provides a good description of the nature of the lands in the planning area. The proposed routes in the Proposed Action, along with the existing loop trails that are designated in the Proposed Action, would maintain a substantial number of miles of loop opportunities. The BLM fees that the, conditions of use in the Proposed Action alternative, such as limiting use to certain types of vehicles, or seasonal closures, would benefit recreation overall in the planning area for all users.


COMMENT:
I did not read anywhere about a plan allowing for additional new motorized routes in the future. This will be needed as usage increases.

RESPONSE:
Travel Management Plan - Page 17
Alternatives 2 (Proposed Action), 3, and 4 consist of:
2.  Selected routes and uses, proposed new routes and routes to be closed to certain or all uses ("travel network system")

Follow-on Actions - Page 19
All proposed routes in the approved Travel Management Plan would have the appropriate level of environmental analysis and documentation prepared, required clearances, and any necessary mitigation completed for cultural resources and special status plant/animal species and habitat before construction starts. Construction and maintenance work would be subject to the conditions and guidelines that create sustainable, low maintenance routes. These conditions would apply to any proposed route, regardless of the purpose of the route, and would help:
-  Ensure that the designated routes in the approved Travel Management Plan would be considered in planning for new additional routes,
-  Prevent impacts to public lands and resources, and
-  Ensure that routes would be located properly and constructed with good design and planning.

Adaptive Management - Page 20
Over time, changes may need to be made to the approved and adopted Travel Management Plan in terms of adding, relocating, or closing certain routes, maintenance needs, and seasonal or other use restrictions on routes. These changes would be documented using appropriate BLM Land Use Planning regulations and National Environmental Policy Act (NEPA) procedures. Persons

[A-74]

# Appendices

or organizations can request the BLM to make route status changes based on a variety of criteria including route condition, maintenance needs, resource conditions, existing uses, historical information, changing needs, cultural information, economic information, ecological issues, and use types and levels.


COMMENT:
3.  The north end of Sub-region A and C don't have any motorized single track shown. I know some exists there. They need to be included.

RESPONSE:
Please see response to comment #185.


| 153 | Western Slope 4 Wheelers Club |
|---|---|

COMMENT:
Feel that the Montrose Resource Office of the Bureau of Land Management has done a commendable job with the Dry Creek Travel Management Plan in attempting to provide recreational access for all types of users while also protecting our valuable natural resources.

RESPONSE:
Thank you for your comment.


COMMENT:
However, several parts of the plan would like to see modified before final approval. (Where applicable, modifications are marked on the Alternative 2 map that was attached.)  Would like to request that you give serious consideration to revisiting the parking restriction that requires vehicles to stay within one vehicle width of the roadway. We feel that this distance should be the same 300 feet restriction that the adjacent US Forest Service lands on the Uncompahgre Plateau currently used. This would result in less user confusion when traveling between these two categories of public lands. Because of the very rocky and heavily treed nature of the BLM lands, the impact of this change on the natural resources of the area would be minimal.

RESPONSE:
Please see response in comment #150


COMMENT:
Coyote Canyon (See Map) - Although this trail does run along a canyon bottom, it only infrequently runs water, and then only after very heavy rains or snow melt. The travel surface is predominately un-vegetated sand and rock cobble, with numerous boulder covered sections. After each run-off event, the surface is re-arranged. Vehicle travel does not result in any significant resource degradation and we would like to see this route opened up for vehicle travel.

[A-75]

BLM_0014772

# Appendices

RESPONSE:
After considering the comment, no changes were made.  The route in question is a route that follows a sandy wash and is susceptible to water erosion and has existing bank/channel stabilization concerns and is located in an area with sensitive resources.


COMMENT:
Upper Dry Creek Bench Trail (See Map) - This is an old wood cutting road that provides a moderately difficult four wheel drive challenge. Listed in the travel plan as an ATV trail, we would like to see it opened up to 4x4 vehicles. By doing so, a scenic, more difficult 4x4 trail would be available while not taking anything away from the ATV users and not causing any additional environmental impact.

RESPONSE:
After considering the comment, no changes were made.  The route in question is a route that is in an area where some Land Health Standards are not being met and is susceptible to erosion concerns.


COMMENT:
Lower Dry Creek Parallel Trail (See Map) - This trail, also listed in the plan as an ATV trail, parallels Dry Creek and provides moderate 4x4 challenges not found on many of the other open routes in the plan. Again, by opening this trail to full sized vehicles, there would be no additional impact on the environment while providing an additional, more difficult 4x4 trail.

RESPONSE:
After considering the comment, no changes were made.  The route in question is a route that has sensitive resource concerns as well as maintenance concerns.


COMMENT:
Boulder Canyon Trail (See Map) - appreciate the addition of this trail to the management plan however do see a problem with the seasonal closure in the vicinity. The seasonal closure is not in effect for this trail, but the access routes into and out of the trail do have a seasonal closure. We would like to see the seasonal restriction on the access routes to the Boulder Canyon trail removed. These routes are in very close proximity to Hwy 90 (less then 1/4 mile) and as such, would have very limited if any additional vehicular impact on winter range use by big game.

RESPONSE:
After reviewing the comment, changes have been made on the Hwy 90 rock crawling trail.  It will be seasonally closed from 12/1 to 4/15 also see comment #150.

[A-76]

BLM_0014773

# Appendices

| 154 |
|-----|

COMMENT:
Sub-region D - please see comments on attached map
The remainder of Alternative 2 looks fantastic!  Thank you for taking on such a large project.

Map comment
This trail segment ties into the singletrack on the North side of the road - Currently a very rough double track that could be reduced to a single track. This segment has been used in the Dry Creek Canyon Challenge for the last 3 years.

RESPONSE:
After considering the comment, no changes were made.  The route in question is a route that has sensitive resource concerns and erosion as well as route proliferation concerns

| 155 | Blue Ribbon Coalition |
|-----|-----|

COMMENT:
Most of the BRC members who contacted us regarding the Dry Creek TMP said they appreciated the willingness of the UFO staff to answer questions and consider suggestions. That's not always the case, so we want to commend the UFO staff.

RESPONSE:
Thank you for your comment.

COMMENT:
There are two key problems identified by BRC members who regularly visit the area.

One problem is the lack of opportunity for single-track motorcycle and ATV use. We strongly urge the UFO to consider specific route info and suggestions made by the local OHV community and look for opportunities to include routes into the Final Plan.

RESPONSE:
After considering the comment, additional ATV routes were added where possible however no additional single-track motorcycle routes were added.  Alternative 2 maintains ample opportunities for motorcycles on single-tracks, ATV routes, or roads throughout the area. Alternative 2 currently maintains more motorized single track than ATV or Mountain Bike trails of which almost all were requested by the individuals and groups.

COMMENT:
The other key problem is the proposed seasonal closures. BRC strongly objects to the establishment of a calendar-based seasonal closure. The proposed seasonal closure is not supported by the facts on the ground. The EA fails to make a logical connection between any documented need or resource condition that warrants a seasonal closure.

BLM_0014774

# Appendices

RESPONSE:
See response in comment #150

| 156 | Uncompahgre Valley Trail Riders |
|---|---|

COMMENT:
Can live with Alternative 2, but with just a little tweaking.

Our greatest concern is for the lack of ATV routes. You have provided for ample trails for bicycles, excluding other vehicles. You have provided for ample motorized single track, excluding ATV's and four-wheel drives. 4-wheel-drive roads are no more practical for ATV's than two-tracks and roads are for the dirt bikes and bicycles--not a quality ride at all.

RESPONSE:
After considering the comment, approximately 7 new miles of trails were added in Sub-region F. This in turn provides over 40 miles of ATV trails which is comparable to other uses in the area.

COMMENT:
Seasonal closure through April 15, to protect wintering wild game animals, is quite late. Also, how about exempting vehicles less than 50" wide, like the Forest Service or at least go back to April 1 opening.

RESPONSE:
See response in comment #150

COMMENT:
The Cushman Mesa trail ends a short distance from the Forest Boundary. We urgently ask that you include this short segment for ATV's. The Forest Service has indicated interest in widening .2 miles to create a loop over to Transfer Road and back down to the parking area at the power lines using one of the trails northwest of Transfer Rd.

RESPONSE:
After considering the comment and speaking with the US Forest Service, BLM has decided to change the designation of the route in question in Alternative 2. The route designation change will now allow ATV access.

COMMENT:
Add a few short spur routes that lead to canyon overlooks be put back in Alternative 2.

RESPONSE:
After considering the comment, no changes were made. There are several overlook (spurs) opportunities already proposed in Alternative 2.

[A-78]

BLM_0014775

# Appendices

| 157 | Uncompahgre Valley Trail Riders |
|-----|--------------------------------|

COMMENT:
Feel the one labeled "Alternative 2" is the closest to what I believe will work with some exceptions.

Don't think that a mere 35 miles of trails is sufficient for ATVs.

RESPONSE:
See response in comment #156

COMMENT:
Want seasonal closures to be shortened especially for ATV's

RESPONSE:
See response in comment #150

COMMENT:
Suggest that the spurs be replaced on the trails, as well as extending Cushman Trail to the forest boundary.

RESPONSE:
See response in comment #156

| 158 | Uncompahgre Valley Trail Riders |
|-----|--------------------------------|

COMMENT:
Feel that Alternative 2 would be the closest to what I believe will work with some exceptions.

Concerned with the unbalanced availability of trails between bicycles and ATV's. There is a lot of money going from the ATV rider to where?

RESPONSE:
See response in comment #156

COMMENT:
The seasonal closure of Dry Creek area through April 15 is quite late, move the date back to April 1, and also consider the Forest Service criteria, exempting vehicles less than 50" wide.

RESPONSE:
See response in comment #150

[A-79]

BLM_0014776

# Appendices

COMMENT:
Spurs leading to great scenic views are important enough to add back on the trails.

RESPONSE:
See response in comment #156

COMMENT:
I also believe that noxious weeds can and are carried from one area to another by foot traffic and horses more than any ATV rider. I believe not one fire in the state can be blamed on an ATV rider.

RESPONSE:
Observation has shown that weed seeds can be transported by almost any type of vehicle, equipment, or device that contacts weeds, including full size motorized vehicles, hikers, horses, mountain bikes, ATVs and motorcycles. BLM does not know of any methodology to calculate the amount of weed seeds that are transported by these various methods.

COMMENT:
Request attention to is in Subsection D, on the Cushman Trail. A short section of trail that extends out into Forest Service land needs to stay open to ATV's! The Forest Service has expressed interest in widening about .2 miles of this trail to create a loop from the powerline on Transfer Road, up Cushman Mesa, over to Transfer Road, and back to the power line, via Transfer Road or BLM land.

RESPONSE:
See response in comment #156

| 159 | Ouray Ranger District USFS |
|---|---|

COMMENT:
Ouray Ranger District found no issues and have no comment.  The only inconsistency we noted was in the 300 ft travel variance permitted by our travel plan for dispersed camping and firewood collection, but not permitted in your plan.  Though this may confuse some shared users, we do not suggest you consider changing it.

RESPONSE:
Thank You for your comment.

| 160 | Uncompahgre Valley Trail Riders |
|---|---|

COMMENT:
Seasonal closures need to be moved back to the 1st of March or at the latest mid March or

[A-80]

# Appendices

exempt vehicles under 50".

RESPONSE:
See response in comment #150


COMMENT:
Cushman Mesa is very nice trail to ride in early spring and if the short section (about 1/4 mile) is widened to connect Cushman Mesa trail to Transfer road it will make nice loop.

RESPONSE:
See response in comment #156


COMMENT:
The trails that go from the main road to the Olathe Reservoir need to be open to let seniors like myself access to get to the reservoir.

RESPONSE:
After reviewing the comment and the routes mentioned, no changes were made because the main road to the Olathe Reservoir is open however there are little spur routes that dead-end that have been proposed to be closed on the main access.


