✓ Jeeping, motorcycle riding.

✓ Balanced uses of recreation and extractions.

**Question 5.** **How you and/or your community/county/organization benefit from using public lands.**

✓ Not addressed.

**Question 6.** **What specific physical, social, and administrative activities, characteristics, and regulations you would have BLM maintain or change for you to achieve your desired outcomes or expectations while visiting public lands.**

| Characteristic | Maintain | Change |
|---|---|---|
| Physical Landscape Characteristics | ✓ Maintain public access. | |
| Social Landscape Characteristics | | |
| Administrative/Managerial Landscape Characteristics | ✓ Ouray cannot make suggestions to BLM about what to maintain because it hasn't had interactions with the agency and doesn't know what BLM does.<br>✓ Maintain minimal regulations. Additional regulations do not help, because law breakers will continue to break laws and law-abiding citizens are the only ones who suffer. | ✓ Allow local decision making. |

**Question 7.** **Specific BLM management actions that should be implemented to assure you can achieve your desired outcomes.**

✓ Retain public lands – do not see them for private development.

✓ Do not limit public access to BLM lands. It is obvious the nation is an aging population and needs the ability to access places with motorized vehicles.

✓ If there is only one existing route to an area, do not remove it and prohibit all access to areas.

Community Assessment for the Uncompahgre RMP Planning Area                    December 9, 2008
Meeting with City of Ouray                                                      page 4/5
**Final Community Assessment of the Uncompahgre Planning Area**            **C-130**
**February 2009**

BLM_0015174

**Question 8.  Partnership/collaboration opportunities between BLM and your community/county/organization.**

✓ Collaboration with the US Forest Service makes sense, but not with the BLM at this point.

| Potential Partners | Collaborative Role in Planning | Collaborative Role in Managing |
|---|---|---|
| Municipal Governments? | ✓ Possible recreation center (R&PP project?). | |
| County Governments? | | |
| Tourism Industry? | | |
| Community Residents? | | |
| Organizations or clubs? | | |
| Others? (State, etc.) | | |

**Question 9.  Other comments regarding:**

| Identified Issues | Comments/Suggestions |
|---|---|
| Public Lands | |
| The Land Use Planning Process | |
| This Small Group Discussion | |

**Question 10.  Describe your vision for surrounding public lands over the next 10 to 15 years.**

✓ Develop lands in a responsible way (leave land better than you found it).

✓ Maintain public access to everything and add access in areas, if possible.

**Question 11.  Is there an official vision statement for your community/county/organization?**

✓ Refer to Master Plan.

**5.  ACTION ITEMS**

✓ No action items identified.

Community Assessment for the Uncompahgre RMP Planning Area                    December 9, 2008
Meeting with City of Ouray                                                                              page 5/5
**Final Community Assessment of the Uncompahgre Planning Area**          **C-131**
**February 2009**

BLM_0015175

BLM_0015176

# APPENDIX D
# SAMPLE INVITATION LETTERS

BLM_0015177

BLM_0015178

# APPENDIX D
# SAMPLE INVITATION LETTERS

The BLM mailed invitation letters to stakeholder groups inviting them to participate in the community assessment process. Sample invitation letters are provided in this appendix. Somewhat different letters were provided to counties, community groups (i.e., communities, towns, and cities), and organizations (i.e., stakeholders). Invitation letters were mailed in late September and early October 2008.

BLM_0015179

This page intentionally left blank.

BLM_0015180



# United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401



IN REPLY REFER TO:
1610
(CO-150)

October 1, 2008

Mayor Kerry Welch
ATTN: Ms. Patty Parker, Town Administrator
Town of Norwood, Colorado
1670 Naturita St.
PO Box 528
Norwood, CO 81423

Dear Ms. Parker and Mayor Welch:

The Bureau of Land Management (BLM) Uncompahgre Field Office plans to begin revising their existing land use plan, also known as their Resource Management Plan, in the spring of 2009. To better prepare for the upcoming plan revision, the Field Office would benefit greatly by having input from local government, community, and key organization representatives regarding their relationships to surrounding BLM-managed lands, considering local and community issues. This input would help us accurately identify and consider important local values and issues and economic, environmental, or other concerns as they relate to surrounding public lands. We are proposing to gather this input in over 20 small-group meetings in the communities surrounding the public lands managed by the Field Office. The meetings will be made up of participants from the local communities. Please see the enclosed map for the revision planning area and the meeting locations. The objective of these initial meetings is to foster collaborative relationships and information sharing throughout the plan revision process and during implementation of the revised plan.

The BLM is asking for the participation of representatives and residents from Norwood and Redvale in a two-hour, informal, small group discussion. Third-party neutral facilitators from EMPSi and West Slope Mediation and Facilitation have been hired to organize, convene, and facilitate the informal discussions. We would like for 8 to 12 participants from Norwood and Redvale to attend and participate in the meeting in your area. The group ideally would be made up of a mix of elected or appointed officials, organization representatives, planning or other governmental staffs, or other key residents or local stakeholders who:

1) can represent, or are knowledgeable about, your organization and community,

2) have an understanding of, and preferably a working knowledge of, your local Town or planning documents,

3) have a vested interest in what happens on local BLM-managed lands,

4) are somewhat familiar with public lands in their local areas, or

5) are stakeholders in the local community.

Potential participants could include, for example:
- Mayors,
- Town Clerks or other local knowledgeable people,
- land use planning staff,
- planning commission member,
- the Chamber of Commerce Director,
- fire protection district chief and/or town/city fire chief,
- law enforcement personnel,
- community relation coordinators,
- visitor center personnel,
- emergency manager,
- environmental compliance officer,
- local Tourism Board member,
- local stakeholder group representative, or
- other key residents or community member

EMPSi will document each of the small group discussions, highlighting major themes, issues, and recommendations of the sessions. These summaries will not attribute specific comments to individuals. Notes from individual sessions will be shared with participants for review and comment. A report summarizing the results of all the small group discussions, highlighting major findings and common patterns that emerge from the sessions, will be provided to participants and will be available to the public. This report will also be used to support the RMP revision process. A BLM representative will attend and observe the meetings, and would be there to answer questions if needed.

The following date and time has been set aside for the meeting in your area: **October 29, 2008, at 2:00 pm. Please notify Mr. Bill Bottomly at (970) 901-9079 by Wednesday, October 15, 2008, if this date works for the participants you select for this meeting.** A meeting room that would hold the number of participants you anticipate, plus three additional people, will be appreciated.  If you do not have a meeting conference room available, please let Bill know so he can make other arrangements.

The BLM also asks that Town representatives bring any available or existing electronic and/or hard copies of all current and relevant local planning documents to the meeting for BLM to take with them to use during the plan revision process.

In addition, the BLM representative will be present at the end of the small group discussion to explain the role of cooperating agencies during the plan revision and to share some written information about the role of a cooperating agency.  The Council on Environmental Quality's

2

regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as cooperating agencies in the preparation of environmental impact statements, and in this case, for the plan revision. Specific information about cooperating agency relationships can be found at the following website.

http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

We look forward to hearing from you by October 15, 2008, regarding our meeting proposal, and to your later participation in our plan revision process. Please call Bill Bottomly at (970) 901-9079 or (970)240-5310 if you need additional information or have questions.

Sincerely,

Barbara Sharrow

Barbara Sharrow
Field Manager

Enclosure:    BLM Uncompahgre Field Office map
Potential participants with contact information

BLM_0015183

BLM_0015184



# United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401



IN REPLY REFER TO:
1610
(CO-150)

October 1, 2008

Commissioners Meinert, Albritton and Batchelder
Ouray County Board of County Commissioners
Attn: Michelle Nauer, County Clerk and Recorder
PO Box C
541 4th St.
Ouray, CO 81427

Dear Ms. Nauer and Commissioners Meinert, Albritton and Batchelder:

The Bureau of Land Management (BLM) Uncompahgre Field Office plans to begin revising their existing land use plan, also known as their Resource Management Plan, in the spring of 2009. To better prepare for the upcoming plan revision, the Field Office would benefit greatly by having input from local government, community, and key organization representatives regarding their relationships to surrounding BLM-managed lands, considering local and community issues. This input would help us accurately identify and consider important local values and issues and economic, environmental, or other concerns as they relate to surrounding public lands. We are proposing to gather this input in over 20 small-group meetings in the communities surrounding the public lands managed by the Field Office. The meetings will be made up of participants from the local communities. Please see the enclosed map for the revision planning area and the meeting locations. The objective of these initial meetings is to foster collaborative relationships and information sharing throughout the plan revision process and during implementation of the revised plan.

The BLM is asking for the participation of local representatives from Ouray County and your community, in a two-hour, informal, small group discussion. Third-party neutral facilitators from EMPSi and West Slope Mediation and Facilitation have been hired to organize, convene, and facilitate the informal discussions. We would like for 8 to 12 participants from Ouray County to attend and participate in the meeting in your area. The group ideally would be made up of a mix of elected or appointed officials, organization representatives, planning or other governmental staffs who:

1) can represent, or are knowledgeable about, your organization and community,

2) have an understanding of, and preferably a working knowledge of, your local planning documents,

3) have a vested interest in what happens on local BLM-managed lands,

4) are somewhat familiar with public lands in their local areas, or

5) are stakeholders in the local community.

Potential participants could include, for example:

- County Commissioners,
- land use planning staff,
- planning commission member,
- the Chamber of Commerce Director,
- fire protection district chief and/or town/city fire chief,
- law enforcement personnel,
- community relation coordinators,
- visitor center personnel,
- emergency manager,
- environmental compliance officer,
- local Tourism Board member,
- local stakeholder group representative, or
- other key community member

Enclosed also is a list of contact information for some key individuals in your area you may wish to contact as you consider potential attendees. There may be other key people not on this list.

EMPSi will document each of the small group discussions, highlighting major themes, issues, and recommendations of the sessions. These summaries will not attribute specific comments to individuals. Notes from individual sessions will be shared with participants for review and comment. A report summarizing the results of all the small group discussions, highlighting major findings and common patterns that emerge from the sessions, will be provided to participants, and will be available to the public. This report will also be used to support the RMP revision process. A BLM representative will attend and observe the meetings, and would be there to answer questions if needed.

The following date and time has been set aside for the meeting: **Wednesday, November 5, at 9:00 pm. Please notify Mr. Bill Bottomly at (970) 901-9079 by Wednesday, October 15, 2008, if this date works for your proposed participants and staff.** A meeting room that would hold the number of participants you anticipate, plus three additional people, will be appreciated. If you do not have a meeting conference room available, please let Bill know so he can make other arrangements.

The BLM also asks that county planning department representatives bring electronic and/or hard copies of all current and relevant local planning documents to the meeting for BLM to take with them to use during the plan revision process.

In addition, the BLM representative will be present at the end of the small group discussion to explain the role of cooperating agencies during the plan revision and to share some written information about the role of a cooperating agency. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as cooperating agencies in the preparation of environmental impact statements, and in

2

this case, for the plan revision. Specific information about cooperating agency relationships can be found at the following website.

http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

We look forward to hearing from you by October 15, 2008, regarding our meeting proposal, and to your later participation in our plan revision process. Please call Bill Bottomly at (970) 901-9079 or (970)240-5321 if you need additional information or have questions.

Sincerely,

Barbara Sharrow

Barbara Sharrow
Field Manager

Enclosure:     BLM Uncompahgre Field Office map
                    Potential participants with contact information

3

BLM_0015188

# APPENDIX E
# LEARNING FROM THE COMMUNITY ASSESSMENT PROCESS

BLM_0015189

BLM_0015190

# APPENDIX E
# LEARNING FROM THE COMMUNITY ASSESSMENT PROCESS

Listed below are the steps that were followed in conducting the community assessment meetings, followed by a discussion of conclusions that can be applied to the RMP revision process and to future community assessment efforts.

## E.1    PREPARATION FOR THE MEETINGS

### Agenda Preparation

Prepare the agenda with the BLM manager and key staff that will attend the meetings. Topics to be discussed and questions to be asked will guide all the meetings, and the use of an agenda should be consistent. In concert, prepare an expanded, step-by-step meeting agenda for facilitators. This tool helps keep the facilitator and recorder on the same page.

### Contacting Groups

Contact the group as soon as possible before the meetings. If possible, once members are aware of the process and purpose, consider having a BLM manager or other key employee attend a formal meeting to answer any standing questions the group may have.

### Initial Contact with Targeted Group (Elected Officials or Organizations)

Identify the key individual for each stakeholder group; the person could be a member of the group or an employee. This is an important task, given the importance of the meetings and the need to have written or electronic information distributed in a timely and appropriate manner.

The initial personal contact with a targeted group is the most important step in convening the assessment meetings. First impressions are important to most people, and the more favorable the better. Prepare for the conversation, and be prepared to consider another key contact person if it is obvious that the contact is less informed and not as close to the group as thought. Ask the

BLM_0015191

contact who they think should attend, once the meeting purpose is understood. Once the key contact is established, a personal visit is recommended, if possible.

### Working with the Key Contact

Regular and timely communication with the key contact is important for selecting potential attendees, scheduling, room setup and meeting logistics, and—most importantly—establishing a positive working relationship with the stakeholder group, since the key contact is in a position to provide information to the group and could facilitate or influence their attendance. Volunteer to assist the person wherever a need may exist. Communicate and work closely, often, and directly with the key contact in each community, county, or organization to stay informed on the progress being made and to learn the names and contact information of each potential participant.

### Elected Officials and Their Meeting Attendance

The BLM, meeting organizers, and facilitators would benefit from understanding the constraints that are placed on town, city, and county elected officials and how, where, and when they meet. Laws and rules that govern their attendance at meetings, either as a body or as individuals, are clear, sometimes dictating their attendance or nonattendance at meetings. Laws also may govern whether the meeting should be open to the public and whether the meeting will need public or legal notice. These "sunshine" laws and regulations are intended to create transparency in government in matters that affect voters and citizens.

### Potential Participants

Categories of potential participants include towns, cities, unincorporated communities, organizations, and other groups. It is important to select participants that have some knowledge about nearby public lands. Key participants include the following:

- Town or City Council or Trustee members, especially the mayors and mayors-pro-tem.
- County Commissioners, especially the chairperson.
- Key staff personnel, such as town, city, or county managers/assistant managers, planning department employees, engineering staff, weed coordinators, GIS staff where important, outreach staff, and appointed commissions (e.g., planning, recreation, or other related commissions or advisory groups).
- Chambers of Commerce officials and visitor information center staff.
- Extension agents.
- Resource Advisory Council members.

BLM_0015192

- Key citizens in the communities, especially in the unincorporated smaller communities. This task is difficult but could benefit the process greatly. An example is the attendee from the community of Paradox, a small community in the West End of Montrose County.

### Learn About the Stakeholder Group

Find out what issues are at play in the community or within the organization. Serious concerns need to be identified so as to learn how to deal with them if they come up, or avoid them if appropriate. Ongoing concerns could even lead to meeting cancellations or postponements, so be flexible and have dates that can be used in rescheduling meetings. Some groups may not really be ready to deal with these topics.

## E.2   CONDUCTING THE MEETINGS

The following items are important to remember when conducting community assessment meetings:

- Start on time and end on time.
- Stick to the agenda.
- Be flexible. Not every meeting will proceed as anticipated.
- Be aware of local elections, as some initial participants could be replaced.
- Have enough handouts.
- Provide contact information to participants.
- Get an understanding of the knowledge of participants about the BLM and nearby public lands as early as possible in the meeting so as to amend the agenda to suit the audience. The amount of public lands near communities differ, and some communities or groups may not have a wide understanding of public lands or their management.
- Establish the desired scope of responses early on with the group through maps or a verbal description of the area to be discussed. An example would be a meeting with a group that might represent the entire planning area or area being considered instead of simply the lands within a five-mile radius of a town or city.

## E.3   BLM MANAGER OR OTHER STAFF ATTENDANCE

It is important for BLM personnel to take the following items into consideration:

- The attendance of the local BLM manager is important, especially since relationships with unincorporated communities, towns, and cities may not be as close as those between BLM and counties.

BLM_0015193

- At a minimum, BLM managers could benefit both from the process and later relationships with the group by attending all meetings with organizations and counties.

- Attendance at all the meetings by the BLM manager would also benefit the existing or future working relationship between the BLM office and the group, but that is not always possible because of demands on time.

- The same BLM staff person or persons should attend every meeting.

## E.4    FOLLOW UP

As a follow up to each community assessment meeting, it is important to let participants know what will happen next and when, and what will become of the responses provided.

## E.5    CONCLUSIONS

The community assessment process was successful in meeting its twofold purpose of starting a dialogue between BLM and local communities and identifying issues of importance to these communities prior to starting the RMP revision process. The greatest benefit to the BLM may have been realized just by attending these meetings. The meetings permitted the Field Office manager and planning staff, as well as the invited participants, to observe and listen to town, county, and organizational officials in a facilitated environment in which all the topics were relevant and meaningful to all attendees. The dialogues established will potentially set the stage for more effective and informative outreach during the RMP revision process, and afterwards, during implementation. The networks established with town and city officials will potentially result in more interaction, cooperation, and involvement between these parties and the BLM.

The community assessment also yielded the important insight that while these communities are different and unique and have their own individual values, issues, and concerns, many of the communities do have common concerns. Based on the degree of similarity of identified values and issues, certain geographical areas within the RMP revision planning area could be grouped together for similar or common management. The data gathered from stakeholders, combined with socioeconomic data for the communities (Table 2-1), was used to develop a map of socioeconomic management units. These proposed management units, which are shown as Figure 4-1 of this report, can be used as a starting point in the RMP revision process.

While the community assessment process was largely successful, it could have been improved upon if those conducting the meetings had learned more about the groups before the meetings were held. However, having local facilitators greatly benefited the meetings, since knowledge about the BLM and nearby public lands, and some history and knowledge of the communities in the planning area, enabled timely issues and concerns to be identified and discussed.

BLM_0015194

# APPENDIX F
# INFORMATION ABOUT THE
# UNCOMPAHGRE FIELD OFFICE
# PLANNING AREA

BLM_0015196

# APPENDIX F
# INFORMATION ABOUT THE UNCOMPAHGRE
# FIELD OFFICE PLANNING AREA

The BLM Uncompahgre Field Office is in southwestern Colorado. The planning area is the Field Office boundary, excluding the area covered by the 2004 RMP for the Gunnison Gorge National Conservation Area. The planning area is composed of BLM; US Department of Agriculture, National Forest Service; US Department of Interior, National Park Service; and State of Colorado lands; private property; and the whole landscape (Figure 1-1 and Table F-1). The planning area encompasses approximately 3,216,790 acres in the following six counties: Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel (Table F-2). Within the planning area, 787,628 acres (24 percent) are BLM lands (surface lands and federal minerals). The planning area contains 1,276,179 acres of federal minerals under other federal land, as well as 294,291 acres of federal minerals under private and state lands.

**Table F-1**
**Land Status Within the Uncompahgre Field Office Planning Area**

| Land Status | Acres of Land | Percentage of Planning Area |
|---|---|---|
| Private | 1,131,706 | 35% |
| Local | 14,253 | <1% |
| State | 7,010 | <1% |
| BLM | 787,628 | 24% |
| National Park Service | 27,126 | 1% |
| US Forest Service | 1,249,067 | 39% |
| **TOTAL** | **3,216,790** | **100%** |

Source: BLM 2009

BLM_0015197

**Table F-2**
**BLM Lands by County within the Uncompahgre Field Office Planning Area**

| County | Acres of BLM Public Lands | Percentage of Planning Area |
|---|---|---|
| Delta | 178,153 | 23% |
| Gunnison | 13,182 | 2% |
| Mesa | 37,129 | 5% |
| Montrose | 478,248 | 61% |
| Ouray | 23,793 | 3% |
| San Miguel | 57,123 | 7% |
| **TOTAL** | **787,628** | **100%** |

Source: BLM 2009

Management direction that will be outlined in the RMP revision will apply only to BLM-managed public lands in the planning area and to federal mineral estate under BLM jurisdiction that may lie beneath other surface ownership. Federal mineral estate includes mineral estate underlying BLM public lands, federal mineral estate underlying privately owned lands, and federal mineral estate underlying state-owned lands.

Twenty-five distinct and diverse communities exist within the Uncompahgre Field Office; the communities have widely different economic bases, values, and resources, and include high-end resort communities, farm and ranching communities, coal mining towns, and others. The population growth in many of the counties is expected to be significantly faster than the statewide average over the next 25 years.

BLM lands within the planning area range from salt-desert shrub (at 4,700 feet elevation) to alpine forest (at 11,400 feet elevation). The area exhibits varied topography, geology, soil, and floral and fauna components, including desert scrub, riparian, sagebrush parks, pinyon-juniper woodlands, mountain shrub, ponderosa pine, and spruce-fir forests.

BLM_0015198

BLM

# U.S. Department of the Interior
# Bureau of Land Management

**DOI-BLM-CO-S050-2008-0064**
**Environmental Assessment**
**November 2009**

# Uncompahgre Basin & San Juan/San Miguel Resource Management Plan Amendments

*Location:* The planning area is located throughout the Uncompahgre Field Office, with exceptions. See Map below

*Project Name:* Amendment of OHV Designations in the Uncompahgre Basin and San Juan/San Miguel Resource Management Plans

*Planning Unit:* Uncompahgre Field Office

*Applicant:* BLM

**U.S. Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office**
**2465 S. Townsend Ave.**
**Montrose, CO  81401**
**Phone: 970-240-5300**
**FAX: 970-240-5368**



BLM_0015199

BLM_0015200

## TABLE OF CONTENTS

*ACRONYMS USED* ................................................................................................................................. 3

*PURPOSE AND NEED FOR THE ACTION* ............................................................................................ 4

Purpose for the Action ...................................................................................................................4

Need for the Action .........................................................................................................................4

*BACKGROUND\ INTRODUCTION* ...................................................................................................... 5

*DESCRIPTION OF THE ALTERNATIVES* .............................................................................................. 7

Management Common to Both Alternatives ....................................................................................7

Proposed Action...............................................................................................................................8

No Action........................................................................................................................................11

*ALTERNATIVES CONSIDERED BUT NOT BROUGHT FORWARD*.......................................................... 11

*SCOPING AND ISSUES* ...................................................................................................................... 12

Scoping ..........................................................................................................................................12

Issues and Concerns.......................................................................................................................12

*PLAN CONFORMANCE REVIEW* ....................................................................................................... 13

*RELATIONSHIP TO STATUTES, REGULATIONS OR OTHER PLANS* ..................................................... 13

*AFFECTED ENVIRONMENT / ENVIRONMENTAL CONSEQUENCES:*.................................................... 14

Critical Elements ...........................................................................................................................15

Other Elements...............................................................................................................................59

*CUMULATIVE IMPACTS SUMMARY* ................................................................................................. 78

*PERSONS / AGENCIES CONSULTED* .................................................................................................. 85

*INTERDISCIPLINARY TEAM* .............................................................................................................. 85

*LITERATURE CITED*........................................................................................................................... 86

*GLOSSARY* ....................................................................................................................................... 87

*APPENDIX INDEX* ............................................................................................................................ A1

Appendix A...................................................................................................................................... A2

Appendix B...................................................................................................................................... A4

Appendix C...................................................................................................................................... A6

Appendix D...................................................................................................................................... A9

Appendix E.................................................................................................................................... A12

BLM_0015201

## ACRONYMS USED

| | |
|---|---|
| ATV | All-Terrain Vehicle |
| BLM | Bureau of Land Management |
| EA | Environmental Assessment |
| NEPA | National Environmental Policy Act |
| OHV | Off-Highway Vehicle (Off-Road Vehicle) |
| RIZ | Road Influence Zone |
| RMP | Resource Management Plan |
| RMPA | Resource Management Plan Amendment |
| UFO | Uncompahgre Field Office |

## PURPOSE AND NEED FOR THE ACTION

### Purpose for the Action

The purpose of the Proposed Action is to address:

1. Existing and future land health concerns relative to travel management expressed in recently completed Land Health Assessments (available at the Uncompahgre Field Office);

2. Issues raised during the scoping period regarding OHV management, especially the proliferation of user-created routes primarily caused by cross-country travel;

3. BLM's commitment to support the recommendations of the Southwest Resource Advisory Council to restrict travel to existing routes, and to later proceed with route-by-route travel management planning on selected areas in the UFO.

### Need for the Action

Colorado has witnessed rapidly increasing demand for motorized access to Colorado's public lands. Since Colorado State Parks first began managing the Off-highway Vehicle Registration Program in 1991, registrations have increased 154%, from around 12,000 to nearly 68,000 in 2002 to close to 131,000 in 2007. According to Colorado's *2008 Statewide Comprehensive Outdoor Recreation Plan*, OHVs comprise nearly half of all registrations of the 254,000 total motorized recreation vehicles registered through Colorado State Parks which include OHVs, boats, and snowmobiles.

In addition, communities, towns, and cities surrounding the planning area are experiencing an increase in population and destination tourism primarily in response to year-round access to public lands, as well as the availability of a wide array of recreational opportunities. The Uncompahgre Field Office (UFO) has also seen an increase in requests for commercial, competitive, organized and event use Special Recreation Permits over the past several years.

New recreational opportunities on public lands managed by the UFO have resulted in increasing conflicts and impacts to vegetation, soils, wildlife habitat, and other natural, as well as cultural, resources. New equipment and technological advancements in modes of travel are enabling more people to reach areas that were previously inaccessible.

Public lands in the planning area are heavily utilized for a variety of purposes, including firewood gathering, Christmas tree cutting and other forest-related activities, decorative rock gathering, livestock grazing management, rights of way management, mineral resource activities, recreational opportunities, BLM administrative and maintenance activities, access to Forest Service lands, and numerous other uses. Public recreation uses include hiking, horseback riding, mountain bike riding, hunting, technical four-wheel driving, ATV riding, motorcycle riding, sightseeing, snowmobiling, photography, and non-motorized overnight and day-use recreation activities.

BLM_0015203

The critical need to balance increasing access and use demands with management and sustainability of the public lands within the planning area, has made it essential to amend the two Resource Management Plans (RMP) prior to the upcoming UFO Land Use Plan Revision and Dominquez-Escalante National Conservation Area (DENCA) RMP. The DENCA legislation requires BLM to manage the area in a manner that conserves, protects and enhances the resources and values of the NCA.  Addressing travel management with the NCA will help achieve this mandate until an RMP can be completed for the area.  Route by route travel management planning for the DENCA will be completed in conjunction with the RMP process. As for the rest of the planning area, the UFO will delineate Travel Management Areas for the "limited" designated areas throughout the planning area and to the extent possible produce a schedule to complete the route by route travel management planning. As per BLM's planning handbook guidance this should not exceed 5 years after the RMP revision has been completed.

Without this RMP amendment, the proliferation of user-created routes and increasing natural resource demands will continue to impact sensitive resources, including riparian zones, cultural values, and threatened or endangered species during the time it would take to do an RMP or RMP revision (about three to four years). The BLM has determined that OHV designations and travel management practices need to be addressed immediately in order to prevent further deterioration of land health while promoting responsible use through active management.

## BACKGROUND\ INTRODUCTION

This Resource Management Plan Amendment/Environmental Assessment analyzes the impacts of two different alternatives that address motorized and mechanized modes of travel on public lands administered by the Uncompahgre Field Office.  The UFO travel management planning area is located in parts of Montrose, Delta, Ouray, San Miguel, Mesa, and Gunnison Counties, Colorado, and contains approximately 460,567 acres of BLM-managed public land and approximately 2793 miles of existing routes (see Appendix A for maps).  The action applies to BLM lands only, and not to private, state, or other agency-managed lands.

Two Resource Management Plans (RMPs) currently guide BLM actions within the UFO travel management planning area: the 1989 Uncompahgre Basin Resource Management Plan and the 1985 San Juan-San Miguel Resource Management Plan. Both RMPs are scheduled for revision beginning in early 2010 with completion anticipated in the fall of 2013 as well as a new Resource Management Plan for Dominquez-Escalante National Conservation Area (DENCA). Analysis and actions resulting from this amendment would be considered in the RMP revision and National Conservation Area RMP.

The UFO proposes to limit users to existing routes, with some seasonal closures. Seasonal closures would correspond to those areas identified in the RMPs as having limited designations from December 1 to April 30 or from May 1 to June 15, until further travel planning can be completed.

Route by route travel management planning for the DENCA will be completed in conjunction with the RMP process. As for the rest of the planning area, the UFO RMP revision will delineate

BLM_0015204

Travel Management Areas for the "limited" designated areas and to the extent possible produce a schedule to complete the route by route travel management planning. As per BLM's planning handbook guidance this should not exceed 5 years after the RMP revision has been completed.

The existing RMPs identify three categories of Off-Highway Vehicle (OHV) designations within the planning area: *Open*, *Limited* and *Closed*. The *Limited* designation includes further stipulations such as: "Limited to Designated Routes Yearlong," "Limited to Existing Routes Yearlong," "Limited to Designated Routes from May 1 to June 15," and "Limited to Designated Routes from December 1 to April 30." These designations are used by the BLM to establish where and to what extent motorized uses may occur on public lands.

Route designation within the planning area has not been implemented since the RMPs went into effect, which is a deficiency that hinders the UFO's ability to effectively enforce seasonal route designations and restrictions. Therefore, motorized and mechanized on-route and cross-country travel in the planning area has occurred yearlong in an "open" fashion. In recent years with increased public use and increased capability and popularity of motorized equipment, the miles of user-created routes in the planning area has expanded and the traffic on primitive roads has become more frequent.

The following lands are not part of the planning area and would not be affected by the proposed RMP Amendment:

- BLM-managed lands in the Gunnison Gorge National Conservation Area covered by the 2004 Gunnison Gorge NCA Resource Management Plan.

- North Delta OHV Play Area, which will be addressed in subsequent travel management planning.

- Gunnison Travel Interim Restrictions Plan Amendment Area, which will be addressed in subsequent travel management planning and includes the North Fork Valley east of Colorado Highways 65 and 92, and north or south of Colorado Highway 133 in Montrose, Delta, and Gunnison counties.

- Areas having designations of "Closed," "Limited to Existing Routes Yearlong" and "Limited to Designated Routes Yearlong" in the RMPs

- Private, municipal, state or other federal agency lands.

6

BLM_0015205

## DESCRIPTION OF THE ALTERNATIVES

Table 1 compares public land area and miles of existing routes by OHV designation category for the Proposed Action Alternative and the No Action Alternative.

| Table 1 Proposed Management Alternatives | | | |
|---|---|---|---|
| OHV Designation Categories | | ACRES | APPROXIMATE MILES OF ROUTES |
| PROPOSED ACTION | NO ACTION | | |
| Limited to Existing Routes Yearlong | Open to Cross-Country Travel Yearlong | 410, 351 | 2,520 |
| Limited to Existing Routes 5/1 to 11/30; Closed 12/1 to 4/30 | Open 5/1 to 11/30; Limited to Designated Routes 12/1 to 4/30, | 46,842 | 265 |
| Limited to Existing Routes 6/16 to 4/30; Closed 5/1 to 6/15 | Open 6/16 to 4/30; Limited to Designated Routes 5/1 to 6/15, | 3,374 | 8 |
| PLANNING AREA TOTALS | | 460,567 | 2,793 |

## Management Common to Both Alternatives

### Travel Use Conditions

Travel on horse or by foot would be permitted yearlong on existing routes and cross-country on public lands throughout the planning area where available for public use.

### Existing Laws, Regulations, Policy, Guidance, Land Use Authorizations and Valid Existing Rights

The BLM would manage the public lands in accordance with applicable laws, regulations, and BLM policy and guidance. Implementation of either of these alternatives would be subject to all valid existing rights at the time of the signing of the Decision Record.

Existing laws and protocols pertaining to the protection of cultural and historical resources would apply to known and discovered historic properties. Guidance can be found within the State Protocol Agreement Between the Colorado State Director of the Bureau of Land Management (BLM) and the Colorado State Historic Preservation Officer Regarding the Manner in which the Bureau of Land Management will Meet Its Responsibilities Under the National

7

BLM_0015206

Historic Preservation Act and the National Programmatic Agreement Among the BLM, Advisory Council on Historic Preservation, and the National Conference of state Historic Preservation Officers, dated April 29, 1998.

The use of motorized or mechanized modes of travel (including snowmobiles) during the execution of BLM-issued authorizations or permits would be subject to the terms and conditions or stipulations of each individual authorization on a case-by-case basis. Examples of authorizations or permits include construction of and access to rights-of-way, fuel wood and decorative rock gathering, special recreation permits, or grazing permit operations. Additional environmental documentation and analysis could be required for some authorizations.

In accordance with Code of Federal Regulations (CFR) procedure 43 CFR 8364.1, Closure and Restriction Orders, BLM has authorization to close areas and/or routes to public use when necessary to protect persons, property, and public lands and resources. This process is very time consuming and less effective in meeting Land Health Standards with the western Colorado's rapid growth rate and the increasing amount of route proliferation in vast Open designation areas within the Uncompahgre Field Office.

Any existing or future road use or maintenance agreements with counties would continue according to the terms and conditions of those agreements.

**Proposed Action**

Limit travel to existing routes.  Prohibit cross-country travel by motorized or mechanized modes of travel. In addition to "Management Common to Both Alternatives", the following actions would be implemented.

*OHV Designation Changes*
OHV designations on BLM-managed lands within the planning area would be changed to "Limited to Existing Routes".

The UFO RMP revision will delineate Travel Management Areas for the "limited" designated areas and to the extent possible produce a schedule to complete the route by route travel management planning. As per BLM's planning handbook guidance this should not exceed 5 years after the RMP revision has been completed. The need for travel management support facilities, new routes, re-routes and closures would be evaluated at that time.  Also at that time, the "Limited to Existing Routes" designation would be changed to "Limited to Designated Routes".  During the Dominquez-Escalante National Conservation Area RMP, the designations will be changed to Limited to Designated Routes as part of the RMP process.

*Travel Use Conditions*
Travel use conditions describe allowed, restricted or limited travel uses on routes.

Travel using motorized and mechanized modes of travel would be limited to the use of existing routes. Thus, no cross-country or off-route travel using motorized or mechanized modes of travel would be permitted for any purpose, except as specifically allowed in this alternative.

8

BLM_0015207

No new routes may be created unless authorized by the BLM and covered by additional NEPA analysis.

Any emergency or administrative motorized vehicle or equipment use off existing routes on BLM-managed lands would require prior notification and approval. Should prior notification not be possible, contact with an authorized BLM official would have to be made within 72 hours following emergency entry.

Use of motorized or mechanized modes of travel on existing routes would not be permitted if the result would:

- Convert or upgrade a single-track route (maximum of 36 inches in width) to a two-track route, i.e. driving an all-terrain vehicle (ATV) or a full-size passenger vehicle on a route consisting of a single track used by hikers, horseback riders, motorcycles, mountain bikes, game or livestock.

- Convert or upgrade a route (with a maximum width of 50 inches) used by and established for use by an ATV to a wider two-track route, such as would occur if a full-size passenger vehicle were used to travel along a route narrower than its wheel base.

BLM administrative functions related to resource management objectives (e.g., wildlife habitat and species monitoring and management, noxious weed eradication, resource enhancement and restoration, and fence repair) requiring cross-country travel using motorized vehicles or equipment, would be addressed at the project level on a case-by-case basis, and additional environmental documentation and analysis could be required for certain administrative functions.

***Implementation & Monitoring***
An official agency map showing valid existing routes would be made available to the public and used to determine if motorized and mechanized travel is permitted on a particular route during any part of the year.

Informational/directional signs, as well as kiosks where appropriate, would be installed in sensitive areas and other locations where needed throughout the planning area including the Dominquez Escalante National Conservation Area. Not all routes may be signed or identified, as signing for routes would be implemented by the BLM over time and as funding allows. The BLM would work cooperatively with other agencies, organizations, clubs and individuals to determine appropriate sign locations.

Implementation would include a strategy of educating users and enforcing regulations, including the development of easily understood maps and other tools to effectively communicate that it is not permissible for operators of motorized or mechanized modes of travel to drive off of existing routes within the planning area.

The UFO would prepare and implement a public education program in a variety of formats to promote responsible use of public land. This would include educational information on BLM National Landscape Conservation Systems and the Dominquez Escalante National Conservation Area, "Stay the Trail" and "Tread Lightly" ethics, noxious weeds and best management

BLM_0015208

practices, and information regarding controlling noise levels while recreating on public lands. This includes the Colorado noise level standards pertaining to the operation of motor vehicles, including provisions in Colorado Senate Bill 08-063, and any pertinent regulations that would be promulgated.

Additional implementation would involve:
- Providing management presence and enforcing travel regulations
- Installing and replacing travel management signs
- Maintaining some existing routes based on priorities and funding
- Reconstructing or improving existing routes
- Maintaining existing trailhead facilities
- Preparing brochures
- Monitoring and evaluating use and implementing needed changes

### Adaptive Management
The BLM would have the option to further restrict travel and use, by vehicle type or season, on any route in order to protect (natural or other) resources or infrastructure from being impacted by vehicle use in the event of extreme winters, wet conditions, to reduce safety hazards, or in other unforeseeable situations, or to better manage or protect other values, such as big game or nesting raptors. These actions could include permanent or seasonal route closures or relocations. These actions would be taken following appropriate emergency closure or other procedures, and/or after appropriate site-specific NEPA analysis.

Over time, changes to the route network may be necessary, including adding, designating, relocating, closing, maintaining, and/or changing seasonal or other use restrictions on routes, as well as adding necessary travel management support facilities. Such changes would be documented using appropriate BLM Land Use Planning regulations and NEPA procedures.

### Enforcement
Users and motorists would be responsible for understanding and following area and route restrictions on official agency maps. The BLM would assign personnel, including law enforcement, recreation and other resource staff and volunteers to actively patrol existing routes. Actual enforcement would be conducted by BLM law enforcement personnel in accordance with 43 CFR 9268.0-3 and other applicable regulations.

### Design Features
The following design features would be implemented and include mitigation measures intended to reduce or eliminate impacts to certain resources.

- Maintenance of routes would be performed according to BLM annual work plans and as funding permits.

- Impacts from travel on existing routes are expected to be greatest for the Colorado hookless cactus and clay-loving wild buckwheat. Therefore, to mitigate impacts on these species or other future listed species, the BLM UFO would systematically install roadside signs to indicate especially sensitive areas, where travel-related impacts on these species would be greater. Signs would be installed no later than one year from the signing of the

10

BLM_0015209

FONSI for this Environmental Assessment. Sensitive areas that would be signed include all travel routes within 25 meters of known populations (based on the Biological Assessment's habitat models and maps), and other potential conflict areas as determined necessary. Signs shall notify the public and other users that, to protect sensitive resources, motorized and mechanized travel in these areas is restricted to existing routes and that off-route travel is strictly prohibited. This regulation would be enforceable by law officers, and compliance would be monitored by the BLM.

- If impacts to listed species that were not analyzed in this consultation are expected to occur due to future geographic area travel management planning, further consultation will occur at that time.

- In accordance with information in the Biological Opinion (U.S. Fish and Wildlife Service, August 11, 2009), re-initiation of formal consultation with the Wildlife Service would occur if:

  1. New information reveals effects of the agency action that may adversely affect listed species or critical habitat in a manner or to an extent not considered in the BO;
  2. The agency action is subsequently modified in a manner that causes an effect to a listed species or critical habitat that was not considered in the BO; and/ or
  3. A new species is listed or any new critical habitat is proposed or designated that may be affected by this action.

## No Action

The No Action Alternative would continue current management and policies, including the actions identified in the "Management Common to Both Alternatives" section above. This would include allowing open cross-country travel with no specific route restrictions or route designations, unless modified in the future by travel management planning processes on public lands.

## ALTERNATIVES CONSIDERED BUT NOT BROUGHT FORWARD

Many comments were submitted by the public that suggested BLM not make any changes in the planning area at all involving existing routes or OHV designations. Since almost all the existing roads and trails on public lands, and all public lands in the planning area are now available for motorized and mechanized travel, the No Action Alternative in this document endorses and encompasses these suggestions. The No Action Alternative, however, did not meet the purpose and need for preparing this document.

Many public comments suggested that BLM should designate selected routes, now or in the future, for certain uses only, or close certain routes. These actions will be considered in future travel management planning. Public or internal scoping did not identify other alternatives, or the need for other alternatives.

11

## SCOPING AND ISSUES

### Scoping

The Bureau of Land Management Uncompahgre Field Office began work on the Uncompahgre Basin & San Juan/San Miguel Resource Management Plan Amendment/Environmental Assessment in March of 2007. The team defined the boundaries for the planning area and initiated the public scoping process, notifying the public through press releases, electronic mailings, and sending letters to individuals and groups who had expressed interest in participating in travel management planning efforts. Public meetings were held in Montrose, Delta and Naturita.  An additional 60-day comment period was provided March to May of 2008.

By close of the public scoping period, the UFO received a total of 62 comment letters, cards, forms, and emails from the public. Of the 62 comment documents received, 40 were from individuals, and 22 were from organizations, businesses, or federal or state agencies.  Comments received were from New Mexico, British Columbia, Illinois Denver, Ridgway, Telluride, Whitewater, Redvale, Cedaredge, Eckert, Ouray, Norwood, Paonia, Delta, Naturita, Nucla, Olathe, Grand Junction, and Montrose. Five comments were received with no mailing address. Of the 62 documents received, 24 support the OHV area designation changes in the Proposed Action, three individuals opposed the changes, eight felt that more time was needed to supply BLM with more up-to-date route information, and 10 support future OHV designation changes limiting travel to designated routes.  Of the eight comments received desiring more time, three were from organizations or state agencies, and five were from individuals. Eighteen of the 24 comments in support of the Proposed Action were from individuals and six were from organizations or state agencies. Of the 10 comments in support of future OHV designation changes leading to designated routes, five were from organizations or state or federal agencies, and five were from individuals.

Some of the scoping comments recommended the BLM extend the comment period in order for the public to have more time to submit documents identifying existing routes not shown on BLM maps presented to the public during scoping.  The BLM did subsequently postpone further action on this amendment because of higher priorities, and did receive submissions for new routes.

### Issues and Concerns

Based on internal and public scoping results, the BLM has identified the following issues to be addressed through this analysis and Resource Management Plan Amendment:
- Historical use of routes and continued access for a variety of uses
- Environmental impacts
- Enforcing regulations
- Route conditions
- Safety
- Land Health
- Protect the resources and values of the Dominquez Escalante National Conservation Area
- Eliminating the proliferation of user-established off-route cross country motorized travel
- Discouraging erosion-causing activities

BLM_0015211

- Installing general signing
- Ensuring legal access to public lands for rights of way, managing grazing allotments, or to conduct mineral exploration.

## PLAN CONFORMANCE REVIEW

The Proposed Action is consistent with the Uncompahgre and San Juan/San Miguel RMPs, which were amended to include the requirement that BLM management activities comply with the standards for land health. All the Public Lands in the Proposed Action have been assessed for landscape health under the BLM's Standards and Guidelines procedures.

The Proposed Action is not consistent with OHV decisions in either RMP; if the Proposed Action is approved, the RMPs would be amended.

## RELATIONSHIP TO STATUTES, REGULATIONS OR OTHER PLANS

This RMP Amendment is being conducted in order to help meet *Standards for Public Land Health* within the Planning area and to comply with the *Federal Land Policy and Management Act.* Coordination was conducted with the US Forest Service for consistency with travel management occurring on adjacent Forest Service managed lands. In addition, coordination and consultation was conducted with US Fish and Wildlife, Colorado Division of Wildlife (CDOW), State Historical Preservation Office (SHPO), and the Southern Ute Tribal Council and the Ute Mountain Ute Tribal Council.

Other statutes, regulations or plans were also identified and reviewed for consistency with this RMP Amendments, including: Standards for Public Land Health in Colorado; Recreation Management Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado; Executive Order 11644 – Use of off-road vehicles on public lands; Code of Federal Regulations (43 CFR Part 8340); H-1601-1, Land Use Planning Handbook – Appendix C, Section D; National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands; National Mountain Bicycling Strategic Action Plan; National and Colorado NLCS Strategies; Colorado BLM Travel Management Guidance; and 8550-Interim Management Policy and Guidelines For Lands Under Wilderness Review & BLM Handbook 8550-1, Interim Management Policy For Lands Under Wilderness Review. All other existing laws, regulations, and policies would be complied with.

Standards for Public Land Health:  In January 1997, Colorado Bureau of Land Management (BLM) approved the Standards for Public Land Health.  Standards describe conditions needed to sustain public land health and relate to all uses of the public lands.  A finding for each standard will be made in the environmental analysis (next section).

| Standard | Definition/Statement |
|---|---|
| #1 Upland Soils | Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff. |

13

| Standard | Definition/Statement |
|---|---|
| #2 Riparian Systems | Riparian systems associated with both running and standing water, function properly and have the ability to recover from major surface disturbances such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and bio-diversity. Water quality is improved or maintained. Stable soils store and release water slowly. |
| #3 Plant and Animal Communities | Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes. |
| #4 Threatened and Endangered Species | Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by the BLM, and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities. |
| #5 Water Quality | The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM lands will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under State law as found in (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act. |

## AFFECTED ENVIRONMENT / ENVIRONMENTAL CONSEQUENCES:

This section summarizes the physical, biological, social, and economic environments of the planning area and the nearby lands and the direct and indirect effects of implementing each alternative on that environment.  It also presents the scientific and analytical basis for the comparison of alternatives.  The Uncompahgre Field Office has inventoried and mapped all existing routes for consideration.  These include existing routes constructed by the BLM, and all existing motorized and non-motorized routes that have been created through public use.  The terms "effects" and "impacts" are synonymous in this document.  The term "existing routes" means routes that can be identified on the 2005 aerial photography or that have already been GPS'd and stored on the inventoried route data base file(s). Existing routes and existing and proposed OHV designations are shown on maps in Appendix A.  Photos in Appendix B show examples of what would be considered existing routes.

Direct effects are those effects "…which are caused by the action and occur at the same time and place" (40 CFR 1508.8(a)).  Indirect effects are those effects "…which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate, and related effects on water and air and other natural systems, including ecosystems".

The long-term effects are between 5-10 years, and short-term effects are within 5 years.

The area of consideration for the direct effects discussed includes the public lands in the planning area.  The area of consideration for the indirect effects includes the Cities, Towns, and communities, and lands within and adjacent to the planning area.

14

BLM_0015213

**Critical Elements**

Elements specified by statute, regulation, executive order, or the Standards for Public Land Health are described and analyzed in this section.

The following critical elements are considered.  Those that could be impacted are brought forward for analysis.   Any element not affected by the proposed action or alternatives will not be analyzed in this document; the reasons for no impact will be stated.

| Critical Element | Not Applicable or Not Present | Present, But No Impact | Applicable & Present; Brought Forward for Analysis |
|---|---|---|---|
| Air Quality | | | X |
| ACEC | X | | |
| Wilderness | X | | |
| Wild and Scenic Rivers | | | X |
| Cultural | | | X |
| Native American Religious Concerns | | | X |
| Farmlands, Prime/Unique | | | X |
| Soils | | | X |
| Vegetation | | | X |
| Invasive, Non-native Species | | | X |
| Threatened and Endangered Species | | | X |
| Migratory Birds | | | X |
| Wildlife, Terrestrial | | | X |
| Wildlife, Aquatic | | | X |
| Wetlands & Riparian Zones | | | X |
| Floodplains | | | X |
| Water Quality, Surface and Ground | | | X |
| Wastes, Hazardous or Solid | | | X |
| Environmental Justice | | | X |

15

BLM_0015214

**AIR QUALITY**

**Affected Environment**

The quality and condition of the air within the planning area and as seen from nearby lands is influenced at any one time by the amount and intensity of vehicular traffic on dry, un-surfaced routes or those that do not receive dust abatement treatment. Wildfires, agricultural burning, vehicle emissions, energy extraction activities, industry, and other activities and processes also contribute to the quality and condition of air quality.

Air quality is defined by ambient air concentrations of specific pollutants determined to be of concern with respect to the health and welfare of the general public. Under the Clean Air Act Amendments of 1990, the US EPA-established National Ambient Air Quality Standard's six "criteria pollutants" are lead, ozone, sulfur dioxide, oxides of nitrogen, carbon monoxide, and particulate matter. Areas that exceed a federal air quality standard are designated as non-attainment areas. The Western Colorado Counties generally contain smaller towns located in fairly broad river valleys. Grand Junction is the only large city and the only location that monitors for carbon monoxide on the western slope. The other western slope monitors (PM10) in the planning area are located in the cities of Delta and Telluride. The monitoring data for 2008 from these stations shows that the air quality is in attainment with the National Ambient Air Quality Standards (http://www.epa.gov) for particulate matter (www.colorado.gov/airquality).

The air quality of the planning area is good and is believed to be typical of undeveloped regions in the western US; ambient pollutant levels are usually near or below measurable limits. Locations vulnerable to decreasing air quality from development include the population centers at Montrose, Telluride, Olathe, Ouray, Delta, Ridgway, Paonia, and Hotchkiss. Emissions from vehicle use and small engines used in a variety of construction, industrial and farm applications affect local air quality. On an individual basis off-road engines and OHV equipment emit much higher levels of criteria pollutants than passenger vehicles. Standards have been adopted to reduce the emissions from newly manufactured small non-road engines and OHV equipment (http://www.epa.gov).

Most counties in the planning area treat unpaved main county roads that carry the highest amount of traffic within and through the planning area with magnesium chloride to prevent excessive dust and to help prevent deterioration and wear and tear on the roads. This has had a positive effect on the amount of fugitive dust and particulates coming from the planning area.

Vehicle emissions include nitrogen oxides, hydrocarbons, fine particulate matter, and carbon monoxide. Travel on un-surfaced routes in the planning area, the focus of the analysis, does increase concentrations of fine particulate matter in the air. Vehicle emissions and fine particulate matter stirred up by vehicle travel over unpaved road surfaces have not been identified as a major air quality issue in the planning area. During winters with enough snowfall, motorized snow machines and other winter vehicle recreation use results in emissions such as nitrogen oxides, hydrocarbons, fine particulate matter, and carbon monoxide. To date, overall air

16

BLM_0015215

quality, visibility, or fine particulate matter in all nearby sensitive areas or population centers has not been affected as a result of vehicle emissions, or by dust created by travel on unpaved routes.

Road dust typically becomes an issue related to on-route motorized vehicular travel through the planning area to access Forest Service-managed or private lands on three main routes, or during agency resource management activities, land use permit implementation, mineral material and forest product gathering, livestock grazing management, hunting, or recreational uses, and especially when there is concentrated travel by large vehicles on unpaved roads.  These situations conducted under agency permits or land use authorizations can be remedied through project-specified mitigation under the terms and conditions of permits.

Particulate matter concentrations are expected to be higher near towns because of local combustion sources and unpaved routes.  Suspended particles are probably due to fugitive dust that is primarily windblown.  Although there is no gaseous pollutant monitoring in the planning area, levels are estimated to be low and within standards.  Ozone levels in the Rocky Mountain West are relatively high but of unknown origin.  Occasional peak concentrations of carbon monoxide and oxides of nitrogen may be found in the immediate vicinity of combustion equipment.  When prescribed burns or wild fires are burning in the vicinity of the planning area, air quality could be decreased during the short term.

## Environmental Consequences

**Impacts Common to All Alternatives**
Magnesium chloride or other environmentally acceptable dust abatement chemicals would continue to be applied to major County roads in the planning area, helping maintain the air quality in the planning area.

Most effects of wintertime motorized recreation would be localized and temporary.  Because of the anticipated reduction in vehicular travel during winter periods in the planning area due to weather constraints, overall air quality impacts from winter-motorized recreation would not change by alternative.

Current levels of fugitive dust would continue to be generated from travel on existing routes until future travel management planning is completed.

**Impacts from the No Action Alternative**
The impacts of road dust from unpaved roads depend on factors such as the amount of travel, size and speed of the vehicle, climatic conditions, and geology.  Compared to the Proposed Action, the No Action Alternative would account for the greatest density and mileage of motorized routes and trails and the highest amount of anticipated traffic.  Anticipated increases in motorized and mechanized cross-country travel would create new user created routes, and the growth in unrestricted cross-country traffic on dry soils could eventually result in generation of PM10 that could be seen from the Camelback Wilderness Study Area, the Gunnison Gorge National Conservation Area and Wilderness, Tabeuguache Special Area, and the Black Canyon National Park.  Given the unconfined and incrementally increasing extent of user-created routes, and assuming growth in recreational use over a 5-10 year period, the risk of adverse impacts is increased due to greater cross country travel and disturbed soils. This is because of the

17

BLM_0015216

immediate short-term nature of the activities that would have a high potential for generating increasing amounts of fugitive dust and adversely impacting air quality over the entire planning area for part of the year.  Under the No Action Alternative, fugitive dust and pollution would be expected to increase throughout the planning area, and could potentially reach intensities that impact air quality on or as seen from neighboring nearby sensitive areas and private, BLM-managed lands, and other federal lands.

**Impacts from the Proposed Action Alternative**
This alternative would reduce the risk of adverse air quality impacts from motorized and mechanized travel in the planning area. The decrease in this risk would come from preventing cross-country travel that would incrementally reduce the amount of surface disturbed that could result in fugitive dust.  The other decrease in risk would occur due to no additional routes being established in the planning area unless approved by the BLM. Air quality impacts from roads and trails are based not only on miles but also on the amount of traffic each receives, surface composition, and moisture content of each route.  When compared to the No Action Alternative, this alternative would result in increased protection of natural resources (i.e. soils and vegetation) and localize fugitive dust to existing roads and trails as cross-country travel would be prohibited.

**Cumulative Effects**

In addition to growth in recreational travel, reasonably foreseeable actions that may affect air quality over the next 10 years on private and public lands include continued residential growth, mechanical and prescribed fire fuels reduction/habitat projects, county road maintenance and upgrades, mining activities, oil/gas extraction, agricultural burning, utility corridor maintenance and upgrades, and new road rights-of-way. Future activities on public lands that could also potentially impact air quality and require mitigation, but cannot be specified in terms of time and place in current analysis, include special recreation events and vegetation treatments. Over the next 10 years, dust, smoke, and pollution from these and other sources, including local industries and from traffic on county roads, cumulative with recreational travel on BLM routes, are expected to have long-term, low intensity/impact to air quality.

## AREAS OF CRITICAL ENVIRONMENTAL CONCERN

**Affected Environment**

There are currently no roads in areas of critical environmental concern within the planning area and none proposed or considered in this EA. There would be no environmental impacts or cumulative effects to any Areas of Critical Environmental Concern from implementing either alternative in this EA.

## WILDERNESS

**Affected Environment**

This component of the environment is not present in the planning area. Nearby Wilderness and

BLM_0015217

Wilderness Study Area (WSA) includes the Dominguez Canyon Wilderness, Tabeguache Area, Camelback WSA, Adobe Badlands WSA, Dolores River Canyon WSA, and Sewemup Mesa WSA.  There would be no environmental impacts or cumulative effects to any Wilderness or Wilderness Study Areas from implementing either alternative in this EA because these areas are closed to motorized and mechanized vehicles through the Wilderness Interim Management Policy.

## WILD AND SCENIC RIVERS

### Affected Environment

The Wild and Scenic Rivers Act (Public Law 90-542; 16 US Code 1271-1287) directs federal agencies to consider potential wild and scenic rivers in their land and water planning processes. The Uncompahgre Field Office is presently conducting an inventory and analysis of rivers and streams within the planning area to determine their eligibility for inclusion in the National Wild and Scenic Rivers System. The draft eligibility report will be included as part of the public scoping process for the resource management plan revision anticipated to begin in early 2010. The final eligibility report will detail the completed stream inventory and eligibility determinations for the Uncompahgre planning area.  Protective management, once a river segment is determined eligible and given a tentative classification, shall provide adequate protection for its characteristics, subject to valid and existing rights, until a suitability determination is made.

To be eligible for WSR designation, a river or stream segment must possess one or more Outstandingly Remarkable Value (ORV).  These values may be scenic, recreational, geological, fish related, wildlife related, historic, cultural, botanical, hydrological, paleontological, or scientific.  ORVs are of a quality or scarcity that makes them unique, rare or exemplary within the region.  To meet basic eligibility requirements, rivers must also have sufficient water quality to support those values, and be free-flowing.

### Environmental Consequences:

**Impacts Common to All Alternatives**
All stream segments within the planning area that are determined to be eligible in the final "Eligibility Study Report" would be managed to not adversely affect the eligibility or the tentative classification. To achieve this level of protective management may require some modification to the travel routes as proposed under each alternative.

**Impacts from the No Action Alternative**
Under the No Action Alternative, leaving the area open to off-route travel and experiencing a potential increase in user created routes that receive little or no maintenance increases the risk of impacts to Outstanding Remarkable Values associated with potentially "eligible" stream segments.

19

BLM_0015218

**Impacts from the Proposed Action Alternative**
Under the proposed action alternative, protection of Outstanding Remarkable Values on potentially eligible stream segments would be sustained or enhanced by eliminating all cross country motorized and mechanized modes of travel.

## Cumulative Effects

There would be no short term, long term or cumulative impacts to existing ORVs or Wild and Scenic Rivers.

## CULTURAL RESOURCES

## Affected Environment

Cultural Resources in the Planning area encompass a broad spectrum ranging from Paleo-Indian and Early Archaic archaeological sites to late historic period homesteads and farms. Geographically, historic properties in the UFO tend to be more common on the lower bench lands above the major river systems and less common in higher elevation zones.

The public lands in the Planning area are contained within the larger Uncompahgre Plateau archaeological context.  The region is known for its high concentrations of recorded archaeological sites, with some of the highest concentrations seen in the entire larger Uncompahgre Plateau.  Approximately 48,974 acres of public land in the Planning area have been intensively inventoried (or approx. 1% of total planning area).  Over 3,140 individual historic properties are known with 197 sites or roughly 6 % of the known sites represented as eligible for nomination to the National Register of Historic Places. Aboriginal site types include, but are not limited to, open camps, chipped stone manufacture and processing sites, open and sheltered architectural locales, and isolated artifacts and features.  The density of National Register Eligible and ineligible properties varies from 0 sites per section in some of the Mancos Shale lowlands to a high of 40 to 70 sites per section in more favorable bench lands above the major rivers.  Eligible prehistoric site types include both open and sheltered occupations, rock art, lithic procurement sites and historic Ute encampments. Sites that date to the historic period include mines, homesteads and ranches, as well as many other locations of past human activity. Roads and trails themselves are often of historic age and are occasionally eligible for nomination to the National Register of Historic Places.

Historically, unregulated travel has left National Register and Register-eligible sites vulnerable to damage.  Off road travel has, in many known cases, compromised the National Register character of sites, leading to irreversible, irretrievable loss of integrity and the destruction of valuable scientific data concerning the human past of the area.  Route proliferation also continues to open previously less accessible areas.

There are 48 known National Register Eligible sites within or within 100 feet of existing roads and tracks, but the actual number is unknown since there may be many more sites in roads that still need inventory and National Register evaluation.  Estimates of site density within roadways

20

may be from 50% to 150% higher than known sites, although tests of these figures during previous travel planning efforts revealed much lower densities than the estimates suggest. Thus, there are at least 48 known sites that are eligible and as many as 100 more potentially eligible historic properties within the current road corridors.

Cultural Resource inventories of all the existing routes have not yet been completed. There are potentially hundreds of archaeological sites in the vicinity of the known/existing routes. There are also known sites which may be susceptible to secondary impacts arising from accessibility. Any or all of these sites may be tested for National Register eligibility, and a recommendation would be made as to the potential for secondary impacts. BLM's preferred option, as recommended by the Cultural Resource Handbook and SHPO, is to avoid continued damage to cultural sites by designating roads as closed to vehicular traffic.

Authority for the methodology used herein is contained in Addendum 1 to the Colorado protocol executed on 19 October 2006. Addendum 1 outlines a phased cultural resource inventory process that can be completed after designation of existing routes. Restricting travel to existing routes will protect cultural resources outside the road corridors, thus protecting eligible and potentially eligible cultural resources as required by existing laws. Class III inventory is required on all new routes. Class III inventory may be required on existing routes, depending on such factors as limitations to travel, degree of potential for National Register eligible sites, or increases in travel usage. The phased cultural resource process will be fully completed during the route-by-route travel management planning and route maintenance.

## Environmental Consequences

**Impacts Common to All Alternatives**
Potential National Register Eligible properties, and possibly other cultural resources located within existing routes would continue to be effected as a result of allowing motorized and mechanized travel on all existing routes.

Routes would be closed, if necessary, to help prevent impacts to known eligible archeological sites.

Impacts to currently known eligible cultural properties would be avoided, minimized or mitigated in consultation with State Historic Preservation Office (SHPO). Where National Register eligible sites are known to be in danger or are currently being impacted by travel activities, routes would be closed to travel if necessary until the appropriate mitigation has been implemented. Where existing inventories are sufficient, standard discovery stipulations would apply. Road segments known to contain National Register or otherwise eligible sites will be permanently or temporarily closed pending mitigation in order to protect and preserve cultural resource values. In those cases where road closures are impractical or undesirable, BLM would implement the appropriate mitigation measures after consultation with the appropriate agencies including SHPO and Tribal authorities.

**Impacts from the No Action Alternative**
There would be no reduction in off-road travel, and the existing increase of potential damage and impacts to historic properties would continue. Most existing routes would remain in full use for

BLM_0015220

a variety of types of motorized and non-motorized vehicles, and existing impacts would continue.  In addition to known sites in existing roads, unlimited cross country travel has a high potential for impacting eligible properties situated in previously untraveled areas resulting in degradation of the resource value and long term irreversible, irretrievable impacts to archaeological sites.  Route proliferation also continues to open previously less accessible areas, leading to increased secondary impacts to eligible properties, such as a potential for increased soil erosion, which can accelerate erosion of intact archaeological resources.  This is a specific concern for prehistoric sites that occur in meadows or riparian zones. These sites are particularly vulnerable to severe impacts when soils are wet. Once these sensitive and nonrenewable resources or sites have been impacted through erosion or other causes, they cannot be restored to original quality.  In the absence of route-specific information the extent of the impacts would remain unknown.  The No Action Alternative would not meet BLM RMP direction for the protection of significant cultural resources. More intensive inventories would likely be required.

**Impacts from the Proposed Action Alternative**
The impacts would be similar to the No Action alternative, except that the level of potential impacts to National Register eligible properties would be greatly reduced by limiting travel to existing routes.  Any OHV designations that impose limitations on cross country travel are likely to reduce adverse effects on cultural resources.  Under the Proposed Action the potential impacts to both documented and undocumented historic properties throughout the planning area would be much less.  Limiting travel to existing routes would reduce the potential for impacts to previously un-damaged properties.

## Cumulative Effects

Cumulative effects on cultural resources and historic properties cannot be specifically identified until cultural resources inventories are completed and historic properties have been identified. In general, however, erosion caused by on-route and cross country vehicle travel, depending on its proximity to a site, could have long-term negative impacts on both buried sites as well as those with standing structures.

## NATIVE AMERICAN RELIGIOUS CONCERNS

## Affected Environment:

Native American religious concerns center around the landscape concept and traditional cultural property, defined as:

> "....one that is eligible for inclusion in the National Register because of its association with cultural practices or beliefs of a living community that (a) are rooted in the community's history, and (b) are important in maintaining the continuing cultural identity of the community" (NRB 38:1).

McBeth (1999) identifies traditional cultural properties as locations where wild foods or medicines are gathered, or are landforms associated with aboriginal traditions or beliefs, and also

22

notes that locations with "intangible spiritual attributes" and contemporary use areas are known in Colorado.

Unless specifically identified by Native Americans, many traditional cultural properties, intangible spiritual attributes and contemporary use areas are extremely difficult or impossible for a field archaeologist to recognize. Such sites, often considered sacred, include mountain tops, waterfalls, river and trail confluences, the headwaters of streams, ecotones, clay sources, "origin places", anthropomorphic and zoomorphic rock formations and springs. More readily identifiable are rock art, sweat baths, battle sites, sun dance arbors, vision quest sites, and medicine wheels (McBeth 1999: 342-345).

In compliance with regulations interpreting the National Historic Preservation Act of 1966, amended 1992, specifically 36 CFR 800.2(c)(3)(i)-(vi), BLM consulted Indian tribes that might have an interest in the planning area including the Northern Ute Tribe, the Southern Ute Tribe and the Ute Mountain Ute Tribe. Officials from the Northern Ute Tribe have an expressed interest in the Uncompahgre area, and the tribe's cultural office has been engaged in ongoing government-to-government consultation. In addition, BLM will consult with the tribes in determining appropriate mitigation and treatment procedures for adversely affected historic and traditional cultural properties.

## Environmental Consequences

### Impacts Common to All Alternatives

Impacts to traditional cultural properties and sacred sites as a result of access from existing routes would continue at current levels, and no special or overall inventory work would be scheduled to identify and/or mitigate potential impacts. Consultation and collection of information would occur when surface-disturbing activities are proposed on public lands, and mitigation conducted as appropriate. Sites of Native American Religious Concern are impacted in many different ways depending on their proximity to existing routes. In some cases, these properties correspond with known historic and prehistoric sites, though this correlation is by no means automatic. Until site specific surveys are completed, the extent of traditional cultural properties and impacts would remain unknown.

Stipulations contained in applicable existing laws and protocols would be applied to known Sacred Sites and Traditional Cultural Properties. Where such properties are known to be in danger or are currently being impacted by travel activities, routes would be closed to travel until the appropriate mitigation has been implemented.

### Impacts from the No Action Alternative

Impacts to traditional cultural properties and Sacred sites would continue at current levels. Also, the potential exists for an increase in access and impacts due to the high likelihood for the creation of additional user created routes and increased off-route travel, and the indiscriminate use of narrow trails or routes by wider vehicle types.

### Impacts from the Proposed Action Alternative

23

The potential impacts to both documented and undocumented traditional cultural properties and Sacred Sites would be greatly reduced due to the prohibition of all cross country motorized and mechanized travel. This would also reduce the potential for impacts to previously un-impacted properties, and reduce the impacts to sites currently being impacted.

## Cumulative Effects

Cumulative effects on sites of Native American religious concern cannot be specifically identified until cultural resources inventories are completed and such locales have been identified. In general, however, erosion caused by vehicle travel, depending on its proximity to a site, could have long-term negative impacts on both buried sites as well as those with surface phenomena. The introduction of routes into an area might also increase the potential for vandalism and looting.


## FARMLANDS, PRIME OR UNIQUE

### Affected Environment

Four categories of farmlands are federally regulated by the United States Department of Agriculture (USDA) under the Farmland Protection Policy Act: (1) Prime farmlands, (2) Unique farmlands, (3) Farmlands of statewide importance, and (4) Farmlands of local importance (USDA, Soil Conservation Service and Colorado State University, 1980). Important farmlands are a distinction made by the USDA as soils that support the crops necessary for the preservation of the nation's domestic food and other supplies, specifically the capacity to preserve high yields of food, seed, forage, fiber, and oilseed with minimal agricultural amendment of the soil, adequate water, and a sufficient growing season.

There are no Farmlands of National or Statewide Importance within the planning area on public lands. However, Prime Irrigated or Irrigated (Not Prime) Lands of Statewide Importance (USDA Soil Conservation Service 1980) occur in the Uncompahgre, North Fork, Surface Creek and Smith Fork drainage basins, most of which are located topographically low in the valleys. In locations such as south of Montrose to Colona and adjacent to the Uncompahgre River, some of these farmlands can receive floodwater, runoff from tributary drainages that include public lands within the planning area.

### Environmental Consequences

**Impacts from No Action Alternative:** Additional off-route travel and user created routes would result in more soil surface and stream channel disturbance. Consequently, both accelerated storm runoff and sediment yield could affect some of the off-site farmlands and irrigation facilities that receive drainage from public lands.

**Impacts from Proposed Action Alternative:** All off route travel would be prohibited except for horseback or foot travel. By limiting the proliferation of user created routes and off route travel, and implementing some travel route maintenance, accelerated rates of sediment and runoff would be minimized, along with potential impacts to downstream farmlands.

24

BLM_0015223

**Cumulative Effects**

Population growth and the associated development (residence and commercial) of farmlands would continue to occur throughout the region if past trends continue.  In addition to farmland being lost to development, the expected increase in recreation and other surface disturbing activities on public lands could exacerbate flooding and sediment yields on downstream farmlands. The cumulative effects of limiting travel to existing routes to mitigate growing recreational and other demands will help alleviate potential impacts to downstream farmlands. Measures such as maps, informational kiosks, regulations and enforcement will help educate the public land users about their travel-related impacts, and may lead many to adopt better travel practices which could further reduce impacts to farmlands.  Overall cumulative impacts from the proposed action are expected to be a benefit to farmlands.

**SOILS (**includes findings on Standard 1)

**Affected Environment**

The soils on the planning area are largely a product of the local geologic parent material, climatic conditions, and the soils topographic position on the landscape. Sedimentary sandstone and shale formations occupy much of the surface geology of the area. The inter-bedded sandstone and shale units of the Dakota and Morrison formations, which dominate the surface over much of the planning area, weather to produce sandy and fine sandy loam textured soils.

The deeper soils with little rock content are mostly found on the interior portions of mesa tops and terraces adjacent to drainage channels. The shallower, rocky soils are found along mesa rims and canyon side slopes.  The soils in the lower and more arid portions of the area are mostly classified in the soil orders Aridisols (soils of dry climate regimes) and Entisols (very limited soil development), and have little organic matter throughout their vertical profile. At the higher elevations, soils are commonly in the soil orders Alfisols (high level of subsoil development) and Mollisols (soils having darkened, organic matter enriched surfaces).  The primary shale formation in the planning area is Mancos shale, which weathers to produce fine textured soils, commonly silty clay loams. Additionally, the Mancos shale formation is a marine-deposited, evaporite (sediment deposit resulting from the evaporation of ancient water bodies), and resultantly, often contain excessive levels of selenium (a non-metallic chemical element) and a variety of dissolvable salts, both of which can degrade water quality in receiving streams when mobilized by wind or water processes.  The soils in the planning area are more specifically described in the Soil Surveys for Ridgway Area, Colorado, San Miguel Area, Colorado, and Paonia Area, Colorado (USDA, Natural Resources Conservation Service).

The local climate, landscape position, land uses, and soil properties largely dictate the density and composition of vegetation cover over most of the planning area. Vegetation cover and plant litter are important components for maintaining a healthy soil surface.  At the higher elevations of the planning area, mountain shrub and ponderosa pine vegetation communities provide soil surface cover, usually at relatively high cover densities. At the lower elevations Pinyon-juniper

25

BLM_0015224

and sagebrush plants communities dominate the coarser textured, non saline soils, while salt desert shrub plant communities occur on the saline, shale-derived soils. On these lower elevation areas with sparse plant cover, another important soil cover component is biological soil crust. Biological soil crusts are comprised of a complex mosaic of cyanobacteria, green algae, lichens and mosses, and other bacteria (USDI, Bureau of Land Management, 2001).

Biological soil crusts serve many beneficial functions to protect and enhance soil productivity, including acting as a soil surface stabilizer to protect soils from erosive forces. It is most prevalent on the more arid portions of the planning area that receive less than 14 inches of annual precipitation and on slopes less than 25%. In areas receiving higher than 14 inches of annual precipitation, competition from vascular plants reduces the occurrence of biological soil crusts, and on slopes great than 25%, soil surface erosional forces act to minimize its establishment. Soil texture and chemistry can also be controlling factors in the density and composition of biological soil crust communities but field inventories to define these differences have not been completed, thus, these two variables were not used in delineating soils having a high potential. Accordingly, in the planning area there are 186,728 acres of soils with a high potential for supporting biological soil crusts.

Erosion of the planning area soils occurs from energy generated by blowing wind and/or moving water. The potential for wind erosion on these soils is mostly in the moderate category with a few soil units having a low potential. The soil erosion potential from water across the area is variable, and is dependent on the physical and chemical properties of the soil, land slope and topographic position, and rock fragment content in the soil matrix. Specifically for un-surfaced travel routes, a soil's erosion potential (slight, moderate, severe) is commonly estimated using a combination of the soil erodability potential (K Factor), degree of land slope, and volume of rock fragments greater than 75 mm in the top 30 cm soil (USDA, Forest Service, Rocky Mountain Region, Soils Group USDA Forest Service). Table 2 and Figure 1 show the area of three erosion categories using these criteria, for the planning area.

The planning area includes about 43,011 acres of salinity enriched geologic units (the Mancos shale and Paradox formations) Table 2. Selenium is also a common element found in excessive levels in the Mancos shale. For the most part, soils enriched with salinity and selenium are coincident with these geologic formations. However, salinity and selenium concentrations in these surface soils vary with site specific topographic position, the local climate, and the member of the Mancos shale that weathered to produce the soil. Steep, badland shale areas generally exhibit higher surface soil salinity concentrations than valley fill or outwash, shale derived soils. Within the badland areas, the southerly and westerly, hill slope aspects are higher in surface salinity levels compared to the more northerly aspects. Other factors being equal, soil surface salinity and selenium concentrations tend to be higher in the more arid portions of the planning area.

| Table 2 Fragile Soil Acreage in the Planning Area[1] | | | |
|---|---|---|---|
| Soil Attribute | Low Potential | Moderate Potential | High Potential |
| Wind Erosion | 153,018 | 249,441 | 1,111 |
| Water Erosion | 211,798 | 94,263 | 62,213 |

26

| Table 2 Fragile Soil Acreage in the Planning Area[1] | | | |
|---|---|---|---|
| Soil Attribute | Low Potential | Moderate Potential | High Potential |
| Salinity/Selenium Enriched | | | 43,011 |
| Potential for Biological Soil Crust | | | 186,728 |

[1] The total acreage under each soil attribute varies from each other and the total planning area acreage as a result of the specific set of soil units rated for each attribute by the Natural Resources Conservation Service.

The yield of both salinity and selenium to receiving water courses from Mancos shale derived soils is positively correlated with erosion rates. That is, the higher the rate of soil erosion, the greater the yield of both salinity and selenium. Both salinity and selenium are water quality issues in the planning area (see the Water Quality section for more specifics on this issue).

27

BLM_0015226



Figure 1 - Potential for Soil Erosion from Water on Un-surfaced Roads and Trails in the Planning Area

28

BLM_0015227

## Environmental Consequences

**Impacts Common to All Alternatives**

Soil resources rarely benefit from un-surfaced travel routes. Commonly, travel routes alter and expand drainage patterns, and collect and concentrate runoff which can accelerate erosion rates above natural conditions. Travel routes across the planning area include locations in both uplands and channel bottoms, with variable soil conditions. Travel routes on areas dominated by either rock outcrop or high rock content in the soil matrix are somewhat resilient to surface impacts, while the finer textured soils containing little rock in the near surface horizons are more prone to accelerated erosion when disturbed. Travel routes crossing or running adjacent to stream channels have a higher potential of degrading water quality than routes on upland sites. Soil impacts from travel routes commonly include an increase in the soils bulk density from compaction, loss of vegetation and biological soil crust and destabilization of physical soil surface crusts and aggregates, all of which can accelerate soil loss from erosion. Overall, surface erosion from travel routes is dependent on physical soil factors, route grade and position on the landscape, traffic type and volumes, and the effectiveness of drainage maintenance.

**Impacts from No Action Alternative**

With the open travel status of the planning area under this alternative, the anticipated future increase in public land use would result in additional user created travel routes and diffuse off route use. This combined with no planned mitigation (i.e. travel route maintenance, seasonal and weather related closures, etc.) would result in a progressive increase in the amount and severity of soil disturbance, resulting in higher rates of accelerated soil erosion over time. Soil surface health would also decline, being able to support less vegetation and biological soil crust. Salinity and selenium yields would potentially increase on soils with excessive concentrations of these constituents. An increase of invasive plant species would potentially occur, as they commonly establish on disturbed soils.

> **Finding on the Public Land Health Standard for upland soils:** Under this alternative, soil productivity would be expected to decline over time as more user created routes and diffuse off road use increases. The lack of mitigation to keep travel route erosion at a minimum would also add to the decline of soil productivity. Consequently, ground surface disturbance would increase, decreasing the potential for healthy native vegetation communities and accelerating soil erosion. Thus, this alternative would not meet the intent of Public Land Health Standard #1.

**Impacts from Proposed Action Alternative**

Under the Proposed Action, travel would be restricted to existing routes, and all off route travel would be prohibited except for horseback and foot travel. Thus, soil surface impacts that result in reduced vegetation and biological soil crust cover and the resultant increase in soil erosion would be reduced compared to the present situation. Soil conditions would be expected to progressively improve over time compared to the no action alternative, as the expected increase in user created routes and open travel would not occur. Coincident with the expected improved soil surface conditions would be reductions in salinity and selenium yields from soils with excessive levels of these constituents.

BLM_0015228

**Finding on the Public Land Health Standard for upland soils:** Under this alternative, soil productivity and soil surface conditions would improve over time as off route travel and user created routes are eliminated. Thus, implementation of this alternative would meet the intent of Public Land Health Standard #1.

## Cumulative Effects

The expected regional population growth over the coming decades will result in increased amounts of recreational and other types of surface disturbing activities on public lands, which could increase rates of soil erosion. Projected changes to the climate could also affect watershed, vegetation cover density in coming years which could also increase erosion from public lands. Measures such as maps, informational kiosks, regulations and enforcement will help educate the public land users about their travel-related impacts, and may lead many to adopt better travel practices which could reduce soil surface disturbance and minimize accelerated rates of soil erosion. Overall cumulative impacts from the proposed action are expected to be an improvement to the health of soils compared to the no action alternative.

VEGETATION (includes a finding on Standard 3)

## Affected Environment

Over 30 distinct vegetation classes occur at high levels on public lands in the planning area. These classes are tied to soil type as well as elevation and precipitation, and are characterized by various types and combinations of plant species. Upland vegetation communities are described below and riparian vegetation is described in the Wetland and Riparian section.

Drought tolerant vegetation classes described as saltbush and salt desert shrub communities occur at the lowest elevations of the planning area, and are found on saline soils derived from Mancos shale. These communities include the following shrubs: shadscale (*Atriplex confertifolia*), Gardner saltbush (*Atriplex gardneri*), mat saltbush (*Atriplex corrugata*), black greasewood, four-wing saltbush (*Atriplex canescens*), black sagebrush (*Artemesia nova*), winterfat (*Krascheninnikovia lanata*), snakeweed (*Gutierrezia sarothrae*) and prickly pear cactus (*Opuntia polycantha*) in varying amounts. Native grasses including western wheatgrass (*Pascopyrum smithii*), galleta grass (*Pleuraphis jamesii*), bottlebrush squirreltail (*Elymus elymoides*), Salina wildrye (*Leymus salinus*) and Indian ricegrass (*Achnatherum hymenoides*) are found on better condition sites. Many different forbs occur, but some of the most common are wild buckwheats (*Eriogonum* spp.), death camas (*Zigadenus venenosus*), and biscuitroots (*Lomatium* and *Cymopterus* spp.). Frequently, weedy exotic species are also present. Clasping pepperweed (*Lepidium perfoliatum*), filaree (*Erodium cicutarium*), burr buttercup (*Ceratocephala testiculata*), cheatgrass (*Bromus tectorum*), spreading wallflower (*Erysimum repandum*) and European madwort (*Alyssum simplex*) are among the most common.

With increasing elevation and precipitation, saline soils diminish, and the salt-adapted communities transition into the pinyon-juniper woodland class on rocky, steeper soils and the pinyon-juniper/sagebrush mix, sagebrush community, and sagebrush/grass mix classes on less rocky soils. The pinyon-juniper woodland is dominated by Utah juniper (*Juniperus*

30

BLM_0015229

*osteosperma*), with Colorado pinyon (*Pinus edulis*) in some areas. There is typically a sparse and variable understory that may contain remnant shrubs like Wyoming big sagebrush (*Artemesia tridentata wyomingensis*), birchleaf mountain mahogany (*Cercocarpus montanus*), Utah serviceberry (*Amelanchior utahensis*), snakeweed, yucca (*Yucca harrimaniae*), potato cactus (*Opuntia fragilis*), muttongrass (*Poa fendleriana*), Sandberg bluegrass (*Poa secunda*), and bottlebrush squirreltail. The sagebrush community is dominated by Wyoming big sagebrush or black sagebrush. Frequently snakeweed or four-wing saltbush is a secondary shrub in these communities, and there is an understory of the same native grasses found in the saltdesert shrub zone. Primary forbs in the area are western tansymustard (*Descurainia pinnata*), scarlet globemallow (*Sphaeralcea coccinea*), and numerous species of *Penstemon, Arabis, Astragalus, Lomatium, Erigeron, Phlox* and *Machaeranthera*. Nonnative forbs are widespread with filaree and burr buttercup among the most common. Nonnative grasses are very common with cheatgrass almost ubiquitous, and crested wheatgrass persisting in areas where it has been seeded.

In some areas, woodland (mainly juniper) occurs together with sagebrush at a higher level of canopy cover. These may be successional stages that follow fire or other major natural disturbance. Numerous fire scars of varying ages are evident in parts of the planning area. Grass-forb rangeland and grass dominated communities are also present in isolated areas in this zone. They contain the forb and grass species listed above, and are often the result of fire, mechanical treatment implemented to open the woodland canopy, or they occur on small inclusions of soil which are not suitable for tree or shrub growth.

At higher elevations the PJ/mountain shrub mix, mesic mountain shrub mix, sagebrush-mesic mountain shrub mix, PJ/oak mix, and Gambel oak classes are found. The pinyon-juniper community contains birchleaf mountain mahogany (*Cercocarpus montanus*), Utah serviceberry (*Amelanchior utahensis*), and Gambel oak (*Quercus gambelii*). With increasing elevation, Utah juniper and pinyon trees drop out of the community, and the mountain shrubs dominate the vegetation. In some areas Gambel's oak forms almost closed stands. Rocky Mountain juniper (*Juniperus scopulorum*) is present in some areas, while black chokecherry (*Prunus virginiana*) is found on more mesic sites intermixed with the other mountain shrubs. Roundleaf snowberry (*Symphoricarpos rotundifolius*) is common throughout most of these communities. Where there are openings between the typically dense shrub canopies, or in areas where the canopy is significantly above the ground surface, a productive understory of forbs and grasses exists. Commonly found species include elk sedge (*Carex geyeri*), Letterman's needlegrass (*Acnatherum lettermanii*), Kentucky bluegrass (*Poa pratensis*), muttongrass, Sandberg bluegrass, bottlebrush squirreltail, western wheatgrass, and nodding brome (*Bromus anomalus*). Forbs are numerous with many species. The most widespread and dominant include western yarrow (*Achillea millefolium*), lupine (*Lupinus* spp.), biscuitroot (*Lomatium* spp.), and aspen peavine (*Lathyrus lanzwertii*).

At the very highest elevations and in mesic drainages the Aspen, Douglas fir, and Spruce-Fir vegetation classes are found on BLM. The understory in the Douglas fir (Pseudotsuga menziesii) community is generally sparse but contains many of the same grasses and forbs found in the mountain shrub communities. The aspen (*Populus tremuloides*) understory typically contains snowberry and often black chokecherry, with a very productive understory of the grasses and forbs found with the mountain shrubs, in addition to mountain brome (*Bromus marginatus*),

31

BLM_0015230

Thurber fescue (*Festuca thurberi*), and slender wheatgrass (*Elymus trachycaulus*). The spruce-fir type contains Engelmann spruce (*Picea engelmannii*), and subalpine fir (*Abies lasiocarpa*), and has an understory typically dominated by whortleberry (*Vaccinium myrtillus*) and arnica (*Arnica cordifolia*)

Grass-forb rangeland is a vegetation class that occurs across the range of elevations. In some cases it is related to soil characteristics, in others it is a result of disturbance, and is a successional stage to other vegetation classes. The species are typically those grasses and forbs found in each of the different community types listed above.

In addition to the non-native species listed above, state listed noxious weeds are scattered in still isolated infestations across the unit. These are discussed in more detail in the Invasive Species section of this EA.

The current state of vegetation health has been determined by the various Land Health Assessments which have been carried out over the past 10 years (BLM 1999-2009). Vegetation across the area was subdivided according to soil types and grazing allotment boundaries, and then rated as meeting, meeting with problems, or not meeting Standard 3 for healthy plant and animal communities. The ratings for Standard 3 are shown in the following table by total acreage.

| Std 3 Rating for Healthy Plant Communities | Total Acreage in Planning Area |
|---|---|
| Meeting | 234,412 |
| Meeting with Problems | 155,700 |
| Not Meeting | 52,618 |
| Unknown or Not Upland | 14,104 |

Vegetation problems identified in the Land Health Assessments include low levels of perennial grasses, low perennial forb cover, poor shrub vigor and heavy hedging on shrubs, exotic plants, noxious weeds, and low vegetation diversity. These problems typically occur in some areas and not others. At the time of the Land Health evaluation, the problems were attributed to the following primary causes in order of prevalence: historic livestock grazing, the seral stage of the vegetation, noxious weeds, past vegetation treatments, roads, fire suppression, drought, nearby private lands and associated disturbance, wildlife use, current grazing, heavy browse use, harsh site conditions, mining, recent fire, rights of way, and OHV use. In addition to these, there were other causes for lands to have problems with vegetation, but they were more localized, or minor in nature. All Land Health Assessments are available for review in the UFO headquarters in Montrose.

## **Environmental Consequences**

### **Impacts Common to All Alternatives**

Routes generally degrade native vegetation. This has been well documented by numerous researchers in many locations (Forman and Alexander, 1998, Walker and Everett, 1987, Jones et al 2008, Trombulak and Frissell 2008). On public lands, vegetation degradation ranges from complete destruction on the route surface to impacts on the adjacent plant community. This

32

impact includes erosion and sedimentation associated with routes, introduction of weeds, depressed vegetation vigor due to production and deposition of dust, increased grazing levels from enhanced livestock and grazing animal access, and destruction or impacts from increased human presence, such as woodcutting, human-caused fires, dumping, and other activities. These off-route impacts often extend up to many feet on either side of a route in an effect researchers have termed "the road influence zone" (RIZ). In general, an area with more routes (expressed as higher route density) would have more degraded vegetation than an area with lower route density, if all other factors are equal. A route density of one route mile per square mile of land area is estimated to directly or indirectly impact approximately 1% of the vegetation within that square mile. These impacts will occur wherever there are existing routes.

**Impacts from No Action Alternative**
This alternative continues current travel management, which has contributed to the upland vegetation conditions in place today. If existing trends in community population growth, recreational use and increasing numbers of public land visitors continue, it is likely that there would be additional vegetation affected, and increased severity of impacts to the existing affected area. Increased RIZ impacts in the form of more dust deposition, weed seed introduction, route widening, and general human presence impacts could be expected to occur to vegetation where there are existing routes. In vehicle-accessible areas where there are currently no routes, it is likely that more vegetation will be damaged by new user-created routes that would develop after one or two initial off-road vehicle passes. Even where vehicle passage does not lead to new user created routes, vegetation damage would occur through physical disturbance, crushing, and possible deposits of weed seed into formerly undisturbed areas. Compared to the existing environment, impacts would be more weed infestations, loss of additional vegetation, depressed plant vigor through increased sedimentation onto vegetation, and in some places increased erosion that would affect vegetation. Anticipated damage to vegetation would be widespread throughout the planning area, moderate, and long term.

> **Finding on the Public Land Health Standard for plant and animal communities** (partial, see also Wildlife, Aquatic; Wildlife, Terrestrial; and Invasive, Non-native Species): The No Action Alternative would result in no changes to land health in areas where vehicle access is limited by topography or vegetation. Modest declines in land health ratings for vegetation for Standard 3 would be expected in areas where vehicle passage is not constrained by topography, rocks, vegetation or the soil surface. This is not consistent with the intent of Standard 3.

**Impacts from Proposed Action Alternative**
This alternative represents a change from the No Action Alternative in that it stops the increase of routes across public lands, prevents routes from widening due to use of larger classes of vehicles, and it also prohibits use on some routes during some periods of the year. In addition, it prohibits all cross country travel. As a result, it would freeze or at least reduce the rate of growth of most vegetation impacts at their current levels, and might reduce some impacts in some areas where routes are closed for a portion of the year. The proposed action would result in a cessation of direct damage to vegetation through crushing and removal associated with off road driving and new route creation. While growth of population and recreational use is expected to trigger modest increases in RIZ impacts along existing routes, some vegetation damage would be mitigated in some areas by seasonal closures and vehicle class restrictions. Seasonal closures

33

BLM_0015232

would provide some "rest" to route-side vegetation and reduce levels of vegetation damage associated with human presence. On balance, impacts to vegetation are anticipated to be beneficial in comparison to the No Action Alternative, and very minor, localized and short term in comparison with the existing situation.

>**Finding on the Public Land Health Standard for plant and animal communities** (partial, see also Wildlife, Aquatic; Wildlife, Terrestrial; and Invasive, Non-native Species): With the exception of slightly increased RIZ impacts from increased route use levels, the Proposed Alternative would largely freeze route impacts to upland vegetation, and would therefore have little influence on the existing status of upland vegetation relative to Standard 3. While some of the current vegetation problems are related to roads and OHV use, the Proposed Action represents an improvement over the No Action Alternative in that it stops a worsening trend for these parameters. As a result it is a first step toward correcting travel-related vegetation health problems and is consistent with the intent of Standard 3 of managing for healthy, native and desirable plant communities.

## Cumulative Effects

Population growth and residential development of surrounding private lands, increasing infrastructure development and right of way approvals on BLM, would continue to occur throughout the greater region if past trends continue. This will result in increased amounts of recreational and other types of usage and disturbance on public lands. In addition, as large scale and regional events like climate change and weed invasions occur, the upland vegetation would be expected to degrade. The cumulative effects of limiting travel to existing routes to mitigate growing recreational and other demands will help alleviate impacts from the pressure of existing and new users. Measures such as maps, informational kiosks, regulations and enforcement will help educate the public land users about their travel-related impacts, and may lead many to adopt better travel practices which would reduce vegetation impacts. Increases in the miles of routes from additional permitted activities would be analyzed in separate environmental assessments; however they would be expected to incrementally degrade vegetation. Seasonal closures will help mitigate weed spread and improve vegetation connectivity, which will be important for upland vegetation to be resilient to climate change. Overall cumulative impacts from the proposed action are expected to be favorable to upland vegetation in the planning area.

## INVASIVE, NON-NATIVE AND EXOTIC SPECIES

### Affected Environment

A noxious weed is any plant designated by a federal, state, or county government to be injurious to public health, agriculture, recreation, wildlife, or any public or private property (Sheley and Petroff, 1999). The state of Colorado has developed a noxious weed list which has been divided into three categories ("A", "B" and "C") that determines how noxious weed species will be managed. Along with this list there is a BLM National List of Invasive Weed Species of Concern. Both lists are available on the internet.

Within the planning area, there are approximately 10,000+ noxious weed infestations, and 2,526

BLM_0015233

of these are linear infestations, 420 are point (small infestations) and 7,031 are larger polygon infestations. These are conservative numbers as noxious weed surveys have not been completed for the entire planning area. These infestations are comprised of several noxious weeds that are on the Colorado Noxious weed list and the BLM species of concern list. The most prevalent across the planning area area include but are not limited to: tamarisk (*Tamarix ramosissima*), Russian knapweed (*Acroptilon repens*), Spotted knapweed (*Centaurea stoebe L. spp. micranthos*), Diffuse knapweed (*Centaurea diffusa)*, Yellow starthistle (*Centaurea solstitialis*), Whitetop (*Cadaria draba*), Canada thistle (*Cirsium arvense)*, Musk thistle (*Carduus nutans*), Bull thistle (*Cirsium vulgare*), Absinth wormwood (*Artemisia absinthium*), Dalmation and Yellow toadflax (*Linaria dalmatica and vulgaris*, respectively), Russian olive (*Elaeagnus angustifolia)*, and Oxeye daisy (*Chrysanthemum leucanthemum)*. Examples of other state-listed species from "List C" (where management emphasis is deferred to local governments) known to occur in the planning area are: cheatgrass (*Bromus tectorum*), halogeton (*Halogeton glomeratus)*, jointed goatgrass (*Aegilops* cylindrical), and field bindweed (*Convolvulus arvense)*. Herbaceous alien weeds are widespread and fairly common throughout the planning area including Jim Hill mustard (*Sisymbrium altissimum*), alyssum (*Alyssum* spp), and Kentucky bluegrass (*Poa Pratensis*), which are present at high levels in the native plant communities (BLM 2002).

## Environmental Consequences

**Impacts Common to All Alternatives**
It is widely known and documented that weeds (invasive and/or noxious) tend to sprout first where people and animals travel most: roads, trails, fields, and riparian areas (waterways). Unfortunately, when noxious weeds are established along these introduction points they are often overlooked and spread into adjacent areas where they can compromise the native ecosystem. In the Western United States on federal lands weeds are spreading at the rate of approximately 4,600 acres per day and have invaded about 17 million acres (BLM). Noxious weeds affect the health of recreation sites and are often introduced at staging areas where there is disturbance and bare ground for rapid establishment. A study in Montana demonstrated a single ATV can disperse more than 2,000 invasive noxious knapweed seeds over a 10 mile radius (Montana State University Extension Service, 1992). Tom Rooney, University of Wisconsin 2002, noted that noxious weed seeds are commonly transported by ATV and that a single ATV could potentially spread over 200 million seeds in Wisconsin over the next 20 years. A number of infestations could be avoided with educational signing explaining best management practices at key locations. A few of the impacts common to all alternatives include: decline in wildlife habitat and livestock forage, compromising of native plant communities and threatened and endangered species habitat, and increases in soil erosion and sedimentation into lakes, streams, and river systems.

**Impacts from No Action Alternative**
This alternative has the potential to increase invasive noxious weed establishment through the proliferation of user created roads/trail and cross country vehicular travel.

**Finding on the Public Land Health Standard for plant and animal communities** (partial, see also Wildlife, Aquatic; Wildlife, Terrestrial; and Vegetation): This alternative would result in increased establishment of invasive noxious weeds with proliferation outside already disturbed areas. This would cause declines in land health ratings for Standard 2, which is not

BLM_0015234

consistent with the intent of Standard 3.

**Impacts from Proposed Action Alternative**
Under the Proposed Action, travel would be restricted to existing routes, and off route travel by motorized and mechanized means would be prohibited. However, foot travel and equestrian use would still be permitted off trail and cross country.  Even though foot and equestrian use will still have the potential to introduce noxious weeds the distance these users travel and the soil disturbance associated is often much less than motorized and mechanized travel. The actions associated with this alternative would contribute to small decreases in noxious weed establishment in comparison to No Action Alternative. This is accomplished by allowing more effective inventorying and monitoring of noxious weeds along trails/roadsides which lend themselves more readily to early detection and rapid response.

> **Finding on the Public Land Health Standard for plant and animal communities** (partial, see also Wildlife, Aquatic; Wildlife, Terrestrial; and Vegetation): This alternative would result in a slight decrease in invasive noxious weeds especially in areas that have not had significant soil disturbance. It would also make early detection and rapid response and possible eradication much easier.  This would contribute to maintaining land health for Standard 3.

## Cumulative Effects

The projected population growth in the region will result in increased amounts of recreational and other types of usage and disturbance on public lands. The cumulative effects of limiting travel to existing routes will help detection and treatment of invasive noxious weed establishment in all vegetation communities.  Measures such as informational kiosks, education fairs, and enforcement of regulation will help educate the public land user about travel-related impacts and invasive noxious weeds, and would potentially lead to less disturbing travel practices. Overall cumulative impacts from the proposed action are expected to be a benefit to vegetation communities in the subject area.

**THREATENED, ENDANGERED, AND SENSITIVE SPECIES** (includes finding on Standard 4)

## Affected Environment

The Endangered Species Act (ESA), as amended (16 U.S.C. 1531-1534) mandates the protection of species listed as threatened or endangered of extinction and the habitats on which they depend. Section 7 of the ESA clarifies the responsibility of federal agencies to utilize their authorities to carry out programs for the conservation of listed species. In addition, federal agencies must consult with the U.S. Fish and Wildlife Service (Service) to ensure that any action authorized, funded or carried out by the agency is "…not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species…". The Uncompahgre Field Office refers to the most current Colorado county list provided by the U.S. Fish and Wildlife Service to analyze the effects of a proposed action on threatened, endangered and candidate species and designated critical habitat for these

36

BLM_0015235

species. In accordance with *BLM Manual 6840 Special Status Species Management*, the goal of management is to prevent a trend toward federal listing or loss of viability for sensitive species.

Appendix C lists potentially occurring federally protected species within the UFO and provides assessments for their occurrence within the planning area. A detailed description of each of these species, their distributions in the planning area and estimated habitat available are provided in the Biological Assessment for this project (BLM 2009). This document is available at the UFO headquarters in Montrose. In the Biological Assessment potential and occupied habitats were modeled, mapped, and quantified based on species' habitat descriptions and occurrence data. These habitat models are based on numerous sources including Uncompahgre Field Office files, Colorado Division of Wildlife data, Colorado Natural Heritage Program data, clearance survey reports, scientific journals, and others. This information was then used as a baseline to assess travel-related impacts on species and their habitats.

Appendix D and Appendix E lists BLM sensitive species that are known or have potential to occur within the UFO along with occurrence assessments for the planning area. Given the large scale of the planning area, most of these species or their habitats are present.

## Environmental Consequences

### Impacts Common to All Alternatives

Travel impacts on wildlife and plants depend on multiple factors (Table 3), and the interaction of those factors, and can result in any number of unique species' responses depending on the circumstances. Travel, spatial, temporal, species, and social variables all determine the level of impact travel has on a species and its habitat. Impacts on a species may include energetic costs, behavioral changes (feeding, breeding, sheltering), loss of fitness (survival, growth, reproduction rates), site avoidance, and others. Such impacts may be direct or indirect, and temporary or long-term. Refer to the Vegetation section in this document for a description of travel-related impacts on vegetation and habitats. Travel routes and travel activities can influence hydrology, surface and subsurface waterflows, sedimentation/ turbidity, and erosion rates and may also introduce or increase chemicals and other pollutants (e.g., salts, lead and other heavy metals, petroleum products, etc.) that may negatively affect aquatic species. Weed invasions are commonly associated with travel routes and may alter habitat composition, structure, and function. Also refer to the Riparian and Water Quality section in this document for more discussion on travel-related impacts on aquatic habitats.

Depending on the area and situation, authorization and use of existing routes may have ongoing and residual effects on species. This is particularly true for the endemic plants, Colorado hookless cactus (*Sclerocactus glaucus*) and clay-loving wild buckwheat (*Eriogonum pelinophilum*). Most impacts would be indirect—i.e., fugitive dust, chemical pollutants from dust abatement, etc.  Some species, such as the clay-loving wild buckwheat, are known to occur on or near existing routes including routes identified in the 2005 road inventory, and may even colonize disturbed areas.

### Impacts from No Action Alternative

Unrestricted travel and the proliferation of user-created routes will continue to affect federally protected and sensitive species and their habitats.  When new routes are created by users, impacts

BLM_0015236

on a species may increase which might include energetic costs, behavioral changes (feeding, breeding, sheltering), loss of fitness (survival, growth, reproduction rates), site avoidance as well as others. Also, plants could be crushed, and fugitive dust could impact plants that are removed from currently established routes.

**Finding on the Public Land Health Standard for Threatened & Endangered species:**
Under the No Action Alternative, habitat for imperiled, rare, or sensitive species would generally continue to be degraded and become less suitable as a result of unrestricted travel, cross-country travel, and route proliferation. This would indirectly impact species' productivity, resiliency, diversity, and vigor and their capability to reproduce and sustain natural fluctuations and ecological processes. Thus, in the future, it is possible that this standard would not be achieved in certain areas as a result of unrestricted travel.

**Impacts from Proposed Action Alternative**
Fourteen listed or candidate species occur or have potential to occur within the Uncompahgre Field Office (Appendix C). It was determined in the Biological Assessment that the proposed action "may affect" nine of these species. In general, the proposed action would benefit most species by limiting mechanized and motorized travel to existing routes, prohibiting cross-country travel, minimizing the creation of new routes, and concentrating activities in already disturbed areas. Travel impacts on species would continue to occur but would be reduced to a greater extent if the Proposed Action were implemented.

*ESA sec.7 Consultation*
In accordance with Section 7 of the Endangered Species Act, the BLM UFO prepared a Biological Assessment (BLM 2009) and initiated formal consultation for this project. The consultation package was received by the U.S. Fish and Wildlife Service (FWS) Ecological Services, Grand Junction, Colorado, on May 18, 2009. An updated Biological Assessment (BA) was sent by the BLM and received on June 4, 2009. The BA provides a detailed analysis of the impacts of the proposed action on federally protected species and quantifies those impacts based on the habitat models previously described. Also, the BA depicts a comparison of impacts of the Proposed Action and the No Action Alternative on threatened and endangered species. Final effects determinations for these species are provided in Appendix C.

The Fish and Wildlife Service issued a Biological Opinion on August 11, 2009. The Biological Opinion (BO) concurred with the BA's "may affect, is not likely to adversely affect" determinations for the Canada lynx (*Lynx canadensis*), Colorado pikeminnow (*Ptychocheilus lucius*) and its critical habitat, humpback chub (*Gila cypha*), bonytail (*Gila elegans*), and razorback sucker (*Xyrauchen texanus*) and its critical habitat. This concurrence is based on all of the conservation measures and rationale included in the BA.

The BO also determined that the proposed action is not likely to jeopardize the continued existence of Colorado hookless cactus (*Sclerocactus glaucus*) or clay-loving wild buckwheat (*Eriogonum pelinophilum*) in the planning area or the continued existence of the species. Although the proposed action did not meet the threshold of insignificant or discountable effects necessary in order to meet a "may affect, not likely to adversely affect determination", very few individual plants are expected to be negatively impacted. FWS's conclusions are based on the

38

BLM_0015237

following rationale and conservation measures, as provided in the BA (BLM 2009).
(Conservation measures are also incorporated as Proposed Action Design Features.)

The BO also determined that the Gunnison's prairie dog (Cynomys gunnisoni) and Yellow-billed
cuckoo (Coccyzus americanus) are not likely to result in a trend toward federal listing in the
planning area.

- Overall, the proposed action will likely benefit the species by limiting travel to existing
  routes, prohibiting cross-country travel, and minimizing the creation of new routes.
  Travel impacts on species would continue to occur but would be reduced to a greater
  extent if the proposed action were implemented.
- To minimize impacts on the species, within one year of the signing of the FONSI for this
  project, the BLM UFO will systematically install roadside signs to identify especially
  sensitive areas, areas where travel-related impacts on these species would be greater.
- In the future, all travel routes would be analyzed in greater detail, by geographic area.
  Based on this information, specific routes would be proposed for designation. These areas
  would then be changed from Limited to Existing Routes (result of the current proposed
  action) to Limited to Designated Routes. If impacts to listed species that were not
  analyzed in this consultation are expected to occur due to the future geographic area
  travel management planning, further consultation will occur at that time.

In accordance with the BO, reinitiation of formal consultation would occur if:

1. New information reveals effects the agency action that may adversely affect listed species
   or critical habitat in a manner or to an extent not considered in the BO;
2. The agency action is subsequently modified in a manner that causes an effect to a listed
   species or critical habitat that was not considered in the BO; and/ or
3. A new species is listed or any new critical habitat is proposed or designated that may be
   affected by this action.

The BO also provided the following Conservation Recommendations for the Proposed Action:

1. In order to reduce ongoing impacts to listed species, implement the proposed action as
   soon as possible.
2. Develop a listed plant survey program. Focus future survey efforts in areas where higher
   road density occurs near known or suspected listed plant locations.
3. During future route by route planning, strongly consider closing travel routes that are
   within 20 meters of known listed plant occurrences.

**Finding on the Public Land Health Standard for Threatened & Endangered species:**
Restricting motorized and mechanized to existing routes and minimizing route proliferation
are expected to improve habitat for imperiled, rare, and sensitive species. Among other
benefits, the proposed action would likely help reduce habitat degradation and fragmentation,
minimize weed invasions, and minimize direct impacts on biological communities. In turn,
species' productivity, resiliency, diversity, and vigor and their capability to reproduce and
sustain natural fluctuations and ecological processes should benefit. Therefore, this Standard
would be met under the Proposed Action.

BLM_0015238

**Cumulative Effects**

A variety of land uses occur within the planning area including recreation, irrigation and farming, ranching, residential development, hunting, and more. These activities will likely increase and continue into the future. To varying degrees, these activities are known to have a cumulative impact on federally protected species and habitats across the landscape. When viewed in conjunction with other past, ongoing, and future land uses, the proposed action is not anticipated to result in cumulative effects at a level that would appreciably impact these species. Overall, the proposed action should benefit species by limiting travel to existing routes, prohibiting cross-country travel, and minimizing the creation of new routes.

As it pertains to Sec.7 of the Endangered Species Act, "cumulative effects" are defined as "those effects of future State or private activities, not involving Federal activities that are reasonably certain to occur within the action area of the Federal action subject to consultation." In other words, cumulative effects do not include any past or ongoing actions, but involve only future non-federal actions. A variety of land uses occur on private and state lands adjacent to public lands within the project area. Current uses on non-federal lands may include irrigation and farming, ranching, residential development, recreational vehicle use, and hunting. These trends will likely continue into the future. To varying degrees, these activities could impact federally protected species and habitats across the landscape. When viewed in conjunction with future non-federal activities, the proposed action is not anticipated to result in cumulative effects at a level that would appreciably impact these species. Overall, the proposed action should benefit these species by limiting travel to existing routes, prohibiting cross-country travel, and minimizing the creation of new routes.


**MIGRATORY BIRDS**

**Affected Environment**

Plant communities within the analysis area provide habitats for a variety of migratory bird species. Refer to the Vegetation section of this document for a more detailed description of vegetation types in the planning area. The U.S. Fish and Wildlife Service list of Birds of Conservation Concern was used as to complete this analysis (USFWS 2008, Table 14, p.32, BCR 16 [Southern Rockies/Colorado Plateau]). Appendix D identifies the species from this list which are known or have potential to occur in the UFO and which are protected under the Migratory Bird Treaty Act (MBTA). Their likelihood of occurrence in the planning area is evaluated in the final column of the table. Due to the large scale of the planning area, most species are present or are likely to occur.

**Environmental Consequences**

**Impacts Common to All Alternatives**
Travel impacts on wildlife and plants depend on multiple factors (Table 3), and the interaction of those factors, and can result in any number of unique species' responses depending on the circumstances. Travel, spatial, temporal, species, and social variables all determine the level of

40

impact travel has on a species and its habitat. Impacts on a species may include energetic costs, behavioral changes (feeding, breeding, sheltering), loss of fitness (survival, growth, reproduction rates), site avoidance, and others. Such impacts may be direct or indirect, and temporary or long-term. Refer to the Vegetation section in this document for a description of travel-related impacts on vegetation and habitats.

| Table 3 Examples of factors that determine travel impacts on biological resources |
| --- |
| Zone of influence (proposed action area) |
| Travel mode (hiking, OHV, equestrian, pets, etc.) |
| Route density |
| Travel volume |
| Travel frequency |
| Travel duration |
| Travel intensity (noise levels, speeds, etc.) |
| Travel timing/ season |
| Habitat type |
| Site characteristics (soil or vegetation type; site resistance, resiliency, etc.) |
| Species biology and behavior |
| Individual animal habituation |
| Peoples' perceptions, values, and behaviors |

**Impacts from No Action Alternative**
Unrestricted vehicular travel and the proliferation of user-created routes will continue to impact migratory bird populations and habitats.

**Impacts from Proposed Action Alternative**
In general, the proposed action would benefit most species by limiting mechanized and motorized travel to existing routes, prohibiting cross-country travel, minimizing the creation of new routes, and concentrating activities in already disturbed areas. However, depending on the area and situation, authorization and use of existing routes may have ongoing and residual effects on species. This is particularly true for those species which rely on areas near roads that provide crucial habitats for breeding or nesting. Most impacts would be indirect—e.g., degradation of habitats through weed proliferation or fragmentation. Some species are known to occur near existing routes including routes identified in the 2005 road inventory, and may even prefer disturbed areas and edge, or transitional, habitats created by travel routes. Thus, there is also a risk of direct impacts as a result of the proposed action including mortality of individuals or inadvertent destruction of nests or eggs. However, it should be noted that some of these impacts are likely already occurring under No Action Alternative. Travel impacts on species would continue to occur but would be reduced to a greater extent if the Proposed Action Alternative were implemented. The proposed action would ultimately benefit bird communities by restricting motorized and mechanized travel to existing routes and trails. Continued use of existing routes by motorized and mechanized travel may impact individuals but would be unlikely to have a measurable impact on migratory bird populations or species, or their viability, on a landscape scale.

## Cumulative Effects

A variety of land uses occur within the planning area including recreation, irrigation and farming, ranching, residential development, hunting, and more. These activities will likely

BLM_0015240

increase and continue into the future. To varying degrees, these activities are known to have a cumulative impact on migratory birds and habitats across the landscape. When viewed in conjunction with other past, ongoing, and future land uses, the proposed action is not anticipated to result in cumulative effects at a level that would appreciably impact these species. Overall, the proposed action should benefit these species by limiting travel to existing routes, prohibiting cross-country travel, and minimizing the creation of new routes.

**WILDLIFE, TERRESTRIAL** (includes a finding on Standard 3)

## Affected Environment

The planning area supports a diversity of terrestrial wildlife species. Refer to the Vegetation section in this document for a description of vegetation communities and habitat types. Common species include deer and elk, bobcats, raccoons, rabbits, black bear, mountain lion, snakes, and lizards. The Colorado Division of Wildlife has identified numerous portions of the planning area as winter range, severe winter range, winter concentration areas, production areas, migration corridors, and highway crossings for mule deer, elk, pronghorn, and big horn sheep.

## Environmental Consequences

**Impacts Common to All Alternatives**
Travel impacts on wildlife and other species depend on multiple factors (Table 3), and the interaction of those factors, and can result in any number of unique species' responses depending on the circumstances. Travel, spatial, temporal, species, and social variables all determine the level of impact travel has on a species and its habitat. Impacts on a species may include energetic costs, behavioral changes (feeding, breeding, sheltering), loss of fitness (survival, growth, reproduction rates), site avoidance, and others. Such impacts may be direct or indirect, and temporary or long-term. Weed invasions are commonly associated with travel routes and may alter habitat composition, structure, and function. Also refer to the Vegetation section in this document for more discussion on travel-related impacts on terrestrial habitats.

**Impacts from No Action Alternative**
Unrestricted travel and the proliferation of user-created routes will continue to impact terrestrial species and habitats

> **Finding on the Public Land Health Standard for plant and animal** communities (partial, see also Vegetation; Invasive, Non-native Species; and Wildlife, Aquatic): Under the No Action Alternative, terrestrial habitats would generally continue to be degraded and become less suitable as a result of unrestricted travel, cross-country travel, and route proliferation. Thus, in the future, it is possible that this standard would not be achieved in certain areas as a result of unrestricted travel.

**Impacts from Proposed Action Alternative**
In general, the proposed action would benefit most terrestrial species by limiting mechanized and motorized travel to existing routes, prohibiting cross-country travel, minimizing the creation of new routes, and concentrating activities in already disturbed areas. However, depending on the

42

area and situation, authorization and use of existing routes may have ongoing and residual effects on species. Most impacts would be indirect—e.g., degradation of water as a result of sedimentation or alteration of riparian vegetation due to weed invasion. However, it should be noted that these impacts are already occurring under the No Action Alternative. Travel impacts on species would continue to occur but would be reduced to a greater extent if the Proposed Action were implemented. The proposed action would ultimately benefit terrestrial communities and habitats by restricting motorized and mechanized travel to existing routes and trails. Seasonal closures for big game crucial habitats identified in the current RMPs would remain effective under the Proposed Action, but more restrictive than current rules (see Proposed Action section for more details).

> **Finding on the Public Land Health Standard for plant and animal** communities (partial, see also Vegetation; Invasive, Non-native Species; and Wildlife, Aquatic): Those areas currently meeting this standard are expected to continue meeting, and are likely to improve, under the proposed action. Those areas not currently meeting this standard may also improve under the proposed action.

## Cumulative Effects

A variety of land uses occur within the planning area including recreation, irrigation and farming, ranching, residential development, hunting, and more. These activities will likely increase and continue into the future. To varying degrees, these activities are known to have a cumulative impact on terrestrial wildlife and habitats across the landscape. When viewed in conjunction with other past, ongoing, and future land uses, the proposed action is not anticipated to result in cumulative effects at a level that would appreciably impact these species. Overall, the proposed action should benefit these species by limiting travel to existing routes, prohibiting cross-country travel, and minimizing the creation of new routes.

## WILDLIFE, AQUATIC (includes a finding on Standard 3)

### Affected Environment

A variety of aquatic wildlife occur in the planning area including fish, amphibians, and reptiles. Common species include brook trout, rainbow trout, brown trout, carp, various suckers, mottled sculpin, speckled dace, Woodhouse toad, and garter snake. Aquatic habitats are also seasonally important to numerous other animals such as insects, waterfowl, and songbirds. Refer to the Riparian and Water Quality sections for additional information related to aquatic habitats. Also refer to the Threatened, Endangered, and Sensitive section, Appendix C, and Appendix E for a discussion of special status aquatic wildlife.

### Environmental Consequences

**Impacts Common to All Alternatives**
Travel impacts on wildlife and plants depend on multiple factors (Table 3), and the interaction of those factors, and can result in any number of unique species' responses depending on the circumstances. Travel, spatial, temporal, species, and social variables all determine the level of

BLM_0015242

impact travel has on a species and its habitat. Impacts on a species may include energetic costs, behavioral changes (feeding, breeding, sheltering), loss of fitness (survival, growth, reproduction rates), site avoidance, and others. Such impacts may be direct or indirect, and temporary or long-term. In general, travel routes and travel activities may influence hydrology, surface and subsurface waterflow, sedimentation/ turbidity, and erosion rates and may also introduce or increase chemicals and other pollutants (e.g., salts, lead and other heavy metals, petroleum products, etc.) that can negatively affect aquatic species. Weed invasions are commonly associated with travel routes and may alter riparian habitat composition, structure, and function. Also refer to the Riparian and Water Quality section in this document for more discussion on travel-related impacts on aquatic habitats.

**Impacts from No Action Alternative**
Unrestricted travel and the proliferation of user-created routes will continue to impact aquatic species and their habitats.

> **Finding on the Public Land Health Standard for plant and animal communities** (partial, see also Vegetation; Wildlife, Terrestrial; and Invasive, Non-native Species): Under the No Action Alternative, habitat for aquatic species would generally continue to be degraded and become less suitable as a result of unrestricted travel, cross-country travel, and route proliferation. Thus, in the future, it is possible that this standard would not be achieved in certain areas as a result of unrestricted travel.

**Impacts from Proposed Action Alternative**
In general, the proposed action would benefit most aquatic species by limiting mechanized and motorized travel to existing routes, prohibiting cross-country travel, minimizing the creation of new routes, and concentrating activities in already disturbed areas. However, depending on the area and situation, authorization and use of existing routes may have ongoing and residual effects on aquatic species. Most impacts would be indirect—e.g., degradation of water as a result of sedimentation or alteration of riparian vegetation due to weed invasion. However, it should be noted that these impacts are already occurring under the current management scenario (No Action Alternative). Travel impacts on species would continue to occur but would be reduced to a greater extent if the Proposed Action were implemented. The proposed action would ultimately benefit aquatic communities by restricting motorized and mechanized travel to existing routes and trails.

> **Finding on the Public Land Health Standard for plant and animal communities** (partial, see also Vegetation; Wildlife, Terrestrial; and Invasive, Non-native Species): Those areas currently meeting this standard are expected to continue meeting, and are likely to improve, under the Proposed Action. Those areas not currently meeting this standard may improve under the Proposed Action Alternative.

## Cumulative Effects

A variety of land uses occur within the planning area including recreation, irrigation and farming, ranching, residential development, hunting, and more. These activities will likely increase and continue into the future. To varying degrees, these activities may have a cumulative impact on aquatic species. When viewed in conjunction with other past, ongoing, and future land

BLM_0015243

uses, the proposed action is not anticipated to result in cumulative effects at a level that would appreciably impact these species. Overall, the proposed action should benefit these species and aquatic habitats by limiting travel to existing routes, prohibiting cross-country travel, and minimizing the creation of new routes.

## WETLANDS AND RIPARIAN ZONES (includes a finding on Standard 2)

### Affected Environment

There are 193 miles of perennial and intermittent streams on public lands in the planning area. The majority of these streams are perennial (116 miles), while the remainder are intermittent in flow but still have enough water to support major amounts of riparian vegetation. The 193 miles is estimated to support 3,474 acres of riparian habitat.

These drainages contain riparian vegetation which can be subdivided into shrub-dominated, cottonwood and evergreen dominated communities. The cottonwood vegetation class includes Rio Grande cottonwood trees (*Populus deltoides ssp.Wislizenii*) at lower elevations and narrowleaf cottonwood (*Populus angustifolia*) at higher elevations with occasional hybrids between these two occurring in small stands. There are some areas of boxelder (*Acer negundo*) trees as well. Sandbar willow (*Salix exigua*), thinleaf alder (*Alnus tenuifolia*), and water birch (*Betula occidentalis*) are the main shrub species near the water's edge. On higher terraces, skunkbush sumac (*Rhus aromatica*), silver buffaloberry (*Shepherdia argentea*), wood rose (*Rosa woodsii*), seep willow *(Baccharis salicina)*, New Mexico privet (*Forestiera neomexicana*) and clematis (*Clematis ligusticifolia*) are the most common species. Common reed grass (*Phragmites australis*) is present in some areas. Riparian vegetation at the highest elevations includes evergreens such as Douglas fir (*Pseudotsuga menzieseii*) and blue spruce (*Picea pungens*), often mixed with alder, dogwood, or higher elevation willow species. Ephemeral drainages are often dominated by tamarisk (*Tamarix chinensis*), greasewood (*Sarcobatus vermiculatus*) and seep willow.

Weeds are common in some of the riparian areas. Russian knapweed (*Acroptilon repens*), tamarisk, Russian olive (*Eleagnus angustifolia*), hoary cress (*Cardaria draba*) and Canada thistle (*Cirsium arvensis*) have invaded riparian communities in many areas resulting in degraded riparian habitat and community quality.

A major amount of the riparian area is associated with narrow, V-shaped valleys located at the bottom of steep canyons. This is particularly true of the higher elevation streams, where topography has isolated and protected them from route development and proliferation, and other direct human associated disturbances. Lower elevation streams tend to be in wider, flatter canyon bottoms which have traditionally served as access ways up into high plateaus or mountain areas.

Nearly all of the streams in the planning area have been assessed for Land Health within the past 13 years. One hundred ten miles of streams fully met the Standard 2 for healthy streams, 62 miles met Standard 2 with problems, and 19 miles were found to not meet Standard 2. Generally, stream health problems included one or more of the following: poor channel sinuosity and width

BLM_0015244

to depth ratios, exotic plant and noxious weed prevalence, inadequate vegetation and roots to protect streambanks, poor riparian plant vigor, riparian areas not reaching their potential extent, lack of riparian species where they would be expected, poor upland watershed condition affecting the riparian area, lack of diversity in vegetation age classes, and an imbalance between water and sediment. At the time of the Land Health evaluation, the problems were attributed to the following causes in order of prevalence: watershed condition, upland erosion, noxious or invasive weeds, water diversions, mining, regulated flow, road encroachment, grazing, roads, drought, augmented flows, upstream channel conditions, nearby private disturbed lands, irrigation tailwater, intermittent flow, stream channelization, flow regulations, channel erosion, current grazing, upstream water quality, geology, past vegetation treatments, and wildlife use.

There are very few lentic (non-riparian) wetlands which have been inventoried on BLM lands in the project area. Most are associated with stock ponds. These are low quality wetlands with little obligate wetland vegetation, and problems related to dewatering, irregular flow from irrigation water, heavy livestock use, and occasionally off road travel. It is likely that there are additional small naturally occurring wetlands associated with seeps and springs, however these have not been inventoried for wetland condition, and how the existing routes interact with them is not known.

## Environmental Consequences

### Impacts Common to All Alternatives

Routes generally degrade riparian and wetland areas. This has been well documented by numerous researchers in many locations (Forman 2008, Jones et al 2008, Trombulak and Frissell 2008). In addition to direct destruction of and impacts to riparian vegetation for the width of the route (estimated here as 6 meters in width including shoulder area), off-route impacts often extend up to many feet on either side of a route in an effect researchers have termed the "road influence zone" (RIZ). Riparian vegetation in this zone is at a greater risk of being degraded. Degradation includes weeds invading undisturbed riparian vegetation, overgrazing because of increased access for livestock and other grazers, sediment deposits onto the riparian vegetation, and increased erosion within the riparian zone. The amount of degradation varies depending on different route characteristics. These characteristics include the route's orientation within the riparian zone, its proximity to the stream, the substrate the route passes over, route width and the type and the level of use the route receives. In general, these impacts are additive, so that an area with more routes in and near riparian vegetation and wetlands would have more degraded riparian systems than similar areas with fewer routes.

### Impacts from No Action Alternative

This alternative continues current travel management, which has contributed to the existing riparian conditions in the planning area. If existing trends in local population growth, recreational use and increasing numbers of public land visitors continue, it is likely that there would be additional riparian acreage affected, and increased severity of impacts to the existing affected area. Impacts could be expected to occur to wetlands and riparian zones in vehicle-accessible areas where there are routes, and where there are no routes, as a result of the unrestricted cross country travel. These impacts would be incurred by new user-created routes that would likely be developed after one or two initial vehicle passes. Even where vehicle passage does not lead to new user created routes, vegetation damage would occur through

46

BLM_0015245

physical disturbance, crushing, and possible deposits of weed seed into formerly undisturbed areas. In addition, the existing routes would be available for use with any type of vehicle, and many would likely increase in width and level of direct damage to riparian areas over time. Impacts would be more weed infestations, loss of additional riparian vegetation, increased sedimentation onto riparian vegetation, and in some places increased erosion within the riparian zone. In some cases, channel alteration would be expected, which could further degrade riparian vegetation and function. Anticipated damage to the riparian area would be localized and minor to moderate in a few places, and long term.

**Finding on the Public Land Health Standard for riparian systems**: Alternative 1 would result in no changes to modest declines in land health ratings for Standard 2, particularly on lower elevation streams. This is not consistent with the intent of Standard 2.

**Impacts from Proposed Action Alternative**

This alternative represents a change from the No Action Alternative in that it stops the increase of routes in riparian areas, prevents routes from widening due to use of larger classes of vehicles, and it prohibits use on some routes seasonally. In addition, it prohibits all cross country travel within riparian areas. As a result, it would freeze most impacts at their current levels, and might reduce some impacts in some areas where routes are closed for a portion of the year. The proposed action would result in a cessation of direct damage to riparian vegetation through crushing and removal associated with off road driving and new route creation. In comparison with the No Action Alternative, it would also decrease the opportunities for weed invasion because of lower levels of disturbed soil and riparian vegetation. Riparian areas affected by routes which would be seasonally closed would be "rested" and the riparian species might incrementally recover from some of the vegetation damage associated with travel on those routes. Overall, anticipated improvements to the riparian area would be very minor, localized, and short term.

**Finding on the Public Land Health Standard for riparian systems**: The Proposed Action Alternative would largely freeze route impacts to riparian areas, and would therefore have little influence on the existing status of streams relative to Standard 2. While some of the current stream problems are related to poor watershed condition, upland erosion, and roads, the Proposed Action Alternative represents an improvement over the No Action Alternative in that it stops a worsening trend for these parameters. As a result it is a first step toward correcting travel-related stream health problems and is consistent with the intent of Standard 2 of managing for streams in proper functioning condition.

## Cumulative Effects

Population growth and residential development of surrounding private lands, increasing infrastructure development and right of way approvals on BLM, would continue to occur throughout the greater region if past trends continue. This will result in increased amounts of recreational and other types of usage and disturbance on public lands, including riparian areas and wetlands. In addition, as large scale and regional events like climate change and weed invasions occur, the riparian and wetland areas would be expected to degrade. The cumulative effects of limiting travel to existing routes to mitigate growing recreational and other demands will help alleviate impacts from the pressure of existing and new users. Measures such as maps,

BLM_0015246

informational kiosks, regulations and enforcement will help educate the public land users about their travel-related impacts, and may lead many to adopt better travel practices which would reduce riparian and wetland impacts. Increases in the miles of routes from additional permitted activities would be analyzed in separate Environmental Assessments; however they would be expected to incrementally degrade riparian areas where they pass through or near to them. Seasonal closures will help mitigate weed spread and improve riparian connectivity, which will be important for riparian/wetland areas to be resilient to climate change. Overall cumulative impacts from the proposed action are expected to be neutral to riparian/wetland areas in the planning area.

## FLOODPLAINS

### Affected Environment

Floodplains along the planning area's watercourses are managed in accordance with Executive Order 11988 – "Floodplain Management". Floodplains along the higher order rivers such as the San Miguel, Dolores, Uncompahgre, North Fork of the Gunnison and Lower Gunnison Rivers are FEMA mapped, at least in some reaches. The remaining lower order streams have no delineated floodplains, but are commonly considered to include the extent of the riparian zone bordering the channel, in reaches that are not incised. The floodplain width on low order stream systems, common throughout the planning area, is partially determined by the degree of valley confinement, and they typically extend less than 50 feet from the active channel banks. The primary benefit of floodplains is to dissipate floodwater energy and attenuate the magnitude of high flows. Other benefits include sustaining healthy riparian plant communities, and recharging alluvial ground water systems.

### Environmental Consequences

**Impacts from No Action Alternative:** Under the No Action Alternative, travel would remain open, both on and off travel routes. Consequently, additional user created routes would become established, some of which would occur in the floodplain influence zone. Travel routes in these locations can affect the functionality of floodplains and stream channels by physically disturbing vegetation and the soil surface. Travel routes in floodplains can also encroach on active stream channels, restricting the natural processes of channels dynamics and migration. Since floodplains dissipate stream flow energy during high flows, floodplain function can be compromised when travel routes encroach or isolate floodplains. Disturbance to vegetation on floodplains could also occur from spills of petroleum related products where motorized travel occurs. Thus, the potential impacts to floodplains would be expected to increase over time as more open travel use and user created routes occur.

**Impacts from Proposed Action Alternative:** Under the Proposed Action, travel would be restricted to existing routes, and all off route travel would be prohibited except for horseback or foot travel. These actions would result in less physical disturbance to stream channels and adjacent floodplains. Thus, floodplain function, stream channel stability, and water quality would be expected to improve under this alternative.

48

BLM_0015247

**Cumulative Effects**

The projected population growth in the region will result in increased amounts of recreational and other types of usage and disturbance on public lands, including both direct and indirect impacts to floodplains. In addition, continued climate change could result in invasive phreatophytic weed species, such as salt cedar that can affect the form and function of floodplains. The cumulative effects of limiting travel to existing routes to mitigate growing recreational and other demands will help alleviate direct impacts to floodplains from the pressure of existing and new users. Measures such as maps, informational kiosks, regulations and enforcement will help educate the public land users about their travel-related impacts, and would lead to less disturbing travel practices which would reduce impacts to floodplains. Overall cumulative impacts from the proposed action are expected to be a benefit to floodplains.


**WATER QUALITY/ HYDROLOGY** (includes information related to Standard 5)

**Affected Environment:**

The planning area covers portions of seven, 4th level hydrologic units (Table 4). Most of the subject public lands occur at the lower to mid elevations in these hydrologic units, where the annual precipitation varies from less than 8 inches on lands around Delta, Colorado to more than 25 inches on some of the higher elevation lands in the headwaters of the Uncompahgre, and San Miguel Basins. Table 5 shows the public land distribution across the planning area by 4th level hydrologic unit and amount of annual precipitation. These data show that 74% of the area receives 15 inches of annual precipitation or less, and less than 1% of the area receives more than 25 inches annually.

The larger drainages that headwater at higher elevations experience high flows from the spring season snowmelt which can last for several weeks. Baseflow in these drainages occurs from late summer through February or March. In all of the areas drainages, high magnitude, short duration flood flows occur in the summer months from localized, high intensity, short duration precipitation events associated with southwest monsoonal air flow. The frequency and magnitude of these events is highly variable from year to year. Localized flooding from these events can be significant in ephemeral channels, as flood waters commonly contain large amounts of accumulated vegetation debris and sediment. Additionally, watershed characteristics such as size, shape, slope, orientation, watershed cover condition, and soils can affect the magnitude of flood peaks produced from localized summer storms.

Table 4 **4th Level Hydrologic Units in the Travel Plan Area**

| Watershed | 4th Level Hydrologic Unit[1] | BLM Acres | Percent of Planning Area |
|---|---|---|---|
| Lower Dolores Basin | 14030004 | 53,783 | 11.68 |
| Lower Gunnison Basin | 14020005 | 94,958 | 20.63 |
| North Fork Gunnison Basin | 14020004 | 724 | 0.16 |
| San Miguel Basin | 14030003 | 167,632 | 36.41 |
| Uncompahgre Basin | 14020006 | 53,739 | 11.67 |

49

| Watershed | 4th Level Hydrologic Unit[1] | BLM Acres | Percent of Planning Area |
|---|---|---|---|
| Upper Dolores Basin | 14030002 | 82,500 | 17.92 |
| Upper Gunnison Basin | 14020002 | 5,872 | 1.28 |

1 – HUC – Hydrologic Unit Code developed by the US Water Resources Council to delineate and catalog the drainage basins of the United States.

Table 5 Table W-2 Annual Precipitation[1] in Planning Area (acres) by 4th Level Hydrologic Unit

| Watershed | Annual Precipitation (inches) | | | | |
|---|---|---|---|---|---|
| | < 10 | 10 - 15 | >15 - 20 | >20 - 25 | > 25 |
| Lower Dolores Basin | | 41,253 | 8,749 | 3,507 | |
| Lower Gunnison Basin | 912 | 58,591 | 31,685 | 3,770 | 274 |
| North Fork Gunnison Basin | | 724 | | | |
| San Miguel Basin | | 144,353 | 21,602 | 1,593 | - |
| Uncompahgre Basin | | 16,732 | 34,358 | 2,597 | 83 |
| Lower Gunnison Basin | | 73,764 | 8,736 | | 53 |
| Upper Gunnison Basin | | 1,545 | 1,836 | 2,226 | |
| Total Acres | 912 | 336,963 | 106,966 | 13,694 | 410 |

1.   PRISM Group at Oregon State University. June, 2006. United States Average Monthly or Annual Precipitation, 1971 – 2000. Corvallis, Oregon, USA

Water quality standards for the areas waters are set by the Colorado Water Quality Control Commission (CWQCC) and are applicable to all surface water drainages, including intermittent and ephemeral streams. The water quality classifications and standards applicable to the areas surface waters and downstream receiving streams are contained in the CWQCC's Regulation No. 35, Classifications and Numeric Standards for Gunnison and Lower Dolores River Basins (Colorado Water Quality Control Commission, July 2007).

In addition to the state's water quality classifications and numeric standards, all surface waters of the state are subject to the Basic Standards (Colorado Water Quality Control Commission, December, 2007), which in part read: state surface waters shall be free from substances attributable to human-caused point or nonpoint source discharge in amounts, concentrations or combinations that:

1. Can settle to form bottom deposits detrimental to the beneficial uses (e.g. silt and mud).
2. Are harmful to the beneficial uses or toxic to humans, animals, plants, or aquatic life.
3. Produce a predominance of aquatic life.

The intention of this narrative standard is to address and prohibit water quality degradation from excessive sediment, nutrients, or toxic compounds.

The sediment yield of the planning area's streams is largely associated with episodic, high flow events, resulting from intense precipitation events during the summer season. Sediment supplied to the area's streams during these events is from a variety of sources, including both in and near

50

BLM_0015249

channel, and upland sources. Unsurfaced roads and trails on soils most prone to erosion and accelerated levels of sediment production. Additionally, the existing network of travel routes in the area, as well as off route travel has the potential to intercept and concentrate storm runoff, which increases the sediment yield. High flow from snowmelt on the larger streams does transport sediment, but is mostly limited by the sediment supply in or near the channel.

Selenium loading of waters from sources on the planning area is primarily diffuse, non-point sources associated with natural runoff and erosion process. An assessment made by the local NRCS office determined that areas dominated by Mancos shale in its natural state contains up to 34 times the concentration of selenium compared to similar irrigated lands. On public lands, accelerated yields of selenium can occur from activities that result in soil surface disturbance and increased runoff and erosion.

Accelerated levels of salinity in surface waters are also an issue for the UFO. Table 6 shows salt loading for the higher order rivers with the planning area. The processes that cause salinity loading of waters are similar to those discussed above for selenium. And as with selenium, areas dominated by Mancos shale have the highest potential to yield dissolvable salts to receiving surface waters (Figure 2). Colorado has no state water quality standards for salinity but complies with Colorado River Basin-wide standards, promoted by the Colorado River Basin Salinity Control Forum. The BLM is also mandated by the Colorado River Basin Salinity Control Act (Colorado River Water Quality Office) to manage lands to minimize salinity yields to surface waters. Because of the semi-arid climate over much of the UFO, most of the salinity yielded from public lands is episodic, and only occurs during rainfall events that produce runoff. Thus, maintaining adequate watershed cover and healthy soil surface conditions are important for minimizing runoff, sediment and salinity from areas dominated by Mancos shale.

**Table 6 Salt Loading of High Order Rivers within the Planning Area**

| River Station | Salt Load (tons/day)[1] | | |
|---|---|---|---|
| | High Flow Season | Irrigation Season | Low Flow Season |
| Gunnison River above Uncompahgre River | 3,310 | 1,630 | 2,370 |
| Gunnison River near Mouth | 5,150 | 2,540 | 2,090 |
| Uncompahgre River at Ouray, CO | 95 | 70 | 30 |
| Uncompahgre River near Mouth | 935 | 1730 | 760 |
| San Miguel River at Uravan, CO | 800 | 220 | 205 |
| Dolores River at Bedrock, CO | 930 | 175 | 70 |

1 -Data Source- USDI, United States Geological Survey, Salinization of the Upper Colorado River – Fingerprinting Geologic Salt Sources - Scientific Investigations Report 2009-5072

BLM_0015250



Figure 2 Public lands in the Planning area with Soils Containing High Levels of Salinity.

The stream segments in Table 7 are on the 2008 Colorado 303(d) list (Colorado Water Quality Control Commission, April, 2008, 303(d)) of impaired waters and either include reaches of, or receive drainage from the planning area. The most widespread impairment to the areas water quality is excessive selenium. Elevated levels of selenium have been shown to cause reproductive failure and deformities in fish and aquatic birds. The Dolores River exceeds the standard for total recoverable iron, the source of which is

52

believed to be, in part, the high sediment load delivered to this river system. High concentrations of total recoverable iron are believed to be impacting to aquatic life.

**Table 7 Colorado 303(d) List of Water Quality Impaired Waters in the Planning Area**

| Water Source | Impairment | Priority |
|---|---|---|
| Gunnison River, Uncompaghre River to Colorado River | Selenium | High |
| Tributaries to Gunnison River, Crystal Reservoir to Colorado River | Selenium | High |
| North Fork of the Gunnison from Black Bridge above Paonia to the confluence within the Gunnison | Selenium | High |
| Big Creek, Short Draw | Selenium | High |
| Cottonwood Creek, Big Gulch | Selenium | High |
| Uncompahgre River, Red Mountain Creek to Montrose | Cadmium, Copper, and Iron | High |
| Uncompaghre River, La Salle Road to Confluence Park | Selenium | High |
| Uncompaghre River, Confluence Park to Gunnison River | Selenium | High |
| Tributaries to Uncompahgre River, South Canal to Gunnison River | Selenium | High |
| Dolores River from Little Gypsum Valley bridge to Colorado/Utah border | Iron | High |

The stream segments in Table 8 are on the 2008 Colorado Monitoring and Evaluation List (Colorado Water Quality Control Commission, April, 2008) of waters that are suspected of being water quality impaired, and either include reaches on, or receive drainage from public lands within the travel plan area. As sufficient water quality data are collected and analyzed for these stream reaches, they will ultimately be either removed from the Monitoring and Evaluation List or transferred to the 303(d) of impaired waters. While on the Monitoring and Evaluation List, the BLM recognizes the potential water quality impairment and manages lands draining to these streams to minimize further water quality degradation.

**Table 8 Colorado Monitoring and Evaluation List of Waters with Suspected Quality Impairments, in the Planning Area**

| Water Source | Suspected Impairment |
|---|---|
| Gunnison River from the confluence with the Uncompaghre River to the Colorado River | Sediment |
| Tongue Creek and Ward Creek | Selenium |
| Cottonwood Creek (tributary to the North Fork of the Gunnison) | Iron |
| Ridgway Reservoir | Dissolved Oxygen and Temperature |
| Uncompaghre River Highway 90 to confluence with Gunnison River | Sediment |

BLM_0015252

| Water Source | Suspected Impairment |
|---|---|
| Billy Creek, Onion Creek, and  Alkali Creek (tributary to the Uncompahgre River) | Selenium |

## Environmental Consequences

**Impact Analysis Common to all Alternatives**

Few if any hydrologic (water quality, quantity, and timing of flow) benefits occur from unsurfaced travel routes. Commonly, travel routes alter natural drainage patterns, collect and concentrate runoff, and accelerate both runoff and sediment yield. However, the route location on the landscape, soil erodability and degree of soil compaction on the route surface, and route design and maintenance all factor into the magnitude that hydrologic function and water quality is influenced. Routes located in lower topographic positions, in close proximity to or in drainages, have the potential to have the greatest impact to drainage channel stability and water quality. The following are some of the more common impacts that occur when travel routes are located within or close to stream channels.

- At route/stream crossings, channel geometry is altered, affecting floodplain function and channel stability, resulting in accelerated sediment yield.

- Routes parallel to stream channels often disturb riparian vegetation, which is needed for channel stability and proper floodplain function. Travel routes within close proximity to streams also have a shorter flow path to deliver concentrated runoff and sediment to the receiving drainage channel.

- Routes in or close to channels can more easily convey chemical contaminants (e.g., motor and hydraulic oils, grease, fuel, antifreeze, and heavy metals from tire wear) to the water course.

- Routes close to channels also have the potential to intercept surface runoff from the land area upslope, concentrating the runoff and routing it to locations less capable of conveying the flow without eroding.

- Routes in channels diminish bank stabilizing vegetation, shear channel banks, and pulverize channel bed substrate decreasing the substrate particle size and increasing the transportability of these materials, which increases downstream sediment yield.

Travel routes located on the upper portion of watersheds have less direct influence on drainage channels, but still have the potential to capture, redirect, and concentrate runoff from upslope, often onto the road or trail surface. Surface runoff captured and concentrated on travel route surfaces can augment high flow peaks in receiving streams. Concentrated flow on travel routes located on soils that have a high capacity to erode, results in accelerated soil erosion and a higher sediment yield to local surface water ways.

BLM_0015253

**Impacts from No Action Alternative**

The No Action Alternative would essentially leave the planning area in the current status of being open to all forms of vehicular travel, yearlong or seasonally. Over time the area would be expected to experience a progressive increase in the number of user created travel routes and diffuse, off route travel. User created travel routes are often poorly located and designed and receive little or no drainage maintenance. Indiscriminant off route use disturbs soil surface vegetation cover and biological soil crust. The resultant water quality and quantity impacts would include accelerated sediment yield, the potential addition of petroleum based contaminants from motorized forms of travel, and augmented high flows from concentrated runoff. On soils derived from Mancos shale (Figure 2), salinity and selenium yield increases would be expected where surface soil disturbance occurs.

Accelerated sediment production could have both on and off site impacts. On site sediment impacts include excess deposition in stream channels and loss of aquatic life habitat in perennial streams, and more frequent maintenance of livestock water impoundments.

Off site sediment impacts include potential damage to farm or irrigation facilities that receive drainage from the plan area (see Farmlands, Prime and Unique), and accelerated sediment, salinity, selenium, and iron delivery to the streams on the 303 (d) and monitoring and evaluation lists.

> **Finding on the Public Land Health Standard for Water Quality:** The potential exists for an accelerated and progressive increase in levels of sediment, salinity and selenium from the planning area, which could be transported to waters presently on the Colorado Monitoring and Evaluation List and 303(d) list. Leaving the area open to all forms of travel would potentially result in more riparian areas not meeting the rating of "Proper Functioning Condition", and unstable stream channels. Consequently, the "no action" alternative would not, in the long term, meet the Water Quality, Public Land Health Standard.

**Impacts from Proposed Action Alternative**

The greatest change from present, in the proposed action that would benefit water resources, is restricting mechanized and motorized forms of travel to existing routes and prohibiting all cross country travel except by foot and horseback. These actions would prevent additional soil surface disturbance and the associated, accelerated levels of sediment and on soils derived from Mancos shale, salinity, and selenium. Additional impacts to stream channel stability from travel route crossings, and the nearby channel zone (within 100' of stream channels) would be avoided. This would benefit water quality by minimizing sediment availability and the potential addition of petroleum based contaminants to stream systems.

Other actions in this proposal that would benefit water resources are implementation of a public education program, providing maps of existing routes, seasonal restrictions, and having more law enforcement and other BLM staff patrolling the area to ensure plan compliance. These actions would help ensure that public use of travel routes is in compliance with the travel plan, which is designed to manage soil and water resources to meet the Public Land Health Standards. Additionally, allowing route use decisions to be modified based on changing resource, or climatic conditions (adaptive management) would also prevent impacts to water quality by avoiding disturbance to soil resources, stream channels, and riparian areas. Concentrated runoff

55

BLM_0015254

and augmented flood peaks, often a result of a high density of travel routes would also be avoided.

> **Finding on the Public Land Health Standard for Water Quality:** With implementation of the proposed action, water quality would improve over time when compared to no action. Several actions with this alternative (discussed in Water Quality Impacts section above) would benefit water quality by managing the area to minimize soil and stream channel disturbance, thereby reducing accelerated runoff, sediment, salinity, and selenium. Thus, implementation of this alternative would meet the intent of Public Land Health Standard #5.

## Cumulative Effects

The expected regional population growth over the coming decades will result in increased amounts of recreational and other types of surface disturbing activities on public lands, which could increase sediment yields to receiving surface waters. Projected changes to the climate could also affect watershed, vegetation cover density in coming years which could also increase sediment yields from public lands. Measures such as maps, informational kiosks, regulations and enforcement will help educate the public land users about their travel-related impacts, and may lead many to adopt better travel practices which could reduce soil surface disturbance and minimize impacts to water quality. Overall cumulative impacts from the proposed action are expected to be an improvement to water quality compared to the no action alternative.

## WASTES, HAZARDOUS OR SOLID

## Affected Environment

Hazardous and solid wastes are not a part of the natural environment but are introduced into the environment either intentionally, through illegal dumping or in some instances as a by-product of commercial/industrial activities (i.e. mining), or accidentally, in the form of spills. Solid and hazardous waste issues are addressed as they are discovered. Response to the discovery of solid wastes (hazardous wastes are a category of solid wastes) is dictated by various State and Federal laws. Foremost among these is the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. 9601 et seq.) and Resource Conservation and Recovery Act (RCRA) (42 U.S.C. 6901 et seq.). CERCLA outlines a clear procedure for assessing and removing hazardous materials and repairing damage from these materials. RCRA defines which materials are hazardous wastes and regulates the transportation and disposal of those wastes. CERCLA also has a mechanism to identify hazardous waste sites and prioritize them for cleanup with the worst being placed on the National Priorities List (NPL.) There are no NPL sites in the area subject to this plan

## Environmental Consequences

**Impacts Common to All Alternatives**
Hazardous materials and hazardous wastes are, almost exclusively, a by-product of human activities and the distribution of these hazardous materials follows the transportation network, which includes roads, rivers, and railroads. In this case, the more roads there are, the greater the

BLM_0015255

possible distribution there will be of illegal dumping and accidental spills. Illegal dumping generally is along or immediately off of improved roads. There is no record of illegal dumping from OHV's in the subject area. Accidental spills would be expected to involve commercial vehicles along improved roads. An accidental spill from an OHV would most likely be fuel, and limiting the OHV access would limit the areas subject to this occurrence. However, incidents of this nature are likely rare and most likely not of great consequence. Limiting the miles of roads and trails overall, will not likely reduce the instance of hazardous materials spilled or dumped on the public lands. It would only limit the instances to a smaller area. The argument might be made that since the purpose of limiting vehicle travel on public lands is to protect critical habitats and wildlife, either seasonally or year-round, limiting the likelihood of there being hazardous wastes either dumped or accidentally spilled in these areas at the critical times would have a positive effect. Still, overall, the impacts of regulating OHV use in the subject area will not likely affect the frequency or harmful impacts from dumping or spilling of hazardous materials as this activity is most likely to occur along, or immediately off of improved roads.

**Impacts from No Action Alternative**
Little or no impact other than described above.

**Impacts from Proposed Action Alternative**
Little or no impact other than described above.

## Cumulative Effects

As a trail receives more use, it may eventually become a road and might provide an opportunity to be used for illegal dumping and thus, might increase the area available for this activity. However, as noted above, limiting the proliferation of trails and roads will not likely limit the occurrence of illegal dumping overall.


# ENVIRONMENTAL JUSTICE

## Affected Environment

While analyzing a federal action, BLM identifies and addresses, as appropriate, disproportionately high and adverse human health and environmental effects of program, policies, or activities on minority or low income populations. Environmental Justice involves the fair treatment, which means that no group of people, including a racial, ethnic, or socio-economic group, should bear a disproportionate share of the negative environmental consequences resulting from a federal action.

Census data from 2008 (estimated) shows that non-Hispanic whites comprised 82.3% of the population in Montrose, San Miguel, Ouray, and Delta counties, which is higher than the Colorado average of 71%. Native Americans represented 1.1% of the population in the same counties, similar to the Colorado average of 1.2%. The Hispanic population represented 14.6% of the counties, below the Colorado average of 20.2% (U.S. Census Bureau; Quickfacts.census.gov)

BLM_0015256

In 2007 (estimated), 11.8% of the populations in Montrose, San Miguel, Ouray, and Delta counties earned incomes below the federal poverty level compared to a Colorado average of 11.5% (U.S. Census Bureau; Quickfacts.census.gov)

## Environmental Consequences

**Impacts from No Action Alternative**
This alternative would not change existing uses within the planning area.  OHV designations would remain the same therefore recreational uses would not be altered.  Although demands and impacts would continue to increase, it is not anticipated this alternative would result in a disproportionate impact on minority or low income populations.

**Impacts from Proposed Action Alternative**
The proposed action was developed based on the stated purpose and needs.  The entire area (on any route and cross-country) would remain open to horse riding and hiking.  The proposed action would not have a disproportionate impact on minority or low income populations because opportunities for recreation have still been maintained for both non-motorized and motorized travel.

## Cumulative Effects

Cumulative impacts that would be measurable would not likely occur as a result of implementation of either alternative.

BLM_0015257

**Other Elements**

The following elements are considered.  Those that could be impacted are brought forward for analysis.

| Other Elements | Not Applicable or Not Present | Present, But No Impact | Applicable & Present; Brought Forward for Analysis |
|---|---|---|---|
| Access | | | X |
| Transportation | | | X |
| Cadastral Survey | | X | |
| Realty Authorizations | | | X |
| Range Management | | X | |
| Forest Management | | | X |
| Fire | | X | |
| Hydrology/Water Rights | | | X |
| Noise | | X | |
| Recreation | | | X |
| Visual Resources | | | X |
| Geology and Minerals | | X | |
| Paleontology | | | X |
| Law Enforcement | | | X |
| Socio-Economics | | | X |

## TRANSPORATION AND ACCESS

**Affected Environment**

In preparing for this RMP Amendment, the BLM conducted an inventory of the existing routes. Whenever possible, the inventory utilized global positioning satellite (GPS) and geographic information system (GIS) technologies to accurately locate and accumulate information about the routes.  In areas that could not be physically reached for utilizing GPS, other means were used to capture the routes, including aerial photo interpretation and the transference of existing transportation data from other reliable sources.  During the inventory process all existing routes in the planning area, including those not under BLM jurisdiction (Non-BLM routes) were recorded.  Non-BLM routes are not affected by BLM management other than cooperating with the jurisdictions for maintenance.  Existing BLM RMP decisions do not affect these roads in any manner. These routes would remain available to the public under all of the alternatives and usage would be according to the managing jurisdiction statutes. Maps located in Appendix A shows the existing routes in the planning area.

Within the planning area, the existing BLM road network consists primarily of low standard dirt routes that are linked to county roads. Currently approximately 2,793 miles of existing routes are available for non-motorized use and motorized use with any type of vehicle.

BLM_0015258

Montrose, Delta, Ouray, Mesa, Gunnison and San Miguel Counties have several county roads (Non-BLM roads) throughout the Uncompahgre Field Office planning area which are open for public use.

Most of the existing routes were developed to provide access for specific activities, such as livestock grazing management, harvesting forest products, constructing power transmission and telephone lines, constructing flood control "check dams", constructing irrigation ditches and pipelines, performing "chaining" operations, hunting access, recreation activity travel, and suppressing wildfires. Many of the BLM routes were developed over time to serve needs for temporary or intermittent access and were not designed to serve sustained high levels of use.

Under the existing RMPs covering the Uncompahgre Field Office, the planning area contains four categories of OHV designations: Open, Limited to Designated Routes from December 1 to April 30, Limited to Designated Routes from May 1 to June 15, and Closed. These designations are used by BLM to establish where and to what extent motorized uses may occur on public lands. See the Introduction and Background section for definitions of these designations. However, since the RMPs have been in effect, no routes in the planning area have been designated on the ground as a result of travel management planning which is required to implement these seasonal route designations and restriction decisions. Maps in Appendix A show the existing and proposed off-highway vehicle designations and location of existing routes in the planning area. Table 1 shows the acreages of public land and miles of existing routes within existing OHV designations in the planning area.

In today's environment, BLM routes are needed to serve a variety of uses for many purposes in addition to recreation pursuits. Over the years, some routes have been improved to accommodate changes in the types of vehicles that become available and to respond to the growing use of the public lands for multiple use management activities. Routes are still needed for these purposes, such as access for power line maintenance and building and maintaining fences, but they are also used for a wide variety of recreational uses as well.

## Environmental Consequences

### Impacts Common to All Alternatives
Existing routes would continue to impact resources and values discussed in the various components of this Environmental Assessment to varying degrees. New BLM authorized routes would continue to be planned, designed, and located on appropriate sites with appropriate environmental documentation to minimize impacts to soils and watersheds. New access easements would be acquired as needed through cooperation with other landowners and managers.

### Impacts from the No Action Alternative
Existing routes would continue to be available for the public for all non-motorized and motorized uses. New user created routes would continue to be established by a variety of users and for a variety of purposes through cross country travel and use throughout the planning area.

60

Existing OHV decisions that would restrict motorized or mechanized modes of travel in the current RMPs would continue to be under-implemented until further travel management planning was completed, resulting in continued, yearlong, on-route and cross-country travel throughout the planning area.  A high potential exists for many new user-created routes to be developed. The current policies allowing the use of bicycles and other mechanized vehicles off existing routes and driving motorized vehicles off routes would be unchanged.

Environmental impacts from the increased use of poorly located and designed routes would steadily grow over time. New user created routes and conflicts resulting from the incompatible uses of routes would also steadily increase.

Impacts to the management of the transportation system would also steadily grow over time. An increasing need for route maintenance would result from this alternative. However, as recreation uses on Public Lands increase with frequency, the number of miles of routes that would require regular maintenance would also gradually increase.  Increased reconstruction and maintenance efforts would be needed to mitigate the deterioration of new and existing routes that were not designed for sustained or high levels of use, but experience increased amounts of traffic. The eventual closure and rehabilitation of some routes could also be required where severe resource impacts or conflicts with other uses occur.

**Impacts from the Proposed Action Alternative**
Changing existing OHV designations and prohibiting all cross country travel using motorized and non-motorized vehicles would generally benefit the overall management of the transportation system for planning, construction, and maintenance needs.  Closing certain areas seasonally to motorized and mechanized modes of travel would also benefit the transportation system in that traffic would be restricted during potentially wet periods.

Any new routes proposed would be planned, designed, and located to minimize impacts to resources in the affected areas and documented with the appropriate environmental documentation.

In the short term, this alternative could require additional maintenance efforts, particularly for replacing signs that are likely to be removed or vandalized during the first few years after implementation. In the long term, however, the removal and vandalism of signs should decrease as users become familiar with the changes in OHV designations and route restrictions.  Also partnering with specialized user groups could result in cooperative route maintenance and construction.

None of the inventoried routes in the planning area would be closed yearlong in this alternative unless necessary to mitigate hazardous route conditions or excessive resource damage.

**Cumulative Effects**

In addition to growth in recreational travel, reasonably foreseeable actions that may affect transportation in the future on private and public lands include continued residential growth, mechanical and prescribed fire fuels reduction/habitat projects, county road maintenance and upgrades, utility corridor maintenance and upgrades, and new rights-of-way. Other future

61

BLM_0015260

activities on public lands in the travel planning area that could also potentially impact transportation and require mitigation include Forest Service planning and projects, local land use planning, soil research, BLM Uncompahgre Field Office Resource Management Plan revision and new RMP for Dominquez Escalante National Conservation Area, continued population growth, vegetation treatments, county road upgrades, special recreation permits and activities, and utility rights of way and corridors. The cumulative impacts to transportation from all action alternatives will be dispersed, long-term and require on-going monitoring and mitigation by BLM and partners.  Future travel management planning would be conducted, which would, over time, decrease cumulative effects on public lands.

## REALTY AUTHORIZATIONS

### Affected Environment

The public lands throughout the planning area are generally made available to all types of land use authorizations.  Typical authorizations in the planning area include: roads, gas and water pipelines, other water facilities such as irrigation ditches and canals, electric powerlines and substations, telephone lines, communication sites, energy related facilities such as compressors, film permits and reservations to other federal agencies.  In recent years an average of 25 rights-of-way have been processed per year.

### Environmental Consequences

**Impacts Common to All Alternatives**
All rights-of-way, existing or new, would be subject to the terms and conditions and stipulations specific to the authorization.

**Impacts from No Action Alternative**
There would be no impacts to realty authorizations under the No Action Alternative.  New rights-of-way would be analyzed on a case-by-case basis and would be subject to additional NEPA analysis.

**Impacts from Proposed Action Alternative**
Under the Proposed Action Alternative there would be no impact to existing realty authorizations since they are considered prior existing rights, and they would continue to be subject to the stipulations of the existing authorization.  New rights-of-way would be analyzed on a case-by-case basis and would be subject to additional NEPA analysis.  They could be subject to the seasonal road closures of the Proposed Action.

### Cumulative Effects

The proposed action would not add incrementally to the impacts of existing or future rights-of-way within the planning area since the proposed action allows holders to operate within the terms and conditions and stipulations of their authorization.

BLM_0015261

## FOREST MANAGEMNT

### Affected Environment

The planning area includes all of the forest types found throughout the Uncompahgre Field Office (UFO). (See the Vegetation section for additional information). The dominant forest cover types in the planning area are pinyon woodlands, juniper woodlands, and mixed pinyon-juniper woodlands.

Ponderosa pine, Douglas fir, aspen and some spruce-fir mix are found in the planning area, but are limited in extent and generally not in commercial quantities. The entire planning area, except for Wilderness, Wilderness Study Areas, and some ACECs are currently available for firewood and post and pole cutting and gathering by individuals. The BLM conducts no commercial sales of forest products in the planning area except where other resource objectives are desired, where stands are in need of restoration due to past management activities, or fire suppression has altered stand characteristics. Non-commercial Christmas tree and transplant harvesting occurs in designated locations within the planning area. Personal use firewood gathering is authorized by permit. Approximately 254 cords of firewood were sold under personal use firewood permits, 354 Christmas tree permits, 7 rail post permits, and 1 bough permit were issued in 2008. Stipulations for minimizing resource impacts are attached to each permit that is issued, including permitted off-route use of motorized vehicles. Forest product permits that are issued to the general public currently include a stipulation that limits parking to within 10 feet of existing open routes. Because of the close proximity of the public lands to the towns and communities, firewood cutting, post and pole cutting, and Christmas tree cutting are important uses of resources on public lands.

Some unauthorized firewood cutting and harvesting does occur in the planning area.

Very little recent forest management activity has been accomplished in the planning area on public lands. Numerous pinyon-juniper chainings were conducted in the past on the ridges and mesa tops within the planning area on approximately 15,900 acres. These chained areas are being re-vegetated naturally with shrubs and scattered pinyon-juniper communities. Most forest management related actions in the planning area have been conducted within these formerly chained areas to develop greater age class diversity and improve forest health and resiliency to disturbance.

There are approximately 319,315 acres of forested cover types within the planning area (see table below). Of the total acreage 93% of forested lands within the planning area are pinyon-juniper communities. Approximately 569 acres of these communities do not currently meet health standards while approximately 2,341 acres of forest cover type are meeting land health standards with problems that range from insects, disease, or presence of invasive species. (Uncompahgre Field Office Land Health Assessments 1999-2008, available in Uncompahgre Field Office).

63

BLM_0015262

| Forest Cover Type | Acres |
|---|---|
| Aspen | 324 |
| Aspen-Spruce | 79 |
| Cottonwood | 202 |
| Douglas fir | 305 |
| Juniper | 13,961 |
| Oakbrush | 540 |
| Pinyon-Juniper (Non-Productive) | 3,656 |
| Pinyon-Juniper (Productive) | 296,325 |
| Ponderosa Pine | 1,009 |
| Spruce-Fir | 2,394 |
| Spruce-Fir-Aspen | 519 |
| **Total** | 319,315 |

Historic photos and tree stand structure indicate that in some areas in the planning area pinyon-juniper woodlands have increased in density within the last century and have expanded into other plant communities. Recent long-term drought has brought on an Ips beetle epidemic in much of southwestern Colorado. Many other pinyon pathogens have also combined with these to create "pinyon decline" which kills the pinyon trees. Because pinyon are such an important part of the plant communities in the planning unit, pinyon decline has been used as an indicator of health during the Land Health Assessments, and captured by evaluating the vigor or pinyon trees. Pinyon decline was observed at many sites across the unit, and is especially prevalent in the southern part of the unit.

Approximately 1,885 miles of existing routes and trails traverse the forest cover types, and all the routes are available for motorized use. The more accessible routes are used to gather and cut firewood using full-size pickup trucks and small utility trailers. All the available public lands are currently available for motorized, cross-country access for this activity.

## Environmental Consequences

**Impacts Common to All Alternatives**
Existing and future individual firewood permits and permits for gathering other forest products would be issued, with stipulations that address motorized vehicular access. Permits could contain stipulations regarding resource impacts or limiting the activity in wet weather. Public lands could be closed to the gathering of forest products in the event of fire danger or other safety concerns.

**Impacts from No Action Alternative**
As populations continue to grow in the area, the expected increasing demands for forest product gathering or cutting would result in an increase in the rate of creation of new routes from cross-country travel for this activity and continued loss of vegetation and additional soil disturbance.

64

BLM_0015263

**Impacts from Proposed Action Alternative**

Limiting all motorized travel for forest management activities to designated routes would not greatly affect the implementation of forest management programs.

Public forest product acquisition could become slightly less accessible as product removal, away from existing routes, will need to be with non-motorized or mechanized means. Product removal such as wood cutting would occur at greater concentration levels adjacent to approved routes, on those lands within proximity to towns or sub-divisions within the planning area, while the more rural routes will see very little forest product gathering activities.

Limiting route proliferation from all activities will greatly reduce the loss of vegetation, introduction of noxious weeds, and soil disturbance within the forest types in the planning area. Such reduced disturbances should result in greater opportunity for the forest cover types to meet public land health standards.

## Cumulative Effects

The alternatives under consideration create no long-term adverse or beneficial cumulative effects to forest management in the travel planning area when considered with other reasonably foreseeable actions.

## HYDROLOGY/WATER RIGHTS

This information and analysis was combined with the "Water Quality" section.

## RECREATION

## Affected Environment

The goal of recreationists using public lands is to obtain satisfying recreational activities in attractive settings. Resource managers have two goals in providing recreation opportunities. The first is to provide the recreational opportunities; the second is to minimize the impacts of recreational use on the natural resources. Recreation managers try to provide opportunities through management of natural resource settings, and the activities that occur within them. To obtain this goal, settings and probable opportunities have been set along a spectrum called the Recreation Opportunity Spectrum (ROS) (see Glossary). A broad spectrum of recreation opportunities are provided in the UFO, ranging from primitive to urban-interface settings. User-created roads and trails, and increases in off-route motorized and mechanized use, have changed the planning area to a semi-primitive motorized setting and, in some cases, even a roaded-natural setting.

Recreation opportunities in the UFO vary by season, topography, and vegetative cover. The diversity of settings defined by terrain, scenic beauty, and types of access available offers outstanding recreation opportunities to users of these public lands. The diverse types of recreation that occur in the UFO include hunting, fishing, hiking, dispersed and developed

65

camping, picnicking, horseback riding, mountain bike riding, motorcycle riding, ATVs and 4WD touring and extreme driving, rafting, and cross-country skiing.

Nearly all public land visitors use vehicles to get to their preferred activities and settings. For many people, their vehicle is just the mode of transportation used to access their recreational activity. For others, vehicle use itself is the activity.

More recreationists are using public lands today than 10-15 years ago. The technology of recreational equipment also advanced during this time to create ATVs and mountain bikes that were not used for recreation when previous travel management plans were completed. Changing values, attitudes and motivations of recreationists have resulted in changes in the way they use technology, especially new types of vehicles with which to enjoy public lands.

## Environmental Consequences

### Impacts Common to All Alternatives
The BLM has defined recreation activities in various categories such as big game hunting, motorized and mechanized use, horseback riding, hiking, fishing, camping, etc. Using these definitions, no recreation activities would be eliminated by either the proposed action or no action alternative. OHV use would still occur on roads and trails under both alternatives. Some of the recreation opportunities within an activity may change. Recreation users would not be eliminated from public lands, since access on roads and trails would remain the same.

Under both alternatives, disabled access will be allowed per the Rehabilitation Act of 1973. At the field office level, each request will be evaluated on a case-by-case basis as specified by the Rehabilitation Act.

### Impacts from No Action Alternative
Under the No Action alternative, cross-country, off-route motorized and mechanized recreational opportunities would continue to be available on 460,567 acres in the planning area, resulting in the creation of unauthorized roads and trails through repeated use of the same portions of ground.

As new routes are created by users, there would be a continuing loss of opportunities for solitude for dispersed recreationists, and continued conflicts. Sportsmen, hikers, OHV enthusiasts, horse users, bikers, and hunters would be faced with more conflicts, less satisfying opportunities, and a degraded resource as off-route motorized and mechanized use continues to increase.

Conflicts with adjacent private landowners would continue due to off-route use creating an opportunity for trespass.

### Impacts from Proposed Action Alternative
Restricting off-route motorized and mechanized travel to existing routes would help reduce the creation of future user-created roads and trails, and would help preserve the remaining semi-primitive non-motorized areas in the UFO. With the increase in motorized and mechanized use, semi-primitive non-motorized opportunities have decreased dramatically in the UFO over the last 10 to 15 years.

BLM_0015265

Because off-route travel would not be allowed under the Proposed Action, users would have to use existing roads and trails. Much of the planning area is still within one-half mile of an existing motorized or mechanized route. Hunting experiences for those who venture further from roads and trails would be improved.

People who hold the belief that public lands should be open to all forms of recreation without restrictions might feel their personal freedoms are being taken away by the proposed action. Conversely, recreationists who do not like to see or hear the impacts associated with off-route motorized or mechanized vehicle use feel their freedoms are currently being affected by these impacts.

Other effects associated with the Proposed Action include:
- Dispersed recreationists would have greater opportunities for solitude and fewer conflicts with other visitors. Sportsmen, hikers, OHV enthusiasts, horse users, fisherman, and hunters would have fewer conflicts, improved resources, and greater opportunities for solitude.
- Consistency of travel management restrictions would be improved. These restrictions would be much easier for the general visitor to understand and follow if motorized or mechanized use were restricted to roads and trails through consistent policy.

## Cumulative Effects

Population growth and residential development of surrounding private lands, increasing infrastructure development and right of way approvals on BLM, would continue to occur throughout the greater region if past trends continue. This will result in increased amounts of recreational and other types of usage on public lands. Measures such as maps, informational kiosks, regulations and enforcement will help educate the public land users about their travel-related impacts, and may lead many to adopt better travel practices which would reduce recreational impacts.

## VISUAL RESOURCES

## Affected Environment

The planning area offers a great diversity of landforms and vegetation. The public lands are highly valued by the public and local communities for their scenic quality, as emphasized in the recent Community Assessment conducted in the planning area. The landscapes in the planning area are characterized by rugged canyons, mesa tops, and 360 degree scenic vistas of the Grand Mesa and the San Juan, Uintah, West Elk, Sawatch, and other mountain ranges.

The BLM's visual resource management system was designed, and is used, to help ensure that as proposed man-made features or surface-disturbing activities on public lands are constructed, the existing landscape character and inherent visual resources are considered. The BLM Manual 8410-1 Visual Resource Management defines and categorizes visual resource management classes that provide objectives for these resources as projects are proposed and implemented in the landscape. These Visual Resource Management (VRM) classes are determined through an

BLM_0015266

inventory process described in the manual mentioned above, and are used to provide guidance to BLM and project proponents when contemplating proposed surface disturbing activities.  Class I areas are intended to protect an area from visible change, Class II areas allow for visible changes that do not attract attention, Class III areas allow for visible changes that attract attention but are not dominant, and Class IV areas allow for visible changes that can dominate the landscape. The VRM Classes for the Uncompahgre Field Office can be found in the Uncompahgre Basin Resource Management Plan (RMP).  A new inventory was conducted in 2009 in preparation for the RMP Revision process.

On public lands, existing man-made features in the planning area not considered part of the natural landscape include travel roadways and routes, fences, structures, utility lines, vegetation manipulations, such as land treatments (vegetative chaining, roller chopping, etc.), energy and mineral related facilities, and developed improvements.  These man-made features are considered to be visual intrusions, including motorized and non-motorized roadways and routes, but these transportation elements also provide a means for the public to experience, benefit economically from, and enjoy the scenery.  These features have become part of the existing landscape character.  Many of the routes have been in existence for decades and were developed by ranchers, loggers, and miners.

## Environmental Consequences

### Impacts from the No Action Alternative

New user-created routes and soil and vegetation disturbances related to OHV use, including parallel routes, multiplicity of routes going to one destination, and routes that serve no known or obvious purpose, would continue to be established through vehicular or other uses, resulting in more visual contrast or impacts in some landscapes and terrain types that offer visual exposure over a wide area.  Many existing routes would continue to be widened by the usage of larger vehicles on narrow routes, such as single track or ATV two-track routes, resulting in additional vegetation removal and soil disturbances

Over time, because of the increase in travel use anticipated for all purposes, the combined visual impacts from existing, and anticipated new, user created routes might not meet the VRM Class objectives in some locations in the planning area, as the routes would begin to dominate the landscapes.  New user created routes would continue to create visual impacts in the landscape that might exceed the amount of allowable visual impacts and not meet VRM Class objectives, because of their location on the landscape.

### Impacts from the Proposed Action Alternative 2

Changing existing OHV designations to "Limited to Existing Routes Yearlong", and restricting all OHV travel to existing routes would result in a decrease or elimination of new user-created routes, preventing future visual impacts from occurring.  Restricting cross-country vehicular usage for camping or other activities would prevent potential future surface disturbances and associated visual impacts from occurring as a result of the associated vehicular traffic and associated impacts. Maintenance of some existing routes could result in indirect improvements in the degree of visual impacts.

BLM_0015267

Planning, designing, and properly locating any new authorized routes for a variety of purposes would permit Visual Resource Management Class objectives to be met. Potential visual impacts from new routes would not exceed visual resource management objectives as a result of good design and site location within the landscape.

## Cumulative Effects

In addition to growth in recreational travel, other reasonably foreseeable actions that could affect visual resources over the next 10 years on private and public lands include residential growth, new road construction on private land, fuels reduction projects, utility corridor maintenance and upgrades, and new buried utility rights-of-way. Activities on public lands in the travel planning area that could also potentially impact visual resources and require mitigation include, Forest Service planning and projects, Uncompahgre Plateau Project activities, local land use planning, soil research, BLM Uncompahgre Field Office Resource Management Plan revision, continued population growth, vegetation treatments, county road upgrades, special recreation permits and activities, and utility rights of way and corridors.

## PALEONTOLOGY

## Affected Environment

The planning area spans all five of the distinctive Potential Fossil Yield Classification (PFYC). Potential Fossil Yield Class designates geological units based on their expected or historically known potential to contain scientifically important fossils, and the unit's sensitivity to adverse impacts. Under the classification system, there are 5 classes, with a higher number indicating a greater potential for containing important fossils and/or a higher sensitivity to effect. Most of the planning area is contained in PFYC 2, 3 and 4, with several notable class five areas with known significant localities.

Notable paleontological locations within the area include the Dry Mesa dinosaur quarry, Bedrock and Paradox Dinosaur Trackways, the Young Egg Locality and outcroppings in various other areas. Scientific paleontological quarrying has been accomplished in many localities in the area. Continued paleontological resource inventories are being conducted and project-specific inventory would be required on those areas which rank in the Potential Fossil Yield Class (PFYC) 4 or higher. These inventories would identify those areas that require special attention or mitigation.

## Environmental Consequences

## Impacts Common to All Alternatives

The most serious type of impacts to this resource would be caused by dirt bikes and ATV's traveling over steep clay slopes where fossils are eroding from the shale layers. The potential for illegal digging is high due to the density of routes, and could result in major impacts to irreplaceable fossil resources. The degree and extent of impact would be unknown. Vandalism, damage, or removal of these resources would be the potential result of the impacts.

BLM_0015268

**Impacts from the No Action Alternative**
Current OHV designations and management would potentially impact some important paleontological localities in the planning area, and secondary impacts from fossil collection and erosion may also occur. This alternative would allow the current level of potential impacts to continue. In addition, development of new, user created routes would increase the potential for impacts to paleontological values in the form of vandalism, damage, or removal.

**Impacts from the Proposed Action Alternative** This alternative would result in an improvement to the further protection of paleontological values such as fossils and historic dinosaur quarries. Elimination of all cross country vehicular driving would prevent the use of motorcycle, passenger vehicles, mountain bikes, and ATV use on the steep clay slopes where sensitive fossils may be exposed and disturbed by the resulting erosion.

## Cumulative Effects

Cumulative effects on paleontological resources cannot be specifically identified until inventories are completed and paleontological resources have been identified.

## LAW ENFORCEMENT

## Affected Environment

The planning area covers a large geographic area, which equates to a large area of enforcement responsibility for BLM law enforcement personnel. BLM law enforcement rangers enforce a variety of Class A misdemeanors to felony offenses on public lands. Relating to this proposal, BLM law enforcement rangers would enforce the restrictions pertaining to travel management violations and the pertinent Code of Federal Regulations (CFR) associated with travel and resource concerns.

## Environmental Consequences

**Impacts Common to All Alternatives**
All Federal and Colorado State laws that apply to motorized vehicle use must be followed. BLM law enforcement rangers will continue to enforce 43 CFR 8341.1 and 43 CFR 9268.3, in addition to other applicable state regulations regarding motorized vehicle use on BLM land. BLM will continue to work cooperatively with local and state law enforcement, including the Division of Wildlife (DOW) and Colorado State Park Rangers, involving the enforcement of State OHV regulations on BLM land.

**Impacts from No Action Alternative**
Existing travel management would remain unchanged. Law enforcement would remain the same. Currently, restrictions in place do not regulate travel off roads and trails in open travel areas. Regulations and penalties for off-route travel on BLM-managed lands are found in 43 CFR 8340.0-7.

BLM_0015269

**Impacts from Proposed Action Alternative**

Implementation would involve the publication of a brochure explaining, through pictures and text, what constitutes an established route. A brochure could also provide travel management ethics, and information on what modes of travel are appropriate on routes (i.e., only single-track vehicles can operate on single-track trails). The photographs and language in the brochure would serve as information and education for users, and enforcement personnel would be better able to exercise enforcement and take appropriate actions when necessary.

Successful implementation of this element would be in direct proportion to the effort put forth through public education by the BLM, mountain bike, OHV, and related organizations. It is reasonable to assume that peer pressure would provide educational and citizen assistance to law enforcement.

Success would be dependent on the agency personnel to do a complete job of law enforcement. A complete job in law enforcement is an effort which includes all BLM employees, as well as enforcement personnel. To be successful on the ground, the three elements that must work together include:

1. Provide the public with consistent and up-to-date education and travel management information;
2. Prevention through complete and on-the-ground engineering (i.e., proper closures, proper signing, and on-going maintenance of closures, signs, etc.); and
3. Fair, consistent, and progressive enforcement by agency law enforcement, with support from BLM personnel. Key enforcement actions would include incident reports, warning notices, and violation notices.

The effects of implementing the Proposed Action would benefit law enforcement in several areas:
1. It would allow consistent and uniform enforcement of restrictions; and
2. It would provide clear regulation, so visitors would know when they are violating a regulation.

New routes would be closed if they were created.

## Cumulative Effects

Population growth and residential development of surrounding private lands, increasing infrastructure development and right of way approvals on BLM, would continue to occur throughout the greater region if past trends continue. This will result in increased amounts of recreational and other types of usage and disturbance on public lands. Measures such as maps, informational kiosks, regulations and enforcement will help educate the public land users about their travel-related impacts, and may lead many to adopt better travel practices which would reduce law enforcement impacts.

71

## SOCIO-ECONOMICS

### Affected Environment

The planning area includes parts or all of Delta, Montrose, Gunnison, Mesa, San Miguel, and Ouray counties.

**Population:**
Between 1990 and 2008, the population of Delta County increased by 47%; Montrose County, 65%; Gunnison County, 47%; Mesa County, 53%; Ouray County, 98%; and San Miguel County, 106%. The average population in the counties in the planning area increased by 69%. The population in the state as a whole increased by 49% during that same period. (From State of Colorado Population Projections, State Demography Office).

| Table 9 | | | |
|---|---|---|---|
| **Population Growth between 1990 and 2008** | | | |
| Area | 1990 | 2008 | 1990-2008 Percent Change |
| Colorado | 3,294,394 | 4,939,456 | 49% |
| Delta County | 20,980 | 30,923 | 47% |
| Montrose County | 24,423 | 40,539 | 65% |
| Gunnison County | 10,273 | 15,147 | 47% |
| Mesa County | 93,145 | 143,171 | 53% |
| Ouray County | 2,295 | 4,560 | 98% |
| San Miguel | 3,653 | 7,552 | 106% |

U.S. Census Bureau, 2008 Population Estimates, Census 2000, 1990 Census

Between 2005 and 2025, the population within Delta County is projected to grow 68%, and 100% within Montrose County, 33% within Gunnison County, 57.8% within Mesa County, 57.7% within Ouray County, and 75% within San Miguel County. The average population in the counties in the planning area is forecast to increase by 65%. Of note is that the population of Montrose County is expected to increase by 100%. The state as a whole is projected to grow 44.2% for the same period. (From State of Colorado Population Projections, State Demography Office). Part of this growth for both time periods can be attributed to the abundance of nearby public lands managed by the BLM and the US Forest Service, which is a desired value for many people.

**Employment and Economy:**
Between 1991 and 2001, the total number of employed people increased by 48.6% in Delta County, 49% in Montrose County, 55% within Gunnison County, 45% within Mesa County, 71% within Ouray County, and 89% within San Miguel County. The greatest increase in employment occurred under the construction and services sectors in all counties. See Table 10. According to a 1999 model of the distribution of tourism employment, 8% of total employment was generated by tourism in Delta County, and 9% of total employment was generated by tourism in Montrose County, 34% within Gunnison County, 8% within Mesa County, 38% within Ouray County, and 51% within San Miguel County. About 8% of total employment in

BLM_0015271

Colorado was reported to tourism (Tourism Jobs Gain Ground in Colorado page 3, Center for Business and Economic Forecasting, Inc., April 27, 2001).

| Table 10 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sector Employment – Numbers of Jobs in the Planning Area,** | | | | | | | | | | | | | |
| Sector | Colorado | | Delta County | | Montrose County | | Gunnison County | | Ouray County | | Mesa County | | San Miguel County | |
| | 2001 | 2007 | 2001 | 2007 | 2001 | 2007 | 2001 | 2007 | 2001 | 2007 | 2001 | 2007 | 2001 | 2007 |
| Agricultural | 47,709 | 46,664 | 1,462 | 1,331 | 1,540 | 1,409 | 338 | 324 | 0 | 103 | 1739 | 1,600 | 111 | 105 |
| Mining | 14,866 | 27,935 | 0 | 368 | 0 | 143 | 0 | 781 | 0 | 3 | 524 | 3,362 | 25 | 131 |
| Construction | 219,474 | 226,097 | 911 | 1,275 | 2,016 | 2,675 | 1,298 | 1,485 | 416 | 534 | 6150 | 8,134 | 1075 | 1,299 |
| Manufacturing | 188,714 | 155,722 | 559 | 736 | 1,566 | 1,530 | 179 | 161 | 65 | 48 | 0 | 3,532 | 120 | 178 |
| Transportation, Information and Utilities | 198,446 | 174,734 | 326 | 365 | 952 | 1,185 | 249 | 350 | 28 | 49 | 2700 | 4,342 | 36 | 208 |
| Wholesale and Retail Trade | 393,146 | 408,211 | 1,782 | 1,981 | 448 | 3,261 | 55 | 1,247 | 195 | 296 | 11294 | 12,879 | 25 | 468 |
| Finance and Real Estate | 213,105 | 238,374 | 537 | 709 | 1,007 | 1,419 | 753 | 830 | 183 | 217 | 4626 | 5,549 | 806 | 858 |
| Services | 1,063,542 | 1,230,847 | 2,596 | 4,153 | 5,454 | 7,085 | 4,145 | 4,584 | 639 | 1,155 | 26093 | 31,232 | 2306 | 3,547 |
| Government | 391,531 | 439,016 | 2,133 | 2,460 | 2,863 | 3,040 | 1,605 | 1,853 | 295 | 373 | 8463 | 9,863 | 752 | 839 |
| Total Employment | 2,730,558 | 2,947,648 | 11,520 | 13,378 | 18,229 | 21,750 | 10,431 | 11,615 | 2128 | 2,868 | 66695 | 80,494 | 6435 | 7,998 |

Source: State of Colorado Jobs by Sector (NAICS based), State Demography Office 2001 and 2007

Community and County Socio-economic Indicators in the Planning Area:

Table 11 below shows values for certain socio-economic indicators for all counties, communities, towns, and cities in the planning area (Community Assessment Report, Uncompahgre Field Office, February 2009).

73

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | **Table 11**<br>**Community and County Socio-economic Indicators in The Planning Area** |

| Town, City, or County | County Located In | Popu-lation | Year Established | Governing Designation | County Seat? | Land Area | Number Housing Units | Unem-ployment % | Median. House Income | Primary Industry* (% Population) | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Crawford | Delta | 366 | 1910 | Statutory Town | N | 0.26 sq. mi. | 179 | 2.9% | $23,281 | 2 (18.5), 11 (16.0), 5 (13.4) | |
| Hotchkiss | Delta | 968 | 1901 | Statutory Town | N | 0.67 sq. mi. | 451 | 4.3% | $28,056 | 5 (19.6), 10 (19.1), 1 (16.3) | |
| Delta | Delta | 6,400 | 1882 | Home Rule Municipality | Y | 5.52 sq. mi. | 2,749 | 2.5% | $27,415 | 10 (18.3), 5 (15.6), 11 (13.4) | |
| Naturita | Montrose | 635 | 1951 | Statutory Town | N | 0.73 sq. mi. | 314 | 8.6% | $28,977 | 2 (21.2), 5 (15.4), 10 (12.1) | |
| Nucla | Montrose | 734 | 1915 | Statutory Town | N | 0.71 sq. mi. | 369 | 3.0% | $28,466 | 11 (19.7), 10 (16.5), 2 (13.7) | |
| Maher | Montrose | 1,486 | | Unincorporated Community | N | | | | | | Zip Code (81415) Tabulation Area used for population from Census Bureau |
| Olathe | Montrose | 1,573 | 1907 | Statutory Town | N | 1.33 sq. mi. | 571 | 4.5% | $26,286 | 2 (14.9), 10 (14.6), 3 (13.2) | |
| Montrose | Montrose | 12,344 | 1882 | Home Rule Municipality | Y | 11.47 sq. mi. | 5,581 | 3.1% | $33,750 | 10 (16.1), 5 (14.7), 2 (13.3) | |
| Ridgway | Ouray | 713 | 1891 | Home Rule Municipality | N | 2.0 sq. mi. | 318 | 2.6% | $40,903 | 2 (21.6), 11 (14.5), 3 & 10 (13.0) | |
| Ouray | Ouray | 813 | 1884 | Statutory City | Y | 0.84 sq. mi. | 583 | 0.8% | $36,094 | 11 (23.4), 10 (15.6), 2 (12.8) | |
| Sawpit | San Miguel | 25 | 1896 | Statutory Town | N | 0.03 sq. mi. (0.1km sq) | 18 | 0.0% | $26,250 | 6 (35.7), 3 (21.4), 9 (21.4) | |
| Norwood | San Miguel | 438 | 1903 | Statutory Town | N | 0.26 sq. mi. | 258 | 4.5% | $39,375 | 2 (25.7), 11 (18.1), 10 (10.1) | |
| Mt. Village | San Miguel | 978 | 1995 | Home Rule Municipality | N | 3.31 sq. mi. | 1,022 | 4.5% | $30,663 | 11 (34.5), 2 (21.5), 8 (10.2) | |
| Telluride | San Miguel | 2,221 | 1878 | Home Rule Municipality | Y | 0.71 sq. mi. | 1,938 | 1.7% | $51,937 | 10 (31.1), 5 (13.2), 8 (13.1) | |

BLM_0015273

| Table 11 |||||||||||
| --- |
| **Community and County Socio-economic Indicators in The Planning Area** |||||||||||
| **Town, City, or County** | **County Located In** | **Popu-lation** | **Year Established** | **Governing Designation** | **County Seat?** | **Land Area** | **Number Housing Units** | **Unem-ployment %** | **Median. House Income** | **Primary Industry* (% Population)** | **Notes** |
| Ouray County | | 3,742 | 1877 | County | | 542.21 sq. mi. | 2,146 | 2.2% | $42,019 | 2 (18.6), 11 (14.1), 10 (13.7) | |
| San Miguel County | | 6,594 | 1883 | County | | 1288.49 sq. mi. | 5,197 | 2.2% | $48,514 | 11 (26.2), 2 (16.2), 8 (11.1) | |
| Gunnison County | | 13,956 | 1877 | County | | 3259.75 sq. mi. | 9,135 | 3.9% | $36,916 | 11 (21.8), 10 (17.5), 5 (14.3) | |
| Delta County | | 27,834 | 1883 | County | | 1148.52 sq. mi. | 12,374 | 3.1% | $32,785 | 10 (17.8), 1 (13.4), 5 (13.1) | |
| Montrose County | | 33,432 | 1883 | County | | 2242.57 sq. mi. | 14,202 | | | | |
| Mesa County | | 116,255 | 1883 | County | | 3341.11 sq. mi. | 48,427 | 3.7% | $35,864 | 10 (20.7), 5 (13.4), 2 (10.4) | |

Sources: US Census Bureau 2000; Colorado State Archives 2004; Colorado Department of Local Affairs 2009; Colorado Department of Public Health and the Environment 2009.

*Industry
1   Agriculture, forestry, fishing and hunting, and mining
2   Construction
3   Manufacturing
4   Wholesale trade
5   Retail trade
6   Transportation and warehousing, and utilities
7   Information
8   Finance, insurance, real estate, and rental and leasing
9   Professional, scientific, management, administrative, and waste management services
10  Educational, health and social services
11  Arts, entertainment, recreation, accommodation and food services
12  Other services (except public administration)
13  Public administration

BLM_0015274

**Income:**

Between 1990 and 2005, total per capita personal income for the state increased 92%. During this same period, total per capita personal income increased 84% in Delta County, and 91% in Montrose County, 115% within Gunnison County, 88% within Mesa County, 117% within Ouray County, and 127% within San Miguel County (From US Department of Commerce, Bureau of Economic Analysis), possibly due to increases in the number of jobs in several Sectors.  In 2005, in all counties in the planning area, per capita personal income was below that for the state as a whole (See Table 12).

| Table 12 | | |
|---|---|---|
| **Per Capita Personal Income for 1990 and 2005** | | |
| | 1990 | 2005 |
| Colorado | 19,575 | 37,510 |
| Delta County | 12,843 | 23,612 |
| Montrose County | 14,393 | 27,402 |
| Gunnison County | 13,419 | 28,795 |
| Mesa County | 15,324 | 28,872 |
| Ouray County | 16,785 | 36,398 |
| San Miguel | 19,146 | 43,476 |

Source: US BEA 2007

**Uses:**

The *Longwoods International Colorado Travel Year 2006* report stated that Colorado is ranked 9th in the country for outdoor trips and that outdoor trips now comprise the largest segment among those visiting Colorado on marketable leisure trips.  The report illustrates the importance of the outdoors and public lands to the experience of Colorado visitors who cite mountains, wilderness, and lakes/rivers as important elements of their vacation experience.  Montrose, the Gunnison Gorge National Conservation Area (NCA), the Black Canyon of the Gunnison National Park, the Uncompahgre Plateau, Telluride, Ouray, and Gunnison are among the most popular destinations for overnight pleasure trips within or near the planning area.  The Gunnison River and Gunnison Gorge in the NCA are regional and national recreation destinations – primarily because of the popularity and variety of the heavily marketed whitewater boating opportunities and gold medal trout stream fishing.  In addition to these major tourist attractions, the routes on the public lands also provide opportunities for various types of motorized, mechanized, and non-motorized recreation uses.

Off-highway vehicle (OHV) registrations, which includes all-terrain vehicles (ATVs), dirt or dual purpose motorcycles, and 4-wheel drive vehicles, has increased 145% between 2000-01 season and the 2007-08 season and the 2007-08 season direct economic contributions of OHV use in Colorado was reported to be $784 million with an addition $243 million in indirect economic contributions (*Economic Contribution of Off-Highway Vehicle Recreation in Colorado, July 2009*).

BLM_0015275

Tourism has grown in the Southwest Region fairly steadily since 2000 based on total travel impacts as measured by direct travel spending, tourism-related employment wages, and state and local taxes.

## Environmental Consequences

### Impacts Common to All Alternatives

Both alternatives would basically maintain the social and economic status quo. Multiple use activities on public lands would continue according to the current Resource Management Plan and BLM policy, regulations, and guidelines, including realty actions, mineral and energy development, livestock grazing, recreation management, and other programs, which could result in slight economic improvements throughout the planning area. A potential slight increase in the local economies of some of the towns and cities near the planning area could occur if more commercial, competitive, or other recreation permits were to be issued for motorized or non-motorized mechanized events. No great changes to the area's population and employment would result from implementing these alternatives. User behaviors, however, would evolve under varying lesser degrees of management intensity, intensive management, and few cross country vehicular travel restrictions.

### Impacts from the No Action Alternative

Behaviors would evolve under less intensive management and travel restrictions, such as cross-country use, trespass, creation of new routes, and uncontrolled motorized/mechanized play would increase in intensity and scale. User behaviors would evolve with few cross country vehicular travel restrictions, and could influence the frequency of unauthorized trespass, creation of new routes, and uncontrolled motorized/mechanized play in some areas, as a result of cross country vehicular travel occurring throughout the planning area.

### Impacts from the Proposed Action Alternative

Some users may feel that they are being restricted too much and their experience has been diminished. However, BLM expects this alternative to improve the overall experience for most users by restricting vehicular travel to existing routes, which would have a positive effect on the social component of recreation and travel, as seen by some users. Behaviors would evolve under more intensive management and more travel restrictions that would mitigate increased cross-country use, trespass, creation of new routes, and uncontrolled motorized/mechanized play. Alternative 2 would allow development of some additional BLM-authorized, planned, and designed routes in proper locations for a variety of uses.

## Cumulative Effects

Measurable cumulative impacts would not likely occur as a result of implementation of either alternative.

BLM_0015276

## CUMULATIVE IMPACTS SUMMARY

**Introduction**

This section discloses the cumulative effects from all alternatives. Cumulative effects were analyzed above for each resource. This section will analyze additional known cumulative impacts that may not have been identified above.

The Council on Environmental Quality (CEQ) regulations defines cumulative effects as "…the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions". The cumulative effects are the direct and indirect incremental effects of the impacts from implementing the proposed changes and projects in each of the alternatives, when added to other past, present, and reasonably foreseeable actions (40 CFR Part 1508.7). Past activities are those activities whose effects are still present on the landscape. These activities will continue into the future. Future activities are those reasonably foreseeable actions that may add to the cumulative effects on resources and social impacts. Guidance for implementing NEPA (Public Law 91-190, 1970) requires that federal agencies identify the timeframe and geographic boundaries within which they will evaluate potential cumulative effects of an action and the specific past, present, and reasonably foreseeable projects that will be analyzed. For this EA, the timeframe is five to 10 years, from approximately 2009 to 2020. This encompasses a range within which data are reasonably available and forecasts can be reasonably made. The geographic boundary of the analysis area is the planning area and the surrounding Forest Service-managed and private lands, and the nearby communities.

Major specific actions and activities with the potential to cumulatively affect the resources evaluated in this document are identified below. These actions are generally summarized in the narrative following the table below. Some resources would be affected by several or all of the described activities, while others would be affected very little or not at all.

Alternative 1 would result in the continuation of existing OHV designations and additional cross country vehicular routes being established, and increases in already occurring impacts to a variety of resource values. Since the existing RMPs have been in effect, travel management planning has been under-implemented in the planning area, resulting in on-route and cross-country motorized and mechanized travel occurring yearlong. New user-created routes established since the RMPs were approved have increased to the point that about 2,793 miles of routes of all kinds now exist on public lands within the planning area. Implementing the No Action Alternative, would continue this practice.

Alternative 2 – Proposed Action, if implemented, would prohibit all cross country motorized and mechanized vehicular travel, change all existing OHV designations such that all motorized and mechanized travel would be limited to existing routes except for hiking and horseback riding, and maintenance of some OHV routes would occur to mitigate existing impacts. By implementing the alternative, the public would be aware of the routes that would be available

BLM_0015277

for use and what travel use conditions would be in effect.  Reductions of cumulative impacts would occur throughout the entire planning area as a result of this alternative.

Major specific actions and activities with the potential to cumulatively affect the resources evaluated in this document are identified below.  These actions are generally summarized in the narrative following the table below.  Some resources would be affected by several or all of the described activities, while others would be affected very little or not at all.

Planned BLM vegetation treatments, UP biological treatments, upgrading some county roads, and the growth in applications for rights of way and special recreation use permits could add to impacts from the demand of access onto or through public lands, along with potential transportation elements to facilitate implementation of local master plans.

**Past, Present, and Reasonably Foreseeable**
**Actions Considered in Determining Cumulative Effects**

| Past, Present, and Reasonably Foreseeable Actions | Past | Present | Future |
|---|:---:|:---:|:---:|
| Local Land Use Planning | ✓ | ✓ | ✓ |
| BLM-USGS Soil Research | ✓ | ✓ | ✓ |
| BLM Uncompahgre Field Office & San Juan-San Miguel Resource Management Plans and Revision | | | ✓ |
| Continued population growth | | ✓ | ✓ |
| Uncompahgre Field Office Vegetation Treatments | ✓ | ✓ | ✓ |
| Possible Upgrading Of Some Major County Roads In Or Through The Planning Area | | | ✓ |
| BLM Special Recreation Permits | ✓ | ✓ | ✓ |

**Local Land Use Planning**

The BLM completed a community assessment process in 2009, in which meetings were held with all planning area City, Town, and County leaders and partnering organization leaders.  The goals and plans for these communities, counties, and organizations were utilized during the preparation of this document.  The local master plans collected were of varying ages, from just beginning, to just completed, to those being updated.  However, the meetings conducted captured the desires of the leaders and were considered. Delta County completed its current master plan in October 1996.  The city of Delta completed a comprehensive plan in March 1997, the city of Montrose completed a comprehensive plan update in March 2008, and Montrose County is currently updating their master plan.  The Town of Olathe has discussed updating their Master Plan. These plans will continue to provide tools for growth and outline management direction for projected land use, transportation planning and elements, planning policies, and zoning surrounding the majority of the planning area.

BLM_0015278

Local master plans could impact public lands by authorizing new subdivisions, open space identification, needs for travel element updates, relocations, or new construction.  The cumulative impacts of combining additional new uses on private land and open off highway vehicle designations, as written in Alternative 1, is significant.  In some cases, the lack of adequate local land use planning could result in increases in cumulative impacts to all resources due to the increased number of people and vehicles accessing private lands.  These impacts would be mitigated by BLM conducting travel management planning in the planning area over time, in order to arrive at efficient travel plans that provide public needs and enhance or improve the health of the land.

**BLM - United States Geological Survey Soil Research**

The BLM is working with the United States Geological Survey on Mancos soil research on public lands east of Montrose and other similar adobe watershed areas.

They are analyzing impacts from surface-disturbing activities on the adobe hills and the alluvial bottoms in the Mancos Shale areas.  The studies are intended to provide information on how off highway vehicle  use, grazing, and other surface-disturbing activities on these highly erosive soils need to be managed to meet the BLM's public land health standards.

Research could result in improvements in outcomes for projects that otherwise would create undesirable effects to sensitive resources, such as soil and water, and could hasten rehabilitation.

**BLM Uncompahgre Field Office & San Juan-San Miguel Resource Management Plans and Revision as well as Dominquez Escalante National Conservation Area Resource Management Plan**

Under the existing resource management plans covering the existing Uncompahgre Field Office (1989 Uncompahgre Basin Resource Management Plan and the 1985 San Juan-San Miguel Basin Resource Management Plan), the planning area contains four categories of off highway vehicle decisions OHV designations: Open, Limited to Designated Routes from December 1 to April 30, Limited to Designated Routes from May 1 to June 15, and Closed.  Among the issues addressed in these documents were coal leasing, salinity, forestry, recreation, cross-country vehicles, wilderness, and lands.  Decisions were made in most resource management programs that affected travel management in the planning area.  Over time, several amendments have been made to the existing resource management plan, including for fire management, lands management, newly designated Dominquez Escalante National Conservation Area (DENCA) and the Gunnison Gorge National Conservation Area land use plan.  The resource management plan and amendments include many actions that have already been implemented, some of which have taken place within the planning area, and also decisions that have not been implemented. Route by route travel analysis has not been done for the planning area.  The BLM Uncompahgre Field Office plans to revise the Resource Management Plans beginning in the winter of 2009 and a new resource management plan will be completed for the DENCA with an anticipated completion date of March 2012.

BLM_0015279

Not conducting travel planning as a follow up to implement off highway vehicle decisions regarding limiting travel to designated routes has resulted in cumulative impacts. A large number of the existing routes were established as a result of the under-management of off highway vehicle travel. Therefore, it can be assumed that cumulative impacts for Alternative 1 would also continue to increase. The RMP revision will set schedules for travel planning on the public lands and the RMP for DENCA will include route by route decisions, which will contribute to long term improvements in Alternatives 1 and 2.

Travel management planning after the completion of the revision and during the RMP for DENCA would help to modify and reduce the impacts to a multitude of resource values discussed in this document by selecting designated routes that would be available and establishing use conditions, such as seasonal closures and restrictions on the types of use that can occur on a route.

**Continued Population Growth**

Between 2005 and 2025, the population within each of the six counties in which the planning area is located will vary in different degrees, depending on the economic and resource demand growth. For instance, Delta County is projected to grow 72%, and 77% within Montrose County. Other counties in the planning area will also grow in population. This growth is expected to result in more private agricultural or undeveloped land being converted into residential or commercial uses. A great deal of the public lands in the planning area is adjacent to private lands. With this growth, new management challenges including travel management will face the land management agencies surrounding the communities, private land owners, and the nearby communities themselves. In addition to population growth, growing awareness about the area due to area designations (Dominquez Escalante National Conservation Area and Gunnison Gorge National Conservation Area) lead to higher visitation. Greater awareness may contribute to additional outdoor recreation related services in the community and more pressure on public lands in the area.

Population and visitation increases in and around the planning area would result in more demand for public land access for a variety of purposes, both motorized and non motorized. As motorized, mechanized, and non-motorized quiet recreation use demand escalates and increases, there would be more requests for routes throughout the planning area. This would lead to widespread on-site and off-site impacts on nearby federal lands and private lands and potentially a loss of the values for which visitors come to the area to seek.

Routes established as a result of increased population growth and increases in volume of motorized uses contribute to surface runoff which ultimately reaches perennial and intermittent steams, ponds, riparian habitat, and wetlands and affects the physical and biological components of these areas. Urbanization near the planning area has contributed in the development of user created routes that contributes to cumulative soils, vegetation, and watershed impacts. Cumulative effects on aquatic and riparian resources can be mitigated through the application of watershed conservation practices to all well-designed and located agency routes during their construction, reconstruction, and maintenance as outlined in Alternative 2.

BLM_0015280

Cumulative actions considered include regional and local growth entailing additional vehicle traffic within and through the planning area. Although vehicular travel on unpaved roads can be heavy during the late spring, summer, and the fall, the most heavily used major county roads receive magnesium chloride treatments which "holds" soils and road base in place and abates erosion and fugitive dust. Sustained and heavy traffic use on the existing dirt routes and trails in the planning area does create erosion and fugitive dust, noise, and other significant disturbance factors throughout the planning area.

Population growth, private land development adjacent to or near the planning area, and the increase in popularity of recreational activities, combined with the extremely high number of existing route miles in the planning area and the likelihood of the continuation of user created routes being created, incremental increases in impacts would occur to soils, cultural properties, water quality, air resources, floodplain functions, riparian and wetland habitat, sensitive plant and animal species and habitat, vegetation (removal, impacts, or weed invasion increases), and aquatic and terrestrial species and habitat. At the heart of these impacts is the likelihood of an exponential increase in the rate of establishment of new, user created routes from the existing routes as discussed in Alternative 1. Any additional limitations to the transportation system could cause crowding of users and may increase safety concerns and conflicts as discussed in Alternative 2.

Alternative 1 considered in this analysis might result in violations of air quality standards during the next five to 10 years due to the continuation of new user created routes and the increase in use volume as a result of population growth.

**Uncompahgre Field Office Fuel Reduction Projects**

Several projects have been implemented in the past, and several projects have been proposed and evaluated in the Field Office that have or would reduce the amount of standing and downed wildfire fuel in the planning area. These projects have and would make the public lands, where this activity occurs, less likely to incur wildfires, and land health conditions could be improved. Use of roads or need to travel cross country with motorized vehicles to accomplish projects would be analyzed for each case however cumulative use of roads to accomplish projects would be negligible. Overall land health conditions could be improved.

Implementation of treatments can affect wildlife solitude and habitat forage, fragment migration routes, and add sediment to waterways on a short term basis, and require more temporary new routes, but mitigation and design features in project plans would mitigate these impacts to vegetation (wildlife habitat, sensitive species and habitat, potentially more weeds introduced), soils, and potentially to water courses.

Cumulative effects for implementing the projects would be similar for all alternatives, but with the additional mitigation outlined for Alternative 2, effects would be minimized through rehabilitation of roads and trails that are needed for the project.

BLM_0015281

**Possible Upgrading of Some Major County Roads in or Through the Planning area**

Several major county graveled roads located within and that pass through the planning area could be upgraded, partially relocated, and or paved during the next 10-15 years in order to provide better and quicker access to private and public lands.  Private high-scale developments on the Ouray and Montrose County roads have generated increased traffic by construction, visitor, and resident uses.  Property owners and users are requesting the counties to pave and improve the roads.  This upgrading could require some BLM right of way actions or modifications, reconstruction, and relocating in segments to eliminate dangerous curves or poorly located segments, which could also directly impact public lands adjacent to these roads.

Routes established as a result of increased population growth and increases in volume of motorized uses contribute to surface runoff which ultimately reaches perennial and intermittent steams, ponds, riparian habitat, and wetlands and affects the physical and biological components of these areas.  Urbanization near the planning area has contributed in the development of user created routes that contributes to cumulative soils, vegetation, and watershed impacts.  If county roads passing through the planning area or within the planning area are upgraded in the life of this analysis, easier and quicker access to the lands in the planning area would be available, adding to the cumulative effects from increases in use of motorized vehicles for all alternatives but especially Alternative 1.

**BLM Special Recreation Permits**

BLM issues and manages Special Recreation Permits to groups or individuals for organized, commercial, or competitive purposes and events.  The BLM has had a growing number of requests for consideration of all types of Special Recreation Permits.  In FY2008 within the UFO, approximately 60 Special Recreation Permits were being used and active. These permits were issued for a variety of activities and events including 4-WD vehicle tours, hunting (big game and mountain lion), mountain bike, running and archery events, rafting and fishing.  The recreation opportunities provided by commercial and special recreation uses produce important benefits for visitors, businesses, communities, and the environment.  The road and trail system on public lands is essential to all of these commercial and special recreation uses, and the impacts of travel management decisions to these activities was considered in developing the alternatives.  Each of the alternatives would allow the activities and events currently authorized by Special Recreation Permits to be considered in the future, under certain circumstances.  New applications would be evaluated through the National Environmental Policy Act process and with public input to determine conformance with travel management decisions and to develop potential stipulations for operation, maintenance, and monitoring of permitted activities.

In Alternative 1, requests for these permits for competitive, commercial, or organized events would continue, possibly resulting in more disturbances in the planning area to soils, water, vegetation and opportunities for solitude due to the fact that areas would be designated as open.  While Special Recreation Permits requests will probably increase in the next 15 – 20 years for all alternatives, decisions on these permits will conform to travel management policy and decisions at the time of applications for permits, thus mitigating cumulative effects from this activity.

83

BLM_0015282

**Proposed Action – Alternative 2**

Alternative 2 would result in reductions in the incremental cumulative effect that would occur from continuing with Alternative 1. This alternative would result in incremental decreases in existing and potential effects by prohibiting all cross country off highway vehicle use, rehabilitating routes, and implementing the travel use conditions and other measures in this alternative. The land health of the planning area would be improved, air quality standards would not be violated, and other resources would realize the benefits of this alternative.

Effects from prohibiting potential new cross country routes alone include reductions in impacts from applying conditions of use, education and information, and implementing travel management design features. Cumulative physical effects from past, present, and future action relative to Alternative 1 would be reduced on sensitive biological soil crusts and erosive soils, in streams, riparian and wetland habitat, vegetation types, on visual resources, to terrestrial and aquatic wildlife species and habitat, special status plants and animals and their existing and potential habitat, migratory bird habitat, and other related resources.

The cumulative effects from reasonably foreseeable actions above and the effects of Alternative 2 would, when combined, not result in adverse impacts to those resources managed by BLM in the planning area.

**Irreversible and Irretrievable Commitments of Resources**

Irreversible commitments of resources are those that cannot be regained, such as the extinction of a species or the removal of mined ore. Irretrievable commitments are those that are lost for a period of time such as the temporary loss of wildlife habitat in a right of way linear clearing.

The implementation of any of the alternatives, including the no-action alternative, would have no irreversible commitment of resources. The alternatives define the road and trail system. Some limited new route construction could be implemented, which could be rehabilitated if necessary.

Irretrievable commitment of resources would occur under all alternatives. Irretrievable commitments of resources from roads and trails exist because routes change the natural landscape to a non-natural, out-of-vegetative-production landscape. The limiting off highway vehicle designation of Alternative 2 would create temporary losses associated with maintenance of roads and trails. Resources affected would be scenery, vegetation (including rangeland, riparian area vegetation, and woodland stands of pinyon and juniper, and associated wildlife or other animal or plant habitats. Implementation of any of the alternatives would commit these resources over the life of the road or trail.

Alternative 1 would also cause irretrievable commitments of the most resources due to the increase in new user created routes that would occur.

BLM_0015283

**Short-Term Uses of Man's Environment and the Maintenance and Enhancement of Long-Term Productivity**

The National Environmental Policy Act (NEPA) requires the consideration of the relationship between the short-term uses of man's environment and the maintenance and enhancement of long-term productivity which would be involved in implementing any of the alternatives being considered in an environmental document.  As declared by Congress, this includes using all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans (NEPA Section 101). Alternative 2 will have the potential to improve long-term productivity by reducing the potential for new user created routes in the planning area and implementing the measures in this alternative. Any routes that might be closed for resource protection reasons will have the potential to revert to vegetated conditions.

**PERSONS / AGENCIES CONSULTED**

Southwest Resource Advisory Council (SWRAC)
U.S. Fish and Wildlife Service
Colorado State Historical Preservation Officer
Southern Ute Tribal Council and the Ute Mountain Ute Tribal Council
Colorado Division of Wildlife (CDOW)
San Miguel, Ouray, Montrose and Delta County Commissioners
State Historic Preservation Office (SHPO)

**INTERDISCIPLINARY TEAM**

| Areas of Responsibility | Preparers |
| --- | --- |
| Air Quality | A. Worstell |
| Cultural Resources, Paleontology | G. Hadden |
| Environmental Justice | B. Krickbaum |
| Farmlands (Prime and Unique) | D. Murphy |
| Floodplains | D. Murphy |
| Invasive, Non-Native Species | L. Rogers/D. Stindt/ K. Kubik |
| Migratory Birds | C. Sharp |
| Native American Religious Concerns | G. Hadden |
| Threatened, Endangered, and Sensitive Species, Wildlife (Aquatic and Terrestrial) | C. Sharp |
| Wastes, Hazardous or Solid | A. Kraus |

85

BLM_0015284

| Areas of Responsibility | Preparers |
|---|---|
| Water Quality, Surface and Ground, Soils, Hydrology/Water Rights | D. Murphy |
| Wetlands & Riparian Zones, Vegetation | A. Clements |
| Wild and Scenic Rivers, Wilderness, Access and Transportation, Recreation, and Visual Resources | J. Jackson/A. Sharp/ E. Franz |
| Realty Authorizations and Geology and Minerals | T. Pfifer/L. Reed/R. Ernst |
| Fire | D. Huisjen/K. Holsinger |
| Law Enforcement | J. Maloney |
| Forest Management | K. Holsinger |
| Socio-Economics | B. Krickbaum |

## LITERATURE CITED

Bureau of Land Management (BLM) 1999-2009. Annual Land Health Assessments. Each of these analyzes approximately 10% of the lands in the Uncompahgre Field Office annually.

Bureau of Land Management (BLM). 2009. Biological assessment for federally protected species and designated critical habitats: an amendment to the Uncompahgre Basin and

San Juan-San Miguel Resource Management Plans, limiting motorized and mechanized travel to existing routes. Available at BLM Uncompahgre Field Office, Montrose, CO.

Colorado Water Quality Control Commission, July, 2007. Classification and Numeric Standards for Gunnison and Lower Dolores Basins – Regulation # 35 (5CCR-1002-35)

Colorado Water Quality Control Commission, December, 2007. The Basic standards and Methodologies for Surface Water – Regulation # 31 (5CCR – 1002-31)

Colorado Water Quality Control Commission, April, 2008. Colorado Monitoring and Evaluation List – Regulation # 94 (5CCR 1002- 94)

Colorado Water Quality Control Commission, April, 2008, 303(d). Water Quality Limited Segments Requiring Total Maximum Daily Load (TMDL's), Regulation # 93(5CCR 1002-93)

Forman, R.T.T., and Alexander, L.E., 1998, Roads and their major ecological effects: Annual Review of Ecology and Systematics, v. 29, p. 207–231.

BLM_0015285

Jones, J. A., F. J. Swanson, B. C. Wemple and K. U. Snyder. In press. A perspective on road effects on hydrology, geomorphology, and disturbance patches in stream networks. Conservation Biology.

Louis Berger Group, Inc, July 2009. Economic Contribution of Off-Highway Vehicle Recreation in Colorado.

Trombulak, S. C. and C. A. Frissell. In press. Review of ecological effects of roads on terrestrial and aquatic communities. Conservation Biology.

USDA, Forest Service, Rocky Mountain Region, Soils Group, Interpretations Rating Guide, page 66.

USDA, Natural Resources Conservation Service, Soil Surveys of: Paonia Area, Colorado (Parts of Delta, Gunnison, and Montrose Counties), Ridgway Area, Colorado (Parts of Delta, Montrose, Gunnison and Ouray Counties), and San Miguel Area, Colorado.

USDA, Soil Conservation Service and Colorado State University, 1980. Important Farmlands of Colorado, State Summary and Map, Special Series 17.

USDI, Bureau of Land Management 2001. Biological Soil Crusts: Ecology and Management, Technical Reference 1730-2, 2001.

Walker, D.A. and K.R. Everett. 1987. Road Dust and Its Environmental Impact on Alaskan Taiga and Tundra. *Arctic and Alpine Research* 19: 479-489

U.S. Census Bureau; http://quickfacts.census.gov/qfd/states

## GLOSSARY

**All-Terrain Vehicle (ATV):** Motorized mode of travel 50 inches or less in width and weighing no more than 800 pounds.

**ATV Route:** Travel lane intended for use by modes of travel less than 50 inches wide and weighing no more than 800 pounds, such as an ATV.

**Existing route:** Road or path that has been inventoried and mapped and that existed on the ground as of 2005.

**Full-size Vehicle Route:** Travel lane intended for use by modes of travel greater than 50 inches wide.

**Mechanized Travel:** Movement by means of a mechanical device such as a bicycle; not powered by a motor

BLM_0015286

**Motorized Vehicle:** Any vehicle propelled by a motor, including cars, trucks, all-terrain vehicles, sport utility vehicles, motorboats and snowmobiles; synonymous with **off-road vehicle** and **off-highway vehicle.**

**Non-Motorized Use:** Employs foot, stock or pack animal, boat or mechanized vehicle, such as a bicycle.

**Off-Highway Vehicle (OHV):** A contemporary term synonymous with **off-road vehicle (ORV)** and referring to any motorized means of transportation capable of or designed for travel on or immediately over land, water, or other natural terrain, excluding: (1) any non-amphibious registered motorboat: (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) any vehicle used for official business; and (5) any combat or combat support vehicle when used in times of national defense emergencies. Off-road vehicle is used in the Code of Federal Regulations.

**OHV Area Designations:** The BLM utilizes three major OHV classifications:
- *Open* refers to an area where all types of vehicle use is permitted at all times, anywhere in the area subject to the operating regulations and vehicle standards set forth in 43 CFR 8341 and 8342.
- *Limited* refers to an area where access is restricted at certain times, in certain areas, and/or to certain vehicle use. These restrictions may be of any type, but can generally be accommodated within the following type of categories: Numbers of vehicles; types of vehicles; time of season of vehicles use; permitted or licensed use only; use on existing routes; use on designated routes; and other restrictions.
- *Closed* refers to an area where off-road vehicle use is prohibited. Use of off-road vehicles in closed areas may be allowed for certain reasons; however, such use shall be made only with the approval of the authorized officer.

**Planning Area:** Geographic area within which the BLM makes decisions during a planning effort. While a planning area boundary may contain lands with a variety of jurisdictions, the BLM only makes decisions regarding lands within the BLM's jurisdiction.

**Resource Management Plan (RMP):** BLM planning document prepared in accordance with Section 202 of the Federal Land Policy and Management Act, that establishes resource conditions, goals and objectives to be attained, allocates resources and identifies allowable uses, identifies land areas for limited, restrictive, or exclusive uses, provides guidance for implementation of decisions made in the plan, and that best meets multiple use and sustained yield mandates.

**Route:** Group or set of roads, trails, and primitive roads that represents less than 100% of the BLM transportation system. Generically, components of a transportation system are described as "routes."

**Single Track Route:** Travel lane intended for use by modes of travel less than 36 inches wide.

BLM_0015287

**Standards for Public Land Health:** Set of guidelines for maintaining ecosystems in an optimal state on public lands throughout Colorado.

**Transportation Management Plan:** Document that focuses on all aspects of transportation within a land area. Transportation planning can also be accomplished within Integrated Activity Plans and Coordinated RMPs, in which multiple resource programs are planned concurrently.

BLM_0015288

# APPENDIX INDEX

*Maps of the Alternatives* ................................................................................................................ *A2*

*Photographic Examples of Single-Track, Two-Track, and Full-Size Vehicle Routes* ............................ *A4*

*Species Considered and Evaluated* .................................................................................................. *A6*

*Birds of Conservation Concern of the UFO* ..................................................................................... *A9*

*Sensitive Species of the UFO* ......................................................................................................... *A12*

A1

BLM_0015289

# Appendix A

## Maps of the Alternatives

Map 1. OHV Designations in the Planning Area
Proposed Action and No Action Alternative

BLM_0015290

(Existing Route Maps are located on CD or BLM web site as separate PDFs if reviewing the document electronically)

BLM_0015291

**Appendix B**

## Photographic Examples of Single-Track, Two-Track, and Full-Size Vehicle Routes

Examples of single-track routes used by motorcycles, mountain bikes, hikers, or horseback riders.

 

Examples of ATV routes, also available for use by motorcycles, mountain bikes, hikers, or horseback riders, but not full-size passenger vehicles.



A4

BLM_0015292

**Examples of routes used by full-size passenger vehicles, also available for use by ATVs, motorcycles, mountain bikes, hikers, or horseback riders.**



A5

BLM_0015293

## Appendix C

### Species Considered and Evaluated [5]

| Species | Status | Habitat Description | Potential and/ or Known Occurrence in Planning Area[1] | Designated Critical Habitat in Planning Area? | Effects Determination[2] |
|---|---|---|---|---|---|
| Bonytail *Gila elegans* | E | Warm-waters of the Colorado River mainstem and tributaries, some reservoirs; flooded bottomlands for nurseries; pools and eddies over rocky substrates with silt-boulder mixtures for spawning | No known occurrences; suitable and historical habitat present | No | May affect, is not likely to adversely affect |
| Colorado pikeminnow *Ptychocheilus lucius* | E | Warm-waters of the Colorado River mainstem and tributaries; deep, low velocity eddies, pools, runs, and nearshore features; uninterrupted streams for spawning migration and young dispersal; also floodplains, tributary mouths, and side canyons; highly complex systems | Known occurrence; suitable habitat present | Yes | May affect, is not likely to adversely affect |
| Humpback chub *Gila cypha* | E | Warm-water, canyon-bound reaches of Colorado River mainstem and larger tributaries; turbid waters with fluctuating hydrology; young require low-velocity, shoreline habitats such as eddies and backwaters | No known occurrences; suitable and historical habitat present | No | May affect, is not likely to adversely affect |
| Razorback sucker *Xyrauchen texanus* | E | Warm-water reaches of the Colorado River mainstem and larger tributaries; some reservoirs; low velocity, deep runs, eddies, backwaters, sidecanyons, pools, eddies; cobble, gravel, and sand bars for spawning; tributaries, backwaters, floodplain for | Known occurrence; suitable habitat present | Yes | May affect, is not likely to adversely affect |

A6

| Species | Status | Habitat Description | Potential and/ or Known Occurrence in Planning Area[1] | Designated Critical Habitat in Planning Area? | Effects Determination[2] |
|---|---|---|---|---|---|
| | | nurseries | | | |
| Greenback cutthroat trout *Oncorhynchus clarki stomias* | T | Cold water streams and lakes with adequate spawning habitat (riffles), often with shading cover; young shelter in shallow backwaters | No known occurrences; suitable and historical habitat present | No | No effect |
| Gunnison's prairie dog *Cynomys gunnisoni* | C | Level to gently sloping grasslands, semi-desert shrublands, and montane shrublands, from 6000'-12,000 in elevation | No known occurrences; suitable and historical habitat present | No | May affect, is not likely to result in a trend toward federal listing |
| Black-footed ferret *Mustella nigripes* | E | Prairie dog colonies for shelter and food | No known occurrences; suitable and historical habitat present | No | No effect |
| Canada lynx *Lynx canadensis* | T | Spruce-fir, lodgepole pine, willow carrs, and adjacent aspen and mountain shrub communities that support snowshoe hare populations | Known occurrence; suitable habitat present | No | May affect, is not likely to adversely affect |
| Mexican spotted owl *Strix occidentalis* | T | Mixed-conifer forests and steep-walled canyons with minimal human disturbance | No known occurrences; suitable habitat present | No | No effect |
| Southwestern willow flycatcher [3] *Empidonax traillii extimus* | E | For breeding, riparian tree and shrub communities along rivers, wetlands, and lakes; for wintering, brushy grasslands, shrubby clearings or pastures, and woodlands near water | No known occurrences; suitable habitat present | No | No effect |
| Yellow-billed cuckoo *Coccyzus americanus* | C | Deciduous riparian woodland including cottonwood and willow communities with dense understories | No known occurrences; suitable habitat present | No | May affect, is not likely to result in a trend toward federal listing |
| Colorado hookless cactus *Sclerocactus glaucus* | T | Salt-desert shrub communities in clay soils on alluvial benches and breaks, toe slopes, and deposits often with cobbled, rocky, or graveled surfaces; 4500' – 6000' in elevation | Known occurrence; suitable habitat present | No | May affect, is likely to adversely affect |

A7

| Species | Status | Habitat Description | Potential and/ or Known Occurrence in Planning Area[1] | Designated Critical Habitat in Planning Area? | Effects Determination[2] |
|---|---|---|---|---|---|
| Clay-loving buckwheat *Eriogonum pelinophilum* | E | Mancos shale badlands in salt desert shrub communities, often with shadscale, black sagebrush, and mat saltbush; 5200' – 6400' in elevation | Known occurrence; suitable habitat present | No | May affect, is likely to adversely affect |
| Uncompahgre fritillary butterfly [4] *Boloria acrocnema* | E | Restricted to moist, alpine slopes above 12,000' in elevation with extensive snow willow patches; restricted to San Juan Mountains | No known occurrences; no suitable habitat | No | No effect |

[1] Species occurrence and habitat assessment information are described in the Environmental Baseline section of the Biological Assessment (BLM 2009).

[2] Rationale for effects determinations are provided in the Biological Assessment (BLM 2009).

[3] Southwestern willow flycatcher not known to occur in UFO, but species retained on USFWS 2008 species list.

[4] Uncompahgre fritillary butterfly is not known to occur in UFO, but species retained on USFWS 2008 species list.

[5] DeBeque phacelia is not known to occur in UFO, and this species was removed from USFWS 2008 species list.

A8

BLM_0015296

**Appendix D**

**Birds of Conservation Concern of the UFO**

| BIRDS OF CONSERVATION CONCERN OF THE UFO [1] | | | |
|---|---|---|---|
| SPECIES | HABITAT DESCRIPTION [2] | RANGE AND STATUS IN THE UFO [2, 3] | POTENTIAL AND/OR KNOWN OCCURRENCES IN PLANNING AREA [4] |
| Gunnison sage grouse *Centrocercus minimus* | Sagebrush communities (especially big sagebrush) for hiding and thermal cover, food, and nesting; open areas with sagebrush stands for leks; sagebrush-grass-forb mix for nesting; wet meadows for rearing chicks | Year-round resident, breeding | |
| American bittern *Botaurus lentiginosus* | Marshes and wetlands; ground nester | Spring/ summer resident, breeding confirmed in the region but not within the UFO | |
| Bald eagle [5] *Haliaeetus leucocephalus* | Nests in forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby | Fall/winter resident, no confirmed breeding | |
| Ferruginous hawk *Buteo regalis* | Open, rolling and/or rugged terrain in grasslands and shrubsteppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops | Fall/ winter resident, non-breeding | |
| Golden eagle *Aquila chrysaetos* | Open country, grasslands, woodlands, and barren areas in hilly or mountainous terrain; nests on rocky outcrops or large trees | Year-round resident, breeding | |
| Peregrine falcon [5] *Falco peregrinus* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags | Spring/summer resident, breeding | |
| Prairie falcon *Falco mexicanus* | Open country in mountains, steppe, or prairie; winters in cultivated fields; nests in holes or on ledges on rocky cliffs or embankments | Year-round resident, breeding | |

A9

BLM_0015297

| BIRDS OF CONSERVATION CONCERN OF THE UFO [1] | | | |
|---|---|---|---|
| SPECIES | HABITAT DESCRIPTION [2] | RANGE AND STATUS IN THE UFO [2, 3] | POTENTIAL AND/OR KNOWN OCCURRENCES IN PLANNING AREA [4] |
| Snowy plover [6] *Charadrius alexandrines* | Sparsely vegetated sand flats associated with pickleweed, greasewood, and saltgrass | Spring migrant, non-breeding | |
| Mountain plover *Charadrius montanus* | High plain, cultivated fields, desert scrublands, and sagebrush habitats, often in association with heavy grazing, sometimes in association with prairie dog colonies; short vegetation | Spring/ fall migrant, non-breeding | |
| Long-billed curlew *Numenius americanus* | Lakes and wetlands and adjacent grassland and shrub communities | Spring/ fall migrant, non-breeding | |
| Yellow-billed cuckoo [7] *Coccyzus americanus* | Riparian, deciduous woodlands with dense undergrowth; nests in tall cottonwood and mature willow riparian, moist thickets, orchards, abandoned pastures | Summer resident, breeding | |
| Flammulated owl *Otus flammeolus* | Montane forest, usually open and mature conifer forests; prefers ponderosa pine and Jeffrey pine | Summer resident, breeding | |
| Burrowing owl *Athene cunicularia* | Open grasslands and low shrublands often in association with prairie dog colonies; nests in abandoned burrows created by mammals; short vegetation | Summer/ fall resident, breeding | |
| Lewis's woodpecker *Melanerpes lewis* | Open forest and woodland, often logged or burned, including oak, coniferous forest (often ponderosa), riparian woodland, and orchards, less often in pinyon-juniper | Year-round resident, breeding | |
| Willow flycatcher [6] *Empidonax traillii* | Riparian and moist, shrubby areas; winters in shrubby openings with short vegetation | Summer resident, breeding | |
| Gray vireo *Vireo vicinior* | Pinyon-juniper and open juniper-grassland | Summer resident, breeding | |
| Pinyon jay *Gymnorhinus cyanocephalus* | Pinyon-juniper woodland | Year-round resident, breeding | |
| Juniper titmouse *Baelophus griseus* | Pinyon-juniper woodlands, especially juniper; nests in tree cavities | Year-round resident, breeding | |
| Veery *Catharus fuscescens* | Deciduous forests, riparian, shrubs | Possible summer resident, breeding not confirmed | |

A10

BLM_0015298

| BIRDS OF CONSERVATION CONCERN OF THE UFO [1] | | | |
|---|---|---|---|
| SPECIES | HABITAT DESCRIPTION [2] | RANGE AND STATUS IN THE UFO [2, 3] | POTENTIAL AND/OR KNOWN OCCURRENCES IN PLANNING AREA [4] |
| Bendire's thrasher *Toxostoma bendirei* | Desert, especially areas of tall vegetation, cholla cactus, creosote bush and yucca, and in juniper woodland | UFO is outside known range | |
| Grace's warbler *Dendroica graciae* | Mature coniferous forests | Summer resident, breeding | |
| Brewer's sparrow *Spizella breweri* | Sagebrush-grass stands; less often in pinyon-juniper woodlands | Summer resident, breeding | |
| Grasshopper sparrow *Ammodramus savannarum* | Open grasslands and cultivated fields | UFO is outside known range | |
| Chestnut-collared longspur *Calcarius ornatus* | Open grasslands and cultivated fields | Spring migrant, non-breeding | |
| Black rosy-finch *Leucosticte atrata* | Open country including mountain meadows, high deserts, valleys, and plains; breeds/ nests in alpine areas near rock piles and cliffs | Winter resident, non-breeding | |
| Brown-capped rosy-finch *Leucosticte australis* | Alpine meadows, cliffs, and talus and high-elevation parks and valleys | Summer residents, breeding | |
| Cassin's finch *Carpodacus cassinii* | Open montane coniferous forests; breeds/ nests in coniferous forests | Year-round resident, breeding | |

[1] U.S. Fish and Wildlife Service. 2008. Birds of Conservation Concern 2008. United States Department of Interior, Fish and Wildlife Service, Division of Migratory Bird Management, Arlington, Virginia. 85 pp. [Online version available at <http://www.fws.gov/migratorybirds/>].

[2] Cornell Lab of Ornithology. All about birds: bird guide. < http://www.allaboutbirds.org/guide/> Accessed 05/15/2009.

[3] San Juan Institute of Natural and Cultural Resources. Colorado Breeding Bird Atlas. Fort Lewis College, Durango, Colorado.   <http://www.cobreedingbirdatlasii.org/> Accessed: 05/15/2009.

[4] Assessment based on UFO files and GIS data, partner data, and local knowledge.

[5] ESA delisted species.

[6] Non-listed subspecies/ population.

[7] ESA candidate species.

BLM_0015299

## Appendix E

## Sensitive Species of the UFO

| SENSITIVE SPECIES OF THE UFO [1] | | |
|---|---|---|
| SPECIES | HABITAT DESCRIPTION [2,3] | POTENTIAL AND/OR KNOWN OCCURRENCES IN PROJECT AREA [4] |
| *FISH* | | |
| Roundtail chub<br>*Gila robusta* | Warm-water rocky runs, rapids, and pools of creeks and small to large rivers; also large reservoirs in the upper Colorado River system; generally prefers cobble-rubble, sand-cobble, or sand-gravel substrate | |
| Bluehead sucker<br>*Catostomus discobolus* | Large rivers and mountain streams, rarely in lakes; variable, from cold, clear mountain streams to warm, turbid streams; moderate to fast flowing water above rubble-rock substrate; young prefer quiet shallow areas near shoreline | |
| Flannelmouth sucker<br>*Catostomus latipinnis* | Warm moderate- to large-sized rivers, seldom in small creeks, absent from impoundments; pools and deeper runs often near tributary mouths; also riffles and backwaters; young usually in shallower water than are adults | |
| Colorado River cutthroat trout<br>*Oncorhynchus clarki pleuriticus* | Cool, clear streams or lakes with well-vegetated streambanks for shading cover and bank stability; deep pools, boulders, and logs; thrives at high elevations | |
| *MAMMALS* | | |
| Kit fox<br>*Vulpes macrotis* | Semi-desert shrublands of saltbrush, shadscale and greasewood | |
| River otter<br>*Lutra Canadensis* | Perennial streams and rivers with abundant fish and crayfish; often in association with beavers and abandoned bank dens | |
| Allen's (Mexican) big-eared bat<br>*Idionycteris phyllotis* | Ponderosa pine, pinyon-juniper woodland, oak brush, riparian woodland (cottonwood); typically found near rocky outcrops, cliffs, and boulders; often forages near streams and ponds. | |

A12

BLM_0015300

| SENSITIVE SPECIES OF THE UFO [1] | | |
|---|---|---|
| SPECIES | HABITAT DESCRIPTION [2,3] | POTENTIAL AND/OR KNOWN OCCURRENCES IN PROJECT AREA [4] |
| Big free-tailed bat<br>*Nyctinomops macrotis* | Rocky areas and rugged terrain in desert and woodland habitats; roosts in rock crevices in cliffs and in buildings caves, and occasionally tree holes | |
| Spotted bat<br>*Euderma maculatum* | Desert shrub, ponderosa pine, pinyon-juniper woodland, canyon bottoms, open pasture, and hayfields; roost in crevices in cliffs with surface water nearby | |
| Townsend's big-eared bat<br>*Corynorhinus townsendii* | Mesic habitats including coniferous forests, deciduous forests, sagebrush steppe, juniper woodlands, and mountain; maternity roosts and hibernation in caves and mines; does not use crevices or cracks; caves, buildings, and tree cavities for night roosts | |
| Fringed myotis<br>*Myotis thysanodes* | Desert, grassland, and woodland habitats including ponderosa pine, pinyon/juniper, greasewood, saltbush, and scrub oak; roosts in caves, mines, rock crevices, and buildings | |
| Yuma myotis<br>*Myotis yumanesis* | Strongly associated with water, typically rivers or streams; riparian, scrublands and deserts, and forests; roosts in buildings, bridges, cliff crevices, trees, and abandoned mud nests of cliff swallows | |
| *BIRDS* | | |
| Bald eagle [5]<br>*Haliaeetus leucocephalus* | Nests in forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby | |
| Peregrine falcon [5]<br>*Falco peregrines anatum* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags | |
| Northern goshawk<br>*Accipiter gentilis* | Nests in a variety of forest types including deciduous, coniferous, and mixed forests including ponderosa pine, lodgepole pine, or in mixed-forests with fir and spruce; also nest in aspen or willow forests | |

A13

BLM_0015301

| SENSITIVE SPECIES OF THE UFO [1] | | |
|---|---|---|
| SPECIES | HABITAT DESCRIPTION [2,3] | POTENTIAL AND/OR KNOWN OCCURRENCES IN PROJECT AREA [4] |
| Ferruginous hawk<br>*Buteo regalis* | Open, rolling and/or rugged terrain in grasslands and shrubsteppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops | |
| Gunnison sage grouse<br>*Centrocercus minimus* | Sagebrush communities (especially big sagebrush) for hiding and thermal cover, food, and nesting; open areas with sagebrush stands for leks; sagebrush-grass-forb mix for nesting; wet meadows for rearing chicks | |
| Columbian sharp-tailed grouse<br>*Tympanuchus phasianellus columbian* | Native bunchgrass and shrub-steppe communities for nesting; mountain shrubs including serviceberry are critical for winter food and escape cover | |
| Long-billed curlew<br>*Numenius americanus* | Lakes and wetlands and adjacent grassland and shrub communities | |
| White-faced ibis<br>*Plegadis chihi* | Marshes, swamps, ponds and rivers | |
| Black tern<br>*Chlidonias niger* | Marshes, swamps, and ponds | |
| *REPTILES AND AMPHIBIANS* | | |
| Longnose leopard lizard<br>*Gambelia wislizenii* | Desert and semidesert areas with scattered shrubs or other low plants; e.g., sagebrush;  areas with abundant rodent burrows, typically below 5,000' in elevation | |
| Texas horned lizard [6]<br>*Phrynosoma cornutum* | Plains grasslands, particularly where there are large patches of bare ground; seeks cover in rodent burrows | |
| Midget faded rattlesnake [7]<br>*Crotalus viridis concolor* | Rocky outcrops for refuge and hibernacula, often near riparian; upper limit of 7500'-9500' in elevation | |
| Northern leopard frog [8]<br>*Rana pipiens* | Springs, slow-moving streams, marshes, bogs, ponds, canals, flood plains, reservoirs, and lakes; in summer, commonly inhabits wet meadows and fields; may forage along water's edge or in nearby meadows or fields | |

A14

| SENSITIVE SPECIES OF THE UFO [1] | | |
|---|---|---|
| SPECIES | HABITAT DESCRIPTION [2,3] | POTENTIAL AND/OR KNOWN OCCURRENCES IN PROJECT AREA [4] |
| Canyon treefrog<br>*Hyla arenicolor* | Rocky canyon bottoms along intermittent or perennial streams in temporary or permanent pools or arroyos ; semi-arid grassland, pinyon-juniper, pine-oak woodland, scrubland, and montane zones; elevation 1000' - 10,000' | |
| *PLANTS* | | |
| Grand Junction milkvetch<br>*Astragalus linifolius* | Sparsely vegetated habitats in pinyon-juniper and sagebrush communities, often within Chinle and Morrison Formation and selenium-bearing soils; elevation 4800' – 6200' | |
| Naturita milkvetch<br>*Astragalus naturitenis* | Cracks and ledges of sandstone cliffs and flat bedrock area typically with shallow soils, within pinyon-juniper woodland; elevation 5400' –  6700' | |
| San Rafael milkvetch<br>*Astragalus rafaelensis* | Banks of sandy clay gulches and hills, at the foot of sandstone outcrops, or among boulders along dry watercourses in seleniferous soils derived from shale or sandstone formations; elevation 4500'–  5300' | |
| Sandstone milkvetch<br>*Astragalus sesquiflorus* | Sandstone rock ledges (Entrada formation), domed slickrock fissures, talus under cliffs, sometimes in sandy washes; elevation 5000' – 5500' | |
| Rocky Mountain thistle<br>*Cirsium perplexans* | Open areas and disturbed sites in mixed shrublands and pinyon-juniper woodlands; elevation 5000' – 8000' | |
| Kachina daisy<br>*Erigeron kachinensis* | Saline soils in alcoves and seeps in canyon walls; elevation 4800' – 5600' | |
| Montrose (Uncompahgre) bladderpod<br>*Lesquerella vicina* | Sandy-gravel soil mostly of sandstone fragments over Mancos Shale (heavy clays) mainly in pinyon-juniper woodlands or in the ecotone between it and salt desert scrub; also in sandy soils derived from Jurassic sandstones and in sagebrush steppe communities; elevation 5800' – 7500' | |
| Colorado desert parsley<br>*Lomatium concinnum* | Adobe hills and plains on rocky soils derived from Mancos Formation shale; shrub communities dominated by sagebrush, shadscale, greasewood, or scrub oak; elevation 5500' – 7000' | |
| Paradox Valley (Payson's) lupine<br>*Lupinus crassus* | Pinyon-juniper woodlands, or clay barrens derived from Chinle or Mancos Formation shales, often in draws and washes with sparse vegetation; elevation 5000' – 5800' | |

A15

BLM_0015303

| SENSITIVE SPECIES OF THE UFO [1] | | |
|---|---|---|
| SPECIES | HABITAT DESCRIPTION [2,3] | POTENTIAL AND/OR KNOWN OCCURRENCES IN PROJECT AREA [4] |
| Dolores skeleton plant<br>*Lygodesmia doloresenis* | Reddish purple, sandy alluvium and colluviums of the Cutler Formation between the canyon walls and the river in juniper, shadscale, and sagebrush communities; elevation 4000' – 5500' | |
| Eastwood monkey-flower<br>*Mimulus eastwoodiae* | Shallow caves and seeps on steep canyon walls; elevation 4700' – 5800' | |
| Paradox breadroot<br>*Pediomelum aromaticum* | Open pinyon-juniper woodlands in sandy soils or adobe hills; elevation 4800' – 5700' | |
| *INVERTEBRATES* | | |
| Great Basin silverspot butterfly<br>*Speyeria nokomis nokomis* | Found in streamside meadows and open seepage areas with an abundance of violets | |

[1] Based on Colorado BLM State Director's Sensitive Species List (Last update: March 17, 2000)

[2] Van Reyper G. 2006. Bureau of Land Management TES [threatened, endangered, sensitive] species descriptions. Uncompahgre Field Office, Montrose, CO, updated 2009.Unpublished document.

[3] Spackman SB, JC Jennings, C Dawson, M Minton, A Kratz, C Spurrier. 1997. Colorado rare plant field guide. Prepared for the BLM, USFS, and USFWS by the Colorado Natural Heritage Program.

[4] Assessment based on UFO files and GIS data, partner data, and local knowledge.

[5] ESA delisted species.

[6] Species not known to occur in UFO

[7] Midget faded rattlesnake: validity of subspecies designation is in question by taxonomists

[8] Species currently under status review by FWS and a 12-month finding is pending; i.e., listing of the species throughout all or a significant portion of its range may be warranted

BLM_0015304

BLM_0015305

**U.S. Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, CO**

**DECISION RECORD**

**DOI-BLM-CO-S050-2008-0064**
**Environmental Assessment**

**Project Name:**  Resource Management Plan Amendment/Environmental Assessment for the Uncompahgre Field Office (UFO) Travel Management Plan

**INTRODUCTION:**  The Uncompahgre Field Office Travel Management Planning Area (planning area) is located within the UFO administrative boundary. The planning area surrounds the towns of Montrose, Olathe, Delta, Nucla, Naturita, Norwood, Cedaredge, Ridgway, Ouray, Crawford, and Hotchkiss, Colorado, and contains approximately 460,567 acres of BLM public lands. The decision will be for public lands only and will not apply to private lands without easements.

The critical need to balance increasing access and use demands with management and sustainability of the public lands within the planning area, has made it essential to amend the two Resource Management Plans (RMP) prior to the upcoming UFO Land Use Plan Revision and Dominquez-Escalante National Conservation Area (DENCA) RMP. The DENCA legislation requires BLM to manage the area in a manner that conserves, protects and enhances the resources and values of the NCA. Addressing travel management with the NCA will help achieve this mandate until an RMP can be completed for the area.  Route by route travel management planning for the DENCA will be completed in conjunction with the RMP process. As for the rest of the planning area, the UFO will delineate Travel Management Areas for the "limited" designated areas throughout the planning area and to the extent possible produce a schedule to complete the route by route travel management planning. As per BLM's planning handbook guidance this should not exceed 5 years after the RMP revision has been completed.

This Decision regarding Off-Highway Vehicle Area Designations is subject to a 30-day public protest period and 60-day governor's consistency review. In accordance with BLM policy, decisions pertaining to OHV Area Designations require an amendment to Resource Management Plans, and are subject to the protest procedures outlined below.

The Uncompahgre Field Office Travel Management Plan/Environmental Assessment (CO-150-2008-64 EA) is available for review at the following web address:
**http://www.blm.gov/co/st/en/fo/ufo.html**

Please direct questions and comments about this Decision Record, CO-150-2008-64 EA, or the Finding of no Significant Impact to Julie Jackson, Recreation Planner, or Bruce Krickbaum, Environmental Coordinator, at (970)240-5300, or by submitting your questions via email to Julie_Jackson@blm.gov or Bruce_Krickbaum@blm.gov.

1

BLM_0015306

**DECISION:**  It is my Decision to

**(1) Change the Off-Highway Vehicle (OHV) Area Designations on public lands within the Uncompahgre Field Office Travel Management Planning Area (planning area) through amendments to the 1989 Uncompahgre Basin and 1985 San Juan/San Miguel Resource Management Plans.**

**OHV Area Designation Changes**
OHV areas in the planning area designated as *Open* or *Limited* will be changed to *Limited to existing routes yearlong or with seasonal restrictions.* Routes within areas with seasonal restrictions are closed to all motorized and mechanized travel from December 1 to April 30 or May 1 to June 15 annually in order to prevent disturbance to wintering big game or calving elk. These routes are available for motorized and mechanized travel the remainder of the year. Any exceptions to the listed dates are made by the authorizing officer and are implemented according to appropriate notification and posting, and/or according to other appropriate regulations.

No new routes are permitted to be constructed or established unless reviewed, analyzed and authorized by the BLM. See CO-150-2008-64 EA for maps identifying routes and restrictions.

Following are the acreages within each designation:

- 0 acres Open
- 410,351 acres Limited to Existing Routes Yearlong
- 46,842 acres Limited to Existing Routes 5/1 to 11/30; Closed 12/1 to 4/30
- 3,374 acres Limited to Existing Routes 6/16 to 4/30; Closed 5/1 to 6/15

**(2) Approve the following management actions described in CO-150-2008-64 EA.**

**Travel Use Conditions**
The following describe travel use conditions allowed, restricted or limited on routes designated for use by motorized and mechanized modes of travel:

> Motorized and mechanized travel off of existing routes is not authorized or permitted, except as noted in the description of the Proposed Action.

> Travel on horse or by foot would be permitted yearlong on existing routes and cross-country on public lands throughout the planning area where available for public use.

> Use of motorized or mechanized modes of travel on existing routes would not be permitted if the result would:
> - Convert or upgrade a single-track route (maximum of 36 inches in width) to a two-track route, i.e. driving an all-terrain vehicle (ATV) or a full-size passenger vehicle on a route consisting of a single track used by hikers, horseback riders, motorcycles, mountain bikes, game or livestock
> - Convert or upgrade a route (with a maximum width of 50 inches) used by and established for use by an ATV to a wider two-track route, such as would occur

2

BLM_0015307

if a full-size passenger vehicle were used to travel along a route narrower than its wheel base.

**Implementation & Monitoring**

An official agency map showing valid existing routes would be made available to the public and used to determine if motorized and mechanized travel is permitted on a particular route during any part of the year.

Informational/directional signs, as well as kiosks where appropriate, would be installed in sensitive areas and other locations where needed throughout the planning area. Not all routes may be signed or identified, as signing for routes would be implemented by the BLM over time and as funding allows. The BLM would work cooperatively with other agencies, organizations, clubs and individuals to determine appropriate sign locations.

Implementation of the approved RMP amendment would include a strategy of educating users and enforcing regulations, including the development of easily understandable maps and other tools for effectively communicating that it is not permissible for operators of motorized or mechanized modes of travel to drive off of existing routes within the planning area.

The UFO would prepare and implement a public education program in a variety of formats to promote responsible use of public land. This would include educational information on noxious weeds and best management practices, information regarding controlling noise levels while recreating on public lands, as well as Colorado noise level standards pertaining to the operation of motor vehicles, including provisions in Colorado Senate Bill 08-063, and any pertinent regulations that would be promulgated.

**Emergency and Administrative Use**

Any emergency or administrative motorized vehicle or equipment use off of existing routes on BLM-managed lands would require prior notification and approval. Should prior notification not be possible, contact with an authorized BLM official would have to be made within 72 hours following emergency entry.

BLM administrative functions related to resource management objectives (e.g., wildlife habitat and species monitoring and management, noxious weed eradication, resource enhancement and restoration, and fence repair) requiring cross-country travel using motorized vehicles or equipment, would be addressed at the project level on a case-by-case basis, and additional environmental documentation and analysis could be required for certain administrative functions.

**Adaptive Management**

The BLM would reserve the option to further restrict travel and use, by vehicle type or season, on any route in order to protect (natural or other) resources or infrastructure from being impacted by vehicle use in the event of extreme winters, wet conditions, to reduce safety hazards, or any other unforeseeable situations, or to better manage or protect other values, such as big game or nesting raptors. These actions could include permanent or seasonal route closures or relocations. These actions would be taken following appropriate emergency closure or other procedures, and/or after appropriate site-specific NEPA analysis.

3

BLM_0015308

Over time, changes to the route network may be necessary, including adding, designating, relocating, closing, maintaining, and/or changing seasonal or other use restrictions on routes, as well as adding necessary travel management support facilities. Such changes would be documented using appropriate BLM Land Use Planning regulations and NEPA procedures. Individuals and organizations can request that the BLM make route status changes based on a variety of criteria, including route condition, maintenance needs, resource conditions, existing uses, historical information, changing needs, cultural information, economic information, ecological issues, road density, duplicative uses/displacement, fish and wildlife, and use types and levels.

**Enforcement**

Users and motorists would be responsible for understanding and following area and route restrictions on official agency maps. The BLM would assign personnel, including law enforcement, recreation and other resource staff and volunteers to actively patrol existing routes. Actual enforcement would be conducted by BLM law enforcement personnel in accordance with 43 CFR 9268.0-3 and other applicable regulations.

**Design Features**

The following design features will be implemented and include mitigation measures intended to reduce or eliminate impacts to certain resources.

- Maintenance of routes will be performed according to BLM annual work plans and as funding permits.

- Impacts from travel on existing routes are expected to be greatest for the Colorado hookless cactus and clay-loving wild buckwheat. Therefore, to mitigate impacts on these species, the BLM UFO will systematically install roadside signs to indicate especially sensitive areas, where travel-related impacts on these species are potentially substantial. Signs will be installed no later than one year from the signing of the FONSI for the Environmental Assessment (EA). Sensitive areas that will be signed include all travel routes within 25 meters of known populations (based on the Biological Assessment's habitat models and maps), and other potential conflict areas as determined necessary. Signs shall notify the public and other users that, to protect sensitive resources, motorized and mechanized travel in these areas is restricted to existing routes and that off-route travel is strictly prohibited. This regulation will be enforceable by law officers, and compliance will be monitored by the BLM.

- If impacts to listed species that were not analyzed in this consultation are expected to occur due to future geographic area travel management planning, further consultation will occur at that time.

- In accordance with information in the Biological Opinion (U.S. Fish and Wildlife Service, August 11, 2009), re-initiation of formal consultation with the Wildlife Service will occur if:

  1. New information reveals effects of the agency action that may adversely affect listed species or critical habitat in a manner or to an extent not considered in the BO;

4

BLM_0015309

2.  The agency action is subsequently modified in a manner that causes an effect to a listed species or critical habitat that was not considered in the BO; and/ or
3.  A new species is listed or any new critical habitat is proposed or designated that may be affected by this action.

RATIONALE:  The changes to existing OHV Area Designations and the additional management actions are intended to balance recreational demands with resource needs, RMP goals, and compliance with Public Land Health Standards. My decision is based on the findings and analysis in CO-150-2008-64 EA, including supporting documentation and reports, and public participation and involvement in this project.

Implementation of the Proposed Action will not result in any undue or unnecessary environmental degradation, and does not constitute a major federal action having significant effect on the human environment; this has been documented in a Finding of No Significant Impact. Best available data was used in the preparation of the EA. An Environmental Impact Statement for this project would not, in all likelihood, provide any significant new information.

COMPLIANCE:  This decision amends both the 1989 Uncompahgre Basin and 1985 San Juan/San Miguel Resource Management Plans.

This decision is in compliance with other major laws to minimize environmental impacts to public lands, including: Endangered Species Act of 1973 (P.L. 94-325); Migratory Bird Treaty Act of 1918, as amended (16 U.S.C. 703-712); Federal Water Pollution Control Act of 1948 (Clean Water Act), as amended (33 U.S.C. Chap. 26); Clean Air Act of 1963, as amended (P.L. 88-206); Federal Noxious Weed Act of 1974, as amended (P.L. 93-629, 7 U.S.C. 2801 *et seq*); National Historic Preservation Act of 1966, as amended (P.L. 89-665); Archaeological and Historic Preservation Act of 1974 (P.L. 86-253); Archaeological Resources Protection Act of 1979, as amended (P.L. 96-95); and Native American Graves Protection and Repatriation Act of 1990 (P.L. 101-601).

PROTEST OPPORTUNITIES: Pursuant to BLM planning regulations at 43 CFR 1610.5-2, any person who participated in the planning process for CO-150-2008-64 EA, and has an interest that is or may be adversely affected by the proposed amendments to the RMPs may protest such amendments. A protest may raise only those issues that were submitted for the record during the planning process. New issues may not be brought into the record at the protest stage. These issues may have been raised by the protesting party or others. For consideration, the protest must be filed within 30 days of the published notice of this Decision Record's effective date. Please see the accompanying protest regulations on the pages that follow.

E-mailed and faxed protests will not be accepted as valid protests unless the protesting party also provides the original letter by either regular or overnight mail postmarked by the close of the protest period. Under these conditions, the BLM will consider the e-mailed or faxed protest as an advance copy and will afford it full consideration. If you wish to provide the BLM with such advance notification, please direct faxed protests to the attention of Brenda Hudgens-Williams, BLM protest coordinator at 202-452-5112, and **E-mail protests to:** Brenda_Hudgens-Williams@blm.gov

BLM_0015310

Please also courtesy copy (cc:) advance notification of protest to Julie Jackson, Recreation Planner (Email: julie_jackson@blm.gov).

**If sent by regular mail to:**
Director (210)
Attention: Brenda Hudgens-Williams
P.O. Box 66538
Washington, D.0 20035

**Cc:**
BLM-Uncompahgre Field Office TMP/EA
Attention: Julie Jackson
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401

**For overnight mailing (by Federal Express only) send to**:
Director (210)
Attention: Brenda Hudgens-Williams
1620 L Street, N.W. Suite 1075
Washington, D.C. 20036

***Regulations comprise critical elements of your protest.*** Take care to document all relevant facts. As much as possible, reference or cite planning documents or available planning records (e.g. meeting minutes or summaries, correspondence, etc.) To aid in ensuring the completeness of your protest, a protest check list is attached following this letter.

Before including your address, phone number, e-mail address, or other personal identifying information in your protest, be advised that your entire protest – including your personal identifying information – may be made publicly available at any time. While you can ask us in your protest to withhold from public review your personal identifying information, we cannot guarantee that we are able to do so.

The BLM Director will make every attempt to promptly render a decision on each protest. Decisions will be made in writing and sent to the protesting party by certified mail, return receipt requested. The decision of the BLM Director regarding protests shall be the final decision of the Department of the Interior.

Upon completion of the 60-day Governor's consistency review and resolution of any resource management plan protest, the BLM will issue an Approved RMP Amendment. Approvals are withheld on any portion of the Amendment under protest until final action has been completed on such protest. The Approved RMP Amendment will be available to all parties at this website: http://www.blm.gov/co/st/en/fo/ufo.html.

BLM_0015311

**SIGNATURE OF RECOMMENDING OFFICIAL:**

_____

Barbara Sharrow                                    Date
Field Manager
Uncompahgre Field Office

**DECISION**

It is my decision to amend certain Off-Highway Vehicle area designations in the Uncompahgre Basin and San Juan/San Miguel Resource Management Plans as described above.

**SIGNATURE OF AUTHORIZED OFFICIAL:**

_____

Helen Hankins                          Date
State Director

BLM_0015312



# Uncompahgre Field Office
# Gunnison Gorge NCA

## Weed Management Strategy
## Including
## Strategy by Species

An abstract of management direction for species present on or threatening BLM lands

Compiled, 2007/2008
Updated March 2010



BLM_0015313

# TABLE OF CONTENTS

Introduction ……………·…………………………………………………….. 2

**Chapter 1** Biological Wildfire……………………………·……………….3-9

**Chapter 2** Goals, Strategies, and Objectives and Exotic noxious weeds on UFO/GGNCA lands
Plant list…………………………………………………………………...12
Abstracts of management Strategy by Species…………………………….13-23

**Chapter 3** Safety and Storage of Equipment and Herbicides…………………24-25

**Chapter 4** Cost of doing Business……………………………………………...26-28

+

BLM_0015314

## INTRODUCTION

The successful campaign to fight an enemy requires good strategy, or long term goals to eventually wear down the opponent. This plan outlines, in general, the course of action the Uncompahgre Field Office and Gunnison Gorge National Conservation Area (GGNCA) will take in our attempt to combat noxious and other invasive weed invasions on BLM lands. There are many species of exotic plants present on or threatening lands administered by the Uncompahgre and Gunnison Gorge NCA. Some of these plants are worthy of being deemed noxious weeds either by the characteristics they exhibit in the rangeland environment, or because they are listed by the State Department of Agriculture as such. Some weeds are serious threats to rangelands, rangeland improvements, recreation areas, and wildlife habitat. This document will focus on the status of exotic plants known to exist or are threatening Uncompahgre and Gunnison Gorge BLM lands, and how we will treat these infestations through INTEGRATED WEED MANAGEMENT, including the Horsefly Coordinated Weed Management Area Plan prepared by the UP project.

The Uncompahgre and Gunnison Gorge BLM lands, encompass approximately 884,000 acres of BLM administered lands. Included in these boundaries there are 23 known noxious perennial/biennial weed species. There are a number of invasive annual weeds, for example cheatgrass (state "C" list) is significantly degrading 30% of the Land Health Assessment areas analyzed in the North Fork valley in the 2006 field season.

After inventorying approximately 60% of the Uncompahgre and Gunnison Gorge NCA the number of noxious weed infestations is approximately 2,436. These infestations equal 4,429 acres of noxious weeds, not including 1,860 miles of roads and drainages infested that pass through BLM lands. In 2004, which was considered a typical treatment year approximately 995 acres were treated for noxious weed which is approximately 22% of the known infested acreage, or approximately 11% of the known infestations. The amount of linear treatment added up to 89 miles treated which is approximately 4% of the roads/trails or drainages with known infestations. These numbers are conservative as the inventory is not complete and additional inventory is needed to locate weeds along with monitoring to ensure weeds are being treated and weed free areas are staying weed free. Our existing weed treatments are only treating a small fraction of the known infestations. With creeping perennial like Hoary cress, Oxeye daisy Russian knapweed, and Spotted knapweed spreading at rates of 8-24% a year we don't have the luxury of not utilizing all the tools allowed in the BLM toolbox for Integrated Weed Management (IWM) and Early Detection Rapid Response (EDRR).

BLM_0015315

**If there is one word that dictates the management strategy of noxious weeds it would by the word *INVASIVE*.** There are many exotic weeds that are not invasive; these will see a lower priority of management. Some native plants are invasive if the ecosystem is out of balance. *The highest priority for management will focus on exotic, noxious, plants that are invasive, and pose a serious threat to public land health.* This document will be dynamic and as new plants arrive they will be added to the strategy. Also, as new management strategies emerge our management will adjust.

*Prepared by:* _____ *Date:* _____
       Lynae Rogers, Rangeland Mgt Specialist

*Reviewed by:* _____ *Date:* _____
       Melissa Siders, Biological Supervisor

*Reviewed by:* _____ *Date:* _____
       Amanda Clements, Ecologist

*Reviewed by:* _____ *Date:* _____
       Dave Kauffman, Assoc. Field Manager

*Reviewed by:* _____ *Date:* _____
       Karen Tucker, Gunnison Gorge NCA Manager

*Reviewed by:* _____ *Date:* _____
       Carol Dawson, Botanist, Colorado State Office

*Approved by:* _____ *Date:* _____
       Barbara Sharrow, Uncompahgre Field Manager

BLM_0015316

# CHAPTER 1

## *BIOLOGICAL WILDFIRE*

Invasive noxious weeds have been described as a raging biological wildfire—out of control, and spreading rapidly. The impact from these alien plants is enormous: devastating economic loss to agriculture and irreparable ecological damage to wildlands. Millions of acres have been infested or are at risk (Invasive Plants Fact Book). Like wildfire, weeds do not follow jurisdictional boundaries, and private lands, public lands, rangelands, forests, wilderness areas, recreation areas.....are all affected.

The areas managed by the Uncompahgre Field Office and Gunnison Gorge NCA are no exception. Noxious weeds are found in all planning regions. While some noxious weeds have been established for some time (e.g. Russian Knapweed), previously unknown weeds are appearing at an alarming rate. Some of these invaders have permanently altered the landscape in neighboring states. The mobility of our society means the spread of noxious weeds will only increase. The Field Office must take an aggressive approach to weed management if we are to be successful.

## *IMPACT*

Similar to an unwanted wildfire, noxious weeds can drastically affect rangeland plant and animal communities, damage watersheds, adversely impact recreation and threatened and endangered habitat, and increase soil erosion. *However*, unlike the temporary impacts of a wildfire, the ecological damage of extensive noxious weed infestations is often permanent. Lands altered by fire are self-healing over time, not so with weed invasions. Lands invaded by weeds do not return to pre-invasion conditions; weeds continue to spread and the damage worsens.

## *SPREAD*

Like wildfires, noxious weed infestations begin small, and then expand to cover huge areas if conditions are optimal and quick control is not initiated. Weed seeds are spread by the wind, vehicles, animals, and humans which all contribute to expanding the perimeter of the infestation. These resulting "spots" grow and merge, much like the growth of a large fire.

BLM_0015317

## MANAGEMENT

**Prevention, Detection, Suppression (control)** and **Revegetation**, are the elements of modern firefighting. The same fundamentals apply to weed management, and a balance of these elements is the key to success. The following chart is a guide to the amount of effort required for these elements (Dewey 1996):

Percent Resource/Budget Allocation



Figure 1.  Percent of the total budget associated with the elements involved in Integrated Weed Management (Dewey 1996).

BLM_0015318

**PREVENTION**

"An ounce of prevention is worth a pound of cure" applies to both wildfire and noxious weed management. Weed prevention means placing an emphasis on preserving and protecting lands not presently infested. A balance of education and regulation are the key ingredients to raise public awareness and gain support for weed prevention. Informed hikers, bikers, hunters, OHV riders, equestrian users, grazing permitees, energy developers, and other visitors to the public lands can do much to prevent the spread of noxious weeds. Equally important are the use of stipulations to prevent introduction and establishment of noxious weeds onto BLM lands for all permitted activities. The strategic goal here is to take special precautions where land is especially vulnerable to weed infestation, especially during ground disturbing activities. The Uncompahgre and Gunnison Gorge NCA Offices manage lands for all users and the strategic goal is to educate and inform all users as well as develop our own weed management program while cooperating with other agencies in weed prevention programs. Outright prevention is best. However, once an infestation starts, catching and treating weeds while patches are small and controllable is the most cost efficient, and promotes the sustainability of ecosystems for all users, as noted in the graph below.



Figure 2. Management costs in million dollars and invasion phase
Relationship show that prevention is the least costly phase,
with exponentially rising costs once the invading weed has
become established and most costly if it is displacing native
species and/or disrupting native habitats (Anderson, 2000).

**DETECTION**

Early detection of wildfires helps make rapid and complete control a more likely outcome. The same is true for weeds. Typically in the wildfire community detection is assigned to specific individuals. But all field personnel are expected to watch for and report fires. In weed detection programs the strategy is similar: employees trained in weed identification and dedicated to weed detection are an important tool, as well as the training of all field-going personnel in weed

6

identification and mapping. Because of the scope of the weed problem, organizing and securing weed detection information into a useful and credible database is key to successful detection program. The strategy of the field office will be to incorporate these two levels of field detection personnel as well as the training of user groups in weed ID and mapping, together with a GIS database manager. By joining forces, we will be able to gather an accurate picture of the extent of weeds in this area and track changes through time.

## CONTROL

The third element of weed and fire management is actual control. There is a definite sequence of events for the control of a fire beginning with (1) rapid response, (2) size-up of the situation, (3) containment, and (4) mop-up. Suppression efforts may fail if the proper sequence is not followed. A similar 4-step approach to weed control will increase the likelihood of success in a weed program.

### Rapid Response

Controlling unwanted wildfires when small reduces costs and minimizes resource damage. The same approach is vital to new weed infestations. Often action is not taken until infestations are too large and beyond hope for eradication. *The Field Office will incorporate an early detection rapid response(EDRR) attitude toward new and small weed infestations.* Rapid response activities will in part be dictated by the Colorado Noxious Weed Act, State weed priorities, District priorities, and weeds on the Federal Species of Concern list.

### Size-up

The thorough size-up of a fire is crucial. Location, size, intensity, threatened resources, limits to control efforts, and safety of personnel are all critical elements to know before management begins. Failure to gather good information to build a plan severely limits the effectiveness of an operation. The same principles apply to weed management, and it is the intent of the Field Office and GGNCA to develop an accurate assessment system for "sizing-up" a weed problem. As in multiple wildfire situations, developing a priority system is important. Some fires are worse than others, and the same is true for weeds. Knowing the priority system will aid in the tactical decisions made to manage an infestation. The Field Office will utilize data from the detection database (which typically includes GPS, hand mapping, and size-up for gathering information about weeds.) In areas covered by Weed Management Plans, priorities for control are usually enumerated and will be worked into the overall field management strategy.

### Containment/Confinement

These wildfire terms define the type of tactics to use on a fire. Both terms deal with the perimeter of a fire *before* the interior of a fire. The same important concept is applicable to weed infestations. Too often weed managers concentrate on the interior of an infestation first ignoring the real threat which is the perimeter. Only after the perimeter is secure, and all "spots" outside the main perimeter controlled does work begin on the interior. Many a fire has been lost due to the unfound spot fire that later grew into a new fire. Likewise, tremendous amounts of time and money can be spent on a weed infestation only to lose it again later. Some weed infestations are small and the perimeter-to-interior process is short. Others will require more time spent before they can be called contained. In some cases a weed infestation can be confined to a geographic area using a natural barrier. This process will be an important component in the Field Office and

7

BLM_0015320

GGNCA battle against weeds. Along with establishing control of the perimeter, it is vital to establish control of the sources of weed transmission into an infested area. This includes weeds growing along ditch, drainage or road networks. If these are not contained first across an area targeted for weed control, reinvasion will quickly occur.

## Mop-up

The final step is mop-up. For both fire fighting and weed fighting, this is the most tedious and time consuming stage. In weed management this means killing every weed within the infestation. Eradication may only be feasible on relatively small infestations. Unlike a wildfire which can be left with a few smokes on the interior, a few weeds on the interior will eventually mean more weeds again. For this reason alone, the smaller the infestation at initial attack, the more likelihood of success. In weed management, mop-up means repeated visits to the same area to ensure all are gone. The Field Office will adopt a strategy of complete and thorough mop-up in as much of the areas treated as possible, emphasizing eradication of smaller infestations and containment of larger ones ensuring no spread. Developing a system for tracking infestations, treatment history, and their current status is the goal.

## Rehabilitation

The fourth fundamental of both efforts is rehabilitation. In the fire regime this sometimes is a natural event, and other times a necessary step for us as stewards of the land. Weed infestations will be the same: some areas will not need help in re-establishing viable plant communities and some will. Re-vegetation will depend on the ecological damage the infestation has done to soils, and surrounding native vegetation and will be decided using a biological team approach. Incorporated into the Field Office strategy is a checklist for determining when revegetation is necessary and will be based upon the Land Health Standards.

## INTEGRATED WEED MANAGEMENT

The Field Office will adopt an integrated approach to weed management on public lands surrounding the Uncompahgre Field Area and GGNCA. Integrated Weed Management is defined as "A management system which uses all suitable methods to reduce weed populations to levels below those causing acceptable economic or ecological consequences." Experts agree that IWM approaches are more effective than reliance on any single method. Integrated weed management must correspond with a number of variables including targeted species, time of year, climatic conditions, and soil types.

**Examples of Integrated Control Techniques**:

### Cultural
A. Preventative regulations can help reduce the spread of noxious weeds. The weed-free hay program, maintaining parking lots, and recreation trails and facilities in weed-free conditions will aid in the prevention weed spread and are excellent examples of cultural integration of weed management.

BLM_0015321

B. Manipulation of domestic animals. Adopt a holistic approach to grazing which includes weed management. For example, timing of grazing to avoid spread of seed by grazing animals, if possible.

C. Wildlife Manipulation. Determine feasibility of changes in wildlife movement that can reduce or contain an infestation.

D. Soil Disturbance Activities. Revegetate all bare soil following a disturbance such as the construction of recreation facilities, energy developments, and range improvements. Select species that are good competitors against weeds.

E. Public Use. Determine the most feasible land use to reduce or prevent infestations. For example, consider temporary closures of areas under treatment to prevent the inadvertent spread of weed seed.

### Physical

A. Manual control is determining whether hoeing or grubbing will reduce or increase the infestation. Determine whether hand pulling is practical.

B. Mechanical control involves mowing or cultivation techniques to treat infestations.

C. Prescribed Fire. In some cases controlled burning is a viable method to treat weed problems.

### Biological Control

A. Natural competition is a method of biological control where naturally occurring, or planted species, compete with invading plants. Re-seeding fires to compete with downy brome is one example. Understanding the pest and the attributes of the selected species is important.

B. Biological Control Agents, such as insects, can be introduced into the ecosystem to control or maintain weed infestations. The Leafy Spurge Flea Beetle is an example of an agent used to prey on leafy spurge plants. Domestic grazing and browsing animals are considered biological control agents, and have been used effectively to control infestations.

### Chemical

Chemical Control is using herbicides to control plants. The mode of action varies, some are selective to certain plants, and others are non-selective. Understanding the pest and understanding the label of a chemical are key components to an effective chemical treatment program.

## AUTHORITY

The Authority for BLM to undertake integrated weed management programs is outlined in H-9015, dated 12/2/92. This manual sets forth BLM's policy relating to the management and coordination of noxious weed activities. Furthermore it is the BLM responsibility mandated by the following legislation and orders:

1. Federal Land Policy and Management Act (FLPMA) of 1976.

9

BLM_0015322

2.  Public Rangelands Improvement Act of 1978.
3.  Federal Noxious Weed Act of 1974 (as amended 1990).
4.  Departmental Manual parts 609 and 517.
5.  Carson-Foley Act of 1968.
6.  Executive Order 11987, Exotic Organisms.
7.  Pulling Together, National Strategy for Invasive Plant Management
8.  Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17
    Western States Programmatic Environmental Impact Statement, June 2007

The Authority and guideline for BLM to use chemicals in the control of invasive plants is H-9011, dated 5/25/88.

## Credits

Much of the material used in this strategic plan is patterned after publication AG 500, the work of Steven A. Dewey, Extension Weed Specialist at Utah State University, the combined work of many individuals in the Integrated Pest Management and Pesticide Applicator Certification course of the BLM and Mark "Sparky" Taber of the Grand Junction Field Office.

Anderson, L.W.J. 2000. Personal communication, *in* Invasive Plant Species, Council for Agriculture Science and Technology, Issue Paper Number 13. USDA-ARS, Exotic and Invasive Weed Research, University of California, Davis.

Mullin et. al., 2000. Invasive Plant Species, Council for Agriculture Science and Technology, Issue Paper Number 13.

Dewey, S.A. 1995. Noxious Weeds…A Biological Wildfire. Cooperative Extension Service, Utah State University, Logan Utah.

BLM_0015323

# CHAPTER 2

| GOALS, OBJECTIVES AND EXOTIC, NOXIOUS WEEDS PRESENT ON UFO/GGNCA LANDS |
| --- |

## GOALS

- Protect and restore species diversity and the productivity of native plant communities through Integrated Weed Management.
- To expand community knowledge of the social, and economic impacts of noxious weed invasions.
- Increase community and partner involvement in the application of Integrated Weed Management, including development of weed plans, coordination of efforts across boundaries, and efficient use of resources.
- Retain a healthy ecosystem which will provide the goods and services that benefit our community now and in the future.

## STRATEGIES AND OBJECTIVES

- Update and finish the comprehensive weed survey for the UFO, including mapping using GPS, in the next 5 years.
- Resurvey the GGNCA for noxious weeds in 2017.
- Monitor selected weed treatments yearly to ensure control.
- Set priorities and timing sequence for weed treatments through knowledge of weed morphology and IWM processes including Early Detection Rapid Response.
- Continue to support internal capability to treat weeds.
- Improve external resource base for treating weeds, such as establishing cooperative agreements with all counties, building reputable contractor list, and formalizing partnerships.
- Implement treatments for high priority infestations.
- Ensure that effective weed prevention measures are being taken across all BLM programs (review standard realty and mineral stipulations for weed prevention, review process for ensuring compliance, weed free hay requirements for hunter permits, weed free trail heads, etc)
- Develop weed identification classes for permittees, seasonal employees, fire staff, and the public.
- Work with GIS specialist and Ecologist so data collected is available for use office wide.

## PRIORITIES

- Implement Early Detection Rapid Response for small infestations and newly invading species in UFO.
- Keep areas that are Weed Free, Weed Free through Early Detection Rapid Response.
- Treat and try to eradicate weeds along ditches, ROW's and high use areas.
- Treat and eradicate small, outlying infestations of invasive weeds.
- Work inward from the perimeter to the middle to eradicate large infestations over a series of years.
- For inaccessible or extremely large infestations pursue biological control releases.

11

BLM_0015324

## PLANT LIST

The following list is for exotic weeds currently established on land administered by UFO/GGNCA field offices. An asterisk(*) indicates this plant is a state-listed noxious weed, either as a prohibited or restricted species and a  (#) indicates this plant is a BLM national weed species of concern, plants without designation are additional problematic species that can compromise rehabilitation efforts or establish during ground disturbing activities.

**Annuals:**
Bur buttercup
Clasping pepperweed
Downy brome* #
Japanese brome#
Halogeton * #
Jointed goatgrass* #
Kochia
Flixweed
Redstem filaree*
Russian thistle
Yellow starthistle* #
Jim Hill Mustard
Blue Mustard
Prostrate Verbena
Annual wheatgrass
Annual ryegrass

**Biennials:**
Musk thistle *#
Scotch thistle * #
Diffuse knapweed*#
Common mullein*
Bull thistle * #
Hounds tongue * #
Common burdock *#

**Perennials:**
Canada thistle* #
Chicory*#
Curly dock*
Dalmatian toadflax* #
Yellow toadflax*#
Spotted knapweed* #
Field bindweed*#
Hoary cress*#
Purple loosestrife*#
Russian olive*#
Tamarisk*#
Leafy spurge*#
Oxeye daisy*#
Meadow knapweed*#
Chinese Clematis *#
Russian knapweed*#
Meadow knapweed*#
Absinth Wormwood *#
Horehound
Sulfur cinquefoil*#

**Species of Concern on Borders:**

Squarrose knapweed*#
Rush skeletonweed*#
Goats rue#
Dyer's woad*#
Perennial pepperweed*#(Grand Junction, in treatment along Colorado River)
Camelthorn*#
Black henbane*# (Grand Junction, Baxter Pass)
Silverleaf nightshade
Ripgut brome# (Grand Junction, along Bike path devils cyn area)
Garlic mustard (Ogden Utah) and Boulder Creek in Colorado (new infestation)

BLM_0015325

## ABSTRACTS OF MANAGEMENT STRATEGY

Plants are categorized by life form (perennial, biennial, and annual), and are listed in alphabetical order. Not all plants have abstracts.

## PERENNIAL PLANTS:

**Name:** Absinth wormwood, *Artemisia absinthium,* *Restricted state "B" list noxious
**Non-Standard Name:** American, common, or wormwood sage.
**Life Cycle:** Perennial          **Origin:** temperate regions of Eurasia and northern Africa
**Growth habit:** A perennial forb or herb with a strong sage fragrance dying back to the ground every year. Plant usually grows for approximately 3ft but can grow over 5ft, leaves are spirally arranged, greenish-gray above and white below covered with silky silvery-white trichomes and bearing minute oil producing glands. Can be cultivated easily in dry soil, has allelopathic properties, and prefers soil rich in nitrogen.
**Current Status:** Wide spread in the Ouray and Ridgeway area. Is very prolific and spread is occurring at a rapid rate.
**Management Strategy:** Eradicate all infestations on BLM lands with herbicide.

**Name:** Canada thistle, *Cirsuim arvense,* *Restricted state "B" list noxious, BLM species of concern.
**Non-Standard Name:**
**Life Cycle:** Creeping Perennial      **Origin:** Found nearly worldwide
**Growth habit:** Colony forming perennial from deep, extensive root system. Asexual reproduction allows male-only colonies to maintain themselves. Aggressive weed, especially on moist sites along waterways, seeps, springs, and irrigation ditches.
**Current Status:** Widespread across UFO at higher elevations (generally mountain shrub communities), or along streams or other wet areas. Typically in small infestations, is difficult to control and often associated with nearby irrigated ground.
**Management Strategy:** Try to eradicate most infestations.  This could be done in combination with grazing followed by herbicide however treatment is going to be site specific.

**Name:** Chicory, *Cichorium intybus,* *Restricted state "C" list noxious, BLM species of concern.
**Non-Standard Name:**
**Life Cycle:** Perennial **Origin:** Mediterranean
**Growth habit:** Found mostly along roadsides, but has the ability to invade rangelands in higher moisture regimes.
**Current Status:** Occurs throughout the UFO. It is occasionally, seen along maintained roads and usually near irrigated ground. This species does not appear to be invading our native plant communities at any significant level.
**Management Strategy:** Monitor invasive characteristics, treat if needed using herbicide or grazing.

**Name:** Chinese clematis**,** *Clematis orientalis L,* *Resticted state "B" list noxious, BLM species of concern.
**Non-Standard Name:**
**Life Cycle:** Perennial **Origin:** China

BLM_0015326

**Growth habit:** Most *Clematis* species prefer sunny, well drained soils, although they may be shade tolerant to some degree. In Utah, Chinese clematis is found in sagebrush, mountain brush, and ruderal habitats up to 7,500 feet (Welsh et al. 1987).

**Current Status:** Present in the Headache 40 area north of Ridgeway.

**Management Strategy:** Preventing the spread of this species by eliminating seed production from established stands. Remove young plants. Herbicidal control seems to be best used at flowering.

**Name:** Curly Dock, *Rumex crispus,* *Restricted seed into state, BLM weed of concern

**Non-Standard Name:** Sour dock, Yellow dock

**Life Cycle:** Perennial          **Origin:** Eurasia

**Growth habit:** Aggressive in wet meadows, along ditchbanks, and in disturbed areas.

**Current Status:** Possible field area wide especially around roads, spring, and seeps. This species does not appear to be invading our native plant communities at any significant level.

**Management Strategy:** Treat nuisance areas (pond and springs) with herbicide when necessary.

**Name:** Dalmation and Yellow toadflax, *Linaria genistifolia* and *Linaria vulgaris,* Prohibited state "B" list noxious, BLM species of concern

**Non-Standard Name:** Yellow toadflax known as Butter and Eggs.

**Life Cycle:** Creeping Perennial        **Origin:** Eurasia

**Growth habit:** Aggressive plants that are a serious threat to rangelands. Extensive and deep rooted system makes this plant extremely difficult to control. Really aggressive with 15-20" of precipitation.

**Current Status:** Known infestation in the Colona LHA, along the Upper Gunnison River near Duncan campsites, probable along North Fork of the Gunnison and likely to be spreading through upper elevations of the North Fork in isolated spots. An isolated Dalmation toadflax plant has been documented along Carpenter Ridge road north of Paradox Valley, indicating more may be in the area.

**Management Strategy:** Map infestations of both species, eradicate Carpenter Ridge infestation with herbicide if possible and monitor area for additional infestations. Yellow toadflax continue treating with herbicide and monitor for additional infestations. Work with counties and other outreach groups for public education and coordinate with the Uncompahgre Plateau for private land treatments.

**Name:** Field bindweed, *Convolvulus arvensi,* Prohibited state "C" list noxious weed, BLM species of concern

**Non-Standard Name:** Creeping jenny, Morning glory, Perennial morning glory

**Life Cycle:** Perennial          **Origin:** Europe

**Growth habit:** Remarkable adaptability enables plant to grow under many conditions, including to elevations of 10,000 ft. Deep taproot giving rise to numerous lateral shoots make this plant difficult to control and seeds remain viable for up to 50 years.

**Current Status:** Widespread in cultivated fields and orchards across the UFO area. The plant is mostly confined to maintained roadsides through BLM, although it has spread into disturbed areas like the Wake Fire.

**Management Strategy:** Attempt to determine extent of it on BLM lands. Eradicate infestations found when feasible with herbicide or when appropriate use biological control (bindweed mite).

**Name:** Hoary cress, *Cardaria draba,* Prohibited state "B" list noxious weed, BLM species of concern

**Non-Standard Name:** Whitetop

14

BLM_0015327

**Life Cycle:** Creeping Perennial          **Origin:** Europe
**Growth habit:** Highly competitive and invasive. Well adapted to alkaline soils. Growth and maturity occur in early spring around the valley and surrounding BLM lands.
**Current Status:** Plant appears to have reached a critical mass and is widespread throughout private lands in the valley and in the Northfork and Nucla area. Found in isolated patches on the Uncompahgre Plateau. Treatable with herbicides, but extremely difficult to control once established in especially in steep mountain shrub communities.  There is some in the Northfork area and the Wake Fire that is small in size and would respond well to herbicide treatment and should be a treatment priority! Will invade healthy rangelands and out compete native vegetation.
**Management Strategy:**  Eradicate all new infestations, especially in remote areas.  Attempt to control along all road sides especially in and around the NCA and eradicate all patches or isolates in wilderness areas. Work on treatment off roads and push weed to road sides where treatment is more accessible. Treatment will be with herbicide.

**Name:** Leafy spurge, *Euphorbia esula,* Prohibited state "B" list noxious weed, BLM species of concern
**Non-Standard Name:**
**Life Cycle:** Creeping Perennial          **Origin:** Eurasia
**Growth habit:** Stems are thickly clustered. Flowers are yellowish-green, arranged in numerous small clusters and subtended by paired heart-shaped yellow green bracts. Roots are brown with pink adventitious buds which may produce more shoots or roots. The entire plant contains a milky juice with cause's severe irritation of the mouth and digestive track of wildlife and many livestock.  It has the capability to reduce livestock and wildlife carrying capacity by 50-75%. Cattle will not graze an area infested with even 10-20% leafy spurge cover. In the United States, direct livestock production losses combined with indirect economic effects due to this species alone approached $100 million in 1990.
**Current Status:** Known infestations in the North Fork area near Minnesota Creek outside of Paonia, and in the Colona area near Ridgway in the vicinity of Girl Scout Camp.
**Management Strategy:** Inventory and attempt eradication of all new and existing BLM infestation using a combination of herbicide, grazing + herbicide, and biological. Monitor areas of BLM where it is known to exist on adjacent private. Care should be taken around this weed the milky sap contains latex and can cause blistering, rash and eye irritation in people susceptible.  PPE should be worn to handle plant.

**Name:** Meadow knapweed, *Centaurea pratensis*, Prohibited state "A" list noxious weed, BLM species of concern
**Non-Standard Name:**
**Life Cycle:** Perennial                    **Origin:** Europe
**Growth habit:** It is a hybrid between brown knapweed and black knapweed and is fully fertile. It invades moist sites including meadows, riparian areas, irrigation ditches and openings in forested areas and is associate with areas oxeye daisy would be present. Does not tolerate shade. It primary reproduction is by seed but will sprout by the roots and crown of the plant.
**Current Status:** Possible small infestation in the Colona area.
**Management Strategy:** Inventory the area during LHA and dig out if small enough infestation. Roots must be cut at least 8" below crown and plants must be bagged and hauled out. If infestation is too large herbicide application will be necessary to start the eradication process then monitoring and digging of any seedlings.

BLM_0015328

**Name:** Oxeye daisy, *Chrysanthemum leucanthemum,* Prohibited state "B" list noxious weed, BLM weed of concern
**Non-Standard Name:**
**Life Cycle:** Creeping Perennial        **Origin:** Eurasia
**Growth habit:** Erect rhizomatous perennial, leaves progressively reduce in size upward on the stem. It inhabits meadows, roadsides, and waste areas. Flowers from June through August.
**Current Status:** Widespread around mountain towns and moving downstream along riparian corridors. Along San Miguel River to Pinyon, in the Colona area around Billy Creek, scattered plants in riparian areas on the Uncompahgre Plateau and in the North Fork area, especially along roadsides, North Fork of the Gunnison River and its tributaries. The greatest impact of oxeye daisy is on forage production of infested pastures and meadows. Cattle and wildlife avoid oxeye daisy and therefore any pasture infested with dense stands of oxeye daisy will decrease forage available for grazing of domestic livestock and wildlife. Dense stands of oxeye daisy can decrease plant diversity and increase the amount of bare soil in an area. The full extent of ecological, environmental, economical and sociological impacts are not well documented.
**Management Strategy:** Can apply high density grazing (by goats) followed by herbicide to gain control and eradicate. Most treatment will be with herbicide. Must think long term the plant is a prolific seed producer with a robust plant producing up to 26,000 seeds/yr which are viable up to 6 years with a few viable up to 39 years. No biological controls available.

**Name:** Perennial pepperweed, Prohibited state "B" list noxious weed, BLM weed of concern.
**Non-Standard Name:** Tall whitetop
**Life Cycle:** Perennial                **Origin:** SE Europe and SW Asia
**Growth habit:** Has the ability to invade and establish in a wide range of habitats. Most often found in riparian areas, irrigation canals and areas where the water table is higher.
**Current Status:** Located along the Colorado River. Some could be along the Gunnison River and other river corridors. Need to inventory waterways for this plant.
**Management Strategy:** Eradicate where possible, contain and treat large infestations with herbicide.  Junction has had good success treating this plant when caught early and infestations are small.

**Name:** Purple loosestrife, *Lythrum salicaria,* Prohibited state "A" list noxious weed, BLM weed of concern
**Non-Standard Name:** Purple lythrum
**Life Cycle:** Perennial                **Origin:** Eurasia
**Growth habit:** Escaped ornamental that invades aquatic sites such as streambanks, springs, seeps, or shorelines of ponds.
**Current Status:** Long estabilished population in Nucla area, Redvale and drainages down to San Miguel River. Has been seen in Montrose along ditchbanks. Possible isolated single plants along the Gunnison River from the forks to the Delta Bridge.
**Management Strategy:** Eradicate all infestations, either with herbicide treatments, or biological control if patch has gone outside economical treatment. Institute yearly scouting and hand pulling if patch is less than 10 plants.

**Name:** Russian knapweed, *Centaurea repens,* Prohibited state "B" list noxious, BLM weed of concern
**Non-Standard Name:**
**Life Cycle:** Perennial        **Origin:** Mongolia, W. Turkestan, Iran, Turkish Armenia
**Growth habit:** Infests roadsides, pastures, disturbed sites, orchards. Allelopathic properties of this plant exclude other vegetation from growing. On BLM lands this plant seem to the most

16

aggressive in riparian areas, including irrigation ditch banks and is less aggressive in open rangeland. Has the ability to form monocultures over long periods of time.

**Current Status:** Found area-wide on BLM lands. Found along roadsides, and other disturbed or wetter areas. Extensive infestations (near monocultures) along Gunnison river below the Cedaredge bridge and along the lower Dolores River, etc.

**Management Strategy:** Eradicate all infestations in WA and in the potato plantation area acquired by BLM. Continue eradication of small infestation along roads, ponds, boat ramps, camp sites, high traffic areas, seeps and springs. Complete removal of this weed from BLM is unlikely, given the scope of infestations of public and private land. Overall goal is to slowly reduce the current amount of R. knapweed, and not have anymore that exists in aggregate. Hope for biological control tests are underway and hopeful for larger releases in next two years. Herbicide works well in the fall until frost and spring before flowering. Most treatment will be with herbicide as this plant can cause severe allergic reactions for susceptible persons.

**Name:** Russian olive, *Eleagnus angustifolia,* Prohibited state "B" list noxious, BLM weed of concern
**Non-Standard Name:**
**Life Cycle:** Perennial tree                **Origin:** Europe
**Growth habit:** Introduced as an ornamental shade tree, with wildlife food and habitat benefits. This tree does invade pastures, meadows, and riparian areas. It can be a serious weed problem as it negatively affects native cottonwood galleries.
**Current Status:** Found sporadically along main river courses, small streams, and irrigation ditches. Seldom found in open rangeland.
**Management Strategy:** Work on eradication along waterways in the wilderness areas, NCA as priorities then along the main water ways in the field area. Treatment will be with herbicide, either using cut stump method or jab stick.

**Name:** Spotted knapweed, *Centaurea maculosa,* Prohibited state "B" list noxious, BLM weed of concern
**Non-Standard Name:**
**Life Cycle:** Biennial or short-lived perennial      **Origin:** E. Europe
**Growth habit:** Basal leaves of the plant grow up to 6" long and are entire to pinnately parted, stem leaves are pinnately divided. Bracts have a distinctive dark spot distinguishing it from diffuse along with a pink to purple flower. Diffuse and spotted are often found growing together in the same habitats. Seed disseminate in the fall and readily germinate in the spring. Some seeds can be viable for up to 8 years in the soil, so monitoring of site after control is essential in maintaining control. It does not tolerate total shading well and this will help to reduce spread in a closed canopy site. Has ability to invade healthy rangelands and out compete native species.
**Current Status:** Along Highway 90 and the Rim Road there is a patch that has spread to approximately 600 acres. Some contract treatment has been done, but lack of funding has not allowed for contracts every year. This is a patch that needs to be treated every year until contained and controlled, then monitoring and spot spraying with BLM crews to maintain. Present in large infestations on the Forest Service, to include the powerline and pipeline ROWs in the Horsefly area of the Forest Service. It is also known on BLM at Ledges campsite, at Beaver Creek crossing along the Beef Trail outside of Norwood and in the Fruitland Mesa area.
**Management Strategy:** Mandated by the state to eradicate all patches and not let go to seed. Treatment is by herbicide for large infestation. Small isolated spots can be hand dug making sure to get the root and the plant would be bagged and properly disposed of.

BLM_0015330

**Name:** Tamarisk , *Tamarisk spp,*  Prohibited state "B" list noxious, BLM weed of concern, H.R. 2720 signed 12, Oct.2006 is for the eradication of Tamarisk.
**Non-Standard Name:** Saltcedar, Tamarik
**Life Cycle:** Perennial shrub or tree   **Origin:** E. Mediterranean, S. Europe
**Growth habit:** Escaped ornamentals that have gained a foothold over much of the United States. Readily invades riparian areas, ephemeral drainages, and water developments.  Salt accumulation extruded from the leaves onto the soil gives allelopathic properties pushing out and limiting germination of native vegetation.
**Current Status:** Found area-wide on BLM lands. It is beginning to show in higher elevations of Colorado.
**Management Strategy:** Will use biological control where feasible, and have worked with Dan Bean at Palisade Insectory for two biological releases along the Gunnison and San Miguel Rivers. Other treatments with mechanical or manual removal will occur in high value areas i.e. recreation areas, and high value riparian area. The office needs to contemplate what to do with standing dead tamarisk after defoliation with biological control agents. These dead trees in riparian areas increase the fuel loading and can carry a riparian fire into areas of concern (healthy cottonwood/riparian areas).

## BIENNIAL PLANTS

**Name:** Common burdock, *Arctium minus *Restricted on state "C" list noxious weed*
**Non-Standard Name:**
**Life Cycle:** Biennial      **Origin:** Europe
**Growth habit:** Readily establishes near water sources and degraded rangeland in moisture collecting areas. Burs a nuisance for domestic pets and livestock especially sheep where it will reduce the quality of wool.
**Current Status:** Found varying levels area-wide.
**Management Strategy:** May have to use herbicides to contain very large infestations. Eradicate small isolated patches.  Rosettes can be dug with shovel when small. Treat areas where livestock are affected. Keep un-infested areas free of burdock.  Try to keep out of wilderness and wilderness study areas.

**Name:** Common mullien, *Verbascum thapsus*   *Restricted on state "C" list noxious weed
**Non-Standard Name**: Flannel mullien
**Life Cycle:** Biennial        **Origin:** Asia
**Growth habit:** Occupies open rangeland, more when area is disturbed or in marginal condition. Numerous seeds make it difficult to control.
**Current Status:** Varying degrees throughout the field area.
**Management Strategy:** Treat with herbicide or dig out rosettes when nuisance levels are no longer tolerable. Not known whether plant forms near monocultures. Not palatable to livestock or wildlife. Maybe beneficial for butterflies and pollinators.

**Name:** Bull Thistle, *Cirsium vulgare*  *Restricted state "B" list noxious weed, BLM weed of concern
**Non-Standard Name:**
**Life Cycle:** Biennial                    **Origin:** Eurasia
**Growth habit:** Aggressive rangeland weed, especially in higher moisture regimes.   Readily occupies highly disturbed sites such as gas pads, campsites, rights-of-ways, wildfires, etc.
**Current Status:** Found area wide although, no monocultures known to exist.

BLM_0015331

**Management Strategy:** Eradicate all infestation possible. Can be treated with herbicide at the same time as Whitetop, Hounds tongue, and Burdock or can dig rosettes when feasible.

**Name:** Diffuse knapweed, *Centurea diffusa,* *Prohibited state "B" list noxious weed, BLM weed of Concern.
**Non-Standard Name:** Tumble knapweed, White knapweed
**Life Cycle:** Biennial                    **Origin:** Europe/Eurasia
**Growth habit:** Diffuse knapweed often portrays a rosette form for one year, reaching maximum size, then rapidly growing and flowering during the second year. A single plant can produce approximately 18,000 seeds/yr. Areas in which diffuse knapweed has been readily established are plains, rangelands, and forests. Land that has been recently disturbed—by human or natural processes—is favored for the establishment of diffuse knapweed. It grows in semi-arid and arid environments and seems to favor light, dry, porous soils. Areas with large amounts of shade or high levels of water discourage diffuse knapweed growth**.**
**Current Status:** The field office has several relatively small infestations of this species. One is located off Buckhorn rd, one in the Ouray area, and an area off Shinn Park area.
**Management Strategy:** Mandated by the state to eradicate all patches and not let go to seed. Treatment is by herbicide for large infestation. Very small isolated spots can be hand dug making sure to get the root, the plant would be bagged and properly disposed of.

**Name:** Houndstongue, *Cynoglossum officinale,* *Prohibited state "B" list noxious weed, BLM weed of Concern
**Non-Standard Name:**
**Life Cycle:** Biennial                    **Origin:** Europe
**Growth habit:** Readily invades moist areas and areas of higher precipitation regardless of condition, will thrive in disturbed sites such as gas pads, camp sites, bed grounds etc.
**Current Status:** Known to be established in the Colona, North Fork, and Uncompahgre Plateau areas, primarily in mountain shrub and riparian areas. This plant occurs in isolated patches throughout the field office area. Highly toxic to wildlife, livestock and people if consumed, causing liver cells to stop reproducing, lag time to death could be six months.
**Management Strategy:** To eradicate small infestations, and new infestations. Treatment will be with herbicide and trying to graze areas when seed is not present. Biological controls have already been released in Canada, however these may not be considered in the US due to cross over onto native borages. Can dig rosettes when infestation is small and digging is feasible. Roots must be cut at least 4 inches below rosette.

**Name:** Musk thistle, *Carduus nutans*  * Prohibited state"B" list noxious weed, BLM weed of concern
**Non-Standard Name:** Nodding thistle
**Life Cycle:** Biennial                    **Origin:** Europe, W. Asia
**Growth habit:** Aggressive invader of range and forest land, roadsides, ditchbanks, disturbed areas. Rapid spread forms dense monocultures. Thrives in higher regimes, but will grow small plants in drier sites.
**Current Status:** Present throughout field office area. Large, problematic infestations known from Bostwick Park and in the Burn Canyon Fire.  North Fork higher elevation areas would also be likely for large infestations along with higher elevation in the Colona area.  Other spotty infestations probable throughout the field area, especially along irrigation ditches and wetter areas.

BLM_0015332

**Management Strategy:** Contain infestation when found. Small infestations could be treated using a shovel to cut the taproot, while other larger infestation will need to be treated with herbicide or a biological. When cutting the rosette the tap root need to be cut 4 inches below the top of the rosette.

**Name:** Scotch Thistle, *Onopordum acanthium* and *Onopordum tauricum*   * Prohibited state "B" list noxious weed, BLM weed of concern
**Non-Standard Name:** Cotton thistle
**Life Cycle:** Biennial                    **Origin:** Europe, E. Asia
**Growth habit:** Aggressive plant can grow up to 12 feet. First year plant grow enormous rosette. If allowed, forms dense monocultures impenetrable by livestock. Thrives in higher moisture regimes, but will grow small plants in drier sites.
**Current Status:** Present in North Fork area around coal mines and in the Cedaredge area along ROWs. This plant is also seen along irrigation ditches, perennial streams, or river corridors throughout the field area.
**Management Strategy:** Eradicate small infestations when located. Control can be done with a shovel at least 8" down on the root or herbicide on small infestation.

### Annual Plants

**Name:** Annual wheatgrass, *Eremopyrum triticeum*
**Non-Standard Name:** Annual wheatgrass
**Life Cycle:** Winter annual                    **Origin:** Central and Western Asia
**Growth habit:** Annual wheatgrass is found in the lower margins of the big sagebrush zone, arid shrub steppe and salt desert environments.  It is a highly undesirable weed.
**Current Status:** Spotty throughout the field office and GGNCA.
**Management Strategy:** Cultural maintenance (i.e. fire rehabilitation) in areas that would be susceptible to invasion. Good grazing management to support native plant communities. Eradicate where problematic to restore areas, possibly using an herbicide application depending upon size of infestation.

**Name:** Blue mustard, *Chorispora tenella*
**Non-Standard Name:** Purple mustard, Tenella mustard
**Life Cycle:** Annual        **Origin:** SW Asia
**Growth habit:** Competitive, especially after soil disturbance or fire in desert areas. This species establishes easily in semi-deserts, foothills, woodlands, and agricultural fields. It can form a dense mat making seed establishment of desirable species difficult.
**Current Status:** Total status unknown. Frequent in the field office boundaries.
**Management Strategy:** Cultural maintenance (i.e. fire rehabilitation) in areas that would be susceptible to invasion. Good grazing management to support native plant communities. Eradicate where problematic to restore areas, possibly using an herbicide application depending upon size of infestation.

**Name:** Bur buttercup, *Ranunculus testiculatus*
**Non-Standard Name:** Little bur and testiculate buttercup
**Life Cycle:** Annual      **Origin:** SE Europe
**Growth habit:** Competitive, especially after soil disturbance or fire in desert areas. This species can form a dense mat making seed establishment of desirable species difficult.
**Current Status:** Total status unknown. Frequent in the field office boundaries.

BLM_0015333

**Management Strategy:** Cultural maintenance (i.e. fire rehabilitation) in areas that would be susceptible to invasion. Good grazing management to support native plant communities. Eradicate where problematic to restore areas, possibly using an herbicide application depending upon size of infestation.

**Name:** Clasping pepperweed, *Lepiduim perfoliatum*
**Non-Standard Name:**
**Life Cycle:** Winter annual or annual   **Origin:** Europe
**Growth habit:** Not highly competitive, but establishes after disturbances such as fire. Occasional plants found in open rangeland settings, particularly on disturbed soils at lowest elevations.
**Current Status:** Found in many areas of the field office, mostly on clayey or adobe sites.
**Management Strategy:** Monitor for unusual infestations. Treat with herbicide if necessary.

**Name:** Downy brome, *Bromus tectorum,* State weed list "C", BLM weed of concern
**Non-Standard Name:** Cheatgrass
**Life Cycle:** winter annual          **Origin:** Europe, N. Africa, Middle East, and Asia
**Growth habit:** Invasive following disturbance or poor management. Lower elevations are more susceptible.
**Current Status:** Found in many areas of the field office, with lower elevations and Pinyon/Juniper and sagebrush areas containing the most.
**Management Strategy:** Can be reduced by cultural practices such as fire rehabilitation (including seeding with competitive species), careful timing and design of vegetation treatments to avoid increasing cheatgrass, sound grazing management, and small-scale restoration of disturbed sites, such as trailheads, and boat ramp areas. Some projects targeting cheatgrass are possible to restore native plant communities. Use of the herbicide Imazapic where appropriate for fire stabilization and land health treatments when needed. Research into biological control underway, stay informed on developments.

**Name:** Flixweed, *Descurainia sophia*
**Non-Standard Name:** tansy mustard
**Life Cycle:** winter annual      **Origin:** Europe
**Growth habit:** Occupies disturbed areas, roadsides, agricultural areas, may come into burned areas at lower elevations.
**Current Status:** Found in isolated disturbances. This plant does not appear to be highly competitive in healthy rangelands.
**Management Strategy:** May be necessary to control through cultural practices such as fire rehabilitation and good grazing practices.

**Name:** Hologeton, *Halogeton glomeratus* *Prohibited state "C" list noxious weed, BLM weed of concern
**Non-Standard Name:**
**Life Cycle:** Annual                 **Origin:** Asia
**Growth habit:** Not highly competitive, but readily invades disturbed or over-grazed lands. It is ideally adapted to alkaline soils and semi-arid environments of the high-desert. Unpalatable and very toxic to sheep at all stages of growth.
**Current Status:** Halogeton has been in the field area for many years and is present especially in lower area, on adobe soils or other fine grained soils.
**Management Strategy:** Contain using herbicide treatment on new disturbances (i.e. pipelines, roads etc.) Reseed disturbances with competitive species.

21

BLM_0015334

**Name:** Japanese brome, *Bromus japonicus,* BLM weed of concern
**Non-Standard Name:**
**Life Cycle:** annual, winter annual     **Origin:** European introduction
**Growth habit:** More of a nuisance in depleted rangelands. It is often confused with downy brome (cheatgrass). Will invade disturbed sites such as pipelines, and recently disturbed areas seen in areas with cheatgrass.
**Current Status:** Seen within the field area, Total infestation not known, sizeable patches (10s-100s of acres) in Crawford, and Cederedge areas.
**Management Strategy:** Same as cheatgrass, can be reduced by cultural practices such as fire stabilization, sound grazing management, and small-scale restoration of disturbed sites, such as trailheads, and boat ramp areas. Some projects to remove and restore native plant communities possible with herbicide either Imazapic or Glyphosate.

**Name:** Jim Hill Mustard, *Sisymbruim altissimum*
**Non-Standard Name:** tumble mustard, tall tumble mustard
**Life Cycle:** annual                    **Origin:** Eurasia
**Growth habit:** Waste ground, disturbed ground, follows fire as early succession species
**Current Status:** Wide spread throughout the field office. Not a problem in most areas.
**Management Strategy:** To rehabilitate disturbed areas especially wildland fires and prescribed burns. Use good grazing practices and best management practices for ground disturbing projects. Can hand pull if infestation is small enough if not herbicide may be used.

**Name:** Jointed goatgrass, *Aegilops cylindrical*   *Prohibited State "C" list noxious weed, BLM weed of Concern
**Non-Standard Name:** Jointgrass
**Life Cycle:** winter annual       **Origin:** S. Europe
**Growth habit:** Growth habitat is usually along newly disturbed areas especially roadways and areas associated with agricultural practices especially wheat farming. This grass seems to be invasive in Grand Junction with it pushing out cheatgrass in areas.
**Current Status:** This field office has some infestation but they are believed to be spotty. Substantial infestations have been observed along roadsides in Peach Valley area, Naturita Creek, and the North Fork.
**Management Strategy:** This grass is highly competitive with disturbance and continued screenings along roads, agricultural areas, and new disturbances should be made. Effective treatments include pulling before seed is mature on small infestation with follow up visits to the area, grazing in the spring if done at the appropriate levels not to hamper perennials and application of herbicide treatments when area is too big for hand pulling.

**Name:** Kochia, *Kochia scoparia*
**Non-Standard Name:** Kochia, fireweed, burning bush, summer cypress
**Life Cycle:** annual              **Origin:** Eurasia
**Growth habit:** Kochia is seen on dry pastures, rangeland, and areas with alkaline soils. It readily establishes following fire and ground disturbances. Does not establish in areas with very high acid soils. Is cultivated as a forage crop and is used in fire rehabilitation areas in the Great basin to add a fuel break in marginal areas dominated by cheatgrass.
**Current Status:** Throughout the field office and GGNCA infestations are usually small and spotty. Species is usually not a problem.
**Management Strategy:** To rehabilitate disturbed areas especially wildland fires and prescribed burns. Use good grazing practices and best management practices for ground disturbing projects.

22

BLM_0015335

Can hand pull if infestation is small enough, can graze the patch if done at appropriate time, if not herbicide may be used.

**Name:** Redstem filaree, *Erodium cicutarium*
**Non-Standard Name:** storksbill, filaree
**Life Cycle:** winter annual          **Origin:** Eurasia
**Growth habit:** This species is adapted to a broad range of soil types and is found in oak woodlands, semi-desert grasslands, and desert shrublands.
**Current Status:** It occurs sporadically throughout the field office and GGNCA. It is normally not a problem unless established in the wake of ground disturbing activities.
**Management Strategy:** To control when necessary by hand pulling, grazing or herbicide.
**Name:** Russian thistle, *Salsola tragus or Salsola iberica*
**Non-Standard Name:** Russian thistle, tumbleweed
**Life Cycle:** winter annual          **Origin:**
**Growth habit:** This species is found in fields, roadsides, waste places, and disturbed sites. It does best on high, dry land if other plants are not crowding it. It is quite drought resistant.
**Current Status:** It occurs sporadically throughout the field office and GGNCA. It is normally not a problem unless established in the wake of ground disturbing activities.
**Management Strategy:** To control when necessary by hand pulling, grazing or herbicide.


 **Name:** Yellow starthistle, *Centaurea solstitalus* *Prohibited state "A" list noxious weed, BLM weed of Concern
**Non-Standard Name:** St. Barnaby's thistle, golden starthistle or yellow cockspur
**Life Cycle:** Winter Annual          **Origin:** S. Europe, W. Eurasia
**Growth habit:** Extremely aggressive once established. Numerous small seeds scattered by wind and other means, usually introduced on roadsides.  UFO/GGNCA  highly susceptible to invasion.
**Current Status:** Major patch in Montrose/Ouray county on private but has crossed over onto BLM.  An isolated infestation was found in 2009 in the west end of Mesa County, UFO Field Office. Large 100+ acre infestation on private land in the Paonia area, it has crossed onto BLM. The office will be working with all County Weed Coordinator s to map infestations and treat with herbicide as necessary.
**Management Strategy:** This species is mandated by the state to eradicate all new infestations with either hand pulling or herbicide. Continue scouting adjacent to and downwind of known infestations. Early detection and treatment are vital.

23

# CHAPTER 3

## Safety and Storage of Equipment and Herbicides

| Toxicity of Herbicides |
| --- |

**How toxic are herbicides?**
- All herbicides are toxic, ***whether they are dangerous depends on the dose!***
- The measure of toxicity is in milligrams per kilogram mg/kg body weight, therefore the smaller the number the more toxic the herbicide.
- Relative toxicities are measured using a measure called LD-50, which is the dose of the *ACTIVE INGREDIENT* of herbicide being tested that will kill 50% of the test animals, which is measured on mg/kg of body weight.

As herbicides available have only a fraction of the active ingredient when they are sold as a *commercially available herbicide*, the toxicity of a commercially available product is much less than the stated toxicity of the active ingredient.

Then commercially available herbicides are diluted even more with water and a surfactant is added before application!!! The LD-50 is even lowered again.  The table below shows some relative toxicity of herbicides as compared with other common products, **before dilution for application**. *Remember the lower the number the higher the toxicity, so **Nicotine** is 86 times more toxic than **Glyphosate**!!*  Table is in order of toxicity.

| Substance | Use | Oral LD-50 |
| --- | --- | --- |
| Nicotine | Tobacco | 50 |
| Caffeine | Coffee beans | 150 |
| 2, 4-D amine | Herbicide | 300 |
| Garlon | Herbicide | 713 |
| Penicillin | Antibiotic | 1000 |
| Banvel | Herbicide | >2000 |
| Table salt | Condiment | 3300 |
| Glyphosate | Herbicide | 4300 |

Figure 3. Queensland Government, Department of Industries and Fisheries.

## Safety for Application of Herbicides and Disposal of Empty Containers

- Since studies have shown that 90% of herbicides get into the body through the skin, simple precautions such as wearing the appropriate PPE (coverall, gloves, safety glasses, rubber boots) will reduce the intake of the product considerably (Department of Primary Industries and Fisheries, Queensland Australia).  Grand Junction and Meeker are examples of an excellent safety program with herbicides. NO INCIDENTS!
- All individuals applying herbicides will receive training on safety and application procedures prior to application.
- A copy of  MSDS sheets for all herbicides will be available at all times. Employees will be briefed and familiar with the information in these documents in  the case of an event or spill.

24

➢ PPE will be worn at all times when herbicides are being mixed and applied. All label requirements will be followed, note minimum requirements for BLM personnel below.
➢ An emergency spill kit, with directions for use, will be present when herbicides are being mixed, and transported. Employees will be briefed on the use of the spill kit prior to initiation of operations. Kit will include: shovel, broom, absorbent material, large plastic bags and nitrile gloves.
➢ All containers will be triple rinsed, holed, and disposed of in the dumpster.
➢ All sprayers will be triple rinse between uses (herbicide).
➢ All rinsing of sprayers will be done in the field, and all sprayers will be stored cleaned.

Minimum Requirements for BLM Personnel, regardless if the label requirements are less.

| Minimum PPE Requirements for BLM Personnel | | | | |
|---|---|---|---|---|
| | Aerial contract (Admin) | Loading | Mixing | Application |
| Coveralls | Required | Required | Required | Required |
| Gloves | | Required | Required | Required |
| Goggles | | | Required | Required |
| Boots | | | Required | Required |
| Headgear | | | Required | Required |

Queensland Government. 2004. How Toxic are Herbicides on your Property. Department of Primary Industires and Fisheries.

## Storage of Herbicides

Storage will be in accordance with federal and state regulations.
➢ Two self closing herbicide cabinets with locks.
➢ Herbicide log out sheet: who, what herbicide, amount taken, target species, and where applied. These sheets are then turned into the Weed Coordinator along with the pesticide application record to help maintain accurate records.
➢ Spill kit and directions on how to use it if needed will be stationed by the cabinets.

BLM_0015338

# CHAPTER 4

## Cost of Doing Business

The cost figures for this document are from consultation with various weed managers in western Colorado (Meeker, Grand Junction). The figures represented here are approximately ½ of the cost to contract all control applications. Some of these figures are on time and will not be needed again for some time.

The weed treatment season is similar to the prescribed fire season *because the window tends to be fairly short and varies by species.* Application contractors are few, there are a limited number of county personnel, and both are spread out over several jurisdictions for a relatively short window of application. Timing has not always been best for applications. Weather plays an important role, with the effectiveness of herbicides limited to certain weather conditions. Most spraying is done early in the day before winds are too strong.

The BLM has a national policy " Pulling Together" which emphasizes "Early Detection Rapid Response" through three national goals, Effective Prevention/Detection, Effective Control, and Effective Restoration. We need to be able to respond quickly to infestation without having to go through the long process of developing and awarding a contract or depending on the county for weeds spreading off county roads into rangeland or spraying small patches of weeds off county roads dissecting BLM. Too often when the pre-work is done and a contract awarded, the window is closed or the contractor has other obligations…and the weeds go untreated. We on the other hand could be in and out on small infestations with a high probability of success of stopping the spread of weeds before they become large ecological wildfires.

This integrated approach will still support the counties on spraying county road ways through BLM and certain BLM roads, along with using contractors where appropriate and economically sound i.e. tamarisk control along the river and drainage corridors, or large scale treatment of cheatgrass for fire rehabilitation treatments.

| Prevention |
| --- |

Weed Coordinator:
- Orders and distributes prevention materials
- Conducts weed training sessions
- Attends interagency and county weed board meetings, along with delegated range specialist for the weed board area.
- Conducts/assists with public weed meetings if feasible
- Delegates duties to other weed, recreation, and range staff as needed
- Maintains currency as a certified applicator
- Works with GIS specialist on GIS database, along with Ecologist
- Supervises seasonal weed staff
- Prepares Pesticide Use Proposals and necessary NEPA
- Reports to State Office on annual accomplishments through Pesticide Use Reports
- Prepares contracts for weed treatments, COR's and designates a project inspector (PI)

26

➢ Reviews and approves weed stipulations for permitted activities
➢ Responsible for weed sections of NEPA documents and developing effective weed mitigation measures for projects
➢ Coordinates BLM's preventive weed treatment activities—eg. ensures annual inspections of boatramps, trailheads, livestock corrals etc. are carried out and weeds are treated in these areas.

**Budget Needs**
$500.00 annually for prevention materials.

| Detection |
|---|

Staffing yearly
➢ One seasonal Detection/Herbicide applicator, GS-5 for 5/6 months $22,000.00

General Duties:
➢ Identifies weeds, documents size of infestation, and topography using GPS
➢ Inputs weed data into GIS with assistance from GIS Specialist and Weed Coordinator
➢ Produces maps using Arc Map when necessary

Additional weed detection through BLM field staff and permittees will be developed through weed ID classes.

Logistical Needs:
➢ Range has one Artic Cat ATV and one old Honda, would like to trade in Artic Cat for new ATV, UTV already purchased $2000.00
➢ ATV training for seasonal employees, (Chris Pipkin, Sparky Taber) Montrose BLM has an ASI Instructor (or did have—Chad Greinor)
➢ Weed identification training
➢ GPS training

**Budget Needs**:
$24,000.00

| Control |
|---|

Staffing

➢ Two seasonal Certified Applicators for UTV, ATV-mounted spraying and backpack sprayers(Biological Technicians).

General Duties:
Under direction from Field Office Weed Coordinator:
➢ Vehicle operators will treat weeds along two track roads, trailheads, livestock developments, and other ATV accessible infestations using ATV and UTV mounted sprayers

BLM_0015340

> ➢ Treat weeds in remote areas by hiking in and using backpack sprayers, this will be done with prior logistical planning some camping may be necessary.

Additional spraying will be done by the counties along county roadways and potentially other areas on BLM lands. Large weed control projects will be pursued and carried out in concert with partners such as the UP Uravan Weed Management Project and The Nature Conservancy Tamarisk Project along the San Miguel River. These will require participation of the BLM weed coordinator before growing season to plan strategy and possible hiring of personnel, but budget needs are not discussed here. Other large weed control projects which will require the use of additional funds and outside contractors are not covered in this budget either.

Logistical/budget Needs:

> ➢ Staffing ~ $45,000.00
> ➢ ATV and UTV  maintenance (included under detection)
> ➢ Vehicle 2 F-250 4x4, $4000.00 lease
> ➢ Fuel for vehicles and ATV/UTV, $\leq$ $2,000.00
> ➢ Herbicide $5000.00
> ➢ PPE, washable coveralls, gloves, rubber boots, hats, cleaning and replacement $500.00
> ➢ $15,000.00 to contract with counties, Montrose, Ouray, San Miguel and Delta, to spray county roads on BLM ground.  Will need to coordinate with BLM so we can spray areas away from the road at the same time. Providing the budget allows for it, Counties will need to give paper work to BLM on what chemical was sprayed, amount sprayed, acres and weed species treated at the end of every two weeks.  We are liable for keeping these records 10 years.

> ➢ **Budget Needs**: $ 71,000.00

---

## Rehabilitation

Staffing
In general, most of the rehabilitation duties will fall on the Weed Coordinator and other resource staff interested in participating (Ecologist, Recreation etc.). Most treated areas won't require extensive rehabilitation; however some of the heavily infested areas may see more extensive treatment.

**Budget Needs:**
 $1000.00 for seed reserve.

**Total Operating Budget:**
> ➢ Prevention        $500.00
> ➢ Detection        $22,000.00
> ➢ Control        $71,000.00
> ➢ Rehabilitation      $1000.00
> TOTAL        $94,500.00

BLM_0015341

BLM_0015342



Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

June 2010

*Final* **WILD AND SCENIC RIVER ELIGIBILITY REPORT**

*for the BLM* **Uncompahgre Planning Area**

BLM_0015343

BLM_0015344

# FINAL WILD AND SCENIC RIVER ELIGIBILITY REPORT

## FOR THE

# BLM UNCOMPAHGRE PLANNING AREA



**PREPARED BY:**
**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**UNCOMPAHGRE FIELD OFFICE, COLORADO**
**JUNE 2010**

---

**BARBARA SHARROW**
**UNCOMPAHGRE FIELD MANAGER**
**MONTROSE, COLORADO**

*To have some parts flowing free again...*

*With deer grazing on its banks...*

*Ducks and geese raising their young*
*in the backwaters...*

*Eddies and twists and turns for canoeists...*

*And fishing opportunities such as Lewis*
*and Clark enjoyed...*

*Would be the finest possible tribute*
*to the men of the Expedition,*
*and a priceless gift for our children.*

*~ Stephen Ambrose, Undaunted Courage ~*

CONTENTS

# Table of Contents

ACRONYMS AND ABBREVIATIONS..................................................................................................V

## EXECUTIVE SUMMARY ......................................................................................................... VII
INTRODUCTION ............................................................................................................................VII
DETERMINATION OF WILD AND SCENIC RIVER ELIGIBILITY ........................................VII
ELIGIBILITY RESULTS......................................................................................................................VII
SUMMARY OF CHANGES FROM DRAFT TO FINAL ELIGIBILITY REPORT............................. VIII
*Table ES-1  Summary of Changes from Draft to Final WSR Eligibility Report*............................................ *ix*

## CHAPTER 1 - INTRODUCTION ................................................................................................. 1
1.1  WILD AND SCENIC RIVERS ACT ...................................................................................... 1
1.2  FLOWCHART - WILD AND SCENIC RIVER ELIGIBILITY PROCESS................................. 2
1.3  RATIONALE FOR STUDY OF UNCOMPAHGRE PLANNING AREA RIVERS....................... 3
1.4  INVENTORY AND EVALUATION AREA.............................................................................. 3
1.5  WILD AND SCENIC RIVERS STUDY PROCESS ................................................................ 3
1.6  PROTECTIVE MANAGEMENT.............................................................................................. 4
*Table 1-1  Interim Protection for Agency-Identified WSR Eligible Streams*................................................. *4*
1.7  GENERALIZED DRAINAGE PATTERN IN THE WSR EVALUATION AREA ......................... 6

## CHAPTER 2 - INVENTORY OF UNCOMPAHGRE RIVERS........................................................ 7
2.1  FIELD ASSESSMENTS............................................................................................................ 7
2.2  DATA ANALYSIS .................................................................................................................. 7

## CHAPTER 3 - ELIGIBILITY CRITERIA ....................................................................................... 8
3.1  DETERMINATION OF FREE-FLOWING CHARACTER ........................................................ 8
3.2  OUTSTANDINGLY REMARKABLE VALUES.......................................................................... 9
3.3  REGIONS OF COMPARISON.............................................................................................. 9
*1.  Scenic*................................................................................................................................*10*
*2.  Recreational*......................................................................................................................*10*
*3.  Geologic*...........................................................................................................................*10*
*4.  Fish*...................................................................................................................................*11*
*5.  Wildlife*.............................................................................................................................*11*
*6.  Cultural*............................................................................................................................*11*
*Table 3-1  National Register of Historic Places Evaluation Criteria*.........................................................*12*
*7.  Historic*............................................................................................................................*12*
*8.  Vegetation*.......................................................................................................................*12*
*Table 3-2  Colorado Natural Heritage Program Element Imperilment Ranks*.............................................*13*
*9.  Other Similar Values*.......................................................................................................*13*
3.4  ECOREGIONS WITHIN THE WSR EVALUATION AREA ................................................ 14
3.5  WILD, SCENIC AND RECREATIONAL CLASSIFICATIONS........................................................ 15

BLM_0015347

## Contents

*Table 3-3  Criteria for Preliminary Classification*........................................................................... 15

**CHAPTER 4 - NEIGHBORING AGENCY ELIGIBILITY DETERMINATIONS ....... 17**

4.1  BLM GRAND JUNCTION FIELD OFFICE ..................................................................... 17

*Table 4-1  Eligible Grand Junction Field Office Segments adjoining UFO Boundary*.................... 17

4.2  SAN JUAN PUBLIC LANDS CENTER.......................................................................... 17

*Table 4-2  Eligible San Juan Public Lands Segments adjoining UFO Boundary*......................... 18

4.3  MANTI-LA SAL NATIONAL FOREST ......................................................................... 18

*Table 4-3  Eligible Manti La Sal National Forest Segments adjoining UFO Boundary*.......... 18

4.4  BLM GUNNISON AND MOAB FIELD OFFICES, AND GRAND MESA, GUNNISON AND UNCOMPAHGRE NATIONAL FORESTS ................................................................................. 18

**CHAPTER 5 - ELIGIBLE RIVER SEGMENTS ............................................................. 19**

*Table 5-1  Eligible River Segments by Hydrologic Unit*........................................................... 19

5.1  MAP - ELIGIBLE RIVER SEGMENTS IN THE WSR EVALUATION AREA.................. 20

5.2  AGENCY REVIEW.......................................................................................................... 21

5.3  PUBLIC REVIEW AND COMMENT............................................................................. 21

5.4  RIVER SEGMENT DESCRIPTIONS AND RATIONALE ................................................ 21

HYDROLOGIC UNIT 1 - LOWER GUNNISON.................................................................. 22

1 - COTTONWOOD CREEK................................................................................................ 24

2 - DRY FORK ESCALANTE CREEK, SEGMENT 2 ............................................................. 26

3 - ESCALANTE CREEK, SEGMENT 1 ................................................................................. 28

4 - ESCALANTE CREEK, SEGMENT 2 ................................................................................. 32

5 - GUNNISON RIVER, SEGMENT 2 ................................................................................. 35

6 - GUNNISON RIVER, SEGMENT 3 ................................................................................. 37

7 - MONITOR CREEK......................................................................................................... 40

8 - POTTER CREEK............................................................................................................. 42

9 - ROSE CREEK ................................................................................................................ 44

10 - ROUBIDEAU CREEK, SEGMENT 1 ............................................................................. 46

11 - ROUBIDEAU CREEK, SEGMENT 2 ............................................................................. 49

HYDROLOGIC UNIT 2 - NORTH FORK OF THE GUNNISON...................................... 50

12 - DEEP CREEK .............................................................................................................. 52

13 - WEST FORK TERROR CREEK ..................................................................................... 54

HYDROLOGIC UNIT 3 - SAN MIGUEL ............................................................................. 55

14 - BEAVER CREEK .......................................................................................................... 57

15 - DRY CREEK ................................................................................................................ 59

16 - NATURITA CREEK....................................................................................................... 62

17 - SALTADO CREEK......................................................................................................... 64

18 - SAN MIGUEL RIVER, SEGMENT 1 ............................................................................. 66

19 - SAN MIGUEL RIVER, SEGMENT 2.............................................................................. 70

20 - SAN MIGUEL RIVER, SEGMENT 3.............................................................................. 73

21 - SAN MIGUEL RIVER, SEGMENT 5.............................................................................. 76

BLM_0015348

## Contents

22 - San Miguel River, Segment 6 .............................................................................. 79

23 - Tabeguache Creek, Segment 1 ........................................................................... 82

24 - Tabeguache Creek, Segment 2 ........................................................................... 84

HYDROLOGIC UNIT 4 - LOWER DOLORES .......................................................... 86

25 - Lower Dolores River ........................................................................................ 88

26 - North Fork Mesa Creek ................................................................................... 91

HYDROLOGIC UNIT 5 - UPPER DOLORES .......................................................... 92

27 - Dolores River, Segment 2 ................................................................................ 94

28 - Ice Lake Creek Segment 2 ............................................................................... 98

29 - La Sal Creek, Segment 1 ................................................................................. 100

30 - La Sal Creek, Segment 2 ................................................................................. 102

31 - La Sal Creek, Segment 3 ................................................................................. 104

32 - Lion Creek Segment 2 ..................................................................................... 107

33 - Spring Creek .................................................................................................... 109

### CHAPTER 6 - SUITABILITY ANALYSIS ............................................................... 110

6.1   CRITERIA USED IN SUITABILITY EVALUATION ........................................... 110

6.2   TIMING AND PROCESS OF THE SUITABILITY PHASE ................................. 112

### CHAPTER 7 - APPENDICES ................................................................................. 114

APPENDIX A - REPORT PREPARERS ..................................................................... 115

APPENDIX B - REFERENCES ................................................................................... 116

APPENDIX C - UNCOMPAHGRE RIVER INVENTORY ......................................... 119

Table 7-1   River Segments in the WSR Evaluation Area Reviewed for Eligibility ...................... 119

APPENDIX D - SCOPING COMMENTS .................................................................. 142

INTRODUCTION .................................................................................................... 142

Table 7-2   Newspaper Advertising for Scoping Meetings ................................................. 143

Table 7-3   Newspaper Articles Discussing RMP Revision and Scoping .............................. 143

Table 7-4   Scoping Open House Information ................................................................ 144

CONTENT ANALYSIS OF PUBLIC COMMENTS .................................................. 144

Table 7-5   Comments Regarding General Issues ........................................................... 145

ELIGIBILITY ISSUES ................................................................................................ 147

Table 7-6   Comments Regarding Eligibility Issues ......................................................... 147

SUITABILITY ISSUES ............................................................................................... 149

Table 7-7   Comments Regarding Suitability Issues ........................................................ 149

APPENDIX E - DRAFT ELIGIBILITY REPORT PRESS RELEASE ........................... 151

BLM_0015349

CONTENTS

## RIVER SEGMENT MAPS

Map 1 - Cottonwood Creek ........................................................................................... 23
Map 2 - Dry Fork Escalante Creek, Segment 2 ....................................................... 25
Map 3 - Escalante Creek, Segment 1 ......................................................................... 27
Map 4 - Escalante Creek, Segment 2 ......................................................................... 31
Map 5 - Gunnison River, Segment 2 ......................................................................... 34
Map 6 - Gunnison River, Segment 3 ......................................................................... 36
Map 7 - Monitor Creek ............................................................................................... 39
Map 8 - Potter Creek ................................................................................................... 41
Map 9 - Rose Creek ...................................................................................................... 43
Map 10 - Roubideau Creek, Segment 1 .................................................................... 45
Map 11 - Roubideau Creek, Segment 2 .................................................................... 48
Map 12 - Deep Creek ................................................................................................... 51
Map 13 - West Fork Terror Creek ............................................................................. 53
Map 14 - Beaver Creek ................................................................................................ 56
Map 15 - Dry Creek ..................................................................................................... 58
Map 16 - Naturita Creek ............................................................................................. 61
Map 17 - Saltado Creek ............................................................................................... 63
Map 18 - San Miguel River, Segment 1 .................................................................... 65
Map 19 - San Miguel River, Segment 2 .................................................................... 69
Map 20 - San Miguel River, Segment 3 .................................................................... 72
Map 21 - San Miguel River, Segment 5 .................................................................... 75
Map 22 - San Miguel River, Segment 6 .................................................................... 78
Map 23 - Tabeguache Creek, Segment 1 ................................................................... 81
Map 24 - Tabeguache Creek, Segment 2 ................................................................... 83
Map 25 - Lower Dolores River ................................................................................... 87
Map 26 - North Fork Mesa Creek .............................................................................. 90
Map 27 - Dolores River, Segment 2 .......................................................................... 93
Map 28 - Ice Lake Creek Segment 2 .......................................................................... 97
Map 29 - La Sal Creek, Segment 1 ............................................................................. 99
Map 30 - La Sal Creek, Segment 2 ............................................................................. 101
Map 31 - La Sal Creek, Segment 3 ............................................................................. 103
Map 32 - Lion Creek Segment 2 ................................................................................. 106
Map 33 - Spring Creek ................................................................................................. 108

# ACRONYMS AND ABBREVIATIONS

| ACRONYM OR ABBREVIATION | COMPLETE PHRASE |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| BLM | Bureau of Land Management |
| cfs | cubic feet per second (water flow measurement) |
| CNHP | Colorado Natural Heritage Program |
| EIS | Environmental Impact Statement |
| EPA | U.S. Environmental Protection Agency |
| FWS | U.S Fish and Wildlife Service |
| NCA | National Conservation Area |
| NE | northeast |
| NF | National Forest |
| NMPM | New Mexico Principal Meridian (longitude 106° 53' 40") |
| NRHP | National Register of Historic Places |
| NW | northwest |
| NWSRS | National Wild and Scenic River System |
| ORVs | Outstandingly Remarkable Values |
| PM | Principal Meridian (Public Land Survey System) |
| R | Range (Public Land Survey System) |
| RMP | Resource Management Plan |
| S | Section (Public Land Survey System) |
| SE | southeast |
| SW | southwest |
| T | Township (Public Land Survey System) |
| UFO | Uncompahgre Field Office |


BLM_0015351

## ACRONYMS AND ABBREVIATIONS

| ACRONYM OR ABBREVIATION | COMPLETE PHRASE |
|---|---|
| USFS | United States Forest Service |
| VRM | Visual Resource Management |
| WSA | Wilderness Study Area |
| WSR | Wild and Scenic Rivers |
| WSRA | Wild and Scenic Rivers Act |

BLM_0015352

# *Executive Summary*



## INTRODUCTION

The Bureau of Land Management Uncompahgre Field Office is conducting an inventory and analysis within the Uncompahgre planning area, as well as the portion of the Dominguez-Escalante National Conservation Area within the field office, to determine the eligibility and suitability of rivers and streams for inclusion in the National Wild and Scenic Rivers System. The evaluation is a required component of preparing the Uncompahgre Resource Management Plan (RMP). This report details the completed river inventory and final eligibility determinations.

## DETERMINATION OF WILD AND SCENIC RIVER ELIGIBILITY

The initial step in determining eligibility was to generate an inventory of all rivers and streams within the evaluation area. Every known river with a perennial or intermittent flow regime was identified, using a variety of Bureau of Land Management and other data sources. Some waterways were further segmented based upon differences in level of development, physiographic character, land status, or the existence of in-channel diversions or dams.

The river segments were then evaluated to determine whether they meet the dual criteria of being free-flowing and possessing one or more outstandingly remarkable values, as defined in the Wild and Scenic Rivers Act. Eligible river segments were preliminarily classified as wild, scenic, or recreational, based on water quality and level of human development along the river corridor.

## ELIGIBILITY RESULTS

During the inventory phase, 174 river segments were identified for review. After evaluating these river segments, 22 rivers separated into 33 segments were determined to be free-flowing and possessed one or more outstandingly remarkable values necessary for Wild and Scenic River eligibility. In addition, the San Juan Public Lands Draft Land Management Plan identifies a segment of the Dolores River as eligible. The northernmost 11.8-mile downstream portion of this segment is managed by the Uncompahgre Field Office and will be evaluated by the field office during the suitability phase, resulting in a total of 34 eligible river segments.

Management constraints were not considered during the eligibility phase, but will be assessed during the suitability analysis. This next phase of the Wild and Scenic Rivers review process will occur during development of the Uncompahgre RMP and associated Environmental Impact Statement. A final determination of suitability will be issued in the RMP Record of Decision.


BLM_0015353

## EXECUTIVE SUMMARY

### SUMMARY OF CHANGES FROM DRAFT TO FINAL ELIGIBILITY REPORT

The Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Planning Area is the culmination of field assessments and data analysis conducted by UFO staff, review of free-flowing character and outstandingly remarkable value (ORV) determinations by the Colorado Division of Wildlife, U.S. Fish and Wildlife Service, and Colorado Natural Heritage Program, and review and comment on the Draft Eligibility Report by the public, interest groups, and government and non-government agencies. Comments regarding suitability (outlined in Appendix D on page 149) were not considered, but will be carried forward to the Suitability phase.

Fall Creek (within the San Miguel Hydrologic Unit) was the only stream segment identified as eligible in the draft report to be reclassified as not eligible in the final report, due to an inability to confirm that the segment is occupied habitat for the Canada Lynx *(Lynx canadensis)*.

Several animal species, including the Canada Lynx, the Gunnison sage grouse *(Centrocercus minimus)*, and the yellow-billed cuckoo *(Coccyzus americanus)*, were removed from the Wildlife ORV of some river segments because the BLM was unable to verify the segments as occupied habitat.

In addition, plant species and communities were removed from a number of Vegetation ORVs due to clarification of global ranking by the Colorado Natural Heritage Program. The Colorado hookless cactus *(Sclerocactus glaucus)* was removed from the Vegetation ORV of four river segments because the species is not uniquely dependent on rivers and occurs outside of river corridors. In most cases, an ORV was supported by other qualifying plant species, while in others the removal of a species eliminated the ORV.

In some instances, water quality issues affected the preliminary classification of a segment. UFO staff recently learned that certain tributary stream segments along the Gunnison River previously thought to be on the Colorado 303(d) list for impairment due to excessive selenium were exempted based on segment descriptions in the Colorado Department of Public Health *Classifications and Numeric Standards for Gunnison and Lower Dolores River Basins.* The stream segments affected by this are listed in Table ES-1 under the Lower Gunnison Hydrologic Unit.

Table ES-1 summarizes the changes made to the Draft Eligibility Report to produce this Final Eligibility Report.

BLM_0015354

**Table ES-1  Summary of Changes from Draft to Final WSR Eligibility Report**

| HYDROLOGIC UNIT | RIVER SEGMENT | CHANGES FROM DRAFT TO FINAL ELIGIBILITY |
|---|---|---|
| **LOWER GUNNISON** | **Cottonwood Creek** | • Omitted statement that segment is on Colorado State 303(d) impaired water quality list for excessive selenium. Preliminary Classification remains Scenic. |
| | **Dry Fork Escalante Segment 2** | • Omitted statement that segment is on Colorado State 303(d) impaired water quality list for excessive selenium. Preliminary Classification remains Recreational. |
| | **Escalante Creek Segment 1** | • Omitted statement that segment is on Colorado State 303(d) impaired water quality list for excessive selenium. Preliminary classification remains Scenic.<br>• Removed Colorado hookless cactus (*Sclerocactus glaucus*) from Vegetation ORV due to specie's lack of unique dependence on river and occurrence outside of river corridor. Vegetation ORV remains based upon other vegetation values. |
| | **Escalante Creek Segment 2** | • Omitted statement that segment is on Colorado State 303(d) impaired water quality list for excessive selenium. Preliminary classification remains Recreational.<br>• Removed Eastwood's monkeyflower (*Mimulus eastwoodiae*) from Vegetation ORV, due to an inability to document occupied habitat within the segment.<br>• Removed Colorado hookless cactus (*Sclerocactus glaucus*) from Vegetation ORV due to specie's lack of unique dependence on river and occurrence outside of river corridor. Vegetation ORV remains based upon other vegetation values. |
| | **Gunnison River Segment 2** | • Omitted statement that segment is on Colorado State 303(d) impaired water quality list for excessive selenium. Preliminary Classification remains Recreational. |
| | **Gunnison River Segment 3** | • Added statement to preliminary classification rationale to document that a draft Total Maximum Daily Load Plan has been prepared for this segment which, if implemented, would improve water quality. Preliminary Classification remains Recreational.<br>• Removed Colorado hookless cactus (*Sclerocactus glaucus*) from Vegetation ORV due to specie's lack of unique dependence on river and occurrence outside of river corridor. Vegetation ORV remains based upon other vegetation values. |
| | **Monitor Creek** | • Omitted statement that segment is on Colorado State 303(d) impaired water quality list for excessive selenium.<br>• Changed Preliminary Classification from Scenic to Wild. |

BLM_0015355

EXECUTIVE SUMMARY

| HYDROLOGIC UNIT | RIVER SEGMENT | CHANGES FROM DRAFT TO FINAL ELIGIBILITY |
|---|---|---|
| **LOWER GUNNISON** (continued) | **Potter Creek** | • Omitted statement that segment is on Colorado State 303(d) impaired water quality list for excessive selenium.<br>• Changed Preliminary Classification from Scenic to Wild. |
| | **Rose Creek** | • Omitted statement that segment is on Colorado State 303(d) impaired water quality list for excessive selenium.<br>• Changed Preliminary Classification from Scenic to Wild. |
| | **Roubideau Creek Segment 1** | • Omitted statement that segment is on Colorado State 303(d) impaired water quality list for excessive selenium.<br>• Changed Preliminary Classification from Scenic to Wild. |
| | **Roubideau Creek Segment 2** | • Omitted statement that segment is on Colorado State 303(d) impaired water quality list for excessive selenium. Preliminary Classification remains Scenic.<br>• Removed Colorado hookless cactus (*Sclerocactus glaucus*) from Vegetation ORV due to specie's lack of unique dependence on river and occurrence outside of river corridor. Vegetation ORV remains based upon other vegetation values. |
| **SAN MIGUEL** | **Beaver Creek** | • Removed sandbar willow-strapleaf willow (*Salix exigua-Salix ligulifolia*) riparian shrubland from Vegetation ORV due to change in ranking from globally imperiled (G2G3) to globally vulnerable (G3). Vegetation ORV remains based upon other vegetation values. |
| | **Dry Creek** | • Removed Wildlife ORV due to an inability to document occupied habitat for Gunnison sage grouse (*Centrocercus minimus*). Segment remains eligible based on Scenic and Geologic ORVs. |
| | **\*Fall Creek** | • Withdrew Fall Creek from eligibility due to an inability to document occupied habitat for Canada Lynx (*Lynx canadensis*), invalidating Wildlife ORV. |
| | **San Miguel River Segment 1** | • Removed Canada lynx (*Lynx canadensis*) and yellow-billed cuckoo (*Coccyzus americanus*) from Wildlife ORV due to an inability to document occupied habitat. Wildlife ORV remains based upon other wildlife values. |
| | **San Miguel River Segment 2** | • Removed yellow-billed cuckoo (*Coccyzus americanus*) from Wildlife ORV due to an inability to document occupied habitat. Wildlife ORV remains based upon other wildlife values.<br>• Modified designation in Wildlife ORV from Important Bird Area to Southwest Canyon Riparian Habitat. |

BLM_0015356

| HYDROLOGIC UNIT | RIVER SEGMENT | CHANGES FROM DRAFT TO FINAL ELIGIBILITY |
|---|---|---|
| SAN MIGUEL (continued) | San Miguel River Segment 3 | • Removed Canada lynx *(Lynx canadensis)* and yellow-billed cuckoo *(Coccyzus americanus)* from Wildlife ORV due to an inability to document occupied habitat. Wildlife ORV remains based upon other wildlife values.<br>• Modified designation in Wildlife ORV from Important Bird Area to Southwest Canyon Riparian Habitat. |
| | San Miguel Segment 5 | • Changed ranking of New Mexico privet *(Forestiera pubescens)* riparian shrubland from critically imperiled globally (G1G2) to globally imperiled (G2). |
| | San Miguel Segment 6 | • Changed ranking of New Mexico privet *(Forestiera pubescens)* riparian shrubland from critically imperiled globally (G1G2) to globally imperiled (G2). |
| LOWER DOLORES | Lower Dolores River | • Changed segment name to Lower Dolores River to distinguish from Upper Dolores river segments.<br>• Added statement to Preliminary Classification rationale documenting that a water quality monitoring plan is being initiated to determine concentration and source of total recoverable iron in Dolores River, and develop remedial actions if necessary. Preliminary Classification remains Scenic. |
| | Tabeguache Creek Segment 2 | • Changed ranking of New Mexico privet *(Forestiera pubescens)* riparian shrubland from critically imperiled globally (G1G2) to globally imperiled (G2). |
| UPPER DOLORES | Dolores River Segment 2 | • Added statement to Preliminary Classification rationale documenting that a water quality monitoring plan is being initiated to determine concentration and source of total recoverable iron in Dolores River, and develop remedial actions if necessary. Preliminary Classification remains Recreational.<br>• Changed ranking of New Mexico privet *(Forestiera pubescens)* riparian shrubland from critically imperiled globally (G1G2) to globally imperiled (G2). |
| | Ice Lake Creek | • Removed Vegetation ORV due to change in ranking of sandbar willow-strapleaf willow *(Salix exigua-Salix ligulifolia)* riparian shrubland from globally imperiled (G2G3) to globally vulnerable (G3). Segment remains eligible based on Scenic ORV. |
| | La Sal Creek Segment 1 | • Changed ranking of boxelder-river birch *(Acer negundo-Betula occidentalis)* riparian woodland from critically imperiled globally (G1G2) to globally imperiled (G2). |


BLM_0015357

| HYDROLOGIC UNIT | RIVER SEGMENT | CHANGES FROM DRAFT TO FINAL ELIGIBILITY |
|---|---|---|
| **UPPER DOLORES** (continued) | **La Sal Creek Segment 2** | • Changed ranking of boxelder-river birch (*Acer negundo-Betula occidentalis*) riparian woodland from critically imperiled globally (G1G2) to globally imperiled (G2). |
| | **La Sal Creek Segment 3** | • Changed ranking of boxelder-river birch (*Acer negundo-Betula occidentalis*) riparian woodland from critically imperiled globally (G1G2) to globally imperiled (G2). |
| | **Lion Creek** | • Removed sandbar willow-strapleaf willow *(Salix exigua-Salix ligulifolia)* riparian shrubland from Vegetation ORV due to ranking change from globally imperiled (G2G3) to globally vulnerable (G3). Vegetation ORV remains based upon other vegetation values.<br>• Changed ranking of boxelder-river birch riparian woodland *(Acer negundo-Betula occidentalis)* from critically imperiled globally (G1G2) to globally imperiled (G2). |
| | **Spring Creek** | • Removed sandbar willow-strapleaf willow *(Salix exigua-Salix ligulifolia)* riparian shrubland from Vegetation ORV due to ranking change from globally imperiled (G2G3) to globally vulnerable (G3). Vegetation ORV remains based upon other vegetation values.<br>• Changed ranking of boxelder-river birch riparian woodland *(Acer negundo-Betula occidentalis)* from critically imperiled globally (G1G2) to globally imperiled (G2). |

BLM_0015358

# CHAPTER 1
# *Introduction*



This Wild and Scenic Rivers (WSR) eligibility report details the results of an evaluation of waters within the Uncompahgre planning area and portions of the Dominguez-Escalante National Conservation Area (NCA) for inclusion in the National Wild and Scenic Rivers System (NWSRS). Segments identified as *eligible* in the final report will be further evaluated for *suitability* during preparation of the Uncompahgre RMP.

A team of resource specialists from the Uncompahgre Field Office (UFO) identified potential river and stream segments on public land administered by the Bureau of Land Management (BLM). Using a standardized set of criteria, the team evaluated each segment to determine whether or not it was (1) free-flowing and (2) possessed any of several *outstandingly remarkable values* (ORVs) required for eligibility. Eligible segments were then assigned a preliminary classification of *wild*, *scenic,* or *recreational*, as defined in the Wild and Scenic Rivers Act (WSRA).

## 1.1 WILD AND SCENIC RIVERS ACT

Congress enacted the WSRA (Public Law 90-542; 16 U.S.C. 1271 et seq.) on October 2, 1968 to address the need for a national system of river protection. The legislation was the outgrowth of a nationwide conservation movement that took place during the 1950s and 1960s, as well as a response to the numerous diversion projects and dams constructed along American waterways during the 1930s through 1960s. The WSRA stipulates that the free-flowing condition, water quality, and ORVs of selected waterways should be preserved and protected for the benefit and enjoyment of present and future generations. Since 1968, the WSRA has been amended a number of times, primarily in order to designate additional rivers and to authorize the study of other rivers for possible inclusion.

WSR designation affords certain legal protections from development. For example, the construction of dams or other federally assisted water projects that might negatively affect a designated river's values is not permitted. When private lands are involved, the adjacent federal land management agency works with local governments and property owners to develop protective measures.

As of the 40th anniversary of the WSRA in 2008, some 166 river segments totaling more than 11,000 miles in 38 states and Puerto Rico have been granted protective status through the NWSRS. These nationally recognized waterways make up a little more than one-quarter of one percent of the nation's rivers, and provide a valuable network of natural and cultural resources, scenic beauty, and recreational opportunities.


BLM_0015359



## 1.2 WILD AND SCENIC RIVER ELIGIBILITY PROCESS

BLM_0015360

## 1.3  RATIONALE FOR STUDY OF UNCOMPAHGRE PLANNING AREA RIVERS

Section 5(d)(1) of the WSRA requires federal agencies to evaluate potential wild and scenic rivers when preparing land and resource management plans: "In all planning for the use and development of water and related land resources, consideration shall be given by all federal agencies involved to potential national wild, scenic, and recreational river areas."

The BLM is currently developing an RMP for BLM-administered lands within the Uncompahgre planning area. The Uncompahgre RMP will supersede two existing RMPs under which the UFO has been managed for the past two decades. Neither the 1984 San Juan/San Miguel RMP nor the 1989 Uncompahgre Basin RMP included a WSR evaluation. Public scoping for the Uncompahgre RMP occurred during the winter of 2009-2010. The scoping period included an opportunity for public review and comment on the draft eligibility report. (See Appendix D on page 142.)

## 1.4  INVENTORY AND EVALUATION AREA

The UFO manages over 880,000 surface acres of public land in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel counties, Colorado. The area inventoried and evaluated for this WSR eligibility report encompasses approximately 787,640 surface acres and associated waters within the UFO boundary. Waters within the newly designated Dominguez-Escalante NCA fall within the UFO boundary and were included in this evaluation. However, because the NCA will be managed under a separate RMP, the WSR inventory and evaluation area is referred to as the **WSR evaluation area** in this report.

The WSR evaluation area does not include the Gunnison Gorge NCA, which also operates under a separate RMP. The final Gunnison Gorge NCA RMP includes a WSR finding for its rivers. (See Map 1.7 on page 1 for an overview of the area evaluated in this report.)

## 1.5  WILD AND SCENIC RIVERS STUDY PROCESS

The study and designation of watercourses under the WSRA consists of a multi-step process: *eligibility → suitability → congressional action*. The eligibility phase of the process is shown in the flowchart on page 2. It begins with the identification of potentially eligible river segments (as described in Chapter 2 on page 7). Stream segments are then evaluated to determine if they meet the criteria set forth in the WSRA. They must be free-flowing and possess one or more ORVs (as described in Chapter 3 beginning on page 8).

The river **study area** runs the length of an identified river segment, and includes the river and its immediate environment, as well as a boundary that extends one-quarter mile on either side of the river channel. Segments determined to be eligible are preliminarily classified in one of three categories—**wild**, **scenic**, or **recreational**—based upon water quality and the level of human development along the river corridor. This report details the UFO's findings, as well as the basis for designating a particular river segment as eligible (as described in Chapter 5 beginning on page 19).


BLM_0015361

Eligible river segments are then carried forward to a suitability phase (as described in Chapter 6 on page 110). Results of the suitability analysis are included as part of the Draft RMP/Draft Environmental Impact Statement (EIS) and Proposed RMP/Final EIS. Final determination of suitability will be documented in the Approved Uncompahgre RMP and Record of Decision. Following completion of the Uncompahgre RMP, the BLM will forward the results of the suitability determination to Congress for consideration. Congress (and sometimes the Secretary of Interior) has the final authority to designate a river segment as part of the NWSRS.

## 1.6 PROTECTIVE MANAGEMENT

Eligible river segments are afforded interim protection until a suitability analysis is completed and an RMP Record of Decision is issued. These measures are intended to protect the values for which a river was determined eligible, and preserve the integrity of the preliminary classification. Table 1-1 below details the interim protection afforded eligible segments during an agency's planning process.

While congressionally authorized study rivers are protected under the WSRA, agency-identified rivers receive protection through other authorities, including the National Environmental Policy Act, the Federal Lands Policy and Management Act, the Clean Water Act, and the Endangered Species Act. For example, potential effects on the free-flowing condition, water quality, and ORVs of eligible river segments must be considered when proposing federal or federally permitted actions subject to the National Environmental Policy Act.

Once a Record of Decision is approved, segments identified as not suitable will revert to management according to the prevailing RMP. Suitable rivers will be managed to maintain their free-flowing character and ORVs in support of the alternative selected in the Final RMP, until released from consideration by Congress.

**Table 1-1  Interim Protection for Agency-Identified WSR Eligible Streams**

| ISSUE | PROTECTION UNDER ELIGIBLE DESIGNATION |
|---|---|
| Study Boundary | • Minimum of one-quarter mile from the ordinary high water mark on both sides of the active channel<br>• Boundary may include adjacent areas needed to protect identified values |
| Preliminary Classification | • Wild, scenic, and recreational classes as defined by statute<br>• Manage segment at preliminary classification |
| Private Land:<br>• Administration<br>• Acquisition | • Affect private land uses through voluntary partnership with state/local governments and landowners<br>• No regulatory authority<br>• No ability to acquire interest in land under the Act's authority prior to designation |
| Water Resources Project | • River's free-flowing condition protected to the extent of other agency authorities |

BLM_0015362

CHAPTER ONE - INTRODUCTION

| ISSUE | PROTECTION UNDER ELIGIBLE DESIGNATION |
|---|---|
| Land Disposition | • Agency discretion to retain lands within river corridor in federal ownership |
| Mining and Mineral Leasing | • Protect free flow, water quality, and ORVs through other agency authorities |
| Actions of Other Agencies | • Affect actions of other agencies through voluntary partnership |
| Protect Outstandingly Remarkable Values (ORVs) | • No regulatory authority conferred by Act; agency protects through other authorities<br>• Section 11(b)(1):  limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources |

**Source:  Interagency Wild and Scenic River Coordinating Council, Wild and Scenic Rivers Study Process**



BLM_0015363

**CHAPTER ONE - INTRODUCTION**



**1.7 GENERALIZED DRAINAGE PATTERN IN THE WSR EVALUATION AREA**

BLM_0015364

# CHAPTER 2
# *Inventory of Uncompahgre Rivers*



The initial step in the WSR eligibility process is to identify river segments. All rivers and streams with either a perennial or intermittent flow regime located within the WSR evaluation area were considered during the eligibility review. Additionally, some river segments were divided for evaluation purposes due to differences in level of development, physiographic character, land status, or the existence of in-channel diversions or dams.

## 2.1 FIELD ASSESSMENTS

A team comprised of UFO resource specialists from a variety of disciplines (listed in Chapter 7, Appendix A on page 115) conducted field assessments during the 2006 field season, and compiled a comprehensive list of 174 river and stream segments to be evaluated for potential eligibility. (See the Uncompahgre Rivers Inventory in Chapter 7, Appendix C beginning on page 119.) A detailed description of the methods used for river segment identification can be found in BLM Manual 8351, Wild and Scenic Rivers—Policy and Program Direction for Identification, Evaluation, and Management (BLM Manual 8351).

## 2.2 DATA ANALYSIS

The interdisciplinary team utilized multiple data sources to delineate segments and boundaries, including:

- United States Geological Survey National Hydrography Datasets
- United States Department of Agriculture Natural Resources Conservation Service 4th and 5th-level Hydrologic Units
- Colorado Land Ownership data
- BLM enterprise data
- a Named Streams dataset prepared by resource staff
- UFO river and riparian inventory and monitoring datasets
- the accumulated knowledge of UFO resource specialists regarding field conditions


BLM_0015365



# CHAPTER 3
# *Eligibility Criteria*

Section 16(b) of the WSRA defines a river as "a flowing body of water or estuary or a section, portion, or tributary thereof, including rivers, streams, creeks, runs, kills, rills, and small lakes." According to the WSRA, a river segment must be both free-flowing and possess one or more river-related outstandingly remarkable values to be eligible for the WSRS. Determinations are based exclusively on those portions of a river managed by the UFO, and because such determinations require professional judgment, the collective knowledge and experience of the interdisciplinary team is critical to the success of the eligibility process.

BLM Manual 8351 provides guidance for determining the eligibility of segments identified in the initial inventory and identification phase. Jurisdictional and management constraints will be addressed during the subsequent suitability analysis (described in Chapter 6 on page 110).

## 3.1  DETERMINATION OF FREE-FLOWING CHARACTER

As defined in the WSRA, a free-flowing water body is characterized as "existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway." The interdisciplinary team applied this definition, as well as guidance contained in BLM Manual 8351, when evaluating a segment's free-flowing character.

Small dams, diversion works, or other minor structures along a river's course do not automatically disqualify it from consideration for potential inclusion in the NWSRS. In authorizing the WSRA, Congress did not intend to require rivers to be "naturally flowing"—flowing without any upstream manipulation except by nature. The presence of impoundments above and/or below the segment—including those that regulate the flow regime through the segment, as well as existing minor dams, and diversion structures within the study reach—will not by themselves render a river ineligible. There are many segments in the NWSRS that are downstream from major dams or on reaches between dams.

A river segment need not be "boatable or floatable" in order to be eligible. For purposes of eligibility determination, the volume of flow is sufficient if it is enough to maintain the ORVs identified within the segment. Rivers with intermittent flows exist within the NWSRS, and rivers representative of desert ecosystems that have outstanding ecological or other values should be considered as well (BLM Manual 8351). In addition, there are no specific requirements for segment length. Supplemental guidance provided in BLM Instruction Memorandum 2004-196 states that:

As to the first issue, judgment is required in determining eligibility of water courses that are free-flowing and have associated ORVs. As a general rule, the segment should contain regular and predictable flows (even though intermittent, seasonal, or interrupted). This flow should derive from naturally occurring circumstances, e.g., aquifer recharge, seasonal melting from snow or ice, normal precipitation, in-stream flow from spillways or upstream facilities. Caution is advised in applying the free-flow criterion to water courses that only flow during flash floods or unpredictable events. The segment should not be ephemeral (flow lasting only few days out of a year). Evaluation of flows should focus on normal water years, with consideration of drought or wet years during the inventory.

A *river study area* extends the length of an identified river segment and includes a river corridor area of no more than 320 acres per mile from the ordinary high-water mark on both sides of the river. During field assessments, the interdisciplinary team outlined a preliminary one-quarter mile corridor boundary on both sides of the active channel of an eligible river segment. When existing data was inconclusive, the team considered the presence of riparian vegetation to be a surrogate indicator of a river's perennial or intermittent free-flowing state.

## 3.2  OUTSTANDINGLY REMARKABLE VALUES

While values must be river-related, eligible ORVs may be *scenic*, *recreational*, *geologic*, *fish*, *wildlife*, *cultural*, *historic*, *vegetation*, or other similar value (such as *paleontological*). In addition, in order to be considered outstandingly remarkable, a value must be unique, rare, or exemplary, as well as significant within a defined region of comparison.

## 3.3  REGIONS OF COMPARISON

A *region of comparison* is used to compare the special values for which a river is being considered against comparable elements within a defined geographic area. The area, region, or scale used for comparison is not fixed, and should be that which best serves as a basis for meaningful analysis—it might vary, depending on the value being considered. The scale of a region could consist of a portion of a state or other appropriately scaled geographic area or hydrologic unit (Interagency WSR Coordinating Council, 1999).


BLM_0015367

## CHAPTER THREE - ELIGIBILITY CRITERIA

The following regions of comparison for each ORV category were developed by UFO resource specialists, and used to evaluate the WSR eligibility of UFO rivers:

### 1. SCENIC

**Standard** - The landscape elements of landform, vegetation, water, color, and related factors must result in notable or exemplary visual features and/or attractions within the geographic region. The BLM Visual Resource Inventory Handbook (H8410-1) may be used to assess visual quality and evaluate the extent to which development impacts an area's scenic values. The area must have a *Scenic Quality Classification of A*, as defined in H8410-1. When analyzing scenic values, additional factors such as seasonal variations in vegetation, scale of cultural modifications, and length of time negative intrusions are viewed may be considered. Scenery and visual attractions may be highly diverse over the majority of the river segment length and not common to other rivers in the geographic region.

**Region of Comparison** - The landscape has a *Scenic Quality Classification of A* within either the Southern Rockies or Colorado Plateau ecologic region (as shown in the Ecoregions Map on page 14).

### 2. RECREATIONAL

**Standard** - Recreational opportunities are or have the potential to be unusual enough to attract visitors to the geographic region. Visitors are willing to travel long distances to use the river resources for recreational purposes. Recreation-related opportunities could include, but are not be limited to, sightseeing, wildlife observation, camping, photography, hiking, fishing, hunting, and boating. Interpretive opportunities may be exceptional and attract or have the potential to attract visitors from outside the geographic area. The river may provide or have the potential to provide settings for national or regional commercial usage or competitive events. In addition, the river may be eligible if it is determined to provide a critically important regional recreation opportunity, or be a significant component of a regional recreation opportunity spectrum setting.

**Region of Comparison** - The area possesses recreational opportunities popular enough to attract visitors from throughout or beyond the state of Colorado, and/or that are unique or rare within either the Southern Rockies or Colorado Plateau ecologic region (as shown in the Ecoregions Map on page 14). Opportunities could include Gold Medal fisheries, rafting, and others.

### 3. GEOLOGIC

**Standard** - The river or the area within the river corridor contains one or more examples of a geologic feature, process, or phenomenon that is rare, unusual, or unique to the geographic region. The feature or features may be in an unusually active stage of development, represent a textbook example and/or represent a unique or rare combination of geologic features (erosional, volcanic, glacial, and other geologic structures).

BLM_0015368

**Region of Comparison** - The feature is unique or rare within either the Southern Rockies or Colorado Plateau ecologic region (as shown in the Ecoregions Map on page 14).

### 4. FISH

**Standard** - Fish values may be judged on the relative merits of either fish populations or habitat, or a combination of these river-related conditions.

a) ***Populations:*** The river is nationally or regionally one of the top producers of resident, indigenous, and/or anadromous fish species. Of particular significance may be the presence of wild or unique stocks, or populations of Colorado State and/or federally listed or candidate threatened and endangered species.

b) ***Habitat:*** The river provides exceptionally high quality habitat for fish species indigenous to the region. Of particular significance is habitat for Colorado State and/or federally listed or candidate threatened and endangered species.

**Region of Comparison** - Distribution of native species across their entire range, within either the Southern Rockies or Colorado Plateau ecologic region (as shown in the Ecoregions Map on page 14).

### 5. WILDLIFE

**Standard** - Wildlife values may be judged on the relative merits of either wildlife populations or habitat, or a combination of these conditions.

a) ***Populations:*** The river or area within the river corridor contains nationally or regionally important populations of resident or indigenous wildlife species dependent on the river environment. Of particular significance may be species considered to be unique or populations of Colorado State and/or federally listed or candidate threatened and endangered species.

b) ***Habitat:*** The river or area within the river corridor provides exceptionally high quality, occupied habitat for wildlife of national or regional significance, or may provide a unique or critical habitat link for special status species known to occur in the area. Contiguous habitat conditions are such that the biological needs of the species are met.

**Region of Comparison** - Distribution of native species across their entire range, within either the Southern Rockies or Colorado Plateau ecologic region (as shown in the Ecoregions Map on page 14).

### 6. CULTURAL

**Standard** - The river or area within the river corridor contains one or more sites where there is evidence of occupation or use by Native Americans. Sites must be rare, have unusual characteristics, or exceptional human interest values. Sites may have national or regional importance for interpreting prehistory, may be rare, may represent an area where culture or cultural period was first identified and described, may have been used



BLM_0015369

concurrently by two or more cultural groups, or may have been used by cultural groups for rare, sacred, tribal, or spiritual purposes.

**Region of Comparison (RAC)** - A site that is on, or could be eligible for, the National Register of Historic Places (NRHP).

**Table 3-1  National Register of Historic Places Evaluation Criteria**

| The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association, and: | |
|---|---|
| **CRITERION** | **DESCRIPTION** |
| A | That are associated with events that have made a significant contribution to the broad patterns of our history |
| B | That are associated with the lives of persons significant in our past |
| C | That embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction |
| D | That have yielded, or may be likely to yield, information important in history or prehistory |

**7. HISTORIC**

**Standard** - The river or area within the corridor contains one or more sites or features associated with a significant event, person, or cultural activity of the past that was rare or unusual in the region. Historic and/or Native American sites or features in most cases are 50 years old or older. Sites or features listed in, or eligible for inclusion in, the NRHP may be of particular significance.

**Region of Comparison** - A site that is unique or rare within the state of Colorado, and is on or could be eligible for the NRHP. See Table 3-1 above.

**8. VEGETATION**

**Standard** - The river or stream segment supports a riparian vegetation community that is a superior occurrence or is rare on a global basis:

a) *Superior occurrence:* For this standard, a superior community is defined as having received an **Element Occurrence Ranking of A** by the Colorado Natural Heritage Program (CNHP). A-ranking denotes that a community has excellent estimated ecological integrity based on size, condition, and landscape context.

b) *Rare on a global basis:* For this standard, rareness is defined as a ranking of **G1 or G2**, as determined by CNHP and described in Table 3-2.



Riparian vegetation that is located in a **Potential Conservation Area** (as determined by CNHP) has enhanced value because it has been identified as highly important for conserving regional and global biodiversity.

**Region of Comparison** - The river or area within the river corridor provides exceptional vegetative species or communities of significance within either the Southern Rockies or Colorado Plateau ecologic region (as shown in the Ecoregions Map on page 14). Consideration should be given to habitats and rare plants identified by CNHP as being of global importance (such as exceptional riparian areas and hanging gardens).

The element imperilment ranks shown in the table below are assigned in terms of an element's imperilment over its entire range (its Global-rank or G-rank):

**Table 3-2  Colorado Natural Heritage Program Element Imperilment Ranks**

| RANK | DESCRIPTION |
|------|-------------|
| G1 | Critically imperiled globally because of rarity (5 or fewer occurrences in the world or 1,000 or fewer individuals), or because some factor of its biology makes it especially vulnerable to extinction. |
| G2 | Imperiled globally because of rarity (6 to 20 occurrences or 1,000 to 3,000 individuals), or because other factors demonstrably make it very vulnerable to extinction throughout its range. |
| G3 | Vulnerable through its range or found locally in a restricted range (21 to 100 occurrences or 3,000 to 10,000 individuals). |
| G4 | Apparently secure globally, though it may be quite rare in parts of its range, especially at the periphery. Usually more than 100 occurrences and 10,000 individuals. |
| G5 | Demonstrably secure globally, though it may be quite rare in parts of its range, especially at the periphery. |

### 9. OTHER SIMILAR VALUES

**Standard** - While no specific evaluation guidelines have been established for the "other similar values" category, additional values deemed relevant to the eligibility of the river segment should be considered in a manner consistent with the foregoing guidance including, but not limited to, paleontologic, and scientific study opportunities.

**Region of Comparison** - Unique or rare within the Southern Rockies or Colorado Plateau ecologic region (as shown in the Ecoregions Map on page 14). For paleontological resources, these regions would be defined based on geological associations.


BLM_0015371

## CHAPTER THREE - ELIGIBILITY CRITERIA



## 3.4 ECOREGIONS WITHIN THE WSR EVALUATION AREA

BLM_0015372

## 3.5 WILD, SCENIC AND RECREATIONAL CLASSIFICATIONS

The interdisciplinary team assigned each eligible river segment a classification of *Wild*, *Scenic* or *Recreational* based upon water quality, as well as the type and degree of human development and access associated with the river and adjacent lands at the time of the eligibility determination. Classifications assigned during the eligibility phase are preliminary. Final classification is a congressionally legislated determination, along with the designation of a river segment as part of the NWSRS. The criteria for classification used in this evaluation are defined in Section 2(b) of the WSRA and summarized in Table 3-3 below.

**Table 3-3  Criteria for Preliminary Classification**

| ATTRIBUTE | RIVER CLASSIFICATION | | |
|---|---|---|---|
| | **WILD** | **SCENIC** | **RECREATION** |
| **Water Resources Development (such as impoundments and diversions)** | • Free of impoundment | • Free of impoundment | • Some existing impoundment or diversion<br>• The existence of low dams, diversions, riprap, or other modifications of the waterway is acceptable, provided the waterway remains generally natural and riverine in appearance |
| **Shoreline Development** | • Essentially primitive<br>• Little or no evidence of human activity<br>• The presence of a few inconspicuous structures, particularly those of historic or cultural value, is acceptable<br>• A limited amount of domestic livestock grazing or hay production is acceptable<br>• Little or no evidence of past timber harvest<br>• No ongoing timber harvest | • Largely primitive and undeveloped<br>• No substantial evidence of human activity<br>• The presence of small communities or dispersed dwellings or farm structures is acceptable<br>• The presence of grazing, hay production or row crops is acceptable<br>• Evidence of past or ongoing timber harvest is acceptable, provided the forest appears natural from the riverbank | • Some development<br>• Substantial evidence of human activity<br>• The presence of extensive residential development and a few commercial structures is acceptable<br>• Lands may have been developed for the full range of agricultural and forestry uses<br>• May show evidence of past and ongoing timber harvest |

BLM_0015373

CHAPTER THREE - ELIGIBILITY CRITERIA

| ATTRIBUTE | RIVER CLASSIFICATION | | |
|---|---|---|---|
| | **WILD** | **SCENIC** | **RECREATION** |
| **Accessibility** | • Generally inaccessible except by trail<br>• No roads, railroads, or other provision for vehicular travel within the river area<br>• A few existing roads leading to the boundary of the river area is acceptable | • Accessible in places by road<br>• Roads may occasionally reach or bridge the river<br>• The existence of short stretches of conspicuous or longer stretches of inconspicuous roads or railroads is acceptable | • Readily accessible by road or railroad<br>• The existence of parallel roads or railroads on one or both banks, as well as bridge crossings and other river access points, including fords, is acceptable |
| **Water Quality** | • Meets or exceeds Federal criteria or Federally approved state standards for aesthetics, for propagation of fish<br>• Wildlife normally adapted to the habitat of the river, and for primary contact recreation (swimming), except where exceeded by natural conditions | • No criteria prescribed by the WSR Act. The Federal Water Pollution Control Act Amendments of 1972 have made it a national goal that all waters of the U.S. be made fishable and swimmable. Therefore, rivers will not be precluded from scenic or recreational classification because of poor water quality at the time of their study, provided a water quality improvement plan exists or is being developed in compliance with applicable federal and state laws. | |

Source:  Federal Register, NWSRS, Final Revised Guidelines for Eligibility, Classification, and Management of River Areas. Section 1(3), Vol. 47, No. 173, page 39461. September 7, 1982.

BLM_0015374

# CHAPTER 4
## Eligibility Determinations of Neighboring Agencies



## 4.1 BLM GRAND JUNCTION FIELD OFFICE

The BLM Grand Junction Field Office borders the UFO to the north. Grand Junction completed a WSR eligibility report in March 2009 in preparation for an upcoming RMP revision. Eligible Grand Junction watercourses adjoining the UFO boundary are summarized in Table 4-1 below.

**Table 4-1  Eligible Grand Junction Field Office Segments adjoining UFO Boundary**

| RIVER SEGMENT | TOTAL LENGTH (IN MILES) | ORVs | TENTATIVE CLASSIFICATION |
|---|---|---|---|
| Dolores River | 32.01 | • Scenic<br>• Recreational<br>• Geologic<br>• Paleontologic | Recreational |
| North Fork Mesa Creek | 2.05 | • Vegetation | Scenic |
| Gunnison River | 15.73 | • Recreational<br>• Fish<br>• Historic | Scenic |

## 4.2 SAN JUAN PUBLIC LANDS CENTER

The San Juan Public Lands Center borders the UFO to the south. The Draft Land Management Plan and Draft EIS for the San Juan Public Lands Center identifies a 109.20-mile segment of the Dolores River from McPhee Reservoir to Bedrock, Colorado as eligible. The northernmost, downstream portion of this segment is within the UFO. Approximately 9.4 miles of this segment fall within the Dolores River Canyon WSA and have been preliminarily classified as *wild*. The remaining 2.4 miles from the WSA boundary to Bedrock, Colorado have been classified as *recreational*.


BLM_0015375

CHAPTER FOUR - NEIGHBORING AGENCY ELIGIBILITY DETERMINATIONS

**Table 4-2  Eligible San Juan Public Lands Segments adjoining UFO Boundary**

| RIVER SEGMENT | TOTAL LENGTH (IN MILES) | ORVs | TENTATIVE CLASSIFICATION |
|---|---|---|---|
| Dolores River | 109.20 (11.80 within the UFO) | • Scenic<br>• Recreational<br>• Fish<br>• Wildlife<br>• Geologic<br>• Ecologic<br>• Archeologic | Wild (9.4) Recreational (2.4) |

## 4.3 MANTI-LA SAL NATIONAL FOREST

The Manti La Sal National Forest borders the UFO to the west. Manti La Sal issued a Final Eligibility Study of Wild and Scenic Rivers in March 2003. This report identifies Roc Creek as eligible up to the UFO boundary. The details are provided in Table 4-3 below.

**Table 4-3  Eligible Manti La Sal National Forest Segments adjoining UFO Boundary**

| RIVER SEGMENT | TOTAL LENGTH (IN MILES) | ORVs | TENTATIVE CLASSIFICATION |
|---|---|---|---|
| Roc Creek | 9.40 | • Scenic<br>• Geologic<br>• Hydrologic | Wild |

## 4.4 BLM GUNNISON AND MOAB FIELD OFFICES, AND GRAND MESA, GUNNISON AND UNCOMPAHGRE NATIONAL FORESTS

The BLM Gunnison Field Office borders the UFO to the east. Gunnison completed a WSR review as part of their RMP revision in 1993. 130 watercourses were inventoried as part of this review. One eight-mile segment of the Upper Lake Fork of the Gunnison River was determined to be eligible. This river segment was dropped from WSR consideration at the suitability phase.

The BLM Moab Field Office borders the UFO to the west. Moab issued a Draft RMP and EIS in August 2007, which included a WSR study. There were no watercourses adjoining the UFO boundary identified as eligible.

The Grand Mesa and Uncompahgre National Forest issued a proposed Forest Plan Revision in conjunction with the Gunnison National Forest in March 2007, which included a WSR eligibility study. There were no watercourses adjoining the UFO boundary identified as eligible.

BLM_0015376



# CHAPTER 5
# *Eligible River Segments*

This chapter describes 34 river segments within the Uncompahgre planning area that were evaluated and found to meet the WSR eligibility criteria of being free-flowing and possessing at least one ORV. (See the eligibility criteria in Chapter 3 beginning on page 8) Table 5-1 below shows the number of eligible segments within each hydrologic unit of the UFO. In addition, Table 7-1 in Appendix C provides a detailed inventory of all UFO segments inventoried. Eligibility determinations apply only to that portion of a segment under BLM jurisdiction. The BLM will coordinate with and seek additional support from landowners and users during the suitability phase of the WSR process (described in Chapter 6 of this report).

**Table 5-1  Eligible River Segments by Hydrologic Unit**

| HYDROLOGIC UNIT | NUMBER OF ELIGIBLE SEGMENTS | MAP REFERENCE |
|---|---|---|
| Upper Gunnison | 0 | N/A |
| Lower Gunnison | 11 | Map 1 to Map 11 |
| Uncompahgre | 0 | N/A |
| North Fork of the Gunnison | 2 | Map 12 to Map 13 |
| San Miguel | 11 | Map 14 to Map 24 |
| Lower Dolores | 2 | Map 25 to Map 26 |
| Upper Dolores[1] | 8 | Map 27 to Map 33 |
| **TOTAL SEGMENTS** | **34** | |

[1]**Includes one reach of the Dolores River in the UFO that was determined to be eligible in the San Juan Public Lands, Draft Land Management Plan (map not included for this reach).**


BLM_0015377



## 5.1 ELIGIBLE RIVER SEGMENTS IN THE WSR EVALUATION AREA

### Total Eligible Segments: 34

BLM_0015378

## 5.2 AGENCY REVIEW

Eligible river segments and associated ORVs were reviewed and incorporate comments by the following agencies and organizations:

- Colorado Department of Wildlife
- Colorado Natural Heritage Program (CNHP)
- United States Fish and Wildlife Service (FWS)

## 5.3 PUBLIC REVIEW AND COMMENT

The draft eligibility report was available for public review and comment as part of the scoping phase for the Uncompahgre RMP revision, which occurred from December 15, 2009 to March 29, 2010. A summary of the comments received during scoping are in Appendix D of Chapter 7 of this report.

## 5.4 RIVER SEGMENT DESCRIPTIONS AND RATIONALE

The following river segments were found to be eligible for WSR consideration by the UFO interdisciplinary team. They are listed in alphabetical order within their appropriate hydrologic unit:





## HYDROLOGIC UNIT 1 - LOWER GUNNISON

### *Eligible River Segments: 11*

1. Cottonwood Creek
2. Dry Fork Escalante Creek, Segment 2
3. Escalante Creek, Segment 1
4. Escalante Creek, Segment 2

5. Gunnison River, Segment 2
6. Gunnison River, Segment 3
7. Monitor Creek
8. Potter Creek

9. Rose Creek
10. Roubideau Creek, Segment 1
11. Roubideau Creek, Segment 2


BLM_0015380

## CHAPTER FIVE - ELIGIBLE RIVER SEGMENTS: LOWER GUNNISON



**Map 1 - Cottonwood Creek**

> *Total Segment Length:* **18.27 miles**
>
> *BLM-administered Portion:* **18.27 miles**
>
> *Hydrologic Unit:* **Lower Gunnison**
>
> *Preliminary Classification:* **Scenic**
>
> *Outstandingly Remarkable Values:* **Vegetation**


BLM_0015381

## CHAPTER FIVE - ELIGIBLE RIVER SEGMENTS: LOWER GUNNISON

### 1 - RIVER SEGMENT:  COTTONWOOD CREEK
### HYDROLOGIC UNIT:  Lower Gunnison
****Segment will be evaluated for suitability during development of the Dominguez-Escalante RMP.**

---

**Description:** Cottonwood Creek is a tributary of Roubideau Creek that drains from the east side of the Uncompahgre Plateau. This segment is located within the Dominguez-Escalante NCA. Its upper terminus is the BLM boundary with the Uncompahgre National Forest, while the lower terminus is at the lower extent of BLM-managed lands, approximately 2.5 miles above the Roubideau Creek confluence. The flow regime of Cottonwood Creek is typically perennial in average to above average water years, but can become intermittent in lower reaches during dry years. High flows occur during spring snowmelt and from runoff generated by summer thunderstorm activity, especially in the lower reaches.

> **Lower Terminus** – Latitude: 38° 41' 36.07" N; Longitude: 108° 10' 47.74" W
> **Upper Terminus** – Latitude: 38° 31' 57.44" N; Longitude: 108° 20' 21.17" W

**River Segment Ownership (in Miles):**

| BLM | USFS | State | Private | TOTAL LENGTH | % FEDERAL |
|------|------|-------|---------|--------------|-----------|
| 18.27 | | | | **18.27** | **100%** |

**Land Ownership within One-Half Mile Wide Corridor (in Acres):**

| BLM | USFS | State | Private | TOTAL ACRES | % FEDERAL |
|------|------|-------|---------|-------------|-----------|
| 4,725.9 | 22.3 | | 277.6 | **5,025.8** | **94.5%** |

**Outstandingly Remarkable Values:  Vegetation**

1) <u>Vegetation</u> - The entire length of this segment supports a superior (A-ranked) occurrence of globally vulnerable (G3) narrowleaf cottonwood/skunkbush sumac riparian woodland *(Populus angustifolia/Rhus trilobata)*. The Colorado Natural Heritage Program (CNHP) includes this segment within the Cottonwood Creek Potential Conservation Area.

**Preliminary Classification:  Scenic**

<u>Rationale</u> - One unsurfaced road crosses Cottonwood Creek approximately one-half mile downstream of the upper terminus. There are no absolute water right diversions or impoundments along this stretch and little evidence of human activity. The shoreline is primitive.

BLM_0015382



**Map 2 - Dry Fork Escalante Creek, Segment 2**

*Total Segment Length:* **2.89 miles**

*BLM-administered Portion:* **2.43 miles**

*Hydrologic Unit:* **Lower Gunnison**

*Preliminary Classification:* **Recreational**

*Outstandingly Remarkable Values:* **Vegetation**


BLM_0015383

## 2 - RIVER SEGMENT:  DRY FORK ESCALANTE CREEK, SEGMENT 2
## HYDROLOGIC UNIT:  Lower Gunnison
**\*\*Segment will be evaluated for suitability during development of the Dominguez-Escalante RMP.**

**Description:** The Dry Fork of Escalante Creek is an intermittent-flowing tributary of Escalante Creek, draining from the east side of the Uncompahgre Plateau. High flows in this stream typically occur during spring snowmelt and from runoff generated by occasional summer thunderstorm activity. The upper terminus of this segment is the confluence of Dry Fork and Tatum Draw, while the lower terminus is the confluence of Dry Fork with Escalante Creek. This creek segment lies entirely within the Dominguez-Escalante NCA.

> **Lower Terminus -** Latitude: 38° 42' 57.59" N; Longitude: 108° 15' 59.61" W
> **Upper Terminus -** Latitude: 38° 41' 10.08" N; Longitude: 108° 16' 14.85" W

**River Segment Ownership (in Miles):**

| BLM | USFS | State | Private | TOTAL LENGTH | % FEDERAL |
|------|------|-------|---------|--------------|-----------|
| 2.43 |      |       | 0.46    | **2.89**     | **84.1%** |

**Land Ownership within One-Half Mile Wide Corridor (in Acres):**

| BLM | USFS | State | Private | TOTAL ACRES | % FEDERAL |
|-------|------|-------|---------|-------------|-----------|
| 766.4 |      |       | 96.1    | **862.5**   | **88.9%** |

**Outstandingly Remarkable Values:  Vegetation**

1) <u>Vegetation</u> - This segment contains an area of Fremont cottonwood/skunkbush sumac riparian forest *(Populus deltoides ssp. wislizenii/Rhus trilobata)*, classified as globally imperiled (G2). Part of this segment is included in the CNHP-designated Escalante Creek Potential Conservation Area.

**Preliminary Classification:  Recreational**

<u>Rationale</u> - A heavily used unsurfaced road follows and crosses the Dry Fork stream channel. In addition, several fences cross the channel to delineate livestock grazing pastures. The Colorado Decision Support System water rights database shows no water diversions or impoundments along this reach.

BLM_0015384

CHAPTER FIVE - ELIGIBLE RIVER SEGMENTS: LOWER GUNNISON



**Map 3 - Escalante Creek, Segment 1**

*Total Segment Length:* **8.45 miles**

*BLM-administered Portion:* **5.75 miles**

*Hydrologic Unit:* **Lower Gunnison**

*Preliminary Classification:* **Scenic**

*Outstandingly Remarkable Values:* **Scenic, Recreational, Geologic, Wildlife, Vegetation**


BLM_0015385

### 3 - RIVER SEGMENT:  ESCALANTE CREEK, SEGMENT 1
### HYDROLOGIC UNIT:  Lower Gunnison

***Segment will be evaluated for suitability during development of the Dominguez-Escalante RMP.***

---

**Description:** Escalante Creek is a major perennial tributary of the lower Gunnison River that drains from the east side of the Uncompahgre Plateau. This segment of the creek lies within the Dominguez-Escalante NCA. The upper terminus is its meeting with the Uncompahgre National Forest boundary, while the lower terminus is the boundary between BLM and State managed lands. This stream supports both a trout fishery and native flannelmouth and bluehead suckers.

**Lower Terminus -** Latitude: 38° 40' 42.47" N; Longitude: 108° 18' 44.70" W
**Upper Terminus -** Latitude: 38° 36' 44.01" N; Longitude: 108° 24' 12.21" W

**River Segment Ownership (in Miles):**

| BLM | USFS | State | Private | TOTAL LENGTH | % FEDERAL |
|------|------|-------|---------|--------------|-----------|
| 5.75 |      |       | 2.69    | **8.45**     | **68%**   |

**Land Ownership within One-Half Mile Wide Corridor (in Acres):**

| BLM | USFS | State | Private | TOTAL ACRES | % FEDERAL |
|-------|------|-------|---------|-------------|-----------|
| 1,796.5 | 13.5 | 13.7 | 654.9 | **2,478.6** | **73%** |

**Outstandingly Remarkable Values:  Scenic, Recreational, Geologic, Wildlife, Vegetation**

1) <u>Scenic</u> - An interdisciplinary BLM field inventory team evaluated the area and assigned a Scenic Quality Classification of A. The following observations were derived from their field notes: Escalante Creek offers very high scenic qualities. The cascading whitewater creek runs swift and linear here, creating dramatic potholes and waterfalls. A large-scale sandstone canyon provides dramatic vistas, prominent vertical and horizontal cliffs, major rock outcroppings, and jagged ridgelines that dominate the landscape. Landform colors abound in shades of tans, pinks, reds, oranges, brown and blue. The surrounding vegetation adds to the beauty, providing shades of green, golden, yellow, and tan, which become increasingly dense along the river.

This canyon has scenic features that are rare in the region of comparison: a "double canyon" system. The broader outer canyon bounded by colorful cliffs of sedimentary rock holds within it a smaller, narrow canyon of dark gray and black Precambrian metamorphic rock within which the creek flows. This vivid contrast is only found in a handful of canyons on the Colorado Plateau.

1) <u>Recreational</u> - This segment has outstanding opportunities for recreation, primarily in the Escalante Potholes Recreation Site. Escalante Creek has smoothed and sculpted the Precambrian metamorphic rock through which it flows, creating a series of chutes, falls and plunge-pools. These features are rare. During spring snowmelt, high water surges through the

BLM_0015386

Potholes area, attracting extreme kayakers from all over the western United States. The complex hydraulic features challenge even the most experienced kayakers. Later in the season, as the snowmelt tapers off and the creek returns to a more sedate and steady flow, the potholes are used for wading, swimming and streamside camping by groups and individuals, primarily from Colorado's West Slope. Classic Colorado Plateau canyon scenery and the rare occurrence of black Precambrian schist in a perennially-flowing streambed combine to make this section of Escalante Creek an exceptional recreational experience.

2) <u>Geologic</u> - The Escalante Potholes are a regionally rare geologic and hydrologic streambed feature in the lower reach of this segment. The potholes are hourglass-shaped erosional features occurring in hard Precambrian gneiss where it intercepts the streambed of Escalante Creek. Stream channel knickpoints have formed in the overlying softer sedimentary rock units, providing high velocity waters with adequate sediment supply and hydrologic energy to produce circulating erosive water currents. The scouring process that occurs primarily during annual spring snowmelt, has taken thousands of years to produce the potholes in their current state.

There are no other areas in the region where Precambrian gneiss is exposed and shaped by a stream powerful enough to create the feature, yet not so powerful as to completely erode the stream channel smooth. This rare combination of lithology and erosion demonstrates not only the efficacy of hydrology upon geology, but also the creative sculpturing action that time and water have upon a very resistant medium. With almost any other medium, such as sandstone or even marble, this effect would not have produced as dramatic a feature as has been formed in Escalante Creek.

3) <u>Wildlife</u> - Escalante Canyon provides exceptionally high quality habitat for peregrine falcons *(Falco peregrinus)*, and is considered a regionally important area for this BLM sensitive species. In 1999, the peregrine was delisted from threatened status under the Endangered Species Act. The BLM monitors the status of peregrine populations to ensure continued recovery of the species. Peregrine falcons are closely associated with steep-walled canyons and often nest near perennial water sources that support prey populations such as waterfowl, songbirds, and shorebirds. Peregrine falcon pairs were observed in Escalante Canyon as recently as 2008 and 2009, and breeding/nesting activity has been confirmed along this segment.

4) <u>Vegetation</u> - This segment contains several plant communities considered to be rare globally, including occurrences of narrowleaf cottonwood/strapleaf willow-silver buffaloberry riparian forest *(Populus angustifolia/Salix ligulifolia/Shepherdia argentea)*, which is critically imperiled globally (G1) and Fremont cottonwood/skunkbush sumac riparian forest *(Populus deltoides ssp. wislizenii/Rhus trilobata)*, which is globally imperiled (G2). Giant helleborine orchid *(Epipactis gigantea)*, rare along this segment. Hanging gardens arise from seeps on nearby cliffs, and support Mancos columbine/Eastwood's monkeyflower wetland *(Aquilegia micrantha/Mimulus eastwoodiae)*, which is categorized as globally imperiled (G2). Just uphill from


BLM_0015387

the stream, these seeps lead into an unusual salt meadow dominated by alkali cordgrass *(Spartina gracilis)*, which is ranked as rare in Colorado.

An ecologically important occurrence of Eastwood's monkeyflower *(Mimulus eastwoodiae)*, a rare BLM sensitive species, occurs in the vicinity of Escalante Creek. This species is associated with seeps, springs, and tributaries in hanging garden vegetation communities. Several occurrences are within the Escalante Creek corridor.

This segment is included in the CNHP-designated Escalante Creek Potential Conservation Area. The BLM manages the hanging gardens and salt meadow vegetation adjacent to the segment as an Area of Critical Environmental Concern (ACEC). In addition, the Colorado Natural Areas Program recognizes this as a State Natural Area.

*Preliminary Classification:* **Scenic**

Rationale - An unsurfaced county road runs parallel to Escalante Creek for much of this reach, but is primarily well above the stream along a bench, and therefore not visible from the stream channel. The road crosses Escalante Creek near the upper terminus. Extensive recreational activity occurs in the Potholes area along this segment. There are water diversions as well, but no impoundments.

BLM_0015388



**Map 4 - Escalante Creek, Segment 2**

*Total Segment Length:* **8.48 miles**

*BLM-administered Portion:* **0.90 miles**

*Hydrologic Unit:* **Lower Gunnison**

*Preliminary Classification:* **Recreational**

*Outstandingly Remarkable Values:* **Fish, Wildlife, Vegetation**


BLM_0015389

## 4 - RIVER SEGMENT:  ESCALANTE CREEK, SEGMENT 2
## HYDROLOGIC UNIT:  Lower Gunnison
**\*\*Segment will be evaluated for suitability during development of the Dominguez-Escalante RMP.**

*Description:* Escalante Creek is a major perennial tributary of the Gunnison River, draining from the east side of the Uncompahgre Plateau. High flows typically occur during spring snowmelt, as well as from runoff generated by occasional summer thunderstorm activity. This segment is located within the Dominguez-Escalante NCA. The upper terminus is the boundary between BLM and State managed lands, while the lower terminus is the confluence of Escalante Creek and the Gunnison River.

> *Lower Terminus* - Latitude: 38° 45' 32.20" N; Longitude: 108° 15' 32.56" W
> *Upper Terminus* - Latitude: 38° 40' 42.47" N; Longitude: 108° 18' 44.70" W

**River Segment Ownership (in Miles):**

| BLM | USFS | State | Private | TOTAL LENGTH | % FEDERAL |
|------|------|-------|---------|--------------|-----------|
| 0.90 |      | 2.51  | 5.07    | 8.48         | 10.6%     |

**Land Ownership within One-Half Mile Wide Corridor (in Acres):**

| BLM | USFS | State | Private | TOTAL ACRES | % FEDERAL |
|-------|------|-------|---------|-------------|-----------|
| 987.6 |      | 550.3 | 1,001.8 | 2,539.7     | 38.9%     |

**Outstandingly Remarkable Values:  Fish, Wildlife, Vegetation**

1) <u>Fish</u> - Escalante Creek is regionally important habitat for resident populations of native bluehead suckers *(Catostomus discobolus)* and flannelmouth suckers *(Catostomus latipinnis)*, as well as serving as a spawning site for Gunnison River populations of both these BLM and Colorado sensitive species.

2) <u>Wildlife</u> - This section of Escalante Creek is regionally important habitat for desert bighorn sheep *(Ovis canadensis)*, primarily due to the presence of a water source. River otters *(Lontra canadensis)*, a BLM sensitive and Colorado endangered species, also occupy the creek.

Escalante Canyon provides exceptionally high quality habitat for peregrine falcons *(Falco peregrinus)*, and is considered a regionally important area for this BLM sensitive species. In 1999, the peregrine was delisted from threatened status under the Endangered Species Act. The BLM monitors the status of peregrine populations to ensure continued recovery of the species. Peregrine falcons are closely associated with steep-walled canyons and often nest near perennial water sources that support prey populations such as waterfowl, songbirds, and shorebirds. Peregrine falcon pairs were observed in Escalante Canyon as recently as 2008 and 2009, and breeding/nesting activity has been confirmed along this segment.

BLM_0015390

3) <u>Vegetation</u> - This segment contains an occurrence of Fremont cottonwood/skunkbush sumac riparian forest *(Populus deltoides ssp. wislizenii/Rhus trilobata)*, which is classified as globally imperiled (G2). A portion of this segment is included in the CNHP-designated Escalante Creek Potential Conservation Area.

***Preliminary Classification:*** **Recreational**

<u>Rationale</u> - An unsurfaced county road runs along portions of this stream segment and crosses Escalante Creek via a bridge near the mouth. A low water ford across Escalante Creek provides road access to the Dry Fork Escalante Creek area. There are several water diversions along this reach, primarily for irrigating agricultural lands along the river corridor.


BLM_0015391



**Map 5 - Gunnison River, Segment 2**

> *Total Segment Length:* **0.41 miles**
> *BLM-administered Portion:* **0.41 miles**
> *Hydrologic Unit:* **Lower Gunnison**
> *Preliminary Classification:* **Recreational**
> *Outstandingly Remarkable Values:* **Fish**


BLM_0015392

## 5 - RIVER SEGMENT:  GUNNISON RIVER, SEGMENT 2
## HYDROLOGIC UNIT:  Lower Gunnison

*Description:* The Gunnison River flows perennially, with its flow regulated primarily by upstream releases from Blue Mesa, Morrow Point and Crystal reservoirs. These reservoirs are authorized under the Colorado River Storage Project and collectively managed as the Aspinall Unit by the Bureau of Reclamation (BOR). This stretch of the Gunnison is upstream from Delta, Colorado and lies within Colorado Sixth Principal Meridian, T15S, R95W, Section 5 of the BLM Public Land Survey System. The upper terminus is the upstream boundary, and the lower terminus is the downstream boundary, of BLM lands within this geographic section.

> *Lower Terminus -* Latitude: 38° 46' 25.24" N; Longitude: 108° 2' 21.92" W
> *Upper Terminus -* Latitude: 38° 46' 28.47" N; Longitude: 108° 1' 55.65" W

### River Segment Ownership (in Miles):

| BLM | USFS | State | Private | TOTAL LENGTH | % FEDERAL |
|---|---|---|---|---|---|
| 0.41 | | | | 0.41 | 100% |

### Land Ownership within One-Half Mile Wide Corridor (in Acres):

| BLM | USFS | State | Private | TOTAL ACRES | % FEDERAL |
|---|---|---|---|---|---|
| 85.5 | | | 43.1 | 128.6 | 66.5% |

### Outstandingly Remarkable Values:  Fish

1) <u>Fish</u> - The lower Gunnison River has been identified as habitat for two fish species classified as endangered under the Endangered Species Act: the Colorado pikeminnow (*Ptychocheilus lucius*) and razorback sucker (*Xyrauchen texanus*). Both species are known to inhabit this segment. In addition, this section of water supports predominantly native fish species, including exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers (*Catostomus latipinnis*), bluehead suckers (*Catostomus discobolus*), and roundtail chubs (*Gila robusta*).

### Preliminary Classification:  Recreational

<u>Rationale</u> - There is an unsurfaced road along the north river channel for most of this segment. There are no water diversions or impoundments along this stretch.


BLM_0015393



**Map 6 - Gunnison River, Segment 3**

> *Total Segment Length:* **17.48 miles**
>
> *BLM-administered Portion:* **14.02 miles**
>
> *Hydrologic Unit:* **Lower Gunnison**
>
> *Preliminary Classification:* **Recreational**
>
> *Outstandingly Remarkable Values:* **Recreational, Fish, Cultural, Vegetation**

BLM_0015394

## 6 - RIVER SEGMENT:  GUNNISON RIVER, SEGMENT 3
## HYDROLOGIC UNIT:  Lower Gunnison
***Segment will be evaluated for suitability during development of the Dominguez-Escalante RMP.***

___

***Description:*** The Gunnison River is a large, perennially flowing river that is regulated upstream by the Aspinall Unit (Blue Mesa, Morrow Point, and Crystal reservoirs). The present flow regime is designed to mimic historic conditions to best meet habitat requirements for native warm-water fish. The upper terminus of this segment is the boundary between BLM and State managed lands, approximately one-half mile upstream from Dominguez-Escalante NCA. The lower terminus is the boundary between the BLM UFO and BLM Grand Junction Field Office. The BLM Grand Junction WSR Eligibility Report identifies the contiguous reach of the Gunnison River downstream as "eligible."

> ***Lower Terminus -*** Latitude: 38° 50' 7.02" N; Longitude: 108° 21' 37.21" W
> ***Upper Terminus -*** Latitude: 38° 43' 33.87" N; Longitude: 108° 10' 33.72" W

***River Segment Ownership (in Miles):***

| BLM | USFS | State | Private | TOTAL LENGTH | % FEDERAL |
|---|---|---|---|---|---|
| 14.02 | | 0.87 | 2.59 | **17.48** | **80.2%** |

***Land Ownership within One-Half Mile Wide Corridor (in Acres):***

| BLM | USFS | State | Private | TOTAL ACRES | % FEDERAL |
|---|---|---|---|---|---|
| 3,489.1 | | 412.4 | 1,616.6 | **5,518.1** | **63.2%** |

***Outstandingly Remarkable Values:  Recreational, Fish, Cultural, Vegetation***

1) <u>Recreational</u> - This section of the Gunnison River provides outstanding opportunities for relatively easy half-day to multi-day float trips through the Dominguez-Escalante NCA. The river is generally Class I flat water, with an occasional Class II riffle providing a challenge for novice boaters. Though much of this river segment flows through private lands, several BLM campsites and a boat launch provide good public access. Rafts, kayaks and canoes are the most common types of watercraft used on this section of river.

   Because of its non-technical nature and public access points, the lower Gunnison is extremely popular with novice, family and casual recreationists from across the state. In addition, the river provides the only public access to the mouth of Leonard's Basin, a broad BLM canyon with important recreational and cultural values. Scenic canyon walls, verdant orchards and historic features add to the recreational value of this section.

2) <u>Fish</u> - This river segment is predominantly comprised of native fish species, and is identified as designated critical habitat for both the endangered Colorado pikeminnow *(Ptychocheilus lucius)* and razorback sucker *(Xyrauchen texanus)*. Both species are known to reside within this



BLM_0015395

segment. In addition, this segment supports exemplary populations of three BLM and Colorado sensitive species: flannelmouth suckers *(Catostomus latipinnis)*, bluehead suckers *(Catostomus discobolus)*, and roundtail chubs *(Gila robusta)*.

3) <u>Cultural</u> - This segment of the Gunnison River flows through canyon country that has been inhabited by prehistoric and historic cultures for over 10,000 years. Over 300 Native American sites have been recorded in the vicinity, ranging from Paleo-Indian sites to Archaic hunting and occupational camps to late Historic Period Ute villages. Rock art sites in the Escalante Bridge, Palmer Gulch and Leonard's Basin areas are of extremely high quality and significance. These sites qualify for nomination to the NRHP under **Criterion C:** *Embodies the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction* and **Criterion D:** *Yielded, or may be likely to yield, information important in history or prehistory.*

4) <u>Vegetation</u> - This segment contains a large area of Fremont Cottonwood/skunkbush sumac riparian woodland *(Populus deltoides/Rhus trilobata)*, which is classified as globally imperiled (G2).

***Preliminary Classification: Recreational***

<u>Rationale</u> - There are several road access points along this reach, as well as a county road bridge crossing. A railroad runs adjacent to the river along the entire segment. There are also several water diversions, but no impoundments. Several parcels adjacent to the river are irrigated agricultural lands. This river segment has very high biodiversity significance (B2) and lies within the Gunnison River Potential Conservation Area, designated by CNHP in order to protect the endangered fish and threatened cactus.

This segment is also on Colorado's 303(d) list for impaired water quality due to the presence of selenium, which is suspected of impacting native warm water fish propagation in the Gunnison River (Water Body ID COGULG02, (Colorado Water Quality Control Commission). The state of Colorado is preparing a draft Total Maximum Daily Load Report with the goal of reducing the selenium concentration in the Gunnison River.

BLM_0015396



**Map 7 - Monitor Creek**

> *Total Segment Length:* **9.42 miles**
>
> *BLM-administered Portion:* **9.42 miles**
>
> *Hydrologic Unit:* **Lower Gunnison**
>
> *Preliminary Classification:* **Wild**
>
> *Outstandingly Remarkable Values:* **Vegetation**


BLM_0015397

## 7 - RIVER SEGMENT: MONITOR CREEK
## HYDROLOGIC UNIT: Lower Gunnison

**Description:** Monitor Creek is an intermittent tributary of Potter Creek, which in turn is a tributary of Roubideau Creek. Monitor Creek drains from the east side of the Uncompahgre Plateau, with high flows typically occurring during spring snowmelt. The upper terminus of this reach is the BLM boundary with the Uncompahgre National Forest, while the lower terminus is the confluence of Monitor Creek and Potter Creek.

**Lower Terminus -** Latitude: 38° 37' 13.37" N; Longitude: 108° 12' 30.12" W
**Upper Terminus -** Latitude: 38° 31' 57.26" N; Longitude: 108° 18' 3.86" W

**River Segment Ownership (in Miles):**

| BLM | USFS | State | Private | TOTAL LENGTH | % FEDERAL |
|------|------|-------|---------|--------------|-----------|
| 9.42 | | | | **9.42** | **100%** |

**Land Ownership within One-Half Mile Wide Corridor (in Acres):**

| BLM | USFS | State | Private | TOTAL ACRES | % FEDERAL |
|-------|------|-------|---------|-------------|-----------|
| 2,613.0 | 14.5 | | 104.9 | **2,732.4** | **96.2%** |

**Outstandingly Remarkable Values: Vegetation**

1) <u>Vegetation</u> - This segment contains areas of narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest *(Populus angustifolia/Salix ligulfolia/Sheperdia argentea)* which is classified as critically imperiled globally (G1). Areas of globally imperiled (G2) Fremont cottonwood/skunkbush sumac riparian woodland *(Populus deltoides spp. Wislizeni/Rhus trilobata)* also occur along this segment. In addition, Monitor Creek contains a superior (A-ranked) occurrence of the common coyote willow riparian shrubland *(Salix exigua/mesic graminoids)*. Monitor Creek is within the CNHP-designated Roubideau Creek Potential Conservation Area.

**Preliminary Classification: Wild**

<u>Rationale</u> - Potter Creek Trail crosses Monitor Creek via an unhardened ford near the confluence with Potter Creek. With the exception of this crossing, the shoreline is essentially primitive. There are no water diversions or impoundments along this river segment.

BLM_0015398

## CHAPTER FIVE - ELIGIBLE RIVER SEGMENTS: LOWER GUNNISON



### Map 8 - Potter Creek

*Total Segment Length:* **9.82 miles**

*BLM-administered Portion:* **9.82 miles**

*Hydrologic Unit:* **Lower Gunnison**

*Preliminary Classification:* **Wild**

*Outstandingly Remarkable Values:* **Vegetation**


BLM_0015399

## 8 - RIVER SEGMENT:  POTTER CREEK
## HYDROLOGIC UNIT:  Lower Gunnison

**Description:** This perennial tributary of Roubideau Creek drains from the east side of the Uncompahgre Plateau. The upper terminus of this segment is the boundary between BLM land and the Uncompahgre National Forest, while the lower terminus is the confluence of Potter Creek and Roubideau Creek. High flows in Potter Creek primarily occur during spring snowmelt and occasional summer rain events.

**Lower Terminus -** Latitude: 38° 38' 18.30" N; Longitude: 108° 11' 41.99" W
**Upper Terminus -** Latitude: 38° 31' 58.37" N; Longitude: 108° 15' 25.70" W

**River Segment Ownership (in Miles):**

| BLM | USFS | State | Private | TOTAL LENGTH | % FEDERAL |
|---|---|---|---|---|---|
| 9.82 | | | | **9.82** | **100%** |

**Land Ownership within One-Half Mile Wide Corridor (in Acres):**

| BLM | USFS | State | Private | TOTAL ACRES | % FEDERAL |
|---|---|---|---|---|---|
| 2,828.5 | 6.7 | | 43.3 | **2,878.5** | **98.5%** |

**Outstandingly Remarkable Values:  Vegetation**

1) <u>Vegetation</u> - This segment supports areas of narrowleaf cottonwood/strapleaf willow-silver buffaloberry riparian forest (*Populus angustifolia/Salix ligulfolia/Sheperdia argentea*), classified as critically imperiled globally (G1). This segment is included in the CNHP-designated Roubideau Creek Potential Conservation Area.

**Preliminary Classification:  Wild**

<u>Rationale</u> - There are no water diversions or impoundments along this river segment. The shoreline is essentially primitive, with the exception of a horse and hiking trail that crosses Potter Creek at several points along the canyon floor.

BLM_0015400



### Map 9 - Rose Creek

*Total Segment Length:* **3.90 miles**

*BLM-administered Portion:* **3.90 miles**

*Hydrologic Unit:* **Lower Gunnison**

*Preliminary Classification:* **Wild**

*Outstandingly Remarkable Values:* **Scenic**


BLM_0015401