## CHAPTER SEVEN - APPENDIX C: INVENTORY OF UNCOMPAHGRE RIVERS

| Segment Name | Segment Location | Total Segment Length (in miles) | Segment Length on BLM Lands (in miles) | Free-Flowing Determination (Y or N) | Outstandingly Remarkable Values[1] | | | | | | | | Classification[2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Scenic | Recreational | Geologic | Fish | Wildlife | Cultural | Historic | Vegetation | |
| La Sal Creek Segment 2 | Sharp Canyon to Dolores River Canyon WSA boundary | 4.52 | 3.82 | Y | | | | X | | | | X | S |
| La Sal Creek Segment 3 | Dolores River Canyon WSA boundary to Dolores River | 3.37 | 3.37 | Y | X | X | | X | | X | | X | W |
| Lion Canyon | UFO boundary to La Sal Creek | 0.70 | 0.43 | Y | | | | | | | | | |
| Lion Creek Segment 1 | Headwaters of Lion Creek to knickpoint in T47N/ R20W/Sec 1 NMPM | 1.95 | 1.95 | N | | | | | | | | | |
| Lion Creek Segment 2 | Knickpoint in T47N/ R20W/Sec 1 NMPM to La Sal Creek | 1.57 | 1.26 | Y | | | | | | | | X | S |
| Spring Creek | Headwaters of Spring Creek to La Sal Creek | 2.65 | 1.49 | Y | | | | | | | | X | R |
| West Paradox Creek | Reach on UFO land in T48N/R19W/Sec 29 NMPM | 0.15 | 0.15 | Y | | | | | | | | | |

BLM_0015499

# APPENDIX D - SCOPING COMMENTS

## INTRODUCTION

The UFO conducted public scoping for the purpose of receiving comments on the Draft Wild and Scenic River Eligibility Report. Solicitation for comments began with a news release on December 15, 2009. (See Appendix E on page 151.) The news release requested feedback specifically on the Eligibility Phase of the Wild and Scenic Rivers review process, which consisted of determinations of **outstandingly remarkable values** and **free-flowing** and preliminary classifications of stream segments in the Uncompahgre planning area and the portion of the Dominguez-Escalante NCA within the UFO. The news release summarized the Wild and Scenic Rivers Act, identified the larger river segments found eligible in the draft report, and described the subsequent Suitability Phase of the Wild and Scenic River review process.

The news release also stated that comments would be accepted through February 26, 2010 (later extended to March 29, 2010) and provided a web address for viewing and downloading the Draft Wild and Scenic River Eligibility Report: (http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html). In addition, the news release provided both a mailing address (Uncompahgre Field Office, Attn: RMP Revision, 2465 S. Townsend Ave., Montrose, CO 81401) and an email address (uformp@blm.gov) for submitting comments to the BLM.

Public comment on the Draft Wild and Scenic Eligibility Report was also solicited during the scoping period for the Uncompahgre RMP/EIS. This process was initiated on December 24, 2009, when the BLM mailed a newsletter announcing the start of the scoping period to more than 390 individuals from the public, agencies, and organizations that participated in past UFO activities and had been included on past UFO distribution lists. The newsletter provided the dates and venues for the original six scoping open houses held in the Towns of Hotchkiss, Delta, Montrose, Ridgway, Norwood, and Naturita, all communities with the Uncompahgre planning area. The newsletter also included an insert with a comment form for submitting scoping comments, and described the various methods for submitting comments, including dedicated e-mail and postal addresses.

In addition, a press release was posted on the RMP webpage (www.uformp.com) on January 5, 2010. This press release announced the scoping period for the Uncompahgre RMP/EIS process and provided information on the original six scoping open houses to be held in the Towns of Hotchkiss, Delta, Montrose, Ridgway, Norwood, and Naturita. It also described the various methods for submitting comments.

A newspaper advertisement was published in six local newspapers in December 2009 and January 2010, prior to the scoping meetings, Table D1. This newspaper advertisement announced the original six scoping open houses located in the Towns of Hotchkiss, Delta, Montrose, Ridgway, Norwood, and Naturita, all in Colorado.

CHAPTER SEVEN - APPENDIX D: SCOPING COMMENTS

**Table 7-2  Newspaper Advertising for Scoping Meetings**

| NEWSPAPER | LOCATION (COLORADO) | DATE(S) ADVERTISEMENT APPEARED |
|---|---|---|
| Delta County Independent | Delta | • December 23, 2009<br>• January 6, 2010 |
| Montrose Daily Press | Montrose | • December 30, 2009<br>• December 31, 2009<br>• January 6, 2010<br>• January 10, 2010 |
| Norwood Post | Norwood | • December 30, 2009<br>• January 20, 2010 |
| Ouray Plaindealer | Ouray | • January 8, 2010 |
| Ridgway Sun | Ridgway | • January 6, 2010<br>• January 13, 2010 |
| Telluride Daily Planet | Telluride | • January 20, 2010<br>• February 2, 2010 |

Six local newspapers are known to have published articles regarding the RMP revision and scoping period, Table D2.

**Table 7-3  Newspaper Articles Discussing RMP Revision and Scoping**

| NEWSPAPER | DATE(S) ARTICLE(S) APPEARED |
|---|---|
| Delta County Independent | January 20 and 27, 2010 |
| Montrose Daily Press | January 15 and February 3, 2010 |
| Norwood Post | January 23, 2010 |
| Ridgway Sun | January 13, 2010 |
| San Miguel Basin Forum | January 21 and 28, 2010 |
| Telluride Daily Planet | January 17 and February 2, 2010 |

The BLM hosted seven open houses to provide the public with opportunities to become involved, to learn about the project and the planning process, to meet the Uncompahgre RMP team members, and to offer comments. The seventh open house in Telluride was added in response to a special request from the San Miguel County Commissioners. The open houses were advertised via press release, newspaper advertisements, the project newsletter, the project Web site, and flyers posted in various towns throughout the planning area. A flyer announcing the dates and locations of the original six scoping open houses was posted in public locations in Delta, Hotchkiss, Montrose, Naturita, Norwood, Nucla, Paonia, and Redvale on January 8 and 12, 2010.

BLM_0015501

## CHAPTER SEVEN - APPENDIX D: SCOPING COMMENTS

A BLM webpage was launched and has been updated regularly to provide the public with current information about the Uncompahgre RMP revision, including activities associated with the Wild and Scenic River study process. The webpage, available online at http://www.uformp.com, provides background information about the RMP revision, notices about public involvement opportunities, maps of and fact sheets about the planning area, newsletters, and current planning documents such as the Community Assessment and Federal Register Notice of Intent. The dates and locations of all seven scoping open houses were announced on the webpage. The webpage also provided a link for submitting comments during the scoping period, which included the Draft Wild and Scenic Eligibility Report.

**Table 7-4  Scoping Open House Information**

| LOCATION | VENUE | DATE (2010) | NUMBER OF ATTENDEES | COMPLETED COMMENT FORMS |
|---|---|---|---|---|
| Hotchkiss, CO | Memorial Hall | January 12 | 99 | 11 |
| Delta, CO | Bill Heddles Recreation Center | January 13 | 42 | 0 |
| Montrose, CO | Montrose Pavilion | January 14 | 84 | 1 |
| Ridgway, CO | Town Hall | January 19 | 41 | 3 |
| Norwood, CO | Town Hall | January 20 | 26 | 0 |
| Naturita, CO | Community Building | January 21 | 60 | 2 |
| Telluride, CO | Miramonte Building | February 3 | 17 | 0 |
| **TOTAL** | | | **369** | **17** |

All scoping meetings were held in an open house format to encourage participants to discuss concerns and questions with BLM staff representatives. Copies of the first issue of the project newsletter, as well as blank scoping comment forms and a guide to providing substantive comments, were available at the sign-in station. A Microsoft PowerPoint presentation providing an overview of the RMP process and information about public involvement opportunities played continuously on a large screen. At every meeting, one of eight resource stations provided information regarding the Draft Wild and Scenic Rivers Eligibility Report and accepted public comments.

## CONTENT ANALYSIS OF PUBLIC COMMENTS

During the public comment period described in the preceding section, comments regarding the Wild and Scenic Rivers Draft Eligibility report were received from 87 individuals. Comments were overwhelmingly from communities within the vicinity of the planning area. Of those providing a home address, only twelve (14%) of the 87 respondents were from outside the planning area, including nine from within Colorado and three from other states (California, Texas and Wyoming).

Public comments received by the BLM were grouped according to issue. If several issues were addressed within one submission, each issue was tabulated as a separate comment. Multiple general

BLM_0015502

statements from the same commenter for the same segment(s) were counted as one comment. The 227 identified comments were further grouped into one of three categories according to type of issue: General, Eligibility, or Suitability. The comments are summarized below within these categories.

## GENERAL ISSUES

General issues included those comments stating support for or opposition to the Wild and Scenic River eligibility study process or one or more of the draft eligible stream segments, without mentioning a specific eligibility determination. As shown in Table D4, 109 (48%) of the 227 comments received were identified as General Issues.

**Table 7-5  Comments Regarding General Issues**

| GENERAL ISSUE COMMENTS | | |
|---|---|---|
| Wild and Scenic River Study Process | Support for One or More Stream Segments | Opposition to One or More Stream Segments |
| 14 | 54 | 41 |

Fourteen comments were received regarding the Wild and Scenic River Study Process:

- One expressing concern with the high cost of conducting the inventory.

- One stating that one year to inventory the streams was not long enough.

- One stating that the streams in the Dominguez-Escalante NCA have sufficient protection through NCA designation.

- One requesting that the BLM not rely on the Dominguez-Escalante NCA or wilderness designation to protect streams.

- One stating that the San Miguel River already has protection through ACEC designation.

- One stating that San Miguel Segment 3 is already sufficiently protected through the Cottonwood Creek Conservation Area.

- One expressing appreciation to the BLM UFO for accepting comments on the Draft Eligibility Report.

- One recommending Monitor Creek, Potter Creek, Rose Creek, Roubideau Creek, Big and Little Dominguez Creeks, the Dry Fork of Escalante, Cottonwood Creek (a tributary of Roubideau Creek), and Escalante Creek segments 1 and 2 as good candidates for alternative management plans.

- One requesting that the BLM keep all local water users informed of decisions made throughout the Wild and Scenic Rivers study process.


BLM_0015503

- One recommending that the Colorado instream flow program be considered for river value protection.

- One expressing appreciation for the BLM's willingness to collaborate, and recommending that the BLM continue to collaborate with outside groups during the Suitability Analysis.

- One recommending that the UFO build from the experience of the San Juan Public Lands Center, Dolores River Working Group and the Dolores River Dialogue.

- One requesting that the Colorado Water Conservation Board have the opportunity to provide additional comment on the Wild and Scenic Rivers study process as needed.

- One requesting that the UFO Eligibility Report include a map and supporting text for the Dolores River segment upstream of Bedrock, Colorado (evaluated for eligibility by the San Juan Public Lands Center).

Fifty-four general comments were received expressing support for carrying forward one or more eligible segments in the Wild and Scenic Rivers study process:

- Seven expressing support for all eligible streams in the draft report.

- One expressing support for all eligible streams in the North Fork of the Gunnison drainage.

- Twelve expressing support for the Dolores River.

- Eleven expressing support for the San Miguel River.

- Other stream segments with five or fewer comments of general support include: Tabeguache Creek, Beaver Creek, Dry Creek (tributary to the San Miguel River), Fall Creek, Naturita Creek, Saltado Creek, Cottonwood Creek (tributary to Roubideau Creek), Potter Creek, Monitor Creek, Roubideau Creek segments 1 and 2, Escalante Creek segments 1 and 2, the Gunnison River segments 2 and 3, Horsefly Creek (tributary to the San Miguel River), La Sal Creek, Lion Creek, Roc Creek, and the North Fork of the Gunnison River.

Forty-one general comments were received expressing opposition to carrying forward one or more eligible segments in the Wild and Scenic Rivers review process:

- Two expressing opposition to carrying forward any streams identified as eligible in the draft report.

- Sixteen expressing opposition to carrying forward the San Miguel River.

- Seven expressing opposition to carrying forward Escalante Creek segments 1 and 2.

- Six expressing opposition to carrying forward segments on the Gunnison River.

- Other segments with five or fewer comments expressing opposition to being carried forward include: Roubideau Creek, Naturita Creek, and stream segments in the West End of Montrose County.


BLM_0015504

## ELIGIBILITY ISSUES

The Eligibility Issue category includes all comments that pertain to the Outstandingly Remarkable Value (ORV) and free-flowing determinations of draft eligible segments. Comments on both stream segment delineation, number of segments, and the preliminary classification of draft eligible segments (Wild, Scenic, and Recreational) were also included as Eligibility Issues. Of the total comments received, 35 (15%) were related to eligibility. (See Table D5 below.)

**Table 7-6  Comments Regarding Eligibility Issues**

| ELIGIBILITY ISSUE COMMENTS | | | | |
|---|---|---|---|---|
| Wild, Scenic, Recreation Preliminary Classification | Outstandingly Remarkable Values | Free-Flowing Stream Segment Determination | Stream Segment Delineation | Number of Eligible Stream Segments |
| 5 | 15 | 6 | 6 | 3 |

Five comments were received regarding preliminary stream classifications:

- Two stating that draft eligible streams on the Miller Ranch do not meet classification definitions and should be withdrawn from eligibility.

- One opposing the classifications and interim stream management standards.

- One stating that the preliminary classification of *Scenic* for Ice Lake Creek is inconsistent with historic mining impacts.

- One stating that the preliminary classification of *Recreational* for Spring Creek is in conflict with historic mining impacts.

Fifteen comments were received regarding ORVs:

- One stating that the CNHP global ranking for vegetation is not an appropriate measure for an ORV.

- One stating that San Miguel River Segment 3 has no outstanding values.

- One questioning the presence of native fish in Naturita Creek.

- One questioning why Lion Creek was assigned a preliminary classification of *Scenic* when the ORV is Vegetation.

- One questioning whether the vegetation and geology along Dolores Segment 2 are unique.

- Two disagreeing with the ORV determinations for Dry Fork of Escalante Segments 1 and 2 and Escalante Creek Segment 2.


BLM_0015505

- One disagreeing with the ORV determinations for all draft eligible segments on the Dry Fork of Escalante Creek, Escalante Creek, and the Gunnison River.

- Three stating that the riparian vegetation along Escalante Creek Segment 2 is very common and expressing doubt that either the Eastwood's monkeyflower *(Mimulus eastwoodiae)* or the Colorado hookless cactus *(Sclerocactus glaucus)* occur along this reach.

- One questioning how the peregrine falcon *(Falco peregrinus)* pertains to the Wildlife ORV.

- One recommending that the ORVs along both Escalante and Roubideau Creeks be protected.

- One recommending that wilderness values be added to Cottonwood Creek (a tributary to Roubideau Creek) for the Wild and Scenic evaluation.

- One stating that the native fishes identified as a Wildlife ORV for La Sal Creek Segment 1 do not impart the characteristics necessary for a preliminary classification of **Recreational**.

Six comments were received pertaining to the free-flowing stream determinations:

- One stating that Dry Creek (a tributary of the San Miguel River) is dry 90% of the time (rather than intermittent) and should not be eligible.

- One stating that, due to water rights and an unpredictable flow regime, Naturita Creek has dried up 11 out of the last 19 years, and should not be considered free-flowing or eligible.

- One stating that the Dry Fork of Escalante Creek flows only ten days per year and should not be eligible.

- Two stating that, due to rip rap, agricultural use, and the number and size of water diversions, Escalante Creek segments 1 and 2 and Gunnison River Segment 3 should not be eligible.

- One stating that, due to the presence of significant upstream water control facilities (of the Aspinall Unit) both Gunnison River segments 1 and 2 should not be eligible.

Six comments were received pertaining to stream segment delineation:

- One stating that the Dry Creek segment (a tributary of the San Miguel River) is too long, given that the geologic anticline is only two miles.

- One questioning why the upper terminus of Gunnison River segment 3 terminates at the boundary with state lands.

- Two expressing concern with how the BLM calculated ownership along Gunnison River Segment 3.

- One recommending that exceptionally short, and in some cases not contiguous, river segments (identified as Gunnison River Segment 2, Escalante Creek Segments 1 and 2, Deep Creek, West Fork of Terror Creek, Dry Fork of Escalante Creek Segment 2, Rose Creek, and North Fork of Mesa Creek) be removed from eligibility.

BLM_0015506

- One stating the need to show Bureau of Reclamation, Section 5a withdrawn lands on stream segment maps.

Three comments were received regarding the number of eligible segments:

- One stating that too few of the 174 streams inventoried were found to be eligible.

- One requesting to review the inventory data on stream segments determined to be not eligible.

- One questioning why no eligible stream segments were located in either the Uncompahgre or Upper Gunnison river basins.

## SUITABILITY ISSUES

Suitability issues include all comments pertaining to the manageability of stream segments. Thirty-seven percent of the total comments received were categorized as pertaining to suitability and will be carried forward to the subsequent Suitability Analysis, which is being conducted as part of the UFO RMP revision. (See Table D6.) Suitability issues pertaining to river segments within the Dominguez-Escalante NCA will be addressed during development of the RMP for the NCA.

The most common suitability themes included concerns regarding:

- How designation of a river segment could affect future uses within the river corridor.

- How private and other non-BLM lands within a river corridor could be affected by WSR designation (including the degree of existing development within some corridors).

- Existing water rights and the need for instream flows.

- Mining rights within WSR-designated river corridors.

- Potential economic impacts to local communities from WSR designation.

**Table 7-7  Comments Regarding Suitability Issues**

| SUITABILITY ISSUE COMMENTS | | | | |
|---|---|---|---|---|
| Impacts to Land Uses Resulting from WSR Designation | Impacts to Private and Non- BLM Land and Existing Development | Impacts on Water Rights and Projects from WSR Designation | Impacts to Mining Rights from WSR Designation | Local Economic Impacts from WSR Designation |
| 7 | 29 | 13 | 32 | 2 |

Seven comments were received regarding changes in land use along WSR-designated rivers:

- One expressing general concern that designated rivers would serve a select few users groups, and one expressing similar concern specifically regarding the San Miguel River from Horsefly Creek to Pinon.


BLM_0015507

- Four expressing concerned about increased recreation use (and associated impacts) on the Gunnison River and Escalante Creeks if designated.

- One recommending that oil and gas development be banned from the Dolores River if designated.

- One recommending that no more dams or major water diversions be constructed on the Gunnison River if designated.

29 comments were received regarding private and non-BLM land issues:

- Fifteen stating that the level of existing development, water diversions, and fragmented land status along the Dry Fork of Escalante Creek, Escalante Creek, and the Gunnison River is too great for these to remain eligible.

- One stating that there is too much private land along La Sal Creek.

- One stating a need to retain road access to the Cashen Mine if La Sal Creek is designated.

- One stating a need to retain access along the North Fork of Mesa Creek if the creek is designated.

- Three expressing concern that there is too much private land and existing development with potential for condemnation if Naturita Creek is designated.

- Five opposing designation of the San Miguel River due to impacts to private property rights, instream flow water rights, and existing development.

- Three expressing general concern for impacts to private lands, including the right to graze livestock and other historic uses.

Thirteen comments were received regarding water rights or water projects:

- All expressing concern for impacts to existing water rights or water projects along various waterways, including the San Miguel River (3 comments), and the Dry Fork of Escalante Creek, Escalante Creek, and the Gunnison River (3 comments).

32 comments were received regarding mining rights:

- Two expressing concern for potential impacts to local economies.

- Eleven expressing concern specifically for the San Miguel River, while the remainder did not specify a river segment.

The full text of scoping comments is available for public review at the BLM Uncompahgre Field Office headquarters in Montrose, Colorado. Phone (970) 240-5300 for more information.

BLM_0015508

# APPENDIX E - DRAFT ELIGIBILITY REPORT PRESS RELEASE

United States Department of the Interior          Bureau of Land Management          2815 H Road
Grand Junction Field Office                       http://www.co.blm.gov               Grand Junction, CO 81506

# BLM News Release

**Contact: Erin Curtis, Public Affairs Specialist 970-244-3097**

December 15, 2009

## Draft Wild and Scenic River Eligibility Report Available for the BLM Uncompahgre Planning Area

**Montrose, Colo.** – The Bureau of Land Management (BLM) is seeking public comments on a draft Wild and Scenic River Eligibility Report conducted by the Uncompahgre Field Office.

The report is the first step in a Wild and Scenic River evaluation for the 900,000-acre field office, which is being conducted as the field office revises the Uncompahgre Resource Management Plan. The Draft Eligibility Report provides an inventory of river and stream segments on BLM-administered lands, and identifies those segments that meet the eligibility criteria necessary for federal Wild and Scenic River consideration.

The Wild and Scenic Rivers Act was passed in 1968 to preserve selected rivers or sections in their free-flowing condition in order to protect "the water quality of such rivers and to fulfill other vital national conservation purposes." To be eligible under the Wild and Scenic Rivers Act, a river or stream segment must possess one or more "outstandingly remarkable values," have sufficient water quality to support those values, and be "free-flowing." The BLM evaluated 174 river and stream segments and found 35 to be eligible.

The draft report identifies five segments of the San Miguel River (approximately 55 miles), two segments of the Dolores River (approximately 20 miles), and two segments of the Gunnison River (approximately 18 miles) as eligible. Eligibility review does not take into account potentially conflicting uses or the manageability of a river segment, which will be addressed in the upcoming *suitability* phase.

At this stage, the BLM is specifically looking for information regarding free-flowing condition and outstandingly remarkable values, including vegetation, wildlife, cultural, recreation, hydrologic, geologic, and scenic. Public comments on the draft report will be accepted through Feb. 26. The report is available at
http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.

Comments can be emailed to uformp@blm.gov or mailed to the Uncompahgre Field Office, Attn: RMP Revision, 2645 S. Townsend Ave., Montrose, CO 81401.

"Once the eligibility study has been finalized, we'll be working with stakeholders to look at each eligible segment to determine whether or not it is suitable for Wild and Scenic River consideration," said Uncompahgre Field Manager Barb Sharrow. "Public involvement in this process is essential."



BLM_0015509

**Draft Eligibility Report Press Release (continued)**

The suitability study will be included in the Resource Management Plan revision, which will analyze a range of possible recommendations. The BLM may or may not actively recommend suitable segments for Wild and Scenic River designation, based on input from stakeholders and the public.

River segments determined to be eligible are afforded interim protective management by the BLM until a suitability study is completed. The Resource Management Plan revision and suitability analysis is scheduled to be completed in 2013.

The Cache La Poudre River is currently the only river in Colorado with segments included in the Wild and Scenic River system. For more information on Wild and Scenic Rivers, visit http://www.nps.gov/rivers/.

-BLM-

BLM_0015510

BLM_0015511

# Colorado Water Conservation Board



**1313 Sherman Street**
**Room 721**
**Denver, CO 80203**

**303-866-3441**

**cwcb.state.co.us**



## Tabulation of Instream Flow and Natural Lake Level Water Rights

### 2012

BLM_0015512



# Colorado Water Conservation Board
# Instream Flow Tabulation - Streams



## Water Division 1

| Case Number | Stream | Watershed | County | Upper Terminus | Lower Terminus | Length (miles) | USGS QUADS | Amount(dates) (CFS) | Approp Date |
|---|---|---|---|---|---|---|---|---|---|
| 1-87CW269 | Acme Creek | Cache la Poudre | Larimer | headwaters in vicinity of lat 40 54 40N long 105 40 07W | confl Sheep Creek at lat 40 55 47N long 105 38 05W | 2.20 | Eaton Reservoir | 0.5 (1/1 - 12/31) | 12/11/1987 |
| 1-80CW221 | Antelope Gulch | South Platte headwaters | Park | headwaters in vicinity of lat 39 24 23N long 105 54 34W | confl Michigan Creek at lat 39 24 37N long 105 53 04W | 2.50 | Boreas Pass | 1.5 (1/1 - 12/31) | 5/7/1980 |
| 1-74W7734 | Arikaree River | Arikaree | Yuma | begins at lat 39 43 44N long 102 36 46W | ends at lat 39 44 34N long 102 33 23W | 2.00 | Abarr SE Adler Creek Vernon SW Wildcat Canyon | 1.5 (1/1 - 12/31) | 6/21/1974 |
| 1-74W7734A | Arikaree River | Arikaree | Yuma | begins at lat 39 44 34N long 102 33 23W | ends at lat 39 45 36N long 102 27 47W | 7.00 | Abarr SE Adler Creek Vernon SW Wildcat Canyon | 3.5 (1/1 - 12/31) | 6/21/1974 |
| 1-74W7734B | Arikaree River | Arikaree | Yuma | begins at lat 39 45 36N long 102 27 47W | ends at lat 39 46 13N long 102 21 37W | 5.00 | Abarr SE Adler Creek Vernon SW Wildcat Canyon | 7 (1/1 - 12/31) | 6/21/1974 |
| 1-84CW653 | Bard Creek | Clear Creek | Clear Creek | headwaters in vicinity of lat 39 43 19N long 105 47 33W | confl West Fork Clear Creek in NE SW S28 T3S R74W 6PM | 7.00 | Empire Georgetown Grays Peak | 1.5 (1/1 - 12/31) | 7/13/1984 |
| 1-94CW263 | Bear Creek | Upper South Platte | Clear Creek | unnamed lake at lat 39 35 47N long 105 38 15W | confl Beartrack Creek at lat 39 35 56N long 105 34 25W | 3.80 | Harris Park Mount Evans | 2.5 (10/1 - 4/30) 6.5 (5/1 - 9/30) | 9/13/1994 |

Thursday, April 05, 2012      * - Donated/Acquired Water Right      # - Case Pending Decree in Water Court, Information Subject to Change      Page 1 of 165

BLM_0015513

BLM Colorado - Botany - BLM National List of Invasive Weed Species of Concern

**U.S. DEPARTMENT OF THE INTERIOR**
# BUREAU OF LAND MANAGEMENT

Colorado

BLM

BLM > Colorado > Programs > Botany > BLM National List of Invasive Weed Species of Concern

Print Page

## BLM National List of Invasive Weed Species of Concern

The definition of "weed" is always debatable. Traditional definitions include "plants out of place" or "plants that by their presence conflict with management objectives for the site." The definition included here also tries to incorporate the concepts of public land health and sustainability. A weed is defined as "a non native plant that disrupts or has the potential to disrupt or alter the natural ecosystem function, composition and diversity of the site it occupies. It 's presence deteriorates the health of the site , it makes efficient use of natural resources difficult and it may interfere with management objectives for that site. It is an invasive species that requires a concerted effort (manpower and resources) to remove from its current location, if it can be removed at all." This definition is adapted from Noss and Cooperider (1994) and Beck (personal communication).

"Noxious" weeds refer to those plant species which have been legally designated as unwanted or undesirable. This includes national, state and county or local designations. According to the Federal Noxious Weed Law, native plant species are not designated "noxious". Native plant species that may be of a management concern, such as poisonous plants or desert shrub and sub-shrub species are not considered priorities for noxious weed work or funding and are not included on the following list.

All weeds are not of equal importance for management. The focus of this list is on exotic species that are highly invasive in natural systems. Those species that are of a concern in agricultural situations, but do not pose a threat to rangelands, forestlands and wetlands have not been included. Many annual forbs have not been included. Exotic species typically used in range restoration which are known to be invasive have not been included. Invasive annual grasses which disrupt natural ecosystem function have been included.

**Botany**

Plants in Colorado Federally Listed as Threatened or Endangered and Candidates for Listing

Sensitive Species List

Non-Native Invasive Plant Management Program

Weed Management Areas in Colorado

BLM National List of Invasive Weed Species of Concern

Weed Management Coordinators

Weed Gallery

Publications

Where to Purchase Weed Free Hay in Colorado

Prototype-Weed Prevention Measures

| Scientific Name | Common Name | Family |
|---|---|---|
| **Grasses** | | |
| Aegilops cylindrica | jointed goatgrass | Poaceae |
| Ammophila arenaria | European beachgrass | Poaceae |
| Arundo donax | giant reed | Poaceae |
| Bromus diandrus | ripgut brome | Poaceae |
| Bromus japonicus | Japanese brome | Poaceae |
| Bromus rubens | red brome | Poaceae |
| Bromus tectorum | downy brome | Poaceae |
| Cenchrus longispinus | longspine sandbur | Poaceae |
| Cortaderia jubata | Andean pampas grass | Poaceae |
| Cortaderia selloana | pampas grass | Poaceae |
| Cynodon dactylon | bermudagrass | Poaceae |
| Ehrharta calycina | veldt grass | Poaceae |
| Elytrigia repens | quackgrass | Poaceae |
| Eragrostis lehmanniana | Lehmann lovegrass | Poaceae |
| Nardus stricta | matgrass | Poaceae |
| Panicum miliaceum | wild proso millet | Poaceae |
| Pennisetum setaceum | crimson fountain grass | Poaceae |
| Schismus arabicus | schismus | Poaceae |
| Schismus barbatus | mediterranean grass | Poaceae |
| Sorghum halepense | johnsongrass | Poaceae |
| Taeniatherum caput-medusae | medusa-head | Poaceae |
| **Forbs** | | |
| Acroptilon repens | Russian knapweed | Asteraceae |
| Anthemis arvensis | scentless chamomile | Asteraceae |

BLM_0015514

| Anthemis cotula | mayweed chamomile | Asteraceae |
|---|---|---|
| Arctium minus | common burdock | Asteraceae |
| Bassia hyssopifolia | bassia Basellaceae | Asteraceae |
| Brassica nigra | black mustard | Brassicaceae |
| Brassica tournefortii | wild turnip | Brassicaceae |
| Caesalpinia gilliesii | Mexican bird-of-paradise | Fabaceae |
| Cardaria chalepensis | lens-podded whitetop | Brassicaceae |
| Cardaria draba | hoary cress | Brassicaceae |
| Cardaria pubescens | hairy whitetop | Brassicaceae |
| Carduus acanthoides | plumeless thistle | Asteraceae |
| Carduus nutans | musk thistle | Asteraceae |
| Carduus pycnocephalus | Italian thistle | Asteraceae |
| Carduus teniflorus | slender-flowered thistle | Asteraceae |
| Carpobrotus edulis | hottentot fig | Aizoaceae |
| Carpobrotus chilensis | sea iceplant | Aizoaceae |
| Carthamus lantus | distaff thistle | Asteraceae |
| Carum carvi | common caraway | Apiaceae |
| Centaurea calcitrapa | purple starthistle | Asteraceae |
| Centaurea cyanus | cornflower | Asteraceae |
| Centaurea diffusa | diffuse knapweed | Asteraceae |
| Centaurea iberica | Iberian starthistle | Asteraceae |
| Centaurea jacea | brown knapweed | Asteraceae |
| Centaurea macrocephala | bighead knapweed | Asteraceae |
| Centaurea maculosa | spotted knapweed | Asteraceae |
| Centaurea melitenisis | malta starthistle | Asteraceae |
| Centaurea montana | mountain cornflower | Asteraceae |
| Centaurea nigra | black knapweed | Asteraceae |
| Centaurea nigrescens | Vochin knapweed | Asteraceae |
| Centaurea pratensis | meadow knapweed | Asteraceae |
| Centaurea squarrosa | squarrose knapweed | Asteraceae |
| Centaurea solstitialis | yellow starthistle | Asteraceae |
| Centaurea trichocephala | feather-headed knapweed | Asteraceae |
| Chondrilla juncea | rush skeletonweed | Asteraceae |
| Chrysanthemum leucanthemum | ox-eye daisy | Asteraceae |
| Cichorium intybus | chicory | Asteraceae |
| Cirsium arvense | Canada thistle | Asteraceae |
| Cirsium vulgare | bull thistle | Asteraceae |
| Clematis orientalis | Chinese clematis | Ranunculaceae |
| Conium maculatum | poison hemlock | Apiaceae |
| Convolvulus arvensis | field bindweed | Convoluvaceae |
| Crepis setosa | bristly hawkweed | Asteraceae |
| Crupina vulgaris | common crupina | Asteraceae |
| Cynara cardunculus | artichoke thistle | Asteraceae |
| Cynoglossum officinale | houndstongue | Boraginaceae |
| Digitalis purpurea | foxglove | Scrophulariaceae |
| Dipsacus fullonum | common teasel | Dipsacaceae |
| Echium vulgare | blueweed | Boraginaceae |
| Egeria densa | Brazillian waterweed | Hydrocharitaceae |
| Eichhornia crassipes | water hyacinth | Hydrocharitaceae |
| Erechtites glomerata | Australian fireweed | Asteraceae |
| Euphorbia cyparissias | cypress spurge | Euphorbiaceae |
| Euphorbia esula | leafy spurge | Euphorbiaceae |
| Euphorbia myrsinites | myrtle spurge | Euphorbiaceae |
| Foeniculum vulgare | fennel | Apiaceae |
| Galega officinalis | goats rue | Fabaceae |

BLM_0015515

BLM Colorado - Botany - BLM National List of Invasive Weed Species of Concern

| *Gypsophila paniculata* | babys breath | Caryophyllaceae |
|---|---|---|
| *Halogeton glomeratus* | halogeton | Chenopodiaceae |
| *Hesperis matronalis* | dames's rocket | Brassicaceae |
| *Hieracium aurantiacum* | orange hawkweed | Asteraceae |
| *Hieracium pilosella* | mouseear hawkweed | Asteraceae |
| *Hieracium pratense* | yellow hawkweed | Asteraceae |
| *Hydrilla verticillata* | hydrilla | Hydrocharitaceae |
| *Hyoscyamus niger* | black henbane | Solanaceae |
| *Hypericum perforatum* | common St. Johnswort | Hypericaceae |
| *Hyposhaeris radicata* | common catsear | Asteraceae |
| *Isatis tinctoria* | dyer's woad | Brassicaceae |
| *Knautia arvensis* | blue buttons | Dipsacaceae |
| *Lathyrus latifolius* | everlasting peavine | Fabaceae |
| *Lepidium latifolium* | perennial pepperweed | Brassicaceae |
| *Linaria genistifolia spp. dalmatica* | dalmation toadflax | Scrophulariaceae |
| *Linaria vulgaris* | yellow toadflax | Scrophulariaceae |
| *Lysimachia vulgaris* | garden loosestrife | Primulaceae |
| *Lythrum salicaria* | purple loosestrife | Lythraceae |
| *Lythrum virgatum* | wand loosestrife | Lythraceae |
| *Madia sativa* | Chilean tarweed | Asteraceae |
| *Myriophyllum spicatum* | Eurasian watermilfloil | Haloragaceae |
| *Onopordum acanthium* | Scotch thistle | Asteraceae |
| *Onopordum taricum* | Scotch thistle | Asteraceae |
| *Peganum harmala* | African rue | Zygophyllaceae |
| *Potentilla recta* | sulphur cinquefoil | Rosaceae |
| *Salvia aethiopsis* | Mediterranean sage | Lamiaceae |
| *Saponaria officinalis* | bouncing bet | Caryophyllaceae |
| *Senecio jacobaea* | tansy ragwort | Asteraceae |
| *Senecio mikanoides* | German ivy | Asteraceae |
| *Solanum dulcamara* | bitter nightshade | Solanaceae |
| *Sonchus arvensis* | perennial sowthistle | Asteraceae |
| *Sphaerophysa salsuia* | swainsonpea | Fabaceae |
| *Tanacetum vulgare* | common tansy | Asteraceae |
| *Zygophyllum fabago* | Syrian bean caper | Zygophyllaceae |
| **Shrubs and Trees** | | |
| *Ailanthus altissima* | tree-of-heaven | Simaroubaceae |
| *Alhagi pseudalhagi* | camelthorn | Fabaceae |
| *Cytisus junceum* | Spanish broom | Fabaceae |
| *Cytisus monspessulanas* | French broom | Fabaceae |
| *Cytisus scoparius* | Scotch broom | Fabaceae |
| *Cytisus striatus* | Portugese broom | Fabaceae |
| *Elaeagnus angustifolia* | Russian olive | Elaeagnaceae |
| *Ficus carica* | edible fig | Moraceae |
| *Lespedeza cuneata* | Himalayan bush clover | Fabaceae |
| *Retama monosperma* | bridal veil broom | Fabaceae |
| *Rubus discolor* | Himalaya blackberry | Rosaceae |
| *Schinus terebrinthifolius* | Brazillian pepper | Anacardiaceae |
| *Tamarix aphylla* | athel | Tamaricaceae |
| *Tamarix chinensis* | tamarisk | Tamaricaceae |
| *Tamarix gallica* | French tamarisk | Tamaricaceae |
| *Tamarix parviflora* | small flower tamerisk | Tamaricaceae |
| *Tamarix pentanda* | tamarisk | Tamaricaceae |
| *Tamarix ramosissima* | salt cedar | Tamaricaceae |
| *Uiex europaeus* | gorse | Fabaceae |
| *Ulmus pumila* | Siberian elm | Ulmaceae |

BLM_0015516

BLM Colorado - Botany - BLM National List of Invasive Weed Species of Concern

Last updated: 08-12-2008

BLM_0015517

# Interim Management Policy
# Dominguez-Escalante National Conservation Area and
# Dominguez Canyon Wilderness



## Prepared for the Bureau of Land Management
## Department of Interior

**August 24, 2010**

Attachment 1-1

# Introduction

The Dominguez-Escalante National Conservation Area (NCA) and Dominguez Canyon Wilderness were established by the Omnibus Public Lands Management Act (Public Law 111-11) on March 30, 2009.  The Dominguez-Canyon Wilderness, which is within the NCA Boundary, is designated as wilderness and as a component of the National Wilderness Preservation System will be managed in accordance with the Wilderness Act (16 U.S.C. 1131 et seq.) as well as other Bureau of Land Management (BLM) wilderness guidance and policy.  The NCA will be managed in accordance with its designating legislation as well as all other pertinent federal guidance.

As established by the Omnibus Act, the purposes of the NCA are to conserve and protect for the benefit and enjoyment of present and future generations—

1. The unique and important resources and values of the land, including the geological, cultural, archaeological, paleontological, natural, scientific, recreational, wilderness, wildlife, riparian, historical, educational, and scenic resources of the public land; and

2. The water resources of area streams, based on seasonally available flows that are necessary to support aquatic, riparian, and terrestrial species and communities.

To fulfill these purposes, the NCA, which crosses two BLM administrative boundaries, will be managed as a single unit with one Manager.  The following direction was developed to supplement the existing management plans[1] until long-term comprehensive management guidance is developed through the NCA Resource Management Planning (RMP) process and, where applicable, the Wilderness and Travel Management Planning processes.  These interim guidelines are not all-inclusive and will be read in combination with the legislation when making commitments and decisions to ensure that long-range management is understood before such commitments are made:

– Before making any new authorizations, especially those that would result in long-term uses occurring on federal lands, the BLM will consider if they will inhibit the ability of the NCA management staff to implement any of the alternatives being developed through the RMP process.  For activities that would potentially be managed differently under various RMP alternatives, decisions should be deferred until the RMP is completed.

– Where possible, existing management policies, designations, and allocations established by existing RMPs will be maintained.  However, changes in management direction may be necessary to comply with the legislation and protect the resources cited within the purposes of the legislation.

---

[1] **The area is currently managed under the 1987 Grand Junction Resource Area RMP and the 1989 Uncompahgre Basin RMP.**

Attachment 1-2

BLM_0015519

─ The public will be provided with prompt and accessible information regarding the use of federal lands within the NCA.

─ Coordination with other federal, local, state, and tribal governments/agencies will occur under existing agreements as well as any new arrangements deemed necessary, to disseminate and exchange information and cooperate in management actions, consistent with all applicable legal authorities and other directives.

─ All applications, proposals, and future use requests that were pending when the legislation was issued, will be subject to the terms of the legislation, including its recognition of valid existing rights, and other management directives and decisions.

# Discussion of Specific Activities

In general, actions that are not precluded by legislation and which do not conflict with the established purposes of the NCA and Wilderness may continue.   Activities would be restricted only where (1) the BLM, as required by existing law, identifies places where such uses ought to be restricted or prohibited as necessary to protect the federal lands and resources, including the resources cited as the purposes for which the NCA and Wilderness were established; or (2) where the BLM finds a clear threat from such a use to the federal lands and resources, including the resources cited as the purposes for which the NCA and Wilderness were established, and the circumstances call for swift protective action.

**Animal Damage Control**[2]: Coordinate closely with Colorado Department of Wildlife (CDOW) and Animal and Plant Health Inspection Service (APHIS) on animal damage control proposals.

**Collection of Natural Materials (Including Paleontological Resources, Rocks, and Vegetative Materials)**: The collection of objects, including vegetation or "wildings", paleontological resources, or rock specimens will not be permitted, except where intended for legitimate scientific uses or Native American spiritual or traditional uses, for which documentation is provided to the satisfaction of the responsible management official.

**Facilities and Roads**:   Maintenance of existing facilities may be authorized, subject to compliance with current policies and practices, provided legislated resources are protected.  The following recreational facilities were proposed prior to designation and may be completed; generally, no other new facilities will be authorized unless immediate action is required to protect conservation area resources or improve public safety:

---

[2] Animal Damage Control includes the category of predator damage management, typically focused on depredations on livestock, achieving population management objectives for native wildlife species, miminizing damage to property, including agriculture, to suppress wild animal-borne diseases,  to protect public safety, and to protect Federally and State-listed threatened and endangered species.

Attachment 1-3

- Cactus Park Trailhead improvements with one section of new trail to provide access to the wilderness (to minimize resource damage that would occur from route finding)
- Bridgeport alternative access (designed to improve public safety)

**Roads**: Pending development of an approved travel management plan, road improvements will be limited to maintenance necessary to correct conditions that are unsafe, hazardous, or which are resulting in resource degradation

**Signs and Interpretation**: Signs at the NCA's boundaries should be established.  Other relevant information may be posted as needed.  Actions should be initiated to interpret the resources and values and provide environmental education to visitors on important topics (i.e., visitor safety, resource protection, and other objects and values for which the NCA was designated).  In signing routes, care should be taken to avoid giving the public the perception that routes are being "designated" as open; thus, existing roads should not be signed as open (e.g., consider only signing closures).

**Livestock Grazing**: Where applicable and consistent with the designation, livestock grazing within the NCA will continue pursuant to the terms of permits and leases. Appropriate grazing management practices (as in all properly managed grazing pastures) will be followed to protect rangeland resources. Implementation of standards and guidelines for rangeland improvement will continue.  Actions should be taken to assist permitees in assuring compliance with existing requirements. Enforcement actions against trespassers or other violators continue to be authorized under policy.

**Minerals**:  As established by the Omnibus Public Lands Management Act, subject to valid existing rights, all Federal land within the Conservation Area and Wilderness and all land and interests in land acquired by the United States within the Conservation Area or Wilderness are withdrawn from all forms of entry, appropriation, or disposal under the public land laws; location, entry, and patent under the mining laws; and operation of the mineral leasing, mineral materials, and geothermal leasing laws.

**Recreation**:  Until an approved plan is in place, no additional special recreation permits for additional commercial use or competitive events should be considered, and existing permits should not be expanded.  Special Recreation Permits for limited, one-day events for organized groups and educational purposes may be allowed so long as they do not affect resources and values or result in additional use allocations.  For the specific recreational use of climbing, new routes in sensitive areas will be discouraged.  If bolting is proposed within the wilderness, follow the criteria established in Instruction Memorandum 2007-084 or more current guidance, and using the Wilderness Management Planning process to consider these commitments concurrent with preparation of the Resource Management Plan.

**Camping**: Dispersed recreational camping may continue consistent with current policies and practices and the legislation.

Attachment 1-4

**Hunting and Fishing**: Consistent with law and as stated in the legislation, hunting and fishing continue to be managed by the State of Colorado; the State's responsibilities and authorities regarding wildlife management within the NCA, including managing fishing and hunting, are unaffected by legislation.  The NCA will coordinate with the State to ensure public safety, specifically if there are areas of increased visitor use.

**Off-Road Vehicles**: Based on current planning decisions, travel within the majority of the NCA is limited to existing roads and trails (as documented in the travel management inventory).  No areas in the NCA will be authorized for cross-country, off-road vehicular use, except for authorized administrative and emergency purposes.  Temporary (and to a lesser extent, emergency) closures will be authorized as needed to protect NCA resources, consistent with guidance in IM 2010-028, or other current guidance.  In general, existing roads and trails will remain open for motorized and mechanized use as currently authorized.  Cultural and natural resources will be monitored where needed if damage is suspected, and temporary closures of roads and trails will be initiated prior to completion of the RMP only if resource damage is documented.  Final route designations will be established in the RMP.  No new roads or trails will be developed pending completion of the RMP (except for the segment authorized in Facilities, above).

**Recreational Facilities**:  See "Facilities" section of this document for guidance related to recreational structures and developments.

**Lands and Realty:**
**Land Tenure Adjustment**:  Where willing sellers/participants exist, consider land or easement acquisitions and land exchanges that will enhance the values of the NCA.  If any trespass situations are identified, work to develop solutions.

**Rights-of-Way**:   Generally, proposals for new rights-of-way should not be processed until the plan is completed.

**Withdrawals**:  Consider revoking withdrawals within the NCA that no longer serve a purpose, such as Power Site Classifications, Power Site Reserves, Waterpower Designations, and the Bureau of Reclamation Withdrawal (Colorado 16609) that was relinquished in 1988.

**Scientific, Archeological, and Historical Investigations**: Scientific investigations that increase our understanding of the NCA's resources are important; scientific uses that require additional surface disturbance may only be allowed if they would result in a high relative benefit to the purposes for which the NCA was designated and have a high likelihood surface disturbance could be successfully rehabilitated.

**Surface Disturbance and Reclamation Activities under Current Permits**:  Surface disturbance and reclamation activities under current permits may proceed consistent with those permits.  Permit

Attachment 1-5

extensions will be considered subject to consistency with applicable policies, laws, legislation and resource protection needs.

**Vegetation Management**: Projects to control fire, insects, or disease may be undertaken in both the wilderness, subject to section 4(d)(1) of the Wilderness Act (16 U.S.C. 1133(d)(1)); and the NCA, subject to the designating legislation and other applicable laws.  Where other vegetation projects are considered, they should be designed to restore, enhance, or protect NCA resources.  Surface disturbing projects should be considered carefully and substantial information should be presented to ensure that NCA resources would not be affected.

**Fire & Fuels Management:**  All fire and fuels management activities and projects will be tiered to the relevant Fire Management Plans (updated annually).

**Noxious Weeds or Invasive/Exotic Species**: Existing noxious weed control activities should continue. Exotic species should not be introduced, unless doing so is essential to control noxious weeds or other undesirable species or stabilize soils in certain limited conditions that would protect NCA resources.

**Wood & Other Vegetative Products (Forestry)**:  Pending completion of the RMP, where commercial or personal firewood cutting has been permitted in the past, it should only be allowed when the authorized officer has made an assessment and determined that the activity would be likely to improve forest health, could be implemented in a sustainable fashion, and would not require additional off-road exploration.  Christmas tree permits would continue to be granted as long as these same conditions could be met.

**Water Resources:**

**Hydrologic Studies and Information:**  The BLM should continue to collect flow information on Big Dominguez Creek and Little Dominguez Creek to further document the hydrologic regime of the two creeks.   BLM should explore the possibility of installing a permanent stream gage on Big Dominguez Creek, because such a gage could provide previously unavailable information on the natural hydrology of Uncompahgre Plateau streams, which would be helpful for planning and monitoring purposes.  BLM should collect water quality data on perennial streams within the NCA to identify any water quality issues that should be addressed as part of the land use plan, and to address listing of streams under Section 303(d) of the Clean Water Act.    The BLM should collect water quality information on springs on seeps to assist in identifying ground water source areas for springs and to identify whether there are any groundwater quality issues within the NCA.

**Instream Flow Protection:**  The Colorado Water Conservation Board (CWCB) has made an initial appropriation of an instream flow water right to support water-dependent values along Little Dominguez Creek and Big Dominguez Creek.   The water right is for all of the available flows, minus a small water development allowance for private properties located upstream and for small water developments on federal lands.   BLM will cooperate with the CWCB in completing

Attachment 1-6

BLM_0015523

the water right appropriation process and administering the new water right once it is decreed by the Colorado water court system.    If BLM observes unauthorized water developments and diversions within these two watersheds, it shall report those incidences to the CWCB for further investigation.

**Water Rights**:  The BLM has applied for water rights on all known point water sources, such as springs, wells, and reservoirs, within the wilderness area and NCA.  BLM shall continue to conduct inventory efforts on previously undocumented water sources that are important for wildlife, recreation, and livestock use, and file for water rights on those water sources.

**Wilderness:**

**Dominguez Canyon Wilderness Area**:  will be managed in accordance with the Wilderness Act (16 U.S.C. 1131 et seq.), designated as wilderness and as a component of the National Wilderness Preservation System as well as all other wilderness guidance and policy.  A Wilderness Management Plan (WMP) will be developed concurrently with the D-E NCA RMP.  All lands within the Dominquez Canyon Wilderness Area are withdrawn from:

1. All forms of entry, appropriation, or disposal under the public land laws;
2.  Location, entry, and patent under the mining laws; and
3. Operation of the mineral leasing, mineral materials, and geothermal leasing laws.

**Wilderness Study Areas**:  Maintain the non-impairment standard for wilderness study areas, per FLPMA, to prevent undue and unnecessary degradation of resources in accordance with existing guidance and policy.

Attachment 1-7

# Appendix A
# Omnibus Public Lands Management Act of 2009
# 123 STAT. 1102 PUBLIC LAW 111–11—MAR. 30, 2009

Subtitle E—Dominguez-Escalante National Conservation Area

SEC. 2401. DEFINITIONS.
In this subtitle:
(1) CONSERVATION AREA.—The term ''Conservation Area'' means the Dominguez-Escalante National Conservation Area established by section 2402(a)(1).
(2) COUNCIL.—The term ''Council'' means the Dominguez-Escalante National Conservation Area Advisory Council established under section 2407.
(3) MANAGEMENT PLAN.—The term ''management plan'' means the management plan developed under section 2406.
(4) MAP.—The term ''Map'' means the map entitled ''Dominguez-Escalante National Conservation Area'' and dated September 15, 2008.
(5) SECRETARY.—The term ''Secretary'' means the Secretary of the Interior.
(6) STATE.—The term ''State'' means the State of Colorado.
(7) WILDERNESS.—The term ''Wilderness'' means the Dominguez Canyon Wilderness Area designated by section 2403(a).

SEC. 2402. DOMINGUEZ-ESCALANTE NATIONAL CONSERVATION AREA.
(a) ESTABLISHMENT.—
(1) IN GENERAL.—There is established the Dominguez-Escalante National Conservation Area in the State.
(2) AREA INCLUDED.—The Conservation Area shall consist of approximately 209,610 acres of public land, as generally depicted on the Map.
(b) PURPOSES.—The purposes of the Conservation Area are to conserve and protect for the benefit and enjoyment of present and future generations—
(1) the unique and important resources and values of the land, including the geological, cultural, archaeological, paleontological, natural, scientific, recreational, wilderness, wildlife, riparian, historical, educational, and scenic resources of the public land; and
(2) the water resources of area streams, based on seasonally available flows, that are necessary to support aquatic, riparian, and terrestrial species and communities.
(c) MANAGEMENT.—
(1) IN GENERAL.—The Secretary shall manage the Conservation Area—
(A) as a component of the National Landscape Conservation System;
(B) in a manner that conserves, protects, and enhances the resources and values of the Conservation Area described in subsection (b); and (C) in accordance with—
(i) the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.);
(ii) this subtitle; and
(iii) any other applicable laws.
(2) USES.—

Attachment 1-8

BLM_0015525

(A) IN GENERAL.—The Secretary shall allow only such uses of the Conservation Area as the Secretary determines would further the purposes for which the Conservation Area is established.

(B) USE OF MOTORIZED VEHICLES.—

(i) IN GENERAL.—Except as provided in clauses (ii) and (iii), use of motorized vehicles in the Conservation Area shall be allowed—

(I) before the effective date of the management plan, only on roads and trails designated for use of motor vehicles in the management plan that applies on the date of the enactment of this Act to the public land in the Conservation Area; and

(II) after the effective date of the management plan, only on roads and trails designated in the management plan for the use of motor vehicles.

(ii) ADMINISTRATIVE AND EMERGENCY RESPONSE USE.—Clause (i) shall not limit the use of motor vehicles in the  Conservation Area for administrative purposes or to respond to an emergency.

(iii) LIMITATION.—This subparagraph shall not apply to the Wilderness.

SEC. 2403. DOMINGUEZ CANYON WILDERNESS AREA.

(a) IN GENERAL.—In accordance with the Wilderness Act (16 U.S.C. 1131 et seq.), the approximately 66,280 acres of public land in Mesa, Montrose, and Delta Counties, Colorado, as generally depicted on the Map, is designated as wilderness and as a component of the National Wilderness Preservation System, to be known as the "Dominguez Canyon Wilderness Area".

(b) ADMINISTRATION OF WILDERNESS.—The Wilderness shall be managed by the Secretary in accordance with the Wilderness Act (16 U.S.C. 1131 et seq.) and this subtitle, except that—

(1) any reference in the Wilderness Act to the effective date of that Act shall be considered to be a reference to the

date of enactment of this Act; and (2) any reference in the Wilderness Act to the Secretary of Agriculture shall be considered to be a reference to the Secretary of the Interior.

SEC. 2404. MAPS AND LEGAL DESCRIPTIONS.

(a) IN GENERAL.—As soon as practicable after the date of enactment of this Act, the Secretary shall file a map and a legal description of the Conservation Area and the Wilderness with—

(1) the Committee on Energy and Natural Resources of the Senate; and (2) the Committee on Natural Resources of the House of Representatives.

(b) FORCE AND EFFECT.—The Map and legal descriptions filed under subsection (a) shall have the same force and  effect as if included in this subtitle, except that the Secretary may correct clerical and typographical errors in the Map and legal descriptions.

(c) PUBLIC AVAILABILITY.—The Map and legal descriptions filed under subsection (a) shall be available for public inspection in the appropriate offices of the Bureau of Land Management.

SEC. 2405. MANAGEMENT OF CONSERVATION AREA AND WILDERNESS.

(a) WITHDRAWAL.—Subject to valid existing rights, all Federal land within the Conservation Area and the Wilderness and all land and interests in land acquired by the United States within the Conservation Area or the Wilderness is withdrawn from—

(1) all forms of entry, appropriation, or disposal under the public land laws;

(2) location, entry, and patent under the mining laws; and

(3) operation of the mineral leasing, mineral materials, and geothermal leasing laws.

(b) GRAZING.—

(1) GRAZING IN CONSERVATION AREA.—Except as provided in paragraph (2), the Secretary shall issue and administer

Attachment 1-9

any grazing leases or permits in the Conservation Area in accordance with the laws (including regulations) applicable to the issuance and administration of such leases and permits on other land under the jurisdiction of the Bureau of Land Management.

(2) GRAZING IN WILDERNESS.—The grazing of livestock in the Wilderness, if established as of the date of enactment

of this Act, shall be permitted to continue—

(A) subject to any reasonable regulations, policies, and practices that the Secretary determines to be necessary;

and (B) in accordance with—

(i) section 4(d)(4) of the Wilderness Act (16 U.S.C. 1133(d)(4)); and

(ii) the guidelines set forth in Appendix A of the report of the Committee on Interior and Insular Affairs of the House of Representatives accompanying H.R. 2570 of the 101st Congress (H. Rept. 101–405).

(c) NO BUFFER ZONES.—

(1) IN GENERAL.—Nothing in this subtitle creates a protective perimeter or buffer zone around the Conservation Area.

(2) ACTIVITIES OUTSIDE CONSERVATION AREA.—The fact that an activity or use on land outside the Conservation Area can be seen or heard within the Conservation Area shall not preclude the activity or use outside the boundary of the Conservation Area.

(d) ACQUISITION OF LAND.—

(1) IN GENERAL.—The Secretary may acquire non-Federal land within the boundaries of the Conservation Area or the Wilderness only through exchange, donation, or purchase from a willing seller.

(2) MANAGEMENT.—Land acquired under paragraph (1) shall—

(A) become part of the Conservation Area and, if applicable, the Wilderness; and

(B) be managed in accordance with this subtitle and any other applicable laws.

(e) FIRE, INSECTS, AND DISEASES.—Subject to such terms and conditions as the Secretary determines to be desirable and appropriate, the Secretary may undertake such measures as are necessary to control fire, insects, and diseases—

(1) in the Wilderness, in accordance with section 4(d)(1) of the Wilderness Act (16 U.S.C. 1133(d)(1)); and

(2) except as provided in paragraph (1), in the Conservation Area in accordance with this subtitle and any other applicable laws.

(f) ACCESS.—The Secretary shall continue to provide private landowners adequate access to inholdings in the Conservation Area.

(g) INVASIVE SPECIES AND NOXIOUS WEEDS.—In accordance with any applicable laws and subject to such terms and conditions as the Secretary determines to be desirable and appropriate, the Secretary may prescribe measures to control nonnative invasive plants and noxious weeds within the Conservation Area.

(h) WATER RIGHTS.—

(1) EFFECT.—Nothing in this subtitle— (A) affects the use or allocation, in existence on the date of enactment of this Act, of any water, water right, or interest in water;

(B) affects any vested absolute or decreed conditional water right in existence on the date of enactment of this Act, including any water right held by the United States;

(C) affects any interstate water compact in existence on the date of enactment of this Act;

(D) authorizes or imposes any new reserved Federal water rights; or

(E) shall be considered to be a relinquishment or reduction of any water rights reserved or appropriated by the United States in the State on or before the date of enactment of this Act.

(2) WILDERNESS WATER RIGHTS.—

Attachment 1-10

BLM_0015527

(A) IN GENERAL.—The Secretary shall ensure that any water rights within the Wilderness required to fulfill the
purposes of the Wilderness are secured in accordance with subparagraphs (B) through (G).
(B) STATE LAW.—
(i) PROCEDURAL REQUIREMENTS.—Any water rights within the Wilderness for which the Secretary pursues adjudication shall be adjudicated, changed, and administered in accordance with the procedural requirements and priority system of State law.
(ii) ESTABLISHMENT OF WATER RIGHTS.—
(I) IN GENERAL.—Except as provided in subclause (II), the purposes and other substantive characteristics of the water rights pursued under this paragraph shall be established in accordance with State law.
(II) EXCEPTION.—Notwithstanding subclause (I) and in accordance with this subtitle, the Secretary may appropriate and seek adjudication of water rights to maintain surface water levels and stream flows on and across the Wilderness to fulfill the purposes of the Wilderness.
(C) DEADLINE.—The Secretary shall promptly, but not earlier than January 2009, appropriate the water rights required to fulfill the purposes of the Wilderness.
(D) REQUIRED DETERMINATION.—The Secretary shall not pursue adjudication for any instream flow water rights unless the Secretary makes a determination pursuant to subparagraph (E)(ii) or (F).
(E) COOPERATIVE ENFORCEMENT.—
 (i) IN GENERAL.—The Secretary shall not pursue adjudication of any Federal instream flow water rights established under this paragraph if—
(I) the Secretary determines, upon adjudication of the water rights by the Colorado Water Conservation Board, that the Board holds water rights sufficient in priority, amount, and timing to fulfill the purposes of the Wilderness; and
(II) the Secretary has entered into a perpetual agreement with the Colorado Water Conservation Board to ensure the full exercise, protection, and enforcement of the State water rights within the Wilderness to reliably fulfill the purposes of the Wilderness.
(ii) ADJUDICATION.—If the Secretary determines that the provisions of clause (i) have not been met, the Secretary shall adjudicate and exercise any Federal water rights required to fulfill the purposes of the Wilderness in accordance with this paragraph.
(F) INSUFFICIENT WATER RIGHTS.—If the Colorado Water Conservation Board modifies the instream flow water rights obtained under subparagraph (E) to such a degree that the Secretary determines that water rights held by the State are insufficient to fulfill the purposes of the Wilderness, the Secretary shall adjudicate and exercise Federal water rights required to fulfill the purposes of the Wilderness in accordance with subparagraph (B).
(G) FAILURE TO COMPLY.—The Secretary shall promptly act to exercise and enforce the water rights described in subparagraph (E) if the Secretary determines that—
(i) the State is not exercising its water rights consistent with subparagraph (E)(i)(I); or (ii) the agreement described in subparagraph (E)(i)(II) is not fulfilled or complied with sufficiently to fulfill the purposes of the Wilderness.
(3) WATER RESOURCE FACILITY.—
(A) IN GENERAL.—Notwithstanding any other provision of law and subject to subparagraph (B), beginning on the date of enactment of this Act, neither the President nor any other officer, employee, or agent of the United States shall fund, assist, authorize, or issue a license or permit for the development of any new irrigation and pumping facility, reservoir, water conservation work, aqueduct, canal, ditch, pipeline, well, hydropower project, transmission, other ancillary facility, or other water, diversion, storage, or carriage structure in the Wilderness.
(B) EXCEPTION.—Notwithstanding subparagraph (A), the Secretary may allow construction of new livestock watering facilities within the Wilderness in accordance with—

Attachment 1-11

(i) section 4(d)(4) of the Wilderness Act (16 U.S.C. 1133(d)(4)); and (ii) the guidelines set forth in Appendix A of the report of the Committee on Interior and Insular Affairs of the House of Representatives accompanying H.R.

(4) CONSERVATION AREA WATER RIGHTS.—With respect to water within the Conservation Area, nothing in this subtitle— (A) authorizes any Federal agency to appropriate or otherwise acquire any water right on the mainstem of

the Gunnison River; or (B) prevents the State from appropriating or acquiring, or requires the State to appropriate or acquire, an instream flow water right on the mainstem of the Gunnison River.

(5) WILDERNESS BOUNDARIES ALONG GUNNISON RIVER.—

(A) IN GENERAL.—In areas in which the Gunnison River is used as a reference for defining the boundary of the Wilderness, the boundary shall—

(i) be located at the edge of the river; and

(ii) change according to the river level.

(B) EXCLUSION FROM WILDERNESS.—Regardless of the level of the Gunnison River, no portion of the Gunnison River is included in the Wilderness.

(i) EFFECT.—Nothing in this subtitle—(1) diminishes the jurisdiction of the State with respect to fish and wildlife in the State; or (2) imposes any Federal water quality standard upstream of the Conservation Area or within the mainstem of the Gunnison River that is more restrictive than would be applicable had the Conservation Area not been established.

(j) VALID EXISTING RIGHTS.—The designation of the Conservation Area and Wilderness is subject to valid rights in existence on the date of enactment of this Act.

SEC. 2406. MANAGEMENT PLAN.

(a) IN GENERAL.—Not later than 3 years after the date of enactment of this Act, the Secretary shall develop a comprehensive management plan for the long-term protection and management of the Conservation Area.

(b) PURPOSES.—The management plan shall—

(1) describe the appropriate uses and management of the Conservation Area;

(2) be developed with extensive public input;

(3) take into consideration any information developed in studies of the land within the Conservation Area; and

(4) include a comprehensive travel management plan.

SEC. 2407. ADVISORY COUNCIL.

(a) ESTABLISHMENT.—Not later than 180 days after the date of enactment of this Act, the Secretary shall establish an advisory council, to be known as the ''Dominguez-Escalante National Conservation Area Advisory Council''.

(b) DUTIES.—The Council shall advise the Secretary with respect to the preparation and implementation of the management plan.

(c) APPLICABLE LAW.—The Council shall be subject to—

(1) the Federal Advisory Committee Act (5 U.S.C. App.); and

(2) the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.).

(d) MEMBERS.—The Council shall include 10 members to be appointed by the Secretary, of whom, to the extent practicable—

(1) 1 member shall be appointed after considering the recommendations of the Mesa County Commission;

(2) 1 member shall be appointed after considering the recommendations of the Montrose County Commission;

Attachment 1-12

BLM_0015529

(3) 1 member shall be appointed after considering the recommendations of the Delta County Commission;

(4) 1 member shall be appointed after considering the recommendations of the permittees holding grazing allotments

within the Conservation Area or the Wilderness; and

(5) 5 members shall reside in, or within reasonable proximity to, Mesa County, Delta County, or Montrose County,

Colorado, with backgrounds that reflect—

(A) the purposes for which the Conservation Area or Wilderness was established; and

(B) the interests of the stakeholders that are affected by the planning and management of the Conservation Areaand Wilderness.

(e) REPRESENTATION.—The Secretary shall ensure that the membership of the Council is fairly balanced in terms of the points of view represented and the functions to be performed by the Council.

(f) DURATION.—The Council shall terminate on the date that is 1 year from the date on which the management plan is adopted by the Secretary.

SEC. 2408. AUTHORIZATION OF APPROPRIATIONS.

There are authorized to be appropriated such sums as are necessary to carry out this subtitle.

Attachment 1-13

## Appendix 2:  Map of NCA & Wilderness Area



Attachment 1-14

BLM_0015531

# Appendix 3:  List of Current Grand Junction/Uncompahgre Management Plans

Management of the Dominguez-Escalante National Conservation Area is currently guided by the following management and activity-level plans:

- Grand Junction RMP -- The Grand Junction Resource Area RMP, approved in January 1987, covers approximately 1.28 million acres of public land. Since being approved, the RMP has been amended 12 times and adjusted through plan maintenance 43 times. Amendments relevant to this planning area include:
  - Grand Junction Field Office/Colorado National Monument Interagency Fire Management Plan (updated annually)
  - Allotment Management Plans
  - Grand Valley Habitat Management Plan
  - Grand Junction Resource Area Wilderness FEIS and Wilderness Study Report

- Uncompahgre Basin Resource Management Plan -- The Uncompahgre Basin Resource Area RMP, approved in July 1989 covers approximately 1.38 million acres of public lands. Amendments relevant to this planning area include:
  - Allotment Management Plans
  - Land Use Disposal Plan (1992)
  - Fire Management Plan (updated annually)

Attachment 1-15

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

---

# MINERAL POTENTIAL REPORT
For The
Grand Junction Resource Area
Grand Junction Field Office

---

Grand Junction Planning Area
Encompassing Approximately 1.2 million acres
Garfield, Mesa and Montrose Counties, Colorado

Prepared By:

/s/ Jim Burnell
(Signature)

Energy and Minerals, Program Manager - CGS
(Title)

March 24, 2010
(Date)

Technical Approval:

/s/ John Morrone,  /s/Scott Gerwe
(Signature)

COSO Geologist,  GJFO Geologist
(Title)

July 13, 2010,   June 17, 2010
(Date)

Management Acknowledgement:

Catherine Robishers
(Signature)

Field Manager
(Title)

2/7/11
(Date)

BLM_0015534

# TABLE OF CONTENTS

Chapter                                                                 Page

1.   INTRODUCTION ........................................................................................1-1
     1.1   Purpose and Scope ..........................................................................1-1
     1.2   Lands Involved and Record Data ......................................................1-1

2.   GEOLOGY IN THE RESOURCE AREA ...................................................2-1
     2.1   Stratigraphy ...................................................................................2-1
           2.1.1   Precambrian ........................................................................2-3
           2.1.2   Cambrian, Ordovician, Silurian, Devonian, Mississippian ...........2-4
           2.1.3   Pennsylvanian .....................................................................2-4
           2.1.4   Permian ..............................................................................2-5
           2.1.5   Triassic ...............................................................................2-5
           2.1.6   Jurassic ..............................................................................2-6
           2.1.7   Cretaceous .........................................................................2-10
           2.1.8   Tertiary ..............................................................................2-12
     2.2   Structural Geology and Tectonics .....................................................2-14
           2.2.1   Proterozoic Structural Elements .............................................2-16
           2.2.2   Late Paleozoic Structural Elements ........................................2-16
           2.2.3   Late Mesozoic and Early Cenozoic Structural Elements ...........2-17
           2.2.4   Cenozoic Structural Elements ................................................2-18
           2.2.5   Evaporite Flow Structures .....................................................2-18

3.   DESCRIPTION OF ENERGY AND MINERAL RESOURCES .......................3-1
     3.1   Leasable Minerals ...........................................................................3-2
           3.1.1   Coal ...................................................................................3-2
           3.1.2   Oil Shale .............................................................................3-5
           3.1.3   Potash and Sodium ..............................................................3-5
     3.2   Locatable Minerals ..........................................................................3-6
           3.2.1   Uranium-Vanadium ..............................................................3-6
           3.2.2   Gold ...................................................................................3-7
           3.2.3   Copper ...............................................................................3-7
           3.2.4   Silver .................................................................................3-7
     3.3   Salable Minerals .............................................................................3-7
           3.3.1   Sand and Gravel ..................................................................3-7
           3.3.2   Dimension and Decorative Stone ...........................................3-8
           3.3.3   Clay ...................................................................................3-9

4.   MINERAL EXPLORATION, DEVELOPMENT, AND PRODUCTION ............4-1
     4.1   Coal .............................................................................................4-1
           4.1.1   Oil Shale .............................................................................4-3
           4.1.2   Potash and Salt ...................................................................4-3
     4.2   Locatable Minerals ..........................................................................4-4
           4.2.1   Uranium and Vanadium ........................................................4-4
           4.2.2   Gold ...................................................................................4-6
           4.2.3   Copper ...............................................................................4-7
           4.2.4   Silver .................................................................................4-8
     4.3   Salable Minerals .............................................................................4-9

July 2010          *Mineral Potential Report for the Grand Junction Resource Area*          i
*US Department of the Interior, Bureau of Land Management, Grand Junction Field Office*

BLM_0015535

# TABLE OF CONTENTS *(continued)*

Section | Page

| 4.3.1 | Sand and Gravel | 4-9 |
| 4.3.2 | Dimension Stone | 4-9 |
| 4.3.3 | Clay | 4-10 |

**5.** **POTENTIAL FOR OCCURRENCE AND DEVELOPMENT OF ENERGY AND MINERAL RESOURCES** .... 5-1

| 5.1 | Leasable Minerals | 5-2 |
| | 5.1.1 Coal | 5-2 |
| | 5.1.2 Oil Shale | 5-3 |
| | 5.1.3 Potash and Sodium | 5-3 |
| 5.2 | Locatable Minerals | 5-4 |
| | 5.2.1 Uranium and Vanadium | 5-4 |
| | 5.2.2 Gold | 5-5 |
| | 5.2.3 Copper | 5-5 |
| | 5.2.4 Silver | 5-7 |
| 5.3 | Salable Minerals | 5-7 |
| | 5.3.1 Sand and Gravel | 5-7 |
| | 5.3.2 Dimension and Decorative Stone | 5-7 |
| | 5.3.3 Clay | 5-8 |

**6.** **REASONABLY FORESEEABLE DEVELOPMENT** .... 6-1

| 6.1 | Leasable Minerals | 6-1 |
| | 6.1.1 Coal | 6-1 |
| | 6.1.2 Oil Shale | 6-4 |
| | 6.1.3 Potash and Salt | 6-4 |
| 6.2 | Locatable Minerals | 6-5 |
| | 6.2.1 Uranium and Vanadium | 6-5 |
| | 6.2.2 Gold | 6-6 |
| | 6.2.3 Copper | 6-6 |
| | 6.2.4 Silver | 6-6 |
| 6.3 | Salable Minerals | 6-6 |
| | 6.3.1 Sand and Gravel | 6-6 |
| | 6.3.2 Dimension and Decorative Stone | 6-7 |
| | 6.3.3 Clay | 6-7 |

**7.** **SUMMARY AND CONCLUSION** .... 7-1

**8.** **REFERENCES** .... 8-1

# FIGURES

Page

1. Correlation Chart of Geologic Strata for the Grand Junction Project Office .... 2-2
2. Generalized Structural Geology .... 2-15
3. Historic Coal Mine Locations in the GJFO Planning Area .... 4-2
4. Price of Gold from 1989 to 2009 .... 4-7
5. Average Annual Copper Spot Price from 1991 to 200 .... 5-6

BLM_0015536

# TABLES

<div style="text-align: right">Page</div>

Table 3-1 Coal Quality Values for Historic and Active Coal Mines in the Grand Junction Area ..........3-4
Table 3-2 Coal Quality Values for Historic Mines and Coal Development Wells in the Grand Junction
    Area..................................................................................................................................3-4
Table 3-3 Oil Shale Resources within the GJFO Planning Area .........................................................3-5
Table 4-1 Historic Coal Production in the GJFO Planning Area.........................................................4-2
Table 4-2 Size of Deposits in Uravan District of Colorado ................................................................4-5
Table 6-1 Original Coal Resources by Depth for the Mesaverde Group Coals, GJFO Planning Area ..6-2
Table 6-2 Acreage for Hypothetical Coal Mines in Mesaverde Group, by Category............................6-3

# APPENDICES

A       Maps

BLM_0015537

| ACRONYMS AND ABBREVIATIONS | Full Phrase |
|---|---|
| Bbbl/sqmi | billion barrels of oil in-place per square mile |
| BLM | United States Department of the Interior, Bureau of Land Management |
| Btu/lb | British Thermal Units per pound |
| CGS | Colorado Geological Survey |
| DOE | United States Department of Energy |
| FSI | Free Swelling Index |
| GIS | geographic information systems |
| GJFO | Grand Junction Field Office |
| GMUG | Grand Mesa, Uncompahgre, and Gunnison National Forests |
| IAEA | International Atomic Energy Agency |
| K2O | potassium oxide |
| Kbc | Burro Canyon Formation |
| Kd | Dakota Sandstone |
| Kdb | Dakota-Burro Canyon |
| Ma | million years before present |
| NURE | National Uranium Resource Evaluation |
| R&D | research and development |
| US | United States |
| USGS | United States Geological Survey |
| $U_3O_8$ | triuranium octoxide |
| $V_2O_5$ | vanadium oxide |

BLM_0015538

# CHAPTER 1
# INTRODUCTION

## 1.1   PURPOSE AND SCOPE

The purpose of this mineral potential report is to assess and document the mineral resource occurrence and development potential within the Grand Junction Field Office (GJFO) planning area for the next land-use planning period (15-20 years). This report excludes an assessment of oil and gas resources, which is found under a separate report. The assessment and the information provided in this report are based upon published data and other information provided by the United States (US) Bureau of Land Management's (BLM) Colorado State Office and the GJFO, Federal and Colorado State agencies, and industry. No field studies were conducted. Identified mineral resources are classified according to the systems found in BLM Manuals 3031 and 3060.

This report provides an intermediate level of detail for mineral assessment as prescribed in BLM Manual 3031 for planning documents. Mineral information in this report will be used in the preparation of the GJFO Resource Management Plan and associated Environmental Impact Statement required by the Federal Land Policy and Management Act and the National Environmental Policy Act. Mineral resource occurrence ratings provided in this report are for all lands within the GJFO regardless of land ownership. (Note, however, that decisions in BLM resource management plans are limited to BLM-managed lands.) This report is not a decision document and does not present specific recommendations on the management of mineral resources.

## 1.2   LANDS INVOLVED AND RECORD DATA

The GJFO planning area is located in southwestern Colorado, encompassing nearly all of Mesa County, a large portion of southwestern Garfield County, and a small portion of northern Montrose County (**Appendix A**, **Map 1**, Surface Management Status). The boundaries of the GJFO do not necessarily follow geologic or political boundaries except for the Colorado-Utah state line on the west. The area includes the Grand Valley and the west end of the Grand Mesa, the Piceance Basin, the Uncompahgre Plateau, and the west end of the White River Uplift. The Colorado, Gunnison, and Dolores Rivers flow through the area.

BLM_0015539

Land ownership and administration of the GJFO planning area are shown on **Appendix A**, **Map 1** and **Map 2**, Subsurface Federal Mineral Ownership. The GJFO includes approximately 1,787,610 acres of land, of which approximately 1,063,321 are administered by the BLM.

The GJFO planning area encompasses lands where Federal mineral estate underlies surface lands not administered by the BLM. These lands include the Grand Mesa-Uncompahgre-Gunnison National Forests, 99,591 acres of the Dominguez-Escalante National Conservation Area, and 119,502 acres of the McInnis Canyons National Conservation Area.

BLM minerals management programs fall into three categories: leasable, locatable, and salable. Leasable minerals, including oil and gas, coal, potash, and sodium, are subject to disposal under the authority of the Mineral Leasing Act of 1920, as amended by lease. A classification for leasable minerals, such as a Known Recoverable Coal Resource Area or a Known Potash Leasing Area, defines an area where the BLM has determined there exists a potentially valuable deposit of such minerals and where competitive (versus noncompetitive) leasing is required. **Appendix A**, **Map 3**, Solid Mineral Lease Areas, shows existing leases and lands designated for leasing in the GJFO planning area (exclusive of oil and gas leases, since oil and gas are not included in the scope of this report.) Locatable minerals, including uranium, vanadium, gold, and copper, are subject to mining claim location under the amended authority of the Mining Law of 1872. **Appendix A**, **Map 4**, Mining Claims, shows the existing mining claims within the GJFO planning area. Salable minerals are subject to disposal under the authority of the Materials Act of 1947, as amended by contract sale or free use permit. Community pits are designated on known deposits of salable minerals for the purpose of ensuring a supply of material by providing a superior right over subsequent claims or entries of the lands. **Appendix A**, **Map 5**, Salable Mineral Disposal Areas, shows the existing areas of salable mineral disposals within the GJFO planning area.

BLM_0015540

# CHAPTER 2
# GEOLOGY IN THE RESOURCE AREA

The geologic history of the GJFO planning area involves tectonics, sedimentation, igneous activity, and erosion extending from the Precambrian Era to the present, with the current landscape resulting from uplift and erosion during the past five million years. **Figure 1**, Correlation Chart of Geologic Strata for the Grand Junction Field Office, is a correlation chart for rocks in the GJFO planning area. This figure provides a correlation chart for rocks across the GJFO planning area, with periods of sedimentary deposition and non-deposition, and includes rocks both on the surface and in the subsurface. The correlation chart displays the change in units laterally across the area and indicates variations in nomenclature from the east to the west. Following are discussions of the stratigraphy and structure of the area.

## 2.1   STRATIGRAPHY

Rocks in the GJFO planning area range in age from Precambrian to Quaternary, with some significant gaps. Precambrian rocks form the basement to the planning area, appearing in canyon bottoms in several places. Pennsylvanian-age Hermosa Group rocks are the oldest in the southwest part of the GJFO planning area, having formed in the Paradox Basin (including Paradox and Sinbad Valleys) prior to the uplift of the ancestral Rocky Mountains. The restricted circulation in the basin saw deposition of evaporites that have moved upward as diapiric structures with deposits of salt and potash.

The uplift in the Pennsylvanian and Permian Periods shed sediments to the west into the Paradox Basin, depositing the Cutler Formation, which consists of coarse clastic sediments. To the north and east, the strata overlying exposed Precambrian rocks are Triassic, representing a hiatus of some 400 million years and indicating a period of either erosion or non-deposition in those geographical areas. Intrusive activity emplaced veins and dikes through the Precambrian strata that host small deposits of copper, gold, and silver, along with other minerals.

BLM_0015541



**Figure 1.** Correlation chart of geologic strata for the Grand Junction Project Office, compiled and synthesized from Baars, 1972; Craig et al, 1972, Lachman-Balk, 1972; MacLachlan, 1972; McGookey, 1972; Peterson, 1972. Correlation chart is diagrammatic, representing generalized stratigraphy from A-A', shown on Map 5 (Geology.)

After the Chinle Formation was deposited in the Triassic Period, the GJFO planning area experienced a period of fluvial deposition, with river systems forming broad floodplains and deltas. The climate was arid for long periods of time, with deposition of windblown sands in a very dry environment occurring across the area. The development of a large inland sea, the Cretaceous Inland Seaway, introduced a period of deposition from floodplain to deep water as sea level fluctuated back and forth across the area. Numerous volcanic eruptions to the west of the area deposited felsic tuffs, especially during the Jurassic period. These tuffs are believed to be the source of uranium that was subsequently mobilized and redeposited in the sandstone stream channels of the underlying fluvial sediments in the Morrison Formation. The Cretaceous environment saw development of significant coal deposits in the fluvial, deltaic, and estuarine environments bordering the Cretaceous Interior Seaway.

Toward the end of the Mesozoic Era, Laramide deformation raised uplifts and downwarped basins, leading to the maturation of the natural gas deposits found in the Piceance Basin of the GJFO planning area. The seaway disappeared by the Tertiary Period, replaced by large lake systems. These lakes received clastic sediments from the surrounding uplands and were also the site for the quiet-water, varve-like deposition of the oil shale of the Green River Formation. Since that time, the lakes disappeared and the arid climate has taken over, with movement and deposition of sediments shed off the higher features dominating the landscape.

### 2.1.1   Precambrian

Precambrian rocks occur in the southwest portion of the GJFO planning area where they have been exposed by erosion beneath Paleozoic strata. No specific studies have been conducted on the geology of the Precambrian rocks within the GJFO planning area. Descriptions of the rocks and additional information are available from the Gunnison River area to the east.

Cater (1955c) briefly noted the Precambrian crystalline rocks present in the northeast corner of the Gateway quadrangle. Most of the exposed rock is a gray, medium-grained granite containing masses of partially assimilated schist and gneiss. The gray granite is intruded by pink, coarse-grained granite, dikes of pegmatite and aplite, and dark hornblende-rich dikes.

Hansen's (1965, 1968, 1971) mapping in the Black Canyon area divided the Precambrian rocks into metamorphic and igneous suites. Metamorphic rocks included quartz-mica gneiss, mica schists, sillimanite schist, amphibolites, and migmatites. The igneous rocks are the Pitts Meadow Granodiorite (Hansen 1968), the Vernal Mesa and Curecanti Quartz Monzonites, and smaller volumes of rocks intruded into those older plutonic bodies, including aplites, pegmatites, lamprophyres, and diabases.

Hansen and Peterman (1968) radiometrically dated the rocks of the Black Canyon area. Their dates indicate that the Pitts Meadow Granodiorite is the oldest of the intrusive rocks at 1730 million years before present (Ma) ± 190 Ma. The quartz monzonites date at 1480 Ma (Vernal Mesa) and 1420 Ma (Curecanti), and the lamprophyres date at 1420 Ma. The youngest rocks are the diabases that intrude the other units, dated at 510 Ma–actually Paleozoic, rather than Proterozoic.

Day and Bove (2004) assigned the supracrustal rocks (metavolcanics and metasediments) an age of 1.8 to 1.7 billion years before events elsewhere in Colorado. The Pitts Meadow Granodiorite is

BLM_0015543

the age of the Routt Plutonic Suite, and the Curecanti event in the Black Canyon area is roughly the age of the Berthoud Plutonic Suite.

Toth et al. (1983, 1987) looked in more detail at the Precambrian crystalline rocks of the GJFO planning area in their study of the Dominguez Canyon Wilderness Study Area. They distinguished four separate units interpreted to be supracrustal in origin:

- Pink and grey gneissic biotite schists;
- Gray and pink medium-grained mica schist with felsic xenoliths;
- Pink, yellow, and gray medium-grained gneiss with a well-defined schistosity; and
- Black to dark blue and gray to black medium-grained amphibolites.

Intrusive units distinguished in their study include the following:

- Pink and white foliated granular granite;
- Pink and gray medium-grained biotite-hornblende granite;
- White to gray coarse-grained biotite granodiorite;
- Green coarse-grained biotite hornblendite (completely chloritized); and
- Pegmatites.

All the units are cut by metamorphosed diabase dikes of hornblende biotite garnet, striking northwest with low dips. Pegmatites cross-cut the diabases in the Big Dominguez Creek area. Those pegmatites are vertical, with the northeast-southwest strike.

## 2.1.2   Cambrian, Ordovician, Silurian, Devonian, Mississippian
No strata of early Paleozoic age occur within the GJFO planning area, and Mississippian rocks, while present in the subsurface, are not represented at the surface and thus do not appear on geologic maps.

## 2.1.3   Pennsylvanian

### *Hermosa Group*
Hermosa Group rocks appear in the Sinbad Valley in the far southwest corner of the GJFO planning area. Salt and gypsum beds of the Paradox Formation belonging to the Hermosa Group have pierced the overlying strata. These appear as contorted beds of salt diapirs associated with a limestone unit, possibly the Honaker Trail Formation, the unit which overlies the Paradox stratigraphically (Shoemaker 1955a, 1955b). The nature of the occurrence precludes a determination of the thickness of the Hermosa Group, but Cater (1955a) notes that a well drilled in the Paradox Valley, immediately south of the GJFO planning area, penetrated 2,300 feet of limestone believed to be the Honaker Trail Formation before encountering anhydrite beds of the Paradox Formation.

The Paradox Formation is a cyclical sequence of evaporites and shales, bounded on the top and bottom by black shales (Condon 1992). No conclusion has been reached as to the cause of the

BLM_0015544

cyclicity, being either eustatic or tectonic. The adjacent Uncompahgre highlands were uplifted from Pennsylvanian through Permian time and could well have influenced the sedimentation in the Paradox depositional basin.

The Paradox Valley, adjacent to the Sinbad Valley in the GJFO planning area, contains well-known potash deposits, including a Known Potash Leasing Area (US BLM 2005). The same potash-bearing geology occurs in the Sinbad Valley and is classified by the US Geological Survey (USGS) (DeCicco et al. 1977) as a resource area for potash.

### 2.1.4   Permian

#### Rico Formation
The Rico Formation is composed of conglomeratic sandstone and arkose with some interbedded shale and limestone. Condon (1992) discussed controversy surrounding the recognition of the Rico as a transitional facies between marine strata of the Hermosa below and the continental sequence above represented by the Cutler Group above. His conclusion, based on drillhole and geophysical data, was that the use of the name Rico Formation has merit.

Within the GJFO planning area, the Rico Formation has been mapped only in a small area of the Juanita Arch quadrangle, but may appear in other locations in the Sinbad Valley.

#### Cutler Group
The Cutler Formation of Permian age consists of maroon, purple, red, and mottled light-red, arkosic conglomerate and some sandy mudstone. In the Davis Mesa quadrangle just south of the GJFO planning area, the Cutler Formation consists of a basal limestone, alternating with the arkosic sandstones upward in the section (Cater 1955a, 1955b, 1955c). The conglomeratic units contain clasts of granite, gneiss, schist, and quartzite, in addition to mineral grains.

The Cutler Formation is exposed along the Dolores River below Gateway and along West Creek (Schwochow 1978). Measured to be as thick as 3,500 feet (Condon 1992), the unit thins and pinches out against the rocks of the Uncompahgre Uplift. The Cutler Group is interpreted by Mack and Rasmussen (1984) as the proximal section of alluvial fan sediments shed by the ancestral Rocky Mountains of the Uncompahgre Plateau. They detail five different facies of the formation, including debris-flow facies, water-laid deposits, laterally continuous streamflood facies, braided stream facies, and sheetflood facies.

No mineral resources are known in the Permian rocks.

### 2.1.5   Triassic

#### Moenkopi Formation
The Moenkopi Formation is a sequence of mostly coarse-grained terrestrial sediments. Shoemaker (1955a, 1955b) and Cater (1955a, 1955b, 1955c) recognized three members in the adjacent Roc Creek, Juanita Arch, and Davis Mesa quadrangles, respectively: (1) a lower red sandy mudstone and silty sandstone with thin beds of gypsum; (2) a middle member of arkosic conglomerate and conglomeratic sandstone with interlayered thin shales, and (3) an upper micaceous brown sandstone and shale sequence. Numerous names have been proposed and

BLM_0015545

adopted for the Moenkopi members across the Colorado Plateau, but these have not yet been applied to the sequence in the GJFO planning area.

The members have been interpreted by Cater (1970) to represent terrain that began with shallow standing-water deposition, moving to a fluvial regime in the middle member, and returning to the shallow, standing-water environment in the upper member. The Moenkopi has generally been considered to represent a shoreline environment across the Plateau. The unit is approximately 500 feet thick in the southwest corner of the GJFO planning area.

### Chinle Formation

The Chinle Formation of Upper Triassic age also appears in the southwest corner of the GJFO planning area. The unit is a red siltstone with interbedded fine-grained siltstones. Those are interbedded with conglomeratic units which are considered to be equivalent to the Shinarump Member that occurs in greater abundance to the south and west. Some cross-bedding and ripple marks can be found.

The Chinle Formation is interpreted as a braided stream facies. The Shinarump Member lenses and channels represent stream channels and other coarse debris that probably filled the lower valleys (Blakey and Ranney 2008).

In the GJFO planning area, Chinle Formation outcrops are commonly obscured by talus from overlying sandstones. In many places, the Chinle Formation lies directly on Precambrian rocks, representing a profound unconformity, with no strata present between the Precambrian and the Triassic, a hiatus of at least 400 million years. As it moves south, the unit thickens from 100 feet at Grand Junction to nearly 300 feet at Gateway (Schwochow 1978; Cater 1955c).

### 2.1.6   Jurassic

The Glen Canyon Group is the collective term for three distinctive units of terrestrial sediments that provide the character of the Colorado Plateau's spectacular scenery. The Glen Canyon Group has been divided into three units, discussed in detail below.

### Wingate Sandstone

The Wingate Sandstone is a massive, fine-grained, red-gray to tan eolian sandstone that lies unconformably on the Chinle Formation. The unit displays cross-bedding characteristic of dune sands. Bedding ranges in thickness, from several inches to several feet, and weathers in a blocky to slab-like fashion (Scott et al. 2002).

The unit consists of sands that were supplied by streams from the east, deposited by ephemeral streams, and subsequently windblown across the terrain (Blakey and Ranney 2008).

The Wingate Sandstone ranges from 275 to 400 feet thick where exposed in the GJFO planning area. The unit is a distinctive cliff-former, enhanced by prominent vertical jointing. Exposures are especially notable in the Colorado National Monument, where it is the predominant rock type.

BLM_0015546

### Kayenta Formation

Conformable with the Wingate Sandstone is the Kayenta Formation, a varicolored sandstone containing thin-bedded shale and red siltstone layers. Most of the sandstone is thin-bedded and flaggy. Conglomerate and mudstone occur in the upper half of the unit (Scott et al. 2002).

The Kayenta Formation was formed as braided alluvial streams that were prograded over the desert terrain during Wingate time.

As a result of the interbedded shales and lensoidal sandstones, the Kayenta Formation weathers to form benches and ledges above the cliffs of Wingate Sandstone. The unit is harder and more tightly cemented near the bottom, shielding the underlying Wingate Formation from erosion and preserving the cliff faces. Thickness typically varies from 90 to 220 feet; however, it may change abruptly over short distances (Cater 1955c).

### Navajo Sandstone

The Navajo Sandstone is a fine-grained, gray to buff, cross-bedded sandstone of windblown origin. It represents a return to the desert environment that dominated before the deposition of the Kayenta Sandstone. The prominent cross-bedding is characteristic of this unit.

The unit thickens to the east, from thin exposures in Maverick Canyon, reaching a thickness of 260 feet that occurs only in the far southwest corner of the GJFO planning area. The unit forms rounded hills caused by disintegration of the sandstone.

### Entrada Sandstone/Carmel Formation

The Carmel, Entrada, and Summerville Formations together comprise the San Rafael Group. Shoemaker (1955a, 1955b) and Cater (1955a, 1955c) did not distinguish the lower two units because of the scale of their mapping and the relatively thin units, but they are nonetheless easily distinguishable in the field.

The Carmel Formation is composed of tan and red sandstones, siltstones, and mudstones grading upward from the underlying coarser-grained Navajo Sandstone. Cater (1955a, 1955b, 1955c) interpreted that the Carmel Formation sediments were deposited on an irregular Navajo Formation terrain, accounting for variations in the thickness. In many places, the Carmel Formation consists of reworked Navajo Sandstone, and it is interpreted to represent a complex suite of deposition along a fluctuating shoreline.

The Entrada Sandstone is a picturesque unit of orange, red, and white eolian sandstone overlying the Carmel Formation. The unit consists of two parts, according to Scott et al. (2002). The prominent Slick Rock Member forms characteristic bulging, massive cliffs of sandstone with pits formed by differential weathering that occur up to a foot across. Above that is a unit referred to as the "board beds." This is interbedded resistant sandstone and mudstone that form outcrops resembling a stack of boards. The Entrada Sandstone was formed as dunes once again encroached over the area. The "board beds" unit is interpreted as an interdune, wet sand flat environment, described by Blakey and Ranney (2008) as a sabkha environment. The total thickness of the Carmel-Entrada sequence ranges from 10 to more than 100 feet.

BLM_0015547

### Summerville Formation/Wanakah Formation

The Summerville Formation has a type section in Utah and was originally mapped in the GJFO planning area of the Colorado Plateau (Shoemaker 1955a, 1955b; Cater 1955a, 1955b, 1955c, 1970). The sequence is described as silty shales, sand, and thin-bedded mudstones exhibiting even, thin horizontal bedding. Cater (1955a, 1955b, 1955c) described a thin dark gray freshwater limestone in the upper part of the section. The interpreted gradational contact between the Summerville and the overlying Morrison Formation made distinguishing the two quite difficult. Schwochow (1978) described the Summerville Formation as forming debris-littered slopes beneath the more resistant sandstones of the Morrison Formation.

More recently, geologists working to the north and east of the Uravan Mining District have stopped using the term Summerville Formation and have interpreted instead that the top of the San Rafael Group in Colorado is represented by the Wanakah Formation. Molenaar (1981) showed the Summerville Formation and the Wanakah Formation roughly time-equivalent in Utah and Colorado, respectively. Pipiringos and O'Sullivan (1978) interpreted the Summerville Formation as pinching out west of Colorado, but did not use the term Wanakah. O'Sullivan (1992) presented an interpretation that the Summerville and Wanakah Formations are both truncated by a regional unconformity which is, in turn, overlain by the basal Morrison Formation, the Summerville to the west and the Wanakah to the east. He interpreted the Summerville Formation to be younger than the Wanakah Formation, but shows no correlation between the Wanakah Formation and any of the other western San Rafael Group units, although Toth et al. (1987) used the Wanakah terminology in their study of the Dominguez Canyon Wilderness Study Area.

Scott et al. (2002) describe the Wanakah in the Colorado National Monument as mostly interstratified mudstone with 5 to 15 percent sandstone and silty sandstone and up to 5 percent impure limestone. Traces of volcanic ash and gypsum also occur. The unit throughout the GJFO planning area is rather thin, probably not exceeding 100 feet in thickness.

It is not known if the unit mapped as Summerville in the Uravan Mining District is equivalent to the Wanakah Formation.

### Morrison Formation

The Morrison Formation is a varied assemblage of siltstones, sandstones, and mudstones, ranging in thickness from 800 to 900 feet in the southwest to 500 to 600 feet near the city of Grand Junction. Four members are recognized in the Colorado Plateau region, but only three occur within the GJFO planning area – the Tidwell, the Salt Wash, and the Brushy Basin Members. The depositional environment of the Morrison Formation–braided streams, lakes, and deltas–provided what Blakey and Ranney (2008) describe as "one of the world's great dinosaur graveyards." The units are described individually.

### Tidwell Member

Mudstone characterizes the Tidwell Member, with minor beds of sandstone and limestone. The mudstone is grayish-red to graying-yellow-green, with sandy siltstone, silty claystone, and siltstone, generally quite thin. Sandstone is light gray to greenish gray, rather fine-grained and well-sorted, with local bioturbation.

BLM_0015548

Limestone beds present in the upper section represent the only limestones in the Colorado National Monument area. The unit is 125 feet thick in the National Monument (Scott et al. 2002).

The Tidwell Member probably represents deposition in freshwater to brackish environments (Scott et al. 2002).

*Salt Wash Member*

Over much of its extent, the Salt Wash Member consists of alternating beds of siltstone or mudstone with lenticular sandstone. Near the base, persistent limestone beds are not uncommon (Lohman 1965). Sandstone predominates in the Uravan Mining District of the GJFO planning area. Cater (1955c) describes the sandstone facies in the Gateway quadrangle as traceable as ledges in outcrop for long distances, but individual beds within a stratum are lenticular and discontinuous, wedging out laterally where others wedge in, forming interfingering lenses in a mudstone matrix. This configuration is indicative of the depositional environment of meandering and anastamosing stream channels. It is these channels that host the abundant uranium deposits of the area.

The Salt Wash Member decreases in thickness from 600 feet in Utah to 200 to 300 feet in the Grand Junction area. As one approaches Grand Junction from Utah, the nature of the rocks changes from a sandstone-mudstone facies to claystone containing lenticular sandstones. To the east and north of Grand Junction, the Salt Wash Member ceases to be a recognizable unit. The Salt Wash units form cliffs and steep slopes above the less resistant units beneath (the Summerville and Wanakah Formations).

The environment of deposition was probably a series of flat floodplains and marshy areas, rich in vegetation. Rivers meandered across the terrain, contributing abundant organic material to the sedimentary pile and providing habitat for the fauna whose fossils remain.

*Brushy Basin Member*

The Brushy Basin Member is predominantly mudstone and siltstone, but it contains some beds of sandstone, limestone, and bentonitic mudstone. The sequence is characteristically colored, with red, purple, and green units. In the Uravan Mining District, beds are commonly notable by their turquoise blue-green color.

Deposition in a fluvial to lacustrine environment is indicated for the Brushy Basin Member (Lohman 1965). Aubrey (1992) describes the Brushy Basin Member as the "world's largest and oldest known playa lake complex." Notable particularly in the southern portion of the area is the contribution of volcanic tuffs. Alteration of these tuffs to bentonite and other secondary minerals have created the colors characteristic of Brushy Basin units. Furthermore, it is believed that these silicic tuffs are the source for uranium and vanadium that has been deposited in the sandstone channels of the underlying Salt Wash Member. The unit varies in thickness from around 95 feet in the Colorado National Monument area (Scott et al. 2002) to over 400 feet to the south in the Rock Creek quadrangle (Shoemaker 1955a).

BLM_0015549

### 2.1.7    Cretaceous

***Burro Canyon Formation***
In the GJFO planning area, the Burro Canyon Formation comprises a sequence of sandstones, siltstones, and green and red shales with a basal conglomerate, very much like the Salt Wash Member of the Morrison Formation. The sequence represents a change from the predominantly silty beds of the Brushy Basin Member to the conglomerate and then more sandy units up through the stratigraphic section.

The Burro Canyon Formation caps gently sloping mesas in the area around the city of Grand Junction (Lohman 1965) at about 100 feet in thickness. The unit also occurs on mesa tops in the Gateway quadrangle, as the youngest unit present in that area. The environment of deposition was certainly similar to that of the Salt Wash Member – an area of broad floodplains and slow, meandering rivers.

***Dakota Sandstone***
The Dakota Sandstone is a widespread unit that appears in the GJFO planning area mainly as a pale orange to gray, fine-grained sandstone. A basal conglomerate rests unconformably on the Burro Canyon Formation in the Grand Junction area (Lohman 1965), but to the south, the contact between the two units becomes gradational (Steven and Hail 1989; Morgan et al. 2008). It grades laterally from a fluvial sandstone to conglomerate, carbonaceous mudstones and shale with thin coals, and to marine sandstone. The carbonaceous units contain numerous plant fossils while the sandstones show cross-bedding, bioturbation, and channel fills. The Dakota Sandstone contains coal beds that are mined to the south in the Nucla area.

Scott et al. (2002) describe the Dakota Sandstone as forming prominent ledges and ridges with steep slopes on the interbedded mudstones. The Dakota Sandstone is about 200 feet thick through much of the area, thinning somewhat to the south.

The Dakota Sandstone was formed as the Cretaceous Interior Seaway encroached from the east, leading to the formation of delta, bar, swamp, and shoreline facies (Blakey and Ranney 2008). Dolson and Muller (1994) interpret the Dakota as a stack of strata comprising four separate sequences, reflecting tectonic and eustatic sea level fluctuations along the western edge of the interior sea.

The Dakota Sandstone in many locations forms a very hard, resistant quartzite.

***Mancos Shale***
The Mancos Shale is a sequence dominated by rocks formed offshore of the Cretaceous Interior Seaway. The total unit is 3,450 to 4,150 feet thick in the Piceance Basin (Hettinger and Kirschbaum 2002) and grades upward and intertongues with the overlying Mesaverde Group.

The Mancos Shale is generally a gray to brown fissile shale with interbedded calcareous and silty zones and limestones (Scott et al. 2002). Morgan et al. (2008), working just south of the GJFO planning area, defined nine separate members of the Mancos Shale; their work can be consulted for details.

BLM_0015550

Topographically, the Mancos Shale forms gentle slopes broken by calcareous sandstones and containing occasional white bentonite layers. The complex unit is interpreted as deposition in changing offshore environments, from distal turbidites to near-shore muds, silts, and sandstones.

### Mesaverde Group

The Mesaverde Group overlies the Mancos Shale throughout the GJFO planning area, comprising a thick sequence of rocks deposited shoreward of the Mancos Shale as the seaway regressed across the area toward the east. Because of the direction of the shoreward migration, the underlying Mancos Shale persists later in time to the east; rocks of the Mesaverde Group enter the section later in Colorado than in Utah. The stratigraphy has been studied carefully because of the presence of the economic coal deposits formed in the near-shore swamp and lagunal environments. Most of the discussion is derived directly from Hettinger and Kirschbaum (2002), who summarized most of the previous work to present a coherent comprehensive picture of the sequence.

The lowermost unit of the Mesaverde Group is the Castlegate Sandstone. Not a major unit in Colorado, the Castlegate Sandstone does occur in the GJFO planning area, pinching to a thin tongue in the Piceance Basin (Young 1983).

The Sego Sandstone is defined in the Sego Canyon of Utah. It is separated from the Castlegate Sandstone by the Buck Tongue of the Mancos Shale and is divided higher up the section into two parts by another tongue of the Mancos Shale – the Anchor Mine Tongue. The Sego Sandstone is a fine- to medium-grained sandstone interpreted by Young (1983) to be delta-front and delta plain sediments. The Anchor Mine Tongue is 100 feet thick at the Colorado-Utah state line, thickening and merging with the main body of Mancos Shale at East Salt Creek. The Sego Sandstone was being deposited in the western part of the area while the Mancos Shale was still being deposited in the offshore areas to the east.

### Mount Garfield Formation

Atop the Sego Sandstone in the Book Cliffs area is the Mount Garfield Formation, consisting of a sequence of brown to gray sandstone, siltstone, shale, and coal. The Mount Garfield is a shoreline and coastal plain facies characterized by three well-defined cliff-forming sandstones – the Corcoran Sandstone, the Cozzette Sandstone, and the Rollins Sandstone, all three considered members of the Mount Garfield Formation separated by tongues of Mancos Shale (Carrara 2000). These units are described below as they are also members of the Iles Formation to the east.

### Iles Formation

The Iles Formation is the next unit in the sequence in the east, considered by Hettinger and Kirschbaum (2002) to represent the Colorado equivalent of the Neslen Formation of Utah. In general, the Iles Formation is fine- to medium-grained sandstone, siltstone, mudstone, carbonaceous shale, and coal, formed along a coastal plan and lower alluvial plain under tidal influence. The Iles Formation is composed of three members–the Corcoran, the Cozzette, and the Rollins.

<u>Corcoran Member</u>. The Corcoran Member is very fine-grained sandstone, siltstone, shale, and coal, lying disconformably on the Sego Sandstone (Young 1983). The Corcoran forms 40 feet of delta plain deposits, including carbonaceous shale, coal, and minor sandstone at Big Salt Creek.

BLM_0015551

This represents the Palisade Coal Zone. The Corcoran Member is considered a tight gas sand and has been an exploration target.

Cozzette Member. The Cozzette Member is as thick as 230 feet, with the same description as the Corcoran Member. It contains the Chesterfield and Carbonera coal zones, the former defined in and restricted to Utah, while the Carbonera zone has been traced into Colorado to East Salt Creek. The Cozzette Member is also a tight gas sand target.

Rollins Sandstone Member. At the top of the Iles Formation sequence is the Rollins Sandstone Member. Ranging in thickness from 200 feet in the east to zero presence, it pinches out near Layton Wash north of Grand Junction. The Rollins Sandstone is a coarse-grained, cliff-forming sandstone formed in a near-shore marine environment. Near the top of the Rollins Sandstone is the Cameo coal zone, the uppermost coal zone of the Book Cliffs coal field.

*Williams Fork Formation*
Following the terminology and descriptions of Hettinger and Kirschbaum (2002), the Williams Fork Formation includes all the Cretaceous strata above the Rollins Sandstone east of the Utah border. This is a thick sequence, grading from 1,200 feet thick at the Utah state line to nearly 5,155 feet thick at the Grand Hogback. Included in the Williams Fork Formation are coal zones in two of the members. The description of the Williams Fork Formation is much the same as the Iles Formation – fluvial and coastal plain strata of sandstones, siltstones, carbonaceous shales, and some major coals.

Included in the Williams Fork Formation are the Paonia and Bowie Shale Members and the Cameo-Fairfield, South Canyon, and Coal Ridge coal zones. The Bowie Shale Member is nearly 1,000 feet thick, consisting of two coal-bearing coastal plain units overlain by marine shale and marginal sandstone. The Paonia Shale Member, up to 560 feet thick, also consists of coal-bearing coastal plain sediments but does not extend as far west as the GJFO planning area. An upper undifferentiated member is fluvial sandstone, conglomerate, siltstone, and shale. The top of the undifferentiated member consists of a kaolinitic sandstone that is correlated with the Ohio Creek Member of the Hunter Canyon Formation.

The Cameo-Wheeler coal zone occurs within the Williams Fork Member, intertonguing with the Rollins Sandstone and pinching out toward the south and west. The South Canyon and Coal Ridge coal zones both overlie and interfinger with the Bowie Shale but do not extend as far west as the GJFO planning area.

## 2.1.8   Tertiary
The Tertiary rocks in the GJFO planning area consist of Paleocene and Eocene formations described in the following sections.

***Paleocene***

*Wasatch Formation*
The main body of the Wasatch Formation ranges from 1,000 to nearly 6,000 feet in thickness, consisting primarily of varicolored sandstones and mudstones (Roehler 1992) representing floodplain, coastal plain, and lacustrine facies. Detailed mapping at 1:24,000 scale in the GJFO

BLM_0015552

planning area has identified three members of the Wasatch Formation – the Atwell Gulch of Late Paleocene age, the Molina of Paleocene-Eocene age, and the younger Shire Member (Donnell et al. 1984, 1985a; Donnell et al. 1992; Johnson 1985). The Atwell Gulch Member will be discussed in the Paleocene section, and the other two members will be discussed in the Eocene section.

<u>Atwell Gulch Member</u>. The Atwell Gulch Member is described as comprising three discernable portions. The lower section is 80 to 1,150 feet of black and gray claystone, and mudstone with some coals. Sandstones are mapped toward the south in the Mesa quadrangle (Donnell et al. 1984), while in DeBeque quadrangle, the Member is conglomeratic at the base and sits unconformably on the underlying Mesaverde Group. The unit disappears to the east, as it is not mapped in the Housetop Mountain or Hawxhurst quadrangles.

### Eocene

*Wasatch Formation*

<u>Molina Member</u>. Overlying the Atwell Gulch Member is the Molina Member of the Wasatch Formation. This unit is characterized by conspicuous gray to brown massive, ledge-forming sandstones, up to 50 feet thick and persistent laterally, interlayered with grey to greenish to lavender non-laminated mudstones.

<u>Shire Member</u>. The top member of the Wasatch Formation is the Shire Member. It is composed of mudstones and claystones with a few lenticular sandstones. The Shire Member thickens to the northeast, from as thin as 90 feet in the west to 1,700 feet in the Hawxhurst Mountain quadrangle in the northeast, where it is the only member of the Wasatch identified (Donnell et al. 1988).

The Wasatch Formation was formed at a time when Piceance and Uinta Basins were beginning to take form as they appear today. In the GJFO planning area, an onlap of coastal plain sediments was followed by wetland and lacustrine environments. In the Eocene, the system of lakes was expanding in the basin, with clastics sporadically introduced (the Molina Member).

*Green River Formation (Garden Gulch, Douglas Creek, Parachute Creek Members)*
The Green River Formation is found in the northeast corner of the GJFO planning area. The formation is divided into three members – the basal Anvil Points Member, the middle Garden Gulch Member, and the upper Parachute Creek Member. Earlier mapping by Johnson and Douglas (1980) in the Wagon Track Ridge quadrangle and by Donnell et al. (1984) in the Mesa quadrangle identified the Douglas Creek Member, but this appears to be at least equivalent to the Garden Gulch Member.

<u>Anvil Points Member</u>. The Anvil Points Member is primarily a massive, cliff-forming sandstone that thickens to the northeast, toward the axis of the Tertiary basin where it reaches 1,200 feet in thickness in the Hawkshurst Mountain quadrangle.

<u>Garden Gulch Member</u>. Above the Anvil Points, the Garden Gulch Member is mainly a carbonate unit, composed of light gray marlstone, light-gray oolitic limestone with ostracodal and algal limestone, some paper-thin shale, and thin sandstones. Thickness reaches 1,000 to 1,200 feet in the northeast of the GJFO planning area.

BLM_0015553

<u>Parachute Creek Member</u>. The youngest unit, the Parachute Creek Member, is composed of a gray-weathering marlstone that is a local cliff-former, containing minor beds of oil shale. The Mahogany Bed is a rich oil shale zone that occurs near the base of the Parachute Creek Member and reaches 120 feet of thickness within the GJFO planning area.

The Green River Formation reflects a large area with internal drainage. A large lake, with fluctuating shorelines, may have reached its maximum size at the time of the deposition of the oil-shale rich Mahogany Bed (Franczyk et al. 1992). By Late Eocene time, the lakes receded and, by the Oligocene, were gone.

*Uinta Formation*

The Uinta Formation occurs in the far northeast corner of the GJFO planning area, capping the Tertiary strata with 900 feet of light-colored, fine-grained sandstone with lesser marlstone and siltstone. The Uinta Formation is generally fossiliferous and represents clastic deposition along the margins of the retreating Eocene lake system.

***Quaternary***

Numerous unconsolidated Quaternary deposits occur within the GJFO planning area, including glacial deposits (map unit Qd), older gravels (map unit Qgo), colluvium (map unit Qc), and alluvial and eolian deposits (map unit Qae) (see **Appendix A**, **Map 6**, Generalized Geology). Sand and gravel deposits occur in the larger river channels and their associated higher-level terrace deposits.

## 2.2   STRUCTURAL GEOLOGY AND TECTONICS

The GJFO planning area covers a portion of the northeast corner of the Colorado Plateau geographic and structural province. Physiographic characteristics of this province reflect structural characteristics of the region that contrast with structurally more complex terrain surrounding it. As a structural province, the Colorado Plateau acts as a high-standing block of relatively undeformed rocks framed by complexly deformed rocks of the Middle and Southern Rocky Mountains provinces, which wrap around from north to east, and the Basin and Range Province to the south and west. It is characterized by large regions of nearly flat-lying Paleozoic and younger sedimentary formations occasionally broken up into broad uplifts bounded by monoclines and high-angle faults. This style typifies structural elements within the GJFO planning area, wherein Mesozoic and younger sedimentary rocks are relatively undeformed with the exception of a few very prominent structural features related to the geologic evolution of the northwest-trending Uncompahgre Plateau and adjoining Piceance Basin.

Structural elements within the GJFO planning area can be best described by those primary periods of deformation during which they were active. For purposes of this discussion, the primary periods include early evolution of the North American craton during the Proterozoic followed by the late Paleozoic uplift of the Ancestral Rocky Mountains and the subsequent compressional Laramide Orogeny during the late Mesozoic and early Cenozoic. Finally, a recent period of extensional deformation began in the mid Cenozoic and continues today. A fifth category is described that covers deformation caused by flowage of buried evaporite deposits that began shortly after burial in the Late Paleozoic and has continued off and on since. **Figure 2**, Generalized Structural Geology, depicts the major structural features in the GJFO planning area and vicinity.

BLM_0015554



**Figure 2: Generalized Structural Geology**

Grand Junction Field Office
Planning Area Mineral Potential Report

BLM_0015555

### 2.2.1   Proterozoic Structural Elements

The relatively undeformed nature of the Mesozoic and younger sedimentary formations at the surface within the GJFO planning area mask greater structural complexity at depth in the older rocks, particularly in the crystalline Proterozoic basement rocks. Exposure of Proterozoic rocks within the GJFO planning area is limited to a few narrow canyons on the Uncompahgre Plateau, such as Unaweep Canyon, and nearby canyons along the northeast edge of the Uncompahgre Plateau. Little direct information about the buried Proterozoic rocks can be obtained from within the GJFO planning area with such limited exposure; however, enough can be understood from regional exposures to have a basic understanding of the hidden terrain beneath the surface.

Day and Bove (2004) provide a comprehensive description of the evolution of the Proterozic rocks in this region. These rocks formed at the margin of the North American Craton in an island arc and back arc basin setting as a series of sedimentary and volcanic rocks that underwent metamorphism between approximately 1.8 and 1.7 billion years before present followed by intrusive events up to approximately 1.4 billion years before present. The regional structural grain of these rocks trends northeast, and the predominant deformational style is ductile associated with regional metamorphism. Subsequent brittle deformation is evidenced by the emplacement of mafic dikes and pegmatites with northeast trends in the Colorado National Monument area (Scott et al. 2002) and northwest trends in the Dominguez canyon area (Toth et al. 1983).

For the next nearly 1 billion years the area underwent erosion, with the next period of deposition starting approximately 520 Ma in the early Paleozoic (Day and Bove 2004). Stone (1977) postulates that development of the west-to-northwest-trending Garmesa and Uncompahgre fault zones may have occurred during this period of non-deposition in late Precambrian time. These fault zones were later reactivated as primary structures during development of the ancestral Uncompahgre highland as described below. Early to middle Paleozoic time was marked by repeated transgression and regression of shallow continental seas across the entire region. Tectonic activity was apparently limited; however, uplift along high angle faults resulted in erosion in central Colorado during the Early Ordovician epoch (De Voto 1990). There is very little preserved of this period of time in the GJFO planning area due to tectonic uplift and erosion during the late Paleozoic.

### 2.2.2   Late Paleozoic Structural Elements

During the Pennsylvanian and Permian Periods of the Late Paleozoic, around 300 to 250 Ma, the region underwent tectonism that resulted in the uplift and erosion of the Ancestral Rocky Mountains (De Voto 1980; Stone 1977). Fault-bound, uplifted highlands trending generally northwest to southeast arose, providing abundant sediments to adjacent basins. In Colorado these ancient mountain ranges included the Front Range and Apishapa highlands in the central part of the state and the Uncompahgre highland in the southwest part of the state. Basins adjacent to these highlands included the Central Colorado Trough, also known as the Eagle Basin, in the northwest part of the state, and the Paradox Basin that extended southwest of the Uncompahgre highland across much of the Four Corners region.

The ancestral Uncompahgre highland extended across most of the area now encompassed by the GJFO planning area and includes the modern day Uncompahgre Plateau. This uplift was bounded on the southwest by the Uncompahgre fault zone where there may have been as much as 20,000

BLM_0015556

feet of vertical displacement. This fault zone includes the Gateway Fault. Stone places the edge of the uplift along the Garmesa Fault Zone where there may have been up to at least 2,000 feet of vertical separation (Stone 1977). This edge of the ancestral highland is now concealed beneath Late Cretaceous and Tertiary sediments of the Piceance Basin.

Development of the highlands and basins continued into the Permian Period; however, tectonic activity was apparently most robust during the Pennsylvanian (Maughan 1980). By Middle Triassic, uplift of the highlands had pretty much ceased with the Chinle Formation being the first formation to completely blanket the region (Stone 1977).

### 2.2.3    Late Mesozoic and Early Cenozoic Structural Elements

Following a period of relative tectonic quiescence from the Middle Triassic through Early Cretaceous, around 240 Ma to 100 Ma, the region underwent a period of compressional tectonic deformation that developed many of the major structural and topographic features present today. This period of deformation began with regional subsidence along a north-south trending foreland basin east of the Sevier orogenic belt of west-central Utah (Day and Bove 2004). This broad foreland basin was flooded by the Cretaceous Interior Seaway. Eastward progression of the Sevier thrust front pushed the axis of deposition in the seaway to the east and eventually the seaway retreated. Tectonic deformation subsequently advanced into the Rocky Mountain region during Late Cretaceous and into the Eocene, from around 70 to 50 Ma, as manifested by the Laramide Orogeny. During this phase of deformation, Precambrian basement-cored uplifts were accompanied by subsidence of intervening basins. In many places this event reactivated faults developed during the earlier Proterozoic period and Late Paleozoic events.

Although the main Laramide mountain-building activity occurred in the Central and Southern Rocky Mountains, north and east of the Colorado Plateau, the area encompassed by the GJFO planning area was affected by this tectonic event. Laramide deformation within the relatively stable Colorado Plateau occurred primarily as broad uplifts bounded by monoclines and high-angle faults (Scott et al. 2002). Northwest-trending monoclines cored by high-angle reverse faults bound the modern Uncompahgre Plateau, a prominent topographic high extending across the southwestern portion of the GJFO planning area. Most notable of these structural features is the Redlands fault and monocline that form the dramatic southwest edge of the Grand Valley and pass through the Colorado National Monument. This feature offsets Mesozoic strata downward to the northeast approximately 1,800 feet (Scott et al. 2002). On the southwest side of the Uncompahgre Plateau, Laramide deformation resulted in as much as 1,300 feet of vertical displacement along the Uncompahgre fault zone (Heyman 1983).

The GJFO planning area also spans the southwest flank of the Piceance Basin, an asymmetric Laramide structural basin with its northwest-trending axis situated just west of the Grand Hogback. On this flank, strata dip gently to the northeast toward the axis. Subtle Laramide folds trending generally northwest sub-parallel to the basin axis deform the flank in a number of locations (Tyler 1995).

The Douglas Creek Arch is a broad north-south trending anticline that forms the west edge of the Piceance Basin in the northwest part of the GJFO planning area. This structural feature developed during the Laramide Orogeny contemporaneously with subsidence of the Piceance Basin and the Uintah Basin to the west (Johnson and Finn 1986) and exerted a strong influence on deposition

BLM_0015557

patterns of the Green River Formation. Late Cretaceous strata, deposited in the foreland basin at the edge of the Cretaceous Interior Seaway, are partially truncated by the arch, while the Paleocene and Eocene Wasatch and lower Green River Formations thin dramatically over the arch (Dubiel 2003). Upper members of the Green River Formation, including the oil shale-bearing Parachute Creek Member, display less thinning over the arch than the older members. These relationships, combined with distribution of clastic facies within the Green River Formation, suggest that at times the feature formed a sub-areal lowland separating the greater Eocene Lake Uinta into two lakes, one within the Piceance Basin and one within the Uinta Basin. By the time the Parachute Creek Member was deposited, the lakes had transgressed over the arch forming one large lake (Moncure and Surdam 1980).

### 2.2.4  Cenozoic Structural Elements

By the end of the Eocene, Laramide-style deformation in the region had waned. To the east, in the Southern Rocky Mountain region, this was followed by a period of voluminous volcanic activity, but little direct evidence of tectonic activity was preserved within the GJFO planning area. The next period of major tectonic activity affecting the region has been extensional deformation that began approximately 25 Ma in late Oligocene (Chapin and Cather 1994) and has continued through the Quaternary. While the most notable structural features developed during this phase are associated with the Rio Grande Rift to the east, there is evidence of deformation within the GJFO planning area. Regional uplift has led to broad erosion and deep incision of modern stream systems (McMillan et al. 2006; Moucha et al. 2008). Other evidence includes Pliocene arching of the Uncompahgre Plateau as summarized by Scott et al. (2002), and there are a number of northeast-trending normal faults developed on the Douglas Creek Arch that have probable post-Laramide ages (Johnson and Finn 1986). Possible Quaternary movement has been identified for several faults within the Uncompahgre Plateau (Witkind 1976; Kirkham and Rogers 1981).

### 2.2.5  Evaporite Flow Structures

The southwest corner of the GJFO planning area extends into the Paradox Basin and enters a structural region known as the Paradox fold and fault belt where unique structures have developed in response to flowage of Pennsylvanian evaporite deposits (Baars and Stevenson 1981; Doelling 1983). Within the GJFO planning area, the Sinbad Valley is one of these unique structures.

During basin subsidence in the Pennsylvanian and Permian periods, up to 20,000 feet of clastic sediments and evaporite deposits accumulated in the Paradox Basin; evaporite deposits, primarily salt, may account for a thickness of up to 8,000 feet in this wedge of sediments. These evaporite deposits began to flow and form elongate salt anticlines as they were buried beneath rapidly accumulating clastic sediments. Pre-existing, northwest-trending basement faults that may have originated in Late Precambrian, along with the main boundary faults of the ancestral Uncompahgre highland (Stone 1977), probably controlled alignment of the salt anticlines. Stratigraphic evidence suggests that upward salt flowage was rapid from Pennsylvanian through early Permian and continued into the Jurassic (Baars and Stevenson 1981). Flowage generally ceased as the source salt beds were depleted until uplift and erosion began to expose the salt anticlines to meteoric groundwater flow. Modern groundwater flow and surface dissolution have led to collapse of the anticline crests to form grabens within the anticlines.

BLM_0015558

# CHAPTER 3
# DESCRIPTION OF ENERGY AND MINERAL RESOURCES

This section of the report describes and analyzes the solid mineral resources of the GJFO planning area. The known history of occurrence and exploitation of important mineral resources is described along with the likelihood of continued or new development of these resources. These include the leasable minerals coal, oil shale, potash, and sodium; the locatable minerals uranium, vanadium, gold, and copper; and the salable mineral commodities clay, sand, gravel, and dimension or decorative stone. Oil and gas, including coalbed methane resources, are described and analyzed in a separate report entitled: Reasonably Foreseeable Development Scenario for Oil and Gas, Grand Junction, Field Office, Colorado (BLM 2010). Several other mineral commodities have been mined or described within the study area in the past. They will be noted for completeness, but all evidence indicates their occurrences are limited to small deposits or rather low-grade and thus are unlikely to be developed in the time period covered by this analysis. In that group are molybdenum, feldspar, mica, fluorspar, beryllium, quartz, and various minerals valued by collectors.

Molybdenum and silver have both been identified within the GJFO planning area. Worcester (1919) listed molybdenum prospects along fault zones in the Unaweep Canyon. No detailed information is available on those prospects, and no production was recorded. Similarly, both gold and silver were reported in accompanying copper mineralization in the Unaweep District (Colorado Bureau of Mines 1959), although no production figures were reported. Murphy and Houston (1955) reported of titaniferous beach sands within the Mesaverde Group, although no details were provided.

Reports of prospects and small operations for pegmatite minerals were found in the records of the Mineral Resources Data System. The commodities of interest include feldspar, mica, fluorspar, beryllium, and quartz. Records show that pegmatites were exploited off and on through the 1960s and 1970s at the Ladder Canyon and QE#2 Mines (Colorado Bureau of Mines 1956-1966; 1970-1979). There is no evidence of significant production, no operations permitted in the last thirty years, and no indication of current activity for those industrial minerals.

BLM_0015559

The GJFO planning area includes areas known to rockhounds as good sources of jasper, agate, petrified and opalized wood, geodes, amethyst, and other varieties of specimen minerals. Included are the following:

- Opalized wood at Glade Park, Pinion Mesa, and Opal Hill southeast of Fruita (Kappele 1995);

- Petrified wood, jasper and agate along West Salt Creek (Voynick 1994), Pinon Mesa, Glade Park (Voynick 1994; Kappele 1995; Mitchell 1997), Black Ridge 15 miles northeast of Glade Park (Voynick 1994), and the Gateway area (Mitchell 1997);

- Black petrified wood between Whitewater and Delta (Pearl 1972);

- Geodes near Whitewater (Kappele 1995; Mitchell 1997; Voynick 1994);

- Carnelian in Devils Canyon just west of Opal Hill (Voynick 1994);

- Barite, calcite, and selenite from the Book Cliffs (Pearl 1972; Voynick 1994); and

- Amethyst, feldspar and mica in Unaweep Canyon (Kappele 1995; Mitchell 1997; Pearl 1972; Voynick 1994).

## 3.1 LEASABLE MINERALS

### 3.1.1 Coal

There are two geologic intervals of coal-bearing rocks in the GJFO planning area: the Dakota Group and the Mesaverde Group (**Appendix A**, **Map 7**, Coal Deposits – Occurrence Potential). The Dakota Group coals consist of localized shallow coal outcrops in bluffs above the Dolores and Gunnison Rivers. The Dakota is exposed and partly eroded on the flanks of the Uncompahgre Uplift west of Delta, Colorado.

On the geologic map of the GJFO planning area (**Appendix A**, **Map 6**) the Dakota Sandstone (Kd) is included with the underlying Burro Canyon Formation (Kbc), and called the Dakota-Burro Canyon (Kdb). The Kbc is a non-coal bearing unit, so only the Kd was used from detailed geologic mapping to determine Dakota coal resources. A 1:24,000-scale geologic mapping was used throughout the GJFO planning area where possible to map the coal-bearing Dakota Sandstone. In the Whitewater area the Kdb-mapped areas were used because the Kd was not mapped separately.

The Mesaverde Group coals are exposed in the cliff edge of the Book Cliffs north of Grand Junction (Scott et al. 2002). From youngest to oldest, the Mesaverde Group is locally divided into the Hunter Canyon Formation, Mount Garfield Formation, Sego, and Castlegate sandstones (Kirschbaum and Hettinger 2002). The Mesaverde Group was deposited in near-shore continental fluvial settings along the coastal plain adjacent to the Cretaceous Interior Seaway. The coal environment was preserved and buried as the shorelines migrated during an overall regressive sequence to the southeast (Kirschbaum and Hettinger 2004; Hettinger et al. 2000). Coal-bearing coastal plain and continental strata above the Rollins Sandstone Member of the Mount Garfield Formation intertongue southeastward with marine shale facies of the upper Mancos Shale regionally (Kirschbaum and Hettinger 2002).

BLM_0015560

The majority of the coal resources in this study are located in the Book Cliffs Region north of Grand Junction. The Mesaverde Group gently dips to the north and is covered by increasing overburden to the northern edge of the GJFO planning area. Upper Cretaceous rocks in the Book Cliffs generally dip less than 6 degrees north and northeast.

The Mesaverde Group coals were deposited in fresh-water mires along the margin of a prograding shoreline of the Cretaceous Interior Seaway. Within the GJFO planning area the oldest, or stratigraphically lowest, coal beds were deposited along the west side along the Utah-Colorado border. These coal beds correlate to the Farrer Member of the Neslen Formation in Utah. All of the coal zones are assigned to the Mount Garfield Formation. The Carbonera, Cameo, Palisade, and Anchor coal zones are located in the lower 300 to 660 feet of the formation (Kirschbaum and Hettinger 2004).

The Black Diamond coal group represents the lowermost stratigraphic coals along the Utah-Colorado border within the Mesaverde Group. They are located stratigraphically beneath the Rollins Sandstone and are termed the Anchor, Palisade, and Chesterfield coal zones. The Anchor coal zone is stratigraphically located between the Corcoran Sandstone Member and the upper Sego Sandstone. It extends from the Utah state line and pinches out near Hunter Canyon (Kirschbaum and Hettinger 2004). The Palisade coal zone extends 32 miles along the Book Cliffs from Big Salt Wash to the Colorado River (Young 1955) near the abandoned Roadside Mine. The Chesterfield coal zone consists of thin coal beds in the Cozzette Member. Geologic data suggest that the Black Diamond Group of coals of minable thickness extends at least 3 miles from the measurement points along the outcrop of Farrer coals from Utah. The thickest coal bed is 7 feet in the Corcoran coal bed of the Palisade coal zone. The Black Diamond Coal Group was named for coal-bearing strata in the lower part of the Iles Formation in the northern Piceance Basin.

Cameo-Wheeler Coal Zone contains all coal-bearing strata in the Mount Garfield Formation 100 to 450 feet above the Rollins Sandstone. It includes the Cameo, Wheeler, Carbonera, and Fairfield coal zones. The Cameo-Wheeler coal zone, as mapped in the Book Cliffs, contains one to three coal beds ranging from 1 to 15 feet thick, with as much 16 feet of net coal within a 50-foot interval. Using subsurface coal intercepts from 3,000 drill holes in the USGS data set (Hettinger et al. 2000), the average Cameo coal bed is 3.56 feet thick locally.

The Carbonera coal zone is 60 feet above the base of the Cameo coal zone. It is 20 to 80 feet thick with one to five coal beds ranging from 1 to 5 feet thick. The thickest Carbonera coal bed is 13 feet.

The South Canyon coal zone is an extensive coal body in the Rifle and Newcastle region. Its western extent pinches out in the northeast corner of the GJFO planning area. The thickest South Canyon coal bed is 7 feet thick, while the entire coal zone is only 1 to 25 feet thick. Within the GJFO planning area it is only located in T9S R93W. Three coal beds there are between 6,793 and 6,963 feet deep.

The Coal Ridge Coal Zone occupies the same areal extent within the GJFO planning area as the South Canyon coal zone (T9S R93W) where it is less than 10 feet of net coal. It consists of two or three coal beds 2 to 3 feet thick at depths ranging from 6,897 to 7,654 feet.

BLM_0015561

The coals present in the GJFO planning area vary from semi-bituminous to bituminous B and C in apparent rank. The coal is non-coking, non-agglomerating in nature. **Table 3-1**, Coal Quality Values for Historic and Active Coal Mines in the Grand Junction Area, lists the parameters recorded from a data set of 51 historic coal mines within the GJFO planning area.

**Table 3-1**
**Coal Quality Values for Historic and Active Coal Mines in the Grand Junction Area[1]**

| Analyses | Average | Range |
|---|---|---|
| Btu/lb[2] | 11,674 | 10,391-12,460 |
| Ash (percent) | 8.39 | 5.1-16.7 |
| Sulfur (percent) | 0.79 | 0.5-1.7 |
| Moisture (percent) | 8.63 | 6.25-11.4 |
| Fixed Carbon (percent) | 46.9 | 38.7-51.8 |
| FSI (Free Swelling Index) | 0.62 | 0-2 |
| Volatile Matter (percent) | 35.74 | 28.9-39.7 |

[1] Data from 77 samples collected from 32 mines. All values as-received.
[2] British Thermal Units per pound
Source: CGS Information Series 64 (Carroll and Bauer 2002)

The USGS also lists coal quality data for the Book Cliffs and Grand Mesa coal fields. **Table 3-2**, Coal Quality Values for Historic Mines and Coal Development Wells in the Grand Junction Area, consists of data from drill holes and mines summarized for all coal beds in those coal fields.

**Table 3-2**
**Coal Quality Values for Historic Mines and Coal Development Wells in the Grand Junction Area[1]**

| Coal Field | Ash (percent) | Sulfur (percent) | Btu/lb |
|---|---|---|---|
| Book Cliffs | 4.9-23.3 | 0.4-1.7 | 9,830-13,560 |
| Grand Mesa | 2.1-23.3 | 0.4-2.2 | 8,300-13,490 |

[1] All values as received
Source: USGS PP 1625-B, Chapter O; Hettinger et al. 2000, 2004

Although the Grand Mesa coal field partly lies within the GJFO planning area, there are no historic coal mines in that part of the GJFO planning area. Coal quality at the active McClane Canyon Mine in the Book Cliffs coal field is 10,391 Btu/lb (as received), High volatile C Bituminous coal rank. Ash ranges from 13.5 to 19.89 percent, and sulfur ranges from 0.5 to 0.66 percent (both as received).

The Dakota Sandstone contains coal up to 6 feet thick in the GJFO planning area. Mostly, it is an impure coal with high ash content. The Dakota is mantled on the Uncompahgre Plateau as an eroded pavement draped over the eastern flank. It is shallow-dipping on the top, but is increasingly steeper dipping on the edge where it dives beneath the Grand Valley floor. Landis (1959) described the Dakota Group coals as thin, impure, and discontinuous, but that mineable

reserves may be very local. Small pockets of Dakota Group coal represent low to moderate potential for mineable coal because they are on geologic trend with the New Horizon mine.

### 3.1.2   Oil Shale

Oil shale is an organic-rich sedimentary rock consisting of calcareous shale (marlstone) with interbedded layers of various evaporite minerals, primarily nahcolite, dawsonite, and halite. Kerogen is the organic matter present in the shale that likely originated as decaying algae and bacteria that thrived in the nutrient-rich waters of Lake Uinta (Dyni 1987). It is present throughout the lower Parachute Creek Member and the underlying Garden Gulch Member of the Green River Formation (Johnson et al. 2009). This interval has been subdivided into nine "rich" zones separated by eight "lean zones" based on relative kerogen content in the shale. While the depocenter and thickest accumulation of oil shale sits north and northwest of the GJFO planning area near the structural axis of the Piceance Basin, significant occurrences extend south into the GJFO planning area in the mesas above Roan Creek and its tributaries.

**Table 3-3**, Oil Shale Resources within the GJFO Planning Area, summarizes the oil shale resources estimated to exist within the GJFO planning area using data obtained from Johnson et al. (2009). Oil shale can be found at or near the surface within parts of 20 townships in the northeastern part of the area (**Appendix A, Map 8**, Oil Shale Deposits – Occurrence Potential). Within this area resource grades can be as high as 1 billion barrels of oil in-place per square mile (Bbbl/sqmi) and average approximately 0.33 Bbbl/sqmi. This is lower than what is found to the north near the depocenter, where grades can exceed 2 Bbbl/sqmi in places. The entire Piceance Basin is estimated to contain as much as 1,525 billion barrels of oil in-place (Johnson et al. 2009).

<div align="center">

**Table 3-3**
**Oil Shale Resources within the GJFO Planning Area[1]**

</div>

| Grade (Billion Barrels per square mile) | | Total in GJFO (Billion Barrels) |
|---|---|---|
| Range | Average | |
| 0.08-0.98 | 0.33 | 87.44 |

[1]For comparison, grades near the basin depocenter north of the planning area can be as high as 2 Billion Barrels per square mile.
Source: Johnson et al. 2009

In addition to having generally lower grades than found at the depocenter, the oil shale resources in the GJFO planning area occur in mesas that are erosional remnants of a formerly larger area of extent. While this means that the total resource may be lower on a township by township basis, the resources are well exposed and more accessible by surface or underground mining methods.

### 3.1.3   Potash and Sodium

Potash and sodium resources are known to occur in the Paradox Formation of the Hermosa Group. Prud'homme and Kurkowski (2006) discuss the abundance of potash in the Paradox Formation. The Paradox Formation outcrops in the Sinbad Valley, in the Rock Creek (Shoemaker 1955a), Juanita Arch (Shoemaker 1955b), and Mount Peale (now the Buckeye Reservoir) quadrangles (Carter et al. 1958) in the southwest corner of the GJFO planning area.

BLM_0015563

Salt (sodium chloride) and gypsum beds of the Paradox Formation of the Hermosa Group have pierced the overlying strata and appear as contorted beds of salt diapirs associated with a limestone unit, possibly the Honaker Trail Formation, the unit which overlies the Paradox stratigraphically (Shoemaker 1955a, 1955b). The nature of the occurrence precludes a determination of the thickness of the Hermosa, but Cater (1955c) notes that a well drilled in the Paradox Valley, immediately south of the GJFO planning area, penetrated 2,300 feet of limestone believed to be the Honaker Trail Formation before encountering anhydrite beds of the Paradox Formation.

## 3.2   LOCATABLE MINERALS

### 3.2.1   Uranium-Vanadium

Within the GJFO planning area, uranium and vanadium are known to occur primarily in the Salt Wash Member of the Jurassic Morrison Formation, although mineralization has been reported from both the Chinle Formation and the overlying Wingate Sandstone and Kayenta Formation of the Glen Canyon Group (Nelson-Moore et al. 1978) (**Appendix A**, **Map 9**, Uranium and Vanadium Deposits – Occurrence Potential).

The Salt Wash Member represents an alluvial floodplain facies in the latest Jurassic time – described by Shawe (1962) as the toe or distal end of large alluvial fan with a source in the southwest (Poole and Williams 1956; Boardman et al. 1956). The Salt Wash Member reaches its greatest thickness in Utah, with an average thickness of 200 to 300 feet in the GJFO planning area. Shawe (1976) described three different types of sandstone in the Salt Wash based on the color – red, tan, and gray. The red represents an oxidizing environment and contains no carbonaceous material or iron sulfides. The tan and gray are both reduced sandstones and can be productive for uranium and vanadium. Zones containing organic debris or sulfides also contain the uranium and vanadium. Mineralized zones are widespread, with thicker and higher grade zones locally.

The sandstones are associated with distributary channels of the fluvial system. With the sandstones are mudstones, also reflective of the alluvial environment. The mudstones can be thick and massive or simply thin sheets, representing the quiet terrain between channels. The uranium and vanadium deposits are commonly associated with tuffaceous sediments that could very possibly be the source of the uranium. The tuffs, now altered to bentonite, are common in the Brushy Basin Member of the Morrison Formation, directly above the Salt Wash stratigraphically. Some ore zones have been identified in higher-permeability layers within the Brushy Basin, but no economical deposits have been found there to our knowledge (Thamm et al. 1981).

The Chinle Formation hosts uranium deposits that have been mined in Utah (Isachsen and Evenson 1956); however no mining has taken place within the GJFO planning area in this formation. There are a few documented occurrences of uranium from the Chinle Formation in other areas of the Uravan Mining District in Colorado (Nelson-Moore et al. 1978), but no occurrences have been documented in the Chinle Formation within the GJFO planning area. Uranium has been found in the Wingate and Kayenta Formations on the Colorado Plateau, but none within the GJFO planning area.

BLM_0015564

### 3.2.2 Gold

Gold has been mined within the GJFO planning area from both lode and placer deposits. Most of the placer gold activity in the GJFO planning area has occurred on and off for 135 years, mainly in the terrace gravels along the Dolores River corridor in the far southwest portion of the area, with additional interest in the Gunnison and Colorado River areas (**Appendix A**, **Map 10**, Gold Placer Deposits–Occurrence Potential). In the area of Mesa Creek–one of the major concentrations of placer gold activity–Parker (1992) pointed out that the river canyons are cut into alternating resistant and non-resistant strata, with productive gold placer gravels lying on sandstone beds. Remnants of several terraces occur along the slopes of the canyon from 25 to 30 feet and from 60 to 85 feet above the river. No detailed information is available on the placer deposits.

Lode gold was reported in the copper deposits in both the Unaweep Canyon and Sinbad Valley. The deposits are reported to occur in so-called fissure veins, mainly in sandstone (Vanderwilt 1947), but no details are available.

### 3.2.3 Copper

Emmons (1905a) published the first descriptions of copper in southwest Colorado, briefly describing the deposits in both the Sinbad Valley and the Unaweep Canyon districts in redbeds near faults. Later, Butler (1915) observed that mineralization in the Unaweep District was associated with faults and fissure-filling dikes that cut both the Paleozoic redbeds and the underlying crystalline Precambrian rocks. Holmes and Harrer (1952) agreed that the mineralization was associated with faulting and fracturing in the Sinbad Valley area.

Copper (and minor gold) mineralization was also found associated with veins in Precambrian rocks in Glade Park.

Copper mineralization has been found mainly at the base of the Triassic Wingate Formation (Glen Canyon Group), although it has been reported from the Chinle Formation, the Entrada Sandstone, and even in the Salt Wash Member of the Jurassic Morrison Formation (**Appendix A**, **Map 11**, Copper Deposits–Occurrence Potential) (Fischer 1936; Isachsen et al. 1955).

### 3.2.4 Silver

Silver has been found sporadically within the GJFO planning area, commonly associated with copper (**Appendix A**, **Map 12**, Silver Deposits – Occurrence Potential). The copper deposits of the Sinbad Valley have yielded silver, associated with faulting and fracturing. In the Unaweep Canyon area, silver has been described as occurring in "fissure veins in sandstones" by Vanderwilt (1947).

## 3.3 SALABLE MINERALS

### 3.3.1 Sand and Gravel

Sand and gravel, as construction aggregate, is an extremely important resource. The extraction of the resource varies according to the amount of nearby road building and maintenance and urban development, as sand and gravel are necessary for that infrastructure development. Even more so than other resources, however, the proximity of both transportation and markets are key elements in the development of a deposit.

BLM_0015565

Generally the most valuable is the gravel component, so commonly deposits are sought that contain higher proportions of gravel. Stream channel deposits are commonly sought. These are areas of high-energy sediment deposition, where finer-grained sediments were removed and coarser particles were concentrated. These deposits generally concentrate more durable rock also. Floodplain and older terrace deposits are commonly utilized, along with alluvial fans, especially in locations where stream action has upgraded the deposits by removing finer material. In general, floodplains are privately owned, including both surface and mineral estate, and not under the administration of the GJFO, referred to as "fee lands" (see **Appendix A**, **Map 1** and **Map 2**).

Eight areas within the GJFO planning area contain sand and gravel deposits – the Colorado River floodplain, the Gunnison River valley, upland deposits in the Whitewater area, the Plateau Creek area, the Upper Grand Valley (north of the Colorado River and south of the Book Cliffs), the Uncompahgre Plateau area, the Dolores River area, and the Roan Creek area.

The Colorado River floodplain, defined by Schwochow (1978) as extending from the mouth of the canyon at Palisade to the entrance to the canyon at Loma, exposes excellent gravel deposits in a narrow strip of gravel and at Redlands Mesa and Orchard Mesa.

The Gunnison River valley has exposures of alluvial fans and glacial drift from the Grand Mesa, especially near Kannah Creek. Near Whitewater, upland deposits on the hills provide a potential resource (Schwochow 1978). The Plateau Creek area also contains alluvial deposits and terraces and glacial deposits from the Grand Mesa.

The Upper Grand Valley deposits, defined by Schwochow (1978) as the area between the Colorado River and the Book Cliffs from Lewis Wash to the Utah border, is a very favorable area for the occurrence of sand and gravel deposits, but contains very little land administered by the GJFO, and therefore no Federal mineral estate (**Appendix A**, **Map 1** and **Map 2**). The Uncompahgre Plateau area, primarily the Unaweep Canyon, contains some narrow deposits except for the very lower (southwestern) end and at Cactus Park. The Dolores River Valley is a very narrow valley/canyon but contains reworked alluvial fans where the canyon is wide and cuts those deposits.

### 3.3.2   Dimension and Decorative Stone

Dimension stone is a general term for rock products that are finished to specific shape and size for building, monuments, industrial applications, or other end use. Dimension stone can be sold sawn. Other stone of similar characteristics is sold "raw" and uncut and later sorted into shapes and sized. Flagstone consists of thin slabs of stone used for paving. Fine-grained sandstone is the most popular and common type, and the principle rock type found in the GJFO planning area (**Appendix A**, **Map 13**, Dimension Stone Deposits – Occurrence Potential).

The Wingate Sandstone, in particular, has been a popular source of dimension stone because of its "flaggy" texture – forming in rather thin beds, easily separated to form flat, hard sheets. The sandstone displays an attractive color and a fine-grained texture.

The second type, referred to as decorative stone, is valued for the size, color, texture, and surface characteristics. Normally picked up or pried from the ground without extensive quarrying, this type is often referred to as "fieldstone." Practically any rock type that appears attractive to the

BLM_0015566

market can be used–sandstone, basalt, limestone, gneiss, schist, quartzite, and granite are common decorative stones. Thus, nearly any attractive rock can be sought and collected.

Quartzite within the Dakota Sandstone tends to break into angular blocks and shows some potential for use as building stone. Boulders within glacial deposits from the Grand Mesa, just south of the GJFO planning area, can be utilized as decorative stone.

In the GJFO planning area, the most common type is termed "moss rock," for the covering with lichens that give the rock an aged appearance. Nearly any type of durable rock that has persisted on the surface can be "moss rock."

### 3.3.3   Clay

Salable varieties of clay are widespread in the GJFO planning area and present in several stratigraphic units. None of the clays present have been defined or described as locatable varieties. The Brushy Basin Member of the Morrison Formation contains abundant bentonite, as a weathering product of volcanic ash that is a large proportion of the rock. Bentonite is commonly used as an absorbent, for drilling mud in oil and gas drilling and such consumer uses as cat litter. The Mancos Shale contains layers of clay, and the weathered products of clay-rich zones of the Mancos have been used in the area as adobe bricks (Morgan et al. 2008). The published geologic mapping in the GJFO planning area does not distinguish these zones.

Butler (1914) conducted a study for the Colorado Geological Survey (CGS) of clays from across the state, detailing their composition and physical characteristics and discussing the potential of each as a commercial clay. Within the GJFO planning area, Butler tested twelve different clays from the Colorado River corridor and concluded they had varying degrees of potential as a commercial product.

The Dakota Sandstone is known to contain usable clay in other areas of Colorado (Waage 1953), including refractory clay that has been mined commercially. Vanderwilt (1947) also noted "good pottery clay" in the Dakota Sandstone at Grand Junction.

BLM_0015567

This page intentionally left blank.

BLM_0015568

# CHAPTER 4
# MINERAL EXPLORATION, DEVELOPMENT, AND PRODUCTION

## 4.1   LEASABLE MINERALS

### 4.1.1   Coal

As stated in Section 3.1.1, Coal, there are two geologic intervals of coal-bearing rocks in the GJFO planning area: the Dakota Group and the Mesaverde Group (**Appendix A**, **Map 7**). No coal has ever been produced from the Dakota Group within the GJFO planning area. Dakota coals are currently mined 18 miles southeast of the GJFO planning area in the Nucla-Naturita coal field, where the New Horizon coal mine uses this sub-bituminous coal to supply the Nucla Power Station. Currently there is only one operating coal mine in the GJFO planning area: the McClane Canyon Mine, operated by Rhino Energy. This mine supplies bituminous coal to the Cameo Power Plant.

Over 21.3 million short tons of coal have been mined from 32 mines in the Mesaverde Group, the majority of which (91 percent) was mined from the Cameo coal zone (**Table 4-1**, Historic Coal Production in the GJFO Planning Area; **Figure 3**, Historic Coal Mine Locations in the GJFO Planning Area) (Carroll and Bauer 2002). Over 307,000 short tons of coal have been mined from the Carbonera coal zone (above the base of the Cameo coal zone) locally Mesaverde Group coals have been mined in the Book Cliffs since 1890. Anchor Tongue coal from the Black Diamond coal zone within the Mesaverde Group was mined at three locations, with over 24,000 short tons of coal produced. Over 1.5 million short tons of coal were produced from 16 Palisade coal bed mines of the Palisade coal zone. The Chesterfield coal zones have been mined in the past along the Book Cliffs north of Fruita and Loma. The Coal Ridge coal zone in the Mesaverde Group, while more extensive in the Rifle and Newcastle areas, is not an economic coal in the GJFO planning area and no coal has been mined from this coal zone within the planning area.

BLM_0015569

4. Mineral Exploration, Development, and Production

**Table 4-1**
**Historic Coal Production in the GJFO Planning Area[1]**

| GJFO Cumulative Coal Production | Palisade Coal Zone | Cameo Coal Zone | Carbonera Coal Zone | Corcoran Coal Zone | Anchor Tongue Coal Zone |
|---|---|---|---|---|---|
| Short Tons Produced | 1,557,689 | 19,449,534 | 307,777 | 8,474 | 18,973 |

[1] Coal production from a total of 32 coal mines.
Source: CGS IS-64 (Carroll and Bauer 2002)

**Figure 3**
**Historic Coal Mine Locations in the GJFO Planning Area**



Source: Carroll and Bauer 2002

BLM_0015570

Currently there is coal exploration in Section 23, T7S R102W by Ark Land Company, a subsidiary of Arch Coal. This coal exploration permit from 2007 enabled Arch to drill several exploration holes in the Mesaverde Group coals. In 2006, Central Appalachian Mining Company-Colorado conducted coal exploration activity in Section 8, T8S R102W. The Central Appalachian Mining Company was the predecessor owner at the McClane Canyon Mine. In 2008, the Central Appalachian Mining Company also explored for coal in Section 3 of T8S R102W for the Red Cliff Mine project. In 2004, the Central Appalachian Mining Company explored in Section 33, T7S R102W in the Stove Canyon Exploration Project.

### 4.1.2   Oil Shale

The potential for oil shale as a source of hydrocarbon fuel has been recognized since the early 20th century (Miller 1987). Under the Mining Law of 1872, several mining claims were staked on oil shale outcrops starting in about 1910. These claims included large tracts of land along Roan Creek in the GJFO planning area (Donnell 1987). Many of these claims were eventually patented and became private lands; however, detailed analysis of the status of these claims is beyond the scope of this evaluation. Claim staking for oil shale under the 1872 Mining Law ceased with passage of the 1920 Mineral Leasing Act, which instead provided for leasing of oil shale, subject to valid existing rights.

Development of mining and surface retort operations was attempted in the 1920s near Rulison and again in the early 1980s at Logan Wash, a tributary to Roan Creek. Additional development occurred on private land in the Parachute Creek valley east of the GJFO planning area. Today, Exxon-Mobil continues limited research and development (R&D) activities at their mining and surface retort facility on Parachute Creek. Additionally, there are five active in-situ R&D leases in the center part of the basin, but all of these leases are outside of the GJFO planning area.

While current R&D efforts focus outside of the GJFO planning area, resources within the area have potential for eventual development given favorable grades as explained in Section 3.1.2, Oil Shale. Occurrence of oil shale at or near the surface lends itself to surface mining operations.

### 4.1.3   Potash

Potash, or potassium oxide (K2O), was first discovered in the Paradox Formation in the process of oil and gas exploration in the Paradox Valley. Historic mining and exploration activity has occurred in that location. Potash has been produced from the Paradox Formation in Utah (BLM 2005). Its presence has been reported (Vanderwilt 1947), and the Mineral and Water Resources of Colorado (1968) shows the Sinbad Valley as a source area. No production of this commodity has been documented in Colorado.

US consumption of potash exceeded 6 million metric tons in 2008 and the average price exceeded $700/ton in 2008, a 250-percent increase since 2004 (USGS Commodity Statistics and Information 2010). The Intercontinental Potash Corporation has prospecting permit applications pending with the GJFO in the Sinbad Valley with plans to lease 2,600 acres, so the area is clearly being considered for commercial development. No other exploration or development for potash has been reported from the GJFO planning area.

BLM_0015571

## 4.2   LOCATABLE MINERALS

### 4.2.1   Uranium and Vanadium

The GJFO planning area includes the Uravan Mining District, historically one of the most prolific producers of uranium and vanadium in the US. The Uravan District is an informal name for a mineralized belt that occupies the southwest corner of the GJFO planning area in southern Mesa County and northernmost Montrose County. The bulk of the district lies to the south in Montrose and San Miguel Counties. The Uravan District lies within the National Uranium Resource Evaluation (NURE) Favorable Area as identified on **Appendix A**, **Map 9**, and **Appendix A**, **Map 14**, Uranium and Vanadium Deposits – Development Potential.

Uranium and vanadium are found across the Colorado Plateau and have been mined there since the end of the 19th century. The history of uranium exploration and mining in Colorado can be divided into four periods. The first period was the early years when the demand for radium peaked, especially in Europe, from 1898 until the early 20th century. The first carnotite was discovered in 1881 at Roc Creek, just south of the GJFO planning area. Early mining efforts were directed at uranium to extract the miniscule amounts of radium present in the ore. When large deposits were discovered and developed in the Belgian Congo in 1923, the market dried up on Colorado's first uranium boom (Ringholz 2006).

The second period was the vanadium period, from approximately 1937 to 1945 (Butler 1964). This metal was recognized in World War I as a very effective alloying agent in steel that was especially effective for armor plating. Uses of vanadium grew during that period, when several mills were constructed in the Uravan District just to separate vanadium. Old uranium tailings piles were re-mined for this new commodity of interest.

The Manhattan Project brought on the third period in Colorado's uranium history in the early 1940s. The demand for uranium by the US Department of Defense was followed closely by the development of the nuclear power industry, further increasing demand and activity in the GJFO planning area and elsewhere in Colorado. Two events served to curtail the nuclear power industry's growth. The Three Mile Island accident in 1979 and the disaster at Chernobyl in 1986 curbed further development of the nuclear industry and immediately softened demand for uranium.

The fourth period began in 2007 when recognition of the supply deficit of uranium caused a rapid increase in the price, the spot price increasing to more than $130 per pound in June 2007. Reacting to the price increase and anticipating a continuing growth in demand, exploration efforts increased greatly in the historic mining areas of southwest Colorado. Claims filed in areas that include the GJFO planning area increased to 223 claims in Mesa County and 3,767 in Montrose County (Burnell et al. 2008). Prices have since dropped in the worldwide recession to as low as $46 per pound, and exploration activity has slowed for the time being. The most recent release from the International Atomic Energy Agency (IAEA) reports an anticipated 40 percent increase in nuclear power production worldwide by 2030. The anticipated growth in demand for uranium has caused the IAEA to initiate a new worldwide reserve estimate (IAEA 2009). The USGS will coordinate that study for the US with participation by the CGS. No current official reserve estimates are available.

BLM_0015572

Within the GJFO planning area, Nelson-Moore et al. (1978) have tabulated 299 historic mines. Of the mines within the GJFO planning area specifically, the great majority mined the Morrison Formation, specifically the Salt Wash Member. The totals tabulated are 276 mines in the Salt Wash Member; 52 mines listed in the Morrison Formation, but not specifying the Salt Wash member; 72 mines with unspecified or unknown stratigraphic location; and 2 mines in the Wingate Sandstone.

It appears that of those mines described simply as occurring in the Morrison Formation, most if not all are in the Salt Wash Member. Likewise, those with an unspecified source rock are probably also in the Salt Wash Member of the Morrison Formation, given their map locations. Of the two in the Triassic Wingate Formation, one specifies that the mineralization occurs in fault gouge along fault planes.

The reported ore grades among the above-referenced 299 mines averaged approximately 0.24 percent triuranium octoxide ($U_3O_8$) and 1.25 percent vanadium oxide ($V_2O_5$). The ratio of vanadium to uranium is relatively consistent throughout the area at about 5 to 1. In fact, Thamm et al. (1981) state that the deposits are really vanadium deposits with associated uranium. Total production for the Uravan Mining District from 1947 to 1979 was 13,808,000 pounds of $V_2O_5$.

Colorado statistics have been historically tabulated by county, making data specific to the GJFO planning area difficult to extract. Some data for the Uravan District can be used to demonstrate the general characteristics of the deposits in the planning area. Wright and Everhart (1960) illustrate the size of deposits in the Uravan District with the following table to show the range of deposit sizes (**Table 4-2**, Size of Deposits in Uravan District of Colorado).

**Table 4-2**
**Size of Deposits in Uravan District of Colorado**

| Size of Deposit in Tons | Percent of Total[1] |
|---|---|
| 0-100 | 29 |
| 100-3000 | 41 |
| 3000-10,000 | 16 |
| 10,000 – 25,000 | 8 |
| 25,000 – 50,000 | 3 |
| 50,000 – 150,000 | 3 |

[1] Of 666 Uravan Mines
Source: Wright and Everhart 1960

Note that these data are for the entire Uravan District, which occurs not only within the GJFO planning area, but extends through other areas of Mesa, Montrose, and San Miguel Counties. The 666 mines are not all located within the GJFO planning area, but the size distribution is representative of the entire mining district and is used to provide a range of sizes of deposits that might occur within the GJFO planning area.

The authors estimate the average grade of deposits across the Uravan District at 0.28 percent $U_3O_8$ and 1.62 percent $V_2O_5$. The most comprehensive figures available for production from the time period 1948 through 1978 are available from CGS (Nelson-Moore et al. 1978). Total

BLM_0015573

production for Mesa County was 2,271,000 tons of ore producing 13,180,000 pounds of $U_3O_8$. Tabulation of figures for those mines in Montrose County that lie within the GJFO planning area show an estimate of 88,691 tons of ore, producing 383,419 pounds of $U_3O_8$. As such, the total estimated production for the GJFO planning area from 1948 to 1978 is 2,359,691 tons of ore providing 13,563,419 pounds of $U_3O_8$.

### 4.2.2   Gold

The GJFO planning area has a history of gold mining. Vanderwilt (1947) reported the production of 225 ounces of placer gold and 46 ounces of lode gold in Mesa County during the period 1885 to 1945, but no details are available on where the production originated. Montrose County also produced gold historically, but probably very little from the small portion in the northwest corner of the county that lies within the GJFO planning area.

In 1883, gold was discovered in gravels along the Dolores River (Voynick 1992). Gold placers on the Dolores River corridor were the object of the famous engineering project that built the "hanging flume" in the Dolores River canyon. Five companies had placer projects in the areas of Mesa and Cottonwood Creeks. One of the companies, the Montrose Placer Mining Company, built the 10-mile long ditch and flume that was pinned to the sheer wall of the Dolores Canyon for a distance of four miles. The placer mining began in 1891 and closed by 1893 (Parker 1992).

According to Parker (1992), placer mining resumed in the 1930s and concentrated on terrace gravels above the current level of the Dolores River. Annual reports in "A Summary of Mineral Industry Activities in Colorado," show that gold placers were active in the vicinity of Uravan between 1964 and 1979. From the published locations of these placers, it is not clear if they lie within the GJFO planning area or are just nearby. The following placers are included to show placer activity in the vicinity:

- Kaess and Young placer (near Uravan) in 1964;

- The Red Canyon placer (7 miles northwest of Uravan) in 1965, 1973, and 1978;

- The Aurora #2 placer (near Uravan) in 1967;

- The Truck Stop placer in 1978 (8 miles northwest of Uravan); and

- The Bancroft placer in 1979 (9 miles northwest of Uravan).

The most recent production figures are from the Colorado Mineral, Oil and Shale Resources report of 1924, in which $5,040 worth of gold was produced between 1888 and 1923 from Mesa County; Dalzell (1908) reported production of 302 ounces in Mesa County from 1897 through 1908. The last production was in 1906 (Colorado Bureau of Mines 1959).

From 2007 to 2009, there was renewed interest in staking and placering, both in the river and in the terrace gravels. To date, there has been no large-scale exploration or mining activity (Gerwe 2009).

There seems to be very little indication that gold prices will decrease in the next several years. Economic conditions in the US point toward sustained high price for the metal. However,

BLM_0015574

historically, gold prices have been volatile. Therefore, price projections over the next twenty years are difficult to accurately predict.

**Figure 4**, Price of Gold from 1989 to 2009, illustrates the average price of gold in US dollars per ounce. The 2009 value was reported from November 4, 2009.

**Figure 4**
**Price of Gold from 1989 to 2009**



Source: Kitco 2009a.

### 4.2.3   Copper

Copper has been recognized in the Colorado Plateau region of the state since the 1890s when mining began in the Lisbon Valley area of adjacent Utah. The Cashin Mine, in nearby Montrose County, Colorado (within the Uncompahgre Field Office area), has been active off and on from the early 20th century, calling attention to smaller deposits in the Sinbad Valley that lie in the GJFO planning area. Additionally, the Unaweep District was named specifically as a promising district in CGS Bulletin 22 (Aurant 1924), although no detailed information was provided.

The potential exists for future copper production in the Sinbad Valley area, given the quality of deposits in similar settings in the Lisbon Valley. An estimate of potential resources can be developed using data from the Cashin Deposit, in the nearby Lisbon Valley area. Constellation Copper Corporation reported in 2005 a reserve estimate for the Cashin Deposit of 5,705,000 tons of ore with a grade of 0.411 percent copper at a copper price of $1.25 per pound. The resource calculated at that price was 8,849,000 pounds of copper. Using that number with the projection that a small copper deposit similar to the Cashin Deposit exists in the Sinbad Valley, the same numbers would apply for the GJFO planning area. (Note that as the price of copper increases, the estimated reserves generally increase also. Reserve estimates and decisions on the economic viability of mining are generally made using conservative price numbers. If the price of copper

BLM_0015575

increases and shows promise of remaining strong, estimates of the reserves can be recalculated. These estimates are not available from company sources.)

Some production figures are available in Dalzell (1908), who reported that 29,595 pounds of copper were produced in Mesa County in the years 1899 through 1902. After that, production ceased. The Colorado Mineral, Oil and Shale Resources publication of 1924 shows that 35,280 pounds of copper were produced in Mesa County between 1888 and 1923.

Several mines have been active in the GJFO planning area. In the Sinbad Basin, Ruth's 1 thru 6 were active in 1958 and 1959; the Copper Queen was listed as active in 1959, 1960, 1964, and 1965 (Colorado Bureau of Mines 1950, 1960, 1964, 1965); and the Cliffdweller Mine was active in 1963 and 1965 (Colorado Bureau of Mines 1963, 1965). All of these mines were active in the early part of the 20th century, including the Copper Rivet Mine, which has seen some recent activity for specimen mineral collection.

In the 1960s and 1970s there was a surge of activity in the Unaweep Canyon area when the Copper Queen, the Amethyst Queen, and the Queen Beth opened for copper, fluorspar, and amethyst.

In the Precambrian rocks of Glade Park, the Missouri Girl Mine was reported as an operating mine in the 1966, although no production was reported for Mesa County (Colorado Bureau of Mines 1966) with no production reported since.

The production from the mines in Precambrian rocks of the Unaweep Canyon and Glade Park has never been large; Dalzell (1908) lists a total of 29,595 pounds of copper from Mesa County from 1899 to 1902. The possibility exists of additional resources in those rocks, but the absence of larger deposits implies that the probability is low.

### 4.2.4   Silver

Silver has been mined off and on throughout the years in the GJFO planning area. Silver has been reported accompanying copper mineralization in both the Sinbad Valley and the Unaweep Districts. Dalzell (1908) reported that 5,363 ounces of silver were produced in Mesa County from 1898 through 1906. Peak production was in 1899, with 4,120 ounces. The Colorado Mineral, Oil and Shale Resources publication of 1924 reported a total of 4,934 fine ounces of silver produced in Mesa County from 1888 to 1923. Because production was reported by county, the figures for Montrose County cannot be separated out for the GJFO planning area.

A significant amount of silver was described as a byproduct of the copper mines in the southwest portion of the GJFO planning area. As an example, Vanderwilt (1947) listed a total of 5,366 ounces of silver produced in Mesa County from 1885 to 1945. The literature indicates that most of this production was from the Sinbad Valley area. No production from the GJFO planning area has been reported since then.

BLM_0015576

## 4.3    SALABLE MINERALS

### 4.3.1    Sand and Gravel

The area contains numerous sand and gravel operations, most of which are located along the Colorado River corridor on private fee land. The Colorado Division of Mining, Reclamation and Safety records 71 active permits for mining of aggregate, sand, gravel, and borrow within the GJFO planning area, with a total permitted acreage of 4,448 acres. Not much of that mining has been recorded historically on federally administered lands within the GJFO planning area.

Two commercial operations on federal mineral estate have been recorded in the GJFO planning area, both in the Orchard Mesa area. United Companies removed 127,753 tons of material from September 2002 through June 2009. Nearby, Upland Gravel quarried 238,541 tons between July 2007 and June 2009. Calculating an average annual production is not meaningful because the sales of gravel fluctuate with construction. When construction is thriving, the sales are greater; in the last year, production and sales of sand and gravel has slowed considerably, along with the construction industry.

Other borrow removal has been recorded in the GJFO planning area, mostly from borrow pits. Borrow can be virtually any type of fill material so it is impossible to predict where activity will occur. Users look for sources as close to their site as possible; the nature of the material is not of prime importance.

Ten borrow pits have been recorded as listed on BLM-administered mineral estate land: 25 Road pit, Loma pit, a "burnt shale" pit along Highway 139; and seven pits for the Bureau of Reclamation near the Highline Canal for canal lining and other uses. No production records are listed for these borrow pits.

Free-use permits are recorded for six additional facilities as follows:

- Fruita pit – borrow for road construction and maintenance, 27,743 cubic yards from 1993 through 1997;

- Wright Draw sandpit – decomposed granite for sanding roads, 1,279 cubic yards in 1996-1997;

- 13 Road pit – on a gravel bench over Mancos Shale bedrock for road maintenance, 18,600 cubic yards in 1988-1989;

- Baxter Road pit (49 Road pit) – gravel bench adjacent to Prairie Canyon, 2,702 cubic yards from 1989 through 1997;

- 21 Road pit – gravel bench above Little Salt Wash, 7,917 cubic yards in 1978; and

- Lumsden Canyon, 1 mile west of Gateway – dissected alluvial fan, 706 cubic yards from 1989 through 1995.

### 4.3.2    Dimension Stone

According to BLM records accessed in the GJFO, 4,775 tons of Wingate Sandstone flagstone has been excavated within the GJFO planning area from 1993 to 2008, mainly from the area south of Route 141. The operations were known as Jacks Canyon, Buckskin Quarry, Goldstone Quarry,

BLM_0015577

Boulder Quarry, and Ute Quarry, occurring in Sections 16 and 29, T14S, R100W. This area has now been removed from the eligible sources for extractable resources with the designation of the Dominguez-Escalante National Conservation Area.

Fifty tons of flagstone was also removed from the northwest quarter, southwest quarter of Section 31, T13S, R99W in Cactus Park in 1993.

Product identified as moss rock has been harvested from the Wasatch Formation in Sections 3 and 35 of T8S, R98W, from Maverick Canyon (T50N, R18W), and from the same area as the Wingate Sandstone flagstone quarries from 1990 through 1994. A total of 1,789 tons of moss rock has been gathered from various areas within the GJFO planning area.

### 4.3.3   Clay

Bentonite is being extracted from the Little Park Road community pit in the Brushy Basin Member of the Morrison Formation. The records available for the Little Park Road community pit, though incomplete, indicate that over 1,000 cubic yards were sold between 1988 and 1991, the Grand Junction Drainage District removed 700 cubic yards in 2002, and 678 cubic yards were sold from 2006 through 2009. No other records could be found regarding clay production within the GJFO planning area.

BLM_0015578

# CHAPTER 5

# POTENTIAL FOR OCCURRENCE AND DEVELOPMENT OF ENERGY AND MINERAL RESOURCES

The mineral resource potential of the GJFO planning area is classified using the system outlined in BLM Manual 3031. Under this system, mineral occurrence potential ratings are strictly based on the geologic probability of a mineral to be present in the area and do not address the economic feasibility of development of the resource. These ratings address the potential of occurrence of mineral resources and certainty of data as follows:

**O**    The geologic environment, the inferred geologic processes and the lack of mineral occurrences do not indicate potential for the accumulation of mineral resources.

**L**    The geologic environment and the inferred geologic processes indicate **low** potential for accumulation of mineral resources.

**M**    The geologic environment, the inferred geologic processes, and the reported mineral occurrences or valid geochemicall/geophysical anomaly, and the known mines or deposits indicate **moderate** potential for accumulation of mineral resources.

**H**    The geologic environment, the inferred geologic processes, and the reported mineral occurrences or valid geochemical/geophysical anomaly, and the known mines or deposits indicate **high** potential for accumulation of mineral resources. The known mines and deposits do not have to be within the area that is being classified, but have to be within the same type of geologic environment.

**ND**    Mineral potential may not be determined due to lack of useful data.

BLM_0015579

Level of Certainty Ratings:

**A**     The available data are insufficient and/or cannot be considered as direct or indirect evidence to support or refute the possible existence of mineral resources within the respective area.

**B**     The available data provide indirect evidence to support or refute the possible existence of mineral resources.

**C**     The available data provide direct evidence but are quantitatively minimal to support or refute the possible existence of mineral resources.

**D**     The available data provide abundant direct and indirect evidence to support or refute the possible existence of mineral resources.

The potential for development (high, moderate, or low) of each mineral resource in the GJFO planning area is projected for a 20-year period. The likelihood for development is based on review of available literature on mineral developments and markets, communication with industry experts and government officials familiar with the specific resources and activities in the area, and considerations such as mineral occurrence potential, historical development, and the assumption that all potentially productive areas are open under standard lease terms and conditions. The projected development may be directly affected by planning decisions that restrict or preclude mineral exploration and/or development activity. Areas closed to mineral development by laws, regulations, or executive orders are not included in the development potential. This would include National Parks, Wilderness Study Areas, and Wilderness Areas. The occurrence and development potentials for each mineral resource in the planning area are described in the following sections.

## 5.1     LEASABLE MINERALS

### 5.1.1     Coal

Coal resources in the GJFO planning area were evaluated using the USGS methodology for coal resource calculations. The USGS published Professional Paper 1625-B in 2000 to evaluate the coal resources of the Colorado Plateau. Chapter O (Hettinger et al. 2000) of that study was a regional assessment of the coal resources in the southern Piceance Basin, which overlaps with the Book Cliffs area of the GJFO planning area. The USGS created digital files for geographic and geologic features for the area. Using their spatial data, the CGS was able to clip the geographic information system (GIS) data using mapping software for the GJFO planning area. Contour and isopach maps were generated, and coal resource tables were constructed from those models for each coal interval.

The CGS methodology used the clipped features within the GJFO planning area to calculate resources only where the Mesaverde Group coals were less than 3,000 feet in depth. An average volume of coal per acre was assessed, based on USGS calculations from each township. These values were then multiplied by the number of acres in each township within the GJFO planning area. Polygon areas assigned to the Dakota Sandstone coal or the Mesaverde Group coals were digitized from the best geologic maps available (see Coal Occurrence Potential (**Appendix A, Map 7**) and Coal Development Potential (**Appendix A, Map 15**)). Note that coal mining is the

5-2     *Mineral Potential Report for the Grand Junction Resource Area*     July 2010
*US Department of the Interior, Bureau of Land Management, Grand Junction Field Office*

BLM_0015580

only extractive coal methodology assessed in this study, and coalbed methane is not addressed. See Reasonably Foreseeable Development Scenario for Oil and Gas, Grand Junction Field Office, Colorado (2009) for discussion of coalbed methane. The various digital files used in this report are available to the user for integrating various coverages with coal ownership, coal thickness, coal depth, and geographic areas.

In the GJFO planning area, the Mesaverde Group coal that is less than 3,000 feet deep was assigned a high occurrence potential with a certainty level of D (**Appendix A, Map 7**). This is the location of the most economically viable coal to be mined in the future (**Appendix A, Map 15**). Coal in the Cameo-Wheeler Coal Zone is most likely to be developed in the future. Thick Mesaverde Group coal that occurs at depths greater than 3,000 feet is assigned moderate occurrence potential with a certainty level of C. As a mineable resource, the South Canyon coal is much too deep for economic purposes in the GJFO planning area and thus has a low potential for development.

Coal occurrence potential of the Dakota Group coal are all assigned low occurrence potential with various criteria of certainty based on depth and thickness of coal, hence a certainty level of C. Shallow Dakota Group coal occurring near the Dolores River region may have a higher certainty, but its small areal extent and remote access preclude any significant mining potential. Most of the Dakota Group coal near Grand Junction is considered to have low potential for development because it is too deep.

### 5.1.2   Oil Shale

The potential for occurrence of oil shale coincides with the outcrop of the Parachute Member of the Green River Formation as illustrated in **Appendix A, Map 6**. Oil shale-bearing strata are found in the steep faces of the mesas that rise above Roan Creek and its tributaries. Younger non-oil shale-bearing strata cap many of the mesas; however, the presence of oil shale beneath this cover is demonstrated by outcrop patterns around the mesas and by drilling data (Johnson 2009). These areas, shown on **Appendix A, Map 8**, have been designated with an occurrence potential of High with a certainty level of D. Given the high potential for occurrence for oil shale beneath large expanses within the GJFO planning area, favorable grades, and relative accessibility at or near the surface, the areas shown on **Appendix A, Map 16** have been designated with a potential for development of Moderate.

### 5.1.3   Potash and Sodium

Potash and sodium (salt) deposits occur in Sinbad Valley, which is located in the southwest corner of the GJFO planning area and hosted by the Pennsylvanian Paradox Formation of the Hermosa Group. The Paradox Formation crops out in the Sinbad Valley, and documented recoverable resources of potash and sodium chloride are known to occur within that formation. According to the Intercontinental Potash Corporation (2009), a drillhole in the area shows a well-defined stratigraphic target for exploration.

The presence of the Paradox Formation – a known producer – in the Sinbad Valley and the evidence from the company's drilling indicates that the occurrence potential for potash and salt in the Sinbad Valley is High with a certainty level of C (**Appendix A, Map 17**).

BLM_0015581

Demand for potash had been increasing in the United States until slowed by the recession. With the price and demand both increasing and the fact that a corporation has inquired about an exploration permit in the Sinbad Valley, the development potential for potash in the GJFO planning area is considered High (**Appendix A**, **Map 18**).

## 5.2   LOCATABLE MINERALS

### 5.2.1   Uranium and Vanadium

The renewal of exploration and the eventual reopening of uranium mines in the GJFO planning area will be a function of a number of factors. On the mining side, the price of uranium (and vanadium) and the cost of operation will be the determining factors. On the financial side, the availability of capital to finance exploration and development appears to be the key element. Denison Mines reported a production cost of $55.29 per pound of $U_3O_8$ (Denison Mines 2009). If this price is viewed as a baseline for estimating the cost of mining, it would imply that a uranium price near $60 to $70 per pound would be necessary to cause renewed activity. The situation is not that simple, however, as Denison Mines has a mill to process the ore. The cost of milling would have to be added to the costs for other mine operators, making their threshold price of $U_3O_8$ higher than $60 per pound. Because of the occurrence of vanadium in the GJFO planning area, that metal is considered hand-in-hand with uranium.

The availability of capital has recently been a problem for those companies with properties in the GJFO planning area. Most of the companies involved in the exploration phase are "junior" companies. They need ready cash to finance their work until the mine begins producing. Costs include exploration, the costs of permitting an operation, capitol/equipment costs, and the costs of developing of a mine. The condition of financial markets in 2009 has dried up most sources of financing. This, along with the declining price of uranium, has slowed activity to only those companies with the ability to obtain financing. It is suggested that a uranium price of $70 per pound will be required to reinvigorate uranium exploration and development activity in the GJFO planning area and the rest of Colorado.

The potential for occurrence and certainty ratings for uranium and vanadium are shown on **Appendix A**, **Map 9**. Areas of historic mining have an occurrence potential of high with a level of certainty of D. An area categorized in the NURE study by the USGS as a "favorable area" is given a high potential but with a C level of certainty. The Morrison Formation outside the historic mining areas is given a moderate chance of occurrence with a certainty rating of C, as are the outcrops of the Glen Canyon Group.

Based on the likelihood of uranium prices increasing, the development potential of those areas underlain by rocks of the Morrison Formation in the areas of historic mining are considered high. Within that area is a Department of Energy (DOE) lease tract. In 1948, the Atomic Energy Commission withdrew 25,000 acres from the public domain to lease to private industry for exploration and development of uranium and vanadium (US DOE 2009). The DOE, successor to the Atomic Energy Commission, has retained authority over these tracts as particularly promising areas for exploration.

The remainder of the area that is designated by the NURE study but outside the historic mining area is considered Moderate. Areas mapped as Morrison Formation and Glen Canyon Group in

BLM_0015582

the southern portion of the GJFO planning area, adjacent to the historic mining area, also have moderate potential for development. Other areas of Morrison Formation occurrence are considered of low potential and the remainder is considered to have no potential (**Appendix A**, **Map 14**).

### 5.2.2   Gold

The history of placer gold in the alluvium and terrace gravels of the Dolores River requires that these areas be assigned a high occurrence probability with a certainty of D (**Appendix A**, **Map 10**).

The steadily increasing price of gold (near $1,100/ounce in November 2009, **Figure 4**) and the fear of monetary inflation have spurred the interest in gold prospecting and mining at all levels recently. The proliferation of recent claim activity along the Dolores River corridor indicates that the development potential for placer gold is high (**Appendix A**, **Map 19**).

While lode gold has been reported from copper mines in both the Sinbad Valley and the Unaweep Districts, the absence of detailed information and the probable small amount results in a no occurrence potential ranking in those areas. Since the mines were known for their copper, these areas are ranked in the following section on that metal, regarding both occurrence and development potential.

### 5.2.3   Copper

Copper exploration generally increased in recent years as the price of the metal rose with the overall commodities boom, driven to a great degree by development of the Chinese economy. The copper spot price rose to a record of $4 per pound in 2008, dropped back significantly in early 2009, but then recovered dramatically. Most analysts anticipate the price to remain at the higher levels as the worldwide economy rebounds and construction activity increases. Maintenance of prices at these levels will spur exploration activity for copper within the GJFO planning area and elsewhere.

**Figure 5,** Average Annual Copper Spot Price from 1991 to 2009, illustrates the average annual copper spot price over a ten-year period. In November 2009, the copper spot price was less than $3 per pound. The price exceeded $3.00 per pound in 2008.

BLM_0015583

**Figure 5**
**Average Annual Copper Spot Price from 1991 to 2009**



Source: Kitco 2009b.

An estimate of potential resources can be developed using data from the Cashin Deposit in the nearby Libson Valley area. Constellation Copper Corporation reported in 2005 a reserve estimate for the Cashin Deposit of 5,705,000 tons of ore with a grade of 0.41 percent copper at a copper price of $1.25 per pound. The resource calculated at that price was 8,849,000 pounds of copper. Using that number with the projection that a copper deposit similar to the Cashin Deposit exists in Sinbad Valley, the same numbers could apply for the GJFO planning area.

The occurrence potential for copper is high with a certainty of D in locations where copper has been historically found and mined, including the Sinbad Valley and Unaweep Districts, as shown on **Appendix A**, **Map 11**. Because of the association of copper mineralization with faulting, the area southwest of the Unaweep District has been ranked as moderate with a certainty of B because of the mapped faulting in the area and the proximity to nearby known deposits. Also ranked as moderate with a certainty of B are other redbed units in which copper mineralization has been identified on the Colorado Plateau, including the Chinle, Entrada, and Dakota Formations.

There may be potential for future copper production in the Sinbad Valley area, given the quality of deposits in similar geologic settings in the Libson Valley. Development potential is determined

BLM_0015584

to be moderate in the Sinbad Valley area, given its relatively significant history, and finite but low in the rest of the areas with occurrence potential (**Appendix A, Map 20**).

### 5.2.4    Silver

The Cashin Mine, while not in the project area, displays mineralization typical of deposits in the Colorado Plateau Province and produced a significant amount of silver. For example, the BLM Moab Mineral Potential Report (2005) discusses a mine in the Salt Valley Anticline that produced 100,000 ounces of silver in ore that was 8 percent copper. Emmons (1905b) reported the Cashin ore was producing 28 ounces of silver per ton, but the ore being mined was higher grade than that remaining. A similar ratio of copper to silver in a hypothetical deposit in the Sinbad Valley (as discussed above in Section 4.2.3), would provide approximately 6,250 ounces of silver, very near the amount of silver removed from the area historically.

Because significant historic production has been documented, the occurrence potential of silver in the redbed deposits of the Sinbad Valley is considered moderate with a certainty of B. Areas in the Unaweep Canyon are considered low with a certainty of C because of the small, localized nature of the occurrences mined in the past.

Likewise, the potential for development is moderate in the Sinbad Valley and low in the other areas because of the small, scattered nature of the deposits.

## 5.3    SALABLE MINERALS

### 5.3.1    Sand and Gravel

Surficial deposits of alluvium, colluvium, gravels, and glacial deposits can all host economic deposits of sand and gravel. In this analysis, all these units are given an occurrence potential of high. Based on the mode of occurrence, the deposits that are known (currently mined) are given a certainty of D, while those areas not being mined are assigned a certainty of B. These are shown on **Appendix A, Map 21**.

The potential for development is judged to be moderate (**Appendix A, Map 22**) because the best quality deposits and those closest to the city of Grand Junction lie on fee land. Accelerated urban development in areas such as Whitewater, outside metropolitan Grand Junction, could lead to demands on sand and gravel deposits outside the immediate Grand Junction area.

### 5.3.2    Dimension and Decorative Stone

The areas of outcrop of the Wingate sandstone, included on the geologic map as a member of the Glen Canyon Group, have been designated moderate potential of occurrence with a certainty of C as marketable dimension stone. The formation is not suitable as flagstone everywhere in the area.

Moss rock or other decorative stone could be found almost anywhere within the GJFO planning area because there is much variability of what might be considered attractive. Several geologic occurrences have been added here because the formation has been used for decorative stone elsewhere in the State of Colorado. For example, the Dakota Sandstone, a dense, hard, fine-grained clean sandstone, has been rated moderate with a certainty level of C. Glacial deposits from the Grand Mesa contain large basalt boulders, which show lichen very plainly. Boulders suitable for decorative rock occur in the Grand Valley at the ground surface and are therefore also

July 2010                    *Mineral Potential Report for the Grand Junction Resource Area*                    5-7
*US Department of the Interior, Bureau of Land Management, Grand Junction Field Office*

BLM_0015585

Case No. 1:20-cv-02484-MSK   Document 30-6   filed 04/27/21   USDC Colorado   pg 88 of 219

considered moderate with a certainty level of C for decorative rock occurrence potential. These appear on **Appendix A, Map 21**.

Development potential of the Wingate Sandstone of the Glen Canyon Group is considered moderate because the best and most accessible deposits have been withdrawn from mining. The glacial deposits are considered moderate even though the deposits occur a long distance from the largest market in Grand Junction. The Dakota Sandstone is considered low in development potential because of the presence of other known sources in the area.

### 5.3.3   Clay

The occurrence of bentonite clays in the Brushy Basin Member of the Morrison Formation necessitates that those outcrops be given a moderate occurrence potential; because recoverable occurrences of bentonite are sporadic and not ubiquitous, the certainty level is C. There is no potential for other clays within the Mancos in the GJFO planning area. The existing Little Park Road community pit has a high potential for occurrence with a certainty level of C. The Mancos Formation is given a the same rating (**Appendix A, Map 23**) because of the known presence of clays in parts of the unit.

The development potential for the existing site is high, but the development potential for the Mancos Shale and the rest of the Morrison Formation is moderate (**Appendix A, Map 24**) because potential local markets for bentonite could be developed in the oil and gas sector.

BLM_0015586

# CHAPTER 6
# REASONABLY FORESEEABLE DEVELOPMENT

This section presents the projected development scenarios for those resources in the GJFO planning area that are considered likely to be developed over the next 20 years. Leasable, locatable, and saleable resources are discussed.

## 6.1   LEASABLE MINERALS

### 6.1.1   Coal

The coal development potential is an assessment of coal minerals that may be mined in the near future. For this criterion, only the Mesaverde Group coals were considered. The Dakota Group coals in the GJFO planning area are either too thin or too deep to mine economically. The Mesaverde Group coals in the Book Cliffs Region are considered mineable only to a depth of less than 3,000 feet. Based on those criteria, USGS coal resource calculations by township were used to map those areas with the most coal per acre. The highest potential for mining lies near the McClane Canyon and Roadside Mine areas. This is the highest potential for mining within the next 20 years (**Appendix A, Map 15**). Townships 7S 102W, 7S 101W, 8S 101W, and 8S 102W, near the McClane Canyon and Red Cliff Mine areas, have the highest potential for mining. Another area along the Colorado River near the former Roadside Mine is also considered a high potential area for mining because of additional thick coal at a depth of less than 3,000 feet. These are Townships 9S 98W, 9S 97W, and 10S 97W. The exact development potential rationale also includes current mining activity and coal use. As the Cameo Power Plant is scheduled for closure in December 2010, there is now no known use for coal locally.

Using the criteria of the USGS to determine how much coal is in the GJFO planning area, there is an estimated 86 billion short tons of original coal in the Cameo-Wheeler coal zone with unlimited depth (**Table 6-1**, Original Coal Resources by Depth for the Mesaverde Group Coals, GJFO Planning Area). This large value counts all coal greater than 1-foot thick with less than 12,000 feet of overburden. This original coal resource is a sum of all coal beds within the Cameo-Wheeler coal zone, which may have up to 10 individual coal beds locally. Of this amount, the unmineable portion is substantial, as 67.5 billion tons are greater than 3,000 feet deep. Technologically, since coal mining in Colorado does not occur beneath more than 3,000 feet of cover, only 19.16 billion short tons are considered potentially mineable original coal resources

BLM_0015587

with coal beds greater than 1-foot thick and less than 3,000 feet deep. Further reductions for minimum thickness (usually 5 feet thick) of mining, faults, steeply dipping structures, and interburden parting should be considered to assess economically mineable conditions.

**Table 6-1**
**Original Coal Resources by Depth for the Mesaverde Group Coals, GJFO Planning Area**

| Overburden Category (Feet) | | Mineable Coal | | | Coal Too Deep to Mine | | | Total All Coal |
|---|---|---|---|---|---|---|---|---|
| | 0-500 | 500-1,000 | 1,000-2,000 | 2,000-3,000 | 3,000-6,000 | 6,000-10,000 | >10,000 | |
| Coal Tonnage[1] | 1,644 | 1,876.45 | 6,463.2 | 9,177.63 | 31,243.4 | 33,935 | 2,357 | |
| Total Coal Tonnage[1] | | 19,161.6 | | | 67,535.4 | | | 86,697 |

[1] Values in million short tons

These values are significantly large and must be regarded with caution because coal recoverability factors are not reflected in the original coal less than 3,000 feet category. These further restrict the original value. Restrictions include technological and economic constraints to mining such as subtracting coal less than 5 feet thick, coal in strata dipping more than 12 degrees, and subtracting coal beds greater than 12 feet thick from mining purposes. Further surface restrictions such as roads, alluvial valleys, urban areas, power plants, oil and gas wells, and pipelines restrict the amount of coal available for mining. The USGS suggests that less than 10 percent of the original coal resource may be mined in any given area. In the GJFO planning area, that may leave only an estimated 1.9 billion tons of potentially mineable coal. Any application of unsuitability criteria as a surface restriction should follow the guidance of 43 CFR 3461.

The development potential for the Mesaverde coals less than 3,000 feet deep is considered high, and development potential for the Mesaverde coals deeper than 3,000 feet is considered moderate. Any future coal mining would be restricted to the high potential development zone only. The potential for development of the Dakota Coals is considered low (**Appendix A, Map 15**). Where the Dakota coal is deep beneath the Book Cliffs, there is no potential.

An assessment of the coal development potential shows whether a coal region may be developed within the near future. For this criterion only the Mesaverde Group coals were considered. While the Dakota Sandstone contains coal beds that are mined in the Nucla area (outside the GJFO planning area), the Dakota Group coals in the GJFO planning area are either too thin, too small, or too deep to mine economically. No new mines are anticipated in the Dakota Group in the GJFO planning area in the foreseeable future.

The Mesaverde Group coals in the Book Cliffs region are considered mineable only to a depth less than 3,000 feet. Based on that criterion, USGS coal resource calculations by township were used to map those areas with the highest density of coal per acre. Due to steeply dipping structures at the coal outcrops in the GJFO planning area, there is no potential for surface mining in the near future. All resource estimates are for underground mining only.

BLM_0015588

The highest potential for development within the next 20 years occurs near the McClane Canyon and Roadside Mine areas. Townships 7S 102W, 7S 101W, 8S 101W, and 8S 102W, near the McClane Canyon and proposed Red Cliff Mine areas, are considered to have the highest potential for future coal development. Another area along the Colorado River near the former Roadside Mine is also considered to have a high potential for development because of thick coal beds at depths less than 3,000 feet. These are Townships 9S 98W, 9S 97W, and 10S 97W (**Appendix A, Map 7**). The potential for development is high, but the actual possibility may remain low for the Roadside area because that mine closed due to high ash and parting in the mineable coal bed. The extent of that condition in the remaining coal resource is unknown at this time. Note that this discussion centers on coal resource. The USGS data available indicate that unmined coal remains in the area. The Roadside Mine operated intermittently between 1966 and 1999, when the recovered high-ash coal could not meet the requirements of their customers. **A** significant coal development potential still exists near the former Roadside lease area. As the Cameo Power Plant is scheduled for closure in December 2010, there will be no current use for coal locally, but the existing rail facilities could provide transport to other markets. Rhino Energy would like to expand its McClane Canyon Mine operation from 300,000 tons per year to nearly 6 million tons per year at Red Cliff. The customer base would be the same Midwest, Mideast, and Southeast US power plants that use the coal from the North Fork Valley.

Since the depth of the coal in the GJFO planning area eliminates the use of surface mining methods with current technology, it is assumed that three new underground mines would be developed in the GJFO planning area in the next 20 years. Using an estimate based on average underground coal mines in the nearby North Fork Valley (from the existing Bowie III Mine producing at 2 million tons per year), figures for permitted, affected, and disturbed acreage in the GJFO planning area can be estimated (see **Table 6-2**, Acreage for Hypothetical Coal Mines in Mesaverde Group, by Category). The "permit acres" figure is the total number of acres within the mine permit boundary. This would reasonably be assumed to be a number just beyond the maximum limit for the "affected area," which is the total acreage with surface disturbance plus the area that has been undermined. For an underground mine, since most of the activity is, of course, underground, the affected acres is a much greater number than "disturbed acres," which is that land that has experienced surface disturbance. Acreage figures for the Bowie Mine are used to estimate the acreage for three similar-sized mines in the GJFO planning area over the next 20 years.

**Table 6-2**
**Acreage for Hypothetical Coal Mines in Mesaverde Group, by Category**

|  | Acres per Mine | Total Acres (3 Mines) |
|---|---|---|
| **Disturbed Area per Mine** | 310 | 930 |
| **Affected Area per Mine** | 3,976 | 11,928 |
| **Permit Area per Mine** | 5,865 | 17,595 |

The estimated acreage for three mines in the Mesaverde Group coal is 17,595 acres of permitted area. Nearly all of that total would be affected area, since a large proportion of the permitted area would likely be undermined. The total in **Table 6-2** shows that area at a point in time for one

July 2010          *Mineral Potential Report for the Grand Junction Resource Area*          6-3
*US Department of the Interior, Bureau of Land Management, Grand Junction Field Office*

BLM_0015589

mine of the hypothetical size of a GJFO planning area mine. The disturbed area is a great deal less, since it is the small area that contains roads and surface facilities that will require reclamation. For the example mine, that is slightly over 300 acres, resulting in an estimate of 930 disturbed acres for three mines in the GJFO planning area.

### 6.1.2   Oil Shale

Although the potential of oil shale as a source of fuel is widely recognized, there has not yet been economically successful conversion of oil shale into useable liquid fuels. Conversion requires retorting of the kerogen-rich shale at temperatures above approximately 900 degrees Fahrenheit. This can be done with shale removed by surface or underground mining or as an in-situ process in deep boreholes. Methodology will depend on thickness of overburden, resource thickness and grade, and environmental concerns.

Development of oil shale has not proven economically viable in the Piceance Basin as of the date this document was published. Current efforts consist of limited R&D for mining and surface retort in the Parachute Creek area east of the GJFO planning area and R&D for in-situ retort in the basin interior north of the GJFO planning area. Given the current economic conditions, the areas within the GJFO planning area have been designated as moderate for development potential within the next 20-year period, as shown in **Appendix A, Map 8**. This designation is based on the high potential for the occurrence of oil shale combined with the historic claim activity in the area. Technological advances or economic changes could increase the potential above this level. Development could result in up to 400 acres of direct surface disturbance.

### 6.1.3   Potash and Salt

The reasonably foreseeable development of potash mining in the Sinbad Valley is one mining operation, using solution mining for the highly soluble commodity. A similar operation in Utah has disturbed an area of 1,002 acres (Krahulec 2009). A similar operation is anticipated in the GJFO planning area, reaching up to 1,000 acres of disturbance. Demand for potash had been increasing in the US until slowed by the current economic recession. With the price and demand both increasing, the development potential for potash in the Sinbad Valley discussed in **Section 4.1.3** is considered high (**Appendix A, Map 18**).

6-4                     *Mineral Potential Report for the Grand Junction Resource Area*                     July 2010
*US Department of the Interior, Bureau of Land Management, Grand Junction Field Office*

BLM_0015590

## 6.2 LOCATABLE MINERALS

### 6.2.1 Uranium and Vanadium

The probability of mining at any location is strongly dependent on the price of the commodity, the grade of the deposit, and the costs of mining. Conclusions can be drawn from recent activity about the threshold price of uranium that will support mining in the GJFO planning area. When the uranium price passed $60 per pound, exploration activity resumed for the first time in years. When the price reached $130 per pound, exploration activity increased tenfold. Since the price has sunken back to $50 per pound and less, exploration activity has practically ceased. This implies that a uranium price of $60 per pound will support exploration and mining activity. An additional factor is that, as price of the commodity increases, the reserves that can be mined profitably also increase. The IAEA (2009) estimate of world nuclear capacity increasing 40 percent by 2030 implies that the demand for uranium will increase, and with it, the price.

A complicating factor for uranium and vanadium mining on the Colorado Plateau is the conventional milling capacity. Currently, only one conventional uranium mill is operating in the US. The White Mesa Mill in Blanding, Utah, can accept ore from mines in the GJFO planning area. A second mill is being planned in the Paradox Valley just south of the GJFO planning area. Multiple milling opportunities would reduce the cost of processed uranium and further increase the number of mines operating.

The anticipated mining method in the GJFO planning area is underground mining. For many of the properties in the GJFO planning area, infrastructure such as roads and mine openings and workings already exist. Once permitting obligations are fulfilled, mining could begin rather quickly. Other mining methods, such as in-situ recovery, are not considered appropriate for the Uravan. In-situ recovery requires specific hydrogeologic conditions, including deposits located beneath the local water table. That condition is not met by deposits in the Uravan District.

Uranium mining is a competitive business, and many factors must be considered in predicting the future of mining in a given area. Production costs are a key economic driver; political climate is also important. For example, breccias pipe deposits occurring in northern Arizona generally are higher grade and carry lower production costs than the underground mining in the Uravan District. However, the current political climate for mining in the vicinity of the Grand Canyon has placed a moratorium on further efforts in that area. In-situ recovery is generally less expensive and avoids the necessity of conventional milling that is a problem in the US. Attempts at in-situ recovery mining in Colorado have met with public and political opposition. A further benefit of the ores in the GJFO planning area is the abundance of vanadium, not found in all uranium deposits. The ability to recover vanadium enhances the value of the Uravan ores.

The future of any individual mining operation will depend upon the determination of the mining company of the potential profitability of their venture. Based on the activity generated in the GJFO planning area by the enhanced uranium spot price, it seems that numerous companies think that the market will support their ability to profit from mining in the area. Assuming that uranium prices increase during the 20-year period, and that sufficient conventional milling is available, development potential is high (**Appendix A, Map 14**), and it is anticipated that at least 20 new mines will be opened within the GJFO planning area. The currently operating Whirlwind Mine

BLM_0015591

will cause 24 acres of disturbance. Using that as an example, 20 additional uranium mines would cause 504 acres of disturbance.

### 6.2.2   Gold

The steadily increasing price of gold (approximately $1,300 per ounce in May 2010) and the fear of monetary inflation have spurred the interest in gold prospecting and inflation at all levels recently. Reasonably foreseeable development of gold mining in the GJFO planning area is limited to placer mining along the Dolores River corridor, and is rated as high (**Appendix A, Map 19**, Gold Placer Deposits – Development Potential). The activity involves relatively little acreage. Personal communication with Scott Gerwe, BLM GJFO, indicates that recent claims have been staked by small-scale operators (Gerwe 2009). It is estimated that a maximum of twenty claims will become active over the next twenty years, with approximately an acre of disturbance per claim, yielding 20 acres of disturbance. There is no reasonable foreseeable development of lode gold mining within the GJFO planning area.

### 6.2.3   Copper

The price of copper reached record highs in 2008 before dropping as worldwide demand dropped. With demand increasing in 2009, copper has regained much of its lost price, and, with the increasing demands for copper in energy development and resumption of demand in developing countries, the interest in historic areas of copper occurrence is likely to increase. Development potential is determined to be moderate in the Sinbad Valley area, given its relatively significant history, but low in the rest of the areas with occurrence potential (**Appendix A, Map 20**, Copper Deposits – Development Potential).

One new copper mine is projected in the GJFO planning area. An estimate of disturbance is based on the disturbance at the Lisbon Valley Mine in adjacent Utah, discussed in the Moab Mineral Potential Report (BLM 2005). The disturbed acreage was estimated at 1,103 acres of combined Federal, state, and private land. A copper operation in the Sinbad Valley can be assumed to occupy a footprint of that size, so the surface disturbance with reasonably foreseeable development of one copper mine in the GJFO planning area is 1,103 acres.

### 6.2.4   Silver

The steadily increasing price of silver (up 200 percent from 2005 to 2009) has led to renewed interest in historic prospects. It is projected that no silver mining will take place on its own, but silver production could occur with copper production, discussed in Section 6.2.3, Copper. For this reason, the development potential in the Sinbad Valley, likely associated with copper deposits, is considered to be moderate (**Appendix A, Map 25**, Silver Deposits – Development Potential).

## 6.3   SALABLE MINERALS

### 6.3.1   Sand and Gravel

While abundant sand and gravel resources exist on GJFO-administered lands, most of the sand and gravel needs are being met by mining operations on fee lands, mostly adjacent to the Colorado River. Activity at existing and future sand and gravel operations will depend on the economy of the Grand Junction area. The development potential for sand and gravel is considered to be moderate for BLM-administered lands (**Appendix A, Map 22**).

BLM_0015592

The two current operations on GJFO-administered lands have permitted disturbance areas of 35.6 and 152.16 acres for a total of 187.76 acres. Assuming continued development demanding gravel resources, it is anticipated that an area roughly double that will be needed in the next 20 years, for a total anticipated disturbance of 400 acres. Future use of these gravel operations (and others) will depend on the economy of the Grand Junction area.

### 6.3.2    Dimension and Decorative Stone

Development potential of the Wingate Sandstone of the Glen Canyon Group is considered moderate (**Appendix A, Map 26**) because the best and most accessible deposits are no longer accessible. The glacial deposits are considered moderate even though the stone is marketable because of the distance of the deposits from the larger market in Grand Junction. The Dakota Sandstone is considered low in development potential.

Generally the size of dimension stone operations is rather small, with existing operations in the area occupying 4 to 8 acres. An estimate of several small operations opening in the next 20 years yields a prediction of 20 acres total disturbance over that time period.

### 6.3.3    Clay

The development potential for the existing site at Little Park Road Community Use Area is high, but the development potential for the Mancos Shale and the rest of the Morrison Formation is moderate (**Appendix A, Map 24**) for both bentonite and common clays. Both bentonite and common clay operations are generally small in Colorado. Assuming continued development of the existing bentonite pit and the development of two additional pits, an estimated 10 acres of disturbance could occur over the next 20 years for clay.

BLM_0015593

This page intentionally left blank.

BLM_0015594

# CHAPTER 7
# SUMMARY AND CONCLUSION

The mineral resource occurrence and development potential for the GJFO planning area was assessed using the system outlined in the BLM Manual 3031 (see **Chapter 5**, Potential for Occurrence). Mineral resource development in the GJFO planning area during the next 15 to 20 years is estimated to have a cumulative disturbance of up to 4,350 acres. The conclusions regarding specific mineral resources (except oil/gas and coal-bed methane) occurring within the planning area are summarized as follows.

### Coal

The Mesaverde Group coals in the GJFO planning area are the main source for potential future development. Coal resources in the Mesaverde Group at depths of less than 3,000 feet have an occurrence potential of high with a certainty level of D. Coals in that unit at greater than 3,000 feet deep are not quite as well know and have an occurrence potential of moderate with a certainty level of C. Coals in the Dakota Group have a low potential for occurrence with a certainty level of C.

The development potential for Mesaverde coals at less than 3,000 feet deep is high; for Mesaverde coals at greater than 3,000 feet the potential is moderate. The development potential for coals in the Dakota group is low. Coal development activity is expected to result in three new underground mines disturbing approximately 930 acres in the Book Cliffs near the now active McClane Canyon coal mine.

### Oil Shale

There is a high potential, with a certainty level of D, for the occurrence of oil shale in the Parachute Member of the Green River Formation in the northern portion of the GJFO planning area, including areas where the Parachute Member occurs beneath non-oil shale-bearing cover strata. The potential for increasing prices for petroleum and the constantly developing technological advances are interpreted to give the area a moderate level of probability for development. This development will probably involve small, experimental pilot operations totaling several hundred acres (300 to 400 acres).

BLM_0015595

***Potash and Sodium***

Potash and salt (sodium chloride) are known to occur in the Paradox Formation, outcropping in the Sinbad Valley at the extreme southwest corner of the GJFO planning area. The probability of occurrence in the Sinbad Valley area is considered high with a certainty level of D. The observation that a mining company has inquired about an exploration permit for the area leads to the conclusion that development potential within the next twenty years is high. Reasonably foreseeable development involves a single solution mining operation with a disturbed area of 1,000 acres.

***Uranium and Vanadium***

Uranium and vanadium are considered together, because they occur together in the ores of the GJFO planning area. A high potential for uranium and vanadium exists in areas of historical mining with a certainty level of D. The NURE "Favorable Area" described by the USGS is also considered high, with less certainty (C). The most favorable geologic unit, the Jurassic Morrison Formation, along with geologic units that contain uranium deposits in other areas of the Colorado Plateau, are considered to have a moderate probability of uranium and vanadium occurrence with a certainty level of C. The remainder of the GJFO planning area is considered to have no potential.

The areas of historical mining are considered to have a high potential for development, the NURE Favorable Area, has a moderate potential for development, and the Morrison Formation in the GJFO planning area, outside those two areas, is considered to have low potential.

The assumption is made that the price of uranium will encourage mine development in the GJFO planning area in the next 20 years. Reasonably foreseeable development in the next 20 years includes 20 new underground uranium mines with a disturbed area of 480 acres.

***Gold***

The occurrence potential for gold in the GJFO planning area is high with a certainty level of D in placer deposits along the Dolores River corridor. The development potential on the alluvial plane and the benches above the Dolores River are considered high also. There is considered to be no potential for occurrence or development of lode gold within the GJFO planning area.

Reasonably foreseeable development of placer gold deposits along the Dolores River is approximately 20 acres.

***Copper***

The occurrence potential for copper in the Sinbad Valley, in the extreme southwest corner of the GJFO planning area, is considered to be high with a certainty level of D. Potential in areas of historic small-scale copper mining in the Unaweep District northeast of Gateway is moderate with a certainty level of D. In the Unaweep Canyon area, areas away from the historic mines have a moderate potential with a certainty level of B, as do other geologic strata in the south of the GJFO planning area that contain redbed copper deposits in adjacent states.

Development potential in the Sinbad Valley is moderate, and development potential is low in the other areas.

BLM_0015596

Reasonably foreseeable development assumes one small mine of about 1,100 acres.

### Silver

Documented occurrence of silver deposits in the southwest end of the GJFO and adjacent areas of the Colorado Plateau leads to an assessment of occurrence potential for silver in the Sinbad Valley of moderate with a certainty level of B. Small, localized deposits containing silver in the Unaweep Canyon provide an occurrence potential of low with a certainty level of C for that area. There is considered to be no reasonably foreseeable development for silver alone. It is more likely that silver would be a by-product of copper mining, noted above.

### Sand and Gravel

Sand and gravel deposits have an occurrence potential of high in all alluvium, colluviums, gravel, and glacial deposits within the GJFO planning area with a certainty of D in areas already being mined and a certainty of B in other areas. The potential for development is moderate. Reasonably foreseeable development for sand and gravel within the GJFO planning area is 400 additional acres.

### Dimension and Decorative Stone

Areas of outcrop of the Glen Canyon Group (and specifically the Wingate Sandstone) have an occurrence potential of moderate with a certainty level of C for dimension stone. Not all the rocks of the Glen Canyon Group are suitable for flagstone like the Wingate Sandstone. Both the Dakota Sandstone and the glacial deposits of the Grand Mesa contain in places rocks suitable as decorative stone and have a Moderate occurrence potential with a certainty level of C. Development potential for the Glen Canyon Group is moderate, as are the glacial deposits. The development potential of the Dakota Sandstone is low. Reasonable foreseeable development for this resource could result in approximately 10 additional acres of surface disturbance.

### Clay

Usable bentonite clay does exist in the Brushy Basin Member of the Morrison Formation, but its occurrence is sporadic. The existing mine (Little Park Road community pit) has a high occurrence potential, while the remainder of the Morrison Formation has an occurrence potential of moderate with a certainty level of C. The Mancos Shale has a Moderate potential with a certainty level of C because of the occasional occurrence of clay zones. Development potential at the existing pit is high, while it is moderate for the rest of the Morrison Formation and Mancos Shale in the planning area. Reasonably foreseeable development includes continued utilization of the community pit plus an additional 10 acres of development over the next 20 years.

BLM_0015597

This page intentionally left blank.

BLM_0015598

# CHAPTER 8
# REFERENCES

Aubrey, William M. 1992. New interpretations of the stratigraphy and sedimentology of the uppermost Jurassic to lowermost Upper Cretaceous strata in the San Juan Basin of northwestern New Mexico. US Geological Survey Bulletin. 1808.

Aurant, H. A. 1924. Mineral Deposits of the Western Slope. Colorado Geological Survey Bulletin 22. 78 pp.

Baars, D. L. and G. M. Stevenson. 1981. Tectonic Evolution of the Paradox Basin, Utah and Colorado. Wiegand, D. L., ed. Geology of the Paradox Basin: Rocky Mountain Association of Geologists Guidebook, 1981 Symposium. pp. 23-32.

Blakey, R., and W. Ranney. 2008. Ancient Landscapes of the Colorado Plateau. Grand Canyon Association. Grand Canyon, Arizona.

Boardman, R. L., Ekren, E. Bartlett, and Howard E. Bowers. 1956. Sedimentary features of upper sandstone lenses of the Salt Wash Member and their relation to uranium-vanadium deposits in the Uravan District. Montrose County, Colorado: Contributions to the Geology of Uranium and Thorium by the US Geological Survey and the Atomic Energy Commission. US Geological Survey Professional Paper. pp. 300.

Burnell, James R., Christopher Carroll, and Genevieve Young. 2008. Colorado Mineral and Energy Industry Activities, 2007: Colorado Geological Survey Information Series 77.

Butler, A. P. Jr. 1964. Uranium in Mineral and Water Resources of Colorado. US Geological Survey and the Colorado Mining Industrial Development Board.

Butler, B. S. 1915. Notes on the Unaweep Copper District, Colorado. USGS Bulletin 580-B. pp. 12.

Butler, G. Montague. 1914. Clays of Eastern Colorado. Colorado Geological Survey Bulletin 8.

BLM_0015599

Carrara, Paul E. 2000. Geologic Map of the Palisade Quadrangle, Mesa County, Colorado. US Geological Survey Miscellaneous Field Studies Map MF-2326.

Carroll, C.J. and M.A. Bauer. 2002. Historic Coal Mines of Colorado; Colorado Geological Survey Information Series 64.

Carroll, C. J., M. A. Bauer, and T. M. Mercier. 2009. Historic Coal Mines of Colorado. Colorado Geological Survey Information Series 64. CD-ROM.

Carter, William D., James I. Gualtieri, and Eugene M. Shoemaker. 1958. Preliminary Geologic Map of the Mount Peale 1 NE Quadrangle, San Juan County, Utah, and Montrose County, Colorado. US Geological Survey Mineral Investigations Field Studies Map MF 139.

Cater, Fred W. Jr. 1955a. Geology of the Davis Mesa Quadrangle, Colorado. US Geological Survey. Map GQ-71.

_____. 1955b. Preliminary Geologic of the Pine Mountain Quadrangle, Colorado. US Geological Survey. Map MF-20.

_____. 1955c. Geology of the Gateway Quadrangle, Colorado. US Geological Survey. Map GQ-55.

_____. 1970. Geology of the Salt Anticline Region in southwestern Colorado; US Geological Survey Professional Paper 637.

Chapin, C. E. and S. M. Cather. 1994. Tectonic Setting of the axial basins of the northern and Central Rio Grande Rift. Basins of the Rio Grande Rift: Structure, Stratigraphy, and Tectonic Setting. Geological Society of America Special Paper 291. pp. 5-26.

Colorado Bureau of Mines. Annual Reports for 1956, 1958, 1959, 1960, 1961, 1963, 1964, 1965, 1966. Denver, Colorado.

Colorado Bureau of Mines. A Summary of Mineral Industry Activities in Colorado for 1970, 1971, 1972, 1973, 1976, 1977, 1978, 1979. Denver Colorado.

Colorado Mineral, Oil and Shale Resources. 1924. State Board of Immigration, Denver, Colorado.

Condon, S. M. 1992. Geologic framework of pre-Cretaceous rocks in the Southern Ute Indian Reservation and adjacent areas, southwestern Colorado and northwestern New Mexico. Geology and mineral resources of the Southern Ute Indian Reservation. US Geological Survey Professional Paper 1505-A. pp. A1-A56

Craig, Lawrence C. 1981. Lower Cretaceous Rocks, Southwestern Colorado and Southeastern Utah. D. L. Wiegand, ed. Geology of the Paradox Basin: Rocky Mountain Association of Geologists Field Conference Guidebook. pp. 195-200.

Dalzell, T. J. 1908. Report of State Bureau of Mines for 1907-1908. Denver, Colorado. 81 pp.

BLM_0015600

Day, Warren C. and Dana J. Bove. 2004. Review of the Geology of Western Colorado. US Geological Survey Bulletin 2213-B.

DeCicco, D. A. et al. 1977. Leasable mineral and waterpower land classification map of the Moab Quadrangle, Utah, Colorado. US Geological Survey Open File Report. pp. 77-612.

De Voto, R. H. 1980. Pennsylvanian stratigraphy and history of Colorado. Kent, H.C., and K. W. Porter, eds. Colorado Geology: Rocky Mountain Association of Geologists Guidebook, 1980 Symposium. Denver, Colorado. pp. 71-102.

_____. 1990. Paleozoic stratigraphy, tectonism, thermal history, and basin evolution of Central Colorado. Beaty, D. W., G. P. Landis, and T. B. Thompson, eds. Carbonate-hosted sulfide deposits of the Central Colorado Mineral Belt. Economic Geology Monograph 7. pp. 29-44.

Doelling, H. 1983. Observations on Paradox Basin salt anticlines. Averett, W.R, ed. Northern Paradox Basin-Uncompahgre Uplift. Grand Junction Geological Society Field Trip, October 1983. pp 81-90.

Denison Mines Corporation. 2009. Annual Report 2008. Denison Mines Corporation, Toronto, Ontario, Canada.

Dolson, J. C. and D. S. Muller. 1994. Stratigraphic evolution of the Lower Cretaceous Dakota Group, Western Interior, US. Caputo, Mario V., James A. Peterson, Karen J. Franczyk, eds. Mesozoic Systems of the Rocky Mountain Region, USA. Rocky Mountain Section, Society for Sedimentary Geology. Denver, Colorado.

Donnell, J. R. 1987. Storehouse of energy minerals in the Piceance Basin. Taylor, O.J., ed. Oil shale, water resources, and valuable minerals if the Picaeance Basin, Colorado: The challenge and choices of development. US Geological Survey Professional Paper. 1310.

Donnell, J. R., W. E. Yeend, and M. C. Smith. 1984. Preliminary Geologic Map of the Mesa Quadrangle, Mesa County, Colorado. U. S. Geological Survey Miscellaneous Field Studies Map MF-1698.

_____. 1985a. Preliminary Geologic Map of the Housetop Mountain Quadrangle, Garfield and Mesa Counties, Colorado. US Geological Survey Miscellaneous Field Studies Map MF-1965.

_____. 1985b. Preliminary Geologic Map of the Mesa Quadrangle, Mesa County, Colorado. US Geological Survey Miscellaneous Field Studies Map MF-1698.

_____. 1988. Preliminary Geologic Map of the Hawxhurst Creek Quadrangle, Garfield and Mesa Counties, Colorado. US Geological Survey Miscellaneous Field Studies Map MF-2026.

Donnell, J. R., W. E. Yeend, L. J. Schmitt, M. C. 1992. Geologic Map of the De Beque Quadrangle, Garfield and Mesa Counties, Colorado. US Geological Survey Miscellaneous Field Studies Map MF-2201.

Dubiel, R. F. 2003. Geology, Depositional Models, and Oil and Gas Assessment of the Green River Total Petroleum System, Uinta-Piceance Province, Eastern Utah and Western Colorado. US Geological

BLM_0015601

Survey Uinta-Piceance Assessment Team. 2003. Petroleum and Geologic Assessment of Oil and Gas in the Uinta-Piceance Province, Utah and Colorado, US Geological Survey Digital Data Series DDS-69-B. 96 p.

Dyni, John R. 1987. Origin if oil shale and associated minerals. Taylor, O.J., ed. Oil shale, water resources, and valuable minerals if the Picaance Basin, Colorado: The challenge and choices of development. US Geological Survey Professional Paper. 1310.

Emmons, S. F. 1905a. Copper in the redbeds of the Colorado Plateau region. US Geological Survey Bulletin 260. pp. 221-232.

Emmons, W. H. 1905b. The Cashin Mine, Montrose County, Colorado. US Geological Survey Bulletin 285.

Finch, Warren I. 1991. Map showing distribution of uranium-deposit clusters in the Colorado Plateau mining province. US Geological Survey Miscellaneous Field Studies Map MF-2080.

Fischer, Richard P. 1936. Peculiar hydrothermal copper-bearing veins of the northeastern Colorado Plateau. Economic Geology, v. 31. pp. 571-599.

Franczyk, K. J., et al. 1992. Cretaceous and Tertiary paleogeographic reconstructions for the Uinta-Piceance Basin study area, Colorado and Utah. US Geological Survey Bulletin 1787.

Gerwe, Scott. 2009. Geologist, BLM, Grand Junction Field Office. Personal Communication with Jim Burnell, Colorado Geological Survey. 2009.

Hahne, F. J. 1979. Early uranium mining in the United States in Fourteenth International Symposium on the Discovery of Uranium. London, UK. Internet Web site: http://www.world-nuclear.org. Accessed April 9, 2007.

Hansen, Wallace R. 1965. The Black Canyon of the Gunnison: Today and Yesterday. US Geological Survey Bulletin 1191.

_____. 1968. Geologic map of the Black Ridge Quadrangle, Delta and Montrose Counties, Colorado. US Geological Survey Map GQ-747.

_____. 1971, Geologic Map of the Black Canyon of the Gunnison River and Vicinity, Western Colorado; US Geological Survey Misc. Geologic Investigations Map I-584.

Hansen, W. R. and Z. E. Peterman. 1968. Basement-rock geochronology of the Black Canyon of the Gunnison, Colorado. US Geological Survey Professional Paper 600-C. pp. C8-C90.

Hettinger, R.D., L. N. R. Roberts, and T. A. Gognat. 2000. Investigations of the Distribution and Resources of Coal in the Southern Part of the Piceance Basin, Colorado, Chapter O.

Hettinger, R. D. and M. A. Kirschbaum. 2002. Stratigraphy of the Upper Cretaceous Mancos Shale (upper part) and Mesaverde Group in the southern part of the Uinta and Piceance basins, Utah and Colorado: US Geological Survey Geological Investigations Series I-2764.

BLM_0015602

Hettinger, R. D., L. N. R. Roberts, and M. A. Kirschbaum. 2004. Coal Resources and Coal Resource Potential, Chapter M in Bankey, Viki, ed., Resource Potential and Geology of the Grand Mesa, Uncompahgre, and Gunnison (GMUG) National Forests and Vicinity, Colorado. US Geological Survey Bulletin 2213-M.

Heyman, O. G. 1983. Distribution and Structural Geology of Faults and Folds Along the Northwestern Uncompahgre Uplift, Western Colorado and Eastern Utah, in Averett, W.R, ed, Northern Paradox Basin-Uncompahgre Uplift. Grand Junction Geological Society Field Trip. October 1983, pp 45-58.

Holmes, R. V. and C. M. Harrer. 1952. Investigation of the Colorado Copper Co. properties, Mesa and Montrose Counties, Colorado. US Bureau of Mines RI-4869.

Hunter, J. F. 1925. Precambrian Rocks of the Gunnison River, Colorado. US Geological Survey Bulletin 777.

International Atomic Energy Agency. 2009. IAEA Revises Nuclear Power Projections Upward. 9 Sep 2009. Internet Web site: http://www.iaea.org/NewsCenter/News/2009/npprojections.html. Accessed September 22, 2009.

Interncontinental Potash Corporation. 2009. Internet Web site: http://www.intercontinentalpotash.com/projects/sinbadvalley. Accessed September 14, 2009.

Isachsen, Y. W., T. W. Mitcham, and H. B. Wood. 1955. Age and sedimentary environments of uranium host rocks, Colorado Plateau. Economic Geology, vol. 50. pp. 127-134.

Isachsen, Y. W. and C. G. Evenson. 1956. Geology of uranium deposits of the Shinarump and Chinle Formations on the Colorado Plateau. US Geological Survey Professional Paper 300.

Johnson, Ronald C. 1985. Preliminary Geologic Map of the Winter Flats Quadrangle, Garfield and Mesa Counties, Colorado. US Geological Survey Miscellaneous Field Studies Map MF-1777.

Johnson, Ronald C. and T. M. Finn. 1986. Cretaceous Through Holocene History of the Douglas Creek Arch, Colorado and Utah. Stone, D.S. and K. S. Johnson, eds. New Interpretations of northwest Colorado Geology. Rocky Mountain Association of Geologists Guidebook, 1986 Symposium. pp 77-96.

Johnson, Ronald C. and B. J. Douglas. 1980. Preliminary Geologic Map of the Wagon Track Ridge Quadrangle, Garfield and Mesa Counties, Colorado. US Geological Survey Miscellaneous Field Studies Map MF-1182.

Johnson, Ronald C. 1985. Preliminary Geologic Map of the Winter Flats Quadrangle, Garfield and Mesa Counties, Colorado: U. S. Geological Survey Miscellaneous Field Studies Map MF-1777.

Johnson, Ronald C. et al. 2009. Assessment of In-Place Oil Shale Resources of the Green River Formation, Piceance Basin, Western Colorado. US Geological Survey Fact Sheet FS 2009-3012.

Kappele, William A. 1995. The Rockhound's Guide to Colorado. Falcon Press. Helena, Montana.

BLM_0015603

Kellogg, Karl S. 2004. Geologic Story of the Gunnison Gorge National Conservation Area, Colorado. US Geological Survey Professional Paper 1699.

Kirkham, R.M. and W. P. Rogers. 1981. Earthquake potential in Colorado. Colorado Geological Survey Bulletin 43. 171 p.

Kirschbaum, M. A., L. N. R. Roberts, and L. R. H. Biewick, eds. 2002. Geologic Assessment of Coal in the Colorado Plateau: Arizona, Colorado, New Mexico, and Utah. US Geological Survey Professional Paper 1625-B.

Kirschbaum, M. A. and R. D. Hettinger. 2002. Stratigraphy of the Upper Cretaceous Mancos Shale (upper part) and Mesaverde Group in the southern part of the Uinta and Piceance basins, Utah and Colorado. US Geological Survey I-Map-2764.

_____. 2004. Facies analysis and sequence stratigraphic framework of upper Campanian strata (Neslen and Mount Garfield formations, Bluecastle Tongue of the Castlegate sandstone, and Mancos Shale), Eastern Book cliffs, Colorado and Utah. US Geological Survey Digital Data Series publication DDS-69-G. CD-ROM.

Kitco. 2009a. Historical Gold Charts and Data. Internet Web site: http://www.kitco.com/charts/historicalgold.html. Accessed November 4, 2009.

Kitco. 2009b. Spot Copper Historical Charts and Graphs. Internet Web site: http://www.kitcometals.com/charts/copper_historical.html. Accessed November 4, 2009.

Krahulec, Ken. 2009. Geologist, Utah Geological Survey, Energy and Minerals Program. Personal communication with Jim Burnell, Colorado Geological Survey. December 2009.

Landis, E. R. 1959. Coal Resources of Colorado. US Geological Survey Bulletin 1072-C.

Lohman, S. W. 1965. Geology and Artesian Water Supply, Grand Junction Area, Colorado. US Geological Survey Professional Paper 451.

Mack, Greg H. and K. A. Rasmussen. 1984. Alluvial-fan sedimentation of the Cutler Formation (Permo-Pennsylvanian) near Gateway, Colorado. Geological Society of America Bulletin, v. 95, pp. 109-116.

Maughan, E. K. 1980. Permian and Lower Triassic Geology of Colorado. Kent, H.C. and K. W. Porter eds. Colorado Geology. Rocky Mountain Association of Geologists Guidebook, 1980 Symposium. Denver, Colorado. pp. 103-110.

McMillan, M. E., P. L. Heller, and S. L. Wing. 2006. History and causes of post-Laramide relief in the Rocky Mountain orogenic plateau Geological Society of America Bulletin. v. 118, No. 3-4. pp. 393-405.

Miller, G. A. 1987. Development of oil shale and associated minerals. Taylor, O.J., ed. Oil shale, water resources, and valuable minerals of the Picaeance Basin, Colorado: The challenge and choices of development. US Geological Survey Professional Paper 1310.

8-6                  *Mineral Potential Report for the Grand Junction Resource Area*                  July 2010
*US Department of the Interior, Bureau of Land Management, Grand Junction Field Office*

BLM_0015604

Mitchell, James R. 1997. Gem Trails of Colorado. Gem Guides Book Company. Baldwin Park, California.

Molenaar, C. M. 1981. Mesozoic Stratigraphy of the Paradox Basin – An Overview. Wiegand, D.L., ed. Geology of the Paradox Basin: Rocky Mountain Association of Geologists Field Conference Guidebook. pp. 119-127.

Moncure, G., and R. C. Surdam. 1980. Depositional environment of the Green River Formation in the vicinity of the Douglas Creek Arch, Colorado and Utah. University of Wyoming Contributions to Geology, vol. 19, no. 1, 99. pp. 9-24.

Morgan, Matthew L. et al. 2008. Geologic Map of the Delta Quadrangle, Delta and Montrose Counties, Colorado. Colorado Geological Survey. Open-File Report 08-02.

Moucha, Robert, Forte, M. Alessandro, David B. Rowley, Jerry X. Mitrovica, Nathan A. Simmons, and Stephen P. Grand. 2008. Mantle convection and the recent evolution of the Colorado Plateau and the Rio Grande Rift valley, Geology, June 2008, vol. 36. pp. 439-442.

Murphy, J. F. and R. S. Houston. 1955. Titanium-bearing black san deposits of Wyoming. Wyoming Geological Assoc. 10th Annual Field Conference Guidebook. pp. 190-196.

Nelson-Moore, James L., D. B. Collins, and A. L. Hornbaker. 1978. Radioactive Mineral Occurrences of Colorado. Colorado Geological Survey Bulletin 40.

Odell, Robert D. 2007 Getting the Cake in the Can. Internet Web site: http://www.wma-minelife.com Accessed April 9, 2007.

O'Sullivan, Robert B. 1992. The Jurassic Wanakah and Morrison Formations in the Telluride-Ouray-Western Black Canyon Area of Southern Colorado. US Geological Survey Bulletin 1927.

_____. 2004. Correlation of the Middle Jurassic San Rafael Group and Related Rocks from Bridgeport to Ouray in Western Colorado. US Geological Survey Scientific Investigations Map 2849.

O'Sullivan, R. B, M. A. Carey, and S. C. Good, 2006. Fossils from the Middle Jurassic Wanakah Formation near Delta in Western Colorado. US Geological Survey Scientific Investigations Report 2006-5105.

Parker, Jr., Ben H. 1992. Gold Panning and Placering in Colorado. Colorado Geological Survey Information Series 33. 83 pp.

Pearl, Richard M. 1972. Colorado Gem Trails and Mineral Guide, 3rd edition. Swallow Press. Athens OH.

Pipiringos, G. N. and R. B. O'Sullivan. 1978. Principal Unconformities in Triassic and Jurassic Rocks, Western Interior United States – A Preliminary Survey. US Geological Survey Professional Paper 1035-A.

BLM_0015605

Poole, Forest G. and George A. Williams. 1956. Direction of sediment transport in the Triassic and associated formations of the Colorado Plateau. Contributions to the Geology of Uranium and Thorium by the US Geological Survey and the Atomic Energy Commission. US Geological Survey Professional Paper 300.

Prud'homme, Michel and Stanley T. Krukowski. 2006. Potash in Industrial Rocks and Minerals. Kogel, Jessica E. et al; eds. Society for Mining Metallurgy and Exploration, Inc. Littleton, Colorado.

Ringholz, Raye. 2006. Uranium Boom, in From the Ground Up, the History of Mining in Utah. Whitley, Colleen, editor. Utah State University Press. Logan, Utah.

_____. 2007 Uranium Mining in Utah in Utah History to Go. Internet Web site: http://historytogo.utah.gov. Accessed April 2007.

Roehler, H. W. 1992. Correlation, composition, areal distribution, and thickness of Eocene stratigraphic units, greater Green River basin, Wyoming, Utah, and Colorado. Geology of the Eocene Wasatch, Green River, and Bridger (Washakie) formations, greater Green River basin, Wyoming, Utah, and Colorado. US Geological Survey Professional Paper, 1506-E. pp. E1-E49.

_____. 1993, Eocene climates, depositional environments, and geography, greater Green River basin, Wyoming, Utah, and Colorado, IN Geology of the Eocene Wasatch, Green River, and Bridger (Washakie) formations, greater Green River basin, Wyoming, Utah, and Colorado: US Geological Survey Professional Paper, 1506-F. pp. F1-F74.

Schwochow, Stephen D. 1978. Mineral Resources Survey of Mesa County – A Model Study. Colorado Geological Survey, Resource Series 2.

Scott, Robert B. et al. 2002. Geologic map of Colorado National Monument and adjacent areas, Mesa County, Colorado. US Geological Survey Geologic Investigations Series I-2740.

Shawe, D. C. 1962. Localization of the uranium mineral belt by sedimentation. Short Papers in Geology and Hydrology. US Geological Survey Professional Paper 450-C. pp. C-6-8.

_____. 1976. Sedimentary Rock Alteration in the Slick Rock District, San Miguel and Dolores Counties, Colorado. US Geological Survey Bulletin 1009-E. pp. 125-168.

Shoemaker, E. M. 1955a. Preliminary Geologic Map of the Roc Creek Quadrangle, Colorado. Mineral Investigations Field Studies Map MF 23. US Geological Survey.

_____. 1955b. Preliminary Geologic Map of the Juanita Arch Quadrangle. Colorado, Mineral Investigations Field Studies Map MF 28.

Steven, T. A. and W. J. Hail, Jr. 1989, Geologic Map of the Montrose 30' x 60' Quadrangle, Southwest Colorado, U. S. Geological Survey Miscellaneous Investigations Series Map I-1939.

Stone, Donald S. 1977. Tectonic History of the Uncompahgre Uplift, in Veal, Harry, K., Exploration Frontiers of the Central and Southern Rockies. Rocky Mountain Association of Geologists Guidebook. 1977 Symposium. pp. 23-30.

BLM_0015606

Thamm, John K., Anthony A. Kovschak, Jr., and Samuel S. Adams. 1981. Geology and recognition criteria for sandstone uranium deposits of the Salt Wash Type, Colorado Plateau Province. National Uranium Resource Evaluation, Department of Energy. Grand Junction, Colorado.

Toth, Margo 1., et al. 1983. Geology and mineral resource potential of the Dominguez Canyon Wilderness Study Area, Delta, Mesa, and Montrose Counties, Colorado (GEM Phase 2). US Geological Survey Open-File Report 83-797.

Toth, Margo I., Charles G. Patterson, and Dolores M. Kulik,. 1987. Mineral Resources of the Dominguez Canyon Wilderness Study Area, Delta, Mesa, and Montrose Counties, Colorado. US Geological Snrvey Bulletin 1736.

Tweto, Ogden. 1987. Rock units of the Precambrian basement of Colorado. US Geological Survey Professional Paper 1321. 54 pp.

Tyler, R. 1995. Tectonic Evolution and Stratigraphic Setting of the Piceance Basin, Colorado: A Review, Tyler, R., et al, eds. 1995. Geologic Characterization and Coalbed Methane Occurrence: Williams Fork Formation, Piceance Basin, Northwest Colorado. Bureau of Economic Geology, The University of Texas at Austin for the Gas Research Institute. Exploration and Production Group, Annual Report March 1995. pp 1-31.

US Bureau of Land Management. 2005. Moab Planning Area Mineral Potential Report. Moab Field Office, Moab, Utah.

_____. 2010. Reasonably Foreseeable Development Scenario for Oil and Gas, Grand Junction Field Office, CO.

US Department of Energy. 2009. Uranium Leasing Program – DOE Leasing Program. Internet Web site: http://www.lm.doe.gov/default.aspx?id=119. Accessed on August 10, 2009.

US Geological Survey Commodity Statistics and Information. 2010. Potash. US Geological Survey Mineral Commodities Surveys, January 2010.

US Geological Survey Branch of Mineral Classification. 1971. Reported occurrences of selected minerals in Colorado, US Geological Survey Mineral Resource Map MR-57.

US Geological Survey and Colorado Mining Industrial Development Board. 1964. Mineral and Water Resources of Colorado.

_____. 1968. Mineral and Water Resources of Colorado.

Vanderwilt, J. W. 1947. Mineral Resources of Colorado. Colorado State Mineral Resources Board. 547 pp.

Voynick, Stephen M. 1992. Colorado Gold. Mountain Press Publishing. Missoula, Montana.

Voynick, Stephen M. 1994. Colorado Rockhounding. Mountain Press Publishing. Missoula, Montana.

BLM_0015607

Waage, Karl M. 1953. Refractory clay deposits of south-central Colorado. US Geological Survey Bulletin 993.

Witkind, I. J. 1976. Preliminary map showing known and suspected active faults in Colorado. US Geological Survey Open-File Report 76-154.

Worcester, P. G. 1919. Molybdenum deposits of Colorado with general notes on the molybdenum industry. Colorado Geological Survey Bulletin 14.

Wright, Robert J. and Donald L. Everhart. 1960. Uranium, in Mineral Resources of Colorado First Sequel. State of Colorado Mineral Resources Board. pp. 329-365.

Young, R. G. 1955. Sedimentary facies and intertonguing in the Upper Cretaceous of the Book Cliffs, Utah-Colorado. Geological Society of America Bulletin. v. 66, no. 2. pp. 177–202.

_____. 1983. Book Cliffs Coal Field, Western Colorado. Grand Junction Geological Society 1983 Field Trip Guide, pp. 9-15.

BLM_0015608

# Appendix A
## Maps

This page intentionally left blank.

BLM_0015610

# APPENDIX A
# MAPS

BLM_0015611

This page intentionally left blank.

BLM_0015612



**Map 1**
**Grand Junction Planning Area**
**Surface Management Status**

**EXPLANATION**

— Road
········· Rail line
— River

**Surface Management**

- Bureau of Land Management (BLM)
- BLM, Wilderness Study Area
- Bureau of Reclamation
- US Forest Service
- National Park Service
- State of Colorado
- State Park, Wildlife Area, or Recreation Area
- Private

0        5        10 Miles
Scale 1:250,000

Data sources:
Bureau of Land Management: Surface management, PLSS, administrative boundaries
Colorado Department of Transportation: Roads, railroads
Colorado Department of Local Affairs: Counties
US Geological Survey: Rivers, cities

BLM_0015613

This page intentionally left blank.

BLM_0015614



**EXPLANATION**

— Road
⋯⋯⋯ Rail line
— River

**Subsurface Federal Mineral Ownership**

- All Federal Minerals
- Federal Oil and Gas
- Federal Coal
- Federal Oil, Gas, and Coal
- Other Federal Minerals
- No Federal Minerals

**Map 2**
**Grand Junction Planning Area**
**Subsurface Federal Mineral Ownership**

BLM_0015615

This page intentionally left blank.

BLM_0015616



**Map 3**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Solid Mineral Lease Areas

**EXPLANATION**

— Road
---- Rail line
— River

**Coal Resource Lease Areas**

Authorized coal lease parcel

Closed coal lease parcel

**Other Mineral Resource Lease Areas**

Uranium lease parcel

Federal land (BLM, USFS, NPS, BOR)

BLM Wilderness Study Area

This page intentionally left blank.

BLM_0015618



**EXPLANATION**

Road

Rail line

River

**Mining Claims by Status**

Active

Closed

Federal land (BLM, USFS, NPS, BOR)

BLM Wilderness Study Area

**Map 4**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**

Mining Claims
(portrayed to closest 1/4 section)

This page intentionally left blank.

July 2010 *Mineral Potential Report for the Grand Junction Resource Area* A-10
*US Department of the Interior, Bureau of Land Management, Grand Junction Field Office*

BLM_0015620



**EXPLANATION**

Road

Rail line

River

**Salable Mineral Disposal Area by Commodity**

Clay

Sand and gravel

Stone

Soil

Federal land (BLM, USFS, NPS, BOR)

BLM Wilderness Study Area

**Map 5**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Salable Mineral Disposal Areas

Case No. 1:20-cv-02484-MSK   Document 30-6   filed 04/27/21   USDC Colorado   pg 124 of 219

This page intentionally left blank.

BLM_0015622



**EXPLANATION**

— Road
······· Rail line
—— River

**Geologic Structures**

—— Fault, certain
—— Fault, concealed
----- Fault, inferred
—✕— Anticline
—✕— Syncline

**Generalized Geologic Units**

| | |
|---|---|
| Qae | Alluvium and eolian deposits (Quaternary) |
| Qc | Colluvium (Quaternary) |
| Qgo | Older gravel (Quaternary) |
| Qd | Glacial drift (Quaternary) |
| Tb | Basalt flows (Tertiary) |
| Tg | Green River Formation (Tertiary) |
| Tw | Wasatch Formation (Tertiary) |
| Kmv | Mesaverde Group (Cretaceous) - Mesaverde Fm, Castlegate SS, Farrer Fm, Hunter Canyon Fm, Mt Garfield Fm, Neslin Fm, Sego SS |
| Km | Mancos Shale (Cretaceous) |
| Kdb | Dakota SS and Burro Canyon Fm (Cretaceous) |
| Jm | Morrison Formation (Jurassic) |
| Jse | Summerville Fm and Entrada SS (Jurassic) |
| J-gc | Glen Canyon Group (Jurassic/Triassic) - Navajo SS, Kayenta Fm, Wingate, SS |
| Rcm | Chinle and Moenkopi Formations (Triassic) |
| Pc | Cutler Formation (Permian) |
| Ph | Hermosa Formation (Pennsylvanian) |
| pC | Precambrian |
| | Water |

**Map 6**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Generalized Geology

Data sources:
Bureau of Land Management PLSS, administrative boundaries
Colorado Department of Transportation: Roads, railroads
Colorado Department of Local Affairs: Counties
US Geological Survey: Geology, rivers, cities

BLM_0015623

Case No. 1:20-cv-02484-MSK   Document 30-6   filed 04/27/21   USDC Colorado   pg 126 of 219

This page intentionally left blank.

BLM_0015624



**EXPLANATION**

Road

Rail line

River

**Coal Mine Permits**

🔴 McClane Mine - Active

🟨 Red Cliff Mine - Pending/Proposed

🔺 Roadside Mine - Closed

**Coal Resource Lease Areas**

Authorized coal lease parcel

Closed coal lease parcel

**Coal Deposits - Development Potential**

Kmv   Mesaverde coal, <3000 ft deep - **High/D**

Kmv   Mesaverde coal, >3000 ft deep - **Moderate/C**

Kd    Dakota coal, <3000 ft deep - **Low/C**

**Map 7**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Coal Deposits - Occurrence Potential

This page intentionally left blank.

BLM_0015626



**EXPLANATION**

Road

Rail line

River

**Oil Shale Deposits- Occurrence Potential**

● Oil shale mine permit - **High/D**

Tgp   Parachute Creek Member of the
       Green River Formation - **High/D**

Tu    Uinta Formation overlying Parachute Creek
       Member of the Green River Formation - **High/D**

**Map 8**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Oil Shale Deposits - Occurrence Potential

BLM_0015627

This page intentionally left blank.

BLM_0015628



**EXPLANATION**

— Road
— Rail line
— River

**Uranium/Vanadium Deposits - Occurrence Potential**

- Active Uranium Mine - **High/D**
- NURE/Historic Mining Area - **High/D**
- DOE Lease Parcel - **High/D**
- Morrison Formation - **High/D**
- NURE Area - **High/C**
- Morrison Formation - **Moderate/C**
- Glen Canyon Group - **Moderate/C**

**Map 9**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Uranium and Vanadium Deposits - Occurrence Potential

Case No. 1:20-cv-02484-MSK   Document 30-6   filed 04/27/21   USDC Colorado   pg 132 of 219

This page intentionally left blank.

BLM_0015630



**EXPLANATION**

— Road
⋯ Rail line
— River

**Gold Placer Deposits - Occurrence Potential**

Qa  Alluvium and Terrace Deposits - **High/D**

Gravel and Alluvium - **High/D**

**Map 10**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Gold Placer Deposits - Occurrence Potential

BLM_0015631

This page intentionally left blank.

BLM_0015632



**Map 11**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Copper Deposits - Occurrence Potential

BLM_0015633

This page intentionally left blank.

BLM_0015634



**EXPLANATION**

—— Road

------- Rail line

—— River

**Silver Deposit - Occurrence Potential**

- Sinbad Mining District - **Moderate/B**
- Unaweep Mining District - **Low/C**
- Unaweep Mining District vicinity- **Low/C**
- Other geologic units - **Low/B**

**Map 12**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Silver Deposits - Occurrence Potential

BLM_0015635

This page intentionally left blank.

BLM_0015636



**Map 13**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Dimension Stone Deposits - Occurrence Potential

BLM_0015637

This page intentionally left blank.

BLM_0015638



**EXPLANATION**

Road
Rail line
River

**Uranium/Vanadium Deposits - Development Potential**

High

Moderate (NURE areas hatched)

Low

**Map 14**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Uranium and Vanadium Deposits - Development Potential

This page intentionally left blank.

BLM_0015640



**Map 15**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Coal Deposits - Development Potential

BLM_0015641

This page intentionally left blank.

*Mineral Potential Report for the Grand Junction Resource Area*
*US Department of the Interior, Bureau of Land Management, Grand Junction Field Office*

BLM_0015642



**EXPLANATION**

—— Road

······· Rail line

—— River

**Oil Shale Deposits- Development Potential**

Moderate

**Map 16**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Oil Shale Deposits - Development Potential

This page intentionally left blank.

BLM_0015644



Map 17
Grand Junction Field Office Planning Area
Mineral Potential Report
Potash and Salt Deposits - Occurrence Potential

This page intentionally left blank.

*Mineral Potential Report for the Grand Junction Resource Area*
*US Department of the Interior, Bureau of Land Management, Grand Junction Field Office*

BLM_0015646



**Map 18**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Potash and Salt Deposits - Development Potential

EXPLANATION
— Road
----- Rail line
— River

**Potash and Salt Deposits - Development Potential**
High

BLM_0015647

This page intentionally left blank.

July 2010

*Mineral Potential Report for the Grand Junction Resource Area*
*US Department of the Interior, Bureau of Land Management, Grand Junction Field Office*

A-38

BLM_0015648



**Map 19**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Gold Placer Deposits - Development Potential

EXPLANATION

—— Road
----- Rail line
—— River

**Gold Placer Deposits - Development Potential**

🟩 High

This page intentionally left blank.

BLM_0015650



**Map 20**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Copper Deposits - Development Potential

**EXPLANATION**
— Road
---- Rail line
— River
**Copper Deposits - Development Potential**
Moderate
Low

This page intentionally left blank.

BLM_0015652



**EXPLANATION**

Road

Rail line

River

**Sand and Gravel Deposits - Occurrence Potential**

● Sand and Gravel Site - **High/D**

Qae  Quaternary alluvium - **High/B**

**Map 21**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Sand and Gravel Deposits - Occurrence Potential

BLM_0015653

This page intentionally left blank.

BLM_0015654



**Map 22**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Sand and Gravel Deposits - Development Potential

BLM_0015655

This page intentionally left blank.

BLM_0015656



**EXPLANATION**

— Road

---- Rail line

— River

**Clay Deposits - Occurrence Potential**

● Existing Clay Site - **High/D**

Km  Mancos Shale - **Moderate/C**

Jmb  Brushy Basin Member Morrison Formation - **Moderate/C**

**Map 23**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Clay Deposits - Occurrence Potential

This page intentionally left blank.

BLM_0015658



**Map 24**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Clay Deposits - Development Potential

BLM_0015659

This page intentionally left blank.

BLM_0015660



**EXPLANATION**

— Road

┈┈ Rail line

— River

**Silver Deposits - Development Potential**

Moderate

Low

**Map 25**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Silver Deposits - Development Potential

This page intentionally left blank.

BLM_0015662



EXPLANATION
— Road
----- Rail line
— River

**Dimension Stone Deposits - Development Potential**

Moderate

Low

**Map 26**
**Grand Junction Field Office Planning Area**
**Mineral Potential Report**
Dimension Stone Deposits - Development Potential

BLM_0015663

This page intentionally left blank.

BLM_0015664

*BIO-Logic, Inc.*                    *Record of Conversation*

Date:  May 28, 2010
With:  Charles Sharp, Biologist, BLM Uncompahgre Field Office
Recorded By:  Steve Boyle
RE:  Occurrences of Colorado pikeminnow


I talked with Charlie Sharp by phone.  I asked him about known occurrences of Colorado pikeminnow in the UFO area.  He said that fish sampling efforts he is aware of, from unpublished data in the BLM Colorado State Office, have recently located individuals of Colorado pikeminnow in the Dolores River, near the confluence with the Colorado River.

BLM_0015665

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**COLORADO STATE OFFICE**
**2850 YOUNGFIELD STREET**
**LAKEWOOD, COLORADO 80215-7093**

In Reply Refer To:
6500 (CO-930) **P**

August 17, 2010

EMS TRANSMISSION  08/17/2010
Instruction Memorandum No. CO-2010-028
Expires:  09/30/2011

To:             District and Field Managers

From:           State Director

Subject:        Gunnison Sage-grouse (GUSG) and Greater Sage-grouse (GRSG) Habitat
                Management Policy on Bureau of Land Management (BLM) Administered Lands
                in Colorado

**Program Area**:  All Programs.

**Purpose**:  This Instruction Memorandum (IM) provides guidance to BLM Colorado Field
Offices (FOs) on sage-grouse (SG) habitat management for proposed activities and resource
management planning.  This guidance:

> • Recognizes the U.S. Fish and Wildlife Service's (FWS) recent GRSG Endangered
> Species Act (ESA) listing decision (March 5, 2010) and the FWS GUSG species status
> review and listing determination expected to be issued in September 2010.

> • Provides direction regarding implementation of the National BLM Sage-grouse
> guidance.

> • Ensures continued coordination with Colorado Division of Wildlife (CDOW) and other
> agency partners regarding implementation, update, and project prioritization of sage-
> grouse conservation and strategies identified in local, state, and rangewide sage-grouse
> conservation plans.

The term 'sage-grouse' refers to both Gunnison and Greater Sage-grouse collectively within this
guidance.  BLM Colorado will conduct an annual review of implementation of this policy to
determine the effectiveness of the guidance and make changes as necessary.

**Policy/Action**:  The GUSG and GRSG are BLM sensitive species that are to be managed to promote their conservation and minimize the need for listing under ESA, in accordance with BLM's special status species policy (BLM Manual 6840).  It is the policy of BLM Colorado to manage sage-grouse seasonal habitats and maintain habitat connectivity to support sustainable sage-grouse populations and/or sage-grouse population objectives as determined in coordination with CDOW.  This policy is consistent with strategies outlined in the Colorado Greater Sage-grouse Conservation Plan (CCP) and the Gunnison Sage-grouse Range-wide Conservation Plan (RCP).  This policy is consistent with the BLM National Sage-grouse Habitat Conservation Strategy (USDI BLM 2004a), WO IM 2010-071 (energy), WO IM 2010-022 (structures), WO IM 2010-149 (fire), CO IM 2008-44 (fire), WO IM 2004-110 (leasing), and CO IM 2005-03 (GUSG RCP).

This policy is structured to incorporate adaptive management processes in order to achieve habitat conservation, restoration and enhancement goals.  For the purposes of this IM, "core habitat" refers to those areas of highest conservation value as identified by BLM Colorado and CDOW and may include previously identified core, key or priority habitat designations.  For GUSG, "core" habitat will be areas of currently occupied habitat supporting Gunnison Sage-grouse populations, including those smaller populations that are vulnerable to localized extirpation but necessary to maintain range-wide connectivity and genetic diversity.  This policy applies to all activities and programs authorized and/or occurring on public lands, as well as Federal mineral estate in Colorado.

Where a proposed activity is occurring on private lands and a BLM right-of-way is needed to access those lands, the BLM may need to analyze the connected actions on private land and disclose the impacts of those activities on sage-grouse habitat.  If the actions on private lands are reasonable and foreseeable, then the impacts to sage-grouse habitat will be disclosed as direct or indirect impacts in the cumulative effects analysis for the right-of-way grant.

**Sage-grouse Habitat Mapping**
CDOW has completed initial statewide mapping efforts for GRSG (2008) and GUSG (2004) to include currently occupied habitat, potentially suitable habitat (in need of restoration, but capable of supporting sagebrush communities) and vacant/unknown habitat (suitable habitat with no documentation of occupancy).  In addition, core habitats for GRSG were first developed as a 'refuge concept' for the Colorado GRSG Conservation Plan (CCP, pg 293) via a CDOW modeling effort in 2008.  The initial core habitat mapping effort was intended to represent and protect 50-60 percent of the given GRSG population (based on male lek densities).  In some cases, this analysis identified core areas that protect more than 60 percent of the local estimated population, allowing a higher level of local management flexibility (GRSG CCP 2008, pg. 293).  It is recognized that representative population goals for management of GRSG core areas may need to be revisited to incorporate current research.

The BLM Washington Office (WO) is currently planning to contract a range-wide "priority habitat" mapping effort for GRSG (WO IM 2010-071).  CDOW is also in the process of updating the GRSG core habitat map for Colorado by incorporating additional seasonal habitats associated with known nesting/breeding habitat, and refining mapping criteria such as population goals.  BLM Colorado will continue to work with CDOW to ascertain the interrelationship of all

existing habitat mapping efforts.  Additional step-down guidance will be developed following coordination with CDOW on key conservation strategies applicable within core habitats, and completion of refined CDOW core area maps and the BLM range-wide priority habitat map for GRSG.

BLM Colorado will continue to work with CDOW and other partners to collect site-specific sage-grouse habitat data.  Sage-grouse habitat data includes seasonal habitat mapping (nesting, brood rearing, and winter) and/or sage-grouse habitat condition assessments (progress towards meeting sage-grouse habitat objectives set forth in state, range-wide or local conservation plans) as determined through Land Health Assessments or other BLM approved habitat monitoring methods.

## Land Use Planning

• Although conferencing is not required by law or BLM special status species policy as outlined in the BLM Manual 6840, BLM Colorado will coordinate and seek technical assistance from the FWS on future and in-progress Resource Management Plan (RMP) revisions or amendments with respect to SG habitats and planned land uses that occur within the planning area boundary.  This will be accomplished by including the appropriate SG species, conservation measures and associated analysis in discussion with the FWS during the planning process, and including the FWS as a cooperating agency in the planning process.

• During RMP revisions/amendments, BLM Colorado will ensure all new RMPs contain language consistent with recent IBLA decisions (Yates Petroleum Corp., IBLA 2006-213, 2006-226 and William P. Maycock, IBLA 2008-197, 2008-200) that give BLM discretion to modify surface operations to add specific mitigation measures supported by site-specific NEPA analysis undertaken during the development phase on existing leases.

• In RMP revisions/amendments, BLM Colorado will analyze one or more alternatives that exclude fluid mineral (oil & gas or geothermal) leasing, energy development, and rights-of-way in identified core sage-grouse habitat, when needed to maintain sustainable SG populations (per WO IM 2010-71).  During the RMP revision/amendment address the land allocations following expiration of oil & gas and geothermal leases with a full range of alternatives.  If no lease/no development scenario is selected through a RMP revision/amendment, when existing leases expire, the lands will not be re-offered for lease in core sage-grouse areas.

• BLM Colorado will continue to defer fluid mineral lease nominations in core sage-grouse habitat until management prescriptions and strategies outlined in species conservation plans (see Attachment 1 containing CCP and RCP document links) and potential impacts to local sage-grouse populations as summarized in recent/existing research studies have been evaluated and/or adopted through RMP revisions or amendments.

• When developing alternatives during the RMP revision process, BLM Colorado will identify landscape level sage-grouse resource objectives.  This should include thresholds

for allowable uses, adaptive management language to allow for consideration of new population and habitat data, as well as new scientific research and management recommendations, and a monitoring strategy to track progress in meeting those objectives. If funding for monitoring is unavailable, FOs need to ensure RMP alternatives contain "fallback" conservation measures to achieve desired resource objectives.

## All Program Areas

FOs are encouraged to:

• Work within multiple programs: including the recreation, hazardous fuels, fire management, range, and wildlife programs, to accomplish sage-grouse habitat conservation. When permitting or authorizing activities, FOs should consider, evaluate, and incorporate appropriate sage-grouse management strategies and best management practices (BMPs) through NEPA analysis or other regulatory processes. FOs should continue to implement appropriate BMPs through the appropriate permitting process in all program areas. BMPs include, but are not limited to, those identified at the local, state, or national level for oil and gas development in sage-grouse habitat.

• Continue coordination with CDOW on appropriate site-specific or population level management strategies (CCP 2008, RCP 2004). This will include, but is not limited to, consideration, prioritization, and implementation of management options outlined in the state, range-wide, and local sage-grouse conservation plans, as well as all subsequent updates.

• Evaluate and implement livestock grazing management practices that are consistent with achieving sage-grouse habitat objectives during allotment permit renewals or as identified though Land Health Assessments. Habitat objectives identified in the CCP (Appendix A) and RCP (Appendix H), depending on species, should be considered the fallback standards for managing sage-grouse seasonal habitats. If more localized habitat structural data is available, habitat objectives may be adjusted accordingly in coordination with CDOW on a population-by-population basis. Habitat objectives should always be managed with consideration to ecological site potential.

• Evaluate the need, and implement where appropriate, seasonal or permanent road or trail closures in core sage-grouse habitat through travel management planning.

• When renewable energy (e.g., wind, solar, or biomass) development and associated infrastructure (i.e., transmission lines) is proposed in sagebrush habitat, analyze the impacts to sage-grouse and avoid core sage-grouse habitat if warranted.

• Consider routing above-ground transmission lines outside of sage-grouse core habitats.

• Evaluate the impacts of non-discretionary activities managed under 43 CFR 3809 (those actions authorized under the 1872 mining law) on local sage-grouse populations, and clearly describe those effects that cannot be mitigated through the regulatory process. Analyze and mitigate wherever possible potential impacts of discretionary mining

activities approved under 43 CFR 3400 (such as coal management), 43 CFR 3500 (non-energy leasable materials), and exploration or extraction of other solid minerals through the NEPA process.  Discretionary mining activities will consider unsuitability criteria as it relates to sage-grouse as part of the tract delineation process.

• Incorporate adequate reclamation standards designed to re-establish suitable sage-grouse seasonal habitats to all surface disturbing activities within the range of the species. Incorporate native seed mixtures wherever possible in restoration efforts.  Use desired non-persistent, non-native vegetation in emergency rehabilitation only where necessary.

• Monitor all restoration activities for success in meeting vegetation objectives and reclamation standards, including potential weed infestations.  Conduct follow-up treatments to eliminate weeds as identified through monitoring.  If vegetation objectives are not being met, adjust restoration actions accordingly to improve success of achieving desired objectives.

**<u>Processing of Fluid Mineral Leases in Sage-grouse Habitat in Colorado</u>**
**New Plans/Revisions/Amendments:**
*New Nominated Leases*
    • In accordance with WO IM 2004-110, Change 1, "the State Directors have discretion to temporarily defer leasing on specific tracts of land based on information under review during planning."  Since the CCP (GRSG) and RCP (GUSG) were signed, it has been policy of the BLM Colorado State Office to defer leasing of core SG habitats until FO Plan Revisions have been completed, as these documents detail significant new information on SG not addressed in our current plans.  Deferral is necessary not to affect decisions related to future management actions.

• BLM Colorado Field Offices should consider and evaluate sage-grouse habitat conservation measures related to timing restrictions, distances or percentages of allowable surface disturbing activities, and desired density levels or other development constraints consistent with State or Range-wide SG Conservation Planning for Colorado (including subsequent updates), current peer reviewed SG research, or as developed in conjunction with CDOW to meet local population objectives, in RMP revisions or amendments.  FOs may vary in their application of development constraints, when those constraints are based on locally collected scientific data and information or local habitat conditions, and is clearly supported and outlined in the RMP NEPA analysis.  Those prescriptive measures carried forward through the selection of the preferred alternative in RMP revisions or as amended into existing RMPs, will be incorporated into all new leases within core or other sage-grouse habitats as outlined in the planning document. Where RMPs have been approved, appropriate stipulations will be added to new leases as described above.

• Lands determined to be available for lease and development within occupied SG habitat, and under what constraints, will be described in final Plan Revisions/Amendments.  Below is a Lease Notice that should be applied to all parcels offered for sale within occupied SG habitat.

6

*Lease Notice*

Greater Sage-grouse (or Gunnison, as appropriate) Habitat:  The lease may in part, or in total, contain important Greater (or Gunnison, as appropriate) Sage-grouse habitats, as identified by the BLM, either currently or prospectively.  The operator may be required to implement specific measures to reduce impacts of oil and gas or geothermal operations on the Greater (or Gunnison, as appropriate) Sage-grouse populations and habitat quality.  Such measures shall be developed during the Application for Permit to Drill (APD) on-site and environmental review process, or during the environmental review process for sundry notices and associated rights-of-way, and will be consistent with lease rights granted.

*Existing Leases*

For authorization of any development actions (for individual APDs or where an operator proposes a Master Development Plan) where there are valid existing rights, FOs must coordinate with CDOW (consistent with COGCC MOU) and industry on management actions designed to minimize impacts to sage-grouse or their habitat, including Conditions of Approval (COAs) that will be applied to future APDs.   BLM must ensure that any proposed COAs or mitigation measures are consistent with the RMP, are adequately supported by site-specific NEPA analysis, and do not violate any lease rights (see Yates Petroleum Corp. 176 RBLA 144 (2008)).  Offices are encouraged to work with CDOW and industry in advance of planned development to develop potential strategies in a particular geographic area.  This pre-planning may include conservation strategies such as sitting a project in lower quality habitat or clustering activities to minimize fragmentation of existing habitat patches.  This policy does not preclude the development and immediate implementation of new mitigation or conservation measures necessary to reduce activity/project impacts to sage-grouse or their habitats, provided this mitigation is in accordance with existing RMPs.  Any new measures applied for sage-grouse will be coordinated with CDOW.  FOs will work with project proponents, the state and private landowners when appropriate to implement direct mitigation (e.g. relocating disturbance, timing restrictions, etc.) and utilize COAs.  Ensure any recommended COAs or "agreed to" stipulations are supported by appropriate analysis through NEPA during the APD, POD, or use authorization approval process.  Biologists are encouraged to reference existing analysis or accepted recommendations from national, range-wide, state or local conservation plans, existing or new peer reviewed research studies or other scientific reports, within the NEPA analysis, rather than restate those analyses.  However, such references must clearly tie to the local population conditions, need and applicability.

For existing leases, conditions to the approval of APDs that are more protective than the stipulations or restrictions identified in the applicable Resource Management Plan (RMP) can only be attached where supported by the NEPA analysis in the RMP.  If existing RMPs do not contain this language (see Yates/Maycock decisions), the mitigation guidelines in the plan must give BLM the discretion to modify surface operations to add specific mitigation measures.  If the existing lease is in core SG habitat, and the plan does not contain this type of language, FOs should request the operator to modify existing stipulations or add an additional stipulation to mitigate the impacts to SG habitat.  When applicable under 43 CFR 3101.1-4, if modification of a stipulation involves an issue of major concern to the public, modification of the stipulation will be subject to public review for at least 30 days.  Posting a notice in the FO public room will satisfy this requirement.  If the operator refuses to sign a stipulation modification or to add a new

stipulation, the BLM will need to carefully evaluate whether the project can proceed based on the level of impacts identified in the site- specific NEPA analysis.

Where authorized in the applicable RMP, exceptions to lease stipulations or COAs in sagebrush habitats will be considered on a case-by-case basis and coordinated with CDOW before approval.  Any exception authorized in SG core areas will require District Manager review.

## Sagebrush Habitat Improvement Projects
• All sage-grouse habitat improvement projects should clearly articulate and document the need for the project to achieve desired habitat objectives.   Documentation should include current habitat condition assessments and specific treatment objectives as it relates to sage-grouse habitat.

• All vegetation treatments in sagebrush habitat should consider and incorporate site-specific sage-grouse habitat needs into project design, analysis, and approval, when those projects are completed to meet other program area objectives.

• All habitat treatments and management prescriptions in sage-grouse habitat should incorporate appropriate effectiveness monitoring to determine one or more of the following: 1) the effectiveness in meeting site-specific sage-grouse habitat objectives, 2) the long term impacts to local sage-grouse populations, and 3) meeting specific project or management objectives as it relates to sage-grouse or their habitat.  Monitoring design and objectives will be coordinated and/or conducted in conjunction with CDOW, and will use BLM accepted inventory or monitoring methods.

• BLM Colorado will continue to support, coordinate with, and participate in sage-grouse conservation activities that are led or initiated by CDOW, local workgroups, or other partnerships.  Such activities may include, but are not limited to, ongoing sage-grouse research studies, habitat modeling efforts, conservation planning and project implementation, and population monitoring.

## Adaptive Management
For purposes of this IM, adaptive management is used in two broad contexts:
1. Incorporating applicable new research or guidance into sage-grouse management.
2. Adjusting management to achieve specific sage-grouse resource objectives as determined through monitoring (DOI Technical Guide for Adaptive Management, Williams et.al 2007).

As new research, national or state management guidance, population or habitat data, or other pertinent sage-grouse information becomes available, recommended management of this species in Colorado should be adjusted accordingly.  All recommended management applications will continue to be implemented via NEPA analysis.  This guidance will be reviewed on an annual basis for success in implementation and effectiveness in meeting sage-grouse resource objectives.

Alternatively, where specific sage-grouse or habitat objectives have been set, use monitoring data to determine the effectiveness of existing management actions in meeting those objectives. If not deemed effective, management prescriptions should be adjusted to meet identified resource objectives.

**Timeframe**: This IM is effective immediately.

**Budget Impact**: This IM will result in additional operational costs for coordination, NEPA review, and monitoring of all activities in Gunnison and Greater Sage-grouse habitats in Colorado.

**Background:** Since 1999, both the Gunnison and Greater Sage-grouse have been petitioned and reviewed for listing under ESA several times. In 2009, *Ecology and Conservation of Greater Sage-Grouse: A Landscape Species and Its Habitats*, (Studies in Avian Biology, Cooper Ornithological Soc.) was completed and provided substantial information to FWS for their respective species review. In March, 2010, greater sage-grouse were found to be warranted, but precluded from listing due to other higher listing priorities (http://www.fws.gov/mountain-prairie/species/birds/sagegrouse/FR03052010.pdf). As a candidate species, they will continue to be conserved as a BLM sensitive species. FWS will complete the species status review of Gunnison Sage-grouse and release their finding in September of 2010. Management prescriptions for this species may or may not change depending on the outcome of that decision.

GRSG occur in six 'populations' in Colorado, naturally separated by topography or forested habitat. Two of those populations likely interchange to the north with Wyoming sage-grouse populations. Similarly, GUSG occur in seven isolated 'populations,' one of which is connected to a GUSG population in Utah. Strongholds (loosely defined in this IM as larger self-sustaining populations) for these species in Colorado occur in Northwest CO and North Park for GRSG and in Gunnison Basin for GUSG. However, it is important to maintain existing populations and/or current distribution throughout the state- especially in GUSG range, where more than 90% of the estimated range-wide population occurs within Colorado. Both species have undergone state/range-wide and local conservation planning efforts. Local SG workgroups have been established for most populations and are engaged in management of the species to varying degrees depending on land ownership and local involvement. Threats to these species vary by population in the state, and are articulated in their respective Conservation Plans (CCP 2008, RCP 2004).

As a land manager of sage-grouse habitat in the state, it is imperative that BLM conserve sagebrush communities to support sustainable sage-grouse populations in Colorado and maintain or improve connectivity of habitat within and between existing populations. However, successful management of sage-grouse will require cooperation from private, state, and federal land owners and managers to address the wide range of land uses in Colorado that intersect with sage-grouse habitat. For instance, while BLM is a primary land manager of sage-grouse habitat in the state, between 80-90 percent of all oil and gas drilling activity statewide occurs on private, county, or state lands, with no federal nexus. Only by finding ways to work across ownership boundaries will federal, state, and private land owners and managers achieve substantial and measurable conservation of sagebrush communities.

BLM_0015673

9

**Directives Affected**: A Colorado handbook supplement will be created to incorporate this new policy guideline.

**Coordination:** This IM was coordinated with BLM Colorado Field Offices, CO-930 and CO-920 Divisions, WO BLM, Colorado Division of Wildlife, and U.S. Fish and Wildlife Service.

**Contact:** Robin Sell, Conservation Biologist, at (303) 239-3723, or Leigh Espy, Acting Deputy State Director, Division of Resources and Fire Management, at (303)-239-3801.

Signed by:                                    Authenticated by:
Helen M. Hankins                       Cathy Cooney
State Director                             Branch of IRM & Access

1 Attachment:
     1 – CCP and RCP References (1 p)

BLM_0015674

U.S. DEPARTMENT OF THE INTERIOR   **BUREAU OF LAND MANAGEMENT**

Print Page

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, DC  20240
October 1, 2010

In Reply Refer To:
1601/1611/8300/8310/8320 (250) P
Refers to IM No. 2008-090

EMS TRANSMISSION 10/14/2010
Instruction Memorandum No. 2011-004
Expires: 09/30/2012

To:          All WO and Field Officials

From:        Assistant Director, Renewable Resources and Planning

Subject:     Transmittal of Revised Recreation and Visitor Services Land Use Planning Guidance, Updated Checklist, and Three Land Use Planning Templates

**Program Area**:  Recreation and Visitor Services; Decision Support, Planning and NEPA.

**Purpose**: The purpose of this Instruction Memorandum (IM) is to transmit revised guidance for Recreation and Visitor Services planning in conjunction with the Bureau of Land Management's (BLM) land use planning process.

**Policy/Action**: One policy change; two action changes:

- Policy Change – The Recreation and Visitors Services guidance in Appendix C of the BLM's H-1601-1 Land Use Planning Handbook is revised with Attachment 1 to more accurately describe the planning and implementation decisions required through the land use planning process.
- Action Change 1 – The Land Use Plan (LUP) Checklist for Recreation and Visitor Services (Attachment 2) is updated to implement the guidance in Attachment 1. This IM and the revised checklist replace IM 2008 – 090. The checklist should be used as a tool by field offices engaged in preparing, revising, or amending land use plans and by district and state offices when reviewing LUPs.
- Action Change 2 – Three Recreation Outcomes Focused Management (OFM) templates (Attachments 3, 4, and 5) have been developed.  They are designed to facilitate the land use planning process and may be used for e-Planning and other LUP purposes. The use of these templates is optional, but field offices may find these tools helpful during the LUP process. Contact Hal Hallett, WO-250, Division of Recreation and Visitor Services, with suggestions and recommendations for improving these templates.

**Timeframe**: Effective immediately.

**Budget Impact**: This is a clarification of existing policy that should have little impact on the budget. There are some minimal one-time costs to implement the OFM templates as e-Planning templates.

**Background**: The current Land Use Planning Handbook, H-1601-1, was released in early 2005, and included planning guidance for Recreation and Visitor Services within Appendix C. Field offices have adhered to this guidance; however, clarification has been requested by many offices undertaking Resource Management Plan (RMP) revisions.

In responding to the need for clarified and refined guidance, the Washington Office Division of Recreation and Visitor Services together with a team of field personnel developed the five attached documents in draft. The Washington Office Instruction Memorandum No. 2010-092 provided these documents to the state offices for a formal review. The documents then were revised after consideration of the state office comments.

The major change establishes a three-tier classification for lands used and managed for recreation. This new classification replaces the existing 30-year-old, two-tier system where all lands were classified as either special or extensive recreation management areas.

The primary goal of the attachments is to create a functional, viable recreation LUP process that is easily understood and can be consistently implemented throughout the BLM.

The updated guidance addresses the following specific issues in the current Appendix C:

- Complex and confusing terminology making it difficult to understand.
- Ambiguity in distinguishing between land use level decisions and implementation level decisions.
- Unclear guidance for extensive recreation management area planning.

The revised guidance also:

- Changes terminology from benefits based management to outcomes focused management.
- Establishes a three-tier system of lands managed for recreation that replaces the current two-tier system.

Concurrent with the development and release of the updated guidance, the LUP Checklist was revised and renamed and three optional OFM templates were prepared to facilitate the land use planning process and may be used for e-Planning and other LUP purposes.

**Manual/Handbook Sections Affected**: This IM clarifies recreation and visitor services policy guidance contained in BLM Manuals 1601, 8300, 8310, and 8320 and BLM Handbook H-1601-1 – *Land Use Planning Handbook Appendix C Guidance for Recreation and Visitor Services*. The LUP Checklist replaces the Appendix 1 Checklist issued under Washington Office IM No. 2008-090.

**Coordination**: The development of this guidance was coordinated among the Recreation and Visitor Services Division; the Division of Decision Support, Planning and NEPA; the Division of the National Landscape Conservation System; and the BLM State Office Recreation and Travel Management Leaders.

**Contact**: If you have any questions regarding this policy, please contact Andy Tenney, Chief, Planning and Resources Branch, Recreation and Visitor Services Division, (WO-251) at 202-912-7094, or andy_tenney@blm.gov; or Marci Todd, Chief, Division of Decision Support, Planning and NEPA (WO-210) at 202-912-7292, or Marci_Todd@blm.gov.

Signed by:                     Authenticated by:
Richard Hanes                  Robert M. Williams
Acting, Assistant Director     Division of IRM Governance,WO-560
Renewable Resources and Planning

BLM_0015675

**5 Attachments**
1 – Recreation and Visitor Services Planning Decision Guidance (4 pp)
2 – Land Use Planning Checklist for Recreation and Visitor Services (8 pp)
3 – Special Recreation Management Area Template (1 p)
4 – Extensive Recreation Management Area Template (1 p)
5 – Recreation Setting Characteristics Matrix (1 p)

Last updated: 10-19-2010

USA.GOV  |  No Fear Act  |  DOI  |  Disclaimer  |  About BLM  |  Notices  |  Get Adobe Reader®
Privacy Policy  |  FOIA  |  Kids Policy  |  Contact Us  |  Accessibility  |  Site Map  |  Home

BLM_0015676

**Recreation and Visitor Services Planning Decision Guidance**
(Replaces H-1601-1 – Appendix C for Recreation and Visitor Services)

***Land Use Plan Decisions.***  Land use plan (LUP) decisions for recreation and visitor services (R&VS) include the:
1. Designation of recreation management areas (RMAs).
2. Establishment of R&VS objectives for each RMA.
3. Identification of LUP-level supporting management actions and allowable uses for each RMA.

***Recreation Management Areas (RMA).***  The RMAs are classified as either special recreation management areas (SRMA) or extensive recreation management areas (ERMA).  The RMAs are land units where Recreation and Visitor Services (R&VS) objectives are recognized as a primary resource management consideration and specific management is required to protect the recreation opportunities.  The RMA designation is based on: recreation demand and issues, recreation setting characteristics, resolving use/user conflicts, compatibility with other resource uses, and resource protection needs.

1. ***Designation of Special Recreation Management Areas (SRMA).***
   *Definition.*  The SRMAs are administrative units where the existing or proposed recreation opportunities and recreation setting characteristics are recognized for their unique value, importance and/or distinctiveness, especially as compared to other areas used for recreation.

   *Management Focus.*  The SRMAs are managed to protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics.  The SRMAs may be subdivided into recreation management zones (RMZ) to further delineate specific recreation opportunities.  Within SRMAs, R&VS management is recognized as the predominant LUP focus, where specific recreation opportunities and recreation setting characteristics are managed and protected on a long-term basis.

   *Requirements.*  The SRMAs/RMZs must have measurable outcome-focused objectives.  Supporting management actions and allowable use decisions are required to: 1) sustain or enhance recreation objectives, 2) protect the desired recreation setting characteristics, and 3) constrain uses, including non-compatible recreation activities that are detrimental to meeting recreation or other critical resource objectives (e.g. cultural or threatened and endangered species).

   A. ***Establish SRMA/RMZ Objectives.***
      The SRMA/RMZ objectives must define the specific recreation opportunities (i.e. activities, experiences, and benefits derived from those experiences) which become the focus of R&VS management.

   B. ***Identify Land Use Plan-level Management Action and Allowable Use Decisions for SRMAs/RMZs.***

Attachment 1-1

Identify necessary management action and allowable use decisions for R&VS and other programs to achieve SRMA/RMZ objectives.

i.  Within the R&VS Program.  Identify decisions necessary to:
- Facilitate the targeted recreation opportunities.
- Maintain or enhance the desired physical, social, and operational recreation setting characteristics.
- Address visitor health and safety, resource protection, and use and user conflicts (e.g. areas closed to target shooting, camping limits).
- Address the type(s), activities and locations where special recreation permits would be issued, or not issued.

ii.  Within Other Programs.  Establish terms, conditions, or special considerations for other resource programs necessary to achieve the SRMA/RMZ objective(s) (e.g. stipulations on mineral or other development, designations for all types and modes of travel, areas available for livestock grazing, or visual resource management classes).  All actions must conform to applicable program policy, regulations, and valid existing rights.

## 2.  *Designation of Extensive Recreation Management Areas (ERMA).*
*Definition.*  The ERMAs are administrative units that require specific management consideration in order to address recreation use, demand or R&VS program investments.

*Management Focus.*  The ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. Management of ERMA areas is commensurate with the management of other resources and resource uses.

*Requirements.*  The ERMAs must have measurable objectives.  Supporting management actions and allowable use decisions must facilitate the visitors' ability to participate in outdoor recreation activities and protect the associated qualities and conditions.  Non-compatible uses, including some recreation activities, may be restricted or constrained to achieve interdisciplinary objectives.

### A.  *Establish ERMA Objectives.*
The ERMA objectives must define the recreation activities and the associated qualities and conditions which become the focus for R&VS management.

### B.  *Identify Management Action and Allowable Use Decisions for ERMAs*
Identify management action and allowable use decisions for R&VS and other programs to achieve ERMA objectives.  Ensure all decisions are compatible with other resource objectives.

i.  Within the R&VS Program.  Identify decisions necessary to:

Attachment 1-2

- Facilitate visitor participation in the identified outdoor recreation activities.
- Maintain particular recreation setting characteristics.
- Address visitor health and safety, resource protection, and use and user conflicts (e.g. areas closed to target shooting, camping limits).
- Address the type(s), activities, and locations where special recreation permits would be issued or not issued.

ii. Within Other Programs: Establish terms, conditions, or special considerations for other resource programs necessary to achieve the ERMA objective (e.g. stipulations on mineral or other development, designations for all types and modes of travel, areas available for livestock grazing, or visual resource management classes). All actions must conform to applicable program policy, regulations and valid existing rights.

### 3. Public Lands Not Designated as Recreation Management Areas

*Definition.* All lands not designated as an SRMA or ERMA.

*Management Focus.* Public lands that are not designated as RMAs are managed to meet basic R&VS and resource stewardship needs. Recreation is not emphasized however recreation activities may occur. The R&VS are managed to allow recreation uses that are not in conflict with the primary uses of these lands.

*Requirements.* Management actions and allowable use decisions may still be necessary to address basic R&VS and resource stewardship needs:
- Visitor health and safety.
- Use and user conflicts.
- The type(s), activities and locations where special recreation permits would be issued or not issued.
- Mitigation of recreation impacts on cultural and natural resources.

### Implementation Decisions.

Implementation decisions allow site specific actions to achieve land use plan decisions (see Land Use Planning Handbook H-1601-1, p. 30-31). If implementation-level decisions are included in the land use planning document to achieve R&VS program objectives, they must have site-specific NEPA analysis (see Land Use Planning Handbook H-1601-1, p. 29-31; NEPA Handbook H-1710-1, Section 6.8) and be clearly distinguished as implementation decisions that are appealable to the Interior Board of Land Appeals. For example, a planning decision to establish designated areas for camping is protestable. Implementation decisions addressing specific site locations, size and amenities are appealable. Making implementation decisions as part of the planning process does not change the administrative remedies or the timing of those remedies.

Implementation decisions include these four categories:

Attachment 1-3

a) Management.  Recreation management actions, such as commitment of resources, services to be offered to visitors, and/or the development and provision of facilities (e.g. developed recreation sites, roads and trails, concessions).

b) Administration.  Regulatory actions including the implementation of allocation systems, permits, fees, use restrictions, partnership agreements, as well as business plans or fiscal accountability systems, and data management protocols.

c) Information and Education.  Information and education actions including maps or brochures, websites, outreach efforts, events, interpretation, environmental education, signing; and other visitor information delivery services.

d) Monitoring.  Monitoring of recreation resources and human use including: visitor use and use patterns; recreation caused resource effects or impacts; visitor satisfaction; and effectiveness or attainment of outcomes-focused management objectives, recreation setting characteristics, standards and indicators.

Recreation management areas with complex implementation issues may require a subsequent plan that addresses implementation-level management, administration, information and monitoring actions.

***Notices, Consultations, and Hearings***. No additional specific requirements exist.

Attachment 1-4

BLM_0015680

# Land Use Planning Checklist
# for Recreation and Visitor Services

> **Preparing for a Planning Effort (New Resource Management Plan (RMP), RMP Revision, or Planning Amendment)[1]**

<u>Collect planning information/data; determine issues; and identify planning considerations, participants, and data needs.</u>

- ✓ <u>Issues and Concerns</u>:  Identify recreation planning issues and management concerns. These may be categorized as user demand, use/user conflict, visitor health, and safety and resource protection.  Identify rationale to designate, drop, or change Special Recreation Management Areas (SRMAs) and Extensive Recreation Management Areas (ERMAs).
- ✓ <u>Preliminary Planning Criteria</u>:  Identify recreation-related planning criteria, plan parameters, or constraints (i.e. areas or issues that will not be addressed by the plan). For example, stating that the Prineville RMP revision will not revisit decisions made in the recently completed Deschutes River plan.
- ✓ <u>Data Needs and Management</u>:  Identify existing recreation-related data sources, data gaps, or information to gather for plan development (i.e. community assessment reports, recreation setting characteristics or other inventories, visitor surveys, focus groups data, state-wide comprehensive outdoor recreation plans (SCORP), regional tourism plans and other relevant recreation, resource setting, community or economic data that can be captured and analyzed as data layers in GIS).[2]  Data needs require information to determine recreation:
  - o <u>Demand – Identify</u> and describe activities, settings, and outcomes visitors and residents prefer or demand by specific geographical areas.
  - o Supply – Identify and describe existing or available physical, social and operational settings, (i.e. supply).  Use recreation setting characteristics and map using GIS.
- ✓ <u>Participants in the process</u>:  Identify likely recreation and tourism stakeholders, and other individuals or interest organizations that should be involved in the planning process and development.  This fosters cooperation and coordination with other government agencies and potential recreation service providers.
  - o Identify agencies, tribal or local governments with recreation interests that could participate as cooperating agencies or have interest as potential cooperating recreation service providers.
  - o Identify interested and affected members of the public, including user or interest groups, outfitters and guides, and parks and recreation district staffs.
  - o If requested, identify potential individuals or organizations for Resource Advisory Council (RAC) subgroup representatives.

---

[1] Refer to WO IM 2009-127 and Land Use Planning Handbook H-1610-1, Appendix F-1 for additional general Preparation Plan guidance.
[2] For specific format and additional information see Attachment 2 of WO IM 2009-127.

Attachment 2-1

Planning Schedule:  Identify any critical path time frames, such as timeframes for work with required time limits (e.g., Draft NEPA document comment period or Governor's consistency review), or factors influencing the collecting or analyzing recreation related data and information, such as time for focus groups or workshops for travel management planning.

✓ Budget:  Identify labor and operation support costs for filling recreation data gaps and obtaining critical inventory information.  The budget information along with scheduling details will contribute to developing the statement of work if the project is to include third-party contractors.

| Scoping[3] |
|---|

Conduct public scoping and implement public involvement strategies.

✓ Public scoping:  Work with planning staff to develop appropriate public involvement strategies to identify new or affirm preliminary recreation and visitor services related issues that should be addressed in the LUP and collect public input regarding the designation of SRMAs or ERMAs.

✓ Additional parameters:  Identify any additional recreation related planning criteria. In consideration of public comments, make needed changes to the scope of the plan.  For example: "due to public comments received, the Prineville Field Office will revisit the decisions made in the Deschutes River Plan."

✓ Scoping report:  Once the scoping period has closed, review the comments, then identify and revise the priority recreation issues and concerns that will be addressed by the planning effort.

| Analysis of the Management Situation (AMS)[4] |
|---|

Describe current management direction from a/l available decision documents.

✓ Existing plan direction:  Identify recreation and visitor services management decisions from all applicable BLM plans (RMPs, Management Framework Plans, and plan amendments).

Prepare area profile that describes the current level and location of recreation use and categorize by management, administration, information and education and monitoring.  Focus on

---

[3] Public scoping and extensive public involvement is particularly important for recreation and other social, environmental and economic issues as it helps determine public expectations, benefits and potential cooperators for implementation of plan actions.

[4] See the BLM Land Use Planning Handbook H-1610-1, Appendix F-3 for additional general AMS guidance.  The intent of the AMS is to describe the current condition and trends of resources and resource uses within the planning area, and to describe and analyze the adequacy of the current management situation.  To complete the AMS follow the guidance in the Land Use Planning Handbook H-1610-1, Appendix F, p. 12 for consistency and coordination with other plans and any specific mandates or authorities related to recreation and visitor services.  Much of this information will have already been collected and analyzed as part of the earlier planning stages noted above.

BLM_0015682

information pertinent to LUP decisions that will be made.

- ✓ Special Recreation Management Areas
  - Identify all existing SRMAs.
- ✓ Extensive Recreation Management Areas
  - Identify all existing ERMAs.
- ✓ Public lands not designated as RMAs.
  - Identify lands with limited or minimal recreational values.
  - Identify lands reserved for other resource uses that preclude recreation use.
- ✓ Recreation Settings and Opportunities – Identify the current amount, type and condition of natural resource recreation settings (physical, social and operational), recreation opportunities available and recreation infrastructure/development (on-site and if necessary regional).
- ✓ Quantify the existing recreation use.
- ✓ Identify the type(s), activities and locations where special recreation permits are issued. Identify partnerships and agreements. Identify visitor health and safety issues. Identify use and user conflicts.

Forecast or *d*escribe anticipated demand for recreation use.

- ✓ Recreation Demand – Identify the public land visitors, including international, national and resident customers, as appropriate, and their preferences/demands for:
  - Physical, social & operational natural resource recreation settings,
  - Activity opportunities,
  - Experience opportunities, and
  - Personal, community, economic & environmental benefits.
- ✓ Indicators – Identify data and information sources:
  - Local/regional/national data,
  - Input from agencies, governments, and the public, and
  - Monitoring data (i.e. visitor use estimates and use patterns, information derived from visitor studies and focus group discussions).
- ✓ Analyze the above information to formulate statements related to trends and forecasts for recreation and visitor services.  For example, "Analysis of the visitor records and monitoring data indicates that there has been a 5 percent increase annually of recreation use in the SRMA."

Describe key features or areas of high potential for use.

- ✓ Identify unique landscapes and areas or types of resource features that should guide allowable uses and management action decisions.

Attachment 2-3

BLM_0015683

<u>Describe Potential Management Opportunities.</u>[5]

- ✓ Management capability:  Evaluate the ability of current management direction to achieve desired conditions and address resource demands.  Consider:
    - The ability of current management and recreation supply to meet present and future demands based on resource and demand trends.
    - Opportunities to manage the land/people differently such as the designation or elimination of RMAs.
    - Field office capacity in terms of: staff, annual budget, partnerships and workload.
    - Applicable issues and concerns identified through scoping.
- ✓ Identify areas of relative social, economic or ecological importance to the recreation and visitor services program.

<u>Describe consistency and coordination with other plans.</u>

- ✓ Consistency with other entities:  Discuss implications to and from other plans (county, city, state lands, tribal plans, federal agency plans).
- ✓ Opportunities for coordination:  Identify opportunities for enhancing coordination or gaining expertise through cooperating agency relationships.

<u>Specific Mandates and Authority - Laws, Regulations, Policy.</u>

- ✓ Other requirements:  Describe applicable state and federal laws, regulations and policy requirements that apply to recreation and visitor services.  See Recreation Planning Manual 8320.

| Land Use Plans or Land Use  Plan Amendments and NEPA Documentation (EIS/EA)[6] |
|---|

<u>Introduction.</u> (Chapter 1)
- ✓ For the introduction briefly explain recreation and visitor services issues that were addressed and used to develop alternatives as well as alternatives considered but eliminated from further analysis.

---

[5] Identifying management opportunities is a process of considering changes in management to respond to current condition and trend information and scoping issues. It serves as a starting point for alternative formulation (if applicable) by providing a list of possible management opportunities for later sorting and refining into a framework of compatible alternatives. Organize the information following the format in the Land Use Planning Handbook H-1610-1, Appendix F, p. 11.

[6] General guidance for planning process and document development can be found in the Land Use Planning Handbook H-1610-1, Appendix F-4.  Specific NEPA guidance related to alternative development, affected environment, and environmental impacts can be found in the NEPA Handbook, H-1701-1, Chapters 6 and 9.  The following applies to planning efforts that will require the analysis of alternatives through preparation of an Environmental Impact Statement (EIS).

Attachment 2-4

BLM_0015684

<u>Alternative Descriptions (see NEPA Handbook, Section 6.6).</u> (Chapter 2)

- ✓ Within the general narrative description of each alternative, highlight the recreation and visitor services characteristics that distinguish each alternative.
- ✓ Within the management common to all alternatives narrative, describe the goals and management decisions for recreation and visitor services that are common to all alternatives.
  For the No Action alternative narrative, describe the existing recreation and visitor services direction which can be taken from Current Management Direction tables developed as part of the AMS.
  For narratives in the "action" alternatives, describe recreation and visitor services direction (theme) for each of the action alternatives.
- ✓ Identify alternative approaches for recreation and visitor services that were considered but eliminated from detailed analysis and briefly explain why they were eliminated. This is especially true for external recreation and visitor services proposals.

<u>Develop Alternatives Comparison table[7] in accordance with Land Use Planning guidance for Recreation and Visitor Services.</u> (Chapter 2)

- ✓ Identify goals and objectives for recreation and visitor services.
- ✓ Identify areas to be designated as RMAs.
- ✓ Identify areas that will not be managed as RMAs.
- ✓ Identify recreation and visitor services management actions and allowable uses.
- ✓ Identify the interdisciplinary planning management actions and allowable uses for other resource programs necessary to achieve and complement the RMA objective.
- ✓ Identify all implementation-level decisions included in the LUP or amendment.

<u>Impacts Comparison Table</u> (Chapter 2)
- ✓ Provide a comparative summary of the social, economic and environmental impacts to recreation and visitor services associated with each alternative.

<u>Affected Environment Description (see NEPA Handbook, Section 6.7)[8]</u> (Chapter 3)
- ✓ Describe applicable supply and demand information (e.g. user preferences; demand for particular recreation activities, recreation settings, experiences or benefits).
- ✓ Describe the physical, social and operational recreation setting character conditions.
- ✓ Explain pertinent recreation management, administration, information and monitoring direction (e.g. type, volume and location of recreation use; recreation management plans; existing closures and restrictions; existing infrastructure; types and volume of special recreation permits; fee program; tourism; and partnerships).

---

[7] The Planning Handbook (H-1610-1) requires the inclusion of tables that compare alternatives and impacts (Appendix F, p. 16).
[8] Discuss existing management, conditions, issues and trends but be concise and limit discussion to what is needed to understand issues and environmental consequences and to provide context for the goals and objectives. Most of this information will come from the AMS (such as the current condition and trend information), key environmental areas, and current management direction.

Attachment 2-5

BLM_0015685

<u>Environmental Consequences and Effects (see NEPA Handbook, Section 6.8).</u>[9] (Chapter 4)
- ✓ Describe the direct, indirect and cumulative effects and their significance.
- ✓ Describe and quantify the consequences of the no action alternative as if there were no change in the existing management.
- ✓ Describe the impacts of other resource decisions on Recreation and Visitor Services and provide a sufficient analysis to support all conclusions.
- ✓ For SRMAs analyze the:
  - ➢ Recreation opportunities and recreation setting characteristics by describing their unique value, importance or distinctiveness; especially compared to other areas used for recreation.
  - ➢ Ability to protect and enhance a targeted set of activities, experiences and benefits and desired recreation setting characteristics where specific recreation opportunities and recreation setting characteristics are managed and protected on a long-term basis.
  - ➢ Consequences of proposed management actions and allowable uses within the R&VS program to:
    - • facilitate the targeted recreation opportunities;
    - • maintain or enhance the desired physical, social and operational recreation setting characteristics;
    - • address visitor health and safety, resource protection, and use and user conflicts (e.g. areas closed to target shooting, camping limits); and
    - • address the type(s), activities and locations where special recreation permits would be issued or not issued.
  - ➢ Need for the proposed management actions and allowable uses (e.g. terms, conditions, or special considerations) for other resource programs necessary to achieve the SRMA/RMZ objective(s) (e.g. stipulations on mineral or other development, designations for all types and modes of travel, areas available for livestock grazing, or visual resource management classes).
  - ➢ Availability and ability of partners and other recreation program, facility or service providers to deliver services or compliment management actions. Include entities that will be coordinated with in regard to joint management or assisting with implementation of plan actions or management alternatives.
- ✓ For ERMAs analyze the:
  - ➢ Recreation use, demand or R&VS program investments that require specific management consideration.
  - ➢ Ability to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.
  - ➢ Ability to manage recreation commensurate with the management of other resources and resource uses.
  - ➢ Consequences of proposed management actions and allowable uses within the R&VS program to:

---

[9] The NEPA analysis must identify the known and predicted effects that are related to the issues. The effects analysis predicts the degree to which the resource would be affected upon implementation of the decisions/actions. Describe the methodology and analytical assumptions for analyzing impacts, and identify any incomplete or unavailable information that is critical to the analysis.

Attachment 2-6

- facilitate visitor participation in the identified outdoor recreation activities;
- maintain particular recreation setting characteristics;
- address visitor health and safety, resource protection, and use and user conflicts (e.g. areas closed to target shooting, camping limits); and
- address the type(s), activities and locations where Special Recreation Permits would be issued or not issued.

➢ Need for the terms, conditions, or special considerations for other resource programs necessary to achieve the ERMA objective (e.g. stipulations on mineral or other development, designations for all types and modes of travel, areas available for livestock grazing, or visual resource management classes).

Consultation and Coordination (Chapter 5)

✓ Describe any actions taken to consult and coordinate with recreation and visitor services interests.
✓ Identify the recreation and tourism stakeholders, individuals or interest organizations that participated in plan development or will be collaboratively engaged in plan implementation.

Preparing the Final NEPA Document (Proposed LUP/Final EIS)[10]

✓ Evaluate public comments received on the draft LUP/EIS related to the recreation and visitor services program.
✓ Make changes to the draft LUP/EIS based upon public comment/staff comment for the proposed LUP/final EIS.
✓ Identify and note any changes made to the document.

---

[10] The Proposed LUP/Final EIS builds on the Draft LUP/EIS to include appropriate responses to public comments received on the draft documents. The Proposed LUP/Final EIS may also contain modifications to the alternatives and the accompanying impact analysis contained in the Draft LUP/EIS.

Attachment 2-7

BLM_0015687

**The Record of Decision/Approved LUP[11]**

- ✓ Identify planning and implementation recreation and visitor service decisions in the approved LUP.
- ✓ If the LUP makes monitoring and evaluation decisions and/or adopts mitigation measures, make sure they are included in the ROD and approved LUP.

---

[11] The ROD/approved LUP is typically the Proposed LUP as modified in response to protests, the Governor's consistency review, or other considerations.  It describes the goals, objectives, and management actions for fulfilling the management direction developed within the land use planning process.

Attachment 2-8

BLM_0015688

## Special Recreation Management Area Template

_____ Special Recreation Management Area (SRMA)

*(Name)*

SRMAs are administrative units where the existing or proposed recreation opportunities and recreation setting characteristics are recognized for their unique value, importance, and/or distinctiveness; especially compared to other areas used for recreation. For each SRMA: establish objective decisions, describe recreation setting characteristics, identify management actions and allowable use decisions and, if necessary, identify implementation decisions.

### SUPPORTING INFORMATION

Briefly describe the rationale for designating the SRMA including the unique value, importance or distinctiveness of the area. This documents the rationale for consideration of the SRMA in the planning process and, if selected, designation of the SRMA in the record of decision.

### SRMA/RECREATION MANAGEMENT ZONE (RMZ) OBJECTIVE(S) DECISIONS

SRMAs may be subdivided into RMZs with discrete objectives. SRMA/RMZ objectives must define the specific recreation opportunities (i.e. activities, experiences and benefits derived from those experiences) which become the focus of Recreation and Visitor Services (R&VS) management.

**Objective Statement** *[e.g. In visitor assessments, ___% of respondents who participated in targeted activities (listed below) report the ability to realize the targeted experiences and benefits (listed below)].*

**Activities** (e.g. camping, rafting):

**Experiences** (e.g. Enjoying frequent exercise, Enjoying the closeness of family & friends):

**Benefits** (e.g. Personal/Individual, Community/Social, Economic, and/or Environmental):

### RECREATION SETTING CHARACTERISTIC (RSC) DESCRIPTIONS

Describe the physical, social and operational recreation setting qualities to be maintained or enhanced.

**Physical Components** (e.g. Remoteness, Naturalness, Visitor Facilities):

**Social Components** (e.g. Contacts, Group Size, Evidence of Use):

**Operational Components** (e.g. Access (types of travel), Visitor Services/Information, Management Controls):

### MANAGEMENT ACTIONS & ALLOWABLE USE DECISIONS

Identify necessary management action and allowable use decisions for R&VS and other programs to achieve SRMA/RMZ objectives and maintain or enhance the desired recreation setting characteristics.

**Recreation and Visitor Services Program** (e.g. camping limits, recreation permit/fees, conditions of use):

**Other Programs** (e.g. stipulations on mineral or other development, types and modes of travel designations, or visual resource management classes):

### IMPLEMENTATION DECISIONS

Implementation decisions are actions to achieve or implement land use plan decisions. Implementation decisions include: management, administration, information and education and monitoring.

**Implementation Decisions** (e.g. The LUP decision may be to designate overnight camping areas while the supporting implementation decisions would address specific site locations, size and amenities to be provided.):

Attachment 3

BLM_0015689

BLM_0015690

**Extensive Recreation Management Area Template**

_____ Extensive Recreation Management Area (ERMA)
*(Name)*

ERMAs are administrative units that require specific management consideration in order to address recreation use, demand, or Recreation and Visitor Services (R&VS) program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. ERMA management is commensurate and considered in context with the management of other resources and resource uses.

**ERMA OBJECTIVE(S) DECISION**

ERMA objectives must define the recreation activities and the associated qualities and conditions which become the focus for R&VS management.

**Objective Statement** (e.g. By 2015, the Bailey Lake ERMA will offer recreation opportunities, in a relatively unchanged physical recreation setting, that facilitate the visitors' freedom to participate in a variety of dispersed, non-motorized/non-mechanized recreation activities.):

**MANAGEMENT ACTIONS & ALLOWABLE USE DECISIONS**

Identify management action and allowable use decisions for R&VS and other programs necessary to: facilitate visitor participation in the identified outdoor recreation activities; maintain particular recreation setting characteristics, address visitor health and safety, resource protection, and use and user conflicts; and, address the type(s), activities, and locations where special recreation permits would or would not be issued.

**Recreation and Visitor Services Program** (e.g. camping limits, recreation permit/fees, conditions of use):

**Other Programs** (e.g. stipulations on mineral or other development, types and modes of travel designations, or visual resource management classes):

**IMPLEMENTATION DECISIONS**

Implementation decisions are actions to achieve or implement land use plan decisions. Implementation decisions include: management, administration, information and education and monitoring.

**Implementation Decisions** (e.g. The land use plan decision may be to designate overnight camping areas while the supporting implementation decisions would address specific site locations, size and amenities to be provided.):

Attachment 4

BLM_0015692

## RECREATION SETTING CHARACTERISTICS MATRIX

### PHYSICAL COMPONENT – Qualities of the Landscape

| | Primitive Classification | Back Country Classification | Middle Country Classification | Front Country Classification | Rural Classification | Urban Classification |
|---|---|---|---|---|---|---|
| Remoteness (approx. distance from routes) | More than ½ mile from either mechanized or motorized routes. | Within ½ mile of mechanized routes. | Within ½ mile of four-wheel drive vehicle, ATV and motorcycles routes. | Within ½ mile of low-clearance or passenger vehicle routes (includes unpaved County roads and private land routes). | Within ½ mile of paved/primary roads and highways. | Within ½ mile of streets and roads within municipalities and along highways. |
| Naturalness (landscape texture form, line, color) | Undisturbed natural landscape. | Natural landscape with any modifications in harmony with surroundings and not visually obvious or evident (e.g. stock ponds, trails). | Character of the natural landscape retained. A few modifications contrast with character of the landscape (e.g. fences, primitive roads). | Character of the natural landscape partially modified but none overpower natural landscape (e.g. roads, structures, utilities). | Character of the natural landscape considerably modified (agriculture, residential or industrial). | Urbanized developments dominate landscape. |
| Facilities | No structures. Foot/horse and water trails only. | Developed trails made mostly of native materials such as log bridges. Structures are rare and isolated. | Maintained and marked trails, simple trailhead developments and basic toilets. | Rustic facilities such as campsites, restrooms, trailheads, and interpretive displays. | Modern facilities such as campgrounds, group shelters, boat launches, and occasional exhibits. | Elaborate full-service facilities such as laundries, restaurants, and groceries. |

### SOCIAL COMPONENT – Qualities Associated with Use

| | Primitive Classification | Back Country Classification | Middle Country Classification | Front Country Classification | Rural Classification | Urban Classification |
|---|---|---|---|---|---|---|
| Contacts (avg. with any other group) | Fewer than 3 encounters/day at camp sites and fewer than 6 encounters/day on travel routes. | 3–6 encounters/day off travel routes (e.g., campsites) and 7–15 encounters/day on travel routes. | 7–14 encounters/day off travel routes (e.g., staging areas) and 15–29 encounters/ day on travel routes. | 15–29 encounters/day off travel routes (e.g., campgrounds) and 30 or more encounters/day on travel routes. | People seem to be generally everywhere. | Busy place with other people constantly in view. |
| Group Size (average - other than you own) | Fewer than or equal to 3 people per group. | 4–6 people per group. | 7–12 people per group. | 13–25 people per group. | 26–50 people per group. | Greater than 50 people per group. |
| Evidence of Use | No alteration of the natural terrain. Footprints only observed. Sounds of people rare. | Areas of alteration uncommon. Little surface vegetation wear observed. Sounds of people infrequent. | Small areas of alteration. Surface vegetation showing wear with some bare soils. Sounds of people occasionally heard. | Small areas of alteration prevalent. Surface vegetation gone with compacted soils observed. Sounds of people regularly heard. | A few large areas of alteration. Surface vegetation absent with hardened soils. Sounds of people frequently heard. | Large areas of alteration prevalent. Some erosion. Constantly hear people. |

### OPERATIONAL COMPONENT – Conditions Created by Management and Controls over Recreation Use

| | Primitive Classification | Back Country Classification | Middle Country Classification | Front Country Classification | Rural Classification | Urban Classification |
|---|---|---|---|---|---|---|
| Access (types of travel allowed) | Foot, horse, and non-motorized float boat travel. | Mountain bikes and perhaps other mechanized use, but all is non-motorized. | Four-wheel drives, all-terrain vehicles, dirt bikes, or snowmobiles in addition to non-motorized, mechanized use. | Two-wheel drive vehicles predominant, but also four wheel drives and non-motorized, mechanized use. | Ordinary highway auto and truck traffic is characteristic. | Wide variety of street vehicles and highway traffic is ever-present. |
| Visitor Services (and information) | No maps or brochures available on-site. Staff rarely present to provide on-site assistance. | Basic maps, staff infrequently present (e.g. seasonally, high use periods) to provide on-site assistance. | Area brochures and maps, staff occasionally (e.g. most weekends) present to provide on-site assistance. | Information materials describe recreation areas & activities, staff periodically present (e.g. weekdays & weekends). | Information described to the left, plus experience and benefit descriptions, staff regularly present (e.g. almost daily). | Information described to the left, plus regularly scheduled on-site outdoor demonstrations and clinics. |
| Management Controls | No on-site posting/signing of visitor regulations, interpretive information or ethics. Few use restrictions. | Basic user regulations at key access points. Minimum use restrictions. | Some regulatory and ethics signing. Moderate use restrictions. (e.g. camping, human waste). | Rules, regulations and ethics clearly posted. Use restrictions, limitations and/or closures. | Regulations strict and ethics prominent. Use may be limited by permit, reservation, etc. | Enforcement in addition to rules to reduce conflicts, hazards, and resource damage. |

NOTE:  This matrix can be customized to meet particular planning needs: 1) classes can be added, split, or merged; 2) characteristics can be added or deleted; 3) class names can be changed; and 4) the text can be modified. However, the concept of a spectrum must remain intact.

Attachment 5

Form 3060-1
(July 1984)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Serial Number

# MINERAL REPORT

## Mineral Potential Report
## For The
## Uncompahgre Planning Area

Lands Involved:

Lands encompassing approximately 700,000 acres in
Delta, Gunnison, Montrose, Ouray, and San Miguel Counties,
Colorado

Prepared By:

_(Signature)_
Geologist,
(Title)
4 March 2011
(Date)

Technical Approval:

(Signature)
Geologist, Mining Law Program Lead, COSO
(Title)
03/03/2011
(Date)

Management Acknowledgement:

(Signature)
Field Manager, Uncompahgre
(Title)
7-8-11
(Date)

BLM_0015694

# Table of Contents

TABLE OF CONTENTS............................................................................................I

ACRONYMS AND ABBREVIATIONS ........................................................IV

SUMMARY AND CONCLUSIONS........................................................... V

   CONCLUSIONS ........................................................................................ V

      Uranium and Vanadium ...............................................................................v

      Gypsum .......................................................................................................v

      Placer Gold..................................................................................................v

      Sodium and Potassium................................................................................vi

      Sand and Gravel .........................................................................................vi

      *Table 1 - Summary of Mineral Potential Findings in the Uncompahgre Planning Area ...................* vi

INTRODUCTION ................................................................................... 7

   PURPOSE AND SCOPE ........................................................................... 7

   LANDS INVOLVED ................................................................................. 7

      *Table 2 - Land Status and Mineral Estate within the Uncompahgre Planning Area.......................* 8

   MINERAL MANAGEMENT CATEGORIES ................................................ 9

OVERVIEW OF GEOLOGY.................................................................. 10

   REGIONAL GEOLOGY AND PHYSIOGRAPHIC PROVINCES...................... 10

      **Colorado Plateau Uranium Province.............................................. 10**

      Uravan Mineral Belt....................................................................................10

      *Figure 1:  Colorado Uranium Mining Districts............................................* 11

      *Figure 2:  Regional Location of the Uravan Mineral Belt .............................* 12

   STRATIGRAPHY ................................................................................... 13

      **Paleozoic Era Strata ..................................................................... 13**

      Pennsylvanian Period (360-300 Million Years Ago)......................................13

      **Mesozoic Era Strata..................................................................... 13**

      Triassic Period (245-208 Million Years Ago).................................................13

      Jurassic Period (208-146 Million Years Ago)................................................14

      Cretaceous Period (146-65 Million Years Ago).............................................15

BLM_0015695

# CONTENTS

*Figure 3: Generalized Geology of West End of Montrose County, CO* ........................................ 16

*Figure 4: Colorado Plateau Stratigraphic Correlation* .................................................................. 17

*Figure 5:  Composite Generic Stratigraphic Column of Uravan Mineral Belt* ............................... 18

*Figure 6:  View of Jurassic Strata within Planning Area near Uravan, CO* .................................... 19

*Figure 7:  Stratigraphy of Dolores River Canyon within Planning Area* ....................................... 19

## STRUCTURAL GEOLOGY ............................................................................................................ 20

### The Paradox Basin ............................................................................................................... 20

*Figure 8:  Structural Elements of Paradox Basin and Adjacent Areas* ........................................... 21

*Figure 9:  Cross-section of Paradox Valley Salt Anticline* ............................................................ 23

# ENERGY AND MINERAL DEPOSITS ................................................................................ 24

## LOCATABLE MINERALS ............................................................................................................ 24

### Uranium and Vanadium ..................................................................................................... 24

Uranium Isotopes ....................................................................................................................... 24

Known Uranium Deposits ........................................................................................................... 24

Mineralogy ................................................................................................................................. 26

*Figure 10:  Eh-pH Diagram of UO2-CO2-H2O System at 25 degrees C and pCO2=10-2 atm* ......... 27

History of Exploration, Development, Production, and Economics ............................................... 28

Current Demand and Production ................................................................................................. 32

*Figure 11:  Location of the White Mesa Mill in relation to the UMB* ............................................ 33

*Figure 12:  Location of the proposed Piñon Ridge Uranium Mill* ................................................. 34

### Gypsum ............................................................................................................................... 35

Known Deposits ......................................................................................................................... 35

Mineralogy ................................................................................................................................. 35

History of Exploration, Development, Production, and Economics ............................................... 35

Current Demand and Production ................................................................................................. 35

### Placer Gold ......................................................................................................................... 35

Known Deposits ......................................................................................................................... 35

History of Exploration, Development, Production, and Economics ............................................... 35

Current Demand and Production ................................................................................................. 36

*Figure 13:  Location map of placer gold areas on the San Miguel River* ....................................... 36

*Figure 14:  Placer gold locations along the San Miguel and Dolores Rivers* ................................. 37

## SOLID LEASABLE MINERALS ................................................................................................ 37

### Potassium and Sodium ....................................................................................................... 37

## SALABLE MINERALS .............................................................................................................. 38

### Sand, Gravel, Fill, Clay, Riprap, and Moss Rock ................................................................ 38

BLM_0015696

## CONTENTS

**OCCURRENCE AND DEVELOPMENT POTENTIAL OF ENERGY & MINERAL RESOURCES** ................................................................................................ 40

  **LOCATABLE MINERALS** .......................................................................... 40

    **Uranium and Vanadium** ...................................................................... 40

      *Figure 15:  Active uranium projects on Morrison Formation sites within the planning area* ........ 41

      Uranium Leasing Program ................................................................ 42

      *Figure 16:  Location of DOE lease tracts in Mesa, Montrose, and San Miguel counties* ................ 43

      Uranium-Vanadium Prices ................................................................ 44

      *Figure 17:  Uranium Pricing Chart from 1988 to present* ................................................ 44

      *Figure 18:  Ferro-Vanadium Price Chart from 1996 to 2005* .......................................... 45

      *Figure 19:  Top World Uranium-Producing Countries for 2008* ...................................... 46

    **Gypsum** .............................................................................................. 47

    **Placer Gold** ...................................................................................... 47

  **SOLID LEASABLE MINERALS** ................................................................ 47

    **Potassium and Sodium** .................................................................. 47

  **SALABLE MINERALS** ............................................................................ 48

    **Sand and Gravel** .............................................................................. 48

      *Figure 20:  Potential Sand and Gravel Deposit Areas with State Permitted and UFO Salable Permit Sites* ...................................................................................................... 49

**RECOMMENDATIONS** ................................................................................ 50

**APPENDIX A - MAPS** .................................................................................. 51

    *Map 1 - The Uncompahgre Planning Area* ................................................ 52

    *Map 2 - Geology of the Uncompahgre Planning Area* .................................. 53

**APPENDIX B - MINERAL POTENTIAL CLASSIFICATION SYSTEM** ................ 54

  **LEVEL OF POTENTIAL** ........................................................................ 54

  **LEVEL OF CERTAINTY** ........................................................................ 54

**APPENDIX C - GLOSSARY** ........................................................................ 56

**APPENDIX D - REFERENCES** .................................................................... 58

BLM_0015697

# Acronyms and Abbreviations

| ACRONYM OR ABBREVIATION | COMPLETE PHRASE |
|---|---|
| BLM | Bureau of Land Management |
| CFR | Code of Federal Regulations |
| DOE | Department of Energy |
| FLPMA | Federal Land Policy and Management Act |
| RMP | Resource Management Plan |
| UFO | Uncompahgre Field Office |
| UMB | Uravan Mineral Belt |
| USFS | United States Forest Service |

BLM_0015698

# SUMMARY and CONCLUSIONS

This preliminary mineral potential report assesses the occurrence and development potential for locatable, solid leasable, and salable mineral resources within the Uncompahgre planning area (planning area), for use in preparing the Uncompahgre Resource Management Plan. The planning area is located within the Bureau of Land Management (BLM) Uncompahgre Field Office in southwestern Colorado.

The report provides a general geologic description of the planning area, including physiography, stratigraphy, structural geology, and historical geology. In addition, the report includes a description of mineral resources that are present and a discussion of their development potential over the 15 to 20-year life span of a resource management plan. Two separate reports address the coal, and oil and gas potential in the planning area.

Each mineral resource identified in the planning area received a classification rating of high, moderate, or low, for its development potential using the Mineral Potential Classification System outlined in BLM Manual 3031, Energy and Mineral Resource Assessment (shown in Appendix B).

## CONCLUSIONS

The following describes the preliminary findings for mineral resources within the planning area (summarized in Table 1 on page vi):

***Uranium and Vanadium*** - Abundant direct and indirect evidence indicates **high potential** for the occurrence of uranium and vanadium deposits within historic mining sites in the planning area.

Where the Chinle Formation and Morrison Formation are present outside of these areas, there is minimal evidence indicating ***moderate potential*** for the occurrence of these two minerals. With the price of uranium ($U_3O_8$) at $72 per pound and the price of ferro-vanadium at $31 per kilogram as of February 14, 2011, production activity at some historic mines is likely to resume within the next fifteen years.

***Gypsum*** - Abundant direct evidence indicates **high potential** for the occurrence of gypsum deposits within the Paradox Valley portion of the planning area.

Where the Paradox Member of the Hermosa Group is present, there are outcrops of high grade (>97% pure $CaSO4$) gypsum mineralization which have active mining claims located and communication of a mine plan to be submitted.

***Placer Gold*** - Abundant evidence indicates **high potential** for the occurrence of placer gold deposits in the San Miguel and Dolores River drainage systems. With the price of gold at $1,413 per


BLM_0015699

## SUMMARY AND CONCLUSIONS

troy ounce as of February 22, 2011, and world political unrest increasing, placer gold mining activity is projected to continue at the same level or increase over the next fifteen years.

*Sodium and Potassium* - Abundant evidence indicates **high potential** in the Paradox Valley area for the occurrence of sodium and potassium deposits within the Paradox Member of the Hermosa Group. With high demand for this resource expected to continue, soda ash, and potash exploration activity in the planning area is projected to increase over the next fifteen to twenty years.

*Sand and Gravel* - Abundant evidence indicates **high potential** for the occurrence of sand and gravel deposits at presently known sites in the planning area.  With high demand for these resources likely to continue, production rates are projected to remain at present levels or increase over the next fifteen to twenty years.

### Table 1 - Summary of Mineral Potential Findings in the Uncompahgre Planning Area

| MINERAL RESOURCE | LOCATION | POTENTIAL | LEVEL OF CERTAINTY |
|---|---|---|---|
| Uranium and Vanadium | Known historic mining sites | High | D |
| | Chinle or Morrison Formation outside of historic mining areas | Moderate | C |
| Gypsum | Paradox Valley | High | D |
| Placer Gold | San Miguel and Dolores River drainages | High | D |
| Sodium and Potassium | Paradox Member of the Hermosa Group | High | D |
| Sand and Gravel | Presently known sites in the Uncompahgre planning area | High | D |

**LEVELS OF CERTAINTY**

A.  The available data are insufficient and/or cannot be considered as direct or indirect evidence to support or refute the possible existence of mineral resources within the respective area.

B.  The available data provide indirect evidence to support or refute the possible existence of mineral resources.

C.  The available data provide direct evidence but are quantitatively minimal to support or refute the possible existence of mineral resources.

D.  The available data provide abundant direct and indirect evidence to support or refute the possible existence of mineral resources.

# INTRODUCTION

## PURPOSE AND SCOPE

The purpose of this Mineral Potential Report is to assess and document the occurrence of and development potential for mineral resources within the planning area for the Uncompahgre Resource Management Plan (planning area). The information contained in this report is based upon information and data from published and unpublished agency and industry reports and contacts. No field studies were conducted. Identified mineral resources are classified according to the system found in BLM manuals 3031 - Energy and Mineral Resource Assessment and 3060 - Mineral Reports: Preparation and Review (shown in Appendix B).

This mineral resource assessment provides an intermediate level of detail required for use during land use planning, as described in BLM Manual 3031. It is a preliminary assessment to be used in preparing an Environmental Impact Statement for the Uncompahgre Resource Management Plan (RMP), as required by the National Environmental Policy Act. This report is not a decision document and does not present specific recommendations regarding the management of mineral resources. The conclusions presented in this report should not be used for other purposes.

This report includes the following information for the important known mineral resources found in the planning area, and does not include other undiscovered mineral resources, such as rare earth elements, copper, molybdenum, iron, titanium and others:

- exploration, development, and production of mineral deposits
- classification of the potential for occurrence of each mineral throughout the planning area
- determination of whether the development potential for each mineral resource is anticipated to be high, moderate, or low over the next 15 years.

Two separate reports address the coal, and oil and gas potential of the planning area.

## LANDS INVOLVED

As shown in Map 1 on page 52, the planning area for the Uncompahgre RMP encompasses parts of Montrose, Delta, San Miguel, Gunnison, Ouray, and Mesa counties in southwestern Colorado. The planning area is bounded by Utah to the west, the BLM Grand Junction Field Office to the north, the BLM Dolores Field Office to the south, and the BLM Gunnison Field Office to the east.



BLM_0015701

## INTRODUCTION

As shown in Table 2, the planning area contains 675,764 acres of public lands administered by the BLM Uncompahgre Field Office (UFO). In addition, the planning area includes 1,564,303 acres of federal minerals underlying surface lands not administered by the BLM (including state, private, and other federal lands). The planning area does not include lands within the Gunnison Gorge National Conservation Area, which is managed under a separate RMP, or the newly designated Dominguez-Escalante National Conservation Area, which will also operate under a separate RMP. Mineral resource development projections provided in this report are for all lands within the planning area.

## Table 2 - Land Status and Mineral Estate within the Uncompahgre Planning Area

| SURFACE LAND | ACRES |
|---|---|
| BLM | 675,764 |
| Forest Service | 1,248,385 |
| NPS | 27,126 |
| State | 8550 |
| CDOW | 11,563 |
| Private | 1,125,345 |
| US Fish and Wildlife | 82 |
| Other (including City Lands) | 684 |
| **Total Surface Land:** | **3,097,499** |
| MINERAL ESTATE | |
| No Federal Minerals | 862,834 |
| [1]All Federal Minerals | 2,140,721 |
| Coal Only | 55,577 |
| Oil and Gas Only | 10,996 |
| Oil, Gas, and Coal Only | 8,966 |
| [2]Other | 18,407 |
| **Total Mineral Estate:** | **3,097,501** |
| Total Federal Minerals | 2,234,667 |
| Federal Minerals under BLM Land | 669,379 |
| Federal Minerals under Other Federal Lands (including USFS & National Park Service) | 1,269,719 |
| Federal Minerals under Private/State/City Lands | 294,584 |

[1]**All Federal Minerals** - The federal government owns rights to all minerals (including coal, oil, gas, uranium, gravel, sand, and moss rock).
[2]**Other** - The federal government owns rights to other minerals, either singly or in combination. Other minerals may include uranium, moss rock, gravel, and sand, as well as other minerals not listed in this table.

BLM_0015702

# MINERAL MANAGEMENT CATEGORIES

The BLM recognizes three categories of manageable minerals: locatable, leasable, and salable. Uranium, vanadium, and gold are classified as locatable minerals. Locatable minerals are subject to disposal by mining claim location under authority of the Mining Law of 1872. Leasable minerals (including oil, gas, and potash) are subject to disposal by lease under authority of the Mineral Leasing Act of 1920 (as amended). Salable minerals (such as sand and gravel) are subject to disposal by contract sale or free use permit under authority of the Materials Act of 1947.



BLM_0015703

# OVERVIEW OF GEOLOGY

The geologic history of lands within the planning area involves a complex interplay of tectonic and structural developments from the Precambrian Eon to the present, along with resulting sedimentation patterns. Although geologic structure and stratigraphy are intricately linked, it is possible to separate the two processes for ease of discussion. This section details the formation of pertinent stratigraphic units in the planning area, followed by a discussion of the area's structural geologic history, emphasizing host formations for uranium and vanadium resources.

## REGIONAL GEOLOGY AND PHYSIOGRAPHIC PROVINCES

### COLORADO PLATEAU URANIUM PROVINCE

The Colorado Plateau Uranium Province was first formally described in 1985 (Granger and Finch 1988), and later expanded upon with a greater emphasis on tectonics (Finch 1991). The boundaries of the area were drawn where differences in regional structures define the Colorado Plateau physiographic province. The province is bounded on the east by Laramide Rocky Mountain deformational structures, which contrast markedly with the flat-lying formations of the stable craton. The province is bounded on the north primarily by the Precambrian Uinta uplift. The western boundary is drawn along thrust faults, related monoclinal folds, and normal faults that define the Basin and Range province. As shown in Figure 8, on page 21, the southern boundary with the Basin and Range is more subtle and broadly defined, especially along the Mogollon Rim (modified from Finch 1996).

#### Uravan Mineral Belt

There are 310 known uranium mining districts within the Colorado Plateau Uranium Province, one of which is the Uravan Mineral Belt (UMB). The UMB is an arcuate zone of uranium-vanadium deposits in San Miguel, Montrose, and Mesa counties, Colorado, and Grand County, Utah. As shown in Figure 1 on page 11 and Figure 2 on page 12, a portion of the planning area in southwestern Montrose County lies within the UMB, while the western edge of the northwest-trending Uncompahgre Plateau lies about twenty miles to the northeast of the arc (Gerlitz et al 1988).

##### Source Material for Principal Uranium-bearing Strata

The Uncompahgre uplift exposed older sedimentary and Precambrian metamorphic rocks outside of the stable Colorado Plateau block. Within the planning area portion of the UMB, historic mining principally occurred in the Salt Wash Member of the Morrison Formation (as shown in Figure 3 on



## OVERVIEW OF GEOLOGY

page 16, Figure 4 on page 17, and Figure 5 on page 18). The source of uranium for the tabular sandstone is thought to have been various volcanic arcs to the west and south at the edge of the North American plate, which provided silicic ash for the thick fine-grained units lying above the major Triassic and Jurassic host sandstone layers (Finch 1996). Uranium deposits in sandstone beds were most likely precipitated by reduction between uranium-bearing groundwater and underlying saline brine (Finch 1996). Uranium and vanadium deposits generally parallel the attitude of the enclosing rock (Wright and Everhart 1960).



Source: Matthews (2007)

**Figure 1:  Colorado Uranium Mining Districts**

BLM_0015705

## OVERVIEW OF GEOLOGY



**Figure 2: Regional Location of the Uravan Mineral Belt**

BLM_0015706

Figure 4 on page 17 shows a correlative stratigraphic column across the Colorado Plateau from southwest to northeast, with uranium-producing members highlighted in yellow. A generic stratigraphic column on page 18 shows the vertical relationship of the most visible strata for the portion of the UMB within the planning area. In ascending order, the strata are the Chinle Formation, the Wingate Sandstone, the Kayenta Formation, the Entrada Formation, the Wanakah Formation, and the Morrison Formation (which hosts the Salt Wash Member).

# STRATIGRAPHY

Figure 3 on page 16 and Map 2 on page 53 illustrate the surface geologic areal relationships of rock formations present in the planning area, and Figure 4 on page 17 shows the stratigraphic correlation of these Colorado Plateau rock formations, demonstrating some of the facies relationships that exist in the area. The stratigraphic evolution of the area, integrating those stratigraphic horizons important to known mineral deposits in the planning area, is discussed below. Figure 5 on page 18 shows the temporal relationship of the various Mesozoic sedimentary formations.

## PALEOZOIC ERA STRATA

### Pennsylvanian Period (360-300 Million Years Ago)

#### Hermosa Group - Paradox Formation

The Paradox Formation consists of black shale interbedded with evaporite deposits of gypsum, anhydrite, and salts, remnants of a vast sea that covered the Paradox Valley region in early Pennsylvanian time. The Paradox Basin subsided and the Uncompahgre Mountains were uplifted to the east. Great quantities of seawater were trapped in the subsiding basin and water became increasingly saline in the hot and dry climate. Thousands of feet of evaporites (consisting of anhydrite and gypsum followed by halite) built up during the mid-Pennsylvanian, and storms occasionally washed in sediment from nearby mountains. Fresh seawater periodically refilled the basin, but was unable to flush out the very salty water. These beds (up to 5,000 feet thick in places) lithified to become the Paradox Formation, a member of the Hermosa Group. Compressed salt beds from this formation began to flow plastically later in the Pennsylvanian. Satellite-based measurements indicate that flow of salt and gypsum continues to cause flexing and faulting of overlying sedimentary layers (Furuya and others 2007).

## MESOZOIC ERA STRATA

### Triassic Period (245-208 Million Years Ago)

Lower Triassic-age sediments in the planning area are characterized by thick, red, clastic sequences deposited in a range of near-shore environments (Gloyn and others 1995).



BLM_0015707

## OVERVIEW OF GEOLOGY

### Moenkopi Formation

The Moenkopi Formation consists of chocolate-colored, fluvial, deltaic, and coastal deposits that include silty, micaceous shale interbedded with sandstone and limestone.

### Chinle Formation

The Chinle Formation rests unconformably on the Moenkopi Formation. The depositional regime of the Chinle ranged from fluvial, floodplain, and lacustrine continental environments (Woodward-Clyde Consultants 1982). This formation consists of red, brown, and gray sandstone, conglomerate, and red, purple, and green-gray mudstone (Hahn and Thorson 2002). These deposits form distinctive red upper and green lower units. In Utah, the Moss Back and Shinarump members of this formation are hosts to a large number of uranium deposits that have supported small to medium-sized mining operations (Wood 1968; Gloyn and others 1995).

### Jurassic Period (208-146 Million Years Ago)

Jurassic sediments in the planning area were deposited in various continental environments, ranging from eolian (massive windblown sandstone) to fluvial (interbedded sandstone, shale, and siltstone) to lacustrine (freshwater limestone). These sediments are comprised of the Glen Canyon Group, the San Rafael Group, and the Morrison Formation (Hintze 1988).

### Glen Canyon Group

The Jurassic Glen Canyon Group consists of Wingate Sandstone, Kayenta Formation, and Navajo Sandstone. The Wingate Sandstone consists of massive, gray-orange to red-brown, eolian, cross-bedded sandstone. It overlies the Chinle Formation unconformably and varies from approximately 250 to 650 feet thick (Hintze 1988).

The Kayenta Formation varies from 0 to 340 feet thick, thinning to the southeast (Hintze 1988; Gloyn and others 1995). It is a very fine to fine-grained, irregularly bedded, locally conglomeratic, fluvial sandstone, siltstone, and shale. It also contains beds of mudstone or lacustrine limestone (Gloyn and others 1995).

In the planning area, Navajo Sandstone varies from 0 to 1,250 feet thick (Hintze 1988; Gloyn and others 1995). This formation thins eastward and consists of massive, white and yellow, eolian sandstone.

### San Rafael Group

The San Rafael Group includes the Entrada Sandstone and Wanakah Formation (Hintze 1988). The Entrada Sandstone is recognized overall as a non-marine, cross-stratified sandstone and siltstone. The Wanakah Formation (formally called the Curtis and Summerville formations) ranges up to 200 feet thick (O'Sullivan 1996). The lower part of the formation consists of thin-bedded red mudstone and gray and yellow sandstone, while the upper portion is a marine glauconitic sandstone (Gloyn and others 1995).

### Morrison Formation

The Jurassic-age Morrison Formation consists of various members, but not all are present in the planning area. The Morrison is host to extensive uranium deposits where the Salt Wash Member,


BLM_0015708

## OVERVIEW OF GEOLOGY

particularly in its upper part, is the most prolific uranium-producing horizon, and hosts small to large uranium deposits in channel sandstones (Wood 1968; Woodward-Clyde 1982; Gloyn and others 1995). This member consists of brown, lenticular, fluvial sandstone that is interbedded with red mudstone, and with thin gray limestone at its base. The Salt Wash Member varies from absent to 550 feet thick (Hintze 1988). The youngest member of the Morrison Formation is the Brushy Basin Member. It varies from 200 to 440 feet thick and consists of brown, bentonitic mudstone and brown, conglomeratic sandstone (Hintze 1988). The bentonite was derived from voluminous amounts of volcanic ash that was carried to depositional sites by north and northwesterly flowing paleo-streams (Turner-Peterson and others 1986).

### *Cretaceous Period (146-65 Million Years Ago)*

Cretaceous sediments represent a sustained marine transgression across the Jurassic continental lowlands (Hahn and Thorson 2002). Conglomerate, sandstone, mudstone, and coal were deposited in transitional regimes, while carbonaceous shale and minor limestone reflect deposition in a marine environment.

#### Burro Canyon Formation
The Burro Canyon Formation is the basal Cretaceous unit found in the area, and varies from 50 to 180 feet thick (Hintze 1988). It consists of brown and gray fluvial sandstone and conglomerate in its lower half, while thin beds of dense gray limestone and variegated green and purple mudstone comprise its upper half (Gloyn and others 1995). It inter-fingers with the underlying Morrison Formation, and is unconformably overlain by the Dakota Sandstone.

#### Dakota Sandstone
The Dakota Sandstone varies from 30 to 150 feet thick and consists of brown and yellow fluvial sandstone and conglomerate, as well as interbedded green, gray, and black mudstone (Hintze 1988). Some of the sandstones are interbedded with siltstone, claystone, and thin coal seams. These coals are commonly impure, bony, and discontinuous, with an ash content that reaches 30% in many seams, with individual seam thicknesses ranging from two to 15 feet (Gloyn and others 1995). Sandstone from this formation may also be locally suitable for building stone or aggregate for road construction and maintenance.

#### Mancos Shale
Within the planning area, an interval of the Mancos Shale, which exceeds 4,000 feet in thickness, overlies the Dakota Sandstone. The youngest Cretaceous-age formation in the UMB, the Mancos Shale consists of gray thin-bedded fissile shale interbedded with natural gas-producing sandstone and sandy siltstone.


BLM_0015709

## OVERVIEW OF GEOLOGY



Source: modified from Green (1992)

Figure 3:  Generalized Geology of West End of Montrose County, CO

## OVERVIEW OF GEOLOGY



Source: Molenaar 1987

**Figure 4:  Colorado Plateau Stratigraphic Correlation**

**Historic uranium-bearing formations are highlighted in yellow.**

BLM_0015711

## OVERVIEW OF GEOLOGY



Source: **Wegweiser (2008)**

**Figure 5:  Composite Generic Stratigraphic Column of Uravan Mineral Belt**

BLM_0015712

## OVERVIEW OF GEOLOGY



Source: Wegweiser (2008)

**Figure 6:  View of Jurassic Strata within Planning Area near Uravan, CO**



Source: Wegweiser (2008)

**Figure 7:  Stratigraphy of Dolores River Canyon within Planning Area**

BLM_0015713

# STRUCTURAL GEOLOGY

## THE PARADOX BASIN

As shown in Figure 8 on page 21, the Paradox Basin is a northwest to southeast-trending, oval-shaped feature, approximately 180 miles long and 100 miles wide, that dominates most of the western portion of the planning area (Merrell and others 1979). The most significant structural activity controlling the deposition of source rocks in the Paradox Basin region occurred during the late Paleozoic through the Permian. The Uncompahgre Uplift was active concurrent with sagging along a Precambrian basement fault and lineament shear zone, creating the Paradox Basin (Hintze 1988). Downwarping occurred along sub-parallel, northwest to southeast trending, northeast dipping, hinge-line fracture zones that were initially sites of monoclinal folding. Rapid subsidence adjacent to the Uncompahgre Uplift produced extensional faults that attenuated the deepening eastern portion of the basin, creating its characteristic asymmetry. The areal extent of the Paradox Basin is defined as the geographic extent of salt deposits hosted in the Paradox Formation (Baars and Stevenson 1981).

The thick accumulation of salts and evaporites set in motion the key structural developments of the Paradox Basin. While evaporites were being deposited in the deep basin, carbonate facies were forming on an adjacent shallower platform at the southwest margin of the basin (Chidsey and others 1996b). The platform developed almost at sea level, so that any sea level fluctuations would either flood the basin or cut off the supply of seawater, thus isolating the basin from the open seaway. During lower sea level stands, intense evaporation occurred under the hot, dry climate of the middle Pennsylvanian, concentrating the salts to form brine. As the density of the brine increased, it sank to the bottom of the rapidly subsiding basin, where it was preserved. Multiple periods of sea level fluctuation caused the accumulation of evaporites during sea level subsidence alternating with carbonate facies that flourished during periods of sea level influx (Chidsey and others 1996b). From a structural standpoint, it should be noted that the distribution of these facies mirrors the northwest to southeast structural fabric of the Paradox Basin.

The rapid uplift of the Uncompahgre Plateau resulted in the erosion of the exposed Precambrian and Paleozoic rocks (Hintze 1988). Depositional thinning and stratigraphic pinch-outs occur over the uplift in several formations, providing evidence for the timing of the upward movement. The position of the current Uncompahgre Plateau closely approximates the location of this ancestral Uncompahgre Uplift. With the rise of the ancestral Uncompahgre Uplift, a thick wedge of Cutler Group clastic sediments (reaching over 10,000 feet in some areas), was shed to the southwest onto the 5,000 to 8,000 feet of evaporites and shales in the deep, northeast trough of the Paradox Basin (Gloyn and others 1995; Cole and others 1996). The overburden pressure from this great thickness of sediments on the underlying evaporites induced ductile flow of the salt, which moved in a southwest direction, away from the thickest accumulations of Cutler sediments. Buried fault scarps along the northwest-trending basement faults acted as buttresses to the flow of salt, forcing it upward into the overlying strata, and forming the salt anticlines of the Paradox Fold and Fault regions (Hintze 1988).

BLM_0015714

## OVERVIEW OF GEOLOGY

The Paradox Fold and Fault Belt is characterized by high-angle basin faults, and non-piercement and complex piercement salt anticlines (Nuccio and Condon 1996). In some instances, the black, organic shales created mature source rocks that have been juxtaposed against Devonian and Mississippian rock by salt diapirism. In fact, those areas of greatest salt flowage coincide with areas of maximum fracturing of overlying sediments.



**Source: Modified from Kelley (1958a)**

**Figure 8:  Structural Elements of Paradox Basin and Adjacent Areas**

BLM_0015715

## OVERVIEW OF GEOLOGY

Where the salt anticlines breached the surface, collapsed or depressed surficial features were created by the dissolution of the salt deposits. Topographically, these anticlines are typically expressed as large elongate oval-shaped northwest-trending valleys where salt is commonly found at the surface or at shallow depths (Nuccio and Condon 1996). These valleys are enclosed by high walls and bounded by complex marginal structures and include Moab Valley, Spanish Valley, Lisbon Valley, Salt Valley, Fisher Valley, Sinbad Valley, Paradox Valley, and Castle Valley. The anticlines within the Paradox Fold and Fault Belt are prolific structural traps for hydrocarbons, and offer shallow accumulations of sodium and potassium.

During the Pennsylvanian Period, movement of the basement rocks and overlying sediments occurred along the pre-existing faults and lineaments. The relative movements controlled the location of shelf carbonates, provided topographic shoals for carbonate mound development, and created horst blocks that diverted the flow of salt upwards into the overlying sediments (Nuccio and Condon 1996).

By the Triassic Period, the rate of salt flowage had slowed considerably and by the close of the Jurassic Period, there was no longer an available supply of salt to continue the flowage, and the formation of salt anticlines ceased. Meanwhile, the Uncompahgre Plateau was eroded to a topographically low surface, allowing the deposition of the first Mesozoic age sedimentary rocks across the uplift (Hintze 1988).

The second significant structural event to affect the geology in the western planning area was the Late Cretaceous to Early Tertiary Laramide Orogeny, involving compressional tectonism in western North America and associated rejuvenation of pre-existing structures. In many places, compressional forces dramatically altered the landscape by forming mountain ranges. In the Paradox Basin region, however, the pre-existing lineament and fault systems may have acted as buttresses, deflecting the lateral compressional forces (Baars and Stevenson 1981).

Beginning in the middle Tertiary, the entire Colorado Plateau area underwent uplift and regional tilting towards the north. The Uncompahgre Plateau is a northeast tilted fault block with thousands of feet of vertical relief. The process of incisement and erosion that continues today was set in motion following this last tectonic event. Large rivers, including the Colorado, San Juan, and Dolores, incised deeply into the uplifted Colorado Plateau, creating the characteristic canyons of southeast Utah. Thousands of feet of sedimentary rocks were eroded, exposing both Paleozoic and Mesozoic sediments. In the area of the salt anticlines, groundwater dissolved the salt cores, leading to solution collapse along the anticlinal axes (as shown in Figure 9 on page 23). The removal of these salts has created the elongated, northwest trending valleys characteristic of the Salt Anticline physiographic province (Aubrey 1996).

Between 24 and 48 million years ago, igneous intrusions of the La Sal and Abajo Mountains occurred near the intersection of the Precambrian lineaments in eastern Utah, suggesting another impact of old, deep-seated structures (Hintze 1988). Here the La Sal and Abajo igneous complexes intruded the basinal and fold belt sequences of southeastern Utah. Their emplacement was forceful and arched the overlying sedimentary sequence resulting in the formation of mantled domes, which have now been breached by erosion to expose their igneous cores. Similar features occur in

BLM_0015716

## OVERVIEW OF GEOLOGY

adjoining portions of Colorado; all appear to be localized at the intersection of major Precambrian lineaments (Hintze 1988).



**Source: Wright and Everhart (1960)**

**Figure 9:  Cross-section of Paradox Valley Salt Anticline**

BLM_0015717