protection of the small BLM portions of occupied habitat adjacent to private, state and Forest Service lands being managed for GUSG, provide additional protection for the species.

***Values Assessed***

- Wildlife Resource: *Habitat for BLM Sensitive Species*

***Relevance Criteria Considered:*** 2

***Importance Criteria Considered:*** 2 and 3

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Much of the historic and occupied habitat and leks are on private and state lands in the area. Concentrated nesting and brood rearing habitat exist on BLM lands in limited small areas near Miramonte Reservoir. |

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Locations of this potential ACEC, adjacent to occupied habitats on state forest and private lands where active management is occurring, could be sensitive to change and change could have impacts to populations. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | The Gunnison sage grouse is being considered for federal listing under the Endangered Species Act. There is also a great deal of interest locally and statewide in protecting the species. |

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 12 - San Miguel Gunnison Sage-Grouse ACEC (Proposed)**
**470 acres**

Redvale
Williams Ranch
Coventry
Naturita Creek
MONTROSE COUNTY
SAN MIGUEL COUNTY
Norwood
Power Station
UNCOMPAHGRE NATIONAL FOREST
IRON SPRINGS MESA
San Miguel Canyon
BEAVER MESA
SPECIE MESA
UNCOMPAHGRE NAT FOR
LITTLE CONE
UNCOMPAHGRE NATIONAL FOREST
LONE CONE
SAN MIGUEL COUNTY
DOLORES COUNTY
McKenna Peak
Lizard Head Wilderness
BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
NCAs
USFS
CDOW
USFS Wilderness
WSAs
0 1
Miles
N

49

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015817

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 13. WEST MONTROSE COUNTY GUNNION SAGE GROUSE ACEC (Proposed)

***Status:*** Proposed

***Proponent:*** San Miguel County, WSERC, WCC

***General Location:*** Western Montrose County, in Paradox Valley, and in areas from northwest of Nucla to south of Naturita, CO.

***Acreage:*** 22,930

***Significance:*** The proposed ACEC contains historic and potential Gunnison sage grouse (GUSG) habitat in western Montrose County.

***Description:*** The proposed ACEC is located on several small parcels of BLM land containing historic GUSG habitat, as defined by Colorado Division of Wildlife. It should be noted that determining the historic range of GUSG is problematic for many reasons, most notably because of widespread loss of sagebrush habitats, which preceded scientific study of the species. Additionally, GUSG have been extirpated from many areas for which no useful zoological records or specimens exist ([4]).

GUSG currently occur in what have previously been considered eight widely scattered and isolated populations in Colorado and Utah. In Colorado, seven GUSG population areas are: Cerro Summit-Cimarron-Sims Mesa, Crawford, Dove Creek, Gunnison Basin, Piñon Mesa, Poncha Pass, and San Miguel Basin. The San Miguel Basin population exhibits a patchy distribution of GUSG. As a result, there are six separate "subpopulations" identified within San Miguel Basin: Dry Creek Basin; Hamilton Mesa; Miramonte Reservoir; Gurley Reservoir; Beaver Mesa; and Iron Springs.[5] This proposed ACEC area is the northern end of what is considered part of the San Miguel population of GUSG. The core of this population is found on the Dolores Field Office to the south. Historically, Dove Creek-Monticello, San Miguel, Crawford, and Piñon Mesa all had much more sagebrush habitat and probably larger GUSG populations that were somewhat connected through more contiguous areas of sagebrush habitat. An estimated 20% loss of sagebrush habitat between the late 1950s and the early 1990s and fragmentation of sagebrush habitat in southwestern Colorado is thought to have led to the current isolation of these populations.[6]

***Values Assessed***

- Wildlife Resource: *Habitat for BLM Sensitive Species*

---

[4] Pg 32 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.
[5] Pg 36-37 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.
[6] Pg 51 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

50

BLM_0015818

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

***Relevance Criteria Considered:*** 2

***Importance Criteria Considered:*** 1, 2, and 3

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | No | Locations in the proposed ACEC contain areas of potential habitat which have not been occupied for greater than 50 years. These particular locations do not meet the relevance criteria. |

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | No | The habitat is not occupied, and has not been for over 50 years. The area is in the extreme northern portion of habitat for the San Miguel population. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | No | Locations west of Redvale contain areas of potential habitat which has not been occupied for greater than 50 years. Potential habitat in these locations does not meet the importance criteria. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | The Gunnison sage grouse is being considered for federal listing under the Endangered Species Act. There is also a great deal of interest locally and statewide in protecting the species. |

51

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015819

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## ACEC Map 13 - West Montrose County Gunnison Sage-Grouse ACEC (Proposed) 22,930 acres

Sewemup
CARPENTER FLATS
ATKINSON
MARTIN MESA
SPRING CREEK MESA
LONG MESA
Tabeguache Area
PINTO MESA
Tabeguache Area
Bedrock
Dolores River Canyon
DAVIS MESA
SAWTOOTH RIDGE
MONTROSE COUNTY
SAN MIGUEL COUNTY
BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
NCAs
USFS
CDOW
USFS Wilderness
WSAs
0 1
Miles
N

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area 52

BLM_0015820

## 14. SIMS CERRO GUNNISON SAGE GROUSE ACEC (Proposed)

***Status:*** Proposed

***Proponent:*** Art Goodtimes

***General Location:*** Approximately five to thirteen miles south of Montrose, CO, east of Spring Creek, and on BLM lands on both sides of Happy Canyon, Dolores Canyon, and Horsefly Canyon; approximately ten to fourteen miles east of Montrose, on both sides of highway 50 near Cerro Summit.

***Acreage:*** 25,620

***Significance:*** The proposed ACEC contains potential, occupied, and historic Gunnison Sage grouse (GUSG) habitat in Montrose County. The Sims Mesa location has been periodically occupied by a few grouse as recently as 2002. Other lek sites in the area include Coal Hill (6 birds seen in 2004), Hairpin (1 bird seen in 2010), Cimarron (5 birds seen 2009), Cerro (last seen 2000) (Banulis, CDOW pers. comm. 5/27/2010). While no GUSG have been seen on the Cerro lek in recent years, a GUSG was seen in the Cerro Summit area in 2009 (based on personal communication with Ken Holsinger).

***Description:*** The proposed ACEC is located on a large parcel of BLM land southeast of Montrose, and on smaller pieces of BLM lands about 10 miles east of Montrose near Cerro Summit. The ACEC contains historic, potential, and occupied GUSG habitat, as defined by Colorado Division of Wildlife.

GUSG currently occur in what have previously been considered eight widely scattered and isolated populations in Colorado and Utah. In Colorado, the seven identified GUSG population areas are: Cerro Summit-Cimarron-Sims Mesa, Crawford, Dove Creek, Gunnison Basin, Piñon Mesa, Poncha Pass, and San Miguel Basin. The Cerro Summit-Cimarron-Sims Mesa population exhibits a patchy distribution of GUSG. As a result, there are two subpopulations identified within Cerro Summit-Cimarron-Sims Mesa: Cerro Summit-Cimarron; and Sims Mesa.[7] This proposed ACEC area includes the BLM lands within the Sims Mesa subpopulation, and a very small portion of the Cerro Summit-Cimarron subpopulation that is within the planning area. An estimated 20% loss of sagebrush habitat between the late 1950s and early 1990s and fragmentation of sagebrush habitat in southwestern Colorado is thought to have led to the current isolation of these populations.[8] The protection of the small BLM portions of occupied/historic habitat provides additional protection for the species.

---

[7] Pg 36-37 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

[8] Pg 51 *in* Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

***Values Assessed***

- Wildlife Resource: *Habitat for BLM Sensitive Species*

***Relevance Criteria Considered:*** 2

***Importance Criteria Considered:*** 1, 2, and 3

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | These locations have historic, potential, and occupied habitat for the Gunnison sage grouse as defined by CDOW. |

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | No | The habitat has had only occasional grouse lekking activity in recent years (See the description above). |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Gunnison sage grouse habitat has been fragmented by human uses. Habitat for this GUSG population has become relatively small and isolated from other GUSG populations, and the population is vulnerable to extirpation. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | The Gunnison sage grouse is being considered for federal listing as an endangered species. There is also a great deal of interest locally and statewide in protecting the species. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

54

BLM_0015822

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 14 - Sims Cerro Gunnison Sage-Grouse ACEC (Proposed)
25,620 acres**

Gunnison Gorge National
Conservation Area
Black Canyon
of the Gunnison
Wilderness
Montrose
Montrose
MONTROSE COUNTY
OURAY COUNTY
UNCOMPAHGRE
NATIONAL
FOREST
LOG HILL
MESA
OURAY COUNTY
MONTROSE COUNTY
GUNNISON COUNTY
BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
NCAs
USFS
CDOW
USFS Wilderness
WSAs
0 1
Miles
N

55

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015823

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 15. DOLORES RIVER SLICK ROCK CANYON ACEC (Proposed)

***Status:*** Proposed

BLM has submitted two ACEC proposals for the area. The larger one is called "Dolores Slick Rock Canyon" and this smaller proposed area is called "Dolores River Slick Rock Canyon."

***Proponent:*** BLM (includes the CNHP La Sal PCA)

***General Location:*** Coyote Wash to approximately Bedrock, CO, within the Dolores River canyon, including La Sal Creek and La Sal Creek canyon.

***Acreage:*** 10,670 and 9,780

***Significance:*** A spectacular deep canyon with steep cliffs supports high quality riparian vegetation and rare and exemplary riparian communities, hanging gardens, BLM Sensitive plants and fish, desert bighorn sheep, and peregrine falcon. The area also has high scenic quality. An ACEC would help protect these resources.

***Description:*** The Dolores River, La Sal Creek, and Coyote Wash have carved a spectacular deep canyon through Jurassic and Triassic sandstones. Steep vertical cliffs dominate the canyonsides, broken only where tributaries enter the canyon.

Major geologic formations in the canyon are Wingate, Kayenta, Navajo, and Entrada sandstones. The Morrison Formation appears near the southern end. Most of this area is roadless and accessible only by raft, canoe, or kayak.

This site includes the riparian zone and adjacent uplands along the Dolores River, from Slick Rock Canyon north to Bedrock. There are excellent to good occurrences of the globally common coyote willow/mesic graminoids (*Salix exigua*/mesic graminoids). Typical vegetation along the river and creeks includes a band of coyote willow, mixed with giant reed at the water's edge between the low and high water marks. La Sal Creek supports a critically imperiled plant association consisting of box elder and river birch. The largest population of the BLM Sensitive (G2/S1) Kachina daisy *(Erigeron kachinensis)* within Colorado occurs along drainages feeding into Coyote wash and canyon.

The canyon bottoms support a nearly continuous occurrence of the riparian plant association known as New Mexico privet foothills riparian shrubland. The site supports two excellent (A-ranked) occurrences of a globally imperiled (G2/S1) New Mexico privet riparian shrub community (*Forestiera pubescens*) along the Dolores River. The New Mexico privet plant community is known only from the major rivers in the Four Corners area.

There are a few hanging garden communities (*Aquilegia micrantha - Mimulus eastwoodiae*), imperiled to vulnerable on a global scale (G2G3/S2S3), containing small populations of the globally vulnerable (G3/S1) Eastwood monkeyflower (*Mimulus eastwoodiae*).

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area 56

BLM_0015824

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

The proposed ACEC also has a good (B-ranked) occurrence of the Naturita milkvetch (*Astragalus naturitensis*), a BLM Sensitive species and considered to be imperiled to vulnerable both globally and in Colorado (G2G3/S2S3).

Uplands in this area have pinyon-juniper woodlands, sagebrush, or barren sandstone cliffs. Naturita milkvetch was found in the pinyon-juniper community.

Additionally, the Dolores River throughout the length of the site supports populations of roundtail chub (*Gila robusta*), which is a BLM Sensitive species and globally vulnerable (G3/S2). Populations of the chub are at the upstream margin of the species' range and comprise the majority of occurrences for this species. Flannelmouth suckers and bluehead suckers also likely occur in the area. Other animal species with conservation significance are desert bighorn sheep and peregrine falcon.

The proposed ACEC also has rock art panels and paleontological sites.

***Values Assessed***

- Botanical: *Riparian Communities and BLM Sensitive Species*
- Fish and Wildlife: *BLM Sensitive Species*
- Scenic

***Relevance Criteria Considered:*** 1, 2, and 3

***Importance Criteria Considered:*** 1, 2, and 3

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans). | Yes | BLM has rated the area as VRI Class 2. Cultural sites (rock art panels and historic structures) are in the area, as is a paleontological study area. |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Desert bighorn sheep, peregrine falcon, and Roundtail chub (BLM Sensitive species) inhabit the area. Potential habitat for other BLM Sensitive fishes including flannelmouth and bluehead suckers. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | Yes | Several globally vulnerable and state rare plants are in the proposed ACEC area. The river banks also have box-elder, river birch and red-osier dogwood communities. |

57

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015825

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | The paleontological resource is of state and national significance. Rare and globally vulnerable plants and plant communities are in the area. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Rock art panels are vulnerable to damage. Vulnerable to invasive species that threaten native ecosystems. Several globally vulnerable and state rare plants are in the proposed ACEC area. Nesting peregrine falcons, a recently delisted species, are sensitive to disturbances. Bighorn sheep are experiencing declines across the region and human-related disturbances and other adverse changes may contribute to these trends. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | Within a WSA. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

58

BLM_0015826

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 15a - Dolores Slick Rock Canyon ACEC (Proposed)**
**10,670 acres**

Yellow Bird Mines
Sharp Canyon
Morning Glory Mine
Too High Mine
Wray Mesa
Landing Strip
Yip Yip Mine
Nyswonger Mesa
Bedrock
Gravel Pit
Dolores Canyon
Mulesho Bend
Dolores River Canyon
Skein
BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
NCAs
USFS
CDOW
USFS Wilderness
WSAs
0
1
Miles
N

59

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015827

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 16 - Dolores River Slick Rock Canyon ACEC (Proposed)**
**9,780 acres**

Yellow Bird Mines
Sharp Canyon
Morning Glory Mine
Nyswonger Mesa
Bedrock
Gravel Pit
Too High Mine
Wray Mesa
Landing Strip
Yip Yip Mine
Dolores
Canyon
Rock
Muleshoe Bend
Dolores River Canyon
BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
NCAs
USFS
CDOW
USFS Wilderness
WSAs
0
1
Miles
N

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

60

BLM_0015828

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## *16. LA SAL CREEK ACEC (Proposed)*

***Status:*** Proposed

***Proponent:*** CNAP

***General Location:*** In Montrose County, from the south rim of La Sal Creek to Paradox Valley, and from the east rim of the Dolores River canyon to about Spring Creek.

***Acreage:*** 10,500

***Significance:*** A spectacular deep canyon supports high quality riparian vegetation and relic riparian communities, BLM Sensitive plants, desert bighorn sheep, and peregrine falcon. Eroding shale slopes on the uplands support populations of rare plants. The area also has high scenic quality.

***Description:*** La Sal Creek cuts a spectacular canyon of entrenched meanders through red Triassic and Jurassic sandstones and siltstones. The narrow floodplain supports a critically imperiled plant association consisting of box elder and river birch. In the narrow band of riparian vegetation, box elder accounts for as much as 70% cover, with river birch providing 25 to 60% cover. Only a few other small occurrences of this community are known.

New Mexico privet, coyote willow, red-osier dogwood, giant reed, and wild rose are also common. Although there are some introduced pasture grasses, including Kentucky bluegrass, there is no tamarisk along the upper part of the creek.

Eroding shale slopes support populations of rare plants: Paradox breadroot (*Pediomelum aromaticum*), a G3/S2 BLM Sensitive Species; and Paradox Valley lupine (*Lupinus crassus*), a G2/S2, BLM Sensitive Species.

Upland vegetation consists of pinyon-juniper woodland with dwarf and true mountain mahogany, cliffrose, Gambel oak, yucca, cacti, and rabbitbrush. A good-sized population of Paradox breadroot, with several hundred plants, was found on a dry bench overlooking La Sal Creek.

***Values Assessed***

- Botanical: *Unique Vegetation Communities and BLM Sensitive Species*
- Fish and Wildlife: *BLM Sensitive Species*

***Relevance Criteria Considered:*** 2 and 3

***Importance Criteria Considered:*** 1, 2, and 3

61 Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015829

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | Desert bighorn sheep and peregrine falcon (BLM Sensitive species) inhabit the area. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | Yes | Several globally vulnerable and state rare plants are in the proposed ACEC area. The river banks also have box-elder, river birch and red-osier dogwood communities. |

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Rare and globally vulnerable plants and plant communities are in the area. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Vulnerable to invasive species that threaten native ecosystems. The globally vulnerable plant communities are difficult to restore. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | A portion of the ACEC is within a WSA. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

62

BLM_0015830

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## ACEC Map 17 - La Sal Creek ACEC (Proposed)
## 10,500 acres

West
Paradox
Creek
PARADOX
River
Gravel Pit
Bedrock
Nyswagger Mesa
Morning Glory Mine
Canyon
Wray
Too High Mine
Landing Strip
Dolores
Dolores River Canyon
Canyon
BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
NCAs
USFS
CDOW
USFS Wilderness
WSAs
0
1
Miles
N

63

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015831

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 17. COYOTE WASH ACEC (Proposed)

***Status:*** Proposed

***Proponent:*** CNAP

***General Location:*** In Montrose County, CO; Coyote Wash to the rim of Wray Mesa.

***Acreage:*** 2,100

***Significance:*** A spectacular deep canyon with steep cliffs supports hanging gardens and BLM Sensitive plant species. Coyote Wash contains the best known occurrence of the globally imperiled Kachina daisy.

***Description:*** Coyote Wash is a steep-sided tributary canyon that joins the Dolores Canyon. Its flat sandy bottom has a small meandering stream that occasionally floods. Colorado's largest population of Kachina daisy (*Erigeron kachinensis*), a G2/S1 BLM Sensitive Species, occurs along drainages feeding into the wash and canyon; hanging gardens in the canyon walls support Eastwood monkeyflower (*Mimulus eastwoodiae*) a BLM Sensitive species. Isolated benches in the canyon support Great Basin grassland communities in excellent condition.

The south boundary of the ACEC is the Uncompahgre Field Office boundary. Because of this, the proposed ACEC does not include the bottom of the Coyote Wash drainage.

***Values Assessed***

- Botanical: BLM Sensitive Species

***Relevance Criteria Considered:*** 3

***Importance Criteria Considered:*** 1, 2, and 3

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | Yes | Several globally vulnerable and state rare plants occur within the proposed ACEC area. The river banks also support box-elder, river birch and red-osier dogwood communities. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

64

BLM_0015832

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | BLM Sensitive and rare and globally vulnerable plants and plant communities are in the area. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Globally vulnerable, state rare and BLM Sensitive plants are in the proposed ACEC area. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | Within a WSA. |

65

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015833

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 18 - Coyote Wash ACEC (Proposed)**
**2,100 acres**

Landing Strip
Mesa
1987
2015
Canyon
Rock
Muleshoe Bend
Dolores River Canyon
Silveys Pocket
Buck
Mesa
Spring
Landing Strip
BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
NCAs
USFS
CDOW
USFS Wilderness
WSAs
0
1
Miles
N

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

66

BLM_0015834

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## *18. EAST PARADOX ACEC (Proposed)*

***Status:*** Proposed

The BLM has proposed a smaller ACEC within this area called the "Biological Soil Crust ACEC."

***Proponent:*** BLM

***General Location:*** Montrose County, CO, from the west rim of the Dolores River canyon to about six miles east of Dolores River, and from highway 90 to the north rim of Paradox Valley.

***Acreage:*** 7,360 (Biological Soil Crust ACEC is 1,900 acres)

***Significance:*** The proposed ACEC would preserve the best known occurrence of the BLM Sensitive Paradox Valley lupine (*Lupinus crassus*), a higher than normal density and diversity of biological soil crusts (BSC), and two species of BSC that are rare and typically found only on gypsiferous soils.

***Description:*** The East Paradox Creek site is located west of Naturita, Colorado and north of Highway 90 as it travels through Paradox Valley. Geologic strata includes the Hermosa, Moenkopi, Cutler, Kayenta, and Chinle formations, and Quaternary alluviums. The site is underlain by multiple soils, including Mikim (ustic torriorthents, fine-loamy, mesic, mixed calcareous soils), Palmer (ustollic haplargids, coarse-loamy, mixed, mesic soils), and Zyme (ustic torriorthents, clayey, montmorillontic calcareous, mesic shallow soils) compositions.

The proposed East Paradox ACEC supports the best known occurrence of Paradox Valley lupine, a globally imperiled (G2/S2) BLM Sensitive species found only in Colorado. There are two excellent (A-ranked) occurrences of Paradox breadroot (*Pediomelum aromaticum*), a BLM Sensitive species considered to be globally vulnerable and rare in Colorado (G3/S2).

Dark red soils apparently derived from the Chinle Formation provide habitat for the Paradox Valley lupine. The soils differ notably from those at the other major lupine location near Naturita. Large populations of Paradox breadroot grow with the lupine, typically further downstream in washes.

Well-developed BSC occurs between plants. Highly gypsiferous soils derived from the Paradox Formation tend to support a higher than normal density and diversity of BSC. During the spring of 2009, BLM Vernal Field Office Botanist Jessie Salix conducted a BSC inventory in the Paradox Valley at the request of the UFO.

The inventory was conducted approximately within T47N, R18W, sections 22, 23, 26, and 27 immediately southeast of the Dolores River and resulted in documentation of the occurrence of two BSC species (*Lecanora gypsicola* and *Gypsoplaca macrophylla*) considered somewhat rare and typically found only on gypsiferous soils. The identification of these species was verified by Dr. Larry St. Clair, a lichenologist at Brigham Young University. Dr.

67 Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015835

Case No. 1:20-cv-02484-MSK Document 30-8 filed 04/27/21 USDC Colorado pg 21 of 141

St. Clair conveyed to Jessie Salix via e-mail that he felt that the lichen were in need of protection because 1) they occur exclusively on gypsiferous soils (a limited habitat that is commonly mined) and 2) the species occur on less than half of the gypsiferous sites that Dr. St. Clair has inventoried. The location is also the type locality for the Paradox catseye (*Cryptantha paradoxa*).

In addition, the area supports occurrences of a number of wildlife species with conservation significance, the rarest of which are the roundtail chub *(Gila robusta)* and flannelmouth sucker *(Catostomus latipinnis)*, both BLM Sensitive fish species. Peregrine falcons also nest within the proposed area.

***Values Assessed***

- Botanical: *Unique Vegetation Communities and BLM Sensitive Species*
- Fish and Wildlife: *BLM Sensitive Species*

***Relevance Criteria Considered:*** 2 and 3

***Importance Criteria Considered:*** 1, 2, and 3

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The Dolores River through the area supports two BLM Sensitive fish species: roundtail chub and flannelmouth sucker. Peregrine falcons nest in the area. |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | Yes | Supports biological soil crust containing two significant and rare lichen species found only in gypsiferous soil ecosystems.<br><br>Supports BLM Sensitive Paradox Valley lupine and Paradox breadroot. Paradox catseye is endemic to gypsiferous soils and somewhat rare only found in eastern Utah, western Colorado, and one site in northwest New Mexico. |

BLM_0015836

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Two significant and rare species of biological soil crust are limited to this type locality. The BLM Sensitive Paradox Valley lupine and Paradox breadroot that occur here have national significance. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | The biological soil crusts are fragile, easily damaged, and heal slowly. Supports the best known occurrence of sensitive and rare Paradox Valley lupine, which grows only in Colorado. Type locality for Paradox catseye is both scientifically unique and irreplaceable. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | CNHP has recommended the area as a PCA. |

69

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015837

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 198a - East Paradox ACEC (Proposed)**
**7,360 acres**

Dolores River Canyon
BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
NCAs
USFS
CDOW
USFS Wilderness
WSAs
0
1
Miles
N

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

70

BLM_0015838

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 18b - Biological Soil Crust ACEC (Proposed)**
**1,900 acres**

PARADOX VALLEY
East Paradox Creek
DOLORES RIVER CANYON
MESA
Dolores River Canyon
BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
NCAs
USFS
CDOW
USFS Wilderness
WSAs
0
1
Miles
N

71

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015839

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## *19. WEST PARADOX ACEC (Proposed)*

***Status:*** Proposed

***Proponent:*** BLM

***General Location:*** Montrose County, CO, from the west rim of the Dolores River canyon to the west end of Paradox Valley, and up to Montrose County Rd Q13.

***Acreage:*** 5,190

***Significance:*** The proposed ACEC would preserve habitat for the Paradox Valley lupine (*Lupinus crassus*). In addition, the area supports peregrine falcon *(Falco peregrinus)* eyries.

***Description:*** The West Paradox Valley site is located on the north side of Paradox Valley and west of the Dolores River, on dark red soils derived from the Chinle Formation. This site contains an excellent (A-ranked) occurrence and historical occurrences of Paradox Valley lupine (*Lupinus crassus*), a BLM Sensitive and globally imperiled (G2/S2) species. It also contains Paradox breadroot (*Pediomelum aromaticum*), which is also BLM Sensitive, and a globally vulnerable (G3/S2) plant.

Paradox Valley lupine and Paradox breadroot are both locally common in the bottoms and on the sides of draws at the base of the south-facing slopes, with thousands of individuals of both species and a variety of ages represented.

Other vegetation consists of Utah juniper woodland, with galleta (Genus *Pleuraphis)* and snakeweed (Genus *Gutierrezia*). The plant community is in good condition, with few exotic species present.

The boundary is drawn to encompass known occupied sites of Paradox Valley lupine and Paradox breadroot, while allowing adequate additional habitat for the plants to move or expand their range over time. The proposed area includes the lower edge of the pinyon-juniper community where the two species occur and includes the cliff faces to the canyon rim, which support peregrine falcon eyries.

The area experiences light vehicle use. The land is primarily administered by the BLM, with some private land on the south side.

***Values Assessed***

- Botanical: *Unique Vegetation Communities and BLM Sensitive Species*
- Fish and Wildlife: *BLM Sensitive Species*

***Relevance Criteria Considered:*** 2 and 3

***Importance Criteria Considered:*** 1, 2, and 3

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

72

BLM_0015840

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 2 | A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity). | Yes | The area supports peregrine falcon (a BLM Sensitive species). |
| 3 | A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features). | Yes | The area supports Paradox lupine and Paradox breadroot (BLM Sensitive species). |

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Paradox lupine and Paradox breadroot are BLM Sensitive species; they are also globally imperiled and globally vulnerable, respectively. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Has populations of the sensitive and rare Paradox Valley lupine which grows only in Colorado. |
| 3 | Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of FLPMA. | Yes | CNHP has recommended the area as a PCA. |

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 19 - West Paradox ACEC (Proposed)**
**5,190 acres**

Sewemup
Carpenter
Flats
Beehive
Canyon
Little Buckhorn Mine
Red
Martin
Mesa
Sunrise Mine
Paradox
West
Paradox
Creek
Salt Evaporator
Gaging Sta
BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
NCAs
USFS
CDOW
USFS Wilderness
WSAs
0
1
Miles
N

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

74

BLM_0015842

## 20. PARADOX ROCK ART ACEC (Proposed)

***Proponent:*** WSERC, WCC

***General Location:*** Montrose County, on the north slope of Paradox Valley, approximately nine miles west of Nucla, CO.

***Acreage:*** 1,080

***Significance:*** The proposed ACEC contains important rock art and archaeological sites. It is the northern extent Anasazi rock art and occupation. The area also contains Paradox Valley lupine (*Lupinus crassus*).

***Description:*** The proposed ACEC is located in the eastern portion of Paradox Valley and contains important rock art panels and archaeological sites, including several outstanding examples of Ancestral Puebloan-style petroglyphs, Formative Period and earlier occupations, features, and isolates, and settled village sites dating back more than five hundred to a thousand years.

The site contains an occurrence and historical occurrences of Paradox Valley lupine (*Lupinus crassus*), a BLM Sensitive and globally imperiled (G2/S2) species. There is potential for conflict between peregrine falcons and hang gliders on the cliffs above Paradox.

***Values Assessed***

- Cultural

***Relevance Criteria Considered:*** 1

***Importance Criteria Considered:*** 1 and 2

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans). | Yes | Rare northern extent Anasazi rock art and occupation. VRI Class 2. |

BLM_0015843

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | Inter-state and Regional significance due to Anasazi rock art. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | Fragile and irreplaceable if damaged. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

76

BLM_0015844

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 20 - Paradox Rock Art ACEC (Proposed)**
**1,080 acres**

BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
NCAs
USFS
CDOW
USFS Wilderness
WSAs
0
1
Miles
N

77

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015845

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 21. TABEGUACHE PUEBLO/TABEGUACHE CAVES ACEC (Proposed)

***Status:*** Proposed

***Proponent:*** WSERC, WCC

***General Location:*** Montrose County, approximately six miles north of Nucla, CO, from the Uncompahgre National Forest to about two miles east of old Uravan; along Tabeguache Creek and Spring Creek, and areas in between.

***Acreage:*** 26,400

***Significance:*** The proposed ACEC contains important archaeological sites that show a relationship between the Fremont and Anasazi cultures. There is some evidence of farming (corn production).

***Description:*** The proposed ACEC includes part of the Tabeguache Special Management Area. The Tabeguache Pueblos and Tabeguache Caves are important both to the prehistory of the region and to the history of archaeology in Colorado, being some of the earliest explored and described archaeological sites in the state. In addition to their historic interest, both Tabeguache caves and the pueblos still contain intact archaeological deposits dating to the Formative period Anasazi, or Ancestral Puebloan people.

***Values Assessed***

- Cultural

***Relevance Criteria Considered:*** 1

***Importance Criteria Considered:*** 1 and 2

| RELEVANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| **#** | **DESCRIPTION** | | |
| 1 | A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans). | Yes | Contains important archaeological sites that show a relationship between the Fremont and Anasazi cultures. |

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

78

BLM_0015846

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

| IMPORTANCE CRITERION | | YES/ NO | RATIONALE FOR DETERMINATION |
|---|---|---|---|
| # | DESCRIPTION | | |
| 1 | Has more than locally significant qualities, which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. | Yes | The area is important to the history of archaeology in North America. |
| 2 | Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. | Yes | The archaeological sites are fragile and irreplaceable if damaged. |

79

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015847

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

**ACEC Map 21 - Tabeguache Pueblo/Tabeguache Caves ACEC (Proposed)**
**26,400 acres**

Windy Point
Pinon Mountain
Blue Springs Point
Spring Creek Mesa
Wild Cow Mesa
Long Mesa
Burro Mesa
Campbell
Shavano
Tabeguache
Tabeguache Area
Park
Third
Canyon
Box
Doby
BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
NCAs
USFS
CDOW
USFS Wilderness
WSAs
0
1
Miles
N

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area
80

BLM_0015848

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## 22. YOUNG EGG LOCALITY ACEC (Proposed)

**NOTE: Because it is outside of the planning area, the proposed Young Egg Locality ACEC will not be considered further in the Uncompahgre RMP.**

***Status:*** Withdrawn from further consideration.

***Proponent:*** CNAP

***General Location:*** Approximately one-half mile east of the Gunnison River and two miles west of highway 50, in the Dominguez-Escalante NCA.

***Acreage:*** 120

***Significance of the Proposed ACEC:*** The proposed ACEC is a scenic area that consists of a section of the upper Jurassic Morrison Formation containing thousands of black eggshell fragments. The site represents a nesting site used repeatedly by dinosaurs.

***General Description:*** The location of this proposed ACEC is at the mouth of Wells Gulch near the Gunnison River. It is within the Dominguez-Escalante NCA, which is not included in the Uncompahgre Planning Area.

81

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015849

ACEC IMPORTANCE AND RELEVANCE EVALUATIONS

## ACEC Map 22 - Young Egg Locality ACEC (Proposed)
120 acres

Dominguez - Escalante
National Conservation Area
Broughton
GUNNISON
Wells
Dominguez
Canyon
Wilderness
DOMINGUEZ
RIVER
Basin
BLM
Private
BLM Wilderness
RMP Boundary
NPS
State
NPS Wilderness
Dominguez - Escalante NCA
USFS
CDOW
USFS Wilderness
WSAs
0
1
Miles
N

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

82

BLM_0015850

INTERDISCIPLINARY TEAM MEMBERS

# 5.0 - INTERDISCIPLINARY TEAM MEMBERS

The following Uncompahgre Field Office Staff participated in determining the relevance and importance of the nominated and existing ACECs.

| NAME | TITLE |
|---|---|
| Debbie Burch | Range Technician |
| Amanda Clements | Ecologist |
| Rob Ernst | Geologist |
| Glade Hadden | Archaeologist |
| Ken Holsinger | Natural Resource Specialist |
| Dan Huisjen | Fire Ecologist |
| Julie Jackson | Outdoor Recreation Planner |
| Bruce Krickbaum | Planner |
| Jeff Litteral | Hydrologist (former) |
| D. Maggie Magee | Technical Writer-Editor |
| Teresa Pfifer | Land and Minerals Supervisor |
| Linda Reed | Realty Specialist |
| Lynae Rogers | Rangeland Management Specialist |
| Charles Sharp | Wildlife and T&E Biologist (former) |
| Barbara Sharrow | Field Manager |
| Melissa Siders | Wildlife and T&E Biologist |
| David Sinton | GIS Specialist |
| Jedd Sondergard | Hydrologist |
| Dean Stindt | Rangeland Management Specialist (former) |
| Thane Stranathan | Natural Resource Specialist |
| Karen Tucker | Recreation Staff Supervisor |

83

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015851

# 6.0 - REFERENCES

**Bureau of Land Management**

1988 Manual H-1613, *Areas of Critical Environmental Concern.*

2000 Colorado BLM State Director's Sensitive Species List (Animals and Plants). Webpage: *http://www.blm.gov/co/st/en/BLM_Programs/botany/Sensitive_Species_List_.html*

2007 *San Juan Public Lands Center Draft Land Management Plan and Draft Environmental Impact Statement.* Durango, Colorado.

2008 *Moab Field Office Record of Decision and Approved Resource Management Plan.* Moab Field Office, Utah.

2008b *Monticello Field Office Record of Decision and Approved Resource Management Plan.* Moab Field Office, Utah.

2008c *Preparation Plan for the Uncompahgre Resource Management Plan.* Uncompahgre Field Office. Montrose, Colorado.

**Colorado Division of Wildlife**

2005 Gunnison Sage-grouse Rangewide Steering Committee, Gunnison Sage-grouse Rangewide Conservation Plan. Colorado Division of Wildlife, Denver, Colorado.

**Colorado Natural Heritage Program**

2009 Level 4 Potential Conservation Area (PCA) Reports. Colorado Natural Heritage Program (CNHP). Colorado State University, Fort Collins, CO.

