susceptible to soil detachment and transport during runoff, increasing delivery of sediments and contaminants to nearby waterways. In addition, agricultural runoff would introduce nutrients, pesticides, and herbicides to surface water and shallow groundwater.

Oil and gas development has considerable cumulative impacts to water resources. Water depletions from the Colorado River basin, for drilling, cementing, dust abatement, and hydrostatic pipeline testing, may decrease overall flow patterns and volumes of springs/seeps, streams and rivers throughout the CRVFO. Decreased flow often compounds existing water quality impairments, and may lead to reduced water quality elsewhere. Many resources values throughout the CRVFO, such as aquatic and wildlife habitat, recreation, and grazing, are dependent on consistently good water quantity and quality. Soil and water contamination via spills, leaks or compromised down-hole well infrastructure also contributes to overall impacts to water sources.

Expansion of communities along the Eagle, Colorado, Roaring Fork, and Crystal Rivers is anticipated to have impacts on water quantity and water quality. Urban development and associated increases in recreational and commercial land use will increase in the foreseeable future. For example, population projections for Garfield County alone are expected to increase by 30 percent (from 63,000 to 98,000 people) in the next 10 years (Colorado State Demography Office 2007d). Industrial land use, especially fluid minerals development on federal, state, private, and other lands within and adjacent to the planning area, will continue to increase. Oil and gas wells on non-BLM land are expected to increase at a similar or greater rate than BLM wells, which currently account for 20 percent of wells in Garfield County (COGCC 2010).

Unavoidable water quality impacts would include temporary increases in suspended load in flowing streams as a result of culvert installation, vehicle use of low-water crossings, livestock use of streambanks and wetlands, and permitted channel fills resulting from construction of oil and gas pads, roads, and pipelines. Water quantity impacts would include water withdrawals for livestock use, fluid minerals resource development, and watering of roads for dust mitigation.

Reasonably foreseeable future actions on federal, state, private, and other lands within and adjacent to the planning area that could have an adverse effect on water resources include urban development, expansion of recreational use (including increased OHV use), livestock grazing, and ongoing mineral exploration, development, and production. Without proper mitigation and BMPs, these activities could have similar adverse impacts, as described above.

Under all alternatives, water resources would benefit from management in accordance with the Fundamentals of Rangeland Health and Standards and Guidelines for Grazing Administration and applicable state and federal water-quality standards. Site-specific mitigation and BMPs for surface-disturbing activities would further reduce impacts on water resources. Adherence to these standards would reduce many of the adverse impacts from future actions. In addition, existing and proposed stipulations designed to protect water resources would be beneficial in minimizing sediment and contaminant delivery potential by preventing or limiting surface-disturbing activities in proximity to hydrologic features. Stipulations and limitations for other resources that prevent or limit surface-disturbing activities would provide additional protection for water resources and thereby could be beneficial (e.g., fisheries, riparian). Furthermore, timing limitations could benefit water resources by limiting or preventing surface-disturbing activities during times of the year when saturated soil conditions exist or when precipitation and runoff are frequent (e.g., winter, spring).

BLM_0016460

Stipulations designed to protect water resources vary by alternative, as do stipulations for other resources that provide additional protection for water resources. Under all alternatives, the BLM would continue to oppose water right applications that could adversely affect water quantity on BLM lands or that could injure existing water rights for maintenance of habitat, wildlife, water quality, and fisheries. Under Alternative A, major rivers and domestic watersheds would be protected by stipulations and additional protection would be provided by riparian stipulations. However, hydrologic features with no riparian vegetation (e.g., springs, ephemeral drainages) would essentially be protected only by applicable state and USACE laws and regulations. In addition, land uses under this alternative would continue at the existing rates of development.

Alternative B would provide additional protection for water resources by applying the streamside management zones stipulation and would include less projected land use and development than under Alternative A. However, under this alternative less protection would be provided by riparian stipulations. Alternative C would provide the most protection for water resources by applying stipulations to protect all hydrologic features and by providing more riparian protection than under Alternative B. In addition, this alternative would decrease land use activities and development. Of the four alternatives, Alternative D would be the least restrictive, allowing use to increase beyond existing conditions. Water resources would have little protection under this alternative, and riparian protection would be less than under Alternatives A and C.

BLM_0016461

### 4.2.5   Vegetation

***Methods and Assumptions***

This section is a discussion of the potential impacts of other management actions on vegetation, based on existing conditions of vegetation resources described in Section 3.2.5. Impacts analyses and conclusions are based on interdisciplinary team knowledge of resources and appropriate data within the planning area, on a review of existing literature, and, in the absence of quantitative data, on the professional judgment of experts within and outside the BLM. Spatial data analysis was conducted using ESRI, ArcGIS Desktop computer software, and was utilized to identify the amount of vegetation affected and, in some cases, to quantify the level of impact from the various management actions. In the absence of quantitative or spatial data, impact analysis is based on existing literature and professional knowledge of the CRVFO staff. The focus of the impact analysis is on the goals, objectives and actions associated with resources and uses that have more than a negligible effect on vegetation. Objectives or actions that have no impacts or negligible impacts on vegetation resources are typically not addressed. Impacts are sometimes described using ranges of potential impacts or in qualitative terms if appropriate.

Impacts on vegetation include actions that physically disturb or change the composition of vegetation communities and their functioning condition in the planning area. The impacts of management actions on vegetation communities vary, depending on such factors as the type of soils, watershed conditions, wildland fire management, topography, vegetation type, climatic conditions, and plant reproductive characteristics. Impacts on vegetation diversity, which includes structure, productivity, vigor, percent cover, density, and species composition, were based on likely changes relative to movement toward desired ecological conditions.

Impacts on vegetation communities result from two categories of management actions: those designed to improve vegetation resources for their intrinsic ecological values and those directed at other resources but that also impact vegetation. Some impacts are direct, while others are indirect and affect vegetation through a change in another resource. Direct impacts on vegetation include crushing, trampling, or removing rooted vegetation, resulting in a reduction in vegetation cover. Direct impacts also include actions that unequivocally reduce the total numbers of plant species or that reduce or cause the loss of total area, diversity, vigor, structure, or function of vegetation habitat. Surface-disturbing activities from management actions would probably affect the relative abundance of species within plant communities, the relative distribution of plant communities, and the relative occurrence of seral stages of those communities.

Indirect impacts from surface disturbance on vegetation include soil compaction, erosion, and sedimentation, changes in hydrology, loss of pollinators and pollinator habitat, and increased likelihood for weed invasion. Together, these impacts would probably lead to reduced vegetation health and vigor, reduced plant cover, lower plant diversity, habitat fragmentation, and altered fire regimes. Riparian areas are particularly sensitive to these changes because they depend on vegetation to stabilize banks and soils and need sufficient water supply and quality to maintain vegetation. These qualities would probably increase over the life of the RMP. The main contributors to surface disturbances are minerals and energy development, wildland and prescribed fire, vegetation management activities (such as thinning and chemical treatments), recreation, travel, and issuance of ROWs. However, the implementation of mitigation measures and BMPs would decrease the impacts on vegetation resources over time.

The vegetation analysis is based on the following assumptions:

September 2011          *Colorado River Valley Field Office – Draft RMP Revision EIS*          4-110
*Chapter 4, Environmental Consequences*

BLM_0016462

- If areas are seeded following ground-disturbing activities, or if vegetation naturally reestablishes following wildfire, adequate ground cover (such as grasses and forbs) could be established within 2 to 5 years. Shrubs (such as oakbrush and sagebrush) could take several decades to reestablish, and woodland communities would take even longer to return to predisturbance conditions. Vegetation recovery would have a lower chance of success in those areas with poor soils, south-facing slopes, and low precipitation (e.g., salt desert shrublands).

- All plant communities would be managed toward achieving a mix of native species composition, cover, and age-classes across the landscape.

- Without disturbance, forest and woodland communities would increase in age and cover, with reduced composition and cover of understory species.

- The degree of impact attributed to any one disturbance or series of disturbances would be influenced by several factors, including location in the watershed, the type, time, and degree of disturbance, existing vegetation, precipitation, and mitigating actions applied to the disturbance.

- Compliance with use authorizations (e.g., ROW authorizations, special recreation permits [SRPs], grazing permits) would be adequate to ensure mitigation and stipulations are adhered to for protection of riparian-wetland resources.

- Riparian conditions would be monitored, as needed, for any surface uses that could affect riparian areas and would help ensure that appropriate action to protect these vegetation communities be taken before the functioning conditions deteriorate.

- Other management actions (e.g., implementation actions) not specifically mentioned in this plan would be guided by goals and objectives established for the particular resource or use.

- Many of the resources and uses have NSO or CSU stipulations that extend beyond or overlap the NSO or CSU stipulations listed for protection of riparian-wetland resources. Although NSO or CSU stipulations for other resources and uses may offer additional benefits (e.g., reduced erosion and sedimentation) and indirectly support riparian-wetland resources, most of these benefits would be negligible or minor. In addition, riparian NSO or CSU stipulations would provide adequate protection for riparian-wetland resources in most cases. For these reasons, impacts on riparian-wetland resources from NSO or CSU stipulations associated with other resources or uses are not always addressed, particularly if they involve relatively small areas.

- Maps for riparian areas throughout this document were derived from a variety a sources and represent the best estimate at this time. The CRVFO, as with most other BLM field offices, does not currently have all riparian-wetland resources mapped. Although most lotic (flowing water) sites have been identified, there may be some riparian areas, such as those that exist in ephemeral and intermittent drainages that have yet to be identified. In addition, the number of acres within each riparian zone for lotic systems has not been inventoried or mapped. The amount and extent of riparian areas associated with lentic (standing water) systems is one the largest data gaps. This is especially true for the relatively small lentic sites that are associated with springs and seeps. Previously undocumented spring sources are discovered every year. It is assumed that riparian NSO and CSU stipulations would apply to all riparian areas, regardless of whether they are currently mapped (i.e., the stipulations apply to undocumented riparian areas as well). Conversely, maps depicting riparian areas may not always mean a riparian area exists. It is assumed that the NSO and CSU stipulations would

BLM_0016463

not apply to riparian areas that are currently mapped but determined not to exist after a subsequent site visit.

- Roads closed to motorized use (including road closures precipitated by special designations) would still be open for administrative use, such as riparian monitoring, land health assessment, maintenance of existing riparian projects, and compliance with other use authorizations.

- Many range and habitat improvements are essential for maintaining the condition and land health standard for riparian areas. The definition for surface-disturbing activity and standard exception criteria for NSOs is subject to interpretation on whether maintenance of existing range or habitat improvements would be allowed. Accordingly, it is assumed that NSOs could pertain to these maintenance actions.

- All RMP decisions and subsequent implementations actions would be in conformance with existing laws, policies, executive orders, and regulations associated with the management and protection of riparian and wetland resources. These are summarized below.

### Department of Interior (DOI) Policy (BLM Manual 1737.06(A))

The DOI has a mandate for the management of the nation's natural resources, including riparian-wetland areas. The policy is to (1) exercise leadership and take action to avoid, to the extent possible, the long- and short-term adverse impacts associated with the occupancy and modification of wetlands and floodplains; (2) avoid the direct or indirect support of wetland or floodplain projects whenever there is a practical alternative; and (3) restore and preserve the natural and beneficial values served by floodplains and wetlands.

### BLM Policy (BLM Manual 1737.06(B))

In accordance with laws, Executive Orders, and DOI policy to maintain, restore, improve riparian-wetland values to achieve a healthy and proper function condition for maximum long-term benefits, it is BLM's policy to:

- Conduct and maintain an inventory of all riparian areas, quantifying physical and biological condition and potential.

- Achieve riparian-wetland area improvement and maintenance objectives through the management of existing and future uses, wherever feasible.

- Ensure that new resource management plans and activity plans, and existing plans when revised, recognize the importance riparian-wetland values and initiate management to maintain, restore, improve, or expand them.

- Use prescribed/planned fire management for riparian-wetland values that is based on site-specific characteristics.

- Monitor and evaluate management activities in riparian-wetland areas and revised management practices where site-specific objectives are not being met.

- Cooperate with and encourage the involvement of interested federal, state, and local governments and private parties to share information, implement management, coordinate activities, and provide education on the values, productivity, and management of riparian-wetland areas.

- Retain riparian areas in public ownership, unless disposal would be in the public interest, and to acquire riparian-wetlands as determined in the land use planning system.

BLM_0016464

- Identify, encourage, and support research and studies needed to ensure that riparian-wetland area management objectives can be properly defined and met

## BLM's Riparian-Wetland Initiative for the 1990s

The Riparian-Wetland Initiative for the 1990s (published September 1991) provides a blueprint for management and restoration of riparian and wetland areas under BLM jurisdiction. Four nationwide riparian-wetland goals have been established, as follows:

(1) Restore and maintain riparian-wetland areas so that 75 percent or more are in proper functioning condition by 1997. The overall objective is to achieve an advanced ecological status, except where resource management objectives, including proper functioning condition, would require an earlier successional stage.

(2) Protect riparian-wetland areas and associated uplands through proper land management and avoid or mitigate negative impacts. Acquire and expand key areas to provide for their maximum public benefit, protection, enhancement, and efficient management.

(3) Ensure an aggressive riparian-wetland information and outreach program, including providing training and research.

(4) Improve partnerships and the cooperative restoration and management process in implementing the riparian-wetland initiative.

## Executive Order 11988 (Floodplain Management)

EO 11988 mandates a reduction in hazards to human safety and preserves values served by floodplains.

## Executive Order 11990 (Protection of Wetlands)

This EO directs federal agencies to take action to minimize the destruction, loss, or degradation of wetlands and to preserve and enhance the natural and beneficial value of wetlands in carrying out programs affecting land use. All federally initiated, financed, or permitted construction projects in wetlands must include all practical measures to minimize adverse impacts. This requires that all leases, rights-of-way, easements, and disposals involving federal wetlands must contain restrictions to uses by the grantees that are consistent with federal, state, and local wetland regulations.

## Standards for Public Land Health

In February 1997, the Colorado BLM implemented five standards for determining the health of public lands in Colorado. Public Land Health Standard 2 deals with protecting and improving the condition of riparian areas. These standards have been incorporated into all existing resource management plans in Colorado.

## Taylor Grazing Act of 1934

This directs the Secretary of the Interior to stop injury to the public lands, including riparian-wetland areas, by preventing overgrazing and soil deterioration and to provide for their orderly use, improvement, and development.

## National Environmental Policy Act of 1969

NEPA requires federal agencies to initiate and use ecological information to analyze the planning and development of resource-oriented projects, including those affecting riparian-wetland areas.

BLM_0016465

## *Clean Water Act of 1972*

The CWA requires any individual or entity (such as the BLM) proposing to discharge dredged or fill material into the waters of the US to obtain a 404 permit from the Corps of Engineers before commencing the discharge. The BLM must obtain all necessary permits before performing any dredge or fill work and must also review 404 permit applications that affect BLM lands.

## *Federal Land Policy and Management Act of 1976*

FLPMA requires that the public lands be managed in a manner that will protect the quality of ecological, environmental, and water resources values, among others, including riparian-wetland areas.

- All land uses would comply with the Colorado Standards for Public Land Health (BLM 1997a). These standards describe conditions needed to sustain public land health and relate to all uses of the public lands. Environmental consequences resulting from proposed management actions or allowable use decisions are analyzed based on their ability to contribute to help or hinder meeting Public Land Health Standard 2 for healthy riparian systems and Standard 3 for healthy and productive plant and animal communities.

- CSU stipulations generally require special project design features or relocation of surface-disturbing activities (e.g., from a riparian area to an upland area) but rarely preclude the action altogether. Therefore, CSUs were not considered to be beneficial to vegetation (except for CSUs that would allow for avoidance of significant plant communities or special status plant populations) because they would ultimately shift the disturbance from one area to another and impacts on vegetation would still result.

- Direct and indirect adverse impacts of management actions on vegetation are generally best mitigated by minimizing the disturbance to the degree practicable, followed by the application of Conditions of Approval (COAs) or BMPs such as revegetation or weed control.

- Noxious and invasive weeds would continue to be introduced and spread as a result of surface-disturbing activities, vehicle traffic, recreation, and wildlife and livestock grazing.

- Weed and pest control would be carried out in coordination with the appropriate county weed and pest control districts, adjacent land management agencies, and private landowners of adjacent property.

- The CRVFO would comply with the Colorado Noxious Weed Act (CRS Title 35, Article 5.5), which declares that certain undesirable plants constitute a threat to the "continuous economic and environmental value of lands of the state" and requires that these "noxious weeds" be managed on private and public lands. The BLM would also comply with all federal policies, regulations, and strategies regarding invasive species prevention and management.

- The CRVFO would implement relevant Standard Operating Procedures (SOPs) and mitigation measures based on the Final PEIS concerning the use of herbicides in the BLM integrated pest management program (BLM 2007ia). The BLM would also follow protective measures indentified in the U.S. Fish and Wildlife Service (USFWS) and National Marine Fisheries Service (NMFS) Endangered Species Act Section 7 Consultation and Biological Opinion for the Proposed Vegetation Treatment Program for 17 Western States (BLM 2007ib). Best management practices for preventing infestations of noxious and invasive weeds (BLM 2009e) are available for land managers as well.

BLM_0016466

### Environmental Consequences

Impacts on vegetation resources would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on vegetation resources under any of the four alternatives.

### Vegetation—Forests and Woodlands

#### Alternative A

**Impacts from General Vegetation Management.** Vegetation management actions would have beneficial, direct and indirect, long-term impacts on vegetation. Colorado Public Land Health Standard 3 addresses plant and animal communities and is a goal for the management of vegetation. It states, "Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and the habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes."

Under Alternative A, vegetation management activities in forest and woodlands would include the following: weed treatments (manual, chemical, or biological), timber management (i.e., fuels reduction), thinning of pinyon-juniper woodlands encroaching on sagebrush and conifers encroaching on aspen stands (manual, mechanical, or prescribed fire), unplanned fire managed for resource benefit, and restoration.

In general, vegetation treatments have the potential to affect most plant species in much the same way: all are intended to kill or injure target plants, which may vary in intensity and extent, while providing benefits to nontarget vegetation. Vegetation treatments are designed to move plant communities toward desired conditions. If vegetation treatments were not implemented, attainment of ecological objectives and desired conditions for forest and woodlands could be inhibited or prevented.

#### Weed Treatments

Under all alternatives, treatment of noxious and invasive weeds would include manual, biological, and chemical controls, both ground-based and aerial. Impacts on nontarget vegetation would differ, depending on the method used. The CRVFO would continue implementation of the CRVFO Integrated Weed Management Plan and Programmatic Environmental Assessment (BLM 2009e), which would allow for the treatment of up to 5,000 weed-infested acres. This EA tiers to the Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States PEIS (BLM 2007na), and all applicable SOPs and mitigation measures from the ROD will be followed to help reduce adverse impacts on the environment.

Weed treatments would probably affect plant species composition and might affect plant species diversity. Elimination or reduction of non-native species would benefit native plant communities by removing competition from weeds, which would provide more resources (e.g., water and nutrients) to native plants, allowing them to reestablish sites previously dominated by weeds.

#### Manual Control

Manual control would involve hand pulling, hand digging, clipping, or cutting woody vegetation with chainsaws. In general, the effects of manual treatment methods would be minimal, both because of the low level of environmental impact of this method and the limited area in which manual use is feasible. Nontarget vegetation could be killed or injured if inadvertently dug or pulled up, or personnel could trample and crush

BLM_0016467

vegetation. Manual methods would probably cause small amounts of soil disturbance, which could increase soil erosion.

<u>Biological Control</u>

Biological control by domestic animals could kill or injure nontarget plants through browsing and trampling. Biological control agents, such as insects and pathogens, do not typically have an effect on nontarget plant species or habitats. However, some biological control agents have been known to attack nontarget plant species in addition to target plants. All biocontrol agents utilized by the CRVFO would be tested before release to ensure they are host specific.

Biological control by domestic animals could lead to soil compaction from trampling, increased soil erosion from loss of plant cover, and loss of biological soil crusts, which have an important role in hydrology and nutrient cycling. Domestic animals selectively feed on palatable species, which could result in changes in species composition over time.

<u>Chemical Control</u>

Herbicides could come into contact with and impact nontarget plants through drift, runoff, wind transport or accidental spills and direct spraying. Potential impacts include one or more of the following: mortality, loss of photosynthetic foliage, reduced vigor, abnormal growth, or reduced reproductive output. Plants could be crushed by trucks or ATVs during ground applications, and plants could be injured or killed. Risks to nontarget plants from spray drift are greater with smaller buffer zones between target and nontarget vegetation and application from greater heights (i.e., aerial application or ground application with a high boom). Application rate is a major factor in determining risk, with higher application rates associated with greater risk to plants.

Because certain herbicides target broadleaf species, non-broadleaf ("graminoid") species such as grasses may begin to dominate the site, changing the species composition. Use of herbicides that target broadleaf species, particularly with aerial application, could reduce or eliminate native forbs in the treated areas. This could result in a long-term change in the plant community composition. The less a native plant community is disrupted by treatment, the more likely it would be to retain or regain characteristics that could resist weed invasion.

<u>Timber Management</u>

Where fuel loads are excessive, failure to conduct vegetation treatments to reduce biomass could increase the risk of catastrophic fire, which would have a large impact on vegetation and wildlife habitat. Timber management could also be used to control insect outbreaks and disease by removing infected trees from the stand.

Impacts from timber management on forest and woodland vegetation would be similar to those under forestry management, Alternative A.

<u>Prescribed Fire and Unplanned Natural Fire Managed for Resource Benefit</u>

Prescribed fire would be used to reduce fuel loads, reduce pinyon-juniper encroachment into sagebrush shrublands, and reduce conifer encroachment into aspen stands. Unplanned natural fire managed for resource benefit would benefit vegetation in WSAs and areas managed for wilderness characteristics by allowing natural processes like fire to modify vegetation to meet ecological objectives and desired conditions.

BLM_0016468

Impacts on vegetation from fire under all alternatives would be similar to those described under wildland fire management, Alternative A.

## Vegetation Treatments

Vegetation treatments in forest and woodlands would include manual, mechanical, prescribed fire (see above for impacts from prescribed fire), or fire managed for resource benefit. Manual treatments would involve the use of chainsaws to thin forest or woodland stands. In general, adverse impacts from manual treatments would be minimal, creating little surface disturbance.

Mechanical treatments would involve the use of vehicles (e.g., hydro axes or brush hogs) to cut, uproot, or chop vegetation. Levels of disturbance to soil and vegetation would depend on the method used—more surface disturbance would occur from a tracked vehicle versus a rubber-tired vehicle.

Manual and mechanical vegetation treatments would reduce canopy cover and increase diversity of understory vegetation, would increase soil moisture (because of a reduction in evapotranspiration), would create a variety of age-classes, and would change vegetation density, canopy cover, and structure, which could lead to changes in habitat type. Thinning of pinyon-juniper woodlands encroaching on sagebrush could result in an increased herbaceous understory, which would benefit wildlife and livestock by increasing the quality and quantity of forage.

Adverse impacts would occur if a vegetation treatment failed. A vegetation treatment would be considered a failure if it were successful in removing vegetation but the desired vegetation community did not become established. A variety of impacts could result, including increased soil erosion from loss of vegetation cover, increased weed invasion, and long-term changes in habitat and species composition. The duration of these effects would vary by treatment method, habitat and community type, proximity of native seed sources, and the amount and timing of precipitation. If left alone, most failed treatments would eventually be revegetated by either the former plant community or, if weeds were present before the treatment, by a new and less desirable community dominated by non-native species.

## Restoration

Disturbed areas would typically be reseeded or planted with desirable vegetation if the native plant community could not recover and occupy the site sufficiently. Seeding could include aerial, broadcast, or drill seeding, planting of shrub or tree plugs, and tilling or other soil preparation techniques.

Revegetation would create long-term benefits by decreasing bare soil, which would reduce the risk of weed invasion, decrease soil erosion and sedimentation, and restore or improve habitat conditions. However, revegetation could also create soil disturbance and lead to weed establishment and erosion if seeded (desirable) species did not successfully reoccupy the site. Seed drills could cause soil compaction and damage soil crusts. Subsequent revegetation of treated areas could cause plants to be crushed by tractors or ATVs during drill seeding or injured or killed during cultivation or raking. Before any proposed soil cultivation activities, cultural and biological surveys would be conducted, and a site-specific NEPA document would be prepared.

Alternatives B, C, and D would provide more benefit to vegetation than under Alternative A. These alternatives would focus on weed treatments, timber management, thinning of encroaching pinyon-juniper and other conifers, prescribed fire and unplanned fire managed for resource benefit, and restoration as under

BLM_0016469

Alternative A. Alternatives B, C, and D also propose specific direction with clearly defined objectives for old growth maintenance and restoration, create more diverse age-class structure in lodgepole pine and aspen, and manage conifer species to mimic natural stand conditions and regeneration processes.

**Impacts from Soils Management.** Soil protections that exclude surface-disturbing activities, such as NSO stipulation (GS-NSO-15) for steep slopes greater than 50 percent and GS-NSO-14 for debris flow zones, would have a beneficial impact on vegetation by reducing soil erosion, minimizing direct impacts on vegetation, and reducing the risk of weed invasion.

Alternative A would provide the least protection to vegetation of any alternative because GS-NSO-15 would apply only to oil and gas activities and not to pipelines. In the other alternatives, the stipulation would apply to all surface-disturbing activities.

**Impacts from Water Resources Management.** Stipulations that restrict surface-disturbing activities, such as existing GS-NSO-3 for major river corridors and GS-NSO-13 for domestic watersheds, would have a beneficial impact on vegetation by reducing direct and indirect impacts.

Under Alternative A, water resource stipulations would provide less protection to vegetation than under other alternatives because GS-NSO-13 would apply only to the Rifle and New Castle watersheds (as opposed to all municipal watersheds under other alternatives). In addition, Alternatives B and C would implement CRV-NSO-5 for streamside management zones, which would protect vegetation within 50 feet of any hydrologic feature. Neither Alternatives A nor D would have this additional stipulation.

**Impacts from Fisheries and Aquatic Wildlife Management.** Stipulation GS-NSO-5 under Alternative A protects the Rifle Falls and Glenwood Springs fish hatcheries. Surface-disturbing activities would be excluded within a 2-mile radius of these hatcheries. This would provide a beneficial long-term impact on vegetation.

Other alternatives would protect more acres of vegetation with NSO stipulations, so impacts on vegetation would be the least beneficial under Alternative A.

**Impacts from Terrestrial Wildlife Management.** Terrestrial wildlife management actions would have beneficial, direct and indirect, long-term impacts on vegetation. Colorado Public Land Health Standard 3 addresses plant and animal communities and is incorporated as a goal. It states, "Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes." The same goal applies to vegetation management. Hence, most actions proposed for terrestrial wildlife management would benefit vegetation.

NSO stipulations to protect wildlife habitat from surface-disturbing activities, route closures to reduce road density and habitat fragmentation, and travel restrictions on motorized and mechanized travel would benefit vegetation by reducing adverse impacts, such as vegetation removal, reduced vigor, soil erosion and compaction, and weed invasion.

Habitat improvement projects would target pinyon-juniper woodlands and other forest stands to reduce canopy cover and promote variation in age classes. Adverse impacts on vegetation could occur if habitat

BLM_0016470

improvement projects failed to improve vegetation, leading to reduced biomass, increased bare ground, or weed invasion or expansion.

Construction of ponds and guzzlers to provide water for wildlife would directly impact vegetation in the immediate area and could lead to soil compaction, erosion, and weed invasion. However, under all alternatives, beneficial impacts from terrestrial wildlife management would be much greater than adverse impacts.

Alternative A would provide slightly more benefit to vegetation than under Alternative D, which would open more acres to oil and gas development, but much less benefit than under Alternatives B and C, which would both implement more NSO stipulations.

**Impacts from Special Status Species Management.** Under Alternative A, several NSO stipulations for special status species habitat and sage-grouse leks would protect vegetation from surface-disturbing activities, resulting in a beneficial long-term impact. Under Alternative A, these stipulations cover approximately the same number of acres as in Alternative B, which is more than Alternative D, but less than Alternative C.

**Impacts from Cultural Resource Management.** Stipulations that exclude surface-disturbing activities, such as existing NSO for historic properties, would have a minor beneficial impact on vegetation located within the 100-meter NSO buffer. Under Alternative A, cultural resource stipulations would provide the least protection to vegetation. Alternatives B and C would implement a larger NSO buffer for historic properties as well as an NSO for heritage areas which would protect the most acres of vegetation. Alternative D would provide an intermediate level of vegetation protection with the same buffer for historic properties as Alternative A, but with the addition of the NSO stipulation for heritage areas.

**Impacts from Visual Resource Management.** VRM Class I would essentially prohibit vegetation treatments and other surface-disturbing activities, except for those actions that would not create a visual impact (e.g., weed treatments). VRM Class II would allow for limited small-scale surface disturbances, such as vegetation treatments (e.g., sagebrush mowing, weed management, and timber harvest), as long as project design features met the VRM Class requirements and mitigations were adequate. VRM Class III and IV would be less restrictive to surface disturbance because design features and mitigations would be less intensive.

VRM Class I and II areas would provide protection to vegetation by limiting surface-disturbing activities, creating a long-term beneficial impact. Inversely, VRM Class III and IV areas would result in the most surface disturbance and would result in the most impacts on vegetation. Alternatives that designate more acres to Class I and Class II would have fewer acres designated to VRM Class III and IV and therefore would allow for fewer impacts on vegetation.

Under Alternative A, existing NSOs to protect VRM Class I areas within ACECs (GS-NSO-16) and to protect the Interstate-70 viewshed (GS-NSO-18) would provide protection to vegetation; however, other alternatives would protect more acres. Forest health could be adversely affected by VRM Class I and Class II areas, since those classifications seek to preserve and retain landscapes. Impacts on forest health could include reductions in allowable harvest, restrictions on prescribed burns, and restrictions or prohibitions on other treatments to manage insects and disease.

BLM_0016471

Alternative A would designate the least area to VRM Class I and II (247,200 acres) and the most area to VRM Class III and IV (257,900 acres), which would allow for the most adverse impacts on vegetation.

**Impacts from Wildland Fire Management.** Wildland fire management would cause a range of impacts on vegetation, both beneficial and adverse, depending on the Fire Management Unit (FMU), type of activity (suppression, unplanned fire managed for resource benefit, prescribed fire, manual and mechanical treatments, or rehabilitation), and vegetation type. FMUs differ in the amount of fire suppression. The acres proposed for each FMU are the same across all alternatives; therefore, impacts on vegetation from wildland fire management would be the same across all alternatives.

## FMUs with Full Suppression

FMUs with full fire suppression are generally located near the wildland-urban interface (WUI), around areas of sensitive resources, such as special status species habitat or cultural sites, or in habitats not historically adapted to wildland fire. Impacts from fire suppression, both beneficial and adverse, would be highest in these FMUs. Fire suppression activities could adversely affect vegetation from construction of fire lines and fuel spills. In addition, roads, fire lines, other surface disturbances associated with fire suppression or application of fire retardant, could increase dust and weed invasion. Fire vehicles could introduce and spread noxious and invasive weed seeds.

The suppression of fire would allow for less habitat improvement and age-class diversification. In forests and woodlands, lack of fire can cause aspen stands to be replaced through succession by conifers and cause sagebrush to be invaded by pinyon pine and juniper. The lack of fire, combined with relatively older age-classes and increased fuel loading, can lead to more catastrophic fires. Impacts on vegetation would be adverse and long-term.

Fire suppression could benefit vegetation by reducing direct and indirect impacts from fire. Fire can cause injury to and loss of vegetation, especially in plant communities that have not evolved with frequent fire intervals. Stabilization and rehabilitation efforts (e.g., seeding and erosion control) following wildland fire would benefit vegetation over the long term by decreasing bare soil, which would reduce the risk of weed invasion, decrease soil erosion and sedimentation, and restore or improve habitat conditions. However, adverse impacts on vegetation could result if equipment were to crush plants, or if certified weed-free erosion control materials were not used and weed invasion occurred. Seeding grasses with quick germination and establishment characteristics to stabilize soils could result in an increase in grass cover that could outcompete certain plant species that typically grow in ecosystems with low vegetation cover.

Loss of vegetation would increase the risk of soil erosion and sedimentation. Suppression of fire would increase the risk of weed spread and invasion since fire could change native plant species composition, plant density, and vegetation structure, which would increase the opportunity for invasion of non-native, invasive, fire-adapted species such as cheatgrass. This would result in a long-term adverse impact on vegetation.

## FMUs where Fire is Allowed

Fire management would involve the use of manual/mechanical treatments to lessen fuel loading. Excess fuel would be placed in piles and burned. Use of manual treatment (e.g., chainsaws) and mechanical treatment (e.g., hydro axes) in most sites would reduce canopy cover, would increase diversity of understory vegetation, and would change vegetation type.

BLM_0016472

Long-term indirect impacts would result from changes in habitat type, which in turn would result from changes in vegetation density, canopy cover, and structure. Mechanical equipment could increase weed introduction and spread.

The intensity of impacts from fire would depend on the size and severity of the fire, as well as the fuel type and quantity. Impacts from fire, such as injury or loss of vegetation, would be short-term. Impacts from fire that would change species composition, plant density, and vegetation structure and increase the abundance of non-native, invasive, fire-adapted plant species would be direct and both short-term and long-term. Most areas where fire is allowed are relatively intact ecosystems, such as WSAs, with predominantly native vegetation. The risk of weed invasion following fire would be limited because there would be few weeds to begin with. Allowing for unplanned fire managed for resource benefit could result in habitat improvement and age-class diversification.

Under all alternatives, beneficial impacts would generally outweigh adverse impacts as wildland fire would improve habitat and diversify age-class structures.

**Impacts from Forestry Management.** Forestry and woodland management actions would include harvest of the following products: timber, firewood, posts and poles, Christmas trees, transplants, vegetation materials, pine nuts, and native plant seed. The goal of forest management is to improve forest health and vigor and to provide a variety of forest products to meet commercial and private demands on a sustained yield basis. Improved health and vigor of forests and woodlands is anticipated over the long term, with a potential for increased yields as a result. Forest treatments would generally improve the structure, composition, health, and vigor of forest and woodland vegetation.

Under Alternative A, 17,900 acres of commercial forestland would be intensively managed to improve forest health and vigor and to provide wood products. The probable sale quantity (PSQ) is estimated at 1.8 million board feet under all alternatives, although recent harvest trends and anticipated harvest volumes in the next 15 to 20 years are expected to be less. Anticipated harvest would occur on less than 1,000 acres per year. Future timber harvests would focus on improving forest and woodland health more than commercial timber and wood product values.

Wildland fire potential would be reduced by the removal of dead and dying stands and those infected with insects and disease, as well as by thinning overstocked stands. These long-term improvements in forest health would eventually produce more forest products and products of higher quality.

Limited management (thinning and other forest health treatments and techniques) would occur on 60,000 acres under Alternative A. This would improve forest health and vigor on the acres treated, although not as much as with intensive management. Harvesting would be primarily to salvage for wood products, such as posts and poles and firewood. Control of fires, insects, and diseases would be a lower priority than for intensively managed stands.

Alternative A would also manage 82,400 acres of primarily pinyon-juniper woodlands. Wood products, such as posts and poles and firewood, would be produced on these lands. Reduction of pinyon-juniper encroachment into rangeland ecosystems and fuels reduction would be the focus of treatments in woodland stands, primarily through thinning by hand crews and the use of mechanized equipment for clearing and

BLM_0016473

thinning. Reducing the cover of encroaching pinyon-juniper stands would lead to an increase in understory vegetation, such as grasses and forbs, providing more forage for wildlife and livestock.

Commercial forestry activities could include the use of heavy equipment, helicopters, chemicals, road construction, and culvert installation and would typically result in increased traffic, noise, and human presence. Harvesting forest and woodland products would result in the loss of overstory vegetation cover, increased soil erosion and sedimentation, increased risk of weed invasion and expansion, and short- or long-term changes in species composition or community structure.

Collection of Christmas trees, plants, and seeds would result in a small-scale loss of vegetation biomass. Collectors could impact vegetation by trampling or could crush vegetation with vehicles used to access collection sites.

Long-term beneficial impacts on forest health and vigor would be the least under Alternative A because less forest management would occur. Direct and indirect impacts on vegetation would be the least under Alternative A because fewer acres would be harvested than under other alternatives. Short- and long-term changes in species composition and community structure would be the least under Alternative A.

**Impacts from Livestock Grazing Management.** Under Alternative A, the most acres of land would be available for grazing (489,600 acres) and the most animal unit months (AUMs) of livestock forage would be allocated (56,900 AUMs). However, it should be noted that only 32,900 AUMs are actually allocated under current management due to a variety of decisions related to rangeland and riparian health, among other reasons. No active allotments would be closed for resource concerns or conflicts.

Direct impacts from livestock grazing management could include vegetation removal, disturbance, or trampling. Overgrazing or improper grazing could reduce plant vigor or kill plants. Indirect impacts from livestock grazing management could include soil compaction and loss of biological soil crusts from trampling, increased soil erosion from loss of plant cover, and increased potential for weed invasion and spread, which could subsequently reduce vegetation health and vigor and alter the natural fire regime by introducing non-native invasive annuals. Grazing could also change the overall structure and composition of vegetation and affect diversity, as livestock tend to selectively graze the most palatable plant species. Impacts would be both short-term and long-term and could range from minor to major, depending on grazing intensity, duration, and season of use and local climatic conditions.

Grazing could create beneficial impacts on vegetation by reducing litter and fine fuel loading, which could reduce fire size and severity. Grazing could also stimulate new growth in the spring. Construction of new stock ponds would permanently remove vegetation within the footprint. Water developments would concentrate livestock use and reduce vegetation cover in the vicinity of the pond. Soil compaction and erosion would increase as well as the potential for noxious weed invasions. New rangeland development projects, such as construction of stock ponds or fences, would have mitigation attached, which would require livestock operators to monitor and control weeds on surfaces they disturb. Range improvements for livestock would improve livestock distribution and reduce excessive utilization levels, which would reduce vegetation disturbance, weed invasion and spread, and soil compaction in any one area.

Under all alternatives, when deemed necessary and feasible by the BLM, livestock grazing would be excluded or deferred for two growing seasons on disturbed areas (e.g., reclaimed seeded areas, except for pipelines), or

BLM_0016474

until monitoring data indicated that vegetation cover, species composition, and litter accumulation were adequate to support and protect watershed values, meet vegetation objectives, and sustain grazing use. Where this would occur, reclaimed and reseeded areas would have time to become established, and the risk of weed invasion would be reduced. Impacts would be beneficial and long-term.

Management of livestock grazing would comply with Colorado Public Land Health Standards and Guidelines for Livestock Grazing under all alternatives. Where current livestock grazing was causing standards to not be met, changes would be made to make significant progress in meeting those standards. This would help reduce adverse impacts on vegetation. Historic grazing practices have caused some areas not to meet Land Health Assessment (LHA) standards due to widespread cheatgrass infestations and poor native plant diversity and cover (BLM 2005a, 2008l). However, LHAs have found that most grazing allotments are meeting or moving toward meeting the standards for public land health. Where standards are not being met, the BLM would continue to improve grazing systems to move toward meeting the standards in all alternatives.

Since the most acres and AUMs would be available for livestock grazing under Alternative A, adverse impacts on vegetation would be the greatest.

**Impacts from Recreation and Visitor Services Management.** Recreation and visitor services management would include the designation of special recreation management areas (SRMAs) under all alternatives. The goal of SRMAs would be to emphasize recreation by managing for specific recreation opportunities and recreation setting characteristics on a sustained or enhanced long-term basis. The BLM would direct recreation funding and personnel to provide specific "structured" recreation opportunities.

SRMAs would concentrate recreational use in certain areas, which would also concentrate impacts on vegetation, especially in high-use areas, such as campgrounds, parking lots, boat launches, and trailheads. Motorized use (e.g., motorcycles or OHVs) would create the greatest adverse impacts on vegetation. Mechanized use in SRMAs (e.g., mountain biking) would impact vegetation less than motorized use but would create more impacts than non-motorized uses, such as horseback riding, hiking, and boating.

Under all alternatives, visitor use is expected to increase and impacts on vegetation would be expected to increase as a result. An increase in visitor use would create the need for additional facilities and trails within SRMAs to accommodate recreationists. Development would create direct and indirect impacts on vegetation, such as loss of vegetation and vegetation cover, soil erosion and compaction, and weed introduction and expansion.

Alternative A would designate eight SRMAs (60,400 acres) and six recreation management areas (RMAs) (60,700 acres). NSO stipulations would limit surface-disturbing activities and would provide protection to vegetation within the NSO area. GS-NSO-16 would apply to five SRMAs, and GS-NSO-17 would limit surface-disturbing activities within RMAs.

SRPs would be issued to control visitor use and protect resources under all alternatives. Mitigations to protect vegetation could be included in SRPs to minimize impacts on plant communities.

Under all alternatives, adverse impacts from recreation and visitor services on vegetation would be greater than beneficial impacts. Alternative A would create fewer impacts than under Alternative D, which would

BLM_0016475

allow for the most development and use. Alternatives B and C would impact vegetation less by designating fewer SRMAs and applying NSOs to more acres.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative A, a total of 294,300 acres of the CRVFO would be open to cross-country OHV travel. Areas open to OHV travel would allow public users to gain access to and through more terrain, which would create widespread impacts on vegetation.

Alternative A would limit OHV use to existing routes on 38,000 acres. While this would minimize new routes from being created by limiting vehicles to routes that are already disturbed and hardened, it would still allow for widespread OHV use and impacts on vegetation. Alternative A would limit the least amount of acres of OHV travel to designated routes (123,000 acres). Limiting vehicles to designated routes would confine impacts on trails or roads designated for use, which would result in less widespread impacts on vegetation.

The construction of roads and trails, as well as recreation impacts from OHV and motorized vehicle use, would result in adverse impacts on vegetation, such as plant mortality, reduced vegetation cover and density, soil compaction, erosion, sedimentation, habitat fragmentation, and increased dust. Motorized vehicle use would increase the risk of introducing and continuing the spread of noxious and invasive weed seeds. Motorized activities in undisturbed and remote areas would probably distribute weed seeds into weed-free areas. These impacts would reduce the vigor and productivity of native plant communities and alter plant community composition.

Adverse impacts would be greatest in those areas designated as open or limited to existing routes. They would be less in areas limited to designated routes, although damage to vegetation and weed invasion or spread would probably still occur in these areas. Areas closed to vehicular travel (44,000 acres under Alternative A) would provide the most protection to vegetation.

Under all alternatives, trails and travel management would have adverse impacts on vegetation. Alternative A would create the greatest impacts on vegetation by allowing for open cross-country travel across a large portion of the CRVFO. No other alternative would allow for open OHV use.

**Impacts from Lands and Realty Management.** Lands and realty actions, including ROWs, transportation systems, utilities, communication sites, renewable energy development, and land disposals, would increase habitat fragmentation and would allow for direct impacts on vegetation, conversion to other habitat types, and weed species proliferation. Under some actions, such as construction of pipelines and buried fiber-optic lines, habitat could be reclaimed immediately following installation, resulting in fewer adverse impacts than such actions as installing new roads and communication sites, which would have long-term adverse impacts on vegetation.

ROW exclusion areas would result in beneficial long-term impacts on vegetation by excluding these areas from ROW development. Alternative A would exclude the least amount of acres from ROW actions.

Under all alternatives, adverse impacts from lands and realty actions on vegetation would be greater than beneficial impacts. Under Alternative A, lands and realty management actions would result in the most adverse impacts on vegetation since the fewest acres would be excluded from ROW actions and because there would be no criteria to retain lands that contain valuable plant communities.

BLM_0016476

**Impacts from Coal Management.** There are currently no leases or development activities for coal in the CRVFO. The Grand Hogback Field is considered to have potential for coal mining. However, based on historical activity and the nature of the deposit, coal is not expected to be commercially developed within the CRVFO over the next 20 years.

Alternatives A, B, and D would open 28,500 acres of federal mineral estate to coal leasing, and of this, 1,560 acres would be considered unacceptable for leasing, based on multiple-use conflicts. If coal mining were to occur, impacts on vegetation would be similar to those found below, under fluid minerals, Alternative A. However, adverse impacts on vegetation would not be as widespread because coal mining would target only one area in the CRVFO, whereas fluid minerals development would cover a much wider area.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Fluid minerals include oil and gas, oil shale, and geothermal development. Of the fluid minerals, oil and gas would create the greatest adverse impacts on vegetation. Oil shale is not expected to be commercially developed within the CRVFO for 20 years or more, and the likelihood of geothermal development is low, except for cases where it would be used for on-site electrical generation for oil and gas facilities.

Under Alternative A, a total of 679,200 acres of federal mineral estate would be open to oil and gas development. Up to 2,664 wells and 333 multi-well pads are anticipated, with an estimated 3,347 acres of surface disturbance. This disturbance would be reduced to 2,181 acres on interim reclamation of well pads. Approximately 27,800 acres would be closed to fluid minerals leasing, and NSO stipulations would be applied to 239,600 acres. Stipulations that exclude oil and gas development and other surface-disturbing activities would provide a beneficial long-term impact on vegetation.

Direct impacts associated with oil and gas development would include short- and long-term losses of vegetation and biological soil crusts due to clearing of sites to build pads, roads, pipelines, and facilities. Indirect impacts would include soil erosion and compaction, habitat modification and fragmentation, changes in plant community composition, density, canopy cover, and structure, and an increased potential of weed invasion and spread. This could lead to changes in fire regime if annual weeds outcompeted native species, and impacts on air quality from fugitive dust and chemical fumes, which could lead to reduced plant vigor by disrupting plant respiratory and photosynthetic functions.

Long-term adverse impacts would result from disturbances like roads, portions of pads, and other facilities that would not be reclaimed for the life of the project. Short-term impacts would result from pipelines, which would be reclaimed immediately after installation, and unused portions of pads and roads, which would be interim reclaimed with desirable herbaceous vegetation (grasses and forbs) within 2 to 5 years. The establishment of mature shrubs could take from 5 to 25 years, and the establishment of trees would take even longer. Interim reclamation would result in about a 75 percent reduction in surface disturbance of a pad that would remain over the long-term life of the project; however, reclamation efforts often have poor success rates, with loss of species diversity, increase in annuals, decrease in perennials and woody plants, and an increase in weed species.

Closing areas to fluid minerals leasing and the application of NSO stipulations would limit adverse impacts on vegetation. However, stipulations developed for this RMP revision would not apply to existing leases, and stipulations developed under the 1999 Oil and Gas Leasing and Development Final Supplemental EIS (BLM

BLM_0016477

1999d) would not apply to older leases that existed before it was completed. The BLM could add more stringent stipulations to new leases under the RMP revision.

Under all alternatives, the BLM would utilize COAs attached to all applications for permit to drill (APDs) to reduce impacts on vegetation. COAs for reclamation include requirements for seeding timelines, topsoil salvage, seedbed preparation, native seed mixes, mulching, fencing, and reclamation monitoring. Operators are required to monitor their reclaimed areas on BLM land and submit an annual status report to the CRVFO. Follow-up work (e.g., reseeding and weed control) would be required on those areas where reclamation did not meet BLM objectives. COAs would increase the likelihood of successful reclamation and would result in a beneficial impact on vegetation.

Alternative A would open the most acres to oil and gas development of any alternative but would permit much less surface disturbance than under Alternative D. Alternative A would provide the least protection of any alternative through CL designations and less protection through NSO stipulations than either Alternative B or C. Because Alternatives B and C would close the most acres to oil and gas development and apply NSO stipulations to more acres, they would result in the greatest benefit to vegetation.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Locatable minerals include gypsum, gold, copper, and limestone. Locatable minerals fall under the General Mining Law of 1872 and would be exempt from stipulations such as NSOs and CSUs. All lands within the CRVFO would be open to mining claims except for those recommended for withdrawal. Under Alternative A, a total of 34,600 acres would be recommended for withdrawal, including some existing ACECs.

Within the CRVFO, the only current mining activity for locatable minerals is for gypsum and limestone. There is an active gypsum mine just north of the town of Gypsum and a historic limestone quarry above Glenwood Springs. Locatable minerals management would be exempt from BLM stipulations to protect vegetation and prevent ground disturbance and would create the greatest adverse impacts on vegetation if widespread mining were to occur.

Mineral materials (or salables) include sand and gravel, topsoil, moss rock, cinders, decorative rock, and others. Activity for salables is primarily limited to local commercial and residential uses; hence, disturbances associated with obtaining salables would be smaller in scale than for locatable minerals. Salables are subject to any stipulations and COAs that the BLM would apply to protect vegetation and prevent ground disturbance. Under Alternative A, a total of 476,900 acres would be open to mineral materials disposal.

Non-energy leasable minerals, such as sylvite and halite, are not expected to be developed commercially over the next 20 years. Currently, no leases or development activities exist for non-energy leasable minerals in the CRVFO. However, if development were to occur, non-energy leasable minerals would be subject to stipulations and COAs, similar to the process for oil and gas development, because they are both governed by the Mineral Leasing Act of 1920. Alternative A would open 476,900 acres to non-energy leasable minerals development.

Withdrawing areas from mineral development or applying NSOs would be beneficial to vegetation, preventing impacts within those areas. Impacts would be similar in nature but smaller in scope to those described under Fluid Minerals, Alternative A, and would be adverse and both short-term and long-term.

BLM_0016478

Alternative A would withdraw the least amount of acres from mineral development of any alternative; therefore, impacts on vegetation would be the greatest under this alternative.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Alternative A would designate 27,030 acres of ACECs, approximately 23,300 acres of which would be covered by NSOs and 20,800 acres of which would be ROW exclusion areas. NSOs and exclusion areas would result in long-term benefits to vegetation by limiting surface disturbance. Alternative A would prevent oil and gas leasing in a portion of the Thompson Creek ACEC (960 acres), providing additional protection to vegetation; however, Alternative A would prevent the least amount of acres of oil and gas leasing.

Travel restrictions would also minimize impacts on vegetation. Restrictions applicable to various ACECs include ensuring no net increase in motorized/mechanized routes, closing ACECs to unauthorized motorized travel, closing ACECs to mechanized travel, and limiting travel to designated routes.

More than half of the ACECs under Alternative A (17,100 acres) would be designated as VRM Class I, with most of the remaining acres designated as VRM Class II (9,800). These classifications would limit actions to those that would not create a large visual impact, thus protecting vegetation. While vegetation treatments would not be excluded in ACECs, they would be limited to situations where they would maintain or enhance the identified relevant and important values. This could prevent attainment of ecological objectives and desired conditions for forest and woodland communities.

Alternative A would designate more acres of ACECs than under Alternative D but would designate many fewer acres than under Alternatives B and C. Alternative C would designate more than double the amount of acres of ACECs. Alternative A would protect more vegetation from surface-disturbing activities than under Alternative D, but less than under Alternatives B and C.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** The CRVFO currently has four designated WSAs, totaling 27,724 acres. WSAs are managed to preserve their wilderness characteristics and to prevent activities that would impair wilderness values. Permitted activities in WSAs must be temporary uses that create no new surface disturbance or permanent placement of structures.

Under all alternatives, the CRVFO would implement CRV-CL-11, which would close all 27,724 WSA acres to fluid minerals leasing. Under Alternative A, three WSAs would be closed to motorized and mechanized travel. Although not officially covered by an NSO under the current plan, the nonimpairment criteria for WSAs would preclude all or most surface-disturbing activities in the area. WSAs would protect vegetation by minimizing disturbances from recreation and travel management, mineral development, and lands and realty actions, which would have a long-term beneficial impact on vegetation.

WSAs would allow for small-scale vegetation treatments (e.g., weed treatments) that would enhance wilderness characteristics but would mainly rely on natural processes (e.g., fire) to meet ecological objectives and desired conditions.

Under all alternatives, WSAs would result in long-term beneficial impacts on vegetation. Other alternatives would implement NSO stipulations, would prohibit motorized travel in all WSAs, and would designate all WSAs as VRM Class I; however, the nonimpairment criteria for WSAs would be very restrictive and probably

BLM_0016479

would exclude most actions that would have an impact on vegetation. Therefore, WSAs under all alternatives would have similar beneficial impacts on vegetation.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Alternative A would not implement any CL or NSO stipulations to exclude surface-disturbing activities, like Alternatives B and C; however, 26 stream segments would be identified as eligible and managed under interim protection to preserve values. This protection would extend to 0.25 mile on both sides of the stream centerline.

Alternatives A and C would provide the most protection to vegetation by excluding surface-disturbing activities within 0.25 mile of 26 stream segments. Alternative B would exclude surface-disturbing activities only within 0.25 mile of four stream segments, and Alternative D would not provide any protection to vegetation because no stream segments would be determined suitable.

**Impacts from Transportation and Facilities Management.** Road maintenance activities, such as blading or dozing, would adversely affect vegetation by uprooting, burying, or undercutting vegetation and increasing dust. Impacts would be confined to the road corridor. Impacts would be similar in all alternatives.

### _Alternative B (Preferred Alternative) (Forests and Woodlands)_

Impacts to forest and woodland vegetation from wildland fire management, coal management, WSA management, and transportation and facilities management would be the same as or similar to those under Alternative A. Impacts from management of all other resources and uses would be as scribed below.

**Impacts from General Vegetation Management.** Under Alternative B, vegetation management actions in forests and woodlands would include those listed under Alternative A, plus the following: management of lodgepole pine and aspen to create a more diverse age-class structure; management of pinyon-juniper, Engelmann spruce, Douglas-fir, subalpine fir, and limber pine to mimic natural stand conditions and natural regeneration; and the maintenance or contribution toward restoration or development of old-growth structure and composition.

Creating more diverse age-class structures in forests and woodlands would help prevent widespread disease and insect outbreaks because old or decadent trees are typically more susceptible to these invasions than younger ones. Regeneration of aspen could help modify fire behavior due to the herbaceous understory cover acting as a fire break. A variety of age-class structures for wildlife would benefit more species by providing different niches for use.

Maintaining and restoring old-growth habitat would benefit wildlife by providing a unique habitat to species that prefer older forests. Snags would provide nesting, foraging, and denning sites; fallen tree trunks and large branches would provide shelter and foraging grounds. Old-growth forests can serve as a source of biological restoration, serving as genetic reservoirs. Because they have survived under changing conditions, old-growth trees may contain genes that would enable them to survive global climate change and new diseases better than their neighbors. These stands could be invaluable for the restoration of commercial forests, agricultural lands, and urban forests (MDNR 2010).

Alternatives B, C, and D would provide more benefit than under Alternative A to forest and woodland vegetation by focusing on weed treatments, timber management, thinning of encroaching pinyon-juniper and other conifers, prescribed fire and unplanned fire managed for resource benefit, and restoration. These

BLM_0016480

alternatives also would propose specific direction with clearly defined objectives for old growth maintenance and restoration, would create more diverse age class structure in lodgepole pine and aspen, and would manage conifer species to mimic natural stand conditions and regeneration processes.

**Impacts from Soils Management.** Soil protections that exclude surface-disturbing activities, such as proposed CRV-NSO-2 for steep slopes greater than 50 percent and CRV-NSO-1 for debris flow zones, would have a beneficial impact on vegetation by reducing soil erosion, minimizing direct loss of vegetation, and reducing the risk of weed invasion.

Alternatives B, C, and D would provide more protection to vegetation than under Alternative A because CRV-NSO-2 would apply to all management activities (not just oil and gas), and the NSO would also apply to pipelines.

**Impacts from Water Resource Management.** Stipulations that exclude surface-disturbing activities, such as proposed CRV-NSO-3 for major river corridors, CRV-NSO-4 for designated municipal watersheds, and CRV-NSO-5 for streamside management zones, would have a beneficial impact on vegetation by preventing direct impacts and reducing indirect impacts.

Under Alternative B (similar to Alternative C), water resource stipulations would provide more protection to vegetation than under Alternative A because NSOs would apply to more acres. Alternatives B and C would provide more protection to vegetation than under Alternative D, which would not implement CRV-NSO-5.

**Impacts from Fisheries and Aquatic Wildlife Management.** Two NSO stipulations would be implemented under Alternative B: CRV-NSO-15 would prohibit surface-disturbing activities within 100 meters of all fish-bearing streams, and CRV-NSO-17 would prohibit surface-disturbing activities within a 2-mile radius of Rifle Falls and Glenwood Springs fish hatcheries. NSO stipulations would provide a beneficial long-term impact on vegetation.

In addition, under Alternatives B, C, and D, select priority species habitat would be improved by closing and reclaiming selected routes. This would provide a long-term beneficial impact by increasing vegetation cover in previously cleared areas.

Under Alternative B, NSO stipulations for fisheries and aquatic wildlife would protect more vegetation due to surface disturbance than under Alternatives A and D, but would protect less vegetation than under Alternative C.

**Impacts from Terrestrial Wildlife Management.** Terrestrial wildlife management actions under Alternative B would cover many more acres with NSO stipulations than under Alternatives A and D, providing more protection to vegetation by limiting surface-disturbing activities. NSOs would protect 57,600 acres of core wildlife areas and all State Wildlife Areas. The protection of core wildlife areas, which contain healthy, productive plant communities, would be a long-term beneficial impact on vegetation.

Habitat improvement projects would target aspen stands to stimulate sprouting and regrowth in decadent patches, and pinyon-juniper woodlands and other forest stands to reduce canopy cover and promote variation in age-classes. Adverse impacts on vegetation could occur if habitat improvement projects failed to improve vegetation and resulted in weed invasion or expansion.

BLM_0016481

Alternative B would provide more benefit to vegetation than under Alternatives A and D because NSO stipulations to protect terrestrial wildlife habitat would exclude surface disturbance from more acres. Alternative C would be similar to Alternative B in the degree of impact.

**Impacts from Special Status Species Management.** Numerous NSO stipulations for special status species habitat and sage-grouse leks would protect vegetation from surface-disturbing activities, resulting in a beneficial long-term impact. Under Alternative B, NSO stipulations for special status species would protect more acres than under Alternatives A and D but less than under Alternative C.

In addition, Alternatives B and C would implement a management objective for the restoration of special status species habitat. This would have a beneficial impact by reducing undesirable vegetation in these areas.

**Impacts from Cultural Resource Management.** Stipulations that exclude surface-disturbing activities, such as proposed CRV-NSO-39 for historic properties and CRV-NSO-37 for heritage areas, would have a beneficial impact on vegetation by preventing direct impacts on vegetation within the NSO areas.

Cultural resource stipulations under Alternative B would prevent more acres of surface disturbance than in Alternatives A and D, resulting in more protection for vegetation. NSO stipulations under Alternative C would protect the most acres of vegetation.

**Impacts from Visual Resource Management.** Under Alternatives B, C, and D, proposed NSO stipulations would protect VRM Class I areas (CRV-NSO-42) and VRM Class II areas with slopes over 30 percent and high visual sensitivity (CRV-NSO-41). In addition, all WSAs would be managed under VRM Class I objectives. These stipulations and restrictions would provide a long-term beneficial impact on vegetation by preventing surface disturbance.

Forest health could be adversely affected by VRM Class I and Class II areas, since those classifications seek to preserve and retain landscapes. Impacts on forest health could include reductions in allowable harvest, restrictions on prescribed burns, and restrictions or prohibitions on other treatments to manage insects and disease.

Alternative B would designate more area as VRM Class I and Class II (282,800 acres) than under Alternatives A and D, but less than under Alternative C; therefore, protection to vegetation under Alternative B would be less than under Alternative C, but more than under Alternatives A and D.

**Impacts from Forestry Management.** Under Alternative B, a total of 31,400 acres of forest and woodlands would be intensively managed to improve forest health and vigor and to provide wood products. This is almost double the number of acres that would be intensively managed under Alternative A, representing a more beneficial impact on forest health and vigor, structure, and composition than under Alternative A.

Limited management (thinning and other forest health treatments and techniques) would occur on 391,700 acres, compared to 60,000 acres under limited management for Alternative A. This increase in the number of acres, more than six-fold over Alternative A, would beneficially impact forest health and vigor.

Commercial timber harvest would be prohibited on 81,800 acres of forest and woodlands under Alternative B. Compared to Alternative A, which would close only 27,800 acres, this prohibition would represent a long-

BLM_0016482

term adverse impact on forest health and vigor. Harvesting would be more extensive on acres outside the prohibited areas in order to maintain the expected PSQ.

Immediate salvage or accelerated harvests would occur following adverse events (e.g., blowdown, insects, or disease) under this alternative, which would result in a beneficial long-term impact on forest health and vigor that would not occur under Alternative A. However, this is not expected to increase annual harvest rates, compared to Alternative A.

Restrictions to protect air quality could adversely affect forestry, similar to impacts under Alternative A. Direct and indirect impacts on soils would be greater than under Alternative A because more acres would be managed, which would increase the risk of weed invasion. Short- and long-term changes in species composition and community structure would be more pronounced than under Alternative A.

**Impacts from Livestock Grazing Management.** Livestock grazing management actions would open 451,400 acres to grazing and provide 36,000 AUMs of livestock forage under Alternative B. One active allotment (County Line) would be closed due to noncompliance with land health standards from livestock grazing. Closing this allotment would benefit vegetation, allowing it to rest and return to a more native plant community; however, cheatgrass would continue to be the dominant vegetation cover on this allotment unless vegetation treatments were able to successfully reduce weed cover.

Direct and indirect impacts from grazing would be similar to Alternative A except for the degree of impact. Since fewer acres and AUMs would be available to livestock under this alternative compared to Alternative A, adverse impacts on vegetation would be less.

**Impacts from Recreation and Visitor Services Management.** Alternative B would designate six SRMAs (51,000 acres). NSO stipulations would limit surface-disturbing activities and provide protection to vegetation within the NSO areas. GS-NSO-45 would limit surface disturbance within Rifle Mountain Park, and GS-NSO-46 would limit surface disturbance within five of the six SRMAs, the exception being Bocco Mountain. These restrictions would provide protection for vegetation within these NSO areas.

Under Alternatives B, C, and D, areas not designated as SRMAs would be managed as extensive recreation management areas (ERMAs). Recreation would be unstructured in ERMAs and would not require intensive management or significant investments in trails or facilities. This type of "dispersed" recreation would provide little in the way of visitor services or developed recreational facilities.

While SRMAs would probably create more concentrated impacts on vegetation, ERMAs would disperse use, and therefore impacts on vegetation would probably be more widespread. ERMAs would include less development of facilities and trails, so impacts on vegetation from development activities would be less.

Under all alternatives, adverse impacts from recreation and visitor services on vegetation would be greater than beneficial impacts. Impacts on vegetation would be similar to those under Alternative A, except for the degree. Alternative B would create fewer impacts than under Alternatives A and D by designating fewer SRMAs, but would create more impacts than under Alternative C, which would designate fewer SRMAs than any other alternative and apply NSOs to more acres.

BLM_0016483

**Impacts from Comprehensive Trails and Travel Management.** Under Alternatives B, C, and D there would be no land open to cross-country OHV travel and no OHV use limited to existing routes. OHV use would be allowed only on designated routes. Limiting vehicles to designated routes would confine impacts on areas that are already disturbed and hardened and would confine impacts on vegetation over a smaller area.

Alternative B proposes to obliterate 70 miles of routes, which would provide a long-term beneficial impact by increasing vegetation cover. Under all alternatives, trails and travel management would have adverse impacts on vegetation. Alternative B would create fewer impacts on vegetation than under Alternatives A and D but slightly more impacts than under Alternative C. Alternative C would close 200 more acres to OHV use, and would obliterate more routes than under Alternative B.

**Impacts from Lands and Realty Management.** Adverse impacts from the lands and realty program on vegetation would be less under Alternative B than under Alternative A because 39,300 acres would be excluded from ROW development, more acres than under Alternative A. ROW developments outside exclusion areas would have adverse, direct and indirect, long-term impacts on vegetation; however, ROW exclusion areas would result in beneficial, direct and indirect, long-term impacts by withdrawing these lands from ROW development.

Alternative B would retain BLM lands for long-term management, such as WSAs, proposed, candidate, and listed species habitat, big game critical winter range, and ACECs. These lands contain high quality plant communities, so retention of these areas would result in a beneficial long-term impact on vegetation. Disposal of federal lands could create adverse impacts if vegetation were cleared from the land and if it were paved or permanently altered. Retaining lands under federal ownership would typically benefit vegetation because the BLM would aim to protect the ecological health of vegetation communities.

Under all alternatives, adverse impacts from lands and realty actions on vegetation would be greater than beneficial impacts. Alternative B would result in fewer adverse impacts on vegetation than under Alternatives A and D because more acres would be excluded from ROW development. Alternative C would result in the least adverse impacts of any alternative because more acres would be excluded from ROW actions, and the most acres of land would be retained.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Under Alternatives B, a total of 651,400 acres of federal mineral estate would be open to oil and gas development. Up to 2,026 wells and 276 multi-well pads are anticipated under Alternatives B and C, with an estimated 2,774 acres of surface disturbance. This disturbance would be reduced to 1,814 acres on interim reclamation. Alternative B would close approximately 55,600 acres to fluid minerals leasing with No Leasing designations, and 326,700 acres with NSO stipulations. Stipulations that exclude oil and gas development and other surface-disturbing activities would provide a beneficial long-term impact on vegetation.

Alternatives B and C would close more acres to oil and gas development than under Alternatives A and D, creating fewer disturbances to vegetation. Closing areas to fluid minerals leasing and applying NSO stipulations under Alternative B would prevent more acres of oil and gas development than under Alternatives A and D, providing more protection to vegetation.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative B, a total of 97,000 acres of locatable minerals would be recommended for

BLM_0016484

withdrawal, including ACECs and WSAs. Approximately 363,000 acres of salables and non-energy leasable minerals would be open to minerals development.

Impacts would be similar to those found under Alternative A and would be adverse and both short-term and long-term. Alternative B would withdraw more acres from minerals development than under Alternatives A and D but less than under Alternative C; therefore, Alternative B would result in fewer impacts on vegetation than under Alternatives A and D but more than under Alternative C.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Alternative B would designate nine ACECs (34,480 acres), 28,400 acres of which would be covered by NSOs and 19,900 acres would be ROW exclusion areas. NSOs and exclusion areas would result in long-term benefits to vegetation by limiting surface disturbance. Alternative B (and Alternative C) would prevent oil and gas leasing in the Blue Hill, Bull Gulch, Deep Creek, and Thompson Creek ACECs (19,900 acres), providing additional protection to vegetation. Travel restrictions in ACECs would also minimize impacts on vegetation.

Three of the ACECs under Alternative B would be designated as VRM Class I and two ACECs would be designated as VRM Class II. These classifications would limit actions to those that would not create a large visual impact, protecting vegetation.

Alternative B would designate more acres of ACECs than under Alternatives A and D but would designate much fewer acres than under Alternative C, approximately 45,000 fewer acres. Alternative B would protect more vegetation from surface-disturbing activities than under Alternatives A and D, but substantially less than under Alternative C.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Alternative B would close four suitable stream segments to fluid minerals leasing (CRV-CL-12). This closure would extend 0.25 mile on both sides of the stream centerline and would provide protection to vegetation by excluding oil and gas development. In addition, four stream segments would be identified as eligible and managed under interim protection to preserve values. This protection would extend to 0.25 mile on both sides of the stream centerline and would provide protection to vegetation by excluding surface-disturbing activities.

Alternatives A and C would provide the most protection to vegetation by excluding surface-disturbing activities within 0.25 mile of 26 stream segments. Alternative B would exclude surface-disturbing activities within 0.25 mile of only four stream segments, and Alternative D would not provide any protection to vegetation because all stream segments would be determined unsuitable.

## Alternative C (Forests and Woodlands)

Impacts to forest and woodland vegetation from wildland fire management, WSAs management, and transportation and facilities management would be the same as or similar to those under Alternative A. Impacts to forest and woodland vegetation from soils management, water resources management, vegetation management, and cultural resource management would be the same as or similar to those under Alternative B. Impacts from management of all other resources and uses would be as described below.

**Impacts from Fisheries and Aquatic Wildlife Management.** Two NSO stipulations would be implemented under Alternative C: CRV-NSO-16 would prohibit surface-disturbing activities within 100 meters of all perennial waters (as opposed to only fish-bearing streams under Alternative B), and CRV-NSO-

BLM_0016485

17 would prohibit surface-disturbing activities within a 2-mile radius of the Rifle Falls and Glenwood Springs fish hatcheries. NSO stipulations would provide a beneficial long-term impact on vegetation. In addition, Alternatives B, C, and D would improve select priority species habitat by closing and reclaiming selected routes, which would provide a long-term beneficial impact on vegetation. NSO stipulations for fisheries and aquatic wildlife under Alternative C would prevent more surface disturbance than any other alternative, thus providing the greatest beneficial impacts on vegetation.

**Impacts from Terrestrial Wildlife Management.** Terrestrial wildlife management actions under Alternative C would implement more NSOs than under Alternatives A and D, providing more protection to vegetation by limiting surface-disturbing activities. NSO stipulations would protect core wildlife areas and big game migration corridors. In addition, Alternative C would close state wildlife areas to fluid minerals leasing. This designation would be more restrictive than the NSO for state wildlife areas under Alternatives A and B because not only would it deny fluid minerals leasing, but the Colorado Division of Wildlife (CDOW), which owns the surface, could deny all surface-disturbing activities. NSO stipulations contain exclusion criteria that, if met, could allow for limited surface disturbance. Protecting core wildlife areas, which contain healthy, productive plant communities, would provide a long-term beneficial impact on vegetation.

Alternative C would provide more benefit to vegetation than under Alternatives A and D because NSO stipulations to protect terrestrial wildlife habitat would exclude surface disturbance from more acres. Alternative C would be similar to Alternative B in the degree of impact.

**Impacts from Special Status Species Management.** Under Alternative C, NSO stipulations for special status species would protect the most vegetation of any alternative, providing the greatest benefit to vegetation. Additionally, under Alternatives B and C, management goals for special status species would include restoring potential habitat to suitable habitat. This would have a beneficial impact by reducing non-native vegetation in these areas and improving the diversity and condition of native vegetation.

**Impacts from Visual Resource Management.** Alternative C would designate the most area (291,700 acres) as VRM Class I and Class II of any alternative; therefore, protection to vegetation would be the greatest under Alternative C.

**Impacts from Management of Lands with Wilderness Characteristics Outside Existing WSAs.** Under Alternative C, approximately 47,000 acres of land would be managed for wilderness characteristics. These lands were chosen because they exhibited a high degree of naturalness, provided outstanding opportunities for solitude and primitive and unconfined types of recreation, and contained unique ecological, geological, or other features. Most actions proposed for these lands would provide long-term benefits to vegetation.

Management actions would include closing the areas to fluid minerals leasing (CRV-CL-4), designations of VRM Class I and predominantly Class II, limiting motorized and mechanized travel to existing routes, allowing for continuation of grazing where allotments exist, and implementing an NSO stipulation (CRV-NSO-43) to exclude oil and gas development and other surface-disturbing activities.

Two proposed units—Grand Hogback and Thompson Creek—have already been partially leased, but no wells drilled have been drilled to-date. Closing lands with wilderness characteristics to fluid minerals leasing would limit oil and gas development to those areas already leased, preventing additional leasing and development. The CL and NSO stipulations would protect vegetation, except in areas already leased.

BLM_0016486

These lands would allow for small-scale vegetation treatments (e.g., weed treatments) that would enhance wilderness characteristics but would mainly rely on natural processes (e.g., fire) to meet ecological objectives and desired conditions.

Under Alternative C, management actions would benefit vegetation by limiting surface-disturbing activities. There are no lands proposed with wilderness characteristics outside existing WSAs under the other alternatives, so Alternative C would provide the most protection to vegetation.

**Impacts from Forestry Management.** Under Alternative C, 28,400 acres of forest and woodlands would be intensively managed to improve forest health and vigor and to provide wood products. This is more than double the number of acres that would be intensively managed under Alternative A, representing a more beneficial impact on forest health and vigor, structure, and composition than under Alternative A. Impacts would be similar to those under Alternative B.

Limited management (thinning and other forest health treatments and techniques) would occur on 341,500 acres under Alternative C, compared to 60,000 acres under Alternative A and 391,700 acres under Alternative B. Beneficial long-term impacts on forest health and vigor would be greater than those under Alternative A and similar to those under Alternative B.

Commercial timber harvest would be prohibited on 135,000 acres of forest and woodland under Alternative C, the greatest of any alternative. Consequently, the prohibition under Alternative C would represent a more adverse long-term impact on forest health and vigor than the other alternatives. Harvesting would be more extensive on acres outside the prohibited areas in order to maintain the expected PSQ.

Immediate salvage or accelerated harvests would not occur following adverse events under Alternative C, which would result in adverse long-term impacts on forest health and vigor. This provision is also under Alternative A, so the impacts on forest health and vigor from this provision would be the same.

Restrictions to protect air quality could adversely affect forestry, similar to impacts under Alternative A. Direct and indirect impacts on soils would be greater than under Alternative A and similar to Alternative B because more soil disturbance would probably occur, which would increase the risk of weed invasion. Short- and long-term changes in species composition and community structure would be more pronounced than under Alternative A, similar to Alternative B, and less pronounced than under Alternative D.

**Impacts from Livestock Grazing Management.** Livestock grazing management actions would open the fewest acres to livestock grazing (432,000 acres) and would provide the fewest AUMs (35,500) of forage. Three active allotments would be closed under this alternative: County Line, Smith Gulch, and Alkali Gulch. County Line would be closed for noncompliance with land health standards due to livestock grazing and County Line and Smith Gulch would also be closed to protect threatened and endangered species. Closing these allotments would have a beneficial impact on vegetation, allowing it to rest and return to a more native community. Alkali Gulch would be closed to provide more forage for wildlife; however, Alkali Gulch is also under increased development for oil and gas production, so closing this allotment would not be a great benefit to vegetation.

Adverse impacts on vegetation would be the least compared with other alternatives due to more acres closed to grazing under Alternative C.

BLM_0016487

**Impacts from Recreation and Visitor Services Management.** Alternative C would designate two SRMAs, the least of all alternatives. The same NSOs under Alternative B would apply to Alternative C. SRMAs under Alternative C—Red Hill and Upper Colorado River—would not allow for motorized activities, which would reduce impacts on vegetation.

Special recreation permits under Alternative C would limit recreation in areas managed for wilderness characteristics outside WSAs because they would be issued only if the proposed activity were beneficial to the wilderness characteristics of that area. This would indirectly benefit vegetation by limiting recreation in areas that contain high-quality plant communities.

Under all alternatives, adverse impacts from recreation and visitor services on vegetation would be greater than beneficial impacts. Alternative C would create fewer impacts than under Alternatives A, B, and D by designating fewer SRMAs.

**Impacts from Comprehensive Trails and Travel Management.** Alternative C would have impacts similar to those under Alternative B, except adverse impacts would be slightly less. Alternative C would create fewer impacts on vegetation than under Alternatives B and D by closing the most acres to OHV use and by obliterating more routes than the other alternatives. Alternative C would create far fewer adverse impacts on vegetation than under Alternative A because OHVs would be limited to designated routes only.

**Impacts from Lands and Realty Management.** Impacts on vegetation from the lands and realty program are similar to those under Alternative B; however, a total of 50,600 acres would be excluded from ROW development under Alternative C, compared to 39,300 acres under Alternative B. Alternative C would provide more protection to vegetation than under Alternative B because 11,300 more acres would be excluded from surface-disturbing activities; however, ROW developments outside the exclusion areas would have adverse, direct and indirect, long-term impacts on vegetation.

In addition to the lands retained under Alternative B, Alternative C would seek to retain wetlands and riparian areas, occupied special status species habitat, and lands managed for wilderness characteristics outside existing WSAs. Retaining lands under federal ownership would typically benefit vegetation because the BLM would manage these lands to protect the ecological health of vegetation communities. These areas contain high quality plant communities, so retention of these lands would result in a beneficial long-term impact on vegetation.

Alternative C would result in the fewest adverse impacts on vegetation of any alternative because it would retain more land and would exclude the most acres from ROW actions.

**Impacts from Coal Management.** Alternative C would open 17,900 acres of federal mineral estate to coal leasing (10,600 acres less than the other alternatives), 1,560 acres of which would be considered unacceptable for leasing based on multiple-use conflicts. Alternative C would exclude lands in the Grand Hogback ACEC and lands managed for wilderness characteristics outside existing WSAs, which would protect high value vegetation communities.

If coal mining were to occur, impacts on vegetation would be similar to those found under fluid minerals, Alternative A. However, impacts on vegetation would not cover as wide a range because coal mining would target only one area of the CRVFO, the Grand Hogback. Alternative C would result in the fewest adverse

BLM_0016488

impacts on vegetation because there would be less surface disturbance permitted than under the other alternatives.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Alternative C would open 531,500 acres of federal mineral estate to oil and gas development. The same number of wells and pads are anticipated as under Alternative B. Approximately 175,500 acres would be closed to fluid minerals leasing, and NSO stipulations would be applied to 333,800 acres, providing the most protection to vegetation of any alternative. Stipulations that exclude oil and gas development and other surface-disturbing activities would provide a beneficial long-term impact on vegetation.

Alternative C would close the most acres to oil and gas development of all alternatives. Closed areas and NSO stipulations under Alternative C would prevent the most acres of oil and gas development, providing the most protection to vegetation.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative C, a total of 172,100 acres of locatable minerals would be recommended for withdrawal, including ACECs, WSAs, and areas managed for wilderness characteristics outside existing WSAs. Approximately 317,000 acres of salables and non-energy leasable minerals would be open to mineral development.

Impacts would be similar to those found under Fluid Minerals, Alternative A. Impacts would be adverse and both short-term and long-term. Alternative C would withdraw the most acres of any alternative, providing the greatest benefit to vegetation.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Alternative C would designate the most acres of ACECs: approximately 79,700 acres in 16 ACECs. NSOs would place the most restrictions on surface disturbance among the alternatives. This would result in the most beneficial impacts on vegetation. In addition, a total of 20,190 acres are ROW exclusion areas, which would limit surface disturbance.

Alternative C and Alternative B would exclude the Blue Hill, Bull Gulch, and Thompson Creek ACECs (17,500 acres) from fluid minerals leasing, providing additional protection to vegetation. In Alternative C, the Greater Sage-Grouse Habitat ACEC would also be closed to fluid minerals leasing. Travel restrictions in ACECs would also minimize impacts on vegetation.

Three ACECs under Alternative C would be designated as VRM Class I, with the remaining areas designated as VRM Class II. These classifications would limit actions to those that would not create a large visual impact, protecting vegetation.

Alternative C would protect the most vegetation of any alternative by designating the most acres of ACECs.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Alternative C would close nine suitable stream segments to fluid minerals leasing (CRV-CL-12), as opposed to four stream segments under Alternative B. This closure would extend 0.25 mile on both sides of the stream centerline, which would provide protection to vegetation by excluding oil and gas development. In addition, 26 eligible stream segments would be identified as suitable, and interim protective management would be applied. This

BLM_0016489

protection would extend to 0.25 mile on both sides of the stream centerline and would protect vegetation by excluding surface-disturbing activities.

Alternatives A and C would provide the most protection to vegetation by excluding surface-disturbing activities within 0.25 mile of 26 stream segments. Alternative B would exclude only surface-disturbing activities within 0.25 mile of four stream segments, and Alternative D would not provide any protection to vegetation because all stream segments would be determined unsuitable.

### *Alternative D (Forests and Woodlands)*

Impacts to forest and woodland vegetation from wildland fire management, coal management, WSAs management, and transportation and facilities management would be the same as or similar to those under Alternative A. Impacts to forest and woodland vegetation from soils management and vegetation management would be the same as or similar to those under Alternative B. Impacts from management of all other resources and uses would be as described below.

**Impacts from Water Resources Management.** Alternative D would implement CRV-NSO-3 for major river corridors and CRV-NSO-4 for designated municipal watersheds, which would have a beneficial impact on vegetation by reducing direct and indirect impacts from surface-disturbing activities.

Alternative D would provide more protection to vegetation than under Alternative A because CRV-NSO-4 would apply to all municipal watersheds as opposed to only the Rifle and New Castle watersheds, but less protection than under Alternatives B and C because Alternative D would not implement CRV-NSO-5.

**Impacts from Fisheries and Aquatic Wildlife Management.** Only one NSO stipulation would be implemented under Alternative D, CRV-NSO-17, which would prohibit surface-disturbing activities within a 2-mile radius of the Rifle Falls and Glenwood Springs fish hatcheries. This would provide a beneficial long-term impact on vegetation; however, Alternative D would protect fewer acres of vegetation than under Alternatives B and C, due to the implementation of fewer NSOs. Alternative D would provide slightly more benefit to vegetation than under Alternative A because Alternative D (like Alternatives B and C) would close and reclaim certain routes.

**Impacts from Terrestrial Wildlife Management.** Terrestrial wildlife management under Alternative D would implement the fewest NSO stipulations of any alternative. Alternative D would provide the least benefit to vegetation of all alternatives, preventing the least amount of surface disturbance.

**Impacts from Special Status Species Management.** Alternative D would protect the least amount of vegetation with NSO stipulations, providing the least benefit to vegetation of any alternative.

**Impacts from Cultural Resource Management.** Alternative D would provide more protection to vegetation than under Alternative A because Alternative A would not implement CRV-NSO-37 for heritage areas. Alternative D would provide less protection to vegetation than under Alternatives B and C because CRV-NSO-37 would buffer historic properties by only 100 meters versus 200 meters under Alternatives B and C.

**Impacts from Visual Resource Management.** Alternative D would designate more acres as VRM Class I and Class II (262,300 acres) than under Alternative A, but less than under Alternatives B and C; therefore,

BLM_0016490

protection to vegetation under Alternative D would be greater than under Alternative A, but less than under Alternatives B and C.

**Impacts from Forestry Management.** Under Alternative D, 32,200 acres of forest and woodlands would be intensively managed to improve forest health and vigor and to provide wood products, the most acres of any alternative. Long-term beneficial impacts on forest health and vigor and sustainable harvest of wood products are the greatest under Alternative D since it designates the most acres for intensive management.

Limited management (thinning and other forest health treatments and techniques) would occur on 387,700 acres, the most of any alternative. Under Alternative D, impacts on forest health and vigor would be the most beneficial over the long term, substantially greater than under Alternative A, similar to those under Alternative B (since Alternative B designates only 1 percent more acres than under Alternative D), and slightly greater than under Alternative C.

Commercial timber harvest would be prohibited on 85,000 acres of forest and woodlands under Alternative D, similar to the 81,800 acres prohibited under Alternative B. Prohibitions on commercial harvesting would create an adverse long-term impact on forest health and vigor and on the production of wood products. Harvesting acts as a treatment for insects and disease and managing species composition and age distribution, while providing wood products. Consequently, the prohibition and resulting adverse impacts under Alternative D are substantially greater than those under Alternative A, similar to those under Alternative B, and fewer than those under Alternative C.

Immediate salvage or accelerated harvests would occur following adverse events under Alternative D, the same as under Alternative B. Alternative A does not provide for either of these actions, and Alternative C allows for salvage operations but does not allow for accelerated harvests. Consequently, Alternatives B and D would have the greatest beneficial long-term impact on forest health and vigor and supply of wood products.

Restrictions to protect air quality could adversely affect forestry, similar to impacts under Alternative A. Direct and indirect impacts on soils would be greater than under Alternative A and similar to Alternative B because more acres would be managed, which would increase the risk of weed invasion. Short- and long-term changes in species composition and community structure would be more pronounced than under Alternative A, similar to Alternative B.

**Impacts from Livestock Grazing Management.** Livestock grazing management actions would open 443,400 acres to grazing and would provide 36,500 AUMs of livestock forage under Alternative D. Four active allotments—Alkali Creek, Alkali Gulch, County Line, and Dry Creek/Pete and Bill—would be closed. County Line would be closed for noncompliance with land health standards due to livestock grazing. Closing this allotment would have a beneficial impact on vegetation. However, the other three allotments would be closed because of the growing conflict between grazing and increased oil and gas development. There would be a major adverse impact on vegetation if both management activities continued unabated. Closing these allotments to livestock grazing while still allowing for oil and gas development would lessen adverse impacts on vegetation.

Since fewer acres and AUMs would be available to livestock under this alternative, compared to Alternatives A and B, adverse impacts on vegetation from grazing would be fewer.

BLM_0016491

**Impacts from Recreation and Visitor Services Management.** Alternative D would provide for the most visitor use and development by designating 68,200 acres of SRMAs. More trails and campgrounds would be constructed under this alternative. The same NSOs as under Alternatives B and C would apply.

As opposed to other alternatives, special recreation permits would be issued to maximize opportunities for commercial recreation. This would have indirect adverse effects on vegetation.

Under all alternatives, adverse impacts from recreation and visitor services on vegetation would be greater than beneficial impacts. Impacts on vegetation would be similar to those under Alternative A, except for the degree. Alternative D would create the most adverse impacts on vegetation of any alternative.

**Impacts from Comprehensive Trails and Travel Management.** Similar to Alternatives B and C, Alternative D would have no land open to cross-country travel. However, fewer acres under Alternative D would be closed to OHV use than the other alternatives.

Alternative D would create more impacts on vegetation than under Alternatives B and C by closing the least acres to OHV use, and by obliterating fewer routes than under Alternatives B and C. Alternative D would result in far fewer adverse impacts on vegetation than under Alternative A because OHVs would be limited to designated routes.

**Impacts from Lands and Realty Management.** Alternative D would designate 39,000 acres of ROW exclusion areas, 300 acres less than under Alternative B. Beneficial impacts on vegetation would be slightly less as a result. ROW developments would have adverse, direct and indirect, long-term impacts on vegetation.

Impacts from retention of lands would be similar to Alternative B since the lands to be retained would include all the same areas, with the exception of different ERMAs. Most of these areas contain high quality plant communities, so retention of these lands would result in a beneficial long-term impact on vegetation.

Alternative D would result in fewer adverse impacts on vegetation than under Alternative A because it would exclude more acres and retain more lands. Alternatives B and C would result in slightly fewer adverse impacts than under Alternative D because they would exclude more acres from ROW actions.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Under Alternative D, a total of 658,200 acres of federal mineral estate would be open to oil and gas development. Up to 4,198 wells and 525 multi-well pads are anticipated, with an estimated 5,276 acres of surface disturbance. This disturbance would be reduced to 3,439 acres on interim reclamation of well pads. Approximately 48,800 acres would be closed to fluid minerals leasing, and NSO stipulations would be applied to 203,000 acres. Restrictions that exclude oil and gas development and other surface-disturbing activities would provide a beneficial long-term impact on vegetation.

Alternative D would permit the greatest number of wells and pads, creating the most surface disturbance of any alternative and the most adverse impacts on vegetation. CL and NSO stipulations under Alternative D would prevent the least amount of surface disturbance of all alternatives, providing the least protection to vegetation.

BLM_0016492

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative D, 72,300 acres of locatable minerals would be recommended for withdrawal, including some ACECs. A total of 477,200 acres of salables and 477,200 acres of non-energy leasable minerals would be open to mineral development.

Impacts would be adverse and both short-term and long-term. Alternative D would withdraw more acres than under Alternative A but fewer than under Alternative B, and substantially fewer acres than under Alternative C; therefore, Alternative D would create fewer impacts on vegetation than under Alternative A but more than under Alternatives B and C.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Alternative D would designate three ACECs (20,200 acres), the fewest number and acres of any alternative. All ACECs under this alternative would be covered by NSOs, and 14,100 acres would be designated as ROW exclusion areas. Alternative D would exclude the Blue Hill and Bull Gulch ACECs (14,100 acres) from fluid minerals leasing, providing additional protection to vegetation, more than under Alternative A, which would exclude only 4,300 acres from fluid minerals leasing.

Under Alternative D, only one ACEC would be designated as VRM Class I, with the other two ACECs designated as VRM Class II. These classifications would limit management actions to those that would not create a large visual impact, thereby protecting vegetation. Travel restrictions would limit adverse impacts on vegetation.

Alternative D would provide the least protection for vegetation of any alternative by designating the least amount of acres as ACECs.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Alternative D would not implement any stipulations to exclude surface-disturbing activities, like Alternatives B and C. All 26 suitable stream segments would be determined to be unsuitable under Alternative D, so there would be no protection to vegetation.

### Cumulative Impacts (Forests and Woodlands)

Potential cumulative impacts on vegetation would occur from a combination of BLM and non-BLM activities and land uses occurring both within the planning area boundary and on public and private lands immediately adjacent to the boundary. Surface disturbance within the CRVFO from non-BLM actions, such as from permittees (e.g., oil and gas companies), is anticipated to be substantively greater than surface disturbance from BLM actions (e.g., recreation development). For the most part, soil disturbances would be revegetated or reclaimed, which would reduce bare ground and decrease the risk of weed invasion and spread; however, restoration efforts can have poor success rates, with loss of species diversity, increase in annuals, decrease in perennials and woody plants, and an increase in weed species.

Some impacts are direct, while others are indirect and affect vegetation through a change in another resource. Direct impacts on upland vegetation are considered to include disruption or removal of rooted vegetation, resulting in a reduction in areas of native vegetation, reduction of total numbers of plant species (species richness) within an area, and reduction or loss of total area, diversity, structure, or function of wildlife habitat.

Because most direct impacts on vegetation are the result of physical ground disturbance, these impacts are usually analyzed in terms of relative area of disturbance. Direct impacts on vegetation would result primarily

BLM_0016493

from oil, gas, and other minerals development, vegetation treatments and forestry management, ROW development, grazing by livestock and wildlife species, wildland and prescribed fire, construction of roads, trails, and recreation facilities, and cross-country OHV use. The combination of past, present, and future surface-disturbing activities would result in cumulative impacts on vegetation throughout the CRVFO. Each disturbance increases the risk of weed invasion and disrupts the spatial continuity of vegetation communities, thereby fragmenting habitat.

A number of indirect impacts on vegetation resources could result from proposed management actions. Potential indirect impacts include disruption or reduction of pollinator populations, loss of habitat suitable for colonization due to surface disturbance, introduction of noxious weeds by various vectors or conditions that enhance the spread of weeds, and general loss of habitat due to surface occupancy, surface compaction, or trampling. Failed reclamation or mitigation may also cause indirect impacts on these resources.

Past fire suppression has contributed to increasing pinyon-juniper encroachment and to a concurrent decrease in the extent of sagebrush communities. Lack of fire has also contributed to invasion of aspen stands by conifers, contributing to the declining health of aspen stands. Using natural fire managed for resource benefit and vegetation treatments under the proposed alternatives would generally maintain or improve vegetation communities by removing undesired species, increasing species diversity and age-class, and improving vegetation composition and structure. In addition, vegetation treatments and range improvements on lands adjacent to the CRVFO would increase available forage for wildlife populations and livestock in these areas. This would improve the distribution of livestock and wildlife, improving vegetation health by decreasing concentrated impacts from grazing.

As larger tracts of land adjacent to public lands are subdivided, the urban interface and its associated issues (e.g., fragmentation, fire suppression, and spread of weeds) are also expected to grow. As the urban interface expands, some tracts of BLM land may become disconnected or isolated from other native habitats and ultimately adversely affect the continuity and diversity of vegetation, thereby impacting wildlife. Pressure to use and expand recreation areas is expected to continue as these communities grow. Associated development of roads, trails, and infrastructure to accommodate growing use contributes to habitat fragmentation.

Impacts from oil and gas development would occur both within the CRVFO and on private and public lands adjacent to the planning area. Failure to perform adequate reclamation or avoid riparian/wetland vegetation during off-site development could in turn result in indirect impacts on BLM lands through the increased incidence of noxious weed and other undesirable plant introductions or transport of eroded soils and sediments. Degradation of these areas would also cause a decrease in the areal extent of natural vegetation communities throughout the larger area.

Although management of livestock grazing within the CRVFO is expected to result in improvements to vegetation resources, the same management on private lands cannot be assumed. Therefore, any potential negative impacts from livestock use in off-site areas—including erosion, siltation, and other impacts on streams, as well as general vegetation degradation and noxious weed infestations—could negatively affect lands within the planning area.

Cumulative impacts on vegetation would also result from travel on public lands within and surrounding the planning area. In general, public lands receive much greater use than private lands. Therefore, the beneficial road closures and cross-country travel restrictions for motorized and mechanized uses would help offset the

BLM_0016494

anticipated increase in use of both public and private lands and the indirect and direct negative impacts these activities have on vegetation resources.

Noxious weeds and other undesirable vegetation are assumed to occur at approximately the same densities off-site as within the planning area. If unmanaged, the presence of these populations off-site would serve as a constant infestation source for the planning area, especially in areas where human traffic and livestock or wildlife movement can serve to spread weed seeds into new sites, counteracting active and coordinated management within the CRVFO.

Regardless of management actions within the planning area, direct and indirect, adverse impacts on vegetation resources would result from ongoing human development throughout the general region, which would bring new roads, housing projects, commercial development, and increased recreational use. These impacts would continue on a regional scale and would be in addition to impacts expected from land uses and resource management activities in the planning area. If negative impacts on vegetation continue to increase as expected, the condition of vegetation communities on public lands would become even more important because of their intrinsic value, the biodiversity they represent, and the continuation of the ecological values they support.

Actions on BLM land would implement BMPs to reduce cumulative adverse impacts on vegetation. Any entity causing a permitted ground-disturbing activity would comply with specified reclamation and revegetation practices, as well as annual monitoring and adaptive management of these sites, until the BLM deems success criteria are achieved.

The potential for adverse cumulative impacts on vegetation would be greatest under Alternative A, which would allow for the most surface disturbance and would protect the least acres with protective stipulations. Alternative C would result in the most beneficial cumulative impacts by implementing protective stipulations over the most acres, allowing for the least amount of development, and designating the most acres of ACECs, WSAs, and wilderness outside existing WSAs. Alternative B would provide an intermediate level of protection. Alternative D would create fewer adverse cumulative impacts on vegetation than under Alternative A due to more acres protected by stipulations, but would allow for the most oil and gas, and recreation development of any alternative.

### *Vegetation—Rangelands*

#### *Alternative A*

Impacts to rangeland vegetation from management of other resources under Alternative A would be the same as or similar to those described above for management of forest and woodland vegetation under Alternative A, except as follows.

**Impacts from General Vegetation Management.** Under Alternative A, vegetation management actions in rangelands would include weed treatments (manual, chemical, or biological), management of sagebrush and mountain shrublands (mechanical, biological, chemical, fire managed for resource benefit, or prescribed fire), management of salt-desert shrublands (mechanical, biological, or chemical), management of native grasslands (natural fire managed for resource benefit), and habitat restoration.

BLM_0016495

## Weed Treatments

Impacts from weed treatments would be the same as or similar to those listed above under vegetation management - forests and woodlands, Alternative A.

## Prescribed Fire and Natural Fire Managed for Resource Benefit

Prescribed fire would be used in sagebrush and mountain shrublands to reduce canopy cover and fuel loads, to create a more diverse age-class, and to reduce pinyon-juniper encroachment into sagebrush stands. This would increase the cover of understory species (i.e., grasses and forbs) and would create more vegetation diversity, which would benefit wildlife and livestock. Fuels reduction in shrublands would reduce the potential for a catastrophic fire that could kill or injure vegetation, decreasing forage for wildlife and livestock over the short term.

Wildland fire managed for resource benefit would benefit vegetation in WSAs and areas managed for wilderness characteristics by allowing natural processes (e.g., fire) to modify vegetation to meet ecological objectives and desired conditions.

Impacts on vegetation from fire under all alternatives would be the same as or similar to those described under wildland fire management in forests and woodlands, Alternative A.

## Vegetation Treatments

Vegetation treatments in rangelands would include mechanical, chemical, fire managed for resource benefit, or prescribed fire (see above for impacts from prescribed fire). Mechanical methods could include mowing, hydro axing, or roller chopping sagebrush and mountain shrublands and hydro axing or cutting pinyon-junipers woodlands to reduce encroachment into sagebrush stands. Levels of disturbance to soil and vegetation would depend on the method used; more surface disturbance would occur from a tracked vehicle versus a rubber-tired vehicle. Mowing and roller chopping would probably impact more vegetation than hydro axing, which is more selective.

Chemical treatments involve the use of herbicides on sagebrush and mountain shrublands to decrease shrub cover and enhance understory vegetation. Impacts from mechanical and chemical treatments on vegetation would be the same as or similar to those listed above under vegetation management in forests and woodlands, Alternative A.

The objective for sagebrush treatments would be to transition from homogenous stands of old (or decadent) sagebrush to create a more diverse age-class structure across the landscape and to improve the diversity and cover of understory species, which would benefit wildlife and livestock by increasing the quality and quantity of forage. Mountain shrublands would be managed for similar objectives: to improve composition and structure, which would increase the palatability of these shrubs for wildlife by stimulating new growth.

Salt desert shrublands would be managed to improve the vigor and composition of shrubs and the diversity and cover of understory species and biological soil crusts. Improving salt desert shrublands would benefit general vegetation as well as the special-status plant species that grow there and would provide increased cover and forage for wildlife.

Impacts from vegetation treatments would be the same as or similar to those listed above under vegetation management - forests and woodlands, Alternative A.

BLM_0016496

Restoration

Impacts from restoration on vegetation would be the same as or similar to those listed above under vegetation management - forests and woodlands, Alternative A.

Under all alternatives, vegetation treatments of rangelands would create a long-term benefit to vegetation.

Impacts to rangeland vegetation under Alternative B would be similar to those under Alternative A for all resource management actions not described below.

**Impacts from Terrestrial Wildlife Management.** Impacts from terrestrial wildlife management on rangelands would be similar to those under forests and woodlands, Alternative A., with the following difference:

- Habitat improvement projects would target mountain shrub and sagebrush communities, seeking to reduce pinyon-juniper encroachment, create diversity among age-classes, reduce canopy cover, increase forb and grass diversity and abundance, and improve the palatability and nutrition of forage for wildlife.

**Impacts from Wildland Fire Management.** Impacts from wildland fire management would be similar to those under forests and woodlands, Alternative A, with the following differences for rangelands:

- Prescribed burning, fire managed for resource benefit, and mechanical treatments would be used to rejuvenate and enhance decadent stands of sagebrush and mixed mountain shrublands.

- The risk of cheatgrass invasion following fire would be considerably higher since cheatgrass is predominantly found in rangelands in the CRVFO, including pinyon-juniper woodlands.

- The designation of certain salt desert shrublands as Class A areas would protect these communities from disturbance caused by fire. Salt desert shrublands are not adapted to fire and are highly susceptible to cheatgrass invasion following fire.

**Impacts from Forestry Management.** While no timber would be harvested in rangelands, access roads could be constructed through rangelands to access forest and woodlands where harvesting would take place. Construction of access roads would result in direct and indirect adverse impacts on vegetation. Vegetation cover and density would be reduced and soil compaction, erosion, sedimentation, and increased dust would occur. Soil disturbance and motorized vehicle use would probably introduce and continue the spread of noxious and invasive weeds. These impacts would probably decrease plant vigor and productivity and alter the composition of plant communities.

*Alternative B (Preferred Alternative) (Rangelands)*

Impacts to rangeland vegetation from wildland fire management, coal management, WSAs management, and transportation and facilities management would be the same as or similar to those described above for forests and woodlands under Alternative A. Impacts to rangeland vegetation from forestry management would be the same as or similar to those described for rangelands under Alternative A. Impacts to rangeland vegetation from management of all other resources and uses would be the same as or similar to those described previously for forests and woodlands under Alternative B, except as described below.

BLM_0016497

**Impacts from General Vegetation Management.** Impacts on rangelands from vegetation management would be the same as or similar to those listed above under Alternative A; however, Alternatives B, C, and D would propose specific direction with clearly defined objectives for the management of sagebrush, salt desert shrublands, mountain shrublands, and grasslands, whereas Alternative A would not.

**Impacts from Terrestrial Wildlife Management.** Impacts from terrestrial wildlife management on rangelands would be similar to those under forests and woodlands, Alternative B, with the following difference:

- Habitat improvement projects would target mountain shrub and sagebrush communities, seeking to reduce pinyon-juniper encroachment, create diversity among age classes, reduce canopy cover, increase forb and grass diversity and abundance, and improve the palatability and nutrition of forage for wildlife.

## Alternative C (Rangelands)

Impacts to rangeland vegetation from general vegetation management and forestry management would be the same as or similar to those under rangeland vegetation under Alternative A. Impacts to rangeland vegetation from wildland fire management, WSA management, and transportation and facilities management would be the same as or similar to those described above for forests and woodlands under Alternative A. Impacts to rangeland vegetation from soils management, water resources management, and cultural resource management would be the same as or similar to those described above for forests and woodlands under Alternative B. Impacts to rangeland vegetation from management of other resources and uses would be the same as or similar to those described above for forests and woodlands under Alternative C, except as described below.

**Impacts from Terrestrial Wildlife Management.** Impacts from terrestrial wildlife management on rangelands would be similar to those under forests and woodlands, Alternative C, with the following difference:

- Habitat improvement projects would target mountain shrub and sagebrush communities, seeking to reduce pinyon-juniper encroachment, create diversity among age-classes, reduce canopy cover, increase forb and grass diversity and abundance, and improve the palatability and nutrition of forage for wildlife.

## Alternative D (Rangelands)

Impacts to rangeland vegetation from general vegetation management and forestry management would be the same as or similar to those described above for rangeland vegetation under Alternative A. Impacts to rangeland vegetation from wildland fire management, coal management, WSA management, and transportation and facilities management would be the same as or similar to those described above for forests and woodlands under Alternative A. Impacts to rangeland vegetation from soils management would be the same as or similar to those described above for forest and woodlands under Alternative B. Impacts to rangeland vegetation from management of other resources and uses would be the same as or similar to those described above for forest and woodlands under Alternative D, except as described below.

**Impacts from Terrestrial Wildlife Management.** Impacts from terrestrial wildlife management on rangelands would be similar to those under forests and woodlands, Alternative D. However, habitat

BLM_0016498

improvement projects would target mountain shrub and sagebrush communities, seeking to reduce pinyon-juniper encroachment, create diversity among age classes, reduce canopy cover, increase forb and grass diversity and abundance, and improve the palatability and nutrition of forage for wildlife.

### Cumulative Impacts (Rangelands)

Cumulative impacts on rangeland vegetation would be the same as described in Section 4.2.5.2 for forests and woodlands.

### Vegetation—Riparian

#### Alternative A

**Impacts from Riparian Management.** There are no objectives or actions listed for Riparian Management under Alternative A; however, this alternative includes NSO and CSU stipulations that would provide protection to riparian-wetland resources from impacts associated with other resources or uses. These stipulations would serve to maintain or achieve Public Land Health Standard 2 for riparian systems and accomplish the objective of the land use plan to attain riparian area Proper Functioning Condition (PFC).

**Impacts from Soils Management.** Objectives and actions that impact riparian resources appear under Alternative B; therefore, the discussion of impacts is deferred to Alternative B. This alternative includes an NSO stipulation to prohibit surface occupancy and surface-disturbing activities on slopes greater than 50 percent. In most cases, riparian NSO or CSU stipulations would provide adequate protection for riparian/wetland resources; however, these stipulations are only applicable to the riparian zone and 500 feet beyond the outer edge. The NSO stipulation for soils may offer additional benefits (e.g., reduced erosion/sedimentation) to riparian areas by restricting disturbances that occur outside the 500-foot buffer. Conversely, the soils NSO stipulation may restrict or prohibit new (or maintenance of existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Water Resource Management.** An objective of this alternative is to increase water yield throughout the resource area through forest management practices and vegetation manipulation for livestock and big game forage. Objectives and associated actions to increase water yield would generally be beneficial to riparian areas by providing additional water necessary to maintain, enhance riparian vegetation, or create these systems. Conversely, actions associated with increased water yield that increase sediment yield (e.g., any action that results in long-term decrease of vegetation cover) may offset the beneficial impacts. This alternative includes an NSO stipulation that would prohibit surface occupancy and surface-disturbing activities within 0.5 mile of either side of the high water mark of five major rivers: Colorado, Roaring Fork, Crystal, Frying Pan, and Eagle. In most cases, riparian NSO or CSU stipulations would provide adequate protection for riparian/wetland resources; however, these stipulations are only applicable to the riparian zone and 500 feet beyond the outer edge. The NSO stipulation for water management may offer additional benefits (e.g., reduced erosion/sedimentation) to riparian areas by restricting disturbances that occur outside the 500-foot buffer. Conversely, the NSO stipulation for water management may restrict or prohibit new (or maintenance of existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

BLM_0016499

**Impacts from Forest and Woodland Vegetation Management.** Impacts from forestry management are also addressed in this section since its objectives and actions are interrelated with those listed for forests and woodlands.

The commercial harvest of forest and woodland products and associated surface disturbances (e.g., road construction and vehicle use) would remove seedlings, understory vegetation, and mature trees where harvest occurs. In most cases, riparian NSO or CSU stipulations would provide adequate protection for riparian-wetland resources from impacts associated with forest and woodland management. A review of current PFC data within the planning area for systems that were Functioning at Risk (FAR) or Nonfunctional (NF) did not identify any issues or concerns with forestry management. However, it is acknowledged that forestry management has been a relatively minor program within the CRVFO. Over the long term, the harvest of forest and woodland products would increase penetration of light to understory vegetation (i.e., grasses and forbs) and could increase diversity, composition, and ground cover (both litter and vegetation). Increased ground cover may result in less surface runoff and sediment load into riparian areas. Increases in vegetation cover over a relatively large area may also reduce surface runoff, increase water infiltration into soils, and recharge floodplains. This may increase the duration of flow in drainages. Increased duration of flow would be beneficial to riparian systems (i.e., additional water would maintain or enhance riparian vegetation or create these systems). Forest and woodland management practices would also reduce fuel loads, thereby reducing the likelihood of catastrophic wildfires and subsequent loss of riparian vegetation.

**Impacts from Rangeland Vegetation Management.** Objectives and actions that impact riparian resources appear under Alternative B; therefore, the discussion of impacts is deferred to Alternative B.

**Impacts from Weed Management.** The only objective or action for weed management under Alternative A is to hold project proponents, including livestock operators, rights-of-way holders, and other permittees deemed necessary by the BLM, responsible for monitoring and controlling noxious weeds that result from any new facilities, improvements or other surface disturbances authorized on BLM land (e.g., roads, communication sites, pipelines, stock ponds, and fences).

This action is also included under Alternative B, along with other objectives and actions associated with weed management. Refer to Alternative B for impacts on riparian-wetland resources associated with weed management.

**Impacts from Fisheries and Aquatic Wildlife Management.** There are no objectives or actions listed for fisheries and aquatic management under Alternative A other than an NSO stipulation prohibiting surface occupancy and surface-disturbing activities within a 2-mile radius of the hatcheries to protect the quality and quantity of surface water and underground aquifers supplying the Rifle Falls (CRVFO) and Glenwood Springs (CRVFO) state fish hatcheries. This stipulation is similar to CRV-NSO-17, which is included under Alternative B. Refer to Alternative B for impacts on riparian/wetland resources associated with fisheries and aquatic management.

**Impacts from Terrestrial Wildlife Management.** Objectives and actions that impact riparian resources appear under Alternative B; therefore, the discussion of impacts is deferred to Alternative B.

BLM_0016500

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Objectives and actions that impact riparian resources appear under Alternative B; therefore, the discussion of impacts is deferred to Alternative B.

**Impacts from Special Status Plants and Terrestrial Wildlife.** Objectives and actions that impact riparian resources appear under Alternative C; therefore, the discussion of impacts is deferred to Alternative C.

**Impacts from Cultural Resource Management.** This alternative includes an NSO stipulation prohibiting surface-disturbing activities within 100 meters of historic properties; however, no land was identified associated with the NSO. Impacts on riparian-wetland resources cannot be determined since the amount of land involved with the NSO is unknown. If the amount (acres) of land is significant, this NSO stipulation may offer indirect benefits (e.g., reduced erosion/sedimentation) to riparian areas by further restricting disturbances near riparian areas; however, the stipulation may restrict or prohibit new (or maintenance of existing) habitat and range improvements designed to maintain/improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Visual Resource Management.** Designation of VRM Class I and II areas may offer indirect benefits (e.g., reduced erosion/sedimentation) to riparian areas by further restricting management activities near riparian areas; however, in most cases, riparian CSU and NSO stipulations would provide adequate protection for riparian-wetland resources. The designations may restrict or prohibit new (or maintenance of existing) habitat and range improvements designed to maintain/improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Wildland Fire Management.** Since wildland fires will be aggressively suppressed in A and B FMUs, direct impacts on riparian vegetation and wetlands will be minor because fire occurrence within these areas is infrequent. Over the long term, fuels and fuel continuity will continue to increase, which will increase the chance of catastrophic fire. Catastrophic fire has the potential to cause consequential damage to riparian zones and channel morphology. In addition, as woody vegetation increasingly dominates the landscape, the flow in some streams may be further reduced, which would reduce the vigor and amount of associated riparian vegetation.

Restrictions and fire rehabilitation actions are designed to minimize or eliminate impacts on riparian vegetation and will be addressed in site-specific environmental analysis for vegetation treatments. Adverse impacts on riparian zones are expected to be minimal, except where specific treatments are designed to control or manage vegetation within riparian areas.

Wildland fire suppression strategy in FMUs C and D is expected to have minimal direct impact on riparian vegetation. Riparian areas are unlikely to burn as a result of natural ignition because of their position on the landscape and due to the high live-fuel moisture content that riparian vegetation typically has. On the remote chance that riparian vegetation does burn, these are typically resilient systems and would be expected to recover within one growing season after the fire. The return to the vegetation condition that existed before disturbance would vary considerably, depending on the riparian vegetation type. For example, riparian vegetation that consisted of mature cottonwood trees could take hundreds of years before conditions returned to what existed before the fire. Willow communities could take 5 to 10 years, and riparian grass and

BLM_0016501

forb communities would take 1 to 2 years. Again, the chance of riparian vegetation burning to any consequential degree is remote.

Since more upland area vegetation should burn on a typical year in FMUs C and D, indirect impacts on riparian vegetation could result. There might be short-term localized increases in runoff and sedimentation into the stream channels and riparian zones. In the long term, positive impacts on riparian areas should result. In most burn areas, percent ground cover of vegetation would be greater than what existed before the burn. This would result in an increase in water infiltration, a corresponding reduction in erosive runoff within watersheds, and a reduction of in-channel erosion. In addition, as the woody vegetation in many areas is reduced, there would likely be an increase in the duration and the amount of stream flow and the quantity of associated riparian vegetation, particularly in intermittent and ephemeral streams. Finally, as fuel continuity is reduced overall as a result of wildland fire management, it would reduce the likelihood of catastrophic wildland fires, which could damage riparian systems by destroying the vegetation and causing sedimentation in channels.

Impacts from wildland fire management would be the same for all alternatives since objectives and actions do not vary by alternative.

**Impacts from Forestry Management.** These impacts are addressed in the impacts from vegetation—forest and woodland management section above.

**Impacts from Livestock Grazing Management.** Direct impacts on vegetation from livestock grazing include removal of forage (herbivory) and trampling damage. Indirect impacts from livestock grazing management may also result in soil compaction and erosion. Poor grazing management can result in excessive utilization, soil compaction, or repeated defoliations that do not allow sufficient time for rest and recovery of plant species. Reduced vigor or death of plant species may result, as well as increased potential for weed invasion or other undesirable vegetation. Excess herbivory or trampling damage can lead to greater erosion or deposition, changes in channel geomorphology, and less soil moisture. Conversely, well-managed grazing can provide a variety of environmental benefits. Herbivory can remove old or dead growth that allows for an increase green matter (regrowth). Hoof action from livestock can plant seeds, which promotes the germination and establishment of new plants. Targeted grazing can be a useful tool to control undesirable invasive plant species or reduce fuels that contribute to severe wildfires. Livestock grazing that promotes and is compatible with healthy riparian vegetation contributes to sustainable levels of aboveground biomass, root growth, and root strength in streambanks. Through overbank flows, riparian vegetation is naturally defoliated or buried by stream and sediment deposition. Livestock can contribute to the maintenance of vegetation by defoliating dormant or dead growth between these overflow events, thus increasing green matter and hence root strength and growth (Wyman et al. 2006).

A review of the most current riparian PFC data (as of February 2010) within the CRVFO planning area, shows most (264 miles) of the lotic systems rated as PFC. A total of 14 miles were rated as FAR or NF, of which 9 miles (six streams) had issues associated with livestock grazing. The most current PFC assessment or monitoring data indicate that 7 of the 9 miles have an improving trend. All 42 acres of lentic systems within the planning area were rated as PFC. The data above indicate that adverse impacts from livestock grazing management are relatively minor within the CRVFO planning area.

BLM_0016502

Under all alternatives, Colorado Livestock Grazing Management Guidelines as well as other grazing management tools and methods would be used to maintain or achieve the Standards for Public Land Health and to meet other vegetation objectives.

Alternative A shows a relatively large amount of AUMs (56,900) compared to other alternatives; however, that figure includes the Roan Plateau, whereas the other alternatives do not. In addition, the amount of AUMs under Alternative A was a target under the existing RMP that was never reached. Alternatives B, C, and D are more reflective of the actual level of permitted use (active grazing preference). In summary, the actual level of grazing use would not vary substantially by alternative; therefore, impacts on riparian-wetland resources would not vary substantially.

**Impacts from Recreation and Visitor Services Management.** Recreational use is often concentrated on or near riparian areas for a variety of reasons (e.g., water source, scenic quality, shade, and proximity to recreational opportunities). Impacts on riparian areas can result from recreation, such as camping, hiking, picnicking, mountain biking, horseback riding, boating, and OHV use. Concentrated human use on or near riparian areas can trample vegetation, compact soils, lower water infiltration rates, and increase surface runoff and sediment load into riparian areas. Recreation can also be a source of introduced invasive plant species, resulting in the introduction and spread of these plants into riparian ecosystems. Similar damage patterns can also occur at dispersed-use areas. Many of these dispersed-use areas are so popular that visitors repeatedly return to the same spots, developing "improvements" and creating, in essence, developed sites. Some recreationists often share the same riparian areas used by such other activities as livestock grazing, which compounds the impacts on riparian ecosystems. Both activities can lead to trampled vegetation, soil compaction, and destabilized streambanks and shorelines (Eubanks 2004). OHV use in riparian areas can result in destruction of vegetation, soil compaction, an increase in bare soil, eroding streambanks, increased sediment load in streams, and introduction and spread of invasive plant species. All of the above could adversely affect riparian functioning condition.

Of the 14 miles of lotic systems that were rated as FAR or NF within the CRVFO planning area, only 2.3 miles had issues (causal factors affecting functioning condition) associated with recreational use. These areas include Prince Creek (campsites) and McHatten Creek (mountain bike trails). Both of these areas had issues identified with livestock grazing as well. As recreation increases within the planning area, additional impacts may occur that could adversely affect the functional condition and land health standard for riparian systems. Increased recreational use can also disrupt livestock grazing management (e.g., herding and riding), resulting in indirect adverse effects on riparian resources. Prince Creek is one example where recreation interferes with grazing distribution and causes more livestock concentration along the creek bottom.

Actions under Alternative A would administratively recognize eight SRMAs and six RMAs. There were no ERMAs proposed under this alternative. Generally, there would be increased intensity and level of recreation associated with the targeted activity (e.g., OHV and mountain biking) established for an SRMA. This would be especially true for SRMAs that are near communities (e.g., Thompson Creek and Red Hill SRMAs near Carbondale). Due to the increased recreation in these areas, there would be greater potential for adverse impacts on riparian resources. However, there would be more focus on the management of recreation in these areas to avoid or minimize impacts on riparian areas. For SRMAs located in more remote areas (e.g., Hack Lack and Bull Gulch), the intensity of recreation would not be expected to increase substantially. Adverse impacts on riparian resources in these areas would be less likely.

BLM_0016503

Recreation and management within both SRMAs would conform to Colorado Public Land Health Standard 2 for riparian systems and would comply with riparian CSU or NSO stipulations, which would minimize impacts on riparian resources.

RMAs are areas established for non-motorized recreation. Since non-motorized opportunities would be emphasized in these areas, this would tend to minimize adverse impacts on riparian resources from OHV use.

Alternative A also includes NSO stipulations prohibiting surface occupancy and surface-disturbing activities in SRMAs and RMAs. Standard exceptions to the NSOs apply, except there are no exceptions permitted in King Mountain Area, Siloam Springs Area, Castle Peak Area, Bull Gulch Area (the portion of the Bull Gulch WSA not within the Bull Gulch SRMA), Sunlight Peak Area, and the Haff Ranch portion of the Fisher Creek Area. In most cases, riparian CSU and NSO stipulations would provide adequate protection for riparian-wetland resources; however, the NSO stipulations for SRMAs and RMAs may offer additional benefits (e.g., reduced erosion/sedimentation) to riparian areas by further restricting disturbances near riparian areas. These stipulations may restrict or prohibit new (or maintenance of existing) habitat and range improvements designed to maintain/improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Comprehensive Trails and Travel Management.** OHV use in riparian areas can result in a variety of adverse impacts, such as the following:

- Destruction and loss of vegetation

- Soil compaction

- Reduced soil infiltration

- An increase in the amount of bare soil

- Eroding streambanks

- Increased sediment load in streams

- Introduction/spread of invasive plant species

All of the above could adversely affect riparian functioning condition. Generally, the more area that is open to OHV use, the greater the potential for adverse impacts mentioned above. Although there have been few issues identified with damage to riparian-wetland resources from OHV use within the planning area, the potential for adverse impacts may increase in the future given the increase in OHV use. In addition, technological improvements in OHVs have allowed easier access to more remote areas, increasing the potential for damage to riparian-wetland resources. Limiting travel to designated routes confines the impacts on areas already hardened or otherwise disturbed for vehicle use.

Alternative A would have areas open for motorized travel; therefore, adverse impacts on riparian-wetland resources would be greatest under this alternative. Alternatives B, C, and D would confine motorized travel to designated routes, which would minimize damage to riparian-wetland resources. Alternative D would have more miles designated for motorized travel followed by B and C (Alternative C having the fewest miles designated for motorized travel). Consequently, the potential for adverse impacts on riparian-wetland resources may decrease respectively although the difference in impacts under each of these alternatives would

BLM_0016504

be negligible to minor. The main factor potentially affecting riparian areas is the amount of acres open for motorized travel.

**Impacts from Lands and Realty Management.** Alternative A does not include many objectives or actions that impact riparian resources other than land tenure adjustments. Most objectives and actions appear under Alternative B; therefore, discussion of impacts, including those from land tenure adjustments, is deferred to Alternative B.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Mineral and energy development would cause direct and indirect impacts, such as loss of riparian vegetation, increased exposure to dust and other contaminants, soil erosion, and weed introduction or spread. Oil and gas activities can also disrupt livestock grazing management (e.g., herding, riding, grazing distribution), resulting in indirect adverse effects on riparian resources. Applying NSO or CSU stipulations to leases should protect riparian areas, provided they have been identified before lease issuance (the BLM does not currently have all riparian-wetland resources mapped). However, these stipulations would apply to new or more recent leases only. For existing leases that do not have NSO and CSU stipulations, compliance with these stipulations would be voluntary. Riparian areas may be protected to a lesser degree with the use of the Standard Terms and Conditions and by adding certain COAs to APDs, as developed in the permitting NEPA analysis. These COAs may include (1) minimizing the number of stream crossings and locating those crossings where riparian values are the lowest, (2) replanting native riparian vegetation to restore site function, (3) installing sediment traps to reduce erosion, and (4) relocating proposed operations up to 200 meters to avoid impacts on riparian areas. In addition, permits include COAs that address weed infestation and spread.

Of the 14 miles of lotic systems that were rated as FAR or NF within the CRVFO planning area, only 0.9 mile (one stream) had issues (causal factors affecting functioning condition) associated with oil and gas activity. As oil and gas activities increase within the planning area, additional impacts may occur that could adversely affect the functional condition and land health standard for riparian systems.

Alternative A would have the most acres open for fluid minerals leasing, followed by Alternatives D, B, and C (the last with the fewest acres open for fluid minerals leasing). Therefore, adverse impacts on riparian-wetland resources would be greatest under Alternative A, followed by D, B, and C.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts on riparian-wetland resources from locatable, mineral materials and non-energy leasable minerals management would be similar to those discussed for fluid minerals. However, the potential for development of locatable minerals, mineral materials, and non-energy leasable minerals is much less than for fluid minerals. Therefore, impacts on riparian resources from these activities would be less than impacts from fluid mineral activities. The greatest potential for impacts on riparian resources would be from mineral materials (salable minerals). Closing areas from mineral materials disposal would prevent impacts on vegetation within those areas. Application of riparian NSO or CSU stipulations should protect riparian areas in most cases.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Designation of ACECs, including protective stipulations (e.g., NSOs), may offer indirect supporting benefits (e.g., reduced erosion/sedimentation) to riparian areas by further restricting disturbances and other activities on or near riparian areas; however, in most cases, riparian CSU or NSO stipulations would provide adequate protection

BLM_0016505

for riparian-wetland resources. Conversely, these ACEC NSO stipulations may restrict or prohibit new (or maintenance of existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Wilderness Study Areas would preserve wilderness characteristics in accordance with nonimpairment standards under Interim Management Policy. These nonimpairment standards may offer indirect supporting benefits (e.g., reduced erosion/sedimentation) to riparian areas by further restricting disturbances and other activities on or near riparian areas; however, in most cases, riparian CSU or NSO stipulations would provide adequate protection for riparian-wetland resources. Conversely, the nonimpairment standards may restrict or prohibit new (or maintenance of existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative A, there would be 26 river segments within the CRVFO identified as eligible and they are afforded interim protective management until a suitability study is completed. It is BLM's policy to manage and protect the free-flowing character, tentative classification, and identified ORVs of eligible rivers according to the decisions in the associated RMP. These interim protection measures may offer indirect supporting benefits to riparian areas; however, in most cases, riparian CSU or NSO stipulations would provide adequate protection for riparian-wetland resources.

### *Alternative B (Preferred Alternative) (Riparian)*
**Impacts from Vegetation—Riparian Management.** The objective for Riparian Management under Alternative B is to attain riparian area PFC. Riparian-wetland areas are functioning properly when adequate vegetation, land form, or large woody debris is present to accomplish the following:

- Dissipate stream energy associated with high flows, thereby reducing erosion and improving water quality.

- Filter sediment, capture bedload, and aid floodplain development.

- Improve floodwater retention and groundwater recharge.

- Develop root masses that stabilize streambanks against cutting action.

- Develop diverse ponding and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses.

- Support greater biodiversity.

The physical and biological aspects above are naturally a benefit to riparian-wetland resources, as well many other resources and uses.

The action for riparian management under Alternative B is to manage for riparian-wetland values using management actions for improvement or protection. These actions may include implementing grazing management actions (e.g., adjusting livestock numbers, distribution, season of use, and duration of use), plantings, recreation restrictions, structures (e.g., fencing), and upland water developments. All of these are a

BLM_0016506

benefit to riparian-wetland resources as they would facilitate achieving the objective for riparian management (i.e., to attain riparian area PFC).

Alternative B also includes a CSU stipulation that would provide protection for riparian-wetland resources from impacts associated with other resources or uses. An NSO stipulation to prevent surface occupancy and surface-disturbing activities within riparian vegetation would not be applied under Alternative B; therefore, this alternative may have less protection to riparian areas, compared to Alternatives A and C, which include the NSO stipulation. In most cases, the CSU stipulation would accomplish similar protection measures to an NSO; however, there would be more flexibility allowed for disturbance to riparian vegetation under a CSU stipulation.

Impacts to riparian vegetation from wildland fire management, livestock grazing management, comprehensive trails and travel management, fluid minerals management (oil and gas, oil shale, and geothermal resources) management, locatable minerals, mineral materials, and non-energy leasable minerals management, and WSA management would be the same as or similar to those under Alternative A.

**Impacts from Soils Management.** Unlike Alternative A, Alternative B contains an objective for soils to ensure surface disturbances do not cause accelerated erosion (e.g., rills, soil pedestals, actively eroding gullies) on a watershed scale. Management actions that are guided by this objective would be beneficial to a riparian zone by reducing sediment. This alternative also includes an NSO stipulation to prohibit surface occupancy and surface-disturbing activities on slopes greater than 50 percent. In most cases, the riparian CSU stipulation would provide adequate protection for riparian/wetland resources; however, this stipulation is applicable to the riparian zone and 500 feet beyond the outer edge only. The NSO stipulation for soils may offer additional indirect supporting benefits (e.g., reduced erosion and sedimentation) to riparian areas by restricting disturbances that occur outside the 500-foot buffer. Conversely, the soils NSO stipulation may restrict or prohibit new (or maintenance of existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Water Resource Management.** This alternative includes an objective to ensure streams on BLM lands are in geomorphic balance (e.g., stream channel size, sinuosity, and substrate are appropriate for its landscape position and geology) with the water and sediment being supplied by the watershed (e.g., no accelerated erosion, deposition, or head-cutting). This supports the objective for riparian systems, as the water management objective above is required to maintain or achieve PFC. Associated with this objective are actions to monitor channel stability and morphology and to improve dysfunctional streams caused by unnatural factors. These actions would also help ensure PFC of riparian systems is maintained or achieved. Another objective of this alternative is to provide sufficient water quantity on BLM lands for multiple use management and functioning, healthy riparian, wetland, aquatic, and upland systems. The objective and associated management actions are designed to provide sufficient water quantity and would be beneficial to riparian systems (i.e., sufficient water is necessary to maintain, enhance riparian vegetation, or create these systems).

Water management actions also include NSO stipulations to prohibit surface occupancy and surface-disturbing activities within 0.5 mile of either side of the high water mark of six major rivers and 50 feet from the ordinary high water mark of any hydrologic feature. In most cases, the riparian CSU stipulation would provide adequate protection for riparian/wetland resources; however, this stipulation is applicable to the

BLM_0016507

riparian zone and 500 feet beyond the outer edge only. The water management NSO stipulations above may offer some additional benefits (e.g., reduced erosion and sedimentation) to riparian areas by restricting disturbances that occur outside the 500-foot buffer. Conversely, the NSO stipulations for water management may restrict or prohibit new (or maintenance of existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Vegetation—Forest and Woodland Vegetation Management.** Impacts would be similar to those discussed under Alternative A, impacts from vegetation—forest and woodland management, although the amount (acres) of intensive forest and woodland management would be less under Alternative B.

**Impacts from Rangeland Vegetation Management.** An objective for sagebrush steppe and salt/desert shrub is to improve cover of understory species. A variety of treatments such as mechanical, chemical, biological, and prescribed fire and unplanned fire managed for resource benefit, are proposed to accomplish this objective. These treatments would initially reduce vegetation cover on upland sites and would increase bare ground. This may cause more surface runoff and increase sediment load into riparian areas. These impacts would be short-term (1 to 2 years) as new vegetation becomes established. Once vegetation becomes established, ground cover of herbaceous species would increase, compared to current conditions, resulting in less surface runoff and sediment load into riparian areas. The reduction of surface runoff and sediment load would diminish over time as succession gradually moves to a more woody-dominated vegetation type, similar to current conditions, within 10 to 20 years after treatment. Increases in vegetation cover, over a relatively large area, may also reduce surface runoff, increase water infiltration into soils, and recharge floodplains, which may increase the duration of flow in drainages. Increased duration of flow would be beneficial to riparian systems (i.e., additional water would maintain, enhance riparian vegetation, or create these systems).

**Impacts from Weed Management.** The objective of weed management is to prevent the establishment of, to treat existing, and to reduce or slow the spread of noxious and invasive weeds across the landscape and ownership boundaries. Riparian areas and spring and seeps are included as a priority for weed treatment under management actions. Integrated vegetation treatments (e.g., chemical, mechanical, prescribed fire, unplanned fire managed for resource benefit, or biological) would be used for the control of invasive/noxious weeds. In addition, Alternative B includes an action to hold project proponents responsible for monitoring and controlling noxious weeds that result from any new facilities, improvements, or other surface disturbances authorized on BLM land.

The objective and associated actions for weed management would have an overall benefit on riparian-wetland resources. Invasive plant species are one factor that degrades wetland and riparian function. Weed treatments would remove or suppress competition by the invasive species, improving the growth and reproduction of desirable species. Successful revegetation or natural restoration of treated areas would eventually lead to increased diversity, vigor, and reproductive success of desirable species in riparian and wetland habitats. These beneficial changes would reduce erosion, slow the rate of storm-related runoff, improve bank stability and hydrologic function, and provide better vegetation cover and structural diversity. These benefits to riparian-wetland resources would contribute to riparian management objective to attain riparian area PFC.

A more detailed discussion of impacts on riparian-wetland resources from weed management can be found in the CRVFO integrated weed management plan and EA (BLM 2009e).

BLM_0016508

**Impacts from Fisheries and Aquatic Wildlife Management.** Several of the actions under fisheries and aquatic wildlife management would be beneficial to riparian-wetland resources. These actions include riparian plantings, tamarisk removal, changing management of other program activities (e.g., changing livestock grazing season use) to achieve desired future condition, and actively seeking minimum in-stream flow protections and minimum pool depths where opportunities arise. All of these are a benefit to riparian-wetland resources as they would facilitate achieving the objective for riparian management (i.e., to attain riparian area PFC). Alternative B also includes an NSO stipulation prohibiting surface occupancy and surface-disturbing activities within 100 meters of all fish-bearing streams. In most cases, the riparian CSU stipulation would provide adequate protection for riparian-wetland resources; however, the NSO stipulation for fish-bearing streams may offer additional benefits (e.g., reduced erosion/sedimentation) to riparian areas by further restricting disturbances. Under the NSO, there would be less flexibility allowed for surface-disturbing activities.

**Impacts from Terrestrial Wildlife Management.** Habitat treatments proposed for terrestrial wildlife management (e.g., chemical, mechanical, prescribed fire, unplanned fire managed for resource benefit, biological) to reduce the canopy cover in mature uniform aged brush, mature pinyon juniper stands and other forest stands would have similar impacts on those discussed under Alternative B, Impacts from Rangeland Vegetation Management. Several of the actions under terrestrial wildlife management would be beneficial to riparian-wetland resources (e.g., actions to restore, enhance, and maintain riparian-wetland habitats). All of these are a benefit to riparian-wetland resources as they would facilitate achieving the objective for riparian management (i.e., to attain riparian area PFC).

Alternative B also includes an NSO stipulation prohibiting surface occupancy and surface-disturbing activities in essential big game habitat and an NSO stipulation for core wildlife areas. In most cases, the riparian CSU stipulation would provide adequate protection for riparian/wetland resources; however, the NSO stipulations for terrestrial wildlife management may offer additional benefits (e.g., reduced erosion/sedimentation) to riparian areas by further restricting disturbances. Conversely, the NSO stipulations for terrestrial wildlife management may restrict or prohibit new (or maintenance of existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife**. Several of the actions under special status species—fisheries and aquatic wildlife management would be beneficial to riparian-wetland resources. These actions include riparian plantings, changing management of other program activities (e.g., changing livestock grazing season use) to achieve desired future condition, and actively seeking minimum in-stream flow protections and minimum pool depths where opportunities arise. All of these are a benefit to riparian-wetland resources as they would facilitate achieving the objective for riparian management (i.e., to attain riparian area PFC).

**Impacts from Special Status Plants and Terrestrial Wildlife Management.** Objectives and actions that impact riparian resources appear under Alternative C; therefore, the discussion of impacts is deferred to Alternative C.

**Impacts from Cultural Resource Management.** This alternative includes an NSO stipulation prohibiting surface-disturbing activities within 0.25 mile of heritage areas. It also includes an NSO stipulation prohibiting surface-disturbing activities within 200 meters of eligible historic properties. No land was identified associated

BLM_0016509

with the NSO stipulations. Impacts on riparian-wetland resources cannot be determined since the amount of land involved with the NSOs is unknown. If the amount of land (acres) is significant, the NSO stipulations may offer indirect benefits (e.g., reduced erosion and sedimentation) to riparian areas by further restricting disturbances near riparian areas; however, in most cases, riparian CSU or NSO stipulations would provide adequate protection for riparian-wetland resources. Conversely, the NSO stipulations for cultural resources management may restrict or prohibit new (or maintain existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Visual Resource Management.** Impacts would be similar to those discussed under Alternative A, although more acres would be designated under Alternative B as VRM Class I and II. Therefore, impacts on riparian-wetland resources would be greater under this alternative (i.e., more acres protected from management activities and more acres that may restrict or prohibit habitat and range improvements).

**Impacts from Forestry Management.** These impacts are addressed under Impacts from Forest and Woodland Vegetation Management.

**Impacts from Recreation and Visitor Services Management.** Actions under Alternative B differ somewhat from Alternative A. The number and acres of SRMAs is less under Alternative B, and no RMAs are proposed. In addition, Alternative B identifies separate ERMAs to specifically address local recreation issues. ERMAs are areas where recreation is planned for and actively managed on an interdisciplinary basis, in concert with other resources and resource programs. Despite the differences mentioned above, impacts on riparian-wetland resources would be similar to those addressed under Alternative A. Impacts from ERMAs would be similar to those discussed for SRMAs.

Alternative B includes an NSO stipulation prohibiting surface occupancy and surface-disturbing activities in SRMAs. In most cases, the riparian CSU stipulation would provide adequate protection for riparian-wetland resources; however, the NSO stipulation for SRMAs may offer additional benefits (e.g., reduced erosion and sedimentation) to riparian areas by further restricting disturbances near riparian areas. Conversely, the NSO stipulation for SRMAs may restrict or prohibit new (or maintain existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Lands and Realty Management.** Impacts on riparian resources could result from issuance of land use authorizations (ROWs, permits, leases, and easements). Impacts, both beneficial and adverse, from issuance of these authorizations would vary, based on the nature and purpose of the authorization. These authorizations would generally be addressed in site-specific NEPA analysis. Riparian CSU stipulations, BMPs, or other mitigating measures would result in negligible to minor adverse impacts on riparian resources. There have been few issues (causal factors affecting functioning condition) identified that are associated with these authorizations within the CRVFO planning area. This suggests that CSUs/mitigating measures have been effective in minimizing impacts.

Areas designated as ROW avoidance or exclusion may offer additional indirect supporting benefits (e.g., reduced erosion/sedimentation) to riparian areas by avoiding or prohibiting disturbances on or near riparian areas. However, in most cases, the riparian CSU stipulation would provide similar levels of protection.

BLM_0016510

Land tenure adjustments (acquiring or disposing of lands) can result in riparian communities entering or leaving federal ownership. Impacts from land tenure adjustments would vary and would be addressed in site-specific NEPA analyses. It is BLM's policy (BLM 2008a; Section 1737.06) to retain riparian-wetland areas in public ownership, unless disposal would be in the public interest, and to acquire riparian-wetlands as determined in the land use planning system. Program-specific guidance (BLM; 2008a Section 1737.47, Lands and Realty) requires wetland tracts be retained in federal ownership if any of the following criteria cannot be met: (1) the tract of public wetlands is either so small or remote that it is uneconomical to manage; (2) the tract of public wetlands is not suitable for management by another federal agency; (3) the patent contains restrictions of uses as prohibited by identified federal, state, or local wetlands regulations; or (4) the patent contains restrictions and conditions that ensure the payee can maintain, restore, and protect the wetlands on a continuous basis. The policy and program specific guidance would facilitate retention of riparian-wetland resources in public/federal ownership. Alternative B would designate major river and perennial stream corridors as retention areas, which would be a supporting benefit to riparian resources.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts would be similar to those discussed under Alternative A, except there are more areas and acres designated as ACECs under Alternative B. Therefore, the supporting benefits to riparian-wetland resources would be greater. Conversely, restrictions on new (or maintenance of existing) habitat and range improvements may be greater.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Impacts would be similar to those discussed under Alternative A, except that fewer river segments and miles would be identified as eligible as well as suitable (four); therefore, indirect supporting benefits to riparian areas would be less than under Alternative A. The suitable designation does not change impacts on riparian resources and would be the same as the eligible designation, at least on an interim basis.

Alternative B would close the suitable stream segments to fluid minerals leasing, CRV-CL-12, and an NSO stipulation would prohibit surface occupancy and surface-disturbing activities on suitable streams classified as wild. In most cases, the riparian CSU stipulation would provide adequate protection for riparian-wetland resources; however, the CL designation and NSO stipulations for wild and scenic rivers may offer additional benefits (e.g., reduced erosion/sedimentation) to riparian areas by further restricting disturbances. Under the NSO, there would be less flexibility allowed for surface-disturbing activities.

Alternative B2 would adopt and implement the stakeholder alternative management plan to manage minimum flows in the WSR-eligible sections of the Colorado River. This could alter the recent flow regime of the Colorado River, with the potential for either adverse or beneficial impacts on riparian resources.

### Alternative C

Impacts to riparian vegetation from wildland fire management, livestock grazing management, comprehensive trails and travel management, fluid minerals management (oil and gas, oil shale, and geothermal resources) management, locatable minerals, mineral materials, and non-energy leasable minerals management would be the same as or similar to those described above under Alternative A. Impacts to riparian vegetation from management of all other resources and uses would be the same as or similar to those described under Alternative B, except as described below.

**Impacts from Riparian Vegetation Management.** Impacts would be similar to those discussed under Alternative B, with the exception that Alternative C includes an NSO stipulation that prohibits surface

BLM_0016511

occupancy and surface-disturbing activities within riparian vegetation. This alternative also includes a CSU stipulation (Riparian/Wetland Vegetation Zones—500 feet of Outer Edge). This alternative may offer more protection to riparian areas compared to Alternatives B and D, which do not include the NSO stipulation. Under the NSO, there would be less flexibility allowed for disturbance to riparian vegetation.

**Impacts from Forest and Woodland Vegetation Management.** Impacts would be similar to those discussed under Alternative A, impacts from vegetation—forest and woodland management, although the amount (acres) of intensive forest and woodland management would be less under Alternative C.

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts from this alternative would be similar to those discussed under Alternative B; however, Alternative C differs somewhat as it includes an NSO stipulation prohibiting surface occupancy and surface-disturbing activities within 100 meters of perennial waters. (Alternative B applied an NSO just to fish-bearing streams.) In most cases, the riparian NSO or CSU stipulations would provide adequate protection for riparian-wetland resources; however, the NSO stipulation for perennial waters may offer additional supporting benefits (e.g., reduced erosion/sedimentation) to riparian areas by further restricting disturbances near riparian areas.

**Impacts from Special Status Species Management—Plant and Terrestrial Wildlife Management.** This alternative involves several NSO stipulations for special status plants and terrestrial wildlife, including an NSO stipulation prohibiting surface-disturbing activities within a 200-meter buffer around current or historical occupied habitat for those plant species listed as threatened, endangered, proposed, candidate, or BLM sensitive species. The amount of land (28,300 acres) involved for this stipulation in this alternative is relatively large. This NSO may offer indirect benefits (e.g., reduced erosion/sedimentation) to riparian areas by further restricting disturbances near riparian areas; however, in most cases, riparian CSU or NSO stipulations would provide adequate protection for riparian-wetland resources. Conversely, the NSO stipulation for special status plant species may restrict or prohibit new (or maintenance of existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. This would offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Visual Resource Management.** Impacts would be similar to those discussed under Alternative A, although there are more acres designated under Alternative C as VRM Class I and II compared to other alternatives. Therefore, impacts on riparian-wetland resources would be greatest under this alternative (i.e., more acres would be protected from management activities and more acres that may restrict or prohibit habitat and range improvements).

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Approximately 47,000 acres of lands with wilderness characteristics outside existing WSAs would be managed as LWCs under Alternative C and protected with specific management and setting prescriptions. An NSO stipulation prohibiting surface occupancy and surface-disturbing activities would be applied to these lands, as well as an administrative closure to fluid minerals leasing. All of the above protection measures may offer indirect and supporting benefits (e.g., reduced erosion/sedimentation) to riparian areas by further restricting disturbances and other activities near riparian areas; however, in most cases, riparian CSU or NSO stipulations would provide adequate protection for riparian-wetland resources. Protection measures for the lands above may restrict management activities (e.g., construction of new range or habitat improvements, vegetation treatments) that would maintain or improve the condition of riparian areas. In addition, the NSO stipulation for the lands above may restrict or prohibit new (or maintain existing) habitat and range improvements

BLM_0016512

designed to maintain or improve the condition of riparian areas. The protection measures and stipulations may offset the beneficial impacts and possibly result in an overall negative impact on riparian-wetland resources.

**Impacts from Forestry Management.** These impacts are addressed in the impacts from vegetation—forest and woodland management section above.

**Impacts from Recreation and Visitor Services Management.** The number and extent of SRMAs is much less under Alternative C, and there are more ERMAs proposed. Alternative C also includes an NSO stipulation prohibiting surface occupancy and surface-disturbing activities in SRMAs. Since SRMAs involve fewer acres under Alternative C, this alternative would be less restrictive on new (or on maintaining existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. Other impacts would be similar to those discussed under Alternative B.

**Impacts from Lands and Realty Management.** Impacts would be similar to those addressed under Alternative B, except Alternative C would also designate wetlands and riparian areas as retention areas, which would provide additional benefits to riparian resources. As a result, this alternative would have greater benefits on riparian and wetland resources.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts would be similar to those discussed under Alternative A, except Alternative C includes the most areas and acres designated as ACECs. Therefore, the supporting benefits on riparian-wetland resources would be the greatest under this alternative. Conversely, restrictions on new (or maintenance of existing) habitat and range improvements would be the greatest.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Impacts would be the same as those discussed under Alternative A. Under Alternative C, the 26 eligible river segments were identified as suitable; however, impacts on riparian resources would be the same, at least on an interim basis.

*Alternative D (Riparian)*

Impacts to riparian vegetation from visual resource management, wildland fire management, livestock grazing management, comprehensive trails and travel management, fluid minerals (oil and gas, oil shale, and geothermal resources) management, locatable minerals, mineral materials, and non-energy leasable minerals management, and ACEC management would be the same as or similar to those under Alternative A. Impacts to riparian vegetation management of all other resources and uses would be the same as or similar to those under Alternative B, except as described below.

**Impacts from Water Resource Management.** Impacts from this alternative would be similar to those discussed under Alternative B; however, this alternative does not include a stipulation to prohibit surface occupancy and surface-disturbing activities within 50 feet from the ordinary high water mark of any hydrologic feature. The impacts on riparian-wetland resources from this stipulation would not occur under this alternative.

**Impacts from Forest and Woodland Vegetation Management.** Impacts would be similar to those discussed under Alternative A, although the amount (acres) of intensive forest and woodland management would be less under Alternative D.

September 2011            *Colorado River Valley Field Office – Draft RMP Revision EIS*            4-161
*Chapter 4, Environmental Consequences*

BLM_0016513

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts from this alternative would be similar to those discussed under Alternative B; however, Alternative D differs somewhat as it includes a CSU for site-specific relocation restrictions within 100 meters (328 feet) of all trout-bearing streams (Alternative B applied an NSO to fish-bearing streams). Protection of riparian-wetland resources by the riparian CSU stipulation already provides this protection, and there would be no added benefits from the CSU stipulation for trout-bearing streams.

**Impacts from Terrestrial Wildlife Management.** Impacts from this alternative would be the same as those discussed under Alternative B, with the exception of impacts associated with NSO stipulations. This alternative does not include those stipulations.

**Impacts from Cultural Resource Management.** Alternative D includes an NSO stipulation prohibiting surface-disturbing activities within 0.25 mile of heritage areas; however, no land was identified associated with the NSO. Impacts on riparian-wetland resources cannot be determined since the amount of land involved with the NSO is unknown. If the amount (acres) of land is significant, this NSO stipulation may offer indirect supporting benefits (e.g., reduced erosion/sedimentation) to riparian areas by further restricting disturbances near riparian areas; however, in most cases, the riparian CSU stipulation would provide adequate protection for riparian-wetland resources. Conversely, the NSO stipulation for cultural resources management may restrict or prohibit new (or maintenance of existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. This would offset the beneficial impacts and result in an overall negative impact on riparian-wetland resources.

**Impacts from Forestry Management.** These impacts are addressed under Impacts from Vegetation— Forest and Woodland Vegetation Management.

**Impacts from Recreation and Visitor Services Management.** The number and acres of SRMAs is more than under Alternative B, and there are fewer ERMAs proposed. Alternative D also includes an NSO stipulation prohibiting surface occupancy and surface-disturbing activities in SRMAs. Since SRMAs involve more acres under Alternative D, this alternative would be more restrictive on new (or maintenance of existing) habitat and range improvements designed to maintain or improve the condition of riparian areas. Other impacts would be similar to those discussed under Alternative B.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts would be similar to those discussed under Alternative A, except that fewer areas and acres would be designated as ACECs under Alternative D. Therefore, the supporting benefits to riparian-wetland resources would be the least in this alternative.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative D, all eligible rivers would be determined as not suitable and would be released from interim management protections afforded eligible segments. Consequently, there would be no indirect supporting benefits to riparian areas from these interim protection measures.

### Cumulative Impacts (Riparian)

A review of the most current riparian PFC data (as of February 2010) within the CRVFO planning area, shows a total of 278 miles of lotic riparian areas assessed, and most (264 miles) were rated as PFC. A total of 14 miles of habitat length were rated as functioning at risk or NF. The most current PFC assessment or

BLM_0016514

monitoring data for the 14 miles indicate that 9 miles have an improving trend, 3 miles have no apparent trend, and 2 miles have a downward trend. All 42 acres of lentic systems within the planning area were rated as PFC. The data above indicate that adverse impacts from past or present actions, that affect the functional condition of riparian systems, are relatively minor within the CRVFO planning area. Corrective management actions (e.g., improved livestock grazing management) may have also taken place in the past to improve the functional condition of riparian areas. Given the above, cumulative impacts on wetland-riparian resources will focus on the effects from reasonably foreseeable actions and proposed RMP actions. The geographic scope of this cumulative effects analysis includes all lands within the planning area and surrounding watersheds that flow into the planning area.

Impacts on wetland-riparian resources result from activities that have direct or indirect effects on the attributes and processes (hydrogeomorphic, vegetation, erosion/deposition, soils, and water quality) that occur in the riparian-wetland area. Activities that alter vegetation soils and hydrology are most likely to affect wetland-riparian areas.

Cumulative effects on riparian-wetland resources from reasonably foreseeable actions (including those from other federal and non-federal actions) include increased oil and gas development, increased recreational use, and water diversions. Noxious and invasive weed species are expected to continue to spread on all lands. Climate change may increase the reoccurrence and severity of drought conditions, resulting in an increase in the occurrence and severity of wildfires. All of the above could adversely affect attributes and processes of riparian areas, resulting in a decline of the functioning condition of these systems.

Cumulative effects on riparian-wetland resources can result from the combination of proposed RMP actions that affect attributes and processes above, such as oil, gas, forage use by livestock and wildlife species, prescribed burning, wildfires, vegetation treatments, recreation, travel management, forestry, and realty. Adverse effects on attributes and processes of riparian areas are most likely to occur from activities that result in surface disturbance on or near wetland-riparian. However, stipulations, BMPs and other protective measures would minimize or avoid adverse impacts on riparian areas. Alternative A may have the most adverse impacts since it allows for the most acres open for fluid minerals leasing as well as the most areas open for motorized travel, followed by Alternatives D, B, and C.

Cumulative effects also result from the combination of stipulations (NSOs) or other protective measures (e.g., WSA IMP) proposed by resources and uses. Many of these stipulations and protective measures would have indirect supporting benefits to riparian-wetland resources by prohibiting surface-disturbing activities on or near riparian areas. However, they present a double-edged sword in that they may prohibit or restrict riparian area management actions (e.g., the construction or maintenance of improvements) designed to maintain or achieve improved riparian conditions and land health standards. Supporting benefits to riparian-wetland resources from NSO stipulations and protective measures would be negligible to minor since riparian CSU and NSO stipulations (as well as laws and policy pertaining to riparian-wetland resources) would provide adequate protection. Consequently, adverse impacts from NSO stipulations and protective measures that prohibit or restrict riparian area management actions would override the beneficial impacts. Resources and uses that have NSO stipulations or protective measures include soils, water management, vegetation, fisheries, terrestrial wildlife, special-status species, cultural resources, visual resources, lands with wilderness characteristics outside existing WSAs, WSAs, SRMAs, ACECs, and WSRs. The most acres of NSO stipulations and protection measures occur under Alternative C, followed by B, D and A; the potential for adverse impacts on riparian-wetland resources would decrease commensurately.

BLM_0016515

### *Vegetation—Weeds*

#### *Alternative A*

**Impacts from General Vegetation Management.** Vegetation management actions would include weed treatments (manual, chemical or biological), timber management (i.e., fuels reduction), vegetation treatments (manual, mechanical, chemical, or prescribed fire), unplanned fire managed for resource benefit, and restoration. Management actions also include requirements to use certified weed-free hay and certified weed-free seed on public lands to help prevent introductions of new weeds.

#### Weed Treatments

Under all alternatives, the CRVFO Integrated Weed Management Plan and Programmatic EA would allow the CRVFO to treat up to 5,000 weed-infested acres per year using manual, chemical (both ground-based and aerial), and biological controls under all alternatives. The Noxious and Invasive Weed Management Plan for Oil and Gas Operators (BLM 2007cc) would require oil and gas operators to monitor and control weeds on all lands they disturb under all alternatives. The BLM would hold other project proponents (e.g., livestock operators and rights-of-way holders) responsible for monitoring and controlling noxious weeds that result from any new facilities, improvements, or other surface-disturbing activities.

In general, weed treatments have the potential to affect most plant species in much the same way: all are intended to kill or injure target plants, which may vary in intensity and extent. Herbicides offer an effective and often resource-efficient means of treating and managing undesirable vegetation. Manual methods (e.g., hand digging or pulling) often require the most time and labor. Biological control provides an affordable method to control larger weed infestations that are not cost-effectively or feasibly controlled by other methods. However, biological control by domestic animals could introduce weed disseminules (seeds or fruits) to a site, attached to an animal's fur or deposited in its feces.

Controlling weed infestations benefits native plant communities by decreasing the growth, seed production, and vigor of undesirable species, thereby reducing competition. However, if too little vegetation remains following treatment, other weeds may invade the area. To minimize this potential, areas with limited desirable species may be revegetated following treatment. Seeding or interseeding these types of areas can hasten the establishment of desirable native species and help prevent colonization by weeds.

#### Timber Management

Where fuel loads are excessive, failure to conduct vegetation treatments to reduce fuel loading could increase the risk of catastrophic fire, which would have a large impact on vegetation by reducing vegetation cover and increasing the risk of weed invasion and spread. Impacts from timber management on weeds would be the same as or similar to those under forestry management, Alternative A.

#### Prescribed Fire and Unplanned Natural Fire Managed for Resource Benefit

Impacts on weeds from prescribed fire and unplanned fire managed for resource benefit under all alternatives would be the same as or similar to those described under wildland fire management, Alternative A.

#### Vegetation Treatments

Vegetation treatments in general can create soil disturbance and impact nontarget native vegetation, which could increase weed invasion and spread. Mechanical treatments would probably create the most surface disturbance, with the most risk of weed expansion.

BLM_0016516

Weed introduction and spread would be the most pronounced if a vegetation treatment were to fail. A vegetation treatment would be considered a failure if the treatment were successful in removing vegetation but the desired vegetation community did not become established. A variety of impacts could result, including increased soil erosion from loss of vegetation cover, increased weed invasion, and long-term changes in habitat and species composition. The duration of these effects would vary by treatment method, habitat and community type, proximity of native seed sources, and the amount and timing of precipitation. If left alone, most failed treatments would eventually be revegetated by either the former plant community or, if weeds were present before the treatment, by a new and less desirable community dominated by non-native species.

<u>Restoration</u>

Disturbed areas would typically be reseeded or planted with desirable vegetation if the native plant community could not recover and occupy the site sufficiently. Revegetation would benefit vegetation over the long term by decreasing bare soil, which would reduce the risk of weed invasion and improve habitat conditions. However, revegetation could create soil disturbance and lead to weed establishment and erosion if seeded (desirable) species did not successfully reoccupy the site. Monitoring of revegetated areas is critical to ensure that the area is recovering as intended or, if not, to provide a basis for additional weed control or seeding or both.

Across all alternatives, weed control would reduce the potential for weed invasion and spread.

**Impacts from Soils Management.** Since surface-disturbing activities increase the risk of weed invasion and expansion, soil protections that exclude surface-disturbing activities, such as existing GS-NSO-15 for steep slopes greater than 50 percent and GS-NSO-14 for debris flow zones, would minimize the risk of weed invasion and expansion by limiting the loss of native vegetation and minimizing soil disturbance.

The risk of weed invasion and expansion would be greatest under Alternative A because GS-NSO-15 would apply only to oil and gas activities and the NSO would not apply to pipelines, which would result in more surface disturbance than the other alternatives.

**Impacts from Water Resources Management.** Because surface-disturbing activities increase the risk of weed invasion and expansion, water protection stipulations that exclude surface-disturbing activities, such as existing GS-NSO-3 for major river corridors and GS-NSO-13 for domestic watersheds, would minimize the risk of weed invasion and expansion by preventing the loss of native vegetation and limiting soil disturbance.

The risk of weed invasion and expansion would be greatest under Alternative A because GS-NSO-13 is applicable only to the Rifle and New Castle watersheds (as opposed to all municipal watersheds under other alternatives). In addition, Alternatives B and C would implement CRV-NSO-5 to protect streamside management zones, which would prevent surface disturbance within 50 feet of any hydrologic feature.

**Impacts from Fisheries and Aquatic Wildlife Management.** Since surface-disturbing activities increase the risk of weed invasion and expansion, stipulations that exclude surface disturbance, such as GS-NSO-5, which would limit surface disturbance within a 2-mile radius of the Rifle Falls and Glenwood Springs fish hatcheries, would minimize the risk of weed invasion and expansion by preventing the loss of native vegetation and soil disturbance.

BLM_0016517

Under Alternative A, NSO stipulations for fisheries and aquatic wildlife would prevent the least amount of surface disturbance, so the potential for weed invasion and spread would be the greatest.

**Impacts from Terrestrial Wildlife Management.** Terrestrial wildlife management actions would have beneficial impacts on weeds. Most actions proposed for terrestrial wildlife management would benefit vegetation and decrease the risk of weed invasion and expansion.

NSO stipulations to protect wildlife habitat from surface-disturbing activities, route closures to reduce road density and habitat fragmentation, and travel restrictions on motorized and mechanized travel would benefit vegetation by reducing direct and indirect impacts, such as vegetation removal, reduced vigor, soil erosion and compaction, and weed invasion.

Habitat improvement projects would aim to stimulate sprouting and regrowth in decadent aspen stands and reduce canopy cover and increase age class variation in pinyon-juniper woodlands and other forest stands. Adverse impacts on vegetation could occur if habitat improvement projects failed to improve vegetation, leading to weed invasion or expansion.

Construction of ponds and guzzlers to provide water to wildlife would directly impact vegetation and could lead to soil compaction, erosion, and weed invasion. However, under all alternatives, cumulative impacts from terrestrial wildlife management would tend to decrease the potential for weed invasion and spread.

Alternative A would result in slightly less risk of weed invasion and spread than under Alternative D by protecting more acres with NSOs but would result in more risk than under Alternatives B or C, both of which would implement more protective stipulations.

**Impacts from Special Status Species Management.** Several NSO stipulations for special status species would protect vegetation from surface-disturbing activities, minimizing soil disturbance and weed invasion and spread. Under Alternative A, NSO stipulations for special status species would prevent more ground disturbance than under Alternative D but less than under Alternatives B and C; therefore, the risk of weed invasion and spread under Alternative A would be less than D but greater than under Alternatives B and C.

**Impacts from Cultural Resource Management.** Cultural resource stipulations that exclude surface-disturbing activities, such as the existing NSO with 100-meter buffer around historic properties, would minimize the risk of weed invasion and expansion by preventing the loss of native vegetation and preventing soil disturbance.

The risk of weed invasion and expansion would be greatest under Alternative A because cultural resource stipulations would prevent the least acres of surface disturbance. Alternatives B and C would have the least risk of weed invasion due to more protective stipulations.

**Impacts from Visual Resource Management.** VRM Class I and II areas would limit surface-disturbing activities, which would decrease the risk of weed invasion and spread. Alternative A would designate the least amount of acres to VRM Class I and II (247,200 acres) and protect the least amount of acres from surface-disturbing activities with NSO stipulations. The potential for weed expansion would be greatest under Alternative A.

BLM_0016518

**Impacts from Wildland Fire Management.** Under Class A, there would be full fire suppression, and no unplanned fire would be managed for resource benefit. Fire suppression could cause weed invasion from roads, construction of fire lines, and other surface disturbances. Fire vehicles could introduce and spread noxious and invasive weed seeds. However, suppression of fire would greatly reduce the risk of weed invasion and spread since fire could change native plant species composition, plant density, and vegetation structure and could lead to an increase in the abundance of non-native, invasive, fire-adapted species, such as cheatgrass, especially in rangelands and pinyon-juniper woodlands. This would have a long-term adverse impact on vegetation.

Fire suppression would still occur under Class B, but to a lesser extent; therefore, weed impacts related to fire suppression would be similar but to a slightly lesser degree. There would be limited prescribed fire in Class B; fire management would mostly involve manual/mechanical treatments to lessen fuel loading. Mechanical equipment could increase weed introduction and spread.

Class C would allow for unplanned fire managed for resource benefit and fuel treatments using prescribed fire and manual/mechanical treatments. Weed impacts from using unplanned fire managed for resource benefit would be similar to those under Class D but to a lesser degree since there would be less under Class C.

Impacts from using unplanned fire managed for resource benefit would be highest under Class D. Class D areas would allow for the most use of wildland fire and the least amount of suppression, which would result in the most direct impacts on vegetation. This would create the greatest risk of weed invasion and expansion.

The acres proposed for each fire management class are the same across all alternatives; therefore, impacts on weeds would be the same across all alternatives.

**Impacts from Forestry Management.** Harvesting of forest and woodland products would increase the risk of weed invasion and expansion under all alternatives because impacts on soil would occur from equipment and vehicles used to conduct the treatments, construction of access roads, and loss of vegetation cover. Vehicles could introduce and continue the spread of noxious and invasive weed seeds. Motorized activities in undisturbed and remote areas increase the risk of distributing weed seeds into weed-free areas. Additionally, removing overstory canopy cover would increase the amount of solar radiation reaching the ground, potentially resulting in a flush of annual or perennial weeds that could outcompete the native species.

The risk of weed invasion and expansion would be the least under Alternative A because less soil disturbance would probably occur, a result of fewer acres of intensive management.

**Impacts from Livestock Grazing Management.** Under Alternative A, the most acres of land would be available for grazing (489,600 acres) and the most AUMs of livestock forage (56,900 AUMs). It should be noted that only 39,200 AUMs are currently being provided due to various actions related to rangeland and riparian health. Grazing and rangeland development projects could increase the potential for weed invasion and spread due to various direct and indirect impacts listed under Forests and Woodlands, Alternative A.

Under all alternatives, adverse impacts from livestock grazing management on weeds would be greater than beneficial impacts. Since the most acres and AUMs would be available for livestock grazing under Alternative A, the potential for weed invasion and spread would be the greatest.

BLM_0016519

**Impacts from Recreation and Visitor Services Management.** Alternative A would designate eight SRMAs (60,400 acres) and six RMAs (60,700 acres). No Surface Occupancy stipulations would limit surface-disturbing activities and provide protection to vegetation within the SRMA and RMA areas, reducing the risk of weed invasion and spread.

SRMAs would concentrate recreational use in certain areas, which would also concentrate impacts on vegetation, especially in high-use areas, such as campgrounds, parking lots, boat launches, and trailheads. These areas of concentrated use would have the greatest risk of weed invasion and spread due to more risk of humans or vehicles acting as vectors for weed spread, carrying weed seeds or plant propagules on tires or clothing.

Under all alternatives, an increase in visitor use would be directly related to an increase in weed invasion and spread. More visitor use would create the need for additional facilities and trails within SRMAs to accommodate recreationists. Development would create direct and indirect impacts on vegetation, such as loss of vegetation and vegetation cover, soil erosion and compaction, and an increase in weed introduction and expansion.

Under all alternatives, adverse impacts from recreation and visitor services on weeds would be greater than beneficial impacts. Alternative A would create less risk of weed invasion and expansion than under Alternative D (which would allow for the most development and use), but more risk than under Alternatives B and C (which would designate fewer SRMAs and apply NSOs to more acres).

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative A, 294,300 acres of the CRVFO (more than 70 percent of the CRVFO) would be open to cross-country OHV travel. Areas open to OHV travel would allow public users to gain access to and through more terrain, which would create widespread impacts on vegetation. OHVs would probably introduce and continue the spread of noxious and invasive weed seeds. Motorized activities in undisturbed and remote areas would probably distribute weed seeds into weed-free areas. These impacts would probably decrease plant vigor and productivity and alter plant community composition.

Adverse impacts would be greatest in those areas designated as open or limited to existing routes. They would be less in areas limited to designated routes, although damage to vegetation, and weed invasion and spread would probably still occur in these areas. Areas closed to vehicular travel (44,000 acres under Alternative A) would create the least risk of weed invasion and expansion. However, road closures would probably limit BLM access to certain areas to perform vegetation or weed treatments.

Under all alternatives, trails and travel management would have adverse impacts on weeds. Alternative A would create the greatest risk of weed invasion and spread by allowing for open cross-country travel across more than 70 percent of the CRVFO. No other alternative would allow for open OHV use.

**Impacts from Lands and Realty Management.** Lands and realty actions, including ROWs, transportation systems, utilities, communication sites, renewable energy development, and land disposals, would cause direct impacts on vegetation, soil disturbance, and weed species proliferation. The degree of the impact on weeds would depend on the size of the disturbance and whether it remained unvegetated or was successfully reclaimed. Bare ground and loss of native vegetation would increase the risk of weed invasion and expansion.

BLM_0016520

ROW exclusion areas would be designated under all alternatives. These areas would decrease the risk of weed invasion since they would exclude ROW developments and result in less surface disturbance. The least amount of ROW exclusion areas would be designated under Alternative A. As a result, Alternative A would have the greatest risk of weed invasion and expansion.

**Impacts from Coal Management.** Alternatives A, B, and D would open the most acres of federal mineral estate to coal leasing—10, 600 acres more than under Alternative C—creating the greatest potential for weed invasion and spread. If coal mining were to occur in the CRVFO, impacts on weeds would be similar to those found under fluid minerals, Alternative A. However, the increase and expansion of weeds would not occur over as wide of an area as with fluid minerals development because coal mining would target only one area of the CRVFO, the Grand Hogback.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Under Alternative A, a total of 679,200 acres of federal mineral estate would be open to oil and gas development. Up to 2,664 wells and 333 multi-well pads are anticipated, with an estimated 3,347 acres of surface disturbance. Approximately 27,800 acres would be closed to fluid minerals leasing, and NSO stipulations would be applied to 239,600 acres. Stipulations that exclude oil and gas development and other surface-disturbing activities would provide a beneficial long-term impact on vegetation, reducing the risk of weed invasion and spread.

Oil and gas development would have a high risk of weed invasion and spread. The widespread surface disturbance, soil impacts, loss of vegetation cover, and risk of heavy equipment and vehicles carrying weed propagules into previously undisturbed and remote areas, would probably create more weed invasion and spread. Successful reclamation would help decrease these adverse impacts from weeds.

Oil and gas operators are required to regularly monitor and promptly control noxious weeds or other undesirable plant species, as set forth in the CRVFO Noxious and Invasive Weed Management Plan for Oil and Gas Operators (BLM 2007cc). Operators must also submit an annual weed monitoring report to the CRVFO. These requirements would reduce the risk of weed invasion and expansion by ensuring that operators monitor and control noxious and invasive weeds on all lands they disturb.

Alternative A would open the most acres to oil and gas development of any alternative but would prohibit more surface disturbance with NSOs and permit less surface disturbance (almost 2,000 fewer acres) than under Alternative D, creating less risk of weed invasion and expansion. Alternatives B and C would create the least potential for weed invasion and expansion because they would disturb the fewest acres and would close the most acres to oil and gas development through CL designations and NSO stipulations.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative A, a total of 34,600 acres would be recommended for withdrawal from locatable minerals development. A total of 476,900 acres would be open to mineral materials disposal, and 476,900 acres would be open to non-energy leasable minerals development. Withdrawing areas from mineral development would reduce the risk of weed invasion and spread.

Alternative A would withdraw the least amount of acres from mineral development of any alternative, which would create the greatest amount of surface disturbance and the greatest risk of weed invasion and expansion.

BLM_0016521

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Alternative A would designate 27,030 acres of ACECs, 23,300 acres of which would be covered by NSOs, limiting surface disturbance. ROW exclusions on 20,800 acres and no fluid minerals leasing on 4,300 acres would minimize impacts on vegetation, creating less chance of weed invasion and spread. Travel restrictions in all ACECs would reduce weed spread since motorized activities in undisturbed and remote areas could distribute weed seeds into weed-free areas.

Weed treatments would not be excluded from ACECs; rather they would be used to control noxious weeds aggressively, using integrated pest management (IPM) consistent with the protection of identified relevant and important values.

NSOs under Alternative A would prevent 3,100 more acres of surface disturbance than under Alternative D, about 5,100 fewer acres than under Alternative B, and 23,400 fewer acres than under Alternative C. Alternative A would limit weed introduction and spread more than under Alternative D but would not prevent as much weed introduction and spread as Alternative B, and would prevent substantially less weed impacts than under Alternative C.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** The CRVFO currently contains four designated WSAs, totaling 27,724 acres. Alternative A would implement CRV-CL-11, which would close all 27,724 acres to fluid minerals leasing, and three WSAs would be closed to motorized and mechanized travel. All WSAs would be designated as either VRM Class I or II. Disturbances from recreation, travel management, and lands and realty would be limited, which would have a long-term beneficial impact on vegetation, reducing the risk of weed invasion and spread.

Weed treatments would be permitted in WSAs as long as they met wilderness provisions. The risk of weed invasion and expansion in WSAs would be low due to limited surface disturbance. WSAs are relatively intact ecosystems, with predominantly native vegetation. The risk of weed invasion following fire or other natural disturbances would be limited as there would be few weeds to begin with.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Alternatives A and C would result in the least risk of weed invasion and spread by excluding surface-disturbing activities within 0.25 mile of 26 stream segments. Alternative B would exclude surface-disturbing activities within 0.25 mile of only four stream segments, and Alternative D would result in the most risk of weed invasion and spread because no surface disturbance would be excluded.

**Impacts from Transportation and Facilities Management.** Road maintenance, such as blading or dozing, would increase the risk of weed invasion and spread by creating disturbance to vegetation and soils along the road corridor. Heavy equipment could act as a vector for weed seed dispersal if not properly cleaned.

*Alternative B (Preferred Alternative) (Weeds)*
Impacts on weeds from general vegetation management, wildland fire management, coal management, WSAs management, and transportation and facilities management would be the same as or similar to those under Alternative A. Impacts from management of all other resources and uses would be as described below.

**Impacts from Soils Management.** Soil protections that exclude surface-disturbing activities, such as proposed CRV-NSO-2 for steep slopes greater than 50 percent and CRV-NSO-1 for debris flow zones,

BLM_0016522

would minimize the risk of weed invasion and expansion by preventing the loss of native vegetation and minimizing soil disturbance.

Alternatives B, C, and D would result in less risk of weed invasion and expansion than under Alternative A because soil stipulations that would reduce the amount of surface disturbance CRV-NSO-2 would apply to all management (not just oil and gas), and the NSO would apply to pipelines.

**Impacts from Water Resources Management.** Proposed stipulations, such as CRV-NSO-3 for major river corridors, CRV-NSO-4 for designated municipal watersheds, and CRV-NSO-5 for streamside management zones, would minimize the risk of weed invasion and expansion by preventing the loss of native vegetation and minimizing soil disturbance.

The risk of weed invasion and expansion would be the least under Alternatives B and C because water resources stipulations would prevent the most acres of surface disturbance.

**Impacts from Fisheries and Aquatic Wildlife Management.** Under Alternative B, NSO stipulations for fisheries and aquatic wildlife would prevent more surface disturbance than under Alternatives A and D but less than under Alternative C. In addition, under Alternatives B, C, and D, select priority species habitat would be improved by closing and reclaiming selected routes. This would result in a long-term beneficial impact by increasing vegetation cover and reducing the potential for weed invasion and spread.

Under Alternative B, the risk of weed invasion and expansion would be less than under Alternatives A and D but more than under Alternative C.

**Impacts from Terrestrial Wildlife Management.** Alternative B would provide more benefit to vegetation than under Alternatives A and D because additional NSO stipulations to protect terrestrial wildlife habitat would reduce surface disturbance, hence the potential for weed invasion and expansion would be less. Alternative C would be similar to Alternative B in the degree of impact on weeds.

**Impacts from Special Status Species Management.** Under Alternative B, NSO stipulations for special status species would prevent more ground disturbance than under Alternatives A and D, resulting in less risk of weed invasion and spread than under Alternatives A and D. However, NSO stipulations under Alternative C would prevent much more ground disturbance than Alternative B. Alternatives B and C would have an objective to restore potential special-status species habitat to suitable habitat, which would help decrease weed expansion since one of the components of habitat restoration would be weed treatments.

**Impacts from Cultural Resource Management.** Alternatives B and C would implement CRV-NSO-39 for historic properties and CRV-NSO-37 for heritage areas, which would minimize the risk of weed invasion and spread by reducing the loss of native vegetation and limiting soil disturbance. Weed risk would be the least under Alternatives B and C because cultural resource stipulations would prevent the most surface disturbance.

**Impacts from Visual Resource Management.** Alternative B would designate more acres as VRM Class I and Class II (282,800 acres) than under Alternatives A and D, but less than under Alternative C; therefore, the risk of weed invasion and spread under Alternative B would be greater than under Alternative C, but less than under Alternatives A and D.

BLM_0016523

**Impacts from Forestry Management.** The risk of weed invasion and expansion would be greater than under Alternatives A and C and slightly less than under Alternative D. Impacts on weeds from forestry management would be similar to those listed above under Alternative A.

**Impacts from Livestock Grazing Management.** Livestock grazing management actions would open 451,400 acres to grazing and would provide 36,000 AUMs of livestock forage under Alternative B. One active allotment (County Line) would be closed due to noncompliance with land health standards from livestock. Closing this allotment would benefit vegetation, decreasing the potential for weed expansion. Grazing and rangeland development projects could increase the potential for weed invasion and spread due to various direct and indirect impacts listed under Forests and Woodlands, Alternative A.

Under all alternatives, adverse impacts from livestock grazing management on weeds would be greater than beneficial impacts. Since fewer acres and AUMs would be available to livestock under this alternative, compared to Alternative A, the potential for weed invasion and spread would be less. Alternative C would result in the least potential for weed spread.

**Impacts from Recreation and Visitor Services Management.** Alternative B would designate six SRMAs (51,000 acres). NSO stipulations would limit surface-disturbing activities and provide protection to vegetation within the NSO areas, reducing the risk of weed invasion and spread.

Under all alternatives, adverse impacts from recreation and visitor services on weeds would be greater than beneficial impacts. Alternative B would create less risk of weed invasion and expansion than under Alternatives A and D (which would allow for the most development and use) but more risk than under Alternative C (which would designate the fewest SRMAs).

**Impacts from Comprehensive Trails and Travel Management.** Under Alternatives B, C, and D, there would be no land open to cross-country OHV travel and no OHV use limited to existing routes. OHV use would be limited only to designated routes. Limiting vehicles to designated routes would confine impacts on areas that were already disturbed and hardened, and would confine impacts over a smaller area. This would decrease the risk of weed invasion and spread.

Alternative B would have impacts similar to those under Alternative A, except adverse impacts on weeds would be much less. Alternative B would create less risk of weed invasion and expansion than under Alternatives A and D, but slightly more risk than under Alternative C. Alternative C would close 200 more acres to OHV use and would obliterate more routes than under Alternative B.

**Impacts from Lands and Realty Management.** Alternative B would result in slightly less risk of weed invasion and spread than under Alternatives A and D because more acres would be excluded from ROW development, minimizing surface disturbance. Alternative C would exclude the most acres of ROW development and would have the least risk of weed invasion and expansion.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Under Alternative B, a total of 651,400 acres of federal mineral estate would be open to oil and gas development. Up to 2,206 wells and 276 multi-well pads are anticipated, with an estimated 2,774 acres of surface disturbance. Approximately 55,600 acres would be closed to fluid minerals leasing, and NSO stipulations would be applied to 326,700 acres. Stipulations that exclude oil and gas development and other

BLM_0016524

surface-disturbing activities would provide a beneficial long-term impact on vegetation, reducing the risk of weed invasion and spread.

Direct and indirect impacts on weeds from oil and gas development would be similar to Alternative A, except for the degree of impact. Alternative B would close more acres to oil and gas development than under Alternatives A and D, creating fewer disturbances to vegetation and less risk of weed invasion and spread. Closure to fluid minerals leasing and NSO stipulations under Alternative B would prevent more acres of oil and gas development than under Alternatives A and D, creating less risk of weed invasion and expansion by preventing more surface disturbance.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative B, a total of 97,000 acres would be recommended for withdrawal from locatable minerals development. A total of 363,000 acres would be open to mineral materials disposal, and the same areas would be open to non-energy leasable minerals development. Withdrawing areas from mineral development would limit surface-disturbing activities and reduce the risk of weed invasion and spread.

Impacts on weeds would be similar to those found under Fluid Minerals, Alternative A. Alternative B would withdraw more acres from mineral development than under Alternatives A and D, but less than under Alternative C; hence, the risk of weed invasion and expansion would be less than under Alternatives A and D but greater than under Alternative C.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative B, a total of 34,480 acres would be designated as ACECs, 28,400 acres of which would be covered by NSOs, limiting surface disturbance. ROW exclusions on 19,900 acres and no fluid minerals leasing on 17,500 acres would minimize impacts on vegetation, creating less chance of weed invasion. Travel restrictions in all ACECs would reduce weed invasion and spread since motorized activities in undisturbed and remote areas would probably distribute weed seeds into weed-free areas.

Alternative B would prevent 5,100 more acres of surface disturbance with NSOs than under Alternative A, about 8,200 more acres than under Alternative D, and 18,300 fewer acres than under Alternative C, which means that Alternative B would limit weed introduction and spread more than under Alternatives A and D, but substantially less than under Alternative C.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Alternative B would close four suitable stream segments to fluid minerals leasing (CRV-CL-12). This closure would extend 0.25 mile on both sides of the stream centerline and would exclude oil and gas development. Alternative B would minimize the risk of weed invasion and expansion by preventing the loss of native vegetation and preventing soil disturbance; however, Alternatives A and C would result in the least risk of weed invasion and spread because they would prevent the most surface disturbance.

## Alternative C (Weeds)

Impacts to weeds management from general vegetation management, wildland fire management, forestry management, WSAs management, and transportation and facilities management would be the same as or similar to those under Alternative A. Impacts to weeds management from management of all other resources and uses would be the same as or similar to those under Alternative B, except as described below.

BLM_0016525

**Impacts from Fisheries and Aquatic Wildlife Management.** Under Alternative C, NSO stipulations for fisheries and aquatic wildlife would prevent the most surface disturbance of all alternatives, which would result in the least risk of weed invasion and expansion.

**Impacts from Terrestrial Wildlife Management.** Impacts from terrestrial wildlife management on weeds would be similar to Alternative A, except for the degree of impact. Alternative C would create less risk of weed invasion and expansion than under Alternatives A and D because NSO stipulations to protect habitat would exclude surface disturbance from more acres. Alternative C would be similar to Alternative B in the degree of impact on weeds.

**Impacts from Special Status Species Management.** Under Alternative C, NSO stipulations for special status species would prevent the most ground disturbance of any alternative, resulting in the least risk of weed invasion and expansion. In addition, Alternatives B and C would restore potential special status species habitat to suitable habitat. This would help decrease weed spread because one of the components of habitat restoration would be weed treatments.

**Impacts from Visual Resource Management.** Alternative C would designate the most acres as VRM Class I and Class II (291,700 acres) than the other alternatives; therefore, the risk of weed invasion and spread would be the least under Alternative C.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under Alternative C, a total of 47,000 acres of land would be managed as LWCs and managed for wilderness characteristics. Management actions for these lands would include closing the areas to fluid minerals leasing (CRV-CL-4), designating the areas as VRM Class I and predominantly Class II, limiting motorized and mechanized travel to existing routes, allowing for grazing where allotments exist, and implementing an NSO stipulation (CRV-NSO-43) to exclude surface disturbances from oil and gas development and other activities.

Protective stipulations would prevent surface disturbance, which would reduce the risk of weed invasion and expansion. Alternative C would protect more vegetation than the other alternatives and would result in the lowest risk of weed invasion and spread. There are no lands proposed with wilderness characteristics outside existing WSAs under other alternatives.

**Impacts from Livestock Grazing Management.** Livestock grazing management actions would open the fewest acres to livestock grazing (432,000 acres) and would provide the fewest AUMs of forage (35,500). Grazing and rangeland development projects could increase the potential for weed invasion and spread due to various direct and indirect impacts listed under Forests and Woodlands, Alternative A.

Under all alternatives, adverse impacts from livestock grazing management on weeds would be greater than beneficial impacts. Since more acres would be closed to grazing under Alternative C, the potential for weed invasion and spread would be the least.

**Impacts from Recreation and Visitor Services Management.** Alternative C would designate two SRMAs, the least of any alternative. The same NSOs under Alternative B would apply to Alternative C, reducing the risk of weed invasion and spread. SRMAs under Alternative C—Red Hill and Upper Colorado River—would not allow for motorized activities, which would reduce impacts on vegetation and reduce the risk of weed invasion and expansion.

BLM_0016526

Under all alternatives, adverse impacts from recreation and visitor services on weeds would be greater than beneficial impacts. Alternative C would result in the least risk of weed invasion and spread of any alternative because it would allow for the least amount of development and the fewest SRMAs.

**Impacts from Comprehensive Trails and Travel Management.** Alternative C would have impacts similar to those under Alternative B, except adverse impacts would be slightly less. Alternative C would create fewer impacts on vegetation than under Alternatives B and D by closing the most acres to OHV use and by obliterating more routes than the other alternatives. Alternative C would create far fewer adverse impacts on vegetation than under Alternative A because OHVs would be limited to designated routes only. Hence, Alternative C would result in the least risk of weed invasion and spread of any alternative.

**Impacts from Lands and Realty Management.** The risk of weed invasion and expansion would be slightly less under Alternative C as opposed to Alternative B since 11,300 more acres would be excluded from ROW development, minimizing surface disturbance. Alternatives A and D would result in greater potential for weed invasion and spread because they would exclude fewer acres from ROW development.

**Impacts from Coal Management.** Alternative C would open the least acres of federal mineral estate to coal leasing—10,600 acres fewer than under Alternatives A, B, and D—resulting in the lowest potential for weed invasion and spread of any alternative. If coal mining were to occur, impacts on weeds would be similar to those found under fluid minerals, Alternative A. However, the increase and expansion of weeds would not occur over as wide an area as with fluid minerals development because coal mining would target only the Grand Hogback.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Alternative C would open 531,500 acres of federal mineral estate to oil and gas development. Up to 2,206 wells and 276 multi-well pads are anticipated, with an estimated 2,774 acres of surface disturbance, the same as under Alternative B. Under Alternative C, approximately 175,500 acres would be closed to fluid minerals leasing, and NSO stipulations would be applied to 333,800 acres, providing the most protection to vegetation of any alternative. Stipulations that exclude oil and gas development and other surface-disturbing activities would provide a beneficial long-term impact on vegetation, reducing the risk of weed invasion and spread.

Alternative C would close the most acres to oil and gas development of all alternatives, creating the least risk of weed invasion and spread. Closure to fluid minerals leasing and NSO stipulations under Alternative C would prevent the most acres of oil and gas development, creating the least risk of weed invasion and expansion by reducing surface disturbance the most.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative C, a total of 172,100 acres would be recommended for withdrawal from locatable minerals development. In comparison, 317,000 acres would be open to mineral materials disposal and non-energy leasable minerals development. Withdrawing areas from mineral development would limit surface-disturbing activities and reduce the risk of weed invasion and spread.

Impacts on weeds would be similar to those described for fluid minerals under Alternative A. Alternative C would withdraw the most acres from mineral development of any alternative. Consequently, the potential for weed invasion and expansion under this alternative would be less than under Alternatives A, B, or D.

BLM_0016527

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Alternative C would designate 79,700 acres in 16 ACECs, with the most acres covered by NSOs. This would reduce surface disturbance the most of any alternative, resulting in the lowest risk of weed invasion and spread.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Alternative C would close nine suitable stream segments to fluid minerals leasing (CRV-CL-12), as opposed to four segments under Alternative B. This closure would extend 0.25 mile on both sides of the stream centerline and would exclude oil and gas development. Alternatives A and C would minimize the risk of weed invasion and expansion the most by preventing more loss of native vegetation and soil disturbance than under Alternatives B and D.

*Alternative D (Weeds)*

Impacts on weeds from general vegetation management, wildland fire management, coal management, WSAs management, and transportation and facilities management would be the same as or similar to those under Alternative A. Impacts from soils management would be the same as or similar to those under Alternative B. Impacts from management of all other resources and uses would be as described below.

**Impacts from Water Resources Management.** Alternative D would implement CRV-NSO-3 for major river corridors and CRV-NSO-4 for designated municipal watersheds, which would minimize the risk of weed invasion and expansion by preventing the loss of native vegetation and minimizing soil disturbance.

The risk of weed invasion and expansion would be less under Alternative D than under Alternative A because CRV-NSO-4 would apply to all municipal watersheds, as opposed to only the Rifle and New Castle watersheds. Weed risk would be greater than under Alternatives B and C because Alternative D would not implement CRV-NSO-5.

**Impacts from Fisheries and Aquatic Wildlife Management.** NSO stipulations for fisheries and aquatic wildlife would allow a greater amount of surface disturbance than under Alternatives B and C and a similar amount as Alternative A. However, Alternative D would have a more beneficial impact than under Alternative A because it would also improve select priority species habitat by closing and reclaiming selected routes. This would provide a long-term beneficial impact by increasing vegetation cover and reducing the potential for weed invasion and spread.

Alternative D would have a greater risk of weed invasion and expansion than under Alternatives B and C, but slightly less risk than under Alternative A.

**Impacts from Terrestrial Wildlife Management.** Terrestrial wildlife management actions under Alternative D would implement the fewest NSO stipulations of any alternative. Impacts from terrestrial wildlife management on weeds would be similar to Alternative A except for the degree of impact. Alternative D would prevent the least amount of surface disturbance of any alternative, resulting in the most potential for weed invasion and spread.

**Impacts from Special Status Species Management.** Under Alternative D, NSO stipulations for special status species would prevent the least amount of ground disturbance of any alternative, resulting in the greatest risk of weed invasion and expansion.

BLM_0016528

**Impacts from Cultural Resource Management.** The risk of weed invasion and expansion would be less than under Alternative A but more than under Alternatives B and C, because stipulations under Alternative D would prevent more acres of surface disturbance than under Alternative A but fewer than under Alternatives B and C.

**Impacts from Visual Resource Management.** Alternative D would designate more acres as VRM Class I and Class II (262,300 acres) than under Alternative A but fewer than under Alternatives B and C; therefore, the risk of weed invasion and expansion under Alternative D would be less than under Alternative A but greater than under Alternatives B and C.

**Impacts from Forestry Management.** The risk of weed invasion and expansion would be the greatest under this alternative because the most soil disturbance would occur, a result of the most planned acres of intensive management. Impacts on weeds from forestry management would be similar to those listed above under Alternative A.

**Impacts from Livestock Grazing Management.** Livestock grazing management actions would open 443,400 acres to grazing and provide 36,500 AUMs of livestock forage under Alternative D. Grazing and rangeland development projects could increase the potential for weed invasion and spread due to various direct and indirect impacts listed under Forests and Woodlands, Alternative A.

Since fewer acres and AUMs would be available for livestock grazing under this alternative, compared to Alternatives A and B, adverse impacts on weeds from grazing would be less. Alternative C would result in the least potential for weed invasion and spread due to the fewest acres open to grazing.

**Impacts from Recreation and Visitor Services Management.** Alternative D would provide for the most visitor use and development by designating 68,200 acres of SRMAs, which would result in the greatest potential for weed invasion and spread. The same NSOs as under Alternatives B and C would apply.

As opposed to other alternatives, special recreation permits would be issued to maximize opportunities for commercial recreation. This would have indirect adverse effects on weeds by creating greater potential for disturbance and weed spread.

Under all alternatives, adverse impacts from recreation and visitor services on weeds would be greater than beneficial impacts. Alternative D would create the most risk of weed invasion and spread by providing for the most development and visitor use.

**Impacts from Comprehensive Trails and Travel Management.** Similar to Alternatives B and C, Alternative D would have no land open to cross-country travel. However, fewer acres under Alternative D would be closed to OHV use than the other alternatives, creating more risk of weed invasion and spread.

Alternative D would create more impacts on vegetation than under Alternatives B and C by closing the fewest acres to OHV use and by obliterating fewer routes. Alternative D would create far fewer adverse impacts on vegetation than under Alternative A because OHVs would be limited to designated routes only. Hence, Alternative D would create less risk of weed invasion and spread than under Alternative A but slightly more than under Alternatives B and C.

BLM_0016529

**Impacts from Lands and Realty Management.** Under Alternative D, the risk of weed invasion and expansion would be slightly more than under Alternatives B and C since fewer acres would be excluded from ROW development. Alternative A would have the greatest risk of weed invasion and expansion since it would exclude the fewest acres from ROW development.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Under Alternative D, a total of 658,200 acres of federal mineral estate would be open to oil and gas development. Up to 4,198 wells and 525 multi-well pads are anticipated, with an estimated 5,276 acres of surface disturbance. Approximately 48,800 acres would be closed to fluid minerals leasing, and NSO stipulations would be applied to 203,000 acres. Stipulations that exclude oil and gas development and other surface-disturbing activities would provide a beneficial long-term impact on vegetation, reducing the risk of weed invasion and spread.

Alternative D would permit the greatest number of wells and pads, creating the most surface disturbance of any alternative and the greatest risk of weed introduction and expansion. CL designations and NSO stipulations under Alternative D would prevent the fewest acres of oil and gas development, creating the greatest risk of weed impacts.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative D, approximately 72,300 acres would be recommended for withdrawal from locatable minerals development. In contrast, a total of 477,200 acres would be open to mineral materials disposal and non-energy leasable minerals development. Withdrawing areas from mineral development would limit surface-disturbing activities and reduce the risk of weed invasion and spread.

Alternative D would withdraw more acres than under Alternative A but fewer than under Alternative B and substantially fewer acres than under Alternative C; therefore, Alternative D would create less risk of weed invasion and expansion than under Alternative A but more risk than under Alternatives B and C.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Alternative D would designate the fewest number and acres of ACECs (three ACECs totaling approximately 20,200 acres), all of which would be covered by NSOs. This means that Alternative D would present the least amount of surface disturbance of all alternatives, which would result in the greatest potential for weed introduction and spread.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Wild and scenic rivers management under Alternative D would not exclude surface-disturbing activities like other alternatives, resulting in the greatest risk of weed invasion and spread.

## Cumulative Impacts (Weeds)

The cumulative impact analysis boundary for weeds includes the entire planning area, plus public and private lands directly adjacent to the CRVFO boundary. Noxious and invasive weeds are a threat to land health as they contribute to loss of rangeland productivity, increased soil erosion and sedimentation, degraded vegetation communities, reduced species richness, reduced wildlife habitat quality, altered fire regime, and reduced aesthetic quality. Surface disturbance creates conditions favorable for the invasion and establishment of noxious weeds and other non-native species, particularly when these species are already present in the surrounding area.

BLM_0016530

Surface-disturbing activities will continue to occur, and will increase in some cases, within and adjacent to the CRVFO. The major actions that would cause or facilitate weed invasion and expansion are mineral leasing and development; issuance of ROWs; construction of roads, trails, and recreation facilities; wildland and prescribed fire; grazing; and cross-country OHV use. Vectors for weed dispersal, such as vehicles, recreationists, livestock, and wildlife, would continue to be present, spreading weed disseminules to new sites.

In general, the more soil disturbed over the life of the plan, the greater the cumulative impact anticipated relative to noxious and invasive weed spread. Surface disturbance from non-BLM actions, such as from permittees (e.g., oil and gas companies), is anticipated to be substantively greater than surface disturbance from BLM actions (e.g., recreation development). For the most part, soil disturbances would be revegetated or reclaimed, which would reduce bare ground and decrease the risk of weed invasion and spread; however, restoration efforts can have poor success rates, with loss of species diversity, increase in annuals, decrease in perennials and woody plants, and an increase in weed species.

In addition to the total acres of land disturbed, the type of disturbance is important to the spread of noxious and invasive weeds. For example, construction, maintenance, and existence and operation of linear features (e.g., waterways, roads, trails, and ROW corridors) in the planning area could have a substantial impact on the spread, and particularly the introduction, of noxious and invasive weeds across large areas. Water, wind, vehicles, livestock, humans, and wildlife inadvertently transport weed seeds and propagules along these linear features. The more miles of linear features constructed, the greater the adverse cumulative impact would be from weed spread and expansion.

Noxious and invasive weeds are assumed to occur at approximately the same densities outside the CRVFO. If unmanaged, the presence of these populations on adjacent land would serve as a constant weed seed source for the CRVFO, especially in areas where human traffic and livestock or wildlife movement could serve to spread weed seeds into new sites, counteracting active and coordinated management as proposed under all alternatives.

Management actions associated with each alternative would require some degree of reclamation and weed prevention measures following surface disturbance on BLM lands. However, prevention measures may be applied unevenly across the planning area and between different management actions, and enforcement and monitoring of these measures depends on BLM priorities and funding.

Across all alternatives, the BLM would continue to monitor and treat new and existing populations of noxious and invasive weeds and would continue to work with partners from local, state, and federal agencies to control weeds on a broad scale. The CRVFO would continue implementation of the CRVFO integrated weed management plan and EA (BLM 2009e) and Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States PEIS (BLM 2007na), which would continue to help guide the management of noxious and invasive weeds.

The cumulative surface disturbance across the CRVFO is anticipated to be the most under Alternative A and the least under Alternative C. Alternative B would have slightly more surface disturbance than under Alternative C but substantially less than under Alternative D. Because weed invasion and spread is directly related to the amount of surface disturbance, Alternative A would have the most risk of weed spread, whereas Alternative C would have the least.

BLM_0016531

## *Vegetation—Significant Plant Communities*

Direct and indirect impacts on significant plant communities from management actions would be similar to those described above for vegetation. However, because significant plant communities are relatively rare and localized, and often small in extent, impacts would be magnified. Loss of plants would reduce genetic diversity within these communities. Reproductive success would decrease in smaller populations, and inbreeding and loss of genetic variation would increase. Fragmentation would result in lower population viability and would increase local population extinction risk (Kolb 2008).

Surface-disturbing activities would have adverse, direct, and long-term impacts. Due to the small and often pristine nature of these communities, adverse impacts would occur if surface-disturbing activities resulted in plant losses, weed invasion, or a change in species composition or diversity, which would degrade the integrity and functionality of the plant community.

For all alternatives, CSU stipulations (GS-CSU-3 and CRV-CSU-7) would be implemented to protect significant plant communities. These stipulations would allow for relocation of proposed surface-disturbing activities by more than 200 meters to avoid occupied habitat and habitat necessary for the maintenance or recovery of the communities.

In addition to CSU stipulations, most significant plant communities would indirectly benefit from the implementation of NSO stipulations for other resources. Nine significant plant communities would fall within the major river corridors NSO implemented under all alternatives. A *Juniperus scopulorum/Cornus sericea* significant plant community is located within the Bull Gulch ACEC, and the entire ACEC would be protected by an NSO under all alternatives.

Two other significant plant communities (*Betula occidentalis*/mesic graminoids shrubland and *Artemisia tridentata* ssp. *tridentata/Leymus cinereus* shrubland) would fall within the Colorado River Seeps ACEC under Alternative C, the entire ACEC of which would be protected by an NSO; however, these two communities would not be protected by NSOs under other alternatives. A *Populus deltoides* ssp. *wislizeni/Rhus trilobata* woodland near the Colorado River would fall within the NSO to protect big river fish under Alternatives B, C, and D but would not be covered by an NSO under Alternative A.

Two significant plant communities (*Populus angustifolia/Betula occidentalis* woodland and *Populus deltoides* ssp. *wislizeni/Rhus trilobata* woodland) would be protected by NSOs for streamsides and perennial waters only, under Alternatives B and C. One community near Bear Creek (*Populus tremuloides/Acer glabrum* forest) would be protected by the NSO for perennial waters only, under Alternative C. The remaining two significant plant communities would not have the additional protection of an NSO under any alternative: a *Populus balsamifera* woodland located north of Eagle and a *Juniperus scopulorum/Cercocarpus montanus* woodland near Bocco Mountain. These would be protected only by the CSU stipulation for significant plant communities.

Seven significant plant communities would fall within the Upper Colorado River SRMA, which would be managed for fishing, boating, and swimming. Vehicles would be restricted to existing county and private roads, thereby reducing potential adverse impacts. The SRMA would be closed to fluid minerals leasing and would be recommended for withdrawal from locatable mineral development and exploration. An NSO for SRMAs would be implemented under Alternatives B, C, and D to prevent any surface-disturbing activities incompatible with recreation objectives. All of these actions would benefit the significant plant communities within the SRMA by limiting surface disturbance.

BLM_0016532

Impacts from visitor use and recreation development in the Upper Colorado River SRMA would be minimal under Alternatives A, B, and C; however, Alternative D would allow for increased use and recreation development. Since significant plant communities within the SRMA would be covered by CSU stipulations, potential development would be shifted away from these communities.

Under the current management plan, unless otherwise designated as "closed" or "limited to existing or designated routes," the CRVFO is considered "open to motorized vehicle use on and off roads." Cross-country OHV use could adversely affect significant plant communities. Under Alternatives B, C, and D, OHVs would be limited to designated routes, reducing potential impacts on these communities. The CSU for significant plant communities would provide protection from construction of new roads and trails by relocating the development to areas outside significant plant community habitat.

Two significant plant communities (both *Populus deltoides* ssp. *wislizeni*/*Rhus trilobata* woodlands) occur within areas of high potential for oil and gas development; however, the majority of significant plant communities occur within low or medium potential areas. None of the 17 significant plant communities has yet been leased, and if they were to be leased, the significant plant community CSU and other relevant NSO stipulations from other resources would be attached to the lease.

Two significant woodland plant communities (*Juniperus scopulorum*/*Cornus sericea* and *Populus angustifolia*/*Juniperus scopulorum*) occur within the Pisgah Mountain area, which would be managed as LWCs and managed for wilderness characteristics under Alternative C. Management restrictions to protect wilderness character would minimize surface disturbances, which would protect these communities from direct impacts. Actions to maintain wilderness characteristics on lands outside existing WSAs are not proposed under Alternatives A, B, or D, so there would be no additional protection to significant plant communities.

Under all alternatives, management actions would result in no livestock grazing in seven significant plant communities, preventing impacts from grazing to those communities, while ten significant plant communities would continue to have grazing. Grazing or browsing by livestock could cause direct loss or trampling of individuals or populations, especially those plants that are palatable to animals.

Locatable mineral development is not subject to NSO or CSU restrictions, so significant plant communities in areas not withdrawn from mineral development would be vulnerable to surface-disturbing actions. The degree of impacts would vary depending on the location of proposed mineral development in relation to the significant plant community. No public lands in the CRVFO where these communities occur would be closed to mineral materials (salables) disposal or non-energy solid leasable minerals. However, unlike locatable mineral development, these activities would be subject to existing stipulations, so impacts on these communities could be minimized.

The Bull Gulch and Colorado River Seeps ACECs and the Upper Colorado River SRMA would be recommended for withdrawal from locatable mineral exploration and development. Withdrawing these areas would protect ten significant plant communities from surface-disturbing actions related to locatable mineral development.

Wildland fire management could adversely affect significant plant communities if firefighters were to trample individuals or habitat. Fire suppression, such as the construction of fire lines using hand tools and heavy machinery, could also affect these communities by crushing or uprooting individual plants, increasing erosion

BLM_0016533

and sedimentation, and providing a vector for the invasion or expansion of noxious weeds. The fire itself could result in the death of individual plants or the alteration of habitat.

Several significant plant communities span public and private lands, making BLM management actions even more critical, since occurrences on private land would not necessarily be protected. Land tenure adjustments (i.e., acquiring or disposing of lands) could result in plant communities entering or leaving federal ownership.

Alternatives A and D would have the most adverse impacts on significant plant communities. These alternatives would implement the fewest resource protections and stipulations and would create the most surface disturbance. Alternative B would result in slightly more impacts on significant plant communities than under Alternative C. More NSO stipulations and other protective management actions would be implemented under Alternative C, as opposed to other alternatives, resulting in indirect benefits to significant plant communities. In addition, Alternative C would implement the Colorado River Seeps ACEC, which would protect two significant plant communities, and the Pisgah Mountain area would be managed as LWCs for their wilderness characteristics, protecting one significant plant community.

BLM_0016534

## 4.2.6   Fish and Wildlife

### 4.2.6.1 Fisheries and Aquatic Wildlife

**Environmental Consequences**

Impacts on fisheries and aquatic wildlife would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on fisheries and aquatic wildlife under any of the four alternatives.

**Issues**

The following primary impacts for aquatic species and their habitats are the focus of the impact analysis:

- Sediment and Turbidity—Increased sediment loading in waters containing sediment-intolerant fish species, loss of recruitment, stress, habitat alteration, and habitat loss.

- Habitat Alteration—Changes in habitat that make it nonfunctional for select species or more conducive to competitive species.

- Loss or Reduction of Streamside Vegetation/Cover—Increased temperatures, stress, reduced productivity, and impacts on food webs.

- Water Quality Alteration—Actions that alter important water quality parameters, including pH, dissolved oxygen, temperature, hardness, alkalinity/salinity, and turbidity.

- Water Depletions—Loss of physical habitat, changes in water quality, sediment accumulation, habitat alteration, loss of habitat complexity, food source reduction.

- Potential direct mortalities to amphibians from motorized travel.

**Assumptions**

The following assumptions are used in the impact analysis for aquatic species:

- Impacts on fish and other aquatic species populations and habitat are not discrete since some actions may benefit one species while having a negative or beneficial impact on another.

- Maintaining high quality habitat conditions would have some influence on reducing the severity of outbreaks and subsequent losses from diseases, but the prevalence in the environment of various diseases cannot be fully controlled, particularly at chronic levels of occurrence.

- The health of fish and other aquatic wildlife populations is directly related to overall health and functional capabilities of aquatic, riparian, and wetland resources, which in turn are a reflection of overall watershed health.

- Fish populations fluctuate, sometimes widely, in response to natural factors, such as the abundance of prey or extremes in weather, such as flooding or drought.

- The analysis of roads and road density in a given area (watershed) can provide approximations of the potential for impacts on fish and other aquatic species. It is a measure of lands available for accelerated water transport, potential erosion, and offsite sediment transport. However, the actual impacts and degree of impacts of roads are dependent on additional variables, including road class (dirt, gravel, paved), road condition (rutted, bar ditched, proper and adequate drainage features),

BLM_0016535

topography, upland and riparian vegetation condition, soil characteristics, climate, and proximity of roads to fish-bearing streams.

- Impacts on fish and other aquatic wildlife are based on the cause and effect premise of exposure/stressor/response :

  o Exposure—The likelihood that a given stressor will affect a given species

  o Stressor—The portion(s) of an action that may cause some sort of a reaction by the species

  o Response—The response (negative, positive, neutral) of the species to the stressor

- Common impacts are disclosed in detail once and then are referenced as appropriate in each alternative, discussing any notable differences in risk, magnitude, duration, and scope specific to that alternative's program or resource prescriptions. Where impacts are new or unique to an alternative, detailed analysis will be done on that alternative and referenced as appropriate in other alternatives.

- Variation of identified impacts by alternative are determined based on the following:

  o Risk—likelihood or probability of an action resulting in the identified effect

  o Magnitude—intensity and severity of the identified impact

  o Duration—length of time in which the identified impact would occur

  o Scope—spatial extent or size over which the identified impact would occur, as related to the proximity of the action to the species or habitat

- Unless otherwise noted, short-term impacts are defined here as impacts expected to have a duration of 2 years or less.

- Unless otherwise noted, long-term impacts are defined here as impacts expected to have a duration greater than 2 years.

- Generally, all NSO protective stipulations that limit ground-disturbing activities would help to protect and minimize impacts on fish and other aquatic species. Various protective measures are components of each alternative, and if implemented in a timely and correct manner, would reduce negative effects on aquatic species. This is true whether the measures are existing (Alternative A), if they are newly proposed under other alternatives, if they are fisheries and aquatic wildlife-specific, or if they are those primarily directed at other resource programs that indirectly protect or minimize effects on fish and other aquatic wildlife.

- The following programs would have negligible impacts, be they beneficial or negative to fish and other aquatic wildlife: air, watchable wildlife, cadastral, cultural, visual, interpretation and environmental education, transportation facilities, health and safety, paleontology, cave and karst resources. These programs are not analyzed for impacts in the Fisheries and Aquatic Wildlife section.

- Impact analysis is grouped by species, where appropriate (e.g., sediment-intolerant aquatic species are grouped). Under Alternative A, detailed impacts may be disclosed once and then are referenced in subsequent alternatives to avoid repetition.

### Methods of Analysis

All NSO stipulations that would limit ground-disturbing activities would minimize potential risk of sediment and turbidity impacts on aquatic species and their habitats. At the beginning of each alternative is a table listing those primary protective measures that either directly or indirectly minimize or eliminate negative

BLM_0016536

Case No. 1:20-cv-02484-MSK   Document 30-10   filed 04/27/21   USDC Colorado   pg 78 of 539

effects on aquatic species and their habitats. Impact analysis then focuses on those residual impacts ("those effects remaining after mitigation has been applied to the proposed action or alternative" [BLM 2008]) anticipated or reasonably likely to occur by resource or program on the priority species and habitats identified for that specific alternative. Under Alternative A, impacts by resource and by alternative are tied back to the detailed analysis completed once, and are subsequently referenced or summarized, noting any differences in risk, magnitude, duration, and scope specific to that alternative's program or resource prescriptions.

### Alternative A

**Impacts from Fisheries and Aquatic Wildlife Management.** Fisheries and aquatic wildlife management is or would be largely beneficial to fish and other aquatic wildlife. This alternative contains no specific protective measure for aquatic species. Depending on the type of fisheries project or action, and stipulation exception criteria, several of the current protective measures would help to limit impacts and protect aquatic habitats. In addition, fisheries and aquatic wildlife habitat management is subject to the Colorado Public Land Health Standard 2, 3, 4, and 5 (BLM 1997a), which help guide habitat management on public lands. In areas where these standards are being met, there is reduced potential impact on fish and other aquatic wildlife from loss or reduction of streamside vegetation and offsite erosion and increased sedimentation and turbidity associated with select projects/actions.

In select areas where proactive fish habitat management in the form of projects would occur, there is potential for site-specific short-term negative impacts on aquatic species, including loss or reduction of streamside vegetation cover and increased sediment loading and turbidity. These effects are described in detail in the sections on impacts from forest and woodland management and riparian management. All fish projects would be designed to have long-term benefits to target aquatic species and their habitats.

Sediment-tolerant species would be impacted in ways similar to those of the sediment-intolerant species described above. Where, in cooperation with CDOW or USFWS biologists, non-native fish or other undesirable aquatic species removal is conducted, selected species would be negatively impacted to the benefit of native fish and other aquatic species.

**Impacts from Soils Management.** Under the current plan, soil resource management benefits aquatic species through protective stipulations implemented to protect fragile, sensitive, or steep soil areas. Specific stipulations include NSOs 14 and 15 and CSU-4. Other stipulations either directly or indirectly help to limit impacts on aquatic species from other resource uses. In addition, soils are subject to the Colorado Public Land Health Standard 1 (BLM 1997a), which helps guide soils management on public lands. In areas where Standard 1 is being met, there is minimal potential impact on fish and other aquatic wildlife from offsite erosion and increased sedimentation. Soils management benefits aquatic species the same under all alternatives as the same protective measures are carried forth in all alternatives.

Given their biology, feeding habits, habitat needs, and niche in the ecosystem, sediment-tolerant species can persist in the face of actions that increase sediments to streams and rivers. These species would generally benefit from soils management as currently conducted.

**Impacts from Water Resource Management.** Under the current plan, water resource management benefits aquatic species and their habitats. Protective stipulations implemented specifically to protect water quality include NSOs 3 and 13, which would collectively limit ground disturbance next to 77 miles of six major rivers and one discrete domestic water supply watershed area, Beaver Creek, which contains brown trout as well as a

BLM_0016537

conservation population of Colorado River cutthroat trout. Other stipulations either directly or indirectly help to protect aquatic species and their habitats. In addition to stipulations, water management is subject to the Colorado Public Land Health Standard 5 (BLM 1997a) and Colorado State Water Quality Standards, which help guide water management on public lands. In areas where Standard 5 and state standards are being met, there is minimal potential impact on fish and other aquatic wildlife from impacts associated with alteration of water quality parameters. Benefits to sediment-tolerant species would be the same as for the sediment-intolerant species.

**Impacts from Forest and Woodland Vegetation Management.** Vegetation treatments for forest and woodland include mechanical treatments and prescribed fire. None of the current protective stipulations for fisheries and aquatic life applies specifically to management of forest and woodland vegetation. However, the protective measures protect aquatic species and their habitats either directly or indirectly. Forest and woodland vegetation management is not necessarily constrained under existing NSOs, as some prescriptive treatments can be conducted with little or no ground disturbance in some areas. All vegetation management is subject to the Colorado Public Land Health Standards 3 and 4 (BLM 1997a), which help guide vegetation management on public lands. Where these standards are being met, active management of forest and woodland vegetation is having minimal impact on fish and other aquatic wildlife. Impacts can be and are mitigated during site-specific analysis of individual treatment actions.

The primary impacts on aquatic species and their habitats associated with forest and woodland vegetation management are habitat alteration and increased sedimentation and turbidity. The effects on sediment-intolerant aquatic species are addressed in detail below. In general, sediment-tolerant species would be less affected by actions that increase sediments to streams and rivers, but alteration of habitat and water quality can impact these species in ways similar to those of sediment-intolerant species.

*Habitat Alteration.* Stream channel and streambank alterations can affect aquatic species in many ways. Actions that can result in habitat alteration include roads, livestock grazing, natural gas development, and other large ground-disturbing actions. Mechanisms for impact on stream channels include channel relocation, diking, riprapping, and fine sediment input at levels greater than the stream can efficiently or effectively move. Actions that affect streambanks can result in soil compaction, increased erosion, and subsequent widening of stream channels. Stream widening results in a loss of habitat complexity and diversity and reduced water depths, which can reduce available habitat and cause increased stream temperatures. Increased temperatures can affect fish by increasing physiological stress, reducing feeding, and increasing susceptibility to disease. Streambank alteration also exposes bare soils, which provide for points of invasion by weedy species, and increases the risk of further erosion of the streambank. Actions that increase the amount of soil exposed to the erosive effects of water will increase sediment loading and turbidity. This can alter feeding by fish that require water clarity to forage and capture prey. Actions that cause soil compaction result in decreased vegetation cover, less vigorous root systems, and more exposure of the soil surface to erosion (Burton et al. 2008). Reduced flows can result in buildup of sediment and alter channels by narrowing them and reducing habitat complexity for some species.

Amphibians can be impacted by alteration of limited breeding pond habitats and overwinter habitats. Many species aestivate (burrow into streambank, pond, or soil substrates during summer). Activities that disturb ground have the potential to disrupt amphibians and result in direct mortality. Breeding ponds can be drained or lowered in volume or have shorelines altered that can impact breeding sites and limit productivity.

September 2011
*Colorado River Valley Field Office – Draft RMP Revision EIS*
*Chapter 4, Environmental Consequences*
4-186

BLM_0016538

*Sediment and Turbidity.* Actions that increase sediment loading into streams can impact sediment-intolerant aquatic species in many ways. These include ground disturbance, vegetation removal, and constructing roads and trails, which are the primary culprits with regard to increased sediment and turbidity impacts. Increased sediments in the stream environment reduce dissolved oxygen, raise stream temperature, and can cover spawning/rearing areas, thereby reducing the survival of fish embryos and juveniles (US Forest Service 2000). Excessive sedimentation can also fill in important pool habitats, reducing their depth and making them less usable by fish and other aquatic organisms. Knopp (1993), in a study of 60 northwestern California streams, found that intensive land use management was correlated to loss of pool volume. High sediment transport can fill pools and cause reduction or loss of essential salmonid juvenile rearing habitat (Frissell 1992). Pool habitats are important as oversummer and overwinter thermal refugia areas and, when coupled with stream flows, are often a limiting factor in many small mountain streams.

A number of sublethal effects on resident trout may also occur as a result of sedimentation, including avoidance behavior, reduced feeding and growth, and physiological stress (Waters 1995). Over the long term, increased sediment loading reduces primary production in streams (US Forest Service 2000). Reduced macroinvertebrate productivity and diversity result when excessive sediment fills in the spaces between stream substrates needed by these aquatic invertebrates. Food webs can be altered as sediment-intolerant macroinvertebrates are replaced by sediment-tolerant species. Reduction in stream productivity can disrupt the food chain and result in reduced food sources for resident fish species. Suspended sediment causes turbidity within streams, which can impact species that need clear water in which to successfully capture prey, such as trout. Results from a study on turbidity (Barrett et al. 1992) clearly indicated that wild rainbow trout exposed to increasing levels of suspended sediment are subject to reductions in their ability to detect prey. This in turn may lead to reduced prey capture rates and foraging success, lowering the growth and fitness of individual fish and populations. The longer the duration of high turbidity, the more damage is likely to fish and other aquatic organisms (Newcombe and MacDonald 1991).

Where actions or activities include roads, there is high risk of sediment impacts. Roads increase surface runoff and sedimentation and, where they cross water bodies, often require in-channel structures such as culverts and bridges that remove aquatic habitat and may be barriers to fish passage (Bryant 1981; Barrett et al. 1992). Studies show that roads can contribute 50 to 80 percent of the sediment that enters streams (Hagans et al. 1986). Cedarholm et al. (1980) found that fine sediment in salmon spawning gravels increased by 2.6 to 4.3 times in watersheds with more than 4.1 miles of roads per square mile of land area. As sediment delivery into streams increases, the standing stock of trout decreases.

Amphibians that require clear ponds in which to breed can be impacted by increased sediment and turbidity. Egg masses can be covered by sediment, which impacts productivity, and tadpoles can have reduced feeding efficiency caused by prolonged turbidity.

Forest and woodland vegetation management is limited in scope and primarily consists of removal of pinyon pine and juniper where they have encroached or are encroaching into adjacent sagebrush and grassland habitats. Where this activity is occurring or would occur, limited direct negative impacts at specific locations on select streams containing sediment-intolerant fish and other aquatic wildlife species would result. However, these impacts are or would be generally short term and of limited scope and intensity. Fish and other aquatic wildlife are considered upfront in site-specific project identification and planning, and impacts are mitigated and treatments are designed with long-term watershed improvement and meeting of Standards 3 and 4 as the primary goal. In the absence of new permanent road construction for treatments, forest and

BLM_0016539

woodland vegetation management has long-term benefits to fish and other aquatic wildlife by improving upland watershed health and maintaining productive habitats that allow for natural water infiltration and absorption rates and limited erosion potential over time. Where permanent or long-term road construction is associated with select treatments, impacts associated with erosion and increased sedimentation and turbidity can be chronic and long term at specific areas, and can result in increased risk of identified impacts. These disturbed areas also create niches for weed infestation, which reduces upland habitat condition and increases the risk of erosion. In addition, select amphibians would be at increased risk of being killed by vehicles in areas with increased road density.

**Impacts from Vegetation Management—Rangelands.** Vegetation management for rangelands includes mechanical, prescribed fire, biological and chemical treatments. None of the protective stipulations for fisheries and aquatic species applies specifically to management of rangeland vegetation. However, many of the stipulations identified directly or indirectly protect aquatic species and their habitats by limiting ground-disturbing activities by an NSO. Rangeland vegetation management is not necessary constrained under NSO because some prescriptive treatments can be conducted with little or no ground disturbance in some areas. All vegetation management is subject to Colorado Public Land Health Standards 3 and 4 (BLM 1997a), which help guide vegetation management on public lands. Where these standards are being met, active management of forest and woodland vegetation is having minimal impact on fish and other aquatic wildlife.

The primary impacts associated with rangeland vegetation management are habitat alteration and increased sediment loading and turbidity. In addition, there is the potential for increased spread of weeds where vegetation is treated, which would reduce upland habitat condition and increase erosion potential. These impacts are discussed in detail in the section on impacts from forest and woodland management. Where treatments are occurring in watersheds containing occupied habitats of sediment-intolerant species, there is increased risk of the identified impacts because of their requirement for cold, clear, well oxygenated water.

Treatment of rangeland vegetation is common. This activity is having or would have limited direct negative impacts at specific locations on select streams containing sediment-intolerant fish and other aquatic species. However, these impacts are and would continue to be generally short term and of limited scope and intensity. Fish and other aquatic wildlife are considered upfront in site-specific project identification and planning, and impacts are mitigated. All vegetation treatments are designed with long-term watershed improvement and meeting Standards 3 and 4 as the ultimate goal. Despite the potential for short-term impacts, rangeland vegetation management has long-term benefits to fish and other aquatic wildlife by improving upland watershed health and maintaining productive habitats that provide adequate vegetation ground cover. This allows for natural water infiltration and absorption rates and limited erosion potential. Impacts from rangeland vegetation management would be generally the same under all alternatives.

Given their biology, feeding habits, habitat needs, and niche in the ecosystem, sediment-tolerant species can persist in the face of actions that increase sediments to streams and rivers. However, habitat alteration and water quality alteration can impact these species in ways similar to those of sediment-intolerant species.

**Impacts from Vegetation Management—Riparian.** Riparian vegetation management is and would continue to be largely beneficial to aquatic species. Protective stipulations that specifically protect riparian habitats include NSOs 3, 5, and 6 and CSUs 2, 3, and 6. These stipulations directly and indirectly benefit aquatic species and their habitats within all watersheds that contain riparian vegetation. Other stipulations either directly or indirectly protect aquatic species and their habitats from other resource uses. In addition,

BLM_0016540

riparian vegetation management is subject to Colorado Public Land Health Standard 2 (BLM 1997a), which helps guide riparian management on public lands. In areas where Standard 2 is being met, there is reduced potential impact on fish and other aquatic wildlife from offsite erosion and increased sedimentation because healthy, robust riparian areas buffer streams from identified impacts.

Vegetation treatments in riparian areas could include the use of herbicides, fire, or mechanical removal of exotic plant species, such as tamarisk or Russian olive. In select areas where proactive restoration of riparian areas is occurring or would occur, there is potential for short-term negative impacts on aquatic species, including habitat alteration, increased sediment loading and turbidity, and reduction or loss of streamside vegetation and cover. The scope of impact would be very limited because BLM lands contain very few infestations of tamarisk and Russian olive. The impacts from habitat alteration and increased sediment loading and turbidity are addressed in detail in the section on impacts from forest and woodland management. Loss or reduction of streamside vegetation cover is addressed in detail below. Tamarisk removal would result in losses or reductions of streamside vegetation cover, which would impact fish in the short term. However, this activity has or would have long-term benefits to aquatic species because native vegetation is or would be restored, improving streambank stability, water absorption and infiltration rates, and habitat diversity. Willow planting, exclosure fencing, and upland water development has or would result in some short-term effects of habitat alteration, loss of vegetation, and increased sedimentation and turbidity. However, these actions would have long-term benefits to aquatic species, similar to tamarisk removal.

**Loss or Reduction of Streamside Vegetation Cover.** Loss or reduction of streamside riparian vegetation can alter the nutrient dynamics of the aquatic ecosystem. In areas where riparian vegetation has been depleted or lost, a shift in energy inputs from riparian organic matter to primary production by algae and vascular plants has been predicted (Minshall et al. 1989) and observed (Spencer et al. 2003). The increased solar radiation that results from the loss of streamside (or poolside) vegetation causes temperatures, light levels, and autotrophic production (i.e., plants and algae) to increase. This change in a stream's food web can alter the composition of food and thus energy sources that are available to resident fish and aquatic invertebrates. Terrestrial insect diversity and productivity also decrease with reductions in streamside vegetation, which also affects food availability for resident fish. Increased stream temperatures affect trout by reducing their growth efficiency and increasing their likelihood of succumbing to disease.

Prolonged and excessive utilization of streamside/riparian vegetation can also result in increased peak flows as vegetation is not sufficient in root mass, size, or abundance to sufficiently slow stream velocities. In addition, the loss of streamside vegetation reduces water percolation and infiltration, leading to unnaturally high and frequent runoff. This can result in accelerated bank erosion and sloughing, increased siltation, elevated stream temperatures, widened and braided stream channels, and loss of overhanging banks, all of which are important factors affecting trout productivity in a given stream (Gardner 1950; Armour 1977; Behnke 1979; Claire and Storch 1977; Glinski 1977; Kaufman et al. 1983). The results of a study by Gunderson (1968) indicated that the weight per acre of brown trout (*Salmo trutta*) was 31 percent higher in unaltered stream sections. It was noted that this was attributed to there being a narrower, deeper channel system, more favorable composition and distribution of water types, and more cover in the unaltered section because the riparian vegetation had been preserved.

Loss of shoreline vegetation at amphibian breeding sites can reduce shade and increase water temperatures. Reduced food sources can also result with the loss or reduction of riparian vegetation. Reduced vegetation

BLM_0016541

can allow for more sediment to enter breeding sites as the filtering properties are reduced. Reduced cover can also increase predation, as amphibians occupy areas with less hiding cover and are more exposed to predators.

Risk of identified impacts from other resource uses is reduced under this alternative. Proactive riparian management impacts would be the same under all alternatives. Sediment-tolerant species would benefit in the long term from riparian vegetation management that protects or enhances riparian resources. Short-term impacts would be similar to those for sediment-intolerant species.

**Impacts from Vegetation Management—Weeds.** Weed management is conducted under the recently completed CRVFO integrated weed management plan and EIS (BLM 2009e), which is tiered to the programmatic EIS for 17 western states (BLM 2007m). Analysis of aquatic species and their habitats was addressed in both documents, and each set the sideboards on treatment of weeds within and near aquatic habitats. Depending on the type of weed treatment and exception criteria, some of the current NSOs would protect fish and other aquatic wildlife. In addition, weed management is subject to the Colorado Public Land Health Standards 2, 3, and 4 (BLM 1997a), which help guide vegetation management on public lands. In areas where these standards are being met, there is reduced potential impact on fish and other aquatic wildlife from offsite erosion and increased sedimentation associated with degraded weed-infested habitats.

Noxious and invasive weed management includes herbicide use, biological controls, and mechanical or manual treatments in weed-infested areas. In areas where proactive weed management in the form of treatments does or would occur, there is potential for short-term negative impacts on aquatic species, including loss or reduction of streamside vegetation cover (which is treated for tamarisk, Russian olive, or other weedy riparian species) and increased sediment loading and turbidity from loss of vegetation before establishment of desirable species. These impacts are addressed in detail in the section on impacts from forest and woodland management and the section on impacts from riparian vegetation management. All weed treatments would have long-term benefits to fish and other aquatic species and their habitats as native vegetation is or would be restored, improving watershed health and in select cases streambank stability, water quantity, and habitat diversity. Impacts from weed management would be the same under all alternatives.

Sediment-tolerant species would benefit in the long term from weed vegetation management that protects or enhances riparian and upland habitats. Short-term impacts would be similar to those for sediment-intolerant species.

**Impacts from Terrestrial Wildlife Management.** Wildlife habitat management is or would be largely beneficial to fish and other aquatic wildlife. Depending on the type of wildlife project or action, and stipulation exception criteria, the current fisheries and aquatic species protective measures would help to protect aquatic species. Several wildlife-specific NSOs collectively limit ground-disturbing activities from primarily upland habitat, which indirectly helps to minimize impacts on aquatic species and their habitats. In addition, wildlife habitat management is subject to the Colorado Public Land Health Standards 2, 3, and 4 (BLM 1997a), which help guide habitat management activities on public lands. In areas where these standards are being met, there is reduced potential impact on fish and other aquatic wildlife.

Habitat manipulations, such as prescribed burns and mechanical and chemical controls, are typically used to improve habitat for wildlife. In areas where proactive wildlife habitat management in the form of vegetation treatments or projects does or would occur, there is potential for short-term negative impacts on aquatic species, including habitat alteration, loss or reduction of streamside vegetation cover, and increased sediment

BLM_0016542

loading and turbidity. These effects are described in detail in the sections on impacts from forest and woodland management and impacts from riparian area management. Treatments for tamarisk, Russian olive, or other weedy species would result in losses or reductions of streamside vegetation, which could impact fish in the short term. Upland vegetation treatments intended to improve wildlife habitat are varied and would continue to occur in all vegetation types. These projects often result in some vegetation reduction or removal intended to stimulate re-growth, change species composition or diversity, and improve upland watershed health. In some cases, ground disturbance is minimal; in others it is more substantial. In the short-term, increased sediment loading and turbidity would result until desired vegetation is established in treated areas. Over the long-term, improved watershed health would benefit aquatic species as soil stability is increased, erosion potential is reduced, and water absorption and infiltration rates are improved.

Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species, except that actions that increase sediment loading in the short term would have minimal impact.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Management of special status fish and other aquatic wildlife species and their habitats would impact fish and other aquatic wildlife generally the same as that described in the section on impacts from fisheries and aquatic wildlife. In select areas where competitive or non-native fish or other aquatic species are impacting native special status species, there is potential for actions that result in the reduction or removal of selected target species, which would have direct negative effects on local populations of these species (e.g., brook trout, bullfrogs). Select habitat treatments that target special status species could impair or reduce habitats for non-target species.

Impacts under this alternative would be similar under all alternatives with regard to proactive fish management projects. Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species, except that actions that increase sediment loading in the short term would have minimal impact. In selected areas where competitive or non-native fish or other aquatic species are impacting native species, there is potential for actions to reduce or remove specific species, which would have direct negative effects on local populations of some sediment-tolerant species (e.g., white suckers).

**Impacts from Special Status Plants and Terrestrial Wildlife Management.** Management of special status plants and terrestrial wildlife species and their habitats impacts or would impact fish and other aquatic wildlife the same as previously described in the impacts from the wildlife management section and the vegetation management sections (forest and woodland, rangeland, riparian, weeds).

This alternative contains some limited scope NSOs for special status plants and terrestrial wildlife that would indirectly help to protect aquatic species from other resource uses. Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species, except that actions that increased sediment loading in the short-term would have minimal impact.

**Impacts from Wildland Fire Management.** The GSFO Fire Management Plan (FMP) manages fire as outlined in the current RMP. The FMP contains in-depth analysis of impacts to fish and other aquatic species, and mitigation measures required to conduct fire management activities. This analysis and associated mitigations are incorporated by reference as addressed in the FMP and are the same for all alternatives. In summary, fire suppression could result in loss or reduction of streamside vegetation cover, increased sedimentation and turbidity, water quality alteration, and water depletions.

84 | 84
| 84

84BLM_0016543

**Impacts from Forestry Management.** Forestry and woodland management actions include the harvesting of firewood, poles, Christmas trees, pine nuts, timber, and seeds. Commercial forestry (e.g., timber harvests and sales) is restricted to upland forests and includes a variety of prescriptive silviculture applications. These activities could include the use of heavy equipment, helicopters, chemical applications, road construction, and culvert installation. Depending on the type of treatment and the need for road construction, many of the current protective stipulations for fisheries and aquatic species would help to reduce impacts from forest management. However, some forest management practices result in minimal ground disturbance and would not necessarily be prohibited by the NSOs in those protective measures. Forested vegetation is generally associated with coldwater fish, mainly trout and sculpin species. All vegetation management is subject to the Colorado Public Land Health Standards 3 and 4 (BLM 1997a), which help guide vegetation management on public lands. Where these standards are being met, active management of forest and woodland vegetation is having minimal impact on fish and other aquatic wildlife. Impacts can be and are mitigated during site-specific analysis of individual treatment actions.

Forest management is limited in scope and application, and a limited number of treatments have occurred to date. However, with ever-increasing pine beetle issues, it is likely that select treatments will increase in number and scope. Where this activity is occurring or would occur, limited direct negative impacts at specific locations on select streams would result, including increased sediment loading and turbidity and habitat alteration. These impacts are addressed in detail in the section on impacts from forest and woodland management. However, in the absence of new road construction, these impacts are or would be generally short term and of limited scope and intensity. Treatments are designed with long-term watershed improvement and meeting of Standard 3 and 4 as the ultimate goal, and prescriptive treatments would have long-term benefits to fish and other aquatic wildlife by improving upland watershed health and maintaining productive habitats that allow for natural water infiltration and absorption rates, improved vegetation ground cover, and limited erosion potential.

Where new road construction is or would be associated with select treatments, impacts associated with erosion and sedimentation and turbidity would be chronic and long term at specific areas, and would result in increased risk of identified impacts on coldwater trout and other sediment-intolerant aquatic species. In addition, increased risk of direct mortality on amphibians would result where road density and use increases. New roads could also fragment habitat and limit connectivity between preferred and limited breeding habitats for select amphibian species.

This alternative actively manages 17,900 acres of forested habitats, the least number of acres amongst the alternatives. The broadest scope of impacts would be similar under all alternatives, but slightly reduced under this alternative and would still be site specific and short term with long-term benefits. Given their biology, feeding habits, habitat needs, and niche in the ecosystem, sediment-tolerant species can persist in the face of actions that increase sediments to streams and rivers. Sediment-tolerant species would be minimally affected by forest management as currently conducted.

**Impacts from Livestock Grazing Management.** None of the current protective stipulations for fisheries and aquatic species applies specifically to livestock grazing. Under Alternative A, a total of 494,400 acres of BLM land are open and available for livestock grazing providing for 39,200 AUMs. Livestock grazing is subject to the Colorado Public Land Health Standards (BLM 1997a), which help guide grazing management on public lands. Where the guidelines are being followed and the standards are being met, livestock grazing is

BLM_0016544

having minimal impact on fish and other aquatic wildlife. Impacts can be and are mitigated during site-specific analysis of individual-term grazing permit renewals where problem areas are identified and addressed.

The primary potential impacts on fish and other aquatic species associated with livestock grazing is habitat alteration, loss or reduction of streamside vegetation cover, water quality alteration, increased sediment loading and turbidity, and water depletion. These impacts, except water depletion and water quality alteration, are discussed in detail in the sections on impacts from forest and woodland management, vegetation management—riparian, and impacts from livestock grazing management. Where livestock grazing is occurring in or near occupied habitats of trout and sculpin species and mountain whitefish, there is increased risk of the identified impacts to occur due to their requirement for cold, clear, well-oxygenated water.

Given their biology, feeding habits, habitat needs, and niche in the ecosystem, sediment-tolerant species can persist in the face of actions that increase sediments to streams and rivers. Therefore, impacts would generally be similar to those for sediment-intolerant species.

*Water Depletions.* Stream and river flows and reservoir and pond volumes are generally climate dependent but water diversions and impoundments play a large role with regard to localized flow regimes and water volumes . The primary actions and activities that result in water depletions include construction of water impoundments (stock ponds, reservoirs), water diversions for agricultural and domestic uses, water use associated with natural gas development, and fire suppression. Reduced water flow or volume directly correlates to a loss of wetted habitat for fish and amphibians.

Reduced flow can result in increased water temperatures, reduced food supplies, reduced habitat complexity and diversity, and a loss of carrying capacity. Important microhabitats, such us spawning bars and pools, can be lost or altered. Reduced flows can result in habitat fragmentation and limit movement of cutthroat between preferred habitats. Holding habitats (pools) can be reduced in size and become less usable by fish or amphibians. Fish that congregate in limited pool habitats for long periods can incur increased stress and susceptibility to disease.

Breeding ponds that lose water volume can become unusable by amphibian species. Increased predation can result due to less wetted habitat available for evading predators. Reduced pond volumes can cause increased risk of anoxia (severe oxygen depletion) for northern leopard frogs. Bradford (1983) observed that anoxia was more severe in shallow lakes or ponds (i.e., less than 4 meters deep), and nearly all adult frogs died in these bodies of water in some winters.

*Water Quality Alteration.* The effects of changes in water quality are well documented on trout species. Trout prefer cold water, neutral pH, and high dissolved oxygen levels in which to thrive. With increased nutrient input and limited summer and fall stream flows, eutrophication can result. This is the condition in which the increase of mineral and organic nutrients has reduced the dissolved oxygen levels within the stream, producing an environment that favors plant life over animal life. In other words, the mineral and organic nutrient levels being inputted into these streams are greater than the streams' flows can dilute or carry through the system. The symptoms of this are often seen as large algae blooms that form dense patches of algae within a stream. This further depletes oxygen levels and reduces habitat quality for resident fish.

Such activities as natural gas development, road use, and other construction can alter water quality through spills, leaks, or vehicular accidents. Where these could occur near occupied cutthroat and amphibian habitat,

September 2011          *Colorado River Valley Field Office – Draft RMP Revision EIS*          4-193
*Chapter 4, Environmental Consequences*

BLM_0016545

impacts would be acute and could result in direct mortality. Use of chemicals for weed treatments, fire suppression, or other vegetation management could impact aquatic species and their habitats by overspray and drift to nontarget areas and habitats. This can result in direct mortality, reduced feeding, loss of prey species, and habitat avoidance. Grazing by cattle has also been reported to affect water quality (Buckhouse and Gifford 1976), water chemistry (Jefferies and Klopatek 1987), and water temperature (Van Velson 1979). The changes are subtle over time (Elmore and Beschta 1987) but tend to have a profound effect on aquatic ecosystems (Kauffman and Krueger 1984).

Livestock grazing is having or would have direct negative impacts at specific locations on select streams containing sediment-intolerant aquatic species. This is occurring in areas where the Colorado Public Land Health Standards are not currently being met. These standards ensure that sufficient residual vegetation in upland and riparian areas remain to protect soils and streambanks from wind and water erosion and to maintain stream stability.

In areas where range improvements associated with livestock management are constructed, such as fencing and upland water developments, there is potential for short-term negative impacts on aquatic species, including habitat alteration, increased sediment loading and turbidity, and water depletions. Where new road construction is needed to access range improvements, these improvements can create chronic long-term point sources for increased sedimentation and turbidity. Stock ponds are often designed to capture water that would otherwise feed streams. This results in water depletion impacts. Upland water developments also tend to concentrate livestock use, which can negatively impact amphibians as sedimentation and turbidity increases and shoreline vegetation is lost. However, many of the these range improvements have or would have long-term benefits to fish and other aquatic species as livestock distribution is improved or would be improved, grazing is reduced along streams, and, in some cases, amphibian habitat is created by stock pond creation.

Impacts under this alternative would be slightly increased in scope and intensity compared to the other alternatives given the higher number of acres and AUM figures.

**Impacts from Recreation and Visitor Services Management.** Under Alternative A, a total of 60,400 acres are managed in eight SRMAs, 60,700 acres are managed as RMA's, and the remaining acres are managed as ERMAs. Protective stipulations associated with these include NSO-16, which limits large surface-disturbing activities on 22,300 acres of five SRMAs, and NSO-17, which limits large surface-disturbing activities on 64,200 acres within eight RMAs. In addition, the current protective measures either directly or indirectly protect fish and other aquatic wildlife by limiting ground-disturbing activities from other resource uses. However, identified protective measures have limited effectiveness because they apply to managed recreation and not to dispersed recreation.

Recreation management can impact aquatic species and their habitats in many ways. Human activity along or within streams and rivers, and around or within ponds, lakes, and reservoirs can result in habitat alteration, reduced or loss of riparian vegetation cover, increased sedimentation and turbidity, and water quality alteration. These impacts are discussed in detail in the sections on impacts from forest and woodland management, impacts from vegetation management—riparian, and impacts from livestock grazing management. Specifically, user created trails, road and OHV use, camping, fishing, hunting, mountain biking, hiking, wildlife watching, and boating can all result in these impacts along and within aquatic habitats.

BLM_0016546

Under Alternative A, a total of 86,500 acres are protected by an NSO, which limits ground-disturbing activities in select SRMAs and RMAs. This is substantially more protection than under other alternatives. This alternative provides the most protection, be it direct or indirect, to aquatic species and their habitats from other resource uses.

Visitor use is expected to increase within the planning area under all alternatives. All of the identified impacts associated with recreation would be expected to increase as well. Under current management, more intensively managed recreation opportunity is provided within the SRMAs where specific recreational pursuits are identified and managed. However, these areas are not managed to the exclusion of other recreational uses. ERMAs are the more traditional dispersed recreational areas, where no one use is necessarily favored or targeted over another, and BLM management is largely custodial, with no specific recreation prescriptions identified. In areas where OHV use is occurring or would increase, impacts, including sediment and turbidity, habitat alteration, loss or reduction of riparian vegetation cover, and water quality alteration, would be long term and chronic. Impacts from managed recreation can be and are mitigated during site-specific analysis of individual actions. This is done primarily by the issuance of SRPs used to control some visitor use and reduce resource conflict.

Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant fish, except that increased sediment and turbidity impacts would be negligible because these species can generally persist in the face of actions that increase sediments to streams and rivers.

**Impacts from Comprehensive Trails and Travel Management.** Under current management, a combined 294,300 acres are open to year-round off-road travel. An additional 4,300 acres are open seasonally to off-road travel. This allows for proliferation of user-created routes and increased risk, scope, and intensity of identified impacts. In known OHV concentration areas, and other areas with high road and trail densities, impacts on site-specific streams and fish species are further intensified. The current protective stipulations either directly or indirectly protect fish and other aquatic wildlife from some road- and trail-related impacts, but these have limited utility as they apply to managed recreation management activities and not dispersed activities.

Trail and travel management impacts fish and other aquatic species in many ways. The mere presence of trails and roads within watersheds containing aquatic species can cause habitat alteration, loss or reduction of streamside vegetation cover, increased sedimentation and turbidity, and water quality alteration. The resulting impacts are discussed in detail in the sections on impacts from forest and woodland management, impacts from vegetation management—riparian, and impacts from livestock grazing management. Roads and trails provide means of water conveyance, which accelerates flow velocities and increases erosion and offsite soil movement and ultimately sedimentation and turbidity. These routes also compact soils, which reduce water absorption and infiltration rates and increase the peaks of runoff flows. Where motorized and, in some cases, mechanized use are high and or increasing, erosion potential is increased. These impacts are amplified where user-created routes and OHV use is occurring or increasing. In areas of high road and trail density with high use, there is increased risk of killing amphibian species, especially during peak movement periods during breeding seasons. These routes can also fragment habitat and limit connectivity between limited breeding pond habitats for amphibians.

Visitor use is expected to increase within the planning area under all alternatives, which would probably result in increased trail and road use. All of the identified impacts associated with trail and road management would

BLM_0016547

be expected to increase as well. In areas where OHV use is occurring or would increase, impacts such as sedimentation and turbidity, soil compaction, loss of riparian vegetation and cover, habitat alteration, and water quality changes would be long term and chronic. Current management would have the greatest risk of increased magnitude and intensity of negative impacts, compared to other alternatives where OHV use is eliminated and travel is restricted to designated routes.

This alternative has the greatest risk, magnitude, and intensity of identified impacts on aquatic species and their habitats. This is due primarily to the allowance of off-road vehicular use, and closure of only limited numbers of select roads and routes. Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species, except that increased sediment and turbidity impacts would be negligible because these species can persist in the face of actions that increase sediments to streams and rivers.

**Impacts from Lands and Realty Management.** Fish and other aquatic organisms could be impacted, positively or negatively, by lands and realty actions. Impacts would be similar for sediment-intolerant and sediment-intolerant species, except that the latter would be less affected by actions that result in increased sedimentation and turbidity.

*Land Tenure Adjustments.* The effects of land tenure adjustment on aquatic species are determined through site-specific environmental analysis. The current plan identifies those parcels of public land available for disposal, and any disposal or acquisition of lands could result in either a loss or gain of aquatic habitat. This could result in either benefits to or impacts on aquatic wildlife. Under the current plan, there are 550,500 acres of lands identified for retention.

*Withdrawals.* Under Alternative A, a total of 34,600 acres would be withdrawn from locatable mineral exploration and development. Current management allows for the most potential impact of locatable mineral exploration and development, with the least amount of land withdrawn. This would increase the risk of habitat and water quality alteration and increased sediment loading and turbidity impacts, as well as the scope and intensity of these impacts, which are addressed in detail in the sections on impacts from forest and woodland vegetation and impacts from livestock grazing management.

*Rights-of-Way and other Land Use Authorizations.* Under the current plan, protective stipulations for fisheries and aquatic species apply to most ROWs. Impacts can be and are mitigated during site-specific analysis of individual actions.

Construction and maintenance associated with ROWs or other land use authorizations (such as permits, leases, and easements) can affect aquatic species by habitat alteration, loss or reduction of streamside vegetation cover, water quality alteration, increased sediment loading and turbidity, and water depletions. These impacts are discussed in detail in the sections on impacts from forest and woodland management section and impacts from livestock grazing management. Specifically, activities that result in ground disturbance and the removal of native vegetation for construction of ROWs can have short- or long-term negative effects on aquatic species and their habitats. Collectively, all of these activities have the potential to provide for the offsite movement of soils and increased sediment loading and turbidity into nearby water bodies. In addition, they serve as niches in which invasive weedy vegetation can take hold. This reduces watershed health and results in poor soil retention, increased runoff, and poor water infiltration and absorption. Increased miles and densities of roads are a concern, as they are a long-term chronic source of erosion and sedimentation, because they serve as water collection and conveyance corridors to live streams

BLM_0016548

and ephemeral drainages that ultimately feed live streams. These routes can also impact amphibians by direct mortality from vehicular interactions and by reducing habitat connectivity to limited breeding pond habitats.

Identified impacts would be similar across all of the alternatives. This alternative contains 101,300 acres of avoidance areas and 20,800 acres of exclusion areas for communication facilities and utilities, primarily in the existing WSAs. In addition, several of the current fisheries and aquatic species protective measures would apply to select ROWs and help to reduce impacts on aquatic species and their habitats.

**Impacts from Coal Management.** Current management allows for 28,000 acres of the federal mineral estate as open to further consideration for coal leasing. However, of that amount, 1,500 acres was found to be unacceptable for coal leasing. This will reduce coal mining potential and provide long-term benefits to fish and other aquatic species across broad portions of the planning area. Actions calling for an NSO stipulation on surface coal mining would result in the reduced potential for surface disturbances unrelated to coal mining.

Management of coal resources could impact fish and other aquatic species in many ways. Coal mining within watersheds containing fish can cause habitat alteration, increased sedimentation and turbidity, water quality alteration, and water depletions. These impacts are discussed in detail in the section on impacts from forest and woodland management, the section on impacts from riparian vegetation management, and the section on impacts from livestock grazing management.

Large-scale coal mining is not currently being conducted. If activity were to increase under current management, the impacts discussed above would occur at specific locations. Site-specific planning would help to mitigate and reduce negative impacts on fish and other aquatic wildlife. The anticipated risk of this activity is relatively low under all alternatives. Sediment-tolerant species would be impacted in ways similar to sediment-intolerant species, except that increased sediment and turbidity would have negligible impacts on the former.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Throughout this and all alternatives, 95 percent of the high potential area (the planning area west of the Grand Hogback) has already been leased for natural gas development. Depending on the time of lease, any number of protective stipulations may apply to specific lease parcels. Where lands have been leased since completion of the Supplemental 1999 Oil and Gas Leasing EIS, the current fisheries and aquatic species protective stipulations would apply. Under current planning, several of the protective stipulations help to minimize or eliminate impacts on fish and other aquatic wildlife. Where natural gas development is occurring or would occur in or near occupied habitats of trout and sculpin species, there is increased risk of the identified impacts to occur, due to these species' requirement for cold, clear, well-oxygenated water.

The primary potential impacts on fish and other aquatic species include water quality alteration, water depletions, and increased sediment loading and turbidity. These impacts are addressed in detail in the sections on impacts from forest and woodland management and impacts from livestock grazing management. Specifically, of primary concern are activities that result in ground disturbance and the removal of native vegetation for construction of well pads, roads, pipelines, compressor and relay stations, settling ponds, geophysical seismic exploration, and various assorted infrastructure. Collectively, all of these activities have the potential to provide for the offsite movement of soils and increase sediment loading and turbidity into nearby water bodies. In addition, they serve as niches in which invasive weedy vegetation can take hold. This reduces watershed health and results in poor soil retention, increased runoff, and poor water infiltration and

BLM_0016549

absorption. Increased numbers and densities of roads are a concern, because they are long-term chronic point sources of sediment input and serve as water collection and conveyance corridors to live streams and ephemeral drainages that ultimately feed live streams. Impacts are amplified and more acute in areas where natural gas development is occurring in small discrete watersheds containing these species. Increased road density and use can impact amphibians by direct vehicular mortality and fragmentation of habitats that limit accessibility to seasonal breeding habitats.

Generally, where proper and timely reclamation is occurring at well pad and pipeline sites, and where proper road construction and maintenance is occurring, impacts from offsite soil movement and sediment and turbidity are minimized. Where reclamation and road maintenance practices have been poor or neglected, the sediment loading and turbidity impacts discussed in detail are occurring.

Under current management, oil and gas development is having direct negative impacts at site-specific portions of select streams on aquatic species throughout the western quarter of the planning area. Under this alternative, a combined 679,200 acres would be open for fluid minerals leasing, resulting in an anticipated 3,300 acres of surface disturbance, including pads, access roads, pipelines, and offsite facilities. With the exception of Alternative D, this alternative would allow for the most oil and gas activity and largest number of acres of disturbance. Given the protective measure in place on a given lease, the identified impacts may be reduced at specific locations but are still occurring over a broad area. Several COA-level mitigation and minimization measures are used to reduce identified impacts and are listed in Appendix G. Identified impacts are long term and chronic in areas where extensive road construction has and is occurring, associated specifically with these activities. Approximately 99 percent of all of the anticipated activity would continue to occur in the high-potential areas where activity is being conducted.

Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species, except that increased sediment and turbidity impacts would be negligible.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The current fisheries and aquatic wildlife protective stipulations would apply to all of these activities, except locatable minerals activities, which are subject to federal laws and regulations under the General Mining Law of 1872. Under Alternative A, 34,600 acres would be recommended for withdrawal for these activities. The remaining acres would be open to these activities, subject to site-specific analysis. Locatable and salable mineral management could impact fish and other aquatic species in many ways, including habitat alteration, increases in sediment load and turbidity, loss of riparian vegetation cover, and water quality alteration. These impacts are discussed in detail in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management. In particular, gravel pits located in proximity to occupied rivers and streams would have a higher risk to aquatic species and their habitats. Water quality is a major concern with certain mineral materials mining practices, and, depending on location and scope, could have site-specific direct negative impacts over the long term. This alternative would have the greatest risk to aquatic species and their habitats because the fewest acres would be withdrawn from consideration of these activities.

Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species, except that increased sediment and turbidity impacts would be negligible because these species can persist in the face of actions that increase sediments to streams and rivers.

BLM_0016550

**Impacts from Renewable Energy Management.** According to the US Department of Energy, National Renewable Energy Laboratory, the planning area has a low potential for wind and solar energy. Aquatic species were addressed in the Final Programmatic Environmental Impact Statement on Wind Energy Development (BLM 2005b). In summary, these impacts fit into the categories of habitat alteration and increased sediment and turbidity. Under Alternative A, applications for solar and wind energy exploration and development would be considered on a case-by-case basis. Any impacts on special status aquatic species would depend on the location and type of project proposed. Current protective measures for fisheries and aquatic species would help reduce potential impacts. Impacts would be the same across all alternatives. Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species.

**Impacts from Areas of Critical Environmental Concern (ACEC) Management.** Under the current plan, the management of six ACECs benefits fish and other aquatic species and their habitats. Although managed for select resource values, the six existing ACECs protect 27,000 acres of habitat by limiting ground disturbance by a protective NSO stipulation. This provides protection to fish and other aquatic species and their habitats from various identified impacts from other resource uses. Sediment-tolerant species would benefit from current ACEC management, which is similar to the sediment-intolerant species.

**Impacts from Wilderness and Wilderness Study Areas (WSA) Management.** The continued management of three WSAs would benefit fish and other aquatic wildlife. These WSAs encompass 27,700 acres and, with the prescriptive management, would limit human uses and exclude ground disturbance to the benefit of fish and other aquatic species and their habitats.

Direction for managing fish and other aquatic wildlife in WSAs is prescribed by the IMP, which allows stocking of native fish species within their historical ranges or exotics that were being stocked before October 21, 1976, and introductions of threatened, endangered, or other special status species native to North America within their historic ranges. Permanent installations could be permitted to maintain or improve conditions for fish, if the benefiting native species enhance wilderness values. All proposed actions must be scrutinized to determine if the action is necessary to protect the physical, biological, and cultural resources, as well as the quality of the wilderness experience. This alternative provides slightly less protection than other alternatives because the Eagle Mountain WSA is not included.

A large number of the fish found in the planning area, such as speckled dace, fathead minnow, carp, white sucker, and channel catfish, are generally considered sediment-tolerant fishes. These species would benefit from continued WSA management.

**Impacts from Wild and Scenic Rivers (WSR) Management.** Under current management, all 26 eligible stream segments would be managed under interim protection to preserve the free-flowing nature, ORVs, and tentative classification. Aquatic species, some of which are identified ORVs, would benefit from continuing these protections because surface-disturbing activities from other resource uses would be limited along these streams. However, in many cases, the protections afforded aquatic species under WSR interim management would be additive to existing protective measures, except that WSR protections would be longer term until such time as new planning efforts were initiated, or Congress officially acts on these eligible stream segments.

This alternative would be the most protective, although this alternative would provide protections for a lesser duration than other alternatives. Sediment-tolerant species would benefit in ways similar to the sediment-intolerant species.

BLM_0016551

_Alternative B (Preferred Alternative)_

Impacts to fisheries and aquatic wildlife from soils management, forest and woodland vegetation management, rangeland vegetation, weed management, wildland fire management, coal management, and renewable energy management would be the same as or similar to Alternative A. Impacts from management of all other resources and uses would be as described below.

**Impacts from Fisheries and Aquatic Wildlife Management.** Fisheries and aquatic wildlife management would be largely beneficial to aquatic species and their habitats, similar to Alternative A, but with some exceptions. Under this alternative, NSO-15 would protect all fish-bearing streams by limiting ground-disturbing activities within 100 meters on either side of the stream edge. Stipulation TL-7 would reduce impacts associated with in-channel work during important spawning periods. Depending on the type of fisheries project or action, and stipulation exception criteria, the remaining protective measures for fisheries and aquatic species under Alternative B would help to limit impacts on aquatic species from some activities.

In select areas where proactive fish habitat management in the form of projects would occur, impacts could include site-specific and short-term habitat alteration, loss or reduction of streamside vegetation cover, and increased sediment loading and turbidity. Impacts would generally be the same for sediment-tolerant and sediment-intolerant species. Where (in cooperation with CDOW and USFWS biologists) non-native fish or other undesirable aquatic species are removed, selected species would be negatively impacted, to the benefit of desirable species.

**Impacts from Water Resource Management.** Under Alternative B, water resource management would benefit aquatic species. However, this alternative includes additional protective stipulations specifically to protect water quality, including NSOs 3, 4, and 5. These NSOs would limit ground-disturbing activities on all hydrologic features (perennial, ephemeral, and intermittent streams, lakes, wetlands, fens, and springs) within the planning area. In addition, other protective stipulations identified for Alternative B either directly or indirectly protect aquatic species and their habitats from other resource uses.

This alternative includes protection of the streamside management zone (NSO-5) to protect all hydrological features and is more protective than Alternative A. It could allow for more water quality alteration, particularly in ephemeral and intermittent drainages. Sediment-tolerant species would generally benefit from water management in ways similar to those of sediment-intolerant species.

**Impacts from Riparian Vegetation Management.** Under this alternative impacts would be similar to Alternative A where riparian vegetation management would be largely beneficial to these aquatic species and their habitats. However, riparian protective measures under this alternative are by a CSU instead of an NSO, as under Alternatives A. This reduced protection could result in more allowable disturbance within riparian habitats, but when coupled with the other protective stipulations covering the same general habitats (primarily NSO-5 and 15), aquatic species and their habitats would still be largely protected. Impacts and benefits would generally be the same as for sediment-intolerant species, except that actions increasing sediment transport to streams would have negligible impacts on these species.

**Impacts from Wildlife Management.** Wildlife habitat management under this alternative would be largely beneficial to fish and other aquatic wildlife. Depending on the type of wildlife project or action and stipulation exception criteria, the protective measures identified for Alternative B above would help to limit impacts on aquatic species and their habitats. In addition, this alternative includes several wildlife, special status plant, and

BLM_0016552

special status wildlife NSOs, which would collectively protect approximately 113,700 acres of upland habitats from surface-disturbing activities. This in turn would indirectly help protect aquatic species and their habitats from offsite sedimentation and turbidity from other resource uses. Wildlife habitat management under this alternative would be more protective than under Alternative A. Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species, except that actions that increase sediment loading in the short term would have minimal impact.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Management of special status fish and other aquatic wildlife species and their habitats would benefit and impact fish and other aquatic wildlife generally the same as described in the section on impacts from fisheries and aquatic wildlife. In select areas, where competitive or non-native fish or other aquatic species are impacting native or special status aquatic species, there is potential for actions that result in the reduction or removal of selected undesirable species. This would have direct negative effects on local populations of these species (e.g., brook trout, bullfrogs). Selected habitat treatments that target special status species could impair or reduce habitats for nontarget species.

Sediment-tolerant species would be impacted in ways similar to those for sediment-intolerant species, except that actions increasing sediment loading in the short term would have minimal impact. In selected areas where competitive or non-native fish or other aquatic species are impacting native special status species, there would be potential for the reduction or removal of undesirable species. This would have direct negative effects on local populations of these species (e.g., white suckers, smallmouth bass).

**Impacts from Special Status Plants and Terrestrial Wildlife Management.** Management of special status plants and terrestrial wildlife species and their habitats would benefit and impact fish and other aquatic wildlife, the same as previously described in the section on impacts from wildlife management and the sections on impacts from vegetation management (forest and woodland, rangeland, riparian, and weeds). Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species, except that actions that increase sediment loading in the short term would have minimal impact.

**Impacts from Forestry Management.** Impacts on fisheries and aquatic wildlife from forestry management under Alternative B would be similar to Alternative A; however, short-term impacts would be reduced in scope, as this alternative would seek to manage fewer acres of forest and woodland habitat. In addition, Alternative B has more protective measures than under Alternative A and would probably limit the scope of identified impacts of forest treatments. Sediment-tolerant species would be minimally affected by forest management.

**Impacts from Livestock Grazing Management.** None of the protective stipulations for fisheries and aquatic wildlife under Alternative B applies specifically to livestock grazing. Impacts under this alternative would be similar to Alternative A, but to a lesser degree due to the fewer acres and AUMs that would be designated as open and available for livestock grazing. Impacts would generally be the same for sediment-tolerant species as for sediment-intolerant species, except that actions increasing sedimentation would have negligible impacts.

**Impacts from Recreation and Visitor Services Management.** Under Alternative B, a total of 51,000 acres of land would be managed in six SRMAs, and the remaining acres would be managed as ERMAs. The primary protective stipulation associated with the SRMAs is NSO-46, which protects lands within the six

BLM_0016553

SRMAs by limiting large ground-disturbing activities from other resource uses. This directly and indirectly helps to limit impacts on aquatic species and their habitats. In addition, the protective stipulations for fisheries and aquatic wildlife under Alternative B would limit ground-disturbing activities from other resource uses. All of these protective measures have limited effectiveness because they would apply to managed recreation and not dispersed activities. Dispersed recreation would continue to occur throughout the planning area.

Other impacts would be similar to Alternative A, but this alternative provides less protection from other resource uses. Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species, except that increased sediment and turbidity impacts would be negligible.

**Impacts from Comprehensive Trails and Travel Management.** Under this alternative, no land would be open to off-road travel. A total of 467,600 acres would be limited to designated routes, and 37,300 acres would be closed. The fisheries and aquatic wildlife protective stipulations under Alternative B would directly and indirectly protect fish and other aquatic species from new road- and trail-related impacts.

Trail and travel management would impact fish and other aquatic species similar to Alternative A. Under this alternative however, the intensity and scope of impacts would be substantially reduced, compared to Alternative A, because no OHV use would be allowed, and travel would be restricted to designated routes. This would eliminate user-created routes and would reduce identified impacts across large portions of the planning area. Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant fish, except that increased sediment and turbidity impacts would be negligible.

**Impacts from Lands and Realty Management.** Impacts on fisheries and aquatic wildlife from lands and realty management under Alternative B would be similar to Alternative A, except that fewer acres would be retained and more acres would be recommended for withdrawal of locatable mineral exploration or development. This would protect fish and other aquatic species and their habitats across a broad extent and would reduce the risk of habitat alteration, alteration of water quality, and increased sediment loading and turbidity impacts. Combined with other resource protective measures would reduce the scope and intensity of impacts on resident aquatic species and their habitats under Alternative B.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The primary impacts on fish and other aquatic species under Alternative B would be similar to Alternative A. Under this alternative however, oil and gas development would result in direct negative impacts at site-specific portions of select streams on aquatic species throughout the western quarter of the planning area. This alternative would allow 651,400 acres as open to fluid minerals leasing. Alternative B anticipates an estimated 2,800 acres of surface disturbance. In comparison, Alternative A would manage 679,200 acres as open for fluid minerals leasing. Given the protective measure in place on a given lease, the identified impacts may be reduced at specific locations, but may still occur over a broad area. Several COA-level mitigation and minimization measures are used to reduce identified impacts and are listed in Appendix G. Identified impacts are long-term and chronic in areas where extensive road construction and use would occur associated with these activities. About 99 percent of the proposed activity would continue to occur in the high-potential areas where activity is currently being conducted. Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant fish, except that increased sediment and turbidity impacts would be negligible.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals.** Impacts on fisheries and aquatic wildlife under Alternative B would be similar to Alternative A with a few exceptions.

BLM_0016554

Under Alternative B, a total of 97,000 acres would be recommended for withdrawal of locatable mineral exploration or development, compared to 34,600 acres for Alternative A. This would provide protection to fish and other aquatic species and their habitats across a broad extend and reduce the risk of identified impacts as well as the scope and intensity of impacts. In addition, ACECs, WSAs, SRMAs, NWSRS, developed recreation sites, and municipal watersheds would all be closed to mineral materials disposal. This further limits the lands available for this activity. Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant fish, except that increased sediment and turbidity impacts would be negligible.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under this alternative, the management of the six current ACECs would continue, and three new ACECs are identified, totaling 34,500 acres. The management of these ACECs would benefit aquatic species and their habitats. Although managed for select resource values, the nine ACECs would protect 34,500 acres of habitat by limiting ground disturbance by a protective NSO stipulation. This provides direct and indirect protection to fish and other aquatic species from identified impacts. This alternative would provide greater protection than under Alternatives A and would provide increased aquatic species protection across a broader portion of the planning area. In addition, overlapping stipulations would protect portions of these areas, and select protective measures for fisheries and aquatic wildlife under Alternative B would further limit and reduce impacts on aquatic species and their habitats. Sediment-tolerant species would benefit from current ACEC management, similar to sediment-intolerant species.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** This alternative would include the three existing WSAs and add the Eagle Mountain WSA. The management of WSAs would generally benefit fish and other aquatic wildlife. Impacts within these four WSAs would be similarly beneficial as Alternative A, but to a greater degree due to the additional WSA. Sediment-tolerant species would benefit from continued WSA management similar to sediment-intolerant species.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** *Alternative B1.* Under this alternative, four stream segments identified as eligible—Colorado River segments 6 and 7, Deep Creek segments 2 and 3—would be identified as suitable for designation. This would provide interim protection to preserve the free-flowing nature, ORVs, and tentative classification until such time as Congress would act on a suitability determination. Aquatic species and their habitats would benefit from the protections afforded these stream segments as limited surface-disturbing activities would be allowed within 0.25 mile of either side of each stream segment.

As compared to Alternative A, the number of stream miles protected by WSR is substantially reduced. However, other protective measures for fisheries and aquatic wildlife under Alternative B would still help to reduce and minimize impacts on aquatic species and their habitats from other resource uses, except that WSR protections would be more long term in the event Congress would officially designate these stream segments. Sediment-tolerant species would benefit from WSR management under this alternative, the same as sediment-intolerant species.

*Alternative B2.* Under Alternative B2, the BLM would recommend Deep Creek segments 2 and 3 as suitable for designation. The BLM would defer a suitability determination on the Colorado River segments and would adopt and implement the stakeholders' plan to protect the free-flowing nature, ORVs, and tentative classifications on the Colorado River segments 4 through 7. This alternative would provide substantially less protection than under Alternative A, but could provide better protection than under Alternative B1. This is

BLM_0016555

because the water stakeholders would attempt to operate their facilities in a manner that meets water supply objectives and protects the ORVs and subsequently aquatic species and their habitats. With no stakeholder plan, water flows would continue to be subject to the water rights system. Without some sort of specific effort to protect and manage flows, there may be a gradual reduction in flows necessary to support resident aquatic species populations in some years. In addition to the stakeholders plan, many of the protective measures under Alternative B would still help to reduce and minimize impacts on aquatic species and their habitats from other resource uses, although not in perpetuity, as with a potential congressional WSR designation. This alternative would have similar benefits to aquatic species and their habitats, except that protective measures would not be of the same duration compared to Alternative B1. However, the stakeholders' water delivery component could provide the best protection to ORVs and aquatic species in the long term. Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species.

## *Alternative C*

Impacts to fisheries and aquatic wildlife from soils management, forest and woodland vegetation management, rangeland vegetation management, riparian vegetation management, weed management, wildland fire management, and renewable energy management would be the same as or similar to those described for Alternative A.

Impacts to fisheries and aquatic wildlife from special status species management, forestry management, livestock grazing management, lands and realty management, fluid minerals management, and WSA management would be the same as or similar to those described for Alternative B.

**Impacts from Fisheries and Aquatic Wildlife Management.** Fisheries and aquatic wildlife management is or would be largely beneficial to fish and other aquatic species. Under Alternative C, stipulation CSU-6 would apply to all trout-bearing streams and would reduce ground-disturbing activities within select streams. Depending on the type of fisheries project or action, and stipulation exception criteria, the remaining NSOs, CSUs, and TLs identified as protective measures under Alternative C would help to protect habitats for fish and other aquatic species.

In selected areas with proactive fish habitat management, impacts would be similar to Alternative A, but would only include habitat alteration, loss or reduction of streamside vegetation cover, and increased sediment loading and turbidity. Alternative C would provide the most protection for aquatic species because all perennial waters would be subject to NSO. Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species. Where (in cooperation with CDOW and/or USFWS biologists) non-native fish or other undesirable aquatic species are removed, the target species would be negatively impacted to the benefit of the desirable species.

**Impact from Water Resource Management.** Benefits to aquatic species would generally be the same as Alternative B, except that in addition to the proposed NSOs, CSU-2 for hydrologic features is also proposed and would manage ground-disturbing activities beyond the NSO boundary for an additional 50 feet. This alternative is the most protective and benefits are the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Wildlife Management.** Benefits and short-term impacts would be the same as those addressed in detail under Alternative A, but this alternative has more indirect protections for fisheries and aquatic wildlife.

BLM_0016556

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under this alternative, six areas with lands with wilderness characteristics outside existing WSAs totaling 47,000 acres would be protected with an NSO and closed to fluid minerals leasing. This would benefit aquatic species and their habitats by limiting ground disturbance from other resource uses. This would provide additional protection compared to other alternatives, which do not identify these lands. Sediment-tolerant species would benefit in ways similar to those of sediment-intolerant species.

**Impacts from Recreation and Visitor Services Management.** Impacts would be similar to Alternative B, except under Alternative C fewer acres would be managed as SRMAs; 23,800 acres of land would be managed in two SRMAs; and the remaining acres would be managed as ERMAs. The primary protective stipulation is NSO-46, which protects 23,800 acres by limiting ground-disturbing activities within the two SRMAs. This alternative provides less protection from other resource uses than under Alternatives B.

**Impacts from Comprehensive Trails and Travel Management.** Impacts on fisheries and aquatic wildlife would be similar to Alternative B, except that Alternative C would obliterate 220 miles of existing routes, compared to only 70 miles under Alternative B. This alternative would also close the most acres to use and would allow for the least full-size vehicle use, which would decrease erosion potential on a larger scope and would reduce the magnitude and intensity of identified impacts. Impacts on aquatic species and their habitats would be the least impactful under this alternative.

**Impacts from Coal Management.** Impacts from coal management would be similar to Alternative A, except the scope of potential impacts would be reduced under this alternative due to fewer available acres.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals.** Impacts would be the same as those addressed under Alternative B, except that under Alternative C a total of 172,100 acres would be recommended for withdrawal of locatable mineral exploration or development, compared to 97,000 acres for Alternative B. Alternative C would provide the greatest protection to fish and other aquatic species and their habitats across a broad extent, and would reduce the risk of identified impacts as well as the scope and intensity of impacts.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts on fisheries and aquatic wildlife would be similar to Alternative B, except under Alternative C a total of 16 ACECs are identified, totaling 65,800 acres, providing habitat protection in more areas.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Benefits under this alternative would be the same as addressed those under Alternative A, except that this alternative would provide protections for a longer duration.

*Alternative D*

Impacts to fisheries and aquatic wildlife from soils management, water management, forest and woodland management, rangeland management, weed management, wildlife management, wildland fire management, coal management, and renewable energy management would be the same as or similar to Alternative A. Impacts to fisheries and aquatic wildlife from special status fish and other aquatic wildlife management, special status plants and terrestrial wildlife management, forestry management, livestock grazing management, and WSAs management would be the same as or similar to Alternative B. Impacts to fisheries and aquatic

BLM_0016557

wildlife from locatable minerals, mineral materials, and non-energy leasable minerals would be similar to both Alternatives A and B. Impacts from management of other resources and uses would be as described below.

**Impacts from Fisheries and Aquatic Wildlife Management.** Benefits and short-term impacts under Alternative D are similar to those addressed for Alternative A, except this alternative would provide better protection to aquatic species. Under this alternative, CSU-6 would help to manage ground-disturbing activities near occupied habitats containing trout species. TL-7 would help protect special status fish during the spring spawning seasons. Impacts to fisheries and aquatic wildlife from recreation and visitor services management would be similar to Alternative C.

**Impacts from Riparian Vegetation Management.** Under Alternative D, proactive riparian vegetation management would be beneficial to fish and other aquatic species. No protective stipulations are provided for riparian areas under this alternative. This would result in greater risk to riparian areas and associated aquatic habitats from identified impacts, compared to other alternatives. Some riparian and stream habitats would still be protected under this alternative by other resource stipulations that would limit other resource uses. In select areas where proactive restoration of riparian areas would occur, impacts would include water quality alteration, loss or reduction of streamside vegetation cover, and increased sediment loading and turbidity. Sediment-tolerant species would be impacted in ways similar to those of sediment-intolerant species.

**Impacts from Comprehensive Trails and Travel Management.** Impacts on fisheries and aquatic wildlife would be similar to Alternative A; however, the intensity and scope of impacts would be substantially reduced under this alternative, as no OHV use would be allowed. This would eliminate user-created routes and would reduce identified impacts across large portions of the landscape.

**Impacts from Lands and Realty Management.** Impacts on fisheries and aquatic wildlife from lands and realty management under Alternative D would be similar to Alternative A, with some exceptions. Fewer lands would be identified for retention. Other than under Alternative A, this alternative would provide the least protection to aquatic species and their habitats and would increase the risk of identified impacts as well as the scope and intensity of those impacts. Impacts under this alternative would be more protective than under Alternative A, which contains more ROW avoidance and exclusion areas. These, in addition to other resource protective measures, would reduce the scope and intensity of impacts on resident aquatic species and their habitats.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts under Alternative D would be similar to Alternative A, except that under Alternative D, oil and gas development would result in the greatest amount of direct negative impacts at site-specific portions of select streams on aquatic species throughout the western quarter of the planning area. This alternative would allow for the most fluid minerals leasing, well development, and surface disturbance of any alternative.

**Impact from Areas of Critical Environmental Concern (ACECs) Management.** Impacts from ACEC management under Alternative D would be similar to other alternatives except only three of the six current ACECs would continue, totaling 20,200 acres. This is the fewest ACECs and the least number of acres protected for select resource values amongst the alternatives. Increased disturbance in some areas would likely occur compared to other alternatives.

BLM_0016558

### Cumulative Impacts

As it pertains to NEPA, cumulative effects are defined as "…the effect that results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions." For this plan, cumulative effects address the impact of implementing any one of the RMP alternatives in combination with other actions outside the scope of this RMP, either within the planning area or adjacent to it. For information on the current/baseline condition of aquatic species and their habitats, refer to Chapter 3, Affected Environment. The scope of analysis for cumulative impacts for aquatic wildlife takes in the mainstem Colorado River basin and its tributaries downstream to just beyond the CRVFO boundary on adjacent private lands and BLM lands managed by the adjacent Grand Junction Field Office. This accounts for the influence zone of past, present, and reasonably foreseeable actions that could cumulatively affect aquatic species.

Declines in the abundance or range of many aquatic species have been attributed to various human activities on federal, state, and private lands, such as (1) human population expansion and associated infrastructure development, and construction and operation of dams along major waterways; (2) water retention, diversion, or dewatering of springs, wetlands, or streams and recreation, including off-road vehicle activity; (3) expansion of agricultural or grazing activities, including alteration or clearing of native habitats for domestic animals or crops; and (4) introduction of non-native plant, wildlife, or fish or other aquatic species, which can alter native habitats or outcompete or prey on native aquatic species. Many of these activities are expected to continue on lands within the range of the various aquatic species and could contribute to cumulative effects on these species within the planning area. Species with small population sizes, endemic locations, or slow reproductive rates, or species that primarily occur on nonfederal lands, would generally be highly susceptible to cumulative effects.

### Past Actions

A variety of past actions have incrementally affected aquatic species and their habitats within the planning area on BLM, USFS, state, private, and other federal lands. Water diversions began when the first settlers to the region began to manage water for human uses, including irrigation for crops, livestock, and domestic uses. As population centers within the planning area and beyond, such as Denver, continued to grow and expand, water demand increased. Western Colorado is considered "water rich" compared to the Front Range population center of Colorado, where water is more limited. Several dams and reservoirs and large trans-mountain water diversions were constructed to take water from headwater streams within the Colorado River Basin and move it through the Continental Divide to Front Range municipalities. Many of these water diversions and water rights are still in place today and have resulted in impacts on native stream and river flows, including the Colorado River. This has affected aquatic species and their habitats by reducing wetted physical habitat, sediment aggradation, habitat alteration, and reduced overall sediment input and habitat complexity and diversity.

Introductions of non-native fishes were common in the late 1800s and throughout the 1900s. Several species were stocked for sport fish and food production, including rainbow trout, brown trout, brook trout, and Yellowstone and Snake River cutthroat trout. In addition, purposefully or by accident, other species have made their way to the western slope of Colorado, such as white suckers, longnose suckers, and fathead minnow. Non-native species often outcompete native species, and non-native fishes of the same genus or subspecies can hybridize with native species, reducing their genetic integrity and fitness.

BLM_0016559

Land management actions and activities have been ongoing since the settling of the west. Fire suppression, logging, livestock grazing, mining, natural gas development, conversion of native rangeland to agriculture, road construction, pipelines, power lines, railroads, and ever-increasing urban sprawl have all resulted in cumulative impacts within watersheds that contain aquatic species, including habitat alteration, reduction of streamside vegetation cover, water quantity and quality impacts, and site-specific increases in sediment and turbidity. Protective actions and designations, such as wilderness areas on lands administered by the USFS and WSAs on BLM lands, have protected some areas from impacts and helped reduce cumulative effects.

## Present Actions

Many of the actions addressed in the past actions continue today. Urban sprawl continues, as does the demand for limited water supplies, water diversions, and impoundments. New large-scale water developments are limited, but select projects are in the works, and new ideas are being considered. Large-scale mining is all but gone, but potential still exists in some areas. Livestock grazing continues, as well as agriculture. Oil and gas development has increased in recent years, along with road construction. Logging has been largely replaced by prescriptive treatments aimed at managing forests and other vegetation types for other uses (wildlife, watershed improvement, fuel reduction). Beetle-killed pine is a large and ever-increasing concern in the forested habitats within the planning area and has the potential to increase the risk of catastrophic fires in the near term.

Stocking of non-native fishes is much more limited today, as emphasis has begun to shift to native species management. Recreation has emerged as an ever-increasing pursuit within the planning area and is expected to increase. Popular and common within the planning area on BLM lands and USFS-administered lands are rafting, boating, hunting, fishing, hiking, camping, skiing, rock climbing, mountain biking, and four-wheeling, among other pursuits. Oil and gas development is occurring in concentrated portions of the western quarter of the planning area, primarily on private and BLM lands. All of these activities are resulting in cumulative impacts, including site-specific sediment loading and turbidity, habitat alteration, and water quality and quantity impacts. Restoration and reclamation actions are more common today, as impacts are mitigated and as degraded habitats are improved.

## Reasonably Foreseeable Future Actions

It is likely that many of those actions identified in the past actions and present actions sections will continue into the future. Urban sprawl and development is increasing as human populations increase within the planning area and outside. Along with this, water consumption and demand is increasing concurrently.

Expansion and sprawled development in the Eagle, Roaring Fork, and Upper Colorado River Valleys is anticipated to have impacts on stream and river flows. Continued and newly proposed water diversions to the Front Range to serve the water needs of Denver, Aurora, Colorado Springs, and other municipalities are likely. The major potential water project is the Homestake Project, which is jointly operated by the cities of Aurora and Colorado Springs. Phase 1 of the project was completed in 1968, and Phase 11 has been granted the necessary federal and state permits and approvals for construction, including the issuance of a ROD as part of NEPA by the USFS. If segment 1 or 2 of the Colorado River is designated as wild and scenic and instream flow prescriptions are put into place, it could have an impact on Phase II development of the Homestake Project. The Clinton Ditch and Reservoir Company is the owner and operator of Clinton Gulch Reservoir in Summit County, which has a decreed water right of approximately 4,250 acre-feet of storage. Shareholders represent the major water users and providers in Summit County, as well as the largest ski resort in Grand County. Colorado Springs Utilities plans to develop conditional water storage rights associated with

BLM_0016560

the Continental-Hoosier System, which diverts water from the headwaters of the Blue River, upstream of the study river segments. The Moffat Firming project proposes to divert more water out of headwater streams in Grand County for conveyance to Front Range locales. Irrigation rights are expected to continue being bought and sold in the future, with some new property owners informally changing how the right was historically used. Due to population growth and land sales, more agricultural water rights may be converted to municipal and industrial uses.

Recreation demand is expected to continue to increase as western Colorado is a destination area for outdoor pursuits. Oil and gas development is expected to continue, as is livestock grazing, agriculture, and irrigation. One emerging issue is the potential for large-scale oil shale development within and adjacent to the planning area. This would result in large amounts of water use and could affect stream and river flows as well as increase sediment and turbidity and alter habitat. Another emerging issue is climate change. This has the potential to impact fish by changing distributions and altering food webs and water quality (temperatures). Trout species would probably be most affected, but as new information emerges, impacts on other species could result. Local effects of a changing climate would vary in intensity and duration because of differences in habitat quality, distance from coastal areas, and elevation and topography of the watershed. Scientists predict that there will be an increase in the severity and frequency of droughts and floods. Increasing human demand for water will place additional stresses on watersheds and will amplify the negative impacts of climate change on fish populations.

Among the alternatives proposed, Alternative D would have greater potential for direct and indirect effects on aquatic species and their habitats and, subsequently, more cumulative impacts when added to the numerous actions, activities, and land management practices occurring on other federal, state, and private lands within the scope of analysis. Alternatives B and C would provide greater protections from BLM-initiated or -authorized activities and actions, would result in reduced direct and indirect effects, and subsequently would have reduced cumulative effects. Alternative B proposed protective measures are more targeted, while Alternative C proposed protective measures are broader in scope and application. Alternative A is similar to Alternative D and would allow for greater potential cumulative effects on aquatic species and their habitats. Two programs in particular, trails and travel management and fluid minerals management, would allow for substantial cumulative effects under Alternative A, as OHV use would continue to be allowed to go largely unabated across large portions of the planning area, and natural gas development and associated road construction would continue to occur on large expanses of private and BLM lands. Roads are one of the single biggest issues with regard to aquatic habitat quality.

### 4.2.6.2 Terrestrial Wildlife

Impacts on terrestrial wildlife resources from implementation of each alternative are summarized in the following subsections. Information regarding potential impacts on special status species is presented in Section 4.2.7.

### Assumptions and Methods

This section is a discussion of potential impacts of other program objectives, allowable use, and management actions on terrestrial wildlife populations and their habitat, based on existing conditions described in Section 3.2.6. Impact analyses and conclusions are based on interdisciplinary team knowledge of resources and relevant data, on a literature review, and on the professional judgment of experts within and outside BLM. Spatial data analysis was conducted using ESRI ArcGIS desktop computer software. Impacts were quantified where possible, and, in the absence of quantitative data, best professional judgment was used. Impacts are

BLM_0016561

sometimes described using ranges of potential impacts or in qualitative terms, if quantitative data were not necessary or available.

The following assumptions were used in the terrestrial wildlife analysis:

- Proposed decisions under all alternatives would conform to maintaining Colorado Standards for Public Land Health (BLM 1997a). Standards describe conditions needed to sustain public land health and relate to all uses of the public lands. Standards are applied on a landscape scale and relate to the potential of the landscape. Standard 3 addresses plant and animal communities and is incorporated as a goal. It states, "Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations and ecological processes." Environmental consequences resulting from proposed management action or allowable use decisions are often analyzed based on their ability to contribute to maintaining/achieving (i.e., benefit) or risk of causing a decline (i.e., adverse impact) in meeting Colorado Public Land Standard 3.

- The proposed management in each alternative would include the proposed mitigation in the form of stipulations (e.g., NSO, CSU, TL) to reduce impacts on wildlife. Direct and indirect impacts of land uses on terrestrial wildlife are generally best mitigated by avoiding or minimizing the impact on the degree practicable with stipulations (e.g., NSO, CSU, and TL stipulations). The various management action and allowable use decisions outlined in Chapter 2 and stipulations described in Appendix B emphasize this approach for maintaining or conserving terrestrial wildlife and their habitat. Impacts that cannot be avoided would at least be minimized by the application of COAs or BMPs (Appendix G).

- Wildlife habitat needs vary significantly by species. However, it is generally true that healthy and sustainable wildlife populations can be supported where there is a diverse mix of plant communities with multiple seral stages to supply structure, forage, cover, and other specific habitat requirements.

- Impacts on wildlife populations and habitat are not discrete since actions may benefit one species while having an adverse or beneficial impact on another.

- Wildlife populations fluctuate, sometimes widely, in response to natural factors, such as the abundance of prey, extremes in weather (e.g., severe winters and drought), outbreaks of wildlife disease, or insects (e.g., mountain pine beetle) that impact habitat. Maintaining high quality habitat conditions would have some influence on reducing the severity of outbreaks and subsequent losses from diseases, but the prevalence in the environment of various diseases cannot be fully controlled, particularly at chronic levels of occurrence.

- Significant modifications to habitat suitability can impact the survivability and viability of populations (e.g., higher winter mortality, reduced reproductive success).

- Impacts on terrestrial wildlife from displacement depend on the location, extent, timing, or intensity of the disruptive activity. Impacts from displacement of wildlife would be greater for wildlife species that have limited habitat or a low tolerance for disturbance.

- The quality and quantity of winter ranges are generally considered to be the limiting factors on big game populations. The ability of these areas to support wintering populations is a major factor in determining yearlong population levels.

BLM_0016562

- The CDOW would continue to manage wildlife populations, and the BLM would continue to manage wildlife habitat in coordination with the CDOW. Big game habitat would be managed in coordination with CDOW herd objectives and species-specific plans. Sufficient habitat currently exists to maintain current CDOW data analysis unit (DAU) objectives for big game.

- In the context of this analysis, *avoidance* means reduced use and does not imply zero use or an absence of use by wildlife.

- Federal oil and gas regulations prevent the BLM from applying new or additional lease stipulations that would be developed through this planning effort to existing leases. However, federal regulations do allow the BLM to apply other protection measures in conjunction with planning and implementing oil and gas projects. These include applying stipulations consistent with the most recent land use plan as terms and conditions for discretionary approvals (e.g., right-of-way actions) and applying COAs to augment protections related to lease activities. The latter include applying a TL of up to 60 days and requiring that a project component be relocated by up to 200 meters (or more than 200 meters for areas with CSU stipulations) to protect a sensitive resource value. Examples of additional regulatory protections that the BLM applies to existing leases are requirements of adequate reclamation, weed control, erosion control, and dust abatement.

## Disturbance

Disturbances are events that disrupt ecological systems; they may occur naturally (e.g., wildfires, storms, or floods) or be induced by human actions, such as recreation, forestry, energy development, ROW construction, urban development, roads, or alteration of stream channels. The disturbed animal incurs a physiological cost, through excitement (preparation for exertion) or locomotion. A fleeing or displaced animal incurs additional costs through loss of food intake and potential displacement to poorer (lower) quality habitat. The effects of disturbances are determined in large part by their intensity, duration, frequency, timing, and the size and shape of the area affected. Continuous disturbance would probably result in reduced animal fitness and reproductive potential.

Human disturbance near raptor nests can result in the abandonment of the nest, high nestling mortality from overheating, chilling, or dehydration when young are left unattended if adults are flushed from the nest, premature fledging, and reduced access to resources (Gutzwiller et al. 1998). Evidence suggests that some falcons, ospreys, and owls are generally more tolerant of human-induced disturbance and human environments. Golden eagles, turkey vultures, northern harriers, northern goshawks, Cooper's hawks, and sharp-shinned hawks appear less tolerant, and buteos exhibit a wide range of acceptance levels.

A recognized consequence from recreation and human development adjacent to BLM land is the effect of domestic dogs on wildlife. Dogs allowed to run off-leash can chase, catch, and kill small wildlife species and potentially large species, such as big game. Even the scent left by a dog can have an effect on wildlife.

Roads, timber clearcuts, and oil and gas developments are not the only reported sources of disturbance that can affect wildlife use. Other sources may involve the following:

- Gutzwiller et al. (1998) experimentally subjected forest birds to increased human activity, which consisted of walking through breeding territories. Effects included nest abandonment and reduced nest attentiveness, leading to nest failure. However, Riffell et al. (1996) noted that this impact is not cumulative (i.e., it does not carry across years if the disturbance ceases).

BLM_0016563

- Friesen et al. (1995) discussed the exacerbating effect of disturbance on habitat fragmentation due to decreased seclusion in the interiors of smaller patches. They found that 10-acre woodlots not located near human habitations supported more species and individuals of Neotropical migrant songbirds than did 62.5-acre urban woodlots.

- Freddy et al. (1986) reported that deer would move away in response to pedestrian traffic as close as 200 meters (660 feet).

- Parker et al. (1984) emphasized the importance of avoiding situations in which wintering deer would be forced to move to avoid human activity, owing to decreased energy stores in winter and greater effort in moving through snow.

- Joslin and Youmans (1999) provide in-depth information on the effects of recreation on Rocky Mountain wildlife in Montana. Their compendium includes a listing by Knight and Cole (1995) of specific effects of recreation on wildlife (excerpted below):

  o Viewing (close encounters)—Altered behavior, unnecessary energy expenditure during flight, altered nest placement, and reduced survivorship of young due to abandonment or predation.

  o Backpacking/hiking/riding/cross-country skiing—Flight, displacement, or elevated heart rate.

  o Rock climbing—Disturbance of preferred raptor perching and nesting sites.

  o Spelunking (caving)—Disturbance or abandonment of bat roosting and maternity sites.

  o Pets (dogs)—Stronger predator-alarm response than a person without a dog. Increased stress and energy expenditure while fleeing. Risk of injury or mortality.

  o OHVs—Potential disturbance (flight and stress) and redistribution.

  o Snowmobiles—Same as OHVs.

## Direct Habitat Loss

Direct habitat loss occurs when required life-sustaining conditions are lost, e.g., through removing vegetation or draining a pond. Removing vegetation affects wildlife by reducing the extent or quality of habitat in terms of food, cover, and structure for nesting and other uses. For example, removing vegetation during construction of a road or water tank essentially strips the affected area of any wildlife value. While closure and reclamation of disturbed areas can eventually restore lost habitat values, it may require years or decades for recovery to pre-disturbance structure and function.

## Habitat Modification

Changes in habitat are generally less obvious and less severe than losses of habitat but can be significant, especially if small impacts accumulate across large areas. Examples include removal of too much forage by domestic livestock, invasions of weeds, and removal of tree cover during timber harvesting. Habitat modification (i.e., habitat treatment) can also be beneficial and is an important tool in wildlife habitat management. Examples include use of prescribed fires to stimulate new growth on older woody vegetation and thinning of overly dense shrubs to enhance forage production.

BLM_0016564

### Habitat Fragmentation

Habitat fragmentation occurs when contiguous habitat is broken into smaller blocks by surface-disturbing activities. This can reduce usable ranges and disrupt movements among habitats, transitional areas, and parturition area, can isolate populations of less mobile species, and can increase the number of habitat generalists (those that are not restricted to a specific habitat to meet their needs) and habitat-edge species (those that prefer the interface between two or more habitat types), while decreasing habitat specialists or habitat-interior species. Impacts of habitat fragmentation relate to the reduced size of individual habitat blocks and the increased percentage of habitat edges on smaller blocks, compared to larger blocks. Thus, two 50-acre blocks of habitat may support fewer individuals of a particular species than one 100-acre block, and four 25-acre blocks may be incapable of sustaining any habitat-interior species. Habitat-interior species may avoid habitat edges because the species are either less well-adapted there than edge specialists and habitat generalists or they are more secretive and likely to seek the greater seclusion available away from an edge.

Some species benefit from breaks in continuous stands of vegetation. These "edge species" prefer the boundary between two different plant communities or successional stages. These species are also commonly associated with human habitation, including farmlands, ranchlands, and rural residential development.

### Reduced Habitat Effectiveness

Habitat effectiveness is the comparison of the habitat and disturbance components that reflects an area's actual ability to support certain species of wildlife. The amount of habitat actually available to wildlife is called "effective habitat," and reductions in the amount of effective habitat (or "habitat effectiveness") can greatly exceed any direct habitat loss. Increasingly there is a need to understand and predict the consequences of habitat alterations (WGFD 2004). For example, Ruediger et al. (2006) discussed how elk use of habitat decreases as the proximity of that habitat to roads and highways increases. Lyon (1979) determined that roads open to traffic caused available habitat to be less than fully effective.

Reed et al. (1996) calculated that the effective habitat loss associated with construction of new roads in an area open to logging was 2.5 to 3.5 times the actual habitat loss, assuming a "road-effect" zone extending 100 meters from a road. However, disturbances such as roads should not be considered independent of other criteria by which elk habitat is evaluated (Lyon 1979). Habitat effectiveness models often incorporate variables such as density of open roads, size and spacing of areas of forage and cover, quality of cover, seasonal habitats, availability of other similar habitats, historic disturbances, topography, and steepness of slope. Ruediger et al. (2006) noted elk responses to highways and roads vary by a number of factors, such as topography, vegetation, traffic volumes and how the highway is designed, and whether elk are hunted. These interrelated factors make a quantitative analysis particularly difficult, especially within the planning area's fragmented landscape that already has reduced habitat effectiveness.

### Direct Mortality

Direct mortality can result in areas of increasing human use due to collisions with vehicles, electrocution of raptors on utility lines, or inadvertent trampling of reptiles. In the case of oil and gas development, wildlife mortality associated with petroleum pollution has also been reported. Human activities, such as hunting, cause the direct mortality of animals and over the long term can affect the population numbers, male/female ratios, area densities, and population structure.

BLM_0016565

## *Habitat Avoidance*

Direct disturbance to a species and possibly its habitat can affect its use of BLM lands. Avoidance or displacement occurs when wildlife make proportionately less use of particular areas than their accessibility would imply. Although the physical habitat is still present, the animals use it to a much lesser extent than before the disturbance. The result is a de facto loss of habitat because avoided areas meet no survival needs.

Some species are more tolerant of human activity than are others. Species such as big game must adapt to human-related disturbances to some degree, especially on winter ranges that have been altered by roads, public land investments, and residential/commercial development. But virtually all species have some threshold of disturbance above which they would avoid or abandon an area or use it at a significantly reduced level.

Activities that are widely prevalent (e.g., urban development or recreation) or land use activities (e.g., energy development or logging) that are supported by an expansive network of roads or trails likely result in higher levels of wildlife avoidance. Wildlife often compensate for these site-specific disturbances by shifts in use of range, centers of activities, and use of other habitats (Van Dyke 1996). Surface disturbances or disruptive activities can move animals into less desirable habitat or private lands and increase competition for available resources with other species. It is important to note that avoidance does not mean total avoidance but refers to disproportionately low use.

## *Interference with Movement Patterns*

Human-induced impacts can also affect wildlife by altering important daily or seasonal movement patterns. These patterns may be altered through shifts to avoid human activity, to avoid crossing open areas that provide inadequate cover, or to circumvent some physical barrier (e.g., fences and steep roadcuts). This type of impact is not as much of an issue for small mammals or reptiles that do not move across large areas or for birds that easily avoid them. Even without the need for these regular movements, most mammals tend toward some population dispersal as young seek new habitats to occupy. This is important to the species to ensure that suitable habitat is occupied and facilitate gene exchange between distinct populations. For large mammals, such as deer and elk, changes in the landscape can profoundly affect their ability to meet daily and annual requirements. For example, these large species must drink water regularly (daily during warm weather, and almost as often during winter), and home ranges must include sources of water. Blockage of a route between foraging or bedding areas and watering areas can cause the animals to abandon areas altogether. Seasonal movements between summer and winter ranges are also important for these species. For example, local movement of big game onto private lands occurs each fall in response to the influx of big game hunters onto BLM lands.

## *Impact Estimation*

Impacts on wildlife are difficult to quantify. Among the reasons are the following:

- Species differ in their tolerance of disturbance.

- Species differ in their ability to utilize less desirable habitats if displaced or to otherwise adapt to changing conditions.

- Habitats differ in their ability to screen wildlife from areas of disturbance and in their importance to wildlife.

- The planning area's fragmented landscape has already experienced a loss of habitat effectiveness.

BLM_0016566

- Areas differ in their existing (baseline) quality and in the existing level of human activity to which wildlife may have already adjusted their use patterns.

- All of the above may differ by season or other variables, both within and among years and within and among areas.

## Environmental Consequences

Proposed management action and allowable use decisions for terrestrial wildlife are considered as causing a beneficial impact – or just benefit – to terrestrial wildlife species and are discussed in the sections titled "Impacts from Terrestrial Wildlife Management". Impacts, some beneficial and some negative, on terrestrial wildlife would result from management actions and allowable uses proposed by other programs. The analyses of their proposals are discussed under the program-specific impact section. Variations in proposed management action and allowable use decisions are in accordance with the theme of the alternatives, each of which includes varying levels of benefit in the form of habitat maintenance, conservation, and improvement to terrestrial wildlife. Programs not addressed below were deemed to have no or negligible impacts on terrestrial wildlife under any of the four alternatives.

### Alternative A

Under Alternative A, terrestrial wildlife management would continue to focus on: (1) providing approximately 57,933 AUMs of big game forage (the amount to meet CDOW big game population goals in 1988), (2) improving existing wildlife habitat, and (3) increasing wildlife species diversity as defined by the existing RMP, amendments and species-specific plans.

**Impacts from Terrestrial Wildlife Management.** All alternatives allow for the introduction, translocation, transplantation, restocking, augmentation, and reestablishment of native and naturalized fish and wildlife species in cooperation with the CDOW and USFWS, subject to the guidance provided by BLM Manual 1745 policy, and by existing or future memorandums of understanding with the CDOW. Wildlife reintroductions would increase species and genetic diversity, would augment existing populations, and would reestablish species that were previously extirpated.

All alternatives would require biological inventories in areas of known or suspected habitat of species of interest (e.g., raptor nests, migratory birds) before approval of surface-disturbing operations. The implementation-level inventory would be used to prepare mitigating measures to reduce the impacts of surface disturbance on the affected species or their habitats. All alternatives would require energy companies to establish a set of reasonable operating procedures for employees and contractors working in important wildlife habitats through lease notices. Such procedures would be designed to inform employees and contractors of ways to minimize the effect of their presence on wildlife and wildlife habitats. Procedures might address such items as working in bear country, controlling dogs, and understanding and abiding by hunting and firearms regulations.

### Disturbance from Public Travel, Access, and Land Use Activities

*Big Game Ungulates and Other Large Mammals.* Winter ranges on BLM lands are becoming increasingly important, as adjacent private lands are altered by residential and commercial development. The CRVFO's objective is to minimize big game stress and disturbance from surface occupancy and surface-disturbing activities on winter ranges, winter concentration areas, severe winter ranges, migration corridors, and birthing areas. The amount of use that winter ranges receive from big game and other wildlife depends on the severity of the winter. To protect wintering wildlife, the BLM would continue to close important winter ranges to

BLM_0016567

public motorized travel from December 1 to April 30 to protect wintering big game from potential disturbance caused by public motorized use (Table 4.2.6-1).

**Table 4.2.6-1**
**Big Game Winter Closures for Alternatives A, B, C, and D**

| Area | Alternative A<br>Acres Closed to Motorized Use 12/1 to 04/30 | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| | | Acres Closed to Motorized and Mechanized Use 12/1 to 04/15 | | |
| Basalt Mountain | N/A | N/A | 1,540 | N/A |
| Bocco Mountain/Red Canyon/Hells Pocket / East Castle Peak (Alt C only) | 6,520 | 6,520 | 14,550 | 6,520 |
| Boiler/East Elk Creek./New Castle (Alts B and C) | 3,490 | 4,410 | 4,410 | 4,410 |
| Cottonwood Creek | 13,800 | 13,800 | 13,800 | 13,800 |
| Fisher Creek (Haff Pasture)/Cattle Creek (Alt C) | 1,030 | 1,030 | 2,830 | 1,030 |
| Flatiron Mesa | 770 | 770 | 770 | 770 |
| Hardscrabble | N/A | 24,600 | 24,600 | N/A |
| Light Hill | 3,800 | 3,800 | 3,800 | 3,800 |
| Old Man's Gulch/Red Hill (Alt C) | 0 | 3,840 | 13,000 | N/A |
| Prince Creek and West Sopris Creek | 0 | N/A | 1,713 | N/A |
| Red Hill SRMA (Alt A including mechanized travel 12/1—03/31) | 2,640 | 2,640 | 2,640 | 2,640 |
| The Crown | 9,200 | 9,200 | 9,200 | 9,200 |
| Thompson Creek./Holgate Mesa | N/A | 9,510 | 9,510 | 9,510 |
| Vulcan | N/A | N/A | 911 | N/A |
| West Rifle Creek | N/A | N/A | 1,080 | N/A |
| Winter Ridge/Pisgah Mountain/Windy Point/Boore Flat/Domantle | 33,500 | 33,500 | 33,500 | 33,500 |
| Williams Hill | N/A | 1,530 | 1,530 | N/A |
| **Total** | **74,770** | **117,970** | **148,160** | **87,410** |

The BLM would also apply a TL that would prohibit surface occupancy and surface-disturbing activities from December 1 to April 30 to protect big game (mule deer, elk, pronghorn antelope, and bighorn sheep) winter range, including crucial winter habitat and other definable winter range as mapped by the CDOW. In addition, wintering wildlife are protected from motorized disturbance in other areas (e.g., WSAs, Thompson Creek ACEC, Deep Creek ACEC, Hack Lake SRMA, and the Burnt Tree Ridge area) by a closure to motorized over-snow travel and limitations to stay on designated routes (e.g., King Mountain). These seasonal limitations for other purposes indirectly preserve winter habitat effectiveness and reduce disturbance and habitat avoidance.

Under all alternatives, big game birthing areas for elk and bighorn sheep are protected from surface occupancy and surface-disturbing activities by a TL. The TL prohibits surface occupancy and surface-disturbing activities on: elk calving areas from April 16 to June 30, pronghorn antelope fawning areas from May 1 to July 15, Rocky Mountain bighorn sheep lambing areas from May 1 to July 15 and desert bighorn sheep lambing areas from March 1 to May 1.

BLM_0016568

**Birds.** In all alternatives TL stipulations on surface-use and surface-disturbing activities (not just oil and gas operations) would be applied during specified periods to protect active nest sites and fledgling habitat of raptors. The TL prohibits surface occupancy and surface-disturbing activities within a buffer zone centered on an active raptor nest site. The TLs help to alleviate human-induced impacts such as displacement of raptors, nest abandonment or other human caused stresses. In Alternative A, the TL stipulations would be applied (1) from February 1 to August 15 within a 0.25-mile radius of a raptor nest sites for accipiters, falcons (except kestrels), buteos, and owls, and (2) from April 1 to August 31 within a 0.5-mile radius of osprey nests.

Under all alternatives, TL stipulations to protect nesting waterfowl and shorebird habitat and rookeries would be applied from April 15 to July 15 in a 0.25-mile radius around the nesting and production areas of the Fravert Reservoir, Consolidated Reservoir, and the King Mountain Reservoirs (e.g., Grimes-Brooks and Nobel and Upper and Lower King Mountain). This TL is consistent with the TL decision made for the Roan Plateau portion of CRVFO. Other stipulations for major river corridors, riparian and wetland zones, threatened and endangered species also indirectly protect birds.

### Habitat Fragmentation and Habitat Connectivity

*State Wildlife Areas (SWA).* SWAs were acquired by the state not only to protect wildlife habitat but also to provide the public with opportunities to hunt, fish, and watch wildlife (CDOW 2010). Under Alternatives A and B, the Garfield Creek, Basalt, and West Rifle Creek SWAs have an NSO stipulation to protect wildlife habitat values from unnecessary surface occupancy and surface-disturbing activities. Some portions of the Garfield Creek SWA are leased and being developed with seasonal drilling constraints. The NSO stipulation does not prohibit fluid minerals leasing, like the CL stipulation under Alternative C, but the NSO stipulation is considered a major constraint on surface-disturbing activities that would protect wildlife values on unleased lands.

*Big Game Ungulates and Other Large Mammals.* The CRVFO 1999 Oil and Gas Leasing and Development Record of Decision and RMPA (BLM 1999b) applied an NSO stipulation for the protection of wildlife seclusion areas. The NSO stipulation prohibits surface occupancy and surface-disturbing activities within seclusion areas that provide high wildlife value: Starkey Gulch, Riley Gulch, Crawford Gulch, Paradise Creek, Coal Ridge, Lower Garfield, Jackson Gulch, Bald Mountain, and Battlement Mesa. An NSO stipulation was applied to protect a broad range of values from the impact of human intrusion. Exceptions have been and would continue to be granted based on approval by the BLM of a mitigation plan that suitably addresses the wildlife seclusion values at risk.

*Birds.* Under all alternatives, BLM Instruction Memorandum (IM) No. 2008-050 would provide guidance toward meeting the agency's responsibilities under the Migratory Bird Treaty Act (MBTA) and Executive Order (EO) 13186. The guidance directs the CRVFO to promote the maintenance and improvement of habitat quantity and quality, and to avoid, reduce, or mitigate adverse impacts on the habitats of migratory bird species of conservation concern to the extent feasible and in a manner consistent with regional or statewide bird conservation priorities. Under Alternative A, the BLM would continue to apply conditions of approval on a case-by-case basis for the maintenance of migratory bird habitat.

All alternatives would offer NSO stipulations for raptors; however Alternative A would be the least restrictive by prohibiting surface occupancy and surface-disturbing activities within a 0.125-mile radius of a nest site of golden eagles, ospreys, accipiters, buteos, falcons (except kestrels), and owls.

BLM_0016569

Under all alternatives, NSO stipulations would be applied to protect waterfowl and shorebird habitat and rookeries within significant production areas as mapped by the CDOW.

*Habitat Improvement.* As opposed to Alternatives B, C, and D, Alternative A has no specific big game habitat condition objective. The primary emphasis of habitat improvements would continue to be determined on a case-by-case basis.

*CDOW Big Game Population and Harvest Objectives.* The BLM would continue to close routes to motorized use to help keep big game on BLM lands and reduce big game movement to private lands during the big game hunting season in the Castle Peak area. Under all alternatives, areas accessed by the Stagecoach Trail (#8535) and Domantle Road (#8513) would be closed from October 1 to November 30. Under all alternatives, the CRVFO would annually coordinate with the CDOW District Wildlife Managers to allow specific motorized routes to remain open after December 1 in order to increase elk harvest in specific areas when elk numbers are over population objectives.

In summary, the benefits of terrestrial wildlife management action and allowable use decisions on terrestrial wildlife would vary between alternatives, based on the different temporal and spatial constraints on use and surface-disturbing activities in wildlife habitats. Based on these factors, Alternatives A and D are not as effective as Alternatives C or B, respectively, at maintaining desirable species at viable population levels commensurate with the species' and habitats' potential through the life of the plan.

**Impacts from Soils Management.** Under all alternatives, proposed actions would comply with Colorado Public Land Health Standard 1. Soils that achieve these standards would in turn maintain healthy wildlife habitat conditions. Therefore, the soils management goals and objectives under all alternatives would benefit terrestrial wildlife.

Surface-disturbing activities that negatively impact soils also indirectly impact plant growth and vigor in wildlife habitats. Harmful changes in vegetation cover or conditions negatively impact the condition and quality of wildlife habitats, reducing habitat effectiveness. Across all alternatives, an NSO stipulation would be applied on the debris flow hazard zone around the town of Glenwood Springs. In all alternatives, NSO stipulations would prohibit surface occupancy and surface-disturbing activities on slopes greater than 50 percent.

Requiring geotechnical engineering, reclamation plans, and monitoring of projects would minimize surface runoff and erosion of soils, thereby reducing the chances of habitat fragmentation. The CSU stipulations require special design measures to new construction on erosive soils and slopes greater than 30 percent. The intentions of the stipulations were to apply the constraints to all public land uses, not just fluid mineral development, in order to reduce erosion and maintain soil site stability. The language under Alternative A for soils stipulations was adapted from oil and gas stipulations, unlike Alternative B, C, and D stipulations that straightforwardly address all surface-disturbing activities.

Therefore, the soils management action and allowable use decisions under all alternatives would indirectly, but beneficially, contribute to maintaining and protecting the condition and quality of wildlife habitat, ensuring that Standard 3 for terrestrial wildlife would be met through the life of the plan.

BLM_0016570

**Impacts from Water Resource Management.** All proposed decisions would be consistent with applicable state and federal water quality standards. Under all alternatives, implementation actions would comply with Colorado public land health standard No. 5. Soils that achieve these standards would in turn maintain healthy wildlife populations. Therefore, the water resource management goals and objectives under all alternatives would benefit terrestrial wildlife.

NSO stipulations for major river corridors protect riverine areas, waterfowl and shorebird production areas, and wildlife habitat along the Colorado, Roaring Fork, Crystal, Frying Pan, Eagle, and Piney Rivers. NSO stipulations to protect domestic watershed areas also safeguard terrestrial wildlife habitat south of Rifle and north of New Castle.

Proposed water resources management action and allowable use decisions, along with complementary riparian stipulations, would guide proposed actions of all programs in a manner conducive to maintaining or improving water quality of all water bodies, including groundwater located on or influenced by BLM lands. Such species as waterfowl, which are commonly found in or near water bodies, are directly benefited. These decisions would indirectly benefit wildlife and wildlife habitats because the distribution and quality of water are important factors in maintaining viable terrestrial wildlife population levels commensurate with the species' and habitats' potential. Therefore, the water resource decisions under all alternatives would indirectly, but beneficially, contribute to maintaining the condition and quality of wildlife habitat, ensuring that standard 3 for terrestrial wildlife would be met through the life of the plan. Alternatives A and D are similar but less restrictive on surface-disturbing activities.

**Impacts from General Vegetation Management.** Under all alternatives, proposed actions would comply with Colorado Public Land Health Standard 3. The overall vegetation goal is to provide healthy and productive plant communities of native and other desirable species at viable population levels commensurate with the species' and habitats' potentials. Plant communities that achieve these standards would in turn support terrestrial wildlife populations that are productive, resilient, diverse, vigorous, and able to reproduce. Therefore, the vegetation goals and objectives under all alternatives would benefit terrestrial wildlife.

Vegetation treatments are designed to move plant communities toward desired conditions. Under Alternative A, CRVFO vegetation management guidance would continue though the implementation of various RMP amendments (e.g., CRVFO Fire Management Plan—Wildland Fire Management and Prescriptive Vegetation Treatment Guidance) or program-specific plans developed by the BLM or other agencies, such as the CDOW. Current management direction has been to restore the physical function and biological health of BLM land to achieve Colorado public land health standards. At the implementation level, vegetation manipulations would continue creating a more diverse age-class structure of vegetation by reducing canopy cover, changing vegetation density, mimicking natural stand conditions and natural regeneration processes, reducing weeds, and thinning pinyon-juniper woodlands encroaching on sagebrush shrublands in order to protect the shrublands and increase the quality and quantity of herbaceous forage.

Successional vegetation management by habitat manipulations would be beneficial for (a) species dependent on younger seral stages and (b) species that prefer a diversity of vegetation age-classes or managing for a diversity of species. However, there could also be adverse direct and indirect impacts on species dependent on large blocks of older seral stage habitats until vegetation communities reestablish themselves. Adverse impacts on these species would be direct habitat loss, modification, fragmentation, and reduced habitat effectiveness.

BLM_0016571

Noxious and invasive weeds are often of lower value to wildlife and degrade wildlife habitat by reducing optimal cover or food. Invasive non-native plants with little or no forage value for big game species are increasing. A concern of resetting vegetation seral stages through performing vegetation treatments is the invasion of undesirable plant species. Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds. For example, cheatgrass outcompetes most native plants when moisture is limited. It can also change site-specific fire ecology and result in the loss of critical shrub communities. Cheatgrass would provide some short-term forage benefits to big game species in early stages of growth, but it lacks the ability to provide high quality forage during most of the year.

Most surface-disturbing activities include the potential for allowing the introduction of noxious or invasive weeds. The CRVFO would continue implementation of its integrated weed management plan and EIS (BLM 2009e), which would allow the treatment of up to 5,000 weed-infested acres. This EA tiers to the programmatic EIS for use of herbicides on BLM lands in 17 western states (BLM 2007m). All applicable conservation measures, BMPs, and mitigation measures from the plan would be adhered to, helping to reduce adverse impacts on nontarget vegetation. Across all alternatives, the BLM would hold project proponents responsible for monitoring and controlling noxious weeds that result from any new facilities, improvements or other surface-disturbing activities. Actions common to all alternatives that control weeds would have a beneficial impact on wildlife habitat.

**Impacts from Riparian Vegetation Management.** Riparian habitat is one of the richest and most diverse habitat types. One percent of the BLM lands are composed of riparian areas. This small but important habitat type provides a multistoried plant community for terrestrial wildlife. Riparian corridors offer excellent travel corridors for safe movement between habitat types and promote the dispersal of wildlife populations. Riparian areas supply an abundance of edge habitat that is spread out over a large area, making cover more accessible to wildlife. Riparian areas also serve as security, resting, feeding, and staging areas for mammals and birds. The health of wildlife populations is directly related to overall health and functional capabilities of riparian and wetland resources, which in turn are a reflection of watershed health.

The objective of the riparian program is to attain riparian area proper functioning condition (PFC). Riparian areas are classified as in PFC when adequate vegetation and landform structure is present to dissipate stream energy from high flows. This condition reduces erosion, improves water quality, filters sediment, captures bedload, and aids floodplain development. Under all alternatives, riparian and wetland vegetation areas are managed under the goal of Colorado Public Land Health Standard 2. This includes ensuring riparian vegetation captures sediment and provides forage, habitat, and biodiversity. The management of wetland/riparian areas to maintain or improve their PFC rating would improve habitat conditions for various wildlife species that use these areas. However, numerous other species would also benefit from improved riparian PFC, including amphibians, big game mammals that feed in these areas (e.g., moose), and raptors, migratory birds, and cavity-nesting birds that rely on riparian vegetation for stopover habitat, feeding areas, or shelter.

Alternatives A and C would continue applying the current NSO stipulation to riparian areas and wetland zones and a CSU stipulation 500 feet from the outer edge of riparian vegetation. These stipulations help avoid long-term and short-term direct adverse impacts on riparian areas. Application of the stipulations would ensure that riparian habitats provide conditions suitable to meet the life history requirements of various wildlife species. The protection of riparian areas is important because it is better to protect riparian habitat rather than try to restore degraded habitat. Healthy riparian areas support terrestrial wildlife communities that

BLM_0016572

are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes. Therefore, implementing the proposed riparian management action and allowable use decisions would indirectly, but beneficially, contribute to maintaining the condition and quality of wildlife habitat, ensuring that Colorado Public Land Health Standard 3 for terrestrial wildlife would be met through the life of the plan.

**Impacts from Fisheries and Aquatic Wildlife Management.** Under all alternatives, proposed management action and allowable use decisions would comply with Colorado Public Land Health Standard 3. In areas where these standards are being met, there is reduced risk to terrestrial wildlife from loss or reduction of streamside vegetation, offsite erosion and increased sedimentation and turbidity associated with implementation-level projects and actions.

Protection of fish and other aquatic wildlife would be based on application of NSO, CSU, and TL stipulations and LNs in all alternatives. The existing aquatic wildlife stipulation protects water sources by establishing a 2-mile buffer around the Rifle Falls and Glenwood Springs fish hatcheries. The watershed protections under this stipulation also provide protections for populations of native fishes and sportfishes in Rifle Creek and Mitchell Creek and their tributaries, as well as adjacent habitat conditions for terrestrial wildlife. Although the NSO stipulations would indirectly conserve terrestrial wildlife habitat, the stipulations would probably constrain habitat improvement projects, such as prescribed fire. Mechanical, biological, and chemical wildlife habitat treatments would need site-specific design to mitigate impacts.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Under all alternatives, no decision would be approved in this RMP revision or authorized on BLM lands that would jeopardize the continued existence of fish or aquatic wildlife species that are listed, officially proposed, or candidates for listing as threatened and endangered. The proposed management action and allowable use decisions are directed at preventing the need for listing proposed, candidate, and sensitive species under the ESA, protecting special status species, and improving their habitats to a point where their special status recognition is no longer warranted (i.e., Standard 4).

Protection of special status species fish and other aquatic wildlife would be based on application of NSO, CSU, and TL stipulations and LNs in all alternatives. These management action and allowable use decisions would result in site-specific higher quality habitat conditions for terrestrial wildlife, especially riparian-associated species. Alternative A proposes fewer constraints on use and surface-disturbing activities and a smaller area of constraints, so qualitatively it is estimated that it would indirectly, but beneficially, contribute the least to ensuring that Standard 3 for terrestrial wildlife would be met through the life of the plan. However, there would not be a planning area-wide quantitative measurable difference on terrestrial wildlife populations between alternatives. Managing habitat for special status fish and other aquatic species at the implementation level would continue to involve many techniques, including instream structures, riparian plantings, and exclosure fences, removing impediments, and placing in-channel barriers and bank stabilization.

Although the proposed NSO stipulations would indirectly conserve and maintain terrestrial wildlife habitat, the stipulation would probably constrain habitat improvement projects, such as prescribed fire. Mechanical, biological, and chemical wildlife habitat treatments would need site-specific designs to mitigate for the NSO stipulation.

BLM_0016573

**Impacts from Special Status Plants and Terrestrial Wildlife Management.** Under all alternatives, no decision would be approved in this RMP revision or authorized on BLM lands that would jeopardize the continued existence of plant and terrestrial wildlife species that are listed, officially proposed, or candidates for listing under the ESA. The proposed land use plan decisions are directed at preventing the need for listing proposed, candidate, and sensitive species under the ESA, protecting special status species, and improving habitats for special status species to a point where their special status recognition is no longer warranted (i.e., land health standard 4).

Management of special status plants and terrestrial wildlife and their habitat would be based on the application of: (1) NSO, CSU, and TL stipulations, (2) LNs, and (3) management action and allowable use decisions in all alternatives. Managing special status species during RMP implementation would continue to involve many techniques, including application of treatments to degraded habitats, introduction, translocation, transplantation, restocking, augmentation, and reestablishment of native species, and application of conservation measures and guidance from conservation plans.

The loss of a special status species can conceivably affect other terrestrial wildlife species. Decisions intending to benefit special status plant and terrestrial wildlife species would influence other species occurring in that same habitat. For instance, decisions that conserve or maintain habitats for special status species also help retain larger blocks of contiguous habitat, habitat connections, and wildlife corridors for terrestrial wildlife species that do not have special status. Thus, proposed decisions preventing use and occupancy and other surface disturbances that would degrade habitat would indirectly benefit terrestrial wildlife species that do not have special status. Alternatives A and D propose fewer constraints on use and surface-disturbing activities and a smaller area of constraints, so qualitatively it is estimated that those alternatives would indirectly result in the most potential for adverse impacts on terrestrial wildlife habitat.

**Impacts from Visual Resource Management.** The impacts on terrestrial wildlife from VRM decisions are primarily associated with limitations on surface-disturbing activities intended to maintain the scenic values of the public lands. Different levels of scenic values require different levels of management. For example, management might be focused on preserving or retaining the existing character of a landscape with high scenic value so the area would be designated VRM Class I or II. An area with less scenic value might be managed to allow for some landscape modifications, and those areas would be designated Class III or IV.

VRM Class I and Class II designations do not preclude land use activities but the level of change to the landscape would be low. Alternatives B and C propose the most VRM Class I and Class II designations, so qualitatively it is estimated that they would indirectly, but beneficially, contribute the most to ensuring that Standard 3 for terrestrial wildlife would be met through the life of the plan.

At the implementation level, habitat improvement projects in VRM Class I and Class II areas would be designed to mitigate for scenic values. Any changes to the landscape would need to repeat the basic elements of form, line, color, and texture found in the natural features of the landscape

**Impacts from Wildland Fire Management.** The composition, structure, function, and pattern of wildlife habitats on BLM lands have been dramatically influenced by fire historically and by suppression more recently. Fire suppression has changed vegetation types and structure and has fostered unnaturally high fuel loads that could eventually result in catastrophic fires. In lower elevations, encroachment of pinyon-juniper woodlands in the absence of fire has decreased understory diversity and productivity. At higher elevations,

BLM_0016574

absence of fire or other disturbance has resulted in some aspen forests being replaced by spruce forests and in aspen stands becoming decadent, having much lower forage or cover value for wildlife.

The impacts of fire management on terrestrial wildlife would be the same under all alternatives, with all use guided by the current Fire Management Plan (FMP), whose goals are restoring the physical function and biological health of the land to maintain and achieve Colorado public standards, protecting existing and improving degraded riparian areas, and limiting the spread of noxious and invasive plants, insect infestations, and disease. The specific wildland fire management unit (FMU) objectives and strategies consider local wildlife values, such as maintaining healthy sagebrush shrublands. The FMP includes guidance specific to heavy equipment, motorized vehicle use and the placement of large fire camps, the aerial application of retardant or foam, WSAs and ACECs, threatened and endangered and other special status species, and vegetation treatments. All of these would directly and indirectly lessen the negative impacts of wildland fire suppression and prescriptive vegetation treatments on wildlife values over the life of the plan. Identified post-fire emergency stabilization and rehabilitation efforts would benefit terrestrial wildlife over the long term by decreasing erosion and restoring or improving habitat conditions following a fire, although there could be short-term adverse impacts.

The FMP has helped maintain and conserve wildlife values as well as allow for the implementation of prescriptive vegetation treatments that benefit terrestrial wildlife. It is projected that the current FMP and FMUs would beneficially contribute to ensuring that standard 3 for terrestrial wildlife would be met through the life of the plan in all alternatives.

**Impacts from Cave and Karst Resource Management.** Caves provide escape for terrestrial wildlife (e.g., reptiles, owls, bats, and small mammals), shelter from cold temperatures and snow during the winter, refuge from daytime heat in the summer, and water sources. While the CRVFO does not market, publish, or release information regarding cave locations to the general public, cave use has the potential to damage fragile and sensitive resources. Under all alternatives, cave and karst resources would be managed under specific cave management objectives and setting prescriptions that allow for appropriate access while addressing issues and concerns relating to preservation of the caves' pristine and fragile resources, wildlife values, scientific and research values, and visitor safety/rescue issues. The cave management objectives and setting prescriptions would retain the current physical, social and operational qualities of caves. If caves are found to be significant, they would be managed in accordance with the Federal Cave Resources Protection Act. An NSO stipulation for the protection of the Deep Creek cave area would prohibit surface occupancy and surface-disturbing activities in that area. The NSO extends to 5,000 feet below the surface. The NSO area encompasses the cave openings and portions of the subsurface features and watersheds immediately above the caves. Proposed management under Alternatives A and D would directly benefit terrestrial wildlife species that use the Deep Creek cave area such as bats that use caves for roosting, maternity colonies, or hibernation.

**Impacts from Forestry Management.** The annual allowable harvest is 1.8 million board feet in the CRVFO. However, harvest levels have averaged less than 10,000 board feet in the last 5 years. Lodgepole pine is the primary commercial species. Pinyon-juniper woodlands are managed as forest products, with an estimated allowable harvest of 6,465 cords. Most of this harvest is firewood for individual use. However, average annual firewood harvest over the last 5 years is 650 cords. All in all, the CRVFO forestry program is very small. In addition, past decisions regarding forest and woodland products management emphasized wood products, but forest management policy on federal lands has changed, emphasizing forest health and

September 2011    *Colorado River Valley Field Office – Draft RMP Revision EIS*    4-223
*Chapter 4, Environmental Consequences*

BLM_0016575

hazardous fuel reduction. Much of the current forest management is now guided by the Healthy Forests Restoration Act.

At the implementation level, forest management would be performed using clearcuts, shelterwood cuts, pre-commercial and commercial thinning, seeding, and planting, timber stand improvement, sanitation treatments and mechanical treatments, or prescribed fire for stand replacement or conversion. These forest management activities, including the construction of timber access roads, could result in direct habitat loss, modification, or fragmentation and reduced habitat effectiveness for some terrestrial wildlife species but could be a long-term benefit for others. These activities could include short-term impacts, such as the use of heavy equipment, helicopters, chemical applications, road construction, traffic, noise, and human presence.

Since the CRVFO has limited lodgepole woodlands (i.e., Black Mountain and King Mountain) and no forester on staff, it is estimated that the intensive forest program would remain small. Since the BLM is managing for a diversity of wildlife species in balance with habitat and landscape potential, implementation of some forestry management actions might be a benefit for some priority wildlife species. For example, reducing pinyon-juniper woodland encroachment on sagebrush shrublands would benefit sagebrush-dependent species and wintering mule deer. The clearing of old, dense, relatively less productive woodlands could make more productive areas available to terrestrial wildlife species.

If forest management is performed, the proposed terrestrial wildlife management actions and stipulations (i.e., NSO, CSU, and TL) would adequately protect terrestrial wildlife. In addition terrestrial wildlife habitat would be indirectly protected by proposed management action and allowable use decisions for other resources. Weighing all the mitigating measures, it is projected that Colorado Public Land Health Standard 3 for terrestrial wildlife would be met through the life of the plan under all forest management alternatives.

**Impacts from Livestock Grazing Management.** Domestic livestock grazing would continue to be permitted under all of the alternatives. BLM lands would be grazed primarily by cattle but also sheep and some domestic horses. The relative numbers and kinds of livestock have not varied much over the last 10 years and are not expected to vary much in the future. Under all alternatives, implementation level grazing decisions would comply with Colorado Public Land Health Standards and Guidelines for Livestock Grazing Management. If livestock grazing is the cause for not achieving standards, changes would be made to address the kind, numbers, and class of livestock, and the season, duration, distribution, frequency, and intensity of grazing use.

The impacts from livestock grazing management on wildlife habitat include competition for forage and water and habitat use. Grazing invariably reduces the height and ground cover of plants, at least temporarily, thus reducing the cover wildlife species need for protection, escape, feeding (including the availability of prey populations), roosting, breeding, and nesting. Inappropriate grazing or overgrazing could change habitat effectiveness and connectivity of wildlife habitats by changing the structure, composition, or diversity of vegetation. Impacts could be both short term and long term and could range from minor to major, depending on the grazing intensity, duration, season of use, and local climatic conditions. Managing the timing and intensity of livestock grazing is critical to maintaining habitat conditions preferable to wildlife. For example, cattle grazing during the early season could improve the quality of winter forage for elk, but cattle must be removed early enough in the fall to allow plants to regrow.

BLM_0016576

CRVFO land health assessments (LHAs) have found that most grazing allotments are meeting, or moving towards meeting, the standards. The LHA data, along with range compliance data, indicate that current livestock grazing is consistently achieving, or moving toward achieving, standard 3 for terrestrial wildlife. Some localized livestock distribution problems exist, but the continuation of livestock grazing as proposed under all alternatives would provide for adequate rest and recovery before or following grazing to maintain vegetation health and wildlife populations.

Alternative A has slightly more AUMs (39,200) available for livestock grazing; however, across all alternatives, there is no qualitative or quantitative data that indicate that any of the proposed alternatives would have any measurable negative impacts on the number, density, or composition of terrestrial species or the quality or connectivity of terrestrial wildlife habitat through the life of the plan. Any alternative would continue to meet standard 3 for terrestrial animal communities because meeting this standard would not allow the degradation of BLM lands.

**Impacts from Recreation and Visitor Services Management.** Conflicts between recreation and wildlife could increase over the life of the plan, given (1) the numerous outdoor activities available in this region, (2) increasing recreation demand, (3) increasing local populations, (4) emphasis on international tourism and marketing, and (5) presence of world class destination resorts. Two key issues with recreation use were noted during scoping: wildland-urban interface recreation use on big game winter ranges, and recreation use and development in sagebrush steppe communities. Recreation use on big game winter ranges and in sagebrush steppe communities can create short-term physiological and behavior impacts and long-term habitat avoidance. Recreation developments reduce habitat effectiveness and connectivity.

In all alternatives the most determinative land use plan decision for recreation and visitor services (R&VS) is whether to designate an area as a recreation management area (RMA) or not. Alternative A would continue managing eight areas as SRMAs (Bocco Mountain, Bull Gulch, Deep Creek, Gypsum Hills, Hack Lake, Red Hill, Thompson Creek, and the Upper Colorado River). All but Gypsum Hills and Bocco Mountain SRMAs have an NSO stipulation applied to retain the existing physical recreation setting characteristics (RSCs). Seven areas would continue to be managed as RMAs with an NSO stipulation to protect non-motorized recreation opportunities. Non-motorized recreation opportunities were further described as those areas where the visitor can generally expect to see fewer people, largely due to the fact that access is more difficult or challenging, and can enjoy a mostly natural setting with a high degree of solitude and tranquility. Also, refer to Section 4.3.3, Recreation and Visitor Services, Section 4.3.4, Comprehensive Trails and Travel Management, and Appendix M, Draft Recreation and Visitor Services Framework for SRMAs and ERMAs for specific recreation and travel proposals and analysis.

A secondary consideration is the type of activities being emphasized, the anticipated use levels and the amount of recreation infrastructure necessary to accommodate the recreation demand. To fully understand the impacts of these factors, they must be considered in combination with each other.

In all alternatives, recreation activities would take place on BLM lands unless the lands are closed to human entry. Recreation activities and use would be unevenly dispersed and distributed by location, intensity, activity type, infrastructure, season, and time on BLM lands. Activities that create the most adverse effects either alter habitat or affect an animal's behavior. The severity of the response depends on the species involved and the characteristics of the disturbance. Birthing/nesting and wintering areas are normally the most sensitive to human use and development because these areas are usually restricted geographically.

BLM_0016577

In the CRVFO, recreation use peaks during the summer in locations like the Colorado and Eagle Rivers, on weekends and evenings on BLM lands adjacent to communities or within easy access of communities, and during the fall big game hunting seasons when many resident and out-of-town hunters add to the mix of recreation. Areas managed for lower recreation use levels (i.e., total, group size and contact) in undeveloped landscapes are considered less impacting to terrestrial wildlife, regardless of the identification or number of acres of recreation designation. It is important to note that some aspects that affect recreation use and, indirectly, wildlife are outside the parameters of this plan and BLM, such as urban growth/development, promotional marketing, the location of destination resorts, decisions made by other land/wildlife managing agencies, and new technology.

Developed recreation sites, within or outside of RMAs, would be small localized points of high use. Roads and trails would be linear corridors of high use. In all alternatives, recreation development (e.g., trails, trailheads, river access, and campgrounds) would likely increase disturbances, modify habitat, reduce connectivity, reduce habitat effectiveness, increase habitat fragmentation, increase habitat avoidance, and potentially change and interfere with movement patterns.

Realizing the discussion on recreation impacts above, the most important analysis consideration in the land use plan for terrestrial wildlife and terrestrial wildlife habitat is whether adequate mitigation is proposed to alleviate potential negative impacts from implementation-level recreation use and development. Alternatives A and D lack the number and extent of the terrestrial wildlife mitigation in the form of management actions (e.g., winter big game closures, core wildlife areas) and stipulations (e.g., NSO, TL) that are proposed under Alternatives C and B, respectively. Alternative A also lacks the limitations on recreation use (e.g., camping closures, firearm use restriction) proposed under Alternatives C, B and D, respectively. The risks to wildlife habitat (including sagebrush shrublands) and wintering wildlife from inappropriate or just increasing recreation use are higher under Alternatives A and D.

Under all alternatives, land use plan decisions and implementation actions for recreation would be somewhat mitigated by compliance with Recreation Guidelines to Meet Public Standards on Bureau of Land Management Managed Lands in Colorado (BLM 2000c). These guidelines specify that recreation use on BLM lands is managed to promote the survival and health of native wildlife, to protect wildlife habitat by preserving connectivity and avoiding fragmentation, and to minimize wildlife disturbances by limiting recreation use by type, season, intensity, distribution, or duration when necessary.

**Impacts from Comprehensive Trails and Travel Management.** Roads that provide access for the public can reduce the quality of habitats for many wildlife species due to: spread of weeds, collision mortality, behavior changes, disturbance and habitat fragmentation. Shifts in distribution of wildlife away from roads may occur across a range of temporal and spatial scales. The shifts away from roads also are influenced by topography, slope, vegetation, intensity and duration of disturbance, type of road, and types of use on the road. Changes in habitat use, including relocation to other areas, can impact survivorship and reproductive success by forcing the animals into areas of lower habitat quality or increasing the density of animals relative to the carrying capacity of the habitat. For raptors and other sensitive birds, disturbance can also cause nest failure as a result of abandonment or reduced nest attentiveness by one or both adults or starvation of the young due to reduced hunting success.

Decisions about roads, including construction, reconstruction, closure, obliteration, or decommissioning, are complex because they affect a multitude of resources, not just wildlife. Trails have effects that are much

BLM_0016578

harder to describe. However, heavily used trails or those that support noisy or high-speed activity can have the same types of impacts associated with disturbance and displacement of wildlife to less suitable areas. No alternative prescribes road or trail densities that limit the number of roads or trails or the spatial distribution of routes. However, for areas designated as "limited to designated routes," the CRVFO would manage public travel according to the route designations proposed for each alternative. Through the life of the plan, site-specific travel management issues would cause some routes to be rerouted, closed, or seasonally limited. It is also likely that some additional trails would be created for public use to connect regional trails systems, to support local community trail systems, and to meet the recreation objectives in some SRMAs and ERMAs.

The impacts of travel decisions (i.e., OHV area and route decisions) on wildlife and wildlife habitat would primarily depend on the number of acres open and closed to OHV use under each alternative, the specific routes open and closed for public use, the type of travel permitted, and the application of limitations (i.e., time or season of use). Inappropriate use, whether OHV or pedestrian, has the potential to damage wildlife habitat as well as disturb individuals. Cross-country travel in "open" travel areas would continue to create new unplanned routes into sensitive wildlife habitats and to increase habitat fragmentation. As opposed to Alternatives B, C, and D, Alternative A has area travel designations of "open" and "limited to existing routes," which allows unplanned expansion of routes. Over time, this would cause the most direct and indirect impacts on wildlife populations and habitats. Inappropriate and unplanned travel allowed by the current travel designations, on approximately 300,000 acres under Alternative A, is likely to cause the most impacts on the number, density, and composition of terrestrial species and the quality and connectivity of terrestrial wildlife habitat through the life of the plan. Foot travel is not limited in any alternative, and horse travel is limited only on the Storm King Trail.

Winter is a trying time for most wildlife. Disturbance on wintering habitats can cause animals to utilize critical energy reserves and avoid foraging areas with the highest quality forage. Constant disturbance during harsh winters would probably result in reduced animal fitness and reproductive potential. Seasonal travel limitations (e.g., closure of big game winter range from December 1 to April 15 and closure of the Red Hill SRMA from December 1 to March 31) would have benefits for wildlife by limiting disturbance and avoidance caused by motorized travel during the critical winter months.

**Impacts from Lands and Realty Management.** The following lands and realty decisions would impact terrestrial wildlife: land tenure adjustments, withdrawals, rights-of-way and other land use authorizations (including renewable energy), and renewable energy development.

*Land Tenure Adjustments.* Land exchanges, acquisitions, and disposals would add or remove habitat from BLM jurisdiction. The effects of land tenure adjustments on wildlife species would be determined through site-specific environmental analysis for any proposed land disposal. Land disposals could result in losses of wildlife habitat, whereas acquisitions would benefit wildlife species by providing protections that would not be afforded on nonfederal ownership.

Under Alternative A, land tenure adjustments are performed to increase the overall efficiency and effectiveness of BLM land management. There is no specific guidance in the current plan regarding disposal or retention of BLM lands for the benefit of wildlife species.

*Withdrawals.* Withdrawing areas from mineral entry would offer long-term benefits for terrestrial wildlife by reducing any adverse effects that could result from mineral development. Deep Creek and Thompson Creek

BLM_0016579

areas were identified to be recommended for withdrawal to the Secretary of the Interior for closure to the mining laws for locatable exploration or development (locatable minerals).

*Rights-of-Way and other Land Use Authorizations.* Construction, operation, and maintenance associated with rights-of-way could result in short-term impacts on a variety of wildlife species, including direct mortality, damage to burrows, temporary displacement, loss of forage, human presence, noise, and vehicular traffic. The spatial distribution, including density, composition, and frequency of species, could be impacted by the location and size of the project, along with the intensity and duration of construction and maintenance. Aboveground ROW actions, such as communication sites and power lines, would have long-term impacts. These types of permanent structures are particularly hazardous to avian wildlife because of the potential for collision or electrocution. Long-term impacts could include loss of habitat and habitat modification and reduced habitat effectiveness. Habitat loss is caused by road construction and use, facility construction and placement, pipeline construction, field facility maintenance, ROW construction, range improvements, and indirect areas of disturbance surrounding these areas.

The length of time of reduced habitat effectiveness and avoidance would depend on the timeliness and effectiveness of reclamation efforts. If these disturbed areas are successfully reclaimed, the regrowth of native vegetation would provide ideal forage and foraging areas for some wildlife species (i.e., raptors and mammalian predators) if operation and maintenance are low.

Impacts from renewable energy development on terrestrial wildlife species (including migratory birds) would include habitat disturbance, introduction of invasive weeds, individual mortality, erosion and runoff, fugitive dust, noise, exposure to contaminants, and interference with behavioral activities. Operational impacts of most concern to ecological resources would be those associated with bird and bat strikes to turbines and associated infrastructure (e.g., transmission lines, meteorological towers) and, to a lesser extent, the electrocution of birds. Other concerns would include habitat fragmentation, noise, and disturbance caused by human and vehicular activity.

BLM lands identified as exclusion areas would be unavailable for ROWs. BLM lands identified as avoidance areas may not be totally unavailable but should be avoided if possible due to some resource value that may become damaged or detracted from if development were allowed. Alternative A designates 20,800 acres as ROW exclusion areas (unsuitable) and 101,300 acres as ROW avoidance (sensitive) areas. Under all alternatives, ROW avoidance and exclusion areas would apply to ROWs, other land use authorizations, and renewable energy. Although some terrestrial wildlife values (i.e., elk calving, raptors, and bighorn sheep) are considered in the identification of avoidance areas under Alternative A, the wide diversity of wildlife species and their habitats is not.

The amount of land proposed as open to ROW placement is not necessarily indicative of the number of acres of important wildlife habitat that would be directly disturbed. At the land use level, the best indicator of reducing adverse impacts of future lands and realty decisions is the level of constraint and size in acres of protections or withdrawals directly or indirectly afforded to wildlife or wildlife habitats. Under all alternatives, ROWs would be subject to the concurrent NSO, CSU, and TL stipulations approved in the RMP and applied during the site-specific environmental analysis to eliminate or lessen the impact of ROWs.

September 2011          *Colorado River Valley Field Office – Draft RMP Revision EIS*          4-228
*Chapter 4, Environmental Consequences*

BLM_0016580

Through the life of the plan, Alternatives A and D would pose more risk of not sustaining area-specific wildlife habitat conditions due to the extent and types of stipulations proposed to mitigate for adverse impacts of lands and realty actions.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts associated with minerals exploration and development would include habitat loss, habitat modification and loss of habitat effectiveness. Impacts result from the removal of vegetation (surface disturbance) and subsequent occupation of areas for oil and gas well pads, open pit mines, and associated roads and infrastructure. These impacts extend beyond the physical structures (Kaal et al. 2008). Many species of wildlife would avoid areas with high levels of noise, roads with frequent automobile/truck traffic, and areas surrounding structures. Repeated human disturbance of big game populations on crucial winter ranges can change activity patterns, increase predation, reduce access to resources, and increase energy expenditures necessary for survival (NMDGF 2010). Radiotelemetry and GPS collaring data have shown elk to avoid oil and gas development by moving to less developed areas (BLM 2008).

Each phase of oil and gas development—from exploration and construction through operation and abandonment—has a specific combination of impact type, intensity, and duration.

- Construction, Drilling, and Completion—The initial phase of development typically lasts for 25 to 40 days per well, depending on depth, geology, equipment used, and other variables. Associated activities include blading an access road and pad (with an average combined area of 3.4 acres per well) and nearly continuous operation of a drill rig and other specialized heavy equipment. During completion operations, specialized equipment is used to force fluids and associated materials into the gas-producing zones to fracture the rock and increase gas flow. On average, more than 500 round-trips by heavy trucks and pickups are associated with each new well.

- Production and Maintenance—This phase typically involves minimal personnel in the field, except at compressor stations and water disposal facilities, with periodic traffic to each well for monitoring and maintenance. Interim reclamation of temporarily disturbed areas of pads (areas not needed for routine production and maintenance) is conducted when the last well on a pad has been completed. Reclamation of temporarily disturbed areas along roads and pipelines is performed immediately following construction. Successful interim reclamation for weed and erosion control is expected to occur within 3 to 5 years after an area has been seeded with a BLM-approved seed mix. However, restoration to productive wildlife habitat could take 20 years or longer. The remainder of the disturbed area is occupied by surface facilities and ongoing human activity throughout the life of the well.

- Abandonment—The final phase of an oil or gas well occurs at the end of its productive life, typically ranging from 20 to 40 years. During abandonment, surface facilities are removed, wells are plugged, and access roads are reclaimed unless deemed necessary for resource management or if requested by the landowner. These activities involve a short-term increase in workers and vehicles in the project areas. Abandonment and reclamation require approximately 3 days per well and 4 days per mile of access road, for a crew of four people.

- Final Reclamation—Restoration of temporarily disturbed areas at the well pad and along the access road begins on completion of construction. Attaining reclamation standards in terms of erosion control, weed control, and establishment of vegetation cover typically requires at least 3 to 5 years following planting. Actual recovery of reclaimed areas to conditions that represent productive wildlife

BLM_0016581

habitat may take 20 years or longer, especially in drier sites. Areas of long-term disturbance, which are occupied by surface facilities and ongoing human activity throughout the life of the well, are reclaimed following abandonment.

Oil and gas development activity is concentrated on the western 22 percent of the CRVFO (the area west of the Grand Hogback), where high potential for the occurrence of gas resources is found. It is estimated that 99 percent of future drilling would occur in the areas identified as high potential for the occurrence of oil and gas resources. Infill drilling and step-out drilling would be the major portion of future activity. Of the 127,335 acres of BLM mineral estate in this high potential area that is not within the Roan Plateau planning area, 95 percent has been leased and is being developed. The eastern 78 percent of the CRVFO (east of the Grand Hogback) has a lower potential for the occurrence of oil and gas resources. Approximately 1 percent of future drilling activity is likely to occur in areas of medium and low potential, and no drilling is predicted in the areas identified as no known potential. Consequently, wildlife impacts relating to the location of oil and gas development would not be expected to vary among alternatives. Under Alternative A, all WSAs and the Thompson Creek ACEC (formerly Natural Environment Area) would remain closed to fluid minerals leasing and geophysical development. Over the life of the current RMP, the CL designation for these areas would continue to indirectly maintain wildlife habitat.

The CRVFO 1999 Oil and Gas Leasing and Development Record of Decision and RMPA identified stipulations for leases issued after 1999 to reduce impacts on wildlife. They included NSO stipulations for state wildlife areas, major river corridors, and raptors; TL stipulations for big game winter habitat, big game birthing areas, grouse, raptors, osprey, white pelicans, greater sandhill cranes, and ferruginous hawks; and LN stipulations for wildlife and wildlife habitat. The ROD also included an NSO stipulation for wildlife seclusion areas. This NSO prohibits surface occupancy and surface-disturbing activities within seclusion areas that provide high wildlife value: Starkey Gulch, Riley Gulch, Crawford Gulch, Paradise Creek, Coal Ridge, Lower Garfield, Jackson Gulch, Bald Mountain, and Battlement Mesa. An NSO stipulation was applied to protect a broad range of values from the impact of human intrusion. Exceptions have been granted and would continue to be considered based on approval by the BLM of a mitigation plan that suitably addresses the wildlife seclusion values at risk.

Federal oil and gas regulations prevent the BLM from applying new or additional lease stipulations that would be developed through this planning effort to existing leases. Federal regulations do allow the BLM to apply other protection measures in conjunction with planning and implementing oil and gas projects. All alternatives require energy companies through lease notices to implement specific measures to reduce impacts of oil and gas operations on wildlife and wildlife habitat within high-value or crucial big game winter range. These mitigation measures could include applying stipulations consistent with the most recent land use plan as terms and conditions for discretionary approvals (e.g., right-of-way actions) and applying COAs to augment protections related to lease activities. The latter include applying a TL of up to 60 days and requiring that a project component be relocated by up to 200 meters (or more than 200 meters for areas with CSU stipulations) to protect a sensitive resource value. Alternative A also requires reasonable mitigation of impacts of past and proposed oil and gas development within a geographic area plan when well pad densities exceed one pad per 640 acres or road densities exceed 3 miles per 640 acres. Examples of additional regulatory protections that the BLM applies to existing leases include requirements of adequate reclamation, weed control, erosion control, and dust abatement. Such measures are developed in concert with the BLM during preparation of the environmental analysis.

BLM_0016581

East of the Grand Hogback, little impact on terrestrial wildlife from fluid mineral development is expected due to the lower potential for gas resources under all alternatives. BLM lands west of the Grand Hogback would continue to experience habitat loss, habitat modification, and loss of habitat effectiveness. Alternative A anticipates the development of approximately 2,700 federal wells on 330 multi-well pads and approximately 3,300 acres of surface disturbance. This includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 2,200 acres on interim reclamation of well pads. The landscape would continue to exhibit a loss of connectivity of habitats due to the increased presence of corridors and roads. The spatial distribution, including density, composition, and frequency of species, would be impacted by the intensity and duration of fluid mineral development and production. Maintaining current levels of terrestrial wildlife populations west of the Grand Hogback, commensurate with the species' and habitats' potential, would be at risk under all alternatives. Alternatives A and D would pose more risk of not sustaining the habitat conditions necessary for a variety of terrestrial wildlife species than under Alternatives B or C, due to the potential level of development and disturbance.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The effects of mineral resource development and production on wildlife could vary, depending on the location and degree of disturbance, the proximity to key habitats, and the need to develop roads and other support facilities. Environmental contaminants associated with mining could affect wildlife species in many ways and at many levels within the ecosystem. Some contaminants (e.g., lead, arsenic, and cyanide) associated with mines could cause acute or chronic effects on resident wildlife. Site-specific impacts on wildlife would be addressed in individual mining plans of operation.

Acres of locatable minerals, mineral materials sales, and non-energy leasable minerals open to development would vary by alternative, with Alternatives A and D having the most open acres. However, the amount of land that is open to mineral use is not necessarily indicative of the number of acres that would be directly disturbed since the amount of expected mineral development is low. Recognizing that mineral development technologies change through time and because there are no specific actions being evaluated at this time, the indicator of effects between alternatives is the level and type of protection provided to wildlife or wildlife habitats. Adverse effects of minerals decisions on terrestrial wildlife and their habitat would be reduced (by locale and season) by the application of the protective management action and allowable use decisions in addition to recommendations for withdrawals.

The spatial distribution, including density, composition, and frequency of species would be impacted by the intensity and duration of mineral development. Under all alternatives, minerals would be subject to the concurrent stipulations for each alternative. If mineral development would occur through the life of the plan, Alternative A would pose more risk of not sustaining the area-specific wildlife habitat conditions than under Alternatives B or C but less risk than under Alternative D.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative A, the BLM would designate and protect relevant and important values in the following ACECs: Blue Hill, Bull Gulch, Deep Creek, Glenwood Springs Debris Flow Hazard Zone, Lower Colorado River, and Thompson Creek. ACEC designations and their management prescriptions offer long-term benefits for the conservation and protection of terrestrial wildlife that occur within their boundaries by limiting or preventing surface disturbance, human activities, and associated habitat degradation and fragmentation. ACECs designated specifically to protect scenic, wildlife, or geologic values would directly benefit all terrestrial wildlife species and their habitats. ACECs designated to preserve historic or cultural values would indirectly benefit wildlife

BLM_0016583

by limiting surface disturbance and preserving habitat. Impacts on wildlife vary between alternatives, primarily according to the proposed number of acres for the proposed ACECs. Table 4.2.6-2 displays the amount of important big game winter habitat that would be maintained and conserved by the various ACEC designations proposed in the different alternatives.

**Table 4.2.6-2**
**Acres of Mule Deer and Elk Severe Winter Range and Winter Concentration Areas within Proposed ACECs**

| ACEC | Total Acres | Mule Deer | | Elk | |
|---|---|---|---|---|---|
| | | Severe Winter Range | Winter Concentration Area | Severe Winter Range | Winter Concentration Area |
| Abrams Creek (Alt C) | 190 | 0 | 0 | 0 | 0 |
| Blue Hill (All Alts) | 3,720 | 3,250 | 240 | 3,640 | 310 |
| Bull Gulch (All Alts) | 10,400 | 4,440 | 110 | 120 | 150 |
| Colorado River Seeps (Alt C) | 460 | 370 | 0 | 460 | 0 |
| Deep Creek (Alts B & C) | 2,410 | 1,100 | 1 | 1,230 | 450 |
| Dotsero Crater (Alt C) | 100 | 0 | 0 | 0 | 0 |
| Glenwood Debris Flow (All Alts) | 6,100 | 510 | 100 | 2,190 | 390 |
| Grand Hogback (Alt C) | 14,000 | 5,150 | 7,860 | 1,870 | 3,220 |
| Greater Sage-grouse Habitat (Alt C) | 24,600 | 4,530 | 6,550 | 3,760 | 1,600 |
| Hardscrabble/Mayer Gulch (Alt B) | 3,380 | 2,100 | 2,090 | 380 | 460 |
| Hardscrabble/Mayer Gulch/East Eagle Ridge (Alt C) | 4,170 | 2,880 | 2,870 | 660 | 630 |
| Lower Colorado River (Alt A) | 130 | 0 | 0 | 0 | 0 |
| Lyons Gulch (Alt C) | 480 | 480 | 480 | 480 | 7 |
| McCoy Fan Delta (Alt C) | 220 | 220 | 0 | 220 | 0 |
| Mount Logan Foothills (Alt C) | 3,900 | 2,169 | 1,688 | 0 | 0 |
| Sheep Creek Uplands (Alts B & C) | 4,500 | 120 | 0 | 4,500 | 2,110 |
| The Crown Ridge (Alt C) | 1,000 | 40 | 40 | 0 | 660 |
| Thompson Creek (Alts A, B, C) | 4,300 (A) 3,400 (B,C) | 84 | 84 | 0 | 420 |

The protection and conservation of terrestrial wildlife and their habitats under Alternative A would be less than under Alternatives B and C but more than under Alternative D. The reverse is true for wildlife habitat improvements because ACEC designation may adversely affect terrestrial wildlife by restricting habitat treatments or the methods available to perform wildlife habitat improvements.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** The BLM has no discretion to change management of WSAs through this planning process, with the exception of decisions relating to VRM designation and motorized vehicle use. Under all alternatives, the CRVFO would continue to manage Bull Gulch, Castle Peak, Eagle Mountain, and Hack Lake WSAs, consistent with the Interim Management Policy (IMP) for Lands under Wilderness Review (BLM 1995).

Managing WSAs to maintain wilderness characteristics would directly benefit wildlife by reducing habitat fragmentation and modification, maintaining habitat effectiveness, and reducing disturbances through

BLM_0016584

constraints on surface-disturbing activities, motorized/mechanized types of travel, permanent new development, ROWs, and fluid minerals leasing.

Although WSAs maintain and conserve wildlife habitat for a variety of species, the reverse is true for wildlife habitat improvements, because WSA designation may adversely affect wildlife by restricting the methods available to perform wildlife habitat improvements. Direction for managing wildlife in WSAs is prescribed by the IMP. All proposed actions would need to be scrutinized to determine whether the action would be necessary to conserve the wildlife species. The impacts are the same across all alternatives since the acres and locations of WSAs are the same under all alternatives.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The designation of a river as eligible for WSR status would beneficially impact wildlife that utilize habitats directly associated with the river (e.g., riparian, wetlands, open water) by mandating the protection of the river's free-flowing character and restricting surface-disturbing activities within 0.25 mile of the river.

Under Alternative A, all stream segments would be identified as eligible for inclusion in the National Wild and Scenic River System. To be eligible for Wild and Scenic River designation, a river or stream segment must possess one or more ORVs, must have sufficient water quality to support those values, and must be free flowing. ORVs could be scenic, recreational, geological, fish related, wildlife related, historic, cultural, botanical, hydrological, paleontological, or scientific.

Although WSR eligibility would maintain and conserve wildlife habitat for a variety of species, the reverse is true for wildlife habitat improvements, because protection of eligible segments, especially those classified as wild or scenic, would adversely affect wildlife by restricting the methods available to perform wildlife habitat improvements.

**Impacts from Transportation Facilities Management.** Transportation corridors and the subsequent fencing (e.g., Interstate 70, State Highway 82) can cause habitat loss, habitat fragmentation, habitat modification and can create barriers to wildlife movement. Effects can also be indirect, such as displacement or increased mortality of wildlife. High-speed roads (state highways and paved county roads outside the jurisdiction of the BLM) have the greatest potential for direct mortality. Under all alternatives, BLM-maintained roads would continue to have a native or gravel surface, with about 60 to 80 miles of roads being maintained each year.

The BLM has no authority over state or county roads. East of the Grand Hogback, little expansion of transportation facilities authorized by the BLM is expected due to the lower potential for gas resources under all alternatives. The greatest change in transportation facilities would be associated with energy development west of the Grand Hogback. BLM lands west of the Grand Hogback would continue to experience habitat loss, habitat modification, and loss of habitat effectiveness, with some degree of difference based on the level of development proposed. Maintaining current levels of terrestrial wildlife populations, west of the Grand Hogback, commensurate with the species' and habitats' potential, would be at risk under all alternatives. Based on the proposed level of development, Alternative A would pose more risk of not sustaining the habitat conditions necessary for a variety of terrestrial wildlife species than under Alternatives B or C but less risk than under Alternative D.

BLM_0016585

### *Alternative B (Preferred Alternative)*

Impacts to terrestrial wildlife from management of other resources and uses would be the same as or similar to those under Alternative A, except as described below.

**Impacts from Terrestrial Wildlife Management.** Impacts would be similar to those described under Alternative A, except as described below. All management action and allowable use decisions proposed in Alternatives B, C, and D for the benefit of terrestrial wildlife species would offer short- and long-term beneficial effects for wildlife resources. The degree of benefit often varies by the theme of each alternative. Proposed decisions focus on managing habitat with overall results of maintaining healthy, productive animal communities of native and other desirable species at viable population levels commensurate with the species' and habitats' potential.

### Disturbance from Public Travel, Access, and Land Use Activities

*Big Game Ungulates and Other Large Mammals.* An animal in good physical condition may not be measurably impacted by human activity while one in the winter may burn precious energy while avoiding humans and pets (Bernatowicz 2004). To protect wintering wildlife, the BLM would apply a TL on big game winter habitat under Alternatives B, C, and D. The TL prohibits surface occupancy and surface-disturbing activities from December 1 to April 30 to protect big game (mule deer, elk, moose, pronghorn, and bighorn sheep) winter range, including crucial winter habitat and other definable winter range as mapped by the CDOW. This TL may also apply to sundry notices that require an environmental analysis. This TL is the same as the TL decision made for the Roan Plateau portion of the CRVFO and is 15 days longer than CDOW's Actions to Minimize Adverse Impacts to Wildlife Resources (CDOW 2009), which recommends that oil and gas activities in mule deer critical winter range or elk winter concentration areas must occur outside the period from December 1 through April 15.

In addition, the BLM would increase the number of big game winter ranges closed to public motorized and mechanized travel. The closure dates would be from December 1 to April 15 (Table 4.2.5-1). The closure date is 15 days less than under Alternative A; however it also applies to mechanized use which is dominant on low elevation winter ranges that often can be snowfree by April 15. The dates are consistent with the dates in CDOW's Actions to Minimize Adverse Impacts to Wildlife Resources.

To reduce the disturbance of humans and dogs, Alternatives B, C, and D would reduce the stress of harsh winters on big game by eliminating human activity and dogs at the request of the CDOW on an area-specific basis. The closures would be defined by a combination of factors such as snow depth, snow crusting, daily mean temperatures (long periods of cold temperatures), and concentrations of animals. Some people have suggested that the BLM should close the majority of winter ranges to all human activity. The fragmented public-private landscape with so much wildland-urban interface and limited staff for enforcement makes such a proposal unrealistic to effectively implement. This proposal is a flexible approach that can be applied when and where it is most needed.

*Birds.* In all action alternatives, authorized activities resulting in the removal of vegetation and broad-scale use of pesticides would be subject to a condition of approval that would protect birds of conservation concern (BCC) from disturbance during the nesting season. The COA would apply to activities that would take place between May 15 and July 15. The COA would consider the scale/type of the project, the length of time of disturbance, potential species present, weather conditions, elevation, type of motorized equipment, and

BLM_0016586

habitat types. An exception may be granted if nesting surveys indicate no nesting BCC species within 10 meters of the area to be disturbed.

In all action alternatives, the BLM would apply a TL that constrains surface occupancy and surface-disturbing activities to protect use of nesting and fledgling habitat.

A 0.25-mile radius would be applied:

- February 15 to July 15 for red-tailed hawk and all owls
- April 1 to July 15 for Swainson's hawk
- April 1 to August 31 for osprey
- April 15 to July 15 for sharp-shinned hawk and Cooper's hawk

A 0.5-mile radius would be applied:

- December 15 to July 15 for golden eagle
- March 15 to July 15 for prairie falcon
- March 1 to September 15 for northern goshawk

## Habitat Fragmentation and Habitat Connectivity

*State Wildlife Areas.* Impacts would be the same as those described under Alternative A with the application of an equivalent NSO stipulation.

*Big Game Ungulates and Other Large Mammals.* Alternatives B, C, and D do not propose an NSO stipulation for wildlife seclusion areas but Alternatives B and C propose an NSO stipulation for wildlife core areas. The rationale for this is based in the simple fact that BLM has been unable to manage for wildlife seclusion values due to the dominance of previous leases issued before the 1999 GSRA Oil and Gas Leasing and Development ROD and RMPA, when the NSO stipulation for wildlife seclusion areas took effect. The NSO also does not apply to split-estate lands or directional drilling into a federal lease from private land. In summary, these leases are being held by extensive development and production with no opportunity to ever apply the NSO stipulation.

An NSO stipulation for core wildlife areas would be applied under Alternatives B and C. Core wildlife areas include habitats of high wildlife value for multiple species including sage-grouse, elk, mule deer, and bighorn sheep. The NSO stipulation would apply to all use or occupancy of the land surface for fluid mineral exploration/development as well as to all other surface occupancy and surface-disturbing activities. The NSO stipulation would reduce habitat fragmentation and maintain habitat effectiveness and connectivity for a multiple of species. More importantly, the core wildlife areas would conserve big game winter concentration areas defined as that part of the winter range where densities are at least 200 percent greater than the surrounding winter range density during the same period used to define winter range in the average five winters out of ten; and big game severe winter ranges defined as that part of the overall range where 90 percent of the individuals are located when the annual snowpack is at its maximum or temperatures are at a minimum in the two worst winters out of ten (Table 4.2.6-3).

BLM_0016587

**Table 4.2.6-3**
**Acres of Mule Deer and Elk Severe Winter and Winter Concentration Ranges within Core Wildlife Areas under Alternatives B and C**

| Core Wildlife Area | Total Acres | Mule Deer | | Elk | |
| | | Severe Winter Range | Winter Concentration Area | Severe Winter Range | Winter Concentration Area |
|---|---|---|---|---|---|
| Cottonwood/Eby Creek | 7,450 | 6,780 | 2,510 | 6704 | 0 |
| Dry Rifle Creek | 2,210 | 1,490 | 2,210 | 0 | 0 |
| East Eagle | 5,930 | 4,990 | 5,000 | 5,140 | 3,930 |
| Fisher Creek | 2,830 | 1,510 | 940 | 2,830 | 310 |
| Hernage/Abrams Creeks | 4,340 | 3,070 | 3,070 | 900 | 980 |
| Horse Mountain | 1,860 | 920 | 1,1000 | 510 | 1,630 |
| Light Hill | 3,800 | 1,200 | 3,560 | 630 | 1,590 |
| Main-West Elk Ridge | 1,120 | 620 | 1,120 | 990 | 1,120 |
| New Castle North | 1,060 | 510 | 980 | 690 | 0 |
| Old Man's Gulch | 1,310 | 1,040 | 1,040 | 0 | 1,060 |
| Tenderfoot Mesa | 3,030 | 2,330 | 2,330 | 0 | 0 |
| The Crown | 5,150 | 1,940 | 1,940 | 0 | 4,350 |
| Thompson Creek—Holgate Mesa | 3,420 | 1,390 | 1,570 | 520 | 3,090 |
| West Elk Ridge | 2,320 | 1,780 | 2,320 | 1,470 | 2,320 |
| West Rifle Creek | 1,080 | 960 | 1,030 | 190 | 990 |
| Williams Hill | 1,540 | 930 | 1,460 | 940 | 940 |
| Winter Ridge- Deer Pen | 7,170 | 1,490 | 2,220 | 1,700 | 1,090 |
| Wolcott (Ute Creek) | 1,970 | 1,640 | 870 | 1,480 | 63 |
| **Total** | **57,570** | **34,610** | **35,270** | **18,646** | **23,460** |

Under Alternatives B and C, additional winter big game closures from December 1 to April 15 have been proposed. Many of these winter big game closures complement the application of NSO stipulations constraining development in core wildlife areas (Table 4.2.6-4). These corresponding management proposals would help ensure habitat effectiveness is maintained especially for big game.

**Table 4.2.6-4**
**Acres of Winter Big Game Closure within Core Wildlife Areas under Alternatives B and C**

| Core Wildlife Area | Total Acres | Winter Closure under Alternative B (Acres) | Winter Closure under Alternative C (Acres) |
|---|---|---|---|
| Cottonwood/Eby Cr. | 7,400 | 6,510 | 6,510 |
| Dry Rifle Creek | 2,200 | 2,210 | 2,210 |
| East Eagle | 5,900 | N/A | 5,930 |
| Fisher Creek | 2,830 | 1,030 | 2,830 |
| Hernage/Abrams Cr. | 4,340 | 4,340 | 4,340 |
| Horse Mountain | 1,860 | * | * |
| Light Hill | 3,800 | 3,780 | 3,780 |
| Main-West Elk Ridge | 1,120 | * | * |
| New Castle North | 1,060 | 1,060 | 1,060 |
| Old Man's Gulch | 1,310 | 1,310 | 1,310 |
| Tenderfoot Mesa | 3,030 | 3,030 | 3,030 |
| The Crown | 5,150 | 5,150 | 5,150 |

BLM_0016588

**Table 4.2.6-4**
**Acres of Winter Big Game Closure within Core Wildlife Areas under Alternatives B and C**

| Core Wildlife Area | Total Acres | Winter Closure under Alternative B (Acres) | Winter Closure under Alternative C (Acres) |
|---|---|---|---|
| Thompson Cr.- Holgate Mesa | 3,420 | 3,420 | 3,420 |
| West Elk Ridge | 2,320 | * | * |
| West Rifle Creek | 1,080 | N/A | 1,080 |
| Williams Hill | 1,540 | 1,540 | 1,540 |
| Winter Ridge- Deer Pen | 7,170 | 7,170 | 7,170 |
| Wolcott (Ute Creek) | 1,970 | * | * |
| **Total** | **57,570** | **40,480** | **49,290** |

*Terrain, topography, vegetation, lack of roads, or lack of public access makes area not conducive to over-snow travel; closure not needed.

Under Alternatives B and C, the BLM would ensure habitat connectivity of big game ranges by identifying big game migration corridors as retention areas. All action alternatives would increase the permeability of the landscape by providing long-term protection and restoration of wildlife linkages by reducing the density of roads and trails in priority big game habitats, and avoid developing permanent structures that are restrictive to wildlife movement.

*Birds*. To maintain migratory bird habitat for a wide variety of species, maintain connectivity, and reduce fragmentation, all action alternatives would incorporate the following measures: manage plant communities for a variety of seral stages, structural diversities, and (habitat) patch sizes capable of supporting diverse and viable migratory bird populations.

All action alternatives propose an NSO stipulation that prohibits surface occupancy and surface-disturbing activities within a buffer zone centered on a raptor nest site to protect raptor habitat and nest sites. The NSO helps to alleviate human-induced impacts such as the physical destruction of nests or impacts to the surrounding habitat. Buffer widths for non-special status raptors are as follows:

- 0.25 mile –osprey, sharp-shinned hawk, Cooper's hawk, Swainson's hawk, red-tailed hawk, golden eagle, all owls

- 0.5 mile –northern goshawk, prairie falcon

## Habitat Improvement

*Big Game and Other Large Mammals*. Under Alternatives B, C, and D, the objective is to create or maintain of the optimum habitat combinations for big game targeting a general ratio of 60 percent foraging habitat to 40 percent escape/hiding/thermal /birthing cover (on transitional/summer ranges). This is challenging because foraging habits differ between grazers, such as bighorn sheep and elk, which feed primarily on grasses and forbs, and browsers, such as deer, moose, and pronghorn, which forage primarily on woody materials, such as shrubs and trees (BLM 2008m). Studies generally indicate that in interspersed habitats there should be approximately 40 percent cover to 60 percent feeding areas (Olson 1992) to meet the needs of big game animals.

To meet this objective the BLM would need to actively implement habitat improvement projects (e.g., chemical, mechanical, prescribed fire, biological, seeding) to increase the amount of available, palatable, and

BLM_0016589

nutritious forage by setting back succession and creating a diverse age structure of plants, to increase the diversity and abundance of grasses and forbs in the understory, and to reduce pinyon-juniper encroachment and other woody species into mountain shrub/sagebrush communities. Areas such as Bocco, Mountain, East Eagle, Red Hill (Gypsum), Old Man's Gulch, Hardscrabble, Light Hill, Williams Hill, The Crown, Thompson Creek-Holgate Mesa, and Rifle Creek would be targeted for treatment. To create these conditions on summer/transition ranges, the BLM would need to implement habitat improvement projects such as projects that would stimulate sprouting and regrowth of decadent aspen patches.

*Birds.* Snags (i.e., standing dead trees) provide important habitat for many wildlife species and cavity nesting birds. Alternatives B and C would broadly manage all forest types to provide an average snag retention density of three snags per acre.

*CDOW Big Game Population and Harvest Objectives.* The BLM would continue to close routes to motorized use to help keep big game on BLM lands and reduce big game movement to private lands during the big game hunting season in the Castle Peak area (Stagecoach Trail and the Domantle Road from October 1 to November 30). Under Alternatives B and C, the BLM would additionally close routes in the Dry Rifle Creek area and the West Rifle Creek area from October 1 to November 30.

**Impacts from Water Resource Management.** Impacts would be similar to those under Alternative A except that under Alternatives B and C, NSO stipulation for streamside management zones prohibits surface occupancy and surface-disturbing activities within 50 feet from the ordinary high water mark of any hydrologic feature (i.e., ephemeral, intermittent, perennial channels, wetland, lake, fen, spring). The areas and acres with constraints on surface-disturbing activities would be increased, compared to Alternatives A and D. The size in acres of this NSO stipulation is not great, but its extent is large. It would conserve and maintain terrestrial wildlife habitat; however the stipulation would probably constrain habitat improvement projects such as prescribed fire. Mechanical, biological, and chemical habitat treatments would need to be designed to avoid all ephemeral, intermittent, perennial channels, wetland, lake, fen, and springs.

**Impacts from General Vegetation Management.** Alternatives B, C, and D propose specific direction for vegetation management.

For forest and woodlands, this would include the following:

- Manage lodgepole pine and aspen on an even-aged basis to transition from homogeneous stands of over-mature aspen and lodgepole pine to create a more diverse age-class structure across the landscape.

- Manage other species (e.g., pinyon-juniper, Engelmann spruce, Douglas-fir, subalpine fir, limber pine) on an uneven-aged basis to mimic natural stand conditions and natural regeneration processes.

- Maintain or contribute towards the restoration or development of old-growth structure and composition.

BLM_0016590

For rangeland management this would include the following:

- Manage sagebrush steppe to transition from homogeneous stands of old sagebrush to create a more diverse age-class structure across the landscape and to improve diversity and cover of understory species.

- Reduce encroachment of pinyon-juniper and other tree species in sagebrush steppe.

- Manage salt/desert shrub to improve vigor and composition of shrubs, diversity and cover of native understory species, and cover by microbiotic crust.

- Manage native grasslands to maintain ecological functions.

Land health assessments have noted that in many locations vegetation communities are in decline due to the dominance of cheatgrass, presence of weeds, the poor diversity and abundance of grasses and forbs, decadence hedging by livestock and big game, and pinyon-juniper encroachment. In general, a large amount of vegetation in the CRVFO has reduced nutritional quality of forage for wildlife.

For example, a local concern pertains to the lack of natural disturbances in sagebrush communities and the encroachment of pinyon-juniper woodlands into surrounding areas, especially sagebrush shrublands. Although mature pinyon-juniper forests provide high quality thermal and escape cover for big game, as pinyon-juniper forests expand and age, they eliminate understory vegetation by depriving understory plants of sunlight, moisture, and nutrients. Pinyon-juniper removal and other treatments increase the availability, palatability, and nutrition of forage on big game ranges; in addition it also benefits all sagebrush dependent species.

Under Alternatives B, C, and D, these objectives would be achieved through the use of restoration techniques including revegetation, fertilization, and soil amendments; the use of vegetation manipulation (e.g., fire, mechanical, biological, chemical treatments); identification and protection of old-growth stands; and, regarding noxious and invasive weeds, prevention of their establishment, treatment of existing, and reduction in their spread.

Mimicking natural periodic disturbance is often necessary to stimulate plant productivity, increase diversity, and increase nutritional value. Improving vegetation in upland areas would provide more forage to big game species and other herbivorous species that occur in these areas and have a direct beneficial impact. In addition, vegetation treatments in upland areas often divert livestock and wildlife use from riparian and wetland areas, thus increasing the vigor and structural diversity of these plant communities.

Most wildlife species would move into adjacent untreated areas but direct mortality during the vegetation treatments is possible. TL stipulations for big game birthing areas, for raptors and waterfowl and shorebird nesting and production areas, along with timing limitations for migratory birds are proposed under all alternatives to mitigate the short-term impact of vegetation treatments.

Specifically retaining old-growth stands would provide healthy and productive habitat for cavity-nesting species. Dead trees or snags provide a valuable forest component for wildlife, which uses these standing habitats as a place to feed, nest, perch, and roost. Some small mammals and birds use large, down woody material as a place to live and feed on insects, seeds, and fungi.

The spread of noxious, invasive, and non-native weed species would be controlled through implementation of the Noxious and Invasive Weed Management Plan for Oil and Gas Operators to meet the requirements of the Colorado Noxious Weed Act. Actions taken to help slow the spread of weeds would reduce the adverse impacts of surface-disturbing activities that result in the adverse alteration of wildlife habitat.

Healthy, productive, and diverse plant communities support terrestrial wildlife communities that are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations and ecological processes. Therefore, implementing the proposed vegetation management action and allowable use decisions would indirectly, but beneficially, contribute to maintaining the condition and quality of wildlife habitat, ensuring that standard 3 for terrestrial wildlife would be met through the life of the plan.

**Impacts from Riparian Vegetation Management.** Impacts would be similar to those under Alternative A except, that Alternatives B and D would apply only a CSU stipulation to 500 feet from the outer edge of riparian vegetation, which is less restrictive on surface-disturbing activities. This reduced protection could result in allowable surface-disturbing activities within riparian habitats, but when coupled with the stipulations for water resources and fish and other aquatic species, riparian areas would still be mostly protected.

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts would be similar to those under Alternative A, except that Alternative B applies an NSO stipulation for fish-bearing streams and a TL for coldwater sport and native fish in addition to stipulation for fish hatcheries. These stipulations would protect fish-bearing streams by constraining surface-disturbing activities by location and timing. Since aquatic wildlife and their habitat support (i.e., food, forage, shelter, breeding, or nesting habitat) a variety of terrestrial species, these proposed decisions would indirectly result in higher quality habitat conditions for terrestrial wildlife. Alternatives C and B, respectively, propose more constraints on use and surface-disturbing activities, and a larger area of constraints, so qualitatively it is estimated that they would indirectly, but beneficially, contribute the most to ensuring that Colorado Public Land Standard 3 for terrestrial wildlife would be met through the life of the plan.

**Impacts from Special Status Plants and Terrestrial Wildlife Management.** Terrestrial wildlife species generally benefit from proposed management action and allowable use decisions for special status plants and terrestrial wildlife species because they usually share similar species protection and habitat conservation objectives. Alternatives C and B, respectively, include more constraints on use and surface-disturbing activities and a larger area of constraints for special status species. Consequently, it is estimated that these alternatives would be the most beneficial to indirectly reducing adverse impacts on terrestrial wildlife habitat.

**Impacts from Cave and Karst Resource Management.** The NSO stipulation for the cave and karst occurrence areas applied in Alternatives B, C, and D would prohibit surface occupancy and surface-disturbing activities in a 40 acre area around 17 known cave and karst resources to a depth of 5,000 feet below the surface. The NSO area encompasses cave openings and portions of the subsurface features and watersheds immediately above the caves. The NSO stipulation would be applied to ten known caves in the Deep Creek cave area, a cave at Hack Lake on the Flattops, and small, dry caves in Glenwood Canyon. Alternatives B and D would protect known caves but would not protect caves yet undiscovered. Alternatives B and D also offer less protection to subsurface portions of the cave that extend beyond the 40 acre margin of the NSO stipulation. The potential indirect impacts to terrestrial wildlife that use caves would parallel the change in coverage of the NSO stipulations.

BLM_0016592

**Impacts from Livestock Grazing Management.** Impacts would be similar to those described under Alternative A, except that this alternative would make approximately 36,000 AUMs available for livestock grazing. Of the 55 vacant allotments, six would be made available for grazing while others would be closed or combined with adjacent allotments. Only one currently active allotment would be closed to grazing (i.e. County Line).

Late-season grazing can remove residual vegetation that is necessary in some years on big game winter ranges. To benefit wintering big game, Alternatives B and C would adjust livestock grazing management in allotments containing wildlife core areas to allow as much fall forage as possible for wintering wildlife. When AUMs are voluntarily relinquished by grazing permittees in wildlife core areas, those AUMs may be reallocated to wildlife.

**Impacts from Recreation and Visitor Services Management.** Under Alternatives B, C, and D, BLM lands would be designated as SRMAs, designated as ERMAs, or left undesignated. Within SRMAs, R&VS management is recognized as the predominant land use focus, where specific recreation opportunities and RSCs are managed and protected on a long-term basis. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. Since management within ERMAs is commensurate with the management of other resources and resource uses, all R&VS decisions would be compatible with other resource objectives.

In SRMAs, where the predominant land use focus is R&VS, terrestrial wildlife would be at greater risk for negative impacts. Generally the greatest impact to terrestrial wildlife would occur in SRMAs that (1) emphasize accommodating or attracting higher numbers of visitors increasing the risk of disturbance or (2) require an expansion of recreation trails and facilities that would fragment (i.e. cause loss of connectivity) wildlife habitat. A potential implementation level conflict exists in Alternative B where the Crown core wildlife area completely overlaps with the Crown SRMA. However the NSO stipulation applied on core wildlife areas would limit recreation developments that would impact wildlife on key winter ranges and sagebrush shrublands on the northern side of the Crown. A small inconsequential overlap also occurs between the Colorado River SRMA the Winter Ridge-Deer Pen core wildlife area in Alternatives B and C.

Priority wildlife areas (e.g. core wildlife areas, occupied habitat) would generally be most compatible with BLM lands that are undesignated for R&VS or designated as ERMAs, because wildlife management and conservation would be emphasized, or emphasized on an interdisciplinary basis commensurate with the management of R&VS. Overlap with ERMAs does occur in the following core wildlife areas: Cottonwood-Eby Creek, East Eagle, Fisher Creek, Hernage-Abrams, New Castle, Tenderfoot Mesa, Thompson Creek, and Wolcott.

In Alternatives C, B, and D, respectively, wildlife disturbance would be mitigated through additional winter closures that apply to both mechanized and motorized use, potential closures to human activity and dogs during harsh winters, and indirectly through travel route designations. Alternatives C, B, and D, respectively, include limitations (e.g., camping closures, firearm use restriction, SRPs) on inappropriate recreation use. Alternatives B and C, with the additional wildlife mitigation in the form of management actions (e.g., winter big game closures) and stipulations (e.g., NSOs and TLs), better protect wildlife from disturbance and would better maintain habitat effectiveness, through the life of the plan.

September 2011          *Colorado River Valley Field Office – Draft RMP Revision EIS*          4-241
*Chapter 4, Environmental Consequences*

BLM_0016593

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be the same as or similar to those under Alternative A, except that Alternatives B, C, and D have no area travel designations of "open" or "limited to existing routes," which has been identified in land health assessments and other documents as causing negative impacts to wildlife habitats. BLM lands would have area designations of "limited to designated routes" which prohibit overland cross-country motorized and mechanical travel. This designation would be a benefit to terrestrial wildlife species by (1) reducing inappropriate human disturbances and (2) prohibiting the proliferation of user created routes as is currently occurring on BLM lands.

While road density itself may not be the best measure of habitat effectiveness for wildlife, road and trail designations/use play an important role in habitat security, fragmentation, and disturbance from human activities. For example, Table 4.2.6-5 displays the existing route densities (Alternative A) in wildlife core areas.

**Table 4.2.6-5**
**Existing (Alternative A) Route Density within Core Wildlife Areas**

| Core Wildlife Area | Square Miles | Miles of Routes/Square Mile of BLM Land | | |
| | | Roads | All Motorized | Total Including Mtn. Bike |
|---|---|---|---|---|
| Cottonwood/Eby Creek | 11.6 | 0.4 | 0.4 | 1.1 |
| Dry Rifle Creek | 3.4 | 3.9 | 5.7 | 5.7 |
| East Eagle | 9.3 | 1.7 | 2.2 | 3.1 |
| Fisher Creek | 4.4 | 0.7 | 0.7 | 2.3 |
| Hernage/Abrams Creeks | 6.8 | 1.1 | 1.2 | 2.1 |
| Horse Mountain | 2.9 | 0.5 | 0.5 | 0.5 |
| Light Hill | 5.9 | 2.4 | 2.4 | 2.4 |
| Main-West Elk Ridge | 1.8 | 4.0 | 4.2 | 4.2 |
| New Castle North | 1.6 | 0.6 | 1.1 | 2.5 |
| Old Man's Gulch | 2.1 | 3.4 | 3.7 | 3.7 |
| Tenderfoot Mesa | 4.7 | 2.7 | 3.4 | 3.4 |
| The Crown | 8.0 | 2.6 | 4.0 | 4.1 |
| Thompson Cr./Holgate Mesa | 5.3 | 2.3 | 2.3 | 2.4 |
| West Elk Ridge | 3.6 | 3.0 | 3.0 | 3.0 |
| West Rifle Creek | 1.6 | 2.3 | 2.3 | 2.3 |
| Williams Hill | 2.4 | 0.8 | 0.8 | 0.8 |
| Winter Ridge- Deer Pen | 11.2 | 0.7 | 0.7 | 2.1 |
| Wolcott (Ute Creek) | 3.1 | 0.8 | 0.8 | 0.8 |
| **Average** | | **2.0** | **2.3** | **2.7** |

While no prescriptive standard (i.e., miles of routes/square mile of habitat) is being proposed, Alternatives B and C do propose reducing the amount of routes and the type of use on the routes through travel route designation. Table 4.2.6-6 displays proposed public travel route designations (i.e., vehicle, all-terrain vehicle [ATV], motorcycle, mountain bike, and foot/horse) for Alternatives B and C within wildlife core areas. Generally, there is a reduction in motorized travel designations in both alternatives, with Alternative C proposing the least amount of routes open for public travel and the least amount of motorized travel. Qualitatively, the travel designations under Alternative C would offer the most habitat security and a decrease in the indirect effect of human activities in core wildlife areas. Cumulatively, with the NSO stipulation for core wildlife areas, the areas should experience an increase in habitat effectiveness over the life of the plan.

BLM_0016594

**Table 4.2.6-6**
**Public Travel Route Designations within Core Wildlife Areas for Alternatives B and C**

| Core Wildlife Area | Square Miles | Miles of Routes/Square Mile of BLM Land | | | | | |
| | | Alternative B | | | Alternative C | | |
| | | Roads | All Motorized | Total Including Mtn. Bike | Roads | All Motorized | Total Including Mtn. Bike |
|---|---|---|---|---|---|---|---|
| Cottonwood/Eby Creek | 11.6 | 0.6 | 0.6 | 0.6 | 0.3 | 0.3 | 0.3 |
| Dry Rifle Creek | 3.4 | 2.1 | 2.1 | 2.1 | 2.0 | 2.0 | 2.0 |
| East Eagle | 9.3 | 0.4 | 0.6 | 2.9 | 0.4 | 2.0 | 2.0 |
| Fisher Creek | 4.4 | 0.1 | 0.1 | 2.3 | 0.1 | 0.1 | 0.1 |
| Hernage/Abrams Creeks | 6.8 | 0.3 | 0.3 | 1.9 | 0.2 | 0.2 | 1.7 |
| Horse Mountain | 2.9 | 0.5 | 0.5 | 0.5 | 0.3 | 0.3 | 0.3 |
| Light Hill | 5.9 | 1.7 | 1.7 | 1.7 | 1.6 | 1.6 | 1.6 |
| Main-West Elk Ridge | 1.8 | 1.8 | 1.8 | 1.8 | 1.7 | 1.7 | 1.7 |
| New Castle North | 1.6 | 0 | 0 | 1.4 | 0 | 0 | 1.4 |
| Old Man's Gulch | 2.1 | 2.4 | 2.4 | 2.4 | 1.4 | 1.4 | 1.4 |
| Tenderfoot Mesa | 4.7 | 1.2 | 1.2 | 4.3 | 0.7 | 0.7 | 2.7 |
| The Crown | 8.0 | 0 | 0 | 6.3 | 0.7 | 0.7 | 2.7 |
| Thompson Cr./Holgate Mesa | 5.3 | 0.9 | 1.4 | 2.2 | 0 | 0 | 0 |
| West Elk Ridge | 3.6 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 |
| West Rifle Creek | 1.6 | 2.0 | 2.0 | 2.0 | 0 | 0 | 0 |
| Williams Hill | 2.4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Winter Ridge- Deer Pen | 11.2 | 0.8 | 0.8 | 2.3 | 0.5 | 0.5 | 0.5 |
| Wolcott (Ute Creek) | 3.1 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Average** | | **1.0** | **1.1** | **2.1** | **0.8** | **0.8** | **1.4** |

It is important to note that the level of fragmentation, based on the physical existence of routes on the ground, would be unchanged unless the existing routes are rehabilitated or naturally revegetate due to a lower level of use or facilities, such as communication sites, livestock facilities, and ROWs, and their associated roads are removed. The tables also do not address the intensity of use. For example, conversion of motorized routes to mountain bike routes may result in more use, especially in popular recreation areas near communities.

Alternative B would prohibit over-snow travel on more acres than Alternatives A or D but less than Alternative C. The additional areas and acres that would be closed to over-snow travel would benefit terrestrial wildlife species by (1) reducing the sight and sound disturbances and (2) minimizing activities that increase current use levels and human-induced snow compaction (Claar et al. 1999).

The combination of additional travel limitations and the reduced number of designated routes would be beneficial to helping maintain the number, density, and composition of terrestrial species and the quality and connectivity of terrestrial wildlife habitat through the life of the plan. Alternative B would be more beneficial than Alternatives A or D but slightly less beneficial than Alternative C due to the extent of the limitations.

**Impacts from Lands and Realty Management.** Impacts would be similar to those under Alternative A, except under Alternatives B, C, and D, ACECs not included in ROW exclusion areas, occupied habitat for sage-grouse, occupied habitat for special status species, wetlands and wildlife treatments would be designated

BLM_0016595

as ROW avoidance areas. Land use authorizations within these areas would be avoided to the extent possible so as not to damage or diminish the terrestrial wildlife values, thereby offering protections to local terrestrial wildlife populations. For example authorizing wind energy development would permanently alter habitats and create collision hazards for bats and bird species.

Under Alternatives B and C, these areas are included as retention areas: elk severe winter range; mule deer critical winter range; deer and elk migration corridors; core wildlife areas; major river corridors; and habitats for proposed, candidate, and listed species under ESA. This benefits terrestrial wildlife by retaining high-value wildlife habitats in federal ownership unless a land exchange proposal provides similar or greater value to terrestrial wildlife.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts would be similar to those described under Alternative A, except that Alternatives B and C would result in less development, totaling approximately 2,200 federal wells on 280 multi-well pads, with an estimated 2,800 acres of surface disturbance. This includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 1,800 acres on interim reclamation of well pads. Federal oil and gas regulations prevent BLM from applying new or additional lease stipulations that would be developed through this planning effort to existing leases. However, under Alternatives B through D, federal regulations would allow BLM to apply mitigation measures consistent with decisions proposed in this RMP revision as terms and conditions for discretionary approvals (e.g., right-of-way actions) and apply COAs to augment protections related to lease activities. This could be applied on a case-by-case basis at the implementation level and could locally lessen the adverse impacts of energy development on terrestrial wildlife populations west of the Grand Hogback. Also Alternatives B and C propose reducing the impacts of direct and indirect habitat loss and fragmentation in conjunction with oil and gas development by requiring reasonable onsite or offsite mitigation associated with construction of new well pads, access roads (including upgrading of existing two-track routes), pipelines, and centralized tank facilities. Mitigation would consider the extent and intensity of development, existing habitat quality, and options available within the project boundary or in other areas of federal or private land.

Alternatives B, C, and D do not propose an NSO stipulation for wildlife seclusion areas. The rationale for this is that the BLM has been unable to manage for wildlife seclusion values due to the fluid mineral leases issued before the 1999 GSRA Oil and Gas Leasing and Development ROD and RMPA, when the NSO stipulation for wildlife seclusion areas took effect. Only approximately 640 acres of the wildlife seclusion areas are left unleased. Decisions from this RMP revision would apply to those 640 acres.

Alternatives B and C propose an NSO stipulation to be applied to wildlife core areas on unleased BLM lands. This stipulation would create minor negative impacts to high potential resources because core wildlife areas are mapped as having a low to moderate potential for the occurrence of gas resources (Table 4.2.6-7).

Under all action alternatives, terrestrial wildlife and their habitats would indirectly benefit from an increase in stipulations and areas closed to fluid minerals leasing for other resources.

BLM_0016596

**Table 4.2.6-7**
**Potential for Occurrence (Acres) of Oil and Gas Resources within Core Wildlife Areas**

| Core Wildlife Area | Total Acres | Low Potential | Moderate Potential | High Potential |
|---|---|---|---|---|
| Cottonwood/Eby Creek | 7,450 | 7,450 | 0 | 0 |
| Dry Rifle Creek | 2,210 | 0 | 2,210 | 0 |
| East Eagle | 5,930 | 5,930 | 0 | 0 |
| Fisher Creek | 2,830 | 2,830 | 0 | 0 |
| Hernage/Abrams Creeks | 4,340 | 4,340 | 0 | 0 |
| Horse Mountain | 1,860 | 1,860 | 0 | 0 |
| Light Hill | 3,800 | 1,280 | 2,520 | 0 |
| Main-West Elk Ridge | 1,120 | 280 | 840 | 0 |
| New Castle North | 1,060 | 510 | 540 | 0 |
| Old Man's Gulch | 1,310 | 1,310 | 0 | 0 |
| Tenderfoot Mesa | 3,030 | 3,030 | 0 | 0 |
| The Crown | 5,150 | 5,060 | 850 | 0 |
| Thompson Cr—Holgate Mesa | 3,420 | 920 | 2,490 | 0 |
| West Elk Ridge | 2,320 | 680 | 1,650 | 0 |
| West Rifle Creek | 1,080 | 0 | 1,080 | 0 |
| Williams Hill | 1,540 | 610 | 930 | 0 |
| Winter Ridge- Deer Pen | 7,170 | 280 | 6,880 | 0 |
| Wolcott (Ute Creek) | 1,970 | 540 | 1,430 | 0 |

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts would be the same as or similar to those under Alternative A except that under Alternative B, nine ACECs would be designated. Based on a qualitative use of acres within ACEC designation, Alternative B would be better than either Alternatives A or D at indirectly providing for the maintenance and conservation of wildlife habitat.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Alternative B is subdivided into modified Alternatives B1 and B2. Under Alternative B1, the BLM would determine that the Colorado River segments and Deep Creek segments are suitable for inclusion in the National Wild and Scenic Rivers System. All other segments would be determined not suitable and released from further protection under the WSR Act. Under Alternative B2, the BLM would determine that Deep Creek segments 1 and 2 are suitable. All other segments except the Colorado River segments would be determined not suitable and released from further protection under the WSR Act. The BLM would defer a suitability determination on the Colorado River segments and would adopt and implement the water stakeholders' plan to protect the free-flowing nature, ORVs, and tentative classifications. The assumption is that the water stakeholders' plan would protect the ORVs through a cooperative water delivery mechanism; if thorough monitoring indicated a decline in the condition of the ORVs, the BLM would start the formal suitable/recommendation process to designate the Colorado River segments into the NWSRS.

The BLM has not identified, not brought forward, and is not analyzing in-stream flows in this planning process and is not required to do so until after designation. At the time of designation, the BLM would write a WSR management plan that would then address the needed in-stream flows.

The management action and allowable use decisions in this planning process would apply and provide direct and indirect protections for the ORVs under both Alternatives B1 and B2. Alternative B2, with stakeholder

cooperation, may better support the areas' terrestrial wildlife, because the water stakeholders would attempt to operate their facilities in a manner that meets water supply objectives and protects the ORVs. With no stakeholder plan, water flows would be subject to the water rights system. Without some sort of specific effort to protect and manage flows, there may be a gradual reduction in flows necessary to support recreation use over the life of the plan.

Alternatives B1 or B2 would be more beneficial to wildlife than under Alternative D, where no segments are found suitable. However, because BLM's policy is to protect any outstandingly remarkable values identified in the eligibility study until a decision on suitability can be made, Alternative A would actually be more beneficial in conserving habitat, at least on an interim basis.

### Alternative C

Impacts to terrestrial wildlife from general vegetation management, and lands and realty management would be similar to those described under Alternative B. Impacts from management of all other resources and uses would be the same as or similar to those described under Alternative A, except as stated below.

**Impacts from Terrestrial Wildlife Management.** Impacts would be similar to those under Alternatives A and B, except as described below.

*Disturbance from Public Travel, Access, and Land Use Activities*. As opposed to Alternatives B and C, Alternative D would decrease the number of big game winter ranges closed to motorized and mechanized vehicles (Table 4.2.5-1). The areas closed would be the same as Alternative A, with the addition of the Dry Rifle Creek area the New Castle area (north of town) and the Thompson Creek/Holgate Mesa area. Of all action alternatives, Alternative D offers the fewest limitations on disturbances from public travel and access.

*Habitat Fragmentation and Habitat Connectivity*. SWAs would be closed to fluid minerals leasing under Alternative C, eliminating the opportunity to develop fluid minerals. Surface-disturbing activities would be managed under SWA management plans. The NSO stipulation proposed under Alternative B and CSU stipulations proposed under Alternative D would not close unleased areas to fluid minerals leasing.

**Impacts from Water Resource Management.** Impacts would be similar to those under Alternative B except, under Alternative C, a 100-foot (50 feet beyond the NSO) CSU stipulation for hydrologic features is proposed. The stipulation would apply to ephemeral, intermittent, and perennial channels, wetlands, lakes, fens, springs, and their associated plants, and in turn would benefit terrestrial wildlife by ensuring water sources are protected. The areas and acres with constraints on surface-disturbing activities would increase, compared to other alternatives. It would conserve and maintain terrestrial wildlife habitat; however the stipulation would probably constrain habitat improvement projects, such as prescribed fire. Mechanical, biological, and chemical habitat treatments would need to be designed to avoid all ephemeral, intermittent, and perennial channels, wetland, lake, fens, and springs.

**Impacts from Fisheries and Aquatic Wildlife Management.** The indirect impacts would be similar to those under Alternatives A and B, except Alternative C would be slightly more beneficial because it proposes application of an NSO stipulation to all perennial waters instead of only fish-bearing streams. It also applies a TL for coldwater sport and native fish, in addition to an NSO stipulation for fish hatcheries.

BLM_0016598

**Impacts from Special Status Plants and Terrestrial Wildlife Management.** Alternatives B and C propose more constraints on use and surface-disturbing activities, and a larger area of constraints. Therefore, it is qualitatively estimated that Alternatives C and B, respectively, would indirectly be the most beneficial to reducing adverse impacts from surface-disturbing activities and use on terrestrial wildlife habitat.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Terrestrial wildlife resources are a supplemental value that contributes to an area's wilderness character. Under Alternative C, all LWCs would be managed consistent with the Proposed Management and Setting Prescriptions for BLM Lands Outside of WSAs Being Managed to Protect Wilderness Characteristics. This would ensure that these lands are managed to preserve their wilderness characteristics. The prescriptions collectively retain the area's natural biological integrity, which benefits terrestrial wildlife by maintaining habitat connectivity and habitat effectiveness.

Management activities on these lands would emphasize natural processes for wildlife management. While wildlife habitat treatments are not specifically excluded, wildlife management would emphasize natural processes for wildlife management. This could constrain using vegetation manipulation techniques such as mechanical, chemical, or prescribed fire to improve wildlife habitat. Activities such as hunting and trapping would be allowed consistent with the State of Colorado regulations. Stocking of wildlife species native to the area may be permitted. Introduction of threatened, endangered, or other special status species native to North America may be allowed.

**Impacts from Cave and Karst Resource Management.** Alternative C proposes to apply both the NSO stipulation for the Deep Creek Cave area and the cave and karst occurrence NSO stipulation. Alternative C would protect known caves and caves yet undiscovered in the Deep Creek area. Alternative C offers protections to the subsurface portions of caves in the Deep Creek area that extend beyond the 40 acre margin of the cave and karst occurrence NSO stipulation. Alternative C would offer the greatest extent of protection for caves and special status wildlife species that use caves

**Impacts from Livestock Grazing Management.** Impacts would be the similar to those described under Alternative A, except if livestock-wildlife conflicts for forage arise, preference would be given to wildlife. Of the 55 vacant allotments, all would be closed. Three currently active allotments would be closed to grazing (County Line, Smith Gulch, and Alkali Gulch). This alternative offers the greatest potential increase in herbaceous vegetation for forage and cover for wildlife.

In addition, closing vacant allotments such as Oasis Creek allotment, would be an effective strategy to reduce commingling potential (WGFD 2004) between wild sheep and domestic sheep and goats. If vacant allotments are stocked with sheep in the future, then the chance of disease transmission might increase. The more vacant allotments that are closed near bighorn ranges the less likelihood of disease transmission.

**Impacts from Recreation and Visitor Services Management.** Under the Alternative C theme, current recreation uses would be recognized but not necessarily accommodated when considering land uses. Impacts from R&VS would be the same as or similar to those under Alternative B, except that Alternative C would designate only the Red Hill and Upper Colorado SRMAs. No overlap exists with SRMAs except a small inconsequential overlap between the Colorado River SRMA the Winter Ridge-Deer Pen core wildlife area.

BLM_0016599

Three additional ERMAs (Hack Lake, King Mountain, and the Crown) would be identified to sustain the principal recreation activities and the associated qualities and conditions. Proposed management action and allowable use decisions for terrestrial wildlife would mitigate implementation-level recreation developments that would impact wildlife in ERMAs and on lands undesignated for R&VS. Overlap with ERMAs does occur in the following core wildlife areas: Cottonwood-Eby Creek, Crown, East Eagle, Fisher Creek, Hernage-Abrams, New Castle, Tenderfoot Mesa, Thompson Creek, and Wolcott.

Alternatives C, B, and D, respectively propose more limitations (e.g., camping closures, firearm use restriction, and SRPs) on inappropriate recreation use. Alternative C includes the most wildlife mitigation in the form of management actions (e.g., winter big game closures) and stipulations (e.g., NSO and TL stipulations) to reduce disturbance and maintain habitat effectiveness. Alternative C best ensures that Colorado Public Land Health standard 3 for terrestrial wildlife would be met through the life of the plan.

**Impacts from Comprehensive Trails and Travel Management.** The additional travel limitations and reduced number of designated routes proposed under Alternative C would further decrease travel related disturbance to wildlife. Alternative C would be slightly more beneficial than Alternative B in reducing recreational disturbance to wintering terrestrial wildlife on low elevation winter ranges because additional areas are closed to over-snow travel (e.g. East Eagle, Red Hill-Gypsum, Grand Hogback and the Vulcan).

**Impacts from Lands and Realty Management.** Under Alternative C the Greater Sage-grouse ACEC would also be designated as a ROW avoidance area. Land use authorizations within the ACEC would be avoided to the extent possible so as not to damage or diminish sage-grouse habitat or populations.

Alternative C adds occupied BLM sensitive species habitat, wetlands and riparian areas, and LWCs to the list of criteria for BLM lands found in Alternative B that would be retained for long-term management. The additional number of acres qualitatively benefits terrestrial wildlife slightly more than what is proposed by Alternative B.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Core wildlife areas would also be closed to fluid minerals leasing and geophysical exploration in Alternative C. This would eliminate the disturbance of wildlife and the fragmentation of wildlife habitat by fluid mineral development and geophysical exploration.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts would be the same as or similar to those under Alternatives A and B, except that under Alternative C, 16 ACECs would be designated. Based on a qualitative use of acres within ACEC designation, Alternative C would be the best at indirectly providing for the maintenance and conservation of wildlife habitat.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative C, 26 river segments throughout the CRVFO would be recommended as suitable for wild, scenic, or recreational classification under the National Wild and Scenic Rivers System (NWSRS). Those segments recommended as suitable for wild or scenic classification would be managed to protect ORVs. This alternative would be more beneficial to terrestrial wildlife compared to Alternative B, where four segments are found suitable. Because BLM's policy is to protect any ORVs identified in the eligibility study until a decision on suitability can be made, Alternative A and Alternative C would differ administratively; however, the implications to terrestrial wildlife habitat and management would be the same, at least on an interim basis.

BLM_0016600

## Alternative D

Impacts to terrestrial wildlife from management of other resources would be the same as or similar to those described above for Alternative A, except as stated below.

**Impacts from Terrestrial Wildlife Management.** Impacts would be similar to those under Alternatives A, B, and C, except as described below.

*Disturbance from Public Travel, Access, and Land Use Activities.* The BLM would close important winter ranges to public motorized and mechanized travel from December 1 to April 15 to protect wintering big game from potential disturbance caused by public use (Table 4.2.6-1). However, the areas and acres proposed to be closed are lower than under Alternatives B or C but still higher than under Alternative A.

*Habitat Fragmentation and Habitat Connectivity.* A CSU stipulation is proposed under Alternative D, which is considered a moderate constraint that allows some use and occupancy while protecting wildlife values on unleased lands. The NSO stipulation (Alternatives A and B) and the CSU stipulations would not close unleased areas to fluid minerals leasing, unlike the CL designation under Alternative C.

**Impacts from Special Status Plants and Terrestrial Wildlife Management.** Alternatives A and D propose less constraints on use and surface-disturbing activities, and a smaller area of constraints, so qualitatively it is estimated that those alternatives would indirectly result in the most potential for adverse impacts on terrestrial wildlife habitat.

**Impacts from Livestock Grazing Management.** Impacts would be the similar to those described under Alternative A, except that Alternative D would make approximately 36,500 AUMs available for livestock grazing. Of the 55 vacant allotments, six would be made available for grazing, while others would be closed or combined with adjacent allotments. Four currently active allotments would be closed to grazing (County Line, Alkali Gulch, Alkali Creek, and Dry Creek Pete and Bill).

**Impacts from Recreation and Visitor Services Management.** Under the theme of Alternative D, overall management would favor recreation use as well as other land uses. Recreation infrastructure would be constructed to accommodate higher use levels and a destination tourism market for mountain biking in many of the proposed SRMAs (e.g., The Crown, Fisher Creek Hardscrabble/East Eagle, Red Hill, a portion of Thompson Creek, and Upper Colorado River). Generally more conflicts are anticipated to occur with terrestrial wildlife in areas that (1) emphasize accommodating or attract higher numbers of visitors, increasing the risk of disturbance or (2) require an expansion of recreation trails and facilities that would fragment (i.e. cause loss of connectivity) wildlife habitat. The anticipated increases in recreation use and infrastructure, as well as the reduced mitigation (less than Alternatives B or C), would increase the risk of disturbance of wildlife. Alternative D would also pose the most potential of habitat fragmentation and loss of habitat connectivity over the life of the plan.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be the same as or similar to those under Alternatives B except that fewer areas (e.g. Hardscrabble, Old Man's Gulch, Williams Hill, or Triangle Peak) and acres would be closed to protect wintering big game. In addition, within those areas more year-round motorized and mechanized travel would occur due to the travel designations.

BLM_0016601

**Impacts from Lands and Realty Management.** Under Alternative D, elk severe winter range, mule deer critical winter range, and deer and elk migration corridors are not included in retention areas. These high-value wildlife habitats would be at risk of not necessarily being maintained in federal ownership.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts would be similar to those under Alternatives A, B, and C, except that Alternative D anticipates more development totaling approximately 4,200 federal wells on 520 pads with an estimated 5,300 acres of surface disturbance. This includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 3,400 acres on interim reclamation of well pads. West of the Grand Hogback, Alternative D offers a high risk of not sustaining the habitat conditions due to the proposed increase in development and the reduction in proposed stipulations.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts would be the same as or similar to those under Alternatives A, B, and C, except that under Alternative D, only three ACECs would be designated. Based on a qualitative use of acres within ACEC designation, Alternative D would be the least beneficial at indirectly providing for the maintenance and conservation of wildlife habitat.

### Cumulative Impacts

Past and present actions that have had and are having direct and indirect impacts on recreation are discussed in Chapters 3 and 4. Cumulative effects include other future federal, state, local, or private actions that are reasonably certain to occur in the planning area and their cumulative impact. Adjacent federal landowners include the KFO, White River CRVFO and the Grand Junction Field Office, WRNF, and Routt National Forest. The CDOW administers some land within the planning area but directly affects wildlife through the introduction and transplantation of wildlife and the regulation of hunting of game species.

Generally, cumulative impacts on wildlife result from surface disturbances and disruptive land uses and vary by species. Habitat type-conversion, degradation, fragmentation, and loss have significant adverse effects on wildlife but sometimes take years to manifest as population reductions. Quantified data on the existing and future extent of land uses are not available. However, where these land use activities occur, their contribution would result in some increased level of cumulative impact greater than the impacts of activities proposed or authorized by the BLM on BLM lands.

For example, BLM lands in the CRVFO contain a large amount of interspersed private lands, and some small parcels of state lands. Approximately 80 percent of BLM lands are within one mile of private lands, making for an enormous amount of wildland-urban interface issues. An undetermined amount and diverse variety of commercial, residential, and agricultural land use are ongoing on these lands. Big game winter habitats in the Eagle-Vail, Roaring Fork, and Colorado River valleys have been converted from agricultural lands to urban areas by the expansion of towns and supporting facilities. The trend of subdividing ranches to accommodate residential and commercial development is expected to continue and contribute to habitat fragmentation. As the urban interface expands, some tracts of BLM land may eventually become disconnected or isolated from other native habitats and ultimately adversely affect planning area biological diversity. In some areas, there may be a long-term slight reduction in livestock grazing due to the sale of ranches and the resulting residential and commercial developments.

The towns of Basalt, Carbondale, Eagle, Gypsum, Glenwood Springs, New Castle, Silt, and Rifle all have BLM lands bordering them that are used as "backyard" recreation areas by local residents. These local

BLM_0016602

community centers are reasonably certain to continue to grow in both geographic extent and population over the life of the plan. In addition, local world-class destination resorts, such as Aspen and Vail, and their accompanying businesses would continue marketing efforts to attract visitors year-round. Demand to use BLM lands and expand local recreation opportunities are expected to continue with these regional pressures. The long-term management challenge would be minimizing impacts on wildlife through constraints, stipulations, and limitations, without simply closing areas to all human use.

Proposed management action and allowable use decisions under Alternatives A and D would maintain terrestrial wildlife habitats and protect individual and local wildlife populations from disturbance. However, habitat effectiveness would slowly but slightly decrease over time, in particular in such areas as lands leased for energy development and those BLM lands near growing communities, since Alternatives A and D recognize and accommodate more land uses. Alternative A has the greatest risk of negative cumulative impacts on BLM lands when viewed in conjunction with those activities currently occurring and reasonably certain to occur on adjacent private lands. Alternative D would result in the greatest impacts on terrestrial wildlife west of the Grand Hogback due to the amount of energy development and the estimated acres of disturbance in combination with other land uses.

The increasing effects of conversion of native sagebrush shrublands to agriculture, invasion by non-native plant species, energy and associated developments, rural expansion, and off-route travel have reduced, degraded, or fragmented sagebrush habitats in many key locations. The continued modification of sagebrush on private lands and other ownerships would cumulatively reduce the availability and quality of that habitat within the planning area. Alternatives B and C both address reducing sagebrush steppe fragmentation and land use impacts on sagebrush-dependent species on BLM lands.

Alternative B focuses on strategically managing to protect critical habitats, sagebrush habitats, wildlife corridors, winter ranges, and core wildlife areas while moderately limiting surface-disturbing activities and human uses. Alternative C emphasizes sustaining the ecological integrity of habitats for all priority wildlife species and as well as improving habitats. Alternative C places major constraints on surface-disturbing activities and the most limitations (e.g., area, seasonal) on human uses. In particular, Alternative C has the most actions to prevent habitat fragmentation, such as closing allotments to livestock grazing and fluid minerals leasing, applying NSO stipulations, designating the fewest SRMAs for destination visitors, managing the most lands to protect their wilderness character, identifying the most ROW exclusion areas, and designating the most ACECs and suitable WSR segments. As such, cumulative impacts in the form of habitat fragmentation, habitat modification, habitat effectiveness, disturbance, and avoidance would be the least under Alternative C.

The largest federal land management agency in the planning area is the USFS. The 2002 WRNF ROD provided for a wide variety of recreation opportunities and forest uses while promoting ecosystem health (WRNF 2002). In relation to terrestrial wildlife and wildlife habitats, the forest plan strives to promote ecosystem health and conservation through the mix of management area allocations, standards and guidelines, to actively manage to improve wildlife habitat, to maintain or contribute to the maintenance of species viability, and to protect landscape linkages that allow for landscape-scale movement, migration, and dispersal of forest carnivores and other wide-ranging wildlife species. This is analogous to the resource emphasis proposed under Alternatives B and C. Anticipated actions on private lands may result in further reductions in connectivity between habitats at lower elevations but Alternative B, and better yet Alternative C, in

BLM_0016603

combination with the WRNF direction, would best provide for wide-ranging terrestrial species, such as raptors, migratory birds, mule deer, and elk.

Land health assessments and this analysis conclude terrestrial wildlife populations and associated habitats on BLM lands are meeting Colorado Public Land Health Standard 3 for terrestrial wildlife species and would continue to do so at a watershed scale under all alternatives. Alternative C and Alternative B, respectively, best reduce the possibility of localized departure of meeting standard 3.

BLM_0016604

## 4.2.7   Special Status Species

### Methods of Analysis

This section describes the potential impacts on special status species from implementing management actions for the special status species program as well as allowable uses and management actions for other resource programs. Special status species include federally listed, proposed, and candidate threatened or endangered species, BLM sensitive species, and Colorado state-listed species. Existing conditions regarding special status species are discussed in Section 3.2.7.

Although substantial data on known locations and habitats within the planning area are available, the data are neither complete nor comprehensive for all special status species known to occur or with potential habitat that might exist within the planning area. Known and potential special status species and habitat locations were considered in the analysis; however, the potential for species to occur outside these areas was also considered. Impacts were quantified when possible. In the absence of quantitative data, best professional judgment based on scientific reasoning was used. As a result, some impacts are discussed in more general terms.

Under all alternatives, no decision would be approved in this RMP revision or authorized on BLM lands that would jeopardize the continued existence of special status plant species that are listed, proposed, or candidates for listing as threatened or endangered. Implementation of the special status species program is directed at preventing the need for listing of proposed or candidate species under the ESA, protecting special status species, and improving their habitats to a point where their special status recognition is no longer warranted (i.e., Land Health Standard 4).

Direct and indirect impacts of land uses on special status species are generally best mitigated by avoiding or minimizing the impact to the degree practicable with stipulations (e.g., NSO, CSU, and TL). The various management actions and allowable use decisions outlined in Chapter 2 and stipulations described in Appendix B emphasize this approach for maintaining or conserving special status species and their habitat. Impacts that cannot be avoided would at least be reduced by the application of COAs or BMPs.

### Assumptions Common to All Special Status Species

The analysis is based on the following assumptions:

- Impacts on special status species can occur from actions that result in direct mortality of special status species, loss of habitat or modifications to habitat suitability, and in the case of special status wildlife, actions that displace individuals or disrupt behavior. Because special status species have specific habitat requirements, and their habitats are often diminishing, disturbance to the species or their habitat could result in population declines, which could adversely affect viability of local populations.

- Since special status species populations are, by their nature, generally small and localized, the total area affected by other activities or restrictions is less important than where the activities or restrictions occur in relation to special status species and their habitat.

- The health of special status species populations is directly related to the overall health and functional capabilities of upland, aquatic, riparian and wetland resources, which in turn are a reflection of overall watershed health.

BLM_0016605

- Ground-disturbing activities could lead to modification (positive or negative) of habitat and loss or gain of individuals, depending on the nature of the activity, the intensity of the surface-disturbance, the amount of area disturbed, the location of the disturbance, and the species affected.

- Road density in a given area (watershed) and the distance of roads from special status species habitat provides an indication of the potential for impacts on special status species. For fish and aquatic wildlife, roads are a measure of lands available for accelerated water transport and potential erosion and offsite sediment transport. For plants, roads also contribute to increasing exposure to dust, reducing pollinator habitat, and providing a niche for the invasion of noxious weeds. However, the actual impacts and degree of impacts are dependent on additional variables, such as the class of road (dirt, gravel, paved), road condition (rutted, bar ditched, properly drained) the type of vegetation between the road and occupied or suitable habitat, the topography, the ecological condition of the suitable or occupied habitat, and soil characteristics.

- Special status species health, population levels, and habitat conditions fluctuate in response to natural factors. Periods of drought or excessive moisture, and outbreaks of diseases that affect special status species directly or impact habitat (e.g., mountain pine beetle) would likely impact special status species population levels.

- Implementation-level actions would be further assessed at an appropriate spatial and temporal scale and level of NEPA analysis. Additional field inventories would likely be needed to determine whether any such species could be present in the project area.

- Land uses would be managed to maintain or move toward meeting the Colorado Standards for Public Land Health (BLM 1997a) on a landscape basis. Site-specific NEPA environmental analysis would assess whether management actions would contribute to the maintenance or achievement of land health standards or risk causing a decline in land health conditions.

- All permitted activities that could affect federally threatened or endangered species would be required to undergo ESA Section 7 consultation with the USFWS and would need to be mitigated to ensure that those species would not be adversely affected on a project-specific basis or at a cumulative level.

- The BLM would implement measures to conserve BLM sensitive species and their habitats to reduce the likelihood and need for such species to become listed (BLM 2001d).

- The BLM would implement the standard operating procedures and mitigation measures from the programmatic EIS for herbicide treatments on BLM lands in 17 western states (BLM 2007m) and conservation measures from the associated biological assessment. These would mitigate the potential impacts from herbicide treatments.

- Success of mitigation depends on the specific protective measures employed and the assumption that proper implementation of these measures would take place. Adaptive management would be used (i.e., changing techniques, as necessary) until success is achieved.

- Many of the resources and uses have NSO or CSU stipulations that extend beyond or overlap the NSO or CSU stipulations listed for protection of special status species. Although NSO or CSU stipulations for other resources and uses may offer additional benefits (e.g., reduced erosion, sedimentation, and weed invasion) and indirectly support special status species management, in most cases, these benefits would be negligible or redundant to the protections provided by stipulations for special status species. For these reasons, impacts on special status species from NSO or CSU stipulations associated with other resources will not be addressed unless they provide a more

BLM_0016606

restrictive stipulation or cover a broader area than the stipulations for special status species under that alternative.

- On occasion, conflicts arise between different resource protections in a given area (e.g., special status species and visual, soil, and cultural resources). Where these occur, there is the potential for adverse impacts on special status species if protections applied to the other resources are more stringent, and as such, have priority over protections to special status species. For example, a CSU stipulation for protection of sensitive plants may not be implemented because moving the proposed activity would encounter an NSO stipulation for steep slopes or cultural resources. Impacts could be direct, by loss of individuals or populations, or indirect, by fragmentation or alteration of potential habitat. These types of conflicts and resulting impacts on special status species are anticipated to increase as development intensifies.

### 4.2.7.1 Special Status Species—Plants

#### Assumptions

The main contributors to surface disturbances that could affect special status plants are minerals and energy development, wildland and prescribed fire, vegetation management (such as brushbeating and mechanical removal of trees), recreation, travel, and issuance of ROWs. Regardless of the nature of the disturbance, surface-disturbing activities may result in the following effects on special status plants:

- **Direct Mortality.** This can result from crushing, trampling, or physically removing plants. Contact with herbicides or other chemicals, such as those associated with oil and gas development, can also cause direct mortality. Reduction in total numbers of individuals within the population may lead to reduced genetic diversity and a reduced ability to withstand natural or human-caused disturbance events.

- **Loss of Vigor or Reduced Reproductive Success.** Trampling and contact with chemicals may not always result in direct mortality but can cause a reduction in vigor that affects the ability of the plant to reproduce and sustain the population. Herbivory (consumption of inflorescences, seeds, or stems and foliage of special status plants) can result in reduced reproductive success, or in some cases, death. Dust deposition on special status plants may reduce photosynthetic ability or the ability of pollinators to transfer pollen between plants.

- **Direct Loss of Potential or Occupied Habitat.** Surface-disturbing activities, such as construction and use of roads, trails, parking lots, buildings, power poles, wind turbines, and ponds, may result in permanent loss of occupied or potential habitat. This would reduce the total habitat capable of supporting special status plant populations. While closure or reclamation of disturbed areas may eventually restore lost habitat values, the disturbance can require years or decades for recovery to predisturbance conditions. If reclamation does not result in habitat suitable for sustaining special status plants, habitat may be permanently lost.

- **Changes in Habitat Structure.** A canopy cover of shrubs offers habitat characteristics that appear to be favorable for the germination and establishment of several special status plant species, such as Colorado hookless cactus and Harrington's penstemon. Shrubs may provide protection for some special status plants from herbivory or trampling and may provide improved moisture availability or reduced moisture loss under the canopy. Surface-disturbing activities that significantly reduce the

BLM_0016607

percent canopy cover of shrubs may allow increased herbivory or moisture loss resulting in decreased vigor or mortality of special status plants.

Increases in canopy cover can also be detrimental to certain special status plants. For example, invasion of sagebrush communities by pinyon and juniper trees can reduce sunlight and nutrients available to Harrington's penstemon. When invasion by pinyon-juniper trees reaches an advanced stage, populations of Harrington's penstemon are at risk, since the species cannot persist under dense canopies of pinyon and juniper trees.

- **Competition.** Changes in species composition also affect special status plant populations. Proliferation of noxious weeds or other invasive plants may render habitat unsuitable by outcompeting special status plants for water and nutrients or by preventing seedling germination and establishment. Occupied Colorado hookless cactus habitat that is dominated by cheatgrass appears to inhibit germination of seedling cactus, thereby threatening the long-term viability of these populations. In some cases, increases in canopy cover and density of native species, particularly grasses, can compete with special status plants for limited water and nutrients.

  Other special status plant species, such as the Roan Cliffs blazing star and Parachute penstemon, thrive in environments where competition is low. Increases in vegetation cover (following disturbances, such as fire or mechanical treatments, or seeding) may cause competition with special status plants, resulting in decreased vigor or mortality.

- **Loss of Pollinators or Pollinator Habitat.** Actions that disturb pollinators or destroy their habitat can have a detrimental impact on special status plant species. Long-term loss of pollinators can reduce the reproductive ability of these plant species and affect maintenance and genetic diversity of populations.

- **Habitat Fragmentation.** Habitat fragmentation occurs when contiguous habitat is broken up by surface-disturbing activities, reducing overall potential habitat and reducing movement of pollinators or genetic material among habitats. Smaller populations received fewer pollinator visits and therefore seed production was lower in small populations. Small population size decreases reproductive success and increases inbreeding and loss of genetic variation. As a result, fragmentation may lower population viability and increase local population extinction risk. Herbivory did not decrease with population size; therefore herbivory enforces fragmentation effects by further reducing the number of flowering individuals (Kolb 2008). Closure and rehabilitation of roads within special status plant habitat may benefit the long-term survival of special status populations by decreasing habitat fragmentation.

- **Soil Compaction.** Soil compaction resulting from heavy equipment or vehicle travel may reduce soil pore size and water infiltration, thereby inhibiting maintenance or establishment of special status plants.

- **Erosion or Sedimentation.** Special status plants may be washed away or have roots exposed by erosion from surface-disturbing activities, such as blading or bulldozing of roads. Special status plants may be buried by sedimentation resulting from disturbances upslope of special status plant populations.

- **Alteration of Hydrologic Conditions.** Some special status plant species (such as Ute ladies'-tresses orchid), which are dependent on seasonally flooded environments, subirrigated soils, or seeps, may be adversely affected by changes in water flow.

BLM_0016608

- **Changes in Fire Regime.** Changes in species composition, either within special status plant habitat, or in adjacent plant communities, may alter the natural fire regime to which the plants are adapted. Cheatgrass, a highly flammable annual grass, may drastically increase the fire frequency in special status plant habitat, affecting the survivability and viability of the population.

Together, these impacts could lead to fewer and more fragmented special status populations that are more at risk for extirpation due to reduced habitat quality, diminished reproductive ability, and altered fire regime. Impacts on special status plants from implementation of the RMP are summarized by alternative in the following subsections.

## Environmental Consequences

Impacts on special status plants would result from some of the management actions and allowable uses included under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on special status plants under any of the four alternatives.

### Alternative A

**Impacts from Special Status Species Management—Plants.** Management for special status plant species may include various actions, such as restrictions on surface-disturbing activities, designating ACECs to provide special management attention, closing selected roads that are negatively affecting habitat, or implementing habitat improvement projects.

Table 4.2.7-1 compares management protections for special status plants by alternative. Under Alternative A, an NSO stipulation for threatened, endangered, proposed and candidate plants and wildlife prohibits surface-disturbing activities in occupied habitat and habitat necessary for ecosystem processes. This stipulation encompasses 6,020 acres of habitat and would afford direct protection for occupied habitat of special status plants. A CSU stipulation for BLM sensitive plants and wildlife also provides some protection, allowing relocation of surface-disturbing activities but is unlikely to avoid all individuals where populations are extensive and would not protect potential, but currently unoccupied, habitat. The CSU stipulation would apply to 144,700 acres.

Under the current management plan, no ACECs would be designated to provide protection for special status plants. ACECs are typically withdrawn from locatable mineral entry, managed as ROW exclusion or avoidance areas, and restricted from a net increase in travel routes. These special management prescriptions provide broad protection from habitat fragmentation and loss of potential habitat. Without ACEC designation, occupied habitat for special status plants would be open for exploration and development of locatable minerals. Since this activity would not be subject to NSO or CSU restrictions, populations of special status plants could be impacted by any mineral development that takes place in special status plant habitat.

Other management actions, such as vegetation treatments that are designed with special status plant habitat needs in mind could improve habitat for special status plants and maintain or increase population size. In general, vegetation treatments that improve the cover and diversity of forbs, reduce noxious weed infestations, and reduce shrub density and woodland encroachment in sagebrush habitats, would benefit special status plants and their pollinators.

BLM_0016609

**Table 4.2.7-1**
**Protective Management for Special Status Plants by Alternative**

| Special Status Plant Protections | Buffer | Applicable Species | Acres by Alternative | | | |
|---|---|---|---|---|---|---|
| | | | A | B | C | D |
| **No Surface Occupancy Stipulations** | | | | | | |
| GS-NSO-12 | Broad habitat | Federally listed or candidate plants and wildlife | 6,020 | | | |
| CRV-NSO-18 | 200 meter | Federally listed or candidate plants | | 1,240 | | 1,240 |
| CRV-NSO-19 | 200 meters | Federally listed or candidate and BLM sensitive plants | | | 28,300 | |
| CRV-NSO-20 | 100 meters | BLM sensitive plants (Harrington's penstemon only in ACECs) | | 1,570 | | |
| CRV-NSO-22 | Broad habitat | DeBeque phacelia | | Habitat unmapped | Habitat unmapped | Habitat unmapped |
| **Controlled Surface Use Stipulations** | | | | | | |
| GS-CSU-3 | Broad habitat | All BLM sensitive plants and wildlife | 144,700 | | | |
| CRV-CSU-8 | 100 meters | Harrington's penstemon outside ACECs | | 13,800 | | |
| CRV-CSU-9 | 100 meters | All BLM sensitive plants | | | | 15,200 |
| **Number of ACECs for Special Status Plants** | | | 0 | 3 | 5 | 0 |
| **Number of ACEC Acres for Special Status Plants** | | | 0 | 8,380 | 14,080 | 0 |

**Impacts from Soils Management.** An NSO stipulation (GS-NSO-15) would protect soil resources by prohibiting surface disturbances related to oil and gas facilities on steep slopes greater than 50 percent. Several special status plant species such as Parachute penstemon (*Penstemon debilis*) and Roan Cliffs blazing star (*Mentzelia rhizomata*) grow on steep talus slopes. Occupied Parachute penstemon habitat would also be covered by an NSO stipulation for federally listed, proposed and candidate species habitat (GS-NSO-12), but the steep slope stipulation would provide additional protection for suitable but unoccupied habitat. The Roan Cliffs blazing star is a BLM sensitive species, which would be covered by a CSU stipulation (GS-CSU-3), so the NSO stipulation for steep slopes would provide greater protection for this species. Soils management in Alternative A would provide the least protection to special status plants of any alternative because the steep slope NSO would apply only to oil and gas activities and would not apply to pipelines. The other alternatives would implement more restrictive soil stipulations.

**Impacts from Water Resources Management.** Water resources management would include an NSO stipulation (GS-NSO-3) prohibiting surface-disturbing activities within 0.5 mile on both sides of major river corridors. This stipulation would provide protection for the Ute ladies'-tresses, which is known to occur adjacent to the Roaring Fork River and has the potential to occur near other river corridors.

Known populations of the Ute ladies'-tresses would be covered under an NSO stipulation for threatened and endangered species (GS-NSO-12) in the current management plan. However, the NSO restriction would protect only occupied habitat, which is less than 0.5 mile from the rivers. The NSO for major river corridors would provide a wider buffer, thereby enhancing protection of threatened plant habitat from indirect impacts, such as sedimentation, soil erosion, or weed invasion.

BLM_0016610

Alternative A would provide the same protection for special status plants as under Alternative D but less protection than under Alternatives B and C. Alternatives B and C would implement GS-NSO-5 for streamside management zones, which would protect any special status plants within 50 feet of hydrologic features.

**Impacts from Vegetation Management—General.** Vegetation management includes a variety of treatments, including timber harvest, planned and unplanned natural fires managed for resource benefits, manipulation of vegetation communities by manual, mechanical, chemical, or biological means, riparian plantings, weed treatment, and seeding of disturbed or treated areas. Vegetation treatments may have beneficial or adverse affects on special status plants depending on the type of treatment performed and the resultant structure and composition of the vegetation community.

Vegetation treatments, especially those utilizing heavy equipment, could result in the crushing and death of individual plants or direct removal of vegetation, which would expose soils and make indirect impacts, such as erosion and weed invasion, more likely.

Vegetation treatments that increase diversity in plant species and age classes, control weeds, stabilize soils, improve pollinator habitat, and promote a more natural fire regime would benefit most special status plant species. Impacts of vegetation management actions, both beneficial and adverse, would be similar across all alternatives.

**Impacts from Vegetation Management—Forest and Woodland.** Vegetation treatments for forest and woodland include mechanical treatments and prescribed fire. None of the special status plant species in the CRVFO is located in forested areas that would be directly impacted by vegetation treatments in forest or woodlands.

Fuels reduction in forests would cause indirect benefits to special status plants by reducing the potential for a large scale, severe fire that could spread to special status species habitat and kill individuals or populations.

**Impacts from Vegetation Management—Rangeland.** Vegetation treatments methods for rangelands include mechanical, prescribed fire, biological and chemical treatments. Surface-disturbing activities, such as the use of heavy equipment, could crush or kill individual special status plants, and the soil disturbance may provide a niche for noxious weed invasions. Chemical control methods could kill special status plants and could also affect potential pollinators by eliminating their habitat.

Vegetation treatments that are not designed to meet special status species objectives could have adverse impacts on special status plants. Harrington's penstemon, which grows in Wyoming and mountain big sagebrush habitats, often grows under the canopy of sagebrush shrubs. The shrub cover protects the special status plants from grazing and trampling and may provide a better moisture regime. Vegetation treatments that significantly reduce the density of shrubs may leave the Harrington's penstemon plants vulnerable to trampling and grazing.

Colorado hookless cactus, which grows in salt-desert shrub habitat, also favors the microclimate under the shrub canopy. Seedlings, in particular, find protection from trampling, shade, and increased moisture within the shrub canopy. Fire or other vegetation treatments that remove canopy cover may adversely affect this species.

BLM_0016611

Many special status plants thrive in vegetation communities without a high degree of competition from other vegetation. Treatments that substantially increase herbaceous cover, particularly graminoid cover, may actually degrade habitat conditions for these species. Conversely, vegetation treatments that result in an increase in forb cover may benefit special status plant species by improving habitat for pollinators. The implementation of vegetation treatments that reduce invasion of pinyon-juniper woodland into sagebrush habitat would benefit Harrington's penstemon by reducing competition with the trees for sunlight and nutrients.

When the desired future vegetation community does not become established following a vegetation treatment, surface disturbances can lead to increased erosion because soil stabilizing vegetation has not become established, or may lead to a proliferation of noxious weeds (such as cheatgrass) or other invasive species that directly compete with special status plants.

Vegetation treatments that improve the diversity and age-class structure of native species may provide positive benefits for special status plants by reducing the potential for weed invasion and by improving habitat for pollinator species. Fuels reduction in shrubland habitat would reduce the potential for a large scale, severe fire that could kill individuals or populations of special status plants. Vegetation treatment actions and their impacts would be similar in all alternatives.

**Impacts from Vegetation Management—Riparian.** Current management includes an NSO stipulation (GS-NSO-2) to prohibit surface-disturbing activities within riparian vegetation. No surface-disturbing activities would be allowed within the riparian or wetland zone unless the activity would cause no loss of riparian vegetation or that the vegetation lost can be replaced within 3 to 5 years with like vegetation. This restriction would also protect the Ute ladies'-tresses orchid and its wetland habitat from surface-disturbing activities. Potentially beneficial actions such as riparian-area restoration and vegetation treatments would be allowed if long-term impacts could be fully mitigated and the activity would benefit and enhance the riparian area.

Vegetation treatments in riparian areas could include the use of herbicides, fire, or mechanical removal of exotic plant species, such as tamarisk or Russian olive. Application of herbicides has a remote potential for accidental drift into special status plant habitat. In the long term, activities to maintain or improve riparian health would probably benefit occupied and potential habitat for Ute ladies'-tresses orchid. Such activities could include streambank stabilization projects, or construction of livestock, wildlife, and recreation exclosures within riparian habitats.

**Impacts from Vegetation Management—Weeds.** Noxious and invasive weed management activities include herbicide use, biological controls, and mechanical or manual treatments in weed infested areas. Actions conducted in areas near special status plant habitat could benefit these species by removal of species that would compete with native species for available space and resources.

If herbicide treatments were to occur in special status plant habitat, plants could be crushed by trucks or ATVs during ground applications, and injury or death of plants could occur. Herbicides could come into contact with and impact special status plants through drift, runoff, wind transport, accidental spills, or direct spraying. Potential impacts could include one or more of the following: death, loss of photosynthetic tissue, reduced vigor, abnormal growth, or reduced reproductive output. Risks to special status plants from spray drift are greater with smaller buffer zones between target and nontarget vegetation and application from

BLM_0016612

greater heights (i.e., aerial application or ground application with a high boom). Application rate is a major factor in determining risk, with higher application rates associated with greater risk to plants.

The GSFO would implement relevant Standard Operating Procedures (SOPs) and mitigation measures presented in the Final Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States PEIS (BLM 200ma) to ensure that adverse impacts to special status plants from weed treatments are avoided. In addition, the BLM would follow the conservation measures identified in the U.S. Fish and Wildlife Service (USFWS) and National Marine Fisheries Service (NMFS) Endangered Species Act Section 7 Consultation and Biological Opinion for the Proposed Vegetation Treatment Program for 17 Western States to protect federally listed, proposed, or candidate threatened or endangered species (BLM 2007n). The conservation measures include suitable buffer distances between treatment sites and populations of special status plant species to avoid negative effects from aerial drift, runoff, or wind erosion during and following treatments. The buffer distances vary based on the herbicide formulation. Adherence to the SOPs and the mitigation and conservation measures would ensure that all practicable means to avoid or minimize harm to special status species have been adopted by the GSFO.

Biological control by domestic animals could kill or injure special status plants through browsing and trampling. Concentrated grazing by domestic animals could increase soil erosion from loss of plant cover or loss of biological soil crusts. Biological control agents such as insects and pathogens do not typically have an effect on nontarget plant species or habitats. However, some biological control agents have been known to attack species in addition to the target plant. All biocontrol agents would be tested before release to ensure they are host specific.

In general, the effects of manual treatment methods would be minimal, both because of the low level of environmental impact of this method and the limited area in which manual use is feasible. Special status plants could be directly killed or injured by treatment or trampling, but soil disturbance and risks of erosion would be minimal with manual methods. Manual treatments would have an overall beneficial effect on special status plant habitat.

Subsequent revegetation of treated areas could include broadcast seeding followed by raking or harrowing or drill seeding, or possibly cultivation (discing) before seeding. Plants could be crushed by tractors or ATVs during the drill-seeding, or injured or killed during cultivation or raking. Before implementing any cultivation, cultural and biological surveys would be conducted and a site-specific NEPA document would be prepared. Safety buffers around special status plants would prevent direct impacts. Revegetation could increase the vegetation cover around special status plant species, creating more competition and limiting resources available to special status plants. It could also create a beneficial effect to special status plants by restoring the site with native vegetation that was present before weeds dominated the area.

With proper implementation, all weed treatment methods would have long-term beneficial effects to special status plant species. Elimination or reduction of noxious weeds would benefit special status plant communities by reducing competition. This would provide more resources (e.g., water and nutrients) to special status plants and other native plants, allowing them to reestablish sites previously dominated by weeds. The type and degree of weed management actions are expected to be similar between alternatives and impacts would be similar across alternatives.

BLM_0016613

**Impacts from Fisheries and Aquatic Wildlife Management.** Activities in support of the fisheries and aquatic wildlife management program may include controlling or removing invasive aquatic species, improving aquatic habitat by installing instream habitat structures or planting riparian vegetation. Habitat improvements that involve surface disturbances in potential or occupied habitat for the Ute ladies'-tresses orchid could cause direct mortality to the species. Under Alternative A, an NSO stipulation for threatened and endangered species (GS-NSO-12) would prohibit surface-disturbing activities in Ute ladies'-tresses habitat, so adverse impacts would be avoided. In the long term, the orchid would benefit from habitat treatments that improve riparian habitat. These actions and impacts would be similar across all alternatives. Alternative A has the fewest protective stipulations for fish and other aquatic wildlife management, so Alternative A would have the least indirect benefits for special status plants of all alternatives.

**Impacts from Terrestrial Wildlife Management.** Habitat manipulations such as prescribed burns, mechanical, and chemical controls are typically used to improve habitat for wildlife. While habitat manipulations for wildlife in the vicinity of special status plants could hold some long-term benefits for the species, there could be short-term adverse impacts from vegetation treatments as discussed in Vegetation Management—Rangelands.

Restrictions or stipulations on surface-disturbing activities within wildlife habitats that overlap with special status plant habitat could benefit special status plants within the restricted areas. The current NSO stipulations to protect wildlife seclusion areas (GS-NSO-11) and state wildlife areas (GS-NSO-4) would not have any direct benefit to special status plants since these stipulations do not overlap any known habitat for special status plants. The NSO to prohibit surface-disturbing activities within 0.125-mile radius of an active nest of most raptor species (NSO-CO-3) would benefit special status plants that occupy similar or adjacent habitats. Alternative A would have the least restrictions on surface-disturbing activities and would have the least benefit to special status plants of all alternatives.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Impacts from management of special status fish and other aquatic wildlife would generally be the same or similar as impacts from management of general fish and other aquatic wildlife.

**Impacts from Special Status Species Management—Terrestrial Wildlife.** In addition to the stipulations mentioned above that would apply to both special status plants and terrestrial wildlife, there are several stipulations for other wildlife species that may benefit special status plants. Protections for a 0.25-mile radius around grouse leks (courtship sites) (NSO-CO-2) and 0.25-mile radius around bald eagle nest or roost sites (NSO-CO-4) would prevent disturbance over larger areas, particularly within sagebrush vegetation, and would protect habitat for Harrington's penstemon that are found within the buffer zones. However, the amount of habitat protected would be minimal since there are few active leks within CRVFO and no known special status plants within proximity of bald eagle nest or roost sites.

Impacts from special status wildlife management would be beneficial for special status plants. Alternative A has the least restrictions on surface disturbances and would have the least benefit for special status plants of all alternatives.

**Impacts from Visual Resource Management.** VRM class designations would either limit or allow surface-disturbing activities in certain areas, thereby affecting special status plants. VRM Classes I and II, which preserve or retain the existing character of the landscape, would protect special status plants by restricting

BLM_0016614

ground-disturbing activities; VRM Classes III and IV would provide less protection by allowing moderate to major changes to the landscape and being less restrictive of ground-disturbing activities.

Bull Gulch, Deep Creek, and Thompson Creek ACEC/SRMAs and Hack Lake SRMA would be managed as VRM Class I. The small populations of Harrington's penstemon within these ACEC/SRMAs would be protected by this management class, which would preclude most surface-disturbing activities.

Portions of the occupied habitat for Colorado hookless cactus, DeBeque phacelia, and Naturita milkvetch would be designated VRM Class II. VRM Class II is protected with a CSU stipulation (GS-CSU-5) to allow relocation of activities beyond 200 meters to protect visual values. Habitat for special status plants may be protected where it coincides with VRM Class II zones. However, it may also present a conflict if VRM Class II zones are adjacent to special status plant habitat and activities are moved into special status plant habitat to retain visual character.

VRM Class III or IV areas would allow for greater landscape modification and therefore greater surface disturbance. These areas could be subject to such actions as complete vegetation removal, which would drastically alter (at least in the short term) the habitat for special status plant species. Alternative A has 257,900 acres in Class III and IV designations, which is more than any other alternative. Habitat for special status plants in Class III or IV areas includes Lower Colorado River, Flatiron Mesa, Hardscrabble, Gypsum Hills, and Sheep Creek Uplands. Visual resource management under Alternative A would provide the least benefit for special status plants of all alternatives.

**Impacts from Wildland Fire Management.** This analysis focuses on fire management including planned or unplanned natural fire managed for resource benefits, wildland fire suppression, and nonfire fuels treatments, as well as on the impacts of wildland fire itself.

*Effects of Wildland Fire on Special Status Plants.* Fire management could affect special status plant species in several ways. The fire itself could result in the death of individual plants or the alteration of their habitat. The construction of fire lines using hand tools or heavy machinery could also affect special status plants by crushing or uprooting individual plants, increasing erosion and sedimentation, and providing a vector for the invasion or expansion of noxious weeds.

Many special status plant species are found in locations where wildland fire did not historically burn due to sparse vegetation cover. However, the proliferation of invasive weeds, such as cheatgrass (*Bromus tectorum*), has resulted in increased fine fuel loads, which can carry fires through areas where they did not previously burn. Therefore, the potential of a wildland fire, with attendant suppression, in special status plant species habitat is increasing.

Under all alternatives, planned natural fire would be used to reduce hazardous fuel loading. Planned natural fire, including fire line construction and use of staging areas, could adversely affect special status plant species by trampling individual plants or altering habitat as previously described. However, the severity of this impact would be much less than that described above for wildland fire suppression or management of unplanned natural fire, because planned natural fires would generally be preceded by a survey for special status plants and surface-disturbing activities would be designed to avoid occupied special status plant species habitat whenever possible. Habitat manipulations resulting from the use of fire may also benefit special status plants over the

BLM_0016615

long term by improving vegetation conditions and reducing fuel loadings that would lower the risk of large scale, severe fires.

Fire plays an important role in mountain big sagebrush sites that support some populations of Harrington's penstemon. The historical fire return interval in this community type ranged from 25 to 75 years depending on soil type and annual precipitation. Fire reduced shrub densities, removed invading pinyon pine and juniper trees, and increased herbaceous cover. Fire may have mixed impacts on Harrington's penstemon depending on the fire frequency and severity and on the intensity of grazing following fire. As discussed under Vegetation Management—Rangeland above, the complete removal of shrub canopy may leave the special status plants vulnerable to grazing and trampling and may promote increase herbaceous vegetation that would compete with the special status plants for water and nutrients. The ability of the plant community to resist weed invasion depends on many factors, including the presence of weeds before the fire, plant diversity and cover before the fire, fire intensity and duration, and climate and elevation.

Stabilization and rehabilitation efforts would benefit special status species over the long term by decreasing erosion and restoring or improving habitat conditions following a fire, although there could be short-term adverse impacts. The use of heavy equipment within special status plant species habitat could crush individual plants and segment populations. In order to stabilize soils following fire, rehabilitation efforts often focus on seeding of grasses with quick germination and establishment characteristics. An increase in grass cover may suppress some species of special status plants, which frequently grow in ecosystems with low vegetation cover.

## FMUs

FMUs that do not allow fire would require aggressive wildland fire suppression of all fires, leading to fewer acres burned, and as such would cause the least amount of short-term direct disturbance to vegetation. This would make direct loss of special status species and habitat fragmentation less likely. However, as fewer areas would experience wildland fire, these areas would also have the fewest beneficial impacts on potential habitats (e.g., clearing undergrowth, stimulating germination of native species, age class diversification).

These FMUs are generally located near the wildland urban interface (WUI) or around areas of sensitive resources, such as special status species habitat or cultural sites. The Mount Logan Foothills FMU is designated specifically to protect occupied and potential habitat for Colorado hookless cactus, DeBeque phacelia, Naturita milkvetch, and some Parachute penstemon habitat. Vegetation in this area is salt-desert scrub in which fire never played a historical role in the maintenance of the ecosystem (Chambers et al. 2009). However, the invasion of cheatgrass into the salt-desert scrub ecosystem has increased the risk of wildland fire and, if it did burn, would result in a proliferation of cheatgrass that could suppress special status plants.

In FMUs where an unplanned ignition could have negative effects, such as invasive weed encroachment or an extremely altered fire regime that would not burn as it would have historically, fire suppression could have adverse impacts on special status plants as discussed above. However, the CRVFO Fire Management Plan has BMPs in place to guide wildland fire suppression while in habitat areas known to contain federally listed, proposed, or candidate plant species. Section 7 consultation with USFWS has concurred with BLM's determination that these guidelines would be "not likely to adversely affect" listed plant species. Large scale, severe wildland fires caused by excessive fuel loading from maximum fire suppression could reduce vegetation cover across large expanses, creating hydrophobic soil conditions, which inhibit seed germination and water infiltration and accelerate soil erosion.

BLM_0016616

FMUs where fire is allowed would result in the most direct disturbance to vegetation and could lead to direct loss of individual special status plants or entire populations, or adverse changes to occupied or potential habitat. These FMUs were designated in areas with intact healthy ecosystems that are resilient to disturbances, have high resistance to weed invasion, and historically frequent fire return intervals. Planned or unplanned natural fire in these areas may result in the most habitat improvement and age-class diversification, which would benefit special status plants in these habitats. Impacts from Wildland Fire Management would be the same or similar across all alternatives.

**Impacts from Forestry Management.** Forestry and woodland management actions include the harvesting of firewood, poles, Christmas trees, pine nuts, timber, and seed collection. Commercial forestry (e.g., timber harvests and sales) are restricted to upland forests. These activities could include the use of heavy equipment, helicopters, chemical applications, road construction, and culvert installation, and typically result in increased traffic, noise, and human presence.

None of the special status plants species in the CRVFO occurs in forested areas that would be directly impacted by commercial timber harvesting. The BLM sensitive species Harrington's penstemon occurs in habitats next to suitable commercial forestlands. Construction of roads through occupied and suitable Harrington's penstemon habitat to access the timber could kill this special status plant and cause a loss of habitat, and may reduce plant vigor by increasing dust.

Collection of seeds and other plant parts is a forestry management activity that could have adverse impacts on special status plants. Collection of seeds within special status plant species habitat could result in loss or damage to plants. Seeds are typically gathered by thrashing the plants with tennis rackets. Motorized vehicles are used as part of the collection activity. Collection of listed plants would require a permit from USFWS. Permits would generally not be authorized in areas of BLM sensitive plants unless special status plant species were targeted for the purpose of increasing seed for restoration. Potential impacts from forest and woodland harvesting or from seed and live plant collection would be reduced during site-specific NEPA analysis for proposed projects.

**Impacts from Livestock Grazing Management.** The primary impacts on special status plants from the implementation of the livestock grazing program can occur from actual grazing or from surface-disturbing actions related to range developments, such as the construction of fences, water pipelines, cattle guards, and livestock ponds.

*Livestock Grazing.* Potential impacts of livestock grazing vary by the special status plant species and their habitats. Many of the special status plants in the CRVFO grow in areas with naturally sparse vegetation cover. Some of these species also occur on steep, talus slopes. These habitats typically receive only incidental livestock use and impacts of grazing would be minimal.

Several other special status plants occur in sagebrush or riparian habitats that can receive heavy livestock grazing. Direct impacts are more likely to occur where livestock congregate. Grazing in these habitats could cause direct loss or trampling of special status plant individuals or populations, especially special status plants that are palatable to animals. Livestock grazing can also cause a decrease in total vegetation cover, an increase in areas of bare ground, a change in species composition, soil compaction, erosion, sedimentation, and an increased potential for weed invasion and spread, all of which could reduce the health and vigor of the special status plant community, as well as alter the natural fire regime.

BLM_0016617

Dispersed, light grazing could have beneficial impacts on special status plant habitat. Grazing may decrease the cover of other vegetation that competes with special status plants for sunlight and nutrients. Grazing also reduces litter and fine fuel loading, which could reduce the scale and severity of wildfires. This would be beneficial particularly for special status species in the salt desert shrub environment, which is not historically adapted to wildfires.

Management of livestock grazing would comply with Colorado Public Land Health Standards and Guidelines for Livestock Grazing under all alternatives. In areas where livestock grazing causes land health standards to not be met, changes would be made to make significant progress toward meeting those standards. This would help reduce adverse impacts on special status plants by improving overall soil and vegetation condition. Of the allotments that were determined not to be meeting the land health standards, livestock grazing was considered a significant causal factor in only a few allotments. The County Line allotment, which contains occupied habitat for several special status plants, was one in which livestock grazing was contributing to the failure to meet land health standards. Changes in grazing use, including a temporary deferral from livestock grazing, have been implemented to move the allotment towards meeting the land health standards.

Under Alternative A, approximately 489,600 acres would be available for livestock grazing with 56,900 AUMs, which is more than any other alternative. The current, active grazing preference is approximately 35,300 AUMs. If the full number of available AUMs were activated, livestock concentration areas and overall utilization levels would likely increase, which could result in more adverse impacts on special status plants than under Alternatives B, C, or D.

*Range Developments.* Construction of range developments has the potential to directly impact special status plant species through direct mortality during construction. The construction of fences or livestock ponds would concentrate livestock use and would potentially affect occupied special status plant habitat in the vicinity due to trampling or grazing of plants, changes in species composition, and invasion of noxious weeds. Placement of salt and mineral supplements can also lead to cattle concentration in habitat for special status plant species and could result in similar impacts. New range development projects, such as construction of stock ponds or fences, would have stipulations attached requiring grazing permittees to monitor and control noxious weeds within the project area. Range improvements for livestock would improve livestock distribution and reduce localized excessive utilization levels, which would minimize disturbance, weed spread, and soil compaction in any one area.

Under all alternatives, when deemed necessary and feasible by the BLM, livestock grazing would be excluded or deferred for two growing seasons on disturbed areas (e.g., reclaimed seeded areas, except for pipelines), or until monitoring data indicated that vegetation cover, species composition, and litter accumulation were adequate to support and protect watershed values, meet vegetation objectives, and sustain grazing use. Where these conditions would occur, reclaimed and reseeded areas would have time to become established, and the risk of weed invasion would be reduced. Impacts would be beneficial and long term. Alternative A has the most acres available for livestock grazing (494,400 acres) and the most AUMs available (56,900) of any alternative. Impacts from Livestock Grazing Management would be greatest under Alternative A, followed by Alternatives D, B, and C.

**Impacts from Recreation and Visitor Services Management.** Recreational use includes a variety of activities that may impact special status plants. Surface-disturbing activities, such as construction of campgrounds, parking lots and trails, camping outside designated areas, foot, horse, or motorized or

BLM_0016618

mechanized vehicle traffic off existing roads or trails, have the potential to adversely affect special status plants by crushing or trampling plants or by removing or altering habitat. Visitor use is expected to increase within the planning area under all alternatives. All of the identified impacts associated with recreation would be expected to increase proportionately.

Recreational opportunities are more intensively managed within SRMAs and RMAs than in the remainder of the planning area. The goal of SRMAs and RMAs would be to enhance certain recreation experiences and tailor the recreational setting to meet those uses. Those SRMAs that focus on mountain biking, motorcycle riding, or OHV activities tend to concentrate those uses and impacts within the SRMA. RMAs, in general, provide for more dispersed non-motorized or mechanized recreational use.

Under the current plan, seven of the SRMAs (Bocco Mountain, Bull Gulch, Deep Creek, Gypsum Hills, Hack Lake, Thompson Creek, and the Upper Colorado River) and one of the RMAs (Pisgah Mountain) include occupied habitat for the BLM sensitive plant, Harrington's penstemon. The management emphasis in Bocco Mountain and Gypsum Hills would be motorized recreation opportunities. An NSO stipulation on occupied habitat for listed, proposed, and candidate plants and a CSU stipulation on occupied habitat for BLM sensitive plants would allow relocation of new surface-disturbing activities or special project design measures to lessen impacts on special status plants. However, an overall increase in route density and vehicular traffic would probably lead to loss of potential but unoccupied habitat, fragmentation of overall habitat, and increased dust deposition on plants.

The other SRMAs and the RMA under Alternative A with special status plant habitat are managed primarily for hiking and horseback riding opportunities, with low density of trails and low levels of use anticipated. Impacts on special status plants within these SRMAs and RMA would be minimal. Except for Bocco Mountain and Gypsum Hills, an NSO stipulation would protect the SRMAs and RMAs with special status plant habitat from incompatible surface-disturbing activities. This restriction would indirectly provide protection for Harrington's penstemon within these areas.

Under Alternatives B and C, fewer SRMAs would be designated, and Gypsum Hills would no longer be designated as an SRMA. Alternative D would designate the most SRMAs with special status plant habitat. Impacts of SRMAs under Alternative A would be greater than under Alternatives B and C but less than under Alternative D.

**Impacts from Comprehensive Trails and Travel Management.** Trails and travel management impact special status plants in a variety of ways. Construction and use of roads and trails and cross-country OHV use could adversely affect special status plants. Impacts of these actions could also include direct mortality of special status plants, habitat destruction and fragmentation, soil compaction, transportation of noxious weeds from infested areas to uninfested areas, increased dust, and increased access for illegal collectors. Disturbances from cross-country travel (casual use) would probably be greatest to special status plant species and their habitat because these activities occur over widespread areas and are generally unsupervised. Unlike permitted activities (e.g., mineral development, ROWs, and vegetation treatments) that are subject to site-specific environmental review and mitigation measures, casual use activities do not have to undergo the same level of scrutiny and could therefore result in detrimental impacts on special status plants. Visitor use is expected to increase within the planning area under all alternatives, which would probably result in increased trail and road use. All of the identified impacts associated with trail and road management would be expected to increase as well.

BLM_0016619

Under the current management plan, unless otherwise designated as "closed" or "limited to existing or designated routes," the CRVFO would be considered "open to motorized vehicle use on and off roads." Travel management actions would maintain the most acres (294,300) as open to year-round travel and the fewest acres (123,000) as limited to designated routes.

Under Alternative A, a total of 186 miles of roads occur within 200 meters of special status plant habitat (the most of any alternative). Impacts would vary depending on the class of road, i.e., more impact would result from dirt roads than from gravel or paved roads. Vehicle traffic on dirt and gravel roads creates dust, which can limit photosynthesis and decrease plant vigor and pollination success. Roads also provide a vector for weed invasion, which can degrade special status plant habitat.

As compared to the other alternatives, Alternative A would result in the greatest risk of impacts on special status plants, because of the amount of existing routes within special status plant habitat that are open to full-sized vehicles, and because most of the habitat is considered "open to motorized vehicle use on and off roads."

**Impacts from Lands and Realty Management.** The effects of land tenure adjustments on special status plants would be determined through site-specific environmental analysis for any land disposals or acquisitions. Although there is no specific guidance in the current plan regarding disposal or retention of special status species, BLM policy (BLM 2001d; Manual 6840) is to "retain in federal ownership all habitat essential for the survival and recovery of any listed species." Disposal of habitat for proposed, candidate, or sensitive species may result in loss of populations and habitat, unless lands leaving public ownership are guaranteed protection under other ownership. Land acquisitions involving special status plants and their habitats would provide additional protection by managing them under BLM's guidelines and regulations.

ROWs, including roads, pipelines, power lines, wind and solar power sites, and communications sites, could be proposed in populations and habitats for special status plants. Construction of ROWs in special status plant habitats could cause direct removal of special status plants, increased habitat fragmentation, conversion of habitat to unsuitable habitat types, or degradation of habitat due to sedimentation or weed invasion. Construction and operation of road ROWs could provide increased access for illegal collectors.

In Alternative A, approximately 20,800 acres are designated as right-of-way exclusion areas, precluding the construction of utility and communication facilities, and approximately 101,300 acres are designated as "sensitive" for these uses, requiring special mitigation measures if avoidance is not possible. Under the other alternatives, the term "sensitive areas" is replaced with "avoidance areas." Exclusion areas include Deep Creek and Bull Gulch ACECs, Thompson Creek Natural Environment Area, and the Hack Lake area. Potential adverse impacts from ROWs would be greatest under this alternative since it designates the fewest acres as exclusion or avoidance areas for utility and communication facilities and none for other ROWs. However, listed, proposed, and candidate threatened and endangered plant species would be protected through an NSO stipulation and BLM sensitive plants would be afforded some protection by a CSU stipulation which would lessen the impacts. Several small populations of Harrington's penstemon within ROW exclusion areas would receive greater protection than that provided by the CSU stipulation for BLM sensitive species.

BMPs and weed control measures in the ROW terms and conditions would serve to minimize impacts of surface disturbances. Under all alternatives, adverse impacts from lands and realty actions would be greater than beneficial impacts, but impacts would be greatest under Alternative A.

BLM_0016620

According to the US Department of Energy, National Renewable Energy Laboratory, the planning area has a low potential for wind and solar energy. Impacts of renewable energy development to special status plants could include direct mortality, habitat disturbance, habitat loss, introduction of invasive weeds, erosion and runoff, and fugitive dust. Under Alternative A, applications for solar and wind energy exploration and development would be considered on a case-by-case basis. Any impacts on special status plant species would depend on the location and type of project proposed. For example, the use of solar panels within a special status plant species population could block sunlight or the surface disturbance associated with the installation of wind turbines could crush or remove individual special status plants. Implementation of existing NSO stipulations would prevent impacts on federally listed, proposed or candidate threatened or endangered species. CSU stipulations on sensitive species may require relocation of the activity outside known populations but may allow such activities within unoccupied but potential habitat. Impacts would be the same across all alternatives.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, Geothermal Resources).** Of all types of mineral and energy development, oil and gas development has the greatest potential for impacts on special status plants, given the current level of development and the high potential for oil and gas resources in the area. Direct impacts associated with mineral development and seismic explorations include direct mortality of special status plants from construction equipment and vehicles in occupied habitats. In addition, habitat could be lost or modified by constructing well pads, pipelines, and associated facilities in occupied and suitable habitats, and by disturbing habitat of the species' pollinators.

Construction and operation of facilities expand current roadway systems and increase both traffic and visitation to otherwise remote areas. Increased traffic could result in increased mortality of special status species from trampling of habitat and poaching by illegal collectors. Dust associated with increased soil disturbance and vehicular traffic within special status plant habitat can reduce the photosynthetic activity of plants and reduce pollination success. In the long term this may reduce seed productivity and recruitment of young special status plants needed to replace mortality due to senescence.

In addition to direct human-caused mortality, indirect impacts could include weed introduction, weed spread, sedimentation, erosion, and dust deposition associated with construction of infrastructure and use of access roads. Mineral development would fragment habitats and could degrade or eliminate potentially suitable habitat for special status plants.

As shown in Table 4.2.7-2, much of the known special status plant habitat is already leased and undergoing development. Most of the habitat for these special status plants was leased before the current stipulations were developed, so the leases do not contain NSOs or CSUs for special status plants. Under all alternatives, the BLM can develop COAs on APDs or voluntary mitigation with the oil and gas companies to reduce impacts on special status species. However, COAs are often less protective than lease stipulations because of limitations on what BLM can require under its regulatory authority.

Other oil and gas stipulations are in place to require the reestablishment of desirable vegetation following completion of the mineral and fluid management actions. However, reclamation efforts often have poor success rates, with loss of species diversity, an increase in annuals, and a decrease in forbs and woody plants. In addition, permits include weed control stipulations that are effective, if enforced. Overall, special status

BLM_0016621

**Table 4.2.7-2**
**Existing Oil and Gas Leases in Special Status Plant Habitat**

| Special Status Species | Approximate Acres of Habitat | | Portion of Habitat Leased |
|---|---|---|---|
| | Known | Leased | |
| Colorado hookless cactus | 5,580 | 5,300 | 95% |
| DeBeque phacelia | 93 | 93 | 100% |
| Harrington's penstemon | 37,640 | 2,450 | 7% |
| Naturita milkvetch | 62 | 62 | 100% |
| Parachute penstemon | 310 | 90 | 29% |
| Roan Cliffs blazing star | 93 | 54 | 58% |
| Ute ladies'-tresses orchid | 62 | 0 | 0% |

species habitat could be altered by minerals management actions, but mitigation measures would be implemented to lessen the impact on special status species. Under all alternatives, adverse impacts would be greater than beneficial impacts.

Under Alternative A, a total of 27,800 acres would be closed to fluid minerals leasing. This would include approximately 750 acres of Harrington's penstemon habitat within the Bull Gulch WSA. All other special status plant habitats would be open to fluid minerals leasing. In 2009, approximately 95 percent of Colorado hookless cactus habitat and 100 percent of known DeBeque phacelia and Naturita milkvetch habitats were already leased. The habitat is in high potential oil and gas areas and is currently being developed.

Currently, 58 percent of Roan Cliffs blazing star habitat and 29 percent of Parachute penstemon habitat are leased. The remaining habitat for these two special status plant species is within high potential oil and gas areas. If these areas were to be leased in future, an NSO stipulation would be attached to Parachute penstemon habitat since it is a species proposed for listing under the ESA, and a CSU would be applied to Roan Cliffs blazing star habitat since it is a BLM sensitive species.

Only 7 percent of Harrington's penstemon habitat is currently leased, which represents all of the habitat within high-potential oil and gas areas. Another 30 percent of Harrington's penstemon habitat is in moderate-potential areas. Under Alternative A, future leases would include a CSU stipulation on Harrington's penstemon habitat. This would provide some protection from oil and gas and other surface-disturbing activities; however, in areas where Harrington's penstemon habitat is extensive, it may be difficult to move operations beyond the occupied habitat and still attain the down-hole targets for natural gas. Some populations of Harrington's penstemon are likely to be lost if habitat is protected with a CSU stipulation instead of an NSO.

None of the Ute ladies'-tresses habitat is currently leased, and the habitat is in an area with low potential for oil and gas development. Fluid mineral leasing and development is likely to have little effect on this threatened plant species.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under the current plan, the following areas that contain special status plant habitat would be petitioned for withdrawal from locatable mineral exploration and development: Bull Gulch, Deep Creek, and Thompson Creek ACEC/SRMAs. Withdrawing these three areas would protect several small populations of Harrington's penstemon from surface-disturbing actions related to locatable mineral development. Locatable

BLM_0016622

mineral development is not subject to NSO or CSU restrictions, so special status plant habitat not withdrawn from mineral development would be vulnerable to surface-disturbing actions. The degree of impacts would vary depending on the location of proposed mineral development in relation to special status plant habitat. No public lands in CRVFO would be closed to mineral materials (salables) disposal or non-energy solid leasable minerals, except WSAs if Congress designates them as wilderness. However, unlike locatable mineral development, these activities would be subject to the existing stipulations, so impacts on special status plants would be minimal. Alternative A would withdraw the least amount of habitat for special status plants of any alternative, potentially creating the most adverse impact.

**Impacts from Renewable Energy Management (Wind and Solar).** According to the US Department of Energy, National Renewable Energy Laboratory, the planning area has a low potential for wind and solar energy. Impacts of renewable energy development to special status plants could include direct mortality, habitat disturbance, habitat loss, introduction of invasive weeds, erosion and runoff, and fugitive dust. Under Alternative A, applications for solar and wind energy exploration and development would be considered on a case-by-case basis. Any impacts on special status plant species would depend on the location and type of project proposed. For example, the use of solar panels within a special status plant species population could block sunlight, or the surface disturbance associated with the installation of wind turbines could crush or remove individual special status plants. Implementation of existing NSO stipulations would prevent impacts on federally listed or candidate threatened or endangered species. CSU stipulations on sensitive species may require relocation of the activity outside known populations but may allow such activities within unoccupied but potential habitat. Impacts would be similar across all alternatives.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative A, BLM would continue designation and special management of the following ACECs: Blue Hill, Bull Gulch, Deep Creek, Glenwood Springs Debris Flow Hazard Zone, Lower Colorado River, and Thompson Creek. Four of these ACECs—Blue Hill, Bull Gulch, Deep Creek, and Thompson Creek—contain small occurrences of the special status plant Harrington's penstemon. Although not designated specifically for special status plants, an NSO stipulation (GS-NSO-16) on Bull Gulch, Deep Creek, and Thompson Creek to protect the ACEC values may indirectly benefit the portions of Harrington's penstemon habitat that occur within these ACECs. However, the NSO would be designed to protect the relevant and important values for which these ACECs were designated, such as scenic qualities and geologic features. Exceptions to the NSO may be granted for activities that do not impair these values but may have impacts on other resources, such as special status plants.

These ACECs would be petitioned for withdrawal from exploration and development of locatable minerals. If these areas are withdrawn, it would protect special status plants from surface disturbances related to locatable mining activities. Protections for special status plants provided under Alternative A would be less than under Alternatives B and C, but more than under Alternative D.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** The Bull Gulch WSA includes several small occurrences of Harrington's penstemon. The Castle Peak WSA contains some potential habitat for Harrington's penstemon. These areas would be closed to fluid minerals leasing. Although not officially covered by an NSO stipulation on surface-disturbing activities under the current plan, the nonimpairment criteria for WSAs would preclude all or most surface-disturbing activities in the area.

BLM_0016623

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative A, a total of 26 stream segments would be determined to be eligible for inclusion in the National Wild and Scenic River System. Each of these stream segments would be provided interim protection to preserve their free-flowing nature and the ORVs for which they were deemed eligible. The interim protections would apply to lands within 0.25 mile of either side of the stream. A small amount of Harrington's penstemon habitat within the WSR corridors would indirectly benefit from these protections. Alternatives A and C would provide the most protection to special status plants by excluding surface-disturbing activities on 26 stream segments.

**Impacts from Transportation Facilities Management.** Road maintenance has had impacts on several special status plants, including Parachute penstemon, DeBeque milkvetch, and Harrington's penstemon where these species occur within old road cuts, fills, or borrow ditches, or where they colonize infrequently used roads. Blading or dozing roads has resulted in burial, uprooting, or undercutting of special status plants. Impacts on Harrington's penstemon would be negligible compared to the overall population size. Impacts on Parachute penstemon and DeBeque milkvetch could be minor to moderate because their populations within the planning area are much smaller.

### Alternative B (Preferred Alternative)

Impacts to special status species plants from management of other resources under Alternative B would be the same as or similar to those under Alternative A, except as describe below.

**Impacts from Special Status Species Management—Plants.** Management of special status plants under Alternative B would involve fewer acres of special status plant potential habitat covered under NSO and CSU stipulations than under Alternative A but more acres and areas of known occupied habitat. Extensive inventories for special status plants have been conducted in the past few years. Mapping has been refined to reflect more areas of known occupied habitat and to remove areas formerly considered potential habitat but where no special status plants have been located in surveys repeated for several years. Although Alternative B includes fewer total acres of NSO and CSU for special status plants, all known existing populations (and subsequent populations that are found) would be protected under Alternative B.

A new NSO stipulation would prohibit surface-disturbing activities within a 200-meter buffer of occupied threatened, endangered, proposed, and candidate plant habitat. This restriction would adequately protect occupied habitat from direct and indirect impacts and would protect potential but currently unoccupied habitat adjacent to occupied habitat. An NSO stipulation for sensitive plants would prohibit surface disturbances within a 100-meter buffer of occupied sensitive plant habitat. For Harrington's penstemon, this NSO would apply only within the ACEC boundaries. Outside ACECs, Harrington's penstemon would be provided less protection with a CSU stipulation. The NSO for sensitive plants under Alternative B would provide more stringent protection than the CSU stipulation under Alternative A; therefore, sensitive plants other than Harrington's penstemon would receive greater protection under Alternative B.

Additionally, suitable habitat for DeBeque phacelia would be protected (GS-NSO-22), unless surveys conducted during a "reliable year," as defined in the stipulation, find the habitat unoccupied. DeBeque phacelia is a diminutive, annual plant that germinates only in response to favorable climatic conditions. This stipulation would protect potential habitat for DeBeque phacelia unless it could be reliably demonstrated that the habitat is unoccupied. This would provide additional protection not found under Alternative A.

BLM_0016624

These stipulations would protect special status plants from surface-disturbing activities, including oil and gas, except where leases have already been issued. With the exception of Ute ladies'-tresses orchid and Harrington's penstemon, most of the known special status plant habitat has already been leased for oil and gas.

Three ACECs—Hardscrabble-Mayer Gulch, Lyons Gulch, and Sheep Creek Uplands—would be designated specifically for special status plants, protecting 8,400 acres of core habitat for Harrington's penstemon. These ACECs would include an NSO stipulation with 100-meter buffer around occupied special status plant habitat. The ACECs would be designated ROW avoidance areas, would be recommended for withdrawal from mineral location, would be closed to mineral materials sales, and would not be available for coal leasing. Prescribed fire and other vegetation treatments would be allowed if they were determined to maintain or enhance habitat for Harrington's penstemon. The management prescription for these ACECs would allow no net increase in motorized or mechanized routes. A number of roads that were open to full-sized vehicles under Alternative A would be limited to pedestrian and equestrian use only or would be closed altogether under Alternative B to reduce fragmentation, improve habitat connectivity, and reduce risk of weed invasion for wildlife and special status species habitat. Under Alternative B, there would be 157 miles of routes within special status plant habitat, a reduction of 31 miles from Alternative A. Alternative B would provide more benefits to special status plant conservation and management than under Alternative A and D, but less than under Alternative C.

**Impacts from Soils Management.** Under Alternative B, the NSO stipulation to protect soils on steep slopes greater than 50 percent would be applied to all surface-disturbing activities, including pipelines and facilities not associated with oil and gas. Several special status plant species, such as the proposed species, Parachute penstemon, and the BLM sensitive species, Roan Cliffs blazing star, grow on steep talus slopes. Under this alternative, federally listed, proposed, or candidate species would be protected with an NSO stipulation with a 200-meter buffer to protect plants from direct impacts and loss of immediately adjacent suitable habitat. BLM sensitive plants would be protected with an NSO stipulation with a 100-meter buffer around occupied habitat. The NSO stipulation for soils management may provide some additional protection by protecting a larger buffer around the special status plant habitat.

**Impacts from Water Resources Management.** Under Alternative B, the current NSO stipulations for major river corridors and for domestic watershed areas would be maintained. This would provide protections for Ute ladies'-tresses orchid, a threatened plant species that is found in riparian and wetland habitat. An NSO for streamside management zones (CRV-NSO-5) which prohibits surface-disturbing activities within 50 feet of drainages, may provide some additional protections for the Ute lades'-tresses orchid if it occurs in drainages other than the major river corridors.

**Impacts from Vegetation Management—Rangeland.** The types of impacts experienced as a result of vegetation management would be similar to those described for Alternative A. Beneficial effects could result from many of these activities, which would include improved vegetation conditions, such as a reduction in pinyon-juniper encroachment into sagebrush habitat that supports Harrington's penstemon.

Vegetation treatments that dramatically increase native or non-native herbaceous cover could directly compete with special status plant species for sunlight and nutrients. Additionally, adverse effects could also result from the construction efforts associated with some vegetation treatments, as described previously for Alternative A.

BLM_0016625

**Impacts from Terrestrial Wildlife Management.** Alternative B would prohibit surface-disturbing activities on 57,600 acres of core wildlife areas (CRV-NSO-8). Protective stipulations placed on important winter wildlife habitat would indirectly protect special status plants, particularly Harrington's penstemon, that depend on sagebrush habitat. This would provide greater protection for this species than would be provided by the stipulations for special status plants in this alternative. However, habitat and range improvement projects would be allowed. The types of impacts experienced as a result of habitat improvement projects for wildlife would be similar to those described under Alternative A.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** The NSOs under Alternative B for big river fish and the three native fish species have a buffer of 100 meters each, which would not be as large as the NSO stipulation for major river corridors. There would be no additional protections for special status plants. Impacts of special status fish and other aquatic wildlife under Alternative B would be the same as or similar to Alternative A.

**Impacts from Special Status Species Management—Terrestrial Wildlife.** Additional protections for sage-grouse habitat would be implemented under Alternatives B, C, and D. The 0.25-mile buffer around grouse leks under Alternative A would be replaced with a 0.60-mile buffer around active leks. This broader buffer would protect more habitats for other special status species, such as Harrington's penstemon, whose sagebrush habitat overlaps that of sage-grouse. However, the amount of habitat protected would be minimal since there are few active leks within CRVFO. Other stipulations would be the same or similar as Alternative A, so the impacts would be similar to Alternative A.

**Impacts from Visual Resource Management.** Bull Gulch, Deep Creek, and Thompson Creek ACEC/SRMAs would continue to be managed as VRM Class I. Under Alternative B all WSAs as well as the Blue Hill ACEC would be included under VRM Class I. VRM Class I areas would preserve or retain the existing character of the landscape with the application of an NSO (CRV-NSO-42, VRM Class I areas). Several of these areas contain small populations of Harrington's penstemon that would be afforded additional protection from surface disturbances. All the VRM Class II management areas from Alternative A would be maintained, and some additional VRM Class II acres would be included, mostly in the SRMAs and the ACECs. A CSU stipulation would be attached to VRM Class II areas to protect the visual character. NSO and CSU restrictions on special status plant habitat under Alternative B would provide greater protection than the CSU for VRM Class II.

**Impacts from Forestry Management.** Under Alternative B, the acres of identified commercial forest and woodlands would increase to 31,400; however, these additional areas do not support special status plant habitat. The BLM sensitive species Harrington's penstemon does occur next to suitable commercial forestlands. Construction of roads through occupied and suitable Harrington's penstemon habitat to access the timber could adversely affect this special status species.

Under this alternative, a total of 81,800 acres would be closed to commercial timber harvest. Several of these areas, including Thompson Creek, Hack Creek, and East Hardscrabble, provide habitat for Harrington's penstemon. Closing these areas to commercial timber harvest would protect these populations from surface disturbances associated with timber harvest.

BLM_0016626

Potential impacts from forest and woodland harvesting or from seed and live plant collection would be reduced during site-specific NEPA analysis and consultation under Section 7 of the ESA for projects involving habitat for listed plant species or their seeds.

**Impacts from Livestock Grazing Management.** Impacts on special status plants from livestock grazing management would be slightly less under Alternative B than under Alternative A. Under Alternative B, there would be 451,400 acres available for livestock grazing; a reduction of approximately 38,000 acres from Alternative A. Eight of the 38 allotments that would be closed to grazing contain known special status plant habitat: County Line, Eby Creek, Heuschkel, North McCoy, Pocket, Sheep Creek G&F, Wheatley, and Williams Hill. Closing these allotments to livestock grazing would be expected to have generally positive impacts on special status plant habitat by decreasing the risk of trampling or browsing damage or adverse changes in habitat. However, the County Line allotment is heavily infested with cheatgrass, and removing livestock grazing alone is not likely to restore the vegetation community to desired conditions. Additional vegetation treatments (weed control, seeding) may be needed to improve habitat for special status plants.

Under Alternatives B, C, and D, where feasible and deemed necessary by the BLM, livestock grazing on disturbed areas would be deferred for two growing seasons or until site-specific monitoring indicates that vegetation cover, species composition, and litter accumulation are adequate to protect watershed values, to meet vegetation objectives, and to sustain grazing use. Implementation of this temporary grazing deferment would benefit habitat for special status plants by allowing desirable vegetation to become firmly established and would reduce the potential for weed invasion.

**Impacts from Recreation and Visitor Services Management.** Under Alternative B, six SRMAs would be designated in the CRVFO. Four of these SRMAs (Bocco Mountain, Hack Lake, The Crown, and the Upper Colorado River) contain populations of the special status plant, Harrington's penstemon. As under Alternative A, Bocco Mountain would be managed to maintain a trail system for motorcycle riding. Additional trails could cause impacts on special status plants by crushing or removing individuals, increasing dust emission in the vicinity of special status plants, which may reduce photosynthetic activity and plant vigor, or by reducing overall local population size below a viable level. Under Alternative B, Harrington's penstemon habitat would be covered by a CSU stipulation (CRV-CSU-8) to allow relocation of new surface-disturbing activities or special project design measures to lessen impacts on this species. The Crown SRMA would be managed for multiple use zones with little emphasis on increasing road and trail densities. This would create few new impacts on special status plants. Hack Lake and the Upper Colorado River would be managed for low-density non-motorized use, which would have minimal impact on special status plants. Alternative B would result in fewer impacts on special status plants than under Alternatives A and D but greater impacts than under Alternative C.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative B, no lands would remain "open to motorized vehicle use on and off roads." All travel would be limited to designated routes (467,600 acres) or closed to motorized vehicles (37,300 acres). Areas limited to designated routes would have beneficial impacts by preventing new disturbances that would further fragment special status plant habitat. Under Alternative B, some routes would be closed, and other routes would be converted from full-sized vehicle use to mechanized use or designated for pedestrian and equestrian use only to benefit a variety of programs, including recreation management, wildlife, and special status species. There would be 157 miles of roads within special status plant habitat under Alternative B, which are 29 fewer miles than under Alternative A. These changes would benefit special status plant habitat by limiting the actual acres of disturbance and

BLM_0016627

decreasing dust impacts. Impacts from trails and travel management actions would be less than under Alternatives A and D but more than under Alternative C.

**Impacts from Lands and Realty Management.** Lands that provide habitat for listed, proposed, or candidate species would be retained for long-term management under Alternative B. Other areas that would be retained in federal ownership include ACECs, SRMAs, and ERMAs, sage-grouse core areas, and big game critical winter range. Seven ACECs, four SRMAs, one ERMA, and the core sage-grouse and big game winter range all support some habitat for sensitive plant species. Retaining all these lands in federal ownership would benefit the management and protection of special status species.

Under Alternative B, more areas would be managed as ROW exclusion areas than under Alternative A. The ROW exclusion areas would be applied to all WSAs, five ACECs, all VRM Class I areas, and one suitable WSR corridor. Several of these ROW exclusion areas contain habitat for Harrington's penstemon. The ROW exclusion designation would provide greater protection for Harrington's penstemon than the CSU stipulation for Harrington's penstemon included in this alternative.

ROW avoidance would also be applied to more areas than under Alternative A. Occupied habitat for special status plants would be managed as ROW avoidance areas. Although the ROW avoidance does not preclude all ROW development, it would limit surface disturbances and give priority consideration to special status plant habitat. Impacts on special status species in these avoidance areas would be negligible. As in all alternatives, weed control measures in the ROW terms and conditions would serve to minimize impacts of any surface disturbances.

Under Alternative B, more areas that contain special status plant habitat would be petitioned for withdrawal from locatable mineral entry than under Alternative A. In addition to the three ACEC/SRMAs under Alternative A, three other ACECs, the Upper Colorado River SRMA, the Beaver Creek municipal watershed, and four WSR segments all contain special status plant habitat that would be protected with a mineral withdrawal.

The types of impacts experienced as a result of wind and solar authorizations would be similar to those described under Alternative A, except that Alternative B would give greater consideration to renewable energy projects. In addition, implementation of Alternative B would allow wind energy exploration and development to be considered in ACECs that are not identified as ROW exclusion areas. This could directly impact special status plant species if wind facilities were permitted in these areas.

Under Alternative B, lands and realty actions would have less impact on special status plants than under Alternative A and D but more than under Alternative C.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** As shown in Table 4.2.7-2, much of the known special status plant habitat is already leased and undergoing development. Impacts from oil and gas development in currently leased areas would be similar to Alternative A.

Under Alternative B, approximately 55,600 acres would be closed to fluid minerals leasing. This would include the following areas that contain special status plant habitat: Bull Gulch WSA, the Upper Colorado River SRMA, Blue Hill, Bull Gulch, Deep Creek, and Thompson Creek ACECs, and four suitable WSR

BLM_0016628

corridors. In total, these areas would protect approximately 2,800 acres of Harrington's penstemon habitat from surface-disturbing activities associated with oil and gas development. Three other ACECs that would be designated under Alternative B would prohibit surface-disturbing activities on an additional 8,400 acres of Harrington's penstemon habitat. Overall, impacts from fluid minerals development under Alternative B would be slightly less than under Alternative A.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Locatable mineral exploration and development would be allowed under the General Mining Law in areas not withdrawn from mineral entry, and the activity would not be subject to NSO or CSU stipulations. Surface disturbances associated with locatable mineral exploration and development in special status plant habitat may result in direct mortality of special status plants or habitat loss, degradation, or fragmentation that would adversely affect the species.

Under Alternative B, more acres that contain special status plant habitat would be petitioned for withdrawal from locatable mineral exploration and development than under Alternative A. In addition to the three ACEC/SRMAs under Alternative A, three other ACECs, the Upper Colorado River SRMA, the Beaver Creek municipal watershed, and four WSR segments all contain special status plant habitat that would be protected with a mineral withdrawal. These areas would also be closed to mineral materials disposal and leasing of non-energy solid minerals, protecting the special status plant therein from surface disturbances associated with mineral development.

Alternative B would withdraw more acres from minerals development than under Alternatives A and D but less than under Alternative C. Therefore, Alternative B would result in fewer impacts on special status plants than under Alternatives A and D but more than under Alternative C.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative B, nine ACECs would be designated. Three ACECs (Hardscrabble-Mayer Gulch, Lyons Gulch, and Sheep Creek Uplands) would be designated primarily to protect and enhance habitat for the BLM sensitive plant, Harrington's penstemon. These ACECs would protect 8,400 acres of known occupied habitat, which includes several high-quality core populations of this special status plant. ACECs would provide protections that would not exist in the absence of the designation, such as an NSO with 100-meter buffer for occupied Harrington's penstemon habitat, withdrawal from locatable mineral entry, a ROW avoidance designation, and no net increase in roads. These management prescriptions would protect Harrington's penstemon from surface disturbances that would directly impact plants and alter habitat composition or fragment habitat.

Four other ACECs would contain small occurrences of this special status plant totaling 840 acres; however these ACECs are designated for other resource values. An NSO applied to these ACECs would indirectly provide protection for Harrington's penstemon; however, exceptions may be granted that would impact this species. Other protections applied to these ACECs would include ROW exclusion and withdrawal from salable and leasable minerals. ACECs under Alternative B would provide protection for only one special status plant species. ACEC designations would provide greater protections for special status plants than under Alternatives A or D but fewer than under Alternative C.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Bull Gulch WSA includes several small occurrences of Harrington's penstemon. Castle Peak WSA contains some potential habitat for Harrington's penstemon. These WSAs would be closed to fluid minerals leasing and would have an NSO

BLM_0016629

stipulation prohibiting other surface-disturbing activities that would protect special status plants that occur in the area. Exceptions may apply if the action does not impact wilderness values. If the WSA is released by Congress for multiple uses, the areas would become open for leasing and the NSO stipulation would be waived. Impacts on special status plants would be similar to Alternative A.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative B, four eligible stream segments would be determined suitable for designation to the National Wild and Scenic River System. The three stream segments classified as recreational would be ROW avoidance areas and would be covered with a CSU stipulation. An NSO stipulation would be applied to a 0.25-mile buffer on both sides of the stream for the one wild stream segment. This area would also be designated a ROW exclusion area. Several small populations of Harrington's penstemon within these 0.5-mile-wide stream corridors; these would receive indirect protection from the NSO stipulation.

## Alternative C

Impacts to special status plants from vegetation management, wildland fire management, coal management, and transportation facilities management would be the same as or similar to those under Alternative A. Impacts from management of all other resources and uses would be the same as or similar to those under Alternative B, except as described below.

**Impacts from Special Status Species Management—Plants.** Under Alternative C, all occupied special status plant habitats would be protected from surface-disturbing activities with a 200-meter buffer (CRV-NSO-19) to minimize direct and indirect impacts to special status plants and pollinator habitat. If properly implemented, the NSO for special status plants and their habitat would afford direct protection to plant populations, would minimize habitat fragmentation and loss of pollinator habitat, and would help maintain potential habitat for future population expansion. The NSO stipulation would provide a refuge for special status species sensitive to surface-disturbing activities. Management of special status plants under Alternative C would involve the most acres protected from surface-disturbing activities, totaling 28,300 acres.

As under Alternatives B and D, suitable habitat for DeBeque phacelia would be protected with an NSO stipulation unless surveys in "reliable years" find the habitat unoccupied. CRV-NSO-22 would protect the habitat and seed bank for this annual plant, which germinates only in years of favorable environmental conditions.

Under Alternative C, five ACECs would be designated specifically for the management of special status plants. The Mount Logan Foothills ACEC would protect 95 percent of the known habitat for the Colorado hookless cactus on public lands within the CRVFO area, approximately 50 percent of the known habitat for Parachute penstemon, and all of the known habitat for DeBeque phacelia and Naturita milkvetch. Four ACECs (Hardscrabble-Mayer Gulch/East Eagle, Lyons Gulch, Sheep Creek Uplands, and The Crown Ridge) would protect core habitat for Harrington's penstemon. These ACECs would include an NSO stipulation with a 200-meter buffer around occupied special status plant habitat. The ACECs would also be designated ROW avoidance areas, recommended for withdrawal from mineral location, closed to mineral materials sales, and not available for coal leasing. These ACECs would be protected with a Class II VRM designation. Prescribed fire and other vegetation treatments would be allowed if they were determined to maintain or enhance the special status plant values. Certain routes that are potentially adversely affecting special status plant habitat under Alternative A would be closed or limited to pedestrian and equestrian traffic only under

BLM_0016630

Alternative C. There would be 143 miles of roads within special status plant habitat under Alternative C, which is the lowest number of miles among the alternatives.

As mentioned under Alternative A, most of the special status plant habitat in the southwestern portion of the planning area is already leased for oil and gas. This includes nearly all of the Mount Logan Foothills ACEC. The designation of an ACEC and additional stipulations developed in this RMP would not affect current leases. Impacts on special status plants from oil and gas activity would be mitigated to the extent possible with COAs. The USFWS would be consulted on any activities that may affect ESA listed plants. Alternative C would be the most beneficial for conservation of special status plants of any alternative.

**Impacts from Visual Resource Management.** Alternative C has the same areas designated as VRM Class I as Alternative B. Under Alternative C, additional acres would be designated VRM Class II, including all ACECs not already designated as VRM Class I and lands managed as LWCs to protect their wilderness characteristics. Visual resource values in VRM Class II areas would be managed with a CSU stipulation. However, special status plants in these ACECs would be protected with an NSO stipulation with a 200-meter buffer, so the VRM restrictions would not provide additional protection. Impacts from VRM management under Alternative C would provide the most protection for special status plants of all alternatives.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under Alternative C, six non-WSA areas would be managed as LWCs to protect their wilderness characteristics. Four of these areas—Deep Creek, Flat Tops addition, Pisgah Mountain, and Thompson Creek—would encompass several small populations of Harrington's penstemon. Management restrictions to protect LWCs would limit impacts on Harrington's penstemon populations and habitat. The areas would be closed to fluid minerals leasing (CRV-CL-4). In addition, an NSO stipulation on these lands (CRV-NSO-43) would minimize other surface disturbances, which would protect Harrington's penstemon from direct impacts of surface disturbances. However, the restrictions against surface-disturbing activities may also prohibit any vegetation treatments that might be implemented to maintain or improve habitat for Harrington's penstemon. Overall, the management of LWC under Alternative C would benefit special status plants.

**Impacts from Forestry Management.** Compared to Alternative B, slightly fewer acres would be identified for commercial forest management and more areas would be closed. Several of the closed areas (Pisgah Mountain and Castle Peak) support populations of Harrington's penstemon. The closure to timber harvesting would protect these special status plant populations from surface-disturbing activities associated with timber harvesting. This alternative would provide the most protection (the fewest risk of impacts) for special status plants.

**Impacts from Livestock Grazing Management.** Impacts from livestock grazing management would be similar to Alternative B, except that approximately 20,000 fewer acres would be available for grazing and 55 currently vacant allotments would be closed to grazing under Alternative C. Two allotments that contain occupied habitat for special status plant species (County Line and Smith Gulch) would be closed to grazing. This would benefit many special status plant species, including Colorado hookless cactus, DeBeque phacelia, Parachute penstemon, and Naturita milkvetch. Closing these allotments to livestock grazing would be expected to have generally positive impacts on special status plant habitat by decreasing the risk of trampling or browsing damage or adverse changes in habitat.

BLM_0016631

**Impacts from Recreation and Visitor Services Management.** Under Alternative C, only two SRMAs would be designated: Red Hill and the Upper Colorado River. Red Hill has no known special status plant populations; the Upper Colorado River SRMA includes several small populations of the special status plant, Harrington's penstemon. The Upper Colorado River would be managed for non-motorized water-based activities, which would have negligible impacts on Harrington's penstemon, an upland species. SRMA designation under Alternative C would have the least impacts on special status plants of all alternatives.

**Impacts from Comprehensive Trails and Travel Management.** Alternative C would designate approximately the same number of acres (37,500) as limited to designated routes and closed to travel as Alternative B (37,300 acres). However, under Alternative C, more routes within known special status plant habitat would be closed or limited to pedestrian and equestrian use than in the other alternatives. Road closures would increase habitat connectivity, would provide buffer areas from weed invasion and dust impacts, and if properly reclaimed, could increase habitat suitable for population expansion. Under all alternatives, adverse impacts from travel and recreation would be greater than beneficial impacts, but Alternative C would result in fewer adverse impacts than the other alternatives.

**Impacts from Lands and Realty Management.** In addition to retaining lands that provide habitat for listed, proposed, and candidate species as under Alternative B, Alternative C would retain lands that include occupied habitat for sensitive species. Retaining all land with special status species habitat would benefit the management and protection of special status species. Alternative C would provide the greatest protection for special status species.

As under Alternative B, occupied habitat for special status species (including plants) would be managed as ROW avoidance areas. Although the ROW avoidance does not preclude all ROW development, it would limit surface disturbances and give priority consideration to special status plant habitat. Impacts on special status species in these avoidance areas would be negligible.

As in all alternatives, weed control measures in the ROW terms and conditions would serve to minimize impacts of any surface disturbances. Overall, lands and realty actions would have less impact on special status plants under Alternative C than under any other alternative.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** As shown in Table 4.2.7-2, much of the known special status plant habitat is already leased and undergoing development. Impacts from oil and gas development in currently leased areas would be similar to Alternative A.

Under Alternative C, approximately 175,500 acres would be closed to fluid minerals, more than any other alternative. This would include all the areas closed to fluid minerals leasing under Alternative B, plus the Sage-Grouse Habitat ACEC, lands managed as LWCs to protect their wilderness characteristics, and an additional nine suitable WSR stream segments. In total, these areas would protect approximately 3,200 acres of Harrington's penstemon habitat from surface-disturbing activities associated with oil and gas development.

Under Alternative C there would be more ACECs designated than any other alternative. Most of these ACECs would prohibit surface-disturbing activities, such as oil and gas development. This restriction on oil and gas development would not apply to the already leased portions of the Grand Hogback ACEC or the

BLM_0016632

Mount Logan Foothills ACEC. Overall, impacts from fluid minerals development under Alternative C would be slightly less than under the other alternatives.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Alternative C would recommend the following areas with special status plant habitat for closure to locatable exploration and development, closure to mineral materials (salables) disposal, and closed to non-energy leasable minerals: the same areas as under Alternative B, plus Alternative C ACECs, lands managed as LWCs to protect their wilderness characteristics, and an additional 21 WSR segments. Alternative C would protect the most special status plant habitat from surface disturbances associated with mining development.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative C, the BLM would designate five ACECs with a total of 14,100 acres primarily for special status plants: Hardscrabble-Mayer Gulch/East Eagle (4,200 acres), Lyons Gulch (480 acres), Mt Logan Foothills (3,900 acres), Sheep Creek Uplands (4,500 acres), and The Crown Ridge (1,000 acres). The ACECs would include an NSO with a 200-meter buffer around occupied habitat, ROW avoidance areas, withdrawal from locatable and salable minerals, and no net increase in roads. The Mt Logan Foothills ACEC is already leased, so no NSO can be applied to oil and gas development. Rather in this ACEC, COAs would be applied to protect special status plant habitat.

Five other ACECs that contain several occurrences of the BLM sensitive plant, Harrington's penstemon, would also be designated under this alternative. ACEC designations under Alternative C would protect the greatest amount of special status plant habitat of all alternatives and have the most benefit for maintaining and improving special status plant populations and habitat.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative C, a total of 26 eligible stream segments (13 segments outside the Roan Plateau Planning Area) would be determined suitable for designation to the National Wild and Scenic River System. A portion of Deep Creek and Thompson Creek would receive the tentative classification of wild. An NSO stipulation would be applied to a 0.25-mile buffer on both sides of the stream for the wild stream segments. These corridors would also be designated a ROW exclusion area. The remaining seven segments would be classified as scenic or recreational. These stream corridors would be covered with a CSU stipulation and would be ROW avoidance areas. Several small occurrences of Harrington's penstemon occur within these 0.5-mile stream corridors and may receive indirect protection from the NSO stipulation.

## Alternative D

Impacts to special status plants from soils management, water resource management, riparian vegetation management, special status terrestrial wildlife management, forestry management, and WSA management would be the same as or similar to those under Alternative B. Impacts from management of all other resources and uses would be the same as or similar to those under Alternative A, except as described below.

**Impacts from Special Status Species Management—Plants.** Under Alternative D, protections for special status plants would include an NSO stipulation with a 200-meter buffer for threatened, endangered, proposed, and candidate plant habitat. This NSO would affect approximately 1,200 acres. A CSU stipulation on roughly 15,200 acres would be applied to occupied habitat for all sensitive plant species. The CSU stipulation would protect most occupied habitat for special status plants (except in the cases of large,

BLM_0016633

extensive populations) but would not likely protect suitable but unoccupied habitat or habitat for pollinator species. No ACECs would be designated specifically for special status plants. This alternative would provide the least protection for special status plants of all alternatives and would have the greatest risk of impacts on special status plants, potential habitat, and pollinators.

**Impacts from Visual Resource Management.** Alternative D has the same number of acres of VRM Class I as Alternatives B and C. Under Alternative D, fewer acres would be designated as VRM Class II with more acres classified as VRM Class III and IV. VRM Class III and IV areas would not provide any benefit for the protection of special status plants. This alternative would be the least beneficial for special status plants since a larger number of acres would change from Class II to Class III, which would allow for more surface disturbances in these areas.

**Impacts from Livestock Grazing Management.** Under Alternative D, a total of 443,400 acres would be available for livestock grazing, which is more acres available for grazing than under Alternative C, but slightly fewer acres than under Alternative B. Seven allotments that contain special status plant habitat would be closed to grazing. Closing these allotments to livestock grazing would be expected to have generally positive impacts on special status plant habitat by decreasing the risk of trampling or browsing damage or adverse changes in habitat. Impacts on special status plants from livestock grazing management under Alternative D would be greater than under Alternative C, similar to Alternative B, but less than under Alternative A.

**Impacts from Recreation and Visitor Services Management.** Seven SRMAs would be designated under Alternative D. Of these, five SRMAs (Bocco Mountain, Hardscrabble/East Eagle, The Crown, Thompson Creek, and the Upper Colorado River) include occupied and potential habitat for the BLM sensitive plant, Harrington's penstemon.

Management in The Crown and the Hardscrabble SRMAs would focus on improving mountain biking opportunities and experiences. New trails would probably be built to provide a network of trails that accommodate riders of multiple ability levels. Special status plant populations and suitable habitat could be impacted by new trail construction. Under Alternative D, a CSU stipulation (CRV-CSU-9) would be applied to sensitive plant habitat to allow relocation of new surface-disturbing activities or special project design measures to lessen impacts on this species. However, with a denser trail system and more concentrated recreational use, the risk of habitat fragmentation and loss of potential but currently unoccupied habitat is greater. Indirect and cumulative impacts on special status plants would probably increase.

Management of Thompson Creek SRMA would provide zones for hiking, rock climbing, and mountain biking. New trails to accommodate mountain biking would be constructed within the mountain biking zone. As with The Crown SRMA, impacts on special status plants would be likely to occur, but these impacts would be reduced by site-specific mitigation.

Recreation management under Alternative D is likely to result in more adverse impacts than under Alternatives B and C but would be comparable to Alternative A.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative D, no lands would remain "open to motorized vehicle use on and off roads." A total of 31,400 acres would be closed to motorized vehicles, which is less than the other alternatives. More acres would be limited to designated routes (473,500 acres). Within known special status plant habitat, 178 miles of routes would remain open to full-

BLM_0016634

sized vehicle use, which is more than under Alternatives B and C but less than under Alternative A. In general, impacts of trails and travel management on special status plant populations, and habitat would be less than under Alternative A but more than under Alternatives B and C.

**Impacts from Lands and Realty Management.** As under Alternative B, lands that support habitat for listed, proposed, or candidate species would be retained in federal ownership. Lands that contain occupied sensitive species habitat may be considered for disposal on a case-by-case basis. Impacts on special status plants would be the same as Alternative B.

Under Alternative D, fewer areas would be managed as ROW exclusion areas than the other alternatives. Small populations of Harrington's penstemon would be protected from surface-disturbing activities associated with in WSAs, Blue Hill, and Bull Gulch ACECs and in VRM Class I areas. Alternative D would provide less protection for special status plants than under Alternatives B or C but more than under Alternative A.

The ROW avoidance areas would be reduced from Alternative B because of the omission of several ACECs. However, occupied habitat for all special status plants would still be managed as ROW avoidance areas. Although the ROW avoidance does not preclude all ROW development, it would limit surface disturbances and give priority consideration to special status plant habitat. Impacts on special status species in these avoidance areas would be negligible. As in all alternatives, BMPs and weed control measures in the ROW terms and conditions would serve to minimize impacts of any surface disturbances. Lands and realty actions under this alternative would have more impacts on special status plants than under Alternatives B or C but less than under Alternative A.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** As discussed in the other alternatives, much of the known special status plant habitat is already leased and undergoing development. Impacts from oil and gas development in currently leased areas would be similar to Alternative A. Under Alternative D, approximately 48,800 acres would be closed to fluid minerals leasing. This would include the WSAs, plus the Upper Colorado SRMA and the Blue Hill and Bull Gulch ACECs. Harrington's penstemon habitat in these areas would be protected from surface-disturbing activities associated with oil and gas development. Overall, impacts from fluid minerals development under Alternative D would be slightly less than under Alternative A but more than under Alternatives B or C.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative D, the following areas with special status plant habitat would be petitioned for withdrawal from locatable exploration and development: Alternative D ACECs and Upper Colorado River SRMA. Only WSAs would be withdrawn from mineral materials disposal (salables) and only if Congress designates them as wilderness. Areas closed to non-energy leasable minerals would be roughly 27,800 acres, which is the same as under Alternative A. Impacts on special status plants under Alternative D would be less than under Alternative A, but much greater than under Alternatives C or B.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under this alternative, no ACECs would be designated specifically for special status plant species. Of the three ACECs included for designation in this alternative, only Blue Hill and Bull Gulch contain small occurrences of the BLM sensitive plant, Harrington's penstemon. Designation of these ACECs would provide indirect benefits to Harrington's penstemon habitat by limiting surface-disturbing activities. These three ACECs contain only a small amount of occupied habitat for one special status plant species and would not protect core habitat for this species or

BLM_0016635

habitat for any other special status plants. Compared to the other alternatives, Alternative D would provide the least amount of protection for special status plants with ACEC designations.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** All 41 river segments would be determined to be not suitable for inclusion in the National Wild and Scenic River System and would be released from interim management. No direct or indirect protections would be afforded to special status plants within these corridors.

### Cumulative Impacts (Special Status Plants)

The cumulative impact analysis boundary for special status plants includes the entire planning area plus private and public lands adjacent to the CRVFO that contain occurrences of these species. Impacts associated with past, present, and reasonably foreseeable future actions are discussed below for special status plants with habitat or occurrences in the CRVFO.

A number of present and future actions have the potential to impact special status plants. Some management actions would have a beneficial cumulative impact on these species over time, such as the implementation of protective stipulations, designations of certain lands to protect valuable resources (e.g., ACECs and WSAs), and vegetation treatments to improve special status plant habitat. However, some actions could create adverse cumulative impacts on special status plants over time, such as trails and travel access and recreation management, ROW authorizations, and oil and gas development.

Where these existing and future activities occur on BLM lands and on adjacent non-BLM lands that contain special status plant habitat, they would cumulatively add up to the total potential impact for these species. Some special status plants may be pushed closer to listing or extinction as a result of adverse cumulative impacts. The special status plants environmental consequences analysis above provides a comprehensive list of potential direct and indirect effects on these species.

Regardless of landownership, impacts from surface-disturbing activities, such as oil and gas development, wildland fire, weed spread, and other actions that remove vegetation and disturb soil are anticipated to contribute to habitat fragmentation within and adjacent to the planning area. Habitat fragmentation from non-BLM actions in the planning area is primarily anticipated from urban development, energy development, and associated infrastructure (e.g., roads and utility lines). The majority of habitat fragmentation is anticipated to occur near population centers, particularly in Garfield and Mesa Counties, which are anticipated to have the most population growth over the life of the plan. Habitat fragmentation is also expected to be greater in the western portion of the CRVFO, where most of the mineral development is concentrated.

Cumulative impacts on special status plants would result from actions on adjoining ownerships that affect habitat availability and create disturbance. One factor influencing special status plants in the planning area is the scattered landownership. Since most of these species span public and private lands, activities on adjoining ownerships may compromise or enhance efforts on public lands.

The Colorado Natural Heritage Program (CNHP) reports that some special status plant species are being heavily impacted on private lands by road construction and both residential and commercial development accompanying rapid human population growth and recreational use throughout the region (CNHP 2005).

BLM_0016636

Threatened or endangered plant species that occur on private lands are not specifically protected under the Endangered Species Act. Likewise, the State of Colorado provides no legal protection for BLM sensitive plant species. Neither special status plants nor significant plant communities are necessarily inventoried on private lands, and monitoring and protection of these species is voluntary. If negative impacts on special status species continue to increase as expected, occurrences on public lands would become even more important to the survival and continuation of these species.

A positive cumulative impact on special status plants could result if surveys conducted before a proposed action occurred or to gain additional information on the distribution of special status species discovered new populations of special status plants or expanded known populations. Larger or new populations could serve as genetic sources for propagating these species into offsite areas. New populations of DeBeque phacelia were recently discovered in 2009 on USFS and private lands. As new areas are surveyed, additional populations may continue to be discovered. If these areas are afforded adequate protection, special status species would benefit.

All alternatives would implement protective NSO and CSU stipulations for special status plants and significant plant communities. If properly implemented, these stipulations would afford direct protection to these species and would provide a refuge from surface-disturbing activities.

The Colorado hookless cactus, DeBeque phacelia, DeBeque milkvetch, Naturita milkvetch, and Parachute penstemon all occur in areas of high potential for oil and gas development, and most of their habitat has already been leased. While protective stipulations for special status plants were attached to newer leases at the time of sale, most areas were leased before the development of these stipulations.

The CRVFO has not had any known losses of Colorado hookless cactus, DeBeque phacelia, or Naturita milkvetch from oil and gas development or any other permitted activities. However, indirect impacts such as weed invasion from the construction of pads, pipelines, and roads near these species have led to declines in habitat. Additionally, historic grazing in areas where these species occur resulted in heavy infestations of cheatgrass. This has created adverse impacts by increasing non-native vegetation cover and competition for resources in areas typically low in cover and resources.

As of 2010, fewer than 15 DeBeque milkvetch individuals have been lost as a result of oil and gas development and other activities. The Grand Junction Field Office (GJFO) which borders the CRVFO on the west, also has occurrences of these four species, but they are more widespread and numerous within the GJFO. The GJFO is experiencing the same problems of high intensity oil and gas development within areas occupied by these species. They have experienced no losses of hookless cactus from oil and gas development but have lost three cacti to illegal poaching, and one was crushed by a vehicle near a roadside. The GJFO has lost around 10 Naturita milkvetch plants from oil and gas development, and an estimated 20 DeBeque milkvetch individuals were transplanted to avoid a pipeline, resulting in some mortality. Potential DeBeque phacelia habitat has been lost but not any occupied habitat.

The BLM can typically implement avoidance when special status plants are located in the direct line of proposed development and can implement mitigations and BMPs to lessen indirect effects. Hence, plant losses on BLM lands are typically limited. However, private lands to the west of the CRVFO also have occurrences of these four species and are under the same pressures from oil and gas and other development. Since special status plants receive no protection on private lands, it is assumed that most plant losses are

BLM_0016637

occurring on these lands. All plant losses, regardless of surface ownership, would contribute to cumulative adverse impacts on these species.

While most known populations of Harrington's penstemon occur within the CRVFO, a smaller number are located on private and USFS lands. Cumulative impacts would result mainly from recreation and travel management, vegetation treatments, and oil and gas development. Existing and proposed SRMAs and RMAs include occupied habitat for the Harrington's penstemon. An increase in roads and trails in the SRMAs is likely to have an impact, resulting in loss of individuals, fragmentation of populations, increased dust deposition on plants, and reductions in overall population size, which may lead to reduced genetic diversity.

Only 7 percent of Harrington's penstemon habitat is currently leased, which represents the entire habitat within high-potential oil and gas areas. Another 30 percent of Harrington's penstemon habitat is located in moderate-potential areas, none of which has been leased. Numerous losses of Harrington's penstemon from oil and gas development have already occurred on BLM land and adjacent private lands. Future development could result in even more losses. Future leases issued under Alternatives A, B, or D would include a CSU stipulation to protect Harrington's penstemon habitat; however, it is difficult to route roads and pipelines around occurrences since they can cover such an extensive area. Under Alternative C, an NSO stipulation would be attached to future leases, which would provide greater protection for occupied and potential habitat.

ACECs to protect Harrington's penstemon are included under Alternatives B and C, and Bull Gulch ACEC would provide protection to Harrington's penstemon under all alternatives. If these ACECs were implemented and provided protection to core populations of this species, losses of Harrington's penstemon on the edges of its range (where the high-potential oil and gas development is located) would not create as adverse an impact if core populations remained intact.

Vegetation treatments (e.g., sagebrush mowing or pinyon-juniper removal) that are not designed to meet special status species objectives could have adverse impacts if they were to remove important habitat components, such as protective shrub cover and increased herbaceous cover that competed with special status plants for sunlight and nutrients. Vegetation treatments that reduce pinyon-juniper woodland invasion into sagebrush habitat would benefit Harrington's penstemon, which requires less canopy cover. Fuels reduction in shrubland habitat would reduce the potential for a large-scale, severe fire that could kill individuals or populations. However, if vegetation or fuels reduction treatments were to fail and were to increase invasive species, Harrington's penstemon would be adversely affected.

Two small populations of Ute ladies'-tresses are known to occur within the CRVFO, one of which spans private land in the Roaring Fork Valley. Dewatering of streams for irrigation and development of springs and headwaters of small streams for livestock watering would alter the hydrologic cycle and contribute to a reduction in riparian and wetland habitat that supports this species. The private lands where this species occurs are currently grazed. This may have a beneficial impact by reducing the surrounding vegetation cover, which would reduce competition for space and resources.

Trampling of spring sources and streambanks by livestock and wildlife would contribute to lowered water tables and a diminution of wetland habitat. Loss of riparian and wetland habitat would probably result in population declines of the Ute ladies'-tresses orchid. The known population on BLM land would be protected by NSO stipulations that would be implemented to protect federally listed plant species and major river corridors; however, the population on private land would not receive the same protection. A residential

BLM_0016638

housing development was recently approved on private lands where the largest known population exists. Although the housing development was designed to avoid direct losses of the plants, potential changes in hydrology or grazing management may adversely affect this population.

In the long term, activities to maintain or improve riparian health would probably benefit habitat for Ute ladies'-tresses. Such activities could include streambank stabilization projects and construction of livestock, wildlife, and recreation exclosures within riparian habitats.

All permitted activities that could impact threatened and endangered plant species would require USFWS consultation pursuant to Section 7 of the Endangered Species Act to ensure projects would not adversely affect these species at a cumulative level. Beneficial cumulative impacts would be obtained through implementation of conservation measures developed in coordination with the USFWS.

The potential for adverse cumulative impacts on special status plants would be greatest under Alternative A, which would allow for the most surface disturbance and would protect the least acres of habitat with protective stipulations. Alternative C would result in the most beneficial cumulative impacts by implementing protective stipulations over the most acres, allowing for the least amount of development, designating the most acres of ACECs and WSAs. Alternative B would provide an intermediate level of protection to special status plants. Alternative D would create less adverse cumulative impacts on vegetation than under Alternative A due to more acres protected by stipulations, but would allow for the most oil and gas and recreation development of any alternative.

### 4.2.7.2 Special Status Species—Fish and other Aquatic Wildlife

### Assumptions

The following assumptions apply throughout the assessment of environmental consequences of management actions and resources uses on BLM lands under the four alternatives:

- Impacts on special status fish and other aquatic species populations and habitats are not discrete since some actions may benefit one species while having a negative or beneficial impact on another.

- Maintaining high quality habitat conditions would have some influence on reducing the severity of outbreaks and subsequent losses from diseases, but the prevalence in the environment of various diseases could not be fully controlled, particularly at chronic levels of occurrence.

- Impacts on special status fish and aquatic species are based on the following Cause and Effect premise: Exposure—Stressor—Response:

  o Exposure—the likelihood that a given stressor will affect a given species

  o Stressor—the portion(s) of an action that may cause some sort of a reaction by the species

  o Response—the response (negative, positive, neutral) of the species to the stressor

- Variation of identified impacts by alternative are determined based on:

  o Risk - the likelihood or probability of an action resulting in the identified effect

  o Magnitude - the intensity and severity of the identified impact

  o Duration - the length of time in which the identified impact would occur

BLM_0016639

o Scope—the spatial extent or size over which the identified impact would occur as related to the proximity of the action to the species or habitat

- Unless otherwise noted, short-term impacts are defined as impacts expected to last 2 years or less.

- Unless otherwise noted, long-term impacts are defined as impacts expected to last greater than 2 years.

- Impact analysis is grouped by species where appropriate (e.g., sediment-intolerant species, such as the Colorado River and greenback cutthroat trout), depending on resource program impacts and similar habitats. Detailed impacts may be disclosed once under Alternative A and then referenced back in subsequent alternatives to avoid repetition.

The following primary impacts for special status aquatic species and their habitats are the focus of the effects analysis:

- Sediment and Turbidity—increased sediment loads in waters containing sediment-intolerant fish species—stress, reduced recruitment, habitat loss, reduced quality and quantity of food.

- Habitat Alteration—changes in habitat that make it nonfunctional for select species or more conducive to competitive species—reduced bank and channel stability, reduced in-channel habitat structure and diversity, loss of complexity.

- Loss or Reduction of Streamside Vegetation Cover—increased temperatures, reduced productivity, reduced bank and channel stability, reduced quality and quantity of food.

- Water Quality Alteration—actions that alter important water quality parameters (e.g., pH, dissolved oxygen, temperature, alkalinity, and turbidity)—direct mortality, stress, reduced recruitment, reduced quality and quantity of food.

- Water Depletions—loss of physical habitat, reduced water quality, increased sedimentation, loss of habitat structure and complexity, reduced recruitment, reduced food quality and quantity.

- Direct Mortality—potential direct mortality of eggs, larvae, and adults of fish and amphibians fish in areas of low-water crossings.

All NSO stipulations that would limit ground-disturbing activities would minimize the risk of impacts on special status aquatic species. At the beginning of each alternative is a table listing primary protective measures that either directly or indirectly minimize or eliminate the potential for negative effects on special status aquatic species and their habitats. Impacts by resource and by alternative are tied back to the detailed analysis completed once under Alternative A and are referenced or summarized noting any differences in risk, magnitude, duration, and scope specific to that alternative's program or resource prescriptions. Special status aquatic species addressed in this section are identified in Table 4.2.7-3.

**Methods**

All NSO stipulations that would limit ground-disturbing activities would minimize potential risk of sediment and turbidity impacts on special status aquatic species. At the beginning of each alternative is a table listing primary protective measures that either directly or indirectly minimize or eliminate negative effects on special status aquatic species and their habitats. Impact analysis then focuses on residual impacts ("those effects remaining after mitigation has been applied to the proposed action or alternative" [BLM 2008j]) anticipated or reasonably likely to occur by resource or program to the priority species and habitats identified for that

specific alternative. Impacts by resource and by alternative are tied back to the detailed analysis completed once under Alternative A and are referenced or summarized noting any differences in risk, magnitude, duration, and scope specific to that alternative's program or resource prescriptions. Special status aquatic species addressed are identified in Table 4.2.7-3.

**Table 4.2.7-3**
**Special Status Aquatic Species**

| Species | Scientific Name | Federal Status |
|---|---|---|
| Bonytail chub | *Gila elegans* | Endangered with critical habitat |
| Colorado pikeminnow | *Ptychocheilus lucius* | Endangered with critical habitat |
| Humpback chub | *Gila cypha* | Endangered with critical habitat |
| Razorback sucker | *Xyrauchen texanus* | Endangered with critical habitat |
| Greenback cutthroat trout | *Oncorhynchus clarkii stomias* | Threatened |
| Colorado River cutthroat trout | *O. c. pleuriticus* | BLM sensitive |
| Bluehead sucker | *Catostomus discobolus* | BLM sensitive |
| Flannelmouth sucker | *Catostomus latipinnis* | BLM sensitive |
| Roundtail chub | *Gila robusta* | BLM sensitive |
| Great Basin spadefoot toad | *Spea intermontanus* | BLM sensitive |
| Boreal toad | *Bufo boreas boreas* | BLM sensitive |
| Northern leopard frog | *Rana pipiens* | BLM sensitive |

## Environmental Consequences

Impacts on special status fish and other aquatic wildlife would result from some of the actions included under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on special status fish and other aquatic wildlife under any of the four alternatives.

### Alternative A

Current CRVFO planning documents that guide the management of public lands provide a variety of protective measures and stipulations that either directly or indirectly protect or minimize impacts on special status aquatic species and their habitats from other program activities and actions. Table 4.2.7-4 shows the primary protective measures found in current planning documents.

**Table 4.2.7-4**
**Primary Protective Measures Found in Current Planning Documents**

| Stipulation | Origin | Acres/Miles Protected |
|---|---|---|
| GS-NSO-2 riparian and wetland zones | 1999 Oil and Gas Leasing ROD | 145 miles of fish-bearing stream |
| GS-NSO-3 major river corridors | 1999 Oil and Gas Leasing ROD | 75 miles of fish-bearing river |
| GS-NSO-12 threatened or endangered species | 1999 Oil and Gas Leasing ROD | Not mapped; would apply as needed by species |
| GS-NSO-13 municipal watershed areas | 1999 Oil and Gas Leasing ROD | 1 mile of fish-bearing stream |
| GS-NSO-14 debris flow hazard zones | 1999 Oil and Gas Leasing ROD | 1 mile of fish-bearing stream |
| GS-NSO-15 steep slopes | 1999 Oil and Gas Leasing ROD | 86,400 acres of uplands |
| GS-CSU-2 riparian and wetland zones | 1999 Oil and Gas Leasing ROD | 145 miles of fish-bearing stream |
| GS-CSU-3 BLM sensitive species | 1999 Oil and Gas Leasing ROD | Not mapped; would apply as needed by species |
| GS-CSU-4 erosive soils and slopes greater than 30 percent | 1999 Oil and Gas Leasing ROD | 183,700 acres of uplands |

BLM_0016641

For analytical purposes, select species in Table 4.2.7-4 are sediment intolerant and include Colorado River cutthroat trout, greenback cutthroat trout, boreal toad, northern leopard frog, and Great Basin spadefoot toad. The remaining species are generally more sediment tolerant and include the Colorado pikeminnow, razorback sucker, bonytail chub, humpback chub, roundtail chub, flannelmouth sucker, and bluehead sucker. Analysis groups these species as appropriate with regard to addressing impacts especially from actions that could increase sediment to occupied habitats. The bonytail and humpback chub are not found within the planning area, but are within the zone of influence particularly with regard to water depleting impacts. Discussion of these species is limited.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Management of special status fish and other aquatic wildlife species and their habitats would have long-term benefits to native cutthroat trout and amphibians. GS-NSO-12 would help reduce impacts on portions of Cache Creek, which contains the only currently known population of greenback cutthroat trout in the planning area. GS-CSU-3 would help Colorado River cutthroat trout and amphibians by managing ground-disturbing impacts in and near occupied habitats. Other protective measures in Table 4.2.7-4 would directly or indirectly help minimize impacts on special status aquatic species and their habitats from other resource uses.

Actions to improve habitat could include barrier placements and removals, in-channel habitat enhancement structures (e.g., rocks and logs), riparian plantings, and fencing. In select areas where proactive habitat management in the form of projects are occurring or would occur, there is potential for site-specific short-term negative impacts on native cutthroat trout and amphibians, including loss or reduction of streamside vegetation cover and increased sediment loading and turbidity. These effects are described in detail in the sections on impacts from forest and woodland management and impacts from riparian vegetation management. Projects would be designed to provide long-term benefits to these species and their habitats.

Impacts described under this alternative would be similar under all alternatives with regard to proactive cutthroat or amphibian habitat projects. Alternative B would provide greater protection by an NSO on all fish-bearing streams and known or identified breeding sites of amphibian species. Alternative C would provide protections by an NSO on all perennial waters and known or identified breeding sites of select amphibians. Alternative D provides limited protection only in streams containing conservation populations of cutthroat trout and a CSU on all known or identified amphibian breeding sites.

Under this alternative, GS-NSO-3 and GS-NSO-12 would help to protect sediment-tolerant endangered fishes (Colorado pikeminnow and razorback sucker) along occupied portions of the Colorado River. GS-CSU-3 would provide some protection for sediment-tolerant BLM sensitive fishes (bluehead sucker, flannelmouth sucker, and roundtail chub) by managing ground-disturbing activities in habitats for these species on a site-specific basis. These protections would help protect these fishes and would be similar to NSOs included under Alternatives B, C, and D.

**Impacts from Soils Management.** Under current soils management, all of the special status aquatic species would benefit by protective stipulations implemented to protect fragile, sensitive, or steep soil areas. Specific stipulations include GS-NSO-14 and GS-NSO-15, and GS-CSU-4. GS-NSO-14 and CS-NSO-15 collectively limit ground-disturbing activities from 92,300 acres of upland habitat. This minimizes the potential for erosion and reduces the risk and scope of sedimentation and turbidity impacts in occupied habitats. Other stipulations identified in Table 4.2.7-4 either directly or indirectly help to further limit impacts on these species from other resource uses. In addition, soils are subject to Land Health Standard 1 (BLM 1997a),

which helps guide soil management on public lands. In areas where this standard is being met, there is minimal potential impact on special status aquatic species or their habitat from offsite erosion and increased sedimentation. Soils management benefits specials status aquatic species the same under all alternatives, as protective measures are carried forward in all alternatives.

Benefits for sediment-tolerant species are generally the same as for sediment-intolerant species, except that increased sediment loading would be minimal.

**Impacts from Water Resource Management.** Under the current plan, water resource management benefits all special status aquatic species by protective stipulations implemented specifically to protect water quality. These include GS-NSO-3, which would collectively limit ground-disturbing activities adjacent to 77 miles of six major rivers, including the Colorado River, which contains the four endangered fishes (Colorado pikeminnow, razorback sucker, bonytail chub, and humpback chub), as well as most of the habitat for the three BLM sensitive fishes (bluehead sucker, flannelmouth sucker, and roundtail chub). GS-NSO-13 limits ground disturbance within two discrete domestic water supply watershed area, including Beaver Creek, which contains a conservation population of Colorado River cutthroat trout. Other stipulations identified in Table 4.2.7-4 directly or indirectly help to protect special status aquatic species and their habitats from other resource uses. In addition to stipulations, water management is subject to Land Health Standard 5 (BLM 1997a), and Colorado State Water Quality Standards, which help guide water management on public lands. Areas where this standard and state standards are being met have minimal potential for adverse impacts on special status aquatic species or their habitat from impacts associated with alteration of water quality parameters. Water management activities are beneficial to special status aquatic species and their habitats under all alternatives.

This alternative is much less protective than under Alternatives B and C, both of which include streamside management zone NSOs to protect all hydrological features (perennial, ephemeral, and intermittent streams, lakes, wetlands, fens, and springs). Alternative D provides similar protective measures and levels of protection as this alternative.

Benefits for sediment-tolerant species would be the same as for the sediment-intolerant species.

**Impacts from Vegetation—Forest and Woodland Management.** Vegetation treatments for forest and woodland include hand thinning, mechanical treatments, and prescribed fire. None of the protective stipulations identified in Table 4.2.7-4 applies specifically to management of forest and woodland vegetation. However, they directly or indirectly help protect special cutthroat and amphibian species and their habitats from certain resource uses. Forest and woodland vegetation management is not necessary constrained under existing NSOs as some prescriptive treatments can be conducted with little or no ground disturbance in some areas. All vegetation management is subject to Land Health Standards 3 and 4 (BLM 1997a), which help guide vegetation management on public lands. Where these standards are being met, active management of forest and woodland vegetation is having minimal impact on special status aquatic species or their habitats. Impacts can be and are mitigated during site-specific analysis of individual treatment actions. The primary potential impacts on these species are increased sediment and turbidity, and habitat alteration. These effects result when ground is disturbed and vegetation is removed and are intensified on steeper slopes and near perennial waters and occupied habitats. These effects are discussed in detail below.

BLM_0016643

*Habitat Alteration.* Stream channel and streambank alterations can affect special status aquatic species in many ways. Actions that can result in habitat alteration include roads, livestock grazing, natural gas development, pipelines, and other large ground-disturbing actions. Mechanisms for impact on stream channels include channel relocation, diking, riprapping, and fine sediment input at levels greater than the stream can efficiently or effectively convey. Actions that affect streambanks can result in soil compaction, increased erosion, and subsequent widening of stream channels. Stream widening results in a loss of habitat complexity and diversity and reduced water depths, which can reduce available habitat and cause increased stream temperatures. Increased temperatures can affect fish by increasing physiological stress, reducing feeding, and increasing susceptibility to disease. Streambank alteration also exposes bare soils, which provide for points of invasion by weedy species, and increases the risk of further erosion of the streambank. Actions that increase the amount of soil exposed to the erosive effects of water will increase sediment loading and turbidity. This can alter feeding by fish that require water clarity to forage and capture prey. Actions that cause soil compaction result in decreased vegetation cover, less vigorous root systems, and more exposure of the soil surface to erosion (Burton et al. 2008). Reduced flows can result in buildup of sediment and alter channels by narrowing them and reducing habitat complexity for some species.

Special status amphibians can be impacted by alteration of limited breeding pond habitats and overwinter habitats. Many species aestivate (burrow into streambank, pond, or soil substrates). Activities that disturb ground have the potential to disrupt amphibians and result in direct mortality. Breeding ponds can be drained or lowered in volume or have shorelines altered which can impact breeding sites and limit productivity. Amphibians, particularly northern leopard frogs and boreal toads, require clear water ponds in which to breed and lay egg masses. Shoreline vegetation helps to buffer sediment impacts and moderate water temperatures. Activities such as livestock grazing and road construction and use in and near occupied habitats can alter habitats by reduction or loss of vegetation cover and increased sediment and turbidity. Roads and road use can disrupt spring migrations of these species from overwintering sites to breeding ponds.

*Sediment and Turbidity.* Actions that cause increases in sediment loading into streams can impact sediment-intolerant special status species in many ways. Actions that cause increased sediment loading include ground disturbance, vegetation removal, and roads and trails, which are the primary causes of sediment and turbidity impacts. Increased sediments in the stream environment reduce dissolved oxygen, raise stream temperature, and can cover spawning and rearing areas, thereby reducing the survival of fish embryos and juveniles (US Forest Service 2000). Excessive sedimentation can also fill in important pool habitats, reducing their depth and making them less usable by fish and other aquatic organisms. Knopp (1993), in a study of 60 northwestern California streams, found that intensive land use management was correlated to loss of pool volume. High sediment transport can fill pools and cause reduction or loss of essential salmonid juvenile rearing habitat (Frissell 1992). Pool habitats are important as over-summer and over-winter thermal refuge areas and, when coupled with stream-flows, are often a limiting factor in many small mountain streams.

A number of sub lethal effects on resident cutthroat trout may also occur as a result of sedimentation, including avoidance behavior, reduced feeding and growth, and physiological stress (Waters 1995). Over the long term, increased sediment loading reduces primary production in streams (US Forest Service 2000). Reduced macroinvertebrate productivity and diversity results when excessive sediment fills in the interstitial spaces between stream substrates needed by these aquatic invertebrates. Food webs can be altered as sediment-intolerant macroinvertebrates are replaced by sediment-tolerant species. Reduction in stream productivity can disrupt the food chain and result in reduced food sources for resident fish species. Suspended sediment causes turbidity within streams, which can impact species that feed visually and need

*Colorado River Valley Field Office – Draft RMP Revision EIS Chapter 4, Environmental Consequences*

BLM_0016644

clear water in which to successfully capture prey, such as trout. Results from a study on turbidity (Barrett et al. 1992) clearly indicated that wild rainbow trout exposed to increasing levels of suspended sediment are subject to reductions in their ability to detect prey. This in turn may lead to reduced prey capture rates and foraging success, lowering the growth and fitness of individual fish and populations. The longer the duration of high turbidity, the more damage is likely to fish and other aquatic organisms (Newcombe and MacDonald 1991).

Where actions or activities include roads, there is high risk of sediment impacts. Roads increase surface runoff and sedimentation and, where they cross waterways, often require in-channel structures, such as culverts, and bridges that remove aquatic habitat and may be barriers to fish passage (Bryant 1981; Barrett et al. 1992). Studies show that roads can contribute 50 percent to 80 percent of the sediment that enters streams (Hagans et al. 1986). Cedarholm et al. (1980) found that fine sediment in salmon spawning gravels increased by 2.6 to 4.3 times in watersheds with more than 4.1 miles of roads per square mile of land area. As sediment delivery into streams increases, the standing stock of trout decreases.

Special status amphibians that require clear ponds in which to breed can be impacted by increased sediment and turbidity. Egg masses can be covered by sediment, which impacts productivity, and tadpoles can have reduced feeding efficiency caused by prolonged turbidity. Road use can increase the risk of mortality to amphibians.

Forest and woodland vegetation management is limited in scope and application. Where this activity is occurring or would occur, direct negative impacts at specific locations on select streams would result. However, these impacts are, or would generally be, short term and of limited scope and intensity. Treatments are designed with long term watershed improvement and meeting of Public Land Health Standards 3 and 4 as the primary goal. In the absence of new permanent road construction for treatments, forest and woodland vegetation management has long-term benefits to cutthroat and amphibians by improving upland watershed health and maintaining productive habitats that allow for natural water infiltration and absorption rates and limited erosion potential over time. Where permanent or long-term road construction is associated with select treatments, impacts associated with erosion and increased sedimentation and turbidity can be chronic and long term at specific areas and can result in increased risk of identified impacts. Impacts would be similar under all alternatives.

Sediment-tolerant species would be less impacted by actions that could result in increased sediment loading and turbidity than would sediment-intolerant species. Sediment-tolerant species are well adapted to the high sediment loads traditionally carried by the Colorado River and its tributary streams. Sediment input become an issue in the absence of adequate stream and river flow, which can cause sediment buildup and result in habitat alteration by channelizing river reaches, by reducing habitat complexity, loss of backwater and side channel habitats, and by impacts on spawning substrates. Water depletion impacts are discussed in detail in the impacts from livestock grazing management.

**Impacts from Vegetation Management—Rangelands.** Vegetation management for rangelands includes mechanical treatment, prescribed fire, and biological and chemical treatments. None of the protective stipulations identified in Table 4.2.7-4 applies specifically to management of rangeland vegetation; however, many of the stipulations identified would directly or indirectly protect special status aquatic species and their habitats by limiting ground-disturbing activities by an NSO. Rangeland vegetation management is not necessarily constrained under NSO, as some prescriptive treatments can be conducted with little or no ground disturbance in some areas. All vegetation management is subject to Land Health Standards No. 3 and 4 (BLM

BLM_0016645

1997a), which help guide vegetation management on public lands. Where these standards are being met, active management of forest and woodland vegetation is having minimal impact on native cutthroat trout and amphibians and their habitats.

The primary impacts associated with rangeland vegetation management are habitat alteration and increased sediment loading and turbidity. In addition, disturbed areas serve as niches in which invasive weedy vegetation can take hold. This reduces watershed health and results in poor soil retention, increased runoff, and poor water infiltration and absorption. Where treatments are occurring in watersheds containing occupied habitats of cutthroat and amphibians, there is increased risk of the identified impacts to occur.

Treatment of rangeland vegetation is common. Where ground disturbance and vegetation removal is occurring or planned, this activity is having or would have limited direct negative impacts at specific locations on select streams containing cutthroat or amphibians. However, these impacts are and would generally be short term and of limited scope and intensity. Despite the potential for short-term impacts, rangeland vegetation management has long-term benefits to cutthroat and amphibian species by improving upland watershed health and maintaining productive habitats that provide adequate vegetation ground cover that allow for natural water infiltration and absorption rates and limited erosion potential. Impacts would be similar under all alternatives. Impacts on sediment-tolerant species would be similar to those for sediment-intolerant species, as identified and addressed in the section on impacts from forest and woodland management.

**Impacts from Vegetation Management—Riparian.** Riparian vegetation management is and would continue to be largely beneficial to all special status aquatic species. Protective stipulations that specifically protect riparian habitats include GS-NSO-2 and GS-NSO-3 and GS-CSU-2. The two NSOs limit ground-disturbing activities along 36 miles of occupied cutthroat trout streams, which directly and indirectly benefit these fish and their habitats. These protective stipulations limit ground-disturbing activities within riparian habitats, which can directly and indirectly benefit native cutthroat trout subspecies and amphibians, and their habitats. Other stipulations identified in Table 4.2.7-4 would protect these species and their habitats, directly or indirectly, from other resource uses. In addition, riparian vegetation management is subject to Land Health Standard 2 (BLM 1997a), which helps guide riparian management on public lands. Areas where this standard is being met have a reduced potential for adverse impacts on these species and their habitats from offsite erosion and increased sedimentation. This is due to the buffer provided by healthy, robust riparian areas along streams, rivers, and lakes—a buffer that filters out sediments as well as any undesirable constituents adsorbed onto the particles. Vegetated buffers also help protect surface waters from inflow of adverse dissolved constituents by capturing or slowing overland runoff, increasing the amount that infiltrates into the soil where it is filtered before reaching the water through interstitial percolation.

Vegetation treatments in riparian areas could include the use of herbicides, fire, or mechanical removal of exotic plant species such as tamarisk or Russian olive. In select areas where proactive management or restoration of riparian areas is occurring or would occur, there is potential for short-term negative impacts on native cutthroat trout subspecies and amphibians from habitat alteration, increased sediment loading and turbidity, and reduction or loss of streamside vegetation cover. The impacts from habitat alteration and increased sediment loading and turbidity are addressed in detail in the section on impacts from forest and woodland management. Loss or reduction of streamside vegetation cover is addressed in detail below.

BLM_0016646

*Loss or Reduction of Streamside Vegetation Cover*. Loss or reduction of streamside riparian vegetation can alter the nutrient dynamics of the aquatic ecosystem. In areas where riparian vegetation has been depleted or lost, a shift in energy inputs from riparian organic matter to primary production by algae and vascular plants has been predicted (Minshall et al. 1989) and observed (Spencer et al. 2003). The increased solar radiation that results from the loss of streamside (or poolside) vegetation causes temperatures, light levels, and autotrophic production (i.e., plants and algae) to increase. This change in the food web of a stream can alter the composition of food and thus energy sources that are available to resident fishes and aquatic invertebrates. Terrestrial insect diversity and productivity also decreases with reductions in streamside vegetation, which also affects food availability for resident fish. Increased stream temperatures affect trout by reducing their growth efficiency and increasing their likelihood of succumbing to disease.

Prolonged and excessive utilization of streamside/riparian vegetation can also result in increased peak flows as vegetation is not sufficient in root mass, size, or abundance to sufficiently slow stream velocities. In addition, the loss of streamside vegetation reduces water percolation and infiltration, leading to unnaturally high and frequent runoff. This can result in accelerated bank erosion and sloughing, increased siltation, elevated stream temperatures, widened and braided stream channels, and loss of overhanging banks, all of which are important factors affecting trout productivity in a given stream (Gardner 1950; Armour 1977; Behnke 1979; Claire and Storch 1977; Glinski 1977; Kaufman et al. 1983). A study by Gunderson (1968) indicated that the weight per acre of brown trout was 31 percent higher in unaltered stream sections. It was noted that this was attributed to there being a narrower, deeper channel system, more favorable composition and distribution of water types and more cover in the unaltered section because the riparian vegetation had been preserved.

Loss of shoreline vegetation at amphibian breeding sites can reduce shade and increase water temperatures. Reduced food sources can also result with the loss or reduction of riparian vegetation. Reduced vegetation can allow for more sediment to enter breeding sites as the filtering properties are reduced. Reduced cover can also increase predation because amphibians generally occupy habitats with less hiding cover and thus are more vulnerable to predation.

Tamarisk removal would result in losses or reductions of streamside vegetation cover, which would impact fish in the short term at site-specific locations. The scope of impact would be very limited as BLM lands within the planning area contain very few infestations of tamarisk or Russian olive. Treatment of these species would have long-term benefits to cutthroat and amphibians as native vegetation is or would be restored improving streambank stability, water absorption and infiltration rates, and habitat diversity. Willow planting, exclosure fencing, and upland water development initiated to improve riparian areas is resulting in or would result in some short-term effects of habitat alteration, loss of vegetation, and increased sedimentation and turbidity. However, these actions would have long-term benefits to native cutthroat trout and amphibians similar to tamarisk removal.

Alternative A protects riparian areas, and consequently native cutthroat trout and amphibian habitats, with an NSO stipulation. Risk of identified impacts from other resource uses is substantially reduced under this alternative. The impacts of proactive riparian management would be generally the same under all alternatives.

Sediment-tolerant species would be benefited and impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts.

BLM_0016647

**Impacts from Vegetation Management—Weeds.** Weed management would be largely beneficial for native cutthroat trout and amphibians. Weed management is conducted under the recently completed CRVFO integrated weed management plan and EIS (BLM 2009e), which is tiered to the programmatic EIS for use of herbicides on BLM Lands in 17 western states (BLM 2007m). Analysis of select special status aquatic species and their habitats was addressed in both documents and each set the sideboards on treatment of weeds within and near aquatic habitats. Depending on the type of weed treatment and exception criteria, some of the NSOs identified in Table 4.2.7-4 would protect cutthroat and amphibians species from identified impact. In addition, weed management is subject to Land Health Standards 2, 3, and 4 (BLM 1997a), which help guide vegetation management on public lands. In areas where these standards are being met, there is reduced potential impact on fish and other aquatic wildlife from offsite erosion and increased sedimentation associated with degraded weed infested habitats.

Management for noxious and invasive weeds includes herbicide use, biological controls, and mechanical or manual treatments in weed infested areas. In areas where proactive weed management in the form of treatments are or would occur, there is potential for short-term negative impacts on cutthroat and amphibian species including, loss or reduction of streamside vegetation cover (where tamarisk, Russian olive, or other weedy riparian treatments occur), and increased sediment loading and turbidity from loss of vegetation before establishment of desirable species. These impacts are addressed in detail in sections on impacts from forest and woodland management section and impacts from riparian vegetation management. All weed treatments would have long-term benefits to cutthroat and amphibians and their habitats, as native vegetation is being or would be restored, improving watershed health. In addition, weed treatments would improve streambank stability, water quantity, and habitat diversity. Impacts associated with weed management would be the same under all alternatives.

Sediment-tolerant species would be benefited and impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts.

**Impacts from Fisheries and Aquatic Wildlife Management.** Fisheries and aquatic wildlife management is being or would be largely beneficial to native cutthroat trout subspecies and amphibians and their habitats. This alternative contains no specific protective measure for aquatic species, but GS-NSO-12 would help reduce impacts on portions of Cache Creek, which contains the only currently known population of greenback cutthroat trout in the planning area. GS-CSU-3 would help Colorado River cutthroat trout and the amphibian species by managing ground-disturbing impacts in and near occupied habitats. Depending on the type of fisheries project or action, and stipulation exception criteria, some of the protective measures identified in Table 4.2.7-4 would eliminate or reduce impacts associated with proactive fish and other aquatic wildlife management. In addition, fisheries and aquatic wildlife habitat management is subject to Land Health Standard 2, 3, 4, and 5 (BLM 1997a), which help guide habitat management on public lands. In areas where these standards are being met, there is reduced potential impact on fish and other aquatic wildlife from loss or reduction of streamside vegetation and offsite erosion and increased sedimentation and turbidity associated with select projects/actions.

Actions to improve habitat could include barrier placements and removals, in-channel habitat enhancement structures (e.g., rocks, logs), riparian plantings, and fencing. In select areas where proactive fish habitat management in the form of projects are occurring or would occur, there is potential for site-specific, short-term negative impacts on cutthroat and amphibians, including loss or reduction of streamside vegetation cover and increased sediment loading and turbidity. These impacts are addressed in detail in the sections on

BLM_0016648

impacts from forest and woodland management and impacts from riparian vegetation management. General fisheries and amphibian projects would be designed with cutthroat and special status amphibians in mind and would strive to have mutual long-term benefits to target species and special status aquatic species and their habitats.

Impacts associated with management of fish and other aquatic wildlife would be generally the same under all alternatives with regard to proactive fish management projects. Alternative B would provide greater protection by an NSO on all fish-bearing streams. Alternative C would provide protections by an NSO on all perennial waters. Alternative D would be similar to this alternative and would provide no specific protective measures for general aquatic species and their habitats.

Sediment-tolerant species would be benefited and impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts.

**Impacts from Wildlife Management.** Wildlife habitat management is or would be largely beneficial to native cutthroat trout and amphibians in the long term. Depending on the type of wildlife project or action and stipulation exception criteria, the protective measures identified in Table 4.2.7-4 would help to protect aquatic species. In addition, several wildlife-specific NSOs collectively limit ground-disturbing activities from primarily upland habitat, which indirectly helps to minimize impacts on native cutthroat trout and amphibians and their habitats from other resource uses. In addition, wildlife habitat management is subject to Land Health Standards 2, 3, and 4 (BLM 1997a), which help guide habitat management on public lands. In areas where these standards are being met, there is reduced potential impact on fish and other aquatic wildlife.

Habitat manipulations, such as prescribed burns, mechanical treatments, and chemical controls, are typically used to improve habitat for wildlife. In areas where proactive wildlife habitat management in the form of vegetation treatments or projects are occurring or would occur, there is potential for short-term negative impacts on native cutthroat trout and amphibians, primarily by habitat alteration and increased sediment loading and turbidity. In addition, disturbed areas serve as niches in which invasive weedy vegetation can take hold. This reduces watershed health and results in poor soil retention, increased runoff, and poor water infiltration and absorption. These impacts are addressed in detail in the section on impacts from forest and woodland management. Upland vegetation treatments intended to improve wildlife habitat are varied and would continue to occur in all vegetation types. These projects often result in some vegetation reduction or removal intended to stimulate regrowth, change species composition or diversity, and improve upland watershed health. In some cases, ground disturbance is minimal in others more substantial. In the short term, increased sediment loading and turbidity would result until such time as desired vegetation is established in treated areas. Over the long term, improved watershed health would benefit special status aquatic species as vegetation cover is improved, soil stability is increased, erosion potential is reduced, and water absorption and infiltration rates are improved.

Impacts associated with proactive wildlife habitat treatments would be generally the same under all alternatives. Alternatives B and C would provide more substantial indirect protection to special status aquatic species and their habitats by limiting ground disturbance by an NSO on more acres from other resource uses. Alternative D would provide more limited protection for wildlife and therefore less indirect protection to special status aquatic species.

BLM_0016649

Sediment-tolerant species would be benefited and impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts.

**Impacts from Special Status Plants and Terrestrial Wildlife Management.** Management of special status plants and terrestrial wildlife species and their habitats impact or would impact special status aquatic species the same as previously described in the impacts from wildlife management and the vegetation management sections (forest and woodland, rangeland, riparian, weeds).

This alternative contains NSOs for specific special status plants and terrestrial wildlife that would help to indirectly protect cutthroat and amphibian species from other resource uses where these NSOs reside within occupied watersheds containing these species. Alternatives B and C contain more protective measures and would indirectly help protect a greater amount of cutthroat and amphibian habitat by limiting ground-disturbing activities on larger expanses. Alternative D would provide less protection to special status plan and terrestrial species and hence less indirect protection to these special status aquatic species.

Sediment-tolerant species would be benefited and impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts.

**Impacts from Wildland Fire Management.** The GSFO Fire Management Plan (FMP) manages fire as outlined in the current RMP. The FMP contains in-depth analysis of impacts to fish and other aquatic species, and mitigation measures required to conduct fire management activities. This analysis and associated mitigations are incorporated by reference as addressed in the FMP and are the same for all alternatives. In summary, fire suppression could result in loss or reduction of streamside vegetation cover, increased sedimentation and turbidity, water quality alteration, and water depletions.

Sediment-tolerant species would be impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts.

**Impacts from Forestry Management.** Forestry and woodland management actions include the harvesting of firewood, poles, Christmas trees, pine nuts, timber, and seed collection. Commercial forestry (e.g., timber harvests and sales) is restricted to upland forests and include a variety of prescriptive silvicultural applications. These activities could include the use of heavy equipment, helicopters, chemical applications, road construction, and culvert installation. Depending on the type of treatment and the need for road construction, many of the protective stipulations in Table 4.2.7-4 would help to reduce impacts on cutthroat and amphibian species from forest management. However, some forest management practices result in minimal ground disturbance and would not necessarily be encumbered by identified NSOs. All vegetation management is subject to Land Health Standards 3 and 4 (BLM 1997a), which help guide vegetation management on public lands. Where these standards are being met, active management of forest and woodland vegetation is having minimal impact on native cutthroat trout and amphibians and their habitats. Impacts can be mitigated and are mitigated during site-specific analysis of individual treatment actions.

Forest management is limited in scope and application, and a limited number of treatments have occurred to date. However, with the ever-increasing pine beetle issues, it is likely that select treatments will increase in number and scope. Where this activity is occurring or would occur, limited direct negative impacts at specific locations on select streams would result, including habitat alteration and increased sediment loading and turbidity. In addition, disturbed areas serve as niches in which invasive weedy vegetation can take hold. This

*Colorado River Valley Field Office – Draft RMP Revision EIS*
*Chapter 4, Environmental Consequences*

BLM_0016650

reduces watershed health and results in poor soil retention, increased runoff, and poor water infiltration and absorption. These impacts are addressed in detail in the section on impacts from forest and woodland management. However, in the absence of new road construction, these impacts are or would be generally short-term and of limited scope and intensity. Treatments are designed with the goal of accomplishing long-term watershed improvement and meeting of Standard 3 and 4. Prescriptive treatments would have long-term benefits to special status aquatic species by improving upland watershed health and maintaining productive habitats that allow for natural water infiltration and absorption rates, improved vegetation ground cover, and limited erosion potential.

Where new road construction is or would be associated with select treatments, impacts associated with erosion and sedimentation and turbidity would be chronic and long-term at specific areas and would result in increased risk of identified impacts on both Colorado River and greenback cutthroat trouts. In addition, increased risk of direct mortality on northern leopard frogs and boreal toads would result where road density and use increases. New roads could also fragment habitat and limit connectivity between preferred and limited breeding habitats for these amphibian species.

Alternative A actively manages 17,900 acres of forested habitats. Alternatives B, C, and D would manage for nearly twice as many acres of this vegetation type. The broadest scope of impacts would occur under this alternative.

Sediment-tolerant species would be impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts.

**Impacts from Livestock Grazing Management.** None of the protective stipulations identified in Table 4.2.7-4 applies specifically to livestock grazing. Under Alternative A, a combined 489,600 acres of BLM land are open and available for livestock grazing providing for 56,900 AUMs. Livestock grazing is subject to Land Health Standards (BLM 1997a), which help guide grazing management on public lands. Where the guidelines are being followed and the standards are being met, livestock grazing is having minimal impact on native cutthroat trout and amphibians or their habitats. Impacts can be and are being mitigated during site-specific analysis of individual term grazing permit renewals where problem areas are identified and addressed.

The primary potential impacts on native cutthroat trout subspecies and amphibians associated with livestock grazing is habitat alteration, loss or reduction of streamside vegetation cover, water quality alteration, increased sediment loading and turbidity, and water depletion. In addition, disturbed areas serve as niches in which invasive weedy vegetation can take hold. This reduces watershed health and results in poor soil retention, increased runoff, and poor water infiltration and absorption. These impacts, except water depletions and water quality alteration, are discussed in detail in the sections on impacts from forest and woodland management and impacts from riparian vegetation; water depletions and water quality alteration are discussed in detail below. Where livestock grazing is occurring in or near occupied habitats of Colorado River and greenback cutthroat trout, boreal toads, and leopard frogs, there is increased risk of the identified impacts to these species occurring due to their requirement for cold, clear, well oxygenated water. Impacts are also resulting in specific areas where improper grazing is occurring.

*Water Depletions.* Stream and river flows and reservoir and pond volumes are generally climate dependent, but water diversions and impoundments play a large role with regard to localized flow regimes and water volumes of streams, rivers, and ponds. The primary actions and activities that result in water depletions include

BLM_0016651

construction of water impoundments (stock ponds, reservoirs), water diversions for agricultural and domestic uses, water use associated with natural gas development, and fire suppression. Reduced water flow or volume directly correlates to a loss of wetted habitat for fish and amphibians.

Reduced flow can result in increased water temperatures, reduced food supplies, reduced habitat complexity and diversity, and a loss of carrying capacity. Important microhabitats can be lost or altered, such us spawning bars and pools. Reduced flows can result in habitat fragmentation and limited movement of cutthroat between preferred habitats. Holding habitats (pools) can be reduced in size and become less useable by fish or amphibians. Fish that congregate in limited pool habitats for long periods can incur increased stress and susceptibility to disease.

Breeding ponds that lose water volume can become unusable by amphibian species. Increased predation can result, as less wetted habitat exists in which to hide from predators. Reduced pond volumes can cause increased risk of anoxia for northern leopard frogs. Bradford (1983) observed that anoxia was more severe in shallow lakes or ponds (i.e., less than 4 meters deep), and nearly all adult frogs died in these bodies of water in some winters.

*Water Quality Alteration.* The effects of changes in water quality are well documented on trout species. Trout prefer cold water, neutral pH, and high dissolved oxygen levels in which to thrive. With increased nutrient input and limited summer and fall stream flows, eutrophication can result. This is the condition in which the increase of mineral and organic nutrients has reduced the dissolved oxygen levels within the stream, producing an environment that favors plant life over animal life. In other words, the mineral and organic nutrient levels being inputted into these streams are greater than the streams flows can dilute or carry through the system. The symptoms of this condition are often seen as large algae blooms that form dense patches within a stream. This further depletes oxygen levels and reduces habitat quality for resident fish.

Such activities as natural gas development, road use, and other construction can alter water quality through spills, leaks, or vehicular accidents. Where these could occur near occupied habitat for cutthroat trout and amphibians, impacts would be acute and could result in direct mortality. Use of chemicals for weed treatments, fire suppression, or other vegetation management could impact aquatic species and their habitats by overspray and drift to nontarget areas and habitats. This can result in direct mortality, reduced feeding, loss of prey species, and habitat avoidance. Grazing by cattle has also been reported to affect water quality (Buckhouse and Gifford 1976), water chemistry (Jefferies and Klopatek 1987), and water temperature (Van Velson 1979). The changes are subtle over time (Elmore and Beschta 1987) but tend to have a profound effect on aquatic ecosystems (Kauffman and Krueger 1984).

Livestock grazing is having or would have direct negative impacts at specific locations on select streams containing Colorado River cutthroat and greenback cutthroat trout. This is occurring in areas where the land health standards are not currently being met. These standards ensure that sufficient residual vegetation in upland and riparian areas remains to protect soils and streambanks from wind and water erosion and to maintain stream stability.

In areas where range improvements associated with livestock management are constructed, such as fencing, cattle guards, and upland water developments, there is potential for short-term negative impacts on aquatic species, including habitat alteration, increased sediment loading and turbidity, and water depletions. Where new road construction is needed to access range improvements, these new roads can create chronic long-term

BLM_0016652

point sources for increased sedimentation and turbidity. Stock ponds are often designed to capture water that would otherwise feed streams. This results in water depletion impacts. Upland water developments also tend to concentrate livestock use, which can negatively impact northern leopard frogs and boreal toads as sedimentation and turbidity increases, and shoreline vegetation is lost. However, many of the these range improvements are having or would have long-term benefits to these species as livestock distribution is or would be improved, grazing is reduced along streams, and in some cases amphibian habitat is created by stock pond creation.

Impacts under this alternative would be slightly increased in scope and intensity compared to Alternatives B, C, and D, given the higher number of acres and AUM figures.

Sediment-tolerant species would be impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts. Water depletions impacts for these species are addressed in more detail below.

**Impacts from Recreation and Visitor Services Management.** Under Alternative A, a total of 60,400 acres are managed in eight SRMAs, 60,700 acres are managed as RMAs, and the remaining area is managed as ERMAs. Protective stipulations associated with these include GS-NSO-16, which limits large surface-disturbing activities on 22,300 acres of five SRMAs, and GS-NSO-17, which limits large surface-disturbing activities on 64,200 acres within eight RMAs. In addition, the protective measures in Table 4.2.7-4 either directly or indirectly protect native cutthroat trout and amphibians by limiting ground-disturbing activities from other resource uses. However, identified protective measures have limited effectiveness, as they apply to managed and not dispersed recreation.

Recreation management can impact native cutthroat trout and amphibians and their habitats in many ways. Human activity along or within streams and rivers and around or within ponds, lakes, and reservoirs can result in habitat alteration, reduced or loss of riparian vegetation cover, increased sedimentation and turbidity, and water quality alteration. In addition, disturbed areas serve as niches in which invasive weedy vegetation can take hold. Humans can serve as dispersal mechanisms for some weed species and help spread weeds to new areas. This reduces watershed health and results in poor soil retention, increased runoff, and poor water infiltration and absorption. These impacts are discussed in detail in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management. Specifically, user-created trails, road and OHV use, camping, fishing, hunting, mountain biking, hiking, wildlife watching, and boating can all result in these impacts along and within aquatic habitats.

Under this alternative, 60,400 acres are protected by an NSO, which limits ground-disturbing activities in select SRMAs and RMAs. This is more protection than under Alternative B and Alternative C and similar to Alternative D. This alternative provides the most protection from other resource uses, be it direct, in areas overlapped by occupied cutthroat and amphibian habitats, or indirect, in areas away from occupied habitats.

Visitor use is expected to increase within the planning area under all alternatives. All of the identified impacts associated with recreation are expected to increase in scope and intensity as well. Under current management, more intensively managed recreation opportunity is provided within the SRMAs where specific recreational pursuits are identified and managed for. However, these areas are not managed to the exclusion of other recreational uses. ERMAs are the more traditional dispersed recreational areas where no one use is necessarily favored or targeted over another and BLM management is largely custodial with no specific recreation

BLM_0016653

prescriptions identified. In areas where OHV use is occurring or would increase, such impacts as sediment and turbidity, habitat alteration, loss or reduction of riparian vegetation cover, and water quality alteration would be long-term and chronic. These impacts would be primarily where road and trail density and use are high near occupied cutthroat streams and amphibian concentration areas. Impacts from managed recreation can be and are mitigated during site-specific analysis of individual actions. This is done primarily by the issuance of Special Recreation Use permits, which are used to control some visitor use and reduce resource conflict. Sediment-tolerant species would be impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts.

**Impacts from Comprehensive Trails and Travel Management.** Under current management, a total of 294,300 acres is open to year-round off-road travel. An additional 4,300 acres are open seasonally to off-road travel. This allows for proliferation of user created routes and increased risk, scope, and intensity of impacts, including habitat alteration, loss or reduction of streamside vegetation cover, increased sedimentation and turbidity, and water quality alteration. These impacts are discussed in detail in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management. In known OHV concentration areas and other areas with high road and trail densities, impacts on occupied native cutthroat trout and amphibians and their habitats are intensified. The protective stipulations in Table 4.2.7-4 either directly or indirectly protect native cutthroat trout subspecies and amphibians from some road- and trail-related impacts but these have limited utility as they apply to managed recreation management and not dispersed activities.

Roads increase surface runoff and sedimentation and, where they cross waterways, often require in-channel structures, such as culverts, and bridges that remove aquatic habitat and may be barriers to fish passage (Bryant 1981; Barrett et al. 1992). Studies show that roads can contribute 50 to 80 percent of the sediment that enters streams (Hagans et al. 1986). Cedarholm et al. (1980) found that fine sediment in salmon spawning gravels increased by 2.6 to 4.3 times in watersheds with more than 4.1 miles of roads per square mile of land area. Matthews (1999) linked increased road densities to increased sediment yield in the Noyo River.

Roads and trails provide means of water conveyance, which accelerates flow velocities and increases erosion and offsite soil movement and ultimately sedimentation and turbidity. They also compact soils, which reduces water absorption and infiltration rates and increases the peaks of runoff flows. In addition, disturbed areas associated with OHV use serve as niches in which invasive weedy vegetation can take hold. Vehicles can move weed seeds and aid in dispersal and establishment of new populations. This reduces watershed health and results in poor soil retention, increased runoff, and poor water infiltration and absorption. Where motorized and in some cases mechanized use are high or increasing, erosion potential is increased. These impacts are amplified where user-created routes and OHV use is occurring or increasing. In areas of high road and trail density with high use, there is increased risk of direct mortality to northern leopard frogs, boreal toads, and Great Basin spadefoot toads, especially during peak movement periods during breeding seasons. These routes can also increase sedimentation and habitat fragmentation and limit connectivity between limited breeding pond habitats for these amphibians.

Visitor use is expected to increase within the planning area under all alternatives, which would probably result in increased trail and road use. All of the identified impacts associated with trail and road management would be expected to increase in scope and intensity as well. In areas where OHV use is occurring or would increase, impacts, including increases in sediment and turbidity, soil compaction, loss of riparian vegetation and cover, habitat alteration, and water quality changes, would be long-term and chronic.

BLM_0016654

As compared to Alternatives B, C, and D, which would restrict travel to designated routes, this alternative would have the greatest risk, magnitude, and intensity of identified impacts on special status aquatic species and their habitats. This is due primarily to the allowance of off-road vehicular use and closure of only limited numbers of select roads and routes.

Sediment-tolerant species would be impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts.

**Impacts from Lands and Realty Management.** Sediment-tolerant species would be impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts. Impacts from different types of lands and realty actions are summarized below.

The effects of land tenure adjustment to native cutthroat trout subspecies and amphibians are determined through site-specific environmental analysis. The current plan identifies parcels of public land available for disposal and any disposal or acquisition of lands could result in a loss or gain of aquatic habitat. This could result in either benefits or impacts on these species. Under the current plan, there are 550,500 acres of lands identified for retention.

Under current management, 34,600 acres would be withdrawn from locatable mineral exploration and development, compared to 97,000 acres under Alternative B; 172,100 acres under Alternative C; and 72,300 acres under Alternative D. Current management would allow potentially the most impact of locatable mineral exploration and development with the least amount of land withdrawn. This would increase the risk of habitat alteration, alteration of water quality, and increased sediment loading and turbidity impacts, as well as the scope and intensity of these impacts, which are addressed in detail in the sections on impacts from forest and woodland management and the impacts from livestock grazing management.

Under the current plan, the protective stipulations identified in Table 4.2.7-4 apply to most ROWs. Impacts can be and are being mitigated during site-specific analysis of individual actions.

Construction and maintenance associated with ROWs or other land use authorizations (such as permits, leases, and easements) can affect native cutthroat trout subspecies and amphibians by habitat alteration, loss or reduction of streamside vegetation cover, water quality alteration, increased sediment loading and turbidity, and water depletions. These impacts are discussed in detail in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management. Specifically, activities that result in ground disturbance and the removal of native vegetation for construction of ROWs can have short-term or long-term negative effects on native cutthroat trout subspecies and amphibians and their habitats. Collectively, all of these activities have the potential to provide for the offsite movement of soils and increase sediment loading and turbidity in nearby water bodies. In addition, disturbed areas serve as niches in which invasive weedy vegetation can take hold. This reduces watershed health and results in poor soil retention, increased runoff, and poor water infiltration and absorption. Increased miles and densities of roads are a concern, because they are a long-term chronic source of erosion and sedimentation, serving as water collection and conveyance corridors to live streams and ephemeral drainages that ultimately feed live streams. Where these activities would occur within or near occupied cutthroat trout habitat, impacts would be more acute. These routes can also impact amphibians, which can be killed by vehicles and by reduced habitat connectivity to limited breeding pond habitats.

BLM_0016655

This alternative contains 101,300 acres of avoidance areas and 20,800 acres of exclusion areas for communication facilities and utilities primarily in the existing WSAs. Identified impacts under this alternative would be slightly higher in scope and intensity compared to Alternatives B, C, and D, which have increased avoidance and acres of exclusion.

**Impacts from Coal Management.** Current management allows for 28,000 acres of the federal mineral estate as open to further consideration for coal leasing. All of the identified coal resources within CRVFO are located along the Grand Hogback between Rio Blanco Hill and Glenwood Springs. However, of that amount 1,500 acres were found to be unacceptable for coal leasing. This will reduce coal mining potential and provide long-term benefits to fish and other aquatic species across broad portions of the planning area. Actions calling for NSOs (GS-NSO-47) on surface coal mining areas would result in the reduced potential for surface disturbances unrelated to coal mining. This area is largely outside the influence zone for cutthroat trout species as no occupied habitat is located near this portion of the Grand Hogback. Some northern leopard frog populations may be found in the nearby area.

Management of coal resources could impact amphibians and their habitats in many ways. Coal mining would probably result in habitat alteration, increased sedimentation and turbidity, water quality alteration, and water depletions. Disturbed areas could serve as niches in which invasive weedy vegetation can take hold. This reduces watershed health and results in poor soil retention, increased runoff, and poor water infiltration and absorption. These impacts are discussed in detail in the section on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management. Large-scale coal mining is not currently being conducted. If activity were to increase under current management, the impacts discussed above would occur at site-specific locations. Site-specific planning would help to mitigate and reduce negative impacts on fish and other aquatic wildlife. The anticipated risk of this activity is relatively low, and impacts would be similar under all alternatives.

Sediment-tolerant species would be impacted in ways similar to those for sediment-intolerant species. The Grand Hogback is near occupied habitats for some of these species in the Colorado River. Therefore, coal mining in this area would have higher risk of identified impacts on these species, except that any actions that would increase sediment and turbidity would have negligible impacts.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Oil and gas development activity is concentrated on the western 22 percent of the CRVFO (the area west of the Grand Hogback), where the high potential for the occurrence of gas resources is found. It is estimated that 99 percent of future drilling will occur in the areas identified as high potential for the occurrence of oil and gas resources. Infill drilling and step-out drilling will be the major portion of future activity. Of the 127,300 acres of BLM mineral estate in this high potential area that is not within the Roan Plateau planning area, 95 percent has been leased and currently is being developed. The eastern 78 percent of the CRVFO (east of the Grand Hogback) has a lower potential for the occurrence of oil and gas resources. Approximately 1 percent of future drilling activity is likely to occur in areas of medium and low potential and no drilling activity is predicted in the areas identified as no-known potential.

Each phase of oil and gas development—from exploration and construction through operation and abandonment—has a specific combination of impact type, intensity, and duration.

BLM_0016656

- Exploration and Construction—The initial phase of development typically lasts for 25 to 40 days, depending on depth, and is very equipment intensive. Associated activities include blading an access road and pad (with an average combined area of 3.4 acres per well) and nearly continuous operation of a drill rig and other specialized heavy equipment. On average, 580 round trips by heavy trucks and pickups are associated with each new well.

- Operation and Production—This phase typically involves minimal personnel in the field except at compressor stations and water disposal facilities, with periodic traffic to each well for monitoring and maintenance. Reclamation of temporarily disturbed areas begins on completion of construction. Successful reclamation for weed and erosion control is expected to occur within 3 to 5 years after disturbance.

- Abandonment—The final phase of an oil or gas well occurs at the end of its productive life, typically ranging from 20 to 40 years. During abandonment, surface facilities are removed, wells are plugged, and access roads are reclaimed unless deemed necessary for resource management or if requested by the landowner. These activities involve a short-term increase in workers and vehicles in the project areas. Abandonment and reclamation require approximately 3 days per well and 4 days per mile of access road, for a crew of four people.

- Reclamation—Restoration of temporarily disturbed areas at the well pad and along the access road begins on completion of construction. Attaining reclamation standards in 3 to 5 years following planting. Areas of long-term disturbance, which are occupied by surface facilities and ongoing human activity throughout the life of the well, are reclaimed following abandonment.

Throughout this and all alternatives, 95 percent of the high-potential area has already been leased for natural gas development. Depending on the time of lease, any number of protective stipulations may apply to specific lease parcels. Where lands have been leased since completion of the Supplemental 1999 Oil and Gas Leasing EIS, the stipulations in Table 4.2.7-4 would apply.

The primary potential impacts on native cutthroat trout subspecies and amphibians include water quality alteration, water depletions, and increased sediment loading and turbidity. These impacts are discussed in detail in the sections on impacts from forest and woodland management and impacts from livestock grazing management. Specifically, of primary concern are activities that result in ground disturbance and the removal of native vegetation for construction of well pads, roads, pipelines, compressor and relay stations, settling ponds, geophysical seismic exploration, and various assorted infrastructure. Collectively, all of these activities have the potential to provide for the offsite movement of soils and increase sediment loading and turbidity into nearby water bodies. In addition, disturbed areas serve as niches in which invasive weedy vegetation can take hold. This reduces watershed health and results in poor soil retention, increased runoff, and poor water infiltration and absorption. Increased numbers and densities of roads are a concern, as they are long-term chronic point sources of sediment input. Impacts are amplified and more acute in areas where natural gas development is occurring in small discrete watersheds containing native cutthroat trout and amphibians.

Generally, where proper and timely reclamation is occurring at well pad and pipeline sites and where proper road and drainage structure construction and maintenance are occurring, impacts from offsite soil movement and sediment and turbidity are minimized. Where reclamation and road maintenance practices have been poor or neglected, the sediment loading and turbidity impacts discussed in detail are occurring.

BLM_0016657

Under this alternative, oil and gas development would result in direct negative impacts at site-specific portions of select streams on native cutthroat trout subspecies and amphibians throughout the western quarter of the planning area where occupied habitats exists (Baldy Creek, East Divide Creek, June Creek, Battlement Creek, Beaver Creek, Cache Creek, and Wallace Creek). Under this alternative, a total of 679,200 acres would be open for leasing, with an anticipated 3,300 acres of surface disturbance including pads, access roads, pipelines, and offsite facilities. This alternative would allow for the most activity and most acres of disturbance, except that Alternative D would allow for 658,200 acres open for leasing. Given the protective measure in place on a given lease, the identified impacts may be reduced at specific locations but are still occurring over a broad area. Identified impacts are long-term and chronic in areas where extensive road construction has occurred and is occurring associated with these activities. Approximately 99 percent of all of the proposed activity would continue to occur in the high-potential areas where activity is currently being conducted.

Sediment-tolerant species would be impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The protective stipulations in Table 4.2.7-4 would apply to all of these activities, except locatable minerals activities that are subject to federal laws and regulations under the General Mining Law of 1872. Under Alternative A, a total of 34,600 acres would be petitioned for withdrawal to these activities. The remaining acres would be open to these activities, subject to site-specific analysis. Locatable and salable mineral management could impact native cutthroat trout subspecies and amphibians in many ways including, habitat alteration, increases in sediment load and turbidity, loss of riparian vegetation cover, and water quality alteration. These impacts are discussed in detail in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management. In particular, gravel pits near occupied habitats would have a higher risk to these species and their habitats. Water quality is a major concern with certain mineral materials mining practices and, depending on location and scope, could have site-specific direct negative impacts over the long term.

This alternative would have the greatest risk to special status aquatic species and their habitats as the fewest acres would be withdrawn from consideration of these activities compared to Alternatives B, C, and D. However, very few of these activities are occurring on BLM lands at this time. These activities could increase in future years in site-specific areas.

**Impacts from Renewable Energy Management.** According to the US Department of Energy, National Renewable Energy Laboratory, the planning area has a low potential for wind and solar energy. Special status aquatic species were addressed in the Final Programmatic Environmental Impact Statement on Wind Energy Development (BLM 2005b). In summary, these impacts fit into the categories of habitat alteration and increased sediment and turbidity. Under Alternative A, applications for solar and wind energy exploration and development would be considered on a case-by-case basis. Any impacts on special status aquatic species would depend on the location and type of project proposed. Protective measures included in Table 4.2.7-4 would help reduce potential impacts. Impacts would be the same across all alternatives.

Sediment-tolerant species would be impacted in ways similar to those for sediment-intolerant species, except that any actions that would increase sediment and turbidity would have negligible impacts.

September 2011        *Colorado River Valley Field Office – Draft RMP Revision EIS*        4-306
*Chapter 4, Environmental Consequences*

BLM_0016658

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under the current plan, the management of six ACECs would generally benefit native cutthroat trout and amphibians where these designations overlap with occupied habitat or are upstream and within watersheds containing these species. Although managed for select resource values, the six existing ACECs protect 27,000 acres of habitat by limiting ground disturbance by a protective NSO stipulation. This provides some direct and indirect protection to cutthroat and amphibians from various identified impacts from other resource uses.

Current management provides less protection than under Alternatives B and C but not D. However, when coupled with select protective measures in Table 4.2.7-4, impacts on special status aquatic species and their habitats would still be reduced across large portions of the planning area.

Sediment-tolerant species would be benefited in ways similar to those for sediment-intolerant species.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** The continued management of three WSAs would benefit native cutthroat trout and amphibians, especially where occupied habitat is located in these designated areas. These existing WSAs with the prescriptive management (IMP) would limit human uses and exclude ground disturbance to the direct and indirect benefit of native cutthroat trout and amphibians and their habitats.

Direction for managing aquatic wildlife in WSAs is prescribed by the IMP. The IMP allows stocking of native fish species within their historical ranges or exotics that were being stocked before October 21, 1976, and introductions of threatened, endangered, or other special status species native to North America within their historic ranges. Permanent installations could be permitted to maintain or improve conditions for fish, if the benefiting native species enhance wilderness values. All proposed actions must be scrutinized to determine if the action is necessary to protect the physical, biological, and cultural resources, as well as the quality of the wilderness experience.

This alternative provides slightly less indirect protection primarily to amphibians than under Alternatives B, C, and D, because the Eagle Mountain WSA is not included. No known or suspected cutthroat populations are known in the vicinity of the Eagle Mountain WSA.

Sediment-tolerant species would be benefited in ways similar to those for sediment-intolerant species.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under current management, all of the 26 eligible stream segments would be managed under interim protection to preserve the free-flowing nature, ORVs, and tentative classification. Select cutthroat and amphibian populations, some of which are identified ORVs, would benefit from continuing these protections because surface-disturbing activities from other resource uses would be limited along these streams. However, in many cases, the protections afforded aquatic species under WSR interim management would be additive to existing protective measures identified in Table 4.2.7-4, except that WSR protections would be longer term until such time as new planning efforts were initiated or Congress would officially act on these eligible stream segments.

This alternative would be the most protective, similar to Alternative C, except that this alternative would provide protections for a lesser duration. Under Alternative B1, the BLM would recommend segments 6 and 7 on the Colorado River and segments 2 and 3 on Deep Creek as suitable for designation; this is substantially less protection than under Alternatives A or C. Under Alternative B2, the BLM would recommend Deep

BLM_0016659

Creek segments 2 and 3 as suitable for designation. It would defer a suitability determination on the Colorado River segments and would adopt and implement the stakeholders' plan to protect the free-flowing nature, ORVs, and tentative classifications on the Colorado River segments 4 through 7. This alternative would provide substantially less protection than under Alternatives A and C but could provide better protection than under Alternative B1, as with water stakeholder cooperation the water stakeholders would attempt to operate their facilities in a manner that meets water supply objectives and protects the ORVs and subsequently aquatic species and their habitats. Under Alternative D, the BLM would not recommend any of the 26 eligible segments suitable for designation and they would all be released from further protection under the Wild and Scenic Rivers Act.

The Colorado River segments included in this alternative contain occupied habitat for bluehead suckers, flannelmouth suckers, and roundtail chubs, which are considered sediment-tolerant species. These fishes would also benefit from the interim protection measures. In addition, select protective measures included in Table 4.2.7-4 would provide additional or overlapping protections for these species.

*Alternative B*

This alternative includes a variety of protective stipulations that either directly or indirectly protect/benefit fisheries and aquatic species/priority habitats. This alternative contains fisheries-specific stipulations as well as other resource stipulations that either directly or indirectly protect special status aquatic species and their habitats. In general, any NSO that limits ground-disturbing activity is beneficial to aquatic species.

Table 4.2.7-5 shows the primary protective measures/stipulations under this alternative that would provide protections and reduce or minimize negative effects on special status aquatic species and their habitats under this alternative.

Impacts to special status fish and other aquatic wildlife from soils management and renewable energy management would be the same as or similar to those under Alternative A. Impacts from management of all other resources and uses would be as described below.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Management of sediment-intolerant special status fish and other aquatic wildlife species would benefit these species and their habitats under Alternative B. Benefits would be similar to those described in the section on impacts from fisheries and aquatic wildlife. This alternative includes CRV-CSU-15 for special status amphibians at known or identified breeding sites. Impacts associated with proactive project work would result in short-term negative effects, including habitat alteration, loss or reduction of streamside vegetation cover, and increased sediment and turbidity. These impacts are discussed in detail in the sections on impacts from forest and woodland management and impacts from riparian vegetation management.

Management of special status fish and other aquatic wildlife under this alternative would provide greater protection and reduce risk and scope of identified impacts compared to Alternatives A and D, but less protection to amphibians than under Alternative C, which includes an NSO instead of CSU at known or identified breeding sites.

September 2011          *Colorado River Valley Field Office – Draft RMP Revision EIS*          4-308
*Chapter 4, Environmental Consequences*

BLM_0016660

**Table 4.2.7-5**
**Primary Protective Measures/Stipulations under Alternative B**

| Stipulation | Origin | Acres/Miles Protected |
|---|---|---|
| CRV-NSO-1 debris flow hazard zones | Newly proposed | 1 mile of fish-bearing stream |
| CRV-NSO-2 steep slopes greater than 50 percent | Newly proposed | 86,400 acres of upland habitat |
| CRV-NSO-3 major river corridors | 1999 Oil and Gas Leasing ROD | 75 miles of fish-bearing stream |
| CRV-NSO-4 designated municipal watershed areas | Newly proposed | 1 mile of fish-bearing stream |
| CRV-NSO-5 streamside management zones | Newly proposed | 270 miles of fish-bearing stream |
| GS-NSO-12 threatened or endangered species | 1999 Oil and Gas Leasing | Not mapped; replaced by individual NSOs for individual species |
| CRV-NSO-15 fish-bearing streams | Newly proposed | All 270 miles of fish-bearing streams |
| CRV-NSO-32 endangered big-river fishes | Newly proposed | 2 miles of the Colorado River |
| CRV-NSO-33 sensitive big-river fishes | Newly proposed | 100 miles of stream |
| CRV-CSU-1 slopes greater than 30 percent | Newly proposed | 183,700 acres of uplands |
| CRV-CSU-7 BLM sensitive species | 1999 Oil and Gas Leasing ROD | Not mapped; would apply as needed by species |
| CRV-CSU-3 riparian and wetland zones | Newly proposed | All 140 miles of fish-bearing stream |
| CRV-CSU-15 sensitive amphibians | Newly proposed | 2,400 acres of breeding habitat |
| CRV-TL-7 coldwater sport and native fish spawning | Newly proposed | 250 miles of stream |
| CRV-TL-19 occupied cutthroat trout waters | Newly proposed | 65 miles of fish-bearing stream |

Management under Alternative B would also benefit sediment-tolerant special status species, including the federally listed (endangered) and BLM sensitive big river fish. Short-term impacts from proactive projects would be similar to those described in the section on impacts from fisheries and aquatic wildlife. This alternative includes CRV-NSO-32, which would provide protection to Colorado pikeminnow and razorback sucker along small portions of occupied habitat within the Colorado River by limiting ground-disturbing activities. In addition, CRV-NSO-33 would provide protection for bluehead suckers, flannelmouth sucker, and roundtail chubs along the Colorado River and some of its larger tributaries by limiting ground-disturbing activities. However, these stipulations are somewhat duplicative as other protective measures apply to portions or all of the same habitats, including CRV-NSOs 3, 5, and 15. For these species, this alternative would provide similar protections as Alternatives C and D and slightly more than under Alternative A.

**Impacts from Water Resource Management.** Alternative B water management would benefit cutthroat and amphibians generally the same as addressed under Alternative A. However, this alternative includes additional stipulations specifically to protect water quality, including CRV-NSOs 3, 4, and 5. These NSOs would limit ground-disturbing activities on all hydrologic features (perennial, ephemeral, and intermittent streams, lakes, wetlands, fens, and springs) within the planning area. In addition, other stipulations identified in Table 4.2.7-5 directly or indirectly protect native cutthroat trout subspecies and amphibians and their habitats from other resource uses.

This alternative provides similar protection as Alternative C, which also includes the streamside management zone (CRV-NSO-5) to protect all hydrological features. Alternative A is less protective and could allow for

BLM_0016661

more water quality alteration particularly in ephemeral and intermittent drainages. Alternative D is similar to A and provides limited protective measures.

Benefits are the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Vegetation—Forest and Woodland Management.** The primary potential impacts on native cutthroat trout and amphibians would be habitat alteration and increased sedimentation and turbidity. These impacts are discussed in detail under Alternative A in the section on impacts from forest and woodland management. Impacts would generally be similar under all alternatives.

Impacts would generally be the same for sediment-intolerant species.

**Impacts from Vegetation Management—Rangelands.** The primary potential impacts on native cutthroat trout and amphibians would be habitat alteration and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the section on impacts from forest and woodland management. Impacts would generally be similar under all alternatives.

Impacts would generally be the same for sediment-tolerant and sediment intolerant species.

**Impacts from Vegetation Management—Riparian.** Under this alternative, riparian vegetation management would be largely beneficial to native cutthroat trout subspecies and amphibians. However, riparian protective measures under this alternative are by a CSU instead of NSO as under Alternatives A and C. This reduced protection could result in more allowable disturbance within riparian habitats, but when coupled with the other protective stipulations covering the same general habitats (primarily CRV-NSO-5 and CRV-NSO-15), native cutthroat trout and amphibians and their habitats would still be largely protected. Alternative D would provide no specific protections to riparian vegetation and would increase the risk and scope of identified impacts.

In select areas where proactive restoration of riparian areas is occurring or would occur, impacts would include alteration of water quality, habitat alteration, increased sediment loading and turbidity, and reduction or loss of streamside vegetation and cover. These impacts are the same as addressed in detail under Alternative A in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management.

Impacts and benefits would generally be the same as for sediment-intolerant species, except that actions that could increase sediment would have negligible impacts.

**Impacts from Vegetation Management—Weeds.** Benefits and impacts are the same as addressed under Alternative A. In areas where proactive weed management in the form of treatments would occur, impacts would include short-term loss or reduction of streamside vegetation cover (where tamarisk, Russian olive, or other weedy riparian treatments occur), and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management and impacts from riparian vegetation management. Weed management benefits and impacts would be generally the same under all alternatives.

Impacts and benefits would generally be the same for sediment-tolerant and sediment-intolerant species.

BLM_0016662

**Impacts from Fisheries and Aquatic Wildlife Management.** Fisheries and aquatic wildlife management would be largely beneficial to native cutthroat trout and amphibians and their habitats, similar to Alternative A. Under this alternative, CRV-NSO-15 would protect all fish-bearing streams by limiting ground-disturbing activities within 100 meters on both sides of the stream edge. CRV-TL-7 would reduce impacts associated with in-channel work during important spring spawning periods for cutthroat trout. Depending on the type of fisheries project or action and stipulation exception criteria, the remaining protective measures identified in Table 4.2.7-5 would help to limit impacts on these species from some activities.

In select areas where proactive fish habitat management in the form of projects would occur, impacts could include site-specific and short-term habitat alteration, loss or reduction of streamside vegetation cover, and short-term increases in sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the section on impacts from forest and woodland management and impacts from riparian vegetation management. This alternative would be more protective than under Alternatives A and D but not as protective as Alternative C, which includes an NSO on all perennial streams.

Impacts would generally be the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Wildlife Management.** Wildlife habitat management under this alternative would be largely beneficial to special status aquatic species and their habitats. Depending on the type of wildlife project or action and stipulation exception criteria, the protective measures identified in Table 4.2.7-5 above would help to limit impacts on special status aquatic species and their habitats. In addition, this alternative includes several wildlife, special status plant, and special status wildlife NSOs, which would collectively protect primarily upland habitats from surface-disturbing activities. This would indirectly help protect aquatic habitats containing cutthroat and amphibians from offsite sedimentation and turbidity from other resource uses, especially where these NSOs overlap with occupied watersheds containing these species.

In areas where proactive wildlife habitat management in the form of vegetation treatments or projects would occur, impacts would include short-term increases in sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the section on impacts from forest and woodland management. Wildlife habitat management under this alternative would be more protective than under Alternatives A and D but not as protective as Alternative C, which includes additional wildlife-specific NSOs that would indirectly help protect aquatic habitats containing cutthroat and amphibians from other resource uses.

Impacts would generally be the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Special Status Plants and Terrestrial Wildlife Management.** Management of special status plants and terrestrial wildlife species and their habitats would benefit and impact special status aquatic species and their habitats the same as previously described in the section on impacts from wildlife management section and the vegetation management sections (forest and woodland, rangeland, riparian, weeds). Alternatives A and D provide less indirect protection, and Alternative C would provide the greatest amount of indirect protection and reduction in the scope of identified impacts.

Impacts would generally be the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Forestry Management.** The primary potential impacts on native cutthroat trout subspecies and amphibians associated with management of this vegetation type are habitat alteration and increased

BLM_0016663

sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the section on impacts from forest and woodland management. However, the short-term impacts would be slightly increased in scope, as this alternative would actively manage 31,400 acres of forest and woodland habitat compared to Alternative A's 17,900 acres. Alternatives C and D would manage similar numbers of acres as this alternative. In addition, this alternative has more protective measures than under Alternatives A and D and would probably limit the scope of identified impacts of forest treatments. Alternative C would further limit these activities and reduce the scope and intensity of identified impacts.

Impacts would generally be the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Livestock Grazing Management.** None of the protective stipulations identified in Table 4.2.7-5 applies specifically to livestock grazing. Under Alternative B, a total of 451,400 acres of BLM land would be open and available for livestock grazing, providing for approximately 36,000 AUMs. The primary potential impacts on native cutthroat trout subspecies and amphibians and their habitats associated with livestock grazing are habitat alteration, loss or reduction of streamside vegetation cover, water quality alteration, increased sediment loading and turbidity, and water depletion. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management. Impacts under this alternative would be similar in scope and intensity as Alternative C, given the relatively small number of acres and AUM differences among alternatives. Alternatives A and D would slightly increase the risk of identified impacts.

Impacts would generally be the same for sediment-tolerant species as for sediment-intolerant species, except that actions that could increase sediment would have negligible impacts.

**Impacts from Recreation and Visitor Services Management.** Under Alternative B, a combined 51,000 acres of land would be managed in six SRMAs; the remaining acres would be managed as ERMAs. The primary protective stipulation associated with these is CRV-NSO-46, which protects lands within the six SRMAs from large ground-disturbing activities from other resource uses. This directly and indirectly helps to limit impacts on native cutthroat trout subspecies and amphibians and their habitats. In addition, the protective stipulations in Table 4.2.7-5 would directly and indirectly protect these species by limiting ground-disturbing activities from other resource uses. All of these protective measures have limited effectiveness as they would apply to managed recreation and not dispersed activities. Dispersed recreation would continue to occur throughout the planning area.

The impacts on special status aquatic species and their habitats are habitat alteration, reduced or loss of riparian vegetation cover, and increased sedimentation and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management and impacts from riparian vegetation management.

This alternative would provides less indirect protection for cutthroat and amphibians from other resource uses compared to Alternative A but provides almost twice the NSO protection as Alternatives C and Alternative D.

Impacts would generally be the same for sediment-tolerant and sediment-intolerant species.

BLM_0016664

**Impacts from Comprehensive Trails and Travel Management.** Under this alternative, no land would be open to off-road travel, compared to 294,300 acres open to year-round off-road travel and 4,300 acres open seasonally to off-road travel under Alternative A. A total of 467,600 acres would be limited to designated routes, and 37,300 acres would be closed. The protective stipulations in Table 4.2.7-5 would directly and indirectly protect native cutthroat trout subspecies and amphibians and their habitats from new road and trail-related impacts and other resource uses by limiting and managing ground-disturbing activities.

Under this alternative, trail and travel management would impact native cutthroat trout subspecies and amphibians by habitat alteration, water quality alteration, and increased sedimentation and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management and impacts from livestock grazing management. Under this alternative, the intensity and scope of impacts would be substantially reduced compared to Alternative A, as no OHV use would be allowed and travel would be restricted to designated routes. This would eliminate user-created routes and would reduce the risk and intensity of identified impacts across large portions of the planning area.

This alternative calls for the obliteration of 70 miles of existing routes, compared to 220 miles under Alternative C and 50 miles under Alternative D. This alternative would close nearly the same amount of acres to use as Alternative C and would allow for 30 more miles of full-size vehicle use than under Alternative C. These actions would decrease erosion potential on a larger scope and would reduce the risk, magnitude, and intensity of identified impacts. Impacts on cutthroat and amphibians would be reduced substantially compared to Alternative A, and moderately compared to Alternative D.

Impacts would generally be the same for sediment-tolerant species as for sediment-intolerant species, except that actions that could increase sediment would have negligible impacts.

**Impacts from Lands and Realty Management.** Impacts from lands and realty actions and authorizations would generally be the same for sediment-intolerant and sediment-intolerant species, except that actions that could increase sediment would have negligible impacts on organisms more tolerant of higher sediment loads. Impacts from different types of lands and realty actions are summarized below.

The effects of land tenure adjustment to cutthroat and amphibian species would be determined through site-specific environmental analysis. This alternative identifies parcels of public land available for disposal, and any disposal or acquisition of lands could result in a loss or gain of aquatic habitat. This could result in either benefits or impacts on aquatic wildlife. Under Alternative B, there are 419,700 acres of land identified for retention.

Under Alternative B, a total of 97,000 acres would be petitioned for withdrawal of locatable mineral exploration or development, compared to 34,600 acres under Alternative A; 172,100 acres under Alternative C; and 72,300 acres under Alternative D. This would provide protection to native cutthroat trout subspecies and amphibians across a broad extent where these withdrawals overlap with occupied habitats, and would reduce the risk of habitat or water quality alteration and increased sediment loading and turbidity impacts. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management and impacts from livestock grazing management. Only Alternative C includes a greater amount of withdrawal acres.

BLM_0016665

Under this alternative, the protective stipulations included in Table 4.2.7-5 would apply to most ROWs. Impacts would be mitigated during site-specific analysis of individual actions.

Construction and maintenance associated with ROWs or other land use authorizations (such as permits, leases, and easements) affect native cutthroat trout subspecies and amphibians by habitat alteration, loss or reduction of streamside vegetation cover, increased sediment loading and turbidity, and water depletions. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management.

Impacts under this alternative would be reduced compared to Alternative A, which contains 101,300 acres of avoidance areas and 20,800 acres of exclusion areas for communication facilities and utilities, and Alternative D, which contains less avoidance and exclusion area. Impacts would be similar to Alternative C. This alternative contains 169,600 acres of ROW avoidance area and 39,300 acres of ROW exclusion area. These areas, in addition to other resource protective measures, would reduce the scope and intensity of impacts on these species and their habitats.

**Impacts from Coal Management.** Management of coal resources would impact native cutthroat trout subspecies and amphibians the same as addressed under Alternative A. Impacts on these and other sediment-intolerant species under Alternative B would be the same as for Alternatives A and D, which call for the management of 28,000 acres as open for consideration of coal leasing. Alternative C would allow only 17,900 acres as open to consideration and would be the most protective.

Impacts on sediment-tolerant species would generally be the same as addressed for Alternative A.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The primary impacts on native cutthroat trout subspecies and amphibians would be habitat and water quality alteration, water depletions, and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management.

Under Alternative B, oil and gas development would result in direct negative impacts at site-specific portions of select streams containing native cutthroat trout subspecies and amphibians throughout the western quarter of the planning area, including (Baldy Creek, East Divide Creek, June Creek, Battlement Creek, Beaver Creek, Cache Creek, and Wallace Creek). This alternative would manage 651,400 acres as open to leasing, while Alternative C would allow for 531,500 acres open for leasing. Both of these alternatives would allow for an anticipated 2,800 acres of surface disturbance. Alternatives A and D would manage 679,200 acres and 658,200 acres, respectively, as open for leasing. Given the protective measure in place on a given lease, the identified impacts may be reduced at specific locations but would still occur over a broad area. Identified impacts are long-term and chronic in areas where extensive road construction and use would occur associated with these activities. Approximately 99 percent of all of the proposed activity would continue to occur in the high-potential areas where there is activity.

Impacts would generally be the same for sediment-tolerant and sediment-intolerant species, except that actions that could result in increased sediments would have negligible impacts.

BLM_0016666

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The protective stipulations in Table 4.2.7-5 would apply to all of these activities, except locatable minerals activities, which are subject to federal law and regulations under the General Mining Law of 1872. Withdrawal of acres from consideration of these activities is the primary means by which impacts are or would be reduced. Locatable and salable mineral management could impact these species by habitat alteration, increases in sediment load and turbidity, loss of riparian vegetation cover, and water quality alteration. These impacts are discussed in detail under Alternative A in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management. In particular, gravel pits near occupied rivers and streams would have a higher risk of aquatic species. Water quality is a concern with certain mineral materials mining practices and, depending on location and scope, could have site-specific direct negative impacts over the long term.

Under this alternative, a combined 97,000 acres would be petitioned for withdrawal of locatable mineral exploration or development, compared to 34,600 acres for Alternative A; 172,100 acres for Alternative C; and 72,300 acres for Alternative D. This would provide protection to native cutthroat trout subspecies and amphibians across a broad extent where these withdrawals overlap with occupied habitats and would reduce the risk, scope, and intensity of identified. Only Alternative C would provide greater withdrawal acres and greater protection. In addition, ACECs, WSAs, SRMAs, NWSRS, developed recreation sites, and municipal watersheds would all be closed to mineral materials disposal. This further limits the lands available for these activities.

Impacts would generally be the same for sediment-tolerant and sediment-intolerant species, except that actions that could increase sediment would have negligible impacts.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under this alternative, nine ACECs would be designated, totaling 34,500 acres. The management of these ACECs would benefit native cutthroat trout subspecies and amphibians and their habitats. Although managed for select resource values, the nine ACECs would protect 34,500 acres of habitat by limiting ground disturbance by a protective NSO stipulation. This provides direct (where protective measures overlap with occupied habitats) and indirect protection to these species from identified impacts from other resource uses.

This alternative would provide greater protection than under Alternatives A and D and would provide increased indirect protection across a broader portion of the planning area. In addition, overlapping stipulations would protect portions of these areas, and select protective measures in Table 4.2.7-5 would further limit and reduce impacts on these species and their habitats from other resource uses.

Benefits would generally be the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** This alternative would include the three existing WSAs and add in the Eagle Mountain WSA. The management of WSAs would generally benefit fish and other aquatic wildlife. The four WSAs encompass 27,700 acres and, with the prescriptive management (IMP), would limit human uses and exclude ground disturbance to benefit occupied habitats of native cutthroat trout subspecies and amphibians.

Direction for managing fish and other aquatic wildlife in WSAs is prescribed by the IMP, which allows stocking of native fish species within their historical ranges or exotics that were being stocked before October

BLM_0016667

21, 1976, and introductions of threatened, endangered, or other special status species native to North America within their historic ranges. Permanent installations could be permitted to maintain or improve conditions for fish, if the benefiting native species enhance wilderness values. All proposed actions must be scrutinized to determine if the action is necessary to protect the physical, biological, and cultural resources, as well as the quality of the wilderness experience.

This alternative provides the same protection as Alternatives C and D and slightly more indirect protection primarily to amphibians than under Alternative A, as the Eagle Mountain WSA is not included. No known or suspected cutthroat populations are known in the vicinity of the Eagle Mountain WSA.

Benefits for sediment-tolerant species would generally be the same as for sediment-intolerant species.

**Impacts from Wild and Scenic Rivers (WSRs) Management.**
*Alternative B1.* Under Alternative B1, the BLM would recommend four stream/river segments identified as eligible (Colorado River segments 6 and 7 and Deep Creek segment 2 and 3) as suitable for designation. This would provide interim protection to preserve the free-flowing nature, ORVs, and tentative classification until such time as Congress would act on the suitability determination. Conservation populations of native cutthroat trout subspecies would not necessarily benefit from these protections because no occupied habitat is found in any of these identified segments. Select amphibian species could benefit directly from the protections provided these four stream segments.

The Colorado River segments included in this alternative contain occupied habitat for sediment-tolerant BLM sensitive fishes: the bluehead sucker, flannelmouth sucker, and roundtail chub. These species would benefit from the protections provided by WSR suitability determination. However, other protective measures included in Table 4.2.7-5 would still provide overlapping protections for these species, but not for the same duration as WSR protective measures.

*Alternative B2.* Under Alternative B2, the BLM would recommend Deep Creek segments 2 and 3 as suitable for designation. It would defer a suitability determination on the Colorado River segments and would adopt and implement the stakeholders' plan to protect the free-flowing nature, ORVs, and tentative classifications on the Colorado River segments 4 through 7. This alternative would provide substantially less protection than under Alternatives A and C but could provide better protection than under Alternative B1. This is because, with water stakeholder cooperation, the stakeholders would attempt to operate their facilities in a manner that meets water supply objectives and protects the ORVs and subsequently aquatic species and their habitats. With no stakeholder plan, water flows would continue to be subject to the water rights system. Without some sort of specific effort to protect and manage flows, there may be a gradual reduction in flows necessary to support resident aquatic species populations in some years. In addition to the stakeholders' plan, many of the protective measures in Table 4.2.7-5 would still help to reduce and minimize impacts on aquatic species and their habitats from other resources uses although not in perpetuity, as with a potential congressional WSR designation.

This alternative would have similar benefits to amphibians and their habitats, except that protective measures would not be of the same duration, compared to Alternative B1. However, the stakeholders' water delivery component could provide the best protection to ORVs and aquatic species in the long term. Alternatives A and C would provide the greatest protections to aquatic species and their habitats as all 26 stream segments

BLM_0016668

would be protected under interim management. Alternative C would provide for longer duration protection than under Alternative A.

The Colorado River segments included in this alternative contain occupied habitat for bluehead suckers, flannelmouth suckers, and roundtail chubs, all of which are sediment-tolerant species. These species would all benefit from the stakeholders' plan that would provide flow regimes adequate to support and sustain these resident fish species. In addition, the protective measures included in Table 4.2.7-5 would provide protections for these species.

*Alternative C*

This alternative includes a variety of protective stipulations that either directly or indirectly protect and benefit fisheries and aquatic species and priority habitats. This alternative contains special status aquatic species and other fisheries-specific stipulations as well as other resource stipulations that indirectly protect fish and their habitats. In general, any NSO that limits ground-disturbing activity is beneficial to aquatic species. Table 4.2.7-6 shows the primary protective measures/stipulations included for this alternative that would provide protections and reduce or minimize negative effects on special status aquatic species and their habitats under this alternative.

**Table 4.2.7-6**
**Primary Protective Measures/Stipulations under Alternative C**

| Stipulation | Origin | Acres/Miles Protected |
|---|---|---|
| CRV-NSO-1 debris flow hazard zones | 1999 Oil and Gas Leasing ROD | 1 mile of fish-bearing stream |
| CRV-NSO-2 steep slopes greater than 50 percent | Newly proposed | 86,400 acres of uplands |
| CRV-NSO-3 major river corridors | 1999 Oil and Gas Leasing ROD | 75 miles of fish-bearing stream |
| CRV-NSO-4 designated municipal watershed areas | Newly proposed | 1 mile of fish-bearing stream |
| CRV-NSO-5 streamside management zones | Newly proposed | 270 miles of fish-bearing stream |
| CRV-NSO-6 riparian and wetland zones | 1999 Oil and Gas Leasing ROD | 145 miles of fish-bearing stream |
| GS-NSO-12 threatened or endangered species | 1999 Oil and Gas Leasing ROD | Not mapped; replaced by individual NSOs for individual species |
| CRV-NSO-16 perennial waters | Newly proposed | 380 miles of perennial streams |
| CRV-NSO-32 endangered big-river fishes | Newly proposed | 2 miles of the Colorado River |
| CRV-NSO-33 sensitive big-river fishes | Newly proposed | 100 miles of fish-bearing stream |
| CRV-NSO-34 sensitive amphibian species | Newly proposed | 2,400 acres of breeding habitat |
| CRV-CSU-1 slopes greater than 30 percent | Newly proposed | 183,400 acres of uplands |
| CRV-CSU-2 hydrologic features | Newly proposed | 3,000 miles |
| CRV-CSU-7 BLM sensitive species | 1999 Oil and Gas Leasing ROD | Not mapped; would apply as needed by species |
| CRV-CSU-4 riparian and wetland zone | 1999 Oil and Gas Leasing ROD | 145 miles of fish-bearing streams |
| CRV-TL-7 coldwater sport and native fish spawning | Newly proposed | 250 miles of stream |
| CRV-TL-19 occupied cutthroat trout waters | Newly proposed | 65 miles of stream |

Impacts to special status fish and other aquatic wildlife from soils management, vegetation management, wildland fire management, and renewable energy management would be the same as or similar to those under

BLM_0016669

Alternative A. Impacts to special status species fish and other aquatic wildlife from WSAs management would be the same as or similar to those under Alternative B.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Benefits and short-term impacts would be the same as addressed under Alternatives A and B, except that the CSU level protection for amphibians would be replaced by CRV-NSO-34 for the same known or identified breeding sites. In addition, this alternative includes CRV-TL-19, which would protect cutthroat species during the spring spawning season. The other protective measures in Table 4.2.7-6 would all help to eliminate or reduce identified impacts from other resource uses.

Management of special status fish and other aquatic wildlife under this alternative would provide greater protection and reduce the risk and scope of identified impacts compared to Alternatives A and D. This alternative would provide additional protection, especially to amphibians, by an NSO instead of CSU at known or identified breeding sites.

Impacts and benefits for sediment-tolerant species would be the same as addressed under Alternative B.

**Impact from Water Management.** Benefits to native cutthroat trout subspecies and amphibians would generally be the same as addressed under Alternative B, except that in addition to the proposed NSOs, CRV-CSU-2 for hydrologic features is also included and would manage ground-disturbing activities beyond the 50-foot NSO boundary for an additional 50 feet.

This alternative is the most protective and is similar to Alternative B, which also includes CRV-NSO-5 a Streamside Management Zone NSO to protect all hydrological features. Alternatives A and D provide less protective measures.

Benefits for sediment-tolerant species would be the same as for sediment-intolerant species.

**Impacts from Fisheries and Aquatic Wildlife Management.** Fisheries and aquatic wildlife management is now or would be largely beneficial to cutthroat and amphibian species and their habitats. Under this alternative, CRV-NSO-16 would protect all perennial waters, and CRV-TL-7 would apply to all coldwater sport and native fish species to protect fish during specific spawning times. Depending on the type of fisheries project or action, and stipulation exception criteria, the remaining protective measures identified in Table 4.2.7-6 would help to protect habitat for fish and other aquatic species from some activities.

In select areas where proactive fish habitat management in the form of projects would occur, impacts would include loss or reduction of streamside vegetation cover, habitat alteration, and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management and impacts from riparian vegetation management. This alternative would provide the most protection for native cutthroat trout and amphibians as all perennial waters would be subject to NSO. Alternative B would provide the next best protection on all fish-bearing streams, and Alternatives A and D would be the least protective. However, other protective measures that overlap habitats for special status aquatic species would still provide some measures of protection.

Impacts and benefits would generally be the same as for sediment-tolerant and sediment-intolerant species.

BLM_0016670

**Impacts from Wildlife Management.** Benefits and short-term impacts would be the same as addressed under Alternative A. This alternative includes several wildlife, special status plant, and special status wildlife NSOs, which would collectively limit ground-disturbing activities from primarily upland habitats and would exclude leasing for fluid minerals on additional acres. These protective measures would directly and indirectly reduce the risk of impacts on native cutthroat trout subspecies and amphibians and their habitats by limiting ground-disturbing activities from other resource uses especially where these protections overlap occupied cutthroat and amphibian habitats. This alternative provides similar indirect protection as Alternative B and more than under Alternatives A or D.

Impacts and benefits for sediment-tolerant species would generally be the same as for sediment-intolerant species, except that actions that would increase sediments would have negligible impacts.

**Impacts from Special Status Plants and Terrestrial Wildlife Management.** Benefits and short-term impacts for sediment-intolerant species would be the same as addressed under Alternatives A and B. The management of special status plants and terrestrial wildlife would provide greater indirect protection under this alternative compared to Alternatives A and D. Alternative B would provide similar protections from other resource uses.

Benefits and short-term impacts for sediment-tolerant species would be the same as addressed under Alternative B.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under Alternative C, six areas totaling 47,000 acres with wilderness characteristics would be managed as LWCs and protected with an NSO and a designation as closed to fluid minerals leasing. This would benefit native cutthroat trout subspecies and amphibians where these protections overlap occupied habitats for these species by limiting ground disturbance from other resource uses. This would provide additional protection compared to Alternatives A, B, and D, which do not identify these lands for protection. Impacts would be the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Forestry Management.** Impacts are the same as addressed in detail under Alternative A. However, the short-term impacts would be slightly increased in scope, as this alternative would seek to actively manage 28,400 acres of forest and woodland habitat, compared to Alternative A where active management of forest and woodland habitats include 17,900 acres. Alternatives B and D would manage similar numbers of acres as this alternative. In addition, this alternative has more protective measures than the other alternatives and would limit the scope of identified impacts from forest treatments.

Impacts would generally be the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Livestock Grazing Management.** None of the protective stipulations identified in Table 4.2.7-6 applies specifically to livestock grazing. Under Alternative C, a total of 432,000 acres of BLM land would be open and available for livestock grazing, providing for approximately 35,500 AUMs. The primary potential impacts on native cutthroat trout subspecies and amphibians associated with livestock grazing are habitat alteration, loss or reduction of streamside vegetation cover, water quality alteration, increased sediment loading and turbidity, and water depletion. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management. The scope of impacts would be slightly reduced but

BLM_0016671

generally the same under this alternative compared to Alternatives B and D given the reduced grazing acres and AUMs.

Impacts would generally be the same for sediment-tolerant as for sediment-intolerant species, except that actions that could increase sediment would have negligible impacts.

**Impacts from Recreation and Visitor Services Management.** Under Alternative C, a total of 23,800 acres of land would be managed in two SRMAs, and the remaining acres would be managed as ERMAs. The primary protective stipulation is CRV-NSO-46, which includes protection by limiting ground-disturbing activities within the two SRMAs. In addition, the stipulations in Table 4.2.7-6 would directly and indirectly protect native cutthroat trout subspecies and amphibians from ground-disturbing activities from other resource uses. All of these protective measures have limited effectiveness as they would apply to managed recreation and not dispersed activities. Dispersed recreation would continue to occur throughout the planning area.

The impacts on native cutthroat trout subspecies and amphibians include habitat alteration, loss or reduction of streamside vegetation cover, and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management and impacts from riparian vegetation management. This alternative provides less protection from other resource uses than under Alternatives A and B and is similar to Alternative D.

Impacts would generally be the same for sediment-tolerant as for sediment-intolerant species, except that actions that could increase sediment would have negligible impacts.

**Impacts from Comprehensive Trails and Travel Management.** Under this alternative, no land would be open to off-road travel, compared to 294,300 acres open to year-round off-road travel and 4,300 acres open seasonally to off-road travel under Alternative A. A total of 467,400 acres would be limited to designated routes, and 37,500 acres would be closed. The protective stipulations in Table 4.2.7-6 would directly and indirectly protect special status aquatic species and their habitats from new road- and trail-related impacts.

Trail and travel management would impact special status aquatic species by habitat alteration and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the section on impacts from forest and woodland management. However, the intensity and scope of impacts would be substantially reduced under this alternative compared to Alternative A, because no OHV use would be allowed. This would eliminate user-created routes and would reduce identified impacts across large portions of the landscape.

This alternative would obliterate 220 miles of existing routes, compared to 70 miles under Alternative B and 50 miles under Alternative D. This alternative would also close the most acres to use and would allow for the least amount of full-size vehicle use, which would decrease erosion potential on a larger scope and reduce the magnitude and intensity of identified impacts. Impacts on native cutthroat trout subspecies and amphibians would be reduced in scope and intensity more under this alternative compared to Alternatives A, B, and D.

Impacts would generally be the same sediment-tolerant as for sediment-intolerant species, except that actions that could increase sediment would have negligible impacts.

BLM_0016672

**Impacts from Lands and Realty Management.** Impacts from lands and realty actions and authorizations would generally be the same for sediment-tolerant and sediment-intolerant species, except that actions that could increase sediment would have negligible impacts. Effects associated with different types of lands and realty actions are summarized below.

The effects of land tenure adjustment on aquatic species are determined through site-specific environmental analysis. This alternative identifies parcels of public land available for disposal, and any disposal or acquisition of lands could result in a loss or gain of aquatic habitat. This could result in either benefits or impacts on native cutthroat trout and amphibians. Under Alternative C, there are 433,400 acres of lands identified for retention.

Under Alternative C, a combined 172,100 acres would be petitioned for withdrawal of locatable mineral exploration or development, compared to 34,600 acres under Alternative A, 97,000 acres under Alternative B, and 72,300 acres under Alternative D. This alternative would provide the greatest protection to native cutthroat trout subspecies and amphibians, both directly, where these withdrawals acres are within occupied habitats, and indirectly, where occupied habitats are downstream in watersheds containing these species. This alternative would reduce the risk of identified impacts as well as the scope and intensity of those impacts.

Under this alternative, the protective stipulations identified in Table 4.2.7-6 would apply to most ROWs. Impacts would be mitigated during site-specific analysis of individual actions.

Construction and maintenance associated with ROWs or other land use authorizations (such as permits, leases, and easements) affect aquatic species by water quality alteration, habitat alteration, water depletions, and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management.

Impacts under this alternative would be reduced compared to Alternatives A and D and similar to B. This alternative contains 162,000 acres of ROW avoidance area and 50,600 acres of ROW exclusion area. These, in addition to other resource NSOs, would reduce the scope and intensity of impacts on resident special status aquatic species and their habitats.

**Impacts from Coal Management.** Under Alternative C, a combined 17,900 acres of the mineral estate would be open to further consideration for coal leasing. This is reduced from the 28,000 acres open under Alternatives A, B, and D. Consequently, coal resources would have minimal impact on sediment-intolerant native cutthroat trout subspecies because no occupied habitat is located in or near the area open for consideration. Amphibians could be impacted by water quality alteration, water depletions, and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management, impacts from riparian vegetation, and impacts from livestock grazing management.

Impacts on sediment-tolerant species under this alternative would generally be the same as addressed under Alternative A.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The primary impacts on native cutthroat trout subspecies and amphibians would be habitat alteration, water

BLM_0016673

quality alteration, water depletions, and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management and impacts from livestock grazing management.

Under Alternative C, oil and gas development would result in direct negative impacts at site-specific portions of select streams on native cutthroat trout subspecies and amphibians throughout the western quarter of the planning area where occupied habitats exists (Baldy Creek, East Divide Creek, June Creek, Battlement Creek, Beaver Creek, Cache Creek, and Wallace Creek). Under this alternative, 531,500 acres would be open to leasing, while Alternative B would allow for 651,400 acres open for lease. Both these alternatives would allow for an anticipated 2,800 acres of surface disturbance. Alternatives A and D would manage 679,200 acres and 658,200 acres, respectively, as open for leasing. Given the protective measure in place on a given lease, the identified impacts may be reduced at specific locations but would still occur over a broad area. Identified impacts are long-term and chronic in areas where extensive road construction would occur associated with these activities. Approximately 99 percent of all of the proposed activity would continue to occur in the high-potential areas where activity is currently being conducted.

Impacts would be the same for sediment-tolerant as for sediment-intolerant species, except that actions that would result in increased sediment and turbidity would have negligible impacts.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts would be the same as addressed under Alternative B, except that under this alternative, a combined 172,100 acres would be petitioned for withdrawal of locatable mineral exploration or development, compared to 34,600 acres for Alternative A, 97,000 acres for Alternative B, and 72,300 acres for Alternative D. This would provide the greatest protection to fish and special status aquatic species and their habitats across a broad extent and would substantially reduce the risk of identified impacts as well as the scope and intensity of impacts. In addition, ACECs, WSAs, SRMAs, NWSRS, developed recreation sites, and municipal watersheds would all be closed to mineral materials disposal. This further limits the lands available for this activity.

Impacts would generally be the same for sediment-tolerant species as for sediment-intolerant species except that actions that could increase sediment would have negligible impacts.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative C, the management of five of the six current ACECs would continue, and eleven new ACECs are included, totaling 79,700 acres. The management of these ACECs would benefit native cutthroat trout and amphibians and their habitats either directly, where these acres coincide with occupied habitats, or indirectly within watersheds that contain these species. The proposed Abrams Creek ACEC in this alternative would specifically provide additional protection to Colorado River cutthroat trout located in the creek. Although managed for select resource values, the 16 ACECs would protect 79,700 acres of habitat by limiting ground disturbance by a protective NSO stipulation. This would provide additional protection to these species from identified impacts from other resource uses. This alternative has the greatest number of ACECs and the most acres protected for select resource values compared to the other alternatives.

Benefits would generally be the same for sediment-tolerant and sediment-intolerant species.

BLM_0016674

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Benefits to sediment-intolerant species under this alternative would be the same as addressed under Alternative A, except that this alternative would provide protections for a longer duration. Benefits to sediment-tolerant species from WSR management would be the same as for sediment-intolerant species.

_Alternative D_

This alternative includes several protective stipulations that either directly or indirectly protect/benefit fisheries and aquatic species/priority habitats. This alternative contains limited fisheries-specific protective measures as well as other resource stipulations that can directly or indirectly protect special status aquatic species and their habitats. In general, any NSO that limits ground-disturbing activity is beneficial to aquatic species. Table 4.2.7-7 shows the primary protective measures and stipulations proposed for this alternative that would provide protections and reduce or minimize negative effects on special status aquatic species and their habitats under this alternative.

Impacts to special status fish and other aquatic wildlife from locatable minerals, mineral materials, non-energy leasable minerals, and WSA would be the same as or similar to those under Alternative B. Impacts to special status fish and other aquatic wildlife from WSA would be the same as or similar to those under Alternative C. Impacts from management of all other resources and uses would be the same as or similar to those under Alternative A, except as described below.

**Table 4.2.7-7**
**Primary Protective Measures/Stipulations under Alternative D**

| Stipulation | Origin | Acres/Miles Protected |
|---|---|---|
| CRV-NSO-1 debris flow hazard zones | 1999 Oil and Gas Leasing ROD | 1 mile of fish-bearing stream |
| CRV-NSO-2 steep slopes greater than 50 percent | Newly proposed | 86,400 acres of uplands |
| CRV-NSO-3 major river corridors | 1999 Oil and Gas Leasing ROD | 75 miles of fish-bearing stream |
| CRV-NSO-4 designated municipal watershed areas | Newly proposed | 1 mile of fish-bearing stream |
| GS-NSO-12 threatened or endangered species | 1999 Oil and Gas Leasing ROD | Not mapped; replaced by individual NSOs for individual species |
| CRV-NSO-31 conservation populations of cutthroat trout | newly proposed | 35 miles of occupied cutthroat trout habitat |
| CRV-NSO-32 endangered big-river fishes | Newly proposed | 2 miles of the Colorado River |
| CRV-NSO-33 sensitive big-river fishes | Newly proposed | 100 miles of stream |
| CRV-CSU-1 slopes greater than 30 percent | Newly proposed | 183,700 acres of uplands |
| CRV-CSU-6 trout-bearing streams | Newly proposed | 250 miles of fish-bearing stream |
| CRV-CSU-15 amphibian breeding sites | Newly proposed | 2,400 acres of breeding habitat |
| CRV-CSU-7 BLM sensitive species | 1999 Oil and Gas Leasing ROD | Not mapped; would apply as needed by species |
| CRV-TL-7 coldwater sport and native fish spawning | Newly proposed | 250 miles of stream |
| CRV-TL-20 conservation populations of cutthroat trout – spawning | Newly proposed | 35 miles of occupied cutthroat habitat |

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Under this alternative, CRV-NSOs 31, 32, and 33 and CRV-CSU-15 would protect small tracts along the Colorado River,

BLM_0016675

portions of some of the larger tributary streams, conservation and core conservation populations of Colorado River cutthroat and greenback cutthroat trout, and amphibian breeding sites by limiting and managing ground-disturbing activities. CRV-TL-20 would protect cutthroat species during the spring spawning seasons.

Special status fish and other aquatic wildlife management under this alternative would provide greater protection and reduce risk and scope of identified impacts compared to Alternative A, and similar protection as Alternatives B and C.

Benefits and impacts would generally be the same for sediment-tolerant and sediment-intolerant species.

**Impact from Water Management.** Under this alternative, benefits would be similar as addressed under Alternative A. This alternative would provide less protection compared to Alternatives B and C, which include streamside management zone NSOs to protect all hydrological features (perennial, ephemeral, and intermittent streams, lakes, wetlands, fens, and springs).

Benefits for sediment-tolerant species would be the same as those for sediment-intolerant species.

**Impacts from Vegetation Management—Riparian.** Under this alternative, riparian vegetation management would be beneficial to native cutthroat trout subspecies and amphibians. However, no riparian-specific protective measures are included under this alternative, which would allow for more potential disturbance to riparian and aquatic habitats from ground-disturbing activities. Alternative B provides limited protection by a CSU stipulation, and Alternatives A and C provide NSO protection for all riparian areas. Riparian vegetation management would still be subject to Land Health Standard 2 (BLM 1997a), which helps guide riparian management on public lands.

In select areas where proactive restoration of riparian areas would occur, impacts would include loss or reduction of streamside vegetation cover and increased sediment loading and turbidity. These impacts are the same as addressed in detail under Alternative A. These impacts are discussed in detail in the sections on impacts from forest and woodland management and impacts from riparian vegetation management.

Benefits and impacts would generally be the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Fisheries and Aquatic Wildlife Management.** Benefits and short-term impacts are similar as addressed under Alternative A. Under this alternative, CRV-CSU-6 would help to manage ground-disturbing activities near occupied habitats containing trout, which would help protect Colorado River and greenback cutthroat trout from other resource uses. CRV-TL-7 would help protect special status fish during the spring spawning seasons. In select areas where proactive fish habitat management in the form of projects would occur, impacts would include loss or reduction of streamside vegetation cover, habitat alteration, and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management and impacts from riparian vegetation management. This alternative would provide better protection to native cutthroat trout subspecies and amphibians compared to Alternative A, but is less protective than under Alternatives B and C, which provide NSO protections on all fish-bearing streams (Alternative B) and all perennial waters (Alternative C) as well as known or identified amphibian breeding sites.

Benefits and impacts would generally be the same for sediment-tolerant and sediment-intolerant species.

BLM_0016676

**Impacts from Wildlife Management.** Benefits and short-term impacts would be the same as addressed under Alternative A. This alternative contains select wildlife, special status plant, and special status wildlife-specific NSOs. These would provide indirect protection from other resource uses where these NSOs overlap with watersheds containing cutthroat and amphibians. However, this alternative provides less protection than under Alternatives B or C and slightly more than A, which would limit ground-disturbing activity from fewer acres than the other alternatives.

In areas where proactive wildlife habitat management in the form of vegetation treatments or projects would occur, impacts would include increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the section on impacts from forest and woodland management.

Benefits and impacts would generally be the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Special Status Plants and Terrestrial Wildlife Management.** Management of special status plants and terrestrial wildlife species and their habitats would benefit and impact native cutthroat trout subspecies and amphibians the same as previously described in the impacts from wildlife management, and the vegetation management sections (forest and woodland, rangeland, riparian, weeds). Under this alternative, several of the protective measures in Table 4.2.7-7 would limit ground-disturbing activities, which would limit the risk and magnitude of identified impacts on special status aquatic species and their habitats. Protective measures aimed specifically at reducing impacts on wildlife, special status plants, and special status terrestrial wildlife would be more limited under this alternative, compared to Alternatives A, B, and C. This would provide less indirect protection to native cutthroat trout subspecies and amphibians from other resource uses.

Impacts and benefits would be the same for the sediment-tolerant and sediment-intolerant species.

**Impacts from Forestry Management.** Depending on the type of treatment and the need for road construction, many of the protective stipulations identified in Table 4.2.7-7 would apply to forest management. The primary potential impacts on native cutthroat trout subspecies and amphibians associated with management of this vegetation type are habitat alteration and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the section on impacts from forest and woodland management. However, these impacts would be slightly higher in scope compared to Alternative A where active management of forest and woodland habitats would include 17,900 acres of this vegetation type. Impacts would be similar in scope and intensity as Alternatives B and C.

Impacts would be the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Livestock Grazing Management.** None of the protective stipulations identified in Table 4.2.7-7 applies specifically to livestock grazing. Under Alternative D, a total of 443,400 acres of BLM land would be open and available for livestock grazing, providing for approximately 36,500 AUMs. The primary potential impacts on fish and other aquatic species associated with livestock grazing are water quality alteration, water depletions, habitat alteration, loss or reduction of streamside vegetation cover, and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management. The scope of impacts would be slightly increased but generally similar under this alternative compared to Alternatives A, B, and C given the increased grazing acres and AUMs.

BLM_0016677

Impacts would generally be the same for sediment-tolerant as sediment-intolerant species, except that actions that could increase sediment would have negligible impacts.

**Impacts from Recreation and Visitor Services Management.** Under Alternative D, a total of 68,200 acres of land would be managed in seven SRMAs; the remaining acres would be managed as ERMAs. The primary protective stipulation is CRV-NSO-46, which would protect lands by limiting large ground-disturbing activities within select SRMAs. In addition, the protective measures in Table 4.2.7-7 would help to directly and indirectly protect native cutthroat trout and amphibians by limiting ground-disturbing activities. All of these protective measures have limited effectiveness as they would apply to managed recreation and not dispersed activities. Dispersed recreation would continue to occur throughout the planning area.

Impacts on native cutthroat trout subspecies and amphibians and their habitats include habitat alteration, loss or reduction of streamside vegetation cover, and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A. These impacts are discussed in detail in the sections on impacts from forest and woodland management and impacts from riparian vegetation management.

Under this alternative, lands within select SRMAs would be protected by an NSO, which limits ground-disturbing activities. This alternative provides less protection from other resource uses compared to Alternative A and B and is similar to C.

Impacts would generally be the same for sediment-tolerant as for sediment-intolerant species, except that actions that could increase sediment would have negligible impacts.

**Impacts from Comprehensive Trails and Travel Management.** Under this alternative, no land would be open to off-road travel, compared to 294,300 acres open to year-round off-road travel and 4,300 acres open seasonally to off-road travel under Alternative A. A total of 473,500 acres would be limited to designated routes, and 31,400 acres would be closed. The protective stipulations in Table 4.2.7-7 would directly and indirectly protect native cutthroat trout subspecies and amphibians from new road and trail related impacts.

Trail and travel management would impact special status aquatic species and their habitats by water quality alteration, habitat alteration, loss or reduction of streamside vegetation cover, and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management and impacts from riparian vegetation management. However, the intensity and scope of impacts would be substantially reduced under this alternative compared to Alternative A because no OHV use would be allowed. This would eliminate user-created routes and would reduce identified impacts across large portions of the landscape.

This alternative would obliterate 50 miles of existing routes, compared to 70 miles under Alternative B and 220 miles under Alternative C. This alternative would also close the least acres to use and would allow for 300 more miles of full-size vehicle use, which would increase erosion potential on a much larger scope. Identified impacts on native cutthroat trout subspecies and amphibians would be moderately greater in magnitude and intensity under this alternative compared to Alternatives B and C, but substantially less than under Alternative A.

Impacts would generally be the same for sediment-tolerant as for sediment intolerant species, except that actions that could increase sediment would have negligible impacts.

BLM_0016678

**Impacts from Lands and Realty Management.** The effects of land tenure adjustment to aquatic species are determined through site-specific environmental analysis. This alternative identifies parcels of public land available for disposal and any disposal or acquisition of lands could result in a loss or gain of aquatic habitat. This could result in either benefits or impacts on native cutthroat trout and amphibians. Under Alternative D, there are 418,300 acres of lands identified for retention. Impacts would be generally the same to sediment-tolerant and sediment-intolerant species.

The effects of land tenure adjustment on aquatic species are determined through site-specific environmental analysis. This alternative identifies parcels of public land available for disposal, and any disposal or acquisition of lands could either result in a loss or gain of aquatic habitat. This could result in either benefits or impacts on native cutthroat trout subspecies and amphibians.

Under this alternative, 72,300 acres would be petitioned for withdrawal of locatable mineral exploration or development, compared to 34,600 acres (Alternative A), 97,000 acres (Alternative B), and 172,100 acres (Alternative C). Other than under Alternative A, this alternative would provide the least protection to native cutthroat trout subspecies and amphibians and would increase the risk of identified impacts as well as the scope and intensity of those impacts.

Under this alternative, the protective stipulations identified in Table 4.2.7-7 would apply to most ROWs. Impacts would be mitigated during site-specific analysis of individual actions.

Construction and maintenance associated with ROWs or other land use authorizations (such as permits, leases, and easements) affect aquatic species by water quality alteration, habitat alteration, water depletions, and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the section on impacts from forest and woodland management, impacts from riparian vegetation management, and impacts from livestock grazing management.

Impacts under this alternative would be slightly greater in scope compared to Alternatives B and C but more protective than under Alternative A, which contains 101,300 acres of avoidance areas and 20,800 acres of exclusion areas for communication facilities and utilities. This alternative contains 126,700 acres of ROW avoidance and 39,000 acres of exclusion areas.

**Impacts from Coal Management.** Management of coal resources would impact sediment-intolerant native cutthroat trout subspecies and amphibians as well as sediment-tolerant fishes in generally the same way as Alternative A. Impacts under this alternative are the same as Alternatives A and B, which call for the management of 28,000 acres as open for consideration of coal leasing. Alternative C would allow only 17,900 acres as open to consideration and would be the most protective.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The primary impacts on native cutthroat trout subspecies and amphibians would be habitat alteration, water quality alteration, water depletions, and increased sediment loading and turbidity. These impacts are addressed in detail under Alternative A in the sections on impacts from forest and woodland management and impacts from livestock grazing management.

Under this alternative, oil and gas development would result in direct negative impacts at site-specific portions of select streams on native cutthroat trout subspecies and amphibians throughout the western quarter of the

BLM_0016679

planning area where occupied habitats exists (Baldy Creek, East Divide Creek, June Creek, Battlement Creek, Beaver Creek, Cache Creek, and Wallace Creek). This alternative would have the risk of the greatest impacts on special status aquatic organisms because it would manage 658,200 acres as open for leasing, with an anticipated 5,300 acres of surface disturbance. This is in comparison to 679,200 acres open for leasing under Alternative A, 651,400 acres open under Alternative B, and 531,500 acres open under Alternative C. Given the protective measure in place on a given lease, the identified impacts may be reduced at specific locations but are still occurring over a broad area. Identified impacts are long term and chronic where extensive road construction would occur associated with these activities. Approximately 99 percent of all of the proposed activity would continue to occur in the high-potential areas where activity is currently being conducted.

Impacts on sediment-tolerant species would be the same as for sediment-intolerant species, except that actions that could result in increased sediment would have negligible impacts.

**Impact from Areas of Critical Environmental Concern (ACECs) Management.** Under this alternative, the management of three of the six current ACECs would continue, totaling 20,200 acres. The management of these ACECs would benefit special native cutthroat trout and amphibians and their habitats. Although managed for select resource values, the three ACECs would protect 20,200 acres of habitat by limiting ground disturbance by a protective NSO stipulation. This provides direct protection where the NSO includes occupied habitats, as well as indirect protection from impacts associated with other resource uses.

This alternative has the fewest number of ACECs and the smallest amount of acres protected for select resource values. This would allow for increased risk of disturbance is some areas. However, overlapping stipulations would protect portions of these areas and select protective measures in Table 4.2.7-7 would reduce impacts on special status aquatic species and their habitats from other resource uses. Benefits would generally be the same for sediment-tolerant and sediment-intolerant species.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under this alternative, the BLM would not recommend any of the 26 stream segments identified as eligible as suitable for designation. This would provide no additional protections to preserve the free-flowing nature, ORVs, and tentative classifications. As compared to the other alternatives, special status aquatic species and their habitats would be protected the least under this alternative as only select protective measures found in Table 4.2.7-7 would help reduce identified impacts. Sediment-tolerant species would be impacted in ways similar to those for sediment-intolerant species.

### *Cumulative Impacts (Special Status Fish and Aquatic Wildlife)*
As pertains to NEPA, cumulative effects are defined as "the effect that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." For this plan, cumulative effects address the impact of implementing any one of the RMP alternatives in combination with other actions outside the scope of this RMP, either within the planning area or adjacent to it. For information on the current/baseline condition of aquatic species and their habitats, refer to Chapter 3, Affected Environment. The scope of analysis for cumulative impacts for special status aquatic wildlife takes in the entire mainstem Colorado River basin and its tributaries downstream to the Colorado-Utah state line on the mainstem Colorado River. This includes, private, state, and other federal lands to account primarily for cumulative effects on Colorado pikeminnow, razorback sucker, bonytail chub, humpback chub, flannelmouth sucker, bluehead sucker, and roundtail chub associated with water depletions.

BLM_0016680

Declines in the abundance or range of many special status aquatic species have been attributed to various human activities on federal, state, and private lands. These activities include human population expansion and associated infrastructure development; construction and operation of dams along major waterways; water retention, diversion, or dewatering of springs, wetlands, or streams; recreation, including off-road vehicle activity; expansion of agricultural or grazing activities, including alteration or clearing of native habitats for domestic animals or crops; and introductions of non-native plant, wildlife, or aquatic species. All of these can alter native habitats. When introductions of non-native fish occur, the introduced fish can prey on young of the native species or outcompete the natives for space, optimal habitats, and food. Many of these activities are expected to continue on lands within the range of the various special status aquatic species and could contribute to cumulative effects on these species within the planning area. Species with small population sizes, endemic locations, or slow reproductive rates or species that primarily occur on nonfederal lands would generally be highly susceptible to cumulative effects.

### *Past Actions*

A variety of past actions have incrementally impacted aquatic species and their habitats within the planning area on BLM, USFS, state, private, and other federal lands. Water diversions began when the first settlers to the region began to manage water for human uses, including irrigation for crops, livestock, and domestic uses. As population centers within the planning area and beyond, such as Denver, continued to grow and expand, water demand increased. Western Colorado is considered water rich, compared to the Front Range population center of Colorado, where water is more limited. Several dams and reservoirs and large trans-mountain/basin water diversions were constructed to take water from headwater streams within the Colorado River Basin and move it through the Continental Divide to Front Range municipalities. Many of these water diversions and water rights are still in place today and have resulted in impacts on native stream and river flows, including the Colorado River. These activities have impacted all of the special status aquatic species and their habitats by reducing wetted physical habitat, sediment aggradation, habitat alteration, reduced overall sediment input, reduction of streamside vegetation cover, and reduced habitat complexity and diversity.

Introductions of non-native fishes were common in the late 1800s and throughout the 1900s. Several species were stocked as sport fish and for food production, including rainbow trout, brown trout, brook trout, and Snake River and Yellowstone cutthroat trout. In addition, purposefully or by accident, other species, such as fathead minnows, white suckers, longnose suckers, channel catfish, and smallmouth bass, have made their way to the west slope of Colorado. Non-native species often outcompete native species where they commingle. These species can also prey on native fishes, and in other cases, non-native fishes of the same genus or subspecies can hybridize with native species, reducing their genetic integrity and fitness. This is particularly common within the cutthroat trout species and the native sucker species.

Land management actions and activities have been ongoing since the settling of the west. Fire suppression, logging, livestock grazing, mining, natural gas development, conversion of native rangeland to agriculture, road construction, pipelines, power lines, railroads, and ever-increasing urban sprawl have all resulted in cumulative impacts within watersheds that contain aquatic species, including habitat alteration, reduction of streamside vegetation cover, water quantity and quality impacts, and site-specific increases in sediment and turbidity. Protective actions and designations, such as wilderness areas on lands administered by the USFS and WSAs on BLM lands, have protected some areas from impacts and helped reduce cumulative effects.

BLM_0016681

## Present Actions

Many of the actions addressed in the past actions section continue today. Urban sprawl continues, as does the demand for limited water supplies, water diversions, and impoundments. New large-scale water developments are limited but select projects are in the works, and new projects are being considered. Large-scale mining is all but gone, but potential still exists in some specific areas. Livestock grazing continues, as does agriculture uses. Natural gas development has increased in recent years, along with road construction. Logging has been largely replaced by prescriptive treatments aimed at managing forests and other vegetation types for other uses (wildlife, watershed improvement, fuel reduction). Beetle-killed pine is a large and ever-increasing concern in the forested habitats within the planning area and has the potential to increase the risk of large scale, severe fire in the near term. Non-native fish stocking is much more limited today as emphasis has begun to shift to native species management. Recreation has emerged as an ever-increasing pursuit within the planning area and is expected to increase as rafting, boating, hunting, fishing, hiking, camping, skiing, rock climbing, mountain biking, and four-wheeling, among other pursuits, are all popular and common within the planning area on BLM lands and lands administered by the USFS. Natural gas development is occurring in concentrated portions of the western quarter of the planning area, primarily on private and BLM lands. All of these activities are resulting in cumulative impacts, including site-specific sediment loading and turbidity, habitat alteration, and water quality and quantity impacts. Restoration and reclamation actions are more common today as impacts are mitigated and degraded habitats are improved.

## Reasonably Foreseeable Future Actions

It is likely that many of these past actions and present actions identified in previous sections will continue into the future. Urban sprawl and development is ever increasing as human populations increase within the planning area and outside. Along with this, water consumption and demand is increasing concurrently.

Expansion and sprawled development in the Eagle, Roaring Fork, and Upper Colorado River Valleys is anticipated to have impacts on stream and river flows. The major potential water project is the Homestake Project, which is jointly operated by the cities of Aurora and Colorado Springs. Phase I of the project was completed in 1968, and Phase II has been granted the necessary federal and state permits and approvals for construction, including the issuance of a Record of Decision as part of the National Environmental Policy Act by the USFS. If segments 1 or 2 of the Colorado River are designated as Wild and Scenic and instream flow prescriptions are put into place, it could have an impact on Phase II development of the Homestake Project. The Clinton Ditch and Reservoir Company is the owner and operator of Clinton Gulch Reservoir in Summit County, which has a decreed water right of approximately 4,250 acre-feet of storage. Shareholders represent the major water users and providers in Summit County, as well as the largest ski resort in Grand County. Colorado Springs Utilities plans to develop conditional water storage rights associated with the Continental-Hoosier System, which diverts water from the headwaters of the Blue River, upstream of the study river segments. The Moffat Firming project would divert more water out of headwater streams in Grand County for conveyance to Front Range areas. Irrigation rights are expected to continue being bought and sold in the future, with some new property owners informally changing how the right was historically used. Due to population growth and land sales, more agricultural water rights may be converted to municipal and industrial uses. Reduced water flows will continue to impact the Colorado pikeminnow, razorback sucker, bonytail chub, humpback chub, flannelmouth sucker, bluehead sucker, and roundtail chub by habitat alteration, sediment aggradation, reduced spawning habitat, and reduced habitat complexity and diversity, and loss of important microhabitats including backwaters, flooded bottomlands, and side channels.

BLM_0016682

Recreation demand is expected to continue to increase as western Colorado is a destination area for outdoor pursuits. Natural gas development is expected to continue as is livestock grazing, agriculture, and irrigation. One emerging issue is the potential for some level of oil shale development within and adjacent to the planning area. This could result in large amounts of water use and could affect stream and river flows as well as increase sediment and turbidity and cause habitat alteration. Another emerging issue is climate change. This has the potential to impact fish by changing distributions, altering food webs, and altering water quality (temperatures). Cutthroat trout species would probably be most affected but as new information emerges, impacts on other species could result. Local effects of a changing climate will vary in intensity and duration because of differences in habitat quality, distance from coastal areas, and elevation and topography of the watershed. Scientists predict that there will be an increase in the severity and frequency of droughts and floods. Increasing human demand for water will place additional stresses on watersheds and will amplify the negative impacts of climate change on fish populations.

Among the alternatives analyzed, Alternative D would have greatest potential for direct and indirect effects on aquatic species and their habitats and subsequently, more cumulative impacts when added to the numerous actions, activities, and land management practices occurring on other federal, state, and private lands within the scope of analysis. Alternatives B and C would provide greater protections from BLM-initiated or - authorized activities and actions, and would result in reduced direct and indirect effects and subsequently would have reduced cumulative effects. Protective measures under Alternative B are more targeted, while those under Alternative C are broader in scope and application. Alternative A is similar to Alternative D, both of which would have greater potential than under Alternatives B and C for cumulative impacts on aquatic species and their habitats. Two programs in particular—Trails and Travel Management and Fluid Minerals Management—would allow for substantial cumulative effects under Alternative A, because OHV use would continue to be allowed largely unabated across large portions of the planning area, and natural gas development and associated road construction would continue to occur on large expanses of private and BLM lands. Roads are one of the biggest issues with regard to aquatic habitat quality.

### 4.2.7.3 Special Status Species—Terrestrial Wildlife

### Assumptions

Impact analyses and conclusions are based on interdisciplinary team knowledge of resources and relevant data, on a literature review, and on the professional judgment of experts within and outside BLM. Spatial data analysis was conducted using ESRI ArcGIS desktop computer software. Impacts were quantified where possible, and in the absence of quantitative data, best professional judgment was used. Impacts are sometimes described using ranges of potential impacts or in qualitative terms, if quantitative data were not necessary or available.

The following assumptions were used in the analysis of impacts on special status terrestrial wildlife:

- Impacts on special status wildlife populations and habitat are not discrete since actions may benefit one species while having an adverse or beneficial impact on another.

- Maintaining high quality habitat conditions would have some influence on reducing the severity of outbreaks and subsequent losses from diseases, but the prevalence in the environment of various diseases cannot be fully controlled, particularly at chronic levels of occurrence.

BLM_0016683

- Significant modifications to habitat suitability can affect the survivability and viability of populations (e.g., higher winter mortality, reduced reproductive success).

- Impacts on special status terrestrial wildlife from displacement depend on the location, extent, timing, or intensity of the disruptive activity.

- Impacts from displacement of wildlife would be greater for special status species that have limited habitat or a low tolerance for disturbance.

- In the context of this analysis, the term "avoidance by wildlife" means reduced use not absence of use by wildlife.

- CDOW would continue to manage wildlife populations.

- The BLM would continue to manage wildlife habitat in coordination with the CDOW. The BLM is not restricted from making reasonable land management decisions within the framework of multiple use management, applicable laws, policy, and supplemental guidance.

- Federal oil and gas regulations prevent the BLM from being able to apply new or additional lease stipulations to existing leases. However, federal regulations do allow the BLM to apply other protection measures in conjunction with planning and implementing oil and gas projects. These include applying stipulations consistent with the most recent land use plan as terms and conditions for discretionary approvals (e.g., right-of-way actions) and applying COAs to augment protections related to lease activities. The latter include applying a TL of up to 60 days and requiring that a project component be relocated by up to 200 meters (or more than 200 meters for areas with CSU stipulations) to protect a sensitive resource value. Examples of additional regulatory protections that the BLM applies to existing leases include requirements of adequate reclamation, weed control, erosion control, and dust abatement.

## Methods

Impacts to special status wildlife species and their habitat would be considered significant if the following were to occur:

- Disturbance or loss of aquatic and terrestrial habitat, food supplies, cover, breeding areas, and other habitat components to a degree considered essential to the local populations for population maintenance.

- Disturbance or loss of seasonally important habitat, such as critical for overwintering or successful breeding, to the degree considered essential for maintenance of the local population.

- Interference with the movement patterns of a species to the extent that it decreases the ability of the species to breed or overwinter successfully to a degree considered essential for maintenance of the local population.

- Special status species objectives are not achieved.

Impacts on special status wildlife resources from implementation of the RMP are summarized by alternative in the following subsections. These include federally listed, proposed, or candidate threatened or endangered species (Table 4.2.7-8), BLM sensitive species (Table 4.2.7-9), and state-listed threatened, endangered, or special concern species. These impacts would be direct or indirect and would result from proposed land use objectives, management actions, and allowable uses.

BLM_0016684

**Table 4.2.7-8**
**Federally Listed, Proposed, or Candidate Terrestrial Wildlife Species**

| Species | Habitat/Range | Potential of Occurrence |
|---------|---------------|-------------------------|
| Canada lynx (*Lynx canadensis*) | Threatened species found in mesic forests of lodgepole pine, subalpine fir, Engelmann spruce, and quaking aspen in the upper montane and subalpine zones, generally between 8,000 and 12,000 feet in elevation. | Present |
| Greater sage-grouse (*Centrocercus urophasianus*) | Candidate species found in shrub-steppe and meadow-steppe habitats. Typically found in areas with low rolling hills adjacent to valleys. Prefer medium-density sagebrush mixed with a variety of other plants. | Present |
| Black-footed ferret (*Mustela nigripes*) | Endangered species with potential habitat in Colorado including the eastern plains, mountain parks, and western valleys, specifically grasslands or sparse shrublands that support prairie dogs, the ferret's primary prey. | Unlikely |
| Mexican spotted owl (*Strix occidentalis lucida*) | Threatened species that inhabits mature montane forests, shady canyons, and steep canyons. The key components in montane forests are common to old-growth forests: uneven-age stands with high canopy closure and tree density, fallen logs and snags. | Undocumented |
| Yellow-billed cuckoo (*Coccyzus americanus*) | Candidate species that inhabits mature riparian forests of cottonwoods and large deciduous trees with a well-developed understory of tall riparian shrubs. Uncommon summer resident of Colorado. | Undocumented |

**Table 4.2.7-9**
**BLM Sensitive Terrestrial Wildlife Species**

| Species | Habitat/Range | Potential of Occurrence |
|---------|---------------|-------------------------|
| **Mammals** | | |
| Townsend's big-eared bat (*Corynorhinus townsendii*) and fringed myotis (*Myotis thysanodes*) | Occur as scattered populations at moderate elevations on the Western Slope, along the foothills of the Front Range and the mesas of southeastern Colorado. Maximum elevation is 7,500 feet. Breeds and roosts in caves, trees, mines, and buildings; hunts over pinyon-juniper, montane conifer, and semidesert shrub land habitats. Known occurrences—Potential in caves, mines, or trees. | Present |
| White-tailed prairie dog (*Cynomys leucurus*) | Found in semidesert open shrublands, grasslands and mountain valleys in the lower elevations. | Present |
| **Birds** | | |
| Northern goshawk (*Accipiter gentilis*) | Resident in mountains and occasional in migration and winter at lower elevations. Primarily uses mature stands of aspen and conifers in the montane and subalpine zones. | Present |
| White-faced ibis (*Plegadis chihi*) | Inhabits wet meadows, marsh edges, and reservoir shorelines. Very rare, non-breeding, summer migrant in western Colorado valleys and mountain lakes. Main breeding area is in the San Luis Valley. | Unlikely |
| Bald eagle (*Haliaeetus leucocephalus*) | Nests and roosts in mature cottonwood forests along rivers, large streams, and lakes. | Present |
| American peregrine falcon (*Falco peregrinus anatum*) | Inhabits open habitats usually associated with high cliffs and bluffs overlooking rivers. | Present |
| Brewer's sparrow (*Spizella breweri*) | Sagebrush shrublands at middle elevations, including mountain parks; rarely found in alpine willow stands. | Possible |
| **Reptiles** | | |
| Midget faded rattlesnake (*Crotalus viridis concolor*) | Occurs in cold desert dominated by sagebrush and with an abundance of rock outcrops and exposed canyon walls. | Present |

BLM_0016685

### Environmental Consequences

Impacts on special status terrestrial wildlife would result from some of the actions included under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on special status terrestrial wildlife under any of the four alternatives.

### Alternative A

**Impacts from Special Status Species Management—Terrestrial Wildlife.** Under all alternatives, no decision would be approved in this RMP revision or authorized on BLM lands that would jeopardize the continued existence of plant and terrestrial wildlife species that are listed, officially proposed, or candidates for listing as threatened and endangered. The proposed land use plan decisions are directed at preventing the need for listing proposed, candidate, and sensitive species under the ESA, protecting special status species, and improving habitats for special status species to a point where their special status recognition is no longer warranted (i.e., Land Health Standard 4).

The application of NSO stipulations for special status species and their habitats (i.e., American white pelican, bald eagle, ferruginous hawk, peregrine falcon, greater sage-grouse, Columbian sharp-tailed grouse, Mexican spotted owl, and special status bat species) would afford direct protection of special status species habitat and conservation of their habitats. The size of the NSO stipulation varies by species. NSO stipulations in Alternative A are less protective than the NSO stipulations in the action alternatives for ferruginous hawk, greater sage-grouse, Columbian sharp-tailed grouse, Mexican spotted owl, and special status bat species. NSO stipulations in Alternative A are the same or similar to the NSO stipulations in the action alternatives for the bald eagle and peregrine falcon.

TLs for special status species and their habitats (i.e., American white pelican, bald eagle, ferruginous hawk, peregrine falcon, greater sage-grouse, Columbian sharp-tailed grouse, greater sandhill crane, Mexican spotted owl, and special status bat species) would prevent surface occupancy and surface-disturbing activities that could interfere with habitat function or compromise animal condition. The TLs help to alleviate human-induced impacts such as displacement of raptors, nest abandonment, or other human caused stresses. The duration of the TL would vary by species and theme of the alternative. TLs in Alternative A are less protective than the TLs in the action alternatives for bald eagle, ferruginous hawk, and special status bat species. TLs in Alternative A are the same or similar to the TLs in the action alternatives for the American white pelican, peregrine falcon, greater sage-grouse, Columbian sharp-tailed grouse and greater sandhill crane.

Exceptions to stipulations protecting special status species could be granted if the action is intended to improve special status species habitat or if the activity, by its nature, must be done within the area covered by the stipulation. Seasonal closures of habitats for special status species would provide direct protection from disruptive activities during biologically sensitive periods, that is, nesting, courtship, fledging, spawning, and hatching.

**Impacts from Soils Management.** Activities conducted under the soil management program are limited to monitoring, support activities, providing information for other BLM programs, and recommending appropriate mitigation. Typical activities implemented under the soil resource program would include mapping soils, maintaining soil databases, identifying timing stipulations, and recommending protective measures for critical soils.

BLM_0016686

For example, implementation of timing stipulations would reduce surface disturbance in areas with high seasonal erosion potential. As a result, special status species would benefit from a decrease in erosion and sedimentation, thereby generally maintaining or improving habitat.

Across all alternatives, an NSO stipulation would be placed on the debris flow hazard zone around the town of Glenwood Springs. In all alternatives, NSO stipulations would prohibit surface occupancy and surface-disturbing activities on slopes greater than 50 percent. CSU stipulations would be applied as appropriate to require special design measures for construction on erosive soils and slopes greater than 30 percent. The intent of these stipulations is to apply the similar measures to other public land activities in order to reduce erosion and maintain soil site stability. The language under Alternative A for soils stipulations was adapted from oil and gas stipulations, unlike those under Alternative B, C, and D that address all surface-disturbing activities.

**Impacts from Water Resource Management.** All decisions would be consistent with applicable state and federal water quality standards. Under all alternatives, implementation actions would comply with Land Health Standard 5 for water quality. Therefore, the goals and objectives for water resource management under all alternatives would benefit terrestrial wildlife.

Implementation of water quality and quantity related actions would guide or advise other program actions and activities in a manner conducive to maintaining or improving surface water quality. This would be consistent with existing and anticipated uses and applicable state and federal water -quality standards. Beneficial impacts on special status species include improved habitat for fish and wildlife and their associated prey. Maintaining or improving habitat associated with aquatic systems would provide long-term benefits for bald eagle, northern goshawk, and western yellow-billed cuckoo and their potential habitats. Alternative A prohibits surface occupancy within 0.5 mile on both sides of the high water mark of six major rivers as well as in the domestic watersheds for the communities of Rifle and New Castle.

**Impacts from Vegetation—General Management.** Vegetation management would be implemented to some degree under all alternatives. These would most often benefit special status wildlife species and their potential habitat. For example, vegetation treatments would increase plant diversity and variety in age classes, improve pollinator habitat, control weeds, stabilize soil, and promote a more natural fire regime. Vegetation management includes fencing, weed treatment, timber harvest, prescribed fires, mechanical treatments, and seeding of disturbed or weed treatment areas.

In the short term, vegetation treatments would cause disruption or direct removal of vegetation, which would disrupt potential habitat and expose soils, making indirect impacts, such as erosion and weed invasion, more likely. The use of herbicides or pesticides in occupied habitat could render the habitat unsuitable for use by some species.

Removing vegetation with heavy equipment could temporarily reduce potential breeding and nesting habitats. Human disturbance and noise associated with the use of heavy equipment could also temporarily displace special status bird species from foraging and nesting habitats.

Chemical treatments and prescribed burning could also disturb nesting special status bird species from smoke or chemical spray inadvertently drifting into occupied habitat. These activities have the potential to remove suitable habitat or other desirable vegetation.

BLM_0016687

In the long term, special status wildlife species would benefit from most vegetation treatments through an increase in vegetation productivity, which would provide additional forage, cover, and prey base.

Vegetation treatments that are not designed to meet special status wildlife species objectives could have adverse impacts if they were to result in weed infestations or remove habitat necessary for special status species. Under all alternatives, beneficial impacts from vegetation management would be greater than the adverse impacts.

**Impacts from Vegetation—Forest and Woodlands Management.** Alternative A would provide intensive management on forestlands growing commercial species (lodgepole pine, Engelmann spruce, or Douglas-fir) on productive growing sites (producing 20 cubic feet of wood fiber per acre per year) on lands not withdrawn for other resource needs. It would also provide limited management on woodlands or non-commercial species (pinyon-juniper, ponderosa pine, subalpine fir, or aspen) or on sites producing less than 20 cubic feet of wood fiber per acre per year. This type of management could have a more significant impact on forest-dwelling species like Canada lynx. Forest management practices, such as thinning, commercial harvest, road construction, and post harvest treatments all influence habitats for lynx and prey. Snowshoe hares, the primary prey for lynx, may reach highest densities in young dense coniferous or coniferous-deciduous forests or in mature forests with a dense understory of shrubs, aspen, and conifers.

Forest management practices could also affect special status wildlife species by direct removal of vegetation and displacement or disruption of special status wildlife, particularly during biologically sensitive periods. Erosion, sedimentation, trampling, soil compaction, and habitat fragmentation are also possible impacts on special status species. There are possible long-term benefits to special status species. For example, removal of encroaching pinyon pine and juniper trees in sagebrush habitats can benefit the greater sage-grouse by eliminating raptor perches and therefore reducing predation. Altering the structure of forested lands could result in adverse or beneficial impacts, depending on the species in the affected area and their habitat requirements and preferences (Table 4.2.7-8).

**Impacts from Vegetation—Rangeland Management.** Rangeland management would have a long-term beneficial impact on special status wildlife species. Improving the overall condition of rangelands through prescribed fire, weed control, and mechanical treatments would improve forage, nesting habitats, cover, and habitat quality in the long term. There are possible short-term impacts, such as temporarily reducing potential breeding and nesting habitats as well as cover and forage. Human disturbance and noise associated with the use of heavy equipment could also temporarily displace special status wildlife.

**Impacts from Vegetation Management—Riparian.** Although riparian lands occupy a small proportion of the landscape, they frequently support a higher diversity of plants and animals than the surrounding landscape and therefore are regarded as high-value habitat (Lynch et al. 1985). In addition to providing important dwelling habitat for wildlife, riparian areas provide vital vegetation corridors that enable wildlife to move between patches of remnant vegetation.

Several special status wildlife species rely on healthy riparian communities. Bald eagles nest in riparian areas within the CRVFO and are susceptible to nest abandonment with increased human disturbance. In Colorado, bald eagles are often found near rivers and reservoirs, especially where fish are abundant. In addition to fish (self-caught or stolen from other birds), bald eagles eat sick and injured waterfowl, muskrats, squirrels, rabbits,

BLM_0016688

prairie dogs, and often eat carrion and road-killed animals. Nests can be 7 to 8 feet across, usually in tall trees high above the ground. Bald eagles often choose dead limbs in tall trees.

Canada lynx also benefit in the protection of riparian vegetation. Riparian and wetland shrub communities (for example, willow, alder, and serviceberry) found in valleys, drainages, wet meadows, and moist timberline locations may support important prey resources for lynx (Noss and Cooperrider 1994). Lynx transplanted to Colorado in 1999 are frequently located in well developed riparian and valley wetland shrub habitats of the upper montane and subalpine zones (Ruggiero et al. 2000).

Alternative A prohibits surface-disturbing activities within riparian vegetation, which applies to both riparian areas and wetland zones. In addition, a CSU stipulation applied within 500 feet of the outer edge of riparian vegetation will require special design, construction, and implementation measures, including relocation of operations beyond 200 meters, as appropriate to protect resource values.

**Impacts from Vegetation Management—Weeds.** Noxious and invasive weed management includes herbicide use, biological controls, and mechanical treatments in weed infested areas. Actions conducted in areas near special status wildlife species habitat could benefit these species by removal of species that would compete with native species for available space and resources. Adverse impacts could result from mechanical vegetation treatments requiring the use of heavy equipment, disturbing special status species. Short-term habitat and forage loss for some special status species could also result. Adverse direct impacts could also result from accidental chemical drift from herbicide use in nearby areas.

**Impacts from Fisheries and Aquatic Wildlife Management.** Under all alternatives, management actions and allowable use decisions would comply with Land Health Standard 4 (BLM 1997a). Management action and allowable use decisions to protect fish hatcheries under all alternatives would benefit special status wildlife species and their habitat from surface-disturbing activities that might degrade habitat or disturb populations or individuals. Other management action and allowable use decisions vary slightly across alternatives, with Alternative C being the most restrictive, followed by Alternative B. Since aquatic wildlife habitat indirectly provides food, forage, shelter, breeding, and nesting opportunities for a variety of special status wildlife species, the most restrictive alternatives would be the most beneficial to special status wildlife species. As opposed to Alternatives A or D, the decisions under Alternatives B and C would offer the most benefit to special status species.

Alternative A provides a stipulation for no surface occupancy within a 2-mile radius around the Rifle Falls and Glenwood Springs State Fish Hatcheries.

**Impacts from Terrestrial Wildlife Management.** Wildlife habitat management is largely beneficial to special status wildlife species. Depending on the type of wildlife project or action, protective measures are identified that would help to protect special status wildlife species. Wildlife-specific NSO stipulations collectively limit ground-disturbing activities in upland habitats, which directly helps to minimize impacts on special status wildlife species and their habitats. In addition, wildlife habitat management is subject to Land Health Standard 2, 3, and 4 (BLM 1997a), which help guide habitat management on public lands. Areas where these standards are being met have a lower potential for adverse impacts on special status wildlife species. Proactive wildlife habitat management in the form of vegetation treatments or projects have some potential for short-term adverse impacts on special status wildlife species, including loss or reduction in cover, forage, and breeding habitat, but would be an overall benefit.

BLM_0016689

The objectives of Alternative A, i.e., continuation of existing management, can be found in the existing RMP (BLM 1988). The objectives are to provide approximately 57,933 AUMs of big game forage (the amount to meet CDOW big game population goals in 1988), to improve existing wildlife habitat, and to increase wildlife species diversity. RMP amendments and species-specific plans have helped define this objective.

All alternatives allow for the introduction, translocation, transplantation, restocking, augmentation, and reestablishment of native and naturalized fish and wildlife species in cooperation with CDOW and USFWS, subject to the guidance provided by BLM Manual 1745 policy and by memorandums of understanding with CDOW.

All alternatives will require biological inventories as a lease notice in areas of known or suspected habitat of species of interest (e.g., raptor nests) before approval of surface-disturbing operations. The implementation-level inventory would be used to prepare mitigating measures to reduce the impacts of surface disturbance on the affected species or their habitats.

All alternatives will require energy companies to establish a set of reasonable operating procedures for employees and contractors working in important wildlife habitats. Such procedures would be designed to inform employees and contractors of ways to minimize the effect of their presence on wildlife and wildlife habitats. Procedures might address such items as working in bear country, controlling dogs, and understanding and abiding by hunting and firearms regulations.

Under Alternatives A and B, the Garfield Creek, Basalt, and West Rifle Creek State Wildlife Areas (SWA) would have an NSO stipulation applied to protect wildlife habitat values from unnecessary surface occupancy and surface-disturbing activities. These areas were acquired by the state not only to protect wildlife habitat but also to provide the public with opportunities to hunt, fish, and watch wildlife (CDOW 2010g). However, a total of 7,400 acres of the Garfield Creek SWA is leased and is being developed with seasonal drilling restrictions.

Currently, the CRVFO closes important winter ranges to motorized travel from December 1 to April 30 to protect wintering big game from potential disturbance caused by public motorized use. Under all alternatives, during mild winter conditions, the last 60 days of the seasonal limitation period may be suspended after consultation with CDOW. Under severe winter conditions, the limitation period may be extended if requested by the CDOW. Severity of the winter would be determined based on snow depth, snow crusting, daily mean temperatures, and whether animals are concentrated on the winter range during winter. These winter closures are beneficial to special status wildlife species that winter in pinyon pine and sagebrush habitats (Table 4.2.7-8 and Table 4.2.7-9). Alternative A has the smallest area (74,800 acres) of big game winter closures, with Alternative C having the largest (148,200 acres).

As opposed to Alternatives B, C, and D, Alternative A does not contain a specific action to close areas to human activity and dogs during severe winter weather conditions, as defined by such factors as snow depth, snow crusting, long periods of daily low mean temperatures, and concentrations of animals, if requested by the CDOW. However, human activity and dogs could be restricted through emergency closure orders established under the authority of 43 CFR 8364.1.

The CRVFO 1999 Oil and Gas Leasing and Development Record of Decision and RMPA identified an NSO stipulation for wildlife seclusion areas. The NSO stipulation prohibits surface occupancy and surface-

BLM_0016690

disturbing activities within the following seclusion areas that provide high wildlife value: Starkey Gulch, Riley Gulch, Crawford Gulch, Paradise Creek, Coal Ridge, Lower Garfield, Jackson Gulch, Bald Mountain, and Battlement Mesa, totaling approximately 37,839 acres (Refer to Appendix C and Figure 2-1 in Appendix A). These areas provide several unique qualities, such as an optimum mix of quality forage, cover, and water; proximity to natural migration corridors; birthing areas; topographic features that moderate severe winter conditions; and seclusion from humans. Exceptions may be granted based on approval by the BLM of a mitigation plan that suitably addresses the wildlife seclusion values at risk. Wildlife seclusion areas have been difficult to manage because they do not apply to lands that were leased before 1999, when the application of the stipulation took effect (BLM 1999b)

**Impacts from Special Status Fish and Other Aquatic Wildlife Management.** Management of special status fish and other aquatic wildlife species and their habitats would affect special status wildlife species in generally the same way and extent as described in the Impacts from Fisheries and Other Aquatic Wildlife (Section 4.2.5). Select habitat treatments that target special status fish and other aquatic wildlife species could impair or reduce habitats for nontarget special status wildlife species.

Alternative A does not provide any stipulations that are specifically for special status fish and other aquatic wildlife. However, The NSO stipulation protections are in place on habitats for federally listed, proposed, or candidate threatened or endangered species and state-listed species (BLM 1999b).

**Impacts from Cultural Resource Management.** Cultural resource actions could occur within occupied or potential habitat of special status wildlife species. Such actions could include developing interpretive sites, identifying cultural resources, establishing temporary camping areas, building fences, and stabilizing deteriorating buildings. Human activities in habitats for special status bird species could disrupt nesting and foraging behaviors and cause the species to leave the area or abandon nests. Interpretive sites placed near nests or within home ranges of bird pairs could disturb nesting behavior on a long-term basis. This activity could lead to individual nest failure and reduced reproductive success.

The development of interpretive sites located within special status wildlife species habitat could also increase human activity in an area, resulting in the crushing and trampling of vegetation and habitat degradation over the long term. If a cultural resource project is conducted within special status wildlife species habitat, the described actions could adversely affect special status animal species, such as greater sage-grouse, through habitat degradation. These actions could result in surface disturbance, increased human presence, and noise that would disturb or displace special status wildlife species. Additionally, excavation within occupied habitat could cause direct mortality to the species. Human activities could disrupt foraging behaviors and could cause species to abandon habitat. Interpretive sites within or near occupied habitat could disturb species' natural behavior on a long-term basis because of increased human presence.

Management actions that would be implemented to protect cultural resources include an NSO stipulation surrounding eligible historic properties. This restriction would protect any special status wildlife species and habitat within these areas from surface-disturbing activities. For example, greater sage-grouse habitat overlaps many of these protected areas, thus Alternative A would reduce adverse impacts in greater sage-grouse habitat.

**Impacts from Visual Resource Management.** In general, VRM class designations would limit or allow surface-disturbing activities in certain areas, thereby affecting special status wildlife species. VRM Classes I

BLM_0016691

and II, which preserve or retain the existing character of the landscape, would protect special status wildlife species by restricting ground-disturbing activities and retaining existing vegetation. VRM Classes III and IV would provide less protection by allowing more changes to the landscape and by being less restrictive of ground-disturbing activities. Areas managed as VRM Class III or IV would be subject to actions that allow for greater landscape modification and therefore greater surface disturbance. These areas could be subject to such actions as complete vegetation removal, which would drastically alter (at least in the short term) the habitat for special status wildlife species. See the Table 4.2.7-10 below for a summary of the VRM acres in each alternative.

**Table 4.2.7-10**
**Acres of VRM Class by Alternative**

| VRM Class | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| VRM Class I | 17,100 | 33,600 | 33,600 | 34,000 |
| VRM Class II | 230,100 | 249,200 | 258,100 | 228,300 |
| VRM Class III | 113,700 | 102,100 | 97,500 | 104,600 |
| VRM Class IV | 144,200 | 120,300 | 116,000 | 138,300 |

Management actions under Alternative A would benefit special status wildlife species by prohibiting surface occupancy within certain areas. These are the Deep Creek ACEC/SRMA, Deep Creek cave area, Bull Gulch ACEC/SRMA, Thompson Creek ACEC/SRMA, Hack Lake SRMA, and Rifle Mountain Park and on slopes over 30 percent with high visual sensitivity in the Interstate-70 viewshed. These actions also would restrict areas in VRM Class II.

**Impacts from Wildland Fire Management.** Increased human activity and noise associated with wildland fire suppression and prescribed fire in areas occupied by special status bird species would affect nesting, foraging, or roosting behavior. Foraging, nesting, and communal winter roosting habitats could be lost because of the use of heavy equipment, hand tools, and noise associated with intensive human activity. Some snags used for perching, roosting, or nesting could be lost because of suppression operations. However, these snags could be replaced as new snags result from fire mortality. The effects from wildland fire suppression could become long term, depending on the severity and extent of the activities conducted during a particular fire suppression operation. A large fire that would require extensive suppression operations, such as extensive staging areas and fire-line construction, could result in long-term adverse effects on special status bird species and their habitats. However, smaller fires that would require less extensive suppression operations would generally avoid these long-term adverse effects.

Fire suppression could adversely affect special status animal species, such as the Canada lynx and greater sage-grouse, and could cause immediate post-fire alteration or damage of occupied or suitable habitats. Large scale, severe wildland fires caused by excessive fuel loading from previous fire suppression could reduce vegetation cover across large expanses, which could permanently displace many wildlife species.

Suppression operations could result in harassment, displacement, injury, or mortality during staging, fire-line construction, backburning, noise, or other human-caused disturbance. Any direct adverse effects would generally be short term, ending when or shortly after suppression actions are concluded. However, surface-disturbing operations conducted during fire suppression would result in a reduction or loss in quantity and quality of cover and forage habitat in both the forest and sagebrush habitats. These activities would reduce

BLM_0016692

forage availability, damage or destroy nests, and remove the sagebrush and other shrubs that provide aboveground vegetation cover. Despite the immediate initial loss of forage and shrub cover, some suppression tactics (e.g., backburning) or emergency restoration would stimulate vigorous regrowth of forb species and young trees in the growing seasons that follow. This regrowth would benefit special status wildlife species through improved forage quality and quantity.

Under all alternatives, prescribed fires would be used to reduce hazardous fuels within the planning area. As stated above, prescribed fires could adversely affect special status wildlife species. However, habitat manipulations resulting from the use of fire would also benefit special status wildlife species over the long term by improving vegetation conditions.

Stabilization and rehabilitation efforts would benefit special status wildlife species over the long term by decreasing erosion and restoring or improving habitat conditions following a fire, although there could be short-term adverse impacts. Planting non-native species that could outcompete native plant species used by special status wildlife species would alter habitat conditions and would make them less favorable. Increased human activity during construction could cause special status bird species to alter foraging, nesting, and roosting behaviors.

**Impacts from Cave and Karst Resource Management.** Caves provide escape for terrestrial wildlife (e.g., reptiles, owls, bats, and small mammals), shelter from cold temperatures and snow during the winter, refuge from daytime heat in the summer, and water sources. While the CRVFO does not market, publish, or release information regarding cave locations to the general public, cave use has the potential to damage fragile and sensitive resources. Under all alternatives, cave and karst resources would be managed under specific cave management objectives and setting prescriptions that allow for appropriate access while addressing issues and concerns relating to preservation of the caves' pristine and fragile resources, wildlife values, scientific and research values, and visitor safety/rescue issues. The cave management objectives and setting prescriptions would retain the current physical, social, and operational qualities of caves. If caves are found to be significant, they would be managed in accordance with the Federal Cave Resources Protection Act. An NSO stipulation for the protection of the Deep Creek cave area would prohibit surface occupancy and surface-disturbing activities in that area. The NSO extends to 5,000 feet below the surface. The NSO area encompasses the cave openings and portions of the subsurface features and watersheds immediately above the caves. Proposed management under Alternatives A and D would directly benefit terrestrial wildlife species that use the Deep Creek cave area such as special status bats that use caves for roosting, maternity colonies, or hibernation.

**Impacts from Forestry Management.** Forestry and woodland management actions include the harvesting of firewood, poles, Christmas trees, and timber. Commercial forestry (e.g., timber harvests and sales) are restricted to upland forests. These activities could include the use of heavy equipment, helicopters, chemical applications, road construction, and culvert installation and typically would result in increased traffic, noise, and human presence.

The implementation of forestry management actions that reduce pinyon-juniper woodland invasion would benefit special status wildlife species that require open space. Such species include greater sage-grouse and Brewer's sparrow. Clearing of old, dense, relatively less productive woodlands could open up more productive areas for special status wildlife.

BLM_0016693

Potential adverse impacts on special status bird species and Canada lynx could include loss of habitat, increased human access to remote habitats because of new road construction, increased noise, increased human activity, and culvert installation or waterbar construction, all of which could alter riparian function. These activities could result in habitat loss or fragmentation, displacement of individuals, reduction in special status bird species' prey base, or direct mortality of individuals. Human activities associated with forestry and woodland actions could increase noise and visual stimulants in habitats. These factors could disrupt nesting and foraging behaviors, could result in the species leaving the area or abandoning nests, or could lead to individual nest failure and reduced reproductive success. A significant alteration of habitat could render suitable habitat uninhabitable for special status wildlife species.

Construction of roads through viable and occupied habitat of special status wildlife species to access the timber could also adversely affect special status wildlife species.

Under Alternative A, managing 17,900 acres as commercial forest and 82,400 acres as woodland could increase disturbance to habitats and could disturb special status wildlife species sensitive to these activities. It should be noted that although these acres have been identified for potential commercial harvest, they have never actually been managed for any significant commercial harvest.

**Impacts from Livestock Grazing Management.** Livestock use could cause direct competition to special status wildlife species and their habitat. Indirect impacts from livestock use likely include habitat disturbance or destruction, soil compaction, erosion, sedimentation, and increased potential for weed invasion and spread, which could subsequently reduce the health and vigor of vegetation, as well as alter the natural fire regime. To minimize impacts, however, the BLM would continue to improve grazing systems under all alternatives by requiring rotation of use and prohibiting grazing on disturbed areas, where feasible. Furthermore, livestock grazing permits have mitigation measures, BMPs, and stipulations to prevent weed invasion and impacts on vegetation and soils. Livestock grazing in the fall or early spring would remove the residual herbaceous understory, reducing its vertical structure, which reduces the visual security for upland nesting birds. This could lead to increased predation and lower nesting success.

Livestock grazing could benefit special status wildlife species. Well-designed water developments for livestock use and associated riparian vegetation create nesting, feeding, and brood-rearing habitat for waterfowl, greater sage-grouse, and other migratory birds. The development of water sources in dry regions would allow special status wildlife species to expand into habitats that previously were used only seasonally. Range improvements for livestock would disperse the impact of livestock on the land, which would prevent disturbance, weed spread, and soil compaction in any one area.

Under Alternative A, livestock grazing would be open on 489,600 acres for 56,900 AUMs in the CRVFO, causing impacts in areas where potential and occupied special status species habitat occurs (Table 4.2.7-11). Although this alternative has the highest amount of AUMs available for livestock grazing, 55 allotments are currently vacant and would probably remain vacant. Colorado Land Health Standards would be achieved under all alternatives. Where current livestock grazing is the cause for not achieving standards, changes will be made in grazing to make significant progress in meeting those standards.

BLM_0016694

**Table 4.2.7-11**
**Livestock Grazing By Alternative**

|  | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Acres open to grazing | 489,600 | 451,400 | 432,000 | 443,400 |
| Number of AUMs | 56,900 | 36,000 | 35,500 | 36,500 |

**Impacts from Recreation and Visitor Services Management.** In all alternatives the most determinative land use plan decision for recreation and visitor services (recreation and visitor services) is whether to designate an area as a recreation management area (RMA) or not. Alternative A would continue managing eight areas as SRMAs (Bocco Mountain, Bull Gulch, Deep Creek, Gypsum Hills, Hack Lake, Red Hill, Thompson Creek, and the Upper Colorado River). All but Gypsum Hills and Bocco Mountain SRMAs have an NSO stipulation applied to retain the existing physical recreation setting characteristics (RSCs). Seven areas would continue to be managed as RMAs with an NSO stipulation to protect non-motorized recreation opportunities. Non-motorized recreation opportunities were further described as those areas where the visitor can generally expect to see fewer people, largely due to the fact that access is more difficult or challenging, and can enjoy a mostly natural setting with a high degree of solitude and tranquility. Also, refer to Section 4.3.3, Recreation and Visitor Services, Section 4.3.4, Comprehensive Trails and Travel Management, and Appendix M, Draft Recreation and Visitor Services Framework for SRMAs and ERMAs for specific recreation and travel proposals and analysis.

A secondary consideration is the type of activities being emphasized, the anticipated use levels, and the amount of recreation infrastructure necessary to accommodate the recreation demand. To fully understand the impacts of these factors they must be considered in combination with each other.

In all alternatives, recreation activities would take place on BLM lands unless the lands are closed to human entry. Recreation activities and use would be unevenly dispersed and distributed by location, intensity, activity type, infrastructure, season, and time on BLM lands. Activities that create the most adverse effects either alter habitat or affect an animal's behavior. The severity of the response depends on the species involved and the characteristics of the disturbance. Birthing/nesting and wintering areas are normally the most sensitive to human use and development because these areas are usually restricted geographically.

In the CRVFO, recreation use peaks during the summer in locations like the Colorado and Eagle Rivers, on weekends and evenings on BLM lands adjacent to communities or within easy access of communities, and during the fall big game hunting seasons when many resident and out-of-town hunters add to the mix of recreation. Areas managed for lower recreation use levels (i.e., total, group size and contact) in undeveloped landscapes are considered less impacting to terrestrial wildlife, regardless of the identification or amount of acres of recreation designation. It is important to note that some aspects that affect recreation use and, indirectly, wildlife are outside the parameters of this plan and BLM, such as urban growth/development, promotional marketing, the location of destination resorts, decisions made by other land/wildlife managing agencies, and new technology.

Developed recreation sites, within or outside RMAs, would be small localized points of high use. Roads and trails would be linear corridors of high use. In all alternatives, recreation development (e.g., trails, trailheads, river access, and campgrounds) would likely: increase disturbances, modify habitat, reduce connectivity,

BLM_0016695

reduce habitat effectiveness, increase habitat fragmentation, and increase habitat avoidance. Such development can change and interfere with movement patterns.

Recreation actions must be mitigated so as not to contribute to the need to list any special status species under the provisions of the ESA. Therefore, it is unlikely that any recreation implementation-level action would be authorized for which an environmental analysis concluded an adverse impact to special status species would result. Therefore, the most important consideration in the land use plan for special status wildlife species and their habitat is whether adequate mitigation is proposed to avoid or alleviate potential negative impacts from future recreation use and development.

Alternatives A and D lack the number and extent of special status terrestrial wildlife mitigation in the form of management actions and stipulations that are included under Alternatives B and C. Alternative A also lacks the limitations on recreation use (e.g., camping closures, firearm use restriction) included under Alternatives C, B, and D, respectively. The risk to special status terrestrial wildlife species and their habit from inappropriate or increasing recreation use is higher under Alternatives A and D, respectively.

Under all alternatives, land use plan decisions and implementation actions for recreation would comply with Recreation Guidelines to Meet Public Land Health Standards on Bureau of Land Management Managed Lands in Colorado (BLM 2000c). This specifies that recreation use on BLM lands is to be managed to promote the survival and health of native wildlife, to protect wildlife habitat by preserving connectivity and avoiding fragmentation, and to minimize wildlife disturbances by limiting recreational use by type, season, intensity, distribution, or duration when necessary.

**Impacts from Comprehensive Trails and Travel Management.** Roads that provide access for the public can reduce the quality of habitats for many wildlife species due to spread of weeds, collision mortality, behavior changes, disturbance, and habitat fragmentation. Trails have effects that are much harder to describe but have been linked to disturbance and displacement of some wildlife species. The impacts of travel decisions (i.e., OHV area and route decisions) on special status wildlife species and their habitat would primarily depend on the number of acres open and closed to OHV use under each alternative, the specific routes open and closed for public use, the type of travel permitted, and the application of limitations (i.e., time or season of use). Cross-country travel in open travel areas would continue to create new unplanned routes into sensitive wildlife habitats and increase habitat fragmentation. Disruptive activities would probably move animals into less desirable habitat and increase competition for available resources with other species. Chronic or continuous disturbance during harsh winters would probably reduce animal fitness and reproductive potential.

No alternative prescribes road densities that limit the number of roads or trails or the spatial distribution of routes resulting from management through time. However, for areas designated as limited, the BLM would manage public travel according to the route designations included under each alternative. Through the life of the plan, site-specific travel management issues would cause some routes to be rerouted, closed, or seasonally limited. It is also likely that some additional trails would be created for public use to connect regional trails systems, to support local community trail systems, and to meet the recreation objectives in some SRMAs and ERMAs.

Foot travel is not limited under any alternative, and horse travel is limited only on the Storm King Trail. As opposed to Alternatives B, C, and D, Alternative A has area travel designations of open and limited to

BLM_0016696

existing routes, which have allowed an unplanned expansion of routes and over time would cause the most direct and indirect impacts on wildlife populations and habitats. Seasonal limitations (e.g., wintering big game closures from December 1 to April 30, Red Hill SRMA from December 1 to March 31) would benefit special status wildlife species by limiting disturbance and avoidance caused by motorized travel during the critical winter months.

BLM lands are currently closed in many areas to over-snow travel to reduce stress on wintering wildlife. Snowmobiles can raise physiological stress hormones in animals (Conservation Magazine 2011). Land use restrictions on snowmobiles in lynx conservation areas may be appropriate to reduce interference or exploitation competition by coyotes using packed trails (Bunnell et al. 2006). The Castle Peak and State Bridge Canada lynx linkage areas are largely closed to over-snow travel BLM lands on King Mountain in the Egeria Canada lynx linkage area are closed to over-snow travel except for a few short designated routes. BLM lands in the Glenwood Canada lynx linkage area are open to over-snow travel. In greater sage-grouse winter habitat, recreation and travel activities should be dramatically reduced or at least be confined to established and approved roads and trails (CDOW 2010e). Winter habitat for sage-grouse is only partially protected by over-snow closures and limitations in Alternative A.

Inappropriate and unplanned travel allowed by the current travel designations under Alternative A has the most potential to impact the number, density, and composition of terrestrial wildlife species and the quality and connectivity of terrestrial wildlife habitat through the life of the plan.

**Impacts from Lands and Realty Management.** Lands and realty management actions, including ROWs and land disposals, could increase habitat fragmentation and could allow for direct removal of habitat, conversion of habitat to other habitat types, and weed invasion. Weed control measures in the ROW terms and conditions would minimize impacts. Benefits to special status wildlife species would result from withdrawing lands from locatable mineral development and by avoiding known habitat for special status species. These actions would protect special status species from removal, mortality, displacement, or disturbance, would prevent weed invasion or spread in these areas, and would reduce overall habitat fragmentation. Land acquisitions would protect special status species and their habitats by managing them under BLM guidelines and regulations. Under all alternatives, adverse impacts from lands and realty actions would be greater than benefits to special status wildlife species. However, implementation of mitigation measures would lessen the adverse impacts.

The effects of land tenure adjustments on special status wildlife species would be determined through site-specific environmental analysis for any proposed land disposals. Under Alternative A, all acres in the CRVFO would be considered on a case-by-case basis for disposal. Generally, lands containing listed plant and animal species habitat would not be considered for disposal. The BLM could acquire lands that contain special status wildlife species habitat. Doing so would benefit special status wildlife species by providing protections that would not be afforded by nonfederal ownership.

Implementation of Alternative A would include recommending the following areas for mineral withdrawal: Bull Gulch ACEC/SRMA, Deep Creek ACEC/SRMA, Thompson Creek ACEC/SRMA, Public water reserve, Rifle Gap reclamation project, and WSAs. Withdrawing these areas from mineral entry would reduce any adverse effects on special status wildlife species that could result from mineral development in these areas. Of the alternatives, the fewest acres would be petitioned for withdrawal under Alternative A, providing the fewest benefits to special status species.

BLM_0016697

ROWs or other land use authorizations (e.g., permits, leases, and easements) could be proposed in populations and habitats for special status wildlife species. Construction of ROWs in habitat for special status wildlife species could cause indirect impacts on special status wildlife species through degradation of habitat, habitat fragmentation, and other surface disturbance. ROWs within viable or occupied special status wildlife species habitat could also degrade habitat through the introduction of invasive weeds.

Surface disturbances associated with ROWs and other land use authorizations could cause habitat loss or changes in vegetation structure, which could alter special status bird species' breeding at or near disturbance locations. In addition, the construction, operation, and maintenance of ROWs could increase noise and human presence in otherwise remote areas and could increase stress levels of special status bird species. Increased human presence could disturb foraging and nesting behavior of special status bird species prey. The disturbance of individuals could result in reduced productivity or nesting success and increased likelihood of individual mortality.

Construction and operation of roadway systems increase both traffic and visitation to otherwise remote areas. Increases in traffic and human presence could lead to increased mortality of special status wildlife species, such as the Canada Lynx, because of vehicle collisions and potential poaching.

ROW construction has the potential to result in short-term impacts on the greater sage-grouse, including temporary displacement, loss of forage, and direct mortality. Potential long-term impacts include loss of habitat and disturbance from increased human presence, noise, and increased vehicular traffic on roadways. Direct habitat loss, including the conversion of habitat to agriculture, urban sprawl, and roadway development, has been cited as the reason for population declines in many special status wildlife species. Any direct habitat loss caused by ROW development in occupied or potential habitat could adversely affect special status species.

Alternative A has the fewest acres designated as ROW avoidance areas and ROW exclusion areas of all the alternatives and therefore is the least beneficial to special status wildlife species. However, it does have the highest retention areas, which should generally benefit special status wildlife species since habitat in these areas would be subject to BLM protections (Table 4.2.7-12).

**Table 4.2.7-12**
**Lands and Realty Acres by Alternative**

| Lands and Realty | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| ROW avoidance areas | 101,300 | 169,600 | 169,600 | 126,700 |
| ROW exclusion areas | 20,800 | 39,300 | 50,600 | 39,000 |
| Retention areas (land tenure) | 494,400 | 488,400 | 488,700 | 418,300 |
| Suitable for land tenure adjustment | 11,100 | | | |

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Of all types of mineral and energy development, fluid mineral development has the greatest likelihood for development to take place in the CRVFO, given the current development and the high potential in the area. Existing leases are of concern since the BLM has much less control over these, compared to future leases. Under all alternatives, the BLM can develop COAs on APDs or voluntary mitigation with the oil and gas companies to reduce impacts on special status species. However, if this occurs, the mitigation is likely to be

BLM_0016698

less protective than if a stipulation were to be placed on the lease. Impacts associated with minerals exploration and development would include habitat loss, habitat modification, and loss of habitat effectiveness. Indirect impacts are displacement of prey species, increased exposure to dust and other contaminants, weed introduction, weed spread, sedimentation, and erosion associated with construction of infrastructure and use of access roads. In the worst-case scenario, all vegetation would be removed from a parcel of land, and the site could be permanently altered. Mineral development would fragment habitats and could eliminate potentially suitable habitat for special status species. Oil and gas stipulations are in place to protect habitats or to ensure the reestablishment of desirable vegetation following completion of the mineral and fluid management actions. In addition, permits include weed control stipulations that are effective if enforced. Overall, special status species habitat could be altered by minerals management actions, but mitigation measures would be implemented to lessen the impact. Under all alternatives, adverse impacts would be greater than beneficial impacts, as reclamation efforts often have poor success rates, with loss of species diversity, increase in annuals, and decrease in perennials and woody plants.

Each phase of oil and gas development—from exploration and construction through operation and abandonment—has a specific combination of impact type, intensity, and duration.

- Exploration and Construction—The initial phase of development typically lasts for 25 to 40 days, depending on depth, and is very equipment intensive. Associated activities include blading an access road and pad (with an average combined area of 3.4 acres per well) and nearly continuous operation of a drill rig and other specialized heavy equipment. On average, 580 round-trips by heavy trucks and pickups are associated with each new well.

- Operation and Production—This phase typically involves minimal personnel in the field except at compressor stations and water disposal facilities, with periodic traffic to each well for monitoring and maintenance. Reclamation of temporarily disturbed areas begins on completion of construction. Successful reclamation for weed and erosion control is expected to occur within 3 to 5 years after disturbance; however, productive wildlife habitat restoration could take up to 20 years. The remainder of the disturbed area is occupied by surface facilities and ongoing human activity throughout the life of the well.

- Abandonment—The final phase of an oil or gas well occurs at the end of its productive life, typically ranging from 20 to 40 years. During abandonment, surface facilities are removed, wells are plugged, and access roads are reclaimed unless deemed necessary for resource management or if requested by the landowner. These activities involve a short-term increase in workers and vehicles in the project areas. Abandonment and reclamation activities require approximately 3 days per well and 4 days per mile of access road, for a crew of four people.

- Reclamation—Restoration of temporarily disturbed areas at the well pad and along the access road begins on completion of construction. Attaining reclamation standards in terms of erosion control, weed control, and establishment of vegetation cover typically requires at least 3 to 5 years following planting. Actual recovery of reclaimed areas to conditions that represent productive wildlife habitat may take 20 years or longer, especially in drier sites. Areas of long-term disturbance, which are occupied by surface facilities and ongoing human activity throughout the life of the well, are reclaimed following abandonment.

Oil and gas development is concentrated on the western 22 percent of the CRVFO (the area west of the Grand Hogback), where the high potential for the occurrence of gas resources is found. It is estimated that 99

BLM_0016699

percent of future drilling will occur in the areas identified as high potential for the occurrence of oil and gas resources. Infill drilling and step-out drilling will be the major future activity. Of the 127,335 acres of BLM mineral estate in this high potential area that is not within the Roan Plateau planning area, 95 percent has been leased and is currently being developed. The eastern 78 percent of the CRVFO (east of the Grand Hogback) has a lower potential for the occurrence of oil and gas resources. Approximately 1 percent of future drilling is likely to occur in areas of medium and low potential and no drilling activity is predicted in the areas identified as no-known potential. Because of this, wildlife impacts relating to natural gas development are not expected to vary by location between alternatives.

Under Alternative A, all WSAs and the Thompson Creek Natural Environment Area (core portion of the ACEC) would be closed to fluid minerals leasing. Over the life of the current RMP, the designation as closed to fluid minerals leasing for these areas would continue to indirectly maintain special status wildlife species habitat.

The CRVFO 1999 Oil and Gas Leasing and Development Record of Decision and RMPA identified stipulations for leases issued after 1999 to reduce impacts on wildlife. These included NSO stipulations for state wildlife areas, major river corridors, and raptors, TL stipulations for big game winter habitat, big game birthing areas, grouse, raptors, American white pelicans, and greater sandhill cranes, and LNs for wildlife and wildlife habitat. The ROD also included an NSO stipulation for wildlife seclusion areas and prohibits surface occupancy and surface-disturbing activities within seclusion areas that provide high wildlife value. These areas are Starkey Gulch, Riley Gulch, Crawford Gulch, Paradise Creek, Coal Ridge, Lower Garfield, Jackson Gulch, Bald Mountain, and Battlement Mesa. An NSO stipulation was applied to protect a broad range of values from the impact of human intrusion. Exceptions have been granted and would continue to be granted based on BLM approval of a mitigation plan that suitably addresses the wildlife seclusion values at risk.

Federal oil and gas regulations prevent the BLM from applying new or additional lease stipulations that would be developed through this planning effort to existing leases. However, federal regulations do allow the BLM to apply other protection measures in conjunction with planning and implementing oil and gas projects. These include applying stipulations consistent with the most recent land use plan as terms and conditions for discretionary approvals (e.g., right-of-way actions), and applying COAs to augment protections related to lease activities. The latter include applying a TL of up to 60 days and requiring that a project component be relocated by up to 200 meters (or more than 200 meters for areas with CSU stipulations) to protect a sensitive resource value. Examples of additional regulatory protections that the BLM applies to existing leases are requirements for adequate reclamation, weed control, erosion control, and dust abatement.

East of the Grand Hogback, little impact on special status wildlife species from fluid mineral development would occur under all alternatives due to the lower potential for gas resources. BLM lands west of the Grand Hogback would continue to experience habitat loss, habitat modification, and loss of habitat effectiveness, with some degree of difference based on the level of development proposed. Alternative A anticipates 2,664 federal wells on 333 multi-well pads, with an estimated 3,347 acres of surface disturbance. This includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 2,181 acres on interim reclamation of well pads. The landscape would continue to exhibit a loss of connectivity of habitats due to the increased presence of corridors and roads. The spatial distribution, including density, composition, and frequency of species, would be impacted by the intensity and duration of fluid mineral development and production. Maintaining current levels of special status wildlife species populations commensurate with the species and habitats' potential would be at risk under all alternatives. Alternative A

BLM_0016700

would pose more risk of not sustaining the habitat conditions necessary for a variety of terrestrial wildlife species than under Alternatives B or C but less risk than under Alternative D.

Mineral and energy development under Alternative A would open the greatest amount of land (679,200 acres) and would close the least amount of land (27,800 acres) to fluid minerals leasing in the CRVFO. This would probably cause direct and indirect adverse impacts on potential and occupied special status wildlife habitat. Adverse impacts from fluid mineral development would be greatest under this alternative. Mineral and energy development management would protect special status species and their potential habitat from direct and indirect disturbance by identifying CL areas. Implementation of mitigation measures would lessen the adverse impacts on special status species. Alternatives B and C have the most acres protected by NSO stipulations, CSU stipulations and TLs, with Alternative C being slightly more restrictive. Alternative D has fewer acres open to leasing; however, it has fewer acres protected by stipulations.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative A, the following areas would be petitioned for withdrawal from locatable mineral exploration and development: Bull Gulch, Deep Creek, and Thompson Creek ACEC/SRMAs. Withdrawing these three areas would protect special status wildlife species in those areas from surface-disturbing actions related to locatable mineral development. Locatable mineral development is not subject to NSO or CSU constraints, so special status wildlife habitat not withdrawn from mineral development would be vulnerable to surface-disturbing actions. The degree of impacts would vary depending on the location of proposed mineral development in relation to special status wildlife habitat. No public lands in CRVFO would be closed to mineral materials (salable) disposal or non-energy solid leasable minerals, except WSAs if Congress designates them as wilderness. However, unlike locatable mineral development, these activities would be subject to the existing stipulations, so impacts on special status wildlife would be minimal.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Special designations, such as ACECs, would protect special status wildlife species and their habitats by minimizing disturbances from recreation, mineral development, and noxious weeds. Some ACECs would be given additional protection by designating them as ROW avoidance or exclusion areas and by implementing travel restrictions.

Under Alternative A, the BLM would continue designation and special management of the following ACECs: Blue Hill, Bull Gulch, Deep Creek, Lower Colorado River, and Thompson Creek. Although not designated specifically for special status wildlife species, an NSO stipulation on Bull Gulch, Deep Creek, and Thompson Creek to protect the ACEC values may indirectly benefit any special status wildlife species habitat that occurs within these ACECs. However, this NSO stipulation is designed to protect the relevant and important values for which these ACECs were designated, such as scenic qualities and geologic features. Exceptions to the NSO stipulation may be granted for activities that do not impair these values but may have impacts on other resources, such as special status wildlife species.

These ACECs would be petitioned for withdrawal from exploration and development of locatable minerals, which would protect special status wildlife species from surface disturbances related to locatable mining activities. Protections for special status wildlife species provided under Alternative A would be similar to Alternative B, more than under Alternative D, but much less than Alternative C.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Four CRVFO WSAs (27,700 acres) are currently managed under the Interim Management Policy: Bull Gulch, Castle Peak, Hack

BLM_0016701

Lake, and Eagle Mountain. It is generally thought that WSAs are beneficial to special status wildlife species since they are designated to retain their character and influence, without permanent improvements or human habitation, and are managed to preserve their natural conditions. These WSAs contain 14,300 acres of mapped lynx habitat and 600 acres of sage-grouse habitat.

Alternative A would not have an NSO stipulation prohibiting surface occupancy and surface-disturbing activities in WSAs. Proposals would be evaluated on a case-by-case basis. Activities proposed under leases, permits, and mining claims would be subject to the IMP nonimpairment criteria, except to the extent that a specific proposal is affected by the grandfathered or valid existing rights provision. Alternatives B, C, and D include an NSO stipulation prohibiting all surface-disturbing activities in WSAs. If Congress were to release the four WSAs in the CRVFO, these areas, encompassing approximately 27,724 acres, would be managed as ERMAs, and special status species could be disturbed by recreation there.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative A, a total of 26 stream segments totaling 144 miles have been determined to be eligible for inclusion in the National Wild and Scenic River System. Each of these stream segments would be provided interim protection to preserve their free-flowing nature and the ORVs for which they were deemed eligible. The interim protections would apply to lands within 0.25 mile of either side of the stream. This would benefit special status wildlife species, particularly bird species that prefer riparian habitats for breeding (Table 4.2.7-8 and Table 4.2.7-9).

The 26 CRVFO segments are:

- Abrams Creek
- Battlement Creek
- Colorado River—segments 6 and 7
- Deep Creek—segments 2 and 3
- Eagle River
- Egeria Creek
- Hack Creek
- Mitchell Creek
- No Name Creek
- Rock Creek
- Thompson Creek
- East Middle Fork Parachute Creek complex (five segments) (Roan Plateau)
- East Fork Parachute Creek complex (eight segments) (Roan Plateau)

<u>Alternative B (Preferred Alternative)</u>
Impacts to special status species-terrestrial wildlife from soils management, general and rangeland vegetation management, weed management, wildland fire management, coal management, WSA management, and LWC management would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be as described below.

BLM_0016702

**Impacts from Special Status Species Management—Terrestrial Wildlife.** Impacts would be similar to those under Alternative A, except as described below. All management action and allowable use decisions proposed in Alternatives B, C, and D for the benefit of special status terrestrial wildlife species would offer short and long-term benefits to the species and their habitats. The extent of protection varies somewhat by the theme of each alternative. Proposed decisions focus on managing habitat with overall results of (1) preventing the need for listing of proposed, candidate, and sensitive species under the ESA; (2) protecting special status species; and (3) improving their habitats to a point where their special status recognition is no longer warranted.

Alternatives B, C, and D apply a more extensive NSO stipulation buffer radius for ferruginous hawk nesting and fledgling habitat, greater sage-grouse leks, active Columbian sharp-tailed grouse leks, Mexican spotted owl, and special status bat species roost sites (Alternative B and C only). Alternatives B, C, and D apply revised TLs for bald eagle nest sites and winter roost sites, ferruginous hawk nesting and fledgling habitat, greater sage-grouse winter and nesting habitat, Columbian sharp-tailed grouse winter and nesting habitat, Mexican spotted owl primary activity centers, and special status bat species maternity and hibernation sites.

Land use activities that result in the loss or degradation of sagebrush habitat within occupied greater sage-grouse habitat are of particular concern because sage-grouse are dependent on sagebrush plant communities year-round. In the CRVFO, occupied greater sage-grouse habitat (Northern Eagle and Southern Routt Counties) and areas of likely gas development (west of the Grand Hogback in Garfield and Mesa Counties) do not overlap; however, other types of land uses may impact greater sage-grouse habitat. Alternatives B and C propose applying a CSU stipulation to relocate potential land use disturbances in sagebrush shrublands within greater sage-grouse habitat. In Alternative C, where the CSU stipulation overlaps with the NSO stipulation for the Greater Sage-Grouse Habitat ACEC, the NSO stipulation would take precedence.

Alternatives B, C and D propose applying an NSO stipulation, which prohibits surface occupancy and surface-disturbing activities within a 0.6-mile radius of an active lek (i.e., a lek that has been attended by male sage-grouse during the strutting season within the last 10 years). This is more restrictive than under Alternative A, which has a 0.25-mile radius of protection. The larger radius NSO stipulation would reduce the impacts of surface disturbances such as roads on lek occupancy (Hess and Beck 2009), and in turn would sustain lek persistence over the long-term.

In addition, Alternatives B, C, and D have a timing limitation that prohibits surface occupancy and surface-disturbing activities within a 4-mile radius of an active lek from March 1 to June 30, and within greater sage-grouse crucial winter habitat from December 16 to March 15. This is more restrictive than under Alternative A, which applies a 2-mile radius stipulation.

Alternatives B, C and D, propose an NSO stipulation that would be applied for Columbian sharp-tailed grouse leks that prohibits surface occupancy and surface-disturbing activities within a 0.4-mile radius of an active lek. This is more protective than the NSO stipulation proposed under Alternative A, which covers a 0.25-mile radius. The larger radius NSO stipulation would better sustain lek persistence over the long term if an active lek were to occur on or near BLM lands. However there is currently no active or known Columbian sharp-tailed grouse leks on BLM lands within the CRVFO at this time. The closest lek is in Egeria Park, 5 miles northwest of Toponas, Colorado.

BLM_0016703

To protect special status bat species, a TL included under Alternatives B, C, and D, would limit ground disturbance for maternity sites from April 15 to August 31, and for winter hibernacula sites from November 15 to April 15. An NSO stipulation, found under Alternatives B and C, prohibits surface occupancy and surface-disturbing activities within a 0.25-mile radius of roost sites for Townsend's big-eared bat, fringed myotis, and other special status bat species, as well as non-status bats that use the sites.

**Impacts from Water Resource Management.** Alternative B prohibits surface occupancy and surface-disturbing activities within 0.5 mile of either side of the high water mark of six major rivers as in Alternative A. It also prohibits these activities within 50 feet of the ordinary high water mark of any hydrologic feature and within any municipal watershed providing domestic water.

**Impacts from Vegetation Management—Forests and Woodlands.** Alternatives B, C, and D would manage lodgepole pine and aspen on an even-aged basis to transition from homogeneous stands of over-mature aspen and lodgepole pine to create a more diverse age-class structure across the landscape. They would manage other species (e.g., pinyon-juniper, Engelmann spruce, Douglas-fir, subalpine fir, limber pine) on an uneven-aged basis to mimic natural stand conditions and natural regeneration processes. This would benefit special status wildlife species, in particular lynx since it would increase available forage for snowshoe hare.

Another objective of these alternatives is to identify areas for current or potential old-growth conditions based on structure and composition across the landscape. Old-growth forest stands are composed of trees that are generally in the late successional stages of development. The desired attributes of old-growth stands are older, large trees for the species and site; signs of decadence (broken or deformed tops or boles and some root decay); multiple layers of canopy; standing and down dead trees; a variation in tree age, size, and spacing; and gaps or patchiness in the canopy and understory. In addition, these objectives aim to maintain or contribute toward the restoration or development of old-growth structure and composition (primarily of spruce/fir, pinyon-juniper, and Douglas-fir stands) in areas where forest treatments utilizing the Healthy Forest Restoration Act are proposed. They would retain stands with old-growth characteristics such as, but not limited to, large trees, down and standing dead trees, and multiple canopy layers. These objectives would benefit lynx in that they would provide or maintain adequate down woody material necessary for lynx denning habitat.

**Impacts from Vegetation Management—Riparian.** Impacts would generally be the same as described for Alternative A, except that Alternative B includes a CSU stipulation instead of an NSO stipulation and therefore does not prohibit surface-disturbing activities within riparian vegetation. This could be potentially detrimental to special status wildlife species.

**Fisheries and Aquatic Wildlife Management.** In addition to the restrictions discussed under Alternative A, Alternative B prohibits surface occupancy within 100 meters of all fish-bearing streams and a TL that prohibits in-channel stream work in all occupied trout streams during appropriate spring and fall spawning periods of March 1 to August 1 for rainbow and cutthroat trout, and October 1 to November 30 for brown and brook trout. The additional protection would benefit special status wildlife species such as the Yellow-billed cuckoo that are dependent on mature riparian areas for nesting by not allowing the removal of important riparian vegetation.

BLM_0016704

**Impacts from Terrestrial Wildlife Management.** Alternatives B, C, and D do not propose an NSO stipulation for wildlife seclusion areas. Alternatives B and C propose an NSO stipulation for wildlife core areas on unleased BLM lands. The rationale for this is that the BLM has been unable to manage for wildlife seclusion values due to the fluid minerals leases issued before the 1999 GSRA Oil and Gas Leasing and Development ROD and RMPA, when the NSO stipulation for wildlife seclusion areas took effect. Only approximately 640 acres of the wildlife seclusion areas are left unleased. The identification and protection of core wildlife also would protect habitat for special status wildlife species such as greater sage-grouse, Brewer's sparrow, and midget faded rattlesnake.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Applying NSO and CSU stipulations for the protection of special status fish and other aquatic wildlife constrain surface-disturbing activities and would indirectly protect special status wildlife species and their habitat. Surface-disturbing activities often result in the loss of vegetation, which degrades wildlife habitat and alters the behavior of wildlife in those areas. Limiting these impacts would benefit special status wildlife species and their habitat. TLs for special status aquatic species would indirectly protect terrestrial species from disruptive activities during biologically sensitive periods (e.g., nesting, courtship, fledging, spawning, and hatching).

**Impacts from Special Status Species Management—Plants.** Special status plant species management and stipulations would indirectly protect terrestrial wildlife under Alternative B. The stipulations would provide indirect protection to special status wildlife species and their habitats in these areas.

**Impacts from Cultural Resource Management.** Impacts would generally be the same as or similar to those under Alternative A. However, proposed decisions under Alternatives B and C to protect cultural resources include NSO stipulations to protect historic properties and traditional cultural properties or Native American areas of concern. These restrictions would indirectly protect any special status wildlife species and habitat within these areas from surface-disturbing activities. For example, greater sage-grouse habitat overlaps many of these protected areas, thus Alternatives B and C would indirectly reduce adverse impacts in greater sage-grouse habitat.

**Impacts from Visual Resource Management.** Impacts would generally be the same as described under Alternative A. In addition, all areas designated as VRM Class I or VRM Class II with slopes greater than 30 percent and high visual sensitivity would be protected with NSO stipulations, and areas designated as VRM Class II would be protected with a CSU stipulation. These stipulations are more constraining than those under Alternative A and would indirectly offer better protections to special status wildlife species and habitat. More area would be designated under Alternative B as VRM Class I (33,600 acres) and VRM Class II (249,200 acres) than under the other alternatives, which would protect special status wildlife species by restricting surface-disturbing activities in these areas.

Under Alternative B, a total of 102,100 acres would be designated as VRM Class III, and 120,300 acres would be managed as VRM Class IV. These areas, which can allow for greater landscape modification and therefore greater surface disturbance, could be subject to such actions as complete vegetation removal, which would drastically alter (at least in the short term) the habitat for special status wildlife species. Alternative B would designate more acres in VRM Class III and IV than under C but fewer acres than under Alternatives A or D.

**Impacts from Cave and Karst Resource Management.** The NSO stipulation for the cave and karst occurrence areas applied in Alternatives B, C, and D would prohibit surface occupancy and surface-disturbing

BLM_0016705

activities in a 40-acre area around 17 known cave and karst resources to a depth of 5,000 feet below the surface. The NSO area encompasses cave openings and portions of the subsurface features and watersheds immediately above the caves. The NSO stipulation would be applied to ten known caves in the Deep Creek cave area, a cave at Hack Lake on the Flattops, and small, dry caves in Glenwood Canyon. Alternatives B and D would protect known caves but would not protect caves yet undiscovered. Alternatives B and D also offer less protection to subsurface portions of the cave that extend beyond the 40-acre area of the NSO stipulation at each cave. The potential indirect impacts to terrestrial wildlife would parallel the change in coverage of the NSO stipulations.

**Impacts from Forestry Management.** Management actions on forests and woodlands would have similar impacts on special status species as under Alternative A. Under Alternative B, the BLM would intensively manage 31,365 acres of forested lands. These actions would probably disturb special status species when and where the actions take place. The location and severity of these actions depends on the timing and number of commercial forestry actions that would occur. Maintaining and constructing roads for forestry would have impacts. The adverse impacts would be lessened through the implementation of mitigation measures.

Under the forestry program of Alternative B, a total of 20,734 acres that fall under intensively managed commercial forest and woodland are also within the Canada lynx range, and 4,908 acres are within greater sage-grouse range. If these lands were to ever be harvested, impacts on the special status wildlife species in the area would be adverse, both directly and indirectly.

Conversely, under Alternative B, a combined 81,800 acres of forests and woodlands would be closed to commercial forestry development due to WSA, SRMA, WSR, and other special designations. Of that total area, some 21,032 acres would be within Canada lynx range, and 2,222 acres would be within greater sage-grouse range. These closures would benefit special status wildlife.

**Impacts from Livestock Grazing Management.** In addition to the management discussed under Alternative A, Alternative B meets the forage demands of livestock operations based on current active preference (AUMs), while improving the quantity and quality of forage available for livestock and wildlife. In regards to greater sage-grouse, the populations found in the planning area are limited to a small northeast corner of the field office. Resource uses from livestock grazing are not believed to be impacting sage-grouse as evidenced by both grazing and sage-grouse monitoring as well as the Land Health Assessments. This alternative is more beneficial to special status wildlife species than under Alternatives A or D, but less so than under Alternative C.

**Impacts from Recreation and Visitor Services Management.** Under Alternatives B, C, and D, BLM lands would be designated as SRMAs, designated as ERMAs, or left undesignated. Within SRMAs, recreation and visitor services management is recognized as the predominant land use focus, where specific recreation opportunities and RSCs are managed and protected on a long-term basis. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. Since management within ERMAs is commensurate with the management of other resources and resource uses, all recreation and visitor services decisions would be compatible with other resource objectives.

Managing occupied habitat would generally be most compatible with BLM lands that are undesignated for recreation and visitor services or ERMA designations, because wildlife management and conservation would be emphasized, or emphasized on an interdisciplinary basis commensurate with the management of recreation

BLM_0016706

and visitor services. However, since recreation actions must be mitigated so as not to contribute to the need to list any special status species under the provisions of the ESA, it is unlikely that any recreation designation or action would be authorized that would negatively impact special status species.

Alternatives C, B, and D, respectively, include more limitations (e.g., camping closures, firearm use restriction, SRPs) on inappropriate recreation use. These limitations along with the additional wildlife mitigations and stipulations in Alternatives C, B, and D, respectively, generally offer reduced risk of disturbance, increased habitat protection and increased habitat effectiveness through the life of the plan.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be the same as or similar to those under Alternative A, except that Alternatives B, C, and D have no area travel designations of "open" or "limited to existing routes," which has been identified in land health assessments as causing impacts on wildlife habitats. BLM lands would have area designations of "limited to designated routes," which prohibit over-land cross-country motorized and mechanical travel. This designation would be a benefit to special status terrestrial wildlife species by (1) reducing inappropriate human disturbances and (2) prohibiting the proliferation of user created routes that is currently occurring on BLM lands.

Alternatives B and C propose more areas with seasonal limitations, which would benefit wildlife by limiting disturbance and avoidance on a greater extent of the CRVFO during critical periods of the year. The winter closure dates may be 15 days less, but the closures apply to motorized and mechanized travel, the modes of travel with the capability to cover long distances.

Alternative B would prohibit over-snow travel on 174,900 acres. The areas and acres that would be limited or closed to over-snow travel would benefit special status terrestrial wildlife species. For example the functional value of the Castle Peak Canada lynx linkage area and the occupied habitat for greater sage-grouse would be improved by (1) reducing the sight and sound disturbances and (2) minimizing activities that increase current use levels and human-induced snow compaction (Claar et al. 1999).

Due to the combination of travel limitations for wildlife and the route designations, Alternatives B and C are more beneficial to maintaining the number, density, and composition of special status terrestrial wildlife species and the quality and connectivity of terrestrial wildlife habitat.

**Impacts from Lands and Realty Management.** Under Alternative B, lands and realty actions would have impacts similar to those described under Alternative A. Adverse impacts would be direct and indirect. Implementation of Section 368 of the Energy Policy Act of 2005 would reduce impacts by addressing energy corridor-related issues. Benefits to special status wildlife species would result from designating additional ROW avoidance (169,600 acres) and exclusion areas (39,300 acres) (Table 4.2.7-5). Other benefits to special status wildlife species would result from minimizing communication sites, identifying areas for retention, and withdrawing lands from locatable mineral development. These actions would protect special status species from removal, displacement, or disturbance, would prevent weed invasion or spread in these areas, and would reduce overall habitat fragmentation. Beneficial impacts would be direct and indirect.

The types of impacts experienced as a result of land tenure adjustments would be similar to those described under Alternative A, except that Alternative B would also include retention areas. Approximately 488,400 acres have been identified for retention for long-term management and include such areas as ACECs, sage-grouse core habitat, perennial stream corridors, and habitat for listed, proposed, or candidate species.

BLM_0016707

The types of impacts as a result of withdrawals would be similar to those described under Alternative A, except that under Alternative B, there would an additional 62,400 acres proposed for withdrawal.

The types of impacts experienced as a result of wind and solar authorizations would be similar to those described under Alternative A, except that Alternative B would give greater consideration to renewable energy projects. In addition, implementation of Alternative B would allow wind energy exploration and development to be considered in ACECs that are not identified as ROW exclusion areas.

Oil, gas, oil shale, geothermal, wind, solar development, and associated rights-of-ways can affect the sustainability of sage-grouse populations. It is imperative that fragmentation and degradation of greater sage-grouse habitat not occur to the point that sustainable sage-grouse populations can no longer be supported. In November 2004, the BLM National Strategy set goals and objectives and assembled guidance and resource materials. It also provided comprehensive management direction for BLM's contributions to the ongoing multi-state sage-grouse conservation effort. BLM Instruction Memorandum (IM) 2010-071 reflects continued implementation of the goals set forth in the BLM National Strategy. The IM direction, along with the management actions proposed in Alternatives B and D, would minimize impacts on occupied sage-grouse habitat from energy development and transmission projects that could degrade habitat necessary to sustain sage-grouse populations.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Mineral and energy development under Alternative B would open 651,400 acres and would close 55,600 acres to fluid minerals leasing. As a result, mineral and energy development would probably impact potential and occupied special status wildlife species habitat in the CRVFO, causing direct and adverse impacts. Impacts would be slightly less than under Alternative A because fewer acres would be open to fluid minerals leasing under Alternative B. Adverse impacts would be lessened through the implementation of mitigation measures.

Alternatives B, C, and D do not include an NSO for wildlife seclusion areas. Alternatives B and C include an NSO for wildlife core areas on unleased BLM lands with low to moderate potential for the occurrence of natural gas resources. The rationale for this is fact that the BLM has been unable to manage effectively for wildlife seclusion values due to the large number of leases issued before the 1999 GSRA Oil and Gas Leasing and Development ROD and RMPA, when the NSO stipulation for wildlife seclusion areas took effect. In addition, the BLM cannot manage for wildlife seclusion on split-estate lands with private surface. Only approximately 640 acres of the wildlife seclusion areas underlying BLM surface lands are left unleased. Decisions from this RMP revision would apply to those 640 acres.

Special status wildlife species and their habitats would benefit indirectly from an increase in stipulations and areas closed to fluid minerals leasing for other resources (e.g. NSO on Core Wildlife Areas). The application of NSO and TL stipulations for wildlife areas would offer specific and direct protections not afforded under Alternative A. West of the Grand Hogback, Alternative B offers slightly less risk of not sustaining the habitat conditions, based on the lower level of development anticipated and the possible application of mitigation measures consistent with decisions included in this RMP revision.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts would be generally similar to Alternative A. However, the following areas with special status wildlife species habitat would be petitioned for withdrawal from locatable mineral exploration and development: same areas discussed under Alternative A, Alternative B ACECs, Upper Colorado River SRMA,

BLM_0016708

municipal watersheds (Beaver Creek), and four WSR segments. The following areas with special status wildlife species habitat would be closed to mineral materials (salable) disposal and closed to non-energy leasable minerals under Alternative B: ACECs, SRMAs, WSR segments, and the Beaver Creek municipal watershed. This would protect more special status wildlife habitat than under Alternatives A or D but less than under Alternative C.

Oil, gas, oil shale, and geothermal development, can affect the sustainability of sage-grouse populations. It is imperative that fragmentation and degradation of greater sage-grouse habitat not occur to the point that sustainable sage-grouse populations can no longer be supported. In November 2004, the BLM National Strategy set goals and objectives and assembled guidance and resource materials. It also provided comprehensive management direction for BLM's contributions to the ongoing multi-state sage-grouse conservation effort. BLM Instruction Memorandum (IM) 2010-071 reflects continued implementation of the goals set forth in the BLM National Strategy. The IM direction, along with the management actions proposed in Alternatives B and D, would minimize impacts on occupied sage-grouse habitat from energy development and transmission projects that could degrade habitat necessary to sustain sage-grouse populations.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative B, the BLM would continue designation and special management of the following ACECs: Blue Hill, Bull Gulch, Deep Creek, Glenwood Springs Debris Flow Hazard Zone, and Thompson Creek. Although not designated specifically for special status wildlife species, an NSO to protect the ACEC values may indirectly benefit the special status wildlife species habitat that occurs within these ACECs. However, this NSO is designed to protect the relevant and important values for which these ACECs were designated, such as scenic qualities and geologic features. Exceptions to the NSO may be granted for activities that do not impair these values but may have impacts on other resources, such as special status wildlife species. In addition, Alternative B would also designate Dotsero Crater, Hardscrabble-Mayer Gulch, Lyons Gulch, and Sheep Creek Uplands as ACECs, which would benefit special status wildlife species in those areas.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Alternative B is subdivided into modified Alternatives B1 and B2. Under Alternative B1, the BLM would determine that the Colorado River segments and Deep Creek segments are suitable for inclusion into the National Wild and Scenic Rivers System. All other segments would be determined not suitable and released from further protection under the Wild and Scenic River Act.

Under Alternative B2, the BLM would determine that Deep Creek segments 1 and 2 are suitable. All other segments, but the Colorado River segments, would be determined not suitable and would be released from further protection under the Wild and Scenic River Act. The BLM would defer a suitability determination on the Colorado River segments and would adopt and implement the water stakeholders' plan to protect the free-flowing nature, ORVs, and tentative classifications. The assumption is that the water stakeholders' plan would protect the ORVs through a cooperative water delivery mechanism and if monitoring indicated a decline in the condition of the ORVs, the BLM would start the formal suitable/recommendation process to designate the Colorado River segments into the National WSR system.

The BLM has not identified or brought forward and is not analyzing in-stream flows in this planning process, nor is it required to do so until after designation. At the time of designation, the BLM would write a WSR management plan that would then address the needed instream flows.

BLM_0016709

The management action and allowable use decisions in this planning process would apply and provide direct and indirect protections for the ORVs under both Alternatives B1 and B2. Alternative B2, with water stakeholder cooperation, may better support the areas' terrestrial wildlife, because the water stakeholders would attempt to operate their facilities in a manner that meets water supply objectives and protects the ORVs. With no stakeholder plan, water flows would be subject to the water rights system. Without some sort of specific effort to protect and manage flows, there may be a gradual reduction in flows necessary to support recreation use over the life of the plan.

Alternative B1 or B2 would be more beneficial to wildlife, compared to Alternative D, where no segments are found suitable. However, because BLM's policy is to protect any ORVs identified in the eligibility study until a decision on suitability can be made, Alternative A would actually be more beneficial, at least on an interim basis. The interim protections would apply to lands within 0.25 mile of either side of the "suitable" stream. This would benefit special status wildlife species, particularly bird species that prefer riparian habitats for breeding.

**Impacts from Renewable Energy Management.** Alternative B would encourage development of alternative energies on BLM land, including wind energy. Special status birds and bats could be killed by colliding with the wind turbines. Other infrastructure associated with the development of renewable energy (e.g., roads and buildings) would result in the loss and fragmentation of habitat and increased harassment of special status wildlife species in those areas.

## *Alternative C*

Impacts to special status terrestrial wildlife from general, rangeland, and riparian vegetation management, weed management, wildland fire management, coal management, and WSA maagement would be the same as or similar to those under Alternative A. Impacts to special status terrestrial wildlife from soils management, forests and woodlands vegetation management, cultural resource management, and comprehensive trails and travel management would be the same as or similar to those under Alternative B. Impacts from management of other resources and uses would be as described below.

**Impacts from Special Status Species Management—Terrestrial Wildlife.** Alternatives B and C propose applying a CSU stipulation to relocate potential land use disturbances in sagebrush shrublands within greater sage-grouse habitat. In Alternative C where the CSU stipulation overlaps with the NSO stipulation for the Greater Sage-Grouse Habitat ACEC, the NSO stipulation would take precedence. See Impacts from Areas of Critical Environmental Concern (ACECs) Management below for analysis of the Greater Sage-Grouse Habitat ACEC.

**Impacts from Water Resource Management.** Implementation of water quality and quantity related actions would guide or advise other program actions and activities in a manner conducive to maintaining or improving surface water quality. This would be consistent with existing and anticipated uses and applicable state and federal water quality standards. Beneficial impacts on special status species include improved habitat for fish and wildlife and their associated prey. Maintaining or improving habitat associated with aquatic systems would provide long-term benefits for bald eagle, northern goshawk, and western yellow-billed cuckoo habitats and populations.

Alternative C prohibits surface occupancy and surface-disturbing activities within 0.5 mile of either side of the high water mark of nine major rivers as well as within 50 feet from the ordinary high water mark of any

BLM_0016710

hydrologic feature, and within any municipal watershed providing domestic water. In addition, Alternative C restricts surface use within 100 feet of the edge of a hydrologic feature, such as ephemeral, intermittent, and perennial channels, wetlands, lakes, fens, and springs.

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts would be similar to those described in Alternative A. In addition, Alternative C prohibits surface occupancy within 100 meters of all perennial waters. There is also a TL that prohibits in-channel stream work in all occupied trout streams during appropriate spring and fall spawning periods, from March 1 to August 1 for rainbow and cutthroat trout and from October 1 to November 30 for brown and brook trout.

**Impacts from Terrestrial Wildlife Management.** Instead of the NSO stipulation applied under Alternatives A and B, all SWAs would be closed to fluid minerals leasing. In addition core wildlife areas would be closed to fluid minerals leasing. Special status terrestrial wildlife species would indirectly benefit by the elimination of a potential land use disturbances and the reduced risk of habitat fragmentation by fluid minerals development.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Impacts would be similar to those described in Alternative B. However, Alternative C proposes major constraints on surface-disturbing activities in that it establishes three NSO stipulations and no CSU stipulations for the protection of special status fish and other aquatic wildlife. Prohibiting surface-disturbing activities would benefit special status terrestrial wildlife species and their habitat by reducing the loss of vegetation, which degrades wildlife habitat and alters the behavior of wildlife.

**Impacts from Special Status Species Management – Plants.** Impacts would be generally similar to Alternatives A and B. In addition, under Alternative C, additional protection would be provided to special status plant species with an NSO stipulation, applied to 26,800 acres. This would provide some indirect protection to special status wildlife species and their habitats in these areas. More ACECs to protect special status plants would be designated under this alternative than any other alternative. Impacts on special status wildlife species terrestrial wildlife would be beneficial, both directly and indirectly.

**Impacts from Visual Resource Management.** Impacts and management actions would generally be the same as or similar to those under Alternative B. However, more area would be designated as VRM Class I (33,600 acres) and VRM Class II (258,100 acres) under this alternative, which would protect special status wildlife species by restricting surface-disturbing activities in these areas.

Also under Alternative C, a total of 97,600 acres would be designated as VRM Class III and 116,000 acres would be managed as VRM Class IV. These areas, which can allow for greater landscape modification and therefore greater surface disturbance, could be subject to such actions as complete vegetation removal, which would drastically alter (at least in the short term) the habitat for special status wildlife species. Alternative C would designate fewer acres in VRM Class III than under Alternatives A, B, and D.

**Impacts from Cave and Karst Resource Management.** Alternative C proposes to apply both the NSO stipulation for the Deep Creek Cave area and the cave and karst occurrence NSO stipulation. Alternative C would protect known caves and caves yet undiscovered in the Deep Creek area. Alternative C offers protections to the subsurface portions of caves in the Deep Creek area that extend beyond the 40-acre margin

BLM_0016711

of the cave and karst occurrence NSO stipulation. Alternative C would offer the greatest extent of protection for caves and special status terrestrial wildlife species that use caves.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under Alternative C, lands with wilderness characteristics outside existing WSAs (47,600 acres) would be managed as LWCs to protect their qualities of naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation. These lands would be closed to fluid minerals leasing. In addition, an NSO would prohibit surface occupancy and surface-disturbing activities. These protections would limit impacts on special status wildlife species and their habitat within the protected lands. However, specific exemptions/allowances would be made to accommodate valid existing rights. For example, mineral leases represent a valid existing right, and, within areas managed to maintain wilderness characteristics, existing livestock grazing and the activities and facilities that support a grazing program are permitted to continue.

Linkage areas for Canada lynx and 6,100 acres of greater sage-grouse habitat occur within areas managed as LWCs. Protecting wilderness characteristics of these lands would reduce or eliminate potential impacts on the lynx and sage-grouse and their habitats within these areas.

New discretionary uses that create valid existing rights are not allowed if they would detract from the wilderness values. For example, new permanent roads would not be authorized without meeting strict criteria. These lands are also closed to commercial timber harvest, firewood cutting, and special forest product harvest and fluid minerals leasing development.

**Impacts from Forestry Management.** Management actions on forests and woodlands would have similar impacts on special status wildlife species as under Alternative B. However, Alternative C would designate 3,000 fewer acres as commercial forest for intensive management. There would also be more area (135,500 acres) closed to commercial harvest under Alternative C. These differences would lessen the negative impacts on special status wildlife species by limiting the disturbance to habitat and individuals.

Under Alternative C, a total of 19,449 acres that fall under intensively managed commercial forest and woodland are also within the Canada lynx range, and 4,908 acres are within greater sage-grouse range. If these lands were to ever be developed, impacts on the special status wildlife species in the area would be adverse, both directly and indirectly.

Conversely, under Alternative C, some 135,000 acres of forests and woodlands would be closed to commercial forestry development due to WSA, SRMA, WSR, or other special designations. Of that total area, some 26,226 acres are within Canada lynx range, and 12,000 acres are within greater sage-grouse range. These closures would benefit special status wildlife species.

**Impacts from Livestock Grazing Management.** Impacts would be the same as or similar to Alternative A. However, Alternative C would meet the forage demands of wildlife first, based on CDOW objectives, and would meet the forage demands of livestock operations second, based on current active preference. If conflicts for forage were to arise that cannot be mitigated by vegetation or habitat treatments, these areas would either be authorized for a reduced level of livestock use or be designated as unavailable for livestock grazing. This alternative would be the most beneficial to special status wildlife species.

BLM_0016712

**Impacts from Recreation and Visitor Services Management.** Under Alternative C, current recreation uses would be recognized but not necessarily accommodated when considering land uses. Impacts would generally be the same as or similar to those under Alternative B except Alternative C would designate only the Red Hill and the Upper Colorado SRMAs. Three additional ERMAs (Hack Lake, King Mountain, and The Crown) would be identified to specifically address local recreation issues. The NSO stipulation for core wildlife areas would mitigate recreation developments that would impact special status wildlife species.

Disturbance to special status wildlife would be mitigated through additional winter closures that apply to both mechanized and motorized use, potential closures to human activity and dogs during harsh winters, and travel route designations.

Alternatives B, C, and D include more limitations (e.g., camping closures, firearm use restriction, and SRPs) on inappropriate recreation use. Alternative C includes the most wildlife mitigation in the form of management actions (e.g., winter big game closures) and stipulations (e.g., NSO, TL stipulations) to reduce disturbance and maintain habitat effectiveness. Alternative C best ensures that Land Health Standard 4 for special status wildlife species would be met through the life of the plan.

**Impacts from Trails and Travel Management.** Alternative C would prohibit over-snow travel on 208,500 acres. Impacts would be similar to those under Alternative B except the expanded travel limitations and reduced number of designated routes proposed under Alternative C would further decrease travel related disturbance to wide-ranging special status terrestrial wildlife species. Under Alternative C the entire Castle Peak portion of the Greater Sage-Grouse Habitat ACEC is closed to over-snow travel, which will decrease human disturbance during the winter months when birds are stressed due to factors such as weather, cold temperatures, and reduced food supplies.

**Impacts from Lands and Realty Management.** Lands and realty actions under Alternative C would have impacts similar to those described under Alternative A. However, Alternative C would offer the most benefit of all alternatives by designating the greatest number of acres for retention and withdrawal and by designating the greatest total number of acres of ROW avoidance and exclusion areas, 212,600 acres (Table 4.2.7-12). Adverse impacts from alternative energy development are similar to those described for Alternative B. However, the IM direction, along with the management actions proposed in Alternative C ( ROW exclusion area identification in the Greater Sage Grouse ACEC and within 0.6 mile of active lek sites), would eliminate impacts to occupied sage-grouse habitat from energy development and transmission projects that could degrade habitat necessary for sustaining sage-grouse populations.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts would be the same as or similar to Alternative A. However, mineral and energy development would open the fewest acres (531,500) and would close the most acres (175,500) to fluid mineral development under Alternative C. This would probably impact potential and occupied special status wildlife species habitat in the CRVFO. Adverse impacts from fluid mineral development would be least under this alternative. Adverse impacts on special status species would be lessened through the implementation of mitigation measures.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Alternative C would recommend the following areas with special status wildlife habitat for closure to locatable exploration and development, for closure to mineral materials (salable) disposal, and for closure to non-energy leasable minerals: same areas as discussed under Alternative B, Alternative C ACECs,

BLM_0016713

areas managed as LWCs to protect their wilderness characteristics, and an additional 21 WSR segments. Alternative C would protect the most special status wildlife species habitat from surface disturbances associated with mining development.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative C, the BLM would continue designation and special management of the following existing ACECs: Blue Hill, Bull Gulch, Deep Creek, Glenwood Springs Debris Flow Hazard Zone, and Thompson Creek. Although not designated specifically for special status wildlife species, an NSO stipulation to protect the ACEC values may indirectly benefit the special status wildlife species habitat that occurs within these ACECs. However, this NSO is designed to protect the relevant and important values for which these ACECs were designated, such as scenic qualities and geologic features. Exceptions to the NSO may be granted for activities that do not impair these values but may have impacts on other resources, such as special status wildlife species.

Alternative C proposes to designate additional ACECs (i.e. Abrams Creek, Colorado River Seeps, Dotsero Crater, Grand Hogback, Greater Sage-Grouse Habitat, Hardscrabble-Mayer Gulch/East Eagle, McCoy Fan Delta, Mount Logan Foothills, Lyons Gulch, Sheep Creek Uplands, and The Crown Ridge). Management prescriptions for ACECs generally limit habitat disturbances and land uses, indirectly benefiting a wide range of special status terrestrial wildlife.

The Greater Sage-Grouse Habitat ACEC is proposed specifically to protect 24,600 acres of greater sage-grouse habitat on BLM land. The ACEC would encompass the southwest flanks of King Mountain, the northern tier of Castle Peak, and the sagebrush shrublands north of Wolcott, Colorado. The Northern Eagle/Southern Routt greater sage-grouse population is one of the smaller populations in Colorado and the portion of the population within the CRVFO is vulnerable to local extirpation. The CDOW believes this area to be priority greater sage-grouse habitat for the Northern Eagle/Southern Routt greater sage-grouse population (Rossi 2011.). Priority habitat is the habitat of highest conservation value relative to maintaining sustainable sage-grouse populations. This ACEC would maintain the current available greater sage-grouse habitat on BLM lands considered as critical to conserving the population and necessary to maintain range-wide connectivity and genetic diversity.

Proposed management action and allowable use decisions (e.g., VRM Class II designation, ROW avoidance area identification, closing the Castle Peak portion to over-the-snow travel) for the Greater Sage-Grouse Habitat ACEC will help maintain or enhance greater sage-grouse numbers and distribution through the protection of habitat from potentially impacting surface uses. The Greater Sage-Grouse Habitat ACEC is encumbered by valid existing rights, such as powerlines, ditches, and roads. However the proposed management action and allowable use decisions ensure that conservation principles such as consolidation of infrastructure to reduce habitat fragmentation and loss are included in authorized activities or infrastructure maintenance.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative C, a total of 26 stream segments (see Alternative A), totaling 144 miles of stream length, have been determined to be suitable for inclusion in the National Wild and Scenic River System. Each of these stream segments would be provided interim protection to preserve the ORVs for which they were deemed suitable. The interim protections would apply to lands within 0.25 mile of either side of the stream. This would benefit special status wildlife species, particularly bird species that prefer riparian habitats for breeding. In addition, Alternative C would include a

September 2011                    *Colorado River Valley Field Office – Draft RMP Revision EIS*                    4-362
*Chapter 4, Environmental Consequences*

BLM_0016714

stipulation which would manage nine segments that are suitable for inclusion in the NWSRS as closed to oil and gas leasing.

BLM would adopt the interim protective management guidelines identified under Alternative A until designated or released to multiple use by Congress. In addition BLM would:

- Implement an NSO on suitable stream segments classified as "Wild." (Refer to Appendix C).
- Implement a CSU stipulation on suitable stream segments classified as "Scenic" and "Recreational." (Refer to Appendix C).
- Apply ROW exclusion (including solar and wind development) on suitable stream segments classified as wild.
- Apply ROW avoidance on suitable stream segments classified as scenic or recreational.

## Alternative D

Impacts to special status terrestrial wildlife from soils management, riparian vegetation management, and forests and woodlands vegetation management would be the same as or similar to those under Alternative B. Impacts from management of all other resources and uses would be the same as or similar to those under Alternative A, except as described below.

**Impacts from Special Status Species Management—Terrestrial Wildlife.** Grouse habitat under Alternative D is addressed in the same way as under Alternatives B and C but without a stipulation concerning Columbian sharp-tailed grouse leks. There are no known Columbian sharp-tailed grouse populations or individuals in the CRVFO planning area.

Special status bats have the same timing limitation stipulation as under Alternatives B and C. However, Alternative D does not have an NSO for roost sites for special status bat roost sites but does include a CSU stipulation, which applies restrictions within 0.25 mile of roost sites of special status bat species.

**Impacts from Water Resource Management.** Impacts would be generally similar to Alternative A, but Alternative D prohibits surface occupancy and surface-disturbing activities within 0.5 mile on both sides of the high water mark of nine major rivers and within any municipal watershed providing domestic water with two NSOs).

**Impacts from Vegetation Management—Forests and Woodlands.** Impacts would be the same as or similar to Alternative A, except that 20,734 acres would be designated forest management units that occur in mapped lynx habitat.

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts would be similar to Alternative A. In addition, Alternative D designates controlled surface use within 100 meters of all trout-bearing streams and a timing limitation that prohibits in-channel stream work in all occupied trout streams during spring and fall spawning, from March 1 to August 1 for rainbow and cutthroat trout and from October 1 to November 30 for brown and brook trout.

**Impacts from Terrestrial Wildlife Management.** Impacts would be similar to Alternative A, but, instead of the NSO under Alternatives A and B, Alternative D has a CSU stipulation to restrict surface disturbance on

BLM_0016715

State Wildlife Areas. A CSU stipulation is considered a moderate constraint that allows some use and occupancy while protecting wildlife values on unleased lands.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Impacts would be similar to Alternative B, but Alternative D has an additional NSO that protects core conservation populations of Colorado River cutthroat trout. In addition, there is a timing limitation that applies only to core conservation populations of this species instead of to all occupied habitat, as under Alternative B.

**Impacts from Special Status Species Management – Plants.** Impacts would be similar to Alternatives A and B. An NSO Stipulation (CRV-NSO-18) on 5,000 acres for special status plant species would provide some indirect protection to special status wildlife species and their habitats in these areas. A CSU stipulation would protect 13,700 acres of BLM sensitive plant species. Impacts on special status wildlife species terrestrial wildlife would be beneficial, both directly and indirectly.

**Impacts from Cultural Resource Management.** Alternative D is the least restrictive alternative, with only one management action, an NSO that prohibits surface occupancy and surface-disturbing activities within 0.25 mile of traditional cultural properties or Native American areas of concern. This NSO would be beneficial, both directly and indirectly to special status wildlife species.

**Impacts from Visual Resource Management.** Impacts and management actions would generally be the same as or similar to those under Alternative B. However, more acres would be designated as VRM Class I (34,000), which would protect special status wildlife species by restricting surface-disturbing activities in these areas. Conversely, fewer acres would be designated VRM Class II (228,300) than under Alternatives A, B, and C.

Under Alternative D, a total of 104,600 acres would be designated as VRM Class III, and 138,300 acres would be managed as VRM Class IV. These areas, which can allow for greater landscape modification and therefore greater surface disturbance, could be subject to such actions as complete vegetation removal, which would drastically alter (at least in the short term) the habitat for special status wildlife species. Alternative D would designate more acres in VRM Class III and IV than under Alternatives B and C but less than under Alternative A.

**Impacts from Forestry Management.** Management actions on forests and woodlands would have similar impacts on special status species as under Alternative B. The difference is that Alternative D would designate 1,000 fewer acres as commercial forest for intensive management. There would also be more area (85,000 acres) closed to commercial harvest under Alternative D. These differences would lessen the negative impacts on special status species by limiting the disturbance to habitat and individuals.

Under Alternative D, approximately 20,700 acres that fall under intensively managed commercial forest and woodland are also within the Canada lynx range, and 4,900 acres are within greater sage-grouse range. If these lands were to be developed, impacts on the special status wildlife species in the area would be adverse, both directly and indirectly.

**Impacts from Livestock Grazing Management.** Impacts would be generally similar to Alternative A, but under Alternative D, the BLM would provide adequate forage for livestock first and for wildlife second. This would have fewer benefits for special status wildlife than under other alternatives.

BLM_0016716

**Impacts from Recreation and Visitor Services Management.** Under the theme of Alternative D, overall management would favor recreation use as well as other land uses. Recreation infrastructure would be constructed to accommodate higher use levels and a destination tourism market for mountain biking in many of the proposed SRMAs (e.g., The Crown, Fisher Creek Hardscrabble/East Eagle, Red Hill, a portion of Thompson Creek, and Upper Colorado River). Generally more implementation-level conflicts are anticipated to occur with special status terrestrial wildlife in areas that (1) emphasize accommodating or attracting higher numbers of visitors, increasing the risk of disturbance or (2) require an expansion of recreation trails and facilities that would fragment (i.e., effect loss of connectivity) wildlife habitat. The anticipated increases in recreation use and infrastructure, as well as the reduced mitigation (less that Alternatives B or C), would increase the risk of disturbance of wildlife. Alternative D would also pose the most potential of habitat fragmentation and loss of habitat connectivity over the life of the plan.

**Impacts from Lands and Realty Management.** Lands and realty actions under Alternative D would have impacts similar to those described for Alternative A. Adverse impacts would be direct and indirect. Overall, benefits to special status wildlife species would be less than under Alternatives B and C because communication sites would not be minimized, and avoidance areas (126,700 acres) and retention areas would be smaller. Adverse impacts from alternative energy development are similar to those described under Alternative B. Adverse impacts could be lessened through mitigation measures.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts would be generally similar to Alternative A. Mineral and energy development under Alternative D would open 658,200 acres and would close 48,800 acres to fluid mineral development. This would probably impact potential and occupied special status wildlife species habitat in the CRVFO. Impacts would be slightly greater than under Alternative B, due to the larger amount of land open to leasing. Impacts would be direct and adverse. Adverse impacts would be lessened through the implementation of mitigation measures.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative D, the following areas with special status wildlife species habitat would be petitioned for withdrawal from locatable exploration and development: Alternative D ACECs and Upper Colorado River SRMA. Only WSAs would be withdrawn from mineral materials disposal (salable) and only if Congress designates them as wilderness. Areas closed to non-energy leasable minerals would generally be the same as under Alternative B.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts would be greatest under Alternative D. The BLM would continue designation and special management for only three ACECs: Blue Hill, Bull Gulch, and Glenwood Springs Debris Flow Hazard Zone. Alternative D would have the least benefits for special status wildlife species of all alternatives.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative D, a total of 26 stream segments (see Alternative A), totaling 144 miles of stream length, would be determined to be not suitable for inclusion in the National Wild and Scenic River System. Each of these stream segments would be released from protections under which they were previously covered under Alternative A. This would adversely affect special status wildlife species, particularly bird species that prefer riparian habitats for breeding.

BLM_0016717

### Cumulative Impacts (Special Status Terrestrial Wildlife)

The cumulative impacts for special status wildlife vary by species. These cumulative impacts would result from surface disturbance and disruptive activities in and near the CRVFO, such as housing development, oil and gas development, and increased recreation. The quantity and quality of habitat available for special status species would be expected to decline over time, especially under Alternatives A and D, which have the fewest overall restrictions and result in the most development of mineral resources.

The challenge of habitat fragmentation and associated impacts, primarily on biological resources, is anticipated to continue under all alternatives. Regardless of landownership, surface-disturbing activities, fire, weed spread, and activities that remove vegetation and disturb soil are anticipated to contribute to habitat fragmentation within the planning area. Habitat fragmentation from non-BLM actions in the planning area is primarily anticipated from urban development, energy development, and associated infrastructure (e.g., roads and utility lines). The majority of habitat fragmentation is anticipated to occur near population centers, particularly in Garfield and Mesa Counties in the CRVFO, which are anticipated to have the most population growth over the life of the plan. Habitat fragmentation is also expected to be greater in the western portion of the CRVFO, where most of the mineral development is concentrated.

Increasingly, agencies are working together to reduce habitat fragmentation in the CRVFO and surrounding lands. For example, the BLM, the Federal Highway Administration (FHWA), USFWS, USFS, CDOW, and Colorado Department of Transportation (CDOT) entered into an MOU to address the impacts of the Interstate-70 corridor on wildlife dispersal and habitat fragmentation. The MOU aims to identify and implement corrective actions to increase the permeability of the I-70 corridor to terrestrial wildlife species and to streamline the Section 7 consultation process under the ESA for certain projects relating to the corridor.

In general, Alternative C has the most actions to prevent habitat fragmentation, such as closing the most acres to livestock grazing and fluid minerals leasing, applying NSO stipulations on the most land, designating the fewest SRMAs, and designating the most ROW exclusion areas and special designations. Alternative A has the fewest actions to prevent habitat fragmentation, as it uses outdated guidance to manage BLM lands. As such, cumulative impacts from habitat fragmentation would be greatest under Alternative A and the least under Alternative C.

If supported by favorable economic conditions, population centers are expected to grow in both geographic area and population density over the life of the plan. The trend in western states of subdividing larger private parcels to support development of residential subdivisions and ranchettes (e.g., 35-acre parcels) is expected to continue and contribute to habitat fragmentation. As larger tracts of land adjacent to public lands are subdivided, the urban interface and its associated issues (e.g., fragmentation, fire suppression, and spread of weeds) are also expected to grow. As the urban interface expands, some tracts of BLM land may become disconnected or isolated from other native habitats and ultimately adversely affect planning area biological diversity. For example, the towns of Carbondale, Glenwood Springs, New Castle, and Rifle all have public lands bordering them that are used as "backyard" recreation areas by local residents. Pressure to use and expand these recreation areas is expected to continue as these communities continue to grow. The fences, roads, weed spread, fire suppression, and changes in land use associated with an expanding urban interface all serve to fragment habitat. In addition, multiple landowners in the urban interface are expected to result in varied management of resources and resource use impacting habitat fragmentation, including weed spread, fire, wildlife, livestock grazing, OHV use, and development.

BLM_0016718

Land acquisitions by the BLM for the purposes of maintaining vegetation and wildlife habitat, including habitat for special status species, could increase the potential to mitigate degradation of habitat, especially where such acquisitions by the BLM would result in large contiguous blocks of public land.

Surface disturbances associated with uses such as recreation, oil and gas, and residential or commercial development would result in cumulative effects over a larger scale and would continue into the future. The combined amount of surface disturbance of these past, present, and future actions would be detrimental to special status wildlife. Other surface-disturbing activities, such as road building and increased OHV use, would increase human access to sensitive areas where the special status wildlife species occur.

Major disturbance factors include recreation throughout most of the area, habitat alteration from mineral related development, and some vegetation treatments, such as forest improvement projects. Direct impacts would be loss of individual special status animals. Indirect impacts would be loss or reduction of cover, forage, and breeding habitat. The overall cumulative impact of activities proposed for all of these resources is projected to be moderate to detrimental at localized areas within the short term, with some long-term improvements for wildlife habitat, such as reclamation. Change in land use or ownership could also result in the loss of habitat for some wildlife species.

The cumulative impacts of all these land uses could affect the sustainability of some populations of special status wildlife species in the future, with the potential for impact greatest under Alternatives A and D and reduced under Alternatives B and C, respectively. It would benefit special status wildlife species to designate potential ACECs and manage for wilderness characteristics because numerous wildlife habitats would be given special management protection within the boundaries of those designated areas. These benefits would be the greatest under Alternatives B and C.

BLM_0016719

### 4.2.8   Cultural Resources

Cultural resources are finite and irreplaceable material and physical remains of prehistoric and historic human activity, occupation, or endeavor. Cultural resources include prehistoric and historic archaeological locations, architectural structures, features, and objects and Native American traditional cultural and religious properties. Natural features, such as mountains, springs, and landscapes that are important to history or that have traditional or religious meaning to a cultural group, also are considered cultural resources.

The primary goals of cultural resources management are to identify and evaluate these resources to determine their appropriate uses or management and to administer them accordingly, both on public lands and on other lands where BLM decisions would have a significant impact. The objective of cultural resources management has several parts: preserving sites and landscapes, promoting public outreach and education, encouraging professional and academic research, and facilitating Native American traditional uses and consultation with interested groups.

Cultural resources on BLM land are protected by an extensive framework of laws, regulations, executive orders, and formal agreements that have requirements for consultation, site-specific inventory, and evaluation of impacts. The most important of these is Section 106 of the NHPA. Nearly all implementation actions would be subject to further cultural resource review before site-specific projects are authorized or implemented. If adverse impacts are identified, mitigation measures, including avoidance, would have to be implemented to minimize or eliminate the impacts. For broad implementation actions, formal agreement documents would have to be initiated between the interested parties to mitigate impacts (e.g., SHPO, Tribal Historic Preservation Officers, tribal councils, and other groups).

Facilitation of Native American consultation and the recognition of Native American interests are emphasized in all the action alternatives. The preservation of site integrity, setting, and feeling is emphasized, along with the identification and development of protective measures. Increased consultation with Native American groups would provide land managers with information regarding site use and significance. This information would provide additional mechanisms for site protection that might not have been recognized. In this effort, an ethnographic study of the Ute people was initiated. One of the goals of this study was to bring the Ute people onboard with the RMP process to gather information on their priorities for resource protection and management actions. This study began in 2007 (Ott 2010) and will likely continue into the future through additional consultations and field trips to the planning area and significant sites. It includes management recommendations for incorporating Native American interests and protections.

### *Assumptions*

- All four alternatives require that BLM-held cultural resources be managed and protected and comply with all relevant laws and regulations.

- Cultural resources are defined as including archaeological, historic, and Native American traditional cultural property (TCP), religious sites, and sensitive areas unless otherwise specified in the analysis.

- Historic properties are defined as "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register. The term includes, for purposes of these regulations, artifacts, records, and remains that are related to and located within such properties. The term 'eligible for inclusion in the National Register' includes both properties formally determined as such by the Secretary of the Interior and all other properties that meet National

BLM_0016720

Register listing criteria" (quoted from 36 CFR 800.2(e); compare National Historic Preservation Act, Section 301, Appendix 5).

- "An adverse effect is found when an action would alter the characteristics of a historic property that qualify it for inclusion in the National Register of Historic Places (NRHP) in a manner that would diminish the integrity of the property's location, design, setting, workmanship, feeling, or association. Adverse impacts would include reasonably foreseeable impacts caused by the action that would occur later in time, be farther removed in distance, or be cumulative" (36 CFR, Part 800.5a).

- Direct impacts result from implementing the management goals, objectives, and actions of other resources that conflict with cultural resource management goals, objectives, and actions.

- Indirect impacts are caused by actions that are farther removed in time or distance.

- Beneficial impacts include management actions or policies that result in preserving the characteristics of cultural resources that are important to traditional or religious uses and protecting the integrity of the cultural property's location, design, setting, workmanship, feeling, or association that would qualify them for listing on the NRHP.

- Any ground-disturbing activity should be considered a potential threat to cultural and Native American resources. Adverse impacts are permanent and beneficial impacts cannot reverse these impacts; therefore, every impact would be considered cumulative. Even minor impacts accrue over time, resulting in deteriorating site condition and loss of important scientific data and cultural values.

- All NSO stipulations, regardless of the resource being protected, would also likely protect cultural resources. Without these protections, information relevant to the function, dates of occupation, plants and animals used, past environments, and other important research questions would be lost.

- Buffer zones would provide beneficial protection for historic properties from direct and indirect impacts and alterations to setting and feeling, an integral part of TCPs and other significant Native American resources.

- All alternatives require consultation with Native American tribes and recognition of tribal interests during the planning phase of proposed federal undertakings.

- Traditional cultural property locations, importance, and extent of use are limited by the communities associated with them. Maintaining access to and reducing impacts on them are responsibilities of the BLM and an important objective of cultural resource management.

- The Blue Hill ACEC would be designated for its cultural and Native American resources values. All cultural resources would be protected from incompatible activities within this archaeological landscape and it would be nominated to the NHRP as a district.

- Periodic monitoring would establish a baseline of direct, indirect, and cumulative impacts and the intensity and duration of unapproved uses that could occur as a result of approved undertakings, as well as casual public uses.

- Promoting research opportunities and site interpretation would result in additional scientific information about cultural resources for the professional and Native American communities as well as provide valuable information to resource managers. Site interpretation for the public would result in long-term beneficial impacts on the resource base as a whole by helping to educate the public about the importance of cultural and tribal resources.

BLM_0016721

- Nondiscretionary mining notices are not federal undertakings, but 43 CFR, Part 3809, specifically provides for the protection of cultural properties by prohibiting mining operators on claims of any size from knowingly disturbing or damaging these properties.

- Unauthorized or unplanned activities, wildland fire, dispersed recreation, natural processes and unauthorized collection, excavation, and vandalism would lead to impacts that would be difficult to monitor and mitigate. Impacts on TCPs, sacred sites, historic trails, and some other cultural resources that are significant for reasons other than data potential would be difficult or impossible to mitigate unless the resources and associated settings are avoided.

### *Method of Analysis*

Analysis is based on knowledge of the cultural resource base, the Class I statistical model (Reed et al. 2008), and the level of impacts (or risk of impacts) on cultural resources from the plan. Quantitative analysis was not undertaken for all resources but was concentrated on resources that would have the greatest adverse or beneficial impact on cultural resources. This GIS process consisted of overlaying the other resource values with the cultural high prehistoric and historic sensitivity areas database, and then clipping the common areas as potential impact zones. Qualitative impacts were based on the best professional judgment of the preparers and BLM cultural resource specialists.

- Approximately 90 percent of the planning area has not been inventoried for cultural and Native American resources. Only a small percentage of the cultural resources have been identified, and fewer have been evaluated for their eligibility for the NRHP or their potential importance to traditional communities. Therefore, an assumption is made that historic properties and significant Native American resources (TCPs and religious sites) would be present throughout the planning area and would be subject to impacts and mitigation prescriptions as appropriate.

- The cultural resource database as of May 2007 contained 6,250 known sites. These data were used in the Class I analysis (Reed et al. 2008) and for the RMP analyses.

- Approximately 11.1 percent of the planning area has been inventoried to current archaeological standards.

- The average site density is 11.6 known sites per square mile inventoried; this assumption acknowledges that cultural sites do not occur uniformly across the planning area.

- Impacts on cultural resources from the transportation system are presented in the following three ways:

  o The first was to determine the number of miles of transportation routes that overlap the high prehistoric and historic sensitivity zones, with the exception of obliterated routes.

  o The second method incorporated the assumption that cultural resources within a quarter mile of a road or trail are more susceptible to adverse impacts, including looting and vandalism, than backcountry sites (Nickens et al. 1981, Hovezak et al. 2003). This analysis was based on a quarter-mile wide corridor on each side of the road/trail.

  o The third was to determine the probable number of sites within this half-mile-wide corridor using the assumptions that a square mile equals 640 acres and there are about 11.6 sites per square mile.

- Calculations for ground disturbances are used in a relative sense to compare alternatives.

BLM_0016722

At the time of preparation of this document, many of the GIS layers associated with management actions were not available, which limited the ability to conduct spatial analysis. In addition, a variety of changes to Chapter 2 were being made at the same time Chapter 4 was being prepared. As a result, the analysis may not reflect all of the changes made in Chapter 2. Some of these changes may alter the analysis.

Impacts on cultural resources are assessed by applying the "criteria of adverse effect." The criterion provides a general framework for identifying and determining the context and intensity of potential impacts on cultural resources However, a complete assessment of impacts involving Native American or other traditional community, cultural, or religious practices or resources also requires focused consultation with the affected group. In this analysis, the criteria of adverse effect are applied on a broad scale to all known or anticipated cultural resources or cultural resource types.

## Environmental Consequences

Impacts on cultural resources would result from some of the actions included under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on cultural resources under any of the four alternatives.

### Alternative A

**Impacts from Cultural Resource Management.** Under Alternative A, present management would continue to comply with applicable laws and regulations, including a 100-meter avoidance buffer based upon Technical Guidance from the CO BLM state office (Haas 2008) to protect historic properties from adverse direct impacts and reduce the potential for indirect impacts. This buffer has been incorporated into the Standard Operating Procedures for Cultural Resource Management and has been used consistently across-the-board for all resources that may impact a historic property since 2008.

**Impacts from Soils Management.** Many cultural resources are susceptible to damage and destruction from ground disturbance and erosion. Damage to cultural sites from ground disturbance could include the modification of the spatial relationships and displacement and broken or destroyed artifacts, features, and midden deposits. The information loss is relevant to the site function, dates of occupation, subsistence, and past environments, and is important to understanding cultural resources. Reclamation measures would preserve or restore the setting of cultural resources as long as the methods used did not impact cultural resources further. Actions under all of the alternatives would limit soil erosion on steep slopes and ground-disturbing activities. These actions would be beneficial and would help protect cultural resources.

Under Alternative A, soil protection measures would be limited primarily to debris flow and erosion hazard zones. As a result, direct and indirect impacts on cultural resources would be greater under this alternative than under Alternatives B, C, and D. Adverse effects would occur if compliance with pertinent laws and regulations were not followed. In addition, inadvertent discovery would still likely occur.

**Impacts from Water Resources Management.** Under this alternative, water quality issues dominate the goals and objectives to protect watersheds and municipal water sources. Protections of watersheds function in the capture, retention, and release of water in quantity, quality, and time to meet aquatic and terrestrial ecosystem needs and to ensure that streams are in geomorphic balance with the water and sediment being supplied by the watershed (e.g., GS -NSO-5 and GS -NSO-3).

BLM_0016723

Detrimental effects on cultural resources would be similar to those described under soil management. Additionally, erosional processes would have the potential to expose once-buried cultural resources, resulting in an adverse impact. Short-term adverse impacts on cultural resources might occur, depending on the action and methods used to achieve the desired result of protecting water resources. Modifying water resource management practices and stream restoration techniques to address causal factors would probably provide for long-term cultural resource protection.

Some water sources and features are important to the tribes. Actions that protect and maintain these water features and native plant and animal natural resources would help preserve these tribal values and traditional resources.

Adverse effects would occur if compliance with pertinent laws and regulations were not followed during project planning and implementation. Inadvertent discoveries would probably continue. Adverse impacts under Alternative A would be similar to Alternative D, and would probably result in more direct and indirect impacts on cultural resources than under Alternatives B and C.

**Impacts from Vegetation Management.** The goals of vegetation management are to maintain healthy, productive native and other desirable plant communities and ensure riparian vegetation compliance with Land Health Standards 2 and 3, maintain forest health, and improve rangeland forage. This would probably be beneficial in the long run for cultural resource management goals. The restoration of desired native species would help retain the historic setting and protect tribal valued resources by reducing visual interference and noise, thus preserving the setting and feeling and benefiting cultural, Native American, and TCP resources. However, vegetation treatments to eliminate some weed species may adversely affect a Native American resource.

Mechanical, biological, and chemical treatments could adversely affect cultural resources. Ground-disturbing mechanical vegetation treatments could result in substantial direct impacts that include churning soils and features and breaking artifacts. Chemical treatments could alter the chemistry of soils and the artifact residue. These changes could affect the potential and reliability of obtaining accurate radiocarbon dates or determining the function and use of an artifact. Prescribed fire treatments would cause adverse impacts primarily on standing wooden cultural resource features and rock art. These treatments are currently practiced under Alternative A and could cause direct and indirect adverse effects on historic properties and important Native American resources. The key to preventing these adverse effects would be carefully planned and executed implementation and mitigation measures.

Adverse effects would occur if pertinent laws and regulations are not followed. Inadvertent discoveries would probably still occur. Direct and indirect adverse effects on cultural resources under Alternative A would probably be greater than under Alternatives B, C, and D.

**Impacts from Fisheries and Wildlife Management.** The objectives and action to maintain healthy productive plant and animal communities of native and other desirable species, minimize big game stress, and protect winter ranges and concentration areas, severe winter range, migration corridors, and birthing areas are important Native American values. Implementation measures to achieve these goals could include chemical and mechanical treatments, prescribed fire, reduced road and trail density, pond construction or maintenance, and water guzzler installation. All of these actions could initially result in adverse impacts on cultural and Native American resources but in the long term would be beneficial to cultural resource management goals.

BLM_0016724

The key to preventing adverse effects would be carefully planned and executed implementation and adherence to mitigation measures.

Adverse effects would occur if pertinent laws and regulations were not followed; inadvertent discovery effects would probably still occur. Adverse impacts under Alternative A would be similar to Alternative D, and would be less protective of cultural and Native American resources than under Alternatives B and C.

**Impacts from Special Status Species Management.** Protection of special status species and habitat by requiring inventories before ground disturbance and imposing stipulations restricting surface-disturbing activities would be beneficial to cultural resources. Any action that restricts ground-disturbing activities would reduce the potential for direct and indirect impacts on cultural resources. Additionally, these measures would probably reduce visual interference and noise, thus preserving the setting and feeling of TCPs and sensitive Native American resources, and preserving their integrity. Preservation of certain species that are culturally important to the tribes would also be beneficial; however, there may be some loss of access to these species for gathering purposes. Collecting rare plants or plant parts would need to be as permitted by the BLM. Alternative A would provide fewer beneficial protections for cultural and Native American resources than under Alternatives B, C, and D. Inadvertent discoveries would probably still occur.

**Impacts from Visual Resource Management.** Protection of open spaces, natural aesthetics, and scenic vistas are considered a social, economic, and environmental benefit. VRM Class I and Class II classifications provide more protection of these values; therefore, they would also constitute the greatest beneficial impact on cultural resources. By maintaining the integrity of the visual landscape, the BLM would ensure the landscape, feeling, association, and setting of TCPs, thereby preserving their integrity. Table 4.2.8-1 presents the high cultural sensitivity zones overlain with the various VRM classes.

This alternative has the fewest acres designated as Class I and II of all the alternatives; however, the percentage of prehistoric and historic resources protected would be greater under Alternative A, thereby providing the greatest protection for cultural resources under these designations. However, only surveys within these Classes will determine if this projection is true. When all the visual classes across all the alternatives are considered, Alternative A would have fewer beneficial impacts than under Alternatives B and C and about the same as Alternative D.

**Impacts from Wildland Fire Management.** Both wildland fire and prescribed fire would have the potential to result in direct disturbance or loss of cultural resources through the destruction or modification of structures, features, artifacts, cultural use areas, and culturally modified trees. Organic materials and the information that might have been obtained from cultural resources are especially vulnerable to heat damage, but intense fire could damage stone as well. Fire control and suppression would involve ground-disturbing activities that could also directly impact cultural resources by altering the spatial relationships of archaeological sites. The removal of vegetation increases the visibility of cultural resources and exposes previously undiscovered resources. This could be beneficial or detrimental. These newly discovered resources could then be studied, increasing the informational database or protections that could be installed to preserve these resources. However, they may also be destroyed by the fire or erosional processes. Sites exposed by fire or flagged for fire avoidance in prescribed burns would also be susceptible to unauthorized collection and vandalism. The risk of adverse impacts on cultural resources is greatest from unplanned wildland fire since the locations of cultural resources are less likely to be known and avoided during the fire and fire suppression.

BLM_0016725

**Table 4.2.8-1**
**Visual and Cultural Resources Sensitivity**

| | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Class I Acres (approx.)** | **17,100** | **33,600** | **33,600** | **34,000** |
| Within prehistoric high sensitivity zones (acres) | 12,500 | 9,900 | 9,900 | 15,100 |
| (%) | 73% | 29% | 29% | 44% |
| Within historic high sensitivity zones (acres) | 3,600 | 2,120 | 2,120 | 3,710 |
| % | 21% | 8% | 6% | 11% |
| **Class II Acres (approx.)** | **230,100** | **249,200** | **258,100** | **228,300** |
| Within prehistoric high sensitivity zones (acres) | 153,440 | 176,700 | 186,000 | 163,800 |
| (%) | 67% | 71% | 72% | 72% |
| Within historic high sensitivity zones (acres) | 44,500 | 47,600 | 48,100 | 45,900 |
| (%) | 19% | 19% | 19% | 20% |
| **Class III Acres (approx.)** | **113,700** | **102,100** | **97,000** | **104,600** |
| Within prehistoric high sensitivity zones (acres) | 87,000 | 79,000 | 74,600 | 78,400 |
| (%) | 77% | 77% | 77% | 75% |
| Within historic high sensitivity zones (acres) | 6,600 | 5,500 | 5,000 | 5,500 |
| (%) | 6% | 5% | 5% | 5% |
| **Class IV Acres (approx.)** | **144,200** | **120,300** | **116,000** | **138,300** |
| Within prehistoric high sensitivity zones (acres) | 100,500 | 88,000 | 83,000 | 96,300 |
| (%) | 70% | 73% | 72% | 70% |
| Within historic high sensitivity zones (acres) | 920 | 540 | 540 | 540 |
| (%) | 1% | <1% | <1% | <1% |
| **Urban (approx.)** | **170** | **170** | **150** | **150** |
| Within prehistoric high sensitivity zones (acres) | 150 | 150 | 130 | 130 |
| (%) | 89% | 87% | 88% | 87% |
| Within historic high sensitivity zones (acres) | 78 | 77 | 76 | 76 |
| (%) | 52% | 52% | 50% | 50% |

Adverse impacts could introduce seeds and pollens, which could impact the accuracy of paleobotanical or radiocarbon data obtained from cultural resources. When possible, designated fire classes and planning could reduce these adverse impacts by avoiding culturally sensitive areas when creating firebreaks and by using minimum impact suppression tactics in sensitive areas. The key to preventing adverse effects is carefully planned and executed implementation and adherence to mitigation measures for prescribed fires. Restoration of native vegetation serial stages by fire management would probably be a long-term beneficial impact for Native American resources.

Adverse effects would occur if compliance with pertinent laws and regulations were not followed. Inadvertent discoveries would probably still occur. Impacts both detrimental and beneficial on cultural resources would be similar across all the alternatives.

**Impacts from Cave and Karst Resource Management.** Cave and karst resources would be managed to retain their current physical, social, and operational settings under all of the alternatives, which could be beneficial to cultural resources. However, the protections under Alternatives B, C, and D and the NSO stipulation prohibiting surface occupancy and surface-disturbing activities would not be present under Alternative A. This absence could also lead to adverse impacts on cultural resources. In addition, overuse from public visitation could result in direct and indirect impacts, which could affect the integrity of significant cultural resources.

BLM_0016726

Adverse effects would occur if compliance with pertinent laws and regulations are not followed. Inadvertent discovery would probably still occur. Adverse direct and indirect affects to cultural and Native American resources could be greater under Alternative A than under Alternatives B, C, and D.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** A review of CRVFO lands was undertaken to determine if additional areas possess one or more of the wilderness characteristics of WSAs. No areas were identified for Alternative A. Protections normally afforded non-WSAs would have restricted incompatible activities, thereby adding protections for cultural and Native American locations by reducing the potential for direct and indirect impacts, as well as preserving the integrity of feeling, association, and setting of TCPs and other significant Native American resources.

Adverse effects would occur if compliance with pertinent laws and regulations were not followed. Inadvertent discovery effects would probably still occur. The potential for adverse direct and indirect impacts on cultural resources under Alternative A would be similar to Alternatives B and D but greater than under Alternative C.

**Impacts from Forestry Management.** The focus of improving forest health and vigor by providing a variety of forest products to meet commercial and private demands on a sustained yield basis could lead to direct and indirect adverse impacts on cultural resources, depending on the methods used and the amount of ground-disturbing activity. Maintenance measures that contribute to the restoration or development of old-growth forest structure and composition would probably protect and enhance the setting and feeling of TCPs and other sensitive Native American resources.

Intensive management would include such activities as clearcutting, thinning, mechanical treatments, and prescribed fire. Increased access would be particularly damaging through direct disturbance and erosion and indirect altering of the setting, particularly for Native American resources (e.g., wickiups, platforms, and traps) and TCPs. Healthy forest limited management includes thinning and other less ground destructive treatments and techniques, which would have less adverse impacts on cultural resources than intensive management. Table 4.2.8-2 summarizes forestry within culturally high sensitivity zones across all alternatives.

**Table 4.2.8-2**
**Forest and Woodlands Management and Cultural Resources Sensitivity**

|  | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Intensively Managed Acres (approx.)** | 17,900 | 31,400 | 28,400 | 32,200 |
| Acres | NA | 1,260 | 990 | 1,700 |
| % within prehistoric high sensitivity zones |  | 4% | 4% | 5% |
| Acres | NA | 68 | 53 | 68 |
| % within historic high sensitivity zones |  | 0.2% | 0.1% | 0.2% |
| **Limited Management Acres (approx.)** | 82,400 | 391,700 | 341,500 | 387,700 |
| **Closed Acreage (approx.)** | 27,800 | 81,800 | 135,000 | 85,000 |
| Acres | NA | 53,200 | 86,500 | 56,200 |
| % within prehistoric high sensitivity zones |  | 65% | 64% | 66% |
| Acres | NA | 21,700 | 33,900 | 26,800 |
| % within historic high sensitivity zones |  | 26% | 25% | 31% |

No forest management GIS data were available for Alternative A, therefore no analysis of prehistoric and historic high sensitivity areas could be made. Under Alternative A, less land would be available for intensive

BLM_0016727

treatments, which would be beneficial to cultural resources, but fewer acres would be closed, which would be detrimental.

Adverse effects would occur if compliance with pertinent laws and regulations are not followed. Inadvertent discovery would probably still occur. Adverse direct and indirect impacts would probably be more under Alternative A than under Alternatives B, C, and D.

**Impacts from Livestock Grazing Management.** Direct impacts occur more frequently where livestock concentrate. These impacts include trampling, chiseling, and churning of soils, cultural features, and cultural artifacts, and artifact breakage, resulting from livestock standing, leaning, and rubbing against historic structures, aboveground cultural prehistoric features, and rock art. Indirect impacts include soil erosion, gullying, and increased potential for unlawful collection and vandalism. Continued grazing may cause substantial ground disturbance and cause cumulative, long-term, irreversible adverse effects on cultural resources by reducing their contextual integrity and NRHP value (Haas 2009). Range improvement and maintenance construction projects of such features as springs, reservoirs, fences, corrals, and livestock trails have the potential to adversely affect cultural resources, especially if these areas have not been previously inventoried.

Using measures to restrict livestock grazing and fencing sensitive areas to disperse impacts around riparian areas would tend to protect cultural resources. The downward trend in the number of AUMs over the life of the plan is expected to reduce the type and extent of adverse impacts on cultural resources. Analysis of grazing conditions would continue, and when necessary, the grazing levels would be adjusted to reflect this analysis. This, along with monitoring grazing use by the lessees, would ensure the use is consistent with the allowable uses. These actions would also tend to have beneficial impact on cultural resources.

High culturally sensitive zones within livestock grazing allocations across all alternatives are presented in Table 4.2.8-3.

**Table 4.2.8-3**
**Livestock Grazing and High Cultural Resources Sensitivity**

|  | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Number of Allotments** | **252** | **204** | **193** | **203** |
| **Acres (approx.)** | **489,600** | **451,400** | **432,000** | **443,400** |
| Acres | 341,300 | 314,700 | 302,200 | 309,900 |
| % within prehistoric high sensitivity zones | 70% | 70% | 70% | 70% |
| Acres | 50,700 | 43,000 | 39,800 | 44,000 |
| % within historic high sensitivity zones | 10% | 10% | 9% | 10% |
| Acres closed to livestock grazing | 15,300 | 53,600 | 73,000 | 61,500 |
| Available AUMs | 56,900 | 36,000 | 35,500 | 36,500 |

Conflicts between livestock congregation areas and cultural resources would continue under all the alternatives, requiring additional cultural resource inventories and mitigation. The percentage of lands within prehistoric and historic high sensitivity zones is about the same across all alternatives.

Under Alternative A, more acres would be available for livestock grazing by more AUMs, which could result in more adverse impacts on cultural resources than under Alternatives B, C, and D. Additionally, no provision

BLM_0016728

would be made for excluding livestock from disturbed areas under Alternative A. Implementing this alternative would result in additional ongoing and future adverse impacts on cultural resources. Additionally, adverse impacts would occur if compliance with pertinent laws and regulations are not followed. Inadvertent discoveries would still occur. This alternative would probably have the greatest potential for adverse impacts on cultural resources of the four alternatives.

**Impacts from Recreation and Visitor Services Management.** Recreational use and access would adversely affect cultural resources through ground disturbance, soil compaction, altered surface water drainage, erosion, and intrusions of setting and feeling to TCPs and other sensitive Native American resources. Additionally, access to once remote areas could lead to direct and indirect impacts, including unauthorized excavation, collection, and vandalism. The potential for adverse impacts on cultural resources would increase as the population and recreational pressure increase or as they are concentrated.

The designation of eight SRMAs in this alternative would increase the intensity of permitted use of these areas, increasing the risk for direct, indirect, and inadvertent damage to cultural and Native American resources. Although cultural resources would be protected somewhat by a variety of NSOs, indirect impacts would increase as a result of increased visitor use, motorized recreation, and user modifications to trails and camping areas. Depending on the type of activity and the intensity of use, the potential for direct and indirect impacts on cultural resources would vary. For example, motorized and mechanical activities concentrated in specific areas would have more potential to adversely affect cultural resources. User created trails can often lead to increased erosion, exposing and damaging cultural resources. An increase in human presence can also intrude on values (e.g., setting and feeling), which are important to TCP or other sensitive Native American resources.

High cultural sensitivity zones within proposed SRMAs across all alternatives are presented in Table 4.2.8-4.

**Table 4.2.8-4**
**SRMAs and Cultural Resources Sensitivity**

|  | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Number of SRMAs** | 8 | 6 | 2 | 7 |
| **Acres (approx.)** | 60,400 | 51,000 | 23,800 | 68,200 |
| Acres | 50,500 | 32,000 | 23,600 | 56,800 |
| % within prehistoric high sensitivity zones | 84% | 63% | 99s | 89% |
| Acres | 20,800 | 19,700 | 19,000 | 22,000 |
| % within historic high sensitivity zones | 35% | 39% | 80% | 35% |

Eighty-four percent of the SRMAs are potentially within high prehistoric sensitivity zones, while 35 percent would be within highly historic sensitivity areas. Adverse impacts would probably be greater in SRMAs with an emphasis on motorcycles or OHV use, followed by mountain bike use. Potential adverse impacts on cultural resources within SRMAs under this alternative would probably be similar to Alternative D, since the number of SRMAs, acres within SRMAs, and the percentage of acres within high culturally sensitive areas are about the same. Dispersed recreation, while not intensive, would have the same potential for adverse impacts, primarily through ground disturbance, vandalism, and unauthorized collecting; however, it would be spread across a wider area. This would make monitoring and mitigating adverse impacts on cultural resources difficult. Dispersed camping would be allowed throughout the planning area, with the exception of specified areas in Fisher Creek, Spring Creek, Glenwood Canyon, and Deep Creek. The removal of camping in these

BLM_0016729

areas would decrease the potential of adverse impacts on cultural resources. Recent studies indicate that most people do not travel more than one-quarter mile from an established camp or road (Nickens et al. 1981, Hovezak et al. 2003). While this would not keep the cultural resources in these areas from adverse impacts, it would probably reduce the potential of impacts on outlying cultural resources.

Construction of additional visitor facilities would probably result in adverse impacts due to ground disturbances. Alternative A would not include additional visitor facilities, which would reduce the amount of ground disturbance and the potential direct and indirect effects on cultural and Native American resources.

SRPs could reduce the potential of adverse impacts by reducing overuse by commercial users within specific areas. Additionally they could provide an avenue for public education and interpretation, which could result in long-term beneficial impacts on cultural resources. Additional cultural review and monitoring of SRPs could reduce the potential for direct and indirect impacts.

ERMAs are undesignated recreational areas managed on an interdisciplinary resource base to allow the public the freedom to pursue a variety of recreation for a variety of outcomes. Specific ERMAs to address local recreation issues, targeted outcomes, or prescribed recreation setting conditions could result in direct and indirect adverse impact in the same way as SRMAs. The magnitude of effects would be dependent on the specific activity and management prescriptions applied to meet these activities. No ERMAs have been identified under Alternative A, but everything outside a SRMA within the planning boundary could be considered an ERMA. High cultural sensitivity within the proposed ERMAs across all alternatives is presented in Table 4.2.8-5.

**Table 4.2.8-5**
**Designated ERMAs and Cultural Resources Sensitivity**

|  | Alternative A* | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Number** | 0 | 6 | 9 | 5 |
| **Acres (approx.)** | 0 | 45,500 | 71,300 | 33,000 |
| Acres | 0 | 39,600 | 46,600 | 14,800 |
| % within prehistoric high sensitivity zones |  | 87% | 65% | 45% |
| Acres | 0 | 7,200 | 7,700 | 4,900 |
| % within historic high sensitivity zones |  | 15% | 11% | 15% |

* No GIS information was available for ERMAs under Alternative A; therefore, no spatial analysis was undertaken.

Adverse direct and indirect effects would occur if compliance with pertinent laws and regulations are not followed. Inadvertent discovery effects would probably continue to occur. Implementation of Alternative A would be expected to result in more adverse effects on cultural resources than the other alternatives.

**Impacts from Comprehensive Trails and Travel Management.** OHV use and user created trails can result in similar adverse direct and indirect impacts as described under recreation and visitor services. Impacts on cultural resources from open cross-country OHV use would result in more impacts than those in SRMAs dedicated to motorized uses. No open OHV use would be permitted within the CRVFO, thereby reducing the potential for adverse impacts. Ongoing direct and indirect impacts on cultural resources from use of current routes are less likely to be detected or monitored. Restricting vehicle use to existing or designated routes would also reduce the risk of disturbing cultural resources located off travel routes and help protect TCPs and sensitive Native American resources from impacts that might otherwise affect their integrity. However, enforcing travel routes would be difficult, and unauthorized travel would probably continue. The

BLM_0016730

closure of areas to OHV use provides the greatest protection for cultural resources, as long as administrative access is maintained to allow Tribal motorized access to TCPs for cultural uses. The potential risk for unauthorized collection or vandalism would continue.

Travel routes within high cultural sensitivity areas, as presented in Table 4.2.8-6, are based on the methodology assumptions presented above.

**Table 4.2.8-6**
**Designated Routes and Probable Impacted Sites**

|  | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Miles of routes (all designations except obliterated)(approx.)** | 6,800 | 6,800 | 6,800 | 6,800 |
| Within prehistoric high sensitivity zones (miles) | 3,400 | 3,370 | 3,250 | 3,390 |
| (%) | 57% | 49% | 48% | 49% |
| Acres within 0.25 mile of routes within high prehistoric zones | 536,300 | 534,300 | 648,200 | 536,003 |
| Estimated number of sites within zone | 9,700 | 9,700 | 11,800 | 9,700 |
| Within historic high sensitivity zones (miles) | 150 | 147 | 140 | 153 |
| (%) | 2% | 2% | 2% | 2% |
| Acres within 0.25 mile of routes within high historic zones | 25,800 | 26,300 | 25,700 | 26,600 |
| Estimated number of sites within zone | 470 | 480 | 470 | 480 |

The number of miles within the high prehistoric sensitivity zones under Alternative A would be similar to Alternative D but more than under Alternatives B and C, as would the projected number of prehistoric resources that could be impacted. Historic era resources would be less likely to be impacted. However, only surveys will determine if this projection is true.

Adverse effects would occur if compliance with pertinent laws and regulations are not followed because routes are designated without surveying or monitoring to determine if historic properties, TCPs, or other Native American sensitive areas are present. Inadvertent discovery effects would probably continue. The potential for adverse impacts under Alternative A would be greater than under Alternatives B and C, and slightly more than under Alternative D.

**Impacts of Lands and Realty Management.** Management actions under this resource include retaining, acquiring, and disposing of lands or interests that complement important resource values and that enhance multiple use and further management objectives. The exchange or disposal of lands to nonfederal entities would permanently remove federal protections for significant cultural resources and would be an adverse effect under the NHPA, if not adequately mitigated. The retention of lands would be beneficial for cultural resources because they would remain under federal ownership and protection.

The issuance of ROWs for transportation systems, utilities, communication sites, and renewable energy would also occur. Provisions for siting utility and communication lines along existing corridors where cultural resources are present could be both beneficial and detrimental. Placing linear features side by side would be beneficial to cultural resources located some distance away from the corridors since they would not be disturbed. However, side-by-side linear features could have an adverse effect on cultural resources within the

BLM_0016731

corridor. As each new linear feature is added, additional disturbance is likely to the same cultural resource, which would require the BLM to mitigate the adverse effects. In some cases, some sites would have to be mitigated repeatedly as new lines are added. Various NSOs and CSUs could reduce the area available or would limit how and when the land could be assigned ROWs, which would be a beneficial impact on cultural and Native American resources. Retention areas and ROW avoidance and exclusion areas are presented in Table 4.2.8-7.

**Table 4.2.8-7**
**Retention Areas and ROW Avoidance and Exclusion Areas**

|  | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Retention acres | 494,400 | 488,400 | 488,700 | 418,300 |
| ROW avoidance areas (acres) | 101,300 | 169,600 | 162,000 | 126,700 |
| ROW exclusion areas (acres) | 20,800 | 39,300 | 50,600 | 39,000 |
| Disposal acres | 11,100 | NA | NA | NA |

Under Alternative A, the CRVFO would identify land suitable for disposal through public sale, which could result in adverse impacts on cultural resources if they are not mitigated. Although Alternative A does not call for designating specific retention areas, a combined 494,400 acres would continue to be considered unsuitable for disposal, which would be beneficial to cultural resource management goals. ROW exclusion or avoidance areas set aside under Alternative A could be detrimental to cultural resources.

Adverse effects would occur if compliance with pertinent laws and regulations were not followed. Inadvertent discovery would also still occur. Potential adverse impacts on cultural resources under Alternative A would be more than under Alternatives B, C, and D.

**Impacts from Renewable Energy Management.** As interest in renewable and alternative energy sources increases, the potential for ground disturbance would also increase, which could result in adverse direct and indirect impacts on cultural resources. Additionally, construction of facilities required for renewable energy would probably result in adverse impacts on setting and feeling for TCPs and significant Native American resources. At present, the area available for renewable energy developments would be limited and generally would occur outside high cultural sensitivity areas, although this could change in the future. Under this alternative, a case-by-case review would determine the needs for cultural resources inventory and mitigation.

Adverse effects would occur if compliance with pertinent laws and regulations were not followed. Inadvertent discovery effects would occur if newly discovered cultural resources were identified during project implementation. Potential adverse impacts on cultural resources under Alternative A would probably be similar to Alternatives B, C, and D, depending upon the demand for renewable resources.

**Impacts from Coal Management.** The Grand Hogback Field is the primary location in the CRVFO with the potential for coal mining; however, no leases have been issued and no development has occurred since recent mining operations closed in 1991. If in the future coal mining were permitted, there would be the potential for ground-disturbing activities and the potential for adverse direct and indirect impacts on cultural and Native American resources. All permits would have to comply with NRHP Section 106 procedures before being authorized, to ensure that historic properties were not within the permit area or that they were mitigated. The same would apply for TCPs or other areas of Native American significance.

BLM_0016732

Adverse effects would occur if compliance with pertinent laws and regulations were not followed. Inadvertent discovery effects would still occur. Under Alternative A, the potential for adverse impacts would likely be greater than the other alternatives since the number of restrictive stipulations would be less than under Alternatives B, C, and D.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Exploration, development, and maintenance would continue through the life of the plan, based on RFD scenarios. Although large portions of the planning area would be open to energy and mineral exploration, only a small portion of the planning area is expected to be subject to new disturbance or further development, which could adversely impact significant cultural and Native American resources if compliance with pertinent laws and regulations were not followed. The relocation of industrial facilities when an activity is incompatible with cultural resource protection would be beneficial. Abandonment of facilities would also have beneficial impacts by reducing access to or activity in areas where cultural and Native American resources are present or anticipated.

Mineral withdrawals, closures, and NSO stipulations would further reduce the risk of adverse impacts from existing development, providing additional direct and indirect protection, and would benefit cultural resources and TCPs. The potential impacts from oil and gas development within high cultural resources sensitivity is presented in Table 4.2.8-8.

**Table 4.2.8-8**
**Energy and Mineral Management and Cultural Resources Sensitivity**

|  | High Gas Potential | Medium Gas Potential | Low Gas Potential | Unknown Gas Potential |
|---|---|---|---|---|
| Acres | 205,800 | 146,400 | 358,100 | 15,800 |
| % within prehistoric high sensitivity | 32% | 43% | 28% | 2% |
| Acres | 7,960 | 15,000 | 28,200 | 4,6700 |
| % within historic high sensitivity | 1% | 4% | 2% | 1% |

The majority of the high and medium gas potential areas occur within high prehistoric zones, which would result in a greater probability of direct and indirect impacts. Potential impacts on historic resources would be low because most gas exploration and development is outside town boundaries and urban areas where historic resources are congregated.

Oil and gas exploration and development would be subject to the NRHP Section 106 process, protocol regulations, or permitting stipulations, which would probably avoid or address many potential adverse impacts. However, the potential of indirect impacts on cultural resources, TCPs, and their settings would probably be difficult or impossible to adequately mitigate. Alterations to the landscape would impact a large number of cultural and Native American resources. Adverse impacts on cultural resources should be addressed early in the planning phase after the required inventories are completed. Restricting mineral activities that impact NRHP listed or eligible cultural resources, TCPs, or Native American resources, or requiring additional mitigations (COAs) would be beneficial to cultural resource management goals. However, ongoing indirect impacts in the vicinity of existing developed energy locations would probably continue.

BLM_0016733

Adverse effects would occur if compliance with pertinent laws and regulations were not followed. Inadvertent discovery would probably still occur. Under Alternative A, more surface disturbance would be allowed than under Alternatives B and C, but less than under Alternative D; as such, the potential for adverse direct and indirect impacts on cultural resources would also be greater under Alternative A.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Locatable minerals and mining activity is anticipated to increase under all alternatives. This would increase the potential for adverse direct and indirect effects on cultural resources. Numerous mining claims currently exist, but at present, the only significant mining activity is associated with gypsum mining claims north of Gypsum. The uranium, vanadium, and copper operations have been closed and mostly reclaimed. Gold placer activity is primarily limited to sporadic recreational gold panning and dredging. Saleable minerals are primarily limited to small to medium size sales for commercial and residential uses and are sold or permitted under the Salable Minerals Sale Act of 1947, as amended. Nondiscretionary mining notices are not federal undertakings, but 43 CFR, Part 3809 specifically provides for the protection of cultural properties by prohibiting mining operators on claims of any size from knowingly disturbing or damaging these properties.

Various NSOs, CSUs, TLs, state wildlife areas, fish hatcheries, domestic watershed areas, and VRM Class I and Class II areas would benefit cultural resources by restricting ground disturbance and maintain visual integrity. However, any time ground-disturbing activities are anticipated, the potential for adverse direct and indirect impacts on cultural resources also increases. All permits would have to comply with NRHP Section 106 procedures before being authorized, to ensure that historic properties are not within the permit area or that they are mitigated as needed.

Adverse effects would occur if compliance with pertinent laws and regulations were not followed. Inadvertent discovery effects would occur if newly discovered cultural resources are identified during project implementation. Under Alternative A, the potential for impacts on cultural resources would be greater than under Alternatives B, C, and D, due to fewer restrictive stipulations and protections.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** These special management areas are important for the protection of a number of resources, e.g., geologic, botanic, historic, cultural, and scenic resources, fish and wildlife resources, and rare or exemplary natural systems, or to protect human life and property from natural hazards. Although, not all ACECs would be specifically designated for the protection of cultural resources, all ACECs would be beneficial due to the special management accorded them. Special management practices include heavy equipment use avoidances, ground disturbance restrictions, new motorized route prohibition, annual monitoring, and incompatible activity avoidance. Additional beneficial impacts would be afforded though various resource NSOs, VRM Classes I and II, and ROW exclusion and avoidance areas. All of these practices would provide beneficial impacts on cultural resources.

Under this alternative, six areas would be designated as ACECs. The Blue Hill ACEC would be designed under all alternatives to specifically manage and protect cultural and Native American resource concerns; thereby its designation would be an obvious beneficial impact on cultural and Native American resources. Cultural high sensitivity zones within ACECs are presented in Table 4.2.8-9.

BLM_0016734

Table 4.2.8-9
ACECs and Cultural High Resources Sensitivity Zones

|  | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Number | 6 | 9 | 16 | 3 |
| Total Acres (approx.) | 27,000 | 34,500 | 65,800 | 20,200 |
| Acres | 20,300 | 25,000 | 43,700 | 14,600 |
| % within prehistoric high sensitivity zones | 75% | 73% | 66% | 72% |
| Acres | 5,690 | 5,620 | 12,100 | 4,090 |
| % within historic high sensitivity zones | 21% | 16% | 18% | 20% |

Under Alternative A, 75 percent of the ACECs are within high prehistoric sensitivity zones, while only 21 percent are within a historic era high sensitivity zone. This would indicate that Alternative A might be more protective than the other alternatives; however, the greater area protected under ACEC designations under Alternative C would probably provide the most long-term benefits to cultural resources. Even with the protections provided for ACECs, the potential for adverse impacts still exists if compliance with relevant laws, regulations, and guidelines is not achieved. In addition, the potential for inadvertent discovery effects would still occur. Potentially, Alternative A could be less protective and would provide fewer beneficial impacts on cultural resources than under Alternatives B and C, but more than under Alternative D.

**Impacts of Wilderness and Wilderness Study Areas (WSAs) Management.** The existing four wilderness areas would be retained under all alternatives. Characteristics that define WSAs include naturalness and solitude, both of which are important Native American values, especially for maintaining TCP integrity. All activities approved in a WSA would be closely managed to ensure that they would not impair the area's wilderness characteristics or its suitability for designation as wilderness, including restricting ground-disturbing activities.

Protecting these areas from incompatible activities would reduce the potential for adverse direct and indirect impacts on cultural resources, as well as provide beneficial impacts by protecting the integrity of feeling, association, and setting of TCPs and other sensitive Native American resources. Restrictive stipulations from other resources, such as NSOs, VRM Classes I and II, and ROW exclusion and avoidance areas, would be beneficial and would tend to protect cultural resources.

Adverse effects would occur if compliance with pertinent laws and regulations were not followed. Inadvertent discovery effects would probably still occur. The protection of WSAs would benefit cultural resources and reduce the potential for direct impacts and indirect impacts. Beneficial and detrimental impacts on cultural resources would probably be similar across all alternatives.

**Impacts of Wild and Scenic Rivers (WSRs) Management.** Evaluation of eligible river segments as well as the identification of suitable river segments for inclusion into the NWSRS would protect ORVs, which includes cultural resources. Proposed developments would have to comply with those permitted by the Wild and Scenic Rivers Act and the NHPA Section 106. Twenty-one identified stream segments would be managed under interim protection to preserve their free-flowing nature, ORVs, and tentative classification. Depending on the stream classification, impacts on cultural resources could be either beneficial or detrimental. The intensity of impacts would vary dependent on the use. Wild and scenic classification would probably result in fewer direct impacts and would probably be more protective of the landscape setting and feeling, which

BLM_0016735

would benefit TCPs and other sensitive Native American areas, although indirect impacts would probably continue. Recreational classifications would probably result in more direct and indirect impacts.

Adverse effects would occur if compliance with pertinent laws and regulations were not followed. Inadvertent impacts would probably still occur. The potential for adverse direct and indirect impacts on cultural resources would probably be greater under Alternative A, due to fewer restrictive stipulations and protections than are present under Alternatives B and C, and slightly less than under Alternative D.

### Alternative B (Preferred Alternative)
Impacts to cultural resources from management of other resources would be as described below.

**Impacts from Cultural Resource Management.** Under Alternative B, compliance with applicable laws and regulations would still be required. However, a 200-meter avoidance buffer (CRV-NSO-39) would be applied to historic properties to better protect these resources from direct and indirect adverse impacts. Analysis of looting and vandalism (Nickens et al. 1981, Hovezak et al. 2003) has shown that distance is a key factor in prevention of adverse effects on cultural resources. These NSOs would increase the protection of cultural resources. The 0.25-mile buffer (CRV-NSO-37) would apply to TCPs and other Native American areas of cultural concern for protection. Additionally, proactive field inventories and research would continue to provide information about cultural resources for the benefit of the public, archaeological community, and most importantly to resource managers. The BLM would work toward a cooperative agreement with the tribes, the USFS, and other interested parties to identify and protect Native American sites for the future of all Americans by incorporating information from the Ute Ethnohistory of west-central Colorado (Ott 2010). This includes reintroducing Native American tribes to their heritage lands and developing an intern program for Native Americans to learn about and earn college credit by obtaining ethnographic information useful to the tribes and government entities.

**Impacts from Wildland Fire.** Impacts on cultural resources from wildland fire management would be the same as or similar to those under Alternative A.

**Impacts from Soils Management.** Impacts on cultural resources would be similar to Alternative A, except that protective measures included under this alternative to ensure surface disturbances would not accelerate erosion on a watershed basis, thereby providing additional protection to cultural and Native American resources. Compliance with Colorado Public Land Health Standard 1 would also be beneficial to cultural resources. Adverse direct and indirect impacts under this alternative would be less than under Alternative A and similar to Alternatives C and D.

**Impacts from Water Resources Management.** Impacts on cultural resources would be similar to Alternative A; however, the additional protective management prescriptions would provide additional benefit for cultural resource management goals. Adverse direct and indirect impacts under this alternative would be less than under Alternative A, similar to Alternative C, and slightly more than under Alternative D.

**Impacts from Vegetation Management.** Impacts on cultural resources would be similar to Alternative A, except that implementation of vegetation treatment and manipulation projects based on several land management goals, including forest health, livestock forage improvement, noxious and invasive weed control, and big game habitat improvements, would be greater than under Alternative A. This could result in additional adverse impacts if laws and regulations were not followed. However, protective management

BLM_0016736

prescriptions, such as CSU-3, would probably provide additional protections to cultural resources. Direct and indirect adverse impacts under this alternative would be less than under Alternative A and similar to Alternatives C and D.

**Impacts from Fish and Wildlife Management.** Impacts on cultural resources would be similar to Alternative A, with the exception of habitat improvements that could include the construction of in-channel features, ponds, and water guzzlers, with a potential adverse impact on cultural resources. The relocation of travel routes, sale or exchange of lands to consolidate wildlife habitat, and protection of State Wildlife Areas from unnecessary surface occupancy and surface-disturbing activities could increase the beneficial impacts on cultural resources. Direct and indirect impacts under this alternative would be less than under Alternative A and D and more similar to Alternative C.

**Impacts from Special Status Species Management.** Impacts on cultural resources would be similar to Alternative A, except that the addition of more surface restrictions, buffers, and closures limiting activities that are incompatible with cultural resource protection and management would be beneficial. The identification and modification or removal of in-channel features that block the movement of fish may result in adverse impacts, since some water diversion structures may be considered historic properties. Modification of these historic facilities might damage their integrity, resulting in a considerable adverse effect, requiring, at a minimum, consultation with the SHPO and the application of mitigating measures to reduce or eliminate the adverse effect. This alternative would provide more beneficial protections for cultural resource management goals than Alternate A, but less than under Alternative C and somewhat more than under Alternative D.

**Impacts from Visual Resource Management.** Impacts on cultural resources would be similar to Alternative A; however, the increase in VRM Classes I and II acres when compared to Alternative A would increase the level of protection of TCPs and sensitive Native American resources within these classes. However, the percentage of Class I and II lands within high cultural sensitivity zones is less than under Alternative A, suggesting that fewer cultural properties might be protected. Only surveys within these Classes will determine if this projection is true. This alternative would provide more long-term protection for cultural resource management goals than under Alternative A and D but less than under Alternative C.

**Impacts from Cave and Karst Resource Management.** Impacts on cultural resources would be similar to Alternative A; however, additional NSO stipulations prohibiting surface occupancy and surface-disturbing activities under this alternative would complement cultural resource management goals. Beneficial effects would be greater under this alternative than under Alternative A and similar to Alternatives C and D.

**Impacts from Forestry Management.** Impacts on cultural resources would be similar to Alternative A; however, the increase in the number of acres available for intensive and limited management, as well as the associated number of miles of roads that would have to be built, would probably have adverse direct and indirect impacts on cultural resources. Additional measures to limit ground-based harvesting systems to slopes of 40 percent or less on suitable soils would probably also result in fewer direct impacts. The closure of more acres would have a beneficial impact for cultural resource management goals. Under this alternative, potential adverse impacts on cultural resources would be less than under Alternatives A and C and similar to Alternative D.

**Impacts from Livestock Grazing Management.** Impacts on cultural resources would be similar to Alternative A, except that under Alternative B the provision for excluding livestock from disturbed areas for

BLM_0016737

two years, or until site-specific analysis determines that recovery has occurred, would provide temporary and possibly long-term benefits for cultural resource management goals by avoiding the adverse impacts resulting from loss of vegetation cover, erosion, and livestock trampling. Thirty-five allotments would also be closed to livestock grazing due to suitability concerns. The reduced amount of land available for grazing, along with the reduction in AUMs, would reduce the potential of direct and indirect impacts and the intensity of these adverse impacts. The percentage of lands available within culturally high sensitivity zones is the same across alternatives. Adverse effects under this alternative would be less than under Alternative A, more than under Alternative C, and about the same as Alternative D.

**Impacts from Recreation and Visitor Services Management.** Impacts on cultural resources would be similar to Alternative A, except that under this alternative six SRMAs would be designated. Fewer acres would be dedicated for motorcycle and OHV recreational use. Additionally, fewer acres would be in the high sensitivity zones for both prehistoric and historic resources than under Alternative A, thereby reducing the potential of direct and indirect impacts. Six ERMAs would also be designated to specifically address local recreation issues, which could increase the potential for direct and indirect impacts on cultural resources. Increased cultural resources monitoring and other resource CSU and NSO protections would benefit cultural resource management goals and help protect historic properties, TCPs, and areas of Native American significance. Alternative B would probably result in fewer direct and indirect impacts on cultural resources than under Alternative A, about the same as Alternative D, and more than under Alternative C.

**Impacts from Comprehensive Trails and Travel Management.** Impacts on cultural resources would be similar to Alternative A, except that under this alternative, fewer miles of designated routes would be within both the prehistoric and historic sensitivity zones, thereby reducing the potential of adverse impacts on outlying sites. However, inadvertent discovery effects would probably continue to occur. Adverse direct and indirect impacts under this alternative would probably be less than under Alternative A and C and about the same as Alternative D.

**Impacts from Lands and Realty Management.** Impacts on cultural resources would be similar to Alternative A, except that the reduction in the area of retention could result in more adverse impacts on cultural resources. However, this would probably be offset by the addition of avoidance and exclusion areas, which would have a beneficial impact on cultural resource management goals. The addition of the Blue Hill ACEC as an exclusion area would greatly benefit cultural and Native American resources. Adverse direct and indirect impacts under this alternative would probably be less than under Alternative A, more than under Alternative C, and about the same as Alternative D.

Effects from renewable energy management would be similar to Alternative A, except that fewer acres would be available for leasing, which would result in fewer direct and indirect impacts on cultural and Native American resources. Potential adverse impacts on cultural resources under Alternative A would probably be similar to Alternatives B, C, and D.

**Impacts from Coal Management.** Impacts on cultural resources would be similar to Alternative A, except that application of special conditions, more detailed planning, lease sale, or post-lease activities, including resource protective measures, would benefit cultural resource management goals. Adverse impacts under Alternative B would therefore be less than under Alternative A, more than under Alternative C, and about the same as Alternative D.

BLM_0016738

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).**
Impacts on cultural resources would be similar to Alternative A, along with more restrictive stipulations than under Alternative A. This would benefit cultural resource management goals and would reduce the potential for adverse impacts. Potential adverse direct and indirect impacts would therefore be less under this alternative than under Alternative A, about the same as Alternative D, but more than under Alternative C.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts on cultural resources would be similar to Alternative A, except that under this alternative, more lands would be recommended for withdrawal or exempt from salable and non-energy solid leasable minerals. All of these actions would benefit cultural resource management goals by reducing the potential for direct and indirect impacts. Adverse direct and indirect impacts under this alternative would therefore be less than under Alternatives A and D, but more than C.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts on cultural resources would be the similar to Alternative A, except that three additional ACECs would be designated; however, while the protected acres would increase, the percentage within high cultural sensitivity zones would be slightly less than under Alternative A. This suggests that fewer resources would be protected under this alternative. However, the additional ACEC acres would provide more long-term benefits for cultural resource protection, so there would probably be fewer adverse direct and indirect impacts under this alternative than under Alternatives A and D but more than under Alternative C.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Impacts on cultural resources would be similar to Alternative A, except that under this alternative, additional protections would enhance the benefits for the protection of cultural and Native American resources. These additional protections include no motorized or mechanical travel in the Eagle Mountain WSA, no surface occupancy or ground-disturbing activities, and designation of VRM Class I for these areas. Impacts under Alternative B would be more beneficial than under Alternative A and similar to Alternatives C and D.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Impacts on cultural resources would be similar to Alternative A, except that under Alternative B1, four eligible river segments would be suitable for congressional designation in the NWSRS. Alternative B2 (stakeholder alternative) would add two more river segments, for a total of six. Monitoring the ORVs within each segment would retain their integrity and would also help protect historic values associated with the segments. The closure to fluid minerals leasing and the ROW avoidance or exclusion restrictions would provide long-term protection of cultural resources by restricting incompatible uses; however, these designations could also increase the potential for adverse impacts due to increased focused recreational uses. Direct and indirect impacts would probably continue with the potential for them to increase through time. The restrictive stipulations and public education could reduce the potential for adverse impacts. This alternative would be more protective than under Alternative A, but would be less than under Alternative C and more than under Alternative D.

## Alternative C

Impacts to cultural resources from wildland fire management and wilderness and WSA management would be the same as or similar to Alternative A. Impacts to cultural resources from soils management, cultural resources management, cave and karst resource management, and wild and scenic rivers management would be the same as or similar to Alternative B. Impacts from management of all other resources and uses would be as described below.

BLM_0016739

**Impacts from Water Resources Management.** Impacts on cultural resources under this alternative would be similar to Alternative B, except CRV-CSU-2 would be added. This CSU calls for site-specific relocation within 100 feet of the edge of a hydrologic feature, which would benefit cultural resources management goals by protecting sites along water features. This alternative would have the fewest adverse direct and indirect impacts on cultural and Native American resources.

**Impacts from Vegetation Management.** Impacts on cultural resources under this alternative would be the same as Alternative B, with the exception that this alternative has more restrictions to protect riparian and wetland zones (CRV-NSO-6). These protective measures would also benefit cultural resources management goals by protecting sites along water features. This alternative would have the fewest adverse direct and indirect impacts on cultural and Native American resources.

**Impacts from Fish and Wildlife Management.** Impacts on cultural resources under this alternative would be similar to Alternative B; however, a few fish and wildlife management protective measures would be upgraded under this alternative. While all these measures would benefit cultural resource management goals, the oil and gas NSO in State Wildlife Areas would provide substantially more benefits. This alternative would have the fewest adverse direct and indirect impacts on cultural and Native American resources.

**Impacts from Special Status Species Management.** Impacts on cultural resources under this alternative would be similar to Alternative B; however, protective measures included under this alternative would be somewhat more restrictive than under Alternative B, thereby providing additional beneficial impacts on cultural resource management goals. This alternative would have the fewest adverse direct and indirect impacts on cultural and Native American resources.

**Impacts from Visual Resource Management.** Impacts on cultural resources under this alternative would be similar to both Alternatives A and B; however the increase in VRM Classes I and II acres, when compared to Alternatives A and B, would increase the level of protection of cultural and Native American resources, especially TCPs. The percentage of Class I and II lands within high cultural sensitivity zones is less than under Alternative A, suggesting that fewer cultural properties might be protected. However, only surveys within these classes would determine if this projection were true. In the long term, Alternative C likely would provide the greatest amount of protection for cultural resource management goals.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Six areas would be managed as LWCs under Alternative C and managed to protect their wilderness values. High cultural sensitivity zones within these LWCs are presented in Table 4.2.8-10.

**Table 4.2.8-10**
**Lands with Wilderness Characteristics (LWCs) and Cultural Resources Sensitivity**

|  | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Number** | 0 | 0 | 6 | 0 |
| **Acres (approx.)** | 0 | 0 | 47,000 | 0 |
| Within prehistoric high sensitivity zones (acres) (%) | NA | NA | 29,700 63% | NA |
| Within historic high sensitivity zones (acres) (%) | NA | NA | 10,500 22% | NA |

BLM_0016740

These areas would be protected by many of the same management actions that would protect such sensitive areas as WSAs, ACECs, WSRs, SRMAs, sensitive plant and wildlife areas, and visually sensitive areas. Protecting these areas from incompatible activities would reduce the potential for adverse direct and indirect impacts on cultural resources, as well as protect the integrity of feeling, association, and setting of TCPs and other sensitive Native American resources. However, non-WSA lands that have already been leased for fluid minerals development could experience impacts from surface disturbance, which would probably result in adverse direct and indirect impacts on cultural resources, and require mitigation. Overall, this alternative would provide the most protection for cultural resource management goals.

**Impacts from Forestry Management.** Impacts to cultural resources under this alternative would be similar to Alternative B, except that there would be fewer acres available for intensive and limited management, along with the associated number of miles of roads to access these areas. While there would probably still be direct and indirect impacts on cultural and Native American resources that would have to be mitigated, the closures would have a beneficial impact on cultural resource management goals. Adverse impacts on cultural resources would be less under this alternative than under Alternatives B and D, but more than under Alternative A.

**Impacts from Livestock Grazing Management.** Impacts to cultural resources under this alternative would be similar to Alternative B, except that 55 allotments would be closed due to suitability issues. The reduced amount of land available for grazing, along with the reduction in AUMs, could reduce the potential of direct and indirect impacts, as well as the intensity of these impacts. The percentage of lands available within culturally high sensitivity zones is the same across alternatives. This alternative would have the fewest adverse impacts.

**Impacts from Recreation and Visitor Services Management.** Impacts on cultural resources under this alternative would be similar to Alternative B, except only two SRMAs would be designated. On the other hand, nine ERMAs would be designated. While fewer acres would be designated as SRMAs, a greater percentage of this land would be within high cultural sensitivity zones, which could increase the potential for direct and indirect impacts. Just the opposite is true for ERMAs. Additionally, far fewer acres would be available for motorcycles and OHV recreational use, which would substantially reduce the potential for adverse direct and indirect impacts. This is especially beneficial for the protection of TCPs and other sensitive Native American areas that have been or could be threatened under other alternatives. Overall this alternative would have the fewest adverse impacts and would provide the most benefits to cultural resource management goals.

**Comprehensive Trails and Travel Management.** Impacts on cultural resources would be similar to Alternative A, except that fewer miles of routes would be designated under this alternative. The potential to impact outlying cultural resources is greater than the other alternatives. This may be a result of where these designated routes are located compared to the other alternatives. However, long-term adverse direct and indirect impacts on cultural resources and management goals would probably be less under this alternative than the other alternatives.

**Impacts from Lands and Realty Management.** Impacts on cultural resources would be similar to Alternative A, except that more acres would be placed in retention and ROW avoidance and exclusion areas under this alternative. Beneficial impacts would be more protective of cultural and Native American resources than the other alternatives. Direct and indirect impacts under this alternative would be substantially less than under Alternative A and slightly less than under Alternatives B and D.

BLM_0016741

**Impacts from Coal Management.** Impacts under this alternative would be similar to Alternative B, except that fewer acres would be available for leasing. This alternative would have the fewest adverse impacts on cultural and Native American resources.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts on cultural resources would be similar to Alternative A, except that under this alternative, more acres would be closed to fluid minerals leasing than the other alternatives. This closure would result in fewer well locations and ancillary facilities, along with more restrictive stipulations, which would benefit cultural resource management goals by providing more protection and fewer adverse impacts. This alternative would have fewer adverse direct and indirect impacts than the other alternatives.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts on cultural resources would be similar to Alternative A, except that more acres could be withdrawn, and more restrictive measures would apply under this alternative than the other alternatives. This alternative would have the fewest adverse impacts on cultural and Native American resources.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts on cultural resources would be similar to Alternative A; however, the addition of ten ACECs would provide more protection for cultural resource management goals. While the area within these ACECs is greater than under the other alternatives, the percentage of land within cultural resource high sensitivity areas is less, suggesting that fewer resources might be protected under this alternative. However, not all the ACECs have been adequately inventoried, and the actual number of significant resources within these ACECs could be greater than projected. Over the life of the plan, more long-term beneficial protections would be afforded to cultural resources. Therefore, there would be fewer direct and indirect impacts under this alternative than under any of the other alternatives. This alternative would provide the greatest protection to cultural resources and would enhance cultural resource management goals.

*Alternative D*

Impacts on cultural resources from wildland fire management would be the same as Alternative A. Impacts on cultural resources from management of all other resources and uses would be the same as or similar to Alternative B, except as described below.

**Impacts from Cultural Resources Management.** Under this alternative, the avoidance buffer would be 100 meters (328 feet) (CRV-NSO-38) instead of 200 meters (656 feet) (CRV-NSO-39). Alternative B would be applied to historic properties to protect these resources from direct and indirect adverse impacts.

**Impacts from Visual Resource Management.** The reduction in VRM Classes I and II acres, when compared to Alternative C, could also reduce the level of protection of cultural and Native American resources, especially TCPs. The percentage of Class I and II lands within high cultural sensitivity zones is less than under Alternative A but more than under Alternatives B and C. This suggests that more cultural properties might be protected under this alternative than under Alternative B and C but fewer than under Alternative A. However, only surveys within these classes will determine if this projection is true. In the long term, the area protected under Alternative D would be expected to be more beneficial for cultural resource management goals than under Alternatives A and B, but less than under Alternative C.

BLM_0016742

**Impacts from Forestry Management.** Impacts to cultural resources resulting from actions and land allocations under this alternative are similar to Alternative B, but with greater potential for adverse impacts on cultural and Native American resources.

**Impacts from Recreation and Visitor Services Management.** Impacts on cultural resources would be similar to Alternative B, except that the percentage of ERMA land within sensitivity zones would be less. There would also be fewer restrictive actions under this alternative when compared to Alternative B, which could result in increased direct and indirect impacts. Adverse effects under this alternative would probably be more than under Alternative C, about the same as under Alternative B, but less than under Alternative A.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts on cultural resources would be similar to Alternative A, except that the increase in acres available for leasing, the number of well locations and roads, as well as fewer restrictive stipulations have the potential to increase the amount of adverse impacts on cultural resources. There would probably be more adverse direct and indirect impacts under this alternative than under the other alternative on cultural and Native American resources.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts on cultural resources under this alternative would be similar to those under Alternative B; however, more acres would be open to mineral exploration, and fewer restrictive stipulations would apply, increasing the potential of direct and indirect impacts on cultural resources. Alternative D would have the most adverse impacts on cultural and Native American resources.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The percentages of ACEC acres within culturally high sensitivity zones are about the same as under Alternative A but lower than under Alternatives B and C. This suggests that more cultural resources might be impacted than under this Alternatives B and C. However, not all the ACECs have been adequately inventoried, and the actual number of significant resources within these ACECs could be greater than projected. Over the life of the plan, more long-term adverse impacts and fewer protections for cultural resources are likely under this alternative. Therefore, potential adverse direct and indirect impacts would be greatest under this alternative on cultural and Native American resources.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The impacts on cultural resources from Wild and Scenic Rivers would be similar to Alternative A, but none of the eligible river segments would be nominated as suitable under this alternative. There would also be fewer restrictive stipulations to protect cultural resources. Direct and indirect impacts on cultural resources would probably continue, with the potential for them to increase through time due to the anticipated increase in river recreational uses. This alternative would have the fewest beneficial impacts on cultural and Native American resources and the greatest adverse impacts.

## Cumulative Impacts

Decisions from this RMP would have impacts that, when combined with other past, present, and reasonably foreseeable actions, could produce cumulative impacts on cultural resources and religious, traditional, or other sensitive Native American resources. The potential for cumulative impacts includes neighboring lands with connected cultural resources and actions, including adjoining BLM lands, the White River National Forest, Bureau of Reclamation (BOR) lands, and state and private lands within and adjacent to the planning area.

BLM_0016743

Every impact on cultural resources is cumulative. Adverse impacts are permanent, and beneficial impacts cannot reverse these impacts.

All federal undertakings, whether sanctioned by the BLM, USFS, or BOR, are required to adhere to cultural resource laws and regulations requiring inventory, identification, and evaluation of cultural sites, avoidance, and in some cases data recovery. These requirements are expected to continue into the future. While federal undertakings can and do extend some protection for cultural resources onto private and state lands, exclusively private projects are subject only to state statutes covering cases of inadvertent discovery of burials.

Increasing development pressures, including increased oil and gas development, recreation uses, construction of pipelines, transmission lines, and roads, urban expansion, as well as livestock grazing, would probably continue on a regional scale. Resource management within the planning area and surrounding areas would probably result in a trend toward increased adverse impacts and ultimately the destruction of many cultural resources through time and across political boundaries. If this trend continues as expected, the preservation of cultural resources, research, public education, and consultation with Native American tribes will become even more critical.

Surface-disturbing activities are the greatest contributor to cumulative impacts on cultural resources. Before the NHPA, Section 106, many activities occurred with no regard for the protection of cultural resources. In the recent past, vegetation treatments using bulldozers and chains ripped trees, mostly pinyon and juniper, from the ground, destroying many cultural resources. These treatments not only destroyed the physical remains of sites (such as wickiups and platforms), but also exposed the ground surface to increasing erosion. In many cases, the increased erosion either washed the site away or exposed buried cultural materials. In addition, many roads and trails were constructed before Section 106. User-created trails and roads still occur and often exacerbate erosion and adversely affect the setting and feeling of TCPs and other Native American sensitive areas, affecting their integrity.

Oil and gas development and other mineral development have occurred across this region in the past and are expected to continue into the future on lands within and surrounding the planning area. As mineral development increases, so will the human presence, thereby increasing the risk of looting, vandalism, and inadvertent impacts, which could ultimately result in adverse cumulative impacts. Impacts depend on the proximity of roads, pads, and support facilities and the magnitude, duration, and intensity of these activities. However, cumulative impacts of mineral development would probably be less than the potential impacts from the increasing recreational activity in and around the planning area, which is expected to continue and increase over time regardless of which alternative is selected.

Regionally and nationally, recreation is on the increase. As more and more people find themselves living in urban environments, the demand to recreate on public lands is becoming more intense. The wide publicizing of recreation within the area, the expanded target audience, and the marketing strategy will likely increase the numbers of recreational users, which would probably stress the regional infrastructure such that it may become insufficient to support the demand for additional public recreation and such services as search and rescue and law enforcement. The expected increased use of public and private lands, along with the availability and use of GPS technology and the easy and rapid access afforded by the substantial increase in OHV use, will continue to subject cultural resources in the region to heightened risk of damage, vandalism, and looting, increasing the cumulative effect on cultural resources.

BLM_0016744

Encroachment onto public lands is also increasing as adjacent agricultural lands are being converted into subdivisions, increasing the risk of impacts on cultural resources. The impacts on adjacent private lands may be significantly greater than on federal lands since they would not be subject to the same requirements or protections as federal lands. The construction of buildings, roads, and associated structures increases ground disturbance, causing adverse direct impacts as well as indirect impacts on the natural landscape. Changes that affect the visual aspect, along with increased noise levels from human presence (voices and vehicles) will affect TCPs and other sensitive Native American resources. Any one of these may individually reduce and cause a loss of scenic values, thus diminishing the landscape setting and the feeling of an area. Cumulatively these impacts would negate integral factors important to TCPs. In general, the more people and development in an area, the greater the potential is for disturbance and increased cumulative impacts on cultural resources.

Analysis of the alternatives has shown that implementation of Alternative C would have the lowest degree of potential negative impacts on cultural resources and would provide the greatest overall benefits for cultural resource management goals. Overall, fewer acres of land would be open for ground-disturbing activities under this alternative than under any other alternatives. While there is no direct correlation between acres of surface and subsurface disturbance and numbers of cultural resources impacted, this trend is substantiated by the analysis. Alternative B would be somewhat less protective of cultural resources with an intermediate potential for adverse impacts. Alternatives A and D have roughly comparable levels of potential adverse impacts on cultural resources, which would be greater than under Alternatives B and C.

Under all alternatives, beneficial impacts, such as those from road closures, reduced livestock grazing, and the maintenance of large undisturbed land blocks, may help to offset these impacts. All undertakings would be subject to the Section 106 process of the NHPA and other applicable laws and regulations. Adherence to appropriate predevelopment, development, and post-development protective measures are critical to mitigate direct, indirect, and cumulative impacts.

BLM_0016745

### 4.2.9   Paleontological Resources

*Methods and Assumptions*

This section is a discussion of impacts on paleontological resources from management actions of other resources and resource uses. Adverse impacts on paleontological resources occur from natural weathering and erosion and from surface-disturbing activities, excavations, and theft or vandalism. In general, adverse impacts on paleontological resources include the physical destruction or damage of fossil-bearing geological formations and resulting loss of significant resources. Without removing some rock surrounding fossils, they would remain largely undetected; therefore, management actions that result in erosion do not necessarily result in damage to paleontological resources. Excessive erosion, especially from other surface disturbance, could damage fossils at the surface. While the location of every significant paleontological locality in the CRVFO is not known, the analysis considers the different management actions and their potential to directly or indirectly affect paleontological resources. Beneficial impacts include increased knowledge about the presence and types of paleontological resources in the planning area. Management actions considered protective of existing paleontological resources are also regarded as beneficial.

For this analysis, adverse impacts on paleontological resources would be significant if there were substantial direct or indirect damage or destruction to or loss of vertebrate fossils or other scientifically significant fossil resources.

The analysis was based on the following assumptions:

- Scientifically significant fossils would continue to be discovered throughout the planning area. Most discoveries would occur in Class 4 and 5 geologic units.

- Inventories conducted before surface disturbance in high-probability areas and some unknown potential areas would result in the identification and evaluation of previously undiscovered resources, which the BLM would manage accordingly.

- Unmitigated surface-disturbing activities could dislodge or damage paleontological resources and features that were not visible before surface disturbance.

- Increased access associated with new development and increased recreation use would lead to increased access to paleontological sites.

- Vandalism and unauthorized collecting could destroy a feature or remove it from its context and availability for scientific study.

- Public education would increase public appreciation and awareness of the need for protection, but publication of specific locations would lead to increased visitation.

*Environmental Consequences*

Impacts on paleontological resources would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no impacts or only negligible impacts on paleontological resources under any of the four alternatives.

*Alternative A*

**Impacts from Paleontological Resources Management.** Management decisions for the protection of paleontological resources would provide opportunities for scientific, educational, and recreational uses of

BLM_0016746

those resources. Standard lease terms require a paleontological survey prior to surface disturbance for areas historically known to produce an abundance of fossils. These surveys may result in protection of any paleontological resources discovered.

**Impacts from Recreation Management.** Unauthorized off-trail recreational OHV travel has the potential to damage undiscovered fossil resources. Theft and vandalism from associated recreational uses also has the potential to destroy these resources. Actions that would have a beneficial impact on protecting paleontological resources include increased monitoring and patrolling, onsite presence of friends groups and volunteers, maintaining trails and signs, controlling erosion, conducting interpretive and guided educational programs, promoting public awareness, and continuing to prohibit unauthorized uses.

Although recreational rockhounding and fossil collecting is allowed on public lands, except for developed recreation sites, special management areas, and where otherwise prohibited and posted, recreational collectors may inadvertently collect scientifically important fossil specimens. Current guidelines specify that common invertebrate and plant fossils can be collected, but not to exceed what one person can fit into a 1-gallon container in 1 day. Vertebrate fossils, which include dinosaurs, mammals, sharks, and fish or any animal with a skeletal structure, or any scientifically important invertebrate or plant fossils cannot be collected on public lands without a special collecting permit administered by the BLM. Increased education and awareness about what is or is not a vertebrate fossil will have a beneficial impact on these resources. Under Alternative A, no management measures would provide increased knowledge and protection of such resources.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Activities related to oil and gas development have the potential to impact paleontological resources if surface-disturbing activities related to such development uncover vertebrate, scientifically important invertebrate, or plant fossils. Predisturbance field assessments of geologic units mapped as Class 4 or 5 under the Potential Fossil Yield Classification (PFYC) system are required of oil and gas operators under standard lease terms and conditions. Field assessments for fossil resources are performed by a qualified paleontologist in areas that are devoid of thick soils, well developed vegetation, or in areas that have previously yielded fossil resources. Oil and gas development or drilling would not be precluded, but mitigations, including preconstruction pedestrian surveys and construction monitoring, may be appropriate. Geologic units mapped Classes 1 to 3 are generally not required to have preconstruction assessments. Under Alternative A, LN-CO-29 requires a paleontological inventory of surface-disturbing activities in Class 4 and 5 paleontological areas.

**Impacts from Locatable Minerals, Mineral Materials, and Non-Energy Leasable Minerals Management.** Paleontological resources could be impacted by the extent and depths of ground disturbance associated with salable and locatable mineral development. However, Lease Notice LN-CO-29 calls for a paleontological survey before land use authorizations or surface disturbance. This inventory allows for avoidance and mitigations to be implemented, which would adversely affect mineral resources, but such actions would be direct and short term. Subsequent reclamation efforts may backfill obscure known paleontological resources, but impacts in that instance would be indirect, preserving the fossil resource until subsequent erosion or additional activities uncover those resources.

### Alternative B (Preferred Alternative)

Impacts on paleontological resources from fluid minerals management and locatable minerals, salable minerals, and non-energy leasable minerals management would be similar to those under Alternative A, although generally less because of less area would be available to these extractive industries and greater

BLM_0016747

restrictions would apply on surface-disturbing activities. Impacts from other resource management actions would be as described below.

**Impacts from Paleontological Resources Management.** Management decisions for the protection of paleontological resources would provide opportunities for scientific, educational, and recreational uses of those resources. Management actions through standard lease terms would continue and further expand the protection of paleontological resources through the Potential Fossil Yield Classification system, which further defines criteria and expectations based on geologic units, to which paleontological resources are closely tied. The Potential Fossil Yield Classification System will be used to classify paleontological resource potential on public lands in order to assess possible resource impacts and mitigation needs for federal actions involving surface disturbance, land tenure adjustments, and land use planning. This classification system for paleontological resources would provide a uniform tool to assess potential occurrences of paleontological resources and evaluate possible impacts.

**Impacts from Recreation Management.** Impacts on paleontological resources from the management of recreation would have beneficial anticipated impacts under this alternative. Increased protection would be provided by management measures to expand paleontological support activities, such as data gathering, GIS integrations, Class 4 and 5 surveys, and sensitivity mapping. Opportunities for education, awareness, and interpretation would be provided for sites deemed suitable for such qualities. Increased educational opportunities may provide greater public awareness of the occurrence of fossils on public lands and the educational values they provide. These actions would have an overall beneficial impact on these resources.

## Alternative C

Impacts from paleontological resources management, recreation management, and locatable, salable, and non-energy leasable minerals management would be similar to those under Alternative B. The greater amount of land closed to fluid minerals leasing under this alternative, and the somewhat generally greater restrictions on surface-disturbing activities would reduce the potential for adverse impacts from fluid and solid minerals development.

## Alternative D

Impacts on paleontological resources would be similar to those under Alternative A and somewhat greater than those under Alternative B and, especially, Alternative C.

## Cumulative Impacts

The cumulative impact analysis for paleontological resources includes the planning area and neighboring lands with connected paleontological resources. The cumulative effects of surface-disturbing activities within PFYC Class 4 and 5 areas, especially mineral development within the region, have the potential to damage or destroy this nonrenewable resource. However, existing laws, regulations, and policies provide for mitigation of effects through avoidance or data recovery efforts. Although it is expected that some fossils would be destroyed in the course of legitimate uses of public lands, as well as natural weathering and erosion, mitigation measures would probably bring paleontologists to areas that had not been previously studied. Fossils that would have otherwise been destroyed would be collected for curation in university and museum repositories. Beyond mineral development, cumulative impacts on paleontological resources could occur through incremental degradation from a variety of sources, including dispersed recreation use and cross-country OHV use. These impacts would reduce the educational and interpretative potential of the resource value, and would result in impacts on paleontological resources.

BLM_0016748

## 4.2.10  Visual Resources

### Methods and Assumptions

This section presents potential impacts of the alternatives on visual resources, specifically the potential for management decisions to create visual changes in or contrasts from the existing landscape. Visual resources generally are impacted by surface-disturbing activities that introduce new visual elements into the landscape, changing the features that characterize the existing landscape (e.g., the form, line, color, and texture of the landform, water, vegetation, and structures). Generally, the greater the surface disturbance, the greater is the change to the characteristic landscape.

BLM's VRM class objectives are used in analyzing impacts on visual resources. These objectives provide a baseline for determining how much a proposed management action would affect visual resources and scenic quality, as well as determining the level of disturbance an area can support while still meeting visual resource objectives. The following BLM VRM class objectives and descriptions are summarized from BLM Manual Handbook H-8431-1 (1986a).

### VRM Class I

The objective of Class I is to preserve the existing character of the landscape. This class provides for natural ecological changes, but it does not preclude very limited management activities. The level of change to the characteristic landscape should be very low and should not attract attention.

### VRM Class II

The objective of this class is to retain the existing character of the landscape. The level of change to the landscape should be low. Management activities may be visible but should not attract the attention of the casual observer. Any changes to the landscape must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.

### VRM Class III

The Class III objective is to partially retain the existing character of the landscape. The level of change to the landscape should be moderate. Management activities may attract the attention of the casual observer but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.

### VRM Class IV

The objective of Class IV is to provide for management activities that require major modifications to the existing character of the landscape. The level of change to the landscape can be high. The management activities may dominate the view and may be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repetition of the basic visual elements of form, line, color, and texture.

All surface-disturbing activities, regardless of the alternative or management action, would be subject to the management objectives of the area within which the activity takes place. The visual resource contrast rating system is used to analyze the potential site-specific impacts of surface disturbance and the facility design and placement. Surface-disturbing activities and facilities would be designed to mitigate their visual impacts and conform to the area's designated VRM objective. Mitigation could include painting, facility design, and placement.

BLM_0016749

The criteria for analysis are the number of acres of the various VRM classes to be designated under each alternative and the associated amount of impacts and surface disturbance anticipated for each class. At the broad-scale level, analysis of the impacts on visual resources is discussed in terms of the number of acres in each VRM class, because the RMP management actions would be required to not exceed the designated VRM class objectives within the CRVFO. Impacts on visual resources are determined through the consistency of proposed management actions with the identified VRM class prescriptions and objectives. More surface disturbance or structures would add to the cumulative impact of resource development on the visual quality of the landscape. Degradation of visual qualities would primarily occur from surface-disturbing activities, such as those associated with construction of ROWs (e.g., pipelines, transmission lines, communication lines) and oil and gas facilities (e.g., well pads, reserve pits, roads). The development of permanent structures would result in long-term degradation of scenic quality and in some cases could become the dominant feature on the landscape. The degree of impact would depend on the amount of development projected to occur and the effectiveness of mitigation measures (e.g., siting, painting, and screening).

The analysis is based on the following assumptions:

- VRM class objectives apply to all resource uses. Class objectives would be adhered to through application of best management practices, which could include special project design, avoidance, or mitigation.

- All management and resource uses would be subject to NEPA analysis, which may include completing a VRM visual resource contrast rating analysis.

- Proposed activities that could not be effectively mitigated would not be authorized.

- In accordance with BLM Policy (2001d), WSAs would be managed as VRM Class I, which would preserve the existing character of the landscape under all alternatives.

- All resources with management actions that permit surface disturbances could have adverse impacts on visual resources to some degree if not properly mitigated. Surface disturbances could introduce new visual elements onto the landscape or intensify existing visual elements, thus altering the line, form, color, and texture that characterize the existing landscape. Changes in air quality from smoke, dust, haze, or other pollutants could reduce or degrade scenic quality by obscuring distant views in the short term and long term. However, the Clean Air Act sets limits on the allowable degradation of visibility within the adjacent Class I Airsheds.

- The greater the size and severity of surface disturbance and degree of air quality degradation, the greater the impact there would be on scenic quality.

- Scenic resources and related "open space" have been identified as an important value on public lands by adjacent affected communities. The importance of scenic values, natural appearing landscapes, and unaltered open space on BLM lands is expected to increase in value to residents and visitors over the life of the RMP. The Visual Resource Management Update (Otak, Inc. 2007) prepared for the CRVFO was used to update VRM classes based on an assessment done with information from affected communities and agencies and from a viewshed analysis done on key transportation corridors with high visual sensitivity within the CRVFO.

- While visual values have been mapped on private surface lands and the BLM would consider the visual values on adjacent private lands when analyzing proposals, visual resource management classes

BLM_0016750

and subsequent management objectives apply only to federal surface lands. On split-estate lands, visual objectives can be adopted for private surface land with a landowner's consent.

- Valid existing leases would be managed under the stipulations in effect when the leases were issued, and new stipulations proposed under this RMP would apply if leases were renewed.

- Actions (such as CSU and NSO) designed to prevent surface disturbance or disturbance to wildlife and special status species could indirectly limit the level of change to characteristic landscapes. In Class I and II areas, these actions could support VRM management objectives but would have a negligible impact, since the level of change to the characteristic landscape would already be low to very low. In addition, NSO stipulations would be applied to all VRM Class I areas, and VRM Class II-designated areas would have CSU leasing stipulations applied. In Class III and IV areas, these actions could be beneficial to the scenic quality by limiting the amount of surface disturbance, since the level of change to the characteristic landscape could be moderate to high. Under all alternatives, NSO and CSU stipulations have exception criteria, which may mean the stipulations would have no impact on visual resources if an exception is granted. The BLM may grant an exception if it can be demonstrated that the surface-disturbing activity would not cause adverse impacts, would have negligible impacts, would improve the protected resource or resource use (as defined by RMP objectives, standards, or conditions in the stipulation), or, by its nature, must be done within the NSO area. Therefore, the impacts on visual resources from NSO and CSU stipulations will be addressed by listing those actions, but the acre totals and impact from specific stipulations from other resources will not be analyzed further.

Table 4.2.10-1 shows the acres of the Visual Resource Inventory (VRI) and designated VRM management classes under each alternative. The analysis assumes that areas designated as VRM Class III and VRM Class IV objectives would permit more surface-disturbing impacts and potentially have greater adverse impacts on visual resources and scenic quality than those areas designated as VRM Class I and Class II objectives.

**Table 4.2.10-1**
**Acres of Visual Resource Inventory and Visual Resource Management Classes by Alternative**

| VRM Class | VRI | Alternative A | Alternative B | Alternative C | Alternative D |
|-----------|-----|---------------|---------------|---------------|---------------|
| Class I | 0 | 17,100 | 33,600 | 33,600 | 34,000 |
| Class II | 228,100 | 230,100 | 249,200 | 258,100 | 228,300 |
| Class III | 129,100 | 113,700 | 102,100 | 97,500 | 104,600 |
| Class IV | 148,100 | 144,200 | 120,300 | 116,000 | 138,300 |
| **Total** | **505,300** | **505,100** | **505,200** | **505,200** | **505,200** |

Acre figures vary by alternative due to variances in GIS shapefiles.

## Environmental Consequences

Impacts on visual resources would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on visual resources under any of the four alternatives.

### Alternative A

**Impacts from Visual Resource Management.** There would be negligible impacts on the visual quality of the landscape in Class I areas, where virtually no change to the visual character of the landscape is allowed. There would be minor impact on the visual quality of the landscape in Class II areas. The objective in Class II areas allows projects to be seen but not to create sufficient impact (i.e., contrast with the surrounding

BLM_0016751

landscape) to attract the attention of the casual observer. However, ongoing resource use and development in areas managed as Class III and IV would have the potential to impact visual resources. This is particularly true in areas that are largely natural in appearance.

Stipulation GS-NSO-18 for the Interstate70 viewshed would prohibit surface occupancy and surface-disturbing activities on slopes over 30 percent with high visual sensitivity. Lands with high visual sensitivity are those within 5 miles of Interstate70, of moderate to high visual exposure, where details of vegetation and landform are readily discernible, and where changes in visual contrast can be easily noticed by the casual observer on the interstate. This management action would preserve and protect visual resources to the extent allowable under the VRM class objectives, with long-term beneficial impacts on scenic quality in these areas.

Table 4.2.10-1 shows the acres designated as each VRM class for all alternatives. The analysis assumes that areas designated as VRM Class III and VRM Class IV objectives would permit more surface-disturbing impacts and potentially have greater adverse impacts on visual resources and scenic quality than those areas designated as VRM Class I and Class II objectives. Compared to the VRI, Alternative A would increase protections to visual resources due to the increase in acres of VRM Class I and II. Compared to Alternatives B, C, and D, Alternative A includes the least amount of VRM Class I and II.

**Impacts from Air Quality Management.** All planning area resources that degrade air quality could have adverse impacts on visual resources to some degree. Changes in air quality from smoke, dust, haze, or other pollutants could reduce or degrade scenic quality by obscuring distant views in the short term and long term. The Clean Air Act sets limits on the allowable degradation of air quality. In addition, impact analysis for air management is deferred pending completion of air quality modeling.

**Impacts from Soils Management.** Over the long term, soil management designed to improve ecological conditions could indirectly enhance visual resources on a localized basis. However, in the short term, methods used to achieve improved ecological conditions could directly create visual changes to landscape form, line, color, and texture.

Stipulations GS-NSO-3 for steep slopes greater than 50 percent for oil and gas facilities and GS-NSO-14 for debris flow hazard zones would prohibit surface occupancy and surface-disturbing activities. GS-CSU-4 for erosive soils and slopes greater than 30 percent may require special design, construction, operation, and reclamation measures to limit the amount of surface disturbance. The intentions of the stipulations were to apply the similar measures to other public land activities in order to reduce erosion and maintain soil site stability.

**Impacts from Water Resource Management.** Over the long term, water resource management designed to improve ecological conditions could indirectly enhance visual resources, on a localized basis. However, in the short term, methods used to achieve improved ecological conditions could directly create visual changes to landscape form, line, color, and texture. Mitigation to meet VRM Class Objectives would be required for any water management-related project that would cause any surface disturbance. Stipulations GS-NSO-3 for major river corridors and GS-NSO-13 for municipal watershed areas would prohibit surface occupancy and surface-disturbing activities.

**Impacts from Vegetation Management.** Restoration and vegetation treatments designed to improve ecological conditions could indirectly enhance visual resources on a localized basis. However, in the short

BLM_0016752

term, methods used to achieve improved ecological conditions could directly create visual changes to landscape form, line, color, and texture. Such impacts would range from minor to moderate, depending on the scope and magnitude of treatment and the methods used. Any vegetation removal associated with larger scale research or restoration efforts could produce impacts similar to those described for mechanical vegetation treatments. Chemical and biological methods would tend to gradually create visual contrasts that mimic natural ecological change, whereas fire and mechanical methods would create such contrasts more suddenly and noticeably. All alternatives allow for a full range of treatment methods (including mechanical, wildland or prescribed fire, and chemical methods). Some of the identified treatment methods (e.g., mechanical, chemical) would result in localized short-term impacts on visual resources by creating visual contrasts.

Stipulations GS-NSO-2 for riparian and wetland zones, which would prohibit surface occupancy and surface-disturbing activities within riparian vegetation, and GS-CSU-2 for riparian/wetland vegetation (within 500 feet of the outer edge) would require special design, construction, and implementation measures.

**Impacts from Fisheries and Aquatic Wildlife Management.** Provisions to maintain and improve the priority habitat requirements on BLM lands for a variety of aquatic species are in all alternatives. These measures would generally complement the maintenance of landscape character and the conservation of visual resources. Constructing or modifying wildlife water developments could create visual contrasts with surrounding landscapes. Stipulation GS-NSO-5 for the Rifle Falls and Glenwood Springs fish hatcheries and GS-NSO-17 for fish hatcheries would prohibit surface occupancy and surface-disturbing activities.

**Impacts from Terrestrial Wildlife Management.** Provisions to maintain and improve BLM's share of the priority habitat requirements for a variety of terrestrial wildlife species are in all alternatives. These measures would generally complement the maintenance of landscape character and the conservation of visual resources. Constructing or modifying wildlife habitat could create visual contrasts with surrounding landscapes. Stipulations for wildlife seclusion areas, State Wildlife Areas, and raptor, waterfowl, and shorebird nesting habitats would prohibit surface occupancy and surface-disturbing activities.

**Impacts from Special Status Species Management.** All alternatives prohibit actions that destroy, adversely modify, or fragment federally listed species habitat and include habitat improvements for special status species, which could indirectly limit the level of change to characteristic landscapes. The protective management prescribed for special status species (including those relating to riparian habitats, ACECs, and non-ACEC habitats) would also indirectly limit the level of change to the landscape. Restoration measures that involve surface or vegetation-disturbing components could create contrast or reduce scenic quality ratings. Such impacts would be direct and short term and could range from minor to moderate, depending on the type of treatment or restoration and the amount of change that it would cause to existing landscape form, line, color, or texture. NSO stipulations for a variety of special status plant and wildlife species would prohibit surface occupancy and surface-disturbing activities.

**Impacts from Cultural Resource Management.** The protective management of cultural resources would generally complement the maintenance of landscape character and the conservation of visual resources. When excavation or restoration measures involve surface- or vegetation-disturbing activities, noticeable contrast or reduced scenic quality ratings could result. Stipulation GS-NSO-38 for historic properties would prohibit surface occupancy and surface-disturbing activities.

BLM_0016753

**Impacts from Wildland Fire Management.** Impacts on visual resources from prevention and mitigation programs aimed at reducing unwanted fire would be similar to those described for vegetation treatments. However, actions related to prevention could reduce human-caused ignitions and related visual impacts caused by fire. Post-fire rehabilitation methods, such as seed drilling, mulching, netting, or hydroseeding, could directly result in localized visual contrasts. Impacts would be minor to moderate in the short term but would become negligible in the long term. Wildland fires and prescribed fires would result in smoke, causing short-term, minor to moderate impacts on visual resources. Such fires would also affect visual resources because of increased vehicle traffic, fire lines, and the contrast between burned and unburned areas. The latter could vary in size from a few acres to thousands of acres.

**Impacts from Cave and Karst Resource Management.** Stipulation GS-NSO-16 for the Deep Creek cave area would prohibit surface occupancy and surface-disturbing activities in the Deep Creek cave area (including NSO for 5,000 feet below the surface). The area encompasses the cave openings, subsurface features, and the watersheds immediately above the caves. Compared to Alternatives B, C, and D, Alternative A provides the same benefits to visual resources but over a smaller area.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under Alternative A, all lands with wilderness characteristics outside WSAs—Castle Peak Addition, Flat Tops Addition, Grand Hogback, Pisgah Mountain, and Thompson Creek—could be managed as VRM Class III or IV. This would lead to management actions that do not retain the characteristic landscape. This would offer less protection to visual resources.

**Impacts from Forestry Management.** Restoration and forestry treatments designed to improve ecological conditions could indirectly enhance visual resources on a localized basis. However in the short term, methods used could directly create visual changes to landscape form, line, color, and texture. These methods are clearcuts, shelterwood, and other partial cuts, pre-commercial and commercial thinning, seeding and planting, timber stand improvement, sanitation treatments, and mechanical treatments or prescribed fire for stand replacement or conversion to achieve improved ecological conditions. Such impacts would range from minor to moderate, depending on the scope and magnitude of treatment and the methods used. Any vegetation removal associated with larger scale research or restoration efforts could produce impacts similar to those described for mechanical treatments. Under Alternative A, a total of 17,900 acres of commercial forestland would be intensively managed.

**Impacts from Livestock Grazing Management.** Livestock grazing would continue to be authorized on 494,400 acres. The installation of additional fences or livestock improvements (cattle guards, water developments, and roads necessary to access improvement sites) could change characteristic landscapes. Such impacts would be localized and long term and could range from negligible to moderate. Where livestock grazing would not be available, the potential for these impacts would be eliminated, effectively maintaining visual resource integrity over the long term. Any removal of livestock facilities in these areas would enhance visual resources in the long term by bringing the area back into its natural or near-natural condition. Areas in which livestock tend to congregate would create contrasts that would be noticeable to the casual observer. These impacts would typically be long term, direct, and localized. Alternative A allows for the most acres available to grazing and would therefore have the most impacts on visual resources.

**Impacts from Recreation and Visitor Services Management.** Overall recreation guidance, ERMA management decisions, and the continued issuance of special recreation permits would not affect visual

BLM_0016754

resources. No specific facilities are identified, but any facilities constructed would be based on needs for resource protection and user demand. New facilities or new types of commercial activities could result in changes to the landscape. However, specific projects are not identified at this time and therefore cannot be analyzed. Recreation would have site-specific impacts near frequent high-use areas, such as campgrounds, parking lots, trailheads, and other recreation-related use areas. Long-duration trail use (e.g., walking, horseback and OHV riding, mountain biking) could result in loss of vegetation cover, especially during wet periods. These impacts would change the characteristic landscape and would be site-specific and localized. Dispersed recreation would create fewer impacts on visual resources than would these more intensive, concentrated recreation uses. Closing or rehabilitating undeveloped sites would restore the visual resources of those sites.

Under Alternative A, existing stipulations GS-NSO-16 for SRMAs and GS-NSO-17 for Recreation Management Areas (both including Rifle Mountain Park) would prohibit surface occupancy and surface-disturbing activities. A total of 60,400 acres is currently managed as SRMAs, and 60,700 acres are recognized as RMAs.

**Impacts from Comprehensive Trails and Travel Management.** Under all alternatives, the designation of OHV open areas could cause adverse impacts on landscapes and visual values. The level of use, season of use, type of soil, and vegetation community all could influence the amount of change to the landscape. Cross-country OHV use could result in visual contrasts in color because of disturbed soils and vegetation and contrasting linear disturbance on the landscape. Although the landscape in many areas would not be impacted by cross-country use because of topographic and vegetation limitations, continuing to manage large areas as open would allow the greatest potential for changes to the landscape and impacts on scenic resources because of soil disturbance, tire tracks, and hill climbs. In those areas in which OHV use is limited to designated routes, management would limit impacts on the landscape to the existing transportation system and would eliminate the creation of new routes that would result in further changes to the landscape and visual quality. The designation of limited routes would protect visual resources by reducing the potential for the creation of additional routes and changes to the landscape, such as soil disturbance, erosion, and loss of vegetation. Areas with a closed designation would have long-term benefits to visual resources because those areas would no longer receive impacts from OHV use. Alternative A would designate 294,300 acres as open to OHV use, 165,300 acres as limited to existing and designated routes, and 44,000 acres as closed to OHVs.

**Impacts from Lands and Realty Management.** ROWs associated roads or other access would create linear features across the landscape. Impacts from issuance of these authorizations would vary based on the nature and purpose of the authorization and the amount of change it would cause to existing landscape form, line, color, or texture. Sale or exchange of public lands would remove all VRM designations and accompanying objectives for protection of their scenic values. When public lands are disposed of, the BLM no longer controls the scenery, and development could affect the visual qualities of adjoining public lands. Because it is unknown which lands (if any) might be sold, it is unknown whether those lands would be of high value because of visual interest. When the BLM acquires lands, it also acquires responsibility for the scenery. Acquired lands would undergo a visual resource inventory or could have a management class designated as part of the acquisition process.

**Impacts from Coal Management.** Exploration and development of coal creates surface disturbances that could adversely affect visual resources. Impacts on visual resources would be unavoidable because of major

BLM_0016755

surface-disturbing activities to mine for coal. However, little development of locatable minerals is expected during the next 15 to 20 years.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** In the area with development, the construction of roads, well pads, and other facilities would add impacts on the landscape. Many of the developments would be visible and would attract attention, which would result in changes to the existing visual resources. Oil and gas development would be augmented by large numbers of lights because drilling rigs operate at all hours of the day and night. Night lighting in the immediate area of gas field development and potentially in large areas surrounding the gas field would significantly reduce the nighttime viewing experiences of individuals. The CRVFO RFD (BLM 2008g) estimated that 99 percent of new gas development would occur in high-potential areas and 1 percent moderate to low potential areas. Fluid mineral development would have long-term adverse impacts on visual resources. Alternative A would manage 679,200 acres as open to fluid minerals leasing and development, potentially resulting in an estimated 2,664 wells on 333 multi-well pads with approximately 3,347 acres of surface disturbance.

**Impacts from Locatable Minerals, Mineral Materials, and Non-Energy Leasable Minerals Management.** Exploration and development of locatable minerals create surface disturbances that could adversely affect visual resources. Impacts on visual resources would be unavoidable because of major surface-disturbing activities to mine for the mineral sources. Alternative A would open 476,900 acres to solid minerals leasing.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Although ACEC designation alone does not necessarily provide protection, the management actions included in ACECs are often more restrictive, thus indirectly providing protection for visual resources.

**Impacts from Wilderness Study Areas (WSAs) Management.** The visual quality of WSAs would be protected. Under all alternatives, they are managed under both the Wilderness IMP and the VRM Class I objective, which would protect them until Congress provides alternate direction for their management. In all alternatives, 27,724 acres would be VRM Class I. This would have long-term benefits to visual management.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Protecting the outstandingly remarkable values of the eligible WSRs would help protect visual resources by preventing ground-disturbing activities that would impact the scenic character in the river corridors. Under Alternatives A, B, and D, eligible segments would be managed under interim protection to preserve their ORVs, free-flowing nature, and tentative classification. This management would preserve the existing character of the landscape in these areas.

Alternative A would identify 26 stream segments as eligible, (refer to Appendix C, Wild and Scenic River Suitability Report, Figures 1-5 through 1-7). See Table 2-3, Summary of Wild and Scenic River Suitable Segment Lengths and Corridor Acres, for total segment lengths and segment study corridor acres, as well as segment lengths on BLM land and segment study corridor acres on BLM land. A description of each segment is provided in Appendix C, Wild and Scenic River Suitability Report.

**Impacts from Transportation Facilities Management.** Under all alternatives, BLM roads would be maintained according to intensity levels. As costs have risen, fewer miles of BLM roads have been maintained each year. The actual miles of roads maintained each year would be based on annual budgets. Maintenance

BLM_0016756

could result in visual contrasts in color because of disturbed soils and vegetation and contrasting linear disturbance on the landscape. Since the roads already exist, these impacts would be low to moderate on the characteristic landscape and would be site specific and localized.

**Impacts from Health and Safety Management.** Under all alternatives, the CRVFO would continue to monitor and address public health and safety as problems arise. Emergency actions required for health and safety management could have an adverse impact on visual resources.

## *Alternative B (Preferred Alternative)*

Impacts to visual resources from management of other resources would be the same as or similar to those under Alternative A except as described below.

**Impacts from Visual Resource Management.** There would be negligible impacts on the visual quality of the landscape in Class I areas. The objective for Class I allow virtually no change to the visual character of the landscape. There would be minor impact on the visual quality of the landscape in Class II areas, where the objective allows projects to be seen but not to create impact (i.e., contrast with the surrounding landscape) sufficient to attract the attention of the casual observer. However, ongoing resource use and development in Class III and IV areas could impact visual resources. This is particularly true in areas that are largely natural in appearance.

The following management actions would preserve and protect visual resources to the extent allowable under the VRM class objectives, with long-term beneficial impacts on scenic quality in these areas:

- Within VRM Class II areas, concentrate all new disturbances within existing ROWs or within 200 meters (656 feet) of existing disturbances.

- Stipulation CRV-NSO-41 prohibits surface occupancy and surface-disturbing activities in VRM Class II areas with slopes over 30 percent and high visual sensitivity to preserve the visual setting and integrity. Lands with high visual sensitivity are those lands within 5 miles of the sensitive viewshed corridors of moderate to high visual exposure, where details of vegetation and landform are readily discernible and changes in visual contrast can be easily noticed by the casual observer.

- Stipulation CRV-NSO-42 prohibits surface occupancy and surface-disturbing activities within areas designated VRM Class I.

Table 4.2.10-1 shows the acres designated as each VRM class for all alternatives. The analysis assumes that areas designated as VRM Class III and VRM Class IV objectives would permit more surface-disturbing impacts and potentially have greater adverse impacts on visual resources and scenic quality than those areas designated as VRM Class I and Class II objectives. Compared to the VRI, Alternative B would increase protections to visual resources due to the increase in acres of VRM Class I and II. Alternative B would provide less benefit than Alternative C, and Alternative D would provide the least benefit for visual resources among the action alternatives. All of the action alternatives provide more benefit to visual resources than Alternative A.

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts under Alternative B would be similar to those under Alternative A, with the additional protection of CRV-NSO-15 for fish-bearing streams,

BLM_0016757

which would prohibit surface occupancy and surface-disturbing activities. Compared to Alternative A, Alternative B offers more benefits to visual resources.

**Impacts from Terrestrial Wildlife Management.** Impacts under Alternative B would be similar to those under Alternative A, with the addition of NSO stipulations for big game migration areas, core wildlife areas, and osprey nesting areas, which would further prohibit surface occupancy and surface-disturbing activities.

**Impacts from Special Status Species Management.** Impacts under Alternative B would be similar to those under Alternative A, with the addition of NSOs for additional special status species (e.g., occupied sensitive plant habitat, big-river fishes, sage-grouse leks, Mexican spotted owl, special status bat habitats, and sensitive amphibian breeding area), which would further prohibit surface occupancy and surface-disturbing activities.

**Impacts from Cultural Resource Management.** The protective management of cultural resources would generally complement the maintenance of landscape character and the conservation of visual resources. When excavation or restoration measures involve surface- or vegetation-disturbing activities, noticeable contrast or reduced scenic quality ratings could result. Stipulations CRV-NSO-37 for heritage areas and CRV-NSO-39 for historic properties would prohibit surface occupancy and surface-disturbing activities. Compared to Alternative A, Alternative B would have similar benefits.

**Impacts from Cave and Karst Resource Management.** Stipulation CRV-NSO-44 for cave and karst occurrence areas would prohibit surface occupancy and surface-disturbing activities in the area of 17 known cave and karst resources (including no subsurface occupancy for 5,000 feet below the surface). The area encompasses the cave openings, subsurface features, and watersheds immediately above the caves. This would apply protective measures on 680 acres for 17 known cave and karst resources. Compared to Alternative A, the addition of CRV-NSO-44 under Alternatives B, C, and D offer more protection to visual resources.

**Impacts from Forestry Management.** Impacts would be similar to those under Alternative A, except that Alternative B would intensively manage 31,400 acres of commercial forest and woodland to target an average annual PSQ of 1.8 million board feet, would apply limited management to the 391,700 acres of remaining forests and woodlands, and would prohibit commercial timber harvest on 81,800 acres of forests and woodlands in CRVFO. Compared to Alternatives C and D, Alternative B has less area that prohibits commercial timber and therefore would have an impact on visual resources.

Alternatives B and D allow for accelerated harvest levels after adverse events (e.g., pine and spruce beetle infestations, other insect outbreaks, disease, blow down, wildfire). Allowing accelerated harvest would accelerate the regenerative process of the forest and lead to a greater variety of natural contrasts in form, line, color, and texture in the characteristic landscape after adverse events. However, the harvest of timber can lead to short-term adverse impacts on the form, line, color, and texture of the characteristic landscape while the area is regenerating. In addition, accelerated harvest levels after adverse events would help to prevent a large wildfire, reducing the risk of experiencing a high degree of modification and contrasts to the existing landscape.

**Impacts from Livestock Grazing Management.** Impacts under Alternative B would be similar to those under Alternative A, except that livestock grazing would continue to be authorized on 451,400 acres.

BLM_0016758

Compared to Alternative A, Alternative B allows for 43,400 fewer acres for grazing compared to Alternative A, which would provide long-term benefits to visual resources.

**Impacts from Recreation and Visitor Services Management.** Impacts under Alternative B would be similar to those for Alternative A, except that Stipulation CRV-NSO-45 for the Rifle Mountain Park would prohibit surface occupancy and surface-disturbing activities, and CRV-CSU-19 for developed recreation facilities and trails would allow the BLM to require special design, construction, and implementation measures.

A total of 51,000 acres would be managed as SRMAs. CRV-NSO-46 for SRMAs would prohibit surface occupancy and surface-disturbing activities in these areas. Compared to Alternatives A and C, recreation and visitor services management under Alternative B provides more benefits to visual resources.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be the same as those under Alternative A, except that Alternative B would designate no acres as open to OHV use, 467,600 acres as limited to designated routes, and 37,300 acres as closed to OHVs. Compared to Alternative A, Alternative B has no open designation and would have long-term beneficial impacts on visual resources.

**Impacts from Lands and Realty Management.** Impacts would be similar to those under Alternative A, except that Alternative B has 169,600 acres of ROW avoidance areas and 39,300 acres of ROW exclusion areas. Compared to Alternative A, Alternative B would provide more benefits to visual resources.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts would be the same as under Alternative A, except that Alternative B would manage 651,400 acres as open to fluid minerals leasing and development, potentially resulting in an estimated 2,206 federal wells on 276 multi-well pads, with approximately 2,774 acres of surface disturbance. Compared to Alternative A, Alternative B creates fewer impacts on visual resources.

**Impacts from Locatable Minerals, Mineral Materials, and Non-Energy Leasable Minerals Management.** Impacts would be similar to those under Alternative A, except that Alternative B would open 362,700 acres to solid minerals leasing. Compared to Alternative A, Alternative B creates fewer impacts on visual resources and the least among all the action alternatives.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts would be similar to those under Alternative A, except that Alternative B would designate 16,200 acres in Thompson Creek, Bull Gulch, and Deep Creek ACECs as VRM Class I and 9,900 acres in Deep Creek, Dotsero Crater, and Glenwood Springs Debris Flow ACECs as VRM Class II. Compared to Alternative A, Alternative B provides more benefits to visual resources.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Impacts would be similar to those under Alternative A, except that Alternative B would determine six eligible rivers as suitable (Figure 2-64, Appendix A). See Table 2-3, Summary of Wild and Scenic River Suitable Segment Lengths and Corridor Acres, for total segment lengths and segment study corridor acres, as well as segment lengths on BLM land and segment study corridor acres on BLM land (segment descriptions are provided in Appendix C, Wild and Scenic River Suitability Report).

September 2011   *Colorado River Valley Field Office – Draft RMP Revision EIS*   4-407
*Chapter 4, Environmental Consequences*

BLM_0016759

_Alternative C_

Impacts under Alternative C to visual resources from soils management, terrestrial wildlife management, special status species, cultural resource management, visual resource management, and cave and karst resource management would be the same or similar to those under Alternative B. Impacts from management of all other resources and uses would be the same or similar to those under Alternative A, except as described below.

**Impacts from Water Resource Management.** Impacts under Alternative C would be similar to those under Alternative B, with the addition of CRV-CSU-2 for hydrologic features, which may apply restrictions preventing surface-disturbing activities. Compared to Alternative A, Alternative C would provide the most benefits to visual resources.

**Impacts from Vegetation Management.** CRV-NSO-6 for riparian and wetland zones would prohibit surface occupancy and surface-disturbing activities and CRV-CSU-4 for riparian/wetland vegetation may require special design, construction, and implementation measures. Compared to Alternative A, Alternative C offers more benefits to visual resources.

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts under Alternative C would be similar to those under Alternative A except for the addition of CRV-NSO-16 for perennial waters, which would prohibit surface occupancy and surface-disturbing activities. Compared to Alternative A, Alternative C would offer more benefits to visual resources.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under Alternative C, all lands within the external wilderness characteristic proposals—Castle Peak Addition, Flat Tops Addition, Grand Hogback, Pisgah Mountain, Thompson Creek—would be managed as LWCs with VRM Class II. This would preclude management actions that do not retain the characteristic landscape. The management of LWCs as closed to fluid minerals leasing (CRV-CL-4) under Alternative C would close Castle Peak Addition, Deep Creek, Flat Tops Addition, Grand Hogback, Pisgah Mountain, Thompson Creek (approximately 47,000 acres). This would preclude impacts on these lands from fluid minerals leasing. CRV-NSO-43 for LWCs would prohibit surface occupancy and surface-disturbing activities. Compared to the other alternatives, Alternative C would be the most beneficial to visual resources.

**Impacts from Forestry Management.** Impacts would be similar to those under Alternative A, except that Alternative C would intensively manage 28,400 acres of commercial forest and woodland to target an average annual PSQ of 1.8 million board feet, would apply limited management to the remaining 341,500 acres of forests and woodlands, and would prohibit commercial timber harvest on 135,000 acres of forests and woodlands in CRVFO. Compared to the other alternatives, Alternative C has the most area that prohibits commercial timber and therefore would have the least impact on visual resources.

Alternative C does not allow for accelerated harvest levels after adverse events (e.g., pine and spruce beetle infestations, other insect outbreaks, disease, blow down, wildfire). Not allowing accelerated harvest would slow the regenerative process of the forest and lead to changes in form, line, color, and texture of the characteristic landscape after adverse events. While these events may be natural, they can still have an adverse impact on visual resources. In addition, not allowing for accelerated harvest levees after adverse events could contribute to or cause a large wildfire. If this were to occur in the area, while it would be a natural process, the landscape could experience a high degree of modification and contrasts to the existing landscape.

BLM_0016760

**Impacts from Livestock Grazing Management.** Impacts under Alternative C would be similar to those under Alternative A, except that livestock grazing would continue to be authorized on 432,000 acres. Compared to Alternative A, Alternative C allows for the least amount of grazing at 66,400 acres less than Alternative A. This would provide the most long-term benefits to visual resources of any of the alternatives.

**Impacts from Recreation and Visitor Services Management.** Impacts under Alternative C under Alternative C would be similar to those under Alternative B. Stipulation CRV-NSO-45 for Rifle Mountain Park would prohibit surface occupancy and surface-disturbing activities, and CRV-CSU-19 for developed recreation facilities and trails would allow the BLM to require special design, construction, and implementation measures. A total of 23,800 acres would be managed as SRMAs. Stipulation CRV-NSO-46 for SRMAs would prohibit surface occupancy and surface-disturbing activities in these areas. In addition, SRMAs would be managed as VRM Class II, so they would provide long-term beneficial impacts on visual resources. Compared to Alternatives B and D, recreation and visitor services management under Alternative C provides fewer benefits to visual resources.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be similar to those under Alternative A, except that Alternative C would designate no land as open to OHV use, 467,400 acres as limited to designated routes, and 37,500 acres as closed to OHVs.

Compared to Alternative A, Alternative C has no open designation, has the most amount of closed designation, and would have the most long-term beneficial impacts on visual resources.

**Impacts from Lands and Realty Management.** Impacts would be similar to those under Alternative A, except that Alternative C has 162,000 acres of ROW avoidance areas and 50,600 acres of ROW exclusion areas. Compared to Alternative A, Alternative C would provide the most benefits to visual resources of all the action alternatives.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts under Alternative C would be similar to those under Alternative A, except that Alternative C would manage 531,500 acres as open to fluid minerals leasing and development, potentially resulting in an estimated 2,206 federal wells on 276 multi-well pads, with approximately 2,774 acres of surface disturbance. Compared to Alternative A, Alternative C creates fewer impacts on visual resources and the least among all the action alternatives.

**Impacts from Locatable Minerals, Mineral Materials, and Non-Energy Leasable Minerals Management.** Impacts would be similar to those under Alternative A, except that Alternative C would open 395,400 acres to solid minerals leasing. Alternative C creates fewer impacts on visual resources than the other alternatives.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts would be similar to those under Alternative A, except that Alternative C would designate 16,200 acres in Thompson Creek, Bull Gulch, and Deep Creek ACECs as VRM Class I and the remaining 49,560 acres of ACECs as VRM Class II. Compared to Alternative A, Alternative C would benefit visual resources and would have the most benefit among all the action alternatives.

BLM_0016761

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Impacts would be similar to those under Alternative A, except that Alternative C would determine all 41 eligible rivers as suitable (Figure 2-65, Appendix A). See Table 2-3, Summary of Wild and Scenic River Suitable Segment Lengths and Corridor Acres, for total segment lengths and segment study corridor acres, as well as segment lengths on BLM land and segment study corridor acres on BLM land (segment descriptions are provided in Appendix C, Wild and Scenic River Suitability Report).

_Alternative D_

Impacts to visual resources from soils management, water resource management, vegetation, cultural resource management, visual resource management, and cave and karst resource management would be the same as or similar to those under Alternative B. Impacts to management of all other resources and uses would be the same as or similar to those for Alternative A, except as described below.

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts under Alternative D would be similar to those under Alternative A, with the additional stipulation of CRV-CSU-6 for trout-bearing streams, which may have site-specific relocation restrictions. Compared to Alternative A, Alternative C would offer more benefits to visual resources.

**Impacts from Terrestrial Wildlife Management.** Impacts under Alternative D would be similar to those under Alternative A, except for the application of an NSO stipulation for osprey nesting areas. Compared to Alternative A, Alternative D would have similar impacts.

**Impacts from Special Status Species Management.** Impacts under Alternative D would be similar to those under Alternative A, except for additional NSO stipulations, including those for occupied sensitive plant habitat, sage-grouse leks, Mexican spotted owl habitat, special status bats, and big-river fishes, all of which would prohibit surface occupancy and surface-disturbing activities. Additionally, CRV-CSU-8 for significant plant communities would provide additional management flexibility to BLM by requiring special design or relocation of projects by more than 200 meters.

**Impacts from Forestry Management.** Impacts would be similar to those under Alternative A, except that Alternative D would intensively manage 32,200 acres of commercial forest and woodland to target an average annual PSQ of 1.8 million board feet, would apply limited management to the remaining 387,700 acres forests and woodlands, and would prohibit commercial timber harvest on 85,000 acres of forests and woodlands in CRVFO. Compared to Alternative C, Alternative D has less area where commercial timber harvesting is prohibited but an area similar to Alternative B; therefore, Alternative D would have an impact on visual resources similar to that of Alternative B.

Alternatives B and D do allow for accelerated harvest levels after adverse events (e.g., pine and spruce beetle infestations, other insect outbreaks, disease, blow down, wildfire). Allowing accelerated harvest would accelerate the regenerative process of the forest and would lead to a greater variety of natural contrasts in form, line, color, and texture in the characteristic landscape after adverse events. However, the harvest of timber can lead to short-term adverse impacts on the form, line, color, and texture of the characteristic landscape while the area is regenerating. In addition, accelerated harvest levels after adverse events would help to prevent a large wildfire, reducing the risk of experiencing a high degree of modification and contrasts to the existing landscape.

BLM_0016762

**Impacts from Livestock Grazing Management**. Impacts under Alternative D would be similar to those under Alternative A, except that livestock grazing would continue to be authorized on 443,400 acres. Alternative D allows for 51,400 fewer acres for grazing compared to Alternative A and 7,700 fewer acres than under Alternative B, which would provide long-term benefits to visual resources.

**Impacts from Recreation and Visitor Services Management.** Impacts under Alternative D would be similar to those under Alternatives B and C. Stipulation CRV-NSO-45 for Rifle Mountain Park would prohibit surface occupancy and surface-disturbing activities. Stipulation CRV-CSU-19 for developed recreation facilities and trails would allow the BLM to require special design, construction, and implementation measures.

A total of 68,200 acres would be managed as SRMAs. Stipulation CRV-NSO-46 for SRMAs would prohibit surface occupancy and surface-disturbing activities in these areas. In addition, SRMAs would be managed as VRM Class II. Therefore, SRMAs would provide long-term benefits to visual resources. Compared to Alternatives A, B, and C, recreation and visitor services management under Alternative D provides the most benefits to visual resources.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be similar to those under Alternative A, except that Alternative D would designate no land as open to OHV use, 473,500 acres as limited to designated routes, and 31,400 acres as closed to OHVs. Compared to Alternative A, Alternative D has no open designation, has the least amount of closed designation among the action alternatives, and would have long-term beneficial impacts on visual resources.

**Impacts from Lands and Realty Management.** Impacts would be similar to those under Alternative A, except that Alternative D has 126,700 acres of ROW avoidance areas and 39,000 acres of ROW exclusion areas. Compared to Alternative A, Alternative D would provide more benefits to visual resources.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts would be similar to those under Alternative A, except that Alternative D would manage 658,200 acres as open to fluid minerals leasing and development, potentially resulting in an estimated 4,198 federal wells on 525 multi-well pads, with approximately 5,300 acres of surface disturbance. Compared to Alternative A, Alternative D has the most impact on visual resources of all the action alternatives, allowing for the largest number of wells and amount of surface disturbance.

**Impacts from Locatable Minerals, Mineral Materials, and Non-Energy Leasable Minerals Management**. Impacts would be similar to those under Alternative A, except that Alternative D would open 407,200 acres to solid minerals leasing. Compared to Alternative A, Alternative D has the most impact on visual resources of all the action alternatives, allowing for the most amount of solid mineral leasing.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management**. Impacts would be similar to those under Alternative A, except that Alternative D would designate 10,400 acres in Bull Gulch ACEC as VRM Class I and 3,700 acres in Blue Hill as VRM Class II. Compared to Alternative A, Alternative D would benefit visual resources and would have the least benefit among all the action alternatives.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Alternative D would determine all 41 eligible rivers as not suitable and would release them from interim management protections afforded eligible

BLM_0016763

segments. See Table 2-3, Summary of Wild and Scenic River Suitable Segment Lengths and Corridor Acres, for total segment lengths and segment study corridor acres. This table also includes segment lengths on BLM land and segment study corridor acres on BLM land (segment descriptions are provided in Appendix C, Wild and Scenic River Suitability Report). This could lead to impacts on visual resources if the underlying VRM Class III or IV, or if no NSO or CSU from other resources, overlies the segments. Compared to Alternative A, Alternative D would offer less benefit to visual resources and has the least amount of benefit of all the action alternatives.

BLM_0016764

## 4.2.11 Wildland Fire Management

### Methods and Assumptions

This section describes potential impacts on wildland fire management from implementing management actions for other resource programs. Existing conditions concerning wildland fire management are described in Section 3.2.11. Impacts on resources and resource uses resulting from implementation of the wildland fire management program are discussed in those particular resource sections in this chapter. Impacts on wildland fire management generally result from activities that affect fire intensity, ignition, frequency, and suppression. This analysis was based on the following assumptions:

- Fire is an important functional natural disturbance in many of the ecological systems found in the CRVFO.

- Demands for fuels treatments would likely increase over the life of this plan.

- All conservation measures pertaining to fire suppression operations would be followed unless firefighter or public safety or the protection of property, improvements, or natural resources renders them infeasible during a particular operation.

- All conservation measures pertaining to fuels treatments would be followed when implementing management of unplanned natural fire for resource benefit, prescribed fires, and other vegetation treatments.

- A direct relationship exists between the level of human use within the planning area and the frequency of human-caused fires.

- A direct relationship exists between fuel loading and potential fire intensity and severity.

- Most fires in the planning area have natural causes (e.g., lightning strikes).

- Suppression costs are similar throughout all alternatives.

### Environmental Consequences

Impacts on wildland fire management would result from some of the actions included under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on wildland fire management under any of the four alternatives.

### Alternative A

**Impacts from Wildland Fire Management.** Fire and fuels management would be tiered to the CRVFO fire management plan. Fire Management units (FMUs) are the same through all alternatives. FMUs are designated as either allowing or not allowing fire. FMUs that do not allow fire include 22,500 acres that require aggressive fire suppression and a higher priority on fuels projects, generally located near the WUI or around an area of high value such as cultural sites, sensitive species, or unstable soils, where fire never played a historic role in development or maintenance of the ecosystem. Another 278,904 acres are identified where fire is not allowed because fire could have negative effects, such as invasive weed encroachment, or an extremely altered fire regime that would not burn as it would have historically. Fuel reduction projects are a high priority in these areas. Fire is allowed on approximate 253,400 acres, providing fire managers with flexibility in suppression tactics. Fire is a desirable component of these ecosystems and constraints, such as political, ecological, and social, need to be considered when developing suppression tactics, including 22,800 acres where fire can be

BLM_0016765

used as a tool to meet resource objectives such as improving vegetation, wildlife habitat, and watershed conditions and restoring historic fire regimes.

**Impacts from Air Quality Management.** Air quality management could have an adverse impact on wildland fire management. Air quality management could reduce acres burned by prescribed fire or unplanned natural fire due to smoke management and emissions standards. All fire and fuels projects require a Colorado smoke permit from Colorado Air Pollution Control Division. Once permits are attained, projects follow strict standards to meet air quality conditions. If Class 1 airsheds are adversely affected, it could lead to suspending use of unplanned natural fire as a tool or prescribed burns. Stricter air regulations could limit windows for prescribed burns to be accomplished and could result in project units being smaller and more difficult hold.

Most smoke impacts can be mitigated through the planning process of a project or the Wildland Fire Decision Support System (WFDSS) process for an unplanned fire. Identifying receptors of smoke in the planning process and outreaching to those areas or mitigating with wind directions, unit size, and timing of burns can be accomplished, and a reasonable option for all can be brought forward.

**Impacts from Soils Management.** Soils management could have a negative impact on fire management. Certain criteria may be established in unplanned managed fire situations in the event the fire was in an area of soils concern. Minimal impact suppression tactics may be used during an unplanned wildland fire to minimize soil impacts during suppression operations.

Impacts on the fuels management program could include stipulation on mechanical equipment (i.e., hydro axe, roller-chopper, tires or tracked vehicles) during implementation of fuels projects.

**Impacts from Water Resources Management.** Impacts from implementation of water resource management actions would affect wildland fire management with stipulations that have buffer zones from high water marks. These stipulations could affect design of fuels projects and implementation of unplanned natural fire used as a tool. Most conflicts with fuels projects and water resource management would be mitigated and addressed in the NEPA process and design of the project. Conflicts associated with unplanned managed fire can be addressed and either mitigated or go to a suppression action in the WFDSS process.

Wildland fire and fuels management actions could release some sediment into water ways. Sediment release would be mitigated to the extent possible and could produce short-term water quality concerns. Post-fire restoration could expedite soils stabilization, and vegetation regeneration would support slope stabilization.

**Impacts from Vegetation Management.** Vegetation management actions complement fire and fuels management through objectives to manage vegetation to improve or maintain ecological function. There would be beneficial effects on wildland fire management with implementation of Alternative A. Prescribed fire and mechanical treatments would be used as a tool to treat pinyon and juniper woodlands to reduce fuels and treat encroachment into rangelands. Both of these actions would improve ecosystem health and help to restore historical fire regimes.

**Impacts from Fish and Wildlife Management.** Fish and wildlife management would have both adverse and beneficial effects on the fire and fuels management program. Managing habitat for wildlife species would include vegetation manipulation, prescribed fire, or managing unplanned natural fire as a tool across all alternatives, and would present a beneficial effect on the wildland fire management program.

BLM_0016766

Stipulations associated with migratory birds could present a negative impact on hazardous fuels treatments; however, projects can be designed to encompass the stipulations through timing, surveys, type of treatment, and location. Further analysis and mitigations can be addressed in the NEPA process with wildlife specialist input. Vegetation alteration avoidance from May 15 to July 15 could present conflicts with prescribed burn windows, according to seasonal snowfall and moisture, resulting in missing windows to accomplish projects.

Fisheries management could have some negative impacts on the fire and fuels management program. Prescribed fire and fuels projects may lead to short-term sedimentation entering waterways. Mitigation to address this could lead to increased costs and redesigned projects.

**Impacts from Special Status Species Management.** Buffer distances for special status species management (including nesting sites) could have negative impacts on suppression flexibility and fuels project design. Buffer distances vary by species and have different exceptions that would affect the resource program.

Buffer distance for known greater sage-grouse leks under Alternative A is 0.25 mile. This could have a negative minor impact on fuels project locations and design. Surveys for projects could increase overall cost of the project. Impacts from implementation of special status species management could increase cost and put flexibility limitations on suppression efforts.

Stipulations for special status plant species could have minor negative effects on wildland fire management by adding survey costs to project design and by moving flexibility from fire managers in suppression actions. However, fuel projects can be designed with special status species in mind and implemented successfully. Fire managers can take suppression actions around known special status species areas and still have flexibility outside buffer zones.

Some special status species habitat improvement actions could beneficially affect wildland fire management programs by enabling fuel treatments to go forward and opening flexibility to fire managers in the suppression efforts. Any fire or fuels project affecting special status species would have further analysis conducted during the design, scoping, WFDSS, and NEPA process.

**Impacts from Cultural Resources Management.** Proposed decisions for cultural resources could have some impact on the design of fuels treatment projects that would be determined in site-specific environmental analysis. Projects would be designed with specific mitigations necessary to inventory and protect cultural resources in the site-specific project analysis, which may cause projects to be redesigned and costs to increase. Cultural resource management would require cultural inventory surveys, if they have not been completed, on all proposed fuels management projects, which would add to the cost of projects. Mitigations for cultural resources could have moderate to major impacts for prescribed fire and mechanical treatments.

**Impacts from Visual Resource Management.** VRM would impact wildland fire management by designating areas deemed visually pleasing or in need of preserving to enhance the resource. Class I VRM under Alternative A includes 17,100 acres, and VRM Class II includes 230,100 acres. Impacts on the wildland fire management program could include added priorities on suppression and eliminating some flexibility in managing unplanned natural fires. Fuels management could be affected due to the challenge of implementing projects in a VRM Class I or Class II. If vegetation manipulation is required in a proposed fuels project, new VRM Class I and Class II could affect the scope of the mitigation necessary to alter potential fire behavior. Excluding or limiting fuels treatments due to VRM class restrictions would increase the fuel loading in those

BLM_0016767

areas and, in turn, could increase the potential for more frequent and intense fires. An increase in more frequent ignitions and greater suppression effort is possible in these areas. Smoke from a wildland fire or fuels project could have adverse impacts on a Class I or II VRM designated area. Alternative A would have the least amount of Class I VRM, resulting in lower suppression costs due to more options available to fire managers for suppression tactics.

**Impacts from Forestry Management.** Forestry management under Alternative A would be beneficial to wildland fire management. Under Alternative A, a total of 17,900 acres of commercial forestland would be managed. Management of these lands would reduce ignition potential, therefore benefiting the wildland fire management program. Dead and dying trees could be harvested under this alternative, resulting in reduced fuel loading, thinned stands, and increased ecosystem health and vigor.

Alternative A would allow 60,000 acres to have limited management, including thinning and forest health treatments. A combined 82,400 acres of woodlands, mostly pinyon and juniper, would be managed for wood products and encroachment of pinyon and juniper woodlands into rangelands. Prescribed fire and other fuels treatments would be used to accomplish this.

**Impacts from Livestock Grazing Management.** Livestock grazing can have beneficial and adverse impacts on wildland fire management. Livestock can assist with suppression efforts by reducing the fine fuel loading of grasses and forbs, which are the main carriers of fire. Livestock also can create trails through woodlands, which can assist fire suppression efforts by creating almost natural firebreaks in certain instances.

There may be a need to defer livestock grazing for short-term post-fire or project rehabilitation to allow for grasses and forbs to get established. This would be short term, however.

Impacts from livestock grazing management would depend on timing, season, and location of the fire or fuels project.

**Impacts from Comprehensive Trails and Travel Management.** Impacts from comprehensive trails and travel management actions include both beneficial and adverse impacts on wildland fire management. Open overland travel associated with Alternative A could increase public access, which in turn can increase human ignition potential for fires, which could negatively affect wildland fire management. Overland travel can also increase the spread of invasive weeds, particularly cheatgrass, which can alter fire regimes and increase fire behavior potential.

On the other hand, overland travel can increase access for fire equipment and personnel in the event of an unplanned wildland fire or fuels reduction project, which can have a beneficial effect on wildland fire management. Increased access can lead to increased detection and decreased response times, helping to keep fires small. Greater access as outlined in Alterative A could reduce suppression costs due to faster response times.

**Impacts from Lands and Realty Management.** Issuance of ROWs can cause both beneficial and adverse impacts on wildland fire management. While there is a need to meet the needs of development and public use authorizations, such as power lines, utilities, transportation systems, and communication sites, it adversely affects wildland fire management by creating additional WUI, access, and program costs. As new WUI sites are developed, additional fuels treatments are necessary to address potential impacts from unplanned fires.

BLM_0016768

Necessary protections to these sites can cost the wildland fire management program additional money and loss of suppression flexibility. Planning processes for fuels projects can be increased resulting in changes to design of projects.

As infrastructure is permitted and developed, access is more readily available for both public and fire equipment and personnel. Added access for the public can lead to increased fire starts but also to increased detection of new fire starts. Certain infrastructure permitted through the lands and reality management would increase access for fire equipment and personnel, enabling fires to be detected earlier and action to be taken sooner, resulting in possible smaller numbers of acres affected.

Critical infrastructure ROW corridors would need maintenance throughout their life to keep vegetation at a level that would moderate fire behavior and allow for some level of protection from an unplanned wildland fire. Vegetation maintenance would ensure that critical infrastructure would not fail at a time of need such as a wildland fire.

**Impacts from Energy and Minerals Management.** The development of oil and gas would increase access and would potentially designate the development area as a higher priority for fire suppression. Materials and machinery that are associated with oil and gas development have a potential to increase human-started fires through thrown sparks, heated material, and spontaneous combustion.

Development of oil and gas resources could create new facilities that would need protection from wildland fire, thus limiting the ability to maintain or restore ecosystems and treat hazardous fuels in certain areas by using prescribed fire and unplanned natural fire managed as a tool. Flexibility of fire managers to use unplanned fires could be limited in development areas and full suppression efforts may need to take place.

Additional hazards to fire personnel could be present. Hydrogen sulfide gas has been a problem for fire managers in the past and affects the direct attack of an unplanned wildland fire because the gas cannot be seen. There are some mitigation devices, such as hydrogen sulfide detectors, that can be worn by firefighters to detect levels of hydrogen sulfide. Evacuation of oil fields in the event of an unplanned wildland fire is challenging. The location of industry workers needs to be identified, communication with individuals is difficult, and evacuation routes are usually smaller than the amount of traffic. Some industry workers are required to stay in place and shut in wells, leaving individuals for fire personnel to look after. Additional cost to the fire program would be necessary for training and equipment to properly address safety issues while working in emergency situations.

Additional WUI is created in the oil and gas development process with infrastructure such as well pads, pipelines, water lines, and power lines. These developments create challenges for the fuels program when designing hazardous fuels treatments. Additional constraints and mitigations can be added to projects, raising overall project costs.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The designation and management of ACECs are potential actions through all alternatives. Alternative A designates 27,030 acres as ACECs. This can have beneficial and negative effects on the wildland fire management program. ACECs generally allow no surface disturbance, including machinery for fire suppression and mechanical fuels treatments. OHV use would be closed, and access to the public would be limited to pedestrian and equestrian travel, limiting the potential for human-caused fire starts.

BLM_0016769

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** WSAs are the same through all alternatives. A total of 27,700 acres would be designated as WSAs. These WSAs provide for unplanned natural fire managed as a tool as a suppression alternative. This is a benefit to the wildland fire management program. Unplanned natural fire can be used to treat hazardous fuels and provide for ecosystem health and restoration.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** WSRs are designated through all alternatives. These designations can have minor negative effects on the wildland fire management program. Designation could have an impact on using unplanned natural fire as an alternative for fire suppression. Some designated areas would be considered VRM Class 1, therefore impacting design of hazardous fuels projects and adding to planning costs. VRM Class 1 in WSR could lead to increased fuel loadings due to no fuel reduction actions being taken in the area.

WSRs would provide an increase in recreation users, potentially increasing the number of human-caused fire ignitions. Aerial retardant use would be limited or would not be considered, which could impact suppression efforts.

The BLM has mitigations in place for aerial retardant near waterways, so impacts on fire management would be minimal. Impacts on using unplanned natural fire would also be minimal due to using the WFDSS process to either consider or eliminate managing unplanned fires as a suppression option. Full suppression of an ignition is a potential option for a WSA and would be considered in the WFDSS process.

### _Alternative B (Preferred Alternative)_
Impacts to wildland fire management from management of other resources would be the same as or similar to those under Alternative A, except as described below.

**Impacts from Vegetation Management.** Individual resource uses not identified would have similar impacts as those identified in Alternative A, except that vegetation management in Alternative B allows for an increase in the acres that would have limited vegetation management. This would benefit the wildland fire management program, allowing for better management of vegetation, which would result in improving ecosystem health and working toward a more historic fire regime.

Impacts from special-status species management are similar to those under Alternative A, except that the buffer distance for known greater sage-grouse leks under Alternative B is 0.6 mile. This could affect the design, implementation, and costs of fuels projects.

**Impacts from Visual Resource Management.** Visual resource management impacts are similar to those under Alternative A, except that Alternative B increases acres in VRM Class I and Class II. The increase in acres could lead to difficulties in planning and implementing fuels projects. Flexibility of fire managers to use unplanned natural fire could be limited because a Class I VRM would require aggressive suppression tactics, which could lead to higher suppression costs.

**Impacts from Forestry Management.** Forestry management under Alternative B would enable 31,400 acres to be intensively managed for wood products and forest health. This would benefit wildland fire management by reducing fuel loadings and altering potential fire behavior in areas managed. Limited management would

BLM_0016770

occur on 391,700 acres to allow for thinning and forest health treatments. These treatments would be beneficial to the wildland fire management resource.

Salvage and accelerated harvests would be allowed under Alternative B. This would be beneficial to wildland fire management by reducing fuel loadings after an adverse event, such as bug kill or blow down. Reducing fuel loadings would moderate expected fire behavior and would increase firefighter safety in the event of an unplanned wildland fire.

**Impacts from Comprehensive Trails and Travel Management.** Comprehensive trails and travel management under alternative B closes all acres in the resource planning area to overland travel. Not allowing overland travel would reduce the number of people accessing areas, which in turn would reduce the number of human-caused fire starts. Established roads and trails that would be closed would still have administrative access for fire equipment and personnel to access new starts or to implement fuels projects.

**Impacts from Renewable Energy Management.** With the development of renewable energy comes increased infrastructure. Certain facilities and transmission lines can be considered WUI. Additional WUI increases fire and fuels program costs and decreases fire manager flexibility with suppression options.

Additional hazards to firefighters can be associated with development of renewable energy. Hazards can consist of unknown toxins, facility protection, evacuation of industry personnel, and overhead power lines. Fire programs could incur additional costs to train firefighting personnel for emergency situations associated with renewable energy development.

## Alternative C

Impacts to wildland fire management from air quality management, soils management, water resources management, vegetation management, fish and wildlife management, special status species management, cultural resources management, wildland fire management, livestock grazing management, lands and realty management, energy and minerals management, ACEC management, wilderness and WSA management, wild and scenic rivers management, and public health and safety management would be the same as or similar to those under Alternative A. Impacts to wildland fire management from visual resource management, comprehensive trails and travel management, and renewable energy management would be the same as or similar to those under Alternative B. Management of lands with wilderness characteristics to protect those characteristics, which would occur only under Alternative C, would not affect overall wildland fire management in this alternative.

**Impacts from Forestry Management.** Under Alternative C, forestry management would allow for 28,400 acres to be intensively managed for wood products and forest health. Limited management would occur on 341,500 acres for thinning and other forest health treatments. Salvage and accelerated harvest treatments would not occur after an adverse event, leading to fuel buildup and potentially a large scale, severe fire.

## Alternative D

Impacts to wildland fire management from visual resource management and renewable energy management would be the same as or similar to those under Alternative B. Impacts to wildland fire management from management of all other resources and uses would be the same as or similar to those under Alternative A, except as described below.

BLM_0016771

**Impacts from Forestry Management.** Forestry impacts under Alternative D are similar to Alternative B, with a few exceptions. Under Alternative D, a total of 32,200 acres would be intensively managed for forest products. Limited management would occur on 387,700 acres to include thinning and forest health techniques. Commercial timber harvest would be prohibited on 85,000 acres of forest and woodlands. Alternative D would complement the wildland fire management program by reducing fuel loading on treated acres, allowing for thinning and forest health techniques, and using fuels treatments for forest health. These actions would moderate fire behavior in treated areas.

**Impacts from Comprehensive Trails and Travel Management.** Impacts from comprehensive trails and travel management would be similar to Alternative B, except that 473,500 acres would be limited to designated routes (approximately a 6,000-acre increase from Alternative B and C), and 31,400 acres would be closed to all travel (a 5,900-acre decrease from Alternative B and 6,100-acre decrease from Alternative C). These are small differences and would present only a minor impact if any on the wildland fire management resource.

### Cumulative Impacts

The cumulative impact analysis area falls within the CRVFO resource boundary. The CRVFO area is composed of a mix of BLM-administered lands, state-administered lands, and private lands. The BLM-administered lands are not always continuous and have private lands next to or within BLM parcels. Other agency land that borders CRVFO-administered lands includes USFS-administered lands.

Effects of wildland fire management due to any of the CRVFO RMP alternatives are overshadowed by reasonably foreseeable stand-replacing fire, continued fire suppression made necessary by WUI and intermingled landownership, and potential for large-scale insect and disease outbreaks that affect vegetation, and would continue over the life of the RMP. Management by other landowners adjacent to BLM lands could affect wildland fire management by altering fuel loadings and increasing firefighter and public safety with fuels management programs, or by having a wildland fire cross boundaries and cause the need for suppression efforts which would decrease firefighter and public safety. Most communities within the CRVFO resource area have adopted or are in the process of adopting a Community Wildland Fire Protection Plan to identify and treat hazardous fuels on private land.

Continuing efforts to treat fuels with prescribed burning and unplanned wildland fire, increased wildland fire, and agricultural burning on non-BLM administered lands could impact air quality regionally. BLM's ability to use prescribed fire and manage unplanned natural fire could be impacted because of air quality concerns and requirements to meet air quality. This could postpone or eliminate future fuels reduction treatments and impact a fire manager's flexibility with response types for unplanned wildland fires.

An increase in WUI development on private land would increase the need for higher suppression priorities within the planning area. Additional WUI would increase the need for fuels-related projects to reduce risk of large-scale, intense wildland fires. Increased WUI can also increase costs associated with suppression and be more dangerous to firefighters and the public. Additional fire suppression resources could be needed, including federal, state, and local agencies, to help protect life and property.

Increased recreation opportunities on both public and private lands can increase the number of users and access. This can increase the number of human–related fire starts that would require suppression. According

BLM_0016772

to location of any human-related ignition, flexibility for fire managers can be reduced and the need for full suppression of wildland fires and the need for additional resources can increase.

Oil and gas development on both public and private lands can lead to additional WUI areas. Roads associated with oil and gas development can increase access for both industry personnel and the public. Increased access could increase human-caused fire ignitions in these areas. New development of oil and gas can require aggressive suppression to protect life, property, and infrastructure. Oil and gas development adds to safety problems for both firefighters and the public. Evacuations, unknown hazardous materials, hydrogen sulfide, pipelines, and flammable materials add to the complexity of a wildland fire in these areas. Increased cost and time for training firefighters to respond safely to fires in oil and gas areas also need to be considered.

Along with the increase of recreation, road systems, and oil and gas development, the potential for spreading noxious weeds, which can alter historic fire regimes and increase the intensity of a wildland fire behavior, also increases. An increase in noxious weeds could change vegetation types that would not normally support an intense wildland fire and add the fine fuel element that would enable a fire to gain intensity.

The overall contribution of the Draft RMP/EIS alternative decisions to the cumulative effect of wildland fire management within the planning area would be moderate due to several factors. Air quality standards, increased WUI, including oil and gas development, increased recreation opportunities, additional training for firefighters, and the overall safety of firefighters working in an increasingly challenging environment all contribute to the moderate cumulative impact.

*Chapter 4, Environmental Consequences*

BLM_0016773

## 4.2.12 Lands with Wilderness Characteristics (LWCs)

### Methods and Assumptions

This section addresses impacts from RMP management actions on lands with wilderness characteristics (LWCs) outside existing WSA. Note that LWCs do not represent a special designation but merely identify lands containing characteristics typically associated with wilderness. Existing conditions concerning LWCs are described in Section 3.2.12. Wilderness values considered in this analysis include naturalness, opportunities for solitude, and opportunities for primitive/unconfined recreation. Impacts identified in this section are limited to potential changes in wilderness characteristics for only the identified areas.

The following assumptions were used in the analysis:

- BLM lands identified as LWCs contain wilderness values (e.g., size, naturalness and outstanding opportunities for solitude or primitive recreation).

- Impacts on LWCs are analyzed based on the maintenance, enhancement, or degradation (adverse impacts) of naturalness and outstanding opportunities for solitude or primitive recreation.

- The identified areas would be managed as LWCs under the Management and Setting Prescriptions for BLM Lands Outside WSAs Being Managed to Protect Wilderness Characteristics, described in Appendix F.

### Environmental Consequences

Impacts on LWCs would result from some of the actions included for other resources and uses. Programs not addressed below were deemed to have no impacts or only negligible impacts on LWCs under any of the four alternatives.

### Alternative A

Under Alternative A, BLM would not manage lands to protect wilderness characteristics outside existing WSAs. Some wilderness characteristics may be afforded indirect protections through the application of management actions (i.e., ACECs, WSRs, SRMAs, travel designations, VRM classifications) and allowable use decisions for other resources and resource uses (e.g., designations as closed to fluid minerals leasing and application of NSO, CSU, and TL stipulations). However, no land use planning decision would be made specifically to protect wilderness characteristics in Alternative A. Therefore, while the natural character and opportunities for solitude and primitive and unconfined types of recreation may be indirectly afforded protections, they would be likely to change or degrade through the life of the plan.

### Alternative B (Preferred Alternative)

Under Alternative B, BLM would not manage lands to protect wilderness characteristics outside existing WSAs. However, greater indirect protection of wilderness characteristics would result under this alternative than under Alternative A due to the greater number and acres of fluid mineral closures, solid mineral closures, ACECs, and protective stipulations (particularly NSO stipulations) associated with other resource values.

### Alternative C

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Alternative C would include a decision to protect and preserve wilderness characteristics on 47,000 acres of BLM lands outside existing WSAs. Although not a special designation, this decision would apply special management and

BLM_0016774

protections to the following areas identified as LWCs: Castle Peak Addition, Deep Creek, Grand Hogback, Flat Tops Addition, Pisgah Mountain, and Thompson Creek. None of the other alternatives includes the management of areas as LWCs to protect wilderness characteristics. Protecting these lands for their natural character and opportunities for solitude and primitive and unconfined types of recreation would result from applying the management and setting prescriptions and an NSO stipulation specifically for LWCs. The NSO for LWCs under Alternative C would be a major constraint on surface use and occupancy and surface-disturbing activities, except where provided for by valid existing rights. Alternative C also proposes to administratively close LWCs to fluid minerals leasing to further protect wilderness characteristics.

**Impacts from Soils Management.** Surface-disturbing activities that negatively impact soils would negatively impact the naturalness of LWCs. Under all alternatives, implementation of actions would comply with Colorado Public Land Health Standard 1 for soils. Soils that meet this standard would in turn help maintain wilderness characteristics of the LWCs by supporting native vegetation and wildlife and reducing impacts to water resources.

An NSO stipulation under Alternative C and all alternatives would constrain surface occupancy and surface-disturbing activities on slopes greater than 50 percent, and a CSU stipulation would apply special design measures to new construction on slopes greater than 30 percent and areas of severe erosion hazard. In areas not covered by these stipulations, the NSO specifically for LWCs would also prohibit surface disturbance and occupancy. Therefore, the included soils stipulations would indirectly, but beneficially, contribute to maintaining wilderness characteristics if surface-disturbing activities are authorized in LWCs due to prior rights (e.g., leases under the Recreation and Public Purposes Act, leases/permits under 43 CFR 2920, and ROWs).

**Impacts from Water Resource Management.** Surface-disturbing activities that negatively impact water quality would negatively impact the naturalness of LWCs. Under all alternatives, implementation actions would comply with Colorado Public Land Health Standard 5 for water resources. Waters that achieve this standard would in turn help maintain wilderness characteristics of the LWCs.

An NSO stipulation under Alternative C would prohibit surface occupancy and surface-disturbing activities within streamside zones, and a CSU stipulation would be applied to hydrologic features. In areas not covered by these stipulations, the NSO specifically to protect LWCs would still apply. Therefore, the water quality stipulations would indirectly, but beneficially, contribute to maintaining wilderness characteristics if surface-disturbing activities are authorized in LWCs due to prior rights (e.g., leases under the Recreation and Public Purposes Act, leases/permits under 43 CFR 2920, and ROWs).

**Impacts from Vegetation Management.** Depending on the vegetation community treated (grassland and shrubland versus woodland or coniferous forest), the length of time that evidence of mechanical treatments remains on the landscape before the soil and vegetation disturbances return to a more natural or unmodified condition would vary.

Vegetation manipulation to control insect and disease outbreaks or to control invasive species would be allowed when there is no effective alternative, and when the control is necessary to maintain wilderness characteristics and maintain supplemental values. Control/manipulation methods could include hand (e.g., tools or chainsaws), chemical (e.g., spraying weeds), and biological treatment, provided it would not cause adverse impacts (apparent evidence of human intervention on the landscape) to the wilderness characteristics.

BLM_0016775

The management and setting prescriptions for LWCs under this alternative would ensure that the natural character is protected if vegetation management actions are performed within those lands.

**Impacts from Vegetation Management—Riparian.** The objective of riparian management is to manage riparian areas for Proper Functioning Condition (PFC) and to avoid or minimize loss or degradation of riparian, wetland, and associated floodplains. This helps preserve and enhance the natural and beneficial values of these areas and provides habitat for fish, wildlife, and special status species. Properly functioning riparian areas would improve the overall natural vegetation condition of LWCs and thus their associated biological and natural values.

An NSO stipulation under Alternative C would prohibit surface occupancy and surface-disturbing activities within riparian and wetland zones. In areas where this stipulation does not apply, the NSO specific to LWCs would also protect against surface disturbance and surface occupancy. Therefore, the water quality stipulation would indirectly, but beneficially, contribute to maintaining wilderness characteristics if surface-disturbing activities are authorized in LWCs due to prior rights (e.g., leases under the Recreation and Public Purposes Act, leases/permits under 43 CFR 2920, and ROWs).

**Impacts from Fisheries and Aquatic Wildlife Management.** Fish and other aquatic wildlife resources (including special status species) are a special feature that contributes to an area's wilderness character. Proposed management action and allowable use decisions would comply with Colorado Public Land Health Standard 3 (BLM 1996). Areas where this standard is being met are less at risk for direct impacts to aquatic life, riparian vegetation, and aquatic habitats from erosion and sedimentation.

Under Alternative C, a variety of management action and allowable use decisions (i.e., stipulations) would help restore, maintain, and enhance populations of native fish and other aquatic wildlife. Improved aquatic wildlife populations would enhance the natural character of LWCs. Larger and healthier fish populations would expand opportunities for primitive and unconfined recreation opportunities, including wildlife study, nature study, fishing, and scientific research.

Fisheries management on these lands would emphasize natural processes for wildlife management. Stocking of fish species native to the area may be permitted. Introduction of threatened, endangered, or other special status species native to North America may be allowed. The State of Colorado would continue to establish and enforce fishing regulations. The protective measures under Alternative C would ensure that the natural character of the LWCs would be protected if fisheries or aquatic wildlife improvements are performed within these lands.

**Impacts from Terrestrial Wildlife Management.** Terrestrial wildlife resources are a special feature that contributes to an area's wilderness character. Proposed management action and allowable use decisions would comply with Colorado Public Land Health Standard 3. In areas where these standards are being met, there is reduced risk to terrestrial wildlife from habitat loss, habitat fragmentation, habitat effectiveness, and wildlife disturbance and avoidance.

Under Alternative C, a variety of management action and allowable use decisions (i.e., stipulations) are proposed to restore, maintain, and enhance terrestrial populations. Improved terrestrial wildlife populations would enhance the natural character of LWCs. Larger and healthier wildlife populations would expand

BLM_0016776

opportunities for primitive and unconfined recreation opportunities, including nature study, hunting, and scientific research.

Wildlife management on these lands would emphasize natural processes for wildlife management. Introduction of threatened, endangered, or other special status species native to North America may be allowed. The State of Colorado would continue to establish and enforce hunting regulations.

LWCs overlap wildlife core areas in Thompson Creek (approximately 2,500 acres) and in West Rifle Creek/Grand Hogback (approximately 500 acres). The Pisgah Mountain unit and Castle Peak Addition overlap with the Greater Sage-grouse Habitat ACEC. The proposed core areas and ACECs and the accompanying NSO stipulations would protect and conserve terrestrial wildlife habitat and indirectly benefit wilderness characteristics. Management prescriptions would ensure that the natural character of the LWCs would be protected if wildlife improvements were performed within LWCs.

**Impacts from Cultural Resource Management.** The proposed cultural resource decisions provide protection of cultural and historic resources. Cultural and historic resources are important supplemental values to an area's wilderness characteristics. Specific guidance for management of these resources to protect wilderness characteristics allows cultural resource inventories, studies, and research. Surface examination may be permitted, as well as rehabilitation, stabilization, reconstruction, and restoration work on historic structure and limited excavations. Extensive surface collections may also be permitted if they maintain the area's wilderness character, and permanent physical protection, such as fences, will be limited to measures needed to protect resources eligible for the National Register of Historic Places, and would be constructed to minimize impacts on naturalness.

The proposed cultural resource decisions would protect and conserve cultural and historic properties and would indirectly benefit wilderness characteristics. Management prescriptions would ensure that the natural character of the LWCs would be protected if permanent physical protections were installed.

**Impacts from Paleontological Resource Management.** The proposed paleontology decisions are to ensure that paleontological resources are available for appropriate scientific and education uses. Paleontology resources are important supplemental values to an area's wilderness characteristics. Specific guidance directs that paleontological resource projects, such as excavations, would be evaluated on a case-by-case basis. These evaluations are intended to ensure that impacts on wilderness characteristics are temporary and that wilderness characteristics are protected over the long term.

The proposed paleontology decisions would protect paleontological resources, would offer limited opportunities for scientific and educational use, and would indirectly benefit wilderness characteristics. Management prescriptions would ensure that the natural character of LWCs would be protected if paleontological resource projects such as excavations were authorized.

**Impacts from Visual Resource Management.** Managing lands as VRM Classes III and IV would have adverse impacts on wilderness characteristics because these classes allow for moderate to major changes in the landscape, thereby allowing large visual disturbances. Specific guidance directs that LWCs would be managed under VRM Class II objectives, unless otherwise managed as VRM Class I (Table 4.2.12-1).

BLM_0016777

**Table 4.2.12-1**
**Visual Resource Management Classes on Lands with Wilderness Characteristics under Alternative C**

| WC Lands | Approx. Acres by VRM Management Class | | | |
|---|---|---|---|---|
| | I | II | III | IV |
| Castle Peak Addition (4,023 acres) | | 4,000 | 0 | 0 |
| Deep Creek (4,416 acres) | 2,400 | 2,000 | 0 | 0 |
| Flat Tops Addition (3,543 acres) | 0 | 3,500 | 0 | 0 |
| Grand Hogback (11,701 acres) | | 11,700 | 0 | 0 |
| Pisgah Mountain (15,698 acres) | | 15,700 | 0 | 0 |
| Thompson Creek (8,229 acres) | 3,700 | 4,600 | 0 | 0 |

The VRM Class I designations would protect the most outstanding visual resources in these areas. VRM Class II designations would require that the level of change to the landscape be low. The VRM Class II designations with the accompanying NSO stipulation would protect the natural character of LWCs and would reduce the risks of small, localized surface-disturbing activities that may be consistent with VRM Class II designations.

**Impacts from Wildland Fire Management.** The proposed wildland fire management decisions are the same across all alternatives. In the short term, wildland fire suppression operations (e.g., fire line construction, location of camps) would degrade the natural character of these areas. Without emergency stabilization and restoration (ESR) actions, long-term impacts on wilderness character would occur.

To offset the impacts of wildland fire suppression, the management and setting prescriptions would recognize maintaining wilderness characteristics in these areas. Specific guidance directs reducing the negative effects of wildland fire suppression: by applying minimum impact suppression tactics (MIST) by placing large fire camps outside these areas; by performing fire suppression impacts and emergency stabilization and rehabilitation (ESR) actions as defined by the resource advisor to restore visual and wilderness characteristics; and by encouraging the use of natural firebreaks and roads to contain a wildland fire. Management prescriptions would ensure that the natural character of the LWCs would be protected if an unplanned wildland fire would occur.

**Impacts from Cave and Karst Resource Management.** The proposed cave and karst management action and allowable use decisions are directed at protecting the surface and subsurface geologic values and other associated natural and cultural values. Management and setting prescriptions for caves would allow for appropriate access, while addressing issues and concerns relating to preservation of the caves' pristine and fragile resources. For example, protecting the geologic values specific to the high concentration of cave and karst resources within the Deep Creek area would benefit values associated with wilderness character.

**Impacts from Forestry Management.** Woodland product harvest would remove vegetation and create surface and visual disturbances, thereby degrading naturalness. The noise created by vehicles accompanying these activities would adversely affect the outstanding opportunities for solitude. Wilderness characteristics may be compromised by surface-disturbing activities, such as driving cross country to view the trees, cutting the trunks of trees, leaving stumps and debris, and affecting the solitude and primitive recreation opportunities with chainsaws and surface disturbances associated with human activity.

To retain the naturalness of LWCs, the management and setting prescriptions would close these areas to commercial timber harvest, firewood cutting, and special forest product harvest.

BLM_0016778

**Impacts from Livestock Grazing Management.** Domestic livestock grazing would continue to be permitted under all of the alternatives. BLM lands would be grazed primarily by cattle, but also by sheep and some domestic horses. The relative numbers and kinds of livestock have not varied much over the last 10 years and are not expected to vary much in the future. Implementation level grazing decisions would comply with Colorado's Standards for Public Land Health and Guidelines for Livestock Grazing Management. If livestock grazing results in standards not being met, changes would be made to address the kind, numbers, and class of livestock, season, duration, distribution, frequency, and intensity of grazing use.

To offset the impacts of inappropriate livestock use, the management and setting prescriptions for LWCs would include adjustments in the numbers and kinds of livestock permitted to graze as a result of the RMP revision or amendments. Construction of grazing facilities would be permitted if they are primarily for the purposes of protecting wilderness characteristics and more effectively managing resources, but not if they are intended to accommodate increased numbers of livestock. Use of motorized equipment for livestock management would be allowed only on an emergency basis.

It is not anticipated that livestock grazing would have impacts on LWCs, because meeting the land health standards and the management and setting prescriptions would not permit degradation of the lands. When livestock use is properly managed, it would not affect the appearance of naturalness.

While there could be some visual evidence of livestock use in the areas (presence of livestock, feces, trampling of soil, fences, and consumption of vegetation), rangeland health and riparian conditions would be maintained through proper management under the standards and guides assessments, and the appearance of a natural condition of these areas would be maintained. For some visitors, the presence of livestock would have an adverse impact on the desired experience (connection with the natural world and experiences of solitude). However, this effect would be seasonal. At other times of the year, livestock would not be present, soils would recover, and vegetation would regrow, reducing the impact on the visitor.

**Impacts from Recreation and Visitor Services Management.** To protect the wilderness characteristics of LWCs, recreation management and use would be subject to management and setting prescriptions as follows: permanent recreation structures are not permitted; no new special recreation permits (SRPs) will be authorized unless they are necessary for helping people realize the primitive and unconfined recreational values (e.g., upland outfitting service); when commercial SRPs are renewed, the terms and conditions of the SRP will be modified as necessary; no competitive events would be authorized; and recreational or hobby collecting of mineral specimens when conducted without location of a mining claim may be allowed. This use would be limited to hand collection and detection equipment.

**Impacts from Comprehensive Trails and Travel Management.** OHV travel on LWCs under Alternative C would be designated as either closed or limited to designated routes, because wilderness characteristics would be adversely affected by permitted or inappropriate cross-country travel. All types and modes of travel, except pedestrian and equestrian travel, would be limited to designated routes. Table 4.2.12-2 portrays the current routes and the current types of public travel occurring on the routes, and Table 4.2.12-3 shows route designations for public travel under Alternative C. The approximate change in motorized and mechanized public travel to enhance wilderness characteristics is displayed by comparing the differences by area and total.

BLM_0016779

**Table 4.2.12-2**
**Public Travel Routes (miles) within Lands with Wilderness Characteristics under Alternative A**

| WC Lands | Obliterate | Foot/Horse & Admin. | Mountain Bike | Motorcycle | ATV | Full Size Vehicle | Total |
|---|---|---|---|---|---|---|---|
| Castle Peak Addition | N/A | 12 | 0 | 0 | 0 | 2 | 14 |
| Deep Creek | N/A | 2 | 0 | 0 | 0 | 6 | 8 |
| Flat Tops Addition | N/A | 10 | 0 | 0 | 0 | 1 | 11 |
| Grand Hogback | N/A | 1 | 0 | 0 | 0 | 5 | 6 |
| Pisgah Mountain | N/A | 1 | 7 | 0 | 0 | 13 | 21 |
| Thompson Creek | N/A | 1 | 5 | 0 | 1 | 10 | 17 |
| **Total** | | **27** | **12** | **0** | **1** | **37** | **77** |

**Table 4.2.12-3**
**Public Travel Route Designations (miles) for LWCs under Alternative C**

| WC Lands | Obliterate | Foot/Horse & Admin. | Mountain Bike | Motorcycle | ATV | Full Size Vehicle | Total |
|---|---|---|---|---|---|---|---|
| Castle Peak Addition | 0 | 12 | 0 | 0 | 0 | 2 | 14 |
| Deep Creek | 0 | 8 | 0 | 0 | 0 | 0 | 8 |
| Flat Tops Addition | 0 | 10 | 0 | 0 | 0 | 1 | 11 |
| Grand Hogback | 2 | 3 | 0 | 0 | 0 | 1 | 6 |
| Pisgah Mountain | 0 | 2 | 6 | 0 | 0 | 13 | 21 |
| Thompson Creek | 1 | 16 | 0 | 0 | 0 | 0 | 17 |
| **Total** | **3** | **51** | **6** | **0** | **0** | **17** | **77** |

Other proposed trail and travel management decisions that either protect or maintain wilderness characteristics on LWCs include closing these lands to over-snow travel, closing portions accessed by the Stagecoach Trail (BLM #8535) and Domantle Road (BLM #8513) from August 20 to November 30, and granting administrative use authorizations on a case-by-case basis only with approval from the BLM.

To further protect wilderness characteristics over the life of the plan, trails and travel management would be subject to management and setting prescriptions, including not allowing the construction of new permanent or temporary routes or roads, not allowing unauthorized travel off designated routes, and minimizing motorized and mechanized routes and the restoration of unnecessary routes.

The proposed travel designations and the management and setting would ensure that the natural character of the LWCs would be maintained and possibly enhanced through the life of the plan.

**Impacts from Lands and Realty Management.** The following lands and realty decisions would impact lands managed as LWCs under Alternative C:

*Land Tenure Adjustments.* LWCs would be retained for long-term management. The effects of land tenure adjustments would be a loss of these wilderness characteristics if an area managed as an LWC leaves federal ownership.

BLM_0016780

*Withdrawals.* The Secretary of the Interior would be petitioned to withdraw LWCs from the mining laws for locatable exploration or development (locatable minerals). Withdrawing LWCs from mineral entry would offer long-term benefits for wilderness characteristics by reducing adverse effects that could result from mineral development.

*Rights-of-Way and Other Land Use Authorizations.* ROW construction, operation, and maintenance could result in both short-term and long-term impacts on wilderness characteristics. LWCs would be identified as a ROW avoidance area (including sites for renewable energy, such as solar, wind, hydro, and biomass development). LWCs identified as avoidance areas may not be totally unavailable but should be avoided if possible due to some resource value that may become damaged or detracted from if development were allowed. The ROW avoidance, along with the NSO stipulation, would exclude surface-disturbing activities and the placement of facilities, which would disrupt the natural character of the area.

To further protect wilderness characteristics, lands and realty management would be subject to management and setting prescriptions. These may include: (1) retaining in public ownership lands with wilderness characteristics; (2) renewing prior rights such as leases under the Recreation and Public Purposes Act, leases and permits under 43 CFR 2920, and ROWs; (3) allowing the BLM to acquire state and private inholdings when practicable; (4) authorizing adequate access to inholdings that are compatible with the defined values; and (5) not allowing new discretionary uses that create valid existing rights, if they would detract from the wilderness values.

**Impacts from Coal Management.** Coal resources within the CRVFO occur primarily in the Grand Hogback Field and are estimated at approximately 1.6 billion tons. Approximately 9,100 acres of the Grand Hogback Field is identified as suitable for coal leasing and overlaps with the Grand Hogback unit. However, no coal leases are currently authorized, and coal is not expected to be commercially developed during the life of the plan. If coal were to be leased, it would be with an NSO stipulation that protects wilderness characteristics from surface-disturbing activities, so there would be no impacts on wilderness characteristics.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Oil and gas development activity is concentrated on the western 22 percent of the CRVFO (the area west of the Grand Hogback), where the high potential for the occurrence of gas resources is found. It is estimated that 99 percent of future drilling will occur in the areas identified as high potential for the occurrence of oil and gas resources. Infill drilling and step-out drilling will be the major portion of future activity. Of the 127,335 acres of BLM mineral estate in this high potential area that is not within the Roan Plateau planning area, 95 percent has been leased and is being developed. The eastern 78 percent of the CRVFO (east of the Grand Hogback) has a lower potential for the occurrence of oil and gas resources. Approximately 1 percent of future drilling activity is likely to occur in areas of medium and low potential, and no drilling activity is predicted in the areas identified as no-known potential (Table 4.2.12-4). The two units most susceptible to fluid minerals leasing would be Thompson Creek and the Grand Hogback.

In areas open to oil and gas leasing, the presence and noise of people, vehicles, and equipment needed for exploration, development, production, and maintenance of energy resources would impact opportunities for solitude and primitive recreation. Construction and operation of oil and gas wells and associated support facilities, including roads, surface and buried pipelines, power lines, and compressor stations, would create soil and vegetation disturbances that would degrade LWCs. To constrain these impacts, all unleased lands

BLM_0016781

**Table 4.2.12-4**
**Potential for the Occurrence of Fluid Mineral Resources on LWCs**

| LWCs | Acres with Potential for Fluid Mineral Resources | | |
| --- | --- | --- | --- |
| | Low | Moderate | High |
| Castle Peak Addition | | 4,000 | |
| Deep Creek | 4,400 | | |
| Flat Tops Addition | 3,500 | | |
| Grand Hogback | | 6,100 | 5,600 |
| Pisgah Mountain | 11,600 | 4,100 | |
| Thompson Creek | 340 | 7,900 | 6 |

would be subject to the management and setting prescriptions, including designation as closed to leasing, that would prohibit oil and gas exploration and development. Thus, no leasing would occur within the Castle Peak Addition, Deep Creek, Flat Tops Addition, Pisgah Mountain, or Thompson Creek, and wilderness characteristics would be protected.

The Grand Hogback lies along the eastern boundary of the Piceance Basin. There currently are 15 active oil and gas leases within the boundaries, totaling approximately 4,417 acres. None of these leases has been drilled as of the date of this analysis. Furthermore, no APDs have been filed on these leases, which have various expiration dates no later than 2016. Several stipulations are attached to most of the leases, including an NSO stipulation for steep slopes, a CSU stipulation for erosive soils and slopes greater than 30 percent, and a CSU for VRM Class II values. While these stipulations were designed to protect these values, development may still occur if the operator can demonstrate that operations can be conducted without causing unacceptable impacts on the values through site-specific mitigation or special design measures.

**Impacts from Locatable Minerals, Mineral Materials, and Non-Energy Leasable Minerals Management.** Salable mineral disposal is a discretionary decision, but there is potential to authorize mineral materials (salable, such as moss rock, top soil, sand and gravel, scoria, fill dirt) disposal within any of these areas. If new mining development would occur within these areas, direct loss of wilderness characteristics would be unavoidable due to surface-disturbing activities. To protect wilderness characteristics, the areas would be closed to salable mineral disposal and non-energy solid mineral leasing, thus constraining potentially adverse impacts.

To further protect wilderness characteristics, solid minerals management would be subject to management and setting prescriptions. These may include the following within LWCs: (1) existing mining operations would be regulated using the 43 CFR 3809 regulations to prevent unnecessary and undue degradation of the lands; (2) existing leases would be regulated through conditions of approval to prevent unnecessary or undue degradation; and (3) BLM would recommend that the Secretary of the Interior close these lands to mining laws for locatable exploration or development.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Six ACECs would overlap with LWCs (Table 4.2.12-5).

BLM_0016782

**Table 4.2.12-5**
**Overlap of LWCs with ACECs under Alternative C**

| LWCs Unit | Approx. Overlap (acres) | ACEC |
|---|---|---|
| Castle Peak Addition | 1,930 | Greater Sage-Grouse Habitat |
| Deep Creek | 2,400 | Deep Creek |
| Flat Tops Addition | 15 | Sheep Creek Uplands |
| Grand Hogback | 8,100 | Grand Hogback |
| Pisgah Mountain | 4,580 | Greater Sage-Grouse Habitat |
| Thompson Creek | 3,380 | Thompson Creek |

The relevant and important values (greater sage-grouse, Harrington's penstemon, scenic, geologic) of the ACECs are special features that contribute to an area's wilderness character. Management prescriptions to protect the relevant and important values within ACECs would offer long-term positive benefits for LWCs that overlap with their boundaries by limiting or preventing surface disturbances.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** The Castle Peak Addition unit is adjacent to the Castle Peak WSA. The Flat Tops Addition unit is adjacent to the Hack Lake WSA. The Castle Peak and Hack Lake Additions offer opportunities for solitude that can be considered outstanding within the unit alone or in combination with the adjacent WSAs. Deciding to protect the units for their wilderness characteristics would create a larger, contiguous, intact landscape to protect naturalness and supplemental values, would enhance opportunities for solitude, and could enhance opportunities for primitive and unconfined recreation within the existing Castle Peak WSA and Hack Lake WSA.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative C, 26 river segments throughout the CRVFO would be recommended as suitable for wild, scenic, or recreational classification under the National Wild and Scenic Rivers System (NWSRS). Segments recommended as suitable for wild or scenic classification would be managed to protect ORVs. Four segments overlap with LWCs (Table 4.2.12-6).

**Table 4.2.12-6**
**Overlap of LWCs with ACECs under Alternative C**

| WC Lands Unit | River Segment |
|---|---|
| Deep Creek | Deep Creek (wild classification) |
| Flat Tops Addition | Hack Creek (scenic classification) |
| Pisgah Mountain | Colorado River (recreational classification) |
| Thompson Creek | Thompson Creek (wild classification) |

Protection of the ORVs (until Congress acts on BLM's recommendations) would prevent surface-disturbing activities that would adversely affect the natural character of LWCs within 0.5 mile of the stream segment (0.25 mile from the high water mark on each riverbank).

**Impacts from Transportation Facilities Management.** Construction within LWCs would degrade the natural and undeveloped character of the units. To protect wilderness characteristics over the life of the plan, transportation facilities management would be subject to management and setting prescriptions. These specify

BLM_0016783

that construction of new permanent or temporary routes would not be allowed. Use and construction of temporary roads, structures, and installations are allowed for emergency purposes but must be conducted to achieve the least disturbance and reclaimed as soon as possible.

## Alternative D

Under Alternative D, BLM would not manage any lands to protect their wilderness characteristics outside existing WSAs. Although indirect protection of wilderness characteristics would result under this alternative due to closures and restrictive stipulations related to other resources, these would generally be fewer in number and smaller in extent than under the other alternatives. Consequently, Alternative D would be likely to result in the least protection of wilderness characteristics among the four alternatives.

## Cumulative Impacts

The cumulative impact analysis boundary for wilderness values includes lands with wilderness characteristics, WSAs, and designated wilderness within the planning area as well as designated wilderness on neighboring federal lands.

Currently, approximately 27,760 acres are designated as WSAs within the CRVFO. The neighboring Kremmling Field Office (KFO) contains 9,120 acres of designated WSAs. Neither the CRVFO nor the KFO contains a designated wilderness. In the neighboring Grand Junction Field Office, the Black Ridge Wilderness and the Dominguez Canyon Wilderness were designated in 2000 and 2009, respectively. The WRNF manages eight designated wilderness areas totaling approximately 754,500 acres, or one-third of the forest. This is the largest proportion of any national forest in Colorado (USFS 2002). The 2002 forest plan revision noted there were 298,000 acres available for wilderness recommendations. The ROD for the WRNF forest plan emphasized balancing opportunities for active management with retention of the undeveloped character of roadless areas (USFS 2002). The WRNF ROD assigned 82,000 acres to recommended wilderness allocations, representing approximately 28 percent of the total 298,000 acres noted in the ROD as available for wilderness recommendation. The final revised forest plan for the Routt National Forest did not include any recommended wilderness allocations.

Many groups and congressional representatives are proposing the designation of additional wilderness in Colorado, which includes BLM lands within the CRVFO and surrounding national forests. Representative Diana DeGette has proposed legislation (H.R. 4289) in the US House of Representatives that would designate additional federal lands on the WRNF and surrounding BLM lands as components of the National Wilderness Preservation System (DeGette 2010). The 2009 Colorado Wilderness Act included the following BLM lands managed by the CRVFO: Thompson Creek, Pisgah Mountain, Maroon Bells-Snowmass Addition, the Grand Hogback, the Flats Tops Addition and Deep Creek, Castle Peak, and Bull Gulch. Another wilderness bill is in Congress for lands in southwest Colorado. Another proposal, called the Hidden Gems Wilderness Campaign, is seeking designation of new wilderness areas on the WRNF, Gunnison National Forest, and BLM lands. That campaign includes Eagle Mountain, Thompson Creek, Bull Gulch, Castle Peak, and Pisgah Mountain within the CRVFO. Representative Jared Polis has proposed legislation (H.R. 6280 – Eagle and Summit County Preservation Act) for Eagle and Summit Counties that includes the Hidden Gems Wilderness Campaign proposal.

Under all alternatives, WSAs in the planning area would continue to be managed under the Interim Management Policy (IMP) for Lands under Wilderness Review (BLM 1995) until Congress either designates or releases all or portions of the WSAs from further consideration for wilderness. Since this is the case, there

BLM_0016784

are no present or future actions, or combination of actions, likely to have significant cumulative effects on the wilderness characteristics in WSAs.

Alternatives A, B, and D do not propose to manage any BLM lands to protect their wilderness characteristics outside existing WSAs. Some wilderness characteristics may be afforded indirect protections, but no land use planning decision would be made to specifically protect wilderness characteristics. While the natural character and opportunities for solitude and primitive and unconfined types of recreation may be indirectly afforded protections, they would probably change or degrade through the life of the plan.

Only Alternative C would include specific management prescriptions for LWCs to protect and preserve wilderness values outside WSAs. Although this would not be a special designation, implementing the management and setting prescriptions for LWCs under Alternative C would protect wilderness characteristics on 47,000 acres not included within the 27,760 acres of WSAs. While most of the region's WSAs and designated wilderness areas are in higher elevation locations, Alternative C would protect wilderness characteristics in some mid-elevation areas, representing a broader range of ecosystems. In addition, the location of most of the identified LWCs adjacent to existing WSAs, or areas that the WRNF has recommended or will recommend to Congress for designation as wilderness, would allow Alternative C to protect wilderness characteristics on larger contiguous blocks and intact landscapes.

Two factors—an overall population increase in the region over the life of the plan and a growth in regional tourism based on available outdoor opportunities and scenic landscapes—are expected to continue the current trend of increased demand for a variety of recreation in a variety of recreation settings. Preserving and protecting lands with wilderness characteristics through management prescriptions specific to LWCs would expand opportunities to enjoy naturalness, solitude, opportunities for primitive recreation, and supplemental values.

Beyond the visitor to BLM lands, Alternative C would enhance long-term, non-market values (social, scientific, educational, ecological, and scenic values) as well as economic values in the region. It would promote existence values (simply knowing wilderness exists) and bequest values (protecting an area for future generations).

BLM_0016785

## 4.2.13  Cave and Karst Resources

### Methods and Assumptions

This section addresses impacts from RMP management actions for cave and karst resources. Existing conditions concerning cave and karst resources are described in Section 3.2.13. Human contact with caves through exploration, recreation, or vandalism can alter the resources directly as a result of physical damage to cave features and formations or disturbance-related impacts on bats or other cave biota. Indirect impacts on cave resources can result from disruption of cave hydrology, particularly for active ("wet") caves. Management activities on the overlying surface that affect the hydrology of caves or that compromise their isolation and integrity can have essentially permanent adverse impacts.

The following comparative analysis of impacts on cave and karst resources from other management activities under the four alternatives is based on the following assumptions:

- BLM lands would be managed to protect and maintain, to the extent practical, significant caves.

- New cave and karst resources would be identified continually, whether through federal inventories or the result of other activities, such as cave exploration, research, and surveys.

- Unmanaged cave use has the potential to permanently damage fragile sensitive cave and karst resources.

- Traditional recreational uses within the planning area would continue to increase as a result of overall population growth of the region, increase in the amount of outdoor and nature-based recreation, and technological advances that make caving more accessible to a growing number of people.

Under all alternatives, BLM's management would have the objective of protecting significant cave and karst values, per the standards identified by the Colorado Cave Survey.

The following subsections describe impacts of management action related to the objective of protecting cave and karst resources from other resources and uses under the four alternatives analyzed. A cumulative impact summary is presented following the discussion of Alternative D.

### Environmental Consequences

Impacts on cave and karst resources would result from some of the actions included under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on cave and karst resources under any of the four alternatives.

Cave and karst resources would be managed under all alternatives to conform to the cave management objective; that is, all significant caves would be managed to allow for appropriate access while addressing issues and concerns related to preserving pristine and fragile resources, wildlife values, scientific and research values, and visitor safety. The Federal Caves Resources Protection Act (FCRPA) defines a cave as significant if it meets at least one of the following criteria: size, mineral formations, endemic or other unusual species/subspecies, seasonally important habitat for non-endemic species or subspecies, archaeological or paleontological site, historical or religious significance, hydrologic connectivity to other caves or springs, unusual geologic strata or processes, recreationally important, or pristine in that human contact has been minimal or nonexistent.

BLM_0016786

To date, two caves within the CRVFO have been found to meet the FCRPA significance criteria: La Sunder limestone cave and Anvil Points claystone cave. The Anvil Points claystone cave is in the Roan Plateau planning area and therefore is not addressed in this analysis.

Meeting the management objective outlined above would entail applying the following prescriptions:

- Physical—Manage all significant caves to maintain the current level of remoteness (backcountry in nature) from motorized and mechanized vehicles and to preserve the natural appearance of the cave. Prohibit construction of new facilities, roads, or trails to access the caves. Allow for only minor modifications (e.g., tape, signage, rescue caches) for scientific purposes and to accommodate safe use. Maintain low evidence of use and other people.

- Social—Manage visitor use limits, group size, and season of use, in coordination with the Colorado Cave Survey, through monitoring and subsequent implementation decisions described through cave management plans for each significant cave, group of caves, or complex of caves.

- Targeted Activities and Outcomes—Focus all management actions on specific activity outcomes for caving and research. Outcomes will be for participants to enjoy and learn about cave and karst resources. Specific benefit outcomes will be for environmental benefits, such as increased environmental stewardship, and the preservation and protection of unique biological, paleontological, archaeological, and mineralogical aspects. Social benefits will be to provide environmental learning and appreciation of cave and karst systems.

- Operational—Continue to allow appropriate access while addressing issues and concerns relating to visitor safety and preservation of the caves' values. If issues or concerns arise, apply necessary managerial controls, such as closures, permits, trip requirements, and gating, in coordination with the Colorado Cave Survey. Administer and authorize research, inventory, work projects, and digging trips. Provide information and education materials to authorized visitors. Do not market or promote cave and karst resources.

### Alternative A

**Impacts from Cave and Karst Resource Management**. The primary means under Alternative A for protecting significant cave and karst resources (not including the Roan Plateau) is GS-NSO-16, which includes the Deep Creek cave area and some adjacent BLM lands. The establishment of this NSO (total area of 5,082 acres) under current management (Alternative A) was based on the high concentration of caves along both the north and south sides of the canyon, including La Sunder cave, classified as significant under the FCRPA criteria. A portion of the NSO containing approximately 2,400 acres along the Deep Creek canyon, but not including adjacent federal lands outside the canyon, is included within the Deep Creek ACEC and SRMA areas. The NSO stipulation for the Deep Creek cave area protects the entrances, subsurface features, and overlying ground surface of ten distinct caves clustered along the canyon sideslopes. This coverage protects upgradient hydrology, important for the continued health of the cave system. The NSO also extends to 5,000 feet beneath the ground surface, precluding the potential for inadvertent damage to the cave and karst system by directional drilling from outside the NSO boundaries to access underlying federal mineral estate. However, this NSO does not apply to seven additional caves that are outside that area, including one in the Hack Lake area of the Flattops but mostly in Glenwood Canyon. The latter are small, dry caves relatively lacking in distinctive cave features.

BLM_0016787

The continuation of current management under Alternative A also includes designation of the Deep Creek ACEC, which includes nearly half of the total NSO area, as a right-of-way exclusion area, meaning that the BLM would not approve ROW grants. The combination of the NSO and the ROW exclusion designation would preclude future development of salable and leasable minerals. Additionally, management under Alternative A includes a recommendation that the Deep Creek SRMA and (under all alternatives) the Deep Creek ACEC be withdrawn from locatable mineral claims. The BLM can only recommend this action, which is covered under the General Mining Law of 1872 and outside BLM's purview. Further protection is provided by designation of the ACEC as closed to motorized travel, including over-snow travel.

The effect of the NSO stipulation for the entire area, in combination with the ROW exclusion and recommendation for withdrawal from locatable mineral claims and closure to unauthorized motorized travel in the ACEC portion of the area, under Alternative A, is to protect caves and karsts.

**Impacts from Vegetation Management.** Vegetation management actions would generally not affect cave resources. A potential exception would include the use of chemical herbicides to treat weeds on the surface overlying the cave complex, if situations exist in which the herbicides could enter a cave without filtration through overlying soil and geologic material. Before using herbicides in the Deep Creek NSO area, the BLM would ensure that the application would not pose a risk of contamination to any cave.

**Impacts from Comprehensive Trails and Travel Management.** Unauthorized motorized travel, including over-snow travel, would be prohibited in the Deep Creek ACEC area, reducing potential impacts on sensitive cave features and hibernating bats by minimizing human visitation, particularly during the winter.

**Impacts from Land and Realty Management.** Designation of the Deep Creek ACEC and SRMA as a right-of-way exclusion area would reduce or eliminate most or all of the potential for adverse impacts related to utility corridors.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The application of GS-NSO-16 to approximately 5,100 acres in the Deep Creek cave area, including the surface and the subsurface to a depth of 5,000 feet, will protect the cave and karst values.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The recommendation for withdrawal of the Deep Creek ACEC and SRMA area from locatable minerals claims will protect the cave and karst resources in this area if the recommendation is applied.

**Impacts from Health and Safety Management.** No impacts are anticipated. However, placement of a locked gate across selected caves with the greatest potential for visitation, including the largest cave (La Sunder), has reduced the potential for injury or mortality to members of the public by limiting visitation to qualified cavers.

### _Alternative B (Preferred Alternative)_

Impacts to cave and karst resources from management of other resources would be the same as or similar to those under Alternative A except as follows.

BLM_0016788

**Impacts from Cave and Karst Resource Management.** Management actions described in the introduction to this section would apply under Alternative B, except as follows: Existing stipulation GS-NSO-16, which includes 5,100 acres of surface and subsurface resources to a depth of 5,000 feet, would be replaced with new stipulation CRV-NSO-49 for ACECs and CRV-NSO-44 for cave and karst occurrences. The first stipulation would include 2,400 acres in the Deep Creek ACEC but would exclude most of the subsurface features and cave hydrology. New stipulation CRV-NSO-44 would include 40 acres at each of 17 caves (680 acres total), including seven outside the Deep Creek area, but would not incorporate most of the underground features or upgradient hydrology. The seven additional caves protected by CRV-NSO-44 under Alternative B include one in the Hack Lake area on the Flattops but are mostly in Glenwood Canyon along the Interstate 70 corridor. Although this NSO adds protection to some caves not covered under Alternative A, the benefit of including these mostly small, dry caves is outweighed by the greatly reduced protection in the Deep Creek cave area, since only the cave entrances and immediate surroundings would be included.

Implementing a permit program at significant caves to provide a basis for restricting or monitoring cave use and for compiling information returned by permittees on cave condition and presence/absence of bats does allow for providing opportunities for people to engage in caving, research, and scientific exploration at significant caves.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be similar to those under Alternative A. Additional protection for bats would result from closing the Deep Creek cave area to mechanized travel thereby reducing disturbance as well as the number of casual visitors to the caves.

**Impacts from Land and Realty Management.** Impacts would be similar to those under Alternative A. There would be additional measures to protect bats from closing the Deep Creek Cave area to salable and leasable minerals.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The application of CRV-NSO-49 to the 2,400 acres of the Deep Creek ACEC and of CRV-NSO-44 to 680 acres (40 acres at each of 17 identified caves) would protect cave and karst values from fluid mineral development at or near the cave entrances. However, the more extensive protection in the Deep Creek cave area under Alternative A associated with the 5,100 acres protected by GS-NSO-16 would not be carried into Alternative B. This increases the potential for adverse impacts on cave hydrology from fluid mineral development on upgradient federal mineral estate lands.

**Impacts from Renewable Energy Management.** The measures described above for fluid minerals and locatable minerals (including CRV-NSO-44 and CRV-NSO-49) and for lands and reality (designation of a right-of-way exclusion area for the Deep Creek ACEC) would also avoid impacts from renewable energy developments, including both surface (wind, solar) and subsurface (geothermal). However, protections for the ten caves in the Deep Creek cave area would be less, because the 5,082 acres in current GS-NSO-16, which would not be carried into Alternative B, precludes the larger area of federal mineral estate from surface and subsurface facilities associated with fluid minerals or other mineral developments, including geothermal energy as well as wind and solar.

## _Alternative C_

Impacts to cave and karst resources from soils management, water management, vegetation management, visual resource management, wildland fire management, forestry management, livestock grazing management,

---

BLM_0016789

recreation and visitor services management, and management of locatable minerals would be the same as or similar to those under Alternative A. Impacts to cave and karst resources from comprehensive trails and travel management, lands and realty management, and renewable energy resources management would be the same as or similar to those under Alternative B. Impacts from all other resource management would be as described below.

**Impacts from Cave and Karst Resource Management.** Alternative C would retain almost the same level of protection of caves in the Deep Creek cave area as under Alternative A, through an NSO that includes 5,100 acres of BLM surface incorporating the cave entrances, underground features, and a large portion of the upgradient hydrology. The NSO extends to a depth of 5,000 feet below the ground surface. In addition, a new stipulation also applied under Alternative B would include a 40-acre area around the entrance of all 17 identified caves (680 acres total), including ten in the Deep Creek cave area, a cave at Hack Lake on the Flattops, and small, dry caves in Glenwood Canyon. Alternative C adds further protection for the Deep Creek cave area through designation as closed to fluid minerals leasing for both the 2,400-acre Deep Creek ACEC and 4,400 acres of lands with wilderness characteristics (LWCs).

Implementing a permit program at significant caves to provide a basis for restricting or monitoring cave use and for compiling information returned by permittees on cave condition and presence/absence of bats does allow for providing opportunities for people to engage in caving, research, and scientific exploration at significant caves.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** New stipulation CRV-NSO-54 would replace existing stipulation GS-NSO-16. These identical stipulations include 5,100 acres and protect cave entrances, underground features, and upgradient hydrology and underground features, and the designation as closed to fluid minerals leasing for the Deep Creek ACEC (2,400 acres) and for LWCs (4,400 acres in the Deep Creek area). This level of protection is the greatest among the alternatives, because designation as closed to fluid minerals leasing would preclude the use of directional drilling to access the underlying federal mineral estate for fluid mineral or geothermal development. As in Alternative B and D, this alternative would also include new stipulation CRV-NSO-44, which protects the entrances of 17 caves, including ten in the Deep Creek area seven outside the area, mostly in Glenwood Canyon, by applying a 40-acre NSO at each (680 acres total). Although the seven additional caves are generally dry and small, they provide potential roosting areas for bats.

## Alternative D

Impacts to cave and karst resources from lands and realty management, fluid minerals management, and renewable energy management would be the same as or similar to those under Alternative B. Impacts from all other resource management actions would be the same as or similar to those for Alternative A except as described below.

**Impacts from Cave and Karst Resource Management.** Under Alternative D, the only specific management action for cave and karst resources would be CRV-NSO-44, which totals 680 acres and includes 40 acres at each of 17 caves (ten in the Deep Creek area and seven outside that are, mostly in Glenwood Canyon). Although Alternative B also lacks protections specifically for caves other than CRV-NSO-44, it includes some indirect protection under GS-NSO-49 for the 2,400-acre Deep Creek ACEC. Therefore, Alternative D provides the least protection for cave and karst areas among the four alternatives.

BLM_0016790

Implementing a permit program at significant caves to provide a basis for restricting or monitoring cave use and for compiling information returned by permittees on cave condition and presence/absence of bats does allow for providing opportunities for people to engage in caving, research, and scientific exploration at significant caves.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be the similar to Alternatives B and C, except that motorized access would be permitted on two routes south of Deep Creek and west of the cave areas, providing fewer protective measures for bats. Motorized vehicles would have to access the routes through adjacent private land, which is permissible under Alternative D but not under Alternatives B and C.

### Cumulative Impacts

Unlike many of the resources administered by the CRVFO, cave and karst resources are localized features, generally unaffected by management actions or land uses related to other resources, and with a small highly specialized group of users. In general, cave and karst resources are affected primarily by direct impacts on the cave resources, particularly physical damage from uninformed or uncaring recreationists. Consequently, the only cave on BLM lands designated as significant within this plan—the La Sunder cave in the Deep Creek cave area—has already been protected by a locked gate across its entrance. The Anvil Points claystone cave in the Roan Plateau planning area, also designated as significant, lacks similar protection from physical damage, but has an NSO for no ground-disturbing activities in the area encompassing the cave opening, subsurface features, and watersheds overlying the cave. While the lesser caves in the Deep Creek area and along portions of Glenwood Canyon attract some use by cavers or untrained visitors, they lack the same degree of sensitive resources in terms of cave formations (stalactites, stalagmites, cave popcorn, and soda straws). Potential indirect impacts are related primarily to interruption of the hydrologic regime that led to the creation of the caves and, in some cases, their continued viability and the continued growth of cave formations.

Most of the types of management actions and land uses discussed in Chapters 3 and 4 will continue into the future. Cumulative impacts from federal, state, local, or private actions that are reasonably certain to occur generally have very limited bearing on cave and karst resources within the CRVFO planning area. Had the BLM not already taken steps to protect La Sunder Cave from unfettered public access, the greatest cumulative impact would probably be related to the general population growth in the region and the increasing interest in caving as a sport. More users, whether skilled cavers or the general public, equates with greater risk of direct harm from inadvertent damage to cave formations as well as the unauthorized collection of samples of cave formations, vandalism, or merely touching sensitive formations.

No future actions are planned under any of the alternatives that would substantially affect the degree to which caves are vulnerable to damage associated with the growth in the human population of the region and of caving as a sport. Qualitatively, the more restrictive travel designations under Alternatives B and C would provide a modicum of increased protection compared to Alternative D by placing greater restrictions on mechanized and motorized travel. However, such travel is only slightly more likely to occur to a substantial degree under Alternative D, and the actual difference among alternatives in this regard is small. Differences in the amount of population growth among the alternatives would be negligible, particularly in terms of permanent residents likely to engage in cave exploration versus transitory workers.

Cumulative impacts associated with the indirect impact on caves from interruption of cave hydrology are potentially of greatest risk under future alternatives, because this damage can occur from an activity

BLM_0016701

conducted on the surface of the ground at a considerable upgradient distance—i.e., unimpeded by the presence of a locked grate. In this regard, Alternative A is overwhelmingly more protective than the other alternatives in a cumulative sense. Only Alternative A has an NSO stipulation for oil and gas projects or other land developments that would preclude long-term surface- or subsurface-disturbing activities (to a depth of 5,000 feet) extending upgradient from the Deep Creek caves. This NSO would protect the upgradient cave hydrology from impacts related to drilling for oil and gas, geothermal resources if any, other minerals, or water. Therefore, the federal mineral estate upgradient from the Deep Creek caves would be protected from these potential activities under Alternative A to a much greater degree than under Alternatives B and D (2,400 acres versus 680 acres) but less so than under Alternative C (4,100 acres) due to a more extensive cave and karst NSO.

Moreover, the Deep Creek area, which is on the edge of the White River Uplift (Flat Tops Wilderness) and underlain by very old limestones and metamorphic basement rocks, is unlikely to contain oil, gas, or other mineral resources, with the possible exception of unidentified geothermal sources. Consequently, the lesser protection provided under Alternatives B, C, and D is unlikely to result in adverse impacts on cave hydrology as a result of cumulative impacts under those alternatives.

BLM_0016792

## 4.3   IMPACTS ON RESOURCE USES

### 4.3.1   Forestry

This analysis addresses potential impacts on forestry, caused by implementing the management actions under the alternatives described in Chapter 2. Particular focus was placed on potential changes in the quantity or quality of forest and woodland products available for harvest from designated FMUs. The analysis focuses on those management actions that limit or affect the quantity or quality of products within the CRVFO area. In the absence of quantitative data, best professional judgment was used, and impacts are sometimes described by using ranges of potential impacts or in qualitative terms, if appropriate.

### *Methods*

The RMP designates four FMUs within the planning area: King Mountain, Black Mountain, Castle Peak, and Seven Hermits. These FMUs represent the four largest contiguous and productive forests within the planning area. Intensive forest management with an emphasis on the production of wood products is limited to forest and woodlands within FMUs.

The resource area includes thousands of acres of forest and woodlands outside designated FMUs. These areas are designated for the management of other resource protection or needs, or are isolated or minimally productive for forest management. However, this does not preclude the management of forest and woodlands outside FMUs to meet other resource management objectives (i.e., hazardous fuels reduction and wildlife habitat enhancement), while potentially generating forest and woodland products. Forest products generated from these management activities were not included in the estimated PSQ provided for each alternative.

Thus, the impacts on forestry are defined as management actions or activities that alter the quality or quantity of forest and woodland products available for forest management actions within FMUs. When applicable, impacts on forest and woodlands outside FMUs will be mentioned specifically as they relate to potential augmentation of forest and woodland products to the estimated PSQ.

When possible, mitigation measures were incorporated into the analysis to reduce the adverse impact on forest and woodland areas.

### *Assumptions*

The assumptions used in this analysis include the following:

- Forest and woodland management treatments promote forest and woodland preservation, production, health, and value.

- The structure and stocking of the forest is different from historic conditions in that more trees and higher stocking rates exist today compared to historical conditions. In addition, the overall age of the forest and woodland resource is increasing within the planning area. The historical condition is the baseline toward which alternatives are striving to achieve. Those alternatives that will better achieve historical conditions are also better for the forest resource.

- Insect and disease mortality is higher today than it was in the past. Epidemic or near-epidemic levels of insect outbreaks, primarily mountain pine beetle, will continue for at least the next 5 years and will significantly change the composition, structure, and function of the forested areas within the planning

BLM_0016793

area. Probable annual harvest levels under each alternative are based on live growing stock trees. Trees killed by the mountain pine beetle deplete the live growing stock inventory of trees.

- No current forest or woodland inventory or age and species classifications are available for the planning area.

- Demand for forest and woodland products is not anticipated to grow substantially during the planning period. The supply of forestry and woodland products would continue to exceed demand.

- Distributing and managing vegetation treatments will vary in forest and woodland areas, depending on the desirable goals.

- Several traditional woodland products (e.g., firewood, Christmas trees, posts, and poles) could be harvested from forest and woodlands outside designated FMUs.

## Environmental Consequences

Allowable uses and management actions potentially impacting forests, woodlands, and forest products primarily include surface-disturbing activities and proactive management actions. As forests, woodlands, and forest products are impacted by the alternatives, these resources can in turn impact other resources. The impacts of forests, woodlands, and forest products on other resource topics (i.e., physical, biological, and wildland fire and fuels management) are discussed under their respective impacted resource sections in this chapter.

Forest management treatments are anticipated on a small portion of the resource area, making all impacts in regard to forest management minor. The combined acreage for all FMUs is less than 1 percent of the total planning area. Despite the focus on forest health treatments, resulting timber products are expected to meet local demand. As the forestry program continues to evolve and improve forest and woodland health, the quantity of forest products should meet future demand.

The types of impacts projected to occur to forests, woodlands, and forest products because of the four alternatives are similar; however, the intensity of impacts is anticipated to vary by alternative. Therefore, impacts on forests, woodlands, and forest products from surface-disturbing activities and resource protective management actions are described under individual alternatives.

Impacts on forestry and woodlands would result from some of the actions included under other resources and uses. Programs not addressed below were deemed to have no impacts or only negligible impacts on forestry and woodlands under any of the four alternatives.

### Alternative A

**Impacts from Forestry Management.** Insect and disease mortality are higher today than in the past. Epidemic or near-epidemic levels of insect outbreaks, primarily mountain pine beetle, will continue for at least the next 5 years and will significantly change the composition, structure, and function of the forested areas within the planning area. Future timber harvest would focus on improving forest and woodland health. Long-term benefits from vegetation treatments would be realized as removal of dead, dying, insect and disease affected, and overstocked forest and woodlands would improve forest health and would reduce wildland fire potential through fuels reduction. These long-term improvements in forest health would eventually produce more forest products of higher quality.

September 2011                   *Colorado River Valley Field Office – Draft RMP Revision EIS*                   4-442
*Chapter 4, Environmental Consequences*

BLM_0016794

Alternative A places a moderate emphasis on the management of forest and woodlands to minimize losses from, or damage from, insects and disease.

**Impacts from Soils Management.** In general, decisions for managing soil resources would also improve forest and woodland health by providing for overall ecosystem health through the continued implementation of the Colorado Standards for Public Land Health (BLM 1997a). Soil stipulations designed to protect soil resources on unstable areas and during periods when soils are saturated have the potential to limit forest and woodland treatment methods and seasonal timing, resulting in short-term minor adverse impacts by potentially increasing costs associated with vegetation treatments in these areas. The FMUs do not include any identified debris flow areas, which would preclude forest management activities. Areas with unstable soil are localized and impact only a small percentage of the acres available for forest management. Therefore, the direct impacts that soils decisions would cause on forest and woodland products harvesting under Alternative A would be minimal.

**Impacts from Water Resources Management.** Management of water resources would enhance forest and woodland health by providing for overall ecosystem health. None of the FMUs includes high water resource values or municipal watersheds, which would limit or modify forest management activities. Streamside buffer zone restrictions could limit the size of a forest product harvest or restrict an area from harvest. Actions under water quality and watershed resources would have a low impact on the overall forest and woodland management program.

**Impacts from Fish and Wildlife Management.** Wildlife habitat improvement projects could indirectly improve forest and woodland health and increase the availability of some woodland products, depending on the treatment method used. Proposed decisions for fish and wildlife could also adversely affect forest and woodland management by restricting some harvest by location or season. Forest management actions could be modified to comply with fish and wildlife stipulations and restrictions to minimize disturbance, as well as to maintain connectivity between large contiguous blocks of wildlife habitat.

Forest and woodland vegetation within FMUs provide habitat for a variety of wildlife species, including elk, deer, black bears, and wild turkeys. None of the FMUs includes designated critical habitat for any terrestrial wildlife species. Seasonal or spatial restrictions for mule deer and elk could adversely affect the success of commercial product harvest and forest health projects.

Much of the big game critical winter range is mapped within sagebrush and pinyon-juniper woodlands outside higher elevation FMUs. The reduction of pinyon-juniper encroachment into sagebrush ecosystems improves foraging habitat in big game critical winter range. The clearing of pinyon-juniper would generate woody biomass and forest products that could augment the amount of forestry products harvest to meet the PSQ.

BLM Instruction Memorandum No. 2008-050 provides guidance toward meeting BLM's responsibilities under the MBTA and EO 13186. The guidance directs CRVFO to promote the maintenance and improvement of habitat quantity and quality. Limited specific bird count or species data exist for the FMUs and responses of individual bird species to forest and woodland management activities are often habitat and species specific.

Forest and woodland vegetation within FMUs provides both foraging and nesting habitat for a variety of migratory birds that summer, winter, or migrate through the area. The habitat diversity provided by the broad

BLM_0016795

expanses of sagebrush, mixed mountain shrub, oakbrush, aspen, pinyon-juniper woodlands, other types of coniferous forests, and riparian and wetland areas support many bird species. Management of migratory birds could adversely affect the treatment boundaries and access roads, and potentially influence the type, size, timing, and location of a forestry project or treatment, which could fragment habitat, interfere with nesting season, or contribute to the intentional take of native bird species. The potential impact on forest management is relatively the same for all alternatives regarding compliance with the MBTA and EO 13186.

Bald eagles, which are increasing in numbers throughout their range, were removed from the federal threatened and endangered species list in 2007, but they are still protected under the MBTA. Bald eagles are not known to winter in higher elevation upland forest and woodland habitat found in the FMUs. However, upland habitats within FMUs next to waterways may be utilized as scavenging areas primarily for winter-killed animals. Management for bald eagle habitat within FMUs is not anticipated to have an impact on forest and woodland management.

Forest and woodland vegetation within FMUs also provide potential habitat for many species of raptors (e.g., red-tailed hawks, Cooper's hawks, American kestrels, and owls) not on the USFWS list of Birds of Conservation Concern. Current raptor surveys are not available for the area. Short-term impacts regarding the timing or location of vegetation treatments may result from temporary surface-use restrictions, seasonal restrictions, or other surface-development restrictions within buffers for raptors and bald eagle roost sites located within forests and woodlands.

Fish and amphibian decisions could impact the management of forest and woodland projects. Protection and mitigation measures to reduce soil compaction and displacement from forest and woodland vegetation treatments could directly impact the location, size, and timing of individual forestry and woodland treatments. BMPs designed to mitigate erosion are commonly implemented under all alternatives.

Implementation of the protective and mitigation measures and management decisions for fish and wildlife management are very similar across all alternatives. Fish and wildlife management decisions under Alternative A are aimed at maintaining the current fish and wildlife habitat condition and trends. Therefore, Alternative A is the least restrictive of the alternatives on timing, size, and location of forest and woodland vegetation treatment.

**Impacts from Special Status Species Management.** Forest and woodland vegetation provide important habitat for several special status species; therefore, the management of sensitive, threatened, and endangered species and their habitats would impact forestry activities. Forest management actions could be modified to comply with wildlife stipulations and restrictions to minimize disturbance, as well as to maintain connectivity between large contiguous blocks of critical wildlife habitat. Management measures could affect the economic viability of projects by limiting the intensity of management, the amount and type of products removed, the tools used, and the timing of activities. These effects would vary from minor to prohibitive. In addition, requirements for biological inventories in localized areas of concern would result in short-term delays or increased costs of forest management treatments.

The Lynx Conservation Assessment and Strategy (LCAS) provides direction on the types of activities and the amount of habitat that can be modified in lynx habitat. Because lynx habitat includes cool moist forests of lodgepole pine, spruce, or Douglas-fir, treatments in these habitat types could be restricted. Thinning high-density medium to large trees would be the least restricted treatment in lynx habitat, as long as suitable habitat

BLM_0016796

is maintained. The thinning of small-diameter trees would be the most restricted type of activity. Small-diameter thinning treatments in lodgepole pine stands would be heavily restricted in order to retain forage habitat for lynx. This could slow growth and productivity, lengthening the amount of time needed to grow large-diameter pine trees in these stands. The size and location of openings created through forest management could be restricted, but openings may be considered beneficial if forage habitat for lynx is limited.

Alternative A has approximately 30,000 acres of lynx habitat that has been mapped across all four FMUs. Lynx habitat makes up approximately 72 percent of all FMU acres available for intensive forest and woodland management. The adverse impact from managing lynx habitat is moderate under Alternative A.

King Mountain FMU includes 630 acres of core greater sage-grouse habitat under all alternatives. Management of sage-grouse habitat would focus on reducing pinyon-juniper woodland encroachment into sagebrush ecosystems. Sage-grouse habitat enhancement treatments designed to clear pinyon-juniper vegetation would provide an opportunity to recover woody biomass for production of various forest products and would contribute to the PSQ.

The bulk of greater sage-grouse habitat is mapped outside FMUs. Some of these areas include vegetation transition zones between sagebrush and pinyon-juniper woodland ecosystems. As mentioned above, the encroachment of pinyon-juniper woodland on sage bush ecosystems contributes to the loss of sage-grouse habitat. The clearing of pinyon-juniper to enhance and maintain sage-grouse habitat would generate woody biomass and forest products that could augment the amount of forestry products harvest to meet the PSQ.

Management of special status plant species and communities could limit or preclude timber harvest activities in places where such species occur. Special status species within the planning area are not commonly found in forested ecosystems. The exception would be the presence of Harrington's penstemon found in sagebrush and woodland ecosystems. Approximately 790 acres have been mapped as core Harrington's penstemon habitat in the northeast corner of the Seven Hermits FMU. Woodland management actions within the core habitat area would be modified to minimize soil-disturbing activities to avoid impact on existing populations of penstemon. An additional adverse impact is the requirement for biological inventories in localized areas of concern and could result in short-term delays or increased costs of woodland management treatments. Impacts on woodland management within FMUs under Alternative A are minor, given the limited area (less than 2 percent) requiring protecting and mitigation for Harrington's penstemon.

All forest and woodland management activities would comply with protection and recovery plans for individual special status species. Treatment would be designed to avoid, mitigate, or improve designated key and core habitat. The implementation of the protective and mitigation measures and management decisions for special status species management are very similar across all alternatives. Special status species management decisions under Alternative A are aimed at maintaining the current habitat condition and trends. Therefore, Alternative A is the least restrictive on timing, size, and location of forest and woodland vegetation treatment compared to the other alternatives.

**Impacts from Cultural Resource Management.** Without a complete inventory of all public lands within the decision area, the exact number, kind, and variability of cultural resources will be unknown. Direct long-term adverse impacts on forest management occur in localized areas where new cultural resource sites are discovered. While not typically found in forested areas, cultural sites are typically small and isolated, thereby

BLM_0016797

resulting in minor effects on forest management. These effects include restricting or relocating treatment boundaries and access roads, and potentially influence the type, size, and location of a forestry project or treatment. In addition, requirements to complete a cultural survey before disturbance could delay implementation and increase costs of planning and preparing forestry projects.

None of the FMUs is known to contain or have the conditions indicative of supporting potential concentration of cultural resources. Any discovered cultural resources within FMUs are anticipated to comprise a relatively small percentage of the total acres available to forest management. Thus, actions under cultural resources would have a minor impact on the overall forest management program.

**Impacts from Visual Resource Management.** Changes in forest management are anticipated from VRM classification. None of the FMUs is required to meet VRM Class I objectives, which is the most restrictive. However, under Alternative A, approximately 34,200 acres (82 percent) of FMUs would be managed to meet VRM Class II objectives. The majority of those acres are within the King Mountain and Castle Peak FMUs. VRM Class II management objectives require that the visual resource contained within these forested and woodland areas be maintained, or that changes to the visual resource be noticeable to the casual observer. VRM constraints would restrict timber harvests in these areas. Managing 34,200 acres to meet VRM Class II objectives could alter the size, type, and location of forest and woodland product harvest or forest health projects. Other forested areas within the FMUs would be managed as VRM Class III and IV, which would impose few restrictions on forest and woodland management actions.

Alternative A has the most acres and the greatest percentage of VRM Class II management within FMUs. Thus, Alternative A would be impacted the most from meeting and maintaining Visual Resource Management Objectives, especially for Class II viewsheds.

**Impacts from Wildland Fire Management.** Fire management can affect forestry activities. The Upper Colorado River Interagency Fire Management Plan (BLM 2002b, revised 2009) provides the fire management strategies for wildland fire suppression, unplanned fire managed for resource benefits, prescribed or planned fire, and nonfire fuels treatments. The CRVFO is managed under FMUs for the purpose of wildland fire and prescribed vegetation/fuels management. All proposed FMUs designate whether fire is allowed or not allowed.

An emphasis on wildfire suppression would minimize the potential loss of forest products for commercial or noncommercial use.

Vegetation and hazardous fuel reduction treatments designed to reduce wildland fire intensity and severity through the reduction and removal of forest and woodland vegetation can impact forest and woodland management. Effective vegetation and hazardous fuels reduction treatment can reduce the potential loss of forest and woodland products due to wildland fire.

Although vegetation and hazardous fuels reduction may be implemented across the landscape to protect a variety of resource values, the overwhelming treatments are targeted to reduce wildland fire intensity and severity within the WUI. As with areas outside the WUI, these treatments can mitigate the potential loss of forest and woodlands from wildland fire, while providing an opportunity for the utilization and harvest of commercial and noncommercial forest products.

BLM_0016798

**Impacts from Livestock Grazing Management.** Lands available for livestock grazing are open and permitted in all FMUs. Livestock management actions would include the implementation of the Colorado Standards for Public Land Health and Guidelines for Livestock Management (BLM 1997a), which requires meeting standards for vegetation health, wildlife habitat, and riparian habitat. Livestock grazing intensity within forested landscapes has been moderate to light throughout the planning area. Impacts from Livestock Grazing Management are attributed to decreased competition from herbaceous plants that compete with tree seedlings for water, sunlight, and nutrition. In limited incidents where livestock concentrate, there could be an increase in the grazing of tree saplings and seedlings in regenerating harvest or treatment sites, causing the trees to grow in a bush-type manner with stunted or stagnant growth. In all cases, the above impacts are limited in size and scope, resulting in an overall livestock grazing impact of low for forest and woodland management.

**Impacts from Recreation and Visitor Services Management.** The current recreation management would have little to no effect on the harvest of forest and woodland products. Developed recreation sites within the planning area are generally small and concentrated along river corridors and are not located in higher elevation FMUs. The majority of current recreation activity occurring within FMUs is of a dispersed nature, with little recreation occurring in woodland zones, except for seasonal big game hunting. Recreational pursuits in forested areas are generally compatible with most forest management activities, including forest health objectives and some forms of timber harvesting. Recreational use within forestlands could result in indirect short-term adverse impacts from accidental fires.

**Impacts from Comprehensive Trails and Travel Management.** Proposed decisions for route designations are expected to have little impact on access to and within designated FMUs. Main arterial and secondary travel routes for motorized vehicles will remain open in all FMUs. Vehicle routes closed to the public could be authorized for use under administrative authorization for the planning, preparation, implementation, and monitoring of all forest management activities. In addition, the construction of temporary roads to access forest management activities could be used to supplement the route designations to be implemented under this alternative.

However, the proposed decision for route designations for areas outside designated FMUs could impact collection and harvest of forest and woodland products, by limiting road access. Travel restrictions under Alternative A are the least of any alternative and therefore impose the least impact on forest and woodland product collection and harvest outside FMUs.

**Impacts from Lands and Realty Management.** ROWs and land use permits can result in adverse impacts on forest and woodland management when associated actions require the clearing of forests and woodlands. It is common that vegetation removal under these circumstances is necessary to accommodate the approved development. Conventional realty actions within the resource area include roads, communication sites, and utility transmission corridors. Forest and woodland vegetation in these areas would be cleared and taken out of production for the life of the development. The long-term impact of the lost forest and woodland vegetation is concentrated in specific areas and limited across the landscape. The cumulative impact of lost forest and woodland cover could result in less than 0.01 percent of woodland acres taken out of production each year. The impact from realty actions would have an overall minor impact on forest and woodland management.

BLM_0016799

**Impacts from Fluid Mineral Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The planning area does include large acres of woodlands (pinyon and juniper) outside FMUs, which are in the western portion of the planning area. This area has been classified as having a high potential for fluid mineral development. Impacts from oil and gas resource development on woodland management include the removal of forest cover for the construction of well pads, associated production facilities, roads, and pipelines. These areas would be taken out of production for the life of the well or improvement. The long-term impact of the lost woodland vegetation is dispersed across the landscape. Cumulatively, this impact could result in hundreds of woodland acres taken out of production each year. However, this loss does not represent more than 1 percent of the total woodland vegetation for the resource area. The impact from oil and gas development would have an overall minor impact on forest and woodland management.

**Impacts from Renewable Energy Management—Biomass.** Recent studies indicate that Colorado has a fair biomass resource potential. This biomass resource potential is based on the supply from five general categories of biomass: urban residues, mill residues, forest residues, agricultural residues, and energy crops. The CRVFO area has a source of potential biomass from forest residue from within and outside designated FMUs. Forest residues include underutilized logging material, imperfect commercial trees, dead wood, and other noncommercial trees that need to be thinned from crowded, unhealthy, fire-prone forests. However, because of the sparseness and remote location for biomass processing facilities, these residues are usually more expensive to recover than urban and mill residues and are not economically feasible for commercial energy development.

New tax credits or incentives, increased monetary valuation of environmental benefits, increased transportation efficiency, and sustained high prices for fossil fuels could make biomass from forest residue more economically feasible during the life of the Resource Management Plan. The improved economic feasibility of energy development from forest biomass would result in an increased demand for residual forest products. Alternative A has the greatest PSQ to meet the anticipated demand for biomass energy from forest residue.

### Alternative B (Preferred Alternative)

Impacts to forestry from management of other resources would be the same as or similar to those under Alternative A, except as described below.

**Impacts from Forestry Management.** Tree death from insects and disease is higher today than it was in the past. Epidemic or near-epidemic levels of insect outbreaks, primarily mountain pine beetle, will continue for at least the next 5 years and will significantly change the composition, structure, and function of the forested areas within the planning area. Future timber harvest would put a focus on improving forest and woodland health. Long-term benefits from vegetation treatments would be realized as removal of dead, dying, insect and disease affected, and overstocked forests and woodlands would improve forest health and reduce wildland fire potential through fuel reduction. These long-term improvements in forest health would eventually produce more forest products of higher quality.

Alternative B emphasizes the immediate salvage or accelerated harvest following adverse events to regenerate stands and capture the economic value of forest products before that value is lost. Alternatives B and D are the most aggressive of all the alternatives to implement forest health treatments to address impact from insect and disease.

BLM_0016800

**Impacts from Fish and Wildlife Management.** Wildlife habitat treatment projects could indirectly improve forest and woodland health and increase the availability of some woodland products, depending on the treatment method used. Proposed decisions for fish and wildlife could also adversely affect forest and woodland management by restricting some harvest by location or season. Forest management actions would potentially be modified to comply with fish and wildlife stipulations and restrictions to minimize disturbance, as well as to maintain connectivity between large contiguous blocks of wildlife habitat.

Forest and woodland vegetation within FMUs provide habitat for a variety of wildlife species, including elk, deer, black bears, and wild turkeys. None of the FMUs includes designated critical habitat for any terrestrial wildlife species. Seasonal or spatial restrictions for mule deer and elk could impact the success of commercial product harvest and forest health projects.

Much of the big game critical winter range is mapped within sagebrush and pinyon-juniper woodlands outside higher elevation FMUs. The reduction of pinyon-juniper encroachment into sagebrush ecosystems improves foraging habitat in big game critical winter range. Clearing pinyon-juniper would generate woody biomass and forest products that could augment forestry products harvest to meet the PSQ.

BLM Instruction Memorandum No. 2008-050 provides guidance toward meeting BLM's responsibilities under the MBTA and EO 13186. The guidance directs CRVFO to promote the maintenance and improvement of habitat quantity and quality. Limited specific bird count or species data exist for the FMUs, and responses of individual bird species to forest and woodland management activities are often habitat and species specific.

Forest and woodland vegetation within FMUs provides both foraging and nesting habitat for a variety of migratory birds that summer, winter, or migrate through the area. The habitat diversity provided by the broad expanses of sagebrush, mixed mountain shrub, oakbrush, aspen, pinyon-juniper woodlands, other types of coniferous forests, and riparian and wetland areas supports many bird species. Management of migratory birds could adversely affect the treatment boundaries, access roads and potentially influence the type, size, timing, and location of a forestry project or treatment, which could fragment habitat, interfere with nesting season, or contribute to the intentional take of native bird species. The potential impact on forest management is relatively the same for all alternatives regarding compliance with the MBTA and EO 13186.

Bald eagles, increasing in numbers throughout their range, were removed from the federal threatened and endangered species list in 2007 but remain protected under the MBTA and the Bald and Golden Eagle Protection Act. Bald eagles are not known to winter in higher elevation upland forest and woodland habitat found in the FMUs. However, upland habitats within FMUs next to waterways may be used as scavenging areas primarily for winter-killed animals. Management for bald eagle habitat within FMUs is not anticipated to have an impact on forest and woodland management.

Forest and woodland vegetation within FMUs also provides potential habitat for many species of raptors (red-tailed hawks, Cooper's hawks, American kestrels, and owls) not on the USFWS list of Birds of Conservation Concern. Current raptor surveys are not available for the area. Short-term impacts regarding the timing or location of vegetation treatments may result from temporary surface use restrictions, seasonal restrictions, or other surface development restrictions within buffers for raptors, and bald eagle roost sites within forests and woodlands.

BLM_0016801

Fish and amphibian decisions could impact the management of forest and woodland projects. Protection and mitigation measures to reduce soil compaction and displacement from forest and woodland vegetation treatments could directly impact the location, size, and timing of individual forestry and woodland treatments. Best management practices designed to mitigate erosion are commonly implemented in all alternatives.

Implementation of the protective and mitigation measures and management decisions for fish and wildlife management are very similar across all alternatives. Fish and wildlife management decisions under Alternative B are focused on strategically managing fish and wildlife habitats, with an emphasis on protecting critical habitat. Therefore, Alternative B is slightly more restrictive on timing, size, and location of forest and woodland vegetation treatment compared to Alternative A.

**Impacts from Special Status Species Management**. Forest and woodland vegetation provide important habitat for several special status species. Therefore, the management of sensitive, threatened, and endangered species and their habitats would impact forestry activities. Forest management actions could be modified to comply with wildlife stipulations and restrictions to minimize disturbance, as well as to maintain connectivity between large contiguous blocks of critical wildlife habitat. Management measures could affect the economic viability of projects by limiting the intensity of management, the amount and type of products removed, the tools used, and the timing of activities. These effects would vary from minor to prohibitive. In addition, requirements for biological inventories in localized areas of concern would result in short-term delays or increased costs of forest management treatments.

The Lynx Conservation Assessment and Strategy (LCAS) provides direction on the types of activities and the amount of habitat that can be modified in lynx habitat. Because lynx habitat includes cool moist forests of lodgepole pine, spruce, or Douglas-fir, treatments in these habitat types could be restricted. Thinning high-density medium to large trees would be the least restricted treatment in lynx habitat as long as suitable habitat is maintained. Thinning small-diameter trees would be the most restricted type of activity in order to retain forage habitat for lynx. This could slow growth and productivity, lengthening the amount of time needed to grow large-diameter pine trees in these stands. The size and location of openings created through forest management could be restricted but openings may be considered beneficial if forage habitat for lynx is limited.

Alternative B has approximately 20,730 acres of lynx habitat that has been mapped across all four FMUs. Lynx habitat comprises approximately 66 percent of all FMUs available for intensive forest and woodland management. The adverse impact from managing lynx habitat is moderate under Alternative B.

Management of special status plant species and communities could limit or preclude timber harvest activities in places where such species occur. Special status species within the planning area are not commonly found in forested ecosystems. The exception would be the presence of Harrington's penstemon found in sagebrush and woodland ecosystems. Approximately 790 acres have been mapped as core Harrington's penstemon habitat in the northeast corner of the Seven Hermits FMU. Under Alternative B, the core habitat is designated and managed as an ACEC. The area available for intensive forest and woodland management within the Seven Hermits FMU was therefore reduced by 790 acres. Impacts are disclosed under the ACEC for Alternative B.

All forest and woodland management activities would comply with protection and recovery plans for individual special status species. Treatment would be designed to avoid, mitigate, or improve designated key

BLM_0016802

and core habitat. The implementation of the protective and mitigation measures and management decisions for special status species management are very similar across all alternatives. Special status species management decisions under Alternative B are focused on strategically managing special status species habitats with an emphasis on protecting key and core habitat. Therefore, Alternative B is slightly more restrictive on timing, size, and location of forest and woodland vegetation treatment compared to Alternative A.

**Impacts from Visual Resource Management.** Changes in forest management are anticipated from VRM classification. None of the FMUs is required to meet VRM Class I objectives, which is the most restrictive. However, under Alternative B, approximately 22,600 acres (72 percent) of FMUs would be managed to meet VRM Class II objectives. The majority of those acres are within the King Mountain and Castle Peak FMUs. VRM Class II management objectives require that the visual resource contained within these forested and woodland areas be maintained or that changes to the visual resource not be noticeable to the casual observer. VRM constraints would restrict timber harvests in these areas. Managing 22,600 acres to meet VRM Class II objectives could alter the size, type, and location of forest and woodland product harvest or forest health projects. Other forested areas within the FMUs would be managed as VRM Class III and IV, which would impose few restrictions on forest and woodland management actions.

Alternative B has the second most acres and percentage of VRM Class II management within FMUs. Thus, Alternative B would be impacted slightly less than under Alternative A and measurably more than under Alternative D from meeting and maintaining VRM objectives, especially for Class II viewsheds.

The prohibitive implementation of wildfire use strategies would minimize the potential loss of forest products for commercial or noncommercial use. Both FMUs B and C prohibit the use of wildfire use, whereas FMU D allows for the potential management of wildfires under wildfire use strategies. Under Alternative B, approximately 2,400 acres (8 percent) of the forest management acres would be managed under FMU D. All of those acres are managed within the Castle Peak FMU. Alternative B has substantially fewer acres and percentage of FMUD management, compared to Alternative A. The impact from the implementation of wildfire use strategies and the potential loss of forest products is minimal under Alternative B.

**Impacts from Recreation and Visitor Services Management.** Alternative B is the only alternative that designates King Mountain as an SRMA. The King Mountain SRMA designation overlaps the King Mountain FMU. The recreation management objectives for the King Mountain SRMA were determined to be compatible with most forest management activities, including forest health objectives and some forms of timber harvesting. No adjustment to the acres of the King Mountain FMU was necessary. Although management objectives for SRMA and FMU were compatible, and no reduction in FMU acres was necessary, there is the potential for limiting the intensity, timing, location, and size of vegetation treatments. The impact from designating King Mountain as an SRMA would have an overall minor impact on forest and woodland management, and would not have a measurable effect on the quantity of forest and woodland products available under Alternative B.

**Impacts from Comprehensive Trails and Travel Management.** Proposed decisions for route designations are expected to have little impact on access to and within designated FMUs. Main arterial and secondary travel routes for motorized vehicles will remain open in all FMUs. Vehicle routes closed to the public could be authorized for use under administrative authorization for the planning, preparation, implementation, and monitoring of all forest management activities. In addition, the construction of

BLM_0016803

temporary roads to access forest management activities could be used to supplement the route designations to be implemented under Alternative B.

However, the proposed decision for route designations for areas outside designated FMUs could impact collection and harvest of forest and woodland products by limiting road access. Travel restrictions under Alternative B are moderately restrictive compared to any other alternative and therefore would have a moderate impact on forest and woodland product collection and harvest outside FMUs.

**Impacts from Renewable Energy Management—Biomass.** Recent studies indicate that Colorado has a fair biomass resource potential. This biomass resource potential is based on the supply from five general categories of biomass: urban residues, mill residues, forest residues, agricultural residues, and energy crops. The Colorado River Valley Field Office Area has a source of potential biomass from forest residue from within and outside designated FMUs. Forest residues include underutilized logging material, imperfect commercial trees, dead wood, and other noncommercial trees that need to be thinned from crowded, unhealthy, fire-prone forests. However, because of the sparseness and remote location for biomass processing facilities, these residues are usually more expensive to recover than urban and mill residues and presently are not economically feasible for commercial energy development.

New tax credits or incentives, increased monetary valuation of environmental benefits, increased transportation efficiency, and sustained high prices for fossil fuels could make biomass from forest residue more economically feasible during the life of the Resource Management Plan. The improved economic feasibility of energy development from forest biomass would result in an increased demand for residual forest products. Alternative B has the third largest PSQ to meet the anticipated demand for biomass energy from forest residue.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Management actions for protection of relevant and important values of ACECs may affect the availability of forest and woodland products for harvest. Alternative B designates Mayer Gulch as an ACEC for the protection and conservation of sensitive plants. The ACEC designation resulted in the reduction of approximately 800 acres from the Seven Hermits Forest Management Units, which is approximately 2.5 percent of the overall FMU acres under Alternative B. The impact from designating Mayer Gulch as an ACEC would have an overall minor impact on forest and woodland management, and does not measurably affect the quantity of forest and woodland products available under Alternative B.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** WSAs would be managed according to BLM's interim management policy (BLM Handbook 8550-1, Interim Management Policy for Lands under Wilderness Review [BLM 1995]), until Congress either designates each WSA as wilderness or releases it from consideration and it reverts to multiple-use management. Alternative B designates Castle Peak as a WSA for the protection and conservation of wilderness values and characteristics. The WSA designation resulted in the reduction of approximately 12,200 acres from the Castle Peak FMU, which is approximately 25 percent of the overall FMU acres under Alternative B. The impact from designating Castle Peak as a WSA would have an overall large impact on forest and woodland management and measurably reduce the quantity of forest and woodland products available under Alternative B.

BLM_0016804

## *Alternative C*

Impacts to forestry from special status plants management and ACECs management would be the same as or similar to those under Alternative B. Impacts from management of all other resources would be the same as or similar to those under Alternative A except as described below.

**Impacts from Forestry Management.** Tree death from insects and disease is higher today than it was in the past. Epidemic or near-epidemic levels of insect outbreaks, primarily mountain pine beetle, will continue for at least the next 5 years and will significantly change the composition, structure, and function of the forested areas within the planning area. Future timber harvest would focus on improving forest and woodland health. Long-term benefits from vegetation treatments would be realized as removal of dead, dying, insect and disease affected, and overstocked forest and woodlands would improve forest health and reduce wildland fire potential through fuel reduction. These long-term improvements in forest health would eventually produce more forest products of higher quality.

Alternative C places the least emphasis on salvage harvest operations and forest health treatments to capture economic value lost from insects and disease.

**Impacts from Fish and Wildlife Management.** Wildlife habitat treatment projects could indirectly improve forest and woodland health and increase the availability of some woodland products, depending on the treatment method used. Proposed decisions for fish and wildlife could also adversely affect forest and woodland management by restricting some harvests by location or season. Forest management actions could be modified to comply with fish and wildlife stipulations and restrictions to minimize disturbance, as well as to maintain connectivity between large contiguous blocks of wildlife habitat.

Forest and woodland vegetation within FMUs provides habitat for a variety of wildlife species, including elk, deer, black bears, and wild turkeys. None of the FMUs includes designated critical habitat for any terrestrial wildlife species. Seasonal or spatial restrictions for mule deer and elk could impact the success of commercial product harvest and forest health projects.

Much of the big game critical winter range is mapped within sagebrush and pinyon-juniper woodlands outside higher elevation FMUs. The reduction of pinyon-juniper encroachment into sagebrush ecosystems improves foraging habitat in big game critical winter range. The clearing and of pinyon-juniper would generate woody biomass and forest products that could augment the amount of forestry products harvest to meet the PSQ.

BLM Instruction Memorandum No. 2008-050 provides guidance toward meeting BLM's responsibilities under the MBTA and EO 13186. The guidance directs the CRVFO to promote the maintenance and improvement of habitat quantity and quality. Limited specific bird count or species data exist for the FMUs, and responses of individual bird species to forest and woodland management activities are often habitat and species specific.

Forest and woodland vegetation within FMUs provides both foraging and nesting habitat for a variety of migratory birds that summer, winter, or migrate through the area. The habitat diversity provided by the broad expanses of sagebrush, mixed mountain shrub, oakbrush, aspen, pinyon-juniper woodlands, other types of coniferous forests and riparian and wetland areas support many bird species. Management of migratory birds could adversely affect the treatment boundaries and access roads and could influence the type, size, timing, and location of a forestry project or treatment, which could fragment habitat, interfere with nesting season, or

BLM_0016805

contribute to the intentional take of native bird species. The potential impact on forest management is relatively the same for all alternatives regarding the compliance with the MBTA and EO 13186.

Bald eagles, which are increasing in numbers throughout their range, were removed from the federal threatened and endangered species list in 2007; however, bald eagles are still protected under the MBTA. Bald eagles are not known to winter in higher elevation upland forest and woodland habitat found in the FMUs. However, upland habitats within FMUs next to waterways may be used as scavenging areas primarily for winter-killed animals. Management for bald eagle habitat within FMUs is not anticipated to have an impact on forest and woodland management.

Forest and woodland vegetation within FMUs also provides potential habitat for many species of raptors (red-tailed hawks, Cooper's hawks, American kestrels, and owls) not on the USFWS list of Birds of Conservation Concern. Current raptor surveys are not available for the area. Short-term impacts regarding the timing or location of vegetation treatments may result from temporary surface use restrictions, seasonal restrictions, or other surface development restrictions within buffers for raptors and bald eagle roost sites within forests and woodlands.

Fish and amphibian decisions could impact the management of forest and woodland projects. Protection and mitigation measures to reduce soil compaction and displacement from forest and woodland vegetation treatments could directly impact the location, size, and timing of individual forestry and woodland treatments. Best management practices designed to mitigate erosion are commonly implemented under all alternatives. Alternative C provides for the protection of the upper reaches of Rock and Abrams Creeks under a Wild and Scenic River designation to protect outstanding and remarkable values for fish. Approximately 100 acres were removed from the Black Mountain FMU and 350 acres were removed from the Seven Hermits FMU. The direct impact on forest and woodland management is discussed under impacts from Wild and Scenic River designation for Alternative C.

Implementation of the protective and mitigation measures and management decisions for fish and wildlife management are very similar across all alternatives. Fish and wildlife management decisions under Alternative C emphasize the protection of fish and wildlife through proactively identifying, protecting, and improving habitats. Therefore, Alternative C is the most restrictive on timing, size, and location of forest and woodland vegetation treatment compared the other alternatives.

**Impacts from Special Status Species Management.** Forest and woodland vegetation provide important habitat for several special status species. Therefore, the management of sensitive, threatened, and endangered species and their habitats would impact forestry activities. Forest management actions could be modified to comply with wildlife stipulations and restrictions to minimize disturbance and maintain connectivity between large contiguous blocks of critical wildlife habitat. Management measures could affect the economic viability of projects by limiting the intensity of management, the amount and type of products removed, the tools used, and the timing of activities. These effects would vary from minor to prohibitive. In addition, requirements for biological inventories in localized areas of concern would result in short-term delays or increased costs of forest management treatments.

The LCAS provides direction on the types of activities and the amount of habitat that can be modified in lynx habitat. Because lynx habitat includes cool moist forests of lodgepole pine, spruce, or Douglas-fir, treatments in these habitat types could be restricted. Thinning high-density medium to large size trees would be the least

BLM_0016806

restrictive treatment in lynx habitat as long as suitable habitat is maintained. Thinning small-diameter trees would be the most restricted type of activity. Small-diameter tree thinning in lodgepole pine stands would be heavily restricted in order to retain forage habitat for lynx. This could slow growth and productivity, lengthening the amount of time needed to grow large-diameter pine trees in these stands. The size and location of openings created through forest management could be restricted, but openings may be considered beneficial if forage habitat for lynx is limited.

Alternative C has approximately 19,520 acres of lynx habitat that has been mapped across all four FMUs. Lynx habitat comprises approximately 69 percent of all FMUs available for intensive forest and woodland management. The adverse impact from managing lynx habitat is moderate under Alternative C.

All forest and woodland management activities would comply with protection and recovery plans for individual special status species. Treatment would be designed to avoid, mitigate, or improve designated key and core habitat. The implementation of the protective and mitigation measures and management decisions for special status species management are very similar across all alternatives. Special status species management decisions under Alternative C emphasize the protection of special status species through proactively identifying, protecting, and improving habitats. Therefore, Alternative C is the most restrictive on timing, size, and location of forest and woodland vegetation treatment compared the other alternatives.

**Impacts from Visual Resource Management.** Changes in forest management are anticipated from VRM classification. None of the FMUs is required to meet VRM Class I objectives, which is the most restrictive. However, under Alternative C, approximately 13,400 acres (47 percent) would be managed to meet VRM Class II objectives. The majority of those acres are within the Castle Peak FMU. VRM Class II management objectives require that the visual resource contained within these forested and woodland areas be maintained or that changes to the visual resource not be noticeable to the casual observer. VRM constraints would restrict timber harvests in these areas. Managing 13,400 acres to meet VRM Class II objectives could alter the size, type, and location of forest and woodland product harvest or forest health projects. Other forested areas within the FMUs would be managed as VRM Class III and IV, which would impose few restrictions on forest and woodland management actions.

Alternative C has the lowest percentage of VRM Class II management within FMUs. Thus, Alternative C would be the least impacted of all alternatives from meeting and maintaining VRM objectives, especially for Class II viewsheds.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Only Alternative C allocates lands to be managed as LWCs east of the proposed Castle Peak WSA. The LWC allocation, which includes management prescriptions specific to the protection and preservation of wilderness values, resulted in the reduction of approximately 2,600 acres from the Castle Peak FMU, which is approximately 9 percent of the overall FMU acres under Alternative C. The impact from allocating land for management as LWCs would have an adverse impact on forest and woodland management and measurably affects the quantity of forest and woodland products available under Alternative C.

**Impacts from Comprehensive Trails and Travel Management.** Proposed decisions for route designations are expected to have little impact on access to and within designated FMUs. Main arterial and secondary travel routes for motorized vehicles will remain open in all FMUs. Vehicle routes closed to the public could be authorized for use under administrative authorization for the planning, preparation,

BLM_0016807

implementation, and monitoring of all forest management activities. In addition, the construction of temporary roads to access forest management activities could be used to supplement the route designations to be implemented under this alternative.

However, the proposed decision for route designations for areas outside designated FMUs could impact collection and harvest of forest and woodland products by limiting road access. Travel restrictions under Alternative C are the most restrictive of any alternative and therefore would pose the greatest impact on forest and woodland product collection and harvest outside FMUs.

**Impacts from Renewable Energy Management—Biomass.** Recent studies indicate that Colorado has a fair biomass resource potential, based on the supply from five general categories of biomass: urban residues, mill residues, forest residues, agricultural residues, and energy crops. The Colorado River Valley Field Office Area has a source of potential biomass from forest residue from within and outside designated FMUs. Forest residues include underutilized logging material, imperfect commercial trees, dead wood, and other noncommercial trees that need to be thinned from crowded, unhealthy, fire-prone forests. However, because of the sparseness and remote location for biomass processing facilities, these residues are usually more expensive to recover than urban and mill residues and presently are not economically feasible for commercial energy development.

New tax credits or incentives, increased monetary valuation of environmental benefits, increased transportation efficiency, and sustained high prices for fossil fuels could make biomass from forest residue more economically feasible during the life of the Resource Management Plan. The improved economic feasibility of energy development from forest biomass would result in an increased demand for residual forest products. Alternative C has the lowest largest PSQ to meet the anticipated demand for biomass energy from forest residue.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** WSA would be managed according to BLM's interim management policy (BLM Handbook 8550-1, Interim Management Policy for Lands under Wilderness Review [BLM 1995]), until Congress either designates each WSA as wilderness or releases it from consideration and it reverts to multiple-use management. Alternative C designates Castle Peak as a Wilderness Study Area for the protection and conservation of wilderness values and characteristics. The WSA designation resulted in the reduction of approximately 12,200 acres from the Castle Peak FMU, which is approximately 32 percent of the overall FMU acres under Alternative C. Designating Castle Peak as a WSA would have an overall large impact on forest and woodland management and would not measurably reduce the quantity of forest and woodland products available under Alternative C.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Alternative C designates two Wild and Scenic River segments that impact the management of forest and woodland management. The Rock Creek Wild and Scenic River designation resulted in the reduction of approximately 100 acres from the Black Mountain FMU. Another approximately 350 acres were reduced from the Seven Hermit Forest Management as a result of designating the Abrams Creek Wild and Scenic River. Together both Wild and Scenic River designations reduced the total FMU acres by approximately 450 acres, which is approximately 1.5 percent of the overall FMU acres under Alternative C. The impact from designating the Rock Creek and Abrams Creek as Wild and Scenic Rivers would have an overall minor impact on forest and woodland management and does not measurably affect the quantity of forest and woodland products available under Alternative C.

BLM_0016808

### *Alternative D*

Impacts to forestry from fish and wildlife management, forest resources management, and WSA management would be the same as or similar to those under Alternative B. Impacts from management of all other resources would be the same as or similar to those under Alternative A except as described below.

**Impacts from Special Status Species Management.** Forest and woodland vegetation provide important habitat for several special status species. Therefore, the management of sensitive, threatened, and endangered species and their habitats would impact forestry activities. Forest management actions could be modified to comply with wildlife stipulations and restrictions to minimize disturbance as well as to maintain connectivity between large contiguous blocks of critical wildlife habitat. Management measures could affect the economic viability of projects by limiting the intensity of management, the amount and type of products removed, the tools used, and the timing of activities. These effects would vary from minor to prohibitive. In addition, requirements for biological inventories in localized areas of concern would result in short-term delays or increased costs of forest management treatments.

The LCAS provides direction on the types of activities and the amount of habitat that can be modified in lynx habitat. Because lynx habitat includes cool moist forests of lodgepole pine, spruce, or Douglas-fir, treatments in these habitat types could be restricted. Thinning high-density medium to large size trees would be the least restrictive treatment in lynx habitat as long as suitable habitat is maintained. Thinning small-diameter trees would be the most restricted type of activity. Small-diameter tree thinning in lodgepole pine stands would be heavily restricted in order to retain forage habitat for lynx. This could slow growth and productivity, lengthening the amount of time needed to grow large-diameter pine trees in these stands. The size and location of openings created through forest management could be restricted, but openings may be considered beneficial if forage habitat for lynx is limited.

Alternative D has approximately 20,730 acres of lynx habitat that has been mapped across all four FMUs. Lynx habitat comprises approximately 64 percent of all FMU acres available for intensive forest and woodland management. The adverse impact from managing lynx habitat is moderate under Alternative D.

All forest and woodland management activities would comply with protection and recovery plans for individual special status species. Treatment would be designed to avoid, mitigate, or improve designated key and core habitat. The implementation of the protective and mitigation measures and management decisions for special status species management are very similar across all alternatives. Decisions related to the management of special status species under Alternative D are aimed at maintaining the current habitat condition and trends. Therefore, Alternative D is similar to Alternative A, but is the least restrictive on timing, size, and location of forest and woodland vegetation treatment compared to the other alternatives.

**Impacts from Visual Resource Management.** Changes in forest management are anticipated from VRM classification. None of the FMUs is required to meet VRM Class I objectives, which is the most restrictive. However, under Alternative D, approximately 18,200 acres (56 percent) would be managed to meet VRM Class II objectives. The majority of those acres are within the Castle Peak FMU. VRM Class II management objectives require that the visual resource contained within these forested and woodland areas be maintained or that changes to the visual resource not be noticeable to the casual observer. VRM constraints would restrict timber harvests in these areas. Managing 18,200 acres to meet VRM Class II objectives could alter the size, type, and location of forest and woodland product harvest or forest health projects. Other forested areas

BLM_0016809

within the FMUs would be managed as VRM Class III and IV, which would impose few restrictions on forest management and woodland actions.

Alternative D has the next fewest acres and percentage of VRM Class II management within FMUs. Thus, Alternative D would be impacted slightly more than Alternate C and measurably less than under Alternatives A and B from meeting and maintaining VRM objectives, especially for Class II viewsheds.

**Impacts from Comprehensive Trails and Travel Management.** Proposed decisions for route designations are expected to have little impact on access to and within designated FMUs. Main arterial and secondary travel routes for motorized vehicles will remain open in all FMUs. Vehicle routes closed to the public could be authorized for use under administrative authorization for the planning, preparation, implementation, and monitoring of all forest management activities. In addition, the construction of temporary roads to access forest management activities could be used to supplement the route designations to be implemented under this alternative.

However, the proposed decision for route designations for areas outside designated FMUs could impact collection and harvest of forest and woodland products by limiting road access. Travel restrictions under Alternative D are the least restrictive of the action alternatives and therefore would pose the least impact on forest and woodland product collection and harvest outside FMUs.

**Impacts from Renewable Energy Management—Biomass.** Recent studies indicate that Colorado has a fair biomass resource potential. This biomass resource potential is based on the supply from five general categories of biomass: urban residues, mill residues, forest residues, agricultural residues, and energy crops. The Colorado River Valley Field Office Area has a source of potential biomass from forest residue from within and outside designated FMUs. Forest residues include underutilized logging material, imperfect commercial trees, dead wood, and other noncommercial trees that need to be thinned from crowded, unhealthy, fire-prone forests. However, because of the sparseness and remote location for biomass processing facilities, these residues are usually more expensive to recover than urban and mill residues and presently are not economically feasible for commercial energy development.

New tax credits or incentives, increased monetary valuation of environmental benefits, increased transportation efficiency, and sustained high prices for fossil fuels could make biomass from forest residue more economically feasible during the life of the Resource Management Plan. The improved economic feasibility of energy development from forest biomass would result in an increased demand for residual forest products. Alternative D has the second largest PSQ to meet the anticipated demand for biomass energy from forest residue.

### Cumulative Impacts

The cumulative impacts of past, present, and reasonably foreseeable future actions described in Chapter 3 would have long-term beneficial and adverse impacts on forest and woodland resources. The greatest adverse impact on the management and availability of forest and woodland products results from protective special designations. The special designations of ACECs, WSAs, LWCs, WSRs, and selected SRMAs are closed to timber and woodland management. Alternative C has approximately 135,000 acres (27 percent of the planning area) managed under special designations, which is the largest amount of acres under all alternatives. The impacts of special designations under Alternatives A, B, and D are relatively equal, with approximately 16 percent of the planning area closed to forest and woodland management and harvest.

BLM_0016810

Management decisions for air quality, soil and water, fish and wildlife, special status species, and cultural resources, and associated protective and mitigation measures, cumulatively have an adverse impact on the management and availability of forest and woodland products. Management for the above natural and cultural resources is most protective under Alternative C, which emphasizes protection through identifying, protecting, and improving resource values. Therefore, Alterative C is the most restrictive on timing, size, and location of forest and woodland vegetation treatments compared to the other alternatives. Alternatives A and D strive to maintain the natural and cultural resource condition and trends, and are therefore the least restrictive on forest and woodland vegetation treatments. Alternative B is focused on strategically managing natural and cultural resources, with an emphasis on protecting key and core resource values, and is slightly more restrictive than Alternatives A and D.

Forest and woodland vegetation management is impacted beneficially by the management of fire and fuels, forest and woodland health (insect and disease control), and enhancement of wildlife and special status species habitat. The proactive management of these resources provides opportunities for the management and availability of forest and woodland products. Fire management plans for the BLM, USFS districts, and local communities emphasizing fuel load reductions, vegetation treatments, and woodland salvaging would reduce the risks of wildland fire and long-term loss of woodland resources and productivity within the Colorado River Valley Field Office area. These activities (including stand thinning and salvage of dead, diseased, and infested trees) would also improve woodland resource productivity by indirectly improving woodland ecological conditions. These beneficial impacts would be greatest under Alternatives A and D, which could treat the most acres annually. The proactive management of wildlife and special status species habitat within forest and woodland vegetation on BLM, USFS, state, county, and private lands would also benefit the management and availability for forest and woodland products. Habitat enhancement treatments that target the harvest of forest and woodland vegetation are greatest under Alternatives B and D.

The following conclusion is formed from meaningful differences between cumulative beneficial and adverse impacts on the management and availability of forest and woodland products: Alternative A allows for greater allowable sale quantity and acres managed, and so provides greater benefits to forest products and greater benefits to creating overall healthier forest and woodlands. Benefits to forest products and management for healthier forests and woodlands are expected to be less under Alternative C than under the other alternatives.

BLM_0016811

## 4.3.2   Livestock Grazing

This section describes the potential impacts on livestock grazing from implementing management actions for the livestock grazing program as well as other resource programs. Existing conditions concerning livestock grazing are described in Section 3.3.2. Impacts on resources and resources uses from implementing the livestock grazing program are discussed in those particular resource sections of this chapter. Impacts on livestock grazing activities are generally the result of activities and management from other resources and uses. Management actions can affect livestock grazing by constraining the permittees or BLM's ability to manage rangeland forage levels, the ability to construct range improvement projects, and human disturbance and harassment of livestock. Management actions can also benefit livestock grazing by improving forage levels and limiting disturbances. Impacts are assessed in both a quantitative and qualitative manner. Where the effects are quantifiably different, they are identified under the discussion of each alternative.

Direct impacts on livestock grazing are anticipated from actions that restrict livestock grazing or that affect the allotment permittees in terms of lease conditions, such as allowable AUMs and season of use. Indirect impacts include those that change rangeland health and productivity or that change livestock grazing management.

### *Methods and Assumptions*

The analysis is based on the following assumptions:

- All new and existing leases and permits would be subject to terms and conditions determined by the authorized officer to be appropriate to achieve the management and resource condition objectives for the public lands and to meet land health standards.

- Livestock operators would work toward achieving the Colorado Standards for Public Land Health on grazing allotments. In some cases, changes to terms and conditions may be necessary to achieve Land Health Standards. Modifications could include a temporary or permanent loss of AUMs available for livestock grazing.

- Construction of range improvements (i.e., fences, spring developments, and reservoirs) would result in localized loss of vegetation throughout their useful life.

- Vegetation would be reestablished through reclamation practices along pipelines within 2 years but would consist mostly of early seral seeded species (grasses). Sagebrush/grass communities would be reestablished within 10 years, and juniper/lodgepole pine communities would be reestablished within 20 years. Livestock are often attracted to these areas.

- Range improvements would continue to be carried out in the planning area as needed.

- Range improvements generally lead to better livestock distribution and management, which would maintain or improve rangeland condition and health.

- By definition in the plan, livestock grazing is not a surface-disturbing activity, although livestock grazing could affect the surface in areas where livestock concentrate.

- Grazing preference is attached to base property owned or controlled by a permittee or lessee.

- When forage levels are impacted by other resources or resource uses (i.e. fuels treatments, oil and gas development, special designations) the amount of available AUMs can change.

BLM_0016812

- Areas that are treated with interim reclamation efforts would be invaded by weeds, which would be successfully eradicated.

- Actual use would increase if additional AUMs were made available for livestock.

## Environmental Consequences

Impacts on livestock grazing would result from some of the actions included under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on livestock grazing under any of the four alternatives.

### Alternative A

**Impacts from Livestock Grazing Management.** This alternative would continue to authorize grazing on 489,600 acres (97 percent of BLM lands in the CRVFO) and approximately 39,200 AUMs. Livestock grazing management would have beneficial impacts by providing a forage source for grazing permittees to achieve economic stability and preserve the open spaces that working ranges provide. Programs that ranchers use to improve their management, such as brush control, grass seedings, salt distribution, and water developments, also benefit wildlife species, and carefully controlled grazing plans are designed to enhance the vigor and diversity of vegetation systems. Colorado Land Health Standards will be achieved under all alternatives. Where current livestock grazing is the cause for not achieving standards, changes will be made to make significant progress in meeting those standards. Monitoring data would support these changes, which may be an adverse impact in the short term by requiring more management efforts from the permittee but would be beneficial in the long term by improving rangeland health. Although this alternative has the most AUMs available for livestock grazing, 59 allotments are currently vacant and would likely remain vacant (see Figure 2-23).

**Impacts from Soil and Water Resources Management.** Implementing appropriate stipulations to minimize detrimental effects that ground-disturbing activities could cause to soils and to maintain or enhance riparian areas would help to reduce soil erosion, surface runoff, sedimentation in streams, and stream channel characteristics. These stipulations may impact the size, location, and timing of range improvement projects. In cases where livestock grazing is a significant causal factor in not meeting Land Health Standards for soil and water resources, adjustments in grazing systems would be made. Impacts would be similar across all alternatives.

**Impacts from Vegetation and Wildland Fire Management.** Vegetation management and fire and fuels management actions under Alternative A would mostly benefit livestock grazing. Actions to improve vegetation communities in forests, rangelands, and riparian areas would indirectly benefit livestock grazing by improving the quantity and quality of forage. Actions to prevent and control invasive and noxious weeds using integrated weed management techniques would improve conditions in areas were valuable forage production is limited by competition from weed species. In some cases, grazing permittees would be responsible for controlling weeds that occur from new range improvement projects. Wildland fire management would help to prevent large scale, severe wildfires and in most cases increase the usable forage for livestock. Impacts may occur if livestock are excluded from certain areas or where range improvement projects are prohibited. In some cases livestock grazing may be deferred for 2 years to allow revegetation projects to become established. Although this would be beneficial in the long term, it may be adverse in the short term. Impacts would be similar across all alternatives.

BLM_0016813

**Impacts from Fish, Wildlife, and Special Status Species Management.** Management actions to enhance wildlife habitat could affect livestock grazing by improving vegetation conditions and indirectly maintaining or improving forage production. However, stipulations to protect special status species and fish habitat could restrict the placement and design of certain range improvement projects. This alternative contains the least amount of these restrictions or management actions.

**Impacts from Cultural Resource Management.** Management actions to protect cultural resources would affect relatively small, localized areas and would not have a measurable impact on livestock forage. In some cases, evaluating, mitigating, and protecting cultural resources would result in a modification or relocation of range improvements. This alternative contains the least amount of restrictive stipulations.

**Impacts from Visual Resource Management.** New range improvements would be required to meet VRM Class objectives under Alternative A. VRM Class I and II would be aimed at greater retention of existing landscape character than would Class III and IV. The class designation could affect range improvement design or prohibit the construction of some range improvements, such as pipelines and water storage tanks necessary to properly manage or improve livestock practices. This alternative would be the least restrictive to range improvement project construction, with 17,100 acres as Class I and 230,100 acres as Class II.

**Impacts from Recreation and Visitor Services Management.** Management actions to improve recreational opportunities would have direct and indirect impacts on livestock grazing. This alternative designates the most SRMAs (eight) and is the only alternative designating RMAs (six), totaling approximately 121,000 acres. In most cases, these designations increase and support a certain type of recreational experience. Impacts would be greatest where the SRMAs and RMAs are located close to communities and are more heavily used. Recreation directly impacts livestock grazing operations through disturbance, displacement, and harassment of livestock, vandalism to range projects, gates left open, damaged or removed forage, and weed spread. The NSO associated with protecting special recreational experiences would impact the placement and design of range improvement projects. Indirect impacts occur when recreational groups have general conflicts with livestock grazing management practices that interfere with recreational opportunities. In some cases, these interest groups can impact decisions on grazing management.

Although there are more SRMAs and RMAs in this alternative, impacts from recreation under Alternatives B and D would be more intense due to the designation of new SRMAs close to communities that would increase direct and indirect impacts stated above.

**Impacts from Comprehensive Trails and Travel Management.** Travel management actions under Alternative A would maintain the most acres (294,300) as open to overland travel and the least acres (38,000) as limited to existing routes. This allows for the greatest area of possible disturbance of all alternatives. Seasonal closures would limit motorized travel during the fall and winter in some areas. Livestock grazing permittees would continue to maintain access to range improvement projects for maintenance and grazing administration.

**Impacts from Lands and Realty Management.** Generally, lands and realty actions impact livestock grazing when ROWs are granted to individuals, groups, or corporations that reduce the amount of available forage for livestock. In some cases, a ROW can conflict with grazing management programs and restrict the placement or design of range improvement projects. Impacts are more severe when a ROW crosses a grazed area and leads to the suspended use of the area by livestock until vegetation can be reestablished. In some cases a

BLM_0016814

ROW can have beneficial impacts on livestock grazing when forage levels or access to remote parts of the allotment are improved (e.g., pipelines). Generally, impacts on livestock grazing from realty actions are associated with energy development.

Disposals, acquisitions, or exchanges would also impact livestock grazing. Depending on the situation, those impacts would be adverse or beneficial or both.

**Impacts from Energy and Minerals Management.** Management actions under Alternative A would open the most acres (679,200) of federal mineral estate to leasing and development and would close the fewest (27,800). Of all mineral and energy development, fluid mineral development is most likely to cause direct and indirect adverse impacts on livestock grazing. Impacts associated with surface-disturbing activities (e.g., pipelines, roads, and wells pads) would disturb soils, remove vegetation, increase the potential for the introduction and proliferation of weeds, increase livestock and human interactions and disturbance, increase the displacement of livestock, and alter management practices. In some cases, livestock movement would be hindered and livestock would be limited to undeveloped areas of the allotment. The opposite is also true, new pipelines and roads can increase the opportunity and ability of livestock to move around on the allotment. Although, the improvement of roads could facilitate livestock management, it also increases traffic and in some cases improves public access into areas that were previously limited in use.

Indirectly, livestock grazing benefits from mineral and energy development by allowing grazing permittees more flexibility in their operations by providing an alternate source of income (e.g., mitigation money, mitigation services, ROW agreements, grazing leases, and royalties).

**Impacts from Special Designations (ACECs, WSAs, WSRs) Management.** Management actions under Alternative A would designate six ACECs, for a total of 27,030 acres. These areas would be managed to protect their relevant and important values. This alternative would manage for fewer ACECs than under Alternatives B and C.

There would be four WSAs, for a total of 27,724 acres throughout all alternatives. These areas would be managed to preserve their wilderness characteristics under the interim management policy until congress either designates these lands as wilderness or releases them for other purposes. If released these areas would continue to be managed for their recreational opportunities.

There would be 26 segments of river or streams managed as eligible for WSR designation. Interim management would preserve the free-flowing nature and ORVs for these segments.

None of these designations would exclude livestock grazing if standards and guidelines are being achieved. These designations could affect range improvement design or prohibit the construction of some range improvements, such as pipelines and water storage tanks necessary to properly manage or improve livestock practices. In some cases these designations can improve the vegetation resource by excluding motorized use or surface-disturbing developments, which would benefit livestock grazing.

## Alternative B (Preferred Alternative)

Impacts to livestock grazing from soils management and water resources management would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be as described below.

BLM_0016815

**Impacts from Livestock Grazing Management.** Impacts would be similar to those described under Alternative A. This alternative would make approximately 36,000 AUMs available for livestock grazing. Of the 59 vacant allotments, three would be made available for grazing, while others would be closed or combined with adjacent allotments (see Figure 2-24). Only one currently active allotment would be closed to grazing (County Line).

**Impacts from Vegetation and Wildland Fire Management.** Impacts would be similar to those under Alternative A, although under Alternatives B, C, and D more descriptive measures would be taken to improve the quantity and quality of the vegetation resource.

**Impacts from Fish, Wildlife, and Special Status Species Management.** Management actions to enhance wildlife habitat could affect livestock grazing by improving vegetation conditions and indirectly maintaining or improving forage production. However, stipulations to protect fish, wildlife, and special status species could restrict the placement and design of certain range improvement projects. The level of protection under Alternatives B and C is similar, and is the most restrictive to livestock grazing management. Under Alternative B, three ACECs would be created to help protect special status species (Harrington's penstemon). In wildlife core areas, grazing management would be adjusted to allow as much fall forage as possible for wintering wildlife. When AUMs are voluntarily relinquished by grazing permittees in wildlife core areas, those AUMs may be reallocated to wildlife. Current and historic habitat for threatened, endangered, proposed, and candidate plants would have a surface-disturbing buffer of 200 meters, and sensitive plants would have a buffer of 100 meters, further impacting the placement and design of range improvements and possibly affecting grazing use patterns.

**Impacts from Cultural Resource Management.** Management actions to protect cultural resources would affect relatively small, localized areas and would not have a measurable impact on livestock forage. In some cases evaluating, mitigating, and protecting cultural resources would result in a modification or relocation of range improvements; for example, surface occupancy and surface-disturbing activities would be prohibited within 200 meters of historic properties.

**Impacts from Visual Resource Management.** New range improvements would be required to meet VRM Class objectives. VRM Class I and II would be aimed at greater retention of existing landscape character than would Class III and IV. The class designation could affect range improvement design or prohibit the construction of some range improvements, such as pipelines and water storage tanks, necessary to properly manage or improve livestock practices. This alternative would be more restrictive to range improvement project construction than under Alternatives A and D, with 33,600 acres as Class I and 249,200 acres as Class II.

**Impacts from Recreation and Visitor Services Management.** Management actions to improve recreational opportunities would have direct and indirect impacts on livestock grazing. This alternative designates six SRMAs, totaling approximately 51,000 acres. In most cases, these designations increase and support a certain type of recreational experience. Impacts would be greatest where the SRMAs are located close to communities and are more heavily used. For example, this alternative would maintain fewer SRMAs than under Alternative A, but the creation of The Crown SRMA would close motorized routes and add new mountain bike trails because the area would be managed for that type of experience. This would make the area more attractive to mountain bikers, who are numerous in the local communities, and would increase the amount of use in the area. The increased use would affect livestock grazing operations by disturbing,

September 2011     *Colorado River Valley Field Office – Draft RMP Revision EIS*     4-464
*Chapter 4, Environmental Consequences*

BLM_0016816

displacing, or harassing livestock, making range projects available to vandals, leaving gates open, damaging or removing forage, and spreading weeds. The NSO associated with protecting this kind of experience would impact the placement and design of range improvement projects. Indirect impacts may be intensified when recreational groups have general conflicts with livestock grazing management practices that interfere with the specific recreational opportunities. In some cases, these interest groups can impact decisions on grazing management.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative B, all travel would be limited to designated routes. (See tables in the comprehensive trails and travel management section (Section 4.3.4) for acres and miles of route designations.) Limiting overland travel would help improve the quantity and quality of forage across the CRVFO. Livestock grazing permittees would continue to maintain access to range improvement projects for maintenance and grazing administration. Routes without public access would be closed to motorized travel and open only to pedestrian and equestrian or administrative use. This would have an indirect impact on livestock grazing permittees by limiting their opportunity for income associated with motorized hunting access.

**Impacts from Lands and Realty Management.** Generally, impacts would be similar to Alternative A, except that 169,600 acres would be identified as ROW avoidance areas and 39,300 acres as ROW exclusion areas. Although these designations would help to protect the forage resource, they would impact the placement and design of range improvement projects.

**Impacts from Energy and Minerals Management.** Impacts from management actions for energy and mineral development under this alternative would be similar to Alternative A, except that 651,400 acres of federal minerals estate would be open to leasing and development and 55,600 acres would be closed. Under this alternative, approximately 2,206 federal wells on 276 multi-well pads outside the Roan Plateau would be developed, with an estimated 2,774 acres of surface disturbance. This would be slightly less than under Alternative D.

**Impacts from Special Designations (ACECs, WSAs, WSRs) Management.** Management actions under Alternative B would include designating nine ACECs for a total of 34,500 acres. These areas would be managed to protect their relevant and important values. This alternative would manage for more ACECs than under Alternatives A and D.

There would be four WSAs under Alternative B, for a total of 27,724 acres throughout all alternatives. These areas would be managed to preserve their wilderness characteristics under the interim management policy until Congress either designates these lands as wilderness or releases them for other purposes. If released, these areas would continue to be managed for their recreational opportunities.

There would be four eligible segments of river or streams designated as suitable for designation as WSRs. These segments would be managed to preserve the free-flowing nature and ORVs associated with the designation. One segment would be managed as wild, while the other three would be managed as scenic or recreational. Segments managed as wild would be more likely to affect livestock grazing or range improvements. This alternative would manage fewer river and stream segments as wild and scenic than under Alternatives A and C.

BLM_0016817

None of these designations would exclude livestock grazing if standards and guidelines are being achieved. These designations could affect range improvement design or prohibit the construction of some range improvements, such as pipelines and water storage tanks necessary to properly manage or improve livestock practices. In some cases, these designations can improve the vegetation resource by excluding motorized use or surface-disturbing developments, which would benefit livestock grazing.

### Alternative C

Impacts to livestock grazing from soils management and water resources management would be the same as or similar to Alternative A. Impacts to livestock grazing from cultural resource management would be the same as or similar to Alternative B. Impacts from management of other resources and land uses would be as described below.

**Impacts from Livestock Grazing Management.** Impacts would be similar to those described under Alternative A. This alternative would make approximately 35,500 AUMs available for livestock grazing. Of the 59 vacant allotments, one would be made available for grazing, while others would be closed or combined with adjacent allotments (see Figure 2-25). Three currently active allotments would be closed to grazing (County Line, Smith Gulch, and Alkali Gulch).

**Impacts from Vegetation and Wildland Fire Management.** Impacts would be similar to those under Alternative A, although under Alternative C (as well as B and D) more descriptive measures would be taken to improve the quantity and quality of the vegetation resource.

**Impacts from Fish, Wildlife, and Special Status Species Management.** Impacts would be the same as those described under Alternative B, except that seven ACECs would be created to help protect special status species.

**Impacts from Visual Resource Management.** New range improvements would be required to meet VRM Class objectives. VRM Class I and II would be aimed at greater retention of landscape character than would Class III and IV. The class designation could affect range improvement design or prohibit the construction of some range improvements, such as pipelines and water storage tanks necessary to properly manage or improve livestock practices. This alternative would be the most restrictive to range improvement project construction, with 33,600 acres as Class I and 258,100 acres as Class II.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Management actions under Alternative C would prohibit surface occupancy and surface-disturbing activities on 47,300 acres of BLM lands managed as LWCs and managed to protect their wilderness characteristics. For this reason, Alternative C would be the most restrictive to range improvement projects and grazing management practices.

**Impacts from Recreation and Visitor Services Management.** Impacts would be similar to those described under Alternative A, except that there would be only two SRMAs. The Crown would be managed as an ERMA instead of a SRMA and would be protected with a CSU instead of an NSO, which would be less limiting to other uses and the placement and design of range improvement projects. Other areas formerly managed as SRMAs or RMA would be managed as ERMAs.

BLM_0016818

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be similar to those described under Alternative B, except there would be fewer designations for motorized and mechanized uses. This alternative would designate the greatest amount of trails for pedestrian and equestrian use only.

**Impacts from Lands and Realty Management.** Generally, impacts would be similar to Alternative A, except that 162,000 acres would be identified as ROW avoidance areas and 50,600 acres as ROW exclusion areas. Although these designations would help to protect the forage resource, they would impact the placement and design of range improvement projects. This alternative designates the most ROW avoidance and exclusion areas.

**Impacts from Energy and Minerals Management.** Impacts from management actions for energy and minerals development under this alternative would be similar to Alternative A, except that 531,500 acres of federal mineral estate would be open to fluid minerals leasing and development, and 175,500 acres would be closed. In this alternative, the most acres would be closed to energy and mineral development. Under this alternative, approximately 2,206 federal wells on 276 multi-well pads would be developed, with an estimated 2,774 acres of surface disturbance, the same as under Alternative B.

**Impacts from Special Designations (ACECs, WSAs, WSRs) Management.** Management actions under Alternative C would include designating 16 ACECs, for a total of 79,700 acres. These areas would be managed to protect their relevant and important values. This alternative would manage for the most ACECs.

There would be four WSAs, for a total of 27,724 acres throughout all alternatives. These areas would be managed to preserve their wilderness characteristics under the interim management policy until congress either designates these lands as wilderness or releases them for other purposes. If released, these areas would continue to be managed for their recreational opportunities.

All 26 eligible segments of river or streams would be designated as suitable for designation as WSRs. These segments would be managed to preserve the free-flowing nature and ORVs associated with the designation. Nine segments would be managed as wild, while the other 17 would be managed as scenic or recreational. Segments managed as wild would be more likely to affect livestock grazing or range improvements. This alternative would manage the most river and stream segments as wild and scenic.

None of these designations would exclude livestock grazing if standards and guidelines were being achieved. These designations could affect range improvement design or prohibit the construction of some range improvements, such as pipelines and water storage tanks necessary to properly manage or improve livestock practices. In some cases, these designations can improve the vegetation resource by excluding motorized use or surface-disturbing developments, which would benefit livestock grazing.

<u>*Alternative D*</u>

Impacts to livestock grazing from soils management and water resources management would be the same as or similar to Alternative A. Impacts from management of other resources and uses would be as described below.

**Impacts from Livestock Grazing Management.** Impacts would be the same or similar to those described under Alternative A. This alternative would make approximately 36,500 AUMs available for livestock grazing. Of the 59 vacant allotments, six would be made available for grazing, while others would be closed or

BLM_0016819

combined with adjacent allotments (see Figure 2-26). Four currently active allotments would be closed to grazing (County Line, Alkali Gulch, Alkali Creek, and Dry Creek Pete and Bill). Closing the Dry Creek Pete and Bill allotment would have a significant adverse effect on two grazing permittees who use the allotment to access other private leases and USFS permits.

**Impacts from Vegetation and Wildland Fire Management.** Impacts would be similar to those under Alternative A, although under Alternatives B, C, and D more descriptive measures would be taken to improve the quantity and quality of the vegetation resource.

**Impacts from Fish, Wildlife, and Special Status Species Management.** Impacts would be similar to Alternatives B and C but with fewer restrictive management actions. No ACECs would be created to protect special status species. Competitions with wildlife in big game winter range habitat may not be addressed with livestock grazing adjustments, and fall grazing in severe winter range and winter concentration areas would not be eliminated. Where conflicts arise, they would likely be addressed with range improvement projects, such as pasture fencing, water developments, grazing rotations, or wildlife-specific management.

**Impacts from Cultural Resource Management.** Impacts would be the same as those described under Alternatives B and C, except there is no stipulation for historic properties.

**Impacts from Visual Resource Management.** New range improvements would be required to meet VRM Class objectives. VRM Class I and II would be aimed at greater retention of existing landscape character than would Class III and IV. The Class designation could affect range improvement design or prohibit the construction of some range improvements, such as pipelines and water storage tanks necessary to properly manage or improve livestock practices. This alternative would be less restrictive to range improvement project construction than under Alternatives B and C, with 34,000 acres as Class I and 228,300 acres as Class II.

**Impacts from Recreation and Visitor Services.** Impacts would be the similar to those described under Alternative B, except there would be seven SRMAs totaling approximately 68,200 acres. Although this would be less than what is included under Alternative A, the placement and management of three new SRMAs (The Crown, Fisher, and Hardscrabble/East Eagle) would increase the amount of mountain bike use and create the greatest amount of conflicts with livestock grazing.

**Impacts from Comprehensive Trails and Travel Management.** Under this alternative, all travel would be limited to designated routes. (See tables in comprehensive trails and travel management section (Section 4.3.4) for acres and miles of route designations.) Limiting overland travel would help improve the quantity and quality of forage across the CRVFO. More areas would be designated for motorized and mechanized uses and less area would be designated as pedestrian and equestrian only. Livestock grazing permittees would continue to maintain access into range improvement projects for maintenance and grazing administration. Unlike Alternatives B and C, this alternative would allow motorized uses for public landowners who have legal access.

**Impacts from Lands and Realty Management.** Generally, impacts would be similar to those under Alternative A, except that 126,700 acres would be identified as ROW avoidance areas and 39,000 acres as ROW exclusion areas. Although these designations would help to protect the forage resource, they would impact the placement and design of range improvement projects. This alternative designates the least ROW avoidance and exclusion areas.

BLM_0016820

**Impacts from Energy and Minerals Management.** Impacts from management actions for energy and minerals development under this alternative would be similar to those under Alternative A, except that 658,000 acres of federal mineral estate would be open to leasing and development and 48,800 acres would be closed. Under this alternative, approximately 4,198 federal wells on 525 multi-well pads outside the Roan Plateau would be developed, with an estimated 5,276 acres of surface disturbance. This alternative would allow the most wells and have the most amount of disturbance associated with mineral and energy development.

**Impacts from Special Designations (ACECs, WSAs, WSRs) Management.** Management actions would designate three ACECs, for a total of 20,200 acres. These areas would be managed to protect their relevant and important values. This alternative would manage for the fewest ACECs.

Alternative D would include four WSAs for a total of 27,724 acres. These areas would be managed to preserve their wilderness characteristics under the interim management policy until Congress either designates these lands as wilderness or releases them for other purposes. If released, these areas would continue to be managed for their recreational opportunities.

All 26 eligible stream segments would be determined as not suitable for designation as WSRs. These areas would not be managed to preserve the free-flowing nature and ORVs. This alternative would manage the fewest river and stream segments as wild and scenic.

None of these designations would exclude livestock grazing if standards and guidelines are being achieved. These designations could affect range improvement design or prohibit the construction of some range improvements, such as pipelines and water storage tanks necessary to properly manage or improve livestock practices. In some cases these designation can improve the vegetation resource by excluding motorized use or surface-disturbing developments, which would benefit livestock grazing.

## Cumulative Impacts

Cumulative impacts in the planning area could result from surface-disturbing activities, the presence and abundance of grazing wildlife, increased recreational demands, and protections for sensitive resources. Urban development, energy production, and the conversion of private lands to other uses could reduce livestock numbers and forage available for livestock. Big game winter range encompasses a significant amount of private and BLM lands. If private lands were to become less desirable and less conducive to wildlife use due to development, BLM lands would become more important for wintering wildlife habitat, further impacting the amount of forage available for livestock grazing. Restrictions placed on public lands may drive more development on privately owned surface land, and the expected increase in population would add to the future development demands on private ranches. Areas close to communities would be impacted the most.

Range improvements, including water developments, fencing, and vegetation treatments, have been critical in the past management of livestock. Maintenance of existing projects and the continued ability to identify needs for improved grazing systems with range improvements will be critical in the future. Grazing management systems have allowed livestock managers to better distribute livestock across the landscape, resulting in improvements in resource conditions. Protective stipulations in the planning area may result in restrictions on the type, location, design, and extent of future range improvements. In extreme cases, livestock grazing may be eliminated where land health standards cannot be achieved.

BLM_0016821

In the future, land values may result in ranch ownership and control by corporations or other groups. The property would be leased for base property, or ranch managers would be hired to manage livestock grazing operations. Ranches incorporating diverse enterprises are more likely to succeed, especially in the face of changing climate, growing populations, and fluctuating markets. Ranch properties that are successful will have implemented management plans that incorporate energy development, that benefit from wildlife production, that allow for recreational opportunities, and that provide sufficient forage for livestock production. The BLM management actions across all alternatives would have a minor incremental impact on the overall cumulative impact on the resource in the planning area.

BLM_0016822

### 4.3.3   Recreation and Visitor Services

This section discusses impacts on recreation and visitor services (R&VS) from the management of other resources and resource uses. Current R&VS management is described in Section 3.3.3 and carried forward as Alternative A. Travel management is discussed under Section 3.3.4. A detailed management framework (i.e. proposed objectives, recreation setting characteristics (RSCs), management action and allowable use decisions, implementation-level actions and BMPs for special recreation management areas (SRMAs), and extensive recreation management areas (ERMAs) proposed in Alternatives B, C and D can be found in Appendix K - Draft R&VS Prescriptions for Proposed Special and Extensive Recreation Management Areas. A recreation management area (RMA) specific analysis follows the program-specific impact analysis.

#### Assumptions

The R&VS analysis is based on the following assumptions:

- BLM lands are designated as SRMAs, designated as ERMAs, or left undesignated. Both types of RMAs, SRMAs and ERMAs, offer quality and highly valued recreation opportunities. Within SRMAs, R&VS management is recognized as the predominant land use focus, where specific recreation opportunities and recreation setting characteristics are managed and protected on a long-term basis. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions. Since management of ERMAs is commensurate with the management of other resources and resource uses, all R&VS decisions must be compatible with other resource objectives.

- RMPs are required to identify the necessary management action and allowable use decisions for R&VS and other programs. Management action and allowable use decisions are generally described as decisions needed to achieve program objectives or constrain non-compatible land use activities. These decisions (including stipulations) are analyzed in terms of their impact on participation in recreation activities, recreation objectives (i.e., recreation opportunities), maintenance or enhancement of RSCs, or recreation management.

- It is important to note that the 1999 Oil & Gas Leasing & Development RMP amendment also used the term "recreation management areas (RMAs)" to describe areas where a no surface occupancy (NSO) stipulation would be applied in order to protect the non-motorized recreation opportunities. The stipulation was applied in the following areas: King Mountain, Siloam Springs, Castle Peak, Bull Gulch (the portion of the Bull Gulch WSA not within the Bull Gulch SRMA), Sunlight Peak, Fisher Creek, and the Pisgah Mountain. The stipulation protected the physical recreation setting (i.e., naturalness and remoteness) by restricting surface-disturbing and inconsistent activities. The stipulation for these areas did not amend the RMP and establish the lands as SRMAs. However, areas covered by the stipulation are discussed because the recognition of the recreation values is relevant to understanding recreation and other program proposals and analysis.

- The CRVFO visitor study (Virden et al. 2008) and public comments indicated one of the most important contributions to recreation satisfaction was the experience of being able to enjoy "close to home or frequent access to outdoor physical activity." This was considered to have determinative effect on realizing desired recreation benefits, such as "living a more outdoor-oriented lifestyle," "escaping everyday responsibilities for a while," or "enjoying frequent access to outdoor physical activity."

BLM_0016823

- The CRVFO visitor study (Virden et al. 2008) and public comments indicated the other important contribution to satisfaction was retaining the current naturalness of BLM lands, along with a similar degree of remoteness and access. These RSCs were considered to have a determinative effect on activity participation and the realization of recreation outcomes.

- The CRVFO visitor study (Virden et al. 2008) and public comments indicated that crowding was currently not an issue in surveyed areas. However, visitation is assumed to increase, fostered by the outdoor recreation opportunities in the region, the desire of visitors/residents to have an outdoor-oriented lifestyle, the promotion of regional outdoor recreation-tourism opportunities, and growing resident populations. These factors would eventually weigh on social RSCs, especially near towns and near destination resorts in the Vail Valley and the Roaring Fork Valley.

- NSO stipulations are considered a major constraint on surface-disturbing activities and surface use/occupancy. CSU stipulations are considered a moderate constraint on surface-disturbing activities and surface use/occupancy. Physical RSCs are best maintained by the application of NSO stipulations. It is assumed that the more acres protected by either stipulation, the greater the benefit to managing recreation settings to meet R&VS objectives.

- NSO stipulations for other resources and resource uses: (1) would not affect casual or dispersed recreation activities; (2) would constrain recreation-related surface-disturbing activities such as trail or facility development; and (3) would indirectly help retain the current physical RSCs such as naturalness and remoteness of BLM lands.

- Special designations, either legislative or administrative, would probably attract more visitors and result in higher use levels. In a region that is already renowned and marketed for its outdoor recreation amenities, a special identification or designation (e.g., SRMA, WSR) likely would lead to increased visitation. Areas that are currently receiving a custodial level of management would consequently need more intensive recreation oversight and monitoring (e.g., more visitor facilities, more signs, increased staff presence and enforcement, and increased user controls).

- Public comments indicate that some people believe SRMA designations would attract larger numbers of people, which might cause negative impacts to natural and cultural resources, as well as displacing established, dispersed outdoor recreation activities.

- Overlapping designations for other resources are less problematic with ERMAs, than SRMAs, because recreation objectives and management of ERMAs is commensurate and considered in context with the management of other resources and resource uses.

- The demand for SRPs would increase during the life of the plan.

- Recreation use and management would conform to Colorado Standards for Public Land Health (BLM 1997a). These standards describe conditions needed to sustain public land health and relate to all uses of the public lands. Standards are applied on a landscape scale and relate to the potential of the landscape.

### Methods

- Visitors seek a diverse range of setting-dependent outdoor recreation opportunities. They choose different areas to recreate in based on the qualities and conditions of the area, and because they want to realize a specific set of recreation experiences and benefits. For example, primitive camping in a backcountry valley by a remote lake offers a different experience from camping in a highly developed campground adjacent to a rural reservoir. Therefore, the physical, social, and operational components

BLM_0016824

of the recreation area, along with their defining characteristics, offer a method to describe and qualitatively analyze the impacts to the qualities and conditions of the recreation area, as follows:

- o  Physical Component – The physical qualities of the landscape defined by: remoteness, naturalness, and visitor facilities.

- o  Social Component – The social qualities associated with use defined by: contacts, group size, and evidence of use.

- o  Operational Component – The operational conditions to manage recreation use defined by: access, visitor services, and management control.

- The end product of recreation management is the experiences and benefits (i.e., outcomes) people realize from participating in recreation activities.

- The RMAs are classified as either special recreation management areas (SRMA) or extensive recreation management areas (ERMA). The RMAs are land units where R&VS objectives are recognized as a primary resource management consideration, and specific management is required to protect the recreation opportunities. The RMA designation is based on recreation demand and issues, recreation setting characteristics, resolving use/user conflicts, compatibility with other resource uses, and resource protection needs.

- SRMAs are administrative units where the existing or proposed recreation opportunities and recreation setting characteristics are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. SRMAs are managed to protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics. The SRMAs may be subdivided into recreation management zones (RMZs) to further delineate specific recreation opportunities. Within SRMAs, R&VS management is recognized as the predominant land use plan (LUP) focus, where specific recreation opportunities and recreation setting characteristics are managed and protected on a long-term basis.

- ERMAs are administrative units that require specific management consideration in order to address recreation use, demand, or R&VS program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. Management of ERMAs is commensurate with the management of other resources and resource uses.

- Off-highway vehicle riders/drivers include users of motorcycles, all-terrain vehicles (ATVs) and 4-wheel drive vehicles (4x4s). Participants generally prefer a relatively natural or natural appearing environment. Motorized vehicle closures and limitations would have adverse impacts on this group's recreational activity. Adverse impacts are generally considered to increase as the acres or the miles of routes affected increases. Improved roads for other public land uses, such as gas development, may offer additional access but not contribute to an improved recreation opportunity.

- Mountain bikers generally prefer a relatively natural or natural appearing environment. They also prefer single-track trails instead of roads, and routes not shared with motorized vehicles. Mechanized vehicle closures and limitations would have adverse impacts on this group's recreational activity. Adverse impacts are generally considered to increase as the acres or the miles of routes affected increases.

- Hikers, runners, backpackers, and equestrians prefer a natural-appearing environment with a low level of human-caused disturbance. They also prefer trails instead of roads and routes not shared with

BLM_0016825

motorized and mechanized vehicles. Closures to human use, including equestrian use, would have an adverse impact on this group's recreational activity. Adverse impacts are generally considered to increase as the acres or the miles of routes affected increases.

- Previously SRMAs were identified where BLM lands were experiencing heavy recreation use or where BLM plans to make large investments in staff, funding, facilities, or time. All remaining BLM lands were identified as part of a large nonspecific ERMA called the Glenwood Springs ERMA and custodially managed. Alternative A proposes to continue the management direction set forth in existing documents, resulting in the current prevailing RSCs and trends.

- In contrast to Alternative A, the designation and management direction for Alternatives B, C, and D apply 2011 BLM Instruction Memorandum No. 2011-004 (BLM 2010), which clarified and refined land use planning guidance for R&VS. The guidance established three potential classifications for R&VS – SRMAs, ERMAs, and undesignated lands.

- Impact analyses and conclusions are based on interdisciplinary team knowledge of resources and the planning area, reviews of existing literature, and information from other agencies. Effects are quantified, where possible. In the absence of quantitative data, best professional judgment is used to qualitatively analyze the impacts. Impacts are sometimes described using ranges of potential impacts or in qualitative terms, if appropriate.

## Environmental Consequences

Impacts on R&VS would result from management action and allowable use proposals for resources and resource uses. Proposed R&VS management action and allowable use decisions generally create beneficial impacts for the recreation use and enjoyment of BLM lands. Some proposed decisions are a benefit for targeted recreation activities and a negative impact to non-targeted recreational activities (i.e. SRMA designations). In addition, proposed R&VS program actions may restrict recreation use in order to protect public health and safety (i.e., firearm use restrictions), reduce user conflicts, or protect natural and cultural resources. These impacts are discussed in the sections titled "Impacts from Recreation and Visitor Services Management" and in the recreation management area analysis. Variations in proposed management action and allowable use decisions are in accordance with the theme of the alternatives. Land uses and resources not addressed below were deemed to have no or only negligible impacts on R&VS under any of the four alternatives.

### Alternative A

**Impacts from Recreation and Visitor Services Management.** Under Alternative A, the CRVFO would continue to manage eight SRMAs (i.e. Bocco Mountain, Bull Gulch, Deep Creek, Gypsum Hills, Hack Lake, Red Hill, Thompson Creek and the Upper Colorado River) totaling 60,400 acres (Table 4.3.3-1). The remaining BLM lands would continue to be managed as part of a large nonspecific ERMA (i.e. Glenwood Springs ERMA). All areas would be managed under direction set forth in the current RMP and amendments. However, the proposed management direction is inconsistent with revised BLM R&VS planning guidance transmitted in 2010 by Instruction Memorandum No. 2010-092 (BLM 2010).

An NSO stipulation would protect the physical RSCs for non-motorized recreation activities in other areas (i.e. Bull Gulch – portion of the WSA outside the SRMA, Castle Peak, Fisher Creek, King Mountain, Pisgah Mountain, Siloam Springs and Sunlight Peak).

BLM_0016826

**Table 4.3.3-1**
**Summary of Existing and Proposed Recreation Management Areas by Alternative**

| Area | Alternative A (Existing) | Alternative B | Alternative C | Alternative D |
|------|--------------------------|---------------|---------------|---------------|
| Bocco Mountain | SRMA | SRMA | - | SRMA |
| Bull Gulch | SRMA/ **RMA | - | - | - |
| Castle Peak | *ERMA/ **RMA | - | - | - |
| The Crown | *ERMA | SRMA | ERMA | SRMA |
| Deep Creek | SRMA | | | |
| Eagle River | *ERMA | ERMA | ERMA | ERMA |
| Fisher Creek | *ERMA/ **RMA | ERMA | ERMA | SRMA |
| Gypsum Hills | SRMA | - | - | - |
| Hack Lake | SRMA | SRMA | ERMA | ERMA |
| Hardscrabble/E. Eagle | *ERMA | ERMA | ERMA | SRMA |
| King Mountain | *ERMA/ **RMA | SRMA | ERMA | ERMA |
| New Castle | *ERMA | ERMA | ERMA | ERMA |
| Pisgah Mountain | *ERMA/ **RMA | - | - | - |
| Red Hill | SRMA | SRMA | SRMA | SRMA |
| Siloam Springs | *ERMA/ **RMA | - | - | - |
| Silt Mesa | *ERMA | ERMA | ERMA | ERMA |
| Sunlight Peak | *ERMA/ **RMA | - | - | - |
| Thompson Creek | SRMA | ERMA | ERMA | SRMA |
| Upper Colorado River | SRMA | SRMA | SRMA | SRMA |

- Public lands that are not designated as RMAs would be managed to meet basic R&VS and resource stewardship needs.
* BLM lands identified as part of a large nonspecific ERMA called the Glenwood Springs ERMA and custodially managed.
**Undesignated areas referred to as an RMA in the 1999 Oil & Gas Leasing & Development amendment because an NSO stipulation was applied to these lands in order to protect the non-motorized recreation opportunities (see Assumptions).

Under all alternatives, camping limits and closures would protect resources, reduce conflicts, and reduce long-term camping (i.e., squatting) on BLM lands. Under all alternatives, firearm use restrictions on inappropriate recreational target shooting would provide for public safety. Alternatives B and C propose the most areas where recreational target shooting is restricted, followed by Alternatives D and A, respectively.

RMP's address the type(s), activities, and locations where special recreation permits (SRPs) would be issued or not issued. The issuances of SRPs are discretionary implementation actions. Across the alternatives, SRPs would be issued or not issued based on their ability to support R&VS management objectives, the proposed designations, and the desired RSCs, along with considerations for visitor health and safety, resource protection, and use and user conflicts.

Under all alternatives, an NSO stipulation would be applied to Rifle Mountain Park and major river corridors to protect high scenic and recreation values from surface-disturbing activities and use.

Under all alternatives, the CRVFO would implement recreation fees as provided by the guidelines in the Federal Lands Recreation Enhancement Act to help maintain visitor services and facilities if budgets decline and/or recreation demand increases.

<u>Recreation Setting Characteristics</u>

Highways, roads (i.e., city, county, improved, dirt, 4x4), and trails (ATV, motorcycle, mountain bike, horse, foot) influence RSCs and visitors' experiences. The amount of routes and the types of public use permitted on

BLM_0016827

those routes influence the physical qualities of the landscape and indirectly affect the social conditions of an area. Remoteness refers to the extent to which individuals perceive themselves removed from the sights and sounds of human activities (US Forest Service 1990). Therefore, this analysis considers roads and trails, their existence, the type of use, and how they are administered. For a large planning area, a baseline (Alternative A) against which action alternatives can be compared can be created using GIS (Table 4.3.3-1). From this baseline, proposed public travel designations for each alternative can be evaluated as reducing or increasing remoteness. The classes are named only to help display a spectrum of distances from types of routes. For example, the primitive class does not relate specifically to wilderness or WSA designations. Since the BLM has no jurisdiction on private, county, city, or state highways, the front country, rural, and urban classifications do not change across alternatives.

Table 4.3.3-2 shows the quantitative changes in RSC classes by alternative. Table 4.3.3-2 displays how the theme and accompanying management actions (e.g., special designations, travel designations) of each alternative impact the physical RSC of remoteness. For example, Alternatives A and D place an emphasis on producing recreation opportunities in combination with other land uses in less remote recreation settings. The physical character of the landscape would be more remote under Alternatives C and B, respectively. Alternative D provides the most acres where mountain biking occurs in isolation from motorized vehicles.

Impacts on naturalness are determined by the presence and amount of human-caused changes (e.g., roads, trails, fences, pipelines, power lines, livestock developments, residential or commercial development, energy development, ditches, ROWs). Since roads and trails occur by themselves or in combination with other human-made impacts, similar conclusions can be drawn for an estimation of the physical characteristic of naturalness.

The social RSCs (i.e., contacts, group size, and evidence of use) that characterize the interaction or indication of visitors are likely to parallel the changes in remoteness. One exception may be areas that are closed to motorized use but emphasize mountain biking. SRMAs like The Crown, Red Hill, Thompson Creek, Hardscrabble/East Eagle, or Fisher Creek may actually see an increase in use due to the popularity of mountain biking in areas without motorized vehicles.

**Table 4.3.3-2**
**Physical Recreation Setting Characteristic—Remoteness—Based on Travel Management Designations**

| | Classification in Acres | | | | | |
|---|---|---|---|---|---|---|
| Alternative | Primitive More than 0.5 mile from either mechanized or motorized routes | Backcountry within 0.5 mile of mechanized routes | Middle country within 0.5 mile of four-wheel drive vehicle, ATV, and motorcycle routes | Front country within 0.5 mile of passenger vehicle routes (including county and private routes) | Rural within 0.5 mile of paved/primary roads and highways | Urban within 0.5 mile of streets and roads within municipalities and along highways |
| A | 65,700 | 15,900 | 132,800 | 208,600 | 53,600 | 28,900 |
| B | 104,700 | 15,700 | 93,900 | 208,600 | 53,600 | 28,900 |
| C | 117,520 | 8,700 | 88,100 | 208,600 | 53,600 | 28,900 |
| D | 73,900 | 26,400 | 114,100 | 208,600 | 53,600 | 28,900 |

BLM_0016828

The social RSCs (i.e., contacts, group size, and evidence of use) that characterize the interaction of visitors are likely to parallel the changes in remoteness. One exception may be areas that are closed to motorized use but emphasize mountain biking. SRMAs like The Crown, Red Hill, or Fisher Creek may actually see an increase in use with the increase in backcountry acres.

**Impacts from Soils Management.** Under all alternatives, RMP decisions and implementation actions for recreation would comply with *Recreation Guidelines to Meet Public Land Health Standards on BLM Managed Lands in Colorado* (BLM 1996), whereby recreation routes, trails, and developments are not developed on highly erosive soils.

Across all alternatives, an NSO stipulation would be placed on the debris flow hazard zone around the City of Glenwood Springs. In all alternatives, NSO stipulations would prohibit surface occupancy and surface-disturbing activities on slopes greater than 50 percent. The CSU stipulations apply special design measures to new construction on erosive soils and slopes greater than 30 percent. The intentions of the stipulations were to apply similar measures to other public land activities in order to reduce erosion and maintain soil site stability. The language under Alternative A for soils stipulations was adapted from oil and gas stipulations, unlike Alternative B, C, and D stipulations that specifically address all surface-disturbing activities.

Across all alternatives, at the implementation level, stipulations to reduce the impact of surface-disturbing activities on soils would create the same or similar impacts on recreation use, RSCs, and recreation management. During implementation of the land use plan, the stipulations may limit the placement and construction of recreation facilities or trails. On the other hand, the stipulations would help retain the naturalness of the existing physical landscape, especially on highly visible slopes.

**Impacts from Water Resource Management.** Under all alternatives, RMP decisions and implementation actions for recreation would comply with *Recreation Guidelines to Meet Public Land Health Standards on BLM Managed Lands in Colorado*, whereby recreation is managed to achieve or exceed applicable water quality standards.

NSO stipulations for major river corridors would conserve scenic values, recreation opportunities, and physical RSCs along the Colorado, Roaring Fork, Crystal, Frying Pan, Eagle, and Piney Rivers. NSO stipulations to protect domestic watershed areas also would conserve scenic values, recreation opportunities, and physical RSCs south of the town of Rifle and north of the town of New Castle.

Stipulations proposed for water quality and the protection of groundwater would also benefit recreational uses by maintaining the quality and quantity of public water sources, waterways, and springs.

**Impacts from Vegetation Management.** Under all alternatives, RMP decisions and implementation actions for recreation would comply with Recreation Guidelines to Meet Public Land Health Standards on BLM Managed Lands in Colorado whereby recreation is managed to protect riparian areas, maintain sufficient vegetation on upland areas, and protect against the establishment or spread of noxious weeds. Across all alternatives, at the implementation level, stipulations to reduce the impact of surface-disturbing activities on riparian areas would create similar impacts on R&VS. The NSO stipulation would restrict intensive/large-scale human use or occupation (e.g., group use events) but not casual or dispersed recreation activities. The stipulations would limit the construction or adjust the placement of recreation facilities or trails unless the

BLM_0016829

exception criteria are met. On the other hand, the stipulations would help retain the naturalness of the existing physical landscape along waterways and springs.

In all alternatives, visitors would temporarily be displaced from vegetation treatment areas; however, the size of the vegetations treatments performed within the CRVFO are generally small (i.e., hundreds of acres) and have only localized, short-term, negative impacts on visitors. Depending on the vegetation community treated (grassland and shrubland versus a woodland or coniferous forest), the length of time the treatment remains evident would vary before the treatment area returned to a more natural condition. Since most vegetation treatments are directed at creating/maintaining healthy, productive plant and animal communities, the long-term benefit would occur for wildlife-related activities. Recreation-related project proponents that create surface disturbances would be responsible for monitoring and controlling noxious weeds under all alternatives.

**Impacts from Fisheries and Aquatic Wildlife Management.** Under all alternatives, RMP decisions and implementation actions for recreation would comply with Recreation Guidelines to Meet Public Land Health Standards on BLM Managed Lands in Colorado, whereby recreation is managed to protect wildlife habitat by preserving connectivity and minimizing wildlife disturbances by limiting recreational use by type, season, intensity, distribution, or duration. This alternative contains no specific management action or allowable use decisions for aquatic species except an NSO stipulation based on a 2-mile radius of the Rifle Falls and Glenwood Springs fish hatcheries to protect the quality and quantity of surface water and underground aquifers. The NSO stipulations would constrain intensive/large-scale human use or occupation (e.g., group use events) but not casual or dispersed recreation activities. Since the stipulation protects fish hatcheries, it benefits angling for trout.

**Impacts from Terrestrial Wildlife Management.** Under all alternatives, RMP decisions and implementation actions for recreation would comply with Recreation Guidelines to Meet Public Land Health Standards on BLM Managed Lands in Colorado whereby recreation is managed to protect wildlife habitat by preserving connectivity and minimizing wildlife disturbances by limiting recreational use by type, season, intensity, distribution, or duration.

Generally, decisions that benefit wildlife and their habitat are considered beneficial to visitors in the long term because most visitors enjoying seeing wildlife as part of their visit to BLM lands. However, big game management can be controversial where it conflicts with other resource activities, such as logging, grazing, suburban developments, and public access (WGFD 2004), and non-wildlife related recreation activities. Some wildlife closures that limit motorized or mechanized activities or access, such as winter big game closures, negatively impact recreation activities on an area-specific basis.

Alternative A has the fewest areas and acres closed to motorized recreation activities to protect wintering big game, thus the fewest overall acres closed to motorized recreation activities. Alternatives C, B and D, respectively, have the most acres closed to over-snow travel. Alternative A has a 15-day longer limitation (December 1 to April 30) than under Alternatives B, C, and D (December 1 to April 15), however the closure under Alternatives B, C, and D applies to both motorized and mechanized recreation activities.

The winter wildlife closures have a minor impact on winter motorized recreation, since these areas have traditionally not been popular winter destinations due to the accumulation of lower amounts of snow, shorter season of snow cover, the vegetation types, and the proximity of better winter recreation opportunities on the

BLM_0016830

adjacent WRNF. Mechanized activities are not affected by the closures under Alternative A; however, mechanized activities are included in the seasonal closure under Alternatives B, C, and D. The 15-day shorter closure should reduce impacts on mountain biking, since low elevations areas can be snowfree and dry by April 15.

In all alternatives, stipulations to protect wildlife species or habitat would restrict intensive/large-scale human use or occupation (e.g., group use events) but not casual or dispersed recreation activities. NSO stipulations would indirectly help retain the current naturalness and remoteness of BLM lands; however, the stipulations would be a localized constraint on recreation-related surface-disturbing (construction) activities in SRMAs and ERMAs, unless the exception criteria are met. Alternatives A and D are the least constraining.

Garfield Creek, Basalt, and West Rifle Creek State Wildlife Areas (SWAs) were acquired by the state not only to protect wildlife habitat but also to provide the public with opportunities to hunt, fish, and watch wildlife. Alternatives A and B apply an NSO stipulation and Alternative C applies a CL designation, all of which are considered major constraints on surface-disturbing activities which in this situation would benefit recreation opportunities to hunt, fish, and watch wildlife. Alternative D applies a less constraining CSU stipulation.

In all alternatives, timing limitations (e.g., big game birthing areas, raptors, osprey, waterfowl and shorebird habitat, and rookeries) would be applied to protect wildlife species, areas, or habitat by restricting large-scale human use or occupation during crucial seasons. However, the TLs would not preclude casual or dispersed recreation activities. The TLs would be a seasonal constraint on recreation-related surface-disturbing/construction activities unless the exception criteria are met. Alternative C is the most constraining, followed by Alternative B. Alternatives A and D are the least constraining.

In all alternatives, the BLM Field Manager could enact temporary closure or restriction orders to resolve management conflicts and protect persons, property, public lands and resources (including wintering wildlife) using 43 CFR Subpart 8364 (Closures and Restrictions).

In all alternatives, recreation construction activities resulting in the removal of vegetation would be subject to a condition of approval that would protect BCC habitat during the nesting season. The COA would apply to activities that would take place between May 15 and July 15. The COA would consider the scale/type of the project, the length of time of disturbance, potential species present, weather conditions, elevation, type of motorized equipment, and habitat types. An exception may be granted if nesting surveys indicate no nesting BCC species within 10 meters of the area to be disturbed.

**Impacts from Special-Status Species Management—Fish and Other Aquatic Wildlife.** Under all alternatives, RMP decisions and implementation actions for recreation would comply with Recreation Guidelines to Meet Public Land Health Standards on BLM Managed Lands in Colorado whereby recreation is managed to protect habitat for federal and state threatened and endangered species. In all alternatives, recreation would be similarly affected by management for threatened and endangered species because law, direction, and policy require that listed species be protected.

The placement of recreation sites or facilities could be impacted if biological surveys found any special status species in the area of proposed recreation-related developments. As opposed to Alternatives B, C, and D, Alternative A does not contain any TLs for special status fish and other aquatic wildlife species.

BLM_0016831

**Impacts from Special Status Species—Plants and Terrestrial Wildlife Management.** Under all alternatives, RMP decisions and implementation actions for recreation would comply with Recreation Guidelines to Meet Public Land Health Standards on BLM Managed Lands in Colorado whereby recreation is managed to protect habitat for federal and state threatened and endangered species. In all alternatives, recreation would be similarly affected by management for threatened and endangered species because law, direction, and policy require that listed species be protected.

NSO stipulations for a variety of special status species and their habitats would restrict intensive/large-scale human use or occupation and some recreation developments, but not casual or dispersed recreation activities. The NSO stipulations would indirectly help retain the existing physical RSCs. The acres of NSO stipulations and ACECs vary across alternatives with Alternatives C and B, respectively, having the most acres and Alternatives A and D having the fewest acres within ACECs and NSO stipulations. Across alternatives, the overall impact would be similar, localized, and possibly mitigated through site-specific design, engineering, or relocation of the recreation developments or events. At the implementation level, the placement of recreation sites or facilities could be impacted if biological surveys found any special status species in proposed recreation-related developments.

**Impacts from Cultural Resource Management.** Current federal laws and BLM policy to protect cultural resources would have similar long-term impacts on recreation use and recreation surface-disturbing projects under all alternatives. The minor changes across alternatives in NSO stipulations would cause a negligible impact on RSCs and recreation opportunities. Cultural resource management actions generally would enhance recreational opportunities and provide benefits by protecting resources and educating the public about cultural resources. Management actions for cultural resources could preclude the development of recreational facilities in some areas, but this is expected to be minimal. Management actions involving interpretive programs, signage, markers, and other elements for historic trails, other historic sites, and important prehistoric sites would enhance educational opportunities, and increase public awareness and stewardship over the long term. In all alternatives, the on-the-ground negative impact would be similar, localized, and possibly mitigated through site-specific engineering or relocation of the recreation development.

**Impacts from Visual Resource Management.** Across all alternatives, areas designated as VRM Class I would provide the most protection to the physical RSCs. The character of the landscape in VRM Class I or II areas would be maintained, which would retain the existing degree of naturalness. In areas designated as VRM Class III or IV, moderate to major modifications to the character of the landscape could occur. Visually evident impacts may alter the recreation setting character and at some levels negatively impact the visitors' recreation experience. However, at the implementation level, recreation projects in VRM Class I and Class II areas would have to be designed to mitigate for scenic values. Any changes to the landscape would need to repeat the basic elements of form, line, color, and texture found in the natural features of the landscape.

Under Alternative A, VRM class designations were generally assigned to maintain the existing visual quality throughout the CRVFO and protect unique and fragile resource values such as found in ACECs, except for the Red Hill SRMA, which was assigned VRM Class II specifically to help retain the physical RSCs of the SRMA. The physical RSCs of the other SRMAs have been retained, and would continued to be retained, by the Class I and Class II designations, or have been somewhat impacted by Class III and Class IV designations. Under Alternatives B, C, and D, VRM Class II designations were specifically assigned to all SRMAs unless otherwise managed as VRM Class I to maintain physical RSCs.

BLM_0016832

**Impacts from Wildland Fire Management.** The CRVFO fire management is the same in all alternatives. Scenic values and recreation values are identified for protection. Short-term closures of recreation areas and facilities could occur during wildland fire suppression and during prescribed fires for visitor safety.

**Impacts from Cave and Karst Resource Management.** Under all alternatives, cave and karst resources would be managed under specific cave management objectives and setting prescriptions that allow for appropriate access, while addressing issues and concerns relating to preservation of the caves' pristine and fragile resources, wildlife values, scientific and research values, and visitor safety/rescue issues. The cave management objectives and setting prescriptions would retain the current physical, social, and operational qualities of caves. If caves are found to be significant, they would be managed in accordance with the Federal Cave Resources Protection Act. An NSO stipulation for the protection of the Deep Creek cave area would prohibit surface occupancy and surface-disturbing activities in the Deep Creek Cave Area. The NSO extends to 5,000 feet below the surface. The NSO area encompasses the cave openings and portions of the subsurface features and watersheds immediately above the caves. Proposed management under Alternatives A and D would directly benefit physical and biological resources of caves in the Deep Creek area, as well as the recreational, scientific and education opportunities provided by the caves.

**Impacts from Forestry Management.** The amount of acres (100,300 acres) that are managed for commercial forestland and woodland management is three times greater under Alternative A than in any action alternative. However, harvest levels have averaged less than 10,000 boardfeet per year in the last 5 years. Under all alternatives, wood cutting and intensive commercial timber management would impact recreation opportunities in or outside SRMAs by altering the physical, social, and operational RSCs. Over the long term, the physical RSC of naturalness would be degraded if landscape design features were not incorporated to offset impacts on the landscape. Road construction from timber harvesting would result in additional vehicle routes and change the remoteness of the area. Access to and through the area may be improved if forestry roads were open to the public; however, the improved roads may provide no additional opportunities for OHV driving/riding and even displace visitors participating in trail-based motorized (e.g., ATV riding, motorcycling) and non-motorized activities.

Since wood cutting areas are few and small in the CRVFO, the greatest concern are areas proposed to be intensively manage for commercial forest and woodland products. This includes King Mountain, portions of Castle Peak, and the southern part of the Hardscrabble area. These areas are now popular destinations for local and regional visitors. In King Mountain and Castle Peak (outside the WSAs), certain harvest treatments may improve wildlife habitat and result in better hunting, a popular activity. Under Alternative A, no SRMAs are specifically closed to wood cutting and commercial timber management for the benefit of R&VS, as opposed to Alternatives B, C, and D.

**Impacts from Livestock Grazing Management.** Livestock grazing affects human visitors to public lands on an individual basis. For some recreationists, just the signs of livestock grazing, such as the presence of cattle or sheep, fences, driveways, stock tanks and ponds, cropped forage, trampled vegetation, and manure, affect the natural aesthetics and their visit. Rare conflicts occur between visitors and sheep dogs used to control and protect sheep.

The most common criticism comes from visitors and managers engaged in wildlife-related recreation. They raise the question of forage competition between livestock and big game and the indirect impact on wildlife-related recreation. The existing RMP generally allocated forage on a basis where 50 percent could be removed

BLM_0016833

(available forage) and 50 percent was retained to maintain sufficient residual vegetation cover. Of the available forage, the RMP proportionately allocated 50 percent to livestock and 50 percent to big game. Completed land health assessments seem to support this allocation of forage as adequate to meet the needs of livestock, as well as big game. The land health assessments (LHAs) have indicated that livestock grazing management and the current AUM levels are creating only site-specific distribution issues and that sufficient forage is available within assessed areas for a diversity of wildlife. In addition, elk populations from the late 1970s to present have been increasing, while livestock AUMs and periods of use have decreased. Big game population trends and CDOW big game objectives in relationship to the livestock grazing management alternatives (maintaining similar levels of livestock AUMs, along with the applied land health standards) indicate that the cumulative annual use of forage by big game and livestock would remain compatible with CDOW's big game objectives while achieving public land health standards.

The impacts of livestock grazing decisions are similar under Alternatives A, B, and D. Unlike Alternative C, where livestock grazing management would meet the forage demands of livestock and if conflicts arise that cannot be mitigated by vegetation or habitat treatments, grazing preference would be given to wildlife.

**Impacts from Comprehensive Trails and Travel Management.** Trails and travel management directly affects RSCs, recreation opportunities, and recreation outcomes. Travel designations, including the level of development and maintenance, influence recreation use and recreation carrying capacities. The amount of access and the types and modes of travel permitted are considered a determinative RSC in the CRVFO and in this analysis.

The comprehensive trails and travel management section discusses area designations, limitations on public travel and access, and miles of routes open to different types and modes of travel by alternative. Adverse impacts on specific recreation activities are generally considered to increase as the acres or the miles of routes decrease. However, a quality recreation opportunity has many more variables (i.e., naturalness, level of contact with other visitors, group size, level of management control, level of maintenance) to consider. Designated routes for each SRMA can be found in Section 4.3.4, Comprehensive Trails and Travel Management. Pedestrian and equestrian travel is not constrained by limited travel area designations for motorized and mechanized types of travel and the subsequent route designations in any alternative. Only the Storm King Trail, which begins on private property, is closed to horse travel.

Under Alternatives B, C, and D, over-snow travel is limited to designated routes on King Mountain, Blue Hill ACEC, Sheep Uplands ACEC, Lyons Gulch ACEC, and Glenwood Springs Debris Flow ACEC. Over-snow travel is prohibited in the Deep Creek ACEC, Thompson Creek ACEC, WSAs, Hack Lake area, the Haff Pasture portion of Fisher Creek, Siloam Springs area, and wildlife closure areas. In WSAs, the over-snow travel closures support primitive and unconfined recreation opportunities. In ACECs and the other areas listed above, the closures support non-motorized RSCs, protect resource values, and reduce conflicts with recreation use.

Under all alternatives, the BLM closes portions of Castle Peak area accessed by the Stagecoach Trail (#8535) and Domantle Road (#8513) from August 20 to November 30 to motorized types of activities. This is to help keep big game on BLM lands and to reduce big game movement to private lands during the big game hunting season. These seasonal closures were first implemented in 2000 and are viewed as beneficial to hunters using public lands.

BLM_0016834

Continuing with the current area travel designations and not to specific designated routes would allow for increased cross-country motorized travel, route proliferation, and conflict (i.e., resource use and recreation). The long-term impacts on all visitors, including motorized activity participants, from these travel decisions would be negative because the naturalness and visual aesthetics of BLM lands would be negatively impacted by permissible but inappropriate motorized use.

**Impacts from Lands and Realty Management.** ROWs (including renewable energy sites such as solar, wind, hydro, and biomass development) can change the physical RSCs of naturalness and remoteness, or impact developed recreation sites and trails, depending on the location of the corridor or development. In turn, the social and operation RSCs could also change. To avoid ROWs that could negatively impact the naturalness or remoteness of an area, the BLM can designate ROW avoidance areas or ROW exclusion areas. A ROW may not be totally unavailable in an avoidance area but should not be permitted if possible. ROWs are to be completely prohibited from exclusion areas. As opposed to Alternatives B, C, and D (only developed recreation sites in Alternative D), there are no specific ROW avoidance areas proposed for R&VS under Alternative A. Alternatives A and D would allow for the most change in RSCs from ROWs.

Alternative A identified 494,400 acres that are not suitable for disposal through public sale as Category II lands. These lands are considered for disposal on a case-by-case basis through exchange, boundary adjustment, state selection, Recreation and Public Purpose Act purchase, or other appropriate statutory authority, provided such disposal is consistent with management efficiency and effectiveness under multiple use principles for specific areas.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The oil and gas development activity is concentrated on the western 22 percent of the CRVFO (the area west of the Grand Hogback), where the high potential for the occurrence of gas resources is found. It is estimated that 99 percent of future drilling will occur in the areas identified as high potential for the occurrence of oil and gas resources. Infill drilling and step out drilling will be the major portion of future activity. Of the 127,335 acres of BLM mineral estate in this high potential area that is not within the Roan Plateau planning area (PA), 95 percent has been leased and is currently being developed.

The eastern 78 percent of the CRVFO (east of the Grand Hogback) has a lower potential for the occurrence of oil and gas resources. Approximately 1 percent of future drilling is likely to occur in areas of medium and low potential, and no drilling is predicted in the areas identified as no-known potential.

In areas with a high potential for the occurrence of gas resources, impacts on visitors have included physical and visual surface-disturbing activities, noise, dust, odors, and additional traffic and people. RSCs, such as naturalness, remoteness, and evidence of use, have changed over the life of the current RMP and would continue to change with expanding fluid mineral development and associated ROWs, pipelines, roads, and facilities. Access to and through the area may be improved if roads were open to the public. However, the improved roads may provide no additional opportunities for OHV driving and riding, and may even displace visitors participating in trail-based motorized (e.g., ATV riding, motorcycling) and non-motorized activities.

Currently all WSAs and the Thompson Creek ACEC are closed to fluid mineral leasing and geophysical development. Over the life of the current RMP, the CL designation for these areas has helped retain the RSCs and maintain primitive and unconfined recreation opportunities in the WSAs.

BLM_0016835

No SRMAs, except for a small portion of the Thompson Creek SRMA in Alternatives A and D, are proposed in any alternative, in locations identified as having a high potential for the occurrence of gas resources. This is because existing RSCs could not be retained due to the development of gas resources. Opportunities would remain to pursue a variety of outdoor recreation activities and to enjoy dispersed recreation opportunities. However, the extent and quality of those dispersed recreation opportunities would likely change or diminish proportionate to the amount of area affected by active fluid mineral development and production.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Recreation opportunities and RSCs could be impacted during all phases of minerals development. Minerals-related exploration and development, would create visual and physical disturbances, noise, and localized increases in people. These impacts would be greatest if mineral development occurred in the more natural appearing landscapes.

Locatable mineral exploration and development on BLM land would be regulated under 43 CFR 3800 under all alternatives. Under Alternative A, developed recreation sites, the Bull Gulch SRMA, the Deep Creek SRMA, the Thompson Creek SRMA, and all WSAs would be petitioned for withdrawal to the Secretary of the Interior for closure to the mining laws for locatable minerals. Avoiding surface disturbances resulting from the withdrawal of lands from locatable mineral entry would benefit existing recreational opportunities, help retain the existing RSCs, and protect developed recreation sites.

Under all alternatives, acres of locatable minerals, mineral materials sales, and non-energy leasable minerals open to development would vary by alternative, with Alternatives A and D having the most acres open. If new mining development would occur, direct change of RSCs would be unavoidable due to surface-disturbing activities and associated use. However, the amount of land that is open to mineral use is not necessarily indicative of the number of acres that would be directly disturbed, since the amount of expected mineral development is low. Recognizing that mineral development technologies changes through time and because there are no specific actions being evaluated at this time, the indicator of effects between alternatives is the level and type of protection provided to R&VS. Adverse impacts of minerals decisions on recreation opportunities would be reduced by the application of protective management action and allowable use decisions in addition to petitions for withdrawals.

Under all alternatives, minerals would be subject to the concurrent stipulations for each alternative. The risk of impacting R&VS would vary according to the type of stipulation (i.e., NSO or CSU) for R&VS and other resources applied, and the locations where the stipulations would be applied in each alternative.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative A, 27,030 acres would be designated as ACECs to protect relevant and important values, including cultural and paleontological resources, scenic quality, riparian habitat, fish and wildlife, and sensitive and endangered species. Management action and allowable use decisions (e.g., VRM Class 1 or 11 designations, application of NSO/CSU stipulations, CL designations, and designation of ACECs as avoidance/exclusion areas) for ACECs have indirectly helped retain the existing RSCs of these areas. Due to the protection of relevant and important values, the ACECs have route limitations that restrict motorized and mechanized activities and NSO stipulations that constrain the construction of recreation trails and facilities.

BLM_0016836

ACEC designations under Alternative A would overlap 18,171 acres of SRMAs (Table 4.3.3-3). For example, overlapping designations have created management conflicts where the Thompson Creek ACEC overlaps with the Thompson Creek SRMA. Climbing activities have been limited due to incongruous management direction aimed at protecting the relevant and important geologic values of the ACEC. Overlaps with ERMAs are less complex because recreation is commensurate and considered in context with the management of other resources and resource uses.

**Table 4.3.3-3**
**Overlap of SRMAs with ACECs under Alternative A**

| SRMA | Acres of Overlap | ACEC |
|------|------------------|------|
| Bull Gulch | 8,240 | Bull Gulch |
| Deep Creek | 2,400 | Deep Creek |
| Thompson Creek | 4,270 | Thompson Creek |
| Upper Colorado River | 3,250 | Blue Hill and Bull Gulch |
| **Total** | **18,160** | |

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** WSAs are areas that generally appear to have been affected primarily by the forces of nature, that provide outstanding opportunities for solitude or primitive and unconfined types of recreation, and that often are characterized by such special qualities as ecological, geological, educational, historical, scientific, and scenic values. Recreational activities that would impair wilderness suitability are prohibited in WSAs. Examples of activities that are allowed in WSAs are hunting, fishing, and trapping under state and federal laws and rockhounding, camping, hiking, and horseback riding.

The BLM has no discretion to change management of WSAs through this planning process, with the exception of decisions relating to VRM designation and motorized vehicle use. Under all alternatives, the CRVFO would continue to manage four WSAs (Bull Gulch, Castle Peak, Eagle Mountain, and Hack Lake) consistent with IMP guidelines for recreation.

Under Alternative A, WSAs and SRMAs overlap in Bull Gulch and the Hack Lake area. Recreation and management are subject to limitations aimed at protecting wilderness characteristics. The SRMAs are being managed for hunting, hiking, camping, horseback riding, wildlife viewing, floatboating, fishing, and photography, which are consistent with providing opportunities for primitive and unconfined types of recreation in WSAs. Existing RMP decisions, as well as IMPs, would continue to indirectly retain the existing RSCs and recreation opportunities in the overlapping SRMAs and ERMAs. The constraint on permanent facility development is not a management issue because the management of both the SRMAs and the WSAs is striving to maintain the naturalness of the area.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** All stream segments would be identified as eligible for inclusion in the National Wild and Scenic River System (NWSRS) under Alternative A. To be eligible for wild and scenic river designation, a river or stream segment must possess one or more ORVs, have sufficient water quality to support those values, and be free flowing. ORVs could be scenic, recreational, geological, fish-related, wildlife-related, historic, cultural, botanical, hydrological, paleontological, or scientific.

BLM_0016837

Rivers in the national system are often referred to as "wild and scenic rivers" without regard to actual classification. This is acceptable when speaking of the national system in general, but the specific legal classification is an important distinction as it has a direct effect on how the river is administered and whether certain activities on federally owned land within the boundaries are permissible (NPS 1998). The BLM's policy is to protect any ORVs identified in the eligibility study until a decision on suitability can be made. The BLM would protect the free-flowing character, tentative classification of the segment (based on the level of stream corridor development), and identified ORVs of eligible segments. Future recreation-related actions would conform to interim management that protects the ORVs until a decision on suitability is made by the BLM.

The impacts on RSCs, recreation opportunities, and recreation management along the eligible Colorado River segments would be insignificant because the segments would continue to be managed as part of the Upper Colorado River SRMA and covered by stipulations that help to retain the physical RSC and to protect recreation opportunities, which are also the identified ORVs for the stream segments. Along the other stream segments, the impact on RSCs and recreation opportunities would be minimal because these stream segments were determined to be eligible under current recreation management and use. Changes in the types of recreational use or new recreation development may not be appropriate in eligible stream segments, especially if classified as scenic or wild. Any proposed recreation implementation actions would be evaluated on a case-by-case basis until a suitability determination is made by the CRVFO.

**Impacts from Transportation Facilities Management.** Maintenance and upkeep of BLM roads is critical for recreational access. As costs have risen, fewer miles of BLM roads have been maintained each year. The actual miles of roads maintained each year would be based on annual budgets. Under all alternatives, the CRVFO would emphasize maintaining the majority of BLM system roads at maintenance intensities that may not provide year-round access but that are intended to keep the route in use for most of the year. This is sufficient to meet the recreation objectives across all alternatives.

**Impacts from Health and Safety Management.** Under all alternatives, the CRVFO would continue to monitor and address public health and safety as problems arise. Lease Notices (LNs) attached to fluid mineral leases would require operators (lessees) drilling on federal mineral estate to consider the impact of operations on nearby communities and residences, to reasonably adjust operating procedures to accommodate local residential concerns, and to provide emergency communications plans in case of an accident. Under all alternatives, camping limits and camping closures would help maintain sanitary conditions. Firearm use restrictions would protect visitors and adjacent homeowners from unsafe target shooting, especially in high use areas, such as developed recreation sites and in urban interface areas.

<u>Alternative B (Preferred Alternative)</u>
Impacts to R&VS from management of resources and uses would be the same as or similar to those under Alternative A, except as described below.

**Impacts from Recreation and Visitor Services Management.** Under Alternative B, six SRMAs (i.e. Bocco Mountain, Hack Lake, King Mountain, Red Hill, The Crown, and the Upper Colorado River) totaling 51,000 acres are proposed for designation. Under Alternative B six ERMAs (i.e. Eagle River, Fisher Creek, Hardscrabble/East Eagle, New Castle, Silt Mesa and Thompson Creek) totaling 50,200 acres are proposed for designation (Table 4.3.3-1) (see Figure 2-35). The remaining BLM lands would not be designated for R&VS management. Public lands that are not designated as RMAs would be managed to meet basic R&VS and

BLM_0016838

resource stewardship needs. Although recreation is not emphasized, recreation activities may occur. The R&VS areas are managed to allow recreation uses that are not in conflict with the primary uses of these lands

Alternative B as well as Alternative D designate the most areas where recreation opportunities, recreation setting characteristics, recreation use, and demand for R&VS program investments are recognized as a predominant land management focus, or considered commensurate with the management of other resources and resource uses.

Under Alternatives B, C, and D, a CSU stipulation would be applied on developed recreation sites and trails (e.g., Boy Scout, Fisher Creek, Arbaney-Kittle, Storm King, and Rifle Arch), when not covered by NSO stipulations, which would help protect existing and future recreation developments from surface-disturbing activities.

Under all alternatives, camping limits and closures would protect resources, reduce conflicts, and reduce long-term camping (i.e., squatting) on BLM lands. Camping limit language is clarified in Alternatives B, C and D. Alternative C proposes the most closures, followed by Alternatives B, D, and A, respectively.

Under Alternatives B, C, and D, SRPs would be issued as a discretionary action for a variety of uses that are consistent with resource/program objectives and within budgetary/workload constraints.

### Recreation Setting Characteristics

Alternative B places an emphasis on the conservation of natural and cultural resources. The accompanying management action and allowable use decisions (e.g., special designations, stipulations, travel designations) included under these alternatives create recreation settings that are (1) more remote from four-wheel-drive vehicle, ATV, and motorcycle routes and (2) more natural appearing across the CRVFO (Table 4.3.3-2).

**Impacts from Water Resource Management.** Impacts would be similar to those under Alternative A, except that the stipulations for streamside management zones (Alternatives B and C) and stipulations for hydrologic features (Alternative C), would probably impact the placement and development of recreation facilities and routes for trail-based activities like mountain biking and motorcycling. The stipulations would be applied on a case-by-case basis, so the actual impact would be determined at the implementation level.

**Impacts from Terrestrial Wildlife Management.** Impacts would be similar to those under Alternative A, except under Alternatives B, C, and D, a proposed wildlife management decision would identify specific factors for closing portions of BLM lands to human activity and dogs during severe winter weather conditions. The decision would be based on a combination of factors, such as snow depth, snow crusting, daily mean temperatures (long periods of cold temperatures), and concentrations of animals. The closure order would locally restrict winter recreation use.

To reduce big game movement to private lands during the big game hunting season and increase game hunter success, additional seasonal closures are included under Alternatives B and C. These would include the Dry Rifle Creek area and the West Rifle Creek area. The BLM has worked in concert with the CDOW to perform vegetation treatments for big game and sagebrush-dependent species in the Dry Rifle Creek and West Rifle Creek areas. The combination of seasonal closures from October 1 through November 30 and the habitat treatments would probably keep more animals on BLM land and accessible to hunters.

BLM_0016839

An NSO for core wildlife areas would be applied under Alternatives B and C. The NSO stipulation would apply to all surface-disturbing activities (and occupancy) associated with land use authorizations, permits, and leases. The NSO stipulation for core wildlife areas would limit recreation developments that would impact wildlife on winter ranges and sagebrush shrublands. A potential implementation level conflict exists where the NSO stipulation for core wildlife areas overlaps with The Crown SRMA. The NSO could limit new recreation developments on the northern side of The Crown SRMA, which emphasizes recreation opportunities for mountain biking.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Alternative B applies an NSO for fish-bearing streams and a TL for coldwater sport and native fish, in addition to an NSO for fish hatcheries. The TL prohibits in-channel work during certain spawning periods. The TLs would be a seasonal constraint on recreation-related surface-disturbing and construction activities, unless the exception criteria were met. The overall impact would be localized and possibly mitigated through site-specific engineering or relocation of the recreation development.

**Impacts from Visual Resource Management.** Under Alternatives B, C, and D, a VRM Class II designation was specifically assigned to all proposed SRMAs, unless the area was covered indirectly by VRM Class I. As opposed to Alternative A, the VRM Class II designations better retain the physical RSCs for the Bocco Mountain SRMA (166 acres of Class III to Class II) and Upper Colorado River SRMA (1,271 of Class III and 504 acres of Class IV to Class II).

Under each action alternative the acres of VRM Class II vary by the number and acres of SRMAs proposed. The specific objective of VRM Class II is to retain the existing character of the landscape, and the level of change to the characteristic landscape should be low. The VRM Class II designation was assigned to minimize the visual impacts of non-recreational surface-disturbing activities and to retain the current degree of naturalness, which was an important contribution to the quality of recreation opportunities desired by visitors and emphasized in the proposed SRMAs.

**Impacts from Cave and Karst Resource Management.** The NSO stipulation for the cave and karst occurrence areas applied in Alternatives B, C, and D would prohibit surface occupancy and surface-disturbing activities in a 40-acre area around 17 known cave and karst resources to a depth of 5,000 feet below the surface. The NSO area encompasses cave openings and portions of the subsurface features and watersheds immediately above the caves. The NSO stipulation would be applied to ten known caves in the Deep Creek cave area, a cave at Hack Lake on the Flattops, and small, dry caves in Glenwood Canyon. Alternatives B and D would protect known caves but would not protect caves yet undiscovered. Alternatives B and D also offer less protection to subsurface portions of the cave that extend beyond the 40-acre NSO area at each cave. The potential indirect impacts to recreational, scientific and education opportunities in the cave would parallel the change in coverage of the NSO stipulations.

**Impacts from Forestry Management.** Impacts would be similar to those under Alternative A, except only approximately one-third as much area (31,400 acres under Alternative B, 28,400 acres under Alternative C, and 32,200 acres under Alternative D) would be managed intensively to provide wood products. Under Alternatives B, C, and D, various SRMAs and ERMAs are specifically closed to wood cutting and commercial timber management for the benefit of retaining RSCs, such as naturalness and remoteness.

BLM_0016840

**Impacts from Livestock Grazing Management.** Impacts would be similar to those under Alternative A, except that under Alternative C, livestock grazing management would meet the forage demands of livestock. If conflicts were to arise that could not be mitigated by vegetation or habitat treatments, grazing preference would be given to wildlife. This would benefit wildlife-related recreation in those allotments.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be similar to those under Alternative A, except the travel management system included under Alternative B outside SRMAs would be structured to balance a variety of uses while protecting resources. No acres would be open to cross-country OHV travel. Impacts on RSCs, recreation opportunities, and recreation management from OHV area designations (open, closed, and limited) and route limitations would be variable, and would depend on the recreation activity and the user's desired outcome (see Assumptions).

Over-snow travel is limited to designated routes on King Mountain under all alternatives, in the Glenwood Springs Debris Flow Hazard Zone ACEC under Alternatives B, C, and D, and in the Sheep Creek Uplands ACEC under Alternatives B and C.

Over-snow travel is prohibited in the following all-winter wildlife closures: Deep Creek ACEC, Thompson Creek ACEC, WSAs, the Hack Lake area, Fisher Creek (Haff Pasture), and the Siloam Springs area. Alternatives C, B and D, in order, have the most acres closed to over-snow travel. Alternative A has a 15-day longer limitation (December 1 to April 30) than under Alternatives B, C, and D (December 1 to April 15), but the closure under Alternatives B, C, and D applies to both motorized and mechanized recreation activities. Motorized cross-country travel for big game retrieval is prohibited in all action alternatives to protect resources from inappropriate recreation use.

In all alternatives, to help keep big game on BLM lands and reduce big game movement to private lands during the big game hunting season, the BLM closes portions of the Castle Peak area accessed by the Stagecoach Trail (#8535) and Domantle Road (#8513) from August 20 to November 30 to motorized types of activities. Under Alternatives B and C, the closure is also applied to routes in Dry Rifle and West Rifle Creeks to help keep big game on BLM lands and reduce big game movement to private lands during the big game hunting season. These seasonal closures are viewed as beneficial to hunters.

Currently, many tracts of BLM lands are inaccessible (i.e., legally or physically) to the general public for motorized and mechanized activities. Adjacent landowners may have exclusive use of these lands for motorized and mechanized recreation activities. Under Alternatives B and C, routes in these inaccessible parcels are proposed to be designated administrative routes and are open only to pedestrian and equestrian travel, unless otherwise authorized by the BLM. This would create a more equitable system of public travel and access, without impeding authorized users.

Under Alternatives B, C, and D, designating a public travel management system throughout the planning area would help retain the existing RSCs and would reduce unethical travel, recreation conflicts, resource conflicts, and recreational trespass on adjacent private lands. This would reduce conflicts between recreationists and private landowners.

**Impacts from Lands and Realty Management.** Impacts would be similar to those described under Alternative A, except that Alternatives B, C, and D propose identifying retention areas specifically for the protection of ERMAs, SRMAs and developed recreation sites. In all action alternatives, SRMAs and ERMAs

BLM_0016841

would be retained in federal ownership for long-term management unless specific exception criteria are met. This would guarantee recreation opportunities would be available through the life of the plan. In all alternatives, recreation opportunities outside of RMAs would indirectly benefit from retention areas identified for other programs (i.e., WSAs, suitable WSR segments, major river corridors, and LWCs).

Under Alternatives B and C, all SRMAs and all developed recreation sites are designated as a ROW avoidance area to help maintain the desired recreation settings. Also under all action alternatives, existing recreation opportunities and RSCs outside of SRMAs indirectly are retained from designation of ROW avoidance areas and ROW exclusion areas identified for other resources (i.e., heritage areas, wetlands, WSAs, ACECs, special-status species habitat).

Pursuing additional access to BLM lands through exchanges, boundary adjustments, donations, or purchase of lands according to criteria outlined in Chapter 2 for the lands and realty program would benefit retaining key RSCs and offering a diversity of recreation opportunities. Land tenure adjustments would facilitate greater access to recreation areas and reduce conflicts between private landowners and recreation user groups (e.g., trespass issues).

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** In all action alternatives, the entire Silt Mesa ERMA and the Garfield Creek portion of the New Castle SRMA are proposed on BLM lands as having a high potential for the occurrence of gas resources or on BLM lands that are leased for fluid minerals. The Garfield Creek portion of the New Castle ERMA is indirectly protected from surface-disturbing activities by the NSO stipulation for major river corridors. However, the Silt Mesa ERMA is partially leased and the likelihood of development is high. The ERMA objective may not be achieved if the existing RSCs become more industrialized due to the development of gas resources. Opportunities to pursue a variety of outdoor recreation activities and to enjoy dispersed recreation opportunities afforded would remain. However, the extent and quality of those dispersed recreation opportunities would likely change or diminish proportionate to the amount of area affected by active fluid mineral development and production.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The impacts would be similar to those under Alternative A, except that Alternatives B and C propose closing SRMAs and developed recreation sites to mineral materials (salable) disposal for the protection of RSCs in SRMAs from surface-disturbing activities and the protection of existing and future recreation developments. Closing WSAs, ACECs, suitable WSR segments, and municipal watersheds would indirectly help retain existing RSCs and would maintain primitive and unconfined recreation opportunities in the WSAs.

In addition, the BLM would recommend to the Secretary of the Interior to withdraw developed recreation sites for closure to the mining laws for locatable mineral exploration or development to help retain the physical RSCs under all action alternatives.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts from ACECs on RSCs and recreation opportunities in ERMAs would be similar to those described under Alternative A. Under Alternative B, a total of 34,520 acres would be designated as ACECs, 3,268 acres of the Blue Hill ACEC, and the Bull Gulch ACEC overlap with the Upper Colorado River SRMA. This decrease of overlap

BLM_0016842

acres would reduce potential administrative conflicts by allowing SRMAs to be managed for specific recreation opportunities and RSCs on a sustained or enhanced long-term basis.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** The impacts on RSCs, recreation opportunities, and recreation management within the WSAs under all action alternatives would be similar to those under Alternative A because the IMP would be applicable. If the WSAs were released by Congress, the CRVFO would manage the areas as separate distinct ERMAs for non-motorized recreation, along with the identified management action and allowable use decisions in this plan.

Managing WSAs as VRM Class I would help maintain the naturalness of WSAs. Closing the Eagle Mountain WSA (320 acres) to motorized and mechanized use would not impact motorized or mechanized activities since the area is small and rugged and has no known motorized or mechanized routes. Both management actions would enhance primitive and unconfined recreation opportunities.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Impacts would be similar to those under Alternative A, except that under Alternative B1, the BLM would determine that the Colorado River and Deep Creek segments are suitable for inclusion into the National Wild and Scenic Rivers System. All other segments are determined not suitable and are released from further protection under the Wild and Scenic Rivers Act.

Under Alternative B2, BLM would determine that Deep Creek segments 1 and 2 are suitable. The BLM would defer a suitability determination on Colorado River segments and would adopt and implement the stakeholders' plan to protect the free-flowing nature, ORVs, and tentative classifications. All other segments would be determined not suitable and released from further protection under the Wild and Scenic Rivers Act.

Alternative B2, with water stakeholder cooperation, may better support a wide range of recreational uses because the water stakeholders would attempt to operate their facilities in a manner that meets water supply objectives and recreation ORVs within the Upper Colorado River SRMA. With no stakeholder plan, water flows would be subject to the water rights system. Without some sort of specific effort to protect and manage flows, there may be a gradual reduction in flows necessary to support recreation use over the life of the plan.

This alternative would be more beneficial to wildlife compared to Alternative D, where no segments are found suitable. However, because BLM's policy is to protect any ORVs identified in the eligibility study until a decision on suitability can be made, Alternative A would actually be more beneficial, at least on an interim basis.

**Impacts from Health and Safety Management.** Impacts would be similar to those under Alternative A, except the CRVFO would also proactively close specific routes to motorized vehicles that access persistent and repetitive trash dumping areas in order to reduce the amount of trash and hazardous waste dumped on BLM lands.

### Alternative C

Impacts to R&VS from soils management, vegetation – general management, special status species—plants and terrestrial wildlife management, cultural resource management, wildland fire management, cave and karst resource management, fluid minerals management (oil and gas, oil shale, and geothermal resources) management, and transportation facilities management would be similar to those under Alternative A.

BLM_0016843

Impacts to R&VS from management of all other resources and would be the same or similar to those under Alternative B, except as described below.

**Impacts from Recreation and Visitor Services Management.** Under Alternative C, two SRMAs (i.e. Red Hill and Upper Colorado River) totaling 23,800 acres are proposed for designation. Under Alternative C, nine ERMAs (i.e. The Crown, Eagle River, Fisher Creek, Hack Lake, Hardscrabble/East Eagle, King Mountain, New Castle, Silt Mesa, Thompson Creek) totaling 64,300 acres are proposed for designation (Table 4.3.3-1). (see Figure 2-36). The remaining BLM lands would not be designated for R&VS management. Public lands that are not designated as RMAs would be managed to meet basic R&VS and resource stewardship needs.

Alternative C would designate the fewest SRMAs where R&VS management is recognized as the predominant land management focus. However, Alternative C would designate the most ERMAs where recreation opportunities are considered commensurate with the management of other resources and resource uses. The resultant corresponding management in ERMAs (e.g. Thompson Creek, Hack Lake) and on undesignated lands (e.g. Pisgah Mountain, Castle Peak) would emphasize opportunities for more primitive, non-mechanized recreation activities (e.g. foot, horseback riding).

Recreation Setting Characteristics

Alternative C, and to a slightly less degree Alternative B, place an emphasis on the conservation of natural and cultural resources and protection of the ecological integrity of plant, fish, and wildlife habitat. The accompanying management actions (e.g., special designations, stipulations, travel designations) included under these alternatives in turn create recreation settings that (1) are more remote from four-wheel-drive vehicle, ATV, and motorcycle routes, (2) are more natural appearing and (3) contain fewer recreation facilities (Table 4.3.3-2).

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts would be similar to those under Alternative B except, Alternative C applies a slightly more constraining NSO stipulation to all perennial waters instead of just fish-bearing streams. It also applies a TL stipulation for coldwater sport and native fish, in addition to an NSO stipulation for fish hatcheries.

**Impacts from Terrestrial Wildlife Management.** Impacts would be similar to those under Alternatives A and B, except Alternative C is slightly more constraining on group use events and recreation-related surface-disturbing activities due to the amount and extent of NSO stipulations included to protect wildlife and wildlife habitat. On the other hand, Alternative C indirectly offers more acres of protection for retaining the physical RSCs of naturalness and remoteness. Generally, this alternative would be the most beneficial for enhancing wildlife-related activities.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Impacts would be similar to those under Alternative B except an ACEC is included to protect Colorado River cutthroat trout in Abrams Creek southwest of the town of Eagle. Due to the size of the ACEC, it would have only a minor local impact on RSCs or recreation opportunities.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under Alternative C, 47,761 acres would be managed to protect wilderness characteristics. Recreation management would be subject to Management and Setting Prescriptions for Areas with Wilderness Characteristics in these areas. No permanent recreation structures would be permitted. The construction of new travel routes would be

BLM_0016844

constrained. No new SRPs would be authorized unless they were necessary for helping people realize the primitive and unconfined recreational values (e.g., upland outfitting service). When commercial SRPs are renewed, their terms and conditions would be modified as necessary to comply with the Management and Setting Prescriptions for Areas with Wilderness Characteristics. No competitive events would be authorized in these areas.

Within the Thompson Creek ERMA, for example, recreation activities would be subject to protecting wilderness characteristics. As a result, opportunities for sport climbing and mountain biking in Thompson Creek would be adversely affected because those activities would be inconsistent with providing opportunities for primitive and unconfined recreation.

Recreationists seeking primitive and unconfined recreation activities in an area characterized by essentially unmodified natural landscapes would benefit from the identification of LWCs and prescriptions applied to these lands. Table 4.3.3-4 displays the change in the RSC of remoteness between Alternative A (existing condition) and Alternative C created by changes in travel designations. All units except the Flat Tops Addition would have a physically more remote recreation setting character.

More than 3,450 acres of the Pisgah Mountain unit would overlap with the Upper Colorado SRMA. The proposed physical RSCs (i.e., keeping the level of change to the natural landscape low) for the SRMA is consistent with the maintenance of naturalness in LWCs. The SRMA's targeted activities (fishing and floatboating) are consistent with offering opportunities for primitive and unconfined recreation. However, the SRMA is not being managed for solitude. The SRMA is being managed to offer experiences for the following: enjoying closeness to family/friends; enjoying the area's wildlife, scenery, views, and aesthetics; experiencing the natural surroundings; developing skills and abilities; and escaping everyday responsibilities for a while. The administration of the SRMA may be somewhat constrained by prescriptions for LWCs along the north side of Pisgah Mountain.

**Table 4.3.3-4**
**Recreation Setting Characteristic of Remoteness – A Comparison between Alternative A (Existing) and Alternative C within Lands Managed as LWCs**

| Lands Managed as LWCs | | Recreation Setting Character Classification (acres) | | | | | |
|---|---|---|---|---|---|---|---|
| | | Primitive | Backcountry | Middle Country | Front Country | Rural | Urban |
| Castle Peak Addition | Alt. A | 2,060 | 0 | 1,380 | 580 | 0 | 0 |
| | Alt. C | 2,550 | 0 | 889 | 580 | 0 | 0 |
| Deep Creek | Alt. A | 730 | 0 | 1,616 | 2,070 | 0 | 0 |
| | Alt. C | 1,800 | 0 | 550 | 2,070 | 0 | 0 |
| Flat Tops Addition | Alt. A | 1,060 | 0 | 870 | 1,600 | 1,060 | 0 |
| | Alt. C | 1,060 | 0 | 870 | 1,600 | 1,060 | 0 |
| Grand Hogback | Alt. A | 3,470 | 0 | 3,120 | 2,680 | 2,280 | 0 |
| | Alt. C | 6,160 | 0 | 430 | 2,680 | 2,280 | 0 |
| Pisgah Mountain | Alt. A | 3,240 | 1,748 | 4,870 | 1,990 | 3,850 | 0 |
| | Alt. C | 4,880 | 1,935 | 3,040 | 1,990 | 3,850 | 0 |
| Thompson Creek | Alt. A | 1,520 | 251 | 3,280 | 2,830 | 370 | 0 |
| | Alt. C | 5,020 | 0 | 5 | 2,830 | 370 | 0 |

BLM_0016845

**Impacts from Cave and Karst Resource Management.** Alternative C proposes to apply both the NSO stipulation for the Deep Creek Cave area and the cave and karst occurrence NSO stipulation. Alternative C would protect known caves and caves yet undiscovered in the Deep Creek area. Alternative C offers protections to the subsurface portions of caves in the Deep Creek area that extend beyond the 40-acre area around the cave entrance. Alternative C would offer the greatest extent of protection for caves and the recreational, scientific and education opportunities they provide.

**Impacts from Livestock Grazing Management.** The impacts of Alternative C are similar to the other alternatives, except the combining, closing, and creation of reserve allotments would reduce or eliminate competition between wildlife and livestock and would improve livestock management. These actions would help ensure that future conflicts are reduced and that would indirectly benefit wildlife-related recreation activities. These actions would also benefit individuals who dislike recreating where livestock is grazed.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be similar to those under Alternative B, except the travel management system included under Alternative C, outside SRMAs, would be structured to emphasize resource protection, sustaining the ecological integrity of habitats for priority plant and animal species and sustaining a relatively unmodified physical landscape. No acres would be open to cross-country OHV travel.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative C, a total of 65,800 acres would be designated as ACECs, 4,190 acres of which overlap the Upper Colorado River SRMA. In comparison to Alternative A, this is a 60 percent increase in ACEC acres. It also represents an increase of 48 percent over Alternative B. Impacts on recreation management and administration from overlapping SRMAs and ACECs would be similar to those described under Alternatives A and B. Impacts from ACECs on recreation opportunities in ERMAs would be similar to those described under Alternatives A and B.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative C, 26 river segments throughout the CRVFO would be recommended as suitable for wild, scenic, or recreational classification under the NWSRS. Those segments recommended as suitable for wild or scenic classification would be managed to protect ORVs. This alternative would be more beneficial to recreation compared to Alternative B, where four segments are found suitable. Because BLM's policy is to protect any ORVs identified in the eligibility study until a decision on suitability can be made, Alternative A and Alternative C would be administratively different; however, the implications to management, RSCs, and recreation opportunities would be the same, at least on an interim basis.

## *Alternative D*

Impacts to R&VS from visual resource management, forestry management, wilderness and wilderness study areas (administrative designations) management, and health and safety management would be similar to those under Alternative B. Impacts from management of all other resources and uses would be the same as or similar to those under Alternative A, except as described below.

**Impacts from Recreation and Visitor Services Management.** Under Alternative D, seven SRMAs (i.e. Bocco Mountain, Fisher Creek, Hardscrabble/East Eagle, Red Hill, The Crown, Thompson Creek and the Upper Colorado River) totaling 63,600 acres are proposed for designation. Under Alternative D, five ERMAs (i.e. Eagle River, Hack Lake, King Mountain, New Castle and Silt Mesa) totaling 21,300 acres are proposed

BLM_0016846

for designation (Table 4.3.3-1) (see Map 2-37). The remaining BLM lands would not be designated for R&VS management. Public lands that are not designated as RMAs would be managed to meet basic R&VS and resource stewardship needs.

Alternative D, as well as Alternative B, designate the most areas where recreation opportunities, recreation setting characteristics, recreation use, and demand for R&VS program investments are recognized as a predominant land management focus or considered commensurate with the management of other resources and resource uses.

Under Alternatives B, C, and D, SRPs would be issued as a discretionary action for a variety of uses that are consistent with resource/program objectives and within budgetary/workload constraints. Alternative D would offer the most opportunities for SRPs in such locations as the Colorado and Eagle Rivers.

## Recreation Setting Characteristics

Alternative D, as well as Alternative A, place more of an emphasis on producing recreation opportunities in combination with other land uses. The accompanying management actions (e.g., special designations, stipulations, travel designations) included under these alternatives in turn create recreation settings within the CRVFO that (1) are less remote from four-wheel-drive vehicle, ATV, and motorcycle routes (i.e., more routes open to motorized and mechanized activities), (2) are less natural appearing and (3) contain more recreation facilities (Table 4.3.3-2). Alternative D provides the most acres where mountain biking occurs in isolation from motorized vehicles. The recreation emphasis on maintaining local tourism revenue and accommodating more destination visitors would likely result in higher use levels in already highly visited areas like the Roaring Fork Valley and the Vail Valley.

**Impacts from Terrestrial Wildlife Management.** Impacts would be similar to those under Alternative A, except that Alternative D applies a CSU stipulation that is a less protective, moderate constraint on surface-disturbing activities on Garfield Creek, Basalt, and West Rifle Creek State Wildlife Areas. Alternative D also closes the Dry Rifle Creek area, the New Castle area, and the Thompson Creek/Holgate Mesa area to protect wintering big game to motorized and mechanized activities from December 1 to April 15.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Impacts would be similar to those under Alternative B, except an NSO stipulation is applied to streams containing conservation and core conservation populations of Colorado River cutthroat trout due to the lack of other NSOs for fisheries and aquatic wildlife under Alternatives B and C. This NSO stipulation covers fewer miles of streams, providing fewer safeguards for fisheries and anglers, but more opportunities for new recreation development, pending other overlapping stipulations for soils, water, and riparian vegetation.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be the same as or similar to those under Alternative A, except that the travel management system included under Alternative D, outside SRMAs, would support a variety of mixed uses, while protecting natural and cultural resources. Impacts on RSCs, recreation opportunities and recreation management from OHV area designations (open, closed, and limited) and route limitations would be similar to those under Alternatives B and C, which also have no acres open to cross-country travel and similar acres with limited and closed area designations.

**Impacts from Lands and Realty Management.** Under Alternative D, only developed recreation sites are designated as ROW avoidance areas. This would allow ROWs to be authorized that could cause unplanned

BLM_0016847

and possibly unacceptable impacts to the physical, social, and operational RSCs in SRMAs and ERMAs. Alternative D does not identify any retention criteria for R&VS that would retain for long-term management SRMAs or ERMAs or developed recreation sites.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The impacts would be the same as or similar to those under Alternative A, except Alternatives A and D do not close any BLM surface estate to mineral materials disposal.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative D, a total of 20,200 acres would be designated as ACECs, 3,253 acres of which overlap with the upper Colorado River SRMA. In comparison to Alternative A, this would result in a 25 percent decrease of total acres designated as ACECs and managed as SRMAs. Impacts from ACECs on recreation opportunities in ERMAs would be the same as or similar to those under Alternative A.

**Impacts from Wild and Scenic Rivers (WSRs) Management**. All river segments would be found not suitable and released from interim management protections afforded eligible segments, so Alternative D would have no impact on recreation use or visitor services.

*Recreation Management Area Analysis*

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Bocco Mountain (northeast of Eagle) | SRMA | SRMA | - | SRMA |

- Public lands that are not designated as RMAs would be managed to meet basic R&VS and resource stewardship needs.

The SRMA is a destination for advanced motorcycle riders in the spring and for big game hunters in the fall. Under Alternative A, the BLM would continue to manage the Bocco Mountain SRMA specifically for motorcycle riding, in accordance with the 1997 Castle Peak Travel Management Plan Amendment. The Glenwood Springs visitor study (Virden et al. 2008) respondents highlighted the need for more motorcycle trails. However, protecting cultural values and highly erosive soils, while allowing motorcycle use, has created conflicts that have resulted in the closure of many motorcycle trails, the closure of the motocross track, and the need to reroute many trails. A big game winter closure to motorized use from December 1 to April 30 further limits spring shoulder season riding. Under Alternative A, no explicit protective measures to maintain the RSCs of the SRMA exist, and only the limited area travel designation protects the physical RSCs.

Under Alternatives B and D, the Bocco Mountain area would be managed as a SRMA. Emphasizing motorcycling would allow visitors the opportunity to experience frequent access to outdoor physical activity, adventure, excitement, and challenge. These activities and experiences would offer personal benefits to participants, such as a more outdoor-oriented lifestyle, improved balance of work and play, freedom from stress, tension, and anxiety, and improved outdoor recreation skills (Appendix N). However, due to limitations created by existing cultural and natural resources, it would be likely that neither new trails nor a broader diversity of easy to moderate difficulty motorcycle trails could be created. The latter would be for different levels of motorcycle riders to better realize their desired outcomes of challenge and excitement. Under these circumstances, it is unrealistic to assume that R&VS management would be recognized as the predominant management focus with specific recreation opportunities and desired RSCs maintained on a long-term basis.

BLM_0016848

The visitor study (Virden et al. 2008) indicated that respondents across all activities showed a preference to retain the existing physical RSCs. Under the action alternatives, the physical, social, and operational RSCs would be maintained through proposed allowable use and management actions (e.g., CSU stipulation, closures to mineral material sales, ROW avoidance areas, special recreation permit limitations, closure to wood cutting and commercial timber management, closure to non-energy solid mineral leasing, and travel designations).

Under Alternative C, the area would be undesignated because the management of natural and cultural resources would be the primary resource management focus. Public lands that are not designated as RMAs are managed to meet basic R&VS and resource stewardship needs. Although recreation would not be emphasized, recreation activities not in conflict with the primary uses of these lands would continue to occur.

The implementation decisions for comprehensive trails and travel management and SRPs included in each alternative would sustain recreation opportunities and address visitor health and safety, resource protection, and use and user conflicts. Alternatives A, B, and D would require a continued R&VS management commitment (e.g., staff time, volunteer hours, and funding) to offer the proposed recreation opportunities, to reduce conflicts with natural and cultural resources, and to maintain the desired RSC.

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Bull Gulch (north of Dotsero) | SRMA/*RMA* | - | - | - |

- Public lands that are not designated as RMAs would be managed to meet basic R&VS and resource stewardship needs.

Under Alternative A, the BLM would continue to manage the Bull Gulch SRMA, as identified in the 1988 CRVFO RMP. SRMA management would continue to emphasize non-motorized activities, specifically hiking and hunting. No RAMP was ever completed for the Bull Gulch SRMA because the remote and rugged area requires a low level of recreation management. Under Alternative A, the SRMA identification is overlapped by ACEC and WSA designations. A duplicative NSO stipulation for RMAs covers the portion of the WSA not within the SRMA. Recreation use and implementation-level management would continue to be subject to management direction provided by the BLM Handbook H-8550-1, Interim Management Policy (IMP) for Lands Under Wilderness Review (BLM 1995), and ACEC prescriptions.

Under Alternatives B, C, and D, the Bull Gulch area would not be designated as a RMA. Recreation use and implementation-level management would be subject to management direction provided by the BLM Handbook H-8550-1, IMP for Lands Under Wilderness Review (BLM 1995), and ACEC prescriptions. An NSO stipulation would be applied, as well as a closure to mineral materials sales. The WSA and ACEC designations, along with their guidance and prescriptions, would maintain the natural-appearing landscape, the current degree of remoteness, and the emphasis on primitive and unconfined recreation. From a visitor's perspective, the resulting RSCs and recreation opportunities would be the same under all alternatives.

The implementation decisions for comprehensive trails and travel management and SRPs included in each alternative would support maintaining wilderness characteristics and ACEC values while achieving CRVFO-wide R&VS objectives. Correspondingly, recreation management costs and personnel requirements would be low under all alternatives.

BLM_0016849

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Castle Peak (northwest of Wolcott) | Glenwood Springs ERMA/RMA | - | - | - |

- Public lands that are not designated as RMAs would be managed to meet basic R&VS and resource stewardship needs.

Under Alternative A, the Castle Peak area (approximately 19,650 acres) would continue to be identified as part of the CRVFO ERMA and managed under the current management direction. Recreation management would focus on providing visitor information, sanitation facilities, and access, and focus on resolving management issues. The 12,200-acre Castle Peak WSA lies within the Castle Peak area, and recreation management is guided by the IMP. The 1999 Oil and Gas RMP Amendment/Supplemental EIS applied an NSO stipulation to protect non-motorized opportunities and recreation settings in the Castle Peak area. The travel management decisions for non-WSA lands were made in the 1997 Castle Peak Travel Management Plan and would continue.

The CRVFO visitor study indicated respondents were moderately to very satisfied with their visit to the Castle Peak area. Respondents said that all physical, social, and operational RSCs should be left as is but that more information should be available for visitors. People felt only slightly crowded (Virden et al. 2008).

Under Alternatives B, C, and D, the area would be undesignated for R&VS because protecting wilderness values would remain the predominant land management focus. Management would continue to emphasize primitive and unconfined recreation opportunities within the Castle Peak WSA portion and dispersed recreation opportunities outside the WSA. The majority of the area would be subject to IMP. R&VS management would continue to meet basic R&VS and resource stewardship needs. Under Alternatives B, C, and D, little change is expected in the determinative RSCs of naturalness, remoteness, and access.

Under Alternative C, an additional 4,000 acres outside the WSA would be managed as LWCs and managed for wilderness values. In addition, the Greater Sage-Grouse Habitat ACEC would create a large, contiguous, intact landscape where existing physical RSCs and recreational opportunities would continue to be indirectly maintained. These designations would enhance opportunities for solitude and opportunities for primitive and unconfined recreation in the Castle Peak area.

The implementation decisions for comprehensive trails and travel management and SRPs included in each alternative would help sustain recreation opportunities and address visitor health and safety, resource protection, and use and user conflicts. Recreation management costs and personnel requirements would be low under all alternatives.

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| The Crown (east of Carbondale) | Glenwood Springs ERMA | SRMA | ERMA | SRMA |

In all alternatives, The Crown area would offer Roaring Fork Valley residents frequent access to outdoor physical activities near their home. However, the emphasized recreation activities vary by alternative.

Under Alternative A, The Crown area would continue to be part of the Glenwood Springs ERMA where recreation is not the management focus but an issue of some significance. Recreation management would focus on providing visitor information, sanitation facilities, and access, and focus on resolving management issues. No specific RSCs or recreation opportunities would be emphasized. Visitors would continue to

BLM_0016850

participate in a variety of dispersed activities (e.g., OHVs, ATVs, motorcycling, mountain biking, hiking, and hunting). Mountain biking and hunting would remain seasonally dominant activities.

Under Alternatives B and D, The Crown area would be designated as a SRMA for its unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. R&VS management would be recognized as the predominant LUP focus and managed in two RMZs to further delineate specific recreation opportunities. Alternative B would focus on producing a specific set of recreation opportunities for OHV riding and driving in RMZ 1 (2,350 acres), and opportunities for mountain biking in RMZ 2 (6,700 acres). Management would focus on accommodating Roaring Fork Valley residents as the primary visitors. Alternative D proposes to emphasize mountain biking in the entire area. Management under Alternative D would focus on accommodating destination mountain bike riders to the Roaring Fork Valley as well as local mountain bike riders.

The overall management direction under Alternative D is to recognize and expand existing uses and accommodate new uses to the greatest extent possible. To that end The Crown SRMA would be part of a valley-wide emphasis on mountain biking, which would include the Red Hill SRMA, Fisher Creek SRMA, and a portion of Thompson Creek SRMA, along with opportunities on adjacent National Forest land. According to proponents, SRMA designation, recreation enhancements for mountain biking, the exclusion of motorized use, and subsequent marketing would draw the attention of destination visitors and create a regionally popular mountain biking destination, like Fruita, Colorado. This would benefit businesses catering to the needs of mountain bikers but may hurt businesses supporting the current mix of recreation activities. Increases in destination visitors, combined with local population growth, would result in increases in social RSCs (e.g. level of contact, group sizes, and evidence of recreation use) through the life of the plan.

The activity emphasis within the proposed SRMA would change (Alternative B) or eliminate (Alternative D) traditional motorized recreation activities. For example, the popular activity of hunting would take place in the SRMAs. However, the level of public motorized access would decrease under Alternative B, and motorized access would be completely eliminated under Alternative D, due the emphasis on creating a non-motorized recreation setting for mountain biking.

Under Alternative B, (RMZ 2) and Alternative D, travel designations allowing only foot, horse and mechanized travel would create the greatest change in public use and traditional public access. The existing road system would remain in place for authorized users. This results in recreation use on existing two-track roads, not single-track trails specifically designed for foot, horseback riding, or mountain biking.

Under Alternative B, SRMA-specific NSO stipulations would limit changes to the naturalness of the landscape by prohibiting surface-disturbing activities and intensive/large-scale human use or occupation (e.g., group use events). Recreation-specific CSU stipulations under Alternatives D and C would minimize conflicts with recreation opportunities by requiring surface-disturbing activities that negatively impact recreation opportunities to be moved more than 200 meters away from recreation trails and facilities.

Alternative C proposes to designate The Crown area as an ERMA in recognition of existing and anticipated recreation use, demand, and R&VS program investments. The ERMA would be managed to support and sustain the existing recreation activities and the associated qualities and conditions of the ERMA. Management of ERMA areas would be commensurate with the management of other resources and resource uses (i.e. core wildlife area, livestock grazing, ACEC). Alternative C, through route designations, would offer

BLM_0016851

opportunities for a variety of recreation activities without emphasizing any specific recreation activity in a particular zone. Route designations would maintain the current single-track mountain bike trail system. Some motorized routes would be closed due to resource and private land issues.

Wildlife conflicts, squatters, trash, unsanitary conditions, and evidence of recreation use are current management issues. Alternatives B and D propose prohibiting camping and overnight use within 0.25 mile of Prince Creek Road (Pitkin County Road 7) to reduce squatters, trash, unsanitary conditions, and evidence of use. Alternative C would prohibit camping and overnight use on BLM lands outside designated campsites and developed campgrounds within The Crown ERMA.

Motorized activities would be prohibited from December 1 to April 30 under Alternative A due to a big game winter closure. Motorized and mechanized activities would be prohibited from December 1 to April 15 under Alternatives B and C. Under Alternative D, motorized activities would be prohibited year-round, and mechanized use would be prohibited from December 1 to April 15. The seasonal limitation does not create recreation conflicts because visitation dramatically drops during the winter. The shorter seasonal limitation under Alternatives B, C, and D would allow earlier spring recreation use.

Although Alternative B emphasizes OHV activities in a portion of the SRMA, the area is small, requiring the use of the Prince Creek Road (Pitkin County Road 7) to create loop rides. This forces unlicensed OHV users onto the Prince Creek Road, adding to the current recreation use and traffic conflicts.

It is likely that visitation levels would increase under all alternatives, which would require more intensive administration, management, and monitoring (e.g. more visitor facilities, more signs, increased managerial and enforcement presence, increased user controls), especially in the proposed SRMAs. Resolving the existing recreation-related trespass issues would be time and labor intensive under all alternatives. The implementation decisions for comprehensive trails and travel management and SRPs included in each alternative would support the recreation opportunities and address visitor health and safety, resource protection, and use/user conflicts. The effectiveness of managing recreation resources and the anticipated increases in use would depend on (a) gateway communities (e.g. businesses, chambers, tourism organizations, and local governments) marketing the SRMA responsibly and accurately; (b) local partners providing on-the-ground support; and (c) sufficient funding to support recreation developments and staffing. Recreation management costs, volunteer contribution requirements, and personnel requirements would be substantial under Alternatives B and D.

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Deep Creek (west of Gypsum) | SRMA | - | - | - |

- Public lands that are not designated as RMAs would be managed to meet basic R&VS and resource stewardship needs.

Alternative A maintains the 1988 CRVFO RMP identification of Deep Creek as a SRMA. The SRMA administratively overlies the Deep Creek ACEC with duplicative management action and allowable use decisions applied to protect the physical and biological qualities of the area. Recreation activities and management would be subject to finding Deep Creek as eligible for inclusion in the NWSRS.

Recognizing the multiple land use designations aimed at protecting natural processes, ecological values, and primitive and unconfined recreation opportunities, the area would not be designated an RMA under Alternatives B, C, and D. Dropping the overlapping SRMA identification would create only an administrative change from Alternative A and no on-the-ground change for visitors. The Deep Creek area would continue to

BLM_0016852

offer opportunities to participate in activities, such as hiking, fishing, or hunting. The interdisciplinary mix of allowable use and management action decisions and limited area travel designations would retain the current RSCs.

Under Alternatives A, B, and C, recreation use would be subject to ACEC designation, along with corresponding prescriptions, proposed protective measures, and non-motorized travel designations. Under Alternative C, recreation use and management would be subject to finding the two segments of Deep Creek suitable for inclusion in the NWSRS. Under Alternative C, recreation use and management would be subject to Management and Setting Prescriptions for Areas with Wilderness Characteristics.

Under Alternative D, the Deep Creek area would not have any special designations. Management action and allowable use decisions for individual resources and travel management would guide and constrain R&VS management. Some motorized use, south of Deep Creek, would be provided to the private landowner but all public access would remain non-motorized. The Deep Creek area would probably continue to offer opportunities to participate in activities, such as hiking, fishing, or hunting. The most constraining use on surface-disturbing activities would be the VRM Class I designation. It is likely the VRM Class I designation alone would retain the existing physical RSCs; however, Alternative D does provide the least protections of all alternatives.

Minimal recreation management is currently performed outside the Coffee Pot Road corridor, where developed campsites exist. In a region that is already renowned and marketed for its outdoor recreation amenities, a subsequent congressional WSR designation under Alternatives B and C would highlight Deep Creek to a recreation-tourism market, and consequently more intensive management and administration would be needed. The implementation decisions included in each alternative would support the recreation opportunities and address visitor health and safety, resource protection, and use and user conflicts.

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Eagle River | Glenwood Springs ERMA | ERMA | ERMA | ERMA |

Under Alternative A, the Eagle River corridor would continue to be identified as part of the Glenwood Springs ERMA, where recreation is not the management focus but an issue of some significance. Recreation management would be focused on providing visitor information, sanitation facilities, and access, and focused on resolving management issues. This direction has resulted in the creation of many developed recreation sites. Visitors currently participate in a variety of river-related activities, camping, and picnicking. A moratorium on commercial river-related SRPs would continue. Recreation activities and recreation management would be subject to finding the Eagle River as eligible for inclusion into the NWSRS.

Alternatives B, C, and D propose designating the Eagle River corridor as an ERMA in recognition of existing and anticipated recreation use, demand, and R&VS program investments. The fragmented parcels of BLM lands provide valuable river access but are not sufficient to be designated and managed as a SRMA. The ERMA designation would appropriately support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. Recreation use, demand, or R&VS program investments would be addressed. All alternatives would offer day-use recreation opportunities near local communities and allow participants frequent access to outdoor physical activity.

BLM_0016853

An NSO stipulation for major rivers (0.5 mile on both sides of the river) applied to the Eagle River corridor and ROW avoidance identification on developed recreation sites would protect the physical RSC on BLM lands from unnecessary surface-disturbing activities. However, factors outside BLM's control, such as access to Interstate 70, population growth, and the development of adjacent private lands, would continue to change the social and operational RSCs of the Eagle River corridor through the life of the plan.

Changing recreation use, camping/partying, campground staffing, sanitation, overfishing, low water levels, and launch site crowding are noted area-specific recreation/tourism issues. Alternatives B and C would prohibit camping and overnight use on BLM lands and manage the corridor for day-use activities by converting the Wolcott and Gypsum campgrounds to day-use recreation sites. Alternative D would prohibit camping and overnight use on BLM lands outside designated campgrounds. Alternatives B and C would better address sanitation, management, staffing, and the changing recreation use patterns, but would impact visitors who enjoy camping. Under Alternative C, recreation activities and management would be subject to finding the Eagle River suitable for inclusion into the National Wild and Scenic River system.

The Eagle River ERMA includes a similar mix of proposed recreation decisions as the Upper Colorado River SRMA-RMZ 6. Alternatives B and C propose to not authorize new river-related SRPs whereas Alternative D allows for additional river-related SRPs. Since many commercial river outfitters access the river through private and municipal lands, the impacts on commercial use may be minimal.

The implementation decisions for comprehensive trails and travel management and SRPs included in each alternative would support the recreation opportunities and address visitor health and safety, resource protection, and use and user conflicts. Alternative C includes a group size limit of 25 people per group to reduce crowding at recreation sites because the current infrastructure is limiting. Moderate increases in funding and staffing would be required under all alternatives due to wildland-urban interface issues and anticipated increases in visitors.

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Fisher Creek (north of Carbondale) | Glenwood Springs ERMA/RMA | ERMA | ERMA | SRMA |

A 1995 land exchange added Haff Pasture (1,040 acres) to neighboring BLM lands along Cattle Creek. The area is now known as Fisher Creek and is included in the Glenwood Springs ERMA where recreation is not the management focus but an issue of some significance. Recreation management has focused on providing visitor information, sanitation facilities, and access, and focused on resolving management issues. The Haff Pasture portion of the area has restrictions on motorized use, mechanized use, cross-country skiing, dogs, and camping. The 1999 Oil and Gas RMP Amendment/Supplemental EIS applied an NSO stipulation to protect non-motorized opportunities and recreation settings in the Haff Pasture portion of the Fisher Creek area. Alternative A would continue this management direction.

Alternatives B and C propose designating the Fisher Creek area (i.e. Haff Pasture and Cattle Creek) as an ERMA in recognition of existing and anticipated recreation use and demand. The ERMA would be managed to support and sustain the principal non-motorized recreation activities and the existing qualities and conditions of the ERMA. Management of the ERMA would be commensurate with the management of maintaining and improving terrestrial wildlife habitat, as the area is also identified as a core wildlife area.

BLM_0016854

Under Alternatives B and C, the area would have an NSO stipulation applied to protect core wildlife habitat. On-the-ground management and recreation opportunities would be similar to Alternative A.

Alternative D proposes to designate the area as a SRMA, which recognizes the close-to-town recreational opportunities for local mountain bikers and RSCs for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. R&VS management would be recognized as the predominant LUP focus. Emphasizing mountain biking would allow visitors the opportunity to experience frequent access to outdoor physical activity, challenge, reduced mental tensions, and improved skills and abilities. These activities and experiences would offer participants personal benefits, such as improved physical fitness, improved mountain biking skills, and improved balance of work and play in their lives, and encourage the development of a more outdoor-oriented lifestyle.

The determinative RSC attributes of naturalness, remoteness, and access would be maintained, and management issues would be addressed by applying supporting management action and allowable use decisions (e.g., VRM Class II class designation, ROW avoidance area identification, closure to mineral materials sales, closure to wood cutting and commercial timber management, closure to non-energy solid mineral leasing, and travel designations). Recreation-specific CSU stipulations under Alternative D would minimize conflicts with recreation opportunities by requiring surface-disturbing activities that negatively affect recreation opportunities to be moved more than 200 meters away from trails and developed recreation sites.

The overall management direction under Alternative D is to recognize and expand existing uses and accommodate new uses to the greatest extent possible. To that end, the Fisher Creek SRMA would be part of a valley-wide emphasis on mountain biking, which would include the Red Hill SRMA, The Crown SRMA, and a portion of Thompson Creek SRMA, along with opportunities on adjacent National Forest land. According to proponents, SRMA designation, recreation enhancements for mountain biking, the exclusion of motorized use, and subsequent marketing would draw the attention of destination visitors and create a regionally popular mountain biking destination, like Fruita, Colorado. This would benefit businesses catering to the needs of mountain bikers but may hurt businesses supporting the current mix of recreation activities. Increases in destination visitors, combined with local population growth, would result in increases in social RSCs (e.g. level of contact, group sizes, and evidence of recreation use) through the life of the plan.

Sustaining big game habitat, protecting wintering wildlife, maintaining open space values, and increasing recreation use are local recreation/tourism issues. Alternatives B, C, and D propose management action and allowable use decisions to address these issues, including December 1 to April 15 seasonal limitations on motorized and mechanized use, limitations on over-snow travel, recreational target shooting, and prohibition of camping and overnight stays. All alternatives include a seasonal limitation to protect wintering big game. Alternative A has a 15-day longer limitation (December 1 to April 30) than under Alternatives B, C, and D (December 1 to April 15), but the closure under Alternatives B, C, and D applies to both motorized and mechanized recreation activities.

The effectiveness of managing recreation resources and the anticipated increases in use would depend on: (a) gateway communities (e.g. businesses, chambers, tourism organizations, and local governments) marketing the SRMA responsibly and accurately; (b) local partners providing on-the-ground support; and (c) sufficient funding to support recreation developments and staffing. Under Alternative D, the Red Hill Council (managing partner for the Red Hill SRMA) has been identified as a potential managing partner for the SRMA.

BLM_0016855

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Gypsum Hills Area (northwest of Gypsum) | SRMA | - | - | - |

- Public lands that are not designated as RMAs would be managed to meet basic R&VS and resource stewardship needs.

Alternative A maintains the 1997 Castle Peak Travel Management Plan Amendment designation of Gypsum Hills as a SRMA specifically for OHV riding/driving. No RAMP (i.e., implementation plan) has been completed due to lack of interest. Without such a plan, the CRVFO staff has focused on managing travel management issues, such as designating travel routes, installing signs, and reducing cross-country travel and bandit trails.

Due to the fact that existing recreation opportunities and RSC are not unique or distinctive, especially as compared to other areas used for recreation, Alternatives B, C, and D would not designate the area as an ERMA or SRMA. Public lands that are not designated as RMAs are managed to meet basic R&VS and resource stewardship needs. Motor sport activities would take place but the amount of motorized routes would vary by the emphasis of each alternative. The most route reductions would occur under Alternative C, and the least amount of route reductions would occur under Alternative D.

Recreation management costs and personnel requirements would not increase from present levels under any alternative, but travel management implementation costs would be high, depending on the miles of routes closed.

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Hack Lake (northwest of Gypsum) | SRMA | SRMA | ERMA | ERMA |

Alternative A maintains the 1988 CRVFO RMP identification of the Hack Lake area as a SRMA. The 1999 Oil and Gas RMP Amendment/Supplemental EIS applied an NSO stipulation to protect non-motorized recreation opportunities and RSCs within the SRMA. Existing recreation management and supporting travel designations emphasize non-motorized activities. No RAMP was completed to guide R&VS implementation. The four-acre WSA would continue to be managed under IMP under all alternatives. Recreation activities and management would be subject to finding Hack Creek as eligible for inclusion into the NWSRS.

Alternative B proposes to manage the area as a SRMA, where the existing recreation opportunities and RSCs are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. R&VS management would be recognized as the predominant LUP focus. The focus would be on producing a specific set of outcomes (i.e., experiences and benefits) desired from the activities of hiking, hunting, horseback riding, and camping. Emphasizing these activities would offer visitors the opportunity to escape everyday responsibilities for a while, experience solitude, reduce tensions, exercise, and enjoy the area's wildlife scenery and aesthetics. These activities and experiences would offer participants personal benefits, such as improved mental well-being and physical fitness, stronger ties with friends and family, and greater environmental awareness and sensitivity.

The physical, social, and operational RSCs would be retained through proposed management action and allowable use decisions (e.g., NSO/CSU stipulations, VRM class designations, ROW avoidance area identification, and closure to mineral materials sales, wood cutting, commercial timber management, non-energy solid mineral leasing, and travel designations).

BLM_0016856

Under Alternatives C and D, the Hack Lake area would be designated as an ERMA in recognition of existing and anticipated recreation use, demand, and R&VS program investments. The ERMA would be managed to sustain the principal non-mechanized recreation activities (e.g. hiking, hunting, horseback riding, and camping) and the associated qualities and conditions of the ERMA.

Under Alternative C, recreation use and management would be commensurate with and subject to finding Hack Creek as suitable for inclusion into the NWSRS and managed as an LWC. This designation and management would create a large, contiguous, intact landscape where physical RSCs would be protected. The designation and management would enhance opportunities for primitive and unconfined recreation in the area. The accompanying NSO stipulation would preserve the natural-appearing landscape. From a visitor's perspective, Alternatives A, B, and C offer analogous recreation opportunities due to the similarity of activities permitted and resultant RSCs created over the life of the plan. Under Alternative D, the recreation-specific CSU stipulation would minimize conflicts between land uses and recreation use. Alternative D has the greatest potential for RSC change through the life of the plan.

The implementation decisions for comprehensive trails and travel management and SRPs included in each alternative would support the recreation opportunities and would address visitor health and safety, resource protection, and use and user conflicts. Minimal on-the-ground actions would be performed under all alternatives; thus, recreation management costs and personnel requirements would probably be low under all alternatives.

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Hardscrabble/East Eagle (Eagle/Gypsum area; south of I-70) | Glenwood Springs ERMA | ERMA | ERMA | SRMA |

In all alternatives, the Hardscrabble/East Eagle area would offer Eagle-Vail Valley residents frequent access to outdoor activities near their home.

Under Alternative A, the Hardscrabble/East Eagle area would continue to be identified as part of the Glenwood Springs ERMA, where recreation is not the management focus but an issue of some significance. Recreation management would be focused on providing visitor information, sanitation facilities, and access, and focused on resolving management issues. Visitors would continue to participate in a variety of dispersed activities (e.g. OHVs, ATVs, motorcycling, mountain biking, hiking, and hunting). No explicit RSCs or specific recreation opportunities would be emphasized except in the East Eagle area where the single-track trail system emphasizes mountain biking and hiking. Recreation activities and recreation management would be subject to finding Abrams Creek as eligible for inclusion into the NWSRS.

Alternatives B and C propose to designate the area as an ERMA in recognition of existing and anticipated recreation use, demand, and R&VS program investments. The ERMA would be managed to support and sustain current variety of recreation activities and the existing qualities and conditions of the ERMA. Management of the ERMA would be commensurate with the management of other resources and resource uses (i.e. core wildlife areas, ACECs, livestock management). Alternatives B and C would offer opportunities for a variety of recreation activities through route designations without emphasizing any specific recreation activity in a particular zone. Route designations would maintain the current single-track mountain bike trail system. However, some motorized routes would be closed due to resource issues and private lands.

BLM_0016857

Recreation activities and management would be subject to management prescriptions for the Hardscrabble-Mayer Gulch ACEC under Alternative B and the larger Hardscrabble-Mayer Gulch/East Eagle Ridge ACEC under Alternative C. Recreation activities and management would also be subject to finding Abrams Creek as suitable for inclusion in the NWSRS in Alternative C.

Under Alternative D, the Hardscrabble/East Eagle area would be designated as a SRMA where the existing recreation opportunities and RSCs are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. R&VS management would be recognized as the predominant LUP focus and managed in two RMZs to further delineate specific recreation opportunities. Alternative D would focus on producing a specific set of recreation opportunities for the day-use activities of mountain biking in RMZ 1 (11,650 acres), and OHV riding and driving in RMZ 2 (5,300 acres). Under Alternative D, the Hardscrabble/East Eagle SRMA (RMZ 1) would be part of a local emphasis on mountain biking and the creation of a biking destination, like Fruita, Colorado. The activity emphasis by RMZ would reduce the area open to motor sports.

The RSCs within the SRMA would be retained through proposed management action and allowable use decisions (e.g. CSU stipulations, VRM class designations, ROW avoidance area identification, and closures to mineral materials sales, wood cutting and commercial timber management, non-energy solid mineral leasing, and travel designations). The CSU stipulation for the ERMA is a moderate constraint on surface-disturbing activities whereas physical RSCs are best maintained by the application of an NSO stipulation.

All alternatives include specific protective measures and management actions to protect resources and provide for visitor safety. Protective measures and management actions include firearm use restrictions, parking restrictions, and camping and overnight use restrictions.

It is likely that visitation levels would increase through the life of the plan because (a) the Vail region is renowned and marketed for its outdoor recreation amenities and (b) information about the local mountain biking and hiking opportunities can be found on websites and brochures produced by the town of Eagle, Eagle County, and local businesses. Maintaining the existing social RSCs (i.e., level of contact with others, group size and evidence of use) will be difficult over the life of the plan. More intensive administration, management, and monitoring (e.g., more visitor facilities, more signs, increased managerial and enforcement presence, increased user controls), especially in the proposed SRMAs, would be necessary.

The implementation decisions for comprehensive trails and travel management and SRPs included in each alternative would help sustain recreation opportunities and address visitor health and safety, resource protection, and use and user conflicts. The effectiveness of managing recreation resources and the anticipated increases in use would depend on: (a) gateway communities (e.g. businesses, chambers, tourism organizations, and local governments) marketing the SRMA responsibly and accurately; (b) local partners providing on-the-ground support; and (c) sufficient funding to support recreation developments and staffing. To fulfill the local desire for a motor-cross track; Alternatives B, C, and D would propose locating a motocross track/staging area (pending an environmental assessment) in the Spring Creek area. The track would be managed under a Recreation and Public Purposes lease by the Town of Gypsum.

BLM_0016858

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| King Mountain (near Toponas) | Glenwood Springs ERMA/RMA | SRMA | ERMA | ERMA |

Under Alternative A, the King Mountain area would continue to be included as part of the Glenwood Springs ERMA identified in the 1984 GSRA RMP. The public gained access in 1993 by a conservation partnership between the BLM, the CDOW, and the Rocky Mountain Elk Foundation that acquired private land along the north slope of King Mountain. Recreation management would focus on providing visitor information, sanitation facilities, and access, and focus on resolving management issues. The 1999 Oil and Gas RMPA/Supplemental EIS applied an NSO stipulation to protect non-motorized opportunities and RSCS.

Alternative B proposes to manage the area as a SRMA, recognizing the existing recreation opportunities and RSCs for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. The focus would be on producing a specific set of outcomes desired for the activities of hunting, horseback riding, wildlife viewing, and camping. Emphasizing these activities would offer visitors the opportunity to escape everyday responsibilities for awhile, to experience solitude and reduce tensions, to exercise, and to enjoy the area's wildlife scenery and aesthetics. These activities and experiences would offer participants personal benefits, such as improved mental well being, improved physical fitness, stronger ties with friends and family, and greater environmental awareness and sensitivity.

In Alternative B, the determinative RSCs of naturalness, remoteness, and access would be maintained and management issues would be addressed by applying an NSO stipulation along with other supporting management action and allowable use decisions. These would include VRM Class II class designation, ROW avoidance area identification, and closure to mineral materials sales, wood cutting and commercial timber management, and non-energy solid mineral leasing and travel designations.

Under Alternatives C and D, King Mountain would be managed as an ERMA in order to address recreation use, demand, and existing R&VS program investments. The ERMA designation would support and sustain the principal recreation activities (e.g. hunting, horseback riding, wildlife viewing, and camping) and the associated qualities and conditions of the ERMA. The management of the ERMA areas would be commensurate with the management of other resources and resource uses.

Under Alternative C, a CSU stipulation is applied to the entire area to constrain surface use, occupancy, and surface-disturbing activities. Under Alternative D, a less extensive CSU is applied only to developed recreation sites, allowing the potential for more physical change in the landscape. Alternatives C and D have more potential than either Alternatives A or B for adverse physical RSC change through the life of the plan.

The implementation decisions for comprehensive trails and travel management and SRPs included in each alternative would support the targeted recreation opportunities and would address visitor health and safety, resource protection, and use and user conflicts. Staff presence would probably remain low, except during the fall big game hunting season. Recreation management costs and personnel requirements would probably stay close to present levels in all alternatives.

BLM_0016859

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| New Castle (near New Castle) | Glenwood Springs ERMA | ERMA | ERMA | ERMA |

The New Castle area is part of the Glenwood Springs ERMA, where recreation is not the management focus but an issue of some significance. Recreation management is focused on providing visitor information, sanitation facilities, and access, and focused on resolving management issues. On-the-ground implementation actions would continue to focus on maintaining the undeveloped Garfield Creek Colorado River access recreation site, working with the Town of New Castle as a managing partner for the Colorow Trail, reducing recreation/wintering wildlife conflicts, and handling travel management.

Alternatives B, C, and D propose to designate the New Castle area as an ERMA in recognition of existing and anticipated recreation use, demand and R&VS program investments. The ERMA would be managed to support and sustain the existing recreation activities and the associated qualities and conditions of the ERMA. Management of ERMA areas would be commensurate with the management of other resources and resource uses (i.e. core wildlife area, livestock grazing).

The physical, social, and operational RSCs are maintained through proposed management action and allowable use decisions (e.g., CSU stipulations, VRM class designations, ROW avoidance applied to developed recreation sites, and closure to mineral materials sales, to wood cutting and commercial timber management, to non-energy solid mineral leasing, and travel designations). Under Alternatives B and C, a CSU stipulation would be applied to the entire area; under Alternative D, a less extensive CSU would be applied only to developed recreation sites, allowing the potential for more physical change in the landscape. Management action and allowable use decisions for other resources (e.g., NSO stipulations for wildlife core areas, soils, steep slopes) would indirectly help retain the existing physical RSCs. To reduce seasonal wildlife conflicts, over-snow travel and the winter big game closures are proposed for the entire area under Alternative C; it excludes the Tibbetts area under Alternatives B and D.

The implementation decisions for comprehensive trails and travel management and SRPs included in each alternative would help sustain recreation opportunities and address visitor health and safety, resource protection, and use and user conflicts. In this community growth area, community partners would be necessary to hold down BLM recreation/travel management costs and staffing needs. With community support, the BLM recreation management costs and personnel requirements would slightly increase above present levels under Alternatives B, C, and D.

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Pisgah Mountain (between Burns and McCoy) | Glenwood Springs ERMA/RMA | - | - | - |

- Public lands that are not designated as RMAs would be managed to meet basic R&VS and resource stewardship needs.

The Pisgah Mountain area was included as part of the Glenwood Springs ERMA identified in the 1984 GSRA RMP. Recreation management focused on providing visitor information, sanitation facilities, and access, and focused on resolving management issues. Recreation opportunities, non-motorized activities, RSCS, and management were influenced by area-specific decisions made in the 1997 Castle Peak Travel Management Plan. The 1999 Oil and Gas RMP Amendment/Supplemental EIS applied GS-NSO-17 to protect non-motorized activity opportunities and RSCs in the Pisgah Mountain area. Recreation activities and management would be subject to finding the Colorado River as eligible for inclusion in the NWSRS.

BLM_0016860

Under Alternatives B, C, and D, the Pisgah area would not be designated as a RMA. BLM lands that are not designated as RMAs are managed to meet basic R&VS and resource stewardship needs. Under Alternative C, recreation use would be subject to and consistent with prescriptions for the Greater Sage-Grouse Habitat ACEC and the Management and Setting Prescriptions for Areas with Wilderness Characteristics, which emphasize primitive and unconfined recreation. Under Alternatives B1 and C, recreation activities and management would be subject to finding the Colorado River as suitable for inclusion in the NWSRS.

Under Alternatives B, C, and D, non-motorized activities would be emphasized and managed through non-motorized travel designations. Travel designations, along with decisions for visual, natural, and cultural resources (e.g., NSO stipulations for major rivers and Upper Colorado River SRMA prescriptions) would indirectly retain the current RSCs on portions of the area through the life of the plan.

The minimum recreation management actions would be required to achieve CRVFO-wide recreation objectives. Recreation management costs and personnel requirements would slightly increase from present levels under all alternatives.

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|------|---------------|---------------|---------------|---------------|
| Red Hill (near Carbondale) | SRMA | SRMA | SRMA | SRMA |

Unlike other SRMAs in the CRVFO, the 2000 Red Hill RMPA identified Red Hill as a SRMA. The Red Hill SRMA emphasizes opportunities to participate in day-use mountain biking, hiking, and walking. The majority of visitors come from the Roaring Fork Valley. Under all alternatives, the Red Hill area would be managed as a SRMA, with a commitment to emphasize recreation by managing for specific recreation opportunities and RSCs on a long-term basis. Alternatives B, C, and D propose to revise the SRMA's outcome objective based on the visitor study (Virden et al. 2008) and scoping comments.

Rationale for maintaining the SRMA under Alternatives B, C, and D is based on public comment and the CRVFO visitor study data (Virden et al. 2008) suggests the existing recreation opportunities and recreation setting characteristics are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. The data suggested that visitors are extremely satisfied with the existing RSCs and the recreation opportunities. All alternatives would continue to offer close-to-town hiking/walking and mountain biking opportunities, and would allow participants frequent access to outdoor physical activity. Emphasizing these activities would allow visitors the opportunity to experience frequent access to outdoor physical activity, the area's wildlife, scenery, views, and aesthetics, challenge, reduced mental tension, and improved skills and abilities. These activities and experiences would offer participants personal benefits such as improved physical fitness, improved outdoor skills, and improved balance of work and play in their lives, and would encourage the development of a more outdoor-oriented lifestyle. Social, economic, and environmental benefits would include lifestyle improvement or maintenance, greater value-added local services, increased desirability as a place to live or retire, and the desire to preserve the special landscape character of Red Hill.

The determinative RSCs of naturalness, remoteness, and access would be maintained, and management issues would be addressed by applying supporting management action and allowable use decisions. These include NSO stipulation, non-motorized travel designations, closure to timber harvest, ROW avoidance of recreation sites, closure to non-energy solid mineral leasing, camping closure, seasonal winter wildlife closures, over-

BLM_0016861

snow limitations, restriction of firearms in developed recreation sites, non-motorized travel designations, closure to timber harvest, ROW avoidance of recreation sites, and VRM Class II designation. An ROW avoidance area identification and a closure to mineral materials sales under Alternatives B and C would complement the existing NSO stipulation, and would ensure that the physical RSCs are retained. These actions are not included under Alternatives A and D.

The RMP management direction under Alternative D is to recognize and expand existing uses and accommodate new uses to the greatest extent possible. To that end, the Red Hill SRMA would be part of a valley-wide emphasis on mountain biking, which would include The Crown SRMA, Fisher Creek SRMA, and a portion of Thompson Creek SRMA, along with opportunities on adjacent National Forest land. According to proponents, SRMA designation, recreation enhancements for mountain biking, the exclusion of motorized use, and subsequent marketing would draw the attention of destination visitors and would create a regionally popular mountain biking destination, like Fruita, Colorado. This would benefit businesses catering to the needs of mountain bikers. Increases in destination visitors, combined with local population growth, would result in increases in social RSCs (e.g. level of contact, group sizes, and evidence of recreation use) through the life of the plan.

Overall, respondents and comments have suggested that all RSCs should be left as is, but that fewer visitor services should be provided in the Mushroom Rock area, a few more trails could be constructed on the north side, and a few more signs should be installed, especially at trail junctions. Alternatives A and C would maintain the existing trail system and new trails would be constructed only to connect to new access points. The construction of new mountain bike trails could be authorized under Alternative B to make additional loop trail connections and connect new access points. Under Alternative D, more miles of trail would likely be needed to support increases in recreation tourism.

The SRMA is currently and would continue to be administered under a Memorandum of Understanding with the Red Hill Council. The effectiveness of managing recreation resources and the anticipated increases in use would depend on: (a) gateway communities (e.g. businesses, chambers, tourism organizations, and local governments) marketing the SRMA responsibly and accurately; (b) local partners providing on-the-ground support; and (c) sufficient funding to support recreation developments and staffing.

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Siloam Springs (near Dotsero) | Glenwood Springs ERMA/RMA | - | - | - |
| Sunlight Peak | Glenwood Springs ERMA/RMA | - | - | - |

- Public lands that are not designated as RMAs would be managed to meet basic R&VS and resource stewardship needs.

The Siloam Springs and Sunlight Peak areas were included as part of the Glenwood Springs ERMA identified in the 1984 GSRA RMP. Recreation management focused on providing visitor information, sanitation facilities, and access, and focused on resolving management issues. The 1999 Oil and Gas RMP Amendment/Supplemental EIS applied an NSO stipulation to protect non-motorized activity opportunities and RSCs in both areas. Implementation-level management, administration, and monitoring have focused solely on travel management issues.

Due to the fact that existing recreation opportunities and RSC are not unique or distinctive, especially as compared to other areas used for recreation, Alternatives B, C, and D would not designate the areas as an

BLM_0016862

ERMA or SRMA. Public lands that are not designated as RMAs are managed to meet basic R&VS and resource stewardship needs. Under Alternatives B, C, and D, non-motorized recreation activities would be emphasized and managed through non-motorized travel designations. Travel designations, along with management action and allowable use decisions for visual, natural, and cultural resources, would indirectly but cumulatively retain the current RSCs through the life of the plan.

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Silt Mesa (north of Silt) | Glenwood Springs ERMA | ERMA | ERMA | ERMA |

Under Alternative A, the Silt Mesa area would continue to be identified as part of the Glenwood Springs ERMA, where recreation is not the management focus but an issue of some significance. Recreation management would focus on providing visitor information, sanitation facilities, and access, and focus on resolving management issues.

Under Alternatives B, C, and D, the Silt area would be managed as an ERMA to better to address recreation use and demand. The ERMA would be managed to support and sustain the principal non-motorized recreation activities and the associated qualities and conditions of the ERMA. Management of the ERMA would be commensurate with the management of other resources. A SRMA designation was considered but not proposed because portions of the area are mapped as high potential for gas resources and are leased for natural gas development, so surface-disturbing activities are anticipated during the life of the plan. The inability of recreation managers to plan for and maintain RSCs or to produce specific recreation opportunities on a long-term basis means the SRMA designation is inappropriate.

Alternative C emphasizes opportunities to participate in dispersed, day-use, non-motorized recreation. Alternatives B and D emphasize a greater range of recreation activities including both motorized and non-motorized recreation. All alternatives offer a mix of recreation opportunities near the town and allow participants in emphasized activities frequent, close-to-town, access to outdoor physical activities.

Alternatives B and C would apply a CSU stipulation to constrain surface use, occupancy, and surface-disturbing activities on unleased lands within the ERMA. Alternative D would apply a CSU stipulation on developed recreation sites and trails. The CSU stipulation in Alternatives B and C would cover more acres of the ERMA, offering better protections for the physical RSCs.

Current management issues involve inappropriate and unsafe target shooting, trash, OHV use, and trespassing. To address these issues, Alternatives B and C would propose prohibiting camping and target shooting. Other local BLM and state lands would probably absorb that current use. The implementation decisions for comprehensive trails and travel management and SRPs included in each alternative would support the recreation opportunities, and would address visitor health and safety, resource protection needs, and use and user conflicts. In this community growth area, community partners would be necessary to hold down BLM recreation/travel management costs and staffing needs.

BLM_0016863

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Thompson Creek (southwest of Carbondale) | SRMA | ERMA | ERMA | SRMA |

Under all alternatives, the Thompson Creek area would offer Roaring Fork Valley residents frequent access to outdoor physical activities near their home. However, the emphasized activities vary by alternative.

Alternative A maintains the 1988 RMP identification of the southern portion of the Thompson Creek area as a SRMA managed primarily to provide scarce recreation opportunities not available elsewhere and, secondarily, to reduce resource damage, solve visitor health and safety problems, and mitigate conflicts. Overlapping ACEC prescriptions for the protection of geologic and scenic values has created unresolved management conflicts with rock climbing on the geologically unique rock fins. The 1999 Oil and Gas RMP Amendment/Supplemental EIS applied an NSO stipulation to protect non-motorized activities and recreation settings within the SRMA. No RAMP was completed to guide implementation. Recreation activities and management would be subject to finding Thompson Creek as eligible for inclusion in the NWSRS.

Under Alternatives B and C, the area would be designated as an ERMA in recognition of existing and anticipated recreation use, demand, and R&VS program investments. The ERMA would be managed to sustain the principal recreation activities (e.g. hiking, hunting, horseback riding, and camping) and the associated qualities and conditions of the ERMA.

Under Alternative C, recreation use would be subject to and managed consistent with Management and Setting Prescriptions for Areas with Wilderness Characteristics, which emphasize primitive and unconfined recreation opportunities. Also under Alternative C, recreation use would be subject to and managed consistent with finding Thompson Creek as suitable for WSR designation (wild classification) and with interim protective management guidelines.

Under Alternative D, the Thompson Creek area would be identified as a SRMA where the existing recreation opportunities and RSCs are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. R&VS management would be recognized as the predominant LUP focus and managed in three RMZs to further delineate specific recreation opportunities. Alternative D would focus on producing a specific set of outcomes for the day-use activities of hiking in RMZ 1 (700 acres), climbing in RMZ 2 (4,000 acres), and mountain biking in RMZ 3 (4,850 acres).

The overall management direction under Alternative D is to recognize and expand existing uses and accommodate new uses to the greatest extent possible. To that end the RMZ 3 would be part of a valley-wide emphasis on mountain biking, which would include the Red Hill SRMA, Fisher Creek SRMA, and The Crown SRMA, along with opportunities on adjacent National Forest land. According to proponents, SRMA designation, recreation enhancements for mountain biking, the exclusion of motorized use and subsequent marketing would draw the attention of destination visitors and create a regionally popular mountain biking destination, like Fruita, Colorado. This would benefit businesses catering to the needs of mountain bikers but may hurt businesses supporting the current mix of recreation activities. Increases in destination visitors, combined with local population growth, would result in increases in social RSCs (e.g. level of contact, group sizes, and evidence of recreation use) through the life of the plan.

BLM_0016864

Under Alternative A, climbing would continue as outlined in an agreement with the Roaring Fork Climber's Coalition. Alternatives B and C propose some climbing limitations to protect geologic values in the ACEC (Alternative B and C) and wilderness characteristics (Alternative C). Some climbers argue that the nature of the rocks in Thompson Creek require that permanent fixed anchor bolts are needed for sport climbing and safety. Alternative D focuses on emphasizing sport climbing in RMZ 2 and allows for bolting and drills. The corresponding implementation decisions for climbing by alternative include those described below.

*Alternative A:*
- Climbing is permitted on designated bolted routes at the current climbing area (rock crag) only.

- No additional development of bolted routes within the area would be permitted.

- Mechanical devices (e.g., power drills) may not be used at the current climbing area (rock fin) only.

*Alternative B only:*
- Reestablishment of old routes and permanent fixed anchors (bolts and pitons) are permitted at the current climbing area (rock crag) only.

- No additional development of bolted routes within the area would be permitted.

- Mechanical devices (e.g., power drills) may be used at the current climbing area (rock fin) only.

*Alternative C only:*
- The establishment of new routes and reestablishment of old routes using fixed anchors would not be permitted. All climbing must be done without fixed anchors or other human installations.

- All existing fixed anchors (bolts, hangers, and pitons) would be removed.

- Mechanical devices (e.g., power drills) would not be permitted.

*Alternative D only:*
- The establishment of new routes and reestablishment of old routes using fixed anchors would be permitted.

- Mechanical devices (e.g., power drills) would be permitted.

The RSCs within the SRMA are retained through proposed management actions and allowable use decisions (e.g., CSU stipulations, VRM class designations, ROW avoidance area identification, and closure to mineral materials sales, to wood cutting and commercial timber management, to non-energy solid mineral leasing, and travel designations). Management action and allowable use decisions for other resources (e.g., NSO stipulations for soils and riparian area) would indirectly help retain the existing physical RSCs under all alternatives. Alternative D has the greatest potential for RSC change through the life of the plan because the SRMA has a CSU stipulation (moderate constraint on surface-disturbing activities) instead of an NSO stipulation (major constraint) to protect RSCs. The implementation decisions for comprehensive trails and travel management and SRPs included in each alternative would support the targeted recreation opportunities and would address visitor health and safety, resource protection, and use and user conflicts. With community support, R&VS program costs and personnel requirements would increase only under Alternative D.

BLM_0016865

| Area | Alternative A | Alternative B | Alternative C | Alternative D |
|------|---------------|---------------|---------------|---------------|
| Upper Colorado River (State Bridge to Glenwood Canyon) | SRMA | SRMA | SRMA | SRMA |

Alternative A maintains the 1988 RMP identification of the Colorado River corridor as a SRMA, offering opportunities for floatboating and related activities (e.g., fishing and camping) in roaded, semideveloped, but natural-appearing landscape. The BLM's river management would continue to focus on providing facilities and permitting—but not regulating—commercial and private river use. Market demand and conditions would determine the long-term use levels. Recreation activities and management would be subject to finding the Colorado River as eligible for inclusion in the NWSRS.

Under all action alternatives, the Upper Colorado River area would be identified as a SRMA where the existing recreation opportunities and RSCs are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. R&VS management would be recognized as the predominant LUP focus and managed in two RMZs to further delineate specific recreation opportunities. From State Bridge to Burns, opportunities to participate in fishing and floatboating would be emphasized; from Burns to Glenwood Canyon, opportunities to participate in floatboating and tubing would be emphasized.

The determinative RSC of naturalness would be retained and management issues would be addressed by applying the supporting management action and allowable use decisions. These include NSO/CSU stipulations, non-motorized travel designations, closure to timber harvest, ROW avoidance of recreation sites, closure to non-energy solid mineral leasing, camping restrictions, seasonal winter wildlife closures, over-snow limitations, restriction of firearms in developed recreation sites, non-motorized travel designations, closure to timber harvest, ROW avoidance of recreation sites, and VRM Class II designation. In addition, BLM would recommend to the Secretary of the Interior to withdraw developed recreation sites and to close the Upper Colorado River SRMA to the mining laws for locatable mineral exploration or development to help retain the physical RSCs. The lack of a ROW avoidance area identification and closure to mineral materials sales under Alternatives A and D would allow some surface-disturbing activities that could negatively change RSCs. These are prohibited under Alternatives B and C. Under Alternatives B1 and C, recreation activities and management would be subject to finding the Colorado River as suitable for WSR designation and with interim protective management guidelines.

Generally, river use has remained flat on the Upper Colorado River. Between 2007 and 2009, use declined by 4.9 percent, from 31,997 user days to 28,000 user days (CROA 2009). From State Bridge to Burns, 96 percent of visitors were very to extremely satisfied with their trip (Virden et al. 2008a). The visitor studies and public comments indicate the most important contributions to satisfaction were participation in desired river-related activities, companionship, opportunity to think and reflect, and the naturalness of the place. The mean number of groups encountered by visitors was 5.5 per trip, with an estimated average group size of 4.7 people. The small average group size is due to the popularity and dominance of commercial and private fishing groups, which are typically small in size. Eighty-eight percent of visitor study respondents felt the current group size and number of contacts should stay "as is" (Virden et al. 2008a). The long-term management question becomes how much change—if any—to the physical, social, and operational RSCs is acceptable to visitors.

BLM_0016866

Although current use levels are somewhat flat, the recreation management challenge would be maintaining the social RSCs "as is" over the life of the plan. This would be especially true under Alternatives B1 and C, where the Colorado River is found as suitable for inclusion in the NWSRS. In a region that is already renowned and marketed for its outdoor recreation amenities, a subsequent congressional designation would probably highlight the Colorado River to destination visitors. Visitation would probably increase, and consequently the need for more intensive recreation management and administration to protect resources and maintain the desired social RSCs.

The alternatives present several management scenarios to maintain the current high satisfaction levels over the life of the plan. Alternative C proposes to manage for a season average of up to 15 people per group in RMZ 5 and 25 people per group in RMZ 6. To ensure that the desired social RSCs are never exceeded and to curb resource impacts from large groups, Alternative C proposes to limit float-boating group sizes to 15 people (including guides) in RMZ 1 and 25 people per group in RMZ 2. Alternatives B and C also propose to not authorize any new river-related commercial SRPs. Limiting commercial SRPs to current levels adversely affects people wanting to acquire a permit from the BLM instead of purchasing an existing company. No vending permits, group use, or competitive events would be authorized in RMZ 1. All these limitations would offer opportunities for commercial and private use to grow above current use levels, while ideally achieving the RMZ outcome objective and desired social recreation setting throughout the life of the plan.

No permit system is proposed under any action alternative. A permit system would be adaptively implemented only if the level of contact with other groups were to reduce the quality of the visitor's recreation experience based on the standards found in the SRMA objective and desired RSCs.

Alternative D proposes to initially manage both RMZs for a season average group size of 25 people to better maintain tourism revenue and maximize resource use. Alternative D proposes to use monitoring data to determine when limitations would be imposed, based on the RMZ objective and proposed RSCs. Alternative D offers the greatest potential for physical and social RSC change through the life of the plan. Based on data showing a visitor preference for current physical, social, and operational RSCs, it is unclear whether a larger group size limit (15 or 25 people) and an increase amount of contact with other groups would facilitate the visitors' realization of the targeted recreation experiences and benefits in RMZ 1.

The implementation decisions for comprehensive trails and travel management and SRPs included in each alternative would support the recreation opportunities and would address visitor health and safety, resource protection needs, and use and user conflicts. BLM recreation management funding and staffing needs would moderately increase under all action alternatives.

## Other BLM Lands not Identified as an RMA

Under Alternative A, recreation management would be managed under current RMP guidance that focuses on providing visitor information, sanitation facilities, and access, and focuses on resolving management issues. Under all action alternatives, BLM lands not included in an RMA would be managed to meet basic R&VS and resource stewardship needs and achieve CRVFO-wide recreation objectives. The BLM and its partners would monitor recreation use and resources and would adaptively perform additional implementation actions, as necessary, to address basic R&VS and resource stewardship needs.

BLM_0016867

### Cumulative Impacts

Past and present actions that have had and are having direct and indirect impacts on recreation are discussed in Chapters 3 and 4. Cumulative effects include other future actions that are reasonably certain to occur in the region. The CRVFO has experienced many changes in recreation use and management since the 1984 RMP in the types of recreation activities desired, the intensity of recreation, and the location of recreation use. The most complete description of recreation-tourism demand and trends in northwest Colorado can be found in the 2008 Colorado Statewide Comprehensive Outdoor Recreation Plan (CSP 2008). The plan noted the following key points:

- Outdoor recreation opportunities significantly contribute to the high quality of life enjoyed by Colorado residents. Growth in the region will significantly impact the demand for outdoor recreation in the future. Overall, the Northwest Region anticipates an 80 percent increase in residents by 2030, partially attributed to two major factors: anticipated growth in the oil and gas industry and retiring baby boomers seeking the milder climate of the Western Slope. Garfield County is projected to grow more dramatically than other counties in the region, increasing 138 percent between 2007 and 2030.

- Overall, tourism is a major driver of Colorado's economy and is the second largest industry statewide, with over 28 million people visiting the state in 2008. The tourism industry is a critical component of the Northwest Region's economy, contributing nearly $3.9 billion in 2006 through direct travel spending, tourism-related employment wages, and state and local taxes.

- Colorado's tourism industry is tied to the unique landscapes, natural resources, and renowned recreation opportunities that international, domestic, and in-state travelers enjoy throughout the year. The Northwest Region is also home to some of Colorado's most popular resort towns, including Aspen, Snowmass, Vail, Beaver Creek, Winter Park, Breckenridge, Frisco, and Steamboat Springs.

- Recreational opportunities in the Northwest Region are closely tied to the 9.9 million acres of public lands, the majority of which are managed by federal agencies, such as the BLM, USFS, and National Park Service. Nearly 600,000 acres are managed by state agencies, such as the CDOW, Colorado State Parks, and Colorado State Land Board.

- Developing a community trail system is the top need for not just Northwest Region local governments but also for respondents across Colorado. Second was the need to develop trails connecting to public lands. Interestingly, mountain biking trails are not reported as a priority for recreation managers in other regions, but they are important for agencies in the northwest.

- The majority of recreation occurs near the home, particularly during the week, but outdoor enthusiasts are willing to travel much farther on weekends. Nearly half of Coloradans seem to prefer recreation sites with basic services, which consist of toilets, shelter, water, and picnicking areas.

The Survey of Colorado Recreation Trends, Issues, and Needs prepared by Gary Horvath, Colin Hickey, and Cindy DiPersio for the Leeds School of Business at the University of Colorado at Boulder (Horvath et al. 2007), reported the following:

- Coloradans apparently enjoy the full spectrum of recreation destinations from "large parks with a wide range of camping, trails, boating, and fishing" to "wilderness areas with little to no development" to "forests and/or lakes with limited trails, camping, boating, and fishing opportunities."

BLM_0016868

- More than 32 percent engaged in outdoor recreation two to four times per week, and approximately 20 percent participated more than four times per week.

- Respondents used trails, parks, and open spaces approximately 1.5 times per week.

- Cleanliness and crowding were the top concerns about outdoor recreation in the state.

In 1997, the WRNF recorded more than 8.8 million recreation visitor-days. The WRNF Forest Plan ROD projected recreation demand to increase for trails and scenic resources that provide opportunities for hiking, backpacking, horseback riding, mountain biking, all-terrain vehicle and snowmobile use, sightseeing, and pleasure driving (WRNF 2002). That plan increased summer motorized and winter non-motorized recreation activities, limited the number of new developed recreation sites, and allowed developed sites to be expanded to provide concentrated recreational use (WRNF 2002). The North-Central Colorado Community Assessment Report for the BLM indicated that recreation, scenic beauty, and quality of life were some of the top reasons people live in local communities. As expected, the most commonly identified outcomes that communities want to receive from BLM lands related to benefits from participation in recreation activities and maintenance of open spaces and scenic vistas. The most commonly cited economic benefit derived from BLM lands was contributions to the local economy made by recreation-related tourism, especially hunting and wildlife-related tourism.

## Activities

People seeking outdoor recreation historically have used BLM lands, the adjacent WRNF, and state lands for a wide variety of activities. Since approximately 80 percent of BLM lands are within 1 mile of private land, BLM lands would continue to be the frequent destination for outdoor recreation activities, for community residents as well as visitors to destination resort towns. All alternatives offer dispersed and structured recreation opportunities designed for a specific activity, such as camping, fishing, hunting, wildlife viewing, boating, hiking, rock climbing, mountain biking, OHV riding/driving, snowmobiling, and skiing. Each alternative includes a different strategic mix of recreation opportunities to meet the diverse range of recreation opportunities demanded by visitors and communities in the region. All alternatives, no matter the area designation of SRMAs or identification of separate ERMAs, offer opportunities for "close to home" and frequent access to outdoor physical activities. The BLM would consider additions to community trail systems when necessary to address recreation activity demand created by growing communities and recreation tourism. Alternative D proposes to manage the most areas specifically for mountain biking. Alternative C, with the fewest SRMAs, offers less structured recreation opportunities. Winter limitations on motorized and mechanized activities to protect wildlife are included in all alternatives but are the most widespread under Alternatives B and C.

## RSCs

The effects of proposed BLM management action and allowable use decisions, combined with future actions that are reasonably certain to occur in the region on adjacent lands, could affect recreation by changing the RSCs that are considered desirable for much recreation.

### Physical RSCs (i.e., natural, remote, and those that provide visitor facilities)

Alternatives A, B, and C offer the most management action and allowable use decisions aimed at retaining natural landscapes and scenic vistas in high valued recreation areas. Constraints on surface development and protections afforded to natural resources would be the highest under Alternative C and the lowest under

BLM_0016869

Alternative D. The area west of the Grand Hogback would probably see some degradation of naturalness over the life of the plan due to energy development on already leased lands.

Alternatives B and C use travel management designations to increase the amount of remoteness on BLM lands. Alternatives A and D would maintain a similar degree of remoteness as found now on BLM lands. In SRMAs, recreation facility development would be aimed at achieving the SRMAs' desired RSCs. Alternative C would better meet the needs of visitors who desire little to no development in the recreation setting. Alternative D would result in the most developed recreation facilities (including trails), due to the emphasis on accommodating increases in recreation use and tourism. New recreation developments would be considered under all alternatives to effectively address recreation activity demand near communities.

### Social RSCs (i.e., contacts, group size, evidence of use)

BLM lands would probably stay within acceptable social carrying capacities, at least seasonally, in most locations away from communities. However, other actions outside BLM control, such as improvements to Interstate 70, increased marketing by tourism organizations of local recreational opportunities, and increases in recreation information on the Internet, could more rapidly increase recreation use. If these actions increase visitation, and if regional populations grow as predicted, proposed SRMAs, especially those near communities, would not likely be able to maintain the desired social RSCs through the life of the RMP. More crowded conditions would be likely during peak use times (i.e., summer on the Colorado River, weekday evenings and weekends near communities, big game hunting seasons). Alternatives B and D have more SRMAs with initial social allocations aimed at maintaining social recreation setting qualities. Alternative B generally proposes lower levels of contact, lower group sizes, and less evidence of use, while Alternative D proposes slightly higher levels of social interactions.

### Operational RSCs (i.e., public access, visitor services, management controls)

Proposed SRMA designations, special designations for other resources (i.e., WSRs, ACECs, WSAs, and LWCs), and travel designations under Alternatives B and/or C would change public access and create more mechanized and pedestrian- and equestrian-only recreation settings. Alternative D proposes higher levels of visitor services in SRMAs. Alternatives B and C include more interdisciplinary limitations and restrictions on recreation use, while Alternatives A and D would pose the fewest. In all alternatives, BLM R&VS funding (sometimes substantial when circumstances require it) and staff would be directed toward effectively addressing visitor health and safety, use and user conflict, and resource protection issues created by recreation activities.

### Outcomes (i.e., experiences and benefits)

ERMAs would offer recreation opportunities that facilitate the visitors' freedom to pursue a variety of outdoor recreation activities and attain a variety of outcomes. SRMAs would be managed explicitly for specific activities, sometimes through zoning, to sustain or enhance specific recreation outcomes over the life of the plan. Participants in the emphasized or permitted activities, regardless of the alternative, would have opportunities to realize recreation outcomes, such as "living a more outdoor-oriented lifestyle," or "escaping everyday responsibilities for awhile," or "enjoying frequent access to outdoor physical activity," or improved physical fitness. Alternative D proposes a strategic mix of SRMAs to increase the economic contributions made to local economies from recreation-related tourism on BLM lands.

BLM_0016870

## 4.3.4   Comprehensive Trails and Travel Management

### Methods and Assumptions

This section is an analysis of potential impacts on public access and travel from implementing management actions and allowable uses to meet resource and resource use objectives for the various programs. Travel designations support resource programs and are designed to help achieve their objectives. The land use emphasis for each area guides travel designations. Consequently, the travel designations would adhere to the management prescriptions included under each alternative, while following the theme of each alternative. Impacts resulting from the travel system on other resources and resource uses are discussed in those particular resource sections of this chapter. The existing conditions for trails and travel management are described in Section 3.3.4.

As required by Executive Order and regulation, this RMP would classify all BLM lands as open, limited, or closed to motorized travel activities, as discussed in Chapter 2. Additionally, for areas classified as limited, the RMP would designate the types or modes of travel, such as pedestrian, equestrian, bicycle, motorized, etc.; limitations on time or season of use; limitations to certain types of vehicles (i.e., OHVs, motorcycles, all-terrain vehicles, mechanized [mountain bike]); limitations on licensed or permitted vehicles or users; limitations on BLM administrative use only; or other types of limitations.

The following discussion of the impacts on travel and access focuses on management actions and allowable uses that restrict or facilitate travel opportunities. The analysis describes the changes to miles of routes open for public use, the adjustments in the number of acres open to off-road travel, and the specific travel restrictions (such as vehicle size and seasonal restrictions) that would affect access.

Impact analyses and conclusions were based on interdisciplinary team knowledge of the travel system and information provided by other agencies and the public. Spatial analyses were conducted using ESRI's ArcGIS desktop computer software, and effects were quantified where possible. In the absence of quantitative data, best professional judgment was used. Impacts were sometimes described using ranges of potential impacts or in qualitative terms, when appropriate.

The travel system is managed to achieve the goals and objectives of each alternative and to provide for appropriate public access. This program is considered a support function for all BLM resource programs. As such, the determination of significance for travel management is based on BLM's ability to administer the comprehensive public travel along with administrative access for resource management activities.

The analysis is based on the following assumptions:

- All types and modes of travel, designations, and limitations associated with public access are analyzed.

- A mechanized vehicle is further defined as a mountain bike only.

- The travel designations would not affect ROW holders, permitted uses, county or state roads, or other valid existing rights. Travel closures/limitations apply only to public access.

- The demand to increase travel routes on BLM lands would continue to increase over the life of the plan, especially near communities.

- The BLM has no authority over federal, state, or county roads on BLM lands, so those routes are not included in the analysis tables.

- The incidence of resource damage and conflicts among mechanized, motorized, and non-motorized activities would increase with increasing use of BLM lands.

- If necessary, the BLM would evaluate RS-2477 assertions under process and criteria separate from this planning process.

- Impacts on travel management occur from both limitations (i.e., wildlife stipulations, special designations, and cultural resources) and permitted uses (i.e., gas development, livestock grazing, and mining).

- Due to significant increases in use and the development of new vehicle technologies, designation of large areas as open to cross-country travel is no longer a viable management strategy. There is no motorized/mechanized cross-country travel in areas designated as limited or closed (excluding game retrieval carts). Exceptions for motorized cross-country travel can be included within the terms and conditions of a lease or permit, or by separate written authorization (BLM 2007k).

- Game retrieval carts are not allowed in WSAs.

- In areas with limited travel designations, motorized/mechanized travel is allowed up to 300 feet from designated motorized/mechanized routes for direct, not cross-country, access to dispersed campsites, provided that no resource damage occurs, no new routes are created, and such access is not otherwise prohibited by the BLM Field Manager.

- Pedestrian and equestrian access would not be restricted by travel designations that limit or prohibit motorized/mechanized travel, and pedestrian and equestrian access would be allowed on all routes open to motorized and mechanized uses, unless otherwise specified.

- Administrative use authorizations are granted on a case-by-case basis with approval from the BLM.

- New routes, reroutes, or closures to the travel network in the limited areas would be changed adaptively through activity level planning with site-specific NEPA analyses.

Existing OHV area designations in the CRVFO, as approved under the current RMP and subsequently modified by *Federal Register* notices issued after approval of the RMP, are provided in Table 4.3.4-1, OHV Area Designations in the CRVFO by Alternative (also, see Figures 2-38, 2-39, 2-40, and 2-41 in Appendix A).

**Table 4.3.4-1**
**OHV Area Designations in the CRVFO by Alternative**

| Trails and Travel Management | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Acres open to cross-country travel | 294,300 | 0 | 0 | 0 |
| Acres limited to existing routes | 38,000 | 0 | 0 | 0 |
| Acres limited to existing routes May 1 to November 30 | 4,300 | 0 | 0 | 0 |
| Acres limited to designated routes | 123,000 | 467,600 | 467,400 | 473,500 |
| Acres closed to OHV use | 44,000 | 37,300 | 37,500 | 31,400 |
| Total CRVFO acres | 503,600 | 504,900 | 504,900 | 504,900 |

BLM_0016872

Table 4.3.4-2 shows areas closed to OHV travel in the CRVFO by alternative. Limited area OHV designations would reduce cross-country OHV travel in an area, but would not eliminate it from designated routes. A closed area OHV designation would completely prohibit motorized travel in the entire area.

**Table 4.3.4-2**
**Closed OHV Areas by Alternative**

| Location | Acres Closed* | Acres Closed* | Acres Closed* | Acres Closed* |
|---|---|---|---|---|
| Red Hill SRMA | 2,600 | 2,600 | 2,600 | 2,600 |
| Bull Gulch WSA | 15,200 | 15,200 | 15,200 | 15,200 |
| Bull Gulch ACEC | 0 | 10,400 | 10,400 | 10,400 |
| Deep Creek ACEC | 2,400 | 2,400 | 2,400 | 2,400 |
| Fisher Creek Area | 1,000 | 1,000 | 1,000 | 1,000 |
| Thompson Creek ACEC | 4,300 | 3,400 | 3,400 | 0 |
| Castle Peak WSA | 12,200 | 12,200 | 12,200 | 12,200 |
| Hack Lake WSA | 4 | 4 | 4 | 4 |
| Hack Lake Area/SRMA | 3,300 | 3,700 | 0 | 0 |
| Hack Lake ERMA | 0 | 0 | 3,700 | 3,700 |
| Sloane Peak Area | 2,500 | 0 | 0 | 0 |
| Dotsero Crater ACEC | 0 | 97 | 97 | 0 |
| Eagle Mountain WSA | 320 | 320 | 320 | 320 |
| Abrams Creek ACEC | 0 | 0 | 186 | 0 |

*Some OHV closed area boundaries overlap, so the sum of individual closed areas is greater than the total acres closed.

Table 4.3.4-3 shows total miles of routes designated by modes of travel and alternative in the CRVFO. See Figures 2-38, 2-39, 2-40, and 2-41 in Appendix A for individual travel route designations arranged by alternative and zone.

**Table 4.3.4-3**
**Approximate Miles of Designated Routes in the CRVFO under the Four Alternatives**

| Route Open To | Alternative A (miles) | Alternative B (miles) | Alternative C (miles) | Alternative D (miles) |
|---|---|---|---|---|
| *Routes Not Open to Public Motorized or Mechanized Travel (Open to Foot and Horse)* | | | | |
| Administrative and other [1] [2] | 310 | 310 | 310 | 310 |
| *Total No Public Access* | *310* | *310* | *310* | *310* |
| | | | | |
| *Routes Open to the Public* | | | | |
| Full-sized vehicles | 760 | 470 | 440 | 530 |
| All-terrain Vehicles | 86 | 62 | 55 | 68 |
| Motorcycles | 85 | 66 | 27 | 82 |
| **Subtotal Motorized** | **931** | **598** | **522** | **680** |
| Mechanized | 180 | 220 | 140 | 280 |
| Pedestrian and equestrian | 160 | 420 | 440 | 300 |
| Foot | 2 | 2 | 2 | 2 |
| **Subtotal Non-motorized** | **342** | **642** | **582** | **582** |
| *Total Public Access* | *1,273* | *1,240* | *1,104* | *1,262* |
| *TOTAL DESIGNATED ROUTES* | *1,583* | *1,550* | *1,414* | *1,572* |

[1] Administrative use is authorized on a case-by-case basis. Although non-motorized and non-mechanized routes are open to public use by pedestrians and equestrians, the associated mileage is included with numbers for no public access.
[2] Routes with no public access are open to full-sized vehicles under Alternatives A and D for public with legal access.

BLM_0016873

Table 4.3.4-4 shows designations for over-snow vehicle travel. See Figures 2-38, 2-39, 2-40, and 2-41 in Appendix A for area designations arranged by alternative.

**Table 4.3.4-4**
**Areas Designations for Over-Snow Travel**

| Designation | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Closed | <ul><li>All winter wildlife closures</li><li>Deep Creek ACEC</li><li>Thompson Creek ACEC</li><li>Hack Lake area</li><li>Fisher Creek (Haff Pasture)</li><li>Siloam Springs</li><li>WSAs</li></ul>**Total acres closed to over-snow travel = 127,000** | Same as Alternative D With the addition of:<ul><li>East Castle Peak</li><li>Wolcott</li><li>Castle Peak isolate parcels</li><li>Hardscrabble</li></ul>**Total acres closed to over-snow travel = 174,900** | Same as Alternative D With the addition of:<ul><li>Hardscrabble</li><li>Red Hill Gypsum</li><li>Basalt Mountain</li><li>East Eagle</li><li>East Castle Peak</li><li>Castle Peak isolate parcels</li></ul>**Total acres closed to over-snow travel = 208,500** | <ul><li>All winter wildlife closures</li><li>WSAs</li><li>Deep Creek ACEC</li><li>Thompson Creek ACEC</li><li>Hack Lake area</li><li>Fisher Creek area</li><li>Siloam Springs area</li></ul>**Total acres closed to over-snow travel = 134,100** |
| Limited | <ul><li>King Mountain</li></ul>**Total area limited to designated routes for over-snow travel = 16,800 acres** | <ul><li>King Mountain</li><li>Blue Hill ACEC</li><li>Sheep Creek Uplands ACEC</li><li>Lyons Gulch ACEC</li><li>Glenwood Springs Debris Flow ACEC</li></ul>**Total area limited to designated routes for over-snow travel = 27,900 acres** | Same as Alternative B | Same as Alternative B |
| Open | All areas not designated as limited or closed

**Total area open to over-snow travel = 361,200 acres** | All areas not designated as limited or closed

**Total area open to over-snow travel = 302,200 acres** | All areas not designated as limited or closed

**Total area open to over-snow travel = 268,600 acres** | All areas not designated as limited or closed

**Total area open to over-snow travel = 343,000 acres** |

## Environmental Consequences

Impacts on comprehensive trails and travel management would result from some of the actions included under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on comprehensive trails and travel management under any of the four alternatives.

BLM_0016874

## _Alternative A_

**Impacts from Comprehensive Trails and Travel Management.** Tables 4.3.4-1, 4.3.4-2, 4.3.4-3, and 4.3.4-4 summarize the area and route designations by alternative.

Under Alternative A, the 314 miles of motorized and mechanized routes with no legal public access allow for exclusive access to the landowners adjacent to BLM lands. Alternative A has 294,300 acres designated as open to OHVs. Over-snow travel is limited to designated routes on King Mountain under all alternatives. Under all alternatives, over-snow travel is prohibited in the following areas: all winter wildlife closures, Deep Creek ACEC, Thompson Creek ACEC, WSAs, the Hack Lake area, the Haff Portion of Fisher Creek, and the Siloam Springs area. The over-snow travel closures in WSAs support primitive and unconfined recreation opportunities in WSAs. Within ACECs and the other areas they support, non-motorized RSCs protect resource values and reduce conflicts with recreation use.

**Impacts from Air Quality Management.** Under all alternatives, the impacts on travel would be minor and short term along unpaved travel routes (i.e., Class-D roads, single-track routes, mechanized trails) that require road surfacing-related dust abatement measures because travelers could experience some travel delays or rerouting around the affected road sections during dust abatement and maintenance. In addition, impact analysis for air management is deferred pending completion of air quality modeling.

**Impacts from Soils Management.** GS-NSO-14 would be placed on debris flow hazard zone around Glenwood Springs. GS-NSO-15 would prohibit surface occupancy and surface-disturbing activities on slopes greater than 50 percent. Stipulation GS-CSU-4 would require special design measures to new construction on erosive soils and slopes greater than 30 percent. The intentions of the stipulations were to apply the similar measures to other public land activities in order to reduce erosion and maintain soil site stability. Across all alternatives, new route construction would be mitigated by design features to reduce the impact of surface-disturbing activities on soil management and would create the same or similar impacts that would result in restrictions to transportation and access.

**Impacts from Water Resource Management.** GS-NSO-3 for major river corridors would reduce the impact of surface-disturbing activities on watershed areas along the Colorado, Roaring Fork, Crystal, Frying Pan, Eagle, and Piney Rivers. GS-NSO-13 for municipal watershed areas would reduce the impact of surface-disturbing activities on watershed areas south of Rifle and north of New Castle. Across all alternatives, new route construction would be mitigated by design features to reduce the impact of surface-disturbing activities on water management and would create the same or similar impacts that would result in restrictions to transportation and access.

**Impacts from Vegetation—General Management.** Stipulations to reduce the impact of surface-disturbing activities on vegetation would limit the placement or development of new route construction within 500 feet of riparian areas. Across all alternatives, new route construction would be mitigated by design features to reduce the impact of surface-disturbing activities on vegetation management and would create the same or similar impacts that would result in restrictions to transportation and access.

**Impacts from Wildlife Management.** This alternative contains no specific management action or allowable use decisions for aquatic species, except GS-NSO-5, based on a 2-mile radius of the Rifle Falls and Glenwood Springs fish hatcheries to protect the quality and quantity of surface water and underground aquifers, would limit the placement or the development of new route construction. The seasonal big game closures would

BLM_0016875

close access for motorized and mechanized travel for part of the year. Access and travel would be managed so that deer and elk can effectively use the area during winter and other critical periods. Alternative A has the fewest areas and acres closed to motorized recreation activities to protect wintering big game, thus the fewest overall acres closed to motorized activities. Alternative A also has a 15-day longer limitation (December 1 to April 30) than the other alternatives (December 1 to April 15), although under the other alternatives the closure applies to both mechanized and motorized recreation activities.

Under all alternatives, TLs and NSOs would limit the placement or the development of new route construction to protect wildlife species, areas, or habitat. These include NSO, CSU, or TL stipulations for big game birthing areas, for nesting raptors, for waterfowl and shorebird habitat and rookeries, and for waterfowl and shorebird nesting and production areas. The TLs would be a seasonal constraint on OHV use, unless the exception criteria are met.

The winter wildlife closures have a minor impact on winter motorized recreation since these areas have traditionally not been popular winter destinations due to the accumulation of lower amounts of snow, the shorter season of snow cover, the vegetation types, and the proximity of better winter recreation opportunities on the adjacent WRNF. Mechanized activities are not affected by the closures under Alternative A, but mechanized activities are included in the seasonal closure under the other alternatives. The 15-day shorter closure is intended to reduce impacts on mountain biking, since low elevations areas are often free of snow and dry by April 15.

Across all alternatives, new route construction would be mitigated by design features to reduce the impact of surface-disturbing activities on wildlife management and would create the same or similar impacts that would result in restrictions to transportation and access.

**Impacts from Special Status Species Management.** The management of special status species is guided by law, agency direction, policy conservation plans, and the decisions in this plan. The placement or the development of new route construction could be impacted if biological surveys found any special status species in the area of proposed recreation-related developments. Unlike the other alternatives, Alternative A does not contain TLs for special status fish and other aquatic wildlife.

**Impacts from Cultural Resource Management.** Cultural sites could be closed to visitation if it were determined that travel-related activity threatens cultural site integrity. If sites were closed, then travel opportunities could be adversely affected in the short term or long term, depending on MFO decisions to protect a threatened site. Compared to Alternative A, the action alternatives could have more long-term adverse impacts on travel opportunities because access would be reduced to protect cultural resources.

**Impacts from Visual Resource Management.** Management to protect visual resources would restrict new routes or trail plans in areas identified for such development (SRMAs, for example). VRM classifications would affect the location of new transportation systems. Projects would be designed to meet the objectives of the established VRM class for the project area. Most transportation systems would be compatible with VRM Classes III (113,700 acres) and IV (144,200 acres). Transportation actions would be limited in VRM Class I (17,100 acres) and Class II (230,100 acres) areas.

**Impacts from Recreation and Visitor Services Management.** Under Alternative A, the CRVFO would continue to manage eight SRMAs under existing plans and direction. The RMAs would be generally managed

BLM_0016876

for non-motorized recreation activities, as provided for in the 1999 Oil and Gas Leasing and Development ROD and RMP Amendment. The remaining BLM lands would continue to be managed as the CRVFO ERMA, under the direction of the current RMP, and travel management decisions would be made on an interdisciplinary basis.

Recreation-related demands on public lands could increase the need for access. Overall, there would be minimal impacts on transportation and access from recreation management.

A site-specific travel network of roads and trails available for public use and any limitations placed on that use would be included in the land use plan to the extent practical. In some areas, the final travel management network of trails would be determined at the implementation level due to the complexity of the area and incomplete data.

Table 4.3.4-5 shows the area and route designation for each SRMA by alternative.

**Table 4.3.4-5**
**Route Designations for each SRMA by Alternative**

| SRMA | Alternative A—Area Designation and Route Designations | Alternative B—Area Designation and Route Designations | Alternative C—Area Designation and Route Designations | Alternative D—Area Designation and Route Designations |
|---|---|---|---|---|
| Bocco Mountain | **Area Designation** Limited to existing routes on 1400 acres **Route Designations** Moto 13 miles FSV 2.5 miles | **Same as Alternative A** | N/A | **Same as Alternative A** |
| Bull Gulch | **Area Designation** Closed to OHVs 8,300 acres **Route Designations** No designated routes | N/A | N/A | N/A |
| Deep Creek | **Area Designation** Closed to OHVs 2,400 acres **Route Designations** FHO 2 miles | N/A | N/A | N/A |
| Fisher | N/A | N/A | N/A | **Area Designation** Limited to existing routes on 3,300 acres **Route Designations** Mech 10 miles FSV 0.5 miles |
| Gypsum Hills | **Area Designation** Limited to existing routes on 16,900 acres **Route Designations** FHO 0.5 miles Moto 1 mile ATV 1.5 miles FSV 88 miles | N/A | N/A | N/A |

BLM_0016877

**Table 4.3.4-5**
**Route Designations for each SRMA by Alternative**

| SRMA | Alternative A—Area Designation and Route Designations | Alternative B—Area Designation and Route Designations | Alternative C—Area Designation and Route Designations | Alternative D—Area Designation and Route Designations |
|---|---|---|---|---|
| Hack Lake | **Area Designation** Closed to OHVs 3,300 acres **Route Designations** FHO 9 miles FSV 1 mile | **Area Designation** Closed to OHVs 3,700 acres **Route Designations** FHO 10 miles Admin 0.5 miles | N/A | N/A |
| Hardscrabble/East Eagle | N/A | N/A | N/A | **Area Designation** Limited to existing routes on 11,700 acres in RMZ 1 and 5,300 acres in RMZ 2 **Route Designations** **RMZ 1** FHO 1 mile Mech 6 miles Moto 21 miles ATV 4.5 miles FSV 15 miles **RMZ 2** FHO 2.5 mile Mech 56 miles Moto 0.5 miles ATV 1.5 miles FSV 7 miles |
| King Mountain | N/A | **Area Designation** Limited to existing routes on 13,000 acres **Route Designations** FHO 58 miles FSV 1 mile Admin 0.5 miles | N/A | N/A |
| Red Hill | **Area Designation** Closed to OHVs 3,100 acres **Route Designations** FHO 2.5 miles Mech 15 miles | **Same as Alternative A** | **Same as Alternative A** | **Area Designation** Closed to OHVs 3,100 acres **Route Designations** FHO 1 miles Mech 15 miles FSV— .5 miles |

BLM_0016878

**Table 4.3.4-5**
**Route Designations for each SRMA by Alternative**

| SRMA | Alternative A—Area Designation and Route Designations | Alternative B—Area Designation and Route Designations | Alternative C—Area Designation and Route Designations | Alternative D—Area Designation and Route Designations |
|---|---|---|---|---|
| The Crown | N/A | **Area Designation** Limited to existing routes on 2,400 acres in RMZ 1 and 6,700 acres in RMZ 2. **Route Designations** **RMZ 1** ATV 4.5 miles FSV 7.5 miles **RMZ 2** FHO 13.5 miles Mech 43.5 miles FSV 1.5 miles | N/A | **Area Designation** Limited to existing routes on 9,100 acres **Route Designations** FHO 12 miles Mech 54 miles |
| Thompson Creek | **Area Designation** Closed to OHVs 4,300 acres **Route Designations** FSV 2.5 miles | N/A | N/A | **Area Designation** Limited to existing routes on 700 acres in RMZ 1, 4,000 acres in RMZ 2 and 4,800 acres in RMZ 3 **Route Designations** **RMZ 1** FHO 4 miles Mech 10 miles FSV .5 miles **RMZ 2** FHO 3 miles **RMZ 3** FHO 1 miles Mech 1 miles |
| Upper Colorado River | **Area Designation** Limited to existing routes on 20,700 acres **Route Designations** FHO 2.5 miles Mech 8.5 miles Moto 2.5 miles ATV 4 miles FSV 22.5 miles | **Area Designation** Limited to existing routes on 20,700 acres **Route Designations** FHO 6 miles Mech 5 miles Moto 7 miles ATV 4.5 miles FSV 12 miles Admin 7 miles | **Same as Alternative B** | **Area Designation** Limited to existing routes on 20,700 acres **Route Designations** FHO 6 miles Mech 5 miles Moto 7 miles ATV 5 miles FSV 18 miles |

Abbreviations used: foot and horse (pedestrian and equestrian) only (FHO), mechanized (Mech), motorcycle (Moto), all-terrain vehicle (ATV), full-sized vehicle (FSV), administrative (Admin)

**Impacts from Lands and Realty Management.** The travel designations would not affect ROW holders, permitted uses, county or state roads, or other valid existing rights. Travel closures/limitations apply only to public access. To avoid ROWs that could negatively impact the naturalness or remoteness of an area, including renewable energy sites, such as solar, wind, hydro, and biomass development, the BLM could identify the area as a ROW avoidance area or ROW exclusion area. The ROW may not be totally unavailable in an avoidance area but should not be permitted, if possible; ROWs are to be completely prohibited from

BLM_0016879

exclusion areas. Unlike the other alternatives, there are no specific ROW avoidance areas for recreation and visitor services under Alternative A. It is, therefore, likely that ROWs would, over the long term, impact the naturalness or remoteness of many landscapes.

Alternative A identified 594,400 acres as not suitable for disposal through public sale as Category II lands. These lands are considered for disposal on a case-by-case basis through exchange, boundary adjustment, state selection, Recreation and Public Purpose Act purchase, or other appropriate statutory authority, provided such disposal is consistent with management efficiency and effectiveness under multiple use principles for specific areas. When public lands are disposed of, the BLM no longer controls the access or routes. Because it is unknown which lands (if any) might be sold, it is unknown whether those lands would be of high value because of travel management. When the BLM acquires lands, it also acquires new access, route systems, or lands that may accommodate the construction of new route systems.

Land tenure adjustments could benefit the overall management of the transportation and access program. These actions would help to facilitate the location of transportation systems by providing for a more contiguous public land base and encouraging such developments near communities.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The oil and gas development activity is concentrated on the western 22 percent of the CRVFO (the area west of the Grand Hogback), where the high potential for the occurrence of gas resources is found. It is estimated that 99 percent of future drilling will occur in the areas identified as high potential for the occurrence of oil and gas resources. Infill drilling and step out drilling will be the major portion of future activity. Of the 127,335 acres of BLM mineral estate in this high potential area that is not within the Roan Plateau planning area, 95 percent has been leased and is being developed.

Energy development often leads to the improvement of roads. New roads constructed for energy development would normally be gated and would not offer new public access. Energy development often leads to the improvement of existing roads.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Locatable mineral exploration and development on BLM land would be regulated under 43 CFR 3800 under all alternatives. Minerals-related access roads would be constructed under all of the alternatives. New roads constructed for energy development would normally be gated and would not offer new public access.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Across all alternatives, the travel designations for ACECs would influence area OHV designations. Under Alternative A, the Bull Gulch, Deep Creek, and Thompson Creek ACECs are closed to OHV travel (see Chapter 2 Special Designations—Areas of Critical Environmental Concern (ACEC) (Administrative Destinations); OHV travel in the Blue Hill and Glenwood Springs Debris Flow Hazard Zone ACECs is limited to existing/designated routes. A route closure would reduce public access in an area but may not eliminate it completely. An area closure would completely prohibit travel in the entire area.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** There are 27,724 acres of WSAs, which are closed to motorized and mechanized travel but open to pedestrian and equestrian travel. The WSAs are closed to motorized and mechanized travel to preserve wilderness characteristics, in

BLM_0016880

accordance with nonimpairment standards, as defined by the Interim Management Policy (IMP) for Lands under Wilderness Review (BLM 1995; Manual H-8550-1). The long-term adverse impact would be that these areas would remain closed to any future proposal for motorized and mechanized routes. However, pedestrian and equestrian travel would not be affected.

**Impacts from Transportation Facilities Management.** Maintenance and upkeep of BLM roads is critical for travel management. As costs have risen, fewer miles of BLM roads have been maintained each year. The actual miles of roads maintained each year would be based on annual budgets. All alternatives for the CRVFO would emphasize maintaining the majority of BLM system roads at maintenance intensities that may not provide year-round access but are intended to keep the route in use for most of the year. This is sufficient to meet the recreation objectives across all alternatives.

**Impacts from Health and Safety Management.** Under all alternatives, the BLM Field Manager could enact temporary closure or restriction orders to resolve management conflicts and protect persons, property, and public lands and resources (including wintering wildlife) using 43 CFR Subpart 8364 (Closures and Restrictions).

_Alternative B (Preferred Alternative)_
**Impacts from Comprehensive Trails and Travel Management.** Tables 4.3.4-1, 4.3.4-2, 4.3.4-3, and 4.3.4-4 summarize the area and route designations by alternative.

For motorized and mechanized routes with no physical or legal public access, the travel designation of administrative route was assigned. An administrative route is open to pedestrian and equestrian travel. For routes that do not have designated or legal public access, but where the property owner does not prevent trespassing, this action would limit public access. This action would prevent any private landowner from having exclusive motorized or mechanized access to BLM lands.

Over-snow travel is limited to designated routes on King Mountain under all alternatives, in the Glenwood Springs Debris Flow Hazard Zone ACEC under Alternatives B, C, and D, and in the Sheep Creek Uplands ACEC under Alternatives B and C.

Over-snow travel is prohibited in the following areas: all winter wildlife closures, Deep Creek ACEC, Thompson Creek ACEC, WSAs, the Hack Lake area, Fisher Creek (Haff Pasture), and the Siloam Springs area. Alternatives C, B and D, in order, have the most acres closed to over-snow travel.

Compared to Alternative A, Alternative B has 6,700 fewer acres closed to OHVs and 344,600 more acres limited to designated routes. The impacts from not having any open travel designations would be negligible because under all action alternatives direct access for campsites up to 300 feet from designated routes is still allowed, and game retrieval carts are a permitted for direct access to game, provided that no resource damage occurs, no new routes are created, and such access is not otherwise prohibited by the BLM. Public scoping did not identify a need for unlimited cross-country travel. Designated routes were viewed as a benefit since they still allowed for access to BLM lands, while protecting naturalness, scenic, and other important resource values.

Impacts to comprehensive trails and travel management from management of other resources and uses under Alternative B would be the same or similar to those under Alternative A, except as described below.

BLM_0016881

**Impacts from Water Resource Management.** Impacts would be the same as or similar to those under Alternative A, except that stipulations CRV-NSO-5 for streamside management zones would probably affect the placement and development of travel routes. The stipulations would be applied on a case-by-case basis, so the actual impact would be determined at the implementation level.

**Impacts from Wildlife Management.** To reduce big game movement to private lands during the big game hunting season and to increase game hunter success, additional seasonal closures are included under Alternatives B and C. These would include the Dry Rifle Creek area and the West Rifle Creek area. The seasonal closures from October 1 through November 30 would have a minor impact on winter motorized recreation since these areas have traditionally not been popular winter destinations due to the accumulation of lower amounts of snow, the shorter season of snow cover, the vegetation types, and the proximity of better winter recreation opportunities on the adjacent WRNF.

**Impacts from Special Status Species Management.** Alternative B applies CRV-NSO-15 for fish-bearing streams, in addition to CRV-NSO-17 for fish hatcheries. The overall impact would be localized and possibly mitigated through site-specific engineering of any included routes.

**Impacts from Visual Resource Management.** Impacts would be the same as under Alternative A, except that VRM would be managed as follows: Class I—33,600 acres; Class II—249,200 acres; Class III—102,100 acres; and Class IV—120,300 acres. Compared to Alternative A, Alternative B would be more restrictive for travel management.

**Impacts from Recreation and Visitor Services Management.** Under Alternative B, the CRVFO would continue to manage six SRMAs. Table 4.3.4-5 shows the area and route designation for each SRMA by alternative.

Compared to Alternative A, Alternative B would designate less area as closed to OHVs and would designate more routes for pedestrians and equestrians and for mechanized, motorcycle, ATV, and full-sized vehicles, based on SRMAs.

*Alternative C*

Impacts to comprehensive trails and travel management from comprehensive trails and travel management and soils management would be the same as or similar to those under Alternative B. Impacts from management of all other resources and uses would be the same as or similar to those under Alternative A, except as described below.

**Impacts from Wildlife Management.** Impacts would be the same as or similar to those under Alternative B, except Alternative C applies a slightly more constraining NSO stipulation (CRV-NSO-16) for all perennial waters instead of just fish-bearing streams. It also applies a TL (CRV-TL-7) for coldwater sport and native fish, in addition to CRV-NSO-17 for fish hatcheries. In addition, Alternative C is slightly more constraining on route construction surface-disturbing activities due to the amount and extent of NSO stipulations included to protect wildlife and wildlife habitat.

**Impacts from Special Status Species Management.** Impacts would be the same as or similar to those under Alternative B, except an ACEC is included to protect Colorado River cutthroat trout in Abrams Creek

BLM_0016882

southwest of Eagle. Due to the size of the ACEC, it would have only a minor local impact on travel opportunities.

**Impacts from Visual Resource Management.** Same as Alternative A, VRM would be managed as follows: Class I—33,600 acres; Class II—258,100 acres; Class III—97,594 acres; and Class IV—116,000 acres.

Compared to Alternative A, Alternative C would be more restrictive for travel management and the most restrictive of all the action alternatives.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** The travel designations would be particularly influenced by limitations to protect resources for LWCs. Mitigation measures (i.e., NSO, CSU, and TL stipulations) to protect resources or to manage special areas typically include limitations or closures on the types and modes of travel. A route closure would reduce public access in an area but may not eliminate it completely. An area closure would completely prohibit the type or mode of travel in the entire area. Development of routes for mechanized travel would not be permitted on the approximately 47,000 acres of lands managed for wilderness characteristics outside existing WSAs.

**Impacts from Recreation and Visitor Services Management.** Under Alternative C, the CRVFO would manage two SRMAs. Table 4.3.4-5 shows the area and route designation for each SRMA by alternative.

Compared to Alternative A, Alternative C would designate less area as closed to OHVs and would designate the least amount of routes for pedestrians and equestrians and for mechanized, motorcycle, ATV, and full-sized vehicle, based on SRMAs.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Areas closed to OHV travel are the same as under Alternative B, with the addition of the Abrams Creek ACEC. Overall, the area closed to OHV travel is 610 acres fewer.

Areas limited to OHV travel are the same as under Alternative B, with the addition of the Colorado River Seeps, Grand Hogback, Greater Sage-Grouse Habitat, McCoy Fan Delta, Mount Logan Foothills, and The Crown Ridge ACECs.

In addition to the limited designation, there is no net increase in miles of motorized/mechanized routes stipulated in the ACEC prescriptions. The impact of this management action would require the closure of an equivalent length of route in order to construct a new route. This alternative has the most acres affected by the management action prohibiting a net increase in routes

*Alternative D*
Impacts to comprehensive trails and travel management from management of resources and uses would be the same or similar to those under Alternative A, except as described below.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be the same as those under Alternative B, except for motorized and mechanized routes with no physical or legal public access. The travel designation from Alternative A was assigned unless a resource concern was identified, in which case the corresponding route designation was assigned. This action would provide exclusive access to BLM lands on many routes with no public access. Compared to Alternative A, the exclusive use would be further intensified

BLM_0016883

since no area would have an open travel designation, allowing for one private landowner to control right of entry to any routes without legal public access.

Compared to Alternative A, Alternative D has 12,600 fewer acres closed to OHVs and 350,500 more acres limited to designated routes. The impacts from not having any open travel designations would be negligible because under all action alternatives direct access for campsites up to 300 feet from designated routes is still allowed and game retrieval carts are permitted for direct access to game, provided that no resource damage occurs, no new routes are created, and such access is not otherwise prohibited by the BLM Field Manager. Public scoping did not identify a need for unlimited cross-country travel. Designated routes were viewed as a benefit since they still allowed for access to BLM lands, while protecting naturalness, scenic, and other important resource values.

**Impacts from Visual Resource Management.** Impacts would be the same as Alternative A, except the VRM would be managed as 34,000 acres as Class I, 228,300 acres as Class II, 104,600 acres as Class III, and 138,300 acres as Class IV. Compared to Alternative A, Alternative D would be more restrictive for travel management.

**Impacts from Recreation and Visitor Services Management.** Under Alternative D, the CRVFO would manage two SRMAs. Table 4.3.4-5 shows the area and route designation for each SRMA by alternative. Compared to Alternative A, Alternative D would designate less area as closed to OHVs, would designate more routes for pedestrians, equestrians, motorcycles, ATVs, and full-sized vehicles, and would designate the most routes for mechanized vehicles, based on SRMAs.

**Impacts from Areas of Critical Environmental Concern (Administrative Designations) Management.** The area closed to OHV travel is the Bull Gulch ACEC. The area closed to OHV travel is 6,700 fewer acres.

Areas that would have a limited OHV travel designation include the Blue Hill and Glenwood Springs Debris Hazard Zone ACECs.

In addition to the limited designation, there is no net increase in miles of motorized/mechanized routes stipulated in the ACEC prescriptions. The impact of this management action would require the closure of an equivalent length of route in order to construct a new route. This alternative has the fewest acres affected by the management action, prohibiting a net increase in routes.

## Cumulative Impacts

The cumulative impact analysis boundary includes the CRVFO boundary. Cumulative impacts on trails and travel management would occur primarily from actions that facilitate, restrict, or preclude motorized access. Management actions that restrict OHV use would limit the degree of travel opportunities and the ability to access certain portions of the planning area for the public. The continued maintenance of federal and state highways would provide arterial connections to BLM system roads. County-maintained routes that connect federal and state highways to BLM system routes would maintain and improve access to the decision area's resources. Past, present, and reasonably foreseeable future nonfederal actions have affected and will continue to affect travel management within the planning area. These actions, which include urban development patterns, the continuing growth of vehicle-based recreation, planned road and highway projects, and population growth, are expected to increase demand and construction of transportation routes near the

BLM_0016884

CRVFO. Actions that would limit or restrict transportation project design (e.g., VRM designations, land use closures, NSO stipulations) would result in impacts on transportation and access.

The actions and activities considered in this analysis, including land use restrictions for the preservation of sensitive resources, would not result in the inability of BLM to provide public access. The degree of impact would be lowest under Alternative A because of fewer land use restrictions for the protection of sensitive resources. Conversely, the implementation of increased restrictions to protect sensitive resources under Alternative C would result in the greatest level of impact on transportation and access. Alternative B would have slightly less restriction, and therefore slightly greater impact, than Alternative C. Alternative D would have the fewest restrictions.

BLM_0016885

## 4.3.5   Lands and Realty

This section describes potential impacts on lands and realty management actions of other resource programs. Lands and realty management includes land tenure adjustments (sales, exchanges, donations, and acquisitions) and realty actions. Existing conditions concerning lands and realty are described in Section 3.3.5. The discussion of the impacts on lands and realty in each alternative is limited to the impacts on permitted or authorized uses, including restrictions, costs, timeframes to complete lands and realty actions, and issuance or denial of proposals.

Direct impacts on the lands and realty program are anticipated from actions that restrict realty authorizations or from actions that affect the lessee in terms of authorization conditions, such as modification, design, or relocation of a given proposal.

Impacts on lands and realty management would be considered major if either of the following were to occur:

- Substantial reduction in opportunity for realty authorizations and development activities or
- Substantial reduction in the opportunity for realty actions.

Examples of typical Major Category Rights-of-Way projects include a large-kV powerline (115kV or greater), large-diameter pipeline (generally 24 inches or greater), significant surface disturbance, long distance (e.g., interstate), linear feature (e.g., pipeline, transmission line, fiber optic line), and other projects that involve multiple federal jurisdictions, require a land use plan amendment, have a high level of public controversy or concern, impact critical or sensitive resources, cross international borders, or require preparation of an EIS.

### Methods and Assumptions

Analysis of the potential impacts on lands and realty management involved close collaboration among BLM resource specialists to compile information based on expertise and knowledge within the CRVFO. Impact analyses and conclusions are therefore based on the interdisciplinary team knowledge of resources and review of existing literature, as well as information provided by experts in the BLM and other agencies. Existing conditions concerning lands and realty are described in Section 3.3.5. The discussion of the impacts on lands and realty under each alternative is limited to the influences on community expansion opportunities and realty authorizations for other permitted activities. The following discussion addresses whether the effects of other resource actions could influence or modify the location, size, or design of a given proposal or, in some limited cases, preclude a lands and realty action from being approved. These include restrictions, costs, timeframes to complete lands and realty actions, and issuance or denial of proposals.

The term "realty authorizations" includes all types of authorizations to use public land that are included in the lands and realty program. These include rights-of-way, land leases, land use permits, memorandums of understanding, cooperative agreements, reservations to other federal agencies, and license agreements. The term "realty actions" includes all lands and realty activities, such as realty authorizations, land tenure actions, and withdrawals. All alternatives would similarly meet the needs of government agencies and the public for resource protection through public withdrawals, acquisition of conservation easements, and resolution of unauthorized use. Table 4.3.5-1 identifies the indicators that were used to analyze the effects on lands and realty under each alternative.

BLM_0016886

**Table 4.3.5-1**
**Summary of Effects on Lands and Realty**

| Indicator | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Right-of-way avoidance areas | 101,300 | 169,600 | 162,000 | 126,700 |
| Right-of-way exclusion areas | 20,800 | 39,300 | 50,600 | 39,000 |
| Retention areas, subject to land tenure adjustment on a case-by-case basis | 494,400 | 488,400 | 488,700 | 418,300 |
| Areas identified for sale | 11,100 | -- | -- | -- |

Land exchanges are an important tool to consolidate land ownership for more efficient management and to secure important objectives of resource management, enhancement, development, and protection; to meet the needs of communities; to promote multiple-use management; to foster sustainable development and to fulfill other public needs. However, BLM will evaluate and consider the full range of land sale and acquisition tools available to accomplish these objectives prior to proceeding with a land exchange proposal.

Land ownership transfer through purchase, exchange, donation, and sale is an important component of BLM's land management strategy. The Bureau completes ownership transactions involving land and interests in land when such transactions are in the public interest and consistent with publicly approved land use plans. BLM's land tenure program is designed to accomplish the following:

- Improve management of natural resources through consolidation of federal, state and private lands.

- Increase recreational opportunities and preserve open space.

- Secure key property necessary to protect endangered species and promote biological diversity.

- Preserve archaeological and historical resources.

- Implement specific acquisitions authorized by acts of Congress.

- Allow for expansion of communities and consolidation of non-federal land ownership.

The analysis of land tenure impacts under the various alternatives is based on the following assumptions:

- The demand for sale of public land would average about 500 acres per year. This includes direct sale, competitive sale, modified competitive sale, recreation, and public purpose (R&PP) lease, desert land entry (DLE) patent, or exchange. Before any sales, lands would be examined for the presence of high-value resources. Lands containing high surface values would not be sold, or the sale would provide for those values to be preserved. H-2200-1 Land Exchange Handbook discourages split estate, especially in areas where there are minerals. BLM CRVFO Land Exchange Criteria would be used to screen potential land exchanges for possible resource conflicts. Therefore, land sales would not substantially affect other resource programs. Lands identified for sale under Sections 203 and 206 of FLPMA and identified as such in this plan are hereby classified for sale under Section 7 of the Taylor Grazing Act of 1934, as amended (43 USC315f), under Executive Order 6910, and under 43 CFR 2400.

- Existing withdrawals would be retained throughout the life of the plan unless it was determined, through a withdrawal review, that an existing withdrawal would be revoked or modified. The effects of development and designation of transportation and utility ROW corridors would be mitigated on a

BLM_0016887

case-by-case basis. Generally, this would be accomplished by locating future transportation and utility ROWs adjacent to existing facilities (where possible). Designation of the energy corridor in the CRVFO as described in the Programmatic EIS, Designation of Energy Corridors on Federal Land in the 11 Western States (US DOE and BLM 2008), would provide beneficial impacts on the lands and realty program by providing for a preferred location for energy corridors. Designation of the energy corridor could also aid in addressing compatibility issues with other corridors and project planning efforts.

- The effects of development and designation of transportation and utility ROW corridors would be mitigated on a case-by-case basis. Generally, this would be accomplished by locating future transportation and utility ROWs adjacent to existing facilities (where possible). Designated ROW corridors identified on Figures 2-43, 2-44 and 2-45 (for the action alternatives) would have a variable width on either side of the centerline of the existing facilities (see Lands and Realty section, Chapter 2). The corridors would be designated for (1) aboveground and underground power lines, (2) telephone lines, (3) fiber optic lines, (4) pipelines, and (5) other linear-type ROWs. Specific proposals would require site-specific environmental analysis and compliance with established permitting processes. Activities generally excluded from ROW corridors include mineral materials sales, range, and wildlife habitat improvements involving surface disturbance and facility construction, campgrounds and public recreation facilities, and other facilities that would attract public use. ROW facilities would not be placed adjacent to each other if resource conflicts or issues with safety or incompatibility were identified. Designated corridors would vary by total width, number, type, extent, and compatibility of activities. New oil and gas wells would be sited outside these designated ROW corridors. The designated width, allowable uses, and excluded uses would be modified during implementation of the approved RMP.

- Other impacts on the lands and realty program in both the CRVFO could result from closure of BLM land in municipal boundaries to fluid minerals leasing under CRV-CL-5 (22 acres in the CRVFO) (Appendix B).

- Land-tenure adjustments consolidate and reduce fragmented ownership of lands within the planning area, thereby improving management of public lands. Disposing of scattered and isolated parcels reduces management costs and eliminates inefficiencies in the lands and realty program. The impacts on overall management logistics and budgets would be beneficial and would likely occur as long as the ownership does not change further. Land sales may benefit ongoing development of private lands by making additional lands available. The term "private" in this context refers to all non-public lands, which includes allowing towns and cities to locate or expand infrastructure on public lands.

- Recommending the withdrawal and closure of areas to locatable mineral exploration and development could have impacts on the lands and realty program. The magnitude of these impacts would depend on the number of acres withdrawn or closed to mineral exploration and development (Table 2-1, Comparative Summary of Resource Uses and Special Designations by Alternative). Withdrawing or closing these areas to locatable minerals development would result in long-term beneficial impacts on the lands and realty program by reducing requests for realty authorizations to build roads and other infrastructure associated with mineral exploration and development. However, the withdrawal or closure of these areas may induce and concentrate realty requests in other parts of the planning area that are open to locatable mineral exploration and development.

- Encouraging the collocation of communication sites and realty authorizations in the CRVFO along preferred and existing routes would likely result in beneficial impacts on the lands and realty program

BLM_0016888

by allowing applicants to understand where such uses are desired. This may result in fewer proposals being submitted that are ultimately denied, which could decrease processing costs and speed up timeframes required to complete realty authorizations. Collocating communication sites and realty authorizations could also result in beneficial impacts by reducing land use authorizations that would be required to construct roads and other infrastructure needed to access more distributed sites. However, prioritizing the collocation of realty authorizations and corridors in existing locations could increase the amount of pipeline or other linear infrastructure needed to reach the source or destination. This could result in long-term adverse impacts on the lands and realty program by requiring land use authorizations for more area, which would likely reduce the availability of land for future authorizations. Realty authorization facilities would not be placed adjacent to each other if resource conflicts or issues with safety or incompatibility were identified.

- A total of 419,700 acres in the CRVFO would be retained for long-term management.

- Consolidation of public lands and elimination of scattered parcels of public land that lack access and are difficult to manage are beneficial to the BLM and the public.

- Sale of small isolated parcels of public land would decrease the cost of public land administration to enhance efficiency in management of the remaining public lands. In addition, the sale of these small parcels would decrease conflicts between public land users and private landowners.

- Lands and interests in lands could be acquired from willing landowners by purchase, exchange, or donation.

- Non-federal land, interests in land (including access and conservation easements), and water rights would be considered for acquisition when they are within administratively designated areas or contain important resources (e.g., WSAs, ACECs, critical habitat, lands supporting listed species, riparian-wetland areas).

- The demand for communication sites and ROW corridors would increase within the life of this plan.

- The demand for utility infrastructure on public lands is likely to increase in the future.

- Existing ROWs may be modified at any time with an amendment or on renewal, if it were shown such action meets the objectives of the RMP.

- In terms of major utility lines, companies would focus first on the maintenance and upgrading of lines before undertaking new construction of major utility lines within the planning area.

- Trespass issues on public lands would continue to be a high priority to resolve.

Legislative proposals, as actions and decisions made by Congress, are not decisions within BLM's management of land sale and acquisition, and that is why they are not addressed. Special legislation is sometimes enacted to provide supplemental exchange authority that may prescribe certain aspects of the exchange process, allow for transactions not authorized under FLPMA (e.g., interstate exchange), or simply direct that an exchange transaction(s) be completed. Typically, there are no codified regulations covering transactions that are legislated in this manner.

Legislated exchanges vary widely as to the degree that Congress has specified what will be exchanged, whether NEPA analysis will be conducted, whether appraisals will be undertaken, etc. and must therefore be approached individually. In many instances, land exchange legislation contains direction to complete transactions within a relatively short timeframe. To avoid conflict with these Congressional directives for

BLM_0016889

completing transactions, the BLM Washington Office does not normally issue specific policy and guidance outlining the steps to be taken to process individual legislative land exchanges. However, State Directors may request specific guidance, as needed. It is also advisable to consult with your Regional Solicitor regarding whether or not "standard" processing actions (such as NEPA) do or do not apply in exchanges authorized by legislation.

- Within the CRVFO area, a substantial portion of lands and realty actions are related to the intensive oil and gas development in recent years. Under 43 CFR 2881.2 concerning the Minerals Leasing Act of 1920, as amended (30 USC185), it is BLM's objective to grant rights-of-way under the regulations in this part to any qualified individual, business, or government entity and to direct and control the use of rights-of-way on public lands in a manner that does the following:

  o Protects the natural resources associated with federal lands and adjacent lands, whether private or administered by a government entity.

  o Prevents unnecessary or undue degradation to public lands.

  o Promotes the use of rights-of-way in common considering engineering and technological compatibility, national security, and land use plans.

  o Coordinates, to the fullest extent possible, all BLM actions under the regulations in this part with state and local governments, interested individuals, and appropriate quasi-public entities.

- Management of cultural resources would influence the timing, location, size, and coloration of, but would rarely preclude the development or completion of, lands and realty actions. In most cases, facilities would be relocated to avoid disturbance to intact, buried cultural resources. In areas where the integrity of the setting contributes to NRHP eligibility, proposals resulting in visual elements that diminish the integrity of a property's setting would be redesigned according to applicable requirements.

- "Withdrawals are formal lands actions that set aside, withhold, or reserve federal land by statute or administrative order for public purposes. A withdrawal creates a title encumbrance on the land. Withdrawals are established for a wide variety of purposes, e.g., power site reserves, military reservations, administrative sites, recreation sites, national parks, reclamation projects, wilderness areas, etc. Withdrawals are most often used to preserve sensitive environmental values and major federal investments in facilities or other improvements, to support national security, and to provide for public health and safety." Existing withdrawals that close areas to operation of the public land laws would restrict the location or possibly preclude the placement of lands and realty actions. The review of withdrawals would determine whether the withdrawals are serving or are needed for their intended purpose. Withdrawals that are revoked or modified would then open public land to the operations of the public land laws and locatable mineral entry, which would open more public land for different types of actions and create more flexibility for placement of projects.

- Land acquisitions would mainly be achieved through exchange. This would provide more flexibility and opportunity to site facilities or other lands and realty actions as well as improve the management of the public lands and their resources.

- Management actions associated with fish and wildlife, special status species, water resources, soils, mineral resources associated with WSAs, and the creation of additional ACECs would have negative

BLM_0016890

impacts on the lands and realty program, which are exclusion areas (resulting in less land available for realty authorizations).

- Avoidance areas, requiring resource inventories, surveys, and analysis before any ground disturbance occurs, could in some cases result in the relocation of realty authorizations, communication sites, and renewable energy facilities authorized under the lands and realty program, which would likely increase project costs and result in project delays.

- Other impacts on the lands and realty program in the CRVFO could result from closure of BLM land in municipal boundaries to fluid minerals leasing under CRV-CL-5 (22 acres in the CRVFO) (Appendix B).

- Land tenure adjustments consolidate and reduce fragmented ownership of lands within the planning area, thereby improving management of public lands. Disposing of scattered and isolated parcels reduces management costs and eliminates inefficiencies in the lands and realty program. The impacts on overall management logistics and budgets would be beneficial and would likely occur as long as the ownership does not change further. Land sales may benefit ongoing development of private lands by making additional lands available.

- Recommending the withdrawal and closure of areas to locatable mineral exploration and development could have impacts on the lands and realty program. The magnitude of these impacts would depend on the number of acres withdrawn or closed to mineral exploration and development (Table 2-1, Comparative Summary of Resource Uses and Special Designations by Alternative). Withdrawing or closing these areas to locatable minerals development would result in long-term beneficial impacts on the lands and realty program by reducing requests for realty authorizations and other land use authorizations in and around these areas to build roads and other infrastructure associated with mineral exploration and development. However, the withdrawal or closure of these areas may induce and concentrate realty requests in other parts of the planning area open to locatable mineral exploration and development.

A right-of-way grant pursuant to either the Mineral Leasing Act (in relation to oil and gas) or FLPMA (in relation to produced water and access roads) is required whenever an oil and gas operator uses federal lands to access or convey private fluid minerals or federal fluid minerals associated with a different federal parcel than the one being crossed. Granting of rights-of-way or temporary use permits for construction and use of access roads, well pads, pipelines, and other facilities related to fluid minerals development includes attachment of stipulations associated with the federal mineral estate being accessed, stipulations associated with the federal mineral estate underlying the federal land being crossed, or discretionary actions authorized under the current RMP. An example of a discretionary action is the issuance by BLM of right-of-way grants on lands under its jurisdiction, except when:

(1) A statute, regulation, or public land order specifically excludes rights-of-way.

(2) The lands are specifically segregated or withdrawn from right-of-way uses.

(3) BLM identifies areas in its land use plans or in the analysis of an application as inappropriate for right-of-way uses.

BLM may require common use of a right-of-way and may require, to the extent practical, location of new rights-of-way within existing or designated right-of-way corridors (43 CFR 2802.11). Safety and other

BLM_0016891

considerations may limit the extent to which parties may share a right-of-way. BLM will designate right-of-way corridors through land use plan decisions.

A right-of-way grant or temporary use permit is not required for use of federal surface lands related to access, production, and conveyance of fluid minerals and associated produced water in the lease underlying that surface, or a combination of leases joined together into a communitization agreement.

A pipeline on BLM-administered lands (or on lands administered by two or more federal agencies), located downstream of the "custody transfer point" either on or off a lease, also requires a right-of-way from the BLM. (Refer to 43 CFR 2800, April 22, 2005; The Gold Book 2007)

### Environmental Consequences

Impacts on lands and realty would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on lands and realty under any of the four alternatives. Impacts to lands and realty from livestock grazing would be similar to those across all alternatives.

### Alternative A

**Impacts from Lands and Realty Management.** Under Alternative A, designating specified locations for communication sites in the CRVFO could result in adverse impacts by creating dead zones or delaying the availability of communication sites. Specified locations could also require communication sites to be located in less desirable locations or areas with more restrictions on accessibility or construction. However, designating locations previously disturbed would benefit other resources by reducing surface-disturbing activities. Table 4.3.5-2 presents acres allocated to lands and realty management in the CRVFO.

**Table 4.3.5-2**
**CRVFO Lands and Realty Management – Alternative A**

| Indicator | Alternative A |
|---|---|
| Right-of-way avoidance areas | 101,300 |
| Right-of-way exclusion areas | 20,800 |
| Retention areas subject to land tenure adjustment on a case-by-case basis | 494,400 |
| Areas identified for sale | 11,100 |

Managing 11,100 acres of BLM land as Category I land available for sale would likely benefit the lands and realty program by providing for a clear identification of lands available for sale. Lands designated as available for sale could improve efficiencies in the land tenure adjustment process and reduce the potential for land tenure adjustment proposals for lands not available for sale. Managing 62,800 acres of land as cooperative management areas would result in beneficial impacts by allowing the lands and realty program to work with other government agencies in making land use adjustment decisions that would best benefit management objectives and public needs. Overall, designating lands available for sale and as cooperative management areas would provide for beneficial impacts on the lands and realty program by providing opportunities for land tenure adjustments that would increase management efficiency, improve public access, and increase public and natural resource benefits.

BLM_0016892

In the CRVFO, a total of 494,400 acres of BLM land not suitable for sale through public sale would be managed as Category II lands (managed under multiple use principals). This categorization would slightly constrain the ability of the lands and realty program to sell these lands even to improve management and resource conditions. However, these lands would still be available for sale on a case-by-case basis through exchange, boundary adjustment, state selection, Recreation and Public Purpose Act purchase, or other appropriate statutory authority. This would still allow the lands and realty program the opportunity to make land tenure adjustments that would improve overall management objectives for BLM land.

Sales, acquisitions, or exchanges—depending on the situation—would have adverse or beneficial impacts on various resources.

**Impacts from Soils Management.** Implementing appropriate stipulations to minimize detrimental effects from ground-disturbing activities to maintain or enhance soils would help to reduce soil erosion, surface runoff, sedimentation in streams, and stream channel characteristics. These stipulations may impact the size, location, design, or relocation of realty authorizations.

Approximately 101,400 acres of CRVFO lands are identified as 50 percent or steeper slope or greater. Stipulation GS-NSO-15 could impact realty authorizations related to communication sites and other realty authorizations on slopes 50 percent or greater. Communication sites require high elevation/peak type terrain to allow communication signals free of mountainous obstructions. Most often, roads to access these peaks would require road construction or reconstruction on steeps greater than 50 percent; as a result, there may be "dead zones," lacking communication signals, in pockets throughout the resource area.

**Impacts from Water Resources Management.** Implementing appropriate stipulations to minimize detrimental effects that ground-disturbing activities could have on soils and to maintain or enhance riparian areas would help to reduce soil erosion, surface runoff, sedimentation in streams, and stream channel characteristics. These stipulations may impact the size, location, design, or relocation of realty authorizations. Impacts would be similar across all alternatives.

**Impacts from Vegetation Management.** Implementing appropriate stipulations to minimize detrimental effects that ground-disturbing activities could cause to riparian and wetland zones, and to maintain or enhance riparian areas, would help to reduce riparian vegetation or decline in condition.

Impacts resulting from realty authorizations would be held responsible for monitoring and controlling noxious weeds resulting from new facilities, improvements, or other surface-disturbing activities. These stipulations may impact the size, location, design, or relocation of realty authorizations. Impacts would be similar across all alternatives.

**Impacts from Fish and Wildlife Management.** Proposed decisions for fish and wildlife could restrict some realty authorizations by location or season. In order to avoid or reduce habitat fragmentation, realty applicants would be encouraged (or even required, in some locations) to collocate facilities.

Seasonal or spatial restrictions for wintering game species could delay construction of new realty actions or reconstruction of existing grants. Prohibiting surface-disturbing activities from December 1 through April 30 could make it difficult to complete some projects. In addition, prohibiting surface-disturbing activities to protect big game birthing areas (GS-TL-2) from March 16 through July 15 adds 2.5 months of seasonal

BLM_0016893

restrictions, limiting the time available to complete activities. Another example of seasonal restriction is 22,400 acres prohibiting surface occupancy and surface-disturbing activities from February 1 to August 15 (GS-TL-4) within a 0.25-mile radius of a raptor nest site, including golden eagles, all accipiters, buteos, falcons (except kestrels), and owls.

Descriptions of Alternatives A, B, C, and D as ROW avoidance or exclusion areas would prevent the lands and realty program from issuing realty authorizations, unless a specific case review were to find a justifiable need to authorize a ROW in an avoidance area.

**Impacts from Special Status Species Management.** The goals of special status species management are to protect or improve habitats to a point where their special status recognition is no longer warranted and to take necessary actions by implementing actions and protections that assist in their recovery.

Stipulations (including exclusion areas) to protect special status species could restrict the placement and design of certain realty authorizations and could also preclude issuance of some realty authorizations. The presence of special status species may preclude the issuance of some realty authorizations and place restrictions on others (such as timing restrictions on construction or other ground-disturbing activities, or siting restrictions to avoid habitat areas).

Lands and realty authorizations would be excluded in descriptions of Alternatives A, B, C, and D, where occupied special status species or habitat exists.

Land tenure adjustments would be affected by the management decision to generally retain all habitats for federally listed and candidate species in federal ownership.

**Impacts from Cultural Resource Management.** Management actions to protect cultural resources would affect relatively small, localized areas and would not have a measurable impact on lands and realty action. In some cases evaluating, mitigating, and protecting cultural resources would result in a modification or relocation of realty authorizations. Construction costs could be higher due to the realignment necessary to avoid sites. This alternative contains the least amount of restrictive stipulations.

**Impacts from Visual Resource Management.** New realty authorizations would be required to meet VRM class objectives. VRM Class I and II areas would be aimed at greater retention of existing landscape character than would VRM Class III and IV areas. The class designation could affect realty authorization design by requiring that proposed projects meet VRM class criteria and could affect associated costs on new or amended realty authorizations.

New or amended realty authorizations for the Interstate-70 viewshed (GS-NSO-18) would prohibit surface occupancy and surface-disturbing activities on slopes over 30 percent with high visual sensitivity within 5 miles of the Interstate-70 viewshed. Towns and cities (Eagle, Wolcott, Gypsum, Glenwood Springs, New Castle, Silt, Rifle, and Parachute) in need of infrastructure expansion could be negatively affected and would be required to accomplish additional surveys and designs to meet the exception criteria.

This alternative would be the least restrictive to realty authorization and actions, with 17,100 acres designated as VRM Class I.

BLM_0016894

**Impacts from Wildland Fire Management.** Management actions to meet wildland fire management objectives would have direct and indirect impacts on the lands and realty program by giving first priority protection to life and property. Protection of WUIs is considered critical infrastructure (such as communication sites housing 911 emergency systems). Reducing fuel loading where buried or aerial utility grids and sites exist has a positive effect on the lands and realty program.

**Impacts from Recreation and Visitor Services Management.** Management actions to improve recreational opportunities would have direct and indirect impacts on lands and realty. This alternative designates the most SRMAs (eight) and is the only alternative designating six RMAs, totaling approximately 121,100 acres. In most cases, these designations increase and support a certain type of recreational experience. Impacts would be greatest where the SRMAs and RMAs are close to communities and are more heavily used. Recreation activities indirectly impact lands and realty operations through human disturbance, vandalism to realty authorizations, and expansion or modification of utility infrastructure (such as power lines and communication sites). The NSO associated with protecting special recreational experiences would impact the placement and design of realty authorizations. Indirect impacts occur when recreational groups utilize administrative access for authorized realty infrastructure or vandalize facilities that interfere with recreational opportunities. In some cases, these interest groups could impact decisions on lands and realty.

This alternative is more restrictive than under Alternatives B, C, and D.

**Impacts from Comprehensive Trails and Travel Management.** Resource management decisions to prohibit motorized/mechanized travel off designated routes in limited and closed areas would still provide for administrative access for authorized land uses or valid existing rights, subject to the terms attached to the authorized use or right. For instance, access to authorized communication sites to conduct maintenance would still be allowed or access to an existing ditch to conduct maintenance would still be allowed.

Travel management actions would maintain the most acres (294,300) as open to overland travel and the fewest acres (38,000) as limited to existing routes. This allows for the greatest area of possible disturbance of all alternatives. Many realty authorizations are linear by nature, and in most cases would have minor to no conflicts with existing roads or trails.

**Impacts from Energy and Minerals Management.** Under Alternative A, BLM would continue to manage (through application of oils and gas lease stipulations or discretionary right-of-way stipulations) the exploration, production, and conveyance of oil and gas and associated produced water. The level of protection under current management would be somewhat lower than the other alternatives, with a total of 679,200 acres being open to fluid minerals leasing and development. However, the actual difference between this alternative and the others is lessened by the fact that most of the area with high potential for oil and gas resources has already been leased. In addition, closing to fluid mineral leasing would not apply to development of private minerals that does not involve use of federal surface lands.

**Impacts from Special Designations (ACEC, WSA, WSR) Management.** Management actions designate six ACECs, for a total of 27,030 acres. These areas are managed to protect their relevant and important values. This alternative manages for less area of ACECs than under Alternatives B and C.

Four WSAs including a total of 27,700 acres are included under all of the alternatives. These areas are managed to preserve their wilderness characteristics under the interim management policy until Congress

BLM_0016895

either designates these lands as wilderness or releases them for other purposes. If released, these areas would continue to be managed for their recreational opportunities.

There are 26 segments of river or streams managed as eligible for wild and scenic designation. Interim management would preserve the free-flowing nature and ORVs for these segments.

All of these special designation areas are identified as realty authorization exclusion areas. This could affect realty authorization needs from private inholdings or adjacent private landowners for linear infrastructure, such as pre-FLPMA ditch improvements, access, or utility grid requests.

Descriptions of Alternatives A, B, C, and D as ROW avoidance or exclusion areas would prevent the lands and realty program from issuing realty authorizations unless a specific case review were to find a justifiable need to authorize a ROW in an avoidance area.

### Alternative B (Preferred Alternative)
**Impacts from Lands and Realty Management.** Generally, impacts would be similar to those under Alternative A, except that 169,600 acres would be identified as lands and realty avoidance areas and 39,300 acres as lands and realty exclusion areas. Avoidance areas may be available for land use authorizations with special stipulations or exception criteria. Exclusion areas are not available for location of land use authorizations under any conditions. The benefit of excluding realty authorizations would be the continuance of the natural landscape and values.

Areas of realty avoidance could impose design and siting requirements and increase associated costs on new authorizations or amended or renewed authorizations at existing sites. Such requirements may restrict placement and would likely limit future access or delay availability of services.

Four WSAs (27,700 acres) and five of the nine ACECs (19,900 acres) would exclude realty authorizations. These designations could affect realty authorizations for inholdings and adjacent private landowners (who need access or linear distribution utility service), and cross-country utility grid needs.

Not permitting the placement of memorial monuments on BLM lands under the lands and realty program would eliminate any review or processing time for these types of requests.

The same utility corridors designated under Alternative A would also be designated under this alternative, resulting in the same impacts.

Encouraging the collocation of communication sites and realty authorizations in the CRVFO along preferred and existing routes would likely result in beneficial impacts on the lands and realty program by allowing applicants to understand where such uses are desired.

Long-term retention of 488,400 acres of BLM land in the CRVFO would benefit areas considered highly desirable for public ownership. One benefit to the lands and realty program would be the availability of a more straightforward decisionmaking process for consideration of these land tenure proposals. Another benefit would be keeping valuable resources, such as heritage areas, key wildlife areas, major river frontage, perennial stream corridors, key access points, and lands with high mineral potential, in federal ownership.

BLM_0016896

There are exception criteria that the lands and realty program would consider for land tenure proposals with special circumstances that, if disposed of, would benefit the public.

Alternative A describes sale parcels, while this alternative would list criteria for the land tenure program. While Alternative A makes it clear which parcel is available for sale (though other parcels throughout the CRVFO are available for exchange through a case-by-case basis), this alternative better meets BLM's management objectives of multiple uses by applying resource goals and objectives to enhance the land tenure program.

**Impacts from Soils Management.** Impacts would be similar to those under Alternative A. However, under Alternative B the new allowable use formally designates NSO areas with slopes greater than 50 percent as ROW avoidance areas. For CRVFO, the debris flow hazard NSO areas are also formally designated as ROW avoidance areas. The implementation of this allowable use would be an increase in protection over the current allowable use by minimizing impacts from erosion during ground-disturbing activities. Management actions for resources or resource uses that restrict surface disturbances help protect soil erosion. Construction costs could be higher due to the realignment. Realty authorizations could be required to protect soil resources in conjunction with a land use authorization request, resulting in extended timeframes for approval.

**Impacts from Water Resources Management.** Impacts would be similar to those under Alternative A, although under Alternatives B, C, and D, more descriptive measures would be taken to improve the quantity and quality of the streamside management (CRV-NSO-5) to prohibit surface occupancy and surface-disturbing activities. This could impact issuing, relocating, or denying realty authorizations on pre-FLPMA ditches and pipelines. Construction costs could be higher due to the realignment. Realty authorizations could be required to protect water resources in conjunction with a land use authorization request, resulting in extended timeframes for approval.

**Impacts from Vegetation Management.** Impacts would be similar to Alternative A, although under Alternatives B, C, and D more descriptive measures would be taken to improve the quantity and quality of the vegetation resource. Under Alternatives B, C, and D, within 500 feet of riparian or wetland vegetation, surface-disturbing activities might require special design, construction, and implementation measures, including relocation of operations beyond 200 meters (656 feet).

Under all alternatives, project proponents would be held responsible for monitoring and controlling noxious weeds that result from any new facilities, improvements or other surface disturbances authorized on BLM land (e.g., roads, communication sites, pipelines). This could increase the cost of the project.

**Impacts from Fish and Wildlife Management.** Impacts would be similar to those under Alternative A, although under Alternatives B, C, and D more restrictive measures would be taken to improve the quantity and quality of the fish and aquatic resource. Management actions to enhance fish and aquatic habitat could affect the lands and realty program by improving fish and wildlife conditions. However, stipulations to protect fish and wildlife resources have more restrictions on surface-disturbing activities and could restrict the placement and design of certain realty authorizations. Such stipulations could even preclude them. The level of protection under Alternatives B and C is similar and the most restrictive to the lands and realty program. In some cases, the season of construction or use would be adjusted. Generally, impacts on the lands and realty program would be minimal because fish habitats are not typically areas in which demand for realty authorizations is high. However, impacts from wildlife management for protection of core wildlife areas (e.g.,

BLM_0016897

big game severe winter range, winter concentration areas) to the lands and realty program would be greater. Core wildlife areas, including areas of the highest value/top-ranked wildlife habitat (by the BLM and CDOW) for multiple species, would have a higher impact because of the urban interface intermixed and surrounded by public lands.

Descriptions of Alternatives A, B, C, and D as lands and realty avoidance would prevent the lands and realty program from issuing realty authorizations, unless a specific case review were to find a justifiable need to authorize a ROW in an avoidance area. The exclusion areas would exclude realty authorizations.

**Impacts from Special Status Species Management.** Impacts would be similar to those described under Alternative A, except that Alternative B has more restrictions on surface-disturbing activities in plant habitat, including fluid minerals leasing subject to major constraints. However, stipulations to special status species could restrict the placement and design of most lands and realty projects. The level of protection under Alternatives B and C are similar, and are the most restrictive to lands and realty management. Under this alternative, three ACECs would be created to help protect special status species (Penstemon harringtonii) and would exclude realty authorizations. In addition, current and historic habitat for threatened, endangered, proposed, and candidate special status species would have a surface-disturbing buffer (100 to 800 meters, depending on the special status) that precludes realty authorizations in areas outside the ACECs.

If lands are available for acquisition to facilitate the conservation or recovery of special status species, they would be a high priority.

**Impacts from Cultural Resource Management.** Management actions to protect cultural resources would affect relatively small, localized areas and would not have a measurable impact on the lands and realty program. In some cases evaluating, mitigating, and protecting cultural resources would result in a modification or relocation of realty authorizations; for example, surface occupancy and surface-disturbing activities would be prohibited within 200 meters of historic properties. The processing time could be increased with more consultation with Native American tribes than currently exists. Construction costs could be higher due to the realignment. Impacts would be similar across all alternatives.

**Impacts from Visual Resource Management.** New realty authorizations would be required to meet VRM class objectives. VRM Class I and Class II areas would be aimed at greater retention of existing landscape character than would VRM Class III and IV areas. The class designation could affect realty authorization design and location, as this goal requires that all new disturbances be within existing realty authorization footprints or within 200 meters of existing disturbances to maintain overall scenic quality in utility corridors and in high-sensitivity transportation corridors. New realty authorizations would be required to meet VRM class objectives. VRM Class I and Class II areas would be aimed at greater retention of existing landscape character than would VRM Class III and IV areas. The class designation could affect realty authorization design or prohibit the construction of some realty authorizations, such as roads, pipelines and water storage tanks, and other infrastructure (including utility expansion). This alternative would be more restrictive to the lands and realty program than under Alternatives A and D, with 33,600 acres as Class I and 249,200 acres as Class II.

New or amended realty authorizations for the Interstate-70 viewshed (CRV-NSO-18) would prohibit surface occupancy and surface-disturbing activities on slopes over 30 percent with high visual sensitivity within 5 miles of Interstate-70 viewshed. Towns and cities (Eagle, Wolcott, Gypsum, Glenwood Springs, New Castle,

BLM_0016898

Silt, Rifle, and Parachute) in need of infrastructure expansion could be negatively affected and be required to submit additional surveys and designs to meet the exception criteria.

**Impacts from Wildland Fire Management.** Impacts from wildland fire management would be the same as or similar to those under Alternative A for all alternatives.

**Impacts from Recreation and Visitor Services Management.** Management actions to improve recreational opportunities would have indirect impacts on the lands and realty program. This alternative designates six SRMAs, totaling approximately 51,000 acres. In most cases, these designations increase and support a certain type of recreational experience. Impacts would be greatest where the SRMAs are located close to communities and are more heavily used. For example, this alternative would maintain fewer SRMAs than under Alternative A but the creation of The Crown SRMA would close motorized routes and add new mountain bike trails, as the area would be managed for that type of experience. This would make the area more attractive to mountain bikers, who are numerous in the local communities, and would increase the amount of use in the area. This could limit the opportunities for realty authorizations if the connected activity required cross-country travel (unless administrative access was granted for such purposes). The exception to this stipulation would be proposals by the BLM that would, by their nature, benefit the recreation resource, such as the installations of telephones for safety and power lines for convenience. Although SRMAs have exclusions from realty authorizations, requests for realty actions are low, and therefore, impacts would be minor on the lands and realty program.

**Impacts from Comprehensive Trails and Travel Management.** Under this alternative, all travel would be limited to designated routes, which would impact 467,600 acres, while 37,300 acres would be closed to motorized use. Table 4.3.5-3 summarizes the classification of the 1,460 miles of designated routes.

**Table 4.3.5-3**
**Travel Classification for Designated Routes within the CRVFO Planning Area – Alternative B**

| Full-sized Vehicle | ATV | Motorcycle | Mechanized | Pedestrian/ Equestrian | Pedestrian | Obliterate | Seasonal Closure |
|---|---|---|---|---|---|---|---|
| 470 miles | 62 miles | 66 miles | 220 miles | 420 miles | 2 miles | 70 miles | 8 miles |

The types of impacts that would be experienced as a result of travel management would be similar to those under Alternative A. However, realty lessees (holders) would continue to maintain access to their realty authorizations for maintenance and administration. Existing routes without public access would be closed to motorized travel and open only to pedestrian and equestrian use. This could cause negative impacts on realty authorizations (i.e., motorized use on administrative roads or vandalism to facilities), due to more open roads and trails, and may tempt unauthorized travelers to explore roads open only for administration (permittees and lessees), which could negatively impact resources.

**Impacts from Energy and Minerals Management.** Impacts from management actions for energy and mineral development under Alternative B would be similar to those under Alternative A. Although a slightly smaller area would be available for future leasing and development (651,400 acres), the actual difference compared to Alternative A would be lessened because most of the area with high potential for oil and gas resources has already been leased. In addition, closing to fluid mineral leasing would not apply to development of private minerals that does not involve use of federal surface lands.

BLM_0016899

**Impacts from Special Designations (ACEC, WSA, WSR) Management.** Management actions would designate nine ACECs, for a total of 34,500 acres. These areas would be managed to protect their relevant and important values. This alternative would manage for more ACECs than under Alternatives A and D. The additional acres could slightly affect the lands and realty program. All ACECs would be retained for long-term management unless the lands meet the exception criteria in the impacts for lands and realty section under Alternative B. This benefits lands and realty management by giving a clear understanding of lands available for sale when proposals are presented.

There are four WSAs, for a total of 27,700 acres, across all alternatives. These areas would be managed to preserve their wilderness characteristics under the interim management policy until Congress either designates these lands as wilderness or releases them for other purposes. If released, these areas would continue to be managed for their recreational opportunities. Typically, these areas are undisturbed, where land use authorizations would not be needed, so the impact would be minor. WSAs would also be retained for long-term management.

There would be four eligible segments of rivers or streams designated as suitable as wild and scenic. These segments would be managed to preserve the free-flowing nature and ORVs associated with the designation. One segment would be managed as wild, while the other three would be managed as scenic or recreational. This alternative would manage fewer river and stream segments as wild and scenic than under Alternatives A and C. There would be the possibility of denying some land use authorizations that could not avoid these areas. Construction costs could be higher due to the realignment.

Four WSAs (27,700 acres) and five of the nine ACECs (19,900 acres) would exclude realty authorizations. These designations could affect realty authorizations for inholdings and adjacent private landowners (who need access or linear distribution utility service) and cross-country utility grid needs. A total of 39,300 acres would be designated as realty exclusion acres.

All WSAs would be closed to fluid minerals leasing.

## *Alternative C*
Impacts to lands and realty from soils management and renewable energy management would be the same or similar to those under Alternative B, except that 47,000 acres of lands with wilderness characteristics (LWCs) would be managed to protect their wilderness values. Impacts from management of other resources, resources uses, and special designations would be as described below.

**Impacts from Lands and Realty Management.** Generally, impacts would be similar to those under Alternative B, except the exclusion and avoidance acres would be slightly higher. Certain areas could impose design and siting requirements, and increase associated costs on new authorizations or amended or renewed authorizations at existing sites. Such requirements may restrict placement and would likely limit future access or delay availability of services.

Long-term retention of 488,700 acres of BLM land in the CRVFO would benefit the CRVFO, as these areas are highly desirable to keep in public ownership. The benefit to the lands and realty program would be the availability of a more straightforward decision-making process for consideration of these land tenure proposals, and keeping valuable resources in federal ownership, such as heritage areas, key wildlife areas, major river frontage, perennial stream corridors, key access points, and lands with high mineral potential.

BLM_0016900

There are exception criteria that the lands and realty program could consider for land tenure proposals with special circumstances that if disposed of would benefit the public.

Memorials would not be allowed on BLM lands, and no cooperation would occur with the public for alternative and creative memorial options.

**Impacts from Water Resources Management.** Impacts would be similar to those under Alternative A, although under Alternatives B, C, and D more descriptive measures would be taken to improve the quantity and quality of streamside management, and perennial waters to prohibit surface occupancy and surface-disturbing activities. This could impact issuing, modifying, relocating, or denying realty authorizations to protect water quality and aquatic values and to prevent channel degradation.

In addition, in-channel restoration or enhancement work designed to improve stream habitat conditions, riparian plantings, temporary disturbances of less than 0.1 acre, actions would require a 404 Permit from the US Army Corps of Engineers, with subsequent mitigation, and in areas where slope is less than 15 percent and BMPs are implemented.

**Impacts from Vegetation Management.** Impacts would be similar to those under Alternative A, although under Alternatives B, C, and D more descriptive measures would be taken to improve the quantity and quality of the vegetation resource.

**Impacts from Fish and Wildlife Management.** Impacts would be similar to Alternative B, although there would be about 20 percent more fish-bearing streams in which surface-disturbing activities would be prohibited under Alternative C, and more descriptive measures would be taken to improve the quantity and quality of the fish and wildlife resource.

Descriptions of Alternatives A, B, C, and D as lands and realty avoidance areas would prevent the lands and realty program from issuing realty authorizations, unless a specific case review were to find a justifiable need to authorize a ROW in an avoidance area.

**Impacts from Special Status Species Management.** Impacts would be similar to those described under Alternative B, except that seven ACECs would be created to help protect special status species.

**Impacts from Visual Resource Management.** Impacts would be similar to those under Alternative B, except for a slightly higher area under VRM Class II (258,100 acres, about 8,900 acres more). New realty authorizations would be required to meet VRM class objectives. VRM Class I and Class II areas would be aimed at greater retention of existing landscape character than would VRM Class III and IV areas. The class designation could affect range improvement design or prohibit the construction of some realty projects, such as access roads, pipelines, and water storage tanks. This alternative would be the most restrictive to the lands and realty program.

**Impacts from Recreation and Visitor Services Management.** Impacts would be similar to those described under Alternative A, except there would be only two SRMAs. The Crown would be managed as an ERMA instead of an SRMA and would be protected with a CSU instead of an NSO, which would be less limiting to other uses and the placement and design of lands and realty projects. Other areas formerly managed as SRMAs or RMAs would be managed as ERMAs.

BLM_0016901

**Impacts from Comprehensive Trails and Travel Management.** Under this alternative, all travel would be limited to designated routes, which would impact 467,400 acres, while 37,500 acres would be closed to motorized use. Table 4.3.5-4 summarizes the classification of the 1,460 miles of designated routes.

**Table 4.3.5-4**
**Travel Classification for Designated Routes within the CRVFO Planning Area – Alternative C**

| Full-Sized Vehicle | ATV | Motorcycle | Mechanized | Pedestrian/ Equestrian | Pedestrian | Obliterate | Seasonal Closure |
|---|---|---|---|---|---|---|---|
| 440 miles | 55 miles | 27 miles | 140 miles | 440 miles | 2 miles | 220 miles | 8 miles |

Realty authorization holders would continue to have access to their approved realty authorization areas for maintenance and administration. Existing routes without public access would be closed to motorized travel and open to only pedestrian and equestrian use; however, if they are under a realty authorization, administrative access would be granted on those routes.

**Impacts from Energy and Minerals Management.** Impacts from management actions for energy and minerals development under Alternative C would be similar to those under Alternatives A and B. Although this alternative would have the smallest amount of land open to fluid minerals leasing and development (531,500 acres), the actual beneficial effect would be lessened because most of the high-potential areas for oil and gas have already been leased. In addition, closing to fluid mineral leasing would not apply to development of private minerals.

**Impacts from Special Designations (ACECs, WSAs, WSRs) Management.** Management actions would designate 16 ACECs, for a total of 79,700 acres. Six of these ACECs would be managed to protect their relevant and important values, for a total of 20,200 acres. This alternative would manage for the most ACECs.

There would be four WSAs, for a total of 27,700 acres, in this and the other alternatives. These areas would be managed to preserve their wilderness characteristics under the interim management policy until Congress either designates these lands as wilderness or releases them for other purposes. If released, these areas would continue to be managed for their recreational opportunities.

All 26 eligible segments of river or streams will be designated as suitable for wild and scenic status. These segments would be managed to preserve the free-flowing nature and ORVs associated with the designation. Nine segments would be managed as wild, while the other 17 will be managed as scenic or recreational. This designation would have a minor impact on the lands and realty program.

<u>Alternative D</u>
Impacts to lands and realty from soils management and wildland fire management would be the same or similar to those under Alternative A. Impacts to lands and realty from renewable energy management would be the same or similar to those under Alternative B. Impacts from management actions for other resources, resource uses, and special designations would be as described below.

**Impacts from Lands and Realty Management.** Generally, impacts would be similar to those under Alternative A, except that 126,700 acres would be identified as ROW avoidance areas and 39,000 acres as

BLM_0016902

ROW exclusion areas. Compared to Alternatives B, C, and D, this alternative designates the fewest ROW avoidance and exclusion areas.

Communication site proposals would be reviewed on a case-by-case basis without requiring communication site plans and making relocation a priority. This would be an adverse impact on the lands and realty program, as all proposals would need to be considered and the landscape could be dotted with single towers throughout the CRVFO. Without communication site plans, any type of facility or size of tower could be built, and BLM's information about what is actually at the site and what is authorized at the site could be different. The impacts from acquisitions, sales, renewable energy, and corridors would be the same as those under Alternative B. Retention area acres have increased due to the increased number of SRMAs, and 418,300 acres would be retained for long-term management.

**Impacts from Water Resource Management.** Impacts would be similar to those under Alternative A, although under Alternatives B, C, and D more restrictive measures would be taken to improve the quantity and quality of streamside management and perennial waters and to prohibit surface occupancy and surface-disturbing activities. This could impact issuing, modifying, relocating, or denying realty authorizations to protect water quality and aquatic values and prevent channel degradation. In addition, actions involving in-channel restoration or enhancement work designed to improve stream habitat conditions and riparian plantings, with temporary disturbances of less than 0.1 acre, would require a 404 Permit from the US Army Corps of Engineers, with subsequent mitigation, and in areas where the slope is less than 15 percent and BMPs are implemented.

**Impacts from Vegetation Management.** Impacts would be similar to those under Alternative A, although under Alternatives B, C, and D more descriptive measures would be taken to improve the quantity and quality of the vegetation resource.

**Impacts from Fish and Wildlife Management.** Impacts would be similar to those under Alternatives B and C, but with fewer restrictive management actions. Stipulations under Alternatives A, B, C, and D, as lands and realty avoidance areas could require special design, siting, construction periods, or relocation for proposed realty authorizations. Site-specific relocation restrictions would be applied within 100 meters (328 feet) of all trout-bearing streams (10,100 acres), except those native cutthroat streams identified as Conservation and Core Conservation Populations of Colorado River cutthroat trout and greenback cutthroat trout. On streams where the riparian corridor width is greater than 100 meters (328 feet) from the stream edge, surface use within the riparian zone would be prohibited.

**Impacts from Special Status Species Management.** Impacts would be similar to those described under Alternatives B and C, but with fewer restrictive management actions. Where conflicts arise, they would be likely addressed with the land and realty projects through mitigated measures. A no surface occupancy and ground disturbance stipulation for threatened, endangered, proposed, and candidate species would impact land use authorizations proposals by causing avoidance and realignment. There would be the possibility of denying some realty authorizations that could not avoid the special status species.

**Impacts from Cultural Resource Management.** Impacts would be similar to those under Alternative A, except slightly higher descriptive measures would be taken to protect cultural and historic resources. (Surface occupancy and surface-disturbing activities within 100 meters of historic properties would be prohibited).

BLM_0016903

**Impacts from Visual Resource Management.** New lands and realty projects would be required to meet VRM class objectives. VRM Class I (34,000 acres) is basically the same as under Alternatives B and C (33,600 acres) but substantially higher than under Alternative A (17,100). The 228,300 acres of VRM Class II under Alternative D is only slightly less than the other alternatives. Class VRM Class II would be aimed at greater retention of existing landscape character than would VRM Class III and IV areas. The class designation could affect lands and realty project design or prohibit the construction of some developments, such as access routes, water storage tanks, or utility infrastructure necessary to meet public needs for realty authorizations and also could increase processing time and costs with the increase design and site requirements.

**Impacts from Recreation and Visitor Services Management.** Impacts would be the similar to those described under Alternative B, except there would be seven SRMAs, totaling approximately 68,200 acres, and five separate ERMAs (Eagle River, Fisher Creek, Hardscrabble/East Eagle, New Castle, Silt Mesa, and Thompson Creek) totaling approximately 21,300 acres, which would be excluded from land tenure opportunities and would indirectly benefit the land tenure program by retaining the parcels in BLM ownership. Although this would be less than what is proposed under Alternative C, the placement and management of Hardscrabble/East Eagle SRMA could increase the amount of motorized use and could cause issues of vandalism and trespass with existing realty authorizations. (For example, clearings under linear aerial power lines tend to attract unauthorized motorized use.)

**Impacts from Comprehensive Trails and Travel Management.** Under this alternative, all travel would be limited to designated routes, which would impact 473,500 acres, while 31,400 acres would be closed to motorized use. Table 4.3.5-5 summarizes the classification of the 1,460 miles of designated routes. Realty authorization holders would continue to maintain access to lands and realty authorizations for maintenance and ongoing administration. Existing routes without public access would be closed to motorized travel and open only to pedestrian and equestrian use. There could be a slight impact on the lands and realty program through vandalism.

**Table 4.3.5-5**
**Travel Classification for Designated Routes within the CRVFO Planning Area – Alternative D**

| Full-sized Vehicle | ATV | Motorcycle | Mechanized | Pedestrian/ Equestrian | Pedestrian | Obliterate | Seasonal Closure |
|---|---|---|---|---|---|---|---|
| 530 miles | 68 miles | 82 miles | 280 miles | 300 miles | 2 miles | 50 miles | 8 miles |

**Impacts from Energy and Minerals Management.** Impacts from management actions for energy and minerals development under this alternative would be similar to those under Alternatives A through C, with the total amount of land open to fluid minerals leasing and development (658,200 acres) being intermediate between the lowest (Alternative C) and the highest (Alternative A). However, the actual differences among alternatives are lessened by the fact that most of the area of high potential for oil and gas resources has already been leased. In addition, the protections of designation as closed to fluid minerals leasing or NSO stipulations would not apply to development of private minerals that does not involve use of federal surface lands.

**Impacts from Special Designations (ACEC, WSA, and WSR) Management.** Management actions would designate three ACECs, for a total of 20,200 acres. These areas would be managed to protect their relevant and important values. This alternative would manage the fewest ACECs. There would be four WSAs,

BLM_0016904

for a total of 27,700 acres in this and the other alternatives. These areas would be managed to preserve their wilderness characteristics under the interim management policy until Congress either designates these lands as wilderness or releases them for other purposes. If released, these areas would continue to be managed for their recreational opportunities. All 26 eligible segments of river or streams would be determined as not suitable for designation as WSRs. These areas would not be managed to preserve the free-flowing nature and ORVs. This alternative would manage the fewest river and stream segments as wild and scenic. The WSAs would exclude lands and realty actions; however, impacts would be minor.

### Cumulative Impacts

Effects of past actions include various authorizations and agreements to use BLM land such as right-of-way grants and road use agreements under several different authorities, permits, and leases, pursuant to Section 302 of the FLPMA and Recreation and Public Purposes Act leases. Designation of the energy corridor in the CRVFO as described in the Programmatic EIS, Designation of Energy Corridors on Federal Land in the 11 Western States (US DOE and BLM 2008) was approved January 2009. No new potential right-of-way corridors on BLM lands within the CRVFO have been identified.

Alternative C would have the greatest effect on realty authorizations by contributing to an overall reduction in land available for realty actions. Implementation of the ACECs, along with the four existing WSAs, future actions such as ESA listings, and increased tribal coordination, could result in limitations imposed on realty authorizations in additional areas. However, in the future, there would be increased demands for many kinds of uses on the public lands, such as rights-of-way, leases, permits, recreation, and extractive uses, as a result of increased population in the area. Restrictions placed on public lands may drive more development on privately owned surface, and the increase in population expected would add to the future development demands on private ranches. Areas close to existing communities would be impacted the most. Infrastructure demands by local towns and cities could make it difficult to expand onto public land for their utility requests due to factors from increased restrictions. Overall, the cumulative effects of realty authorizations in the greater planning area would be moderate due to the large percentage of land that is managed by the BLM that is intermixed with the growing communities along the Interstate-70 and State Highway 82 corridors.

Land tenure adjustments for BLM lands that have occurred within the planning area during the most recent 20-year period have included acquisition of 14,567 acres and sale of 13,917 acres. These totals do not include title transactions related to oil shale, other minerals, corrective actions, recordable disclaimers of interest, the Recreation and Public Purposes Act, or transfer of Naval Oil Shale Reserves Nos. 1 and 3 from the U.S. Department of Energy to the BLM. Consolidating existing BLM lands would be a high priority, along with acquiring public easements of special importance to the public. Acquisitions of key parcels for resource protection and scenic values are important contributions to the quality of life and the environment in the planning area. Continued realty actions to consolidate parcels and acquire new holdings (including public easements) would result in positive cumulative effects for the planning area.

BLM_0016905

## 4.3.6  Energy and Minerals

### 4.3.6.1 Coal

This section presents the impacts on coal resources from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning coal resources are described in Chapter 3, Section 3.3.6.

Federal regulations for the management of coal resources are at 43 CFR 3400. Land use planning for coal leasing requires an evaluation to determine the coal resources that have development potential by surface or underground mining methods. In addition, a subsequent evaluation is required under the coal unsuitability criteria, as defined at 43 CFR 3461.5, to determine the coal resources that are acceptable for further consideration of leasing.

Federal regulations for the management of coal resources are at 43 CFR 3400. Land use planning for coal leasing requires an evaluation to determine the coal resources that have development potential by surface or underground mining methods. In addition, a subsequent evaluation is required under the coal unsuitability criteria, as defined at 43 CFR 3461.5, to determine the coal resources acceptable for further consideration of leasing.

Coal resources within the planning area, although estimated at approximately 1.6 billion tons, are of low potential for commercial development. Although coal seams are exposed at or near the surface in several places along the Grand Hogback, the steep dip of these seams limits the quantity available for modern operations. The large reserves in the Coal Basin area near Carbondale have been largely depleted, and reopening of those mines is not anticipated. Large quantities of coal are interbedded with mostly flat-lying near-shore sedimentary deposits beneath the Piceance Basin west of the Grand Hogback, but these are too deep for current subsurface mining techniques. Therefore, in addition to no coal leases currently authorized in the CRVFO, future leasing and development of coal at a commercial scale is not expected to occur during the planning horizon of this RMP.

### Methods and Assumptions

The analysis is based on the following assumptions:

- The evaluation of federal coal resources within the CRVFO area is a reasonable estimation for the RMP planning horizon, based on the assumptions and analysis in the reports.

- Coal exploration and development, in the unlikely event that it occurs, would be conducted in accordance with federal regulations and managed to mitigate impacts on other resources.

Within the area of potential development of the federal coal resource development along the Grand Hogback (identified consistent with Screen 1 as set forth in 43 CFR 3420.1), any future development proposals would be evaluated by applying Screen 2 (acceptability for mining), Screen 3 (multiple resource use), and, for split-estate lands, Screen 4 (surface owner preference). Because of the small quantity of coal actually available along the Grand Hogback (the bulk quickly plunging to depths too great for surface or underground mining), it is unlikely that development would survive Screen 2. Given the other resource values along the Grand Hogback, including sensitive visual resources, critical wildlife habitat, and wilderness characteristics, any development passing through Screen 2 as technically and economically viable would be very unlikely to pass through Screen 3.

BLM_0016906

### Environmental Consequences

Impacts on coal resources would result from some of the actions included under other resources and uses. Programs not addressed below were deemed to have no impacts or only negligible impacts on coal resources under any of the four alternatives.

### Alternative A

**Impacts from Coal Management.** Under Alternative A, approximately 28,500 acres of the federal mineral estate in the planning area would be open to further consideration for coal leasing. Stipulation GS-NSO-1 for surface coal mines would prohibit surface occupancy and surface-disturbing activities within the area of an approved surface coal mine. Additionally, stipulation GS-CSU-1 for underground coal mines would apply CSU restrictions to oil and gas operations within the area of federally leased coal lands. While coal mining would result in surface-disturbing activities, there currently are no active coal mines in the planning area, and the potential is relatively low. The stipulations above would prevent potential conflicts associated with oil and gas development in those areas, thus being beneficial to coal resources in the planning area.

**Impacts from Soils Management.** Under Alternative A, approximately 101,400 acres of the planning area would be protected by stipulation GS-NSO-15 for steep slopes greater than 50 percent. This applies to oil and gas facilities that would prohibit surface occupancy and surface-disturbing activities for oil and gas facilities on slopes greater than 50 percent, but does not apply to pipelines. In addition, approximately 172,300 acres of the planning area would be further protected by stipulation GS-CSU-4 for erosive soils and slopes greater than 30 percent, which would require special design, construction, operation, and reclamation measures. Most of the coal potential in the planning area occurs on the Grand Hogback in areas with erosive soils and steep slopes. These stipulations would probably prevent or limit coal management activities in these areas, thereby having a moderate impact on coal development.

**Impacts from Water Resource Management.** Under Alternative A, approximately 42,300 acres of the planning area would be protected by stipulation GS-NSO-3 for major river corridors that would prohibit surface occupancy and surface-disturbing activities within 0.5 mile of either side of the high water mark of six major rivers. However, this stipulation does not apply to the Naval Oil Shale Reserves production area. Additionally, approximately 5,400 acres would be protected by stipulation GS-NSO-13 for municipal watershed areas, which would prohibit surface occupancy and surface-disturbing activities within watersheds providing domestic water for the communities of Rifle and New Castle. These stipulations would have a negligible impact on coal resources since there is low coal potential in those areas.

**Impacts from Vegetation Management—Riparian.** Under Alternative A, approximately 1,700 acres of the planning area would be protected by stipulation GS-NSO-2 for riparian and wetland zones that would prohibit surface occupancy and surface-disturbing activities within riparian vegetation. Additionally, a substantial amount of acres within the planning area would be protected by stipulation GS-CSU-2, which would require special design and construction and implementation measures within 500 feet of riparian or wetland vegetation. The highest potential for coal development in the resource area exists in the Grand Hogback, which contains numerous steep ephemeral drainages with little to no riparian vegetation. Where riparian vegetation and coal potential simultaneously exist, riparian management would have a minor impact on coal resources by limiting or preventing surface-disturbing activities in those specific areas.

**Impacts from Terrestrial Wildlife Management.** Under Alternative A, a substantial number of acres within the planning area would be protected by applicable wildlife stipulations that would prohibit surface

BLM_0016907

occupancy and surface-disturbing activities in wildlife areas. These areas could coincide with areas that have coal development potential. In those cases, terrestrial wildlife management would limit, prevent, or relocate development activities, resulting in a minor impact on coal resources.

**Impacts from Special Status Species—Plants and Terrestrial Wildlife Management.** Under Alternative A, a significant amount of acres within the planning area would be protected by stipulations for special status plants and terrestrial wildlife that would prohibit surface occupancy and surface-disturbing activities. Where these areas occur in conjunction with potential coal development, they would probably limit, prevent, or relocate coal development activities. Therefore, under this alternative special status plants and terrestrial wildlife management could have a moderate impact on coal resources.

**Impacts from Cultural Resource Management.** Under Alternative A, cultural resources in the planning area would be protected by general stipulation CRV-NSO-38 for historic properties that would prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of historic properties. In addition, stipulation GS-NSO-16 would prohibit surface occupancy and surface-disturbing activities in the Bull Gulch ACEC. Identified and likely undiscovered cultural sites exist throughout the Grand Hogback, where the highest potential for coal development in the planning area exists. The stipulations above could prevent, limit, or relocate coal development, thereby having a moderate impact on coal resources.

**Impacts from Visual Resource Management.** VRM class designations would limit or allow surface-disturbing activities in specific areas. VRM Classes I and II would be aimed at greater retention of existing landscape character than Classes III or IV. Managing areas as VRM Class I and Class II would reduce surface disturbance, whereas VRM Class III or IV would be subject to actions that allow for greater landscape modification and surface disturbance. Under Alternative A, approximately 17,100 acres of the planning area would be classified as VRM Class I and 230,100 acres as VRM Class II. Stipulation GS-NSO-16 for VRM Class I areas within ACECs would prohibit surface occupancy and surface-disturbing activities within ACECs, which account for approximately 23,200 acres of the planning area under this alternative.

Approximately 9,500 acres of the planning area would be further protected by stipulation GS-NSO-18 for the Interstate-70 viewshed, which would prohibit surface occupancy and surface-disturbing activities on slopes over 30 percent with high visual sensitivity in the Interstate-70 viewshed. In addition, stipulation GS-CSU-5 for VRM Class II would apply CSU (site-specific relocation) restrictions to areas in VRM Class II, which account for approximately 264,800 acres under this alternative. Relocation of operations by more than 200 meters (656 feet) may be required to protect visual values. These stipulations would have a moderate impact on coal resources by limiting or preventing development activities in areas where potential exists.

**Impacts from Lands and Realty Management.** The ROW authorization process under Alternative A could adversely affect the development of coal resources. Responding to specific proposals for coal development on a case-by-case basis under the ROW authorization process would not encourage coal development on BLM land, nor would it encourage the development in specific high-potential areas. Coal development would be constrained by existing management policies and prohibitions involving lands with specific resource values and management directions.

Under Alternative A, review of renewable energy proposals through a case-by-case permitting process could create adverse impacts on coal resources by increasing administrative costs due to the increased time associated with environmental data gathering for each proposal. Additional impacts could also include

BLM_0016908

increases in the complexity of infrastructure to support more dispersed coal development. Lands and realty management under this alternative would have a minor impact on coal resources.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Under Alternative A, approximately 679,200 acres of the federal mineral estate within the planning area would be managed as open to oil and gas leasing and development. This alternative accounts for the development of approximately 2,664 federal wells on 333 multi-well pads with an estimated 3,347 acres of surface disturbance and includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 2,181 acres on interim reclamation of well pads.

Under this alternative, the CRVFO would manage approximately 27,800 acres of the federal mineral estate as closed to fluid minerals leasing. Major constraints (NSO stipulations) would be applied to approximately 239,600 acres of the planning area that are open to oil and gas leasing. In addition, moderate constraints (CSU stipulations, site-specific relocation) would apply to approximately 424,800 acres that are open to oil and gas leasing.

The impacts from fluid minerals management on coal resources would be negligible. The potential for coal and fluid mineral development occurring in conjunction is low. In addition, drilling technology allows for directional drilling to occur, and drill rigs no longer need to be directly above targets. Furthermore, existing stipulations for coal resources would minimize development conflicts between coal and fluid mineral development.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative A, approximately 470,300 acres of the planning area would be open to locatable mineral development, and approximately 34,600 acres would be recommended for closure. Approximately 476,900 acres of the planning area would be open to salable minerals and non-energy leasable minerals and approximately 28,000 acres would be recommended for closure. The potential for these activities to occur in potential coal development areas is low. Therefore, management of these mineral resources would have a minor impact on coal resources.

*Alternative B (Preferred Alternative)*
**Impacts from Coal Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A.

**Impacts from Soils Management.** Impacts under Alternative B would be greater and more restrictive to coal resources than under Alternative A. Under this alternative, stipulation GS-NSO-15 would be replaced by stipulation CRV-NSO-2 for steep slopes greater than 50 percent, and stipulation GS-CSU-4 would be replaced by stipulation CRV-CSU-1 for slopes greater than 30 percent and/or severe erosion hazard soils. The highest potential for coal development occurs in the Grand Hogback monocline, much of which either is on slopes steeper than 50 percent or contains erosive soils, as defined by the NRCS. For these reasons, the stipulations above would be very restrictive with regard to coal development having a moderate impact on coal resources.

**Impacts from Water Resource Management.** Under Alternative B, approximately 42,300 acres of the planning area would be protected by stipulation CRV-NSO-3 for major river corridors. This would prohibit surface occupancy and surface-disturbing activities within 0.5 mile of either side of the high water mark of six

BLM_0016909

major rivers within the CRVFO. Additionally, stipulation CRV-NSO-4 for designated municipal watershed areas would prohibit surface occupancy and surface-disturbing activities within municipal watersheds providing domestic water. Stipulation CRV-NSO-5 for streamside management zones would further protect approximately 34,500 acres of the planning area by prohibiting surface occupancy and surface-disturbing activities within 50 feet of the ordinary high water mark of any hydrologic feature.

The highest potential for coal development in the planning area occurs in the Grand Hogback monocline, which contains numerous steep ephemeral drainages, and several seeps and springs. Stipulation CRV-NSO-5 would prevent development in proximity to hydrologic features. However, given the steep topography of ephemeral drainages in the vicinity, development potential in those areas is relatively low and not feasible, based on topographic restraints. Development potential could exist where springs and seeps occur, thus this stipulation would have a minor impact on coal resources by preventing surface occupancy and surface-disturbing activities within 50 feet of hydrologic features.

**Impacts from Vegetation Management—Riparian.** Under Alternative B, a substantial amount of acres within the planning area would be protected by stipulation CRV-CSU-3, which would require special design and construction and implementation measures within 500 feet of riparian or wetland vegetation. The NSO stipulation for riparian zones under Alternative A would not apply under this alternative. This CSU stipulation could allow for surface-disturbing activities to occur, and this alternative would essentially be less restrictive than Alternative A with regard to coal development, therefore having a negligible impact on coal resources. However, it is important to note that other stipulations for steep slopes and erosive soils under Alternative B would probably limit or prevent surface-disturbing activities in much of the Grand Hogback, therefore having a moderate impact on coal resources in those areas.

**Impacts from Terrestrial Wildlife Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A. However, more acres within the planning area would be protected by applicable wildlife stipulations that would prohibit surface occupancy and surface-disturbing activities in wildlife areas. This alternative could have a moderate impact on coal resources by limiting, preventing, or relocating development activities in the planning area.

**Impacts from Special Status Species—Plants and Terrestrial Wildlife Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, but would allow for greater protection with stipulations for special status plants and terrestrial wildlife that would prohibit surface occupancy and surface-disturbing activities. Similar to Alternative A, this alternative would allow the BLM to require restrictions to coal development, thereby having a moderate impact on coal resources.

**Impacts from Cultural Resource Management.** Under Alternative B, approximately 14,100 acres of the planning area would be closed to oil and gas leasing (CRV-CL-9) for the Blue Hill and Bull Gulch ACECs. This designation would prohibit oil and gas leasing within the 3,700 acre Blue Hill ACEC and the 10,400-acre Bull Gulch ACEC. In addition, stipulation CRV-NSO-49 would prohibit surface occupancy and surface-disturbing activities in the Bull Gulch ACEC. Further protection of cultural resources in the planning area would be provided by stipulation CRV-NSO-37 for heritage areas that would prohibit surface occupancy and surface-disturbing activities within 0.25 mile of heritage areas. Additionally, stipulation CRV-NSO-39 for eligible historic properties would prohibit surface occupancy and surface-disturbing activities within 200 meters (656 feet) of eligible historic properties. Due to these stipulations, impacts from cultural resource

BLM_0016910

management would be the same as or similar to those under Alternative A, having a moderate impact on coal resources by potentially limiting, preventing, or relocating surface-disturbing activities.

**Impacts from Visual Resource Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, except that more acres of the planning area would be managed as VRM Class I and Class II, and slightly different stipulations would apply. Under this alternative, approximately 33,600 acres of the planning area would be managed as VRM Class I and approximately 249,200 acres as VRM Class II. Stipulation CRV-NSO-42 for VRM Class I areas would protect Class I VRM values, and prohibit surface occupancy and surface-disturbing activities within areas designated VRM Class I. Stipulation CRV-NSO-41 for VRM Class II areas with slopes over 30 percent and high visual sensitivity would prohibit surface occupancy and surface-disturbing activities in VRM Class II areas with such slopes and sensitivity, to preserve the visual setting and integrity. In addition, stipulation CRV-CSU-16 for VRM Class II would ensure surface-disturbing activities within VRM Class II areas comply with BLM Handbook 8431-1 to retain the existing character of the landscape. VRM Classes I and II are the most restrictive of the four classes, thereby having a moderate impact on coal resources under this alternative by restricting development activities.

**Impacts from Lands and Realty Management.** Under Alternative B, approximately 169,600 acres of the planning area would be managed as ROW avoidance areas (including renewable energy sites, such as solar, wind, hydro, and biomass development). In addition, approximately 39,300 acres of the planning area would be managed as ROW exclusion areas (including renewable energy sites, such as solar, wind, hydro, and biomass development). All ACECs, eligible WSR segments, areas closed to oil and gas leasing, and areas open to oil and gas leasing with no surface occupancy would be managed as ROW avoidance areas (with exceptions granted only if the authorization would not create substantial surface disturbance or would create only temporary impacts). Lands and realty management under this alternative would be more restrictive than under Alternative A, having a moderate impact on coal resources.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts under Alternative B would be the same as or similar to those under Alternative A, but with slightly less development and more restrictions on development, thereby minimizing potential conflicts between coal management and fluid mineral development. Under this alternative, approximately 651,400 acres of the federal mineral estate within the planning area would be managed as open to oil and gas leasing and development. This alternative accounts for the development of approximately 2,206 federal wells on 276 multi-well pads, with an estimated 2,774 acres of surface disturbance and includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 1,814 acres on interim reclamation of well pads.

Under this alternative, the CRVFO would manage approximately 55,600 acres of the federal mineral estate as closed to fluid minerals leasing. Major constraints (NSO stipulations) would be applied to approximately 326,700 acres of the planning area that are open to oil and gas leasing. In addition, moderate constraints (CSU stipulations, site-specific relocation) would apply to approximately 489,500 acres that are open to oil and gas leasing.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, but with fewer acres open to mineral development. Under this alternative, approximately 407,900 acres of the planning area would be open to locatable mineral development and approximately 97,000 acres recommended

BLM_0016911

for closure. Approximately 362,700 acres of the planning area would be open to salable minerals and non-energy leasable minerals, and approximately 142,200 acres would be recommended for closure.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, but would include the designation of approximately 34,500 acres of the planning area as ACECs.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, except these areas would be protected by stipulation CRV-NSO-50 for wilderness study areas, which would prohibit surface occupancy and surface-disturbing activities in WSAs. In addition, stipulation CRV-CSU-22 for wilderness study areas if released from wilderness consideration would apply CSU restrictions if Congress were to release these WSAs from wilderness consideration.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, except that fewer segments would be managed as wild and scenic. Under variants B1 and B2 to this alternative, either four or two stream segments, respectively, would be protected by stipulation CRV-NSO-51 for suitable stream segments classified as wild. This would prohibit surface occupancy and surface-disturbing activities within 0.25 mile of either side of the active river channel. In addition, stipulation CRV-CSU-23 on suitable stream segments classified as scenic or recreational would apply under this alternative that applies CSU restrictions within 0.25 mile on both sides of the active river channel.

### Alternative C
**Impacts from Coal Management.** Impacts under Alternative C would be the same as or similar to those under Alternative A, except that only 17,900 acres of the federal mineral estate within the planning area would be open to further consideration for coal leasing.

Impacts to coal management from soils management and special status species (plants and terrestrial wildlife) management under Alternative C would be the same as or similar to those under Alternative B.

**Impacts from Water Resource Management.** Impacts under Alternative C would be the same as or similar to those under Alternative B but would include additional protection of approximately 69,000 acres by stipulation CRV-CSU-2 for hydrologic features. This stipulation would apply CSU restrictions within 100 feet of the edge of a hydrologic feature, thus further preventing or limiting ground-disturbing activities in those areas, resulting in minor impacts on coal resources.

**Impacts from Vegetation Management—Riparian.** Impacts under Alternative C would be the same as or similar to those under Alternative B but would include additional protection of approximately 4,300 acres in the planning area by stipulation CRV-NSO-6 for riparian and wetland zones that would prohibit surface occupancy and surface-disturbing activities within riparian vegetation. As mentioned under Alternative B, the potential for riparian vegetation and coal development to occur simultaneously in areas such as the Grand Hogback is low, and thus the impacts from riparian management would be minor. Additionally, soil stipulations under this alternative would limit or prevent surface-disturbing activities from occurring in much of the Grand Hogback.

BLM_0016912

**Impacts from Terrestrial Wildlife Management.** Impacts under Alternative C would be the same as or similar to those under Alternative A. However, slightly more acres (fewer than under Alternative B) within the planning area would be protected by applicable wildlife stipulations that would prohibit surface occupancy and surface-disturbing activities in wildlife areas. Therefore, this alternative would probably have a minor impact on coal resources in the planning area.

**Impacts from Cultural Resource Management.** Impacts under Alternative C would be the same as or similar to those under Alternative B but would replace stipulation CRV-NSO-39 for historic properties. In addition, this alternative proposes to designate approximately 14,000 acres of the planning area as the Grand Hogback ACEC to protect scenic, geologic, and cultural values. This ACEC alone would have a moderate impact on coal resources by limiting, preventing, or relocating development in those areas.

**Impacts from Visual Resource Management.** Impacts under Alternative C would be the same as or similar to those under Alternative B except that more acres of the planning area would be managed as VRM Class II. Under this alternative, approximately 258,100 acres of the planning area would be managed as VRM Class II.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under Alternative C, approximately 47,000 acres of the planning area would be protected by stipulation CRV-NSO-43 for LWCs to help retain existing wilderness values. This would prohibit surface occupancy and surface-disturbing activities on BLM lands managed as LWCs. Management of these areas would have a negligible impact on coal resources because the potential for coal development in these areas is low.

**Impacts from Lands and Realty Management.** Impacts under Alternative C would be the same as or similar to those under Alternative B but would include the designation of 50,600 acres of ROW exclusion areas (10 percent of the CRVFO) and 162,000 acres of ROW avoidance areas (32 percent of the CRVFO). This alternative reflects a slight increase in ROW avoidance areas, thereby being more restrictive than under Alternatives A and B. In addition, the Grand Hogback ACEC is included under this alternative and would prohibit surface occupancy and surface-disturbing activities on approximately 14,000 acres. Lands and realty management under this alternative would have a moderate impact on coal resources by preventing, limiting, or relocating development activities.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts under Alternative C would be the same as or similar to those under Alternatives A and B, except that more acres of the planning area would be closed to oil and gas leasing and slightly more acres would be protected by NSO and CSU stipulations, making this the most restrictive of the alternatives. The potential for conflicts between fluid mineral development and coal management would probably be the lowest under this alternative. Approximately 531,500 acres of the federal mineral estate within the planning area would be managed as open to oil and gas leasing and development. This alternative accounts for the development of approximately 2,206 federal wells on 276 multi-well pads, with an estimated 2,774 acres of surface disturbance and includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 1,814 acres on interim reclamation of well pads.

Under this alternative, the CRVFO would manage approximately 175,500 acres of the federal mineral estate as closed to fluid minerals leasing. Major constraints (NSO stipulations) would be applied to approximately 333,800 acres of the planning area that are open to oil and gas leasing. In addition, moderate constraints (CSU

BLM_0016913

stipulations, site-specific relocation) would apply to approximately 500,500 acres that are open to oil and gas leasing.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts under Alternative C would be the same as or similar to those under Alternative B. However, a substantial percentage of the planning area would be closed to mineral development under this alternative. Under this alternative, approximately 332,800 acres of the planning area would be open to locatable mineral development, and approximately 172,000 acres recommended for closure. Approximately 317,000 acres of the planning area would be open to salable minerals and non-energy leasable minerals, and approximately 196,000 acres would be recommended for closure.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts under Alternative C would be the same as or similar to those under Alternative A, but would include the designation of approximately 79,700 acres of the planning area as ACECs. Under this alternative, the CRVFO proposes to designate approximately 14,000 acres of the planning area as the Grand Hogback ACEC to protect scenic, geologic, and cultural values. This ACEC alone would have a moderate impact on coal resources by limiting, preventing, or relocating development in those areas that are not currently leased.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Impacts under Alternative C would be the same as or similar to those under Alternative A, but the NSO and CSU stipulations that apply would be the same as those under Alternative B.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Impacts under Alternative C would be the same as or similar to those under Alternative A, with the same number of eligible river segments (i.e., 13). However, these 13 segments would be recommended for designation by Congress as suitable, along with the same NSO and CSU stipulations as under Alternative B.

*Alternative D*
**Impacts from Coal Management.** Impacts under Alternative D would be the same as or similar to those under Alternative A.

**Impacts from Soils Management.** Impacts under Alternative D would be the same as or similar to those under Alternative B.

**Impacts from Water Resource Management.** Impacts under Alternative D would be the same as or similar to those under Alternative B but would not include the additional protection of approximately 34,500 acres by stipulation CRV-NSO-5 for streamside management zones. This alternative would be less restrictive than Alternatives B and C but could still have minor impacts on coal resources by relocating surface-disturbing activities.

**Impacts from Vegetation Management—Riparian.** Impacts under Alternative D would be similar to Alternative C but would not include the additional riparian protection being provided by stipulation CRV-NSO-6 for riparian and wetland zones. While riparian management under this alternative would be less restrictive, soil stipulations would still apply that would limit or prevent surface-disturbing activities in the vicinity of the Grand Hogback.

BLM_0016914

**Impacts from Terrestrial Wildlife Management.** Impacts under Alternative D would be the same as or similar to those under Alternative A. However, fewer acres within the planning area would be protected by applicable wildlife stipulations that would prohibit surface occupancy and surface-disturbing activities in wildlife areas. This alternative would probably have a negligible impact on coal resources.

**Impacts from Special Status Species—Plants and Terrestrial Wildlife Management.** Impacts under Alternative D would be the same as or similar to those under Alternative A, but would provide less protection by stipulations for special status plants and terrestrial wildlife, which would prohibit surface occupancy and surface-disturbing activities. Under this alternative, management of special status plants and terrestrial wildlife could still have a moderate impact on coal resources by limiting, preventing, or relocating development activities.

**Impacts from Cultural Resource Management.** Impacts under Alternative D would be the same as or similar to those under Alternative B but would have stipulation CRV-NSO-38 (100-meter buffer) instead of CRV-NSO-39 (200-meter buffer) for eligible historic properties.

**Impacts from Visual Resource Management.** Impacts under Alternative D would be the same as or similar to those under Alternative B, except that fewer acres of the planning area would be managed as VRM Class II. Under this alternative, approximately 228,300 acres of the planning area would be managed as VRM Class II. Similar stipulations to the alternatives above would apply under this alternative, thereby limiting or preventing development in those areas.

**Impacts from Lands and Realty Management.** Impacts under Alternative D would be the same as or similar to those under Alternative B but would include fewer acres within the planning area as ROW avoidance areas (126,700 acres) and about the same for ROW exclusion areas (39,000 acres) resulting in less restrictions for geothermal development. This alternative being less restrictive would have a minor impact on coal resources within the planning area.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts under Alternative D would be the same as or similar to those under Alternatives A but with more development and fewer protective measures. Under this alternative, a high percentage of the planning area would be open to oil and gas leasing. In addition, this development scenario accounts for a substantial increase in infrastructure and disturbed acres. This alternative would be the least restrictive and would have the most impacts on water resources. Approximately 658,200 acres of the federal mineral estate within the planning area would be managed as open to oil and gas leasing and development. This alternative accounts for the development of approximately 4,198 federal wells on 525 multi-well pads, with an estimated 5,276 acres of surface disturbance and includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 3,439 acres on interim reclamation of well pads.

Under this alternative, the CRVFO would manage approximately 48,800 acres of the federal mineral estate as closed to fluid minerals leasing. Major constraints (NSO stipulations) would be applied to approximately 203,000 acres of the planning area that are open to oil and gas leasing. In addition, moderate constraints (CSU stipulations, site-specific relocation) would apply to approximately 297,800 acres that are open to oil and gas leasing. This alternative would allow for the most fluid mineral development, thereby increasing the potential for conflicts between coal management and fluid mineral development. However, existing drilling technology and stipulations for coal management would minimize potential conflicts.

BLM_0016915

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts under Alternative D would be the same as or similar to those under Alternative A but with fewer acres open to mineral development and more acres open than under Alternatives B and C. Under this alternative, approximately 432,600 acres of the planning area would be open to locatable mineral development, and approximately 72,300 acres would be recommended for closure. Approximately 477,200 acres of the planning area would be open to salable minerals and non-energy leasable minerals, and approximately 27,800 acres would be recommended for closure.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts under Alternative D would be the same as or similar to those under Alternative A, but would include the designation of approximately 20,200 acres of the planning area as ACECs.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Impacts under Alternative D would be the same as or similar to those under Alternative A, but the NSO and CSU stipulations that apply would be the same as those under Alternative B.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative D, there would be no suitable wild and scenic segments in the planning area, and none of the NSO and CSU stipulations for WSRs would apply. This would allow for surface occupancy and surface-disturbing activities in areas that were previously managed for wild and scenic rivers. While this alternative is less restrictive, the potential for coal development in areas previously proposed for designation as WSRs is low.

### Cumulative Impacts

The geographic extent of the cumulative impacts analysis as it pertains to coal resources would be the CRVFO boundary and would include all federal, state, private, and other lands within this boundary. The potential for coal exploration and development within the CRVFO boundary does exist and is relatively low. At this time, coal resources primarily occur within the Grand Hogback monocline, where they are limited by topographic constraints and thus are not economically viable. Throughout all alternatives, controlled surface use and no surface occupancy stipulations would apply that would limit or prevent conflicting uses in areas where coal development would occur. Under Alternatives A, B, and D, approximately 28,500 acres of the CRVFO would be open to coal exploration and development. Alternative C would be the most restrictive of the four alternatives, limiting the acres to approximately 17,900.

### 4.3.6.2 Fluid Minerals (Oil and Gas, Oil Shale and Geothermal Resources)

### Methods and Assumptions

This section presents the impacts on fluid minerals from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning geothermal resources are described in Chapter 3, Section 3.3.7.

Fourteen oil and gas fields are identified within the CRVFO, all located in the high potential area west of the Grand Hogback (BLM 2008g). Most of the existing gas production is from the Williams Fork Formation, with lesser production from the Wasatch Formation. It is estimated that 99 percent of future production will occur in the high potential area, with the possibility of 1 percent occurring in the medium to low potential areas. It is also estimated that no drilling activity will occur in those areas mapped as no known potential.

BLM_0016916

Directional drilling in the CRVFO occurs in the large majority of new gas wells because it enables operators to drill multiple wells (as many as 24 wells) from a single well pad. It is especially applicable in development areas with multiple downhole reservoir targets with reduced drilling spacing units (10 to 20 acres) as in much of the Piceance Basin. Directional drilling greatly decreases the amount of potential surface disturbance and the potential for adverse impact to surface resources, and enables drilling and testing of subsurface targets beneath areas with prohibitive surface-use conditions and restrictions such as steep slopes, streams and rivers, sensitive plant and animal habitat, and NSO areas. The amount of directional offset possible from the surface location to bottomhole location is not unlimited and has generally been less than 2,500 feet in most directional wells drilled to date, although longer offsets have been drilled. Directional drilling will continue to play an increasing role in the gas development drilling in the CRVFO and will help resolve many of the surface access issues in the CRVFO.

Within the planning area, approximately 254 square miles have been identified as prospectively valuable for geothermal energy. However, commercial development of geothermal resources is not likely due to the absence of geothermal resources with temperatures over 50 degrees Celsius. The BLM would probably receive future applications for onsite electrical generation from geothermal resources for oil and gas facilities, but these localized small-scale facilities would not likely contribute to overall renewable energy resource conditions in the CRVFO.

Geothermal resources are leased under the Geothermal Steam Act of 1970. Through land use planning, the BLM uses the same guidelines for geothermal leasing as it does for oil and gas leasing in designating areas as open subject to standard lease terms, open subject to major or minor constraints, and closed to fluid minerals leasing. Lands available for geothermal leasing would follow the oil and gas leasing designations. The provisions for exceptions, modifications, and waivers would also apply to geothermal resources.

The analysis is based on the following assumptions:

- Oil and gas operations on existing leases would be subject to COAs by the authorizing officer, as developed in the NEPA analysis for proposed projects.

- Leasing and drilling for oil and gas would occur throughout the entire planning area, except where restricted by management actions described in Chapter 2.

- Closures to oil and gas leasing, lease stipulations, and lease notices (Appendix B) would be applied to all new leases and to expired leases that are reissued. On existing leases, the BLM would seek voluntary compliance or would develop COAs for applications for permit to drill to achieve resource objectives of lease stipulations contained in this RMP.

- Valid existing leases would be managed under the stipulations in effect when the leases were issued, and new stipulations included under this RMP would apply if leases were renewed.

- Geothermal resource activity—exploration, drilling, and production if paying quantities are discovered—would be managed according to applicable law, federal regulations, and onshore orders and would be managed to mitigate impacts on other resources according to BMPs appropriate to the site or location.

- The RFD is a reasonable prediction of geothermal resource activity for the planning horizon.

BLM_0016917

- Many stipulations under Alternative A were developed to apply to oil and gas leasing and development, but it is intended that the same or similar measures will be applied to other public land uses in order to maintain or achieve the same resource conditions and to ensure equitable treatment to all public land users.

The estimated wells that could be drilled on federal mineral estate in the CRVFO during the 20-year planning period under each alternative and associated acres of surface disturbance are shown in Table 4.3.6-1, Estimated Oil and Gas Wells, Well Pads, and Surface Disturbance by Alternative.

**Table 4.3.6-1**
**Estimated Oil and Gas Wells, Well Pads, and Surface Disturbance by Alternative**

| Estimated Oil and Gas Impacts | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Federal wells permitted | 2,664 | 2,206 | 2,206 | 4,198 |
| Well pads | 333 | 276 | 276 | 525 |
| Surface disturbance (acres) | 3,347 | 2,774 | 2,774 | 5,276 |

Source: BLM 2008g

Ninety-five percent of the federal mineral estate in the CRVFO that is mapped as high potential has been leased (BLM 2007g). Any protective measures (NSO, CSU, and TL stipulations) included under the alternatives would apply only to new leases.

### Environmental Consequences

Impacts on fluid mineral resources would result from some of the actions included under other resources and uses. Programs not addressed below were deemed to have no impacts or only negligible impacts on fluid mineral resources under any of the four alternatives.

### Alternative A

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Under Alternative A, approximately 679,200 acres the federal mineral estate within the planning area would be managed as open to oil and gas leasing and development. This alternative accounts for the development of approximately 2,662 federal wells on 333 multi-well pads with an estimated 3,347 acres of surface disturbance, and includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 2,181 acres on interim reclamation of well pads. The CRVFO would manage approximately 27,800 acres of the federal mineral estate as closed to fluid minerals leasing. Major constraints (NSO stipulations) would be applied to approximately 239,600 acres of the planning area that are open to oil and gas leasing. In addition, moderate constraints (CSU stipulations, site-specific relocation) would apply to approximately 424,800 acres that are open to oil and gas leasing.

**Impacts from Air Quality Management.** Construction associated with oil and gas development projects, specifically during facility, road, and right-of-way construction, would generate fugitive dust emissions from earthmoving and ground disturbance. Construction and operation equipment also would be a source of engine exhaust emissions, which include both criteria pollutants and greenhouse gases. Owners and operators of such projects would need to comply with state and federal air-quality management requirements and guidelines, including obtaining air quality permits and implementing fugitive dust control plans.

BLM_0016918

**Impacts from Soils Management.** Surface-disturbing activities associated with oil and gas development have the potential to accelerate soil erosion and instability. Mitigations would be developed that would modify proposed oil and gas operations when a Notice of Staking (NOS) or APD is received by the BLM. Most mitigation would be required based on the federal regulations, the standard lease terms, and COAs, as developed in the NEPA analysis for proposed projects. Currently under Alternative A, oil and gas operations would be restricted by stipulation GS-NSO-15 for steep slopes greater than 50 percent for oil and gas facilities, which applies to the surface occupancy and surface-disturbing activities but excludes pipelines on slopes greater than 50 percent. This stipulation affects 90,349 acres, with locations within both the high- and medium-potential areas for oil and gas.

CSU stipulations for surface-disturbing activities are required in specified areas to maintain site stability and productivity and to ensure successful reclamation of areas identified as having highly erosive soils and slopes of greater than 30 percent. Current management actions identify areas under GS-CSU-4 for erosive soils on slopes greater than 30 percent, which requires special design and construction, operation, and reclamation measures to limit the amount of surface disturbance to limit erosion potential. Implementation of this management action may include relocation of operations beyond 200 meters (656 feet) to avoid these areas.

Under Alternative A, approximately 6,100 acres of the planning area would be protected by stipulation GS-NSO-14 (for debris flow hazard zones, which would prohibit surface occupancy and surface-disturbing activities for the protection of the Glenwood Springs Debris Flow). This area would have similar protection by stipulation GS-NSO-16 for ACECs. Soil management under this alternative would have a minor impact on fluid minerals by preventing development in areas where these stipulations apply.

**Impacts from Water Resource Management.** Project design provisions, BMPs, and operational terms and conditions are designed to protect riparian and water quality values from surface-disturbing activities. Shallow alluvial freshwater wells (200 feet or less) are the most productive in the region and are the most susceptible to mineral weathering and surface runoff, which can affect water quality. Impacts on groundwater are analyzed, through the NEPA process, during the APD permitting process. Mitigations would be developed as COAs to ensure protection of groundwater aquifers and freshwater-bearing zones that could be encountered during the drilling of oil and gas wells.

Stipulation GS-NSO-3 for major river corridors prohibits surface-disturbing activities or surface occupancy within 0.5 mile of either side of the high water mark (bank-full stage) of six major rivers within the CRVFO. Of the six, only the Colorado River is affected by oil and gas activities. The other five rivers, the Roaring Fork, Crystal, Frying Pan, Eagle, and Piney Rivers, are east of the Grand Hogback, which delineates the dividing line between the high and low potential areas. The area north of Interstate 70 in the Naval Oil Shale Reserves production area is not included in this stipulation.

Current allowable use stipulation, GS-NSO-13 for municipal watershed areas, prohibits surface occupancy and surface-disturbing activities to protect municipal watersheds providing domestic water for the communities of Rifle and New Castle.

The highest potential areas for geothermal development in the planning area occur along the Colorado River in the vicinity of Glenwood Springs and in South Canyon. Therefore, these stipulations would have a moderate impact on fluid resources by preventing development in these areas.

September 2011    *Colorado River Valley Field Office – Draft RMP Revision EIS*    4-567
*Chapter 4, Environmental Consequences*

BLM_0016919

**Impacts from Vegetation Management—Weeds.** Surface-disturbing activities associated with oil and gas development have the potential to spread the development of invasive and noxious weeds through construction of well pads and associated facilities. Monitoring and controlling of noxious weeds is required through standard lease terms and conditions and lease stipulations. Lease notice GS-LN-3 requires all oil and gas lessees in the CRVFO to report annually of ongoing progress of reclamation and the status of weeds and weed control at locations developed on the lease. Interim reclamation of short-term disturbance of associated facilities that are not necessary for ongoing production and maintenance activities is required within a year of completion of all wells proposed on a pad. Soil stabilization of the disturbed area is required and would be achieved by recontouring, mulching, providing runoff and erosion control, replacing topsoil, seeding with BLM-prescribed native seed mixes (or landowner-requested seed mix on fee surface), and controlling weeds, as necessary. In cases where the exploratory drilling and development drilling on a single pad occur more than a year apart, slopes would be recontoured to the extent necessary to accommodate seeding, and BLM-required or landowner-requested seed mixes would be applied to stabilize the soil between visits.

Final reclamation of all surface disturbances would be required at the end of the life of the wells in accordance with the CRVFO reclamation policies, and the Noxious and Invasive Weed Management Plan for Oil and Gas Operators (BLM 2007c). Reclamation activities would attempt to attain the following vegetation objectives:

- Restore primary productivity of each site and establish diverse native vegetation that provides for natural plant and community succession.

- Establish native vegetation that is a vigorous and self-sustaining stand of desirable native plant species resistant to the invasion of noxious or undesirable species.

- In the long term, reclaimed landscapes should have characteristics that approximate the original visual qualities and plant species composition of the surrounding area.

**Impacts from Vegetation Management—Riparian.** Under Alternative A, approximately 1,700 acres of the planning area would be protected by stipulation GS-NSO-2 for riparian and wetland zones, which would prohibit surface occupancy and surface-disturbing activities within riparian vegetation. Additionally, a substantial number of acres within the planning area would be protected by stipulation GS-CSU-2, which would require special design and construction and implementation measures within 500 feet of riparian or wetland vegetation. These stipulations would limit or prevent geothermal development in those areas having a moderate impact on geothermal resources in those specific areas. While these stipulations would have a minor impact on mineral resources, it is important to note that activities would be further limited under this alternative by stipulation GS-NSO-3 for major river corridors.

**Impacts from Fisheries and Aquatic Wildlife Management.** Under Alternative A, approximately 12,400 acres of the planning area would be protected by stipulation GS-NSO-5 for the Rifle Falls and Glenwood Springs fish hatcheries, which would prohibit surface occupancy and surface-disturbing activities within a 2-mile radius of the hatcheries. This stipulation would have minimal impact on fluid minerals because the potential for development in those areas is low.

**Impacts from Terrestrial Wildlife Management.** Management of wildlife habitat would have an impact on oil and gas exploration and development through imposing restrictions on when such activity would be allowed. Crucial winter range for deer, elk, pronghorn antelope, and bighorn sheep have seasonal restrictions

BLM_0016920

for when exploration and development may occur. Seasonal restrictions would have adverse impacts on oil and gas development, limiting activities to the open season. Such equipment as drilling rigs and work crews may not be available just during the open season. For deeper wells, such restrictions would preclude drilling for deeper targets when the wells could not be feasibly drilled and completed within the open timeframe. Inclement weather may also shorten the drilling season in higher elevations of the planning area. Delays in permitting and scheduling of proposed operations would increase costs for exploration and development.

Under Alternative A, crucial winter range for big game species is protected by timing limitation GS-TL-1 for big game winter habitat, which prohibits surface occupancy and surface-disturbing activities from December 1 to April 30. Protection of wintering big game species is also achieved by closing certain areas to motorized travel from December 1 to April 30. Another timing limitation is imposed during calving and fawning season, GS-TL-2 for big game production (birthing) areas. This stipulation prohibits surface occupancy or surface-disturbing activities during the birthing season.

No Surface Occupancy stipulations are applicable to oil and gas leasing, and surface-disturbing activities within wildlife seclusion areas (GS-NSO-11) and State Wildlife Areas (GS-NSO-4), affecting 25,600 acres and 7,500 acres respectively within the planning area.

Current management action initiates seasonal restrictions to protect raptor and osprey nesting sites and fledgling habitat during use. During the applicable timeframes, surface occupancy and surface-disturbing activities are prohibited within a 0.25-mile radius of a raptor nest site, and a 0.5-mile radius of osprey nests. Waterfowl and shorebird nesting sites are also protected, with seasonal restriction within a 0.25-mile radius of those sites.

Waterfowl and shorebirds are protected by maintaining or enhancing riparian and wetland communities. Under Alternative A, GS-NSO-7 for waterfowl and shorebird habitat and rookeries prohibits surface occupancy and surface disturbance within significant production areas as mapped by the CDOW. These species are also protected by seasonal restriction GS-TL-13, which prohibits surface occupancy from April 15 to July 15 within a 0.25-mile radius of the Fravert Watchable Wildlife Area, Consolidated Reservoir and the King Mountain Reservoirs-Grimes-Brooks, and the Nobel and Upper and Lower King Mountain areas to protect nesting ducks.

**Impacts from Special Status Species Management—Plants and Terrestrial Wildlife.** All oil and gas federal actions would be subject to the requirements of the Endangered Species Act of 1973, as amended. Any action potentially affecting any listed threatened or endangered species would require the appropriate level of Section 7 consultation with the USFWS. Necessary mitigation, such as timing and avoidance, would be implemented to protect federally listed, proposed, or candidate plant and animal species, as well as BLM and USFS sensitive species. Lease Notice CO-30 for nesting grouse species requires relocating surface-disturbing activities proposed between March 1 and June 30, out of grouse nesting habitat to protect nesting grouse species. Grouse leks (courtship areas) are also protected under GS-NSO-6, prohibiting surface occupancy and activities within a 0.25-mile radius of an active lek. Grouse in the CRVFO and surrounding region include greater sage-grouse and Columbian sharp-tailed grouse. Seasonal restrictions also protect greater sage-grouse winter and nesting habitat from December 16 to March 15 and from March 1 to June 30. The peregrine falcons, the greater sandhill crane, and American white pelican nesting sites are also protected by seasonal restrictions. Additional NSO stipulations protect peregrine falcon nesting complexes. Surface disturbance is restricted within a 0.25-mile radius of a cliff-nesting complex.

BLM_0016921

Seasonal restrictions protect bald eagle nesting and winter roost sites, prohibiting surface occupancy and surface-disturbing activities within a 0.5-mile buffer around the sites from December 15 to June 15, and November 16 to April 15, respectively. NSO stipulations are applied to these sites, prohibiting surface disturbance within a 0.25-mile radius of the roost or nest site. These same restrictions apply to the Mexican spotted owl. Also under this alternative, fledgling and nesting habitat of ferruginous hawks are protected by NSO and TL stipulations, calling for surface protection within a 0.125-mile radius of a nest site, and prohibiting surface occupancy and surface-disturbing activities within a 1-mile radius of a nest site from February 1 to August 15. These stipulations will continue across all alternatives, with only minor modification.

Under Alternative A, GS-NSO-12 for threatened or endangered species prohibits surface occupancy and surface-disturbing activities on habitat areas for federally listed, proposed, or candidate threatened or endangered species. GS-CSU-3 for BLM sensitive species requires avoidance of those species, including relocation of operations by more than 200 meters (656 feet), if necessary for maintenance and recovery of the species or communities. GS-NSO-8 for special status plants prohibits surface occupancy and surface-disturbing activities on habitat areas to protect special status plant species, and under Lease Notice GS-LN-2, a biological inventory is required before approval of operations in areas of known or suspected habitat of special status species or species of interest. Mitigations may be required to reduce impacts of surface disturbance on affected species and their habitat, which may include relocation of roads, well pads, pipelines, and other facilities.

Distance or timing restrictions for special status species may have an adverse impact on oil and gas operations. Requirements for special status species inventories may result in relocating proposed well sites or facilities and delays in permitting oil and gas operations, thus adding to the cost of development. Seasonal restrictions would have adverse impacts on oil and gas exploration and development if proposed deep targets could not be feasibly drilled and completed within the open season.

**Impacts from Cultural Resource Management.** Managing public lands to protect cultural resources would impact oil and gas activity as mitigations or restrictions would be developed to modify proposed oil and gas operations when an application, such as a NOS or APD, is received by the BLM. Archaeological sites and sites eligible for historic listing would be avoided, and mitigation would be required consistent with the federal laws and regulations and the standard lease terms. Currently under Alternative A, CRV-NSO-38 for historic properties, surface occupancy and surface-disturbing activities are prohibited within 100 meters (328 feet) of historic properties. Modifying proposed exploration and development activities would have adverse impacts by delaying the time required for approval. GS-NSO-16 would prohibit surface occupancy and surface-disturbing activities in the Bull Gulch ACEC. While these stipulations would prohibit fluid minerals in these areas, the potential is relatively low, thus cultural resources management would have a minimal impact on fluid minerals.

**Impacts from Paleontological Resource Management.** Managing paleontological resources on public lands would have an impact on oil and gas development if surface-disturbing activities related to oil and gas development uncovered vertebrate or scientifically important invertebrate and plant fossils. For each potential surface-disturbing activity, the potential for discovering fossils is assessed and documented. Predisturbance field assessment of geologic units mapped as Class 4 or 5 are performed by a qualified paleontologist in areas that are devoid of thick soils or well developed vegetation, or in areas that have previously yielded fossil resources. Oil and gas development or drilling would not be precluded, but mitigations, including preconstruction pedestrian surveys and construction monitoring, may be appropriate. Geologic units mapped

BLM_0016922

Potential Fossil Yield Classification (PFYC) Classes 1-3 are not required to have preconstruction assessments, or only in rare cases. Currently under Alternative A, GS-LN-1, Instruction Memorandum No. 2008-009, Potential Fossil Yield Classification (PFYC) System for Paleontological Resources on Public Lands, requires a paleontological inventory of surface-disturbing activities in Class 4 and 5 paleontological areas.

**Impacts from Visual Resource Management.** Managing visual resources on public lands would have an impact on fluid mineral activity as mitigations would be developed that would modify proposed oil and gas operations when an application, such as a NOS or APD, is received by the BLM. Based on the VRM class, mitigations would be developed consistent with the guidelines of the VRM classes and the federal laws and regulations and standard lease terms and conditions. Within the CRVFO, there are currently 17,100 acres listed as VRM Class I; 230,100 acres as VRM Class II; 113,700 acres as VRM Class III; and 144,200 acres as VRM Class IV. VRM Class I lands are managed to retain a natural landscape. An area designated VRM Class II would allow for minimal change to its landscape character, thus oil and gas activity would be very restricted, or activities may need to be redesigned or moved depending on the proposed operation. This restriction would preclude surface drilling and surface facilities, unless these were to meet the VRM objective.

Under Alternative A, GS-NSO-18 for the Interstate-70 viewshed prohibits surface occupancy and surface disturbance activities on slopes over 30 percent, with high visual sensitivity in the Interstate-70 viewshed. These lands are within 5 miles of the interstate, where changes in visual contrast can be easily noticed by the casual observer on the interstate. Also under Alternative A, VRM Class II areas are protected by GS-CSU-5, VRM Class II, applying site-specific restrictions. Relocation of operations by more than 200 meters (656 feet) may be required to protect visual values. These stipulations would have a moderate impact on fluid minerals by limiting or preventing development activities in areas where potential exists.

**Impacts from Recreation and Visitor Services Management.** Managing for recreation resources in the form of SRMAs would have no impact on oil and gas development, although it would prohibit surface occupancy and surface-disturbing activities within those areas. Current management actions identify 60,400 acres under SRMA designation and 64,100 acres under RMA designation, but none is located within the high potential area. Under Alternative A, there are no current ERMA designations, but CSU stipulations attached to such designation would subject oil and gas activity to moderate constraints with surface-disturbing activities related to development. Mitigations that would modify operations may result in the inability to develop oil and gas in some locations, as well as added costs for potential development.

**Impacts from Lands and Realty Management.** Lands and realty objectives are to provide for the development of transportation systems, utilities, communication sites, and renewable energy resources when such needs are consistent with other resource values. Incorporated municipalities are closed to oil and gas leasing. Exceptions, modifications, and waivers do not apply to closed areas. Currently under Alternative A, CRV-CL-5 for municipal boundaries closes 22 acres to oil and gas leasing. ROW avoidance areas, which include utility and communication sites and Category I and II lands suitable for public disposal, are currently managed as CSUs. However, they are generally areas that are small enough to be easily avoided by surface-disturbing activities of oil and gas development and therefore have little impact on developing oil and gas resources.

**Impacts from Coal Management.** There are currently no operating coal mines within the planning area, but management objectives identify 28,500 acres of federal mineral estate to remain open to further consideration for coal leasing, of which 1,600 of those acres are deemed unacceptable to leasing due to multiple use

BLM_0016923

conflicts. Surface use restrictions would be applied to oil and gas operations within areas of federally leased coal, requiring site-specific relocation of operations to an area outside the area to be mined, or located to accommodate room and pillar mining operations. Additional CSU restrictions would require oil and gas operations to be relocated from areas where underground coal mine operations are found. Stipulations attached to such designated areas would subject oil and gas activity to major constraints with surface-disturbing activities related to development. Such constraints would result in the inability to develop oil and gas resources within those areas.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative A, most of the planning area would be open to locatable, salable, and non-energy leasable mineral development where activities are not restricted by existing stipulations and regulations. The potential for these activities to occur in potential fluid minerals development areas is low. Therefore, management of these mineral resources would have a minor impact on fluid minerals.

Under Alternative A, approximately 470,300 acres of the planning area would be open to locatable mineral development. However, the CRVFO would recommend for withdrawal to the Secretary of the Interior of approximately 34,600 acres for closure to the mining laws for locatable exploration or development. Approximately 470,300 acres of the planning area would be open to salable minerals and 476,900 acres of the planning area would be open to non-energy leasable minerals. The CRVFO would propose the closure of approximately 28,000 acres in the planning area to mineral materials and non-energy solid mineral leasing.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** ACEC designation would preclude fluid mineral development within those designated areas withdrawn from leasing. ACEC areas with NSO stipulations would preclude drilling or construction activities within those areas. Drilling would need to be by directional methods from adjacent land in order to reach subsurface targets. Current management action protects 960 acres within a portion of the Thompson Creek Natural Environment Area, and is withdrawn from leasing. Two other areas managed as ACECs under this alternative, and totaling 14,100 acres, are also closed to fluid minerals leasing. The only current ACEC managed within the high potential area is 120 acres of the Lower Colorado ACEC. This area has no NSO designation but is managed as riparian habitat and so would have major constraints on oil and gas development. In addition, approximately 6,100 acres of the planning area would be designated the Glenwood Springs Debris Flow Hazard Zones ACEC. Of the ACECs under this alternative, this one is likely to occur in areas where geothermal potential exists. Therefore, ACECs would have a moderate impact on geothermal resources by limiting or preventing development in those areas.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Although 13 stream segments have been identified within the CRVFO as eligible for classification on the Wild and Scenic River Suitability Report as Wild and Scenic designation, under Alternative A management guidelines call for interim protection to preserve the free-flowing nature of the eligible segments and their ORVs. Oil and gas exploration and development would be affected by limiting surface-disturbing activities within the river corridors. Segments that are within WSAs would be closed to fluid minerals leasing. Management actions outside WSAs would vary from open, subject to standard lease terms, to closed to fluid minerals leasing. NSO restrictions on river segments located outside WSAs would have adverse impacts on oil and gas development since directional drilling would be required to develop subsurface targets found within these river corridors, which would add to the cost of successful development. The protected corridor for WSRs, where designated as such, is 0.25

BLM_0016924

mile of the high water mark on each bank of the river segment. In areas closed to fluid minerals leasing, fluid mineral resources would not be available for development.

Geothermal development, where allowed in stream segments designated for potential addition to the NWSRS, which includes eligible rivers, would require a plan of operations as stated at 43 CFR 3809.11(c)(2). As the plan of operations is reviewed and approved under the applicable federal laws and regulations and as consistent with a proponent's rights, mitigations may be required to protect the outstandingly remarkable values of the eligible rivers as consistent with applicable federal laws and regulations and a proponent's rights. Requiring a plan of operations and mitigation would have adverse impacts by delaying the processing time and possibly reducing the feasibility of the proposal. Most of the eligible river segments are within areas that do not have potential for geothermal development.

**Impacts from Public Health and Safety Management.** Management of health and safety objectives on public lands is intended to protect lives, resources, and property within the local communities and adjacent BLM lands. Emergency communications and coordination with local emergency services provide safe facilities and conditions for all users of public lands, with minimum damage to those lands and accompanying resources. Management objectives are defined under standard lease terms and conditions. Under GS-LN-4, oil and gas operators (lessees) are required to prepare and maintain emergency communication plans. Lease Notice GS-LN-7 requires oil and gas operators drilling on federal mineral estate to consider the impact that their operations have on nearby communities and residences. Under this notice, operators may be required to adjust such operations in order to accommodate local residential concerns, which will adversely affect oil and gas activities, adding additional costs and planning to operations.

Additional management actions under GS-LN-9 have defined a 3-mile buffer around the Project Rulisonsite, where oil and gas wells proposed or located would be subject to oversight measures established by the COGCC. This action would have a major constraint on oil and gas development within the monitoring zone but is part of the standard lease terms and conditions.

Hydrogen sulfide gas ($H_2S$) is a by-product of oil and gas drilling and production operations and is produced by the breakdown of organic matter by bacteria. The production of $H_2S$ gas occurs naturally in stagnant waters such as bogs and swamps and is also released from volcanoes, hot springs, and underwater thermal vents. In the oil and gas industry, hydrogen sulfide gas is encountered in two ways. Sour gas formations have naturally occurring $H_2S$ within the sedimentary strata and it is released and brought to the surface with the produced gas. Secondly, some geologic formations have $H_2S$ producing bacteria introduced during workover and recompletion activities.

There are no sour gas formations found within the CRVFO. $H_2S$ production is the result of post-drilling activities and is likely the result of bacteria being introduced from both fresh and produced waters used during recompletion activities. Current management requires detection and monitoring equipment on drilling and completion sites, which must be sensitive enough to detect a minimum of 10 ppm $H_2S$ gas in ambient air. Testing of produced gas to determine presence and concentration of $H_2S$ is also required. Measured $H_2S$ concentrations of 100 ppm or greater in produced gas streams are considered $H_2S$ wells and potentially hazardous. Current detected concentration levels of wells drilled within the CRVFO indicate low levels of $H_2S$. $H_2S$ Drilling Operations Plans and Public Protection Plans are required from oil and gas operators and will be activated immediately on detection of release of a potentially hazardous (100 ppm threshold) volume of $H_2S$. Wind direction warning flags and hazard signs are required to be posted on well facilities that have

BLM_0016925

detectable concentrations of 10 ppm or greater. Additional safety measures in the form of personal protection equipment (PPE) are required for essential personnel in areas where a visible warning is posted.

### *Alternative B*

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts under Alternative B would be the same as or similar to those under Alternative A, but with slightly less development and more restrictions on development. Under this alternative, approximately 651,400 acres the federal mineral estate within the planning area would be managed as open to oil and gas leasing and development. This alternative accounts for the development of approximately 2,206 federal wells on 276 multi-well pads with an estimated 2,774 acres of surface disturbance and includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 1,814 acres on interim reclamation of well pads.

Under this alternative, the CRVFO would manage approximately 55,600 acres of the federal mineral estate as closed to fluid minerals leasing. Major constraints (NSO stipulations) would be applied to approximately 326,700 acres of the planning area that are open to oil and gas leasing. In addition, moderate constraints (CSU stipulations, site-specific relocation) would apply to approximately 489,500 acres that are open to oil and gas leasing.

Impacts to Fluid Minerals from management of weeds, paleontological resources, coal, and health and safety under Alternative B would be the same as those described under Alternative A.

**Impacts from Air Quality Management.** Dust abatement measures for surface disturbing operations and road design and surfacing requirements to control dust emissions would result in higher costs associated with mineral and energy development. New and existing drill rigs would be required to meet EPA diesel emission standards, increasing equipment costs over the short term.

**Impacts from Soils Management.** Managing public lands to protect soil resources would have an impact on oil and gas activity as mitigations would be developed that would modify proposed oil and gas operations when an application, such as an APD, is submitted to the receiving office. Mitigations would be required based on the federal regulations, the standard lease terms, and as COAs for APDs developed through the NEPA analysis for proposed projects. In order to protect soil, controlled surface use would establish the following constraints:

- Exploration and development on slopes greater than 30 percent and having soils with severe or very severe erosion hazard as identified based on the NRCS soil survey, would require site-specific relocation and restrictions.

- Surface occupancy and surface-disturbing activities on steep slopes greater than 50 percent would be prohibited in order to maintain site stability.

- A debris flow hazard zone will be established to prohibit surface activities for the protection of the Glenwood Springs debris flow.

Slopes that have a gradient that is greater than 30 percent would be subject to CSU. This moderate constraint would be subject to modification and exception, based on adequate design and construction to reduce erosion potential and maintain site stability and productivity and to ensure successful reclamation. Slopes that have a gradient of 50 percent or more would be subject to NSO, as will the debris flow hazard area. This major

BLM_0016926

constraint would require redesign or result in the inability to develop oil and gas in some locations, adding cost and delays to permitting oil and gas exploration activities.

Impacts under Alternative B would be greater and more restrictive to geothermal development activities than under Alternative A. Under this alternative, stipulation GS-NSO-15 would be replaced by stipulation CRV-NSO-2 for steep slopes greater than 50 percent, and stipulation GS-CSU-4 would be replaced by stipulation CRV-CSU-1 for slopes greater than 30 percent and/or severe erosion hazard soils. In addition, these stipulations would apply to all surface occupancy and all surface-disturbing activities in the planning area. These stipulations could prevent geothermal development in specific areas thus having a minor impact on geothermal resources.

**Impacts from Water Resource Management.** Managing water resources on public lands to protect watershed functions and water quality and quantity would be achieved by controlled surface use within the following constraints:

- Applicable permits required by Section 402 and 404 of the Clean Water Act will be acquired before project implementation.

- Exploration and development will be prohibited within 0.5 mile of either side of the high water mark (bank-full stage) of six major rivers within the CRVFO planning area.

- Exploration and development will be prohibited within 50 feet from the ordinary high water mark of any hydrologic feature. Such identified features include ephemeral, intermittent, and perennial channels, wetlands, lakes, fens, and springs.

- Exploration and development is prohibited within municipal watersheds providing domestic water.

NSO restrictions to achieve these constraints would impact oil and gas development. Such stipulations would cause modification to operations and development plans, but subsurface targets located under these areas may be reached using directional drilling methods. Relocation of surface-disturbing activities would add costs for potential development and delays in permitting.

Under Alternative B, approximately 43,100 acres of the planning area would be protected by stipulation CRV-NSO-3 for major river corridors that would prohibit surface occupancy and surface-disturbing activities within 0.5 mile of either side of the high water mark of six major rivers within the CRVFO. Additionally, stipulation CRV-NSO-4 for designated municipal watershed areas would prohibit surface occupancy and surface-disturbing activities within municipal watersheds providing domestic water. Stipulation CRV-NSO-5 for streamside management zones would further protect approximately 34,500 acres of the planning area by prohibiting surface occupancy and surface-disturbing activities within 50 feet from the ordinary high water mark of any hydrologic feature. The highest potential areas for geothermal development in the planning area occur along the Colorado River in the vicinity of Glenwood Springs and in South Canyon. Therefore, these stipulations would have a moderate impact on geothermal resources by preventing development in these areas.

**Impacts from Vegetation Management—Riparian.** Under Alternative B, a substantial number of acres within the planning area would be protected by stipulation CRV-CSU-3, which would require special design, and construction and implementation measures within 500 feet of riparian or wetland vegetation. The NSO stipulation for riparian zones under Alternative A would not apply under this alternative. This CSU stipulation

September 2011          *Colorado River Valley Field Office – Draft RMP Revision EIS*          4-575
*Chapter 4, Environmental Consequences*

BLM_0016927

could allow for surface-disturbing activities to occur and this alternative would essentially be less restrictive than Alternative A with regard to fluid minerals development, therefore having a minor impact on them. However, it is important to note that other stipulations for water resources and fisheries under Alternative B would probably limit or prevent surface-disturbing activities in riparian zones, which would have a moderate impact on geothermal resources in those areas.

**Impacts from Fisheries and Aquatic Wildlife Management.** Under Alternative B, approximately 18,400 acres of the planning area would be protected by stipulation CRV-NSO-15 for fish-bearing streams that would prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of all fish-bearing streams. In addition, stipulation CRV-NSO-17 for fish hatcheries would replace stipulation GS-NSO-5 for the Rifle Falls and Glenwood Springs fish hatcheries. These stipulations could have a moderate impact on geothermal resources by preventing and limiting development in those areas. Under this alternative, development would also be impacted by the streamside management zones and major rivers stipulations.

**Impacts from Wildlife Management.** In addition to the impacts described under Alternative A, the following actions would be implemented under Alternative B:

- Establishment of Core Wildlife Areas where surface occupancy and surface-disturbing activities are prohibited.

- Establishment of Big Game Mitigation Areas that prohibit surface occupancy in essential big game habitat to offset impacts of nearby gas development in combination with residential development.

- Prohibition of surface occupancy and surface-disturbing activities on all state-owned wildlife areas.

Managing wildlife on public lands to minimize big game stress, protect winter range and winter concentrations areas, migration corridors, and birthing areas would be achieved by NSO and TL stipulations. CRV-TL-1 would affect 274,400 acres as mapped by CDOW, prohibiting surface-disturbing activities from December 1 to April 30. NSO stipulations under CRV-NSO-8 for core wildlife areas and CRV-NSO-10 for state wildlife areas would prohibit surface occupancy and surface-disturbing activities within these areas. Implementation of these stipulations would protect 57,600 acres and 7,500 acres respectively.

The impacts on oil and gas development would be similar to Alternative A, except additional acres have been added to establish the core wildlife areas. Standard exceptions and modification apply to NSO stipulations, with the exception of state wildlife areas, where no exceptions are permitted.

Protection of nesting and production areas for shorebirds and waterfowl, as defined under Alternative A, would continue under all alternatives.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Under Alternative B, approximately 90 acres of the planning area would be protected by stipulation CRV-NSO-32 for four federally endangered big-river fishes that would prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of the mapped 100-year floodplain on the Colorado River from Glenwood Springs downstream to the CRVFO terminus. An additional 4,800 acres of the planning area would be protected by CRV-NSO-33 for three BLM sensitive big-river fishes, which would prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of all occupied tributary streams for flannelmouth sucker, bluehead sucker, and roundtail chub. Further protection of approximately 3,800 acres in

BLM_0016928

the planning area would be provided by stipulation CRV-CSU-15 for sensitive amphibians that would apply CSU restrictions within an 800-meter (0.5-mile) buffer around all identified breeding sites. The highest potential areas for geothermal development in the planning area occur along the Colorado River in the vicinity of Glenwood Springs and in South Canyon. Therefore, these stipulations would have a moderate impact on geothermal resources by preventing development in these areas.

**Impacts from Special Status Species Management—Plants and Terrestrial Wildlife.** The types of impacts experienced from management of special status species would be similar to those described under Alternative A, with additional exceptions. Controlled surface use for plant communities that meet BLM's criteria for significant, would be required under CRV-CSU-7 for significant plant communities. Special design, construction, and implementation measures, including relocation by more than 200 meters (656 feet), may be required for plants categorized as such.

Harrington's penstemon, a BLM sensitive species, would require restrictions to surface-disturbing activities of oil and gas development. CRV-CSU-8 for Harrington's penstemon habitat outside ACECs would initiate a 100-meter (328 foot) buffer around occupied *Penstemon harringtonii* habitat. Under this alternative, CRV-NSO-20 would prohibit surface occupancy and surface disturbance within a 100-meter (328 feet) buffer around occupied BLM sensitive species habitat. Other NSO stipulations would protect current and historically occupied habitat for federally listed, proposed, or candidate threatened or endangered plants from indirect impacts and loss of suitable habitat, with specific reference to DeBeque phacelia, a candidate species.

Seasonal buffers under lease terms for CRV-TL-5 for nesting grouse would continue under all alternatives, relocating surface-disturbing activities from March 1 to June 30. Additional TLs would limit such activities to protect sage-grouse and sharp-tailed grouse winter and nesting habitat from December 16 to March 15, and March 1 to June 30. NSO restrictions would be imposed within a 0.6-mile radius of an active lek for sage-grouse under CRV-NSO-23 and within a 0.4-mile radius for sharp-tailed grouse under CRV-NSO-24.

Timing and distance restrictions would be imposed at the time of an application for exploration and development, based on applicable federal laws and regulations and the standard lease terms. Requiring seasonal buffers would result in delaying development activities or relocating wells and facilities. Completing species inventories, selecting relocated sites, and modifying development plans would increase delays in permitting and the costs of exploration and development of oil and gas resources.

**Impacts from Cultural Resource Management.** Impacts on fluid minerals activities from the management of cultural resources would be similar to those described under Alternative A, except the current stipulation protecting historic properties, CRV-NSO-38 historic properties, would be replaced by CRV-NSO-39 for eligible historic properties, prohibiting surface occupancy and surface-disturbing activities within 200 meters (656 feet) of properties with such designation. Additional management actions under CRV-NSO-37, heritage areas, would prohibit surface occupancy and surface-disturbing activities within 0.25-mile radius of traditional cultural properties or areas of Native American concern. Also, under Alternative B, approximately 14,100 acres of the planning area would be closed to oil and gas leasing (CRV-CL-9) for the Blue Hill and Bull Gulch ACECs. This designation would prohibit oil and gas leasing within the 3,700-acre Blue Hill ACEC and the 10,400-acre Bull Gulch ACEC. In addition, stipulation CRV-NSO-49 would prohibit surface occupancy and surface-disturbing activities in the Bull Gulch ACEC.

BLM_0016929

Mitigations for these requirements would be imposed for site-specific development applications, such as an APD, as consistent with federal laws and regulations and the standard lease terms. Mitigation would require avoidance of cultural resources. Such mitigation would impact oil and gas explorations and development through an increased cost for cultural resource inventories and relocation of proposed wells and surface facilities.

**Impacts from Visual Resource Management.** The types of impacts experienced from VRM would be similar to those described under Alternative A. Areas included in each of the VRM classes under Alternative B are as follows: VRM Class I—33,600 acres, VRM Class II—249,200 acres, VRM Class III—102,100 acres, and VRM Class IV—120,300 acres. Under this alternative, acres designated as VRM Class I would increase by 16,500, acres designated as VRM Class II would increase by 19,100, acres designated VRM Class III would decrease by 10,800 and designated VRM Class IV acres would decrease by 23,900.

VRM Class I would impact oil and gas exploration and development as surface disturbance would not be allowed, unless the appropriate mitigation met the objective of this VRM class. However, WSAs are also VRM Class I lands that are closed to oil and gas leasing. Designated VRM Class II areas are managed to allow for only minimal change to its landscape character, greatly restricting oil and gas activity. Drilling and surface facilities would be precluded unless Class II objectives could be met. Specific ACECs and SRMAs would be managed under Class II objectives. Under Alternative B, CRV-NSO-41, VRM Class II areas with slopes over 30 percent and high visual sensitivity would prohibit surface occupancy and surface-disturbing activities in areas designated as such. Other VRM Class II areas would be protected by CRV-CSU-16, VRM Class II. Special design measures, mitigation plans, or relocation of operations by more than 200 meters (656 feet) may be required to protect visual values. VRM Classes I and II are the most restrictive of the four classes, thereby having a moderate impact on geothermal resources under this alternative by restricting development activities. VRM Class III and IV designated lands would have minimal impact on oil and gas, although there could be delays and added costs to develop mitigations, such as building facilities in a manner that blends better with the landscape.

**Impacts from Recreation and Visitor Services Management.** Under this alternative, six ERMAs would be established: Eagle River, Fisher Creek, Hardscrabble/East Eagle, New Castle, Silt Mesa, and Thompson Creek. Only Silt Mesa and a portion of the New Castle ERMAs are within the high potential leasing area. The New Castle ERMA consists of three separate portions, with the largest of the three found north of the Grand Hogback, the dividing line between the high potential and medium potential oil and gas activity occurrence areas. These areas would be subject to CSU restrictions that may require site-specific relocation. Also under this alternative, six SRMAs totaling 49,600 acres would be administratively recognized and subject to NSO stipulations. An additional 1,400 acres would be established as an SRMA and subject to CSU stipulations. These lands would be subject to standard lease terms with moderate constraints on oil and gas activity. Of the SRMAs included under this alternative, none is located within the high potential oil and gas activity occurrence area, but portions of the Upper Colorado SRMA and The Crown overlap into the medium potential areas. Minimal impacts on oil and gas activity would be incurred within these two areas.

**Impacts from Lands and Realty Management.** Management of lands and realty objectives would be similar to those described under Alternative A, with the exception of ROW avoidance areas and ROW exclusion areas. Identified ROW avoidance areas include 169,600 acres within the CRVFO and renewable energy sites, such as those for solar and wind development. These areas are managed with major constraints (NSO). Included in such designations are ACECs (those not included in ROW exclusion areas), heritage

BLM_0016930

areas, SRMAs, administrative sites, wetlands, and special status species occupied habitat. Surface occupancy and surface-disturbing activities of oil and gas development would be precluded in areas designated as such. Also under this alternative, ROW exclusion areas would be established, encompassing 39,300 acres, where development proposals would not be considered. Included in this designation are WSAs, ACECs, VRM Class I, and any suitable NWSRS classifications.

Limiting the above areas subject to NSO or closure to leasing would affect oil and gas exploration and development. Drilling from NSO restricted surface or surface occupancy would be disallowed, and undiscovered oil and gas resources would not be available for development in closed areas.

Also under this alternative, retention areas are established for long-term management and affect 488,400 acres within the CRVFO, and include SRMAs, ERMAs, recreation sites, administrative sites, WSAs, ACECs not included in ROW exclusion areas, suitable WSR segments, heritage areas, high potential mineral estate under private lands, high and medium potential mineral estate, perennial stream corridors, major river corridors, BLM land access points, big game critical winter range, sage-grouse core areas, and habitat for federally listed, proposed, or candidate threatened or endangered species. Lands and realty management under this alternative would be more restrictive than Alternative A, having a moderate impact on geothermal resources.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, but with fewer acres open to mineral development. Under this alternative, approximately 407,900 acres of the planning area would be open to locatable mineral development. However, the CRVFO would recommend for withdrawal to the Secretary of the Interior of approximately 97,000 acres for closure to the mining laws for locatable exploration or development. Approximately 362,700 acres of the planning area would be open to salable minerals and non-energy leasable minerals. The CRVFO would propose the closure of approximately 142,200 acres in the planning area to mineral materials and non-energy solid mineral leasing.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative B, four new ACECs would be designated, one would be withdrawn, and one would be modified, adding 7,500 acres to ACEC designation. Thompson Creek ACEC, formerly Thompson Creek Natural Environment Area, will encompass 3,400 acres closed to oil and gas leasing, increased from 960 acres withdrawn from leasing under Alternative A. The Blue Hill, Bull Gulch, Thompson Creek, and Deep Creek ACECs, totaling 19,900 acres, would be closed to fluid minerals leasing and therefore, would have no impact on oil and gas development. All other ACEC designations, unless specified, would have NSO stipulations to prohibit surface occupancy and surface-disturbing activities, which would have major constraints on oil and gas development, although no ACECs managed under this alternative occur within the high-potential area.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, except these areas would be protected by stipulation CRV-NSO-50 for WSAs that would prohibit surface occupancy and surface-disturbing activities in WSAs. In addition, stipulation CRV-CSU-22 for WSAs if released from wilderness consideration would apply CSU restrictions, if Congress were to release these WSAs from wilderness consideration.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The types of impacts from management of WSRs would be similar to those described under Alternative A, with the exception of four additional eligible river segments, one of which is classified as wild, the other three as recreational. Under this alternative, CRV-

BLM_0016931

CL-11, would close to oil and gas leasing the four segments suitable for WSR designation. Suitable segments designated as wild would be subject to NSO stipulations, while those designated as scenic and recreational would be subject to CSU stipulations. NSO stipulations would preclude drilling or construction activities within those areas. Drilling would need to be by directional methods in order to reach subsurface targets. CSU stipulations would apply moderate constraints to oil and gas surface disturbance activities.

*Alternative C*

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).**
Impacts under Alternative C would be the same as or similar to those under Alternatives A and B, except that more acres of the planning area would be closed to oil and gas leasing and slightly more acres protected by NSO and CSU stipulations, making this the most restrictive of the alternatives. Under this alternative, approximately 531,500 acres the federal mineral estate within the planning area would be managed as open to oil and gas leasing and development. This alternative accounts for the development of approximately 2,206 federal wells on 276 multi-well pads with an estimated 2,774 acres of surface disturbance and includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 1,814 acres on interim reclamation of well pads.

Under this alternative, the CRVFO would manage approximately 175,500 acres of the federal mineral estate as closed to fluid minerals leasing. Major constraints (NSO stipulations) would be applied to approximately 333,800 acres of the planning area that are open to oil and gas leasing. In addition, moderate constraints (CSU stipulations, site-specific relocation) would apply to approximately 500,500 acres that are open to oil and gas leasing.

Impacts to fluid minerals from management of weeds, paleontological resources, coal, and health and safety under Alternative C would be the same as those described under Alternative A. Impacts to fluid minerals from management of soils and special status fish and other aquatic wildlife would be the same as those described under Alternative B.

**Impacts from Air Quality Management.** Dust abatement measures for surface disturbing operations and road design and surfacing requirements to control dust emissions would result in higher costs associated with mineral and energy development. New and existing drill rigs will be required to meet EPA diesel emission standards, increasing equipment costs over the short term.

**Impacts from Water Resource Management.** The types of impacts experienced from water management would be similar to those described under Alternative B, with an additional exception. Under this alternative, CSU stipulations would restrict surface occupancy and surface-disturbing activities within 100 feet from the edge of a hydrologic feature, rather than 50 feet as identified under Alternative B. Such identified features include ephemeral, intermittent, and perennial channels, wetlands, lakes, fens, and springs. This additional stipulation would have little impact on fluid minerals as these designated areas are small enough to be easily avoided.

**Impacts from Vegetation Management—Riparian.** Impacts under Alternative C would be the same as or similar to those under Alternative B but would include additional protection of approximately 4,300 acres in the planning area by stipulation CRV-NSO-6 for riparian and wetland zones that would prohibit surface occupancy and surface-disturbing activities within riparian vegetation. Riparian management under this alternative would have a moderate impact on geothermal resources by limiting or preventing geothermal development in those areas.

BLM_0016932

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts under Alternative C would be the same as or similar to those under Alternative B, except that 18,400 acres protected by stipulation CRV-NSO-15 for fish-bearing streams would be replaced by stipulation CRV-NSO-16 for perennial waters, which would provide additional protection of approximately 27,900 acres of the planning area by prohibiting surface occupancy and surface-disturbing activities within 100 meters (328 feet) of perennial waters. Similar to Alternative B, these stipulations would have a moderate impact on geothermal resources by preventing or limiting development in those areas. In addition, the streamside management zones and major rivers stipulations in this alternative would further impact development.

**Impacts from Wildlife Management.** Management of big game species objectives would be similar to those described under Alternative B, with an additional lease exception. Under CRV-CL-2 for state wildlife areas, oil and gas leasing would be prohibited on all state-owned wildlife areas. Areas withdrawn from leasing would have a major impact on oil and gas exploration and development as undiscovered resources or known subsurface targets would not be available for development.

**Impacts from Special Status Species Management—Plants and Terrestrial Wildlife.** Management of plant special status species under this alternative would be similar to those described under Alternative B, with the following exceptions: NSO stipulations designated in sensitive plant occupied habitat would not be applicable to this alternative, but NSO stipulations would be implemented under CRV-NSO-19 for special status plant species and their habitat, which would prohibit surface occupancy and surface-disturbing activities within a 200-meter (656 feet) buffer around the designated species habitat. NSO stipulations for DeBeque phacelia, would continue to be managed under this alternative.

Terrestrial wildlife special status species management objectives would be similar to those described under Alternative B, with the following exceptions: NSO stipulations for Columbian sharp-tailed grouse leks would prohibit surface disturbance with 0.4-mile radius of a known lek, rather than an active lek; and stipulation CRV-CSU-14 for sensitive amphibians would be replaced with stipulation CRV-NSO-34 for sensitive amphibians that would provide additional protection of approximately 3,800 acres in the planning area by prohibiting surface occupancy and surface-disturbing activities within 800 meters (0.5 mile) of identified breeding sites. NSO stipulations would preclude drilling or construction activities within those areas, applying major constraints to fluid mineral development

**Impacts from Cultural Resource Management.** Impacts on oil and gas activities from the management of cultural resources would be similar to those described under Alternative B. The current stipulation protecting eligible historic properties, CRV-NSO-38 for eligible historic properties, would be replaced by CRV-NSO-39, which would increase the buffer width from 100 meters to 200 meters.

Mitigations for these requirements would be imposed for site-specific development applications. Mitigation would require avoidance of cultural resources and would impact oil and gas exploration and development through an increased cost for cultural resource inventories and relocation of proposed wells and surface facilities.

**Impacts from Paleontological Resource Management.** Impacts would be the same as described under Alternative A, with the exception of management actions concerning designation of the new McCoy Fan Delta ACEC. An NSO stipulation would close this area to invertebrate and vertebrate fossil collection. This

BLM_0016933

action would have no impact on oil and gas exploration and development since this area does not fall within the high potential oil and gas activity occurrence potential area.

**Impacts from Visual Resource Management.** Impacts experienced under this alternative for visual resource management would be similar to those described under Alternative B. Acres of the VRM classes under Alternative C are as follows: VRM Class I—33,600 acres; VRM Class II—258,100 acres; VRM Class III—97,000 acres; and VRM Class IV—116,000 acres. Under this alternative, all ACECs are managed as VRM Class II unless specified otherwise, as in the VRM Class I classification for Thompson Creek, Bull Gulch, and Deep Creek ACECs. Additional areas found to contain wilderness characteristics, including the Grand Hogback ACEC, will also be managed under VRM Class II unless designated otherwise. Also under Alternative D, the number of SRMAs managed under Class II designation would decrease from six to two. Only Red Hill and Upper Colorado River SRMAs would be managed as Class II. A net decrease in impacts from oil and gas activities would occur for SRMA designated lands for Alternative C, but special design measures and mitigation and relocation plans would still be required to meet VRM Class II objectives.

**Impacts from Management of Lands with Wilderness Characteristics (LWCs).** Managing lands to protect the naturalness and outstanding opportunities for solitude and primitive recreation are identified as lands with wilderness characteristics. Under this alternative, 47,000 acres of LWCs would be managed as LWCs and closed to fluid minerals leasing, which would preclude exploration and development of oil and gas resources.

Most of the land with wilderness characteristics outside existing WSAs would be in the medium to low potential oil and gas activity areas, with the exception of the proposed Grand Hogback area. Approximately 11,400 acres within the high potential activity area would be closed to oil and gas leasing. This area is also within the remaining unleased parcels of the high potential area. Closing these areas to leasing would have a major adverse impact on oil and gas activities, affecting the opportunity to explore or develop any as yet undiscovered resources. Additionally, surface use of these designated lands would be managed with NSO stipulations prohibiting surface occupancy or surface-disturbing activities. Management of these areas would have minor impacts on geothermal resources because the potential for geothermal development in these areas is low.

**Impacts from Recreation and Visitor Services Management.** Management of recreation and visitor services under this alternative would be similar to those described under Alternative B. Three additional ERMAs would be established: Hack Lake, King Mountain, and The Crown. King Mountain, Hack Lake, and most of The Crown are within the low potential oil and gas activity area, with a small portion of The Crown overlapping into the medium potential area. Also under this alternative, only two SRMAs would be established for the protection of recreation outcomes, affecting 23,800 acres and subject to NSO stipulations. Only a portion of the Upper Colorado River SRMA would be found within the medium oil and gas activity occurrence area, where surface occupancy and surface-disturbing activities would be prohibited. NSO requirements would have a major impact on development activities. If subsurface targets for oil and gas exploration were to be discovered within this area, development of these resources would have to be attained through directional drilling methods, adding costs, and through modification of development plans.

**Impacts from Lands and Realty Management.** Management of lands and realty objectives would be similar to those described under Alternative B, with the exception of a decrease in the acres managed as ROW avoidance areas. This would include areas managed as LWCs and an additional nine river segments found

BLM_0016934

suitable for inclusion in the NWSRS. Total acres managed under this designation would decrease by 7,600 acres. ROW Exclusion Areas are included under this alternative as well and would increase to 50,600 acres, which is 11,300 acres more than under Alternative B. WSAs, VRM Class I lands, and specific ACECs would drop out of this alternative, while segregated lands (specifically State Land Board Exchange parcel in Eby Creek area), and additional NWSRS segments would be included. Development proposals would not be considered within these areas. See Alternative A for stipulations attached to NWSRS designation and impacts on oil and gas development. Segments of Battlement Creek are proposed for wild and scenic designation and are located within the high-potential area for oil and gas activity.

Retention areas would essentially the same (488,700 acres) and would include all areas mentioned under Alternative B.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts under Alternative C would be the same as or similar to those under Alternative B, but a substantial percentage of the planning area would be closed to mineral development under this alternative. Under this alternative, approximately 332,800 acres of the planning area would be open to locatable mineral development. However, the CRVFO would recommend for withdrawal to the Secretary of the Interior of approximately 172,100 acres for closure to the mining laws for locatable exploration or development. In addition, approximately 317,000 acres of the planning area would be open to salable minerals and non-energy leasable minerals. The CRVFO would propose the closure of approximately 196,000 acres in the planning area to mineral materials and non-energy solid mineral leasing.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** In addition to those ACECs identified under Alternative B, seven new ACECs would be designated, and one would be modified, adding 45,200 acres to ACEC designation. Areas described under Alternative B as closed to fluid minerals leasing would be maintained under this alternative. NSO designations as described under Alternative B would also continue under Alternative C. Additional acres proposed for ACEC designation would be subject to NSO stipulations. As under Alternative B, Deep and Thompson Creek ACECs would continue to be managed under lease terms as closed to oil and gas leasing under Alternative C. Under this alternative, the Hardscrabble-Mayer Gulch ACEC would be modified to include an additional 800 acres of the East Eagle Ridge ACEC to protect BLM sensitive plant species, Harrington's penstemon. NSO stipulations for this new ACEC would create a 200-meter (656-foot) buffer protecting occupied habitat of the species. This area is one of the highest known concentrations of the plant. All other ACEC designations, unless specified, would have NSO stipulations to prohibit surface occupancy and surface-disturbing activities, which would have major constraints on oil and gas development. Both the Mount Logan Foothills and Grand Hogback ACECs are within the high-potential areas for oil and gas activity.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The types of impacts from management of WSRs would be similar to those described under Alternative B, with the exception of the addition of nine additional eligible river segments classified for recreational, wild, and scenic designations. Under this alternative, CRV-CL-12 would close to oil and gas leasing the 13 segments suitable for NWSRS designation. Suitable segments designated as wild would be subject to NSO stipulations, while those designated as scenic and recreational would be subject to CSU stipulations. NSO stipulations would preclude drilling or construction within those areas. Drilling would need to be by directional methods in order to reach subsurface targets. CSU stipulations would apply moderate constraints to fluid mineral surface disturbance.

BLM_0016935

*Alternative D*

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts under Alternative D would be the same as or similar to those under Alternatives A, but with more development and less protective measures. Under this alternative, a high percentage of the planning area would be open to oil and gas leasing. In addition, this development scenario accounts for a substantial increase in infrastructure and disturbed acres. This alternative would be the least restrictive with regard to development. Approximately 658,200 acres of the federal mineral estate within the planning area would be managed as open to oil and gas leasing and development. This alternative accounts for the development of approximately 4,198 federal wells on 525 multi-well pads with an estimated 5,276 acres of surface disturbance and includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 3,439 acres on interim reclamation of well pads.

Under this alternative, the CRVFO would manage approximately 48,800 acres of the federal mineral estate as closed to fluid minerals leasing. Major constraints (NSO stipulations) would be applied to approximately 203,000 acres of the planning area that are open to oil and gas leasing. In addition, moderate constraints (CSU stipulations, site-specific relocation) would apply to approximately 297,800 acres that are open to oil and gas leasing. WSR segments would not apply and riparian stipulations would be less restrictive. However, major rivers stipulations and the Glenwood Springs Debris Flow Hazard Zones ACEC would still apply under this alternative, limiting or preventing mineral development in those areas.

Impacts to fluid minerals from management of weeds, paleontological resources, coal, and health and safety under Alternative D would be the same as those described under Alternative A. Impacts to fluid minerals from management of soils and special status fish and other aquatic wildlife would be the same as those described under Alternative B.

**Impacts from Air Quality Management.** Dust abatement measures for surface disturbing operations and road design and surfacing requirements to control dust emissions would result in higher costs associated with mineral and energy development. New and existing drill rigs will be required to meet EPA diesel emission standards, increasing equipment costs over the short term.

**Impacts from Soils Management.** Impacts would be the same as those described under Alternative B.

**Impacts from Water Resource Management.** Impacts under Alternative D would be the same as or similar to those under Alternative B but would not include the additional protection of approximately 34,500 acres by stipulation CRV-NSO-5 for streamside management zones. However, geothermal development activities in high-potential areas would still be limited or prevented by the major rivers stipulation under Alternative D.

**Impacts from Vegetation Management—Riparian.** Impacts under Alternative D would be similar to Alternative B but would not include the additional protection from surface-disturbing activities being provided by water and fisheries stipulations. Riparian stipulations alone under this alternative would have minor impacts on geothermal resources. While the least restrictive of the alternatives, with regard to geothermal development, the major rivers stipulation would still apply to the high-potential areas along the Colorado River and in South Canyon, therefore having a moderate impact on geothermal resources in those areas by limiting or preventing development.

BLM_0016936

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts under Alternative D would be the same as or similar to those under Alternative A, but would provide additional protection of approximately 17,500 acres in the planning area by stipulation CRV-CSU-6 for trout-bearing streams. This stipulation would apply within 100 meters (328 feet) of all trout-bearing streams, except native cutthroat streams identified as conservation and core conservation populations of Colorado River cutthroat trout and greenback cutthroat trout. In addition, stipulation GS-NSO-5 for the Rifle Falls and Glenwood Springs fish hatcheries would be replaced by stipulation CRV-NSO-17 for fish hatcheries. Under this alternative, these stipulations would be less restrictive and have a minor impact on geothermal resources. Additionally, the streamside management zones stipulation would not apply under this alternative, but the major rivers stipulation would still apply, limiting and preventing development in areas of high potential.

**Impacts from Terrestrial Wildlife Management.** Impacts on management of big game species would be similar to those described under Alternative B, with the exception that core wildlife areas would not specifically be managed for. Lease terms prohibiting oil and gas leasing in state wildlife areas would be modified to CSU restrictions within all state wildlife areas, thereby reducing the impacts on oil and gas development activities as defined under Alternative C. Seasonal restrictions for big game winter habitat and big game birthing areas would still be managed, as defined under Alternative B.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Impacts under Alternative D would be the same as or similar to those under Alternative B but would provide additional protection. In approximately 1,500 acres in the planning area, stipulation CRV-NSO-31 would prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of streams containing conservation and core conservation populations of Colorado River cutthroat trout.

**Impacts from Special Status Species Management—Plants and Terrestrial Wildlife.** Impacts from special status species from management actions would be similar to those described under Alternative C, with the following exception: CSU stipulations designated in CRV-CSU-9 for sensitive plant occupied habitat would be applicable and managed to restrict surface-disturbing activities within a 100-meter buffer around occupied BLM sensitive species habitat, including Harrington's penstemon. As under Alternative B, CRV-NSO-18 for federally listed, proposed, or candidate threatened or endangered plants would create a 200-meter buffer around occurrence of these plants and their habitats.

Under this alternative, Columbian sharp-tailed grouse leks would be protected with NSO stipulations, prohibiting surface occupancy within a 0.4-mile radius of an active lek, as defined under Alternative B. Lease terms protecting nesting grouse species would continue, as under all alternatives, but key sage-grouse habitat would not be protected by CSU stipulations. NSO stipulations would preclude drilling or construction activities within those areas, applying major constraints to oil and gas drilling and production activities.

**Impacts from Cultural Resource Management.** Impacts on oil and gas activities from the management of cultural resources would be similar to those described under Alternative A. Additional management actions under CRV-NSO-37 would continue and prohibit surface occupancy and surface-disturbing activities within 0.25-mile radius of traditional cultural properties or areas of Native American concern.

**Impacts from Visual Resource Management.** Impacts experienced under this alternative for visual resource management would be similar to those described under Alternative B, as follows: VRM Class I—34,000 acres, VRM Class II—228,000 acres, VRM Class III—104,600 acres, and VRM Class IV—increasing

BLM_0016937

to 138,300 acres. Under this alternative, all ACECs are managed per underlying classes, unless specified otherwise, as in the VRM Class I classification for Bull Gulch because of a WSA overlap, and Blue Hill ACEC, which is designated to be managed as VRM Class II. This alternative includes no directive to manage LWCs under VRM Class II objectives. Specified SRMAs would be managed to obtain Class II objectives, including Fisher Creek, Hardscrabble/East Eagle, Red Hill, The Crown, Thompson Creek, and the Upper Colorado SRMAs. Bocco Mountain SRMA would be managed under Class III designation. Impacts on oil and gas activities would still occur for SRMA designated lands under Alternative D; special design measures and mitigation and relocation plans would still be required to meet VRM Class II objectives. NSO and CSU stipulations, as defined under Alternative B, would also still be applicable to achieve VRM management directives under this alternative.

**Impacts from Recreation and Visitor Services Management.** Impacts on recreation management would be similar to those described under Alternatives A and B, establishing ERMAs to specifically address local recreation issues would be recognized as part of the Glenwood Springs ERMA, but no surface use stipulations would be applied. Under this alternative, management actions would administratively recognize seven SRMAs, affecting 68,200 acres. NSO stipulations would prohibit surface occupancy and surface disturbance in three designated areas, affecting 27,100 acres. CSU restrictions would protect recreation outcomes of four SRMAs, affecting 41,100 acres. Current areas proposed for designation as SRMAs are not located within any of the high-potential areas for oil and gas activity. Thompson Creek and portions of the Upper Colorado SRMA are located within the medium potential areas, and impacts on oil and gas development within those areas are considered minimal.

**Impacts from Lands and Realty Management.** Under this alternative, ROW avoidance areas would total 126,700 acres, a decrease in total acres identified in both Alternatives B and C. ROW exclusion areas would be reduced in total acres to 39,000 acres and would include only WSAs, Blue Hill, and Bull Gulch ACECs, and VRM Class I lands. Retention areas would be reduced to 418,300 acres and would include a smaller number of SRMAs.

Limiting the above areas subject to NSO or closure to leasing, as is the case with WSAs, would affect oil and gas exploration and development. Drilling from restricted surface would still be disallowed and resources would not be available for development in closed areas.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts under Alternative D would be the same as or similar to those under Alternative A, but with fewer acres open to mineral development and more acres open than under Alternatives B and C. Under this alternative, approximately 432,600 acres of the planning area would be open to locatable mineral development. However, the CRVFO would recommend to the Secretary of the Interior withdrawal of approximately 72,300 acres for closure to the mining laws for locatable exploration or development. Under Alternative D, approximately 477,200 acres of the planning area would be open to salable minerals and non-energy leasable minerals. The CRVFO would propose the closure of approximately 27,800 acres in the planning area to mineral materials and non-energy solid mineral leasing.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Management actions would designate three ACECs under this alternative. Blue Hill, Bull Gulch, and Glenwood Springs Debris Flow Hazard Zones ACECs would affect 20,200 acres. Under standard lease terms, no leasing would be allowed in Bull Gulch or Blue Hill ACECs, while NSO stipulations would prevent surface occupancy and

BLM_0016938

surface-disturbing activities within the Glenwood Springs Debris Flow Hazard Zone ACEC. Areas closed to fluid minerals leasing would have no impact on oil and gas activities. The Glenwood Springs Debris Flow Hazard Zone is within the low oil and gas activity occurrence potential area and therefore would have no impacts on oil and gas development. This would be the least restrictive of the alternatives with regard to geothermal resources. Impacts under this alternative to geothermal resources would be minor.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Alternative D would include no river segments as suitable, and all would be released from interim management. There would be no impacts on oil and gas development activities as a result of the action.

Under Alternative D, there would be no suitable wild and scenic segments in the planning area, and none of the NSO and CSU stipulations for WSRs would apply. This would allow for surface occupancy and surface-disturbing activities in areas that were previously managed for wild and scenic rivers. This alternative is less restrictive than under Alternatives A through C, and would have a negligible impact on geothermal resources in the planning area. Under this alternative, geothermal development could occur in areas where potential exists.

### Cumulative Impacts

The cumulative impact analysis boundary for oil and gas resources within the CRVFO is the Piceance Basin, which is in the western part of the planning area, and encompasses roughly 20 percent of the CRVFO surface area. An oil and gas potential map was created for the CRVFO, defining areas as high, medium, low, or no known potential for the occurrence of oil and gas resources. Within these defined areas, 20 percent of the land that is defined by the planning area boundary is rated as having high potential, 12 percent is rated as having medium potential, 46 percent is rated as having low potential, and 22 percent is deemed to have no known potential. Based on industry analysis, leasing activity, prior exploration and development activity, and the probability of resource occurrence, it is estimated that 99 percent of the future wells will be drilled within the area mapped as having high potential. The remaining 1 percent of future wells is estimated to occur within the medium and low potential areas. The area defined as having no known potential will have no drilling activities. The total acres of BLM mineral estate that fall within the high potential area, including the Roan Plateau Area and split estate, is 200,937 acres (BLM 1999b). The remaining acres available for leasing are approximately 7,000 acres outside the Roan Plateau Area. Most of the unleased areas fall within the high potential area located along the Grand Hogback, with the remainder found in small scattered parcels.

Oil and gas development could increase over the next several years, but the level of development will depend on market fluctuations, pipeline capacity, available markets for distribution, regulatory constraints, new technologies, and reservoir depletion. Adding multiple constraints to oil and gas development, as well as withdrawing areas from leasing altogether, would reduce the amount of natural gas that is available for market. Natural market factors, such as supply and demand, hold production to appropriate levels.

An assumed total of 5,318 new wells would be drilled during the 20-year planning period (BLM 2008g), which includes both BLM (surface and minerals) and BLM split estate wells. The number and distribution of rigs, the number of wells, and the amount of natural gas produced, may vary from the assumed level due to a variety of factors such as gas prices, drilling costs, rig availability, and success rates that cannot be predicted with complete accuracy. Changes due to currently unanticipated factors associated with other resources, land uses, or management priorities for BLM could also affect future development rates. However, the assumed

BLM_0016939

total is believed to be reasonable for the purposes of analysis of impacts. The cumulative amount of natural gas that could be produced over the life of the plan under all alternatives is reflected in Table 4.3.6-2 below.

**Table 4.3.6-2**
**Cumulative Total Gas Produced in 20 Years, Federal Wells Less Roan Less USFS**

|  | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Total fed wells (20 years, less Roan, less USFS) | 2,664 | 2,206 | 2,206 | 4,198 |
| Fed wells per year | 133 | 110 | 110 | 210 |
| Drill rigs per year (28 days per well, including mob, de-mob, downtime = 13 well per year per drill rig) | 10 | 8.5 | 8.5 | 16 |
| BCF gas per well per Year (1.15 BCF per well over 35-year life) | 0.033 | 0.033 | 0.033 | 0.033 |
| Average total BCF gas per year | 4.4 BCF | 3.6 BCF | 3.6 BCF | 6.9 BCF |
| Max BCF gas per year (year 20) | 88 BCF | 72 BCF | 72 BCF | 138 BCF |
| Cumulative total gas produced | 924 BCF | 756 BCF | 756 BCF | 1,449 BCF |

Source: BLM 2008g

Stipulations on oil and gas leasing in the proposed RMP will have a cumulative effect on the ability to develop oil and gas resources. Applying NSO stipulations in order to protect some special status species, lands with wilderness characteristics outside existing WSAs, ACECs, sensitive soils, riparian areas and recreation sites would incrementally impact or prevent some oil and gas recovery, and could increase development and reclamation costs. Added costs associated with multiple leasing stipulations may lead to lower bids on lease parcels. Timing limitation stipulations incrementally impact or affect exploration and drilling operations by causing delays in operations, which may affect internal company project funding and planning. Two or more timing stipulations, having different dates affecting the same parcel, could cause significant financial impact, depending on the total length of time operations would be delayed.

Adding more lease stipulations and constraints will result in direct economic losses by oil and gas companies that cannot fully develop their leased acres. Increased costs would reduce profits and return on investment of companies that drill in step-out or wildcat areas as they try to define the reservoir boundaries. Loss of production in areas that are closed to fluid minerals leasing, or large areas with NSO and heavily stipulated areas, would mean a resulting loss of royalty payments to the federal government, the State of Colorado, and the local communities that are impacted by the development. This loss of production would also mean a loss of natural gas available for distribution to the American markets.

According to the Bureau of Economic Analysis (BEA 2007), oil and gas extraction and supporting activities contributed $179 million to total personal income in 2007 within Garfield County. Personal income of oil and gas workers is generally greater than non-energy employees in Garfield County. According to the US Census Bureau, in 2002 employees working to extract natural gas in Colorado were paid on average $55,389 annually, compared to $23,435 for non-energy workers.

BLM_0016940

A Garfield County socioeconomic impact study estimates gas related employment at approximately 35 workers per well. Maintenance related employment, including work over crews, pumpers, and gas plant operators require about one worker per six completed wells (BBC Research and Consulting 2008). In 2005, an estimated 4,300 jobs were supported by gas development in Garfield County, second only to regional services (trade and service jobs, including construction) and tourism. Indirectly, the oil and gas industry contributes to the job growth within both of these sectors as these workers purchase homes, vehicles, and consumer products.

During increased oil and gas activity, local economies are bolstered by higher income consumers, increasing economic opportunity within the local workforce. Local communities benefit from the additional taxes generated from oil and gas development as well. Increased tax revenue supports local education efforts within the affected communities. The influx of tax dollars has helped to build a new high school and middle school in the community of Parachute, as well as a new fire station and a library expansion. Increased revenues generated from successful exploration and development allow the oil and gas companies to invest in the communities where their employees live and work, as is the case when one industry company gave $3 million to build the West Garfield Campus of Colorado Mountain College (EnCana 2005). Numerous local nonprofits have benefited as well.

Increased development would contribute to the size of the local population base as well, as highly skilled workers arrive in support of such development. An increase in population will result in an increase in small businesses, resulting jobs, and eventual infrastructure.

Since 95 percent of the high-potential area for oil and gas activity is already leased, valid existing lease rights would apply. If any of the existing leases were allowed to expire, validation of those leases would be withdrawn and subsequent leasing of those areas would be subject to the new stipulations as presented under each alternative. Once the leases were subject to new and added stipulations, which could include areas proposed to be closed to fluid minerals leasing and areas managed under major constraints, those potential resources would not be available for production. Under Alternative C, 11,400 acres of the proposed Grand Hogback ACEC would be closed to fluid minerals leasing, and the remaining 2,600 acres would be subject to NSO stipulations. Such constraints would effectively remove 14,000 acres within the high potential area that would otherwise be available for leasing, resulting in a loss of producible gas as well as royalty and tax payments.

### 4.3.6.3 Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals

This section presents the impacts on locatable, salable, and non-energy leasable minerals from management actions of other resources and resource uses discussed in Chapter 2. Existing conditions concerning these mineral resources are described in Chapter 3, Section 3.3.6.

Locatable minerals are those valuable under the US mining laws, generally referred to as the General Mining Law of 1872. Locatable minerals are subject to entry and location. Entry means the public land is subject to application for title to the land, (e.g., patenting under the mining laws). The BLM does not have discretion as to entry and location of mining claims on open, unappropriated, public lands and does not have the discretion to determine mitigations for mining claims at the time of location. However, the BLM does have discretion to make public lands open to entry or to close lands (e.g., withdraw certain public lands from the operations of the mining laws). The BLM also has authority through the FLPMA, the federal regulations at 43 CFR 3809, and other federal laws and regulations as applicable to regulate mining-related operations and the surface

BLM_0016941

disturbances that would be incident to those operations. The BLM regulates mining-related operations on public lands to prevent unnecessary or undue degradation and to ensure the operation is reasonably incident to mining. In WSAs, the BLM regulates mining-related operations under the IMP and as required by 43 CFR 3802, so as to prevent the impairment of a WSAs suitability for designation as wilderness by Congress.

Locatable mining activity within the planning area currently includes the gypsum mine north of the town of Gypsum and the Mid-Continent Limestone Quarry north of the city of Glenwood Springs. Although the prices of uranium and gold have risen in recent years, price increases have not been great enough to generate much current interest in developing any ore deposits for these minerals in the CRVFO. Table 4.3.6-3 shows the acres of BLM lands in the planning area by alternative that would be open to locatable minerals development.

**Table 4.3.6-3**
**BLM Lands Open to Locatable Minerals Development (Acres)**

| Alternative | CRVFO |
|---|---|
| Alternative A | 470,300 |
| Alternative B | 407,900 |
| Alternative C | 332,800 |
| Alternative D | 432,600 |

Sources: BLM 2008c

Salable minerals are subject to disposal under the Materials Act of July 31, 1947. BLM's policy is to make mineral materials available unless detrimental to the public interest, to protect public land resources and the environment, and to minimize damage to public health and safety. Through land use planning, the BLM may designate public land as open or closed to disposals, and the open areas may be designated with special conditions. The designations of open, open with special conditions, and closed would follow the oil and gas leasing designations to the extent practicable. Open with special conditions would include the oil and gas open with minor constraints (timing limitations or controlled surface use stipulations) and open with major constraints (no surface occupancy). The provisions for exceptions, modifications, and waivers would also apply to salable minerals.

Most salable mineral activities within the planning area involve small sales for commercial and residential uses that primarily include moss rock, flagstone, and sand and gravel. On occasion free use permits are issued to government entities for road maintenance activities. The only significant mineral materials activity projected over the 20-year planning period is a continuation of the cinder operation near Dotsero. Demand for decorative rock and sand and gravel is anticipated to increase slightly, based on growth in residential and commercial construction during the 20-year planning period. Most decorative rock sales in the CRVFO come from Cattle Creek, which is a source of moss rock. The BLM sells most sand and gravel in the CRVFO from Sheep Gulch, on the Colorado River. Table 4.6.3-4 shows the acres of BLM lands in the planning area by alternative that would be open to salable minerals disposal and non-energy leasable minerals.

September 2011        *Colorado River Valley Field Office – Draft RMP Revision EIS*        4-590
*Chapter 4, Environmental Consequences*

BLM_0016942

**Table 4.6.3-4**
**Federal Mineral Estate Open to Salable Minerals Disposal and Non-Energy Leasable Minerals**

| Alternative | CRVFO |
|---|---|
| Alternative A | 476,900 |
| Alternative B | 363,000 |
| Alternative C | 317,000 |
| Alternative D | 477,200 |

Sources: BLM 2008c

Non-energy leasable minerals are leased under the Mineral Leasing Act of 1920, as amended, and the federal regulations at 43 CFR Part 3500. Through land use planning, the BLM may designate public land as open or closed to fluid minerals leasing, and the use of open areas may be restricted by special conditions. The designations of open, open with special conditions, and closed would follow the oil and gas leasing designations to the extent practicable. The areas open with special conditions include the oil and gas open with minor constraints (timing or controlled surface use) and open with major constraints (no surface occupancy). The provisions for exceptions, modifications, and waivers would also apply to non-energy solid leasable minerals. The only non-energy leasable minerals in the planning area are evaporate-bearing rocks in the Eagle Valley area, which could yield sylvite and halite. These resources are not expected to be developed commercially in the planning horizon of this RMP.

## Methods and Assumptions

This section presents potential impacts on locatable, salable (mineral materials), and non-energy leasable minerals from management actions for other resource and resource use programs. Leasable minerals are coal, oil and gas, oil shale, potash, geothermal steam, and others. Locatable minerals are strata-bound gold, copper-gold deposits, gems, limestone, uranium, vanadium, gypsum, and others. Salables are sand and gravel, limestone aggregate, building stone, moss-covered rock (moss rock), cinders (clinker), decorative rock, and others. Existing conditions for energy and minerals are described in Chapter 3, Section 3.3.6.

The analysis is based on the following assumptions:

- Increased mitigation would generally increase short-term financial cost and risk but would decrease potential short-term and long-term adverse environmental effects.

- Management of SRMAs, WSAs, and WSR segments would result in greater restrictions on mineral resource development, replacing standard lease terms or special stipulations with NSO stipulations or restrictions on leasing.

- Decisions related to oil shale leasing are being deferred to the in-progress Oil Shale and Oil Shale RMP Amendments to Address Land Use Allocations in Colorado, Utah, and Wyoming and Programmatic EIS (BLM 2007h). As such, direct and indirect impacts from these decisions are not considered in detail in this EIS.

- Demand for such salables as sand and gravel and stone is anticipated to slowly rise within the planning areas. The BLM does not manage salables on split estates, so the impact analysis for salables focuses on BLM lands.

BLM_0016943

- Locatable mineral claims, exploration, and development within the planning areas would probably increase. The BLM does not manage locatables on split-estate lands, so the impact analysis for locatables focuses on BLM lands.

- The analysis for impacts on locatable, salable, and non-energy leasable minerals assumes exploration and development would be regulated under all applicable laws and regulations.

- Energy and mineral decisions on USFS lands are addressed through separate USFS planning efforts and are not addressed in this RMP.

- National Park, National Recreation Area, and National Wildlife Refuges are all withdrawn from mineral entry and are not discussed in this section.

- Many stipulations under Alternative A were developed to apply to oil and gas leasing and development, but it is intended that the same or similar measures will be applied to other public land uses in order to maintain or achieve the same resource conditions and to assure equitable treatment to all public land users.

### Environmental Consequences

Impacts on locatable, salable, and non-energy leasable minerals would result from some of the actions included under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on locatable, salable, and non-energy leasable minerals under any of the four alternatives.

### Alternative A

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative A, approximately 470,300 acres of the planning area would be open to locatable mineral development. However, the CRVFO would recommend for withdrawal to the Secretary of the Interior of approximately 34,600 acres for closure to the mining laws for locatable exploration or development. The extent and locations of these closures would be in areas that would not likely be developed for locatable minerals and not likely impact locatable mineral activities.

Under Alternative A, approximately 470,300 acres of the planning area would be open to salable minerals and 476,900 acres would be open to non-energy leasable minerals. The CRVFO would propose the closure of approximately 28,000 acres in the planning area to mineral materials and non-energy solid mineral leasing. Expansion of mineral materials activities near Dotsero would be limited by NSO, CSU, and TL stipulations. Potential decorative rock sites throughout the planning area and decorative boulder and sand and gravel deposits along the Colorado River would be limited under this alternative by stipulations included under this alternative. Overall, this alternative would have minor impacts on mineral resources and would not affect existing operations in the planning area.

**Impacts from Soils Management.** Under Alternative A, approximately 6,100 acres of the planning area would be protected by stipulation GS-NSO-14 for debris flow hazard zones that would prohibit surface occupancy and surface-disturbing activities for the protection of the Glenwood Springs debris flow. This area would have similar protection by stipulation GS-NSO-16 for ACECs. Approximately 101,400 acres of the planning area would be protected by stipulation GS-NSO-15 for steep slopes greater than 50 percent for oil and gas facilities which would prohibit surface occupancy and surface-disturbing activities for oil and gas facilities on slopes greater than 50 percent but does not apply to pipelines. In addition, approximately 172,300 acres of the planning area would be further protected by stipulation GS-CSU-4 for erosive soils and slopes

BLM_0016944

greater than 30 percent, which could require special design, construction, operation, and reclamation measures.

Most of the mineral potential in the planning area occurs in proximity to major river corridors such as the Colorado, Roaring Fork, and Eagle Rivers. Some of these areas are very steep and consist of erosive soils. In addition, the Debris Flow Hazard Zones NSO could limit or prevent future locatable activity in the vicinity of the city of Glenwood Springs where there is currently an active limestone quarry and several historic quarries. Under this alternative, soil management would have a minor impact on mineral resources.

**Impacts from Water Resource Management.** Under Alternative A, approximately 42,300 acres of the planning area would be protected by stipulation GS-NSO-3 for major river corridors that would prohibit surface occupancy and surface-disturbing activities within 0.5 mile of either side of the high water mark of six major rivers. However, this stipulation does not apply to the Naval Oil Shale Reserves production area. Additionally, approximately 5,400 acres would be protected by stipulation GS-NSO-13 for municipal watershed areas, which would prohibit surface occupancy and surface-disturbing activities within watersheds providing domestic water for the communities of Rifle and New Castle. The NSO for major river corridors could potentially limit or prevent future salable minerals and locatable minerals expansion and development.

Within the planning area, mineral deposits of economic value tend to be located in proximity to streams and rivers that have either exposed these deposits over time or deposited the material during depositional events. In addition, access tends to be better in these areas due to major roads that follow river corridors. For these reasons, the potential for sand and gravel, gypsum, and limestone is relatively high in proximity to the Colorado River, Roaring Fork River, and Eagle River. It is important to note that these three activities are currently occurring at existing sites (Sheep Gulch, Gypsum, and Mid-Continent) and their operations would probably continue under this alternative. Therefore, water management under this alternative would have a minor impact on mineral resources.

**Impacts from Vegetation Management—Riparian.** Under Alternative A, approximately 1,700 acres of the planning area would be protected by stipulation GS-NSO-2 for riparian and wetland zones that would prohibit surface occupancy and surface-disturbing activities within riparian vegetation. Additionally, a substantial amount of acres within the planning area would be protected by stipulation GS-CSU-2, which would require special design, and construction and implementation measures within 500 feet of riparian or wetland vegetation. These stipulations could affect sand and gravel activities that frequently occur in the abandoned floodplains of major rivers. While these stipulations would have a minor impact on mineral resources, it is important to note that activities would be further limited under this alternative by stipulation GS-NSO-3 for major river corridors.

**Impacts from Terrestrial Wildlife Management.** Under Alternative A, a substantial number of acres within the planning area would be protected by applicable wildlife stipulations that would prohibit surface occupancy and surface-disturbing activities in wildlife areas. These areas could coincide with areas that have mineral development potential. In those cases, terrestrial wildlife management would limit, prevent, or relocate development activities resulting in a minor impact on mineral resources. These stipulations would not affect existing mineral operations in the planning area.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** All federal actions are subject to the requirements of the ESA, as amended. A plan of operations is required for

BLM_0016945

operations proposed on lands or waters known to contain federally listed, proposed, or candidate threatened or endangered species or their proposed or designated critical habitats, unless the BLM allows for other actions under a land use plan or threatened or endangered species recovery plan as stated at 43 CFR 3809.11(c)(6). The operator would be required to take such actions as may be needed to prevent adverse impacts on any threatened or endangered species and its habitat that may be affected by mining related operations. Before approving any mining action potentially affecting any listed threatened or endangered species, the BLM must consult with USFWS under Section 7 of the ESA. As necessary and appropriate with the claimant's rights, mitigation (such as timing and avoidance) may be required to avoid or reduce potential impacts on listed species, species proposed for listing, and designated critical habitat. This could result in delays in approval of proposals. Some mitigation, such as timing and avoidance, could reduce the success of or preclude some operations. Under Alternative A, special status fish and other aquatic wildlife management would have a minor impact on mineral resources.

**Impacts from Special Status Species—Plants and Terrestrial Wildlife Management.** Under Alternative A, a significant amount of acres within the planning area would be protected by stipulations for special status plants and terrestrial wildlife that would prohibit surface occupancy and surface-disturbing activities. Where these areas occur in conjunction with potential mineral development, they would probably limit, prevent, or relocate mineral development activities. Therefore, under this alternative special status plants and terrestrial wildlife management could have a moderate impact on mineral resources in the planning area. However, these stipulations would not likely affect existing mineral operations.

**Impacts from Cultural Resource Management.** Managing cultural resources requires the BLM to make a reasonable and good faith effort to identify the potential effects of federal undertakings. All federal undertakings having the potential to adversely affect cultural resources must include mitigation measures designed to avoid the impact. This is covered by the NHPA and its implementing regulations found at 36 CFR Part 800. Operations under the mining laws would be regulated to avoid unnecessary or undue degradation of the public land and cannot knowingly disturb, alter, injure, or destroy any historic or archaeological site, structure, building, or object listed or eligible for listing on the National Register of Historic Places. These requirements could result in the need for avoidance or modification of proposed operations. The federal government bears any costs of investigations and salvage of cultural resources. Exploration for locatable minerals under a Notice is not a federal action, as it is not approved by the BLM. However, the BLM would review the Notice and advise the operator of proposed activity that would impact cultural resources.

Exploration or development under a Plan of Operations is a federal action and requires approval by the BLM. Before approval is granted, the proposed activity for locatable minerals would be reviewed as required under NEPA and all applicable laws including NHPA. Mitigations, as consistent with the claimant's rights under the mining laws, would be imposed on proposed operations. Thus, managing cultural resources would require mining operators under the mining laws to not knowingly impact historic or archaeological sites and to immediately bring to the attention of the BLM any cultural resources that would be altered or destroyed by the mining operation. Modification and/or mitigation requirements would have adverse impacts by delaying the time required for approval of proposed operations.

Under Alternative A, cultural resources in the planning area would be protected by a general stipulation (CRV-NSO-38) for historic properties that would prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of historic properties. In addition, stipulation GS-NSO-16 would prohibit

BLM_0016946

surface occupancy and surface-disturbing activities in the Bull Gulch ACEC. The stipulations above could prevent, limit, or relocate mineral development activities thereby having a minor impact on mineral resources.

**Impacts from Visual Resource Management.** VRM class designations would limit or allow surface-disturbing activities in specific areas. VRM Classes I and II would be aimed at greater retention of existing landscape character than Classes III or IV would be. Managing areas as VRM Class I and Class II would reduce surface disturbance whereas VRM Class III or IV would be subject to actions that allow for greater landscape modification. Notices would be reviewed and the claimant would be advised of the steps necessary in order to be in conformance with the VRM class, as consistent with the claimant's rights under the mining laws. Drilling or other exploration sites and facilities could be relocated in VRM Class II areas to the extent practicable and to preserve the claimant's rights. Plans of operations would be reviewed under NEPA and approved in accordance with the VRM class and the claimant's rights. As consistent with 43 CFR 3809.5, operations would be designed to minimize and reduce adverse visual impacts and avoid or eliminate such impacts, as practical. Thus, operations may need to be relocated in order to utilize screening within the natural topography, and may be modified in color, shape and size, as consistent with a claimant's rights. This action would result in delays in authorizing proposed operations and additional costs.

Under Alternative A, approximately 17,100 acres of the planning area would be classified as VRM Class I and 230,100 acres as VRM Class II. Stipulation GS-NSO-16 for VRM Class I areas within ACECs would prohibit surface occupancy and surface-disturbing activities within ACECs, which account for approximately 23,200 acres of the planning area under this alternative. Approximately 9,500 acres of the planning area would be further protected by stipulation GS-NSO-18 for I-70 Viewshed that would prohibit surface occupancy and surface-disturbing activities on slopes over 30 percent with high visual sensitivity in the I-70 viewshed. In addition, stipulation GS-CSU-5 for VRM Class II would apply CSU (site-specific relocation) restrictions to areas in VRM Class II, which account for approximately 264,800 acres under this alternative. Relocation of operations by more than 200 meters (656 feet) may be required to protect visual values. These stipulations would have a moderate impact on mineral resources by limiting or preventing development activities in areas where potential exists.

**Impacts from Lands and Realty Management.** The ROW authorization process under Alternative A could adversely affect the development of coal resources. Responding to specific proposals for mineral development on a case-by-case basis under the ROW authorization process would not encourage mineral development on BLM land, nor would it encourage the development in specific high-potential areas. Mineral development would be constrained by existing management policies and prohibitions involving lands with specific resource values and management directions.

Under Alternative A, review of mineral proposals through a case-by-case permitting process could create adverse impacts on mineral resources by increasing administrative costs due to the increased time associated with environmental data gathering for each proposal. Additional impacts could also include increases in the complexity of infrastructure to support more dispersed mineral development. Lands and realty management under this alternative would have a minor impact on mineral resources.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Under Alternative A, fluid mineral management would have a negligible impact on mineral resources. High potential oil and gas areas do not occur in conjunction with locatable and salable potential areas or existing

BLM_0016947

areas. If development conflicts occur, oil and gas wells could be practically and feasibly directionally drilled from a well pad that is not located vertically above the subsurface reserves.

Under this alternative, approximately 679,200 acres the federal mineral estate within the planning area would be managed as open to oil and gas leasing and development. This alternative accounts for the development of approximately 2,662 federal wells on 333 multi-well pads with an estimated 3,347 acres of surface disturbance and includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 2,181 acres on interim reclamation of well pads. The CRVFO would manage approximately 27,800 acres of the federal mineral estate as closed to fluid minerals leasing. Major constraints (NSO stipulations) would be applied to approximately 239,600 acres of the planning area that are open to oil and gas leasing. In addition, moderate constraints (CSU stipulations, site-specific relocation) would apply to approximately 424,800 acres that are open to oil and gas leasing.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative A, approximately 27,000 acres of the planning area would be managed as ACECs. Management actions included in ACECs are often more restrictive with regard to surface occupancy and surface-disturbing activities. There is potential for mineral resources to occur in ACECs under this alternative. The Deep Creek area contains outcrops of limestone that could be of marketable quality. However, access to these areas is limited, thus the economic feasibility of development is low. The Glenwood Springs Debris Flow Hazard Zones ACEC could limit or prevent new development of locatable mining activities in the Glenwood Springs area but would not likely impact the existing operations. ACEC management under this alternative would have minor impacts on mineral resources.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Managing WSAs under the federal regulations at 43 CFR 3802 and the Interim Management Policy would impact mineral resources. WSAs are not withdrawn from mineral entry. However, all mining-related operations are subject to the IMP such that actions may not impair the suitability of the WSA for inclusion in the Wilderness Preservation System, thus precluding exploration and development of mineral resources unless the activity is non-impairing, a grandfathered use, or valid existing right. Where WSAs and mineral potential simultaneously occur, the result could be adverse impacts on mineral resources and the loss of associated economic benefits.

Under Alternative A, four WSAs totaling approximately 27,724 acres would be managed under the Interim Management Policy for Lands under Wilderness Review that would prevent most ground-disturbing activities. While these stipulations would prevent or limit mineral development in those areas, the potential is low and the overall impact on mineral resources from WSAs would be negligible. In addition, new leasing of non-energy minerals would not be allowed in WSAs.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Mineral development in stream segments designated for potential addition to the National Wild and Scenic Rivers System, which includes eligible rivers, would require a plan of operations as stated at 43 CFR 3809.11(c)(2). As the plan of operations is reviewed and approved under the applicable federal laws and regulations and as consistent with claimant's right, mitigations may be required to protect the outstandingly remarkable values of the eligible rivers as consistent with applicable federal laws and regulations and a claimant's rights. Requiring a plan of operations and mitigation would have adverse impacts by delaying the processing time and possibly reducing the feasibility of the proposal. Most of the eligible river segments are within areas that have potential for salable and locatable mineral development (e.g., sand and gravel, limestone, gypsum).

BLM_0016948

Under Alternative A, a total of 13 stream segments outside the Roan Plateau would be managed under interim protection to preserve the free-flowing nature, ORVs, and tentative classification. Protecting the outstandingly remarkable values of the eligible wild and scenic rivers would essentially prevent surface occupancy and surface-disturbing activities within the river corridors being designated. The potential for mineral development in these areas is moderate especially within the vicinity of the Colorado River and Deep Creek where there are outcrops of gypsum, limestone, and sand and gravel deposits. Under this alternative, Wild and Scenic Rivers Management would have a moderate impact on mineral resources but would not affect existing operations in the planning area.

### Alternative B (Preferred Alternative)

Impacts to locatable minerals, salable minerals (mineral materials), and non-energy leasable minerals from management of resources and uses under Alternative B would be the same as or similar to those under Alternative A, except as described below.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative B, approximately 407,900 acres of the planning area would be open to locatable mineral development. However, the CRVFO would recommend for withdrawal to the Secretary of the Interior of approximately 97,000 acres for closure to the mining laws for locatable exploration or development. None of the proposed withdrawals would affect the area just north of Gypsum, where a wallboard plant is operating on patented mining claims. Future gypsum exploration and development could be limited under Alternative B along the Colorado River and Deep Creek. Withdrawals related to NWSRS designations under Alternative B could close areas with limestone potential along Deep Creek and the Colorado River. Segments of these water bodies would be designated as suitable for inclusion in the NWSRS under this alternative, closing them to the mining laws for locatable exploration or development.

If prices for uranium and gold continue to increase, the proposed withdrawals could impact areas where these exploration and development activities could occur. Areas favorable for uranium and vanadium mining have been mapped along the Colorado River, including the segment that would be designated as suitable for inclusion in the NWSRS under Alternative B. Recreational gold panning and dredging along the Colorado River could be impacted by the proposed withdrawals along the Colorado River.

Under Alternative B, approximately 362,700 acres of the planning area would be open to salable minerals and non-energy leasable minerals. The CRVFO would propose the closure of approximately 142,200 acres in the planning area to mineral materials and non-energy solid mineral leasing. Expansion of mineral materials activities near Dotsero would be limited by NSO, CSU, and TL stipulations. Potential decorative rock sites throughout the planning area and decorative boulder and sand and gravel deposits along the Colorado River would be limited under this alternative by stipulations under this alternative. The proposed designation of portions of the Colorado River as suitable for the NWSRS under Alternative B would limit sand and gravel extraction within 0.5 mile of the river, where most of the viable geologic material occurs in the CRVFO. Overall, this alternative would have a minor impact on mineral resources throughout the planning area but moderate impacts in areas where mineral development potential exists. Furthermore, this alternative would have impacts on existing operations by limiting or preventing expansion.

**Impacts from Soils Management.** Impacts under Alternative B would be greater and more restrictive to mineral resources than under Alternative A. Under this alternative, stipulation GS-NSO-15 would be replaced by stipulation CRV-NSO-2 for steep slopes greater than 50 percent and stipulation GS-CSU-4 would be

BLM_0016949

replaced by stipulation CRV-CSU-1 for slopes greater than 30 percent. In addition, these stipulations would apply to all surface occupancy and all surface-disturbing activities in the planning area. While these stipulations would limit or prevent future activities in areas where these stipulations apply, they would have minor impacts on existing operations in the planning area. Under Alternative B, soils management would have overall minor impacts on mineral resources but could have moderate impacts in specific areas by restricting development activities.

**Impacts from Water Resource Management.** Under Alternative B, approximately 43,100 acres of the planning area would be protected by stipulation CRV-NSO-3 for major river corridors that would prohibit surface occupancy and surface-disturbing activities within 0.5 mile of the high water mark of six major rivers within the CRVFO. Additionally, stipulation CRV-NSO-4 for designated municipal watershed areas would prohibit surface occupancy and surface-disturbing activities within municipal watersheds providing domestic water. Stipulation CRV-NSO-5 for streamside management zones would further protect approximately 34,500 acres of the planning area by prohibiting surface occupancy and surface-disturbing activities within 50 feet from the ordinary high water mark of any hydrologic feature.

Within the planning area, mineral deposits of economic value tend to be located in proximity to streams and rivers that have either exposed these deposits over time or deposited the material during depositional events. In addition, access tends to be better in these areas due to major roads that follow river corridors. For these reasons, the potential for sand and gravel, gypsum, and limestone is relatively high in proximity to the Colorado River, Roaring Fork River, and Eagle River. It is important to note that these three activities are currently occurring at existing sites (Sheep Gulch, Gypsum, and Mid-Continent), and their operations would probably continue under this alternative. Therefore, water management under this alternative would have a minor impact on mineral resources.

**Impacts from Vegetation Management—Riparian.** Under Alternative B, a substantial number of acres within the planning area would be protected by stipulation CRV-CSU-3, which would require special design, and construction and implementation measures within 500 feet of riparian or wetland vegetation. The NSO stipulation for riparian zones under Alternative A would not apply under this alternative. This CSU stipulation could allow for surface-disturbing activities to occur and this alternative would essentially be less restrictive than under Alternative A with regard to mineral development having a minor impact on mineral resources. However, it is important to note that other stipulations for water management under Alternative B would probably limit or prevent surface-disturbing activities.

**Impacts from Terrestrial Wildlife Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A. However, more acres within the planning area would be protected by applicable wildlife stipulations that would prohibit surface occupancy and surface-disturbing activities in wildlife areas. This alternative could potentially have a moderate impact on mineral resources by limiting, preventing, or relocating development activities in the planning area. These stipulations would not affect existing mineral operations in the planning area.

**Impacts from Special Status Species—Plants and Terrestrial Wildlife Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, but would allow for greater protection by stipulations for special status plants and terrestrial wildlife that would prohibit surface occupancy and surface-disturbing activities. Similar to Alternative A, this alternative would allow BLM to

require restrictions to mineral development, thereby having a moderate impact on mineral resources. These stipulations however, would not affect existing operations in the planning area.

**Impacts from Cultural Resource Management.** Under Alternative B, approximately 14,100 acres of the planning area would be closed to oil and gas leasing (CRV-CL-9) for the Blue Hill and Bull Gulch ACECs. This designation would prohibit oil and gas leasing within the 3,700-acre Blue Hill ACEC and the 10,400-acre Bull Gulch ACEC. In addition, stipulation CRV-NSO-49 would prohibit surface occupancy and surface-disturbing activities in the Bull Gulch ACEC. Further protection of cultural resources in the planning area would be provided by stipulation CRV-NSO-37 for heritage areas that would prohibit surface occupancy and surface-disturbing activities within 0.25 mile of heritage areas. Additionally, stipulation CRV-NSO-39 for eligible historic properties would prohibit surface occupancy and surface-disturbing activities within 200 meters (656 feet) of eligible historic properties. Due to these stipulations, Impacts from Cultural Resource Management would be the same as or similar to those under Alternative A, having a minor impact on mineral resources by potentially limiting, preventing, or relocating surface-disturbing activities.

**Impacts from Visual Resource Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, except that more acres of the planning area would be managed as VRM Class I and Class II, and slightly different stipulations would apply. Under this alternative, approximately 33,600 acres of the planning area would be managed as VRM Class I and approximately 249,200 acres as VRM Class II. Stipulation CRV-NSO-42 for VRM Class I areas would protect Class I VRM values, prohibit surface occupancy and surface-disturbing activities within areas designated VRM Class I. Stipulation CRV-NSO-41 for VRM Class II areas with slopes over 30 percent and high visual sensitivity would prohibit surface occupancy and surface-disturbing activities in VRM Class II areas with slopes over 30 percent and high visual sensitivity to preserve the visual setting and integrity. In addition, stipulation CRV-CSU-16 for VRM Class II would ensure surface-disturbing activities within VRM Class II areas comply with BLM Handbook 8431-1 to retain the existing character of the landscape. VRM Classes I and II are the most restrictive of the four classes, thereby having a moderate impact on mineral resources under this alternative by restricting development activities.

**Impacts from Lands and Realty Management.** Under Alternative B, approximately 169,600 acres of the planning area would be managed as ROW Avoidance Areas. In addition, approximately 39,300 acres of the planning area would be managed as ROW Exclusion Areas. All ACECs, eligible WSR segments, areas closed to oil and gas leasing, and areas open to oil and gas leasing with no surface occupancy would be managed as ROW avoidance areas (with exceptions granted only if the proposed authorization would not create substantial surface disturbance or would create only temporary impacts). Lands and realty management under this alternative would be more restrictive than under Alternative A, having a moderate impact on mineral resources.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts under Alternative B would be the same as or similar to those under Alternative A, but with slightly less development and more restrictions on development. Under this alternative, approximately 651,400 acres the federal mineral estate within the planning area would be managed as open to oil and gas leasing and development. This alternative accounts for the development of approximately 2,206 federal wells on 276 multi-well pads with an estimated 2,774 acres of surface disturbance and includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 1,814 acres on interim reclamation of well pads.

BLM_0016951

Under this alternative, the CRVFO would manage approximately 55,600 acres of the federal mineral estate as closed to fluid minerals leasing. Major constraints (NSO stipulations) would be applied to approximately 326,700 acres of the planning area that are open to oil and gas leasing. In addition, moderate constraints (CSU stipulations, site-specific relocation) would apply to approximately 489,500 acres that are open to oil and gas leasing.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, but would include the designation of approximately 34,500 acres of the planning area as ACECs. Designation of the Dotsero Crater ACEC would limit or prevent cinder operations from expanding into the crater rim, protecting the integrity of the crater and geologic values. Existing operations and proposed expansion would be away from the crater; therefore this designation would have a minor impact. ACEC management under this alternative would have minor impacts on mineral resources.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, except these areas would be protected by stipulation CRV-NSO-50 for WSAs, which would prohibit surface occupancy and surface-disturbing activities in WSAs. In addition, stipulation CRV-CSU-22 for WSAs if released from wilderness consideration would apply CSU restrictions, if Congress releases these WSAs from wilderness consideration.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Impacts under Alternative B would be the same as or similar to those under Alternative A, except that fewer segments would be managed as wild and scenic. Under this alternative, four stream segments would be protected by stipulation CRV-NSO-51 for suitable stream segments classified as wild. This NSO would prohibit surface occupancy and surface-disturbing activities within 0.25 mile of either side of the active river channel. In addition, stipulation CRV-CSU-23 on suitable stream segments classified as scenic and recreational would apply under this alternative, which includes CSU restrictions within 0.25 mile on both sides of the active river channel.

## Alternative C

Under Alternative C, impacts to locatable minerals, salable minerals/mineral materials, and non-energy leasable minerals from management of soils, special status plants and terrestrial wildlife, and cultural resources would be the same as or similar to those under Alternative B. Impacts from management of all other resources and uses would be similar to those under Alternative A, except as described below.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative C, approximately 332,800 acres of the planning area would be open to locatable mineral development. However, the CRVFO would recommend for withdrawal to the Secretary of the Interior of approximately 172,100 acres for closure to the mining laws for locatable exploration or development. As described under Alternative B, the overall extent of the closed areas, combined with the proposed withdrawals related to NWSRS designations under Alternative C, could result in a reduction in locatable mineral activities to a greater extent under Alternative C than under Alternatives A, B, and D, due to the greater area covered by closures. None of the proposed withdrawals would affect the area just north of Gypsum, where a wallboard plant is operating on patented mining claims. Future gypsum exploration and development could be limited under Alternative C along the Colorado River and Deep Creek. Withdrawals related to NWSRS designations under Alternative C could close areas with limestone potential along Deep Creek and the Colorado River. Segments of these water bodies would be designated as suitable for inclusion

BLM_0016952

in the NWSRS under this alternative, closing them to the mining laws for locatable exploration or development.

If prices for uranium and gold continue to increase, the proposed withdrawals could impact areas where these exploration and development activities could occur. Areas favorable for uranium and vanadium mining have been mapped along the Colorado River, including the segment that would be designated as suitable for inclusion in the NWSRS under Alternative C. Recreational gold panning and dredging along the Colorado River could be impacted by the proposed withdrawals along the Colorado River.

Under Alternative C, approximately 317,000 acres of the planning area would be open to salable minerals and non-energy leasable minerals. The CRVFO would propose the closure of approximately 196,000 acres in the planning area to mineral materials and non-energy solid mineral leasing. Expansion of mineral materials activities near Dotsero would be limited by NSO, CSU, and TL stipulations. Potential decorative rock sites throughout the planning area and decorative boulder and sand and gravel deposits along the Colorado River would be limited under this alternative by stipulations under this alternative. The proposed designation of portions of the Colorado River as suitable for the NWSRS under Alternative C would limit sand and gravel extraction within 0.5 mile of the river, where most of the viable geologic material occurs in the CRVFO. In addition to the impacts from stipulations under Alternative C (described under Alternative A), mineral materials closures along West Rifle Creek and in the Cattle Creek watershed could impact future decorative rock disposal sites, including those for moss rock.

Overall, this alternative would have a moderate impact on mineral resources throughout the planning area. Furthermore, this alternative would have impacts on existing operations by limiting or preventing expansion.

**Impacts from Water Resource Management.** Impacts under Alternative C would be the same as or similar to those under Alternative B but would include additional protection of approximately 69,000 acres by stipulation CRV-CSU-2 for hydrologic features. This stipulation would apply CSU restrictions within 100 feet of the edge of a hydrologic feature thus further preventing or limiting ground-disturbing activities in those areas resulting in minor impacts on mineral resources.

**Impacts from Vegetation Management—Riparian.** Impacts under Alternative C would be the same as or similar to those under Alternative B but would include additional protection of approximately 4,300 acres in the planning area by stipulation CRV-NSO-6 for riparian and wetland zones that would prohibit surface occupancy and surface-disturbing activities within riparian vegetation. These stipulations alone would have minor impacts on mineral resources. The water stipulations above would also apply, further limiting or preventing surface-disturbing activities.

**Impacts from Terrestrial Wildlife Management.** Impacts under Alternative C would be the same as or similar to those under Alternative A. However, a slightly greater number of acres (fewer than under Alternative B) within the planning area would be protected by applicable wildlife stipulations that would prohibit surface occupancy and surface-disturbing activities in wildlife areas. Therefore, this alternative would probably have a minor impact on mineral resources in the planning area and would not affect existing operations.

**Impacts from Visual Resource Management.** Impacts under Alternative C would be the same as or similar to those under Alternative B, except that more acres of the planning area would be managed as VRM

BLM_0016953

Class II. Under this alternative, approximately 258,100 acres of the planning area would be managed as VRM Class II.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under Alternative C, approximately 47,000 acres of the planning area would be protected by stipulation CRV-NSO-43 for LWCs, thus prohibiting surface occupancy and surface-disturbing activities. Management of these areas would have a minor impact on mineral resources because the potential for mineral development in these areas is low.

**Impacts from Lands and Realty Management.** Impacts under Alternative C would be the same as or similar to those under Alternative B, but would include the designation of 50,600 acres of ROW exclusion areas and 162,000 acres of ROW avoidance areas. This alternative reflects a slight increase in ROW avoidance areas, thereby being more restrictive than under Alternatives A and B. Lands and realty management under this alternative would have a moderate impact on mineral resources by preventing, limiting, or relocating development activities.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts under Alternative C would be the same as or similar to those under Alternatives A and B, except that more acres of the planning area would be closed to oil and gas leasing and slightly more acres protected by NSO and CSU stipulations, making this the most restrictive of the alternatives. Under this alternative, approximately 531,500 acres of the federal mineral estate within the planning area would be managed as open to oil and gas leasing and development. This alternative accounts for the development of approximately 2,206 federal wells on 276 multi-well pads with an estimated 2,774 acres of surface disturbance and includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 1,814 acres on interim reclamation of well pads.

Under this alternative, the CRVFO would manage approximately 175,500 acres of the federal mineral estate as closed to fluid minerals leasing. Major constraints (NSO stipulations) would be applied to approximately 333,800 acres of the planning area that are open to oil and gas leasing. In addition, moderate constraints (CSU stipulations, site-specific relocation) would apply to approximately 500,500 acres that are open to oil and gas leasing.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts under Alternative C would be the same as or similar to those under Alternative A, but would include the designation of approximately 79,700 acres of the planning area as ACECs. The increased protections would limit or prevent surface-disturbing activities in more of the planning area. While ACEC management under this alternative would have minor impacts on existing mineral development, it could have moderate impacts on mineral resources throughout the planning area by imposing more restrictions on exploration and development activities.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Impacts under Alternative C would be the same as or similar to those under Alternative A, but the NSO and CSU stipulations that apply would be the same as Alternative B.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Impacts under Alternative C would be the same as or similar to those under Alternative A with the same number of eligible river segments (i.e., 13).

BLM_0016954

However, the NSO and CSU stipulations that apply under Alternative B would apply in this alternative as well.

### *Alternative D*

Impacts to locatable minerals, salable minerals/mineral materials, and non-energy leasable minerals under Alternative D would be the same as or similar to those under Alternative A, except as described below.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative D, approximately 432,600 acres of the planning area would be open to locatable mineral development. However, the CRVFO would recommend for withdrawal to the Secretary of the Interior of approximately 72,300 acres for closure to the mining laws for locatable exploration or development. None of the proposed withdrawals would affect the area just north of Gypsum, where a wallboard plant is operating on patented mining claims. Future gypsum exploration and development could be limited under Alternative D along the Colorado River and Deep Creek.

Under Alternative D, approximately 477,200 acres of the planning area would be open to salable minerals and non-energy leasable minerals. The CRVFO would propose the closure of approximately 27,800 acres in the planning area to mineral materials and non-energy solid mineral leasing. Overall, this alternative would have a minor impact on mineral resources throughout the planning area and on existing operations.

**Impacts from Soils Management.** Impacts under Alternative D would be the same as or similar to those under Alternative B.

**Impacts from Water Resource Management.** Impacts under Alternative D would be the same as or similar to those under Alternative B but would not include the additional protection of approximately 34,500 acres by stipulation CRV-NSO-5 for streamside management zones. This alternative would be less restrictive than under Alternatives B and C, but could still have minor impacts on mineral resources by relocating surface-disturbing activities.

**Impacts from Vegetation Management—Riparian.** Impacts under Alternative D would be similar to Alternative B but would not include the additional protection from surface-disturbing activities being provided by water and fisheries stipulations. While riparian management under this alternative would be less restrictive, water stipulations would apply that would further limit or prevent surface-disturbing activities.

**Impacts from Terrestrial Wildlife Management.** Impacts under Alternative D would be the same as or similar to those under Alternative A. However, fewer acres within the planning area would be protected by applicable wildlife stipulations that would prohibit surface occupancy and surface-disturbing activities in wildlife areas. This alternative would probably have a negligible impact on mineral resources in the planning area.

**Impacts from Special Status Species—Plants and Terrestrial Wildlife Management.** Impacts under Alternative D would be the same as or similar to those under Alternative A, but would provide less protection by stipulations for special status plants and terrestrial wildlife that would prohibit surface occupancy and surface-disturbing activities. Under this alternative, management of special status plants and terrestrial wildlife would have a minor impact on mineral resources by limiting, preventing, or relocating development activities.

BLM_0016955

**Impacts from Cultural Resource Management.** Impacts under Alternative D would be the same as or similar to those under Alternative B, but would exclude stipulation CRV-NSO-38 for eligible historic properties.

**Impacts from Visual Resource Management.** Impacts under Alternative D would be the same as or similar to those under Alternative B, except that fewer acres of the planning area would be managed as VRM Class II. Under this alternative, approximately 228,300 acres of the planning area would be managed as VRM Class II. While this alternative has the least amount of VRM Class II designated, it has the same amount of VRM Class I as Alternatives B and C, and more than under Alternative A. Similar stipulations to the alternatives above would apply under this alternative, thereby limiting or preventing development in those areas.

**Impacts from Lands and Realty Management.** Impacts under Alternative D would be the same as or similar to those under Alternative B, but would include slightly fewer acres within the planning area as ROW Avoidance Areas (126,700 acres) and ROW exclusion areas (39,000 acres) resulting in less restrictions for mineral development. This alternative being slightly less restrictive would have a minor impact on mineral resources within the planning area.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts under Alternative D would be the same as or similar to those under Alternatives A, but with more development and less protective measures. Under this alternative, a high percentage of the planning area would be open to oil and gas leasing. In addition, this development scenario accounts for a substantial increase in infrastructure and disturbed acres. This alternative would be the least restrictive with regard to development. Approximately 658,200 acres of the federal mineral estate within the planning area would be managed as open to oil and gas leasing and development. This alternative accounts for the development of approximately 4,198 federal wells on 525 multi-well pads with an estimated 5,276 acres of surface disturbance and includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 3,439 acres on interim reclamation of well pads.

Under this alternative, the CRVFO would manage approximately 48,800 acres of the federal mineral estate as closed to fluid minerals leasing. Major constraints (NSO stipulations) would be applied to approximately 203,000 acres of the planning area that are open to oil and gas leasing. In addition, moderate constraints (CSU stipulations, site-specific relocation) would apply to approximately 297,800 acres that are open to oil and gas leasing.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts under Alternative D would be the same as or similar to those under Alternative A, but would include the designation of approximately 20,200 acres of the planning area as ACECs. This would be the least restrictive of the alternatives with regard to mineral resources. Impacts under this alternative to mineral resources would be minor.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Impacts under Alternative D would be the same as or similar to those under Alternative A, but the NSO and CSU stipulations that apply would be the same as Alternative B.

BLM_0016956

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative D, there would be no suitable wild and scenic segments in the planning area, and none of the NSO and CSU stipulations for WSRs would apply. This would allow for surface occupancy and surface-disturbing activities in areas that were previously managed for wild and scenic rivers. This alternative is less restrictive than under Alternatives A through C, and would have a negligible impact on mineral resources in the planning area.

## Cumulative Impacts

The geographic extent of the cumulative impacts analysis as it pertains to locatable minerals, mineral materials, and non-energy leasable minerals would be the CRVFO boundary and would include all federal, state, private, and other lands within this boundary. Impacts on mineral resources that are individually minor may cumulatively reduce exploration and production of commodities from public lands. Factors that affect mineral extraction and prospecting include, but are not limited to, such things as permitting and permitting delays, regulatory policy, public perception and concerns, travel management, transportation, mitigation measures, proximity to sensitive areas, low commodity prices, taxes, housing and other necessities for workers and many other issues. BLM has no control over many of these issues. Issues within the control of BLM are discussed earlier in this chapter. Most of these issues result in additional costs or permitting delays that can individually or cumulatively add costs to projects.

Public land that currently has no public access could reduce the amount of mineral exploration and development that may occur. Permission from landowners to cross private land to access public land is sometimes denied and could result in mineralization not being discovered and developed. Mineral resources in other ownerships may not be developed if the adjacent public lands are withdrawn from mineral entry, because the deposit may not be economically feasible to develop if it crosses ownership and only a portion is available for development. The withdrawal of areas from mineral entry would cause an irretrievable loss of mineral extraction during the life of the plan. Some of the proposed withdrawals fall in high and moderate mineral potential areas. A mineral withdrawal that lies within or adjacent to a larger ore body could also prohibit mining of the larger ore body. For example, a withdrawn area may lie within an economic open pit perimeter. All or portions of the ore body may not be mined because the mineral withdrawal restricts the opening or expansion of the pit.

Proposed land exchanges could also result in an irreversible and irretrievable loss of minerals for extraction by the general public. Public lands transferred to other ownership would no longer be available for mineral extraction by the general public unless the federal government retains the mineral rights. BLM many times acquires lands in land exchanges; however, these lands are sometimes acquired with stipulations that prohibit mineral extraction. Throughout all alternatives, mineral development and exploration would continue to occur. However, acres open to exploration and development would vary by alternative. Overall, Alternative C would be the most restrictive to mineral developments and could result in the greatest amount of cumulative impacts. It proposes the most acres be withdrawn from mineral entry, the most areas closed to motorized travel, the most road restrictions, and the highest protection to other resources. Alternative C would be followed by Alternative B. Alternatives A through C contain both ACEC designations and WSR segments. Alternative D would be the least restrictive regarding mineral development.

BLM_0016957

### 4.3.7  Renewable Energy

The Affected Environment (baseline) for Renewable Energy has been described in Chapter 3, Section 3.3.7. Please see the following sections for the Chapter 4, Renewable topics:

- For biomass see the Forestry, Section 4.3.1.

- For wind and solar see the Lands and Realty, Section 4.3.5.

- For geothermal see the Energy and Minerals-Fluid Minerals (Oil and Gas, Oil Shale and Geothermal Resources), Section 4.3.6.2.

BLM_0016958

## 4.4    IMPACTS ON SPECIAL DESIGNATIONS

### 4.4.1    Areas of Critical Environmental Concern

An Area of Critical Environmental Concern (ACEC) is an administrative designation assigned by BLM for "areas within the public lands where special management attention is required." FLPMA defines an ACEC as an area:

> "…within the public lands where special management attention is required (when such areas are developed or used, or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards" (FLPMA Section 103[a]).

This analysis identifies effects of management decisions on BLM's ability to protect against and prevent irreparable damage to the relevant and important values associated with each potential ACEC across the alternatives. Protection of relevant and important values can occur as a result of management associated with designating ACECs, management associated with other special designations (e.g., WSAs and wild and scenic rivers), general management of public lands (VRM class designations, restrictions on wildlife habitat, special status species management, SRMAs), or through geographic or topographic characteristics. The most restrictive management that protects an area with relevant and important values will be the focus of the analysis. Analysis of less restrictive management that would not provide additional protection to a relevant and important value will not be addressed. For example, in Alternative C, most ACECs are covered by an NSO for the entire ACEC. If an ACEC with scenic and cultural relevant and important values is covered by an NSO for the entire ACEC, then a smaller buffer NSO around the cultural features would not provide additional protection for the relevant and important values. Therefore, the analysis would not address the impacts of cultural resource management for that alternative. On the other hand, in Alternative D, most ACECs would not be designated and the same NSO for cultural resources would provide substantial protection for the relevant and important values, so the analysis would address cultural resource management in that alternative.

### *Methods and Assumptions*

This analysis is based on the following assumptions:

- Although management decisions for most resources and resource uses have Field Office-wide application, ACEC management prescriptions apply only to those lands within each specific ACEC, as outlined.

- Some areas within the CRVFO may have two or more special designations. Any potential ACEC that falls within a WSA would be managed under the IMP. Although the WSAs are not automatically closed to mineral leasing and development and other surface-disturbing activities, the nonimpairment criteria would preclude or strictly regulate most surface disturbances. Because of the WSA restrictions on surface-disturbing activities, the following analysis assumes that WSAs would generally protect the relevant and important values of potential ACECs and would have a beneficial impact on lands considered for ACEC designation. However, WSAs are designated for different purposes and different values than ACECs. If Congress were to release a WSA from further consideration, the ACEC management prescriptions are designed to protect and enhance the relevant and important values.

BLM_0016959

- Under all alternatives, all public lands within the CRVFO not withdrawn from mineral entry would be open to mining claim location. Mining claims could be located in ACECs if the area is not withdrawn. Locatable mineral development would not be subject to NSO or CSU stipulations.

- Many of the resources and uses have NSO or CSU stipulations (or both) that extend beyond or overlap the stipulations that would be applied to the relevant and important values within each ACEC. Although NSO or CSU stipulations for other resources and uses may offer additional benefits (e.g., reduced erosion/sedimentation/weed invasion) and indirectly support the relevant and important values, in most cases, these benefits would be negligible or redundant to the protections provided by the ACEC management prescriptions. For these reasons, impacts on the relevant and important values within ACECs from NSO and/or CSU stipulations associated with other resources will not be addressed unless they provide a more restrictive stipulation or cover a broader area than those stipulations attached to the relevant and important values.

- Land uses would be managed to maintain or move towards meeting the Colorado Public Land Health Standards on a landscape basis.

Table 4.4.1-1 lists the existing and potential ACECs and their relevant and important values, by alternative.

**Table 4.4.1-1**
**Existing and Potential Areas of Critical Environmental Concern**

| ACEC | Relevant and Important Values | Alternative A (Existing) | Alternative B | Alternative C | Alternative D | Area Leased |
|---|---|---|---|---|---|---|
| **Existing ACECs** | | | | | | |
| Blue Hill | Historic and cultural values and natural hazards | 3,700 acres | 3,700 acres | 3,700 acres | 3,700 acres | 0 |
| Bull Gulch | Scenic qualities | 10,400 acres | 10,400 acres | 10,400 acres | 10,400 acres | 0 |
| Deep Creek | Scenic and geologic values | 2,400 acres | 2,400 acres | 2,400 acres | 0 acres | 0 |
| Glenwood Springs Debris Flow Hazard Zone | Natural hazards, Colorado River cutthroat trout | 6,100 acres | 6,100 acres | 6,100 acres | 6,100 acres | 0 |
| Lower Colorado River | Riparian and wildlife habitat | 130 acres | 0 acres | 0 acres | 0 acres | 0 |
| Thompson Creek | Scenic, geologic, historic, and ecological value | 4,300 acres | 3,400 acres | 3,400 acres | 0 acres | 0 |
| **Potential ACECs** | | | | | | |
| Abrams Creek | Colorado River cutthroat trout | 0 acres | 0 acres | 190 acres | 0 acres | 0 |
| Colorado River Seeps | Significant plant communities | 0 acres | 0 acres | 470 acres | 0 acres | 0 |
| Dotsero Crater | Geologic values | 0 acres | 100 acres | 100 acres | 0 acres | 0 |
| Grand Hogback | Scenic, geologic, cultural values | 0 acres | 0 acres | 14,000 acres | 0 acres | 7,080 acres |
| Greater Sage-Grouse Habitat | Greater-sage-grouse | 0 acres | 0 acres | 24,600 acres | 0 acres | 0 |

BLM_0016960

**Table 4.4.1-1**
**Existing and Potential Areas of Critical Environmental Concern**

| ACEC | Relevant and Important Values | Alternative A (Existing) | Alternative B | Alternative C | Alternative D | Area Leased |
|------|-------------------------------|--------------------------|---------------|---------------|---------------|-------------|
| Hardscrabble-Mayer Gulch | Harrington's penstemon | 0 acres | 3,400 acres | 0 acres | 0 acres | 0 |
| Hardscrabble-Mayer Gulch/East Eagle | Harrington's penstemon | 0 acres | 0 acres | 4,200 acres | 0 acres | 0 |
| Lyons Gulch | Harrington's penstemon | 0 acres | 480 acres | 480 acres | 0 acres | 0 |
| McCoy Fan Delta | Geologic values | 0 acres | 0 acres | 220 acres | 0 acres | 0 |
| Mount Logan Foothills | Colorado hookless cactus, DeBeque phacelia, Naturita milkvetch | 0 acres | 0 acres | 3,900 acres | 0 acres | 3,050 acres |
| Sheep Creek Uplands | Harrington's penstemon | 0 acres | 4,500 acres | 4,500 acres | 0 acres | 0 |
| The Crown Ridge | Harrington's penstemon | 0 acres | 0 acres | 1,000 acres | 0 acres | 0 |
| **Total** | | **27,030 acres** | **34,500 acres** | **79,700 acres** | **20,200 acres** | **10,130 acres** |

### Environmental Consequences

Relevant and important values identified for the ACECs and impacts on those values vary based on the individual ACEC, because the relevant and important values vary by ACEC. Thus, the discussion of impacts will be different for each ACEC. ACECs are analyzed in alphabetical order as they appear in Table 2-2 in Chapter 2.

Impacts on ACECs would result from some of the management actions and activities proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on ACECs under any of the four alternatives.

### Abrams Creek Potential ACEC

The Abrams Creek potential ACEC would designate 190 acres of public land along Abrams Creek, near Eagle, Colorado. The relevant and important value is wildlife resources. Wildlife values consist of a genetically pure population of Colorado River cutthroat trout that is identified as a Core Conservation Population.

### Alternative A

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Abrams Creek Potential ACEC would not be designated under Alternative A. No special management would be applied and no benefits would accrue to the relevant and important values. Potential impacts to Colorado River cutthroat trout habitat from surface-disturbing activities could occur under this alternative.

The following management actions would apply to the Abrams Creek area:

BLM_0016961

- NSO (GS-NSO-15) (for oil and gas facilities) on steep slopes on a portion of the potential ACEC.

- VRM Class II.

- Open to motorized travel.

- Available for ROWs.

- WSR eligible stream segment.

**Impacts from Soils Management.** Approximately one-third of the Abrams Creek Potential ACEC consists of steep slopes greater than 50 percent. Under the current management plan, these slopes would be protected from surface disturbances associated with oil and gas facilities with an NSO stipulation. The NSO would not apply to pipelines or other non-energy-related disturbances. Surface disturbances on steep slopes adjacent to the creek would probably result in erosion and sedimentation within the stream, degrading trout habitat. Under Alternatives B, C, and D, the steep slope stipulation (CRV-NSO-2) would restrict all surface-disturbing activities; therefore, soils management would provide the least benefits under Alternative A.

**Impacts from Visual Resource Management.** Abrams Creek Potential ACEC would be managed as VRM Class II in all alternatives. This would restrict most surface-disturbing activities with the potential to modify the visual landscape. The VRM Class II designation would benefit the Colorado River cutthroat trout habitat within the ACEC. Impacts would be the same in all alternatives.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Under Alternative A, a CSU stipulation for BLM sensitive species would allow relocation of surface-disturbing activities or special design criteria to protect the Colorado River cutthroat trout habitat. This stipulation would protect the Abrams Creek watershed from surface disturbances and would have beneficial effects on the relevant and important fish resources.

**Impacts from Comprehensive Trails and Travel Management.** Current travel management for the Abrams Creek Potential ACEC is open to OHV use on and off roads. A route paralleling the creek is open to full-sized vehicles. A second route through the ACEC is open to mechanized travel. Cross-country travel in open travel areas would continue to result in the creation of new unplanned routes. Roads and other routes in proximity to aquatic habitat can cause potential erosion and off-site sediment transport that can adversely affect fish feeding and spawning. Alternative A would result in the most adverse impacts from travel management.

**Impacts from Lands and Realty Management.** The Abrams Creek Potential ACEC would be available for ROW applications under Alternative A, subject to the steep slope NSO restriction on a portion of the ACEC, and VRM Class II constraints. Activities that result in ground disturbance and the removal of native vegetation for construction of ROWs have the potential to allow for the off-site movement of soils and increase sediment loading and turbidity into nearby water bodies. Alternative A would result in the greatest risk of impacts from lands and realty on the relevant and important values of the potential ACEC.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Lands within the Abrams Creek area would not be withdrawn from mineral entry. Locatable mineral exploration and development would be allowed under the General Mining Law and would not be subject to NSO or CSU stipulations. Plans of operations would not be required for locatable mineral activities

BLM_0016962

that would cause surface disturbances of 5 acres or less. Because activities of less than 5 acres or bulk samples of less than 1,000 tons only require a notice to be filed with the BLM, adverse impacts would be anticipated to the relevant and important values of the potential ACEC. Surface-disturbing activities associated with mineral development may impact Colorado River cutthroat trout habitat through loss of vegetation cover, sedimentation in the stream channel, or degradation of water quality.

Mineral material sales and non-energy leasable minerals would be subject to the management constraints on steep slopes and riparian vegetation. These activities are also discretionary and would not be allowed in areas of high-value resources. Impacts on the relevant and important values would be greatest under Alternative A.

**Impacts from Wild and Scenic Rivers (WSR) Management.** The Abrams Creek stream segment was determined to be eligible for inclusion in the NWSRS. Interim management to protect the outstandingly remarkable values (ORVs) and the free-flowing nature of the stream would apply to a 0.25-mile buffer on both sides of the stream. Interim management would preclude most surface-disturbing activities that would adversely affect the stream corridor. Protecting the eligible WSR segment would have beneficial impacts on the Abrams Creek Potential ACEC.

### Alternative B (Preferred Alternative)

Impacts on ACECs from soils management and from locatable, salable, and non-energy leasable minerals management would be the same or similar to those under Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Abrams Creek Potential ACEC would not be designated under Alternative B. Abrams Creek would be managed as follows:

- NSO within 100 meters of all fish-bearing streams (CRV-NSO-15).
- VRM Class II.
- NSO for VRM Class II with slopes over 30 percent and high visual sensitivity on south side of potential ACEC (CRV-NSO-41).
- Travel limited to designated routes; existing routes limited to pedestrian and equestrian.
- ROW avoidance for special status species occupied habitat.
- Open for mineral entry, mineral materials sales, and non-energy leasable minerals.

Approximately, one-half of the potential ACEC would be covered by an NSO stipulation protecting fish habitat. These management actions would provide greater protection for the Colorado River cutthroat trout habitat than in Alternative A.

**Impacts from Visual Resource Management.** Abrams Creek Potential ACEC would continue to be managed as VRM Class II. Under Alternative B, an NSO stipulation would be applied to slopes greater than 30 percent with high visual sensitivity. The addition of an NSO for a portion of the potential ACEC would result in more protection from surface disturbances that would impact the Colorado River cutthroat trout habitat. Visual resource management under Alternative B would have more beneficial impact than under Alternative A.

BLM_0016963

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Under Alternative B, Colorado River cutthroat trout would benefit from an NSO within 100 meters of all fish-bearing streams. This would result in greater protection for the relevant and important values than under Alternative A.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative B, all travel would be limited to designated routes, and all existing routes within the potential ACEC would be limited to pedestrian and equestrian traffic. Eliminating motorized and mechanized vehicles from within the ACEC would reduce erosion and sedimentation into the stream, particularly on the routes closest to the stream. Alternative B would result in fewer impacts than Alternative A.

**Impacts from Lands and Realty Management.** Under Alternative B, special status species occupied habitat would be considered a ROW avoidance area. This would limit ROW activities within proximity of the creek, although some surface disturbances may be allowed elsewhere within the potential ACEC. Alternative B would result in fewer impacts from lands and realty on the relevant and important values of the potential ACEC than under Alternative A, more than under Alternative C, and the same as Alternative D.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The Abrams Creek stream segment would not be determined suitable for inclusion in the NWSRS under Alternative B. There would be no protection for the relevant and important values from management of wild and scenic river suitable segments. Alternative B would have more risk of impacts than under Alternatives A or C and the same as Alternative D.

*Alternative C*
Impacts on ACECs from soils management and visual resource management would be the same as or similar to Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Abrams Creek area would be designated as an ACEC to protect Colorado River cutthroat trout habitat under this alternative. Designating the Abrams Creek as an ACEC and including an NSO stipulation on the entire ACEC would provide the most protection for cutthroat trout habitat. Alternative C would have the most benefit to the relevant and important values.

Special management prescriptions for the Abrams Creek Potential ACEC would be as follows:

- Apply NSO on all acres (CRV-NSO-49).

- Designate as ROW exclusion area.

- Recommend for withdrawal from mineral entry, close to mineral materials sales, and close to leasing of non-energy solid minerals.

- Close to unauthorized motorized vehicle travel, including over-the-snow travel.

**Impacts from Comprehensive Trails and Travel Management.** The Abrams Creek Potential ACEC would be closed to unauthorized motorized travel, including over-the-snow travel. The route closest to the creek would be obliterated and the other route traversing the ACEC would be limited to pedestrian and equestrian use only. Closing and rehabilitating the road which parallels the stream would reduce the potential

BLM_0016964

for erosion and off-site sedimentation into the creek. Of all alternatives, Alternative C would result in the most protection for the Colorado River cutthroat trout habitat.

**Impacts from Lands and Realty Management.** The Abrams Creek Potential ACEC would be designated as a ROW exclusion area under Alternative C, which would prohibit ROW actions that might impair the values of the ACEC. Realty actions would result in no surface disturbances that would impact the relevant and important values associated with the ACEC.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative C, the ACEC would also be recommended for withdrawal from mineral location, closed to mineral materials disposal and non-energy solid mineral leasing. There would be no impacts from mineral development under this alternative. Of all alternatives, Alternative C would result in the least adverse impacts on Colorado River cutthroat trout habitat within the potential ACEC.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The Abrams Creek stream segment would be determined to be suitable for inclusion in the NWSRS. Interim management to protect the ORVs and the free-flowing nature of the stream would apply to a 0.25-mile buffer on both sides of the stream. Management to protect the ORVs and tentative classification would complement management prescriptions to protect the relevant and important values within the ACEC.

*Alternative D*

Impacts on ACECs from soils management, visual resource management, comprehensive trails and travel management, lands and realty management, and locatable, salable, and non-energy leasable minerals management would be the same as or similar to Alternative B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Abrams Creek Potential ACEC would not be designated under Alternative D. The area would be managed under the following actions:

- NSO within 100 meters for streams that support core conservation populations of Colorado River cutthroat trout (CRV-NSO-31).
- VRM Class II.
- NSO for VRM Class II with slopes over 30 percent and high visual sensitivity on south side.
- Travel limited to designated routes; existing routes limited to pedestrians and equestrians.
- ROW avoidance for special status species occupied habitat.
- Open for mineral entry, mineral materials sales, and non-energy leasable minerals.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** Under Alternative D, the NSO with 100-meter buffer on all perennial streams would be replaced by an NSO with 100-meter buffer on streams supporting core conservation populations of Colorado River cutthroat trout. Impacts would be the same as Alternative B.

BLM_0016965

**Impacts from Wild and Scenic Rivers (WSR) Management.** The Abrams Creek stream segment would not be determined suitable for inclusion in the NWSRS under Alternative D. There would be no protection for the relevant and important values from management of wild and scenic river suitable segments. Alternative D would have more risk of impacts than under Alternatives A or C, and the same as Alternative B.

## Summary

Alternative D would provide less protection for the Colorado River cutthroat trout habitat than in Alternative C, more protection than Alternative A, and similar protection as in Alternative B.

### Blue Hill ACEC

The Blue Hill ACEC encompasses 3,700 acres. This ACEC is located along the Colorado River east of Burns, Colorado. The relevant and important values are historic and cultural resources and natural hazards associated with severe erosion hazard of area soils.

### Alternative A

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Blue Hill area is designated as an ACEC under the current management plan to protect its relevant and important cultural resources and erosive soils. Several management prescriptions specific to the ACEC include designating the area as VRM Class II, identifying the area as sensitive for placement of utilities and communication sites, and limiting travel to designated routes. Although these management prescriptions would provide some protection from surface-disturbing activities, the entire ACEC would not be covered with an NSO stipulation, fluid minerals leasing would be allowed, and some ROW development could occur within the ACEC. The potential would remain for some surface disturbances to impact the relevant and important values. Alternative A would provide less protection for the relevant and important values than the other alternatives, which would include additional management restrictions to protect the Blue Hill ACEC.

The Blue Hill ACEC would have the following management stipulations:

- NSO within 100 meters of historic properties.
- VRM Class II.
- Limited to designated routes, except over-the-snow travel.
- Sensitive for utility and communication site facilities development (ROW avoidance area).

**Impacts from Soils Management.** The Blue Hill area contains soils with severe erosion hazard. Under Alternative A, small portions of the ACEC have a CSU stipulation attached for management of erosive soils and slopes over 30 percent. This stipulation would provide some protection for cultural resources from erosion resulting from surface disturbances.

**Impacts from Cultural Resource Management.** Management actions associated with cultural resources would provide direct protection to the Blue Hill area from surface-disturbing activities. These protective measures are required by laws and regulations before approving any surface occupancy or surface-disturbing activities and include measures such as a cultural resource inventory, evaluation of NRHP eligibility, and mitigation of potential effects, generally through avoidance. Under Alternative A, management of the Blue Hill ACEC would also include an NSO stipulation with a 100-meter buffer around historic properties. This

BLM_0016966

would provide a moderate degree of protection for cultural resources; however, under Alternatives B and C, the buffer distance would increase to 200 meters, which would provide greater protection from potential indirect impacts such as erosion and risk of vandalism due to increased human presence in the vicinity of cultural resources.

**Impacts from Lands and Realty Management.** Currently, the Blue Hill ACEC is managed as a sensitive zone for placement of utilities and communication sites. Sensitive zones are areas where existing resource values must be mitigated before location of utilities or communication facilities. This may restrict some activities within the ACEC or may require some ROW actions to be located in areas where they would have less adverse impacts on cultural resources. The Blue Hill ACEC would not be recommended for withdrawal from mineral entry under Alternative A, which would not prohibit mining activity within the ACEC.

Impacts on the relevant and important values would be greatest under Alternative A, because in other alternatives, the Blue Hill ACEC would be designated as a ROW exclusion area and withdrawn from mineral entry.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The Blue Hill ACEC would be open to fluid minerals leasing under Alternative A. The Blue Hill area has been identified as an area of moderate potential for oil and gas development, although no leases currently exist in the ACEC. If leases were issued in the future, they would be subject to the NSO stipulation for cultural resources and any other pertinent laws, regulations and stipulations that apply to the area. A CSU stipulation protecting erosive soils on slopes greater than 30 percent would allow relocation of activities to areas with less risk of environmental impact. Direct impacts from fluid minerals to cultural resources and erosive soils would probably be minimal; indirect impacts such as vandalism may be minor.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative A, the ACEC would be open for locatable mineral exploration and development. Within a designated ACEC, federal regulations (43 CFR 3809.11 [c][3]) require that a plan of operations be submitted for any operations causing surface disturbances greater than casual use. This regulation would help mitigate the impacts of mining exploration and development on the relevant and important values with the Blue Hill ACEC, but may not completely avoid all impacts associated with the activities.

Under Alternative A, the effects of mineral materials sales on relevant and important values would be evaluated on a case-by-case basis. Since mineral materials sales are discretionary activities, any potential action deemed incompatible with protection of the relevant and important values would be denied.

**Impacts from Renewable Energy Management (Wind and Solar).** According to the US Department of Energy, National Renewable Energy Laboratory, the planning area has a low potential for wind and solar energy. Under Alternative A, applications for solar and wind energy exploration and development would be considered on a case-by-case basis. Surface disturbances associated with construction of solar panels or wind turbines could impact cultural resources and erosive soils located within the area.

Because Alternative A would have fewer protective restrictions for the relevant and important values, Alternative A would have greater risk of impacts than the other alternatives.

BLM_0016967

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The Blue Hill ACEC lies adjacent to the Colorado River, which is an eligible stream for inclusion in the NWSRS under Alternative A. Interim management to protect the free-flowing nature, ORVs, and the tentative classification would apply to a 0.25-mile buffer on both sides of the stream centerline. Management to protect the ORVs and tentative classification would provide indirect protection for the relevant and important values within the ACEC.

### Alternatives B (Preferred Alternative), C, and D

Impacts to ACECs from soils management would be the same as or similar to those under Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternatives B, C, and D, the Blue Hill area would continue to be managed as an ACEC to protect its relevant and important cultural resources and erosive soils. Alternatives B, C, and D would provide several additional management prescriptions not provided under Alternative A:

- Close to fluid minerals leasing (oil and gas, oil shale, geothermal).
- NSO on all acres to protect cultural resources.
- Manage as ROW exclusion area.
- Recommend for withdrawal from mineral location, close to mineral material sales, and make unavailable for coal leasing.
- Prohibit net increase in motorized/mechanized routes.
- Allow vegetation treatments only if they would maintain or enhance the relevant and important values.

These management prescriptions would provide more comprehensive protection than Alternative A, allowing no uses that would cause irreparable damage to the relevant and important values.

**Impacts from Cultural Resource Management.** In addition to the management specific to cultural resources, all acres within the Blue Hill ACEC would be covered by an NSO stipulation to prohibit surface-disturbing activities that would adversely affect the relevant and important values. This stipulation, combined with the other management prescriptions that would be applied under Alternatives B, C, and D, would fully protect the cultural resources from surface-disturbing activities.

**Impacts from Lands and Realty Management.** The Blue Hill ACEC would be designated as a ROW exclusion area that would prohibit ROW actions that might impair the values of the ACEC. In addition, the ACEC would be recommended for withdrawal from mineral location under this alternative and would be protected from surface disturbances associated with mineral and renewal energy development.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** In Alternatives B, C, and D, the Blue Hill ACEC would be closed to all fluid minerals leasing (oil and gas, oil shale and geothermal resources). There would be no impacts from development of these resources within the ACEC.

BLM_0016968

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location under these alternatives and would be protected from impacts associated with locatable mineral development.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternatives B and C, the Colorado River, which is adjacent to the Blue Hill ACEC, would be determined suitable for inclusion in the NWSRS. Interim management to protect the free-flowing nature, ORVs, and the tentative classification would apply to a 0.25-mile buffer on both sides of the stream centerline. Management to protect the ORVs and tentative classification would complement cultural resource management and other management prescriptions to protect the relevant and important values within the ACEC.

Under Alternative D, all streams would be determined not suitable for inclusion in the NWSRS and would be released from interim protection afforded to eligible sections. Although there would be no management to protect the Colorado River corridor adjacent to Blue Hill for WSR status, the river corridor would be managed as a SRMA and would be protected with an NSO for major river corridors, which would restrict most surface-disturbing activities. Combined with the NSO on all acres within the ACEC, the management of WSR corridors would have negligible impact on the relevant and important values of the Blue Hill ACEC.

## Summary
Alternatives B, C, and D would provide greater protection for the relevant and important values of cultural resources and erosive soils than under Alternative A.

### Bull Gulch ACEC
The Bull Gulch ACEC is located on public lands east of the Colorado River and north of Interstate 70 near Derby Junction. The ACEC totals 10,400 acres. The Bull Gulch ACEC falls entirely within the larger Bull Gulch WSA. The relevant and important values are the scenic quality of the area tied to the diverse topography, unique geologic forms and sharp contrasting colors, and several sub-occurrences of Harrington's penstemon.

### Alternative A
**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Bull Gulch ACEC is designated as an ACEC under the current management plan to protect the relevant and important scenic values of the area and to maintain high quality habitat for special status plants. Special management for the relevant and important values includes the following management stipulations:

- NSO on all acres for ACEC values.
- VRM Class I.
- ROW exclusion area.
- Close to unauthorized motorized vehicle travel (including over-the-snow travel).
- Recommend for withdrawal from locatable mineral exploration and development.

The NSO stipulation on the entire ACEC would prohibit surface-disturbing activities that would impair the scenery or would adversely affect Harrington's penstemon populations or habitat within the ACEC. In

BLM_0016969

addition, withdrawing the area from locatable mineral exploration and development would protect the resources from these activities.

**Impacts from Visual Resource Management.** High scenic quality is the primary relevant and important value for which the Bull Gulch ACEC was designated. The Bull Gulch ACEC would be managed under VRM Class I to preserve the existing high scenic character of the landscape by restricting surface-disturbing activities.

**Impacts from Special Status Species Management—Plants.** Under Alternative A, the Harrington's penstemon occurrences within the Bull Gulch ACEC would be covered with a CSU stipulation. This would allow relocation of activities to mitigate impacts on the occupied habitat for this special status plant; however, the NSO that covers the entire ACEC to protect the relevant and important values would provide greater protection that would include suitable, but unoccupied habitat.

**Impacts from Comprehensive Trails and Travel Management.** The ACEC is closed to unauthorized motorized vehicle travel under this alternative, which would provide protection to the relevant and important values by preventing the visual scarring and the potential destruction of special status plants due to OHV travel.

**Impacts from Lands and Realty Management.** The Bull Gulch ACEC is designated as a ROW exclusion area that would prohibit ROW actions that might impair the values of the ACEC. Lands within the Bull Gulch ACEC would be recommended for withdrawal from locatable mineral exploration and development as part of the WSA but would remain open for coal leasing, mineral materials disposal and non-energy solid mineral leasing. The NSO stipulation on all acres within the ACEC would preclude actions that would impair the relevant and important values.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The ACEC is currently closed to fluid minerals leasing due to its location within the Bull Gulch WSA. If the Bull Gulch WSA were released by Congress from consideration as wilderness, the ACEC would be open to fluid minerals leasing. However, the existing NSO that encompasses the entire ACEC would prevent impacts from surface-disturbing activities on the relevant and important values.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location under this alternative and would be protected from surface disturbances associated with locatable mineral development. The NSO stipulation on all acres within the ACEC would preclude actions associated with coal leasing, mineral materials disposal or non-energy solid mineral leasing that would impair the relevant and important values.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** All acres of the Bull Gulch ACEC are within the Bull Gulch WSA. As such, the area would be protected from surface-disturbing activities by IMP, unless Congress releases the area from wilderness consideration. The Bull Gulch WSA would be recommended for withdrawal from locatable mineral exploration and development and would be protected from surface disturbances associated with locatable mineral development. The Bull Gulch WSA would remain open to mineral materials disposal and non-energy solid mineral leasing as long as nonimpairment criteria are met. Although the actions must adhere to nonimpairment criteria, there is still a

BLM_0016970

minor possibility of surface disturbance that would cause erosion and have an indirect, long-term adverse impact on the scenic quality and special status plant populations and their habitat within the ACEC.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Bull Gulch ACEC lies adjacent to the Colorado River, which is an eligible stream for inclusion in the NWSRS under Alternative A. Interim management to protect the free-flowing nature, ORVs, and the tentative classification would apply to a 0.25-mile buffer on both sides of the stream centerline. Management to protect the ORVs and tentative classification would complement management prescriptions to protect the relevant and important values within the ACEC.

### Alternatives B (Preferred Alternative), C, and D

Impacts to ACECs from visual resource management, special status plant species management, comprehensive trails and travel management, lands and realty management, fluid minerals management, and wilderness study areas would be the same as or similar to those under Alternative A.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management**. Under Alternatives B, C, and D, designation and special management would continue for the Bull Gulch ACEC to provide protection for the relevant and important values. Management would be similar to Alternative A, with the following additional management prescriptions:

- Close to fluid minerals leasing (oil and gas, oil shale, geothermal).

- Recommend as unavailable for coal leasing, close to mineral materials sales.

If the Bull Gulch WSA were to be released by Congress, the closure to fluid minerals leasing would still apply to the ACEC. In addition, the ACEC would be closed to mineral materials disposal and non-energy solid mineral leasing. These management actions would ensure that the relevant and important values of the Bull Gulch ACEC would be protected from any surface-disturbing activities in the absence of the WSA status.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts would be the same as Alternative A, except that closing the area to mineral materials disposal and non-energy mineral leasing would afford some additional protection from these actions.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternatives B and C, the Colorado River, which forms the western boundary of the Bull Gulch ACEC, would be determined suitable for inclusion in the NWSRS. Interim management to protect the free-flowing nature, ORVs, and the tentative classification would apply to a 0.25-mile buffer on both sides of the stream centerline. Management to protect the ORVs and tentative classification would complement management prescriptions to protect the relevant and important values within the ACEC.

Under Alternative D, all streams would be determined not suitable for inclusion in the NWSRS and would be released from interim protection afforded eligible sections. Although there would be no management to protect the Colorado River corridor adjacent to Bull Gulch for WSR status, the river corridor would be managed as a SRMA, which would restrict most surface-disturbing activities. Considering the NSO stipulation on all acres within the ACEC, the management of WSR corridors would have negligible impact on the relevant and important values of the Blue Hill ACEC.

BLM_0016971

## Summary

Alternatives B, C, and D would have similar impacts as Alternative A, unless Congress were to release the Bull Gulch WSA from consideration as wilderness, in which case Alternative A would have a greater risk of impacts on the relevant and important values than the other alternatives.

### Colorado River Seeps Potential ACEC

The Colorado River Seeps Potential ACEC is located on a steep slope across the Colorado River from the Bull Gulch ACEC. The ACEC encompasses 470 acres. The hydrologic seep supports natural processes that met the relevant and importance criteria. Two significant plant communities (River birch/mesic grasses and basin big sagebrush/basin wildrye) occur here.

### Alternative A

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative A, the Colorado River Seeps Potential ACEC would not be designated. The following management actions would apply to the area:

- NSO for steep slopes greater than 50 percent for oil and gas facilities (GS-NSO-15).

- CSU for significant plant communities (GS-CSU-3).

- NSO for riparian vegetation (GS-NSO-2).

- VRM Class II (lower slopes), VRM Class III (upper slopes).

- Available for ROW actions.

- Open to locatable mineral exploration and development, mineral materials sales, and non-energy solid leasable minerals.

**Impacts from Soils Management.** An NSO stipulation to protect soils on steep slopes greater than 50 percent would protect a small portion of the potential ACEC from surface disturbances associated with oil and gas development. Under the current management plan, this stipulation would not apply to pipelines or non-oil and gas surface disturbances. This would provide limited benefits to the relevant and important values but would not protect the plant communities from pipelines or disturbances unrelated to oil and gas, and would allow fragmentation where the soil stipulation does not apply. Soils management would have a minimal beneficial effect on the significant plant communities.

**Impacts from Vegetation Management.** Under Alternative A, an NSO stipulation for riparian vegetation would provide protection for the river birch riparian community from direct impacts but would not benefit the sagebrush/basin wildrye community. All significant plant communities are covered by a CSU stipulation in all alternatives. This would protect the resource values from most surface disturbances by allowing relocation of surface-disturbing activities, but may not protect the communities from off-site disturbances that would create soil erosion or weed invasion that would adversely affect the communities. Impacts from vegetation management under Alternative A would provide more protection than under Alternatives B and D, but less than under Alternative C.

**Impacts from Visual Resource Management.** The lower slopes of the Colorado River Seeps Potential ACEC would be included in VRM Class II, providing some protection from surface-disturbing activities. The upper slopes would be classified as VRM Class III, which would allow for moderate modification of the

BLM_0016972

landscape from surface-disturbing activities. The significant plant communities would benefit slightly from the VRM classifications. Impacts from Visual Resource Management would be the same under Alternatives B and D, but more than under Alternative C.

**Impacts from Recreation and Visitor Services Management.** The Colorado River Seeps Potential ACEC would not be included in any SRMAs. Recreation management would be custodial with no specific management emphasis or management controls applied. Little recreational activity occurs within the Colorado River Seeps Potential ACEC (except perhaps some hunting use), and little activity is expected in the future due to the lack of roads and the moderately steep slopes. There would be no impact from recreation management on the relevant and important values under Alternative A.

**Impacts from Lands and Realty Management.** Lands within the Colorado River Seeps Potential ACEC would be available for ROW applications under Alternative A, subject to the NSO restrictions on a portion of the ACEC, and VRM Class II constraints on the lower slopes. Surface-disturbing activities associated with ROW construction and operation would result in the loss of vegetation that may reduce the extent of significant plant communities, fragment the habitat, or change the species composition within the communities. These actions may degrade the ecological condition of the significant plant communities. Alternative A would result in the greatest risk of impacts from lands and realty on the relevant and important values of the potential ACEC.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The Colorado River Seeps area would remain open to locatable mineral entry, disposal of mineral materials, and leasing of non-energy solid minerals. Disposal of mineral materials and leasing of non-energy minerals would be subject to the management constraints in the RMP. These are also discretionary actions that would not be allowed in areas of high resource value. Locatable mineral development would not be subject to NSO or CSU restrictions. Locatable mineral development could result in surface occupancy and surface-disturbing activities causing direct loss of significant plant communities or changes in vegetation cover and composition resulting in reduction of the ecological condition of the significant plant communities. Potential adverse impacts would be the same in Alternatives A, B and D, and less in Alternative C.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The Colorado River stream segment adjacent to the Colorado River Seeps was determined to be eligible for inclusion in the NWSRS. Interim management to protect the ORVs and the free-flowing nature of the stream would apply to a 0.25-mile buffer on both sides of the stream. Interim management would preclude most surface-disturbing activities that would adversely affect the stream corridor. Protecting the eligible WSR segment would have beneficial impacts on the Colorado River Seeps Potential ACEC.

### Alternative B (Preferred Alternative)

Impacts to ACECs from locatable, salable, and non-energy leasable minerals management, ACEC management, and visual resource management would be the same as or similar to those under Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Colorado River Seeps Potential ACEC would not be designated under Alternative B. Management would be similar to Alternative A, except that the lower half of the area would be encompassed within the Upper Colorado River SRMA and managed according to the SRMA objectives.

BLM_0016973

**Impacts from Soils Management.** Impacts would be similar to Alternative A, except that the NSO stipulation for steep slopes would apply to all surface-disturbing activities (CRV-NSO-2), not just oil and gas. The broader application of the NSO stipulation would protect the steep slopes within the potential ACEC from surface disturbances.

**Impacts from Vegetation Management.** Under Alternative B, there would be no NSO stipulation for the protection of riparian resources. Riparian vegetation and significant plant communities would both be covered with a CSU stipulation, which would allow some flexibility to relocate activities to minimize impacts within the potential ACEC, but may not avoid all impacts.

**Impacts from Recreation and Visitor Services Management.** The Upper Colorado River would be designated as a SRMA under Alternatives B, C, and D. The SRMA would overlap the lower slopes of the Colorado River Seeps Potential ACEC. An NSO stipulation (CRV-NSO-46) to protect the recreation setting would indirectly benefit the significant plant communities in the Colorado River Seeps by preventing surface disturbances within the lower part of the potential ACEC. The SRMA is focused primarily on the protection and enhancement of river-related recreation opportunities. Any new boat ramps or parking lots would be proposed on the side of the County Road adjacent to the River, not within the potential ACEC. Recreation management would have a beneficial effect on the relevant and important values of the ACEC under Alternative B.

**Impacts from Lands and Realty Management.** The Upper Colorado River SRMA would be considered a ROW avoidance area. This would restrict ROW actions within the lower part of the potential ACEC and protect the significant plant communities there but would not provide any protection for the upper slopes of the Colorado River Seeps Potential ACEC.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The Colorado River stream segment that is adjacent to the Colorado River Seeps Potential ACEC would be determined suitable for inclusion in the NWSRS under Alternative B. Interim management to protect the ORVs and the free-flowing nature of the stream would apply to a 0.25-mile buffer on both sides of the stream. Management to protect the ORVs and tentative classification would complement management prescriptions to protect the relevant and important values within the potential ACEC.

### Alternative C

Impacts to ACECs from soils management, vegetation management and recreation management would be the same as or similar to those under Alternative B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Colorado River Seeps Potential ACEC would be designated under Alternative C to protect two significant plant communities. Alternative C would provide the most benefit for protection of the relevant and important values.

Special management prescriptions for the ACEC would include:

- Apply NSO on all acres (CRV-NSO-49).
- Manage as VRM Class II on all acres.

BLM_0016974

- Designate as ROW avoidance area.

- Recommend for withdrawal from mineral entry, close to mineral materials disposal, and close to leasing of non-energy solid minerals.

- Prohibit net increase in motorized/mechanized routes.

**Impacts from Visual Resource Management.** All acres within the Colorado River Seeps Potential ACEC would be managed as VRM Class II. This would limit the potential for surface disturbances within the ACEC compared to the other alternatives. Visual resources management under Alternative C would have the most beneficial impact on significant plant communities of all alternatives.

**Impacts from Lands and Realty Management.** All acres within the Colorado River Seeps Potential ACEC would be designated as a ROW avoidance area under Alternative C, which would restrict most ROW actions that might impair the values of the ACEC. Impacts from lands and realty actions would be the least under Alternative C.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location, closed to mineral materials disposal, and closed to leasing of non-energy solid minerals under this alternative. No surface disturbances associated with mineral development would occur. Alternative C would have the least adverse impact on significant plant communities of all alternatives.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The Colorado River stream segment adjacent to the lower slopes of the Colorado River Seeps Potential ACEC would be determined to be suitable for inclusion in the NWSRS in this alternative. Interim management to protect the ORVs and the free-flowing nature of the stream would apply to a 0.25-mile buffer on both sides of the stream. Management to protect the ORVs and tentative classification would complement management prescriptions to protect the relevant and important values within the ACEC.

## Alternative D

Impacts to ACECs from visual resource management would be the same as or similar to Alternatives A and B. Impacts to ACECs from soils management, vegetation management, recreation management, and locatable, salable, and non-energy leasable minerals management would be the same as or similar to those under Alternative B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Colorado River Seeps would not be designated under Alternative D. Management of the area would be very similar to Alternative B.

**Impacts from Lands and Realty Management.** Impacts would be the same as or similar to Alternative A. The SRMA would not be considered an avoidance area for ROW actions. Ground disturbance associated with ROW construction and operation may negatively impact the significant plant communities within the Colorado River Seeps Potential ACEC.

BLM_0016975

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative D, BLM would not recommend any of the 26 eligible stream segments as suitable for designation and they would all be released from further protection under the Wild and Scenic Rivers Act. There would be no protection for the relevant and important values within the Colorado River Seeps area from management of wild and scenic river suitable segments.

## Summary

Alternative D would provide benefits similar to those under Alternative B for the relevant and important values of the potential ACEC, slightly more protection than under Alternative A, but less than under Alternative C.

### *Deep Creek ACEC*

The Deep Creek ACEC encompasses 2,400 acres of public lands within Deep Creek canyon west of the Colorado River. Relevant and important values include outstanding scenic qualities related to the cliffs and canyon, water features, and riparian vegetation. In addition to the scenic values, significant geologic values are present in the prominent geologic faults and high concentration of caves and karst resources found along the cliffs.

### *Alternative A*

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Deep Creek ACEC is designated as an ACEC under the current management plan to protect the relevant and important scenic quality and geologic values of the area. The area has the following management stipulations:

- Apply NSO on all acres (surface).

- Apply NSO on all acres to 5,000 feet below the surface for cave resources.

- Manage as VRM Class I.

- Designate as ROW exclusion area.

- Close to unauthorized motorized vehicle travel (including over-the-snow travel).

- Recommend for withdrawal from locatable mineral exploration and development, close to mineral materials sales, and close to leasing of non-energy solid minerals.

**Impacts from Visual Resource Management.** High scenic quality is one of the relevant and important value for which the Deep Creek ACEC was designated. The Deep Creek ACEC would be managed under VRM Class I to preserve the existing high scenic character of the landscape by restricting surface-disturbing activities.

**Impacts from Cave and Karst Resource Management.** Under Alternative A, the significant cave and karst resources within the Deep Creek ACEC would be protected with an NSO that includes the Deep Creek cave area and some adjacent BLM lands (5,100 acres total). The NSO stipulation applies to surface and subsurface-disturbing activities down to 5,000 feet below the surface to protect the entrances, subsurface features, and overlying ground surface of ten distinct caves within the Deep Creek ACEC. This coverage protects upgradient hydrology, important for the continued health of the cave system. The NSO stipulation precludes the potential for inadvertent damage to the cave and karst system by directional drilling from outside the NSO boundaries to access underlying federal mineral estate.

BLM_0016976

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative A, the ACEC is closed to motorized vehicle travel (except for administrative purposes), which would provide protection to the relevant and important values by avoiding visual scars associated with roads and trails, eliminating the loss of vegetation and damage to the stream due to vehicle traffic.

**Impacts from Lands and Realty Management.** The Deep Creek ACEC is designated as a ROW exclusion area that would prohibit ROW actions that might impair the values of the ACEC.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The Deep Creek ACEC is open to fluid minerals leasing under Alternative A. The Deep Creek area has been identified as an area of low potential for oil and gas development, so the risk of future development is very low. If leases were issued in the future, they would be subject to the NSO stipulation that applies to the entire surface acres of the ACEC as well as the NSO stipulation for cave and karst features that extends to 5,000 feet below the surface. Impacts from fluid minerals would be minimal.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location under this alternative and would be protected from surface disturbances associated with locatable mineral development. The Deep Creek area would also be closed for mineral materials disposal and non-energy solid mineral leasing, preventing any surface-disturbing activities associated with these actions.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Deep Creek is an eligible stream for inclusion in the NWSRS under Alternative A. Interim management to protect the free-flowing nature, outstandingly remarkable values (ORVs) and the tentative classification would apply to a 0.25-mile buffer on both sides of the stream centerline. Management to protect the ORVs and tentative classification would complement management prescriptions to protect the relevant and important values within the ACEC.

*Alternative B (Preferred Alternative)*

Impacts to ACECs from visual resource management and locatable, salable, and non-energy leasable minerals management would be the same as or similar to Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative B, Deep Creek ACEC would continue to be designated as an ACEC, and would be managed similar to Alternative A, with the following additional management prescriptions:

- Close to fluid minerals leasing (oil and gas, oil shale, geothermal resources).
- Recommend as unavailable for coal leasing.
- Close to mineral materials sales.
- Close to mechanized travel.
- Allow fire and other vegetation treatments only if they maintain or enhance the relevant and important values.
- The NSO to 5,000 feet below the surface for cave resources would be reduced to 400 acres.

BLM_0016977

The management restrictions applied under Alternative B would improve protection from surface-disturbing activities within the ACEC boundary, but would lessen protection for cave resources that extend beyond the ACEC boundary. Alternative B would have greater potential for adverse impacts on cave hydrology than under Alternative A.

**Impacts from Cave and Karst Resources.** This alternative would reduce the protection of the Deep Creek cave area compared to current management (Alternative A) by replacing the NSO for 5,100 acres (GS-NSO-16) with a new NSO stipulation (CRV-NSO-44). The new stipulation includes no surface occupancy or subsurface-disturbing activities within a 40-acre area around each of 10 caves within the Deep Creek ACEC (400 acres total). This alternative would reduce the protection of the Deep Creek cave area compared to current management (Alternative A). The new restriction does not protect the entire subsurface features or upgradient hydrology of some of the caves that extend beyond the 40-acre parcel.

**Impacts from Comprehensive Trails and Travel Management.** In addition to classifying the Deep Creek ACEC as closed to unauthorized motorized travel, under Alternative B, the ACEC would be closed to mechanized travel as well. This would provide additional protection for the relevant and important values, particularly the scenery and riparian vegetation.

**Impacts from Lands and Realty Management.** Impacts would be the same as or similar to Alternative A.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The Deep Creek ACEC would be closed to fluid minerals leasing under Alternative B. This would protect the area from any surface-disturbing actions related to oil and gas, oil shale or geothermal development. In addition, closing the ACEC to leasing would prohibit directional drilling under the ACEC, which would protect those portions of the cave resources within the ACEC boundary from any inadvertent impacts from directional drilling. However, the more extensive protection in the Deep Creek cave area under Alternative A associated with the 5,100 acres in GS-NSO-16 would not be carried into Alternative B. This increases the potential for adverse impacts on cave hydrology from fluid mineral development.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative B, the Deep Creek eligible stream segment, which is within the ACEC, would be considered suitable for inclusion in the NWSRS. Interim management to protect the free-flowing nature, ORVs, and the tentative classification would apply to a 0.25-mile buffer on both sides of the stream centerline. Management to protect the ORVs and tentative classification would complement management prescriptions to protect the relevant and important values within the ACEC.

*Alternative C*

Impacts to ACECs from visual resource management, comprehensive trails and travel management, lands and realty management, fluid minerals management, locatable minerals management, and wild and scenic rivers management would be the same as or similar to Alternative B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative C, the Deep Creek ACEC would continue to be designated as an ACEC, and would be managed as under Alternative B, except that the 400-acre NSO for cave and karst resources would be replaced by a 5,100-acre

BLM_0016978

NSO. These management prescriptions would provide the most comprehensive protection of any alternative, allowing no uses that would cause irreparable damage to the relevant and important values.

**Impacts from Cave and Karst Resources.** New stipulation CRV-NSO-54 would be applied to an area of approximately 5,100 acres to protect cave and karst hydrology and underground features of the Deep Creek cave area. This NSO would include 5,100 acres of BLM surface and extend to a depth of 5,000 feet, which would essentially preclude surface or subsurface impacts on all caves within the Deep Creek ACEC, including protection of upgradient hydrology. This is the same protection as provided by the old GS-NSO-16 under Alternative A and is substantially greater protection than under Alternative B, which lacks any NSO extending beyond a 40-acre block at each cave.

**Impacts from Fluid Minerals Management.** As in Alternative B, the Deep Creek ACEC would be closed to fluid minerals leasing. This closure, combined with the NSO for cave and karst resources under Alternative C, would protect the caves and other relevant and important values within the Deep Creek ACEC from any surface or subsurface-disturbing actions related to oil and gas development.

*Alternative D*
Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated in the Deep Creek area under Alternative D and no special management prescriptions would be applied to the ACEC. Although management decisions for visual resources, riparian areas, trout-bearing streams, cave and karst resources, and special status species would provide moderate protections for the relevant and important values, Alternative D would have more adverse impacts than the other alternatives.

Management for the resources in the area would include:

- Open to fluid minerals leasing (oil and gas, oil shale, geothermal resources).
- Open for mineral location, mineral materials sales, non-energy solid mineral leasing.
- VRM Class I on entire area.
- CSU for riparian/wetland vegetation within 500 feet of outer edge.
- CSU for trout-bearing streams for 100 meters on both sides of stream.
- NSO for cave and karst resources (including subsurface features and watershed).
- CSU on special status plant occupied habitat with 100-meter buffer.
- ROW avoidance on special status plant occupied habitat.
- Travel limited to designated routes.

**Impacts from Vegetation Management—Riparian.** Under Alternative D, riparian vegetation and habitat qualities would be maintained with a CSU stipulation within 500 feet (152 meters) of the outer edge of the vegetation. This would provide moderate protection for the relevant and important riparian resources, but may not protect scenic values. Riparian vegetation management under Alternative D would be less beneficial to the relevant and important values than the other alternatives.

BLM_0016979

**Impacts from Fish and Other Aquatic Wildlife Management.** Trout-bearing streams such as Deep Creek would be covered with a CSU stipulation for 100 meters on both sides of the stream. This stipulation would provide management flexibility to relocate activities away from the stream corridor where impacts of surface disturbances to the riparian area would be minimal.

**Impacts from Special Status Species Management—Plants.** Application of the CSU stipulation with 100-meter buffer around occupied special status plant habitat may protect occupied Harrington's penstemon habitat from direct impacts, but would not provide protection for potential habitat or from indirect impacts of surface-disturbing activities.

**Impacts from Visual Resource Management.** The Deep Creek landscape would continue to be managed as VRM Class I to protect the high quality scenic values in the drainage. VRM Class I designation would preclude most surface-disturbing activities within the Deep Creek Potential ACEC area. Impacts from visual resource management would be the same as or similar to Alternative A.

**Impacts from Cave and Karst Resource Management.** Impacts would be the same as or similar to Alternative B.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative D, travel within the Deep Creek area would be managed as limited to designated routes. Existing routes would be designated as open to full-sized vehicles. However, these routes have no public access and use of these routes would be available only to adjacent private landowners. The area would also be open to mechanized travel, which may have some adverse impacts on the relevant and important values. Alternative D would have the same impact as Alternative A, but would have slightly more impact than under Alternatives B and C.

**Impacts from Lands and Realty Management.** Deep Creek would not be considered a ROW exclusion area under Alternative D. ROWs could be located within the Deep Creek area subject to the other stipulations, which would apply. Surface disturbances from ROW development could adversely affect the relevant and important values of the area. Impacts from lands and realty under Alternative D would be greater than the other alternatives.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The Deep Creek area would be open for fluid minerals leasing under Alternative D. The Deep Creek area has been identified as an area of low potential for oil and gas, oil shale and geothermal resources, so the risk of future development is low. If leases were issued in the future, the cave and karst resources would only be protected with an NSO stipulation on surface occupancy or subsurface-disturbing activities within a 40-acre area around each of the caves within the Deep Creek area. This alternative would reduce the protection of the Deep Creek area compared to Alternatives A and C. The new restriction would not protect the entire subsurface features or upgradient hydrology of some of the caves that extend beyond the 40-acre parcel. Other relevant and important values could also be adversely affected by surface-disturbing activities associated with oil and gas development.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative D, the lands within the Deep Creek area would not be recommended for withdrawal from mineral location. Exploration and development of locatable minerals may create surface disturbances that would adversely affect the relevant and important values of the Deep Creek area. Plans of

BLM_0016980

operations would not be required for locatable mineral activities that would cause surface disturbances of 5 acres or less (43 CFR 3809.21[a]). Because activities of 5 acres or less only require a notice to be filed with the BLM, adverse impacts would be anticipated to the scenic and geologic resources in the area. Potential adverse impacts from locatable mineral entry would be greatest in this alternative.

The Deep Creek area would not be closed to mineral materials disposal or leasing of non-energy solid minerals. The Deep Creek area has moderate potential for sand and gravel material and limestone. However, these activities are discretionary actions and would not be allowed in areas of significant resource values.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative D, BLM would not recommend any of the 26 eligible stream segments as suitable for inclusion in the NWSRS and they would all be released from further protection under the Wild and Scenic Rivers Act. There would be no management to protect the Deep Creek stream segment and no protection would be provided to the relevant and important values in the Deep Creek Potential ACEC area.

## Summary

Beneficial impacts on the relevant and important values of the Deep Creek ACEC would be greatest under Alternative C, followed by Alternatives B, A, and D.

### *Dotsero Crater Potential ACEC*

The Dotsero Crater Potential ACEC encompasses the volcanic crater just north of Dotsero, Colorado. The ACEC totals 100 acres. The relevant and important value is the geologic feature associated with the most recent known volcanic event in Colorado.

### *Alternative A*

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated for the Dotsero Crater Potential ACEC under Alternative A. There would be no special management prescriptions applied to protect the relevant and important values of the ACEC. Alternative A would offer the least protection for the geologic values of the Dotsero Crater Potential ACEC of all alternatives.

The area would be managed under the following actions and restrictions:

- NSO on steep slopes greater than 50 percent (for oil and gas facilities).
- VRM Class IV.
- Open to ROW development.
- Open for locatable mineral entry, mineral materials disposal, and non-energy solid minerals leasing.

**Impacts from Soils Management.** Under the current management plan, an NSO stipulation to prohibit surface-disturbing activities on steep slopes greater than 50 percent would protect the slopes of the crater from oil and gas activities; however, the NSO does not apply to pipelines or non-oil and gas surface-disturbing activities. In each of the other alternatives, this NSO for steep slopes over 50 percent applies to all surface-disturbing activities. Under Alternative A, soils management would be less beneficial for protection of the relevant and important values within the Dotsero Crater Potential ACEC than the other alternatives.

BLM_0016981

**Impacts from Visual Resource Management.** Under the current management plan, the Dotsero Crater and surrounding lands are managed as VRM Class IV. This management class would allow management activities that require major modification of the existing visual character of the landscape. Visual resources management under Alternative A would not contribute to the protection of the relevant and important values associated with the potential ACEC.

**Impacts from Lands and Realty Management.** The Dotsero Crater Potential ACEC would be available for ROW applications under Alternative A, subject to the NSO restrictions on the steep sideslopes. Surface-disturbing activities associated with ROW construction and operation could degrade the integrity of the geologic formation and impair the values of the potential ACEC. Alternative A would result in the greatest risk of impacts from lands and realty on the relevant and important values of the potential ACEC.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The Dotsero Crater Potential ACEC would be open to locatable mineral entry, mineral materials disposal, and leasing of non-energy solid minerals. Mineral material sales and leasing of non-energy solid minerals would be subject to management constraints on steep slopes. These activities are discretionary actions and would not be allowed where they could cause irreparable harm to the relevant and important values. Exploration and development of locatable minerals would not be subject to existing stipulations. The geologic values of the crater could be diminished or lost due to surface disturbances associated with locatable mineral entry. Impacts would be greater than under Alternatives B and C, but similar to Alternative D.

*Alternatives B (Preferred Alternative) and C*
Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Dotsero Crater Potential ACEC would be designated as an ACEC under Alternatives B and C. Alternatives B and C would provide more protection for the geologic values of the Dotsero Crater Potential ACEC than under Alternatives A and D.

Management prescriptions that would apply to the area to protect the relevant and important values include:

- Apply NSO on all acres within the ACEC (CRV-NSO-49).
- Manage as VRM Class II.
- Classify as ROW exclusion area.
- Withdraw from mineral location, close to mineral materials sales, and close to non-energy solid mineral leasing.
- Close to unauthorized motorized travel.

**Impacts from Visual Resource Management.** To protect the relevant and important values associated with the ACEC, the VRM Class would change from Class IV under Alternatives A and D, to Class II under Alternatives B and C. VRM Class II would result in protections from most surface-disturbing activities that would modify the visual landscape. The VRM Class II designation would benefit the visual integrity of the crater. Alternatives B and C would provide more protection than under Alternatives A and D.

BLM_0016982

**Impacts from Lands and Realty Management.** The Dotsero Crater Potential ACEC would be managed as a ROW exclusion area under Alternatives B and C, which would prohibit ROW actions that might impair the values of the ACEC. Under Alternatives B and C, lands and realty management would not have adverse impacts on the geologic values of the Dotsero Crater Potential ACEC.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The potential ACEC would be recommended for withdrawal from mineral location, closed to mineral materials sales, and closed to leasing of non-energy solid minerals in Alternatives B and C. These management actions would serve to protect the relevant and important values within the potential ACEC from adverse impacts associated with mineral development. Impacts would be the same as described above for lands and realty actions.

### Alternative D

Under Alternative D, the Dotsero Crater would not be designated as an ACEC. Management actions that would apply to the area are the same as Alternative A, except that all travel would be limited to designated routes. Impacts would be similar to Alternative A.

### Summary

Alternative D would provide slightly more protection for the relevant and important values of the Dotsero Crater Potential ACEC than under Alternative A, but less than under Alternatives B and C.

### Glenwood Springs Debris Flow Hazard Zones ACEC

The Glenwood Springs Debris Flow Hazard Zone encompasses 6,100 acres of public land north and south of Glenwood Springs, Colorado. The relevant and important values are the natural hazards and wildlife resources. Natural hazards are associated with steep, erosive slopes that are subject to mass wasting, debris flows, and rock fall that pose threats to human lives and safety or to property in the area. Wildlife values consist of a genetically pure population of Colorado River cutthroat trout that is identified as a Core Conservation Population.

### Alternative A

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Glenwood Springs Debris Flow Hazard Zone is designated as an ACEC under the current management plan to protect the relevant and important values of the area, which include public hazards associated with steep, erosive soils subject to mass wasting and a Core Conservation Population of the Colorado River cutthroat trout. Special management prescriptions that apply to the area are as follows:

- Apply NSO on all acres.

- Manage as VRM Class II.

- Designate as ROW avoidance area.

- Limit to designated routes, except over-the-snow travel.

- Prohibit net increase in motorized/mechanized routes.

- Allow prescribed fire and other vegetation treatments only if they maintain or enhance the relevant and important values.

BLM_0016983

These management prescriptions would provide protection for the relevant and important values from irreparable damage.

**Impacts from Special Status Species Management—Fish and Other Aquatic Wildlife.** The Glenwood Springs Fish Hatchery lies within the Glenwood Springs Debris Flow Hazard Zone ACEC. An NSO within a 2-mile radius of the Glenwood Springs Fish Hatchery would provide substantial protection for the quality and quantity of surface water and underground aquifers supplying the fish hatchery. Under Alternative A, special status fish and other aquatic wildlife management would benefit the Cutthroat Trout habitat and would also provide protection for the debris flow hazard zone from surface-disturbing activities.

**Impacts from Visual Resource Management.** The Glenwood Springs Debris Flow Hazard Zone would be managed as VRM Class II to preserve or retain the existing character of the landscape. A CSU stipulation on VRM Class II lands would provide protection from most surface disturbances that would benefit the relevant and important values within the area. Impacts from visual resource management would be the same throughout all alternatives.

**Impacts from Comprehensive Trails and Travel Management.** Travel management for the Glenwood Springs Debris Flow Hazard Zones ACEC would limit motorized travel to designated routes, except for over-the-snow travel. Travel management also prohibits a net increase in motorized or mechanized routes within the ACEC. Travel management under Alternative A protects the erosive soils within the ACEC from unregulated OHV use and from surface disturbances associated with construction of new travel routes.

**Impacts from Lands and Realty Management.** The lands within the Debris Flow Hazard Zone ACEC would be considered a ROW avoidance area. This would limit most activities within the ACEC or may require some ROW actions to be located in areas where adverse impacts on the relevant and important values could be mitigated.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The Glenwood Springs Debris Flow Hazard Zone ACEC would not be recommended for mineral withdrawal or closed to mineral materials disposal. Locatable mineral exploration and development would be allowed under the General Mining Law. Within a designated ACEC, federal regulations (43 CFR 3809.11 [c][3]) require that a plan of operations be submitted for any operations causing surface disturbances greater than casual use. This regulation would help mitigate the impacts of mining exploration and development on the relevant and important values with the Debris Flow Hazard Zone ACEC, but may not completely avoid all impacts associated with the activities. Potential impacts from locatable mineral entry would be greatest under Alternative A.

Under Alternative A, the effects of mineral materials sales on relevant and important values would be evaluated on a case-by-case basis. Since mineral materials sales are discretionary activities, any potential action deemed incompatible with protection of the relevant and important values would be denied.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Mitchell Creek is one of the stream segments determined to be eligible for inclusion in the NWSRS under Alternative A. Interim management to protect the stream's ORVs and free-flowing nature would apply to a 0.25-mile buffer on both sides of the stream segment. Management to protect the ORVs and tentative classification would complement other

BLM_0016984

management prescriptions to protect the Colorado River cutthroat trout habitat and erosive soils within the ACEC.

### Alternatives B (Preferred Alternative), C, and D

Impacts to ACECs from special status fish and other aquatic wildlife management, soils management, riparian vegetation management, visual resource management, and lands and realty management would be the same as or similar to those under Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternatives B, C, and D, the Glenwood Springs Debris Flow Hazard Zone ACEC would continue to be designated as an ACEC and would be managed as under Alternative A, with the following additional management prescriptions:

- Limit over-the-snow travel to designated routes.

- Recommend for withdrawal from mineral location, close to mineral materials sales, make unavailable for coal leasing, and close to leasing for non-energy solid minerals.

Management prescriptions provided under Alternatives B, C, and D would result in slightly less risk of adverse impacts on the relevant and important values than under Alternative A.

**Impacts from Comprehensive Trails and Travel Management.** Over-the-snow travel would be limited to designated routes under Alternatives B, C, and D. This would create minor benefits to the relevant and important values by restricting snowmobile travel.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The Glenwood Springs Debris Flow Hazard Zone ACEC would be recommended for withdrawal from locatable mineral exploration and development, as well as closed to mineral materials disposal and leasing of non-energy solid minerals. There would be no impacts from these actions to the relevant and important values under these alternatives.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Mitchell Creek would be considered suitable for inclusion in the NWSRS under Alternative C, but not under Alternatives B or D. In either case, the NSO covering the entire ACEC would protect the relevant and important values. Impacts from determining the Mitchell Creek as suitable or not suitable would have negligible impacts on the Debris Flow Hazard Zone ACEC.

### Summary

Impacts on the Glenwood Springs Debris Flow Hazard Zone relevant and important values would be slightly more beneficial under Alternatives B, C, and D than under Alternative A.

### Grand Hogback Potential ACEC

The Grand Hogback Potential ACEC encompasses two portions of the prominent Grand Hogback feature northwest and northeast of the town of Rifle, Colorado. This ACEC would include 14,000 acres. The relevant and important values of the area include scenic, geologic, historic, and cultural resources. The area represents

BLM_0016985

the largest uninterrupted portion of public land on the Grand Hogback, an outstanding scenic and geologic feature. Historic and cultural values include features related to abandoned coal mines and Ute habitation sites.

*Alternative A*

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated for the Grand Hogback area under Alternative A. There would be no special management prescriptions applied to protect and enhance the relevant and important values of the potential ACEC. Management actions that would apply to the area include:

- NSO on steep slopes greater than 50 percent (for oil and gas facilities).

- NSO within 100 meters of historic properties.

- VRM Class II.

- Open to motorized travel on and off roads.

- Available for ROW development.

- Available for development of locatable, salable, and leasable minerals.

- Open for coal leasing.

- Open for fluid minerals leasing (50 percent of the area currently leased).

Alternative A would result in greater adverse impacts on the relevant and important values of the Grand Hogback Potential ACEC than the other alternatives.

**Impacts from Soils Management.** Approximately one-half of the Grand Hogback Potential ACEC consists of steep slopes greater than 50 percent. Under the current management plan, these slopes would be protected from surface disturbances associated with oil and gas facilities with an NSO stipulation. The NSO would not apply to pipelines or other non-oil and gas related disturbances. Surface disturbances may result in visual scars, erosion, and sedimentation within cultural or historical resource sites or disruption of geologic formations. Under Alternatives B, C, and D, the steep slope stipulation would restrict all surface-disturbing activities; therefore, impacts of soil resource management would be greatest under Alternative A.

**Impacts from Cultural Resource Management.** Management actions associated with cultural resources would provide direct protection to the NRHP eligible properties within the Grand Hogback area. These protective measures are required by law before approving any surface occupancy or surface-disturbing activities and include measures such as a cultural resource inventory, evaluation of NRHP eligibility, and mitigation of potential effects, generally through avoidance. Under Alternatives A and D, management of the cultural resources within the Grand Hogback Potential ACEC would also include an NSO stipulation with a 100-meter buffer around historic properties. This would provide a moderate degree of protection for cultural resources; however, under Alternatives B and C, the buffer distance would increase to 200 meters, which would provide greater protection from potential indirect impacts such as erosion and risk of vandalism due to increased human presence in the vicinity of cultural resources. Cultural resources management would afford less protection for cultural resources under Alternatives A and D, compared with Alternatives B and C.

**Impacts from Visual Resource Management.** The Grand Hogback Potential ACEC would be managed as VRM Class II in all alternatives. This would benefit the relevant and important values by limiting potential

September 2011                 *Colorado River Valley Field Office – Draft RMP Revision EIS*                 4-634
*Chapter 4, Environmental Consequences*

BLM_0016986

surface disturbances within the ACEC but would not necessarily preclude all surface disturbances, especially in areas less visible to the public. Visual resource management would provide some protection for the relevant and important values in all alternatives.

**Impacts from Comprehensive Trails and Travel Management.** Travel management for the Grand Hogback Potential ACEC is currently open to OHV use on and off roads. Several routes within the ACEC area are open to full-sized vehicles; one route is limited to pedestrian and equestrian traffic. Cross-country travel in open travel areas would continue to result in the creation of new unplanned routes. Roads and other routes create visual scarring that degrades the scenic quality of the potential ACEC. Unregulated OHV use may result in damage to, or complete destruction of, cultural sites. Roads can also cause erosion and off-site sediment transport that may adversely affect the integrity of cultural resource sites. Alternative A would result in the most adverse impacts from travel management.

**Impacts from Lands and Realty Management.** Under Alternative A, the Grand Hogback Potential ACEC would be available for ROW applications, subject to the NSO restrictions on steep slopes for oil and gas related facilities and the NSO for protection of cultural resources. Surface-disturbing activities associated with ROW construction and operation could destroy or displace cultural resources, degrade the integrity of the geologic formation, and impair the scenic values of the potential ACEC. Impacts on the relevant and important values from realty actions would be greatest in this alternative.

**Impacts from Coal Management.** There are currently no leases or development activities for coal within the CRVFO, but the Grand Hogback is considered the area with the highest potential for coal development within the CRVFO. Management actions related to coal mining could impact the relevant and important values in several ways. Coal mining can result in surface disturbances that would have the potential to directly impact the scenic quality of the Grand Hogback Potential ACEC and can disrupt or destroy cultural or historical resources. However, based on historical activity and the nature of the deposit within the Grand Hogback, commercial development is not expected to occur over the next 20 years and risk of impacts would be negligible. Site-specific planning would help to mitigate and reduce negative impacts on the relevant and important values.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The lower slopes of the Grand Hogback Potential ACEC lie within a region of high potential for oil and gas development. The upper slopes are considered moderate potential for oil and gas development. Approximately one-half of the potential ACEC (7,075 acres) has already been leased for oil and gas, although no development has occurred in the area yet.

Application of the NSO stipulation with a 100-meter buffer may protect cultural resources from direct impacts but would not fully eliminate indirect impacts. Construction and use of roads for oil and gas facilities would increase both traffic and visitation to otherwise remote areas. Increased human presence in the vicinity of cultural sites would increase the risk of vandalism or looting of sites.

Construction of well pads, pipelines, roads, and associated facilities may cause visual scarring and alteration of geologic formations. The relevant and important values within the potential ACEC would be adversely affected by fluid mineral development.

BLM_0016987

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The Grand Hogback Potential ACEC would be open to locatable mineral entry, mineral materials disposal, and leasing of non-energy solid minerals. Mineral material disposals and leasing of non-energy solid minerals would be subject to the NSO stipulations that would provide some protection for cultural resources. Mineral material disposals and leasing of non-energy solid minerals are also discretionary actions that would not be approved in areas of high resource value.

Impacts on the relevant and important values could occur from locatable mineral development within the potential ACEC. Locatable mineral exploration and development would not be subject to existing stipulations or site-specific analysis. Plans of operations would not be required for locatable mineral activities that would cause surface disturbances of 5 acres or less. Because activities of 5 acres or less require only a notice to be filed with the BLM, adverse impacts would be anticipated to the relevant and important values. Alternative A would result in the greatest risk of impacts from lands and realty on the relevant and important values of the Grand Hogback Potential ACEC.

*Alternatives B (Preferred Alternative)*
Impacts to ACECs from visual resource management, lands and realty management, coal management, fluid minerals management, and locatable, salable, and non-energy leasable minerals management would be the same as or similar to those under Alternative A.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Grand Hogback Potential ACEC would not be designated under Alternative B. Management actions for the area would be the same as Alternative A, except for the following:

- An NSO would be applied within 200 meters of historic properties (CRV-NSO-39).

- Travel would be limited to designated routes. All routes currently open for full-sized vehicles would be changed to pedestrian and equestrian only or ATV.

**Impacts from Soils Management.** The NSO stipulation for steep slopes in the current management plan would be expanded to apply to all surface-disturbing activities under Alternatives B, C, and D. Less surface disturbances would be likely to occur than under Alternative A, resulting in better protection for the relevant and important values within the Grand Hogback Potential ACEC.

**Impacts from Cultural Resource Management.** The NSO buffer around historic properties would be increased from 100 meters to 200 meters under Alternative B and C. This would provide better protection for the relevant and important cultural resources within the potential ACEC and would reduce the potential for indirect impacts to the resource. Cultural resource management under Alternatives B and C would be more beneficial for protection of the relevant and important values than under Alternatives A and D.

**Impacts from Comprehensive Trails and Travel Management.** In Alternatives B and C, all travel would be limited to designated routes, and all routes currently open for full-sized vehicles would be changed to pedestrian and equestrian use. This would benefit the relevant and important values by eliminating cross-country travel and the creation of new unplanned routes. Closing all existing routes within the potential ACEC to motorized and mechanized vehicles would minimize surface disturbances. Alternatives B and C would result in the least adverse impact on the relevant and important values from travel management actions of all alternatives.

BLM_0016988

*Alternative C*

Impacts to ACECs from visual resource management, and fluid minerals management would be the same as or similar to those under Alternative A. Impacts to ACECs from soils management, cultural resource management, and comprehensive trails and travel management would be the same as or similar to those under Alternative B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Grand Hogback area would be designated as an ACEC under Alternative C. Special management prescriptions that would apply to the ACEC to protect the relevant and important values include:

- Apply NSO on all acres (CRV-NSO-49).

- Apply NSO with 200-meter buffer for historic properties (CRV-NSO-39).

- Designate as unavailable for coal leasing.

- Designate as ROW avoidance area.

- Recommend for withdrawal from mineral entry, close to mineral materials disposal, and close to leasing of non-energy solid minerals.

- Prohibit net increase in motorized/mechanized routes.

Management of ACECs would provide more protection for the relevant and important values of the Grand Hogback Potential ACEC than the other alternatives.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under this alternative, the western parcel of the Grand Hogback Potential ACEC would be managed as LWCs to protect their wilderness values. Management actions for these lands would include closing the area to leasing (CRV-CL-4) and an NSO stipulation (CRV-NSO-43) to exclude fluid minerals development and other surface-disturbing activities and limiting motorized and mechanized travel to existing routes. Portions of the Grand Hogback unit have already been leased, but there have been no wells drilled as of yet. Closing the area to leasing to protect LWCs would limit fluid minerals development to those areas already leased, preventing additional leasing and development. These management actions would provide additional protection for the relevant and important values within the western parcel of the Grand Hogback Potential ACEC, except in areas that are currently leased.

**Impacts from Lands and Realty Management.** The Grand Hogback Potential ACEC would be designated as a ROW avoidance area. This would restrict most ROW activities within the potential ACEC, although some ROW actions may be allowed in areas that would have little or no impact on relevant and important values. Under this alternative, lands and realty actions would have the least impact on the relevant and important values.

**Impacts from Coal Management.** As part of the special management prescriptions for the Grand Hogback Potential ACEC, the area would be determined unavailable for coal leasing if the ACEC were designated. This would eliminate any potential impacts of coal development. Coal management actions under Alternative C would have the greatest benefit for the relevant and important values of the ACEC.

BLM_0016989

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location, closed to mineral materials disposal, and closed to leasing of non-energy solid minerals under this alternative. No surface disturbances associated with mineral development would occur. Alternative C would have the least adverse impact on the scenic, geologic, historic, and cultural values of the Grand Hogback Potential ACEC of all alternatives.

*Alternative D*

Impacts to ACECs from soils management would be the same as or similar to Alternatives B and C. Impacts to ACECs from visual resource management, lands and realty management, coal management, fluid minerals management, and locatable, salable, and non-energy leasable minerals management, and would be the same as or similar to Alternatives A and B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts to Areas of Critical Environmental Concern (ACECs) Management.** The Grand Hogback Potential ACEC would not be designated under Alternative D. Management actions for the area would be very similar to Alternative B, except that more routes would be designated open to full-sized vehicles under Alternative D.

**Impacts from Cultural Resource Management.** The NSO stipulation for cultural resources would prohibit surface-disturbing activities within 100 meters of historic sites. Impacts would be the same as or similar to Alternative A. Management of cultural resources would have a greater risk of impacts than under Alternatives B and C.

**Impacts from Comprehensive Trails and Travel Management.** Management actions for the area would be very similar to Alternative B. All travel would be limited to designated routes, but more routes would be designated open to full-sized vehicles under Alternative D. Alternative D would have less impact than under Alternative A, but more than under Alternatives B and C.

Summary

Alternatives A and D would provide the least protection for the relevant and important values of the Grand Hogback Potential ACEC. Alternative C would provide the most protection, followed by Alternative B.

*Greater Sage-Grouse Habitat Potential ACEC*

The Greater Sage-Grouse Habitat Potential ACEC includes 24,600 acres of public land along the northern and eastern flanks of the Castle Peak area between Burns, State Bridge, and Wolcott, Colorado. The relevant and important values associated with this area are that it includes nearly the entire habitat for the CRVFO's remaining sage-grouse population as well as connecting corridors to adjacent habitat. The potential ACEC also includes several populations of Harrington's penstemon and overlaps with a small portion of the Blue Hill ACEC.

*Alternative A*

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Greater Sage-Grouse Habitat Potential ACEC would not be designated under Alternative A. Alternative A would have the least beneficial impact on the relevant and important values within the potential ACEC. Current management actions that would impact the area include:

BLM_0016990

- VRM Class II on Pisgah Mountain and northern and western portion of potential ACEC, VRM Class IV on southern portion.

- NSO within 0.25 mile of known sage-grouse leks (CRV-NSO-6).

- CSU for sensitive wildlife species (CRV-CSU-3).

- TL in winter for sage-grouse crucial winter habitat, TL in spring within 2 miles of a lek (CRV-TL-3).

- Travel limited to designated routes, closed to travel in winter (including over-the-snow travel).

- Open for ROW applications.

- Open for mineral entry (locatable, salable, non-energy leasable).

**Impacts from Visual Resource Management.** Pisgah Mountain and the northern portion of the Greater Sage-Grouse Habitat Potential ACEC would be managed as VRM Class II. The southern portion of the potential ACEC would be managed as VRM Class IV. VRM Class II designation would provide protections from most surface-disturbing activities that would result in loss or fragmentation of sage-grouse habitat or disruption of sage-grouse behavior. VRM Class IV would allow surface disturbances that would substantially modify the visual landscape, and consequently, the sage-grouse habitat. Visual resources management under Alternative A would provide only partial protection of the relevant and important values associated with the potential ACEC.

**Impacts from Special Status Species Management—Terrestrial Wildlife.** Under the current management plan, the active greater sage-grouse leks in the potential ACEC would be covered with an NSO stipulation that prohibits surface-disturbing activities within a 0.25-mile radius of the lek. In addition, a timing limitation would prohibit surface-disturbing activities within a 2-mile radius of an active lek from December 16 to March 15 on sage-grouse crucial winter habitat and from March 1 to June 30 on nesting habitat. These stipulations are based on outdated guidance for sage-grouse management that may not provide adequate protection for sage-grouse populations (Walker et al. 2007). New guidance would be applied to Alternatives B, C, and D resulting in greater protections.

Under Alternative A, a CSU stipulation (CRV-CSU-3) for sensitive species would apply to the occupied sage-grouse habitat within the Greater Sage-Grouse Habitat Potential ACEC. The CSU stipulation may guide where surface-disturbing activities would occur but would not likely protect the overall habitat from fragmentation.

**Impacts from Comprehensive Trails and Travel Management.** Under the current management plan, all travel within the Greater Sage-Grouse Habitat Potential ACEC would be limited to designated routes. The southwest portion of the potential ACEC is open to pedestrian and equestrian travel only (closed to motorized and mechanized travel) as part of the Castle Peak Travel Management Plan. Pisgah Mountain is open to mechanized travel. Seasonal road closures during the winter and breeding period are in place that would help minimize disruption to sage-grouse. The current travel plan would be beneficial for protecting sage-grouse habitat. Travel management designations for the Greater Sage-Grouse Habitat Potential ACEC would remain the same throughout all alternatives, so impacts would be the same across all alternatives.

**Impacts from Lands and Realty Management.** The Greater Sage-Grouse Habitat Potential ACEC would be available for ROW applications under Alternative A, subject to the resource management constraints for

BLM_0016991

special status wildlife described above. ROW actions that include above-ground structures would permanently remove native vegetation and fragment sage-grouse habitat. Temporary disturbances would alter the vegetation structure and composition in reclaimed areas. Overhead power lines may create raptor perches that would increase predation on sage-grouse. Lands and realty management under Alternative A may result in adverse impacts on the relevant and important values within the potential ACEC.

**Impacts from Locatable Minerals, Mineral Material Disposals, and Non-Energy Leasable Minerals Management.** Under Alternative A, the Greater Sage-Grouse Habitat Potential ACEC would be open to locatable mineral entry, mineral materials disposal, and leasing of non-energy solid minerals. Mineral material disposals and leasing of non-energy solid minerals would be subject to the NSO stipulations that would provide some protection for sage-grouse populations and their habitat. Mineral material sales and non-energy leasable minerals are also discretionary. Any such request would be evaluated on a site-specific basis and potential actions deemed incompatible with management objectives for the area would be denied. Locatable mineral exploration and development would not be subject to existing stipulations or site-specific analysis. The risk of impacts from locatable minerals on the relevant and important values of the potential ACEC is greatest under Alternative A.

*Alternative B (Preferred Alternative)*
Impacts to ACECs from visual resource management, comprehensive trails and travel management, and locatable minerals, mineral material disposals, and non-energy leasable minerals would be the same as or similar to Alternative A.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management**. No ACEC would be designated for the Greater Sage-Grouse Habitat area under Alternative B. Management that would apply to the area would be the same as under Alternative A, except for the following additional restrictions:

- NSO within 0.6 mile of known sage-grouse leks (CRV-NSO-23).

- TL in winter on sage-grouse crucial winter habitat; TL in spring within a 4-mile radius of an active lek (CRV-TL-12).

- ROW avoidance area for special status species occupied habitat.

**Impacts from Special Status Species Management—Terrestrial Wildlife.** Under Alternative B, new guidance for the protection of sage-grouse populations and habitat would be incorporated. The NSO stipulation that prohibits surface-disturbing activities around active leks would increase from 0.25-mile radius to a 0.6-mile radius. The timing limitation to protect greater sage-grouse nesting habitat would expand to encompass nesting habitat within a 4-mile radius of an active lek instead of a 2-mile radius as in the current plan. This new guidance is designed to provide more protection for sage-grouse during all life stages. Special status wildlife management under Alternative B would have greater benefits to sage-grouse than under Alternative A.

**Impacts from Lands and Realty Management.** Occupied habitat for special status wildlife would be managed as a ROW avoidance area under Alternative B. ROW avoidance around occupied sage-grouse habitat would limit surface disturbances in portions of the potential ACEC, but ROW actions may be allowed in unoccupied habitat, which would potentially increase traffic and surface disturbance. Increased traffic and surface disturbance may disrupt sage-grouse behavior and reduce connectivity between sage-grouse habitats

BLM_0016992

and populations. Impacts on greater sage-grouse would be less than under Alternatives A and D, but more than under Alternative C.

*Alternative C*
Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative C, the Greater Sage-Grouse Habitat area would be designated as an ACEC to protect currently available sage-grouse habitat within the CRVFO and lands considered necessary for maintaining range-wide connectivity and genetic diversity. The following special management prescriptions would apply:

- Close to fluid minerals leasing (oil and gas, oil shale, geothermal resources).
- Apply NSO on all acres.
- Manage as VRM Class II on all acres.
- Designate as a ROW avoidance area.
- Allow prescribed fire and other vegetation treatments only if they maintain or enhance sage-grouse habitat.
- Limit all travel to designated routes; closed to travel in winter (including over-the-snow travel).
- Prohibit net increase in motorized/mechanized routes.
- Recommend for withdrawal from mineral entry (locatable, salable, non-energy leasable).

Closing the area to fluid minerals leasing and an NSO stipulation on the entire ACEC would prohibit surface-disturbing activities that would have adverse impacts on the sage-grouse habitat while allowing flexibility to implement vegetation treatments or other actions that would enhance habitat. Alternative C would provide the most protection for the relevant and important values of the Greater Sage-Grouse Habitat Potential ACEC of any of alternative.

**Impacts from Special Status Species Management—Terrestrial Wildlife.** The NSO for sage-grouse leks and TL stipulations for winter and nesting habitat from Alternative B would apply. However, the special management prescriptions for the ACEC would provide much greater benefit than the management for special status wildlife alone.

**Impacts from Visual Resource Management.** All lands within the Greater Sage-Grouse Habitat Potential ACEC would be managed as VRM Class II in this alternative. VRM Class II would result in protections from most surface-disturbing activities that would modify the landscape and impact sage-grouse habitat. The VRM Class II designation would benefit the relevant and important values within the potential ACEC.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under Alternative C, the lands north of BLM Route #8530 (Pisgah Mountain) would be managed as LWCs to protect their wilderness values. Management actions for these lands would include closing the area to fluid minerals leasing and an NSO stipulation (CRV-NSO-43) to exclude other surface-disturbing activities. The Greater Sage-Grouse Habitat area is considered low potential for fluid minerals leasing; therefore, closing the area to leasing would provide minimal or negligible additional protection. The NSO stipulation would overlap the NSO stipulation

BLM_0016993

on all acres that would apply within the ACEC. NSO restrictions to protect LWCs may be more stringent than those applied to protect the relevant and important values. The type and extent of vegetation treatments may be restricted in these areas, which may limit the ability to meet vegetation objectives for greater sage-grouse habitat.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be the same as or similar to Alternative A.

**Impacts from Lands and Realty Management.** The entire ACEC would be managed as a ROW avoidance area under Alternative C. This would restrict most new ROW actions within the potential ACEC, but may allow some ROW actions to be located in areas where they would have less adverse impacts on greater sage-grouse habitat. Potential adverse impacts from lands and realty actions on the relevant and important values would be less under Alternative C than any other alternative.

**Impacts from Locatable Minerals, Mineral Material Disposals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location, closed to mineral materials disposal, and closed to leasing of non-energy solid minerals under this alternative. No surface disturbances associated with mineral development would occur. Alternative C would have the least adverse impact on the greater sage-grouse populations and habitat values within the Greater Sage-Grouse Habitat Potential ACEC.

*Alternative D*

Impacts to ACECs from visual resource management and from locatable, salable, and non-energy leasable mineral management would be the same as or similar to Alternatives A and B. Impacts to ACECs from special status terrestrial wildlife management and from lands and realty management would be the same as or similar to Alternative B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated for the Greater Sage-Grouse Habitat area under Alternative D. Management actions for the area would the same as Alternative B and impacts would be the same as or similar to Alternative B.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be the same as or similar to Alternatives A, B, and C.

Summary

Alternative A would provide the least protection for the relevant and important values in the Greater Sage-Grouse Habitat Potential ACEC. This alternative would present the greatest risk of physical loss or degradation of sage-grouse habitat. Alternatives B and D would both provide a moderate degree of protection and reduced risk of impacts. Alternative C would offer the most protection for greater sage-grouse populations and habitat and have the most beneficial impacts on maintenance and enhancement of habitat and range-wide connectivity.

*Hardscrabble-Mayer Gulch Potential ACEC*

The Hardscrabble-Mayer Gulch Potential ACEC includes 3,400 acres of public lands southeast of the town of Eagle, Colorado. The ACEC would protect relevant and important special status plant habitat. The

BLM_0016994

Hardscrabble-Mayer Gulch area supports one of the highest known concentrations of high quality Harrington's penstemon occurrences and is considered a core population of this species.

*Alternative A*

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated for the Hardscrabble-Mayer Gulch area under Alternative A. The area would be managed under the following management actions:

- VRM Class III.

- CSU for sensitive species.

- Open to OHV use on and off roads.

- Available for ROW development.

- Open for mineral entry (locatable, salable, non-energy leasable).

Alternative A would result in the greatest adverse impacts on Harrington's penstemon populations and habitat of all alternatives.

**Impacts from Visual Resource Management.** Under Alternative A, the Hardscrabble-Mayer Gulch Potential ACEC would be managed as VRM Class III. This management class would allow surface disturbances that would create a moderate level of change to the visual character of the landscape. Visual resources management under Alternative A would not contribute to the protection of the relevant and important values within the potential ACEC.

**Impacts from Special Status Species Management—Plants.** A CSU stipulation for sensitive species would apply to the occupied habitat for Harrington's' penstemon under Alternative A. The CSU stipulation may guide where surface-disturbing activities could occur but would be unlikely to prevent disturbance and fragmentation of unoccupied, but potential habitat. Management of special status plant species under Alternative A would have the greatest risk of adverse impacts on populations and habitat for Harrington's penstemon.

**Impacts from Recreation and Visitor Services Management.** The Hardscrabble/East Eagle area would not be designated as a SRMA or an ERMA under Alternative A. No focused management would be applied to the area to enhance recreation opportunities or control recreation impacts on other resources.

Current recreational use in the Hardscrabble-Mayer Gulch area is quite high, partially due to the proximity of the area to local communities, and partially because BLM management has promoted mountain biking and OHV opportunities within this landscape. Impacts on Harrington's penstemon could result from a variety of recreation, such as construction of campgrounds and parking lots, camping outside designated areas, hiking, horseback riding, mountain biking, dirt biking, ATV and OHV use. Impacts include direct mortality from crushing or trampling of plants, direct loss of habitat, soil compaction, and introduction of invasive plant species resulting in degradation of suitable habitat. Any new proposed recreation infrastructure would be subject to site-specific analysis and the CSU stipulation protecting occupied sensitive species habitat. Surface-disturbing activities would be designed to avoid occupied habitat as much as possible, but complete avoidance

BLM_0016995

of occupied habitat may be difficult where populations of Harrington's penstemon are extensive and unoccupied, but potential habitat would not be protected with this stipulation.

The Hardscrabble/East Eagle area would be designated as an ERMA under Alternatives B and C to mitigate potential conflicts between recreation activities and other resource concerns. The area would be designated as a SRMA under Alternative D. Although additional recreation infrastructure would be constructed, site-specific mitigation would be implemented to lessen impacts on the relevant and important resources. These designations would provide improved management of the area compared to Alternative A. Impacts from recreation management under Alternative A would be greater than the other alternatives.

**Impacts from Comprehensive Trails and Travel Management.** Current travel management for the Hardscrabble-Mayer Gulch is open to OHV use on and off roads. Both motorized and mechanized travel on existing routes and motorized or mechanized travel off of existing routes can impact populations of special status plants. Unregulated off-road use would probably have the greatest impact on populations of Harrington's penstemon, because these activities occur over widespread areas and have not been subject to site-specific environmental review and mitigation.

Impacts can include direct mortality through crushing or trampling, dust deposition on plants that may inhibit pollination success, and changes in habitat quality through soil compaction, reduced total vegetation cover, changes in vegetation structure and species composition. The increasing use of OHVs and mountain bikes within the area could also transport noxious weeds and invasive weed seeds from infested areas to uninfested areas. Alternative A would result in the greatest risk of impacts from travel management.

**Impacts from Lands and Realty Management.** The Hardscrabble-Mayer Gulch area would be available for ROW applications under Alternative A. Lands and realty actions could allow surface disturbances such as pipelines, power lines, roads, and communication site facilities within the Hardscrabble-Mayer Gulch Potential ACEC but would be subject to the CSU stipulation for sensitive plant species. The CSU may allow relocation of the activity outside occupied Harrington's penstemon habitat, but may allow such activities within unoccupied, but potential habitat. Surface disturbance and increased traffic associated with the activity would potentially escalate the spread of weeds into occupied habitat and limit the potential expansion of Harrington's penstemon.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative A, the Hardscrabble-Mayer Gulch Potential ACEC area would be open to locatable mineral entry, mineral materials disposal, and leasing of non-energy solid minerals. Mineral material disposals and leasing of non-energy solid minerals would be subject to the CSU stipulation for sensitive species that would provide some protection for occupied Harrington's penstemon habitat. Mineral material disposals and leasing of non-energy solid minerals are also discretionary actions that would not be approved in areas of high resource value. Locatable mineral exploration and development would not be subject to existing stipulations. The risk of impacts from locatable minerals on the relevant and important values of the potential ACEC is greatest under Alternative A.

*Alternative B (Preferred Alternative)*
Impacts under this alternative from management actions for resources, uses, and special designations would be as described below.

BLM_0016996

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Hardscrabble-Mayer Gulch area would be designated as an ACEC under Alternative B and provide special management attention to protect and enhance Harrington's penstemon populations and habitat. Special management actions that would be applied to the ACEC include:

- Manage per underlying VRM Class (VRM Class III).

- Apply NSO within 100 meters of occupied Harrington's penstemon habitat (CRV-NSO-20).

- Apply NSO on core wildlife areas (CRV-NSO-8).

- Limited to designated routes, closed to over-the-snow travel.

- Prohibit net increase in motorized/mechanized routes, with the exception of administrative routes.

- Designate as ROW avoidance area.

- Allow prescribed fire and other vegetation treatments only if they maintain or enhance Harrington's penstemon populations and habitat.

- Recommend for withdrawal from locatable mineral entry, close to mineral materials sales, and close to leasing of non-energy solid minerals.

Alternative B would provide more benefit for the protection of the relevant and important values of the Hardscrabble-Mayer Gulch Potential ACEC than under Alternatives A or D, but less than under Alternative C.

**Impacts from Visual Resource Management.** Impacts would be the same as or similar to Alternative A.

**Impacts from Special Status Species Management—Plants.** Under Alternative B, the CSU stipulation for sensitive plant species would be replaced with an NSO stipulation prohibiting surface-disturbing activities within 100 meters of occupied Harrington's penstemon habitat within ACECs. This would provide a moderate degree of protection for Harrington's penstemon. However, under Alternative C, this buffer would increase to 200 meters, which would provide greater protection from potential indirect impacts such as loss of potential habitat for population expansion, erosion, and introduction of noxious weeds in the vicinity of occupied habitat. Special status plants management under Alternative B would be more beneficial for the relevant and important values than under Alternatives A and D, but less beneficial than under Alternative C.

**Impacts from Terrestrial Wildlife Management.** In Alternatives B and C, the northern half of the Hardscrabble-Mayer Gulch Potential ACEC would be included in an NSO stipulation prohibiting surface-disturbing activities within big game core wildlife habitat. The NSO for terrestrial wildlife management may offer additional benefits for Harrington's penstemon by protecting areas of unoccupied, but potential habitat from surface disturbances. This would maintain more connectivity between populations of Harrington's penstemon and protect potential habitat for future population growth. Impacts of terrestrial wildlife management would be more beneficial under Alternatives B and C than under Alternatives A or D.

**Impacts from Recreation and Visitor Services Management.** The Hardscrabble/East Eagle area would be managed as an ERMA under Alternatives B and C. While SRMAs give priority to recreation and developments, ERMAs rely on interdisciplinary resource objectives to guide recreation developments. Management would address recreation demand but would be balanced with protecting resources and reducing

BLM_0016997

conflicts among users and uses. Fewer new routes would be anticipated, and more routes would be closed or rerouted to minimize adverse impacts on special status plants. Recreation management under Alternatives B and C would have fewer adverse impacts than under Alternatives A and D.

**Impacts from Comprehensive Trails and Travel Management.** All travel would be limited to designated routes under Alternatives B and C, and most of the existing motorized routes would be changed to mechanized use. This would benefit populations and habitat for Harrington's penstemon by eliminating cross-country travel and the creation of new unplanned routes. Changing from motorized to mechanized use on most routes would limit the total disturbance width of routes and would minimize potential dust deposition impacts on Harrington's penstemon plants.

Within the ACEC, no net increase in motorized or mechanized routes would be allowed, with the exception of adding new administrative routes or making routes sustainable, limiting further surface disturbances and loss of habitat due to construction of new routes. Alternatives B and C would result in less total disturbance and less impact than under Alternatives A or D.

**Impacts from Lands and Realty Management.** The Hardscrabble-Mayer Gulch Potential ACEC would be managed as a ROW avoidance area. This would limit some surface-disturbing activities, but may not restrict all ROW actions within the ACEC. The NSO stipulation to prohibit surface disturbances within 100 meters of occupied Harrington's penstemon habitat in ACECs would prevent ROW actions within occupied habitat but may not protect unoccupied, but potential habitat. ROW authorizations in potential habitat may limit the ability of Harrington's penstemon populations to expand into new or previously occupied areas. Alternative B would have less adverse impact on the relevant and important values of the Hardscrabble-Mayer Gulch Potential ACEC than under Alternative A.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location, closed to mineral materials disposal, and closed to leasing of non-energy solid minerals under this alternative. No surface disturbances associated with mineral development would occur. Alternative B would have similar impacts to Alternative C, but less adverse impact than under Alternatives A and D.

### Alternative C

Impacts under this alternative from management actions for resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The potential Hardscrabble-Mayer Gulch ACEC is included within the Hardscrabble-Mayer Gulch/East Eagle area, which would be designated as an ACEC under Alternative C. See that section (below) for impacts of management under this alternative.

### Alternative D

Impacts under this alternative from management actions for resources, uses, and special designations would be as follows.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated in the Hardscrabble-Mayer Gulch area under Alternative D. The western two-thirds of the

BLM_0016998