potential ACEC area would be encompassed within the Hardscrabble/East Eagle SRMA RMZ 1. RMZ 1 would focus on improving mountain biking opportunities and experiences for both local and destination visitors. Management actions that may impact the area include:

- VRM Class II within SRMA, VRM Class III in eastern part outside SRMA.

- CSU for sensitive species.

- CSU on Hardscrabble/East Eagle SRMA.

- Travel limited to designated routes; more mountain biking routes anticipated.

- ROW avoidance for occupied special status species habitat.

- Open for mineral entry.

Impacts of Alternative D would be similar to Alternative A, except that limiting travel to designated routes would result in less adverse impacts on the relevant and important values of the potential ACEC than in Alternative A.

**Impacts from Visual Resource Management.** The VRM Class would change from VRM Class III to Class II within the SRMA. Fewer surface disturbances would be allowed that could modify the visual character of the landscape. This would provide improved protection for the relevant and important values within the potential ACEC. Visual resources management would have more beneficial effects on Harrington's penstemon populations and habitat under Alternative D than in the other alternatives.

**Impacts from Special Status Species Management—Plants.** As under Alternative A, a CSU stipulation would apply to occupied habitat for special status plants. Impacts would be similar to Alternative A.

**Impacts from Recreation and Visitor Services Management.** The Hardscrabble/East Eagle SRMA would be designated under Alternative D. The portion of the SRMA that overlaps with the potential ACEC would be managed as RMZ 1. Recreation activities in RMZ 1 would focus on improving mountain biking opportunities and experiences for both local and destination visitors. Management of the area as a SRMA for destination visitors would probably attract more visitors to the Hardscrabble area. A system of designated single-track mountain biking and hiking trails has been created, but 12 to 14 more miles of trails would probably be constructed to eliminate trespass concerns and create additional riding opportunities for a variety of ability levels. New trail alignments would be determined during a site-specific analysis and would be subject to the CSU stipulation on occupied Harrington's penstemon habitat. Trails would be designed to avoid occupied habitat as much as possible, but complete avoidance of occupied habitat may be difficult where populations of Harrington's penstemon are extensive. Construction of new trails may result in direct mortality of individuals, loss of potential habitat, habitat fragmentation, and degradation of habitat through noxious weed invasion. Recreation management activities under Alternative D would have a greater risk of adverse impacts on the relevant and important values within the ACEC than under the other alternatives.

**Impacts from Comprehensive Trails and Travel Management.** As under Alternatives B and C, travel within the Hardscrabble-Mayer Gulch Potential ACEC would be limited to designated routes. The same routes that were converted from full-sized vehicles to mechanized routes in those alternatives would retain the same designation under Alternative D. As mentioned above, the total number of trails is likely to increase

BLM_0016999

in this alternative. Potential adverse impacts on Harrington's penstemon habitat would be less than under Alternative A, but greater than under Alternatives B and C.

**Impacts from Lands and Realty Management.** Occupied special status species habitat would be managed as a ROW avoidance area. This would limit some surface-disturbing activities, but may not restrict all ROW actions. A CSU stipulation for sensitive plant species may require relocation of the activity outside occupied Harrington's penstemon habitat, but may allow such activities within unoccupied, but potential habitat. Surface disturbance and increased traffic associated with the activity would potentially escalate the spread of weeds into occupied habitat and reduce habitat capable of supporting expansion of plant populations. Alternative D would have less adverse impacts than under Alternative A, but more than under Alternatives B and C.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative D, the Hardscrabble-Mayer Gulch area would be open to locatable mineral entry, mineral materials disposal, and leasing of non-energy solid minerals. Impacts would be the same as or similar to Alternative A.

## Summary
Alternative C would provide the most beneficial effects on the relevant and important values of the potential ACEC, followed in order by Alternatives B, D, and A.

### *Hardscrabble-Mayer Gulch/East Eagle Potential ACEC*
The Hardscrabble-Mayer Gulch/East Eagle Potential ACEC would encompass the Hardscrabble-Mayer Gulch area described above plus portions of the East Eagle area, totaling 4,200 acres. The ACEC would protect relevant and important special status plant habitat. The Hardscrabble-Mayer Gulch/East Eagle area supports several high-density occurrences of Harrington's penstemon that are considered to constitute a core population of this species.

Impacts on the Hardscrabble-Mayer Gulch Potential ACEC are described under that section. The section below will focus on impacts on the East Eagle area only, with the exception of Alternative C, in which the Hardscrabble-Mayer Gulch/East Eagle Potential ACEC would be designated.

### *Alternative A*
**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative A, the Hardscrabble-Mayer Gulch/East Eagle Potential ACEC would not be designated as an ACEC. There would be no special management prescriptions applied to protect the relevant and important values within the East Eagle area. Management actions under Alternative A would result in greater impacts on the relevant and important values than the other alternatives. The East Eagle area would be managed under the following actions:

- VRM Class II.

- CSU for sensitive species.

- Open to OHV use on and off roads.

- Available for ROW applications.

BLM_0017000

- Open for mineral entry (locatable, salable, non-energy leasable).

**Impacts from Visual Resource Management.** Under all alternatives, the East Eagle area would be managed with a VRM Class II designation. The Class II designation would provide protection from most surface-disturbing activities that could result in loss or fragmentation of Harrington's penstemon habitat. Visual resources management would provide moderate protection of the relevant and important values within the potential ACEC.

**Impacts from Special Status Species Management—Plants.** A CSU stipulation for sensitive species would apply to the occupied habitat for Harrington's penstemon under Alternatives A, B, and D. The CSU stipulation may guide where the surface-disturbing activity would occur, but would be unlikely to prevent disturbance and fragmentation of extensive populations or of unoccupied, but potential habitat.

**Impacts from Recreation and Visitor Services Management.** Current recreational use in the East Eagle area is quite high, partly due to the proximity of the area to local communities and partly because BLM management has promoted mountain biking opportunities within this landscape. Impacts on Harrington's penstemon could result from a variety of recreation activities, such as construction of campgrounds and parking lots, camping outside designated areas, hiking, horseback riding, mountain biking, dirt biking, ATV and OHV use. Construction of new recreation infrastructure would be subject to site-specific analysis and the CSU stipulation for occupied Harrington's penstemon habitat. The CSU stipulation may require relocation of the activity outside occupied Harrington's penstemon habitat, but may allow such activities within unoccupied, but potential habitat. Surface disturbance and increased traffic associated with the activity would potentially escalate the spread of weeds into occupied habitat and reduce habitat capable of supporting expansion of plant populations.

Recreational use is expected to increase within the East Eagle area exacerbating the impacts on the relevant and important values within the potential ACEC. The Hardscrabble/East Eagle area would not be designated as a SRMA or an ERMA under Alternative A. No focused management would be applied to the area to enhance recreation opportunities or control recreation impacts on other resources.

The Hardscrabble/East Eagle area would be designated as an ERMA under Alternatives B and C to mitigate potential conflicts between recreation activities and other resource concerns. The area would be designated as a SRMA under Alternative D. Although additional recreation infrastructure would be constructed, site-specific mitigation would be implemented to lessen impacts on the relevant and important resources. These designations would provide improved management of the area compared to Alternative A. Impacts from recreation management under Alternative A would be greater than the other alternatives.

**Impacts from Comprehensive Trails and Travel Management.** Travel management for the East Eagle area would be open to OHV use on and off roads. Both motorized and mechanized travel on existing routes and motorized or mechanized travel off of existing routes could impact populations of special status plants.

Off-road use would probably have the greatest impact on populations of Harrington's penstemon because these activities occur over widespread areas and have not undergone site-specific environmental analysis and mitigation.

BLM_0017001

Impacts can include direct mortality through crushing or trampling, dust deposition on plants that may inhibit pollination success, and changes in habitat quality through soil compaction, reduced total vegetation cover, changes in vegetation structure and species composition. The increasing use of OHVs and mountain bikes within the area could also transport noxious weeds and invasive weed seeds from infested areas to uninfested areas. Alternative A would result in the greatest risk of impacts from travel management.

**Impacts from Lands and Realty Management.** The East Eagle area would be available for ROW applications under Alternative A. Lands and realty actions could allow surface disturbances such as pipelines, power lines, roads, and communication site facilities within the East Eagle area, subject to the CSU stipulation for sensitive plant species. The CSU may require relocation of the activity outside known populations, but may allow such activities within unoccupied, but potential habitat for Harrington's penstemon. Surface disturbance and increased traffic associated with the activity would potentially escalate the spread of weeds into occupied habitat and limit the potential expansion of Harrington's penstemon. Alternative A would result in the greatest risk of adverse impacts of all the alternatives because the stipulations regulating ROW actions are the least restrictive in this alternative.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative A, the East Eagle area would be open to locatable mineral entry, mineral materials disposal, and leasing of non-energy solid minerals. Mineral material disposals and leasing of non-energy solid minerals would be subject to a CSU stipulation that would provide some protection for Harrington's penstemon populations and their habitat. Mineral material disposals and leasing of non-energy solid minerals are also discretionary actions that would be evaluated on a site-specific basis. A potential action deemed incompatible with management objectives for the area would be denied. Locatable mineral exploration and development would not be subject to existing stipulations or site-specific analysis. The risk of impacts from locatable minerals on the relevant and important values of the East Eagle portion of the potential ACEC is greatest under Alternative A.

*Alternative B (Preferred Alternative)*

Impacts to ACECs from visual resource management, special status plant species management, and recreation management would be the same as or similar to those under Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative B, the Hardscrabble-Mayer Gulch area would be designated as an ACEC, but not the East Eagle portion of the Hardscrabble-Mayer Gulch/East Eagle Potential ACEC. Management actions and restrictions that would impact the East Eagle area include:

- VRM Class II.
- CSU for Harrington's penstemon habitat outside ACECs (CRV-CSU-8).
- NSO for core wildlife areas (CRV-NSO-8).
- Travel limited to designated routes; all routes designated for mechanized use.
- ROW avoidance within occupied special status species habitat.
- Open for mineral entry.

BLM_0017002

Alternative B would have less adverse impacts on Harrington's penstemon habitat than under Alternative A because of the NSO for core wildlife areas, the travel restrictions, and the ROW avoidance designation that would apply under Alternative B.

**Impacts from Terrestrial Wildlife Management.** In Alternatives B and C, the western half of the East Eagle area would be included in an NSO stipulation prohibiting surface-disturbing activities within big game core wildlife habitat. The NSO for terrestrial wildlife management may offer additional benefits for Harrington's penstemon by protecting areas of unoccupied, but potential habitat from surface disturbances. This would maintain more connectivity between populations of Harrington's penstemon and protect potential habitat for future population growth. Impacts of terrestrial wildlife management would be more beneficial under Alternatives B and C than under Alternatives A or D.

**Impacts from Comprehensive Trails and Travel Management.** All travel would be limited to designated routes under Alternatives B. Existing BLM routes are all designated for mechanized use. This would benefit populations and habitat for Harrington's penstemon by eliminating cross-country travel and the creation of new unplanned routes. Alternative B would result in less total disturbance and less impact than under Alternatives A or D, but more than C.

**Impacts from Lands and Realty Management.** Under Alternatives B and D, occupied special status species habitat would be managed as a ROW avoidance area. Occupied Harrington's penstemon habitat would also be protected with a CSU stipulation in these alternatives. This would limit some surface-disturbing activities, but may not restrict all ROW actions, particularly in unoccupied, but potential habitat. Surface-disturbing activities within potential habitat for Harrington's penstemon would contribute to habitat fragmentation and would reduce habitat capable of supporting expansion of plant populations. Alternatives B and D would have less adverse impacts than under Alternative A, but more than C, which would implement an NSO restriction within 200 meters of occupied Harrington's penstemon habitat.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative B, the East Eagle area would be open to locatable mineral entry, mineral materials disposal, and leasing of non-energy solid minerals. Impacts would be the same as or similar to Alternative A.

*Alternative C*

Impacts to ACECs from terrestrial wildlife management, and recreation management would be the same as or similar to Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative C, the entire Hardscrabble-Mayer Gulch/East Eagle Potential ACEC would be designated and managed for the protection and enhancement of Harrington's penstemon habitat. Special management prescriptions that would apply to the lands within this potential ACEC include:

- Apply NSO within 200 meters of occupied Harrington's penstemon habitat (CRV-NSO-19).

- Manage as VRM Class II.

- Limit travel to designated routes, closed to over-the-snow travel.

BLM_0017003

- Prohibit net increase in motorized/mechanized routes, with the exception of administrative routes or for making routes sustainable.

- Designate as ROW avoidance area.

- Recommend for withdrawal from mineral location, close to mineral materials disposal, and close to leasing of non-energy solid minerals.

- Allow fire and other vegetation treatments if they maintain or enhance Harrington's penstemon populations and habitat.

Alternative C would provide more benefits for the protection of the relevant and important values of the Hardscrabble-Mayer Gulch/East Eagle Potential ACEC than the other alternatives.

**Impacts from Visual Resource Management.** The Hardscrabble-Mayer Gulch portion of the Hardscrabble-Mayer Gulch/East Eagle Potential ACEC would be managed as VRM Class III under Alternatives A and B. Under Alternative C, all lands within the potential ACEC would be managed as VRM Class II. VRM Class II would result in protections from most surface-disturbing activities that would modify the landscape and impact Harrington's penstemon habitat. The VRM Class II designation would benefit the relevant and important values within the potential ACEC. Under Alternative C, visual resources management would allow the least impacts on the relevant and important values within the potential ACEC.

**Impacts from Special Status Species Management—Plants.** Under Alternative C, the CSU stipulation for sensitive plant species would be replaced with an NSO stipulation prohibiting surface-disturbing activities within 200 meters of occupied Harrington's penstemon habitat (CRV-NSO-19). This would provide greater protection for both occupied and potential habitat than any other alternative. Special status plants management under Alternative C would be have the greatest beneficial effect on the relevant and important values within the Hardscrabble-Mayer Gulch/East Eagle Potential ACEC of all alternatives.

**Impacts from Comprehensive Trails and Travel Management.** All travel would be limited to designated routes under Alternatives B, C, and D, and most of the existing motorized routes would be changed to mechanized use. This would benefit populations and habitat for Harrington's penstemon by eliminating cross-country travel and the creation of new unplanned routes.

Within the ACEC, no net increase in motorized or mechanized routes would be allowed, with the exception of adding new administrative routes or for making routes sustainable, limiting further surface disturbances and loss of habitat due to construction of new routes. Alternatives B and C would result in less total disturbance and less impact than under Alternatives A or D.

**Impacts from Lands and Realty Management.** Under Alternative C, all acres within the Hardscrabble-Mayer Gulch/East Eagle Potential ACEC would be managed as a ROW avoidance area. This would limit most surface-disturbing activities, but may not restrict all ROW actions, particularly in unoccupied, but potential habitat. However, an NSO stipulation prohibiting surface-disturbing activities within 200 meters of occupied Harrington's penstemon habitat would provide protection for both occupied and potential habitat, which would minimize adverse direct and indirect impacts on relevant and important values in this alternative.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location, closed to mineral

BLM_0017004

materials disposal, and closed to leasing of non-energy solid minerals under this alternative. No surface disturbances associated with mineral development would occur. Alternative C would have the least adverse impact on the relevant and important values of the Hardscrabble-Mayer Gulch Potential ACEC of all alternatives.

### Alternative D

Impacts to ACECs from visual resource management, special status plants management, terrestrial wildlife management, and locatable, salable, and non-energy leasable minerals management would be the same as or similar to those under Alternative A. Impacts to ACECs from lands and realty management would be the same as or similar to those in Alternative B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative D, the Hardscrabble-Mayer Gulch Potential ACEC would not be designated as an ACEC. The western third of the East Eagle area would be managed as a SRMA (Hardscrabble/East Eagle) to enhance mountain biking opportunities for local and destination visitors. Management actions that may impact the area include:

- VRM Class II.
- CSU for sensitive plant species (CRV-CSU-9).
- CSU on Hardscrabble/East Eagle SRMA (CRV-CSU-17).
- Travel limited to designated routes; more mountain biking routes anticipated.
- ROW avoidance for occupied special status species habitat.
- Open for mineral entry.

**Impacts from Recreation and Visitor Services Management.** The Hardscrabble/East Eagle SRMA would be designated under Alternative D. The portion of the SRMA that overlaps with portions of the potential ACEC would be managed as RMZ 1. Recreation activities in RMZ 1 would focus on improving mountain biking opportunities and experiences for both local and destination visitors. Management of the area as a SRMA for destination visitors would probably attract more visitors to the Hardscrabble/East Eagle area, increasing the impacts associated with recreational use.

A system of designated single-track mountain biking and hiking trails has been created; however, 12 to 14 more miles of trails would probably be constructed to eliminate trespass concerns and create additional riding opportunities for a variety of ability levels. New trail alignments would be determined during a site-specific analysis and would be designed to avoid occupied habitat as much as possible. This may be difficult where populations of Harrington's penstemon are extensive. Unoccupied, but potential habitat would not be protected with this stipulation. Construction of new trails may result in direct mortality of individuals, loss of potential habitat, habitat fragmentation, and degradation of habitat through noxious weed invasion. Recreation management activities under Alternative D would have a greater risk of adverse impacts on the relevant and important values within the potential ACEC than under the other alternatives.

**Impacts from Comprehensive Trails and Travel Management.** Travel within the East Eagle area would be limited to designated routes and all routes within the East Eagle area would be limited to mechanized use. As mentioned above, the total number of trails within the SRMA boundary is likely to increase in this

BLM_0017005

alternative. Impacts on Harrington's penstemon habitat would be less than under Alternative A but greater than under Alternatives B and C.

## Summary

Alternative A would result in the most adverse impacts on the relevant and important values within the Hardscrabble-Mayer Gulch/East Eagle Potential ACEC, followed by Alternatives D and B. Alternative C would have the most beneficial impact.

### Lower Colorado River ACEC

The Lower Colorado River ACEC encompasses lands along the Colorado River between Rifle and DeBeque, Colorado. The public lands along this segment of the river are small, isolated tracts totaling only 130 acres. The relevant and important values are the area's riparian habitat which supports a variety of wildlife including bald eagles, great blue herons, waterfowl, and two endangered fish species, the Colorado pikeminnow and razorback sucker.

### Alternative A

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative A, the Lower Colorado River would continue to be designated as an ACEC. The ACEC, as originally proposed, includes over 9,000 acres along the river from New Castle to DeBeque; however only 130 acres of this is public land. The ACEC would be managed under the following prescriptions:

- VRM Class II
- Designated as sensitive for utility and communication facilities.

The VRM classification and realty management would allow few surface-disturbing activities within the ACEC. However, given that this ACEC is composed mostly of small, isolated tracts of public land along the Colorado River, BLM management cannot effectively protect the riparian habitat from surface-disturbing activities and other actions with the potential to reduce the quality, quantity, or connectivity of the habitat.

**Impacts from Water Resources Management.** Management actions for water resources management under all alternatives include an NSO stipulation prohibiting surface-disturbing activities within 0.5 mile on both sides of major river corridors (including the Colorado River). This stipulation provides protection for riparian values and wildlife habitat along the river corridor and would include all the public land within this ACEC. Impacts from water resources management would benefit the relevant and important values and would be the same throughout all alternatives.

**Impacts from Visual Resource Management.** Management for the Lower Colorado River ACEC includes designating the area as VRM Class II to preserve or retain the existing character of the landscape. VRM Class II is protected with a CSU stipulation that would allow relocation of surface-disturbing activities beyond 200 meters to protect visual values. The visual resource management class would remain the same throughout all alternatives, even in the absence of the ACEC designation. Impacts would be beneficial to the relevant and important values and would be the same throughout all alternatives.

**Impacts from Lands and Realty Management.** The Lower Colorado River ACEC would be managed as a sensitive zone for utility and communication facilities. Facilities would not be placed within the ACEC unless no feasible alternatives could be found and mitigation could be applied that would minimize impacts on the

BLM_0017006

relevant and important values. The NSO stipulation to protect major river corridors would preclude most realty actions, except perhaps temporary disturbances such as pipelines. Due to the NSO stipulation on major river corridors in all alternatives, few realty actions would be allowed and impacts would be the same across all alternatives.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** All public land parcels adjacent to the Colorado River from New Castle to DeBeque have already been leased for oil and gas. Most of these leases were issued before the current stipulation for major river corridors was developed. Although the NSO stipulation for major river corridors would not apply to these leases, COAs may be attached to Applications for Permit to Drill that could minimize impacts on the relevant and important values by avoiding riparian vegetation or screening activities to reduce disturbance to wildlife. Fluid minerals leasing would potentially have adverse impacts on the relevant and important values and would be the same across all alternatives.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The Lower Colorado River ACEC would not be recommended for withdrawal from mineral location, closed to mineral materials disposal, or made unavailable for leasing of non-energy solid minerals. Surface disturbances associated with these actions could result in degradation of riparian habitat and human activity in the area may disrupt and displace wildlife. Locatable mineral exploration and development would be allowed under the General Mining Law. Within a designated ACEC, Federal regulations require that a plan of operations be submitted for any operations causing surface disturbances greater than casual use. This regulation would help mitigate the impacts of mining exploration and development on the relevant and important values with the ACEC, but may not completely avoid all impacts associated with the activities. Potential adverse impacts from locatable mineral entry would be least in this alternative.

Mineral material disposals and leasing of non-energy solid minerals are discretionary actions. Any potential action deemed incompatible with protection of the relevant and important values would be denied.

### Alternatives B (Preferred Alternative), C, and D

Impacts to ACECs from visual resource management, lands and realty management, fluid minerals management, and locatable, salable, and non-energy leasable minerals management would be the same as or similar to those under Alternative A. Impacts from management of other resources, uses, and special designations would be as follows.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternatives B, C, and D, no ACEC would be designated. Public lands along the Lower Colorado River would continue to be covered by an NSO restriction to prohibit surface-disturbing activities within 0.5 mile of either side of major rivers.

**Impacts from Water Resources Management.** Under all alternatives, management for water resources includes an NSO stipulation to prohibit surface-disturbing activities within 0.5 mile of either side of the Colorado River. Although protections for riparian vegetation, fisheries, and wildlife habitat would also apply to the area, the management of water resources would provide the largest area of protection for the relevant and important values.

BLM_0017007

## Summary

Impacts on the relevant and important values within the Lower Colorado River corridor would be the same or similar across all alternatives.

### *Lyons Gulch Potential ACEC*

The Lyons Gulch Potential ACEC is located north of Deep Creek and west of the Colorado River. This potential ACEC encompasses 480 acres along a ridge at the head of Lyons Gulch. The ACEC would protect relevant and important special status plant habitat. The Lyons Gulch area includes a high quality, undisturbed occurrence of Harrington's penstemon and is considered a core population of this species.

### *Alternative A*

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated within the Lyons Gulch area under Alternative A. Lands within the potential ACEC area would be managed under the current management plan, which includes:

- VRM Class IV.

- CSU for sensitive plant species (GS-CSU-3).

- Open to motorized travel on and off roads; all existing roads open to full-sized vehicles.

- Available for ROW applications.

- Open for mineral entry (locatable, salable, non-energy leasable).

Management under Alternative A would provide minimal protection for the relevant and important values of the potential ACEC and would have greater risk of adverse impacts than the other alternatives.

**Impacts from Visual Resource Management.** The Lyons Gulch area would be managed as VRM Class IV in this alternative. This management class would allow surface disturbances that result in major modification of the visual character of the landscape. Surface disturbances could lead to direct mortality of Harrington's penstemon plants, or loss, degradation, or fragmentation of habitat. Visual resource management under Alternative A would not contribute to the protection of the relevant and important values associated with the potential ACEC.

**Impacts from Special Status Species Management—Plants.** A CSU stipulation for sensitive species would apply to the occupied habitat for Harrington's penstemon. The CSU stipulation would guide where the surface-disturbing activity could occur but would be unlikely to prevent disturbance and fragmentation of unoccupied, but potential habitat. Management of special status plant species under Alternative A would have the greatest risk of adverse impacts on populations and habitat for Harrington's penstemon.

**Impacts from Comprehensive Trails and Travel Management.** Travel management within the Lyons Gulch Potential ACEC would be open to OHV use on and off roads under Alternative A. All existing roads within the potential ACEC would continue to be open to full-sized vehicles although the lack of public access would limit the amount of use on these routes. Cross-country travel in open areas can result in the creation of new unplanned routes. Impacts from roads and other routes in proximity to Harrington's penstemon habitat can include direct mortality through crushing or trampling, dust deposition on plants that may inhibit pollination success or photosynthetic activity, and changes in habitat quality through soil compaction, reduced

BLM_0017008

total vegetation cover, changes in vegetation structure and species composition. Vehicle, horse, and foot traffic can escalate the spread of noxious weeds, thereby increasing competition for nutrients and water, and limiting potential expansion of Harrington's penstemon. The routes within the Lyons Gulch Potential ACEC have no public access, which would limit the amount of use and minimize the potential impacts of the current travel management designations. Alternative A would result in the greatest impacts on relevant and important values of all alternatives.

**Impacts from Lands and Realty Management.** The Lyons Gulch area would be available for ROW applications under Alternative A. Lands and realty actions could allow surface disturbances such as pipelines, power lines, roads, and communication site facilities within the Lyons Gulch Potential ACEC, subject to the CSU stipulation for sensitive plant species. The CSU may require relocation of the activity outside known populations, but may allow such activities within unoccupied, but potential habitat for Harrington's penstemon. Surface disturbance and increased traffic associated with the ROW activity would potentially spread weeds into occupied habitat and limit the potential expansion of Harrington's penstemon. Alternative A would result in greater risk of adverse impacts than under the other alternatives because the stipulations regulating ROW actions are the least restrictive in this alternative.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternatives A and D, the Lyons Gulch area would be open to locatable mineral entry, mineral materials disposal, and leasing of non-energy solid minerals. Mineral material disposals and leasing of non-energy solid minerals would be subject to a CSU stipulation that would provide some protection for Harrington's penstemon populations and their habitat. Mineral material disposals and leasing of non-energy solid minerals are also discretionary actions that would not be approved in areas of high resource value. Locatable mineral exploration and development would not be subject to existing stipulations or site-specific analysis. Alternatives A and D present a greater risk of impacts from locatable minerals on the relevant and important values of the potential ACEC than under Alternatives B and C.

### Alternative B (Preferred Alternative)
Impacts under this alternative from management actions for resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative B, the Lyons Gulch area would be designated as an ACEC and special management prescriptions would be applied to protect the relevant and important values. These include:

- Apply NSO within 100 meters of occupied Harrington's penstemon habitat (CRV-NSO-20).

- Manage with underlying VRM Classes (VRM Class IV).

- Limit travel to designated routes, administrative use only; over-the-snow travel limited to existing routes.

- Prohibit net increase in motorized/mechanized routes, with the exception of administrative routes.

- Designate as ROW avoidance area.

- Recommend for withdrawal from locatable mineral entry, close to mineral materials disposal and leasing of non-energy solid minerals.

BLM_0017009

- Allow fire and other vegetation treatments if they maintain or enhance Harrington's penstemon populations and habitat.

Management actions in Alternative B would provide more benefit for the protection and enhancement of Harrington's penstemon habitat than Alternatives A or D, but less than Alternative C.

**Impacts from Vegetation Management – General.** Vegetation treatments would be allowed within the ACEC only if they maintained or enhanced populations and habitat for Harrington's penstemon. Harrington's penstemon prefers habitat with a moderate density of sagebrush, little or no woodland canopy cover, and a moderate, diverse cover of native grasses and forbs. In general, treatments to remove pinyon juniper trees would benefit Harrington's penstemon habitat. Treatments that result in the elimination of shrub cover or create a dense cover of grasses would not likely benefit the species. Alternative B would provide more benefit for the protection of the relevant and important values of the Lyons Gulch Potential ACEC than Alternatives A or D but less than Alternative C.

**Impacts from Visual Resource Management.** Impacts would be the same as or similar to Alternative A.

**Impacts from Special Status Species Management—Plants.** Under Alternative B, the CSU stipulation for sensitive plant species would be replaced with an NSO stipulation prohibiting surface-disturbing activities within 100 meters of occupied Harrington's penstemon habitat within ACECs. This would provide a moderate degree of protection for Harrington's penstemon. However, under Alternative C, this buffer would increase to 200 meters, which would provide greater protection from potential indirect impacts such as loss of potential habitat for population growth, erosion, and introduction of noxious weeds in the vicinity of occupied habitat. Special status plants management under Alternative B would be more beneficial for the relevant and important values than under Alternatives A and D, but less beneficial than under Alternative C.

**Impacts from Comprehensive Trails and Travel Management.** All travel would be limited to designated routes under Alternatives B, C, and D. This would provide additional benefits for populations and habitat for Harrington's penstemon by eliminating impacts associated with cross-country travel and the creation of new unplanned routes.

Within the ACEC, no net increase in motorized or mechanized routes would be allowed, with the exception of adding new administrative routes or making routes sustainable, limiting further surface disturbances and loss of habitat due to construction of new routes. Alternatives B and C would result in less total disturbance and more benefit to the protection of the relevant and important values than under Alternatives A or D.

**Impacts from Lands and Realty Management.** Under Alternative B, Lyons Gulch Potential ACEC would be managed as a ROW avoidance area. This would limit most surface-disturbing activities, but may not restrict all ROW actions. Harrington's penstemon habitat within the ACEC would be protected with an NSO stipulation that would prevent surface-disturbing activities in occupied habitat, but potential habitat and pollinator habitat may not be fully protected. Impacts on the relevant and important values would be less than under Alternative A, greater than under Alternative C, and comparable to Alternative D.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location, closed to mineral materials disposal, and closed to leasing of non-energy solid minerals under Alternatives B and C. No surface

BLM_0017010

disturbances associated with mineral development would occur. Alternatives B and C would have less adverse impact on the relevant and important values of the Lyons Gulch Potential ACEC than under Alternatives A and D.

### Alternative C

Impacts under this alternative from management actions for resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Lyons Gulch Potential ACEC would be designated an ACEC under Alternative C. Special management prescriptions would be applied to protect the relevant and important values. Management would be similar to Alternative B, with the following exceptions:

- NSO within 200 meters of occupied Harrington's penstemon habitat (CRV-NSO-18).
- VRM Class II.

The NSO stipulation would prohibit surface-disturbing activities that would have adverse impacts within Harrington's penstemon habitat while allowing flexibility to implement vegetation treatments or other actions that would enhance habitat. Alternative C would provide the most protection for the relevant and important values of the Lyons Gulch Potential ACEC of any of the alternatives.

Impacts to ACECs from comprehensive trails and travel management, lands and realty management, locatable, salable, and non-energy leasable minerals management would be the same as or similar to those under Alternative B.

**Impacts from Special Status Species Management—Plants.** Under Alternative C, the NSO buffer around occupied Harrington's penstemon habitat would increase to 200 meters. This would provide greater protection for both occupied and potential habitat than any other alternative, and would reduce habitat loss and habitat fragmentation. The NSO stipulation would also allow flexibility to implement vegetation treatments or other actions if they would enhance habitat. Special status plants management under Alternative C would be have the greatest beneficial effect on the relevant and important values within the Lyons Gulch Potential ACEC of all alternatives.

**Impacts from Visual Resource Management.** Within the ACEC, visual resource management class would change from Class IV to Class II under Alternative C. This would benefit Harrington's penstemon habitat by limiting potential surface disturbances within the ACEC but would not necessarily preclude all surface-disturbing activities. The beneficial impacts from visual resource management would be greater under Alternative C, than in the other alternatives.

### Alternative D

Impacts under this alternative from management actions for resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated in the Lyons Gulch area under Alternative D. Management actions that would apply to the area include:

BLM_0017011

- VRM Class IV.
- CSU for sensitive plant species.
- Travel limited to designated routes; existing roads open to full-sized vehicles.
- ROW avoidance for special status species occupied habitat.
- Open for mineral entry (locatable, salable, non-energy leasable).

Adverse impacts in Alternative D would be greater than Alternatives B and C, but less than Alternative A.

**Impacts from Visual Resource Management.** Impacts would be the same as or similar to Alternatives A and B.

**Impacts from Special Status Species Management—Plants.** Impacts would be the same as or similar to Alternative A.

**Impacts from Comprehensive Trails and Travel Management.** Motorized travel within the Lyons Gulch Potential ACEC would be limited to designated routes. All existing roads would be open to full-sized vehicles. None of the routes in the Lyons Gulch area has public access, so traffic would generally be limited to adjacent landowners, permittees, and hunters. Impacts on Harrington's penstemon populations and habitat would be adverse but minor.

**Impacts from Lands and Realty Management.** Occupied habitat for special status plants would be managed as a ROW avoidance area under Alternative D. Although the ROW avoidance does not preclude all ROW development, it would limit surface disturbances and give priority consideration to protecting special status species habitat. Impacts on Harrington's penstemon in ROW avoidance areas would be less than in areas open for ROW development. Impacts on Harrington's penstemon occupied and potential habitat would be greater than under Alternatives B and C in which the entire ACEC is a ROW avoidance area; however, impacts would be less than under Alternative A in which the Lyons Gulch area would be open for ROW development.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative D, the Lyons Gulch Potential ACEC would be open to locatable mineral entry, mineral materials disposal, and leasing of non-energy solid minerals. Mineral material disposals and leasing of non-energy solid minerals would be subject to a CSU stipulation that would provide some protection for Harrington's penstemon populations and their habitat. Mineral material disposals and leasing of non-energy solid minerals are also discretionary actions that would not be approved in areas of high resource value. Locatable mineral exploration and development would not be subject to existing stipulations or site-specific analysis. Alternatives A and D would present some risk of impacts from locatable minerals development on the relevant and important values of the potential ACEC.

## Summary

Alternative C would provide the most beneficial effects on the relevant and important values of the Lyons Gulch Potential ACEC, followed in order by Alternatives B, D, and A.

BLM_0017012

### *McCoy Fan Delta Potential ACEC*

The McCoy Fan Delta Potential ACEC totals 220 acres located north of the Colorado River and west of McCoy, Colorado. The ACEC would protect relevant and important geologic values associated with fluvial and marine depositional events that occurred along the western margin of the Ancestral Front Range. The McCoy fan deltas are among the most exposed deltaic deposits in the Rocky Mountains and allow for study and observation of the paleontological resources. Marine deposits in the area include fossils of invertebrates, vertebrates, and plants.

### *Alternative A*

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated in the McCoy Fan Delta under Alternative A. The following management actions would apply to the area:

- NSO for major river corridors (lower half of area) (GS-NSO-3).
- VRM Class II.
- Open to motorized travel on and off roads; all existing roads open to full-sized vehicles.
- Available for ROW applications.
- Open for mineral entry (locatable, salable, non-energy leasable).

Of all the alternatives, Alternative A would have the fewest protections for the relevant and important values and would allow the most ground-disturbing activities. Alternative A would have the most risk of adverse impacts on the relevant and important values within the McCoy Fan Delta Potential ACEC.

**Impacts from Water Resources Management.** Management actions for water resources management under all alternatives include an NSO stipulation prohibiting surface-disturbing activities within 0.5 mile on both sides of major river corridors. This NSO would apply to the Colorado River, which flows near the southern border of the potential ACEC. The 0.5-mile buffer would overlap the southern half of the McCoy Fan Delta. This stipulation may afford some indirect protection for the relevant and important values within the potential ACEC, however it is unclear whether this stipulation would be applied within the potential ACEC since the McCoy Fan Delta is across the County Road from the Colorado River and has no riparian vegetation.

**Impacts from Visual Resource Management.** The McCoy Fan Delta would be managed as VRM Class II in all alternatives. VRM Class II would result in protections from most surface-disturbing activities that would modify the landscape and impact the geologic and paleontological values of the area. The VRM Class II designation would benefit the relevant and important values within the potential ACEC.

**Impacts from Recreation and Visitor Services Management.** The McCoy Fan Delta is currently part of the Glenwood Springs ERMA. ERMAs generally receive only custodial management and recreational use is anticipated to be mostly dispersed use. Within the past decade, the McCoy Fan Delta has become a popular area for dirt-bike riding and OHV use. Roads and trails have been pioneered throughout much of the potential ACEC. This unmanaged recreational use has the potential to create surface disturbances that would degrade the geologic value of the formation and result in loss of paleontological resources. Visitor use is expected to increase in the area, with proportional increases in impacts.

BLM_0017013

**Impacts from Comprehensive Trails and Travel Management.** Travel management for the McCoy Fan Delta Potential ACEC would allow OHV use on and off roads. A network of OHV and single-track routes has already been pioneered in the area. Cross-country travel in open travel areas would continue to result in the creation of new unplanned routes. Roads and other routes create surface disturbances that result in soil erosion, damage to surface geologic features, visual scarring, and exposure and potential loss of paleontological resources. Alternative A would result in the most adverse impacts from travel management.

**Impacts from Lands and Realty Management.** The McCoy Fan Delta Potential ACEC would be available for ROW applications under Alternative A, subject to the VRM Class II constraints. Ground-disturbing ROW actions have the potential to create soil erosion and alter the geologic features of the potential ACEC and may destroy invertebrate and vertebrate fossil resources. Alternative A would have the greatest risk of impacts from lands and realty actions of all alternatives.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The McCoy Fan Delta would not be withdrawn from mineral entry under Alternatives A, B, or D. Mineral material disposals and leasing of non-energy solid minerals would be subject to site-specific environmental review and any stipulations that apply to the landscape. Mineral material disposals and leasing of non-energy solid minerals are also discretionary actions that would not be approved in areas of high resource value. Locatable mineral exploration and development would not be subject to existing stipulations and actions that disturb less than 5 acres would not be required to file a mining plan with BLM. Alternatives A, B, and D may result in damage or destruction of the relevant and important values of the potential ACEC.

*Alternative B (Preferred Alternative)*
Impacts from water resources management and locatable, salable, and non-energy leasable minerals management would be the same as or similar to Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The McCoy Fan Delta area would not be designated as an ACEC in this alternative. No special management protection would be applied to protect the relevant and important values within the potential ACEC. Management that would apply to the area would be the same as under Alternative A, except for the following additional stipulations:

- Apply NSO on areas of VRM Class II with slopes over 30 percent and high visual sensitivity (CRV-NSO-41).

- Designate Upper Colorado River SRMA on 160 acres; apply NSO (CRV-NSO-46) and ROW avoidance designation.

- Limit travel to designated routes; designate existing routes for motorcycle use.

**Impacts from Visual Resource Management.** In order to protect areas with high visual sensitivity, an NSO stipulation would be applied within VRM Class II areas with slopes greater than 30 percent and high visual sensitivity. Several slopes within the McCoy Fan Delta Potential ACEC (totaling approximately 50 acres) meet these criteria. The NSO stipulation may provide some protection from construction of new routes and other surface-disturbing activities, but the benefit would be minimal due to the small and disconnected acres to which the stipulation would apply.

BLM_0017014

**Impacts from Recreation and Visitor Services Management.** The Upper Colorado River would be managed as a SRMA under Alternatives B, C, and D. The SRMA would encompass 160 acres of the 220-acre McCoy Fan Delta Potential ACEC. The objective of the SRMA would be to enhance river-related recreation opportunities. An NSO stipulation (CRV-NSO-46) would protect the recreational setting of the SRMA from surface disturbances, which would also protect the potential ACEC from surface disturbance related to non-recreational activities. Recreation management actions under Alternative B would have less adverse impacts on the geologic and paleontological resources than under Alternative A.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative B, all travel would be limited to designated routes and all routes within the McCoy Fan Delta would be managed for motorcycle use. Limiting travel to designated routes would prevent the surface disturbances associated with cross-country travel, if the designation is properly enforced. Managing the area for motorcycle use may limit total width of routes; however, existing two-track routes may not narrow over time unless the routes are actively reclaimed. Alternative B would have less adverse impact on the relevant and important values than under Alternative A.

**Impacts from Lands and Realty Management.** As part of the Upper Colorado River SRMA, 160 acres of the McCoy Fan Delta would be considered a ROW avoidance area. This would limit some ROW actions within the potential ACEC, although some surface disturbances may be allowed. Alternatives B and D would have less adverse impacts from lands and realty management than under Alternative A, but more than under Alternative C.

*Alternative C*
Impacts from visual resources management and recreation and visitor services management would be the same as or similar to Alternative B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative C, the McCoy Fan Delta would be designated as an ACEC to protect the unique geologic features and paleontological resources. Special management prescriptions that would apply within the ACEC include:

- Apply NSO on all acres (CRV-NSO-49).
- Manage as VRM Class II.
- Limit travel to designated routes; obliterate some routes, and designate the remainder pedestrian and equestrian.
- Designate as ROW avoidance area on all acres.
- Recommend for withdrawal from locatable mineral entry, close to mineral materials disposal and leasing of non-energy solid mineral.
- Close to invertebrate and vertebrate fossil collection.

The management prescriptions under Alternative C would provide the most benefit for the maintenance of the relevant and important values associated with this potential ACEC.

**Impacts from Water Resources Management.** Impacts would be the same as or similar to Alternative A.

BLM_0017015

**Impacts from Comprehensive Trails and Travel Management.** All travel would be limited to designated routes under Alternative C. Approximately half of the routes would be closed and reclaimed; the remainder would be designated for pedestrian and equestrian traffic. Limiting travel to designated routes would prevent the surface disturbances associated with cross-country travel, if the designation is properly enforced. Closing and reclaiming some routes would establish vegetation and help prevent soil erosion that adversely affects geologic and paleontological resources. Managing the other routes for pedestrian and equestrian use only would limit surface disturbance and human use in the area. This would have a beneficial effect on maintaining the relevant and important resource values of the potential ACEC. Alternative C would have the least adverse impact on the relevant and important values of all alternatives.

**Impacts from Lands and Realty Management.** Under Alternative C, all acres within the McCoy Fan Delta Potential ACEC would be managed for ROW avoidance. This would limit most surface-disturbing activities but may not restrict all ROW actions. Any surface-disturbing activities allowed under this alternative may have some impacts on the relevant and important values. Alternative C has the least risk of impact on the relevant and important values of all alternatives.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location, closed to mineral materials disposal, and closed to leasing of non-energy solid minerals under this alternative. No surface disturbances associated with mineral development would occur. Alternative C would have less adverse impact on the relevant and important values of the McCoy Fan Delta than the other alternatives.

## Alternative D

No ACEC would be designated at the McCoy Fan Delta under Alternative D. Management that would apply to the area would be the same as Alternative B, and impacts would be the same as or similar to Alternative B.

## Summary

Alternative C would result in the most benefit for the protection of the relevant and important values within the McCoy Fan Delta Potential ACEC, followed by Alternative B. Alternatives A and D would have the least benefit for the values within the potential ACEC.

## _Mount Logan Foothills Potential ACEC_

The Mount Logan Foothills Potential ACEC is an area northeast of the town of DeBeque, Colorado, where several listed, proposed and BLM sensitive plant species are concentrated. The potential ACEC includes 3,900 acres of public lands within the CRVFO. The potential ACEC includes all of the known occurrences of DeBeque phacelia and Naturita milkvetch within the CRVFO, nearly all of the known occurrences of the Colorado hookless cactus within the CRVFO, and a small suboccurrence of Parachute penstemon and Roan Cliffs blazing star.

## Alternative A

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Mount Logan Foothills Potential ACEC would not be designated under Alternative A. Lands within this potential ACEC would be managed under the current management plan restrictions and uses. These include:

- VRM Class II across most of area; VRM Class III immediately adjacent to Interstate 70.

- NSO for occupied threatened, endangered, and candidate species habitat (GS-NSO-12).

BLM_0017016

- CSU for occupied sensitive species habitat (GS-CSU-3).

- Open for livestock grazing.

- Open for vehicle use on and off roads.

- Available for ROW applications.

- Open for mineral entry.

- A total of 3,048 acres (78 percent) currently leased for oil and gas and being developed, mostly on leases predating NSO and CSU stipulations.

- Section 7 consultation with USFWS required for actions within 100 meters of the threatened Colorado hookless cactus.

Of all the alternatives, Alternative A would result in the least protection for the relevant and important values.

**Impacts from Visual Resource Management.** Most of the Mount Logan Foothills Potential ACEC falls within VRM Class II designation, except the portion next to Interstate 70, which is designated Class III. The Class II designation would benefit special status species habitat by limiting potential surface disturbances within occupied habitat but would not necessarily preclude all surface-disturbing activities within potential but currently unoccupied habitat. VRM Class III would allow surface disturbances that would moderately modify the visual character of the landscape. Visual resource management would have some beneficial impacts on special status species but would provide less protection than under Alternative C, which would designate all acres within the potential ACEC as VRM Class II.

**Impacts from Special Status Species Management – Plants.** Occupied habitat for federally listed, proposed, or candidate plant species would be protected with an NSO stipulation. Occupied habitat for BLM sensitive species would be protected by a CSU stipulation. The NSO stipulation would generally protect the Colorado hookless cactus, DeBeque phacelia and Parachute penstemon populations from direct impacts of surface-disturbing activities but would not protect currently unoccupied, but potential habitat for these species. The CSU stipulation would provide some protection for the BLM sensitive plants Naturita milkvetch and Roan Cliffs blazing star but would not apply to potential habitat, and would not prevent overall habitat fragmentation. Neither of these stipulations would apply to oil and gas leases issued before 1999 when the current RMP was implemented. Section 7 consultation under the ESA would be required for surface-disturbing actions within 100 meter of listed or proposed species.

**Impacts from Livestock Grazing Management.** The Mount Logan Foothills Potential ACEC encompasses two grazing allotments: County Line and Smith Gulch. Under Alternative A, these allotments would be open to livestock grazing. The Rifle-West Watershed Land Health Assessment, conducted in 2004 (BLM 2005c), determined that neither the County Line allotment nor the Smith Gulch allotment were meeting the Standards for Public Land Health. Livestock grazing management within the County Line allotment was a significant contributing factor in the failure to meet land health standards. The Smith Gulch allotment had not been grazed for a number of years, so current livestock grazing was not contributing to land health conditions. In 2008, the County Line allotment was placed under a temporary deferral of grazing for vegetation recovery. If grazing resumes in this allotment, reductions in AUMs and changes in season of use have been proposed to move towards meeting Land Health Standards.

BLM_0017017

**Impacts from Comprehensive Trails and Travel Management.** Travel management within the Mount Logan Foothills Potential ACEC would be open to OHV use on and off roads and all existing routes would be open to full-sized vehicles. Cross-country travel in open travel areas may lead to the creation of new unplanned routes. In addition, twelve known special status plant sites are within 200 meters of an existing road. Roads and other routes create surface disturbances that damage or destroy vegetation, including special status plants, provide vectors for noxious weed invasion, contribute to dust deposition and sedimentation, and lead to loss or degradation of habitat for special status plants and their pollinators. Alternative A would result in the most adverse impacts from travel management.

**Impacts from Lands and Realty Management.** The Mount Logan Foothills Potential ACEC would be available for ROW applications under Alternative A, subject to the VRM Class II constraints and restrictions on special status plant occupied habitat. Lands and realty actions could allow surface disturbances such as pipelines, power lines, roads, and communication site facilities. Surface disturbance and increased traffic associated with the ROW activity would reduce habitat capable of supporting expansion of plant populations. Surface-disturbing activities have the potential to introduce or escalate noxious weed invasions, which would degrade habitat suitable for supporting special status plants. Noxious weeds such as cheatgrass are extremely difficult to eradicate once they become established and have the potential to completely dominate the site and outcompete special status plants. Lands and realty actions under Alternative A may have an adverse impact on the relevant and important values of the potential ACEC.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Nearly 80 percent of the Mount Logan Foothills Potential ACEC has already been leased for oil and gas and is undergoing development. Most of the habitat for the special status plants within the potential ACEC was leased before 1999 when the current NSO (GS-NSO-12) and CSU (GS-CSU-3) stipulations were developed. These leases were issued under the standard terms and conditions. The BLM can develop COAs on APDs or voluntary mitigation such as fencing of special status plants within the vicinity of surface-disturbing activities to reduce impacts on special status species. However, the COAs and voluntary mitigation are likely to be less protective than if a stipulation were placed on the lease.

Direct impacts associated with mineral development and seismic explorations could include direct mortality of special status plants from trampling or crushing, loss of habitat or adverse modification of habitat through changes in species composition and invasion by noxious weeds, and disturbance to habitat of the species' pollinators. Construction and operation of facilities expand current roadway systems and increase both traffic and visitation to otherwise remote areas. Increased traffic could result in increased mortality of special status species from trampling of habitat and poaching by illegal collectors. Dust associated with increased soil disturbance and vehicular traffic within special status plant habitat can reduce the photosynthetic activity of plants and reduce pollination success. In the long term, this may reduce seed productivity and recruitment of young special status plants needed to replace mortality due to senescence.

In addition to direct human-caused mortality, special status species could also be affected through exposure to chemical spills or other sources of petroleum products. Indirect impacts include weed introduction, weed spread, sedimentation, and erosion associated with construction of infrastructure and use of access roads. Fluid mineral development would fragment habitats and could degrade or eliminate potentially suitable habitat for special status plants.

BLM_0017018

Reclamation of temporary disturbances and weed control measures which are required for fluid mineral actions would help reduce, but not eliminate, impacts. Noxious weeds such as cheatgrass are extremely difficult to eradicate once they become established and have the potential to completely dominate a site and outcompete special status plants.

Under all alternatives, fluid minerals management may result in adverse impacts on the special status plant species that occupy the Mount Logan Foothills Potential ACEC. Alternative A would have the greatest risk of adverse direct and indirect impacts; however, impacts would not vary much by alternative since 80 percent of the area has already been leased.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Lands within the Mount Logan Foothills area would not be withdrawn from mineral entry under Alternatives A, B, or D. Mineral material disposals and leasing of non-energy solid minerals would be subject to site-specific environmental review and stipulations that may apply to the landscape. Mineral material disposals and leasing of non-energy solid minerals are also discretionary actions that would not be approved in areas of high resource value. Locatable mineral exploration and development would not be subject to existing stipulations and actions that disturb fewer than 5 acres would not be required to file a mining plan with BLM. Alternatives A, B, and D would have a greater risk of impacts on the special status plants within the Mount Logan Foothills Potential ACEC than under Alternative C.

## Alternative B (Preferred Alternative)

Impacts to ACECs from visual resource management and fluid minerals management would be the same as or similar to those under Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated in the Mount Logan Foothills area under Alternative B. Management actions that would apply to the area include:

- NSO for 200 meters around occupied threatened, endangered, proposed and candidate plant species habitat (CRV-NSO-18).

- NSO for 100 meters around occupied BLM sensitive plant species habitat (CRV-NSO-20).

- County Line allotment closed to livestock grazing under Alternatives B, C, and D.

- Travel limited to designated routes; all routes not currently used for access to oil and gas facilities limited to pedestrian and equestrian use.

- ROW avoidance for occupied special status species habitat.

- Open for mineral entry.

Alternative B would provide more benefit for the protection of the relevant and important values than under Alternatives A or D, but less than under Alternative C.

**Impacts from Special Status Species Management—Plants.** The existing NSO stipulation for federally listed, proposed, and candidate threatened or endangered species would be extended to include a 200-meter buffer around occupied threatened, endangered, proposed and candidate plant species habitat. The new NSO

BLM_0017019

would apply to Colorado hookless cactus, DeBeque phacelia, and Parachute penstemon populations. The existing CSU stipulation for sensitive plant species would be replaced with an NSO stipulation prohibiting surface-disturbing activities within 100 meters of occupied sensitive plant habitat. This NSO would apply to populations of Naturita milkvetch and Roan Cliffs blazing star. These new stipulations would provide a greater degree of protection for occupied and potential habitat for listed, proposed and candidate species than under Alternative A and would minimize potential adverse impacts on the habitat for these species. Some impacts on potential but unoccupied habitat may still occur. The NSO for sensitive plants would provide a moderate degree of protection from direct impacts and some indirect impacts; however, under Alternative C, this buffer would increase to 200 meters, which would provide greater protection from potential indirect impacts, such as loss of potential habitat for population growth, erosion, and introduction of noxious weeds in the vicinity of occupied habitat. Special status plants management under Alternative B would be more beneficial for the relevant and important values than under Alternatives A and D, but less beneficial than under Alternative C, which would increase the NSO buffer for sensitive plants to 200 meters and withdraw the area from mineral entry.

**Impacts from Livestock Grazing Management.** The County Line allotment would be closed to livestock grazing under Alternative B. Closing the allotment would have generally positive impacts on special status plant habitat by decreasing the risk of trampling or browsing damage or adverse changes in habitat conditions. However, the County Line allotment is heavily infested with cheatgrass, and removing livestock grazing alone may not be sufficient to restore the native plant community to desired conditions. Additional vegetation treatments may be needed to improve habitat for special status plants. The Smith Gulch allotment would remain open for livestock grazing, and some risk of trampling or adverse habitat modifications would continue.

**Impacts from Comprehensive Trails and Travel Management.** All travel would be limited to designated routes and, under Alternative B, all routes not currently used for access to oil and gas facilities would be designated for pedestrian and equestrian use. Special status plants would benefit from the elimination of cross-country travel and the proliferation of new unplanned routes. Closing routes not needed for oil and gas access to motorized and mechanized use would minimize dust impacts, transport of noxious weeds to uninfested sites, and overall surface disturbance. Alternative B would cause less adverse impacts from travel management than under Alternative A.

**Impacts from Lands and Realty Management.** Occupied special status plant habitat within the Mount Logan Foothills Potential ACEC would be avoidance areas for ROW actions under Alternatives B and D. This would limit some surface-disturbing activities, especially within occupied habitat, but may not restrict all ROW actions in unoccupied but potential habitat. Surface-disturbing activities within potential habitat for special status plants would reduce habitat capable of supporting expansion of plant populations. Lands and realty management actions under Alternatives B and D would have less adverse impacts than under Alternative A.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The Mount Logan Foothills area would not be withdrawn from mineral entry under Alternatives A, B, or D. Mineral material disposals and leasing of non-energy solid minerals would be subject to site-specific environmental review and stipulations that may apply to the landscape. Mineral material disposals and leasing of non-energy solid minerals are also discretionary actions that would not be approved in areas of high resource value. Locatable mineral exploration and development would not be subject to

BLM_0017020

existing stipulations, and actions that disturb fewer than 5 acres would not be required to file a mining plan with BLM. Alternatives A, B, and D may result in damage or destruction of the relevant and important values of the potential ACEC.

*Alternative C*

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative C, the Mount Logan Foothills Potential ACEC would receive ACEC designation. Special management prescriptions would be applied to protect and enhance the relevant and important values. These include:

- NSO for 200 meters around occupied habitat for all special status plant species (threatened, endangered, proposed, candidate and sensitive plants) (CRV-NSO-19).

- VRM Class II for all acres.

- Close County Line and Smith Gulch allotments to livestock grazing.

- Travel limited to designated routes; most routes, except those currently used for access to oil and gas facilities, would be closed and reclaimed.

- ROW avoidance on all acres.

- Recommend for withdrawal from mineral location, close to mineral materials sales, close to non-energy solid minerals leasing.

By limiting non-oil and gas surface-disturbing activities, the special management prescriptions under Alternative C would have a positive impact on the relevant and important values within the potential ACEC. Impacts of oil and gas activities on existing leases would be minimized through the application of COAs.

**Impacts from Visual Resource Management.** The portion of the Mount Logan Foothills Potential ACEC that is currently designated VRM Class III would be changed to VRM Class II. Managing the entire ACEC as VRM Class II would benefit special status species habitat by limiting potential surface disturbances within occupied habitat but would not necessarily preclude all surface-disturbing activities within potential, but currently unoccupied habitat. Visual resource management in this alternative would result in the least adverse impacts of all alternatives.

**Impacts from Special Status Species Management—Plants.** Under this alternative, all special status plants, including BLM sensitive plants, would be protected with an NSO restriction within 200 meters of occupied habitat. This would provide greater protection for both occupied and potential habitat as well as habitat for pollinator species than any other alternative. Special status plants management under Alternative C would have the greatest beneficial effect of any alternative on the relevant and important values within the Mount Logan Foothills Potential ACEC.

**Impacts from Livestock Grazing Management.** Under Alternative C, both allotments within the Mount Logan Foothills Potential ACEC would be closed to livestock grazing. There would be no impacts from grazing on the relevant and important values in the potential ACEC.

**Impacts from Comprehensive Trails and Travel Management.** All travel within the Mount Logan Foothills Potential ACEC would be limited to designated routes, and all routes not currently used for access to oil and gas facilities would be closed and reclaimed. Special status plants would benefit from the

BLM_0017021

elimination of cross-country travel and the creation of new unplanned routes. Closing and reclaiming routes would reduce fragmentation of habitat, reduce opportunities for transport of weeds to uninfested sites, and may create additional suitable habitat for expansion of special status plant populations. Travel management under Alternative C would have less adverse impacts on special status plants than any other alternative.

**Impacts from Lands and Realty Management.** All acres within the Mount Logan Foothills Potential ACEC would be managed for ROW avoidance. This would limit most surface-disturbing activities and any ROW actions considered would be subject to the 200-meter NSO restriction for special status plant habitat. If these restrictions are applied, any surface-disturbing activities allowed under this alternative would have few direct impacts on special status plants but may contribute to loss of potential habitat or overall fragmentation of habitat. Lands and realty actions under Alternative C would have the least risk of impacts on special status plant populations and habitat of all alternatives.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts from fluid minerals would be the same as or similar to Alternative A.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location, closed to mineral materials disposal, and closed to leasing of non-energy solid minerals under this alternative. No surface disturbances associated with mineral development would occur. Alternative C would have less adverse impact on the relevant and important values of the Mount Logan Foothills Potential ACEC than the other alternatives.

## Alternative D

Impacts to ACECs from visual resource management, fluid minerals management, and locatable, salable, and non-energy leasable minerals management would be the same as or similar to Alternative A. Impacts to ACECs from livestock grazing management and lands and realty management, would be the same as or similar to Alternative B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated in the Mount Logan Foothills area under Alternative D. The potential ACEC would be managed in a similar fashion to Alternative B, with the following exceptions:

- CSU with 100-meter buffer around occupied habitat for BLM sensitive plants instead of NSO (CRV-CSU-9).

- Travel limited to designated routes; most existing routes remain open to full-sized vehicles.

**Impacts from Special Status Species Management—Plants.** Under Alternative D, federally listed, proposed and candidate plant species would be protected with an NSO within 200 meters of occupied habitat. BLM sensitive plants would be protected with a CSU stipulation with a 100-meter buffer around occupied habitat. Neither the NSO nor the CSU would apply to existing oil and gas leases. The NSO stipulation would provide adequate protection for federally listed, proposed and candidate plants from non-oil and gas activities. The CSU on sensitive species may protect most occupied habitat from surface disturbances, however, it would be unlikely to prevent disturbances in unoccupied, but potential habitat. Due to the larger

BLM_0017022

buffer for the special status plant stipulations, Alternative D would result in slightly less adverse impacts than under Alternative A.

**Impacts from Comprehensive Trails and Travel Management.** Although travel would be limited to designated routes under Alternative D, most routes would remain open to full-sized vehicles, except two dead-end routes that would be limited to pedestrian and equestrian use. The elimination of cross-country travel would benefit special status plants by avoiding unintentional destruction of plants or habitat. Alternative C would leave more routes open to full-sized vehicle use, resulting in slightly more potential adverse impacts than under Alternative B.

## Summary

Alternative C would have the most beneficial impacts on the relevant and important values of all alternatives, followed by Alternatives B, D, and A, in that order.

### *Sheep Creek Uplands Potential ACEC*

The Sheep Creek Uplands Potential ACEC is located west of the Colorado River and north of Sweetwater Creek. This potential ACEC would consist of 4,500 acres of mostly sagebrush and mixed mountain shrub vegetation. The ACEC would protect relevant and important special status plant habitat. Sheep Creek Uplands area includes high-quality occurrences of Harrington's penstemon that are considered a core population of this species.

### *Alternative A*

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Sheep Creek Uplands Potential ACEC would not be designated under Alternative A. The lands within this potential ACEC would be managed under the directives and restrictions of the current management plan. This would include:

- CSU on occupied BLM sensitive species habitat.

- VRM Class II, III, and IV.

- Open to travel on and off roads.

- Available for ROW applications.

- Open for locatable mineral entry, mineral materials disposal, and non-energy solid mineral leasing.

Alternative A would provide the least protection for Harrington's penstemon habitat of all alternatives.

**Impacts from Special Status Species Management—Plants.** A CSU stipulation for sensitive species would apply to the occupied habitat for Harrington's' penstemon within the Sheep Creek Uplands Potential ACEC under Alternative A. The CSU stipulation may guide where the surface-disturbing activity would occur but would be unlikely to prevent disturbance and fragmentation of unoccupied, but potential habitat. Management of special status plant species under Alternative A would have the greatest risk of adverse impacts on populations and habitat for Harrington's penstemon.

**Impacts from Visual Resource Management.** Under Alternative A, the northern half of the Sheep Creek Uplands Potential ACEC would be managed as VRM Class II. The southern half of the potential ACEC would be managed as VRM Class III and IV. The Class II designation would benefit special status species

BLM_0017023

habitat by limiting most surface-disturbing activities that could impact plant habitat. VRM Class III and IV designations would be unlikely to provide any protection for the relevant and important values since these designations would allow surface disturbances that would require moderate or major modifications to the visual character of the landscape. Visual resource management would have some beneficial impacts on special status species but would provide less protection than under Alternative C.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative A, travel management for the Sheep Creek Uplands area would be open to OHV use on and off roads and all existing routes would be open to full-sized vehicles. Both travel on existing routes and travel off of existing routes could impact populations of special status plants. Off-road vehicle use would probably have the greatest impact on populations of Harrington's penstemon because these activities occur over widespread areas and are not subject to site-specific environmental review and mitigation. Impacts can include direct mortality through crushing or trampling, loss of pollinator habitat, and changes to special status plant habitat quality through soil compaction, reduced total vegetation cover, changes in vegetation structure and species composition. Most of the Harrington's penstemon sites within the Sheep Creek Uplands are within 200 meters of an existing road. Indirect impacts of travel within special status plant habitat include dust deposition on plants that may inhibit pollination success, and the risk of transporting noxious weeds and other invasive species from infested areas to uninfested areas. Alternative A would result in the most adverse impacts from travel management.

**Impacts from Lands and Realty Management.** Under the current management plan, the Sheep Creek Uplands would be available for ROW applications, subject to the VRM Class II constraints and CSU restrictions on Harrington's penstemon occupied habitat. Ground-disturbing ROW actions would be designed to avoid occupied habitat as much as possible, but this may be difficult to achieve where populations of Harrington's penstemon are extensive. Impacts on Harrington's penstemon populations and habitat may include direct loss of individuals, loss, degradation, or fragmentation of habitat, and loss of pollinator habitat, all of which would have an adverse impact on the relevant and important values of the potential ACEC. Impacts would be greater than under Alternatives B and C, but similar to Alternative D.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The Sheep Creek Uplands area would not be withdrawn from mineral entry under Alternatives A, B, or D. Mineral material disposals and leasing of non-energy solid minerals would be subject to site-specific environmental review and stipulations that may apply to the landscape. Mineral material disposals and leasing of non-energy solid minerals are also discretionary actions that would not be approved in areas of high resource value. Locatable mineral exploration and development would not be subject to existing stipulations and actions that disturb fewer than 5 acres would not be required to file a mining plan with BLM. Alternatives A, B, and D may result in damage or destruction of the relevant and important values of the potential ACEC.

*Alternative B (Preferred Alternative)*
Impacts under this alternative from management actions for resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Sheep Creek Uplands Potential ACEC would be designated as an ACEC under Alternative B. Special management prescriptions to protect and enhance the relevant and important values of the Potential ACEC include applying an NSO stipulation for 100 meters around occupied Harrington's penstemon habitat, designating the

BLM_0017024

ACEC as a ROW avoidance area, prohibiting a net increase in motorized and mechanized routes, withdrawing the ACEC from mineral entry, and allowing vegetation treatments that would maintain or improve Harrington's penstemon populations and habitat. Under Alternative B, the special management for the ACEC would provide greater protection for the relevant and important values than under Alternatives A and D, but less than C.

Under Alternative B, the Sheep Creek Uplands area would be designated as an ACEC to protect the relevant and important Harrington's penstemon populations and habitat. Special management prescriptions that would apply within the boundaries of the ACEC include:

- Apply NSO stipulation within 100 meters of occupied Harrington's penstemon habitat (CRV-NSO-20).

- Manage with underlying VRM Classes (VRM Class II, III, and IV).

- Limit travel to designated routes; change a few from full-sized vehicles to pedestrian and equestrian use.

- Prohibit net increase in motorized/mechanized routes, with the exception of new administrative routes.

- Designate as ROW avoidance on all acres.

- Recommend for withdrawal from locatable mineral entry, close to mineral materials sales, and close to leasing of non-energy solid minerals.

- Allow fire and other vegetation treatments only if they maintain or enhance Harrington's penstemon populations and habitat.

Under Alternative B, the special management for the ACEC would provide greater protection for the relevant and important values than under Alternatives A and D, but less than C.

**Impacts from Visual Resource Management.** Impacts would be the same as or similar to Alternative A.

**Impacts from Special Status Species Management—Plants.** Under Alternative B, the CSU stipulation for sensitive plant species would be replaced with an NSO stipulation prohibiting surface-disturbing activities within 100 meters of occupied Harrington's penstemon habitat within ACECs. This would provide a moderate degree of protection for Harrington's penstemon; however, under Alternative C, this buffer would increase to 200 meters, which would provide greater protection from potential indirect impacts, such as loss of potential habitat for population expansion, erosion, and introduction of noxious weeds in the vicinity of occupied habitat. Special status plants management under Alternative B would be more beneficial for the relevant and important values than under Alternatives A and D but less beneficial than under Alternative C.

**Impacts from Comprehensive Trails and Travel Management.** All travel would be limited to designated routes under Alternatives B, C, and D. A few routes that were open to full-sized vehicles would be changed to pedestrian and equestrian use. Limiting OHV use to designated routes would benefit special status plants by restricting access to undisturbed sensitive plant habitat. Designating some routes for pedestrian and equestrian use only would minimize potential impacts from dust deposition and transport of noxious weeds from

BLM_0017025

infected areas to uninfected areas. Alternative B would have less adverse impact on Harrington's penstemon populations and habitat than under Alternative A.

**Impacts from Lands and Realty Management.** The Sheep Creek Uplands Potential ACEC would be managed as a ROW avoidance area. This would limit some surface-disturbing activities, but may not restrict all ROW actions. Some impacts on Harrington's penstemon may occur under this alternative, particularly impacts on unoccupied, but potential habitat, which would not necessarily be avoided by ROW authorizations. Impacts would be the same as Alternative C, as but less than under Alternatives A and D.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location, closed to mineral materials disposal, and closed to leasing of non-energy solid minerals under this alternative. No surface disturbances associated with mineral development would occur. Lands and realty actions would have less adverse impact on the relevant and important values in the Sheep Creek Uplands under Alternatives B and C than under Alternatives A and D.

## Alternative C

Impacts to ACECs from comprehensive trails and travel management, lands and realty management, and locatable, salable, and non-energy leasable minerals management would be the same as or similar to Alternative B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative C, the Sheep Creek Uplands area would be designated as an ACEC. Special management prescriptions for the ACEC would be similar to Alternative B, with the following changes:

- NSO stipulation within 200 meters of occupied Harrington's penstemon habitat (CRV-NSO-19).
- VRM Class II on all acres.

These prescriptions would provide the greatest benefit to the relevant and important values of all alternatives.

**Impacts from Special Status Species Management—Plants.** The CSU stipulation for sensitive plant species would be replaced with an NSO stipulation prohibiting surface-disturbing activities within 200 meters of occupied Harrington's penstemon habitat. This would provide greater protection for both occupied and potential habitat than any other alternative. Special status plants management under Alternative C would have the greatest beneficial effect on the relevant and important values within the Sheep Creek Uplands Potential ACEC of all alternatives.

**Impacts from Visual Resource Management.** Within the ACEC, all acres would be managed as VRM Class II to protect the relevant and important values. This would benefit Harrington's penstemon habitat by limiting potential surface disturbances within the ACEC but would not necessarily preclude all surface-disturbing activities. The beneficial impacts from visual resource management would be greater under Alternative C than under the other alternatives.

BLM_0017026

### Alternative D

Impacts to ACECs from special status plant species management, visual resource management, and locatable, salable, and non-energy leasable minerals management would be the same as or similar to those under Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated in the Sheep Creek Uplands Potential ACEC area under Alternative D. Management actions and restrictions that would affect the area include:

- CSU on occupied BLM sensitive species habitat (CRV-CSU-9).
- VRM Class II, III, and IV.
- Travel limited to designated routes, with same classifications as under Alternatives B and C.
- ROW avoidance for special status plant occupied habitat.
- Open for mineral entry.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be the same as or similar to Alternatives B and C.

**Impacts from Lands and Realty Management.** Occupied habitat for special status plants would be managed as a ROW avoidance area under Alternative D. Although the ROW avoidance does not preclude all ROW development, it would limit surface disturbances and give priority consideration to protecting special status species habitat. Impacts on Harrington's penstemon in ROW avoidance areas would be less than in areas open for ROW development. Impacts on Harrington' s penstemon occupied and potential habitat would be greater than under Alternatives B and C, in which the entire ACEC is a ROW avoidance area; however, impacts would be less than under Alternative A, in which the Sheep Creek Uplands area would be open for ROW development.

### Summary

Designation of the Sheep Creek Uplands Potential ACEC and associated management prescriptions under Alternative C would provide the greatest benefit for the relevant and important values. Alternative B would have slightly less protection for the relevant and important values than under Alternative C, but more than under Alternative D. Alternative A would present the least protection for the relevant and important values within the Sheep Creek Uplands area.

### The Crown Ridge Potential ACEC

The Crown Ridge Potential ACEC is on the ridgeline of The Crown southeast of Carbondale, Colorado. This potential ACEC would consist of 1,000 acres of mostly sagebrush and oakbrush/mixed mountain shrub vegetation. The ACEC would protect relevant and important special status plant habitat. The Crown Ridge supports an excellent quality occurrence of Harrington's penstemon.

### Alternative A

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated within The Crown Ridge area under Alternative A. The lands within this potential ACEC would be

BLM_0017027

managed under the directives and restrictions of the current management plan of Alternative A. These include:

- CSU on occupied BLM sensitive species habitat (GS-CSU-3).
- VRM Class II.
- Travel open to OHV use on and off roads; all roads open to full-sized vehicles.
- Available for ROW applications.
- Open for locatable mineral entry, mineral materials disposals, and leasing of non-energy solid minerals.

**Impacts from Visual Resource Management.** Lands within The Crown Ridge Potential ACEC would be managed as VRM Class II in all alternatives. VRM Class II would allow for some small-scale surface disturbances such as vegetation treatments as long as project design features met the VRM Class requirements and mitigations were adequate. The VRM classification would benefit Harrington's penstemon habitat by limiting potential surface disturbances but would not necessarily preclude all surface-disturbing activities. Impacts from visual resource management would be the same in all alternatives.

**Impacts from Special Status Species Management—Plants.** Under the current management plan, a CSU stipulation would apply to the occupied Harrington's penstemon habitat. The CSU stipulation may allow relocation of surface-disturbing activities to avoid occupied habitat but would not likely protect potential, but currently unoccupied habitat. This may allow overall habitat fragmentation, loss of pollinator habitat, and risk of weed invasion that would degrade habitat for special status plants. Alternatives A and D would have similar risks of adverse impacts on Harrington's penstemon populations and habitat.

**Impacts from Recreation and Visitor Services Management.** Recreational activities, such as hiking, mountain biking and OHV riding, and recreation developments, such as construction of trails, campgrounds, and parking lots, may cause direct loss of special status plants, reduced habitat quality, and habitat fragmentation. Current recreational use in The Crown area is quite high, due to its proximity to nearby towns and the diverse terrain, which offers many recreational opportunities. Recreational use is expected to increase as the human population in the Roaring Fork Valley continues to expand. Impacts on the relevant and important values within The Crown area are expected to increase proportionally.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative A, travel management for The Crown Ridge Potential ACEC would be open to OHV use on and off roads. Disturbances from unregulated OHV use would probably have the greatest impact on populations of Harrington's penstemon because these activities can result in proliferation of numerous new roads and trails within special status plant habitat without benefit of site-specific environmental review and mitigation. Several existing roads and trails are located less than 200 meters from Harrington's penstemon populations. Impacts can include direct mortality through crushing or trampling, dust deposition on plants that may inhibit pollination success, and changes in habitat quality through soil compaction, reduced total vegetation cover, and changes in vegetation structure and species composition. The increasing use of OHVs and mountain bikes within the area could also transport noxious weeds and invasive weed seeds from infested areas to uninfested areas. Adverse impacts of travel management actions on Harrington's penstemon populations and habitat within The Crown Ridge Potential ACEC are likely to be greatest under Alternative A.

BLM_0017028

**Impacts from Lands and Realty Management.** The Crown Ridge area would be available for ROW applications under Alternative A. Lands and realty actions could allow surface disturbances such as pipelines, power lines, roads, and communication site facilities within The Crown Ridge area, subject to the CSU stipulation for sensitive plant species. The CSU may require relocation of the activity outside known populations, but may allow such activities within unoccupied, but potential habitat for Harrington's penstemon. Surface disturbance and increased traffic associated with the activity would potentially escalate the spread of weeds into occupied habitat and limit the potential expansion of Harrington's penstemon. Alternative A would result in greater risk of adverse impacts than the other alternatives because the stipulations regulating ROW actions are the least restrictive in this alternative.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Under Alternative A, The Crown Ridge area would be open to locatable mineral entry, mineral materials disposal, and leasing of non-energy solid minerals. Mineral material disposals and leasing of non-energy solid minerals would be subject to a CSU stipulation that would provide some protection for Harrington's penstemon populations and their habitat. Mineral material disposals and leasing of non-energy solid minerals are also discretionary actions that would not be approved in areas of high resource value. Locatable mineral exploration and development would not be subject to existing stipulations or site-specific analysis. The risk of impacts from locatable minerals on the relevant and important values of The Crown Ridge Potential ACEC is greatest under Alternative A.

*Alternative B (Preferred Alternative)*
Impacts to ACECs from special status plant species management and visual resource management would be the same as or similar to Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Crown Ridge Potential ACEC would not be designated under Alternative B. The potential ACEC would be located within The Crown SRMA and managed to protect the recreation outcomes and settings for that area. Management actions and restrictions that would impact The Crown Ridge Potential ACEC include:

- CSU on occupied Harrington's penstemon habitat outside ACECs (CRV-CSU-8).
- VRM Class II.
- NSO on core wildlife areas (northern half of potential ACEC) (CRV-NSO-8).
- NSO on all acres for SRMA (CRV-NSO-46).
- Travel limited to designated routes; northern half mostly mechanized, southern half either full-sized vehicles or ATV use.
- ROW avoidance on all acres within SRMA.
- Open for mineral entry (locatable); closed to salable and non-energy leasable minerals.

**Impacts from Terrestrial Wildlife Management.** The northern half of The Crown Ridge area has been identified as a core wildlife habitat area under Alternatives B and C, with an NSO applied to prohibit surface-disturbing activities. Harrington's penstemon habitat would be protected from surface disturbances where the core wildlife habitat overlaps with special status plant habitat. Wildlife management actions under Alternatives

BLM_0017029

B and C would have more benefit for the relevant and important values of the potential ACEC than under Alternatives A and D where the NSO does not apply.

**Impacts from Recreation and Visitor Services Management.** Under Alternative B, 9,100 acres of public land within The Crown area would be designated as a SRMA. The SRMA would completely encompass the 1,000-acre The Crown Ridge Potential ACEC. The SRMA would be divided into two recreation management zones: RMZ 1 tailored to beginning OHV riders and RMZ 2 emphasizing novice-intermediate mountain-biking opportunities. Both zones would be managed primarily for residents of the Roaring Fork Valley and the objective would be to maintain similar recreational experiences as exist now. Most of the recreation infrastructure has been created. As much as 6 to 8 miles of new single-track trails are expected to be constructed in order to create loop trails and reduce the amount of biking on roads. The final travel management network of trails would be determined at the implementation level with site-specific analysis. At that time, mitigation would be applied to minimize adverse impacts on Harrington's penstemon populations and habitat.

An NSO stipulation would prohibit surface-disturbing activities within the SRMA that were incompatible with the recreation management objectives for the area. This would indirectly benefit Harrington's penstemon habitat by limiting non recreation-related surface disturbances. Adverse impacts from recreation management would outweigh beneficial impacts in all alternatives, but Alternative B would have less impact than the other alternatives due to the restrictions on the number of new routes, the NSO stipulation that would apply to the SRMA, and the active management within the SRMA that would minimize inadvertent impacts on the relevant and important values.

**Impacts from Comprehensive Trails and Travel Management.** Travel within The Crown Ridge Potential ACEC would be limited to designated routes. Most of the routes in the northern half of the potential ACEC would be designated for mechanized use, whereas most of the routes in the southern half would be designated for full-sized vehicles or ATV trails to accommodate a range of recreational activities. As mentioned above, the total number of trails is likely to increase slightly from Alternative A, but no acres would remain open for off-road travel. Impacts on Harrington's penstemon populations and habitat would be less than under Alternative A.

**Impacts from Lands and Realty Management.** The Crown SRMA would be managed as a ROW avoidance area to protect the character of the recreational setting. This would limit most surface-disturbing activities within The Crown Ridge Potential ACEC, but may not restrict all ROW actions. Some impacts on Harrington's penstemon may occur under this alternative, particularly impacts on unoccupied, but potential habitat. Impacts would be less than under Alternative A, but similar to Alternatives C and D.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management** As part of the SRMA, lands within The Crown Ridge Potential ACEC would be open to locatable mineral entry, but closed to mineral materials disposal and leasing of non-energy solid minerals. Locatable mineral exploration and development would not be subject to existing stipulations or site-specific analysis. Locatable mineral development in special status plant habitat could have adverse impacts on the relevant and important values. Impacts from locatable mineral development would be similar to Alternative A.

BLM_0017030

*Alternative C*

Impacts to ACECs from visual resource management and terrestrial wildlife management would be the same as or similar to Alternative B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative C, The Crown Ridge Potential ACEC would receive ACEC designation and special management prescriptions would be applied to protect the relevant and important values. These include:

- Apply NSO for 200 meters around occupied Harrington's penstemon habitat (CRV-NSO-19).

- Manage VRM Class II.

- Apply NSO on core wildlife areas (northern half of potential ACEC) (CRV-NSO-8).

- Limit travel to designated routes and close to over-the-snow travel. Most routes remain open for full-sized vehicles, and several routes limited to pedestrian and equestrian traffic.

- Prohibit a net increase in motorized/mechanized routes, with the exception of new administrative routes.

- Designate as ROW avoidance on all acres.

- Recommend for withdrawal from locatable mineral entry, close to mineral materials disposal, close to leasing of non-energy solid minerals.

- Allow fire or other vegetation treatments if they would maintain or enhance Harrington's penstemon populations and habitat.

Compared to the other alternatives, Alternative C would result in the greatest beneficial impact on the relevant and important values.

**Impacts from Special Status Species Management—Plants.** The CSU stipulation for sensitive plant species would be replaced with an NSO stipulation prohibiting surface-disturbing activities within 200 meters of occupied Harrington's penstemon habitat. This would provide more protection for both occupied and potential habitat than the other alternatives. Special status plants management under Alternative C would have the greatest beneficial effect on the relevant and important values within The Crown Ridge Potential ACEC of all alternatives.

**Impacts from Recreation and Visitor Services Management.** The Crown Ridge Potential ACEC and surrounding area would be managed as an ERMA, rather than a SRMA in this alternative. Whereas SRMAs give priority to recreation and developments, ERMAs rely on interdisciplinary resource objectives to guide recreation developments. Management addresses recreation demand but is balanced with resource protection and reducing conflicts among users and uses. Fewer new routes are anticipated, and more routes would be closed or rerouted to minimize adverse impacts on special status plants. Of all the alternatives, recreation management under Alternative C would have the fewest adverse impacts on Harrington's penstemon populations and habitat within The Crown Ridge Potential ACEC.

**Impacts from Comprehensive Trails and Travel Management.** There would no net increase in motorized or mechanized routes within The Crown Ridge Potential ACEC. Total miles of roads and trails

BLM_0017031

would probably be least in this alternative, resulting in the least adverse impacts on the relevant and important values.

**Impacts from Lands and Realty Management.** All lands within The Crown Ridge Potential ACEC would be managed as a ROW avoidance area. This would limit most surface-disturbing activities but may not restrict all ROW actions. Some impacts on Harrington's penstemon may occur under this alternative, particularly impacts on potential, but currently unoccupied habitat, which would not necessarily be avoided by ROW authorizations. This alternative would result in the greatest protection for the relevant and important values. Although Alternatives B and D also have a ROW avoidance restriction, the restriction is in place to protect recreation settings and opportunities and may allow exceptions that would impact Harrington's penstemon habitat.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from mineral location, closed to mineral materials disposal, and closed to leasing of non-energy solid minerals. No surface disturbances associated with mineral development would occur. Alternative C would have the least adverse impacts on the relevant and important values within The Crown Ridge Potential ACEC.

*Alternative D*

Impacts to ACECs from special status plant species management and visual resource management would be the same as or similar to Alternative A. Impacts to ACECs from lands and realty management and locatable, salable, and non-energy leasable minerals management would be the same as or similar to those under Alternative B. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The Crown Ridge Potential ACEC would not be given ACEC designation under Alternative D. The Crown area would be managed as a SRMA with an emphasis on enhancing mountain biking opportunities. Management actions or restrictions that might affect the relevant and important values of The Crown Ridge Potential ACEC include:

- CSU on occupied Harrington's penstemon habitat.
- VRM Class II.
- Travel limited to designated routes; all routes designated for mechanized use except those that dead-end on private land; new routes anticipated.
- ROW avoidance on all acres for SRMA.
- Open for mineral entry (locatable); closed to salable, non-energy leasable minerals.

Alternative D would have less adverse impacts on the relevant and important values than Alternative A, but greater than Alternatives B or C.

**Impacts from Recreation and Visitor Services Management.** Under Alternative D, The Crown area would be designated as a SRMA with an emphasis on enhancing mountain biking opportunities. The SRMA would target destination visitors as well as residents of the Roaring Fork Valley. Additional recreation infrastructure would probably be needed to meet the anticipated recreation demand. Approximately 14 to 18

BLM_0017032

miles of new single-track trails are expected to be constructed in order to create loop trails and reduce the amount of biking on roads. This would result in a higher density of trails than proposed under the other alternatives. The final travel management network of trails would be determined at the implementation level with site-specific analysis. At that time, mitigation would be applied to minimize adverse impacts on Harrington's penstemon populations and habitat. However with a denser trail system and more concentrated recreational use, the risk of habitat fragmentation and loss of potential, but currently unoccupied habitat is greater. Recreation management under Alternative D is likely to result in more adverse impacts than under Alternatives B and C, but is comparable to Alternative A.

**Impacts from Comprehensive Trails and Travel Management.** Travel within The Crown area would be limited to designated routes. All routes would be mechanized or pedestrian and equestrian use only, but Alternative D is likely to result in more miles of newly created routes than any other alternative. Travel management would have similar degree of impact as Alternative A but more impact than under Alternatives B and C.

## Summary

Alternative C would provide the most protection for the relevant and important values of The Crown Ridge Potential ACEC of any of the alternatives. Alternative B would have slightly less protection for the relevant and important values than under Alternative C but more than under Alternative D. Alternative A would present the least protection for the relevant and important values.

## *Thompson Creek ACEC*

The Thompson Creek ACEC is located along the North Fork of Thompson Creek southwest of the town of Carbondale, Colorado. The ACEC includes 4,300 acres under Alternative A. The ACEC size is reduced to 3,400 acres under Alternatives B and C, because 900 acres were determined not to contain relevant and important values. The relevant and important values associated with this ACEC are scenic, geologic, historic (cultural), and natural processes. The outstanding scenic values are tied to the unique topography and geologic landforms (fins) and the sharp contrasting colors. Geologic values are based on the prominent, nearly vertical, geologic fins that demonstrate unusual depositional and erosional processes. Historic values are associated with remains of the abandoned Aspen and Western Railway, which operated from 1887 to 1889. The area's intact natural ecological state is also recognized as important for environmental education.

## *Alternative A*

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Under Alternative A, Thompson Creek ACEC would continue to be designated as an ACEC to protect the scenic, geologic, historical, and ecological values within the area. Special management to protect and preserve these values would include:

- Prohibit fluid minerals leasing in the Thompson Creek Natural Environment Area (portion of the area).
- Apply NSO on all acres.
- Designate as ROW exclusion area.
- Manage as VRM Class I.
- Classify as closed to unauthorized motorized travel.

BLM_0017033

- Allow fire and other vegetation treatments only if they maintain or enhance relevant and important values.

- Recommend for withdrawal from mineral location, close to mineral materials sales and leasing of non-energy solid minerals.

**Impacts from Visual Resource Management.** The Thompson Creek area would be classified as VRM Class I to retain the high scenic quality of the area. Most surface-disturbing activities would not be allowed, as this would degrade the scenic values.

**Impacts from Lands with Wilderness Characteristics (LWC) Management.** No actions to manage LWCs to maintain wilderness characteristics outside existing WSAs would be proposed under Alternative A, resulting in no additional protection for the ACEC values.

**Impacts from Recreation and Visitor Services Management.** The Thompson Creek ACEC would also be designated as a SRMA under Alternative A. The overlapping designations have created management conflicts where enhancement of certain recreation activities may not be compatible with protecting the relevant and important values of the ACEC. Intensive climbing activities on the geologic fins within Thompson Creek could impact both the scenic and geologic values.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative A, the ACEC is designated closed to unauthorized motorized vehicle travel, including over-the-snow travel, which protects the relevant and important values by preventing visual scarring, loss of vegetation, and risk of noxious weed invasion that would degrade the scenic and ecological integrity of the area.

**Impacts from Lands and Realty Management.** Under Alternatives A, B, and C, the Thompson Creek ACEC would be managed as a ROW exclusion area, which would prohibit ROW actions that would impact the ACEC values. No impacts on the relevant and important values would be anticipated.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The Thompson Creek Natural Environment Area (NEA) would be closed to fluid minerals leasing. The NEA encompasses a 960-acre tract of land at the core of Thompson Creek canyon. Closing the area to fluid minerals leasing would protect the core of the ACEC from surface disturbances related to oil and gas development. Any leases issued outside the NEA would be subject to the NSO stipulation covering the entire ACEC. There would be negligible impacts on the relevant and important values of the ACEC from fluid minerals development.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The ACEC would be recommended for withdrawal from locatable mineral entry, closed to mineral materials disposal and leasing of non-energy solid minerals. The withdrawal and closures would benefit the ACEC values by precluding any surface-disturbing activities associated with these actions.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative A, Thompson Creek is determined to be eligible for inclusion in the NWSRS. Interim management would protect the ORVs, the free-flowing nature of the stream and the tentative classification within a 0.25-mile buffer on both sides of the

BLM_0017034

stream centerline. Management to protect the eligible stream segment would complement management prescriptions to protect the relevant and important values within the ACEC.

*Alternative B (Preferred Alternative) and Alternative C*

Impacts would be similar to Alternative A, except that the additional management restrictions and prescriptions would afford somewhat greater protection than under Alternative A. Impacts to ACECs from visual resource management, comprehensive trails and travel management, lands and realty management, and locatable, salable, and non-energy leasable minerals management would be the same as or similar to Alternative A. Impacts from management of other resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Designation and protective management would continue for the Thompson Creek ACEC under Alternatives B and C. The ACEC would be managed as under Alternative A, but with the following additional provisions:

- Prohibit fluid minerals leasing on the entire ACEC (3,400 acres).

- Classify as closed to over-the-snow travel and to mechanized travel.

- Recommend for withdrawal from locatable mineral exploration and development.

- Prohibit installation of bolts or other human-caused devices on identified relevant and important geologic features outside the existing climbing rock fin.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under Alternative C, a total of 8,200 acres within the Thompson Creek area would be managed as LWCs to protect wilderness characteristics. This would include the entire Thompson Creek ACEC as well as lands to the north of the ACEC. Management prescriptions to protect wilderness character would prohibit surface-disturbing activities in the area and would complement actions to protect the relevant and important values of the ACEC. The larger boundary and management as LWCs under Alternative C may benefit the ACEC by protecting the scenic views seen from the northern boundary of the ACEC, and by restricting fragmentation of the ecological system that extends beyond the ACEC.

**Impacts from Recreation and Visitor Services Management.** The Thompson Creek ACEC would not be designated a SRMA under Alternative C. Management of the recreational use of the area would focus on non-motorized, dispersed use. There would be no actions implemented to enhance opportunities for hiking, climbing, or mountain biking. The existing natural landscape would be retained. There would be minimal impacts from recreation on the relevant and important values within the ACEC. Management of the ACEC under Alternative C would prohibit installation of bolts or other permanent climbing aids outside the existing climbing rock fin. This would afford protection for the scenic quality of the other geologic fins.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The fluid minerals leasing closure in the Thompson Creek NEA would apply to the entire ACEC under Alternative C. The fluid minerals leasing closure would complement the NSO stipulation covering the entire ACEC. There would be no impacts on the relevant and important values of the ACEC from fluid minerals.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Thompson Creek stream segment would be considered suitable for inclusion in the NWSRS under Alternative C, but not under Alternative B. Impacts of

BLM_0017035

not designating this stream segment as suitable would be minimal. The portion of the stream segment which lies within the ACEC is already afforded protection with an NSO stipulation on the entire ACEC. Impacts would be the same as or similar to Alternative A.

### Alternative D

Impacts under this alternative from management actions for resources, uses, and special designations would be as described below.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** No ACEC would be designated in this alternative and no special management prescriptions would be applied to protect and preserve the relevant and important values. This alternative would present the greatest risk of impacts to the relevant and important values of the potential ACEC. Management actions and allowable use decisions would include:

- NSO for 100 meters from historic properties.
- CSU on the entire SRMA, which includes all of the Thompson Creek ACEC area.
- VRM Class II.
- Travel limited to designated routes; over-the-snow travel prohibited.
- Open for mineral entry.

**Impacts from Cultural Resource Management.** Under Alternative D, cultural resources in the Thompson Creek area would be protected by an NSO stipulation for historic properties that would prohibit surface occupancy and surface-disturbing activities within 100 meters (328 feet) of historic properties. This stipulation would protect cultural resources from adverse direct impacts and would reduce the potential for indirect impacts. The stipulation would provide indirect benefits to other relevant and important values where they occur within this buffer, but would not protect relevant and important values elsewhere in the ACEC.

**Impacts from Visual Resource Management.** Under Alternative D, visual resource management would change the classification from VRM Class I to VRM Class II. VRM Class II would be managed to retain the existing character of the landscape, and the level of change to the landscape should be low. Visual resources management under Alternative D would afford the least protection for the relevant and important values of all alternatives.

**Impacts from Management of Lands with Wilderness Characteristics (LWCs).** No management actions to maintain wilderness characteristics on lands outside existing WSAs would be proposed under Alternative D, resulting in no protection for the ACEC values. Impacts would be the same as under Alternatives A and B.

**Impacts from Recreation and Visitor Services Management.** The Thompson Creek area would be designated as a SRMA under Alternative D. The Thompson Creek area would be managed as a SRMA with three distinct Recreation Management Zones. RMZ 1 would focus on day-use sport climbers, RMZ 2 would target day-use hikers, and RMZ 3 would focus on mountain-biking recreation opportunities for destination visitors. RMZ 3 would be managed to enhance mountain biking opportunities and additional single-track trails would be constructed to eliminate trespass and create loop systems. Management of the area as a SRMA

BLM_0017036

would probably attract more visitors to the Thompson Creek area, particularly in RMZ 3, which would be marketed for destination visitors. Construction of new trails would result in loss of vegetation and may provide a niche for invasive species to expand in the area. These activities may degrade the ecological condition of the vegetation communities and detract from the visual quality of the ACEC. Installation of additional bolts would be allowed within the climbing zone, but BLM would encourage using bolts and other permanent devices that are painted to match the surrounding rock. The installation of more bolts, particularly on new fins, would impact the high scenic quality of the geologic fins. Impacts from recreation to the relevant and important values would be greatest under Alternative D.

**Impacts from Comprehensive Trails and Travel Management.** As in the other alternatives, the Thompson Creek area would be closed to unauthorized motorized travel. Under Alternative D, mechanized travel would be allowed in the northern part of the area on designated routes. New routes would be constructed to enhance the network of mountain biking trails. Additional surface disturbances associated with construction and use of mechanized routes could impact the ecological values in the ACEC and may result in a decline in visual qualities. Alternative D would have the greatest impacts from travel management of all alternatives.

**Impacts from Lands and Realty Management.** In the absence of an ACEC designation, the Thompson Creek area would be managed as a ROW avoidance area rather than a ROW exclusion area. The area would be avoided for ROW actions unless no feasible alternatives could be found, and relevant and important values could be mitigated.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Thompson Creek ACEC would not be designated under Alternative D. The area would be open to fluid minerals leasing subject to the NSO constraints on historic properties and the CSU stipulation attached to minimize impacts on the SRMA values. Although these stipulations would protect cultural resources from direct impacts, it is likely that some surface disturbances would occur within the Thompson Creek area. Surface disturbances associated with oil and gas development would adversely affect the visual and ecological resources within the ACEC boundary. Alternative D would have the most risk of adverse impact on relevant and important values of all the alternatives.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** The Thompson Creek area would remain open to locatable mineral entry, disposal of mineral materials, and leasing of non-energy solid minerals. Disposal of mineral materials and leasing of non-energy minerals would be subject to the management constraints in the RMP. These are also discretionary actions that would not be allowed in areas of high resource value. Exploration and development of locatable minerals may create surface disturbances that would adversely affect the relevant and important values within the Thompson Creek area. Plans of operations would not be required for locatable mineral activities that would cause surface disturbances of 5 acres or less (43 CFR 3809.21[a]). Because activities of 5 acres or less require only a notice to be filed with the BLM, adverse impacts would be anticipated to the scenic, cultural, and geologic resources in the area. Potential impacts from locatable mineral entry under Alternative D would be greater than the other alternatives.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The Thompson Creek stream segment would not be considered suitable for inclusion in the NWSRS under Alternative D. Interim protection for

BLM_0017037

suitable WSR segments would not be applied, resulting in no protections for the relevant and important values of the Thompson Creek ACEC.

## Summary

Alternatives B and C would afford the most protection for the relevant and important values of the Thompson Creek ACEC. Alternative D would have the least benefit to protection of the ACEC values followed by Alternative A

### *Cumulative Impacts*

The cumulative impact analysis boundary for ACECs includes public and private lands within the planning area and neighboring federal lands with designated ACECs or RNAs. ACECs are designated to provide special management attention for relevant and important resources that include physical values such as scenic and geologic features, hazardous soils and cultural resources, and biological values such as important fisheries and wildlife habitat, exemplary ecosystems or plant communities, or special status species populations and habitat. A discussion of cumulative impacts on the ACECs is really an analysis of the incremental impacts from past, present, and reasonably foreseeable future actions on the relevant and important values within the existing and potential ACECs. Within the six existing ACECs, the implementation of special management prescriptions has adequately protected the relevant and important values from past actions. Most of these areas have been protected with an NSO stipulation, excluded from ROW development, closed to motorized vehicles, or at least restricted from a net increase in routes. Past actions have not resulted in irreparable loss of values.

The relevant and important values in areas proposed but not currently designated as ACECs have experienced incremental impacts from a variety of past actions. Off-road vehicle activity on the McCoy Fan Delta has created soil erosion that threatens to degrade the evidence of this fluvial and marine depositional feature. Mining for cinder blocks and landscaping rock has taken place immediately adjacent to the Dotsero Crater, creating a visual impact and a loss of some of the geologic features associated with this volcanic event. Approximately one-half of the Grand Hogback Potential ACEC has been leased for oil and gas development. Although no drilling has taken place within the Hogback area yet, surface disturbances associated with oil and gas activity could degrade the geologic and scenic values of this potential ACEC. Oil and gas development and associated infrastructure within the Mount Logan Foothills Potential ACEC has not resulted in any direct losses of special status plants, but has resulted in loss of potential habitat and overall habitat fragmentation for 5 special status plant species. Proliferation of user-created motorized and mechanized travel routes have contributed to losses of special status plants and fragmentation of special status wildlife habitat in several potential ACECs. Fire suppression and livestock grazing have contributed to encroachment of pinyon and juniper woodlands into sagebrush habitat, with detrimental effects on sagebrush dependent species such as greater sage-grouse. Many of these activities are expected to increase in the future, resulting in further declines in the quantity and quality of the relevant and important values over time.

Currently there are six ACECs totaling 27,030 acres in the CRVFO. The adjacent Kremmling Field Office is considering designation for an additional seven ACECs. In the neighboring Grand Junction Field Office, 23,240 acres are designated within eight ACECs. Of those eight ACECs, three contain relevant and important geologic processes, one contains scenic values, two contain protected special status plant populations, one supports a sensitive butterfly species, and one covers scenic, cultural, and endangered plant resources. The adjacent White River National Forest manages five RNAs for a total of 53,100 acres. These areas are designated to protect excellent representative examples of diverse plant communities throughout the Forest.

BLM_0017038

Designation of ACECs within CRVFO would complement the management of relevant and important resources in adjacent land management agencies. The nature of the relevant and important values that would be protected would be similar to those in surrounding areas, but the actual resources, species, and features protected would be unique, resulting in a better regional representation of the relevant and important values.

Designation of ACECs would have a cumulative beneficial impact on the relevant and important values by providing special management prescriptions to restrict surface disturbances that would detract from the values and by allowing management actions that would enhance these values. Alternative A would retain the currently designated six ACECs to protect outstanding scenic, geological, and cultural values and public safety hazards within the CRVFO. Other resource values such as special status plants and wildlife, and other geologic values found within the CRVFO would not be represented. Alternative D proposes even fewer ACECs than under Alternative A, designating only three ACECs to protect selected scenic, cultural, and public safety hazards.

While the relevant and important values of the potential ACECs not identified for designation in each alternative would receive some direct and indirect protection through management actions associated with various resource programs, ACEC designation provides a more comprehensive suite of management restrictions and allowable uses designed not only to protect, but also to enhance, the relevant and important values. Areas without special designations are managed to accommodate a wide variety of uses and users, and may allow surface disturbances and habitat fragmentation from these uses that would degrade the quality and integrity of the relevant and important values.

Among the alternatives proposed, Alternative D would have the most potential for cumulative effects on the relevant and important scenic, geologic, cultural, and biological values and public safety concerns because it would designate the fewest ACECs, have the fewest overall restrictions, and result in the most development of mineral resources, ROWs, and other surface disturbances. Alternative A would be similar to Alternative D and would allow for greater potential cumulative effects than under Alternatives B and C.

Alternative B would designate nine areas as ACECs, including three areas of high quality habitat for Harrington's penstemon identified as core populations of this special status species, and the Dotsero Crater, a unique geologic feature representing the most recent volcanic activity within the State of Colorado. Alternative C would designate all 16 of the potential ACECs (79,700 acres) including key/core habitat areas for special status species such as the Colorado River cutthroat trout, greater sage-grouse, and nearly all of CRVFO's special status plants. Alternative C would provide the most protection for the broadest spectrum of values within the planning area and would complement similar designations on adjoining federal lands. Alternative C would have the least amount of cumulative impacts when added to the other actions and activities occurring on federal, state, and private lands within the scope of the analysis.

BLM_0017039

## 4.4.2   Wilderness and Wilderness Study Areas (WSAs)

**Methods and Assumptions**

Impacts on the wilderness characteristics of naturalness, opportunities for solitude, primitive/unconfined recreation, and special features are considered in this analysis. Existing conditions concerning wilderness and WSAs are described in Section 3.4.2. Impacts are limited to potential changes in wilderness characteristics for the WSAs. There are no wilderness areas in the CRVFO.

The analysis is based on the following assumptions:

- Under all alternatives, WSAs in the planning area would continue to be managed under the IMP for Lands under Wilderness Review (BLM Handbook H-8550-1) until Congress either designates or releases all or portions of the WSAs from further consideration for wilderness (BLM 1995a).

- The general standard for interim management is that lands under wilderness review must be managed so as not to impair their suitability for preservation as wilderness. This is referred to as the nonimpairment standard, which applies to all uses and activities except those specifically exempted from this standard by FLPMA (such as grandfathered uses).

- IMP identifies the guidelines for specific activities so as not to impair the suitability of WSAs for preservation as wilderness.

- Permitted activities in WSAs (except grandfathered and valid existing rights) are temporary uses that create no new surface disturbance, nor involve permanent placement of structures.

- Those grazing, mining, and mineral leasing uses that existed on October 21, 1976 (the date FLPMA was approved) may continue in the same manner and degree as on that date, even if this would impair wilderness suitability.

- Lands under wilderness review may not be closed to appropriation under the mining laws in order to preserve their wilderness character.

- Valid existing rights are recognized.

- Continued increases in visitation would reduce opportunities for solitude and increase evidence of visitor use (i.e., human waste, trash, and travel violations). These implementation issues would be addressed on a case-by-case basis through the life of the plan.

Impacts on WSAs would be considered significant if management actions "impair the suitability of [WSAs] for preservation as wilderness" (FLPMA Section 603[c]).

Within WSAs, the IMP identifies the guidelines for land use management so as not to impair the suitability of WSAs for preservation as wilderness. Because of the IMP, many resource and resource use proposals would either: (a) not apply, (b) be duplicative, or (c) have a negligible impact (only contain any management action or allowable use decisions that would have little adverse affect or benefit to wilderness study areas). The resource and resource uses that would have an immeasurable or negligible direct impact under any alternative include air quality, climate, soils, water resources, cultural resources, paleontological resources, caves and karsts, forestry, transportation facilities, and public health and safety. Direct and indirect impacts from these programs will not be discussed further in this section. To avoid unnecessary repetition, impacts from special

BLM_0017040

status species are grouped with their respective fish and other aquatic wildlife, terrestrial wildlife, or plants sections.

Terrestrial wildlife resources (including special status species) are a special feature that contributes to an area's wilderness character. Improved aquatic wildlife populations would enhance the supplemental values found within WSAs. Larger and healthier wildlife populations would expand opportunities for primitive and unconfined recreation opportunities, including wildlife study, nature study, hunting, and scientific research.

Since wildlife use BLM lands outside WSAs, as well as inside WSAs, it is likely the proposed stipulations would protect and conserve terrestrial wildlife populations and benefit supplemental values found within WSAs. All alternatives propose a variety of management action and allowable use decisions to protect and conserve native fish and other aquatic wildlife populations. Alternative C followed by Alternative B offers more protective measures than either Alternatives A or D.

## Environmental Consequences

Impacts on Wilderness Study Areas would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on Wilderness Study Areas under any of the four alternatives.

### Alternative A

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** As opposed to Alternatives B, C, and D, there would be no NSO stipulation prohibiting surface occupancy and surface-disturbing activities in WSAs. Proposals would be evaluated on a case-by-case basis. Activities proposed under leases, permits, and mining claims would be subject to the IMP nonimpairment criteria except to the extent a specific proposal is affected by the grandfathered or valid existing rights provision. WSAs, if released by Congress, would undergo a separate planning effort to determine how those lands would be managed, such as managed as LWCs, or managed along with adjacent BLM lands.

**Impacts from Fisheries and Aquatic Wildlife Management.** Fish and other aquatic wildlife resources (including special status species) are special features that contribute to an area's wilderness character. Improved aquatic wildlife populations would enhance the supplemental values found within WSAs. Larger and healthier wildlife populations would expand opportunities for primitive and unconfined recreation opportunities, including wildlife study, nature study, hunting, and scientific research. All alternatives propose a variety of management action and allowable use decisions to protect and conserve native fish and other aquatic wildlife populations. Alternative C followed by Alternative B offers more conservation measures than either Alternatives A or D.

**Impacts from Terrestrial Wildlife Management.** Terrestrial wildlife resources (including special status species) are a special feature that contributes to an area's wilderness character. Improved terrestrial wildlife populations would enhance the supplemental values found within WSAs. Larger and healthier wildlife populations would expand opportunities for primitive and unconfined recreation opportunities, including wildlife study, nature study, hunting, and scientific research.

Within WSAs, the IMP identifies the guidelines for wildlife management so as not to impair the suitability of WSAs for preservation as wilderness. Since wildlife use BLM lands outside WSAs, as well as inside, it is likely the proposed stipulations would protect and conserve terrestrial wildlife populations and benefit supplemental

BLM_0017041

values found within WSAs. All alternatives propose a variety of management action and allowable use decisions to protect and conserve terrestrial wildlife populations. Alternative C followed by Alternative B offers more conservation measures than either Alternatives A or D.

**Impacts from Visual Resource Management.** Current VRM Class II, III, and IV designations (Table 4.4.2-1) allow for changes to the visual landscape and are not compatible with the preservation of wilderness characteristics. This is an inconsistent classification with IMP direction that a low level of contrast must be maintained within WSAs.

**Table 4.4.2-1**
**CRVFO Acres of Visual Resource Management (VRM) Classes in Wilderness Study Areas**

| VRM Class | Alternative A | | | | Alternatives B, C, and D | | | |
|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | I | II | III | IV |
| Bull Gulch WSA (15,200 acres) | 6,000 | 3,530 | 620 | 5,040 | 15,200 | 0 | 0 | 0 |
| Castle Peak WSA (12,200 acres) | 0 | 12,200 | 0 | 0 | 12,200 | 0 | 0 | 0 |
| Eagle Mtn. WSA (320 acres) | 0 | 320 | 0 | 0 | 320 | 0 | 0 | 0 |
| Hack Lake WSA (4 acres) | 0 | 4 | 0 | 0 | 4 | 0 | 0 | 0 |

**Impacts from Wildland Fire Management.** All WSAs are currently managed to allow fire. This would not change under any action alternative (Alternatives B, C, and D). These areas are where unplanned and planned wildland fire may be used to achieve desired objectives such as to improve vegetation, wildlife habitat, or watershed conditions. These areas would be the lowest priority for fire suppression in a multiple fire situation and fuels treatments. WSAs would be the highest priority for emergency stabilization and rehabilitation. It is projected that the current management would continue to lessen the direct and indirect impacts of wildland fire suppression on WSAs and beneficially contribute to ensuring that wilderness characteristics in WSAs would be protected through the life of the plan.

**Impacts from Recreation and Visitor Services Management.** Under all alternatives, the CRVFO would continue to manage recreation and visitor services consistent with IMP guidelines for recreation. Recreational activities that would impair wilderness suitability are prohibited in WSAs. Examples of activities that are allowed in WSAs are hunting, rockhounding, camping, hiking, horseback riding, and fishing and trapping under state and federal laws.

Under Alternative A, SRMAs overlap with the Bull Gulch and the Hack Lake WSAs. Recreation activities and management are subject to limitations aimed at protecting wilderness characteristics. The SRMAs are being managed consistently with the provision of opportunities for primitive and unconfined types of recreation in WSAs.

**Impacts from Comprehensive Trails and Travel Management.** The Eagle Mountain WSA is designated as open to OHV use and the other WSAs are closed to OHV use (Table 4.2.2-2). OHV closure is helping to protect 27,404 acres of WSAs by reducing vehicle presence and impacts within the WSAs. The open area OHV designation for the Eagle Mountain WSA could impact wilderness characteristics. However, the rugged and steep terrain currently restricts vehicles from the WSA. The rugged terrain of the Eagle Mountain WSA has presented a barrier to vehicle intrusions and would probably continue to do so in the future, although advancing technology could make the area accessible and open to impacts from motorized and mechanized travel.

BLM_0017042

**Table 4.4.2-2**
**OHV Area Designations for Wilderness Study Areas**

| OHV Designation | Alternative A | | | Alternatives B, C, and D | | |
|---|---|---|---|---|---|---|
| | Open | Closed | Limited | Open* | Closed* | Limited* |
| Bull Gulch WSA (15,200 acres) | 0 | 15,200 | 0 | 0 | 15,200 | 0 |
| Castle Peak WSA (12,200 acres) | 0 | 12,200 | 0 | 0 | 12,200 | 0 |
| Eagle Mtn. WSA (320 acres) | 320 | 0 | 0 | 0 | 320 | 0 |
| Hack Lake WSA (4 acres) | 0 | 4 | 0 | 0 | 4 | 0 |

*Includes mechanized travel

**Impacts from Livestock Grazing Management.** Eagle Mountain and Hack Lake WSAs receive little to no grazing due to the rugged terrain. Bull Gulch and Castle Peak WSAs are annually grazed by livestock. The BLM utilizes standards (conditions needed to sustain public land health) and guidelines (management tools, methods, strategies, and techniques designed to maintain or achieve healthy public lands as defined by the standards) to assess and manage livestock grazing (BLM 1996). Standards are applied on a landscape scale and relate to the potential of the landscape. CRVFO land health assessments indicate that within the Bull Gulch and Castle Peak WSAs, livestock grazing has not been a factor in the non-achievement of Colorado Public Land Health Standards. In addition, no changes in AUMs are proposed in the grazing allotments overlapping with CRVFO WSAs in any alternative. Applying this information to H-8550-1 Appendix D, Minimum Data Requirements and Maximum Acceptable Impacts for Range Developments and Livestock Grazing Increases, livestock grazing has not and would not exceed IMP maximum allowable impact standards designed to protect the wilderness values in an alternative.

**Impacts from Lands and Realty Management.** As opposed to Alternatives B, C, and D, there is no specific designation of WSAs as ROW exclusion areas under Alternative A. Existing ROWs may be renewed if they are still being used for their authorized purpose. Necessary routine maintenance authorized in the original permit is authorized. New ROWs may be authorized for temporary or permanent uses that satisfy the nonimpairment criteria under certain conditions as described in IMP. Land disposal would be managed under the IMP.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Approximately 27,700 acres of federal mineral estate within WSAs would be designated as closed to fluid mineral leasing under all alternatives. WSAs are open to (a) coal leasing, exploration and development, (b) salable minerals (i.e., moss rock, sand, top soil), and (c) non-energy solid leasable minerals (i.e., sylvite, halite), provided the sale or lease meets the IMP's nonimpairment criteria and that those activities began before the passage of FLPMA. However, no mineral operations currently meet these criteria.

These actions and allowable use decisions support the IMP's nonimpairment criteria and help retain the WSAs natural character. According to IMP, lands under wilderness review may not be closed to appropriation under the mining laws in order to preserve their wilderness character.

**Impacts from Areas of Critical Environmental Concern (Administrative Designations) Management.** In all alternatives, the Bull Gulch WSA and the Bull Gulch ACEC overlap (10,364 acres). The relevant and important values (i.e., scenic, geologic) of the ACEC are special features that also contribute to the wilderness character of the area. The designations are duplicative but harmonious. Management prescriptions to protecting the relevant and important values within the Bull Gulch ACEC are consistent with IMP.

BLM_0017043

_Alternative B (Preferred Alternative)_

Impacts to wilderness study areas from wildland fire management and livestock grazing management would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be as described below.

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** As opposed to Alternative A, a specific NSO stipulation for WSAs is proposed to prohibit surface occupancy and surface-disturbing activities. The stipulation administratively supports the nonimpairment standard in the IMP. Activities proposed under leases, permits, and mining claims would be subject to the stipulation except to the extent a specific proposal is covered by the grandfathered or valid existing rights provision identified in the IMP. By clearly restricting activities and uses that would create new surface disturbances, wilderness characteristics would be assured long-term protection. WSAs, if released by Congress, would be managed under prescriptions set forth in this RMP revision (see Chapter 2, Wilderness Study Areas).

**Impacts from Visual Resource Management.** BLM Instruction Memorandum No. 2000-096 provides clarification on the appropriate VRM class designation for WSAs. Recognizing case-by-case exceptions for valid existing rights and grandfathered uses, IM 2000-096 directs that all WSAs be classified as Class I when preparing RMPs that contain WSAs. The objective of VRM Class I is to preserve the existing character of the landscape. This class provides for natural ecological changes; however, it does not preclude very limited management activity. The level of change to the characteristic landscape should be very low and must not attract attention, thereby helping preserve the visual integrity of the WSAs. Under all action alternatives (Alternatives B, C, and D), WSAs would be designated as VRM Class I (Table 4.2.2-1); therefore, the impacts on WSAs from VRM decisions would be the same for all action alternatives.

**Impacts from Recreation and Visitor Services Management.** The recreation and visitor services program would identify and manage all lands within WSAs as ERMAs where recreation would be planned for and actively managed on an interdisciplinary basis, subject to IMP guidelines for recreation.

**Impacts from Comprehensive Trails and Travel Management.** The BLM would designate all WSAs as closed to OHV travel and closed to mechanized travel. Travel management decisions which close WSAs to motorized and mechanized travel promote opportunities for primitive and unconfined recreation, prevent additional intrusions, and enhance wilderness values which would resulting in long-term benefits.

**Impacts from Lands and Realty Management.** As opposed to Alternative A, Alternatives B, C, and D would designate WSAs as a ROW exclusion area (also applies to renewable energy applications), where no new temporary or permanent ROW proposals would be considered. Existing ROWs may be renewed or maintained if they are still being used for their authorized purpose. This allowable use action would clearly support the IMP and preclude impacts on wilderness characteristics from the authorization of new temporary or permanent ROWs. WSAs would be designated as retention areas (lands retained for long-term management), and land exchanges would not be considered even under very limited cases or unique situations as described in the IMP.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Approximately 27,700 acres of federal mineral estate within WSAs would be closed to fluid minerals leasing under all alternatives (Alternatives A through D). Under Alternatives B, C, and D, WSAs are closed to (a) coal leasing, exploration and development, (b) salable mineral removal (i.e., moss rock, sand, top

BLM_0017044

soil), and (c) non-energy solid leasable mineral development (i.e., sylvite, halite). These allowable use prohibitions administratively protect wilderness characteristics and support the nonimpairment standard in IMP.

### Alternative C

Impacts to wilderness and wilderness study areas from wildland fire management, livestock grazing management and comprehensive trails and travel management would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be the same as or similar to those under Alternative B, except as described below.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** As opposed to the other alternatives, Alternative C proposes to protect and preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation) through special management of lands having those characteristics outside WSAs based on the Draft Wilderness Characteristics Assessment for the CRVFO (Appendix D). The areas include Castle Peak Addition (4,000 acres), Deep Creek (4,400 acres), Flats Tops Addition (3,500 acres), Grand Hogback (11,400 acres), Pisgah Mountain (15,500 acres) and Thompson Creek (8,200 acres). Also included are designation as closed to fluid mineral leasing and an NSO stipulation to protect wilderness characteristics.

The Castle Peak Addition is adjacent to the Castle Peak WSA. The Flat Tops Addition is adjacent to the Hack Lake WSA. Deciding to protect the units for their wilderness characteristics would: (a) create a larger, contiguous, intact landscape to protect naturalness and supplemental values; (b) enhance opportunities for solitude; and (c) and enhance opportunities for primitive and unconfined recreation within the existing Castle Peak WSA and Hack Lake WSA.

### Alternative D

Impacts to wilderness and wilderness study areas from livestock grazing management and comprehensive trails and travel management would be the same as or similar to those under Alternative A. Impacts to management of other resources and uses would be the same as or similar to those under Alternative B.

### Cumulative Impacts

See the combined discussion of cumulative impacts in Section 4.2.12, Lands with Wilderness Characteristics.

BLM_0017045

## 4.4.3   Wild and Scenic Rivers (WSRs)

### Methods and Assumptions

This section is a discussion of the potential impacts of implementing the management actions in this RMP on WSRs, based on the existing conditions of WSR resources described in Section 3.4.4. Section 5(d)(1) of the Wild and Scenic River Act (Public Law 90-542 16 USC, Sections 1271 to 1287) directs federal agencies to consider potential WSRs whenever undertaking a land and water planning effort (for example resource management plan (RMP) and/or land use plan revisions). To fulfill this requirement, the CRVFO completed a WSR eligibility study in September 2002 for the Roan Plateau and in March 2007 for the rest of the CRVFO area. A WSR suitability study is being conducted as part of the current RMP revision process. The *Final WSR Eligibility Reports* identified 26 eligible segments in the CRVFO to be carried forward for analysis in the suitability study. This impact analysis will include analysis of the Roan Plateau eligible segments. The Record of Decision for portions of the Roan Plateau plan amendment (BLM 2007a) found eligible those segments identified in this analysis and protected them with a CSU restriction until a suitability determination is made. These 26 eligible segments serve as the baseline for this impact analysis.

In addition, this section discusses the potential impacts of a range of suitability determinations on four WRNF eligible WSR segments. These segments—two on the Colorado River and two on Deep Creek—were determined eligible in the WRNF Land and Resource Management Plan, 2002 Revision. The WSR suitability determinations for both the BLM and the WRNF, to be implemented as a component of this RMP, would conclude the WSR Suitability Study (Appendix C).

Because implementation of the RMP includes direct WSR administrative determinations, potential impacts are addressed in two separate discussions under each alternative. The first discussion addresses the potential impacts resulting from the administrative WSR determinations described in Chapter 2 of the RMP. The second discussion addresses the potential impacts on WSRs from implementing other resource (not WSR) management actions. Below is a description of the methods used for each of these discussions.

### *Effects Resulting from WSR Determinations*

This discussion focuses on potential impacts on WSR resources from implementing the range of administrative WSR determinations described in Chapter 2. As described above, the BLM and WRNF are conducting a WSR suitability study as part of this RMP, and the alternatives being analyzed address the full range of potential suitability study results. The baseline for the analysis of impacts on wild and scenic resources described in Section 3.4.4 is defined as the final eligibility determinations presented in the March 2007 eligibility study (26 segments were determined eligible) and in the 2002 Forest Plan for the WRNF (WRNF).

The potential administrative WSR determinations being analyzed for each segment are as follows:

- Eligible – This is the "no action" alternative, under which the eligibility determinations in BLM's March 2007 Eligibility Report would remain in place. The WRNF eligibility determinations and subsequent management area prescriptions from the 2002 Forest Plan would remain in place. Under this alternative, no further WSR determinations would be made, and the eligible segments would be managed under guidelines of the Wild and Scenic Rivers Act through agencies' administrative authorities. In addition, the BLM or WRNF would not implement any additional administrative measures to protect these segments, pursuant to its land use planning authorities.

BLM_0017046

- <u>Not Suitable</u> – The BLM and WRNF would make a determination of "not suitable" and the river segment would be managed under other resource allocations and land use prescriptions as adopted in this land use plan. The segment would no longer have protections afforded by the Wild and Scenic Rivers Act for "eligible" stream segments.

- <u>Suitable</u> – The BLM and WRNF would make a determination of "suitable," and the river segment would be managed under the protective provisions of the Wild and Scenic Rivers Act. The BLM would also use resource allocations and land use prescriptions in the land use plan to maintain and enhance the outstandingly remarkable values. Current WRNF management area prescriptions from the 2002 forest plan would remain in place. The BLM would actively recommend designation of these segments to the President and Congress.

- <u>Defer Suitability Determination for Certain Segments, and Adopt Stakeholder Management Plan</u> – The Upper Colorado River Wild and Scenic Stakeholder Group (Stakeholder Group), a broad-based group of stakeholders, has proposed a plan that provides a management alternative for Colorado River Segments 4 through 7, from Gore Canyon within the Kremmling Field Office through a point 1 mile east of the confluence with No Name Creek in the CRVFO (See Appendix Q). Under this alternative, the eligibility determinations made by the BLM and the WRNF would remain in place along with the protections afforded to eligible segments under the Wild and Scenic River Act and other federal administrative authorities. However, the BLM and WRNF would defer its suitability determination for these segments while the Upper Colorado River Wild and Scenic Stakeholder Group Management Plan (Stakeholder Management Plan) was implemented and the effectiveness of the plan was evaluated. A more detailed description of the BLM's and WRNF's proposed oversight of the Stakeholder Management Plan is provided below.

In addition, this analysis considers the potential impacts of federal WSR designation. Formal designation would require an act of Congress and therefore is beyond the scope of this RMP. However, a BLM and/or WRNF's determination of suitability would increase the likelihood of a particular segment's being formally designated a WSR by Congress. Therefore, these segments are analyzed below to identify the potential effects of congressional designation.

<u>Analysis Framework</u>. The level of protection of a river segment's free-flowing nature, ORVs, and classification afforded by the various components of protective river management (Table 4.4.3-1), such as data collection, ease of implementation, and response to other projects, was used to identify the extent of protective measures to be implemented under different WSR determination scenarios. The net level of protection afforded each segment is the basis for determining potential impacts. There are multiple concepts that are important for interpreting the impact analysis found in the matrix:

<u>Wild and Scenic River Act Protections.</u> There are two levels of protection afforded to stream reaches under the Wild and Scenic Rivers Act. The first level of protection occurs as a result of WSR analysis conducted by a land management agency. A BLM and WRNF determination of eligibility or suitability obligates the agencies within its authority to manage the segments for the protection of their free-flowing nature, ORVs, and tentative classification. The BLM and WRNF are also obligated to protect the water quality necessary to support the ORVs. It is important to note that the agencies can change their eligibility or suitability determinations with a land use plan amendment or revision. Therefore, protections under the Wild and Scenic Rivers Act short of a designation by Congress cannot be considered permanent protections. When a segment is added to the NWSRS by Congress, obligations on the federal land management agencies are

BLM_0017047

formalized and made permanent. In addition, the BLM and WRNF would be required to formulate a coordinated resource management plan with cooperating agencies and stakeholders to maintain and enhance outstandingly remarkable values in the river segment. In addition, all other federal agencies are obligated to protect WSR values in their decisions on proposed actions that may affect the stream segment. For example, the U.S. Army Corps of Engineers would be required to protect WSR values in making decisions regarding dredge and fill permits under Section 404 of the Clean Water Act. Similarly, the U.S. Bureau of Reclamation would be required to protect WSR values in making decisions regarding new projects or new storage contracts.

Land Use Planning Protections. The BLM has authorities other than the Wild and Scenic Rivers Act that can be used to protect and enhance ORVs, protect the free-flowing nature of stream segments, protect the level of classification, and protect water quality that supports the ORVs. These authorities are primarily found under Sections 202, 204, and 205 of FLPMA. These sections provide the BLM with authority to make administrative designations as part of a land use planning decision, such as designating specific locations as an ACEC or SRMA. In addition, the BLM can make land use allocations as part of a land use plan, such as closing specific areas to new rights-of-way, or placing stipulations on usage, such as an NSO. Sections 205 and 206 of the Federal Land Policy and Management Act provide authority to acquire private lands from willing sellers, and to exchange lands with other parties, both of which can be used to protect and enhance river-related values. It is important to note that land use planning protections are not permanent, and such protections can be modified or removed by the BLM by amending the land use plan or modifying the protections in a comprehensive land use plan revision. In the following matrix that identifies impacts, the protections for river-related values that are provided by land use planning decisions are referred to as "Land Use Planning Protections."

Like the BLM, the WRNF has land use planning authorities other than the Wild and Scenic Rivers Act that can be used to protect resources including identified WSR values. These authorities are found in the Forest and Rangeland Renewable Resources Planning Act (RPA) as amended by the National Forest Management Act of 1976, (NFMA), FLPMA, NEPA, Organic Administration Act of 1897, and Multiple-Use Sustained-Yield Act of 1960. These Acts provide the WRNF authority to make administrative decisions and subsequent management direction for all National Forest System lands as part of the land use planning process. A forest plan provides guidance for all resource management activities. It establishes forest wide goals and objectives, management requirements (standards and guidelines), desired conditions, direction for specific management areas, monitoring and evaluation requirements, designation of lands as suitable or not suitable for resource management activities, and recommendations to Congress for establishment of wilderness areas, wild, scenic, and recreational river eligibility and other special designations. No recommendations to Congress for WSR designation have occurred to date on the WRNF. This planning process will analyze the suitability of four segments on two rivers found to be eligible in the 2002 Forest Plan.

Protections under Other Federal Laws. Federal agencies have additional authorities to protect WSR values under other federal laws. These laws include the Federal Water Pollution Control Act of 1986, as amended and the Clean Water Act of 1977, as amended. Specifically, Sections 208 and 303 of the Clean Water Act provide authority for implementation of water quality planning processes and best management practices with state governments. In addition, the Presidential Executive Order 11988 regarding Floodplain Management provides authority to federal agencies to take actions to preserve and enhance floodplain functions. Since implementation of these authorities is unlikely to differ between determinations that stream segments are

BLM_0017048

eligible or suitable under the Wild and Scenic Rivers Act, they are not discussed in the following matrix that displays WSR impacts.

Protection of Flow-Related ORVs. While both agencies are obligated to use their legal authorities to protect ORVs in eligible, suitable, or designated river segments, they do not possess comprehensive authority to manage flows through these segments. The federal government has delegated authority to state governments for water allocation, and accordingly, cannot control flow rates. For most of the river segments that have been designated as eligible, there are a substantial number of existing water rights that have been created pursuant to Colorado water law procedures. Administration of these water rights and their relative priorities drives the flow rates experienced in these segments.

BLM and WRNF authorities related to flow rates are primarily found within FLPMA, which allows the agencies to make decisions on land use authorizations for water facilities on BLM and WRNF lands. Both agencies have the discretion to deny applications for new facilities or modification of existing facilities, or attach terms and conditions to an authorization for the purpose of protecting flow rates necessary to support ORVs.

The other flow-related authority that the BLM and the WRNF can rely upon is within the Wild and Scenic Rivers Act, and this authority is conferred upon the BLM and WRNF when a river segment is designated by Congress into the NWSRS. Designation creates federal reserved water with a priority date that is equal to the date of designation. The BLM and WRNF quantify the flow rates necessary to support the ORVs and seek an adjudication of the water right through the Colorado water court system. Since the water right is junior, it cannot prevent or change the exercise of senior water rights, but it can assist in preserving current flow regimes.

Stakeholder Management Plan Analysis Assumptions. As mentioned previously, a broad-based group of stakeholders has proposed a river management plan for Colorado River Segments 4 through 7 (Appendix Q). Since the detailed Stakeholder Plan was received immediately prior to publication deadlines, the BLM and WRNF found it necessary to make multiple assumptions in order to complete a NEPA analysis of the alternative. These assumptions are listed below.

- The Stakeholder Management Plan will ultimately be formally supported by a broad range of stakeholder groups and ultimately formally endorsed by their respective boards.

- The Stakeholder Management Plan will comprehensively address Colorado River Segment 7 in Glenwood Canyon. The plan will ultimately be formally supported by a broad range of stakeholders who operate in the Eagle River watershed, because flows in the Eagle River have a significant impact on Segment 7.

- The Stakeholder Management Plan will have adequate indicators for the status of the various ORVs within the river segments and provide adequate flow rates to support the ORVs.

- The Stakeholder Management Plan will have a provisional period in which the ORV indicators and the range of flow rates necessary to support the ORVs are further refined and verified.

- Sufficient funds and personnel time to operate the Stakeholder Management Plan alternative will be provided by members of the Stakeholder Group.

BLM_0017049

- The Stakeholder Group will consider changes to their proposed plan that are suggested by the public review of the plan that will occur through this EIS process.

- The final Stakeholder Management Plan will consider hydrologic changes created by the authorization of the Windy Gap Firming Project (Northern Colorado Water Conservancy District) and the Moffat Tunnel Firming Project (Denver Water Board), and implement actions necessary to insure that ORVs continue to be supported even when these projects are operating.

- One of the primary advantages offered by the Stakeholder Management Plan is a commitment to operate existing water management facilities to provide flow rates that support the ORVs, to the extent that such operations can be consistent with water supply and water yield requirements for the owners of the facilities. This commitment addresses an element that is critical to the long-term viability of the ORVs but is an element over which the BLM and the WRNF do not have management authority. In addition, the Stakeholder Management Plan proposes an instream flow appropriation on Colorado River Segments 4 through 7 by the Colorado Water Conservation Board (CWCB). While the BLM could also make an instream flow recommendation to the CWCB, such a recommendation would likely not be approved without broad support from stakeholders who are working toward creation of the Stakeholder Management Plan. It is important to note that an instream flow water right held by the CWCB would not be able to protect flows needed to support the recreational ORV because CWCB appropriations are limited to flows necessary to support the natural environment. However, the stakeholder commitment to operate facilities to support ORVs would be able to assist in providing flows necessary to support the recreational ORV.

Stakeholder Management Plan Oversight. If the BLM and WRNF choose to adopt the Stakeholder Management Plan for Colorado River Segments 4 through 7, they cannot delegate their WSR management responsibilities to the Stakeholder Group. The BLM and WRNF will remain responsible for insuring that the ORVs, classification, and free-flowing nature of the portions of the river segments that are on federal land are protected. Accordingly, if the BLM and/or the WRNF choose to adopt the Stakeholder Management Plan, the agencies will implement the following oversight mechanisms:

- The BLM will proceed to amend its land use plan to include a determination that Colorado River Segments 4 through 7 will be managed as eligible. The BLM and USFS will defer a suitability determination while it evaluates the effectiveness of the Stakeholder Management Plan in protecting the ORVs. The deferral will continue as long as the BLM and USFS determine the plan is effective. If the BLM and USFS determine that the Stakeholder Management Plan is not effective in protecting the ORVs, or lacks sufficiently broad-based support to continue to serve as a viable management alternative, the BLM will initiate a process to complete a suitability determination for Colorado River Segments 4 through 7.

- In conjunction with the WRNF, the BLM will establish a multi-disciplinary review team comprised of resource specialists and managers from both agencies. The review team will meet annually to determine whether the Stakeholder Management Plan is effective in supporting and protecting the ORVs. To make its determination, the review team may utilize WSR management criteria found in agency manuals and directives, annual reports and information provided by the Stakeholder Group, and information collected by agency personnel. The agency review team may also elect to consider sources of information concerning the status of ORVs that are created independently of studies conducted by the Stakeholder Group. These additional sources of information may include studies by independent consultants or reports of management outcomes produced in other forums, such as

BLM_0017050

within the implementation of BLM's Special Recreation Management Area for the Colorado River, or within BLM-USFS cooperative management of Glenwood Canyon.

- The BLM and USFS will initiate a partnership with the Stakeholder Group to facilitate coordination and communication. The partnership will include a commitment by the BLM to send staff members to Stakeholder Group meetings, and to schedule periodic meetings exclusively for the purpose of coordinating actions between the federal agencies and the Stakeholder Group. The federal agencies will also commit to communicating to the Stakeholder Group any early indications that the Stakeholder Management Plan is not effectively supporting the ORVs.

- The BLM and/or the USFS will reserve the right to make a suitability determination at any time in response to a proposed project that could threaten the ORVs, classification, or free-flowing qualities of Colorado River Segments 4-7. Before doing so, the BLM and/or the USFS will give the Stakeholder Group the opportunity to communicate with the project proponent. The purpose of this communication would be to determine if the proponent is willing to take advantage of the processes afforded to project proponents in the Stakeholder Management Plan.

- The BLM and USFS will require agency approval of any project proposed by the stakeholders under the plan to be implemented on federal lands. This process will allow NEPA analysis to be performed and will allow the federal agencies to determine whether the proposed project meets the requirements of the Wild and Scenic Rivers Act for eligible stream segments.

- The BLM and USFS will require the Stakeholder Group to advertise meetings at which members of the public may provide comment on operation of the Stakeholder Management Plan. The BLM and USFS will also consider public comments as part of the federal agencies' annual evaluation of the effectiveness of the Stakeholder Management Plan.

BLM_0017051

**Table 4.4.3-1**
**Wild and Scenic Rivers Analysis Framework**

| River Protection Element | Determination of Not Suitable | Eligibility Determination (No Action) | Suitability Determination | Suitability Deferral plus adoption of Stakeholder Management Plan (Colorado River Segments 4 through 7) | Wild & Scenic Designation by US Congress |
|---|---|---|---|---|---|
| *These elements represent the various components of protective river management. The focus is the protection of a particular river segment's free-flowing nature, ORVs, and classification.* | *Note to the BLM and WRNF: This column presents the management options available for segments determined to be not suitable for inclusion in the National Wild and Scenic Rivers System (NWSRS). This determination would complete the assessment of the segment and remove its current status as an eligible river segment.* | *Note to the BLM and WRNF: This column presents the management options available for segments remaining as eligible. The suitability study currently underway would not be completed and segments would remain eligible as identified in the BLM March 2007 study and USFS 2002 plan.* | *Note to the BLM and WRNF: This column presents the management options available for segments determined to be suitable. A suitability determination is an administrative determination and does not directly result in federal designation as part of the NWSRS. However, it would increase the likelihood of formal designation as a WSR.* | *Note to the BLM and WRNF: This column presents the management options available for segments determined to be suitable and which would be managed through the adoption of the Stakeholder Management Plan. Such segments would not be recommended to Congress for formal designation.* | *This column presents the potential management options available for the protection of river segments as Congressionally designated WSR. Such a designation is beyond the scope of this RMP and the authority of the federal agencies, but is explored in this impact analysis because a suitability determination would increase the potential for formal Congressional designation.* |
| Data collection on characteristics, quality, and extent of ORVs | The BLM and WRNF would collect data only as needed to address emerging resource problems. | The BLM and WRNF would collect data only as needed to address emerging resource problems. | The BLM and WRNF would collect data only as needed to address emerging resource problems and to meet management objectives established in the resource management plan for the segment. | Engage a broad range of stakeholders, who are bringing additional resources to the table, to collect and evaluate data for all the flow-dependent ORVs. | Engage a broad range of stakeholders, within the context of a coordinated resource management plan, to collect and evaluate data for all the flow-dependent ORVs. |
| Data collection to monitor any impairment of ORVs | The BLM and WRNF would continue to collect data relevant to ongoing management of existing programs, such as recreation management. ORVs may not receive dedicated monitoring resources. | The BLM and WRNF would continue to collect data relevant to ongoing management of existing programs, and would initiate data collection on ORVs with clear threats. | The BLM and WRNF would collect data only as needed to address emerging resource problems and to meet management objectives established in the resource management plan for the segment. | Establishment of schedule and protocol to continuously collect data to monitor changes in ORVs (early warning system). | The BLM and WRNF would likely partner with state and local agencies to identify data and establish framework for periodic monitoring, triggered when on-the-ground observations detect resource changes. |

BLM_0017052

**Table 4.4.3-1**
**Wild and Scenic Rivers Analysis Framework**

| River Protection Element | Determination of Not Suitable | Eligibility Determination (No Action) | Suitability Determination | Suitability Deferral plus adoption of Stakeholder Management Plan (Colorado River Segments 4 through 7) | Wild & Scenic Designation by US Congress |
|---|---|---|---|---|---|
| **Monitoring of overall plan effectiveness in protecting river corridors and ORVs** | The river corridor would be managed under the agencies' land use plans, updated on 15-20-year cycle. A comprehensive review of plan effectiveness may not occur until plan revision, but the federal agencies would likely be aware of issues where plan decisions are not working well and may implement plan amendments. | The river corridor would be managed under the agencies' land use plans, updated on 15-20-year cycle. A comprehensive review of plan effectiveness may not occur until plan revision, but the agencies would likely be aware of issues where plan decisions are not working well, and may implement plan amendments.<br><br>*Note to the BLM and WRNF: This assumes that the RMP currently being developed would be completed but would exclude suitability determinations.* | The river corridor would be managed under the agencies' land use plans, updated on 15-20-year cycle. In cases where conditions are changing or clear threats exist to ORVs, agencies would implement monitoring to determine effectiveness of plan. | The BLM and WRNF would receive annual updates from the Stakeholder Group on plan effectiveness. The agencies would convene an interdisciplinary team to review and confirm findings in the update and to communicate on-the-ground concerns back to the Stakeholder Group for actions that are within the authorities of the Stakeholder Group. If the plan is deemed by the BLM and the USFS to not be effective, it has an option to recommend WSR designation to Congress. | The BLM and WRNF would be required to complete a Comprehensive River Management Plan within 3 years of designation and update it on a regular basis. This update would require the BLM and WRNF to implement a process to determine if actions in the plan effectively addressed the critical resource issues that were identified. |
| **Flow protection: how quickly can it be implemented?** | The BLM and WRNF could make recommendations to the Colorado Water Conservation Board (CWCB) for instream flow protection. The CWCB can appropriate flows only for protection of the natural environment, and cannot appropriate flows to protect recreation uses. The recommendations process | The BLM and WRNF could make recommendations to the Colorado Water Conservation Board (CWCB) for instream flow protection. The CWCB can appropriate flows only for protection of the natural environment, and cannot appropriate flows to protect recreation uses. The recommendations process | The BLM and WRNF could make recommendations to the Colorado Water Conservation Board (CWCB) for instream flow protection. The CWCB can appropriate flows only for protection of the natural environment, and cannot appropriate flows to protect recreation uses. The recommendations process | The Stakeholder Group would make instream flow recommendations to the CWCB. With this unanimity of support, it is likely that protection could be implemented within 2 years. Cooperative efforts to improve stream flows via coordinated management of water facilities could begin on formal adoption of | Flow protection could not be implemented until Congress formally designates the stream reaches, the BLM and WRNF collects the data necessary to support an application for a federal reserved water right, and the Colorado Water Court acts. Interim flow protection would rely on existing downstream |

BLM_0017053

**Table 4.4.3-1**
**Wild and Scenic Rivers Analysis Framework**

| River Protection Element | Determination of Not Suitable | Eligibility Determination (No Action) | Suitability Determination | Suitability Deferral plus adoption of Stakeholder Management Plan (Colorado River Segments 4 through 7) | Wild & Scenic Designation by US Congress |
|---|---|---|---|---|---|
| | usually requires at least 3 years on major rivers. The BLM and WRNF could participate in existing cooperative flow management efforts, but these forums are not focused on supporting ORVs. | usually requires at least 3 years on major rivers. The BLM and WRNF could participate in existing cooperative flow management efforts, but these forums are not focused on supporting ORVs. | usually requires at least 3 years on major rivers. The BLM and WRNF may be able to accelerate protection by working with partners, such as Colorado Division of Wildlife, to conduct studies and make a joint instream flow recommendation. | Stakeholder Management Plan. | senior water rights and existing instream flow water rights located downstream. |
| **Flow protection: how permanent is the mechanism?** | A federal reserve instream flow water right would not be created. If appropriated, a CWCB-based instream flow is held indefinitely as a public trust by the state. However, the right can be modified via actions of the board. | A federal reserve instream flow water right would not be created. If appropriated, a CWCB-based instream flow is held indefinitely as a public trust by the state. However, the right can be modified via actions of the board. | A federal reserve instream flow water right would not be created. If appropriated, a CWCB-based instream flow is held indefinitely as a public trust by the state. However, the right can be modified via actions of the board. | A CWCB-based instream flow is held indefinitely as a public trust by the state, but the right can be modified by the board. Cooperative flow management via coordinated operation of facilities depends on ongoing commitments from facilities operators. Other measures, such as delivery of water to endangered fishes and senior water rights, rely on continuation of administrative efforts, not on legally mandated protection. | Federal reserved water would be in place permanently and could be modified only through formal court proceedings. The BLM and WRNF would be obligated to promptly quantify, adjudicate, and perfect the water right. |
| **Flow protection: how effective is the mechanism? Can the protection** | A CWCB water right, if adopted, would be a junior water right and could not address flow issues created | A CWCB water right, if adopted, would be a junior water right and could not address flow issues created | A CWCB water right, if adopted, would be a junior water right and could not address flow issues created | A CWCB water right would be a junior water right and could not address flow issues created by operation | A federal reserved water right could claim flows needed to protect the recreation ORV. A |

BLM_0017054

Table 4.4.3-1
Wild and Scenic Rivers Analysis Framework

| River Protection Element | Determination of Not Suitable | Eligibility Determination (No Action) | Suitability Determination | Suitability Deferral plus adoption of Stakeholder Management Plan (Colorado River Segments 4 through 7) | Wild & Scenic Designation by US Congress |
|---|---|---|---|---|---|
| mechanism cooperatively address existing and future flow-related problems? | by operation of senior water rights. A CWCB water right also cannot address flow protection for the recreational ORV. A CWCB water right would be able to address changes in flows created by proposed new water rights by proposed changes to existing rights. | by operation of senior water rights. A CWCB water right also cannot address flow protection for the recreational ORV. A CWCB water right would be able to address changes in flows created by proposed new water rights by proposed changes to existing rights. | by operation of senior water rights. A CWCB water right also cannot address flow protection for the recreational ORV. A CWCB water right would be able to address changes in flows created by proposed new water rights by proposed changes to existing rights. | of senior water rights. A CWCB water right also cannot address flow protection for the recreational ORV. A CWCB water right would be able to address changes in flows created by proposed new water rights by proposed changes to existing rights. With broad stakeholder support and monitoring, it is highly likely that the CWCB right would be effectively implemented and enforced. Coordinated management of existing facilities would enable the Stakeholder Group to address issues created by operation of existing water rights. | federal reserved water right would be a junior water right and could not address flow issues created by operation of senior water rights. A federal reserved water right would be able to address changes in flows created by proposed new water rights by proposed changes to existing rights. |
| Protection of water quality to support the ORVs, including temperature | The BLM and WRNF would continue to participate in state water quality processes to comment on proposed permits, standards, and water quality improvement projects. | Other federal agencies considering permit applications that could affect ORVs would be required to seek formal comments from the BLM and the USFS. The other agencies are not required to act on the BLM and WRNF's comments. The BLM and WRNF would | Other federal agencies considering permit applications that could affect ORVs would be required to seek formal comments from the BLM and the USFS. The other agencies are not required to act on BLM and WRNF's comments. The BLM and WRNF would not be able | Stakeholder group would consider voluntary and proactive steps, such as modification of water project operations, to address water quality issues. Stakeholder group would also rely upon BLM and USFS land management prescriptions to address water quality issues. | Other federal agencies considering permit applications that could affect ORVs would be required to seek formal comments from the BLM and the USFS. Other federal agencies would be prohibited from approving projects that unreasonably |

Table 4.4.3-1
Wild and Scenic Rivers Analysis Framework

| River Protection Element | Determination of Not Suitable | Eligibility Determination (No Action) | Suitability Determination | Suitability Deferral plus adoption of Stakeholder Management Plan (Colorado River Segments 4 through 7) | Wild & Scenic Designation by US Congress |
|---|---|---|---|---|---|
| | | not be able to permit projects on its lands that would unreasonably diminish water quality that is necessary to support ORVs. | to permit projects on its lands that would unreasonably diminish water quality that is necessary to support ORVs. Water quality issues in the segment would be addressed via land use plan protections and via coordination with other state, federal, and local agencies. | | diminish the water quality necessary to support the ORVs. The BLM and the USFS would not be able to permit projects on its lands that would unreasonably diminish water quality or adversely affect the ORVs. |
| Response to water projects that could affect ORVs and classification | There is no legal requirement for The BLM and WRNF to comment to other federal agencies on new projects, but the BLM and the USFS would be free to submit resource-oriented comments to the decision making agency. On the BLM and WRNF lands, terms and conditions would be applied to projects to minimize resource impacts. | Other federal agencies considering permit applications that could affect ORVs would be required to seek formal comments from the BLM and WRNF. The other agencies are not required to act on the BLM's or USFS's comments. The BLM and WRNF would not be able to permit projects on its lands that would adversely affect the ORVs. | Other federal agencies considering permit applications that could affect ORVs would be required to seek formal comments from the BLM and the USFS. The other agencies are not required to act on BLM's or WRNF's comments. The BLM and WRNF would not be able to permit projects on its lands that would adversely affect the ORVs. | Entities seeking to build new water projects would be encouraged with incentives to opt in to a program in which the Stakeholder Group would suggest project configurations and mitigation measures that would protect the ORVs. | Other federal agencies considering permit applications that could affect ORVs would be required to seek formal comments from the BLM and WRNF. Projects that unreasonably diminish the ORVs or invade the protected river corridors would be prohibited. No federal agency would be able to permit projects that would adversely affect the ORVs. |
| Response to other land-based river corridor projects that could affect ORVs and | There is no legal requirement for comments on consultations between federal agencies on new projects, but the BLM and | Other federal agencies considering permit applications that could affect ORVs would be required to seek formal | Other federal agencies considering permit applications that could affect ORVs would be required to seek formal | The Stakeholder Management Plan does not suggest any actions in this area. | Other federal agencies considering permit applications that could affect ORVs would be required to seek formal |

BLM_0017056

Table 4.4.3-1
Wild and Scenic Rivers Analysis Framework

| River Protection Element | Determination of Not Suitable | Eligibility Determination (No Action) | Suitability Determination | Suitability Deferral plus adoption of Stakeholder Management Plan (Colorado River Segments 4 through 7) | Wild & Scenic Designation by US Congress |
|---|---|---|---|---|---|
| classification (bridges, roads, power lines, etc.) | WRNF would be free to submit resource-oriented comments to the decision making agency. On the BLM lands, terms and conditions would be applied to projects to minimize resource impacts. | comments from the BLM and WRNF. The other agencies are not required to act on the BLM and WRNF comments. The BLM and WRNF would not be able to permit projects on its lands that would adversely affect the ORVs, or terms and conditions would be applied to avoid resource impacts. | comments from the BLM and WRNF. The other agencies are not required to act on the BLM and WRNF comments. The BLM and WRNF would not be able to permit projects on its lands that would adversely affect the ORVs, or terms and conditions would be applied to avoid resource impacts. Land use plan protections would be in place to avoid impacts on ORVs and classification. | | comments from the BLM and the USFS. Projects that unreasonably diminish the ORVs or invade the protected river corridors would be prohibited. No federal agency would be able to permit projects on lands that would adversely affect the ORVs, or terms and conditions would be applied to avoid resource impacts. |
| Integration of protection with other ongoing resource management programs | The BLM and WRNF would initiate coordination between programs, between agencies, and with stakeholders on an as-needed basis, as resource management problems arise. | River corridors would be managed according to protective provisions in the BLM and WRNF land use plans. | The river corridor would be managed according to protective provisions in the BLM and WRNF land use plans. All land use plan allocations and prescriptions for all resource management programs will be designed to insure support for the ORVs and to maintain the segment classification. | The Stakeholder Group would rely on the BLM and WRNF land use plans for management of land use issues on the BLM and WRNF lands. For issues where BLM and WRNF lack management authority (water rights operations, wildlife populations, etc). The Stakeholder Group would seek to integrate management on a real-time basis with other stakeholders in the basin. For example, the Stakeholder Group would | Development of comprehensive resource management plan would require cooperation and integration with plans of other state and federal agencies. Issues outside the BLM's and WRNF's management authority (water rights operation, wildlife population management, etc.) may not be addressed in the plan. |

BLM_0017057

Table 4.4.3-1
Wild and Scenic Rivers Analysis Framework

| River Protection Element | Determination of Not Suitable | Eligibility Determination (No Action) | Suitability Determination | Suitability Deferral plus adoption of Stakeholder Management Plan (Colorado River Segments 4 through 7) | Wild & Scenic Designation by US Congress |
|---|---|---|---|---|---|
| | | | | assist with integrating river corridor flow management with the water rights system and with the endangered fishes recovery program. | |
| Ability to implement adaptive management as conditions change | The BLM and WRNF would implement adaptive management with existing cooperators as resource management issues arise. However, certain resource issues that are critical to certain ORVs, such as flow management, may not be addressed because they are not within the BLM's and WRNF's management authority. | The BLM and WRNF would manage resources in accordance with the land use plans. If an adaptive management decision were determined to be at the "implementation level" with regard to the land use plan, the adaptive management could be implemented without amending the land use plans. Major changes in land use management driven by adaptive management objectives would require a land use plan amendment. | The BLM and WRNF would manage resources in accordance with land use plans. If an adaptive management decision were determined to be at the "implementation level" with regard to the land use plan, the adaptive management could be implemented without amending the land use plan. Major changes in land use management driven by adaptive management objectives would require a land use plan amendment. The BLM and WRNF would be likely to implement activity-level plans to guide implementation-level decisions. | The Stakeholder Group recognizes that existing data for the quality, extent, and condition of the ORVs is incomplete and that information is incomplete on flows needed to support the ORVs. The group has suggested a process for continual review of new data and a process to implement corrective actions if data suggest degradation of ORVs. | The requirement to publish a coordinated resource management plan for the river corridor would require the BLM and WRNF to make a long-term commitment to management decisions that could only be changed with a formal plan amendment. To promote adaptive management, the plan could identify where and when adaptive management will occur, and could define the parameters and limits for adaptive management. |

BLM_0017058

Table 4.4.3-1
Wild and Scenic Rivers Analysis Framework

| River Protection Element | Determination of Not Suitable | Eligibility Determination (No Action) | Suitability Determination | Suitability Deferral plus adoption of Stakeholder Management Plan (Colorado River Segments 4 through 7) | Wild & Scenic Designation by US Congress |
|---|---|---|---|---|---|
| **Financial, personnel, and other resources available to maintain and enhance ORVs** | Management of ORVs would be within existing budgets and existing BLM and WRNF agreements with other entities. Funding would typically not be available to address flow management issues. | Funds available are limited to requests made through the annual budget cycle and are typically project-specific funds, rather than long-term funds. Funding would typically not be available to address flow management issues. | Funds available are limited to requests made through the annual budget cycle and are typically project specific rather than long term. Projects on suitable segments typically receive higher priority than projects on eligible or non-suitable segments. Funding would typically not be available to address flow management issues. | The Stakeholder Group would commit to permanent long-term engagement on issues of concern within the river corridor and may be able to bring additional resources to bear on river management issues. The Stakeholder Group would be a logical group to apply to grant funds that may benefit the river corridor. The Stakeholder Group may be able to bring substantial resources to bear on flow management issues. | Typically, the BLM and WRNF Washington office make additional funds available for completion of a CRMP, and typically make dedicated funds available for management of the WSR. However, these funds may not be sufficient to address all issues facing the river segment, such as flow management issues. |
| **Uses on private lands within river corridor that could affect quality of ORVs, classification, and stream flows** | The BLM and WRNF would coordinate and cooperate with local governments on land use issues. | The BLM and WRNF would coordinate and cooperate with local governments on land use issues. | The BLM and WRNF would coordinate and cooperate with local governments on land use issues, and may provide technical assistance. The BLM and WRNF would be likely to actively comment on and participate in decisions made by local governments. | The Stakeholder Group has not yet addressed this issue. The Stakeholder Group plans to rely on the BLM and WRNF management actions and authorities for management of public lands to protect ORVs and free-flowing qualities. | Through the cooperative resource management plan process, local governments would be formally encouraged to cooperate with the BLM and WRNF on land use issues. The BLM and WRNF would proactively work with local governments to encourage zoning, ordinances, long-term plans, and local government land |

Table 4.4.3-1
Wild and Scenic Rivers Analysis Framework

| River Protection Element | Determination of Not Suitable | Eligibility Determination (No Action) | Suitability Determination | Suitability Deferral plus adoption of Stakeholder Management Plan (Colorado River Segments 4 through 7) | Wild & Scenic Designation by US Congress |
|---|---|---|---|---|---|
| | | | | | acquisitions that would protect and enhance river-related values. |
| **Projects on private lands that could affect ORVs, classification, and stream flows (stream diversions, riprapping stream banks, etc.)** | Through normal coordination and cooperation processes with local governments and private landowners, the BLM and WRNF would encourage projects that minimize impacts. | Through normal coordination and cooperation processes with local governments and private landowners, the BLM and WRNF would encourage projects that minimize impacts. | The BLM and WRNF would be likely to formally comment on projects requiring local government approval and may provide technical assistance to local governments and private landowners to design projects that minimize impacts. | The Stakeholder Group has not indicated whether it intends to address this issue. | All federal agencies would be prohibited from authorizing or assisting with projects that create significant and negative impacts. The BLM and WRNF would formally comment on projects requiring local government approval and provide technical assistance to local governments and private landowners to design projects that minimize impacts. |

### *Effects on potential WSR Segments from Implementation of Other Resource Management Actions*

This discussion focuses on the impacts on WSR segments from implementation of other resource management actions described in Chapter 2 of the RMP. For this analysis, WSR segments are defined as those determined to be eligible or suitable under each particular alternative. There are currently no designated WSR segments in the CRVFO to be considered.

In order for a resource management action to have an effect on a WSR segment, it must result in a potential change to the segment's free-flowing nature, ORVs, or tentative classification.

## Environmental Consequences

Impacts on WSR management would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on Wild and Scenic Rivers management under any of the four alternatives.

### *Alternative A*

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The CRVFO would continue to manage the 26 segments identified in Chapter 2 as eligible for inclusion in the NWSRS and would protect the free-flowing nature, associated ORVs, and tentative classifications as wild, scenic, or recreational until suitability is determined on 88.1 miles of river.

Implementation of Alternative A would be a continuation of current management and would not result in effects on WSR segments. Instead, it would continue to provide a long-term beneficial impact on the characteristics associated with WSRs because they would continue to be protected under the eligibility determination. Management methods implemented by the BLM for eligible segments are described above in Table 4.4.3-1.

The primary effect on other resources and land uses from the continued management of 26 eligible segments would be related to BLM's permit approval authorities. For permit applications under BLM authority, the BLM would not permit projects that would adversely affect the free-flowing nature of any of the 26 WSR segments, its ORVs, or its tentative classification. Other federal agencies considering permit applications (not under BLM authority) that could affect the free-flowing nature, ORVs, or tentative classification for any of the 26 WSR segments in the CRVFO would be required to seek formal comments from the BLM. The other agencies are not required to act on BLM's comments, so the effect on WSR segments would depend on decisions outside BLM authority. A secondary effect from the continued management of the 26 segments as eligible would be an increase in awareness of the river-related values associated with these segments. Increased awareness may result in additional project proposals to protect and enhance the values and increased cooperative measures with other agencies that assist in managing these values, such as the Colorado Division of Wildlife.

Alternative A would not make any suitability determinations, which makes Congressional designation of any WSR segments in the CRVFO unlikely. Therefore, no analysis of effects resulting from congressional WSR designation was conducted for Alternative A. The WSR segments for Alternative A are defined as the 26 eligible segments shown in Table 2-2. Impacts on WSR segments resulting from implementing other resource management actions would be considered negligible because allowable uses in each WSR stream segment corridor would be restricted so as not to adversely affect the tentative classification, free-flowing nature, or

BLM_0017061

ORVs identified for each stream segment. Additional beneficial impacts would be experienced where other special management designations overlap a stream segment, thereby providing an additional layer of protection.

**Impacts from Soils Management.** Soils NSO and CSU stipulations would protect ORVs. Stipulation GS-NSO-14 for the debris flow hazard zone would prohibit surface occupancy and surface-disturbing activities within Mitchell Creek's corridor. Stipulation GS-NSO-15 for slopes steeper than 50 percent for oil and gas facilities would prohibit surface occupancy and surface-disturbing activities on slopes greater than 50 percent for all segments except the Roan Plateau segments. Stipulation GS-CSU-4 for slopes steeper than 30 percent on erosive soils would require special design, construction, operation, and reclamation measures to limit the amount of surface disturbance, to reduce erosion potential, to maintain site suitability and productivity, and to ensure successful reclamation in identified areas of highly erosive soils and of slopes greater than 30 percent. This would affect the Colorado River, Hack Creek, Abrams Creek, Deep Creek, Mitchell Creek, Thompson Creek, and Battlement Creek segments. These stipulations will help to protect the ORVs of fish, scenic, geologic, and ecologic.

**Impacts from Water Resources Management.** All eligible stream segments on the Roan Plateau are within Watershed Management Areas, pursuant to the Roan Plateau Land Use Plan, adopted in 2008. The actions, protective stipulations, and land use prescriptions identified in the ROD would be adequate to protect the identified ORVs of fish, scenic, and botanic (BLM 2008b). All segments within East Fork Parachute Creek and East Middle Fork Parachute Creek Complex on the Roan Plateau would benefit additional protection measures prescribed in the Roan Plateau land use plan for Watershed Management Areas.

**Impacts from Vegetation Management – Riparian.** Stipulation GS-NSO-2 for riparian and wetland zones would prohibit surface occupancy and surface-disturbing activities within riparian vegetation and would affect all segments except the Roan Plateau segments. This stipulation specifies that surface-disturbing activities within 500 feet of the outer edge of the riparian or wetland vegetation may require special design, construction, and implementation measures, including relocation of operations beyond 200 meters. This would maintain the integrity of these areas and provide indirect protections to many of the segments' ORVs of scenic, fish, recreational, wildlife, botanic, geologic, ecologic, and historic. A CSU stipulation to protect riparian vegetation would help to maintain or enhance water quality in the affected segments. This affects all segments with the ORVs identified above, except the Roan Plateau segments.

**Impacts from Vegetation Management – Weeds.** The Colorado River and Deep Creek would be most affected by a focus on areas of new infestations and, where possible, extirpate existing populations within priority treatment areas, which include riparian areas, developed recreation sites, campgrounds, and campsites. Allowing for habitat restoration could result in evidence of human activity, however these impacts would be short-term in duration and would not likely result in a change to river classifications. This would benefit the ORVs of scenic and ecologic.

**Impacts from Fisheries and Aquatic Wildlife Management.** By prohibiting surface occupancy and surface-disturbing activities within the watershed upstream of fish hatcheries to protect the quality and quantity of surface water and underground aquifers supplying the hatcheries (GS-NSO-5), the Mitchell Creek fish ORV would be better protected.

BLM_0017062

**Impacts from Wildlife Management.** Allowing the introduction, translocation, transplantation, restocking, augmentation, and reestablishment of native and naturalized fish and wildlife species in cooperation with CDOW and/or USFWS would protect the ORVs of fish and wildlife of all segments with these ORVs.

**Impacts from Special Status Species – Plants and Terrestrial Wildlife Management.** For species listed as sensitive by BLM and for significant natural plant communities, stipulation GS-CSU-3 specifies that special design, construction, and implementation measures, including relocation of operations by more than 200 meters, may be required. This would protect portions of the Colorado River, Abrams Creek, and Deep Creek and the associated botanic, wildlife, fish, and ecologic ORVs.

The Colorado River ORV of wildlife would be minimally protected by the NSO CO-04 to prohibit surface occupancy and surface-disturbing activities within 0.25-mile buffer around eagle nest. Management actions and restrictions on use to protect and enhance bald eagle nesting sites would have beneficial effects on this segment. In addition, the Colorado River ORV of wildlife would be minimally protected by the NSO CO-05 to prohibit surface occupancy and surface-disturbing activities within a 0.5-mile radius of a cliff-nesting complex for peregrine falcon.

Benefits of greater sage-grouse management include prohibiting surface occupancy and surface-disturbing activities within a 0.25-mile radius of an active or historic lek (NSO CO-2) would protect sections of the Colorado River. In addition, prohibiting surface occupancy and surface-disturbing activities during certain timeframes in grouse crucial winter habitat and nesting habitat (GS-TL-3) would also protect small sections of the Colorado River and its associated wildlife ORV.

Designating ACECs to protect the Harrington's penstemon special status plant species will protect Deep Creek's ecologic ORV.

**Impacts from Cultural Resources Management.** Prohibiting surface occupancy and surface-disturbing activities within 100 meters of historic properties (CRV-NSO-38) would have minimal indirect protection in all river segments that have historic ORVs, excluding the Roan Plateau segments. If inventories and collection were to occur within river corridors, short-term impacts could result from associated surface disturbance; however, long-term impacts would be negligible, and, in some instances, may provide additional values to segments. This would not likely affect segment classifications.

**Impacts from Visual Resource Management.** The VRM prescriptions include portions of the river corridor for Colorado River, Deep Creek, and all of Thompson Creek as VRM Class I; portions of Egeria Creek, Rock Creek, Hack Creek, Mitchell Creek, and portions of the Colorado River, Eagle River, Deep Creek, and Abrams Creek as VRM Class II; portions of the Colorado River, Deep Creek, Eagle River, Abrams Creek, and Battlement Creek as VRM Class III; and portions of the Colorado River, Abrams Creek and Battlement Creek as VRM Class IV. River corridors that fall under VRM Class I (ACECs) will be protected from surface occupancy and surface-disturbing activities by GS-NSO-16. Those corridors that fall under VRM Class II would be protected by GS-NSO-18, which prohibits surface occupancy and surface-disturbing activities in VRM Class II Areas with slopes over 30 percent and high visual sensitivity (Interstate-70 viewshed) to preserve the visual setting and integrity. VRM Class II would also be protected by GS-CSU-5 to ensure that surface-disturbing activities comply with BLM Handbook 8431-1 to retain the existing character of the landscape and would minimize impacts to surface-disturbing activities where scenery was identified as an ORV.

BLM_0017063

**Impacts from Cave and Karst Resources Management.** Deep Creek, its corridor, and the associated scenic, geologic, and ecologic ORVs would be protected by GS-NSO-16, which prohibits surface occupancy and surface-disturbing activities in the area of 2,400 acres.

**Impacts from Livestock Grazing Management.** Proposed decisions to manage livestock grazing could have minor and localized effects on some ORVs. Most river segments are inaccessible to cattle, and although livestock grazing would be allowed within all eligible river corridors, impacts to the ORVs would be minimal since management of livestock is subject to rangeland health. However, there is a potential that certain rangeland improvements could be incompatible in some of the segments because of visual intrusion to the natural character of the area, and this may affect scenic ORVs.

**Impacts from Recreation and Visitor Services Management.** Deep Creek would be protected by closing the dispersed area to camping. The Colorado River, Eagle River, and Deep Creek would be more protected from trash and noise by prohibiting the discharge of firearms for recreational target shooting in developed recreation sites. These stipulations would protect the ecologic, recreational, and wildlife ORVs.

Prohibiting surface occupancy and surface-disturbing activities in SRMAs for the protection of the recreation outcomes and setting prescriptions, effected through stipulation GS-NSO-16, would protect the recreational ORV of the Colorado River.

Portions of Deep Creek Segments 2 and 3 (970 acres) and the associated scenic, geologic, and ecologic ORVs are within the existing Deep Creek SRMA boundary. Management of the SRMA includes protecting some scenic, recreational, geologic, fish, wildlife, and cultural resource values. These management measures are similar to the protection afforded to the segments under an eligibility determination.

Colorado River Segments 6 and 7 are within the existing Upper Colorado River SRMA (9,800 acres of overlap). Management of the area is commensurate with protecting the ORVs of scenic, recreational, wildlife, botanic, and geologic, free-flowing nature, and tentative classifications of recreational, as the area is primarily managed to provide an intensive recreation opportunity.

**Impacts from Comprehensive Trails and Travel Management.** Off-highway vehicle (OHV) use could impact ORVs and classifications of eligible river segments. Through closing areas to OHV travel, Hack Creek, Deep Creek, Thompson Creek, and portions of the Colorado River are protected from OHV impact. Thompson Creek, Deep Creek, and portions of the Colorado River are also closed to over-snow travel, which again protects them from impact. Those not listed above would be vulnerable to vehicle intrusions that could adversely affect ORVs. The rugged terrain in some of these areas has presented a barrier to vehicle intrusions in the past and would likely continue to do so in the future, although advancing vehicle technology could allow vehicles to enter and affect areas they have not been able to access in the past. Closures to OHV use will protect the ORVs of historic, ecologic, scenic, wildlife, and botanic.

**Impacts from Lands and Realty Management.** Marginal wind energy development potential in Hack Creek, Thompson Creek, and Deep Creek could produce development in those areas. No proposed management actions from land and realty would impact the classification or ORVs of historic, scenic, geologic, or ecologic of the eligible segments. This is because allowable lands and realty actions and the degree of development with the corridor would be minimized and prohibited due to BLM's policy to manage eligible river segments to protect their free-flowing nature, ORVs, and tentative classification. These river

BLM_0017064

segments would be managed as right-of-way avoidance areas, which would provide additional protection to the ORVs.

Because the BLM has no control over potential modifications to a river's shoreline or any other type of development on non-public lands, impacts could occur in these areas. Land tenure adjustments that would result in the acquisition of non-BLM lands within these river corridors would provide opportunities to better manage ORVs and to mitigate any efforts that could impact the segments' classification or free-flowing nature.

**Impacts from Coal Management.** Designating 1,560 acres as unacceptable for coal leasing would protect the corridors of portions of the Colorado River, Hack Creek, Deep Creek, and Thompson Creek and protect the associated scenic, geologic, botanic, historic, and ecologic ORVs.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Not leasing portions of the Colorado River corridor and Hack Creek corridor for fluid minerals will protect the associated scenic, botanic, historic and wildlife ORVs.

Areas of known or potential geothermal resources are within the Mitchell Creek and Colorado River below Dotsero corridors, which could produce development in those areas. No proposed management actions from fluid minerals management would impact the classification or fish, scenic, recreational, or geologic ORVs of the eligible segments, because allowable actions and the degree of development with the corridor would be minimized and prohibited due to BLM's policy to manage eligible river segments to protect their free-flowing nature, ORVs, and tentative classification.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Deep Creek, Thompson Creek, a small portion of Hack Creek, and a portion of the Colorado River corridor would be recommended for withdrawal for locatable minerals, which would protect those areas and ORVs of scenic, geologic, ecologic, historic, and botanic from surface and underground disturbance. No proposed management actions from minerals management would impact the classification or ORVs of the segments, because actions and the degree of development would be minimized and prohibited due to BLM's policy to manage eligible river segments to protect their free-flowing nature, ORVs, and tentative classification.

Hack Creek and a portion of the Colorado River corridor would be recommended for withdrawal for salable minerals and thus protect the historic, scenic, wildlife, botanic, and geologic ORVs.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Portions of Deep Creek Segments 2 and 3 (970 acres) are within the existing Deep Creek ACEC boundary. Management of the ACEC includes protecting some scenic, recreational, geologic, fish, wildlife, and cultural resource values, and thus the ORVs of scenic, geologic, and ecologic. These measures are similar to the protection afforded to the segments under an eligibility determination. Management of the Deep Creek ACEC also includes restricting surface disturbance through NSO stipulations, designating the area as a ROW exclusion area, and managing the area as VRM Class I.

Additional protection for the ORVs within Thompson Creek related to scenic, geologic, and historic resources would be experienced from management of the existing Thompson Creek ACEC (800 acres of

BLM_0017065

overlap), which includes restricting surface disturbance through NSO stipulations, designating the area as a ROW exclusion area, and managing the area as VRM Class I. Additionally, 1,100 acres of Colorado River Segment 6 is within the existing Bull Gulch ACEC. This designation provides additional protection for the scenic, recreational, wildlife, and botanic ORVs.

Mitchell Creek receives additional protection from the Glenwood Springs Debris Flow Hazard Zones ACEC (300 acres of overlap) for the protection of Colorado River cutthroat trout on the fish ORV. Management actions that restrict surface disturbance (and subsequent runoff and sedimentation) prohibit a net increase in motorized/mechanized routes, surface occupancy, and surface-disturbing activities. The ACEC is managed as a ROW avoidance area and VRM Class II area.

All eligible stream segments on the Roan Plateau are within designated ACECs, pursuant to the Roan Plateau Land Use Plan, adopted in 2008. The actions, protective stipulations, and land use prescriptions identified in the ROD would be adequate to protect the identified ORVs of fish, botanic, and scenic (BLM 2008b).

**Impacts from Wilderness and Wilderness Study Areas (WSAs) Management.** Eleven hundred acres of Colorado River Segment 6 is within the existing Bull Gulch WSA. This designation provides additional protection for the scenic, recreational, wildlife, and botanic ORVs. Protections afforded to the area within the WSA, including closure to oil and gas leasing and motorized and mechanized travel, would remain in place even if the segment were found not suitable (Alternatives A and D), or if the suitable segment were released by Congress from WSR consideration (Alternatives B and C). If the Bull Gulch WSA were released from wilderness consideration by Congress, the area would receive management benefits related to the Bull Gulch ACEC. WSA management pursuant to the IMP would continue to have a beneficial impact on all ORVs within these segments by limiting developments within this river corridor. Management for WSAs would be in accordance with the IMP for Lands Under Wilderness Review (H-8550-1). Other resource management actions would be constrained to ensure that the naturalness of the WSA is not impaired. As a result, the free-flowing nature, ORVs, and tentative classification of this segment would also be protected.

**White River National Forest Segments.** The WRNF would continue to manage the four segments (two Colorado River and two Deep Creek segments) identified in Chapter 2 (Table 2-2) as eligible for inclusion in the NWSRS. The WRNF (NF) Land and Resource Management Plan 2002 Revision prescribed management area that was designed to meet its obligations under the WSR act by protecting all rivers identified as eligible free-flowing nature, ORVs, water quality and tentative classifications within its administrative authority. Management area direction prescribed that eligible river segments are to be managed to "protect and perpetuate eligible and designated" segments at the tentative classification level identified in the planning process (i.e. wild, scenic, recreation). The continuation of current management would not result in effects on WSR segments. Instead, it would continue to provide a long-term beneficial impact on the characteristics associated with WSRs because they would continue to be protected under an eligibility determination. The management standards and guidelines as prescribed in the Forest Plan for the four eligible segments being studied for suitability are identified in 2002 Forest Plan, Chapter 3.

Federal administrative authorities prescribed in land use planning do not provide for water rights based protections or a federal water right until after designation. The effects from and to other resources, resource activities and uses resulting from WSR determinations on WRNF lands were fully analyzed in the WRNF Land and Resource Management Plan 2002 Revision. Therefore, a detailed analysis of effects is limited to water based effects.

BLM_0017066

The primary effect on other resources and land uses from the continued management of four eligible segments would be related to the WRNF's permit approval authorities. For permit applications under WRNF authority, the WRNF would not permit projects that would adversely affect any of the four WSR segments' free-flowing nature, ORVs, water quality, or tentative classification. Other federal agencies considering permit applications (not under WRNF) authority that could affect the free-flowing nature, ORVs, water quality, or tentative classification for any of the four WSR segments would be required to seek formal comments from the WRNF. The other agencies are not required to act on the WRNF's comments, so the effect on WSR segments would depend on decisions outside the WRNF's authority. A secondary effect from the continued management of the four segments as eligible would be an increase in awareness of the river related values associated with these segments. Increased awareness may result in additional project proposals to protect and enhance the values, and increased cooperative measures with other federal, state, and local agencies that assist in managing these values.

Alternative A would not make any suitability determinations, which makes Congressional designation of any WSR segments in the planning area unlikely. Therefore, no analysis of effects resulting from Congressional WSR designation was conducted for Alternative A.

Because no changes are being proposed to the 2002 Forest Plan, and current management prescriptions would stay in place, there are no additional resource management decisions on the WRNF to be considered. Therefore, there are no effects on WSR segments from implementation of other resource management actions.

### Alternative B1

Under Alternative B1, 22 segments in the CRVFO would be determined as not suitable. However, these segments could still receive protection from management measures for other resources adopted under Alternative B1. Impacts on WSRs from soils resource management, weed management, wildlife management, livestock grazing management, fluid minerals management, and wilderness and WSAs management would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be as described below.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Four segments totaling 35 miles would be determined suitable under Alternative B1—two Colorado River segments and two Deep Creek segments— which would ensure the continued protection of their WSR characteristics, representing a long-term beneficial impact.

A determination of suitability would afford these four segments continued protection, similar to what they currently receive as eligible river segments, which would be a long-term beneficial impact on the WSR characteristics of these four segments. The BLM would continue to manage these areas for the protection of the free-flowing nature, the associated ORVs of scenic, recreational, wildlife, botanic, geologic, ecologic, and tentative classifications until Congress makes a determination whether to designate the segment(s) as part of the NWSRS.

Similar to Alternative A, for these four segments, the primary effect on other resources and land uses resulting from the management of the four suitable segments would be related to BLM's permit approval authorities. For permit applications under its authority, the BLM would not permit projects that would adversely affect any of the four WSR segments' free-flowing nature, ORVs, or tentative classification. Other

BLM_0017067

federal agencies considering permit applications (not under BLM authority) that could affect these aspects would be required to seek formal comments from the BLM. The other agencies are not required to act on BLM's comments, so the effect on WSR segments would depend on the decisions outside BLM's authority. However, a secondary effect from the continued management of the four segments as suitable would be an increase in awareness of the river-related values associated with these segments. Increased awareness may result in additional project proposals to protect and enhance the values, and increased cooperative measures with other agencies that assist in managing these values, such as the Colorado Division of Wildlife.

Although formal WSR designation requires an act of Congress, a BLM determination of suitability increases the likelihood of these segments being designated as Wild and Scenic Rivers. The overall effect of designation would be to significantly increase the authority of the federal government to address and respond to threats to the ORVs, free-flowing nature, and classification of the designated segments. Potential threats include reduction in flows, changing in timing of flows, degradation of water quality, proposed water storage projects that could invade the river segment, and development on private, local government, state government, and federal government lands within the river segment that would be incompatible with the ORVs and classification. Congressional designation as a Wild and Scenic River is also a more permanent form of protection for the river segment than most other forms of management. Under designation, long-term negative impacts on the river segment are much less likely than under most other forms of management.

If the four segments were designated by Congress, managers of water supply infrastructure could experience a variety of impacts. The time required for obtaining federal permits for project construction or modification could increase, because the permitting agencies may need additional time to analyze impacts on designated river segments and to identify workable mitigation measures to prevent those impacts. Applications for usage of federally-owned water management facilities may require time for processing, as managers resolve potential conflicts created between the proposed use and the Wild and Scenic River designation by Congress. When applying for new federal authorizations, water users may experience reduced water yield because of project terms and conditions imposed to protect designated river segments. If water users are applying for new junior water rights or for changes of water rights, they may experience reduced water availability for these water rights because of the flows claimed by the federal reserved water right for the designated stream segment. They may also experience longer water court procedures, as additional time is needed to resolve potential conflicts with federal water right claims.

Wild and Scenic River designation by Congress does not create federal control over land use on private lands within the designated river corridor. However, private landowners may experience longer processing time or denial for federal permits needed to conduct activities on private lands. Examples of permits needed for activities on private lands include permits from the U.S. Army Corps of Engineers for dredge and fill operations within stream channels.

**Impacts from Water Resource Management.** Impacts would be the same as those described for Alternative A plus the following additional impacts. Improving dysfunctional streams caused by unnatural factors may enhance the free-flowing nature of the segments, and would affect any segment that may have factors upstream of or within the segments.

Restrictions on use to protect water would have beneficial effects on released segments. The major river corridor NSO (CRV-NSO-3) would prohibit surface occupancy and surface-disturbing activities within 0.5 mile of either side of the high water mark (bank-full stage) of nine major rivers. This would help protect the

BLM_0017068

non-suitable segments from management activities that would threaten water quality that supports ORVs and protects the Colorado River corridor and portions of the Deep Creek corridor. Prohibiting surface occupancy and surface-disturbing activities within 50 feet from the ordinary high water mark of any hydrologic feature as determined on a case-by-case basis would also protect the streambank of all suitable and non-suitable segments. Filing for water rights and water use permits to protect all water uses on BLM-administered lands, improving streamflows, and making recommendations to the Colorado Water Conservation Board for protection or enlargement of instream flows on appropriate stream segments that cross BLM-administered lands will protect the ORVs of fish and the free-flowing nature in both suitable and non-suitable segments.

**Impacts from Vegetation Management—Riparian.** Impacts would be the same as those described for Alternative A plus the following additional impacts. By managing for riparian-wetland values using management actions for improvements or protection, there may be restrictions placed on recreation. This may negatively impact the recreational ORVs of all segments, while enhancing scenic and visual ORVs. However, management actions and restrictions on use for riparian vegetation would most likely result in overall beneficial effects on both suitable and not suitable segments.

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts would be the same as those described for Alternative A plus the following additional impacts. Priority habitats of perennial water sources (streams, rivers, lakes, ponds, springs, seeps, wetlands, wet meadows, bogs, and fens), riparian areas, intermittent streams and ponds, and ephemeral/seasonal water would protect the ORVs of fish, botanic, and ecologic of all associated segments. Identifying limiting habitat factors based on site characteristics and habitat capabilities using channel type and geology classifications, prioritizing and fixing those that can be fixed using proven river, stream, lake, and riparian methodologies (e.g., in-channel habitat structures to create pool, riparian plantings, tamarisk removal), or placing in-channel barriers could affect the free-flowing nature of some of the non-suitable segments, while suitable segments would remain protected through the BLM. Stipulation CRV-NSO-15, to protect fish-bearing streams by prohibiting surface occupancy and surface-disturbing activities within 100 meters, would result in beneficial effects on all fish ORVs of associated suitable and non-suitable segments except the Roan Plateau segments and Hack Creek.

Protecting streams to ensure coldwater sports and native fish production through CRV-TL-6 and prohibiting in-channel stream work in all occupied trout stream during appropriate spring and fall spawning periods would result in overall stream health and provide a level of protection for segments with ORVs associated with fish and recreational fishing, except for the Roan Plateau segments.

**Impacts from Wildlife Management.** Closing Thompson Creek to motorized and mechanized travel from December to April, also protects its scenic ORV.

**Impacts from Special Species – Plants and Terrestrial Wildlife.** Management actions for special status plants and terrestrial wildlife would protect the botanic ORV for the Colorado River. These actions include prioritizing treatments to protect against invasion and establishment of noxious weeds or other aggressive exotic plants, pursuing land tenure adjustments to facilitate the conservation or recovery of special status species, restoring potential special status species habitat to suitable habitat, and applying CRV-CSU-7 for plant communities that meet BLM's criteria for significant plant communities.

Impacts would be the same as those described for Alternative A. In addition, portions of the Colorado River, Eagle River, Abrams Creek, Deep Creek, Hack Creek, and Rock Creek would be minimally protected by

BLM_0017069

CRV-NSOs-19 and 20 for special status plants, occupied habitat, and adjacent 100-meter buffers. A CSU restriction on surface-disturbing activities within a 100-meter buffer around occupied Harrington's penstemon habitat outside ACECs would minimally protect portions of the Colorado River, Eagle River, Rock Creek, Deep Creek, Abrams Creek, and Hack Creek.

Impacts from greater sage-grouse management would be the same as those described for Alternative A, except leks would be protected by 0.6-mile radius instead of a 0.25-mile radius.

The Deep Creek river corridor would be protected by prohibiting surface occupancy and surface-disturbing activities within a 0.25-mile radius of Townsend's big eared, fringed myotis, and special status bat roost sites (CRV-NSO-30).

**Impacts from Cultural Resources Management.** Impacts would be the same as those described for Alternative A plus the additional following impacts. A small increase in buffer around historic properties would offer negligible protection to segments having an ORV of historic. Prohibiting surface occupancy and surface-disturbing activities within 0.25 mile of traditional cultural properties or Native American areas of concern to protect the integrity of place, setting, and/or feeling would provide benefits to portions of the Colorado River, Eagle River, Hack Creek, and Abrams Creek.

**Impacts from Visual Resource Management.** The impacts are the same as Alternative A with the following additional impacts. Rock Creek and the Eagle River also have some VRM Class IV within their corridor; the Thompson Creek also has VRM Class III within its corridor; and Battlement Creek has VRM Class II within its corridor. Concentrating new disturbances in VRM Class II areas to existing ROWs or within 200 meters of existing disturbance would provide increased protection. Designating areas as VRM Class I and II would have beneficial effects on segments with either scenic ORVs or a scenic tentative classification by protecting the scenic values through site-specific relocation requirements of the VRM criteria. Designating areas as VRM Class I and II would have beneficial effects on segments with either scenic ORVs or a scenic tentative classification by protecting the scenic values through site-specific relocation requirements of the VRM Class criteria.

**Impacts from Cave and Karst Resource Management.** Protection would be reduced for cave and karsts surrounding Deep Creek. Stipulation GS-NSO-16 would not be applied to cave and karst resources under this alternative, although it would continue to be applied to the 2,400-acre Deep Creek ACEC (but renumbered as CRV-NSO-49). The Deep Creek ACEC does not completely surround the Deep Creek stream corridor, and so stream corridor protection would be diminished.

**Impacts from Forestry Management.** Closing areas for forestry management would help protect the river corridors along the Colorado River, Hack Creek, Deep Creek, Mitchell Creek, and Thompson Creek.

**Impacts from Recreation and Visitor Services Management.** Applying CSU restrictions on developed (and future) recreation sites and to mapped (and future) national/regional trails, local system trails that connect communities and trailheads and interpretive sites protects portions of the Colorado River, Deep Creek, the Eagle River, and Thompson Creek. By closing camping, the Eagle River would be protected from overnight use impacts, Thompson Creek would be protected, and a small portion of the Colorado River would be protected from overnight impacts. However, the recreational ORV would be negatively impacted. Prohibiting the discharge of firearms in areas along the Colorado River, Eagle River, and Deep Creek would

BLM_0017070

benefit the recreational and ecologic ORVs. Applying CSU restriction within the Thompson Creek river corridor would help protect the scenic ORV.

Prohibiting surface occupancy and surface-disturbing activities in SRMAs and applying CSU (site-specific relation) for the protection of recreation outcomes and setting prescriptions would protect the Colorado River and a small portion of the Eagle River, and benefit the recreational and scenic ORVs.

**Impacts from Comprehensive Trails and Travel Management.** Impacts are the same as those in Alternative A with the following additional impacts. OHV closures would protect less of Thompson Creek corridor, but designations of trails and routes would include Egeria Creek corridor, Rock Creek corridor, Abrams Creek corridor, and Battlement Creek corridor. In addition, Hack Creek and Abrams Creek corridors will also be closed to over-snow travel, while portions of the Colorado River and Mitchell Creek corridors would have limited over-snow travel. Management actions to close or restrict routes along segments would result in beneficial effects by reducing sedimentation and protecting water quality that supports ORVs. In addition, all BLM-administered waters would be closed to motorized travel unless consistent with the area's management objectives, and is authorized by the BLM Field Manager. This would benefit the fish, recreational, and wildlife ORVs for all associated segments.

**Impacts from Lands and Realty Management.** Impacts are the same as those described in Alternative A with the following additional impacts. Right of Way avoidance areas would include portions of the river corridors of Egeria Creek, Rock Creek, the Colorado River, Hack Creek, the Eagle River, Abrams Creek, and Mitchell Creek. Right of Way exclusion areas would include portions of the river corridors of Deep Creek, Thompson Creek, and the Colorado River. Retention areas include portions of the corridors of the Colorado River, Egeria Creek, Rock Creek, Hack Creek, the Eagle River, Abrams Creek, Deep Creek, Thompson Creek, Mitchell Creek, and Battlement Creek. Lands and realty management actions along segments could have adverse impacts on not suitable segments through sedimentation and damage to riparian vegetation, which could result in degradation of water quality. Additional development along the non-suitable segments could result in a significantly higher level of surface disturbance and visual impacts than would be allowed under eligible status. However, other resource protection measure for water, riparian vegetation, and wildlife would add protections that would indirectly protect not suitable segments from lands and realty impacts. The Lands and realty management action to retain major river corridors and perennial streams would keep non-suitable segments in BLM ownership; however, retention would not guarantee protection of the free-flowing nature, ORVs, or the tentative classification.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts on the Colorado River Segments 6 and 7 are similar to those described under Alternative A, except that an additional 10,000 acres (30 river miles) would be closed to oil and gas leasing. In addition, the Deep Creek segments would be more protected through being closed to fluid minerals leasing. This would provide protection to the river corridor by reducing the potential for impacts from oil and gas development and protecting the scenic, botanic, wildlife and geologic ORVs.

A total of 800 acres (2.5 not suitable river miles) of the Thompson Creek area would be closed to fluid minerals leasing, which would protect the scenic and geologic ORVs. A total of 6,300 acres (22 not suitable river miles) would have an NSO stipulation in the Eagle River, Abrams, Battlement, Egeria, Hack, Mitchell, No Name, Rock, and Thompson Creeks areas; 6,000 acres (22 not suitable river miles) would have a TL stipulation in the Eagle River, Abrams, Battlement, Egeria, Hack, Mitchell, No Name, Rock, and Thompson

BLM_0017071

Creeks areas; and 7,500 acres (22 not suitable river miles) would have a CSU stipulation in the Eagle River, Abrams, Battlement, Egeria, Hack, Mitchell, No Name, Rock, and Thompson Creeks areas. While these management actions would provide some protection of the WSR characteristics of these segments that would be determined to be not suitable, they would not afford the level of protection specific to the ORVs, free-flowing nature, or tentative classification that would be provided either by an eligibility or suitability determination.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts would be the same as those described in Alternative A with the following additional impacts. Portions of the Eagle River corridor and Abrams Creek would also be recommended for withdrawal and therefore protect the fish ORV. Minerals management actions along segments could have adverse impacts on not suitable segments through sedimentation and damage to riparian vegetation, which could result in degradation of water quality. Additional development along the not suitable segments could result in a significantly higher level of surface disturbance and visual impacts than would be allowed under eligible status. However, other resource protection measures for water, riparian vegetation, and wildlife would add protections that would indirectly protect not suitable segments from minerals management impacts.

Impacts to salable minerals would be the same as those described in Alternative A with the following additional impacts. Portions of the Eagle River, Thompson Creek, Deep Creek, and all suitable segments would be recommended for withdrawal for salable minerals. Minerals management actions along segments could have adverse impacts on not suitable segments through sedimentation and damage to riparian vegetation, which could result in degradation of water quality. Additional development along the not suitable segments could result in a significantly higher level of surface disturbance and visual impacts than would be allowed under eligible status. However, other resource protection measures for water, riparian vegetation, and wildlife would add protections that would indirectly protect not suitable segments from minerals management impacts.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts on the two Colorado River segments are the same as those described under Alternative A. Impacts on the two Deep Creek segments are the same as those described under Alternative A. Additionally, the Deep Creek ACEC would be closed to motorized and mechanized travel and closed to oil and gas leasing, providing protection from surface-disturbing activities for the scenic, geologic, and ecologic ORVs.

In addition, all eligible stream segments on the Roan Plateau are within designated ACECs and the actions, protective stipulations, and land use prescriptions identified in the ROD would protect the identified ORVs of fish, botanic, and scenic (BLM 2008b). All segments within East Fork Parachute Creek and East Middle Fork Parachute Creek Complex on the Roan Plateau would benefit additional protection measures prescribed in the Roan Plateau land use plan for ACEC.

Mitchell Creek would receive additional protection from management actions for the Glenwood Springs Debris Flow Hazard Zones ACEC, which prohibits surface-disturbing activities and a net increase in motorized/mechanized routes to protect the fish ORV.

A total of 800 acres (2.5 not suitable river miles) of the Thompson Creek ACEC would be closed to fluid minerals leasing and managed as VRM Class I to benefit the scenic and geologic ORVs.

BLM_0017072

The Sheep Creek Uplands ACEC is within a small portion of the Hack Creek river corridor and will bring minimal protections to that corridor and the historic ORV.

**White River National Forest Segments.** All four segments (two Colorado River and two Deep Creek segments) currently managed as eligible, would be determined suitable. A determination of suitability would afford these four segments continued protection similar to what they currently receive as eligible segments. The management standards and guidelines being implemented under the existing 2002 Forest Plan would continue to be implemented. Therefore, the effects of WSR management practices under Alternative B1 would be the identical to those described for Alternative A.

Although formal WSR designation is an act of Congress, a WRNF determination of suitability increases the likelihood of these segments being designated as Wild and Scenic Rivers. The overall effect of designation would be to significantly increase the authority of the federal government to address and respond to threats to the ORVs, free-flowing nature, water quality, and classification of the designated segments. Potential threats that would be reduced include reduction in flows, changing in timing of flows, degradation of water quality, proposed water storage projects that could invade the river segment, and development on private, local government, state government, and federal government lands within the river segment that would be incompatible with the ORVs and classification. Congressional designation of a WSR is also a more permanent form of protection for the river segment than most other forms of management. Under designation, long-term negative impacts to the river segment are much less likely than under most other forms of management.

If the four segments were designated by Congress, managers of water supply infrastructure and hydroelectric projects could experience a variety of impacts. Once designated, all proposed water projects must be evaluated under Section 7 (a) of the Wild and Scenic River Act. A determination under Section 7 is required when: (1) a project is proposed to occur within the bed and banks of the designated river and involves some type of federal action such as issuance of a permit, license, loan, or grant; or (2) a project is proposed to occur in the bed and banks of the river below, above, or on a tributary to a designated river, involves some type of federal action, and is likely to result in effects within the designated river corridor.

The time needed for obtaining federal permits for project construction or modification could increase, because the permitting agencies may need additional time to analyze impacts to values for which a river was added to the national system and to identify workable mitigation measures to prevent those impacts. The Wild and Scenic River Act prohibits other federal agencies from assisting in the construction of any water resources project that would have a direct and adverse effect on a designated river. The Wild and Scenic River Act also prohibits FERC-licensed facilities within a designated river corridor.

Applications for usage of federally owned water management facilities may require time for processing, as managers resolve potential conflicts created between the proposed use and the WSR designation by Congress. When applying for new federal authorizations, water users may experience reduced water yield because of project terms and conditions imposed to protect designated river segments. If water users are applying for new junior water rights or for changes of water rights, they may experience reduced water availability for these water rights because of the flows claimed by the federal reserved water right for the designated stream segment. They may also experience longer water court procedures, as additional time is needed to resolve potential conflicts with federal water right claims.

BLM_0017073

WSR designation by Congress does not create federal control over land use on private lands within the designated river corridor. However, private land owners with inholdings along designated river corridors may experience longer processing time or denial for federal permits needed to conduct activities on private lands. Examples of permits needed for activities on private lands include permits from the Army Corps of Engineers for dredge and fill operations within stream channels.

Because no changes are being proposed to the 2002 Forest Plan and current management prescriptions would stay in place, there are no additional resource management decisions on the WRNF to be considered. Therefore, no effects would occur to WSR segments from implementation of other resource management actions.

### Alternative B2

With the exception of the WSR resource management actions, the management actions to be implemented under Alternative B2 would be identical to those under Alternative B1. Therefore, impacts on WSR segments from implementation of other resource management actions would also be the same as under Alternative B1. Impacts from management of other resources and uses would be as described below.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** Under Alternative B2, two segments of Deep Creek (4.5 miles) would be determined suitable, which would ensure the continued protection of their WSR characteristics, a long-term beneficial impact, as described under Impacts from Wild and Scenic Rivers section under Alternative B1. Suitability determinations would be deferred for two Colorado River segments. Those two segments would continue to receive protection under their eligible status. The two segments would also be managed under the Stakeholder Management Plan, which is expected to provide long-term protection of flows necessary to support the ORVs. The main difference between Alternatives B1 and B2 is that under Alternative B2, the BLM would implement a Stakeholder Management Plan for Colorado River Segments 6 and 7 in conjunction with protective measures under the BLM authority. Deferring a suitability determination for the two Colorado River segments would decrease their potential for congressional designation as WSRs. Consequently, only the potential effects of formal designation for the two Deep Creek segments were analyzed. The remaining 22 eligible segments would be determined not suitable for inclusion in the NWSRS.

The Stakeholder Management Plan for Colorado River Segments 6 and 7is designed to provide sufficient flow rates to support the segments' ORVs, using a cooperative and voluntary approach that works within the existing water rights structure. The primary approach under consideration by the Stakeholder Group would consist of two elements. The first element would be a recommendation from the group to the Colorado Water Conservation Board to appropriate instream flow water rights for Colorado River Segments 4 through 7. The second element would be voluntary and cooperative operation of water management facilities owned by the stakeholders to provide flows needed to support the ORVs. The proposed cooperative operation of these facilities would be subject to meeting the water supply needs of the stakeholders who own those facilities, and it would be subject to maintaining the water supply yield of those facilities. If implemented successfully, this cooperative approach could provide higher long-term certainty that adequate flows would be present to support the ORVs. Since water rights administration and management is outside BLM's management authority, success of this approach could result in a long-term beneficial impact on the WSR characteristics of the suitable streams.

BLM_0017074

A determination of suitability for the two Deep Creek segments would afford these segments continued protection, similar to what they currently receive as eligible river segments. The BLM would continue to manage these areas for the protection of the free-flowing nature, associated ORVs, and tentative classifications, until Congress makes a determination whether or not to designate the segment(s) as part of the NWSRS. Similar to Alternative A, the primary effect on other resources and land uses resulting from the management of the two suitable segments would be related to BLM's permit approval authorities. For permit applications under BLM authority, the BLM would not permit projects that would adversely affect any of the four WSR segments' free-flowing nature, ORVs, or tentative classification. Other federal agencies considering permit applications (not under BLM authority) that could affect these aspects for either of the two WSR segments would be required to seek formal comments from the BLM. The other agencies are not required to act on BLM's comments, so the effect on WSR segments would depend on the decisions outside BLM authority.

The 22 segments determined not suitable would no longer be protected as eligible WSR segments and would be managed in accordance with the other RMP provisions as describe under Alternative B1. In many cases, other administrative designations such as ACECs would provide administrative protection of the identified ORVs. However, the BLM would not be required to consider the ORVs, free-flowing nature, or tentative classification of these 26 segments when reviewing permit applications for other land uses, which would have a long-term adverse effect on these segments, as compared to Alternatives A and C.

**White River National Forest Segments.** Under Alternative B2, two segments of Deep Creek would be determined suitable, which would ensure the continued protection of their WSR characteristics, a long-term beneficial impact, as described under WRNF Effects from WSR Determinations under Alternative B1.

A suitability determination would be deferred on the WRNF Colorado River Segments 1 and 2 in Glenwood Canyon. Those two segments would continue to receive protections prescribed in the 2002 Forest Plan under their eligible status.

Although formal WSR designation is an act of Congress, a WRNF determination of suitability increases the likelihood of these segments being designated as Wild and Scenic Rivers. The overall effect of designation would be to significantly increase the authority of the federal government to address and respond to threats to the ORVs, free-flowing nature, water quality, and classification of the designated segments. Potential effects of designation are described under Alternative B1.

The two Colorado River segments would be managed under the Stakeholder Management Plan, which is expected to provide long-term protection of flows necessary to support the ORVs. The Stakeholder Management Plan for Colorado River Segments 4 through 7 (which includes WRNF Colorado River Segments 1 and 2 in Glenwood Canyon) is designed to provide sufficient flow rates to support the segments' ORVs, using a cooperative and voluntary approach that works within the existing water rights structure. The primary approach under consideration by the stakeholders would consist of two elements. The first element would be a recommendation from the group to the Colorado Water Conservation Board to appropriate instream flow water rights for Colorado River Segments 4 through 7. The second element would be voluntary and cooperative operation of water management facilities owned by the stakeholders to provide flows needed to support the ORVs. The proposed cooperative operation of these facilities would be subject to meeting the water supply needs of the stakeholders who own those facilities and it would be subject to maintaining the water supply yield of those facilities. If implemented successfully, this cooperative approach could provide

BLM_0017075

higher long-term certainty that adequate flows would be present to support the ORVs. Since water rights administration and management is outside BLM and WRNF's management authority, success of this approach may result in a long-term beneficial impact on the WSR characteristics of these stream segments.

Because no changes are being proposed to the 2002 Forest Plan and current management prescriptions would stay in place, there are no additional resource management decisions on the WRNF to be considered. Therefore, there are no effects on WSR segments from implementation of other resource management actions.

*Alternative C*

Alternative C is identical to Alternative B1 in relation to WSRs, because all four eligible segments described in Table 2-2 would be determined suitable for inclusion in the NWSRS. The suitable segments under Alternative C are the 26 segments identified in Table 2-2. In addition to the protections described for Alternatives A and B, Alternative C would include additional special management designations (not related to WSR) with associated benefits in areas that overlap with WSR corridors. This would provide additional layers of protection for some suitable segments, potentially enhancing ORVs; examples include stipulations for special status species, recreation management, and VRM. Overall, Alternative C is the most protective of WSR river values of the alternatives and therefore would provide the greatest long-term beneficial impact of other protective management on the WSR characteristics of these segments.

Impacts to WSRs from weed management, wildlife management, livestock grazing management, fluid minerals management, and WSAs management, would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be the same as or similar to those under Alternative B, except as described below.

**Impacts from Wild and Scenic Rivers (WSRs) Management.** The CRVFO would manage all 26 segments (88.1 miles of river), identified in Chapter 2 (Table 2-2, Descriptions of Alternatives A through D) as suitable for inclusion in the NWSRS. The BLM, within its authority, would protect the free-flowing nature, associated ORVs, and tentative classifications as wild, scenic, or recreational until Congress designates segments or the RMP is revised.

The BLM would continue managing to protect the free-flowing nature, associated ORVs, and tentative classifications as wild, scenic, or recreational on 88.1 miles of river. Implementation of Alternative C would be a continuation of current management and would not result in direct effects on WSR segments. Management methods implemented by the BLM for eligible segments are described above in Table 4.4.3-1.

The primary effect on other resources and land uses resulting from the continued management of 26 eligible segments would be related to BLM's permit approval authorities. For permit applications under BLM authority, the BLM would not permit projects that would adversely affect any of the 26 WSR segments' free-flowing nature, ORVs, or tentative classification. Other federal agencies considering permit applications (not under BLM authority) that could affect the free-flowing nature, ORVs, or tentative classification for any of the 26 WSR segments would be required to seek formal comments from the BLM. The other agencies are not required to act on BLM's comments, so the effect on WSR segments would depend on the decisions outside BLM authority. BLM anticipates that the primary impact that would occur in decision-making processes in other agencies is that the other agencies would ask project applicants to voluntarily offer mitigation measures

BLM_0017076

designed to protect the ORVs of the suitable stream segments. In addition, the NEPA documents created for those decisions would clearly display impacts of the proposed projects on the suitable segments.

Although formal WSR designation is an act of Congress, a BLM determination of suitability increases the likelihood of these segments being designated as Wild and Scenic Rivers. The overall effect of designation would be to significantly increase the authority of the federal government to address and respond to threats to the ORVs, free-flowing nature, and classification of the designated segments. Potential threats include reduction in flows, changing in timing of flows, degradation of water quality, proposed water storage projects that could invade the river segment, and development on private, local government, state government, and federal government lands within the river segment that would be incompatible with the ORVs and classification. Congressional designation as a Wild and Scenic River is also a more permanent form of protection for the river segment than most other forms of management. Under designation, long-term negative impacts on the river segment are much less likely than under most other forms of management.

If all 26 segments were designated by Congress, managers of water supply infrastructure could experience a variety of impacts. The time required for obtaining federal permits for project construction or modification could increase, because the permitting agencies may need additional time to analyze impacts on designated river segments and to identify workable mitigation measures to prevent those impacts. Applications for usage of federally-owned water management facilities may require time for processing, as managers resolve potential conflicts created between the proposed use and the WSR designation by Congress. When applying for new federal authorizations, water users may experience reduced water yield because of project terms and conditions imposed to protect designated river segments. If water users are applying for new junior water rights or for changes of water rights, they may experience reduced water availability for these water rights because of the flows claimed by the federal reserved water right for the designated stream segment. They may also experience longer water court procedures, as additional time is needed to resolve potential conflicts with federal water right claims.

Designation of a WSR designation by Congress does not create federal control over land use on private lands within the designated river corridor. However, private landowners may experience longer processing time or denial for federal permits needed to conduct activities on private lands. Examples of permits needed for activities on private lands include permits from the US Army Corps of Engineers for dredge and fill operations within stream channels.

The potential impacts on water users and private landowners described above would be most prevalent on the Eagle River, if it were designated by Congress as a WSR. Multiple water management facilities are located within and upstream from this river segment, and a significant percentage of the segment is owned by private property owners. Impacts from designation of other stream segments would be anticipated to be significantly less, because there are fewer water management facilities and less private land on these segments.

**Impacts from Water Resources Management.** Impacts would be the same as those described for Alternative B with the following additional impacts. Applying CSU restrictions within 100 feet from the edge of a hydrologic feature as determined on a case-by-case basis benefits all segments except the Roan Plateau segments. On all WSR segments under Alternative C, the effect of implementing other resource management actions would be negligible because allowable uses in each WSR stream segment corridor would be restricted so as not to adversely affect the tentative classification, free-flowing nature, or ORVs identified for each respective stream segment.

BLM_0017077

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts would be the same as those described for Alternative B plus the following additional impacts. Upland habitats within the drainage area of live water would be designated as priority habitats, which would help protect river corridors and fish ORVs. The NSO for fish-bearing streams would not be in this alternative as it is in Alternative B. However, CRV-NSO-16 would apply, which prohibits surface occupancy and surface-disturbing activities within 100 meters of all perennial waters, which would affect all segments except the Roan Plateau segments. This increases protection from Alternative B because it includes Hack Creek.

**Impacts from Special Species Status – Fish and Aquatic Wildlife Management.** Hardscrabble/East Eagle ACEC would be designated to protect the Colorado River cutthroat trout, which would protect the ORV for Abrams Creek.

The Colorado River Seeps ACEC (which would protect a small portion of the Colorado River), and Deep Creek ACEC, would be designated to protect the Harrington's penstemon and benefit the botanic and ecologic ORVs.

**Impacts from Visual Resource Management.** The impacts are the same as Alternative B with the following additional impacts. Deep Creek is only VRM Class I and II. These are stronger VRM protections than Alternative B to protect the scenic ORV.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** Under Alternative C, prohibiting surface occupancy and surface-disturbing activities on BLM lands managed as LWCs to protect their wilderness values through stipulation CRV-NSO-43 would benefit portions of the Colorado River, Hack Creek, Deep Creek, and Thompson Creek and their associated ORVs of historic, ecologic, scenic, botanic, wildlife, and geologic. Thompson Creek, Deep Creek, and Hack Creek would receive additional protection from the management prescription for LWCs.

**Impacts from Cave and Karst Resource Management.** The impacts are the same as Alternative B with the following additional impacts. CRV-NSO-54 would prohibit surface occupancy and surface-disturbing activities in the Deep Creek cave area (4100 acres), protecting more of the river corridor and the scenic, ecologic, and geologic ORVs.

**Impacts from Forestry Management.** Closing areas for forestry management would help protect the river corridors and associated ORVs of scenic, wildlife, botanic, ecologic, and recreational along the Colorado River, Deep Creek, Eagle River, and Thompson Creek.

**Impacts from Recreation and Visitor Services Management.** Prohibiting surface occupancy and surface-disturbing activities in SRMAs for the protection of recreation outcomes and setting prescriptions would protect the Colorado River and benefit the recreational and scenic ORVs.

**Impacts from Lands and Realty Management.** Impacts are the same as those described in Alternative B with the following additional impacts. Right-of-way avoidance areas would include portions of the river corridor of Battlement Creek and the associated fish ORV.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts would be the same as those described in Alternative B with the following additional impacts. No

BLM_0017078

leasing would be allowed along portions of the river corridors of the Eagle River, Egeria Creek, Rock Creek, Hack Creek, Mitchell Creek, Battlement Creek, and Abrams Creek to protect historic, fish, and recreational ORVs.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts would be the same as those described in Alternative B with the following additional impacts. Portions of the Egeria Creek corridor, Rock Creek corridor, Mitchell Creek corridor, and Battlement Creek would also be recommended for withdrawal and therefore would protect the historic and fish ORVs.

Impacts to salable minerals would be the same as those described in Alternative B, except that all segments would be suitable and therefore all recommended for withdrawal and protected.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Impacts would be the same as those described-in Alternative B plus the following additional impacts.

Abrams Creek would receive increased protection from the management of the Abrams Creek ACEC (200 acres of overlap) for the protection of the Colorado River cutthroat trout. The area would be closed to motorized and mechanized travel, and it would be designated as a ROW exclusion area; surface occupancy and surface-disturbing activities would be prohibited and protect the fish ORV.

Thompson Creek would receive additional protection from management of the Thompson Creek ACEC (3,400 acres) for the scenic, geologic, and historic ORVs.

The Colorado River would have more protection from the Colorado Seeps ACEC and Sage Grouse ACEC for the wildlife, scenic, and botanic ORVs.

**White River National Forest Segments.** For the WRNF segments, Alternative C is identical to Alternative B1. All four eligible segments described in Table 2-2 would be determined suitable for inclusion in the NWSRS. Refer to Alternative B1 for a description of the potential effects.

_Alternative D_

Under this alternative, the BLM would no longer manage to protect the free-flowing nature, ORVs, and tentative classifications on 88.1 miles of river, which could result in a long-term adverse impact on the WSR characteristics of these stream segments. Management of these segments would be in accordance with the management provisions of the RMP, which in many cases includes protective measures. However, these measures would not afford the level of protection specific to the ORVs, free-flowing nature, or tentative classification provided by an eligibility or suitability determination. Therefore, Alternative D would have a long-term adverse impact on these 26 segments as compared to Alternatives A and C, and also as compared to Alternatives B1 and B2, which would protect four of the 26 segments. Impacts from management of other resources and uses would be as described below.

Impacts to WSRs under Alternative D from weed management, wildlife management, livestock grazing management, coal management, wilderness and WSAs would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be the same as or similar to those under Alternative B, except as described below.

BLM_0017079

**Impacts from Wild and Scenic Rivers (WSRs) Management.** All 26 eligible segments (88.1 miles) in the CRVFO would be determined as not suitable, a potential long-term adverse impact on the WSR characteristics of these segments, since the ORVs, free-flowing nature, and tentative classification that had been identified under Alternative A would not be protected by either eligibility or suitability management.

**Impacts from Water Resource Management.** Impacts would be the same as those described for Alternative B except streamside management zones would not be protected under a NSO.

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts would be the same as those described for Alternative B with the following changes. Intermittent streams/ponds and ephemeral/seasonal water would not be priority habitats. Fish bearing streams would not have an NSO to protect them, but trout-bearing streams (CRV-CSU-6) would have a CSU applied within 100 meters, except those streams containing conservation or core conservation populations of Colorado River cutthroat trout or occupied habitat of greenback cutthroat trout. This protects all segments except Hack Creek and the Roan Plateau segments. This would protect ORVs for fisheries and cutthroat trout.

Impacts from native trout include prohibiting surface occupancy and surface-disturbing activities within 100 meters of streams containing conservation and core conservation populations of Colorado River cutthroat trout. Stipulation CRV-NSO-31 would protect the fish ORVs in Abrams and Battlement Creeks.

**Impacts from Special Species – Plants Terrestrial Wildlife.** Impacts would be the same as those described for Alternative B with the following change. Habitats of special status species would not be restored to suitable habitats, and would not protect river corridors. A CSU would be applied (CRV-CSU-9) to surface-disturbing activities within a 100-meter buffer around occupied BLM sensitive species habitat. This would protect the wildlife, botanic, and ecologic ORVs in portions of the Colorado River and Deep Creek.

**Impacts from Cultural Resources.** Impacts would be the same as those described for Alternative B, except that the buffer around historic properties would decrease to 100 meters.

**Impacts from Visual Resource Management.** The impacts are the same as Alternative B with the following additional impacts: Thompson Creek includes VRM Class II to benefit the scenic ORV.

**Impacts from Forestry Management.** Closing areas for forestry management would help protect the river corridors and ORVs of scenic, botanic, wildlife, fish, and historic along the Colorado River, Hack Creek, Mitchell Creek, and Thompson Creek.

**Impacts from Recreation and Visitor Services Management.** Prohibiting surface occupancy and surface-disturbing activities in SRMAs for the protection of recreation outcomes and setting prescriptions would protect the Colorado River, a small part of the Eagle River, and Thompson Creek, and benefit the recreational and scenic ORVs.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be the same as those described for Alternative B, except for the following changes. The Colorado River and Hack Creek are the only river corridors affected by closed OHV designations. The Colorado River, the Eagle River, Thompson Creek, Hack Creek, and Deep Creek would be closed to over-snow travel to protect the scenic, recreational, wildlife, botanic, geologic, historic, and ecologic ORVs.

BLM_0017080

**Impacts from Lands and Realty Management.** Impacts are the same as those described in Alternative B with the following changes. Right of Way avoidance areas would include lesser portions of the river corridors of the Colorado River, Eagle River, Abrams Creek, and Battlement Creek. Retention Areas would include lesser portion of the river corridors of the Colorado River, the Eagle River, Deep Creek, and Abrams Creek, thus offering lesser protections than in other Alternatives.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts are the same as those described in Alternative A except that no leasing would be allowed along portions of the river corridor of the Colorado River to benefit the scenic, wildlife, botanic and geologic ORVs.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Impacts are the same as those described in Alternative A except portions of the river corridors of the Colorado River, the Eagle River, Hack Creek, a small portion of Deep Creek, a small portion of Thompson Creek and Mitchell Creek would be recommended for withdrawal and therefore protect the scenic, wildlife, geologic, ecologic, historic and fish ORVs.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Mitchell Creek and the associated fish ORV would be protected by the Glenwood Springs Debris Hazard Flow ACEC. Portion of the Colorado River corridor and ORVs of scenic, botanic, wildlife, and geologic would be protected from the Bull Gulch and Blue Hill ACEC. These ACECs would be recommended for withdrawal from mineral location and sales.

**White River National Forest Segments.** All four of the segments managed as eligible for inclusion in the NWSRS would be determined not suitable under Alternative D. The WRNF would no longer be obligated to perpetuate the rivers' eligibility and the study process would be concluded. For the two Colorado River segments and two Deep Creek segments, specific WSR protections for the rivers' free-flowing nature, water quality, ORVs, and tentative classifications would no longer be managed as a potential WSR river. Potential impacts could be incurred depending on resource management and elements not controlled by the WRNF, such as water rights.

The current management area prescription categories assigned to the segments in the Forest Plan are based on their eligibility determination status, which would no longer be applicable. Therefore, Alternative D would result in an amendment to the 2002 WRNF Land and Resource Management Plan for these segments (Descriptions of current management categories can be found in the WRNF, Land and Resource Management Plan 2002 Revision, Chapter 3 –[(USFS 2002].) Under Alternative D and a not suitable determination, the following new management area categories would result::

- The WRNF Colorado River Segments 1 and 2 (Glenwood Canyon) would be changed from management area prescription category 4.4 Recreation Rivers-Designated and Eligible, to management area prescription category 4.23, Scenic Byways, Scenic Areas, Vistas and Travel Corridors. (Descriptions for Alternative D management categories can be found in WRNF Scenic Byways, Scenic Areas, Vistas and Travel Corridors, Appendix T [USFS 2002].)

- The WRNF Deep Creek Segments 1 and 2a would be changed from management area prescription categories 1.5 Wild Rivers-Designated and Eligible, and 3.4 Scenic River-Designated and Eligible, to

BLM_0017081

management area prescription category 2.1 Special Interest Area – Minimal Use and Interpretation. (Descriptions for Alternative D management categories can be found in WRNF Special Interest Areas, Appendix T [USFS 2002].)

**Colorado River Segments.** The management area prescription changes to the two Colorado River segments could result in long-term adverse impacts, to water-dependent ORVs, free-flowing nature, and water quality. The emphasis for long-term protections that make the two segments eligible for inclusion into the National WSR System would no longer exist. Management of these segments would change from protecting and perpetuating the suite of WSR values in their current condition within the study corridor to management of the area for its scenic and recreational values. While the WRNF strongly desires to protect and preserve all ORVs associated with in-stream flows, authorities found under the Wild and Scenic River Act would not be available and subsequent tools to manage water dependent values and supporting in-stream flows would be limited. To the extent that the WRNF is authorized under law to control water projects on USFS lands, the free-flowing characteristics of the river could be modified by new projects.

Under management area category 4.23-Scenic Byways, Scenic Area, Vistas and Travel Corridors, the focus of management would be on protection and enhancement of the scenic values on federal lands within the segments. In this regard, the scenic ORVs would continue to be protected and possibly enhanced. The recreational and geologic values would no longer be afforded focused protection. However, geologic values are unlikely to be affected as they contribute to the scenic values and as such would continue to be protected. Proposed new uses, management actions, or facilities could be allowed on and off USFS lands as long as they preserve the scenic values. However, recreational values related to whitewater rafting would no longer be afforded focused protection for these segments. The WRNF would continue managing recreational uses, but long term, these values could be reduced due to continued water depletion in the Colorado River resulting from water resource projects outside the agency's control. Additionally, the WRNF would no longer be mandated to manage for the protection of the free-flowing nature (other than scenic values) or water quality under the Wild and Scenic River Act.

There would be no changes or impacts to other resources such as grazing, vegetation management, or timber land base. Potential for impacts to other resources from current condition and management area prescriptions may apply to mineral and energy resources program. Under both categories, the corridor could be withdrawn from mineral entry. In addition, restrictions requiring underground facilities would be removed.

**Deep Creek Segments.** The management changes to the two Deep Creek segments under Alternative D would remove the USFS's obligation to manage for the protection of the entire suite of WSR characteristics under the Wild and Scenic River Act. Administrative protections based on land use plan decisions may or may not offer long-term protections due to changing land use demands and political influences.

Under management area category 2.1-Special Interest Areas-Minimal Use and Interpretation, the focus of management would be to protect or enhance Deep Creek's unique ecological, geological, and scenic characteristics and natural setting (see USFS 2002, Appendix T). Special Interest Areas (SIAs) also can be designated to protect and manage endangered species, other elements of biologic diversity, caves, historic sites, and the like. Deep Creek would be managed for the unique values and natural setting that render the SIA designation.

BLM_0017082

Deep Creek's rare and outstanding values are the primary management consideration and other resource values are typically secondary to the protection, maintenance, and restoration of the areas special values. This would most likely continue to protect the segments, ecologic, scenic, and geologic ORVs through management prescriptions.

Under all alternatives, Deep Creek could be withdrawn from mineral entry when deemed necessary to meet the objectives for which the area was proposed. This particular SIA would not allow motorized or mechanized use to protect the identified values. Recreation use emphasizes interpretation, education, and inspiration when it is compatible with the SIA values. Other management actions would be similar to current management standards and guidelines for grazing, recreation, scenery management, as long as those uses do not threaten the values for which the area was proposed. Timber management is allowed in this prescription as long as it meets specific resource objectives for maintaining the values for which the individual area was established. The current 1.5 and 3.4 management prescriptions do not allow for timber management activities. Management under the 2.1 prescription would continue to result in minimal access and use of the area, protecting the natural features that constitute the identified ORVs.

### Cumulative Impacts

Even though no stream segments would be found suitable, ORVs would still exist and could still be impacted. The BLM would not be required to prevent impacts on free-flowing nature, ORVs, or tentative classification when approving permits or resource use applications. This could result in the approval of permits or uses that degrade river-related values. It is not feasible to accurately anticipate specific projects and impacts related to potential future uses. However, without systematic consideration of impacts on river-related values in permitting decisions made by BLM and other federal agencies, it is possible that there could be significant cumulative impacts on the river-related values. This risk is especially apparent with regard to flow management, in which the impacts associated with any individual project may not be large, but the cumulative effect of multiple projects may result in not meeting the flows necessary to support the ORVs.

BLM_0017083

#### 4.4.4   National Trails

**Methods and Assumptions**

Although portions of the Continental Divide National Scenic Trail, the Top of the Rockies National and State Scenic Byway, and the West Elk Loop State Scenic Byway occur within the planning area, none is managed by the BLM.

**Environmental Consequences**

All programs were determined to have little or no impact on National Trails in the CRVFO.

BLM_0017084

## 4.5 IMPACTS ON SUPPORT

### 4.5.1 Transportation Facilities

**Methods and Assumptions**

Access to BLM lands is crucial for the effective use and stewardship of those lands. This section describes potential impacts on transportation facilities (maintained roads) from management actions for the resources and resource uses discussed in Chapter 2. Existing conditions concerning transportation facilities are described in Section 3.5.1.

Maintained roads provide appropriate ingress, egress, and access in the planning area. The following discussion of the impacts on transportation and access focuses on management actions that restrict or facilitate transportation and access opportunities on federal-, state-, and county-maintained highways and roadways and BLM-maintained system roads described in Section 3.5.1. Potential impacts resulting from management of transportation and access are characterized by changes in vehicle movement on designated roadways within and next to the planning area because of other resource management programs. The impact analysis is based on BLM's knowledge of the planning area, best professional judgment, review of existing literature, information from BLM experts, and information from other agencies' experts.

The proposed transportation network is designated to achieve RMP goals and objectives and to provide for appropriate public and administrative access. Because transportation facilities are considered a support function, significance will be based on the capability to create and manage the comprehensive travel network that best meets the full range of public, resource management, and administrative access needs for each alternative.

The transportation facility and access impact analysis is based on the following assumptions:

- BLM "Maintenance Intensities" provide guidance for appropriate "standards of care" to recognized routes within the BLM planning area. Recognized Routes by definition include roads, primitive roads, and trails carried as assets within the Facility Asset Management System.

- Maintenance Intensities provide consistent objectives and standards for the care and maintenance of BLM routes based on identified management objectives. Maintenance intensities are consistent with land use planning management objectives (for example, natural, cultural, recreation setting character conditions, and visual resource management). Maintenance intensities do not describe route geometry, route types, types of use, or other physical or managerial characteristics of the route.

- Due to the wide range of needs and uses, BLM's routes represent a broad spectrum of linear features from engineered roadways through challenging trails accessible only to non-motorized traffic.

- The BLM would coordinate with Eagle, Routt, Garfield, Mesa, and Pitkin Counties and the State of Colorado in development, maintenance, and management of BLM system, state, and county roads on lands in the planning area.

- Transportation needs would increase through the life of the RMP. The greatest needs for additional transportation facilities are associated with energy development and community expansion.

- Routes created through ROW authorizations would be maintained by the authorized users.

BLM_0017085

- If necessary, the BLM would evaluate Revised Statute 2477 road assertions under a separate process and criteria outside this planning process.

- Under Alternative A in the CRVFO, resources and resource uses that would have negligible impacts on public travel and access are paleontology, wildland fire, cave and karst resources, forestry, wild and scenic rivers, watchable wildlife, livestock grazing management, coal management, lands and realty management, and interpretation and environmental education. These resources have proposed actions or stipulations that would have benefits or negligible adverse impacts to public travel and access, and are not discussed further in this section.

In addition, impacts from forest and woodlands management, rangeland management, riparian and weeds management, special status fish and other aquatic wildlife management, special status plants and terrestrial wildlife management, fisheries and aquatic wildlife and terrestrial wildlife management, LWCs management, cultural resources management, visual resources management, ACEC management, wilderness study areas management, and health and safety management all have NSO, CSU, or other proposed actions which could impact transportation management by limiting ground-disturbing activities. These stipulations and proposed actions were addressed in the Comprehensive Trails and Travel Management (See Section 4.3.4), and would all have similar impacts on the manageability, maintainability, and ability to meet the needs, as defined by the goals and objectives, for resources and resource uses of transportation facilities. Therefore, they are not discussed further in this section.

## Environmental Consequences

Impacts on transportation facilities would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on transportation facilities under any of the four alternatives.

### Alternative A

**Impacts from Transportation Facilities Management.** Maintenance and upkeep of BLM roads is critical for travel management. As costs have risen, fewer miles of BLM roads have been maintained each year. The actual miles of roads maintained each year would be based on annual budgets. Under all alternatives, the CRVFO would emphasize maintaining the majority of BLM system roads at maintenance intensities that may not provide year-round access but are intended to keep the route in use for most of the year. This is sufficient to meet the CRVFO's objectives across all alternatives. The BLM does not remove snow, but some access routes have portions plowed by county road maintenance, utility companies, oil and gas operators, mining companies, or private landowners if the roads provide access to their property, facilities, or operations.

Under this alternative, BLM would provide maintenance on 258 miles of road and 48 miles of trail, the amount needed to serve the area. This includes approximately the following:

- 0 miles of road at Maintenance Level 1

- 239 miles of road at Maintenance Level 2

- 19 miles of road at Maintenance Level 3

- 6 miles of road at Maintenance Level 4

BLM_0017086

**Impacts from Air Quality Management.** Under all alternatives, the impacts on transportation would come from dust abatement projects. These impacts would be minor and short term along unpaved travel routes (i.e., Class D roads, single-track routes, mechanized trails). In addition, impact analysis for air management is deferred pending completion of air quality modeling.

**Impacts from Recreation and Visitor Services Management.** Recreation-related demands on public lands could increase the need for maintenance depending on access requirements and recreation setting objectives. Recreation-related routes would be maintained as needed for maintaining the desired setting, and as allowed by annual budgets.

**Impacts from Comprehensive Trails and Travel Management.** Trails and travel management related demands on public lands could increase the need for maintenance and access. Alternative A has approximately 760 miles of routes designated for full-sized vehicles. Approximately 260 miles of these roads would be maintained, while the remaining 500 miles of routes would not be maintained by BLM. These unmaintained routes would remain open due to repeated use from the public and administrative users. ATV, motorcycle, mechanized, and pedestrian and equestrian routes would be maintained as needed and as allowed by annual budgets.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Leasing the oil and gas mineral estate under the fluid minerals program would have the greatest potential effect on the transportation program by requiring construction of new roads, increasing traffic on existing roads, and upgrading existing routes for access to well pads. A short-term increase in the volume of both heavy and light traffic would occur during the construction, well drilling, and completion phases of developing gas resources. Temporary conflicts, including a potential for delays, dust, road degradation, and increased public safety concerns, would occur during the well construction/drilling phase and recompletion/work over activities. Traffic levels and their impacts would be reduced after gas wells are in operation.

The CRVFO estimates that 99 percent of new gas development and associated energy-related traffic growth would occur in high-potential areas in the western part of the CRVFO from Glenwood Springs to DeBeque, with the remaining 1 percent in moderate to low potential areas throughout the remainder of the CRVFO. Because the high-potential area is already leased, the RMP would allow BLM to require COAs to control traffic volume or require the lease developer to improve roads to help ease road capacity problems.

The greatest impacts on the CRVFO transportation network would continue to occur in the western part of the CRVFO, the area with the greatest potential for natural gas occurrence. Native-surfaced roads would continue to be improved to accommodate the increased traffic and heavy equipment.

The amount of traffic due to oil and gas development would depend on the rate of development, but any period of intense development would impact the major points of access into the planning area. Most traffic would be generated by large (larger than pickup size) vehicles. The actual distribution of traffic cannot be predicted because the exact rate of drilling and distribution within the planning area is both unknown and likely to vary from year to year. For Alternative A, development of approximately 2,664 federal wells on 333 multi-well pads with an estimated 3,347 acres of surface disturbance would occur. This includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 2,181 acres

BLM_0017087

on interim reclamation of well pads. This excludes an estimated 872 wells on lands administered by the USFS. Table 4.5.1-1 presents vehicular traffic expected for oil and gas drilling.

**Table 4.5.1-1**
**Vehicular Traffic Expected for Oil and Gas Drilling on BLM Lands for All Alternatives[1]**

| Vehicle Class | Total Number of Trips for One Well[2] | Total Trips in One Year[3] | Average Daily Trips[4] |
|---|---|---|---|
| **16-wheel tractor-trailers** | | | |
| Alternative A | 88 | 11,700 | 32 |
| Alternative B | 88 | 9,700 | 27 |
| Alternative C | 88 | 9,000 | 27 |
| Alternative D | 88 | 18,500 | 51 |
| **10-wheel trucks** | | | |
| Alternative A | 216 | 28,700 | 79 |
| Alternative B | 216 | 23,800 | 65 |
| Alternative C | 216 | 23,800 | 65 |
| Alternative D | 216 | 45,400 | 124 |
| **6-wheel trucks** | | | |
| Alternative A | 452 | 60,100 | 165 |
| Alternative B | 452 | 49,700 | 136 |
| Alternative C | 452 | 49,700 | 136 |
| Alternative D | 452 | 94,900 | 260 |
| **Pickup trucks** | | | |
| Alternative A | 404 | 53,700 | 147 |
| Alternative B | 404 | 44,400 | 122 |
| Alternative C | 404 | 44,400 | 122 |
| Alternative D | 404 | 84,800 | 232 |
| **Total** | | | |
| Total Alternative A | 1,160 | 154,300 | 423 |
| Total Alternative B | 1,160 | 127,600 | 350 |
| Total Alternative C | 1,160 | 127,600 | 350 |
| Total Alternative D | 1,160 | 243,600 | 667 |

Source: BLM 2006d

[1]Does not account for efficiencies associated with phased and clustered development.
[2]Trips by different vehicle types are not necessarily distributed evenly during the drilling process. Numbers are derived from data used previously by BLM (2006d) in modeling air quality impacts from oil shale development on the Roan Plateau planning area Naval Oil Shale Reserves.
[3]Number in one year is based on Alternative A – 2,664 wells in 20 years (average = 133 per year), Alternatives B and C – 2,206 wells in 20 years (average = 110 per year), and Alternative D – 4,198 wells in 20 years (average = 210 per year)
[4]Average daily trips based on 30 days to complete a well.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Locatable mineral exploration and development on BLM land would be regulated under 43 CFR 3800 in all alternatives. Access roads would be constructed under all of the alternatives. New roads constructed for mining would normally be gated and would not offer new public access. In addition, these roads would be maintained by the mining claimant.

*Alternative B (Preferred Alternative)*

Impacts to transportation facilities from transportation facilities management, air quality management, recreation and visitor services management, and locatable minerals, salable minerals, and non-energy leasable

BLM_0017088

minerals management would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be as described below.

**Impacts from Comprehensive Trails and Travel Management.** Trails and travel management related demands on public lands could increase the need for maintenance and access. Alternative B includes 470 miles of routes designated for full-sized vehicles. Approximately 280 miles of these roads would be maintained by the BLM. The 190 miles of unmaintained routes would remain open due to repeated use from the public and administrative users. ATV, motorcycle, mechanized, and pedestrian and equestrian routes would be maintained as needed and as allowed by annual budgets.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts would be the same as those under Alternative A, except development of approximately 2,206 federal wells on 276 multi-well pads with an estimated 2,774 acres of surface disturbance. This includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 1,814 acres on interim reclamation of well pads. This excludes an estimated 872 wells on lands administered by the USFS. Compared to Alternative A, Alternative B would create fewer vehicular trips.

### Alternative C

Impacts to transportation facilities from air quality management, recreation and visitor services management, locatable minerals, salable minerals, and non-energy leasable minerals management, and transportation facilities management would be the same as or similar to those under Alternative A. Impacts to transportation facilities from fluid minerals management would be the same as or similar to those under Alternative B. Impacts from management of other resources and uses would be as follows.

**Impacts from Comprehensive Trails and Travel Management.** Trails and travel management related demands on public lands could increase the need for maintenance and access. Alternative B includes 440 miles of routes designated for full-sized vehicles. Approximately 280 miles of these roads would be maintained by the BLM. The 160 miles of unmaintained routes would remain open due to repeated use from the public and administrative users. ATV, motorcycle, mechanized, and pedestrian and equestrian routes would be maintained as needed and as allowed by annual budgets.

### Alternative D

Impacts to transportation facilities from air quality management, recreation and visitor services management, locatable minerals, salable minerals, and non-energy leasable minerals management, and transportation facilities management would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be as described below.

**Impacts from Comprehensive Trails and Travel Management.** Trails and travel management related demands on public lands could increase the need for maintenance and access. Alternative D includes 530 miles of routes designated for full-sized vehicles. Approximately 280 miles of these roads would be maintained by the BLM. The 250 miles of unmaintained routes would remain open due to repeated use from the public and administrative users. ATV, motorcycle, mechanized, and pedestrian and equestrian routes would be maintained as needed and as allowed by annual budgets.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts would be the same as those under Alternative A, except development of approximately 4,198 federal

September 2011          *Colorado River Valley Field Office – Draft RMP Revision EIS*          4-737
*Chapter 4, Environmental Consequences*

BLM_0017089

wells on 525 pads with an estimated 5,276 acres of surface disturbance. This includes the pads, access roads, pipelines, and a pro rata share of offsite facilities. The total area would be reduced to 3,439 acres on interim reclamation of well pads. This excludes an estimated 872 wells on lands administered by the USFS. See Table 4.5.1.1 for vehicular traffic expected for oil and gas drilling. Compared to Alternative A, Alternative D would create more vehicular trips, and the most of any of the alternatives.

### Cumulative Impacts

The cumulative impact analysis boundary includes the CRVFO boundary. Cumulative impacts on transportation and access would primarily occur from actions that facilitate, restrict, or preclude motorized access. Management actions that restrict OHV use would limit the degree of travel opportunities and the ability to access certain portions of the planning area. The continued maintenance of federal and state highways would provide arterial connections to BLM system roads. County-maintained routes that connect federal and state highways to BLM system routes would maintain and improve access to CRVFO's resources. Past, present, and reasonably foreseeable future nonfederal actions have affected, and will continue to affect, transportation management within the planning area. These actions, which include urban development patterns, the continuing growth of vehicle-based recreation, planned road and highway projects, and population growth, are expected to increase demand and construction of transportation routes near the CRVFO. Actions that would limit or restrict transportation project design (e.g., VRM designations, land use closures, NSO stipulations) would result in impacts on transportation and access.

The actions and activities considered in this analysis, including land use restrictions for the preservation of sensitive resources, would not result in the inability of BLM to maintain transportation facilities. The degree of impact would be lowest under Alternative A because of fewer land use restrictions for the protection of sensitive resources. Conversely, the implementation of increased restrictions to protect sensitive resources under Alternative C would result in the greatest level of impact on transportation and access. Alternative B has slightly less restriction than under Alternative C. Alternative D would have slightly more restrictions than under Alternative A.

BLM_0017090

## 4.6    IMPACTS ON THE SOCIAL AND ECONOMIC ENVIRONMENT

### 4.6.1   Public Health and Safety

**Methods and Assumptions**

This section is a description of potential impacts on public health and safety from management actions for the resources and resource uses discussed in Chapter 2. Existing conditions concerning public health and safety are described in Section 3.6.1. Abandoned mines are not discussed because most mines are closed or have exclosures to keep people out. Hot springs are not addressed because the BLM does not maintain hot springs for recreation.

The public health and safety impact analysis is based on the following assumptions:

- Public health and safety issues would receive priority consideration in the management of the BLM lands.

- Recreation participation would increase and would probably result in a corresponding increased need to maintain safe public use conditions.

- Increased public land use would result in increased exposure to energy and mineral development, mines, hazardous materials, and illegal dumpsites.

- All new hazardous materials sites would be identified and remediated.

- Resource development activities would not generate new hazardous material waste that would pose a visitor health and safety threat.

- All hazardous material releases on BLM lands posing a substantial threat to the public or the environment are addressed as emergency cleanup actions.

- Interest in energy and mineral development on BLM lands within the planning area would continue, as identified in the RFD projections. The pace and timing of development activities depend on a variety of factors outside the management decisions of BLM. These include national and international energy demand and prices, production factors within the planning area, and business strategies of operators. Because the pace of development in the planning area is unknown, a relatively constant rate of development is assumed for this analysis. Therefore, actual impacts could vary if the rate of development or production changes over the life of the RMP.

**Environmental Consequences**

Impacts on public health and safety would result from some of the actions proposed under other resources and uses including air quality, water resource, recreation and visitor service, fluid minerals, ACEC designation, and public health and safety management. Other programs not addressed below were deemed to have little or no impacts on public health and safety under any of the four alternatives.

**Alternative A**

**Impacts from Public Health and Safety Management.** Incidental dumping of hazardous materials occasionally occurs mostly in proximity to towns and highways within the CRVFO. Under Alternative A, an increase in the amount of illegal dumping would be expected as the population continues to grow in proximity to the BLM lands in the CRVFO.

BLM_0017091

Under all alternatives, mineral extraction operators would be required to prepare and maintain a current emergency communications plan and to adjust operating procedures to accommodate local residential concerns. Operators would be subject to oversight measures within 3 miles of Project Rulison for the benefit of public health and safety. The emergency communications plan would reduce the immediate danger to human health and safety by requiring the operator to remove the threat and to inform appropriate authorities and potentially affected citizens. The operator working in residential areas would be expected to mitigate impacts (e.g., noise, dust, and traffic) in response to public concerns. While there is no known potential for radionuclides to migrate from Project Rulison, the sampling program and oversight measures are a reasonable response to the public concern about the project.

**Impacts from Air Quality Management.** Allowing venting consistent with federal regulations in some instances under Alternative A may result in greater human exposure to air toxics such as volatile organic compounds in proximity to drilling activities and production facilities.

**Impacts from Water Resource Management.** A high degree of protection for the quality of water derived from public land in municipal watersheds would be provided under all alternatives. No surface disturbance that would adversely affect water quality would be permitted. Alternative A specifically prohibits surface occupancy and surface-disturbing activities to protect the domestic watersheds of Rifle and New Castle. Since not all designated municipal watersheds would be specifically protected, the potential exists under Alternative A for greater risks to municipal watersheds than under the other alternatives.

**Impacts from Recreation and Visitor Services Management.** The BLM would continue to allow the discharge of firearms for target shooting on BLM lands, outside areas with firearm use restrictions. It would continue to prohibit the discharge of firearms for target shooting on developed recreation sites and within 300 feet of the centerline of North Hardscrabble Access Road (Spring Creek). There would be no new impacts and ongoing impacts would continue, such as the illegal dumping and littering that frequently accompany target shooting (Responsive Management 2009). This litter includes clay pigeons, spent shells, and metal, plastic, and glass objects brought for targets. The prohibitions would also protect visitor safety by minimizing the potential for accidental shootings.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Garfield County conducted a comprehensive study (Coons and Walker 2008) of health risks associated with oil and gas industry activities. This comprehensive study focused on western Garfield County, which is expected to experience the majority of oil and gas development over the next 20 years. The study concluded, "There is no health crisis in Garfield County, but there are some health trends that should be monitored. We cannot say conclusively that any of these health trends are directly related to the presence of natural gas industry activities or other factors."

Another human health risk study conducted for Garfield County by Witter et al. (2008) concluded, "human health risks and social impacts are associated with oil and gas development." They based this conclusion largely on the types of chemicals used in, or produced by, oil and gas activities and not on documented release rates of those chemicals to the environment. Thus, their study cataloged potential risks associated with uncontrolled exposures, at unspecified exposure rates, and for unspecified exposure durations. Their report did not present evidence of existing exposures to hazardous chemicals used in or produced by oil and gas activities at levels of concern for human health, nor did they document existing health impacts from oil and

BLM_0017092

gas activities in the county. Section 3.6.1 presents a more thorough analysis of the reports of Coons and Walker (2008) and Witter et al. (2008).

A comprehensive hydrogeologic investigation was conducted for Garfield County in 2006 (Papadopoulos and Associates 2007). That study was funded from fines levied against one operator for the only documented case of contamination of surface water and shallow groundwater as a result of inadequate protections during drilling. The hydrogeologic investigation documented the occurrence of detectable levels of methane in 135 of 184 water wells, springs, seeps, ponds, and rivers sampled, but noted these were possible natural occurrences that could not be tied to oil and gas activities.

On a statistical probability basis, fluid minerals development activities would increase the potential for releases of hazardous materials at well pads and during transport in haul trucks and pipelines. Trucking companies are responsible for understanding and abiding by all applicable hazardous materials transportation laws and regulations. The potential exists for gas flowline leakage or ruptures during natural gas extraction and processing. Data from the US Department of Transportation indicate that an average of one rupture annually should be expected for every 5,000 miles of pipeline (Office of Pipeline Safety 2005). More than 50 percent of pipeline ruptures occur as a result of heavy equipment striking the pipeline. Such ruptures would potentially cause a fire or explosion if a spark or open flame ignited the natural gas escaping from the pipeline. Pipeline design, materials, maintenance, and abandonment procedures are required to meet the standards set forth in US Department of Transportation regulations (49 CFR Part 192, Transportation of Natural Gas by Pipelines). However, the more acres open to oil and gas development, the more pipelines, power lines, transportation, etc. would be needed. Therefore, Alternative A, with the greatest number of acres open for development, would have a slightly higher risk of hazardous materials impacts than the other alternatives.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** Continued designation of the Glenwood Springs debris flow hazard zone ACEC under all alternatives would result in management actions (e.g., NSO stipulations) to reduce the debris flow hazard and the potential for harm and damage from debris flow incidents.

### Alternative B (Preferred Alternative)
Impacts to public health and safety from ACEC (administrative designations) management would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be as described below.

**Impacts from Public Health and Safety Management.** Impacts would be similar to Alternative A except that Alternatives B, C, and D would close motorized vehicle access routes that lead to illegal dumpsites. Closing motorized vehicle access would result in a net decrease in the number of illegal dumpsites and thus reduce the amount of hazardous waste materials illegally dumped on the BLM lands within the CRVFO.

**Impacts from Air Quality Management.** Using green completions and applicable best management practices, including locating drilling and production facility operations at suitable distances from public buildings and residences, would reduce the already low risk to humans from exposure to air toxics such as volatile organic compounds.

**Impacts from Water Resource Management.** The impacts from water resource management would be similar to Alternative A. However, Alternatives B, C, and D would expand the protection afforded under

BLM_0017093

NSO stipulations to include all designated municipal watershed areas, thus affording more protection to municipal drinking water supplies within CRVFO.

**Impacts from Recreation and Visitor Services Management.** The types of impacts would be similar to those described under Alternative A. However under Alternatives B and C, additional prohibitions on firearms at Silt Mesa and Battlement Creek would decrease the illegal dumping and littering that frequently accompany target shooting at these locations. The additional prohibitions would also protect visitor safety by minimizing the potential for accidental shootings.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The types of impacts from fluid minerals management would be similar to Alternative A. However, the amount of hazardous materials impacts on public health and safety under Alternative B would be slightly less than under Alternatives A and D. Alternative B would have fewer acres open to fluid mineral extraction compared to Alternative and D. However, the amount of hazardous materials impacts on public health and safety would be slightly greater for Alternative B than for Alternative C, because more acres would be open to fluid mineral extraction.

*Alternative C*

Impacts to public health and safety from ACECs management would be the same as or similar to those under Alternative A. Impacts to public health and safety from air quality management, water resources management, visitor services management, and public health and safety management would be the same as or similar to those under Alternative B. Impacts from management of other resources and uses would be as described below.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The types of impacts from fluid minerals management would be similar to Alternative A. However, the amount of hazardous materials impacts on public health and safety under Alternative C would be slightly less than under Alternatives A, B, and D, because Alternative C would have fewer acres open to fluid mineral extraction.

*Alternative D*

Impacts to public health and safety from ACECs management would be the same as or similar to those under Alternative A. Impacts to public health and safety from water resources management and public health and safety management would be the same as or similar to those under Alternative B. Impacts from management of other resources and uses would be as described below.

**Impacts from Air Quality Management.** The beneficial impacts from air quality management on public health and safety would be similar to Alternative B, except flaring would be required of natural gas well completions that do not use green completion technology.

**Impacts from Recreation and Visitor Services Management.** The impacts would be the same as Alternative B, except that target shooting would be allowed on part of the Silt Mesa.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The types of impacts from fluid minerals management would be similar to Alternative A. However, Alternative D has more acres open for development and would have a slightly higher risk of hazardous materials impacts than the Alternatives B, C, and D, with fewer acres open for development. Alternative D has fewer acres

BLM_0017094

open for development compared to Alternative A. Therefore, Alternative D would have a slightly lower risk of hazardous materials impacts than under Alternative A.

## Cumulative Impacts

Cumulative impacts would be similar under all of the alternatives. The potential impacts would be due to management actions and planning within those lands surrounding the CRVFO, including the White River, Little Snake, Kremmling, Royal Gorge, Gunnison, Uncompahgre, Grand Junction BLM Field offices, the State of Colorado, and the White River National Forest. Minerals development within surrounding areas would increase the use, generation, and transportation of hazardous materials. City and county use plans for surrounding communities could have cumulative effects, whereby mineral resources are developed adjacent to BLM lands. State lands that are surrounded by BLM land could have impacts from inholding development. Hazardous materials are regulated by the EPA and administered by state agencies regardless of land status. The incremental contribution of the alternatives on the cumulative impacts on health and safety is anticipated to be minimal if all applicable laws, regulations, safeguards, and procedures are followed.

BLM_0017095

## 4.6.2   Social and Economic Conditions

The economic analysis focuses on changes in labor income and employment associated with BLM planning actions and estimated outputs for the alternatives. The social analysis focuses on changes in well-being of identified communities relative to the alternatives.

### 4.6.2.1 Economic Conditions

#### Methods and Assumptions

This section presents an analysis of economic impacts of the management alternatives proposed in the RMP/EIS. This section discusses employment, labor income, and effects on sectors in the impact area economies that encompass the CRVFO. Impacts to revenues received by states and counties also are presented. Finally, the alternatives are discussed in light of forecasts for the area over the 20-year period of analysis.

Table 4.6.2-1 presents the estimates of changes in labor income. Higher employment, subject to some qualifications, can be seen as a benefit to the local community. Other benefits are also present, although some are not easily measured or tied to economic activity. Examples of where effects are difficult to quantify are equity effects, impacts to social values, and non-market values. Regardless, these benefits are discussed despite the inability to measure them quantitatively.

### Table 4.6.2-1
### BLM Outputs, by Alternative

| Output | Current | Alternative A No Action | Alternative B Preferred | Alternative C | Alternative D |
|---|---|---|---|---|---|
| General recreation (visits) | 244,280 | 338,00 | 338,000 | 338,000 | 487,500 |
| Fish and wildlife recreation (visits) | 24,300 | 33,600 | 33,600 | 33,600 | 48,400 |
| Grazing (AUMs) | 23,000 | 56,900 | 36,000 | 35,500 | 36,500 |
| Forest products (mmbf) | <0.1 | 1.8 | 1.2 | 0.9 | 1.4 |
| Natural gas (mcf) | 12,500,000 | 59,301,500 | 51,620,500 | 51,620,500 | 85,028,000 |
| Natural gas condensate (barrels) | 37,400 | 177,900 | 154,900 | 154,900 | 255,100 |
| Sand and gravel (short tons) | 525 | 525 | 525 | 525 | 525 |
| Crushed stone (short tons) | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Gypsum (short tons) | 625 | 625 | 625 | 625 | 625 |
| Pumice (short tons) | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |

Sources: FEAST 2010 and IMPLAN 2010.

The following analytical methods and assumptions were used to complete the analysis for the economic impacts from the proposed management decisions:

- The planning area population will continue to increase and age as described in Chapter 3.

- Regional economic impacts are estimated based on the assumption of full implementation of each alternative. The actual changes in the economy would depend on individuals taking advantage of the resource-related opportunities that would be supported by each alternative. If market conditions or

BLM_0017096

trends in resource use were not conducive to developing some opportunities, the impact on the economy would be different than estimated here.

- Resource specialists projected annual resource outputs that are based on the best available information and professional judgment. The purpose of the economic analysis is to compare the relative impacts of the alternatives; it should not be viewed as absolute economic values.

- The share of timber and other forest products harvested within the impact area by logging contractors and local residents was obtained from personal communication with field office staff.

- The ratios of harvests to jobs and income used to assess the impacts of the alternatives are based on statewide ratios developed for Colorado by the University of Montana (Keegan and Dillon 2003).

- Over the long term, timber prices are residual values determined by national and international markets based on what the final product market will pay for timber, rather than supply competition at the local level (Lippke et al. 2006). In addition, the share of timber contributed to total harvest in the area is relatively too small to have price impacts in the short term.

- Projected recreation visits are distributed among different types of visitors based on the results of National Visitor Use Monitoring (NVUM) surveys and interviews with field office staff.

- The ratios of recreation visits to jobs and income used to assess the impacts of the alternatives are based on national ratios developed through the U.S. Forest Service's NVUM program (Stynes and White 2005).

- Baseline recreation demand is assumed to increase at rates based on the observed annual rate of recreation use in both the CRVFO and adjacent Kremmling Field Office (RMIS 2010).

- Non salary-related expenditures made by the CRVFO are assumed to be allocated to different economic sectors based on data compiled for the White River and Routt National Forests.

- Range revenues received by BLM and benefits of BLM forage were calculated using the conservative AUM price for 2009 of $1.35 per AUM and the 2009 statewide average AUM price for private land of $14.70 (U.S. Department of Agriculture 2009).

- The impact area for the social and economic analysis consists of the five counties that include lands managed by the CRVFO: Eagle, Garfield, Mesa, Pitkin, and Routt counties.

- Potential economic impacts are assessed using the Forest Economic Analysis Spreadsheet Tool (FEAST) developed by the U.S. Forest Service Inventory and Monitoring Institute in Fort Collins, Colorado. This tool uses a Microsoft Excel workbook as an interface between user inputs and data generated using the IMPLAN input-output modeling system (FEAST 2010).

- The FEAST analysis assesses the economic impacts of the resource outputs projected under each alternative. Resource outputs in this context are the amount of a resource (e.g., forest products, AUMs, recreation visits, etc.) that would be available for use under each alternative. Average annual resource outputs were projected by resource specialists for each alternative for a 20-year planning period based on the best available information and professional judgment.

- Employment and labor income estimates developed for this analysis include direct, indirect, and induced economic effects. Direct employment would, for example, be generated in the grazing sector. Additional employment would be generated as the affected livestock operators purchase services and materials as inputs ("indirect" effects) and ranchers spend their earnings within the local economy

BLM_0017097

("induced" effects). Direct, indirect, and induced effects are combined in the discussion of effects below.

- Theoretically, expenditures associated with changes in final demand would be available and specific enough to allocate to each of the 440 sectors contained in the IMPLAN model. In the absence of primary data, national level production functions are used. Expenditures should be delineated between local and non-local providers, as purchases out of the economic study region will have no local economic impact. The IMPLAN data contain information, called regional purchase coefficients, which describe the proportion of a given commodity that will be provided by local producers. Previous modeling experience has shown that the data contained in the IMPLAN modeling system for the various sectors are an accurate representation of impacts.

- Biomass opportunities may exist but are not analyzed given impracticalities of projecting future scenarios for implementation.

- Oil and gas development and production are assumed to occur at constant rates over the 20-year period of analysis; consequently, effects are not distinguished for development and production periods since development would not occur over predictable timeframes. For analysis purposes, development and resulting production are assumed to occur at rates averaged over the 20-year period of analysis.

- Changes in population and housing availability are assessed using IMPLAN data specific to field office impact areas. For the CRVFO, data indicate there are 1.4 persons per job and 2.5 persons per household (IMPLAN 2008).

- Traffic effects from oil and gas development are assessed using available information on vehicle trips per well for all vehicle class types (1,160 trips per well for pickup and larger trucks) over a 30-day period (DOI 2006).

- Non-market values, including natural amenities, non-use values, ecosystem services, and aspects of well-being and quality of life, are assessed in qualitative terms, as appropriate.

None of the alternatives would be expected to reduce economic diversity (the number of economic sectors) or increase economic dependency, which occurs when the local economy is dominated by a limited number of industries. Shifts in emphasis could occur, but these would not result as a consequence of planning actions in this RMP/EIS. While the alternatives have the potential to affect local businesses and individuals, the relative contribution of BLM activities to the local economy (see Alternative A) and the relative differences between the alternatives would not be large enough to have any measurable effect on economic diversity or dependency. For example, the dependency of the local economy on the livestock industry, forest products, mining, and recreation activities would not be affected by BLM resource management under this RMP/EIS. Under all the alternatives, all BLM-related contributions, i.e. jobs and labor income, would continue to support less than 1 percent of totals within the impact area economy, but could be more important for smaller communities within the planning area.

Estimates of the levels of employment and labor income that would be supported by the alternatives are based on projected resource outputs from BLM management actions (see Table 4.6.2-1), estimated payments to counties (see below), BLM expenditures, and other externally funded activities on BLM lands. The projected outputs and activities are discussed by resource in the following sections. Estimated average annual

BLM_0017098

employment and labor income from outputs and activities are summarized in Table 4.6.2-2 and Table 4.6.2-3 below, respectively.

**Table 4.6.2-2**
**Average Annual Employment[1] by Program by Alternative (Full and Part-time Jobs)**

| Resource | Current | Alt. A No Action | Alt. B Preferred | Alt. C | Alt. D |
|---|---|---|---|---|---|
| Recreation[2] | 103 | 143 | 143 | 143 | 206 |
| Grazing | 20 | 50 | 32 | 31 | 32 |
| Forest Products | 0.2 | 26 | 17 | 12 | 20 |
| Minerals | 85 | 220 | 191 | 191 | 315 |
| Externally Funded | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| County Payments | 62 | 245 | 215 | 215 | 345 |
| BLM Expenditures | 78 | 78 | 78 | 78 | 78 |
| **Total BLM Management** | **349** | **762** | **675** | **670** | **996** |
| **Change from Current** | | **118%** | **94%** | **92%** | **185%** |

Sources: FEAST 2010 and IMPLAN 2010.

**Table 4.6.2-3**
**Average Annual Labor Income by Program by Alternative (Thousands of 2010 dollars)***

| Resource | Current | Alt. A No Action | Alt. B Preferred | Alt. C | Alt. D |
|---|---|---|---|---|---|
| Recreation** | $3,953 | $5,471 | $5,471 | $5,471 | $7,890 |
| Grazing | $153 | $369 | $234 | $230 | $237 |
| Forest Products | $6 | $1,073 | $685 | $491 | $814 |
| Minerals | $6,835 | $19,359 | $16,852 | $16,852 | $27,756 |
| Externally Funded | $8 | $8 | $8 | $8 | $8 |
| County Payments | $3,220 | $12,644 | $11,095 | $11,095 | $17,819 |
| BLM Expenditures | $4,154 | $4,154 | $4,154 | $4,154 | $4,154 |
| Total BLM Management | $18,328 | $43,078 | $38,498 | $38,301 | $58,677 |
| Percent Change from Current | | 135% | 110% | 109% | 220% |

Sources: FEAST 2010 and IMPLAN 2010.
*Average annual values are based on projected impacts over the 20-year analysis period. Source: Potential employment and labor income impacts are based on the estimated resource outputs summarized by alternative in Table 4.6.2-1. Potential impacts were estimated using the IMPLAN model and FEAST.
**As discussed in Chapter 3, these recreation estimates do not include visits from all local use since their expenditures do not represent new money into the economy. Within the CRVFO it was determined that 85 percent of non-wildlife recreation use would not occur in the impact area if the opportunity on BLM land was not provided; as a result only 15 percent of the local use is not included in the CRVFO model.

In the absence of quantitative data, impacts were described using ranges of potential effects, or a qualitative analysis was performed based on the best available data, as appropriate. Expert opinions were solicited from each CRVFO and the BLM State Office regarding current conditions for specific resources and anticipated outcomes and incorporated into the evaluation.

*Forest Products*

Both the no action and action alternatives would continue to make wood product materials available. As shown by the estimates of forest products output in Table 4.6.2-1, potential commercial harvest varies by

BLM_0017099

alternative. However, these are estimates based on ideal market conditions, which may not provide an accurate portrayal of actual impacts. Factors such as financial limitations on operators, market conditions, and implementation of timber sale practices that limit actual sale volume are important to consider. Consequently, current removal (Table 4.6.2-1) is compared to the potential under the alternatives. Under Alternative A, timber under the current Allowable Sale Quantity (ASQ) would potentially be available, while under the action alternatives the Probable Sale Quantity (PSQ) would potentially be available.

## *Grazing*

Dependency on BLM forage would not change under the alternatives. The permitted use limit is used to evaluate potential impacts under each of the alternatives. Table 4.6.2-1 above shows varying degrees of total forage needed to feed 2007 levels of livestock in the CRVFO area (ranging from 17 to 27 percent in the CRVFO impact area (USDA 2007). However, grazing would not fall below current levels in the CRVFO impact area (11 percent). In addition, jobs and labor income associated with BLM grazing would continue to account for less than 1 percent of area totals. Additionally, jobs and labor income in the agricultural sector associated with BLM management would account for less than 1 percent of area totals in the agricultural sector across all the alternatives.

While dependency on BLM forage would remain low, BLM forage would continue to provide a low cost and important complement to some livestock producers' grazing, forage, and hay production. For smaller communities within the impact area, dependency on BLM forage might also be greater. In addition to potential changes in projected employment and income as a result of changes in BLM forage offered, the value of BLM forage to area operators should also be considered. This value can be estimated as the difference between the competitive market price of an AUM and the BLM lease fee. This value is experienced above the price ranchers pay for AUM leases and can be considered a benefit. The benefit to operators from the potential permitted BLM grazing varies among the alternatives, however would not fall below current levels of actual use. Payments to counties under the Taylor Grazing Act would continue under all the alternatives and are included in Table 4.6.2-4 and discussed below.

**Table 4.6.2-4**
**Payments to Counties Under the Alternatives (2008 dollars)**

| Output | Current | Alternative A No Action | Alternative B Preferred | Alternative C | Alternative D |
|---|---|---|---|---|---|
| PILT | $739,913 | $739,913 | $739,913 | $739,913 | $739,913 |
| Range revenue | $4,869 | $12,062 | $7,632 | $7,526 | $7,738 |
| Mineral royalty distributions | $3,586,691 | $16,282,654 | $14,199,050 | $14,199,050 | $23,261,410 |
| Total | $4,331,473 | $17,034,629 | $14,946,595 | $14,946,489 | $24,009,060 |

Sources: FEAST 2010 and IMPLAN 2010.

## *Recreation*

While change in recreation may occur as a result of planning actions in the alternatives, the role of recreation in the local economy will continue to increase as OHV use, boating, biking, and other forms of recreation continue to increase. Travel to the area from outside the area to enjoy these opportunities is not an unreasonable assumption, and average annual rates of change are based on the observed recreation use data (RMIS 2010).

BLM_0017100

While different levels of recreation are supported under the alternatives, recreation management would continue to sustain opportunities important to the area economy and well-being under all the alternatives. As noted in Chapter 3, opportunities provided to local residents are important; however, their recreation expenditures do not represent new money introduced into the economy. If BLM related opportunities were not present, it is likely that residents would participate in other locally based recreation activities and this money would still be retained in the local economy. Therefore, only a portion of local recreation visits attributable to unique area opportunities are included in the effects from the alternatives. Even without a portion of BLM local recreation use, recreation on BLM administered lands would sustain more jobs and labor income annually than contributions from grazing and forest products programs under all the alternatives (see Table 4.6.2-2 and Table 4.6.2-3).

Jobs and income associated with recreation management should not overshadow the economic value of experience held by recreation users within the planning area. For example, boating or motorized use in the planning area could change as management actions are implemented. The value of these recreation experiences could thus change as visitor use changes. Changes in the quantity and quality of these recreation experiences offered are discussed in the recreation section of this EIS.

### Mineral Resources

Leasable, locatable, and salable minerals would continue to be provided by the BLM in the planning area (Table 4.6.2-1 above). Management under this RMP will determine the extent of mineral resource activity in the future. For example, withdrawal from mineral entry will occur for portions of Areas of Critical Environmental Concern (ACECs) with mineral potential. Regardless of these changes, area dependency on BLM related employment provided to the mining sector would not change among the alternatives.

Under all alternatives, the change in population that would result from changes in mineral sector employment would be less than 1 percent of current population levels in the CRVFO impact area. In addition, the housing vacancy rate within the impact area (25 percent) would accommodate any changes in housing demand from population changes since required households would not exceed 1 percent of current vacancies under all the alternatives. However, with concentrated oil and gas activity occurring alongside high vacancy rates in individual counties, localized change could be greater within the CRVFO impact area. These potential effects are discussed below under the social effects section. It should be noted that these effects are based on current conditions in both the housing and oil and gas markets. Actual oil and gas activity and housing markets cannot be projected, thus these estimates may not be an accurate portrayal of actual impacts. However, they do provide a frame of reference for discussion of housing. In addition projected population increases, discussed in Chapter 3 and the cumulative effects section below, also temper potential effects on housing availability and affordability at the local level.

Crushed stone, sand, and gravel removal by county and state governments is authorized under free use permits, such that no revenues or lease fees are received by the BLM and consequently no payments to counties are made. No fees are collected from the removal of saleable and locatable minerals; however, royalties from oil and gas production are distributed back to local governments under the 1902 Reclamation Act and the 1920 Mineral Leasing Act. These payments are discussed below.

### Impacts to Counties

Costs to local governments would remain unchanged as a result of planning actions, consequent changes in population, or oil and gas development; i.e. demand for services and infrastructure, would not change as a

BLM_0017101

result of BLM planning actions. Payments to counties would remain an important portion of local government revenue (ranging from 4 to 6 percent of total revenue in the CRVFO impact area). Any changes under the alternatives in grazing revenues would not be large enough to substantially affect the overall amount of payments made to counties since these payments make up a small portion of county payments by alternative (less than a tenth of 1 percent under all the alternatives; Table 4.6.2-4). Minerals royalty payments in CRVFO counties provide at least 95 percent of BLM associated payments under all the alternatives. However, impracticalities exist in predicting actual levels of production, market prices, and the resulting royalties paid.

Under all alternatives, BLM land identified for retention or disposal varies; however, the identification of this land for potential land tenure changes does not guarantee disposal would occur. Further site-specific NEPA process not covered under this plan would evaluate the availability of this land for disposal if proposed. If this land is disposed, it would no longer count towards the entitlement acres used in Payment in Lieu of Taxes (PILT) calculations, which could slightly decrease the contribution to county payments from BLM land in the area. However, predicting county payments based on entitlement acres alone is impractical due to other factors used to determine PILT payments such as changes in the population ceiling, congressionally approved annual appropriation acts, and other factors discussed in Chapter 3. Nevertheless, if BLM land is disposed, it would be subject to property taxes, whereas before disposal it was not. Payments under PILT are designed to help offset losses in property taxes due to the nontaxable status of federal lands within state or county boundaries. Therefore, county property taxes could offset losses from the qualifying entitlement acres for PILT.

### *BLM Expenditures and Employment*

Levels of expenditures and employment at the CRVFO are not expected to vary as result of the alternatives. While different alternatives may cost more or less to implement, speculating whether the budget will be available is impractical. However, this does not mean implementation is impractical, since management priorities are likely to determine how funds are allocated to actions outlined in the plan. Thus, a constant budget over the life of the plan is a reasonable and practical assumption, based on the average annual salary and non-salary expenditures of the CRVFO. Under all the alternatives, it is estimated that average annual BLM expenditures would continue to support around 78 total jobs and $4.2 million in total labor income (Table 4.6.2-2 and Table 4.6.2-3) in the CRVFO impact area economy. In addition to direct job and income impacts, these estimates include impacts to industries that provide factors of production to the BLM, and other industries impacted by wage related spending.

### *Externally Funded Ecosystem Restoration*

A portion of the management actions performed on BLM lands is carried out with funds not provided by the BLM. Thus, these expenditures are not accounted for under the category of BLM expenditures discussed above. Recent examples of such projects include trail work and travel management implementation funded by Colorado State Parks, habitat improvement projects funded by Colorado Division of Wildlife, and the implementation of range improvement projects funded with a portion of royalties from grazing payments. These treatments are labor intensive and utilize agricultural industries and associated businesses contained within the impact area economy. As a result of these treatments, less than one job and $10,000 in labor income would be supported annually in the CRVFO impact area economy (see Table 4.6.2-2 and Table 4.6.2-3).

BLM_0017102

*Role of Amenities, Migration, and Non-Market Values*

The economic analysis assesses the economic effects of the direct use of resources in terms of jobs and income. This type of analysis does not include other types of economic value often referred to as non-market values. Non-market values are important to the well-being of visitors, area residents, and others outside the planning area. These values include natural amenities, quality of life factors, recreational opportunities, ecosystem services, and non-use values such as existence, option and bequest values. Non-market values are difficult to quantify and insufficient data exist to assess the effects of management actions. However, the fact that no monetary value is assigned to these values does not lessen their importance in the decision-making process.

In addition, helpful inferences can be made. While there is a general consensus that non-use values exist, the methodologies for measuring these values are controversial and difficult to apply. Wilderness has been the subject of numerous non-use studies, usually conducted for specific natural areas. However, no attempt has been made to directly elicit potential non-use values associated with the alternatives under this RMP. The alternatives establish areas to be managed as LWCs to protect wilderness character and changes to ACECs and other special designations. These designations would further maintain and perhaps enhance non-market values associated with natural amenities protected on these lands.

Additionally these ACECs, land to be managed for wilderness character, and VRM acres may attract new residents and tourists to the area, which would then contribute to area economic activity. While in some cases land protection directly reduces employment growth, it has been shown that natural amenities can offset job losses due to increases in net migration (Eichman et al. 2010). Natural amenities and quality of life have been increasingly recognized as important factors in the economic prospects of many rural communities in the West (Rudzitis and Johnson 2000). In addition, non-labor income is intimately tied to natural amenities as discussed in Chapter 3. Rural county population change, the development of rural recreation, and retirement-destination areas are all related to natural amenities (McGranahan 1999). Thus, designations that maintain and protect natural amenities may similarly contribute to area economic well-being.

## Environmental Consequences

Impacts on economic conditions would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on economic conditions under any of the four alternatives.

*Alternative A*

As a result of Alternative A, about 762 jobs and $43 million in labor income would be generated in the impact area economy on an average annual basis. This is 118 percent more employment and 135 percent more labor income than contributed currently, due to larger natural gas contributions, timber products, permitted grazing, and recreation visits evaluated under this alternative than levels evaluated under the current scenario. Oil and gas estimates are based on current prices and potential production. Because future production and market price cannot be projected, these estimates may not be an accurate portrayal of actual impacts under future market conditions. In addition, estimates of timber products and grazing are based on the sawtimber ASQ and AUM permitted use limit and thus reflect an annual average of the maximum available contribution that would be available rather than actual use. This includes direct, indirect, and induced effects as a result of BLM outputs (Table 4.6.2-1) and county payments (Table 4.6.2-4). The largest employment and labor income effects would occur in the Government, Accommodation & Food Services and Mining sectors (See Table 4.6.2-5 and Table 4.6.2-6).

BLM_0017103

**Table 4.6.2-5**
**Average Annual Employment Contribution by Sector and Alternative**

| Sector | Area Total | Current | Alt. A | Alt. B | Alt. C | Alt. D |
|---|---|---|---|---|---|---|
| Agriculture | 6,842 | 20 | 57 | 37 | 35 | 39 |
| Mining | 13,505 | 115 | 115 | 96 | 96 | 178 |
| Utilities | 1,358 | 3 | 3 | 3 | 3 | 5 |
| Construction | 59,134 | 87 | 88 | 73 | 73 | 136 |
| Manufacturing | 9,302 | 4 | 15 | 11 | 9 | 14 |
| Wholesale Trade | 8,619 | 18 | 21 | 19 | 19 | 31 |
| Transportation & Warehousing | 47,947 | 11 | 13 | 11 | 11 | 19 |
| Retail Trade | 11,294 | 76 | 83 | 74 | 74 | 124 |
| Information | 4,652 | 5 | 6 | 5 | 5 | 8 |
| Finance & Insurance | 10,883 | 16 | 18 | 15 | 15 | 26 |
| Real Estate & Rental & Leasing | 23,801 | 21 | 22 | 19 | 19 | 33 |
| Professional, Scientific, & Tech Services | 20,907 | 36 | 38 | 32 | 32 | 57 |
| Management of Companies | 914 | 3 | 3 | 3 | 3 | 5 |
| Administration, Waste Management & Remediation Services | 18,826 | 22 | 24 | 20 | 20 | 35 |
| Educational Services | 4,395 | 5 | 5 | 4 | 4 | 7 |
| Health Care & Social Assistance | 32,022 | 48 | 50 | 43 | 43 | 74 |
| Arts, Entertainment, and Recreation | 22,823 | 16 | 19 | 18 | 18 | 28 |
| Accommodation & Food Services | 46,850 | 73 | 91 | 86 | 86 | 132 |
| Other Services | 23,035 | 28 | 29 | 25 | 25 | 44 |
| Government | 43,632 | 232 | 233 | 205 | 205 | 328 |
| Total | 410,741 | 838 | 933 | 800 | 795 | 1,323 |

Sources: FEAST 2010 and IMPLAN 2010.

**Table 4.6.2-6**
**Average Annual Labor Income Contribution by Sector and Alternative**
**(Thousands of 2010 dollars)**

| Sector | Area Total | Current | Alt. A | Alt. B | Alt. C | Alt. D |
|---|---|---|---|---|---|---|
| Agriculture | $95,803 | $86 | $398 | $260 | $219 | $298 |
| Mining | $1,352,661 | $17,376 | $17,383 | $14,487 | $14,487 | $27,093 |
| Utilities | $152,966 | $337 | $362 | $306 | $304 | $540 |
| Construction | $3,384,519 | $5,484 | $5,514 | $4,604 | $4,602 | $8,564 |
| Manufacturing | $521,305 | $158 | $576 | $432 | $364 | $574 |
| Wholesale Trade | $558,499 | $1,167 | $1,421 | $1,263 | $1,248 | $2,029 |
| Transportation & Warehousing | $1,587,764 | $647 | $767 | $664 | $654 | $1,092 |
| Retail Trade | $656,499 | $2,382 | $2,633 | $2,332 | $2,326 | $3,905 |
| Information | $280,744 | $316 | $347 | $303 | $302 | $515 |
| Finance & Insurance | $732,593 | $1,139 | $1,228 | $1,040 | $1,034 | $1,803 |
| Real Estate & Rental & Leasing | $1,188,998 | $1,040 | $1,130 | $958 | $951 | $1,656 |
| Professional, Scientific, & Tech Services | $1,286,276 | $2,297 | $2,418 | $2,056 | $2,047 | $3,630 |
| Management of Companies | $80,185 | $275 | $288 | $244 | $243 | $438 |
| Administration, Waste Management & Remediation Services | $802,005 | $882 | $956 | $823 | $819 | $1,422 |
| Educational Services | $104,443 | $112 | $119 | $102 | $101 | $176 |
| Health Care & Social Assistance | $1,622,257 | $2,474 | $2,608 | $2,241 | $2,231 | $3,852 |
| Arts, Entertainment, and Recreation | $699,919 | $472 | $580 | $546 | $545 | $847 |
| Accommodation & Food Services | $1,339,436 | $2,067 | $2,614 | $2,497 | $2,494 | $3,799 |
| Other Services | $688,327 | $835 | $906 | $774 | $767 | $1,331 |
| Government | $2,446,953 | $12,655 | $12,759 | $11,265 | $11,263 | $17,861 |
| Total | $19,582,152 | $52,202 | $55,008 | $47,198 | $47,001 | $81,426 |

Sources: FEAST 2010 and IMPLAN 2010.

BLM_0017104

While employment and labor income contributions under Alternative A would be the higher than under Alternatives B and C, fewer acres would be designated under protected areas (ACECs, land to be managed for wilderness character and VRM Class I and II acres) than the other alternatives (Table 4.6.2-7). Therefore, this alternative would provide less protection of non-market values and natural amenities than the other alternatives.

**Table 4.6.2-7**
**Protected Area Designations***

| Resource | Alternative A No Action | Alternative B Preferred | Alternative C | Alternative D |
|---|---|---|---|---|
| | 274,230 | 317,320 | 404,500 | 282,500 |

*These areas include ACECs, VRM Class I, VRM Class II, and areas with Wilderness characteristics. Based on the proposed management decisions in this RMP/EIS, these areas would typically have fewer surface-disturbing activities occur within their boundaries compared to other locations in the planning area. Total acres does not include VRM Class III or Class IV since these classes include objectives other than the retention and preservation of existing character of the landscape (DOI 2010c).

As discussed above under Methods and Assumptions, BLM expenditures and employment are assumed to be the same under all the alternatives. Direct, indirect, and induced effects from these contributions are displayed in Table 4.6.2-2 and Table 4.6.2-3. Externally funded restoration projects described above under Methods and Assumptions would continue under this alternative so that effects also are the same as those described above.

Under Alternative A, annual payments to counties in the planning area would be approximately $17 million, which includes a portion of PILT payments that can be attributed to BLM entitlement acres, a portion of payments received from grazing revenues, and a portion of royalties received from the sale of mineral material (Table 4.6.2-4). These payments would support about 245 jobs and $12.6 million in labor income (Table 4.6.2-2 and Table 4.6.2-3). Payments to counties and their impacts under this alternative are slightly higher than Alternatives B and C since the level of gas production based on anticipated well drilling is higher. As discussed above, this estimate is based on current prices and potential production. Actual production and market price cannot be projected. Therefore, these estimates may not be an accurate portrayal of actual impacts. Regardless contributions from these payments are likely to remain an important portion of county revenue increasing from 1 to 4 percent of 2007 levels of local government revenue within the impact area.

**Impacts from Visual Resource Management.** Areas managed for visual resources may attract new residents and tourists to the area, which would then contribute to area economic activity, as would ACECs and lands to be managed for wilderness character. In addition, these designations would further maintain and perhaps enhance non-market values associated with natural amenities protected on these lands. Under Alternative A, less land would be managed under protected area designations than under the other alternatives. Therefore, this alternative would provide the least protection of non-market values and natural amenities among the alternatives (Table 4.6.2-7). Consequently, well-being associated with non-market values and potential contributions from new residents and tourists attracted by natural amenities could be less than the other alternatives.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** The economic effects generated by management of LWCs characteristics are described above under Impacts from Visual Resource Management.

BLM_0017105

**Impacts from Forestry Management.** Alternative A would allow an average annual harvest of approximately 1,800 MBF of sawtimber (Table 4.6.2-1). As stated above, this estimate is based on the sawtimber ASQ and reflects an annual average of the volume that would be available rather than actual harvest projections. Annual average harvest has been less than 1 percent of this estimate (Table 4.6.2-1). If harvests were to occur at ASQ levels, approximately 26 jobs and $1.1 million in labor income (Table 4.6.2-2 and Table 4.6.2-3) would be supported within the local economy. In addition to direct job and income impacts in the forest products industry, these estimates include impacts to industries that provide factors of production to the forest products industry, and other industries impacted by wage related spending.

**Impacts from Livestock Grazing Management.** Alternative A could authorize average annual grazing of approximately 45,000 cattle AUMs and 12,000 sheep AUMs (Table 4.6.2-1) and would support approximately 50 jobs with $369,000 in labor income (Table 4.6.2-2 and Table 4.6.2-3). While these contributions are higher than current contributions from grazing, it must be noted these are impacts from the established permitted use limit for AUMs in the planning area. This is the maximum number of AUMs that could be offered under ideal forage conditions, which may not be an accurate portrayal of actual impacts. Factors such as drought, financial limitations on operators, market conditions, and implementation of grazing practices to improve range conditions are important to consider.

The benefit of BLM forage to area operators under Alternative A would be approximately $768,000, which is less than the maximum potential benefit under Alternative D; however, this is greater than the current value of $310,000. Thus despite the relatively small employment and labor income impacts, the value of forage to area operators would remain.

**Impacts from Recreation and Visitor Services Management.** In general, it can be assumed recreation use would continue to increase by 3 percent per year based on rates of visitation observed in the past (RMIS 2010). Given this increase, average annual recreation visits are estimated at 338,000 general visits and another 33,600 wildlife-related visits (Table 4.6.2-1). Expenditures of these visitors would support approximately 143 jobs and $5.5 million in labor income in the impact area economy on an average annual basis.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Under Alternative A, an estimated 3,536 wells are assumed to be drilled on BLM mineral estate within areas with high potential over the 20-year analysis period; this amounts to approximately 177 wells per year. Contributions to employment and income from these uses would provide approximately 220 jobs and $19.4 million in labor income on an average annual basis (Table 4.6.2-2 and Table 4.6.2-3). Approximately 1 percent of employment and labor income would continue to be supported in the minerals sector under this alternative.

As discussed above mineral uses under this alternative would result in higher royalty disbursements to local governments than under the other alternatives.

**Impacts from Locatable Minerals, Mineral Materials, and Non-energy Leasable Minerals Management.** Mineral resource management under this alternative would continue to support levels of saleable, locatable, and leasable mineral resource uses depicted in Table 4.6.2-1.

As discussed above mineral uses under this alternative would result in higher royalty disbursements to local governments than under the other alternatives.

BLM_0017106

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The economic effects generated by management of ACECs are described above under Impacts from Visual Resource Management.

### Alternative B (Preferred Alternative)

As a result of Alternative B, about 675 jobs and $39 million in labor income would be generated in the impact area economy on an average annual basis. This is 94 percent more employment and 110 percent more labor income than contributed currently due to more anticipated gas production under this alternative than levels evaluated under the current scenario. Oil and gas estimates are based on current prices and potential production, and future production and market price cannot be projected; thus, these estimates may not be an accurate portrayal of actual impacts under future market conditions. Approximately 1 percent of employment and labor income would continue to be supported in the minerals sector under this alternative. The largest employment and labor income effects would occur in the Government, Accommodation & Food Services and Mining sectors (See Table 4.6.2-5 and Table 4.6.2-6).

While employment and labor income contributions under this alternative would be the lowest among all the alternatives, apart from Alternative C, more acres would be designated under protected area designations than the other alternatives, except for Alternative C (Table 4.6.2-7). Therefore, this alternative would provide less protection of non-market values and natural amenities than Alternative C, but more than the other alternatives.

The economic impacts from BLM expenditures and employment and externally funded restoration projects under Alternative B would be the same as those described above under Methods and Assumptions and under Alternative A.

Under Alternative B annual payments to counties would be approximately $14.9 million, which includes a portion of PILT payments that can be attributed to BLM entitlement acres, a portion of payments received from grazing revenues, and a portion of royalties received from the sale of mineral material (Table 4.6.2-4). These payments would support about 215 jobs and $11 million in labor income (Table 4.6.2-2 and Table 4.6.2-3). Payments to counties and their impacts under this alternative are lower than Alternative A and Alternative D since the level of permitted grazing and gas production is lower. As discussed above this estimate is based on current prices and potential gas production. Actual production and market price cannot be projected, thus, these estimates may not be an accurate portrayal of actual impacts. Regardless, contributions from these payments to county revenues would increase from current levels (from 1 to 4 percent) and thus would remain an important portion of county revenue within the impact area.

**Impacts from Visual Resource Management.** More areas with protected area designations—VRM Class I and VRM Class II, ACECs, and lands with wilderness characteristics (LWCs)—would occur under Alternative B than under Alternatives A and D, but less than under Alternative C (Table 4.6.2-7). Therefore, this alternative would provide more protection of non-market values and natural amenities among the alternatives apart from Alternative C. Consequently, well-being associated with non-market values and potential contributions from new residents and tourists attracted by natural amenities could be more than these alternatives but less than Alternative D.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** The economic effects generated by management of LWCs characteristics are described above under Impacts from Visual Resource Management.

BLM_0017107

**Impacts from Forestry Management.** Alternative B would allow an average annual harvest of approximately 1,200 MBF of sawtimber (Table 4.6.2-1). As stated above, this estimate is based on the sawtimber PSQ and reflects an annual average of the volume that would be available rather than actual harvest projections. Annual average harvest has been less than 1 percent of this estimate (Table 4.6.2-1). If harvests were to occur at PSQ levels, approximately 17 jobs and $685,000 in labor income (Table 4.6.2-2 and Table 4.6.2-3) would be supported within the local economy. In addition to direct job and income impacts in the forest products industry, these estimates include impacts to industries that provide factors of production to the forest products industry, and other industries impacted by wage related spending. While less volume would be available than under Alternative A, it should be emphasized that less than 1 percent of the average annual available harvest has been removed historically. Consequently, Alternative C could maintain or increase the jobs and labor income levels supported currently since the PSQ estimate is greater than current levels of harvest from BLM lands.

**Impacts from Livestock Grazing Management.** Alternative B would have a smaller permitted use limit than Alternative A and Alternative D, and could thus support fewer average annual AUM contributions (Table 4.6.2-1). On an average annual basis, this permitted use limit would support 32 jobs and $234,000 in labor income within the impact area economy (Table 4.6.2-2 and Table 4.6.2-3). While closure of several inactive allotments yields this decrease, current activity could be accommodated and potentially increase under this alternative. This may be less likely with historic decreases in actual use of AUMs (DOI 2010b). Nonetheless if demand for AUMs existed along with favorable forage and market conditions, the contribution from BLM grazing could relative to current use under this alternative despite the decrease in the permitted use limit. Regardless, BLM grazing related jobs would continue to remain below 1 percent of overall agricultural employment and labor income for the area.

Levels of employment and income associated with Alternative B should not overshadow potential increases in other values as a result of grazing actions under this alternative. The benefit to permittees of low cost BLM forage, below the cost of competitively priced AUMs, would be $486,000. This is less than the maximum potential benefit under Alternative A. However, this is greater than the current value ($310,000), and could reduce conflict and increase value to other resources.

**Impacts from Recreation and Visitor Services Management.** In spite of the decrease in areas open to cross-county travel, it is anticipated that the increase in areas limited to designated routes would accommodate recreation at levels similar to the expected rates of increase discussed under Alternative A. Given this increase, average annual recreation visits are estimated at 338,041 general visits and another 33,576 wildlife related visits (Table 4.6.2-1). Consequent expenditures of these visitors would support approximately 143 jobs and $5.5 million in labor income in the impact area economy on an average annual basis (Table 4.6.2-2 and Table 4.6.2-3).

Jobs and income associated with this alternative should not overshadow the value of experience provided by recreation on BLM lands under this alternative. The absence of actions that support recreation facilities would result in a decrease in the value of experience for some relative to enhanced facilities under Alternative D. However, with the Special Recreation Management Areas and route designation under this alternative, BLM management would likely be more commensurate with desired recreational experiences. For example, certain motorized user segments would benefit from opportunities specifically catered to their interests. Additionally, as conflicts between non-motorized and motorized users are resolved, desired recreation experiences are likely

BLM_0017108

to improve. Consequently, the value of the recreation experience on BLM lands could actually stay the same or slightly increase relative to Alternative A.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Less oil and gas activity would occur under Alternative B than under Alternative A (Table 4.6.2-1). Under this alternative, a total of 3,078 wells are estimated to be drilled on BLM mineral estate within areas with high potential over the 20-year analysis period; this amounts to approximately 154 wells per year. Contributions to employment and income from these uses would provide approximately 191 jobs and $16.9 million in labor income on an average annual basis (Table 4.6.2-2 and Table 4.6.2-3). Approximately 1 percent of employment and labor income would be supported in the minerals sector under this alternative.

Decreases in gas production would result in less royalty disbursements to local governments than under Alternative A and Alternative D.

**Impacts from Locatable Minerals, Mineral Materials, and Non-energy Leasable Minerals Management.** Mineral resource management under this alternative would continue to support current levels of saleable and locatable uses.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The economic effects generated by management of ACECs are described above under Impacts from Visual Resource Management.

### Alternative C
As a result of Alternative C, about 670 jobs and $38 million in labor income would be generated in the impact area economy on an average annual basis. This is 92 percent more employment and 109 percent more labor income than contributed currently due to more anticipated gas production under this alternative than levels evaluated under the current scenario. Oil and gas estimates are based on current prices and potential production and future production and market price cannot be projected. Thus, these estimates may not be an accurate portrayal of actual impacts under future market conditions. In addition, fewer permitted AUMs and less timber volume would be made available (Table 4.6.2-1). These estimates are based on the sawtimber ASQ and AUM permitted use limit and thus reflect an annual average of the maximum available contribution that would be available rather than actual use. The largest employment and labor income effects would occur in the Government, Accommodation & Food Services and Mining sectors (See Table 4.6.2-5 and Table 4.6.2-6).

While employment and labor income contributions under this alternative would be the lowest among the alternatives, more protected area designation would occur than the other alternatives (Table 4.6.2-7). Therefore, this alternative would ensure more protection of non-market values and natural amenities than the other alternatives.

Effects on local economic conditions from BLM expenditures and employment and externally funded restoration projects under Alternative C would be the same as those described above under Methods and Assumptions and under Alternative A. The impacts associated with payments to counties, Recreation and Visitor Services actions, and mineral resource uses under Alternative C would be the same as effects discussed above under Alternative B.

**Impacts from Visual Resource Management.** Under Alternative C, more protected area designations (VRM Class I and VRM Class II, ACECs, and lands with wilderness characteristics) would occur than under

BLM_0017109

the other alternatives (Table 4.6.2-7). Therefore, this alternative would ensure more protection of non-market values and natural amenities than the other alternatives. Consequently, well-being associated with non-market values and potential contributions from new residents and tourists attracted by natural amenities could be more than the other alternatives.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** The economic effects generated by management of LWCs characteristics are described above under Impacts from Visual Resource Management.

**Impacts from Forestry Management.** Alternative C would allow an average annual harvest of approximately 900 MBF of sawtimber (Table 4.6.2-1). As stated above, this estimate is based on the sawtimber PSQ and reflects an annual average of the volume that would be available rather than actual harvest projections. Annual average harvest has been less than 1 percent of this estimate (Table 4.6.2-1). If harvests were to occur at PSQ levels, approximately 12 jobs and $491,000 in labor income (Table 4.6.2-2 and Table 4.6.2-3) would be supported within the local economy. In addition to direct job and income impacts in the forest products industry, these estimates include impacts to industries that provide factors of production to the forest products industry, and other industries impacted by wage related spending. While less volume would be available than under Alternative A, it should be emphasized that less than 1 percent of the average annual available harvest has been removed historically. Consequently, Alternative C could maintain or increase the jobs and labor income levels supported currently since the PSQ estimate is greater than current levels of harvest from BLM.

**Impacts from Livestock Grazing Management.** Alternative C would have a lower permitted use limit than the other alternatives (Table 4.6.2-1). On an average annual basis this grazing would support approximately 31 jobs and $230,000 in labor income (Table 4.6.2-2 and Table 4.6.2-3). While closure of several inactive allotments yields this decrease, current activity could be accommodated and potentially increase under this alternative. This may be less likely with historic decreases in actual use of AUMs (DOI 2010b). Nonetheless, if demand for AUMs existed along with favorable forage and market conditions, the contribution from BLM grazing could increase relative to current use under this alternative despite the decrease in the permitted use limit. Regardless, BLM grazing related jobs would continue to remain below 1 percent of overall agricultural employment and labor income for the area.

Levels of employment and income associated with Alternative C should not overshadow potential increases in other values as a result of grazing actions under this alternative. The benefit to permittees of low cost BLM forage, below the cost of competitively priced AUMs, would be $479,000. This is less than the maximum potential benefit under Alternative A. However, this is greater than the current value ($310,000) and could reduce conflict and increase value to other resources.

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The economic effects generated by management of ACECs are described above under Impacts from Visual Resource Management.

### Alternative D

As a result of Alternative D, about 996 jobs and $59 million in labor income would be generated in the impact area economy on an average annual basis. This is 185 percent more employment and 220 percent more labor income than contributed currently due to higher anticipated gas production, timber product contributions, permitted grazing and recreation visits evaluated under this alternative than levels evaluated under the other

BLM_0017110

action alternatives. Oil and gas estimates are based on current prices and potential production and future production and market price cannot be projected. Thus, these estimates may not be an accurate portrayal of actual impacts under future market conditions. In addition, timber and grazing estimates are based on the sawtimber ASQ and AUM permitted use limit and thus reflects an annual average of the maximum available contribution that would be available rather than actual use. The largest employment and labor income effects would occur in the Government, Accommodation & Food Services and Mining sectors (See Table 4.6.2-5 and Table 4.6.2-6).

While employment and labor income contributions under this alternative would be the highest among the alternatives, less protected area designations would occur than under Alternatives B and C (Table 4.6.2-7). Therefore this alternative would ensure less protection of non-market values and natural amenities than Alternatives B and C, and only slightly more protection than Alternative A.

The economic impacts from BLM expenditures and employment and externally funded restoration projects under Alternative D would be the same as those described above under Methods and Assumptions and under Alternative A.

Under Alternative D annual payments to counties would be approximately $24 million, which includes a portion of PILT payments that can be attributed to BLM entitlement acres, a portion of payments received from grazing revenues, and a portion of royalties received from the sale of mineral material (Table 4.6.2-4). These payments would support about 345 jobs and $17.8 million in labor income (Table 4.6.2-2 and Table 4.6.2-3). Payments to counties and their impacts under this alternative are higher than the other alternatives with higher levels of anticipated gas production. As discussed above this estimate is based on current prices and potential production. Actual production and market price cannot be projected; thus, these estimates may not be an accurate portrayal of actual impacts. Contributions from these payments to local government revenue could potentially increase from current levels (from 1 to 6 percent) and thus would remain an important portion of local government revenue within the impact area.

**Impacts from Visual Resource Management.** Under this alternative, less protected area designations (VRM Class I and VRM Class II, ACECs, and LWCs) would occur than the other alternatives, apart from Alternative A (Table 4.6.2-7). Therefore, this alternative would provide less protection of non-market values and natural amenities among the alternatives, apart from Alternative A. Consequently, well-being associated with non-market values and potential contributions from new residents and tourists attracted by natural amenities could be more than Alternative A but less than Alternatives B and C.

**Impacts from Lands with Wilderness Characteristics (LWCs) Management.** The economic effects generated by management of LWCs characteristics are described above under Impacts from Visual Resource Management.

**Impacts from Forestry Management.** Alternative D would allow an average annual harvest of approximately 1,400 MBF of sawtimber (Table 4.6.2-1). As stated above, this estimate is based on the sawtimber PSQ and reflects an annual average of the volume that would be available rather than actual harvest projections. Annual average harvest has been less than 1 percent of this estimate (Table 4.6.2-1). If harvests were to occur at PSQ levels, approximately 20 jobs and $814,000 in labor income (Table 4.6.2-2 and Table 4.6.2-3) would be supported within the local economy. In addition to direct job and income impacts in the forest products industry, these estimates include impacts to industries that provide factors of production

BLM_0017111

to the forest products industry, and other industries impacted by wage related spending. While less volume would be available than under Alternative A, it should be emphasized that less than 1 percent of the average annual available harvest has been removed historically. Consequently, Alternative D could maintain or increase the jobs and labor income levels supported currently since the PSQ estimate is greater than current levels of harvest from BLM.

**Impacts from Livestock Grazing Management.** Alternative D would have a lower permitted use limit than Alternative A but higher than the other alternatives (Table 4.6.2-1). On an average annual basis this grazing would support approximately 32 jobs and $237,000 in labor income (Table 4.6.2-2 and Table 4.6.2-3). While closure of several inactive allotments yields this decrease relative to Alternative A, current activity could be accommodated and potentially increase under this alternative. This may be less likely with historic decreases in actual use of AUMs (DOI 2010b). Nonetheless, if demand for AUMs existed along with favorable forage and market conditions, the contribution from BLM grazing could increase relative to current use under this alternative despite the decrease in the permitted use limit. Regardless, BLM grazing related jobs would continue to remain below 1 percent of overall agricultural employment and labor income for the area.

Levels of employment and income associated with Alternative B should not overshadow potential increases in other values as a result of grazing actions under this alternative (see Section 3.3.2, Livestock Grazing). The benefit to permittees of low cost BLM forage, below the cost of competitively priced AUMs, would be $493,000. This is less than the maximum potential benefit under Alternative A. However, this is greater than the current value ($310,000) and could reduce conflict and increase value to other resources.

**Impacts from Recreation and Visitor Services Management.** In spite of the decrease in areas open to cross-county travel, it is anticipated that the increase in areas limited to designated routes would accommodate recreation at levels similar to the expected rates of increase discussed under Alternative A. In addition, under Alternative D, improved recreation facilities and management focus would attract additional visitation not experienced under the other alternatives. Given this increase, average annual recreation visits are estimated at 487,543 general visits and another 48,425 wildlife related visits (Table 4.6.2-1). Consequent expenditures of these visitors would support approximately 206 jobs and $7.8 million in labor income in the impact area economy on an average annual basis (Table 4.6.2-2 and Table 4.6.2-3).

Job and income associated with this alternative should not overshadow the value of experience provided by recreation on BLM lands under this alternative. As noted above, actions that support recreation facilities would result in an increase in the value of experience for some relative to the other alternatives. In addition, designation of motorized routes would result in improved landscape health and associated recreation amenity values under this alternative that would likely better match the desired recreational experiences of some visitors. Thus, the value of the recreation experience on BLM lands could increase relative to the other alternatives.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Fluid mineral resource management under Alternative D would support more natural gas related activity than the other alternatives (Table 4.6.2-1). Under this alternative, a total of 5,070 wells are estimated to be drilled on BLM mineral estate within areas with high potential over the 20-year analysis period; this amounts to approximately 254 wells per year. Contributions to employment and income from these uses would provide approximately 315 jobs and $27.8 million in labor income on an average annual basis (Table 4.6.2-2 and Table

BLM_0017112

4.6.2-3). Approximately 1 percent of employment and labor income would be supported in the minerals sector under this alternative.

As discussed above, increases in gas production would result in additional royalty disbursements to local governments than under the other alternatives.

**Impacts from Locatable Minerals, Mineral Materials, and Non-energy Leasable Minerals Management.** Mineral resource management under this alternative would continue to support current levels of saleable and locatable uses (the same as under Alternatives A, B, and C).

**Impacts from Areas of Critical Environmental Concern (ACECs) Management.** The economic effects generated by management of ACECs are described above under Impacts from Visual Resource Management.

### Cumulative Impacts

The regional economy can be affected by a variety of factors including population growth, changes in interest rates, location of new industries, recession, growth of new sectors, tax policy, and state economic policy. When compared to these variables, the management actions under this plan have relatively small effects on the regional economy. Because the changes in economic activity presented above would be largely unnoticeable regionally, there should be no cumulative economic effects regionally. However for smaller areas within counties and communities in the impact area, cumulative economic effects may occur.

#### Forest Products

The potential for biomass utilization within the planning area has been deemed favorable by many (BLM and DOE 2003); however projecting future scenarios for utilization is impractical based on factors outside the scope of BLM management. Utilization is dependent on industry capacity, and decisions to invest in energy development and infrastructure are dependent on factors determined by regional and world markets. In addition, the cost of transportation and removal from public land (i.e. site-specific planning) could hamper development. In the future, with changes in energy markets and technology, utilization of biomass from BLM administered lands in the planning area may become more likely.

#### Grazing

Field office personnel noted the increasing status of allotments in non-use as larger areas of land are split up into smaller private estates and ranchettes (P. Torma and I. Pitman 2010). While these decreasing trends in AUM utilization are largely outside the spectrum of BLM management, current levels of grazing would be supported under all the alternatives, with cooperation of favorable market conditions and willing permittees.

#### Recreation

Travel management planning and forest plan revision is being undertaken on area national forests. The extent and nature of route designations and actions that affect recreation uses on forest service land will determine the economic consequences for the area. Once this RMP is approved, BLM will develop transportation plans that identify a network of routes that will support some current uses now taking place in the area or expected to take place in the future, which will include uses on adjacent national forests.

#### Mineral Resources

Leasable, locatable, and salable mineral production would continue to be provided by BLM in the planning area (Table 4.6.2-1 above). Regardless of differences among the alternatives, area dependency on BLM related

BLM_0017113

employment provided to the mining sector would not change among the alternatives. Consequently, any cumulative economic effects on those dependent on these contributions will remain the same under the alternatives.

## Impacts to Counties

Under all the alternatives, the share of local government revenue attributable to the BLM ranges from 5 to 9 percent in the CRVFO impact area. In addition, the only potential decrease in contributions would occur in the CRVFO impact area where contributions could potentially decrease by 1 percent. Thus, county programs and infrastructure supported by these payments would not differ among the alternatives. Consequently, any cumulative economic effects on those dependent on these contributions would remain the same under all of the alternatives. Similarly, as discussed above in the social and economic sections, costs to local governments would remain unchanged as a result of planning actions. Consequently, changes in population, oil and gas development, or the demand for services and infrastructure would not result from BLM planning actions. As a result, cumulative economic effects to counties will remain the same under all of the alternatives.

## BLM Expenditures and Employment

Under all the alternatives it is assumed the level of expenditures and employment would not vary by alternative, thus the employment and income supported by these actions would not vary among the alternatives. Consequently, cumulative economic effects on those dependent on these contributions would remain the same under the alternatives.

## Externally Funded Ecosystem Restoration

Current levels of management performed on BLM lands in the CRVFO carried out with funds not provided by BLM would continue under all the alternatives. Consequently, associated cumulative economic effects would be the same among the alternatives.

## Role of Amenities, Migration, and Non-Market Values

Establishing areas to be managed for their wilderness character and changes to ACECs, WSR eligibility and Visual Resource Management (Table 4.6.2-8) would further maintain and perhaps enhance non-market values associated with natural amenities protected on these lands. The effects on non-market values from special area designations and management of these attributes on private, state and other federal land cannot be projected. However, the effects could be the greatest under Alternative C and the least under Alternative A, with the respective most and fewest acres designated among the alternatives.

**Table 4.6.2-8**
**Social Indicators**

| Resource | Current | Alternative A No Action | Alternative B Preferred | Alternative C | Alternative D |
|---|---|---|---|---|---|
| Non wildlife recreation (acres) | 244,280 | 338,041 | 338,041 | 338,041 | 487,543 |
| Wildlife recreation (acres) | 24,263 | 33,576 | 33,576 | 33,576 | 48,425 |
| Oil and Gas Development (# of wells per year) | 177 | 177 | 154 | 154 | 254 |
| Oil and Gas Development (average daily trips per year) | 562 | 562 | 489 | 489 | 806 |
| Trails and Travel Management (acres limited to designated routes) | 0 | 123,000 | 467,600 | 467,400 | 473,500 |

BLM_0017114

*Cumulative Effects to Population*

Population increases are also anticipated over the period between 2005 and 2030 within the planning area. According to projections from the Colorado State Demography Office (2009i), the population in the CRVFO impact area would increase by 100 percent (see the Section 3.6.2, Social and Economic Conditions, discussion of population trends). These population increases suggest that challenges associated with increasing uses of BLM lands in the CRVFO impact area will grow along with challenges associated with BLM's urban interface.

In conclusion, projected employment changes in the area suggest economic contributions from BLM management will be small. However, the role BLM plays in the economic aspects of the CRVFO impact area may increase along with the population, since the land managed by BLM sustains area employment, income, and quality of life and will continue to do so under all alternatives. This occurs largely through the provision of natural amenities and recreational opportunities that attract tourists and businesses. None of the alternatives would alter the trends outlined above but would sustain employment, recreation, access, and rural character. While the provision of these resources varies by alternative, these opportunities would be available for a variety of demographic groups, area residents, tourists, and others who value the area.

### 4.6.2.2 Social Conditions

### Methods and Assumptions

The social analysis focuses on changes to social and economic well-being as it relates to the quality of life of those individuals and communities identified in Chapter 3. While many of the potential changes in quality of life can only be discussed qualitatively, several indicators provide an approach to discuss the magnitude of effects to these communities. Table 4.6.2-8 lists these indicators and provides a comparison among the alternatives for communities[1]. Comments from the RMP planning process and the North-Central Colorado Community Assessment Report provided specific information pertaining to the concerns of individuals and groups affected by this plan. All comments were examined and general categories were formed from common themes pertaining to community connections and interests in BLM management. The three communities of interest identified include individuals and groups interested in recreation and access, preservation of rural characteristics and values, and oil and gas development. These are described in Chapter 3, while effects to these communities are discussed below.

The following analytical methods and assumptions were used to complete the analysis for the social impacts from the proposed management decisions:

- The planning area population will continue to increase and age as described in Chapter 3.

- The social groups are defined to facilitate the discussion of social impacts. These discussions simplify what are often quite complex and unique values and attitudes, and the groupings presented here are by no means mutually exclusive. For example, oil and gas workers also participate in recreation activities. It is also worth noting that attitudes, interests, and values often change over time. The social analysis covers the groups and individuals that are most likely to be affected by this plan.

---

[1] Changes in indicators do not imply the same change in quality of life for all communities since marginal changes in quality of life relative to the indicators cannot be considered equal among communities. For example, the change in quality of life associated with an increase in oil and gas development is different for communities interested in recreation from the change in quality of life for those interested in preservation of rural characteristics and values.

BLM_0017115

- The social analysis assesses the potential effects of different management actions on potentially affected social groups. These groups were identified based on the results of public scoping and comments received during the planning process. This analysis addresses the potential impacts of the alternatives based on the issues and concerns raised by these groups. The analysis draws upon ongoing discussions between the BLM and potentially affected publics, as well as discussions with subject matter experts involved in other parts of the analysis. The analysis is primarily qualitative with potential impacts ranked by alternative. Quantitative measures, such as the number of wells, potential traffic, and recreation visitation, are used as appropriate.

- Non-market values, including natural amenities, non-use values, ecosystem services, and aspects of well-being and quality of life are assessed in qualitative terms, as appropriate.

In the absence of quantitative data, a qualitative analysis was performed based on the best available data, as appropriate. Expert opinions were solicited from each CRVFO and the BLM State Office regarding current conditions for specific resources and anticipated outcomes, and were incorporated into the evaluation. Particularly, detractions from existing lifestyles, quality of life, sense of place, and community values did not lend themselves to quantitative analysis. This analysis involved researching the available literature concerning community values and quality of life, including newspaper articles, university research studies, the community assessment report for the planning area, and visitor surveys that reveal public opinions, levels satisfaction, and desired outcomes. The permitted use information derived from these studies was then compared against the anticipated changes in the factors identified as important that would occur under each alternative.

### Recreation and Access

Under all alternatives, wildlife and non-wildlife visits are expected to increase (Table 4.6.2-8). Employment and income related to recreational activities, many of which are dependent on access to public lands, will at minimum continue to support this community's quality of life. While localized changes in access could occur, recreation opportunities will be maintained and enhanced, thus accommodating existing recreation uses and expected increases in recreation uses (Table 4.6.2-8).

Effects of increased visitation on the quality of the recreation experience will depend on the type and location of the recreation activity taking place as well as on the behavior of the individual recreating. No information is currently available on the effects of increased visitation on quality of recreational experience or access to public land. Changes in the quantity and quality of the recreation experiences offered are discussed in the recreation section of this EIS.

Across all alternatives, it is important to recognize that the difference in special management area designations (such as SRMAs and areas open, closed or limited to motorized uses) represents a change in management focus, and may not change the ability to access public land or the uses that occur on that land. In addition, drawing conclusions about changes to access based on acres or route designations may not be appropriate since substantive consideration depends on an accurate proxy for actual portrayal of effects to quality of life. Regardless, as discussed above, it is anticipated that recreation opportunities will be maintained and enhanced with these designations, thus accommodating existing recreation uses and expected increases in recreation uses (Table 4.6.2-8). Therefore, no change in quality of life is anticipated from changes in recreation access; however, the lack of site-specific information on access for other uses makes evaluation impractical.

BLM_0017116

### Preservation of Rural Characteristics and Values

Individuals and communities interested in the preservation of rural characteristics and value noted the importance of access to public land. Effects on access are address in the paragraph directly above. Effects on rural character and value from oil and gas development are discussed under effects by alternative.

### Oil and Gas Development

Under all alternatives, the potential change in population that would result from changes in mineral sector employment would be less than 1 percent of current population levels in the CRVFO impact area. In addition, the housing vacancy rate within the impact areas (25 percent within the CRVFO impact area) would accommodate any changes in housing demand from population changes, since required households would not exceed 1 percent of current vacancies under all the alternatives. However, localized change could be greater for individual counties within the CRVFO impact area. While possible, the maximum potential change would still be small; if all potential changes in population and households within the impact area are examined as a percent of individual county household vacancies, the hypothetical change in vacancy rate would not exceed 4 percent of county vacancies, except in Garfield county where the potential households' percent of current vacancies ranges from 9 to 15. While potential effects on population at a local level are small, they could occur alongside cumulative effects on population from oil and gas development as discussed in the cumulative effects section. As a result of these cumulative effects, changes in housing affordability and availability could adversely affect local economic well-being.

## Environmental Consequences

Impacts on social conditions would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on social conditions under any of the four alternatives.

### Alternative A

**Impacts from Recreation and Visitor Services Management.** Under Alternative A, it is anticipated that recreation use would continue to increase by 2.5 percent per year based on rates of visitation observed in the past (RMIS 2010). Given this increase, average annual recreation visits are estimated at 338,041 general visits and another 33,576 wildlife related visits (Table 4.6.2-8). Thus, Alternative A continues to support quality of life through continued access to public land.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative A, current access for commercial and non-commercial uses would be maintained under current transportation management. Thus, Alternative A continues to support quality of life through continued access to public land.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Of particular concern to those interested in the preservation of rural character and values was increased traffic from oil and gas development. Large traffic volumes can negatively impact quality of life due to traffic congestion, noise, and dust. Additionally, commuting times and threats to the public's health and safety persist because of continued traffic volumes. The number of potential wells is used to estimate potential changes in traffic and is measured in trips made to a well during development. Based on an average of 1,160 trips per well (DOI 2006) and development anticipated (approximately 177 wells completed per year over 20 years), Alternative A would contribute 562 average daily trips (Table 4.6.2-8). This is more than Alternatives B and C, but less than Alternative D.

BLM_0017117

While this traffic volume may not cause traffic congestion by itself (contributing less than 3 percent of current average daily trips along Interstate 70 between Silt and Parachute), it often occurs in rural areas where additional truck traffic, noise, and dust may be easily noticed. Consequently it could negatively impact the quality of life for those living in the vicinity of the development and those who are accustomed to and value a quiet rural setting. While the level and occurrence of this traffic volume along specific roads is not available, the maximum daily trips across the entire planning area would not exceed 10 percent of traffic along Highway 13 between Rifle and Meeker (CDOT 2009).

Employment and income generated from oil and gas development activities contribute to the quality of life for those depending on the industry and connected industries. Under this alternative, 220 jobs would be supported by oil, gas, and mineral uses on BLM lands within the CRVFO (Table 4.6.2-2). Consequently, quality of life for those who depend on oil and gas related employment would continue under this alternative.

Approximately 125 households are dependent on the BLM minerals related employment under this alternative (Table 4.6.2-8), which is no more than 3 percent of total vacancies in individual impact area counties. This does not include Garfield County, where total households supported by BLM minerals related employment could account for 10 percent of current vacancies. Consequently, no effect on the availability and affordability of area housing is anticipated in individual counties, except in Garfield County. Some potential for effects on the availability and affordability of housing exists in Garfield County, given the possibility of concentrated oil and gas activity alongside low housing vacancy rates[2].

### Alternative B
**Impacts from Recreation and Visitor Services Management.** As described below under Impacts from Comprehensive Trails and Travel Management, it is anticipated that the increase in areas limited to designated routes (Table 4.6.2-8) under Alternative B would accommodate recreation access that would be experienced under Alternative A. This access would maintain recreation visitation at the same levels experienced under Alternative A—approximately 338,000 general visits and another 33,600 wildlife-related visits (Table 4.6.2-8).

**Impacts from Comprehensive Trails and Travel Management.** In spite of the decrease in areas open to cross-county travel, it is anticipated that the increase in areas limited to designated routes (Table 4.6.2-8) would accommodate recreation access that would be experienced under Alternative A. In addition, it is anticipated that the designation of routes and site-specific travel management planning will continue to accommodate other commercial and non-commercial uses of public land. Consequently, no change in quality of life is anticipated.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Of particular concern to those interested in the preservation of rural character and values was increased traffic from oil and gas development. Using the same methodology as above to determine the number of average daily trips, Alternative B would result in 489 trips (Table 4.6.2-8). This is the least of all the alternatives. Less traffic than experienced currently could improve quality of life due to less traffic congestion, noise, and dust.

---

[2] It should be noted that these effects are based on current conditions in both the housing and oil and gas markets. Actual oil and gas activity and housing markets cannot be projected. Thus, these estimates may not be an accurate portrayal of actual impacts. However, they do provide a frame of reference for discussion of housing. In addition projected population increases, discussed in Chapter 3 and the cumulative effects section below, also temper potential effects on housing availability and affordability at the local level.

BLM_0017118

Additionally less traffic congestion could lead to decreased commuting times and improved public health and safety.

Regardless, oil and gas related traffic concern would remain for area communities. While this traffic volume may not cause traffic congestion by itself (it could contribute less than 3 percent of current average daily trips along Interstate 70 between Silt and Parachute), it often occurs in rural areas where additional truck traffic, noise, and dust may be easily noticed. Consequently it could negatively impact the quality of life for those living in the vicinity of the development and those who are accustomed to and value a quiet rural setting. While the level and occurrence of this traffic volume along specific roads is not available, the maximum daily trips across the entire planning area would not exceed 8 percent of traffic along Highway 13 between Rifle and Meeker (CDOT 2009).

Employment and income generated from oil and gas development activities contribute to the quality of life for those depending on the industry and connected industries. Under this alternative, 191 jobs would be supported by oil, gas, and mineral uses on BLM lands within the CRVFO (Table 4.6.2-2). Consequently, quality of life for those who depend on oil and gas related employment would continue under this alternative.

Approximately 109 households would be dependent on the BLM minerals related employment under this alternative (Table 4.6.2-8) which is no more than 2 percent of total vacancies in individual impact area counties, apart from Garfield County where total households supported by BLM minerals related employment could account for 9 percent of current vacancies. Consequently, no effect on the availability and affordability of area housing is anticipated in individual counties, except in Garfield County. Some potential for effects on the availability and affordability of housing exists in Garfield County, given the possibility of concentrated oil and gas activity alongside low housing vacancy rates.

## *Alternative C*

Under Alternative C, impacts from Recreation and Visitor Services Management, Comprehensive Trails and Travel Management, and Fluid Minerals Management would be the same as those described above under Alternative B.

## *Alternative D*

**Impacts from Recreation and Visitor Services Management.** As described below under Impacts from Comprehensive Trails and Travel Management, it is anticipated that the recreation levels that would occur under Alternative A would be maintained by the recreation access provided under Alternative D. This access would maintain recreation visitation and other commercial and non-commercial uses of public land at the same levels experienced currently. In addition, facilities development for recreation purposes would provide additional visitation not experienced under the other alternatives: approximately 487,500 general visits and another 48,400 wildlife-related visits (Table 4.6.2-8). Consequently an increase in quality of life relative to the other alternatives could occur.

**Impacts from Comprehensive Trails and Travel Management.** In spite of the decrease in areas open to cross-county travel, it is anticipated that the increase in areas limited to designated routes (Table 4.6.2-8) would accommodate recreation access that would be experienced under Alternative A. This access would maintain recreation visitation and other commercial and non-commercial uses of public land at the same levels experienced currently. Consequently, no change in quality of life is anticipated.

BLM_0017119

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Of particular concern to those interested in the preservation of rural character and values was increased traffic from oil and gas development. Using the same methodology as above to determine the number of average daily trips, Alternative D would result in an estimated 806 trips (Table 4.6.2-8), the most of all the alternatives. More traffic than under the other alternatives would decrease quality of life due to traffic congestion, noise, and dust. Additionally increased traffic could lead to increased commuting times and threats to public health and safety.

While this traffic volume may not cause traffic congestion by itself (it could contribute 4 percent of current average daily trips along Interstate 70 between Silt and Parachute), it often occurs in rural areas where additional truck traffic, noise, and dust may be easily noticed. Consequently it could negatively impact the quality of life for those living in the vicinity of the development and who are accustomed to and value a quiet rural setting. While the level and occurrence of this traffic volume along specific roads is not available, the maximum daily trips across the entire planning area would not exceed 13 percent of traffic along Highway 13 between Rifle and Meeker (CDOT 2009).

Employment and income generated from oil and gas development activities contribute to the quality of life for those depending on the industry and connected industries. Under this alternative, 315 jobs would be supported by oil, gas, and mineral uses on BLM lands within the CRVFO (Table 4.6.2-2). This is more than the current contribution and the other alternatives, consequently quality of life for those who depend on oil and gas related employment could increase under this alternative.

Approximately 180 households would be dependent on the BLM minerals related employment under Alternative D (Table 4.6.2-8). This is no more than 4 percent of total vacancies in individual impact area counties, apart from Garfield County where total households supported by BLM minerals related employment could account for 15 percent of current vacancies. Consequently, no effect on the availability and affordability of area housing is anticipated in individual counties, except in Garfield County. Some potential for effects on the availability and affordability of housing exists in Garfield County, given the possibility of concentrated oil and gas activity alongside low housing vacancy rates.

## Cumulative Impacts

### Recreation

Travel management planning and forest plan revision is being undertaken on area national forests. The extent and nature of route designations and actions that affect recreation uses on forest service land will determine the social consequences for the area. As identified above, once this RMP is approved, the BLM will develop transportation plans that identify a network of routes that will support some current uses now taking place in the area or expected to take place in the future, which will include uses on adjacent national forests.

### Mineral Resources

As discussed above, no additional effect on population change, housing affordability, housing availability, or traffic is anticipated under the alternatives. Under all alternatives, the change in population that would result from changes in mineral sector employment related to BLM activity would be less than half of 1 percent of current population levels within the impact areas. However, localized change could be greater for individual counties within the CRVFO impact area. Consequently, cumulative effects on population could occur to the extent that effects on traffic in rural areas, housing affordability, and housing availability adversely affect local

BLM_0017120

social well-being. As noted above, this depends on concentrated BLM activity in particular counties where vacancy rates are low, such as in Garfield County where 6 percent of housing units are vacant and concentrated oil and gas activity is anticipated.

### Role of Amenities, Migration, and Non-Market Values

Natural amenities and quality of life have been increasingly recognized as important factors in many rural communities in the West (Rudzitis and Johnson 2000). Thus, the established ACECs, WSRs, and land to be managed for wilderness characteristics similarly contribute to area quality of life of communities interested in resource protection. The effects on quality of life from special area designations and management of these attributes on private, state, and other federal land cannot be projected. However, the effects could be the greatest under Alternative C and the least under Alternative A, with the respective most and fewest acres designated among the alternatives (Table 4.6.2-8).

### Cumulative Effects to Population

The role BLM plays in the social aspects of the CRVFO impact area may increase along with the population since the land managed by the BLM sustains area quality of life and will continue to do so under all alternatives. This occurs largely through the provision of natural amenities and recreational opportunities that maintain quality of life. None of the alternatives would alter the trends outlined above, but would sustain aspects of quality of life such as employment, recreation, access, and rural character. While the provision of these resources varies by alternative, these opportunities would be available for a variety of demographic groups, area residents, tourists, and others who value the area.

BLM_0017121

## 4.6.3  Environmental Justice

### Methods and Assumptions

Executive Order 12898, Federal Action to Address Environmental Justice in Minority Populations and Low-Income Populations, requires identifying and addressing disproportionately high and adverse human health and environmental impacts of federal programs, policies, and activities on minority or low-income populations. To evaluate potential environmental justice impacts, guidance obtained from other federal agencies was reviewed, as follows:

- EO 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, February 11, 1994, *Federal Register* at 7630.

- US Environmental Protection Agency, Interim Final Guidance for Incorporating Environmental Justice Concerns in EPA's Compliance Analysis, Office of Federal Activities, September 30, 1997.

- Council on Environmental Quality, Environmental Justice: Guidance under the National Environmental Policy Act, Executive Office of the President, December 1997.

The following four-step method was used to evaluate potential environmental justice impacts associated with land management actions proposed by the BLM:

1. Identify potential minority or low-income populations within the region of influence.

2. Identify a broad range of potential environmental and human health effects that could affect minority or low-income populations, including safety, traffic, exposure to hazardous materials, land use, and socioeconomics.

3. Assess whether these potential impacts would disproportionately affect minority and low-income populations.

4. Evaluate mitigation measures that would be used to minimize impacts on minority and low-income populations.

Relevant Census data for counties within the planning area, including Eagle, Routt, Garfield, Mesa, and Pitkin, as well as for the State of Colorado, were collected for this analysis, as follows:

- Total population.

- Percentage of the population with minority status (e.g., Black or African American, Hispanic or Latino, Asian American, American Indian or Alaskan Native, Native Hawaiian and other Pacific Islander).

- Percentage of the population with low-income status, using annual statistical thresholds from the Bureau of the Census Current Population Reports.

- Percentage of the population with minority status in the entire State of Colorado.

- Percentage of the population with low-income status in the entire State of Colorado, using annual statistical thresholds from the Bureau of the Census Current Population Reports.

BLM_0017122

***Environmental Consequences***

Impacts on environmental justice populations could result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on environmental justice populations under any of the four alternatives. Impacts predominately are associated with programs related to fluid minerals management and recreation and visitor services management.

*Alternative A*

No proposed management actions that would directly affect minority and low-income populations are incorporated into this alternative. However, the proposed management actions could indirectly affect minority or low-income population's quality of life by potentially affecting local housing markets or increasing health and safety risks to children or other environmental justice populations. However, there is no evidence to suggest that minority or low-income populations would be disproportionately affected by these indirect effects. If these effects were to occur, they would probably affect all segments of the area population. Indirect impacts that would result from the proposed management actions could also benefit minority and low-income populations, such as secondary employment that could be generated by increased recreation expenditures in the regional economy and increased oil and gas and energy development. In general, this type of employment occurs in services and retailing industries (Colorado Division of Local Government 2005), which typically employ lower income households.

Under all alternatives, oil and gas development would increase the potential for exposure to the hazardous chemicals involved in oil and gas extraction. Further, the increased traffic congestion, noise, and dust associated with oil and gas operations would be likely to adversely affect the quality of life of populations closest to oil and gas development, some of which would be considered low-income or minority populations. Environmental justice populations also could be affected by oil and gas development to the extent that there could be an influx of transient workers to support oil and gas development, increasing the pressure on the market for affordable housing (Headwaters Economics 2008) in some areas such as Garfield County, where housing vacancies are low and concentrated BLM oil and gas activity is likely. A decrease in housing availability could disproportionately affect low-income families if housing costs (such as property taxes and rents) rise as a share of their income more than the share of the rest of the population. In addition, travel time to work for low-income families could increase if they are displaced as a result of increased costs of housing. Consequently, disproportionate effects on environmental justice populations are possible. These effects are contingent on oil and gas activity and its effect on housing markets, which cannot be accurately projected.

Changes to employment levels identified in Section 4.6.2, Socioeconomics, could affect low-income and minority populations by providing additional employment opportunities. As depicted in Table 4.6.2-5 in Section 4.6.2 Social and Economic Conditions, much of the employment under the alternatives would be generated in the service and retail related sectors (Accommodation & Food Services, Retail Trade, Transportation & Warehousing), which typically provide lower paying jobs that employ members of low-income households. As a share of total employment provided by the alternatives, the construction sector would provide the most employment (Table 4.6.2-5).

Oil and gas development would contribute employment and income to the CRVFO planning area workforce, including low-income and minority populations. While direct employment in the minerals sector, could be taken up by a specialized temporary workforce that would reside in the area only for as long as their skills were required, additional indirect and induced employment would be supported in other industries by the oil and gas related activity on BLM lands.

BLM_0017123

An increase in the oil and gas workforce could also increase the demand for affordable housing in Garfield County, where housing vacancies are low and concentrated BLM oil and gas activity is likely. A decrease in housing availability could disproportionately affect low-income families if housing costs (such as property taxes and rents) rise as a share of their income more than the rest of the population. In addition, travel time to work for low-income families could increase if they are displaced as a result of increased costs of housing. Consequently, disparate effects on environmental justice populations are possible. These effects are contingent on oil and gas activity and its effect on housing markets, which cannot be accurately projected.

Although additional drilling could have health effects associated with exposure to the hazardous chemicals involved in oil and gas extraction, these effects would be distributed among all segment of the population. Consequently, there is no evidence to suggest that minority or low-income populations would be disproportionately affected by the potential health effects.

### _Alternative B (Preferred Alternative)_
Impacts on environmental justice populations would be similar to or the same as those under Alternative A.

### _Alternative C_
Impacts on environmental justice populations would be similar to or the same as those under Alternative A.

### _Alterative D_
Impacts on environmental justice populations would be similar to or the same as those under Alternative A.

BLM_0017124

## 4.7    IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

Section 102(2)(C) of NEPA requires a discussion of any irreversible or irretrievable commitments of resources that are involved in the proposal should it be implemented. An irretrievable commitment of a resource is one in which the resource or its use is lost for a period of time (e.g., extraction of any locatable mineral ore or oil and gas). An irreversible commitment of a resource is one that cannot be reversed (e.g., the extinction of a species or disturbance to protected cultural resources).

The air quality resource in the planning area is not irreversible or irretrievable; however, committed actions that consume PSD increments would use up available PSD increments for other proposed sources. For this EIS, there are no actions by BLM that would require PSD permitting.

Implementation of the RMP management actions would result in surface-disturbing activities, including dispersed recreation, OHV use (especially cross-country OHV use under Alternative A), mineral and energy development, and ROW development, that result in loss of irreversible or irretrievable resources. Although new soil can develop, soil development is a slow process in the planning area. Surface-disturbing activities, therefore, would remove vegetation and accelerate erosion that would contribute to irreversible soil loss. However, management actions and BMPs are intended to reduce the magnitude of these impacts and restore some of the soil and vegetation lost.

Also, surface-disturbing activities could impact areas of high cultural sensitivity or areas containing vertebrate or scientifically significant fossil resources. Such destruction of paleontological and cultural resources could be irreversible and irretrievable.

Fire suppression has led to the accumulation of fuels and makes these forests more susceptible to stand-replacing fires. The loss of forest products from stand-replacing fires is considered an irreversible, and in some instances, irretrievable commitment of resources if an extremely hot fire burned over a long time. Also, if aspen continues to decline in the lands managed by CRVFO, the species could become rare to non-existent in some watersheds and might not be able to be restored.

The extraction and development of nonrenewable fossil fuels (e.g., oil, gas, and coal), locatable minerals, and mineral materials would occur from development over the next 20 years. The impacts would be irretrievable and irreversible because, once extracted, the mineral resource cannot be used again, nor can it be replaced in the foreseeable future.

BLM_0017125

## 4.8   UNAVOIDABLE ADVERSE IMPACTS

Section 102(C) of NEPA requires disclosure of any adverse environmental effects that cannot be avoided should the proposal be implemented. Unavoidable adverse impacts are those that remain following the implementation of mitigation measures, or impacts for which there are no mitigation measures. Some unavoidable adverse impacts occur as a result of implementing the RMP. Others are a result of public use of the BLM lands within the planning area.

Activities planned would produce some level of air emissions even with mitigation; however, none of the activities proposed in this EIS would produce adverse impacts on the air quality resource.

Surface-disturbing activities would result in unavoidable adverse impacts under current BLM policy to foster multiple uses. Although these impacts would be mitigated to the extent possible, unavoidable damage would be inevitable. Permanent conversion of areas to other uses, such as transportation and mineral and energy development or OHV use, would increase erosion and decrease the relative abundance of species within plant communities, the relative distribution of plant communities, and the relative occurrence of seral stages of those communities. Because large portions of the crucial big game habitats coincide with areas of high oil and gas potential, unavoidable wildlife habitat loss would also occur. Areas of high oil and gas potential also coincide with critical habitat of special status species fish and fish-bearing streams within the planning area. Unavoidable adverse impacts on fish and other aquatic wildlife would occur through erosion and sedimentation. These activities would also introduce intrusions, which could affect the visual landscape.

Unavoidable water quality impacts would include temporary increases in suspended loads in flowing streams as a result of culvert installation, vehicle use at low-water crossings, livestock use of streambanks and wetlands, and permitted channel fills resulting from construction of oil and gas pads, roads, and pipelines. Water quantity would be reduced by such activities as water withdrawals for livestock use, oil and gas resource development, and watering of roads for dust mitigation.

Unavoidable soil impacts would occur from activities associated with oil and gas development, including compaction from increased vehicle traffic displacement of soils from the construction pipelines and roads, and erosion.

Unavoidable damage to cultural and paleontological resources from permitted activities could occur if resources undetected during surveys were identified during ground-disturbing activities. In these instances, further impacts would be ceased on discovery and the resource would be mitigated to minimize data loss. Unavoidable loss or destruction of cultural and paleontological resources would also occur in areas open to cross-country OHV use, specifically in areas of high cultural sensitivity or areas containing vertebrate or scientifically significant fossil resources. Unavoidable loss of cultural and paleontological resources due to non-recognition, lack of information and documentation, erosion, casual collection, and inadvertent destruction or use would also occur. Broad-scale sampling and classification of areas with a high likelihood of containing cultural and paleontological resources would be expected to greatly reduce the probability of unavoidable adverse impacts on the resource.

Wildlife and livestock would contribute to soil erosion, compaction, and vegetation loss, which could be extensive during drought cycles and dormancy periods. Conversely, unavoidable losses or damage to forage from human uses in the planning area would affect livestock and wildlife. Some level of competition for

BLM_0017126

forage among the species, although mitigated to the extent possible, would be unavoidable. Instances of displacement, harassment, and injury could also occur.

Recreational activities, development of energy and mineral resources, and general use of the planning area would introduce additional ignition sources into the planning area, which would increase the probability of wildland fire occurrence and the need for suppression activities. These activities combined with continued fire suppression would also affect the overall composition and structure of vegetation communities, which could increase the potential for high-intensity wildland fires.

As recreation demand increases, recreation use would disperse, creating unavoidable conflicts between recreation user types, such as those seeking more primitive types of recreation and motorized users, sharing recreation areas. In areas where development activities would be greater, the potential for displaced users would increase. As recreation demand increases, conflicts between recreational planning and natural resources planning could also occur.

Numerous land use restrictions imposed throughout the planning area to protect sensitive resources and other important values, by their nature, affect the ability of operators, individuals, and groups who use the BLM lands to do so freely without limitations. These restrictions could also require the closing of roads and trails or the limiting of certain modes or seasons of travel. Although attempts would be made to minimize these impacts by limiting them to the level of protection necessary to accomplish management objectives and by providing alternative use areas for affected activities, unavoidable adverse impacts would occur under all alternatives.

BLM_0017127

## 4.9 RELATIONSHIP BETWEEN LOCAL SHORT-TERM USES AND LONG-TERM PRODUCTIVITY

Section 102(C) of NEPA requires discussion of the relationship between local, short-term uses of human environment and the maintenance and enhancement of long-term productivity of resources. As described in the introduction to this chapter, "short term" is defined as anticipated to occur within 1 to 5 years of implementation of the activity; "long term" is defined as following the first 5 years of implementation but within the life of the RMP.

Short-term use of the air quality resource would not affect long-term productivity, except that air quality emissions in high enough concentrations could reduce vegetation and plant vigor.

Short-term use of an area to foster energy and minerals, ROWs, and cross-country OHV use would result in long-term loss of soil productivity and vegetation diversity. Impacts would persist as long as surface disturbance and vegetation loss continued.

The short-term use of big game severe winter range, birthing areas, and/or migratory corridors for energy and minerals, ROWs, and cross-country OHV use could impair the long-term productivity of big game populations by displacing animals from primary habitats and removing components of these habitats that might not be restored for more than 20 years. These short-term uses could also affect the long-term sustainability of some special status species. Long-term productivity, survivorship, and health could be impaired by the long-term use of big game winter range, birthing areas, migratory corridors, and by long-term use activities located near water bodies containing special status species, for energy and minerals, ROWs, and cross-country OHV use. This could occur by displacing animals in areas permanently open to recreational uses and areas permanently altered. Actions associated with specific leases lasting longer than 5 years, but within the life of this RMP, could affect the long-term sustainability of special status species known to occur in the planning area.

BLM_0017128



# Draft Resource Management Plan and Draft Environmental Impact Statement for the Colorado River Valley Field Office, Colorado

Control Number DES 11-33

## Volume III: Appendix A Figures

**U.S. Department of the Interior**
**Bureau of Land Management**
**Colorado River Valley Field Office, Colorado**
**September 2011**

BLM

COLORADO RIVER VALLEY FIELD OFFICE, COLORADO

BLM_0017129

Note to reader: Because the scale of these figures is large, it may be difficult to discern the details of a particular area of interest. In order to ensure that the public has full access to the detailed mapping in this document, higher resolution digital versions of these maps are available online at http://www.blm.gov/co/st/en/BLM_Programs/land_use_planning/rmp/kfo-gsfo/crv.html and can be provided on disc by request by telephoning the Colorado River Valley Field Office at 970-876-9000 or by emailing a request to CRVFO_web@blm.gov. Printed versions of the original 11-by-17-inch mapping are available for viewing at the Colorado River Valley Field Office, 2300 River Frontage Road, Silt, Colorado 81652.

# Volume III: Appendix A – Figures

**Number**      **Name**

1-1 .............. Project Planning Area
1-2 .............. Planning Area and Land Status
2-1 .............. Alternative A:  No Surface Occupancy for Surface-Disturbing Activities
2-2 .............. Alternative B:  No Surface Occupancy for Surface-Disturbing Activities
2-3 .............. Alternative C:  No Surface Occupancy for Surface-Disturbing Activities
2-4 .............. Alternative D:  No Surface Occupancy for Surface-Disturbing Activities
2-5 .............. Alternative A:  Controlled Surface Use for Surface-Disturbing Activities
2-6 .............. Alternative B: Controlled Surface Use for Surface-Disturbing Activities
2-7 .............. Alternative C: Controlled Surface Use for Surface-Disturbing Activities
2-8 .............. Alternative D: Controlled Surface Use for Surface-Disturbing Activities
2-9 .............. Alternative A:  Timing Limitations for Surface-Disturbing Activities
2-10 ............ Alternatives B and C: Timing Limitations for Surface-Disturbing Activities
2-11 ............ Alternative D: Timing Limitations for Surface-Disturbing Activities
2-12 ............ Alternative A: Closed to Fluid Minerals Leasing (Oil and Gas, Oil Shale, Geothermal)
2-13 ............ Alternative B: Closed to Fluid Minerals Leasing (Oil and Gas, Oil Shale, Geothermal)
2-14 ............ Alternative C: Closed to Fluid Minerals Leasing (Oil and Gas, Oil Shale, Geothermal)
2-15 ............ Alternative D: Closed to Fluid Minerals Leasing (Oil and Gas, Oil Shale, Geothermal)
2-16 ............ Alternative A:  Visual Resource Management
2-17 ............ Alternative B:  Visual Resource Management
2-18 ............ Alternative C:  Visual Resource Management
2-19 ............ Alternative D:  Visual Resource Management
2-20 ............ Alternative B: Commercial Forest Management
2-21 ............ Alternative C: Commercial Forest Management
2-22 ............ Alternative D: Commercial Forest Management
2-23 ............ Alternative A: Grazing Allotments
2-24 ............ Alternative B: Grazing Allotments
2-25 ............ Alternative C: Grazing Allotments
2-26 ............ Alternative D: Grazing Allotments
2-27 ............ Alternative A: No Camping Areas
2-28 ............ Alternative B: No Camping Areas
2-29 ............ Alternative C: No Camping Areas
2-30 ............ Alternative D: No Camping Areas
2-31 ............ Alternative A: No Shooting Areas
2-32 ............ Alternatives B and C: No Shooting Areas
2-33 ............ Alternative D: No Shooting Areas
2-34 ............ Alternative A: Special Recreation Management Areas
2-35 ............ Alternative B: Special Recreation Management Areas
2-36 ............ Alternative C: Special Recreation Management Areas
2-37 ............ Alternative D: Special Recreation Management Areas
2-38 ............ Alternative A: OHV Area Designations
2-39 ............ Alternative B: OHV Area Designations

BLM_0017131

**Number**   **Name**

2-40 ............ Alternative C: OHV Area Designations

2-41 ............ Alternative D: OHV Area Designations

2-42 ............ Alternatives A, B, C, and D: Winter Closures for Motorized and Mechanized Travel to Protect Big Game

2-43 ............ Alternative B: Right-of-Way Avoidance and Exclusion Areas

2-44 ............ Alternative C: Right-of-Way Avoidance and Exclusion Areas

2-45 ............ Alternative D: Right-of-Way Avoidance and Exclusion Areas

2-46 ............ Alternatives B, C, and D: Wind Energy

2-50 ............ Alternative A: Locatable Minerals

2-51 ............ Alternative B: Locatable Minerals

2-52 ............ Alternative C: Locatable Minerals

2-53 ............ Alternative D: Locatable Minerals

2-54 ............ Alternatives A, B, C, and D: Coal Leasing

2-55 ............ Alternative A: Closed to Mineral Material Disposal and Non-Energy Leasables

2-56 ............ Alternative B: Closed to Mineral Material Disposal and Non-Energy Leasables

2-57 ............ Alternative C: Closed to Mineral Material Disposal and Non-Energy Leasables

2-58 ............ Alternative D: Closed to Mineral Material Disposal and Non-Energy Leasables

2-59 ............ Alternative A: Special Designations

2-60 ............ Alternative B: Special Designations

2-61 ............ Alternative C: Special Designations

2-62 ............ Alternative D: Special Designations

2-63 ............ Alternative C: Areas Managed for Wilderness Characteristics Outside WSAs

2-64 ............ Alternative B: Segments Suitable for Inclusion in the NWSRS

2-65 ............ Alternative C: Segments Suitable for Inclusion in the NWSRS

3.2.1-1 ........ Aspen PM10 Maintenance Area

3.2.1-2 ........ Clean Air Act Class I Areas

3.2.4-1 ........ Watersheds

3.2.4-2 ........ Water Resources

3.2.5-1 ........ Vegetation Types

3.2.5-2 ........ Riparian Proper Functioning Condition Assessment

3.2.6-1 ........ Fisheries

3.2.6-2 ........ Elk Summer Range

3.2.6-3 ........ Elk Winter Range

3.2.6-4 ........ Mule Deer Summer Range

3.2.6-5 ........ Mule Deer Winter Range

3.2.6-6 ........ Bighorn Sheep Range

3.2.7-1 ........ Greater Sage-grouse Habitat

3.2.7-2 ........ Canada Lynx LAUs and Linkages

3.3.3-1 ........ Recreation Sites

3.3.6-1 ........ Oil and Gas Leases and Occurrence Potential

3.3.6-2 ........ Oil and Gas Well Locations

3.3.7-1 ........ Wind Energy Potential

3.3.7-2 ........ Biomass Potential

3.3.7-3 ........ Regions of Known or Potential Geothermal Resources

3.4.3-1 ........ Stream Segments Eligible for Inclusion in the National Wild and Scenic River System

**Number**      **Name**

C-ES-1........ Suitable Segments and Project Region
O-1 ............. Travel Management Zones
O-2 ............. Alternative A Travel Routes in Zone A
O-3 ............ Alternative A Travel Routes in Zone B
O-4 ............ Alternative A Travel Routes in Zone C
O-5 ............ Alternative A Travel Routes in Zone D
O-6 ............. Alternative A Travel Routes in Zone E
O-7 ............. Alternative A Travel Routes in Zone F
O-8 ............ Alternative A Travel Routes in Zone G
O-9 ............ Alternative A Travel Routes in Zone H
O-10 ........... Alternative A Travel Routes in Zone I
O-11 ........... Alternative A Travel Routes in Zone J
O-12 ........... Alternative A Travel Routes in Zone K
O-13 ........... Alternative A Travel Routes in Zone L
O-14 ........... Alternative A Travel Routes in Zone M
O-15 ........... Alternative A Travel Routes in Zone N
O-16 ........... Alternative A Travel Routes in Zone O
O-17 ........... Alternative A Travel Routes in Zone P
O-18 ........... Alternative A Travel Routes in Zone Q
O-19 ........... Alternative A Travel Routes in Zone R
O-20 ........... Alternative B Travel Routes in Zone A
O-21 ........... Alternative B Travel Routes in Zone B
O-22 ........... Alternative B Travel Routes in Zone C
O-23 ........... Alternative B Travel Routes in Zone D
O-24 ........... Alternative B Travel Routes in Zone E
O-25 ........... Alternative B Travel Routes in Zone F
O-26 ........... Alternative B Travel Routes in Zone G
O-27 ........... Alternative B Travel Routes in Zone H
O-28 ........... Alternative B Travel Routes in Zone I
O-29 ........... Alternative B Travel Routes in Zone J
O-30 ........... Alternative B Travel Routes in Zone K
O-31 ........... Alternative B Travel Routes in Zone L
O-32 ........... Alternative B Travel Routes in Zone M
O-33 ........... Alternative B Travel Routes in Zone N
O-34 ........... Alternative B Travel Routes in Zone O
O-35 ........... Alternative B Travel Routes in Zone P
O-36 ........... Alternative B Travel Routes in Zone Q
O-37 ........... Alternative B Travel Routes in Zone R
O-38 ........... Alternative C Travel Routes in Zone A
O-39 ........... Alternative C Travel Routes in Zone B
O-40 ........... Alternative C Travel Routes in Zone C
O-41 ........... Alternative C Travel Routes in Zone D
O-42 ........... Alternative C Travel Routes in Zone E
O-43 ........... Alternative C Travel Routes in Zone F

BLM_0017133

**Number**       **Name**

O-44 ........... Alternative C Travel Routes in Zone G
O-45 ........... Alternative C Travel Routes in Zone H
O-46 ........... Alternative C Travel Routes in Zone I
O-47 ........... Alternative C Travel Routes in Zone J
O-48 ........... Alternative C Travel Routes in Zone K
O-49 ........... Alternative C Travel Routes in Zone L
O-50 ........... Alternative C Travel Routes in Zone M
O-51 ........... Alternative C Travel Routes in Zone N
O-52 ........... Alternative C Travel Routes in Zone O
O-53 ........... Alternative C Travel Routes in Zone P
O-54 ........... Alternative C Travel Routes in Zone Q
O-55 ........... Alternative C Travel Routes in Zone R
O-56 ........... Alternative D Travel Routes in Zone A
O-57 ........... Alternative D Travel Routes in Zone B
O-58 ........... Alternative D Travel Routes in Zone C
O-59 ........... Alternative D Travel Routes in Zone D
O-60 ........... Alternative D Travel Routes in Zone E
O-61 ........... Alternative D Travel Routes in Zone F
O-62 ........... Alternative D Travel Routes in Zone G
O-63 ........... Alternative D Travel Routes in Zone H
O-64 ........... Alternative D Travel Routes in Zone I
O-65 ........... Alternative D Travel Routes in Zone J
O-66 ........... Alternative D Travel Routes in Zone K
O-67 ........... Alternative D Travel Routes in Zone L
O-68 ........... Alternative D Travel Routes in Zone M
O-69 ........... Alternative D Travel Routes in Zone N
O-70 ........... Alternative D Travel Routes in Zone O
O-71 ........... Alternative D Travel Routes in Zone P
O-72 ........... Alternative D Travel Routes in Zone Q
O-73 ........... Alternative D Travel Routes in Zone R

BLM_0017134



**Project Planning Area**

**Figure 1-1**

BLM_0017135



Source: BLM 2006.

**Planning Area and Land Status**

Figure 1-2



Alternative A:  No Surface Occupancy for Surface-Disturbing Activities

Figure 2-1



**Alternative B:  No Surface Occupancy for Surface-Disturbing Activities**

Figure 2-2

BLM_0017138



**Alternative C:  No Surface Occupancy for Surface-Disturbing Activities**

Figure 2-3



Colorado River Valley Field Office of the Colorado BLM

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data.

**Alternative D: No Surface Occupancy for Surface-Disturbing Activities**

Figure 2-4



**Colorado River Valley Field Office of the Colorado BLM**

Legend:

- ■ Controlled Surface Use for Surface-Disturbing Activities
- • Cities
- ▭ Planning Area Boundary
- ▨ Federal Mineral Estate on Non-BLM Lands

**Land Status**
- Bureau of Land Management
- Bureau of Reclamation
- Department of Defense
- Local Government
- Private
- State
- US Forest Service

General Location Map

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data.

NATIONAL SYSTEM OF PUBLIC LANDS

0  5  10  20 Miles

**Alternative A:  Controlled Surface Use for Surface-Disturbing Activities**

Figure 2-5

BLM_0017141



**Alternative B: Controlled Surface Use for Surface-Disturbing Activities**

Figure 2-6



Colorado River Valley Field Office of the Colorado BLM

**Alternative C: Controlled Surface Use for Surface-Disturbing Activities**

Figure 2-7



Alternative D: Controlled Surface Use for Surface-Disturbing Activities

Figure 2-8

BLM_0017144



**Alternative A:  Timing Limitations for Surface-Disturbing Activities**

Figure 2-9

BLM_0017145



**Alternatives B and C: Timing Limitations for Surface-Disturbing Activities**

Figure 2-10

BLM_0017146



Alternative D: Timing Limitations for Surface-Disturbing Activities

Figure 2-11



# Colorado River Valley Field Office of the Colorado BLM

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data.

**Alternative A: Closed to Fluid Minerals Leasing (Oil and Gas, Oil Shale, Geothermal)**

Figure 2-12



Alternative B: Closed to Fluid Minerals Leasing (Oil and Gas, Oil Shale, Geothermal)

Figure 2-13

BLM_0017149



Alternative C: Closed to Fluid Minerals Leasing (Oil and Gas, Oil Shale, Geothermal)

Figure 2-14

BLM_0017150



Colorado River Valley Field Office of the Colorado BLM

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data.

**Alternative D: Closed to Fluid Minerals Leasing (Oil and Gas, Oil Shale, Geothermal)**

Figure 2-15



Colorado River Valley Field Office of the Colorado BLM

**VRM Class**
- Class I
- Class II
- Class III
- Class IV
- Class V
- Urban
- Cities
- Planning Area Boundary

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data.

**Alternative A:  Visual Resource Management**

Figure 2-16

BLM_0017152



Colorado River Valley Field Office of the Colorado BLM

**VRM Class**
- Class I
- Class II
- Class III
- Class IV
- Class V
- Urban
- Cities
- Planning Area Boundary

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data.

**Alternative B:  Visual Resource Management**

Figure 2-17



Colorado River Valley Field Office of the Colorado BLM

Alternative C:  Visual Resource Management

Figure 2-18

BLM_0017154



**Alternative D:  Visual Resource Management**

Figure 2-19



**Colorado River Valley Field Office of the Colorado BLM**

**Forest Management**
- Intensive
- Closed

- Cities
- Planning Area Boundary

**Land Status**
- Bureau of Land Management
- Bureau of Reclamation
- Department of Defense
- Local Government
- Private
- State
- US Forest Service

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data.

0  5  10  20  Miles

**Alternative B: Commercial Forest Management**

Figure 2-20

BLM_0017156



Alternative C: Commercial Forest Management

Figure 2-21

BLM_0017157



**Alternative D: Commercial Forest Management**

Figure 2-22



Colorado River Valley Field Office of the Colorado BLM

Alternative A: Grazing Allotments

Figure 2-23

BLM_0017159



Alternative B: Grazing Allotments

Figure 2-24



Alternative C: Grazing Allotments

Figure 2-25

BLM_0017161



Colorado River Valley Field Office of the Colorado BLM

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data.

**Alternative D: Grazing Allotments**

Figure 2-26



Alternative A: No Camping Areas

Figure 2-27

BLM_0017163



**Alternative B: No Camping Areas**

Figure 2-28



**Alternative C: No Camping Areas**

Figure 2-29



Alternative D: No Camping Areas

Figure 2-30

BLM_0017166



Alternative A: No Shooting Areas

Figure 2-31



**Alternatives B and C: No Shooting Areas**

Figure 2-32

BLM_0017168



**Alternative D: No Shooting Areas**

Figure 2-33

BLM_0017169



Alternative A: Special Recreation Management Areas

Figure 2-34

BLM_0017170



Alternative B: OHV Area Designations

Figure 2-39

BLM_0017171



Alternative C: OHV Area Designations

Figure 2-40

BLM_0017172



Alternative D: OHV Area Designations

Figure 2-41

BLM_0017173



Source: BLM 2011.

**Alternatives A, B, C, and D: Winter Closures for Motorized and Mechanized Travel to Protect Big Game**

Figure 2-42



Alternative B: Right-of-Way Avoidance and Exclusion Areas

Figure 2-43



Colorado River Valley Field Office of the Colorado BLM

**Alternative C: Right-of-Way Avoidance and Exclusion Areas**

Figure 2-44