**Recreation:** This segment is intensively used for rafting and kayaking.

**Water Supply**: The Town of Hot Sulphur Springs diverts water from the Colorado River for its municipal water supply. Hot Sulphur Springs Resort draws from an alluvial well.

**Agriculture**: Livestock operations have been and continue to be active in the Upper Colorado River basin, although fewer such operations remain as ranchland is converted to urban land use. Crops in the upper basin are limited to irrigated and non-irrigated hay. Farther downriver alfalfa, and spring and winter wheat are cultivated.

**Point Sources:** Domestic wastewater treatment facilities operated by the Town of Hot Sulphur Springs, Ouray Ranch, Colorado Division of Wildlife (Windy Gap Reservoir Visitor's Center), and the Colorado Department of Transportation (Grizzly Creek and Hanging Lake Rest Areas and Bair Ranch) discharge to this segment. The Town of Hot Sulphur Springs also operates a water treatment plant that discharges filter backwash. Rayners Trailer Court discharges to alluvial groundwater. Glenwood Hot Springs, Rock Gardens Campground, Pitkin Iron Corporation (Redstone well), and Shorefox Subdivision also discharge to this segment.

**Water Quality:** Water quality data were collected in this segment by WQCD, USGS, Northern Colorado Water Conservancy District, and River Watch (RW). WQCD collected samples at Colorado River near Dotsero (WQCD #46), Colorado River upstream of Roaring Fork River (WQCD #12100), Colorado River upstream of State Bridge at Highway 131 (WQCD #12103), Colorado River below Granby Reservoir at Highway 34 (WQCD #12105), and North Fork Colorado River at Highway 34 (WQCD #12106). USGS collected samples at Colorado River below Lake Granby, CO (USGS # 9019000), Colorado River near Granby, CO (USGS # 9019500), Colorado River at Windy Gap, near Granby, CO (USGS # 9034250), Colorado River near Kremmling, CO (USGS # 9058000), Colorado River near Dotsero, CO (USGS # 9070500), Colorado River above Glenwood Springs, CO (USGS # 9071750), Colorado River at Bond, CO (USGS # 395306106415601). Northern Colorado Water Conservancy District collected samples at the Colorado River above Fraser River Confluence (CR-WGU). River Watch collected samples at Colorado River at Hot Sulphur Springs (RW #203), Colorado River at Windy Gap (RW #543), and Colorado River at Pedestrian Bridge (RW #46).

**Exceedances:** In Colorado River below Granby Reservoir at Highway 34 (WQCD #12105) there was an exceedance of the acute dissolved cadmium, dissolved copper and dissolved zinc standards, North Fork Colorado River at Highway 34 (WQCD #12106) there was an exceedance of the acute dissolved copper standard, Colorado River below Lake Granby, CO (USGS # 9019000) there was an exceedance of the chronic dissolved zinc sculpin standard and chronic total recoverable arsenic standard, Colorado River at Windy Gap, near Granby, CO (USGS # 9034250) there was an exceedance of the maximum pH standard, chronic dissolved manganese standard, and chronic total recoverable arsenic standard, at the Colorado River near Kremmling, CO (USGS # 9058000) there was an exceedance of the chronic dissolved manganese standard and chronic total recoverable arsenic standard, and in Colorado River above Fraser River Confluence (CR-WGU) there was an exceedance of the chronic dissolved manganese standard.

BLM_0017886

**U.S. Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, CO  81401**

# ENVIRONMENTAL ASSESSMENT

**NUMBER:**  DOI-BLM-CO-S050-2011-0007 EA

**PROJECT NAME:**  North Rim Integrated Vegetation Management Plan

**PLANNING UNIT:**  Gunnison Gorge NCA

**LEGAL DESCRIPTION:**   T15S R93W Sec. 28-33, T49N R7W Sec. 1&2, T50N R6W Sec. 6-7,18,29-30, T50N R7W Sec. 1-26, 28-30, 32, 34-36, T50N R8W Sec. 1-5, 8-15, 23-24, T51N R7W Sec. 19, 29-34, T51N R8W Sec. 7-8, 21-29, 31-36

**APPLICANT:** USDOI, Bureau of Land Management, Uncompahgre Field Office

**PURPOSE AND NEED FOR THE ACTION:**
The purpose of the proposed action is to analyze a project to improve conditions within the North Rim Landscape Strategy area.  The need is to enhance habitat for Gunnison Sage Grouse; restore an appropriate mix of vegetation types and seral stages to benefit elk and mule deer; reduce elk and deer conflicts with private lands and sage grouse lek areas; reduce fuel loading, fuel continuity and potential fire spread near private lands and improvements; and improve ecosystem health across the North Rim landscape.

**BACKGROUND/INTRODUCTION:**
The North Rim Landscape Strategy (NRLS) area encompasses 345 square miles or approximately 220,679 acres of land with a mixed ownership pattern represented by Bureau of Land Management (BLM), National Park Service (NPS), US Forest Service (USFS), State, and private lands (table 1).  The North Rim Landscape Strategy makes broad recommendations for the management of the area and serves as a guide for both short and long-term planning at the landscape scale and as a resource in future site-specific project planning.  Site-specific projects are analyzed through National Environmental Policy Act (NEPA) analysis.

This Environmental Analysis addresses proposed vegetation treatments within a project area of approximately 28,453 acres on BLM and NPS managed lands within the larger Strategy area.  The NPS has completed NEPA on their portion of the project area.  Some isolated private lands could also be included depending on landowner participation and agreements between the federal and state agencies and individual landowners.

1

BLM_0017887

TABLE 1:  Project Area Acreage by Ownership

| Ownership | Acres |
|---|---|
| BLM | 14,994 |
| NPS | 4,638 |
| Private in Project Area | 8,821 |
| Total | 28,453 |

The North Rim landscape is feeling the strain of sustaining varied multiple uses.  Because of this, the North Rim Landscape Management Strategy (NRLSW 2010) was developed to make broad recommendations for management to help resolve several issues on the larger landscape.  These issues include a small Gunnison sage-grouse population that is struggling to remain viable, burgeoning elk population and distribution that is impacting private lands, increasing human development, and recreational use that is impacting grouse habitats.  Encroaching human development has limited the ability to manage essential natural processes, particularly fire, on the landscape, which in turn influences fire behavior and impacts sage grouse and other habitat.

The North Rim area has been identified as crucial Gunnison sage grouse habitat due to the small marginally viable population, limited habitat suitability (particularly specific seasonal habitats), and the species potential listing for protection under the Endangered Species Act.  This particular subpopulation is one of only a few remaining subpopulations and as such has great value for its genetic diversity.   Most of the BLM lands within the area are part of the Gunnison Sage Grouse Area of Critical Environmental Concern (ACEC).  The Gunnison Sage Grouse Conservation Plan for the Crawford area states that habitat quality and quantity are one of the major factors that drive sage grouse population (CWG 2011). Targeted vegetation treatments would help to enhance habitat for several stages of the sage grouse life cycle where pinyon and juniper trees are establishing in sagebrush communities, where the understory community is degraded, and where sagebrush canopy is not at optimal levels. Vegetation treatments outside of sage grouse occupied habitat might also draw deer and elk away from the occupied habitat, thereby reducing their competition with and disruption of the Gunnison Sage grouse.

The North Rim area has also been identified as an important elk and deer utilization area with the majority of elk use occurring during critical times during the winter.  Deer and elk also spend much time on private lands, leading to conflicts with agricultural producers and other landowners in the area.  The winter elk use also has impacts on grouse habitats, particularly on nesting and brood rearing habitat, which are key locations essential for the long-term survival of this subpopulation.  Recent elk monitoring data on the North Rim landscape indicates that elk distribution has in the past been shifted to new locations through vegetation treatments, particularly prescribed burning.  Vegetation treatments to help influence elk distribution could be beneficial both in reducing the number of elk impacting private lands as well as in keeping elk impacts away from crucial grouse habitats.

Residences and other improvements on private lands could be at risk from wildfire should an ignition move off of public lands.  Also, portions of public lands which support a marginally viable Gunnison sage grouse population are at risk from ignitions.  Fuel reduction work is proposed to address concerns to sage grouse and private lands regarding impacts from an undesirable wildfire ignition.

2

BLM_0017888

Land Health Assessments (LHAs) for 110,000 BLM acres across this landscape were completed in 2001 (BLM 2001) and encompassed portions of the proposed project area. The assessment indicates that the following ecological issues are present on the larger landscape, and may well be present throughout the proposed project area as well: heightened risk of erosion, lack of perennial grasses and forbs, extensive invasions by non-native species, scattered noxious weed infestations, low shrub vigor in some areas, and problems with vegetation age-class diversity and desired landscape mosaics. Recommendations in the LHA to alleviate some of the issues include utilizing a combination of mechanical treatments and fire followed by seeding as necessary. The proposed project would help to reverse or reduce some of these trends. Gunnison Gorge LHA will be revisited in 2011 to assess change.

<u>Previous Treatments in the North Rim Landscape Area</u>

There have been many small to moderate size treatments within the North Rim Landscape Area. As much as 20% of the BLM land area appears to have received some type of vegetation treatment or wildfire over the past 40 years. The NRLS strategy recommends that the BLM conduct an analysis of the extent and effectiveness of past habitat treatments during the Land Health Assessment process in 2011. This analysis would be used to check treatment effectiveness and to apply adaptive management to future projects to address problems that may have resulted from the previous treatments.

In the past these treatments have been primarily mechanical treatments to enhance sage grouse habitat or to improve livestock and big game forage. The primary tool used to treat these areas was a roller chopper or brush mower. Two or three areas had prescribed fire implemented on them over the past 10-15 years, and there have been some wildfires. In addition, a tree removal project to improve sage grouse habitat took place in 2010.

## HABITAT and PROJECT OBJECTIVES

The interdisciplinary team (IDT) using the North Rim Landscape Strategy recommendations and other available plans, research, and data, has developed initial 'emphasis areas' within the project area. These emphasis areas will focus efforts on specific resource concerns, but will not exclude options for the other concerns. These emphasis areas include a Sage Grouse emphasis area, an Elk emphasis area, a more general Big Game emphasis area, and a Wildland Urban Interface (WUI) emphasis area. For each of these emphasis areas the IDT identified desired vegetation mosaics and objectives that should optimize vegetation seral and structural stage distribution and pattern to address the target of each emphasis area. The mosaics/objectives are identified in the Montrose Interagency Fire Management Plan.

Objectives of the project are to enhance habitat for Gunnison sage grouse; restore an appropriate mix of vegetation types and seral stages to benefit elk and mule deer; locate treatments so that they reduce fuel loading, fuel continuity and potential fire spread near private lands and improvements; and improve ecosystem health across the landscape.

The <u>primary goal</u> within the Gunnison Sage Grouse ACEC is to not degrade Gunnison sage

3

grouse habitat.  Where there is conflict or concern for the health of the sage grouse habitat, the Sage Grouse Emphasis Area objectives become primary.

## DESCRIPTION OF PROPOSED ACTION AND ALTERNATIVES

Proposed Action

Each year, UFO staff will review proposed projects to ensure compliance with cultural, T&E and Visual Resource programs, and compliance with objectives in this EA, the NRLS strategy, and the Gunnison Sage-grouse Range-wide Conservation Plan.

The proposed action is to use a combination of prescribed fire and mechanical treatments to achieve habitat and project objectives (above) within the project area (map, page 6).  Work on the project will take place over the next 10 years.  The first five years will emphasize mechanical treatments aimed at improving sage grouse habitat suitability, restoring former sagebrush dominant vegetation communities, minimizing the risk to and from the urban interface, and to prepare areas for prescribed burning by creating control lines and appropriate fuel beds.  The prescribed burning emphasis will primarily take place in years 3-10, after the mechanical treatments have been implemented to reduce wildfire risk to the urban interface and key sage grouse habitats.

### Sage Grouse Emphasis Area

The focus of this area is to enhance habitat for Gunnison sage grouse and improve ecosystem health.  The Sage Grouse Emphasis Area covers approximately 4,500 acres of BLM lands.  This emphasis area has 3 life cycle habitats: Leks, Nesting, and Brood Rearing habitats, each with different objectives.  Objectives were developed from Appendix H of the GUSG Structural Habitat Guidelines (Gunnison Sage-grouse Range-wide Steering Committee [GSRSC], 2005).

**Vegetation Treatment Objectives:**

Treat 10-30% of the total Sage Grouse Emphasis Area for approximately 450-1,350 acres of treatment.

Use the following criteria to determine whether to treat an area:
> Treatment would only occur in areas where the understory has been degraded, in areas where sagebrush cover is not within acceptable ranges, or in areas which are currently being invaded by pinyon or juniper trees.

Leks
> Sage grouse habitats used primarily for display and breeding purposes.
> 1) Create and maintain open, low vegetation structure
>    - <3 foot tall grass
>    - 5-10" tall forbs
>    - >15" tall sagebrush at edge of lek (within 300-600 ft)
>    - Approx. 1-3 acres in size

BLM_0017890

2) Utilize mechanical treatments or prescribed fire to maintain and improve lek sites as needed.

3) Avoid treatments during strutting season (March 15 to May 15).

Nesting Habitat

Sage grouse habitat used for nesting, which is generally sagebrush communities within approximately 4 miles of a lek (GSRSC, 2005).

Maintain conditions to provide patches of sagebrush canopy cover and horizontal grass and forb canopy cover sufficient to provide suitable nesting sites. Habitat would provide good hiding and nesting cover and high levels of succulent forbs as well as insects.

1) Mechanically remove invading piñon and juniper from nesting habitat, including snags, which act as raptor perches.

2) Avoid treatments during nesting season (April 15 to June 30)

3) Augment vegetation composition by seeding to restore native grasses and forbs (CDOW 2005, Braun et. al 1977).

4. Strive for sagebrush height of 1 - 2.5 feet, 15 - 25% canopy cover.

Brood Rearing Habitat

Sage grouse brood rearing habitat is habitat is used primarily for the rearing of chicks. It is vegetation communities that include sagebrush, agricultural fields, and wet meadows within 6 miles of lek sites. It also includes some mountain shrub habitat.

1) Create small (3 - 5 acre), open patches of early and early mid-succession habitat by removing tall, old shrubs, covering no more than 1/3 of the area of the brood rearing habitat.

2) Improve grass and forb cover (>15% canopy cover) of taller (>15 inch) grasses and forbs in treated areas.

3) Maintain suitable escape cover, shade, and moisture capture areas in close proximity to treated patches. (i.e. sagebrush height >15", 10-15% canopy cover). Some areas should exceed 20% total shrub canopy cover.

4) Utilize mechanical treatments and prescribed fire to achieve objectives.

5) Avoid treatment during the summer and early fall to avoid negative impacts to grouse.

BLM_0017891



6

**Elk**

BLM_0017892

**Emphasis Area**

The focus of this area is to restore an appropriate mix of vegetation types and seral stages to benefit elk and mule deer; reduce big game conflicts with private lands and sage grouse habitat; and improve ecosystem health.  The Elk Emphasis Area covers approximately 4,000 acres of BLM lands.  Some of this Emphasis Area overlaps onto occupied sage grouse habitat.

**Vegetation Treatment Objectives:**

Treat up to 60-80% of the total Elk Emphasis Area (excluding areas that are occupied suitable habitat for sage grouse) for an estimated 2,400- 3,200 acres of treatment over the next 3-5 years.

> 1) Create openings ranging in size from 10-70 acres that simulate openings created by natural fire (from NRLS recommendation: "*Encourage agencies to develop landscapes that can be sustained by using or mimicking natural disturbances regimes, thereby achieving diverse,  productive, and desired plant communities with high vegetative basal area cover*.")

> 2) Concentrate the larger openings on west and south aspects and smaller openings on the east and north aspects.

> 3) Prescribed burning is the preferred treatment in this emphasis area and should target 80-100% top-kill of all woody species within the ignited areas to reset the patches to an earlier seral stage (i.e. grass/forb) with patches of re-sprouting oak and service berry.

> 4) Any mechanical treatments in this area should target 90-100% mortality of encroaching PJ, oakbrush and serviceberry while keeping mortality of sagebrush <20%.

> 5) If monitoring indicates problems with invasive species dominating the understory following treatment, then additional treatments would not be carried out until a solution is found.

Use the following criteria to determine whether to treat an area:

- In areas of suitable, occupied sage grouse habitat within the Elk Emphasis Area, treatments will be modified to comply with objectives listed under sage grouse, and treatment would only occur where sagebrush is being invaded by pinyon and juniper trees, where there is degraded understory, or where the sagebrush canopy is not optimal.

- Contiguous patches of oak brush and serviceberry, oak brush stands with average stem diameters > 6" would not be considered for treatment.

- Stands with stem diameters of 4 - 6" would be evaluated for benefits of treatment.

- Treat young or mature piñon juniper stands with potential to develop functional sagebrush/sagebrush grass communities.  The ability to manage for no net increase in

7

invasive annuals will also factor into what areas will be treated.

## Big Game Emphasis Area

The focus of this area is to enhance habitat for Gunnison sage grouse; restore an appropriate mix of vegetation types and seral stages to benefit elk and mule deer; reduce conflicts between big game with private lands and sage grouse habitat; and improve ecosystem health across the landscape.   The Big Game Emphasis Area covers approximately 2,300 acres of BLM lands. Some of this Emphasis Area overlaps onto occupied sage grouse habitat.

**Vegetation Treatment Objectives:**

Treat up to 30-50% (700-1150 acres) of the total BLM acreage (excluding areas that are occupied suitable habitat for sage grouse) over the next 10 years.

> 1) Create openings ranging in size from 5-35 acres.
>
> 2) Limit mortality of sagebrush to <20% (in areas with significant sagebrush use mechanical treatments to minimize sage mortality).
>
> 3) Prescribed burning is the preferred treatment in this emphasis area (if sagebrush is limited) and should target 80-100% top-kill of all woody species within the ignited areas to reset the patches to an earlier seral stage, ie, grass/forb, with patches of resprouting oak and serviceberry.
>
> 4) Any mechanical treatments in this area should target 90-100% mortality of encroaching PJ, oakbrush, and serviceberry, while keeping mortality of sagebrush <20%.
>
> 5) A special consideration for this emphasis area is to keep this intensity of treatment out of the north trending drainages in the adjacent Sage Grouse Emphasis Area, which are being managed for brood rearing habitat for grouse.  See the Brood Rearing Habitat under Sage Grouse above for specific drainage objectives.
>
> 6) If monitoring indicates problems with invasive species dominating the understory following treatment, then additional treatments will not be carried out until a solution is found.

Use the following criteria to determine whether to treat an area:

- In areas of suitable, occupied sage grouse habitat within the Big Game Emphasis Area, treatments would be modified to comply with objectives listed under sage grouse, and treatment would only occur where sagebrush is being invaded by pinyon and juniper trees, where there is degraded understory, or where the sagebrush canopy is not optimal.

- Contiguous patches of oak brush and serviceberry, oak brush stands with average stem

8

diameters > 6" would <u>not</u> be considered for treatment.

- Stands with stem diameters of 4 - 6" would be evaluated for benefits of treatment.

- Treat young or mature piñon juniper stands with potential to develop functional sagebrush/sagebrush grass communities.  The ability to manage for no net increase in invasive annuals will also factor into what areas will be treated.

## Sagebrush Restoration Emphasis Area

The focus of this area is to enhance habitat for Gunnison sage grouse; restore an appropriate mix of vegetation types and seral stages; and improve ecosystem health.   The Sagebrush Restoration Emphasis Area covers approximately 4,400 acres of BLM land.

**Vegetation Treatment Objectives:**

Treat up to 60-80% (2,600-3,500 acres) of the total acreage over the next 10 years with prescribed fire and mechanical treatments to restore and/or maintain sagebrush habitats.

> 1) Reset aging sagebrush habitats to early seral and seed with an appropriate grass/forb/ seed mix so that over the long term (40-60 years) healthy, vigorous sagebrush habitats dominate the area.

> 2) Where sagebrush is present in healthy age classes maintain these areas in early-mid and mid seral stages by removing encroaching pinyon and juniper and by interseeding with grasses and forbs.

Use the following criteria to determine whether to treat an area:

- Treat deep soiled sites that were formerly sagebrush that now through succession can be equally considered young piñon juniper stands.  These sites must still exhibit herbaceous plant characteristics of sagebrush communities;

- mature sagebrush communities with piñon and juniper encroachment; or

- sagebrush stands where >50% of the plants are decadent, and recruitment is low or absent.

## WUI Emphasis Area

The focus of this area is to restore an appropriate mix of vegetation types and seral stages; locate treatments so that they reduce fuel loading, fuel continuity and potential fire spread near private lands and improvements; and improve ecosystem health across the landscape.   The WUI Emphasis Area is approximately 4,900 acres of BLM land.  Much of this area is rugged topography in Red Canyon and its tributaries and will not be treatable acres.  The total acres

9

BLM_0017895

available for treatment are roughly 2,200 acres of flatter topography.

**Vegetation Treatment Objectives:**

Treat 30-40% (approximately 660 -880 acres) of the available topography over the next 10 years.

> 1) Reduce the potential fire behavior and resistance to control adjacent to private lands.
>
> 2) WUI areas will be treated similarly to the adjacent Sage Grouse, Elk, Big Game, and Sagebrush Restoration Emphasis Areas; the objectives for those emphasis areas will be the primary focus within the adjacent WUI with minor modifications such as location and intensity of treatment to meet the WUI fire behavior/resistance to control objectives.
>
> 3) There will be a combination of mechanical treatments and prescribed fire to reduce the potential impact of fire to adjacent private lands.

Where feasible pursue treatments on adjacent private lands to meet WUI and sage grouse objectives.

<u>**Summary of Treatment Acres**</u>

Table 4: Emphasis Areas, and Proposed Acres, Treatment Methods, and Time Frames

| EMPHASIS | TOTAL BLM ACRES AVAILABLE (approximately) | % TO TREAT/ ACRES TO TREAT | TREATMENT METHOD EMPHASIS | TIME FRAME |
|---|---|---|---|---|
| Grouse Emphasis Area | 4,500 acres | Up to 10-30% 450-1,350 acres | Mechanical/Limited Prescribed Fire | Within 10 years |
| Elk Emphasis Area | 4,000 acres | Up to 60-80% 2,400-3,200 acres | Prescribed Fire/Some Mechanical | Within 3-5 years |
| Big Game Emphasis Area | 2,300 acres | Up to 30-50% 700-1,150 acres | Prescribed Fire/ Mechanical | Within 5-10 years |
| Sagebrush Restoration Area | 4,400 acres | Up to 60-80% 2,600-3,500 acres | Prescribed Fire/Mechanical | Within 10 years |
| WUI Emphasis Area | 4,900 acres total 2,200 acres or available topography | 30-40% of available topography 650-880 acres | Mechanical/Limited Prescribed Fire | Within 3-5 years |
| **TOTAL BLM TREATMENT ACRES** | | 6,800 – 10,080 BLM acres | | |

Definitions:

- <u>Mechanical Treatment</u> utilizes machinery to manipulate vegetation in areas where fire is difficult to use due either to high values adjacent to the treatment area, fuel types which cannot be effectively treated with fire, or to improve the manageability of a prescribed burn

BLM_0017896

by creating control lines.  Several machines are available to achieve resource objectives including the roller chopper, hydro-ax, brush mower, and chainsaws.

-The *roller chopper* is a large cylinder filled with water and pulled by a dozer.  It cuts up and crushes woody vegetation as it rolls over it.  A seeder is often attached to the rear of the dozer and the seed is directed at the roller chopper so that seed is incorporated into the soil during treatment.

-A *hydro-ax* is a large rotary mower device mounted on a rubber tired tractor.  The mower is lowered onto individual woody plants, shredding the plant and scattering the debris in a 10-20 foot radius.  Due to the small size of the debris and subsequent enhanced decomposition, burning to reduce the fuel load is generally not required after treatment.

-A *brush mower* is a smaller mower pulled by a small farm tractor.  The target vegetation is dense shrubfields such as sagebrush.  The mower mows the shrub close to the soil surface and generally results in a mosaic of dead and resprouting shrubs and an increased diversity of grass and forb species.

-*Chainsaws* are hand-operated power saws that can be used to selectively remove woody species.  The resulting debris is usually broadcast scattered, or piled and burned at a later date.  Once grasses, forbs, and shrubs become established on mechanically treated areas low intensity prescribed burning can be used to maintain the desired seral mosaic.

- Mechanical projects will primarily be contracted out to local heavy equipment operators while some chainsaw projects may be carried out by agency personnel.

- Prescribed Burning is the intentional application of fire to a vegetative type under predetermined weather and fuels conditions to achieve a set of desired objectives.  Approved burn plan and air quality permits are required prior to igniting the burn.  Prescribed burning in the North Rim Landscape vegetation treatment areas will be aimed primarily at 1)reducing scattered or piled fuel loads resulting from mechanical treatment of vegetation, 2)resetting succession by burning mid to late seral pinyon/juniper, mountain shrub, or sage vegetation types to remove the existing vegetation and create an environment in which succession continues at an earlier seral stage, and 3)maintaining earlier seral stages of vegetation by removing invading woody species.

- Prescribed burning projects will be carried out by the Montrose Interagency Fire Management Unit, which will provide the burn planning and operational expertise.

**Fiscal Year 2011 Treatment Activities**

In fiscal year 2011 652 acres of piñon juniper encroachment will be hydro-axed to provide immediate sage-grouse habitat suitability.  Additionally, 409 acres of young piñon juniper woodland would be hydro-axed and seeded with native grasses and forbs described in appendix A to increase herbaceous ground cover and to promote accelerated sagebrush community development.  The three sites identified are deep soiled sites that were formerly sagebrush that now through succession can be equally considered young piñon juniper stands.  These sites still exhibit herbaceous plant characteristics of sagebrush communities.  An additional 512 acres would be slashed.  These sites were formerly plowed and seeded in 1983 and have very

11



Treatment Activities FY 2011

12

BLM_0017898

productive mature sagebrush with an understory of native forbs, crested wheatgrass, and dryland alfalfa.  The sites have mostly young juniper approximately 28 years old or younger.  These reestablishing junipers would be slashed/severed using chainsaws and/or hand sheers.

| Treatment Activity | Acres |
|---|---|
| Hydro-Ax | 652.03 |
| Hydro-Ax Seed | 409.1 |
| Slashing | 511.92 |
| **Total** | 1573.05 |

Design Features for all Activities in Proposed Action:

- Emphasis areas will be inventoried to determine where vegetation treatment is needed to meet habitat objectives. Vegetation will only be treated where habitat objectives are currently not being met.

- To optimize habitat conditions for sage grouse, suitable occupied sage grouse habitat that falls within other emphasis areas will be treated in accordance with sage grouse emphasis objectives.

- To protect breeding Gunnison sage grouse, surface disturbing activities shall not occur from March 15 through July 15 in mountain shrub and sagebrush communities.  This time frame protects both the birds on the leks and birds that are nesting and brood rearing.  Because this project is designed ultimately to benefit Gunnison sage grouse, project activities may be authorized during this time period in pinyon-juniper communities following surveys.  Surveys shall follow BLM UFO standard protocol and shall be conducted as close in time as possible prior to surface disturbance.

- To minimize impacts on breeding migratory birds, it is recommended that no surface disturbing activities occur from May 15 through July 15.  This timeframe encompasses the core breeding period for the majority of migratory birds in the project area.   Exceptions or variances to this restriction will be considered and evaluated according to UFO policies.

- To protect breeding raptors, a raptor survey would be conducted for all proposed surface disturbances. Surveys would follow BLM standard protocol and, if feasible, would be conducted 1 to 2 weeks prior to surface disturbance activities. Survey clearances expire May 1 of the following year. No surface disturbing activities would occur within the established protection buffers for active raptor nests during the breeding period for the species of interest (varies by species and would be determined by the BLM biologist). Variances or exceptions to these requirements may be granted by the BLM authorized officer according to policy. The BLM biologist would provide maps of nest locations and avoidance buffers.

- To minimize impacts on big game, sensitive species, and migratory birds, it is recommended that treatments in sagebrush and mountain shrub communities occur between August 1 and

1

BLM_0017899

November 30.

- To protect wintering big game, it is recommended that surface disturbing activities not occur from December 1 through April 30. Because this project is designed ultimately to benefit these species, an exception to this restriction may be appropriate. Exceptions to this seasonal restriction must be requested in writing to the BLM authorized officer. Exceptions are evaluated on a case-by-case basis and may be granted by a BLM authorized officer depending on location within the project, weather severity, and other factors.

- Proposed vegetation treatments requiring seeding or rehabilitation should not occur consecutive years within the same allotment unless the area is less than 100 acres in size and easily fenced with electric fence.

- Proposed vegetation treatments should not occur in more than one pasture/year within an allotment.

- All treatments should be coordinated with the Rangeland Management Specialist at least 6 months prior to treatments for timely and appropriate coordination with affected permittees.

- Burning and mechanical treatments should avoid wet meadow habitat associated with grouse drinkers or stock ponds.

- All heavy equipment (private and BLM) will be power washed before entering public lands. This includes all lowboys hauling heavy equipment and fire equipment.

- Treatment areas will be inventoried for noxious and invasive weeds prior to treatment.

- All noxious and invasive weeds will be treated before and after treatment has occurred.

- All proposed prescribed fire areas will be free of noxious weeds before burning can occur.

- Monitor for noxious and invasive weeds post treatment for up to 3 years.

- Seeding and Seed Mix Design: Seeding following mechanical and prescribed fire treatments may be essential to ensure that a healthy sagebrush community reestablishes following treatments. If seeding is needed, it would occur in late fall or early spring in the same year of vegetation treatment, with reduced potential for invasive weeds and to maintain a desired shrub, grass and forb species mix.

- Site specific seeding would be based on local conditions (e.g., potential for natural regeneration, risk of invasive species, and erosion potential). Seed mixes would be designed using only native species with the intent to establish 10-30% native grass cover on arid sites and 20-40% on mesic sites. Native forbs would be included in the mix with the intent of establishing 5-15% cover on arid sites and 20-40% on mesic sites.

- A species list for products potentially used for seeding on this project is in appendix A. If

2

BLM_0017900

sagebrush establishment is desired post treatment, where practical sagebrush seed would be collected from the adjacent untreated sagebrush stands to ensure the individual species or subspecies of sagebrush that exists in the area is utilized for restoration.  The sagebrush species or subspecies naturally adapted to the site of interest would determine the suite of possible management action for a successful treatment.

- Proper seedbed preparation is important, as are weed control measures, and the use of native species seed mix.

- Prescribed fire should not be used in areas where invasion of cheatgrass (*Bromus tectorum*) or other exotic species is likely.

- Burned areas should be smaller than 40 acres in size and no more than 20% of the landscape (128 ac per section [640 ac]) should be burned over a 30-year interval in taller sagebrush types.

- Burning shall not occur in low sagebrush habitat types (i.e., *Artemisia nova*).

- Burning that benefits sage-grouse will most likely be that which affects brood habitat.

- All burning in sagebrush types within the whole project area would be designed to remain small in nature (3-5 acres in size) and/or linear in nature (no more than 600 feet on the short axis) to allow for natural sagebrush reseeding.

- Treatments will be monitored to determine if they are being dominated by invasive species, and if so further treatments will be delayed until solutions can be found.

**No Action Alternative**: There would be no vegetation management that would occur at the landscape scale to effectively improve and expand Gunnison sage-grouse habitat, reduce competition between big game species and sage-grouse, or mitigate the impacts from large wildland fire on the project area.  Vegetation would continue to mature as patch size increases and diversity continues to decline.

## SCOPING AND ISSUES

BLM released a draft Environmental Assessment for a public review and comment June 6 – 24, 2011.

PLAN CONFORMANCE REVIEW:  The Proposed Action is subject to and has been reviewed for conformance with the following plan (43 CFR 1610.5-3, BLM 1617.3):

Name of Plan:  Gunnison Gorge National Conservation Area Resource Management Plan

3

Date Approved:  November 5, 2004

Decision Number/Page:  **VEG-C-17& SSS-C-1** (2-17& 2-19), **SMA-C-3& SMA-C-4** (2-26 & 2-27)

Decision Language:  BLM will continue to manage habitat for special status species, including listed species, BLM sensitive species, rare endemic species, and other species of special concern.

Public lands in Management Unit 4 (22,200 acres) will be designated and managed as the Gunnison Sage-Grouse ACEC/IBA. Management and protection of the Gunnison sage grouse and its habitat will be emphasized in this management unit.

This RMP adopts and incorporates the Gunnison Sage-Grouse Conservation Plan, Crawford Area, Colorado (Crawford Sage-Grouse Partnership 1998), as part of the management Objectives and direction for Management Unit 4.

Identify applicable National Environmental Policy Act (NEPA) documents and other related documents that cover the proposed action.

Name of Document:  Programmatic Environmental Impact Statement: Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States, and Programmatic Environmental Report: Vegetation Treatments on Bureau of Land Management Lands in 17 Western States
Date Approved:   September, 2007

Standards for Public Land Health:  In January 1997, Colorado Bureau of Land Management (BLM) approved the Standards for Public Land Health.  Standards describe conditions needed to sustain public land health and relate to all uses of the public lands.  A finding for each standard will be made in the environmental analysis (next section).

| Standard | Definition/Statement |
|---|---|
| #1 Upland Soils | Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff. |
| #2 Riparian Systems | Riparian systems associated with both running and standing water, function properly and have the ability to recover from major surface disturbances such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and bio-diversity. Water quality is improved or maintained. Stable soils store and release water slowly. |
| #3 Plant and Animal Communities | Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes. |
| #4 Threatened and Endangered Species | Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by the BLM, and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities. |

4

| #5 Water Quality | The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM lands will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under State law as found in (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act. |
|---|---|

## AFFECTED ENVIRONMENT and ENVIRONMENTAL CONSEQUENCES

Elements specified by statute, regulation, executive order, or the Standards for Public Land Health are described and analyzed in this section.

The following elements are considered. Those that could be impacted are brought forward for analysis. Any element not affected by the proposed action or alternatives will not be analyzed in this document; the reasons for no impact will be stated.

| Critical Element | Not Applicable or Not Present | Present, But No Impact | Applicable & Present; Brought Forward for Analysis |
|---|---|---|---|
| Air Quality | | | X |
| ACEC | | | X |
| Wilderness | | | X |
| Wild and Scenic Rivers | | X | |
| Cultural | | | X |
| Native American Religious Concerns | | | X |
| Farmlands, Prime/Unique | X | | |
| Soils | | | X |
| Vegetation | | | X |
| Invasive, Non-native Species | | | X |
| Threatened and Endangered Species | | | X |
| Migratory Birds | | | X |
| Wildlife, Terrestrial | | | X |
| Wildlife, Aquatic | X | | |
| Wetlands & Riparian Zones | | X | |
| Floodplains | X | | |
| Water Quality, Surface and Ground | | | X |
| Wastes, Hazardous or Solid | | | X |
| Environmental Justice | | X | |

5

BLM_0017903

AIR QUALITY

**Affected Environment**:  Class I air-sheds in the vicinity of the proposed project include: the Black Canyon of the Gunnison Wilderness, adjacent to the south of the project area; the West Elk Wilderness, about 10 miles to the north and east; and the Maroon Bells – Snowmass Wilderness, about 40 miles northeast.  Notable Class II air-sheds in the vicinity include: the Gunnison Gorge Wilderness, adjacent to the project area to the west; and the Raggeds Wilderness, about 30 miles northeast.  Communities in the area include the towns of Crawford (about 5 miles north) and Hotchkiss (about 10 miles north).  There are also private residences scattered within the Fruitland Mesa area, adjacent to the north of the North Rim Landscape.

Air quality in this area complies with federal air quality standards according to the most recent Colorado Air Quality Control Commission's Report to the Public (CDPHE 2010).  Air quality concerns in this region primarily are from the impacts of a recent increase in energy development.  Impacts from energy development include direct emissions, support service impacts, and associated growth.  The Report also sites windblown dust, wildfires, and prescribed fire as other significant sources of air pollution in the Western Slope Region.

During the daytime, winds in the area are generally from the west across the North Rim Landscape.  Nighttime winds are generally down slope and tend to flow down valley, into the direction of the Gunnison River, rendering northeasterly winds across the North Rim Landscape.

**Environmental Consequences:**
**Proposed Action** – The mechanical treatment would have little impact on air quality, with any impacts being localized to within 300 feet of the equipment.  Localized impacts would be dust and bad fumes from the machine engines, which would contribute to overall short-term air quality degradation.  Degradation would terminate each day upon equipment shut-down, as well as upon completion of the project.  Generally, enough ground cover remains on site after mechanical treatment to minimize the potential for dust storms during wind events.

The primary impact to air quality from the proposed action would be from prescribed burning.  Fire is a natural combustion process that is a potential source of air pollutant emissions.  The amount of emissions depends on the size and intensity of the fire, which are determined by meteorological conditions, such as temperature, wind speed, wind direction, types and moisture content of the fuel, mix of vegetation types, and the total mass of combustible material (available fuels loading). Any impacts to air quality from prescribed burning would generally be short term (<5 hours).  By scheduling the burn under appropriate atmospheric conditions smoke would move away from towns and communities and disperse quickly.  Burning would be done only on good smoke dispersal forecasts to mitigate air quality.  Any burning would be guided by an approved burn plan that identifies environmental and fire behavior parameters, as well as a Smoke Permit acquired from the State of Colorado.  All standards and permit conditions will be adhered to while burning.  If negative smoke impacts do occur during implementation the burn boss would immediately modify the burn to reduce or eliminate the impact.

**No Action Alternative** – Under the no action alternative, there would be no immediate impacts to air quality.  Over time, hazardous fuels would continue to accumulate, as well as the

6

potential for uncontrolled wildfire to release an increased amount of particulates and emissions.

AREAS OF CRITICAL ENVIRONMENTAL CONCERN

**Affected Environment:** The proposed action would occur within the Gunnison sage grouse ACEC and on lands directly adjacent to the ACEC on similar habitat types. The ACEC was designated to specifically manage for a declining population of Gunnison sage grouse which occur on the north rim of the Gunnison Gorge in the Crawford area.

It is believed that the decline in the Crawford area sage grouse numbers reflects a larger decline in the health of the natural landscape in this area. Past management activities including fire suppression and selective livestock grazing appear to have created conditions suitable for establishment of young pinyon and juniper trees which are slowly encroaching into sagebrush areas on the landscape, as well as creating decadent, dense shrub growth. The proposed action is designed specifically to address declines in habitat suitability. Expand the suitable extent of sage-grouse habitat by substantially reducing the PJ component in former sagebrush communities and will preempt the progressive conversion of this former sagebrush disclimax to a pinyon/juniper woodland site. Additionally, the proposal will also attempt to reduce competition from wintering ungulates on sage-grouse by improving forage opportunities in the mountain shrub and dense PJ communities directly adjacent to currently occupied grouse ranges. It is thought that wintering ungulates are also influencing the abundance and diversity of native grasses and forbs in the understory of the sagebrush communities in the North Rim Area.

**Environmental Consequences:**
**Proposed Action** – All the activities described in the proposed action are designed specifically to develop healthy sagebrush communities and other associated critical habitats necessary to fulfill sage-grouse life processes. As a result the proposed action would provide immediate habitat improvement by removing encroaching piñon and juniper from currently occupied ranges. Expand the suitable extent of sage-grouse habitat by preempting the progressive conversion of former sagebrush communities to piñon juniper woodlands. Additionally, improving forage conditions and age class diversity in the mountain shrub and PJ communities would indirectly improve the health and vigor of the sagebrush understory by reducing the duration and intensity of grazing by big game within sagebrush communities. Consequently, the proposed action is consistent with the ACEC and the values for which the ACEC was designated.

**No Action Alternative** – Conditions are expected to continue to decline relative to sage-grouse habitat suitability. In the absence of disturbance events, piñon and juniper will continue to establish and mature within the sagebrush communities that are critical to grouse life processes. The young developing woodlands would continue to mature and infill as sagebrush community species continues to decline. Such situations make it much more difficult to restore functional sagebrush communities after a disturbance event. Competition from wintering ungulates would also continue thus it can be expected that forb and native grass expression will continue to be suppressed/decline which will contribute to grouse habitat limitations. The no action alternative would over time effectively limit grouse populations to the point where a

7

BLM_0017905

viable population may not be plausible.  Consequently, the values for which the ACEC has been designated may become extirpated from the ACEC.


WILDERNESS

   **Affected Environment:**  The proposed treatment areas lie entirely outside the Gunnison Gorge Wilderness.  The "Grouse Emphasis Area" boundary approaches to within 150 feet of the wilderness in the Black Ridge area.  The "Elk Emphasis Area" boundary is adjacent to the wilderness in the Buttermilk Ridge/Lime Kiln Gulch areas.

   **Environmental Consequences:**
   **Proposed Action** – Treatment within the "Grouse Emphasis Area" on Black Ridge would be mechanical in nature, with no burning planned.  Since it is entirely outside the wilderness, there would be no effects to the wilderness from the treatment.  Improvement to sage grouse habitat may improve numbers of grouse in the area, but because of the steeply sloping topography in the wilderness close-by, it would be unlikely to improve chances of seeing grouse in the wilderness.

Treatment within the "Elk Emphasis Area" in the Buttermilk Ridge/Lime Kiln Gulch area involves using prescribed fire.  While the treatment area is entirely outside the wilderness, it is adjacent to the wilderness in places and therefore would have the potential for some spotting (ignition outside the prescribed area from airborne embers) inside the wilderness.  Because of the limits of conditions to allow the ignition of prescribed fire (humidity, wind, temperature, weather forecast), spotting would be unlikely.  If spotting occurs, the burned areas would likely be small, and with the treatment area being immediately upslope and in the direction of prevailing winds, any fire ignited by spotting would tend to burn back into the treatment area.

Wildfire is a natural part of the wilderness.  Spot fires on the edge of the wilderness, and/or smoke from the treatment fires would not impair wilderness values.

   **No Action Alternative** – The wilderness would not be affected.


WILD AND SCENIC RIVERS

   **Affected Environment:**  Red Canyon Creek has been determined to be *suitable* for inclusion in the National Wild and Scenic River System, with a classification of *Scenic*.  The outstandingly remarkable values for the segment are cultural (historic Ute Trail) and scenic.  The segment is 4.2 miles long.  The suitable corridor includes the river segment and ¼ mile of BLM land on each side of the creek.  One edge of the "Elk Emphasis Area" is within a mile of a suitable portion of Red Canyon Creek.

   **Environmental Consequences:**
   **Proposed Action** – The treatment area is well outside the river suitability corridor (0.6 miles at the closest point), and is not visible from the corridor.  Treatment activities would be

BLM_0017906

substantially unnoticeable, except for the possibility of temporary smoke during the rather brief periods of prescribed fire.  The suitability, classification and outstandingly remarkable values of this river segment would not be affected by the proposed action.

**No Action Alternative** – The suitability, classification and outstandingly remarkable values of this river segment would not be affected.

CULTURAL RESOURCES

**Affected Environment:**  The proposed treatment areas lie within an upland steppe environment dominated by low brush and steep terrain.  Previous inventories in this and similar areas reveal a very low to low incidence of prehistoric cultural properties, and a slightly higher incidence of historic period remains.  Few National Register or otherwise eligible properties are anticipated across this landscape.  The project will use a variety of treatment actions, and the project area has been subdivided into inventory zones comprising Class I, II and III depending on the treatment, potential for site damage and potential for structural site types.  Areas in which damage to cultural properties may occur will be inventoried at the appropriate level prior to the initiation of any potentially site disturbing activities.

**Environmental Consequences:**
**Proposed Action** – All areas in which damage to cultural properties may occur would be inventoried at the appropriate level.  If National Register eligible properties are discovered during this inventory process, the project will be re-designed for site avoidance or the sites would be mitigated prior to any activity.  No eligible properties would be impacted by this project.

**No Action Alternative** – There would be no affected cultural properties.

NATIVE AMERICAN RELIGIOUS CONCERNS

**Affected Environment:**  The upland areas included in this project generally contain few if any properties of religious concern.  Previous consultations have revealed that such areas may be of interest for traditional native plant collectors, but are unlikely to contain Traditional Cultural Properties or areas of religious concern.

**Environmental Consequences:**
**Proposed Action** –   There are no known or anticipated Traditional Cultural Properties or Native American concerns for this area.  If any such properties or potential properties are discovered during the inventory phase of the project area, the appropriate tribal consultation would be implemented and said properties would be avoided through project re-design.

**No Action Alternative** – There would be no impacts to any Native American Religious concerns.

9

BLM_0017907

SOILS (includes a finding on Standard 1)

**Affected Environment:**

The soils in the area are a product of the local geologic parent material, climatic conditions, vegetation, and the size and intensity of disturbance. The area consists predominately of the sedimentary sandstone and shale units of the Dakota formation and when weathered, produce soils having textures dominated by sandy and silty clay loams. The deeper soils with little rock content are mostly found on the interior portions of mesa tops and terraces adjacent to drainage channels. The shallower, rocky soils are found along mesa rims and canyon side slopes. The soils in the area are more specifically described in the table below from the Soil Survey for the Paonia Area, Colorado (USDA, Natural Resources Conservation Service).

| Soil Unit Name | Ecosite | Texture | Soil Erodibility (Kw) Higher=More Erodable (0.2-.69) | Acres |
|---|---|---|---|---|
| Absarokee loam, 3 to 12 percent slopes | Brushy Loam | loam | 0.2 | 6863 |
| Beenom-Absarokee loams, 5 to 20 percent slopes | Brushy Loam | loam | 0.28 | 8980 |
| Beenom-Absarokee association, 20 to 60 percent slopes | Rocky Loam | loam | 0.28 | 3402 |
| Cerro loam, 1 to 6 percent slopes | Deep Clay Loam | loam | 0.28 | 45 |
| Fluvents, flooded | | loam | 0.37 | 65 |
| Glenton loam, 3 to 6 percent slopes | Sandy Saltdesert | loam | 0.37 | 96 |
| Kech-Progresso loams, 3 to 15 percent slopes | Loamy Foothills | loam | 0.37 | 2134 |
| Kech-Rock outcrop complex, 10 to 40 percent slopes | | loam | 0.28 | 1183 |
| Lazear-Rock outcrop complex, 3 to 30 percent slopes | Saltdesert Breaks | gravelly loam | 0.2 | 63 |
| Midway-Gaynor silty clay loams, 10 to 40 percent slopes | | silty clay loam | 0.32 | 64 |
| Potts loam, 1 to 6 percent slopes | Loamy Foothills | loam | 0.37 | 127 |
| Progresso loam, 3 to 6 percent slopes | Loamy Foothills | loam | 0.37 | 378 |
| Progresso loam, 6 to 12 percent slopes | Loamy Foothills | loam | 0.37 | 2267 |
| Radersburg loam, 6 to 12 percent slopes | Mountain Loam | loam | 0.24 | 503 |
| Rock outcrop | | unweathered bedrock | 0 | 180 |
| Torriorthents-Rock outcrop, sandstone, complex | | very stony loam | 0.15 | 2732 |
| Work loam, 3 to 6 percent slopes | Deep Clay Loam | loam | 0.28 | 858 |
| Work loam, 6 to 12 percent slopes | Deep Clay Loam | loam | 0.28 | 283 |

The North rim project area is comprised of over 65% of the two soil types described below:

*Absarokee*
The Absarokee component makes up 40 percent of the map unit. Slopes are 5 to 20 percent. This component is on mountain slopes and uplands and the parent material consists of weathered sandstones of the Dakota formation. Depth to a root restrictive bedrock, is 20 to 40 inches. The natural drainage class is well drained and water movement in the most restrictive layer is moderately low. Available water to a depth of 60 inches is low and shrink-swell potential is high.

10

BLM_0017908

There is no zone of water saturation within a depth of 72 inches. Organic matter content in the surface horizon is about 4 percent. The absarokee component is in the Brushy Loam ecological site and the susceptibility to erosion is moderate.

*Beenom*
The Beenom component makes up 40 percent of the map unit. Slopes are 5 to 20 percent. This component is on mountain slopes and uplands and the parent material consists of weathered in place sandstone and shale of the Dakota formation. Depth to a root restrictive layer of lithic bedrock is 10 to 20 inches. The natural drainage class is well drained and water movement in the most restrictive layer is moderately high. Available water to a depth of 60 inches is very low. Shrink-swell potential is low. Organic matter content in the surface horizon is about 2 percent. This component is in the Rocky Loam ecological site and the susceptibility to erosion is moderate.

The remainder of the soils in the project area are comprised of similar deep clay loams and rock outcrops.

### Environmental Consequences:
#### Proposed Action –
*Prescribed Fire*
The effects of prescribed burning on soils is directly related to the extent the surface litter layer and soil organic matter (0 to 3 cm) is burned as well as vegetation removal which exposes the soil to wind and water erosion. In a high intensity burn, the mineral soil surface is exposed, increasing erosion processes such as; rain splash mobilization, soil sealing, increased dry ravel, development of a less permeable hydrophobic layer 1 to 10 cm below the surface and destruction of the protective microbial crust and associated soil aggregates. All of these factors contribute to increased overland flow and the potential to deliver large amounts of sediment to wetlands and stream channels. Another factor that can increase the possibility of mass slope failures is an increase in soil moisture in the absence of vegetation, increasing the soil weight and downward forces on the slope (Graham, 2003).

Most of the prescribed burning would occur on the mesa tops where slopes are shallow and the fuel loading is moderate to low. In addition, conducting the burn while soil and live fuel moisture is high would result in lower surface temperatures and short burning duration. As a result, removal of the surface litter and soil organic matter should not be severe enough to cause significant changes in the physical properties of the soil. Root bed mortality of perennial grasses and forbs, and mortality of the seed bed should also be low. Evidence suggests from previous studies, that in contrast to severe wildfires, low and even moderate severity fires generally do not result in a corresponding increase in runoff and erosion (Robichaud and Waldrop, 1994). Despite the beneficial burning conditions described above, it is possible that some soil erosion could increase for one to three growing seasons post burn due to increased soil surface exposure. Within that time frame, herbaceous vegetation cover should increase above pre-burn levels resulting in increased soil stability, increased water infiltration and uptake, and overall ecological vigor.

11

In areas where fire may burn at a higher intensity due to variations in soil and vegetation moisture conditions, some increased erosion may occur. The magnitude of the erosion on these sites would likely be reduced by several factors. First, the forest structure of the area and the resulting litter layer typically do not produce the appropriate conditions to develop a strong hydrophobic layer. Hydrophobic conditions are strongly correlated with sandy soils under coniferous forest cover (Morris and Moses, 1987). The second factor reducing the potential for significant erosion is the limited scale of the burns. The burns would be conducted in areas surrounded by intact vegetation communities serving as buffers to catch mobilized sediment. Post-fire seeding would also accelerate the rate the plant cover would be restored and improved from pre-fire conditions. Finally, much of the burning would occur in the fall allowing for more vegetation establishment prior to the summer monsoon thunderstorm season, when the highest risk of erosion is likely to occur.

*Mechanical Treatments*
Mechanical treatments result in additional surface cover in the form of ground surface litter (mulch) and increased grass and forb densities. The increased cover and depressions from surface disturbance would reduce the potential for surface runoff and soil erosion from the current conditions. The overall increase in cover would begin immediately after the treatment and slowly increase as the vegetative seeding becomes established.

**No Action Alternative** – There would be no direct impact to soils under this alternative. However, the threat of large fires occurring under extremely dry conditions would continue to exist. The scale and duration of adverse soil impacts is much higher under extreme burning conditions associated with large fire occurrence.

**Finding on the Public Land Health Standard for upland soils:** Soils within the burn units currently "meet" and "meet with problems" standard 1 of the Public Land Health Standards. Implementing this prescribed fire project would cause a short term (1-3 years) increase in soil erosion by decreasing canopy cover and surface litter. However, since soil heating should not be severe, organic content of the soil should remain high, canopy cover should increase with vigorous desirable perennial grasses and forbs, and plant diversity can be expected to increase from current conditions. It is anticipated that by implementing this proposed action the long term effect should improve the indicators for the upland soils standard.

VEGETATION (includes a finding on Standard 3)

**Affected Environment:** Within the project area there are at least three distinct vegetation communities present. Piñon juniper woodlands occupy approximately 15-20% of the project area on shallow soils and steep slopes of the draws and gulches in Red Canyon, around Fruitland Mesa, and into the Gunnison Gorge. This community is dominated by Colorado pinyon (*Pinus edulis*) and Utah juniper (*Juniperus osteosperma*) with and understory of green Mormontea (*Ephedra viridis*), yucca (*Yucca harrimanii*) rock goldenrod (*Petradoria pumila)* and muttongrass (*Poa fendleriana*) on more mesic sites and sandberg bluegrass (*Poa secunda*) and Indian ricegrass (*Achnatherum hymenoides*) on xeric sites.

BLM_0017910

Approximately 60% of the project area is sagebrush community which tends to occupy the deeper soils on the mesa tops. The sagebrush community contains Basin big sage (*Artemesia tridentata tridentata*) in the draws or black sage (*Artemesia nova*) on shallow rocky outcrops, western wheatgrass (*Pascopyrum smithii*), and Sandberg bluegrass. The deep soils along the mesa tops and ridgelines the sagebrush community is mountain big sagebrush (*Artemesia tridentata vaseyana*) type that contains Utah serviceberry (*Amelanchior utahensis)* together with a productive understory of muttongrass and junegrass (*Koeleria macrantha*), and numerous forbs. Approximately 1285 acres of this community was plowed and seeded in 1983. The sagebrush has reestablished well within these treatments but the understory is primarily dominated by crested wheatgrass (*Agropyron cristatum*) and dry land alfalfa (*Medicago sativa*). These sites have very limited expression of the native herbaceous understory. In the lower elevations of this community (north of C77 Road) there is considerable evidence that pinyon-juniper woodlands are now becoming denser than they were in the past and are expanding into the sagebrush community. As this occurs, herbaceous and shrub species decline in dominance at the site level and the landscape loses diversity at the larger scale. Pinyon and juniper invasion (as evidenced by young age classes of trees dominating a site) is used as an indicator of plant community health and wildlife habitat quality. In the Black Ridge area invasive annuals such as cheatgrass (*Bromus tectorum*) and alyssum (*Alyssum simplex*) also comprise a significant proportion of the herbaceous understory.

Slightly higher in elevation, the mountain big sage declines in abundance and is replaced by Gambel oak (*Quercus gambelii)*, Utah serviceberry, squawapple (*Peraphyllum ramosissimum*), birch leaf mountain mahogany (*Cercocarpus montanus*), and elk sedge (*Carex geyeri*).

The 2000 land health assessment of the project area suggests that approximately 12,000 acres are meeting with problems, and 292 acres do not meet public land health standards. The 292 acres that do not meet standards occur in the Black Ridge area and fail to meet standards due to prevalence of invasive annuals in the understory of the sagebrush communities, low shrub vigor, and low vegetation diversity. The primary reason for lands in the project area meeting with problems included: low shrub vigor and heavy browsing, lower than expected perennial grass cover, lower than expected composition of forbs, and invasion of sagebrush communities by piñon juniper woodlands. It is important to point out that the assessment was conducted in 2000 at that point in time the area was experiencing substantial drought which may have contributed to suppressed indicators of land health for vegetation.

### Environmental Consequences:

**Proposed Action** – The removal of encroaching piñon and juniper from functional sagebrush communities would act to maintain the sagebrush community in a mid to late seral stage and allow the communities to remain sagebrush dominant for an additional 20-100 years depending upon climactic variation and associated disturbances such as fire or insects.

In the Sagebrush Restoration, Grouse Emphasis, and WUI emphasis areas on the ridge tops above Red Canyon there are deep soiled sites that were formerly sagebrush that now through succession can be equally considered young piñon juniper stands that still exhibit herbaceous plant characteristics of sagebrush communities. These sites if not disturbed by fire or other similar events would within a generation's time transition to mature piñon juniper woodland

13

BLM_0017911

lacking herbaceous components and seed bank of the former sagebrush community.  Once the sagebrush and herbaceous component is competitively excluded from such sites it becomes very difficult, with less certainty for success, and costly to reestablish a functional sagebrush community after a disturbance such as fire or mechanical manipulation.   Interrupting the gradual succession of these sites to PJ woodlands, by either prescribed fire or mechanical removal of the established PJ, would act to restore and expand former sagebrush communities.  These sites still have some level of sagebrush remaining within the establishing PJ as well as many of the perennial grasses and forbs common in healthy sagebrush communities.  Where there remains as much as 50% of the sagebrush community these sites would likely be mechanically treated and seeded with native grasses and forbs.  Mechanical treatment is preferred for these scenarios because retaining the sagebrush that remains would act as seed sources to more quickly establish desired sagebrush canopy cover favorable to sage-grouse.  Where these type conversions are further along and PJ canopy is greater than 50% prescribed fire would be the preferred method of treatment due to the lack of substantial sagebrush remaining and the more cost effective nature of prescribed fire.  These sites would represent a long term investment in sagebrush expansion/ restoration as it would likely take 20-50 years or more to effectively establish functional sagebrush community for sage-grouse.  Prescribed fire should only be considered for these areas provided there are still remnant herbaceous components of the former sagebrush community that would be available to establish in the post fire environment.  The burned sites would be seeded immediately following the prescribed fire with perennial grasses and forbs to hold the site free of invasive annuals and to ensure that successional processes allow the burned area to develop into functional sagebrush community.  Prescribed fire would not be used in areas where invasion of cheatgrass (*Bromus tectorum*) or other exotic species is likely.

Prescribed burning in sagebrush should be handled cautiously as burned areas should be smaller than 40 acres in size, very mosaic and/or linear in nature, and no more than 20% of the landscape (128 ac per section [640 ac]) should be burned over a 30-year interval in taller sagebrush types. Burning would not be considered in low sagebrush habitat types (i.e., *Artemisia. nova*). Burning that benefits sage-grouse would most likely be that which affects brood habitat. The goal is to not exceed 20% fire coverage (128 ac per section [640 ac]) over a 30-year period.  (Braun 2006) Reseeding sagebrush should not be necessary for prescribed burns, as areas should be sufficiently small so that surrounding sagebrush habitat can reseed the areas naturally.  All burning in sagebrush types within the whole project area would be designed to remain small in nature (3-5 acres in size) and/or linear in nature (no more than 600 feet on the short axis) to allow for natural sagebrush reseeding.  This is because research suggests that sagebrush seed does not travel more than 100 feet from the parent plant.  Other research suggests that sagebrush establishes at approximately 42 feet per year following disturbance.  All sagebrush sites burned would be seeded with perennial grasses and forbs favorable to sage-grouse upon completion of the burn (appendix A).

Prescribed burning or mechanical manipulation of mountain shrub species such as oak brush and serviceberry would stimulate resprouting.  As fuel loads in these vegetation communities are generally light in nature fire intensities should be low enough that mortality of perennial grasses and forbs is expected to be less than 15%.  Generally these sites should ne require seeding to ensure appropriate herbaceous development post fire.  Such disturbances encourage vigorous sprouting and increased palatability of the species found in these vegetation communities.  Long

BLM_0017912

term these sites should help to alleviate big game browsing on mountain big sagebrush communities resulting in improved browse condition and shrub vigor across the sagebrush community within the project area.  Additionally providing greater forage palatability in the mountain browse communities should also improve distribution of all grazing ungulates which may also improve perennial grass cover and diversity within sagebrush communities.

       **No Action Alternative –** There would be no vegetation management that would occur at the landscape scale to effectively improve and expand sagebrush communities, invigorate browse species such as gamble oak and improve distribution of use on such species, or mitigate the impacts from uncharacteristically large wildland fire on the project area.  Vegetation would continue to mature as patch size increases and diversity continues to decline.

       **Finding on the Public Land Health Standard for plant and animal communities**
(partial, see also Wildlife, Aquatic; Wildlife, Terrestrial; and Invasive, Non-native Species):
The project as proposed would directly improve on at least two indicators of poor land health for vegetation by removing invading piñon and juniper from sagebrush communities, and seeding those sites either burned or mechanically treated with native forbs and grasses would address improving both diversity and cover of perennial grasses and forbs.  Additionally, improving deciduous shrub vigor and availability should help to lessen ungulate utilization of sagebrush which could translate into improved sagebrush vigor and lower browse pressure.


INVASIVE, NON-NATIVE SPECIES (includes a finding on Standard 3)

    **Affected Environment:**  Spread across the proposed project area is a number of established noxious weeds patches. Noxious weed infestations range in size from less than 0.25 acre to 10 acres in size, excluding the cheatgrass infestation within the Fruitland fire which is approximately 575 acres. Most noxious weeds are located along roads, trails and in disturbed areas. The most common species in the area include: spotted knapweed (*Centaurea maculosa*), whitetop (*Cardaria draba*), musk thistle (*Carduus nutans*), bull thistle (Cirsium vulgare), Russian knapweed (*Acroptilon repens*), common burdock (*Arctium minus*), and Canada thistle (*Cirsium arvense*).

**Environmental Consequences:**
    **Proposed Action –** The proposed project would create disturbance over a 10 year period across the proposed project area. The mechanical treatments would occur first which could potentially increase the spread of noxious or invasive weeds. However, the area has been inventoried and continually treated for noxious weeds the past 4 years and with the design features the threat of noxious weed expansion would be minimized with this type of treatment.

Prescribed fire is the second tool for treatment within the proposed project area. Fire has the potential to expand noxious weed establishment. Fire, whether prescribed or natural, allows for niche spots to be opened up for early seral plants to establish which include most of the noxious and invasive weeds. The areas were inventoried in 2006 and the noxious weeds in the area have been continually treated and monitored for expansion. With the fire portion of the treatment not occurring for approximately 3 to 5 years, pretreatment of noxious and invasive weeds would

15

BLM_0017913

reduce the threat of noxious and invasive weed establishment post treatment.

**No Action Alternative** – Under the no action alternative the treatments would not occur. A large natural fire risk would still be threat for noxious and invasive weed establishment.

**Finding on the Public Land Health Standard for plant and animal communities** (partial, see also Wildlife, Aquatic; Wildlife, Terrestrial; and Vegetation):  With the design features in place and pre and post treatment noxious weed treatment occurring this project should not contribute to an increase in noxious or invasive weed establishment. On the contrary the project should strengthen the vegetative community making it more resistant to noxious and invasive weed spread and establishment and would therefore meet standard three for noxious and invasive weeds.


THREATENED, ENDANGERED, AND SENSITIVE SPECIES (includes a finding on Standard 4)

**Affected Environment:**  The Endangered Species Act (ESA), as amended (16 U.S.C. 1531-1534) mandates the protection of species listed as threatened or endangered of extinction and the habitats on which they depend.  Section 7 of the ESA clarifies the responsibility of federal agencies to utilize their authorities to carry out programs for the conservation of listed species. In addition, federal agencies must consult with the U.S. Fish and Wildlife Service (Service) to ensure that any action authorized, funded or carried out by the agency is "…not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species…". The Uncompahgre Field Office (UFO) refers to the most current Colorado county list provided by the U.S. Fish and Wildlife Service to analyze the effects of a proposed action on threatened, endangered and candidate species and designated critical habitat for these species. In accordance with *BLM Manual 6840*, the goal of management is to prevent a trend toward federal listing or loss of viability for sensitive species.

Appendix B lists potentially occurring federal special status species within the UFO and provides assessments for their occurrence within the project area. No threatened, endangered, or federally protected species or habitats occur within the project area. Appendix C identifies species of special management concern that are known or have potential to occur within the UFO along with occurrence assessments for the area. Several sensitive species are known or have the potential to occur in the project area.

**Environmental Consequences:**
   **Proposed Action** – Only those species known to occur, or that potentially occur, in the area are assessed in this section. The proposed treatments would have "no effect" on the remaining species. Refer to the Vegetation section above for a general discussion of potential impacts of the proposed treatments on vegetation communities. With the appropriate measures, mechanical and fire treatments would likely result in improved vegetation species diversity, increased habitat edge, and recruitment and growth of young vegetation. The results can be beneficial for some species and less so for others depending on the target species' life history needs (cover, food, space, water). Treatment activities themselves may have impacts on some

BLM_0017914

species, particularly less-mobile species (i.e., reptiles or plants) that are unable to avoid proposed treatment areas. These impacts are expected to be short-term and negligible for both terrestrial species (via habitat modification and direct disturbance) and aquatic species (via sedimentation of waterways).

The Gunnison Sage-Grouse Rangewide Conservation Plan (2005) states that habitat quality and quantity is one of the major drivers affecting sage grouse populations.  This project is designed to improve the quantity and quality of habitat available to Gunnison sage grouse. Vegetative treatments on the North Rim Landscape would help to enhance habitat for several stages of the sage grouse life cycle as well as alleviate detrimental influences to currently suitable and occupied habitats.

Due to the nature of treatments (location, timing, etc.) and/or current distribution of species, the proposed action would have "no effect" on Federally listed bonytail, razorback sucker, Colorado hookless cactus as well as BLM Sensitive Species Colorado River cutthroat trout, white-tailed prairie dog, bald eagle, burrowing owl, white-faced ibis, American white pelican, northern leopard frog, canyon tree frog (See project record or 6840 files for TES Clearance report). With project design features, the proposed treatments "may affect, but is not likely to result in a trend toward federal listing" for the following Sensitive species: spotted bat, Townsend's big-eared bat, fringed myotis, northern goshawk, ferruginous hawk, American peregrine falcon, Gunnison sage grouse, Brewer's sparrow.

The proposed treatment areas do not contain habitat for Sensitive plant species. Based on this information, direct impacts on these species are unlikely to occur. The proposed action would have "no effect" for these species.

      **No Action Alternative** – Habitat improvement projects would not occur and the quantity and quality of Gunnison sage grouse and big game winter range would remain in its present condition or would continue to decline.

      **Finding on the Public Land Health Standard for Threatened & Endangered species:** The majority of the area was found to be meeting this standard with problems. Issues include exotic and noxious species, low perennial grass and forb cover, high bare ground, pinyon-juniper invasion, and moderate shrub utilization. With the appropriate measures, including seeding and weed control, mechanical and fire treatments would likely result in improved vegetation species diversity, increased habitat edge, recruitment and growth of young vegetation, increased age classes of vegetation, and replacement of less desirable forage species with more desirable species. Under the Proposed Action, problem areas are expected to improve. Those areas currently meeting this standard are expected to continue meeting under the Proposed Action. Under the No Action Alternative, conditions for some special status species may continue to decline.

MIGRATORY BIRDS

      **Affected Environment:**  The project areas contain habitats that are frequented by a variety

17

of migratory bird species. For the purposes of this analysis, the U.S. Fish and Wildlife Service List of Birds of Conservation Concern was used as a tool to complete this analysis (USFWS 2008, Table 16, BCR 16 [Southern Rockies/Colorado Plateau]). Birds of Conservation Concern that may use the project area (resident, breeding, or wintering) include: chestnut-collared larkspur, black rosy-finch, brown-capped rosy finch, Cassin's finch, golden eagle, prairie falcon, Lewis's woodpecker , pinyon jay, juniper titmouse, veery (see Appendix D below and Project Record for 6840 Clearance Report for details). Of the species listed that are expected within the project areas, several raptors, woodpeckers and songbirds may be present due to suitable habitat, but there are no documented nest sites within the project area. Ferruginous hawk and black rosy-finch may only use the area in the winter. The other migratory bird species may use the area for foraging and/or nesting habitat.

**Environmental Consequences:**
**Proposed Action** – The impact on other Birds of Conservation Concern that are covered under the Migratory Bird Treaty Act would be minimized through implementing most treatments outside the nesting season. Additional guidance (IM2008-050) further clarifies that seasonal restriction from ground disturbing activities will be in effect between May 15 and July 15 to minimize/avoid impacts to nesting migratory birds. Perch sites, nest sites and habitats supporting prey and food species may be reduced for some bird species, but may increase habitats for other bird species. Short-term displacement of individuals may occur due to these changes in habitats. It is possible individual wintering birds may be affected by the removal of vegetation that provides hiding and thermal cover; however vegetation removal activities in any given area are expected to be short-term. Long term, vegetation diversity and condition should increase. Shrub understory and herbaceous vegetation should increase after the reduction of competition from the overstory. Thinning and/or removing the overstory will improve understory vegetation, resulting in greater foraging opportunities and shelter for some species.

**No Action Alternative** – Under the No Action Alternative, no impacts are expected to migratory birds and associated habitat would remain in its current condition.

WILDLIFE, TERRESTRIAL (includes a finding on Standard 3)

**Affected Environment:** The project area supports a diversity of terrestrial wildlife species including those that use pinyon-juniper, sagebrush, riparian, and mountain shrub vegetation in the area. Common species include deer and elk, bobcat, rabbits, black bear, mountain lion, snakes, and lizards. Species accounts for the area are provided in the Gunnison Gorge LHA report, available at the BLM Uncompahgre Field Office. Winter range, severe winter range, winter concentration areas, and migration corridors for elk occur in the project area. Winter concentration and winter range areas for mule deer occur in the project area.

**Environmental Consequences:**
**Proposed Action** – Possible impacts on terrestrial wildlife would be similar to those described under the Threatened, Endangered, and Sensitive Species section above. Overall, the proposed treatments should improve habitat conditions for most of these species, particularly for elk and deer. The project is designed to improve winter range quality for elk and deer, helping to

BLM_0017916

shift their areas of use to help avoid competition with Gunnison sage grouse and reduce their impacts upon private lands in the area.  Project Design Features (seasonal restriction period) for big game should minimize disturbance of animals during critical winter periods.

**No Action Alternative** – Conditions are expected to continue to decline relative to sagebrush communities.  In the absence of disturbance causing events piñon and juniper will continue to establish and mature within the sagebrush communities that are critical to grouse life processes.  The young developing woodlands would continue to mature and infill as sagebrush community species continues to decline.  Such situations make it much more difficult to restore functional sagebrush communities after a post disturbance event.  Competition from wintering ungulates would also continue thus it can be expected that forb and native grass expression will continue to be suppressed/decline which will contribute to grouse habitat limitations.  Additionally, conflicts between wintering ungulates and private land owners would continue to increase.  The no action alternative would over time effectively limit grouse populations to the point where a viable population may not be plausible.

**Finding on the Public Land Health Standard for plant and animal** communities (partial, see also Vegetation; Invasive, Non-native Species; and Wildlife, Aquatic):  Approximately half of the project area was meeting the standards, while the remainder was meeting the standards with problems. Issues include exotic and noxious species, low perennial grass and forb cover, high bare ground, pinyon-juniper invasion, and moderate shrub utilization. With the appropriate measures, including seeding and weed control, mechanical and fire treatments would likely result in improved vegetation species diversity, increased habitat edge, recruitment and growth of young vegetation, increased age classes of vegetation, and replacement of less desirable forage species with more desirable species. Under the Proposed Action, problem areas are expected to improve. Those areas currently meeting this standard are expected to continue meeting under the Proposed Action. Under the No Action Alternative, conditions for some special status species may continue to decline.

WILDLIFE, AQUATIC

The project area does not include any known wetlands or riparian areas on BLM lands.  There would be no impacts to aquatic wildlife.

WETLANDS & RIPARIAN ZONES (includes a finding on Standard 2)

**Affected Environment:**  The Upper Gunnison River and the Smith Fork are the closest streams or rivers to the project areas. They are at least one mile away from the treatment areas. There are no known naturally occurring wetlands in the treatment area. There are a few small wet areas associated with livestock reservoirs, and 3 small manmade wetlands associated with sage grouse drinkers in the project area.

**Environmental Consequences:**
**Proposed Action** – There will be no impacts to riparian areas, as vegetation treatments

BLM_0017917

will be located too far away. Because of the topography and soils, it is unlikely there are undocumented wetlands in the project area, so there is little chance of impacts to naturally occurring wetlands. Artificial wetlands will be avoided by mechanical treatments. It is unlikely that fire will damage the wet areas as their fuel moistures will prevent much burning. Burned vegetation in these would be expected to recover within a few months.

**No Action Alternative –** There will be no impacts to wetlands and riparian zones.

**Finding on the Public Land Health Standard for riparian systems:** There would be no effect to the current ratings for Land Health Standard 2 from either alternative.

## FLOODPLAINS

There are not any mapped FEMA floodplains in the vicinity of the proposed treatments. There would not be impacts to floodplains.

## WATER QUALITY, SURFACE AND GROUND (includes a finding on Standard 5)

**Affected Environment:** The proposed project sites are within the Gunnison, 4th level watershed - Hydrologic Unit Code (HUC) 14020002. The project area drains into intermittent drainages that are tributary to Red Canyon Creek and the Gunnison River. The treatment units do not contain perennial surface waters. The surface water channels that drain the units only flow in direct response to major precipitation events and occasionally snowmelt.

The table below lists the water quality classifications for the described surface waters:

| 4th *Field Watershed* | *Stream Segment* | *Stream Classification* [1-5] |
|---|---|---|
| 14020002 Lower Gunnison River | Mainstem of the Gunnison River from the outlet of Crystal Reservoir to a point immediately above the confluence with the Uncompahgre River. | Aq Life Cold 1 Recreation E Water Supply Agriculture |
| | All tributaries to the Gunnison River, including all wetlands which are not on national forest lands, from the outlet of Crystal Reservoir to the confluence with the Colorado River, except for specific listings in the North Fork and Uncompahgre River | Aq Life Warm 2 Recreation  N Water Supply Agriculture |

20

BLM_0017918

| | subbasins and in Segments 3, 4b, 4c, 5 through 10, 12 and 13. | |
|---|---|---|

1- Waters are designated either warm or cold based on water temperature regime. Class 1 water's are capable of sustaining a wide variety of cold or warm water biota, while class 2 waters are not.

2- Recreation Class E - Existing Primary Contact Use. These surface waters are used for primary contact recreation or have been used for such activities since November 28, 1975.

3- Recreation Class P - Potential Primary Contact Use. These surface waters have the potential to be used for primary contact recreation.

4- Recreation Class N - Not Primary Contact Use

5- Waters that are suitable for irrigating crops usually grown in Colorado.

6- Waters that are suitable or intended to become suitable for potable water supplies.

In addition to the state's water quality classifications and numeric standards, all surface waters of the State are subject to the Basic Standards (Colorado Department of Public Health and Environment, Water Quality Control Commission, Regulation NO. 31), which in part reads: state surface waters shall be free from substances attributable to human-caused point or nonpoint source discharge in amounts, concentrations or combinations that:

1. Can settle to form bottom deposits detrimental to the beneficial uses (e.g. silt and mud).

2. Are harmful to the beneficial uses or toxic to humans, animals, plants, or aquatic life.

3. Produce a predominance of aquatic life.

The table below shows the surface waters in the area that are on Colorado's impaired waters, 303(d) list (CDPHE, Water Quality Control Commission, 5 CCR 1002-93).

| Segment Description | Portion | Colorado's Monitoring & Evaluation Parameter(s) | Clean Water Act Section 303(d) Impairment | 303(d) Priority |
|---|---|---|---|---|
| Tributaries to Gunnison River, Crystal Reservoir to Colorado River | all | | Se | H |

The project area drains to Red Canyon Creek which is included in "Tributaries to the Gunnison River," on the Colorado 2010 Monitoring and Evaluation List for suspected impairment for excessive selenium loading (Colorado Water Quality Control Division).

**Environmental Consequences:**

**Proposed Action** – In the short term following any prescribed fire, the proposed burn areas pose a slight risk to increased sediment, nutrient and ash constituent loads into local surface water systems. Areas on the burn most susceptible for causing elevated levels of these constituents would be the steeper sites in the lower elevation areas of the canyons. Very little Mancos shale parent material, the primary source for Selenium contributions to water quality, is present in the project area. Due to the planned low intensity burns surrounded by natural vegetation buffers, any sediment transported from burn sites should be slowed and deposited in the unburned areas prior to reaching stream channels.

21

BLM_0017919

High intensity precipitation events, capable of transporting sediment or ash constituents are most likely to occur during mid to late summer. Consequently, spring burns would leave the soil surface more prone to accelerated runoff and erosion compared to fall burns. Burning during the fall as planned, would allow more vegetation establishment in the spring prior to the summer monsoon thunderstorm season. Over the course of 1 to 3 years, the burned areas would reestablish effective watershed cover, resulting in increased soil-water infiltration, decreased surface runoff, reduced soil surface erosion, and improved water quality over the current conditions.

Surface water quality within and downstream of the proposed treatment areas would improve as a result of mechanical treatment. Mechanical treatment results in additional watershed surface cover in the form of ground surface litter and increased grass and forb densities. The increased watershed cover from mechanical treatments would reduce the potential for surface runoff and soil erosion, minimizing the sediment yield from these areas. The overall increase in watershed cover would begin immediately after the treatment and slowly increase as the seeding becomes established.

There would be no impact to ground water resources with implementation of the proposed action.

Limited spot treatment of weeds may be needed to help the establishment of native species in mechanical and prescribed fire treatment areas. The herbicides that may be applied are analyzed in detail including the impact to water quality, in the *Programmatic Environmental Impact Statement: Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States, and Programmatic Environmental Report.*

**No Action Alternative** – There would be no change to present water quality conditions of both surface and groundwater.

**Finding on the Public Land Health Standard for water quality**: Both the mechanical and burn treatments would ultimately result in improved watershed conditions, although a slight, temporary increase in sediment and ash constituents could be realized in the first few years after a burn. The improved watershed conditions would be reflected in improved quality water draining from the area, thus enabling the site to achieve Standard 5 of the Public Land Health Standards.

WASTES, HAZARDOUS OR SOLID

**Affected Environment:** No hazardous or solid wastes are known to exist within the project area.

**Environmental Consequences:**
**Proposed Action –** Diesel fuel and hydraulic fluid would be utilized during the operation of heavy equipment on site. Drip torch fuel would also be on site. Fuels used to ignite prescribed fire would be used on site, and any fuel remaining would be removed from the site.

22

Only the anticipated amount of fuel required for project completion would be transported to the project site. All materials used on the proposed project would be handled to prevent their accidental release to the environment. Hydraulic fluid is generally contained but the possibility of a broken hydraulic line could exist, in which case a small amount of fluid could leak onto the ground. If any spills should occur, the BLM hazardous materials coordinator would be contacted and hazardous materials would be cleaned up utilizing standard hazmat procedures. If manufacturer's directions on herbicides are followed, no negative impacts from herbicide use would be expected.

**No Action Alternative** – Treatments would not be implemented therefore, there would be no impact from hazardous wastes.

ENVIRONMENTAL JUSTICE

**Affected Environment:** While analyzing a federal action, BLM identifies and addresses, as appropriate, disproportionately high and adverse human health and environmental effects of program, policies, or activities on minority or low income populations. Environmental Justice involves fair treatment, which means that no group of people, including a racial, ethnic, or socio-economic group, should bear a disproportionate share of the negative environmental consequences resulting from a federal action.

**Environmental Consequences:**
**Proposed Action** – The proposed action was developed based on habitat requirements for Gunnison sage grouse and the need to modify vegetation structure and composition to expand and/or to restore suitable habitat character the species. The action would not have a disproportionately high or adverse human health or environmental effect on minority or low-income populations.

**No Action Alternative** – There would not be impacts to Environmental Justice.

OTHER ELEMENTS

The following elements are considered. Those that could be impacted are brought forward for analysis.

| Other Elements | Not Applicable or Not Present | Present, But No Impact | Applicable & Present; Brought Forward for Analysis |
|---|---|---|---|
| Access | | X | |
| Transportation | | | X |
| Cadastral Survey | X | | |
| Realty Authorizations | | X | |
| Range Management | | | X |
| Forest Management | | | X |
| Fire | | | X |

BLM_0017921

| Hydrology/Water Rights | | | X |
|---|---|---|---|
| Noise | | | X |
| Recreation | | X | |
| Visual Resources | | | X |
| Geology and Minerals | X | | |
| Paleontology | X | | |
| Law Enforcement | X | | |
| Socio-Economics | | | |

## TRANSPORTATION

**Affected Environment:**  The project area is located within a Limited to Designated Routes area with approximately 73 miles of Montrose County roads and BLM designated routes.  The project area within the Gunnison Sage-Grouse ACEC/IBA is seasonally closed to motorized and mechanized travel from November 15 to April 30 to prevent disturbance to wintering big game and to reduce impacts on strutting Gunnison sage-grouse in the spring.

**Environmental Consequences**:
**Proposed Action** – Designated routes would be used to the extent possible.  If there is a need to create further linear disturbance, the linear disturbance would be rehabilitated and barriers and other means of mitigation would be used immediately after the project has been completed to prevent confusion for the general public. The project leader would be responsible for making sure the disturbance is properly rehabbed and monitoring and mitigating the area in the short term for impacts that may occur in relation to the disturbance.
If designated routes need to be closed for safety reasons in the project area, they would be clearly signed with the reason for the closure and the timeframe of the closure.  Additional outreach should also be done prior to the activity to notify the public of the route closures.
Overall, the project should have minimal impact on transportation.

**No Action Alternative** – Under the no action alternative, there would be no impacts to existing realty authorizations.

## REALTY AUTHORIZATIONS

**Affected Environment**:   Various right-of-way authorizations may be present within the project area; including but not limited to powerlines and telephone lines (both aerial and buried), access roads, county roads, ditches and irrigation facilities, and pipelines.

**Environmental Consequences**:
**Proposed Action** – Rights-of-way will be avoided to the extent possible.  If they cannot be avoided, care will be given to ensure no damage or harm is caused to the right-of-way.  If needed the right-of-way holder will be contacted and coordinated with to ensure consideration and protection of the existing facility.  The appropriate county will be notified of any potential impacts or atypical use of county roads.

BLM_0017922

**No Action Alternative** – Under the no action alternative, there would be no impacts to existing realty authorizations.

RANGE MANAGEMENT

**Affected Environment:** Most grazing activity in the NRLS area occurs on the Fruitland Mesa/Green Mountain Lands, with one sheep allotment, one cattle/sheep allotment, and five cattle allotments. The sheep allotments are entirely on public land. Most of the cattle allotments contain a high percentage of private land that is grazed in conjunction with the public land. The season of use in the cattle allotments is spring and summer except for the Grizzly Gulch Allotment which has fall use. In the sheep allotments, one has fall use and the other has winter use. Sheep bed-ground areas are limited to a five day stay. Sheepherder camps are also required to move as frequently as reasonable to avoid impacts.

The sage grouse habitat in the area consists mostly of the mesa tops and benches dominated by sage brush, pinyon-juniper, and mountain shrub vegetation communities.

*Black Ridge Allotment #05020*

The grazing period is December 12 to February 15 with about 1,200 Sheep. Total available use is 552 AUMs. This allotment has no fenced pastures as the sheep are managed and moved by herders from one use area to another. Normally, grazing use occurs for no more than 30 consecutive days within the grazing period. Use always occurs in the winter and since this area is quite arid with no natural water supply, the sheep are reliant on snow cover for water. The area has a large and significant sagebrush/grass component that occurs mostly in open spaces among the pinyon-juniper. Several roller chop and reseeding treatments (about 700 acres) have occurred in the allotment within the last 10 years. Aside from use by elk and mule deer, spring and summer livestock use is not authorized here. A Gunnison sage grouse drinker was installed here in 2010.

*Green Mountain Allotment #05017*

The cattle grazing period is May 15 to July 5 with approximately 250 cow/calf pairs. Total available use is 1070 AUMs. A four-pasture deferred rest-rotation strategy has been used for the last 8 years. The cattle will usually trail into and exit the allotment at the intersection of Black Canyon and C-77 roads. The *East* pasture is always grazed <u>first</u> for about 10 days to settle the herd, gather, and then move to another pasture. It is normally used again for about 5 days at the end of season. The cattle will spread out as they graze, but some of the use will occur near the C-77 road during these times. This pasture is rarely used for more than 15 days each year. The *Middle* pasture is grazed for about 21 consecutive days at varied times within the grazing period. This pasture is rested once every 3 years. The *West* pasture is grazed for about 21 consecutive days at varied times within the grazing period. This pasture is also rested once every 3 years. The *Green Mountain South* pasture is grazed for no longer than 15 days each year at varied times

BLM_0017923

within the grazing period.  In some years, this pasture is used in two separate durations (early and late) within the season, but for a total of 15 days.

The sheep grazing period extends from October 15 to December 15 with about 1,200 sheep (586 AUMs).  Annual grazing by sheep will normally occur in the East, Middle, and West pastures for a maximum of 45 consecutive days at varied times within the grazing period.  Sheep are herded throughout the allotment with the intent of maintaining use levels at no greater than 40% in any single use area. Snow cover is important for the appropriate distribution and constant movement of sheep throughout the allotment pastures.

*Grizzly Gulch Allotment #05015:*

This allotment has mixed public ownership and is grazed by 250 cattle between September 15 and November 15. BLM lands constitute 400 acres and NPS lands constitute 1,920 acres of the allotment area. Total available use is 309 AUMs. The BLM administers the allotment for both agencies. A larger, adjacent portion of this allotment was retired by the NPS in Dec 2007.

*Poison Spring Allotment #05014*

The grazing period extends from May 20 to June 26 with 60 to 100 mature cows or cow/calf pairs (50 AUMs).  Cattle trail in from the north on the Black Canyon Road, covering the entire allotment quickly and graze for three to four weeks.  The livestock will then leave this allotment and normally be trucked to Forest Service lands for the summer.  This allotment has had several treatments including hydro-axe and brush beating within the last 12 years.  The purpose of these was for improvement of Gunnison Sage Grouse habitat and improvement of the native plant community and forage quality.

*Iron Canyon Allotment #05013*

The grazing period is May 15 to June 30 with about 90 cow/calf pairs (95 AUMs). This allotment has three pastures that are grazed in varied rotations each year. The West Side pasture is closest to the Crawford Gunnison sage grouse population, and has an even mix of sagebrush, oak, and pinyon-juniper habitat.  It receives consistent grazing use each year, for an average of 15 days. This use is easily observed from the Poison Springs Road which runs north/south through this pasture. A Gunnison sage grouse drinker was installed here in 2008.

*Gould Reservoir Allotment #05011*

The grazing period is May 14 to July 14 with about 150 mature cows or cow/calf pairs (305 AUMs).  This allotment utilizes a four-pasture deferred rotation grazing strategy.  All pastures have a mix of sagebrush, oak, and pinyon-juniper habitat. All pastures receive consistent grazing use each year, for a total of approximately 45 days. This use is easily observed from the Poison Springs Road which runs through this allotment.  About 350 acres in this allotment were treated by roller chop and reseeding in 2003.

*Dead Horse Common Allotment #05010*

BLM_0017924

The grazing period is June 1 to October 10 with approximately 150 cattle (97 AUMs).  This allotment area is considered "extended Gunnison sage grouse range", but little is known about actual bird numbers. The landscape here is dominated by mountain shrub with less common stands of pinyon-juniper and sage brush.  Large open meadows are interspersed throughout the allotment with cool season grasses and forbs providing adequate forage for livestock and wildlife.

**Environmental Consequences:**

    **Proposed Action** – Vegetation treatments in the allotments discussed above would be "staggered in" over a period of 10 years, but could have some significant impacts to the permitted grazing use. This would apply mostly to the seeded areas, which would be rested from grazing for the first growing season and potentially resulting in non-use in certain pastures or use areas. The seeded areas would be reevaluated in the spring of the second year for establishment of seedlings and stand success. Depending upon the findings, grazing could resume that year or conversely, additional rest (one or more years) could be prescribed. These issues are normally worked out ahead of time with the permittee by rescheduling a grazing sequence (which would include rest) or locating available grazing in another area. Fencing strategies (portable electric fence) may be used to delineate and protect treated areas. Although these adjustments may be at times difficult for the permittee, feasible solutions are usually found.

Resting the vegetation treatments for one or more growing seasons will enable palatable perennial plants to become established to the point where they can survive and be competitive under well-managed grazing. A competitive herbaceous plant community would stay in a healthy early/early-mid seral stage and prevent reestablishment and dominance of woody plants for many years. Providing season long rest (whenever feasible) would ensure that plants are able to rebuild root reserves, increase in size and produce seed periodically, further promoting their vigor. It should also help build up fuel levels, increasing opportunities for use of natural fire to create earlier seral stages across these allotments. Periodic authorization of grazing outside of the time specified on the permit will provide for occasional rest during seasons in which the plants are usually grazed. This strategy (and others mentioned above) would allow plants to complete critical stages in their life cycles, such as producing seed or rebuilding root reserves.

From the standpoint of improved and sustained vegetation health and forage production, the proposed action will help these grazing allotments to move towards improved overall rangeland health and sustainable grazing.

    **No Action Alternative** – There would be no impacts to range management under this alternative.  However, it would result in a lost opportunity to improve rangeland health of the targeted plant communities.

FOREST MANAGEMENT

    **Affected Environment** – Roughly 80-90% of the project area is not considered to be forested cover types.  Much of the piñon and juniper (PJ) found on the gentle sloped deep soils are the result of no disturbances such as fire and insects.  Such disturbances would function to

27

maintain these areas as grasslands, sagebrush and grasslands, or as mature sagebrush community. As a result much of the PJ that would be influenced by the proposed action is very young (40-120 years old) lightly stocked stands or PJ encroachment into sagebrush and mountain shrub communities. All of the PJ stands identified for treatment within the Sagebrush, Grouse, and WUI emphasis areas are in the early stages of stand development/type conversion from sagebrush. These stands still exhibit characteristics of the former sage community with productive sagebrush, abundant perennial bunch and sod grasses, and forbs commonly found within the sage community. These sites were likely sagebrush communities exhibiting PJ encroachment around the early 1900's in the absence of disturbance/treatment these sites will develop into mature PJ woodlands in another 75-120 years. The PJ resources that would be influenced by the proposed action have some limited value locally as a source of limited firewood and posts for fence construction as well as Christmas trees.

### Environmental Consequences:

**Proposed Action** – Approximately 3000 to 4800 acres of PJ encroachment would be removed by either mechanical treatment or prescribed fire within the Sage Restoration, Grouse, and WUI emphasis areas. Such treatments would preempt the gradual development of PJ woodland characteristics within sagebrush and mountain shrub communities. Another 1000 acres of young lightly stocked PJ woodlands within the Sage Restoration, Grouse, and WUI emphasis areas would be type converted back to early seral favoring the development and expansion of sagebrush community. The removal of these woodland resources would have no impact on commercial forest product production as none of the project area is considered in the commercial forest base.

**No Action Alternative** – Under the no action alternative, there would be no impacts to existing woodland resources. In the absence of disturbance causing events piñon and juniper will continue to establish and mature within the sagebrush communities. The young developing woodlands would continue to mature and infill as sagebrush community species continues to decline.

## FIRE MANAGEMENT

**Affected Environment:** <u>Fuel Types and Fire Regimes</u> - Several fuel types are present in the Project Area, including grass, grass/sagebrush, mountain shrub, and pinyon/juniper. Intermixes of these fuel models also occur in some locations, for example, there are mosaics of grass/sagebrush/mountain shrub in some locations. These fuel types are best represented by the following fuel models:

| Vegetation Type | Fuel Model | Description | Other |
|---|---|---|---|
| Grass | GR1 | Short, discontinuous, grazed grasses | Most area are the result of previous treatments |
| Sagebrush/Grass | GS2 | Sagebrush with limited grasses | Important sage grouse habitat |
| Mountain Shrub | SH2 | Mixed oak, serviceberry, snowberry, etc | Unknown grouse use |
| Pinyon/Juniper | TL1 (light wind) SH5 (mod/hi wind) | PJ with shrub or grass components | |

BLM_0017926

Grass fuel types (Fuel Model GR1) are somewhat limited on this landscape, consisting primarily of small, previously treated areas aimed at enhancing sage grouse habitat. Within the Project Area less than 10% of the area is considered to be a grass fuel type and these areas are small and discontinuous and will not be an emphasis for treatments other than maintenance or as controllable perimeters for larger prescribed burns. The fire regime in grass fuel types is typically characterized by frequent (10-20 year interval), low intensity fires that remove any encroaching woody species, such as sagebrush, pinyon, and juniper, and subsequently maintain openings dominated by grasses and forbs. Within the Project Area there has been little fire influence to maintain or create grass areas over the past 80-100 years.

The Sagebrush/Grass fuel type (Fuel Model GS2) is very extensive within the Project Area and contains the primary habitats needed by the sage grouse. Within the Project Area approximately 50% of the area is sagebrush/grass fuel type. These areas lie primarily in a large band stretching east/west on both sides of C77 Road and in a few other locations such as Grizzly Gulch. The fire regime in the sagebrush/grass fuel type is typically characterized by infrequent (25-100 year interval), higher intensity fires that burn through the sagebrush and grass, removing the sagebrush from the area and creating large patches of grasses and forbs on the landscape. Within the Project Area there has been little fire influence in the sagebrush/grass fuel type over the past 80-100 years. Due to the lack of fire on the landscape in recent history much of the sagebrush/grass fuel type is being encroached on by young pinyon and juniper trees.

The Mountain Shrub fuel type (Fuel Model SH2) is fairly extensive within the Project Area and is probably used to some extent during the brood rearing portion of the sage grouse life cycle. Within the Project Area approximately 25% of the area can be considered to be the mountain shrub fuel type with these areas being located at higher elevations near the NPS/BLM boundary and on some of the north facing slopes. The fire regime in the mountain shrub fuel type is characterized by infrequent (50-120 year interval), high intensity crown fires that remove the above ground portion of the shrubs and create small to large size openings that are initially dominated by grasses and forbs but quickly succeed back to mountain shrub species the rapidly resprout following disturbance. Within the Project Area there has been little fire influence in the mountain shrub fuel type over the past 80-100 years, resulting in fairly dense, continuous stands of shrubs that limit understory grass and forb production.

The Pinyon/Juniper fuel type (Fuel Model TL1 during light wind events and Fuel Model SH5 during higher wind events) is somewhat common in a few locations, including the western end of the Project Area and in scattered locations near the higher ridges, primarily on east and north aspects. Approximately 15% of the Project Area can be considered as the pinyon/juniper fuel type. The fire regime in the pinyon/juniper fuel type is characterized by long return (150-300+ year interval), high intensity fires that burn with high severity through the canopies, removing the pinyon, juniper, and any shrub components and leaving small to large size openings dominated by grasses and forbs and limited resprouting shrubs that may have been present in the understory. Within the Project Area there has been little fire influence in the pinyon/juniper fuel type over the past 80-100 years. Due to the lack of fire on the landscape in recent history the pinyon/juniper stands have become increasingly dense and have also spread outward into sagebrush/grass and grass fuel types. This has impacted understory production of grasses and

29

forbs and caused increasing bare ground to be exposed within the understory.

Fire History - Within a 91,000 acre area encompassing the Project Area there have been approximately 122 wildfire ignitions since 1980 (30 year period) for an average of 4 ignitions/year. 72% (88) of the ignitions were lightning caused while the remaining 18% (34) were from a variety of human causes. The total acreage burned by wildfires within this 91,000 acre area during this 30 year period was 3,139 acres, for an average of 104 acres/year. Many of the fires were single trees fires less than 1/10[th] acre, while the largest fire was 609 acres. Sixteen of the fires in this area were over 10 acres in size.

Under this past fire management scenario the fire cycle for the entire 91,000 acres would be approximately 870 years. Assuming a natural fire return interval on this landscape of approximately 100 years this area is experiencing well less than 10% of the fire occurrence that it may have historically experienced. Several reasons contribute to this situation: 1)livestock and wildlife grazing consistently remove a portion of the finer fuels each year that are needed for fire growth, 2)fire suppression on this landscape has been very successful for the past 80-100 years, 3)some of this fire analysis area includes lands that have been converted from natural vegetation to irrigated pastures and crop growing, which generally preclude fire ignition and spread, and 4)intensive mechanical treatments, primarily for grouse, have kept some portions of this landscape in a younger, less fire-prone vegetation type. Regardless of the reasons, it is clear that the landscape has not been significantly influenced by a natural fire regime for the past 80-120 years and subsequently portions of the landscape have become dominated by woody species such as pinyon, juniper, oakbrush, and sagebrush to the detriment of earlier seral grass and forb species.

Prescribed Burns and Mechanical Treatments - Over the past 20 years approximately 5 prescribed burns have been conducted in this area. A total of approximately 1,700 acres was treated using prescribed fire on these burns. The largest burns were the Green Mountain #3 and the #4 Burns, which were each several hundred acres in size. These burns were designed to remove woody species, particularly oakbrush and other mountain shrub species, as well as encroaching pinyon/juniper, with the goal of improving elk and sage grouse habitat, and reducing fuel loadings and fuel continuity in the Wildland Urban Interface (WUI).

Numerous mechanical treatments have been implemented on this landscape, generally from the mid-1990's to the early-2000's and primarily with the goal of enhancing sage grouse habitat. These treatments included brushbeats, hydroaxing, aeration, and removal of invading trees with chainsaws. Many of the mechanical treatments were followed up with seeding using grass, forb, and sagebrush seed mixes. These treatments have had an important effect of maintaining earlier seral patches on the landscape, patches which would otherwise be very rare due to the lack of natural or managed fire on the landscape.

Wildland Urban Interface – Immediately adjacent to Project Area are 80-100 private parcels that range in size from 35 acres to several hundred acres each. Within 1 mile of the Project Area there are several hundred parcels of this size. A relatively low percentage of these parcels are currently built on, probably in the neighborhood of 20-30%: even with this low percentage there are approximately 16-30 homes located immediately adjacent to the Project Area and 30-60

30

homes within 1 mile of the project area.  More homes and structures will be built on these parcels over future decades.  Additionally, there are 3-4 parcels of private land interior to the Project Area with 1-2 cabins/trailers located on these parcels.  The North Rim Ranger Station and Campground are located on the southern boundary of the Project Area on NPS land and there is an NPS communication repeater on the north boundary of the National Park on Green Mountain.  There are no known powerlines, gas lines, or other infrastructure within the Project Area.

**Environmental Consequences:**
**Proposed Action –** The proposed action would 1) re-establishment of a more natural vegetation mosaic, 2) reintroduce a more natural fire regime to portions of the landscape, 3) reduce risk to WUI areas, including the  development to the north and east as well as to NPS communication sites, ranger stations and campgrounds, and 4)enhance ease in managing future wildfires due to the creation of a mosaic of vegetation age classes.

Reestablishment of a More Natural Vegetation Mosaic – Through mechanical treatments, prescribed burning, and seeding the vegetation/fuels mosaic would become much more natural in patch size, age class, and vegetation diversity.  Specifically the landscape would be less dominated by older woody species, particularly pinyon and juniper, but also oakbrush and serviceberry.  The treatments would create a mosaic of small, medium, and occasionally large patches of younger vegetation that  are dominated by grasses, forbs, and more vigorous young shrubs, including sagebrush, and resprouting oakbrush and serviceberry.  These treated patches would be surrounded by a matrix of older vegetation, including untreated sagebrush/grass, mountain shrub, and pinyon/juniper.  Patch sizes would range from frequent small patches (<10 acres in size), to numerous medium patches (10-50 acres in size), to occasional large patches (>50 acres).

Reintroduction of a More Natural Fire Regime to Portions of the Landscape – Due to a general fire exclusion on this landscape over the past 80-100 years for a variety of reasons brought forward in 'Fire History' above, there is a need to reintroduce fire, and the benefits of fire, back onto this landscape.  As discussed previously, fire can contribute to a more natural mosaic of vegetation species, patch sizes, and age classes on the landscape.  Additionally, fire would help to recycle nutrients back into the soil; these nutrients would then become more available to support new, vigorous growth of earlier seral species, particularly grasses, forbs, and young sagebrush.  Through mechanical treatment and prescribed fire both fuel loadings and fuel continuity would also be modified to a lighter, more natural fuel loading as well as to a reduction in fuel continuity, particularly stand density and stand continuity, across the landscape.  With regard to the fuel types found on this landscape this change in fuel continuity can best be understood primarily as multiple changes in vegetation type, age class, and/or stand density across the landscape, ie, stands of older pinyon/juniper juxtapositioned next to grass/forb openings or numerous small patches of grass/forb/young sagebrush scattered throughout a stand of older sagebrush. These changes to vegetation and fuels should contribute to restoring a more natural fire regime consisting of somewhat shorter intervals between fires and smaller fires that burn only in aging, more woody stands, though some fires could occur in grass areas during drier fire seasons when the grass cures.  These treatments would not completely restore the fire regime since grazing of grasses, forbs  and young shrubs (fine fuels needed to carry fire across the

31

landscape) by cattle, sheep, and wildlife would still be occurring.

Reduced Risk to Wildland Urban Interface Areas -  Within the Wildland Urban Interface areas the treatments may cover a slightly higher percentage of the landscape, with the intention of creating more early seral (grass/forb or grass/forb/young sagebrush), and more fire resistant fuel types, near values such as private lands and development, communication sites, and other facilities.  In these areas the treated patches may also be oriented lengthwise across the general wind direction to protect the values from a fire moving with the wind.  With fuel treatment in the WUI, the future fire intensity (flame length) would be reduced; the combination of lighter fuel loading and decreased flame length reduces a fires 'resistance to control' and allows firefighters to be more successful in controlling and extinguishing threatening fires.  Additionally, the risk of ignition generally decreases with younger vegetation because it contains less dead woody debris and litter.

Managing Future Wildfires – Through mechanical treatment and prescribed burning across this landscape the future management of fire would be enhanced.  Fires would have less potential to spread with high intensity and high rates of spread due to a decrease in both woody fuel loading and fuel continuity; subsequently, in treated areas where fires become less intense and spread more slowly firefighters can control, manage, or extinguish them, depending on the objectives for each specific fire.  Prescribed fire would also be safer and more efficient to implement because of the increased amount of areas with younger, lighter fuels on the landscape in which to anchor and control prescribed fire.  Additionally firefighters would have more areas to use as escape routes and safety zones while managing fire.

**No Action Alternative –** Under the No Action Alternative no additional treatments would take place on the landscape and the continuity and loading of woody species (pinyon, juniper, oakbrush, serviceberry, etc) would continue to increase to the detriment of lighter fuel types (grass/forb and grass/forb/young shrub).  In other locations in Western Colorado (west side of the Uncompahgre Plateau) we have seen increases in fire size, and fire intensity in some of these fuel types over the past 15-20 years as the stands have become more dense and continuous, indicating that there may be an 'optimum' density and continuity in which fire, during more droughty years, can readily spread over largeacreages.  With the increasing WUI to the north and east of the Project Area the potential for damage or loss to private lands and improvements under this No Action scenario may be increasing.  Losses of structures due to wildfires are occurring more and more frequently throughout the Western United States; the Montrose Interagency Fire Management Unit lost structures on the Wake Fire in 1994, in the Hotchkiss/Cederedge area in 2008 and has had numerous fire threaten subdivision over the past few years (Burn Canyon - 2002, McGruder -2004, Grammer -2009).  Additionally, if potential fire size is increasing because of increased continuity and loadings the patch sizes created by these fires would obviously be larger, which could be very detrimental to sage grouse, which require relatively small patch sizes of earlier seral vegetation.


HYDROLOGY AND WATER RIGHTS

**Affected Environment:**  The project area is situated in an area consisting of intermittent and

32

BLM_0017930

ephemeral drainages contributing surface water to Red Canyon Creek. Runoff is produced from snowmelt and summer thunderstorm activity. The area receives about 14 to 16 inches of precipitation annually, about half of which is snow. There are approximately 60 small stock ponds in the project area. There are also several guzzlers installed by the grazing permittee consisting of a large tractor tire cemented in place and connected to a water pipeline.

Sage Grouse drinkers are installed at 5 locations to help increase bird establishment in the area. Additionally, there are several water rights including the SOG Gulch Pit ditch and the Coutts well. The decreed water rights are as follows:

|  | Appropriation Date | Rate (cfs) |
|---|---|---|
| SOG Gulch Pit ditch | 1998 | 0.25 |
| Coutts Well | 1940 | 0.22 |

Data from Colorado Decision Support Systems

**Environmental Consequences:**
   **Proposed Action –** Prior to vegetation being established on burned sites, some minor increased yield of sediment and ash constituents could occur, which mostly drains to Red Canyon Creek, and could temporarily affect the function of the irrigation diversions. These impacts would only potentially occur immediately after runoff-producing high-intensity thunderstorms, and only for the first couple of years post burn. Once the burned areas establish the target vegetation species, the runoff potential would be reduced below the existing conditions.

   **No Action Alternative –** There would be no impact to the area's hydrology or water rights.


NOISE

   **Affected Environment:** The project area is generally characterized as quite for much of the time. The Poison Springs Road and the Black Canyon Road enter the area from the northeast and have a moderate amount of traffic and associated noise, primarily during the late April-early October period. Noise is generated periodically when visitors drive vehicles, ATVs or motorcycles on roads through the area; this is most noticeable during the fall hunting seasons.

   **Environmental Consequences:**
   **Proposed Action –** There would be a short-term generation of noise from equipment used during mechanical treatments, which would be heard in the immediate vicinity, possibly up to a distance of 1 mile. Work would proceed primarily during weekday daylight hours; however, some work could occur on the weekends as well. Noise would only be for the duration of the project, and would not have an impact beyond project completion. Some of the prescribed burning would be ignited using a helicopter, which would be temporarily located at a Helibase somewhere within the Project Area. Noise from the helicopter would occur for 2-3 days during each prescribed burn and may be heard 3-4 miles away from the burn area.

33

BLM_0017931

**No Action Alternative** – There would not be impacts to noise.


VISUAL RESOURCE

**Affected Environment**:   The BLM's visual resource management system was designed, and is used, to help ensure that as proposed man-made features or surface-disturbing activities on public lands are constructed properly considering the existing landscape character and inherent visual resources.  The BLM Manual 8410-1 Visual Resource Management defines and categorizes visual resource management classes that provide objectives for these resources as projects are proposed and implemented in the landscape.  These Visual Resource Management (VRM) classes are determined through an inventory process described in the manual mentioned above, and are used to provide guidance to BLM and project proponents when contemplating proposed surface disturbing activities.  Class I areas are intended to protect an area from visible change, Class II areas allow for visible changes that do not attract attention, Class III areas allow for visible changes that attract attention but are not dominant, and Class IV areas allow for visible changes that can dominate the landscape.

The objective of Class II is to "retain the existing character of the landscape".  The level of change to the characteristic landscape should be low.  Management activities may be seen, but should not attract the attention of the casual observer.  Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.

The objective of Class III is to "partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate. Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape."

The objective of Class IV is to "provide for management activities which require major modification of the existing character of the landscape". The level of change can be high and management activities may dominate the view and be the major focus of viewer attention.  However every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating the basic elements. (BLM Manual Handbook H-8410-1)

The proposed action is located within a Class II, III, and IV area as indicated within the Gunnison Gorge National Conservation Area Resource Management Plan. The landscape consists of piñon /juniper, mountain shrub and sagebrush/grass plant communities. Steep slopes, mesa tops and rounded ridgelines dominate the topography. Currently, there is some limited scarring from prior road building, utility corridors, and other human activities. These disturbed areas are generally not visible from the communities in the North Fork Valley.

**Environmental Consequences**:
**Proposed Action** – In all cases VRM impacts must be mitigated where possible (see Appendix E for a sample list of design techniques).

Class II:

34

Any mechanical treatment other than minimal chainsaw work would have considerable impact on a Class II visual area.

Short term effects of prescribed burning would impact the viewshed however if other disturbances are kept to a minimum then the character of the landscape will remain intact therefore staying consistent with Class II management objectives.

In both cases the long term effects would be minimal.

Class III and IV areas:
Prescribed fire and mechanical treatments within in project area would follow management guidance pertinent to Class III and IV management objectives.  The short term effects would be more noticeable however over time the treatments would be less obvious to the casual observer.

**No Action Alternative** – Under the no action alternative, there would be no impacts to visual resources.


CUMULATIVE IMPACTS SUMMARY

Cumulative impacts are determined by adding the incremental environmental impacts of a proposed action to the impacts generated from other past, present, and reasonably foreseeable future actions within the Area of Influence (AOI).  For this EA, the area considered for cumulative impacts analysis is the North Rim Landscape Area. Located in southwestern Colorado, the North Rim Landscape Strategy Area (NRLSA) encompasses 345 square miles or approximately 220,693 acres. The Gunnison River, running through the Black Canyon of the Gunnison National Park, Curecanti National Recreation Area (NRA), and the Gunnison Gorge National Conservation Area (GGNCA), serves as the southern and western boundary of the NRLS area. The northern boundary follows the Smith Fork drainage. The eastern boundary follows the West Elk Wilderness boundary and Curecanti Creek. The NRLS area is divided among three counties: Delta, Montrose, and Gunnison and is near the communities of Crawford, Hotchkiss, Montrose, Olathe, and Delta.

The proposed action must be assessed cumulatively with all the other activities on private, state and federal lands.  Approximately 64% of the NRLS area is public land. The federal lands are managed by the Bureau of Land Management (BLM) –Uncompahgre Field Office; Forest Service, U.S. Department of Agriculture (USFS) –Grand Mesa, Uncompahgre and Gunnison National Forests, Paonia Ranger District; National Park Service (NPS) –Black Canyon of the Gunnison National Park; and the Curecanti National Recreation Area.

These public lands are distributed across the area in dispersed blocks and several isolated parcels.  The BLM is broken up by large areas of private land which are mainly concentrated where soils and topography are suitable for agriculture or ranching. National Forest Lands occupy most of the higher elevation areas.


**Past, Present, and Reasonably Foreseeable Future Actions**

35

Past and existing activities that have impacted area resources include the following:
- livestock grazing activities;
- recreation activities; and
- minerals development (mining and oil and gas); and
- vegetation management activities.

Livestock grazing and recreation

Under the proposed action, there would be a continuation of existing activities such as livestock grazing, recreation and wildlife use in the area. Increases in grazing and recreational pressure are not foreseen. The existing grazing effects (reduction in vegetation height, trampling, soil compaction, etc.) and recreation effects (compaction from vehicles and dispersed camp sites) would remain unchanged. Because most effects from recreation and grazing are minor compared to effects from vegetation management, discussion of cumulative impacts related to reasonably foreseeable activities focuses primarily on the effects of additional vegetation management activities.

Oil and gas development and Coal mining

Historically oil and gas exploration in the NRLSA has been low. With only two gas wells drilled in the distant past. It is anticipated that the number of oil and gas exploration wells could increase. Currently Gunnison Energy is seeking approval for 16 wells to be drilled just outside the AOI, SG Interests has proposed up to 150 wells within the general North Fork Valley area and Petrox has numerous well proposals under administrative review on National Forest Service Lands. Environmental analysis is currently being conducted for all the projects being considered and to date no final decisions have been made regarding these projects.

Just to the north of the AOI there are three active coal mines with approximately 33,000 acres of federal minerals currently leased. The primary existing disturbances in the area from coal mining/exploration include roads, and exploratory drill sites. Coal potential within the NRLSA is rated as low. Based on these ratings it is reasonable to assume that potential coal development within the NRLSA is low.

Cumulative impacts as a result of all these projects would cause the same types of short term impacts to vegetation, soil erosion and increase in weeds as this project. However, all projects have strict mitigation measures and are of a short duration. In the long term, there should not be an increase in cumulative impacts due to best management practices that are required.

Vegetation Management Activities

In the fall of 2009 the Paonia Ranger District began to implement an elk and deer winter range habitat improvement project on National Forest System Lands in the Lamborn/Landsend area of the Paonia Ranger District within the NRLSA. The purpose of this project is to enhance winter range by increasing the palatability of browse species and increasing grass/forb production, providing openings in pinyon/juniper woodlands, reducing fuels build-up, and providing for a variety of age classes in the mountain shrub / oak and pinyon-juniper communities in this area. Approximately 1955 acres are proposed for treatment by mechanical means (dozer, hydro-axe,

BLM_0017934

roller chop, or similar) and/or prescribed fire to improve forage quality and quantity for deer and elk. Additionally, as a result of the NRLSA the Paonia Ranger District has completed comprehensive travel management planning which has identified in excess of 40 miles of route decommissioning and/or administrative closure in the Black Mesa portion of the NRLSA.

BLM vegetation management in the AOI has primarily focused around habitat maintenance and improvement for Gunnison sage-grouse. Mechanical and prescribed fire vegetation manipulations in the AOI total 9526 acres which prior to 1980 primarily focused on forage development for the livestock industry. Since the early 1990's and the completion of the North Fork LHA in 2000 much of the vegetation management that has occurred in the area has focused on addressing specific land health issues relating to Gunnison sage-grouse, fuels, and vegetation problems identified in the land health assessment. There has also been considerable emphasis on improving big game habitat on public lands within the AOI in cooperation with local land owners and the Colorado Division of Wildlife Habitat Partnership Program (HPP). The table below is a breakdown of vegetation manipulations that have occurred in the AOI since 1965. Approximately 44% of all treatments conducted have been designed to specifically improve Gunnison sage-grouse habitat or to improve ungulate distribution and limit grazing focus on occupied grouse ranges.

| Treatment Type | Acres |
|---|---|
| Brushbeat | 996 |
| Dozer Scrape | 45 |
| Hydroaxe | 318 |
| Interseed | 886 |
| Lawson Aerator | 147 |
| Plow and Seed | 1,955 |
| Prescribed Fire | 3,020 |
| Rollerchop | 1,188 |
| PJ Removal (encroachment) | 971 |
| Total Acres | 9,526 |
| Treatments Benefiting Sage Grouse | 4,187 |

Air quality concerns from the proposed action would be limited to those disclosed earlier in this EA. Cumulatively, the impacts would be short term, and during the time when the project are actively implemented.

Invasive, non-native weeds have the potential to increase. Traffic on roads, livestock grazing, and recreational uses also contribute to the potential establishment of noxious weeds. The proposed action includes provisions specific to the management of the invasive cheatgrass. The project would be monitored for noxious weeds, and noxious weeds would be treated. As a result, the project would not add incrementally to the potential establishment of noxious weeds and does present the potential to greatly reduce the presence and influence of invasive species on vegetative communities.

37

BLM_0017935

Project implementation would not occur during the migratory bird nesting and breeding season. Some species could be displaced at other times, such as during the winter or late summer/fall. The forest service thinning could have the same impact. Cumulatively, the impacts are not expected to have a lasting effect on migratory birds. Improved availability of food and shelter for some species would increase after project implementation. Overall, the proposed treatments are expected to improve and expand native habitats and ultimately benefit the majority of terrestrial wildlife species. No sensitive wildlife or plant species are known to occur within the project areas, however surveys will be conducted and if detected such habitats would be avoided therefore no impacts to sensitive species are anticipated. Impacts to wildlife species from herbicide application are expected to be minimal at the rates proposed considering the precautions identified in the proposed action.

Surface water quality within and downstream of the proposed treatment areas is expected to improve as a result of mechanical and prescribed fire treatment. Mechanical treatment results in additional watershed surface cover in the form of ground surface litter and increased grass and forb densities. Soil erosion is expected to decline due to increased watershed cover and depression storage from surface disturbance which will reduce the potential for surface runoff and soil erosion, minimizing the sediment yield from these areas. Over the longer term, water quality and soil conditions are be expected to improve slightly over current conditions. This project would convert the vegetation composition and structure within the project area. Trees would be removed, resulting in better condition and improved production of shrub communities. The diversity and productivity of herbaceous vegetation in the understory would increase. Overall habitat suitability for Gunnison Sage-grouse is expected to increase in the short term by improving vegetation characteristics which sage-grouse seek out. In the long term functional grouse ranges are expected to be expanded by type converting young piñon and juniper stands back to sagebrush communities and by improving browse opportunities for ungulates outside of currently occupied grouse ranges.

Route proliferation is not expected from OHV use within the area because the area is designated "Limited to Existing Roads and Trails" and due to the amount of private land, most of the area is only accessible to the private land owners. No new routes will be constructed as a result of project implementation. Should any part of the project implementation leave the appearance of routes they would be scarified and seeded and blocked off with woody debris and/or boulders to inhibit route proliferation.

Visual resources will be moderately modified, the proposed action will modify color and texture yet the action mimics what could naturally occur (i.e. wildfire, insects & disease) therefore the casual observer may notice the changes in color and texture but it will not likely draw attention and VRM II and III objectives will be met. Furthermore, any disturbed vegetation will return making the action virtually unnoticeable as vegetation matures and woody debris weathers.


PERSONS / AGENCIES CONSULTED

• Black Canyon Audubon Society
• Black Canyon Land Trust

38

- Colorado Division of Wildlife
- Colorado State University – Extension Service
- Crawford Gunnison Sage-Grouse Working Group
- Forest Service, U.S. Department of Agriculture –Grand Mesa, Uncompahgre and Gunnison National Forests, Paonia Ranger District
- Grazing Permittees
- Local Private Landowners
- National Park Service –Black Canyon of the Gunnison National Park and Curecanti National Recreation Area
- Natural Resources Conservation Service, Delta Conservation District
- U.S. Geological Survey
- Western Area Power Administration
- Interested Members of the Public
- Uncompahgre Plateau Project

INTERDISCIPLINARY REVIEW:  The following BLM personnel have contributed to and have reviewed this environmental assessment.

| Name | Title | Area of Responsibility |
|------|-------|------------------------|
| Robert Bavin | Wildlife Biologist | T&E, Migratory Birds, Wildlife |
| Melissa Siders | Wildlife Biologist | T&E, Migratory Birds, Wildlife |
| | | Soils, Floodplains, Water Quality, |
| Jedd Sondergard | Hydrologist | Hydrology and Water Rights |
| Amanda Clements | Ecologist | Riparian/Wetland |
| | | Vegetation, ACEC, Forest |
| | | Management, Environmental Justice, |
| Ken Holsinger | Fuels and Forestry | Wastes Hazardous and Solid, |
| | | Transportation, Recreation, Visual |
| Julie Jackson | Recreation Planner | Resources, |
| | | Cultural Resources, Native American |
| | | and Religious Concerns, |
| Glade Hadden | Archeologist | Paleontology |
| Ed Franz | Recreation Planner | Wilderness, Wild and Scenic Rivers, |
| Lynae Rogers | Range Management Specialist | Invasive, Non-native Species |
| Kurt Kubik | Range Management Specialist | Range Management |
| Linda Reed | Realty Specialist | Realty Authorizations |
| Kelly Homstad | Prescribed Fire Specialist | Air Quality |

References

BLM.  2001.  Gunnison Gorge Land Health Assessment.  [Available:

39

BLM_0017937

http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/land_health_assessments.Par.23491.File.dat/gunnisongorgelha.pdf]

BLM Manual Handbook H-8410-1 – Visual Resource Inventory.

BLM VRM Handbook H-8431-1 – Visual Resource Contrast Rating.

CDOW. 2005. Gunnison Sage Grouse Range-wide Plan (pgs 215-217 and 263-268 [Available: http://wildlife.state.co.us/WildlifeSpecies/SpeciesOfConcern/Birds/GunnisonConsPlan.htm])

CDPHE. 2010. Colorado Air Quality Control Commission Report to the Public 2009-2010. Colorado Air Quality Control Commission. [Available online at http://www.cdphe.state.co.us/ap/rttplinks.html]

CWG. 2011. Crawford Area Gunnison Sage-grouse Conservation Plan. Crawford Working Group, Crawford, CO.

Braun C. E., T. Britt, and R. O. Wallestad. 1977. Guidelines for maintenance of sage grouse habitats. Wildlife Society Bulletin 5: 99-106

Braun C. E. 2006. A Blueprint for Sage-grouse Conservation and Recovery. Grouse Inc., Tucson, AZ.

Graham, Russell T., Technical Editor. 2003. Hayman Fire Case Study. Gen Tech Rep. RMRS GTR-114. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. 396 p.

Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA. AVAILABLE [http://wildlife.state.co.us/WildlifeSpecies/SpeciesOfConcern/Birds/GunnisonConsPlan.htm]

Monsen, Steven B. et. al., 2004. Restoring Western Ranges and Wildlands. Gen Tech Rep. RMRS RMRS-GTR-136-vol. 1-3. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Morris, S.E., and T.A. Moses. 1987. Forest fire and the natural soil erosion regime in the Colorado Front Range. Annals of the Assoc. of Amer. Geog. 77(2):245-254.

North Rim Landscape Strategy Workgroup. 2010. North Rim Landscape Strategy. [Available: http://www.northrimlandscapestrategy.org/assets/NRLStrategy_Document_Final_2010.pdf].

Robichaud, P.R., and T.A. Waldrop. 1994. A comparison of surface runoff and sediment yields from low- and high-intensity prescribed burns. Water Resour. Bull. 30(1):27-34.

BLM_0017938

**Appendix A**

**POTENTIAL SPECIES LIST FOR REVEGETATION OR SUPPLEMENTAL SEEDING FOLLOWING VEGETATION MANIPULATIONS**

**FORBS**

| Common Name Scientific Name | Common Name Scientific Name |
|---|---|
| Western yarrow *Achillea millefolium* | Utah sweetvetch *Hedysarum boreale* |
| False dandelion *Agoseris glauca* | Prickley lettuce *Lactuca serriola* |
| Everlasting *Antennaria spp.* | Pea *Lathyrus spp.* |
| Aster *Aster spp.* | Pepperweed *Lepidium spp.* |
| Blueleaf aster *A. glaucodes* | Gilia *Linanthus spp.* |
| Hairy balsamroot *Balsamorhiza hookeri* | Lewis flax *Linum lewissi* |
| Cutleaf balsamroot *B. macrophylla* | Desertparsley *Lomatium spp.* |
| Arrowleaf balsamroot *B. sagittata* | Lupine *Lupinus spp.* |
| Sego lily *Calochortus spp.* | Alfalfa *Medicago sativa* |
| Indian paintbrush *Castillega spp.* | Monkey flower *Minulus spp.* |
| Tiny trumpet *Collomia linearis* | Broomrape *Orobanche spp.* |
| Hawksbeard *Crepis spp.* | Penstemon *Penstemon spp.* |
| Fleabane *Erigeron spp.* | Phlox *Phlox spp.* |
| Sulfur eriogonum *E. umbellatum* | Cinquefoil *Potentilla spp.* |
| Wyeth eriogonum *Eriogonum hereleoides* | Groundsel *Senecio spp.* |
| Prairiesmoke *Gayophytum spp.* | Common dandelion *Taraxacum officinale* |
| Curlcup gumweed *Grindelia squarrosa* | Salsify *Tragopogon spp.* |
| | Clover *Trifolium spp.* |

**GRASSES**

**Common Name Scientific Name**

Western wheatgrass *A. smithii*
Bluebunch wheatgrass *A. spicatum*
Slender wheatgrass *A. trachycaulum*
Blue gramma *Bouteloua gracilis*
Mountain brome *Bromus carinatus*
Great Basin wildrye *Elymus cinereus*
Junegrass *Koeleria macrantha*
Indian ricegrass *Oryzopsis hymenoides*
Mutton bluegrass *Poa fendleriana*
Sandberg bluegrass *P. secunda* -
Squirreltail *Sitanion hystrix*
Sand dropseed *Sporobolus cryptandrus*
Needle-and-threadgrass *Stipa comata*
Green needlegrass *S. lettermanii*

41

BLM_0017939

| APPENDIX B - THREATENED AND ENDANGERED SPECIES OF THE UFO [1] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| SPECIES | STATUS | HABITAT DESCRIPTION [2] | CRITICAL HABITAT? [3] | KNOWN? [4] | RANGE? [5] | HABITAT? [6] | NO EFFECT? [7] | MENLAE [8] | MELAE [9] |
| *FISH* | | | | | | | | | |
| Bonytail *Gila elegans* | E | Warm-waters of the Colorado River mainstem and tributaries, some reservoirs; flooded bottomlands for nurseries; pools and eddies over rocky substrates with silt-boulder mixtures for spawning | No | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| Humpback chub *Gila cypha* | E | Warm-water, canyon-bound reaches of Colorado River mainstem and larger tributaries; turbid waters with fluctuating hydrology; young require low-velocity, shoreline habitats such as eddies and backwaters | No | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Razorback sucker *Xyrauchen texanus* | E | Warm-water reaches of the Colorado River mainstem and larger tributaries; some reservoirs; low velocity, deep runs, eddies, backwaters, sidecanyons, pools, eddies; cobble, gravel, and sand bars for spawning; tributaries, backwaters, floodplain for nurseries | No | None | ☒ | ☐ | ☒ | ☐ | ☐ |

42

BLM_0017940

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Colorado pikeminnow<br>*Ptychocheilus lucius* | E | Warm-waters of the Colorado River mainstem and tributaries; deep, low velocity eddies, pools, runs, and nearshore features; uninterrupted streams for spawning migration and young dispersal; also floodplains, tributary mouths, and | No | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Greenback cutthroat trout<br>*Oncorhynchus clarki stomias* | T | Cold water streams and lakes with adequate spawning habitat (riffles), often with shading cover; young shelter in shallow | No | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| *MAMMALS* | | | | | | | | | |
| Black-footed ferret [10]<br>*Mustela nigripes* | E | Prairie dog colonies for shelter and food; >200 acres of habitat with at least 8 burrows/acre | No | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Canada lynx<br>*Lynx canadensis* | T | Spruce-fir, lodgepole pine, willow carrs, and adjacent aspen and mountain shrub communities that support snowshoe hare | No | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| *BIRDS* | | | | | | | | | |
| Mexican spotted owl [11]<br>*Strix occidentalis* | T | Mixed-conifer forests and steep-walled canyons with minimal human disturbance | No | None | ☐ | ☐ | ☒ | ☐ | ☐ |

43

| Species | | Habitat | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Southwestern willow flycatcher [11] *Empidonax traillii extimus* | E | For breeding, riparian tree and shrub communities along rivers, wetlands, and lakes; for wintering, brushy grasslands, shrubby ... | No | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| *PLANTS* | | | | | | | | | |
| Clay-loving wild buckwheat *Eriogonum pelinophilum* | E | Mancos shale badlands in salt desert shrub communities, often with shadscale, black sagebrush, and mat saltbush; 5200' – 6400' | No | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Colorado hookless cactus *Sclerocactus glaucus* | T | Salt-desert shrub communities in clay soils on alluvial benches and breaks, toe slopes, and deposits often with cobbled, rocky, or graveled surfaces; 4500' | No | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| *INVERTEBRATES* | | | | | | | | | |
| Uncompahgre fritillary butterfly [11] *Boloria acrocnema* | E | Restricted to moist, alpine slopes above 12,000' in elevation with extensive snow willow patches; restricted to San Juan Mountains | No | None | ☐ | ☐ | ☒ | ☐ | ☐ |

[1] U.S. Fish and Wildlife Service. 2009. Federally listed species in Colorado. Official correspondence, February.

[2] Van Reyper G. 2006. Bureau of Land Management TES [threatened, endangered, sensitive] species descriptions. Uncompahgre Field Office, Montrose, CO, updated 2009/2010.Unpublished document.

[3] Designated Critical Habitat in Project Area?

[4] Potential and/or known occurrences in Project Area?  Assessment based on UFO files and GIS data, partner data, and local knowledge.

[5] Project area is within the current known range of the species?

[6] Project area contains suitable habitat for the species?

[7] Project activities will have "No Effect" to the species or it's habitat

[8] Project activities "May Effect, Not Likely to Adversley Effect" to the species or it's habitat

[9] Project activities "May Effect, Likely to Adversley Effect" to the species or it's habitat

[10] Black-footed ferret believed to be extirpated from this portion of its range.

[11] Species not known to occur within UFO boundaries, but known to occur in close proximity.

BLM_0017942

| APPENDIX C - BLM SENSITIVE SPECIES OF THE UFO [1] | | KNOWN [4] | RANGE? [5] | HABITAT? [6] | NO EFFECT? [7] | MAI [8] | LFL [9] |
|---|---|---|---|---|---|---|---|
| SPECIES | HABITAT DESCRIPTION [2, 3] | | | | | | |
| *FISH* | | | | | | | |
| Roundtail chub *Gila robusta* | Warm-water rocky runs, rapids, and pools of creeks and small to large rivers; also large reservoirs in the upper Colorado River system; generally prefers cobble-rubble, sand-cobble, or sand-gravel substrate | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Bluehead sucker *Catostomus discobolus* | Large rivers and mountain streams, rarely in lakes; variable, from cold, clear mountain streams to warm, turbid streams; moderate to fast flowing water above rubble-rock substrate; young prefer quiet shallow areas near shoreline | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Flannelmouth sucker *Catostomus latipinnis* | Warm moderate- to large-sized rivers, seldom in small creeks, absent from impoundments; pools and deeper runs often near tributary mouths; also riffles and backwaters; young usually in shallower water than are adults | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Colorado River cutthroat trout *Oncorhynchus clarki pleuriticus* | Cool, clear streams or lakes with well-vegetated streambanks for shading cover and bank stability; deep pools, boulders, and logs; thrives at high elevations | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| *MAMMALS* | | | | | | | |
| Desert bighorn sheep *Ovis canadensis nelsoni* | Steep, mountainous or hilly terrain dominated by grass, low shrubs, rock cover, and areas near open escape and cliff retreats; in the resource area, concentrated along major river corridors and canyons | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Gunnison's prairie dog [6] *Cynomys gunnisoni* | Level to gently sloping grasslands, semi-desert shrublands, and montane shrublands, from 6,000'- 12,000 in elevation | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| White-tailed prairie dog [14] *Cynomys leucurus* | Level to gently sloping grasslands and semi-desert grasslands from 5,000' – 10,000' in elevation | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| Kit fox *Vulpes macrotis* | Semi-desert shrublands of saltbrush, shadscale and greasewood often in association with prairie dog towns | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Allen's (Mexican) big-eared bat *Idionycteris phyllotis* | Ponderosa pine, pinyon-juniper woodland, oak brush, riparian woodland (cottonwood); typically found near rocky outcrops, cliffs, and boulders; often forages near streams and ponds. Thought to be in the West End. | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Big free-tailed bat *Nyctinomops macrotis* | Rocky areas and rugged terrain in desert and woodland habitats; roosts in rock crevices in cliffs and in buildings caves, and occasionally tree holes | None | ☐ | ☐ | ☒ | ☐ | ☐ |

45

BLM_0017943

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Spotted bat *Euderma maculatum* | Desert shrub, ponderosa pine, pinyon-juniper woodland, canyon bottoms, open pasture, and hayfields; roost in crevices in cliffs with surface water nearby | None | ☒ | ☐ | ☐ | ☒ | ☐ |
| Townsend's big-eared bat *Corynorhinus townsendii* | Mesic habitats including coniferous forests, deciduous forests, sagebrush steppe, juniper woodlands, and mountain; maternity roosts and hibernation in caves and mines; does not use crevices or cracks; caves, buildings, and tree cavities for night roosts | None | ☒ | ☐ | ☐ | ☒ | ☐ |
| Fringed myotis *Myotis thysanodes* | Desert, grassland, and woodland habitats including ponderosa pine, pinyon/juniper, greasewood, saltbush, and scrub oak; roosts in caves, mines, rock crevices, and buildings | None | ☒ | ☐ | ☐ | ☒ | ☐ |
| *BIRDS* | | | | | | | |
| Bald eagle [5] *Haliaeetus leucocephalus* | Nests in forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| American peregrine falcon [5] *Falco peregrines anatum* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags | None | ☒ | ☐ | ☐ | ☒ | ☐ |
| Western yellow-billed cuckoo [6] *Coccyzus americanus* | Riparian, deciduous woodlands with dense undergrowth; nests in tall cottonwood and mature willow riparian, moist thickets, orchards, abandoned pastures | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Northern goshawk *Accipiter gentilis* | Nests in a variety of forest types including deciduous, coniferous, and mixed forests including ponderosa pine, lodgepole pine, or in mixed-forests with fir and spruce; also nest in aspen or willow forests; migrants and wintering individuals can be observed in all coniferous forest types | None | ☒ | ☐ | ☐ | ☒ | ☐ |
| Ferruginous hawk *Buteo regalis* | Open, rolling and/or rugged terrain in grasslands and shrubsteppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops | None | ☒ | ☐ | ☐ | ☒ | ☐ |
| Burrowing owl [15] *Athene cunicularia* | Level to gently sloping grasslands and semi-desert grasslands; Prairie dog colonies for shelter and food | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| Gunnison sage grouse [14] *Centrocercus minimus* | Sagebrush communities (especially big sagebrush) for hiding and thermal cover, food, and nesting; open areas with sagebrush stands for leks; sagebrush-grass-forb mix for nesting; wet meadows for rearing chicks | None | ☒ | ☐ | ☐ | ☒ | ☐ |
| Columbian sharp-tailed grouse *Tympanuchus phasianellus columbian* | Native bunchgrass and shrub-steppe communities for nesting; mountain shrubs including serviceberry are critical for winter food and escape cover. Thought to be extirpated from UFO | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Long-billed curlew *Numenius americanus* | Lakes and wetlands and adjacent grassland and shrub communities | None | ☐ | ☐ | ☒ | ☐ | ☐ |

46

BLM_0017944

| Species | Habitat | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| White-faced ibis<br>*Plegadis chihi* | Marshes, swamps, ponds and rivers | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| American white pelican<br>*Pelecanus erythrorhynchos* | Typically large reservoirs but also observed on smaller water bodies including ponds; nests on islands | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| Brewer's sparrow<br>*Spizella berweri* | Breeds primarily in sagebrush shrublands, but also in other shrublands such as mountain mahogany or rabbitbrush; migrants seen in wooded, brushy, and weedy riparian, agricultural, and urban areas; occasionally observed in pinyon-juniper | None | ☒ | ☐ | ☐ | ☒ | ☐ |
| Black swift [15]<br>*Cypseloides niger* | Nests on precipitous cliffs near or behind high waterfalls; forages from montane to adjacent lowland habitats | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| *REPTILES AND AMPHIBIANS* | | | | | | | | |
| Longnose leopard lizard<br>*Gambelia wislizenii* | Desert and semidesert areas with scattered shrubs or other low plants; e.g., sagebrush; areas with abundant rodent burrows, typically below 5,000' in elevation | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Midget faded rattlesnake [13]<br>*Crotalus viridis concolor* | Rocky outcrops for refuge and hibernacula, often near riparian; upper limit of 7500'-9500' in elevation | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Milk snake<br>*Lampropeltis triangulum taylori* | Variable types including shrubby hillsides, canyons, open ponderosa pine stands and pinyon-juniper woodlands, arid river valleys and canyons, animal burrows, and abandoned mines; hibernates in rock crevices | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Northern leopard frog [14]<br>*Rana pipiens* | Springs, slow-moving streams, marshes, bogs, ponds, canals, flood plains, reservoirs, and lakes; in summer, commonly inhabits wet meadows and fields; may forage along water's edge or in nearby meadows or fields | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| Canyon treefrog<br>*Hyla arenicolor* | Rocky canyon bottoms along intermittent or perennial streams in temporary or permanent pools or arroyos ; semi-arid grassland, pinyon-juniper, pine-oak woodland, scrubland, and montane zones; elevation 1000' - 10,000' | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| Boreal toad<br>*Anaxyrus boreas boreas* | Mountain lakes, ponds, meadows, and wetlands in subalpine forest (e.g., spruce, fir, lodgepole pine, aspen); feed in meadows and forest openings near water but sometimes in drier forest habitats | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| *PLANTS* | | | | | | | | |
| Debeque milkvetch<br>*Astragalus debequaeus* | Varicolored, fine-textured, seleniferous, saline soils of the Wasatch Formation-Atwell Gulch Member; elevation 5100' – 6400' | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Grand Junction milkvetch<br>*Astragalus linifolius* | Sparsely vegetated habitats in pinyon-juniper and sagebrush communities, often within Chinle and Morrison Formation and selenium-bearing soils; elevation 4800-6200' | None | ☐ | ☐ | ☒ | ☐ | ☐ |

47

BLM_0017945

| Species | Habitat | | | | | | |
|---|---|---|---|---|---|---|---|
| Naturita milkvetch<br>*Astragalus naturitens* | Cracks and ledges of sandstone cliffs and flat bedrock area typically with shallow soils, within pinyon-juniper woodland; elevation 5400' – 6700' | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| San Rafael milkvetch<br>*Astragalus rafaelensis* | Banks of sandy clay gulches and hills, at the foot of sandstone outcrops, or among boulders along dry watercourses in seleniferous soils derived from shale or sandstone formations; elevation 4500'– 5300' | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Sandstone milkvetch<br>*Astragalus sesquiflorus* | Sandstone rock ledges (Entrada formation), domed slickrock fissures, talus under cliffs, sometimes in sandy washes; elevation 5000' – 5500' | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Gypsum Valley cateye<br>*Cryptantha gypsophila* | Confined to scattered gypsum outcrop and grayish-white, often lichen-covered, soils of the Paradox Member of the Hermosa Formation; often the dominant plant at these sites; elevation 5200' – 6500' | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Fragile (slender) rockbrake<br>*Cryptogramma stelleri* | Cool, moist, sheltered calcareous cliff crevices and rock ledges | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Kachina daisy (fleabane) [15]<br>*Erigeron kachinensis* | Saline soils in alcoves and seeps in canyon walls; elevation 4800' – 5600' | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Montrose (Uncompahgre) bladderpod<br>*Lesquerella vicina* | Sandy-gravel soil mostly of sandstone fragments over Mancos Shale (heavy clays) mainly in pinyon-juniper woodlands or in the ecotone between it and salt desert scrub; also in sandy soils derived from Jurassic sandstones and in sagebrush steppe communities; elevation 5800' – 7500' | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Colorado (Adobe) desert parsley<br>*Lomatium concinnum* | Adobe hills and plains on rocky soils derived from Mancos Formation shale; shrub communities dominated by sagebrush, shadscale, greasewood, or scrub oak; elevation 5500' – 7000' | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Paradox Valley (Payson's) lupine<br>*Lupinus crassus* | Pinyon-juniper woodlands, or clay barrens derived from Chinle or Mancos Formation shales, often in draws and washes with sparse vegetation; elevation 5000' – 5800' | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Dolores skeleton plant [15]<br>*Lygodesmia doloresensis* | Reddish purple, sandy alluvium and colluviums of the Cutler Formation between the canyon walls and the river in juniper, shadscale, and sagebrush communities; elevation 4000' – 5500' | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Eastwood's monkey-flower<br>*Mimulus eastwoodiae* | Shallow caves and seeps on steep canyon walls; elevation 4700' – 5800' | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Paradox (Aromatic Indian) breadroot<br>*Pediomelum aromaticum* | Open pinyon-juniper woodlands in sandy soils or adobe hills; elevation 4800' – 5700' | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| *INVERTEBRATES* | | | | | | | |

BLM_0017946

| Great Basin silverspot butterfly *Speyeria nokomis nokomis* | Found in streamside meadows and open seepage areas with an abundance of violets | None | ☐ | ☐ | ☒ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|

[1] Based on Colorado BLM State Director's Sensitive Species List (Last update: November 20, 2009).

[2] Van Reyper G. 2006. Bureau of Land Management TES [threatened, endangered, sensitive] species descriptions. Uncompahgre Field Office, Montrose, CO, updated 2009/ 2010. Unpublished document.

[3] Spackman SB, JC Jennings, C Dawson, M Minton, A Kratz, C Spurrier. 1997. Colorado rare plant field guide. Prepared for the BLM, USFS, and USFWS by the Colorado Natural Heritage Program.

[4] Potential and/or known occurrences in Project Area?  Assessment based on UFO files and GIS data, partner data, and local knowledge.

[5] Project area is within the current known range of the species?

[6] Project area contains suitable habitat for the species?

[7] Project activities will have no effect to the species or it's habitat

[8] Project activities may effect individuals of the species or it's habitat, but not likely to result in a trend toward federal listing

[9] Project activities are l ikely to result in a trend toward federal listing for the species

[10] ESA delisted species.

[11] Federal candidate species; in accordance with BLM policy and Manual 6840, candidate and proposed species are to be managed and conserved as BLM sensitive species. For the   Gunnison prairie dog, candidate status includes only those populations occurring in the "montane" portion of the species' range.

[12] Species not known to occur in UFO.

[13] Validity of subspecies designation is in question by taxonomists.

[14] Species was petitioned for listing and is currently under status review by FWS, and a 12-month finding is pending; i.e., listing of the species throughout all or a significant portion of its range may be warranted.

[15] Species not on BLM Colorado State Director's Sensitive List; included at the Field Office level to account for recent sightings, proximate occurrences, and/or potential habitat.

49

BLM_0017947

| APPENDIX D - BIRDS OF CONSERVATION CONCERN OF THE UFO [1] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SPECIES | HABITAT DESCRIPTION [2] | RANGE/STATUS [2, 3] | KNOWN [4] | RANGE [5] | HABITAT? [6] | NO EFFECT? [7] | MAI [8] | LFL [9] |
| Gunnison sage grouse *Centrocercus minimus* | Sagebrush communities (especially big sagebrush) for hiding and thermal cover, food, and nesting; open areas with sagebrush stands for leks; sagebrush-grass-forb mix for nesting; wet meadows for rearing chicks | Year-round resident, breeding | See assessment under Sensitive Species Section | | | | | |
| American bittern *Botaurus lentiginosus* | Marshes and wetlands; ground nester | Spring/ summer resident, breeding confirmed in the region but not within the UFO | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| Bald eagle [10] *Haliaeetus leucocephalus* | Nests in forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby | Fall/winter resident, no confirmed breeding | See assessment under Sensitive Species Section | | | | | |
| Ferruginous hawk *Buteo regalis* | Open, rolling and/or rugged terrain in grasslands and shrubsteppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops | Fall/ winter resident, non-breeding | See assessment under Sensitive Species Section | | | | | |
| Golden eagle *Aquila chrysaetos* | Open country, grasslands, woodlands, and barren areas in hilly or mountainous terrain; nests on rocky outcrops or large trees | Year-round resident, breeding | None | ☒ | ☐ | ☐ | ☒ | ☐ |

50

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Peregrine falcon [10]<br>*Falco peregrinus* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags | Spring/summer resident, breeding | See assessment under Sensitive Species Section | | | | | |
| Prairie falcon<br>*Falco mexicanus* | Open country in mountains, steppe, or prairie; winters in cultivated fields; nests in holes or on ledges on rocky cliffs or embankments | Year-round resident, breeding | None | ☒ | ☐ | ☐ | ☒ | ☐ |
| Long-billed curlew<br>*Numenius americanus* | Lakes and wetlands and adjacent grassland and shrub communities | Spring/ fall migrant, non-breeding | See assessment under Sensitive Species Section | | | | | |
| Snowy plover [11]<br>*Charadrius alexandrines* | Sparsely vegetated sand flats associated with pickleweed, greasewood, and saltgrass | Spring migrant, non-breeding | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Mountain plover<br>*Charadrius montanus* | High plain, cultivated fields, desert scrublands, and sagebrush habitats, often in association with heavy grazing, sometimes in association with prairie dog colonies ; short vegetation | Spring/ fall migrant, non-breeding | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Yellow-billed cuckoo [12]<br>*Coccyzus americanus* | Riparian, deciduous woodlands with dense undergrowth; nests in tall cottonwood and mature willow riparian, moist thickets, orchards, abandoned pastures | Summer resident, breeding | See assessment under Sensitive Species Section | | | | | |

51

| Species | Habitat | Residency | Presence | | | | | |
|---|---|---|---|---|---|---|---|---|
| Flammulated owl *Otus flammeolus* | Montane forest, usually open and mature conifer forests; prefers ponderosa pine and Jeffrey pine | Summer resident, breeding | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Burrowing owl *Athene cunicularia* | Open grasslands and low shrublands often in association with prairie dog colonies; nests in abandoned burrows created by mammals; short vegetation | Summer/ fall resident, breeding | See assessment under Sensitive Species Section | | | | | |
| Lewis's woodpecker *Melanerpes lewis* | Open forest and woodland, often logged or burned, including oak, coniferous forest (often ponderosa), riparian woodland, and orchards, less often in pinyon-juniper | Year-round resident, breeding | None | ☒ | ☐ | ☐ | ☒ | ☐ |
| Willow flycatcher [11] *Empidonax traillii* | Riparian and moist, shrubby areas; winters in shrubby openings with short vegetation | Summer resident, breeding | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| Gray vireo *Vireo vicinior* | Pinyon-juniper and open juniper-grassland | Summer resident, breeding | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Pinyon jay *Gymnorhinus cyanocephalus* | Pinyon-juniper woodland | Year-round resident, breeding | None | ☒ | ☐ | ☐ | ☒ | ☐ |
| Juniper titmouse *Baeolophus griseus* | Pinyon-juniper woodlands, especially juniper; nests in tree cavities | Year-round resident, breeding | None | ☒ | ☐ | ☐ | ☒ | ☐ |
| Veery *Catharus fuscescens* | Deciduous forests, riparian, shrubs | Possible summer resident, observed recently in Gunnison County, possible breeding | None | ☒ | ☐ | ☐ | ☒ | ☐ |

52

BLM_0017950

| Species | Habitat[2] | Status[3] | Occurrence[4] | [4] | [5] | [6] | [7] | |
|---|---|---|---|---|---|---|---|---|
| Bendire's thrasher *Toxostoma bendirei* | Desert, especially areas of tall vegetation, cholla cactus, creosote bush and yucca, and in juniper woodland | UFO is outside known range | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Grace's warbler *Dendroica graciae* | Mature coniferous forests | Summer resident, breeding | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Brewer's sparrow *Spizella breweri* | Sagebrush-grass stands; less often in pinyon-juniper woodlands | Summer resident, breeding | See assessment under Sensitive Species Section | | | | | |
| Grasshopper sparrow *Ammodramus savannarum* | Open grasslands and cultivated fields | UFO is outside known range | None | ☐ | ☐ | ☒ | ☐ | ☐ |
| Chestnut-collared longspur *Calcarius ornatus* | Open grasslands and cultivated fields | Spring migrant, non-breeding | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| Black rosy-finch *Leucosticte atrata* | Open country including mountain meadows, high deserts, valleys, and plains; breeds/ nests in alpine areas near rock piles and cliffs | Winter resident, non-breeding | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| Brown-capped rosy-finch *Leucosticte australis* | Alpine meadows, cliffs, and talus and high-elevation parks and valleys | Summer residents, breeding | None | ☒ | ☐ | ☒ | ☐ | ☐ |
| Cassin's finch *Carpodacus cassinii* | Open montane coniferous forests; breeds/ nests in coniferous forests | Year-round resident, breeding | None | ☒ | ☐ | ☒ | ☐ | ☐ |

[1] U.S. Fish and Wildlife Service. 2008. Birds of Conservation Concern 2008. United States Department of Interior, Fish and Wildlife Service, Division of Migratory Bird Management, Arlington, Virginia. 85 pp. [Online version available at <http://www.fws.gov/migratorybirds/>].
[2] Cornell Lab of Ornithology. All about birds: bird guide. < http://www.allaboutbirds.org/guide/> Accessed 05/15/2009.
[3] Status within the UFO. San Juan Institute of Natural and Cultural Resources. Colorado Breeding Bird Atlas. Fort Lewis College, Durango, Colorado.     <http://www.cobreedingbirdatlasii.org/> Accessed: 05/15/2009.
[4] Potential and/or known occurrences in Project Area?  Assessment based on UFO files and GIS data, partner data, and local knowledge.
[5] Project area is within the current known range of the species?
[6] Project area contains suitable habitat for the species?
[7] Project activities will have no effect to the species or it's habitat

BLM_0017951

[8] Project activities may effect individuals of the species or it's habitat, but not likely to result in a trend toward federal listing
[9] Project activities are l ikely to result in a trend toward federal listing for the species

BLM_0017952

**Appendix E: A Sample List of Design Techniques for Mitigating Visual Impacts**

A. LANDFORM/WATER BODY.

1. Reduce Size of Cut and Fill Slopes. Consider:
   a. relocating to an area with less slope.
   b. changing road width, grade, etc.
   c. changing alignment to follow existing grades.
   d. prohibiting dumping of excess material on downhill slopes.

2. Reduce Earthwork Contrasts. Consider:
   a. rounding and/or warping slopes.
   b. retaining rocks, trees, drainage, etc.
   c. toning down freshly broken rock faces with asphalt emulsion spray or with gray point.
   d. (dding mulch, hydromulch, or topsoil.
   e. shaping cuts and fills to appear as natural forms.
   f. cutting rock areas so forms are irregular.
   g. designing to take advantage of natural screens (i.e., vegetation, land forms).
   h. grass seeding of cuts and fills.

3. Maintain the Integrity of Topographic Units. Consider:
   a. locating projects away from prominent topographic features.
   b. designing projects to blend with topographic forms in shape and placement.

B. VEGETATION.

1. Retain Existing Vegetation. Consider:
   a. using retaining walls on fill slopes.
   b. reducing surface disturbance.
   c. protecting roots from damage during excavations.

2. Enhance Revegetation. Consider:
   a. mulching cleared areas.
   b. controlling planting times.
   c. furrowing slopes.
   d. planting holes on cut/fill slopes.
   e. choosing native plant species.
   f. stockpiling and reusing topsoil.
   g. fertilizing, mulching, and watering vegetation.

3. Minimize Impact on Existing Vegetation. Consider:
   a. partial cut instead of clear cut.
   b. using irregular clearing shapes.
   c. feathering/thinning edges.
   d. disposing of all slash.

BLM_0017953

     e.  controlling construction access.
     f.  utilizing existing roads.
     g.  limiting work within construction area.
     h.  selecting type of equipment to be used.
     i.  minimizing clearing size (i.e., strip only where necessary).
     j.  grass seeding of cleared areas.

4.  Maintain the Integrity of Vegetative Units. Consider:
     a.  utilizing the edge effect for structure placement along natural vegetative breaks.

## C. STRUCTURES.

1.  Minimize the Number of Visible Structures.

2.  Minimize Structure Contrast. Consider:
     a.  using earth-tone paints and stains.
     b.  using cor-ten steel (self-weathering).
     c.  treating wood for self-weathering.
     d.  using natural stone surfaces.
     e.  burying all or part of the structure.
     f.  selecting paint finishes with low levels of reflectivity (i.e., flat or semi-gloss).

3.  Redesign Structures that do not Blend/Fit. Consider:
     a.  using rustic designs and native building materials.
     b.  using natural appearing forms to complement landscape character (use special designs only as a last resort).
     c.  relocating structure.

4.  Minimize Impact of Utility Crossings. Consider:
     a.  making crossings at right angles.
     b.  setting back structures at a maximum distance from the crossing.
     c.  leaving vegetation along the roadside.
     d.  minimizing viewing time.
     e.  utilizing natural screening.

5.  Recognize the Value and Limitations of Color. Consider:
     a.  that color (hue) is most effective within 1,000 feet. Beyond that point color becomes more difficult to distinguish and tone or value determines visibility and resulting visual contrast.
     b.  that using color has limited effectiveness (in the background distance zone) in reducing visual impacts on structures that are silhouetted against the sky.
     c.  painting structures somewhat darker than the adjacent landscape to compensate for the effects of shade and shadow.
     d.  selecting color to blend with the land and not the sky.

     (BLM Handbook H-8431-1; Appendix 3)

BLM_0017954



U.S. DEPARTMENT OF THE INTERIOR
**BUREAU OF LAND MANAGEMENT (/)**

# RESOURCE MANAGEMENT PLAN ALTERNATIVE DEVELOPMENT FOR LIVESTOCK GRAZING

***IM 2012-169***
Instruction Memorandum

UNITED STATES DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

WASHINGTON, D.C.  20240

August 14, 2012

In Reply Refer To:
1610/4100 (210/220) P

EMS TRANSMISSION 08/16/2012
Instruction Memorandum No. 2012-169

Expires:  09/30/2013

To:        All Field Office Officials

From:      Assistant Director, Renewable Resources and Planning

BLM_0017955

Subject:          Resource Management Plan Alternative Development for
Livestock Grazing

**Program Areas:** Land Use Planning, Livestock Grazing

**Purpose:** This Instruction Memorandum (IM) communicates policy
guidance regarding resource management plan/environmental impact
statement (RMP/EIS) alternative development for livestock grazing.

**Policy/Action:** Alternative development is one of the critical steps in the
land use planning process, and the range of alternatives forms the "heart of
the environmental impact statement" 40 C.F.R. § 1502.14. This IM focuses
specifically on the RMP/EIS (i.e. revisions and amendments) alternatives
development for livestock grazing and provides the Bureau of Land
Management (BLM) with guidance to meet the requirement of the National
Environmental Policy Act (NEPA) to analyze the environmental impact of
alternative proposals to government action and to "[r]igorously explore and
objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14; *see also*
43 C.F.R. § 1610.4-6.

The range of alternatives sharply defines the issues and provides a clear basis
for choice among options by the decision-maker. The required land use plan
decisions for the livestock grazing program are (1) identification of lands as
available or not available for grazing; and (2) identification of the amount of
forage available for livestock on an area-wide basis (see Land Use Planning
Handbook (H-1601-1), Appendix C, II.B.). Each livestock grazing alternative
for a land use plan should address unresolved conflicts concerning various
uses of available resources. The BLM will develop a range of alternatives for
an RMP/EIS by varying which lands in the planning area are available for
grazing, by varying the amount of forage available for livestock grazing, or
both. The RMP/EIS alternatives also may vary according to the season of use,
kind of livestock, terms and conditions, and levels of range improvement
development.

What constitutes a reasonable range of alternatives depends on the specific
facts of each RMP/EIS. In nearly all cases, however, the range of alternatives
for an RMP/EIS will include one or more alternatives with a meaningful
reduction in either lands available for grazing, forage amounts, or both. An
increased grazing alternative also may be appropriate (where increased
grazing would meet the goals and objectives of the RMP, such as to reducing
fuels for wildfires or designating areas as available for livestock grazing that

BLM_0017956

were previously unavailable), and a "no-grazing" alternative should be considered in detail where it is appropriate, and may be beneficial to show trade-offs between resource uses.

There are a variety of factors to consider in developing the range of alternatives for livestock grazing. Field offices must consider actual or potential resource conflicts and competing or alternate uses of available resources. Specific issues to consider during alternative development will vary depending on the planning area, scoping comments, analysis of the management situation, current resource conditions, desired future conditions and existing resource competition and/or conflict. The following non-exhaustive list describes examples of areas where the BLM could consider reducing, increasing or eliminating livestock grazing within its range of alternatives for detailed analysis in an EIS for an RMP.

- Rangeland Management Program Adjustments:
  - Areas not meeting or not making significant progress towards achievement of rangeland health standards (particularly in areas where current livestock grazing is identified as a significant contributing factor);
  - Areas identified for restoration;
  - Areas identifying where livestock grazing would be used as a vegetation management tool to meet resource objectives (i.e. wildlife habitat or fire management objectives);
  - Areas establishing Reserve Common Allotments;[1] or
  - Areas where forage and grazing preference would not be reallocated upon receipt of a voluntary grazing relinquishment[2].
- Potential Conflicts with Forage or Habitat Needs for Other Species:
  - Reduced forage availability based on a vegetation inventory;
  - Areas identified as preliminary priority sage-grouse habitat;
  - Areas with habitat for threatened, endangered or sensitive species (where livestock grazing is listed as one of the threats to the species);
  - Areas of crucial winter or summer habitat range for wildlife species with forage needs that are similar to livestock; or

BLM_0017957

- Areas designated as Wild Horse and Burro Herd Management Areas.
  - Potential Conflicts with Management of Specific Areas:
    - Units of the National Landscape Conservation System (based on the objects or values for which the area was designated);
    - Areas of Critical Environmental Concern (based on the relevant and important criteria for the area); or
    - Areas close or adjacent to the urban interface or residential development.
  - Potential Conflicts with Other Resources or Uses:
    - Areas with isolated tracts or "checkerboard" lands that make grazing difficult;
    - Areas with traditional cultural properties or other cultural resources (where livestock grazing is listed as a site impact);
    - Areas where conflicts with recreational uses could occur or areas with developed recreation facilities;
    - Lands identified as available for disposal;
    - Areas with valid existing rights, mining operations, or other land uses that make grazing difficult; or
    - Areas identified for future energy development, such as solar energy zones.

If a reduced grazing alternative decreases animal unit months (AUMs) for areas or allotments to resolve conflicts with other uses or resource issues, the AUMs identified in the RMP must be fewer than the average actual use for those areas or allotments.  Otherwise, the reduced grazing alternative would not provide a meaningful difference from the no-action alternative for analysis.

In certain cases, a no-grazing alternative may not be necessary or appropriate for an RMP.  When this is the case, BLM field offices should document the reasons that a no-grazing alternative was considered but eliminated from detailed analysis.  An alternative may be eliminated from detailed analysis for a number of reasons, *e.g.*, if it does not respond to the purpose and need for the action, is technically or economically infeasible or is substantially similar to an alternative analyzed in detail (see NEPA Handbook, H-1790-1, Section

BLM_0017958

6.6.3).  For example, if the no-grazing alternative would make an entire planning area unavailable to livestock grazing, but the purpose and need of the RMP/EIS does not concern livestock grazing or livestock grazing-related issues in the planning area, then analysis of the no-grazing alternative is unnecessary as part of the alternatives development for the RMP.  This may be the case when the RMP/EIS concerns a planning area (for example in Alaska) where livestock grazing does not occur, the RMP/EIS is focused on oil and gas leasing, or BLM is undertaking an amendment to an RMP that does not concern livestock grazing.  In addition, if the RMP/EIS considers and includes reduced grazing levels as part of its alternatives analysis, then analysis of the no-grazing alternative would likely be unnecessary to fulfill the BLM's NEPA obligation for development of a reasonable range of alternatives.

Although the BLM has discretion through its grazing regulations to adjust stocking levels, seasons of use, and grazing management activities during the permit renewal process, this is not a basis for declining to consider a reduced grazing or a no grazing alternative.  The purpose of planning is to take a broad-scale look at the planning area and make large-scale allocation decisions; adjusting grazing levels on a permit-by-permit basis generally cannot substitute for this level of analysis.  In addition, while it can be useful to explain in an RMP/EIS that under the Federal Land Policy and Management Act (FLPMA) the BLM manages the public lands for multiple use and that FLPMA identifies livestock grazing as one of the principal, major uses of public lands, FLPMA's multiple-use mandate does not, in itself, provide a basis for not analyzing a reduced grazing or no grazing alternative. Although multiple use does not require that all lands be managed for livestock grazing, it also does not mean that analyzing a no grazing alternative in an RMP/EIS is automatically unreasonable. This is because NEPA's focus is informed decision making.  Analyzing an alternative that provides a contrast to other action alternatives (such as no-grazing or a reduced grazing) can sharpen the focus on impacts from grazing as well as provide insight into what is not causing impacts to resources.

Considering a no-grazing alternative as part of the alternatives analysis under NEPA—or explaining why analysis of the no-grazing alternative would be unnecessary—is beneficial to the BLM's RMP development process. Documenting this information creates a stronger record of the interdisciplinary team's process of developing the alternatives and tailoring the scope of the analysis to the identified issues.  Additionally, the BLM has the discretion to analyze in detail an alternative that might otherwise be

BLM_0017959

eliminated if such analysis would help inform the decision.   Analysis of a no-grazing alternative could be useful, for example, to help identify potential conditions in the absence of livestock grazing and provide a baseline of conditions for comparison with other alternatives.

The range of alternatives analyzed in detail in an RMP/EIS has implications for the NEPA analysis of subsequent livestock grazing permit renewals.  For example, if the RMP/EIS did not analyze making a particular area unavailable for livestock grazing, it becomes more critical at the permit renewal stage to analyze a no-grazing alternative.  Conversely, if the RMP/EIS analyzed making that area unavailable to livestock grazing, the subsequent NEPA analysis could tier to the analysis of the RMP/EIS.

**Timeframe:**  This guidance is effective immediately.

**Budget Impact:**  None.

**Background:**  The range of alternatives helps the BLM and its stakeholders understand the differing management scenarios and the various ways of addressing identified planning issues.  Reviews of recent RMP/EISs have demonstrated that there is a need for additional guidance for the range of alternatives for livestock grazing, particularly with regard to consideration of reduced and no-grazing alternatives.

**Manual/Handbook Sections Affected:**  This guidance supplements existing guidance found in the BLM's Land Use Planning Handbook, H-1610-1, and NEPA Handbook, H-1790-1.

**Coordination:**  This IM was developed by the Division of Decision Support Planning and NEPA (WO-210); the Division of Forest, Rangeland, Riparian, and Plant Conservation (WO-220); and the Office of the Solicitor.

**Contact:**  If there are any questions concerning this IM, please contact Sam Gaugush, Planning and Environmental Analyst, 202-912-7217, Kimberly Hackett, Rangeland Management Specialist, 202-912-7216, or Andrew Tkach, Planning and Environmental Analyst, 202-912-7283.

Signed by:                                    Authenticated by:

BLM_0017960

Edwin L. Roberson                          Robert M. Williams

Assistant Director                         Division of IRM
Governance, WO-560

Renewable Resources and Planning

**[1]** A "Reserve Common Allotment" (RCA) is a BLM-administered grazing unit (allotment or pasture) used by permittees/lessees participating in land restoration or recovery efforts. Areas that have been closed to grazing are not considered RCAs.  The purpose of RCAs is to facilitate rangeland restoration, recovery and/or management objectives over broad areas in the general vicinity of the allotment.

**[2]** A grazing "relinquishment" is the voluntary and permanent surrender by an existing permittee or lessee, (with concurrence of any base property lienholder(s)), of a grazing permit or lease along with their preference (i.e. the permittee's priority position against others to receive the permit or lease). Relinquishment is not a decision to close areas to livestock grazing and does not require the consent or approval by the BLM.

VIEW ALL POLICIES

**Return to the Policies (/media/blm-policy/Instruction%20Memorandum)**

FISCAL YEAR

2012

BLM_0017961

PRELIMINARY

BLM

DOI-CO-150-2009-0005 EA

# Bull Mountain Unit Master Development Plan
## Preliminary Environmental Assessment

Gunnison County, Colorado

March 22, 2012

**U.S. Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, CO 81401**
Phone: (970) 240-5300
FAX: (970) 240-5367



BLM_0017963

# Table of Contents

PURPOSE OF and NEED FOR THE ACTION ................................................................................... 2
BACKGROUND/INTRODUCTION ................................................................................................. 2
DESCRIPTION OF PROPOSED ACTION AND ALTERNATIVES.................................................. 13
    Proposed Action....................................................................................................................... 13
    Alternative 1............................................................................................................................. 19
    No Action Alternative............................................................................................................... 23
COMPARISON OF ALTERNATIVES ............................................................................................. 29
Alternatives Considered but Not Carried Forward .......................................................................... 30
SCOPING AND ISSUES: ............................................................................................................... 30
PLAN CONFORMANCE REVIEW ................................................................................................. 31
STANDARDS FOR PUBLIC LAND HEALTH.................................................................................. 32
AFFECTED ENVIRONMENT and ENVIRONMENTAL CONSEQUENCES /MITIGATION ............. 33
    Air Quality ............................................................................................................................... 34
    Areas of Critical Environmental Concern................................................................................. 41
    Wilderness............................................................................................................................... 41
    Lands with Wilderness Characteristics .................................................................................... 41
    Wild and Scenic Rivers............................................................................................................ 42
    Cultural Resources .................................................................................................................. 42
    Native American Religious Concerns........................................................................................ 43
    Farmlands, Prime and Unique.................................................................................................. 43
    Soils ........................................................................................................................................ 43
    Vegetation............................................................................................................................... 49
    Invasive, Non-Native Species.................................................................................................. 57
    Threatened, Endangered, and Sensitive Species....................................................................... 59
    Migratory Birds........................................................................................................................ 71
    Wildlife, Terrestrial.................................................................................................................. 76
    Wildlife, Aquatic...................................................................................................................... 88
    Wetlands and Riparian Zones .................................................................................................. 91
    Floodplains.............................................................................................................................. 94
    Water Quality, Surface and Ground.......................................................................................... 94
    Wastes, Hazardous or Solid ................................................................................................... 111
    Environmental Justice ........................................................................................................... 114
    OTHER ELEMENTS .............................................................................................................. 115
    Access ................................................................................................................................... 115
    Transportation ....................................................................................................................... 116
    Realty Authorizations ............................................................................................................ 119
    Rangeland Management.......................................................................................................... 119
    Fire ........................................................................................................................................ 122
    Hydrology and Water Rights .................................................................................................. 123
    Noise ..................................................................................................................................... 130
    Recreation ............................................................................................................................. 133
    Visual Resources ................................................................................................................... 134
    Geology and Minerals............................................................................................................ 141
    Socio-Economics ................................................................................................................... 146
CUMULATIVE IMPACTS SUMMARY ......................................................................................... 151
PERSONS / AGENCIES CONSULTED .......................................................................................... 158
REFERENCES .............................................................................................................................. 161

BLM_0017964

# Appendices

Appendix A. Well Pad Site Suitability Models and Methodology
Appendix B. Construction, Drilling, Completion, and Reclamation
Appendix C. Best Management Practices, Design Features, and Conditions of Approval
Appendix D. 13-Point Surface Use Plan of Operations
Appendix E. 8-Point Drilling Plan
Appendix F. Hazardous Materials
Appendix G. Water Quality Sampling Constituents for the Bull Mountain Unit
Appendix H. Noxious Weed Management Plan

# List of Tables

Table 1. Federal Oil and Gas Subsurface Mineral Estate within the Bull Mountain Unit ........................... 1
Table 2. Private Oil and Gas Subsurface Mineral Estate within the Bull Mountain Unit ........................... 2
Table 3. SG's Existing Wells and Well Pads, Bull Mountain Unit ............................................................. 9
Table 4a. Main Elements of the Proposed Action ................................................................................... 14
Table 4b. Existing and Proposed Well Locations, Proposed Action ....................................................... 15
Table 5a. Main Elements of Alternative 1 ............................................................................................... 19
Table 5b. Existing and Proposed Well Locations, Alternative 1 ............................................................. 19
Table 6a. Proposed Well Pads and Wells, No Action Alternative .......................................................... 23
Table 6b. Main Elements of No Action ................................................................................................... 24
Table 6c. Existing and Proposed Well Locations, No Action .................................................................. 24
Table 7. Total Surface Disturbance by Alternative (New Disturbance Only) ........................................... 29
Table 8. Total Surface Disturbance by Alternative (Existing and New) .................................................. 29
Table 9. Major Federal, State, and Local Permits and Approvals that Apply to the Bull Mountain
         Unit ........................................................................................................................................... 31
Table 10. Approved Standards for Public Land Health ........................................................................... 32
Table 11. Elements Considered ............................................................................................................. 34
Table 12. Mean Monthly Temperature Ranges and Total Precipitation Amounts .................................... 35
Table 13. Wind Direction Frequency Distribution, Pine Ridge, Colorado, 2008-2010 ............................ 36
Table 14. Wind Speed Distribution, Pine Ridge, Colorado, 2008-2010 .................................................. 36
Table 15.  Monitored Air Pollutant Background Concentrations and Colorado and National
         Ambient Air Quality Standards ................................................................................................. 37
Table 16. Soil Erosion Ratings for the Bull Mountain Unit ..................................................................... 44
Table 17. Existing Vegetation Communities in Bull Mountain Unit ......................................................... 49
Table 18. Impacts to Vegetation Communities, All Alternatives ............................................................. 53
Table 19. Cumulative Impacts to Vegetation, Proposed Action .............................................................. 55
Table 20. Cumulative Impacts to Vegetation, Alternative 1 .................................................................... 56
Table 21. Existing Habitats within the Ragged Mountain LAU ............................................................... 60
Table 22. Existing Habitats within the Crystal West LAU ....................................................................... 61
Table 23. Total Water Use under the Proposed Action ........................................................................... 63
Table 24. Cumulative Modeled Impact to Habitats, Proposed Action + No Action .................................. 67
Table 25. Total Water Use under Alternative 1 ...................................................................................... 68
Table 26. Cumulative Modeled Impact to Habitats- Alternative 1 + No Action ....................................... 69
Table 27. Total Water Use under No Action Alternative ......................................................................... 70
Table 28. Migratory Birds in the Uncompahgre Field Office ................................................................... 72
Table 29. Modeled Indirect Impacts to Habitats, Proposed Action ......................................................... 79
Table 30. Cumulative Impacts to Mule Deer Habitat Winter Ranges, Proposed Action + No
         Action ....................................................................................................................................... 83
Table 31. Cumulative Impacts to Elk Habitats and Winter Ranges, Proposed Action + No Action .......... 83
Table 32. Modeled Indirect Impacts to Habitats, Alternative 1 ............................................................... 84

BLM_0017965

Table 33. Cumulative Direct Impacts to Mule Deer Habitat Winter Ranges, Action Alternatives + No Action ........................................................................................................................ 86
Table 34. Cumulative Direct Impacts to Elk Habitats and Winter Ranges, Action Alternatives + No Action ........................................................................................................................ 86
Table 35. Modeled Indirect Impacts to Habitats, No Action ...................................................... 86
Table 36. Impacts to Wetlands, Proposed Action ....................................................................... 91
Table 37. Impacts to Wetlands, Alternative 1 ............................................................................. 92
Table 38. Impacts to Wetlands, No Action ................................................................................. 93
Table 39. Typical Monthly Flows for USGS Gauges near the Unit ............................................. 94
Table 40. General Water Quality of Springs within the Unit (one sample per station) ............... 95
Table 41. Stream Classifications and Water Quality Standards ................................................... 99
Table 42. General Water Quality of East Muddy/Muddy Creeks on Near the Unit ................... 101
Table 43. Water Quality Lab Test Results from Produced Water From Existing Producing Natural Gas Wells within Producing Formations in the Unit .................................................. 103
Table 44. Water Quality Lab Test Results for Organic Pollutants (BTEX) from Produced Water[1] from an Existing Producing Natural Gas Well within the Unit. .................................... 103
Table 45. Other Elements ......................................................................................................... 115
Table 46. Annual Average Daily Traffic, SH 133 between Hotchkiss and Marble, CO – 2009 ............. 116
Table 47. Traffic Associated with Construction, Drilling, Completion, and Production ...................... 117
Table 48. Noise Levels Associated with Typical Construction Equipment ................................. 131
Table 49. Regulatory Limits for Noise Generated by Natural Gas Facilities ............................. 131
Table 50. Comparison of Cumulative Geologic Impacts by Alternative .................................... 146
Table 51. Comparison of Cumulative Economic Impacts by Alternative ................................... 150
Table 52. List of Preparers ....................................................................................................... 158
Table 53. Interdisciplinary Review Team .................................................................................. 158

## List of Figures

Figure 1. Project Area Location .................................................................................................. 5
Figure 2. Surface and Subsurface Ownership within the Bull Mountain Unit .............................. 7
Figure 3. Existing Natural Gas Development and Activities within the Bull Mountain Unit ................. 11
Figure 4. Proposed Action ........................................................................................................ 17
Figure 5. Alternative 1 ............................................................................................................. 21
Figure 6. No Action Alternative ............................................................................................... 27
Figure 7. PSD Class I Areas ..................................................................................................... 39
Figure 8. Soil Erosion Ratings in the Bull Mountain Unit ........................................................ 47
Figure 9. Existing Vegetation in the Bull Mountain Unit ......................................................... 51
Figure 10. Hydrology and Water Resource within the Bull Mountain Unit ............................... 97
Figure 11. IOP Locator Map, Bull Mountain Unit ................................................................. 136
Figure 12. Landslide Areas in the Bull Mountain Unit ........................................................... 143
Figure 13. Cumulative Impact Assessment Area for the Bull Mountain Unit .......................... 155

BLM_0017966

This page left blank for two-sided copying.

BLM_0017967

**U.S. Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office**

# ENVIRONMENTAL ASSESSMENT

NUMBER:  DOI-BLM-CO-150-2009-0005 EA

CASEFILE/PROJECT NUMBER:  COC-67120X

PROJECT NAME:  Bull Mountain Unit Master Development Plan (MDP)

LEGAL DESCRIPTION:  The unitized area encompasses a combination of federal and private subsurface mineral estate totaling 19,645.10 acres. Over 90% of the subsurface minerals, both federal and fee within the geographic area of the Bull Mountain Unit, are committed to the Unit at this time. Table 1 provides a list of currently leased federal oil and gas subsurface minerals within the Unit and their locations. Current federal leases total 13,294.39 acres.

**Table 1. Federal Oil and Gas Subsurface Mineral Estate within the Bull Mountain Unit**

| Acres | Federal Lease Number | Township and Range | Section | Aliquots |
|---|---|---|---|---|
| 274.25 | COC-42314 | T11S R90W | 14 | Lot 3, SWNE, NWNW, SE |
| 301.64 | COC-63486 | T11S R90W | 11<br>13 | Lots 3, 4, 8, 9, 10<br>Lots 5, 12, 13, 14, S2SW |
| 1,284.63 | COC-64164 | T11S R89W | 7<br>8<br>17<br>18 | Lots 1, 2, E2NW<br>N2, E2SW, SE<br>NE, E2NW, N2SW, SESW, SE<br>NESE |
| 948.72 | COC-64165 | T11S R89W | 19<br>20 | Lots 3-11, SESW, SWSE<br>ALL |
| 1,232.59 | COC-64166 | T11S R89W | 30<br>31 | Lots 1-4, 7, W2NE, E2W2, SE<br>Lots 1-4, E2, E2W2 |
| 433.31 | COC-64167 | T11S R89W | 29 | Lots 1-5, E2 |
| 1,343.80 | COC-64170 | T11S R90W | 22<br>23<br>24 | Lots 1-3, NWSE<br>Lots 1-7, N2N2, S2NE, SENW, N2SE, SESE<br>Lots 1-4, W2E2, W2 |
| 1,716.03 | COC-64171 | T11S R90W | 27<br>34<br>35<br>36 | Lots 1-2, W2NE<br>E2<br>ALL<br>Lots 1-4, W2E2, W2 |
| 976.39 | COC-64172 | T11S R90W | 25<br>26 | Lots 1-4, W2E2, W2<br>Lots 1-5, SENE, SE |
| 2,100.71 | COC-66704 | T11S R89W | 4<br>5<br>6<br>7 | Lots 1-4, S2N2, S2<br>Lot 4, SWNW, W2SW, SESW, S2SE<br>Lots 1-7, S2NE, SENW, E2SW, SE<br>Lots 1-4, E2, E2W2 |
| 1,040.00 | COC-66705 | T12S R89W | 8<br>9 | N2, SW, N2SE, SWSE<br>N2, NWSW, E2SE |
| 40.00 | COC-66714 | T11S R90W | 11 | SWSW |

BLM_0017968

**Table 1. Federal Oil and Gas Subsurface Mineral Estate within the Bull Mountain Unit**

| Acres | Federal Lease Number | Township and Range | Section | Aliquots |
|---|---|---|---|---|
| 1,582.97 | COC-66715 | T12S R90W | 1<br>2<br>11<br>12 | Lots 3-4, S2NW, SW<br>Lots 1-9, SWNE, SENW, NESW, W2SE<br>Lot 2, SENE, SWNW, SE<br>ALL |
| 19.40 | COC-67145 | T11S R89W | 19<br>30 | Lot 12<br>Lot 5-6 |

In addition to the federal oil and gas subsurface mineral estate, the Bull Mountain Unit includes the following 6,350.57 acres of private (fee) oil and gas subsurface mineral estate.

**Table 2. Private Oil and Gas Subsurface Mineral Estate within the Bull Mountain Unit**

| Acres | Mineral Estate Owner | Township and Range | Section | P.M. |
|---|---|---|---|---|
| 57.45 | CDOT, State of Colorado: Highway 133 Corridor | T11S R89W<br>T12S R89W | 29, 32<br>5 | 6th<br>6th |
| 6,293.12 | Private (fee) land located in: | T11S R89W | 7-8<br>17-20<br>29-32 | 6th |
|  | Fee land located in: | T11S R90W | 11-14<br>22:  SE<br>23-26<br>27:  E/2<br>34:  E/2<br>35-36 | 6th |
|  | Fee land located in: | T12S R89W | 4-9 | 6th |
|  | Fee land located in: | T12S R90W | 1-2<br>11:  NW, E/2<br>12 | 6th |

APPLICANT:  SG Interests I, Ltd. (SG)

PURPOSE OF AND NEED FOR THE ACTION:

The purpose of this proposal is to develop federal natural gas resources within the Bull Mountain Unit COC-67120X on federal leases consistent with existing federal lease rights. Exploration and development of federal oil and gas leases by private industry are integral to the BLM's oil and gas leasing program. The need for the action is to increase the orderly development of natural gas resources consistent with the Energy Policy Acts of 2001 and 2005 which emphasize the development of domestic natural gas reserves for supply and economic stability.

BACKGROUND/INTRODUCTION:

SG is proposing a Master Development Plan (MDP) for natural gas exploration and development of up to 146 natural gas wells (approximately 50% shale gas and 50% coalbed methane natural gas, or CBNG), 4 water disposal wells, and associated infrastructure on federal and private mineral leases within a federally unitized area known as the Bull Mountain Unit. Instead of structuring the development of the federal leases as a series of individual actions, the Bureau of Land Management (BLM) encourages the use of multi-well development plans to more effectively manage federal lease development (BLM IM 2005-247). Additionally, federal unitization allows for placement of wells within the Unit in a logical fashion

---

BLM_0017969

without regard to setbacks from committed lease lines in order to minimize road development, pipelines, and other surface impacts [Onshore Order 1 (Chapter 3, APDs, 3H-MDPs)].

The decision by SG to develop the area arises from the implementation of drilling that successfully demonstrated the potential for economically viable reserves of natural gas within the vicinity of the geographic feature known as Bull Mountain. At present, SG is required to diligently develop at least two producing wells per year in order to maintain the Bull Mountain Unit designation.

In 2003 (updated in 2008) the BLM unitized the minerals within the Bull Mountain area to provide guidance for orderly, planned, and structured development for extraction of the mineral (oil and natural gas) resources. The Bull Mountain Unit encompasses only those lands considered necessary for the proper development of the unitized resources (BLM Handbook H-3180-1). "The objective of unitization is to proceed with a program that will adequately and timely explore and develop all committed lands within the unit area without regard to internal ownership boundaries . . . By effectively eliminating internal property boundaries within the unit area, unitization permits the most efficient and cost effective means of developing the underlying oil and gas resources." (*Draft* BLM Manual, Section 3180-1 Unitization [Exploratory], p. 2-60).

An approved MDP would provide a guiding "umbrella" environmental analysis to which subsequent Applications for Permit to Drill (APDs) and NEPA efforts would be tiered. Every federal action proposed within the Bull Mountain Unit would require site NEPA compliance. Consistent with the Energy Policy Act of 2005, 30 U.S.C. 15942(b), most federal APDs submitted during the five years following the approval of this MDP would benefit from streamlined NEPA analysis based on the programmatic impact evaluation contained in this MDP. Approval would be subject to onsite examinations of each proposed well, pipeline, and road location including current resource surveys. BLM would apply appropriate mitigation and best management practices to all permitted actions in accordance with federal and state oil and gas regulations and the Uncompahgre Basin Resource Management Plan (UBRMP).

The total project area consists of 500 surface acres of federal surface underlain by federal mineral estate and administered by BLM; 12,795 acres of *split-estate* lands consisting of private surface and federal minerals also administered by BLM; 57 acres of surface owned by the State of Colorado with fee minerals; and 6,923 acres of "*fee*" land consisting of private surface and private minerals regulated by the Colorado Oil and Gas Conservation Commission (COGCC) (Figure 2). The boundaries of the Unit encompass federal and private oil and gas mineral estate which covers approximately 19,645 acres located in Gunnison County, Colorado.

Regarding split-estate lands, a Memorandum of Understanding (MOU) is also in effect between BLM Colorado State Office, the U.S. Forest Service (USFS) Rocky Mountain Region, and the COGCC regarding the application of COGCC's final amended rules for oil and gas operations which became applicable on federal lands July 1, 2009. The MOU facilitates cooperative efforts among these agencies in order to limit potential for redundancy or conflicting regulations among the permitting authorities to the operator, yet recognizes that each regulatory agency in Colorado must receive permits from oil and gas operators which comply with and include responses to their own specific rules and regulatory requirements.

The MOU further instructs operators and regulatory agencies to identify and incorporate applicable standards and practices contained in the COGCC rules into federal APD, MDP, or other authorizations related to oil and gas operations so long as such state standards or practices are at least as stringent as comparable federal standards or practices, in order to minimize the potential for multiple reviews.

<u>Regional Setting</u>

The Bull Mountain Unit is located approximately 30 miles northeast of the Town of Paonia, and is bisected by State Highway (SH) 133. The elevation is approximately 7,400 feet, consisting of rolling topography in a mountainous region (Figure 1). Snow blankets most of the area from mid-October through mid-May, increasing from an average of a few inches through early December to an average high

BLM_0017970

of 5.5 to 6 feet in March (NRCS SNOTEL data, Booth station, Gunnison County, 2010-2011 Water Years). However, south-facing slopes have more winter melting events and north-facing slopes retain snow longer and accumulate more snow through the course of the winter. East and West Muddy Creek, the two main drainages that collect local surface waters within the Unit, reach their confluence just south and outside of the Unit, where they form Muddy Creek. The Unit is within the Colorado River basin.

Expansive irrigated hay meadows are generally found in the bottomlands of the East Muddy Creek basin. Irrigated meadows are also found in the Ault Creek basin at the far western side of the Unit. There are many irrigation diversions off of the larger creeks, especially on the eastern side of the Unit. Stock ponds for domestic cattle and sheep grazing occur frequently on the landscape, and in general retain surface waters throughout the year.

The Unit is dominated by sagebrush (*Artemisia tridentata* subsp. *vaseyana*). Oakbrush communities comprised of Gambel's oak (*Quercus gambelii*), Saskatoon and Utah serviceberry (*Amelanchier utahensis* and *A. alnifolia*), and chokecherry (*Padus virginiana*) are the second most common, followed by mixed mountain shrubland. Other vegetation communities include aspen (*Populus tremuloides*) woodlands and irrigated pasturelands.

Cattle grazing occurs over most of the area during the snow-free months, typically mid-May through mid-October. Some springtime and fall sheep grazing occurs as well. In the fall, portions of the Unit are used for gathering cattle and sheep coming off of grazing allotments on the adjacent Grand Mesa, Uncompahgre, and Gunnison (GMUG) National Forest. A few residential subdivisions are located within the Unit, generally near the SH 133 corridor.

BLM_0017971



**Figure 1. Project Area Location**

This page left blank for two-sided copying.

BLM_0017973

Figure 2. Surface and Subsurface Ownership within the Bull Mountain Unit

**Bull Mountain Unit**

*Land Status & Mineral Ownership within the Bull Mountain Unit*
*January 2012*

Legend:
- Bull Mountain Unit
- Township Boundary
- Section Boundary
- Private Surface Private Minerals
- Private Surface Federal Minerals
- Federal Surface Federal Minerals
- Federal Surface Private Minerals
- Existing Gas Well
- Existing Gathering System
- Perennial Stream
- State Highway
- County Road
- Improved Road
- USFS Sytem Road

This page left blank for two-sided copying.

BLM_0017975

Existing Natural Gas Development and Activities within the Unit

SG began leasing minerals in the Bull Mountain Unit in 2000 and has periodically purchased additional mineral interests within the Unit. The company currently owns and operates 11 fee/fee and 5 federal natural gas wells on 13 well pads and one water-disposal well (Table 3, Figure 3) occupying approximately 21.8 acres in the Unit. The wells were developed at an average of 2 per year for the past 6 years. To date, SG and Gunnison Energy Corporation (the other existing operator in the Bull Mountain Unit) have developed 16.8 miles of gathering pipelines (4.5 miles co-located with roads, and 12.3 miles cross-country) and improved approximately 13.7 miles of roads within the Unit for pad site access (not including Gunnison County Road 265, which has also been improved by Gunnison County Road and Bridge and by the operators according to various road use agreements). Natural gas is currently delivered to the Bull Mountain Pipeline and the Ragged Mountain Pipeline north of the Unit for delivery to local and national markets.

**Table 3. SG's Existing Wells and Well Pads, Bull Mountain Unit**

| Well Name and Number | Lease No. | Surface Ownership | Mineral Rights Ownership | Township, Range, Section | Quarter | Year Drilled/ Status |
|---|---|---|---|---|---|---|
| Falcon Seaboard 11-90-12 #1[1] | n/a | Fee | Fee | T11S R90W S11 | SWNW | 2002 Producing |
| Falcon Seaboard 11-90-12 #1a[1] | n/a | Fee | Fee | T11S R90W S11 | NWNW | 2006 Shut-in |
| Falcon Seaboard 11-90-11 #2 | n/a | Fee | Fee | T11S R90W S12 | SESE | 2006 Shut-in |
| Falcon Seaboard 11-90-12 #2 | n/a | Fee | Fee | T11S R90W S12 | NWNE | 2006 Producing |
| McIntyre 11-90-14 #1 | n/a | Fee | Fee | T11S R90W S14 | NWSE | 2006 Shut-in |
| Jacobs 29-1 | n/a | Fee | Fee | T11S R89W S29 | NWNW | 1991 Shut-in |
| Federal 11-89-17 #1 | COC64164 | Fee | Federal | T11S R87W S17 | SWNE | 2009 Shut-in |
| Federal 11-90-24 #1[2] | COC64170 | Fee | Federal | T11S R90W S24 | SWNE | 2011 Shut-in |
| Federal 11-90-24 #1a[2] | COC64170 | Fee | Federal | T11S R90W S24 | SWNE | 2007 Shut-in |
| Federal 11-90-26 #1 | COC64172 | Fee | Federal | T11S R90W S26 | NENE | 2007 Shut-in |
| Federal 11-90-35 #1 | COC64171 | Fee | Federal | T11S R90W S35 | SWNE | 2009 Shut-in |
| Cow Skull 11-89-18 #1[3] | n/a | Fee | Fee | T11S R989W S18 | NESW | 2011 Shut-in |
| Cow Skull 11-89-18 #2[3] | n/a | Fee | Fee | T11S R989W S18 | NESW | 2011 In dev. [4] |
| HL 11-89-19 #1 | n/a | Fee | Fee | T11S R89W S19 | SENW | 2011 In dev. [5] |
| Pasco Spadafora #2 | n/a | Fee | Fee | T11S R90W S27 | NENE | 2010 Shut-in |
| Pasco Spadafora #3 | n/a | Fee | Fee | T11S R90W S27 | NENE | 2011 In dev. [4] |

BLM_0017976

**Table 3. SG's Existing Wells and Well Pads, Bull Mountain Unit**

| Well Name and Number | Lease No. | Surface Ownership | Mineral Rights Ownership | Township, Range, Section | Quarter | Year Drilled/ Status |
|---|---|---|---|---|---|---|
| Federal 24-2 WDW (water disposal well)[6] | COC64170 State Permit #20081193 | Fee | Federal | T11S R90W S24 | NWSW | 2010 Operational |

[1, 2, 3] Co-located on a single well pad.

[4] In development; permitted and drilled in 2011.

[5] In development; permitted in 2011.

[6] This well was drilled into federal minerals, but the conversion to a water disposal well gives management of the well bore to the State to monitor.

BLM_0017977



**Figure 3. Existing Natural Gas Development and Activities within the Bull Mountain Unit**

### Bull Mountain Unit

*Existing Natural Gas Development & Activities within the Bull Mountain Unit January 2012*

**Existing Development**

- ☼ Existing Gas Well
- ⌇ Existing Gathering System
- State Highway
- County Road
- Improved Road
- Haul Road Improved by SG/GEC
- Two-Track Road

- Bull Mountain Unit
- BLM Lands
- USFS Lands
- Private Lands
- Township Boundary
- Section Boundary
- Stream

This page left blank for two-sided copying.

BLM_0017979

<u>DESCRIPTION OF PROPOSED ACTION AND ALTERNATIVES:</u>

Three alternatives are analyzed in this EA:

- Proposed Action: SG's proposed Master Development Plan
- Alternative 1: an alternative developed in response to comments received during scoping that minimizes surface disturbance while allowing the operator the same number of well pads contained in the Proposed Action.
- No Action: the "No Action" alternative provides a point of reference for evaluating the environmental effects of the action alternatives. It includes existing development on federal and fee mineral estate and proposed new development on fee mineral estate. It does not include further development of federal wells.

For the Bull Mountain Unit, Geographic Information Systems (GIS) technology was employed to identify well pad sites that adhere to specific environmental, regulatory, and cost constraints and still enable efficient development of the Unit to extract natural gas. The model was used to generate the specifics of both action alternatives, using different weights for specific criteria to address issues raised during public and agency scoping. Based on the results of the model, suitable well pad locations were identified. The quantity selected was achieved by compiling statistics and reviewing the suitable locations identified. The statistics gathered for each well pad allowed all locations to be quickly ranked and evaluated by model suitability, impacts to hydrology zones, and overall length of roads and pipelines to generate Alternative 1. Additional detail and discussion of the GIS modeling process is included as Appendix A to this document.

The main difference between the Proposed Action and Alternative 1 is the location of the proposed well pads based on the site-selection process (the GIS model), which results in varying amounts of associated infrastructure such as roads and pipelines.

**PROPOSED ACTION**

SG proposes to drill up to 146 natural gas wells and 4 water disposal wells on 36 new well pads and 5 existing well pads on private surface overlying federal mineral estate within the Bull Mountain Unit. Approximately 50% (73) of the proposed natural gas wells would be CBNG, and 50% (73) would be shale gas. Four of the new well pads would be for water disposal wells to reinject produced and flowback water into the target formations. The existing well pad that currently contains a water disposal well would also be used for drilling additional new CBNG and/or shale gas wells. Due to the exploratory nature of the proposed project, the quantity and combination of CBNG and shale gas wells on each pad is not known at this time; however, no more than one water disposal well would be drilled on a well pad.

Additional activities under the Proposed Action include:

- upgrades and/or new construction and operation of an access road to each well pad;
- installation of pipelines to transport natural gas from each well to existing pipeline infrastructure, including the Bull Mountain Pipeline, and subsequent delivery to local and national markets;
- installation of water pipelines co-located with natural gas pipelines to take produced water from well pads to water disposal wells;
- installation of overhead electrical lines to the water disposal wells; and
- installation of 2 screw compressor stations on already cleared private property.

Well pads and supporting infrastructure for the Proposed Action are summarized in Table 4a. The Proposed Action includes all elements of Appendix B, which has specific information about the construction, drilling, and completion of wells, construction of supporting infrastructure, and requirements for interim and final reclamation.

BLM_0017980

**Table 4a. Main Elements of the Proposed Action**

| Element | Amount | Acres of Surface Disturbance | |
|---|---|---|---|
| | | Construction Phase | Production Phase |
| Well pad sites [1] | **41 total** | **126.9** | **56.0** |
|   Natural gas well pads (4 existing, 32 new) | 36 | 112.8 | 49.3 |
|   Water disposal well (1 existing, 4 new) | 5 | 14.1 | 6.7 |
| Wells | **150** | | |
|   Natural gas wells | 146 | | |
|   Water disposal wells | 4 | | |
| Access roads | **36.4 mi. total** | **97.5** | **69.9** |
|   Existing improved roads [2] | 10.7 mi. | 20.2 | 20.2 |
|   Upgrades to existing two-track roads | 13.5 mi. | 41.0 | 26.3 |
|   Construction of new roads [3] | 12.2 mi. | 36.3 | 23.4 |
| Pipelines [4] | **22.1 mi. total** | **82.7** | **0.0** [5] |
|   Co-located with roads | 11.4 mi. | 20.4 | 0.0 |
|   Not co-located with roads | 10.7 mi | 62.3 | 0.0 |
| Overhead electrical lines to water disposal wells [6] | **14 power poles** | **0.008** | **0.008** |
| **Total surface disturbance** | | **307.1** | **125.9** |
| **Total new surface disturbance** (excludes existing roads) | | **286.9** | **105.7** |

[1]  Initial construction disturbance for all new well pads would include reserve pit backfill, cut-and-fill slopes, and buffer area.
[2]  Existing roads represent unreclaimed surface disturbance used in connection with this action.
[3]  16-foot-wide drivable road surface; 25-foot-wide construction disturbance. For access roads, this includes all surface disturbance resulting from the construction of the proposed road, excluding the roadbed itself (heavy equipment operation and cut/fill areas along road shoulders of road that would be reclaimed following construction).
[4]  Acreage based on an average 50-foot-wide pipeline construction corridor.
[5]  After the pipeline is constructed and buried, the disturbed area would be reclaimed in its entirety.
[6]  Based on the Delta Montrose Electrical Assn. estimate of 14 power poles for the Proposed Action, at eight (8) square feet of construction surface disturbance per pole. Pole installation would be done using existing two-track roads, and no additional clearing of vegetation would be required.

New well pads would average 200'x300' (1.38 acres) in size after interim reclamation (production phase), and would accommodate up to 5 wells each. An average of 3.5 acres would initially be disturbed for construction of each new well pad. Construction of well pads, access roads, pipelines, and electrical lines would disturb a total of 286.9 acres within the Unit. The construction and drilling phase is estimated to last approximately 6 years, as described below.

Drilling and completion of the new wells is proposed to begin in the summer of 2012. The proposed CBNG wells would be drilled conventionally, using a single vertical well-bore. Development of CBNG wells on new well pads, including construction, drilling, stimulation, and completion, would require an average of 60 days. The proposed shale gas wells could be drilled either conventionally or with multiple horizontal well-bores from a single pad where feasible to minimize the number of well pads required to drain the resource. Development of shale gas wells on new well pads would require an average of 85 days, and water disposal wells would require 60 to 120 days.

Although actual operations are subject to change as conditions warrant, for purposes of this analysis SG plans to utilize 3 Tier-2 drilling rigs per season, simultaneously drilling 3 wells for 3 successive sessions, for a total of 27 wells drilled per year until the resource is fully developed. At this rate, full-field development would be complete in just over 5.5 years (effectively 6 construction/drilling seasons). Factors including geologic characteristics, reservoir quality, engineering technology, and economic conditions could result in a different ratio of CBNG to shale gas wells being drilled, and in fewer than 150 total wells being drilled within the Unit. Once completed, the productive life of CBNG, shale gas, and water disposal wells is estimated to be 40 years, which is the production phase of the project.

BLM_0017981

SG estimates that between 500 and 3,000 barrels per day (bbls) of produced water from the CBNG wells would be injected into each of the water disposal wells at full build-out of the Unit. In the interim, produced water would be reinjected into the existing water disposal well within the Unit or trucked to an approved disposal site.

Formations targeted for testing/development include the following (in **underlined bold**):

CRETACEOUS
- Mesaverde Group
  - Williams Fork Formation
    **Sandstones**
    **Coals (Cameo, South Canyon, and Coal Ridge)**
  - Iles Formation
    **Sandstones (Cozzette, Corcoran)**
- **Mancos Shale Group**

Facilities would be located on private surface overlying federal mineral estate. As proposed, all 32 of the proposed new gas well pads would target federal mineral estate, and all 4 proposed water disposal wells would target appropriate disposal zones within federally administered mineral formations. General well pad locations are identified in Table 4b and on Figure 4.

**Table 4b. Existing and Proposed Well Locations, Proposed Action[1]**

|  | Pad No. | Lease No. | Township, Range, Section | Quarter[2] |
|---|---|---|---|---|
|  | **EXISTING** | | | |
| 1 | FED 11-89-17 #1 | COC64164 | T11S R87W S17 | SWNE |
| 2 | FED 11-90-24 #1[3] | COC64170 | T11S R90W S24 | SWNE |
|  | FED 11-90-24 #1a[3] | | T11S R90W S24 | SWNE |
| 3 | FED 11-90-26 #1 | COC64172 | T11S R90W S26 | NENE |
| 4 | FED 11-90-35 #1 | COC64171 | T11S R90W S35 | SWNE |
| 5 | FED 24-2 WDW[4] | COC64170 | T11S R90W S24 | NWSW |
|  | **PROPOSED** | | | |
| 1 | FED 11-89-17 #3 | COC64164 | T11S, R89W, S17 | SESW |
| 2 | FED 11-89-20 #1 | COC64165 | T11S, R89W, S20 | NWSE |
| 3 | FED 11-89-20 #2 | | T11S, R89W, S20 | NWNW |
| 4 | FED 11-89-20 #3 | | T11S, R89W, S20 | SENE |
| 5 | FED 11-89-29 #2 | COC64167 | T11S, R89W, S29 | SESE |
| 6 | FED 11-89-29 #3 | | T11S, R89W, S29 | SWNE |
| 7 | FED 11-89-30 #1 | COC64166 | T11S, R89W, S30 | SESE |
| 8 | FED 11-89-31 #1 | | T11S, R89W, S31 | NWNW |
| 9 | FED 11-89-31 #2 | | T11S, R89W, S31 | SENW |
| 10 | FED 11-89-8 #1 | COC64164 | T11S, R89W, S8 | SENE |
| 11 | FED 11-89-8 #2 | | T11S, R89W, S8 | SESE |
| 12 | FED 11-89-8 #3 | | T11S, R89W, S8 | SWNW |
| 13 | FED 11-90-11 #1 | COC63486 | T11S, R90W, S11 | NWSW |
| 14 | FED 11-90-14 #3 | COC42314 | T11S, R90W, S14 | NESE |
| 15 | FED 11-90-23 #2 | COC64170 | T11S, R90W, S23 | SENW |
| 16 | FED 11-90-24 #3 | | T11S, R90W, S24 | SESE |

BLM_0017982

**Table 4b. Existing and Proposed Well Locations, Proposed Action[1]**

| | Pad No. | Lease No. | Township, Range, Section | Quarter[2] |
|---|---|---|---|---|
| 17 | FED 11-90-25 #1 | COC64172 | T11S, R90W, S25 | SENW |
| 18 | FED 11-90-25 #3 | | T11S, R90W, S25 | NESE |
| 19 | FED 11-90-27 #2 | COC64171 | T11S, R90W, S27 | SWNE |
| 20 | FED 11-90-34 #1 | | T11S, R90W, S34 | SWNE |
| 21 | FED 11-90-35 #2 | | T11S, R90W, S35 | SESW |
| 22 | FED 11-90-36 #1 | | T11S, R90W, S36 | NENW |
| 23 | FED 12-89-4 #1 | COC66704 | T12S, R90W, S4 | SESE |
| 24 | FED 12-89-6 #1 | | T12S, R89W, S6 | SESW |
| 25 | FED 12-89-6 #2 | | T12S, R89W, S6 | NWNE |
| 26 | FED 12-89-6 #3 | | T12S, R89W, S6 | SENE |
| 27 | FED 12-89-7 #1 | | T12S, R89W, S7 | NESE |
| 28 | FED 12-89-9 #2 | COC66705 | T12S, R89W, S9 | NENW |
| 29 | FED 12-90-12 #1 | COC66715 | T12S, R90W, S12 | SESE |
| 30 | FED 12-90-12 #2 | | T12S, R90W, S12 | SWNE |
| 31 | FED 12-90-2 #1 | | T12S, R90W, S2 | SWSE |
| 32 | FED 12-90-2 #2 | | T12S, R90W, S2 | NENE |
| 33 | FED 11-89-17 #2 WDW[4] | COC64164 | T11S, R89W, S17 | SENW |
| 34 | FED 11-90-14 #2 WDW[4] | COC42314 | T11S, R90W, S14 | NWNW |
| 35 | FED 11-90-25 #2 WDW[4] | COC64172 | T11S, R90W, S25 | NWNE |
| 36 | FED 12-89-7 #2 WDW[4] | COC66704 | T12S, R89W, S7 | SENW |

[1] Analysis area for each well pad includes approximately 40 acres surrounding the proposed well head location. Legal location based on proposed location of well head.
[2] Well head location for proposed wells subject to on-site review following submittal of APD.
[3] Co-located on a single well pad.
[4] Water disposal well.

SG has committed to the use of Best Management Practices and mitigation measures as listed in Appendix C. Surface Use Conditions of Approval (COAs) would be attached to each APD to further minimize or mitigate site-specific environmental impacts. The COAs for wells would be specific to each site depending on agency permitting. Appendix D, 13-Point Surface Use Plan of Operations, provides an example of the plan that would be attached to each individual APD, including a typical well site and drilling plan and specific information regarding construction, operation, and reclamation on the specific site. The Surface Use Plan of Operations covers direct and indirect federal actions associated with this development project, including the Proposed Action, Alternative 1, and federal actions that are part of the No Action Alternative. Appendix H is SG's Noxious Weed Management Plan.

BLM_0017983



**Figure 4. Proposed Action**

BLM_0017984

This page left blank for two-sided copying.

BLM_0017985

## ALTERNATIVE 1

Alternative 1 was developed by modifying the GIS model to minimize surface disturbance by putting greater emphasis on soil types and co-locating roads and pipelines whenever possible, which in turn would reduce the miles of road and pipeline needed to service the pad sites (Appendix A). The number of well pads, number and types of wells, and the types of supporting infrastructure would be the same as for the Proposed Action (Table 5a). One well pad would be located on BLM-administered surface, and the remainder would be located on private surface targeting federal mineral estate. Alternative 1 includes all elements shown in Appendix B and all mitigation shown in Appendix C.

### Table 5a. Main Elements of Alternative 1

| Element | Amount | Acres of Surface Disturbance | |
|---|---|---|---|
| | | Construction Phase | Production Phase |
| Well pad sites [1] | **41 total** | **126.8** | **56.0** |
| Natural gas well pads (4 existing, 32 new) | 36 | 112.7 | 49.3 |
| Water disposal well pads (1 existing, 4 new) | 5 | 14.1 | 6.7 |
| Wells | **150** | | |
| Natural gas wells | 146 | | |
| Water disposal wells | 4 | | |
| Access roads | **34.1 mi. total** | **89.4** | **65.4** |
| Existing improved roads [2] | 11.7 mi. | 21.9 | 21.9 |
| Upgrades to existing two-track roads | 11.4 mi. | 34.9 | 22.4 |
| Construction of new roads [3] | 11.0 mi. | 32.6 | 21.1 |
| Pipelines [4] | **16.1 mi. total** | **61.5** | **0.0**[5] |
| Co-located with roads | 7.6 mi. | 13.7 | 0.0 |
| Not co-located with roads | 8.5 mi | 47.8 | 0.0 |
| Overhead electrical lines to water disposal wells [6] | **8 power poles** | **0.006** | **0.006** |
| **Total surface disturbance** | | 277.7 | 121.4 |
| **Total new surface disturbance** (excludes existing roads) | | 255.8 | 99.5 |

[1]  Initial construction disturbance for all well pads would include reserve pit backfill, cut-and-fill slopes, and buffer area.
[2]  Existing roads represent unreclaimed surface disturbance used in connection with this action.
[3]  16-foot-wide drivable road surface; 25-foot-wide construction disturbance. For access roads, this includes all surface disturbance resulting from the construction of the proposed road, excluding the roadbed itself (heavy equipment operation and cut/fill areas along road shoulders of road that would be reclaimed following construction).
[4]  Acreage based on an average 50-foot-wide pipeline construction corridor.
[5]  After the pipeline is constructed and buried, the disturbed area would be reclaimed in its entirety.
[6]  Based on the Delta Montrose Electrical Assn. estimate of 8 power poles for Alternative 1, at eight (8) square feet of construction surface disturbance per pole. Pole installation would be done using existing two-track roads, and no additional clearing of vegetation would be required.

Construction of well pads, access roads, pipelines, and electrical lines would disturb a total of 255.8 acres within the Unit. Proposed well pad locations are identified in Table 5b and on Figure 5.

### Table 5b. Existing and Proposed Well Locations, Alternative 1[1]

| | Pad No. | Lease No. | Township, Range, Section | Quarter[2] |
|---|---|---|---|---|
| | **EXISTING** | | | |
| 1 | FED 11-89-17 #1 | COC64164 | T11S R87W S17 | SWNE |
| 2 | FED 11-90-24 #1[3] | COC64170 | T11S R90W S24 | SWNE |
| | FED 11-90-24 #1a[3] | | T11S R90W S24 | SWNE |

BLM_0017986

**Table 5b. Existing and Proposed Well Locations, Alternative 1[1]**

|  | Pad No. | Lease No. | Township, Range, Section | Quarter[2] |
|---|---|---|---|---|
| 3 | FED 11-90-26 #1 | COC64172 | T11S R90W S26 | NENE |
| 4 | FED 11-90-35 #1 | COC64171 | T11S R90W S35 | SWNE |
| 5 | FED 24-2 WDW[4] | COC64170 | T11S R90W S24 | NWSW |
|  | **PROPOSED** |  |  |  |
| 1 | ALT 11-89-8 #1 | COC64164 | T11S, R89W, S8 | SWNW |
| 2 | ALT 11-89-17 #2 | COC64165 | T11S, R89W, S17 | SESE |
| 3 | ALT 11-89-19 #2 |  | T11S, R89W, S19 | NESW |
| 4 | ALT 11-89-20 #1 |  | T11S, R89W, S20 | SWSW |
| 5 | ALT 11-89-29 #2 | COC64167 | T11S, R89W, S29 | NWNE |
| 6 | ALT 11-89-29 #3 |  | T11S, R89W, S29 | SWNE |
| 7 | ALT 11-89-29 #4 | COC64166 | T11S, R89W, S29 | SESE |
| 8 | ALT 11-89-31 #1 |  | T11S, R89W, S31 | NWNW |
| 9 | ALT 11-89-31 #2 |  | T11S, R89W, S31 | SENW |
| 10 | ALT 11-89-31 #3 |  | T11S, R89W, S31 | SESW |
| 11 | ALT 11-90-11 #1 | COC64164 | T11S, R90W, S11 | NWSW |
| 12 | ALT 11-90-14 #2 |  | T11S, R90W, S14 | NESE |
| 13 | ALT 11-90-24 #3 | COC63486 | T11S, R90W, S24 | NENW |
| 14 | ALT 11-90-24 #4 | COC42314 | T11S, R90W, S24 | SESE |
| 15 | ALT 11-90-25 #2 | COC64170 | T11S, R90W, S25 | SENW |
| 16 | ALT 11-90-25 #3 |  | T11S, R90W, S25 | SWSW |
| 17 | ALT 11-90-26 #3 | COC64172 | T11S, R90W, S26 | SWNE |
| 18 | ALT 11-90-26 #4 |  | T11S, R90W, S26 | SESE |
| 19 | ALT 11-90-34 #1 |  | T11S, R90W, S34 | SWNE |
| 20 | ALT 11-90-35 #2 | COC64171 | T11S, R90W, S35 | SESW |
| 21 | ALT 12-89-4 #1 |  | T11S, R89W, S4 | NESW |
| 22 | ALT 12-89-4 #2 |  | T11S, R89W, S4 | SESE |
| 23 | ALT 12-89-6 #1 |  | T12S, R89W, S6 | SWNW |
| 24 | ALT 12-89-6 #2 |  | T12S, R89W, S6 | NESW |
| 25 | ALT 12-89-6 #3 | COC66704 | T12S, R89W, S6 | SESW |
| 26 | ALT 12-89-7 #1 |  | T12S, R89W, S7 | NWNW |
| 27 | ALT 12-89-7 #3 |  | T12S, R89W, S7 | NESE |
| 28 | ALT 12-89-9 #2 | COC66705 | T12S, R89W, S9 | NWNE |
| 29 | ALT 12-89-9 #3 |  | T12S, R89W, S9 | SENW |
| 30 | ALT 12-90-1 #2 | COC66715 | T12S, R90W, S1 | NESW |
| 31 | ALT 12-90-1 #3 |  | T12S, R90W, S1 | SESW |
| 32 | ALT 12-90-2 #1 |  | T12S, R90W, S2 | NENE |
| 33 | ALT 11-89-20 #2 WDW[4] | COC64164 | T11S, R90W, S20 | SWNE |
| 34 | ALT 11-90-23 #1 WDW[4] | COC42314 | T11S, R90W, S23 | NENE |
| 35 | ALT 11-90-25 #1 WDW[4] | COC64172 | T11S, R90W, S25 | NWNW |
| 36 | ALT 12-89-7 #2 WDW[4] | COC66704 | T12S, R89W, S7 | SENW |

[1] Analysis area for each well pad includes approximately 40 acres surrounding the proposed well head location. Legal location based on proposed location of well head.
[2] Well head location for proposed wells subject to on-site review following submittal of APD.
[3] Co-located on a single well pad.
[4] Water disposal well.

BLM_0017987



**Figure 5. Alternative 1**

BLM_0017988

This page left blank for two-sided copying.

BLM_0017989

## NO ACTION ALTERNATIVE

The No Action Alternative includes continuation of existing federal authorizations on 13 existing well pads, continued operation of existing fee wells targeting fee minerals, and development of 11 new well pads and 55 new wells on fee surface targeting fee minerals, as summarized in Table 6a. In addition, 11 new wells would be drilled on existing well pads. The No Action Alternative would occur even if the Proposed Action or Alternative 1 are not approved. Elements of the No Action Alternative are not a part of the Proposed Action or Alternative 1.

**Table 6a. Proposed Well Pads and Wells, No Action Alternative**
(Based on 5 wells per new pad and 1 additional well per existing pad)

| | WELL PAD TYPE | | |
|---|---|---|---|
| | Gas | Water Disposal | Totals |
| **New well pads** | 11 | 0 | 11 |
| **New wells** | | | |
| • CBNG | 28 | 0 | 28 |
| • Shale Gas | 27 | 0 | 27 |
| • Water Disposal | 0 | 0 | 0 |
| **Total new wells on new pads** | | | 55 |
| **Existing well pads** | 12 | 1 | 13 |
| **Existing wells** | | | |
| • CBNG | 16 | 0 | 16 |
| • Water Disposal | 0 | 1 | 1 |
| **New wells** | | | |
| • CBNG | 6 | 0 | 6 |
| • Shale Gas | 5 | 0 | 5 |
| **Total new wells, existing pads** | | | 28 |
| **Grand total wells, new and existing pads** | | | 83 |

The types of associated facilities and infrastructure to support the No Action Alternative would be similar to the Proposed Action and would also include four flowback pits. Known as the McIntyre flowback pits, they would be constructed on private surface as authorized by Gunnison County and COGCC and are discussed in detail in the Water Resources section.

The main elements of the No Action Alternative are identified in Table 6b.

BLM_0017990

**Table 6b. Main Elements of No Action**

| Element | Amount | Acres of Surface Disturbance | |
|---|---|---|---|
| | | Construction Phase | Production Phase |
| Well pad sites [1] | 24 total | 42.1 | 29.6 |
|    Natural gas well pads | 23 | 42.1 | 28.5 |
|    Water disposal well pads | 1 | 0.0 | 1.2 |
| Flowback pits | 4 total | 19.0 | 10.4 [2] |
| Access roads | 21.6 mi. total | 45.9 | 40.3 |
|    Existing improved roads | 16.4 mi. | 30.2 [3] | 30.2 [3] |
|    Upgrades to existing two-track roads | 2.3 mi. | 7.0 | 4.5 |
|    Construction of new roads [4] | 2.9 mi. | 8.7 | 5.6 |
| Pipelines [5] | 11.3 mi. total | 54.5 | 0.0 [6] |
|    Co-located with roads | 2.4 mi. | 4.3 | 0.0 |
|    Not co-located with roads | 8.9 mi | 50.2 | 0.0 |
| Total surface disturbance | | 161.5 | 80.3 |
| Total new surface disturbance (excludes existing roads) | | 131.3 | 50.1 |

[1]  Initial construction disturbance for all well pads would include reserve pit backfill, cut-and-fill slopes, and buffer area.
[2]  Flowback pits would be reclaimed in their entirety following their useful lifespan.
[3]  Existing roads represent unreclaimed surface disturbance used in connection with this action.
[4]  16-foot-wide drivable road surface; 25-foot-wide construction disturbance. For access roads, this includes all surface disturbance resulting from the construction of the proposed road, excluding the roadbed itself (heavy equipment operation and cut/fill areas along road shoulders of road that would be reclaimed following construction).
[5]  Acreage based on an average 50-foot-wide pipeline construction corridor.
[6]  After the pipeline is constructed and buried, the disturbed area would be reclaimed in its entirety.

Construction of additional well pads, access roads, and pipelines would disturb a total of 131.3 acres within the Unit. No new electrical lines would be needed since there would be no new water disposal wells. Proposed well pad locations are identified in Table 6c and on Figure 6.

**Table 6c. Existing and Proposed Well Locations, No Action[1]**

| | Pad No. | Lease No. | Township, Range, Section | Quarter[2] |
|---|---|---|---|---|
| | EXISTING | | | |
| 1 | Falcon Seaboard 11-90-12 #1 [3] | n/a | T11S R90W S11 | SWNW |
| | Falcon Seaboard 11-90-12 #1a [3] | n/a | T11S R90W S11 | NWNW |
| 2 | Falcon Seaboard 11-90-11 #2 | n/a | T11S R90W S12 | SESE |
| 3 | Falcon Seaboard 11-90-12 #2 | n/a | T11S R90W S12 | NWNE |
| 4 | McIntyre 11-90-14 #1 | n/a | T11S  R90W S14 | NWSE |
| 5 | Jacobs 29-1 | n/a | T11S R89W S29 | NWNW |
| 6 | Federal 11-89-17 #1 | COC64164 | T11S R87W S17 | SWNE |
| 7 | Federal 11-90-24 #1 [4] | COC64170 | T11S R90W S24 | SWNE |
| | Federal 11-90-24 #1a [4] | | T11S R90W S24 | SWNE |
| 8 | Federal 11-90-26 #1 | COC64172 | T11S R90W S26 | NENE |
| 9 | Federal 11-90-35 #1 | COC64171 | T11S R90W S35 | SWNE |
| 10 | Cowskull 11-89-18 #1 [5] | n/a | T11S R89W S18 | NESW |
| | Cowskull 11-89-18 #2 [5] | n/a | T11S R89W S18 | NESW |

BLM_0017991

**Table 6c. Existing and Proposed Well Locations, No Action[1]**

| | Pad No. | Lease No. | Township, Range, Section | Quarter[2] |
|---|---|---|---|---|
| 11 | Pasco Spadafora #2[6] | n/a | T11S R90W S27 | NENE |
| | Pasco Spadafora #3[6] | n/a | T11S R90W S27 | NENE |
| 12 | HL 11-89-19-#1 | n/a | T11S, R89W, S19 | SENW |
| 13 | Federal 24-2 WDW | COC64170 | T11S R90W S24 | NWSW |
| | **PROPOSED** [7] | | | |
| 1 | Falcon Seaboard 11-89-7 #1 | n/a | T11S, R89W, S7 | NWNE |
| 2 | Falcon Seaboard 11-89-7 #2 | n/a | T11S, R89W, S7 | SWSW |
| 3 | Falcon Seaboard 11-89-18 #2 | n/a | T11S, R90W, S18 | NENE |
| 4 | Jacobs 11-89-18 #3 | n/a | T11S, R89W, S1 | SESE |
| 5 | Borich 11-89-32 #1 | n/a | T11S, R89W, S1 | NWSE |
| 6 | Falcon Seaboard 11-90-12 #3 | n/a | T11S, R90W, S12 | NESW |
| 7 | Falcon Seaboard 11-90-13 #1 | n/a | T11S, R90W, S13 | SWNE |
| 8 | McIntyre 11-90-23-#1 | n/a | T11S, R90W, S23 | SESW |
| 9 | Hughes 11-90-26 #2 | n/a | T11S, R90W, S26 | SWSW |
| 10 | Volk 12-89-9 #2 | n/a | T11S, R89W, S1 | SESW |
| 11 | Eck 12-90-1- #1 | n/a | T11S, R89W, S1 | NENE |

[1] Analysis area for each well pad includes approximately 40 acres surrounding the proposed wellhead location. Legal location based on well head location.
[2] Well head location subject to on-site review following submittal of APD.
[3, 4, 5, 6] Co-located on a single well pad.
[7] Up to 5 wells could be drilled on each fee/fee well pad. The No Action Alternative does not analyze additional wells on existing federal pad sites.

Best management practices applied to construction, drilling and completion, production, interim reclamation, workovers or recompletion, final abandonment, final reclamation, and weed management would continue to be applied to existing approved authorizations, and they would generally be applied to the same aspects of development as presented in the Proposed Action. The Bull Mountain Unit would exist in its present form until 2014, at which time it would contract to the participating areas held by production. The Unit could contract earlier if diligent drilling had not occurred, or if the BLM or SG requested early contraction.

The development of the 11 new well pads would have no BLM oversight. With no federal action, no NEPA analysis would be required; however, other state and local regulations would still apply. Natural gas would be routed to the Bull Mountain Pipeline and delivered to regional and national markets.

BLM_0017992

This page left blank for two-sided copying.

BLM_0017993



**Figure 6. No Action Alternative**

BLM_0017994

This page left blank for two-sided copying.

BLM_0017995

## COMPARISON OF ALTERNATIVES

Total new surface disturbance for the Proposed Action, Alternative 1, and No Action are summarized in Table 7.

**Table 7. Total Surface Disturbance by Alternative (New Disturbance Only)**

| | Proposed Action | Alternative 1 | No Action |
|---|---|---|---|
| **Facilities** | | | |
| Well pads (natural gas and water disposal) | 36 | 36 | 11 |
| Flowback pits | 0 | 0 | 4 |
| Natural gas wells | 146 | 146 | 55 |
| Water disposal wells | 4 | 4 | 0 |
| Miles of access roads | 25.7 | 22.4 | 5.2 |
| Miles of pipelines | 22.1 | 16.1 | 11.3 |
| Power poles for overhead electrical lines | 14 | 8 | 0 |
| **Total acres of new disturbance** | | | |
| Construction phase | 286.9 | 255.8 | 131.3 |
| Percentage of total project area | 1.46% | 1.30% | 0.67% |
| Production phase | 105.7 | 99.5 | 50.1 |
| Percentage of total project area | 0.54% | 0.51% | 0.25% |

Total existing and new surface disturbance for the Proposed Action, Alternative 1, and No Action are summarized in Table 8. For comparison purposes, the estimated construction disturbance (the period of time during which construction and drilling of the wells would be completed) and production disturbance (the life of the wells, including the period required for successful reclamation following abandonment of the wells) are shown for all of the alternatives. For the No Action Alternative, short-term disturbance has been reclaimed for existing facilities and therefore is not included in the total.

**Table 8. Total Surface Disturbance by Alternative (Existing and New)**

| | Proposed Action[1] | Alternative 1[1] | No Action |
|---|---|---|---|
| **Facilities** | | | |
| Well pads (gas and water disposal) | 41 | 41 | 24 |
| Flowback pits | 0 | 0 | 4 |
| Natural gas wells | 151 | 151 | 83 |
| Water disposal wells | 5 | 5 | 1 |
| Miles of access roads | 36.4 | 34.1 | 40.3 |
| Miles of pipelines | 38.9 | 32.9 | 28.1 |
| Power poles for overhead electrical lines | 18 | 12 | 4 |
| **Total acres disturbed** | | | |
| Construction phase | 307.1 | 277.7 | 161.5 |
| Percentage of total project area | 1.56% | 1.41% | 0.83% |
| Production phase | 125.9 | 121.4 | 80.3 |
| Percentage of total project area | 0.64% | 0.62% | 0.41% |

[1] All figures shown for the Proposed Action and Alternative 1 include *federal wells only.*

BLM_0017996

<u>ALTERNATIVES CONSIDERED BUT NOT CARRIED FORWARD:</u>

Two additional alternatives were considered during this environmental review process. For different reasons, explained below, these alternatives were eliminated from the analysis.

**500-foot development setback.** During scoping, the Gunnison County Temporary Regulations for Oil and Gas Operations (GTOGR) were discussed, and implementation of a required 500-foot development setback from waterways and riparian areas (vs. a 300-foot setback for the Proposed Action) was considered.

SG and the BLM agreed to modify the GIS modeling program to incorporate this 500-foot setback from waterways and riparian areas. The resulting well site locations would have required an additional 5.6 miles of access roads and an additional 8.3 acres of long-term surface disturbance as compared to Alternative 1. This alternative also placed development higher on ridges and side-slopes. Therefore, the alternative was considered but eliminated from further analysis due to increased surface impacts associated with roads and ridge development, which was counter to comments received during scoping.

**Proximity to road networks.** Another alternative considered but not carried forward was in response to agency scoping which raised the issue of the overall length of roads and the amount of surface disturbance under the Proposed Action as an environmental concern. The BLM developed a set of weights and values for the GIS model criteria that would minimize road lengths and therefore surface disturbance, emphasizing proximity to existing road networks while reducing the weights on surface water and surrounding buffer zones. This alternative failed to meet the project purpose and need of the proposal; adequately and efficiently draining the Bull Mountain Unit of the natural gas resources per the Unit agreement. The well pad locations produced from the modified model were not uniformly distributed throughout the Unit and occurred in high-density groups in close proximity to existing roads, and many pad sites were within 300 feet of waterways. As a result, large portions of the Unit were excluded from development and approximately half of the Unit's natural gas resource would have been drained. This alternative was considered but eliminated from further analysis because it did not meet the purpose and need for the proposal, and it was not consistent with the existing Unit agreement to efficiently develop the federal mineral resources.

<u>SCOPING AND ISSUES:</u>

Project scoping conducted in 2008 and 2009 identified the following issues of key environmental, social, and economic concern:

- **Air quality.** How will harmful emissions and dust from construction and operations be monitored and controlled?
- **Water quality and supply.** How will hydraulic fracturing and reinjection of produced water affect the short-term and long-term quality and supply of water for agricultural and residential use? What are the potential hazards from surface spills and various substances used during drilling and production? An inventory and performance monitoring program should be instituted to establish a baseline and provide regular reporting for the life of the project.
- **Threatened, Endangered, and Sensitive Wildlife Species.** What are the potential impacts to species identified as threatened, endangered, or of concern to state and federal agencies, including Canada Lynx and Gunnison sage-grouse?
- **Wildlife and wildlife habitat.** The area is used by a wide variety of species, including a large population of elk, and the potential impacts, duration, and density of development in this relatively undeveloped area is a concern. How will construction and ongoing use of access roads affect wildlife habitat utilization and connectivity within and adjacent to the Unit?

BLM_0017997

- **Recreation and Visual Resources.** The Unit is adjacent to important recreation areas for camping, hunting, and sightseeing, and includes a segment of the West Elk Scenic Byway. How will the project affect access to and quality of recreation and visual resources?

- **Socio-economics.** How will development and operation of additional roads and infrastructure affect the rural character, lifestyle, and property values in the area, as well as tourism that relies on existing recreational and scenic values? What are the positive and negative economic impacts of developing the mineral resource?

- **Transportation.** How will increased traffic and resulting impacts on road conditions, maintenance, and safety be addressed? How will new pipeline and access road corridors be minimized?

PLAN CONFORMANCE REVIEW:

The Proposed Action and Alternative 1 are subject to and have been reviewed for conformance with the following plan (43 CFR 1610.5, BLM 1617.3):

> Name of Plan:  Uncompahgre Basin Resource Management Plan (UBRMP)

> Date Approved:  July, 1989

> Decision Number/Page:  Management Unit 16, Pages 28 and 32.

> Decision Language:  Federal oil and gas estate will be open to leasing. Seasonal restrictions are required on crucial deer and elk winter range and on bald eagle hunting habitat to protect crucial deer and elk winter range and bald eagle hunting habitat from disturbance.

This EA is prepared under the authority of NEPA and federal regulations found in 40 CFR Part 1500. Exploration and development of federal oil and gas resources by private industry is an integral part of the BLM's oil and gas program under authority of the Mineral Leasing Act of 1920, as amended; the Mining and Minerals Policy Act of 1970; the National Materials and Minerals Policy, Research and Development Act of 1980; and the Federal Onshore Oil and Gas Leasing Reform Act of 1987, Endangered Species Act of 1973, and National Historic Preservation Act of 1966, and various other rules and policy specific to implementation of those laws.

The Proposed Action is subject to federal, state, and local permits and approvals as listed in Table 9.

**Table 9. Major Federal, State, and Local Permits and Approvals that Apply to the Bull Mountain Unit**

| Agency | Permit, Approval, or Action |
|---|---|
| U.S. Army Corps of Engineers | - 404 and 401 permits for compliance with Clean Water Act |
| U.S. Bureau of Land Management | - NEPA<br>- Approval of the APDs<br>- Sundry notices for construction and other changes |
| U.S. Environmental Protection Agency | - Spill Prevention, Control, and Countermeasure Plan (SPCC) |
| U.S. Fish and Wildlife Service | - Section 7 Consultation for compliance with Endangered Species Act |
| District Court - Water Division 4 | - Water Augmentation Plan |
| Colorado Parks and Wildlife | - Coordination regarding impacts of wildlife and state sensitive species |
| Colorado Oil and Gas Conservation Commission | - Coordination on APDs (including Oil and Gas Location Assessment) |

BLM_0017998

**Table 9. Major Federal, State, and Local Permits and Approvals that Apply to the Bull Mountain Unit**

| Agency | Permit, Approval, or Action |
|---|---|
| | • Compliance with COGCC Rules and Regulations |
| Colorado Department of Public Health and Environment | • Construction Discharge Permit for stormwater discharges during project construction (according to current stormwater management plan)<br>• Coordination with COGCC for Injection Permit Applications<br>• Water Well Permit<br>• Air Quality Permits and Air Pollutant Emissions Notices (APEN) for stationary and portable sources |
| Colorado Department of Transportation | • Access permits for access to and from Highway 133<br>• Utility, relocation, and special use permit for work in the highway right-of-way<br>• Oversize/overweight vehicle permits for use of state highway |
| Gunnison County | • Application for an Oil & Gas/land use change Permit<br>• Performance/utilization bond<br>• Driveway permits for county road access<br>• Permits for use of CR 265 for overweight/oversize equipment |

STANDARDS FOR PUBLIC LAND HEALTH

In January 1997, Colorado Bureau of Land Management (BLM) approved the Standards for Public Land Health (Table 10). Standards describe conditions needed to sustain public land health and relate to all uses of the public lands. The following are the approved standards:

**Table 10. Approved Standards for Public Land Health**

| Standard | Definition/Statement |
|---|---|
| #1 Upland Soils | Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff. |
| #2 Riparian Systems | Riparian systems associated with both running and standing water, function properly and have the ability to recover from major surface disturbances such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and biodiversity. Water quality is improved or maintained. Stable soils store and release water slowly. |

BLM_0017999

**Table 10. Approved Standards for Public Land Health**

| Standard | Definition/Statement |
|---|---|
| #3 Plant and Animal Communities | Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes. |
| #4 Threatened and Endangered Species | Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by the BLM, and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities. |
| #5 Water Quality | The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM lands will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under State law as found in (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act. |

A finding for each standard must be made in the environmental analysis. These findings are located in specific elements below.

AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES /MITIGATION

This section provides discussion of current conditions and analysis of potential impacts from the Proposed Action, Alternative 1, and the No Action Alternative for each resource.

Cumulative impacts of the Proposed Action and Alternative 1 are shown in the analysis of each element. A description of the past, present, and reasonably foreseeable actions is at the end of this section. The elements of the No Action Alternative are reasonably foreseeable.

Elements specified by statute, regulation, executive order, or the Standards for Public Land Health are described and analyzed in this section.

The following elements of Table 11 are considerations required of NEPA. Those that could be impacted are brought forward for analysis. Any element not affected by the Proposed Action or alternatives will not be analyzed in this document; the reasons for no impact will be stated.

BLM_0018000

**Table 11. Elements Considered**

| Element | Not Applicable or Not Present | Present, But No Impact | Applicable & Present; Brought Forward for Analysis |
|---|---|---|---|
| Air Quality | | | X |
| ACEC | X | | |
| Lands with Wilderness Characteristics | X | | |
| Wilderness | X | | |
| Wild and Scenic Rivers | X | | |
| Cultural | | | X |
| Native American Religious Concerns | X | | |
| Farmlands, Prime/Unique | X | | |
| Soils | | | X |
| Vegetation | | | X |
| Invasive, Non-native Species | | | X |
| Threatened, Endangered, and Sensitive Species | | | X |
| Migratory Birds | | | X |
| Wildlife, Terrestrial | | | X |
| Wildlife, Aquatic | | | X |
| Wetlands & Riparian Zones | | | X |
| Floodplains | X | | |
| Water Quality, Surface and Ground | | | X |
| Wastes, Hazardous or Solid | | | X |
| Environmental Justice | | | X |

## AIR QUALITY

**Affected Environment**: Climate. The nearest meteorological measurements were collected at Redstone Colorado (1979-1994), approximately 2.5 miles northeast of the project area at an elevation of 8,070 feet amsl (WRCC 2011).

The annual average total precipitation at Redstone, Colorado is 27.7 inches, with annual totals ranging from 20.2 inches (1987) to 40.4 inches (1985). Precipitation is greatest in the spring and fall months. Snowfall occurs from fall though spring with the greatest amount in March. The average annual snowfall is 169.4 inches.

The region has cool temperatures, with average daily temperature (in degrees Fahrenheit [°F]) ranging between 8°F and 33°F in January to between 44°F and 76°F in July. Extreme temperatures have ranged from -29°F (1985) to 93°F (1991). Table 12 shows the mean monthly temperature ranges and total precipitation amounts.

BLM_0018001

**Table 12. Mean Monthly Temperature Ranges and Total Precipitation Amounts**

| Month | Average Temperature Range (°F) | Total Precipitation (inches) | Total Snowfall (inches) |
|---|---|---|---|
| January | 8-33 | 1.8 | 26.0 |
| February | 12-36 | 2.4 | 29.9 |
| March | 17-43 | 3.1 | 32.4 |
| April | 25-51 | 2.0 | 12.1 |
| May | 32-61 | 2.3 | 5.3 |
| June | 39-72 | 1.5 | 0.5 |
| July | 44-76 | 2.2 | 0.0 |
| August | 44-75 | 1.7 | 0.0 |
| September | 37-67 | 3.0 | 0.5 |
| October | 28-55 | 3.0 | 6.9 |
| November | 18-39 | 2.6 | 26.4 |
| December | 9-32 | 2.0 | 29.5 |
| ANNUAL | 39.6 (mean) | 27.7 (mean) | 169.4 |

Source: WRCC 2011.

The closest comprehensive wind measurements are collected at the Pine Ridge, Colorado Remote Automated Weather Station (RAWS) (BLM, 2011), located approximated 55 miles west of the Project Area. Although local wind patterns in mountain areas are almost always controlled by local topography the Pine Ridge site is located at 6,600 feet amsl in rolling terrain and can be used to describe typical wind patterns in the Unit.

A wind rose showing a diagram of the frequency of each wind direction is shown at left for the Pine Ridge site. Wind direction is the direction from which the wind is blowing. For example, the wind is blowing from the north 1.8 percent of the time.



WINDROSE
Pine Ridge, Colorado
Period: 2008-2010

WIND SPEED CLASS BOUNDARIES
(MILES/HOUR)

4.0   7.5   12.1   19.0   24.7

BLM_0018002

Tables 13 and 14 provide the wind direction distribution and wind speed distribution at that site in a tabular format. The annual mean wind speed at the Pine Ridge site is 5.6 miles per hour (mph).

**Table 13. Wind Direction Frequency Distribution, Pine Ridge, Colorado, 2008-2010**

| Wind Direction | Frequency (%) | Wind Direction | Frequency (%) |
|---|---|---|---|
| N | 0.018 | S | 0.067 |
| NNE | 0.044 | SSW | 0.052 |
| NE | 0.136 | SW | 0.056 |
| ENE | 0.206 | WSW | 0.116 |
| E | 0.095 | W | 0.068 |
| ESE | 0.033 | WNW | 0.034 |
| SE | 0.021 | NW | 0.016 |
| SSE | 0.027 | NNW | 0.013 |

**Table 14. Wind Speed Distribution, Pine Ridge, Colorado, 2008-2010**

| Wind Speed (mph) | Frequency (%) | Wind Speed (mph) | Frequency (%) |
|---|---|---|---|
| 0 – 4.0 | 43.9 | 12.1 – 19.0 | 4.9 |
| 4.0 – 7.5 | 30.5 | 19.0 – 24.7 | 0.5 |
| 7.5 – 12.1 | 20.1 | Greater than 24.7 | 0.1 |

Air Quality. The project area is located in Gunnison County, and is within the Mountain Counties Region for air quality planning (Colorado Department of Public Health and Environment – CDPHE, 2010). The Mountain Counties Region includes counties that generally are on or near the Continental Divide. Air quality concerns in this region are primarily from impacts related to particulate pollution from wood burning and road sanding activities.

Air quality impacts from pollutant emissions are limited by regulations, standards, and implementation plans established under the Federal Clean Air Act, as administered by the CDPHE under authorization of the U.S. Environmental Protection Agency (EPA). Under the Federal Land Policy and Management Act (FLPMA) and the Clean Air Act, the BLM cannot conduct or authorize any activity which does not conform to all applicable local, state, tribal or federal air quality laws, statutes, regulations, standards, or implementation plans.

As such, significant impacts to air quality from project-related activities would result if it is demonstrated that:

- National Ambient Air Quality Standards (NAAQS) or Colorado Ambient Air Quality Standards (CAAQS) would be violated;
- Class I or Class II Prevention of Significant Deterioration (PSD) Increments would be exceeded;
- Concentrations of hazardous air pollutants or other toxic air pollutants are predicted to be above designated thresholds;
- Air Quality-Related Values (AQRVs) would be impacted beyond acceptable levels such that:
  - The project would contribute to visibility impacts that would exceed 1.0 deciview (dv) change at a Class I area,
  - Changes in nitrogen or sulfur deposition would exceed the Level of Concern (LOC)
  - Changes in lake acid neutralizing capacity are predicted to be above the Limit of Acceptable Change (LAC)

The CAAQS and NAAQS are health-based criteria for the maximum acceptable concentrations of air pollutants at all locations to which the public has access. Although specific air quality monitoring has not

BLM_0018003

been conducted within the project area, all of Gunnison County is designated as "attainment" by the CDPHE for all criteria pollutants (CDPHE, 2010). Criteria pollutants for which CAAQS and NAAQS exist include carbon monoxide (CO), nitrogen dioxide ($NO_2$), ozone ($O_3$), particulate matter less than 10 microns in effective diameter ($PM_{10}$), particulate matter less than 2.5 microns in effective diameter ($PM_{2.5}$), sulfur dioxide ($SO_2$), and lead (Pb).

Background ambient air concentrations for criteria pollutants ($PM_{10}$, $PM_{2.5}$, CO, $NO_x$, $O_3$ and $SO_2$) used as an indicator of existing conditions in the region are shown in Table 17. These values were obtained from the CDPHE (CDPHE, 2011), and from the Clean Air Status and Trends Network (CASTNET) station site near Gothic Colorado, and are compared to the CAAQS and NAAQS in Table 17. The PSD Class I and Class II increments are also provided in Table 15.

**Table 15.  Monitored Air Pollutant Background Concentrations and Colorado and National Ambient Air Quality Standards (µg/m3)**

| Pollutant | Averaging Time | Measured Background Concentration | Colorado and National Ambient Air Quality Standards | Incremental Increase Above Legal Baseline | |
|---|---|---|---|---|---|
| | | | | PSD Class I | PSD Class II |
| Carbon Monoxide (CO) | 1-hour[1] | 1145 | 40,000 | n/a | n/a |
| | 8-hour[1] | 1145 | 10,000 | n/a | n/a |
| Nitrogen Dioxide ($NO_2$) | Annual[2] | 9[2] | 100 | 2.5 | 25 |
| | 1-hour[2] | 92[2] | 188 (NAAQS) | n/a | n/a |
| Ozone ($O_3$) | 8-hour[3] | 66 | 157 | n/a | n/a |
| Particulate matter ($PM_{10}$) | 24-hour[4] | 30 | 150 | 8 | 30 |
| | Annual[4] | 10 | 50 (CAAQS) | 4 | 17 |
| Particulate matter ($PM_{2.5}$) | 24-hour[5] | 12 | 35 | n/a | n/a |
| | Annual[5] | 5 | 15 | n/a | n/a |
| Sulfur Dioxide ($SO_2$) | 1-hour[6] | 31 | 196 (NAAQS) | n/a | n/a |
| | 3-hour[7] | 24 | 1,300 (NAAQS) 700 (CAAQS) | 25 | 512 |
| | 24-hour[7] | 13 | 365 | 5 | 91 |
| | Annual[7] | 5 | 80(NAAQS) 60(CAAQS) | 2 | 20 |

[1]   American Soda, Parachute 2007-2009 (CDPHE, 2011).
[2]   Southern Ute, 1 mile NE of Ignacio, 2006-2008 (CDPHE, 2011).
[3]   CASTNET Gothic site, 2011
[4]   Energy Fuels, 2008-2009 (CDPHE, 2011).
[5]   Based on S. Ute, 7571 Hwy 5505, 2009-2010 CDPHE, 2011).
[6]   Holcim Portland, 2007-2009 (CDPHE, 2011).
[7]   Unocal, 1983-1984 (CDPHE, 2011).

Federal air quality regulations adopted and enforced by the CDPHE limit incremental emissions increases to specific levels defined by the classification of air quality in a specific area. The PSD Program is designed to limit the incremental increase of specific air pollutant concentrations above a legally defined baseline level. Incremental increases allowed in PSD Class I areas are strictly limited; increases allowed in Class II areas are less strict.

The project area and surrounding areas are classified as PSD Class II. The PSD Class I area located closest to the Unit is the Maroon Bells – Snowmass Wilderness Area, which is approximately 5.6 miles to the east. Other PSD Class I areas located within 62.1 miles (100 kilometers) of the project area include the West Elk Wilderness (11.2 miles south), Black Canyon of the Gunnison National Park (30.4 miles

BLM_0018004

southwest), Flat Tops Wilderness Area (44.7 miles north), and Eagle's Nest Wilderness (62.1 miles northeast) (Figure 7).

All NEPA analysis comparisons to PSD Class I and II increments are intended to evaluate a threshold of concern and do not represent a regulatory PSD increment consumption analysis. The determination of PSD increment consumption is an air quality regulatory agency responsibility. Such an analysis would be conducted as part of the New Source Review process for a major source, as would an evaluation of potential impacts to AQRVs such as visibility, aquatic ecosystems, flora, fauna, etc., performed under the direction of the CDPHE in consultation with federal land managers.

Visibility conditions can be measured as standard visual range (SVR). SVR is the farthest distance at which an observer can just see a black object viewed against the horizon sky; the larger the SVR, the cleaner the air. Continuous visibility-related optical background data, representative of the Unit, have been collected in the PSD Class II White River Wilderness (located approximately 30 miles east of the project area), as part of the Interagency Monitoring of Protected Visual Environments (IMPROVE) program. The average SVR at the White River Wilderness is over 124.2 miles (VIEWS 2011).

**Environmental Consequences/Mitigation:**

   **Proposed Action –** Air-pollutant emissions as well as greenhouse gas (GHG) emissions would occur during construction and operations. Pollutants emitted would include $PM_{10}$, $PM_{2.5}$, nitrogen oxides ($NO_x$), CO, VOCs, and $SO_2$, and GHG emissions including carbon dioxide ($CO_2$) methane ($CH_4$), and nitrous oxide ($N_2O$).   Emissions would occur temporarily during well development and over the life of the project during well production operations.

Well-development emission sources include vehicle traffic, well pad, road and pipeline construction, and drilling and completion activities. Well-development sources would temporarily elevate pollutant levels but impacts would be localized and would occur only for the short-term duration of the activities. Fugitive dust emissions ($PM_{10}$ and $PM_{2.5}$) and vehicle exhaust emissions ($NO_x$, CO, $SO_2$, VOC, and $PM_{10}$, $PM_{2.5}$) would result from work crews commuting to and from the work site and from the transportation and operation of equipment to construct the well pad, access road, and infrastructure. Fugitive dust and vehicle exhaust emissions would also occur during construction of well pads, access roads, and gathering pipelines.

Maximum pollutant emissions from well development sources would occur during well drilling. A maximum of three 1,200-horsepower (hp) diesel-fired drilling rigs would operate during drilling activities (May – November) and would emit primarily CO, $NO_x$, $SO_2$, VOC, and $PM_{10}/PM_2$). The drilling rigs would be EPA Tier-2 compliant engines.

During field production, emissions of $NO_x$, CO, and VOC would occur from operation of the separator and tank heaters during the winter months. Emissions of $NO_x$, $SO_2$, CO, VOC, and particulate matter would also occur from workover rig engines and associated activities operating in the field. Vehicle traffic and well-maintenance activities during production would also result in emissions of fugitive dust and vehicle exhaust; however, these emissions would be localized and would occur only for the short-term duration of the activities.

Emissions associated with construction and operation of the Proposed Action would not be expected to cause or contribute to any adverse air quality conditions nor cause a violation of any applicable ambient air quality standard. In addition, the Proposed Action impacts would be expected to be less than the applicable PSD increments.

BLM_0018005

**Figure 7. PSD Class I Areas**



Bull Mountain Unit
- [ ] Bull Mountain Unit
- Class I Area: Bureau of Land Management
- Class I Area: United States Forest Service
- Class I Area: National Park Service

**Bull Mountain Unit**

*Air Quality: Class I Areas*
*March 2012*

*Disclaimer:*
*This product is for informational purposes and may not have been prepared for, or be suitable for legal, engineering, or surveying purposes. Users of this information should review or consult the primary data and information sources to ascertain the usability of the information. The maps are distributed "AS-IS" without warranties of any kind, either supervised or implied, including but not limited to warranties of suitability to a particular purpose or use.*

DRAFT Bull Mountain MDP | DOI-CO-150-2009-0005 EA | 39

This page left blank for two-sided copying.

BLM_0018007

Maximum potential greenhouse gas emissions expected for the project in metric tons per year of $CO_2$ equivalent ($CO_2e$) would be minimal in comparison to a typical 500 MW coal-fired power plant, and well below the threshold for which federal reporting is required under 40 CFR 98, Mandatory Reporting of Greenhouse Gases (EPA 2010). No mitigation measures specific to air quality would be required.

**Cumulative Impacts** – The area of influence for air quality is considered to be the Bull Mountain Unit and the geographic area within 62.1 miles (100 kilometers) of the Unit boundaries as shown on Figure 7. Cumulative air quality impacts are defined as incremental impacts from any one alternative combined with impacts from other existing or proposed air emission sources in the region. These emission sources include existing and future coal mining and exploration, oil and gas exploration and development, livestock grazing, and regional vehicle traffic. These activities are more fully described in the Cumulative Impacts Summary beginning on page 159 of this document. The contribution from project source emissions to cumulative ambient air concentrations and AQRVs, including regional haze and atmospheric deposition at the PSD Class I Maroon Bells – Snowmass Wilderness Area, and at the other PSD Class I areas located within the area of influence (West Elk Wilderness, Black Canyon of the Gunnison National Park, Flat Tops Wilderness, and Eagle's Nest Wilderness) would be negligible.

**Alternative 1** – The types of cumulative impacts to air quality under Alternative 1 would be the same as the Proposed Action.

**Cumulative Impacts** – The types of impacts to air quality under Alternative 1 would be the same as for the Proposed Action. However, Alternative 1 would have 2.3 fewer miles of access roads and 6 fewer miles of pipelines than the Proposed Action, with proportionately less emissions during construction and production.

**No Action Alternative** – Impacts to air quality under the No Action Alternative would be the less than the Proposed Action.

## AREAS OF CRITICAL ENVIRONMENTAL CONCERN

**Affected Environment:** No Areas of Critical Environmental Concern are located within or adjacent to the Unit.

## WILDERNESS

**Affected Environment:** No congressionally-designated wilderness, Wilderness Study Areas, or citizen-proposed wilderness areas have been identified within Management Unit 16 of the UFO which contains the Bull Mountain Unit. The nearby Raggeds Wilderness in the White River and Gunnison National Forests and the West Elk Wilderness Area in the Gunnison National Forest are managed by the U.S. Forest Service.

## LANDS WITH WILDERNESS CHARACTERISTICS

Through the Federal Land Policy and Management Act (FLPMA, Sec. 201 and 202) of 1976, Congress directed the BLM to establish and maintain an inventory of the lands under its jurisdiction that possess "wilderness characteristics." The characteristics include (a) size (generally 5,000 acres or greater with no mechanically constructed and maintained roads, or smaller areas that share a boundary with existing wilderness or wilderness study areas of 5,000 acres or greater); (b) naturalness; and (c) outstanding opportunities for solitude, **or** primitive and unconfined types of recreation. Supplemental values (characteristic d) include ecological, geological, or other features of scientific, educational, scenic, or historical value. For an area to possess wilderness characteristics it must possess characteristics a, b, and c; d is optional.

BLM_0018008

BLM lands within the Uncompahgre Field Office were inventoried for wilderness characteristics in 2010-2011. No lands possessing wilderness characteristics were found on BLM-managed lands within or adjacent to the Unit.

## WILD AND SCENIC RIVERS

**Affected Environment:** No designated Wild and Scenic Rivers are located within or adjacent to the proposed project area. There are no river segments on BLM-managed lands within the Unit that have been found eligible for inclusion in the National Wild and Scenic River System.

## CULTURAL RESOURCES

**Affected Environment:** The area has been inhabited by humans for approximately 10,000–12,000 years. Early inhabitants are characterized as Paleoindian hunters of big game and Archaic small-game hunters and gatherers (BLM 1984). Current land uses within the Unit include cattle and sheep grazing, oil and gas exploration, and residential development.

To date there have been 22 cultural resource investigations within or overlapping the Unit resulting in the identification of two archaeological sites and five isolated artifacts (isolated finds). The archeological sites date to the Historic Period and include a ranch that is eligible for inclusion in the National Register of Historic Places (NRHP) and a transportation corridor (roadway; field-recommended ineligible for inclusion in the NRHP, no official determination made). Isolated finds include both prehistoric and historic artifacts.

Although very few previous surveys have been conducted in the area to date, it is clear that cultural resources are limited. It is likely that travel in the area was restricted by the geographic features and thick vegetation, thus limiting prehistoric human use to ephemeral activities and resulting in fewer artifacts and features than might typically be expected. Historic use of the area appears to be more common and includes roads and small ranch settings. It can also be assumed that historic water features such as ditches and ponds are scattered across the Unit.

**Environmental Consequences/Mitigation:**

**Proposed Action** – Under the Proposed Action one NRHP-eligible cultural property could be directly impacted. In addition, there is potential for additional historic and prehistoric sites to occur within the Unit. Indirect impacts to undiscovered cultural resources may occur as a result of increased erosion and increased site visitation due to new access. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to cultural resources. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for cultural resources is considered to be the Bull Mountain Unit. A qualified archaeologist would be present to monitor construction during the ground-disturbing portion of project build-out. As such, there would be no additional cumulative impacts.

**Alternative 1** – No known cultural resources would be impacted under Alternative 1. There is, however, potential for both prehistoric and historic sites to be found within the Unit, and for indirect impacts to occur as described under the Proposed Action. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to cultural resources.

**Cumulative Impact**s – A qualified archaeologist would be present to monitor construction during the ground-disturbing portion of project build-out. As such, there would be no additional cumulative impacts.

BLM_0018009

No Action Alternative – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. There would be potential for impact to one ineligible cultural property. Because this property is ineligible for inclusion on the NRHP, no avoidance measures would be required. However, both prehistoric and historic sites could potentially be found within the Unit. Indirect impacts could also occur as described under the Proposed Action.

## NATIVE AMERICAN RELIGIOUS CONCERNS

**Affected Environment:**  No evidence of the presence of Native peoples has been found during previous cultural surveys on federal lands within the Unit.

**Environmental Consequences/Mitigation:**  See the Cultural Resources section for a discussion of potential direct, indirect, and cumulative impacts should any Native American cultural site be found within the project area.

## FARMLANDS, PRIME AND UNIQUE

**Affected Environment:**  No prime or unique farmlands as identified by the Natural Resources Conservation Service (NRCS) have been identified in the vicinity of the Unit (NRCS, 2011).

## SOILS (includes a finding on Standard 1)

**Affected Environment:**  Approximately 15 classified soil types are found within the Unit per the USDA Natural Resource Conservation Service (NRCS), some of which are differentiated based on percent of slope in the Unit. Many have similar characteristics, and 85% are within the Fughes Series and Bulkley Series. Soils derived from the Fughes Series are derived from old alluvium and complex landslide deposits. They are deep, well-drained, and typically found on alluvial fans, uplands, and valley side-slopes. Their texture is heavy clay loam with 36-50% clay. The Bulkley soil series is derived from fine-textured alluvium eroded from shale and interbedded sandstone sedimentary rocks. The texture is clay or silty clay loam with weathered shale, typically found at depths of approximately 3-6 feet. Approximately 7% of the soils are within the Torriorthents complex, a highly variable, generally shallow silty clay or silty clay loam. The Torriorthents complex is typically found in moderately steep to very steep areas with bedrock outcrops of sandstone, shale, and interbedded shale and sandstone. These soils are generally deeper at the base of slopes and are well-drained. Their outcrops include the Wasatch and Mesaverde Formations.

Within these soils are fine-grained, poorly consolidated associations that have Severe erosion hazard ratings. Their suitability rating for roads is Poor due to limitations of slope and low shear strength. Both soils units are classified within Hydrologic Group C. They typically exhibit low infiltration rates when wetted and often have a layer that impedes downward migration of water. These soils have moderately fine to fine texture and have a low rate of water transmission (0.05 – 0.15 in/hr). Table 16 and Figure 8 show the erosion ratings for soils in the Bull Mountain Unit.

BLM_0018010

Table 16. Soil Erosion Ratings for the Bull Mountain Unit

| Rating | Total Acres | Percent of Unit |
|---|---|---|
| Slight (light green) | 2,363.8 | 12% |
| Moderate (yellow) | 8,972.2 | 45% |
| Severe (orange) | 6,799.6 | 35% |
| Very severe (red) | 1,537.7 | 8% |
| **Totals** | **19,673.3** | **100%** |

**Environmental Consequences/Mitigation:**

**Proposed Action** – Construction of access roads, well pads (including reserve pits), power lines, and pipelines would initially disturb approximately 286.9 acres (1.46% of the project area). Once interim reclamation is complete, production disturbance would be about 125.9 acres (0.64% of the project area), a reduction of approximately 44% overall. Potential impacts to soils from the Proposed Action include loss of soil productivity and increased susceptibility to erosion. Loss of soil productivity can result from the mixing of soil horizons when subsurface soils are brought to the surface and mix with or replace surface soils. The result can be less biologically productive surface soils due to elevated soil pH, increased soil salinity, higher sodium and calcium carbonate concentrations, decreased levels of soil nutrients and organic matter, and altered soil structure, texture, and rock content. The effects of soil mixing would be minimized or eliminated through proper soil handling and salvaging and prompt attention to soil stabilization using BMPs as described in Appendix C.

Compaction of soil during construction and production activities can also reduce soil productivity. Soil compaction impacts soil structure and reduces pore size. Excessive compaction can reduce water infiltration and permeability of water through the soil; reduce diffusion of oxygen, carbon dioxide, and other gases into and out of the soil; reduce plant root penetration; and reduce plant growth and production. The effects of compaction would be reduced at the time of reclamation through sound site-preparation BMPS as described in Appendix C.

Spilled frack fluids, drilling fluids, and produced water can also lead to loss of soil productivity during construction and production activities. Depending on the size and type of spill, the effect on soils will vary considerably. The largest threat to soil productivity is the release of produced water onto the soil surface simply because of the volume and force of the water. Released hydraulic fracturing fluids, drilling fluids, and produced water—in sufficient quantity—can lead to the creation of saline and/or sodic soil conditions. Saline soils can interfere with plant germination and growth, and sodic soils can become hard and crusted with effects similar to those of compacted soils. The effects of spilled drilling fluids, hydraulic fracturing fluids, and produced water would be minimized through proper implementation of the Spill Prevention, Control and Countermeasure Plan as described under Wastes, Hazardous and Solid, and the use of approved disposal methods for the produced water discussed in Water Resources.

Susceptibility to erosion is increased when construction and production activities disturb the soil resource. Areas with steep slopes are prone to erosion regardless of soil type. The possibility of increased erosion at well sites, especially those sites constructed in steeper terrain, can be reduced through proper implementation of erosion-control methods and successful, timely reclamation of disturbed areas. The Severe erosion hazards associated with these potentially affected soils units highlight the importance of diligent application of Best Management Practices for proposed soil-disturbing activities. Revegetation, erosion control mats, and water bars to divert stormwater runoff have been successfully used in existing development of the Unit.

All of the existing and proposed access roads for the Unit are surfaced with dirt or gravel and are therefore susceptible to dust formation and subsequent wind erosion during periods of dry weather. During construction, well pad surfaces, topsoil piles, and pipeline corridors would also be subject to

BLM_0018011

erosion from wind and precipitation, creating a potential loss of viability for reclamation purposes. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to soil resources from generation of dust and potential wind and water erosion. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for soil is considered to be the Bull Mountain Unit and the vicinity within the Muddy Creek basin. Cumulative impacts to soils would occur across the Unit from the reasonably foreseeable combined implementation of the No Action Alternative along with the Proposed Action. Based upon the amount of surface disturbance associated with the Proposed Action, the likely incremental cumulative impact of productivity loss and erosion on the existing soil resource would be low. With successful implementation of soil salvaging and reclamation, it is expected that soil productivity and soil erosion losses in the Unit would be controlled and therefore minimal cumulative impacts would occur. It is likely that planned activities would add to fine sediment delivery to drainage systems, but this increased delivery would be over a period of years during project build-out and would not likely be noticeable given the natural background loading of silts that creeks and streams in the Muddy Creek basin already carry.

**Alternative 1** – Construction of access roads, well pads, power lines, and pipelines would initially disturb approximately 255.8 acres (1.3% of the project area). Once interim reclamation is complete, production disturbance would be about 121.4 acres (0.62% of the project area), a reduction of about 47% overall. Potential impacts to soils from the Alternative 1 would be similar to impacts from the Proposed Action. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to soil resources from generation of dust and potential wind and water erosion. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The types of cumulative impacts to soils that could occur across the Unit from the combined implementation of Alternative 1 and the No Action Alternative would be the same as those for the Proposed Action. Alternative 1 would have 3.3 fewer miles of construction impacts to soils from new or improved roads, 2.3 fewer miles of access roads overall, and 6 fewer miles of pipelines than the Proposed Action, with proportionately less impacts to soils during construction and production.

**No Action** – Construction of access roads, well pads, power lines, pipelines, and flowback pits would initially disturb approximately 131.3 acres (0.67% of the project area). Once interim reclamation is complete, production disturbance would be about 80.3 acres (0.41% of the project area), a reduction of about 60% overall. The types of potential impacts to soils from the No Action Alternative would be similar to impacts from the Proposed Action.

**Finding on the Public Land Health Standard for soils:** (partial; see also Vegetation; Invasive and Non-native Species): Based on the Land Health Assessment for the North Fork Landscape (BLM 2007), surface lands managed by the BLM have been identified as having some ongoing soil and vegetation issues associated with the long-term use of the Spring Creek Trail as an existing (and historic) stock driveway that sees heavy cattle utilization, and is also an active OHV trail. Soils issues include small areas with excessive bare soils, low plant and litter cover, low cool-season grass cover, low forb cover, minor noxious weed infestations, poor drainage, and shrubs with poor vigor. These issues are associated with heavy and persistent cattle grazing pressure, trampling of vegetation, high concentrations of elk and mule deer winter browsing, and the continued use of the Spring Creek Trail which is a historic route that was not likely designed to handle OHV use and long-term and persistent disturbances associated with cattle drives and heavy grazing pressure. The Proposed Action would see a pipeline route and new access road crossing BLM lands that do have existing soils issues associated with the stock driveway. However, with proper implementation of proposed BMPs and reclamation, long-term soil health and function would be maintained and the land health standard would continue to be met. Monitoring of additional natural gas development activities in areas with existing soils issues would be necessary, as cattle grazing pressure

BLM_0018012

and trampling can be counter to reclamation efforts, and cause failure of reclamation and soil stabilization efforts. The Proposed Action, Alternative 1, and No Action would not jeopardize soil heath in the Unit given the proposed BMPs and reclamation standards, but timely installation and maintenance of livestock exclosures would be necessary to allow for reclamation to be successful, particularly on steep slopes, in wetlands, and in livestock loafing areas.

BLM_0018013



**Figure 8. Soil Erosion Ratings in the Bull Mountain Unit**

BLM_0018014

This page left blank for two-sided copying.

BLM_0018015

**VEGETATION** (includes a finding on Standard 3)

**Affected Environment:** This section tiers to the Biological Evaluation (Petterson 2012). Vegetation communities found within the Unit are listed in Table 17 and shown on Figure 9:

The following are descriptions of the major community types:

Gambel's Oak Shrubland – This diverse community type is found at middle elevations of the project area. The amount of Gambel's oak ("oakbrush") varies, depending primarily on elevation and aspect. In some areas, the type consists almost entirely of dense, tall oakbrush with few associated shrubs and a sparse herbaceous understory due to extreme shading by the oak canopy and competition for light, moisture, and space. In areas of elevated soil moisture, another tall shrub, chokecherry, is sometimes present and locally co-dominant. On slightly drier exposures, the oakbrush shares dominance with Saskatoon serviceberry. More open stands may

**Table 17. Existing Vegetation Communities in Bull Mountain Unit**

| Vegetation Type | Existing Conditions | |
|---|---|---|
| | *Acres* | *% of Unit* |
| Aspen | 1,123.9 | 5.7% |
| Aspen/Conifer | 12.3 | 0.1% |
| Aspen/Oak | 768.8 | 3.9% |
| Disturbed Area | 174.7 | 0.9% |
| Irrigated Meadow | 1,981.0 | 10.1% |
| Meadow | 552.6 | 2.8% |
| Mixed Conifer | 62.5 | 0.3% |
| Mixed Mountain Shrub | 1,753.5 | 8.9% |
| Oakbrush | 3,991.5 | 20.3% |
| Pinyon/Juniper | 129.3 | 0.7% |
| Riparian Woodland | 87.3 | 0.4% |
| Rock Outcrop | 1.5 | 0.0% |
| Sagebrush | 8,257.4 | 42.0% |
| Wetland/Riparian Area | 671.8 | 3.4% |
| Willow | 16.1 | 0.1% |
| Open Water | 88.8 | 0.5% |
| **Total** | **19,672.9** | **100.0%** |

include snowberry (*Symphoricarpos rotundifolia*) in the understory, occasionally accompanied by wax currant (*Ribes cereum*).

Mixed Mountain Shrubland – On drier slopes at lower elevations or on sunnier aspects, the habitat is dominated by Utah serviceberry and some Saskatoon serviceberry and varying amounts of chokecherry, sagebrush, snowberry, and Gambel's oak. Because of the more open canopies of these shrubs, the herbaceous layer is denser and more diverse. Associated forbs vary with elevation, site moisture, and shrub density but commonly include tailcup lupine (*Lupinus caudatus*), Rocky Mountain penstemon (*Penstemon strictus*), Watson's penstemon (*Penstemon watsonii*), aspen daisy (*Erigeron speciosus*), running fleabane (*Erigeron flagellaris*), Drummond's rockcress (*Boechera drummondii*), Nuttall's larkspur (*Delphinium nuttallianum*), small-leaf pussytoes (*Antennaria parviflora*), lambs-tongue groundsel (*Senecio integerrimus*), longleaf phlox (*Phlox longifolia*), sticky false starwort (*Pseudostellaria jamesii*), and narrowleaf mountain trumpet (*Collomia linearis*). Native perennial graminoids include elk sedge (*Carex geyeri*) and a variety of grasses such as bluebunch wheatgrass (*Pseudoroegneria spicata*), slender wheatgrass (*Elymus trachycaulus*), and junegrass (*Koeleria macrantha*).

BLM_0018016

This page left blank for two-sided copying.

BLM_0018017

**Figure 9. Existing Vegetation in the Bull Mountain Unit**



**Bull Mountain Unit**

*Existing Vegetation in the Bull Mountain Unit January 2012*

**Legend**

Project Area Boundary
Township Boundary
Section Boundary

Existing Gas Well
Existing Gathering System
Perennial Stream
Intermittent Stream

State Highway
County Road
Improved Road
USFS Sytem Road

Aspen
Aspen/Conifer
Aspen/Oak
Disturbance
Irrigated Meadow

Meadow
Mixed Conifer
Mixed Mountain Shrub
Oakbrush
Pinyon/Juniper

Riparian Woodland
Rock Outcrop
Sagebrush
Open Water
Wetland
Willow

This page left blank for two-sided copying.

BLM_0018019

Common grasses include Indian ricegrass (*Achnatherum hymenoides*), bluebunch wheatgrass, slender wheatgrass, western wheatgrass (*Pascopyrum smithii*), bottlebrush squirreltail (*Elymus elymoides*), junegrass, and muttongrass (*Poa fendleriana*). Common forbs include tapertip onion (*Allium acuminatum*), running fleabane, lobeleaf groundsel (*Packera multilobata*), tailcup lupine, death camas (*Toxicoscordion venenosum*), coppermallow (*Sphaeralcea coccinea*), balsamroot (*Balsamorhiza sagittata*), and Indian paintbrush (*Castilleja* sp.).

Pinyon/Juniper Woodland – Stands of pinyon pine (*Pinus edulis*) and Utah juniper—generally consisting almost entirely of the latter—occur at lower elevations of the project area, often interspersed within sagebrush shrublands or drier types of mixed mountain shrubland. This habitat type is best developed at the southern end of the unit on south and west facing slopes. Associated shrubs include bitterbrush, Utah serviceberry, broom snakeweed (*Gutierrezia sarothrae*), and skunkbrush (three-leaf sumac) (*Rhus trilobata*). In general, the sparse herbaceous layer consists of graminoids such as cheatgrass (*Anisantha tectorum*), western wheatgrass, Indian ricegrass, bottlebrush squirreltail, muttongrass, and Sandberg bluegrass. Forbs are a minor component.

Aspen Forest – At the higher elevations in the Unit, and on north facing slopes at mid-elevations stands of quaking aspen occur. In the lower elevation aspen stands, understory vegetation is dominated by chokecherry and Saskatoon serviceberry. The understory in this system can also include low-growing shrubs such as common juniper (*Juniperus communis*), Woods' rose (*Rosa woodsii*), and roundleaf snowberry as well as a diverse grass/forb understory. Perennial grasses in the herbaceous layer include the native mountain brome (*Bromopsis marginatus*) as well as the non-native smooth brome.

Irrigated meadow – A major community type in the Unit is irrigated hay meadows. These pasturelands occur mostly towards the northern end of the Unit. Dominant vegetation includes timothy (*Phleum pratense*), orchardgrass (*Dactylis glomerata*), red clover (*Trifolium pratense*), Kentucky bluegrass (*Poa pratensis*), and smooth brome (*Bromus inermus*). The noxious weed Canada thistle (*Cirsium arvense*) is common in wetter areas and in ditches. Some native wetland graminoids, including beaked sedge (*Carex utriculata*) and meadow sedge (*Carex praegracilis*) occurred in the irrigation ditch laterals. Almost the entire irrigated meadow community is dominated by non-native vegetation.

**Environmental Consequences/Mitigation:** Table 18 details the impacts to vegetation communities under each Alternative.

Table 18. Impacts to Vegetation Communities, All Alternatives

| Vegetation Type | Proposed Action | | | | Alternative 1 | | | | No Action | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Construction | | Production | | Construction | | Production | | Construction | | Production | |
| | *Acres* | *%*[1] | *Acres* | *%* | *Acres* | *%* | *Acres* | *%* | *Acres* | *%* | *Acres* | *%* |
| Aspen | 11.7 | .06% | 3.5 | .02% | 10.1 | .05% | 3.4 | .02% | 1.8 | .01% | 0.3 | .00% |
| Aspen/Conifer | 0.0 | .00% | 0.0 | .00% | 0.0 | 0.0% | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% |
| Aspen/Oak | 3.7 | .02% | 0.9 | .00% | 10.4 | .05% | 3.5 | .02% | 1.7 | .01% | 0.7 | .00% |
| Disturbed Area | 1.0 | .01% | 24.1 | .12% | 0.8 | .00% | 25.3 | .13% | 3.3 | .02% | 41.5 | .21% |
| Irrigated Meadow | 16.5 | .08% | 5.4 | .03% | 22.8 | .12% | 7.7 | .04% | 34.6 | .18% | 7.5 | .04% |
| Meadow | 8.7 | .04% | 4.2 | .02% | 7.1 | .04% | 3.4 | .01% | 7.7 | .04% | 3.2 | .02% |
| Mixed Conifer | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% | 0.2 | .00% | 0.0 | .00% |
| Mixed Mountain Shrub | 9.9 | .05% | 2.2 | .01% | 8.6 | .04% | 3.2 | .02% | 6.4 | .03% | 1.4 | .01% |
| Oakbrush | 36.1 | .18% | 9.7 | .05% | 31.5 | .16% | 8.5 | .04% | 1.9 | .01% | 0.5 | .00% |
| Pinyon/Juniper | 0.1 | .00% | 0.0 | .00% | 0.1 | .00% | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% |
| Riparian Woodland | 0.2 | .00% | 0.1 | .00% | 0.3 | .00% | 0.1 | .00% | 0.0 | .00% | 0.0 | .00% |

BLM_0018020

**Table 18. Impacts to Vegetation Communities, All Alternatives**

| Vegetation Type | Proposed Action | | | | Alternative 1 | | | | No Action | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Construction | | Production | | Construction | | Production | | Construction | | Production | |
| | Acres | %[1] | Acres | % | Acres | % | Acres | % | Acres | % | Acres | % |
| Rock Outcrop | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% |
| Sagebrush | 194.1 | .99% | 74.4 | .38% | 160.6 | .82% | 66.2 | .34% | 72.1 | .37% | 14.2 | .07% |
| Wetland/Riparian Area | 4.1 | .02% | 1.4 | .01% | 3.3 | .02% | 1.1 | .01% | 1.5 | .01% | 0.5 | .00% |
| Willow | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% |
| Open Water | 0.3 | .00% | 0.0 | .00% | 0.1 | .00% | 0.0 | .00% | 0.1 | .00% | 0.0 | .00% |
| **Total** | **286.4** | **1.46%** | **125.8** | **.64%** | **255.7** | **1.3%** | **121.2** | **.62%** | **131.2** | **.67%** | **69.8** | **.35%** |

[1] Percentage of total Bull Mountain Unit

**Proposed Action** – Construction of the temporary and permanent features of the Proposed Action would impact vegetation communities as shown in Table 18.

The pipeline corridors (10.7 miles) would be reclaimed during the same growing season as construction, using one or more seed mixes approved by BLM (Appendix B), subject to discussion and approval by the surface landowner and BLM. BLM's seed mix menus provided to the operator that are appropriate for the project area consist entirely of native perennial grasses. Reclamation of disturbed areas along pipeline corridors and temporary disturbance sites around pads, cut-and-fill slopes, flowback pits, and topsoil piles would result in the conversion of existing shrub- or tree-dominated communities to grass-dominated communities. Over time, however, natural colonization of the reclaimed areas by forbs and woody plants from nearby undisturbed areas would be expected based on observed reclamation patterns in the Unit over the past 6 years. Because full natural colonization would require many years, periodic reopening of temporary disturbance areas (e.g., to replace or add new pipeline) would interrupt this process and restart the revegetation process. Use of more aggressive non-native graminoids or forbs in seed mixes prescribed by landowners or other agencies (e.g., CPW) would extend the period of time during which corridors are dominated by grasses and would retard the establishment of native forbs and shrubs.

With implementation of reclamation practices specified in Appendix B, including topsoil handling, seeding, mulching, and weed control, the establishment of desirable herbaceous vegetation on corridors and temporary disturbance areas sufficient to minimize wind or water erosion and invasion by weeds would occur within 2 to 5 years. In wetland areas, replanting of local native wetland species is required by the U.S. Army Corps of Engineers (USACE), per section 404 of the Clean Water Act.

Construction impacts to vegetation would comprise approximately 286.4 acres (1.46% of the Unit). Permanent disturbances (e.g., roads and pad surfaces) would result in conversion of 125.8 acres of existing vegetation communities (0.64% of the Unit) to a non-vegetated condition.

Deposition of dust from unpaved roads (36.4 miles) is another source of potential impacts to vegetation. Dust from roads can contain very fine particles ($PM_{10}$ and $PM_{2.5}$ that make up part of a dust cloud, described more completely in the Air Quality section).

Potential impacts to vegetation from dust deposits may include, but are not limited to:

- Reduced photosynthesis due to reduced light penetration through the leaf surface, which may cause stunting and/or reduced growth rates and plant vigor.

- Increased incidence of plant pests and disease. Dust deposits can act as a medium for the growth of fungal diseases.

- Reduced efficacy of herbicide sprays due to reduced penetration through the leaf surface.

BLM_0018021

- Potential contamination of native wildflowers and their blossoms, altering patterns of pollen dispersal (and thus gene flow) among plants by altering the foraging behavior of pollinating insects.

Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to vegetation resources and reduce generation of dust. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for vegetation includes the greater Bull Mountain Unit area and surrounding lands. Since 2002, redevelopment of historical well pads and construction of new well pads, roads, and pipelines by SG and Gunnison Energy Corporation have resulted in the direct loss of vegetation communities, as well as temporary impacts from the installation of pipelines and landowner-required vegetation management projects (such as sagebrush mowing).

Cumulative impacts would occur across the Unit from the reasonably foreseeable combined implementation of the No Action Alternative with the Proposed Action, as summarized in Table 19, and would result in production impacts to approximately 0.85% of the Unit's vegetation communities. When combined with existing natural gas impacts, the total long-term impact to vegetation communities in the Unit would still be less than 1%.

**Table 19. Cumulative Impacts to Vegetation, Proposed Action**

| Vegetation Type | Proposed Action + No Action | | | | | |
|---|---|---|---|---|---|---|
| | Construction | | Production | | Existing | |
| | *Acres* | *%*[1] | *Acres* | *%* | *Acres* | *%* |
| Aspen | 13.52 | .07% | 3.7 | .02% | 0.0 | .00% |
| Aspen/Conifer | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% |
| Aspen/Oak | 5.0 | .03% | 1.5 | .01% | 0.0 | .00% |
| Disturbed Area | 4.5 | .02% | 1.4 | .01% | 49.9 | .25% |
| Irrigated Meadow | 48.9 | .25% | 12.1 | .06% | 4.4 | .02% |
| Meadow | 16.0 | .08% | 12.1 | .06% | 3.8 | .02% |
| Mixed Conifer | 0.2 | .00% | 0.0 | .00% | 0.0 | .00% |
| Mixed Mountain Shrub | 15.1 | .08% | 5.4 | .00% | 0.0 | .00% |
| Oakbrush | 37.3 | .19% | 10.0 | .05% | 0.0 | .00% |
| Pinyon/Juniper | 0.1 | .00% | 0.0 | .00% | 0.0 | .00% |
| Riparian Woodland | 0.2 | .00% | 0.1 | .00% | 0.0 | .00% |
| Rock Outcrop | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% |
| Sagebrush | 249.6 | 1.27% | 84.0 | .43% | 3.8 | .02% |
| Wetland/Riparian Area | 5.3 | .03% | 1.9 | .01% | 0.3 | .00% |
| Willow | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% |
| Open Water | 0.4 | .00% | 0.0 | .00% | 0.0 | .00% |
| **Total** | **396.0** | **2.01%** | **168.1** | **0.85%** | **62.1** | **0.32%** |

Other cumulative impacts to vegetation communities could occur from the reasonably foreseeable continuation of livestock grazing across much of the Unit. This grazing puts certain pressures on native grasses, forbs, and shrubs, and has likely shifted the dominance of certain species across the Unit. Additionally, some increased cover of noxious weeds has likely accompanied persistent grazing pressure. Another significant cumulative impact to vegetation communities is the likely long-term continuation of widespread irrigation of meadows for grass hay production. At this time irrigated meadows account for 10.1% of the Unit that would otherwise likely consist of sagebrush community types.

BLM_0018022

**Alternative 1** – Construction impacts to vegetation would comprise 255.8 acres (1.3% of the Unit), which would be approximately 31.1 acres less than the Proposed Action. Production disturbance (e.g., roads and pad surfaces) would result in conversion of 121.2 acres of existing vegetation communities (0.62% of the Unit) to a non-vegetated condition, a difference of less than 5 acres compared to the Proposed Action. The types of impacts would be the same as for the Proposed Action, although there would be fewer miles of pipeline (8.5 miles not co-located with roads) and fewer miles of roads (34.1 miles). Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to vegetation resources and reduce generation of dust. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The types of cumulative impacts to vegetation from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. Alternative 1 would have 3.3 fewer miles of new or improved access roads and 6 fewer miles of new pipelines than the Proposed Action; thus construction impacts would be proportionally reduced. However, production impacts following full reclamation of the pipeline corridor and interim reclamation of well pads would be similar to the Proposed Action at 0.85% of the Unit, as summarized in Table 20.

**Table 20. Cumulative Impacts to Vegetation, Alternative 1**

| Vegetation Type | Alternative 1 + No Action | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Construction | | Production | | Existing | |
| | Acres | % | Acres | % | Acres | % |
| Aspen | 11.8 | .06% | 3.8 | .02% | 0.0 | .00% |
| Aspen/Conifer | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% |
| Aspen/Oak | 11.8 | .06% | 4.1 | .02% | 0.0 | .00% |
| Disturbed Area | 4.0 | .02% | 45.3 | .23% | 49.9 | .25% |
| Irrigated Meadow | 55.0 | .28% | 15.2 | .08% | 4.4 | .02% |
| Meadow | 14.5 | .07% | 6.2 | .03% | 3.8 | .02% |
| Mixed Conifer | 0.2 | .00% | 0.0 | .00% | 0.0 | .00% |
| Mixed Mountain Shrub | 3.7 | .07% | 3.2 | .02% | 0.0 | .00% |
| Oakbrush | 32.7 | .17% | 8.9 | .05% | 0.0 | .00% |
| Pinyon/Juniper | 0.1 | .00% | 0.0 | .00% | 0.0 | .00% |
| Riparian Woodland | 0.3 | .00% | 0.1 | .00% | 0.0 | .00% |
| Rock Outcrop | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% |
| Sagebrush | 220.8 | 1.12% | 78.4 | .40% | 3.8 | .02% |
| Wetland/Riparian Area | 4.6 | .02 | 1.6 | .01% | 0.3 | .00% |
| Willow | 0.0 | .00% | 0.0 | .00% | 0.0 | .00% |
| Open Water | 0.2 | .00% | 0.0 | .00% | 0.0 | .00% |
| **Total** | **369.6** | **1.88%** | **166.8** | **0.85%** | **62.1** | **0.32%** |

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. Construction impacts to vegetation would comprise 131.2 acres (.67% of the Unit), approximately 155.2 acres less than the Proposed Action. Production disturbances (e.g., roads and pad surfaces) would result in conversion of 69.8 acres (0.35% of the Unit) to a non-vegetated state, which is approximately 26.5 acres less than under the Proposed Action. The types of impacts would be the same as for the Proposed Action.

BLM_0018023

**Finding on the Public Land Health Standard for plant and animal communities** (partial; see also Wildlife, Aquatic; Wildlife, Terrestrial; and Invasive, Non-native Species): Based on the Land Health Assessment for the North Fork Landscape (BLM 2007), surface lands managed by the BLM have been identified as having some ongoing vegetation issues associated with the long-term use of the Spring Creek Trail as an existing (and historic) stock driveway that sees heavy cattle utilization, and is also an active OHV trail. Vegetation issues include low plant and litter cover, low cool-season grass cover, low forb cover, minor noxious weed infestations, and shrubs with poor vigor. These issues are associated with heavy and persistent cattle grazing pressure, trampling of vegetation, high concentrations of elk and mule deer winter browsing, and the continued use of the Spring Creek Trail which is a historic route that was not likely designed to handle OHV use and long-term and persistent disturbances associated cattle drives and heavy grazing pressure. The Proposed Action would see a pipeline route and new access road crossing BLM lands that has existing vegetation issues associated with the stock driveway. However, with proper implementation of proposed BMPs and reclamation, long-term plant community health and function would be maintained and the land health standard would continue to be met. Monitoring of additional natural gas development activities in areas with existing vegetation issues would be necessary, as cattle grazing pressure and trampling can be counter to reclamation efforts, and cause failure of revegetation and establishment of health plant communities. The Proposed Action, Alternative 1, and No Action would not jeopardize the viability of any plant population or plant community type and would have no significant consequences for habitat condition, utility, or function or discernible adverse effects on plant species abundance or distribution. Public land health standard 3 would continue to be met. Given the cumulative use of the landscape as livestock range, timely installation of livestock exclosures around sensitive wetland areas and monitoring of revegetation efforts and noxious weeds would be necessary to ensure that revegetation efforts are successful, particularly on steep slopes, in wetlands, and in livestock loafing areas.

## INVASIVE, NON-NATIVE SPECIES (includes a finding on Standard 3)

**Affected Environment:** The Bull Mountain Unit occurs within a mixed mountain shrubland community type that has seen various agricultural uses and surface disturbances over the last 100+ years. Recently, natural gas exploration and development activities have also been creating surface disturbances. Musk thistle (*Carduus nutans*) is widely scattered across the Unit and becomes quite noticeable on private property at the southwestern side of the Unit. Scattered Japanese brome (*Bromus japonicus*) and houndstongue (*Cynoglossum officinale*) are also common. Canada thistle occurs in more mesic (moist) sites. Other weeds in the vicinity of the project area and potentially becoming problematic in areas of surface disturbance include a non-native annual cheatgrass and limited patches of the non-native biennial forbs spotted knapweed (*Centaurea stoebe ssp. micranthos*) and diffuse knapweed (*Centaurea diffusa*), which currently infests the CDOT yard at the junction of CR 265 and SH 133. Other weeds minimally occurring in the general area include oxeye daisy (*Chrysanthemum leucanthemum*), scentless chamomile (*Matriciaria perforata*), whitetop (*Cardaria draba*), and yellow toadflax (*Linaria vulgaris*). Vegetative cover by noxious weeds in the general area is estimated at less than 1% of the total plant cover. For the past 8 years SG has annually treated noxious weeds on their pads, access roads, and pipeline corridors. Noxious weeds in these areas are relatively infrequent.

All of the weedy forbs listed above except cheatgrass are on the Colorado Department of Agriculture "List B" of noxious weeds in the state. These are defined as "weed species for which the Commissioner (in consultation with the state noxious weed advisory committee, local governments, and other interested parties) develops and implements state noxious weed management plans designed to stop their continued spread." Cheatgrass is a "List C" species for which a state noxious weed management plan will be developed in the future.

BLM_0018024

**Environmental Consequences/Mitigation:**

**Proposed Action** – The Proposed Action would create approximately 286.9 acres of construction disturbance and 125.9 acres of production disturbance. Surface-disturbing activities create conditions favorable for the invasion and establishment of noxious weeds and other invasive non-native species, particularly when these species are currently present in the surrounding area. Linear disturbance corridors from roads and pipelines (47.1 miles) can enhance the spread of invasive species.

Direct impacts to vegetation from weed infestations in the project area, if not treated, may reduce structural and native species diversity, result in the loss of wildlife habitat and rangeland productivity, and reduce the cover of desirable plant species.

Since musk thistle, Japanese brome, and Canada thistle are common in the immediate vicinity of the proposed pads and access roads, the potential for increased weed density and new weed invasions following construction disturbance would be high. It is very likely that weeds would be introduced into new areas where they were not previously found as a result of this Alternative. This threat would be reduced by mandatory noxious weed control (for A, B, and C listed species) which is required on pipeline corridors, well pads, and access roads for the life of the project in accordance with the Colorado Noxious Weed Act and the Gunnison River Watershed Integrated Weed Management Plan requirements.

Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts from invasive, non-native species. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for invasive species includes the greater Bull Mountain Unit area, as well as other nearby and relevant areas from which noxious weeds could be imported into the Unit, including the North Fork of the Gunnison River valley and the Roaring Fork valley. Within the Unit, it is reasonably foreseeable that the No Action Alternative would be implemented in conjunction with either the Proposed Action or Alternative 1. This would cumulatively add to impacts to vegetation communities which would increase the likelihood of noxious weed establishment. See the Vegetation section for a description of impacts to vegetation and thus habitat communities cumulatively impacted within the Unit.

In addition to added impacts within the Unit from implementation of the No Action Alternative, other disturbance would likely occur which could increase the risk of noxious weed establishment. Continued livestock grazing may place additional stressors on vegetation communities, which means that in some circumstances noxious weeds have more open ground to become established, or have less competition from adjacent native plant species. Widespread development of organic farms in the North Fork of the Gunnison River valley and recently in the Roaring Fork valley have created very favorable conditions for widespread noxious weed establishment, with limited treatment options. Non-chemical treatments are generally not as effective and noxious weed establishment and spread in these areas is cumulatively adding to seed sources for weeds. The presence of diffuse knapweed on CDOT's yard is a concern given the potential for widespread distribution of this weed with use of stockpiled gravels in the yard.

**Alternative 1** – Alternative 1 would create approximately 255.8 acres of construction disturbance and 121.4 acres of production disturbance, a reduction of approximately 31.1 construction and 4.5 production acres of disturbance as compared to the Proposed Action. Road and pipeline corridors would be 42.6 miles. The types of impacts and required mitigation and monitoring would be the same as for the Proposed Action. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts from invasive, non-native species. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The types of cumulative impacts from invasive, non-native species resulting from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. However, Alternative 1 would have 3.3 fewer miles of new or improved access roads and 6 fewer miles of pipelines than the Proposed Action, which would proportionally reduce the opportunity for the spread of non-native, invasive species during construction.

BLM_0018025

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. This additional development would create 131.3 acres of construction disturbance and 80.3 acres of long-term disturbance, a reduction of approximately 155.6 construction and 45.6 production acres of disturbance as compared to the Proposed Action. Mandatory noxious weed control would be required on pipeline corridors, well pads, and access roads for the life of the project in accordance with the Colorado Noxious Weed Act and the Gunnison River Watershed Integrated Weed Management Plan requirements and federal requirements on existing federal authorizations.

**Finding on the Public Land Health Standard for plant and animal communities** (partial, see also Wildlife, Aquatic; Wildlife, Terrestrial; and Vegetation): Based on the Land Health Assessment for the North Fork Landscape (BLM 2007), surface lands managed by the BLM have been identified as having some ongoing weed issues associated with the long-term use of the Spring Creek Trail as an existing (and historic) stock driveway that sees heavy cattle utilization, and is also an active OHV trail. There are a number of small noxious weed infestations on these BLM lands, likely associated with heavy and persistent cattle grazing pressure and disturbances. The Proposed Action would see a pipeline route and new access road crossing BLM lands that have existing noxious weed issues associated with the stock driveway. Noxious weeds are also common, but in low densities throughout the Unit. Providing mandatory weed management requirements are followed, including the continued treatment of weed species, the Proposed Action, Alternative 1, and No Action would not jeopardize the viability of any plant population, or substantially degrade the natural community as a result of the proliferation of non-native, invasive species. The project would have minor consequence on habitat condition, utility, or function, but would not have any discernible effect on species abundance or distribution at any landscape scale. Monitoring and effective compliance with equipment washing, decontamination efforts, and documentation of those preventative activities would be necessary to ensure that invasive plant and animal species are not accidentally introduced. The public land health standard would continue to be met.

## THREATENED, ENDANGERED, AND SENSITIVE SPECIES (includes a finding on Standard 4)

This section is divided into two discussions: Federally listed, proposed, or candidate threatened or endangered species (as listed under the Endangered Species Act), and BLM sensitive species. The analysis of the impacts addresses the geographic location and habitat characteristics of the project relative to species potentially present in the project vicinity. See the Biological Evaluation detailing wildlife use patterns in the area of the Bull Mountain Unit (Petterson 2012).

**Affected Environment:** Listed or candidate wildlife, fish and plant species that were considered and evaluated for this assessment include those identified by the UFO and the U.S. Fish and Wildlife Service (USFWS) as potentially occurring in Gunnison County (accessed December 2011). While all species were considered, only species which occur in the area, have suitable habitat, or for which the Bull Mountain Unit is within the range of the species were selected for additional evaluation due to direct, indirect, and/or cumulative impacts. See the Biological Evaluation (Petterson 2012) for the full list of species considered and evaluated.

The following habitats dominate the project area: 1) sagebrush, 2) mixed shrublands, 3) oakbrush, 4) riparian/emergent wetlands, 5) aspen, 6) irrigated hay meadows, and 7) upland grass meadows.

Information on species status, distribution, and ecology was derived from USFWS recovery plans, Colorado Natural Heritage Program database maps and reports, CPW habitat mapping (CPW 2011), personal knowledge of the author and reviewing BLM biologists, various scientific studies and reports, and correspondence with USFWS biologists.

Habitat surveys were conducted in the fall of 2007 through spring of 2011.

BLM_0018026

*Federally Listed, Proposed, or Candidate Threatened or Endangered Plant Species*

Habitat necessary for life requirements of federally listed, proposed, or candidate threatened or endangered plant species are not found within the Unit.

*BLM Sensitive Plant Species*

During field surveys for special status plant species, no sensitive plants species were observed, nor was suitable habitat present in the project area for any of these species.

*Federally Listed, Proposed, or Candidate Threatened or Endangered Animal Species*

Canada Lynx (*Lynx canadensis*): Federally Threatened Species – In Colorado, Canada lynx occupy high-elevation coniferous forests characterized by cold, snowy winters and an adequate prey base (Ruggiero et al. 1999). The preferred prey of Canada lynx throughout their range is the snowshoe hare (*Lepus americanus*). In the western United States, lynx are associated with mesic forests of lodgepole pine, subalpine fir, Engelmann spruce, and quaking aspen in the upper montane and subalpine zones, generally between 8,000 and 12,000 feet in elevation. Although snowshoe hares are the preferred prey, lynx also feed on other species such as pine squirrel (*Tamiasciurus hudsonicus*), and blue (dusky) grouse (*Dendragapus obscurus*).

The Canada Lynx Conservation Assessment and Strategy (LCAS, Ruediger et al. 2000, revised 2003) was developed to provide a consistent and effective approach to conserve Canada lynx on federal lands in the conterminous United States. The LCAS indicates that project planning should evaluate the effects to lynx habitat within designated Lynx Analysis Units (LAU) that are generally $\geq$ 25,000 acres in the southern Rocky Mountain Geographic Area. LAUs do not represent actual lynx home ranges, but their scale should approximate the size of an area used by an individual lynx. A major transportation route to the Bull Mountain Unit is SH 133, which passes through the Ragged Mountain LAU (RMLAU) and McClure Pass Lynx Linkage Area (MPLLA). As such, the USFWS (K. Broderdorp, USFWS, pers. comm. 2011) has requested that indirect effects from development of the Bull Mountain Unit be investigated for potential effects to Canada lynx.

The RMLAU comprises 20,174.5 acres or 31.5 square miles (USFS 2008). Mapped lynx habitat in LAU statistics only includes lands in federal ownership. Environmental baseline statistics of lynx habitat in the RMLAU are summarized in Table 21 and Crystal West LAU in Table 22 (after guidance in the Southern Rockies Lynx Amendment [USFS 2008]).

**Table 21. Existing Habitats within the Ragged Mountain LAU**

| Habitat Type | Acres | % |
|---|---|---|
| Primary Suitable | 8,638.1 | 43% |
| Secondary Suitable | 3,166.4 | 16% |
| Unclassified | 8,370.0 | 41% |
| **Total** | **20,174.5** | **100%** |

The RMLAU overlaps a small portion of the 27,034 acre MPLLA at the northern end of the LAU, linking the Huntsman Ridge area with habitats in the Crystal West, Crystal East, and Huntsman Mountain LAUs on the White River and GMUG National Forests. The McClure Pass LLA links suitable lynx habitats in the Elk Mountains to potential habitats on Huntsman Ridge and the Grand Mesa. SH 133 is within the McClure Pass Lynx Linkage Area.

The Crystal West LAU is a relatively large LAU at 97,535 acres, and is located on the White River National Forest. At this time the WRNF still utilizes habitat definitions previously described under the LCAS. The LCAS provides guidelines for the management of lynx habitat within LAUs, and recommends that at least 10% of an LAU be suitable Denning habitat, and the CWLAU is at 15%

BLM_0018027

Denning habitat. The LCAS also recommends that at least 6,500 acres of primary lynx habitat (Denning and Winter Foraging habitats) be available for lynx use; the CWLAU is at 35,392 acres.

Table 22. Existing Habitats within the Crystal West LAU

| Habitat Type | Acres | % |
|---|---|---|
| Winter Foraging | 20,789.8 | 21% |
| Denning | 14,602.8 | 15% |
| Other | 10,884.3 | 11% |
| Non-Habitat | 40,294.3 | 41% |
| Private | 10,963.2 | 11% |
| **Total** | **97,534.4** | **100%** |

Major existing land uses that may influence lynx habitat use within the Ragged Mountain LAU and McClure Pass LLA is generally limited to widespread livestock grazing, dispersed camping and infrequent trail use, relatively active fall big game hunting, and some limited winter-time snowmobile activities.

Colorado River Endangered Fish: Federally Endangered Species – The USFWS lists the humpback chub (*Gila cypha*), bonytail chub (*G. elegans*), Colorado pikeminnow (*Ptychocheilus lucius*), and razorback sucker (*Xyrauchen texanus*) as occurring in downstream waters in the Colorado River, and the Colorado pikeminnow and razorback sucker also occur in lower reaches of the Gunnison River, near the City of Delta down to the confluence with the Colorado River.

The Bull Mountain Unit is approximately 60 river miles upstream of the nearest designated critical habitat for the Colorado pikeminnow and razorback sucker and even further away for designated critical habitats for the humpback chub and bonytail in the mainstem of the Colorado River.

Greenback cutthroat trout (*Onchorhynchus clarkii stomias*): Federally Threatened Species – Genetic testing through the AFLP process has determined that populations of cutthroat trout in Roberts Creek and Dyke Creek (both creeks are tributaries in the Muddy Creek basin) are not Colorado River cutthroat trout (*Onchorhynchus clarkii pleuriticus*) lineages (CR lineage), but are actually greenback cutthroat trout lineages (C. Speas USFS pers. comm. 1/26/2010, D. Kowalski CPW 2010). The Roberts Creek population is 96% genetically pure greenback cutthroat trout and the Dyke Creek population is 98% genetically pure. Any population that shows at least 80% genetic purity would be subject to the requirements of the Endangered Species Act (C. Speas pers. comm. 1/26/2010, USFWS 2010). Fish sampling in Ault Creek revealed that there are no cutthroat trout within that creek (Petterson 2012). Cutthroat trout populations in Henderson Creek have not undergone the AFLP genetic testing process, but mitochondrial DNA testing has shown those trout to have greenback cutthroat trout lineage. Greenback cutthroat trout occur in clear, cold, high-gradient streams and creeks. They are extremely vulnerable to competition by non-native trout (e.g., brook trout [*Salvelinus fontinalis*]), which were accidentally released in the Clear Fork. Trout are also vulnerable to water depletions.

*BLM Sensitive Species*

Of the 31 UFO listed sensitive animal species known or likely to occur in or adjacent to the Bull Mountain Unit, most do not occur in the area- at least not on a regular basis, and most are listed as "unlikely" based on project location and habitat types. However, eight species are considered as "possibly" occurring, indicating a greater likelihood of occurrence, or "present," in that they are known to occur. These species are addressed below.

Northern Goshawk (*Accipiter gentilis*) – This raptor nests in subalpine spruce/fir, Ponderosa pine, aspen forests, and infrequently in mature pinyon/juniper woodlands, but may move to lower-elevation

BLM_0018028

woodlands during winter in search of prey. The Unit provides suitable nesting and foraging habitat for this species.

Bald Eagle (*Haliaeetus leucocephalus*) – Removed from the federal list of threatened or endangered species in August 2007, this large raptor is now considered a sensitive species and remains protected by the Bald and Golden Eagle Protection Act (BGEPA) as well as the Migratory Bird Treaty Act. Bald eagles roost during the winter months along Muddy Creek at the southern end of the Unit, but may scavenge on winter-killed big game species in upland areas in the Unit. Bald eagles are not known to occur in the area during the summer months.

Brewer's Sparrow (*Spizella breweri*) – This migrant is essentially a sagebrush obligate, although it may occasionally nest in other semi-desert shrublands. Sagebrush is a significant component of the habitat in the Unit, and this species is known to nest in the project area (Petterson 2012). This species does not occur in the area during the winter months (see the Migratory Birds Section).

Bat Species – Bats potentially found in the Unit include Townsend's big-eared bat (*Corynorhinus townsendii pallescens*), spotted bat (*Euderma maculatum*), and fringed myotis (*Myotis thysanodes*). All of these bat species may forage over shrublands typified by the sagebrush and pinyon-juniper woodlands occurring within the lower elevations and south-facing slopes in the Unit. However, these bat species require nearby rock outcrops, caves or mines (abandoned or active) for shelter; for fringed myotis and spotted bat, old buildings and larger trees with cavities will suffice. Rock outcrops occur at the southern end of the Unit, near the West Muddy Creek and East Muddy Creek canyons, but no direct or indirect impacts to these outcrops would occur.

Leopard Frog (*Lithobates pipiens*) – This species occurs in the Unit in irrigated meadows, riparian areas and creeks, and prefers sunny, grassy wetlands. It requires abundant aquatic vegetation for breeding and adjacent semi-aquatic vegetation for cover when adults disperse short distances to feed. Leopard frogs feed primarily on emergent adults of aquatic insects or on terrestrial insects attracted to the water.

**Environmental Consequences/Mitigation:**

**Proposed Action –**

*Federally Listed, Proposed, or Candidate Animal Species*

Canada Lynx – The Proposed Action would have no direct or indirect impact to suitable lynx habitat, but the Proposed Action would result in increased traffic over McClure Pass through a Lynx Linkage Area. The additional 160 vehicle trips per day generated during construction of roads and pipelines, and 108 trips per day during drilling and construction of pipelines for the Proposed Action would mostly occur during the summer, would be mostly during the daylight hours, and would not increase traffic beyond the 2,000 vehicles per day threshold. Based on information provided by SG, only 25% of all vehicle trips or approximately 40 vehicle trips per day would be anticipated to be traveling through the McClure Pass linkage area during the development of this project. While a 3% increase in vehicle traffic traveling State Highway (SH) 133 does increase potential for vehicle collision with lynx potentially crossing the highway, the project is not anticipated to cause an increase above the 2,000-vehicle-per-day threshold at which it is believed that lynx are impeded from moving across the highway. Lynx should therefore still be able to cross SH 133 unimpeded (Petterson 2012). The lynx's ability to disperse through the McClure Pass Lynx Linkage Area would be maintained and habitat fragmentation would not be created by the anticipated increased traffic. Lynx habitat in the greater McClure Pass area is generally unsuitable or marginal, and it is relatively unlikely that lynx would establish a home range there. Given these poor habitat conditions, impacts to lynx are likely discountable. While the indirect effects associated with the proposed action or alternative 1 are likely discountable none the less they are present therefore a determination of *"may affect, and is not likely to adversely affect"* is warranted for the Proposed Action.

BLM_0018029

Endangered Colorado & Gunnison River Fishes – Given SG's use of BMPs for construction and maintenance, it is highly unlikely that the Proposed Action would have direct negative impacts to the four endangered Colorado River fish species due to water quality impacts. However, some isolated events may occur which release sediments. Such events would have no effect on the listed fish due to the presence of Paonia Reservoir, which would likely capture any released sediment loads. The distance and diluting abilities of Muddy Creek, Paonia Reservoir and the North Fork of the Gunnison River to occupied or critical habitats would mean that there would be no impact to these species from sediments or reasonably foreseeable contaminant (chemical) spills.

Water depletions are a potential source of impacts to fish. The types of water depletions considered in this EA are summarized in Table 23 and include:

- Water used for access road dust abatement
- Water used for road and pad construction (for moistening of aggregate for compaction)
- Water used to drill and complete wells (lubrication, circulation and cementing)
- Water for hydraulic fracturing
- Water used for connected actions (construction of a pipeline, road, or utility line)

Table 23. Total Water Use under the Proposed Action

| Type of Water Use | Acre-feet per well | Acre-feet, 146 wells |
|---|---|---|
| Construction, roads | NA | 62.90 |
| Pipelines | NA | 0.53 |
| Construction, pads | NA | 116.00 |
| Drilling & cementing | 0.32 | 48.33 |
| Hydraulic fracturing recycled water | 16.24 | 2,371.10 |
| Hydraulic fracturing fresh water | 6.96 | 1,016.21 |
| **Total all fluids** | **23.52** | **3,615.07** |
| **Total fresh water** | **7.28** | **1,064.54** |

Notes: Hydraulic fracturing based on 6 treatments/well, 22.1 miles of pipelines, and 12.2 miles of new roads

As the Unit would be developed over 6 years, the total fresh water acre-feet (ac-ft) depletions would be roughly spread out during this time period, resulting in fresh water annual consumptive depletions of 177.6 ac-ft for the Proposed Action. If development of the Unit were to take longer than 6 years, then the annual water depletion amount would decrease accordingly. Based on data from the USGS gauging station (#09130500), the mean annual discharge rate of East Muddy Creek near Bardine (1935-1953) varied from a low of 54.0 cfs (39,066 ac-ft per year) in 1940 to a high of 135.0 cfs (97,504 ac-ft per year) in 1938 (see the hydrology assessment for the Unit Master Development Plan [Berry 2011]). Therefore, if this water were removed directly from East Muddy Creek, maximum water depletion from the Proposed Action and Alternative 1 for East Muddy Creek ranges from about 0.5% of the average annual discharge during a dry year to 0.2% of the discharge during a wet year. SG has secured previously appropriated water for this project; as such, no "new" water would be depleted from the Muddy Creek system as a result of the construction and drilling phase of this project.

Net water depletions are actually expected to be lower given SG's water augmentation plan (Berry 2011). However, the USFWS considers <u>any</u> net water depletion which could decrease instream flows to have direct and/or indirect impact to the four Colorado River endangered fish species. Therefore the Proposed Action "*may affect, and is likely to adversely affect*" the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub. In May 2008, the BLM prepared a Programmatic Biological Assessment (PBA) that addresses water-depleting activities associated with the BLM's fluid minerals program in the Colorado River Basin in Colorado. In response to the BLM's PBA, the FWS issued a Programmatic Biological Opinion (PBO) (ES/GJ-6-CO-08-F-0006) on December 19, 2008, which determined that BLM water depletions from the Colorado River Basin are not likely to jeopardize the

BLM_0018030

continued existence of the Colorado pikeminnow, humpback chub, bonytail, or razorback sucker, and that BLM water depletions are not likely to destroy or adversely modify designated critical habitat.

A Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin was initiated in January 1988. The Recovery Program serves as the reasonable and prudent alternative to avoid jeopardy and provide recovery to the endangered fishes by depletions from the Colorado River Basin. The PBO addresses water depletions associated with fluid minerals development on BLM lands, including water used for well drilling, hydrostatic testing of pipelines, and dust abatement on roads. The PBO includes reasonable and prudent alternatives developed by the FWS which allow BLM to authorize oil and gas wells that result in water depletion while avoiding the likelihood of jeopardy to the endangered fishes and avoiding destruction or adverse modification of their critical habitat. As a reasonable and prudent alternative in the PBO, FWS authorized BLM to solicit a one-time contribution to the Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin (Recovery Program) in the amount equal to the average annual acre-feet depleted by fluid minerals activities on BLM lands.

This project has been entered into the Uncompahgre Field Office fluid minerals water depletion log which will be submitted to the Colorado State Office at the end of each fiscal year.

SG is already a signatory to the Endangered Fish Recovery Agreement (USFWS 1999), which is considered to be appropriate compensatory mitigation for likely foreseeable impacts, and because of this as well as possible USFWS-coordinated timed releases from augmenting water sources for the maintenance of instream flows (e.g., additional waters released from the Aspinall Unit), the impacts of additional water depletions could be mitigated by SG and the BLM, which would therefore make their activities compliant with the 1999 Programmatic BO and Recovery Agreement and ensure continued recovery of these listed fish species.

Greenback Cutthroat Trout – There would be no activities within the Henderson, Roberts, or Spring Creek drainages. Water depletions from the Ault Creek drainage and from Bainard Reservoir would have no impact on known greenback cutthroat trout lineage (GB lineage) fish or known occupied habitats.

The construction and operation of the features in the Proposed Action, including new roads, pipelines, pads, and associated water depletions would have "*no effect*" to greenback cutthroat trout given the use of Best Management Practices and applicant-committed mitigation. The Proposed Action would not impact conservation population levels or fish densities in nearby tributaries to East Muddy Creek.

*BLM Sensitive Species*

Northern Goshawk – Proposed development activities would have periods which involve loud noises with high levels of activity, but generally lasting for a few months during the spring, summer, and fall in any given area. The Proposed Action would have short-term development impacts directly impacting 13.3 acres, and permanently impact 3.7 acres of aspen and aspen/oak habitats, but would not impact mixed conifer habitats. Another 185.2 acres would have short-term indirect impacts through noise, human activities, and pipeline construction in suitable goshawk habitats. Approximately 136.6 acres around pads and access roads and other suitable goshawk habitats would have long-term, lower-intensity indirect impacts, which would likely keep goshawk from nesting within this area, and may also diminish habitat effectiveness for foraging, but would not entirely preclude use in these areas.

The habitats directly and indirectly impacted are relatively poor quality for goshawk nesting, and moderate quality for foraging. With suitable prey-bases and widespread forested habitat types beyond the Unit area, goshawk could still likely forage within the Unit. Outside of the summer reproduction and nesting season, northern goshawk could still encounter low levels of human activity during the winter months, which would have negligible impacts to goshawk given the small footprint of activities proposed and widespread foraging habitats available during the winter.

BLM_0018031

The Proposed Action "*may adversely impact individuals, but is not likely to result in a loss of viability on the planning area, nor cause a trend to federal listing or a loss of species viability range-wide,*" but nesting raptor surveys should occur to identify potential nesting activities.

Bald Eagle – Under the Propose Action, the short-term construction phase would see approximately 69.7 acres of surface impacts within CPW mapped bald eagle winter ranges, or approximately 2.3% of available mapped winter ranges within the Unit. Long-term, there would be approximately 27.6 acres of surface impacts (0.9% of available mapped habitats). One pipeline would cross East Muddy Creek within winter ranges. The actual construction, drilling, and development of these facilities would likely occur during the summer months, well outside of the time period when bald eagles would be in the area. Therefore, no impact to wintering bald eagles would likely occur due to construction activities. Aside from one pipeline crossing, these activities would occur well away from large cottonwoods and suitable roost trees near East Muddy Creek. The pipeline crossing, if it is open-trenched and not bored, would likely be completed during the low-flow period of early winter, and it is possible that roosting bald eagles in the area would be disturbed and vacate the area during construction. Boring operations could occur during higher flow periods in the summer months. The main impact of development to bald eagles under the Proposed Action could result from a re-distribution of wintering elk and deer in the area and therefore potential scavenging opportunities for eagles. While this may indeed occur near pads and roads, deer and elk would still likely be in the general area, perhaps even closer to East Muddy Creek. The high mobility of bald eagles would still allow them to easily find and feed on any carrion in the general area, and no reduction in winter foraging habitat would be expected.

Because of the potential disturbance to roosting bald eagles during construction of the pipeline crossing of East Muddy Creek (for about 5 days if the creek is crossed during the winter months), and no other likely or foreseeable impacts, the Proposed Action "*may adversely impact individuals, but is not likely to result in a loss of viability on the planning area, nor cause a trend to federal listing or a loss of species viability range-wide.*"

Brewer's Sparrow – The Proposed Action would create short-term construction related impacts to 138 acres (0.7% of available habitats in the Unit) and direct long-term production impact to 71.4 acres of sagebrush habitats. It is assumed that over 10 years or so, most of the cleared pipeline corridors and other temporary-use areas in sagebrush-dominated habitats would begin to support smaller sagebrush plants. However, in some circumstances where landowners choose to plant non-native grasses and forbs, the recovery of sagebrush plants in these temporarily disturbed acres may take much longer due to competitive exclusion of sagebrush.

Most construction activities would occur during the snow-free months when sparrows are in various stages of reproduction. Adult sparrows would easily be able to avoid any clearing of sagebrush plants, and therefore there would be no anticipated direct impacts to adult birds (i.e., mortality). However, sagebrush-clearing activities occurring during the nesting period (late May through early July) may result in the take of nests (i.e., eggs or nestlings).

Indirect impacts to Brewer's sparrow would result from avoidance of nesting in sagebrush habitats near the access roads, construction areas, and active drilling sites during the construction process; however, they may still forage near roads and other active areas. The Proposed Action "*may adversely impact individuals, but is not likely to result in a loss of viability on the planning area, nor cause a trend to federal listing or a loss of species viability range-wide.*"

Bat Species – The Unit provides suitable foraging habitat for the listed sensitive bat species, and while there would be some loss of foraging habitat, the project's impact to potential foraging areas would be very minor given the range of these species and their preference for lower elevation habitats. As bats require free water on a daily basis, any un-netted cuttings pits, flowback pits, or other available fluid storage areas would likely be used by bats for drinking. If these pits contain substances toxic to bats and

BLM_0018032

are not netted during the summer months (when bats are active), it is highly likely that bats would drink from these fluid storage areas, resulting in likely adverse effects. The Proposed Action would likely result in *no adverse impacts to these species, and would not result in a loss of viability on the planning area, nor cause a trend to federal listing or a loss of species viability range-wide*.

<u>Northern Leopard Frog</u> – The Proposed Action would have two pad sites and associated facilities located within irrigated pastures, and would also result in direct construction related impacts to 15.6 acres of wetlands and irrigated pastureland habitats (0.1% of available habitats in the Unit). Long-term production impacts would occur on 6.5 acres of potential frog habitats. The potential take of individual frogs could result from trampling or direct mortality during summer construction and development periods, as well as from substances hazardous to aquatic resources and frogs washing off of pad sites or roads and into suitable aquatic habitats. Some temporary diminished habitat effectiveness would occur in wetlands crossed by pipeline corridors. Stormwater sedimentation from roads would result in indirect impacts to wetlands and frog habitat. Water depletions from area ponds and reservoirs would also occur during construction and well development/completion periods, possibly impacting eggs, larvae, and foraging habitats for adults. As northern leopard frogs are hibernating during the winter months, wintertime activities on roads and pads would have no impact. The Proposed Action *"may adversely impact individuals, but is not likely to result in a loss of viability on the planning area, nor cause a trend to federal listing or a loss of species viability range-wide."*

Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to Threatened, Endangered, and Candidate species. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for special status species includes the greater areas of influence for the species in question. For most species this would be the greater Bull Mountain Unit area and surrounding lands, but for more wide-ranging species, such as lynx, the cumulative impacts assessment area would include suitable habitats within the greater West Elk Mountains and the Grand Mesa. For Colorado River fish species, the cumulative impacts assessment area includes the upper Colorado and Gunnison River basins. Cumulative impacts to special status species would result from SG's continued operation of federal and fee/fee wells and likely development of fee/fee wells as described under the No Action Alternative, in conjunction with the Proposed Action. Other cumulative impacts to wildlife species would result from development of other leases within the greater Muddy Creek basin. However, the mere existence of natural gas leases in the basin does not mean that they would all be developed. Nevertheless, SG and Gunnison Energy are pursuing the development of other leases within the area (see the Cumulative Impacts section for a description of these projects).

Other cumulative impacts would come from the widespread agricultural operations, particularly from cattle and sheep grazing, water diversion projects for irrigation waters, and the widespread conversion of sagebrush shrublands to irrigated hay fields. These impacts have reduced habitats and indirectly reduced habitat effectiveness for many species, and have dramatically reduced instream water levels for fish species. Livestock grazing reduces native plant cover and diversity, and can have negative impacts to riparian systems if not managed correctly. Recently, development of organic farms has increased the presence of noxious weeds in many agricultural areas, which have the potential of spreading into native habitats. More extensive trails systems and higher use levels of trails by mountain bikers, hikers, and OHVs introduces more regular human disturbances, noise, and a loss of habitat effectiveness around trails. In some very popular trail areas, diurnal wildlife use can be significantly reduced because of trail use patterns. While hunting of big game species is an impact, the numbers of hunters and timing of hunting seasons has remained relatively stable.

BLM_0018033

The widespread OHV use associated with hunting is a relatively recent occurrence that has introduced a new type of impact, and has likely changed hunter densities in some areas, and reduced hunter densities in other areas. Area coal mines and associated ancillary facilities has had localized, but intensive impacts to habitats. Indirect impacts from coal imines have included increased traffic, noise and fugitive lighting, which can have direct and indirect negative impact to wildlife and their habitats.

Table 24 presents the modeled indirect impact areas under the Proposed Action with the reasonably foreseeable implementation of the No Action Alternative. Please refer to the BE for a description of the GIS-based indirect impact modeling procedure utilized (Petterson 2012).

**Table 24. Cumulative Modeled Impact to Habitats, Proposed Action + No Action**

| Vegetation Type | Existing Conditions | | Construction Impacts | | Production Impacts | |
|---|---|---|---|---|---|---|
| | Acres | %[1] | Acres | % | Acres | % |
| Aspen | 1,123.9 | 5.7% | 159.9 | 14.2% | 131.5 | 11.7% |
| Aspen/Conifer | 12.3 | 0.1% | 0.0 | 0.0% | 0.0 | 0.0% |
| Aspen/Oak | 768.8 | 3.9% | 57.6 | 7.5% | 57.8 | 7.5% |
| Disturbed Area | 174.7 | 0.9% | 44.7 | 25.6% | 93.4 | 53.4% |
| Irrigated Meadow | 1,981.0 | 10.1% | 619.5 | 31.3% | 521.1 | 26.3% |
| Meadow | 552.6 | 2.8% | 208.0 | 37.6% | 260.8 | 47.2% |
| Mixed Conifer | 62.5 | 0.3% | 4.7 | 7.5% | 2.1 | 3.3% |
| Mixed Mountain Shrub | 1,753.5 | 8.9% | 189.6 | 10.8% | 134.1 | 7.7% |
| Oakbrush | 3,991.5 | 20.3% | 562.5 | 14.1% | 463.5 | 11.6% |
| Pinyon/Juniper | 129.3 | 0.7% | 3.0 | 2.3% | 0.0 | 0.0% |
| Riparian Woodland | 87.3 | 0.4% | 11.7 | 13.4% | 13.2 | 15.1% |
| Rock Outcrop | 1.5 | 0.0% | 0.0 | 0.0% | 0.0 | 0.0% |
| Sagebrush | 8,257.4 | 42.0% | 2,448.1 | 29.6% | 2,573.8 | 31.2% |
| Wetland/Riparian Area | 671.8 | 3.4% | 122.3 | 18.2% | 154.9 | 23.1% |
| Willow | 16.1 | 0.1% | 2.1 | 13.2% | 3.5 | 22.0% |
| Open Water | 88.8 | 0.5% | 11.8 | 13.2% | 14.2 | 15.9% |
| **Total** | **19,673.0** | **100.0%** | **4,445.5** | **22.6%** | **4,423.9** | **22.5%** |

Cumulative impacts would result in additional direct surface impacts as well as increased indirect impacts to wildlife, wildlife habitats, and species ability to utilize otherwise available habitats which are adjacent to roads, pad sites, flowback pits, and to a lesser extent pipeline construction corridors. Under the Proposed Action, total modeled indirect impacts to area habitats would be approximately 34.5% of the Unit, and under Alternative 1, modeled indirect impacts totaled 31.3% of the Unit area. Other cumulative impacts to species and their habitats within the greater Muddy Creek area include cattle and sheep grazing on private lands within the Unit, and on public lands outside of the Unit. With sheep grazing the use of guard dogs is needed to reduce coyote and bear predation, but this can have additional ancillary impacts to other species such as deer, elk, rabbits and hares, other small mammals, and ground-nesting birds. Livestock grazing reduces upland foliar cover and can have significant impacts to riparian and wetland areas through hoof action, reductions in wetland foliar cover, loss of wetland and riparian habitats (through root damage and bank cutting), increased water temperatures and increased silt deposition to aquatic environments. Livestock manure decreases water quality. Irrigation for hay and agricultural crop production reduces instream water levels, decreases water quality, increases water temperatures, and reduces the cover of native wildlife habitats.

Treatment of noxious weeds is common inside and outside of the Unit, and while the benefits of keeping noxious weed cover down dramatically outweigh the deleterious impacts to non-target species, some reductions in native forbs would be likely.

BLM_0018034

Local ranches within and adjacent to the Unit also commonly use widespread application of herbicides to kill shrubby species, including sagebrush, snowberry, rabbitbrush, Gambel's oak, Utah serviceberry, and chokecherry to increase foraging potential for livestock. This can reduce foliar cover of important wildlife forage species, and reduce nesting habitats and refugia for wildlife.

Ranches within the Unit have used mowing to reduce the foliar cover of sagebrush in order to increase foraging potential for livestock. This too can have deleterious impacts to shrubby species and wildlife species that forage and seek shelter in sagebrush communities.

Increased traffic on SH 133 and CR 265 from recreationists, travelers, and from other natural gas development activities can also have negative impacts to wildlife habitat connectivity, dispersal of wildlife species, and utilization of adjacent habitats. Direct mortality from vehicle strikes also occurs, especially during the winter months when big game species congregate at lower elevations near SH 133.

**Alternative 1** – Alternative 1 would have the same types of impacts to individual species, and the same overall determination of impacts as the Proposed Action. Potential changes to the level of impact are described by species.

*Federally Listed, Proposed, or Candidate Animal Species*

Canada Lynx – Alternative 1 would result in an additional 160 vehicle trips per day during road and well pad construction, and 108 vehicle trips per day during drilling and pipeline construction, the same as the Proposed Action; however, as discussed for the Proposed Action, it is relatively unlikely that a lynx would be struck by a vehicle given the poor lynx habitat in the greater area.

Endangered Colorado & Gunnison River Fishes – Alternative 1 would result in annual fresh-water depletions of approximately 177.6 ac-ft (equal to the Proposed Action), and are summarized in Table 25. Net water depletions are expected to be much lower given SG's water augmentation plan.

**Table 25. Total Water Use under Alternative 1**

| Type of Water Use | Acre-feet per well | Acre-feet, 146 wells |
|---|---|---|
| Construction, roads | NA | 56.71 |
| Pipelines | NA | 0.38 |
| Construction, pads | NA | 116.00 |
| Drilling and cementing | 0.32 | 48.33 |
| Hydraulic fracturing recycled water | 16.24 | 2,371.10 |
| Hydraulic fracturing fresh water | 6.96 | 1,016.21 |
| **Total all fluids** | **23.52** | **3,608.75** |
| **Total fresh water** | **7.28** | **1,064.54** |

Notes: Hydraulic fracturing based on 6 treatments/well for 146 wells, 16.1 miles of pipelines, and 11.0 miles of new roads.

Greenback Cutthroat Trout – There would be no activities within the Henderson, Roberts, or Spring Creek drainages. Water depletions from the Ault Creek drainage and from Bainard Reservoir would have no impact on known greenback cutthroat trout lineage fish or known occupied habitats.

The construction and operation of the features in Alternative 1, including new roads, pipelines, pads, and associated water depletions would have "*no effect*" to greenback cutthroat trout given the use of Best Management Practices and applicant-committed mitigation. Alternative 1 would not impact conservation population levels or fish densities in nearby tributaries to East Muddy Creek.

*BLM Sensitive Species*

Northern Goshawk – Alternative 1 has only one proposed pad site within marginally suitable goshawk habitat, the ALT 12-89-4 #2, and two pads in even more marginal habitats, the ALT 12-89-9 #1 and the

BLM_0018035

ALT 11-89-8 #1. The development of the one pad within and two pads as well as associated infrastructure in close proximity to goshawk habitats (aspen, aspen/conifer, and aspen/oak) would temporarily impact 15.1 acres (1.8 acres more than the Proposed Action) and permanently impact 6.5 acres of aspen and aspen/oak habitats (2.8 acres more than the Proposed Action), and would indirectly impact another 170.7 acres of aspen and aspen/oak habitats (14.5 acres less than the Proposed Action) through noise and human activities, which would likely keep goshawk from nesting within this area and may also diminish habitat effectiveness in this area. Long-term, indirect impacts to goshawk habitats would be 15.7 acres more impact under Alternative 1.

Bald Eagle – Alternative 1 would see the development of 9 pad sites, and a pipeline crossing of East Muddy Creek, very similar in scope and extent to the Proposed Action. There would be 62.0 acres of construction impacts (7.7 acres less than the Proposed Action) and 27.5 acres of long-term impacts (0.1 acres less than the Proposed Action) within CPW-mapped bald eagle Winter Foraging and Winter Range.

Brewer's Sparrow – Alternative 1 would have 111.2 acres of temporary impacts from construction activities (26.8 acres less than the Proposed Action) as well as direct long-term production-related impacts to 62.9 acres of sagebrush habitats (8.6 acres less than the Proposed Action) from road and pad construction.

Bat Species – Alternative 1 would have the same level and types of impacts as the Proposed Action.

Northern Leopard Frog – Alternative 1 would have two pad sites located within irrigated pastures, and would also result in direct construction-related impacts to 17.7 acres of wetlands and irrigated pastureland habitats (2.4 acres more than the Proposed Action). Long-term production impacts would be 9.1 acres (2.6 acres more under Alternative 1).

**Table 26. Cumulative Modeled Impact to Habitats- Alternative 1 + No Action**

| Vegetation Type | Existing Conditions | | Construction Impacts | | Production Impacts | |
|---|---|---|---|---|---|---|
| | Acres | %[1] | Acres | % | Acres | % |
| Aspen | 1,123.9 | 5.7% | 103.0 | 9.2% | 109.9 | 9.8% |
| Aspen/Conifer | 12.3 | 0.1% | 0.0 | 0.0% | 2.1 | 17.2% |
| Aspen/Oak | 768.8 | 3.9% | 98.5 | 12.8% | 100.1 | 13.0% |
| Disturbed Area | 174.7 | 0.9% | 45.6 | 26.1% | 91.8 | 52.5% |
| Irrigated Meadow | 1,981.0 | 10.1% | 664.5 | 33.5% | 611.3 | 30.9% |
| Meadow | 552.6 | 2.8% | 147.6 | 26.7% | 232.2 | 42.0% |
| Mixed Conifer | 62.5 | 0.3% | 4.6 | 7.3% | 3.3 | 5.3% |
| Mixed Mountain Shrub | 1,753.5 | 8.9% | 166.3 | 9.5% | 157.1 | 9.0% |
| Oakbrush | 3,991.5 | 20.3% | 476.4 | 11.9% | 451.6 | 11.3% |
| Pinyon/Juniper | 129.3 | 0.7% | 3.0 | 2.3% | 0.0 | 0.0% |
| Riparian Woodland | 87.3 | 0.4% | 9.3 | 10.7% | 8.5 | 9.8% |
| Rock Outcrop | 1.5 | 0.0% | 0.0 | 0.0% | 0.0 | 0.0% |
| Sagebrush | 8,257.4 | 42.0% | 2,100.5 | 25.4% | 2,345.7 | 28.4% |
| Wetland/Riparian Area | 671.8 | 3.4% | 117.2 | 17.5% | 154.4 | 23.0% |
| Willow | 16.1 | 0.1% | 4.7 | 29.4% | 6.6 | 40.7% |
| Open Water | 88.8 | 0.5% | 14.6 | 16.4% | 16.6 | 18.7% |
| **Total** | **19,673.0** | **100.0%** | **3,956.0[2]** | **20.1%[2]** | **4,291.2** | **21.8%** |

[1] Percentage of total Bull Mountain Unit

[2] Use of an existing road during construction and drilling would reduce overall surface disturbance compared to production.

Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts Threatened, Endangered, and Candidate species. In addition, BLM may attach site-specific COAs to the APDs.

BLM_0018036

**Cumulative Impacts** – The types of cumulative impacts to special status species from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. However, Alternative 1 would have 3.3 fewer miles of new or improved access roads and 6 fewer miles of pipelines than the Proposed Action, with proportionately less impacts to wildlife habitat during construction and corresponding reductions in vehicle traffic and noise during construction and production.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. The No Action Alternative would have the same types of impacts to individual species, and the same overall determination of impacts as the Proposed Action and Alternative 1. Potential changes to the level of impact are described by species.

*Federally Listed, Proposed, or Candidate Animal Species*

Canada Lynx – An additional 54 vehicle trips per day would be generated under the No Action Alternative, 36 less than the Proposed Action or Alternative 1. It is relatively unlikely that a lynx would be struck by a vehicle given the poor lynx habitat in the greater area.

Endangered Colorado & Gunnison River Fishes – The No Action Alternative would result in annual fresh water depletions of approximately 80 ac-ft (97.6 ac-ft less than the Proposed Action), and are summarized in Table 27. Net water depletions are expected to be much lower given SG's water augmentation plan.

**Table 27. Total Water Use under No Action Alternative**

| Type of Fluid Use | Acre-feet per well | Acre-feet, 66 wells |
|---|---|---|
| Construction, roads | NA | 14.95 |
| Pipelines | NA | 0.27 |
| Construction, pads | NA | 38.67 |
| Drilling & cementing | 0.32 | 17.72 |
| Hydraulic fracturing recycled water | 16.24 | 1,071.84 |
| Hydraulic fracturing fresh water | 6.96 | 459.36 |
| **Total all fluids** | **23.52** | **2,062.17** |
| **Total fresh water** | **7.28** | **480.48** |

Notes: Hydraulic fracturing based on 6 treatments/well, 66 wells, 11.3 miles of pipelines, and 2.9 miles of new roads.

Greenback Cutthroat Trout – Greenback cutthroat trout lineage fish occur nearby in Roberts, Henderson, and other tributaries to East Muddy Creek. The construction and operation of the features in the No Action Alternative *"may affect, and are not likely to adversely affect"* greenback cutthroat trout lineage fish due to a pipeline crossing of the GB lineage occupied Roberts Creek. These impacts would be very short in duration, and would require implementation of construction-related proactive impact minimization measures.

*BLM Sensitive Species*

Northern Goshawk – Under the No Action Alternative, the only direct impacts to potentially suitable goshawk nesting habitat would be associated with the FSB 11-89-7 #1 pad site, road and pipeline. The rest of the activities would occur outside of suitable goshawk nesting and effective foraging habitats. Approximately 3.6 acres of construction-related and 0.8 acres of long-term production impacts (respectively 9.7 and 2.9 acres less than the Proposed Action) to aspen, aspen/oak and mixed conifer vegetation types which could support goshawk nesting habitats would result from development.

Bald Eagle – Under the No Action Alternative, a small segment of road and half of one pad (Eck 12-90-1 #1) would be located at the far western edge of the bald eagle winter range boundary. Approximately 4.4

BLM_0018037

acres of construction-related impacts would occur in mapped bald eagle Winter Range and Winter Foraging habitats, representing 0.2% of CPW-mapped available habitats in the Unit. Given the lack of gas development activities near East Muddy Creek, and even within a mile of the creek, the No Action Alternative would have no realized impact to bald eagles roosting along the creek during the winter months. Further, given the low level of gas development activities near Muddy Creek, big game use of winter ranges near the creek would likely continue with little change, and bald eagle scavenging opportunities for winter-kill or road-kill along SH 133 and East Muddy Creek would see no change from implementation of the No Action Alternative.

Brewer's Sparrow – The No Action Alternative would involve approximately 60 acres of temporary construction-related impacts (78 acres less than the Proposed Action) through the clearing of sagebrush habitats through the construction of roads, pads, flowback pits, pipelines and other surface appurtenances. Long-term production impacts would result in approximately 13.7 acres of impacts to sagebrush habitats (57.7 acres less than the Proposed Action).

Bat Species – The type of impacts from the No Action Alternative on these species and their habitats would be the same as the Proposed Action.

Northern Leopard Frog – From roads and pads, there would be approximately 26.3 acres of construction-related temporary disturbances (11 acres more than the Proposed Action) associated with pipelines and other temporary disturbances in suitable frog habitats. Additionally, there would 6.8 acres of long-term production-related impacts (0.3 acres less than the Proposed Action) to suitable frog habitats.

**Finding on the Public Land Health Standard for Threatened & Endangered Species:** Based on the Land Health Assessment for the North Fork Landscape (BLM 2007), the main issues regarding species of concern with potential cumulative impacts from this project are associated with water use and habitat connectivity. Currently, there are water quantity and quality issues associated with water diversion for agriculture in the lower North Fork and Uncompahgre watersheds. Irrigation-related reductions of instream flows and poor water quality from irrigation water return flows are hampering endangered fish recovery efforts in the Uncompahgre and North Fork Rivers (USFWS 2008). Non-native fish and irrigation practices in upper reaches of the North Fork are threatening native cutthroat trout (GB lineage) and bluehead suckers. The other issue to which development of the Unit could contribute is lynx habitat connectivity on McClure Pass. However, based on the protective stipulations listed in the Proposed Action and Alternative 1, neither would jeopardize the viability of any population of special status animal species due to habitat loss, modification, fragmentation, or indirect effects. The project would not have substantial impacts on habitat condition, utility, or function or any discernible effect on species abundance or distribution at a landscape scale. Public land health standard 4 would continue to be met.

## MIGRATORY BIRDS

**Affected Environment:** The Migratory Bird Treaty Act (MBTA), established in 1918, made it unlawful to pursue, hunt, kill, capture, possess, sell, purchase, or barter any migratory bird, including the feathers or other parts, nests, eggs, or migratory bird products. In addition, Executive Order 13186 set forth the responsibilities of federal agencies to implement further the provisions of the Act by integrating bird conservation principles and practices into agency activities and by ensuring that federal actions evaluate the effects of actions and agency plans on migratory birds.

As used in the MBTA, "migratory birds" include native resident species that remain in an area throughout the year as well as migrant species that move from northern to southern latitudes and from higher to lower elevations to avoid winter conditions and a seasonal shortage of suitable food.

For most migrant and native resident species, nesting habitat is of special importance because it is critical for supporting reproduction in terms of both nesting sites and food. Also, because birds are generally

BLM_0018038

territorial during the nesting season, their ability to access and utilize sufficient food is limited by the quality of the territory occupied. During non-breeding seasons, birds are generally non-territorial and able to feed across a larger area and wider range of habitats.

Among the wide variety of species protected by the MBTA, special concern is usually given to the following groups:

- Species that migrate across long distances.

- Birds of prey, which require large areas of suitable habitat for finding sufficient prey.

- Species that have narrow habitat tolerances and hence are vulnerable to extirpation from an area as a result of a relatively minor habitat loss.

- Species that nest colonially and hence are vulnerable to extirpation from an area as a result of minor habitat loss.

BLM Instruction Memorandum No. 2008-050 provides guidance toward meeting the agency's responsibilities under the MBTA. This guidance directs Field Offices to promote the maintenance and improvement of habitat quantity and quality for migratory birds of conservation concern to avoid, reduce, or mitigate adverse impacts on their habitats to the extent feasible and in a manner consistent with regional or statewide bird conservation priorities. Because of the many species of migratory birds potentially present within Field Office boundaries, BLM has focused its protection on species listed by the USFWS as Birds of Conservation Concern (BCC). This listing resulted from the 1988 amendment to the Fish and Wildlife Conservation Act, which mandates USFWS to "identify species, subspecies, and populations of all migratory nongame birds that, without additional conservation actions, are likely to become candidates for listing under the Endangered Species Act (ESA) of 1973." A complete listing is available in the Biological Evaluation (Petterson 2012). Table 28 lists those species that occur or have a potential to occur within the Field Office.

Table 28. Migratory Birds in the Uncompahgre Field Office

| Common Name | Habitat Description | Range & Status in UFO | Potential and/or Occurrence in Project Area |
|---|---|---|---|
| American bittern (*Botarurus lentiginosus*) | Marshes and wetlands, ground nester | Spring/summer resident | Suitable habitat is limited, not likely occurring |
| Bald eagle (*Haliaeetus leucocephalus*) | Nests in forested rivers and lakes, winters along major rivers, uses uplands more | Fall/winter resident, no breeding | See assessment under Sensitive Species |
| Ferruginous hawk (*Buteo regalis*) | Open, rolling terrain in grasslands, shrubsteppe, agricultural meadows | Fall/winter resident | Possible migrant through area |
| Golden eagle (*Aquila chrysaetos*) | Open county, grasslands, woodlands and barren areas in hilly or mountainous terrain. Nests on cliffs or large trees | Year-round, breeding | Common in Unit, unknown nest site |
| Peregrine falcon (*Falco peregrinus*) | Anywhere near cliffs, often near water such as rivers, lakes. Nests on cliffs | Spring/summer resident, breeding | Possibly foraging during summer, migrates out of area for winter |

BLM_0018039

**Table 28. Migratory Birds in the Uncompahgre Field Office**

| Common Name | Habitat Description | Range & Status in UFO | Potential and/or Occurrence in Project Area |
|---|---|---|---|
| Prairie falcon (*Falco mexicanus*) | Open country, prairie, deserts, agricultural fields. Nests on cliffs or rocky embankments | Year-round resident, breeding | Observed as migrant through area, migrates out of are for winter |
| Long-billed curlew (*Numenius americanus*) | Wetlands in grassland communities and agricultural fields | Rare spring/fall migrant, non-breeding | Unlikely migrant through area |
| Flammulated owl (*Otus flammeolus*) | Montane forests, occurs in aspen on west slope | Summer resident, breeding | Likely breeder, arrives in May, leaves in September |
| Gray vireo (*Vireo vicinor*) | Pinyon-juniper and open juniper-grassland | Summer resident, breeding | Possibly at southern end of Unit |
| Pinyon jay (*Gymnorhinus cyanocephalus*) | Pinyon-juniper woodland | Year-round resident, breeding | Possibly at southern end of Unit |
| Juniper titmouse (*Baeolophus griseus*) | Pinyon-juniper woodlands, especially juniper, nests in tree cavities | Year-round resident, breeding | Possibly at southern end of Unit |
| Brewer's sparrow (*Spizella breweri*) | Sagebrush, less often in pinyon-juniper woodlands | Summer resident, breeding | Summer resident, breeding, see Sensitive Species assessment |
| Cassin's finch (*Carpodacus cassinii*) | Open montane coniferous forests, breeds/nests in coniferous forests | Year-round resident, breeding | Likely breeder in coniferous forests |

The Unit is dominated by sagebrush communities, with nearby Gambel's oak and mixed shrubs. A variety of migratory birds fulfill nesting requirements within these vegetation communities from late May to mid-July and/or during spring and fall migrations.

Approximately 42% percent of the Unit is dominated by sagebrush shrublands, and provides potential habitat for one BCC species, Brewer's sparrow, See the Sensitive Species section for a discussion on impacts to this species. Other species associated with sagebrush shrublands that occur, but are not BCC species, include the western meadowlark (*Sturnella neglecta*), vesper sparrow (*Pooecetes gramineus*), and lark sparrow (*Chondestes grammacus*). Also, the golden eagle (*Aquila chrysaetos*) and prairie falcon (*Falco mexicanus*) are more likely to hunt across sagebrush areas than in the other habitat types in the Unit, all of which contain taller and more dense woody vegetation.

None of the BCC species in the UFO area are commonly associated with mixed mountain shrub and oakbrush habitats in the Unit. Migratory birds commonly associated with these habitat types but not included on the BCC list include migrants such as the Cordilleran flycatcher (*Empidonax occidentalis*), western scrub-jay (*Aphelocoma californica*), blue-gray gnatcatcher (*Polioptila caerulea*), Virginia's warbler (*Vermivora virginiae*), MacGillivray's warbler (*Oporornis tolmiei*), lesser goldfinch (*Carduelis psaltria*), black-headed grosbeak (*Pheucticus melanocephalus*), spotted towhee (*Pipilo maculatus*), and green-tailed towhee (*P. chlorurus*).

The irrigated meadows occupying 10% of the Unit provide potential habitat for one of the listed species, golden eagle, and potentially for prairie falcon, when this species migrates through the project area.

Areas of quaking aspen or other deciduous trees (including along drainages), occupy approximately 6% of the project area, and provide potential habitat for the BCC species, the flammulated owl, house wren

BLM_0018040

(*Troglodytes aedon*), and warbling vireo (*Vireo gilvus*)as well as migrants which may use habitats periodically such as the cordilleran flycatcher, western wood-pewee (*Contopus sordidulus*), tree swallow (*Tachycineta bicolor*), and violet-green swallow (*Tachycineta thalassina*). A BCC species of riparian habitats, the willow flycatcher, is an obligate in lower-elevation riparian shrublands dominated by tall willows or structurally similar species.

The small area of mixed conifer forests on north-facing slopes in some of the deeper drainages supports limited numbers of coniferous forest species, including one BCC species, Cassin's finch, and potentially the flammulated owl. The area is generally below the elevational range of Cassin's finch for nesting, but use during winter is possible when individuals or flocks move to lower areas in search of food. Other species potentially nesting in the scattered coniferous forest stands include migrants such as Hammond's flycatcher (*Empidonax hammondii*), western tanager (*Piranga ludoviciana*), plumbeous vireo (*Vireo plumbeus*), yellow-rumped warbler (*Dendroica coronata*), chipping sparrow (*Spizella passerina*), dark-eyed junco (*Junco hyemalis*), and pine siskin (*Carduelis pinus*).

Stands or scattered individuals of pinyon pine and Utah juniper provide some habitat for three pinyon/juniper obligates on the BCC list: the pinyon jay, juniper titmouse, and gray vireo. Of these, the last species is unlikely to occur because of the location of the project area is outside the known nesting range, which is located farther to the west. Other migrants occurring in the limited pinyon-juniper include migrants such as the gray flycatcher (*Empidonax wrightii*), Say's phoebe (*Sayornis saya*), mountain bluebird (*Sialia sialis*), blue-gray gnatcatcher, and black-throated gray warbler (*Dendroica nigrescens*).

During winter, three additional species—Clark's nutcracker (*Nucifraga Columbiana*), Townsend's solitaire (*Myadestes townsendi*), and the cedar waxwing (*Bombycilla cedrorum*)—may congregate in pinyon/juniper habitats in search of pine nuts (the nutcracker) or juniper berries (the solitaire and waxwing).

### Environmental Consequences/Mitigation:

Proposed Action – Under the Proposed Action, 194.1 acres of sagebrush habitat, 36.1 acres of oakbrush woodlands, 16.5 acres of irrigated meadow would be temporarily removed within the Unit (see Vegetation section for information on acres of community types impacted). The irrigated meadows would be rapidly reclaimed, unless planned for long-term disturbances (i.e., road construction, pad sites). This could impact species such as mountain bluebird, meadowlark, and common snipe (*Gallinago gallinago*). The mixed mountain shrub/oakbrush habitats would take approximately 20 to 30 years to return to preconstruction conditions. This could displace higher conservation species over the life of the project. Bird species in this community type include spotted towhee, juniper titmouse, Virginia's warbler, blue-gray gnatcatcher, western scrub-jay, and possibly pinyon jay, among other species.

Post-development, temporarily impacted areas would likely take 2 to 4 years to reclaim to vegetated community types, but mature shrubland communities may take 30 years to reclaim the 230.1 acres of more shrubby and woodland habitats. During this time, these shrubby habitats would remain mostly unavailable for nesting by bird species that utilize this habitat type, effectively displacing these birds during this time. In some places impacts to potential nesting habitat for some migratory bird species may extend beyond the life of the project. Construction activities occurring during the bird nesting season would likely displace nesting birds. Adult birds would likely flush and abandon a nest, and they would not likely be harmed, but construction activities would likely kill chicks or fledglings if nests are not protected or avoided through the use of pre-construction surveys. As much of the construction season occurs during the spring, summer, and fall months, roads, pipelines and pads may be constructed during the bird nesting season, and impacts to nests/nestlings may occur.

In addition to direct and indirect habitat loss is the effect of habitat fragmentation on nesting bird species. While the width of the pipeline corridor or roads would not create a movement barrier to birds—unlike, for example, some small mammal species—it would have the effect of reducing the patch size of some

BLM_0018041

tree or shrub stands and increasing the amount of habitat edge. Thus, habitat-interior species—which include most of the BCC species and Neotropical migrants listed above—would be subject to additional habitat loss due their tendency to avoid the newly created habitat edge along the corridor. While the effective width of a habitat edge varies by bird species and type of habitat, a width of up to 300 feet is possible for some species. Bird species associated with grass/forb rather than shrubland communities, or with habitat edges instead of habitat interiors, would benefit slightly from the habitat modification once reclamation has been achieved. Edge species tend to include habitat generalists, such as the migratory American robin (*Turdus migratorius*) and the resident black-billed magpie (*Pica hudsonius*) common crow (*Corvus brachyrhynchos*), and common raven (*Corvus corax*). Crows, ravens and magpies are known to prey upon nestlings of smaller species, and are commonly observed foraging in irrigated pasturelands, hunting for larger insects, amphibians and smaller reptiles.

One common edge species in the region is the brown-headed cowbird (*Molothrus ater*). This species is a nest parasite on some songbird species, notably including vireos and warblers. The female cowbird lays an egg in the nest of its victim. The larger and earlier-hatching cowbird nestling then ejects the eggs or young of the host species. This project would increase edge and grassland habitats, sometimes preferred by cowbirds. This may increase nest parasitism in some of the Unit, but detectable changes in host bird populations would not be expected.

Noise produced by project-related construction, drilling, and operational activities may deter birds from roosting, foraging, or nesting in the area. The intensity, duration, and frequency of noise impacts would vary over the life of the project, but would be most intense during construction activities. Additional noise would occur during pipeline construction and from travel on roads during the operating phase of the project (see the Noise section).

Notwithstanding the sources of direct and indirect impacts discussed above, the direct or indirect loss of habitat and amount of habitat fragmentation associated with the Proposed Action would be unlikely to have a discernible effect on population sizes of any of the BCC species or other birds discussed above. This conclusion is based on both the small amount of actual habitat loss, the transitory nature of the construction phase, and the presence of existing habitat fragmentation in the project area that already has created smaller habitat patches and greater habitat edges than in an undeveloped area. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to migratory birds. In addition, BLM may attach site-specific COAs to the APDs. The Proposed Action *"may adversely impact individuals, but is not likely to result in a loss of viability on the planning area, nor cause a trend to federal listing or a loss of species viability range-wide."*

**Cumulative Impacts** – The cumulative impacts assessment area for migratory birds includes areas which could be used by species likely to be found within the Bull Mountain Unit. This includes the greater Bull Mountain Unit area, and also the western slope of Colorado as it pertains to certain migratory bird environmental factors. Within the Unit, it is reasonably foreseeable that the No Action Alternative would be implemented concurrent with the Proposed Action. This would cumulatively add to impacts to vegetation communities and migratory bird habitats. See the Vegetation section for a description of acreage impacts to vegetation and thus habitat communities cumulatively impacted within the Unit.

In addition to added impacts within the Unit from implementation of the No Action Alternative, other perturbances would likely occur to migratory birds. This includes continued livestock grazing, which could disturb or impact nesting activities of ground- and shrub-nesting birds. Noxious weed treatments could also disturb nesting birds, but this temporary impact likely outweighs the ecological benefits of managing noxious weeds. Vehicle strikes would also continue to occur, primarily on higher-speed roads such as SH 133, but also on other regional roadways.

Continued loss of habitat through the conversion to farmlands, residential developments, and industrial sites is also negatively impacting migratory bird populations and distributions. Water diversion projects negatively impact wetlands and riparian habitats for birds. With additional home-building and residential

BLM_0018042

development possibly occurring within the Unit, domestic cats can have a significant impact on migratory bird populations. Development of wind-generation facilities in some areas of the plains and Great Basin states is also cited as having detrimental impacts to migratory (and residential) birds. Continuing natural gas development and continued and new coal mining activities in western Colorado will directly and indirectly impact foraging and nesting habitats, and will continue to reduce migratory bird habitats and populations. The spread of noxious weeds from organic farms, particularly in the North Fork of the Gunnison valley, would also negatively impact local native plants and habitats for migratory birds.

**Alternative 1** – See the Vegetation section for a description of impacts to community types. The types of impacts anticipated for Alternative 1 would be the same as for the Proposed Action, although there would be fewer acres of disturbance and fewer miles of roads and pipelines. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to migratory birds. In addition, BLM may attach site-specific COAs to the APDs. Alternative 1 *"may adversely impact individuals, but is not likely to result in a loss of viability on the planning area, nor cause a trend to federal listing or a loss of species viability range-wide."*

**Cumulative Impacts** – The types of cumulative impacts to migratory birds from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. However, Alternative 1 would have 3.3 fewer miles of new or improved access roads and 6 fewer miles of pipelines than the Proposed Action, with proportionately less impacts to habitat during construction and corresponding reductions in vehicle traffic and noise during construction and production.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. See the Vegetation section for a description of acreage impacts to community types. Impacted shrubland/woodland habitats could displace up to 30 to 50 pair of higher conservation species over the life of the project, and would likely take 15 to 30 years to return to preconstruction conditions and. Bird species in this community type include Brewer's sparrow, meadowlark, mountain bluebird, green-tailed towhee, and vesper sparrow, spotted towhee, juniper titmouse, Virginia's warbler, blue-gray gnatcatcher, western scrub-jay, and possibly pinyon jay among other species. The types of impacts anticipated would be the same as for the Proposed Action. Under the No Action Alternative, the BLM would not institute mitigation measures.

## WILDLIFE, TERRESTRIAL (includes a finding on Standard 3)

**Affected Environment:**  General Wildlife – See the Biological Evaluation for details of wildlife use patterns in the area of the Bull Mountain Unit (Petterson 2012).

CPW was consulted regarding the development of the Unit through the scoping process. CPW raised concerns over direct and indirect impacts to deer and elk habitats and habitat connectivity. Per their request, CPW was provided a copy of the BE.

Species chosen for impacts analysis have high biological and public interest, as well as regulatory guidance. Individual wildlife species and groups not specifically mentioned in this assessment are not insignificant; rather, they are not presently at issue because the limited extent of the proposed project would avoid or minimally impact these species and their habitats.

General wildlife species of interest that have habitat on or adjacent to the project location include mule deer, elk, black bear, and moose. See the Threatened, Endangered, and Sensitive Species and Migratory Birds sections for additional information on other specific species. See the Vegetation section regarding the acres of different habitat types that could be impacted under the alternatives. A complete list of wildlife species observed in the project area is provided in the BE.

BLM_0018043

<u>Mule Deer</u> – The Bull Mountain Unit is located at the northern end of a larger area of mule deer (*Odocoileus hemionus*) Winter Range, Severe Winter Range and a Winter Concentration Area as mapped by CPW Natural Diversity Information Source (NDIS) data (available at http://ndis.nrel.colostate.edu/). Deer use of the Unit occurs throughout the summer months, and the entire Unit is shown as Mule Deer Summer Range by CPW NDIS mapping. Fawning occurs in the general area, given the suitable aspen and mixed mountain shrubland habitats (which provide good cover), and abundant water sources from frequent stock tanks and creeks (which is important for nursing does). During the winter, deer mainly use pinyon/juniper habitats towards the southern end of the Unit in lower elevations and on south facing slopes, but some winter use may still occur in the northern areas of the Unit during mild winters. The southern and western facing slopes are very important for deer during the winter months due to shallower snow depths and more frequent melting, and northern and eastern slopes are less utilized due to deep and persistent snows. Deer will mobilize throughout the winter to find more desirable foraging areas, and habitat connectivity is important throughout the winter months.

During the fall months and during hunting seasons, deer congregate in the Unit and likely use some of the area as a "hunting refuge" as the Unit is mostly private land. Management of deer herd sizes by CPW is difficult when deer utilize sizable hunting refuges. However, during the fall hunters are known to be legally guided and permitted to hunt on the Falcon Seaboard, Jacobs, Aspen Leaf, Rock Creek, Buck Creek, Hughes, Hotchkiss, and other ranches within the Unit. Continued hunting of the area will be important to keep deer herds from congregating, and will help with managing deer herd sizes.

At this time, mule deer are continuing to pass through the greater area, and yet are also likely modifying movement patterns around some of the more active wells and roads to avoid human activities and traffic. Wells that are shut-in likely have such little activity around them that deer are able to use habitats with little avoidance of pads and access roads. It is documented that deer stress levels, and thus overall fitness, is compromised when mule deer utilize winter range habitats near and within areas of significant natural gas development (Sawyer et al. 2006, Petterson 2012). However, relevant research in mule deer summer ranges is not available. At this time, the total acres of surface disturbance associated with natural gas development is less than 1% of the area within the Bull Mountain Unit (Petterson 2012). While there are likely some changes in mule deer behavior in the area around wells and some of the more heavily used roads, detectable impacts to deer population levels in the area are unlikely.

In the past few years, SG has begun to fence off pads and cut-and-fill slopes around pads to keep livestock off of reclamation areas, and this would discourage deer from accessing a pad site. Recently constructed pads utilize cuttings pits (also sometimes referred to as "reserve pits"), and the pits recently used within the Unit have not been uniformly fenced with 8-foot wildlife fencing. Rather, SG will sometimes use tarps to cover the pits to prevent additional accumulation of moisture from winter snow. It is not known if any deer have fallen into these unfenced pits, but it is reasonably unlikely that they would venture too close given the lack of suitable forage, cover, and unpleasant odors of the pits. The presence of tarps would also likely discourage deer from venturing "into" a pit. Accumulated precipitation water is also common on cuttings pits.

<u>Elk</u> – The Bull Mountain Unit area is mapped as elk (*Cervus elaphus*) Winter Range, Severe Winter Range, Winter Concentration Area and Summer Range by CPW, and is located in DAU (Data Analysis Unit) E-14. This is a large DAU of 2,477 square miles. The majority of the DAU is located on private lands, BLM lands, and the GMUG and White River National Forests.

Computer modeling data as well as other information, including harvest and aerial surveys, show that the elk herd has increased significantly since the 1950s (CPW 2009, Giezentanner 2008). The overall population of this herd increased from approximately 2,500 animals in the early 1950s to an estimated high of over 21,000 in 1990 and 1991. The 10-year average from 1998 to 2007 is approximately 16,000. The post-hunt estimate for 2008 was 18,644 (CPW 2010).

BLM_0018044

Elk can be found in the Unit year-round, but most significant elk use of the Unit occurs generally during the spring, fall, and winter months, with some low-density summertime use. It is assumed that many elk may spend most of the spring, summer, and fall in the aspen stands at the upper elevations outside of the Unit, and along both the extreme eastern and western sides of the Unit. Hunting pressure in the area is likely light to moderate. Most, if not all of the larger ranches within the Unit provide access for hunting, as this helps keep elk from congregating on private property, but also provides an important supplemental source of income for these ranches and helps with herd size management.

Most observed elk use of the Unit area begins in late October and becomes more localized as winter range occupancy in small but important "yards" where elk tend to linger through the deepest snow months. As the snows melt in late winter and early spring elk are more widespread. During the most severe of winters (such as in 2008/2009), elk may be forced toward the more southern end of the Unit and along the Muddy Creek corridor, commonly lingering and utilizing hay spread for wintering cattle.

Elk activities through the winter months vary depending on snowfall depths and subsequent melting events. Elk scat on lower-elevation, steep, south-facing slopes in the Unit are observed to be very common, and browsing levels of brush are indicative of heavy winter utilization. However, the north-facing slopes and more level terrain do not see intense wintertime utilization. Some of the elk yards on south- and west-facing slopes are very small, but are likely critical habitats for wintering elk.

CPW maps the entire Unit as Winter Range; lower elevations of the Unit are also considered Severe Winter Range totaling 4,959.9 acres, and Winter Concentration Areas totaling 11,812.6 acres within the Unit. There are no mapped Production Areas (elk calving grounds), but some elk do calve in the Unit, especially during cool, wet springs. Most cows and calves move to higher elevations outside of the Unit as summer progresses.

Black Bear (*Ursus americanus*) – Black bear have become a major wildlife management issue in the State of Colorado. Bears commonly supplement their diets by raiding garbage cans, breaking into homes, and becoming a hazard and a nuisance. Habitat in the Unit is suitable for bear use.

Moose (*Alces alces*) – Moose were introduced by CPW onto the Grand Mesa approximately 20 years ago. Since that time, moose have expanded their range down towards areas around the Bull Mountain Unit. Moose in general utilize coniferous habitats and wetland complexes, but can also heavily utilize oakbrush and mixed mountain shrubland habitats in the area. CPW has mapped the Unit as Overall Range, which covers most of the Grand Mesa and Muddy Creek basin.

**Environmental Consequences/Mitigation:**

**Proposed Action** – The construction of facilities within the Unit would disturb a total of 286.9 acres (1.46% of the Unit), which would have temporary impacts to wildlife habitat due to pipeline construction and cut-and-fill slopes around roads and pads (see Vegetation section for a description of acres of habitat types impacted). Direct production impacts (loss) of potential habitats would comprise 125.9 acres (0.65% of the Unit) for road surfaces and well pad sites. The direct loss of habitat would reduce foraging, reproduction, and sheltering habitat for a number of wildlife species. However, given that direct impacts to habitat types would total less than 1% of the Unit area, no wildlife species would be greatly impacted.

Deposition of dust on roadside vegetation (36.4 miles) is a direct source of potential impacts to herbivores. In addition to the impacts on the health of potential forage described in the Vegetation section, it can result in decreased palatability and avoidance by wildlife, as well as minor increased tooth wear.

In order to estimate the indirect impacts of development on wildlife resources, a quantitatively determined area was modeled in a GIS to approximate indirect impacts and potential loss of habitat effectiveness around access roads, pipeline corridors and pad sites for activities associated with the construction,

BLM_0018045

drilling, and completion phases. Please refer to the BE for details of the modeling process. Results are summarized in Table 29.

**Table 29. Modeled Indirect Impacts to Habitats, Proposed Action**

| Vegetation Type | Indirect – Construction | | Indirect – Production | |
|---|---|---|---|---|
| | Acres | % of Unit | Acres | % of Unit |
| Aspen | 135.1 | 12.0% | 92.5 | 8.2% |
| Aspen/Conifer | 0.0 | 0.0% | 0.0 | 0.0% |
| Aspen/Oak | 47.8 | 6.2% | 42.0 | 5.5% |
| Disturbed Area | 25.3 | 14.5% | 57.6 | 33.0% |
| Irrigated Meadow | 221.9 | 11.2% | 219.1 | 11.1% |
| Meadow | 157.7 | 28.5% | 195.4 | 35.4% |
| Mixed Conifer | 2.3 | 3.7% | 2.1 | 3.4% |
| Mixed Mountain Shrub | 142.7 | 8.1% | 100.8 | 5.7% |
| Oakbrush | 544.7 | 13.6% | 407.5 | 10.2% |
| Pinyon/Juniper | 3.0 | 2.3% | 0.0 | 0.0% |
| Riparian Woodland | 11.4 | 13.1% | 13.3 | 15.2% |
| Rock Outcrop | 0.0 | 0.0% | 0.0 | 0.0% |
| Sagebrush | 2,073.0 | 25.1% | 2,218.4 | 26.9% |
| Wetland/Riparian Area | 100.7 | 15.0% | 99.6 | 14.8% |
| Willow | 2.6 | 16.0% | 2.3 | 14.0% |
| Open Water | 9.8 | 11.1% | 10.9 | 12.3% |
| **Total** | **3,478.0** | **17.7%** | **3,461.4** | **17.6%** |

Indirect impacts from the development and use of roads, pad sites, flowback pits and other areas of high human activity would reduce the availability and suitability of habitats near these sites. The actual level of habitat impact would vary for each species that may utilize the area. Some species, such as elk, would be much more sensitive to indirect impacts, and would avoid otherwise available habitats at a much greater distance than other species, such as northern leopard frog, which would not likely avoid suitable habitat next to developed areas.

Mule Deer – Mule deer have shown considerable accustomization to human activities within the area, and rarely flee very far from vehicular use of roads. However, it is well-documented that deer stress levels, and thus overall fitness, are compromised when mule deer utilize habitats near and within areas of major natural gas development. At this time, the level of natural gas development in the Unit is not considered to be major, and while there is likely some change in mule deer behavior in the area around producing wells and some of the more heavily used roads, detectable impacts to deer population levels in the area are unlikely.

Direct impacts (i.e., mortality) to mule deer are unlikely in the project area given that all roads within the Unit are dirt roads (with the exception of SH 133), and road speeds are generally below 30 mph. Within the Unit, the slow road speeds and mobility of deer would limit traffic-related deer mortality. The level of traffic on SH 133 from development of the Proposed Action would increase by 6% during the construction and drilling phase, which would likely have additive direct mortality impacts to mule deer wintering in lower elevations along SH 133 (CDOT 2011, Otak 2011). This would likely impact individual deer, but no population level impacts would be expected.

Without fencing around cutting pits (which is not uniformly utilized in the Unit at this time), there is a remote chance that deer could become stuck in a pit, or ingest waters on pit surfaces.

See the Vegetation section for a detailed description of the acres of impact to specific vegetation communities. The Proposed Action would result in 216 acres (1.1% of the Unit) of construction

BLM_0018046

disturbance to potential deer habitat types, and approximately 97.4 acres of production disturbance (0.5%
of the Unit). These direct impacts to habitats would be relatively small in scale.

Modeled indirect impacts from implementation of the Proposed Action would include 3,478 acres of
potential mule deer habitats, or 17.7% of potential mule deer habitats within the Unit. After construction
is complete, long-term indirect impacts would be reduced to approximately 3,461.4 acres, or 17.6% of the
Unit.

The development of 9 pad sites and accompanying access roads and pipelines would result in a total of
69.3 acres of short-term impacts and 19.9 acres of long-term direct impacts to mule deer Winter Range.
Two of these pads would occur on the edge of Winter Concentration areas, impacting 1.4 acres of this
habitat type. One pipeline would clip approximately 445 feet of Severe Winter Range. Indirect impacts, as
modeled, would result in a total impact to all winter ranges of 1,264.9 acres; however, 429.6 acres, or
34% of those impacts would be from pipeline corridors, which would not have long-term impacts to
winter ranges. Nevertheless, over 27% of mule deer winter ranges in the Unit may see some level of
diminished effectiveness due to the nearby presence of roads and pad sites.

In summary, long-term impacts to habitat would decrease after major activities associated with
development are complete, and thus traffic levels and heavy construction activities would also decrease.
However, compared to current conditions, the area would see long-term increased human activity levels
which would diminish the effectiveness of the area for mule deer. Mule deer densities within the Unit
may decrease over time with full development of the Unit due to increased human activities, but the
relatively small footprint of the project would allow for adequate forage for mule deer throughout the
area. The moderately large indirect impact area (17.7% of the Unit) would indicate that there could be
significant shifts in mule deer distributions across the Unit. The long-term indirect impacts to deer would
be largely dependent on the amount of traffic and human activities in the Unit. With automation of
facilities and reduced traffic, it is conceivable that deer may continue to utilize much of the Unit.
However, if wells are checked daily or roads see regular traffic, then deer densities and use of the Unit
would likely remain lower than current levels. Overall deer populations would not be expected to
decrease from the implementation of the Proposed Action, but deer densities in the Unit would be lower.

It would be difficult to anticipate if wintering deer would shift their use patterns more than deer
summering in the Unit. During the summer and fall months, deer often seem to be more sensitive to
human disturbances (which would also coincide with the construction season and fall hunting seasons),
and wintering mule deer seem more accepting of human activities (which coincides with less human
activity in the Unit). Mule deer may indeed change winter range utilization patterns and move to less
impacted areas, but given the low levels of human activity anticipated in the winter, deer may tend to
maintain traditional use patterns. Indirect impacts to deer would be realized through lower fawn weights
as they enter the winter season and possibly higher over-winter fawn mortality due to does and fawns
needing to travel more or avoid otherwise available habitats near roads, pads, pits and other areas of
human activity, which could therefore limit their use of preferred habitats and refugia and increase their
metabolic outputs.

Elk – Direct impacts (i.e., mortality) to elk are unlikely in the project area given that all roads within the
Unit are dirt (with the exception of SH 133), and road speeds are generally below 30 mph. It is possible
that some elk may be struck while attempting to cross a road, but this is relatively unlikely given the road
speeds (which are even slower during the winter months) and agility of elk. Mortality to elk along SH 133
is currently occurring due to existing traffic patterns, and development of the Unit would contribute to
additional traffic on SH 133. The level of traffic on SH 133 from development of the Proposed Action
would increase by 6% (CDOT 2011, Otak 2011), depending on the time of year and level of development
(see the Transportation section later in this document). Traffic increases would likely have additive direct
mortality impacts to elk wintering in lower elevations along SH 133. This would likely impact individual
elk, but no population-level impacts would be expected, especially when considering that elk would be

BLM_0018047

wintering near SH 133 when development-related traffic volumes are lower, outside of the summer construction season.

Without fencing around cutting pits (which is not uniformly utilized in the Unit at this time), there is a remote chance that elk could become stuck in a pit, or ingest waters on pit surfaces. However, this is relatively unlikely given the odor of cuttings pits, tarps covering pits, and the presence of livestock fencing around pads. While elk mortality from unfenced pits is very unlikely, without wildlife fencing around pits it cannot be ruled out.

See the Vegetation section for a detailed description of the acres of impacts to specific vegetation communities. The Proposed Action would result in 216 acres (1.1% of the Unit) of short-term disturbance to potential elk habitat types from road, well pad, and pipeline construction and other surface disturbances, and approximately 97.4 acres of long-term disturbance, or 0.5% of the Unit from access roads and well pads. These direct impacts to habitats are very small in scale.

There may be a 2- to 3-year period when pipeline corridors provide lower elk browsing opportunities on approximately 81.6 acres. It is assumed that over 3 years or so, most of the cleared pipeline corridors and other temporary use areas would be revegetated and once again provide elk with more suitable foraging. However, in some circumstances where landowners or other agencies require the planting of more aggressive non-native grasses and forbs, the recovery of native forbs and shrubs into these temporarily disturbed acres may take much longer due to the competitive exclusion of desirable native plants.

Assuming that decreased elk activities would occur due to indirect impacts, GIS modeling was used to determine the acreage of habitats likely to see decreased elk activity (see previous discussion in mule deer section, and BE for more information). Elk would avoid otherwise suitable habitats near access roads, construction areas, and active drilling sites during the construction process due to human activities, traffic, loud noises, and other perceived threats by elk. This is not to say that elk would never occur near roads, pads, etc. But it is reasonable to assume that decreased utilization would occur near areas of higher human activity, noise, and traffic. Indirect impacts which may occur during the summer construction, drilling, and completion seasons are tempered by the fact that during the summer months most elk have migrated to higher terrain outside of the Unit. Construction, road use, and drilling activities occurring during the calving period (late May through late June) which occur near aspen stands and oakbrush stands may displace some individual calving elk, or disturb some calving activities. As most cows will have left the Unit by this time of year, widespread impacts are not anticipated.

GIS-modeled indirect impacts from construction would be a conservatively estimated 3,478 acres, or 17.7% of the Unit. However, using a simple ¼ mile buffer area around all features, approximately 10,639.5 acres, or 54% of the Unit would be impacted. Given the sensitivity of elk to disturbances, the larger modeled area may be more appropriate for elk during the spring, summer, and fall seasons. Elk appear to be less likely to leave an area during the winter months, and use of the ¼ mile buffer is not warranted. Long-term, the use of roads and activities at pads would result in a reduced indirect impact area (as modeled) of 3,461.4 acres, or 17.6% of the Unit (Petterson 2012). These numbers do not account for existing indirect impacts along SH 133 or CR 265. Modeled indirect impacts to Severe Winter Range would affect 896.2 acres (18% of Severe Winter Range habitats in Unit), and modeled indirect impacts to Winter Concentration Areas would affect 2,449.0 acres (but approximately 774 acres are from pipeline corridors).

In summary, the development of the Unit under the Proposed Action would create a direct loss of less than 2% of the potentially available habitats under any of the proposed activities. This loss of habitat would have an insignificant impact to elk. However, traffic and human activities in the Unit would have a larger indirect impact footprint, especially during the construction and drilling phases, possibly resulting in 17.7% up to 54% of the Unit seeing areas with reduced habitat effectiveness for elk. However, the time of year when elk are most common in the Unit (winter) would be mostly outside of active periods of

BLM_0018048

construction, drilling, and well completion, and modeled indirect impacts, at least for elk, are likely overstated.

Elk would continue to use, migrate through, and may even be seen very close to the facilities and roads within the Unit, but scientific literature indicates that elk utilization of habitats near roads decreases with increasing traffic levels, and new roads reduce habitat effectiveness for elk (see Petterson 2012). Given the size of the project, its location, and surrounding habitats, this project could have moderate impacts on elk densities and distribution within the Unit. However, it is unlikely that elk populations within the greater Muddy Creek basin would decrease, but elk densities across the Unit would likely be lower, or at least elk would be significant redistributed in some areas, with elk seeking habitats away from facilities and higher-use roads. This may place elk in suboptimal habitats. Some areas would likely support similar elk densities as currently occurring due to low levels of development, but some areas proposed for development occur very close to, or within critical winter habitats and impacts to elk in these areas would have disproportionately large impacts.

<u>Black bear</u> – The Proposed Action would have negligible impacts on bear populations or bear habitat. Bear-proof trash containers should be used on-site at all times to minimize visitation by bears.

<u>Moose</u> – The development of the Unit would likely preclude moose lingering or utilizing habitats within the modeled indirect impact areas (see previous discussions). After construction, the low human activity levels around individual well pads would likely cause moose to leave if humans entered the area; depending on the distance from the pad site, however, some moose may linger, or would not "flee" from human activities on pads and roads. This is not to say that moose stress levels would not rise or changes in behavior would not be noticed.

Increased traffic on local roads would also reduce moose use of habitats near roads. Increased mortality from vehicle strikes is not likely within the project area, as road speeds are fairly low, but moose vehicle strikes have been documented on SH 133 on the east side of McClure pass near Placita. In summary, while this project may have minor localized impacts on the ability for moose to continue to fully utilize habitats in the Unit, the Bull Mountain Unit is not optimal moose habitat, and moose use of this area would already likely be relatively infrequent. Therefore, the Proposed Action would have negligible impacts on moose or moose habitat. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to wildlife. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts –** The cumulative impacts assessment area for terrestrial wildlife is considered to be the greater Bull Mountain Unit and surrounding lands. Within the Unit, cumulative development of the Proposed Action in combination with the No Action Alternative would result in impacts to area habitats as presented in the Threatened, Endangered, and Sensitive Species section of this document.

<u>Mule Deer</u> – Within the greater Muddy Creek basin, SG and Gunnison Energy Corporation's maintenance and development of natural gas wells may cumulatively increase the impacts to mule deer. At this time SG's existing gathering pipelines and the Bull Mountain Pipeline bisect suitable mule deer habitats. However, pipelines are generally considered to be temporary impacts, and native grass, forb, and shrub recruitment appears to be occurring in the areas where reclamation is underway.

Cumulative direct and indirect impacts to mule deer within the Unit are summarized in Table 30 (Petterson 2012).

BLM_0018049

**Table 30. Cumulative Impacts to Mule Deer Habitat Winter Ranges, Proposed Action + No Action**

| Habitat & Impact Type | Cumulative Direct Impacts | | Cumulative Indirect Impacts | |
|---|---|---|---|---|
| | *Acres* | *% of Total* | *Acres* | *% of Total* |
| **Winter Range** (4,613 acres) | | | | |
| Construction | 96.3 | 2.1% | 1,052.8 | 22.8% |
| Production | 31.9 | 0.7% | 743.3 | 16.1% |
| **Severe Winter Range** (196.5 acres) | | | | |
| Construction | 0.5 | 0.3% | 11.6 | 5.9% |
| Production | 0.0 | 0.0% | 0.0 | 0.0% |
| **Winter Concentration** (207.4 acres) | | | | |
| Construction | 1.5 | 0.7% | 17.7 | 8.5% |
| Production | 1.2 | 0.6% | 31.1 | 15.0% |

Direct cumulative impacts within the Unit would be relatively minor, with just over 2% of the total potential mule deer winter range habitat being impacted by development.

The largest cumulative indirect impacts to mule deer from the development of the Unit would come from decreased use of otherwise available habitats around the roads and pad sites through avoidance due to high levels of traffic, noise and human activities. Domestic sheep grazing and associated guard dogs also occur across much of the northern half of the Unit. These guard dogs have been observed to prey on wildlife around flocks, and deer would likely avoid the general area when sheep bands are nearby.

Elk – Cumulative impacts within the greater Muddy Creek basin as a result of SG and Gunnison Energy's maintenance and development of natural gas wells would similar to those for deer. Elk are commonly seen lingering on reclaimed pipeline corridors, and appear to have no adverse impacts from the presence of the reclaimed corridors. While corridors do not appear to have negative impacts to elk, it is well-documented that roads and pad sites result in decreased habitat effectiveness around these features, causing elk to avoid otherwise-available habitats.

Cumulative direct and indirect impacts to elk habitats within the Unit are summarized in Table 31.

**Table 31. Cumulative Impacts to Elk Habitats and Winter Ranges, Proposed Action + No Action**

| Habitat & Impact Type | Cumulative Direct Impacts | | Cumulative Indirect Impacts | |
|---|---|---|---|---|
| | *Acres* | *% of Unit* | *Acres* | *% of Unit* |
| **Winter Range** (19,673 acres) | | | | |
| Construction | 396.6 | 2.0% | 4,445.5 | 22.6% |
| Production | 168.2 | 0.9% | 4,423.9 | 22.5% |
| **Severe Winter Range** (4,960 acres) | | | | |
| Construction | 112.2 | 2.3% | 1,304.4 | 26.3% |
| Production | 42.2 | 0.9% | 989.9 | 20.0% |
| **Winter Concentration** (11,813 acres) | | | | |
| Construction | 292.6 | 2.5% | 3,287.6 | 27.8% |
| Production | 119.0 | 1.0% | 3,050.5 | 25.8% |

Within directly and indirectly impacted areas, elk would not linger for long periods of time, would have decreased foraging, and would generally avoid the area due to heavy traffic during construction and drilling periods. However, elk are generally not in the Unit in large numbers during the summer construction season. While it is very likely that some level of elk wintertime activity would continue to occur within the Winter Range areas around the access roads and pad sites, modified overall use patterns and avoidance of these areas is likely.

BLM_0018050

Domestic sheep grazing and associated guard dogs also occur across much of the Unit. These guard dogs have been observed to hunt for wildlife prey around flocks, and elk would likely avoid the general area when sheep bands are nearby. However, sheep bands have generally left the Unit by the time elk arrive during the winter season.

Other Wildlife Species – Other wildlife species in the Bull Mountain Unit are considered to be relatively common, which is not to say that they are not insignificant, but rather their populations, habitats, and distributions are not at issue, and the cumulative impacts from development of the Unit and reasonably foreseeable activities on surrounding lands would not jeopardize the viability of any animal population. The project would have no significant consequence on habitat condition, utility, or function, nor have any discernible effect on species abundance or distribution at any landscape scale for other wildlife species. Cumulative impacts to general wildlife species would be similar to issues discussed under the Threatened and Endangered section of this document. Species of concern have been covered in other sections of this EA.

Alternative 1 – The types of short-term and long-term direct and indirect impacts to wildlife under Alternative 1 would be the same as for the Proposed Action. There would be 31.1 fewer acres of construction disturbance (4.5 fewer from disturbance during production), and 2.3 fewer miles of roads than the Proposed Action. Table 32 summarizes modeled indirect impacts to habitat in the Unit. Cumulative impacts to general wildlife species would be similar to issues discussed under the Threatened and Endangered section of this document. Species of concern have been covered in other sections of this EA.

**Table 32. Modeled Indirect Impacts to Habitats, Alternative 1**

| Vegetation Type | Indirect – Construction | | Indirect – Production | |
|---|---|---|---|---|
| | Acres | % of Unit | Acres | % of Unit |
| Aspen | 79.2 | 7.1% | 70.5 | 6.3% |
| Aspen/Conifer | 0.0 | 0.0% | 0.0 | 0.0% |
| Aspen/Oak | 89.2 | 11.6% | 79.7 | 10.4% |
| Disturbed Area | 24.6 | 14.1% | 59.9 | 34.3% |
| Irrigated Meadow | 243.7 | 12.3% | 233.3 | 11.8% |
| Meadow | 103.5 | 18.7% | 157.9 | 28.6% |
| Mixed Conifer | 2.3 | 3.7% | 2.1 | 3.3% |
| Mixed Mountain Shrub | 120.6 | 6.9% | 106.3 | 6.1% |
| Oakbrush | 449.9 | 11.3% | 397.5 | 10.0% |
| Pinyon/Juniper | 3.0 | 2.3% | 0.0 | 0.0% |
| Riparian Woodland | 9.0 | 10.4% | 8.5 | 9.7% |
| Rock Outcrop | 0.0 | 0.0% | 0.0 | 0.0% |
| Sagebrush | 1,626.5 | 19.7% | 1,935.6 | 23.4% |
| Wetland/Riparian Area | 97.0 | 14.4% | 95.3 | 14.2% |
| Willow | 5.0 | 31.3% | 6.3 | 39.2% |
| Open Water | 12.8 | 14.4% | 13.1 | 14.7% |
| **Total** | **2,866.3** | **14.6%** | **3,166.0** | **16.1%** |

Mule Deer – See the Vegetation section for a description and comparison of impacts to vegetation and habitat types for Alternative 1.

Modeled short-term indirect impacts from Alternative 1 would occur across 2,866.3 acres of potential mule deer habitats. This is approximately 14.6% of potential mule deer habitats within the Unit (3.1% less than the Proposed Action). Long-term impacts (i.e., not including pipeline corridors) would affect 3,166.0 acres (295.4 acres less than the Proposed Action), or 16.1% of the Unit.

BLM_0018051

Development of 8 pad sites, roads, and pipelines would result in a total of 75.2 acres of short-term direct impacts to mapped mule deer Winter Ranges (7.2 acres less than the Proposed Action) and 30 acres of long-term direct impacts (.5 acres more than the Proposed Action). One of these pads would occur on the edge of Winter Concentration areas, directly impacting 1.4 acres. There would be no pads within Severe Winter Range, but 0.5 acre of a pipeline corridor would cross into Severe Winter Range.

Modeled indirect short-term impacts to winter ranges would affect 771.6 acres (162.6 acres less than the Proposed Action); however, 90 acres of those impacts (0.87% less than the Proposed Action) would be from pipeline corridors and would not have long-term impacts to winter ranges. Nevertheless, around 14.8% of mule deer winter ranges in the Unit may see some level of long-term diminished effectiveness due to the nearby presence of roads and pad sites.

In summary, short-term direct impact to habitats in the Unit would be very small (1.1%), and long-term direct impacts to habitat even smaller (0.5%). However, modeling of indirect impacts shows potential reduced habitat effectiveness of 16.1% of the Unit in the short term and 16.1% (1.5% less than the Proposed Action) in the long term. The types of impacts would be the same as described for the Proposed Action.

Elk – Under Alternative 1, short-term direct and indirect disturbances to potential elk habitat types would be the same as for mule deer (see the Vegetation section for a detailed description of impacts to vegetation types and habitats). There may be a 2- to 3-year period when corridors provide few elk grazing opportunities. This impact would have very little impact to wintering elk, as most grasses are covered by snow and elk shift their diet to shrubs during the winter.

Short-term direct impacts to Winter Range from construction of pipelines, roads, and pads would be conservatively estimated at 255.7 acres, or 1.3% of Winter Ranges in the Unit (0.6% more than the Proposed Action). Direct impacts to Severe Winter Range would be 69.5 acres, and impacts to Winter Concentration Areas would be 156.5 acres. Long term, the use of roads and activities at pads would result in a direct impact area of 121.3 acres of Winter Range, 29.2 acres of Severe Winter Range, and 77.9 acres of Winter Concentration Areas. These values are somewhat larger than the impacts under the Proposed Action, but by less than 1%. These numbers do not account for existing indirect impacts along SH 133 or CR 265.

Modeled long-term indirect impacts to Winter Range is 3,166.1 acres (16.1% of Winter Range habitats in Unit), 706.2 acres in Severe Winter Range (14.2%), and 2,016.7 in Winter Concentration Areas (17.1%). These values range from 7% to 3% more impact to various Winter Ranges than under the Proposed Action (see Petterson 2012). The ¼-mile buffer area would be 8,641.3 acres, or approximately 44% of the Unit.

Black bear – Alternative 1 would have negligible impacts on bear populations or bear habitat.

Moose – The development of the Unit under Alternative 1 would have similar impacts to the Proposed Action.

Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to wildlife. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The types of cumulative impacts to migratory birds from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. However, Alternative 1 would have 3.3 fewer miles of new or improved access roads and 6 fewer miles of pipelines than the Proposed Action, with proportionately less impacts to habitat during construction and corresponding reductions in vehicle traffic and noise during construction and production. Tables 33 and 34 summarize cumulative direct and indirect impacts to mule deer and elk habitat, respectively.

BLM_0018052

**Table 33. Cumulative Direct Impacts to Mule Deer Habitat Winter Ranges, Action Alternatives + No Action**

| Habitat & Impact Type | Cumulative Direct Impacts | | Cumulative Indirect Impacts | |
|---|---|---|---|---|
| | *Acres* | *% of Total* | *Acres* | *% of Total* |
| **Winter Range** (4,613 acres) | | | | |
| Construction | 89.6 | 1.9% | 895.4 | 19.4% |
| Production | 47.0 | 1.0% | 710.8 | 15.4% |
| **Severe Winter Range** (196.5 acres) | | | | |
| Construction | 0.5 | 0.3% | 11.8 | 6.0% |
| Production | 0.0 | 0.0% | 0.0 | 0.0% |
| **Winter Concentration** (207.4 acres) | | | | |
| Construction | 1.4 | 0.7% | 15.9 | 7.7% |
| Production | 89.6 | 1.9% | 27.6 | 13.3% |

**Table 34. Cumulative Direct Impacts to Elk Habitats and Winter Ranges, Action Alternatives + No Action**

| Habitat & Impact Type | Cumulative Direct Impacts | | Cumulative Indirect Impacts | |
|---|---|---|---|---|
| | *Acres* | *% of Unit* | *Acres* | *% of Unit* |
| **Winter Range** (19,673 acres) | | | | |
| Construction | 369.6 | 1.9% | 3,956.0 | 20.1% |
| Production | 166.9 | 0.8% | 4,291.2 | 21.8% |
| **Severe Winter Range** (4,960 acres) | | | | |
| Construction | 110.2 | 2.2% | 1,162.6 | 23.4% |
| Production | 44.0 | 0.9% | 982.4 | 19.8% |
| **Winter Concentration** (11,813 acres) | | | | |
| Construction | 256.2 | 2.2% | 2.715.2 | 23.0% |
| Production | 116.3 | 1.0% | 2,943.9 | 24.9% |

     **No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. The types of direct and indirect impacts to wildlife would be the same as for the Proposed Action. Modeled impacts to habitat are summarized in Table 35.

**Table 35. Modeled Indirect Impacts to Habitats, No Action**

| Vegetation Type | Indirect – Construction | | Indirect – Production | |
|---|---|---|---|---|
| | *Acres* | *% of Unit* | *Acres* | *% of Unit* |
| Aspen | 26.5 | 2.4% | 48.7 | 4.3% |
| Aspen/Conifer | 0.0 | 0.0% | 2.1 | 16.8% |
| Aspen/Oak | 19.0 | 2.5% | 23.6 | 3.1% |
| Disturbed Area | 25.4 | 14.5% | 79.5 | 45.5% |
| Irrigated Meadow | 462.1 | 23.3% | 429.8 | 21.7% |
| Meadow | 82.7 | 15.0% | 179.3 | 32.4% |
| Mixed Conifer | 2.3 | 3.7% | 1.2 | 1.9% |
| Mixed Mountain Shrub | 71.6 | 4.1% | 68.4 | 3.9% |
| Oakbrush | 69.3 | 1.7% | 148.0 | 3.7% |
| Pinyon/Juniper | 0.0 | 0.0% | 0.0 | 0.0% |
| Riparian Woodland | 0.3 | 0.4% | 0.5 | 0.6% |
| Rock Outcrop | 0.0 | 0.0% | 0.0 | 0.0% |
| Sagebrush | 731.2 | 8.9% | 1,060.5 | 12.8% |

BLM_0018053

Table 35. Modeled Indirect Impacts to Habitats, No Action

| Vegetation Type | Indirect – Construction | | Indirect – Production | |
|---|---|---|---|---|
| | Acres | % of Unit | Acres | % of Unit |
| Wetland/Riparian Area | 34.4 | 5.1% | 87.5 | 13.0% |
| Willow | 0.0 | 0.0% | 1.5 | 9.5% |
| Open Water | 2.1 | 2.4% | 7.7 | 8.7% |
| Total | 1,527.0 | 7.8% | 2,138.2 | 10.9% |

Mule Deer – See the Vegetation section for a description and comparison of direct impacts to vegetation and habitat types for the No Action Alternative.

The short-term direct impacts to Winter Range from construction are estimated at 17.2 acres (65.2 acres less than the Proposed Action), or .4% of the Winter Range habitats in the Unit. There would be no impacts to Severe Winter Ranges under the No Action Alternative. A minor 0.5 acre of long-term direct impacts to Winter Concentration Areas would occur (0.7 acres more than under the Proposed Action).

Modeled short-term indirect impacts to Winter Range were 199.2 acres (4.3% of Winter Range habitats in the Unit). There were no indirect impacts to Severe Winter Ranges. Long-term, there were 281.9 acres of indirect impacts to Winter Ranges (6.1%), and 26.9 acres of indirect impacts to Winter Concentration Areas (13%), which is 1.8% less than under the Proposed Action. The ¼ mile buffered area around activities was 5,221.9 acres, or approximately 26% of the Unit.

In summary, given the small area impacted directly in the short term, and the moderate area indirectly impacted in the long term (7.8% and 10.9%, respectively), the No Action Alternative would have no detectable impacts to mule deer population numbers; however, it is likely that some individual mule deer would be directly and indirectly impacted. The types of impacts under the No Action Alternative would be the same as for the Proposed Action.

Elk – See the Vegetation section for a description and comparison of direct impacts to vegetation and habitat types for the No Action Alternative.

The No Action Alternative would create direct short-term impacts to approximately 131.2 acres of elk Winter Range (155.7 acres less than the Proposed Action) through the construction of roads, pads, flowback pits, pipelines, and other surface appurtenances, or 0.7% of the Winter Range habitats in the Unit. Direct impacts to Severe Winter Range would be 44.1 acres (0.9%), or 28.5 acres less than the Proposed Action. Impacts to Winter Concentration Areas would be 115.7 acres (1%), or 81.6 acres less than the Proposed Action. Long-term, there would be 69.9 acres of impact to Winter Ranges (0.4%), 19.4 acres of impact to Severe Winter Range (0.4%), and 54.7 acres of impact to Winter Concentration Areas (.5%). These values are less than the Proposed Action indirect impacts by less than 0.5%. The ¼ mile modeled impact area was 5,122.9 acres, or 26% of the Unit. The types of impacts (i.e., how they would affect elk) under the No Action Alternative would be the same as for the Proposed Action.

Black bear – The No Action Alternative would have insignificant impacts on bear populations or bear habitat. Bear-proof trash containers should be used on-site at all times to minimize visitation by bears.

Moose – The development of the Unit under the No Action Alternative would have similar impacts to Proposed Action, with the main difference being a 10% decrease in indirect impacts to surrounding habitats.

**Finding on the Public Land Health Standard for Plant and Animal Communities** (partial; see also Vegetation; Invasive, Non-native Species; and Wildlife, Aquatic): Based on the Land Health Assessment for the North Fork Landscape (BLM 2007), the main issues regarding animal communities with potential cumulative impacts from this project are associated with the health of habitat types, particularly stands of older oakbrush, the impact of noxious weeds, and the impacts of livestock grazing. Older stands of

BLM_0018054

oakbrush provide important habitat components for a number of species. Noxious weeds are an ongoing threat to regional wildlife habitats that could be exacerbated by development of the Unit, and are becoming a greater issue in the North Fork valley as a result of the recent decrease in the treatment of weeds due to the increase in organic farms. Overgrazing and loss of native forb and grass diversity and a reduction in shrub vigor and health also contribute to diminished wildlife habitats. Avoidance of stands of old-growth oakbrush would reduce regional loss of this habitat type. Aggressive and timely noxious weed treatments, as described in the Proposed Action and alternatives, would be critical to prevent degradation of habitats within the Unit. Use of native plants for reclamation would ensure more long-term availability of suitable wildlife habitats. Livestock exclosures, and in some cases changes in grazing strategies, would be necessary to ensure that revegetation efforts are successful, particularly in wetland areas and in shrub-dominated habitats. Based on the protective stipulations listed in the Proposed Action and Alternative 1 there would be no jeopardy to the viability of any animal population. The project would have no great consequence on habitat condition, utility, or function; however, it is likely that the Proposed Action, Alternative 1, and No Action would likely change the abundance for elk and possibly for mule deer at the project scale, at least during the construction and drilling phase. During production, if human activities decrease, elk and mule deer may be able to utilize habitats more readily. Indirect impacts would result in diminished habitat effectiveness across approximately 8% to 18% of the Unit, which would likely cause elk (and mule deer) distributions and densities to change. Cumulatively, indirect impacts would result in diminished habitat effectiveness across approximately 20% to 23% of the Unit. Private landowner requirements (and sometimes from state agency requirements) to use non-native agricultural grasses and forbs would likely reduce the availability of native plant habitats, and would reduce wildlife habitats in some areas. Public land health standard 3 would continue to be met.

**WILDLIFE, AQUATIC** (includes a finding on Standard 3)

**Affected Environment:** The Bull Mountain Unit contains a number of fish-bearing streams, including Henderson, Roberts, Drift, Lee, East and West Muddy, and Ault Creeks. However, East Muddy Creek can only support fish during the late summer and fall months, the rest of the year it is too silty and is likely ineffective for any significant fish use (Petterson 2012). A multitude of smaller tributaries contribute perennial and ephemeral flows to these creeks.

In terms of aquatic life, all of these streams are limited primarily by flows, which are flashy and seasonally very low, and by heavy sediment loads in East Muddy Creek. Other limiting factors include the type of substrate and the presence, density, and width of riparian plant communities. These streams are sourced both directly and indirectly from snowpacks at higher elevations on the flanks of Huntsman Ridge, the Ragged Mountains, and Spruce Mountain to the north of the Unit, but some of these creeks are sourced by lower-elevation hills, and these creeks (mainly on the western side of the Unit) tend to be ephemeral. Much of the recharge from snowpack enters the streams as groundwater inflow from colluvium and shallow bedrock. Substrates vary longitudinally along the streams and include reaches dominated by cobbles and finer sediments.

Fish surveys by CPW have documented the presence of greenback cutthroat trout (*Onchorhynchus clarkii stomias*) lineage fish—a Federally listed threatened subspecies—in upper reaches of Roberts and Henderson Creeks located at the northern end of the Unit. Other creeks in the Unit may contain greenback cutthroat trout, including Lee Creek, Drift Creek and Ault Creek most notably. See the section on Threatened, Endangered, and Sensitive Species for detailed information.

A non-native sport fish, the brook trout, occupies lower reaches of Lee Creek. This trout of eastern North America has been widely introduced in mountainous areas of Colorado because of its tolerance for slightly warmer waters than the cutthroat trout and its ability to reproduce successfully in streams with very small flows. Brook trout may also occur in other creeks within the Unit. Brook trout can competitively displace cutthroat trout.

BLM_0018055

Aquatic macroinvertebrates living in perennial streams such as Lee Creek during a portion of their lifecycles include larvae of stoneflies, mayflies, and some caddisflies in fast-flowing reaches with rocky or detrital substrates. Both the aquatic larvae and winged adults of stoneflies, mayflies, and caddisflies are probably the main prey for trout in Lee, Roberts and Henderson Creeks, and other creeks with low-sediment loading. Other terrestrial invertebrates that land or fall onto the surface or are carried into the stream in runoff from adjacent uplands can also be prey for trout. In slow-flowing portions of area wetlands with fine substrates, and in East and West Muddy Creeks, aquatic macroinvertebrates probably include the larvae of midges, mosquitoes, and some caddisflies. These species are able to tolerate relatively warm, turbid, and poorly oxygenated waters, and their more abbreviated larval stages allow them to reproduce in intermittent streams and in seasonally inundated overbank areas.

### Environmental Consequences/Mitigation:

**Proposed Action** – The Proposed Action has been designed to prevent or minimize disturbance to Roberts Creek and Ault Creek through additional studies and a series of mitigation measures to protect the aquatic resource (see Threatened, Endangered, and Sensitive Species). Revegetation of riparian areas and replacement of existing culverts with more fish-friendly culverts is part of the Proposed Action.

The pipeline crossing the lower reaches of East Muddy Creek would be bored, or crossed during low-flow conditions, and riparian areas would also be quickly stabilized and revegetated per Army Corps of Engineers 404 permitting.

At the trenched crossing of other streams and wetlands, the width of the construction corridor would be kept to the minimum width possible to limit modification to the streambed. Indirect impacts due to runoff from the construction zone on the approach/departure sides of the stream would also be limited by narrowing the construction corridor and not stockpiling soil or other excavated material in proximity to the stream. SG currently has a number of major pipelines in place, which would also help limit the need for new large-scale pipeline crossings of wetlands and waterways.

Water depletions from the Ault Creek drainage would result from use of waters out of Aspen Leaf Reservoir. SG currently has purchased a total of 15 ac-ft (7.4%) of the combined waters of the 86-acre-foot Aspen Leaf Reservoir and the 116-acre-foot Ault Reservoir (which feeds Aspen Leaf). The primary purpose of these reservoirs is flood irrigation of hay meadows on the Aspen Leaf Ranch. Other base flows occur within the Ault Creek drainage, including the perennial eastern fork of Ault Creek. Water depletions may have impacts to greenback habitats, but no realized effects to greenback trout would be anticipated. In the East Muddy Creek drainage, SG has reappropriated existing water depletions from irrigation to industrial use. Therefore no significant decreases in instream flows would be anticipated in East Muddy Creek or downstream habitats. For detailed analyses, See the Biological Evaluation (Petterson 2012). Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to aquatic wildlife. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – Cumulative impacts to aquatic wildlife and their habitats in the area from the implementation of the Proposed Action in combination with the No Action Alternative could include continued spread of whirling disease, degradation of riparian corridors due to domestic livestock grazing, sedimentation of suitable habitats from upland ground-disturbing projects, gravelling/sanding of highways, application of magnesium chloride and other ice-melting chemicals to roads, and continued natural gas exploration and development activities. Stocking of area streams and lakes with non-native salmonids would continue to pose a hybridization and competition threat to greenback cutthroat trout. The presence of brook trout in the Muddy Creek watershed would be a definite threat to long-term greenback cutthroat trout persistence.

Cumulatively, this project would not add to greenback cutthroat trout hybridization threats. The development of roads, pipelines, and pads in the Bull Mountain Unit and on USFS lands would cumulatively add to fine-sediment mobilization into area creeks. Water depletions could also negatively

BLM_0018056

impact aquatic habitats. Given that most of the trout-occupied habitats occur within headwaters of area creeks, the continued development of natural gas in the lower elevations of the basin would not be coincidental to most trout habitats. However, some natural gas pads may indeed occur higher in trout-occupied basins, which may cumulatively have negative impacts to water quality and habitats through fine-sediment delivery and possibly chemical contaminants. Other reasonably foreseeable activities on National Forest System lands would require Section 7 consultation with the USFWS.

**Alternative 1** – Direct and indirect impacts to aquatic wildlife would be the same as for the Proposed Action. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to aquatic wildlife. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The types of cumulative impacts to aquatic wildlife from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. However, Alternative 1 would have 3.3 fewer miles of new or improved access roads and 6 fewer miles of pipelines than the Proposed Action, proportionately reducing related impacts during construction and production.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. The No Action Alternative would have the same number of pipeline crossings of fish-bearing streams as the Proposed Action, including Roberts Creek and East Muddy Creek. Ault Creek would also be crossed with an improved roadway, and mitigation measures for fish would be included in that crossing (the same as under the Proposed Action). Under the No Action Alternative, there would be decreased water depletions from the Ault Creek and East Muddy Creek drainages, due to the reduced need for water. See the sections on Water Quality, Surface and Ground; Threatened, Endangered, and Sensitive Species; and Wetlands and Riparian Zones for more information. For detailed analyses, see the Biological Evaluation (Petterson 2012).

**Finding on the Public Land Health Standard for Plant and Animal Communities** (partial, see also Vegetation; Wildlife, Terrestrial; and Invasive, Non-native Species): Based on the Land Health Assessment for the North Fork Landscape (BLM 2007), the main issues regarding aquatic wildlife communities with potential cumulative impacts from this project are associated with deposition of fine sediments into aquatic habitats, water diversions and reductions in instream flows, noxious weed invasions of riparian communities throughout the North Fork valley, poor water quality of irrigation return flows, and low water temperatures due to water releases from larger reservoirs (i.e., Aspinall Unit). On BLM lands within the Unit, the alignment of the Spring Creek Trail and its use as a stock driveway and OHV trail is causing erosion and deposition of fine sediments into wetland and riparian habitats. The Proposed Action would see a pipeline route and new access road crossing BLM lands that has existing negative impacts to aquatic habitats associated with the Spring Creek Trail. Aggressive and timely treatment of noxious weeds would help riparian and wetland habitat conditions. Use of native wetland plants for reclamation of wetlands areas, as proposed, would allow for rapid recovery and function of wetland and riparian habitats. Robust stormwater management and timely and effective use of BMPs would help reduce fine sediment deposition into aquatic habitats. Required documentation of BMP use would help ensure that BMPs are timely and effective. Livestock exclosures may be necessary around wetlands and riparian areas to ensure that revegetation efforts are successful. The temporary storage and recycling of flowback waters and use of produced water for hydraulic fracturing would help reduce the need for and amount of use of fresh surface waters. Based on the protective stipulations listed, the Proposed Action, Alternative 1, and No Action would not jeopardize the viability of any aquatic vertebrate species. The project would not greatly impact habitat condition, utility, or function or have discernible adverse effects on species abundance or distribution at any landscape scale. Public land health standard 2, 3 and 5 (partial) would continue to be met.

BLM_0018057

**WETLANDS AND RIPARIAN ZONES** (includes a finding on Standard 2)

**Affected Environment** – Jurisdictional wetlands, which are hydrologically connected to Waters of the U.S., are found throughout the Bull Mountain Unit (see Figure 9, Vegetation). Major drainages include Lee Creek and East and West Muddy Creeks. Wetlands in the Unit are dominated by beaked sedge (*Carex utriculata*), woolly sedge (*Carex lanuginosa*), meadow sedge, swordleaf rush (*Juncus ensifolius*), Baltic rush (*Juncus balticus*) and other graminoids. Rocky Mountain willow (*Salix monticola*), Bebb's willow (*S. bebbiana*),and Drummonds willow (*S. drummondiana*) occur in these wetlands. Most wetlands retain moisture well into the summer, and the widespread irrigation at the northern end of the Unit has definitely expanded the surface area of wetlands. Subsequently, many irrigation ditches and laterals move waters across the private ranches, utilizing waters from Lee, Henderson, Spring, Drift, Little Henderson, Grouse, Buck, East and West Muddy, and Ault creeks. Widespread summertime cattle and sheep grazing has impacted these wetlands; hoof action on soft soils is evident and extensive grazing of wetland vegetation was observed during 2008 – 2011 site visits. Hedging of willows was also evident.

No fens have been identified within the Unit.

Using aerial photograph interpretation and wetland delineations (USACE 1987, 2008) approximately 1,981 acres of irrigated meadows, 671.8 acres of wetland/riparian systems, and 16.1 acres of willows were mapped in the Unit.

**Environmental Consequences/Mitigation:**

**Proposed Action** – Many of the proposed well pads would be located within or at the edges of irrigated pastures due to the relatively level terrain, and desires of landowners. While irrigated pastures are not always considered a Water of the U.S., many of the pastures do support isolated features which would fall under the jurisdiction of the USACE. As part of the GIS modeling process in siting pads, higher preference was given to sites further than 300 feet from wetlands, and any road or pipeline crossing was planned to minimize impacts to the extent practicable to wetland resources. Table 36 summarizes the level of impacts to wetlands from the Proposed Action.

**Table 36. Impacts to Wetlands, Proposed Action**

| Vegetation Type | Existing Conditions | | Proposed Temporary | | Proposed Permanent | |
|---|---|---|---|---|---|---|
| | *Acres* | *% of Unit* | *Acres* | *% of Unit* | *Acres* | *% of Unit* |
| Irrigated Meadow | 1,981.0 | 69.6% | 12.7 | 0.4% | 4.1 | 0.1% |
| Riparian Woodland | 87.3 | 3.1% | 0.5 | 0.0% | 0.1 | 0.0% |
| Wetland/Riparian Area | 671.8 | 23.6% | 3.1 | 0.1% | 1.3 | 0.0% |
| Willow | 16.1 | 0.6% | 0.0 | 0.0% | 0.0 | 0.0% |
| Open Water | 88.8 | 3.1% | 0.3 | 0.0% | 0.0 | 0.0% |
| **Total** | **2,845.0** | **100.0%** | **16.6** | **0.5%** | **5.5** | **0.1%** |

Under the Proposed Action there would be 5 pipeline crossings of perennial streams, 4 new road crossings of perennial streams, and 3 upgraded stream crossings. No pads would be located within known wetland areas, but final pad layout and design would occur during the APD process. No pads would be located within a jurisdictional wetland (per USACE).

Any direct impact to jurisdictional wetlands would require permitting through the USACE for compliance with section 404 of the Clean Water Act. Indirect impacts to wetlands could occur, despite best efforts to maintain Best Management Practices and applicant-committed mitigation. The primary possible effect to wetlands would be the increased delivery of fine sediments from cut-and-fill slopes and road surfaces washing down into wetland areas during intense thunderstorm events, or warm spring snowmelt events. There would also be a possibility of accidental spills of chemicals including diesel, produced water, hydraulic fracturing fluids, acids, and other previously listed substances which could be washed into

BLM_0018058

wetlands. As part of CDPHE permitting, the operator is required to report and clean up any spills. Operator-committed mitigation measures to protect wetland and aquatic resources are listed under the Proposed Action.

The impact of increased fine sediments would include the smothering of vegetation, which could reduce plant diversity in wetland areas. There is already fine sediment delivery to many of the wetlands in the Unit due to livestock grazing and road runoff; therefore, impacts to wetland vegetation have already occurred to some degree. Fine sediments could also decrease pool depths, smother egg masses for amphibians, and reduce aquatic macroinvertebrate diversity. The degree to which these effects would be noticed would depend on the amount and duration. Spilled chemicals would likely decrease aquatic macroinvertebrate diversity, and could produce localized die-offs of amphibians which occur downstream of pad sites. The extent and level of potential impacts from spills would be dependent on what is spilled, how much is spilled, and the success and timeliness of cleanup efforts.

Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to wetlands and riparian areas. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for wetlands includes the Bull Mountain Unit and surrounding lands. Combined temporary impacts to wetlands under the Proposed Action plus the No Action Alternative would total 45.3 acres, plus 10.2 acres of permanent impacts. Temporary and permanent impacts would occur mostly within irrigated meadows, which may not be jurisdictional wetlands.

The ongoing use and foreseeable increased use of roads within and around the Unit for natural gas development as well as recreation would increase the mobilization and availability of fine sediments that could wash into wetlands. In gas fields, roads are by far the highest sources of fine-sediment delivery to wetland and aquatic resources.

Other impacts to wetlands include livestock grazing. Cattle often congregate in wetland areas for shade and forage as well as water. In local stream studies (RMES 2009, Petterson 2012), cattle grazing was cited as a high contributor to fine-sediment mobilization, bank destabilization, and negative impacts to wetland resources.

Water depletions in and around the Unit could also cause indirect impacts to wetlands through drying of wetland resources. As most of the perennial creeks within the Unit are diverted for hay production, instream aquatic habitats, functionality, and riparian systems are negatively impacted through decreased available instream flows.

**Alternative 1** – The types of impacts to wetlands would be similar to those for the Proposed Action. Table 37 summarizes impacts to wetlands under Alternative 1.

**Table 37. Impacts to Wetlands, Alternative 1**

| Vegetation Type | Existing Conditions | | Construction | | Production | |
|---|---|---|---|---|---|---|
| | Acres | % of Unit | Acres | % of Unit | Acres | % of Unit |
| Irrigated Meadow | 1,981.0 | 69.6% | 16.4 | 0.6% | 6.3 | 0.2% |
| Riparian Woodland | 87.3 | 3.1% | 0.5 | 0.0% | 0.1 | 0.0% |
| Wetland/Riparian Area | 671.8 | 23.6% | 2.4 | 0.1% | 1.1 | 0.0% |
| Willow | 16.1 | 0.6% | 0.0 | 0.0% | 0.0 | 0.0% |
| Open Water | 88.8 | 3.1% | 0.1 | 0.0% | 0.0 | 0.0% |
| **Total** | **2,845.0** | **100.0%** | **19.4** | **0.7%** | **7.5** | **0.2%** |

Under Alternative 1 there would be 5 pipeline crossings of perennial streams, 3 new road crossings of perennial streams, and 1 upgraded stream crossing. No pads would be located within known wetland areas, but final pad layout and design would occur during the APD process. No pads would be located

BLM_0018059

within a jurisdictional wetland (per USACE). Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to wetlands and riparian areas. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The types of cumulative impacts to wetlands from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. There would be 232.1 acres of temporary impacts during construction, an increase of 186.8 acres as compared to the Proposed Action, and 80.1 acres of permanent impacts, an increase of 69.9 acres as compared to the Proposed Action. These increased impacts would result from more of the Unit development being clustered in irrigated meadows.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. The level of impacts to wetlands are summarized in Table 38. The pad siting process, and types of impacts to wetlands would be the same as for the Proposed Action.

**Table 38. Impacts to Wetlands, No Action**

| Vegetation Type | Existing Conditions | | Construction | | Production | |
|---|---|---|---|---|---|---|
| | *Acres* | *% of Unit* | *Acres* | *% of Unit* | *Acres* | *% of Unit* |
| Irrigated Meadow | 1,981.0 | 69.6% | 27.5 | 1.0% | 4.2 | 0.1% |
| Riparian Woodland | 87.3 | 3.1% | 0.0 | 0.0% | 0.0 | 0.0% |
| Wetland/Riparian Area | 671.8 | 23.6% | 1.1 | 0.0% | 0.4 | 0.0% |
| Willow | 16.1 | 0.6% | 0.0 | 0.0% | 0.0 | 0.0% |
| Open Water | 88.8 | 3.1% | 0.1 | 0.0% | 0.0 | 0.0% |
| **Total** | **2,845.0** | **100.0%** | **28.7** | **1.0%** | **4.6** | **0.1%** |

Under the No Action Alternative there would 4 pipeline crossings of perennial streams, 1 new road crossings of perennial streams, and 1 upgraded stream crossing. No pads would be located within known wetland areas, but final pad layout and design would occur during the APD process. No pads would be located within a jurisdictional wetland (per USACE).

**Finding on the Public Land Health Standard for Riparian Systems:** Based on the Land Health Assessment for the North Fork Landscape (BLM 2007), the main issues regarding riparian systems with potential cumulative impacts from this project are associated with water diversions, livestock grazing, reductions in instream flows, and noxious weed invasions of riparian communities throughout the North Fork valley. On BLM lands within the Unit, the Spring Creek Trail and its use as a stock driveway and OHV trail, and its current alignment is causing erosion and negative impacts to riparian habitats. The Proposed Action would see a pipeline route and new access road crossing BLM lands that has existing negative impacts to riparian systems associated with the Spring Creek Trail. While the Proposed Action and Alternative 1 should have no direct impact to wetland systems beyond what is permitted, accidental spills could occur. Further, despite installation of BMPs, failure of BMPs may occur due to neglect or intense thunderstorm or spring snowmelt events. Any of these unplanned events may have localized detrimental impacts to wetland systems. However, the Operator is required to remedy any BMP failures or accidental spills, so impacts to wetlands from accidents or neglect would likely be short-term. The Proposed Action, Alternative 1, and No Action Alternative should have negligible impact on riparian systems and wetlands given the small scale of the project, the COAs which include installation and monitoring of BMPs, required remediation for accidental spills or failure of BMPs, and required on-site mitigation through section 404 of the Clean Water Act, as administered by the USACE and EPA. The public land health standard would continue to be met.

BLM_0018060

**FLOODPLAINS**

    **Affected Environment:** No floodplains have been identified within the Unit.

**WATER QUALITY, SURFACE AND GROUND** (includes a finding on Standard 5)

    **Affected Environment:** Surface Water: The Unit falls within the North Fork Gunnison River drainage basin, USGS Hydrologic Unit Code (HUC) 1402004, with a drainage area of approximately 969 square miles. Surface water features within the Unit include portions of 12 perennial streams, numerous intermittent streams, manmade reservoirs, and at least 19 springs (Figure 10). East and West Muddy creeks reach their confluence just south of the Unit, where they join to form Muddy Creek. The Unit is within the Colorado River basin.

Peak runoff within the area is a result of spring (April through June) snowmelt runoff (Table 39). The perennial and intermittent channels within the Unit typically have steep gradients. Remnants of the Wasatch Formation, which is present in the upper North Fork watershed, are loosely consolidated and highly erosive and likely produce naturally high sediment loads in the North Fork Gunnison River (NFRIA 2010).

**Table 39. Typical Monthly Flows for USGS Gauges near the Unit (cfs[1])**

| Stream Gage Site (USGS Gage # and Name) | Jan | Feb | Mar | Apr | May | Jun | July | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09131200 West Muddy Creek Near Somerset, Co | 5.0 | 5.1 | 9.9 | 64.7 | 166.8 | 74.7 | 14.5 | 6.3 | 8.7 | 8.5 | 7.4 | 5.7 |
| 09130500 East Muddy Creek Near Bardine, Co | 13.7 | 14.8 | 26.1 | 172.8 | 474.9 | 209.3 | 46.6 | 27.1 | 18.9 | 18.5 | 18.4 | 15.0 |
| 09131500 Muddy Creek at Bardine, Co | 21.0 | 22.4 | 29.9 | 302.3 | 642.1 | 268.7 | 48.7 | 36.0 | 22.4 | 24.0 | 24.0 | 21.0 |

[1] Cubic feet per second
  Source: USGS National Water Information System (http://wdr.water.usgs.gov/nwisgmap/)

One hundred twelve (112) ponds/reservoirs were located within the Unit, as determined from the Bull Mountain and Chair Mountain United States Geological Survey (USGS) 7.5-minute topographic quadrangle maps and 2009 National Agriculture Imagery Program (NAIP). Of this total, 19 were permitted through the Colorado Division of Water Resources (CDWR). The permitted reservoirs have various uses, including recreation, fishery, augmentation, fire, stock federal reserve, other uses, and wildlife (CDWR 2010). Permitted reservoirs are summarized in the Water Resources Technical Report (WWC 2011).

No springs are identified on USGS quadrangle maps within the Unit, but six spring sites are listed in the National Water Information System (NWIS) database and 13 are recorded as surface water rights in the CDWR database (including two that were also in the NWIS database). All spring locations are shown on Figure 10. No flowing wells have been identified within the Unit. Available water quality data for the six NWIS database springs are included in Table 40 (USGS 2010b).

BLM_0018061

**Table 40. General Water Quality of Springs within the Unit (one sample per station)**

| Gauging Station | Parameters | | |
|---|---|---|---|
| | Temperature (°F) | Specific Conductance (μmohs/cm) | pH (standard units) |
| USGS 390210107202001 SC01208909ABB1 | 57 | 70 | 6.9 |
| USGS 390340107213801 SC01108932BAD1 | 50 | 205 | 8.2 |
| USGS 390435107253801 SC01109027AAC1 | 82 | 285 | 7.5 |
| USGS 390611107235601 SC01109013BDB1 | 68 | 320 | 7.2 |
| USGS 390625107231701 SC01109013AAA1 | 61 | 270 | 7.0 |
| USGS 390659107240801 SC01109012BCA1 | 46 | 370 | 6.7 |

Source: USGS National Water Information System – Water Quality Samples for Colorado.
http://nwis.waterdata.usgs.gov/co/nwis/qwdata?search_criteria=search_site_no&submitted_form=introduction

As noted above, East and West Muddy creeks are tributaries to the North Fork Gunnison River, which flows into the Gunnison River, and the Gunnison River ultimately flows into the Colorado River. The Colorado Department of Public Health and Environment (CDPHE) regulations governing the North Fork Gunnison River are contained within Water Quality Control Commission (WQCC) Regulation No. 35. WQCC Regulation No. 35 establishes classifications and numeric standards for the Gunnison and Lower Delores River Basins (CDPHE 2010a).

Colorado has adopted basic standards and antidegradation rules for surface waters. Under these rules, all tributaries to the North Fork Gunnison River (including all lakes, reservoirs, and wetlands) are classified under five separate categories. Colorado further defines each classification by designating a use for each class of water and assigning numeric or narrative water quality standards to protect the assigned use. The classified uses for surface water are Aquatic Life; Recreation; Domestic Water Supply; Wetlands; and Agriculture (CDPHE 2009a). The classifications are as follows:

Aquatic Life

- Class I - Cold Water Aquatic Life - These are waters that (1) currently are capable of sustaining a wide variety of cold water biota, including sensitive species, or (2) could sustain such biota but for correctable water quality conditions. Waters shall be considered capable of sustaining such biota where physical habitat, water flows or levels, and water quality conditions result in no substantial impairment of the abundance and diversity of species.

- Class 1 - Warm Water Aquatic Life - These are waters that (1) currently are capable of sustaining a wide variety of warm water biota, including sensitive species, or (2) could sustain such biota but for correctable water quality conditions. Waters shall be considered capable of sustaining such biota where physical habitat, water flows or levels, and water quality conditions result in no substantial impairment of the abundance and diversity of specifies.

- Class 2 - Cold and Warm Water Aquatic Life - These are waters that are not capable of sustaining a wide variety of cold or warm water biota, including sensitive species, due to physical habitat, water flows or levels, or uncorrectable water quality conditions that result in substantial impairment of the abundance and diversity of species.

BLM_0018062

Recreation

- Class E - Existing Primary Contact Use:  These surface waters are used for primary contact recreation or have been used for such activities since November 28, 1975.

- Class P - Potential Primary Contact Use - These surface waters have the potential to be used for primary contact recreation. This classification shall be assigned to water segments for which no use attainability analysis has been performed demonstrating that a recreation class N classification is appropriate, if a reasonable level of inquiry has failed to identify any existing primary contact uses of the water segment, or where the conclusion of a UAA is that primary contact uses may occur in the segment, but there are no existing primary contact uses.

- Class N - Not Primary Contact Use - These surface waters are not suitable or intended to become suitable for primary contact recreation uses. This classification shall be applied only where a use attainability analysis demonstrates that there is not a reasonable likelihood that primary contact uses will occur in the water segment(s) in question within the next 20-year period.

- Class U - Undetermined Use - These are surface waters whose quality is to be protected at the same level as existing primary contact use waters, but for which there has not been a reasonable level of inquiry about existing recreational uses and no recreation use attainability analysis has been completed. This shall be the default classification until inquiry or analysis demonstrates that another classification is appropriate.

Domestic Water Supply

- These surface waters are suitable or intended to become suitable for potable water supplies. After receiving standard treatment (defined as coagulation, flocculation, sedimentation, filtration, or disinfection with chlorine or its equivalent), these waters will meet Colorado drinking water regulations and any revisions, amendments, or supplements thereto.

Wetlands (The provisions of this section do not apply to constructed wetlands.)

- Compensatory wetlands shall have, as a minimum, the classifications of the segment in which they are located.

- Created wetlands shall be considered to be initially unclassified, and shall be subject only to the narrative standards set forth in section 31.11, unless and until the Commission adopts the "wetlands" classification described below and appropriate numeric standards for such wetlands.

- Tributary wetlands shall be considered tributaries of the surface water segment to which they are most directly connected and shall be subject to interim classifications as follows: such wetlands shall be considered to have the same classifications, except for drinking water supply classifications, as the segment of which they are a part, unless the "wetlands" classification and appropriate site-specific standards have been adopted to protect the water quality dependent functions of the wetlands. Interim numeric standards for these wetlands are described in section 31.7(1)(b)(iv).

BLM_0018063



Figure 10. Hydrology and Water Resource within the Bull Mountain Unit

BLM_0018064

This page left blank for two-sided copying.

BLM_0018065

- The Commission may adopt a "wetlands" classification based on the functions of the wetlands in question. This classification would be the same as that used by both EPA and the USACE. Wetland functions that may warrant site-specific protection include ground water recharge or discharge, flood flow alteration, sediment stabilization, sediment or other pollutant retention, nutrient removal or transformation, biological diversity or uniqueness, wildlife diversity or abundance, aquatic life diversity or abundance, and recreation. Because some wetland functions may be mutually exclusive (e.g., wildlife abundance, recreation), the functions to be protected or restored will be determined on a wetland-by-wetland basis, considering natural wetland characteristics and overall benefits to the watershed. The initial adoption of a site-specific wetlands classification and related standards to replace the interim classifications and standards described above shall not be considered a downgrading.

Agriculture

- These surface waters are suitable or intended to become suitable for irrigation of crops usually grown in Colorado and which are not hazardous as drinking water for livestock.

Stream segment descriptions and water quality classifications within and downstream of the Unit, including the North Fork Gunnison River, are provided in Table 41. A complete listing of numeric standards for physical, biological, inorganic, and metal parameters for Colorado surface water can be found in Basic Standards for Surface Water (CDPHE 2009a).

**Table 41. Stream Classifications and Water Quality Standards**

| Stream Segment Description | Classification |
|---|---|
| 1. All tributaries to North Fork of the Gunnison River including all lakes, reservoirs, and wetlands within the West Elk and Raggeds Wilderness Areas. | Aquatic Life Cold 1 Recreation E Water Supply Agriculture |
| 2. Mainstem of North Fork of the Gunnison River from the confluence of Muddy Creek and Coal Creek to the Black Bridge (41.75 Drive) above Paonia. | Aquatic Life Cold 1 Recreation E Water Supply Agriculture |
| 3. Mainstem of North Fork of the Gunnison River from the Black Bridge (41.75 Drive) above Paonia to the confluence with the Gunnison River. | Aquatic Life Cold 1 Agriculture Oct. 1 to March 31 Recreation N April 1 to Sept. 30 Recreation E |
| 4. All tributaries to the North Fork of the Gunnison River including all lakes, reservoirs, and wetlands from the source of Muddy Creek to a point immediately below the confluence with Coal Creek; all tributaries to the North Fork of the Gunnison including all lakes, reservoirs, and wetlands, including the Grand Mesa Lakes which are on National Forest lands, except for the specific listing in Segments 1 and 7. | Aquatic Life Cold 1 Recreation E Water Supply Agriculture |
| 6a. All tributaries to the North Fork of the Gunnison River including all lakes, reservoirs, and wetlands which are not on National Forest lands, except for the specific listings in Segments 4, 5, 6b and 7. | Aquatic Life Warm 2 Recreation P Agriculture |
| 7. Paonia Reservoir. | Aquatic Life Cold 1 Recreation E Water Supply Agriculture |

BLM_0018066

Regulation No. 93 is Colorado's Section 303(d) list of water quality limited segments requiring total maximum daily loads (TMDLs) (CDPHE 2010b). The 2010 303(d) list of segments needing the TMDLs includes one segment within the North Fork Gunnison River (from Black Bridge above Paonia to the confluence with the Gunnison River), which is listed as impaired due to selenium. This segment is downstream of the Unit and is the only stream segment on the mainstem of the North Fork Gunnison River drainage on the State's Section 303(d) list. Regulation 35 designates Segment 6a of the North Fork Gunnison River as use-protected with numeric standards that protect existing aquatic life (CDPHE 2010a).

Surface water quality in semi-arid regions is typically seasonally variable and dependent on the magnitude and frequency of discharge events. Approximately 80% of Colorado's water supply comes from melting snow (NFRIA 2010). Due to the erosive nature of the area soils, relatively high suspended sediment concentrations are expected, particularly during high-flow events. Intermittent streams in the area commonly exhibit very high suspended sediment concentrations during the first flows of a flood wave, apparently the result of a flushing action. During periods of several months or more without flow, basin surfaces and stream channels accumulate loose material due to weathering, wildlife and livestock movements, bank caving, and wind deposits. These loose materials are then readily picked up and transported (flushed) by the turbulent first flows of a flood wave. Once the initial flush has occurred, the amount of sediment transported is dependent upon supply and magnitude of discharge (Lowham et al. 1982). The amount of runoff from intermittent streams may be small in relation to that of the larger perennial receiving streams (i.e., East and West Muddy creeks, Muddy Creek, and North Fork Gunnison River), although the flushing process results in relatively large concentrations of dissolved and suspended materials that may constitute a shock load to receiving streams, particularly during low-flow summer months. Runoff from arid and semi-arid areas can therefore have a significant influence on the water quality of the perennial streams receiving such runoff (Lowham et al. 1982).

During periods of extensive runoff due to thunderstorms and snowmelt, water within East and West Muddy creeks generally has lower levels of sodium, bicarbonate, calcium, and magnesium. Sulfate and potassium levels also decrease slightly during snowmelt events (USGS 2010b). During the irrigation season, sodium becomes more concentrated and calcium and magnesium concentrations also increase (USGS 2010b).

One USGS surface water quality sampling station (390620107241900) is located within the Unit, and four other sampling stations (09129800, 390000107212700, 385918107205200, and 385903107210800) are located either above or below the Unit that provided relevant long-term water quality data. Temperature, specific conductance, pH, hardness (as $CaCO_3$), SAR, dissolved solids, suspended sediments, and sediment yield are the parameters evaluated, as they are typically indicators for the evaluation of water for various uses.

The USGS has collected water quality samples of various constituents at differing time intervals. Data are available on the USGS website (USGS 2010b) and are summarized in Table 42. These data show that water quality generally decreases in the downstream direction. For example, the average annual total dissolved solids (TDS) concentration ranged from approximately 101 milligrams per liter (mg/L) at the upper stream station (USGS 09129800) to approximately 146 mg/L at the lower station (USGS 390620107241900). Natural erosion of geologic units is the primary source of dissolved solids.

Moderately erosive and saline soils naturally occur within and around the Unit. Once the soil is disturbed (i.e., from construction of a road or well pad), the potential for the release of residual soil sediment is increased. It is possible that oil and gas activities in the general area have contributed, and will continue to contribute, to both sedimentation and salinity levels presently being experienced in the Colorado River. All of the soils within the Unit have the potential to create water quality-related sediment and salinity problems when disturbed.

BLM_0018067

**Table 42. General Water Quality of East Muddy/Muddy Creeks on Near the Unit**

| Parameter | No. of Samples | Range | Mean | Median |
|---|---|---|---|---|
| USGS 09129800 Clear Fork Near Ragged Mountain, CO (1965 – 1973) | | | | |
| Temperature (°C) | 83 | 0-22.0 | 8.2 | 7.0 |
| Specific Conductance (μmohs/cm) | 10 | 82-230 | 153.0 | 146.5 |
| pH (field - standard units) | 10 | 8.0-8.6 | 8.3 | 8.3 |
| Total Hardness (mg/L as CaCO$_3$) | 9 | 40-120 | 80 | 75 |
| SAR (unitless) | 9 | 0.2-0.3 | 0.2 | 0.2 |
| Total Dissolved Solids @ 180 °C (mg/L) | 7 | 61-147 | 100.7 | 95.0 |
| Total Suspended Solids (mg/L) | 10 | 4-641 | 88.1 | 15.5 |
| Sediment Yield (tons/day) | 10 | 0.05-701 | 76.7 | 1.3 |
| USGS 385903107210800 Muddy Creek Above Paonia Reservoir, CO (1982 – 1983) | | | | |
| Temperature (°C) | 15 | 6.5-20 | 13.5 | 13.0 |
| Specific Conductance (μmohs/cm) | 15 | 120-305 | 191.5 | 180.0 |
| pH (standard units) | 15 | 7.6-8.7 | 8.2 | 8.2 |
| Total Hardness (mg/L as CaCO$_3$) | 15 | 60-140 | 90.1 | 79.0 |
| SAR (unitless) | 15 | 0.2-0.4 | 0.3 | 0.3 |
| Total Dissolved Solids @ 180 °C (mg/L) | 14 | 84-182 | 124.4 | 117.5 |
| Total Suspended Solids (mg/L) | 10 | 58-3,660 | 862.3 | 450.5 |
| Sediment Yield (tons/day) | 10 | 9.4-3,710 | 1395.1 | 905.0 |
| USGS 385918107205200 Muddy Creek Above Paonia Res Site No 1 (1977 – 1978) | | | | |
| Temperature (°C) | 2 | 6.5-20 | 0.2 | 0.2 |
| Specific Conductance (μmohs/cm) | 2 | 120-305 | 302.5 | 302.5 |
| pH (standard units) | 2 | 7.6-8.7 | 8.3 | 8.3 |
| Total Hardness (mg/L as CaCO$_3$) | -- | -- | -- | -- |
| SAR (unitless) | 2 | 7.3-8.5 | 140.0 | 140.0 |
| Total Dissolved Solids @ 180 °C (mg/L) | 2 | 60-140 | 0.4 | 0.4 |
| Total Suspended Solids (mg/L) | -- | -- | -- | -- |
| Sediment Yield (tons/day) | -- | -- | -- | -- |
| USGS 390000107212700 Lower West Muddy Creek Near Paonia Reservoir, CO (1982 – 1983) | | | | |
| Temperature (°C) | 12 | 9.0-23 | 15.7 | 17.0 |
| Specific Conductance (μmohs/cm) | 12 | 145-374 | 250.6 | 247.5 |
| pH (standard units) | 12 | 7.8-8.9 | 8.4 | 8.3 |
| Total Hardness (mg/L as CaCO$_3$) | 12 | 68-180 | 120.3 | 125.0 |
| SAR (unitless) | 12 | 0.2-0.4 | 0.3 | 0.3 |
| Total Dissolved Solids @ 180 °C (mg/L) | 12 | 936-210 | 152.8 | 155.5 |
| Total Suspended Solids (mg/L) | 11 | 10-271 | 96.6 | 48.0 |
| Sediment Yield (tons/day) | 11 | 0.15-653 | 110.5 | 6.4 |
| USGS 390620107241900 East Muddy Creek Near Ragged Mountain, CO (1982 – 1983) | | | | |
| Temperature (°C) | 13 | 5.5-19.5 | 13.7 | 14.5 |
| Specific Conductance (μmohs/cm) | 13 | 110-406 | 228.5 | 180.0 |
| pH (standard units) | 13 | 7.8-8.8 | 8.2 | 8.2 |
| Total Hardness (mg/L as CaCO$_3$) | 13 | 56-180 | 105.8 | 78.0 |
| SAR (unitless) | 13 | 0.2-0.7 | 0.4 | 0.4 |
| Total Dissolved Solids @ 180 °C (mg/L) | 11 | 77-233 | 145.6 | 105.0 |
| Total Suspended Solids (mg/L) | 11 | 33-5,790 | 1216.5 | 657.0 |
| Sediment Yield (tons/day) | 11 | 5.5-1,350 | 518.9 | 95.0 |

BLM_0018068

The North Fork is recognized as a major contributor of salt to the Colorado River System (NFRIA 2010). Salinity has become a major concern within the Colorado River drainage basin. The 1972 Clean Water Act required the establishment of numeric criteria for salinity for the Colorado River and in 1973, seven Colorado River Basin states created the Colorado River Basin Salinity Control Forum. The Forum developed water quality standards for salinity including numeric criteria and a basin-wide plan of implementation. The plan consists of a number of control measures to be implemented by State and Federal agencies. In 1974, Congress enacted the Colorado River Basin Salinity Control Act. The Act was amended in 1984, requiring the Secretary of the Interior to develop a comprehensive program to minimize contributions from lands administered by the BLM.

To date, there are no current salinity evaluations of the North Fork watershed or Gunnison basin (NFRIA 2010). USGS information characterizing salinity of the Gunnison River indicated that long-term (1931 through 2011) TDS values fluctuated between 166 and 2,820 mg/L and there has been a significant decline in average annual TDS values over time (USGS 2011).

Groundwater

Groundwater quality is largely related to the depth of the respective source aquifer, flow between aquifers, and the rock type. Temperature, specific conductance, pH, hardness (as $CaCO_3$), SAR, dissolved solids, suspended sediments, and sediment yield are the parameters evaluated below, as they are typically indicators for the evaluation of water for various uses.

Aquifers of the North Fork Gunnison River basin are found in the alluvium and bedrock. Most wells in the North Fork basin are at altitudes below 7,500 feet and yield from 2 to 40 gallons per minute. The wells are often located in alluvial sand and gravel, sandstone, or fractured bedrock. Springs generally are at altitudes above 7,000 feet, discharge from perched water tables at geologic contacts, have calcium magnesium bicarbonate water types, and are much less saline than water from wells (NFRIA 2010).

A USGS investigation of groundwater resources in the North Fork watershed found that alluvial aquifers yield water with dissolved solids concentrations ranging from 43 to 2,300 mg/L. Dissolved solids concentrations of water samples from the Mesaverde Group, the Dakota Sandstone, and Burro Canyon Formation ranged from 56 to 3,200 mg/L. Dissolved solids concentrations of water samples from the Mancos Shale ranged from 1,800 to 8,200 mg/L (Ackerman and Brooks 1986).

According to the North Fork River Watershed Plan, groundwater from bedrock aquifers in the upper watershed is generally of the sodium bicarbonate type that is neutral to alkaline (pH 7-9), with low metals content and high methane content. Dissolved solids in the bedrock units are in the general range of 1,000 to 2,500 mg/L, with the exception of the Rollins Sandstone, which is between 3,000 and 9,000 mg/L (NFRIA 2010).

SG's existing disposal well (Federal 24-2 WDW) is a Class II disposal well located on fee lands in the NWSW Section 24, T11S, R90W and is used to dispose of produced water from current natural gas production in the area. The geological horizons for the primary disposal zones for the one existing and four proposed disposal wells are the Dakota Sandstone, Morrison Formation, Entrada Sandstone, or Maroon Formation at depths between 9,300 and 9,500 feet. The TDS concentration measured in the existing injection well, completed in the Unit in the Permo-Pennsylvanian age Maroon Formation, is 18,962 mg/L. Using USGS salinity classification (Heath, 1983) this water is described as very saline. The quality of the water in the other horizons targeted for injections will likely be of similar, poor quality. Produced-water quality sample lab test results from samples collected in 2007 from existing producing wells within the Unit are included in Tables 43 and 44, and indicate organic pollutants (BTEX) from produced water from one existing producing natural gas well within the Unit and the statewide interim organic pollutant standards as identified in CDPHE WQCC Regulation No. 41 (CDPHE 2009b).

BLM_0018069

**Table 43. Water Quality Lab Test Results from Produced Water From Existing Producing Natural Gas Wells within Producing Formations in the Unit**

| Parameter[1] | McIntyre 11-90-14-4 | Falcon Seaboard 11-90-12-12-1 | Henderson R1 | Federal 26-1 |
|---|---|---|---|---|
| pH (Field) | 5.5 | 7.1 | 5.6 | 9.6 |
| TDS | 10,557 | 8,775 | 18,445 | 4,495 |
| Potassium | 94 | 431 | 312 | 110 |
| Sodium | 2,961 | 2,531 | 5,462 | 1,493 |
| Calcium | 664 | 260 | 736 | 60 |
| Magnesium | 252 | 140 | 572 | 60 |
| Bicarbonate | 280 | 636 | 132 | 260 |
| Chloride | 6,400 | 4,800 | 11,600 | 2,400 |
| Sulfate | 0 | 4 | 4 | 19 |
| Total Iron | 0.9 | 5.4 | 1.6 | 0.1 |

[1]All units in mg/L except pH, which is in standard pH units

**Table 44. Water Quality Lab Test Results for Organic Pollutants (BTEX) from Produced Water[1] from an Existing Producing Natural Gas Well within the Unit.**

| Location | Contaminant | Result (µg/L) | MCL (µg/L)[2] |
|---|---|---|---|
| Well # 05-051-05004 Section 8 T13S R89W | Benzene | 8.1 | 5 |
| | Ethylbenzene | <2 | 700 |
| | Toluene | <2 | 1000 |
| | Xylenes (total) | 12.3 | 10,000 |

[1] Sample Collected July 25, 2004

[2] Maximum Contaminant Level (CDPHE WQCC Regulation No. 41)

Water to be injected into the disposal wells is first piped into holding tanks to allow sediments to settle out. The water then passes through a series of filters to remove solids larger than 10 microns in diameter. Accumulated solids from the settling and filtration process are periodically removed from the holding tanks and trucked to an approved off-site disposal facility. Chemical treatment of water reduces scaling or deposition of minerals in the receiving formation, which, if unabated, could reduce the porosity in the recovery formation and otherwise shorten the life of the disposal wells. Chemicals used for treatment likely include acids, which keep ions in suspension and retard scaling. Disposal of produced water is in accordance with a plan approved by the BLM as provided for in Onshore Oil and Gas Order No. 7, Disposal of Ground Water, the COGCC rules and regulation (approved by EPA), and the Gunnison County Temporary Regulations for Oil and Gas Operations (Gunnison County Board of County Commissioners 2003).

Pre-, During and Post-Project Monitoring
SG currently owns and operates 11 fee/fee and 5 federal natural gas wells on 14 well pads and one water-disposal well within the Bull Mountain Unit. In compliance with Gunnison County and COGCC regulations regarding existing wells and in anticipation of potential new development, SG initiated baseline water quality monitoring of surface water and groundwater (domestic wells intended for human consumption) within the Unit (Gunnison County Board of County Commissioners 2003 and COGCC 2009). Sites have been established to sample surface water along creeks and other water bodies. Samples were also collected from sources of drinking water within a ¼ to 1-mile radius of proposed natural gas wells to establish baseline conditions. SG currently monitors water quality at 75 sites with additional sites added as directed by COGCC and Gunnison County. Sites have been/would be sampled once prior to drilling and would be sampled at year 1, 3, and 5 after well completion. If the project is approved, drilling of new wells (including those on existing pads) would precipitate additional water quality sampling events. The constituents tested and site locations are included in Appendix G.

BLM_0018070

**Environmental Consequences/Mitigation:**

**Proposed Action – <u>Surface Water</u>:** Potential impacts to surface water resources include increased turbidity and sedimentation in watercourses, increased short-term runoff, increased salt-loading, contamination of surface water courses and ponds by produced water and petroleum, and depletion of surface water flows in East and West Muddy creeks and possibly the North Fork. Impacts would likely be greatest during the construction and drilling phase, which would disturb approximately 286.9 acres. Production disturbance would total approximately 125.9 acres. Surface water quality could also be affected by the water use requirements of the project.

The magnitude of impacts to surface water resources would depend on several factors, including the proximity of the disturbance to drainages or ponds, slope aspect and gradient, soil type, duration and timing of the construction activity, and the success or failure of mitigation. In an effort to locate potentially suitable sites within the Unit boundary, SG utilized site-suitability models, which combined a number of data sets across a given area to produce a final composite that ranked the appropriateness of a site (Appendix A). The analyses utilized data sets to develop criteria for each site-suitability study, including the following parameters directly or indirectly related to hydrologic function:

- Slope (steepness of the terrain)
- Proximity to existing road networks
- Proximity to existing natural gas pipeline systems
- Proximity to delineated wetlands and wetland buffer zones
- Proximity to stream networks and stream buffer zones
- Soil erosion factors

Construction of access roads, well pads, and pipelines could have temporary to short-term impacts on water quality. Clearing and grading of streambanks, in-stream trenching, and backfilling could affect perennial surface waters through modifications of aquatic habitat, increased sedimentation, increased turbidity, decreased dissolved oxygen concentrations, and releases of chemical and nutrient pollutants from sediments. A reduction in streambank integrity could increase streambank erosion and result in redirection of streamflow. For pipeline crossings, suspended sediment would temporarily increase for the time required to install the pipe in the streambed (typically less than 24 hours). The sediment concentration would progressively decrease downstream as the large sediment particles deposit on the channel bed. Increased salt loading could potentially occur where saline soils would be disturbed and eroded by runoff into streams. Impacts on intermittent streams would be limited to temporary alteration of beds and banks, and possibly increased sediment loads during initial storm events following construction. Pipeline installation at surface water crossings would not permanently alter stream morphology or hydraulic capacity.

Contamination of surface water near oil and gas facilities can occur in oil and gas fields. Sources of potential contamination include leaks from wellheads, conveyance pipelines, compressor stations, produced water sumps (flowback pits), and condensate storage tanks. Leaks from tanker trucks and leaching of contaminants from impacted soils near these facilities are also sources of potential contamination.

Benzene occurs in amounts slightly higher than the statewide interim organic pollutant standards for ground water (Table 45 above). When released directly to surface waters, benzene should evaporate within a few hours. Benzene does not degrade by reacting with water; however, it may be degraded by microbes. Benzene is not likely to accumulate in aquatic organisms (EPA 2010a). Based on a review of the Colorado Division of Water Resources' surface water rights database, designated uses for surface waters within the Unit includes storage, irrigation, industrial, recreation, fishery, fire, domestic, stock, augmentation, federal reserve, other uses, and wildlife (CDWR 2010). Potential health effects resulting from the ingestion of benzene at quantities at or above the Maximum Contaminant Level (MCL) (5 µg/L) include anemia; decrease in blood platelets; increased risk of cancer (EPA 2010b).

BLM_0018071

Water is needed for a variety of activities associated with development of the Unit, including dust abatement on roads, moistening of soils and gravels for compaction of well pad surfaces, production of drilling muds (to help lubricate the bore hole and circulate drill-bit cuttings), cementing the casing, and hydraulic fracturing and well stimulation. Water is also sometimes used to hydraulically test pipeline integrity. Under the Proposed Action:

- Drilling activities would be completed in just under 6 years. It is estimated that drilling operations (drilling, cementing, and hydraulic fracturing) would use 635 ac-ft per year per year based on three drill rigs drilling an estimated 27 wells per year. Well pad construction would require approximately 29 ac-ft of water per year. The estimated annual water use for the drilling/completion is 664 ac-ft.

- Road/pipeline construction (including 0.5 ac-ft for pressure testing and water for dust abatement and compaction purposes) would require approximately 63 ac-ft of water over the construction phase. For estimation purposes (based on a 6-year drilling schedule) the annual water use for road/pipeline construction would be approximately 11 ac-ft. It is likely that a majority of the road/pipeline construction would be completed ahead of the drilling.

- Total annual water use for construction and drilling operations is estimated to be 675 ac-ft. SG estimated that approximately 70 percent of the water needed for drilling operations could come from recycled hydraulic fracturing fluid or reused produced water, which translates to approximately 203 ac-ft of other water needed for the Bull Mountain GAP project.

Water for drilling and cementing would be pumped to the well site and stored for operations, or would be hauled in by truck. Each well site would have its own procedure for bringing in water, depending on surface-use agreements with local landowners. The water used for the drilling/completion, and additional water for construction (dust abatement and soil compaction) would be considered a "consumptive use" in that the water could not be re-used for other purpose and must be injected into a disposal well, hauled off-site to an approved disposal facility, or allowed to evaporate in a reserve pit. SG plans to re-use drilling fluids where possible due to the expense of disposal and redevelopment of the chemical makeup of the drilling fluids. In order to minimize the consumptive use of water for completion operations, SG is proposing to construct four flowback pits to temporarily store water prior to and after hydraulic fracturing and completion operations (Figure 6).

In June of 2009, HR2766 (Fracturing Responsibility and Awareness of Chemicals Act of 2009) was introduced in Congress to make hydraulic fracturing regulated by the Safe Drinking Water Act (SDWA). It would require the disclosure of the chemical constituents of hydraulic fracturing fluid to the EPA (AIPG 2009). The bill was referred to the House Committee on Energy and Commerce and no action has been taken to date. On December 13, 2011 the State of Colorado enacted 2 Colorado Code of Regulations §404-1:205A, which requires oil and gas operators to disclose on a national public website the chemical ingredients and water volumes used to hydraulically fracture wells within the state. This regulation will apply to wells that undergo hydraulic fracturing treatments on or after April 1, 2012. Additional detail of this regulation is provided in the section on Hazardous and Solid Waste.

COGCC currently has regulations in place to address potential hydraulic fracturing problems. Operators must now notify the COGCC immediately if there are any potential public health problems, and must notify COGCC within 10 days if there are any downhole problems from hydraulic fracturing. A website (http://fracfocus.org/) is now available to provide data on hydraulic fracturing chemicals in Colorado. Other requirements include record-keeping and notification of the chemical components of a spill. Operators must maintain Materials Safety Data Sheets (MSDS) for all chemical products. If there is a spill, a letter from the Director of the COGCC is required to obtain details of proprietary chemicals, and while these documents are kept confidential; they are accessible to health professionals if a confidentiality agreement is signed. The COGCC requires bradenhead testing (pressure testing of the annulus between the surface and production casing) to ensure well integrity (AIPG 2009). EPA recently issued voluntary

BLM_0018072

information requests to leading national and regional hydraulic fracturing service providers. The data requested is integral to the Hydraulic Fracturing Study now underway by EPA, which seeks to understand any potential relationships between hydraulic fracturing and drinking water. EPA is seeking information on the chemical composition of fluids used in the hydraulic fracturing process, data on the impacts of the chemicals on human health and the environment, standard operating procedures at hydraulic fracturing sites, and the locations of sites where hydraulic fracturing has been conducted (EPA 2010c).

In 2009, SG developed a Water Augmentation Plan granted by the District Court – Water Division 4 (Case No. 2009CW16), and regulated through the State Division of Water Resources (Water Division 4) for augmenting approximately 90 ac-ft of water consumptively used from the Muddy Creek basin in order to maintain instream flows. Agricultural waters were re-appropriated for maintaining instream flow requirements under this plan. If necessary, water would be purchased and trucked in from private and/or other sources located near Paonia or Somerset.

Separated, produced water from each producing well would be transported to an approved disposal well within the Unit. SG proposes to develop four additional Class II produced water reinjection (disposal) wells to augment the one existing disposal well (Figure 6). Locations for these new wells were chosen based on the number of gas-producing wells in an area ("pod"), which would be generating water to be reinjected, and on proximity to major road systems to facilitate year-round accessibility. Disposal of produced water would be in accordance with a plan approved by the BLM as provided for in Onshore Oil and Gas Order No. 7, Disposal of Ground Water, COGCC rules and regulation (approved by EPA), and the Gunnison County Temporary Regulations for Oil and Gas Operations.

Approximately 12.2 miles of new access roads and 22.1 miles of new pipelines would be constructed under the Proposed Action, of which approximately 11.4 miles would be co-located with roads. The construction of the new roads and pipelines would result in 17 perennial stream crossings and 41 intermittent stream crossings. The road/pipeline crossings would result in a permanent alteration of channel shape. Due to the flashy nature of these tributaries, the crossings may impact runoff patterns. However, proper design of the crossings to accommodate significantly large flow events would minimize impacts to the drainage. During the construction phase, disturbances associated with the crossings are expected to increase the turbidity, sedimentation, and salt loading within the channels. In the long term, these potential impacts would be minimized as the roadway/pipeline corridors are stabilized by revegetation of the road shoulders and pipeline corridors and paving the road surface, with additional surface disturbances occurring only during major maintenance activities.

<u>Groundwater</u>: Potential impacts to groundwater resources from the Proposed Action include contamination of groundwater with produced water, drilling mud, hydraulic fracturing fluids, or petroleum. Withdrawal of produced water during production activities could impact target aquifers as could reinjection of the produced water.

Alluvial aquifers along East and West Muddy creeks and their tributaries could potentially be contaminated by fluids from the various project components. Soil contamination near these sites, if not remedied quickly, could migrate into the underlying alluvial groundwater and release benzene and other constituents into the groundwater. Domestic, industrial, and irrigation are the present uses for the alluvial groundwater in the Unit. There is the potential for accumulation of organic compounds in the sediment and shallow ground water (perched aquifers) adjacent to the flowback pits. Over the life of the project concentration of these compounds could build to levels significantly higher than state standard MCLs for ground water. Migration of contaminants through soils and perched aquifers to more mobile colluvial/alluvial ground water may occur resulting in contamination of domestic water supplies.

Fracking would be used to stimulate production by increasing the permeability of the producing formation. The hydraulic fracturing fluid, which consists primarily of produced water, is pumped under extremely high pressure downward through the casing and out through the perforations in the casing. Approximately 30,000 bbls (3.87 ac-ft) of hydraulic fracturing fluid per treatment is anticipated. Up to six

BLM_0018073

treatments may be required per well. The pressurized fluid enters the formation and fractures it. The fractures are typically held open or "propped" by silica sand introduced with the hydraulic fracturing fluid. Following the procedure approximately one-half of the hydraulic fracturing fluid may be returned to the surface where it would be re-used for additional hydraulic fracturing operations during the same season.

SG estimates that at full project build-out between 2,500 and 15,000 bbls per day (118 and 706 ac-ft/year) of produced water would be removed from Mesaverde Group and Mancos Shale aquifers to facilitate the natural gas recovery process. The target depths of the proposed natural gas production wells would vary by well site, but are estimated to be between 5,000 and 10,000 feet. The deepest non-industrial designated-use well within the Unit is 460 feet. Due to the depth separation between SG's proposed production wells and existing non-industrial use water wells, non-target aquifers in the area should not be impacted by the removal of water resulting from the Proposed Action.

As part of natural gas development in the area, SG intends to install four additional Class II produced-water injection wells for a total of five injection wells associated with the proposed project. All produced water not recycled and reused for drilling/completion operations would be reinjected into these wells. A Class II disposal well, as designated by the Environmental Protection Agency (EPA), is permitted for the purpose of injecting brines and other associated fluids associated with the production of natural gas. A Class II well protects the fresh water resources by injecting and isolating waste fluid in deep formations and eliminating risks associated with its disposal near surface water. Injection wells are under the jurisdiction of the COGCC. According to COGCC Rule 324, injection cannot occur in a non-exempted aquifer. An exempt aquifer must meet the following criteria:

(1) It does not currently serve as a source of drinking water, and either subparagraph (2) or (3) below apply.

(2) It cannot now and will not in the future serve as a source of drinking water because:

    A. It is mineral, hydrocarbon or geothermal energy producing, or can be demonstrated by a person filing an application pursuant to Rule 325, or Rule 401, to contain minerals or hydrocarbons that, considering their quantity and location, are expected to be commercially producible; or

    B. It is situated at a depth or location which makes recovery of water for drinking water purposes economically or technologically impractical; or

    C. It is so contaminated that it would be economically or technologically impractical to render the water fit for human consumption.

(3) The total dissolved solids content of the ground water is more than three thousand (3,000) and less than ten thousand (10,000) milligrams per liter and it is not reasonably expected to supply a public water system.

The geological horizons for the primary disposal zones for the one existing and four proposed disposal wells are the Dakota Sandstone, Morrison Formation, Entrada Sandstone, or Maroon Formation at depths between 9,300 and 9,500 feet. The TDS concentration measured in the existing injection well, completed in the Unit in the Permo-Pennsylvanian age Maroon Formation, is 18,962 mg/L. The quality of the water in the other horizons targeted for injections will likely be of similar, poor quality. The high TDS concentration in the Maroon Formation in the vicinity of the existing disposal well and the likely similar, poor water quality of the other horizons targeted for injection suggest that these horizons would be classified as exempt aquifers, which would make them suitable for disposal of produced water. SG will demonstrate that the target horizons for injection meet the criteria for an exempt aquifer, per COGCC Rule 324Ba prior to reinjection of produced water. Due to the depth separation between SG's proposed injection wells and existing non-industrial use water wells (the deepest non-industrial designated use well

BLM_0018074

within the Unit is 460 feet), non-target aquifers in the area should not be impacted by the Proposed Action.

The potential hazardous contaminant, benzene, in produced water could occur in amounts higher than the statewide interim organic pollutant standards for ground water (see Table 46). When released directly to soils, the contaminants could leach into ground waters. Benzene does not degrade by reacting with water; however, it may be degraded by some soil microbes. Benzene is not likely to accumulate in aquatic organisms. Because the present uses for the alluvial groundwater in the Unit includes domestic uses, potential exists for contamination of potable water. Potential health effects resulting from the ingestion (municipal water uses) of benzene at quantities at or above the MCL (5 µg/L) range from temporary nervous system disorders, immune system depression, and anemia for short term exposures. Long-term exposures at quantities at or above the MCL (5 µg/L) could result in chromosome aberrations and cancer.

Toluene, ethylbenzene, and xylenes also occur in SG's production water. Levels for toluene, ethylbenzene, or total xylenes were well below the assigned MCL levels (Table 45).

A majority of the project facilities are in the areas where no alluvium is present, but several proposed well sites are located on alluvial deposits. In addition, the Wasatch Formation, which crops out and is widely distributed across the Unit, consists of permeable strata and also has some secondary permeability from fractures and jointing and could therefore provide hydraulic communication to the alluvial aquifer.

There is a minor potential for commingling of waters from the aquifers encountered during well construction, if proper well drilling procedures and completion techniques are not employed.

The design and operating specifications for the pipelines that comprise the system are included in the Plan of Development for the project. The trunk pipeline system would consist of several types of pipelines, generally within a shared trench and a shared right-of-way. Portable pipelines would only be utilized for temporary delivery of water for hydraulic fracturing and subsequent flowback waters in areas lacking constructed steel fluid pipelines. This would occur on a case-by-case basis over small distances (less than ¼ mile). Any portable pipelines to federal wells would be covered in the APD process and would only be used during freeze-free periods. Pipeline construction would cross several perennial streams and their alluvial aquifers. Activities such as trenching and backfilling could cause temporary and minor fluctuations in the shallow alluvial groundwater levels and/or increased turbidity within the aquifer immediately adjacent to the construction activity. These effects would subside after trenching and backfilling activities are completed. Dewatering could be required where groundwater accumulates in the pipeline trench. Dewatering would be required to ensure that the pipe is properly fitted and installed into the ditch, minimum cover provided, and the trench bottom is free of rocks and other debris that could damage the external pipe coating. All dewatering would be under the jurisdiction of CDPHE. A Colorado Discharge Permit for construction dewatering is required where the groundwater or commingled water needs to be discharged to surface water or back to the ground (CDPHE 2009c). Impacts from dewatering discharge could result in erosion and sedimentation to upland areas of surface waters in the discharge vicinity. Erosion and sedimentation impacts would be temporary and would be reduced with mitigation.

Under the Proposed Action, approximately 13.5 miles of upgrades to existing two-track roads, and approximately 12.2 miles of new roads would be constructed. The proposed roadways would cross perennial and named and unnamed intermittent tributaries to East and West Muddy creeks. Construction of the roads could alter natural groundwater recharge patterns along the tributaries.

Unintentional leaks from pipelines or water storage vessels associated with the Proposed Action could potentially occur. SG has minimized the potential for shallow groundwater impacts by utilizing site-suitability models to locate proposed well pads according to environmental and regulatory constraints. In addition, SG will line the reserve pits with 12-mil (minimum thickness) felt-backed liners to minimize the chance of leakage into the soil beneath the ponds.

Water balance (the amount of water produced vs. the capacity to dispose/store produced water) is a topic of potential concern related to natural gas development projects. As discussed above, between 2,500 and

BLM_0018075

15,000 bbls of produced water would be removed per day from Mesaverde Group and Mancos Shale aquifers to facilitate the natural gas recovery process. SG estimates that between 500 and 3,000 bbls per day of produced water would be injected into each of the five water disposal wells at full build-out of the Unit (BLM 2011), indicating that all produced water not reused for well completion would be disposed of through injection. Based on disposal rates documented at Federal 24-2 (an operating disposal well within the Unit), the maximum disposal rate for each well could be 5,000 bbls per day, which is well above the rate needed to inject the maximum amount of water produced.

As described in Appendix B, four flowback pits with 24-mil felt-backed liners are being constructed within the Unit. The primary purpose of flowback pits is to store water, including flowback and produced water, to minimize the consumptive use of water for well completion operations and hydraulic fracturing. The combined capacity of the four proposed flowback pits would be approximately 348,000 bbls (45 ac-ft) of water. SG estimates that the maximum water demand for hydraulic fracturing would be approximately 23.2 ac-ft per well, based on 30,000 bbls of water per fracturing treatment and six treatments per well. Typically about 50 percent of the water injected in a fracturing operation returns to the surface as flowback and is stored temporarily in lined flowback pits. Based on the maximum of three rigs working at any one time during the drilling season (May-November), the maximum total return flow would be 34.8 ac-ft (well within the total capacity of the flowback pits). As discussed in Appendix B, to ensure that sufficient capacity exists in the flowback pits for flowback water, pit fluid levels will be visually monitored daily and at least two feet of freeboard will be maintained in the pits at all times. The pit liners will be marked to indicate maximum capacity so that the inspector can easily verify that each pit has sufficient freeboard. The volume of return flows can be adjusted at each wellhead to maintain the flowback pits at the proper capacity. The flowback pits will remain in place for their useful life and these flowback facilities would be available as a backup or buffer for produced water storage should disposal well capacity be curtailed for maintenance or repair.

Adherence to Best Management Practices listed in Appendix C would minimize the potential for impacts to surface and groundwater resources under the Proposed Action. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for water resources is considered to be the greater Muddy Creek basin.

Surface Water:  Cumulative impacts to surface water would be limited to the surface water features within the same watersheds that are affected by the Proposed Action. Potential cumulative impacts to surface water resources from the Proposed Action in combination with the No Action Alternative would include increased turbidity and sedimentation in water courses, short-term runoff, and salt-loading, contamination of surface water courses and ponds by produced water and petroleum, and depletion of surface water flows in nearby streams.

In May 2008, the BLM prepared a Programmatic Biological Assessment (PBA) that addresses water-depleting activities associated with the BLM's fluid minerals program in the Colorado River Basin in Colorado. In response to the BLM's PBA, the FWS issued a Programmatic Biological Opinion (PBO) (ES/GJ-6-CO-08-F-0006) on December 19, 2008, which determined that BLM water depletions from the Colorado River Basin are not likely to jeopardize the continued existence of the Colorado pikeminnow, humpback chub, bonytail, or razorback sucker, and that BLM water depletions are not likely to destroy or adversely modify designated critical habitat.

A Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin was initiated in January 1988. The Recovery Program serves as the reasonable and prudent alternative to avoid jeopardy and provide recovery to the endangered fishes by depletions from the Colorado River Basin. The PBO addresses water depletions associated with fluid minerals development on BLM lands, including water used for well drilling, hydrostatic testing of pipelines, and dust abatement on roads. The PBO includes reasonable and prudent alternatives developed by the FWS which allow BLM to authorize oil and gas wells that result in water depletion while avoiding the likelihood of jeopardy to the

BLM_0018076

endangered fishes and avoiding destruction or adverse modification of their critical habitat. As a reasonable and prudent alternative in the PBO, FWS authorized BLM to solicit a one-time contribution to the Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin (Recovery Program) in the amount equal to the average annual acre-feet depleted by fluid minerals activities on BLM lands.

This project has been entered into the Uncompahgre Field Office fluid minerals water depletion log which will be submitted to the Colorado State Office at the end of each fiscal year.

Groundwater:  Cumulative impacts to groundwater would be limited to the groundwater aquifers that are affected by the Proposed Action, Alternative 1, and No Action Alternative. Potential cumulative impacts include contamination of groundwater aquifers with hydraulic fracturing fluids, produced water, drilling mud, or petroleum and include impacts to shallow groundwater aquifers due to changes to the hydrologic function of impacted drainages. Cumulative impacts could also result when drilling/completion operations and infrastructure construction inhibit infiltration of surface water into shallow groundwater aquifers and when produced water is removed from target formations to facilitate the natural gas recovery process.

The primary disposal zones for the proposed injection wells are the Dakota Sandstone, Morrison Formation, Entrada Sandstone, or Maroon Formation at depths between 9,300 and 9,500 feet. Rules promulgated by COGCC and approved by EPA regulate the injection of produced water into underground aquifers (COGCC 2009). Natural gas developers must demonstrate that formations targeted for injection meet the criteria for an exempt aquifer, per COGCC Rule 324B(a) prior to injection of produced water, or water injection will not be permitted. Water quality data from the one operational disposal well within the Unit (Federal 24-2 WDW) indicated that the TDS concentration within the disposal zone (Maroon Formation) is 18,962 mg/L. The quality of the water in the other horizons targeted for injection will likely be of similar, poor quality and they would likely qualify as exempt aquifers, suitable to accept produced water.

Due to the depth separation between proposed production wells and existing non-industrial use water wells, non-target aquifers in the area would not be impacted by the cumulative removal of water resulting from natural gas development in the area if proper well drilling procedures and completion techniques are utilized. CDRW requires natural gas wells permitted through the COGCC also be permitted for industrial use for removal of produced groundwater associated with oil and gas exploration and production. Additional groundwater removed from targeted aquifers as a result of cumulative natural gas development would not adversely impact the industrial wells permitted in the Unit.

Cumulative impacts to surface and groundwater would be minimized with implementation of applicable BMPs listed in Appendix C. In addition, BLM may attach additional site-specific COAs to the APDs.

**Alternative 1 – Surface Water:** Alternative 1 would require 3.3 fewer miles of new or improved access roads and 4.5 fewer acres of new production disturbance as compared to the Proposed Action, and would place development higher on ridges and side-slopes. Disturbance from Alternative 1 would cross fewer perennial streams (16 vs. 17), intermittent streams (30 vs. 41), and impact more acres of wetlands (19.4 vs. 16.6).

The types of construction impacts would be the same as for the Proposed Action, affecting approximately 255.8 acres (1.3% of the Unit). Impacts would likely be greatest during the construction and drilling phase. Production disturbance would total approximately 121.4 acres (0.62% of the Unit). Surface water quality could also be affected by the water use requirements of the project.

Groundwater:  The types and level of potential impacts to groundwater resources from Alternative 1 would be similar to the Proposed Action.

Adherence to Best Management Practices listed in Appendix C would minimize the potential for impacts to surface and groundwater resources under Alternative 1. In addition, BLM may attach site-specific COAs to the APDs.

BLM_0018077

**Cumulative Impacts** – The types of cumulative impacts to water resources from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. Compared to the Proposed Action, there would be 4.5 fewer acres of production disturbance and fewer total stream crossings; however, there would be 2.8 acres of additional disturbance to wetlands, and new development would be higher on ridges and side-slopes.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. The No Action Alternative would require 9.3 fewer miles of new access roads and 45.6 fewer acres of new production surface disturbance as compared to the Proposed Action. The types of impacts to water resources would be similar to those described for the Proposed Action and Alternative 1.

**Finding on the Public Land Health Standard for water quality**: **Finding on the Public Land Health Standard for water quality**: Indicators used to assess standard 5 (water quality standards for surface water and groundwater) include: appropriate populations of macroinvertbrates, vertebrates, and algae; pollutants; and sedimentation attributable to human activity. Public land health standards for water quality within the North Fork area, which includes the project area, were assessed in the 2006-2007 Land Health Assessment for the North Fork Landscape (BLM 2007a). According to the assessment, water quality of all water bodies, including groundwater where applicable, located on or influenced by BLM lands will achieve or exceed the water quality standards established by the state of Colorado (BLM 2007a). Over-appropriation of surface water is a significant problem in the North Fork area (BLM 2007a), which negatively impacts macroinvertbrates. Since surface water quantities could be affected by water use requirements for the Proposed Action, Alternative 1, and the No Action Alternative, cumulative impacts to surface water could occur downstream of the Unit. Regarding pollution, the 2010 303(d) list of segments needing the TMDLs includes one segment within the North Fork Gunnison River (from Black Bridge above Paonia to the confluence with the Gunnison River), which is listed as impaired due to selenium. This segment is downstream of the Unit and is the only stream segment on the mainstem of the North Fork Gunnison River drainage on the State's Section 303(d) list. Selenium is not an issue within the project area. Accelerated yield of sediment from upland soil and stream channel erosion is the most widespread water quality issue in the North Fork area. Since surface disturbance and the potential for erosion would increase with the Proposed Action, Alternative 1, and the No Action Alternative, cumulative impacts to accelerated sediment yields could occur downstream of the Unit. Implementation of BMPs and COAs attached to the APDs would minimize the impacts from the Proposed Action, Alternative 1, or the No Action Alternative and ensure that standard 5 would continue to be met.

## WASTES, HAZARDOUS OR SOLID

**Affected Environment:** The affected environment for hazardous materials includes air, water, soil, and biological resources that may potentially be affected by an accidental release of hazardous materials during transportation to and from the Unit, storage, and use in construction, drilling, and operations. Sensitive areas for hazardous materials releases include areas adjacent to water bodies, above aquifers, and areas where humans or wildlife would be directly impacted.

The most pertinent of the federal laws dealing with hazardous materials contamination are as follows:

- The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, Public Law 96-510 of 1980) provides for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment. It also provides national, regional, and local contingency plans. Applicable emergency operations plans in place include the National Contingency Plan (40 CFR 300, required by Section 105 of CERCLA), the Region VIII Regional Contingency Plan, and the Gunnison County Emergency Operations Plan (developed by the Gunnison County Office of Emergency Management).

BLM_0018078

- The Resource Conservation and Recovery Act (RCRA) (Public Law 94-580, October 21, 1976) regulates the use of hazardous substances and disposal of hazardous wastes. Note: While oil and gas lessees are exempt from RCRA, right-of-way holders are not. RCRA strictly regulates the management and disposal of hazardous wastes.

In addition, the EPA and CDPHE require a Spill Prevention, Countermeasure, and Control Plan (SPCC) to be developed and implemented by SG and its subcontractors as applicable and appropriate. The SPCC is intended to preclude the release of oils such as diesel fuel, gasoline, crude oil, or condensate, into the waters of the United States. The plan must also provide response actions to be taken, and notifications to be made, in the event a release occurs.

According to 29 CFR 1910.1200(g), SG is required to maintain a file containing Material Safety Data Sheets for all chemicals, compounds, and/or substances utilized during the course of construction, drilling, completion, and production operations of this project. This file is to be available at all times when employees are present at the site. BLM Instruction Memoranda numbers WO-93-344 and CO-97-023 require that all National Environmental Policy Act documents list and describe any hazardous and/or extremely hazardous materials that would be produced, used, stored, transported, or disposed of as a result of a proposed project.

On December 13, 2011 the State of Colorado enacted a new rule, CCR §404-1:205A, requiring vendors and providers of hydraulic fracturing services to provide the operator of a natural gas well with the identity of each additive and each chemical intentionally added to the hydraulic fracturing fluid, within 30 days following the conclusion of the hydraulic fracturing treatment (Nettles et al. 2011). The operator must then complete a chemical disclosure registry form and post the form to a national public website, fracfocus.org, within 60 to 120 days. The operator must disclose the concentration of the chemical or additive, but is not required to disclose the brand name of the product or additive to which the disclosed chemical/chemical concentration is a component. A vendor, service provider, or operator may claim that the specific identity and/or concentration of a chemical is entitled to trade secret protection and may withhold disclosure of this information on that basis. However, the identity and amount of any chemicals claimed to be a trade secret must be identified to any health professional who requests such information in writing (and agrees to keep the information confidential) for the purpose of diagnosing or treating an individual who may have been exposed to such chemicals. Likewise, this information must be provided to the COGCC upon receipt of a letter stating that such information is necessary to respond to a spill or release, or a complaint from a person who may have been directly and "adversely affected or aggrieved" by a spill or release.

Typical hazardous materials present or likely to be present in the project area during development and production are listed in Appendix F and include:

- drilling mud and cementing products, which are primarily inhalation hazards;
- flammable or combustible motor fuels;
- proprietary materials necessary for well completion and stimulation, such as acids and gels (corrosives);
- fluids such as ethylene glycol that may be used in dehydration units, and are known to be toxic to wildlife and cattle; and
- human solid and liquid wastes, generated primarily during the construction and drilling phases of the project.

Any substances classified as Extremely Hazardous by the Superfund Amendments and Reauthorization Act of 1986 would be limited to proprietary treating chemicals. Materials generated during drilling include drill cuttings, combined with drilling fluids and additives used to maintain circulation and reduce borehole caving and accomplish cementing of the borehole annulus. These fluids would be confined to the borehole and reserve pit.

---

BLM_0018079

**Environmental Consequences/Mitigation:**

**Proposed Action** – Possible pollutants that could be released during the construction phase of this project would include diesel fuel, hydraulic fluid, and lubricants. These materials would be used during construction of the access roads, pads, and gathering lines, and for refueling and maintaining equipment and vehicles. Potentially harmful substances used during construction and operation would be kept on-site in limited quantities and trucked to and from the site as required. No hazardous substance, as defined by 40 CFR 355, would be used, produced, stored, transported, or disposed of in amounts above threshold quantities.

Waste generated by construction activities would not be exempt from hazardous waste regulations under the oil and gas exploration and production exemption of RCRA. Exempt wastes would include those associated with well production and transmission of natural gas through the gathering lines and the natural gas itself.

With the exception of produced hydrocarbons, ethylene glycol (antifreeze), lubricants, and amine compounds, chemicals subject to reporting under Title III of the Superfund Amendments and Reauthorization Act in quantities of 10,000 pounds or more would not be used, produced, stored, transported, or disposed of during construction or operation of the facilities. None of the chemicals that would be used in construction meet the criteria for an acutely hazardous material/substance, or meet the quantities criteria per BLM Instruction Memorandum No. 93-344. In addition, no extremely hazardous substance, as defined in 40 CFR 355, in amounts above threshold planning quantities would be produced, used, stored, transported, or disposed of during construction or operation of the facilities.

Solid waste (human waste, garbage, etc.) would be generated during construction activities and, to a limited extent, during project operations. These would be removed to a landfill or water treatment facility as needed, and all would be removed prior to interim reclamation.

Surface water or groundwater could be impacted under the Proposed Action. Pollutants that might be released during the operational phase of the project could include condensate, produced water, and glycol (carried to the site and used as antifreeze). While uncommon, an accident could occur that could result in a release of any of these materials. A release could result in contamination of surface water or soil. Improper casing and cementing procedures could also result in contamination of groundwater resources. In the case of any release, emergency or otherwise, the responsible party would be liable for cleanup and any damages. Depending on the scope of the accident, any of the above-referenced contingency plans could be activated to provide emergency response. At a minimum, the BLM Uncompahgre Field Office contingency plan would apply.

These laws, regulations, standard lease stipulations, conditions of approval, and contingency plans and emergency response resources are expected to adequately mitigate any potential hazardous or solid waste issues associated with the Proposed Action.

The impact of the Proposed Action from exposure to hazardous or solid wastes would be low to moderate and short-term during construction and low and long-term during production operations. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts from hazardous or solid waste. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for wastes and hazardous materials management includes the Bull Mountain Unit and vicinity southwest to the Delta County Landfill. Cumulative impacts would occur across the assessment area from the reasonably foreseeable combined implementation of the No Action Alternative in combination with the Proposed Action, added to other natural gas development and coal mining in the area. Over its lifetime the project would add to the volume of solid waste as well as wastes from drilling, completion, well workovers, and final reclamation (pit liners) to be disposed of at approved facilities. It is not anticipated that this volume would significantly stress the permitted capacity of existing facilities or necessitate the permitting and construction of additional disposal facilities in proximity to the Unit.

BLM_0018080

**Alternative 1** – The types and level of impacts for Alternative 1 would be the same as for the Proposed Action. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to wetlands and riparian areas. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impact**s – The types and level of cumulative impacts from hazardous and solid wastes from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. The types and level of general impacts, as well as fuel spill data, reporting requirements, and spill containment/cleanup would be the same as for the Proposed Action.

## ENVIRONMENTAL JUSTICE

**Affected Environment:** Presidential Executive Order 12898 mandates that high and/or adverse environmental impacts resulting from federal actions will not be disproportionately borne by minority or low-income populations. Disproportionate impacts are those that would affect minority or low-income populations at levels appreciably higher than effects to non-minority or non-low income groups. Minority populations include those of Hispanic or Native American ethnicity. These populations, as well as some Caucasians, also tend to constitute the low-income groups in the area (USCB 2009a, 2009b).

**Environmental Consequences/Mitigation:**

**Proposed Action** – The location and construction of project features would not disrupt any identified minority and/or low-income communities. The Proposed Action would, in fact, provide additional job opportunities during construction and development of the well sites, because SG contracts this work to local companies. No disproportionate negative impacts to the human or economic health of these communities are anticipated as a result of the Proposed Action. No mitigation measures specific to environmental justice would be required.

**Cumulative Impacts** – The cumulative impacts assessment area for environmental justice includes Gunnison and Delta Counties. Short-term cumulative impacts, when added to existing, planned, and reasonably foreseeable natural gas and coal mining activities in the area, including implementation of the Proposed Action in combination with the No Action Alternative, would include increased employment opportunities for construction workers and laborers during the build-out of the project, and are anticipated to be low as a percentage of overall employment within the cumulative impacts assessment area. Long-term cumulative impacts would be minimal since the workforce would be reduced to well inspection, maintenance, and periodic workover personnel for the life of the project.

**Alternative 1** – Direct and indirect impacts to environmental justice would be similar to impacts from the Proposed Action. No mitigation measures specific to environmental justice would be required.

**Cumulative Impacts** – The types and level of cumulative impacts to environmental justice from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. This would be approximately 44% of the wells planned under the Proposed Action, proportionately reducing the opportunity for employment during the construction and drilling phases of the project. The types of direct and indirect impacts to environmental justice would be similar to impacts from the Proposed Action.

BLM_0018081

## OTHER ELEMENTS

The following elements (Table 45) are also considered during the NEPA process.. Those that could be impacted are brought forward for analysis.

**Table 45. Other Elements**

| Other Elements | Not Applicable or Not Present | Present, But No Impact | Applicable & Present; Brought Forward for Analysis |
|---|---|---|---|
| Access | | | X |
| Transportation | | | X |
| Cadastral Survey | X | | |
| Realty Authorizations | | | X |
| Rangeland Management | | | X |
| Forest Management | X | | |
| Fire | | | X |
| Hydrology/Water Rights | | | X |
| Noise | | | X |
| Recreation | | | X |
| Visual Resources | | | X |
| Geology and Minerals | | | X |
| Paleontology | X | | |
| Law Enforcement | X | | |
| Socio-Economics | | | X |

## ACCESS

**Affected Environment:** Primary access to the Bull Mountain Unit is from State Highway (SH) 133, which is paved, and/or from Gunnison County Road (CR) 265, which is graveled. From SH 133 and CR 265, ranches, agricultural lands, and existing well sites are accessed via private roads and several of the private roads have gates.

**Environmental Consequences/Mitigation:**

**Proposed Action** – Increased traffic as a result of construction, drilling, and completion activities (discussed in the Transportation section) would create short-term direct impacts to access for residents and visitors within and in the vicinity of the Unit through project build-out. These impacts would fluctuate from low to moderate during various phases of development, and would be confined to the drilling season. Rutting when wet and overall road deterioration would result if roads are not properly maintained or are used in inclement weather, impairing access. Long-term direct impacts to access would be low, consisting of traffic generated by daily well inspections and periodic well workovers. Short-term and long-term indirect impacts would include increased access to federal lands through the increased road network. No mitigation measures specific to access would be required.

**Cumulative Impacts** – The cumulative impacts assessment area for access includes the Bull Mountain Unit and immediate vicinity. Cumulative impacts would occur from the reasonably foreseeable implementation of the Proposed Action in combination with the No Action Alternative. Short-term and long-term direct and indirect cumulative impacts to access would be minimal, and would be associated with increased traffic generated by well servicing, maintenance, and periodic workovers, added to planned and reasonably foreseeable development within the Unit.

**Alternative 1** – Short-term and long-term direct and indirect impacts to access for well pad construction, drilling, completion, production, and maintenance would be similar to the impacts described for the Proposed Action. No mitigation measures specific to access would be required.

BLM_0018082

**Cumulative Impacts** – The types and level of cumulative impacts to access from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. This would be 44% of the wells planned under the Proposed Action, which would proportionately reduce the overall duration of construction, and hence the impacts to access. The types of short-term and long-term direct and indirect impacts to access for well pad construction, drilling, completion, production, and maintenance would be similar to the impacts described for the Proposed Action.

## TRANSPORTATION

**Affected Environment:** Existing regional traffic on SH 133 and CR 265 consists primarily of local residents, farmers and ranchers, tourists, and commercial vehicles, including light and heavy trucks from the mineral extraction industries. Average annual daily traffic (AADT) on SH 133 between Hotchkiss and Marble for the year 2009 (the latest year for which data is currently available), including the percentage of truck traffic, is shown in Table 46.

**Table 46. Annual Average Daily Traffic, SH 133 between Hotchkiss and Marble, CO – 2009**

| Begin at Mile Marker | End at Mile Marker | Start Point Description | AADT | Percent Trucks |
|---|---|---|---|---|
| 0 | 2.222 | NE of SH 92, Bridge Street, Hotchkiss | 5,200 | 4.7% |
| 2.222 | 7.822 | NE of Henson Mesa Rd, CR L.25 | 3,700 | 8.6% |
| 7.822 | 8.858 | SW of SH 187, Grand Ave., Paonia | 2,900 | 8.3% |
| 8.858 | 12.170 | SW of Bowie Rd., W junction | 2,700 | 7.9% |
| 12.170 | 16.000 | NE of Bowie Rd., W junction | 2,100 | 10.0% |
| 16.000 | 17.667 | NE of Bowie Rd., E junction | 3,100 | 9.4% |
| 17.667 | 18.211 | SE of 4th St., CR 57, Somerset | 2,200 | 8.2% |
| 18.211 | 24.000 | W of Kebler Pass Rd., CR 12 | 1,300 | 10.4% |
| 24.000 | 46.371 | S of CR 3, to Marble | 1,400 | 6.3% |
| 46.371 | 51.357 | N of CR 3, to Marble | 1,600 | 5.2% |
| Average, all monitoring sites | | | 2,620 | 8.2% |

Source: Colorado Department of Transportation

Gunnison County conducts annual traffic counts on CR 265, also known as Muddy Creek Road. For the period July 31 through October 15, 2007 (the latest period for which data are available), the average daily traffic count was 205 vehicles (102 northbound and 103 southbound).

SG executed Gunnison County Road Improvement Agreement on September 13, 2005 and the First Amendment to Road Improvement Agreement on July 11, 2006 for improvements to CR 265. Gunnison County holds Performance/Utilization Bond No. RLB0004678 in the amount of $10,000 to warrant against road damage to CR 265. In addition, SG and Gunnison Energy have executed an agreement with Gunnison County under which they pay the county to install magnesium chloride product on CR 265 twice each year.

### Environmental Consequences/Mitigation:

Vehicle trips would be generated by road and well pad construction, drilling and completion activities, installation of electrical lines at water-disposal wells, production activities including routine monitoring and maintenance, as well as periodic well workovers. Interim and final reclamation activities would also generate vehicle trips. Vehicle trips would originate from a variety of locations outside the

BLM_0018083

Unit; it is estimated that 75% of vehicle trips would originate from the south (Montrose, Delta, Hotchkiss, and Paonia), and 25% from the north (Redstone). Drilling rigs and some gas-field service and construction equipment would be transported to the Unit and remain there for the duration of a particular contract or task. Drilling rigs would work continuously throughout the drilling season; therefore, trips involving major pieces of equipment, such as rig moves, would occur primarily within the Unit.

**Proposed Action** – Approximately 13.5 miles of road upgrades, 12.2 miles of new road construction, and 22.1 miles of new pipeline (11.4 miles co-located with roads) would be required under the Proposed Action. The proposed use of multi-well pads greatly reduces the need for construction of new access roads and pipelines. Access roads would be constructed using standard crown-and-ditch specifications as required by Gunnison County and BLM, and would have a 15-foot-wide running surface. Construction impacts are discussed in other sections of this EA.

Table 47 summarizes the types and volume of vehicle traffic associated with construction, drilling, completion, and production activities during each drilling season (approximately mid-May through mid-October, depending on weather and site conditions). For the purpose of this analysis, the average size of a well pad is 1.4 acres, the average length of a new access road per well pad is 0.6 mile, and the average length of new pipeline per well pad is 0.7 mile.

**Table 47. Traffic Associated with Construction, Drilling, Completion, and Production**

| Phase | Average Duration | Vehicle Type | Average Trips[1] | |
|---|---|---|---|---|
| | | | Per Well Site | Per Day |
| Well pad/access road construction | 28 days 10 hrs/day | Gravel trucks, semis, pickups | 1,456 | 52 |
| Drilling, new well on new pad | 23 days[2] | Tractor trailer; cement, hydraulic fracturing, and mud trucks; crew cab pickup | 474 | 20 |
| Drilling, new well on existing pad | 23 days[2] | Motor grader; tractor trailer; cement, hydraulic fracturing, and mud trucks; crew cab pickup | 638 | 28 |
| Completion/testing, CBNG wells | 12 days | Haul trucks | 16 | .75 |
| Completion/testing, shale gas wells | 12 days | Haul trucks | 24 | 2 |
| Gathering pipeline construction | 10 days | Tractor trailer (to transport heavy equipment); pipe, welding, X-Ray, and testing trucks; crew cab pickups | 62 | 6 |
| Production | 40 years | Pickup (pumper) | -- | 8[3] |
| Maintenance/workover | 7 days every 2 years | Haul truck, pickups, water trucks | 84 | 12 |

[1] Representative numbers from Gunnison County permit applications submitted by SG. One round-trip is equal to 2 trips.
[2] Average of CBNG wells (8-10 days) and shale gas wells (35 days).
[3] At full buildout, a total of 4 pumpers, each making 1 round trip daily, would be required for routine servicing of all well sites.

Traffic increases on SH 133 and CR 265 as a result of the Proposed Action would fluctuate according to the phase of construction and development, and would be highest during well pad and access road construction. Construction of a single well pad and access road would add 52 trips per day to CR 265 and SH 133. Well-servicing technicians (known as pumpers) would visit each existing well site via pickup truck on a daily basis over the life of the project, adding two vehicle trips per day to traffic on SH 133 and CR 265. Each pumper would service 10 to 12 well sites per day. Assuming the simultaneous construction of 3 well pads and access roads, and including daily servicing of wells at 14 existing well sites, the total traffic increase would be 160 trips per day over a 20-day period in Year 1 of development, representing a 78% increase in traffic on CR 265 and a 6% increase in traffic on SH 133. The maximum trips per day would increase each year through Year 6 of development, as additional wells are completed and daily

BLM_0018084

servicing trips are added. Assuming a total of 44 well pads in operation during construction of the final 3 well pads, the Proposed Action would add 164 trips per day, representing an 80% increase in traffic on CR 265 and a 6% increase in traffic on SH 133.

During drilling and pipeline construction activities, assuming simultaneous drilling of 3 wells at any one time and including daily servicing of existing wells, average trips per day would drop to 108 in Year 1 of development, representing a 56% increase in traffic on CR 265 and a 4% increase in traffic on SH 133 for much of the drilling season. In Year 6, during drilling of the final 3 wells and including servicing of all existing wells, average trips per day would increase to 126, representing a 61% increase in traffic on CR 265 and a 4.8% increase in traffic on SH 133. The potential for traffic delays, accidents, and vehicle/wildlife collisions would be commensurate with these increases in traffic.

Other impacts would include general road degradation of SH 133, CR 265, and the well site access roads. Generation of dust when dry, rutting when wet, and overall road deterioration would result if the access roads are not properly maintained or are used in inclement weather. Application of magnesium chloride to CR 265 could be toxic for vegetation alongside the road. Short-term direct impacts to traffic would fluctuate from low to moderate and would be seasonal during the build-out of the project.

Once every two years, a workover rig would be brought to each site to perform required maintenance over a period of approximately 7 days. Direct impacts to traffic would be low and long-term from maintenance and workover during the life of the project. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to transportation. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for transportation includes the Bull Mountain Unit, SH 133 between Marble on the north and Montrose on the south, and CR 265 in the immediate vicinity of the Unit. Cumulative impacts would occur from the implementation of the Proposed Action in combination with the No Action Alternative. Over time, increased road use by recreationists on the Grand Mesa would incrementally increase road use. Increased traffic within and proximate to the Unit as a result of the project, when added to other existing, planned, and reasonably foreseeable natural gas and coal mine development, as well as and road reconstruction planned by CDOT on SH 133, would have low to moderate short-term cumulative impacts and low long-term cumulative impacts to transportation.

**Alternative 1** – The criteria used to develop Alternative 1 were weighted more toward minimizing the amount of new roads and pipelines than the Proposed Action. Approximately 11.4 miles of road upgrades, 11.7 miles of new road construction, and 16.1 miles of new pipeline (7.6 miles co-located with roads) would be required under Alternative 1. The total length of access roads required would be reduced by approximately 10%, and the total length of pipelines required would be reduced by approximately 8% compared to the Proposed Action, proportionately reducing the overall number of days required for construction from 20 days to 18 days for each section of access road, and from 10 days to about 9 days for each pipeline segment. The types and levels of direct and indirect impacts from daily traffic for well pad construction, drilling, completion, production, and maintenance would be the same as for the Proposed Action. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to transportation. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The types and volume of cumulative impacts to transportation from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. The estimated number of required vehicle trips per day would be the same.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. Approximately 2.3 miles of road upgrades, 2.9 miles of new road construction, and 11.3 miles of new pipeline (2.4 miles co-located with roads)

BLM_0018085

would be required to develop and produce fee/fee wells under the No Action Alternative. Total length of access roads required would be reduced by approximately 63%, the total length of pipelines required would be reduced by 70%, and the total number of wells drilled would be reduced by 56% compared to the Proposed Action. These reductions in construction and drilling activity would proportionately reduce the overall duration of the development phase to approximately 2 years, and hence the overall number of vehicle trips required. However, the level and types of direct and indirect impacts from daily traffic for access road and well pad construction, drilling, completion, and servicing would be similar to those of the Proposed Action for those 2 years. During the production phase of the project, 2 to 3 pumpers would be required for daily servicing of 24 well sites, adding 4 to 6 vehicle trips to CR 265 and SH 133 for the life of the project.

## REALTY AUTHORIZATIONS

**Affected Environment:** Existing federal realty authorizations within the Unit include rights-of-way for SH 133 (Colorado Department of Transportation), DMEA power lines, a Delta County Tele-Com telephone line, the Volk Ditch and private access rights-of-way. Holders of these rights-of-way would be notified prior to construction near their facilities or access roads.

### Environmental Consequences/Mitigation:

**Proposed Action** – Construction of a new access road from SH 133 to the proposed FED 11-89-20 #3 could have short-term, temporary impacts to traffic on SH 133 during staging and initial construction of the access road. Construction of a segment of pipeline running alongside and to the east of SH 133 in T11S, R89W, Section 8, would have short-term temporary impacts to traffic on SH 133. No impacts would be anticipated for private access easements within the Unit. No mitigation measures specific to realty authorizations would be required.

**Cumulative Impacts** – The cumulative impacts assessment area for Realty Authorizations is the Bull Mountain Unit. No short-term or long-term cumulative impacts to federal rights-of-way or easements are anticipated.

**Alternative 1** – Impacts to realty authorizations would be the same as for the Proposed Action. No mitigation measures specific to realty authorizations would be required.

**Cumulative Impacts** – No short-term or long-term cumulative impacts to federal rights-of-way or easements are anticipated.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. No new access roads connecting to SH 133, or new pipelines alongside SH 133 would be constructed under the No Action Alternative, and no impacts would be anticipated for other federal rights-of-way or easements within the Unit.

## RANGELAND MANAGEMENT

**Affected Environment:** Until recently, this area sustained very high levels of both sheep and cattle grazing. Larger ranches within the Unit still host both cattle and sheep grazing, but sheep grazing is mostly limited to ranches at the northern end of the Unit. The McIntyre Livestock Company (which previously owned Rock Creek Ranch) once ran 20 bands of sheep (a band is 1,000 sheep) in this area. Currently, McIntyre Livestock runs one band, and another rancher (Sperry) runs one band northeast of this area. In addition, seasonal cattle grazing occurs in this area, and a grazing permit is leased back to McIntyre Livestock for grazing on the Rock Creek Ranch. On the Rock Creek Ranch, McIntyre Livestock runs 173 cow-calf pairs in one area and 134 pairs in another, plus 10 heifers. The grazing season is highly variable depending on weather, but in general is from June through early December. Rock Creek Ranches itself does not own cattle at this time.

BLM_0018086

The Jacobs Ranch is located at the eastern side of the Unit and is a working cattle ranch. This ranch supports a cow-calf operation, with grazing occurring from May 15th through December. A maximum of 225 cow-calf pairs graze on 2,000 acres of pasture. Cattle start the early season on south-facing slopes north of SH 133, and in mid-July are moved south of SH 133. No cattle are grazed during the winter/spring months on the ranch. Irrigation starts around the end April or early May, and ends in late August to early September. Meadows are hayed for grass-hay production.

The Falcon Seaboard Ranch was consolidated from several smaller ranches in 1990 and was purchased by Falcon Seaboard in its current configuration in 1996. Prior to 1996 the ranch was used for both cattle and sheep grazing, but currently only sees cattle grazing. The ranch supports both a cow/calf and yearling calf operation. Yearlings are brought on (via stock trucks) in early May and grazed through the summer to early September. Cows and nursing calves are trucked to the ranch in early June and come off in early October. No cattle are grazed during the winter/spring months on the ranch. Irrigation of meadows starts around the end of April or early May, and ends in late August to early September. Meadows are hayed for grass-hay production.

Other large ranches in the Unit include the Sperry, Aspen Leaf, and Hotchkiss ranches, all of which support cow/calf and yearling calf operations as well as sheep grazing. Sheep generally graze the ranches in the spring, and are moved onto summertime allotments on USFS lands on the GMUG and White River National Forests. They are trailed back down onto the ranches in the late fall, where they graze on upland meadows, and on irrigated hay fields post-haying. All sheep are generally trucked out of the Muddy Creek basin by early November for market. On the Hotchkiss Ranch, a small herd of sheep (around 30) persists through the summer on the ranch.

Despite the extremely high grazing pressure in the past, the area has a very good distribution of grasses and forbs in the understory of the sagebrush and Gambel's oak habitat types. Within the general area, aspen stands and various increaser species of plants indicate high long-term grazing pressure. These increasers include skunk cabbage (*Veratrum tenuipetalum*), tall larkspur (*Delphinium barbeyi*), tarweed (*Madia glomerata*), and sneezeweed (*Helenium autumnale*). Notable evidence of habitat degradation from past and current grazing was not apparent during a site visit. The dense stands of Gambel's oak are too thick to be greatly utilized by livestock.

Along the SH 133 corridor, from the intersection of SR 265 and south, there is a lack of widespread large ranches, but cattle are often wintered on the lower-elevation meadows near Muddy Creek. Subdivisions and smaller lot sizes have decreased the connectivity of larger ranches, and less cattle grazing occurs. Further, the steeper topography and drier climate reduce grazing opportunities at the southern end of the Unit.

On ranches with elk winter ranges (e.g., lower-elevation, south- and west-facing slopes) there can be quite a bit of elk wintering activity. The Jacobs Ranch currently has concerns and management issues over heavy elk utilization on winter ranges.

### Environmental Consequences/Mitigation:

**Proposed Action** – Sheep and cattle grazing would continue during development and operation of the Unit. The primary impact would be the short-term loss of available forage resulting from construction-related disturbance, and the long-term loss of forage due to installation of production facilities including access roads, well pads, and electrical lines. Across the Unit, 125.9 acres (0.64% of the Unit) would be lost for potential grazing as a result of conversion to roads, pads, and other long-term surface uses. This calculation assumes that all vegetation in these areas provides potential livestock grazing; however, some vegetation types such as oakbrush and sagebrush are not palatable for cattle or sheep so the actual amount would be less. Cattle and sheep do not "avoid" roads and pads like wildlife does, so there would be no indirect impacts per se.

Under the Proposed Action, approximately 5.4 acres of irrigated pasturelands would be lost to development during production, or a total of 0.2% of available irrigated pasturelands within the Unit.

---

BLM_0018087

Reclamation of pipeline corridors, in many situations, would convert unpalatable sagebrush, oakbrush, and mixed mountain shrubland species to more palatable grasses, resulting in a net increase in potential grazing acres within the Unit.

SG also fences off their pad sites to keep livestock off of reclaimed areas, and also fences off wetlands and steep slopes where reclamation activities require less disturbance from livestock to allow for more rapid soil stabilization and resource protection. This would also add insignificant amounts of lost grazing potential.

Deposition of dust on roadside vegetation is a direct source of potential impacts to rangeland. In addition to the impacts on the health of potential forage described in the Vegetation section, it can result in decreased palatability and avoidance by livestock, as well as increased tooth wear.

Other impacts that are harder to quantify include additional gates, replacement of fences, and increased traffic on ranches. While replacement of old fences would be a benefit to ranchers (as SG pays for the replacement or upgrade), additional gates and new fences would likely require additional time and effort for ranchers to work livestock and manage grazing. There would likely be some lost grazing revenue for some ranches with proportionately larger lost grazing availability. However given that less than 1% of grazing acres across the entire Unit would be impacted, the revenues lost to ranchers from decreased forage production would be insignificant. This is especially true when factoring in the conversion of shrublands to grass-dominated vegetation on pipeline corridors, where it has been documented that livestock congregate in order to graze on new grass growth.

Potential positive impacts include additional sources of income to ranches through lease fees or surface-use agreements that provide for compensation of lost revenue due to conversion of rangelands into non-producing status, or loss of irrigated hay meadows. Replacement of old fence lines at the expense of SG could help with long-term costs of maintaining ranching infrastructure. SG may also assist in paying for rangeland improvement projects (sagebrush mowing), as well as new or repaired stock tanks, as they have in the past.

Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to rangeland. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for rangeland management is considered to be the Bull Mountain Unit. Cumulative impacts within the Unit would include the combined implementation of the Proposed Action in combination with the No Action Alternative. A cumulative total of 168.1 acres, or 0.85% of potential grazing would be lost to development under the Proposed Action. Implementation of the Proposed Action would have negligible impacts on ranching operations or grazing potential within the Unit. Reclamation of pipeline corridors would actually result in a net increase in grazing lands in the Unit through the conversion of unpalatable browse species to grasses and forbs.

**Alternative 1** – During production, the total amount of lost potential grazing would be 121.4 acres (0.62% of the Unit), or 0.02% less than the Proposed Action. Total lost irrigated pasture lands would comprise 7.7 acres, or 0.04% of the Unit (0.1% more than the Proposed Action). The types of short-term and long-term direct and indirect impacts would be the same as for the Proposed Action. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to rangeland. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The types of cumulative impacts to rangeland from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. A cumulative total of 166.8 acres, or 0.85% of potential grazing would be lost to development under Alternative 1, which is similar to the Proposed Action.

**No Action** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would likely develop up to 55 new wells on fee surface. During

BLM_0018088

production, the total amount of lost potential grazing would be 80.3 acres (0.41% of the Unit), or 0.23% less than the Proposed Action. Total lost irrigated pasture lands would comprise 7.5 acres, or 0.04% of the Unit (0.6% less than the Proposed Action). The types of short-term and long-term direct and indirect impacts would be the same as for the Proposed Action. The types of short-term and long-term direct and indirect impacts would be the same as for the Proposed Action.

## FIRE

**Affected Environment:** The Bull Mountain Unit is located within the Ragged Mountain Fire District and is geographically located within Management Unit 16. The UBRMP calls for intensive suppression of fire on federally managed lands within this unit. Gunnison County regulations state that natural gas operations "shall not cause a significant risk of wildfire hazard." With normal precipitation, the risk of wildland fire is thought to be minimal. Surface fuels in the Unit are dominated by generally continuous sagebrush fuels, with patches of decadent Gambel's oak and mixed-shrub fuel types. The Colorado State Forest Service rates these sites as "Moderate Hazard" based on topography and fuel loading. Fires within these fuel types would be generally difficult to stop with hand-crews and Type 6 brush trucks, unless natural and man-made fuel breaks (roads, irrigated meadows, etc.) were utilized.

**Environmental Consequences/Mitigation:**

**Proposed Action** – Well pad fires as a result of an explosion or ignition of natural gas are unlikely due to safety procedures and equipment standards. No flaring of the wells is anticipated, and if flaring is required, areas around the flare would be cleared of all vegetation. The operator would closely follow COGCC 600 Series Safety Regulations. This would include maintaining accessible fire extinguishers, fresh water, and hoses on-site; indoctrinating all on-site personnel regarding proper emergency procedures; and immediate closure of the site and notification of local emergency responders in the event of a fire or explosion. The operator's Emergency Response Plan was developed to protect the health and safety of on-site personnel as well as to prevent the spread of fire to surrounding lands. The plan, which would be attached to the APDs for all wells and is on file with Gunnison County, includes detailed procedures for prevention and emergency response procedures. The short-term and long-term risk of fire or explosion on the well site, as well as fire escaping from the site onto public lands, would be low. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts from fire. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for fire is the Bull Mountain Unit and immediate vicinity. Any wildfire resulting from the Proposed Action is expected to be highly localized. Additional cumulative impacts are not anticipated.

**Alternative 1** – The risk of wildfire hazard on surrounding public lands due to natural or human causes would be the same for Alternative 1 as for the Proposed Action. Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts from fire. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts** – No cumulative impacts would be anticipated from the implementation of Alternative 1 in combination with the No Action Alternative.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. Due to the lower number of well pads and wells that would be developed and produced under the No Action Alternative, and the fact that all development would be on fee lands, the risk of wildfire hazard on surrounding public lands due to natural or human causes would be virtually eliminated.

BLM_0018089

## HYDROLOGY AND WATER RIGHTS

**Affected Environment:**  See the Water Quality, Surface and Ground section of this document for a complete discussion of surface and groundwater quality. Climate, temperature, precipitation, and evaporation and evapotranspiration discussions related to hydrology are summarized in the Water Resources Technical Report (WWC 2011).

The Bull Mountain Unit lies within the North Fork Gunnison River (North Fork) watershed (Hydrologic Unit Code [HUC] 14020004). The North Fork is a major tributary to the Gunnison River in the Upper Colorado River watershed (HUC 1402). The perennial East and West Muddy creeks (HUC 1402000409 and HUC 1402000455, respectively) and their intermittent and perennial tributaries drain the Unit. East and West Muddy creeks are tributaries to the North Fork.

<u>Surface Water</u>:  Surface water features within the Unit include portions of 12 perennial streams, numerous intermittent streams, man-made reservoirs, and at least 17 natural springs (Figure 10).  Surface water hydrology adjacent to and within the proposed project area is dominated by the southerly flowing East Muddy Creek and associated tributaries (HUC 1402000409) and the southeasterly flowing West Muddy Creek and associated tributaries (HUC 1402000455).

Flow rates within stream channels in the Unit correlate primarily to precipitation; increased surface runoff occurs in the spring as a result of snowmelt and rainfall and during the summer months following intense rainfall events. Approximately 80% of Colorado's water supply comes from melting snow (NFRIA 2010). Based on peak flow records from USGS gauging stations near the Unit (09131200, 09130500, and 09131500) the most probable month for runoff is May (USGS 2010b). Perennial and intermittent streams in the Unit also receive support from groundwater discharge to sustain flow. Rainfall events can cause large peak flows, although the duration of flow from rainfall is relatively short in comparison to snowmelt runoff. Because precipitation varies greatly from event to event and year to year, runoff volumes vary greatly as well.

There are no USGS gauging stations within the Unit although three stations are located nearby (Stations 09131200, 09130500, and 09131500).  Station descriptions and condensed historical streamflow data recorded at these three stations (USGS 2010b) are as follow:

- USGS Station 09131200, West Muddy Creek near Somerset, Colorado. This site was maintained from 1961 through 1973 and was located on West Muddy Creek upstream of the confluence of West and East Muddy creeks, approximately 4 miles west of the Unit. The drainage area upstream of the gage is approximately 50 square miles. The mean monthly discharge rates for the entire data record at this location ranged from 5.0 cfs (January) to 167 cfs (May). The mean annual discharge rates recorded at this location ranged from 11.0 cfs (1963) to 59.1 cfs (1962). Instantaneous peak discharge rates recorded at this site ranged from 120 cfs (1972) to 1,190 cfs (1973).

- USGS Station 09130500, East Muddy Creek near Bardine, Colorado. This site was maintained from October 1934 through September 1953 and was located on East Muddy Creek just south of the Unit. The drainage area upstream of the gage is 133 square miles. The mean monthly discharge rates for the entire data record at this location range from 14 cfs (January) to 475 cfs (May). The mean annual discharge rates recorded at this location ranged from 53.7 cfs (1940) to 135.0 cfs (1938). Instantaneous peak discharge rates recorded at this site ranged from 480 cfs (1951) to 2,190 cfs (1941).

- USGS Station 09131500, Muddy Creek at Bardine, Colorado. This site was maintained from October 1949 through September 1955 and was located on Muddy Creek below Paonia Reservoir, approximately 5 miles south of the Unit. The drainage area upstream of the gage is 257 square miles. The mean monthly discharge rates for the entire data record at this location ranged from 21 cfs (December and January) to 642 cfs (May). The mean annual discharge rates recorded

BLM_0018090

at this location ranged from 48.9 cfs (1954) to 242.9 cfs (1952). Instantaneous peak discharge rates recorded at this site ranged from 382 cfs (1954) to 3,400 cfs (1952).

During periods of significant rainfall or snowmelt events, most of the streamflow within Muddy Creek and its tributaries is derived from surface runoff. Conversely, during periods in which there is no precipitation or snowmelt runoff, streamflow in the perennial streams is maintained by groundwater discharge (Taylor 1987). Given the arid climate in the area, it is estimated that 98% of the snowmelt and precipitation runoff in northwestern Colorado is lost to evapotranspiration (Taylor 1987).

There are a number of irrigation diversions off of the larger creeks, especially on the eastern side of the Unit (BLM 2010a). Stock ponds occur frequently on the landscape, and in general retain surface waters throughout the year.

Expansive irrigated hay meadows are generally found in the bottomlands of the East Muddy Creek drainage. Irrigated meadows are also found in the Ault Creek drainage at the far western side of the Unit (BLM 2010a). Natural flows of streams are likely affected by diversions for irrigation and there are numerous water rights for both reservoirs and irrigation diversions on North Fork Gunnison River (NFRIA 2010). Based on USGS estimates, approximately 3,000 acres of irrigated lands occur upstream of USGS gauging station 09132500 (North Fork Gunnison River Near Somerset, Colorado) (USGS 2010a). Irrigation diversions affect the intensity, quantity, and timing of streamflows within the North Fork Gunnison River. For example, in May when runoff is highest, irrigation diversions attenuate the peak flow by diverting it onto irrigated lands. Irrigation withdrawals sometimes reduce discharge in the North Fork Gunnison River to low volumes; during drought years, surface flow sometimes disappears from segments of the channel (NFRIA 2010). At certain points, such as through the town of Paonia, the river is almost completely diverted into irrigation ditches and metered at headgates (NFRIA 2010). According to the Colorado Division of Water Resources, there are 35 ditch-type water rights within the Unit. All but three of these ditches list Muddy Creek as the source. Permitted surface water rights on the Unit are summarized in the Water Resources Technical Report (WWC 2011).

Waters of the U.S. Waters of the U.S. include the territorial seas, interstate waters, navigable waterways (such as lakes, rivers, and streams), special aquatic sites, and wetlands that are, have been, or could be used for travel, commerce, or industrial purposes; tributaries, and impoundments of such waters. All channels that carry surface flows and that show signs of active water movement are Waters of the U.S. Similarly, all open bodies of water (except ponds and lakes created on upland sites and used exclusively for agricultural and industrial activities or aesthetic amenities) are Waters of the U.S. (EPA 33 CFR § 328.3[a]). Such areas are regulated by the EPA and USACE. Most of the surface water features in the Unit qualify as Waters of the U.S. Any activity that involves discharge of dredge or fill material into or excavation of such areas is subject to regulation by the USACE pursuant to Section 404 of the CWA. Activities that modify the morphology of stream channels are also subject to regulation by the Colorado Department of Public Health and Environment (CDPHE). Approximately 16.6 acres of wetlands and 6,200 feet of Other Waters of the U.S. would be disturbed by the Proposed Action. Special aquatic sites and wetlands are discussed in greater detail in the Wetlands and Riparian Zones section.

Surface Water Rights. Based on a review of the Colorado Division of Water Resources' surface water rights database, there are 75 permitted surface water rights within the Unit. The majority of the water rights (33) have a designated use that is (or includes) irrigation. Other uses include stock (19), fishery (18), domestic (14), recreation (12), wildlife (5), fire (5), federal reserve (4), storage (2), other (2), industrial (1), and augmentation (1). The sum of water rights uses is greater than 75 as some of the individual rights list multiple uses. Sources for these surface water rights within the Unit are as follows: Muddy Creek is the water source for 71, North Fork Gunnison River is the source for three, and Gunnison River is the source for one. Existing surface water rights within the Unit are tabulated in Water Resources Technical Report.

BLM_0018091

<u>Groundwater.</u> Groundwater resources in the Unit include Tertiary and Upper Cretaceous-age bedrock aquifer systems and Quaternary-age alluvial aquifer systems. Within the North Fork Gunnison River Basin, the thickness of the Upper Cretaceous aquifers varies from 250 to 4,500 feet (Ackerman and Brooks 1986). Alluvial aquifers are thickest in valley bottoms (usually less than 100 feet thick) and are likely connected hydraulically with adjacent bedrock aquifers. Groundwater in the bedrock aquifers flows in the direction of the geologic dip, approximately 4 degrees to the northeast (BLM 2007a). The geology of the area is complex due to the presence of sills, dikes, laccoliths, and igneous intrusions (Ackerman and Brooks 1986). The North Fork Gunnison River Basin is flanked by Grand Mesa on the north and the West Elk Wilderness area on the east and south. Natural recharge to the Tertiary and Upper Cretaceous aquifers within the Unit is primarily from winter snowpack in higher-altitude areas to the north, east, and south. A portion of the spring snowmelt infiltrates into these bedrock strata and the recharge volume increases with an increase in snowpack depth and is greater at higher altitudes (BLM 2007b).

The primary bedrock aquifers in the North Fork Gunnison River Basin are the Dakota Sandstone and the Burro Canyon Formation of Early and Late Cretaceous age (Ackerman and Brooks 1986). The Dakota Sandstone varies from 30 to 150 feet in thickness and the Burro Canyon Formation varies from 50 to 180 feet thick (BLM 2010b). Wells completed in these formations typically yield more than 10 gallons per minute (gpm) (Ackerman and Brooks 1986).

The Upper Cretaceous Mesaverde aquifer is regionally more extensive than the other bedrock aquifers in the area because none of the major river systems (i.e., the North Fork of the Gunnison, Colorado, or White Rivers) have eroded into it. Within the North Fork Gunnison River Basin, the Mesaverde aquifer includes the Lance Formation, the Fox Hills Sandstone (where it is present), the Lewis Shale, and the Mesaverde Group, which is composed of the Williams Fork Formation, the Trout Creek Sandstone Member, and the Iles Formation (Freethey 1991). The lithologic composition of the Mesaverde aquifer is very highly variable from formation to formation and from location to location due to the complex nature in which the strata were deposited. However, within the Piceance Basin, the Mesaverde aquifer is predominantly composed of sandstone with interbedded shale and coal beds. Within the North Fork of the Gunnison River Basin, the thickness of the Mesaverde aquifer varies between approximately 4,000 feet to 5,000 feet. Wells completed in the Mesaverde Formation have yields that are typically less than 10 gpm (Ackerman and Brooks 1986).

Underlying the Mesaverde aquifer is the Mancos shale. Within the Unit, the Mancos Shale is approximately 4,500 feet thick. The Mancos Shale is primarily marine shale, mudstone, and claystone; therefore, permeability is very low. Because of the low permeability within the Mancos Shale, it is considered a major confining layer that essentially stops all groundwater flow (Ackerman and Brooks 1986).

Alluvial deposits within the Unit primarily consist of sand, silt, and gravel of Quaternary age adjacent to the East Muddy Creek valley. Portions of the alluvial aquifers extend into the tributary valleys. Thin alluvial and eolian deposits are present on mesas near the site but none appear to be actually within the Unit (Ackerman and Brooks 1986). Wells completed in the alluvium have yields that can range from 1 to 150 gpm but generally average about 20 gpm (Ackerman and Brooks 1986).

<u>Groundwater Rights</u>

A Colorado Division of Water Resources records review revealed 66 current groundwater permits within the Unit. All of these groundwater permits are filed on water wells apportioned as follows: 20 domestic use; 15 domestic/stock use; 12 other use; 11 household use only; and eight industrial use. Of the 66 permitted wells, 50 wells are developed, no records of completion are available for 14 wells, and two permits were extended. Forty-eight of the 66 permitted wells report positive yields. Details on the permitted wells within the Unit are tabulated in Water Resources Technical Report (WWC 2011).

BLM_0018092

**Environmental Consequences/Mitigation:**

See the Water Quality, Surface and Ground section of this document for analysis of potential impacts to water quality.

**Proposed Action – Surface Water.** Potential impacts to surface water resources from the Proposed Action include increased short-term runoff and depletion of surface water flows in East and West Muddy creeks, Muddy Creek, and possibly the North Fork Gunnison River. Impacts would likely be greatest shortly after the start of construction activities and would likely decrease in time due to natural stabilization and reclamation/revegetation efforts. Surface water quantity could also be affected by the water use requirements of the project.

The magnitude of impacts to surface water resources would depend on several factors, including the proximity of the disturbance to drainages or ponds, slope aspect and gradient, soil type, duration and timing of the construction activity, and the success or failure of mitigation. In an effort to locate potentially suitable sites within the Unit boundary and reduce impacts, SG utilized site-suitability models, which combined a number of data sets across a given area to produce a final composite that ranked the appropriateness of a site. The analyses utilized data sets to develop criteria for each site-suitability study, including the following parameters directly or indirectly related to hydrologic function:

- Slope (steepness of the terrain)
- Proximity to existing road networks
- Proximity to existing natural gas pipeline systems
- Proximity to delineated wetlands and wetland buffer zones
- Proximity to stream networks and stream buffer zones
- Soil erosion factors

After review of the compiled statistics, 50 well pad locations with the best suitability values, the least amount of road construction, and that minimized hydrologic impacts were chosen as a foundation for the Proposed Action.

Clearing, grading, trenching, and soil stockpiling activities could temporarily alter overland flow patterns. Near-surface soil compaction caused by construction equipment and vehicles could reduce the ability of soil to absorb water and could increase the potential for surface runoff and ponding.

Impacts would be greatest immediately following commencement of construction activities and would naturally decrease thereafter due to soil stabilization efforts and reclamation/revegetation of disturbance areas.

Water would be used by the project during construction activities for drilling, dust control, hydraulic fracturing, and hydrostatic testing of the pipelines. Under the Proposed Action:

- Drilling activities would be completed in approximately 6 years. It is estimated that drilling operations (drilling, cementing, and hydraulic fracturing) would use 635 ac-ft per year based on three drilling rigs drilling an estimated nine wells each, or a total of 27 wells per year. Well pad construction would require approximately 29 ac-ft of water per year. The estimated annual water use for all drilling/completion is 664 ac-ft.

- Road/pipeline construction (including 0.5 ac-ft for pressure testing) would require approximately 63 ac-ft of water over the construction phase. For estimation purposes (based on a 6-year drilling schedule) the annual water use for road/pipeline construction would be approximately 11 ac-ft. It is likely that a majority of the road/pipeline construction would be completed ahead of the drilling.

- Total annual water use for construction and drilling operations is estimated to be 675 ac-ft. SG estimated that approximately 70% of the water needed for drilling operations could come from

BLM_0018093

recycled hydraulic fracturing fluid or reused produced water, which translates to approximately 203 ac-ft of other water needed annually for 6 years for the project.

Based on data from USGS gauging station 09130500, the mean annual discharge rate of East Muddy Creek near Bardine (1935-1953) varied from a low of 54.0 cfs (39,066 ac-ft per year) in 1940 to a high of 135.0 cfs (97,504 ac-ft per year) in 1938. Therefore, if water needed for the Proposed Action were removed directly from East Muddy Creek, maximum water depletion for East Muddy Creek would range from about 0.5% of the average annual discharge during a dry year to 0.2% of the discharge during a wet year. SG has secured already appropriated water for this project; as such, no "new" water would be depleted from the Muddy Creek system as a result of the construction and drilling phase of this project.

At this time, SG has one water reinjection (disposal) well in operation (Federal 24-2 WDW). As part of natural gas development in the area, SG intends to install four additional produced-water disposal wells. The construction disturbance associated with five injection wells would be 17.5 acres, 3.5 acres for each disposal well pad. Potential impacts to surface water quality due to injection well development would include increased turbidity and sedimentation in watercourses, increased short-term runoff, and increased salt loading due to this additional disturbance. Impacts to surface water may also occur due to unintentional produced-water spills from produced-water pipelines and storage tanks. The risk of spillage increases somewhat over time as facilities age and with a higher density of pipelines over the life of the field. Spill risk can be reduced through berming, facility location, monitoring, and equipment maintenance programs.

Approximately 12.2 miles of new access roads and 22.1 miles of new pipeline are planned under the Proposed Action. Approximately 11.4 miles of the new pipelines would be co-located with roads. The construction of the new roads and pipelines would result in 17 perennial stream crossings and 41 intermittent stream crossings. The road/pipeline crossings would result in a permanent alteration of channel shape. Due to the flashy nature of these tributaries, the crossings may impact runoff patterns. In the short term, construction disturbances associated with the crossings are expected to increase the turbidity, sedimentation, and salt loading within the channels. During production, these potential impacts would be minimized as the roadway/pipeline corridors are stabilized by revegetation and as the road surfaces are paved. Additional surface disturbances would only occur during major maintenance activities.

Approximately 16.6 acres of wetlands and 6,200 feet of Other Waters of the U.S. would be disturbed by the Proposed Action. Special aquatic sites and wetlands are discussed in greater detail in the Wetlands and Riparian Zones section. Any activities that involve discharge of dredge or fill material into or excavation of such areas are subject to regulation by the USACE pursuant to Section 404 of the CWA. Activities that modify the morphology of stream channels are also subject to regulation by the CDPHE.

Surface Water Rights. Under the Proposed Action, SG would use water for drilling, dust control, hydraulic fracturing, and hydrostatic testing of the pipelines. Potential impacts to water rights users would be a decrease in the available water supply in Muddy Creek due to water being used for SG's industrial activities. Water needed for construction/drilling activities would be obtained from nearby sources (per surface-use agreements with landowners), and would be under the guidance of SG's Water Augmentation Plan granted by the District Court – Water Division 4 (Case # 09CW16), and regulated through the State Division of Water Resources (Water Division 4). If necessary, water would be purchased and trucked in from private and/or other sources near Paonia or Somerset.

The BLM will implement an instream flow requirement on the Muddy Creek below the confluence with East and West Muddy creeks. The purpose of this requirement is to protect and perpetuate beneficial uses for tributaries to North Fork Gunnison River, including Muddy Creek, as designated by the Colorado Department of Public Health and Environment. The designated beneficial uses include Aquatic Life Cold 1, Recreation E, Water Supply, and Agriculture. It is anticipated that the instream flow requirement will be implemented only in rare occasions, because as specified above, SG intends to utilize wells and its

BLM_0018094

existing surface water rights to meet to meet water demands before implementing any new surface water diversions from tributaries to Muddy Creek.

Unless petitioned for inclusion as a nontributary groundwater and approved by the Colorado State Engineer, all groundwater in Colorado is presumed to be tributary; water that is hydrologically connected to surface water and subject to administration under the prior appropriation surface water rights system. Pursuant to 37-92-308(4) or 37-92-308(5), an operator producing non-coalbed natural gas tributary groundwater must operate according to a water-court approved plan of augmentation or a substitute water supply plan (CDWR 2010b). Also, prior to removing tributary groundwater, an operator must first obtain a groundwater well permit from the Colorado State Engineer for beneficial use. This ensures that the well will not cause injury to vested surface water rights (CDWR 2010c). Produced water associated with the proposed project would be removed from Mesaverde Group and Mancos Shale aquifers to facilitate the natural gas recovery process. According to Colorado State Engineer, the Mesaverde Formation aquifer has been designated as a nontributary groundwater within the project area and the Mancos Shale aquifer is classified as a tributary groundwater within the project area (CSOS 2010). As such, the process of removing produced water from the Mancos Shale aquifer would be performed under the guidance of a water augmentation plan granted by the District Court – Water Division 4, and regulated through the State Division of Water Resources (Water Division 4). If withdrawals from the Mancos Shale aquifer impacted surface water rights, the water augmentation plan would be invoked. Water from private sources near Paonia or Somerset would be used to augment surface flows in Muddy Creek to mitigate impacts due to tributary groundwater withdrawals from the Mancos Shale aquifer.

Groundwater. Construction activities may disrupt natural surface and groundwater flow patterns. Altered flow patterns could disrupt natural surface and groundwater recharge/discharge patterns. Changes to natural recharge/ discharge patterns could have adverse impacts on stream channel morphology, productivity of springs, riparian areas, and aquatic life.

A majority of the project facilities are in the areas where no alluvium is present, but several well sites are located on alluvial deposits. Also, the Wasatch Formation, which crops out and is widely distributed across the Unit, consists of permeable strata and also has some secondary permeability from fractures and jointing and could therefore provide hydraulic communication to the alluvial aquifer.

Nine wells completed by SG as CBNG wells (permitted through COGCC) have been permitted through the Colorado Division of Water Resources as industrial use wells for removal of water to facilitate oil and gas production. Groundwater from one or more of the nine wells in the vicinity of the Unit could be used for the daily operation of the facility if a new water well permit is obtained through CDWR for use at the facility.

The proposed roadways would cross named perennial streams and named and unnamed intermittent tributaries to East and West Muddy creeks. Road construction could alter natural groundwater recharge patterns along the tributaries.

SG estimates that at full project build-out between 2,500 and 15,000 bbls per day (118 and 706 ac-ft/year) of produced water would be removed from the Mesaverde Group and Mancos Shale aquifers to facilitate the natural gas recovery process. The target depths of the proposed natural gas production wells would vary by well site, but are estimated to be between 5,000 and 10,000 feet. The deepest non-industrial designated use well within the Unit is 460 feet. Due to the depth separation between SG's proposed production wells and existing non-industrial use water wells, non-target aquifers in the area should not be impacted by the removal of water resulting from the Proposed Action.

As part of natural gas development in the area, SG intends to install four additional Class II produced water injection wells for a total of five injection wells. All produced water not recycled and reused for drilling/completion operations would be reinjected into the five water disposal wells. The primary disposal zones for the proposed injection wells are the Dakota Sandstone, Morrison Formation, Entrada Sandstone, or Maroon Formation at depths between 9,300 and 9,500 feet. The TDS concentration

BLM_0018095

measured in an existing injection well (Federal 24-2 WDW), completed in the Unit in the Permo-Pennsylvanian age Maroon Formation, is 18,962 mg/L. Other water quality parameters for this well were not available. TDS concentrations from produced water from existing natural gas wells within producing formations in the Unit range from 4,495 mg/L to 18,445 mg/L (Table 42). Due to the depth separation between SG's proposed injection wells and existing non-industrial use water wells, non-target aquifers in the area should not be impacted by the Proposed Action. Based on limited water quality data, the zones targeted for reinjection of produced water will likely have poor water quality and will not be adversely impacted by the injection of the produced water.

<u>Groundwater Rights.</u> Under the Proposed Action, SG would use water for drilling, dust control, hydraulic fracturing, and hydrostatic testing of pipelines. Potential impacts to groundwater rights would include a potential decrease in the amount of groundwater available due to groundwater withdrawals for development. The only proposed groundwater withdrawals within the Unit as a result of the Proposed Action would be associated with produced water from natural gas production wells. The target depths of the proposed natural gas production wells would vary by well site, but are estimated to be between 5,000 and 10,000 feet. Due to the depth separation between SG's proposed production wells and existing non-industrial use water wells (the deepest non-industrial designated use well within the Unit is 460 feet), domestic/stock groundwater rights in the area should not be impacted by the Proposed Action. CDRW requires natural gas wells permitted through the COGCC also be permitted for industrial use for removal of produced groundwater associated with oil and gas exploration and production. Additional groundwater removed from targeted aquifers as a result of the proposed project would not adversely impact the industrial wells permitted in the Unit.

Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to hydrology and water rights for both surface and groundwater. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impacts:** <u>Surface Water Hydrology</u> – Cumulative impacts to surface water would be limited to the surface water features within the same watersheds that are affected by the Proposed Action. Potential cumulative impacts to surface water resources from the Proposed Action include increased turbidity and sedimentation in water courses, short-term runoff, salt-loading, contamination of surface water courses and ponds by produced water and petroleum, depletion of surface water flows in nearby streams, and impacts to Waters of the U.S./wetlands. A complete discussion of water depletion and the BLM's fluid minerals program in the Colorado River Basin in Colorado is provided in the Water Quality section of this EA.

Construction of the Proposed Action would have temporary impacts on Other Waters of the U.S. and wetlands. No wetlands would be permanently filled or drained as a result of the Proposed Action, Alternative 1, and No Action Alternative. Any activities that involve discharge of dredge or fill material into or excavation of such areas are subject to regulation by the USACE pursuant to Section 404 of the CWA. Activities that modify the morphology of stream channels are also subject to regulation by the CDPHE. Cumulative impacts would occur where the reasonably foreseeable future projects are constructed adjacent to the Unit, but the impacts would be temporary until wetland vegetation returned to pre-construction levels. Cumulative impacts would be minimized by implementing measures to lessen the duration of disturbance, reduce the soil disturbance, and enhance restoration.

<u>Groundwater Hydrology.</u> Cumulative impacts to groundwater would be limited to the groundwater aquifers that are affected by the Proposed Action, Alternative 1, and No Action Alternative, and are discussed in detail in the Water Resources section.

<u>Surface Water Rights.</u> Cumulative impacts to surface water rights would be limited to the surface water rights within the same watersheds that are affected by the Proposed Action, Alternative 1, and No Action Alternative. Potential cumulative impacts to surface water rights from the Proposed Action, Alternative 1, and No Action Alternative include a decrease in the available water supply in Muddy Creek and downstream surface flows due to water depletion. Cumulative impacts to surface water flows would be

BLM_0018096

mitigated by obtaining water from nearby sources (per surface-use agreements with landowners). Water augmentation plans (granted by the District Court and regulated through the State Division of Water Resources) would also offset water depletions resulting from natural gas development. If necessary, water would be purchased and trucked in from private and/or other sources located near Paonia or Somerset.

According to Colorado State Engineer, the Mesaverde Formation has been designated as a nontributary groundwater within the project area and the Mancos Shale aquifer is classified as a tributary groundwater within the project area and subject to administration under the prior appropriation system (CSOS 2010 and CDWR 2010c). As such, any produced water removed from the Mancos Shale aquifer would be under the guidance of a water augmentation plan granted by the District Court – Water Division 4, and regulated through the State Division of Water Resources (Water Division 4). If withdrawals from the Mancos Shale aquifer impacted surface water rights, the water augmentation plan would be invoked. Water from private sources near Paonia or Somerset would be used to augment surface flows in Muddy Creek to mitigate impacts due to tributary groundwater withdrawals from the Mancos Shale aquifer.

Groundwater Rights:  Cumulative impacts to groundwater would be limited to the groundwater aquifers that are affected by the Proposed Action. Potential impacts to groundwater rights would include a possible decrease in the amount of groundwater available due to groundwater withdrawals for natural gas development. The target depths of the proposed natural gas production wells would vary by well site, but are estimated to be between 5,000 and 10,000 feet. Due to the depth separation between potential production wells and existing non-industrial use water wells, domestic/stock/irrigation groundwater rights in the area should not be impacted by cumulative groundwater removal associated with natural gas development in the area if proper well drilling procedures and completion techniques are utilized. CDRW requires natural gas wells permitted through the COGCC also be permitted for industrial use for removal of produced groundwater associated with oil and gas exploration and production. Cumulative groundwater removed from targeted aquifers as a result of the natural gas development would not adversely impact the industrial wells permitted in the area.

**Alternative 1 –** Alternative 1 would require 3.3 fewer mile of new or improved access roads and 4.5 fewer acres of new production surface disturbance as compared to the Proposed Action, and would place development higher on ridges and side-slopes (Figure 5). Disturbance from Alternative 1 would cross fewer perennial streams (16 vs. 17) and intermittent streams (30 vs. 41), and impact more acres of wetlands (19.4 vs. 16.6). Adherence to applicable BMPs listed in Appendix C would minimize the potential for impacts to hydrology and water rights for both surface and groundwater. In addition, BLM may attach site-specific COAs to the APDs.

**Cumulative Impact**s – The types of cumulative impacts to hydrology and water rights from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. Compared to the Proposed Action, there would be 4.5 fewer acres of production disturbance and fewer total stream crossings.

**No Action –** Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. Production and operation of existing federal and fee/fee wells would continue under the No Action Alternative and SG would likely develop and produce up to 55 additional natural gas wells on fee surface. The No Action Alternative would require 9.3 fewer miles of new access roads and 45.6 fewer acres of new production surface disturbance as compared to the Proposed Action. The types of impacts would be similar to those described for the Proposed Action and Alternative 1.

## NOISE

**Affected Environment:** Noise is generally described as unwanted sound and is measured as sound pressure in units of decibels (dBAs). The decibel scale is logarithmic, or non-linear, because the range of sound that can be detected by the human ear is so great that it is convenient to compress the scale to encompass all the sounds that need to be measured. Each 20-unit increase in the decibel scale increases the sound loudness by a factor of 10.

BLM_0018097

The Unit is within a rural agricultural area that includes a mix of farming and ranching properties and 45 habitable dwellings. Noise levels from human activity are mostly mechanical, consisting mainly of existing natural gas development, new exploration activities, and ranching/farming activities. Ambient levels range from 35–40 dBA increasing up to 60 dBA with traffic from local roads (American Speech and Hearing Association, ASHA, 2008). As a basis for comparison, the noise level during normal conversation of two people 5 feet apart is 60 dBA. The varied terrain and vegetation within the Unit provide barriers and buffers for noise.

Noise from natural gas development within the Unit comes from a number of sources: truck traffic, drilling and completion activities, and well pumps. No compressor stations are currently present in the Unit, and none are proposed. Table 48 summarizes noise levels of typical construction equipment.

### Table 48. Noise Levels Associated with Typical Construction Equipment

| Equipment | Noise Level in dB(A) | | |
|---|---|---|---|
| | 50 feet | 500 feet | 1,000 feet |
| Tractor | 80 | 60 | 54 |
| Bulldozer | 89 | 69 | 63 |
| Motor grader | 85 | 65 | 59 |
| Mechanic truck | 88 | 68 | 62 |
| Backhoe | 85 | 65 | 59 |
| Crane | 88 | 68 | 62 |
| Air compressor | 82 | 62 | 56 |
| Dump truck | 88 | 68 | 62 |
| **Average, nearest dB(A)** | **86** | **66** | **60** |

Source: La Plata County, 2002.

The BLM does not have established noise standards for this area, and the Gunnison County Temporary Regulations for Oil and Gas Operations do not contain specific standards for noise. In 2006, the COGCC established regulatory limits as summarized in Table 49.

### Table 49. Regulatory Limits for Noise Generated by Natural Gas Facilities

| Zoning Area | 7 a.m. to 7 p.m | 7 p.m. to 7 a.m |
|---|---|---|
| Residential | 55 db | 50 db |
| Light industrial | 70 db | 65 db |

In remote areas, with no nearby occupied structures, the light industrial standard may be applied. These levels would be measured 350 feet from the source of the noise. Sound levels would be measured 25 feet from an existing residence if the residence is less than 350 feet from the noise source. Maximum levels may be exceeded by 10 dB(A) for up to 15 minutes within any one-hour period during daytime hours. Periodic, impulsive, or shrill noise may exceed the stated levels by 5 dB(A) day or night.

### Environmental Consequences/Mitigation:

**Proposed Action** – Noise levels would temporarily increase near the area of activity during construction, drilling, and workover. Operation of project-related vehicles and heavy equipment would generate noise during well pad and access road construction, and noise levels could exceed 70 dB(A) for a few minutes at a time between 7:00 a.m. and 7:00 p.m. Well pad and access road construction activities would cease after 7:00 p.m. Well drilling operations would continue 24 hours a day. Construction-related vehicles and maintenance trucks would create transient sources of noise.

BLM_0018098

The COGCC conducted surveys of noise generated by various types of equipment used for drilling and production of natural gas in 2006. The high for operation of drilling rigs ranged from 45–68 DB, which is within the maximum range established by the COGCC.

Operational activities would generate noise from the use of electric and natural gas-fired pumps. The COGCC 2006 surveys showed a high of 37–47 dBA for electric pumps and 38–70 dBA for gas-fired pumps. Of the 37 sites surveyed for gas-fired pumps, three exceeded 60 dBA, and the majority ranged from 40–57 dBA. Electric pumps would be used for the water disposal wells, and gas-fired pumps would be used for the gas wells. In addition, two 600-hp natural-gas-fired screw compressors would be installed, one on private property in a central location within the Unit, and the other at the southern terminus of the Bull Mountain Pipeline just outside the Unit. Screw compressors typically produce high-frequency sound, and SG will install hospital-grade mufflers to minimize the noise from these units.

The nearest dwelling to a proposed well site is approximately 695 feet from the FED 11-89-31 #1. All other dwellings would be at least 1,100 feet away, with varying levels of vegetation and natural terrain providing a sound buffer. Short-term direct and indirect impacts to ambient noise levels within the project area during construction and development would be low to moderate, and below maximum COGCC standards. Long-term impacts from operation would be moderate. Adherence to applicable BMPs as described in Appendix C would minimize impacts from noise. BLM may attach additional site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for noise is considered to be the Bull Mountain Unit and immediate vicinity. Noise would continue to be generated by Unit operations for the life of the field. Cumulative impacts of the Proposed Action in combination with the No Action Alternative would include the addition of development- and production-related noise sources to those that already exist within the Unit. These noise sources include, but are not limited to: existing traffic and equipment noise from natural gas development and well maintenance, agricultural activities, and recreational and tourist traffic on SH 133 and CR 265. In some areas the density of development could be considered by some individuals to be "noisy." This continual (though likely low-level) noise may be disruptive or objectionable to individuals such as recreationists, hunters, and livestock operators and may result in displacement of such activities. Displacement of wildlife in general and sensitive wildlife species may also occur in "busy" or "noisy" areas within the Unit; refer to the Wildlife and Special Status Species sections for this discussion. Short-term cumulative impacts from noise would be low to moderate during the construction and development phase, fluctuating with the specific activity. Long-term cumulative impacts would be low, and would also fluctuate with the specific activity.

**Alternative 1** – Direct and indirect impacts from noise would be increased for a cluster of 4 dwellings under Alternative 1 as compared to the Proposed Action. This cluster is located in an area ranging from 236 to 452 feet from the proposed ALT 12-89-9 #1, with varying levels of terrain and vegetation to buffer sound. In addition, a single dwelling is located approximately 311 feet from the proposed ALT 11-89-20 #1. For each of these dwellings, short-term direct and indirect impacts to ambient noise levels would be moderate but within maximum COGCC standards. Long-term noise levels during operations would be low for the majority of the project area and low to moderate for the dwellings discussed above. Adherence to applicable BMPs as described in Appendix C would minimize impacts from noise. BLM may attach additional site-specific COAs to the APDs.

**Cumulative Impacts** – The types of cumulative impacts from noise due to the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. However, Alternative 1 would have 3.3 fewer miles of new or improved access roads than the Proposed Action, with proportionately less impacts during construction and corresponding reductions in vehicle traffic and noise during construction and production.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee

BLM_0018099

surface and would add up to 11 wells to existing well pads. Direct and indirect impacts from noise would be increased for 2 groups of dwellings as compared to the Proposed Action. A cluster of 3 dwellings is located between 387 and 769 feet from the existing Pasco Spadafora #2; two more dwellings are located at 475 and 834 feet, respectively, from the existing FSB 11-90-12 #1. All have varying degrees of terrain changes and vegetation to provide sound buffering. For these dwellings, short-term direct and indirect impacts to ambient noise levels would be moderate but within maximum COGCC standards. Long-term impacts from operation would be moderate.

## RECREATION

**Affected Environment:**  The Unit is accessed from SH 133, along the West Elk Loop Scenic Byway, and CR 265. The West Elk Loop Scenic Byway passes through the proposed project area on SH 133 and connects the town of Carbondale, Hotchkiss, Crawford, Gunnison, Crested Butte, and other towns. In addition to attracting tourists, SH 133 provides access to hiking, mountain biking, dispersed camping, viewing of seasonal colors, cross-country skiing, and snowmobiling. The byway is known for its history, showcasing towns of varied lifestyles, and natural beauty. This route also provides access to the White River and Gunnison National Forests, the Black Canyon of the Gunnison National Monument, Gunnison Gorge National Conservation Area, Curecanti National Recreation Area, and Crawford and Paonia State Parks.

CR 265 provides access to the Grand Mesa, Uncompahgre, and Gunnison National Forest, which is extensively utilized for fall big game hunting, summer camping, viewing of seasonal colors, and snowmobiling.

Paonia State Park is located in close proximity to SH 133 and provides developed campsites, picnic sites, and a boat ramp surrounding Paonia Reservoir. McClure Pass is also in the vicinity and provides access to hiking, horseback riding, fishing, skiing, and snowshoeing and is a popular area with locals seeking nearby recreation opportunities.

The project area consists primarily of private surface that has historically been used for agriculture and grazing, with seasonal hunting. Hunting on private lands is permitted through local outfitter-guide services located in Crested Butte, Paonia, and Hotchkiss. Most of the larger private ranches in the Unit allow hunting with a ranch-approved guide, or at a minimum through the payment of a fee to the landowner. SG is currently required to negotiate with landowners on a case-by-case basis if drilling or construction activities need to continue into the hunting season; landowners are sometimes compensated for lost hunting revenue by payment of a fee, based on the period of time and amount of area impacted.

**Environmental Consequences/Mitigation:**

**Proposed Action –** Impacts to recreational use would include short-term and long term visual impacts, as well as a low to moderate increase in the ambient level of noise from construction, drilling, and completion activities. This may affect the quality of experience for hunters and recreational users along the West Elk Loop Scenic Byway. Adherence to applicable BMPs as described in Appendix C would minimize impacts to recreation from noise, construction, and drilling. No mitigation measures specific to recreation would be required.

**Cumulative Impacts –** The cumulative impacts assessment area for recreation is considered to be the Bull Mountain Unit and vicinity. Cumulative impacts to recreation would occur from the reasonably foreseeable implementation of the No Action Alternative along with either the Proposed Action or Alternative 1. These activities, when added to other reasonably foreseeable natural gas and coal mining development activities in the area, would incrementally decrease the overall experience for recreational users. The primary user group impacted would be people using the West Elk Loop Scenic Byway, people viewing seasonal colors, and hunters.

**Alternative 1 –** Impacts to recreational use under Alternative 1 would be similar to the Proposed Action, with a slight reduction in visual and noise impacts due to the more clustered configuration of

---

BLM_0018100

wells around existing roads. Adherence to applicable BMPs as described in Appendix C would minimize impacts to recreation from noise, construction, and drilling. No mitigation measures specific to recreation would be required.

**Cumulative Impacts** – The types and levels of cumulative impacts to recreation from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. However, Alternative 1 would have 3.3 fewer miles of new or improved access roads than the Proposed Action, with proportionately less impacts during construction and corresponding reductions in noise during construction and production.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. Direct and indirect impacts from noise would be increased for 2 groups of dwellings as compared to the Proposed Action. The overall reduction in the number of wells and access roads to approximately 44% of the Proposed Action would proportionately reduce the potential for visual and noise impacts to recreation.

## VISUAL RESOURCES

**Affected Environment:** The scenic quality rating unit encompassed the rolling foothills to the northwest of the Ragged Mountain range, which holds a highly diverse landscape with a high amount of visual variety. Vertical relief is present, with high, rolling hills and fairly steep slopes. It is substantially natural in character, with few human intrusions creating a visual imprint on the land. The vegetation is vibrant and healthy, displaying as much or more diversity than seen in comparable areas in the west, resulting in brilliant seasonal color variation.

The BLM utilizes the Visual Resource Management (VRM) system to manage and protect visual/scenic resources. VRM cannot occur in a systematic and objective manner without a proper inventory of visual resources. An accurate inventory of visual resources creates the needed baseline data to conduct VRM. The Visual Resource Inventory (VRI) is a methodical process intended to evaluate and determine the quality of visual resources and the value of those resources in a given area. A VRI was completed for the UFO in September of 2009. While not yet incorporated into the current RMP, this data is the most recent and comprehensive data available for visual resources within the UFO.

The proposed facilities occur on a mixture of private surface/private minerals, private surface/federal minerals, and federal surface/federal minerals. While VRM objectives do not apply to non-BLM lands, visual concerns may be addressed on split estate where federal minerals occur.

VRI Classes are rated as: Class I, Class II, Class III, or Class IV. Class I is the highest value and is assigned to areas with special designations such as a Wilderness Area. Class II is the next most valued and allows for some management activities, but should not attract the attention of a casual observer. Class III allows for management activities that may attract attention, but shall not dominate the view of the casual observer. Class IV is for lands with the least value in scenic quality and allows for management activities that may dominate and be a major focus of attention.

All BLM land within the project area rates as VRM Class II. The management objective for this class is "*to retain the existing character of the landscape. The level of change to the characteristic landscape should be low. Visual resources on lands designated as Class II shall be managed to have a low level change and they shall retain the existing character of the landscape through repetition of the form, line, color and texture. Management activities may be seen, but should not attract the attention of the casual observer.*"

A VRI is comprised of three parts: Scenic Quality Evaluation, Sensitivity Level Analysis, and a delineation of Distance Zones. These three factors are combined to define the VRI Classes for the study area. Information for each of these three factors as they pertain to the planning area is as follows:

BLM_0018101

Scenic Quality Evaluation:  The planning area is within the Bull Mountain Scenic Quality Rating Unit. Landform/water, vegetation, and structures were reviewed and described in the context of form, line, color, and texture as part of the field inventory. In addition, landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications were rated between 0 and 5, with 0 being a low rating and 5 being a high rating. The scenic quality rating values resulted in a Class A designation indicating a high and unique scenery value. The unit was given this rating due to the variety and seasonal color variation of vegetation, the adjacent scenery provided by the Ragged Mountain Range as well as the presence of flowing water. The rating documentation also notes that this unit provides a very diverse and vibrant vegetative community, considerable visual variety in terms of color, and that it is a very scenic landscape.

Sensitivity Level Analysis:  This area is also referred to as Bull Mountain for the Sensitivity Level Rating Unit. During the VRI analysis, it was noted that this area had a high sensitivity in all categories, with a particular note of high public sensitivity to preserving the rural character and open space of the area, as well as the presence of the West Elk Loop Scenic Byway and the volume of tourist traffic and visitor use. The area attracts the notice of conservation groups concerned about energy development.

Distance Zone:  The land within the planning area is all within the foreground/middleground distance zone (0-5 miles) which means the landscape can readily be seen and experienced from a major travel route or point. The primary travel routes within the planning area are SH 133 and CR 265.

The West Elk Loop Scenic Byway passes through the proposed project area on SH 133 and connects the towns of Carbondale, Hotchkiss, Crawford, Gunnison, Crested Butte, and other towns. The byway is known for its history, showcasing towns of varied lifestyles, and natural beauty. This route also provides access to the White River and Gunnison National Forests, the Black Canyon of the Gunnison National Monument, Gunnison Gorge National Conservation Area, Curecanti National Recreation Area, and Crawford and Paonia State Parks.

In addition, the Delta County Master Plan notes the presence of the Scenic Byway and the protection and interpretation of the cultural heritage and natural resources in the area. The Delta County Master Plan also states the following goal:

> The preservation of the rural lifestyle and landscape, which includes the natural environment and unique physical characteristics of Delta County. Natural resources associated with the rural landscape include open space and scenic viewsheds, and includes a desired strategy to map the significant physical features and environmental characteristics of the County, such as important scenic viewsheds.

The Town of Paonia has also developed a SH 133 Corridor Master Plan which specifically states as a goal that *"The open scenic character of the West Elk Scenic Byway shall be protected."*  It states that new development should not detract from the rural qualities of the highway corridor and Paonia's small-town character.

The analysis for visual resources places an emphasis on the SH 133 viewshed due to the added sensitivity of it being a scenic byway. The viewshed is comprised of the rolling foothills and valleys below and to the north of the Ragged Mountain range and west of McClure Pass. Numerous shrub species thrive with open meadows weaving in between large stands of woodlands comprised of aspen, juniper, and oak, along with a few groups of coniferous trees. The viewshed is most open and exposed as the traveler comes down McClure Pass, moving west along SH 133. As the highway begins to drop, the viewshed begins to narrow and is limited by the valley walls of Muddy Creek and the North Fork of the Gunnison River.

CR 265 has less traffic, and is primarily used for local use, with some regional access. This road follows a drainage, which limits its viewshed expanse to the immediate foreground due to the topography.

BLM_0018102



Inventory Observation Points (IOPs) from the recent VRI are included to show the representative character of the existing landscape. These three points show different areas of the scenic quality rating unit (Figure 11).

In addition, due to the sensitivity of the SH 133 corridor a Key Observation Point (KOP) was selected, representing a view while traveling SH 133 west of McClure Pass. KOPs are the most critical viewpoints of a Proposed Action, and are usually located along commonly traveled routes or at other likely observation points.

**Figure 11. IOP Locator Map, Bull Mountain Unit**



**IOP 1. Looking southwest**

BLM_0018103



**IOP 2. Looking south-southwest**



**IOP 3. Looking east-southeast**



**KOP 1: Represents the view while traveling SH 133 west of McClure Pass** (Photo taken October 2007)

BLM_0018104

**Environmental Consequences/Mitigation:**

**Proposed Action** – Some of the proposed facilities would not be visible due to the terrain and the placement of the well pads and linear disturbances fit within the landscape. Due to the sensitivity associated with the SH 133 corridor, facilities seen from this location have a higher concern level.

Well Pad Sites: Within the SH 133 viewshed, a total of four well pad sites would have visible surface disturbance and above-ground facilities, and five additional well pad sites with visible above-ground facilities. All nine of the well pad sites with visible disturbance are on fee surface/federal minerals. The four well pad sites with visible surface disturbance represent approximately 14 acres of construction disturbance (using an average of 3.5 acres per well pad) and 5.52 acres of production disturbance (using an average of 1.38 acres per well pad).

Outside of the SH 133 viewshed there will be additional well pad sites visible from existing roads, notably CR 265. Of the remaining well pad sites, 31 of these well pads are on fee lands/federal minerals, with the remaining two sites straddling fee/fee and fee/federal. Some of the well pad sites may not be visible due to their placement within the landscape that will use the natural lines of the topography and vegetation to screen visual impacts. Additionally, other sites will only have visible facilities, which are easier to mitigate through proper placement and color treatment. In order to accurately analyze and quantify impacts, site specific plans need to be provided detailing the location of the pad a facilities as well as the amount of cut-and-fill.

Linear Disturbance (Access Roads and Pipelines): Linear disturbances have the potential to create greater visual disharmony than the disturbance from the surface of a well pad if not designed correctly. Within the viewshed of the SH 133 corridor there are several proposed pipelines and roads, both new and improved that could have a significant impact on the scenic quality of the area and may not meet the criteria of Class II. New roads, pipelines, and even improved roads may create visible disturbance through the exposure of cut-and-fill slopes and the clearing of vegetation, especially alignments that run perpendicular to the existing contours in the landscape instead of following and blending with them. Depending on the type of vegetation the linear disturbance is impacting, the disturbance may be long-term (trees and large shrubs) or short-term (grass).

The following are the estimated miles of linear disturbance within the SH 133 viewshed:

- Improved existing two track        1.3 miles
- New road                           1.2 miles
- Pipeline co-located with roads     0.5 mile
- New pipeline                       2.4 miles

The total disturbance would be approximately 5.4 miles of visible disturbance due to linear facilities, some of which may be able to be mitigated through proper design and placement. Specific plans would need to be provided for each alignment in order to properly analyze if they will meet the Class II requirements.

Outside of the SH 133 viewshed there would be additional impacts from linear alignments, although some of the disturbance may not be visible due to placement within the landscape that will use the natural lines of the topography and vegetation to screen visual impacts.

Overhead Electric Lines: The impacts from overhead lines may also create visible disturbance by introducing a line into the landscape that does not follow the contours of the land and is visually discordant with the surrounding landscape. In addition, depending on the materials used in the construction, the poles and lines may introduce a color that contrasts with the surround vegetation.

The location and alignment of the overhead electric lines has not been determined. However, direct routes, or often the shortest route from the water-disposal well facility to the existing power lines, may contribute to higher visual impacts. Care should be taken during the design of the alignment to assure that

BLM_0018105

the lines follow existing landforms and blend to the extent possible. Clearing of the power line right of way should be discouraged, and vegetation should only be pruned where necessary and not removed.

Short-term Impacts:  Visual impacts from construction, drilling, and completion activities would occur with the proposed new well pad sites, access roads, and pipelines. The existing landscape would be changed by the introduction of new elements of form, line, color, and texture. The new pad, access road, and surface facilities would increase the presence of drilling rigs, heavy equipment, and vehicular traffic, with an associated increase in dust, light pollution from safety lighting on drilling rigs, and potential well flaring.

The construction of the access road and pad would require major earth work and vegetation removal in the immediate foreground. The exposed soils and augmentation of the landform would result in a strong contrast with the existing forms, lines, and colors of natural landforms. The removal of vegetation would also result in a strong contrast of form, line, color, and also texture between the existing and absent native plant material. The introduction of above-ground equipment such as tanks would also create a strong contrast with the form, line, and texture as there are currently no other structures of this magnitude in the landscape. Construction mitigation would occur, but it will be essential to plan the mitigation correctly to assure that it can meet the Class II requirements for short-term impacts.

Long-term Impacts:  Long term impacts would likely occur from removal of vegetation, specifically trees and shrubs, especially with respect to linear disturbances from roads and pipelines. In this environment, trees and shrubs may not regenerate quickly, therefore leaving a long-term impact with a visible clearing of vegetation that contrasts with the surrounding landscape and would likely not meet VRM Class II objectives. In addition, light pollution may be an issue at sites which operate 24 hours a day and require safety lighting.

Mitigation:  Adherence to applicable BMPs as described in Appendix C would minimize impacts to visual resources In order to determine if the proposed activities will meet VRM Class II requirements it is essential to be able analyze the details of a plan. The APD shall include a detailed, site-specific description outlining how the Proposed Action will be mitigated to meet VRM Class II objectives. The specific location of the facilities, including pads, roads, and pipelines, shall be shown on a map and contain associated cut-and-fill data (location, horizontal and vertical extent, slope length, and steepness) to be able to determine how much slope will be visible, where it would be visible, and if it will be seen from KOPs. A viewshed analysis from project-specific KOPs to determine the correct placement of the pad and facilities to determine if the proposed development can be mitigated to meet the requirement of Class II may also be required. This detailed, site-specific plan may require the addition of COAs in addition to those described in Appendix C, including the following:

- To reduce visual impacts to individuals utilizing the surrounding lands, low-profile tanks will be used.

- Production facilities shall be placed to avoid or minimize visibility from travel corridors, residential areas, and other sensitive observation points—unless directed otherwise by the authorized officer due to other resource concerns—and shall be placed to maximize reshaping of cut-and-fill slopes and interim reclamation of the pad.

Cumulative Impacts – Some of the proposed facilities would be built on fee/fee and may not be mitigated for visual impacts which will alter the viewscape of the area. The casual observer typically does not identify surface ownership when observing the landscape and the proposed facilities would likely be noticeable.

The existing environment would likely be altered due to the continuation of existing federal authorizations of ongoing operations of existing wells, as well as the likely development, operation, and maintenance of 11 new gas pads plus associated facilities and infrastructure. The existing visual resources in the area are expected to be altered through the likely development of approved facilities which includes

BLM_0018106

16 miles of road upgrades, 3 miles of new road construction, 17 miles of new pipelines, four flowback pits, compressors, and above-ground appurtenances.

The additional proposed development of the Proposed Action in combination with the likely development of the No Action Alternative, including the associated access roads, pipelines, and other facilities, as well as the pads, would introduce new forms, lines, colors, and textures not currently native in the landscape. The existing viewshed would begin to have more and more contrast between the existing natural landscape and the introduced man-made features as construction of new facilities takes place, leading to an overall viewscape that many not meet the criteria of VRM Class II.

**Alternative 1** – The types of visual impacts resulting from Alternative 1 would be similar to those from the Proposed Action.

<u>Well Pad Sites</u>:  Within the SH 133 viewshed, a total of two well pad sites would have visible surface disturbance and above-ground facilities, and seven additional well pad sites with visible above-ground facilities. All nine of the well pad sites with visible disturbance would be on fee surface/federal minerals. The two well pad sites with visible surface disturbance represent approximately 7 acres of construction disturbance (using an average of 3.5 acres per well pad) and 2.76 acres of production disturbance (using an average of 1.38 acres per well pad). Compared to the Proposed Action, this is a reduction of 7 acres of construction disturbance and 2.76 acres of production disturbance.

Outside of the SH 133 viewshed there would be additional well pad sites visible from existing roads, notably CR 265. Of the remaining well pad sites, 32 of these proposed well pads are on fee/federal, with one site straddling fee/fee and fee/federal, and one pad on federal/federal. Some of the well pad sites may not be visible due to their placement within the landscape that would use the natural lines of the topography and vegetation to screen visual impacts. Additionally, other sites would only have visible facilities, which are easier to mitigate through proper placement and color treatment. In order to accurately analyze and quantify impacts, site-specific plans need to be provided detailing the location of the pad a facilities as well as the amount of cut-and-fill.

<u>Linear Disturbance (Access Roads and Pipelines)</u>: The types of potential impacts from Alternative 1 would be similar to impacts from the Proposed Action.

The following are the estimated miles of linear disturbance within the SH 133 viewshed:

- Improved existing two track      1.0 mile
- New road      1.0 mile
- Pipeline co-located with roads   0.4 mile
- New pipeline      1.6 miles

The total disturbance would be approximately 4.0 miles of visible disturbance due to linear facilities, some of which may be able to be mitigated through proper design and placement. This is a reduction of 1.4 miles of linear disturbance as compared to the Proposed Action. Specific plans would need to be provided for each alignment in order to properly analyze if they will meet the Class II requirements.

Outside of the SH 133 viewshed there will be additional impacts from linear alignments, although some of the disturbance may not be visible due to their placement within the landscape that will use the natural lines of the topography and vegetation to screen visual impacts.

Short-term and long-term impacts for overhead electrical lines, construction, drilling, and completion activities would be similar to impacts from the Proposed Action. Mitigation measures would be the same as for the Proposed Action.

**Cumulative Impacts** – The types of cumulative impacts to visual resources from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action. However, Alternative 1 would have 1.4 fewer miles of linear disturbance from roads

BLM_0018107

and pipelines than the Proposed Action, with proportionately less visual impacts during construction and production.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. Direct and indirect impacts from noise would be increased for 2 groups of dwellings as compared to the Proposed Action. The existing visual resources in the area are expected to be altered through the likely development of approved facilities which includes additional wells on existing pads, 11 new well pads, 16 miles of road upgrades, 3 miles of new road construction, 17 miles of new pipelines, four flowback pits, and above-ground appurtenances.

## GEOLOGY AND MINERALS

**Affected Environment:** The Bull Mountain Unit is located on the eastern edge of the Colorado Plateau physiographic province and adjacent to the western edge of the southern Rocky Mountain physiographic province (Appel and Butler, 1991). There are numerous Quaternary surficial deposits including alluvium, colluvium, glacial deposits, and landslide deposits. Most of the area is underlain by the Wasatch formation which consists of claystone, siltstone, and sandstone with some conglomerate layers at the base near the contact with the Ohio Creek formation of the upper Mesaverde Group. The Wasatch formation tends to break down into a clay loam soil that can become unstable when saturated due to the high clay content.

The Ohio Creek formation consists of sandstone, siltstone, and shale and is found in the southeast part of the Unit along the valley walls and bottoms of East Muddy Creek. It forms steep canyons in areas of fluvial erosion and is known as a source area for rockfall hazards. Sandstone outcrops of the Ohio Creek Formation are visible along the valley of East Muddy Creek.

Potential geological hazards within the Unit include:

- Avalanches. A few limited areas within the Unit have slopes steeper than 30 degrees, generally considered the minimum angle for avalanche initiation in Colorado's snow climate. Avalanches may occur during periods of intensive snowfall (greater than one inch of snow per hour for 12 hours or more); however the area has not historically had significant avalanche hazards.

- Landslides. Existing landslide areas within the Unit comprise 1,163.4 acres, primarily on the east side of SH 133 in the southeast corner of the Unit (Figure 12). An existing landslide area near Spring Creek was active in 1986, during a period of above-average precipitation and rapid snowmelt (Appel and Butler, 1991). Evidence of recent landslide movement was found along the proposed pipeline route leading  from SH 133 to the proposed FED 12-89-9 #1, with scarps ranging from 2 to 5 feet high (Trautner, 2011).

- Rockfall. Most rockfall hazards within the Unit occur along the west side of the SH 133 corridor. CDOT has conducted extensive mitigation in the form of rockfall fences and scaling of existing hazards. Some small areas occur near the top of slopes with slopes greater than 30%. One such area, which has a small outcrop of sandstone, is located north of the proposed access road and pipeline to the proposed FED 11-80-35 #1.

- Mudflows and debris fans. Mud or debris flows occur when soils become saturated, usually during an intense rain event, and begin to flow down-slope, often carrying rocks or boulders and building up sediment channels. A debris fan is created when the mud or debris flow spreads into a fan-like shape at the bottom of a gully. The landslides that occurred on the east and west sides of East Muddy Creek were a combination of rotation landslides and debris flows.

BLM_0018108

- <u>Seismic activity.</u> The State of Colorado/USGS database shows one minor earthquake recorded in the area of the Bull Mountain Unit in 1988, which does not correspond to any known landslide events.

Mineral extraction within the Unit is currently limited to existing CBNG wells developed by SG (see Table 3). A Plan of Development for the Hotchkiss Federal wells (including 16 wells on 15 well pads) was approved by the BLM on February 10, 2009. The project is located on BLM and fee land directly south of the Bull Mountain Unit between SH 133 and the National Forest System (NFS) boundary to the west approximately one mile north of the Paonia Reservoir. Four gas wells are currently in production, one water-disposal well is active, and two locations have been abandoned (COGCC database, 2011).

BLM_0018109

**Figure 12. Landslide Areas in the Bull Mountain Unit**

### Bull Mountain Unit

*Landslide Areas*
*January 2012*

Existing Development

- ⬡ Existing Gas Well
- ～ Existing Gathering System
- State Highway
- County Road
- Improved Road

- Bull Mountain Unit
- Township Boundary
- Section Boundary

- Landslide Area

- Stream

*Disclaimer:*
*This product is for informational purposes and may not have been prepared for, or be suitable for legal, engineering, or surveying purposes. Users of this information should review or consult the primary data and information sources to ascertain the usability of the information. The maps are distributed "AS IS" without warranties of any kind, either expressed or implied, including but not limited to warranties of suitability to a particular purpose or use.*

This page left blank for two-sided copying.

BLM_0018111

**Environmental Consequences/Mitigation:**

**Proposed Action** – Production of natural gas from CBNG and shale gas wells would contribute to the draining of hydrocarbon-bearing reservoirs from within the Mesaverde and Mancos Group, which complies with the BLM's objectives for Management Unit 16. Production rates for natural gas from CBNG and shale gas wells would be highest during the first few years and then steadily decline over the life of the project. The Proposed Action is estimated to drain 785 billion cubic feet (bcf) of natural gas through 2051 based on a downhole drainage area of approximately 14,266 acres.

At full build-out, development of the water-disposal wells would result in the injection of an estimated 5,000–25,000 bbls of treated produced water from the CBNG wells (1,000–5,000 bbls/well/day) into the Dakota, Morrison, Entrada, and Maroon Formation's sandstone members, at depths of approximately 8,600 to 9,500 feet. The proposed water-disposal wells would be Class II disposal wells as designated by the Environmental Protection Agency (EPA) for the purpose of injecting brines and other fluids associated with the production of natural gas. Class II wells protect fresh water resources by injecting waste fluid underground and preventing its disposal near surface water.

Class II wells are regulated by the COGCC as approved by the EPA under section 1425 of the SDWA noticed in the Federal Records on April 2, 1984. The COGCC administers the requirements for the Underground Injection Control (UIC) program. The State requires installation of continuous recording devices to monitor injection pressure, flow rate, volume, and the pressure on the annulus between the tubing and the long string of casing. This data is reported monthly to the COGCC. The COGCC also requires frequent analysis of injected fluids, periodic mechanical integrity tests (MIT) for the purpose of monitoring well and injection parameters, and other tests and measurements as required by the Regional Director for UIC. The COGCC would periodically inspect the disposal well site for regulation and injection pressure compliance. At present, three produced-water disposal wells are operating in Gunnison County including SG's Federal 24-2 WDW, and three in surrounding counties (two in Chaffee County and one in Delta County). Currently 579 water-disposal wells are operating in Colorado (COGCC 2011), and there have been no reported problems or impacts to the underlying geology.

A total of 8.5 miles of existing roads, 1.86 miles of new access roads, and 1.32 miles of new pipelines would be located within the landslide area to the east of SH 133. Existing road segments in this area would be upgraded to accommodate increased traffic and mitigate potential hazards. Potential short-term and long-term direct and indirect impacts to installed surface and subsurface facilities could occur as a result of inherent geologic hazards in limited areas within the Unit including landslides, mud and debris flows, and rockfall. Adherence to applicable BMPs as listed in Appendix C would minimize impacts to geological and mineral resources. Extra caution would be advised when potential avalanche conditions exist, but no other mitigation is recommended. BLM may attach additional site-specific COAs to the APDs.

**Cumulative Impacts** – The cumulative impacts assessment area for geology and minerals is considered to be the Bull Mountain Unit and vicinity. Cumulative impacts would occur from the reasonably foreseeable implementation of the No Action Alternative in combination with either the Proposed Action or Alternative 1, as well as other reasonably foreseeable energy development in the vicinity. Long-term direct cumulative impacts would include drainage of the overall hydrocarbon resource in the Mesaverde formation, and reinjection of produced water, summarized in Table 50.

BLM_0018112

**Table 50. Comparison of Cumulative Geologic Impacts by Alternative[1]**

| | Proposed Action | Alternative 1 | No Action |
|---|---|---|---|
| Total length of roads in potential landslide area | 1.4 miles | 2 miles | 0 |
| Total length of pipelines in potential landslide area | 1.3 miles | 1.8 miles (0.4 miles co-located with road) | 0 |
| Total natural gas produced | 785 bcf | 438 bcf | 374.1 bcf |
| Downhole acreage drained | 14,266 acres | 12,870 acres | 6,491 acres |
| Reinjected produced water | 6,000-30,000 bbls/day | 6,000-30,000 bbls/day | 1,000-5,000 bbls/day |

[1]  Estimated totals for all development by SG within the Unit based on 5-year project build-out and average 40-year life per well
     Source: SG Interests

Indirect cumulative impacts would include a potential reduction in the amount of natural gas available for drainage from wells in the immediate vicinity of the Unit.

**Alternative 1** – Alternative 1 is projected to drain 438 bcf of natural gas through 2051 based on a downhole drainage area of approximately 12,870 acres, or approximately 77% of the amount projected under the Proposed Action due to the more clustered configuration of the well sites. Potential impacts to installed surface and subsurface facilities would be similar to the Proposed Action, as would the amount of produced water to be reinjected. A total of 8.5 miles of existing roads, 1.83 miles of new access roads, and 0.9 miles of new pipelines would be located within the landslide area to the east of SH 133, somewhat reducing potential impacts to these facilities as compared to the Proposed Action. Adherence to applicable BMPs as listed in Appendix C would minimize impacts to geological and mineral resources. Extra caution would be advised when potential avalanche conditions exist, but no other mitigation is recommended. BLM may attach additional site-specific COAs to the APDs.

**Cumulative Impacts** – The types of cumulative impacts to geology and minerals from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action.

**No Action Alternative** – Under the No Action Alternative, authorization of new development targeting federal minerals would be denied. SG would develop up to 55 new wells on 11 well pads on fee surface and would add up to 11 wells to existing well pads. The No Action Alternative is projected to drain approximately 374 bcf of natural gas through 2051 based on a downhole drainage area of approximately 6,491 acres, or about 42% of the amount projected under the Proposed Action due to the reduced number of wells and their placement within the Unit. The existing Federal 24-2 WDW would be the sole water-disposal well, injecting 1,000–5,000 bbls of treated produced water per day. Potential impacts to installed surface and subsurface facilities as a result of geologic hazards would be similar to the Proposed Action; however, the severity of these impacts would be greatly reduced because only one well, the proposed Volk 12-89-9 #2, and its associated access road and pipeline would be located within the landslide hazard area in the southeast portion of the Unit. A total of 0.14 miles of new access road, co-located with pipeline, would be required for this well.

## SOCIO-ECONOMICS

**Affected Environment:** The geographic analysis area considered for potential socioeconomic effects includes Gunnison and Delta Counties in Colorado. Some population, economic, and housing statistics are reported months or years after the period considered. As a result, some of the following information does not reflect the recent economic downturn and its effects on the areas surrounding the Bull Mountain Unit.

BLM_0018113

Population and Economic Conditions – Gunnison County's population was 15,350 in 2009, representing a 10.0% increase from 2000, compared to statewide Colorado population growth of 16.8% during the same period. Delta County's population was 31,322 in 2009, with a 12.5% increase since 2000 (USCB 2009a). Gunnison County includes a 6.6% Hispanic or Latino population, and an additional 2.8% minority population comprised primarily of Native Americans, African Americans and Asians (USCB 2009b). Delta County is comprised of a 13.8% Hispanic or Latino population, and an additional 2.1% minority population comprised primarily of Native Americans, African Americans and Asians (USCB 2009a).

Gunnison County's economy is based on tourism and recreation, construction, agriculture, and natural resource production. Delta County's economy is similar to Gunnison County's, but also features a significant healthcare and nursing home industry. Based on the recent economic downturn, construction jobs have likely decreased in the past several years in both Gunnison and Delta Counties, though no supporting data is available.

A significant portion of the tourism in Gunnison County is based in the towns of Gunnison and Crested Butte; the Bull Mountain area's economic conditions are not really comparable to the rest of Gunnison County. Specifically, agriculture and natural resource development are more dominant in the Bull Mountain area than tourism. Fall big game hunting is also a popular activity in this area.

Gunnison County's labor force totaled 8,784 people in June 2010 (USBLS 2010), and it has remained the same since 2004 despite population increases during the past decade (USA CED 2010b). Gunnison County's unemployment rate has increased, as a result of the economic downturn, from 4.2% to 7.3% in June 2010. However, the County's unemployment rate remained lower than Colorado's June 2010 unemployment rate of 8.3% (USBLS 2010). Average annual wages were $25,326 in 2000, with a median household income of $36,916. Gunnison County's poverty rate was 15.0% in 2000 (USA CED 2010b).

Delta County's labor force increased 12% from 14,290 people in 2004 (USA CED 2009a) to 17,298 people in 2009 (USBLS 2010). The unemployment rate in Delta County increased from 5.5% (USA CED 2009a) to 8.1% in June 2010 (USBLS 2010), which was similar to Colorado's unemployment rate of 8.3% during the same period. In 2000, average Delta County wages were $23,083 with a median household income of $32,785, and a poverty rate of 12.1% (USA 2009a).

In the past ten years, oil and gas development has increased steadily in Gunnison County. In 2000, gas production for all of Gunnison County was 120,791 million cubic feet (mmcf), with sales of 118,803 mmcf. In 2009, gas production was 1,307,912 mmcf, with sales of 1,178,928 mmcf (COGIS 2010). SG alone has developed 11 wells (ten natural gas and one water disposal) in the area since 2005.

Housing Resources – The US Census Bureau reported 11,006 housing units in Gunnison County in 2000 (USA CED 2009b). In 2000, Gunnison County home ownership was 58.3% with a median housing unit value of $189,400 (USCB 2009b). Of 3,486 vacant Gunnison County housing units in 2000, 114 were for rent (USA CED 2010b).

Delta County contained 12,374 housing units in 2000 (USA CED 2009a), with a home ownership rate of 77.5% and a median housing unit value of $115,500 (USCB 2009a). A total of 1,316 Delta County housing units were vacant in 2000, and 200 of the vacant units were available for rent (USA CED 2010a). Due to the recent economic downturn, it is very likely that more housing units are currently available for rent in both Gunnison and Delta Counties than were available in 2000.

Quality of Life – The Bull Mountain area is rural and largely undeveloped, though some natural gas development is already present. SH 133, a scenic byway, also runs through the eastern portion of the unit. The area features cattle ranching and recreational activities, including fishing, hunting, and off-highway vehicle (OHV) use. Several areas proximate to the Unit, including the Ragged Mountain area and the Raggeds Wilderness Area, also provide hiking opportunities.

BLM_0018114

<u>Law Enforcement and Emergency Response</u> – Law enforcement services in the Bull Mountain area are provided by the Gunnison County Sheriff's Office. Sheriff's deputies provide routine patrol services, First Responder medical care and 24-hour on-call coverage for the area. The Sheriff's office provides dispatch services for all emergency service agencies in the county. Emergency management is also provided under the jurisdiction of the Sheriff's office through the County's emergency manager. Ambulance service is provided by the Gunnison Valley Hospital in Gunnison. Delta County Hospital in Delta also offers ambulance service with advanced life support and is a certified Level IV trauma center. Montrose Memorial Hospital is a Level III trauma center. Fire-suppression services are provided by the Ragged Mountain Fire District.

<u>Fiscal Conditions</u> – Local and state government fiscal conditions examined for this assessment include property taxes, state severance tax and royalties. The Bull Mountain Unit is located within the Delta County School District, so applicable property and severance tax revenue would directly benefit the Delta County School District.

*Property Taxes* – Gunnison County's total taxable assessed value for 2009 was $860,656,930, with oil and gas property representing $6,394,110 or .74% of total County assessed value (Gunnison County 2009a). Gunnison County reported $6,903,396 in property tax revenue for 2009 (Gunnison County 2009b).

*Severance Taxes and Royalties* – Entities that own royalty interests on wells must pay a severance tax on gas or minerals removed from the ground (CO Dept of Revenue). Severance taxes in Colorado are 5% for natural gas, half of which goes to the Colorado Department of Natural Resources to fund water conservation, wildlife, and environmental programs. The Department of Local Affairs (DOLA) distributes 15% of the severance taxes (30% of the 50%) directly to local governments and 35% (70% of the 50%) to local government grant projects. The direct payments from DOLA to Colorado communities are often used to offset the impacts of drilling on roads, schools and public services.

Colorado local governments will receive $37 million in state severance-tax revenue and federal mineral-lease payments (royalties) in 2010 (Denver Post 2010). Gunnison County received $428,093 in severance taxes and $988,302 in federal mineral lease distributions during 2010. In addition, the Delta County School District received $126,527 in 2010 from severance taxes (DOLA 2010).

**Environmental Consequences/Mitigation:**

**Proposed Action** – Implementation of the Proposed Action would result in draining 785 billion cubic feet (bcf) of natural gas through 2051 based on a downhole drainage area of approximately 14,266 acres. The economic, employment and fiscal effects would be greatest through project build-out, which would occur in approximately 2016. After construction and drilling is complete, there would be a marked reduction in employment opportunities and the need for materials. Only those employees operating and maintaining the Unit would continue to have consistent, year-round employment. Taxes and royalties would continue to benefit the communities as long as the Unit is producing. The lifetime expectancy of both coalbed and shale wells is generally 40 years; hence the Unit could continue producing until 2051.

<u>Economic and Employment Effects</u> – The Proposed Action would generate employment and local income throughout the construction and operation phases of the project, generally in Delta County. Natural resource development and construction would be the two industry sectors directly affected; other sectors—primarily the retail trade and service industries—would be indirectly affected.

Many employee and contractor needs would be met through hiring from the local workforce, including road and pad construction contractors, roustabouts, pumpers, pipeline station operators, and office staff. A portion of drilling rig operations and drilling consultant functions, along with part of the well completion, would also likely utilize local contract employees. Some specialty contractors and materials would likely be hired from outside the area due to the specific nature of their jobs. Non-local, seasonal employees would include four Houston-based employees that would reside in Colorado during the project.

BLM_0018115

Project initiation would require numerous local contractors on a seasonal basis from May to November for construction of roads, pads, and gathering pipeline. Contractor/consultant needs would be based upon construction schedules and would vary over the six years of Unit development. SG estimates the need for approximately 110 additional contract laborers for drilling and well completion during Unit development. Most of these positions would be eliminated upon completion of project build-out. SG also estimates that a total of 68 full-time, year-round employees would be necessary by 2016 to manage operations and maintenance of the fully developed Unit. These positions would remain constant for the duration of production and would include a variety of pumpers, pipeline station operators, and roustabout crew members.

Estimated annual payroll for construction, operation, and maintenance of the Unit under the Proposed Action would be at a high of $11.3 million in 2016, and would decline to and remain steady at approximately $3.4 million during production.

Development and operation of the Unit would also require goods and services from a variety of local and regional contractors and vendors, e.g., the purchase of materials, such as gravel available in Delta and Paonia, during road and pad construction. Expenditures by the proponent for these goods and services, coupled with employee and contractor spending, would generate positive indirect economic benefits in Gunnison and Delta Counties, as well as the surrounding area. Total annual material purchases for the Proposed Action are estimated at $56,718,533 in 2012, increasing to $52,368,140 by 2016, and declining to $40,000 from 2020 through project build-out. Some products and materials would necessarily come from outside the area as well.

<u>Population Effects</u> – The Proposed Action would have no measurable impacts on the population of Gunnison or Delta counties. Heavy-equipment operators and a variety of other skilled laborers are readily available in the areas surrounding the Unit, and current unemployment rates have increased the availability of the local labor force. The local retail trade and service industries would indirectly benefit from increased employment resulting from project implementation.

<u>Housing Demand</u> – Housing availability in the areas around the Unit would be sufficient to accommodate employees needed to implement the Proposed Action. The small number of temporary specialty jobs could easily be absorbed through the existing housing supply in the surrounding areas.

<u>Quality of Life</u> – The Proposed Action would change the character of the Bull Mountain by directly increasing local jobs to boost the local economy and increasing local revenues in the service and retail sectors, primarily in Delta County. It would also increase property, severance, and royalty tax revenues for Gunnison County and the Delta County School District.

The Proposed Action may also have short-term and long-term adverse impacts on the Bull Mountain area. Continued natural gas development would increase traffic, dust, and noise in a traditionally quiet rural area. Access roads and wellheads would also change the landscape views during the life of the project. These impacts are more fully discussed in the Noise and Visual Resources sections.

Accelerated development of the area (in addition to natural gas development) may occur once access roads are established on private lands. Fishing, hunting, hiking, and OHV use may also decrease in the Bull Mountain and surrounding areas. Travelers on SH 133 would likely see pads and infrastructure, which may affect their experience (see the Visual Resources section for a detailed discussion); however, implementation of the Proposed Action is not anticipated to measurably impact the tourism industry. Many recreational activities and amenities are available throughout the area that would continue to draw tourists to the vicinity. There would likely be a reduction in hunting opportunities on private lands within the Unit as a result of construction, operation, and maintenance of the facilities within the Unit.

Increased natural gas development would likely impact cattle ranchers. Increased miles of roads and associated traffic as well as pads and pits would likely affect ranching operations to some extent, from the nuisance of additional gates to the possibility of animal mortality from vehicular collisions. Although

BLM_0018116

surface infrastructure would be fenced, it is assumed that these appurtenances would alter movement patterns, creating an additional effect on ranchers.

Law Enforcement and Emergency Response – Demand for law enforcement and emergency management services associated with construction and drilling operations could be accommodated without straining existing resources; the limited population growth associated with this project would not warrant additional law enforcement (Parmenter 2011). Additionally, SG would enforce rules and regulations associated with any "man camps" through the terms of their contracts.

Fiscal Effects – SG estimates net natural gas production for the Proposed Action at 784.8 bcf through 2051. Actual tax revenues would be dependent upon production, natural gas prices, and mills assessed on the product produced. Based on a natural gas price of $5/1,000 cubic feet (mcf), the Proposed Action would generate an estimated $530 million in royalties and $378 million in property and severance taxes for a combined total of $908 million through 2051.

No mitigation measures specific to socio-economics would be required.

**Cumulative Impacts** – The cumulative impacts assessment area for cumulative impacts to socio-economics is considered to be Delta and Gunnison Counties. Table 51 summarizes cumulative short-term and long-term direct economic impacts by alternative.

**Table 51. Comparison of Cumulative Economic Impacts by Alternative**

|  | Proposed Action | Alternative 1 | No Action |
|---|---|---|---|
| **Build-out, 2012-2016**[1] | | | |
| Annual labor force, drilling & completion | 125 | 125 | 37 |
| Annual labor force, full-time year-round employees | 68 | 68 | 38 |
| High annual payroll | $14.2 million | $14.2 million | $ 6.4 million |
| Annual materials cost, startup | $69.0 million | $68.8 million | $27.5 million |
| Annual materials cost, build-out | $67.3 million | $67.1 million | $24.8 million |
| **Production, 2017-2051**[2] | | | |
| Average annual labor force | 75 | 75 | 38 |
| Average annual payroll | $ 4.1 million | $ 4.1 million | $ 2.4 million |
| Total natural gas produced | 784.8 bcf | 607.7 bcf | 324.1 bcf |
| Total royalties[3] | $567 million | $499 million | $234 million |
| Total property/severance taxes[3] | $319 million | $247 million | $132 million |
| Total royalties, property & severance taxes paid[3] | $886 million | $746 million | $364 million |
| Average annual materials cost | $ 40 million | $ 40 million | $ 40 million |

[1] Estimated totals for all new development by SG within the Unit based on 5-year project build-out
[2] Estimated totals for all existing and new development by SG within the Unit based on 40-year life per well.
[3] Based on a natural gas price of $5/mcf
   Source: SG Interests

Cumulative indirect impacts to quality of life as a result of the Proposed Action or Alternative 1, when added to likely development of the No Action Alternative and other reasonably foreseeable development of energy resources in Delta and Gunnison Counties, would include potential accelerated development of the area once access roads are established on private lands and diminished opportunities for and enjoyment of fishing, hunting, hiking, OHV use, and scenic tourism as a result of increased noise, traffic, and views of pads and infrastructure.

BLM_0018117

**Alternative 1** – Implementation of Alternative 1 would result in draining 438 bcf through 2051 based on a downhole drainage area of approximately 12,870 acres. Based on a natural gas price of $5/mcf, Alternative 1 would generate an estimated $296 million in royalties and $211 million in property and severance taxes through 2051 for a combined total of $507 million, or $401 million less than the Proposed Action. Gunnison County government and the Delta County School District would experience an increase in tax and royalty revenues; however, the amount realized would be proportionately less than under the Proposed Action. Due to the more clustered pattern of development and reduced infrastructure, contractor/consultant needs would be reduced in duration from those levels needed to implement the Proposed Action. Due to the identical number of pads and wells, however, SG estimates the same number of additional contract laborers for drilling and well completion. Most of these positions would be eliminated when build-out is complete. Estimated annual payroll would be at a high of $11.1 million in 2016, approximately $200,000 less per year than the Proposed Action, and would decline to and remain steady at approximately $3.4 million (the same as the Proposed Action) after full build-out. Gunnison County government and the Delta County School District would experience an increase in tax and royalty revenues; however, the amount realized would be less than under the Proposed Action. Total annual material purchases for Alternative 1 are estimated at $56,469,908 in 2012, increasing to $52,147,140 by 2016, and declining to $40,000 from 2020 through project build-out. Other direct and indirect impacts to socio-economics would be virtually the same as the Proposed Action. No mitigation measures specific to socio-economics would be required.

**Cumulative Impacts** – The types of cumulative impacts to socio-economics from the implementation of Alternative 1 in combination with the No Action Alternative would be the same as for the Proposed Action.

**No Action** – Implementation of the No Action Alternative would result in draining 374.1 bcf of natural gas through 20451 based on a downhole drainage area of approximately 6,491 acres. Based on a natural gas price of $5/mcf, the No Action Alternative would generate an estimated $252 million in royalties and $180 million in property and severance taxes through 2051, a combined total of $432 million, or $476 million less than the Proposed Action. Estimated payroll through build-out would be at a high of $6.4 million in 2012, or about 57% of the high for the Proposed Action. Labor expenses would decline to and remain steady at approximately $2.4 million after full build-out, about 71% of the total for the Proposed Action. Total annual material purchases for the Proposed Action are estimated at $27,461,745 in 2012, increasing to $24,787,830 by 2016, and declining to $40,000 from 2020 through project build-out.

## CUMULATIVE IMPACTS SUMMARY

Per 40 CFR Section 1508.7, a cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

Cumulative impacts for each element or resource are discussed within each of the sections above. Impacts resulting from the Proposed Action or Alternative 1 could add incrementally to impacts from other activities discussed below.

The geographic scope of analysis is generally based on the natural boundaries of the resources affected, rather than jurisdictional boundaries. The geographic scope often extends beyond the scope of direct effects for each resource but not beyond the scope of direct and indirect effects. If there are no direct or indirect effects of the Proposed Action or other alternatives on a particular resource, then no analysis is included for cumulative effects for that resource in this EA.

BLM_0018118

Timeframes, like geographic scope, can vary by resource. The proposed build-out of the Bull Mountain Unit is 6 years; however, the duration of the operation and maintenance of the unit could extend to 40 years or more, including final abandonment and reclamation. Some resources will be affected differently during construction than during operation of the wells. This is accounted for in the varying timeframes considered by resource.

The cumulative effects analysis for this project considers past, present, and reasonably foreseeable future actions that would affect resources of concern within the geographic scope and timeframe of the analysis. This analysis includes other BLM actions, other federal actions, and non-federal actions including state, local, and other private actions as identifiable.

## Past and Present Actions

Past actions are described by their aggregate effect rather than listing or analyzing the effects of individual past actions; however, more general types of actions that have occurred within the geographic extent of the analysis are included here. Present actions are those that are ongoing during the course of this analysis. These actions are also included below. The combination of these past and present actions creates the baseline for the analysis in the Bull Mountain MDP against which to compare the cumulative effects of the Proposed Action and other action alternatives.

The primary past and present disturbance within the cumulative impacts assessment area for the Proposed Action and Alternative 1 is associated with oil and gas leasing, mining, livestock grazing, and residential/agricultural development. Figure 12 shows the overall cumulative impact assessment area within an administrative boundary that includes past, present, and reasonably foreseeable future actions.

### Federal (BLM and U.S. Forest Service)

Oil and Gas. In the UFO, natural gas resources are located in the same general locations as coal resources, (north of SH 133, across from the Delta County towns of Hotchkiss, Paonia, and Bowie, in the Gunnison County town of Somerset, and in the area north of Paonia Reservoir) (BLM UFO Energy and Mineral Resources website http://www.blm.gov/co/st/en/fo/ufo/solids_and_fluids.html accessed 12-2-10, updated 10-28-11).

Approximately 418,469 acres federal oil and gas mineral estate are located within the cumulative impacts assessment area, and 173,646 are currently leased, including 54,580 acres of inventoried roadless area which were leased prior to implementation of the USFS Roadless Rule. If these pre-2001 leases expire and are subsequently leased again, they will have surface use restrictions for whatever roadless rule may be in place. Approximately 120,631 acres of federal oil and gas mineral estate remains available for nomination to be leased at this time. According to Colorado State historic records, 116 gas wells have been drilled in the North Fork area on federally managed oil and gas leases, including split estate lands. Of these wells, 15 are presently producing natural gas, 29 are shut-in but capable of production, and 72 have been drilled, abandoned, and plugged. The majority of these wells were drilled in the 1970s and 1980s. Most recent activity has related to re-drilling wells on existing well pads (BLM UFO Energy and Mineral Resources website). In the past few years, SG Interests and Gunnison Energy Corporation have begun to develop natural gas resources in the area. This includes construction of several new well pads and drilling approximately 15 wells in the area; it is mostly observed as the improvement of existing roads and construction of pipeline corridors. Figure 1 shows existing oil and gas leases within the Muddy Creek basin, including those associated with the Bull Mountain Unit.

SG currently operates and maintains 13 CBNG wells that are producing or capable of producing natural gas, and one water-disposal well. Three additional wells are in development. Produced water is being injected into deeper formations in the same vicinity, rather than using ponds or trucking to ponds located elsewhere (Table 3). The recently completed Bull Mountain Pipeline is approximately 25 miles long; the southern terminus is an existing facility that ties into SG's existing gathering system on private lands

BLM_0018119

northwest of the Unit. About five miles north of the southern terminus is the Ragged Mountain Pipeline Compressor site, which also provides some compression for the Bull Mountain Pipeline.

Currently 20 wells have been drilled on NFS lands in the Paonia Ranger District; the majority of these wells were drilled in the early 1980s, and many are shut-in. An approved Master Development Plan authorizes Gunnison Energy Corporation to drill 16 wells on four pads on NFS lands approximately 2-4 miles from the Bull Mountain Unit boundary (pers. com. Ryan Taylor, GMUG, Paonia RD, Geologist/Minerals Administrator, December 16, 2010).

Coal mining. The UFO manages several active federal coal leases related to three coal mines located in the valley of the North Fork of the Gunnison River near Paonia. Bowie No. 2, West Elk, and Elk Creek are actively producing longwall coal mines, with a total annual output approaching 12 million tons (BLM UFO Energy and Mineral Resources website as of September 30, 2011). These facilities are all downstream of the Bull Mountain Unit and do not affect resources within the Muddy Creek watershed.

The exception is air quality. All three of these operations require construction of roads and pads to facilitate the drilling of methane drainage wells (also known as gob vent bore holes) to pump additional gas out of the mines for the safety of the workers.

Historic mining activities over the past century include the following:
- Hawks Nest Mine
- Oliver Mine No. 1 and No. 2
- Bear Mine No. 1, No. 2, and No. 3
- Edwards Mine
- USS Steel Mine
- Blue Ribbon Mine
- King Mine
- Farmers Mine
- Oxbow Sanborn Creek
- Bowie No. 1 Mine

Grazing Allotments. The UFO manages 240 grazing allotments with 165 grazing permittees. Historically, several areas throughout the Unit sustained high levels of both sheep and cattle grazing. Seasonal cattle grazing still occurs, to a lesser degree, from approximately June through September. The Forest Service conducted an Environmental Assessment in 2005 for the Muddy Creek basin (also known as Muddy country). On NFS lands surrounding the unit, there are eleven allotments with multiple permittees managing approximately 12,480 ewe/lamb pairs, 1,048 cow/calf pairs, and 30 horses. These allotments are managed intensely with multi-pasture rotations of relatively short duration.

This resource is primarily affected by surface disturbance of forage habitat for the livestock. With the coal mines and increasing oil and gas development, there continues to be a loss of grass/forb vegetation communities, which have become a limiting factor for grazing. On the Forest, some shut-in wells had not been reclaimed, which continues to affect the amount of forage available to livestock (pers. com. Dave Bradford, GMUG National Forest, Paonia Ranger District, Range Management, December 16, 2010). Noxious weeds have become an increasing concern over the past few years with the growth in many activities, including gas exploration and development as well.

**State (CDOT)** – 2011 activities on SH 133 include snow maintenance and emergency response actions. CDOT is working on highway improvement projects on Highway 92 from Hotchkiss to Delta and Highway 50 in the Blue Mesa Lake area; both of these projects are likely to continue for the next several years (pers. comm. Pete Mertes, CDOT Region 3 Engineer, December 2, 2010).

**Local/Municipal (Gunnison and Delta Counties)** – Gunnison County's Assistant Director of Community Development Neil Starkebaum emphasized that lands in the Bull Mountain Unit area are designated almost exclusively agricultural and that the current land use is primarily ranching with interspersed residences. The area is nearly surrounded by NFS lands. There is a small mixed use area south and southeast of County Road 849; however, there are no commercial or industrial uses occurring

BLM_0018120

in this area. The East Bull Mountain subdivision is in the general area; it consists of six 35-acre lots of which only one has been developed. As detailed above, Gunnison Energy Corporation permitted 16 wells on nine pads (Hotchkiss Federal) through Gunnison County; several pads have been constructed, and several wells have been drilled to-date (pers. com. December 6, 2010).

Delta County Senior Planner Dave Rice indicated that with one exception, Gunnison Energy is the sole O&G operator in Delta County. Since 2005 they have drilled approximately ten wells and installed a gathering line in the Oak Mesa area, which is north of Hotchkiss and west of Paonia (pers. com. November 17, 2010).

Several gravel pits have also been approved in the past five years; however, most are within just a few miles of the city of Delta itself.

Residential developments in the area around the communities of Paonia, Hotchkiss, Crawford, and Delta have been growing in population, with many new houses being built. Most of this development has been down-valley from the coal mines in broader portions of the North Fork Valley. This development has increased the traffic load and demand for maintenance on State SH 133.

**Private –** On private lands within Delta and Gunnison Counties, COGIS records as of November 2011 show a total of 43 natural gas wells; 19 wells are producing, 16 are shut-in and capable of producing; 2 are waiting on completion; and the remaining 6 were drilled, abandoned, and plugged.

**Reasonably Foreseeable Actions**

A reasonably foreseeable future action is more than speculation. In most cases, an action has gone through initial stages of planning and permitting and has an available source of funding. The first step in determining reasonably foreseeable future actions was to review the Schedule of Proposed Actions (SOPA) for both the BLM and USFS for the project area. The SOPA includes projects that have been formally accepted by the agency for analysis. The Colorado Department of Transportation was contacted regarding SH 133. Meetings were held with both the Delta County planning and Gunnison County community development departments to assess other reasonably foreseeable actions. The following list describes those actions within the geographic scope of the project that are reasonably foreseeable.

**Federal**

Oil and Gas. Increased development in the cumulative impacts assessment area exceeds the past average. Changes in technology for the drilling and development of Mancos shale wells and wells used to capture methane from coal mines have made development economically feasible. It is estimated that the area will average 20 new wells per year (assuming at least 2 wells per pad and 10 new pads per year) and result in approximately 68 acres of new disturbance per year from oil and gas development.

According to COGIS, 3 drilling permits were issued in 2011 in Gunnison County (all to SG) (http://cogcc.state.co.us/website accessed in November 2011). Two drilling permits were issued to Gunnison Energy in Delta County. Pending oil and gas activity includes a total of 22 permits, as follows:
- 9 shale well permits;
- 8 coal-bed methane wells; and
- 5 coal mine methane wells.

Total estimated disturbance based on current permits would be approximately 150 acres (based on 6.8 acres of disturbance per well).

BLM_0018121



**Figure 13. Cumulative Impact Assessment Area for the Bull Mountain Unit**

BLM_0018122

This page left blank for two-sided copying.

BLM_0018123

The BLM is currently developing an EA regarding the nomination to lease nearly 30,000 acres of federal oil and gas mineral estate to be include in the Colorado BLM August 2012 Quarterly Lease Sale. Approximately 22,000 acres of the proposed nominations lie within the cumulative impacts assessment area for the EA.

Mining. Coal mines in the region are likely to continue exploration drilling and will seek to increase their lease holdings in order to increase production. Two modification requests are being processed by the Forest Service and one by the BLM. Most are less than 160 acres; however, the West Elk mine is seeking an increase of 1,700 acres to its lease holdings. The BLM is also beginning to analyze a coal exploration license on Oak Mesa.

The Tomichi Creek Exploration Project on NFS lands in the Gunnison Ranger District filed a Plan of Operations in October 2011 to drill 9 exploration holes for molybdenum and copper on unpatented mining claims, all located on previously disturbed roads or travel routes.

**State –** CDOT currently has no plans in the short term (five years) or long term (15-20 years) for major construction or improvements on SH 133. The ongoing work on Highways 50 and 92 is anticipated to continue for the next several years (pers. com. Pete Mertes, CDOT, December 3, 2010).

**Local –** The 1996 Delta County Master Plan is the governing document for the county's planning and development. Although it is in the process of being revised, the basic goals and objectives remain the same, and there is no expectation for changes to the plan (pers. com. Dave Rice, Delta County Senior Planner November 17, 2010).

The Town of Paonia has been working on an area just outside the town for a designated commercial growth area. The SH 133 Corridor Master Plan was crafted to address new development that is in close proximity to the municipal boundaries and that has a direct influence on future growth, economic vitality and Paonia's small town character. The SH 133 Overlay was approved by the Town Council as of October 2010. The plan was scheduled for appearance before the Board of County Commissioners in November; however, no further updates are available at this time.

**Private –** COGIS records indicate that no additional wells on private lands are in the approval process. SG has received permits for four flowback pits (referred to as the McIntyre pits 1-4), which would temporarily store water prior to and after hydraulic fracturing and completion operations and associated infrastructure. These pits would service many possible well drilling and hydraulic fracturing operations across the northern half of the Bull Mountain Unit. The pits will be located in close proximity to the FED 11-89-24-2 WDW, which was permitted and constructed in 2008.

Cumulatively, impacts from the proposed lease modifications could include small increases in deposition of sediment or pollutants into surface waters, increased subsidence within the North Fork Valley, low increase in cumulative emission of GHGs from mine ventilation, and a slight increase in water withdrawal from the Colorado River system that may potentially impact several federally-listed species of fish in downstream portions of the North Fork and Gunnison Rivers. None of these impacts is expected to be major as analyzed in the specific resource sections.

Impacts resulting from the proposed lease modifications could add incrementally to impacts from the other activities discussed above, resulting in a low-level increase in noise, human presence, soil erosion, invasive weeds, wildlife habitat loss, and vegetation loss or conversion. These impacts are discussed in the sections below. Cumulative impacts associated with coal mining activities in the area were analyzed in greater detail in the Uncompahgre Basin RMP Environmental Impact Statement (BLM, 1988).

BLM_0018124

PERSONS / AGENCIES CONSULTED

The following federal, state, county, or Tribal entities were consulted during development of this EA:

- Colorado Parks and Wildlife, Paonia District Wildlife Manager and Oil and Gas Liaison – Southwest Region
- Gunnison County Road and Bridge Department
- U.S. Army Corps of Engineers
- U.S. Fish and Wildlife Service
- U.S. Forest Service, Paonia Ranger District

Preparation of the EA also included input from the following private parties or contractors:

**Table 52. List of Preparers**

| Name | Company | Area of Responsibility |
|------|---------|------------------------|
| Linda Schuemaker | Otak, Inc. | Project Coordinator and Writer/Editor; Access and Transportation; Environmental Justice; Fire; Geology and Minerals; Noise; Realty Authorizations; Soils; Waste, Hazardous and Solid |
| John Berry | WWC Engineering | Hydrology and Water Rights; Water Quality, Surface and Ground |
| John Cater, PhD | Aztec Archaeological Consultants | Cultural Resources, Paleontology |
| Zach Perdue | PENDO Solutions | GIS, Mapping, Site Development |
| Eric Petterson | Rocky Mountain Ecological Services, Inc. | Special Status Species, Wildlife, Wetlands, Vegetation, Invasive Species, Rangeland Management |
| Lisa Sakata | PENDO Solutions | Socio-economics |
| Kate Schwarzler, LA | Otak, Inc. | Recreation, Visual Resources |
| Andrew Gleason, P.E. | Trautner Geotech, LLC | Geology |
| Jim Zapert | Carter Lake Consulting | Air Quality |

INTERDISCIPLINARY REVIEW: The following BLM personnel have contributed to and have reviewed this environmental assessment.

**Table 53. Interdisciplinary Review Team**

| Name | Title | Area of Responsibility |
|------|-------|------------------------|
| Thane Stranathan | Natural Resource Specialist | Oil and Gas, Planning and Enforcement |
| Amanda Clements | Ecologist | Wetlands & Riparian Zones |
| Rob Ernst | Geologist | Geology and Minerals |
| Edd Franz | Recreation Specialist | Wilderness, Wild and Scenic Rivers |
| Glade Hadden | Archaeologist | Cultural Resources; Native American Religious Concerns; Paleontology |
| Dan Huisjen | Natural Resource Specialist | Fire |
| Julie Jackson | Recreation Specialist | Access and Transportation, Recreation, Visual Resources |
| Allen Kraus | Environmental Protection Specialist | Wastes, Hazardous or Solid |
| Bruce Krickbaum | NEPA Coordinator | Environmental Justice, Socioeconomics |
| Lynae Rogers | Rangeland Management Specialist | Vegetation, Range Management, Invasive Species |

BLM_0018125

**Table 53. Interdisciplinary Review Team**

| Name | Title | Area of Responsibility |
|------|-------|------------------------|
| Jed Sondergard | Hydrologist | Farmlands (Prime and Unique), Floodplains, Hydrology, Soils, and Water Quality (Surface and Ground), Water Rights |
| Melissa Hovey | Air Quality Specialist | Air Quality |
| Teresa Pfifer | Supervisor, Lands and Minerals | Noise |
| Ted Moe | Law Enforcement Officer | Law Enforcement |
| Teresa Pfifer | Staff Supervisor | Land and Minerals |
| Linda Reed | Realty Specialist | Realty Authorizations |
| Melissa Siders | Wildlife Biologist | Migratory Birds; Threatened, Endangered, and Sensitive Species; Wildlife, Aquatic and Terrestrial |

BLM_0018126

This page left blank for two-sided copying.

BLM_0018127

## REFERENCES

Ackerman, D.J. and T. Brooks. 1986. Reconnaissance of Ground-Water Resources in the North Fork of the Gunnison River Basin, Southwestern Colorado. USGS Water Resource Investigation Report 85-4230. Denver, CO: USGS.

American Institute of Professional Geologists (AIPG). 2009. Hydraulic Fracturing in Colorado: A Public Forum. Online at < http://pttc.mines.edu/FracForum.pdf>. Accessed September 2010.

American Speech and Hearing Association 2008. Noise Levels. Online at <http://www.asha.org/public/hearing/disorders/noise.htm> Accessed 24 July 2008.

Apodaca, L.E. 1998. "Analysis of ground-water-quality data of the upper Colorado River Basin, water years 1972-92." U.S. Geological Survey Water-Resources Investigations Report 97-4240.

Berry, J. 2011. Hydrology and Surface Water Report for Bull Mountain Unit Master Development Plan. WWC Engineering. Sheridan WY.

Broderdorp, K. 2006-2011. Personal communication. Wildlife Biologist. US Fish and Wildlife Service, Western Colorado Field Office. Grand Junction, Colorado.

CDPHE 2010. Colorado 2009 Air Quality Data Report. Air Pollution Control Division, Colorado Department of Public Health and Environment. August 2010.

COGCC database 2011. Online at < http://cogcc.state.co.us/> Accessed 10 November 2011.

COGIS – Production inquiry 2011. Online at http://cogcc.state.co.us/cogis/ProductionSearch2.asp>

Colorado Department of Health and Public Environment (CDPHE). 2009a. Regulation 31- The Basic Standards and Methodologies for Surface Water (amended 10/13/09, effective 11/30/09). Online at < http://www.cdphe.state.co.us/regulations/wqccregs/>. Accessed September 2010.

CDPHE. 2009b. Regulation 41 - The Basic Standards for Ground Water (amended 10/13/09, effective 11/30/09). Online at < http://www.cdphe.state.co.us/regulations/wqccregs/>. Accessed September 2010.

CDPHE. 2009c. General Permit for Construction Dewatering Activities (COG-070000) Frequently Asked Questions (Revised May 2009). Online at <http://www.cdphe.state.co.us/wq/PermitsUnit/POLICYGUIDANCEFACTSHEETS/factsheets/CDWFAQ.pdf>. Accessed May 2011.

CDPHE. 2010a. Regulation 35 - Classifications and Numeric Standards for Gunnison and Lower Dolores River Basins (amended 2/8/10, effective 6/30/10). Online at <http://www.cdphe.state.co.us/regulations/wqccregs/>. Accessed September 2010.

CDPHE. 2010b. Regulation 93 - Colorado's Section 303(d) List of Impaired Waters and Monitoring and Evaluation List (amended 3/9/10, effective 4/30/10). Online at <http://www.cdphe.state.co.us/regulations/wqccregs/>. Accessed September 2010.\ CDPHE, 2011. Colorado Department of Public Health and Environment, Air Pollution Control Division, Letter from Nancy Chick to Ralph Morris, Environ Corporation, Summary of rural area background concentration estimates for the BLM Grand Junction and Uncompahgre Field Office Resource Management Plans., June 6 2011.

CDOT 2011. Colorado Department of Transportation, traffic information website. Online at <www.dot.state.co.us>. Accessed May 2011.

Colorado Parks and Wildlife. 2011. Natural Diversity Information System. http://ndis.nrel.colostate.edu/ftp/index.html

BLM_0018128

Colorado Division of Water Resources (CDRW). 2010. Colorado Decision Support System. Online at <http://cdss.state.co.us/DNN/default.aspx>. Accessed September 2010.

Colorado Oil and Gas Conservation Commission (COGCC). 2009. Amended Rules/Complete Rules (100 - 1200 Series). Online at <http://cogcc.state.co.us/>. Accessed September 2010.

Colorado Department of Revenue 2009. Annual report. Online at http://www.colorado.gov/cs/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1251606078806&ssbinary=true

Colorado Department of Transportation 2010. Online at <http://apps.coloradodot.info/dataaccess/Traffic/index.cfm?fuseaction=TrafficMain&MenuType=Traffic> Accessed 10 July 2010.

Department of Local Affairs 2010. Federal mineral lease and state severance tax direct distribution - payments for 2010. Online at <http://dola.colorado.gov/dlg/fa/dd/payments.html>.

EPA 2010. 40 CFR Part 98, Mandatory Reporting of Greenhouse Gases, Final Rule. Published in Federal Register Vol. 75, No. 242, Friday, December 17, 2010.

Federal Onshore Oil and Gas Order No. 1. Onshore Oil and Gas Operations; Federal and Indian Oil and Gas Leases; Approval of Operations. Effective November 21, 1983. Online at <http://www.fs.fed.us/emc/nepa/oged/includes/oogo_1.pdf>

Federal Onshore Oil and Gas Order No. 2: Drilling Operations on Federal and Indian Oil and Gas Leases. Effective December 19, 1988. Online at < http://www.blm.gov/wy/st/en/programs/energy/Oil_and_Gas/docs/onshore_order_2.html>

Fitzgerald, J.P., C.A. Meaney and D.M. Armstrong. 1994. Mammals of Colorado. Denver Museum of Natural History. University Press of Colorado. P.O. Box 849, Niwot, CO 80544.

Freethey, G. W., and G. E. Cordy, 1991, Geohydrology of Mesozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin. U.S. Geological Survey Professional Paper 1411-C.

Giezentanner, K.I. 2008. Final Environmental Assessment, Management Indicator Species (MIS) Forest Plan Amendment, to the 2002 Land and Resource Management Plan- 2002 Amendment for the White River National Forest. White River National Forest, Glenwood Springs, CO.

Heil, K.D. and J.M. Porter. 1990. Status report for *Astragalus microcymbus*. Unpublished report prepared for the U.S. Fish and Wildlife Service, Golden, CO.

Gunnison County Board of County Commissioners. 2003. Temporary Regulations for Oil and Gas Operations (Amended May 2004). Online at <http://www.gunnisoncounty.org/planning_pdf/TEMP%20OIL%20AND%20GAS%20REGS%20Amended%20May%2018,%202004.pdf?download=TEMP%20OIL%20AND%20GAS%20REGS%20Amended%20May%2018,%202004.pdf> Accessed September 2010.

Gunnison County 2009a. Abstracts of 2009 assessments. Online at <http://www.gunnisoncounty.org/assessor_districts.html>

Gunnison County 2009b. Annual financial report. Online at <http://www.gunnisoncounty.org/fmance_pdf/2010/Audit_Report.pdf>

Heath, R.C. 1983. Basic ground-water hydrology:  U.S. Geological Survey Water-Supply Paper 2220, 84 p. Online at <http://water.usgs.gov/pubs/wsp/wsp2220/>.

La Plata County, Colorado 2002. Final La Plata County Impact Report. October 2002.

BLM_0018129

Lowham H. W., De Long L. L., Collier K. R. and Zimmerman E. A. 1982. Hydrology of Salt Wells Creek-a plains stream in southwestern Wyoming. U.S. Geological Survey Water-Resources Investigations 8 1-62.

Miller, J.F., Frederick, R.H., and Tracey, R.J., 1973, Precipitation-Frequency Atlas of the Western United States, National Oceanic and Atmospheric Administration: Atlas 2, v.3, U.S. Government Printing Office.

National Oceanic and Atmospheric Administration (NOAA). 1982. Evaporation Atlas for the Contiguous 48 United States. Technical Report NWS 33, U.S. Department of Commerce, Washington, D.C., June 1982. 31 pages.

Nettles, Larry W., Kristie M. Tice, and Gabrielle Sitomer. December 28. 2011. "Texas And Colorado Adopt Far-Reaching Hydraulic Fracturing Chemical Disclosure Rules." Online at <www.mondaq.com/unitedstates/x/158852/Environmental+Law/Texas+And+Colorado+Adopt+F arReaching+Hydraulic+Fracturing+Chemical+Disclosure+Rules> Accessed January 20, 2012.

NOAA, 1982, "Evaporation Atlas for the Contiguous 48 United States". Technical Report NWS 33, U.S. Department of Commerce, Washington, D.C., June 1982. 27 pages.

North Fork River Improvement Association (NFRIA). 2010. North Fork of the Gunnison River Watershed Plan Update. Available from website on the Internet as of September 2010: http://www.nfria.org/pdfs/2010_Watershed_Action_Plan.pdf.

NRCS Map Room 2011. Online at <http://www.nrcs.usda.gov/technical/NRI/maps/prime.html> Accessed 2 June 2011.

Otak, Inc. 2011. Traffic Report for Bull Mountain Unit Master Development Plan. Carbondale, CO.

Parmenter, Cary 2011. Personal communication with the Parachute Chief of Police. May 31, 2011.

Petterson, E.S. 2009. Stream Health Monitoring for the Bull Mountain Pipeline. Gunnison County, Colorado. Rocky Mountain Ecological Services, Inc. Glenwood Springs, CO. 140pp.

Petterson, E.S. 2012. Biological Opinion. Wildlife and Aquatic Resources Report for the Bull Mountain Unit Master Development Plan. *Prepared for*: Bureau of Land Management, Uncompahgre Field Office *and* SG Interests, I LTD. Rocky Mountain Ecological Services, Inc. Glenwood Springs, CO. 195pp.

Ruediger, B., J. Claar, S. Gnidek, B. Holt, L. Lewis, S. Mighton, B. Naney, G. Patton, T. Rinalki, J. Trick, A. Vandehey, F. Wahl, N. Warren, D. Wenger, A. Williamson. 2000 (updated 2003). Canada Lynx Conservation Assessment and Strategy. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication #R1-00-53, Missoula, MT. 142p.

Ruggiero, L.F., K.B. Aubry, S.W. Buskirk, G.M. Koehler, C.J. Krebs, K.S. McKelvey and J.R. Squires, eds. 1999. Ecology and conservation of lynx in the United States. Univ. Colorado Press and USDA Rocky Mtn. Res. Stn., USDA Gen. Tech. Rep. RMS-GTR-30WWW. 480 pp.

Ruggiero, L.F., K.B. Aubry, S.W. Buskirk, J.L. Lyon, W.J. Zielinski, tech. Eds. 1994. The scientific basis for conserving forest carnivores: American marten, fisher, lynx and wolverine in the western United States. Gen. Tech. Rep. RM-254. Ft. Collins, CO: USDA, For. Serv., Rocky Mountain Forest and Range Experiment Station. 184 p.

Smith, A. R. 1996. Atlas of Saskatchewan birds. Saskatchewan Nat. Hist. Soc., no. 22.

Taylor, O.J. 1987. Hydrologic System of Piceance Basin. Oil Shale, Water Resources, and Valuable Minerals of the Piceance Basin, Colorado: The Challenge and Choices of Development. U.S.

BLM_0018130

Department of Interior U.S. Geological Survey Professional Paper 1310. U.S. Government Printing Office. Washington D.C. 1987.

The Denver Post 2010. Severance tax, royalty pay falls. September 2. Online at <http://www.denverpost.com/business/ci_15967693#ixzz0yxRmqlJ7>.

Trautner  Geotech, LLC 2011. *Geological Hazard Assessment for Bull Mountain Geographical Area Plan Environmental Assessment, Project Site.* January 7, 2011.

U.S. Army Corps of Engineers (USACE). 1987. Wetland Delineation Manual *by* Environmental Laboratory. Wetlands Research Program Technical Report Y-87-1 (on-line edition).

USACE. 2008. Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Arid West Region V.2 ERDC/EL TR-08-28. U.S. Army Engineer Research and Development Center. Vicksburg, MS.

U.S. Bureau of Reclamation. 2010. Monthly Salinity Data at 20 Key Stations in Colorado River Basin-Gunnison River near Grand Junction, CO. Online at <http://www.usbr.gov/uc/progact/salinity/>. Accessed September 2010.

U.S. Census Bureau. Gunnison County, Colorado 2008 data. Online at <http://quickfacts.census.gov/qfd/states/08/08051.html> Accessed 11 August 2010.

USA Counties or Community Economic Development HotReport 2010a. Delta County. Online at <http://smpbff2.dsd.census.gov/TheDataWeb_HotReport/servlet/HotReportEngineServlet?reporti d=f496a9d21197981e0e9882711bdebec7&emailname=whazard@census.gov&filename=ed_gene ral_v2.hrml>.

USA Counties or Community Economic Development HotReport 2010b. Gunnison County. Online at <http://smpbff2.dsd.census.gov/TheDataWeb_HotReport/servlet/HotReportEngineServlet?reporti d=8fcd079ce0dc81b7d25e77c639e6323b&emailname=whazard@census.gov&filename=ed_gene ral_v2.hrml#>.

U.S. Bureau of Labor Statistics 2010. Local area unemployment. Online at <http://www.bls.gov/lau/laucntycur14.txt?bcsi_scan_43E9F3874D650CAC=0&bcsi_scan_filena me=laucntycur14.txt>

U.S. Census Bureau 2000a. Profile of selected economic characteristics. Delta County. Online at <http://factfinder.census.gov/servlet/QTTable?_bm=y&-context=qt&-qr_name=DEC_2000_SF3_U_DP3&-ds_name=DEC_2000_SF3_U&-tree_id=403&-all_geo_types=N&-redoLog=true&-_caller=geoselect&-geo_id=05000US08029&-search_results=01000US&-format=&-_lang=en>.

USCB 2000b. Profile of selected economic characteristics. Gunnison County. Online at <http://factfinder.census.gov/servlet/QTTable?_bm=y&-context=qt&-qr_name=DEC_2000_SF3_U_DP3&-ds_name=DEC_2000_SF3_U&-tree_id=403&-redoLog=true&-all_geo_types=N&-_caller=geoselect&-geo_id=05000US08051&-search_results=01000US&-format=&-_lang=en>.

USCB 2009a. State and county QuickFacts – Delta County. Online at <http://quickfacts.census.gov/qfd/states/08/08051.html>.

USCB 2009b. State and county QuickFacts – Gunnison County. Online at <http://quickfacts.census.gov/qfd/states/08/08051.html>.

USCB 2010. American FactFinder. Online at <http://factfinder.census.gov/servlet/SAFFFacts?_event=&geo_id=05000US08051&_geoContext =01000US|04000US08|05000US08051&_street=&_county=gunnison+county&_cityTown=gunn

BLM_0018131

ison+county&_state=04000US08&_zip=&_lang=en&_sse=on&ActiveGeoDiv=&_useEV=&pctx
t=fph&pgsl=050&_submenuId=factsheet_1&ds_name=null&_ci_nbr=&qr_name=&reg=%3A&_
keyword=&_industry=21>.

USDI BLM. 1997. Standards for Public Land Health. Online at
<http://www.blm.gov/co/st/en/BLM_Programs/grazing/rm_stds_guidelines.html>. Accessed May
2011.

USDI BLM. 1989. Uncompahgre Basin Resource Management Plan and Record of Decision. Online at
<http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/uncompahgre_field/documents.Pa
r.74380.File.dat/UB%20RMP_ROD.pdf>. Accessed September 2010.

USDI BLM. 2005. White River Field Office, Meeker, Colorado. Preliminary Environmental Assessment
Meeker Pipeline and Gas Plant Project (CO-110-2004-188-EA). March 2005.

USDI BLM. 2007a. North Fork Land Health Assessment 2006-2007, Uncompahgre Field Office – BLM.
Online at
<http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/uncompahgre_field/land_health_a
ssessments.Par.61222.File.dat/North%20Fork%20Land%20Health%20Assessment.pdf>.
Accessed September 2010.

USDI BLM. 2007b. Environmental Assessment Piceance Development Project CO-110-2005-219-EA.
Online at
<http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/white_river_field/completed_
2007_documents.Par.71869.File.dat/co11005219ea.pdf>. Accessed September 2010.

USDI BLM. 2010a. BLM Uncompahgre Field Office RMP Planning Fact Sheet: Coal, Oil & Gas
Resources. Online at
<http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/uncompahgre_field/documents.Pa
r.76192.File.dat/UFO%20RMP%20Fact%20Sheet%207.1%20Coal%20Oil%20Gas.pdf>.
Accessed September 2010.

USDI BLM. 2010b. Analysis of the Management Situation for the BLM Uncompahgre Planning Area.
Online at
<http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_doc
s.Par.60566.File.dat/AMS%20Final%20Web%20071210.pdf>. Accessed September 2010.

USDI BLM 2011. Meteorological observations collected at Pine Ridge Colorado Site, Remote Automated
Weather Station, U.S. Bureau of Land Management, Online at <http://www.raws.dri.edu>.

USDI BLM U.S. Department of Agriculture, Forest Service (USDAFS). 2005. Oil and Gas Surface
Operating Standards for Oil and Gas Exploration and Development "Gold Book". Online at
<http://www.blm.gov/bmp/GoldBook_Draft_v9_Compressed.doc>. Accessed September 2010.

U.S. Environmental Protection Agency (EPA). 2010a. Technical Factsheet on: BENZENE. Online at
<http://www.epa.gov/safewater/pdfs/factsheets/voc/tech/benzene.pdf>. Accessed September
2010.

US EPA. 2010b. Drinking Water Contaminants: List of Contaminants & their MCLs. Online at
<http://water.epa.gov/drink/contaminants/index.cfm#List>. Accessed September 2010.

US EPA. 2010c. Hydraulic Fracturing Voluntary Information Request. Online at
<http://water.epa.gov/type/groundwater/uic/class2/hydraulicfracturing/index.cfm>. Accessed
September 2010.

U.S. Fish and Wildlife Service (USFWS). 1999. Final programmatic biological opinion for Bureau of
Reclamation's operations and depletions, other depletions, and funding and recovery program

BLM_0018132

actions in the upper Colorado River above the confluence with the Gunnison River. USFWS, Grand Jct. CO. July 1999.

USFWS. 2008c. Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River Basin in Colorado. Ecological Services, Grand Junction, CO.

USFWS. 2010. Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition To List *Astragalus microcymbus* and *Astralagus schmolliae* as Endangered or Threatened. Federal Register / Vol. 75, No. 240 / Wednesday, December 15, 2010 / Proposed Rules.

USFWS. 2010a. Endangered and Threatened Wildlife and Plants; Determination for the Gunnison Sage-grouse as a Threatened or Endangered Species; Proposed Rule. Federal Register / Vol. 75, No. 187 / Tuesday, September 28, 2010 / Proposed Rules.

USFWS. 2010c. Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition to List Sprague's Pipit as Endangered or Threatened Throughout Its Range. Federal Register / Vol. 75, No. 178 / Wednesday, September 15, 2010 / Proposed Rules

USFWS. 2011. Threatened, Endangered, Candidate and Proposed Species by County, July 2010. Ecological Services, Colorado Field Offices. Accessed May 2011.U.S. Geological Survey (USGS). 2010a. National Water Information System: Web Interface. Online at <http://waterdata.usgs.gov/nwisweb/local/nwis_host/nwisdcolka/local/site_text/site_info/txt0913 2500.htm>. Accessed September 2010.

U.S. Forest Service. 2008. GIS database for lynx habitat in Colorado. Regional Office, Lakewood, CO.

USGS. 2010b. National Water Information System – Water Quality Samples for Colorado. Online at <http://nwis.waterdata.usgs.gov/co/nwis/qwdata?search_criteria=search_site_no&submitted_for m=introduction>. Accessed September 2010.

USGS. 2011. Water Quality Samples for Colorado. USGS 09152500 Gunnison River Near Grand Junction, Co. Online at <http://nwis.waterdata.usgs.gov/co/nwis/qwdata/?site_no=09152500&agency_cd=USGS>. Accessed May 2011.

VIEWS 2011. Visibility Information Exchange Web System. Regional Haze Summary Data. Means for Best, Middle, and Worst 20% Visibility Days. Online at <http://views.cira.colostate.edu/web/Trends/>. Accessed June 2011.

Western Regional Climate Center (WRCC). 2010. Western Regional Climate Center Colorado Climate Summaries. Online at <http://www.wrcc.dri.edu/summary/climsmco.html>. Accessed May 2011.

WRCC 2011. Historical climate data for Redstone 4 W, Colorado. Online at <http://www.wrcc.dri.edu>. Accessed June 2011.

WWC 2011. WWC Engineering. Water Resources Technical Report. Sheridan, Wyoming. June 2011.

BLM_0018133

BLM Manual 6330—Management of BLM Wilderness Study Areas

Form 1221-2

(June 1969)



UNITED STATES

DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

MANUAL TRANSMITTAL SHEET

| Release |
| --- |
| 6-134 |
| Date |
| 7/13/2012 |

Subject

6330 – Management of Wilderness Study Areas (Public)

1. <u>Explanation of Material Transmitted</u>: This release transmits the revised manual for the BLM's Management of Wilderness Study Areas. This manual provides the line manager and program staff professionals with general policies for the administration and management of these areas. This manual outlines procedures to ensure the Congressional mandate to manage Wilderness Study Areas "so as not to impair the suitability of such areas for preservation as wilderness" will be met.

This policy replaces the Interim Management Policy for Lands Under Wilderness Review and should be applied wherever

2. <u>Reports Required</u>: None

3. <u>Material Superseded</u>: H-8550-1, Interim Management Policy for Lands Under Wilderness Review

4. <u>Filing Instructions</u>: File as directed below.

REMOVE

All of H-8550-1 (Rel. 8-67)

(70 pages)

INSERT

6330

(56 pages)

*/s/ Mike Pool*

Acting Director,

Bureau of Land Management

BLM_0018134

BLM Manual 6330—Management of BLM Wilderness Study Areas

## Table of Contents

1.1    Purpose...........................................................................................................................1-1

1.2    Objectives. .....................................................................................................................1-2

1.3    Authority. .......................................................................................................................1-2

1.4    Responsibility. ...............................................................................................................1-2

1.5    References........................................................................................................................1-3

1.6    Policy. ............................................................................................................................1-4

   A.  Congressional Direction.................................................................................................1-4

       1.   **Direction in FLPMA** ............................................................................................1-4

       2.   **Original and subsequent reviews** ......................................................................1-4

       3.   **Differences in the management of wilderness and the management of WSAs** ...............1-6

   C.  General Policy.................................................................................................................1-6

       1.   **Managing to prevent impairment** ......................................................................1-6

       2.   **Enforcement** ........................................................................................................1-8

       3.   **Restoration** ..........................................................................................................1-8

       4.   **Boundaries of WSAs** ...........................................................................................1-8

       5.   **New discretionary uses**........................................................................................1-9

       6.   **Maintain improved conditions** ..........................................................................1-9

   C.  The Non-Impairment Standard.....................................................................................1-10

       1.   **Exceptions to non-impairment** ..........................................................................1-11

   D.  Policies for Specific Activities .......................................................................................1-13

       1.   **Cultural and paleontological resources** ............................................................1-13

       2.   **Fire**.......................................................................................................................1-13

       3.   **Grazing management** ..........................................................................................1-16

       4.   **Lands actions: disposals, use authorizations, rights-of-way, access, and withdrawals** 1-19

       5.   **Recreation** ...........................................................................................................1-26

       6.   **Soil, water, air** ....................................................................................................1-31

       7.   **Vegetation** ...........................................................................................................1-33

       8.   **Visual resources management** .............................................................................1-35

       9.   **Wild horse and burro management** ....................................................................1-36

      10.   **Wildlife.** ...............................................................................................................1-37

   E.  Evaluation of Proposed Actions. ...................................................................................1-43

BLM_0018135

BLM Manual 6330—Management of BLM Wilderness Study Areas

1.  **Uses or facilities subject to the WSA Management Manual** .......................................... 1-43

2.  **Review requirements** ................................................................................................. 1-43

3.  **Procedures for evaluation of proposed actions subject to the WSA Management Manual** ................................................................................................................... 1-44

1.7.  File and Records Maintenance .......................................................................................... 1-49

1.8.  Data Standards .................................................................................................................. 1-49

Glossary of Terms ........................................................................................................... Glossary-1

BLM MANUAL                                        Rel. No. 6-134
                                                  7/13/2012

## 1.1  Purpose.

The purpose of this manual is to continue to provide policy on the non-impairment standard to Bureau of Land Management (BLM) personnel for use when managing Wilderness Study Areas (WSAs), which are part of the BLM's National Landscape Conservation System.  Specifically, this policy applies to:  (1) WSAs identified by the wilderness review required by Section 603 of the Federal Land Policy and Management Act (FLPMA) and currently under review by Congress (this includes "Instant Study Areas"), sometimes referred to as "603 WSAs"; (2) legislative WSAs (WSAs established by Congress); and (3) WSAs identified during the land use planning process under the authority of Section 202 of FLPMA, sometimes referred to as "202 WSAs." This includes those 202 WSAs that were identified after Wilderness Study Reports were submitted to Congress.[1]  This policy does not apply to areas designated by Congress as Wilderness or to other lands that may have wilderness characteristics.  Nor does this policy apply to Alaska outside of the Central Arctic Management Area WSA designated under the authority of Sections 1001 and 1004 of the Alaska National Interest Lands Conservation Act (ANILCA) and which is managed pursuant to all relevant sections of ANILCA.

This policy is intended to guide BLM personnel in the specific decisions that arise every day in the management of these areas.  First issued in 1979 and most recently revised in 1995, previous iterations of this policy were referred to as the interim management policy (IMP).  The term "interim" was used because the policy was expected to be in effect only for a limited period of time and focused on the short-term stewardship of WSAs.  The BLM will continue to manage WSAs until Congress acts, and therefore the manual addresses the longer term stewardship of WSAs. The Wilderness Study Area Management Manual should be applied in all cases where the IMP is currently applied.

The policy found in this manual applies only to the management of WSAs.  With respect to 603 WSAs, the policy applies during the time an area is under wilderness review, which ends when Congress acts on the WSA by either designating the area as wilderness or releasing it for other purposes.  With respect to certain 202 WSAs (those not submitted to Congress in the Wilderness Study Reports), the policy applies until an area identified as a 202 WSA is changed through a land use planning process (Described more fully in Section 1.6.A, below).

Depending on how Congress acts on a WSA, different laws, regulations, and management policies will apply to the area.  For example, WSAs designated by Congress as wilderness will be managed pursuant to the Wilderness Act of 1964 (16 U.S.C. 1131 *et seq.*), the area's designating statute, the BLM's wilderness regulations at 43 CFR 6300, and BLM Manual 6340—Management of Designated Wilderness Areas.  WSAs that are released by

---

[1] Prior to a Settlement Agreement in 2003 with the State of Utah and the Utah School and Institutional Trust Lands Administration, the BLM designated WSAs pursuant to Sections 202 and 603 of FLPMA.

BLM_0018137

Congress from wilderness study will no longer be subject to this manual and will be managed under general BLM management authorities found in FLPMA (43 U.S.C. 1701 *et seq.*) and associated regulations and policies, including applicable land-use plans.

This manual is not the only policy that governs the management of WSAs. The BLM operates under many other laws and policies that may affect whether and how an activity may take place on WSAs.

## 1.2   Objectives.

The BLM's objectives for implementing this policy are to:

A. Consistent with relevant law, manage and protect WSAs to preserve wilderness characteristics so as not to impair the suitability of such areas for designation by Congress as wilderness.

B. Provide policy guidance for prolonged stewardship of WSAs until Congress makes a final determination on the management of WSAs.

## 1.3   Authority.

A. Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1701 *et seq.*) (FLPMA)

B. National Environmental Policy Act of 1969, as amended (42 U.S.C. 4321 *et seq.*) (NEPA)

C. Omnibus Public Land Management Act of 2009 (16 U.S.C. 7202)

## 1.4   Responsibility.

A. Director, Bureau of Land Management, through the Assistant Director, National Landscape Conservation System and Community Partnerships, shall

1. Establish policy and guidance to support the management and protection of WSAs so as not to impair the suitability of such areas for preservation as wilderness.

2. Provide budget and planning guidance related to the administration of WSAs.

3. Coordinate WSA policy and budget with other BLM programs at the national level.

4. Develop and maintain relationships with other Federal agencies, tribal governments, state and local governments, national-level organizations and non-profit groups, and the general public regarding the stewardship of WSAs.

5. Review land use plans, revisions, and amendments affecting WSAs and ensure that these plans, revisions, and amendments conform to FLPMA, NEPA, relevant designating legislation and other applicable laws, and BLM policies and guidance.

BLM_0018138

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-3

B. State Directors shall:

1. Implement policy guidance and direction reflecting national goals for WSAs.

2. Implement budget and planning guidance related to the administration of WSAs.

3. Coordinate WSA policy and budget with other BLM programs at the state level.

4. Develop and maintain relationships with other Federal agencies, tribal governments, state and local governments, friends' groups and other non-profit organizations, and the general public regarding the stewardship of WSAs.

5. Approve land use plans, revisions, and amendments affecting WSAs and ensure that these plans, revisions, and amendments conform to FLPMA, NEPA, relevant designating legislation and other applicable laws, and BLM policies and guidance.

C. District and Field Managers with WSAs within their purview shall:

1. Consistent with relevant law, manage and protect WSAs so as not to impair the suitability of such areas for preservation as wilderness.

2. Ensure that all decisions and activities within WSAs conform to FLPMA, NEPA, designating legislation and other applicable laws, and BLM policies and guidance.

3. Develop and maintain relationships with other Federal agencies, tribal governments, state and local governments, friends' groups and other non-profit organizations, and the general public regarding the stewardship of WSAs.

**1.5 References.**

A. Alaska and Oregon and California Grant Lands Act of 1937 (43 U.S.C. 1181d.)

B. Archaeological Resources Protection Act of 1979, as amended (16 U.S.C. 470aa et seq.)

C. Clean Air Act (2 U.S.C. §7401 et seq.)

D. Federal Onshore Oil and Gas Leasing Reform Act of 1987 (30 U.S.C. § 181)

E. National Historic Preservation Act of 1966 (16 U.S.C. 470)

F. Wilderness Act of 1964, as amended (16 U.S.C. 1131 *et seq.*)

G. Wild Free-Roaming Horse and Burro Act of 1971 (16 U.S.C. 1331 *et seq.*)

H. Title 43 Code of Federal Regulations, Part 46—Implementation of the National Environmental Policy Act of 1969

I. Title 43 Code of Federal Regulations, Part 2200—Exchanges: General Procedures

J. Title 43 Code of Federal Regulations, Part 2800—Rights-of-Way under the Federal Land Policy and Management Act

BLM_0018139

K. Title 43 Code of Federal Regulations, Part 2920—Leases, Permits and Easements

L. Title 43 Code of Federal Regulations, Part 3400—Coal Management

M. Title 43 Code of Federal Regulations, Part 3500—Leasing of Solid Mineral Other Than Coal and Oil Shale

N. Title 43 Code of Federal Regulations, Part 3800—Mining Claims Under the General Mining Laws

O. BLM Manual 1626—Travel and Transportation Manual

P. BLM Manual 6340—Management of Designated Wilderness Areas

Q. BLM Manual 6830 – Animal Damage Control

R. BLM Manual 8270—Managing Paleontological Resources

S. BLM Manual 8100 series—Managing Cultural Resources

T. BLM Handbook 1790-1—National Environmental Policy Act

U. BLM Handbook H-4180-1—Rangeland Health Standards

V. BLM Handbook H-8120-1—Guidelines for Conducting Tribal Consultation

W. Handbook-8270-1—General Procedural Guidance For Paleontological Resource Management

X. Guidance for Implementation of Federal Wildland Fire Management Policy

**1.6 Policy.**

A. <u>Congressional Direction</u>

1. **Direction in FLPMA**

Wilderness preservation is part of the BLM's multiple-use mandate, and the wilderness resource is recognized as one of the array of resource values considered in the land-use planning process. Section 603(c) of FLPMA provides direction to the BLM on the management of WSAs and states that with some exceptions (explained more fully below in Section 1.6.C.2): "During the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands according to his authority under this Act and other applicable law in a manner so as not to impair the suitability of such areas for preservation as wilderness." This language is referred to as the "non-impairment" mandate. The BLM developed a non-impairment standard (see 1.6.C) in this manual) to meet this mandate.

2. **Original and subsequent reviews**

The original wilderness review process outlined under Section 603 of FLPMA had

BLM_0018140

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-5

three phases: inventory, study, and reporting to Congress. Public involvement was encouraged in all phases of the process, with opportunity provided for comment, participation, and review. Section 603 of FLPMA directed the BLM to carry out a wilderness review of the public lands. The wilderness inventory was conducted from 1978 to 1980, and excluded Alaska and Oregon and California Grant Lands Act of 1937 (O&C Act) lands managed primarily for timber production. The original inventory focused on roadless areas of public lands of 5,000 acres or more and on roadless islands, but also included areas of less than 5,000 acres that had wilderness characteristics in association with contiguous roadless lands managed by another agency, and areas of less than 5,000 acres that had wilderness characteristics and could practicably be managed to keep those characteristics in an unimpaired condition. Additional WSAs were designated through the BLM land use planning process under the authority of Sections 201,202, and 302 of FLPMA after the reports to Congress were completed in 1993.

The inventory phase identified areas that were found to have the characteristics of wilderness enumerated by Congress in Section 2 (c) of the Wilderness Act of 1964:

> "A wilderness…(1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value."

When these characteristics were found within a defined boundary, the presence of the wilderness resource was documented and the area was classified as a WSA.

During the study phase, all values, resources, and uses occurring within each WSA were analyzed, pursuant to the National Environmental Policy Act (NEPA), through legislative environmental impact statements. When the study was completed, recommendations as to the suitability or unsuitability of each WSA for designation as wilderness were submitted to the President through the Secretary of the Interior, and then from the President to Congress. FLPMA required that the reports on the Section 603 WSAs be sent to the President by October 21, 1991, and to Congress by October 21, 1993. Section 202 WSAs designated through the BLM's land use planning process prior to the 1993 report were forwarded to Congress. Section 202 WSAs designated subsequent to the 1993 report were not forwarded to Congress. For those Section 202 WSAs created after the 1993 Report to Congress, the BLM may, through land use planning, adjust the status of and management standards

BLM_0018141

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-6

associated with those post-1993 Section 202 WSAs.

Wherever a baseline date is pertinent to WSA management, October 1976 is used for all Section 603 and Section 202 WSAs that were reported to Congress by October 21, 1993, while the date of designation is used for all 202 WSAs not identified in the reports to Congress, as well as legislative WSAs.

3. **Differences in the management of wilderness and the management of WSAs**

Designated wilderness is managed pursuant to the Wilderness Act, which states that these areas shall be administered to "preserve wilderness character." For WSAs, FLPMA mandates that the BLM "not impair the suitability" of areas we have identified as "having wilderness characteristics." There is a difference between these two mandates. As a result of this difference, the varying legal mandates of FLPMA and the Wilderness Act, and the history of the BLM's management of WSAs, this manual differs in both content and form from BLM Manual 6340, Management of Designated Wilderness Areas.

B. General Policy

The BLM's management policy is, except in the cases stated below (see section 1.6.C.2), to continue resource uses on lands designated as WSAs in a manner that maintains the area's suitability for preservation as wilderness. The BLM's policy will protect the wilderness characteristics of all WSAs in the same or better condition than they were on October 21, 1976 (or for Section 202 WSAs not reported to Congress, the date the WSA was designated), until Congress determines whether or not they should be designated as wilderness. When managers are in doubt as to a course of action in a WSA, this should serve as a guiding principle.

1. **Managing to prevent impairment**

a. Preventing impairing activities through public information. It is important to ensure that the public, commercial entities, other governmental entities, and BLM staff are aware of the location of WSAs and their management requirements. To this end, the BLM will post signs at key WSA access points, provide maps and information about WSAs on BLM websites, and ensure that internal and external maps include WSA boundaries. When possible, the BLM should also present information about WSAs to interested or affected organizations.

b. Monitoring. All WSAs are to be monitored to ensure continued suitability for designation as wilderness at a frequency that will ensure compliance with the non-impairment standard described in section 1.6.C of this manual. Unless an alternative schedule is approved (see below), the minimum frequency of monitoring is at least once per month during the months the area is accessible

BLM_0018142

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-7

by the public, or more frequently where uses and activities warrant greater attention or where resource conflicts are present. Large WSAs may require more than one monitoring event per month in order to adequately monitor all parts of the WSA. Field Offices may utilize staff, volunteer assistance, Adopt-A-WSA efforts, ranger patrol, or cooperative agreements with local law enforcement agencies to ensure that WSAs are being monitored sufficiently to detect impairing activities. Aircraft may also be utilized to assist in monitoring activities.

Alternative monitoring schedules may be approved by the State Director for any WSA that could be effectively monitored less frequently than once per month. Alternative surveillance schedules must be tailored for the special needs of the WSA based on consideration of factors including but not limited to: inaccessibility, history of unauthorized activities and violations, and weather/seasons of use. At a minimum, the alternative monitoring schedule must specify the frequency of ground or air monitoring, the resources required to sustain the schedule, and a justification for replacing monthly monitoring with the alternative schedule. The approved alternative monitoring schedule must be in the WSA's permanent documentation file.

When an action is authorized within a WSA, regular monitoring by qualified BLM staff for project compliance must be included in planning and costs associated with the action.

c. Documentation. Field Offices must maintain a permanent file for each WSA. Each file must include photo documentation of primitive routes (formerly referred to as "ways"), range developments, mining activities, property boundaries, and other similar sites where, over time, activities may impact the naturalness of the WSA. The photo points chosen and frequency of documentation should be sufficient to identify impairing or potentially impairing conditions. Some developments may already be periodically documented by other BLM programs. In such cases, coordination with these programs is essential to prevent duplication of effort.

Permanent files must also include a record of each monitoring visit, including the date of the visit and a narrative, and, where applicable, geospatial data. All monitoring visits must be documented; it is just as important to record a monitoring visit where no violations are detected as it is to record the observance of impairing activities. Field Offices are encouraged to utilize electronic databases to improve the efficiency of retrieving information and assessing trends from which to direct future monitoring and management actions.

BLM MANUAL

Rel. No. 6-134
7/13/2012

2. **Enforcement**

As with all public lands, any violation of the regulations applicable to the use of WSAs, or public land management generally are subject to the enforcement authority of FLPMA (43 USC 1733(a)). Possible violations should be referred to the law enforcement ranger or special agent.

3. **Restoration**

a. <u>Unauthorized impacts.</u> The BLM's goal is to immediately restore the impacts caused by any unauthorized action to at least the condition that existed prior to the impact or that which existed in October 1976 (or on the designation date for Section 202 WSAs not reported to Congress) whichever is better. See also General Policy 7, Maintain Improved Conditions, in this sub-section. If the impacts are so severe as to make it impossible or unreasonably costly to restore, or if restoration efforts would result in greater loss of wilderness values than natural restoration, an alternative restoration strategy should be applied that achieves the maximum possible level of restoration.

The BLM will attempt to collect costs of restoration from any and all persons responsible for causing impacts. If the person(s) responsible for the unauthorized impacts is not known, the BLM will undertake restoration and initiate action to locate the person(s) responsible and collect the restoration costs from these persons. If the person(s) responsible for the unauthorized impacts is known but unwilling to perform the needed restoration, the BLM will undertake restoration and initiate action to collect the costs from the responsible person(s).

b. <u>Other impacts.</u> The BLM may remove structures and other facilities that impair wilderness characteristics, do not meet any of the exceptions to non-impairment, or are not permissible uses as detailed in section 1.6.D of this policy. The restoration of ecological processes is covered in sections 1.6.D.2 and D.8 of this manual.

4. **Boundaries of WSAs**

a. <u>Boundary adjustments.</u> WSAs established under the authority of Section 603 of FLPMA are identified in the 1993 reports to Congress (as depicted on supporting maps), and can only be altered by Congress. Boundaries of legislative WSAs are established by the enabling legislation and cannot be adjusted unless specified in the legislation. Boundaries of Section 202 WSAs that were submitted to Congress cannot be altered through land use planning. Boundaries of Section 202 WSAs established through a Resource Management Plan (RMP) and not included in the Wilderness Study Reports submitted to Congress in 1993, may be adjusted through a subsequent RMP process, in

BLM_0018144

accordance with standard BLM management of land boundaries policies.

Impacts resulting from unauthorized activities may not be cited to adjust the boundaries of a WSA.

b. Boundary setbacks. Except where Congress has specified, or in the case of a Section 202 WSA not reported to Congress where the applicable RMP defines setbacks, there are no setbacks to WSA boundaries. Where a WSA is bounded by a road, the WSA boundary is the edge of disturbance of that road that existed at the passage of FLPMA (or, for Section 202 WSAs, at the time the WSA was designated), or if one exists, the edge of any ROW. (Note: in order for the maps in the 1993 reports to Congress to be readable, the boundary lines on the map may not precisely follow the intended boundary feature, so as not to cover up the feature it is following.)

c. Inclusiveness. The WSA includes all surface and subsurface features (such as caves) under the jurisdiction of the BLM.

d. Acquisition of land by exchange within WSAs. Under the authority of 43 CFR 2200.0-6(f) and (g), upon acceptance of title to non-Federal land within the boundary of a WSA that has been exchanged with the BLM, that land is automatically added to the WSA and from that time on is subject to the WSA Management Manual. This provision applies only to inholdings, not edgeholdings.

5. **New discretionary uses**

It is the BLM's policy not to establish new discretionary uses in WSAs that would impair the suitability of such areas for wilderness designation (see section 1.6.C). For example, identifying a mountain biking route on an existing primitive route may not create new surface disturbance or permanent facilities, but the use of the route may preclude potential designation the area as wilderness and would therefore violate the non-impairment standard. In some cases a local club or business, without consultation with the BLM, may have promoted WSA for a use that may impair the existing wilderness characteristics so as to constrain Congress' prerogative to designate the area as wilderness. In such cases, the BLM should take appropriate action so as not to allow the discretionary activity to rise to a level that would create an expectation of continued use, thereby impairing the suitability of the WSA for designation as wilderness.

6. **Maintain improved conditions**

FLPMA requires the BLM to manage all WSAs "so as not to impair the suitability of such areas for preservation as wilderness." If wilderness characteristics have improved since 1976 for a particular WSA (or, for Section 202 WSAs not reported

BLM_0018145

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-10

to Congress, have improved since the date the WSA was designated), it is the policy of the BLM to not allow actions that would cause the regression of the WSA to its 1976 (or the designation date for Section 202 WSAs not reported to Congress) condition.  For example, if primitive routes have been closed and rehabilitated, the BLM will not permit them to be re-established.  The benchmark for the non-impairment standard is the condition in 1976 or current condition of the WSA, whichever is the better condition of wilderness characteristics.

C.  The Non-Impairment Standard

1.  **Defining the non-impairment standard.**

The BLM will review all proposals for uses and/or facilities within WSAs to ascertain whether the proposal would impair the suitability of the WSA for preservation as wilderness.  Unless excepted under 1.6.C.2, all uses and/or facilities must meet the non-impairment standard (i.e. must be both temporary and not create surface disturbance), as described in the following detailed criteria:

a.  The use or facility is temporary.  The use or facility is needed for a defined time period to respond to a temporary need, and would be terminated and removed prior to or upon wilderness designation.  A chronic, repeated short-term use does not meet this definition of "temporary."  Uses, activities, or facilities that create a demand for uses that would be incompatible with wilderness management also do not meet the definition of temporary.

b.  The use or facility will not create new surface disturbance.  There is no new disruption of the rock, soil, or vegetation, including vegetative trampling, that would necessitate reclamation, rehabilitation, or restoration in order for the site to appear and function as it did prior to the disturbance.  Uses or facilities that would require only passive natural restoration may still be considered surface disturbing.  For example, cross-country vehicle use off boundary roads or existing primitive routes is surface disturbing because the tracks created by the vehicle leave depressions or ruts, compact the soils, and trample or compress vegetation.  Landing fixed wing aircraft is considered surface disturbing unless it is on an existing airstrip or primitive route open to other motorized use (i.e. identified and documented to exist prior to passage of FLPMA).  Certain activities allowed in wilderness areas, such as recreational hiking, use of pack stock, or domestic livestock grazing, are recognized as acceptable within a WSA, although, in the literal sense, they cause surface disturbance.

Management to the non-impairment standard does not mean that the lands will be managed as though they had already been designated as wilderness.  Some uses that could not take place in a designated wilderness area may be permitted under the WSA Management Manual. For example, in many cases it is permissible use

BLM_0018146

motorized vehicles on some primitive routes in WSAs, while such vehicles are prohibited in designated wilderness under the Wilderness Act.

2. **Exceptions to non-impairment**

There are seven classes of allowable exceptions to the non-impairment standard defined in section 1.6.C.1. When a use and/or facility that does not meet the non-impairment standard meets one of these exceptions, the BLM will endeavor to allow only the least impairing activities that facilitate the use and/or facility in order to avoid unnecessary impacts to wilderness characteristics. If an impairing proposed project—even one that meets an exception—can be implemented outside of a WSA and accomplish the objectives identified in the purpose and need statement prepared under NEPA, the BLM should endeavor to ensure that the project is implemented outside the WSA. Consult section 1.6.D for activity-specific guidance on the application of all exceptions.

a. <u>Emergencies.</u> In emergencies, any action necessary to prevent loss of life or property may be taken, even if the action will impair wilderness suitability. Emergencies include, but may not be limited to, fire, flood, pursuit of criminal suspects, search and rescue operations in cases of lost or injured persons, and recovery of deceased persons. To the extent possible, emergency actions will be conducted in the manner that least impairs wilderness suitability while resolving the emergency, and the resulting impacts will be restored as soon as possible after the situation has been resolved. See Section 2.3 of the BLM NEPA Handbook, H-1790-1, regarding NEPA compliance obligations for emergency actions.

b. <u>Public safety.</u> In addition to emergencies, the BLM may take actions that would otherwise violate the non-impairment standard to protect public safety. These actions are limited to remediation of human-caused hazards in the WSA (e.g., mine adits). In addition to correcting the public safety issue, the impacts of the hazard should be mitigated and the area restored, to the extent possible, as part of the authorized action. Altering naturally occurring hazards is not permissible. Since some human-caused hazards may be historic, compliance with the National Historic Preservation Act might be necessary (see section 1.6.D.1 of this manual). See also Section 2.3 and Appendix 5 of the BLM NEPA Handbook, H-1790-1, regarding NEPA compliance obligations for emergencies and actions relating to public health or safety.

c. <u>Restoration of impacts from violations and emergencies.</u> Human-caused impacts from violations and emergencies will be restored as soon as possible after they occur. All restoration should be to a level as close as possible to, or better than, that which existed at the site prior to the disturbance.

BLM_0018147

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-12

d. <u>Valid existing rights.</u> Any valid existing right (VER) existing on the date of approval of FLPMA (October 21, 1976)—or prior to the designation date for Section 202 WSAs not reported to Congress—will be recognized. Examples of VERs include: a valid mining claim, a mineral lease, or a right-of-way authorization (also see 1.6 D.4., Lands Actions, and D.5., Minerals). A validity exam must be conducted for mineral activities to verify valid existing rights. The scope of a VER is not unlimited; it depends upon any conditions, stipulations, or limitations stated in the law or approval document that created the right (e.g. if a lease contains a stipulation prohibiting surface occupancy, then the VER for that lease does not include the right to occupy the surface of the leasehold). If the holder of a VER transfers the claim, lease, or right-of-way authorization to another person, the same VER will be recognized for the new holder. However, a VER is tied to a particular location and cannot be transferred to a different claim, lease, or right-of-way location. The BLM should work with the holder of the VER to ensure that the non-impairment criteria are satisfied to the extent possible without unreasonably interfering with the exercise of the right. The BLM should evaluate the exact language of the instrument that conveyed or created the VER. If it is determined that the right conveyed can be exercised only through activities that will impair wilderness suitability, the activities will be regulated to the extent allowable to prevent unnecessary impacts to wilderness characteristics.

e. <u>Grandfathered uses.</u> Grazing, mining, and mineral leasing uses and facilities that were allowed on the date of approval of FLPMA (October 21, 1976)— or the designation date for Section 202 WSAs not reported to Congress —are grandfathered, i.e. allowed as a preexisting use. As provided for in FLPMA Section 603(c), these uses and facilities may continue in the same manner and degree as on that date, even if this impairs wilderness suitability. As described in FLPMA, grandfathered uses only include grazing, mining, and mineral leases, and do not include other uses such as recreational activities.

Grandfathered uses may be acquired by a new operator, but cannot be transferred to a different location. The benchmark for the "manner and degree" of an existing use is the physical and visual impact that use was having on the area on October 21, 1976 (or the designation date for Section 202 WSAs not reported to Congress), because it is that impact that would have affected the wilderness review. Activities grandfathered under the 1872 mining law allow for logical pace and progression of mining operations (see section 1.6.D.5.g of this manual).

f. <u>Protect or enhance wilderness characteristics or values.</u> As described in section 1.6.A.2 of this manual, Section 2(c) of the Wilderness Act of 1964 outlines the

BLM MANUAL

Rel. No. 6-134
7/13/2012

BLM_0018148

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-13

characteristics required of every wilderness. Actions that clearly benefit a WSA by protecting or enhancing these characteristics are allowable even if they are impairing, though they must still be carried out in the manner that is least disturbing to the site.

g.  Other legal requirements. Activities required to meet obligations imposed by other laws are allowed even though they may violate the non-impairment standard. Such activities should, however, be carried out in the least impairing manner practicable. Many of these requirements are cited in this manual's section 1.6.D, Policies for Specific Activities, but other obligations may be created by Congress.

D.  Policies for Specific Activities

This section includes policies to help answer common questions and provide examples related to specific activities that frequently take place in WSAs. Before using these policies, the guidance found in sections 1.6.A, 1.6.B, and 1.6.C must first be followed. Analysis of proposals and alternatives will be completed through the process in section 1.6.E. In all cases, management decisions should be guided by the principle that uses and/or facilities that would impair the suitability of all or part of a WSA for preservation as wilderness may not be authorized, unless they fit under an exception described in 1.6 C. 2. of this manual.

1.  **Cultural and paleontological resources**

Cultural and paleontological resources, and the information they convey, are supplemental values and an important part of the wilderness characteristics of WSAs where they are found. Inventory, stabilization, rehabilitation, and research involving cultural or paleontological resources may be permitted if the activities satisfy the non-impairment criteria. Activities that clearly benefit the wilderness characteristics of a WSA by stabilizing, recovering, or recording important scientific data may be allowed and may require restoration.

2.  **Fire**

a.  General. This section of the manual cannot be used without incorporating standard agency fire management policies and techniques found in other BLM documents, such as the Guidance for Implementation of Federal Wildland Fire Management Policy, but not repeated here.

    i.  *Managing fire.* The overall goal of managing fire in WSAs is to allow the frequency and intensity of the natural fire regime to play its inherent role in the ecosystem. This means both allowing fire where ecosystems evolved in the presence of fire, and preventing unnatural spread of fire in ecosystems that evolved without broad-scale fires.

BLM_0018149

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-14

ii. *Biological constraints.* The overall goal may be affected by past human actions. These may include fire suppression leading to fuel buildup creating the possibility of unnaturally severe fires, or the invasion of non-native annual grasses leading to the unnatural spread of fire in ecosystems that evolved without broad-scale fires.

iii. *Management constraints.* The overall goal may be affected by budgets, national fire management demands, suppression of fire on adjacent land before it moves into the WSA, or undesired consequences of wildfire moving out of the WSA (such as wildfires that may pose a danger to human life and/or property).

iv. *Terminology.* Changes in fire management terminology should not distract managers from applying the principles listed here. This manual will not be amended when fire terminology changes. The principles described here for fire management are more important than the exact words or acronyms being used.

b. <u>Wildfires.</u>  These are unplanned ignitions or prescribed fires that subsequently are declared wildfires because they exceed the prescription parameters.

i. *Management response.* The management response to a wildfire within a WSA may vary along a continuum from monitoring to suppression according to objectives outlined in the applicable Resource Management Plan (RMP) or Fire Management Plan (FMP) for the affected area. The response to a fire can change over the course of the event due to variations in weather, topography, fuels, and resources available. Managers will use a decision support process to guide and document wildfire management decisions. The process will provide situational assessment, analyze hazards and risk, define implementation actions, and document decisions and rationale for those decisions.

ii. *Emergencies.* Wildfires can be considered emergencies and, as such, management response to a wildfire falls under one of the exceptions to the non-impairment criteria. Nevertheless, the non-impairment criteria will be met to the extent practical. This means using "minimum impact suppression tactics" or "light hand on the land" suppression techniques wherever possible, while providing for the safety of firefighters and the public and meeting fire management objectives.

iii. *Suppression personnel.* Fire managers should inform suppression personnel during dispatch that the fire is in a WSA and that special constraints may apply to prevent impairment of wilderness characteristics. A fire resource

BLM_0018150

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-15

advisor with experience in WSA management should be assigned to all fires in WSAs to assist in the protection of wilderness characteristics.

iv. *Stabilization, rehabilitation, and restoration.* Emergency stabilization, rehabilitation, and restoration of the wilderness resource created by impacts from wildfires must satisfy the non-impairment criteria unless an exception applies.  These activities will be more intensive:

- where the effects of the fire were greater than would occur in an area where fire already plays its natural role on the landscape

- in ecosystems that evolved without broad-scale fire

- for fires whose effects (even within the natural range) pose an unacceptable risk to life, property, or resources outside the WSA

Where wildfires have been managed for resource benefits, most stabilization, rehabilitation, and restoration activities are expected to be limited to the impacts caused by direct management actions or to prevent the spread of exotic vegetation.  These activities will not be used to establish, or re-establish, conditions not provided for in sections 1.6.D.8 or 1.6.D.11 of this manual.

c. <u>Prescribed fires.</u>  These are fires—otherwise known as "planned ignitions"— that are deliberately started by the BLM.  The goal of prescribed fire is to make conditions possible for natural fire to return to the WSA.  In some instances, the goal may be to mimic a natural fire regime where reliance on wildfire is not feasible.

i. Use of prescribed fires in WSAs is limited to instances where this use meets the non-impairment standard or one of the exceptions, such as to clearly protect or enhance the land's wilderness characteristics.  The BLM may utilize prescribed fire in WSAs where the natural role of fire cannot be returned solely by reliance on wildfire or where relying on wildfires might create unacceptable risks to life, property, or natural resources outside the WSA.

ii. Prescribed fire planning for WSAs must take into account protection of cultural resources.

d. <u>Fuel treatment.</u>  This includes thinning or removing vegetation, either mechanically or chemically, in advance of, or as a replacement for, wildland fire (either wildfire or prescribed fire).  The goal of fuel treatment is to make conditions possible for natural wildfire to return to the WSA.

BLM_0018151

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-16

    i. *In advance of prescribed fire.* In some instances, fuel treatment may be necessary to protect site-specific resources in advance of a prescribed fire to prevent the loss of those resources. This necessity must be clearly demonstrated in the prescribed fire plan.

    ii. *Replacement for wildland fire.* Pre-fire treatment used to replace either type of wildland fire (sections b and c, above) is only allowed in WSAs where it meets the non-impairment standard or one of the exceptions. Due to their controversial nature and the complexities of analyzing the effects of these treatments on the non-impairment criteria, more extensive NEPA analysis (e.g. an EIS) including public involvement may be required when fuel treatments are proposed for use as a replacement for wildland fire. The policy in 1.6.D.8.b.iii must be satisfied. Fuel treatments *may* be permitted under the restoration or public safety exceptions to the non-impairment standard when:

        A. prescribed fire in the WSA will inevitably cause unacceptable risks to life, property, or natural resources outside the WSA; or

        B. natural successional processes have been disrupted by past human activity to the extent that intervention is necessary in order to return the ecosystem to a condition where natural process can function; or

        C. non-native species have altered the fire regime so that wildland fires pose an undue risk to the native ecosystem.

    Conclusive documentation of A, B, or C, above, must be included in the NEPA analysis of the proposed action. When fuel treatment is allowed, the BLM must strive to achieve the desired conditions through the least impacting method. Fuel treatments should not be authorized in a WSA if the same objectives can be accomplished by the BLM through fuel treatments on public lands outside of the WSA.

    iii. *Low-intensity Prescribed Fire.* Repeated low-intensity prescribed fires are preferable in most circumstances where pre-fire treatment is contemplated, even if this increases the time and cost of treatment.

3. **Grazing management**

    a. <u>Livestock management developments.</u>

    i. *Pre-FLPMA livestock developments.* Livestock management developments existing or under construction on October 21, 1976 (or the designation date for Section 202 WSAs not reported to Congress), may continue to be used and maintained in the same manner and to the same degree as such use was being conducted on that date. In other words, they can have the same, but

BLM MANUAL

BLM_0018152

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-17

not more, physical or visual impact as they did at that time.

ii. *New livestock developments.* New livestock management developments may only be approved if they meet the non-impairment standard or one of the exceptions, such as protecting or enhancing wilderness characteristics. In determining whether a development meets the protecting or enhancing wilderness characteristics exception, the BLM will determine if the structure's benefits to the natural functioning of the ecosystem outweigh the increased presence of human developments and any loss of naturalness or outstanding recreational opportunities caused by the new development. Cumulative impacts must be assessed consistent with NEPA and implementing regulations, policy, and guidance. In addition, the BLM should consider whether or not the development will be substantially unnoticeable. The project must not require new motorized access since this would constitute surface disturbance and so would not meet the non-impairment standard. In order to allow new grazing development under the grandfathered use exception, there can be no increase in the AUMs existing prior to the new development as the result of any new permanent livestock management development.

b. Livestock management activities.

i. *Salting.* For both grandfathered and non-grandfathered grazing operations, salting practices may occur. New salting locations may be established to improve the distribution of grazing use as long as the non-impairment criteria are met. (For example, no vegetation disturbance requiring restoration would occur at the new site).

ii. *Supplemental feeding.* Supplemental feeding (e.g., minerals, vitamins, protein blocks or cubes, and high quality alfalfa) may be continued if it was allowed under the authorization that was in effect in 1976 (or the designation date for Section 202 WSAs not reported to Congress). No other supplemental feeding inside the WSA is allowed.

iii. *Emergency feeding.* Temporary emergency feeding may be authorized by the BLM when forage becomes unavailable as a result of unforeseen natural events such as fire, flood, or heavy snowfall. Emergency feeding may only be allowed for short periods of time while the emergency exists and until the livestock can be removed.

iv. *Vegetation treatments.* If vegetative manipulation was allowed under the authorization that was in effect in 1976 (or the designation date for Section 202 WSAs not reported to Congress), the vegetative treatment may be

BLM_0018153

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-18

maintained by reapplying the same or similar treatment as long as it does not create greater impacts and achieves the same objective.  See D.8.b.iii below.

v.  *Motor vehicle use.*  Except as permitted by sub-sections 3.a and 3.b.iii, above, or as specifically authorized by the BLM, the use of motor vehicles or mechanical transport is restricted to those primitive routes in the WSA that are open to the general public.

c.  <u>Changes in grazing practices.</u>  As a grandfathered use, grazing management practices (e.g. level of use, season of use etc.) authorized during the 1976 grazing fee year (or prior to the designation date for Section 202 WSAs not reported to Congress), including levels of use, may not be changed solely because the use may impair a WSA's suitability for preservation as wilderness. Section 603(c) of FLPMA, provides for the continuation of grazing on lands under wilderness review, "[p]rovided that in managing the public lands, the BLM shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection." If rangeland within a WSA is failing to achieve Rangeland Health Standards, the significant factors contributing to this failure will be determined through monitoring and a review of existing uses.  If existing grazing management practices are found to be a significant factor in the failure to achieve standards, new grazing management practices may be established as needed if they meet the non-impairment standard or one of the exceptions. BLM Handbook H-4180-1 provides the process for ascertaining whether Rangeland Health Standards are being achieved and for determining causal factors when standards are not achieved.  New grazing management is not a grandfathered use and in all cases may only be established if it meets the non-impairment standard or one of the exceptions.

The NEPA document that authorizes changes to grazing practices (see section 1.6.E of this manual) must evaluate, at a minimum, the following:

- watershed function

- ecological processes

- water quality

- habitat quality

- non-impairment of wilderness characteristics

i.  *Grazing increases.*  Grazing increases (increases in authorized grazing use) may be allowed if the impacts of such increases will meet the non-impairment standard or one of the exceptions.  If the proposal meets the

Rel. No. 6-134
7/13/2012

BLM_0018154

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-19

non-impairment standard or one of the exceptions a temporary non-renewable increase may be authorized.  If the studies indicate the increase is causing impairment of the WSA's suitability for preservation as wilderness the increase will be reduced or discontinued.

ii.  *Grazing reductions.*  While there will be no reduction in grazing use levels due to impacts to wilderness characteristics, grandfathered grazing use is not necessarily frozen at the October 21, 1976 (or date of designation for a 202 WSA not reported to Congress) level, but may be subject to general BLM grazing management policy.  As described above, if the rangeland is failing to achieve standards established by the BLM, the significant factors that contribute to those conditions should be ascertained and temporary or permanent reductions may be implemented as needed.

4.  **Lands actions: disposals, use authorizations, rights-of-way, access, and withdrawals**

a.  <u>Disposals.</u> Except as described below, public lands within WSAs may not be disposed of through any means, including public sales, exchanges, and patents under the Recreation and Public Purposes Act.  Under either of the following two conditions, lands within WSAs may be subject to disposal:

i.  Disposals may be permitted under normal BLM procedures for mining patents.

ii.  Land exchanges involving public and non-Federal lands, can occur when the involved lands are within the same WSA, or when they are in two or more WSAs.  These are unique situations, subject to prior approval by the BLM Director. The exchange must benefit wilderness values and/or improve wilderness management.  Such exchanges may not result in the elimination of a wilderness characteristic, including supplemental values, of a WSA.

b.  <u>Use authorizations.</u>

i.  Any permit or lease issued under 43 CFR 2920 must contain a stipulation that if the WSA is designated as a wilderness area, the lease or permit may be terminated.

ii.  Commercial filming may be permitted under 43 CFR 2920 if it is determined to meet the non-impairment standard or one of the exceptions.  Commercial filming permits must stipulate that if the WSA is designated as a wilderness, the permit will be terminated.

c.  <u>Rights-of-way.</u>

i.  Existing rights-of-way may be renewed if they are still being used for their

BLM_0018155

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-20

authorized purpose.  When processing an application for renewal of an existing right-of-way, consistent with 43 CFR 2807.22(a) and 43 CFR 2887.12, the BLM should consider new, additional, or modified terms and conditions to minimize impacts to wilderness characteristics.  Necessary, routine maintenance to keep an existing right-of-way facility in a safe and reliable condition, as well as any additional actions authorized in the original permit, may be permitted.

ii. Except as described under 1.6.D.4.d (Access) below, no new rights-of-way will be approved for uses that do not satisfy the non-impairment standard.

d. Access.

i. Where non-Federal lands are surrounded by WSA lands and an access route exists, a right-of-way authorization may be approved (as appropriate) under 43 CFR 2800 on the existing access.  The right-of-way must not allow for any upgrading of the access route to a level greater than existed on October 21, 1976, or at the time of a Section 202 WSA's designation, nor allow use that would cause greater impact to the surrounding land or measureable degradation to the route.  In cases where upgrading of the route would be necessary so that the owner may utilize the inholding for the purpose under which it was originally conveyed from Federal ownership (e.g., homestead patents), a right-of-way may be authorized, but must be limited so as to not cause impairment of wilderness characteristics (including such measures as may be necessary to limit the volume of vehicle traffic).

ii. Where non-Federal lands are surrounded by WSA lands and no access routes exist, a right-of-way may be authorized to the extent that it meets the non-impairment standard or one of the exceptions. In cases where a right-of-way will be authorized under one of the exceptions, the BLM should select the route and specify the development allowable that causes the least impact to wilderness characteristics[2].

iii. Where a right-of-way is authorized for access to an inholding, the BLM should consider authorizing the right-of-way for a limited period of time. For example, a right-of-way could be authorized for seasonal access only or

---

[2] This is a change from the 1995 manual, which stated that in all cases the BLM was required to provide reasonable access to inholdings.  The 1995 direction, however, did not reflect the fact that reasonable access is only required in Alaska, under section 1323(b) of ANILCA. Because the provision of reasonable access does not apply to public lands managed by the BLM outside of Alaska, new access can only be provided to inholdings within WSAs outside of Alaska where it is consistent with FLPMA's non-impairment mandate.

BLM_0018156

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-21

limited to one or two years (with renewal being only at the discretion of the authorized officer). Such right-of-ways must be terminated at the date of wilderness designation, if wilderness designation occurs. The Regional Solicitor must review all proposed rights-of-way prior to issuance. As an alternative to a potential access authorization, the possible acquisition of a non-Federal inholding via donation or purchase from a willing owner should be considered, consistent with land use plan decisions. In the event that Congress designates an area as wilderness, inholding access rights-of-way that expire upon the date of designation may be authorized by the BLM under CFR 2920 to ensure continued adequate and reasonable access to their inholdings.

e.  <u>Withdrawals.</u>  Unless a WSA or portion of a WSA was "previously withdrawn from appropriation under the mining laws, such lands shall continue to be subject to such appropriation during the period of review unless withdrawn by the Secretary under the procedures of section 204 of…[FLPMA]…for reasons other than preservation of their wilderness character." Existing withdrawals may be renewed if the withdrawal is still serving its purpose. No new withdrawals may be made except withdrawals that can satisfy the non-impairment criteria.

5.  **Minerals**

   a.  <u>General.</u>  The degree and types of development allowed for various mineral uses depend on the date of the mineral right or activity and the date associated with the WSA designation. For the purposes of this section:

   i.  Grandfathered mineral uses are those that were either being carried out: a) prior to October 21, 1976, in any WSA submitted to Congress in the 1993 reports, b) prior to the date of designation for 202 WSAs not reported to Congress, or c) prior to the date of designation for any congressionally designated WSA. Grandfathered locatable and leasable mineral uses may continue in the same manner and degree in which they were being conducted on that date, even if they would impair wilderness suitability.

   ii.  New mineral uses are those initiated after those respective dates. Valid existing rights (VERs) associated with mineral uses will be honored in WSAs. All reasonable efforts to meet the non-impairment criteria will be made as long as doing so does not unreasonably interfere with the VER. Absent a VER, new mineral uses are allowed only to the extent that wilderness characteristics are not impaired and, consequently, the non-impairment criteria are satisfied.

   b.  <u>Disposal of mineral materials (saleable minerals).</u>  Mineral materials subject to

BLM_0018157

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-22

disposal include, but are not limited to, petrified wood and common varieties of sand, stone, gravel, pumice, and clay.

i. Except as provided for in ii, below, sale or free use of all mineral materials is not allowed because such activities cause surface disturbance and so do not meet the non-impairment criteria.

ii. Free collection of small amounts of mineral materials for personal use may be permitted except:

A. all collection must satisfy the non-impairment criteria

B. no collection of petrified wood is allowed in areas where it has been identified as a supplemental value of the WSA (except under scientific permit; see 1.6.D.1).

c. <u>Oil and gas (leasable minerals).</u>  For the purposes of this section, these resources include oil shale and tar sands.

i. New leasing of oil and gas minerals, including leasing with "no surface occupancy" stipulations, is prohibited within WSAs under the Federal Onshore Oil and Gas Leasing Reform Act of 1987 (30 U.S.C. § 181).  This includes split-estate lands within the boundary of the WSA where Federal mineral estate underlies non-Federal surface.  The BLM may offer lands for lease up to the WSA boundary.  However, where the exact legal description of the WSA boundary is not known due to the lack of an official survey, leasing should be set back from the WSA boundary.  The setback distance will be determined by the manager, through the Management of Land Boundaries Plan where it exists, and be sufficient to guarantee that wilderness characteristics of the lands within the WSA boundary are not impaired.

ii. Pre-existing mineral leases will be allowed to be developed according to the VER conveyed by the specific terms and conditions of each lease.  These rights are neither absolute nor unqualified, but do include the right to access different leasable mineral horizons than were being tapped at the time of WSA designation unless the lease specifies otherwise.  Activities for the use and development of such leases must satisfy the non-impairment criteria, unless this would unreasonably interfere with rights set forth in the mineral lease.  Development of pre-existing leases may be subject to terms and conditions to minimize impairment of wilderness characteristics, including:

A. use of best management practices. These may include:  relocation of operations of up to (or beyond, if identified and applied through additional NEPA analysis) 200 meters or modification of the facility

BLM MANUAL

Rel. No. 6-134
7/13/2012

BLM_0018158

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-23

design (e.g., shaping the road and well pad to minimize cut and fill, or requiring no blading of access route or well pad if conditions allow; requiring low-profile equipment, pitless (closed system) drilling, engine mufflers, telemetric controls, interim reclamation to the wellhead and road surface, liquids gathering systems to offsite production facilities, and final reclamation restoring the landform and native vegetation).

B. standard practices such as blading or gravelling well pads or access routes may be suspended until a well is proven productive.

C. if there is no legal access to a pre-existing lease, and that lease is entirely within a WSA and not contiguous with any part of the WSA boundary, the lease may not be developable since: 1) rights of access across a lease do not include rights of access to the lease; 2) such rights of access to a lease must come in a separate right-of-way authorization; and 3) no new rights-of-way will be issued in WSAs for uses that do not meet the non-impairment criteria or exceptions described in this manual.

D. on leases that cross the boundary of a WSA, the lease rights may be satisfied without allowing drilling in the WSA, depending on the proportion of the leasehold within the WSA.

iii. Suspension of lease terms may be requested by lease holders if an application to conduct operations is denied because of the potential impairment of wilderness suitability as outlined in paragraphs ii.B or ii.D, above. The Secretary of the Interior has the discretionary authority to direct or assent to such a suspension of the operating or producing requirements of a lease if it is in the interest of conservation to do so and when the specific circumstances involved warrant such an action, such as until congressional decision on the wilderness status of the area is made.

iv. Geophysical exploration may be allowed only if it satisfies the non-impairment criteria.

v. Drilling units may include existing leases, but those leases are constrained in their valid existing rights as described above. The rights of leases outside the WSA not subject to the non-impairment criteria cannot be extended to leases within the WSA through formation of a drilling unit, though leases within the WSA enjoy other benefits of unitization and their terms may be continued by drilling, or extended by production, on other leases in the unit.

d. Geothermal resources. These include geothermal heat, steam, hot water, and hot brines, including those resulting from artificially introducing fluids into geothermal formations. To the extent applicable, the policies for managing

BLM MANUAL

Rel. No. 6-134
7/13/2012

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-24

geothermal resources in a WSA are identical to those for managing oil and gas resources.  See also 43 CFR 3200.

e.  <u>Coal.</u>  Except where specifically noted, all provisions apply to both underground or surface mining of coal reserves.  See also 43 CFR 3400.

   i.  New leasing of coal is prohibited within WSAs.

   ii.  Pre-existing coal leases will be allowed to be developed according to the VER conveyed by the specific terms and conditions of each lease.

   iii.  Pre-existing Preference Right Lease Applications (PRLAs) will be adjudicated by applying the criterion for assessing lands unsuitable for coal mining at 43 CFR 3461.5(d)(1).  Therefore, even though the applicant showed a pre-existing commercial discovery of coal, WSAs are considered unsuitable unless and until congressional decision not to designate the WSA as wilderness and to release it from further review.  The Secretary may initiate exchange proceedings under 43 CFR 3430.5-4.

   iv.  Coal exploration licenses may be allowed only if they satisfy the non-impairment criteria.

f.  <u>Other leasable minerals.</u>  These include phosphate, potassium, sodium, sulfur, and uintaite or other vein-type solid hydrocarbons.  To the extent applicable, the policies for managing these resources in a WSA are identical to those for managing oil and gas resources.  See also 43 CFR 3500.

   i.  Preference Right Lease Applications (PRLAs) will be recognized, if in conformance with the terms set forth in 43 CFR 3507.  However, conditions will be imposed in such leases to prevent impairment of the area's suitability for preservation as wilderness.  Therefore, development of an area under a PRLA will be deferred until congressional decision not to designate the WSA as wilderness and to release it from further review.

g.  <u>Mining operations under the 1872 Mining Law (locatable minerals).</u>  In addition to provisions in 43 CFR 3700 and 3800, these activities are managed according to 43 CFR 3802.  This section of the Code of Federal Regulations must be consulted in the management of mining operations subject to the 1872 Mining Law. For WSAs established under the authority of Section 202 of FLPMA, location, subsequent assessment, and mining operations under the 1872 Mining Law are exempt from the non-impairment standard, but still must satisfy the BLM's standard of preventing unnecessary or undue degradation.

   i.  Exploration, Prospecting, and Location of New Mining Claims are permitted in all WSAs unless withdrawn under other provisions of law.  For WSAs established under the authority of Section 603 of FLPMA, all new location,

BLM_0018160

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-25

methods and routes of access, and subsequent assessment must satisfy the non-impairment criteria.

ii. Mining on pre-existing claims may occur.  The degree to which impairing activity, including assessment work, is allowed depends on whether the mining claimant is recognized as having a "valid" discovery as of October 21, 1976.

A. Mining claimants are recognized as having a VER if a valid discovery was made on the claim on or before October 21, 1976, and the claim continues to be supported by such a discovery.  A validity exam performed by BLM, as described in BLM Manual 3812, Validity Examinations, determines whether or not a valid discovery exists.  When it is determined that the claimant's rights can be exercised only through activities that will impair wilderness suitability, they will be allowed to proceed, the impairment notwithstanding.  Claims that do not meet the standards of a VER may still be developed as a grandfathered use if they fit the appropriate criteria (see ii.B, below).

B. Access to claims that meet the requirements of a VER is permitted, even if it fails to meet the non-impairment standard.  Such access must still not cause unnecessary and undue degradation.

C. Pre-existing mining operations that do not satisfy the requirements of having a VER nevertheless are permitted to continue in the "same manner and degree" as were occurring in October 1976 as grandfathered uses.  In practical terms:

I. The same physical and visual impacts are allowed to continue at a logical pace and progression, provided that the impacts of the extension or of the new activity are not of a significantly different kind than the impacts existing on October 21, 1976.

II. The quantity of on-the-ground impacts may be increased by the logical pace and progression of a grandfathered use, but the new impacts may not be of a significantly different kind than the impacts involved with the pre-FLPMA activity.

III. It is the use, rather than the claim, that is grandfathered.  A grandfathered mineral use may continue in the same manner and degree onto adjacent claims held by the same person, even if the adjacent claims are post-FLPMA claims.

BLM_0018161

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-26

        IV.  Access to claims that do not meet the requirements of a VER is limited to the "same manner and degree" that existed on October 21, 1976.

    D.  Work on pre-existing mining claims that do not satisfy the definitions of either VERs or grandfathered uses will be allowed only if the BLM determines that the proposed operations satisfy the non-impairment criteria.

    E.  Because Congress directed the BLM to stop patenting mineral claims in 1994, that process is not discussed here.  If patenting were to resume, this sub-section of the WSA Management Manual will be revised. Patented claims issued prior to 1994 are treated as private land except in the California Desert Conservation Area, where patented claims continue to be regulated to prevent unnecessary or undue degradation.

6.  **Recreation**

    a.  General. Most recreational activities (including hiking, horseback riding, fishing, hunting and trapping, camping, and other primitive forms of recreation) are allowed on WSAs.  However, some activities may be prohibited or restricted if they do not meet the non-impairment standard or one of the exceptions. Examples of recreational use activities that would be found to impair, and so could not be allowed unless they meet one of the exceptions, include those that require permanent structures or depend upon cross-country use of motor vehicles or mechanical transport (for example: pickup vehicles for balloons or sailplanes).

    The BLM will monitor the magnitude of all recreational activities in WSAs to ensure that such use will not impair the area's wilderness suitability.  If monitoring indicates impairment is occurring the BLM will, as appropriate and subject to applicable law, take action to eliminate the impairing activity (e.g., adjust the time, location, or quantity of use, or prohibit that use in the impacted area).  For example, an area may become more frequently used for camping, thereby causing broad physical impacts to soils or vegetation, or an area may become popular for mountain biking, and the resulting increase in use results in a loss of solitude.  In either case, the BLM must take some action to address the impairment of wilderness characteristics.

    Care must be taken not to concentrate use by promoting a recreational activity that is normally allowable but at high use levels would cause impairment or create a conflict that may constrain Congress' ability to designate the area as wilderness.

BLM_0018162

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-27

b. <u>Motorized/Mechanical Transport.</u>

i. Recreational use of motor vehicles or mechanical transport (see Glossary) may only be allowed when such use is consistent with all applicable laws and meets the non-impairment standard. The following are examples of motorized or mechanized transport uses that are not likely to impair an area's suitability and therefore may be allowed in a WSA:

  A. within "open" areas designated prior to the passage of FLPMA (October 21, 1976), unless the area was subsequently limited or closed in a Land Use Plan decision.

  B. on primitive routes (or "ways") identified by the BLM as existing on October 21, 1976 (or prior to the designation date for Section 202 WSAs not reported to Congress) if:

    I. identified in the original wilderness inventory; or

    II. if not identified as in I., having documented proof that the route existed at that time; and

    III. whether I. or II., the route was not otherwise closed through BLM's Travel Management Planning

  C. off of primitive routes for the minimum clearance to allow another vehicle to pass when driving or parking vehicles.

  Note: offices may consider issuing supplementary rules where necessary to provide enforcement of this section of the WSA Management Manual.

ii. Because their development causes new surface disturbance, no new motor vehicle or mechanical transport routes will be permitted in WSAs. Vehicle routes other than those defined in b.i.B, above, should be closed and restored.

iii. No improvement or maintenance of any primitive routes will be permitted to facilitate recreational motor vehicle or mechanized vehicle use in WSAs if it does not meet the non-impairment standard or one of the exceptions.

iv. Primitive routes within WSAs may only be used to the extent that the physical impacts of the primitive route are no greater than existed on October 21, 1976 (or prior to the designation date for Section 202 WSAs not reported to Congress). During the wilderness inventory, the BLM evaluated all "ways" (now referred to as "primitive routes") within WSAs and in many cases established photo documentation of their condition. Except for emergency situations as defined in section 1.6.C.2.a, or for activities authorized under other exceptions to the non-impairment criteria in section

BLM_0018163

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-28

1.6.C.2., the BLM must take action to ensure the route does not exceed the approximate conditions of impact to the wilderness characteristics that existed on October 21, 1976 (or prior to the designation date for Section 202 WSAs not reported to Congress). Actions taken to improve the wilderness characteristics of the route will impose the least restrictions on visitors while effectively restoring the route, and can include closure (seasonally or year-round) of primitive routes to some or all types of motorized or mechanical transport under the authorities of 43 CFR 8341.2 and 8364 where:

A. Use has increased appreciably, causing the route to become more highly developed (for example, a two track route that no longer has center vegetation or has increased in width).

B. Deterioration of the route has occurred, causing drivers to bypass a section(s) of the route (for example, the surface of a primitive route has eroded causing drivers to bypass the original route and drive parallel to it).

In most cases, closure of primitive routes will also include restoration of the soil and vegetation. In some cases, a closure may be made by gating the road and allowing for authorized use to continue (for example, access associated with grazing administration).

v. If outstanding opportunities for solitude were identified in the original inventory, the BLM will monitor remaining primitive routes open to motorized travel within the area and take actions to prevent the impairment of the opportunity for solitude. The BLM cannot allow use (including increased vehicle use on routes remaining open to motorized or mechanical transport within the area) that would impair these opportunities.

vi. As described in BLM Manual 1626—Travel and Transportation Manual, "Any motorized/mechanized linear transportation feature located within [WSAs] will be identified in a transportation inventory as a motorized/mechanized 'primitive route'...Primitive routes will not be made a part of the transportation system, classified as a transportation asset, or entered into the Facility Asset Management System (FAMS) unless one of the following conditions is met:

A. The routes are designated as non-motorized and non-mechanized trails, or

B. Congress releases the WSA from Wilderness consideration."

Motorized/mechanized primitive routes may be signed only to the extent necessary to prevent resource damage or users getting lost; they may not be

BLM_0018164

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-29

assigned names or numbers that would appear to create a *de facto* route system.

    vii. Though motorized and mechanical transport may be permitted to continue along existing primitive routes, "closed" designations may be appropriate for WSAs, or portions of WSAs, where RMP planning goals are to provide primitive recreational opportunities, or where needed for the protection of an identified natural resource.

c. <u>Trails.</u> As surface disturbing developments, no new trails or related structures or installations will be allowed, unless they meet an exception to the non-impairment standard. Where trails are allowed under an exception, no motorized or mechanical transport (e.g. bicycles) will be allowed on such trails.

If found to meet the non-impairment standard or one of the exceptions, new trail sections, trail structures, or installations may be provided under the following conditions:

    i. Hiking or horseback riding use levels have increased, or are expected to increase, to the extent that resource impacts are or are likely to become present (e.g. braided or duplicate trails, impacts to cultural sites or other sensitive resources, or accelerated soil erosion). In these cases, to minimize recreational use impacts to wilderness characteristics a single, properly located, sustainable trail may be provided for under the "restoration of impacts from violations emergencies" or "protect or enhance wilderness characteristics or values" exceptions to the non-impairment criteria (see sections 1.6.C.2.c and 1.6.C.2.f.)

    ii. Hiking or horseback riding use levels have increased so that a defined route is present, and the route leads visitors to a hazard (e.g. along a precipitous ledge or to an abandoned mine). In these cases, a trail may be relocated to a more appropriate location.

    iii. A primitive route closed to motor vehicles is utilized by hiking or horseback riding. The primitive route may be managed as a trail, including constructing water drainage and re-routing of unsustainable sections as defined in c.i and c.ii, above.

d. <u>Boating.</u> Boating may be allowed with or without motors as long as supporting facilities and activities within the WSA satisfy the non-impairment criteria. No launching ramps or boat docks will be built. A "brow log" may be used to reduce erosion at boat landings. A short trail may be designated and maintained between boat landings and campsites at appropriate locations above the waterline in order to minimize recreational use impacts to the wilderness resource consistent with paragraph 6.c, above. Impacts to shoreline campsites

BLM_0018165

will be monitored.

No waters will be closed to motorboats solely because they are in WSAs. However, if the impact of motor boating (such as shore erosion or water pollution) is found to impair the area's suitability for preservation as wilderness, the BLM must limit or close motor boating or otherwise mitigate these impacts.

e.  Skiing.  Skiing is allowed as long as all supporting facilities and activities within the WSA satisfy the non-impairment criteria.

f.  Aerial activities.  Aerial activities such as ballooning, hang gliding, paragliding and parachuting (sky diving), may be allowed as long as they meet the non-impairment standard, including not requiring cross-country use of motorized vehicles or mechanical devices to retrieve  equipment, except in areas designated as "open" before October 21, 1976.

g.  Rock climbing and caving.  Rock climbing and caving are allowed as long as these activities meet the non-impairment criteria.  The placement of permanent fixed anchors (e.g., bolts) or artificial holds is not allowed unless it meets one of the exceptions to the non-impairment standard, e.g. for emergencies, such as search and rescue operations.  Any impacts from emergency actions must be restored to a substantially unnoticeable condition following the emergency situation.  Generally, fixed anchors placed prior to FLPMA will not be removed unless their presence creates—directly or indirectly—impacts that exceed the non-impairment standard.

h.  Camping.  Camping is generally allowed in WSAs.  Primitive camping (i.e., horse camping and backpacking) may occur anywhere in the WSA as long as it meets the non-impairment criteria.  Campsites should be monitored and action taken to limit use and/or restore sites where unacceptable levels of impact are present.  Low impact camping techniques should be promoted within all WSAs.

Campsite developments (e.g. camping pads, picnic tables, etc.) may not be installed.  Toilets may only be provided to protect or enhance wilderness characteristics where resource damage is documented and where the toilet would not rely on motor vehicles for maintenance.  Camping with motor vehicles may occur on existing primitive routes as long as this use meets the non-impairment criteria.  Vehicles may drive off of existing primitive routes no farther than is necessary to allow another vehicle to pass.  In some cases, camping spurs were documented in the route analysis during the wilderness inventory; these may continue to be used as long as vehicles cause no more impact than was present at the time of the inventory.

i.  Education and interpretation.  Environmental education and interpretive

BLM_0018166

programs may be conducted as long as they meet the non-impairment standard or one of the exceptions.

j. <u>Hobby collecting.</u> Hobby collecting of common rock and mineral specimens (rock hounding) and vegetative specimens may be allowed for personal but not commercial use, as long as the collection activity method meets the non-impairment criteria and is not otherwise prohibited. Collecting common invertebrate and plant paleontological resources as allowed under the Paleontological Resources Protection subtitle of 16 U.S.C. 7202 will not be allowed in a WSA where these non-renewable resources have been identified as a supplemental value because said use would impair the area's suitability for preservation as wilderness. See also 1.6.D.5.b.ii in this manual. As on any public land, no hobby collecting of any resource protected by the Archaeological Resources Protection Act is permitted.

k. <u>Gold panning.</u> Recreational gold panning, when conducted without location of a mining claim, may be allowed as long as it is done in a manner that satisfies the non-impairment criteria. If the activity would cause noticeable damage to fish spawning or rearing areas, it will be considered to impair wilderness suitability, and the activity will be limited to prevent such impairment. Dredging is not allowed unless it meets one of the exceptions to the non-impairment standard.

l. <u>Geocaching.</u> Geocaching and other similar activities are allowed as long as the use meets the non-impairment criteria. The BLM must also ensure that activities that would be incompatible with wilderness designation (such as geocaching with physical caches) do not become the dominant use of the area, thereby impairing the solitude or primitive recreational opportunities that existed at the passage of FLPMA. See section 1.6.B.5. The BLM should coordinate with geocachers to ensure that caches are not placed in areas with sensitive resources (e.g. cultural). Where increased use levels are found to be causing impairment (e.g. new visitor created trails or soil and vegetation impacts around the geocache site) geocaching should be discontinued.

m. <u>Special recreation permits.</u> Activities that require authorization under a Special Recreation Permit (SRP) will be allowed only if the use and related facilities satisfy the non-impairment criteria (and therefore do not involve a use of the WSA that would be incompatible with wilderness designation). Examples of uses that may be authorized include river trip outfitters, hunting or fishing guides, group backpack trips, and providers of pack animals and saddle horses.

7. **Soil, water, air**

a. <u>Direction from FLPMA on Soil, Water, and Air.</u> Section 102 of FLPMA sets forth

BLM_0018167

Congress' declaration of policy that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." While air is not within the definition of public lands, the BLM must manage the public lands in a manner that will protect the quality of air values.  FLPMA more specifically directs that the management of the public lands be on the basis of multiple use and sustained yield unless otherwise specified by law.  In developing and revising land use plans, FLPMA requires BLM, among other things, to "provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, of other pollution standards or implementation plans."

b.  Monitoring devices.  Temporary and permanent monitoring markers, instruments, meteorological devices, soil pits, snow gauges, and water quantity and quality measuring instruments may be established where needed to monitor threats to human health, safety, or property or to monitor a WSA's natural resources in order to support restoration or prevent impairment.  Such devices will only be allowed if they meet the non-impairment standard or one of the exceptions.

c.  Watershed rehabilitation.  Measures required for watershed rehabilitation may be permitted if they satisfy the non-impairment criteria or one of the exceptions. Watershed rehabilitation activities to address natural successional processes that have been disrupted by past human activity may be allowed.  Intervention will be limited to what is necessary to allow the system to return to a natural process and to what is necessary to address situations where stabilization through natural processes would take longer than one growing season and the impacted area would be susceptible to significant soil loss during that time or further ecological departure would occur.  (See also section 1.6.D.8).  Approaches that do not restore natural processes should not be approved.

d.  Clean Air Act.  FLPMA requires the BLM to protect the quality of air and atmospheric values, while managing the public lands according to "multiple use" and "sustained yield" principles.  FLPMA also requires that the BLM's land use plans provide for compliance with applicable air pollution standards or implementation plans.  Under the Clean Air Act Prevention of Significant Deterioration (PSD) program, most WSAs are designated as "Class II" areas. This allows moderate deterioration associated with moderate, well-controlled industrial and population growth.  The BLM will continue to manage WSAs consistent with FLPMA and the Clean Air Act requirements for Class II areas, unless an area is redesignated  as "Class I" (a designation that requires greater protection) by the appropriate State through procedures under the Clean Air

BLM_0018168

Act.

8. **Vegetation**

   a. <u>General.</u> Whenever possible, natural processes will be relied on to maintain native vegetation and to influence natural fluctuations in populations. Natural disturbance processes, including fire, insect outbreaks, and droughts, are important functions of the ecosystem. Manipulation of vegetation through management-ignited fire, chemical application, mechanical treatment, or human controlled biological means is allowed only where it meets the non-impairment standard or one of the exceptions. Exceptions that may pertain to vegetative treatment include emergencies, the protection or enhancement of wilderness characteristics, grandfathered uses, valid existing rights, and actions taken to recover a federally listed threatened, endangered, or candidate species. Establishing non-native plants is an example of vegetation management that may impair and therefore may not be permitted within a WSA.

   b. <u>Vegetation management.</u>

      i. *Emergencies.* As an exception to the non-impairment standard, vegetative manipulation in emergency situations may be allowed, e.g. there is no effective alternative for controlling insect and disease outbreaks or fires that threaten lands outside of a WSA. Reseeding or planting of native species may be undertaken following fire or other natural disaster if natural seed sources are not adequate to compete with non-native vegetation or substantial soil loss is expected.

      ii. *Insect and disease control.* Native insect and disease control activities on vegetation will be allowed only to the extent that they meet the non-impairment criteria or one of the exceptions. When specific insects and diseases are documented to be non-native or introduced organisms, then it may be reasonable to consider whether the protection and enhancement of wilderness characteristics exception to the non-impairment standard applies.

      iii. *Restoration.*

         A. General. There are three primary types of restoration:

            I. <u>Site-specific disturbances.</u> Restoration of human impacts, authorized disturbances, or violations normally includes treatments to restore the appearance of site-specific areas and to promote regrowth of native vegetation on the disturbed site.

            II. <u>Control of non-native vegetation.</u> Non-native vegetation that interferes, or has the potential to interfere, with ecosystem processes or function (e.g. non-native annual grasses), or illegally cultivated

BLM_0018169

plants (e.g. marijuana), may be controlled using the method or combination of methods known to be effective, while causing the least damage to non-target species.  Reseeding or planting of native species may be done following weed treatment and fire or other natural disaster as needed where natural seeding is not adequate and to prevent non-native vegetation from becoming dominant.

III. Broad-scale landscape function.  The vegetation of some of the landscapes in which WSAs are located has undergone intentional and unintentional human caused transformation during the modern industrialized era.  In some cases, these activities have resulted in a departure from the natural composition, structure, and density of native species, with impacts to habitat quality, soil stability, and watershed function.

B. Where it meets the non-impairment standard or one of the exceptions, management action may be taken to restore vegetation to characteristic conditions of the ecological zone in which the area is situated where:

I. natural successional processes have been disrupted by past human activity, to the extent that intervention is necessary in order to return the ecosystem to a condition where natural process can function;

II. restoration through natural processes would require lengthy periods of time during which the impacted area would receive unwanted human use or be susceptible to significant soil loss without intervention, or further ecological departure would occur; or,

III. it is necessary to maintain fire-dependent ecosystems when adjacent land uses do not allow for natural fire occurrence.  (see section 1.6.D.2.c)

C. Manipulation should only occur when restoration by natural forces is no longer attainable, and only to restore or maintain vegetative communities to the closest approximation of the natural range of conditions.

D. Restoration treatments should use the least disruptive techniques that have the best likelihood for success.  Patient, incremental treatments should be favored over aggressive attempts to restore long-term changes all at once, unless repeated treatments would pose greater impairment risk to wilderness characteristics.

BLM_0018170

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-35

E. Monitoring programs must be in place prior to treatment and must be sufficient to evaluate responses of key ecosystem components and processes at multiple scales.

F. Restoration projects are based on landscape assessments that identify historical range of variability, current condition, restoration targets, and cumulative effects of management.  The decision to manipulate an ecosystem must be based upon clearly articulated, well-supported management objectives and available scientific information.  At a minimum, the EA or EIS for any proposed manipulation of vegetation must address the following:

- A description based on historical and scientific evidence of the natural vegetative community and processes that would have existed prior to the effects of industrialized humans.

- A description of the existing condition and how it is a departure from the natural vegetative community and processes.

- Evidence from existing research/application that the proposed treatment will bring about the desired result.

- An evaluation of the likelihood of the natural system to be self-sustaining after the treatment.  Treatments should allow for natural processes to resume.  Where this is not possible because of conditions outside the WSA (e.g. a fire regime influenced by adjacent private land development), the contributing conditions and factors must be described.

c. <u>Collection and removal.</u>  Collection of seeds, nuts, berries, and similar items for personal use may be permitted, as may the collection of firewood for recreational use while recreating in the WSA as such uses are generally not found to impair the area's suitability for preservation as wilderness.  Commercial or agency seed or plant collection may be permitted in support of restoration as described in section 8.b.iii, above, or for other restoration or scientific purposes as long as the non-impairment standard or one of the exceptions is met.  Collection activities must be conducted in a non-impairing manner.  Forest product removal, including building material, fuelwood, Christmas trees, and boughs, may not permitted as these activities are generally found to impair, with the exception of forest products resulting from stewardship contracts for restoration activities (1.6.D.8.b.ii.) in which vegetative products become the property of the contractor.

9. **Visual resources management**

BLM_0018171

BLM Manual 6330—Management of BLM Wilderness Study Areas

All WSAs should be managed according to VRM Class I management objectives until such time as Congress decides to designate the area as wilderness or release it for other uses.

10. **Wild horse and burro management**

a. General. Wild horse and burro herds are managed in WSAs only within geographic areas identified as having been used by a herd as its habitat in 1971 as directed by the Wild Free-Roaming Horse and Burro Act. Wild horses and burros are managed to remain in balance with the productive capacity of the habitat; this includes managing herds so as not to impair wilderness characteristics. Wild horse and burro populations must be managed at appropriate management levels so as to not exceed the productive capacity of the habitat (as determined by available science and monitoring activities), to ensure a thriving natural ecological balance, and to prevent impairment of wilderness characteristics, watershed function, and ecological processes. The BLM should limit population growth or remove excess animals as necessary to prevent the impairment of the WSA.

b. <u>Existing wild horse and burro developments.</u> Existing wild horse and burro developments within WSAs may continue to be utilized and maintained.

c. <u>New wild horse and burro developments.</u> Proposed new facilities and their potential impacts must be evaluated in conformance with NEPA (see section 1.6.E). If a portion of the Herd Management Area (HMA) is outside the WSA, any new development should be placed there, where practicable.

  i. *Water developments.* As surface disturbing developments, new water sources for wild horse or burro herds can only be allowed where they meet one of the exceptions to the non-impairment standard. Water developments that are incorporated into the protection of springs or riparian areas (including water developments created to replace water lost elsewhere in the HMA) may be permitted if they meet an exception to the non-impairment standard.

  ii. *Fences.* New fences may be allowed where necessary to protect springs or other water sources from impairment by wild horses or burros. Such exclosure fences must be visually minimized and large enough to avoid making native animals susceptible to predation.

  iii. *Traps.* Traps for the removal of excess wild horses or burros must be located outside of WSAs whenever possible. When practical alternatives do not exist, temporary traps may be located within WSAs for the effective removal of animals in excess of the appropriate management level

BLM_0018172

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-37

established for the herd area.  Traps must be situated to minimize impacts to vegetation and soils.  Vehicles necessary for set-up and take-down of traps and for transporting excess wild horses and burros away from the area may be driven off of existing primitive routes or boundary roads on a route specified through the NEPA analysis.  At the completion of the gather, all facilities must be removed, the route used for trap access closed to motor vehicles until it is restored to the original condition, and any new access route and trap area rehabilitated so that the route is no longer visible to subsequent motor vehicle operators.

iv. *Motor vehicles and aircraft.*  Except as authorized for establishing a trap in b.iii, above, motor vehicles may not drive off open primitive routes and roads if doing so does not meet one of the exceptions to the non-impairment standard.  Helicopters and fixed wing aircraft may be used for aerial surveys and for the gathering of wild horses and burros.

11. **Wildlife.**

a. Coordination between the BLM and state agencies.  Congress directed the Secretary, through the BLM, to manage WSAs "in a manner so as not to impair the suitability of such areas for preservation as wilderness."  However, effective management of WSAs requires close coordination and communication between the BLM and State wildlife management agencies.  "In general the States possess broad trustee and police powers over fish and wildlife within their borders, including fish and wildlife found on Federal lands within a State." (43 CFR 24.3).  Management actions taken to support wildlife management, whether proposed by the State or the BLM, must conform to the non-impairment mandate, as detailed in 1.6.C of this manual.

To facilitate BLM/State coordination, each BLM State Office should maintain effective communication and coordination with their State wildlife management agency counterparts.  The BLM should seek to establish MOUs with the relevant state wildlife agencies to identify any state-specific management activities, policies, and/or procedures that may involve WSAs and to determine under what conditions State fish and wildlife activities will be conducted in WSAs.  Such MOUs, as well as fish and wildlife management actions undertaken by the BLM and not involving the State agency, will include the provisions described in the following sub-sections.  For all actions, the BLM will ensure that the non-impairment criteria are met, or that one of the exceptions to non-impairment applies.  (See section 1.6.C of this manual.) It is the expectation that the BLM will work closely with the state agency in consideration of all project proposals involving WSAs. When a project is under consideration BLM will conduct a non-impairment analysis and assist state

BLM_0018173

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-38

agencies in designing the project to conform with the non-impairment standard. Projects will be subject to NEPA analysis as appropriate.

States regulate where and when the activities of hunting, fishing, and trapping take place in WSAs. Hunting, fishing, and trapping are normally unaffected by WSA designation.   The BLM is responsible for managing the habitat upon which these fish and wildlife are dependent.  In WSAs, the BLM has an additional responsibility to assure that management techniques and tools do not cause impairment to wilderness characteristics and that fish and wildlife management activities emphasize the continuation of natural processes to the greatest extent possible.

b.  <u>General.</u>  Wildlife and their habitat in WSAs are managed to ensure:

- natural distribution, number, and interaction of native species

- natural processes will be allowed to occur under the applicable land use plan unless degrading to other wilderness characteristics

- wildlife species maintain a natural balance with their habitat and with each other

If healthy, viable, self-sustaining populations of native species presently exist within the WSA, then a natural distribution, number, and interaction has already been achieved, and it is generally not appropriate to artificially manipulate natural processes to increase the population of a native species.  Exceptions to this general rule are specified below.

(Note: nothing in this section applies to Wild Horses and Burros -- see section 1.6.D.10.)

c.  <u>Permanent structures and installations.</u>  Permanent facilities used in wildlife management include guzzlers, water tanks, and exclosure fences.  These structures or installations are considered either "existing" or "new."

i.  Existing permanent structures and installations are those that were present on October 21, 1976 (or prior to the designation date for Section 202 WSAs not reported to Congress).  Existing wildlife facilities will be permitted to remain while the area is under wilderness review, and may be maintained as long as the maintenance conforms to the non-impairment standard.

ii.  New permanent structures and installations include not only proposed facilities, but those that were built after the dates described in c.i, immediately above.  New facilities are normally not permitted in WSAs under the non-impairment criteria, but may be allowed to be constructed (or remain) if the facility meets an exception to the non-impairment criteria.

BLM_0018174

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-39

For example, facilities that clearly protect or enhance wilderness characteristics by supporting a natural distribution, number, and interaction of native species within the WSA may be allowed. Permanent wildlife facilities that meet this exception should be limited to:

A. Structures or installations built for the benefit of threatened, endangered, or candidate species if they are determined essential to species conservation and recovery; or

B. Structures or facilities built to restore or compensate for habitat that was lost or deteriorated from modern human influence.

iii. Except where meeting these requirements would jeopardize the recovery of a threatened, endangered, or candidate species, in addition to meeting either ii.A or ii.B. immediately above (i.e. meeting an exception to the non-impairment standard), wildlife-related permanent facilities that may be allowed by the BLM must:

A. be necessary because a determination has been made that alternative sites outside the WSA or nonstructural alternatives will not adequately protect or enhance wilderness characteristics,

B. be substantially unnoticeable,

C. not have a permanent negative impact on habitat in the WSA,

D. not create a cumulative negative impact to the vicinity's natural appearance through its proximity to other pre-existing facilities in the WSA, and

E. not require regular vehicle use for access and/or maintenance (the authorizing document must describe how the project will be maintained and monitored without regular vehicle access; existing primitive routes may be used for access in WSAs as long as such use is consistent with the non-impairment standard and the applicable travel management plan).

iv. Unless the primary benefitting species is threatened, endangered, or a candidate for listing, the BLM generally will deny any wildlife water project for which evidence of the loss of historic natural water sources cannot be produced.

At a minimum, the EA or EIS for any proposed new guzzler or other water capture and delivery structure or installation must address the following:

- the number and locations of historic natural water sources within the WSA,

BLM MANUAL

Rel. No. 6-134
7/13/2012

BLM_0018175

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-40

- the reasons these historic natural water sources have been lost or are not available to the native species,

- why the native species within the WSA are unable to sustain a natural distribution, number, and interaction through natural processes or to maintain a natural balance with their habitat due to the loss of historic natural water sources, and

- why the construction of guzzlers is a more desirable alternative than restoration of historic natural water sources.

d. <u>Other habitat modifications.</u>  Other changes to habitat, such as altering vegetation, are covered elsewhere.  See section 1.6.D.8 of this manual.

e. <u>Stocking, gathering, and transplanting fish & wildlife.</u>  For the purposes of this section we use the following definitions:

- <u>Native species</u> (defined in Executive Order 13112): with respect to a particular ecosystem, a species that, other than as the result of introduction, currently occurs or historically occurred in that ecosystem.

- <u>Non-native species</u> (defined as "alien species" in Executive Order 13112): with respect to a particular ecosystem, any species, including its seeds, eggs, spores, or other biological material capable of propagating that species, that is not native to that ecosystem.

- <u>Stocking</u>: releasing a fish species.

- <u>Gathering</u>: collecting some or all individuals of a species and removing them from the WSA.

- <u>Transplanting</u>: removal, reintroduction, or supplemental introduction of terrestrial wildlife species.

i. If the species in question is federally listed as threatened or endangered, the authority for these actions rests with the U.S. Fish and Wildlife Service or the National Oceanic and Atmospheric Administration National Marine Fisheries Service and with the States.  For non-listed species, these activities typically are carried out by the State fish and wildlife management agencies, which are generally responsible for determining the type, number, and distribution of wildlife involved in these practices.  The BLM is responsible for analyzing activities that could degrade wilderness characteristics to determine whether or not they would satisfy the non-impairment criteria.  Close communication and coordination between the BLM and State fish and wildlife management agencies is required on all issues regarding stocking, gathering, and transplanting fish and wildlife.

BLM_0018176

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-41

ii. Stocking of native fish species may be permitted within the former historical range of the species.  Where non-native species were being stocked before October 21, 1976 (or prior to the designation date for Section 202 WSAs not reported to Congress) such stocking may continue.  The purpose of stocking is to reestablish or maintain a native species (or non-native species introduced prior to 1976, or prior to the designation date for Section 202 WSAs not reported to Congress) adversely affected by human influence.

iii. Gathering native species (not federally listed as threatened or endangered) for relocation may be permitted as long as the non-impairment criteria are met and the gather would not create risk that the species could go into decline.  This includes the use of temporary enclosures used in the gather. The BLM is responsible for the analysis and approval of any proposed surface disturbing activities or construction of structures or facilities associated with the gather.

iv. For a gather of federally listed threatened or endangered species, the non-impairment criteria may be waived under the requirements of the Endangered Species Act.

v. Transplanting will be limited to the historical range of the species unless introduction is needed to prevent extinction or is essential for recovery.  The historical range of the species is determined based on best available information in coordination with the State wildlife management agency. The non-impairment analysis (see section 1.6.E of this manual) should consider effects on naturalness, including the effects on habitat and native species in the WSA.

vi. State and Federal agencies may use temporary enclosures and installations to transplant wildlife as long as the non-impairment criteria are met.  The BLM is responsible for the analysis and approval of any proposed associated surface disturbing activities or structure or facility construction.  In rare instances, permanent enclosures and related installations may be built for the benefit of threatened, endangered, or candidate species if alternative sites outside the WSA cannot be located for such construction. (See also D.11.c.)

vii. The BLM will prohibit, to extent practicable and permitted by Federal law, the introduction of any non-native species into WSAs.  Exceptions to this may be made for threatened or endangered species or the rare circumstances where the BLM determines that the benefits from an introduction of a non-native species clearly outweigh the potential harm--for example, biological controls to eradicate non-native plants.  To the extent practicable and permitted by Federal law, the BLM will prevent non-native species

BLM_0018177

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-42

introduced elsewhere from becoming established in WSAs. As noted above, it is important for the BLM to coordinate and communicate with the State fish and wildlife agency on the prevention of non-native species introduction.

f.   Removal of non-native species. Except for those species stocked prior to October 21, 1976 (or prior to the designation date for Section 202 WSAs not reported to Congress), the BLM will remove, to the extent practicable and permitted by Federal law, any non-native fish or wildlife species from WSAs, unless the BLM finds removal of the non-native species would impair the WSA and its native species—for example, non-native vegetation providing critical habitat to a threatened or endangered species. It is recognized that some non-native plant or animal species are so well-established as to make eradication not feasible.

g.   Predator or other wildlife damage control.

i.   Agency action—which will be coordinated with the U.S. Department of Agriculture's Animal and Plant Health Inspection Service-Wildlife Services—to control predators (or other native wildlife) in WSAs should be undertaken only:

A.   to prevent transmission of diseases or parasites affecting human health or safety;

B.   to prevent transmission of diseases or parasites affecting other native wildlife;

C.   to protect domestic livestock within the WSA; or

D.   to enhance recovery of federally listed threatened or endangered species.

These actions may be taken by the U.S. Department of Agriculture's Animal and Plant Health Inspection Service-Wildlife Services, the BLM, or delegated to a State agency. See BLM Manual 6830—Animal Damage Control.

ii.   Predator control activities must be directed at the specific offending animal or group of animals. Such activities should be carried out so as to minimize impacts to the wilderness characteristics of the WSA (including the natural interaction of native species).

iii.   Nonnative, domestic, and feral animals maybe killed, hunted, or otherwise controlled by Federal and State agencies to protect wilderness character.

iv.   Acceptable control measures include lethal and nonlethal methods. Criteria for choosing a particular method include need, location, environmental

BLM_0018178

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-43

conditions, the preservation of wilderness characteristics, and applicable Federal and State laws. Use only the minimum amount of control necessary to solve the problem.

h. <u>Insect and disease control.</u> Native insect and disease control activities will be allowed only to the extent that they meet the non-impairment criteria or one of the exceptions. When specific insects and diseases are documented to be non-native or introduced organisms, then it may be reasonable to consider whether the protection and enhancement of wilderness characteristics exception to the non-impairment standard applies.

E. <u>Evaluation of Proposed Actions.</u>

1. **Uses or facilities subject to the WSA Management Manual**

All uses or facilities proposed on public lands within WSAs are subject to the review requirements of the WSA Management Manual.

When conducting NEPA for projects outside of WSAs, any impacts to WSAs should be included in the NEPA analysis. On land managed by the BLM outside a WSA, actions to protect or mitigate impacts to the WSA's wilderness characteristics may vary depending on the type of development proposed.

a. For actions that are proposed on public lands adjacent to a WSA the NEPA document for the proposed action should consider impacts on the WSA. Impacts to the WSA should be mitigated to the extent consistent with best management practices and applicable law. For example, constraints consistent with standard terms and conditions of drilling permits may be used, including: relocation of operations of up to 200 meters; prohibition of new surface disturbance for up to 60 days in any lease year; and modification of the facility design (such as requiring low-profile equipment, engine mufflers, or specific paint colors).

All uses or facilities proposed on public lands within or adjacent to WSAs are also subject to the applicable RMP. It is important to review the RMP at the same time as the WSA Management Manual when considering a project.

2. **Review requirements**

All proposals subject to the WSA Management Manual must be evaluated consistent with implementing regulations, policy, and guidance using the NEPA process provided in H-1790-1. Compliance with NEPA may include use of the following: EA, EIS, DNA, or, under rare circumstances, a categorical exclusion (CX). Applicable requirements of other legislation (such as the Endangered Species Act or the National Historic Preservation Act) should be reviewed at this time.

BLM_0018179

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-44

The use of a categorical exclusion (CX) for uses and facilities within WSAs is generally not allowed.  A CX can be considered only when all three of the following conditions are met and are specifically documented in the CX:

a. <u>the activity is listed in 43 CFR 46.210; and</u>

b. <u>no extraordinary circumstances listed in 43 CFR 46.215 apply; and</u>

c. <u>the activity clearly satisfies the non-impairment criteria.</u>

In the case of emergency, the BLM may immediately take any action necessary to prevent or reduce risk to public health or safety, property, or important resources (43 CFR 46.210).  Actions thereafter, including restoration, require NEPA analysis and may not be categorically excluded.

3. **Procedures for evaluation of proposed actions subject to the WSA Management Manual**

   a. <u>Step 1—Review of wilderness characteristics.</u>  Upon receipt of a proposal, and before beginning any evaluation of a proposed action within a WSA, review the wilderness characteristics identified for the WSA through its inventory.  There are some key phrases in the definition of wilderness characteristics that will assist in understanding how a specific proposal may or may not comply with the non-impairment standard:

      i. <u>Size</u>:  A roadless area of contiguous public lands that "has at least 5,000 acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition."

      ii. <u>Naturalness</u>:  An area that "generally appears to have been affected primarily by the forces of nature, with the imprints of man's work substantially unnoticeable."

      iii. <u>Outstanding opportunities</u>:  An area that "has outstanding opportunities for solitude or a primitive and unconfined type of recreation."

      iv. <u>Supplemental values</u>:  An area that may contain "ecological, geological, or other features of scientific, educational, scenic, or historical value."  Threatened, endangered, and candidate species (such as sage grouse) should be considered supplemental values.

   b. <u>Step 2 - Review improvements to the area's wilderness characteristics.</u>

      i. Since the time of designation, the BLM may have acquired inholdings, removed evidence of human activity, or made changes that improve an area's outstanding opportunities for solitude or primitive and unconfined recreation.  These changes need to be recorded in the permanent WSA file,

BLM_0018180

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-45

and the proposal must be evaluated for the effect it would have on the current wilderness characteristics conditions.

ii. Discoveries that have occurred after the designation of the WSA may meet the criteria of being a supplemental value (e.g. paleontological resources recently discovered in the WSA), see Step 1(iv). These values should be recorded in the permanent WSA file as they are identified. The new value should be included in the description of the affected environment in any subsequent NEPA analysis.

c. <u>Step 3 – Notify the public.</u>

i. All offices should notify interested parties of proposed actions on WSAs within their jurisdiction. Notification is normally made when the purpose and need for a proposal is defined. The notification does not require the solicitation of scoping responses, though any substantive responses from the public, either solicited or not, should be incorporated into the development of the NEPA documents. If appropriate, such notifications should be sent directly to the interested parties. Notifications should be sent early enough to provide recipients sufficient time to inform the BLM of their concerns prior to the BLM's development of the NEPA analysis.

ii. The notice should include a map and enough information for the recipient to understand the purpose, location, nature, size, and proposed implementation date of the proposed action.

d. <u>Step 4 - Evaluate whether the use or facility will meet the non-impairment standard, i.e. is temporary and non-surface disturbing.</u>

Provide written documentation of whether the proposal meets the non-impairment criteria found in section 1.6.C.1, and what impacts it will have on wilderness characteristics. Written documentation must be recorded in the NEPA analysis and decision documents. If the proposal does not meet the criteria, the BLM field officials will work with applicants to bring the proposal into compliance with the non-impairment criteria if possible.

e. <u>Step 5 - Consider exceptions to the non-impairment standard.</u>

Consider whether the proposal is covered by one of the exceptions to the non-impairment standard (see section 1.6.C.2 and applicable resource-specific guidance in section 1.6.D). A finding that a proposal meets an exception to the non-impairment standard will be documented and recorded in the NEPA analysis and decision documents.

f. <u>Step 6 - Write the NEPA analysis.</u>

BLM_0018181

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-46

Field offices must evaluate whether a proposal meets the non-impairment standard or an exception (Steps 4 or 5). This finding will be recorded in any applicable NEPA analysis. If a proposal is adequately analyzed in an existing NEPA document, a Determination of NEPA Adequacy (DNA) worksheet may be completed to document the adequacy of the existing NEPA analysis. In addition to compliance with NEPA, CEQ regulations, DOI NEPA regulations, and the BLM NEPA Handbook H-1790-1, any specific evaluation requirements located in section 1.6.D of this manual should be addressed in the NEPA analysis. To adequately analyze the wilderness resource, the following must also be included:

i. Purpose and need for the action. The purpose and need statement should explain why the BLM is proposing the action in a WSA, in addition to meeting NEPA requirements for a "purpose and need" statement.

ii. A precise description of the proposal and its alternatives. A reasonable range of alternatives, including alternative approaches to accomplishing the same management objectives, must be analyzed in the NEPA document, including alternative sites both inside and outside the WSA. Alternatives must be described with the same level of detail as the proposed action, and include references to the particular needs of managing a WSA, including:

- Exact location and proposed time of the action.

- Design specifications, if applicable, including size, color, and materials.

- Construction methods, including machinery, equipment, or vehicles to be used.

- Miles, square feet, or acres of soil and vegetation disturbance.

- Maintenance schedules, techniques, procedures, and required access.

- Connected actions, such as other actions the proposal may trigger, proposals that will not proceed unless other actions are taken previously or simultaneously, or if the proposal is a part of a larger action.

    In the case of temporary facilities, a description of how and when the facility will be removed, and how the purpose and need would be resolved under those circumstances.

iii. Compliance requirements of any other applicable laws, such as the Endangered Species Act or the National Historic Preservation Act.

iv. A description of the affected environment, considering both the specific site and the WSA in its entirety, including:

BLM MANUAL

Rel. No. 6-134
7/13/2012

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-47

- Wilderness characteristics as documented in the intensive inventory report, Wilderness Study Report, or newly identified changes to those characteristics. The characteristics the proposal may affect must be described in detail.

- Any exception to the non-impairment standard that applies to the proposal (for example, if the proposal addresses an activity related to a VER, describe the extent of the VER)

v. Written assessment of potential impacts to the affected environment, from the proposal and all alternatives, including direct and indirect effects and cumulative effects as applicable, including but not necessarily limited to effects to:

- Wilderness Characteristics.  Describe the impact to the area's size, naturalness, outstanding opportunities, and supplemental values.

  o Will this proposal or its alternatives negatively or positively affect the wilderness characteristics of the WSA or a portion of the WSA?

  o Non-impairment.  Will the proposal or its alternatives produce an aggregate negative effect upon the area's wilderness characteristics and values that would constrain Congress's decision to designate the area as wilderness?

    ▪ Describe the degree of impairment that would be caused by each alternative.

      ▫ Would the proposal or alternatives result in an area reduced in size below the minimum threshold?

      ▫ Discuss how the proposal or alternatives would be considered substantially unnoticeable.  Consider the impacts of existing, as well as proposed and future projects on the condition of being substantially unnoticeable.

      ▫ Would the proposal or alternatives result in a change in the quality of opportunities for solitude or primitive and unconfined types of recreation?

    ▪ Conclude whether implementation of the proposed project or alternatives will or will not conform to the non-impairment criteria.  If the affects will be impairing, describe how the proposed project and alternatives are (or are not) exceptions to the non-impairment criteria described in section 1.6.C.2 and as further described in section 1.6.D.

BLM_0018183

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-48

g. <u>Step 7 - Public comment.</u>

The BLM will provide an appropriate comment for interested parties prior to signing a decision on all EAs or EISs involving WSAs, except when it is not possible to do so because of emergency conditions or other regulatory timeframes, e.g., 43 CFR 3802.  If public response indicates more time is required, the approval period may be extended, depending upon the situation and at the discretion of the authorized officer.

h. <u>Step 8 - Decision/record keeping.</u>

The decision to allow or deny the proposed action and whether the action complies with the WSA Management Manual or with the 3802 regulations (for those actions covered under these regulations), must be included in the decision document and recorded in the WSA permanent documentation file.

In addition to the required inventory and WSA information, the WSA file should contain a copy of all NEPA documents pertaining to the WSA since the date of establishment.  In unusual cases, the WSA file may contain a summary and cross-reference to other case files.  The cross-reference will include the following information:

- The WSA name and number.

- A brief description of the proposed use or facility.

- An accurate map of the proposal.

- A description of action taken and authorized uses and facilities (i.e. approved, disapproved, pending). A description of uses and facilities believed to be unauthorized.

- A cross-reference to the pertinent case files, decision rationale, bonding determination, documentation required in section 1.6.B. and the name of the staff member handling the case.

- Comments on problems encountered.

- Chronology of events.

- Restoration schedule.

- Evaluation of restoration efforts.

- Current status of the proposal or investigation.

- Future planned actions.

BLM_0018184

BLM Manual 6330—Management of BLM Wilderness Study Areas

1-49

All subsequent compliance, noncompliance and follow-up actions must be documented in the WSA case file.

1.7. **File and Records Maintenance.** The BLM must maintain a permanent documentation file for each WSA.

1.8. **Data Standards.** All offices must utilize the NLCS data standards when developing, amending, or maintaining electronic wilderness geographic datasets. NLCS data standards will be compatible with BLM corporate data standards such as those for the Geographic Coordinate Database, Land Status System (LR2000 etc), and the Recreation Management Information System.

BLM_0018185

# Glossary of Terms

### -C-

*Cross-country.* Travel that is not on existing access routes (ways, primitive routes, trails, boundary roads).

### -E-

*Edgeholding.* Land owned or managed by an entity other than a wilderness-managing agency that is contiguous with, but not completely surrounded by, the designated WSA boundary.  See also "Inholding."  Parcels touching a WSA only at a corner are not edgeholdings.

### -F-

*Facility.* Any building, structure, site improvement, element, or pedestrian route or vehicular way.  The term facility generally includes things like toilets, picnic tables, fences, grills, etc.

### -G-

*"Grandfathered" uses.* Grazing, mining, and mineral lease uses that existed on the date of approval of FLPMA (October 21, 1976) (or, for Legislative and Section 202 WSAs not reported to Congress, the date the WSA was designated).

### -I-

*Impair wilderness suitability.* To diminish an area's suitability for preservation as wilderness; violate the "non-impairment criteria" set forth in section 1.6.C of this manual.

*Inholding.* Land owned or managed by an entity other than the BLM that is completely surrounded by the WSA boundary.  If two or more contiguous parcels owned by different parties are completely surrounded by the WSA except for their common borders, each is considered an inholding.  See also "Edgeholding."

*Instant Study Area.* One of the 55 primitive and natural areas formally identified by the BLM through a final action published in the Federal Register before November 1, 1975.  FLPMA required an accelerated wilderness review of these Wilderness Study Areas.

### -L-

*Legislative Wilderness Study Area.* Any WSA designated by an Act of Congress.

### -M-

BLM MANUAL

Rel. No. 6-134
7/13/2012

BLM_0018186

*Mechanical transport.* Any vehicle, device, or contrivance for moving people or material in or over land, water, snow, ice, or air that has moving parts as essential components of the transport and that has wheels or otherwise applies a mechanical advantage, regardless of power source. "Mechanical transport" includes, but is not limited to: bicycles, game carts, wagons, and wheelbarrows.  It does not include devices that may provide mechanical advantage but are not used for transporting material over great distances (e.g., pulleys, pry bars, or winches), or for methods of transport where the mechanical advantage is from non-moving parts (e.g., travois), or is incidental to primary means of transport (e.g., ski bindings, horse bits, or oarlocks). Wheelchairs, or other mobility devices that meet the definition of "wheelchair" in the Americans With Disabilities Act, Section 508(c), are not prohibited in WSAs.

*Motor vehicle.* Any means of transportation over land, snow, or ice that is powered by a motor, engine, or other non-living power source.

-N-

*Native Species.* With respect to a particular ecosystem, a species that, other than as the result of introduction, currently occurs or historically occurred in that ecosystem. (Defined in Executive Order 13112):

*Non-Native Species.* With respect to a particular ecosystem, any species, including its seeds, eggs, spores, or other biological material capable of propagating that species, that is not native to that ecosystem. (Defined as "alien species" in Executive Order 13112)

-P-

*Permanent Fixed Anchor.* Climber's hardware requiring the alteration of the rock where the installation is to occur that is left behind when the climber leaves the WSA.

*Pre-FLPMA.* Before October 21, 1976, the date of enactment of the Federal Land Policy and Management Act.

*Primitive Route.* Any transportation linear feature located within a WSA or lands with wilderness characteristics designated for protection by a land use plan and not meeting the wilderness inventory road definition.  See also "way."

-R-

*Reclamation.* Regaining productivity, but not necessarily the area's natural biodiversity.

*Rehabilitation.* Intentionally recreating some, but not necessarily complete, species composition and structure that originally existed at the site.

*Restoration.* Reshaping topography to as close to the original contour as practicable, replacing topsoil, and recreating the native species composition, structure, and function of an ecosystem as close as possible to that which existed at the site prior to the disturbance.

BLM MANUAL                                                                          Rel. No. 6-134
                                                                                              7/13/2012

BLM_0018187

-S-

*Section 202 Wilderness Study Area.* An area inventoried, found to have wilderness characteristics, and managed to preserve those characteristics under authority of the land use planning direction found in section 202 of the Federal Land Policy and Management Act of 1976. Section 202 WSAs that were identified prior to 1993 were forwarded to Congress; those identified during or after 1993 were not.

*Section 603 Wilderness Study Area.* An area inventoried, found to have wilderness characteristics, and managed to preserve those characteristics under authority of the review of public lands required by section 603 of the Federal Land Policy and Management Act of 1976.

*Substantially Unnoticeable.* Either so insignificant as to be only a very minor feature of the overall area; or is not distinctly recognizable by the average visitor as being made or caused by humans.

*Surface Disturbance.* Any new disruption of the soil or vegetation that would require restoration to return to natural appearance or ecological function.

-T-

*Temporary Use.* A use or activity, needed for a defined time period to respond to a temporary need, that would be terminated prior to or upon wilderness designation.

-U-

*Unnecessary or Undue Degradation.* Surface disturbance greater than what would normally result when an activity is being accomplished by a prudent operator in usual, customary, and proficient operations of similar character, and taking into consideration the effects of operations on other resources and land uses, including those resources and uses outside the area of operations. Failure to initiate and complete reasonable mitigation measures, including reclamation of disturbed areas, or creation of a nuisance, may constitute unnecessary or undue degradation. Failure to comply with applicable environmental protection statutes and regulations constitutes unnecessary or undue degradation.

-V-

*Valid Existing Right.* Defined in Section 701 of FLPMA as any "valid lease, permit, patent, right-of-way, or other land use right or authorization" in existence at the passage of FLPMA or, for Legislative and Section 202 WSAs, the time of designation.

-W-

*Way.* A route maintained solely by the passage of vehicles, or which has not been improved and/or maintained by mechanical means to ensure relatively regular and continuous use. See also "primitive route."

BLM MANUAL                                                    Rel. No. 6-134
                                                               7/13/2012

BLM_0018188

*Wilderness Area.* An area formally designated by Congress as part of the National Wilderness Preservation System.

*Wilderness Characteristics.* The attributes enumerated in the "definition of wilderness" found in Section 2(c) of the Wilderness Act of 1964. The wilderness characteristics are the area's size, apparent naturalness, outstanding opportunities for solitude or primitive recreation, and any supplemental features or values present.

*Wilderness Inventory Road.* A route that has been "improved and maintained by mechanical means to insure relatively regular and continuous use. A way maintained solely by the passage of vehicles does not constitute a road." (Defined in House Report 94-1163.)

BLM_0018189

# United States Department of the Interior
# Bureau of Land Management

---

### Final Environmental Assessment
### DOI-BLM-CO-S050-2012-0001 EA

---

### August 2012

# Bowie Coal Lease Modification Application

---

### Uncompahgre Field Office
### 2465 South Townsend Avenue
### Montrose, CO 81401
### Phone: (970) 240-5300



BLM_0018190

# Table of Contents

PURPOSE AND NEED FOR THE PROPOSED ACTION ........................................................ 3
Proposed Action and alternatives .................................................................................... 4
   No Action Alternative .................................................................................................. 11
   Alternatives Considered but Eliminated from Detailed Analysis ............................... 11
SCOPING AND IDENTIFIED ISSUES ........................................................................... 14
PLAN CONFORMANCE REVIEW .................................................................................. 15
Affected Environment, Environmental Consequences, and Mitigation Measures ...................... 16
   AIR QUALITY ........................................................................................................... 18
   AREAS OF CRITICAL ENVIRONMENTAL CONCERN .................................... 36
   WILDERNESS ............................................................................................................ 36
   WILD AND SCENIC RIVERS ................................................................................. 38
   CULTURAL RESOURCES ....................................................................................... 38
   NATIVE AMERICAN RELIGIOUS CONCERNS ................................................. 39
   FARMLANDS, PRIME AND UNIQUE ................................................................... 39
   SOILS ......................................................................................................................... 40
   VEGETATION ............................................................................................................ 43
   INVASIVE, NON-NATIVE SPECIES ...................................................................... 45
   THREATENED, ENDANGERED, AND SENSITIVE SPECIES ............................ 47
   MIGRATORY AND OTHER BIRDS OF CONSERVATION CONCERN ............ 59
   WILDLIFE, TERRESTRIAL .................................................................................... 62
   WILDLIFE, AQUATIC .............................................................................................. 64
   WETLANDS AND RIPARIAN ZONES .................................................................. 65
   FLOODPLAINS ......................................................................................................... 66
   WATER QUALITY, SURFACE AND GROUND (includes a finding on Standard 5) ......... 67
   WASTES, HAZARDOUS OR SOLID ..................................................................... 70
   ENVIRONMENTAL JUSTICE ................................................................................ 71
   ACCESS AND TRANSPORTATION ....................................................................... 71
   REALTY AUTHORIZATIONS ................................................................................. 73
   WILDFIRE ................................................................................................................. 75
   HYDROLOGY/WATER RIGHTS ........................................................................... 75
   NOISE ......................................................................................................................... 77
   RECREATION ............................................................................................................ 77
   VISUAL RESOURCE MANAGEMENT .................................................................. 78
   GEOLOGY AND MINERALS .................................................................................. 80
   PALEONTOLOGY .................................................................................................... 83
   SOCIOECONOMICS ................................................................................................ 84
Cumulative Impacts ......................................................................................................... 86
PERSONS / AGENCIES CONSULTED ............................................................................ 95
INTERDISCIPLINARY REVIEW ................................................................................... 95
List of Acronyms and Abbreviations ............................................................................... 96
REFERENCES ................................................................................................................... 98

BLM_0018191

# List of Maps

Map 1        General Location Map ................................................................................ 2
Map 2        Detailed Project Location ......................................................................... 5
Map 3        Detailed Gob Vent Hole Locations........................................................... 6
Map 4        Bowie Coal Lease Modifications in Relation to Class I Airsheds...................... 25

# List of Figures

Figure 1      Typical Methane Pump ............................................................................ 10

# List of Tables

Table 1 Proposed Surface Disturbance ................................................................... 7
Table 2 Approved Seed Mixture for Use on BLM-Managed Public Lands ................... 8
Table 3 Standards for Public Land Health ............................................................ 16
Table 4 Environmental Assessment Resource Areas............................................... 18
Table 5  Ambient Air Quality Standards [1] ........................................................... 20
Table 6 Direct Criteria and GHG Emissions from Stationary and Mobile Sources (tpy) ............ 28
Table 7 Delta and Gunnison County Emissions Inventory (CDPHE, 2008)............................... 31
Table 8  Mesa County Emissions Inventory (tons), Total Emissions  (CDPHE, 2008)[1] .............. 31
Table 9   Western County Gaseous, Particulate, and Meteorological Monitors in Operation for 2010.............................................................................................................. 32
Table 10  Western County Monitored Particulate Matter Values for NAAQS ............................ 33
Table 12  Summary of Soil Resources within the Proposed Lease Modification Areas  and Affected by Proposed Lease Modification Activities.......................................... 41
Table 13 Vegetative Cover-types Present within Proposed Leases COC-37210 and COC-61209 .................................................................................................................. 44
Table 14 Federal Threatened, Endangered, or Candidate Species in Delta County .................... 48
Table 15 BLM Sensitive Species that May Be Present in or near the Proposed Lease Modification Areas ................................................................................................ 49
Table 16 Birds of Conservation Concern within BCR 16 ........................................................ 60
Table 17 Potential Subsidence Effects to WAPA Towers.......................................................... 74
Table 18 Water Rights Associated with the Project .................................................................. 76
Table 19 Stratigraphy of Proposed Leases.............................................................................. 80
Table 20 Anticipated Subsidence Values within the Proposed Leases......................................... 82
Table 21 Population by Category, 2000 and 2009, Delta County and the State of Colorado ...... 85

BLM_0018192

## List of Appendices

Appendix A    Coal Unsuitability Criteria

Appendix B    Informal Section 7 Consultation for Bowie Resources Underground Coal Mining Associated Surface Activities and Facilities

Appendix C    Geologic and Engineering Report (GER) and Maximum Economic Recovery Report (MER)

Appendix D    Example Calculations

BLM_0018193

**U.S. Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, CO 81401**

# ENVIRONMENTAL ASSESSMENT

NUMBER:   DOI-BLM-CO-SO50- 2012-0001

CASEFILE/PROJECT NUMBER:   COC-37210 and COC-61209

PROJECT NAME:   Bowie Coal Lease Modification

LEGAL DESCRIPTION:

 COC-61209 Modification
  Township 13 South, Range 91 West, 6th P.M.
  Section 5: SWNW, NWSW, SWSW, NESW, S/2NESENW, S/2SENW, S/2NWSENW, SWSWNE, S/2NWSWNE, W/2NWSE;
  Section 6: SENE; containing approximately 265.00 acres.

 COC-37210 Modification
  Township 13 South, Range 92 West, 6th P.M.
  Section 1: S/2NE, S/2NW, Lots 9 – 12; containing approximately 237.43 acres.

APPLICANT: Bowie Resources, LLC

**BACKGROUND/INTRODUCTION**

Currently, Bowie Resources, LLC (Bowie) operates the Bowie No. 2 mine which is an underground longwall coal mine located about 5 miles northeast of Paonia in Delta County, Colorado (see Map 1). Coal mining has been conducted in the North Fork Valley for more than 100 years. The Bowie No. 2 Mine has been in operation since November 1997 and is capable of producing approximately 5,000,000 tons of coal annually. The lease modifications would provide the opportunity for a logical extension of the Bowie B-Seam workings beyond the current mine plan.

The proposed lease modifications would add approximately 265 acres to lease COC-61209, and 237.43 acres to lease COC-37210, for a total of approximately 502.43 acres. Bowie applied for the two coal lease modifications, which are immediately adjacent to their existing federal coal leases at the Bowie No. 2 mine, so that they can continue to mine and sell compliant and super-compliant coal. Bowie holds approximately 11,228 federal lease acres and approximately 1,696 acres of fee coal that are covered by approximately 14,543 acres in the combined permits of the Bowie No. 1 and No. 2 Mines accessed by the Bowie No. 2 mine. The lease modifications are located on lands in which the Bureau of Land Management (BLM) manages a portion of the surface (174 acres on COC-61209), and all of the mineral estate (COC-37210 and COC-61209).

BLM_0018194



**Map 1**

**General Location of the Bowie Coal Lease Modification (COC-61209 and COC-37210)**

No warranty is made by the Bureau of Land Management for use of the data for purposes not intended by the BLM

10   0   10   20
Miles

N

3

BLM_0018195

The BLM is required, by law, to consider leasing federally-owned minerals for economic recovery. Although the decision to lease these lands is a necessary requisite for mining, that decision is not the enabling action that will allow mining. On-going management of the existing leases, permitting of associated mining and surface activities follows the Surface Mining Control and Reclamation Act of 1977 (SMCRA) implementing regulations at 43 C.F.R. § 3400, and 30 C.F.R. § 700 (respectively), and the State of Colorado Coal regulations. Leasing conveys rights to the mineral resource; however, leasing does not authorize coal mining. Subsequent permitting actions would be required to allow mining and/or change the approved mine permit boundary to include the modification area. These permitting actions fall with the purview of the State of Colorado, Division of Reclamation Mining and Safety (DRMS) under procedures set forth in 30 C.F.R. § 700, et. seq. and the regulations of the Colorado Mined Land Reclamation Board for Coal Mining. These changes may also require approval from the U.S. Department of the Interior (USDI) through the Office of Surface Mining Reclamation and Enforcement (OSM).

The OSM has agreed to cooperate in preparing this EA. In addition, OSM has jurisdiction in recommending approval or disapproval of any mining plan that might result from BLM's leasing decision. The BLM, though, must concur with the OSM recommendation to the Assistant Secretary concerning the mining plan submitted to OSM by a successful bidder (lessee).

Federal coal lease holders in Colorado must submit a permit revision application to DRMS for proposed expansions of existing mines that covers mining and reclamation on federal lands. DRMS reviews the package to ensure that the permit application complies with the permitting requirements and that the coal mining operation would meet the State's performance standards. OSM, BLM, and other federal agencies also review the application to ensure it contains the necessary information for compliance with the coal lease, the Mineral Leasing Act (MLA), the National Environmental Policy Act (NEPA) and other applicable federal laws and regulations. If the application complies, DRMS issues a permit to conduct coal mining operations. When needed, OSM recommends approval, approval with conditions, or disapproval of the mining plan to the Assistant Secretary of the Interior, Land and Mineral Management. Prior to mining plan approval, OSM obtains input from BLM (for the mineral estate) and the federal land management agency.

The extraction of the coal resources is established by the MLA of 1920, as amended by the Federal Coal Leasing Amendments Act (FCLAA) of 1976 and the Federal Land Policy and Management Act (FLPMA) of 1976. Modifying the leases would let Bowie lengthen three longwall panels, which would allow the coal to be mined. Should the leases not be modified and the longwall panels not be lengthened, it would become economically unviable and technically infeasible to mine the federal coal within the lease modification areas in the future resulting in a bypass of the federal coal resource.

## PURPOSE AND NEED FOR THE PROPOSED ACTION

Bowie submitted a request on July 11, 2011 seeking to modify two existing federal coal leases for BLM mineral estate located adjacent to the currently operating Bowie No. 2 Mine.

The BLM purpose is to decide whether to accept the coal lease modification proposals as applied for by Bowie, reject the applications, or modify the proposed lease modifications.

3

The BLM need is to respond to a request to modify an existing lease in accordance with the NEPA, the MLA, as amended by the FCLAA of 1976, and the FLPMA of 1976.

## PROPOSED ACTION AND ALTERNATIVES

The Proposed Action is to issue two federal coal lease modifications. The proposed lease modifications would add approximately 502.43 acres to existing coal leases COC-37210 (237.43 acres) and COC-61209 (265 acres) under the direction of the Energy Policy Act of 2005. The lease modifications would allow Bowie to continue operations by providing a logical extension to the mine's current B-Seam workings. Bowie is currently mining the first of nine longwall panels west of Terror Creek (see Map 2). The longwall panels run in a north-south direction. Following the nine longwall panels, Bowie plans to mine four longwall panels, which run in an east-west direction. The four east-west panels are located north of the nine north-south panels. The lease modifications would allow three of the four east-west longwall panels to be lengthened by a total of nearly 8,000 feet. Without the lease modifications, approximately 8,000 feet of longwall coal would be permanently by-passed. Therefore, the modifications avoid bypassing approximately 3.25 million enhanced recoverable tons (1.20 million on existing leases and 2.05 million on the modification tracts (see Appendix C, GER/MER)). The lease modifications would not generate any additional exploration activities.

Under the Proposed Action, the life of the current mine would be extended by approximately one year. Pillars would be left in place in gateroads and bleeders and full extraction of coal would occur in the longwall block. A typical belt conveyor would be used for transportation of the coal to the surface.

Gob vent boreholes (GVBs) would be located on the modification tracts. GVBs would ventilate potentially explosive gases from the mine in order to provide a safe environment for miners working underground. Venting of the potentially explosive gases for the safety of the miners is the overriding consideration. Under the Proposed Action, no measures for capture and use or conversion of the Coal Mine Methane (CMM) have been identified (see discussion *infra*, Alternatives Considered but Eliminated from Detailed Analysis).

If BLM issues the federal coal lease modifications, Bowie would need to construct pads and roads to four GVB sites (see Map 3) on the proposed lease modification tracts. One pad would have a second directional hole drilled from it to avoid construction of an additional pad thus resulting in four pads and five holes. A single GVB pad and hole (GVB-B19A) on existing lease COC-61209 would also be required as a result of Bowie obtaining the lease modification tracts; therefore, requirements for GVBs on the modification tracts come to a total of five pads and six holes. Any and all of the proposed GVB pads and holes would be submitted by Bowie as part of mine plan revisions in the future and would receive site-specific agency review and would be approved as part of mine plan revisions.

BLM_0018197



**Map 2**

**Detailed Location of the**

**Bowie Coal Lease Modification**

Legend

- Proposed Lease Modifications
- Existing Lease COC-61209
- Existing Lease COC-37210
- Existing DRMS Permit Boundary
- Bureau of Land Management
- Pillars - Completed
- Pillars - Proposed
- Conveyor
- GVB Pad Locations

No warranty is made by the Bureau of Land Management
for use of the data for purposes not intended by the BLM

6,000        0        6,000
Feet

N

5

BLM_0018198



### Map 3

**Detailed Location of the**

**Gob Vent Holes**

**Bowie Coal Lease Modification**

No warranty is made by the Bureau of Land Management
for use of the data for purposes not intended by the BLM

7

BLM_0018199

GVBs are utilized as a mine methane drainage technique. Prior to mining, vertical and directional holes are drilled from the surface to within a short distance above a longwall panel. Typically, the GVBs do not produce methane gas in any quantity until after the longwall face has mined past the boreholes and the overburden has collapsed to form highly fractured rocky material, or gob. The GVBs become conduits through which methane released into the gob exhausts to the surface before it can inundate the essential ventilation air courses in the mine. Surface disturbance would be temporary and would be approximately 16.6 acres for GVBs, associated temporary drill pads, and light-use roads (see Table 1).

**Table 1**
**Proposed Surface Disturbance**

| Gob Vent Bore Hole No. | Surface Ownership/ Existing Lease or Lease Modification | Improved Existing Road (Feet) | New Road (Feet) | Drill Pad (Acres) [2] |
|---|---|---|---|---|
| GVB-B19A | BLM / Existing | 2,265 | 415 | 0.92 |
| GVB-B19B and GVB-B20B (Directional) | BLM / Modification | 1,245 | 260 | 0.92 |
| GVB- B19C | Private / Existing | 0 | 1,095 | 0.92 |
| GVB-B20A | BLM / Modification | 1,720 | 300 | 0.92 |
| GVB–B20C | Private / Existing | 0 | 155 | 0.92 |
| GVB-B21A [1] | Private / Existing | 0 | 230 | 0.92 |
| GVB-B21B [1] | Private / Existing | 1,075 | 405 | 0.92 |
| GVB-B21C [1] | Private / Existing | 1,267 | 0 | 0.92 |
| GVB-B22A [1] | Private / Modification | 0 | 0 [3] | 0.92 |
| GVB-B22B [1] | Private / Modification | 1,665 | 0 | 0.92 |
| GVB-B22C [1] | Private / Existing | 2,405 | 0 | 0.92 |
| **Total** | | **11,642 3.2 acres** | **2,860 3.3 acres** | **10.1** |

[1] Water for drilling would be hauled using the Stevens Gulch road maintained by Delta County, which is approximately 15,000 feet long. No improvements are planned.
[2] Following construction, mud pits would be reclaimed shortly after drilling.
[3] There is an existing 160-foot road to GVB-B22A, which would not need to be upgraded.

Access to the GVBs would be from improved jeep trails or new roads. The work required to improve the roads would include widening, smoothing the surface, and in some cases reducing steep grades. GVB-B22A is on the edge of the private property owner's access road. The short stretch of access road (160 feet) would not need to be reconditioned. It is assumed there would

7

BLM_0018200

be a 12-foot wide incremental disturbance to improve existing roads (i.e., jeep trails). The total additional disturbance for the improved existing roads would be 3.2 acres.

New roads would be constructed to handle drill rigs, crews, and support equipment. Because of the potential for cut and fill slopes, it is assumed there would be a 50-foot wide disturbance for new roads. The total disturbance from new roads would be approximately 3.3 acres. The drill rig would be a truck mounted DR24 type capable of both rotary and core drilling. Supporting that rig would be a flatbed supply truck, a 3,000-gallon water truck, when needed, two crew trucks for transportation, and an E-log truck which would run digital logs for each hole.

The following design and reclamation features would apply to access roads:

- New roads and other linear facilities would be located and constructed to follow the contour of the landform or to mimic lines in the vegetation (avoiding straight roads and steep slopes).
- Road beds would be a maximum of 12 feet wide.
- Cutting and filling, and crowning and ditching, of temporary roads would be kept to the minimum necessary.
- Interim reclamation would include seeding the disturbed surface of the roads with the approved seed mixture or cover crop approved by BLM in order to reduce the amount of bare ground created during construction and drilling activities.
- After there is no longer a need for mine ventilation (1 to 3 years from the time construction is completed), the new road segments would be reclaimed to their original contour and rough texture in order to match the "texture" of the surrounding landscape, and revegetated in accordance with BLM direction using a BLM-approved seed mix (see Table 2).

**Table 2**
**Approved Seed Mixture for Use on BLM-Managed Public Lands**

| Name (Variety) | Species | Pounds per acre |
|---|---|---|
| Western Wheatgrass (Arriba) | *Pascopyrum smithii* | 0.96 |
| Slender Wheatgrass (San Luis) | *Elymus trachycaulum* | 0.66 |
| Mountain Brome (Bromar) | *Bromus marginatus* | 1.50 |
| Big Bluegrass (Sherman) | *Poa ampla* | 0.18 |
| Bottlebrush Squirreltail | *Elymus elymoides* | 0.96 |
| Canada Wildrye | *Elymus canadensis* | 0.94 |
| American Vetch | *Vicia Americana* | 0.60 |
| Rocky Mountain Penstemon | *Penstemon strictus* | 0.09 |
| Western Yarrow | *Achillea lanulosa* | 0.06 |
| **Total** | | **5.95 (double rate for broadcasting)** |

BLM_0018201

The following design features would apply to drill pads:

- Drill pads would be approximately 0.92 acre in size (200 feet by 200 feet).
- Construction of each pad would proceed by first selectively clearing brush/vegetation, removing the topsoil and stockpiling it for use in later reclamation, and leveling the subsoil to form a flat pad.
- Drill pads would be designed to prevent or diminish overland flow from entering the site during precipitation events. Pad sites would have berms on all downslope portions and pads would be sloped to drain all spills and site precipitation into the mud pits.
- Impermeable ground cloths would be used under the drill rigs and petroleum product containers to contain minor petroleum leaks. Refueling of equipment would not occur within 100 feet of waterbodies. In the unlikely event of a petroleum spill, it would be contained and cleaned up using standard hazmat procedures. The spill would also be reported to the BLM authorized hazardous material coordinator.
- Light shields would be installed to minimize fugitive light and ensure a dark sky condition during nighttime drilling activities.
- Reserve (mud) pits would be constructed on the prepared pads and lined with a plastic liner. The mud pits would be small, generally 10 feet wide by 40 feet long by 10 feet deep. Biodegradable synthetic polymer drilling fluids or bentonite would be used and would be contained in the reserve pits until dry. If necessary, pits would be pumped out to reduce their content and insure that overflow does not occur. Pumped fluids would be hauled to a State-approved facility for disposal. Once the pits are dry, the pit liner would be removed (as much as possible) and disposed in the trash. The pit would then be filled with reserved soil.
- 

The following would apply to water delivery to drill pads:

- Water would be hauled to GVB-B21A, B21B, B21C, B22A, B22B, and B22C, using the Stevens Gulch Road, which is an existing road.
- Water would be pumped to GVB-B19A, B19B, B20A, and B20B from a point just upstream of the confluence of East and West Terror Creeks. A self-contained pump would be placed in a sheet metal trough capable of containing the full volume of the engine oil and fuel supply used for the pump in case of a leak. Two- to three-inch high-pressure pipelines would be laid alongside the existing, upgraded and new roads. This would reduce the use of water trucks, and, therefore, potential sediment caused by fugitive dust and increased road maintenance requirements.
- Pumping would occur as outlined in the February 21, 2012 informal section 7 consultation for the Bowie Resources Underground Coal Mining Associated Surface Activities and Facilities. Conservation measures 2-5 contained in Appendix A to the consultation provide specific direction on pumping-related activities. This consultation can be found in Appendix B to this EA.
- Cofferdams made of heavy duty plastic would be used to pool water where pump intakes would be located. The cofferdams and pump intakes would be screened using ¼ inch or finer mesh to preclude fish from passing through. Further, the low pumping rate would reduce the chances that any fish would be held against the screen while a pump is operating.

BLM_0018202

- As water is required for drilling activities, a call on Bowie's water rights would be made and water would be continually released into East Terror Creek at a rate equal to or greater than the amount of water being consumed.

All of the GVBs would be drilled at approximately the same time over a period of a few weeks before mining each longwall panel. During the time the longwall panel beneath the GVBs is being mined, and for approximately 1 year after the completion of mining, the GVB pump would require weekly inspection and maintenance. Figure 1 provides a photo of a typical methane pump.



**Figure 1**
**Typical Methane Pump**

The operating size of each pad would be approximately 0.92 acre. The following design features apply to the GVB pads:
- Generally level areas would be chosen for pad locations in order to minimize the need for cutting and filling.
- Natural or artificial features, such as topography, vegetation, or artificial berms, would be used in order to help screen drill pads.
- Topsoil and soil from the pad site would be stockpiled for reclamation. Topsoil would be stockpiled separately from other soil horizons.
- Pads would be totally reclaimed after underground mining activities are completed,

BLM_0018203

longwall panels are sealed, and there is no longer a need for mine ventilation (1 to 3 years from the time construction is completed).

- During reclamation, drill pads would be recontoured back to their original contours and rough texture or to a natural looking contour that blends with the surrounding topography.
- Topsoil that was stockpiled would be spread over the surface of the reclamation area, and any areas of compacted surface would be mechanically ripped in order to loosen the soil.
- A BLM-approved seed mix (see Table 2) would be used for reclamation of BLM-managed lands.
- Reclaimed areas would be monitored annually until they are considered successful. (Reclamation would be considered "successful" when evidence of surface erosion is no greater than in adjacent undisturbed areas, and when natural, perennial plant cover has achieved a density of 75 percent of the pre-disturbance canopy cover.)

GVB abandonment would follow BLM and state guidelines. Holes would be sealed using cement or other approved sealant from the bottom of the hole to within three feet of the surface. Drill cuttings may be mixed with the sealant. The surface casing would be cut off below the ground surface. That portion of the hole between the seal and the reclaimed ground surface would be filled with dirt, drill cuttings, or both to minimize hazards to animals or humans. Hole locations would be marked with a four-foot (minimum) steel roof bolt or a T-shaped fence post.

The mining on the existing leases and proposed lease modification tracts would be short term, lasting approximately 3 years. Due to the economic limitations of this short-term operation, the Proposed Action would include venting methane gas directly into the atmosphere via GVBs and the mine ventilation system (see discussion *infra*, Alternatives Considered but Eliminated from Detailed Analysis).

**No Action Alternative**

In accordance with NEPA and the Council of Environmental Quality (CEQ) regulations, which require that a No Action Alternative be presented in all environmental analyses in order to serve as a "baseline" or "benchmark" from which to compare all proposed "action" alternatives, this EA analyzes a No Action Alternative.

Under the No Action Alternative, the two coal lease modifications would not be approved. As a result, federal coal reserves within the applied for tracts would not be recovered and would, therefore, be bypassed. Production at the Bowie No. 2 Mine would eventually cease once coal reserves under existing leases were mined. Under the No Action Alternative, there would be no surface disturbance, ventilation of explosive gases, removal of coal, or any other impacts associated with the activities described under the Proposed Action within the two proposed coal lease modification areas.

**Alternatives Considered but Eliminated from Detailed Analysis**

If an alternative is considered during the environmental analysis process, but the agency decides not to analyze the alternative in detail, the agency must identify those alternatives and briefly explain why they were eliminated from detailed analysis (40 C.F.R. § 1502.14). An alternative may be eliminated from detailed analysis if:

BLM_0018204

- it is ineffective (does not respond to the Purpose and Need for the Proposed Action);

- it is technically or economically infeasible (considering whether implementation of the alternative is likely, given past and current practice and technology);

- it is inconsistent with the basic policy objectives for the management of the area [such as, not in conformance with the Resource Management Plan (RMP)];

- its implementation is remote or speculative;

- it is substantially similar in design to an alternative that is analyzed; and/or

- it would result in substantially similar impacts to an alternative that is analyzed.

Alternatives specific to this EA that were considered, but that will not be analyzed in detail, are discussed below.

**Coal Mine Methane (CMM) and Gob Vent Gas (GVG) Capture**

An alternative analyzing the capture of CMM and GVG was considered; however, the alternative was not carried through the entire analysis process. The alternative was eliminated from detailed analysis due to the environmental impacts associated with methane capture as well as the economic infeasibility associated with the infrastructure required.

On November 28, 2011, Bowie provided BLM with a report (Vessels Coal Gas Inc., 2011) evaluating the technical and economic feasibility to capture CMM and GVG. Vessels Coal Gas, Inc. (VCG), working for Bowie, evaluated the technical capability and potential for uses of methane recovered from the Bowie No. 2 Mine. VCG is a Denver based company, developing and operating coal mine methane producing properties in the Rocky Mountain and Appalachian coal basins. VCG currently operates a coal mine methane recovery property in Cambria County, Pennsylvania that came on production in May of 2008. VCG installed an electrical generation unit on the same plant site. VCG is also currently developing a similar project in Colorado on the Sanborn Creek Mine in Gunnison County, Colorado. The Sanborn Creek property will initially utilize the coal mine methane as a fuel for electrical generation. This electrical generation and methane destruction facility will also use methane from the active Elk Creek Mine. In the November 2011 report, VGC concluded that the current conditions at the Bowie No. 2 mine make methane capture technologies economically unfeasible.

Methane released to the atmosphere from the Bowie No. 2 Mine activity has two principal avenues:

- High volume circulation of ventilation air through the underground mining access corridors that is subsequently exhausted to atmosphere; and
- GVBs drilled from surface to locations immediately above the longwall panels that are used to remove methane released during the mining of longwall panels for the safety of the mine workers.

---

BLM_0018205

The following is a discussion of the options related to CMM and GVG capture for the Bowie No. 2 Mine.

- **Ventilation Air Methane (VAM)**. This is the methane gathered in the mine ventilation air in substantially diluted amounts as the air is circulated in high volumes throughout the underground mine then exhausted to the atmosphere using large fans. The expulsion of the diluted methane helps ensure a safe working condition for the miners. The VAM may be released at one or more locations for mine air exhaust.

- **Gob Vent Gas -** Prior to mining, vertical and directional holes (GVBs) are drilled from the surface to within a short distance above a longwall panel. Typically, the GVBs do not produce GVG in any quantity until after the longwall face has mined past the boreholes and the overburden has collapsed to form highly fractured rocky material, or gob. The GVBs become conduits through which methane exhausts to the surface before it can inundate the essential ventilation air courses in the mine.

  - Gases exhausted from GVBs, have a higher concentration of methane than that contained in VAM, which presents the opportunity for conversion of the energy from the methane to fire engines and flares using conventional combustion process technology.
  - To the extent that electric and or process heat loads are available, relatively low capital cost equipment, as compared to that required for energy capture from VAM, can be utilized.
    - The geographic location of the proposed new longwall panels are too far from the existing Bowie surface facilities to provide ready access for GVG to be made available for either electric or natural gas markets or to utilize process heat loads. The following were noted in Exhibit E to the report:

While the BLM does not analyze methane capture in the alternatives carried forward in this EA, nothing in this document prevents Bowie from voluntarily implementing a methane capture project in the future if it is determined to be feasible and all needed permits are acquired.

**Reduce Potential Greenhouse Gas Emissions through Methane Flaring**

An alternative analyzing the flaring of CMM was also considered and eliminated from detailed analysis. Any proposed flaring system intended for use at a coal mine in the United States would need to be approved by the Mine Safety and Health Administration (MSHA). MSHA has a process in place to analyze the safety aspects of a proposed design and would conduct a thorough review of the proposed flaring system in order to establish the requirements for the system. It is not likely that a thorough review and approval would occur prior to the development and operation of the mine expansion. To date, MSHA has not approved a flaring system for a coal mine in the Western U.S. MSHA has authorized a flaring system for Solvay's underground trona mine near Green River, Wyoming. This degasification system was commissioned in August 2010 and is currently in operation. Trona mines have similar characteristics to underground coal mines in terms of their methane gas production and mining techniques. However, trona is a non-combustible ore, while coal is highly combustible. Because of the

BLM_0018206

combustibility of coal, and associated concerns for miner safety, the flaring system in use at Solvay cannot be considered for an underground coal mine.

Additionally, flaring of methane can result in the release of other air pollutants, including $NO_2$ and carbon monoxide, which are criteria pollutants.  The following was considered related to methane flaring:

- o  To reduce methane emissions from the GVG conventional flaring technology could be used to destroy the methane.
  - ▪  Production of methane for flaring would only be approximately 80% of the time for 5 to 6 months. Exhibit B to the report provides a summary of GVB flow and methane concentration data.
- o  The report concludes that based on current GVG volumes that a gathering system and flare project would not be economical to pursue and that in order to approach a return on investment, the GVG volumes would need to increase by an approximate 7 times factor. Gathering system costs would then increase with higher volumes as larger pipe sizes would be required and a larger enclosed flare would be required.

Due to the VGC finding that methane flaring would not be economically feasible, and the increased potential for environmental impacts, the methane flaring alternative was not considered a viable alternative for Bowie, and was eliminated from detailed analysis.  While the BLM does not analyze methane flaring in the alternatives carried forward in this EA, nothing in this document prevents Bowie from voluntarily implementing a methane flaring project in the future if it is determined to be feasible and all needed permits are acquired.

## SCOPING AND IDENTIFIED ISSUES

Public comments were solicited via a letter, dated October 3, 2011, that was mailed to the appropriate agencies, specific interested parties, and to the general public.  The scoping notice was also posted on the BLM Uncompahgre Field Office (UFO) website.  Public comments were received through November 7, 2011. All comment letters were reviewed and considered in the development of the EA.

A total of 47 comment letters were received during the public comment period.  The following is a summary of those comments and responses:

- • *39 of the comments were in support of the project based upon: 1) benefit to the local economy; 2) the national need for energy; 3) current lease expansion guidelines and enhanced coal recovery; and 4) no anticipated significant impacts to wildlife populations.* These items are discussed as appropriate in the EA.
- • *One comment asked that the BLM demonstrate that there is no competitive interest in the lands or coal deposits.*  BLM processes lease modifications per appropriate regulations. The proposed modifications are non-competitive by regulation.
- • *Some comments raised the issue of methane release from the GVBs. These comments asked that the impacts to global climate change resulting from the release of methane from mine ventilation systems and GVBs be analyzed in the environmental analysis*

14

BLM_0018207

*process. These comments also asked that methane recovery or flaring systems be employed in order to mitigate the potential impacts of methane release to global climate change.* The EA analyzes impacts related to methane releases, climate change, and appropriate mitigation to identified impacts.

- *One comment suggested that the magnitude of potential impacts warranted the production of an EIS, rather than an EA.* The BLM has followed appropriate NEPA regulations, policy, and manuals in the development of a NEPA document in response to the lease modifications. The BLM concluded that an EA rather than an EIS is the appropriate type of NEPA review for these lease modifications.

- *The Fish and Wildlife service addressed special status species and their habitats in the project area, recommending avoidance of impacts, and raised special concern regarding impacts to greenback and cutthroat trout. A Section 7 Consultation was recommended. Additionally, a recommendation was made to minimize impacts to migratory birds, including nesting raptors.* BLM has followed appropriate agency procedures to consult with the U.S. Fish and Wildlife Service to address special status species and their habitats in the development of the EA.

- *The Office of Surface Mining made one comment requesting to be listed as a cooperating agency.* OSM is now a cooperating agency on this EA.

- *One comment asked the BLM to address cumulative impacts to the endangered Colorado pikeminnow and razorback sucker in the Gunnison River.* The EA addresses the species.

- *One comment stated that impacts to waters and wetlands could require a permit from the U.S. Army Corps of Engineers.* BLM would follow agency procedures related to waters of the United States and wetlands. No impacts to surface waters or wetlands are proposed for the lease modification areas.

## PLAN CONFORMANCE REVIEW

The Proposed Action is subject to, and has been reviewed for, conformance with the BLM Unsuitability Criteria for coal leasing (see Appendix A), and with the following RMP (43 CFR 1610.5-3, 1617.3):

Name of Plan:   Uncompahgre Basin RMP
Date Approved:  July 26, 1989, as amended

Decision Number/Page:  Management Unit 7, pg. 21, and Management Unit 9, pg. 22.

Decision Language:  Management Unit 7:  "The management unit will be managed for both existing and potential coal development.  Development of existing coal leases will continue and non-leased federal coal will be identified as acceptable for further coal leasing consideration with a minimum of multiple-use restrictions.  Activities and land uses that are consistent with maintaining existing coal operations and the potential for coal development will be permitted."

Management Unit 9:  "The management unit will be managed to restore and enhance riparian vegetation along 48 miles of streams."  "Coal development will be considered on a site-specific basis after consultation with affected entities and formulation of mitigating measures." The Proposed Action is consistent with current land management planning.

BLM_0018208

**Other Related NEPA Documents:**

This EA tiers to the 2000, USDA FS and BLM. Environmental Impact Statement for the Iron Point Exploration License, the Iron Point Coal Lease Tract and the Elk Creek Coal Lease Tract (North Fork Coal EIS, FS and BLM, 2000).  The 2000 North Fork Coal EIS analyzed the issuance of lease COC-61209, and referenced the existing lease COC-37210 in its analysis.  The air quality modeling and analysis included in the 2000 North Fork Coal EIS (pages 3-3 to 3-17 and Appendix M) are used in the air quality analysis in this EA.

**Standards for Public Land Health**

In January of 1997, the Colorado BLM approved the Standards for Public Land Health (see Table 3). These standards describe conditions needed in order to sustain public land health in relation to all uses of public lands. A finding for each Standard has been made in the Affected Environment, Environmental Consequences, and Mitigation Measures section of this EA.

**Table 3**
**Standards for Public Land Health**

| Standard | Definition/Statement |
|---|---|
| Standard 1 Upland Soils | Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface run-off. |
| Standard 2 Riparian Systems | Riparian systems associated with both running and standing water function properly and have the ability to recover from major surface disturbance, such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat, and bio-diversity. Water quality is improved or maintained. Stable soils store and release water slowly. |
| Standard 3 Plant and Animal Communities | Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes. |
| Standard 4 Threatened and Endangered Species | Special status, threatened and endangered species (federal and state), and other plants and animals, and their habitats, officially designated by the BLM, are maintained or enhanced by sustaining healthy, native plant and animal communities. |
| Standard 5 Water Quality | The water quality of all water bodies, including groundwater where applicable, located on or influenced by BLM-managed public lands will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under state law as found in (5 CCR 1002-8), as required by Section 303I of the Clean Water Act. |

# AFFECTED ENVIRONMENT, ENVIRONMENTAL CONSEQUENCES, AND MITIGATION MEASURES

This section describes the human and natural environmental resources that could be affected by the Proposed Action and presents comparative analyses of the direct and indirect effects on the

BLM_0018209

environment.  A description of the past, present, and reasonably foreseeable actions is at the end of this section, including the cumulative impacts analysis of each element.

**Environmental Impact Analysis**

Within each resource area, when applicable, definitions of the types of impacts are included in the evaluation of potential environmental impacts. Comparison of impacts is intended to provide an impartial assessment to help inform the decision-maker and the public. The impact analysis does not imply or assign a value or numerical ranking to impacts. Actions resulting in adverse impacts to one resource may impart a beneficial impact to other resources. In general, adverse impacts described in this chapter are considered important if they result from, or relate to, the implementation of any of the alternatives. These impacts are defined as follows:

- Direct impacts – Impacts that are caused by the action, and that occur at the same time and in the same general location as the action.

- Indirect impacts – Impacts that occur at a different time or in a different location than the action to which the impacts are related.

- Short or long-term impacts – When applicable, the short-term or long-term aspects of impacts are described. For the purposes of this EA, short-term impacts occur during or after the activity or action and may continue for up to 2 years. Long-term impacts occur beyond the first 2 years.

Elements specified by statue, regulation, executive order, other resources, or the Standards for Public Land Health are described and analyzed in this section. Table 4 lists the elements considered in this section; those that could be impacted are brought forward for analysis. Any element not affected by the Proposed Action or no action alternative will not be analyzed in this document; the reasons for no impact will be stated. Environmental impact analysis was based upon available data and literature from state and federal agencies, peer-review scientific literature, and resource studies conducted in the proposed lease modification areas.

There are no Areas of Critical Environmental Concern (ACECs), Wilderness Areas, Lands with Wilderness Characteristics, Prime or Unique Farmlands, Native American Religious Concerns, or Floodplains within the lease modification areas.  In addition, other resources that are present, but would not be impacted, and, therefore, not brought forward for analysis include: Range Management and Forest Management. In terms of Range Management, there are no managed grazing leases within the proposed lease modification areas. In terms of Forest Management, the area is not managed as forest.

BLM_0018210

**Table 4**
**Environmental Assessment Resource Areas**

| Element | Not Applicable or Not Present | Present, but No Impact | Applicable and Present; Brought Forward for Analysis |
|---|---|---|---|
| Air Quality | | | X |
| ACEC | X | | |
| Wilderness | X | | |
| Lands with Wilderness Characteristics | X | | |
| Wild and Scenic Rivers | | | X |
| Cultural Resources | | | X |
| Native American Religious Concerns | X | | |
| Farmlands, Prime/Unique | X | | |
| Soils | | | X |
| Vegetation | | | X |
| Invasive, Non-native Species | | | X |
| Threatened and Endangered Species | | | X |
| Migratory Birds | | | X |
| Wildlife, Terrestrial | | | X |
| Wildlife, Aquatic | | | X |
| Wetlands and Riparian Zones | | | X |
| Floodplains | X | | |
| Water Quality, Surface and Ground | | | X |
| Wastes, Hazardous or Solid | | | X |
| Environmental Justice | | X | |
| Access | | | X |
| Transportation | | | X |
| Cadastral Survey | X | | |
| Realty Authorizations | | | X |
| Range Management | | X | |
| Forest Management | | X | |
| Wildfire | | | X |
| Hydrology/Water Rights | | | X |
| Noise | | | X |
| Recreation | | | X |
| Visual Resources | | | X |
| Geology and Minerals | | | X |
| Paleontology | | | X |
| Law Enforcement | X | | |
| Socio-Economics | | | X |

## AIR QUALITY

### Affected Environment

Paonia, Colorado is located in the North Fork Gunnison River Valley and rests at approximately 5,682 feet above MSL. The area is rural with mountainous terrain. The normal temperatures (min and max) for the area range from 14.4 to 38.6 °F in January to 53.4 to 88.9 °F in July. The average annual precipitation amounts to approximately 14.02 inches, which according to historical records is relatively evenly distributed throughout the year. Average annual wind resultants are generally from the southeast at a speed of approximately 7.1 mph. The area enjoys sunshine for approximately 70 percent of the time and has an annual average sky cover of around 52 percent (Western Regional Climate Center, 2012).

BLM_0018211

Implementation of the Proposed Action would result in emissions of criteria pollutants, hazardous air pollutants (HAPs), and greenhouse gases (GHGs). Fugitive particulate matter would be emitted when drill rigs and other vehicles associated with the mining activities travel on existing dirt roads or overland access routes to GVB drilling locations. Emissions of particulate matter would be generated from processing equipment, material handling transfer points, storage piles, rail load-out locations, and mine ventilation shafts. Air quality would also continue to be impacted by fuel combustion sources, such as the engine exhaust emissions from locomotives, mobile material handling equipment, personnel transport equipment, and stationary internal combustion engines.

Air quality in the region, which is generally made up of smaller towns, usually located in fairly broad river valleys, is affected by multiple activities currently conducted within the area. The facility is located near the boundaries of Delta and Gunnison Counties, and so it is reasonable to conclude that indirect and cumulative effects for the area would be influenced in the near field by sources of emissions within each county's respective emissions inventory. Activities occurring within the region that affect air quality include stationary facilities such as coal mining and subsequent coal mining operations (e.g., loading), concrete mix plants, gravel pits, lime storage facilities, natural-gas fired electrical generating plants, natural gas dehydration facilities, landfills, etc. Portable source examples include facilities such as gravel crushers, associated processing equipment, and asphalt plants. Mobile sources of emissions within the region would include highway or on-road vehicles, and off-road vehicles such as construction-related equipment (dozers, loaders, backhoes, etc.) and recreational vehicles (snowmobiles, ATVs, and dirt bikes). Smoke from grass and forest fires represent area source emissions that can have an impact on air quality.

Regulatory Framework

The Clean Air Act (CAA), which was last amended in 1990, requires the Environmental Protection Agency (EPA) to set National Ambient Air Quality Standards (NAAQS) (40 CFR part 50) for criteria pollutants. Criteria pollutants are air contaminants that are commonly emitted from the majority of emissions sources and include carbon monoxide (CO), lead (Pb), sulfur dioxide ($SO_2$), particulate matter smaller than 10 & 2.5 microns ($PM_{10}$ & $PM_{2.5}$), ozone ($O_3$), and nitrogen dioxide ($NO_2$).

The CAA established 2 types of NAAQS:
*Primary standards:* – Primary standards set limits in order to protect public health, including the health of "sensitive" populations (such as asthmatics, children, and the elderly).
*Secondary standards:* – Secondary standards set limits in order to protect public welfare, including protection against decreased visibility, and damage to animals, crops, vegetation, and buildings.

The EPA regularly reviews the NAAQS (every five years) to ensure that the latest science on health effects, risk assessment, and observable data such as incidence rates are evaluated in order to re-propose any NAAQS to a lower limit if the data supports the finding.

The Colorado Air Pollution Control Commission, by means of an approved State Implementation Plan (SIP) and/or delegation by EPA, can establish state ambient air quality

BLM_0018212

standards for any criteria pollutant that is at least as stringent as, or more so, than the federal standards. Ambient air quality standards must not be exceeded in areas where the general public has access. Table 5 lists the federal and state ambient air quality standards.

**Table 5**
**Ambient Air Quality Standards [1]**

| Pollutant [final rule cite] | | Primary/ Secondary | Averaging Time | Level | Form |
|---|---|---|---|---|---|
| Carbon Monoxide [76 FR 54294, Aug 31, 2011] | | Primary | 8-hour | 9 ppm | Not to be exceeded more than once per year |
| | | | 1-hour | 35 ppm | |
| Lead [73 FR 66964, Nov 12, 2008] | | Primary and Secondary | Rolling 3-month average | 0.15 $\mu$g/m$^3$ [2] | Not to be exceeded |
| Nitrogen Dioxide [75 FR 6474, Feb 9, 2010] [61 FR 52852, Oct 8, 1996] | | Primary | 1-hour | 100 ppb | 98th percentile, averaged over 3 years |
| | | Primary and Secondary | Annual | 53 ppb [3] | Annual Mean |
| Ozone [73 FR 16436, Mar 27, 2008] | | Primary and Secondary | 8-hour | 0.075 ppm [4] | Annual fourth-highest daily maximum 8-hr concentration, averaged over 3 years |
| Particle Pollution [71 FR 61144, Oct. 17, 2006] | PM$_{2.5}$ | Primary and Secondary | Annual | 15 $\mu$g/m$^3$ | Annual mean, averaged over 3 years |
| | | | 24-hour | 35 $\mu$g/m$^3$ | 98th percentile, averaged over 3 years |
| | PM$_{10}$ | Primary and Secondary | 24-hour | 150 $\mu$g/m$^3$ | Not to be exceeded more than once per year on average over years |
| Sulfur Dioxide [75 FR 35520, Jun 22, 2010] [38 FR 25678, Sep 14, 1973] | | Primary | 1-hour | 75 ppb [5] | 99th percentile of 1-hour daily maximum concentrations, averaged over 3 years |
| | | Primary | Annual | 0.03 ppm [6] | Arithmetic Average |
| | | Secondary | 3-hour | 0.5 ppm | Not to be exceeded more than once per year |

(1) National Ambient Air Quality Standards (http://www.epa.gov/air/criteria.html)
(2) Final rule signed October 15, 2008. The 1978 lead standard (1.5 µg/m3 as a quarterly average) remains in effect until one year after an area is designated for the 2008 standard, except that in areas designated nonattainment for the 1978, the 1978 standard remains in effect until implementation plans to attain or maintain the 2008 standard are approved.
(3) The official level of the annual NO2 standard is 0.053 ppm, equal to 53 ppb, which is shown here for the purpose of clearer comparison to the 1-hour standard.
(4) Final rule signed March 12, 2008. The 1997 ozone standard (0.08 ppm, annual fourth-highest daily maximum 8-hour concentration, averaged over 3 years) and related implementation rules remain in place. In 1997, EPA revoked the 1-hour ozone standard (0.12 ppm, not to be exceeded more than once per year) in all areas, although some areas have continued obligations under that standard ("anti-backsliding"). The 1-hour ozone standard is attained when the expected number of days per calendar year with maximum hourly average concentrations above 0.12 ppm is less than or equal to 1.
(5) Final rule signed June 2, 2010. The 1971 annual and 24-hour SO2 standards were revoked in that same rulemaking. However, these standards remain in effect until one year after an area is designated for the 2010 standard, except in areas designated nonattainment for the 1971 standards, where the 1971 standards remain in effect until implementation plans to attain or maintain the 2010 standard are approved. (b) The 1997 standard—and the implementation rules for that standard—will remain in place for implementation purposes as EPA undertakes rulemaking to address the transition from the 1997 ozone standard to the 2008 ozone standard. (c) EPA is in the process of reconsidering these standards (set in March 2008).
(6) Colorado Primary Standard
NOTE: Air quality in the Delta and Gunnison County Air Sheds currently meets all NAAQS & CAAQS.

## Emissions Source Classifications and Regulatory Authority.

Emissions sources are generally regulated according to their type and classification. Essentially all emissions sources fall into two broad categories, stationary and mobile. Stationary sources are generally non-moving, fixed-site producers of pollution such as power plants, chemical plants, oil refineries, manufacturing facilities, and other industrial facilities. This source class

BLM_0018213

can also cover certain types of portable sources. Stationary facilities emit air pollutants via process vents or stacks (point sources) or by fugitive releases (emissions that do not pass through a process vent or stack). Stationary sources are also classified as major and minor. A major source is one that emits, or has the potential to emit, a regulated air pollutant in quantities above a defined threshold. Stationary sources that are not major are considered minor or area sources. A stationary source that takes federally-enforceable limits on production, consumptions rates, or emissions to avoid major source status are called synthetic minors. The Colorado Department of Health and Environment (CDPHE), Air Pollution Control Division (APCD) has authority under their approved SIP, or by EPA delegation, to regulate and issue Air Permits for stationary sources of pollution in Colorado.

Mobile sources include any air pollution that is emitted by motor vehicles, engines, and equipment that can be moved from one location to another (typically under their own power). Due to the large number of sources, which includes cars, trucks, buses, construction equipment, lawn and garden equipment, aircraft, watercraft, motorcycles, etc., and their ability to move from one location to another, mobile sources are regulated differently than stationary sources. In general EPA and other federal entities retain authority to set emissions standards for these sources depending on their type (on-road or off-road) and class (light duty, heavy duty, horse power rating, weight, fuel types, etc.). Mobile sources are not regulated by the state (an exception being California) unless they are covered under an applicable SIP specific to a non-attainment or maintenance area.

**Criteria Pollutants.**
Of all the criteria pollutants, only ground level ozone and secondary formation $PM_{2.5}$, also known as condensable particulate matter, are not directly emitted by emissions sources. Ozone is chemically formed in the atmosphere via interactions of oxides of nitrogen ($NO_X$) and volatile organic compounds (VOCs) in the presence of sunlight and under certain meteorological conditions ($NO_X$ and VOCs are Ozone precursors). Ozone formation and prediction is complex, generally results from a combination of significant quantities of VOCs and $NO_X$ emissions from various sources within a region, and has the potential to be transported across long ranges. Therefore, it is typically not appropriate to assess potential ozone impacts of a single project on potential regional ozone formation and transport. However, the State assesses potential ozone impacts from its authorizing activities on a regional basis when an adequate amount of data is available and where such analysis has been deemed appropriate. For this reason (inappropriate scale of analysis), ozone will not be further addressed in this document beyond the related precursor discussions.

The EPA defines $PM_{2.5}$ as particulate matter with an aerodynamic diameter less than or equal to 2.5 microns in size. According to the EPA, the chemical composition of $PM_{2.5}$ is characterized in terms of five major components that comprise the mass of pollutant. In the West, organic carbon (OC) is generally the largest estimated component of $PM_{2.5}$ by mass. Primary emissions of $PM_{2.5}$ are generally from combustion processes with fireplaces and woodstoves being important contributors to OC. A minority component of $PM_{2.5}$ is made up of crustal elements (i.e., fugitive dust). Secondary $PM_{2.5}$ will not be addressed in more detail than a general discussion of particulates due to the current lack of available technical methods and facility data

BLM_0018214

to apply such analysis (see EPA's March 23, 2010 guidance memorandum "Modeling Procedures for Demonstrating compliance with $PM_{2.5}$ NAAQS").

**Hazardous Air Pollutants.**
Toxic air pollutants, also known as hazardous air pollutants (HAPs), are those pollutants that are known or suspected to cause cancer or other serious health effects, such as reproductive effects or birth defects, or adverse environmental effects. The majority of HAPs originate from stationary sources (factories, refineries, power plants) and mobile sources (e.g., cars, trucks, buses), as well as indoor sources (building materials and cleaning solvents). No ambient air quality standards exist for HAPs, instead emissions of these pollutants are regulated by a variety of laws that target the specific source class and industrial sectors for stationary, mobile, and product use/formulations. The majority of HAPs emitted from Bowie's operations are the result of the on-road and non-road vehicle use.

**Green House Gases.** Gases that trap heat in the atmosphere are often called greenhouse gases, and include carbon dioxide ($CO_2$), methane (CH4), nitrous oxide (N2O), and several fluorinated species of gases such as hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. Carbon dioxide is emitted from the combustion of fossil fuels (oil, natural gas, and coal), solid waste, trees and wood products, and also as a result of other chemical reactions (e.g., manufacture of cement). Methane is emitted during the production and transport of coal, natural gas, and oil. Methane also results from livestock and other agricultural practices and by the decay of organic waste in municipal solid waste landfills. Nitrous oxide is emitted during agricultural and industrial activities, as well as during combustion of fossil fuels and solid waste. Fluorinated gases are powerful greenhouse gases that are emitted from a variety of industrial processes and are often used as substitutes for ozone-depleting substances (i.e., CFCs, HCFCs, and halons).
All of the different gases all have various capacities to trap heat in the atmosphere, which are known as global warming potentials (GWPs). Carbon dioxide has a GWP of 1, and so for the purposes of analysis a GHGs GWP is generally standardized to a carbon dioxide equivalent ($CO_2e$), or the equivalent amount of $CO_2$ mass the GHG would represent.

As with the HAPs, ambient air quality standards do not exist for GHGs. In its Endangerment and Cause or Contribute Findings for Greenhouse Gases under Section 202(a) of the Clean Air Act, the EPA determined that GHGs are air pollutants subject to regulation under the CAA. The most recent rules promulgated to regulate the emissions and the industries responsible are the Mandatory Reporting Rule (74 FR 56260) and the Tailoring Rule (70 FR 31514). Under EPA GHG Mandatory Reporting Rule, Underground Coal Mines subject to the rule are required to report emissions in accordance with the requirements of Subpart FF. Under the provisions of the Tailoring Rule (step 2 – July 2011) a facility would be subject to Prevention of Significant Deterioration (PSD) permitting if it has the potential to emit GHGs in excess of 100,000 tpy of $CO_2$ equivalent and 100/250 tpy of GHGs on a mass basis. For existing facilities this review would take place during any subsequent modifications to the facility (CDPHE's anticipated implementation strategy).

The EPA is also planning to develop stationary source GHG emissions reduction rules (New Source Performance Standards) that could mandate substantial reductions in U.S. greenhouse gas emissions. Alternatively, Congress may develop cap-and-trade legislation as another means to

BLM_0018215

reduce GHG emissions.  Consequently, a GHG emissions calculation for coal burned at a power plant is likely to be increasingly regulated in the near future. The first EPA regulation to limit emissions of GHGs imposed carbon dioxide emission standards on light-duty vehicles, including passenger cars and light trucks.  As of February 2011, the EPA had not set GHG emission standards for stationary sources (such as compressor stations); however, the EPA is gathering detailed GHG emission data from thousands of facilities throughout the U.S., and will use the data in order to develop an improved national GHG inventory, as well as to establish future GHG emission control regulations.

**Black Carbon.**  Black carbon is a by-product of incomplete combustion of fossil fuels, biofuels, and biomass.  It can be emitted when coal is burned, as well as through tailpipe emissions from engines that use diesel fuel (such as diesel trucks and locomotives).  Black carbon, therefore, is a likely by-product that will be emitted from haul trucks used during coal mining operations. Black carbon emissions from diesel tailpipe emissions are largely dependent upon the composition of the diesel fuel, and not upon the type of engine used.  Black carbon is an unregulated pollutant; however, the EPA does regulate diesel fuel quality, such that, in recent years diesel fuel quality has been improved.

Black carbon is not emitted from the coal when it is being mined, but is likely to occur when the coal is combusted.  Black carbon emissions associated with coal combustion occur at the facility where the coal is being burned, not where it is being mined. It is a component of the anthropogenic global warming phenomenon, and acts to warm the earth's atmosphere by reducing the ability to reflect sunlight (albedo).  It is the second highest contributor to global warming however; it is very short-lived, staying in the atmosphere only a few days to a few weeks.  This analysis did not quantify indirect emissions of black carbon associated with the coal's combustion because: the BLM does not have information regarding the facilities that may burn the coal (in order to produce electricity); and since power plant facilities have vast variations in structure and emission-control devices (which would, in turn, greatly affect the emissions associated with burning the coal); it is beyond the scope of the analysis; and most coal-fired power plants contain emission control devices (such as baghouses and cyclone separators) that would greatly reduce black carbon emissions; therefore it is highly unlikely that black carbon emissions from coal-fired power plants would be a significant issue, as those emissions would likely be deminimis (in accordance with the Clean Air Act).

The assumption is that as existing coal fired electric generators operate in accordance with regulatory and cost factors in effect in the future, they would continue to acquire coal supplies from national and international coal markets. Examining the options available to reduce GHG releases from burning coal is best applied at the place where the coal is consumed rather than at the sources of supply.

**Classes of Airsheds.**  Classes of airsheds (any geographical area that defines the class boundary) are categorized as either Attainment, an area where the air does not exceed NAAQS specified concentrations of a criteria pollutant, or Nonattainment, an area where the air does exceed NAAQS specified concentrations of a criteria pollutant.  Two additional subset categories of attainment exist for those areas where a formal designation has not been made, i.e., Attainment/Unclassifiable (generally rural, or natural areas), and for areas where previous

BLM_0018216

violations of the NAAQS have been documented, but pollution concentrations no longer exceed NAAQS concentrations, i.e., Attainment/Maintenance areas. Further, all geographical regions are assigned a priority Class (1, 2, or 3) which describes how much degradation to the existing air quality is allowed to occur within the area under the PSD permitting rules. Class I areas are areas of special national or regional natural, scenic, recreational, or historic value, and essentially allow very little degradation in air quality, while Class 2 areas allow for reasonable industrial/economic expansion. There are currently no Class 3 areas defined in Colorado. The closest Federal/State mandatory Class I areas located near the Proposed Action is the West Elk Wilderness Area (approximately 8 miles southeast), Maroon Bells-Snowmass (approximately 18 miles northeast), and the Black Canyon of the Gunnison National Park (approximately 21 miles south-southwest). Map 4 illustrates the location of these and other regional PSD Class I areas relative to the Bowie No. 2 Mine.

For an area that is in attainment for the NAAQS and CAAQS, the CAA provides specific criteria for stationary sources to allow for economic growth under the PSD permitting rules (40 CFR 52.21 or 40 CFR 51.166 for SIP approved Rules). Major PSD sources are required to provide an analysis to ensure their emissions in conjunction with other applicable emissions increases and decreases will not cause or contribute to a violation of any applicable NAAQS or PSD increment. A PSD increment is the amount of pollution an area is allowed to increase while preventing air quality in the airshed from deteriorating to the level set by the NAAQS. The NAAQS is a maximum allowable concentration "ceiling," while a PSD increment is the maximum allowable increase in concentration that is allowed to occur above a baseline concentration for a pollutant. The baseline concentration is defined for each pollutant and, in general, is defined as the ambient concentration existing at the time that the first complete PSD permit application affecting the area is submitted. Significant deterioration is said to occur when the amount of new pollution would exceed the applicable PSD increment. Under no circumstance can the air quality of the airshed deteriorate beyond the concentration allowed by the applicable NAAQS. In addition, the analysis required for permitting must include impacts to surface waters, soils, vegetation, and visibility (also known as air quality related values (AQRVs)) caused by any increase in emissions, and from associated growth. Associated growth is industrial, commercial, and residential growth that will occur in the area due to the source. Where a PSD source is located near a Class 1 airshed (within 50km) the AQRVs thresholds set by the applicable Class 1 controlling agency (Federal Land Manager) must be assessed to determine if an adverse impact on the area is likely to occur.

BLM_0018217



### Map 4

**Bowie Coal Lease Modifications**
**in Relation to**
**Class I Airsheds**

No warranty is made by the Bureau of Land Management
for use of the data for purposes not intended by the BLM

25

BLM_0018218

If a nonattainment designation takes effect for any criteria pollutant, the state will have three years to develop implementation plans outlining how areas will attain and maintain the NAAQS by reducing air pollutant emissions contributing to the violation. Further, any new major stationary source or major modification to a stationary source that emits a nonattainment pollutant in the designated area would be required to offset new or modified emissions sources in a ratio of greater than 1:1. Offset emission or emissions credits would be required to be obtained from within the designated nonattainment area.

## Environmental Consequences/Mitigation Measures
### Proposed Action
Emissions Inventory

The Proposed Action will produce direct and indirect emissions of the above-identified pollutants from both stationary and mobile sources at the facility. Production rates would not increase under the Proposed Action and therefore production emissions can reasonably be expected to be the same. No reasonably foreseeable increases in permitted emissions authorizations are anticipated by the implementation of the Proposed Action. As described in above, however, there will be four additional GVB pads constructed and five GVBs drilled as a direct result of the lease modifications. These are construction activities and not permitted by CDPHE, but their development will be a source of air emissions, and those emissions are quantified herein.

**Direct Emissions.**

With the exception of particulate matter (TSP & $PM_{10}$) all of the directly emitted criteria pollutants originating from the mine's operations are from fuel combustion sources, such as mobile mining equipment and stationary emergency generators. HAPs and GHGs are also emitted from fuel combustion sources, albeit in de minimis amounts. The overwhelming majority of the site's GHG emissions are the result of methane drainage systems that are installed to reduce the combustion potential of the mines underground atmosphere. The systems at the Bowie mine consist of ventilation air methane (VAM) and gob vent borehole (GVB) methane.

The majority of $PM_{10}$ emissions in the area are from miscellaneous sources, which are mainly fugitive dust sources rather than stack emissions or internal engine combustion sources. Fugitive emissions are those not caught by a capture system and are often due to equipment leaks, earth moving/quarrying, equipment and vehicles traveling on paved and unpaved roads, and windblown disturbances.

Stationary sources (including fugitive emissions) at the Bowie No. 2 mine are regulated by CDPHE and are authorized by multiple APCD permits. The permits establish limits for stationary and other regulated emissions sources which maintain emission rates below certain applicability thresholds, allowing the mine to be classified as a synthetic minor source under New Source Review and the Title V Operating Permit program, as well as a PSD minor source not subject to PSD permit requirements. Some stationary equipment at the site is covered by New Source Performance Standard (NSPS) subpart Y, which specifies emissions standards for coal preparation plants. Under the SIP PSD rules the site is covered under one of the 28 named source categories (AQCR 3, Part D, Section II.A.24.e) which requires inclusion of any fugitive

BLM_0018219

emissions related to the coal process operations in the site's potential to emit calculations for major source determination.  The latest revisions made to the permit were issued prior to the implementation of the SIP rules for GHG permitting, and therefore the permit does not cover GHG emissions (including methane) from the mine.  Stationary sources of direct emissions at the Bowie No. 2 Mine and within the lease area include the following:

- Material Processing Screens
- Material Processing Crushers
- Material Handling Conveyors
- Mine Ventilation
- Surface Operations (material handling, stockpiles)
- Coal Preparation
- Train Loading
- GVB Releases

Criteria pollutant emission rates, as permitted in CDPHE-APCD air quality permits 96DL103-1, 96DL103-6,  96DL103-7F,  98DL0726,  01DL0685,  03DL0099F,  03DL0596,  03DL0923F, 04DL0560, and 06DL1082F to which the Bowie No. 2 Mine is currently subject, are provided in Table 7.

HAP emissions from stationary sources are considered de minimis, and there are no permitted sources of HAPs.  HAP emissions are primarily emitted from on-road and nonroad mobile sources.

Mobile sources at the facility include underground mining equipment, listed under source classification code (SCC) 2270009010, and aboveground construction equipment identified under SCC 2270002000, as well as light duty gasoline trucks. The underground mining mobile sources are specialized, industry specific equipment designed to function in the unique environment of an underground mine, while the aboveground sources would be heavy construction equipment used for material handling, stockpile management, and drilling.

With respect to generating an emissions inventory for the mobile sources at the site, insufficient data was available to develop equipment specific, or fleet based emissions that would correspond to the authorized production rates.  A detailed analysis for each mobile source would have to be developed to include equipment specifications such as age, horse power, and the type of equipment, as well as operational parameters such as the hours per year each piece of equipment was used, or the exact amount of fuel the source consumed, the average loading factor, average work cycles per hour, vehicle miles travelled, etc.  The level of detail required to provide a speciated source specific emissions inventory for each mobile source at the Bowie No. 2 Mine is beyond the scope of the analysis required for this EA.

BLM_0018220

**Table 6**
**Direct Criteria and GHG Emissions from Stationary and Mobile Sources (tpy)**

| Stationary Sources | CDPHE-APDC Permit | Stationary $PM_{10}$ | Fugitive $PM_{10}$ | $PM_{2.5}$ | NMOG | CO | $NO_X$ | $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Screen | 96DL103-1 | 6.3 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Crusher | 96DL103-6 | 6.0 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Conveyor Transfer, Haul, Stockpiles | 96DL103-7F | 4.2 | 161.2 | NA | NA | NA | NA | NA | NA | NA | NA |
| Ventilation Shaft | 98DL0726 | 14 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Train Loading | 01DL0685 | 8.76 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Portal Development | 03DL0099F | NA | 39.7 | NA | NA | NA | NA | NA | NA | NA | NA |
| Coal Prep/Wash Plant | 03DL0596 | 8.8 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| GOB Handling | 03DL0923F | NA | 40 | NA | NA | NA | NA | NA | NA | NA | NA |
| Underground Conveyor | 04DL0560 | 0.04 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| GOB Pile Operations | 06DL1082F | 2.1 | 55 | NA | NA | NA | NA | NA | NA | NA | NA |
| Methane Sources | None | NA | NA | NA | NA | NA | NA | NA | ND | 24,905[3] | NA |
| **Mobile Sources[2]** | **SCC** | | $PM_{10}$ | $PM_{2.5}$ | NMOG | CO | $NO_X$ | $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ |
| Underground Mining Equipment | 2270009000 | | 6.82 | 6.62 | 10.46 | 40.38 | 47.97 | 0.65 | 3031.54 | 0.16 | 0.02 |
| Surface Mining Equipment | 2270002036 2270002051 2270002060 2270002069 2270002033 | | 1.79 | 1.73 | 2.18 | 11.55 | 24.68 | 0.39 | 1795.79 | 0.03 | 0.02 |
| Gasoline Trucks | LDGT | | 0.03 | 0.03 | 0.05 | 0.73 | 0.08 | 0.02 | 107.64 | NA | NA |
| **Total Direct Emissions (tons)** | | **50.2** | **304.54** | **8.38** | **12.69** | **52.66** | **72.73** | **1.06** | **4934.97** | **24905.2** | **0.04** |

[1]  All PM10 assumed to be PM2.5, site specific data is not known.
[2]  Mobile sources emissions are for exhaust only.
[3]  Reported in short tons.  The $CO_2e$ of the methane gas is approximately 474,464 metric tons.

BLM_0018221

To provide acceptable emissions estimates and to fully disclose expected direct emissions from the facilities mobile sources, BLM used the EPA's Nonroad model (2008a) to generate SCC specific emissions factors (grams per horsepower-hour) for the Delta and Gunnison County based equipment inventories for the year 2000. The year 2000 inventory was chosen to be reasonably conservative, with respect to the fleets overall state of control technology integration that would be expected to increase as the inventory equipment ages and is replaced with newer and better controlled sources. To estimate emissions from the sources, the analysis had to determine a reasonable thermal efficiency (TE) for the SCC groups in order to estimate the total horsepower-hours the annual fuel use would provide to the equipment. This was necessary because the emissions factors derived from the nonroad model already account for the overall TE of the equipment, as well as some of the other variables, such as deterioration factors, loading factors, etc. The $CO_2$ emission factor was used to estimate the TE because the model does not rely on a particular control technology, engine class, or equipment type for derivation, and instead calculates the $CO_2$ emissions rates based on the in-use brake specific fuel consumption (BSFC - reported as pounds of fuel per horsepower-hour), which is essentially static across all horsepower classes for all model years. Example TE and total horsepower-hour calculations and applicable references are provided in Appendix D along with the emissions estimate calculations for the data provided in Table 6.

For the light duty gasoline trucks (LDGT) the analysis used the corporate average fuel efficiency (CAFE) mileage standards for the model year (MY) 2004 to estimate total vehicle miles travelled (VMT) from the fuel use data that was provided by the mine. The VMT data was then multiplied by the pollutant specific emissions factors for MY 2004 LDGT to derive emissions. The 2004 factor was chosen to be conservative and to reflect the fact that gasoline engines do not last as long as typical diesel powered equipment used at similar rates. Example emissions estimates and applicable references are provided in Appendix D. Emissions estimates are provided in Table 6.

**Indirect Emissions.**
Electrical energy consumed at the site can reasonably be expected to produce emissions from the supplying source, unless that source is some form of renewable energy. It is possible to provide rough estimates of emissions from mine electricity consumption if the annual energy consumption and supplier data is known, however the consumption information is not available to the BLM at this time.

Train emissions from hauling the mined and processed coal were accurately quantified in the original EIS prepared for the mine and are discussed further below. The analysis tiers to the referenced EIS in support of the rail emissions discussion. Rail hauling emissions would continue under the Proposed Action.

Combustion of the mined and processed coal will produce all of the emissions outlined above. According to the U.S. Energy Information Administration (2009), nearly 94 percent of all coal consumed in the U.S. during 2009 was used in the generation of electric power. Bowie ships 95-98% of their coal to electric utilities with the remainder going to various manufacturing plants such as Coke and Cement. It would be possible to provide a quantification of criteria, GHG, and HAP emissions associated with the burning of the mined coal at a specific facility; however, the

BLM_0018222

types and location of the facilities the coal might be processed and consumed in is speculative and not foreseeable. The contractual agreements between the coal fired power plant and the coal supply company are outside the scope of this analysis, and the BLM does not determine at which facilities the coal is used. Different emissions control devices on a power plant could greatly affect the amount of criteria, HAP and GHG emissions that are released into the atmosphere. For example, a power plant that is equipped with selective catalytic reduction or practices $CO_2$ capture would ultimately release much smaller quantities of $NO_X$ and $CO_2$ than a power plant lacking such controls.

Even though the BLM cannot reasonably say where the coal is ultimately going to be burned, it is still possible to do emissions calculations to estimate the associated $CO_2$ emissions from the combustion of the coal. The specific information required, i.e., the number of tons of coal produced per year from the mine, and the heat content or carbon content of that coal in BTUs or % weight per ton, is known for the proposed lease modifications. However since the type of facility the coal might be processed in (i.e., the control efficiency of the facility) is speculative; calculations were made using average numbers for U.S. facilities. Therefore, the emissions calculation does not represent an accurate estimate of potential GHG emissions from this specific project. Assuming the Proposed Action would generate 5.0 million tons of high-quality low-sulfur supercompliant bituminous coal per year, with an average heat content of 24.2 million British thermal units (BTUs) per ton, nearly 12.12 million metric tons of carbon dioxide equivalent (CO2e) would be emitted. This amount represents 10.14 percent of all CO2e emissions in Colorado during 2007, 0.18 percent of all CO2e emissions in the U.S. during 2007, and 0.05 percent of global CO2 emissions during 2007 (CAIT-US, 2011). These calculations are based upon default emission factors for stationary combustion in the Energy Industries (IPCC, 2006), assuming no other use of the coal and complete total combustion, and therefore represent a highly conservative overestimate of potential GHG emissions.

Ultimately, any near or far field impacts associated with most of the indirect emissions sources identified above will ultimately receive analysis (and most likely permitting) from their respective regulatory agencies, so this action should not cause or contribute to the likeliness, frequency, or severity of any detrimental impacts at the respective sources.

<u>Air Quality Impacts</u>
The airshed in the Proposed Action area (Western Counties) is currently designated as attainment for all criteria pollutants. The attainment status for pollutants in the project area is determined by monitoring levels of criteria pollutants for which NAAQS and CAAQS apply. The attainment designation means that no violations of any ambient air quality standard have been documented in the area. The airshed around the Proposed Action area is also identified as a Class 2 airshed, which allows for reasonable economic growth. Table 7 below provides a listing of the most recently available air pollutant emissions inventory compiled by CDPHE for the Delta and Gunnison County emissions sources. Table 8 below provides air pollutant emissions totals from the greater-populated Mesa County as a regional comparison.

BLM_0018223

**Table 7**
**Delta and Gunnison County Emissions Inventory (CDPHE, 2008)**

| Source Type | Inventory Pollutants | | | | | | | | | | | |
| | CO | | NO₂ | | SO₂ | | PM₁₀ | | VOC | | BEN | |
| | Gunnison | Delta | Gunnison | Delta | Gunnison | Delta | Gunnison | Delta | Gunnison | Delta | Gunnison | Delta |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vehicles: | 3,830.83 | 5,027.39 | 537.35 | 745.32 | 3.95 | 5.80 | 21.50 | 30.95 | 365.69 | 461.62 | 11.49 | 14.53 |
| Road Dust: | ND | ND | ND | ND | ND | ND | 1,229.75 | 961.00 | ND | ND | ND | ND |
| Non-Road: | 2,097.71 | 1,206.47 | 275.42 | 248.62 | 0.84 | 0.77 | 39.32 | 27.57 | 664.81 | 270.94 | 16.57 | 7.22 |
| Wood burning: | 1,115.69 | 2,254.55 | 15.09 | 30.50 | 2.34 | 4.73 | 154.58 | 312.36 | 215.74 | 435.96 | 9.17 | 18.52 |
| Point Source: | 38.06 | 0.86 | 36.05 | 6.09 | 0.92 | 0.19 | 215.46 | 378.17 | 60.71 | 17.27 | 1.10 | 0.13 |
| Railroad: | 8.22 | 22.14 | 83.43 | 224.75 | 4.75 | 12.80 | 2.07 | 5.58 | 3.11 | 8.37 | 0.01 | 0.02 |
| Aircraft: | 121.58 | 288.03 | 4.17 | 1.56 | 0.48 | 0.24 | 2.33 | 5.67 | 9.39 | 27.07 | 0.22 | 0.65 |
| Forest/Ag. Fires: | 3,389.85 | 1,051.06 | 89.51 | 34.90 | 28.64 | 7.88 | 469.02 | 130.29 | 218.40 | 61.39 | 16.42 | 4.62 |
| Solvents: | ND | ND | ND | ND | ND | ND | ND | ND | 57.25 | 116.38 | ND | ND |
| Agricultural Tilling: | ND | ND | ND | ND | ND | ND | 0.79 | 270.88 | ND | ND | ND | ND |
| Structure Fires: | 0.93 | 1.91 | 0.02 | 0.04 | ND | ND | 0.17 | 0.34 | 0.17 | 0.35 | ND | ND |
| Surface Coating: | ND | ND | ND | ND | ND | ND | ND | ND | 52.22 | 89.46 | ND | ND |
| Restaurants: | 1.44 | 2.94 | 0.01 | 0.02 | 0.01 | 0.02 | 3.88 | 7.93 | 3.59 | 7.33 | 0.06 | 0.13 |
| Biogenic: | 2,681.08 | 2,040.81 | 192.99 | 232.53 | ND | ND | ND | ND | 20,474.30 | 16,546.90 | ND | ND |
| Oil Gas Point: | 131.56 | ND | 147.24 | ND | 0.07 | ND | 0.97 | ND | 84.79 | ND | 2.81 | ND |
| Oil Gas Area: | 23.23 | 4.97 | 20.36 | 0.11 | 0.44 | ND | 2.21 | 367.98 | 54.92 | 0.57 | ND | ND |
| Combustion: | 29.73 | 231.14 | 19.55 | 47.37 | 1.82 | 15.18 | 0.62 | 0.00 | 1.81 | 9.91 | 0.00 | 0.00 |
| Tank Trucks: | ND | ND | ND | ND | ND | ND | ND | ND | 0.29 | 0.33 | 0.00 | 0.00 |
| Refueling: | ND | ND | ND | ND | ND | ND | ND | ND | 10.77 | 14.55 | 0.11 | 0.15 |
| Portables: | ND | ND | ND | ND | ND | ND | ND | ND | 15.03 | 10.49 | 0.05 | 0.03 |
| Construction: | ND | ND | ND | ND | ND | ND | 400.97 | ND | ND | ND | ND | ND |
| Pesticides: | ND | ND | ND | ND | ND | ND | ND | ND | 13.48 | 27.52 | ND | ND |
| **Totals (tons):** | **13,469.91** | **12,132.27** | **1,421.20** | **1,571.84** | **44.28** | **47.61** | **2,543.65** | **2,498.73** | **22,306.46** | **18,106.41** | **58.01** | **46.00** |

ND = No Data

**Table 8**
**Mesa County Emissions Inventory (tons), Total Emissions  (CDPHE, 2008)[1]**

| CO | NO₂ | SO₂ | PM₁₀ | VOC | BEN |
|---|---|---|---|---|---|
| 40,688 | 9,048 | 2,879 | 8,050 | 39,828 | 161 |

[1] Provided for illustration purposes only.

BLM_0018224

**Pollutant Monitoring.**

Grand Junction is the only large city in the area, and the only location that monitors for CO and air toxics on the western slope. In 2008, Rifle, Palisade, and Cortez began monitoring for ozone. The other Western County locations monitor only for particulates. They are located in Delta, Durango, Parachute, and Telluride. Currently, there are four gaseous pollutant monitors and 11 particulate monitors in the Western Counties area (see Tables 9 and 10). There are one CO, three $O_3$, eight $PM_{10}$, and three $PM_{2.5}$ monitoring sites. $PM_{10}$ data have been collected in Colorado since 1985, however the samplers were modified in 1987 to conform to the requirements of the new standard. Therefore, available trend data is only valid back to 1987. Since 1988, the state has had at least one monitor exceed the level of the 24-hour $PM_{10}$ standard (150 µg/m) every year except 2004. Monitoring for $PM_{2.5}$ in Colorado began with the establishment of sites in Denver, Grand Junction, Steamboat Springs, Colorado Springs, Greeley, Fort Collins, Platteville, Boulder, Longmont, and Elbert County in 1999. Additional sites were established nearly every month until full implementation of the base network was achieved in July of 1999. In 2004, there were 20 $PM_{2.5}$ monitoring sites in Colorado. Thirteen of the 20 sites were selected based on the population of the metropolitan statistical areas. This is a federal selection criterion that was developed to protect the public health in the highest population centers. In addition, there were seven special-purpose monitoring (SPM) sites. These sites were selected due to historically elevated concentrations of $PM_{10}$ or because citizens or local governments had concerns of possible high $PM_{2.5}$ concentrations in their communities. All SPM sites were removed as of December 31, 2006 due to the low concentrations of $PM_{2.5}$ measured and a lack of funding.

**Table 9**
**Western County Gaseous, Particulate, and Meteorological Monitors in Operation for 2010**

| County | Location | CO | SO$_2$ | NO$_x$ | O$_3$ | PM$_{10}$ | PM$_{2.5}$ | Met |
|---|---|---|---|---|---|---|---|---|
| Delta | Delta - Health Dept 560 Dodge St. | | | | | X3 | | |
| | Rifle - Health Dept 195 W. 14th Ave. | | | | X | | | |
| Garfield | Rifle - Henry Building 144 E. 3 | | | | | X3 / H | H | |
| | Parachute - Elem. School 100 E. 2 | | | | | X3 | | |
| La Plata | Durango - River City Hall 1235 Camino del Rio | | | | | X3 | | |
| | Grand Junction - Pitkin  645¼ Pitkin Ave. | X | | | | H | | X |
| | Grand Junction - Powell 650 South Ave. | | | | | X3 | X3 / H | |
| Mesa | Palisade Water Treatment 865 Rapid Creek Rd. | | | | X | | | X |
| | Clifton - Hwy. 141 & D Rd. | | | | | X3 | | |
| Montezuma | Cortez - Health Dept 106 W. North Ave. | | | | X | | X6 | |
| San Miguel | Telluride - 333 W. Colorado Ave. | | | | | X3 | | |
| (Xn) – Filter Sample Continued; n=frequency in days, (H) – Hourly particulate | | | | | | | | |

BLM_0018225

**Table 10**
**Western County Monitored Particulate Matter Values for NAAQS**

| County | Location | PM$_{10}$ | | | PM$_{2.5}$ | |
|---|---|---|---|---|---|---|
| | | Annual[1] | 24 Hour | 3 Yr. Ave. Ex. | Annual | 24 Hour |
| Delta | Delta - Health Dept 560 Dodge St. | 23.4 | 125 | 0 | | |
| Garfield | Rifle - Henry Building 144 E. 3 | 25.5 | 59 | 0 | < 3 yrs Data | < 3 yrs Data |
| | Parachute - Elem. School 100 E. 2 | 22.5 | 125 | 0 | | |
| La Plata | Durango - River City Hall 1235 Camino del Rio | 24.8 | 320 | 6.1 | | |
| Mesa | Grand Junction - Pitkin 645¼ Pitkin Ave. | 26.8 | 171 | 1 | | |
| | Grand Junction - Powell 650 South Ave. | 22.9 | 155 | 0 | 9.3 | 34.5 |
| | Clifton - Hwy. 141 & D Rd. | 23 | 189 | 3 | | |
| Montezuma | Cortez - Health Dept 106 W. North Ave. | | | | < 3 yrs Data | < 3 yrs Data |
| San Miguel | Telluride - 333 W. Colorado Ave. | 19.9 | 354 | 3.1 | | |

[1] Annual standard rescinded

Because the Bowie No. 2 Mine is primarily a source of PM$_{10}$ emissions, only the recent monitoring data for particulate matter is shown below. The regional monitoring data for both ozone and carbon monoxide suggests the air quality at the monitored locations is easily attaining the national standards, and therefore was not included in the values table. More so than other pollutants, PM$_{10}$ is a localized pollutant where concentrations vary considerably. Thus, local averages and maximum concentrations of PM$_{10}$ are more meaningful than averages covering large regions or the entire state. The data below is presented for qualitative purposes only.

With respect to PM$_{2.5}$ the available monitoring data for the region suggests continued attainment of the standard. Because of the limited PM$_{2.5}$ emissions from the site, actual crustal element fractions verses assumed PM$_{10}$ equivalency, PM$_{2.5}$ emissions are not expected to pose any significant impacts to area air quality.

**Potential Impacts Analysis for Criteria Pollutants.**
A detailed air quality assessment, including modeling, of the Bowie No. 2 mine was conducted as part of the environmental analysis for the Iron Point Coal Lease Tract in 2000. (See North Fork Coal EIS, FS and BLM, 2000) In this Final EIS (FEIS), an air quality assessment was completed for the Bowie No. 2 mine, which is permitted by the State to produce up to 5.0 million tons of coal and coal-refuse annually. The Proposed Action analyzed in this EA is an expansion of the Bowie No. 2 mine. As stated previously, the Proposed Action is to continue mining operations into additional lease modification areas. That is, the action would not constitute adding additional production to previously authorized limits or increasing mining intensity.

The air quality analysis conducted for the 2000 North Fork Coal EIS included an emissions inventory and modeling analysis that covered all three active coal mines in the North Fork Valley (Bowie No. 2, Elk Creek, and West Elk) and other related emission sources. That emissions inventory quantified PM$_{10}$, NO$_X$, and SO$_2$ emissions. The modeling analysis also included a visibility impacts assessment in the West Elk Wilderness Area as well as an atmospheric deposition impacts assessment. Emissions that were calculated and modeled included tailpipe emissions from mining equipment, haul trucks, and locomotives (railway

BLM_0018226

emissions).  The results of that detailed impact assessment predicted no significant impacts to air
quality as a result of authorizing the mine.

The equipment used for the mine expansion will be the same equipment that is being used in the
current mining operations.  Therefore, the air quality impacts associated with the proposed mine
expansion can be presumed to be equal to, or less than, impacts predicted in the original air
quality impact assessment.   The air quality assessment for this EA tiers to that original
assessment.  Additionally, given the age of the original assessment, and the useful life of most of
the equipment, it can be reasonably expected that some of the equipment has been replaced by
newer models, which would have the effect of reducing equipment emissions based on the
regulatory requirements placed on newer nonroad engines.

As related to railway emissions, due to more stringent regulations since the North Fork Coal EIS
was written, the EPA predicted that, on a nationwide average, $NO_X$ emissions from locomotives
in the year 2010 would be about 40 percent less than emissions compared to 1999 levels (North
Fork Coal EIS, page 3-7).  The North Fork Coal EIS air quality impact analysis, which relied on
emissions factors for 1999, determined $NO_X$ emissions to be insignificant; therefore, it can be
presumed that $NO_X$ emissions associated with current use of trains is actually lower than
previously modeled levels.

With respect to potential ozone formation, the county level analysis of the emissions inventory
suggests the region is potentially $NO_X$ limited.  Therefore, to effectively limit any potential for
ozone formation due to area emissions, controls should focus on controlling $NO_X$ emissions.  By
continuing to limit the minor reaction species, ozone formation potential from area emissions
should remain small.  The Bowie No. 2 Mine is not a significant source of VOC emissions [the
photochemical reactivity potential of methane in the troposphere is considered negligible
(40CFR51.100 (s)] and therefore operations at the mine are not expected to contribute to any
regional ozone formation potential.

With respect to the facilities emissions in the regional context, emissions of criteria pollutants
from the Bowie No. 2 Mine are not considered regionally significant, should not increase above
current levels, and therefore should not result in any additional impacts on existing ambient air
quality in the area.

**Potential Impacts Analysis for Greenhouse Gas Pollutants.**
According to the U.S. Global Change Research Program (2009), global warming is unequivocal,
and the global warming that has occurred over the past 50 years is primarily human-caused.
Standardized protocols designed to measure factors that may contribute to climate change, and to
quantify climatic impacts, are presently unavailable.  As a consequence, impact assessment of
specific impacts related to anthropogenic activities on global climate change cannot be
accurately estimated.  Moreover, specific levels of significance have not yet been established by
regulatory agencies.  Therefore, climate change analysis for the purpose of this environmental
assessment within this air quality section is limited to accounting for GHG emissions changes
that would contribute incrementally to climate change.

BLM_0018227

Methane associated with coal seams and the surrounding rock would be liberated during the mining process, as well as during the subsequent fracturing of the overburden, which occurs as the gob area (the portion of coal panels that have already been mined) is allowed to collapse. In order to protect the health and safety of miners working underground, explosive gases would be removed from the mine via a ventilation system as well as through GVBs drilled into the gob area. GVBs would be drilled to about 10 to 50 feet above the target coal seam about 1 year before mining operations begin. As the longwall mining passes under the GVB, the strata around the GVB would fracture and liberate methane. GVBs would actively pump mine atmosphere (including methane) to the surface. The GVB pumps are fueled by methane from the gob. The process of fracturing and liberation of methane would continue as the mined area collapses behind the mining operation, and the GVBs continue to pump methane from the gob. Both the ventilation system and the GVBs would release methane directly into the atmosphere. This would result in varying levels of methane release, based upon the relative concentration of methane in the mine air and overburden. Because methane emission rates are roughly correlated with coal production rates, and because coal production from the Bowie No. 2 Mine is expected to be consistent with current production rates, the rate of methane emission is not expected to differ greatly from current emission rates.

Bowie has provided methane emissions estimates for releases through mine ventilation and from the GVBs. Mine ventilation currently liberates 2,710,000 cubic feet per day based on mine exhaust monitoring. GVBs are estimated to release a total of 504,000 cubic feet of methane per day. Based upon the Inventory of U.S. Greenhouse Gas Emissions and Sinks 1990-2008 (EPA Publication 430-R-10-006), April 15, 2010, total coal mining related methane emissions in 2008 were 6.76 tg (teragrams=one million metric tons), and total GHG emissions were 6,956.8 tg $CO_2$ equivalent. At the Bowie No. 2 Mine, the total release of (2,710,000 + 504,000=) 3,214,000 cubic feet $CH_4$ per day is the equivalent of 474,464 metric tons per year or 0.0068 percent of the total calculated $CO_2$ equivalent emissions (0.47 to 6,957) for the U.S. in 2008. Based upon this analysis of mine-vented methane emissions, the calculated GHG emissions associated with the Proposed Action are negligible relative to any potential impacts on the global scale. If the calculated GHG emissions were compared with the global figures (2005 $CO_2$ equivalent emissions of 26,544 tg, World Development Report 2010: Development and Climate Change, World Bank, 2010), the relative significance of the impact to the global climate would further decrease.

The implementation of the Proposed Action is estimated to contribute 0.474 mm metric tons of GHG equivalent annually, with that being about 0.0068 percent of total U.S. contribution. Predicting the degree of impact any single emitter of GHGs may have on global climate change, or on the changes to biotic and abiotic systems that accompany climate change, is not possible at this time. As such, the controversy is to what extent GHG emissions resulting from continued mining may contribute to global climate change, as well as the accompanying changes to natural systems cannot be quantified or predicted. The degree to which any observable changes can, or would, be attributable to the Proposed Action cannot be reasonably predicted at this time.

BLM_0018228

**Mitigation Measures**

Criteria Pollutant Emissions

To reduce particulate matter/fugitive dust emissions during construction and ongoing production activities, the following mitigation measure will be implemented:

- Fugitive emissions from all vehicles traveling on regularly-used non-paved surfaces during all project phases will be controlled utilizing a variety of suppression techniques applied to the non-paved roads.
- Storage piles will be watered or covered as necessary to limit wind erosion potential and reduce fugitive emissions.
- Most coal transfer points and processing activities during coal production have been enclosed and, therefore, limit fugitive particulate matter emissions.
- The mine will continue to comply with their APCD-issued air emissions permit provisions, and any other regulatory requirements the facility is subject to now or in the future.

Greenhouse Gas Emissions

With regard to production activities at the mine, methane liberation from the mine may be reduced through mine planning, sealing previously mined areas, and degasification efforts. Methane drainage systems, consisting of vertical and horizontal boreholes, could reduce methane gas emissions from the un-mined reserve. This can reduce mine ventilation emissions when the coal is mined. Degasification procedures can only be developed as experience is gained during future mining.

**No Action Alternative**

Under the No Action Alternative, mining of the two coal lease modification tracts would not be permitted. Current levels of methane liberation and emissions associated with the existing mine plan would continue until mining is completed. The facility would continue to comply with their APCD issued air emissions permit provisions and any other regulatory requirements the facility is subject to now or in the near future. Methane emissions associated with proposed mining of the Bowie lease tract modifications would not occur.

**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**

The BLM uses the ACEC designation to highlight areas of public lands where special management attention is required in order to protect and prevent irreparable damage to important historical, cultural, and scenic values; fish or wildlife resources; or other natural systems or processes. The ACEC designation may also be used in order to protect human life and safety from natural hazards. The BLM identifies, evaluates, and designates ACECs through its resource management planning process. There are no ACECs in the vicinity of the proposed project. The closest ACEC to the proposed lease is the Needle Rock ACEC, which is located over 15 miles to the southwest; therefore, ACECs will not be evaluated further.

**WILDERNESS**

National Wilderness Areas, designated by Congress, are defined by the Wilderness Act of 1964 as places "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." Designation is aimed at ensuring that these lands are

BLM_0018229

preserved and protected in their natural condition. Wilderness Areas, which are generally 5,000 acres or more in size, offer outstanding opportunities for solitude or a primitive and unconfined type of recreation. These areas may also contain ecological, geological, or other features that have scientific, scenic, or historical value.

Through FLPMA (Sec. 201 and 202) of 1976, Congress directed the BLM to maintain an inventory of the lands under its jurisdiction that possess "wilderness characteristics." Each BLM office maintains an inventory of lands with wilderness characteristics, updating it as necessary. The characteristics are:

A.  Size – generally 5,000 acres or greater that do not have mechanically constructed and maintained roads.  Smaller areas that share a boundary with existing wilderness or wilderness study areas of 5,000 acres or greater may also be considered to have adequate size.

B.  Naturalness – lands must appear to have been affected primarily by the forces of nature, and people's work must be substantially unnoticeable.

C.  Outstanding opportunities for solitude, or primitive and unconfined type of recreation:

    - Solitude – visitors can feel alone, secluded and isolated from the sights and sounds of other people.
    - Primitive and unconfined recreation – the use of the area is primarily through non-motorized or non-mechanical means with no or minimal recreation facilities.

D.  Supplemental values – the area contains ecological, geological, or other features of scientific, educational, scenic, or historical value.

For an area to possess wilderness characteristics it must meet A, B and C; D is optional.

BLM surface ownership lands within the UFO were inventoried for wilderness characteristics in 2010-2011.  No lands possessing wilderness characteristics were found on BLM-managed lands within, or adjacent to, the area of this proposed project.

There are no designated Wilderness Areas within, or adjacent to, the proposed lease modifications. The closest Wilderness Area is the West Elk Wilderness, which is located over 7 miles to the south-southeast of the proposed lease modifications. The Raggeds, Maroon Bells-Snowmass, Hunter Fryingpan, Holy Cross, Eagles Nest, and Flattop Wilderness Areas are within 30 miles, to the north. The Great Sand Dunes National Park, La Garita, Powderhorn, Uncompahgre, and Weminuche Wilderness Areas are to the south and east.

BLM_0018230

## WILD AND SCENIC RIVERS

**Affected Environment**

BLM inventoried area streams and rivers in 2006 as part of the evaluation of Wild and Scenic Rivers in the UFO. A 1.21-mile segment of the West Fork of Terror Creek has Outstandingly Remarkable Values and is potentially suitable for inclusion into the National Wild and Scenic River System. This segment flows through the proposed lease modification for lease COC-61209. The following portions of the lease modification for COC-61209 are within ¼ mile of the stream segment –

> Township 13 South, Range 91 West, 6[th] P.M., Section 5: SWNW, S/2NESENW, S/2SENW, S/2NWSENW, SWSWNE, S/2NWSWNE, W/2NWSE – approximately 105 acres

The revised UFO RMP will make recommended decisions concerning this section and ultimately Congress will have the final decision under the Wild and Scenic Rivers Act. BLM policy is to protect the resource values found in the segments pending decisions by Congress on the eligibility of the various river segments.

### Environmental Consequences/Mitigation Measures

**Proposed Action**

Current plans for mining do not include the lands under the West Fork of Terror Creek (see Map 2). Subsidence associated with the Proposed Action is expected to be minimal to negligible and would generally affect the area immediately overlying those areas that are mined (see Geology and Minerals); therefore, there are likely no impacts to the West Fork of Terror Creek resources resulting from subsidence.

**Mitigation**

State-of-the-art mining techniques (pillar and panel widths, rate of coal development and extraction, mine method, determining angle of draw [angle between a vertical line drawn upward to the surface from the edge of the underground opening and a line drawn from the edge of the opening to the point of zero surface subsidence], etc.) would be used to control subsidence.

- No mining related surface disturbance would occur within 100 feet of the stream channel for the West Fork of Terror Creek without a written finding from the Authorized Officer (AO). These techniques would provide for maximum coal removal while protecting the values associated with the inventoried Wild and Scenic River segment.

**No Action Alternative**

Under the No Action Alternative, there would be no impacts to the West Fork of Terror Creek from leasing of the coal tracts as leases would not be issued.

## CULTURAL RESOURCES

**Affected Environment**

A Class III Cultural Resource Inventory was conducted for a block clearance area (which included the proposed lease modifications) in order to identify any cultural resources present.

BLM_0018231

The Cultural Resource Inventory included a file search and field visits to the area, as well as a search for relevant traditional cultural properties (Grand River Institute [GRI] 2011).

The Cultural Resources Inventory identified and documented one previously recorded site within the study area, three new sites, and a new segment of a previously recorded aqueduct. No traditional cultural properties were found within the proposed lease modification areas (GRI, 2011). None of the identified sites was evaluated as being eligible for the National Register of Historic Places.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**

With mitigation, as discussed below, activities associated with the Proposed Action would result in no impacts to cultural resources. Subsidence associated with the Proposed Action is expected to be minimal to negligible and would generally affect the area immediately overlying those areas that are mined (see Geology and Minerals); therefore, there would be no impacts to cultural resources resulting from subsidence.

**Mitigation**

Roads and drill pads associated with GVB drilling would avoid areas where cultural resources have been identified. In addition, if any cultural resources are discovered during construction of the pads or roads, construction would stop and the BLM would be notified immediately.

**No Action Alternative**

Under the No Action Alternative, there would be no impacts to cultural resources in the proposed lease tracts as leasing would not occur.

## NATIVE AMERICAN RELIGIOUS CONCERNS

Native American religious concerns are associated with cultural practices or beliefs of a living community rooted in the history or religion of that community and are important in maintaining the continuing cultural or religious identity of the community. The Class III Cultural Resource Inventory conducted by GRI (2011) did not identify any Native American religious concerns or potential traditional cultural properties within the proposed lease modification areas; therefore, Native American religious concerns will not be evaluated further.

## FARMLANDS, PRIME AND UNIQUE

Prime Farmland, as defined by the Natural Resource Conservation Service (NRCS), is land that has the best combination of physical and chemical characteristics for producing food, feed, forage, fiber, and oilseed crops. Prime Farmland is also available for such uses as: cropland, pastureland, rangeland, forest land, or other land development. Unique Farmland is land other than Prime Farmland that is used for the production of specific high-value food and fiber crops. No Prime or Unique Farmlands have been identified within the proposed lease modification areas (NRCS, 2008); therefore, Prime or Unique Farmlands will not be evaluated further.

It is noted that approximately 71.5 acres (14.1 percent) in the proposed lease modification for COC-37210 are considered farmland of statewide importance and the associated soils are Soil Mapping Unit 32 - Delson loam, 3 to 12 percent slopes. In some areas, land that does not meet the criteria for prime or unique farmland is considered to be "farmland of statewide importance"

BLM_0018232

for the production of food, feed, fiber, forage, and oilseed crops. The criteria for delineating farmland of statewide importance are determined by the appropriate state agency. Generally, this land includes areas of soils that nearly meet the requirements for prime farmland and that economically produce high yields of crops when treated and managed according to acceptable farming methods. In Colorado, all agricultural lands that are irrigated, regardless of other soil characteristics, are considered farmlands of statewide importance (NRCS, 2011a).

## SOILS

### Affected Environment

Data regarding soils within the proposed lease modification areas were obtained from a custom Soil Resource Report generated using the NRCS Web Soil Survey and the Soil Survey of Paonia area which was based upon soil survey data compiled in 1981 (NRCS, 2011b; USDA, 1981). This information is consistent with the discussion in the North Fork Land Health Assessment (LHA) (BLM, 2007). The North Fork LHA evaluated the general area as meeting Standard 1 for soils. Some potential soil protection issues related to high bare ground and low plant basal cover were noted; however, soil loss and runoff damage problems were not identified.

There are six soil mapping units (MUs) present within the proposed lease modification areas. Four of these mapping units would be disturbed by surface activities associated with installation of roads and GVBs. Each of the soils is described below. The soils, medium to fine grained silt and clays, are generally similarly classified based on particle size and use as construction material. None of the soils has saline or sodic characteristics. Table 12 provides the acres of each soil mapping unit within the proposed lease modification areas.

The Beenon-Absarokee loams (MU 12) are well drained soils derived from weathered sandstone and interbedded shale. The mapping unit slopes range between 5 to 20 percent. The Beenon component is shallow and overlies bedrock at a depth of 10 to 20 inches and contains up to 25 percent large stones. The effective rooting depth is approximately 14 inches. The Absarokee loam is moderately deep, overlies bedrock at a depth of 20 to 40 inches and contains up to 15 percent large stones. The effective rooting depth is approximately 30 inches. Water erosion for this complex is moderate to high. Limiting characteristics of the mapping unit include high clay content, depth to bedrock, low organic content, and low available water content.

The Cochetopa stoney loam (MU 25) is a deep, well drained soil derived from alluvium and or complex landslide deposits and has slopes that range between 10 and 40 percent. The hazard from water erosion is moderate to high, and the effective rooting depth is greater than 60 inches. The stone content varies from areas free of stones to small areas with stone contents up to 45 percent. This mapping unit has inclusions in depressions that are considered hydric. The main limitations for construction within this soil unit are the presence of large stones, shrink-swell potential, low strength, and slope.

The Delson loams (MU32, MU33, MU34) are deep, well drained soils formed in stony outwash alluvium from igneous origin. Slopes within these three mapping units range from 0 to 60 percent, and the stone content ranges from 0 to 70 percent. MU32 is rated farmland of statewide importance in areas used for crops or designated for agriculture by the State. The main

BLM_0018233

limitations for construction within these soil units are stones, low strength, and shrink-swell potential because of the high clay content and the slopes in MU34.

The Fughes loam (MU 39) is a deep, well drained soil formed in old alluvial fan and/or complex landslide deposits.  Surface runoff is rapid to very rapid and the hazard from water erosion is high.  The main limitations for construction within this soil unit are high clay content, low strength, shrink-swell potential, and slope.  The soil limitations within these soil mapping units could be overcome through proper engineering designs and application of appropriate reclamation procedures.

**Table 12**
**Summary of Soil Resources within the Proposed Lease Modification Areas**
**and Affected by Proposed Lease Modification Activities**

| Soil Mapping Unit | Acres in the Proposed Leases | Percent of the Proposed Leases | Acres Affected by Construction of Roads | Acres Affected by Construction of GVB Pads | Hazard of Erosion | Rutting Hazard [1] |
|---|---|---|---|---|---|---|
| Beenon-Absarokee loams (MU12) 5 to 20 percent slope | 12.2 | 2.4 | 0.0 | 0.00 | Moderate to severe – slope erodibility | Severe – low strength |
| Cochetopa stony loam (MU 25) 10 to 40 percent slope | 98.9 | 19.6 | 0.0 | 0.00 | Moderate – slope erodibility | Moderate – low strength |
| Delson loam (MU 32) 3 to 12 percent slope | 71.5 | 14.1 | 0.5 | 1.8 | Moderate – slope erodibility | Severe – low strength |
| Delson stony loam (MU33) 3 to 20 percent slope | 0.6 | 0.1 | 0.0 | 0.02 | Moderate – slope erodibility | Severe – low strength |
| Delson very stony loam (MU34) 20 to 60 percent slope | 106.0 | 21.0 | 3.6 | 2.8 | Severe – slope erodibility | Moderate – low strength |
| Fughes loam (MU39) 25 to 65 percent slope | 215.9 | 42.9 | 2.4 | 5.5 | Severe – slope erodibility | Severe – low strength |
| **Total** | **505.1** | **100** | **6.5** | **10.1** | | |

[1] Soils also have AASHTO soil classification system ratings that are considered fair to poor as road subgrade materials.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**

Approximately 16.6 acres of soil would be affected by the lease modification activities: 6.5 acres for road construction and 10.1 acres for construction of the GVB pads.  Table 12 shows the acres of each soil type within the proposed lease modification areas as well as the potential hazard for roads and rutting.

Drilling and partial reclamation would occur over a period of several years. Topsoil from the portions of GVB drill pads to be reclaimed would be stockpiled separately from other soil horizons and used to reclaim portions of the drill pads. (Topsoil salvage helps to retain microbial communities that can accelerate revegetation of disturbed areas.)

BLM_0018234

The potential direct impacts resulting from GVB drilling would be:

- physical removal, mixing, or burying of surface soils;
- damage including compaction or destruction of soil properties in place;
- mixing of drilling wastes into the pad subsoil materials; and
- localized losses or decreases in vegetation cover and plant litter.

The immediate short-term direct impacts of the drilling would be the removal of vegetation and topsoil over a 200 by 200 foot area (0.92 acre for each pad). This area would be partially reclaimed after drilling, and completely reclaimed after the GVBs are no longer needed (1 to 3 years).

Project activities have the potential to result in short-term indirect impacts to soil through increased water and wind erosion. This could result in a loss of surface soil, potentially impacting the viability of vegetation communities. Soil loss during project activities would be mitigated by seeding the soil stockpiles.

Roads would be reclaimed after mining is complete and ventilation is no longer needed. The period of active use of the roads for drilling would be from a few days to a few weeks, depending upon the number of drill pads a road would access. Reclamation would include returning disturbed areas to original contours and revegetating the disturbed areas using a BLM-approved native seed mix. Reclamation of the disturbed areas would be monitored annually until considered successful. Reclamation would be considered "successful" when evidence of surface erosion is no greater than in adjacent undisturbed areas and when natural, perennial plant cover has achieved a density of 75 percent of the pre-disturbance plant cover.

Some subsidence is expected to occur as a result of underground activities. Some fracturing or loosening of the soil profile may occur in areas where the surface shows tensile subsidence fractures from the irregular pattern of subsidence and, to a lesser degree, some compression may result in, and near, the areas of maximum subsidence. These modifications to the soil profile could result in increased percolation of water in areas that are fractured and reduced percolation in areas that are compressed. These slight modifications to the soil profile are not expected to result in appreciable changes to the characteristics or properties of the soils.

**Mitigation**

Topsoil stockpiles would be stabilized with erosion control fencing/berms and seeded with a BLM-approved seed mix (see Table 2).

**Finding on the Public Land Health Standard for Upland Soils**

The existing soil conditions meet the criteria established in the Public Land Health Standard for upland soils. As appraised in the North Fork LHA (BLM, 2007), the proposed lease modification areas meets LHA Standard 1 for soils; however, there are some sites noted with high bare ground and low plant basal cover in the general area. Yet, these sites had adequate litter cover and showed no soil loss or runoff drainage problems.

BLM_0018235

Currently, there are no identified serious problems with poorly located and maintained roads; however, care needs to be taken in order to maintain this situation in this steep terrain. Based upon the limited disturbance and required site reclamation, the Proposed Action would not change the existing conditions for upland soils in the proposed lease modification areas, and natural soil functions would be maintained with the applied mitigation measures.

**No Action Alternative**
Under the No Action Alternative, there would be no impacts to soils within the proposed lease modification areas.

**VEGETATION**

**Affected Environment**
The vegetation types within the proposed leases were characterized using data from the Colorado Vegetation Classification Project (CVCP) for the North Fork Gunnison River Basin (Colorado Parks and Wildlife [CPW] et al, 2003). Similar vegetation types mapped in the CVCP dataset were grouped together in this analysis because several of the minor vegetation types have similar community compositions, blend into one another at ecotones, and serve similar ecological roles as habitat for wildlife. The dominant vegetative cover-type across the proposed lease areas is a mesic mountain shrub mix codominated by Gambel oak (*Quercus gambelii*), serviceberry (*Amelanchier arborea*), and mountain mahogany (*Cercocarpus montanus*) mixed with sagebrush (*Artemesia* spp.), snowberry (*Symphoricarpos albus*), or chokecherry (*Prunus virginiana*). In some dispersed areas, sagebrush or a sagebrush and grassland mix is more dominant. The mesic mountain shrub/sagebrush mix is interspersed with stands of quaking aspen (*Populus tremuloides*) primarily on proposed lease COC-37210, and stands of Douglas-fir (*Pseudotsuga menzesii*) and pinyon-juniper (*Pinus edulis* and *Juniperus* spp.) within proposed lease COC-61209 (see Table 13). Vegetation present within adjacent, existing leases where seven (7) GVBs would be drilled is similar in composition to vegetation within the proposed lease modification areas described above and included in Table 13.

BLM_0018236

**Table 13**
**Vegetative Cover-types Present within Proposed Leases COC-37210 and COC-61209**

| Vegetative Cover-types | Total Acres | Percent of Proposed Lease Area |
|---|---|---|
| **Proposed Lease COC-37210** | | |
| Mesic Shrub/Sagebrush Mix | 217.9 | 90.6 |
| Quaking Aspen | 19.5 | 8.2 |
| Agriculture | 1.9 | 0.8 |
| Unvegetated (Rock Outcrop, Bareground) | 0.8 | 0.3 |
| Riparian | 0.02 | <0.1 |
| *COC-37210 TOTAL* | *240.1* | |
| **Proposed Lease COC-61209** | | |
| Mesic Shrub/Sagebrush Mix | 249.8 | 94.3 |
| Pinyon-Juniper | 6.1 | 2.3 |
| Douglas-fir/Other Coniferous Forest | 6.0 | 2.2 |
| Quaking Aspen | 2.8 | 1.1 |
| Riparian | 0.3 | 0.1 |
| *COC-61209 TOTAL* | *265* | |
| **OVERALL TOTAL** | **505.1** | |
| Source: CDOW et al., 2003 | | |

## Environmental Consequences/Mitigation Measures

### Proposed Action

Approximately 16.6 acres of vegetation would be disturbed by project activities, of which mesic shrub/sagebrush mix is the vegetation type most affected (92.7 percent). Localized, short-term disturbance to vegetation would result from the construction and use of light-use roads, as well as activities associated with the drilling of 6 GVBs (5 drill pads). Plants would be disturbed, crushed, or removed during the construction and use of the routes, as well as during drilling. Indirect impacts to vegetation include increased dust deposition and effects to native plant community from the introduction of weeds and weedy species, which would not all be controlled. Some low level disturbance to vegetation may occur due to future subsidence.

Interim reclamation would occur after construction and drilling activities are complete to reduce the amount of bare ground associated with construction of roads. After mine ventilation is no longer required (approximately 1 to 3 years after construction is completed), drill pads and new or reopened light-use roads would be reclaimed, recontoured, and revegetated with native vegetation using BLM-approved seed mixes (see Table 2). Some impacts may occur from the introduction of new genetics from the seeding, since the seeds are not going to be from local genotypes. This would be mitigated by applying a diverse seed mix made up of native species, and minimization of new disturbance through use of existing roads, etc. Revegetation of areas where trees or shrubs would be disturbed would take longer (30-50 years) than areas where only grasses and forbs would be disturbed (10 + years) and is not always successful,

Although there would be a short-term shift in species composition until native trees and shrubs become reestablished, all areas of disturbance would be reclaimed, and there would be no permanent impacts. Overall impacts are expected to be: very slight degradation of the vegetation

BLM_0018237

in the area, not significant at landscape level, and vegetation already somewhat degraded due to previous disturbance.

Underground activities are not expected to impact vegetation within the proposed lease modification areas. There would be no permanent loss of vegetation as a result of the Proposed Action.

**Mitigation**
None.

**Finding on the Public Land Health Standard for Plant and Animal Communities (partial, see also Wildlife, Aquatic; Wildlife, Terrestrial; and Invasive, Non-native Species)**

The North Fork LHA (BLM, 2007) found that the project area was generally in good condition, with a few areas with low ground cover and less plant litter than expected. Cheatgrass (*Bromus tectorum*) is present throughout the LHA Area. The problems were not identified as serious. Vegetation communities on BLM-managed lands in the lease modification areas and within the existing lease areas would continue to meet Public Health Standard 3.

**No Action Alternative**
Under the No Action Alternative, there would be no additional surface disturbance and, consequently, no additional impacts to vegetation within the proposed lease modification areas.

**INVASIVE, NON-NATIVE SPECIES**

**Affected Environment**
The State of Colorado maintains a list of plants that are considered to be noxious weeds and are given one of three categories that should be managed according to the Colorado Noxious Weed Act: Category A species are not known to occur in Colorado or are very limited and should be eradicated; Category B species have varying distributions and densities and weed management plans should be designed to stop the continued spread of these species; and Category C species are widespread and common in Colorado but may be required to be controlled (Colorado Department of Agriculture, 2011). In the BLM North Fork LHA (2007), the BLM-managed lands in this area were described as having minimal exotic plant problems but with trace amounts of cheatgrass (Category C). However, since the completion of the LHA, there have been some additions to the list that occur specifically in the project area, all of which occur on the Category B list: scentless chamomile (*Matricaria perforate*), oxeye daisy (*Chrysanthemum leucanthemum*), Russian knapweed (*Acroptilon repens*), and Canada thistle (*Cirsium arvense*). Potential invaders that are adjacent to the project area include one Category A species – yellow starthistle (*Centaurea solstitialis*), and three other Category B species – musk thistle (*Carduus nutans*), yellow toadflax (*Linaria vulgaris*), and sulfur cinquefoil (*potentilla recta*) (Rogers, 2010). Because roads are typically vectors for weed seeds, noxious or invasive weed species are likely to be present on or adjacent to the areas that would be disturbed by drilling equipment.

BLM_0018238

**Environmental Consequences/Mitigation Measures**

**Proposed Action**

Under the Proposed Action, light-use roads and drill pads associated with GVB drilling would cause surface disturbance. Access routes would involve scratch-grading or surface preparation that could result in surface disturbance and expose areas to the establishment of noxious weeds. Where soils are disturbed and native vegetation is lost, there is a potential for invasive and non-native plant species to establish. Once established, invasive and exotic species can dominate the sites and prevent effective recovery of native species.

Reclamation of roads, as well as of each drill pad site, would include grading, scarifying, and seeding using a BLM-approved seed mixture and application rate (see Table 2). Seeding would occur both as an interim control measure after construction activities are completed and as part of final reclamation, and would occur at a time when opportunities are greatest for establishment (including late summer, fall, or early spring) in order to improve germination rates. With the proposed mitigation, the risks of long-term noxious weed problems on the roads and GVB pads are expected to be low.

**Mitigation**

Noxious weed control would be required under the Proposed Action along access routes and at drill sites, in accordance with the Colorado Noxious Weed Act. Mitigation measures would include both preventive measures designed to avoid the introduction of noxious weeds and control measures if invasive species are identified in, or directly adjacent to, the proposed lease modification areas. Mitigation measures would include:

- Complete an inventory for noxious weeds within the proposed lease modification areas before construction begins in order to determine whether there is a need for pre-treatments (with results of the inventory shared with the BLM-UFO weed specialist).
- As a safeguard to avoid the introduction of noxious weeds, drill rigs and vehicles would be required to have all dirt and debris that could contain weed seeds removed; vehicles would also be washed prior to entering the proposed lease modifications in areas where wash-out material can be contained. Inspection of vehicles would be required or proof of cleaning vehicles could be remitted.
- If the drill rigs or other vehicles are used within areas infested with noxious weeds, each vehicle would be cleaned with high-pressure water spray equipment before moving to another area in order to reduce the likelihood of spreading noxious weed seeds.
- Appropriate herbicides and non-ionic surfactants would be applied to disturbed areas, topsoil stockpiles, and reclaimed areas in order to prevent invasion by noxious weeds. Care would be taken to avoid drift onto desirable species.
- Other mechanical or biological means of weed control (such as disking, shoveling, or insects) may also be employed on disturbed areas where appropriate, and where prior consultation with the BLM has occurred.
- Bowie would maintain records of location, type, and date of all weed control, and a Pesticide Use Proposal (PUP) number would be obtained from the BLM prior to any herbicide application. A Pesticide Application Record would be turned into the BLM within 15 days after application.
- If outbreaks of noxious weeds were identified within the proposed lease modification

BLM_0018239

areas, control measures would be implemented in consultation with the BLM.

- All GVB pads and new and upgraded roads within the proposed lease modifications would be monitored for noxious weeds by a qualified contractor or trained Bowie employee. Bowie would be responsible for treating all noxious weeds in areas of project disturbance and would not be responsible for existing roads that have not been modified for the project. A monitoring report would be required by the BLM once a year, in early summer, while the mine is active and/or until BLM releases Bowie from this requirement.
- All herbicide application would be done in accordance with the label, at the appropriate time of year, with the appropriate chemical for the targeted noxious weed species, and would be applied by a certified applicator.

The DRMS mining permit also contains a requirement for a noxious weed control plan.

**Finding on the Public Land Health Standard for Plant and Animal Communities (partial, see also Wildlife, Aquatic; Wildlife, Terrestrial; and Vegetation)**

The proposed lease modification areas meet Public Land Health Standard 3 for healthy native communities; however, some exotic invasive plant species are known to exist within the area. Precautions need to be maintained in order to minimize the spread and/or introduction of invasive, non-native species within the project area. The project would not impact the viability of plant populations or communities. Vegetation communities within the proposed leases would continue to meet the Standard after implementation of the Proposed Action, including mitigation to prevent or minimize invasive, non-native species, listed above.

**No Action Alternative**
Under the No Action Alternative, there would be no increase in the current establishment and occurrence of noxious or invasive weeds within the proposed lease modification areas.

**THREATENED, ENDANGERED, AND SENSITIVE SPECIES**

**Affected Environment**
On February 21, 2012, an informal section 7 consultation for Bowie Resources Underground Coal Mining Associated Surface Activities and Facilities was completed by USFWS, Western Colorado Ecological Services Field Office, and is contained in Appendix B to this EA. The informal consultation is programmatic in nature and addresses Bowie's mining-related surface developments and provides information about the potential effects of Bowie's action on federally-listed species included below. Appendix A to the consultation document contains the BLM-required conservation measures that will be used in future approvals related to Bowie's developments. The scope of this project is consistent with sufficient progress thresholds of the BLM Programmatic Biological Assessment addressing surface disturbance associated with underground mining based on Reasonably Foreseeable Development projections for Bowie activities.

USFWS (2010a) identified 12 species as endangered, threatened, or candidate under the Endangered Species Act (ESA) that may occur in Delta County (see Table 14). In addition to

BLM_0018240

federally-listed species, the BLM (2009) identified 39 other species as sensitive with the potential to occur within the BLM UFO and the general area of the proposed lease modification areas (see Table 15). Those species known to occur or suspected near the proposed lease modifications were surveyed for during block clearance surveys conducted for the proposed lease modifications and surrounding area.  Only species that are known or have potential to be within the proposed lease modification areas or affected by the project area are discussed below (see Tables 14 and 15).

**Table 14**
**Federal Threatened, Endangered, or Candidate Species in Delta County**

| Common Name/ Scientific Name | Status[1] | Habitat[2] | Potential Occurrence in the Analysis Area [3] | Discussed in EA |
|---|---|---|---|---|
| **Mammals** | | | | |
| Black-footed ferret *Mustela nigripes* | E, SE | Requires large prairie dog colonies in open habitat such as grasslands, steppe, and shrub steppe. | None | No |
| Canada lynx *Lynx canadensis* | T, SE | Coniferous forests interspersed with thickets of trees and shrubs, rocky outcrops, large woody debris; closely associated with snowshoe hares.  Present on Grand Mesa. | Possible | Yes |
| North American wolverine *Gulo gulo lucus* | C, SE | High elevation boreal and alpine habitats. | None | No |
| **Birds** | | | | |
| Gunnison sage-grouse *Centrocercus minimus* | C, SC | Expansive sagebrush with grasses, forbs, and healthy riparian ecosystems; project outside of expected range. | None | No |
| (Western) Yellow-billed cuckoo [4] *Coccyzus americanus* | C, SC | Riparian forested habitats dominated by cottonwoods. Observed on North Fork of Gunnison River (Beason, 2009). | None | No |
| **Fish** | | | | |
| Bonytail *Gila elegans* | E, SE | Eddies, pools, and backwaters near swift current in large rivers of the Colorado River system | Possible | Yes |
| Colorado pikeminnow *Ptychocheilus lucius* | E, SE | Fast, deep, white-water rivers with backwater areas and eddy habitats 2 to 3 feet deep that support aquatic insects, small fish as prey species. | Possible | Yes |
| Humpback chub *Gila cypha* | E, SE | Adults, in habitats ranging from deep turbid rapids often associated with large boulders and steep cliffs to flooded lowlands; young, in slow-moving backwaters. | Possible | Yes |
| Greenback cutthroat trout *Oncorhynchus clarki stomias* | E, ST | Cold, clear, gravely headwater streams and mountain lakes with abundant insects; originally in the Arkansas and South Platte river drainages of Colorado and Wyoming. Recent genetic testing indicates populations exist in the | Possible | Yes |

BLM_0018241

| Common Name/ Scientific Name | Status[1] | Habitat[2] | Potential Occurrence in the Analysis Area[3] | Discussed in EA |
|---|---|---|---|---|
| | | Colorado River drainage. | | |
| Razorback sucker *Xyrauchen texanus* | E, ST | Slow backwater habitats or large rivers and impoundments, not small tributaries or headwaters, with mud, sand or gravel substrate. | Possible | Yes |
| **Plants** | | | | |
| Clay-loving wild buckwheat *Eriogonum pelinophilum* | E, SE | Restricted to the badlands/Adobe Hills east of Delta and Montrose, CO. | None | No |
| Colorado hookless cactus *Sclerocactus glaucus* | E, SE | Rocky hills, alluvial benches, and lower mesa slopes in desert shrub communities from 4,500 to 6,000 feet | None | No |

[1] Status: T – Federal Threatened; E – Federal Endangered; C – Federal Candidate; SE – Colorado Endangered; ST – Colorado Threatened; SC – Colorado Candidate
[2] Source: CDOW, 2009; CNHP, 2009.
[3] Potential Occurrence based on habitat associations and known distributions:
   None: May occur in Delta County but restricted distributions are distant and/or habitat is not present in the project area.
   Unlikely: May occur in Delta County and marginally suitable habitat present in the project area.
   Possible: Occurs in Delta County, suitable habitat is present, but not observed in the project area.
   Present: Observed in the project area and/or occupied habitat includes the project area.
[4] Also considered a BLM Sensitive Species within the Uncompahgre Field Office management area.

**Table 15**
**BLM Sensitive Species that May Be Present in or near the Proposed Lease Modification Areas**

| Common Name/ Scientific Name | Status[1] | Habitat[2] | Potential Occurrence in the Analysis Area[3] | Discussed in EA |
|---|---|---|---|---|
| **Invertebrates** | | | | |
| Great Basin silverspot butterfly *Speyeria okomis nokomis* | | Spring-fed meadows, seeps, marshes, boggy streamside meadows with flowing water. | None | No |
| **Amphibians** | | | | |
| Northern leopard frog *Rana pipiens* | SC | Margins, banks of marshes, ponds, streams, other permanent water. | Present | Yes |
| Boreal toad *Anaxyrus boreas boreas* | SE | Pond margins, marshes, wet meadows, riparian areas in subalpine elevations. Present on Grand Mesa. | None | No |
| Canyon treefrog *Hyla arenicolor* | | Intermittent streams in deep rocky canyons with pinyon-juniper vegetation; project outside of expected range. | None | No |
| **Reptiles** | | | | |
| Longnose leopard lizard *Gambelia wislizenii* | SC | Flat or gently sloping, open shrublands; project outside of expected range. | None | No |
| Milk snake *Lampropeltis trianguium* | | Grasslands, sandhills, canyons, open woodlands | Possible | Yes |

BLM_0018242

| Common Name/ Scientific Name | Status [1] | Habitat [2] | Potential Occurrence in the Analysis Area [3] | Discussed in EA |
|---|---|---|---|---|
| *taylori* | | ponderosa, pinyon-juniper; known along the North Fork of the Gunnison River. | | |
| Midget faded rattlesnake *Crotalus viridis concolor* | SC | Most terrestrial habitats in west-central Colorado including grasslands, shrublands, pinyon-juniper woodlands, coniferous forests. | Possible | Yes |
| **Fish** | | | | |
| Roundtail chub *Gila robusta* | | Colorado River drainage, mostly large rivers, also streams and lakes; not documented in Terror Creek. | Possible | Yes |
| Bluehead sucker *Catostomus discobolus* | | Headwater streams to large rivers with moderate velocity; not documented in Terror Creek. | Possible | Yes |
| Sucker, flannelmouth *Catostomas latipinnis* | | Larger streams and rivers with riffles, eddies, backwaters; not documented in Terror Creek. | None | No |
| Colorado River cutthroat trout *Oncorhynchus clarki pleuriticus* | SC | Clear, headwater streams in the Colorado River drainage, clear mountain streams; no known populations of pure strain cutthroats on public lands managed by UFO. | Possible | Yes |
| **Birds** | | | | |
| Long-billed curlew *Numenius americanus* | SC | Short-grass grasslands, wheat fields, dry land agriculture near water. | None | No |
| American peregrine falcon *Falco peregrinus anatum* | SC | Open conifer forests, riparian forests, and cliffs; migrant in western Colorado. | Present | Yes |
| Bald eagle *Haliaeetus leucocephalus* | SC | Reservoirs, rivers, wintering in semidesert and grasslands. | Possible | Yes |
| Brewer's sparrow *Spizella berweri* | | Mostly in sagebrush shrubland but also in mountain mahogany and rabbitbrush, mesas and foothills. | Possible | Yes |
| American white pelican *Pelecanus erythrorhynchos* | | Larger reservoirs, breeding on islands in eastern Colorado. | None | No |
| Columbian sharp-tailed grouse | SC | High elevation grassland areas interspersed with | Unlikely | No |

BLM_0018243

| Common Name/ Scientific Name | Status [1] | Habitat [2] | Potential Occurrence in the Analysis Area [3] | Discussed in EA |
|---|---|---|---|---|
| *Tympanuchus phasianellus columbianus* | | serviceberry, chokecherry, oakbrush, sagebrush, snowberry, and aspen; cultivated crops in spring/summer. | | |
| Northern goshawk *Accipiter gentilis* | | Forests of aspen, ponderosa pine, lodgepole pine; larger trees for nesting. | Possible | Yes |
| Ferruginous hawk *Buteo regalis* | SC | Grassland, semidesert shrublands, rare in pinyon-juniper; nest on isolated structures. | Possible | Yes |
| White-faced ibis *Plegadis chihi* | | Marsh edges, wet meadows, reservoir shorelines. | None | No |
| **Mammals** | | | | |
| Allen's (Mexican) big-eared bat *Idionycteris phyllotis* | | Oak-juniper woodland and ponderosa pine forest; project outside of expected range. | None | No |
| Big free-tailed bat *Nyctinomops macrotis* | | Rocky slopes, canyon lands, roosts in crevices. | None | No |
| Spotted bat *Euderma maculatum* | | Ponderosa pine in montane forest, pinyon-juniper woodlands, aspen, semi-desert shrublands. | Possible | Yes |
| Townsend's big-eared bat *Corynorhinus townsendii* | SC | Montane forests, pinyon-juniper woodlands, semi-desert shrublands. | Possible | Yes |
| Fringed myotis *Myotis thysanodes* | | Ponderosa pine, greasewood, oakbrush, saltbush shrublands. | Possible | Yes |
| Gunnison prairie dog *Cynomys gunnisoni* | | Grasslands and high desert scrub; project outside the current, expected range. | None | No |
| White-tailed prairie dog *Cynomys leucurus* | | Open shrublands, arid grass-shrub, and mountain valleys mostly in semidesert shrublands, also agriculture/pasture. | None | No |
| Kit fox *Vulpes macrotis* | SE | Semidesert shrubland and margins of pinyon-juniper woodlands; saltbush, sagebrush, greasewood. | None | No |
| Desert bighorn sheep *Ovis canadensis nelsoni* | | Steep inaccessible cliffs, areas dominated by grasses. | None | No |
| **Plants** | | | | |
| Grand Junction milkvetch *Astragalus linifolius* | | Pinyon-juniper, sagebrush on Chinle, Morrison Formation; project | None | No |

BLM_0018244