COMMENT:
Need more ATV trails. If most of the trails in this area are closed it will increase the traffic load on the trails that are open and do more damage than having more trails and spreading the traffic out.

RESPONSE:
See response in comment #156


| 161 | Uncompahgre Trail Riders |
|---|---|

COMMENT:
Seen constant pressure to reduce or remove ATV trails in the local area.

Sub-region C is a favorite of the club to ride in the early spring and your intention of keeping this area closed until April 15th is unnecessary. There is little mud and few animals to disturb. The US Forest area boarding area is not closed to ATV use and your closure creates conflicting usage restrictions.

RESPONSE:
See response in comment #150

[A-81]

# Appendices

COMMENT:
Sub-region D contains the Cushman Mesa trail. If you could open up a short section of trail so it extends to the forest boundary. This would allow a loop over to Transfer road and back to the parking area.

RESPONSE:
See response in comment #156

COMMENT:
In Sub-region D we request that you open two small sections of road that go from the main road to the Olathe reservoir so we can use ATVs to get to the reservoir to fish.

RESPONSE:
See response in comment #160

| 162 | UVTR |
|-----|------|

COMMENT:
I strongly support Alternative 1.

I can support stopping cross country travel, but not the closing of a single road or trail.

RESPONSE:
Please see response in comment #151.

| 163 |
|-----|

COMMENT:
As more people come to this area there needs to be as much public land open as possible.

RESPONSE:
Please see response in comment #147.

| 164 |
|-----|

COMMENT:
Your effort on behalf of Colorado and the recreating public is sincerely appreciated.

Especially grateful for your leadership in the following areas:
1. Creating a functional, informative, and enforceable travel map that clearly lays out where one can and can't travel with motorized vehicles and where camping opportunities can be found.
2. Managing the landscape for designated routes only – no longer allowing open cross country travel.

[A-82]

# Appendices

3. Restricting off-route game retrieval to muscle powered carts only.
4. Designating camp spurs in heavy use areas.
5. Promoting a dispersed camping policy that allows users to camp along roads and travel ways so long as they park up to one vehicle length from the road.
6. Closing routes that stem from private land and serve as exclusive access to the backcountry for only a few.

RESPONSE:
Thank you for your comment.

| 165 | Department of Energy |
|---|---|

COMMENT:
Western Area Power Administration (Western) has reviewed the various documents and maps posted to the web page for the Dry Creek area travel management plan per your recent letter concerning this ongoing planning effort.

The Draft EA has adequately recognized Western as an authorized utility user with adequate access to its facilities on existing routes or on certain administrative routes not open to the general public.

At this time we have no additional comments to make on the proposed Dry Creek Travel Management Plan.

RESPONSE:
Thank you for your comment.

| 166 | |
|---|---|

COMMENT:
Road access to the Dry Creek rock climbing area. The climbing area currently has 2 access points and parking areas; one at the south end, and one at the north end. I think most climbers would like to see both of these access roads and parking areas remain open. The BLM maps appear to show only the southern access road.

RESPONSE:
After considering the comment, no changes were made. There have been several spur routes left open in the rock climbing area for access points all along the upper Dry Creek rim.

| 167 | |
|---|---|

COMMENT:
I would just like to take this moment to share a few words.

Access to Clear Creek as in all public lands is an important issue to literally millions of Californians as well as the entire nation.

[A-83]

# Appendices

I would like to also include Red Rock Canyon.  This has been a personal place of family get together as well for me for 40 years.

RESPONSE:
After reviewing the comment, it was concluded that the areas mentioned are not within the Dry Creek travel management boundaries.

| 168 |
|---|

COMMENT:
Same as comment #164

| 169 |
|---|

COMMENT:
Thank you for all the hard work you and your staff have put into the Dry Creek travel management plan.

RESPONSE:
Thank you for your comment.

| 170 |
|---|

Same as comment #164

| 171 | private citizen |
|---|---|

COMMENT:
I strongly favor restricting travel as suggested in the preferred alternative.

I have two concerns:
1. The restriction to one vehicle width for off-route parking seems overly stringent. In your document you express concern, if no changes are made, that additional routes may result in future increased vandalism of such things as sheep camps. I think this same concern might apply for dispersed recreationists who've had to leave their vehicles immediately adjacent to the road.

RESPONSE:
After considering the comment, no changes were made.  While vandalism is always a concern, the travel management plan proposes several staging areas, trailheads, and camping areas that individuals can utilize which will be patrolled more frequently.

[A-84]

BLM_0014781

# Appendices

COMMENT:

2. Regarding big-game retrieval - I don't use such devices as carts but thought you should consider not tying your restrictions exactly to big-game seasons. Those that harvest animals late on the last day of a season, for instance, might be at a disadvantage. Allow game retrieval for a day or two beyond the closing date of each big game season.

RESPONSE:

After considering the comment, no changes were made. Through Adaptive Management and monitoring of the seasonal closures, if changes are needed, BLM would make changes to travel and/or use (see EA, Adaptive Management)

| 172 | Cowboys 4 Indians Trail Riding Club |
|---|---|

COMMENT:

In general we support the BLM's proposed regulations under alternative 2.

RESPONSE:

Thank you for your comment.

| 173 | |
|---|---|

COMMENT:

Would like to have the following roads open for hunting purposes:
Roads # 618,616,580,585, and 543. These are in sections # 33, 28 27, and 22. I pulled these #'s from the plan entitled - Dry Creek Travel Plan & Environmental Assessment, Alternative 1, Sub regions D- G.

RESPONSE:

After considering the comment, no changes were made. Some of the routes in question cross private land which BLM has not obtained easements. The other routes in the area can still be utilized for hunting just not by ATVs or Full Size Vehicles.

| 174 | Center for Native Ecosystems |
|---|---|

COMMENT: (some wording of the comment were the same as comment #164)

Very supportive of several elements of the preferred alternative and EA.

Support BLM's decision not to select either Alternative 1 or Alternative 4 as the Preferred Alternative.

We agree with BLM's conclusion that route reductions in habitat for special status species may have major effects in facilitating the continued existence of these species. Substantial route reductions are necessary in order for BLM to meet Public Land Health Standards. Recommend that BLM implement Alternative 3 however; recognize the challenge inherent in balancing the variety of interests held by users of the Dry Creek Area. The Proposed Action represents a

[A-85]

BLM_0014782

# Appendices

commendable effort to strike a balance between the desires of various users, and although we prefer Alternative 3, we also generally support the Preferred Alternative (Alternative 2).

Comments on Alternatives 2 and 3
Alternative 3 would result in the greatest decrease in the number of route miles and route densities in habitat for special status species. Given that many of these species have already undergone substantial declines across their ranges and within the Uncompahgre Field Office, we feel that BLM should emphasize the highest level of protection for special status species in selecting an alternative, in order to meet its obligation to conserve and restore populations of special status species. In addition, BLM should emphasize meeting and maintaining Land Health Standards. Therefore, we recommend that BLM implement Alternative 3. However, we recognize the challenge inherent in balancing the variety of interests held by users of the Dry Creek Area. The Proposed Action represents a commendable effort to strike a balance between the desires of various users, and although we prefer Alternative 3, we also generally support the Preferred Alternative (Alternative 2).

RESPONSE:
BLM agrees that Alternative 3 would result in the greatest decrease in the number of route miles and route densities in habitat for special status species, and would provide the highest level of protection for special status species (EA, pg 90-91; 92-94; and 97-98). The BLM is attempting through this effort to "maintain a balance of quality recreation with other resources and uses in a sustainable way that maintains the health of the land by designing travel systems that direct travel away from sensitive areas yet maintain adequate transportation opportunities that meet BLM and the public needs (EA pg 10)." While Alternative 3 would result in the greatest decrease in number of routes miles and route densities in habitat for special status species, this alternative is the most restricting for recreational uses (mechanized and motorized) with 368.7 miles of routes closed (EA pg 28-29), which is 43% more route closures than under Alternative 2 (258.7 miles).

Several items under the "Purpose for the Action" (EA, pg 9) emphasize the need to meet or maintain public land health standards. Many of the "Follow-on Actions" (EA, pg 19) and "Design Features" (EA, pg 21-22) were developed to improve or maintain Land Health Standards in the area. In addition, through Adaptive Management and monitoring of our seasonal closures BLM could make changes to travel and/or use (see EA, Adaptive Management). Changes to the transportation network (new routes, reroutes, or closures) in "limited" areas may be made through activity level planning or with site-specific National Environmental Policy Act (NEPA) analysis (WO IM 2008-014).

COMMENT:
We suggest that BLM begin an aggressive effort to rehabilitate newly closed roads, and that BLM prioritize rehabilitation of newly closed roads that travel through habitat for rare and imperiled species. We would be interested in exploring opportunities for CNE to partner with BLM in efforts to effectively close and rehabilitate roads that currently negatively impact habitat for rare and imperiled species and unique natural communities.

[A-86]

BLM_0014783

# Appendices

RESPONSE:
As stated in the EA (pg 22), "closures, rehabilitation and/or re-vegetation of routes would be performed according to the Implementation and Monitoring Plan to be prepared, BLM annual work plans, and as funding permits." We thank CNE for the support for prioritizing rehabilitation of newly closed roads through habitat for rare and imperiled species. BLM agrees that these are high priority for rehabilitation, however during the development of the Implementation and Monitoring Plan other issues could come to the front that would cause other routes to be a higher priority due to resource needs or funding availability (i.e. serious erosion and/or human safety concerns). BLM welcomes and looks forward to CNE's interest to partner with the BLM in efforts to effectively close and rehabilitate roads that currently negatively impact habitat for rare and imperiled species and unique natural communities.

COMMENT:
Concerns with Alternatives 2 and 3:
We view the proposed action as an important first step towards addressing the impacts of travel on rare and imperiled species and unique natural communities. However, we ask that BLM specifically commit to monitoring the impacts of designated routes approved by the proposed alternative on rare and imperiled species, and to closing or re-routing such routes when monitoring suggests that use of particular routes is resulting in negative impacts to rare and imperiled species - even when such routes are in sub-regions where motorized use is emphasized.

RESPONSE:
As stated in the EA (pg 19), an Implementation and Monitoring Plan will be developed. "Monitoring would determine if targeted opportunities and protection of sensitive resources and land health are being achieved in order to meet desired future conditions." In addition, the EA states (pg 20), through Adaptive Management and monitoring of our seasonal closures, if additional protections are needed, BLM would further restrict travel and use.

COMMENT:
We feel that such monitoring is particularly important in habitat for prairie-dogs, occupied or potential habitat for rare and imperiled plants including Uintah Basin hookless cactus, roundtail chub and other special status fish species, canyon tree frogs, northern leopard frogs, Great Basin silverspot butterfly, and Gunnison sage-grouse. Similarly, we feel that it is important for BLM to commit to monitoring the impacts of routes within and adjacent to CNHP PCAs, on unique natural communities within the PCAs, and to close or re-route routes that are negatively impacting unique natural communities. We note that there appear to be high densities of routes remaining in habitat for aquatic and riparian species even under alternative 2, and suggest that BLM pursue additional opportunities to close routes and stream crossings that negatively impact habitat for aquatic and riparian species. The BLM includes a general discussion of monitoring and adaptive management in the EA, but this discussion does not specifically address these issues. We are interested in opportunities to partner with BLM in monitoring efforts.

[A-87]

BLM_0014784

# Appendices

RESPONSE:
We thank CNE for their support for monitoring special status species in the Dry Creek area. We will take their comments under consideration as we develop the Implementation and Monitoring Plan for the Dry Creek Travel area. See previous response to comments on closure of additional routes and in interested of CNE to partners with BLM.