**FLPMA**

1976 Section 202 (43 US Code 1712[c][3]) Federal Land Policy and Management Act of 1976, Public Law 94-579, as amended.

**National Audubon Society**

2010 Important Bird Areas in the U.S. Available online at: *http://www.audubon.org/bird/iba*

**StClair, Larry**

2009 Email communication regarding lichens in Paradox Valley. Larry StClair, Brigham Young University, Utah.

APPENDIX A – UFO RMP SCOPING ACEC FACT SHEET

# 7.0 - Appendices

## Appendix A: UFO RMP Scoping ACEC Fact Sheet

**4.3**

**BLM UNCOMPAHGRE FIELD OFFICE**
**RMP PLANNING FACT SHEET**
***Areas of Critical Environmental Concern***

Barbara Sharrow, UFO Field Manager
2465 S. Townsend Ave, Montrose, CO 81401
Office hours are 8:00 am to 4:30 pm
Phone: (970) 240-5300 | TDD (970) 240-5366
FAX (970) 240-5367

**The BLM Uncompahgre Field Office (UFO) is revising the Resource Management Plan (RMP) for the Uncompahgre planning area. The Uncompahgre RMP will provide detailed information about the current state of resources on public lands within the planning area, and set forth a plan of action for managing those resources for the next twenty or so years under the BLM's dual mandate of *multiple use* and *sustained yield*.**

*Areas of Critical Environmental Concern*, commonly known as *ACECs*, are public lands where special management is required in order to protect the area's values. To be eligible for designation as an ACEC, an area must meet criteria for both *relevance* and *importance*. An ACEC possesses significant historic, cultural, or scenic values, fish or wildlife resources (including habitat, communities, or species), natural processes or systems, or natural hazards. In addition, the significance of these values and resources must be substantial in order to satisfy the importance criteria.

### ACECs IN THE PLANNING AREA

The Uncompahgre planning area contains four ACECs, which were designated in the two existing RMPs:

| ACEC | AREA (ACRES) | VALUES |
|---|---|---|
| Fairview | 374 | Large population of a listed endangered plant species and significant populations of a candidate plant species |
| Needle Rock | 83 | A volcanic geological structure with high-value scientific, interpretive, and scenic characteristics |
| Adobe Badlands | 6,383 | Consists of Mancos Shale hills and flats which, through wind and water erosion, have formed unique scenic formations. The area's soils are highly erodible and saline, resulting in high sediment loads and very saline runoff. The area also contains known and potential habitat for several endangered and threatened plant species. |
| San Miguel | 22,841 | Unique, high quality riparian vegetation resources, the scenic values of the corridor, and preservation of relic riparian communities |

### PROTECTING SIGNIFICANT VALUES

Restrictions arising from ACEC designation are proposed during the final RMP revision and are part of the final decision process. Restrictions are designed to protect the values and/or serve the purposes for which the designation was made. Management prescriptions are developed expressly to protect the important and relevant values of an area. Such measures would not be necessary or prescribed if the critical and important features were not present.

BLM
4.3—Areas of Critical Environmental Concern

85

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015853

APPENDIX A – UFO RMP SCOPING ACEC FACT SHEET

***RMP Scoping ACEC Fact Sheet - Page 2***

### REVIEW OF NEW AND EXISTING ACECs

As part of the RMP revision, existing ACECs will be reevaluated to determine whether:

- the ACEC's relevant and important values are still present and require continued management attention
- threats of irreparable damage to the values have been identified
- current management is sufficient to protect the values.

In addition, new ACECs nominated during the public scoping period will be evaluated for relevance and importance.

Uncompahgre Planning Area
Bureau of Land Management
U.S. Department of the Interior
Adobe Badlands
Needle Rock
Fairview South
San Miguel
ACECs
GGNCA
RMP Boundary
Miles

*The BLM wants your input...*

- Do you know of any areas within the planning area that meet the criteria for becoming an ACEC?

  Any individual or organization may nominate an ACEC during the public scoping period. The nomination should describe the area's special values. Information on why the area meets relevance and importance criteria (43 CFR 1610.7-2) must be included in the nomination.

UFO Planning Webpage:
www.UFORMP.com

Mail comments to:
Bruce Krickbaum,
RMP Project Manager
2465 S. Townsend Ave
Montrose, CO 81401

Email comments to:
UFORMP@blm.gov

UFO 1/2010

Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area 86

BLM_0015854

APPENDIX B – UFO RMP SCOPING ACEC DISPLAY

*Appendix B: UFO RMP Scoping ACEC Display Panel*

SPECIAL
MANAGEMENT AREAS
The BLM's multiple use mandate requires the agency to identify and manage certain public lands in order to protect and preserve values of national significance, worth, consequence, meaning, distinctiveness, or cause for concern.
ACECS
WILDERNESS AND WSAS
Uncompahgre RMP Planning Area
Special Management Areas
01/13/20

87 Evaluation of Existing and Proposed
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area

BLM_0015855



Evaluation of Proposed and Existing
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area



Draft Resource Management Plan and
Draft Environmental Impact Statement for the
Colorado River Valley Field Office, Colorado
Control Number DES 11-33
Volume I: Chapters 1, 2, 3, 5, 6, 7
U.S. Department of the Interior
Bureau of Land Management
Colorado River Valley Field Office, Colorado
September 2011
BLM
Colorado River Valley Field Office, Colorado

# Draft Resource Management Plan and Draft Environmental Impact Statement for the Colorado River Valley Field Office, Colorado
DES 11-33

1. **Responsible Agency:** United States Department of the Interior
   Bureau of Land Management

2. **Type of Action:** Administrative (X) Legislative ( )

3. **Document Status:** Draft (X) Final ( )

4. **Abstract:** This Draft Resource Management Plan and Environmental Impact Statement describes and analyzes four alternatives for managing 504,910 acres of federal lands and resources in western Colorado administered by the Bureau of Land Management. The Colorado River Valley (formerly known as Glenwood Springs) Field Office spans portions of Eagle, Garfield, Mesa, Pitkin, and Routt Counties. The plan alternatives are Alternative A (the "no action" alternative or continuation of the present management situation), Alternative B (the mixed emphasis and agency preferred alternative), Alternative C (conservation emphasis), and Alternative D (resource use emphasis). Planning issues addressed include recreational demand and uses, special designations, and energy development. Resources evaluated include air quality, wildlife habitat management, sagebrush habitat and sagebrush-dependent species, vegetation management, travel management and transportation, lands and realty, wildland-urban interface, range health/upland management, water/riparian resources, and cultural resources. The draft alternatives also address designation of Areas of Critical Environmental Concern and the eligibility and suitability of river segments for designation under the National Wild and Scenic Rivers System.

5. **Review period:** The review period on the Colorado River Valley Draft Resource Management Plan and Draft Environmental Impact Statement is 90 calendar days. The review period began when the Environmental Protection Agency publishes a Notice of Availability in the *Federal Register*.

6. **For further information contact:**

Mr. Allen Crockett
Bureau of Land Management
Colorado River Valley Field Office
2300 River Frontage Road
Silt, CO 81652
Telephone: (970) 876--9000
FAX: (970) 876-9090
Email: cormpkg@blm.gov
Web site: www.blm.gov/co/st/en/BLM_Programs/land_use_planning/rmp/kfo-gsfo.html

*This page intentionally left blank.*

# CHAPTER 1 INTRODUCTION

## 1.1 INTRODUCTION

The United States Department of the Interior (USDI), Bureau of Land Management (BLM) has prepared this draft resource management plan (RMP) revision and environmental impact statement (EIS). The purposes of this document are as follows:

- Provide direction for managing BLM lands and surface acres administered by the BLM, under the jurisdictions of the Colorado River Valley Field Office (CRVFO; formerly the Glenwood Springs Field Office [GSFO]) in Colorado.
- Analyze the environmental effects that could result from implementing the alternatives addressed in the RMP.

The original intent of this RMP revision planning process was to revise the respective land use plans for the BLM Kremmling Field Office (KFO) and CRVFO in a single, joint RMP/EIS document. However, the BLM decided to separate the land use plans for these two field offices based on consideration of public comment and understanding that the decision process would benefit from separating these RMPs by field office.

The affected lands are managed under the Glenwood Springs RMP (BLM 1984a) and its associated plan amendments. This EIS also incorporates and analyzes the US Department of Agriculture, Forest Service's (USFS) White River National Forest (WRNF) Wild and Scenic River (WSR) suitability study determinations for WRNF-managed segments of the Colorado River (Glenwood Canyon) and Deep Creek.

The land use planning process is the key tool the BLM uses to manage resources and to designate uses on its lands, in coordination with tribal, state, and local government, land users, and interested members of the public. Generally, an RMP does not result in a wholesale change of management direction; accordingly, this RMP incorporates new information and regulatory guidance that has been adopted since the previous plans and provides management direction where it may be lacking or requiring clarification to resolve land use issues or conflicts. Current management direction that has proven effective and requires no change has been carried forward into this RMP and will be considered throughout the analysis process.

The RMP is being prepared using BLM planning regulations and guidance issued under the authority of the Federal Land Policy and Management Act (FLPMA) of 1976 (43 US Code [USC] 1701 et seq.) and BLM Land Use Planning Handbook, H-1601-1 (BLM 2005a). An EIS is incorporated into this document to meet the requirements of the National Environmental Policy Act of 1969 (NEPA), Council on Environmental Quality (CEQ) regulations for implementing NEPA (40 Code of Federal Regulations [CFR], Parts 1500-1508; CEQ 1978), and requirements of the BLM NEPA Handbook, H-1790-1 (BLM 2008a). Because this RMP/EIS contains a broad range of information, Diagram 1-1 shows the types of information found in the RMP/EIS and where it is located. Maps and figures cited in Chapters 1 through 4 are presented in Appendix A Maps; Chapter 2 contains the discussion of the proposed management alternatives, which represent the range of potential management actions for the CRVFO. To supplement the discussion of proposed management alternatives in Chapter 2, maps of each resource under each alternative are presented in Appendix A. The stipulations applicable to all surface-disturbing activities (and occupancy) associated with land use authorizations, permits, and leases issued on BLM lands are detailed in Appendix B.

The discussion of the affected environment in Chapter 3 includes a discussion of resources, resource uses, special designations, support, and social and economic conditions. Each topic area includes an introduction that applies to the CRVFO.

## 1.2 Purpose of and Need for the Resource Management Plan

The purpose of the revisions to the current RMP is to ensure that public lands are managed in accordance with the intent of Congress, as stated in FLPMA, under the principles of multiple use and sustained yield. This will be accomplished by establishing desired goals and objectives and allowable uses and management actions needed to achieve the desired conditions for resources and resource uses. The RMPs incorporate new data, address land use issues and conflicts, specify where and under what circumstances particular activities would be allowed on BLM lands, and incorporate the mandate of multiple uses in accordance with FLPMA. The RMPs do not describe how particular programs or projects would be implemented or prioritized; rather, those decisions are deferred to more detailed implementation-level planning.

FLPMA requires that the BLM “develop, maintain, and when appropriate, revise land use plans” (43 USC, 1712 [a]). There is a need to revise the RMP due to new issues that have arisen since the original plan was prepared in 1984 and higher levels of controversy around issues. Major issues contributing to the revision of the current RMP include:

- Managing recreation to improve facilities, protect natural and cultural resources, provide a variety of opportunities, and maximize socioeconomic benefits.
- Managing special designations to protect the natural and cultural resources, and maximize recreational opportunities and socioeconomic benefits.
- Managing energy development, particularly regarding the designation of lands available for fluid minerals leasing and the application of lease stipulations, to protect cultural and natural resources and minimize user conflicts.
- Managing vegetation to reduce fuel loading, to control and prevent noxious weeds, and to maintain a healthy forest ecosystem.
- Managing wildlife to maintain and improve habitats, while maintaining multiple-uses.

**Diagram 1-1**
**How This RMP/EIS is Organized**

**VOLUME I**

**Acronyms and Abbreviations**
Lists the acronyms and abbreviations used in the RMP/EIS.

**Chapter 1 – Introduction**
Summarizes the proposed action, purpose and need, and decisions to be made in the RMP/EIS.

**Chapter 2 – Alternatives**
Describes and compares the proposed management alternatives.

**Chapter 3 – Affected Environment**
Presents existing biological, physical, and socioeconomic resources that could be affected by implementing the management alternatives.

**Chapter 5 – Consultation and Coordination**
Describes the scoping and public comment process, agencies contacted, and government-to-government consultation, and lists the preparers of the RMP/EIS.

**Chapter 6 – References**
Lists the documents and other sources used to prepare the RMP/EIS.

**Chapter 7 – Glossary and Index**
Provides definitions for important terms used in the RMP/EIS.
Lists where significant issues, resource descriptions, NEPA terms, and agencies and groups discussed in the RMP/EIS are located.

**VOLUME II**

**Chapter 4 – Environmental Consequences**
Evaluates the impacts of the alternatives on the human and natural environment in terms of environmental, social, and economic consequences projected to occur from implementing the alternatives.

**VOLUME III**

**Appendix A –** Maps

**VOLUME IV**

**Appendix B –** Administrative Closures to Leasing for Fluid Minerals (Oil and Gas, Oil Shale, and Geothermal) and Stipulations Applicable to All Surface-Disturbing Activities
**Appendix C –** Wild and Scenic River Suitability Report Summary
**Appendix D –** Lands with Wilderness Characteristics – Assessment and Inventory
**Appendix E –** Areas of Critical Environmental Concern (ACEC) Report
**Appendix F –** Lands with Wilderness Characteristics – Management and Setting Prescriptions
**Appendix G –** Best Management Practices / Standard Operating Procedures
**Appendix H –** Management and Setting Prescription for Caves
**Appendix I –** Livestock Grazing Allotments
**Appendix J –** BLM Standards for Public Health
**Appendix K –** CRVFO Description of Recreation Resources
**Appendix L –** Air Resource Impacts
**Appendix M –** Colorado Noxious Weed List
**Appendix N –** System Roads and Maintenance Levels
**Appendix O –** Travel Management
**Appendix P –** Oil and Gas Operations
**Appendix Q –** Upper Colorado River Wild and Scenic Stakeholder Group Management Plan

- Managing sagebrush habitat to reduce continued habitat loss and fragmentation.
- Managing surface water and groundwater resources to maintain and improve habitat, improve water quality, protect drinking water sources, and help meet and maintain local and regional water delivery compacts.

There is also the need to revise the RMP to allow for updated BLM management direction, guidance, and policy. In addition, new resource assessments and scientific information is available to help the CRVFO revise previous decisions. These include management prescriptions and resource allocations to address increased uses and demands on BLM lands (such as oil and gas development and recreation) and concerns over scenic quality and open spaces, as well as the increased interest in protecting natural and cultural resources. Land use plan decisions may be changed only through the amendment or revision processes.

## 1.3 DESCRIPTION OF THE PLANNING AREA

The planning area comprises lands managed by the BLM, the USFS, the USDI Bureau of Reclamation (BOR), the US Department of Energy (DOE), and the State of Colorado. The planning area also includes private property (Figure 1-1 and Figure 1-2).

Together, the federal, state, and private lands within the CRVFO include approximately 2.8 million acres. The decision area for the RMP revision consists of BLM lands only, which make up approximately 18 percent (504,910 acres) of the CRVFO planning area. The CRVFO extends across five Colorado counties: Eagle, Garfield, Mesa, Pitkin, and Routt. A portion (73,602 acres) of the CRVFO planning area managed by the BLM is covered under the separate Roan Plateau RMP Amendment (BLM 2007a, 2008b). This portion is not covered under the current RMP/EIS revision except for Wild and Scenic River eligibility and suitability determinations on the Roan Plateau. The current RMP/EIS revision also includes a portion of the CRVFO planning area managed by the WRNF and analyzed in the Wild and Scenic River Suitability Report (see Appendix C).

Table 1-1 and Table 1-2 highlight the ownership pattern of the CRVFO planning area.

**Table 1-1**
**Acres of Land Status within the Planning Area**

| Land Status | Acres | Percentage of Planning Area |
|---|---|---|
| BLM | 504,910 | 18% |
| US Forest Service | 1,501,617 | 54% |
| Bureau of Reclamation | 1,585 | <1% |
| Department of Energy | 205 | <1% |
| Colorado Division of Wildlife | 514 | <1% |
| State (other than CDOW) | 27,656 | <1% |
| Private | 755,347 | 27% |
| **TOTAL** | **2,791,834** | **100%** |

Source: BLM 2008c

**Table 1-2**
**Colorado River Valley Field Office Mineral Status by County**

| Land Status (acres) | Eagle | Garfield | Mesa | Pitkin | Rio Blanco | Routt | Total |
|---|---|---|---|---|---|---|---|
| BLM/Federal Minerals | 233,879 | 203,017 | 9,904 | 27,490 | 1 | 30,535 | 504,826 |
| Private Surface/Federal Minerals | 63,556 | 74,851 | 5,533 | 19,537 | 70 | 25,482 | 189,029 |
| State Surface/Federal Minerals | 1,414 | 10,449 | 0 | 3 | 0 | 0 | 11,866 |
| BOR/Federal Minerals | 0 | 1,037 | 0 | 0 | 0 | 0 | 1,037 |
| DOE/Federal Minerals | 0 | 205 | 0 | 0 | 0 | 0 | 205 |
| **Total** | **298,849** | **289,559** | **15,437** | **47,027** | **71** | **56,017** | **706,963** |

Source: BLM 2008c

Management direction and actions outlined in the RMP apply only to BLM lands in the planning area and to federal mineral estate under BLM jurisdiction that may lie beneath other surface ownership. Federal mineral estate under BLM jurisdiction is composed of mineral estate underlying BLM lands, privately owned lands, and state-owned lands. No specific measures have been developed for private, state, or other federal lands, but, given that these lands are interspersed with BLM lands, they could be influenced or indirectly affected by BLM management actions. BLM management authority on lands with a split estate (e.g., private surface underlain by federal minerals) is limited to activities, both surface and subsurface, related to exploration and development of the minerals. The BLM adopts the leasing requirements determined by other surface-managing agencies when leasing the mineral estate under split-estate lands.

In general in the CRVFO, lease stipulations associated with federal minerals apply to the overlying surface lands, regardless of ownership. Thus, surface activities on private or state-owned lands associated with exploration and development of underlying federal minerals may be subject to the same restrictions as would apply if the surface were BLM land. Furthermore, as is also the case with activities involving BLM surface lands, the lease stipulations may be supplemented by additional restrictions attached as conditions of approval to issuance of an oil and gas drilling permit, right-of-way grant, or other authorization.

The BLM, acting on behalf of the Secretary of Interior, is responsible under the Mineral Leasing Act of 1920 (MLA), as amended, for the leasing of all federally owned mineral estate. FLPMA mandates that the BLM plan for the management of all federal lands under its jurisdiction, including leasing of the federal mineral estate. This is accomplished through BLM's RMP process, which includes analyses, pursuant to NEPA, of impacts to the human environment resulting from BLM's management decisions. In the 1987 Federal Onshore Oil and Gas Leasing Reform Act, the USFS was directed by Congress to make surface use decisions for oil and gas leasing on National Forest System lands. The Secretary of Interior may lease National Forest System lands only with the consent of the Secretary of Agriculture. The USFS makes its leasing decisions in its Land Resource Management Plans ("forest plans"). However, the BLM makes separate decisions for the administration of the federal mineral estate and conducts the sale of federal mineral leases, regardless of surface ownership. The WRNF is currently preparing a supplemental EIS (SEIS) for oil and gas leasing. When the SEIS is completed, the BLM, which is participating in that process as a cooperating agency, will review and adopt the WRNF decisions regarding leasing of underlying federal minerals. Future leasing decisions by the BLM regarding federal minerals beneath WRNF-administered lands will be consistent with the SEIS and any subsequent revisions to the WRNF forest plan.

The BLM is also responsible for operational decisions involving development of the federal mineral estate, including drilling, completing, producing, and plugging and abandoning oil and gas wells drilled into federal minerals underlying National Forest System lands. In addition, the BLM analyzes lands administered by other federal agencies in its RMP/EIS process and, in cooperation with those agencies, makes appropriate leasing decisions involving underlying federal minerals. Within the CRVFO area, other federal agencies with underlying federal minerals are the BOR and DOE. No USDI National Park Service (NPS) of USDI Fish and Wildlife Service (USFWS) lands are located in the CRVFO.

## 1.4 PLANNING PROCESS

An RMP guides the management of BLM lands in a particular area or administrative unit and is usually prepared to cover the lands administered by a certain BLM field office. The CRVFO is revising its RMP for the BLM lands within its boundary. As part of this RMP revision, published documents will include a draft RMP/EIS, a proposed RMP/final EIS, and an approved RMP/record of decision (ROD). The approved RMP/ROD will describe the following:

- Resource conditions goals and objectives.
- Allowable resource uses and related levels of production or use to be maintained.
- Land areas to be managed for limited, restricted, or exclusive resource uses or for transfer from BLM administration.
- Program constraints and general management practices and protocols.
- General implementation schedule or sequences.
- Intervals and standards for monitoring the RMP.

Preparation of an RMP involves interrelated steps, as described in Table 1-3 and illustrated in Diagram 1-2.

### *Mineral Leasing Plans*

Another aspect of the planning process in areas with the potential for leasing of federal fluid minerals is the Master Leasing Plan (MLP) concept, introduced in Washington Office Leasing Reform Instruction Memorandum (IM) 2010-117. The MLP concept promotes a proactive approach to planning for oil and gas development. Generally, the BLM uses RMPs to make oil and gas planning decisions, such as areas closed to leasing, open to leasing, or open to leasing with major or moderate constraints (lease stipulations) based on known resource values. However, additional planning and analysis can be necessary prior to oil and gas leasing because of changing circumstances, updated policies, and new information. Under IM2010-117, the BLM can reevaluate its leasing decisions in light of such changing circumstances. IM2010-117 lists multiple criteria for the BLM to consider when determining whether circumstances warrant such additional planning and analysis. An MLP is prepared when all four of the following criteria are met:

A substantial portion of the area to be analyzed in the MLP is not currently leased.

- There is a majority Federal mineral interest.
- The oil and gas industry has expressed a specific interest in leasing, and there is a moderate or high potential for oil and gas confirmed by the discovery of oil and gas in the general area.

**Table 1-3**
**BLM Planning Process**

| BLM Planning Process Step | Description | Timeframe |
|---|---|---|
| Step 1—Identify planning issues | Issues and concerns are identified through a scoping process that includes the public, Indian tribes, other federal agencies, and state and local governments. | March to May 2007 |
| Step 2—Develop planning criteria | Planning criteria are developed to ensure decisions are made to address pertinent issues. Planning criteria are derived from applicable laws and regulations, other management plans, other agencies' programs, and public and agency scoping. The planning criteria may be updated and changed as planning proceeds. | March to May 2007 |
| Step 3—Collect data and information | Data and information for the resources in the planning area are collected based on the planning criteria. | Ongoing |
| Step 4—Analyze management situation | The current management of resources in the planning area is assessed. | March to August 2007 |
| Step 5—Formulate alternatives | A range of reasonable management alternatives is developed to address issues identified during scoping. | September 2007 to November 2008 |
| Step 6—Assess alternatives | The effects of each alternative are estimated. | November 2008 to August 2010 |
| Step 7—Select preferred alternative | The alternative that best resolves planning issues is identified as the preferred alternative. | June 2010 |
| Step 8—Select RMP | First, a draft RMP/EIS is issued and is made available to the public for a review period of 90 days. After comments to the draft document have been received and analyzed, it is modified as necessary, and the proposed RMP/final EIS is published and made available for public review for 30 days. A ROD is signed to approve the RMP/EIS. | Draft RMP/EIS: early 2011<br>Proposed RMP/Final EIS: estimated fall 2011<br>Approved RMPs/RODs: estimated late 2011 |
| Step 9—Implementation Monitoring | Management measures outlined in the approved plan are implemented on the ground, and future monitoring is conducted to test their effectiveness. Changes are made as necessary to achieve desired results. | Ongoing after RMP approval |

- Additional analysis or information is needed to address likely resource or cumulative impacts if oil and gas development were to occur where there are:
  - Multiple-use or natural/cultural resource conflicts
  - Impacts to air quality
  - Impacts on the resources or values of any unit of the National Park System, national wildlife refuge, or National Forest wilderness area, as determined after consultation or coordination with the NPS, USFWS, or USFS
  - Impacts on other specially designated areas.

When the new guidance was issued, the BLM Colorado State Office did a review of possible areas where an MLP analysis would be beneficial and appropriate. Although the CRVFO did not meet the four criteria, the current RMP revision is taking a hard look at the impacts of oil and gas development.

**Diagram 1-2**
**BLM Planning Process**

*These steps may be revisited throughout the planning process and may overlap other steps.

The alternatives analyzed in the Draft RMP/Draft EIS capture, in detail, the requirements of an MLP. Chapter 2 discusses the alternatives analyzed in the Draft RMP/Draft EIS. Chapter 3 provides an analysis of those resources and resource uses managed by the CRVFO, including resources and resource uses and the current conditions and characterization of each resource and its use. The characterization of the resources and resource uses include indicators that assess the resource condition, trends that express the direction of change

Case No. 1:20-cv-02484-MSK Document 30-8 filed 04/27/21 USDC Colorado pg 53 of 141

between the present and some point in the past, and forecasts that predict changes in the condition of resources given current management. Chapter 4 evaluates how each alternative will impact the environment.

## 1.5 Scoping and Planning Issues

The CRVFO has provided numerous opportunities to the public, various groups, other federal agencies, Native American tribal governments and members, and state and local governments to participate meaningfully and substantively and to give input and comments to the BLM during the preparation of the RMP/EIS. Early in the planning process, the public was invited to identify planning issues and concerns for managing BLM lands and resources and uses in the planning area.

### 1.5.1 Notice of Intent

The formal scoping period began with publication of the Notice of Intent (NOI) in the *Federal Register* on March 2, 2007.

### 1.5.2 Scoping Process

The NOI was provided for public consideration at the seven scoping open houses (described below) and was posted on the project website, http://www.blm.gov/rmp/co/kfo-gsfo/. The scoping period for receipt of public comments ended May 2, 2007. The Scoping Report (BLM 2007b) documents the results of scoping by summarizing the individual comments received and describing the issues that were raised, it is incorporated here by reference.

A postcard was mailed to members of the public, agencies, and organizations on March 27, 2007. The BLM compiled the mailing list, from over 850 individuals, agencies, and organizations that have participated in past BLM projects, those requesting to be on the mailing list, and those who may have an interest. The postcard informed the recipients of the scoping process and the scheduled open house scoping meetings and gave them various alternative methods to submit written comments.

Seven joint RMP public scoping meetings were held in the joint planning area in 2007: Rifle and Granby on April 10, Carbondale and Kremmling on April 11, Gypsum and Walden on April 12, and Glenwood Springs on April 25. The BLM provided the local media with press releases announcing the time, location, and purpose of these meetings. The format for the scoping meetings featured informal, one-on-one discussions between BLM representatives and members of the public.

Additionally, on May 18, 2007, the BLM prepared a newsletter and distributed it via e-mail and US mail to over 1,050 members of the public, representatives from agencies and organizations. The newsletter summarized the scoping meetings, provided information on data collection workshops for future trails and routes (held in June 2007), and gave overall information about the planning process. Trails and routes data collection workshops were held separately from the scoping meetings and gave individuals, and agency and organization representatives an opportunity to provide the BLM with data and missing information on existing trails and routes.

See Section 1.7, Collaboration, of this chapter and Chapter 5, Consultation and Coordination, for additional information on other public participation opportunities.

BLM_0015868

Case No. 1:20-cv-02484-MSK Document 30-8 filed 04/27/21 USDC Colorado pg 54 of 141

### 1.5.3 Issue Identification

Issue identification is the first step of the nine-step BLM planning process (Table 1-3 above). A planning issue is a major controversy or dispute regarding management of resources or uses on BLM lands that can be addressed in a variety of ways, which is within BLM's authority to resolve.

In September 2005, the BLM prepared a plan analysis for the RMP/EIS. This plan, used by the BLM interdisciplinary team to initiate the planning process, highlighted anticipated planning issues developed by the team internally. Based on the lands and resources managed in the planning area, preliminary issues fell into eight preliminary issue categories in the plan analysis. The comments received during the scoping process were analyzed, and a scoping summary report was finalized in August 2007 (BLM 2007b). Four new issues were identified from public input during the scoping process.

A planning issue statement was developed for each of the 12 planning issue categories. Each statement summarizes the issues and concerns heard for each category during scoping. The 12 planning issue statements are as follows:

1. **Travel management and transportation—**How will transportation be managed to protect natural and cultural resources, provide motorized and non-motorized recreation opportunities, reduce user conflicts, enforce route designations and closures, and improve public access?
2. **Recreation demand and uses—**How will recreation be managed to maintain and improve recreation sites and trails, especially near communities, to reduce user conflicts, to protect natural and cultural resources, to provide a variety of recreation opportunities, and to maximize socioeconomic benefits?
3. **Lands and realty—**What opportunities exist to make adjustments to public land ownership that would result in greater management efficiency, in appropriate and agreeable levels of public access, and in increased public and natural resource benefits?
4. **Special designations—**Where are special designations appropriate to protect unique resources, and how should existing special designations be managed to protect the natural and cultural resources and maximize recreation opportunities and socioeconomic benefits?
5. **Urban interface—**How will BLM lands in urban interface areas be managed to provide benefits desired by the public and to be consistent with future land use plans in neighboring communities?
6. **Energy development—**Which areas should be open to energy development, particularly oil and gas leasing, and what restrictions should be used to protect cultural and natural resources and minimize user conflicts?
7. **Rangeland health/upland management—**How will the BLM manage livestock grazing on its lands while protecting, managing, restoring, and using natural and cultural resources?
8. **Vegetation—**What actions or restrictions will be needed to reduce dangerous fuel loading, to control and prevent the spread of noxious weeds and other undesirable plant species, and to maintain healthy forest ecosystems?
9. **Wildlife—**How will uses and land management activities be managed to maintain and improve terrestrial and aquatic habitats in a scattered land ownership pattern, while maintaining multiple-use land management?

BLM_0015869

10. **Water/riparian—**What measures will be implemented to protect water resources, especially riparian areas, from the effects of other uses?
11. **Sagebrush habitat and species—**How will sagebrush habitat be managed to reduce continued habitat loss and fragmentation?
12. **Cultural resources—**How can the BLM protect and conserve cultural resources, and where do interpretation opportunities exist?

### 1.5.4 Issues Considered but Not Analyzed Further

During scoping, several issues were raised that were not appropriate for addressing in the RMP revisions, namely administrative/policy issues, implementation issues, and issues outside the scope of the RMP. Examples of the administrative or policy comments received include a request that the BLM promote family ranching and a request that the BLM develop new recreation classifications. Only a few comments on implementation issues were received, most of which were requests for toilets at trailheads, particularly near the Thompson Creek Area of Critical Environmental Concern (ACEC). One comment was received that was considered a planning issue outside the scope of the RMP. The respondent urged the BLM to restrict or try to completely stop subsurface oil and gas and other leasing on Forest Service and other lands.

The RMP Scoping Summary Report (BLM 2007b) provides a comprehensive list of issues outside the scope of the RMP. The Scoping Summary Report is available on the RMP revisions website, www.blm.gov/rmp/co/kfo-gsfo/.

## 1.6 Planning Criteria and Legislative Constraints

FLPMA is the primary authority for the BLM to manage its lands. This law establishes provisions for land use planning, land acquisition and disposition, administration, rangeland management, rights-of-way, and designated management areas and the repeal of certain laws and statutes. NEPA provides the basic national charter for environmental responsibility and requires the consideration and public availability of information on the environmental impacts of major federal actions significantly affecting the quality of the human environment. In concert, FLPMA and NEPA provide the overarching guidance for all BLM activities.

Planning criteria are the standards, rules, and guidelines that help to guide data collection and alternative formulation and selection in the RMP-development process. In conjunction with the planning issues, planning criteria ensure that the planning process is focused. The criteria also help guide the final plan selection and provide a basis for judging the responsiveness of the planning options.

The BLM developed preliminary planning criteria before public scoping meetings to set the side discussions for focused planning of the RMP revisions and to guide decision making by topic. These criteria were introduced to the public for review in April 2007 at all scoping meetings. At these meetings, the BLM encouraged the public to provide comments and suggest additions to these criteria through written correspondence and at the RMP revisions website, www.blm.gov/rmp/co/kfo-gsfo/. No comments were received on the preliminary planning criteria during the scoping period, March 2 to May 2, 2007.

The planning criteria are as follows:

- Decisions in the plan will be compatible with the existing plans and policies of adjacent local, state, and federal agencies, as long as the decisions conform to federal laws and regulations that direct resource management on BLM lands.
- The plan will recognize valid existing rights.
- The BLM will recognize the specific niche that federal lands provide, both to the nation and to the surrounding community. A successful plan will be one that is responsive to both national and community needs.
- Public participation will be encouraged throughout the process. The BLM will collaborate and build relationships with tribes, state and local governments, federal agencies, local stakeholders, and others in the community. Collaborators are regularly informed and offered timely and meaningful opportunities to participate in the planning process.
- Results of the Energy Policy and Conservation Act inventory will be integrated into land use planning and energy use authorizations.
- The plan will identify Special Recreation Management Areas (SRMAs), will designate off-highway vehicle (OHV) areas, and will complete defined travel management networks for each field office.
- The plan will treat both environmental protection and energy production as desirable and necessary objectives of sound land management practices and not as mutually exclusive priorities.
- For all stipulations developed and to further improve consistency and understanding of lease stipulations, the BLM Colorado State Office and the BLM field offices will use the Uniform Format for Oil and Gas Lease Stipulations prepared by the Rocky Mountain Regional Coordinating Committee in March 1989. Lease stipulations will be reviewed for consistency with neighboring field offices and states. Where there are discrepancies, efforts will be made to achieve consistency.
- The plan will incorporate the Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado (BLM 1997a) and will lay out a strategy for ensuring that proper grazing practices are followed. Grazing will be managed to maintain or improve the health of the BLM lands to enhance resource conditions into permitted operations.
- The BLM will identify existing and potential utility corridors (which include existing rights-of-way that can be considered for additional facilities and thus be considered a corridor if not already so designated); it also will identify existing and potential development sites, such as energy development areas (for example, wind energy sites) and communication sites.
- The BLM will reevaluate lands selected for disposal and acquisition based on current information.

### 1.6.1 Relationship to BLM RMP Amendments and Implementation-Level Plans

Since the Glenwood Springs RMP (BLM 1984a) was developed, it has been necessary to amend it to respond to new issues and conditions. As the land use plan guidance is put into practice on the ground, implementation-level (activity-level) planning is directed by the land use plan and BLM policy and program-specific guidance. Table 1-4 identifies approved plan amendments and implementation-level plans.