COMMENT:
Not sufficient for the UFO to incorporate language in a plan stating that it will merely "strive" to meet the land health standards and the language is not acceptable. In the Purpose for the Action, the EA identifies the purpose of this document to analyze travel management and actions to address "appropriate actions to meet or maintain public land health standards." EA, p. 9. Similarly, the Purpose and Need for the EA is identified (at p. 10) as: BLM policy for managing public lands is based on the BLM Colorado Standards for Public Land Health and the Colorado Recreation Management Guidelines to Meet Public Land Health Standards on BLM Lands. Under this policy, BLM is charged to manage the public lands in conformance with the standards and guidelines outlined in these documents, and must take appropriate actions when public land health standards are not being met. (emphasis added) We request that the UFO revise the goal of the proposed action to unequivocally state that the UFO intends to take necessary steps to meet or exceed LHS as part of the implementation of the proposed action.

RESPONSE:
After considering the comment, the following changes were made in the document.

On p. 7, under the subtitle "Introduction" the first sentence has been changed to read
*This Resource Management Plan Amendment/Environmental Assessment addresses the environmental and other effects of implementing four different alternatives to help address issues relative to land health and the use of the public lands…activities". A new paragraph has been added under paragraph 3, p. 7:
*The Uncompahgre Basin Resource Management Plan was amended to include Colorado Public Land Health Standards in 1997. This amendment requires BLM to manage public lands to meet land health standards, which describe minimum functional levels for healthy soils, riparian areas, native plant and animal communities, threatened, endangered and sensitive species, and water quality. All completed Land Health Assessments identify areas in the Planning Area where existing travel practices are contributing to public lands not meeting health standards.

On p. 15, the following section was added under Management Common to all Alternatives.
Land Health Standards
Lands in the PA would be managed to meet Colorado Public Land Health Standards through a variety of actions that deal with the various uses of public lands. An example is that emergency route closures and follow-up actions would be implemented to improve the health of lands where a route is the obvious cause of an area failing to meet standards. The procedures in 43CFR------- would be followed to implement emergency closures.

On p. 17, the following section was added immediately under the subtitle "Management Common to Alternatives 2, 3, and 4".
Land Health Standards

[A-88]

BLM_0014785

# Appendices

Lands and resources in the Planning Area would be managed to meet Colorado Public Land Health Standards through a variety of means, including the elimination of all cross country off-route mechanized and motorized travel, and through limiting mechanized and motorized travel to designated routes.  Closures and rehabilitation of some routes would also be used to meet land health standards.

In the descriptions of Alternatives 1, 2, and 4, the sections with the subtitle "Management Objectives" has been changed.  This section in Alternative 3 was not changed.

In Alternative 1-No Action, P. 22:
Management Objectives
"The Management Objectives of Alternative 1 would be to continue existing management and priorities wherever possible. BLM would manage resources on public lands to meet Colorado Land Health Standards.  Where public lands meet standards, or meet standards with problems, BLM would maintain the same level of required resource management and protection. Management of the routes would continue to emphasize "shared use" travel opportunities along with adequate and appropriate public access."

In Alternative 2, p. 23:
Management Objectives
The first sentence has been changed to read "The objective of Alternative 2 (Proposed Action) is to manage resources and public lands to meet Land Health Standards, minimize the areas that meet standards with problems, improve resource protection, and minimize impacts to sensitive resources while providing quality travel opportunities along with adequate and appropriate public access."

In Alternative 4, p. 26:
Management Objectives
The first sentence has been changed to read "The objectives for this alternative are to manage resources and public lands to meet Land Health Standards with the minimum required resource protection and an emphasis on multiple-use travel opportunities and public access."

On p. 30, the first sentence in the second paragraph in the section titled "Implementation and Monitoring" has been changed to read *Monitoring data is used to assess resource conditions, identify resource conflicts, determine if resource objectives--including land health standards--are being met and periodically refine and update desired future conditions and specific management actions in a process known as adaptive management.

COMMENT:
UFO should set forth measurable objectives that will aid in tracking and gauging progress and can be used to make any necessary adjustments to the on-the-ground management as needed. Currently, the only discussion of measuring success in meeting LHS and other objectives of the plan is through facilities.  To meet the requirements of the LHS and the EA, the BLM is required to "take appropriate actions" if LHS are not being met.  To comply with these requirements, the UFO must incorporate a process that will enable the BLM to know if LHS are not being met and

[A-89]

# Appendices

specifically commits to taking necessary actions to ensure that LHS will be met as soon as possible.  We request that the goal of the Proposed Action reiterate these obligations, and describe and commit to the specific process that the BLM will use to meet them.

RESPONSE:
After considering the comment, no change was made in the document. In addition to the construction or modification of travel management support facilities, see p. 30 for a discussion of the proposed action calling for the development of a detailed implementation and monitoring plan.  This plan would be the appropriate location for describing measurable objectives that would aid in tracking progress toward meeting land health standards. This plan would also describe a process to inform BLM whether Land Health Standards are being met, particularly with respect to route and travel impacts.

COMMENT:
Ask that BLM commit to considering additional changes to travel management within nominated ACECs in the future, if changes are necessary to protect the relevant and important values within nominated ACECs.

RESPONSE:
Thank you for the comment.  The request is beyond the scope of the analysis in this document.  ACEC will be considered during the Resource Management Plan revision.

COMMENT:
Conclusion
Prefer Alternative 3, but view Alternative 2 as a reasonable compromise between competing uses that makes important and necessary changes to travel management in the Dry Creek Planning Area.  We ask that you consider selecting Alternative 3 as the preferred Alternative, and/or consider implementing the recommendations above in order to strengthen the alternative that is ultimately selected.

RESPONSE:
The BLM feels that Alternative 2-Proposed Action, best meets the needs of the public lands in the planning area.  Please see the changes discussed above that were made in the document as a result of considering comments in this letter.

| 175 | Western Colorado Congress |
|---|---|

COMMENT:
In general, pleased with the Proposed Action however would like to see a few improvements.

Comments by Subregion

Subregion A - pleased

[A-90]

# Appendices

RESPONSE:
Thank you for your comment.


COMMENT:
Subregion B - approve of the additional trails to form loops

RESPONSE:
Thank you for your comment.


COMMENT:
Subregion C, we appreciate that wildlife habitat values are being protected though seasonal (December 1 - April 15) closures on several routes. However, we see no explanation in the EA as to why the BLM feels it appropriate to have such a high density of high impact routes in this area. Further, the FONSI indicates that you have evidence to support that this high density would not have significant impacts over the short and long term life of this TMP. Due to the lack of detailed justification, we request that the UFO revise the proposal for subregion C and lower the density of routes similar to that in Alternative 3 as a high density will certainly make it challenging if not impossible to meet the Land Health Standards.

RESPONSE:
After considering the comment, no change was made in the document. The BLM's Land Health Assessment for the planning area indicates that a little more than half the acreage in subregion C has some degree of land health problems where roads were a contributing factor. Of this amount, 84% of the acreage was meeting Standard 3 (healthy native plant and animal communities) with problems, while 5% failed to meet this standard. The remainder of the public lands, 11%, fully met the standards. These ratings occurred under the existing situation regarding routes, and is analyzed under Alternative 1. Alternative 2 calls for closing 68.3 miles of routes (40% of the existing total routes currently on the ground, and reduces the amount of existing open routes by 49%, either through route closure or through use limitations. The BLM feels that the degree of route reduction and use limitations in the proposed action is an adequate first step to be taken to address the current scope of road-related land health problems. Provisions in the proposed action for monitoring and adaptive management could result in additional route modifications if land health problems are still occurring as the proposed action is implemented.


COMMENT:
Subregion D - Specifically, the number of miles designated for single-track motorcycle use seems quite excessive. There is simply too high a density of motorized routes. For this subregion, Alternative 3 - with includes a significant single-track motorcycle loop - is very much preferable.

RESPONSE:
After considering the comment, no change was made in the document. The density of motorized routes in subregion D is approximately 2.2 miles per square mile, with motorcycle routes at 0.8 miles per square mile (page 140). This motorized route density is comparable to that found in

[A-91]

BLM_0014788

# Appendices

subregions E, F, and G. It is also in keeping with the Desired Future Condition for Subregion D shown in Appendix 3: "Manage for a range of shared-use quality recreational activities for all users, balanced with resource protection, while maintaining appropriate and adequate access for public and/or administrative uses." Designation of limited use routes is generally expected to reduce the level of impact associated with routes. In addition, providing several loop choices to motorized recreationists is one tactic for managing travel to keep it within the remaining network of routes - a concern raised in this comment.

COMMENT:
Subregion E - support this.

RESPONSE:
Thank you for your comment.

COMMENT:
Subregion F - May be difficult to manage ATV and mechanized routes together near the private land want to maintain the bike trails as non-motorized quiet use and therefore warn against designating these dead-end ATV trails. Pleased to see the bike route designations in the southeast corner of the subregion as this area is popular and tightly contained.

RESPONSE:
After considering the comment, and other comments received regarding ATV use and ATV routes, the subject proposed non-motorized single-track route in Sub-Region F has been changed to a ATV 2-track route.

COMMENT:
Subregion G - Like the quiet-use hiking, horseback and biking routes on the north side of the Spring Creek drainage, but don't like the ATV and motorcycle routes. All in all, the Proposed Action seems to have dealt fairly well with the existing situation.

RESPONSE:
Thank you for your comment.

COMMENT:
Same as comment #164

COMMENT:
*Limit motorized and mechanized access from private lands only to the public access points and designated routes. Would like to see a formalized policy put forth in this EA. We recommend a policy consistent with other Colorado BLM field offices and suggest you incorporate the policy adopted by the Royal Gorge Field Office and supported by the Front Range Resource Advisory Council.

BLM_0014789

# Appendices

RESPONSE:
After reviewing your comment, additional language was added to address the comment (see Management Common to Alternatives 2 (Proposed) Action, 3, and 4 under Description of the Alternatives in the EA)

COMMENT:
The BLM's proposal to limit motorized vehicle use on trails to a width of 50" will be helpful in limiting the severe damage caused by most of the new side-by-side or utility terrain vehicles (UTV) as they widen and create new ruts in the trails surface. Unfortunately (Dennis), it will not address the damage used by the under 50 inch UTVs that are on the market which remain wider than standard ATVs and will continue to widen trails and will lead to more rutting, sedimentation, and will result in an increased soil run-off that will choke nearby sand washes and drainages. This travel planning process is certainly the right time to get ahead of the curve on new technology before it creates impacts on the land. We therefore urge the UFO to take an aggressive stance on this issue by monitoring the new technological trends that arrive on the UFO and taking proactive action to define their appropriateness before damage is caused. This sort of proactive action is well within the capabilities of BLM managers and is supported by the various regulations, guidance and planning handbooks.

RESPONSE:
The Dry Creek Plan is prepared with adaptive management principles which in part allows for travel route monitoring, and implementing routinely scheduled maintenance for adequate drainage and erosion control. As methods of travel change over time, BLM fully expects to monitor the effects on travel routes and adjust maintenance requirements accordingly. Future management of the travel plan area has to remain in compliance with the Colorado Public Land Health Standards, and the BLM is committed to manage travel routes in the area accordingly.

COMMENT:
Elements of the EA and Preferred Alternative that concern us:
*Not sufficient for the UFO to incorporate language in a plan stating that it will merely "strive" to meet the land health standards. Language in the Proposed Action (Alternative #2) is not acceptable; the stated objective of the Proposed Action is to "strive" to meet Land Health Standards.

RESPONSE:
See response in comment #174

COMMENT:
*Should set forth measurable objectives that will aid in tracking and gauging progress and can be used to make any necessary adjustments to the on-the-ground management as needed.