**Table 1-4**
**RMP Amendments and Implementation-level Plans**

| **RMP Amendments** |
|---|
| **Amendments to Glenwood Springs RMP** (BLM 1984a) |
| Amendment for Colorado Oil and Gas Leasing and Development (BLM 1991a) |
| Amendment for Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado (BLM 1997b) |
| Final Resource Management Plan Revised ROD (BLM 1988) |
| Amendment for Castle Peak Travel Management Plan (BLM 1997c) |
| Amendment for Red Hill Management Plan (BLM 1999a) |
| Supplemental Amendment for Colorado Oil and Gas Leasing and Development (BLM 1999b) |
| Amendment for Oil Shale Revocation (BLM 2001a) |
| Amendment for GSFO Fire Management Plan (BLM 2002a) |
| Amendment for the Roan Plateau Planning Area, ROD 1 of 2 (BLM 2007a) |
| Amendment for the Roan Plateau Planning Area, ROD 2 of 2 (BLM 2008b) |
| **CRVFO Implementation Level Plans** |
| Bocco Mountain SRMA OHV and Recreation Management Implementation Plan (BLM 1999c) |
| Noxious and Invasive Weed Management Plan for Oil and Gas Operators (BLM 2007c) |
| GSFO Programmatic Weed EA (BLM 2008d) |
| GSFO Fire Management Plan, Wildland Fire Management, and Prescriptive Vegetation Treatment Guidance (BLM 2002b) |
| Red Hill SRMA Implementation Plan (BLM 2000a ) |

## 1.7 COLLABORATION

The benefits of enhanced collaboration among agencies in preparing NEPA analyses are disclosing relevant information early in the analytical process, applying available technical expertise and staff support, avoiding duplication with other federal, state, tribal, and local procedures, and establishing a mechanism for addressing intergovernmental issues. In addition to formal scoping, the BLM has implemented an extensive collaborative outreach and involvement process that has included making a community assessment, coordinating with cooperating agencies, and working closely with the Resource Advisory Council (RAC).

These efforts are summarized below, and additional information regarding collaboration with governments, agencies, and tribal representatives is provided in Chapter 5, Consultation and Coordination.

### 1.7.1 Community Assessment

The community assessment process began in the fall of 2006 when the BLM held 19 small-group discussions with representatives from local governments in north-central Colorado. BLM gathered input from community representatives about their vision for the landscape and benefits they seek from public lands, identified strategic planning options, and laid the foundation for an ongoing collaboration with communities for the RMP effort. Results of this process were published in the North-Central Colorado Community Assessment Report (BLM 2007d), available on the project website, http://www.blm.gov/rmp/co/kfo-gsfo/.

Case No. 1:20-cv-02484-MSK Document 30-8 filed 04/27/21 USDC Colorado pg 58 of 141

### 1.7.2 Intergovernmental and Interagency Collaboration

#### *Cooperating Agencies*

On November 29, 2006, the BLM invited local, state, federal, and tribal representatives to participate as cooperating agencies for the RMP revision. The following agencies with jurisdiction, special expertise, or interest in the RMP revision process have agreed to participate as cooperating agencies:

- US Fish and Wildlife Service
- Colorado Department of Natural Resources
- Colorado River Water District
- Denver Water Board
- Eagle County
- Garfield County
- Pitkin County
- Routt County
- City of Glenwood Springs
- City of Rifle
- Town of Basalt
- Town of Carbondale
- Town of Eagle
- Town of Gypsum
- Town of Newcastle
- Town of Parachute
- Town of Silt

The CRVFO and the cooperating agencies made and entered into memorandums of understanding (MOUs) that set forth the roles and responsibilities for collaborative planning and production of an EIS for the RMP. These agencies will "work with the BLM, sharing knowledge and resources, to achieve desired outcomes for BLM lands and communities within statutory and regulatory frameworks" (BLM 2005a). Between April 2007 and June 2010, a total of 14 cooperating agency meetings were conducted at the CRVFO. These meetings focused on identifying and defining the planning issues and the alternatives development process for the CRVFO.

#### *Resource Advisory Council*

A RAC is a committee established by the Secretary of the Interior to provide advice or recommendations to BLM management (BLM 2005a). The BLM gave the Northwest RAC an initial presentation on the RMP process in November 2006. At a May 2007 RAC meeting, the BLM gave an additional presentation on the scoping and travel management process. Two subgroups have been formed under the Northwest RAC to advise it on the RMP revision. The individuals on each subgroup represent a broad range of interests and have specific knowledge of the CRVFO.

Between November 2007 and June 2010, a total of 14 CRVFO RAC subgroup meetings were conducted. The CRVFO RAC subgroup focused on all aspects of the CRVFO components of the RMP revision. Recommendations developed by the subgroup were presented formally for discussion to the Northwest RAC at the May 22, 2008, meeting of the full Northwest RAC.

#### *Wild and Scenic River Suitability Study*

In February 2011, the BLM and USFS received a proposal entitled "Upper Colorado River Wild and Scenic Stakeholder Group Management Plan" that provides a management alternative for Colorado River Segments 4, 5, 6, and 7. Colorado River Segments 4 and 5 are located within the KFO planning area and are addressed in the KFO RMP effort. Colorado River Segments 6 and 7 are located within the CRVFO planning area and are addressed in this RMP effort. The stakeholder group comprises nonprofit groups representing environmental, conservation, and recreation interests, as wells as landowners, local governments, water

BLM_0015873

providers, and water districts. The stakeholder group asked the BLM to consider adopting the plan as part of its RMP. The intent was to use cooperative management strategies in multiple arenas, including flow management, water quality management, fisheries and recreation management, and responding to new water development projects. The overall goal of the strategy was to support and protect the Outstandingly Remarkable Values, while allowing stakeholders both within and upstream of the segments to continue to address and meet their needs.

These stakeholders developed the plan in consultation with the Colorado Water Conservation Board, Colorado Division of Wildlife (CDOW), and BOR. The BLM and USFS accepted this plan for impact analysis as part of this RMP revision. That impact analysis appears under Wild and Scenic Rivers Alternative B2 in Chapter 4. The entire text of the Stakeholder Plan is provided for public review and comment in Appendix Q. Since the detailed Stakeholder Plan was received immediately prior to publication deadlines, a detailed analysis of the Stakeholder Plan does not appear in the Draft Suitability Report or in Appendix C of this RMP, which presents the summary of the Draft Suitability Report.

The Draft Suitability Report contains BLM and USFS analysis concerning only Wild and Scenic Rivers Alternative B1, in which Colorado River Segments 4, 5, 6, and 7 would be determined to be suitable for inclusion in the National Wild and Scenic Rivers System. In the Final Suitability Report to be published with the Final EIS and Proposed Plan, BLM and USFS will provide an analysis of the detailed Stakeholder Plan, based upon BLM and USFS review and public review of the detailed Stakeholder Plan.

### 1.7.3   Tribal Relationships and Indian Trust Assets

Consultation with American Indian tribes is part of the NEPA scoping process and is a requirement of FLPMA. Tribal consultation regarding the CRVFO RMP revisions began in April 2007 and is ongoing. American Indian tribes and organizations consulted to date are as follow:

- Colorado Commissioner of Indian Affairs
- Southern Ute Indian Tribe
- Ute Mountain Ute Tribe
- Uintah and Ouray Tribal Business Council

The unique political relationship between the US government and federally recognized Indian tribes is defined by treaties, statutes, executive orders, judicial decisions, and agreements. This relationship has created a special federal trust responsibility, involving the legal commitments and obligations of the US toward Indian tribes, Indian lands, tribal trust resources, and the exercise of tribal rights.

Indian trust resources are legal interests in assets held in trust by the federal government for federally recognized Indian tribes or nations or for individual Indians. These assets can be real property, physical assets, or intangible property rights. Examples are lands, minerals, water rights, hunting and fishing rights, other natural resources, money, or claims. The BLM has no trust administration responsibilities in the CRVFO.

## 1.8    RELATED LAND USE PLANS

BLM planning regulations require that its RMPs be consistent with officially approved or adopted land use related plans of other federal, state, local, and tribal governments, to the extent those plans are consistent with federal laws and regulations applicable to public lands. Plans formulated by federal, state, local, and tribal governments that relate to managing lands and resources have been reviewed and considered as the RMP/EIS has been developed and are listed below.

### 1.8.1    Federal Plans
- Final Programmatic Environmental Impact Statement, Designation of Energy Corridors on Federal Land in 11 Western States (DOE and BLM 2008)
- National Fire Plan (DOI and USDA 2000)
- Final Environmental Impact Statement for the White River National Forest Land and Resource Management Plan (US Forest Service 2002)

### 1.8.2    State Plans
- Colorado Division of Wildlife Strategic Plan (CDOW 2006)
- Division of Wildlife Data Analysis Unit Plans (CDOW, undated)

### 1.8.3    Local Government Plans
- Eagle County Open Space Plan (Eagle County 1979)
- Eagle River Watershed Plan (Eagle County 1996)
- Eagle County Master Plan (Eagle County 2005)
- Eagle Area Community Plan (Town and County of Eagle 2008)
- Town of Basalt Master Plan (Town of Basalt 2007)
- Down Valley Comprehensive Plan (Pitkin County 1987)
- Pitkin County Land Use Policy Guidelines (Pitkin County 2002)
- Crystal River Valley Master Plan (Pitkin County 2003)
- Garfield County Comprehensive Plan of 2000 (Garfield County 2000)

# CHAPTER 2 ALTERNATIVES

## 2.1 INTRODUCTION

The BLM is preparing a draft RMP and draft EIS to provide direction for managing 504,900 acres of BLM lands under the jurisdictions of the CRVFO (not including the 73,600-acre Roan Plateau) to analyze the environmental effects resulting from implementing the alternatives addressed in the draft RMP. This chapter details the proposed Alternatives A through D to be considered in the draft RMP/EIS. Also provided are a narrative description of what decisions each alternative would establish and figures to show where each decision is applicable (Appendix A, Figures).

Stipulations (Appendix B) apply to surface-disturbing activities on lands overlying federal mineral estate, which includes mineral estate underlying BLM lands, privately owned lands, and underlying state-owned lands. As such, federal mineral estate acres are greater than BLM surface acres. In the planning area, federal mineral estate in the CRVFO totals 707,000 acres. Leasing decisions for lands administered by the US Department of Agriculture, US Forest Service, will be made in the appropriate USFS Land and Resource Management Plan EIS. These USFS "forest plans" analyze impacts from oil and gas leasing and development on National Forest System lands, and describe where the USFS will and will not consent to leasing.

The Roan Plateau portion of the CRVFO planning area is not included in this draft RMP, with the exception of the Wild and Scenic Rivers Suitability Study (Appendix C) and associated management guidance. The decision to not include the Roan Plateau portion reflects the fact that the RMP amendment under which it is being managed is recent and already includes many of the newer management actions addressed for other portions of the CRVFO under Alternatives B through D of this RMP revision. In addition, the federal mineral estate underlying the Roan Plateau planning area has been fully leased for oil and gas exploration and development pursuant to the RMP amendment, limiting the range of new management actions that could be applied to the area.

## 2.2 SUMMARY OF RESOURCE USES AND SPECIAL DESIGNATIONS BY ALTERNATIVE

Combined with the figures in Appendix A, Sections 2.2.1 through 2.2.4 and Table 2-1 highlight the meaningful differences among alternatives relative to resource uses and special designations. The alternatives development process is described in Section 2.3, and the alternatives are described in detail in Section 2.7.

Case No. 1:20-cv-02484-MSK Document 30-8 filed 04/27/21 USDC Colorado pg 62 of 141

### 2.2.1 Alternative A (No Action Alternative)

The no action alternative, Alternative A, is a continuation of the present management direction and current prevailing conditions and is based on existing planning decisions and amendments. This alternative meets the requirements of NEPA (40 CFR, Part 1502.14) that a no action alternative be considered; "no action" means that current management practices, based on existing RMPs and other management decision documents, would continue. Goals and objectives for BLM land resources and resource uses would be based on the existing RMP, subsequent RMP amendments, and activity- or implementation-level plans. The emphasis would be on maintaining the land management direction for physical, biological, cultural, and historic resource values, along with recreational, social, and economic land uses. Direction contained in laws, regulations, and BLM policies superseding provisions of the existing RMPs and amendments would be implemented.

### 2.2.2 Alternative B (Preferred Alternative)

Alternative B seeks to allocate limited resources among competing human interests, land uses, and the conservation of natural and cultural resource values. Goals and objectives would focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape. Management direction would generally be broad to accommodate a variety of values and uses. See Section 2.6 for a discussion of the selection of the preferred alternative.

### 2.2.3 Alternative C

Alternative C emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, particularly the habitats needed for the conservation and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal species. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations.

### 2.2.4 Alternative D

The appropriate mix of uses on BLM lands and mineral estate would be based on making the most of resources that target social and economic outcomes, while protecting land health. Management direction would recognize and expand existing uses, and accommodate new uses to the greatest extent possible. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, communication sites, and livestock grazing) would emphasize maximizing resource production in an environmentally responsible manner, while maintaining the basic protection needed to sustain resources.

BLM_0015877

**Table 2-1**
**Comparative Summary of Resource Uses and Special Designations by Alternative**

| Resource or Resource Use | Unit of Measure | Notes | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|---|
| **Visual Resource Management (VRM)** | **Acres** | | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| VRM Class I | | | 17,100 | 33,600 | 33,600 | 34,000 |
| VRM Class II | | | 230,100 | 249,200 | 258,100 | 228,300 |
| VRM Class III | | | 113,700 | 102,100 | 97,000 | 104,600 |
| VRM Class IV | | | 144,200 | 120,300 | 116,000 | 138,300 |
| VRM Class V | | | 100 | | | |
| | | **Total CRVFO Acres** | **505,200** | **505,200** | **505,200** | **505,200** |
| **Wildland Fire Management** | **Acres** | | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| FMU A | | | 22,500 | 22,500 | 22,500 | 22,500 |
| FMU B | | | 254,900 | 254,900 | 254,900 | 254,900 |
| FMU C | | | 190,900 | 190,900 | 190,900 | 190,900 |
| FMU D | | | 36,100 | 36,100 | 36,100 | 36,100 |
| | | **Total CRVFO Acres** | **504,400** | **504,400** | **504,400** | **504,400** |
| **Lands with Wilderness Characteristics (LWCs) Outside WSAs** | **Acres** | | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| Castle Peak Addition | 4,000 | | | | ●[1] | |
| Deep Creek | 4,400 | | | | ●[1] | |
| Flat Tops Addition | 3,500 | | | | ●[1] | |
| Grand Hogback | 11,400 | | | | ●[1] | |
| Pisgah Mountain | 15,500 | | | | ●[1] | |
| Thompson Creek | 8,200 | | | | ●[1] | |
| | | **Total CRVFO Acres** | **0** | **0** | **47,000** | **0** |
| **Forestry** | **Acres or PSQ** | | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| Acres Commercial Forest / Intensive Management | | | 17,900 | 31,400 | 28,400 | 32,200 |
| Acres Closed to Commercial Timber Harvest | | | 27,800 | 81,800 | 135,000 | 85,000 |
| Probable Sale Quantity (PSQ) (million board feet) | | | 1.8 | 1.2 | 0.9 | 1.4 |
| **Livestock Grazing** | **Acres or AUMs** | | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| Acres open to livestock grazing | | | 489,600 | 451,400 | 432,000 | 443,400 |
| Acres closed to livestock grazing | | | 15,300 | 53,600 | 73,000 | 61,500 |
| | | **Total CRVFO Acres** | **504,900** | **505,000** | **505,000** | **504,900** |
| Available AUMs | | | 39,200 | 36,000 | 35,500 | 36,500 |
| **Special Recreation Management Areas (SRMAs)** | **Acres** | **Targeted Activities** | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| Bocco Mountain (northeast of Eagle) | 1,400 | Motorcycle Riding | ● | ● | | ● |
| Bull Gulch (north of Gypsum) | 8,300 | Hiking, Hunting | ● | | | |

**Table 2-1**
**Comparative Summary of Resource Uses and Special Designations by Alternative**

| Resource or Resource Use | Unit of Measure | Notes | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|---|
| Deep Creek (west of Gypsum) | 2,400 | Hiking | • | | | |
| Fisher (north of Carbondale) | 2,800 | Day-Use Hiking, Mountain Biking | | | | • |
| Gypsum Hills (north of Gypsum) | 16,900 | Off-Highway Vehicles (OHVs) | • | | | |
| Hack Lake (northwest of Gypsum) | 3,300 (A) 3,700 (B) | Hiking, Horseback Riding, Hunting, Camping | • | • | | |
| Hardscrabble/East Eagle (east and west of Eagle; south of I-70) | 17,000 | Zones for Day-use, Mountain Biking, OHVs | | | | • |
| King Mountain (far northeastern part of CRVFO) | 13,000 | Hunting, Horseback Riding, Wildlife Viewing, Camping | | • | | |
| Red Hill | 3,100 | Day-use Hiking, Mountain Biking | • | • | • | • |
| The Crown (west of Basalt) | 9,100 | Alternative B – Zones for Day-use Mountain Biking, OHVs Alternative D – Mountain Biking, Camping | | • | | • |
| Thompson Creek (southwest of Carbondale) | 4,300 (A) 9,500 (D) | Alternative A – Dispersed Recreation Alternative D – Zones for Day-use Hiking, Rock Climbing, Mountain Biking | • | | | • |
| Upper Colorado River | 20,700 | Zones for Fishing/Floatboating and Floatboating/Tubing | • | • | • | • |
| | | **Total CRVFO Acres** | **60,400** | **51,000** | **23,800** | **63,600** |
| **Extensive Recreation Management Areas (ERMAs)** | **Acres** | **Targeted Activities** | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| Glenwood Springs (not a destination) | 444,500 | Various Dispersed Activities | • | | | |
| Eagle River (Edwards to Dotsero) | 3,300 | River-related Day-use including Float-boating, Fishing | | • | • | • |
| Fisher Creek (southeast of Glenwood Springs) | 2,800 | Non-motorized Day-use including Mountain Biking, Hiking, Hunting | | • | • | |
| Hack Lake (northwest of Gypsum) | 3,700 | Non-motorized Activities including Backcountry Hiking, Camping, Horseback Riding, Hunting | | | • | • |
| Hardscrabble/East Eagle (east and west of Eagle; south of I-70) | 17,000 | Motorsports, Mountain Biking, Hiking, Hunting, Scenic Driving | | • | • | |
| King Mountain (near Toponas) | 13,000 | Alternative C – Backcountry Camping, Horseback Riding, Hunting Alternative D – Backcountry Camping, Mountain Biking, Horseback Riding, Hunting | | | • | • |

**Table 2-1**
**Comparative Summary of Resource Uses and Special Designations by Alternative**

| Resource or Resource Use | Unit of Measure | Notes | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|---|
| New Castle (near New Castle) | 9,900 | Non-motorized Day-use including Mountain Biking and River-related Activities | | ● | ● | ● |
| Silt Mesa (northwest of Silt) | 3,100 | Alternative B and D – Day-use Motorsports, Mountain Biking, Hiking, Horseback Riding Alternative C – Non-motorized Day-use including Hiking, Mountain Biking, Horseback Riding | | ● | ● | ● |
| Thompson Creek (southwest of Carbondale) | 9,500 | Alternative B – Non-motorized Day-use including Mountain Biking, Hiking, Sport Climbing, Horseback Riding, Hunting Alternative C – Primitive Recreation including Mountain Biking, Hiking, Traditional Climbing, Horseback Riding | | ● | ● | |
| The Crown (west of Basalt) | 9,100 | Motorsports, Mountain Biking, Hiking, Hunting, Scenic Driving | | | ● | |
| | | **Total CRVFO Acres** | **NA** | **45,600** | **71,400** | **33,000** |
| **Trails and Travel Management** | **Acres or Miles** | | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| Acres open to cross-country travel | | | 294,300 | 0 | 0 | 0 |
| Acres limited to existing routes | | | 38,000 | 0 | 0 | 0 |
| Acres limited to existing routes May 1 to November 30 | | | 4,300 | 0 | 0 | 0 |
| Acres limited to designated routes | | | 123,000 | 467,600 | 467,400 | 473,500 |
| *Miles of routes designated for full-sized vehicles* | | | *760* | *470* | *440* | *530* |
| *Miles of routes designated for all-terrain vehicles* | | | *86* | *62* | *55* | *68* |
| *Miles of routes designated for motorcycle* | | | *85* | *66* | *27* | *82* |
| *Miles of routes designated for mechanized* | | | *180* | *220* | *140* | *280* |
| *Miles of routes designated for foot/horse* | | | *160* | *420* | *440* | *300* |
| *Miles of routes designated for foot* | | | *2* | *2* | *2* | *2* |
| | | *Total CRVFO miles of motorized designated routes* | *1,273* | *1,240* | *1,104* | *1,262* |
| | | *Total CRVFO miles of non-motorized designated routes* | *310* | *310* | *310* | *310* |
| | | *Total CRVFO miles of all designated routes* | *1,583* | *1,550* | *1,414* | *1,572* |
| *Miles of routes designated for obliteration* | | | *0* | *70* | *220* | *50* |

**Table 2-1**
**Comparative Summary of Resource Uses and Special Designations by Alternative**

| Resource or Resource Use | Unit of Measure | Notes | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|---|
| *Miles of routes designated for seasonal closure, August 20 to April 30 (Alternatives B and C) or October 1 to April 30 (Alternative D)* | | | *0* | *8* | *8* | *8* |
| Acres closed to off-highway vehicle use December 1 to April 30 (Alt. A) or December 1 to April 15 (Alts. B, C, and D) | | | 74,800 | 118,000 | 148,200 | 87,400 |
| Acres closed to off-highway vehicle use year-round | | | 44,000 | 37,300 | 37,500 | 31,400 |
| **Lands and Realty** | **Acres** | | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| Right-of-way avoidance areas | | | 101,300 | 169,600 | 162,000 | 126,700 |
| Right-of-way exclusion areas | | | 20,800 | 39,300 | 50,600 | 39,000 |
| Retention areas, subject to land tenure adjustment on a case-by-case basis | | | 494,400 | 488,400 | 488,700 | 418,300 |
| Areas identified for sale | | | 11,100 | | | |
| **Stipulations for Surface-Disturbing Activities** (Refer to Appendix B) | **Acres** (Federal mineral estate[2]) | | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| No surface occupancy or surface-disturbing activities | | | 239,600 | 326,700 | 333,800 | 203,000 |
| Controlled surface use | | | 424,800 | 489,500 | 500,500 | 297,800 |
| Timing limitations | | | 352,400 | 339,700 | 339,700 | 398,100 |
| **Fluid Minerals** | **Acres** (Federal mineral estate[2]) | | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| **Closed to fluid minerals leasing** (Refer to Appendix P) | | | 27,800 | 55,600 | 175,500 | 48,800 |
| **Open to fluid minerals leasing** (Refer to Appendix P) | | | 679,200 | 651,400 | 531,500 | 658,200 |
| *Open with NSOs* | | | 109,400 | 134,300 | 78,400 | 81,800 |
| *Open with CSUs* | | | 203,500 | 152,500 | 242,600 | 132,000 |
| *Open with TLs* | | | 170,200 | 201,600 | 201,600 | 199,600 |
| *Open with Standard Stipulations* | | | 196,100 | 163,000 | 8,900 | 244,800 |
| **Locatable Minerals** | **Acres** | | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| Recommended for withdrawal from locatable mineral exploration or development | | | 34,600 | 97,000 | 172,100 | 72,300 |
| Open to locatable mineral exploration or development | | | 470,300 | 407,900 | 332,800 | 432,600 |
| | | **Total CRVFO Acres** | **504,900** | **504,900** | **504,900** | **504,900** |

**Table 2-1**
**Comparative Summary of Resource Uses and Special Designations by Alternative**

| Resource or Resource Use | Unit of Measure | Notes | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|---|
| **Salable Minerals/Mineral Materials and Non-Energy Solid Leasable Minerals** | **Acres** | | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| Closed to salables/mineral materials disposal and non-energy solid mineral leasing | | | 28,000 | 142,200 | 196,000 | 27,800 |
| Open to salables/mineral materials disposal and non-energy solid mineral leasing | | | 476,900 | 362,700 | 317,000 | 477,200 |
| | | **Total CRVFO Acres** | **504,900** | **504,900** | **513,000** | **505,000** |
| **Areas of Critical Environmental Concern (ACECs)** | **Acres** | **ACEC Values** | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| Abrams Creek | 190 | Genetically pure population of naturally reproducing Colorado River cutthroat trout | | | ● | |
| Blue Hill | 3,700 | Heritage values and natural hazards | ● | ● | ● | ● |
| Bull Gulch | 10,400 | Scenic (unique geologic forms and sharp contrasting colors), botanical | ● | ● | ● | ● |
| Colorado River Seeps | 470 | Significant plant communities: *Betula occidentalis*/Mesic grass; *Artemisia tridentata*/*Leymus cinereus* | | | ● | |
| Deep Creek | 2,400 | Scenic, geologic (caves) | ● | ● | ● | |
| Dotsero Crater | 100 | Geologic (volcanic crater) | | ● | ● | |
| Glenwood Springs Debris Flow Hazard Zone | 6,100 | Natural hazard, steep slopes, mud and debris flow protection | ● | ● | ● | ● |
| Grand Hogback | 14,000 | Scenic, geologic, heritage | | | ● | |
| Greater Sage-Grouse Habitat | 24,600 | Sage-grouse (BLM sensitive species) | | | ● | |
| Hardscrabble-Mayer Gulch | 3,400 | Highest known concentrations of Harrington's penstemon (*Penstemon harringtonii*) | | ● | | |
| Hardscrabble-Mayer Gulch/ East Eagle | 4,200 | Highest known concentrations of Harrington's penstemon (*Penstemon harringtonii*) | | | ● | |
| Lower Colorado River | 130 | Riparian, wildlife | ● | | | |
| Lyons Gulch | 480 | Sensitive plant: Harrington's penstemon (*Penstemon harringtonii*) | | ● | ● | |
| McCoy Fan Delta | 220 | Geologic (marine deposits) | | | ● | |
| Mount Logan Foothills | 3,900 | Colorado hookless cactus (*Sclerocactus glaucus*), DeBeque phacelia (*Phacelia submutica*), Naturita milkvetch (*Astragalus naturitensis*) | | | ● | |
| Sheep Creek Uplands | 4,500 | Harrington's penstemon (*Penstemon harringtonii*) core population | | ● | ● | |

BLM_0015882

**Table 2-1**
**Comparative Summary of Resource Uses and Special Designations by Alternative**

| Resource or Resource Use | Unit of Measure | Notes | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|---|
| The Crown Ridge | 1,000 | Sensitive plant: Harrington's penstemon (*Penstemon harringtonii*) | | | ● | |
| Thompson Creek | 4,300 (A) 3,400 (B, C) | Scenic, geologic, historic, ecological | ● | ● | ● | |
| | | **Total CRVFO Acres** | **27,030** | **34,500** | **79,700** | **20,200** |
| **Wilderness Study Areas (WSAs)** | **Acres** | | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| Bull Gulch | 15,200 | Manage under Interim Policy for Lands under Wilderness Review until a determination by Congress | ● | ● | ● | ● |
| Castle Peak | 12,200 | | ● | ● | ● | ● |
| Eagle Mountain | 320 | | ● | ● | ● | ● |
| Hack Lake | 4 | | ● | ● | ● | ● |
| | | **Total CRVFO Acres** | **27,700** | **27,700** | **27,700** | **27,700** |
| **Wild and Scenic Rivers (WSRs) Suitable for Inclusion in the NWSRS** | **Miles Total / on BLM** | **Classification** | **Alt A** | **Alt B** | **Alt C** | **Alt D** |
| **Segments Outside Roan Plateau** | | | | | | |
| Abrams Creek | 3.4 /3.4 | recreational | | | ● | |
| Battlement Creek | 2.9 / 1.7 | recreational | | | ● | |
| Colorado River – segment 6 | 45.4 / 27.3 | recreational | | ●[3] | ● | |
| Colorado River – segment 7 | 15.7 / 3.4 | recreational | | ●[3] | ● | |
| Deep Creek – segment 2 | 3.6 / 3.6 | wild | | ●[3] | ● | |
| Deep Creek – segment 3 | 0.9 / 0.9 | recreational | | ●[3] | ● | |
| Eagle River | 25.7 / 5.5 | recreational | | | ● | |
| Egeria Creek | 8.3 / 7.8 | recreational | | | ● | |
| Hack Creek | 2.4 / 1.6 | scenic | | | ● | |
| Mitchell Creek | 0.9 / 0.9 | recreational | | | ● | |
| No Name Creek | 0.1 / 0.1 | recreational | | | ● | |
| Rock Creek | 4.8 / 3.2 | recreational | | | ● | |
| Thompson Creek | 4.8 / 4.8 | wild | | | ● | |
| **Segments within the Roan Plateau** | | | | | | |
| East Middle Fork Parachute Creek complex | 10.3 / 10.3 | | | | ● | |
| East Fork Parachute Creek complex | 13.8 / 13.8 | | | | ● | |
| | | **Total CRVFO Miles** | | | **143.0/88.3** | |

n/a = not available
[1] Lands with wilderness characteristics (LWCs) outside WSAs would be protected with specific management prescriptions.
[2] Federal mineral estate includes mineral estate underlying BLM lands, privately owned lands, State-owned lands, and BOR and DOE lands. As such, Federal mineral estate acres are greater than BLM surface acres. Federal mineral estate totals 707,000 acres in the CRVFO.
[3] Alternative B comprises two variants. Under Alternative B1, the BLM would find two Colorado River segments (61.1 miles, 30.7miles on BLM) and two Deep Creek segments (4.5 miles, all on BLM) suitable for congressional designation for inclusion in the NWSRS. Under Alternative B2, the BLM would defer a determination of suitability for the two Colorado River segments and recommend adopting and implementing the Stakeholder Management Plan to protect their free-flowing nature, outstanding remarkable values, and tentative classifications. Also under Alternative B2, the BLM would find the two Deep Creek segments suitable for congressional designation for inclusion in the NWSRS.
Source: BLM 2008c (GIS)

## 2.3 ALTERNATIVES DEVELOPMENT

Alternatives development is the heart of the RMP and EIS process. Land use planning regulations and NEPA require the BLM to develop a reasonable range of alternatives during the planning process. Alternatives must be within the established planning criteria (Title 43 Code of Federal Regulations [CFR], Section 1610). The basic goal of developing alternatives is to prepare different possible management scenarios that accomplish the following:

- Address the identified major planning issues.
- Resolve conflicts among resources and resource uses.
- Meet the purpose of and need for the RMP.

Achieving this goal will help the BLM and the public understand the various ways of addressing conflicts concerning alternative uses of available resources, as well as providing the decisionmaker with a reasonable range of alternatives with which to make an informed decision. The components of the alternatives and the general direction of each alternative are discussed below.

### 2.3.1 Developing Alternatives for the CRVFO

The CRVFO implemented the first five steps of BLM's planning process (Section 1.4, Planning Process) in developing alternatives, as follows: scoping, planning criteria development, issue identification, data collection, and current management assessment. The issue identification and current management assessment processes began in 2006, with an extensive review by BLM's interdisciplinary team of current land management decisions and direction from the Glenwood Springs RMP (BLM 1984a) and subsequent amendments (BLM 1988, 1991a, 1991b, 1995, 1997a, 1997c, 1999a, 1999b, 2001a, 2004a, 2007b, 2008b). From this review, the BLM identified preliminary planning issues that could be addressed in a new RMP.

As discussed in Section 1.5, Scoping and Planning Issues, preliminary planning issues were distributed during the scoping process for public comment, along with a request for identifying additional issues. Based on scoping and public participation efforts, the CRVFO identified the 12 planning issues detailed in Section 1.5, Scoping and Planning Issues. Planning issues are concerns or controversies about existing and potential land and resource allowable uses, levels of resource use, production, and related management practices. Planning issues are well defined or topically discrete, and entail alternatives from which to choose. This definition suggests that there are different ways to resolve the competition or demand.

> ***Planning Issues*** express concerns, conflicts, and problems with the existing management of public lands. Frequently, issues are based on how land uses affect resources. Some issues are concerned with how land uses can affect other land uses, or how the protection of resources affects land uses.

To better define the scope of the EIS analysis, the planning issues were broken down into two groups. The first group is composed of those key planning issues requiring varied approaches in alternatives development to address unresolved conflicts and questions. The second group is composed of other planning issues that would have a smaller degree of impact on the development of alternatives.

#### *Key Issues*

Key issues are those that were specifically determined to have the greatest potential impact on the direction of the RMP alternatives. These key issues reflect the resources or resource uses that are the most formative or

determinative (having the power or quality of deciding) and thus were the main factors used to develop alternatives. The five key issues creating variation in the alternatives are as follows:

- Recreational demand and uses
- Special designations
- Energy development
- Wildlife
- Sagebrush habitat and sagebrush-dependent species

**Recreational demand and uses.** As the human environment in the central Rocky Mountains has changed over the past 20-plus years since the current CRVFO RMP (BLM 1984a) was developed, so also have the recreation demands and expectations on Colorado BLM lands. Public use and enjoyment of BLM lands have been affected by intense competition among increasing numbers of people for a finite amount of resources. Recreation visitation and use are expected to increase, especially in areas near growing communities. The public continues to demand a diverse range of recreation opportunities in a variety of natural resource recreation settings. Some people want new or improved facilities for, and improved signage and information about, recreation opportunities, while others do not. Some people want more structured recreation opportunities for specific activities, while others want the BLM to manage for dispersed recreation activities. With changing regional and local economies, rapid population growth, shifting demographics, and the expansion of residential areas, recreation is the center of both conflict and opportunity.

The current RMP (BLM 1984a) addresses only recreation opportunities within Special Recreational Management Areas (SRMAs) and Extensive Recreation Management Areas (ERMAs). However, the revised BLM Land Use Planning Handbook (H-1601-1; BLM 2005a) requires managing for structured outcomes within SRMAs. This requires addressing not only recreation, but also identifying visitor desires for experiences and benefits, the character of the recreation settings, and the necessary implementation framework. The CRVFO needs to review existing SRMAs and propose additional SRMAs to conform to the revised guidance.

**Special designations.** Special designations protect resources and experiences but can reduce current opportunities, experiences, or uses. These specially designated lands may not allow for, or may have reduced levels of, resource use and development. Many people may want more BLM land allocated to these areas, while others may oppose such allocation or may desire a reduction in the established quantities. Specifically, there has been high public interest in studying river segments for inclusion in the National Wild and Scenic Rivers System (NWSRS). Special designations addressed in this planning process include areas of critical environmental concern (ACECs), NWSRS suitability, wilderness study areas (WSAs), and lands with wilderness characteristics (LWCs) outside WSAs to be managed to protect those characteristics.