[A-93]

BLM_0014790

# Appendices

RESPONSE:
See response in comment #174


COMMENT:
*Believe that the UFO has taken a significant step toward providing quite use recreation but mainly through the closures and protection of specific landscapes rather than an actual analysis of the impacts of noise. Also, we believe that factors such as vehicular traffic volume, duration, and frequency will be extremely relevant to this analysis.  Consideration of whether canyon topography blocks or disperses vehicular noise will be important to quiet recreation planning. Quiet use goal-setting, along with attendant standards, is missing from the EA. For example, in the Preferred Alternative 2, we are unable to find where the EA describes in any quantitative way the desired future condition for quiet users in terms of the "natural soundscape", as referenced in the definition of "quiet recreation". Even though the analysis uses terms such as "increase," "decrease," "low" and "less" that imply measurement, it has no quantitative information and scientific methodology upon which to base its conclusions. It is our view that, in order to satisfy its legal obligations under Executive Order 11,644 ("E.O."), BLM regulations, and recent BLM guidance addressing "quiet recreation" and "natural soundscape", the agency must fully analyze these impacts, pursuant to its statutory duties under NEPA. More specifically, this will require (1) quantification of the decibel ("Db") levels of the natural soundscape; and (2) quantitative analysis of ORV Db levels on the natural soundscape, which quiet recreationists seek. Measurement of ORV traffic volume, duration, and frequency are also necessary for a solid estimate of noise impacts.

RESPONSE:
After consideration of the comment, no change has been made to the document. Thank you for the information. The Proposed Action addresses travel management comprehensively and takes a landscape perspective to recreation management planning.  Although no areas have been identified specifically for quiet recreation, the routes designated for non-motorized uses provide a quiet setting.  We used the best available information during the preparation of the analysis in the document.  We don't have the technology, methodology, or funding to do detailed noise monitoring.

The referenced Executive Order addresses noise in Section 3, (a) (3): Sec. 3. Zones of Use. (a) Each respective agency head shall…various uses of those lands. The regulations shall further require that the designation of such areas and trails shall be in accordance with the following--
(1) Areas…lands.
(2) Areas…habitats.
(3) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

The BLM feels that the analysis regarding noise impacts and considerations regarding routes on which motorized vehicles would not be permitted meet the intent in the referenced Executive Order.

[A-94]

BLM_0014791

# Appendices

COMMENT:
*Should place more emphasis on budget constraints and prioritization for the implementation of this plan. Should have a plan and present this plan to the public so we can weigh the "realities" of budget constraints with the proposed actions in order to provide the most informed comments possible. Without being able to factor in these constraints, the public is left to make uninformed recommendations. We request that: 1) Priorities are set, based on current and future budget projections, for how the implementation of this proposal would be carried out and that this action plan be presented to the public before the final decision is made; and 2) That the UFO create a spreadsheet or other means to present to the public an estimation of the costs associated with each presented Alternative.

RESPONSE:
An implementation plan would be prepared when the RMP Amendment is completed and would contain cost estimates. The plan would set priorities for completion of the Amendment based on current and future budget projections.

---

176

COMMENT:
Alternative 2 is mostly acceptable however need to have permission to check on cows during the seasonal closure period when necessary.

RESPONSE:
Thank you for the comment.  Implementing the Proposed Action would not affect authorized access in valid grazing permits.

---

177

COMMENT:
What were the reasons were for closing the road that parallels Dry Creek to 4 wheel drive vehicles.  This is one of if not the only road that runs along the length of a portion of the Dry Creek canyon, and give a nice perspective of its magnitude.  Would like to see it stay open for 4 wheel drive vehicles unless there are valid reasons for placing the ATV 2-Track limit.

RESPONSE:
See response in comment #153

---

178

COMMENT:
Think proper law enforcement and making examples of lawbreakers need to be addressed. but just closing the trails is not the answer.

[A-95]

# Appendices

RESPONSE:
Thank you for comment and it will be taken into consideration.

| 179 |
| --- |

COMMENT:
I strongly disagree with the proposed closures to motorized travel on any and all of the existing trail network in Dry Creek. My foremost concern is that the map that you released for public comment does not have any trail numbers (aside from the fact that the map is almost impossible to obtain). So how am I supposed to make any comments on your proposed closures/usage limitations.

RESPONSE:
Hard copies and CDs of the maps were available upon request; Hard copy maps were given out to all the clubs and organizations and were available online and at the Uncompahgre Field Office front desk.

COMMENT:
Need to make sure that your "Travel Plan" includes an allowance for the re-designation of trail usage. The main reason for this is that since you have provided an in-comprehensible map of you proposed closures/usage restrictions it is only just to include wordage to allow for changes to be made to the initial usage restrictions.

RESPONSE:
After considering the comment, the document has been changed.  In section Management Common to Alternatives 2, 3 and 4, appropriate language has been added to recognize that, as a result of monitoring, adaptive management, or other factors, BLM would change conditions of use on any route in the approved RMP Amendment, after the appropriate environmental analysis, and public input.

| 180 | The Colorado Mountain Club |
| --- | --- |

Same as comment #164

| 181 |
| --- |

COMMENT:
If the current trend continues there will be very few trails left open to motorized travel, this will cause people to over-use what trails remain open. It will also rob future generations from enjoying and developing an appreciation of the outdoors. Concentrating motorized use into smaller areas is un-safe and not how I want to see my/our public lands managed.  There is enough land to satisfy all user groups, we all just need to work together and respect each other's right to enjoy public lands.

[A-96]

BLM_0014793

# Appendices

RESPONSE:
Thank you for the comment.  The BLM feels the number and mileage of routes in the Proposed Action appropriately addresses land health issues in the planning area, as well as maintains adequate motorized travel routes.

COMMENT:
Have reviewed the maps on the BLM website and find it hard to actually locate trails on the map I know exist on the ground, thus making it difficult to comment on actual trails.  Have ridden most of the singletrack trails in this area and cannot see why any of it would be closed to motorcycles, I rarely see any other trail users in this area and do not see any type of resource damage occurring in the area.  I feel all the existing trails should be signed and should remain open, please consider my comment and mark me in the "No Action" column, but I do believe the trails need to be signed and accurate maps need to be created.

RESPONSE:
Please see the text on page 20 of the Draft document that addresses the concern in this comment: The official agency map made available to the public showing designated routes would be used to determine if travel is permitted and authorized on a particular route during any part of the year.  Signs may be posted on routes that provide information as to whether travel on a particular route is permitted.  However, users would be responsible for understanding and following the restrictions on the map(s) and please refer to response in comment #151.

| 182 | Southern Rockies Conservation Alliance |
|---|---|

Same as comment #164

| 183 |
|---|

COMMENT:
1.  The preferred alternative closes the northeastern corner of Cushman Mesa (sections 27, 28, and 33) in sub region D to traditional 4 wheel drive and ATV vehicles used for hunting access.  This is a popular hunting area which does not show evidence of significant resource damage.  It is suggested that access routes #543 and #585 remain open to ATVs during the big game seasons across Sections 33, 28, and 27 to assist in game retrieval.  Looped access on route #543 could also be accomplished in part by utilizing the 2 existing intersections of route #543 and #585 in Sections 27 and 28 to circle and return traffic to the main road.

RESPONSE:
See response in comment #173

COMMENT:
2.  The preferred alternative does not allow for random off road retrieval of game with motorized or mechanized vehicles because of general land health concerns.  However, the

[A-97]

# Appendices

alternative 2 vegetation assessment within the Environmental Assessment document (pg. 139) identifies that vegetative recovery of closed routes - which would be the most severely disturbed and heavily impacted travel areas - is anticipated to take from 3 to 10 years.  This rapid rate of recovery in the most heavily disturbed areas does not seem to support a valid concern over the short term disturbance in minimally impacted, randomly accessed areas.  The use of muscle-powered carts is identified as the alternative to motorized or mechanized game retrieval.  This is not a realistic option for the average Colorado hunter and would negatively impact the ability to hunt in this area.

RESPONSE:
Mechanized equipment would be permitted to retrieve downed game during recognized hunting seasons. The BLM included this use limitation regarding motorized equipment in order to help prevent the further proliferation of new motorized or other routes, primarily for land health concerns. The BLM is concerned with the proliferation of new user created routes that would continue to occur if random off road retrieval of game with motorized equipment were to continue.  Some discussion of impacts from off-route driving for game retrieval is found on pg 138. While vegetation impacts from off-road travel to retrieve game do not approach the level of impacts from established routes, the off-road travel does cause some level of vegetation degradation in the form of crushed plants, disturbed soil surfaces, and often the spread of weed seeds into these disturbed soils. These effects are made worse if other off-route drivers follow the initial game-retrieval track. The document predicts vegetation recovery on closed routes to occur within 3-10 years, and that recovery of the crushed vegetation from a onetime pass would probably occur in less than three years. However, any weeds that were spread off of the main route would not be expected to diminish over time, in fact they would be very difficult to detect and manage since they would not be adjacent to the designated routes,  where weed control would be focused. Therefore, off-route travel would remain a source of vegetation degradation that represents a valid concern.

COMMENT:
3. As a general comment, the preferred alternative appears to go too far in closing too much multiple use access.  The preferred alternative presents an unbalanced approach.

RESPONSE:
The Proposed Action maintains sustainable motorized access to the public lands in the planning area for a variety of users, including for motorized recreation opportunities in the form of 4WD touring, rock crawls, ATV trails, single track motorcycle riding, hiking, horseback riding, and other uses. The Proposed Action also would result in improved land health conditions.

COMMENT:
This action which will lead to perpetual enforcement problems without achieving the intended land health improvement objectives.

RESPONSE:
The Implementation and Monitoring Plan that would be prepared for the RMP Amendment

[A-98]

BLM_0014795

# Appendices

would include processes for determining how successfully improvements are being made in improving land health conditions.  If adjustments would solve any continually occurring problems, then these would be made, which could include a multitude of actions.  Enforcement will always be a concern throughout the Uncompahgre Field Office, and on all public lands.  The BLM will provide enforcement within the capability of funding and resources.  Education and information for the public would assist with enforcement in that more than likely, if users know the routes that would be available for their particular activity, they would more than likely use them, rather than use a route where their activity may not be permitted.

| 184 |
| --- |

COMMENT:
I feel that the proposed Travel Management Plan for the Dry Creek Area does not accurately address the nature of the land or the uses that occur there.

RESPONSE:
After considering the comment, no change was made in the document.  The discussion on page 182 of the document regarding the characteristics of the planning area, along with the detailed information in Appendix 3, Sub-Region General Settings and Desired Future Conditions, provide the reader with a good baseline of the social, physical, and administrative settings in the planning area

COMMENT:
My experience in the basin is that the majority of users are on motorized vehicles or bicycles.  One occasionally encounters hikers near the Rim Road trailhead, but rarely if ever further into the backcountry.

RESPONSE:
The planning area does receive a lot of use by mountain bikers and motorists.  However, hiking and horseback use is heavy at times in the Camel Back Wilderness Study Area and other areas in the planning area.

COMMENT:
Nationwide, the loss of designated open areas in virtually all National Forests and most BLM lands means we will likely see essentially no trail creation from here on, only loss as individual trails are taken from us.

RESPONSE:
The Proposed Action provides for the construction of 16 miles of new routes in the planning area.  Please see the map of Alternative 2 that accompanies the document.

COMMENT:
The motorized community (and the MTB community) is losing more than just a few miles of

[A-99]

# Appendices

singletrack or ATV trails. I note that your plans include no mention of trying to create loops, or re-routing existing trails for one reason or another.

RESPONSE:
Please see proposed routes on the map of Alternative 2 that form loops as well as routes that would be relocated or re-routed in Sub-Region G and F. Also, the Proposed Action provides for the construction of 16 miles of new routes for motorized uses in the planning area. Please see the map of Alternative 2 that accompanies the document. On page 20 in the document is the Adaptive Management section that discusses relocation of routes in the Proposed Action alternative.

COMMENT:
I understand the need for quiet recreation areas however there are Wilderness areas and seem to be increasing with the new Public Lands Omnibus Bill.

Dry Creek is the optimal place to encourage multiple use. The BLM notes the increasing population of the area, as well as a growing percentage of that population that recreates with OHVs. By implementing any of the more restrictive options, the BLM will intensify user conflict, encourage trail damage, and worsen the user experience.