**Energy development (including air quality).** The CRVFO includes areas of oil and gas development on BLM lands, lands administered by the USFS, and both privately owned and state-owned lands with underlying federal mineral estate. The CRVFO is approaching the amount of oil and gas development projected in the reasonable foreseeable development (RFD) scenario from the 1999 Oil and Gas Leasing and Development Amendment EIS (BLM 1999b). The number of applications for permits to drill (APDs) received by CRVFO increased dramatically from 28 in fiscal year 2000 to 397 in 2007, decreased to 200 in 2009 during the

economic downturn, and rose again to 327 in 2010. During that 11-year period, CRVFO approved a total of approximately 2,400 APDs, and more than 1,200 federal wells were drilled. This new development includes oil and gas projects on previously undeveloped federal leases as well as considerable infill drilling of existing development areas. The latter has increasingly involved use of directional drilling technologies to reach new bottomhole targets from existing well pads, with no or only limited additional surface disturbance. Adding numerous new wells without having to construct new pads and access roads and using newer drilling rigs and other more modern equipment have helped reduce air quality impacts on a per-well basis.

**Wildlife (including special status species).** While the USFWS and the Colorado Division of Wildlife (CDOW) are directly responsible for managing fish and wildlife species, the BLM is directly responsible for managing fish and wildlife habitat on its lands and is indirectly responsible for the health and well-being of fish and wildlife whose habitats are on BLM lands. In addition, the BLM is mandated to ensure that special status species are protected, by virtue of the Endangered Species Act of 1973, by policy in the 6840 Manual, and by the BLM Land Use Planning Handbook (H-1601-1; BLM 2005a). This goal is furthered through a memorandum of agreement with the USFWS and the USFS.

Many of the management decisions related to fish and wildlife in the existing CRVFO RMP (BLM 1984a) can be categorized as decisions to collect additional data, cooperate with other agencies, provide new habitat or protect existing habitat for specific species or populations, or improve habitats for particular species (BLM 1984a). Although some wildlife protection or mitigation measures have been effective in preventing impacts on wildlife and wildlife habitat, growing issues will be further examined. Examples of these issues are fragmentation and reduced habitat quality from oil and gas development, expanding subdivisions, and recreation.

**Sagebrush habitat and sagebrush-dependent species.** Sagebrush shrublands are diverse and important habitats that support a variety of unique flora and fauna, including sage-grouse. Sagebrush shrublands are also among the most important wintering and foraging areas for big game, especially mule deer. Many of the lower elevation communities of Wyoming big sagebrush, which comprise the bulk of mule deer winter range in the region, are old, with moderate to severe hedging in much of the CRVFO area. In contrast, mountain big sagebrush and subalpine sagebrush communities in the CRVFO area are in generally good condition, with good diversity and cover of herbaceous species. Throughout the region, sagebrush habitats continue to be threatened by a variety of influences associated with increased human presence and resource development. Conversion of the sagebrush steppe to agriculture, invasion by non-native plant species, energy extraction, rural residential expansion, and recreation have reduced, degraded, or fragmented sagebrush habitats. The bulk of these influences has occurred at lower elevations that contain a higher proportion of private land and are especially critical areas for sage-grouse and wintering big game. The RMP revisions will address issues associated with sagebrush habitat fragmentation and big game winter range.

### *Other Issues*

Seven of the twelve planning issues identified through planning and public participation were determined to have less impact on the direction of the RMP alternatives. These issues were important to respondents during scoping, although they were not as formative or determinative for developing alternatives. These seven issues are considered in the environmental consequences analysis of the alternatives (Chapter 4) and have an impact on the management and use of BLM lands. The seven other issues creating public concerns addressed in this draft RMP/EIS are as follows:

- Vegetation
- Travel management and transportation
- Lands and realty
- Wildland-urban interface
- Range health/upland management
- Water/riparian resources
- Cultural resources

**Vegetation (including special status species).** Regardless of the alternative, the desired outcomes for vegetation communities are to achieve a healthy cover of perennial vegetation that stabilizes the soil, increases infiltration of precipitation, slows surface runoff, prevents erosion, provides clean water to adjacent streams, and enhances the visual quality of BLM lands.

Rangelands, composed primarily of sagebrush steppe and grassland communities, provide valuable cover, forage, and breeding sites for a variety of wildlife (including sage-grouse and wintering big game) and are the foundation for many resource uses. Some have expressed concern that resource uses may be affecting the natural function and condition of these communities. In addition, many rangelands, particularly at the lower and middle elevations, are threatened by the invasion and expansion of non-native annual cheatgrass and other noxious weeds.

Forests, specifically lodgepole pine communities, are experiencing an outbreak of mountain pine beetle; approximately 85 to 95 percent of the lodgepole pine trees greater than 7 inches diameter at breast height (dbh) are infected or already dead. The alternatives provide varying management approaches to address vegetation and resource impacts from lodgepole pine mortality as a result of the mountain pine beetle outbreak.

Under all alternatives, BLM Colorado's Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997a) would apply to vegetation resources.

**Travel management and transportation.** Travel and transportation are an integral part of virtually every activity that occurs on BLM lands. These RMP revisions will comprehensively address all modes of travel and access. Because travel and transportation management supports and facilitates other BLM land uses, the direction for trails and travel management is provided by other resources and program management objectives. In accordance with Colorado BLM guidance in Instruction Memorandum 2007-020 (BLM 2007e), areas open to cross-country travel or designated as "open to existing routes" will change to areas that are "limited to designated routes."

**Lands and realty.** Regardless of the alternative, land tenure adjustments and right-of-way actions should support the goals and objectives set for natural resources and resource uses that determine alternatives development. As such, lands and realty actions are subject to the various criteria developed from prescriptions to achieve the desired outcomes of other resource and resource use programs. The proposed lands and realty actions were adjusted as necessary to comply with the objectives and constraints of each alternative.

**Wildland-urban interface.** BLM land management issues are more complex in areas next to BLM lands where population and development are rapidly expanding. The zone where BLM lands and urban lands are contiguous or intermixed is called the wildland-urban interface. The CRVFO is faced with the challenge of sustaining BLM resources and public demands. Regardless of the alternative, this topic is inherent in all issues for both field offices.

**Range health/upland management.** On February 3, 1997, the Secretary of the Interior approved the BLM Colorado's Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997a). In accordance with the BLM Land Use Planning Handbook (H-1601-1; BLM 2005a), Standards for Public Land Health will be expressed as goals in RMPs. The proposed planning criteria include these standards and guidelines, and lay out a strategy for ensuring that proper grazing practices are followed. Regardless of the alternative, BLM management actions would be designed to achieve the standards for BLM land health. In areas where standards are not achieved, current uses and management actions will be reviewed and modified as necessary to ensure significant progress toward achieving a healthy ecosystem. Grazing will be managed to maintain or improve the health of the BLM lands by incorporating terms to enhance resource conditions into permitted operations.

**Water/riparian.** Regardless of the alternative, water quality of all water bodies, including groundwater (where applicable) on or influenced by BLM lands, would be managed to achieve or exceed the water quality standards established by the State of Colorado. Water quality standards for surface water and groundwater include the designation of beneficial uses, numeric criteria, narrative criteria, and antidegradation requirements set forth under state law (5 Colorado Code of Regulations 1002-8), as required by Section 303(c) of the Clean Water Act.

**Cultural resources.** Regardless of the alternative, significant cultural properties would be protected under Section 106 of the National Historic Preservation Act and the Archaeological Resource and Protection Act. These acts require that any proposed undertaking that may impact cultural resources take into account the potential effects on historic properties. This leads to completion of field and record search inventories and field assessments. Decisions are made in consultation with the State Historic Preservation Officer, the Advisory Council on Historic Preservation, and Native American groups, as applicable. Section 110 of the NHPA guides the long-term preservation of historic properties under federal management.

## 2.4 ALTERNATIVES CONSIDERED FOR DETAILED ANALYSIS

Following the close of the public scoping period in June 2007, the BLM began developing alternatives by assembling an interdisciplinary team of BLM resource specialists in the CRVFO. The BLM also coordinated with cooperating agencies beginning in April 2007 and continuing throughout the planning process. Between September 2007 and June 2008, the BLM interdisciplinary team developed management goals, objectives, and management actions to meet those goals and objectives.

Four management alternatives were developed to fulfill the purpose and need (Section 1.2, Purpose of and Need for the RMP), to meet the multiple use mandates of the Federal Land Policy and Management Act of 1976 (FLPMA; 43 USC 1716), and to address the 12 planning issues. Alternatives A (no action), B, C, and D offer a range of management options that resolve the issues identified in the Community Assessment Report (BLM 2007d), the scoping process, and other outreach activities. These outreach activities include input from cooperating agencies, the Northwest Resource Advisory Council subgroups, visitor studies, focus groups, informal interviews, and reports, such as the NWSRS eligibility study (BLM 2007f) and NWSRS suitability

study (BLM 2008c) (Appendix C) for all rivers in the decision area, ACECs evaluation summarized in Appendix E (BLM 2007g), and visual resource management (VRM) study (Otak 2007). Each alternative stands alone as a potential RMP and provides direction for resource programs based on the development of specific goals, objectives, and management actions. Described in each alternative is specific direction influencing land management, with an emphasis on different combinations of resource uses, allowable uses, and restoration measures to address issues and to resolve user conflicts. Resource program goals are met in varying degrees across alternatives. Resources or resource uses not tied to key planning issues or mandated by laws and regulations often contain few or no differences in management between alternatives. Alternatives may also result in different long-term conditions.

How the alternatives differ from one another is in the relative emphasis given to particular resources or resource uses. Each alternative has been designed to respond to the key issues differently, providing a range of possible management approaches that the BLM could implement. That distinction is expressed in the RMP by varying specific objectives, allowable uses, management actions, and implementation actions, such as travel route designations. The general direction of each alternative is summarized in Sections 2.4.1 through 2.4.4, below.

A complete description of all decisions proposed for each alternative is included in Table 2-2, Descriptions of Alternatives A, B, C, and D, at the end of this chapter.

### 2.4.1 Alternative A (No Action Alternative)

Alternative A is the continuation of the present management situation. Goals and objectives for BLM land resources and resource uses would be based on the existing CRVFO RMP, RMP amendments, and activity- or implementation-level plans. The emphasis would be on maintaining the existing land management direction for physical, biological, cultural, and historic resource values, along with recreational, social, and economic land uses. The BLM would implement the direction contained in laws, regulations, and BLM policies superseding provisions of the existing RMPs and amendments.

The appropriate development scenarios would stay the same for such allowable uses as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing. There would be no change in goals, objectives, allowable uses, or management actions that are allowed, restricted, or prohibited on BLM lands and mineral estate. The BLM would not establish additional criteria or change present criteria to guide the identification of site-specific use levels for implementation activities.

Table 2-1 summarizes proposed decisions, Table 2-2 includes details of all proposed decisions, and Appendix B describes stipulations for oil and gas leasing and surface-disturbing activities. Key components of Alternative A are as follows:

**Recreation demand and uses.** Recreation administration would be directed by decisions in the existing RMP, amendments, and recreation area management plans. Recreation management would generally emphasize the continued availability of outdoor recreation opportunities, interpretation, and visitor safety. The existing eight SRMAs (Bocco Mountain, Bull Gulch, Deep Creek, Gypsum Hills, Hack Lake, Red Hill, Thompson Creek, and the Upper Colorado River) would be established. The remaining BLM lands would be managed custodially as the Glenwood Springs ERMA. Application of No Surface Occupancy (NSO) stipulations would offer some protection for non-motorized recreation opportunities at King Mountain,

Siloam Springs, Castle Peak, Bull Gulch (the portion of the WSA not within the SRMA), Sunlight Peak, Fisher Creek, and Pisgah Mountain.

**Energy development.** Under Alternative A, a total of 679,200 acres in the CRVFO would be open to oil and gas leasing and development. These areas would be subject to a variety of NSO, controlled surface use (CSU), and timing limitation (TL) stipulations as well as conditions of approval (COAs) to ensure that oil and gas activities are conducted in an environmentally acceptable manner.

**Fish and wildlife (including special status species).** The condition and trends of all aquatic habitats within perennial streams or lakes would continue to be maintained and, where needed, improved at levels conducive to a healthy aquatic community. BLM land habitat would be managed to support optimum terrestrial wildlife population levels, as determined cooperatively with the CDOW Strategic Plan and the USFWS, commensurate with public land health standards. Special status species and their habitats would be managed to provide for their continued presence in accordance with applicable laws and regulations. Current stipulations (e.g., seasonal protections) would be maintained to protect sensitive species habitat, such as greater sage-grouse.

**Sagebrush habitat and sagebrush-dependent species.** Implementing measures to protect occupied and suitable habitat for sagebrush-dependent species would continue. Habitat treatments to enhance sagebrush habitat for sagebrush-dependent species would be implemented.

**Special designations.** Four existing WSAs (27,700 acres) and six ACECs (27,000 acres) would continue to be managed, and protective management would be implemented on 26 stream segments (143 miles total, 88.1 miles on BLM) eligible for inclusion in the NWSRS.

### 2.4.2 Alternative B (Preferred Alternative)

Alternative B seeks to allocate limited resources among competing human interests, land uses, and the conservation of natural and cultural resource values. Goals and objectives would focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape. Management direction would generally be broad to accommodate a variety of values and uses. See Section 2.6 for discussion of the selection of the preferred alternative.

Table 2-1 summarizes proposed decisions, Table 2-2 includes details of all proposed decisions, and Appendix B describes stipulations for oil and gas leasing and surface-disturbing activities. Key components of Alternative B are as follows:

**Recreation demand and uses.** Alternative B would emphasize a variety of recreation opportunities and the protection of natural resource recreation settings. Current recreational uses would be recognized and accommodated where possible when considering land uses. Alternative B would include the designation of six SRMAs (Bocco Mountain, Hack Lake, King Mountain, Red Hill, The Crown, and the Upper Colorado River) where recreation opportunities are recognized as a primary management consideration due to their unique value, importance, and/or distinctiveness. Alternative B would also include the designation of six ERMAs (Eagle River, Fisher Creek, Hardscrabble/East Eagle, New Castle, Silt Mesa, and Thompson Creek) where the principal recreation activities, current recreation demand, and existing recreation facilities would receive specific management consideration commensurate with the management of other resources.

**Energy development.** Alternative B would include designation of 651,400 acres as open to oil and gas exploration and development. Oil and gas activities on BLM lands or associated with federal mineral estate would be managed using a variety of NSO, CSU, and TL stipulations (Appendix B) and COAs to ensure that exploration and development are conducted in an environmentally responsible manner. This alternative would have the greatest restrictions on oil and gas leasing and development of the four alternatives.

**Fish and wildlife (including special status species).** Fish and wildlife species (including special status species) would be strategically managed with an emphasis on protecting crucial habitat, streamflows, and riparian areas. Management would protect and improve priority habitat, winter range (quantity and quality), and core wildlife areas. Development would be moderately limited in, and seasonal restrictions would be applied to, winter range.

**Sagebrush habitat and sagebrush-dependent species.** Alternative B would emphasize identifying and protecting sagebrush habitat for sagebrush-dependent species. Alternative B would also implement habitat treatments to enhance sagebrush habitat for sagebrush-dependent species.

**Special designations.** Alternative B would maintain the four existing WSAs (27,700 acres) and designate nine ACECs (34,500 acres). For WSRs, Alternative B is divided into Alternative B1 and Alternative B2. Under Alternative B1, the BLM would find four segments suitable for inclusion in the NWSRS, including two segments of Deep Creek (4.5 miles, all on BLM) and two segments of the Colorado River between the CRVFO boundary near State Bridge and Glenwood Springs (61.1 miles total, 30.7 miles on BLM). Under Alternative B2, the BLM would defer a determination of suitability and would recommend adopting and implementing the Stakeholder Management Plan to protect the free-flowing nature, outstanding remarkable values, and tentative classifications on the Colorado River segments.

### 2.4.3 Alternative C

Alternative C emphasizes protecting resource values and sustaining or restoring the ecological integrity of habitats for all priority plant, wildlife, and fish species, particularly the habitats needed for conserving and recovering listed, proposed, or candidate threatened or endangered plant and animal species. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations.

The appropriate mix of uses on BLM lands and mineral estate would be based on minimizing site specific types and levels of human disturbances to natural and cultural resources. Management direction would generally be ecologically based; existing uses would be recognized but would likely be limited to ensure the protection of natural and cultural values, including intangible Native American landscape values encompassing plant communities, wildlife, viewsheds, air, and water. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, and livestock grazing) are contingent on meeting the essential conditions of natural and heritage resources.

Table 2-1 summarizes proposed decisions, Table 2-2 includes details of all proposed decisions, and Appendix B describes stipulations for oil and gas leasing and surface-disturbing activities. Key components of Alternative C are as follows:

**Lands with wilderness characteristics.** All lands with wilderness characteristics (LWCs) outside WSAs would be managed to protect those characteristics, using the management settings and prescriptions presented

in Appendix F. The total area of LWCs to be managed in this way is 47,000 acres. No other alternative includes management specifically to preserve wilderness character outside the WSAs.

**Recreation demand and uses.** Recreation opportunities would be emphasized under Alternative C in concert with sustaining the biological integrity of habitats for plants, wildlife, and fish species. Recreation may be limited in ecologically sensitive areas. Recreation and visitor services management would be recognized as the primary land use in the Red Hill SRMA and the Upper Colorado River SRMA. In turn, Alternative C would include the designation of nine ERMAs (Eagle River Fisher Creek, Hardscrabble/East Eagle, New Castle, Silt Mesa, Thompson Creek, Hack Lake, King Mountain, and The Crown), the most among the four alternatives analyzed. At these ERMAs, the principal recreation activities, current recreation demand, and existing recreation facilities would be given specific management consideration commensurate with the management of other resources.

**Energy development.** Alternative C would include designation of 531,500 acres as open to oil and gas exploration and development. Oil and gas activities on BLM lands or associated with federal mineral estate would be managed using a variety of NSO, CSU, and TL stipulations (Appendix B) and COAs to ensure that exploration and development are conducted in an environmentally responsible manner. Restrictions on oil and gas leasing and development under this alternative would be intermediate between Alternatives B and D.

The BLM would manage (with adequate rules, regulations, agreements, and stipulations) the exploration of oil and gas and mineral resources in high-potential areas through the extensive application of stipulations, such as NSOs and TLs (Appendix B) applied to energy development. Such stipulations would be aimed at maximum conservation of the relatively unmodified physical landscapes, the essential conditions of natural and cultural resources, and compatibility with adjacent land uses. Under Alternative C, additional areas would be administratively closed to energy development to emphasize resource conservation and protection, particularly for wildlife, special status species, vegetation, soils, air quality, and riparian areas, while providing opportunities for energy development.

**Fish and wildlife (including special status species).** Fish and wildlife species, including special status species, would be managed with an emphasis on proactively identifying, protecting, and improving habitats, such as sensitive and crucial wildlife habitat. Management would also protect and improve priority habitat, winter range (quantity and quality), and core wildlife areas. Parts of core wildlife areas would be closed or major (NSO) constraints would be applied to fluid minerals leasing. Protection of tributary watersheds, fish-bearing streams, streamflows, riparian areas, and habitat connections and migration corridors would be maximized. Development would be limited in, and seasonal restrictions would be applied to, winter range.

**Sagebrush habitat and sagebrush-dependent species.** The BLM would proactively identify, protect, and improve wildlife habitat, including treatments for the benefit of sagebrush-dependent species, particularly in areas identified as historical habitats. Alternative C would include establishing reference areas to use as control groups for evaluating management activities in sagebrush habitat.

**Special designations.** Alternative C would maintain the four existing WSAs (27,700 acres) and designate 16 ACECs (65,800 acres). All 26 eligible stream segments (143 miles total, 88.1 miles on BLM) would be found suitable for inclusion in the NWSRS. This total includes 13 eligible segments in the Roan Plateau planning area.

### 2.4.4 Alternative D

The appropriate mix of uses on BLM lands and mineral estate would be based on making the most of resources that target social and economic outcomes, while protecting land health. Management direction would recognize and expand existing uses and would accommodate new uses to the greatest extent possible. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, communication sites, and livestock grazing) would emphasize maximizing resource production in an environmentally responsible manner, while maintaining the basic protection needed to sustain resources.

Table 2-1 summarizes proposed decisions, Table 2-2 includes details of all proposed decisions, and Appendix B describes stipulations for oil and gas leasing and surface-disturbing activities. Key components of Alternative D are as follows:

**Recreational demand and uses.** Alternative D would emphasize managing BLM lands in a manner that would accommodate recreation uses in combination with other BLM land uses. Alternative D would include the designation of seven SRMAs (Bocco Mountain, Fisher Creek, Hardscrabble/East Eagle, Red Hill, The Crown, Thompson Creek, and the Upper Colorado River) where recreation opportunities are recognized as a primary management consideration due to their unique value, importance and/or distinctiveness. Alternative D would also designate five ERMAs (Eagle River, Hack Lake, King Mountain, New Castle, and Silt Mesa) where the principal recreation activities, current recreation demand, and existing recreation facilities would receive specific management consideration commensurate with the management of other resources.

**Energy development.** Alternative D would include designation of 658,200 acres as open to oil and gas exploration and development. Oil and gas activities on BLM lands or associated with federal mineral estate would be managed using a variety NSO, CSU, and TL stipulations (Appendix B) and COAs to ensure that exploration and development are conducted in an environmentally responsible manner. In general, fewer restrictions would be placed on oil and gas leasing and development than under the other action alternatives.

**Fish and wildlife (including special status species).** Alternative D would continue to manage fish and wildlife (including special status species) with an emphasis on protecting crucial habitat, including protecting streamflows and riparian areas.

**Sagebrush habitat and sagebrush-dependent species.** Fewer restrictions would be placed on uses in sagebrush habitat than under Alternatives B and C.

**Special designations.** Alternative D would maintain the four existing WSAs (27,700 acres) and designate three ACECs (20,200 acres). No segments eligible for inclusion in the NWSRS would be found suitable for congressional designation. Alternative D would not include special management for LWCs.

### 2.4.5 Components of Alternatives

Decisions in RMPs guide future land management actions and subsequent site-specific implementation decisions. The RMP decisions establish goals and objectives (desired outcomes) for resources and resource uses and the allowable uses and management actions needed to achieve those goals and objectives. The goals are the same across all alternatives, but objectives may vary for key issues. This may result in different allowable uses and management actions across alternatives for many resources and resource uses.

More specifically, desired future conditions or desired outcomes are stated as goals and objectives. Goals are broad statements of desired outcomes (RMP-wide and resource or resource-use specific) and generally are not quantifiable or measurable. Objectives are more specifically desired conditions or outcomes to meet the resource/resource use goal. For key issues, objectives are different across alternatives; for other issues, objectives can be the same or different across alternatives.

Management actions and allowable uses are designed to achieve the objectives. Management actions include management measures that will guide future and day-to-day activities. Allowable uses indicate which uses are allowed, restricted, or prohibited and may include stipulations. Allowable uses also identify lands where specific uses are excluded to protect resource values, or where certain lands are open or closed in response to legislative, regulatory, or policy requirements.

Implementation decisions generally constitute site specific, on-the-ground actions and are not addressed in the RMP revisions, with the exception of travel management decisions and a few others.

### 2.4.6 Management Common to All Alternatives

Some of the allowable uses and management actions in this draft RMP/EIS are carried forward from the existing RMPs (Alternative A) because there is no impending concern associated with them or they do not need to change. These decisions are common to all four alternatives because a range of alternative decisions is not necessary for every resource or resource use. Other decisions are common to all action alternatives (Alternatives B, C, and D) only. Each alternative emphasizes a slightly different mix of resources and resource uses, but many similarities exist.

All alternatives contain the following common elements:

- Comply with state and federal laws, regulations, policies, and standards, including the multiple use mandates of FLPMA.
- Conduct implementation actions (day-to-day management, monitoring, and administrative functions) that stem directly from regulations, policy, and law, which are considered in conformance with the RMP alternatives and are not specifically addressed in the alternatives.
- Provide for human safety and property protection from wildfire.
- In limited travel areas, designate specific routes for motorized, mechanized, and non-motorized/non-mechanized use.
- Incorporate Colorado Standards for Public Land Health (BLM 1997a) as goals in the alternatives.
- Authorize livestock grazing in a manner consistent with Colorado Standards for Public Land Health and Guidelines for Livestock Management (BLM 1997a).
- Sustain habitat in sufficient quantities and quality for viable plant, fish, and wildlife populations.
- Include protective measures that minimize air and water pollutants.
- Adhere to the Colorado Department of Public Health and Environment's (CDPHE) Air Quality Control Commission Regulations (CDPHE 2008a), as required by law, to ensure that the Clean Air Act is not violated. Special requirements to alleviate air quality impacts are included on a case-by-case basis in use authorizations (including lease stipulations) within the scope of BLM's authority.

- Facilitate orderly, economic, and environmentally sound energy development. Develop natural gas resources in the CRVFO's Lower Colorado River area (Figure 3-1, Appendix A) under existing lease terms and conditions (e.g., NSO, TL).
- Continue to manage WSAs in compliance with the BLM's interim management policy (BLM Handbook 8550-1, Interim Management Policy for Lands under Wilderness Review [BLM 1995]).
- Offer a diversity of recreation opportunities that foster outdoor lifestyles and that add to people's quality of life.
- Conserve key scenic vistas that communities and visitors value.
- Provide some sustainable forest and woodland products, while maintaining landscape diversity and ecosystem integrity.
- Apply conditions of approval, best management practices, and other site specific mitigation (e.g., recreation guidelines) to all resource uses .
- Apply conditions of approval, best management practices, and other site specific mitigation to minimize erosion, encourage rapid reclamation, retain soils using stormwater mitigation practices, maintain soil stability, and support resources.
- Collaborate with adjacent landowners, federal and state agencies, tribes, communities, other agencies, and other individuals and organizations as needed to attain and monitor water quality standards and to provide source water protection.
- Participate in partnerships and communicate with other agencies and interested parties (e.g., Habitat Partnership Program, Rocky Mountain Elk Foundation, Ducks Unlimited, Trout Unlimited, CDOW, USFWS, and the USFS). Apply Suggested Practices for Raptor Protection on Power Lines: the State of the Art in 2006 (Avian Power Line Interaction Committee 2006) and Avian Protection Plan Guidelines (Avian Power Line Interaction Committee and USFWS 2005) for new power line construction (including upgrades and reconstruction) to prevent raptor electrocution.
- BLM has the discretion to modify surface operations to change or add specific reasonable mitigation measures when supported by scientific analysis and consistent with lease rights. All mitigation/conservation measures not already required as stipulations would be analyzed in a site-specific NEPA document, and be incorporated, as appropriate, into conditions of approval of the permit, plan of development, and/or other use authorizations.

In addition to these common elements, Table 2-2, Descriptions of Alternatives A, B, C, and D (at the end of this chapter) includes allowable uses and management actions common to all four alternatives. These are shown as one common cell across a row of the table.

### *Adaptive Management*

The systematic process of adaptive management (planning, implementation, monitoring, and evaluation) would be used to determine the success of management actions in achieving objectives, as described in the alternatives, and would be conducted within the framework of the RMP. Adaptive management would be guided by Adaptive Management, the US Department of the Interior Technical Guide (Williams et al. 2007). The RMP revisions are based on current scientific knowledge and best available data. To be successful, the implementation of the RMPs must have the flexibility to adapt and respond to new information. Under the concept of adaptive management, new information or changing conditions would be evaluated and a decision

would be made as to whether to make implementation adjustments or changes. The adaptive management approach enables resource managers to determine how well implementation actions achieve the objectives and what steps are needed to modify or cease implementation to increase success or improve results.

## 2.5 ALTERNATIVES CONSIDERED BUT ELIMINATED FROM DETAILED ANALYSIS

The alternatives that follow were eliminated from detailed study because they did not meet the purpose of and need for the RMP (Section 1.2) or because they were outside the technical, legal, or policy constraints of developing an RMP for BLM land resources and resource uses.

### 2.5.1 Implement Exclusive Use or Protection

Some alternatives and general management options were not considered, specifically those that proposed exclusive use or maximum development, production, or protection of one resource at the expense of other resources or resource uses. FLPMA mandates the BLM to manage its lands for multiple use and sustained yield. This eliminates such alternatives as closing all BLM lands to grazing (discussed further in Section 2.5.7) or oil and gas leasing, or managing those lands only for fish, wildlife, and wilderness values, to the exclusion of other resource considerations. In addition, resource conditions do not warrant planning area-wide prohibition of any particular use. Alternatives eliminating traditional uses, where resource conditions do not justify such measures, are not reasonable. Each alternative considered allows for some level of support, protection, or use of all resources in the planning area. In some instances, the alternatives analyzed in detail do include various considerations for eliminating or maximizing individual resource values or uses in specific areas where conflicts exist.

### 2.5.2 Designate Entire Decision Area as either Open or Closed to Off-Highway Vehicle Use

Considered but dismissed were suggestions to designate all areas on BLM lands as entirely open for yearlong OHV use, without regard to current travel restrictions, or to close areas entirely to OHV use. Management of BLM lands not only requires implementing restrictions to address travel concerns and recreation demands, but it also requires protecting resource values. In addition, the BLM concluded that the current level of open, closed, or limited OHV areas would be used as a baseline for comparing alternatives.

Having an alternative entirely open to OHV use, or entirely closed to OHV use, would be inconsistent with the National OHV Strategy (BLM 2001) incorporated here by reference. The National OHV Strategy recognizes that OHV use is an acceptable use of public land wherever it is compatible with established resource management objectives. While allowing this acceptable use of BLM-administered lands, it is also the responsibility of the BLM to ensure that these lands are preserved and conserved for future generations.

As established by the Federal Land Policy and Management Act of 1976 (FLPMA), the BLM is required to manage the public lands on the basis of multiple use and sustained yield, while protecting natural values.

### 2.5.3 Undertake Partial Implementation of the RMP

Alternatives that would focus on only a few issues or that otherwise would result in partial implementation of the RMP were considered but eliminated from detailed study. Preparation and full implementation of the RMP is a BLM requirement, so these alternatives were dismissed as infeasible or impracticable, or they were excluded due to legal insufficiency under BLM requirements.

### 2.5.4 Place Moratorium on Land Exchanges

Placing a moratorium on land exchanges was considered but dismissed. Through FLPMA, Congress determined that land exchanges are an efficient land management tool to consolidate land ownership, as long as individual exchanges are determined to be in the public interest and are done with regulatory constraints.

### 2.5.5 Designate Additional Wilderness Study Areas

Designation of additional WSAs is not being considered in the alternatives because BLM's authority for establishing WSAs ended in 1993. The BLM has the ability to determine if wilderness characteristics are present outside existing WSAs. Appendix D, Draft Wilderness Characteristics Assessments, includes results of BLM's inventory of these non-WSA lands for wilderness character. Values associated with solitude, primitive recreation, and naturalness are considered with all other resources and resource uses. Areas where wilderness character was not found were not brought forward for analysis (see Appendix D, Draft Wilderness Characteristics Assessments). Plan alternatives may include allocations and actions that protect these values.

### 2.5.6 Revoke Withdrawals of Oil Shale Resources on BLM Lands

Decisions related to oil shale leasing are tiered to the Oil Shale and Tar Sands RMP Amendments to Address Land Use Allocations in Colorado, Utah, and Wyoming and Programmatic Environmental Impact Statement (BLM 2007h), incorporated here by reference. Therefore, these decisions are not considered in detail in the alternatives.

### 2.5.7 Close Entire Decision Area to Livestock Grazing

The BLM preliminarily considered including the elimination of any livestock grazing on BLM lands in one alternative. However, this was not analyzed in detail because FLPMA requires the BLM to manage public lands and resources according to the principles of multiple use and sustained yield; Sections 102(7) and 302(A) of FLPMA recognize grazing as a principle use of public lands. Any alternative eliminating this use would be inconsistent with this mandate, as well as Section 102(12) of FLPMA, which directs that public lands be managed in a manner that recognizes the nation's need for domestic food production. The BLM retains discretion to adjust livestock use levels where necessary to protect other resource values and ensure sustainability; therefore, the reduction, modification, or elimination of grazing may be implemented on individual allotments.

An alternative that proposes to make the entire decision area unavailable for grazing would also be inconsistent with the intent of the Taylor Grazing Act, which directs the BLM to provide for livestock use of BLM lands, to adequately safeguard grazing privileges, to provide for the orderly use, improvement, and development of the range, and to stabilize the livestock industry, depending on the public range.

FLPMA requires that public lands be managed on a "multiple use and sustained yield basis" (Sections 302[a] and 102[7]) and includes livestock grazing as a principal or major use of public lands. While multiple use does not require that all lands be used for livestock grazing, complete removal of livestock grazing from the entire decision area would be arbitrary and would not meet the principle of multiple use and sustained yield.

Livestock grazing has been a valid use of the decision area for many years and is a continuing BLM program. Although CEQ's guidelines for implementing NEPA require that agencies analyze the no action alternative in EISs, for the purposes of this NEPA analysis, the no action alternative is to continue current management, which includes livestock grazing. For this reason and those stated above, a no-grazing alternative for the entire decision area has been dismissed from further consideration in this RMP/EIS.

## 2.6 RATIONALE FOR THE IDENTIFICATION OF THE PREFERRED ALTERNATIVE

The draft RMP/EIS presents four different alternatives, which take into consideration comments received by other governmental agencies, public organizations, the state, tribal entities, and interested individuals. Public collaboration through the scoping process shaped issues covering recreation, wildlife, minerals, cultural resources, grazing, land tenure, designation of ACECs, access to public lands, and other topics.

As part of the RMP process, the alternatives evaluated in the draft EIS represent the range of management actions that address issues identified during scoping and that offer a distinct choice among potential management strategies.

The CEQ regulations for implementing NEPA require the lead agency for preparing an EIS to identify the agency's preferred alternative in the draft EIS. The preferred alternative is the alternative that, at this stage, best represents the resolution of planning issues and promotes balanced multiple use objectives. During the public review of the draft EIS, the BLM will ask for comments on what parts of the preferred alternative the public supports and what parts it opposes. After consideration of these comments, the BLM will develop a proposed RMP, to evaluate in the final RMP EIS.

The CRVFO Field Manager is required to recommend to the BLM State Office which of the range of alternatives best represents the basis on which to develop the proposed RMP. As part of the CRVFO's ongoing consultation with cooperating agencies and coordination with the RAC subgroup (See Section 1.7.2 and Chapter 5), the CRVFO Field Manager asked for input on the selection of the preferred alternative for this draft RMP/EIS. The Field Manager, in collaboration with the District Manager of the Northwest District, recommended Alternative B as the preferred alternative.