RESPONSE:
Please see response in comment # 147 and 183. Soils and vegetation impacts of concern regarding travel routes, and the responses to comments in this letter thoroughly explain these concerns.

COMMENT:
If seasonal closures are to be implemented for game management purposes, please show us the science that justifies that closure. Everything I have read shows that a hiker with a dog has far more impact that a motorcycle on game populations. All users should be prohibited if the health of the game is the objective.

RESPONSE:
Within the Dry Creek Travel EA, an explanation (the science) was given for the effects to wildlife species due to OHV-related activities (see Threatened, Endangered and Sensitive Species, p 87-89; Migratory Birds, p 73; Terrestrial Wildlife, p 152; Aquatic Wildlife, p146-147). Non-motorized/mechanized disturbance can also be an issue for the same reasons as motorized/mechanized modes of travel, however motorized and mechanized modes of transportation can, generally, go farther and faster than non-motorized/mechanized modes of transportation. Motorized travel also generally creates greater amounts noise. A generalized example of potential distances traveled during a typical visit to the Dry Creek Travel area using four general modes of transportation are as follows: a hiker at an average speed of 3 mph could travel 3 miles in an hour and 12 miles in a 4 hour period and 24 miles in an 8 hour period; mountain biker at an average speed of 7 mph could travel 7 miles in an hour and 28 miles in a 4 hour period and 56 miles in an 8 hour period; a motorcycle/ATV rider at an average speed of 20

[A-100]

BLM_0014797

# Appendices

mph could travel 20 miles in an hour and 80 miles in a 4 hour period and 160 miles in an 8 hour period; and a person in a full size vehicle at an average speed of 30 mph could travel 30 miles in an hour and 120 miles in a 4 hour period and 240 miles in an 8 hour period. It was assumed that non-motorized/non-mechanized travel would be highly limited in the seasonally restricted areas due to cold weather, muddy or snowy conditions, and limited accessibility. Currently we have limited information on effects of non-motorized/non-mechanized on wildlife. Through Adaptive Management and monitoring of our seasonal closures, if additional protections are needed, BLM would change travel and/or use (see EA, Adaptive Management, pg 20. Changes to the transportation network (new routes, reroutes, or closures) in "limited" areas may be made through activity level planning or with site-specific National Environmental Policy Act (NEPA) analysis (WO IM 2008-014).

COMMENT:
I encourage the BLM to use the volunteer resources available to upgrade and maintain the trails in this area instead of merely closing them. Many of the roads and trails designated will need periodic maintenance and monitoring in order to prevent impacts from occurring. Volunteers will be essential in helping keep up with trail maintenance and monitoring throughout the life of the travel management plan.

RESPONSE:
BLM looks forward to working with many organizations and clubs who have already expressed interest in helping with these tasks and other tasks to help implement the Dry Creek Travel Management Plan. Volunteers will be incorporated in the development of the Implementation and Monitoring Plan for the Dry Creek area.

| 185 | Public Access Preservation Association |
|---|---|

COMMENT:
To simplify the public comment process, it would be preferred to have the routes identified with road/trail numbers or names. The 4 alternatives for the Dry Creek Area do not fully take into consideration the increased use of OHV's or the traditional uses and nature of this area. Access to the Dry Creek Area has resulted in a road and trail system to meet the needs of the communities. Reducing or closing these roads and trails unnecessarily will be to the detriment of the local communities that utilize this area.
The Needs and Purpose section of the Travel Management Plan does not justify the proposed 4 alternatives and subsequent significant closure of areas. It is easy to manage by closure but this does not serve the public. It appears that arbitrary decisions are proposed.

RESPONSE:
See response in comment # 152. No areas in the planning area have been designated as closed. The Proposed Action discusses a balanced alternative that allows for all types of vehicular travel in the planning area while helping to improve land health.

BLM_0014798

# Appendices

COMMENT:
The following specific comments are based on your currently revised 4 alternatives:

- We strongly disagree with the seasonal closures; especially the date set as late as April 15. If you feel that seasonal closure is necessary, it should be adjusted to allow public access no later than March 15.  The seasonal closures are not supported with any scientific data or facts. This area is usually empty of wintering game by early March. The area is dry and supportive of usage by mid-March. Also closing an area to some users but opening it to other users is not fair and equal use.

RESPONSE:
See response in comment #150

COMMENT:
- You are ignoring an important fact that there is an average 13% to 14% increase in OHV registrations yearly. Arbitrary closure of areas is not serving the public.

RESPONSE:
No areas in the planning area have been designated as closed.  The Proposed Action discusses a balanced alternative that allows for all types of vehicular travel in the planning area while helping to improve land health.

COMMENT:
The current alternatives do not provide a plan for additional new motorized routes in the future. Regions A and C on your maps do not provide any of the existing motorized single track.

RESPONSE:
In the Proposed Action, there are about 122 miles of routes that would be available for motorcycle use in these Sub-Regions and about 23 miles of non-motorized single track routes that would be available for hiking, horseback riding, and mountain biking and the route designations in those sub-regions are consistent with the desired future conditions (see appendix 3).

| 186 | UVTR and Thunder Mountain Wheelers |
|-----|-------------------------------------|

COMMENT:
Must be fairness and equitable allocation of use of public land or it is not public.

RESPONSE:
BLM feels that the Proposed Action is a balanced alternative for public access and providing for land health.

[A-102]

BLM_0014799

# Appendices

COMMENT:
Currently there are approximately 133,000 OHVs registered in Colorado. I believe there are more ATVs than any other type of OHV in this area. There are not enough miles of ATV routes designated and riding roads with ATV is not a quality experience. As the population continues to grow as you point out in your plan, those 35 miles will be seriously over used and damaged, not intentionally but unavoidably due to the extremely limited allocation of trail mileage.

RESPONSE:
See response in comment #156

COMMENT:
Want more overlook opportunities.

RESPONSE:
See response in comment #156

COMMENT:
User conflict is a frequent topic in your plan document. Conflicts on the trail can be minimized, however, by adopting and widely publicizing two simple rules. 1, emphasize tolerance and courtesy. It is amazing what a smile or a wave and mutual respect contributes to the pleasure of a ride. Everyone wins from this type of encounter. 2, Extend the rules governing pedestrian and motorized traffic that are applied for In town and on all highways to the public lands.

RESPONSE:
Thank you for the comments. Education on the ground, including personal contacts with visitors, would be included in the Implementation Plan for the RMP Amendment, in order to assist with reducing user conflicts. The regulations and rules for managing motorized travel on public lands would provided a foundation for that education.

COMMENT:
There is a massively disproportional allocation of area for motorized and non-motorized recreation, they have the option to hike/ride on non-motorized trails or across open land if they insist on total solitude.

RESPONSE:
The Proposed Action would maintain about 315 miles of motorized routes, including 32 miles of county roads, and about 72 miles of routes designated for non-motorized uses. No public land areas in the Proposed Action are allocated for exclusive use by either motorized uses or non-motorized uses.

COMMENT:

[A-103]

BLM_0014800

# Appendices

Currently the motorized user community supports trail maintenance efforts with volunteers and grant monies, probably more than any other group. When you take away about 40 percent of motorized access to "public lands" this objective may be difficult to achieve within the motorized community. This disproportional allocation of resources to one special interest group promotes distrust and disrespect within the motorized groups which could easily translate into less support for BLM efforts.

RESPONSE:
Please see the response to the comment immediately above. The BLM would hope that the OHV and non-motorized organizations would continue to support BLM efforts in providing a balance of available travel routes, while improving land health concerns in the planning area.

COMMENT:
SPECIFIC COMMENTS    (Comments are based on the data in the Alternative 2 map.)

The maps provided to the public for comment do not include trail numbers or names or latitude/longitude lines, so making specific comments in any given area is difficult.

RESPONSE:
See response in comment #179

COMMENT:
In sub-region C many of the trails have seasonal closures. In the spring this closure extends to April 15th. In the area directly above the Dry Creek area the Forest Service has no closures for vehicles under 50 inches wide. This inconsistency by BLM will effectively close an important area for early spring riding for motorized users. There are studies conducted by unbiased parties not funded by special interest or Government groups that indicate the presence of motorized vehicles, as long as they are not in the "threat zone" of wildlife, are not any more traumatic to wildlife than foot traffic. I have personally observed this to be true many times and have pictures to prove it. I would therefore request that the closure season in the Dry Creek area be reduced to 1 March or eliminated as the Forest Service has seen fit to do. Perhaps it would be beneficial for BLM to consult with the Forest service on the winter and spring trail closure issue. The Forest service has chosen, for the most part, to exempt vehicles under 50 inches in width from closures.

RESPONSE:
See response in comment #150

COMMENT:
A short section of the Cushman Mesa trail needs to be open to ATVs. The Forest Service has expressed interest in widening about .2 miles to create a loop from the power line on Transfer Road, up Cushman Mesa, over to Transfer Road and back to the power line via Transfer Road or trails across BLM land.

[A-104]

# Appendices

RESPONSE:
See response in comment #156


COMMENT:
It appears that in sub-region D there are two very short sections of road that lead from the main road to Olathe Reservoir that are closed, the map is unclear. These sections need to be reopened.

RESPONSE:
See response in comment #160


| 187 | Uncompahgre Valley Trail Riders |
|---|---|

COMMENT:
Limited choices for ATV trails. All one has to do is look at the colors of the routes on your proposed travel maps to appreciate what a huge discrepancy there is between the ATV routes and other routes. Sharing with 4WD is not the most rewarding exp.

RESPONSE:
See response in comment #156


COMMENT:
I would request that some changes be made to Alternative 2 to make it more palatable since Alt 4 is not a choice:

1. The seasonal closures to April 15 for most of the routes in the portions of sub-region C, D, and F should either be completely removed or at least moved back to mid-March.

RESPONSE:
See response in comment #150


COMMENT:
2. I request that the route at the far southwest end of Cushman Mesa that leads to the Forest boundary (in sub-region D), and now part of the Tabeguache bicycle trail, be converted to an ATV route.

RESPONSE:
See response in comment #156


COMMENT:
3. I request that some of the spur routes be retained on the northeast end of a few of the trails in sub-region F that lead to delightful canyon rims that overlook Shavano Valley. Also, there were a couple of loop routes that were removed in Alternative 2 in this area.

[A-105]

# Appendices

RESPONSE:
See response in comment #156


COMMENT:
4. Reinstate the ATV 2 track route in the Cushman Creek drainage area as shown in Alternative 4, rather than changing it to a purple single track route as shown in Alternative 2. Is there really that large an increase in single track users compared to 2 track users? I doubt it, and anyway, the single track users can still use the 2 track routes but not vice versa. I seriously doubt that the increased number of bicycle and motorcycle users is a great as the number of ATV users.

RESPONSE:
After considering the comment, no changes were made.  The route in question is a route that has sensitive resource concerns.


COMMENT:
5. I fully support your desire to adequately sign the trail system. Obviously, a well-detailed map of the legal routes is mandatory, but we all know that many users don't carry them or the scale is so small that it is very difficult to actually see which trail is which.

RESPONSE:
Thank you for your comment.  BLM intends to work with users to provide a useful and easy to read map.


COMMENT:
6. I fully support the concept of developing loop routes rather than out and back trails because they provide better recreational experience as well as potentially reduce the impact on any given trail.

RESPONSE:
Thank you for your comment.


| 188 |
| --- |

COMMENT:
Process is flawed by having completely different maps than were presented in the November 2007 meeting and changing the guidelines in mid stream.  Almost impossible to comment specifically on the designated routes without numbers to identify them.

RESPONSE:
The maps made available to the public during the scoping process in 2007 were intended to present only options for the public to consider in order to generate input regarding travel management concerns in the planning area.  The written and graphic input received was

[A-106]

BLM_0014803

# Appendices

extensive and was used to develop the alternatives in the document. The different option maps were considered during the preparation of the alternatives presented in the document, but have been modified, and in some cases combined due in part to comments from the public during the scoping process.