In developing the range of alternatives, the BLM identified a single alternative (Alternative C) that analyzed the management of all lands identified as having wilderness characteristics outside WSAs to protect their wilderness character (see Appendix F for management and setting prescriptions related to these LWCs). The other alternatives do not provide specific management prescriptions to protect LWCs, but do analyze and disclose the impacts of the proposed resource management prescriptions, uses, and actions on the LWCs. This analysis represents the full spectrum of alternatives for lands with wilderness characteristics and provides the public with an opportunity to compare the consequences of protecting or not protecting all lands identified as having wilderness characteristics. The decision to not incorporate a subset of the LWCs within the CRVFO into the preferred alternative (Alternative B) reflects a lack of consensus among members of the RAC and cooperating agencies regarding which LWCs to include.

In developing the Proposed RMP/Final EIS, the BLM may choose management actions from within the range of the alternatives presented in the Draft RMP/EIS. The analysis in the alternatives regarding lands with wilderness characteristics could support potential modifications to the preferred alternative that provide for protective management for LWCs. The BLM will consider public comments on the Draft RMP/EIS and continuing participation by the RAC and cooperating agencies in determining whether to protect wilderness characteristics in the Proposed RMP/Final EIS, and, if so, whether to apply the protections to all or only some of the identified LWCs.

## 2.7 MANAGEMENT GUIDANCE FOR ALTERNATIVES A, B, C, AND D

Table 2-2, Description of Alternatives A, B, C, and D, describes all decisions proposed for each alternative, including goals and objectives. All decisions in Table 2-2 are land use plan-level decisions, with the exception

of those in the Comprehensive Trails and Travel Management section, which are implementation-level decisions.

The Roan Plateau portion of the planning area is not included in the decisions in Table 2-2, with the exception of the Wild and Scenic Rivers Suitability Report (Appendix C) and associated management guidance.

Stipulation decisions (Appendix B) apply to surface-disturbing activities on lands overlying federal mineral estate, which includes that underlying BLM lands, private lands, and state-owned lands. As such, federal mineral estate acres are greater than BLM surface acres. In the planning area, federal mineral estate totals 707,000 acres.

### 2.7.1   How to Read Table 2-2

Table 2-2 is written and formatted to show the decisions proposed for each alternative, including goals and objectives. Refer to the Diagram 2-1 for an example of how to read Table 2-2.

- In general, only those resources and uses that have been identified as key planning issues have notable differences between the alternatives.

- Actions that are applicable to all alternatives are shown in one cell across a row. These particular objectives and actions would be implemented regardless of which alternative is ultimately selected.

- Actions that are applicable to more than one but not all alternatives are indicated by either combining cells for the same alternatives or denoting those objectives or actions as, for example, the "same as Alternative B."

BLM_0015899

**Diagram 2-1**
**How to Read Table 2-2**

| Alternative A: No Action<br>Theme: Current Management | Alternative B<br>Theme: Mixed Emphasis | Alternative C<br>Theme: Conservation | Alternative D<br>Theme: Resource Use |
|---|---|---|---|
| ***Resources*** | | | |
| *Air* | | | |
| GOAL:<br>No similar goal under current RMP (BLM 1984a). | GOAL:<br>Within the scope of BLM's authority, ensure that air quality and air quality-related values are adequately protected in conjunction with activities or resource uses authorized by the BLM. | | |
| Objective:<br>Limit air quality degradation in the resource area by ensuring that BLM land-use activities are in compliance with Federal, state, and local laws and regulations. | Objective:<br>Control or reduce air pollutants associated with oil and gas activities to help protect human health, conform with the Colorado Regional Haze State Implementation Plan to improve visibility, reduce atmospheric deposition, and reduce greenhouse gas emissions. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Cooperate with the Colorado Department of Public Health and Environment in identifying monitoring needs, as well as in facilitating installation and operation of monitoring equipment on BLM land or in conjunction with BLM-authorized activities. | | |
| Action:<br>Require oil and gas operators to implement twice-daily watering of construction areas and resource access roads used to support construction and drilling operations. Require fugitive dust control plans. | Action:<br>Reduce emissions of fugitive dust by requiring that oil and gas operators implement watering (minimum twice daily during dry conditions) or application of other dust-suppressant agents at construction areas, including access roads used during construction. The authorized officer may direct the operator to change the level and type of dust abatement if the measures being used are insufficient to prevent visible plumes of fugitive dust or deposition of excessive dust on nearby surfaces in conjunction with vehicular traffic, equipment operations, or wind events. Require fugitive dust control plans in conjunction with oil and gas Master Development Plans (MDPs). | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Require that oil and gas operators use gravel (in combination with watering or other dust suppressant as needed), chip-seal, asphalt, or other road-surfacing material to minimize fugitive dust emissions from BLM-authorized access roads ("local" and "resource" roads) during long-term production and maintenance operations. | | |
| Action:<br>Drill rig and frac pump engines would meet Colorado and EPA requirements. | Action:<br>Within one year of the Record of Decision, require that all new and existing drill rig and frac pump engines used on BLM lands or to access federal minerals meet US Environmental Protection Agency Tier 4 Nonroad Diesel Engine Emission Standards or meet equivalent emission standards, regardless of when the engines begin operation. | | Action:<br>Within one year of the Record of Decision, require that all new and existing drill rig and frac pump engines used on BLM lands or to access federal minerals meet US Environmental Protection Agency |

Actions that are applicable to more than one but not all alternatives are indicated by combining cells for the same alternatives.

**Table 2-2**
**Descriptions of Alternatives A, B, C, and D**

The following is an alphabetical, hyperlinked table of contents for Table 2-2, Descriptions of Alternatives A, B, C, and D:

| | | |
|---|---|---|
| AREAS OF CRITICAL ENVIRONMENTAL CONCERN | LANDS WITH WILDERNESS CHARACTERISTICS | VEGETATION - GENERAL |
| AIR | LIVESTOCK GRAZING | VEGETATION - FOREST AND WOODLANDS |
| CAVE AND KARST RESOURCES | LOCATABLE MINERALS, MINERAL MATERIALS, AND NON-ENERGY LEASABLE MINERALS (SOLID MINERALS) | VEGETATION - RANGELAND |
| COAL | PALEONTOLOGY | VEGITATION - RIPARIAN |
| CULTURAL RESOURCES | RECREATION AND VISITOR SERVICES | VEGETATION - WEEDS |
| FISH AND WILDLIFE | SOILS | VISUAL |
| FLUID MINERALS | SPECIAL STATUS SPECIES - PLANTS AND TERRESTRIAL WILDLIFE | WATER |
| FORESTRY | SPECIAL STATUS SPECIES - FISH AND OTHER AQUATIC WILDLIFE | WILD AND SCENIC RIVERS |
| HEALTH AND SAFETY | COMPREHENSIVE TRAILS AND TRAVEL MANAGEMENT | WILDLAND FIRE MANAGEMENT |
| LANDS AND REALTY | TRANSPORTATION AND FACILITIES | WILDERNESS STUDY AREAS |

**Table 2-2** *(continued)*
**Descriptions of Alternatives A, B, C, and D**

| Alternative A: No Action<br>Theme: Current Management | Alternative B<br>Theme: Mixed Emphasis | Alternative C<br>Theme: Conservation | Alternative D<br>Theme: Resource Use |
|---|---|---|---|
| *Resources* | | | |
| ***Air*** | | | |
| **GOAL:**<br>No similar goal under current RMP (BLM 1984a). | **GOAL:**<br>Within the scope of BLM's authority, ensure that air quality and air quality-related values are adequately protected in conjunction with activities or resource uses authorized by the BLM. | | |
| Objective:<br>Limit air quality degradation in the resource area by ensuring that BLM land-use activities are in compliance with Federal, state, and local laws and regulations. | Objective:<br>Control or reduce air pollutants associated with oil and gas activities to help protect human health, conform with the Colorado Regional Haze State Implementation Plan to improve visibility, reduce atmospheric deposition, and reduce greenhouse gas emissions. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Cooperate with the Colorado Department of Public Health and Environment in identifying monitoring needs, as well as in facilitating installation and operation of monitoring equipment on BLM land or in conjunction with BLM-authorized activities. | | |
| Action:<br>Require oil and gas operators to implement twice-daily watering of construction areas and resource access roads used to support construction and drilling operations. Require fugitive dust control plans. | Action:<br>During construction, reduce emissions of fugitive dust by requiring that oil and gas operators implement watering (minimum twice daily during dry conditions) or application of other dust-suppressant agents at construction areas, including access roads used during construction. The authorized officer may direct the operator to change the level and type of dust abatement if the measures being used are insufficient to prevent visible plumes of fugitive dust or deposition of excessive dust on nearby surfaces in conjunction with vehicular traffic, equipment operations, or wind events. Require fugitive dust control plans in conjunction with oil and gas Master Development Plans (MDPs). | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Require that oil and gas operators use gravel (in combination with watering or other dust suppressant), chip-seal, asphalt, or other road-surfacing material to minimize fugitive dust emissions from BLM-authorized access roads ("local" and "resource" roads) during long-term production and maintenance operations. | | |
| Action:<br>Drill rig and frac pump engines would meet Colorado and EPA requirements. | Action:<br>Require that all new drill rig and frac pump engines used on BLM lands or to access federal minerals use natural gas and that all existing drill rig and frac pump enginers are converted to natural gas within 2 years following issuance of the Record of Decision. | | Action:<br>Within one year of the Record of Decision, require that all new and existing drill rig and frac pump engines used on BLM lands or to access federal minerals use natural gas or meet or exceed US Environmental |

<table>
<tr><th>Alternative A: No Action</th><th>Alternative B</th><th>Alternative C</th><th>Alternative D</th></tr>
<tr><td></td><td></td><td></td><td>Protection Agency Tier 2 Nonroad Diesel Engine Emission Standards.<br><br>By 2015, require that all new and existing drill rig and frac pump engines used on BLM lands or to access federal minerals use natural gas.</td></tr>
<tr><td>Action:<br>No similar action under current plan (BLM 1984a).</td><td colspan="3">Action:<br>Require that oil and gas operators use green completions involving recovery and cleanup of natural gas at all federal wells and all private wells drilled from BLM land. An exemption may be granted on a case-by-case basis if the installation of necessary infrastructure is impracticable.</td></tr>
<tr><td>Action:<br>Allow flaring and venting in accordance with Notice to Lessees (NTL-4A).</td><td colspan="3">Action:<br>Require flaring of natural gas during well completions that are exempted from green completion technology on the basis of impracticability. Prohibit venting of natural gas except during emergency situations.</td></tr>
<tr><td>Action:<br>Require that all glycol dehydrators, condensate tanks, and other volatile organic compound emission sources meet applicable Colorado Department of Public Health and Environment Air Quality Control Commission and US Environmental Protection Agency emission standards.</td><td colspan="3">Action:<br>Reduce emissions of volatile organic compounds associated with federal oil and gas wells by requiring that operators install and maintain measures to achieve at least 90 percent control on glycol dehydrator vents and at least 95 percent control on condensate or condensate/produced water tanks.</td></tr>
<tr><td>Action:<br>Require that at least 60 percent of new federal oil and gas pads use pipelines to transfer natural gas and condensate to consolidated facilities for dehydration, temporary storage in tanks, and (for liquids) transfer to trucks for haulage.</td><td colspan="2">Action:<br>Require that at least 90 percent of new federal oil and gas pads use pipelines to transfer natural gas and condensate to consolidated facilities for dehydration, temporary storage in tanks, and (for liquids) transfer to trucks for haulage.</td><td>Action:<br>Require that at least 80 percent of new federal oil and gas pads use pipelines to transfer natural gas and condensate to consolidated facilities for dehydration, temporary storage in tanks, and (for liquids) transfer to trucks for haulage.</td></tr>
<tr><td>Action:<br>Require that at least 60 percent of new federal oil and gas pads use pipelines instead of trucks to convey produced water to consolidated facilities for treatment or transfer to trucks for</td><td colspan="2">Action:<br>Require that at least 90 percent of new federal oil and gas pads use pipelines instead of trucks to convey produced water to consolidated facilities for treatment or for transfer to trucks for haulage.</td><td>Action:<br>Require that at least 80 percent of new federal oil and gas pads use pipelines instead of trucks to convey produced water to consolidated</td></tr>
</table>

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| haulage. | | | facilities for treatment or for transfer to trucks for haulage. |
| Action:<br>Require that engines at field compression facilities meet applicable Colorado Department of Public Health and Environment Air Quality Control Commission regulations and EPA emission standards. | Action:<br>Require that all new and existing natural-gas-fired reciprocating internal combustion engines at BLM-authorized field compression facilities meet Colorado Department of Public Health and Environment Air Quality Control Commission Regulation No. 7, Emission Standards for New and Relocated engines, regardless of when the engines begin operation.<br><br>Require compliance with applicable US Environmental Protection Agency emission standards for all internal combustion engines. | | |
| Action:<br>No similar action under current plan (BLM 1984a). | Action:<br>Require that 100 percent of new compressors at BLM-authorized centralized compression facilities are powered by electricity, including renewable energy sources. | | Action:<br>Require that at least 50 percent of new compressors at BLM-authorized centralized compression facilities are powered by electricity, including renewable energy sources. |
| ***Soils*** | | | |
| **GOAL:**<br>Ensure that upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, landform, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, minimizes surface runoff (Land Health Standard 1), and minimizes soil erosion. | | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Ensure that surface disturbances do not cause accelerated erosion (e.g., rills, soil pedestals, and actively eroding gullies) on a watershed scale (e.g., 6th hydrologic unit code scale). | | |
| Action:<br>Take measures to protect soils in debris-flow hazard zones and erosion hazard areas (see restrictions on use, below). | Action:<br>Require professional geotechnical engineering and reclamation plans meeting the following conditions in areas having soils with severe or very severe erosion hazard based on the US Department of Agriculture, Natural Resources Conservation Service (NRCS) soil survey or onsite inspection:<br>• Restore site productivity.<br>• Adequately control surface runoff.<br>• Protect offsite areas from accelerated erosion such as rilling, gullying, piping, and mass wasting.<br>• Conduct no surface-disturbing activities during periods when soil is saturated.<br>• Prohibit construction when soils are frozen. | | |
| Restrictions on Use:<br>**STIPULATION** GS-NSO-14 (Alternative A) / CRV-NSO-1 (Alternatives B, C, and D): *Debris Flow Hazard Zones.* Prohibit surface occupancy and surface-disturbing activities for the protection of the Glenwood Springs Debris Flow ACEC (Refer to Appendix B.) See Figures 2-1 (Alternative A), 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Restrictions on Use:<br>**STIPULATION** GS-NSO-15: *Steep Slopes Greater than 50 Percent for Oil and Gas Facilities*. Prohibit surface occupancy and surface-disturbing activities on slopes greater than 50 percent. This NSO does not apply to pipelines (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-*NSO-2: Steep Slopes Greater than 50 Percent*. Prohibit surface occupancy and surface-disturbing activities on slopes greater than 50 percent to maintain site stability. (Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |
| Restrictions on Use:<br>**STIPULATION** GS-CSU-4: *Erosive Soils and Slopes Greater than 30 Percent*. Require special design, construction, operation, and reclamation measures to limit the amount of surface disturbance, to reduce erosion potential, to maintain site stability and productivity, and to ensure successful reclamation in identified areas of highly erosive soils and of slopes greater than 30 percent. Highly erosive soils are soils in the "severe" and "very severe" erosion classes based on NRCS Erosion Condition mapping. Areas identified in the RMP as Erosion Hazard Areas and Water Quality Management Areas are also included in this stipulation. Implementation may include relocation of operations beyond 200 meters (656 feet). (Refer to Appendix B.) See Figure 2-5 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-CSU-1: *Slopes Greater than 30 Percent and/or Soils with Very Severe Erosion Hazard*. Apply CSU restrictions on areas steeper than 30 percent and/or areas of very severe erosion hazard regardless of slope, based on the NRCS soil survey. (Refer to Appendix B.) See Figures 2-6 (Alternative B), 2-7 (Alternative C), and 2-8 (Alternative D) in Appendix A. | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Ensure that on a landscape scale (as defined by Land Health Standard 1), canopy cover and ground cover are appropriate for the soil type as based on current guidelines (e.g., NRCS reference sheets, soil surveys). | | |
| Action:<br>Conduct site-specific monitoring (e.g., vegetation transect analysis) in areas identified as not meeting Land Health Standard 1. Where failure is due to unauthorized or undesirable levels of authorized land uses, take corrective actions (e.g., rehabilitation, management changes, and reclamation). | | | |
| ***Water*** | | | |
| **GOAL:**<br>The water quality of all water bodies, including groundwater where applicable, located on or influenced by BLM lands will be managed to achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface water and groundwater include the designated beneficial uses, numeric | | | |

<table>
<tr><th>Alternative A: No Action</th><th>Alternative B</th><th>Alternative C</th><th>Alternative D</th></tr>
<tr><td colspan="4">criteria, narrative criteria, and antidegradation requirements set forth under State law as found in 5 CFR 1002-8, as required by Section 303c of the Clean Water Act.</td></tr>
<tr><td>Objective:<br>Maintain or improve existing water quality throughout the resource area (CRVFO).</td><td colspan="3">Objective:<br>Protect watershed functions to ensure that streams on BLM lands are in geomorphic balance (e.g., stream channel size, sinuosity, and substrate are appropriate for its landscape position and geology) with the water and sediment being supplied by the watershed (e.g., no accelerated erosion, deposition, or head-cutting).</td></tr>
<tr><td>Action:<br>No similar action under current RMP (BLM 1984a).</td><td colspan="3">Action:<br>Improve dysfunctional streams caused by unnatural factors. Modify management practices (e.g., grazing systems, recreational uses) and/or stream restoration techniques (e.g., native plantings, fencing, energy dissipation structures, bank protection, culverts) as appropriate to address causal factors.</td></tr>
<tr><td colspan="4">Restrictions on Use:<br>STIPULATION CRV-NSO-3: Major River Corridors. Prohibit surface occupancy and surface-disturbing activities within 0.5 mile of either side of the high water mark (bank-full stage) of six major rivers: Colorado, Roaring Fork, Crystal, Frying Pan, Eagle, and Piney. (Refer to Appendix B.) See Figures 2-1 (Alternative A), 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A.</td></tr>
<tr><td>Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a).</td><td colspan="2">Restrictions on Use:<br>STIPULATION CRV-NSO-5: Streamside Management Zones. Prohibit surface occupancy and surface-disturbing activities within 50 feet from the ordinary high water mark of any hydrologic feature (i.e., ephemeral, intermittent, perennial channels, wetland, lake, fen, spring) as determined on a case-by-case basis by Geographic Information Systems (GIS) and/or field tools. Distance is horizontal and independent of slope and topographic characteristics. (Refer to Appendix B.) See Figures 2-2 (Alternative B) and 2-3 (Alternative C) in Appendix A.</td><td>Restrictions on Use:<br>No similar restrictions on use.</td></tr>
<tr><td colspan="2">Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a).</td><td>Restrictions on Use: STIPULATION CRV-CSU-2: Hydrologic Features. Apply CSU restrictions within 100 feet from the edge of a hydrologic feature as determined on a case-by-case basis by GIS and/or field tools. Hydrologic features include ephemeral, intermittent, and perennial streams and stream channels; wetlands; lakes; fens; and springs. (Refer to Appendix B.) See Figure 2-7 Appendix A.</td><td>Restrictions on Use:<br>No similar restrictions on use.</td></tr>
</table>