COMMENT:
Majority of the proposed routes are not sufficient for loop type experiences.  Segregating use has severally compromised this activity.  Feel have over managed the whole area and should consider a more simplistic approach.  The proposed alternative is unrealistic, unsustainable, and doomed for user conflicts.

RESPONSE:
Please see response in comment #184 regarding loop trails. The proposed routes in the Proposed Action, along with the existing loop trails that are designated in the Proposed Action, would maintain a substantial number of miles of loop opportunities.  The BLM fees that the, conditions of use in the Proposed Action alternative, such as limiting use to certain types of vehicles, or seasonal closures, would benefit the overall experiences in the planning area for all users.  Please see the response to comment #186 regarding user conflicts.


COMMENT:
Don't agree with the seasonal closure dates for motorized use.  There is no scientific study information justifying the need for closure.

RESPONSE:
See response in comment #150


| 189 | MTRA Montrose |
|-----|---------------|

COMMENT:
Our preference has been an alternative to leave all existing routes open, identify each by name and or number and proceed with possible closures on the basis of merit and/or detriment.

RESPONSE:
The alternative the the comment refers to is Alternative 1 - No Action.  Please see the Need and Purpose for the Action section and the section on EFFECTED ENVIRONMENT/ENVIRNNMENTAL CONSEQUENCES for rational as to the selection of Alternative 2 - Proposed Action


COMMENT:
Significant problems with Alternative 2.
The users find a "significant damage to the resources of public access and recreational use as a result of Alt. 2.  Consider the current (FONSI) dated Dec. 2008, as incomplete, extremely vague, brief, and professionally unacceptable.

[A-107]

BLM_0014804

# Appendices

RESPONSE:
Please see response in comment #147.  The AFFECTED
ENVIRONMENT/ENVIRONMENTAL CONSEQUENCES section addresses the biological and
other science used to determine land health issues, and where these issues are occurring. The
Proposed Action is a balanced alternative that allows for the many uses that occur on public
lands in the planning area.


COMMENT:
Oppose seasonal closures that are not documented as needed and serve no specified or
measurable purpose and can't be fully effective if human disturbance is allowed by other uses.
There is a conflict between the opening date of Turkey season and the seasonal closure.  If
alternative 2 is the final choice, MTRA will be requesting much greater detail on scientific
research pertaining to individual and seasonal closures.

RESPONSE:
See response in comment #150 and response to the comment immediately above.


| 190 |
| --- |

COMMENT:
Would like more clearly marked trails.

RESPONSE:
After reviewing the comment, BLM addressed signing trails in the EA (see Description of the
Alternatives section under Management Common to Alternatives 2 (Proposed Action), 3, and 4.)
and will also be addressed in the Implementation and Monitoring Plan.


COMMENT:
Want to see more ATV trails designated in preferred alternative.  With the increase in registered
OHVs in State of Colorado and tourists being a large part of our state revenue, it would seem
that more trails would be created.  Support Alternatives 1 and 4.  Riding ATVs is the only way
older people have of reaching and enjoying many areas of the state.

RESPONSE:
See response in comment #156


| 191 | Resident of Beaver Hill Heights subdivision |
| --- | --- |

COMMENT:
Alt. 2 appears to provide adequate travel opportunities in Sub-region G and there are currently
two places where you can access which are both from hwy 90 and neither require crossing
private land.  However a third is proposed where the Old Paradox wagon road crosses the BLM
boundary which requires crossing private land.  The Old Paradox wagon rd, which apparently is

[A-108]

BLM_0014805

# Appendices

a Montrose County easement, is over-grown in most places and is currently impassable. Access would require major road construction and since there is already adequate access from hwy 90, tax dollars could be used for a better purpose than providing a third access.

Any access to the BLM in subregion G through BHH to the proposed staging area must involve all the stakeholders, especially the landowners impacted by an upgrade of the Old Paradox wagon rd. A resolution to the issue of BLM access can certainly be found but the process MUST involve all stake holders.

RESPONSE:
The staging area near the boundary of the subject subdivision is proposed in the event future legal public access is obtained to the public land boundary. If an action is taken by BLM in the future to obtain access to the BLM boundary, the BLM would involve subdivision property owners and others that might be affected by such an access route.

| 192 | Colorado Plateau Mountain Bike Trail Association |
|---|---|

COMMENT:
Map was provided with comments

Don't agree with the reference of mechanized for mountain bike use. Want to be referred to as non-motorized trail users. Attachment provided from IMBA

RESPONSE:
Thank you for the comment and the information. The BLM uses the term "mechanized" to mean Moving by means of mechanical devices such as a bicycle; not powered by a motor. The term is not intended to lessen the importance of the non-motorized equipment users on public lands, but is intended to classify the use and users of this equipment, similarly as "motorized" is used to classify users and uses of motorized equipment.

COMMENT:
Support Alt. 2 however with some exceptions
Support winter closures for wildlife concerns
COPMOBA offers its volunteer team and trail building expertise to assist the BLM in the construction of proposed trails.

Recommend the following changes:
1 Keep Long Gulch Trail open to mountain bikes

RESPONSE:
After considering the comment, no changes were made to the route. The route in question is a route that has numerous sensitive resource concerns as well as maintenance concerns due to erosion.

[A-109]

# Appendices

COMMENT:
2 Sub-region C - keep Phantom Canyon (route #1271) open to mountain bikes

RESPONSE:
After considering the comment, no changes were made to the route. The route in question is a route that has erosion and sediment concerns.

COMMENT:
3 Keep open single track connector on route #1108 in Cushman Creek

RESPONSE:
After considering the comment, no changes were made to the route. The route in question is a route that has sensitive resource concerns.

COMMENT:
4 Consider a change on route 439 to ATV designation on Cushman Mesa

RESPONSE:
See response in comment #156.

COMMENT:
5 Keep routes 730, 731 open to mountain bikes (adjacent to Coyote Cutoff)

RESPONSE:
See response in comment #150.

| 193 | Thunder Mountain Wheelers ATV Club |
|-----|-----------------------------------|

COMMENT:
TMW and its members respect the planning team and their efforts to provide the info necessary to allow the public an opportunity to comment and provide data to assist the decision making process.

TMW asks that BLM be mindful of the changing and increasing demographics in the final plan. Need to carefully plan for the increased use by providing recreational loop trails of the OHV users.

RESPONSE:
See response in comment #184.

[A-110]

BLM_0014807

# Appendices

COMMENT:

Route and Trail Comments

The Dry Creek Area is primarily a late fall and early spring riding opportunity area and with the reduction of riding opportunities further reduces it with seasonal closures. To continue to reduce the availability of riding opportunities when knowing the user group is increasing or having a travel plan restrictive for no logical reason creates increasing susceptibility for the creation of unauthorized or bandit trails and creates problems with enforcement and management.

Biggest problem is with the seasonal closures - don't know what the reason is for the closure to extend to April 15th each year. Having ridden the area for years and personally being from the local area, it is well documented that wildlife has long left the Dry Creek area by April 15th. April 1st is more reasonable and would logically fit with the local wildlife concerns.

RESPONSE:

See response in comment #150

COMMENT:

TMW feels that the travel management plan implementation, requires using signs, maps, and other visitor amenities and should be accomplished with tolerance and understanding. TMW extends an invitation to the BLM to help educate the public on the plan.

RESPONSE:

The implementation plan would contain all the topics in the comment. Thank you for the offer. The BLM welcomes the invitation.

| 194 |
| --- |

COMMENT:

I honestly feel the BLM has already made their discriminatory Travel Plan decisions as to which user groups get what trails. I believe some of the decisions are biased and not realistic.

RESPONSE:

The Proposed Action is a balanced alternative that addresses land health issues as well as the many other issues regarding travel management decisions. Please see the responses to comments in this section that address land health and the mix of recreation travel concerns. No decision has been made concerning either alternative in the document.

COMMENT:

Some trail use and closure decisions I believe create loss and harm to different visitor groups based on lack of access and disregard for loop opportunities. I have reviewed the available maps and have seen some additions where user groups have confessed a few of their loop trail systems missing on your earlier maps, just to have said trails closed on the new Alternative 2 preferred action. Not good. Shows us the BLM's anti-objective towards the motorized/mechanized community.

[A-111]

BLM_0014808

# Appendices

RESPONSE:
The BLM has accepted new information from the public regarding routes that were displayed on the 2007 maps used in scoping.  During the preparation of the RMP Amendment, this new information was used to create alternative maps.


COMMENT:
I deliberately ask a few questions within my comments submitted last year. None were answered. This also makes me believe the BLM is following what they have to complete legally to implement their already made decisions. In other words I feel public comments especially from the motorized community really do not count.

RESPONSE:
Thank you for submitting comment during the scoping process.  The comments submitted during the scoping process pertained to multiple use management, including motorized uses and non-motorized uses. None of these comments were responded to directly by the BLM, but instead were summarized and presented in the document. The comments were further used in alternative development to help BLM with route selection, conditions of use, selection of locations for travel management support facilities, and for other purposes. The scoping comments submitted with this letter are reproduced for the benefit of the readers.


COMMENT:
However do oppose to the seasonal closure but not in its entirety.  The April 15th date is too long.  Would like to see a less restrictive wildlife closure and not arbitrary dates.

RESPONSE:
See response in comment #150


COMMENT:
Problem that the trails do not have any numbers identified on them and makes it hard to comment.

RESPONSE:
See response in comment #179


COMMENT:
Notice a definite disregard for multiple use access and loop opportunities.  Would appreciate the opportunity to make trail to trail comments for re-consideration before you implement your decision.

RESPONSE:
Please see the responses in this section to comments addressing loop trails.  The Proposed Action maintains access for a variety of users, and recognized access authorized in existing permits,

[A-112]

BLM_0014809

# Appendices

such as livestock grazing permits or right-of-way grants.

COMMENT:
Would like to see wording the BLM would consider re-designation of trails if necessary in the future not just the addition of trails.

RESPONSE:
Please see response in comment #179 regarding changes that have been made pertaining to re-designation of trails.

COMMENT:
Don't understand how the oppression of motorized/mechanized uses on multiple use public lands will be beneficial to the surrounding community's economy.

RESPONSE:
Please see response in comment #152.

COMMENT:
Partial list of the most important trails would like the BLM to look at for re-consideration of designation before finalized.

Sub-region A - 1056/1057 need to remain as an ATV designation; 1278 proposed ATV should remain as such - creates better access from 25 Mesa Rd.; 1280 is completely missing and an important part of a loop; 1279, 1290, 1281, 1292 allows access to 1014 and would be great as an ATV trail; 1277 should also be designated as ATV to allow access from 25 Mesa Rd to Monitor Mesa Jeep rd.; 1014  Long Gulch should be singletrack if not ATV - horse and foot have the WSA to enjoy nearby.

RESPONSE:
After considering the comment, no changes were made.  The designations of routes in Sub-Region A are consistent with the desired future conditions for the area and most of the routes mentioned are proposed routes or currently cow trails.  All the trails have sensitive resource concerns as well as erosion concerns.  Also see comment #192.

COMMENT:
Sub-region C - 971, 974 should be reconsidered as an ATV route; 1271 Phantom Canyon should be designated as mountain bike; 817 should be open - it is a scenic route.

RESPONSE:
After considering the response, no changes were made. Route 817 has sensitive resource concerns but a spur route has been left open to enjoy the scenic views of the canyon.  Route 1271 - See response in comment #192.  Route 971 and 974 also have sensitive resource concerns and a

[A-113]

BLM_0014810

# Appendices

route has been maintained on the rim as well as opportunities to access the rim with other routes. Also see response in comment #145.

COMMENT:
Sub-region D - 1104 Dry Creek Basin Jeep Rd old historic jeep road and should remain that way; 629, 634 should be ATV; 389 want road to continue to 490 to complete a loop; 374 what is the reason to close this route?