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Objective:<br>Increase water yield throughout the resource area (CRVFO) through forest management practices and vegetation manipulation for livestock and big game forage. | Objective:<br>Provide sufficient water quantity on BLM lands for multiple use management and functioning, healthy riparian, wetland, aquatic, and upland systems. | | |
| Action:<br>File for water rights and water use permits to protect all water uses on BLM lands, as allowed by State water law. Uses for which BLM will apply for water rights will include, but are not limited to, livestock, wildlife watering, wildlife habitat, recreation, and fire suppression. In addition, BLM will make recommendations to the Colorado Water Conservation Board for protection or enlargement of in-streamflows on appropriate stream segments that cross BLM lands. | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Use tools such as land and water acquisitions, realty actions, and cooperative agreements to achieve water management objectives. These include improving streamflows, maintaining minimum pools in reservoirs, and providing public access to water bodies. | | |
| Restrictions on Use:<br>**STIPULATION** GS-NSO-13: *Domestic Watershed Areas*. Prohibit surface occupancy and surface-disturbing activities to protect municipal watersheds providing domestic water for the communities of Rifle and New Castle. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use :<br>**STIPULATION** CRV-NSO-4: *Designated Municipal Watershed Areas*. Prohibit surface occupancy and surface-disturbing activities within municipal watersheds providing domestic water. (Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |
| ***Vegetation – General*** | | | |
| **GOAL:**<br>Maintain healthy, productive plant communities of native and other desirable species at viable population levels commensurate with the potentials for the species and habitats potentials. Ensure that plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations and ecological processes (Land Health Standard 3). | | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| ***Vegetation – Forest and Woodlands*** | | | |
| Objective:<br>Provide intensive management on forestlands growing commercial species (lodgepole pine, Engelmann spruce, or Douglas-fir) on productive growing sites (producing 20 cubic feet of wood fiber per acre per year) on lands not withdrawn for other resource needs.<br>Provide limited management on woodlands or non-commercial species (pinyon, juniper, ponderosa pine, subalpine fir, or aspen) or on sites producing less than 20 cubic feet of wood fiber per acre per year. | Objective:<br>Manage lodgepole pine and aspen on an even-aged basis to transition from homogeneous stands of over-mature aspen and lodgepole pine to create a more diverse age class structure across the landscape. Manage other species (e.g., pinyon, juniper, Engelmann spruce, Douglas-fir, subalpine fir, limber pine) on an uneven-aged basis to mimic natural stand conditions and natural regeneration processes. | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Identify areas for current or potential old-growth conditions based on structure and composition across the landscape. Old-growth forest stands are composed of trees that are generally in the late successional stages of development. The desired attributes of old-growth stands are older, large trees for the species and site; signs of decadence (broken or deformed tops or boles and some root decay); multiple layers of canopy; standing and down dead trees; a variation in tree age, size, and spacing; and gaps or patchiness in the canopy and understory. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Maintain or contribute toward the restoration or development of old-growth structure and composition (primarily stands of spruce/fir, pinyon, juniper, and Douglas-fir) in areas where forest treatments under the Healthy Forest Restoration Act are proposed. Retain stands with old-growth characteristics such as, but not limited to, large trees, down and standing dead trees, and multiple canopy layers. | | |
| ***Vegetation – Rangeland*** | | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Manage sagebrush steppe where needed to transition from homogeneous stands of old sagebrush to create a more diverse age class structure across the landscape and to improve diversity and cover of understory species. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Achieve diversity of age class in sagebrush communities by using treatments (mechanical, chemical, biological, and prescribed fire and natural fire managed for resource benefits). | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Reduce encroachment of pinyon, juniper and other woody species in sagebrush steppe. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Manage mountain shrub communities to improve composition and structure and to increase bitterbrush and mountain-mahogany. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Use vegetation manipulation (mechanical, biological, and chemical treatments), fencing, seeding, prescribed fire and natural fire managed for resource benefits, and use restrictions to accomplish mountain shrub management objectives. | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Manage salt-desert shrub communities to improve vigor and composition of shrubs, diversity and cover of native understory species, and cover by microbiotic crust. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Use vegetation manipulation (mechanical, biological, and chemical treatments), fencing, seeding, prescribed fire and natural fire managed for resource benefits, and use restrictions to accomplish salt-desert shrub management objectives. Prioritize treatments to target cheatgrass infestations. | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Manage native grasslands to maintain ecological functions. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Use vegetation manipulation (mechanical, biological, and chemical treatments), fencing, seeding with native species, prescribed fire and natural fire managed for resource benefits, and use restrictions to accomplish native grassland management objectives. | | |
| Action:<br>Seed areas receiving moderate to high soil disturbance during treatment or an understory ground cover less than 10 percent with a mixture of grass, forb, and browse species. | Action:<br>Use restoration techniques, including but not limited to revegetation, fertilization, and/or soil amendments (such as those identified in CRVFO interim or long-term restoration plans or BMPs [Appendix G, Best Management Practices and Standard Operating Procedures]) to rehabilitate disturbed or degraded rangeland plant communities. | | |
| ***Vegetation – Riparian*** | | | |
| Objective:<br>Ensure that riparian systems associated with both running and standing water function properly and have the ability to recover from major disturbances such as fire, severe grazing, or 100-year floods. Ensure that riparian vegetation captures sediment and provides forage, habitat, and biodiversity; water quality is improved or maintained; and stable soils store and release water slowly (Land Health Standard 2). | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Manage for riparian/wetland values using management actions for improvement or protection. These actions may include, but are not limited to, implementing grazing management actions (e.g., adjusting livestock numbers, distribution, season of use, duration of use), plantings, recreation restrictions, structures (e.g., fencing), and upland water developments. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Restrictions on Use:<br>**STIPULATION** GS-NSO-2: *Riparian and Wetland Zones*. Prohibit surface occupancy and surface-disturbing activities within riparian vegetation. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>No similar restrictions on use. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-6: *Riparian and Wetland Zones*. Prohibit surface occupancy and surface-disturbing activities within riparian/wetland vegetation. (Refer to Appendix B.) See Figure 2-3 in Appendix A. | Restrictions on Use:<br>No similar restrictions on use. |
| Restrictions on Use:<br>**STIPULATION** GS-CSU-2: *Riparian/Wetland Vegetation Zones (500 feet of Outer Edge)*. Within 500 feet of the outer edge of the riparian or wetland vegetation, surface-disturbing activities may require special design, construction, and implementation measures, including relocation of operations beyond 200 meters (656 feet). The actual required measures will be based on the purpose, nature, and extent of the disturbance, the affected wetland/riparian area and values, and the feasibility of relocating the project. (Refer to Appendix B.) See Figure 2-5 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-CSU-3: *Riparian/Wetland Vegetation Zones (within Riparian/Wetland Area and within 500 feet of Outer Edge)*. Within the riparian/wetland area and within 500 feet of riparian/ wetland vegetation, surface-disturbing activities may require special design, construction, and implementation measures, including relocation of operations beyond 200 meters (656 feet). The actual required measures will be based on the purpose, nature, and extent of the disturbance, the affected wetland/riparian area and values, and the feasibility of relocating the project. (Refer to Appendix B.) See Figures 2-6 (Alternative B), 2-7 (Alternative C) and 2-8 (Alternative D) in Appendix A. | Restrictions on Use:<br>Same as Alternative B. | Restrictions on Use:<br>Same as Alternative B. |
| ***Vegetation – Weeds*** | | | |
| Objective:<br>Prevent the establishment of, treat existing, and reduce/slow the spread of noxious and invasive weeds across landscape and ownership boundaries. | | | |
| Action:<br>Promote weed awareness and preventative behavior through public contact, volunteer programs, and educational materials (e.g., weed identification brochures, Tread Lightly program). | | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Action:<br>Focus on areas of new infestations and, where possible, extirpate existing populations within priority treatment areas, which include the following:<br>• Disturbed areas (e.g., oil and gas and other mine development, burned areas, new road construction)<br>• ACECs<br>• Special status species habitat<br>• Riparian areas<br>• Springs/seeps<br>• Developed recreation sites, campgrounds, and campsites<br>• Roads and trails<br>• Wildland-urban interface<br>• Big game winter range | | | |
| Action:<br>Use appropriate integrated vegetation treatments (e.g., chemical, mechanical, prescribed fire and natural fire managed for resource benefits, biological) for the control of invasive/noxious weeds. Use of herbicides would be consistent with current local, state, and BLM policy. | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Treat monocultures of cheatgrass and other exotic communities through prescribed grazing and chemical, biological, and mechanical treatment methods where eradication is possible. Establish desired vegetation by seeding. | | |
| Action:<br>Hold project proponents, including livestock operators, rights-of-way holders, and other permittees deemed necessary by the Authorized Officer, responsible for monitoring and controlling noxious weeds that result from any new facilities, improvements or other surface disturbances authorized on BLM land (e.g., roads, communication sites, pipelines, stock ponds, fences). | | | |
| Action:<br>Lease Notice GS-LN-1: *Annual Report of Weed Control and Reclamation Progress*. All lessees in the CRVFO are required to report to the Authorized Officer annually on the ongoing progress of reclamation and the status of weeds and weed control at locations developed on the lease. (Refer to Appendix B.) | | | |
| ***Fish and Wildlife*** | | | |
| **GOAL:**<br>Maintain healthy, productive plant and animal communities of native and other desirable species at viable population levels commensurate with the species' and habitats' potential. Ensure that plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations and ecological processes (Land Health Standard 3). | | | |
| ***Fisheries and Other Aquatic Wildlife*** | | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>In addition to providing for a wide variety of aquatic species, maintain and improve the portion on BLM lands of the priority habitat requirements for the following highly | Objective:<br>Same as Alternative B. | Objective:<br>In addition to providing for a wide variety of aquatic species, maintain the portion on BLM lands of the priority habitat requirements for the following highly valued species |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| | valued species *(priority as recognized for at least one factor such as density, diversity, size, public interest, remnant character, or age)*:<br>• Coldwater sport fishes, including rainbow, brown, brook, and nonnative cutthroat trout species (any species of cutthroat trout other than Colorado River or greenback cutthroat, which are addressed in the Special Status Species section [e.g., Yellowstone and Snake River cutthroat trout]).<br>• Colorado River Basin native fishes, excluding special status species and including mountain whitefish, mountain sucker, speckled dace, mottled sculpin, and Paiute sculpin.<br><br>*Note for Alternatives B, C, and D: Habitat standards and desired fisheries population levels are determined in some cases by species-specific plans/strategies (e.g. BLM strategic plans, CDOW Strategic Plans, or USFWS) and commensurate with BLM public land health standards.* | | *(priority as recognized for at least one factor such as density, diversity, size, public interest, remnant character, or age)*:<br>• Coldwater sport fishes, including rainbow, brown, brook, and nonnative cutthroat trout species (any species of cutthroat trout other than Colorado River or greenback cutthroat, which are addressed in the Special Status Species section [e.g., Yellowstone and Snake River cutthroat trout]).<br><br>*Note for Alternatives B, C, and D: Habitat standards and desired wildlife population levels are determined in some cases by species-specific plans/strategies (e.g. BLM strategic plans, CDOW Strategic Plans, or USFWS) and commensurate with BLM public land health standards.* |
| **Common to All Fisheries** | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Designate the following as priority habitats: perennial water sources (streams, rivers, lakes, ponds, springs, seeps, wetlands, wet meadows, bogs, and fens), riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters. | Action:<br>Designate the following as priority habitats: perennial water sources (streams, rivers, lakes, ponds, springs, seeps, wetlands, wet meadows, bogs, and fens), riparian areas, intermittent streams and ponds, ephemeral waters, and upland habitats within the drainage area of live water. | Action:<br>Designate the following as priority habitats: perennial water sources (streams, rivers, lakes, ponds, springs, seeps, wetlands, wet meadows, bogs, and fens) and riparian areas. |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Identify limiting habitat factors based on site characteristics and habitat capabilities using channel type and geology classifications (e.g., Rosgen). Upon identification of limiting factors, prioritize and fix those that can be fixed using proven river, stream, lake, and riparian methodologies (e.g., in-channel habitat structures to create pools, riparian plantings, tamarisk removal), or by changing management of other program activities (e.g., changing livestock grazing season use) to achieve desired future condition. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Identify in-channel features (e.g., culverts, water diversion structures) that block aquatic organism movement and/or impair stream connectivity and replace, modify, or remove these impediments as they are identified and as opportunities allow. Consider and address aquatic organism passage and appropriate life-stage requirements when designing new or modifying existing stream crossings. Where in-channel barriers are needed to protect native fish species from competitive species and/or disease vectors, consider placement in coordination with CDOW Aquatic Biologists and BLM staff. | | Action:<br>Identify in-channel features (e.g., culverts, water diversion structures) that block aquatic organism movement and/or impair stream connectivity and replace, modify, or remove these impediments as they are identified and as opportunities allow. Where in-channel barriers are needed to protect native fish species from competitive species and/or disease vectors, consider placement in coordination with CDOW Aquatic Biologists and BLM staff. |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-NSO-15: *Fish-Bearing Streams*. Prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of all fish-bearing streams. On streams where the riparian corridor width is greater than 100 meters (328 feet) from the stream edge, prohibit surface occupancy and surface-disturbing activities within the riparian zone. (Refer to Appendix B.) See Figure 2-2 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-16: *Perennial Waters*. Prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of perennial waters. On perennial waters where the riparian corridor width is greater than 100 meters (328 feet) from the stream edge, prohibit surface occupancy and surface-disturbing activities within the riparian zone. (Refer to Appendix B.) See Figure 2-3 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-CSU-6: *Trout-Bearing Streams*. Apply CSU restrictions within 100 meters (328 feet) of all trout-bearing streams, except those containing conservation or core conservation populations of Colorado River cutthroat trout or occupied habitat of greenback cutthroat trout (refer to NSO in Special Status Species section). On streams where the riparian corridor width is greater than 100 meters (328 feet) from the stream edge, prohibit surface use within the riparian zone. (Refer to Appendix B.) See Figure 2-8 in Appendix A. |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Restrictions on Use:<br>**STIPULATION** GS-NSO-5: *Rifle Falls and Glenwood Springs Fish Hatcheries*. Prohibit surface occupancy and surface-disturbing activities within a 2-mile radius of the hatcheries to protect the quality and quantity of surface water and underground aquifers supplying the Rifle Falls (and Glenwood Springs (State Fish Hatcheries. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-17: *Fish Hatcheries*. Prohibit surface occupancy and surface-disturbing activities within the watershed upstream of fish hatcheries to protect the quality and quantity of surface water and underground aquifers supplying the hatcheries. This stipulation applies to activities with the potential to adversely affect the quality or quantity of surface water and groundwater sources for the hatcheries. Existing hatcheries include Rifle Falls and Glenwood Springs State Fish Hatcheries. (Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |
| **Coldwater Sport and Native Fish (e.g., Brown, Brook and Rainbow Trout; Nonnative Cutthroat Trout, Mountain Whitefish, Mottled and Paiute Sculpin)** | | | |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-TL-7: *Coldwater Sport and Native Fish (brown, brook, rainbow, and nonnative cutthroat trout, mountain whitefish, mottled sculpin)*. Prohibit in-channel stream work in all occupied trout streams during appropriate spring and fall spawning periods of March 1 to August 1 for rainbow and cutthroat trout and October 1 to November 30 for brown and brook trout to protect redds (egg masses) and emerging fry. (Refer to Appendix B.) See Figures 2-10 (Alternatives B and C), and 2-11 (Alternative D) in Appendix A. | | |
| ***Terrestrial Wildlife*** | | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>In addition to providing habitat for a wide variety of species; maintain and improve the share on BLM lands of habitat requirements for the following priority species (as recognized for at least one factor such as density, diversity, size, public interest, remnant character, or age):<br>• Big game ungulates<br>• Greater sage-grouse<br>• Migratory birds, including birds of conservation concern<br>• Cavity-nesting species<br>• Raptors<br>• Waterfowl and shorebirds | | |
| Action:<br>Allow introduction, translocation, transplantation, restocking, augmentation, and reestablishment of native and naturalized fish and wildlife species in cooperation with CDOW and/or USFWS, subject to the guidance provided by BLM's 1745 policy and by existing or future memorandums of understanding with CDOW. | | | |
| Action:<br>Lease Notice GS-LN-2: *Biological Inventories*. In areas of known or suspected habitat of special status species, or habitat of other species of interest, such as raptor nests, elk calving areas, or significant natural plant communities, require a biological inventory before approval of operations. The inventory would be used to prepare mitigating measures to reduce or avoid the impacts of surface disturbance on the affected species or their habitats. These mitigating measures may include, but are not limited to, relocating roads, well pads, pipelines, and other facilities, and fencing operations or habitat. (Refer to Appendix B.) | | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Action:<br>Lease Notice GS-LN-5 (Alternative A) / CRV-LN-3 (Alternatives B, C, and D): *Working in Big Game Winter Range*. Require operators to implement specific measures to reduce or avoid the impacts of oil and gas operations on wildlife and wildlife habitat within high-value or crucial big game winter range. (Refer to Appendix B.) | | | |
| Action:<br>Lease Notice GS-LN-6 (Alternative A) / CRV-LN-2 (Alternatives B, C, and D): *Working in High-Value Wildlife Habitat*. Require the operator to establish a set of reasonable operating procedures for employees and contractors working in high-value wildlife habitats. These areas include, but are not limited to, special status-species habitat, severe big game winter range, moose priority habitat, and migration corridors. Such procedures would be designed to inform employees and contractors of ways to minimize the effect of their presence on wildlife and wildlife habitats. Procedures might address items such as working in bear country, controlling dogs, and understanding and abiding by hunting and firearms regulations. (Refer to Appendix B.) | | | |
| **Big Game Ungulates** | | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Minimize big game stress and disturbance from surface occupancy and surface-disturbing activities on winter ranges, winter concentration areas, severe winter ranges, migration corridors, and birthing areas. | | |
| Action:<br>Protect wintering big game species by closing the following areas to motorized travel from December 1 to April 30:<br><br>• Black Mountain–Winter Ridge<br>• Bocco Mountain<br>• Boiler–East Elk Creek<br>• Boore Flat–Domantle<br>• Cottonwood Creek<br>• Haff Pasture portion of Fisher Creek<br>• Flatiron Mesa<br>• Light Hill<br>• Pisgah Mountain–Windy Point<br>• Red Canyon–Hells Pocket<br>• Red Hill SRMA (also closed to mechanized travel)<br>• The Crown<br><br>Under mild winter conditions, the last 60 days of the seasonal limitation period may be suspended after consultation with CDOW. | Action:<br>Protect wintering big game species by closing the following areas to motorized and mechanized travel from December 1 to April 15:<br><br>Same areas as Alternative A, plus the following:<br>• Dry Rifle Creek<br>• Hardscrabble<br>• New Castle<br>• Old Man's Gulch<br>• Thompson Creek/Holgate Mesa<br>• Triangle Peak<br>• Williams Hill<br><br>Under mild winter conditions, the last 60 days of the seasonal limitation period may be suspended after consultation with CDOW.<br><br>Under severe winter conditions, the limitation period may be extended if | Action:<br>Protect wintering big game species by closing the following areas to motorized and mechanized travel from December 1 to April 15:<br><br>Same areas as Alternative B, plus the following:<br>• Basalt Mountain<br>• Cattle Creek<br>• East Eagle<br>• Red Hill (Gypsum)<br>• The Crown addition in Price Creek and West Sopris Creek<br>• Vulcan<br>• West Rifle Creek<br><br>Under mild and severe winter conditions, same as Alternative B regarding limitation period exceptions. | Action:<br>Protect wintering big game species by closing the following areas to motorized and mechanized travel from December 1 to April 15:<br><br>Same areas same as Alternative A, plus the following:<br>• Dry Rifle Creek<br>• Newcastle<br>• Thompson Creek/Holgate Mesa<br><br>Under mild and severe winter conditions, same as Alternative B regarding limitation period exceptions. |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Under severe winter conditions, the limitation period may be extended if requested by the CDOW. Severity of the winter will be determined on the basis of snow depth, snow crusting, daily mean temperatures, and whether animals are concentrated on the winter range during the winter months. | requested by the CDOW. Severity of the winter will be determined on the basis of snow depth, snow crusting, daily mean temperatures, and whether animals are concentrated on the winter range during the winter months. | | |
| Restrictions on Use:<br>**STIPULATION** TL CO-9: *Big Game Winter Habitat*. Prohibit surface occupancy and surface-disturbing activities from December 1 to April 30 to protect big game (mule deer, elk, pronghorn antelope, and bighorn sheep) winter range, including crucial winter habitat and other definable winter range as mapped by the CDOW. This may apply to sundry notices that require an environmental analysis. See Figure 2-9 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-TL-1: *Big Game Winter Habitat*. Prohibit surface occupancy and surface-disturbing activities from December 1 to April 30 to protect big game (mule deer, elk, moose, pronghorn, and bighorn sheep) winter range, including crucial winter habitat and other definable winter range as mapped by the CDOW. This may apply to sundry notices that require an environmental analysis. See Figures 2-10 (Alternatives B and C) and 2-11 (Alternative D) in Appendix A. | | |
| Restrictions on Use:<br>**STIPULATION** GS-TL-2 (Alternative A) / CRV-TL-2 (Alternatives B, C, and D): *Big Game Birthing Areas*. Prohibit surface occupancy and surface-disturbing activities as follows:<br>• Elk Calving – April 16 to June 30.<br>• Pronghorn Fawning – May 1 to July 15<br>• Rocky Mountain Bighorn Sheep Lambing – May 1 to July 15<br>• Desert Bighorn Sheep Lambing – March 1 to May 1<br>Refer to Appendix B. See Figures 2-9 (Alternative A), 2-10 (Alternatives B and C), and 2-11 (Alternative D) in Appendix A. | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>At the request of CDOW, and with concurrence by the BLM authorized officer, close areas to human activity and dogs on an area-specific basis during severe winter weather conditions as defined by a combination of factors including snow depth, snow crusting, daily mean temperatures (long periods of cold temperatures), and concentrations of animals. | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Minimize habitat loss and fragmentation and maintain habitat connectivity. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-NSO-8: *Core Wildlife Areas*. Prohibit surface occupancy and surface-disturbing activities on core wildlife areas. Core wildlife areas include areas of high habitat value for multiple species including sage-grouse, elk, mule deer, and bighorn sheep. Please note: Core Wildlife Areas are Closed to Leasing for fluid minerals in Alternative C. Core wildlife areas include:<br>• Cottonwood/Eby Creek<br>• Dry Rifle Creek<br>• East Eagle<br>• Fisher Creek<br>• Hernage/Abrams Creeks<br>• Horse Mountain<br>• Light Hill<br>• Main-West Elk Ridge<br>• New Castle North<br>• Old Man's Gulch<br>• Tenderfoot Mesa<br>• The Crown<br>• Thompson Creek - Holgate Mesa<br>• West Elk Ridge<br>• West Rifle Creek<br>• Williams Hill<br>• Winter Ridge- Deer Pen<br>• Wolcott<br>Refer to Appendix B. See Figures 2-2 (Alternative B) and 2-3 (Alternative C) in Appendix A. | | Restrictions on Use:<br>No similar restrictions on use. |
| Restrictions on Use:<br>**STIPULATION** GS-NSO-11: *Nine Wildlife Seclusion Areas*. Prohibit surface occupancy and surface-disturbing activities within seclusion areas that provide high wildlife value: Starkey Gulch, Riley Gulch, Crawford Gulch, Paradise Creek, Coal Ridge, Lower Garfield, Jackson Gulch, Bald Mountain, and Battlement Mesa. (Refer to Appendix B.) See Figure 2-1 in | Restrictions on Use:<br>No similar restrictions on use. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Appendix A. | | | |
| Objective:<br>Protect State Wildlife Areas from unnecessary surface occupancy and surface-disturbing activities. | | | |
| Restrictions on Use:<br>**STIPULATION** GS-NSO-4: *Garfield Creek, Basalt, and West Rifle Creek State Wildlife Areas*. Protect wildlife habitat values for which these areas were acquired by the state, including crucial big game and upland game winter habitat, concentration areas, and riparian values. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-10: *State Wildlife Areas*. Prohibit surface occupancy and surface-disturbing activities on all State-owned Wildlife Areas to protect wildlife habitat values for which these areas were acquired by the state, including crucial big game and upland game winter habitat, concentration areas, and riparian values. (Refer to Appendix B.) See Figure 2-2 in Appendix A. | Restrictions on Use:<br>**CLOSED TO LEASING** for fluid minerals (CRV-CL-2: *State Wildlife Areas*). Prohibit oil and gas leasing on all State-owned Wildlife Areas. (Refer to Appendix B.) See Figure 2-14 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-CSU-4: *State Wildlife Areas*. Apply CSU restrictions to surface-disturbing activities on all State-owned Wildlife Areas to protect wildlife habitat values for which these areas were acquired by the state, including crucial big game and upland game winter habitat, concentration areas, and riparian values. (Refer to Appendix B.) See Figure 2-8 in Appendix A. |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Create optimum winter range and summer/transition habitat conditions for big game, targeting a ratio of 60 percent foraging habitat to 40 percent escape/hiding/thermal/birthing cover. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Implement habitat improvement projects in the mountain shrub community (e.g., chemical, mechanical, prescribed fire and natural fire managed for resource benefits, biological, seeding) to increase the amount of available, palatable, and nutritious forage by setting back succession and creating a diverse age structure of plants throughout the CRVFO. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Reduce encroachment by pinyon, juniper and other woody species into the mountain shrub/sagebrush community type, primarily by mechanical methods. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Stimulate sprouting and regrowth in decadent aspen patches throughout the CRVFO using treatments such as prescribed fire and natural fire managed for resource benefits and mechanical methods. | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Increase the diversity and abundance of grasses and forbs in the understory of transition and winter range habitats for the critical period of late fall through early spring. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Perform habitat treatments (e.g., chemical, mechanical, prescribed fire and natural fire managed for resource benefits, biological) to reduce the canopy cover in mature uniform-aged brush and mature pinyon, juniper and other forest stands throughout the CRVFO. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Reduce habitat fragmentation and restore habitat connectivity on big game winter ranges, winter concentration areas, severe winter ranges, and movement corridors. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Protect big game migration corridors by retaining parcels within migration corridors. (Also see Lands and Realty section) | | Action:<br>No similar action. |
| Action:<br>Increase the permeability of the I-70 corridor for big game migration by providing long-term protection and restoration of wildlife linkages as per "A Landscape Level Inventory of Valued Ecosystem Components" (ALIVE) Memorandum of Understanding. | | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Help achieve CDOW big game population objectives. | | |
| Action:<br>Close routes to motorized use to help keep big game on BLM lands and reduce big game movement to private lands during the big game hunting season.<br>• Portions of Castle Peak accessed by the Stagecoach Trail (#8535) and Domantle Road (#8513) – from October 1 to November 30. | Action:<br>To help keep big game on BLM lands and reduce big game movement to private lands during the big game hunting season, close the following routes to motorized use:<br>• Portions of Castle Peak accessed by the Stagecoach Trail (#8535) and Domantle Road (#8513) – from August 20 to November 30.<br>• All Dry Rifle Creek routes – from October 1 to November 30 (see Comprehensive Trails and Travel Management section and corresponding figures).<br>• All West Rifle Creek routes -- from October 1 to November 30 (see Comprehensive Trails and Travel Management section and corresponding figures). | | Action:<br>Same as Alternative A. |
| **Migratory Birds** | | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Provide healthy and productive habitat for migratory bird species. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Provide healthy and productive habitat as determined by habitat and population standards from sources such as Birds of Conservation Concern Region Plans, State Partners-in-Flight Plans, and State Wildlife Action Plans) for migratory birds and avoid or minimize impacts on migratory birds by incorporating the following measures:<br>• Manage plant communities for a variety of seral stages, structural diversities, and (habitat) patch-sizes capable of supporting diverse and viable migratory bird populations.<br>• Restore, enhance, and maintain riparian and upland habitats. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| | • Conduct habitat-improvement projects.<br>• Apply conditions of approval to all activities that alter vegetation and to the broad use of pesticides in migratory bird habitat during the nesting season. The COA would apply to activities between May 15 and July 15. The COA would consider the scale, type, and duration of the project; species potentially present; weather conditions; elevation and habitat types present; and type of motorized equipment to be used. An exception may be granted if nesting surveys indicate no nesting BCC species within 10 meters of the area to be disturbed. | | |
| **Cavity-nesting Species** | | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Provide healthy and productive habitat for cavity-nesting species. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Broadly manage all forest types to provide an average snag retention density of three snags per acre. | | Action:<br>No similar action. |
| **Raptors** | | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Provide healthy and productive habitat for birds of prey. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Apply *Suggested Practices for Raptor Protection on Power Lines: the State of the Art in 2006* (Avian Power Line Interaction Committee 2006) and *Avian Protection Plan (APP) Guidelines* (Avian Power Line Interaction Committee and USFWS 2005) for new power line construction (including upgrades and reconstruction) to prevent electrocution of raptors. | | |
| Restrictions on Use:<br>**STIPULATION** NSO CO-3 and GS-NSO-7: *Raptors*. Prohibit surface occupancy and surface-disturbing activities within a 0.125-mile radius of a nest site of golden eagles, ospreys, accipiters, buteos, falcons (except kestrels), and owls. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-12: *Raptors (General, not including special status raptor species)*. Prohibit surface occupancy and surface-disturbing activities within a buffer zone centered on a nest site. Buffer widths for non-special status raptors are as follows:<br>• 0.25 mile – golden eagle, osprey, sharp-shinned hawk, Cooper's hawk, Swainson's hawk, red-tailed hawk, all owls<br>• 0.5 mile – prairie falcon, northern goshawk<br>(Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |
| Restrictions on Use:<br>**STIPULATION** TL CO-18 and GS-TL-6: *Raptors*. Prohibit surface occupancy and surface-disturbing activities from February 1 to August 15 within a 0.25-mile radius of a raptor nest site, including accipiters, falcons (except kestrels), buteos, and owls, to protect nesting | Restrictions on Use:<br>**STIPULATION** CRV-TL-4: *Raptors (0.25-mile buffer species), not including special status raptors*. Prohibit surface occupancy and surface-disturbing activities within a 0.25-mile radius of a nest site during the following periods to protect use of nesting and fledgling habitat:<br>• February 15 to July 15 – red-tailed hawk, all owls<br>• April 1 to July 15 – Swainson's hawk<br>• April 1 to August 31 – osprey | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| and fledgling habitat during use. (Refer to Appendix B.) See Figure 2-9 in Appendix A. | • April 15 to July 15 –sharp-shinned hawk, Cooper's hawk<br>(Refer to Appendix B.) See Figures 2-10 (Alternatives B and C) and 2-11 (Alternative D) in Appendix A. | | |
| Restrictions on Use:<br>**STIPULATION** TL CO-20 and GS-TL-8: *Osprey*. Prohibit surface occupancy and surface-disturbing activities from April 1 to August 31 within a 0.5-mile radius of osprey nests to protect osprey nesting and fledgling habitat during use. (Refer to Appendix B.) See Figure 2-9 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-TL-5: *Raptors (0.5-mile buffer species), not including special status raptors*. Prohibit surface occupancy and surface-disturbing activities within a 0.5-mile radius of a nest site during the following dates to protect use of nesting and fledgling habitat:<br>• December 15 to July 15 – golden eagle<br>• March 15 to July 15 – prairie falcon<br>• March 1 to September 15 – northern goshawk<br>(Refer to Appendix B.) See Figures 2-10 (Alternatives B and C) and 2-11 (Alternative D) in Appendix A. | | |
| **Waterfowl and Shorebirds** | | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Provide healthy and productive habitat for waterfowl, wading birds, and shorebirds | | |
| Restrictions on Use:<br>**STIPULATION** NSO CO-7 (Alternative A) / CRV-NSO-14 (Alternatives B, C, and D): *Waterfowl and Shorebird Habitat and Heron Rookeries*. Prohibit surface occupancy and surface-disturbing activities to protect waterfowl and shorebird habitat and rookeries within significant production areas as mapped by CDOW. (Refer to Appendix B.) See Figures 2-1 (Alternative A), 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | | |
| Restrictions on Use:<br>**STIPULATION** GS-TL-13: *Waterfowl and Shorebird Nesting and Production Areas*. Prohibit surface occupancy from April 15 to July 15 in a 0.25-mile radius around the nesting and production areas of the Fravert Watchable Wildlife Area, Consolidated Reservoir and the King Mountain Reservoirs-Grimes-Brooks, Nobel, and Upper and Lower King Mountain to protect nesting ducks. (Refer to Appendix B.) See Figure 2-9 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-TL-6: *Waterfowl and Shorebird Nesting and Production Areas*. Prohibit surface occupancy and surface-disturbing activities from April 15 to July 15 in a 0.25-mile radius around the nesting and production areas of the Fravert Watchable Wildlife Area, Consolidated Reservoir and the King Mountain Reservoirs-Grimes-Brooks, Nobel, and Upper and Lower King Mountain to reduce the risk of nest abandonment. (Refer to Appendix B.) See Figures 2-10 (Alternatives B and C) and 2-11 (Alternative D) in Appendix A. | | |
| ***Special Status Species – Fish and Other Aquatic Wildlife*** | | | |
| **GOAL:**<br>Prevent the need for listing of proposed, candidate, and sensitive species under the ESA, protect special status species, and improve their habitats to a point where their special status recognition is no longer warranted (Land Health Standard 4). Take necessary actions to help to delist the five Federally listed fish species found in the planning areas by following pertinent Recovery Plans and implementing actions and protections that assist in their recovery. | | | |

<table>
<tr><th>Alternative A: No Action</th><th>Alternative B</th><th>Alternative C</th><th>Alternative D</th></tr>
<tr><td colspan="4">Objective:<br>Protect occupied and suitable habitat for federally listed, proposed, and candidate threatened or endangered species and protect occupied habitat for BLM sensitive species necessary for:<br>• Maintenance and recovery of proposed candidate and threatened or endangered species<br>• Support of BLM sensitive species and significant plant communities, consistent with BLM policy on Special Status Species Management (BLM Manual 6840).</td></tr>
<tr><td colspan="4">Common to All Special Status Fishes</td></tr>
<tr><td>Action:<br>No similar action under current RMP (BLM 1984a).</td><td colspan="3">Action:<br>Identify limiting habitat factors based on site characteristics and habitat capabilities using channel type and geology classifications (e.g., Rosgen). Upon identification of limiting factors, prioritize and fix those that can be fixed using proven river, stream, lake, and riparian methodologies (e.g., in-channel habitat structures to create pools, riparian plantings) or by changing management of other program activities (e.g., changing livestock grazing season use) to achieve desired future condition.</td></tr>
<tr><td>Action:<br>No similar action under current RMP (BLM 1984a).</td><td colspan="3">Action:<br>Protect BLM fish-bearing streams or stream segments by actively seeking minimum in-stream flow protection and, for lakes, minimum pool depths, where opportunities arise.</td></tr>
<tr><td>Action:<br>No similar action under current RMP (BLM 1984a).</td><td colspan="3">Action:<br>Assist as appropriate with the introduction, translocation, transplantation, restocking, augmentation, and reestablishment of special status fishes in cooperation with CDOW and/or USFWS, subject to the guidance provided by BLM's 1745 policy and by existing or future memorandums of understanding with CDOW.</td></tr>
<tr><td colspan="4">Native Trout (Colorado River Cutthroat Trout and Greenback Cutthroat Trout)</td></tr>
<tr><td>Action:<br>No similar action under current RMP (BLM 1984a).</td><td>Action:<br>No similar action.</td><td>Action:<br>Designate the Abrams Creek ACEC to protect the Colorado River cutthroat trout, a special status species (see ACECs section).</td><td>Action:<br>No similar action.</td></tr>
<tr><td>Restrictions on Use:<br>STIPULATION GS-CSU-3: Species Listed as Sensitive by BLM. For those species listed as sensitive by BLM and for significant natural plant communities, special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. For plants, habitat areas include occupied habitat and habitat necessary for the maintenance or recovery of the species or</td><td>Restrictions on Use:<br>STIPULATION CRV-NSO-15: Fish-Bearing Streams. Prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of all fish-bearing streams. On streams where the riparian corridor width is greater than 100 meters (328 feet) from the stream edge, prohibit surface occupancy and surface-disturbing activities within the riparian zone.</td><td>Restrictions on Use:<br>STIPULATION CRV-NSO-16: Perennial Waters. Prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of perennial waters. On perennial waters where the riparian corridor width is greater than 100 meters (328 feet) from the stream edge, prohibit surface occupancy and surface-disturbing activities within the riparian</td><td>Restrictions on Use:<br>STIPULATION CRV-NSO-31: Conservation and Core Conservation Populations of Colorado River Cutthroat Trout. Prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of streams containing conservation and core conservation populations of Colorado River cutthroat trout. Where the riparian corridor width</td></tr>
</table>

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| communities. (Refer to Appendix B.) See Figure 2-5 in Appendix A. | (Refer to Appendix B.) See Figure 2-2 in Appendix A. | zone. (Refer to Appendix B.) See Figure 2-3 in Appendix A. | is greater than 100 meters (328 feet) from stream edge, prohibit surface occupancy and surface-disturbing activities within the riparian zone. (Refer to Appendix B.) See Figure 2-4 in Appendix A. |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-TL-18: *Occupied Cutthroat Trout Waters*. Prohibit in-channel work during the spring spawning period (April 1 to September 1) in all occupied Colorado River cutthroat trout and greenback cutthroat trout waters to protect redds (egg masses) and emerging fry. (Refer to Appendix B.) See Figure 2-10 (Alternatives B and C) in Appendix A | | Restrictions on Use:<br>**STIPULATION** CRV-TL-19: *Conservation and Core Conservation Populations of Cutthroat Trout Waters*. Prohibit in-channel work during the spring spawning period (April 1 to September 1) in all waters supporting conservation and core conservation populations of Colorado River cutthroat trout or occupied habitat of greenback cutthroat trout to protect redds (egg masses) and emerging fry. (Refer to Appendix B.) See Figure 2-11 in Appendix A. |
| **Endangered Big-River Fishes (Razorback Sucker, Colorado Pikeminnow, Humpback Chub, and Bonytail) – CRVFO Only** | | | |
| Restrictions on Use:<br>**STIPULATION** GS-NSO-12: *Threatened or Endangered Species*. Prohibit surface occupancy and surface-disturbing activities on habitat areas for those species listed by the Federal or state government as endangered or threatened and for Federal proposed or candidate species. Habitat areas include occupied habitat and habitat necessary for the maintenance or recovery of the species. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-32: *Endangered Big-River Fishes (Razorback Sucker, Colorado Pikeminnow, Humpback Chub, and Bonytail)*. Prohibit surface occupancy and surface-disturbing activities within Designated Critical Habitat. No exceptions would be granted except pursuant to consultation with the USFWS pursuant to Section 7 of the Endangered Species Act. (Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |
| **BLM Sensitive Big-River Fishes (Flannelmouth Sucker, Bluehead Sucker, and Roundtail Chub) – CRVFO Only** | | | |
| Restrictions on Use:<br>**STIPULATION** GS-CSU-3: *Species Listed as* | Restrictions on Use:<br>**STIPULATION** CRV-NSO-33: *Sensitive Big-River Fishes (Flannelmouth Sucker, Bluehead Sucker, Roundtail Chub)*. Prohibit | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| *Sensitive by BLM.* For those species listed as sensitive by BLM and for significant natural plant communities, special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. For plants, habitat areas include occupied habitat and habitat necessary for the maintenance or recovery of the species or communities. (Refer to Appendix B.) See Figure 2-5 in Appendix A. | surface occupancy and surface-disturbing activities within 100 meters (328 feet) of all occupied or seasonally occupied tributary streams for flannelmouth sucker, bluehead sucker, and roundtail chub. (Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |
| **BLM Sensitive Amphibians (Great Basin Spadefoot, Boreal Toad, Northern Leopard Frog, and Wood Frog)** | | | |
| Restrictions on Use:<br>Apply stipulations that help protect sensitive amphibian species. (Refer to Appendix B.) | | | |
| Restrictions on Use:<br>**STIPULATION** GS-CSU-3: *Species Listed as Sensitive by BLM.* For those species listed as sensitive by BLM and for significant natural plant communities, special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. For plants, habitat areas include occupied habitat and habitat necessary for the maintenance or recovery of the species or communities. (Refer to Appendix B.) See Figure 2-5 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-CSU-15: *Sensitive Amphibians (Great Basin Spadefoot, Boreal Toad, Northern Leopard Frog, Wood Frog).* Apply CSU restrictions within an 800-meter (0.5-mile) buffer around all identified breeding sites. (Refer to Appendix B.) See Figure 2-6 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-34: *Sensitive Amphibians (Great Basin Spadefoot, Boreal Toad, Northern Leopard Frog, Wood Frog).* Prohibit surface occupancy and surface-disturbing activities within 800 meters (0.5 mile) of identified breeding sites. (Refer to Appendix B.) See Figure 2-3 in Appendix A. | Restrictions on Use:<br>Same as Alternative B. |
| ***Special Status Species – Plants and Terrestrial Wildlife*** | | | |
| **GOAL:**<br>Prevent the need for listing of proposed, candidate, and sensitive species under the ESA, protect special status species, and improve their habitats to a point where their special status recognition is no longer warranted (Land Health Standard 4). | | | |
| Objective:<br>Protect occupied and suitable habitat for federally listed, proposed, and candidate threatened or endangered species (including greater sage-grouse) and protect occupied | Objective:<br>Promote maintenance and recovery of federally listed, proposed, and candidate threatened or endangered species (including greater sage-grouse) | Objective:<br>Promote the maintenance and recovery of federally listed, proposed, and candidate threatened or endangered species (including greater sage-grouse) | Objective:<br>Promote the maintenance and recovery of federally listed, proposed, and candidate species threatened or endangered species |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| habitat for sensitive species necessary for:<br>• Maintenance and recovery of proposed, candidate, threatened, and endangered species.<br>• Support of BLM sensitive species and significant plant communities, consistent with BLM policy on Special Status Species Management (BLM Manual 6840). | by protecting occupied and adjacent habitat. Protect core populations of Harrington's penstemon (in the CRVFO) and occupied habitat for all other BLM sensitive species. | and BLM sensitive species by protecting occupied and adjacent habitat. | (including greater sage-grouse) by protecting occupied and adjacent habitat.<br>Promote the maintenance of existing populations of BLM sensitive species by protecting occupied habitat. |
| **Common to All Special Status Plants and Terrestrial Wildlife** | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>• In occupied special status species habitat, prioritize treatments to protect against invasion and establishment of noxious weeds or other aggressive exotic plants. (Also refer to Vegetation–Weeds section.)<br>• Close or relocate selected travel routes to protect special status species and significant plant communities (see Comprehensive Trails and Travel Management section and corresponding figures).<br>• Pursue land tenure adjustments to facilitate the conservation or recovery of special status species. (See also the Lands and Realty section.) | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Restore potential special status species habitat to suitable habitat by applying treatments to historically occupied, degraded habitats (e.g., Colorado hookless cactus, sage-grouse). | | Action:<br>No similar action. |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Allow introduction, translocation, transplantation, restocking, augmentation, and reestablishment of native and naturalized fish and wildlife species in cooperation with CDOW and/or USFWS, subject to the guidance provided by BLM Manual 1745 and by existing or future memorandums of understanding with CDOW. | | |
| Action:<br>**Lease Notice** GS-LN-2 (Alternative A) and CRV-LN-4 (Alternatives B, C, and D): *Biological Inventories*. Require a biological inventory before approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as raptor nests, elk calving areas, or significant natural plant communities. The inventory would be used to prepare mitigating measures to reduce the impacts of surface disturbance on the affected species or their habitats. These mitigating measures may include, but are not limited to, relocation of roads, well pads, pipelines, and other facilities, fencing operations, or habitat. (Refer to Appendix B.) | | | |
| Action:<br>**Lease Notice** LN CO-34: *Endangered Species Act*. The lease area may now or hereafter contain plants, animals, or their habitats determined to be threatened, endangered, or other special status species. BLM may recommend modifications to exploration and development proposals to further its conservation and management objective to avoid BLM-approved activity that will contribute to a need to list such a species or their habitat. BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until | | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| it completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 U.S.C. § 1531 et seq., including completion of any required procedure for conference or consultation. | | | |
| Restrictions on Use:<br>**STIPULATION** GS-NSO-12: *Threatened or Endangered Species*. Prohibit surface occupancy and surface-disturbing activities on habitat areas for those species listed by the Federal or state government as endangered or threatened and for Federal proposed or candidate species. Habitat areas include occupied habitat and habitat necessary for the maintenance or recovery of the species. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>See revised NSO stipulations with buffers for plants and NSOs for individual terrestrial wildlife species in the applicable sections below. | | |
| Restrictions on Use:<br>**STIPULATION** GS-CSU-3: *Species Listed as Sensitive by BLM*. For those species listed as sensitive by BLM and for significant natural plant communities, special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. For plants, habitat areas include occupied habitat and habitat necessary for the maintenance or recovery of the species or communities. (This applies to all sensitive wildlife, fish, and plant species and all significant natural plant communities.) Refer to Appendix B. See Figure 2-5 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-CSU-7: *Significant Plant Communities*. For plant communities that meet BLM's criteria for significant plant communities, special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. For plant communities, habitat areas include occupied habitat and habitat necessary for the maintenance or recovery of the species or communities. (Refer to Appendix B.) See Figures 2-6 (Alternative B), 2-7 (Alternative C), and 2-8 (Alternative D) in Appendix A.<br><br>See revised CSU stipulation for sensitive plants in the "Plants" section below | | |
| **Plants** | | | |
| Action:<br>Prohibit collection of rare plants or plant parts, except as permitted by the Authorized Officer for scientific research. | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Require projects that remove topsoil in areas of suitable habitat for endangered or threatened species to set aside and replace the topsoil when groundwork is completed, to preserve the seedbank and associated mycorrhizal species and to discourage invasive plant species. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Designate ACECs to protect the following special status plant species (see ACECs section):<br><br>• Hardscrabble-Mayer Gulch (Harrington penstemon)<br>• Lyons Gulch (Harrington penstemon)<br>• Sheep Creek Uplands (Harrington's penstemon) | Action:<br>Designate ACECs to protect the following special status plant species (see ACECs section):<br><br>Same areas as Alternative B, plus:<br>• Hardscrabble-Mayer Gulch/East Eagle Ridge (Harrington penstemon)<br>• Mount Logan Foothills (Colorado hookless cactus, DeBeque phacelia, Parachute penstemon, Naturita milkvetch)<br>• The Crown Ridge (Harrington's penstemon) | Action:<br>No similar action. |
| Restrictions on Use:<br>**STIPULATION** NSO CO-8: *Special Status Plant Species*. Prohibit surface occupancy and surface-disturbing activities on habitat areas to protect special status plant species (including Federally listed species, proposed species, and candidate species). (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-18: *Threatened, Endangered, Proposed, and Candidate Plants Current and Historically Occupied Habitat*. Prohibit surface occupancy and surface-disturbing activities within a 200-meter (656-foot) buffer around current and historically occupied habitat as necessary to protect federally listed, proposed and candidate plants from direct and indirect impacts and loss of habitat. (Refer to Appendix B.) See Figure 2-2 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-19: *Threatened, Endangered, Proposed, Candidate, and BLM Sensitive Plant Species Current and Historically Occupied Habitat*. Prohibit surface occupancy and surface-disturbing activities within a 200-meter (656-foot) buffer around current or historically occupied habitat to protect threatened, endangered, proposed, candidate, or BLM sensitive plant species from direct and indirect impacts and loss of habitat. (Refer to Appendix B.) See Figure 2-3 in Appendix A. | Restrictions on Use:<br>Same as Alternative B. |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-NSO-20: *Sensitive Plant Occupied Habitat*. Prohibit surface occupancy and surface-disturbing activities within a 100-meter (328-foot) buffer around occupied BLM sensitive species habitat. Outside | Restrictions on Use:<br>(See stipulation CRV-NSO-19 above for Threatened, Endangered, Proposed, Candidate, and BLM Sensitive Plant Species Current and Historically Occupied Habitat.) | Restrictions on Use:<br>No similar action. |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| | ACECs, this NSO will not apply to Harrington's penstemon habitat. (Refer to Appendix B.) See Figure 2-2 in Appendix A. | | |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-NSO-22: *DeBeque Phacelia*. Prohibit surface occupancy and surface-disturbing activities within suitable habitat for DeBeque phacelia unless absence is demonstrated in the following way: Known DeBeque phacelia sites near the project area should be monitored by a qualified botanist during the flowering period (as determined by best available science) each year. If DeBeque phacelia is located at three nearby known sites in a given year, that year will be deemed a "reliable year." If DeBeque phacelia is not detected at the suitable habitat to be impacted during a reliable year, an exception to the NSO may be granted for that site and that year. (Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-CSU-8: *Occupied Harrington's Penstemon outside ACECs*. Apply CSU restrictions to surface-disturbing activities within a 100-meter (328-foot) buffer around occupied Harrington's penstemon habitat outside ACECs. (Refer to Appendix B.) See Figure 2-6 in Appendix A. | Restrictions on Use:<br>Same as Alternative A. | Restrictions on Use:<br>**STIPULATION** CRV-CSU-9: *BLM Sensitive Plant Species Occupied Habitat*. Apply CSU restrictions to surface-disturbing activities within a 100-meter (328-foot) buffer around occupied BLM sensitive species habitat (including Harrington's penstemon). (Refer to Appendix B.) See Figure 2-8 in Appendix A. |
| **American White Pelican** | | | |
| Restrictions on Use:<br>**STIPULATION** TL CO-17 (Alternative A) / CRV-TL-16 (Alternatives B, C, and D): *American White Pelican*. Prohibit surface occupancy and surface-disturbing activities from March 16 to September 30. (Refer to Appendix B.) See Figures 2-9 (Alternative A), 2-10 (Alternatives B and C) and 2-11 (Alternative D) in Appendix A. | | | |
| **Bald Eagle** | | | |
| Restrictions on Use:<br>**STIPULATION** NSO CO-4 (Alternative A) / CRV-NSO-26 (Alternatives B, C, and D): *Bald Eagle Roost or Nest Site*. Prohibit surface occupancy and surface-disturbing activities within a 0.25-mile radius of the roost or nest site. (Refer to Appendix B.) See Figures 2-1 (Alternative A), 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Restrictions on Use:<br>**STIPULATION** TL-CO-22 and GS-TL-10: *Bald Eagle Nest Site*. Prohibit surface occupancy and surface-disturbing activities within a 0.25-mile buffer around bald eagle nest sites from December 15 to June 15 to protect nesting habitat. (Refer to Appendix B.) See Figure 2-9 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-TL-8: *Bald Eagle Nest Sites and Winter Roost Sites*. Prohibit surface occupancy and surface-disturbing activities within a 0.5-mile buffer around bald eagle nest sites and sinter roost sites to avoid disturbance during seasonally critical behaviors and activities. Protect nesting, including nest-centered courtship, nest attentiveness and construction or repair, egg-laying, incubation, feeding of nestlings, and post-fledging use of the nest vicinity by juveniles. (Refer to Appendix B.) See Figures 2-10 (Alternatives B and C) and 2-11 (Alternative D) in Appendix A.<br><br>TL dates are as follows:<br><br><u>Nest Sites</u>: October 15 to July 31<br><br><u>Roost Sites</u>: November 15 to March 15 | | |
| Restrictions on Use:<br>**STIPULATION** TL CO-23 and GS-TL-11: *Bald Eagle Winter Roost Site*. Prohibit surface occupancy and surface-disturbing activities within a 0.5-mile buffer around bald eagle winter roost sites from November 16 to April 15 to avoid relocation to less suitable areas. (Refer to Appendix B.) See Figure 2-9 in Appendix A. | | | |
| **Ferruginous Hawk** | | | |
| Restrictions on Use:<br>**STIPULATION** GS-NSO-7and NSO CO-19: *Ferruginous Hawk Nesting and Fledgling Habitat*. Prohibit surface occupancy and surface-disturbing activities within a 0.125-mile radius of a nest site to protect ferruginous hawk nesting and fledgling habitat during usage and to avoid nest abandonment. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-29: *Ferruginous Hawk Nesting and Fledgling Habitat*. Prohibit surface occupancy and surface-disturbing activities within a 0.5-mile radius of a nest site to protect ferruginous hawk nesting and fledgling habitat during use and avoid nest abandonment. (Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |
| Restrictions on Use:<br>**STIPULATION** GS-TL-7: *Ferruginous Hawk Nesting and Fledgling Habitat*. Prohibit surface occupancy and surface-disturbing activities from February 1 to August 15 within a 1-mile radius of a nest site to protect ferruginous hawk nesting and fledgling habitat during usage and to avoid nest abandonment. (Refer to Appendix B.) See Figure 2-9 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-TL-10: *Ferruginous Hawk Nesting and Fledgling Habitat*. Prohibit surface occupancy and surface-disturbing activities from February 1 to July 15 within a 0.5-mile radius of a nest site to protect ferruginous hawk nesting and fledgling habitat during use and avoid nest abandonment. (Refer to Appendix B.) See Figures 2-10 (Alternatives B and C) and 2-11 (Alternative D) in Appendix A. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| **Peregrine Falcon** | | | |
| Restrictions on Use:<br>**STIPULATION** NSO CO-5 (Alternative A) / CRV-NSO-27 (Alternatives B, C, and D): *Peregrine Falcon Cliff-Nesting Complex*. Prohibit surface occupancy and surface-disturbing activities within a 0.5 -mile radius of a cliff-nesting complex. (Refer to Appendix B.) See Figures 2-1 (Alternative A), 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D)in Appendix A. | | | |
| Restrictions on Use:<br>**STIPULATION** TL CO-24 (Alternative A) / CRV-TL-14 (Alternatives B, C, and D): *Peregrine Falcon Cliff-Nesting Complex*. Prohibit surface occupancy and surface-disturbing activities within a 0.5-mile buffer around peregrine falcon cliff-nesting complexes from March 15 to July 31. (Refer to Appendix B.) See Figures 2-9 (Alternative A), 2-10 (Alternatives B and C) and 2-11 (Alternative D) in Appendix A. | | | |
| **Greater Sage-Grouse and Sagebrush Biome** | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Apply conservation measures and guidance from the Colorado Greater Sage-grouse Conservation Plan, local work group plans (North Eagle, South Route), Connelly Guidelines, the BLM National Sage-grouse Habitat Conservation Strategy (2004) and Western Association of Fish and Wildlife Agencies, when appropriate. | | |
| Restrictions on Use:<br>**STIPULATION** NSO CO-2: *Grouse Leks*. Prohibit surface occupancy and surface-disturbing activities within a 0.25-mile radius of an active lek (courtship area). Grouse includes greater sage-grouse, Columbian sharp-tailed grouse, and lesser and greater prairie chickens. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-23: *Greater Sage-grouse Leks*. Prohibit surface occupancy and surface-disturbing activities within a 0.6-mile radius of an active or historic (used within the last 10 years) lek. (Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |
| Restrictions on Use:<br>**STIPULATION** GS-TL-3: *Greater Sage-grouse Winter and Nesting Habitat*. Prohibit surface occupancy and surface-disturbing activities during certain timeframes in grouse crucial winter habitat and nesting habitat (includes greater sage-grouse). Sage-grouse nesting habitat is described as sagebrush stands with sagebrush plants between 30 and 100 centimeters (approximately 12 and 40 inches) in height and a mean canopy cover between 15 and 40 percent within a 2-mile radius of an active lek. Sage-grouse crucial winter habitat: | Restrictions on Use:<br>**STIPULATION** CRV-TL-11: *Greater Sage-grouse Winter and Nesting Habitat*. Prohibit surface occupancy and surface-disturbing activities during certain timeframes in grouse crucial winter habitat and nesting habitat (includes greater sage-grouse). Sage-grouse nesting habitat is described as sagebrush stands with sagebrush plants between 30 and 100 centimeters (approximately 12 and 40 inches) in height and a mean canopy cover between 15 and 40 percent within a 4-mile radius of an active lek. Sage-grouse crucial winter habitat: December 16 to March 15. Sage-grouse nesting habitat: March 1 to June 30. (Refer to Appendix B.) See Figures 2-10 (Alternatives B and C) and 2-11 (Alternative D) in Appendix A. | | |