RESPONSE:
After considering the comment, no changes were made.  See response in comment #153 for route 1104; Route 629 and 634  have sensitive resource concerns; route 2001 or the route that continues to 490 has sensitive resource and maintenance concerns; and route 374 is in an area were Land Health Standards are not being met.

COMMENT:
Sub-region E - 1072 4x4 loop opportunity please reconsider; 681 please reconsider opening back up; 647 why is it closed; 679 please reconsider for loop opportunity; Proposed hardened camping area contains a lot of closed routes in its proximity - will these routes continue to be utilized by the public?

RESPONSE:
After considering the comment, no changes were made.  Route 1072 and 679 has sensitive resource, erosion concerns and is in an area were Land Health is a concern; 681 is proposed open in the proposed alternative; 647 is designated as a specialized route; some of the routes around the proposed hardened camping area have been proposed closed and through Adaptive Management and monitoring, BLM could make changes to travel and use (see EA, Adaptive Management)

COMMENT:
Sub-region F - 1149 PR, 1150PR should be reconsidered as singletrack motorized; 1151PR/355, 1152PR/525/535 should be reconsidered as ATV routes.  Very confusing with all the admin routes.; 98 loop now closed to everyone please reconsider; 27 please reconsider for scenic jeep route; 110 this is a predominant access route for many other visitors not just bicycles to complete a loop to and from hwy 90 - very important reconsider.

RESPONSE:
After considering the comment, a few changes were made to some of the routes mentioned. 1149PR, 1150PR, 1152PR, 525, 535, 355 were re-designated as ATV routes.  The rest of the routes remained the same - 98 is in an area where Land Health Standards are not being met; 27 has sensitive resources and land health concerns; and see response in comment #150 for route 110.

[A-114]

BLM_0014811

# Appendices

COMMENT:
Sub-region G - 1212PR, 75, 128, 129PR all need to remain as singletrack motorized - loop with 37 very important loop

RESPONSE:
See response in comment #150


COMMENT:
I do commend the effort that went into this project created by the BLM.

RESPONSE:
Thank you for your comment.


Past Comments that were submitted with this comment are on file at the Uncompahgre Field Office and these comments were considered during the preparation of Dry Creek Travel Management Plan EA.

[A-115]

BLM_0014812

**U.S. Department of the Interior**
**Bureau of Land Management**
**2465 South Townsend Avenue**
**Uncompahgre Field Office**
**Montrose, CO 81401**

# Decision Record
### (CO-150-2008-33 EA)

**PROJECT NAME:** Dry Creek Travel Management Plan

**INTRODUCTION:** BLM has completed an environmental assessment (EA) for the Dry Creek Travel Management Plan. The EA analyzes two decisions: 1) an RMP amendment change to OHV designations; and, 2) implementation of route designations and other associated travel management regulations.

BLM issued a proposed decision in May 2009 to amend the 1989 Uncompahgre Basin RMP, which changed OHV Area Designations for the Dry Creek area from open and limited to limited. One valid public protest was received; this protest was denied and documented within the Director's Protest Resolution Report which can be found online at http://www.blm.gov/wo/st/en/prog/planning/protest_resolution/protestreports.html. The RMP amendment was made final with the signing of the Decision Record by the BLM Colorado Acting State Director on December 1, 2009.

This document describes my decision to implement a designated network of roads and trails analyzed in the environmental assessment for the Dry Creek Travel Management Plan.

**BACKGROUND:** The Dry Creek Travel Management Planning Area (planning area) is located on the lower east flank of the Uncompahgre Plateau and extends south from 25-Mesa Road/Delta-Nucla Rd to Dave Wood Road. The planning area is near Montrose, Olathe, and Delta, Colorado and contains approximately 110,500 acres of public land and approximately 4,500 acres of private land. The decision is for public lands only and does not apply to private lands without easements.

The Dry Creek Travel Management Plan/Environmental Assessment is available for review on the Uncompahgre Field Office web page at: http://www.blm.gov/co/st/en/fo/ufo.html.

**DECISION:** It is my decision to implement travel management actions and route designations described in the Proposed Action (Alternative 2) of EA # CO-150-2008-33 EA, which are briefly outlined below:

**Travel Designations:** Implement the Dry Creek comprehensive travel management network as depicted on the attached Proposed Action (Alternative 2) map – Entire travel management planning area.

The BLM transportation system in the Dry Creek Travel Management Plan will consist of:

- 317 miles of routes in the Motorized Single-Track, ATV-2-Track, and 4WD-2WD travel use categories for motorized and non-motorized travel.

- 9 miles of routes in the Specialized Trails travel use category for Technical 4WD and Motorized and Mechanized Trials bike uses.

- 67 miles of non-motorized routes consisting of 44 miles in the Non-Motorized & Non-Mechanized, Single Track travel use category for hiking and horseback riding, and 23 miles in the Non-Motorized Single-Track travel use category for hiking, horseback riding, and mechanized uses.

- 42 miles of routes in the Administrative Uses Only category available for hiking and horseback riding, but not for public motorized or mechanized uses.

- 8 miles of designated routes to allow users to travel off-route a distance no greater than 300 feet to camp or park. The centerline of these routes will be the point from which the 300 feet will be measured.

- 258 miles of routes to be closed to all motorized and mechanized travel.

- Approximately 16 miles of proposed route construction.

- 62.8 miles seasonally closed to motorized and mechanized travel from December 1 to April 15 **or** December 1 to March 31 to prevent disturbance to wintering big game. Any exceptions to the listed dates will be made by the authorizing officer and will be implemented according to appropriate notification and posting, and or according to other appropriate regulations.

**Design Features:** The following design features will be applied in the implementation of this decision.

- BLM re-routes or re-locations needed for erosion or other mitigation will be limited to a corridor 25 feet wide on either side of the centerline of all designated routes.

- Proposed routes will be designed and located such that Visual Resource Management Class Objectives will be met in order to reduce visual contrast and impacts. They will also be located away from riparian and wetland areas.   Surface disturbance will be kept to a minimum in order to maintain sufficient vegetation to protect soils, and the number of stream crossings will be kept to a minimum, in order to reduce impacts to wetlands and riparian areas.

- Ingress and egress locations for specialized routes will be kept to the minimum and constructed to reduce sediment to the greatest extent possible.

- Restoring natural drainage patterns, surface topography, and vegetation will be

2

BLM_0014814

considered and implemented as needed during rehabilitation of routes to be relocated or closed to travel.

- Improvements will be implemented at stream crossings to reduce channel and riparian impacts.

- If necessary, as use increases, dust generated in localized areas and from specific uses, seasons, or events will be reduced by either hardening surfaces on certain high use routes, watering or treating routes during certain times with approved dust abatement chemicals, or installing speed bumps or obstacles in certain locations in a safe manner to reduce speeds and resultant dust.

- Impacts to currently known eligible cultural properties will be avoided, minimized or mitigated in consultation with State Historical Preservation Office (SHPO). Where National Register eligible sites are known to be in danger or are currently being impacted by travel activities, routes will be closed to travel if necessary until the appropriate mitigation has been implemented. Proposed routes, parking areas and other facilities to be constructed under these alternatives will be intensively inventoried prior to construction or use. Where existing inventories are sufficient, standard discovery stipulations will apply.

- Stipulations contained in applicable existing laws and protocols will be applied to known Sacred Sites and Traditional Cultural Properties. Where such properties are known to be in danger or are currently being impacted by travel activities, routes will be closed to travel until the appropriate mitigation has been implemented. Proposed routes, parking areas and other facilities to be constructed under these alternatives will be intensively inventoried prior to construction or use. Where existing inventories are sufficient, standard discovery stipulations will apply.

- Informational/Directional signs will be installed where needed throughout the planning area, which will include kiosks on entry routes into sub-regions as appropriate. Signing for designated routes will be implemented by BLM over time and as funding allows.

- All routes will be appropriately signed with allowed uses and seasons of use. Because signs are at times vandalized or removed, the user is responsible for determining the correct mode of travel based on official maps. Official maps will be made available to the public.

- Design, construction and maintenance work for routes will be subject to the conditions and guidelines that create sustainable, low maintenance routes and maintain quality recreation. Maintenance of routes will be performed according to the implementation and monitoring plan to be prepared, BLM annual work plans, and as funding permits.

- Closures, rehabilitation and/or re-vegetation of routes will be performed according to the implementation and monitoring plan to be prepared, BLM annual work plans, and as funding permits. This could include reseeding, planting vegetation, such as willows,

3

BLM_0014815

and/or constructing barriers.   If any ground disturbance is required, such as ripping existing routes, digging post holes for fences, or using rangeland drills, the appropriate clearances will be conducted prior to implementation.

**Monitoring & Implementation:**  An implementation and monitoring plan will be completed. The implementation and monitoring plan will contain schedules and frequencies necessary to monitor and implement all decisions in the travel management plan.

Monitoring data will be used to assess resource conditions, identify resource conflicts, determine if resource objectives including land health standards are being met, and to periodically refine and update desired future conditions and specific management actions in a process known as adaptive management.  Monitoring tools will include, but will not be limited to, traffic counter data, on-site contacts and patrols, surveys, and analysis of use occurring.

**Enforcement:**  The official agency map made available to the public showing designated routes will be used to determine if travel is permitted and authorized on a particular route during any part of the year.  Signs may be posted on routes that provide information as to whether travel on a particular route is permitted.  However, users will be responsible for understanding and following the restrictions on the map(s).  Implementation of the approved travel management plan will include a strategy of educating users, utilizing law enforcement efficiently, developing maps for the public, and other tools to communicate that driving off of designated routes for motorized or mechanized uses is not permitted.

**Follow-on Actions:** The following actions will be implemented:

- Provide seven new staging areas, eight new trailheads, three new hardened camping areas, upgrade one existing staging area, and portal signs where needed.

- Maps, brochures, and educational material will be developed and made available for the public, in print and on the internet.

- Public access will be pursued in the Dry Creek Travel Management Planning area as opportunities arise.

- BLM administrative functions related to a variety of natural resource management objectives (e.g., wildlife habitat and species monitoring and management, noxious weed eradication, resource enhancement and restoration, and fence repair) that could potentially require cross-country travel using motorized vehicles or equipment off designated routes will be addressed at the project level on a case-by-case basis and with appropriate project specific and site specific environmental documentation and assessment.

- Applications for Special Recreation Permits (SRPs) will be considered, subject to the approved Travel Management Plan designated route system, the existing approved Resource Management Plan and Amendments, and appropriate environmental

4

documentation and stipulations that will be developed during the processing of these applications.

- All proposed routes in the approved Travel Management Plan will have the appropriate level of environmental analysis and documentation prepared, required clearances, and any necessary mitigation completed for cultural resources and special status plant/animal species and habitat before construction starts. Construction and maintenance work will be subject to the conditions and guidelines that create sustainable, low maintenance routes. These conditions will apply to any proposed route, regardless of the purpose of the route, and will help:
  - o Ensure that the designated routes in the approved Travel Management Plan will be considered in planning for new additional routes,
  - o Prevent impacts to public lands and resources, and
  - o Ensure that routes will be located properly and constructed with good design and planning.

- A weed management plan will be prepared and implemented that will identify all weed infestations and concerns on all routes and an action plan to eliminate or reduce noxious weeds.

- BLM will develop and maintain partnerships with key stakeholders to assist with managing and implementing travel decisions.

- The BLM, in cooperation with other agencies and organizations, will prepare and implement a public education program in a variety of formats to promote wise use on public land, and will include information regarding controlling noise levels while recreating on public lands. Colorado noise level standards pertaining to the operation of motor vehicles, including provisions in Colorado Senate Bill 08-063, and any pertinent regulations that will be promulgated will be incorporated. Accurate maps and other information relevant to travel management for public land visitors as well as contacting visitors on-site by BLM staff, volunteers, and partners will be a part of this program.