2. Alternatives (Management Guidance for Alternatives A, B, C, and D — Special Status Species – Plants & Terrestrial Wildlife: *Greater Sage-grouse and Sagebrush Biome*)

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| December 16 to March 15. Sage-grouse nesting habitat: March 1 to June 30. (Refer to Appendix B.) See Figure 2-9 in Appendix A. | | | |
| Action:<br>Lease Notice CO-30 (Alternative A)/ CRV-LN-5 (Alternatives B, C, and D): *Nesting Grouse Species*. Relocate surface-disturbing activities proposed between March 1 and June 30, consistent with lease rights granted and Section 6 of standard lease terms, out of grouse nesting habitat to protect nesting grouse species (including greater sage-grouse and Columbian sharp-tailed grouse). Refer to Appendix B. | | | |
| Objective:<br>Sustain the integrity of the sagebrush biome to provide the amount, continuity, and quality of habitat that is necessary to maintain sustainable populations of greater sage-grouse and other sagebrush-dependent species. | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>No similar action. | Action:<br>Designate a Greater Sage-grouse Habitat ACEC to protect greater sage-grouse habitat (see ACECs section). | Action:<br>No similar action. |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-CSU-13: *Sage-Grouse Habitat in the CRVFO*. Apply CSU to protect sagebrush plant communities within sage-grouse habitat. (Refer to Appendix B.) See Figures 2-6 (Alternative B) and 2-7 (Alternative C) in Appendix A. | | Restrictions on Use:<br>No similar action. |
| **Columbian Sharp-tailed Grouse** | | | |
| Restrictions on Use:<br>**STIPULATION** NSO CO-2: *Grouse Leks*. Prohibit surface occupancy and surface-disturbing activities within a 0.25-mile radius of an active lek (courtship are). Grouse includes greater sage-grouse, Columbian sharp-tailed grouse, and lesser and greater prairie chickens. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-24: *Active Columbian Sharp-tailed Grouse Leks*. Prohibit surface occupancy and surface-disturbing activities within a 0.4-mile radius of an active lek (used within the previous 10 years). (Refer to Appendix B.) See Figure 2-2 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-25: *Known Columbian Sharp-tailed Grouse Leks*. Prohibit surface occupancy and surface-disturbing activities within a 0.4-mile radius of a known lek. (Refer to Appendix B.) See Figure 2-3 in Appendix A. | Restrictions on Use:<br>Same as Alternative B. |
| Restrictions on Use:<br>**STIPULATION** GS-TL-3: *Columbian Sharp-tailed Grouse Winter and Nesting Habitat*. Prohibit surface occupancy and surface-disturbing activities during certain timeframes in grouse | Restrictions on Use:<br>**STIPULATION** CRV-TL-12 (Alternatives B, C, and D): *Columbian Sharp-tailed Grouse Winter and Nesting Habitat*. Prohibit surface occupancy and surface-disturbing activities during certain timeframes in grouse crucial winter habitat and nesting habitat. Sharp-tailed grouse nesting habitat is described as mountain shrub communities with a density of shrub plants from 1,700 to 32,000 shrubs per hectare and average shrub height of 30 centimeters (12 inches) within a 2- | | |

September 2011 | Colorado River Valley Field Office – Draft RMP Revision EIS Chapter 2, Alternatives | 2-56

BLM_0015931

2. Alternatives (Management Guidance for Alternatives A, B, C, and D — Special Status Species – Plants & Terrestrial Wildlife: *Columbian Sharp-tailed Grouse*)

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| crucial winter habitat and nesting habitat (includes Columbian sharp-tailed grouse). Sharp-tailed grouse nesting habitat is described as sagebrush stands with sagebrush plants between 30 and 100 centimeters (approximately 12 and 40 inches) in height and a mean canopy cover between 15 and 40 percent within a 2-mile radius of an active lek. Sharp-tailed grouse crucial winter habitat: December 16 to March 15. Sage-grouse nesting habitat: March 1 to June 30. (Refer to Appendix B.) See Figure 2-9 in Appendix A. | mile radius of an active lek. Sharp-tailed grouse crucial winter habitat: December 16 to March 15. Sharp-tailed grouse nesting habitat: March 1 to June 30. See Figures 2-10 (Alternatives B and C) and 2-11 (Alternative D) in Appendix A. | | |
| Action:<br>Lease Notice CO-30 (Alternative A)/ CRV-LN-5 (Alternatives B, C, and D): *Nesting Grouse Species*. Relocate surface-disturbing activities proposed between March 1 and June 30, consistent with lease rights granted and Section 6 of standard lease terms, out of grouse nesting habitat to protect nesting grouse species (including greater sage-grouse and Columbian sharp-tailed grouse). Refer to Appendix B. | | | |
| **Greater Sandhill Crane** | | | |
| Restrictions on Use:<br>**STIPULATION** TL CO-16 (Alternative A) / CRV-TL-15 (Alternatives B, C, and D): *Greater Sandhill Crane*. Prohibit surface occupancy and surface-disturbing activities from March 1 to October 16 to protect greater sandhill crane nesting and staging habitat during usage. (Refer to Appendix B.) See Figures 2-9 (Alternative A), 2-10 (Alternatives B and C) and 2-11 (Alternative D) in Appendix A. | | | |
| **Western Yellow-billed Cuckoo** | | | |
| Action:<br>No similar current action under current RMP (BLM 1984a). | Action:<br>If suitable habitat for the Federal candidate yellow-billed cuckoo *(Coccyzus americanus)* is identified, conservation measures would be applied. | | |
| **Mexican Spotted Owl** | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>If areas of suitable Mexican spotted owl habitat is identified, apply conservation measures specified by USFWS. | | |
| Restrictions on Use:<br>**STIPULATION** NSO CO-6: *Mexican Spotted Owl*. Prohibit surface occupancy and surface-disturbing activities within a 0.25-mile radius of a roost or nest site. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-28: *Mexican Spotted Owl*. Prohibit surface occupancy and surface-disturbing activities within a 0.5-mile radius of a roost or nest site. (Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |

September 2011 *Colorado River Valley Field Office – Draft RMP Revision EIS* 2-57
*Chapter 2, Alternatives*

BLM_0015932

Case No. 1:20-cv-02484-MSK Document 30-8 filed 04/27/21 USDC Colorado pg 118 of 141

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Restrictions on Use :<br>**STIPULATION** TL CO-21: *Mexican Spotted Owl Nesting and Fledgling Habitat*. Prohibit surface occupancy and surface-disturbing activities from February 1 through July 31 to protect Mexican spotted owl core habitat areas (i.e., nesting and fledgling habitat) during usage. (Refer to Appendix B.) | Restrictions on Use:<br>No similar restrictions on use. | | |
| Restrictions on Use:<br>**STIPULATION** GS-TL-9: *Mexican Spotted Owl Primary Activity Centers*. Prohibit surface occupancy and surface-disturbing activities from February 1 through July 31. (Refer to Appendix B.) See Figure 2-9 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-TL-9: *Mexican Spotted Owl Primary Activity Centers*. Prohibit surface occupancy and surface-disturbing activities during seasons of critical use. (Refer to Appendix B.) See Figures 2-10 (Alternatives B and C and 2-11 (Alternative D) in Appendix A.<br><br>TL dates are as follows: March 1 to August 31 | | |
| **Bats** | | | |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-NSO-30: *Special Status Bat Species Roost Sites*. Prohibit surface occupancy and surface-disturbing activities within a 0.25-mile radius of Townsend's big-eared bat, fringed myotis, and special status bat roost sites. (Refer to Appendix B.) See Figures 2-2 (Alternative B) and 2-3 (Alternative C) in Appendix A. | | Restrictions on Use:<br>No similar restrictions on use. |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | | | Restrictions on Use:<br>**STIPULATION** CRV-CSU-14: *Special Status Bat Species Roost Sites*. Apply CSU restrictions within 0.25-mile of special status bat roost sites. (Refer to Appendix B.) See Figure 2-8 in Appendix A. |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-TL-17: *Special Status Bat Species Maternity and Hibernation Sites* (i.e., Townsend's big-eared bat, fringed myotis, Yuma myotis, and big free-tailed bat). Limit ground disturbance during the following periods: Maternity sites (April 15 to August 31); and winter hibernation sites (November 15 to April 15). (Refer to Appendix B.) See Figures 2-10 (Alternatives B and C) and 2-11 (Alternative D) in Appendix A. | | |

BLM_0015933

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| **Canada Lynx** | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Implement applicable conservation and restoration measures identified in the *Canada Lynx Conservation Assessment and Strategy* (Ruediger et al. 2000). Occupied lynx habitat is identified in the lands and realty section as a ROW Avoidance Area (including renewable energy sites such as solar, wind, hydro, and biomass development) | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Use timber management, where applicable, in conjunction with or in place of fire, as a disturbance process to create and maintain snowshoe hare habitat in lynx habitats occurring in Lynx Analysis Units to achieve desired conditions in accordance with *Canada Lynx Conservation Assessment and Strategy*. | | |
| **Gray Wolf** | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>If applicable, coordinate with the CDOW and USFWS for wolf management. | | |
| ***Cultural Resources*** | | | |
| **GOAL 1:**<br>Identify, preserve, and protect significant cultural resources in order to ensure appropriate uses by present and future generations (i.e., for research, education, and preservation of cultural heritage (FLPMA Section 103 [C], 201 [A], 202 [A]; National Historic Preservation Act of 1966 (NHPA) Sections 106 and 110; Archaeological Resources Protection Act of 1979 Section 14[a]; the Antiquities Act Section 2, National Programmatic Agreement between the BLM and National Conference of State Historic Preservation Officers, Colorado Protocol, and other pertinent legislation). | | | |
| Objective:<br>Preserve the nature and value of cultural resources. | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>The BLM has allocated cultural resources currently recorded, or projected to occur on the basis of existing data synthesis, to the following uses (BLM 2005a). These allocations are contained in the Class I Cultural Resource Overview of the BLM Colorado River Valley Field Office (Reed et al. 2008), which contains privileged information not for distribution.<br><br><u>Use Allocation</u> / <u>Desired Outcome</u><br>a. Scientific use — a. Preserved until research potential is realized<br>b. Conservation for future use — b. Preserved until conditions for use are met<br>c. Traditional use — c. Long-term preservation<br>d. Public use — d. Long-term preservation, onsite interpretation<br>e. Experimental use — e. Protected until used<br>f. Discharge from management — f. No use after recordation; not preserved<br><br>Sites will be added or removed from each allocation in response to changing conditions or as additional data and information are obtained. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| **GOAL 2:** Seek to reduce imminent threats and resolve potential conflicts from natural or human-caused deterioration, or potential conflict with other resource uses (FLPMA Sec. 103[c], NHPA 106, 110[a][2]) by ensuring that all authorizations for land use and resource use will comply with the NHPA Section 106; Colorado Protocol; Colorado Revised Statutes 24-80-1301 for Historic, Prehistoric, and Archaeological Resources, and for Unmarked Human Graves; and other applicable laws. | | | |
| Objective: No similar objective under current RMP (BLM 1984a). | Objective: Preserve the existing character of the cultural and associated physical landscape. | | |
| Action: Inventory, evaluate, mitigate, and protect cultural resources, giving priority to those that are associated with proposed actions where surfaces will be disturbed. | | | |
| Action: Review all proposed actions and coordinate with proponents early in the implementation planning process to define an area of potential effect; conduct a literature review; and complete inventories, mitigation, and other related actions in consultation with the Native American Tribes, the State Historic Preservation Office and other parties, as appropriate. | | | |
| Restrictions on Use: Technical Guidance from the COSO of a 100-meter (328-foot) buffer for historic properties (BLM 2008f, Chapter 2). | Restrictions on Use: **STIPULATION** CRV-NSO-39: *Historic Properties (200 meters [656 feet]).* Prohibit surface occupancy and surface-disturbing activities within 200 meters (656 feet) of historic properties. (Refer to Appendix B.) See Figures 2-2 (Alternative B) and 2-3 (Alternative C) in Appendix A. | | Restrictions on Use: **STIPULATION** CRV-NSO-38 (BLM 2008f): *Historic Properties (100 meters [328 feet]).* Prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of historic properties. (Refer to Appendix B.) See Figure 2-4 in Appendix A. |
| Objective: No similar objective under current RMP (BLM 1984a). | Objective: Promote professional cultural resource research, public awareness, and education. | | |
| Action: No action under current RMP (BLM 1984a). | Action: Identify measures such as the following to proactively manage, protect, and use cultural resources, including traditional cultural properties:<br>• Develop heritage tourism sites.<br>• Interpret sites.<br>• Identify priority areas in need of Class III cultural resource inventories.<br>• Conduct Class III cultural resource inventories to comply with Section 110 of the NHPA.<br>• Direct proactive inventory toward testing sensitivity predictions described in the Class I overview model (Reed et al. 2008).<br>• Organize and conduct ongoing educational programs for the public, school groups, vocational archaeology groups, project proponents, permittees, contractors, and others about cultural resource ethics, and encourage their help in | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| | reporting incidents of vandalism.<br>• Identify priority at-risk, significant sites for stabilization and rehabilitation. | | |
| Action:<br>Write annual overview and summaries of cultural resource management efforts and resources. | Action:<br>No similar action. | | |
| **GOAL 3:**<br>Uphold Native American trust responsibilities and accommodate traditional uses. | | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Uphold Native American trust responsibilities and accommodate traditional uses. | | |
| Restrictions on Use:<br>No similar action under current RMP (BLM 1984a). Same SOP was developed from Native American Consultation in 2001. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-37: *Heritage Areas (Traditional Cultural Properties)*. Prohibit surface occupancy and surface-disturbing activities within 0.25 mile of traditional cultural properties or Native American areas of concern to protect the integrity of place, setting, and/or feeling. (Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Work toward a cooperative agreement between the Tribes, BLM, Forest Service, and other interested parties to identify and protect Native American sites for the future of all Americans, by incorporating information from the *Perspectives on Ute Ethnohistory in West Central Colorado* to include:<br>• Reintroducing Native American tribes to their heritage lands.<br>• Developing an intern program for Native Americans to learn about and get college credit for obtaining ethnographic information useful for the tribes and government entities. | | |
| ***Paleontology*** | | | |
| **GOAL:**<br>No similar goal under current RMP (BLM 1984a). | **GOAL:**<br>Preserve and protect significant paleontological resources (generally vertebrate or noteworthy occurrences of invertebrate or plant fossils) in compliance with the 2009 Paleontological Resources Preservation Act incorporated here by reference. | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Ensure that paleontological resources are available for appropriate scientific and educational uses. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Provide opportunities for education about and interpretation of paleontological resources. Target areas include, but are not limited to, the dinosaur track-way at Rancho del Rio and other sites deemed suitable for public use by virtue of their educational value, durability, and sustainability. | | |

<table>
<tr><td colspan="4">Action:<br>Lease Notice CO-29 (Alternative A) / CRV-LN-6 (Alternatives B, C, and D): Class 4 and 5 Paleontological Areas. Have an accredited paleontologist approved by the Authorized Officer perform an inventory of surface-disturbing activities in Class 4 and 5 paleontological areas. (Refer to Appendix B.)</td></tr>
<tr><td colspan="4">Visual</td></tr>
<tr><td colspan="4">GOAL:<br>Protect the open spaces, the natural aesthetics, and the scenic vistas that are considered a social, economic, and environmental benefit.</td></tr>
<tr><td>Objective:<br>Maintain visual quality throughout the resource area and protect unique and fragile resource values. Manage Deep Creek and Bull Gulch and the Thompson Creek ACEC's Natural Environment Area under Class I objectives (BLM 1984a).</td><td colspan="3">Objective:<br>Maintain visual quality and integrity in accordance with VRM classes.</td></tr>
<tr><td>Action:<br>Designate VRM classes as shown on Figure 2-16 (Appendix A), as follows:<br>• VRM I = 17,100 acres<br>• VRM II = 230,100 acres<br>• VRM III = 113,700 acres<br>• VRM IV = 144,200 acres<br>• VRM Class V = 100 acres<br>Manage visual resources on BLM land according to the objectives for each class.</td><td>Action:<br>Designate VRM classes as shown on Figure 2-17 (Appendix A), as follows:<br>• VRM I = 33,600 acres<br>• VRM II = 249,200 acres<br>• VRM III = 102,100 acres<br>• VRM IV = 120,300 acres<br>Manage visual resources on BLM land according to the objectives for each class.</td><td>Action:<br>Designate VRM classes as shown on Figure 2-18 (Appendix A), as follows:<br>• VRM I = 33,600 acres<br>• VRM II = 259,700 acres<br>• VRM III = 97,000 acres<br>• VRM IV = 114,900 acres<br>Manage visual resources on BLM land according to the objectives for each class.</td><td>Action:<br>Designate VRM classes as shown on Figure 2-19 (Appendix A), as follows:<br>• VRM I = 34,000 acres<br>• VRM II = 228,000 acres<br>• VRM III = 104,600 acres<br>• VRM IV = 138,300 acres<br>Manage visual resources on BLM land according to the objectives for each class.</td></tr>
<tr><td>Action:<br>No similar action under current RMP (BLM 1984a).</td><td colspan="2">Action:<br>Recognize and make changes in VRM classes that compliment adjacent local, state, and Federal entities' land use plans and objectives to maintain scenic values.</td><td>Action:<br>No similar action.</td></tr>
<tr><td colspan="4">Action:<br>Allow necessary road maintenance regardless of VRM class.</td></tr>
<tr><td>Action:<br>No similar action under current RMP (BLM 1984a).</td><td colspan="3">Action:<br>Within VRM Class II areas, concentrate all new disturbances within existing ROWs or within 200 meters (656 feet) of existing disturbances in order to maintain overall scenic quality in utility corridors and in high-sensitivity transportation corridors identified and analyzed in the Visual Resource Management Update (Otak 2007). This recognizes existing disturbances while not foregoing protections for high-sensitivity transportation corridors.</td></tr>
</table>