**RATIONALE:** The travel management plan will provide for a manageable mix of motorized and non-motorized uses. It addresses the key issues identified from scoping and provides a route system which will meet the project area's management goals and objectives. The plan was developed with careful consideration of BLM travel management strategies and policies and subjected to a thorough analysis of potential impacts to the area's resources and the route system's effect on public land health standards.

The Proposed Action does not constitute a major federal action having significant effect on the human environment; this has been documented in a Finding of No Significant Impact dated April 9, 2009, and thus, an Environmental Impact Statement is not required.

Best available data was used in the preparation of this EA, including the findings and analysis completed by the interdisciplinary team, supporting documentation and reports, and extensive public participation and open houses held throughout the process. BLM held an initial 30-day

5

public scoping period followed by two additional public comment periods within a 22-month period. An EIS for this project would not, in all likelihood, provide any significant new information.

**COMPLIANCE:** This decision is in compliance with the Uncompahgre Basin Resource Management Plan (1989), as amended in 2009, and major laws to minimize environmental impacts to public lands, including: Endangered Species Act of 1973 (P.L. 94-325); Migratory Bird Treaty Act of 1918, as amended (16 U.S.C. 703-712); Federal Water Pollution Control Act of 1948 (Clean Water Act), as amended (33 U.S.C. Chap. 26); Clean Air Act of 1963, as amended (P.L. 88-206); Federal Noxious Weed Act of 1974, as amended (P.L. 93-629, 7 U.S.C. 2801 *et seq*); National Historic Preservation Act of 1966, as amended (P.L. 89-665); Archaeological and Historic Preservation Act of 1974 (P.L. 86-253); Archaeological Resources Protection Act of 1979, as amended (P.L. 96-95); and Native American Graves Protection and Repatriation Act of 1990 (P.L. 101-601).

This decision is in conformance with BLM policy and guidance, under which designation of roads and trails are considered implementation decisions.

1. BLM policy on Off-Highway Vehicles (OHV) use of public land as covered under Executive Order 11644 and Code of Federal Regulations (43 CFR 8340 0-5) and

2. BLM Colorado guidance on *Comprehensive Travel Management Planning and OHV Designations* as defined under BLM Instruction Memoranda No. CO-2007-020 (2/12/2007) and No. WO-2008-014.

**APPEAL OPPORTUNITIES:** Within 30 days of this decision, you have the right of appeal to the Board of Land Appeals, Office of the Secretary, in accordance with the regulations at 43 CFR 4.400, and specifically, 43 CFR 4.410. Appeal and stay procedures are outlined in Form CO-1840-191. Appeals must be made in reference to specific route designations and other decisions made in this Decision Record.

NAME OF ENVIRONMENTAL COORDINATOR: Bruce Krickbaum

Review Date _____ 12/9/2009 _____

SIGNATURE OF AUTHORIZED OFFICIAL

_Barbara Sharrow_          _12-10-09_
Barbara Sharrow                      Date
Field Manager
Uncompahgre Field Office

6

BLM_0014818

**U.S. Department of the Interior
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401**

**Finding of No Significant Impact (FONSI)**

**CO-150-2008-33**

*Location:* This project is located within T. 47 N., R. 9 W, 10 W, and 11W.;  T. 48 N., R. 10 W., 11 W., and 12 W.; T. 49 N., R. 10 W., 11 W., and 12 W.; T. 50 N., R. 10 W., 11 W., 11 W., and 12 W.;  T. 51 N., R. 11 W. and 12 W.

*Project Name:* Uncompahgre Field Office Resource Management Plan Amendment of OHV Designations and Travel Management Plan in the Dry Creek Travel Management Plan Area

*Planning Unit:* Uncompahgre Field Office/Uncompahgre Basin

*Applicant:* BLM

**Background**

The Bureau of Land Management Uncompahgre Field Office (UFO) is preparing to amend the 1989 Uncompahgre Basin Resource Management Plan (RMP). The amendment would change current off highway vehicle (OHV) area designations for the Dry Creek Travel Management planning area.  BLM has prepared the Dry Creek Travel Management Plan - Uncompahgre Resource Management Plan Amendment/Environmental Assessment EA (DCTMP/EA) to analyze the environmental effects of the proposed action.

The proposed action (alternative 2) will amend the 1989 RMP, and is in compliance with BLM planning regulations in CFR 1601.0-1 to 1610.8 and the National Environmental Policy Act (NEPA).

**Finding of No Significant Impact**

I have reviewed Environmental Assessment (EA) CO-150-2008-33.  Based on the analysis of potential environmental impacts contained in the EA, I have determined that the Proposed Action, with the design specifications, will not have a significant effect on the human environment.



**Rationale**

This FONSI is based on my consideration of the Council on Environmental Quality's (CEQ) criteria for significance (40 CFR 1508.27), both with regard to the context and the intensity of impacts described in the EA.

Context:
The approximately 110,500 acres of public land is located on the Uncompahgre Plateau near Montrose and Olathe, Colorado.  Approximately 4,500 acres of private land, are within the boundary of the planning area, and would not be affected except for routes where there are existing or potential easements.  The current acreage of OHV designations on public lands include:

- 28,557 acres Open
- 10,668 acres Closed in the Camel Back Wilderness Study Area
- 1,964 acres Limited to Designated Routes Yearlong
- 69,375 acres Limited to Designated Routes from 12/1 through 4/30

Under the proposed action (alternative 2), all the current OHV designations, except for the Closed designation in the WSA, would be changed to **Limited to Designated Routes Either Seasonally or Yearlong.**  Under Alternative 2, the WSA, which is currently designated **Closed,** would continue to be designated and managed as **Closed** in order to comply with the Interim Management Policy for Lands under Wilderness Review.  Under Alternative 2, the acreage of OHV designations on public lands include:

- 0 acres OHV Open
- 10,668 acres OHV Closed in the Camel Back WSA
- 99,832  acres OHV Limited to Designated Routes Either Yearlong or Seasonally (Some routes would be closed to motorized and non-motorized vehicular travel from December 1 through April 15 or December 1 through March 31 to prevent disturbance to wintering big game and other wildlife).

Alternative 2 would also designate a system or network of routes.  This action designates the specific routes for motorized and non-motorized vehicles and devices, establishes conditions of use for designated routes, such as seasons of use, provides for rehabilitation of routes, and recommends the design and construction of facilities and improvements to support the Transportation Plan.

Intensity:
1) *Impacts that may be both beneficial and adverse.*
The beneficial effects of the Dry Creek Travel Management Plan (DCTMP) include the designation of routes, which should dramatically slow the proliferation of user-created routes.  This would slow the increase in resource impacts and habitat fragmentation occurring in this area.  It will also provide support facilities for motorized and non-motorized users, which will help to distribute use and potential impacts.

Adverse effects include increased motorized and non-motorized use of designated routes that may result in soil compaction as well as the potential crowding of routes that would have vehicle use limitations and other conditions of use.

2) *Degree of effect on public health and safety.*
The designation of routes separates some of the conflicting recreational uses. Signing and maps will clearly define which uses will be allowed on each route, so that users can be informed of the potential safety hazards of using a particular route. Closing and rehabilitating certain routes will remove potentially hazardous routes from the route network. Designing and constructing support facilities will help distribute use, which will potentially create a safer and more enjoyable experience for all users.

3) *Unique characteristics of the geographic area such as proximity to historic or cultural resources, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.*
There are no prime or unique farmlands or wild and scenic rivers in the planning area. The Camel Back WSA is within the area. Camel Back WSA provides the solitude and opportunities for primitive and unconfined recreation values necessary for designation as a WSA. The BLM, according to the Interim Management Policy on Lands under Wilderness Review, must protect these values through proper management. Within adjacent areas, UFO will close some routes and limit travel to designated routes (no off-route travel) on the others; this will enhance the wilderness qualities and values of the WSA.

4) *Degree to which the possible effects on the quality of the human environment are likely to be highly controversial.*
The BLM held numerous public meetings, distributed maps for public consideration, solicited and received public comments, conducted some on-the-ground meetings, and held individual meetings and interviews to discuss and address the affects of the action on the human and natural environment.

The effects on the quality of the human environment are controversial for some people but not for others. Alternative 2 fulfills the legal and regulatory mandates required of BLM to protect the public lands from resource impacts and provides a safer environment for the public. Alternative 2 also provides the best mix of travel opportunities that satisfy the desired future conditions established while reducing environmental effects in the long run, and resolves the many transportation issues identified by the public. Alternative 2 will restrict mechanized and motorized entry onto BLM lands from private lands (limited to designated routes), which could be controversial to some of the public. The EA follows established mandates outlined in the BLM national policy on Comprehensive Travel Management Planning, the Federal Land Policy and Management Act, and BLM Colorado standards for public land health.

5) *Degree to which the possible effects on the quality of the human environment are highly uncertain or involve unique or unknown risk.*

The effects of alternative 2 are not highly uncertain. Alternative 2 is anticipated to improve the overall quality of the human environment by limiting travel to designated routes. Sensitive

areas, such as sensitive plant areas, riparian areas, and wildlife winter range, would receive better protection.

Continuing with current management (alternative 1), would continue unregulated motorized and non-motorized travel, on-route and cross-country, and is anticipated to continue to result in the creation of new and unplanned routes, some in locations that are and could be hazardous to human health. Also, private property adjacent to public lands could continue to receive some degree of unauthorized entry by the public, affecting the owners of the private land.

6) *Degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.*
Alternative 2 requires the preparation of a comprehensive implementation and monitoring plan that will incorporate adaptive management principles to ensure that desired future conditions are met and all proposed actions are carried forward. The adaptive management principles will help ensure that successful implementation occurs and that needed adjustments will occur which may require simple mitigation measures (signs, barriers, rehabilitation) or more complex measures (reallocation of uses, changes in travel management designations). Should resource impacts be observed and documented as the result of implementing the implementation and monitoring plan, BLM will consider different corrective methods. Depending on the type of adaptive action, further environmental analysis or plan amendment may be required. A future action that may occur is the preparation of additional travel management plans on specific land areas in the UFO. The Dry Creek Travel Management Plan EA and the methodology to develop the travel management plan could be a model for future plans in the field office.

7) *Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.*
Alternative 2 does not produce any individual or cumulatively significant environmental impacts. Alternative 2 is anticipated to reduce the adverse impacts occurring from current management (the no-action alternative).

8) The d*egree to which Alternative 2 may adversely affect district, sites, highways, structures, or objects listed in or eligible for the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.*
The UFO operates under a programmatic agreement between the applicable local governments, the Colorado State Historical Society, and the Advisory Council on Historic Preservation. Site specific environmental documentation and assessment, and site surveys are completed for individual projects that involve ground disturbance.

The overall affect of designating routes in the TMP, closing all Open areas, and decreasing additional user established routes is positive for the preservation of historically, culturally and scientifically significant resources. Alternative 2 will provide protection to these important resources.

9) *Degree to which the action may adversely affect an endangered or threatened species or its critical habitat.*

Alternative 2 does not adversely affect any endangered or threatened species. Alternative 2 lessens impacts to the following Federally-listed rare plant species and their potential or known habitat: Uinta Basin hookless cactus (*Sclerocactus glaucus*), Canada lynx (*Lynx canadensis*), and yellow-billed cuckoo (*Coccyzus Americanus*). Alternative 2 also enhances core habitat for larger animal species susceptible to habitat fragmentation from potential effects of nearby suburban development.

10) *Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.*

Alternative 2 will not violate or threaten to violate any Federal, State, or local law or requirement imposed for the protection of the environment.

**Determination**

This Finding of No Significant Impact is based on the information contained in the EA and my consideration of criteria for significance (40 CFR 1508.27). It is my determination that: 1) the implementation of the proposed action will not have significant environmental impacts; and 2) the Proposed Action does not constitute a major federal action having significant effect on the human environment. Therefore, an Environmental Impact Statement is not necessary.

Approved:

_Barbara Sharrow_                                      _4-9-2009_
Barbara Sharrow                                        Date
Field Manager
BLM, Uncompahgre Field Office