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Action:<br>Collocate communication towers, facilities, and associated structures with existing communication sites to minimize overall visual impacts. | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Manage all WSAs under VRM Class I objectives to support interim management policy guidelines to retain a natural landscape. If a WSA is designated as wilderness, the area would continue to be managed as VRM Class I. Exceptions: (1) Case-by-case exceptions for valid existing rights and grandfathered uses; (2) If the WSA is released by Congress (see WSA section). | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Manage the following ACECs where decisions have been made to preserve unique natural, geologic, or cultural features as VRM Class II, unless the ACEC is managed as VRM Class I (Thompson Creek, Bull Gulch, and Deep Creek ACECs):<br>• Blue Hill ACEC<br>• Dotsero Crater ACEC<br>• Glenwood Springs Debris Flow ACEC | Action:<br>Manage all ACECs as VRM Class II, unless the ACEC is managed as VRM Class I (Thompson Creek, Bull Gulch, and Deep Creek ACECs). | Action:<br>Manage ACECs per underlying VRM classes, excluding Bull Gulch ACEC (manage as VRM Class I because of WSA overlap) and Blue Hill ACEC (manage as VRM Class II). |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>No similar action. | Action:<br>Manage the following as LWCs under VRM Class II objectives unless otherwise managed as VRM Class I (Thompson Creek, Bull Gulch, and Deep Creek ACECs):<br>• Castle Peak Addition<br>• Flat Tops addition<br>• Grand Hogback<br>• Pisgah Mountain<br>• Thompson Creek outside ACEC | Action:<br>No similar action. |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Manage the following SRMAs under the following VRM class objectives to support setting prescriptions (for those SRMAs that are within WSAs, see above):<br><br>VRM Class II<br>• Bocco Mountain SRMA<br>• Hack Lake SRMA<br>• King Mountain SRMA<br>• Red Hill SRMA<br>• The Crown SRMA<br>• Upper Colorado River SRMA | Action:<br>Manage the following SRMAs under the following VRM class objectives to support setting prescriptions:<br><br>VRM Class II<br>• Red Hill SRMA<br>• Upper Colorado River SRMA | Action:<br>Manage the following SRMAs under the following VRM class objectives to support setting prescriptions:<br><br>VRM Class II<br>• Fisher Creek SRMA<br>• Hardscrabble/East Eagle SRMA<br>• Red Hill SRMA<br>• The Crown SRMA<br>• Thompson Creek SRMA<br>• Upper Colorado River SRMA |
| Restrictions on Use:<br>**STIPULATION** GS-NSO-16: *VRM Class I Areas within ACECs*. Prohibit surface occupancy and surface-disturbing activities within Deep Creek ACEC/SRMA, Deep Creek Cave Area (includes NSO for 5,000 feet below the surface), Bull Gulch ACEC/SRMA, Thompson Creek ACEC/SRMA, Hack Lake SRMA, and Rifle Mountain Park to protect Class I VRM values in the ACECs and cave resources in the Deep Creek Area. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-42: *VRM Class I Areas*. For the protection of Class I VRM values, prohibit surface occupancy and surface-disturbing activities within areas designated VRM Class I. (Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |
| Restrictions on Use:<br>**STIPULATION** GS-NSO-18: *Interstate 70 Viewshed*. Prohibit surface occupancy and surface-disturbing activities on slopes over 30 percent with high visual sensitivity in the Interstate-70 viewshed. Lands with high visual sensitivity are those lands within 5 miles of the Interstate, of moderate to high visual exposure, where details of vegetation and landform are readily discernible, and where changes in visual | Restrictions on Use:<br>**STIPULATION** CRV-NSO-41: *VRM Class II Areas with Slopes over 30 Percent and High Visual Sensitivity*. Prohibit surface occupancy and surface-disturbing activities in VRM Class II areas with slopes over 30 percent and high visual sensitivity to preserve the visual setting and integrity. Lands with high visual sensitivity are those lands within 5 miles of the sensitive viewshed corridors of moderate to high visual exposure, where details of vegetation and landform are readily discernible, and changes in visual contrast can be easily noticed by the casual observer. (Refer to Appendix B.) See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| contrast can be easily noticed by the casual observer on the Interstate. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | | | |
| Restrictions on Use: **STIPULATION** GS-CSU-5: *VRM Class II*. Apply CSU restrictions to areas in VRM Class II. Relocation of operations by more than 200 meters (656 feet) may be required to protect visual values. (Refer to Appendix B.) See Figure 2-5 in Appendix A. | Restrictions on Use: **STIPULATION** CRV-CSU-16: *VRM Class II*. Ensure that surface-disturbing activities within VRM Class II areas comply with BLM Handbook 8431-1 to retain the existing character of the landscape. Management activities may be seen but should not attract attention of the casual observer. Any change to the landscape must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape. Special design measures, mitigation plans, or relocation of operations by more than 200 meters (656 feet) may be required to protect visual values. (Refer to Appendix B.) See Figures 2-6 (Alternative B), 2-7 (Alternative C), and 2-8 (Alternative D) in Appendix A. | | |
| Action: Lease Notice GS-LN-10 (Alternative A) / CRV-LN-7 (Alternatives B, C, and D): *Sensitive Viewsheds*. Use lease notices to inform oil and gas lessees of operational concerns in sensitive viewsheds. Special design and construction measures may be required to minimize the visual impacts of drilling activities within 5 miles of all communities or population centers, major BLM or county roads, and state or Federal highways. (Refer to Appendix B.) | | | |
| ***Wildland Fire Management*** | | | |
| **GOAL:** Give first priority to public and firefighter safety and to protection of property. Integrate fire and fuels management to meet Land Health Standards and natural and cultural resource objectives across landscapes, agencies, and government boundaries. Recognize the rule of wildland fire as an essential ecological process and allow fire to play a natural role in the ecosystem where or when resource objectives, or both, can be met. | | | |
| Objective: Meet specific wildland fire management unit objectives established in the RMP. Allow for planned and unplanned ignitions to meet wildland fire and other resource management objectives. | | | |
| Objective: Use a full range of wildland fire management options, from full suppression to management of unplanned ignitions managed for resource benefits. | | | |
| Action: Minimize costs and loss of property and natural resources, compliment resource management objectives, and sustain the productivity of biological ecosystems through fire management. | | | |
| Action: Periodically evaluate and, if necessary, alter the fire management units. The following are some of the major evaluation criteria:<br>• Acres burned in one year.<br>• Acres burned in ten years.<br>• New residential and commercial development.<br>• Changes in wildlife and plant special status species.<br>• Other vegetation treatments that may alter the fire regime and condition class.<br>• Social/political changes.<br>Identify areas where unplanned fire could be managed to meet resource objectives | | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| ***Lands with Wilderness Characteristics (LWCs)*** | | | |
| **GOAL:**<br>No similar goal under current RMP (BLM 1984a). | **GOAL:**<br>No similar goal. | **GOAL:**<br>Manage LWCs to protect their wilderness character and preserve the social, cultural, economic, scientific, and ecological benefits they provide to current and future generations. | **GOAL:**<br>No similar goal. |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>No similar objective. | Objective:<br>Improve apparent naturalness in LWCs through rehabilitation/restoration and mitigation of human impacts. Provide opportunities for solitude and/or primitive and unconfined recreation. | Objective:<br>No similar objective. |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>No similar action. | Action:<br>Manage the following LWCs, totaling 47,000 acres, to protect their wilderness character:<br>• Castle Peak Addition: 4,000 acres<br>• Deep Creek: 4,400 acres<br>• Flat Tops Addition: 3,500 acres<br>• Grand Hogback: 11,400 acres<br>• Pisgah Mountain: 15,500 acres<br>• Thompson Creek: 8,200 acres<br>Refer to Appendix D, Draft Wilderness Characteristics Assessments. See Figure 2-63 in Appendix A. | Action:<br>No similar action |
| Restrictions on Use: No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>No similar restrictions on use. | Restrictions on Use:<br>Protect LWCs and their wilderness character per the s Management and Setting Prescriptions for BLM Lands Outside WSAs Being Managed to Protect Wilderness Characteristics. (Appendix F). | Restrictions on Use:<br>No similar restrictions on use. |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Restrictions on Use: No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>No similar restrictions on use. | Restrictions on Use:<br>**CLOSED TO LEASING** for fluid minerals (CRV-CL-4: *Lands with Wilderness Characteristics*. Manage approximately 47,000 acres of the Federal mineral estate as closed to fluid minerals leasing and geophysical exploration to protect their wilderness character. (Refer to Appendix B.) See Figure 2-14 in Appendix A. | Restrictions on Use:<br>No similar restrictions on use. |
| Restrictions on Use: No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>No similar restrictions on use. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-43: *Lands with Wilderness Characteristics*. Prohibit surface occupancy and surface-disturbing activities on these lands to protect their wilderness character. (Refer to Appendix B.) See Figure 2-3 in Appendix A. | Restrictions on Use:<br>No similar restrictions on use. |
| ***Cave and Karst Resources*** | | | |
| **GOAL**:<br>No similar goal under current RMP (BLM 1984a). | **GOAL**:<br>Preserve the biotic, mineralogical, paleontological, hydrologic, and cultural values in caves defined as significant under the Federal Cave Resources Protection Act. | | |
| Objective:<br>Protect significant cave and karst values per the standards identified by Colorado Cave Survey in coordination with BLM. | | | |
| Action:<br>Setting prescriptions: Manage caves to retain their current physical, social, and operational settings (see Appendix H, CRVFO Management Objectives and Setting Prescriptions for Caves). | | | |
| Action:<br>If caves are found to be significant, manage in accordance with the Federal Cave Resources Protection Act. | | | |
| Restrictions on Use:<br>**STIPULATION** GS-NSO-16: *Deep Creek Cave Area (5,100 acres)*. Prohibit surface occupancy and surface-disturbing activities in the Deep Creek Cave Area (extends to 5,000 feet below the surface). The NSO area encompasses the cave openings and portions | Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-NSO-54: *Deep Creek Cave Area (5,100 acres)*. Prohibit surface occupancy and surface-disturbing activities in the Deep Creek cave area (extends vertically to 5,000 feet below the | Restrictions on Use:<br>Same as Alternative B. |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| of the subsurface features and watersheds immediately above the caves. (Refer to Appendix B.) See Figure 2-1 in Appendix A. | | surface and northward to the BLM boundary to protect underground features and supporting hydrology). (Refer to Appendix B.) See Figure 2-3 in Appendix A. | |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-NSO-44: *Cave and Karst Occurrence Area (680 acres)*. Prohibit surface occupancy and surface-disturbing activities in the area of 17 known cave and karst resources (extends to 5,000 feet below the surface). The NSO area encompasses cave openings and portions of the subsurface features and watersheds immediately above the caves. (Refer to Appendix B.) See Figure 2-2 in Appendix A. | Restrictions on Use:<br>Same as Alternative B. | Restrictions on Use:<br>Same as Alternative B. |
| Action:<br>Recommend withdrawal for the Deep Creek ACEC. (Also see sections on Locatable Minerals, Salable Minerals/Mineral Materials, and Non-Energy Leasable Minerals and ACECs.) | | | Action:<br>No similar action. |
| Action:<br>Recommend withdrawal for the Deep Creek SRMA. (Also see Locatable Minerals, Mineral Materials, and Non-Energy Leasable Minerals section.) | Action:<br>No similar action. | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Provide opportunities for people to engage in caving, research, and scientific exploration at significant caves to the extent consistent with the targeted outcomes the protection of cave ecology and cave formations. | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Implement a permit program to provide a basis for restricting or monitoring cave use and for compiling information returned by permittees on cave condition and presence/absence of bats. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| ***Resource Uses*** | | | |
| ***Forestry*** | | | |
| **GOAL:**<br>No similar goal under current RMP (BLM 1984a). | **GOAL:**<br>Use a variety of silvicultural techniques and harvest systems to manage for healthy forests and woodlands while offering a variety of forest products on a sustainable basis. | | |
| Objective:<br>Manage all suitable commercial forestland and woodland to meet saw timber and fuel wood demand and maintain stand productivity. | Objective:<br>On suitable productive forestland, produce a variety of forest products to meet commercial and private demands on a sustained-yield basis. See Figures 2-20 (Alternative B), 2-21 (Alternative C), and 2-22 (Alternative D) in Appendix A. | | |
| Action:<br>Manage 17,900 acres of commercial forestland and 82,400 acres of woodland. The annual allowable harvest from suitable commercial forestlands is estimated at 1.8 million board feet. | Action:<br>Provide forest products, including but not limited to sawlogs, firewood, Christmas trees, posts and poles, transplants, specialty wood products, and biomass by implementing the following actions:<br>• Intensively manage 31,400 acres of commercial forest and woodland to target an average annual PSQ of 1.2 million board-feet (Figure 2-20, Appendix A).<br>• Apply limited management to the remaining 391,700 acres of forests and woodlands in CRVFO.<br>• Prohibit commercial timber harvest on 81,800 acres of forests and woodlands (Figure 2-20, Appendix A). | Action:<br>Provide forest products, including but not limited to sawlogs, firewood, Christmas trees, posts and poles, transplants, specialty wood products, and biomass by implementing the following actions:<br>• Intensively manage 28,400 acres of commercial forest and woodland to target an average annual PSQ of 0.9 million board feet (Figure 2-21, Appendix A).<br>• Apply limited management to the remaining 341,500 acres of forests and woodlands.<br>• Prohibit commercial timber harvest on 135,000 acres of forests and woodlands (Figure 2-21, Appendix A). | Action:<br>Provide forest products, including but not limited to sawlogs, firewood, Christmas trees, post and poles, transplants, specialty wood products, and biomass by implementing the following actions:<br>• Intensively manage 32,200 acres of commercial forest and woodland to target an average annual PSQ of 1.4 million board feet (Figure 2-22 Appendix )<br>• Apply limited management to the remaining 387,700 acres of forests and woodlands.<br>• Prohibit commercial timber harvest on 85,000 acres of forests and woodlands in (Figure 2-22, Appendix A). |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Action:<br>Manage 17,900 acres of commercial forestland and 82,400 acres of woodland. Manage all forestland supporting commercial forestland and woodland species, including the five forest management units (King Mountain, Black Mountain, Castle Peak, Seven Hermits, and Naval Oil Shale Reserve). Major commercial species include lodgepole pine, Engelmann spruce, Douglas-fir, and ponderosa pine (commercial forestland) and pinyon and juniper (woodland). Aspen and subalpine fir are not considered major commercial species. | Action:<br>Conduct intensive management using the following actions: clearcuts, shelterwood, and other partial cuts; pre-commercial and commercial thinning, seeding, and planting; timber stand improvement; sanitation treatments; and mechanical treatments or prescribed fire and natural fire managed for resource benefits for stand replacement or conversion.<br><br>Maintain or improve existing access routes and construct permanent or temporary routes for access to productive forestlands. Pursue temporary or permanent access agreements or easements to provide public or administrative access to productive forest areas that are currently inaccessible. | | |
| Action:<br>Manage forestland to minimize losses of or damage to forest resources from insects and disease. | Action:<br>Implement immediate salvage or accelerated harvests following adverse events (e.g., pine and spruce beetle infestations, other insect outbreaks, disease, blow down, wildfire) to regenerate stands and to capture the economic value of forest products before that value is lost.<br><br>Accelerate harvest of lodgepole pine killed or threatened by mountain pine beetle above the PSQ for the next 10 to 15 years to salvage commercial value and reduce the large scale severe wildfire potential. As markets develop, increase aspen harvest to regenerate stands affected by sudden aspen decline and other pathogens. | Action:<br>Do not accelerate harvest levels to capture the economic values of forest products following adverse events. Conduct salvage operations to capture some commercial value and reduce the large scale severe wildfire potential. | Action:<br>Same as Alternative B. |
| Action:<br>Conduct periodic regeneration surveys to monitor for adequacy of regeneration of all reproduction method treatment areas. If adequate regeneration is not present or | Action:<br>Conduct periodic regeneration surveys to monitor for adequacy of regeneration of all reproduction-method-treatment areas. If adequate regeneration is not present or anticipated within 15 years, then artificially regenerate the area. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| anticipated within 5 years, then artificially regenerate the area. | | | |
| Action:<br>Conduct periodic stand examinations and forest inventories to monitor forest stand conditions. Thinning or other timber stand improvement projects may be monitored by periodic re-measurement of permanently marked plots that compare treated plots with untreated control plots. | | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Limit ground-based harvesting systems to slopes of 40 percent or less on suitable soils. Do not constrain aerial or cable systems by slope. | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Provide supplemental forest products by managing low-productivity forestland (woodlands and forest stands producing less than 20 cubic feet per acre per year), or sites withdrawn from planned harvest for other resource needs or because they are economically inaccessible, commensurate with meeting resource goals and objectives (e.g., insects, disease, wildfire). | | |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Conduct limited management, including harvesting for wood products, through the following actions: clearcuts, shelterwood and other partial cuts, sanitation treatments, and mechanical treatments or prescribed fire and natural fire managed for resource benefits for stand replacement or conversion. Conduct no intensive practices (e.g., artificial regeneration or pre-commercial thinning) unless necessary to achieve management objectives or benefit other resources. | | |
| Action:<br>Apply forest management practices to improve other resource values (e.g., range or wildlife habitat improvement and treatment of insect- or disease-infested trees in recreation sites) or on BLM lands intermingled with private lands. | Action:<br>Apply forest management practices and harvesting to improve other resource values and reduce hazardous fuels in cooperation with forest management activities on adjacent private lands. | | |
| ***Livestock Grazing*** | | | |
| **GOAL:**<br>No similar goal under current RMP (BLM 1984a). | **GOAL:**<br>Apply flexible and sustainable livestock grazing, in accordance with land health standards, to contribute to local economies, ranching livelihoods, and the rural western character integral to many communities. | | |
| Objective:<br>No similar objective under current RMP (BLM 1984a). | Objective:<br>Meet the forage demands of livestock operations based on current active preference (AUMs), while improving the quantity and quality of forage available for livestock and wildlife. | Objective:<br>Meet the forage demands of wildlife first, based on CDOW objectives. Meet the forage demands of livestock operations second, based on current active preference. If conflicts for forage arise, give preference to wildlife. | Objective:<br>Meet the forage demands of livestock operations first, based on current active preference (AUMs). Meet the forage demands of wildlife second, based on CDOW objectives. If conflicts for forage arise, give preference to livestock. |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Action:<br>Provide 489,600 acres for livestock grazing. Provide 39,200 AUMs of livestock forage commensurate with meeting public land health standards. See Figure 2-23 (Appendix A) showing lands available for grazing. | Action:<br>Provide approximately 451,400 acres for livestock grazing, and provide approximately 36,000 AUMs of livestock forage. See Figure 2-24 (Appendix A) showing lands available for grazing. | Action:<br>Provide approximately 432,000 acres for livestock grazing, and provide approximately 35,500 AUMs of livestock forage. See Figure 2-25 (Appendix A) showing lands available for grazing. | Action:<br>Provide approximately 443,400 acres for livestock grazing, and provide approximately 36,500 AUMs of livestock forage. See Figure 2-26 (Appendix A) showing lands available for grazing. |
| Action:<br>Make 756 AUMs on 24 unallotted allotments available for livestock use. | Action:<br>Implement the following actions on 55 currently vacant allotments (Appendix I, Livestock Grazing Allotments):<br>• Combine six allotments with adjacent allotments to facilitate administration (CRVFO).<br>• Close 38 allotments due to suitability for livestock grazing.<br>• Partially close and partially combine three allotments due to suitability for livestock grazing.<br>• Create two reserve allotments.<br>• Make six allotments available for grazing. | Action:<br>Implement the following actions on 55 currently vacant allotments (Appendix I, Livestock Grazing Allotments):<br>• Close all 55 allotments due to suitability for livestock grazing. | Action:<br>Implement the following actions on 59 currently vacant allotments (Appendix I, Livestock Grazing Allotments):<br>• Combine 12 allotments with adjacent allotments to facilitate administration.<br>• Close 30 allotments due to suitability for livestock grazing.<br>• Partially close and partially combine six allotments due to suitability for livestock grazing.<br>• Create two reserve allotments for use during rehabilitation.<br>• Make five allotments available for grazing. |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Close the following allotments that are currently authorized for use to livestock grazing due to resource concerns/conflicts (Appendix I):<br>• County Line 8923 for noncompliance with land health standards due to livestock.<br>• Eby Creek 8638 due to suitability for livestock grazing.<br>• Salt Creek Forest 8722 due to suitability for livestock grazing. | Action:<br>Close the following allotments that are currently authorized for use to livestock grazing due to resource concerns/conflicts (Appendix I):<br>• County Line 8923 for noncompliance with land health standards due to livestock.<br>• Smith Gulch 8922 for noncompliance with land health standards and threatened and endangered species. | Action:<br>Close the following allotments that are currently authorized for use to livestock grazing due to resource concerns/conflicts (Appendix I):<br>• County Line 8923 for noncompliance with land health standards due to livestock.<br>• Alkali Gulch 8131 due to increased gas production.<br>• Alkali Creek 8130 due to increased gas production. |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
| --- | --- | --- | --- |
| | • Falk 8723 due to suitability for livestock grazing. | • Alkali Gulch 8131 for wildlife habitat.<br>• Eby Creek 8638 due to suitability for livestock grazing.<br>• Salt Creek Forest 8722 due to suitability for livestock grazing.<br>• Falk 8723 due to suitability for livestock grazing. | • Dry Creek Pete and Bill 8125 due to increased gas production. |
| Action:<br>Prioritize 254 grazing allotments for management according to one of the following three levels: Maintain, Improve, and Custodial, as follows: 42 Maintain (satisfactory condition/limited potential), 94 Improve (unsatisfactory condition/high potential), and 118 Custodial (small unconsolidated allotments/low potential). | Action:<br>Continue prioritizing grazing allotments according to three levels: Improve as first priority, followed by Maintain and Custodial. Based on monitoring and resource management needs, reassign allotments as necessary. See Appendix I, Livestock Grazing Allotments, listing allotments and levels of each allotment. | | |
| Action:<br>Following initial allocation, manipulate 27,800 acres of vegetation on 98 allotments to increase livestock forage by 12,700 AUMs using vegetation manipulation techniques, resulting in total projected allocation of 51,900 AUMs. | Action:<br>Conduct vegetation manipulation and other range improvement projects, including grazing management practices, to improve the quantity and quality of forage available for livestock and wildlife. | Action:<br>Conduct vegetation manipulation and other range improvement projects, including grazing management practices, to improve the quantity and quality of forage available for wildlife first and for livestock second. | Action:<br>Conduct vegetation manipulation and other range improvement projects, including grazing management practices, to improve the quantity and quality of forage available for livestock first and for wildlife second. |
| Action:<br>No similar action under current RMP (BLM 1984a). | Action:<br>Assess vegetation attributes within grazing allotments to ensure that BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997) (Appendix J) are met per established protocols and technical references. | | |
| Action:<br>Develop a supervision and monitoring plan to ensure that allotments within each category – Maintain, Improve, and Custodial – are checked periodically to determine resource conditions and whether criteria are still being met. Based on monitoring, make adjustments to grazing management (e.g., AUMs, periods of use, allotments, class of livestock, distribution). | Action:<br>Make adjustments to grazing management (e.g., AUMs, periods of use, allotments, class of livestock, distribution) based on monitoring. | | |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Action:<br>Prohibit livestock grazing on all seeded areas for two growing seasons. | Action:<br>When and where deemed necessary by the Authorized Officer, defer or exclude livestock grazing use for two growing seasons on disturbed areas (e.g., a fire event, reclamation of disturbed lands, seedings, surface-disturbing vegetation treatment), or until site-specific analysis and/or monitoring data indicate that vegetation cover, species composition, and litter accumulation are adequate to support and protect watershed values, meet vegetation objectives, and sustain grazing use. | | |
| ***Recreation and Visitor Services*** | | | |
| **GOAL:**<br>No similar goal under current RMP (BLM 1984a). | **GOAL:**<br>Produce a diversity of quality recreational opportunities that support outdoor-oriented lifestyles and add to participants' quality of life while contributing to the local economies. | | |
| Objective:<br>Provide for visitor safety. Reduce the impacts of recreational use on fragile and unique resource values. | FO-wide Resource-protection Objective:<br>Increase awareness, understanding, and a sense of stewardship in recreational activity participants so their conduct safeguards cultural and natural resources as defined by Colorado Standards for Public Land Health or area-specific (e.g., ACEC, wild and scenic river) objectives.<br><br>FO-wide Visitor Health and Safety Objective:<br>Ensure that visitors are not exposed to unhealthy or unsafe human-created conditions (defined by a repeat incident in the same year, of the same type, in the same location, due to the same cause).<br><br>FO-wide Use/User Conflict Objective:<br>Achieve a minimum level of conflict between recreation participants to 1) allow other resources/programs to achieve their RMP objectives; 2) curb illegal trespass and property damage; and 3) maintain a diversity of recreation activity participation.<br><br>FO-wide Community Growth Area Objective:<br>Increase collaboration with community partners to maintain appropriate activity-based recreation opportunities in community growth areas (BLM lands adjacent to, between, and surrounding communities; also referred to as wildland-urban interface areas). | | |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-CSU-19: *Developed Recreation Facilities and Trails*. Apply CSU restrictions on existing and future developed recreation sites, national/regional trails, local system trails, trailheads, interpretive sites, and other sites with recreation value. (Refer to Appendix B.) See Figures 2-6 (Alternative B), 2-7 (Alternative C), and 2-8 (Alternative D) in Appendix A. | | |
| Restrictions on Use:<br>*Camping Limits*. Within ERMAs and SRMAs, implement a 14-day camping limit on BLM lands from September 1 to March 31. From | Restrictions on Use:<br>*Camping Limits*. In areas open to camping and overnight use, implement a 14-day camping limit on BLM lands from September 1 to March 31. From April 1 to August 31, implement a 7-day camping limit. Campers must relocate at least a 30-mile radius away and may not return within 30 days to a previous campsite. | | |

BLM_0015949

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| April 1 to August 31, implement a 7-day camping limit. Campers must relocate at least 30 miles away and may not return within 30 days to a previous campsite. | | | |
| Restrictions on Use:<br>*Camping Closures*. Close the following BLM lands to camping and overnight use outside designated campsites and developed campgrounds (Figure 2-27, Appendix A):<br><br>• Within 0.25 mile of the Fisher Creek Cemetery Road<br>• Within 300 feet from the centerline of North Hardscrabble Access Road (Spring Creek) in Township 5 South, Range 85 West, Track 80, Sixth Principal Meridian<br>• Glenwood Canyon in the Horseshoe Canyon (Bend) area in Township 6 South, Range 89 West Section 3, Sixth Principal Meridian<br>• Within 0.25 mile of Deep Creek in Township 4 South, Range 86 West, Section 30 and Township 4 South, Range 87 West, Section 25, Sixth Principal Meridian | Restrictions on Use:<br>*Camping Closures*. Close the following BLM lands to camping and overnight use outside designated campsites and developed campgrounds (Figure 2-28, Appendix A):<br><br>Same areas as Alternative A, plus the following:<br>• Within 0.25 mile of Prince Creek Road (Pitkin County Road 7)<br>• Within the Eagle River ERMA<br>• Garfield Creek Colorado River Access in Township 6 South, Range 91 West, Sections 7 and 8<br>• Silt Mesa on BLM lands south of the crest of the Grand Hogback in Township 5 South, Range 91 West; Township 5 South, Range 92 West; Township 6 South, Range 91 West; Township 6 South, Range 92 West; Sixth Principal Meridian<br>• Thompson Creek area within 0.25 mile of USFS Road 305<br>• Red Hill SRMA (north of Carbondale)<br>• Siloam Springs area north of the Colorado River in Township 5 South, Range 87 West, Sections 14-15, Sixth Principal Meridian<br>• South Canyon Recreation Site and surrounding area in Township 6 | Restrictions on Use:<br>*Camping Closures*. Close the following BLM lands to camping and overnight use outside designated campsites and developed campgrounds (Figure 2-29, Appendix A):<br><br>Same areas as Alternative B, plus the following:<br>• Within The Crown ERMA | Restrictions on Use:<br>*Camping Closures*. Close the following BLM lands to camping and overnight use outside designated campsites and developed campgrounds (Figure 2-30, Appendix A):<br><br>Same areas as Alternative B, except <u>not including</u> the following:<br>• Silt Mesa on BLM lands south of the crest of the Grand Hogback in Township 5 South, Range 91 West; Township 5 South, Range 92 West; Township 6 South, Range 91 West; Township 6 South, Range 92 West; Sixth Principal Meridian |

<table>
<tr><th>Alternative A: No Action</th><th>Alternative B</th><th>Alternative C</th><th>Alternative D</th></tr>
<tr><td></td><td>South, Range 90 West, Section 2, Sixth Principal Meridian<br>• Ute Trailhead (near Dotsero) west and north of the Colorado River in Township 4 South, Range 86 West, Sections 31-32 and Township 5 South, Range 86 West, Sections 5-6, Sixth Principal Meridian</td><td></td><td></td></tr>
<tr><td colspan="4">Restrictions on Use:<br>Allow the discharge of firearms for recreational target shooting on BLM lands, outside areas with firearm use restrictions (see below), provided that the firearm is discharged toward a proper backstop sufficient to stop the projectile's forward progress beyond the intended target. Targets shall be constructed of wood, cardboard and paper or similar non-breakable materials. All targets, clays, and shells are considered litter after use and must be removed and properly discarded.</td></tr>
<tr><td>Restrictions on Use:<br>Firearm Use Restriction. Prohibit the discharge of firearms for recreational target shooting on the following BLM lands (Figure 2-31, Appendix A):<br>• Developed recreation sites<br>• Within 300 feet from the centerline of North Hardscrabble Access Road (Spring Creek) located in Township 5 South, Range 85 West, Track 80, Sixth Principal Meridian</td><td colspan="2">Restrictions on Use:<br>Firearm Use Restriction. Prohibit the discharge of firearms for recreational target shooting on the following BLM lands (Figure 2-32, Appendix A). The purpose of the restriction is to protect visitor safety by minimizing potential for accidental shootings (43 CFR 8364.1). Continue to permit hunting in accordance with CDOW regulations.<br><br>Same areas as Alternative A, plus the following:<br>• Developed recreation sites (existing and future)<br>• Silt Mesa on BLM lands south of the crest of the Grand Hogback in (Township 5 South, Range 91 West Township 5 South, Range 92 West Township 6 South, Range 91 West Township 6 South, Range 92 West, Sixth Principal Meridian)<br>• Battlement Creek within 0.25 mile of Garfield County Road 302 Township 7 South, Range 95 West Sections 14 and 15</td><td>Restrictions on Use:<br>Firearm Use Restriction. Prohibit the discharge of firearms for recreational target shooting on the following BLM lands (Figure 2-33, Appendix A). The purpose of the restriction is to protect visitor safety by minimizing potential for accidental shootings (43 CFR 8364.1). Continue to permit hunting in accordance with CDOW regulations.<br><br>Same areas as Alternative B, except <u>not including</u> the following:<br>• Silt Mesa on BLM lands south of the crest of the Grand Hogback in Township 5 South, Range 91 West; Township 5 South, Range 92 West; Township 6 South, Range 91 West; and Township 6 South, Range 92 West, Sixth Principal Meridian)</td></tr>
</table>

BLM_0015951

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Restrictions on Use:<br>No similar action under current RMP (BLM 1984a).<br>See existing stipulation GS-NSO-16 for SRMAs, including Rifle Mountain Park. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-45: *Rifle Mountain Park*. Prohibit surface occupancy and surface-disturbing activities in Rifle Mountain Park. See Figures 2-2 (Alternative B), 2-3 (Alternative C), and 2-4 (Alternative D) in Appendix A. | | |
| Action:<br>*Special Recreation Permits*. Issue SRPs as a discretionary action. No new SRPs would be issued and no additional uses would be added to existing SRPs for big game hunting, mountain lion hunting, river-related activities on the Upper Colorado River SRMA and the Eagle River, or any activities within King Mountain, Red Hill SRMA, Thompson Creek ACEC, Deep Creek ACEC, Castle Peak WSA, Bull Gulch WSA or Eagle Mountain WSA. | Action:<br>*Special Recreation Permits*. Issue SRPs as a discretionary action for a variety of uses that are consistent with resource/program objectives and within budgetary/workload constraints. No new SRPs would be issued for big game (except Governor's Tags outfitters on a case-by-case basis) and mountain lion hunting. Prohibit vending permits outside special events on BLM lands. (Also refer to Appendix - Draft Recreation and Visitor Services Prescriptions For Proposed Special and Extensive Recreation Management Areas for specific location SRP management). | Action:<br>*Special Recreation Permits*. Same as Alternative B, except in areas managed as LWCs, issue special recreation permits only if the proposed activity or event is beneficial to the realization of values associated with wilderness characteristics. (Also refer to Appendix - Draft Recreation and Visitor Services Prescriptions For Proposed Special and Extensive Recreation Management Areas for specific location SRP management). | Action:<br>*Special Recreation Permits*. Issue SRPs as a discretionary action. Unless otherwise specified, maximize opportunities for commercial recreation through the issuance of SRPs, including vending permits outside special events. Apply cost-recovery procedures for issuing SRPs where appropriate. (Also refer to Appendix - Draft Recreation and Visitor Services Prescriptions For Proposed Special and Extensive Recreation Management Areas for specific location SRP management). |
| Action:<br>*Fees*. As provided by the guidelines in the Federal Lands Recreation Enhancement Act (FLREA; PL 108-447), implement recreation fees as appropriate to maintain visitor services and facilities through management of sites or areas as a US Fee Area. | | | |
| **Special Recreation Management Areas (SRMAs)** | | | |
| Objective:<br>Ensure the continued availability of outdoor recreational opportunities that the public seeks and that are not readily available from other sources. Adopt recreation opportunity spectrum (ROS) management classes. | Objective:<br>SRMA Objective: Specific outcome-focused objectives, proposed recreation setting characteristics (RSCs), and the proposed management framework can be found in Appendix K, CRVFO Draft Recreation Prescriptions for Proposed Special and Extensive Recreation Management Areas. | | |
| Action:<br>Designate the existing eight SRMAs (60,400 acres): | Action:<br>Designate six SRMAs (51,000 acres):<br>• Bocco Mountain (1,400 acres) | Action:<br>Designate two SRMAs (23,800 acres):<br>• Red Hill (3,100 acres) | Action:<br>Designate seven SRMAs (63,600 acres): |

BLM_0015952

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| • Bocco Mountain (1,400 acres)<br>• Bull Gulch (8,300 acres)<br>• Deep Creek (2,400 acres)<br>• Gypsum Hills (16,900 acres)<br>• Hack Lake (3,300 acres)<br>• Red Hill (3,100 acres)<br>• Thompson Creek (4,300 acres)<br>• Upper Colorado River (20,700 acres)<br><br>Refer to Appendix M. See Figure 2-34 in Appendix A. | • Hack Lake (3,700 acres)<br>• King Mountain (13,000 acres)<br>• Red Hill (3,100 acres)<br>• The Crown (9,100 acres)<br>• Upper Colorado River (20,700 acres)<br><br>Refer to Appendix M. See Figure 2-35 in Appendix A. | • Upper Colorado River (20,700 acres)<br><br>Refer to Appendix M. See Figure 2-36 in Appendix A. | • Bocco Mountain (1,400 acres)<br>• Fisher (2,800 acres)<br>• Hardscrabble/ East Eagle (17,000 acres)<br>• Red Hill (3,100 acres)<br>• The Crown (9,100 acres)<br>• Thompson Creek (9,500 acres)<br>• Upper Colorado River (20,700 acres)<br><br>Refer to Appendix M. See 2-37 in Appendix A. |
| Restrictions on Use:<br>**STIPULATION** GS-NSO-16: *Special Recreation Management Areas, Deep Creek Cave Complex, and ACECs*. Prohibit surface occupancy and surface-disturbing activities in the following SRMAs (22,300 acres):<br>• Bull Gulch<br>• Deep Creek<br>• Hack Lake<br>• Red Hill<br>• Thompson Creek<br><br>**STIPULATION** GS-NSO-17: *Recreation Management Areas*. Prohibit surface occupancy and surface-disturbing activities in the following Recreation Management Areas (64,100 acres):<br>• Bull Gulch Area (the portion of the WSA not within the SRMA)<br>• Castle Peak<br>• Fisher Creek Area (Haff Ranch)<br>• King Creek Area (840 acres on the north side of King Mountain) | Restrictions on Use:<br>**STIPULATION** CRV-NSO-46: *Special Recreation Management Areas*. Prohibit surface occupancy and surface-disturbing activities in the following SRMAs for the protection of the recreation outcomes and setting prescriptions (49,600 acres):<br>• Hack Lake<br>• King Mountain<br>• Red Hill<br>• The Crown<br>• Upper Colorado River<br><br>Refer to Appendix B. See Figure 2-2 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-46: *Special Recreation Management Areas*. Prohibit surface occupancy and surface-disturbing activities in the following SRMAs for the protection of the recreation outcomes and setting prescriptions (23,800 acres):<br>• Red Hill<br>• Upper Colorado River<br><br>Refer to Appendix B. See Figure 2-3 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-NSO-46: *Special Recreation Management Areas*. Prohibit surface occupancy and surface-disturbing activities in the following SRMAs for the protection of the recreation outcomes and setting prescriptions (27,100 acres):<br><br>Same areas as Alternative C, plus:<br>• Fisher Creek<br><br>Refer to Appendix B. See Figure 2-4 in Appendix A. |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| • King Mountain<br>• Pisgah Mountain<br>• Siloam Springs Area<br>• Sunlight Peak<br><br>Refer to Appendix B. See Figure 2-1 in Appendix A. | | | |
| Restrictions on Use:<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-CSU-17: *Special Recreation Management Areas*. Apply CSU restrictions (1,400 acres) in the following SRMAs for the protection of the recreation outcomes and setting prescriptions:<br>• Bocco Mountain<br>Refer to Appendix B. See Figure 2-6 in Appendix A. | Restrictions on Use:<br>No similar restrictions on use. | Restrictions on Use:<br>**STIPULATION** CRV-CSU-17: *Special Recreation Management Areas*. Apply CSU restrictions (41,100 acres) in the following SRMAs for the protection of the recreation outcomes and setting prescriptions:<br>• Bocco Mountain<br>• Hardscrabble/East Eagle<br>• The Crown<br>• Thompson Creek<br>Refer to Appendix B. See Figure 2-8 in Appendix A. |
| **Extensive Recreation Management Areas (ERMAs)** | | | |
| Objective:<br>Ensure the continued availability of outdoor recreational opportunities that the public seeks and that are not readily available from other sources. Adopt recreation opportunity spectrum (ROS) management classes. | Objective:<br>Objective: ERMA objectives and the proposed management framework can be found in Appendix M, CRVFO Draft Recreation Prescriptions for Proposed Special and Extensive Recreation Management Areas). | | |
| Action:<br>Identify BLM lands not included in SRMAs as part of the CRVFO ERMA (Appendix M, Description of Recreation Resources). | Action:<br>Designate the following areas as ERMAs (45,600 acres):<br>• Eagle River (3,300 acres)<br>• Fisher Creek (2,800 acres)<br>• Hardscrabble/East Eagle (17,000 acres)<br>• New Castle (9,900 acres) | Action:<br>Designate the following areas as ERMAs (71,400 acres):<br>Same areas as Alternative B (45,600 acres), plus the following:<br>• Hack Lake (3,700 acres)<br>• King Mountain (13,000 acres)<br>• The Crown (9,100 acres) | Action:<br>Designate the following areas as ERMA (33,000 acres):<br>• Eagle River (3,300 acres)<br>• Hack Lake (3,700 acres)<br>• King Mountain (13,000 acres)<br>• New Castle (9,900 acres)<br>• Silt Mesa (3,100 acres) |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| | • Silt Mesa (3,100 acres)<br>• Thompson Creek (9,500 acres)<br><br>Refer to Appendix M. | Refer to Appendix M. | Refer to Appendix M. |
| Restrictions on Use<br>No similar restrictions on use under current RMP (BLM 1984a). | Restrictions on Use:<br>**STIPULATION** CRV-CSU-18: *Extensive Recreation Management Areas*. Apply CSU restriction in the following ERMAs:<br>• Fisher Creek<br>• Hardscrabble/East Eagle<br>• New Castle<br>• Silt Mesa<br>• Thompson Creek<br><br>(Refer to Appendix B.) See Figure 2-6 in Appendix A. | Restrictions on Use:<br>**STIPULATION** CRV-CSU-18: *Extensive Recreation Management Areas*. Apply CSU restriction in the following ERMAs:<br>• King Mountain<br>• New Castle<br>• Silt Mesa<br><br>(Refer to Appendix B.) See Figure 2-7 in Appendix A. | Restrictions on Use:<br>No similar restrictions on use. |
| ***Comprehensive Trails and Travel Management*** | | | |
| **GOAL:**<br>No similar goal under current RMP (BLM 1984a). | **GOAL:**<br>The travel system supports the BLM mission, achieves resource management goals and objectives, and provides for appropriate public and administrative access. | | |
| Objective:<br>Protect fragile and unique resource values from damage by ORV use and provide ORV use opportunities where appropriate. | Objective:<br>Maintain a comprehensive travel network that best meets the full range of public, resource management, and administrative access needs. | | |
| **Over-Land Travel** | | | |
| Action:<br>Designate OHV area travel as follows (Figure 2-38, Appendix A):<br>• Open: 294,300 acres<br>• Limited to existing routes: 38,000 acres<br>• Limited to existing routes May 1 to November 30: 4,300 acres<br>• Limited to designated routes: 123,000 acres<br>• Closed: 44,000 acres | Action:<br>Designate OHV area travel as follows (Figure 2-39, Appendix A):<br>• Open: 0 acres<br>• Limited to designated routes: 467,600 acres<br>• Closed: 37,,300 acres | Action:<br>Designate OHV area travel as follows (Figure 2-40, Appendix A):<br>• Open: 0 acres<br>• Limited to designated routes: 467,400 acres<br>• Closed: 37,500 acres | Action:<br>Designate OHV area travel as follows (Figure 2-41, Appendix A):<br>• Open: 0 acres<br>• Limited to designated routes: 473,500 acres<br>Closed: 31,400 acres |

| Alternative A: No Action | Alternative B | Alternative C | Alternative D |
|---|---|---|---|
| Action:<br>In areas classified as limited to designated routes, allow public travel on 1,273 miles (Figure 2-38, Appendix A):<br>• Routes designated for full-sized vehicles: 760 miles<br>• Routes designated for all-terrain vehicle (less than 50 inches in width): 86 miles<br>• Routes designated for motorcycle: 85 miles<br>• Routes designated for mechanized: 180 miles<br>• Routes designated for foot/horse: 160 miles<br>• Routes designated for foot: 2 miles<br>• Routes designated for obliteration: 0 miles<br><br>Allow administrative or other non-public travel (e.g., public with legal access) and public foot/horse travel on an additional 310 miles.<br><br>Administrative routes are limited to authorized users (typically motorized access). These are existing routes that lead to developments that have an administrative purpose, where the BLM or a permitted user must have access for regular maintenance or operation. | Action:<br>In areas classified as limited to designated routes, allow public travel on 1,240 miles (Figure 2-39, Appendix A):<br>• Routes designated for full-sized vehicles: 470 miles<br>• Routes designated for all-terrain vehicle (less than 50 inches in width): 62 miles<br>• Routes designated for motorcycle: 66 miles<br>• Routes designated for mechanized: 220 miles<br>• Routes designated for foot/horse: 420 miles<br>• Routes designated for foot: 2 miles<br>• Routes designated for obliteration: 70 miles<br>• Routes designated for seasonal closure August 20 to April 30: 8 miles<br><br>Allow administrative or other non-public travel (e.g., public with legal access) and public foot/horse travel on an additional 310 miles.<br><br>Administrative routes are limited to authorized users (typically motorized access). These are existing routes that lead to developments that have an administrative purpose, where the BLM or a permitted user must have access for regular maintenance or operation. | Action:<br>In areas classified as limited to designated routes, allow travel on 1,104 miles (Figure 2-40, Appendix A):<br>• Routes designated for full-sized vehicles: 440 miles<br>• Routes designated for all-terrain vehicle (less than 50 inches in width): 55 miles<br>• Routes designated for motorcycle: 27 miles<br>• Routes designated for mechanized: 140 miles<br>• Routes designated for foot/horse: 440 miles<br>• Routes designated for foot: 2 miles<br>• Routes designated for obliteration: 220 miles<br>• Routes designated for seasonal closure August 20 to April 30: 8 miles<br><br>Allow administrative or other non-public travel (e.g., public with legal access) and public foot/horse travel on an additional 310 miles.<br><br>Administrative routes are limited to authorized users (typically motorized access). These are existing routes that lead to developments that have an administrative purpose, where the BLM or a permitted user must have access for regular maintenance or operation. | Action:<br>In areas classified as limited to designated routes, allow travel on 1,262 miles (Figure 2-41, Appendix A):<br>• Routes designated for full-sized vehicles: 530 miles<br>• Routes designated for all-terrain vehicle (less than 50 inches in width): 68 miles<br>• Routes designated for motorcycle: 82 miles<br>• Routes designated for mechanized: 280 miles<br>• Routes designated for foot/horse: 300 miles<br>• Routes designated for foot: 2 miles<br>• Routes designated for obliteration: 50 miles<br>• Routes designated for seasonal closure October 1 to April 30: 8 miles<br><br>Allow administrative or other non-public travel (e.g., public with legal access) and public foot/horse travel on an additional 310 miles.<br><br>Administrative routes are limited to authorized users (typically motorized access). These are existing routes that lead to developments that have an administrative purpose, where the BLM or a permitted user must have access for regular maintenance or operation. |