| Common Name/ Scientific Name | Status [1] | Habitat [2] | Potential Occurrence in the Analysis Area [3] | Discussed in EA |
|---|---|---|---|---|
| | | outside of expected range. | | |
| Naturita milkvetch *Astragalus naturitensis* | | Pinyon-juniper, sandstone mesas, ledges, crevices; project outside of expected range. | None | No |
| San Rafael milkvetch *Astragalus rafaelensis* | | Gullied hills, washes, tallus, seleniferous clay, silt, sand; project outside of expected range. | None | No |
| Sandstone milkvetch *Astragalus sesquiflorus* | | Sandstone rock ledges, fissures of domed slickrock, talus under cliffs, sandy washes; project outside of expected range. | None | No |
| Fragile rockbrake *Cryptogramma stelleri* | | Moist, shaded limestone cliffs and ledges. | None | No |
| Uncompahgre bladderpod *Lesquerella vicina* | | Grows on Mancos shale at the ecotone between pinyon-juniper and salt desert scrub; 6,000 to 7,200 feet; project outside of expected range. | None | No |
| Adobe desertparsley *Lomatium concinnum* | | Barren adobe soils derived from Mancos shale formation in shrub-dominated communities; project outside of expected range. | None | No |
| Paradox lupine *Lupinus crassus* | | Grows on Mancos shale in pinyon-juniper woodlands; project outside of expected range. | None | No |
| Eastwood monkey-flower *Mimulus eastwoodiae* | | Shallow caves, seeps, in canyon walls. No habitat present. | None | No |
| Aromatic Indian breadroot *Pediomelum aromaticum* | | Sandy soils, barren hills, in sagebrush, pinyon-juniper; project outside of expected range. | None | No |

[1] Status: T – Federal Threatened; E – Federal Endangered; C – Federal Candidate; SE – Colorado Endangered; ST – Colorado Threatened; SC – Colorado Candidate
[2] Sources: CNHP, 2009; CDOW, 2009; Weber and Wittmann, 1987; Andrews and Righter, 1992; Hammerson, 1986; Woodling, 1985; Fitzgerald et al., 1994.
[3] Potential Occurrence based on habitat associations and known distributions:
    None: May occur in Delta County but restricted distributions are distant and/or habitat is not present in the project area.
    Unlikely: May occur in Delta County and marginally suitable habitat present in the project area.
    Possible: Occurs in Delta County, suitable habitat is present, but not observed in the project area.
    Present: Observed in the project area and/or occupied habitat includes the project area.

BLM_0018245

**Federally-Listed Species**

**Canada Lynx.**  Canada lynx (*Lynx canadensis*) are known to be present on Grand Mesa, and at this time, all suitable habitats are considered to be occupied by this species (USFWS, 2010b). There are no habitats currently mapped as suitable for lynx on public lands in the lease modification areas, and no critical habitat has been designated in Colorado (USFWS, 2009a). The lease modification areas also fall outside a BLM mapped lynx analysis unit (LAU) (BLM, 2002). There is little to no denning, wintering, or dispersal habitat (spruce/fir) within the proposed leases.

**Colorado River Endangered Fishes.**  The federally endangered bonytail (*Gila elegans*), Colorado pikeminnow (*Ptychocheilus lucius*), humpback chub (*Gila cypha*), and razorback sucker (*Xyrauchen texanus*) are not present on the proposed lease modification areas but are found 30 miles downstream (USFWS, 1994) of the lease modification areas in portions of the Colorado River system. No suitable habitat for these species is found within the proposed lease modification areas.

**Greenback Cutthroat Trout (GBCT).**  CPW considers the main stem of Terror Creek, from the confluence of the East and West Forks to the confluence with the North Fork, as occupied habitat for federally-endangered greenback cutthroat trout (*Oncorhynchus clarki stomias*) (Kowalski, 2010). Recent surveys documented GBCT in the West Fork of Terror Creek, the East Fork of Terror Creek, and the upstream portion of Terror Creek. There are an estimated 151 to 400 GBCT per mile within the reaches sampled by the U.S. Forest Service (Carrillo, 2010).  There is no designated critical habitat for this species.

**BLM Sensitive Species**

**Mammals.**  Three species of bats included in Table 15 could occur in the vicinity of the proposed lease modification areas. Townsend's big eared bats (*Corynorhinus townsendii*) roost in caves, tunnels, mines, and buildings and can be found in lower elevation pinyon-juniper woodlands (Culver et al., 2008). Fringed myotis (*Myotis thysanodes*) commonly occupy oak and pinyon woodlands, as well as Douglas-fir and ponderosa pine forests, mines, caves, and buildings (Adams, 2003).   Spotted bats (*Euderma maculatum*) occur in ponderosa pine woodlands, pinyon-juniper woodlands, and open semi-desert shrublands (CDOW, 2009).  Much of the roosting habitat within the North Fork River LHA area is in cracks and crevices in rock/cliff faces (BLM, 2007).  These species are more likely to occur in the proposed lease modification areas during foraging activities.

**Birds.** There are nine species of birds in Table 15 that are identified as sensitive within the BLM UFO. Based on habitat present and range of the species, five of those species are known or could occur in the proposed lease modification areas. Brewer's sparrows (*Spizella berweri*) are a sagebrush-obligate species, occupying sagebrush steppe (Knick and Rotenberry, 2001) and may nest in suitable habitat. It is possible that northern goshawks (*Accipiter gentilis*) may nest within or adjacent to the proposed lease modification areas in larger trees. There is no suitable nesting habitat for bald eagles (*Haliaeetus leucocephalus*), ferruginous hawks (*Buteo regalis*), or peregrine falcons (*Falco peregrinus anatum*) within the proposed lease modification areas,

BLM_0018246

although the lease modification areas may be used for foraging. Peregrine falcons were observed in the proposed lease modification areas.

**Herpetofauna.** Sensitive BLM species of reptiles and amphibians likely or possibly to be present within the proposed lease modification areas, based on known distributions and habitat affinities include the northern leopard frog (*Rana pipiens*), milk snake (*Lampropeltis trianguium taylori*), and midget faded rattlesnake (*Crotalus viridis concolor*). The northern leopard frog is usually found in permanent water with rooted aquatic vegetation, and in the summer it will inhabit wet meadows and fields (NDIS, 2011). The northern leopard frog is known to be present in the general project area. The midget faded rattlesnake occurs in Delta County and is found in most habitats (NDIS, 2011). Milk snakes occur in a variety of habitats including shrubby hillsides, canyons, and open stands of ponderosa pine with Gambel oak, pinyon-juniper woodlands, and river valleys (NDIS, 2011). Milk snakes have been documented along the North Fork of the Gunnison River and could be present within the proposed lease modification areas.

**Fish.** Two BLM-sensitive fish species, the roundtail chub (*Gila robusta*) and bluehead sucker (*Catostomus discobolus*), may be present in Terror Creek or its tributaries based on habitat preferences, although neither species has been documented.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**

**<u>Federally-Listed Species</u>**

**Canada Lynx.** The proposed GVB drilling activities would not directly affect lynx denning habitat, wintering, or dispersal habitat. In addition, surface-disturbing activities would be limited in extent and not occur during winter months; would not affect local habitat components or stands equivalent to areas of lynx habitat; and would not cause lynx to avoid using the area. The Proposed Action would not affect lynx or suitable lynx habitat.

**Colorado River Endangered Fishes.** No direct effects to endangered Colorado River fish are expected; however, water depletions (0.15 acre-feet/year) associated with proposed activities could cause off-site effects to the endangered fish and their critical habitat (Colorado pikeminnow and razorback sucker) in the lower Gunnison River and Colorado River (USFWS, 1994). Water depletions from the Upper Colorado River basin are likely to adversely affect the four federally-listed Colorado River fishes and likely to adversely modify their designated critical habitats. Water depletions were previously addressed with the FWS Programmatic Biological Opinion (PBO) (ES/GJ-6-CO-08-F-0010) for water depletions associated with BLM projects authorized by BLM within the Upper Colorado River Basin in Colorado on February 25, 2009 (USFWS, 2009b). The PBO includes reasonable and prudent alternatives developed by USFWS, which allow BLM to authorize water depletions while avoiding the likelihood of jeopardy to the endangered fishes and avoiding destruction or adverse modification of their critical habitat. The PBO requires the BLM State Office to track all projects that result in water depletions from the Upper Colorado River Basin and provide an annual report to the Service.

BLM_0018247

The UFO would include the water depletions associated with the subject project in their annual report to the BLM State Office.

To comply with the above PBO, Bowie would be required to report their annual water depletions to the BLM UFO by September 30 each calendar year. This includes depletions that result from any coal mining-related actions within the project area, regardless of surface or mineral ownership. Depletion fees would be paid by BLM as required in the above-mentioned PBO.

**Greenback Cutthroat Trout.** Water for drilling would be pumped from a point just upstream of the confluence of East and West Terror Creeks, where GBCT could be entrained or impinged during water withdrawal.
Potential effects to GBCT in Terror Creek and West Fork of Terror Creek could also occur from sediment entering the creeks as a result of soil disturbance during construction and/or improvement of access roads.

The February 2012 informal consultation with USFWS contains a suite of conservation measures designed to protect GBCT that BLM will apply as part of the proposed action, including project setbacks from occupied streams, reclamation standards, erosion/ sediment control measures and implementation monitoring, and measures to avoid take, entrapment, and entrainment of fish during water pumping activities. In particular, no new surface disturbance will occur within 200 feet of GBCT occupied habitat, as measured from the normal high water mark, and maintenance of roads or other existing features within this zone will be limited to the existing road prism or footprints. FWS noted that their understanding of *surface disturbance* to be any project-related disturbance resulting in direct and pronounced alteration, damage, removal, displacement, or mortality of vegetation, soil, or substrates, or similar effects. Also, BLM has committed to ensuring that adequate and proper erosion control measures are implemented and effective, such that adverse effects do not occur to GBCT and its habitat. Based on this information, FWS concurred with BLM's determination that the proposed action may affect, but is not likely to adversely affect greenback cutthroat trout, due to discountable and insignificant effects.

Removal of water from the Terror Creek system could also potentially affect GBCT. To minimize potential effects from water removal from Terror Creek, Bowie would make a call on their water rights and release water into East Terror Creek from Terror Creek Reservoir at a rate equal to or greater than the amount of water being removed.

Terror Creek is approximately 490 feet from the closest longwall mining that would occur if the lease modification were approved. Given a worst-case overburden depth of 600 feet, with an angle of draw of 25 degrees, the effects of surface subsidence are projected to extend approximately 250 feet from the longwall panel (BLM, 2000). Therefore, there would be no subsidence related disturbance to the flows in Terror Creek, and no impacts to Endangered, Threatened, or Sensitive fish species or their habitat.

## BLM Sensitive Species

**Mammals.** The habitats within the proposed lease modification areas may provide roosting, nursery, and/or foraging habitat for bats. Given the existing activity in the area, the short

BLM_0018248

duration of drilling activity, and the small additional surface disturbance, adverse effects to sensitive bats are not expected.

**Birds.**  Potential foraging habitat for peregrine falcons, bald eagles, northern goshawk, and ferruginous hawk is present within the lease modifications; however the small amount of potential habitat removed versus available habitat within the lease modification areas is not expected to affect these species.  No nesting substrate would be removed by the project for these four species and no nests were observed during surveys.

Brewer's sparrows were not documented within the project area during surveys; however potential nesting habitat is present.  Removal of sagebrush vegetation during nesting (May 15 through August 1) could risk mortality of birds, eggs, and/or nestlings (see Migratory and Other Birds of Conservation Concern section for mitigation).

**Herpetofauna.** There is no known habitat at the proposed lease modifications for northern leopard frogs, and there are no GVB pads or access roads proposed within wetland, pond, or reservoir habitats.  Drilling activities, as currently proposed, would not result in habitat losses for milk snakes.  Because midget faded rattlesnakes are found in most habitats within the proposed lease modifications, they would be the most likely affected of the three species. The small amount of potential habitat removed versus available habitat within the lease modifications areas is not expected to affect these species. As would be the case with any terrestrial wildlife species with a small home range, some direct mortality from machinery and human behavior may result in minor short-term effects to local populations.

**Fish.** Although potentially suitable habitat for roundtail chub and bluehead sucker occurs within the project area in Terror Creek and its forks, these species have not been documented.  Effects described above for endangered fish are not expected; however, protective measures implemented for endangered fish, above, would also reduce potential effects to BLM sensitive fish species, if present.

**Mitigation**

BLM would require the following mitigation measures:
- State-of-the-art mining techniques (pillar and panel widths, rate of coal development and extraction, mine method, determining angle of draw, etc.) would be used to control subsidence.  No mining-related surface disturbance would occur within 200 feet of greenback cutthroat trout occupied habitat, as measured from the normal high water mark, without a written finding from the Authorized Officer.  These techniques would provide for maximum coal removal while protecting the values associated with the threatened greenback cutthroat trout habitat.
- Sediment control measures, such as silt fences or straw wattles, would be placed down slope from the pads and access roads to prevent potential sedimentation effects to Terror Creek.
- In order to insure that Best Management Practices (BMPs) relating to the control of sediment from disturbed sites are in place, and functional, Bowie shall, on a monthly basis from May through August, use an independent contractor to inspect Bowie's well pad sites and access roads within the Terror Creek watershed. The independent

BLM_0018249

contractor shall contact Bowie and the BLM UFO (970-240-5300), within two business days of discovering sediment control measures that are missing or non-functional. Bowie will have three business days to correct the problem. Ineffective measures would be redesigned and replaced after consultation with BLM. For each year that Bowie operates under this BA, Bowie shall submit the compiled monthly inspection reports to BLM UFO by September 30. In the event new sediment control methods are identified or current practices are not working as intended, adaptive management will be used to implement methods that are effective at eliminating offsite movement of soils and sedimentation into resident streams.

- At any time during drilling activities, until successful reclamation or continuing into the future, the point of access to temporary roads shall be blocked with gates, rock barriers, or concrete barriers to prevent vehicles, including Off-Highway Vehicles (OHVs), from using them. Signs identifying the road closure shall be placed at the barricades.

- In order to prevent increased risk of sediment being generated as a result of pumping related disturbance, pumping from East Terror Creek would not take place until after the April and May peak runoff period has past. Therefore, pumping from East Terror Creek would not begin until June. The AO may grant an exception that would allow pumping in May if runoff flows have dropped to the normal mean monthly levels for June (6.9 cfs) and USFWS has concurred via informal consultation.

- To prevent mortality of GBCT due to pumping from the East Fork of Terror Creek, the conservation measures are defined as: pumping during the June and July period would require the use of a screened pump intake, with a maximum ¼ inch size mesh. For the August through September period, when GBCT fry would be present in the stream, pump intakes would be screened with no larger than 1/16th mesh screen. The screen would not be confined to just the pump intake, but must cover a larger area, such as a cylinder or box design which has at least 5 times the surface area of the pump intake. Bowie must submit the final design for this screening fixture to the BLM Western Slope fisheries biologist, Tom Fresques (970-876-9078; t1fresqu@blm.gov), for his approval.

- During the June through September period, if the flows in East Terror Creek drop below the ten year mean monthly flow for October (1.0 cfs), Bowie will not pump water from the East Fork of Terror Creek.

- To prevent impacts to GBCT fry and fingerlings, pumping would not take place during the base flow (low flow) periods of the year; October through March.

- If there are existing roads or disturbance features within the 200-foot buffer along GBCT habitat streams, then no additional surface disturbance will be permitted within those areas. Maintenance of roads or other existing features must remain within the existing road prism or footprint of the feature being maintained.

- The operator shall not store equipment, machinery, or construction materials in any locations that are 200 feet or less from the riparian zones of the streams within the Terror Creek watershed.

BLM_0018250

- No overstory or understory vegetation will be removed from the riparian zone of the streams in the Terror Creek watershed.

- During construction or maintenance activities in proximity to the 200-foot riparian buffer zone, the edge of the buffer zone shall be marked for avoidance by construction equipment and activities.

- Within the Terror Creek watershed only fresh water, free of chemicals or other contaminants, may be used for dust abatement activities.

- Within the Terror Creek watershed, additional crossings of perennial streams will not be constructed

- The BLM UFO hydrologist must approve, in advance, the size and composition of riprap material to be used in the East Fork of Terror Creek.

- Bowie must report their annual water depletions to the BLM UFO by September 30 each calendar year. This includes depletions that result from surface activities associated with coal mining related activities within the Action Area, regardless of surface ownership.

- No additional disturbance, such as road widening or upgrading would occur within 200 feet of GBCT occupied habitat, as measured from the normal high water mark, to protect and maintain riparian vegetation and eliminate potential effects to the greenback cutthroat trout, unless exceptions were approved by the Authorized Officer.
- Site-specific surveys for sensitive plants would be conducted onsite prior to the development of any surface facilities or to other soil-disturbance activities.
- There would be no surface occupancy or soil-disturbing activities within a 100-foot radius of sensitive plant locations unless exceptions were approved by the Authorized Officer.
- Application of herbicides, surfactants, and other weed control measures would avoid overspray or drift onto desirable species or sensitive plants.

**Finding on the Public Land Health Standard for Threatened and Endangered Species**
The LHA (BLM, 2007) identified this area as meeting Public Land Health Standard 4 for special status species, including threatened and endangered species, but with problems, mainly as a result of weed infestations affecting the quality of available habitat. Fish habitat within the project area is in good condition with adequate riparian vegetation and water quality. The proposed project with implementation of BMPs and mitigation measures should not further degrade the quality of special status species populations and communities within the project area. The Standard with regard to threatened and endangered species, therefore, would be met.

**No Action Alternative**
The No Action Alternative would have no impacts to threatened, endangered, or sensitive species within the lease modification areas.

BLM_0018251

**MIGRATORY AND OTHER BIRDS OF CONSERVATION CONCERN**

**Affected Environment**

The Migratory Bird Treaty Act (916 U.S.C. 703-711) identifies numerous bird species of the southwestern U.S. that are assigned a migratory status. BLM signed a Memorandum of Understanding (MOU) with the USFWS in April 2010, which is intended to strengthen migratory bird conservation efforts by identifying and implementing strategies to promote conservation and reduce or eliminate adverse impacts on migratory birds. The focus of BLM's conservation efforts is on migratory species and some non-migratory game bird species that are listed as Birds of Conservation Concern (BCC). BCC have been identified by the USFWS (2008) for different Bird Conservation Regions (BCR) in the United States to identify those species in the greatest need of conservation action, outside of those species already listed by the USFWS as threatened or endangered. The entire project area is in BCR 16, the Southern Rockies/Colorado Plateau region. The USFWS lists 27 species (see Table 16) that are BCC in BCR 16 (USFWS, 2008). Table 16 also shows the status for each species within the UFO management area and probable presence within the project area (Kingery, 1998; CDOW, 2011). Several of the species in Table 16 were also included in the Endangered, Threatened, and Sensitive Species section.

Based on species' known distributions and habitat associations in western Colorado, nine species are known or have potential to occur in the project area: bald eagle, golden eagle (*Aquila chrysaetos*), peregrine falcon, prairie falcon (*Falco mexicanus*), Lewis's woodpecker (*Melanerpes lewis*), pinyon jay (*Gymnorhinus cyanocephalus*), Grace's warbler (*Dendroica graciae*), Brewer's sparrow, and Cassin's finch (*Carpodacus cassinii*). Two of these species were observed on-site during surveys: peregrine falcon and golden eagle.

An active peregrine falcon nest is located in the upper end of Dove Gulch. This is the only active peregrine nest known to occur in this general area. The nest is located over a high ridge and more than two miles from any activity associated with road and pad construction, and drilling activity. It is not expected to be affected by the activities associated with the proposed lease modifications.

The bald eagle is present as a winter resident along the North Fork of the Gunnison River. The river and adjacent habitats are designated as Bald Eagle Winter Forage Range by CDOW (2011), of which a small portion of the designated range overlaps proposed lease COC-61209, including GVB-B19A and access roads. Biological surveys indicate that bald eagle activity has been observed along the North Fork Valley, but that no bald eagles have been sighted in the mine area, or in areas near the mine, for several years.

BLM_0018252

**Table 16**
**Birds of Conservation Concern within BCR 16**

| Common Name<br>Scientific Name | Habitat [1] | Status Within UFO | Presence in Project Area |
|---|---|---|---|
| Gunnison sage-grouse<br>*Centrocercus minimus* | Expansive sagebrush with grasses, forbs, and healthy riparian; project outside of expected range. | Resident | No |
| American bittern<br>*Botaurus lentiginosus* | Dense freshwater marshes and extensive wet meadows. | Migrant | No |
| Bald eagle<br>*Haliaeetus leucocehpalus* | Nests, roosts in large cottonwoods along rivers; near prey or carrion during winter. | Migrant/Winter | Yes |
| Ferruginous hawk<br>*Buteo regalis* | Nests in isolated trees, rock outcrops, artificial structures, ground near prey base. | Migrant | No |
| Golden eagle<br>*Aquila chrysaetos* | Nest on open cliffs and in canyons or in tall trees (cottonwoods) in open country and riparian zones. | Resident | Yes |
| Peregrine falcon<br>*Falco peregrinus* | Nests on high cliff faces, often near water; forages in adjacent habitats. | Resident | Yes |
| Prairie falcon<br>*Falco mexicanus* | Nests in cavities on cliffs, rock outcrops adjacent to open grassland, shrublands. | Resident | Yes |
| Snowy plover<br>*Charadrius alexandrinus* | Barren or sparsely vegetated alkaline flats and river bars. | Migrant | No |
| Mountain plover<br>*Charadrius montanus* | Short-grass prairie and shrub-steppe landscapes,   ryland and cultivated farms, and prairie dog towns. | Migrant | No |
| Long-billed curlew<br>*Numenius americanus* | Short-grass grasslands, wheat fields, dry land agriculture near water. | Migrant | No |
| Yellow-billed cuckoo<br>*Coccyzus americanus* | Riparian forested habitats dominated by cottonwoods. | Breeding | No |
| Flammulated owl<br>*Otus flammeolus* | Nests in forest of ponderosa pine and Douglas-fir with aspen, and in aspen stands. | Breeding | No |
| Burrowing owl<br>*Athene cunicularia* | Nests in burrows, especially prairie dog / badger burrows in grasslands, desert shrub. | Breeding | No |
| Lewis's woodpecker<br>*Melanerpes lewis* | Nests in open stands of cottonwood riparian or urban stands, also in aspen, oak shrub. | Resident | Yes |
| Willow flycatcher<br>*Empidonax traillii* | Dense riparian habitats along rivers, streams, or other wetlands. | Breeding | No |
| Gray vireo<br>*Vireo vicinior* | Nests in open pinyon-juniper stands with mountain mahogany, deciduous shrub interspersed. | Breeding | No |
| Pinyon jay<br>*Gymnorhinus cyanocephalus* | Nest in pinyon and/or juniper woodlands, feed/cache pinyon nuts, juniper berries. | Resident | Yes |
| Juniper titmouse<br>*Baeolophus griseus* | Nests in pinyon and/or juniper open or dense woodlands, often intermixed with Gambel oak. | Breeding | No |
| Veery<br>*Catharus fuscescens* | Damp deciduous/mixed woodlands with dense understory, wood swaps/lowlands, and damp ravines. | Not present | No |

BLM_0018253

| Common Name<br>Scientific Name | Habitat [1] | Status Within<br>UFO | Presence in<br>Project Area |
|---|---|---|---|
| Bendire's thrasher<br>*Toxostoma bendirei* | Open farmlands, grasslands, and brushy arid to semi-arid deserts; breeds mainly in grasslands, shrublands or woodlands. | Not present | No |
| Grace's warbler<br>*Dendroica graciae* | Open montane forests, especially oaks, junipers, firs, and pines.. | Breeding | Yes |
| Brewer's sparrow<br>*Spizella breweri* | Nests in sagebrush, occasionally greasewood, rabbitbrush in desert valleys. | Breeding | Yes |
| Grasshopper sparrow<br>*Ammodramus savannarum* | Grasslands with few scattered shrubs. | Not present | No |
| Chestnut-collared longspur<br>*Calcarius ornatus* | Shortgrass or mixed-grass habitats heavily grazed or recently burned. | Not present | No |
| Black rosy-finch<br>*Leucosticte atrata* | Alpine areas usually near rock piles and cliffs; winters in mountain meadows, high deserts, valleys, and plains. | Winter | No |
| Brown-capped rosy-finch<br>*Leucosticte australis* | Nests on cliffs or in caves, rock slides or old buildings above timberline. | Winter | No |
| Cassin's finch<br>*Carpodacus cassinii* | Nests in montane forests with spruce/fir and aspen; also in lower pinyon-juniper woodlands. | Breeding | Yes |
| [1] Based on Righter et al., 2004. | | | |

**Environmental Consequences/Mitigation Measures**

**Proposed Action**

Underground activities would have no impacts on migratory bird and/or raptor populations. There is potential for disturbance to migratory birds during drilling, access, and site reclamation activities associated with GVB drilling where vegetation would be disturbed. This includes direct impacts to unidentified active nests, potential mortalities and injuries to birds and eggs in unidentified nests, and disturbance to suitable nesting habitat potentially resulting in incidental "take" of migratory birds. To minimize or avoid effects to nesting migratory birds, where practicable, Bowie would avoid vegetation removal during the migratory bird nesting period (May 15 to August 1).

Raptors nesting in the project area could abandon nests because of noise and human presence during the breeding period, which varies by species. Recent surveys within the proposed lease modification areas did not observe raptor nests within woodland habitat 0.25 mile from the project or within cliffs 0.5 mile from the project. It is not expected that construction of the project would affect nesting raptors.

**Mitigation**

BLM would require the following mitigation measures:

- A qualified biologist would conduct pre-construction breeding bird and raptor surveys during the breeding period within 0.5 mile of the general disturbance area (drill pads and access roads) if activities would occur during the breeding season (generally May 15 to

BLM_0018254

August 1, but varies by species).  Surveys would document active nests.  If no active nests are found and a survey report is submitted to and approved by the BLM Biologist, activities may begin within the cleared areas.  If active nests are found, development timing would be restricted during the breeding season, as per the BLM authorized officer.

- Where practicable, surface disturbing activities should not occur during the migratory bird nesting period (May 15 through August 1) to prevent potential take of migratory birds and/or eggs, unless vegetation is removed prior to May 15.  Nesting surveys conducted within 2 weeks of surface-disturbing activities that indicate no migratory bird species are nesting or otherwise present within the area to be disturbed may also be considered; however, consultation and approval by BLM would be required.

- If active nests were identified during project implementation, appropriate measures would be taken in order to reduce impacts to these species, including relocating overland access routes and drill-hole locations, and implementing disturbance-free buffer zones and timing limitations for active nests as recommended by the BLM UFO.

- All unavoidable surface disturbance would require approval of the BLM Authorized Officer.  The BLM would coordinate with USFWS and CPW to determine the type and extent of allowable variances.  A site-specific analysis would determine if this stipulation would apply.

**Finding on the Public Land Health Standard for Threatened and Endangered Species**

The LHA (BLM, 2007) identified this area as meeting Public Land Health Standard 4 for special status species, including threatened and endangered species and migratory birds. However, increased weed infestations have negatively affected the quality of available habitat. The project area was mapped as being at the margins of bald eagle winter range and populations of wintering bald eagles have increased in the North Fork LHA area. The project, as proposed, should not adversely affect migratory birds or their habitat, and should maintain this Standard over the life of mine.

**No Action Alternative**

Under the No Action Alternative, there would be no impacts to migratory birds within the proposed lease modification areas.

**WILDLIFE, TERRESTRIAL**

**Affected Environment**

The proposed lease modification areas occurs within the CPW Game Management Unit (GMU) 521, of which mule deer (*Odocoileus hemionus*), elk (*Cervus elaphus*), moose (*Alces alces*), black bear (*Ursus americanus*), and cougar (*Puma concolor*) are all big game species harvested in GMU 521. CPW has mapped seasonal ranges utilized by game species (CPW, 2010), and all portions of the project area are classified as overall range for those big game species, as well as for turkey (*Meleagris gallopavo*) (game bird).  Although CPW identifies the area as part of the overall range for moose on Grand Mesa, the plant communities on the lease modification area are marginally suitable for moose, and except for rare occasions, they are not expected to be present.  Elk winter range and mule deer summer range have also been classified within the project area.  A portion of the lease modification tracts have been identified as mule deer winter

BLM_0018255

range and black bear fall concentration area. Turkey and elk populations within the area are doing well (BLM, 2007). Mountain shrub habitat is widespread on the lower slopes of Grand Mesa, and other terrestrial wildlife associated with this habitat type in this area includes species such as coyote (*Canis latrans*), bobcat (*Lynx rufus*), porcupine (*Erethizon dorsatum*), eagles, hawks, blue grouse (*Dendragapus obscurus*), numerous migratory bird species, small mammals, amphibians, and reptiles (BLM, 2007). Wildlife habitat conditions in the area are generally good, with some areas that are heavily utilized by mule deer and elk, usually as a result of use constraints imposed by winter weather.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**
Activities associated with drilling GVBs may result in some temporary disturbance and in the displacement of local wildlife species from habitats near surface activities, in response to increased human presence and activity (noise). The disturbance and displacement would result in short-term impacts to individuals; however, due to the limited duration of activities and the availability of other unaffected suitable habitats in the vicinity of the proposed lease, these impacts would not be detrimental to population status and health. Presence of garbage during GVB construction activities could attract bears that could develop as a conflict and risk to bears. There would be a short-term loss of approximately 16.6 acres of wildlife habitat resulting from the construction of drill pads and new access roads associated with the GVBs. These impacts would not be long-term because the drill pads and access roads would be reclaimed after mining. In the long-term, reclamation would return the habitat to its pre-mining condition. Underground activities would not have an impact on terrestrial wildlife.

**Mitigation**
BLM would require the following mitigation measures:

- Facility construction and major scheduled maintenance would not be authorized within these crucial winter ranges from December 1 through April 30. All unavoidable surface disturbances within these crucial winter ranges during these times would require approval of the BLM Authorized Officer.

- Bear-proof containers would be used and refuse collected frequently to minimize potential for human-bear conflicts at construction sites. Employee training would include information to reduce bear-human conflicts including not feeding bears.

- Noise reduction mitigation would be utilized on the individual GVB pumps to reduce impacts from their operation.

**Finding on the Public Land Health Standard for Plant and Animal Communities (partial, see also Vegetation; Invasive, Non-native Species; and Wildlife, Aquatic)**

The area of the proposed lease modifications meets Public Land Health Standard 3 for healthy native communities (BLM, 2007). The abundance and amount of exotic and noxious vegetative species is increasing and that could decrease the habitat value for wildlife. Under the Proposed Action and with implementation of the mitigation measures listed within the invasive, non-native

BLM_0018256

species section and other BMPs, viable wildlife populations and communities would be maintained. The public lands within the proposed lease modification areas would continue to meet the standards for healthy plant and animal communities after implementation of the Proposed Action.

**No Action Alternative**

There would be no impacts to terrestrial wildlife as a result of the coal lease modifications and subsequent coal extraction.

## WILDLIFE, AQUATIC

**Affected Environment**

Aquatic habitat is present in Terror Creek and its tributaries. Greenback cutthroat trout are known to be present in the East and West Forks of Terror Creek and are believed to be present in Terror Creek (Speas, 2010; Carrillo, 2010). This species is discussed in the Endangered Species section of this document. Additional species known to be present in this stream system include speckled dace (*Rhinichthys osculus*) and mottled sculpin (*Cottus bairdi*) (Carrillo, 2010). It is likely that additional species are present. Aquatic habitat in Terror Creek is believed to be in good condition, well shaded by riparian vegetation, with stable banks, and a stable substrate. Approximately 3,106 linear feet of the West Fork of Terror Creek is contained with the proposed lease modification for COC-61209. Current mine plans do not propose surface or subsurface disturbance under the West Fork of Terror Creek. The closest longwall unit is approximately 490 feet from the creek.

The BLM North Fork Coal EIS, FS and BLM, 2000 noted that six monitoring stations in the vicinity of the Iron Point Coal Lease Tract measured ephemeral streams that are directly tributary to the North Fork of the Gunnison River. Upper and Lower Stevens Draw, A Gulch, B Gulch, C Gulch, and D Gulch are located within the permit boundary of the Bowie No. 2 Mine. These stations were monitored from February 1995 through December 1998. These streams are dry for much of the year. Flow events were captured only in the Lower B and C gulches. These flow measurements are less than 0.01 cfs, and there is no seasonal pattern.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**

Some short-term increases in sediment production associated with GVB drilling may occur, especially during high intensity storm events. The topography is steeper for both proposed lease modification areas, which slope to the West Fork of Terror Creek on the north and east side, and Stevens Gulch on the west. The lease modifications proposed by Bowie, along with the mitigation resulting from this EA, should result in minimal impacts to aquatic habitat or aquatic life (see also the Endangered Species section of this document). There would be no impact on Terror Creek stream flows from subsidence related to coal extraction in the current mine plan.

**Mitigation**

BLM_0018257

In addition to the mitigation measures provided in the Proposed Action, Wild and Scenic Rivers, and Endangered Species sections of this document, BLM would require Bowie to:

- Disinfect heavy equipment, hand tools, boots, and any other equipment that was previously used in a river, stream, lake, pond, or wetland prior to moving equipment to another waterbody to avoid spreading aquatic nuisance species or other undesirable biota (fish pathogens or parasites).

**Finding on the Public Land Health Standard for Plant and Animal Communities**

The riparian areas, including riparian vegetation along Terror Creek within the project area and Stevens Gulch downstream of the project area meet Standard 2 (BLM, 2007). These streams have no evident problems with hydrology, vegetation, or excessive erosion and deposition from either the stream channel or watershed, with the exception of weed problems.  With the implementation of BMPs and mitigation measures described, the aquatic habitats in the lease modification areas would continue to meet public land health standards.

**No Action Alternative**
There would be no impacts to aquatic species or habitat as a consequence of mining activities associated with the lease modifications.

**WETLANDS AND RIPARIAN ZONES**

**Affected Environment**
No wetlands, as defined in Section 404 of the Clean Water Act, have been identified within the proposed lease modification areas. Approximately 0.27 acre of riparian habitat has been delineated along the West Fork of Terror Creek. This riparian habitat contains limited populations of cottonwood and willow. During field surveys conducted in 2005, very little regeneration of either of these species was observed.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**
Surface-disturbing activities associated with the GVBs would be located so as to avoid impacts to riparian zones and Waters of the U.S., including any wetland/riparian areas associated with Terror Creek (0.27 acre). There would be no impacts to Waters of the U.S. or wetlands under the Proposed Action; therefore, no permit from the U.S. Army Corps of Engineers would be required.

The nearest road construction activities to creeks within the proposed lease modification areas would be those associated with the reopening of previously reclaimed roads and would take place approximately 0.4 mile from Terror Creek (see Map 3). The existing road along Terror Creek and Stevens Gulch would not be modified. Installation of proper sediment controls (see Mitigation Measures below) during road construction, combined with the distance of operations from streams would prevent sedimentation to area streams. Three of the GVB drill pads would be located on the high flats above Terror Creek and would be accessed from the existing road that follows Terror Creek.  Two GVB drill pads would be accessed from the Stevens Gulch Road

BLM_0018258

with two of the pads immediately adjacent to the road and the other four pads accessed from an existing upgraded road.

Existing roads through the proposed lease modification areas that would be used for GVB construction and operation occur immediately adjacent to both Terror Creek and Stevens Gulch. The operation of vehicles on these roads may slightly increase the rate of sedimentation into the stretches of streams closest to the roads. With the mitigation measures, shown below, the amount of sedimentation from these activities is expected to be minimal and short-term.

**Mitigation Measures**

The Proposed Action includes the following measures for protecting wetlands and riparian areas. Additional mitigation measures are also contained in the Threatened, Endangered and Sensitive Species section related to wetlands and riparian area:

- Ground disturbance would be located at least 200 feet away from drainages and wetlands to the extent possible (see mitigation for Threatened, Endangered and Sensitive Species).

- Dust control measures, such as wetting and surfactants, would be applied to exposed surfaces and soil stockpiles except within the Terror Creek watershed where only fresh water, free of chemicals or other contaminants, may be used for dust abatement activities.

- Proper sediment controls would be used during drill pad and road preparation. These would include sediment barriers, such as silt fences or straw bale sediment barriers, equipment matting, prompt revegetation, etc.

- The drill pads, along with any associated disturbance, would be located at least 200 feet from any delineated wetlands or riparian areas.

- No new surface disturbance off the existing road prism or footprint of the feature being maintained would occur in wetlands or riparian areas.

**Finding on the Public Land Health Standard for Riparian Systems**

The proposed lease modifications are identified as meeting Public Land Health Standard 5 for water quality (BLM, 2007). Terror Creek has 0.27 acre of riparian habitat. Based upon the lack of disturbance to wetlands and riparian zones within the proposed lease modifications, the criteria for this Standard would be met.

**No Action Alternative**

Under the No Action Alternative, there would be no impacts to wetlands and riparian zones in the proposed lease modification areas.

**FLOODPLAINS**

A 100-year floodplain is defined by the Federal Emergency Management Agency (FEMA) as the area adjacent to a watercourse that has a 1 percent chance of becoming wet in any single year (FEMA, 1989). Floodplain maps have been prepared by FEMA that cover the proposed leases; no floodplains have been mapped within the proposed lease modification boundaries (FEMA, 1989). Terror Creek is too small to be depicted at the scale of FEMA floodplain maps. However, these streams do not have any significant reaches that are likely to be regularly inundated by

BLM_0018259

flows that overtop their channel banks to the extent that they would leave areas of overbank deposition. Potential subsidence from coal extraction beneath these creeks could result in minor local shifts in channel morphology and gradient; however, these would not be considered floodplain alterations. There are not any mapped or identified floodplains within the proposed lease area; there would be no project-related disturbance within or near mapped floodplains.

## WATER QUALITY, SURFACE AND GROUND (includes a finding on Standard 5)

### Affected Environment

**Surface Water.** The lease modification tracts are located in the Terror Creek watershed. Terror Creek has a drainage basin of approximately 18,826 acres. The lease modification for COC-37210 contains approximately 1.26 % of the Terror Creek watershed and lease COC-61209 contains approximately 1.43 %, for a total of 2.69% (502 acres). The West Fork of Terror Creek is a perennial stream located on the lease modification tract for lease COC-61209.

CDPHE-Water Quality Control Commission (WQCC) (CDPHE, 2010b) classifies beneficial uses for the waters of the Terror Creek drainage on BLM-managed lands as Aquatic Life Cold 1, Recreation P, Water Supply, and Agricultural (CDPHE, 2010b). The Clean Water Act requires states to compile a list of waterbodies, known as the 303(d) list, that do not fully support their beneficial uses. Terror Creek is not identified on the 303(d) list or 305(b) report that the CDPHE provides to EPA under the Clean Water Act. Those documents identify impaired streams, i.e. those that do not meet water quality standards for the designated uses. However, Terror Creek drainage is tributary to the North Fork of the Gunnison River, which is listed on the 2010 303(d) list for selenium (CDPHE, 2010c). According to the most recent update to the Colorado 305(b) report, the leading cause of impairment in Colorado rivers is metals and specifically selenium derived from marine shales (CDPHE, 2010d).
The North Fork Coal EIS, FS and BLM, 2000 noted that surface water quality in streams that drain the Iron Point Coal Lease Tract area is relatively consistent, with only a few exceptions. Generally, flows in Hubbard and Terror creeks, and the North Fork of the Gunnison River, are calcium bicarbonate type water. Four stations: Iron Point Gulch (D34-12), Dove Gulch (D34-15), Lower Freeman Gulch (Free-low), and Lower Stevens Gulch (Steph-low) are calcium/sodium bicarbonate type with high concentrations of TDS. Metals concentrations at these four stations were below detection limits or within the state standards for total iron, manganese, and selenium with one exception; the Dove Gulch station had a concentration of total iron that slightly exceeded the standard in July 1998.

Regional water resources are also summarized in the LHA for the North Fork Area which describes the water sources in the lease modification areas as meeting Land Health Standard 5 (BLM, 2007).

**Groundwater.** Groundwater resources within the area are primarily associated with alluvial deposits, and the direction of flow follows local topography. Generally, this groundwater resource is of good quality, and is used for both human consumption and agricultural purposes. There are no groundwater wells within the proposed lease modification areas (CDNR, 2011).

BLM_0018260

There is some groundwater associated with bedrock formations; specifically, Mancos and Mesa Verde Formations. This analysis focuses on the Mesa Verde Formation because this is the formation in which mining activity would occur. Groundwater resources associated with this formation are minimal to moderate and are primarily associated with sandstone members of the formation. Groundwater flow typically follows the dip (5 degrees) of the bed, which trends to the northeast. Groundwater quantities are higher down-bed and lower near outcrops.

Historically, the Bowie No. 2 Mine has encountered very little water in its B-Seam workings (the area where mining is currently taking place). This is due, in part, to the mine's proximity to the formation's outcrop. Groundwater that has been encountered has been within perched water bearing zones associated with sandstones, and has been of limited extent. All groundwater intercepted during mining activities either by removing the coal or subsidence is currently being pumped into mined out portions of the mine, a practice that would continue to occur if mining of the lease modification tracts takes place.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**
Surface-disturbing activities associated with the drilling of GVBs would result in no direct impacts to surface waters; however, activities could indirectly result in increased amounts of sediment being deposited into surface waters due to increased erosion resulting from clearing and grading of GVB pads and the construction and use of access roads. These impacts would be mitigated by BMPs employed during construction of pads and roads (such as sediment control barriers and dust abatement). Impacts would be mainly short-term, as roads and pads would be reclaimed after construction.

No impacts to local perennial streams or aquatic wildlife are expected as a result of the implementation of the Proposed Action. The depletions of surface flows discussed in the Threatened, Endangered, and Sensitive Species section would impact the North Fork of the Gunnison River.

Terror Creek is approximately 490 feet from the closest longwall mining that would occur if the lease modifications were approved. Given a worst-case overburden depth of 600 feet, with an angle of draw of 25 degrees, the effects of surface subsidence are projected to extend approximately 250 feet from the longwall panel (BLM, 2000). In 2003, the U.S. Geological Survey completed a study of the streamflow gain-loss in a reach of Terror Creek, in the vicinity of the current and future mining. The study utilized tracer techniques and also incorporated other streamflow gauges, etc. in the study area. The study did not note any significant gains or losses of streamflow in the study reach. Through personnel communication with Art Etter, project engineer for Bowie, as Bowie constructed the entry mains under Terror Creek and began to mine west of the creek they found that the B seam is essentially dry (Etter 2012). Therefore, it is unlikely there would be any subsidence-related disturbance to the flows in Terror Creek, and no impacts to surface water, Endangered, Threatened, or Sensitive fish species or their habitat.

Subsidence would occur in areas above and adjacent to longwall mining. The amount of subsidence would depend upon many factors, including mine plans, coal seam thickness,

BLM_0018261

geologic strata, and overburden depth. Within the lease modification areas, overburden depth is greater than 1,000 feet, but less than 2,300 feet, and the maximum subsidence would be expected to be about 6 feet (see Geology and Minerals). Subsidence would be most noticeable on ridges and steeper slopes. Tension cracks may appear in bedrock outcrops, on steep slopes, and at the edges of subsidence. These cracks would result from shifts in the relative position of surface materials, and would have no connection to the fracture zone above the gob. Tension cracks could be comparatively deep and conspicuous in bedrock; however, they would not extend deeply below the surface. Tension cracks would not result in any potential drainage of surface water to the gob or contamination of surface water.

Subsidence from mining could alter surface water hydrology by altering surface water drainage patterns. As discussed above, there is little connection between groundwater flow regimes and surface water hydrology within this area, and no indirect impacts are anticipated. Subsidence under surface-water drainages could result in minor changes in channel morphology and gradient, thereby temporarily impacting water quality by inducing minor cutting, pooling, soil erosion, and sedimentation. Surface-tension cracks have the potential to develop within the surrounding surface drainages, which would result in an initial period of erosion and sedimentation after initial periods of run-off after subsidence occurs. Surface-tension cracks would be small and discontinuous, and would not result in any extensive rechanneling or draining of the stream channels. The potential for larger surface fractures to develop in drainages where unconsolidated materials occur would be partially mitigated by the ductile nature of the unconsolidated alluvium and colluvium. Settling and tension cracking of the surface would not impact surface water quantity, and would result in only local and short-term impacts to water quality.

Water discharge from the mine into surface streams could impact the quality of water in the receiving streams. Mine effluent would be regulated, and any discharge to receiving streams would have to meet permitted effluent requirements. Concentrations of total dissolved solids (TDS), iron, manganese, and sulfate could be constituents likely to increase. All groundwater intercepted during mining activities either by removing the coal or subsidence is currently being pumped into mined out portions of the mine, a practice that would continue to occur if mining of the lease modification tracts takes place.

The GVB drilling activity is not expected to cause impacts to either surface or groundwater in the project area. Mitigation measures associated with soils, hazardous materials, and the Threatened greenback cutthroat trout would be sufficient to protect the water quality in the West Fork of Terror Creek. The potential effects on groundwater as a result of coal mining that is already authorized, or occurring, on the adjacent leases would not be expected to change as a consequence of mining the sections of longwall proposed for the lease modification tracts.

**Mitigation**

See Threatened, Endangered, and Sensitive Species- Greenback Cutthroat Trout section.

BLM_0018262

**Finding on the Public Land Health Standard for Water Quality**

The proposed lease modifications are identified as meeting Public Land Health Standard 5 for water quality (BLM, 2007). Aquatic habitat is present in Terror Creek and its tributaries. Greenback cutthroat trout are known to be present in the East and West Forks of Terror Creek and are believed to be present in Terror Creek. This species is discussed in the Endangered Species section of this document. It is likely that additional species are present. Aquatic habitat in Terror Creek is believed to be in good condition, well shaded by riparian vegetation, with stable banks, and a stable substrate. Approximately 3,106 linear feet of the West Fork of Terror Creek is contained within the proposed lease modification for COC-61209. Current mine plans do not contain surface or subsurface disturbance under the West Fork of Terror Creek. Final locations for the drill pads have not been identified, but would be at least 200 feet from any delineated wetland or riparian area. The public lands within the proposed lease modification areas would continue to meet the Standards for healthy aquatic plant and animal communities after implementation of the Proposed Action.

**No Action Alternative**

No surface or groundwater quality impacts would occur as a result of coal mining on the lease modification tracts. However, water intercepted during mining activities would continue to be pumped into mined-out portions of the mine.

**WASTES, HAZARDOUS OR SOLID**

**Affected Environment**

The equipment and materials needed under the Proposed Action have low potential for accidental spill of regulated or hazardous waste substance release. These materials include motor fuel and drilling fluids (bentonite and benign soaps). Bowie would maintain all of the appropriate Material Safety Data Sheets (MSDS) for all chemicals, compounds, and substances to be used during project activities.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**

Impacts to the environment resulting from the release of hazardous or solid waste are not expected. The potential for impacts resulting from substance release would depend upon the responsible use of chemicals, and the immediate containment and adequate clean-up in the event of unintentional releases. The potential for exposure to hazardous or solid wastes would be low and short-term during drilling activities. Spill kits would be located onsite, which would be used in the case of an accidental spill in order to assist in rapid clean-up. Additionally, appropriate secondary containment would be utilized for all hazardous chemicals.

**Mitigation**

None.

BLM_0018263

**No Action Alternative**

Under the No Action Alternative, there would be no impacts associated with hazardous or solid wastes from the proposed lease modification tracts.

## ENVIRONMENTAL JUSTICE

### Affected Environment

Executive Order No. 12898 on Environmental Justice, regarding how federal actions may impact minority and low-income populations, was issued on February 11, 1994. The purpose of the order is to identify and address, as appropriate, disproportionately high and adverse human health and environmental impacts resulting from programs, policies, or activities on minority or low-income populations. U.S. Census Bureau summary data for Gunnison and Delta Counties (U.S. Census Bureau, 2008a and 2008b), and 2000 Census data for Census Tract 9639 in Gunnison County (U.S. Census Bureau, 2009), do not indicate that there are ethnic groups or communities or low-income populations within the upper drainage of the North Fork of the Gunnison River area, or in adjacent portions of Delta County that may be impacted by changes in employment at the mine. There are no low-income or minority populations that could be disproportionately impacted by the Proposed Action.

### Environmental Consequences/Mitigation Measnres

### Proposed Action

There are no environmental consequences associated with Environmental Justice under the Proposed Action, as operations in the lease modification areas would be continued as currently being conducted at the Bowie No. 2 Mine.

### Mitigation

None.

### No Action Alternative

Under the No Action Alternative, there would be no disproportionate negative impacts to minority and low-income populations.

## ACCESS AND TRANSPORTATION

### Affected Environment

The surface facilities of the Bowie No. 2 operation are accessed from old State Highway 133, approximately 1 mile from a junction between old State Highway 133 and the relocated section of State Highway 133. This junction is approximately 3 miles east of the community of Paonia. Access to the proposed lease modifications is by two roads. The Terror Creek road is an unsurfaced road that takes off from Colorado highway 133 on private land, proceeds up Terror Creek on to BLM land, and continues on to USFS lands. The Terror Creek road does not enter the proposed lease tract COC-61209 but would provide access to the GVBs associated with that tract. Bowie has acquired a BLM right-of-way (see Realty Authorizations section) for that

BLM_0018264

portion of the road on BLM lands.  This is not a public road and has limited access due to locked gates.

The Bowie No. 1 Mine and proposed lease tract COC-37210 is accessed from Paonia by the Stevens Gulch public road, which is initially a Delta County road, and is an asphalt all-weather, two-lane road to the entrances of the Bowie No. 1 Mine (approximately 2.5 miles).  Beyond the turnoff to the mine, the Stevens Gulch public road is no longer a county road but is an unpaved gravel road (FS road # 701) leading to the Gunnison National Forest (GNF).  Delta County maintains the road under agreement with the GNF.  The GNF has acquired easements through the private land for the public to access the National Forest.  The road is not maintained through the National Forest in the winter but is used for snowmobile and other winter access. The overall condition of the Stevens Gulch public road should be considered as fair, and it requires routine maintenance.   The road continues through the proposed lease tract and continues onto the Gunnison National Forest.

Several other roads have been constructed for past coal exploration activities within the proposed lease modifications. These roads have been reclaimed and do not currently serve as access routes into the proposed lease modifications, but would be re-opened to serve the project as access to GVBs sites.  Gates would be placed on these temporary roads to prevent public access, and reclamation would be accomplished when the GVBs sites are no longer needed.
Transportation of mined coal would occur entirely underground on the proposed lease modification areas.  As underground mining advances, conveyor belt lines would be extended to the working faces serving as an extension of the existing coal conveyance system.  The coal would arrive at the surface to be handled by the existing coal handling facilities at the Bowie No. 2 Mine and loaded primarily on trains for delivery.

A very small quantity of coal would be hauled by truck locally in the North Fork Valley. The North Fork Coal EIS, FS and BLM, 2000 did a comprehensive analysis of the truck and train transportation in association with the operations of the mining activities.  Transportation of the coal to the rail system is by a conveyor system.  This EA is tiered to the analysis in the North Fork Coal EIS, FS and BLM, 2000.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**
The Proposed Action is expected to result in only a minor and temporary impact on access to the proposed lease modification areas. GVB activities would result in the reopening of approximately 1 mile of reclaimed access roads and the construction of approximately 0.2 mile of new access roads on BLM-managed lands. These roads would remain open during the mining operations for access by light-duty trucks for regular inspections and maintenance of the GVBs. Both the new access roads and the reopened roads would be reclaimed after mining activities are completed. Roads constructed or reopened for GVB drilling would be kept closed to the public during GVB drilling and operation and appropriate signage would be used. Activities associated with the Proposed Action would not impact current public access to the proposed lease modification tracts.

BLM_0018265

Two longwall units are proposed under the Stevens Gulch public road.  Longwall units B21 and B22 both pass under the Stevens Gulch public road.  The overburden range for the panels is from 1,750 feet to 2,150 feet. At that depth there would be measurable subsidence but no visible surface cracking (see Geology and Minerals).  Therefore, it is expected that there would be no subsidence-related disturbance to the public road in Stevens Gulch.  Mitigation may be appropriate to ensure that impacts do not occur to the road.

The Proposed Action impacts from train transportation in association with the operations of the mining activities are expected to be within the impacts evaluated in the North Fork Coal EIS, FS and BLM, 2000.  This evaluation concluded that the Proposed Action would not result in significant effects beyond the range of effects already analyzed.  The proposed transportation of the coal product was analyzed within the North Fork Coal EIS (BLM, 2000) and presents no significant change to the federal action within that analysis.

**Mitigation**

Stevens Gulch public road would be protected from surface disturbance and subsidence due to mining by the following lease stipulation:

- No mining related disturbance would occur within 100 feet of the outside line of the right-of-way of Stevens Gulch public road.  The angle of draw used to protect the road from subsidence would be dictated by the approved Colorado DMG Mining and Reclamation Plan (the estimated angle of draw is conservatively estimated to be 25 degrees). However, mining-related disturbance may occur if, after public notice and the opportunity for public hearing in the locality, a written finding is made by the Authorized Officer that the interests of the public and the landowners affected by mining within 100 feet of a public road would be protected.

**No Action Alternative**

Under the No Action Alternative, there would be no new road construction and no reopening of existing reclaimed roads associated with the lease modification areas; therefore, there would be no impacts on access and transportation within the proposed lease modification areas.

**REALTY AUTHORIZATIONS**

**Affected Environment**

There are three existing rights-of-way on public lands within the lease modification area for tract COC-61209 (BLM, 2011).

- Right-of-way COC-66873 is an access road to Bowie Resources LLC for their mining operations.
- Right-of-way COC-22713, held by the WAPA, is a 125-foot wide right-of-way for an electrical transmission line with a capacity up to 345 kV.
- The third right-of-way, COC-44585, is for a stream gage monitoring station to Bowie Resources.

An additional public use, located on private land, includes the Pitkin Mesa Pipeline which is west of the Stevens Gulch road.  The pipeline crosses approximately 410 feet of the proposed lease modification for COC-37210. The original pipeline was built in 1938 and it collects water

BLM_0018266

from a series of springs located north of the proposed lease tracts on the National Forest.  During various times the original pipeline (4-inch diameter steel) has been replaced by a 6-inch diameter PVC pipeline.  The pipeline services approximately 160 domestic water taps on Pitkin Mesa.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**
Subsidence effects on the 230/345 kV WAPA transmission line is unlikely.  The worst-case angle of draw for subsidence effects from longwall mining would be 25 degrees (BLM, 2000).  Table 17 provides specific details on the potential subsidence effects to the three WAPA towers.  Given the distance of the three towers from the possible subsidence, no impacts are anticipated.  There is a potential for impacts to the 230/345 kV WAPA transmission line as a consequence of drilling equipment interference with overhead transmission lines or right-of-way access roads from surface drilling operations.  There is minimal potential for any impact on future realty actions on BLM-managed lands.

Table 17
Potential Subsidence Effects to WAPA Towers

| WAPA 230 KV Electrical Tower (north to south) | Depth of overburden for longwall B 20 nearest the tower (feet) | Surface expression of subsidence (using worst-case $25^0$ angle of draw) (feet) | Distance between tower and surface expression of subsidence (feet) |
|---|---|---|---|
| 4 | 1,060 | 447 | 170 |
| 5 | 1,160 | 461 | 135 |
| 6 | 1,140 | 452 | 371 |

**Mitigation**
BLM would require Bowie to implement the following mitigation measures:

- Electrical safety clearances addressed in the Code of Federal Regulations, 29 CFR 1910.333(c) (3) must be maintained at all times.

- All vehicles, equipment, and/or machinery or other materials near the Right-of-Way must be properly grounded.  In order to avoid static or induced electrical hazards no materials may be stored in the transmission line Right-of-Way.

- If future longwall mining would come within 100 feet of any transmission line tower foundation, a structural review and acceptance by WAPA would be required.

- Any drilling activities within WAPA's right-of-way must be approved by WAPA in advance.  Safety provisions would be provided to ensure there are no conflicts with WAPA's transmission line or access.

- Bowie is required to coordinate with WAPA's operations center located in Western Rocky Mountain Region Office in Loveland, Colorado at least two weeks prior to commencement of any work beneath or adjacent to the transmission line.

- Roads used to provide personnel and equipment access to WAPA's facilities cannot be restricted or impaired in a way that denies access.  Alternate access must be provided if an access road is blocked or damaged.  Damage to WAPA's access roads must be repaired by Bowie or Bowie's contractor.

- State-of-the-art mining techniques (pillar and panel widths, rate of coal development and

extraction, mine method, determining angle of draw, etc.) would be used to control subsidence. No mining related surface disturbance would occur within 100 feet of the outside line of the power line right-of-way without a written finding from the Authorized Officer and consultation with the right-of-way holder. These techniques would provide for maximum coal removal while insuring that sufficient coal is left in place to prevent subsidence.

- The applicant plans to mitigate the risk of damage to the Pitkin Mesa pipeline by installing a 6-inch diameter heat fusible high density polyethylene pipe (HDPE) on the surface above the existing buried PVC pipe through the projected zone of subsidence. The new HDPE pipe would be joined to the existing PVC pipe outside the projected zone of subsidence. Two years after mining the HDPE pipe would be buried adjacent to the existing PVC pipe.

**No Action Alternative**

There would be no impacts to current or future realty authorizations in the project area.

**WILDFIRE**

**Affected Environment**

Warm, dry summers experienced in the proposed lease modification areas contribute to a moderate to high risk of wildfire, depending upon specific meteorological conditions. There are no known recent wildfires within the proposed lease modification areas or immediate vicinity.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**

Potential wildfire hazards resulting from the implementation of the Proposed Action would be low to moderate. Drilling crews would be equipped with appropriate fire-suppression devices designed to respond to project-related fire starts. Equipment would only be operated on roads and drill pads, which would reduce the risk of fire ignition resulting from vehicle use. Drilling crews would have access to telephones to facilitate calls to Montrose Fire Dispatch in order to report naturally occurring wildfires.

**Mitigation**

None.

**No Action Alternative**

Under the No Action Alternative, there would be no project-related impacts to the risk of wildfire.

**HYDROLOGY/WATER RIGHTS**

**Affected Environment**

Table 18 provides a description of the water rights associated with the two lease modification tracts.

BLM_0018268

**Table 18**
**Water Rights Associated with the Project**

| Location | Qtr/Qtr | Water Source | Water Right Name | Water Right ID | Structure | Uses |
|---|---|---|---|---|---|---|
| **Proposed Lease modification COC-37210 - 6 surface water rights** | | | | | | |
| 13S 92W Section 1 | NWSW | N Fork Gunnison River | BM Spring | 2677 | Spring | Stock |
| | NWSW | N Fork Gunnison River | D M Spring | 2678 | Spring | Stock |
| | NWSW | N Fork Gunnison River | J M Spring | 2676 | Spring | Stock |
| | NW | Terror Creek | Pitkin Mesa Pipeline | 2737 | Spring, Pipeline | Domestic |
| | NW | Terror Creek | Pitkin Mesa Pipeline | 1191 | Spring, Pipeline | Irrigation, Stock, Domestic |
| | NWSW | Terror Creek | Stratton Springs 1, 2, 3 Pond | 1782 | Ditch, Spring | Stock, Domestic, Recreation |
| **Proposed lease modification COC-61209 - 3 surface water rights** | | | | | | |
| 13S 91W Section 5 | SWSW | Terror Creek | Borrow Spring Pipeline | 1547 | Pipeline | Domestic, Recreation, Stock |
| | NWNW | Terror Creek | Hughes Family Pipeline & Spring | 6241 | Spring, Pipeline | Domestic, Stock, Wildlife |
| | NWNE | N Fork Gunnison River | Reds Spring and Pipeline | 6222 | Pipeline | Domestic, Stock, Wildlife |
| Source:  CDNR, 2011. | | | | | | |

## Environmental Consequences/Mitigation Measures

### Proposed Action
Longwall units B21 and B22 pass under three springs and ponds in lease tract COC-37210.   The overburden range for the panels is from 1,750 feet to 2,150 feet. At that depth there would be measurable subsidence but no visible surface cracking (see Geology and Minerals).   Therefore, there would be no subsidence related disturbance to the springs and ponds.

### Mitigation Measures
Mitigation measures for water rights are normally addressed as part of the DRMS mine plan review process.

### No Action Alternative
Under the No Action Alternative, there would be no project-related impacts to water rights or hydrologic resources.

BLM_0018269

**NOISE**

**Affected Environment**

Noise has been recognized as a health hazard with the potential for causing hearing damage. Efforts by industry and regulatory actions have lessened the likelihood for hearing damage occurrence.

The secondary impact associated with noise is the nuisance effects of noise that include interference with speech, unsettling environment at home, work, recreation and other natural environment disruptions. Background noise levels vary greatly due to location and distance from working equipment. There are many factors that determine whether an increase in the noise level above the existing background is audible. The most important factor is the nature of the new noise source as compared to the nature of the background noise. In some cases relatively a small increase in noise levels caused by mechanical equipment would be noticeable.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**

From the surface, the mining of the coal does not create any noise disturbance. However, the noise generated from construction and drilling equipment in adjacent areas would be noticeable. Typically, the noise emissions as a result of adjacent surface facilities for the underground mines are not expected to be a general nuisance to nearby towns and residents or on the lease modification areas. The Bowie No. 2 surface facilities are located three miles from the community of Paonia, and noise control measures include maintenance of existing equipment and screening to contain, or deflect, noise. Impacts would occur locally associated with GVB well pump operations on the lease modification areas. It is possible that under certain meteorological conditions with quiet background, that noise from the surface facilities of the mine could be audible approximately 2 miles away (USFS, 2011). Most of the noise from the surface facilities at the mine would be blocked by topographic features.

**Mitigation**

Noise reduction mitigation would be utilized on the individual GVB pumps to reduce impacts from their operation and comply with state and Federal standards.

**No Action Alternative**

There would be no additional noise impacts in the project area from activities associated with the lease modifications if they are not issued.

**RECREATION**

**Affected Environment**

The vicinity of the proposed lease modifications provides dispersed, unstructured recreational use and opportunities. There are no developed recreational facilities (such as campgrounds) in the vicinity. The BLM allows year-round motorized and non-motorized recreational activities.

BLM_0018270

Primary recreational activities available to the public within the proposed lease modification areas include big game hunting, camping, and other dispersed recreation. Big game and mountain lion hunting is a seasonal activity, with calendar-specific hunting periods for mountain lion, deer, elk, and bear.

## Environmental Consequences/Mitigation Measures

### Proposed Action

Under the Proposed Action, dispersed recreation activities would likely be impacted during the proposed construction period. The general disturbance of the proposed lease modifications would likely temporarily lessen the potential for recreational use within the proposed lease modification areas and the immediate surroundings. Recreational use of lands within active operational portions of the proposed lease modifications would temporarily be displaced until completion of activities.

Adverse indirect impacts on the recreational experience near the proposed lease modifications, including hunting, hiking, camping, biking, and birding, would possibly be caused by elevated noise levels and a general increase in human activity and traffic stemming from construction activity. Elevated noise levels during construction would be temporary and would diminish with distance from the construction sites. As a whole, impacts to recreation would be localized and short-term.

### Mitigation

None.

### No Action Alternative

Under the No Action Alternative, there would be no project-related impacts to recreation resources if the lease modifications were not issued.

## VISUAL RESOURCE MANAGEMENT

### Affected Environment

The characteristic landscape consists of low rolling hills and steep-sided creek drainages vegetated with low-growing piñon, juniper, oak brush, sagebrush, and grasses. Most of the landscape within the proposed lease appears natural and undeveloped in character, and is composed primarily of scenery that is common for the region. The only visible existing mine facilities within, or near, the proposed lease are located 3 miles east of Paonia, and consist of the rail loadout and other surface facilities. These are readily visible within foreground views (less than 3 miles from viewpoint) of residents and motorists on State Highway 133.

The primary sensitive viewing area is State Highway 133 and the community of Paonia. Some motorists exposed to the landscapes would have a concern for scenic quality, and would be sensitive to modifications to the landscape. With the exception of dispersed recreation activities (primarily hunting and camping), the public does not visit other areas within, or near, the proposed leases. Most of the tracts are on upper slopes and relatively level terraces that are more

BLM_0018271

than 1,000 feet higher in elevation than Paonia and the highway, and are not within the viewsheds.

The BLM has inventoried visual resources within the area with the Visual Resource Management (VRM) system. The BLM recently conducted an updated visual resource management inventory. The proposed affected area falls within a Class III objective in the inventory. Class III objective is to partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate. Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape. In the Uncompahgre RMP, the proposed lease tracts are in BLM's Management Area 7. The RMP does not provide management direction for Management Area 7, which is managed primarily for coal development.

**Environmental Consequences/Mitigation Measures**

**Proposed Action**
Short-term impacts to the visual character of the landscape would result from drill pad construction, GVB drilling, and associated construction of ancillary facilities (such as access roads). These impacts would be temporary, and would not occur within the viewshed of sensitive viewpoints. The dust from construction activities, and the sight of vehicles on access roads used for the transport of equipment and workers, would be visible until construction activities are completed.

Long-term impacts associated with the implementation of the Proposed Action would result from the addition of temporary wellhead structures to the landscape and from the operation of ventilation pumps. The surface disturbance and aboveground facilities associated with the project would be located on flat terraces or on drainage slopes that do not face towards the highway or toward Paonia. All surface facilities would be higher in elevation than the viewpoints, with a very low profile that would not intrude into viewsheds. Access to most of the drill pads would be on existing access roads. The new access road would not be visible from any viewpoint. It is anticipated that there would be minimal to no cut-and-fill slopes at drill pads that would face towards sensitive viewing areas.

**Mitigation**
All aboveground long-term facilities shall be painted with a BLM-approved standard environmental color.

**No Action Alternative**
Under the No Action Alternative, there would be no project-related impacts to visual resources.

BLM_0018272

## GEOLOGY AND MINERALS

### Affected Environment

**General Geology.** The proposed lease modification area is located on the lower southern slopes of the Grand Mesa, in the Paonia-Somerset coal field which contains medium to high coal development potential deposits (BLM, 2000). The modification area resides on Quaternary Alluvium (Holocene Soil-creep deposits and Holocene-Pleistocene colluvial deposits) and the Cretaceous Mesa Verde Formation (Junge, 1978a). The Mesa Verde Formation consists of sandstone interbedded with dark gray shales, where coal beds are found in the two major members (Bowie Shale Member, Paonia Shale Member) (Stewart et al., 2006).

Table 19 provides a description of the geologic resources within the proposed lease modification areas. In addition to the geologic units described below, isolated igneous intrusions, which compromise the quality of adjacent coals, are present in the vicinity of the proposed lease modification areas (USFS and BLM, 2000). No faults are known within the proposed lease areas but they could be present.

**Table 19**
**Stratigraphy of Proposed Leases**

| Geologic Unit | | Geologic Period | Description |
|---|---|---|---|
| Alluvium and Colluvium | | Quaternary | Unconsolidated soil and rock formed by mass wasting processes or by weathering of intact bedrock. |
| Wasatch Formation | | Tertiary | Red and buff sandstones, and mudstones deposited in alluvial floodplains and stream channels (this formation contains abundant vertebrate fossils and outcrops commonly found throughout the region). |
| Mesa Verde Group | Ohio Creek Member | Cretaceous | Fluvial conglomerate often used as a local stratigraphic datum. |
| | Barren Member | | Up to 2,300 feet of interbedded sandstones, shales, siltstones, and coals deposited during the final regression of the Western Interior Seaway. Mesa Verde sandstones are common natural gas reservoirs targeted for production to the northwest in Mesa and Garfield Counties. Coal Seams A, B, and C are found near the base of the Lower Coal Member; the D- and E-Seams are found in the base of the Upper Coal Member; the F-Seam is located at the top of the Upper Coal Member. Portions of the Mesa Verde Formation, including coal seams, do outcrop within the Proposed lease. |
| | Upper Coal Member | | |
| | Lower Coal Member | | |
| | Rollins Sandstone | | |
| Mancos Formation | | | Up to 4,000 feet of marine shales (this formation does not outcrop within the Proposed lease, but is exposed west of Somerset along the North Fork of the Gunnison River). |

The surface geology in the area of proposed leasing is Mesa Verde on the northern tip, grading to Holocene Soil-creep deposits. The Soil-creep deposits are mixtures of sand, silt, and clay with rock fragments. These deposits are characterized by a series of small swales and ridges, and are generally a sign of unstable slopes.

The Cretaceous Mesa Verde Formation is the surface unit in part, and lies below the alluvium in

BLM_0018273

part of the proposed leasing area. The Mesa Verde is the coal bearing formation in the general region and the target of mining in the project area. The top of the Mesa Verde is approximately 0-400 feet below surface. Extensive burn zones exist in the Mesa Verde (Stewart et al., 2006). This is evidenced in the region where the Mesa Verde outcrops as red colored shale and can be seen along Highway 133, which gives access to Terror Creek Road (Chronic and Williams, 2002). The Mesa Verde is above the Mancos Shale which is a regionally extensive bed of marine shales ranging up to 4,000 feet in thickness (Tweto, 1979). The regional geology was described in detail in the North Fork Coal EIS, FS and BLM, 2000.

Geologic hazards are defined in the lease modification areas as potentially unstable and unstable slopes, and rockfall areas. The area of proposed leasing rests upon potentially unstable slopes, which means that past or present mass movement is not apparent (Junge, 1978b).

A portion of federal oil and gas lease (serial number COC64766) held by Gunnison Energy Corp. overlaps the coal lease modification tract COC37210 in T.13 S., R. 92 W., Section 1: SWNW, lots 8 and 9, 6th PM. This lease expires on 04/19/2013.

According to the Colorado Oil and Gas Conservation Commission, there have been no oil and gas wells drilled and/or abandoned in the proposed lease development area.

Past oil and gas activity within the region has included coal-bed methane wells, shale wells, and coal mine methane wells. The wells within approximately 20 miles of the lease modification areas include;

- 56 total wells drilled on private surface (25), split-estate wells (11), Forest Service (20), and no BLM wells.
- 20 wells are producing and 31 are shut-in.
- Total disturbance includes:
  - Well pads - approximately 127.5 acres.
  - Pipelines - approximately 76.4 acres.
  - Roads - approximately 129.6 acres
  - Facilities – approximately 48.11 acres
  - Total disturbance – 381.61 acres (average disturbance per well – 6.8 acres)

**Environmental Consequences/Mitigation Measures**

**Proposed Action**

The Proposed Action could result in the production of approximately 3.25 million recoverable tons of coal that would otherwise be bypassed. There is the possibility of subsidence issues during mining by longwall techniques. Subsidence is the gradual lowering of the surface after the large rectangular blocks of coal are removed from the longwall mining panels. It is common that after coal recovery, the overburden could be altered due to subsidence. Shallow overburden results in greater vertical lowering of the surface over longwall mining areas. Data from the Bowie No. 1 Mine and field measurements of subsidence cracks in the Mesaverde Formation by Dunrud (1976) indicate subsidence cracks may develop through overburden thicknesses of up to 800 feet under unfavorable conditions. While unfavorable conditions cannot be defined exactly, they may include zones of weathered coal and overburden. Overburden thicknesses over 800

BLM_0018274

feet have been classified as having a negligible risk of surface fracturing developing. This is a conservative upper limit under normal conditions.

This analysis of subsidence is tiered to the North Fork Coal EIS, FS and BLM, 2000 in Appendix K "Subsidence Evaluation," and in Chapter 3.2 under the analysis of Topography/Physiography. That EIS document addresses the west tract which is known as the Iron Point Coal Tract and assigned tract serial number COC-61209. That EIS also provides guidance in assessing potential subsidence in the proposed leases. The longwall panel design, and yield and gate road pillar design and configuration are similar to those used in the Iron Point Coal Tract. None of the underlying coal seams has been mined within the proposed lease modification areas; therefore, subsidence amounts are reported for mining in undisturbed ground.

Roof rocks primarily consisting of strong, thick sandstones of the Mesa Verde Group would cave into the mine in larger blocks than would shale roof rocks, and would reduce the height of caving above the mine workings. These sandstones would generally reduce the amount of subsidence compared to shale. Sandstones at the surface would have larger displacements, and may form cracks up to 1 foot wide and 25 to 50 feet deep on steep slopes. Formation of joints and fractures on steep slopes may contribute to slope instability and susceptibility to landslides and rockfalls. At overburden depths greater than 1,000 to 1,500 feet, gate road pillars would yield to the level of recompacted, caved, and broken rock in the longwall panel. This range of depths would be common within the proposed lease modification areas.

The values reported in Table 20 are calculated for undisturbed areas and an average D-Seam mining thickness of 12 feet and a panel width of 800 feet. On average, the maximum amount of subsidence is projected to be approximately 0.6 times the mining thickness.

**Table 20**
**Anticipated Subsidence Values within the Proposed Leases**

| Maximum Subsidence Parameters | | | | |
|---|---|---|---|---|
| Overburden Depth (feet) | Vertical Displacement (feet) | Maximum Tilt (percent) | Horizontal Tensile Strain (percent) | Horizontal Compressive Strain (percent) |
| 100-250 | 7.2 | 21.6 – 8.6 | 7.2 – 2.9 | 7.2 – 2.9 |
| 250-500 | 7.2 | 8.6 – 4.3 | 2.9 – 1.4 | 2.6 – 1.3 |
| 500-1,000 | 7.2 – 6.0 | 4.3 – 1.8 | 1.4 – 0.6 | 1.3 – 0.7 |
| 1,000-1,500 | 6.0 – 4.1 | 1.8 – 0.8 | 0.6 – 0.3 | 0.7 – 0.5 |
| 1,500-2,000 | 4.1 – 2.4 | 0.8 – 0.4 | 0.3 – 0.15 | 0.5 – 0.3 |
| 2,000-2,500 | 2.4 – 1.6 | 0.4 – 0.2 | 0.15 – 0.1 | 0.3 – 0.15 |
| Note: Modified from USFS and BLM, 2000. | | | | |

In the DRMS permit area, Bowie has segregated the mine area into three zones of expected subsidence impact. The zone of greatest subsidence impact is in areas where the overburden is between 110 and 500 feet. The zone of intermediate subsidence impact is in areas where the overburden is between 500 and 1,000 feet. The zone of minor subsidence impact is in areas where the overburden is over 1,000 feet. Under normal conditions, subsidence cracks do not appear likely to propagate through more than 500 feet of overburden.

BLM_0018275

The overburden range for both lease modification areas is from 1,000 feet to 2,150 feet. The east side of the COC-61209 lease modification has the shallower 1,000 feet of overburden but gains overburden rather quickly, climbing out of the drainages. At that depth there would be measurable subsidence but no visible surface cracking (Bowie, 2011). Assuming a coal seam thickness of 12 feet, surface lowering after longwall mining could vary from 6 to 8 feet (BLM, 2000). Based on the information contained in the North Fork Coal EIS, FS and BLM, 2000, the mining is unlikely to result in detectable surface subsidence impacts.

**Geologic Hazards.** Generally, potential geologic hazards include landslides, frost heaves, and seismic activity related to known or suspected active faults. Landslides and rockfall represent the geologic hazards within the proposed lease modification areas. Some landslides have occurred within the proposed lease modification areas during the past 30 years (mainly as a result of higher-than-average precipitation during the 1980's). Some of these landslides occurred as reactivations of previously disturbed slopes, and some were new movements. Rockfall-prone areas occur in the western portion of the study area, as do less-extensive areas of unstable slopes.

**Other Geologic Resources.** Other mineral resources in the area include oil and gas leasing and perhaps interest in coal bed methane. Impacts to the oil and gas resources are not expected to occur as result of the Proposed Action.

## Mitigation
The Colorado DRMS requires detailed information, monitoring, and repair of subsidence impacts as set forth in Section 2.05.6(6), Subsidence Survey, Subsidence Monitoring, and Subsidence Control Plan, of the Regulations of the Colorado Mined Land Reclamation Board for Coal Mining (DRMS, 2010). These regulations have been in force for Colorado since 1980 and would serve as mitigation for future mining on the proposed lease modification areas.

As required by DRMS, a subsidence monitoring survey network was established in May 1999 (Cragg Surveying, 2010), and new monitoring points may be added to the lease modification areas if mined. The subsidence monitoring of these points and others should help to mitigate subsidence during mining.

## No Action Alternative
Under the No Action Alternative, there would be no project-related impacts to the geology of the area from subsidence, and the coal in the lease modification areas would remain in place.

## PALEONTOLOGY

## Affected Environment
Exposed bedrock within the proposed lease consists predominantly of the Cretaceous Mesa Verde Group. Residuum and colluvium of the Tertiary-age Wasatch Formation is also present. Both of these formations are ranked as Class 5 formations (very high potential to yield scientifically significant fossils) under the BLM's Potential Fossil Yield Classification (PFYC) System (DOE and BLM, 2008). Mammalian taxa are most common in the Wasatch Formation of the southern Piceance Basin, and include representatives of the following fossil orders: Pantodonta, Condylarthra, Primata, Taeniodontia, Multituberculata, Rodentia, Tillodontia, and

BLM_0018276

Perissodactyla (Lucas, 1998). Reptiles, amphibians, invertebrate, and plant fossils are also found in the Wasatch Formation. The Mesa Verde Group contains dinosaur, mammal, reptile, crocodile, turtle, invertebrate, and plant fossils (BLM, 2005).

**Environmental Consequences/Mitigation Measures**

**Proposed Action**

Under the Proposed Action, scientifically important paleontological resources could be destroyed during road and pad construction, as well as during GVB drilling. Coal, although the remains of ancient vegetation, is not considered a scientifically important fossil.

**Mitigation**

Mitigation measures for paleontological resources would include:

- If any paleontological resources are located during construction of the pads or roads, construction would stop and the BLM would be notified immediately.

**No Action Alternative**

There would be no impacts to paleontology resources in the project area.

## SOCIOECONOMICS

**Affected Environment**

The area of influence for the social and economic elements of this EA includes Delta County in west central Colorado. Delta County is the area of influence for the population and demographic component because the majority of employees at the coal mining facilities and their families live within the communities in its jurisdiction.

The cumulative impact area would include Delta County. Baseline data for Delta County in the area of influence includes population and demographic data as well as current business and economic statistics information. The information in this section was obtained from the US Bureau of the Census based on the 2000 census and 2009 Census Bureau data (www.census.gov). Additional information was obtained from the Colorado Department of Local Affairs (CDOLA) State Demography Office (www.colorado.gov/cs/Satellite/DOLA-Main/).

**Population.** Table 21 presents basic population and demographic information for Delta County and the State of Colorado.

BLM_0018277

**Table 21**
**Population by Category, 2000 and 2009, Delta County and the State of Colorado**

| Population | Delta County | Colorado |
|---|---|---|
| 2000 | 27,834 | 4,302,015 |
| 2009 | 31,322 | 5,024,748 |
| % Change | 12.5% | 16.8% |
| Male (2008) | 49.8% | 50.4% |
| Female (2008) | 50.2% | 49.6% |
| Under 5 years | 5.8% | 7.3% |
| Under 18 years | 21.4% | 24.4% |
| 65 years and over | 19.9% | 10.3% |
| % Minority (2008) | 16.4% | 29% |
| % Below poverty (2008) | 12.1% | 11.2% |
| Source: US Census Bureau, 2008a. | | |

Delta County comprises 1,142 square miles with 24.4 people per square mile and a total population of 31,322 people in 2009. Delta County grew by almost 12.5% between 2000 and 2009. According to CDOLA, Delta County grew slower than the state but faster than the nation between 1970 and 2000, with an annual average growth rate of 2.7%. The median age in Delta County is 42.3 years with 21.4% of the population being under the age of 18 and almost 20% being 65 years or older. According to census data, over 80% of the people age 25 and older in Delta County have graduated from high school and just over 17% have graduated from college.

The Town of Delta is the largest town in Delta County with a 2000 population of 6,400, an increase of 75% since 1990. Other communities in the county include Cedaredge (2000 population of 1,854), Crawford (2000 population of 366), Hotchkiss (2000 population of 968), Orchard City (2000 population of 2,880), and Paonia (2000 population of 1,497). The 2009 US Census reports that there were 13,391 housing units in Delta County that housed 11,058 households, indicating a vacancy rate of approximately 17%. Only 3.7% of the vacant houses are classified as seasonal, recreational, or for occasional use. Approximately 8% of rental units were classified as vacant. There were 2.43 persons per household. Delta County had a home ownership rate of 77.5% in 2000, well above the state average of 67%. The median value of an owner occupied housing unit was $115,500, well below the state average of $166,600.

**Economic Resources.**   Coal mining employment in Delta County in 2009 is estimated at approximately 1,000 employees (US Department of Commerce, 2012). The unemployment rate in Delta County in 2009 was 7%, much lower than the statewide average of 8.4% for the same period (http://www.bls.gov/lau/laucntycur14.txt).
In 2009, the Bowie No. 2 Mine employed an average of 305 full and part time workers with an annual payroll of approximately $28.3 million. Average mining wages in 2009 were more than twice the average wage for other employment sectors in the project area ($23,254) (Region 10 Review, 2003). The Bowie No. 2 Mine spends many dollars locally for materials, supplies, and services. In addition, the Bowie No. 2 contributes royalty and tax payments to the local and national economy.

BLM_0018278

**Environmental Consequences/Mitigation Measures**

**Proposed Action**

Assuming that the lease modifications are approved and the existing Bowie No. 2 Mine operations and facilities used, there would be no new or added employment at the Bowie No. 2 Mine. Mining the coal reserves in the lease modifications would increase the life of the mine. No additional demand for housing or municipal services would be anticipated. Mining operations would be extended throughout the period required to mine recoverable coal reserves. This extension of mining operations would also extend the annual payroll, local expenditures, and taxes and royalty payments for approximately one year. The federal government receives annual payments from coal lease holders based on rents at not less than $3.00 per acre. The rental rates are specified in the lease. Royalty payments are 8% of the value of the coal removed from an underground mine (43 C.F.R. § 3473). Royalties from the federal coal are distributed in the following way: 50% returns to the federal treasury in the general fund. The other 50% is returned to the State where the coal was mined, with a portion of that percentage being returned to the county where the coal was mined. In Colorado, those funds are managed by CDOLA in the Energy Impact Fund. These monies are distributed on a grant-like basis to counties affected by energy resource development for community benefit projects.

**No Action Alternative**

If the lease modifications were not approved and not offered for sale, coal mining at the Bowie No. 2 Mine would continue at existing rates until existing reserves are depleted. At that point, the mining employment sector would be terminated. An estimated 3.25 million recoverable tons of federal coal would be permanently bypassed. Reductions in jobs and associated salaries, local expenditures, royalty and tax payments would occur after the reserves are depleted. The federal government (US Treasury) would not receive the rents and royalties associated with mining the coal in the lease modifications.

## CUMULATIVE IMPACTS

Cumulative impacts are the environmental impacts that could result from the implementation of the Proposed Action, when added to the impacts from all other past, present, and reasonably foreseeable activities, regardless of who is conducting such activities. Cumulative impacts can result from individually minor, but collectively significant, actions taking place over a period of time. The cumulative effects analysis considers the geographic scope of the cumulative effects and past, present, and reasonably foreseeable actions. Geographic scope may vary by resource and will be described within that cumulative impacts section for that specific resource if different than that described below.

For this project that geographic scope is focused upon the expanded watershed area from east of the town of Delta, north to the Mesa/Delta County line, east to the Pitkin County boundary, then south and west along the watershed for the North Fork of the Gunnison River back towards the town of Delta. This area is approximately 566,700 acres in total with National Forest being 57% (322,400 acres), BLM 11% (61,150 acres), and private land 32% (182,150 acres). A portion of the private land has the mineral estate reserved to the United States in the patents.

**Past Actions.** The primary existing (past) disturbances within the proposed lease are associated

BLM_0018279

with mining, oil and gas, livestock grazing, and residential/agricultural development.

Historic mining activities over the past century include the following:
- Hawks Nest Mine;
- Oliver Mine No. 1 and No. 2;
- Bear Mine No. 1, No. 2, and No. 3;
- Edwards Mine;
- USS Steel Mine;
- Blue Ribbon Mine;
- King Mine;
- Farmers Mine;
- Oxbow Sanborn Creek; and
- Bowie No. 1 Mine (a.k.a. Orchard Valley Mine).

Past oil and gas activity within the region has included coal-bed methane wells and conventional gas wells. The wells within approximately 20 miles of the lease modification areas include:
- 56 total wells drilled. 25 are on private surface/private minerals; 11 are split-estate wells (private surface, federal minerals); 20 are on U.S. Forest Service surface; and no wells are on BLM surface.
- 20 wells are producing, 31 are capable of producing but are shut-in, and 5 are temporarily abandoned.
- Total disturbance includes:
  - Well pads – approximately 127.5 acres.
  - Pipelines – approximately 76.4 acres.
  - Roads – approximately 129.6 acres.
  - Facilities – approximately 48.1 acres.
  - Total disturbance – 381.6 acres (average disturbance per well – 6.8 acres).

Over the last century, there has been noticeable subsidence in a number of areas above the historic mines. However, there has been no known damage to overlying resources or to structures attributable to this subsidence. Subsidence may have aggravated or contributed to some landslide movements, but this is difficult to identify given the pre-mining instability of many areas of the valley.

**Present Actions.**  Present actions are focused on mining, oil and gas, livestock grazing, and residential/ agricultural development.

<u>Mining</u>
The following table contains recent production data for the three coal mines in the North Fork Valley.

**Raw Coal Production - North Fork Valley (NF) - BLM-UFO**
**1-Year Averages**

| Average based on: | Bowie No. 2 | Elk Creek | West Elk | Totals (NF) |
|---|---|---|---|---|
| 5 Year | 2,808,556 | 4,378,814 | 5,721,944 | 12,909,314 |
| 1 Year | 1,873,357 | 3,495,575 | 6,499,048 | 11,867,980 |
| Periods end Sept. 30, 2011 | | | | |

BLM_0018280

NOTE: The total yearly production for the NF is expected to remain about the same -- between 12 and 13 million tons. Each of these mining operations control coal reserves with a mix of Federal and fee coal; however, 90 percent or more of local production is Federal. As mining progresses, only Federal coal will be available in the reserve base.

- Bowie No. 2 was opened in 1997 as a room-and-pillar mine but converted to a longwall system in late 1999. It is located northeast of Paonia and is operated by Bowie Resources, LLC with a loadout northeast of Paonia.
- The Elk Creek Mine is a longwall operation north of Somerset, operated by Oxbow Mining, LLC, with a loadout immediately north of Somerset. There are 13,429 acres permitted.
- The West Elk Mine is a longwall operation located south and east of Somerset and is operated by Mountain Coal Company with a loadout about 1 mile east of Somerset. There are 17,155 acres permitted and the mine is about the 7th largest underground longwall coal mine in the U.S.

The North Fork Branch of the Union Pacific Railroad operates exclusively to serve these coal mines. This line branches from the main line in Grand Junction and passes through Delta, Hotchkiss, Paonia, and Somerset.

Oil and Gas Leasing
There are approximately 418,469 total acres of federal oil and gas mineral estate within the cumulative impacts area. Overall, there are 173,646 acres currently leased. This includes 54,580 acres of inventoried roadless areas which were leased prior to implementation of the 2001 USFS roadless rule. If these pre-2001 leases expire and are subsequently leased again, they will have surface use restrictions for whatever roadless rule may be in place. Approximately 124,192 unleased acres are within inventoried roadless areas which, due to on-going litigation, may have surface use restrictions related to road building if ever nominated for leasing. Approximately 120,631 acres of Federal oil and gas mineral estate remains available for nomination to be leased at this time.

Other
Historically, fruit orchards along the valley floor and low mesas have been important to the local Paonia economy. More recently, vineyards have replaced some orchards in the area.
- Sheep and cattle are grazed in pastureland around Paonia and also at higher elevations near the mining operations during the summer.
- There are a number of water storage reservoirs and canals around the North Fork Valley to serve agriculture and domestic uses.
- WAPA operates the Curecanti-Rifle 230/345 kV transmission line that parallels Terror Creek.
- Residential developments in the area around the communities of Paonia, Hotchkiss, Crawford, and Delta have been growing in population, with many new houses being built. Most of this development has been down-valley from the coal mines in broader portions of the North Fork Valley. This development has increased the traffic load and demand for maintenance on State Highway 133.
- There is little developed recreation in the area; however, the area is widely used for dispersed recreational activities, such as hunting, four-wheeling, hiking, picnicking,

BLM_0018281

horseback riding, snowmobiling, mountain biking and sight-seeing.
- Forest treatments timber sales have been limited in the area.

**Reasonably Foreseeable Future Actions.** Underground coal mining would continue in the North Fork Valley. In addition to existing coal leasing and exploration activities, the following are reasonably foreseeable future actions:

- Oxbow Mining, LLC (Elk Creek Mine) was granted a 786-acre lease by application with surface disturbance of approximately 5.63 acres on public lands and a 157-acre coal lease modification with no surface disturbance on the GMUG.
- Mountain Coal Company (West Elk Mine) applied to construct, operate, and reclaim up to 159 E Seam methane drainage well (MDWs) sites that would support 171 individual MDWs, and use or construction of approximately 26.1 miles of roads within the GMUG are in the final process of approval. Also, on August 2, 2012, the GMUG issued a Record of Decision on its FEIS and consented to BLM to issue two lease modifications adjacent to each other and to current leases to the south within the GMUG. BLM's decision is pending. It would add approximately 1,700 acres to the West Elk Mine, of which an estimated 73 acres will be actively disturbed for the remaining life of the mine.
- Oxbow Mining, LLC (Oak Mesa Project – coal exploration license) - a proposal to drill 43 exploration drill holes on private and federal lands into federal subsurface holdings. The entire exploration area covers about 13,873 acres, and temporary surface disturbances from road and pad construction would occur on about 32.86 acres.
- Bowie Resources, LLC (Bowie No. 2 Mine) applied for two lease modifications adjacent to current leases to the north under private and public lands and are in the first stages of NEPA analysis (i.e., the Proposed Action herein). They would add approximately 502 acres, and temporary surface disturbances from road and pad construction would occur on about 16.6 acres.

Additional actions including coal lease modifications and new coal lease applications could be expected in the North Fork Valley. These factors may affect how long mining would continue in this area; however, it is likely that mining would continue for another decade, if not more.

Pending oil and gas activity includes 22 total permits.
- 9 shale well permits;
- 8 coal-bed methane wells; and
- 5 coal mine methane wells.
- Total estimated disturbance based on current permits – approximately 150 acres (based on 6.8 acres of disturbance per well).

It is difficult to forecast future oil and gas development within the cumulative impact assessment region. The area is seeing an increase in development which exceeds the past average. Activity increases are due to changes in technology for the drilling and development of the conventional mancos shale wells and wells used to capture methane from coal mines. It is estimated that the area will average 20 new wells per year (assumes at least 2 wells per pad – 10 new pads per year). This will then create approximately 68 acres of new disturbance per year from oil and gas development.

BLM_0018282

SG Interests I, Ltd (SG) has proposed a 150 gas well Master Development Plan to develop mineral leases they hold within the Bull Mountain Unit located in Gunnison County, Colorado. SG is proposing to drill and produce 150 wells from approximately 41 individual well pads and associated infrastructure. Approximately 50% of the wells are targeting coalbed methane production and the other 50% will be exploring other potentially productive natural gas zones encountered by drilling into other geologic zones in the area of the Bull Mountain Unit.

2012 Oil and Gas lease nomination: The BLM is currently developing an environmental analysis regarding a nomination to lease nearly 30,000 acres of federal oil and gas mineral estate. 22,000 acres of the proposed nominations lie within the cumulative impacts assessment area of this EA.

**Cumulative Impacts.** Cumulatively, impacts from the proposed coal lease modifications could include small increases in deposition of sediment or pollutants into surface waters, increased subsidence within the North Fork Valley, low increase in cumulative emission of GHGs from mine ventilation, and a slight increase in water withdrawal from the Colorado River system that may potentially impact several federally-listed species of fish in downstream portions of the North Fork and Gunnison Rivers. None of these impacts is expected to be major as analyzed in the specific resource sections. Impacts resulting from the proposed lease modifications could add incrementally to impacts from the other activities discussed above, resulting in a low-level increase in noise, human presence, soil erosion, invasive weeds, wildlife habitat loss, and vegetation loss or conversion. These impacts are discussed in the sections below. Cumulative impacts associated with coal mining activities in the area were analyzed in greater detail in the Uncompahgre Basin RMP Environmental Impact Statement (BLM, 1988), as well as in the North Fork Coal EIS, FS and BLM, 2000.

**Air Quality.** The cumulative impacts to air quality in the area would primarily result in emissions of particulate matter, $NO_X$, and $SO_2$ from current and future mining of coal. Mining activities related to air emissions are permitted by the Air Pollution Control Division of the CDPHE. The State imposes permitting limits and control measures in order to limit emissions of NAAQS pollutants. The State develops air quality attainment and maintenance plans in order to keep Colorado in compliance with the Federal NAAQS. Therefore, cumulative impacts are not anticipated to exceed NAAQS, or to push the region into non-attainment for any NAAQS, and would result in no net change.

Furthermore, a detailed air quality assessment, including modeling, of the original mine was conducted as part of the environmental analysis for the Iron Point Coal Lease Tract in 2000 (See North Fork Coal EIS, FS and BLM, 2000). The APCD also ensures limits are consistent with the NAAQS by requiring air quality modeling where appropriate.

The air quality analysis conducted for the original mine included an emissions inventory and modeling analysis. That emissions inventory quantifies $PM_{10}$, $NO_X$, and $SO_2$ emissions. The modeling analysis also includes a visibility impacts assessment in the West Elk Wilderness Area as well as an atmospheric deposition impacts assessment. Emissions that were calculated and modeled included tailpipe emissions from mining equipment, haul trucks, and locomotives

BLM_0018283

(railway emissions).  The results of that detailed impact assessment predicted no significant impacts to air quality as a result of Bowie Mine operations.

The proposed expanded lease area would retain the current coal production rate of 5.0 million tons, and the emissions generating equipment used is assumed to be slightly newer than equipment analyzed for the operation in 2000. Therefore, the air quality impacts associated with the proposed mine expansion can be presumed to be equal to, or less than, impacts predicted in the original air quality impact assessment.

The BLM estimated the amount of GHG emissions that could be attributed to coal production as a result of the proposed lease modifications, as well as from the forecast coal production from all three coal mines in the North Fork Valley.

Coal production for the operating mines in the North Fork Valley are reported to produce the following emissions of CO2e:
- Coal production and Methane Liberation at the Bowie No. 2 Mine 474,464 metric tons of CO2 equivalent released per year based on on-going mine activities.
- Coal Production and Methane Liberation at the Elk Creek Mine (Oxbow) 1,200,000 tons of CO2 equivalent released per year based on on-going mine activities.
- Coal Production and Methane Liberation from the West Elk Mine 1,230,000 tons of CO2 equivalent released per year based on on-going mine activities.

The BLM assumed that the majority of the coal was used for coal fired electric generation as part of the total U.S. use of coal for electric generation. Policies regulating specific levels of significance have not yet been established for GHG emissions. Given the state of the science, it is not possible to associate specific actions with the specific global impacts such as potential climate effects.  Since there are no tools available to quantify incremental climate changes associated with these GHG emissions, the analysis cannot reach conclusions as to the extent or significance of the emissions on global climate. The potential impacts of climate change represent the cumulative aggregation of all worldwide GHG emissions.

**Climate Change.**  Continued mining, operation of mine surface facilities, and associated vehicle traffic, would result in minor cumulative contributions to the release of GHGs into the atmosphere. The mining, processing, and shipping of coal from the Bowie No. 2 Mine, and from other mines in the area, would contribute to GHG emissions through carbon fuels used in mining (including fuel consumed by heavy equipment and stationary machinery), electricity used on site, methane released from mined coal, and rail transport of the coal.  The use of the coal after it is mined has not been determined at this time; however, almost all of the coal that would be mined from the Bowie No. 2 Mine would be used by coal-fired power plants in order to generate electricity.  This also results in the production of GHGs.  The proposed lease modifications would make an additional area of the coal seam that is being mined available for mining, and would extend the life of mine by approximately 1 year.  Coal production would be consistent with current production rates.  Release of GHGs would remain about the same as current rates.

**Wild and Scenic Rivers.**  Cumulative impacts to the inventoried segment of the West Fork of Terror Creek should be limited with possible effects from livestock grazing, recreation use, and

BLM_0018284

other mineral related activity such as oil and gas development.  Private lands in the area around the inventoried segment could be developed in the future and affect the segment.

**Cultural Resources.**  Few cultural resources have been documented within the Bowie No. 2 Mine area. Cultural resources on steep slopes, and in areas of rock outcrops, could be impacted by subsidence resulting from underground mining. Dispersed residential and other development activities could also impact cultural resources. Currently, there is no requirement for systematic cultural resource surveys for other developments within the proposed lease.

**Native American Religious Concerns.**   There would be no cumulative Native American religious impacts resulting from continued mining and other rural development in the Bowie No. 2 Mine area.

**Soils.**   The cumulative impacts of continued underground mining to soils in the Bowie No. 2 Mine area would primarily be the disturbance effects of GVB surface facilities. In addition, the land over the mined areas would subside in place and remain largely intact. There could be local areas of erosion; however, the overall impacts to soils would be minor.   Oil and gas development, dispersed residential, recreation use, ATV use, and other developments would result in localized impacts to soils; however, the overall cumulative impacts of these developments would be minor.

**Vegetation.**   Other than minor subsidence impacts and disturbance from GVB development, continuing mining operations in the Bowie No. 2 Mine area would not greatly impact vegetation communities. Sustainable grazing is anticipated to continue, as practiced, and vegetation communities are not expected to be altered by this practice. There may be local displacement of vegetation communities as a result of continued dispersed residential and forest management activities. Sustainable grazing is anticipated to continue, as practiced, and vegetation communities are not expected to be altered by this practice. There may be local displacement of vegetation communities as a result of continued oil and gas development, dispersed residential and forest management activities, and recreation and ATV use.  Overall, cumulative impacts to vegetation are expected to be minor, and mining operations would negligibly contribute to these impacts.

**Invasive, Non-Native Species.**   Other than minor subsidence impacts and disturbance from GVB development, continuing mining operations in the Bowie No. 2 Mine area would not greatly impact vegetation communities' health and create opportunities for invasive species. Mitigation required to control invasive species should limit the impacts from invasive species.

**Threatened, Endangered, and Special Status Species.**  There would be negligible cumulative impacts to identified threatened, endangered or special status species or habitats from continued mining and other development activities in the Bowie No. 2 Mine area. Residential or other development would also result in minimal surface disturbance on habitats in the area.

**Migratory and other Birds of Conservation Concern.**  Prolonged mining would result in negligible impacts to migratory and other birds of conservation concern habitat and population dynamics. Dispersed residential development is expected to continue in the area. This

BLM_0018285

development could cause birds sensitive to human activity to seek habitat outside the area of development. The increased presence of houses, other buildings, fences, roads, and traffic would also alter the movement of the birds and increase losses due to human and other introduced species contact. Migratory and other birds of conservation concern and their habitats would still be present in the area; however, but they would likely be altered or reduced.

**Wildlife, Terrestrial.** Other than what has already been analyzed, prolonged mining would result in negligible impacts to wildlife habitat and population dynamics. Dispersed residential development is expected to continue in the area. This development could cause wildlife sensitive to human activity to seek habitat outside the area of development. The increased presence of houses, other buildings, fences, roads, and traffic would also alter the movement of big game animals, and would restrict hunting and other recreational opportunities. Wildlife and their habitats would still be present in the area; however, but they would likely be altered or reduced.

**Wildlife, Aquatic.** Disturbance of aquatic species in the Terror Creek watershed would continue to take place as a result of coal mining, livestock grazing, recreation, timber sales, and other human activities. Due to the short-term nature, and small acreage that would be impacted by actions associated with this lease modification, it is unlikely that they would contribute to a detectable increase in cumulative impacts on aquatic species in the Terror Creek watershed.

**Wetlands and Riparian.** The cumulative impacts of continued mining to wetlands in the Bowie No. 2 Mine area would be minimal, due to subsidence in the mine area. Dispersed residential development is expected to continue in the mine area. This development would remove or alter local wetlands, and their present vegetation communities, in the area. Federal regulations under Section 404 of the Clean Water Act, as well as regulations set by the U.S. Army Corp of Engineers over jurisdictional waters, would reduce the potential for developments to remove or impact wetlands in the area.

**Water Resources.** There would be minor cumulative impacts to identified water resources from continued mining, GVB development, and from other rural development in the Bowie No. 2 Mine area. Underground mines would result in limited disturbance on the surface; however, the subsidence-related impacts to water resources would be additive for other areas of development. Permit requirements would mitigate these potential impacts. Residential and other developments would also have additive impacts due to surface disturbance and use of groundwater for domestic purposes. Uses of water from mining and other developments could impact the quantity and quality available to downstream users in the primary downstream drainages.

**Wastes, Hazardous or Solid.** Continued mining would produce additional quantities of hazardous and solid waste. These materials would continue to be managed and controlled under current regulations and BMPs. Cumulative impacts would be kept within state and federal guidelines, and would be minor. Development of residential and other activities would also generate hazardous and solid wastes. It is expected that the private landowners would contract with private waste management specialists, and the cumulative impacts would be minor.

**Environmental Justice.** There would be no cumulative environmental justice impacts resulting from continued mining and other rural development in the Bowie No. 2 Mine area.

BLM_0018286

**Transportation Facilities and Access.** Future mining operations and other development activities would maintain and, potentially, open new related infrastructure for traffic access. Potential oil and gas development, residential development on private land and other activities may increase access and road infrastructure in the area. The tax revenue generated from mining and other development would contribute to the maintenance of public roads. The railroad traffic related to mining would not impact other traffic with the continuation of mining activities.

**Water Rights.** Mining activity in the Terror Creek watershed and Bowie's adjacent leases would continue, and groundwater would continue to be intercepted with minimal expected impacts. Other activities associated with residential development, oil and gas activities, and recreation use may put additional demands on water resources within the area and especially groundwater used for development.

**Noise.** The principal noise sources related to the continued mining operation of the surface facilities include the ventilation fans, GVB pumps, trucks, conveyors, loadout equipment, and trains in the area. The dispersed residential development, oil and gas activities, and other recreation activities would also impact background noise levels, due to the increased human presence in the area.

**Recreation.** The mining activities are unlikely to result in a detectable change in recreation activities within the lease modification or surrounding areas of the Terror Creek watershed. Recreational use is expected to continue and/or increase in the future with residential development, ATV use, and hunting activities.

**Visual Resources.** Dispersed residential, oil and gas development and other utility development activities would impact visual resources. The houses, roads, and utility infrastructure would alter the visual character of the landscape. These developments are not regulated in terms of visual impacts.

**Geology, Mineral Resources, and Paleontology.** The cumulative impacts resulting from the continued underground mining in the Bowie No. 2 Mine Area would primarily be due to the removal of large amounts of coal. Other geologic features, mineral resources, and paleontology in the overburden of the coal would subside in place and remain largely intact. Subsidence would be expected to be relatively uniform over large areas. The impacts of subsidence may include lowering elevations over subsided areas. There may be small areas that would require mitigation measures in order to restore surface drainage patterns; however, the overall impacts of subsidence would be minor. Dispersed residential and other development activities would result in only localized impacts to geology, mineral resources, and paleontology. The overall cumulative impacts of these developments would be minor.

**Socioeconomics.** The cumulative socioeconomic effects of continued mining would include a constant level of employment and tax revenues during the operation of the mine and the removal of that source of income when the mine is closed. Residential and other development activities would increase the local population and infrastructure in the area. The cumulative social and economic effects of past, present, and reasonably foreseeable actions in the North Fork of the

BLM_0018287

Gunnison River Valley relative to coal mining operations would be to extend the mining employment sector proportionately to the length of the remaining reserves.

**PERSONS / AGENCIES CONSULTED**

The following agencies were contacted for input in the development of this EA. Issues raised during scoping are addressed in more detail in the Scoping and Identified Issues section.

- USFS, Delta and Paonia Offices, Colorado
- USFWS, Grand Junction, Colorado
- Western Area Power Administration
- Colorado Parks and Wildlife
- Office of Surface Mining
- U.S. Army Corp of Engineers
- Delta County Planning Department

**INTERDISCIPLINARY REVIEW**

The following BLM personnel have contributed to and have reviewed this EA:

| Name | Title | Area of Responsibility |
|---|---|---|
| Amanda Clements | Ecologist | Wetland and Riparian |
| Desty Dyer | Mining Engineer | Solid Mineral Leasing |
| Glade Hadden | Archaeologist | Cultural Resources, Paleontology |
| Ken Holsinger | Fuels Specialist | Fire |
| Julie Jackson | Outdoor Recreation Planner | VRM, Recreation, Wilderness, Transportation |
| Alan Kraus | Hazmat Specialist | Solid and Hazardous Wastes |
| Bruce Krickbaum | NEPA Coordinator | EA/NEPA Review and Compliance |
| Teresa Pfifer | Land and Minerals Supervisor | Lands and Minerals |
| Lynae Rogers | Range Specialist | Invasive Species, Range, Vegetation |
| Melissa Siders | Wildlife Biologist | Migratory Birds, Threatened, Endangered and Sensitive Species, Terrestrial and Aquatic Wildlife |
| Dave Kauffman | Biological Staff Supervisor | Biological Resources |
| Jedd Sondergard | Hydrologist | Soil, Water |
| Thane Stranathan | Natural Resources Specialist | Oil and Gas, GIS data |
| Chad Meister | Air Quality Specialist | Air Quality, Climate |
| David Epstein | Socioeconomics Specialist | Socioeconomics |

BLM_0018288

# List of Acronyms and Abbreviations

| | |
|---|---|
| ACEC | Areas of Critical Environmental Concern |
| AO | Authorized Officer |
| AQRVs | Air Quality-Related Values |
| APCD | Air Pollution Control Division |
| APEN | Air Pollution Emission Notice |
| BA | Biological Assessment |
| BCC | Birds of Conservation Concern |
| BLM | Bureau of Land Management |
| BMPs | Best Management Practices |
| Bowie | Bowie Resources, LLC |
| CAA | Clean Air Act |
| CAAQS | Colorado Ambient Air Quality Standards |
| CASTNET | Clean Air Status and Trends Network |
| CDOLA | Colorado Department of Local Affairs |
| CDOW | Colorado Division of Wildlife now known as CPW |
| CDPHE | Colorado Department of Public Health and Environment |
| CDWR | Colorado Division of Water Resources |
| CEQ | Council of Environmental Quality |
| CFC | chlorofluorocarbon |
| cfm | cubic feet minute |
| CFR | Code of Federal Regulations |
| CH4 | methane |
| CMM | Coal Mine Methane |
| COS | Carbon Offsets |
| CO | carbon monoxide |
| $CO_2$ | carbon dioxide |
| $CO_{2e}$ | carbon dioxide equivalent |
| CPW | Colorado Parks and Wildlife formerly known as CDOW |
| CVCP | Colorado Vegetation Classification Project |
| DOE | Department of Energy |
| DRMS | Division of Reclamation Mining and Safety |
| EA | Environmental Assessment |
| EPA | Environmental Protection Agency |
| EO | Executive Order |
| ESA | Endangered Species Act |
| FCLAA | Federal Coal Leasing Amendments Act |
| FEIS | Final Environmental Impact Statement |
| FEMA | Federal Emergency Management Agency |
| FLPMA | Federal Land Policy and Management Act |
| GBCT | Greenback Cutthroat Trout |
| GHG | greenhouse gas emissions |
| GMU | Game Management Unit |
| GNF | Gunnison National Forest |
| GRI | Grand River Institute |
| GVBs | gob vent boreholes |
| GVG | gob vent gas |
| GWP | global warming potential |
| HAP | hazardous air pollutants |

BLM_0018289

| | |
|---|---|
| HDPE | high density polyethylene pipe |
| HCFC | hydrochloroflurocarbon |
| IMPROVE | Interagency Monitoring of Protected Visual Environments |
| IBR | Incorporate by Reference |
| LAU | lynx analysis unit |
| LDGT | light duty gasoline truck |
| LHA | Land Health Assessment |
| MLA | Mineral Leasing Act |
| MDWs | methane drainage well |
| MOU | Memorandum of Understanding |
| MSDS | Material Safety Data Sheets |
| MSHA | Mine Safety and Health Administration |
| MU | mapping unit |
| MY | model year |
| N2O | nitrous oxide |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NF | North Fork Valley |
| $NO_2$ | nitrogen dioxide |
| $NO_x$ | nitrogen oxides |
| NRCS | Natural Resource Conservation Service |
| NSPS | New Source Performance Standard |
| $O_3$ | ozone |
| OSMRE | Office of Surface Mining Reclamation and Enforcement |
| Pb | lead |
| PBO | Programmatic Biological Opinion |
| $PM_{2.5}$ | particulate matter less than 2.5 microns in effective diameter |
| $PM_{10}$ | particulate matter less than 10 microns in effective diameter |
| PUP | Pesticide Use Proposal |
| PSD | Prevention of Significant Deterioration |
| RMP | Resource Management Plan |
| RTO | Regenerative thermal oxidation |
| SIP | State Implementation Plan |
| SMCRA | Surface Mining Control and Reclamation Act of 1977 |
| $SO_2$ | sulfur dioxide |
| SPM | special-purpose monitoring |
| SVR | standard visual range |
| TDS | total dissolved solids |
| TE | thermal efficiency |
| TSP | total suspended particulate |
| UFO | Uncompahgre Field Office |
| USDI | U.S. Department of the Interior |
| VAM | Ventilation Air Methane |
| VCG | Vessels Coal Gas, Inc. |
| VOCs | volatile organic compounds |
| WAPA | Western Area Power Administration |
| WQCC | Water Quality Control Commission |
| WSA | Wilderness Study Area |
| WSR | Wild and Scenic River |
| WUS | Waters of the U.S. |

BLM_0018290

# REFERENCES

Adams, R.A. 2003. Bats of the Rocky Mountain West. University of Colorado Press, Boulder, Colorado.

Andrews, R. and R. Righter. 1992. Colorado Birds: a Reference to their Distribution and Habitat. Denver Museum of Natural History. Denver, Colorado.

Beason, J.P. 2009. Yellow-billed Cuckoos in Western Colorado. Tech Rep. R-YBCUCPW & USFWS-08-1. Rocky Mountain Bird Observatory, Brighton, Colorado, 27 pp. Accessed online at : http://rmbo.org/public/monitoring/PDF_Reports/CPW_USFWS_YBCU_REPORT_26JAN09v3.pdf.

Bureau of Land Management. 1988. Uncompahgre Basin Proposed Resource Management Plan and Final Environmental Impact Statement, September 1988. 196 pages.

Bureau of Land Management. 1989. Uncompahgre Basin Resource Management Plan and Record of Decision (amended, 1992, 1994, 1997, 2001). Uncompahgre Field Office. Montrose, Colorado.

Bureau of Land Management. 2000. North Fork Coal EIS and Record of Decision. Uncompahgre Field Office, Montrose, Colorado.

Bureau of Land Management. 2002. Canada Lynx Habitat Mapping, GIS data. Uncompahgre Field Office, Montrose, Colorado.

Bureau of Land Management. 2005. Little Snake Resource Management Plan, Analysis of the Management Situation. April 2005.

Bureau of Land Management. 2007. North Fork Land Health Assessment, 2006-2007. Bureau of Land Management, Uncompahgre Field Office, Montrose, Colorado. 110 pages.

Bureau of Land Management. 2009. BLM Colorado State Director's Sensitive Species List. Available online: BowieEA12-08-11.dochttp://www.blm.gov/pgdata/etc/medialib/blm/co/programs/botany.Par.8609.File.dat/BLM%20CO%20SD%20Sensitive%20Spec.%20List.pdf. November.

Bureau of Land Management. 2010. Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Planning Area. June 2010.

Bureau of Land Management. 2011. BLM's Land and Mineral Legacy Rehost 2000 System-LR2000. Available online at: http://www.blm.gov/lr2000/.

Bowie Resources. 2011. Personal Communication with Art Etter. Map providing overburden contours.

Carrillo, Michael. 2010. Fish Species in the Terror Creek System. E-mail with WestWater Engineering. March 30, 2010.

Chronic, Halka, and Felicie Williams. 2002. Roadside Geology of Colorado. Second Edition. Mountain Press Publishing Company, Missoula, Montana.

BLM_0018291

Climate Analysis Indicators Tool (CAIT-US). 2011. Version 4.0. World Resources Institute, Washington, DC. Accessed on March 28, 2011 from < http://cait.wri.org/>.

Colorado Department of Agriculture. 2011. Colorado Noxious Weed List. Noxious Weed Management Program. Last accessed online at: http://www.colorado.gov/cs/Satellite/Agriculture-Main/CDAG/1174084048733. September.

Colorado Department of Natural Resources. 2011. Colorado Decision Support Systems, Water Rights Database. Colorado Department of Natural Resources, Division of Water Resources, Denver. Available online at: http://cdss.state.co.us/onlineTools/Pages/WaterRights.aspx.

Colorado Department of Public Health and Environment (CDPHE). 2008. Colorado Air Quality Control Commission Report to the Public 2007-2008. 60 pages.

Colorado Department of Public Health and Environment. 2010a. Colorado 2009 Air Quality Data Report. Colorado Department of Public Health and Environment, Air Pollution Control Division, Denver. August 2010.

Colorado Department of Public Health and Environment. 2010b. State of Colorado Integrated Water Quality Monitoring and Assessment Report Prepared Pursuant to Section 303(d) and Section 305(b) of the Clean Water Act. Colorado Department of Public Health and Environment, Water Quality Control Commission, Denver. Available online at: http://www.cdphe.state.co.us/op/wqcc/Resources/waterstatus_305_b/305bRept2010.pdf

Colorado Department of Public Health and Environment. 2010c. Colorado's Section 303(d) List of Impaired Waters and Monitoring and Evaluation List, Regulation No. 93, effective April 30, 2010. Colorado Department of Public Health and Environment, Water Quality Control Commission, Denver. Available online at: http://www.cdphe.state.co.us/regulations/wqccregs/100293wqlimitedsegtmdlsnew.pdf

Colorado Department of Public Health and Environment. 2010d. Integrated Water Quality Monitoring and Assessment Report, 2010 Update to the 2008 305(b) Report. Colorado Department of Public Health and Environment, Water Quality Control Division, Denver.

Colorado Department of Public Health and Environment. 2011. Letter from Nancy Chick to Ralph Morris, Environ Corporation, Summary of rural area background concentration estimates for the BLM Grand Junction and Uncompahgre Field Office Resource Management Plans. Colorado Department of Public Health and Environment, Air Pollution Control Division, Denver. June 6 2011.

Colorado Division of Wildlife, Bureau of Land Management, and U.S. Forest Service. 2003. Colorado Vegetation Classification Project. Available online at: .

Colorado Division of Wildlife. 2009. Natural Diversity Information Source. Colorado State University. Available at: http://ndis.nrel.colostate.edu/.

Colorado Division of Wildlife. 2010. Threatened and Endangered Species List. Colorado Division of Wildlife. Denver, CO. Available online at: http://wildlife.state.co.us/WildlifeSpecies/SpeciesOfConcern/ThreatenedEndangeredList/ListOfThreatenedAndEndangeredSpecies.htm

BLM_0018292

Colorado Division of Wildlife. 2011. Colorado's Biological Map and Data Resource. Natural Diversity Information Source , Colorado Division of Wildlife. Available Online: http://ndis.nrel.colostate.edu/

Colorado Division of Wildlife, Bureau of Land Management, and U.S. Forest Service. 2003. Colorado Vegetation Classification Project. Available online at: http://ndis.nrel.colostate.edu/coveg/.

Colorado Natural Heritage Program. 2009. Rare Plant Guide. Colorado State University. Available at: http://www.cnhp.colostate.edu/.

Cragg Surveying. 2010. Bowie No. 2 and 3 Mines, Subsidence Surveys. May 17th to June 18th, 2010, Paonia, Colorado.

Culver, D.R., P. Lyon, and J. Huggins. 2008. Survey of Critical Biological Resources, Rio Blanco County, Colorado. Prepared for Rio Blanco County, Meeker, CO, U.S. Environmental Protection Agency, Region 8, Denver CO, and Colorado Department of Natural Resources, Division Wildlife, Wetlands Program, Denver, Colorado.

Division of Reclamation Mining and Safety. 2010. Regulations of the Colorado Mined Land Reclamation Board for Coal Mining, (Section 2.05.6(6)). Available online at: http://mining.state.co.us/

Dunrud, C.R. 1976. Some engineering geologic factors controlling coal mine subsidence in Utah and Colorado: U.S. Geological Survey Professional Paper 969, 39p.

Environmental Protection Agency. 2008 "Identifying Opportunities for Methane Recovery at U.S. Coal Mines: Profiles of Selected Gassy Underground Coal Mines 2002 – 2006" revised January 2009.

Environmental Protection Agency. 2010. "Inventory of U.S. Greenhouse Gas Emissions and Sinks 1990-2008," EPA Publication 430-R-10-006. April 15,2010.

Environmental Protection Agency. 2011. Clean Air Status and Trends Network (CASTNET). Online at: http://epa.gov/castnet/javaweb/index.html. Accessed December 2011.

Federal Emergency Management Agency. 1989. Flood Insurance Rate Map, Gunnison County, Colorado (Unincorporated Areas). Community Panel Numbers 080078 275 B, 080078 125 B, and 080078 235 B. September 29, 2008.

Etter, Art. 2012. Personal Email Communication with Jim Ferguson. WestWater Engineering. January 10, 2012.

Fitzgerald, J.P., C.A. Meaney, and D.M. Armstrong. 1994. Mammals of Colorado. Denver Museum of Natural History and University Press of Colorado. Niwot, Colorado.

Grand River Institute. 2011. Class III Cultural Resources Inventory and Paleontological Assessment of Two Proposed Lease Modification Block Areas (MOD COC-37210 and MOD COC-61209) in Delta County, Colorado for Bowie Resources, LLC. GRI Project No. 2011-86. September 30, 2011.

Hammerson, G.A. 1986. Amphibians and Reptiles in Colorado. Colorado Division of Wildlife, Denver, Colorado.

BLM_0018293

Interagency Working Group on Social Cost of Carbon, United States Government. 2010. Social Cost of Carbon for Regulatory Impact Analysis. Online at: http://www.epa.gov/otaq/climate/regulations/scc-tsd.pdf.

Intergovernmental Panel on Climate Change (IPCC). 2006 IPCC Guidelines for National Greenhouse Gas Inventories, Volume 2 – Energy. Table 2.2 Default Emission Factors for Stationary Combustion in the Energy Industries. ISBN 4-88788-032-4. Accessed on March 28, 2011 from < http://www.ipcc-nggip.iges.or.jp/public/2006gl/index.html>.

Junge, Walter R. 1978a. Surficial Geology of the Bowie Quadrangle. Colorado Geological Survey. Plate 2 of 7. Surficial geology, Hotchkiss-Paonia Reservoir area, Delta and Gunnison Counties, Colorado, Denver.

Junge, Walter R. 1978b. Geologic Hazards Map of the Bowie Quadrangle, Plate 2 of 7, Hotchkiss-Paonia Reservoir area, Delta and Gunnison Counties, Colorado. Denver, Colorado.

Kingery, Hugh E., ed. 1998. Colorado Breeding Bird Atlas. Colorado Bird Atlas Partnership and Colorado Division of Wildlife, Denver. 636 pages.

Knick, S.T., and J.T. Rotenberry. 2001. Effects of Habitat Fragmentation on Passerine Birds Breeding in Intermountain Shrubsteppe. Studies in Avian Biology No. 25:130-140.

Kowalski, D. 2010. Greenback Cutthroat Trout in Terror Creek. Personal Communication with WestWater Engineering, December 9, 2010.

Lucas, S.G. 1998. Fossil Mammals and the Paleocene/Eocene Series Boundary in Europe, North America, and Asia. In Late Paleocene-Early Eocene Climatic and Biotic Events in the Marine and Terrestrial Records, Marie-Pierre Aubry, M-P., Lucas, S.G., and Berggren, W.A., (eds.). Columbia University Press, New York.

Marten, Alex L. and Newbold, Stephen C. 2011. Estimating the Social Cost of Non-CO2 GHG Emissions: Methane and Nitrous Oxide. US EPA, National Center for Environmental Economics, Working Paper #11-01.

Monarch & Associates and Michael Ward Outdoors. 2005. Oxbow Mining, LLC, Elk Creek Mine Block Clearance Project. August, 2005. 38 pages.

Monarch & Associates and Michael Ward Outdoors. 2006. Oxbow Mining, LLC, Elk Creek Mine Habitat and wildlife Studies. June, 2006.

Monarch & Associates and Michael Ward Outdoors. 2008. Oxbow Mining, LLC, Elk Creek Mine 2008 Exploration Project Habitat and Wildlife Studies. June, 2008. 22 pages.

Monarch & Associates. 2011. Habitat and Wildlife Surveys for 2011 Proposed Exploration and GVB Drill Sites and Access Roads. June.

Natural Diversity Information Source. 2011. Colorado's Biological Map and Data Resource. Colorado Division of Wildlife. Available Online: http://ndis.nrel.colostate.edu/.

Natural Resources Conservation Service. 2008. Custom Soil Resource Report for Paonia Area, Colorado, Parts of Delta, Gunnison and Montrose Counties: Oxbow ECET EA. Accessed from NRCS Web Soil Survey on December 11, 2008. Available at http://websoilsurvey.nrcs.usda.gov.

BLM_0018294

Natural Resources Conservation Service. 2011b. NRCS Farm and Ranch Lands Protection Program (FRPP), Colorado. Colorado FRPP Scoring System document. Accessed at http://www.co.nrcs.usda.gov/programs/frpp/2011/2011frpp.htm. September.

Natural Resources Conservation Service. 2011b. Web Soil Survey Geographic (SSURGO) Database. U.S. Department of Agriculture, Natural Resources Conservation Service. Available online at: http://soils.usda.gov/survey/geography/ssurgo/.

Righter, R., R. Levad, Coen Dexter, and K. Potter. 2004. Birds of Western Colorado Plateau and Mesa County. Grand Valley Audubon Society, Grand Junction, Colorado Rogers, Lynae. 2010. Personal Communication, via e-mail with WestWater Engineering, regarding weed information for Bureau of Land Management lands. Bureau of Land Management, Uncompahgre Field Office, Montrose, CO.

Rogers, Lynae. 2010. Personal Communication, via e-mail, regarding weed information for Bureau of Land Management lands. Bureau of Land Management, Uncompahgre Field Office, Montrose, CO.

Speas, Clay. 2010. Programmatic Water Depletion BO for Grand Mesa, Uncompahgre Gunnison National Forest. E-mail communication, March 29.

Stewart, Collin, Greg Hunt and Christopher Mark. 2006. Geology, Ground Control and Mine Planning at Bowie Resources, Paonia, Colorado. 25th International Conference on Ground Control in Mining, July 2006, Morgan Town, West Virginia.

Tweto, Ogden, 1979. USGS geologic map of Colorado. 1:500,000 scale. Available online at: http://geology.about.com/library/bl/maps/blcoloradomap.htm.

U.S. Census Bureau. 2008a. Fact Sheet: Delta County, Colorado. Available online at: http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=05000US0802 9&_geoContext=01000US%7C04000US08%7C05000US08029&_street=&_county=delta+ county&_cityTown=delta+county&_state=04000US08&_zip=&_lang=en&_sse=on&Active GeoDiv=geoSelect&_useEV=&pctxt=fph&pgsl=050&_submenuId=factsheet_1&ds_name= ACS_2007_3YR_SAFF&_ci_nbr=null&qr_name=null&reg=null%3Anull&_keyword=&_i ndustry= Last accessed: 1/27/2009.

U.S. Census Bureau. 2008b. Fact Sheet: Gunnison County, Colorado. Available online at: http://factfinder.census.gov/servlet/SAFFFacts?_event=Search&geo_id=05000US08029&_g eoContext=01000US%7C04000US08%7C05000US08029&_street=&_county=gunnison+c ounty&_cityTown=gunnison+county&_state=04000US08&_zip=&_lang=en&_sse=on&Ac tiveGeoDiv=geoSelect&_useEV=&pctxt=fph&pgsl=050&_submenuId=factsheet_1&ds_na me=ACS_2007_3YR_SAFF&_ci_nbr=null&qr_name=null&reg=null%3Anull&_keyword= &_industry=&show_2003_tab=&redirect=Y Last accessed: 1/27/2009.

U.S. Census Bureau. 2009. U.S. Census Bureau American Fact Finder Web Site, Data Sets, Quick Tables, Census Tract 9639, Gunnison County, Colorado. Available online at: http://factfinder.census.gov. Accessed April 9, 2009.

U.S. Department of Agriculture. 1981. Soil Survey. Paonia Area, Parts of Delta, Gunnison and Montrose Counties.

U.S. Department of Commerce. 2012. Census Bureau, American Community Survey Office, Washington, D.C.

BLM_0018295

U.S. Department of Energy and BLM. 2008. Programmatic Environmental Impact Statement, Designation of Energy Corridors on Federal Land in the 11 Western States (DOE/EIS-0386). Appendix N: Potential Fossil Yield Classifications (PFYC) for Geologic Formations Intersecting Proposed Corridors under the Proposed Action by State. November 2008.

U.S. Energy Information Administration. 2009. Annual Energy Review 2009. Table 7.3 Coal Consumption by Sector, Selected Years, 1949-2009. DOE/EIA-0384(2009). August 2009. Accessed on March 28, 2011 from < http://www.eia.doe.gov/aer/>.

U.S. Fish and Wildlife Service. 1994. Endangered and Threatened Wildlife and Plants; Determination of Critical Habitat for the Colorado River Endangered Fishes: Razorback Sucker, Colorado Squawfish, Humpback Chub, and Bonytail Chub. Federal Register 59(54): 13374–13400.

U.S. Fish and Wildlife Service. 2008. Birds of Conservation Concern 2008. Division of Migratory Bird Management, Arlington, Virginia. 87 pages. [Online version available at http://www.fws.gov/migratorybirds/reports/BCC2008/BCC2008m.pdf; accessed ].

U.S. Fish and Wildlife Service. 2009 Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx.

U.S. Fish and Wildlife Service. 2009. Consultation Guidance for DeMinimis Water Depletions in the Upper Colorado River Basin. U.S. Fish and Wildlife Service. Ecological Services. Lakewood, Colorado.

U.S. Fish and Wildlife Service. 2010a.   Threatened, Endangered, Candidate, and Proposed Species by County. July 2010.   USDI-Fish and Wildlife Service, Ecological Services, Colorado Field Offices. Grand Junction, Colorado.

U.S. Fish and Wildlife Service. 2010b.  Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition to List the North American Wolverine as Endangered or Threatened.  Federal Register 75 (239):  78030-78061.

U.S. Forest Service.  2011.  Environmental Assessment for Federal Coal Lease Modification COC-61357.  Paonia Ranger District (Grand Mesa, Uncompahgre, and Gunnison National Forests).  August 2011.

U.S. Forest Service and Bureau of Land Management. 2000. Final Environmental Impact Statement, Iron Point Exploration License, Iron Point Coal Lease Tract, Elk Creek Coal Lease Tract, Delta and Gunnison Counties, Colorado, February 2000.

U.S Geological Survey (USGS). 2003  Using Tracers to Evaluate Streamflow Gain-Loss Characteristics of Terror Creek, in the Vicinity of a Mine-Permit Area, Delta County, Colorado, Water Year 2003.

U.S. Global Change Research Program. 2009. Reports and Assessments, USGCRP Scientific Assessments, Key Findings. [Web Page] located at: http://globalchange.gov/publications/reports/scientific-assessments/us-impacts/key-findings. Accessed 6/22/2009.

Vessels Coal Gas, Inc.  2011.  Methane Recovery Evaluation – Bowie Resources, LLC-Bowie No. 2 Mine.  November 4, 2011.

BLM_0018296

VIEWS. 2011.  Visibility Information Exchange Web System.  Regional Haze Summary Data. Means for Best, Middle, and Worst 20% Visibility Days. Online at http://views.cira.colostate.edu/web/Trends/.  Accessed December 2011.

Weber, W.A., and R.C. Wittmann. 1987. Colorado Flora, Western Slope. University Press of Colorado. Niwot, Colorado.

Western Regional Climate Center, 2012.  General Climate Summary Data for Paonia, Colorado. http//www.wrcc.dri.edu.

Woodling, J. 1985. Colorado's Little Fish – A Guide to the Minnows and Other Lesser Known Fishes in the State of Colorado. Colorado Division of Wildlife. Denver, Colorado.

BLM_0018297

# APPENDIX A

# Unsuitability Criteria

BLM_0018298

# APPENDIX A

## COAL UNSUITABILITY CRITERIA

### DESCRIPTION OF THE FEDERAL LANDS INVOLVED

This unsuitability analysis has been prepared for the proposed modification of existing coal leases COC-37210 and COC-61209.

**LEGAL DESCRIPTION:**

COC-61209 Modification

Township 13 South, Range 91 West, 6th P.M.

Section 5:     SWNW, NWSW, SWSW, NESW, S/2NESENW, S/2SENW, S/2NWSENW,
                SWSWNE, S/2NWSWNE, W/2NWSE

Section 6:     SENE

containing approximately 265 acres.

COC-37210 Modification

Township 13 South, Range 92 West, 6th P.M.

Section 1:     S/2NE, S/2NW, S/2 Lot 1, S/2 Lot 2, S/2 Lot 3, S/2 Lot 4

containing approximately 237.43 acres.

The tracts were identified as a result of a coal lease modification application submitted by Bowie Resources, LLC (Bowie) on July 11, 2011. The tracts lie approximately 4 miles northeast of the town of Paonia in Delta County, Colorado. The existing leases are part of a Logical Mining Unit held by Bowie, which would be mined from the Bowie No. 2 Mine near Paonia in Delta County, Colorado. The lease modifications are located on lands in which BLM manages a portion of the surface (174 acres on COC-61209) and all of the mineral estate (COC-37210 and COC-61209).

As a first step in this analysis, the preliminary mining plan submitted by the applicant was examined in order to identify areas in which the proposed underground mining operation would produce surface effects. All of the areas on which surface facilities associated with the proposed operation were to be located and all the areas identified as likely to be affected by subsidence were delineated as having surface effects.

The unsuitability criteria were then applied individually to the areas identified as having surface effects. Then after all criteria had been applied, the exceptions of each criterion found to be applicable were then examined to determine if the exceptions were also applicable.

## ANALYSIS OF THE UNSUITABILITY CRITERIA

Exceptions to the criteria are described only if they apply.

# Criterion 1

BLM_0018299

All federal lands included in the following land systems or categories shall be considered unsuitable: National Park System, National Wildlife Refuge System, National System of Trails, National Wilderness Preservation System, National Wild and Scenic Rivers System, National Recreation Areas, Lands with Wilderness Characteristics, lands acquired with money derived from the Land and Water Conservation Fund, National Forests, and federal lands in incorporated cities, towns, and villages.

**Exceptions -** (i) A lease may be issued within the boundaries of any National Forest if the Secretary finds no significant recreational, timber, economic or other values which may be incompatible with the lease; and (A) surface operations and impacts are incident to an underground coal mine, or (B) where the Secretary of Agriculture determines, with respect to lands which do not have significant forest cover within those National Forests west of the 100th Meridian, that surface mining may be in compliance with the Multiple-Use Sustained-Yield Act of 1960, the Federal Coal Leasing Amendments Act of 1976 and the Surface Mining Control and Reclamation Act of 1977.

The application of this criterion to lands within the listed land systems and categories is subject to valid existing rights, and does not apply to surface coal mining operations existing on August 3, 1977.

**Analysis -** BLM inventoried area streams and rivers in 2006 as part of the evaluation of Wild and Scenic Rivers (WSR) in the UFO. A 1.21-mile segment of the West Fork of Terror Creek has Outstandingly Remarkable Values and is potentially suitable for inclusion into the National Wild and Scenic River System. This segment flows through the proposed lease modification for lease COC-61209. The following portions of the lease modification for COC-61209 are within ¼ mile of the stream segment;

> Township 13 South, Range 91 West, 6th P.M., Section 5: SWNW, S/2NESENW, S/2SENW, S/2NWSENW, SWSWNE, S/2NWSWNE, W/2NWSE – approximately 105 acres.

In early 2011 the Gunnison Basin stakeholder group concluded public meetings and submitted their suitability recommendations for eligible segments in the Gunnison river basin to the BLM UFO. These recommendations, as well as other public comment, are being considered during formulation of the preferred alternative for the Uncompahgre Resource Management Plan, which is currently under development.

The RMP will make recommended decisions concerning this section and ultimately Congress will have the final decision under the Wild and Scenic Rivers Act. BLM policy is to protect the resource values found in the segments pending decisions by Congress on the eligibility of the various river segments.

Current plans for mining do not include the lands under the West Fork of Terror Creek. Subsidence associated with the Proposed Action is expected to be minimal to negligible, and would generally affect the area immediately overlying those areas that are mined; therefore, there are likely no impacts to the West Fork of Terror Creek resources resulting from subsidence. Lands inventories are suitable for coal leasing after applying the exceptions to the criteria. In order to protect the West Fork of Terror Creek inventoried segment of the Wild and Scenic River, the following lease stipulation would be required for lease COC-61209:

BLM_0018300

- State-of-the-art mining techniques (pillar and panel widths, rate of coal development and extraction, mine method, determining angle of draw, etc.) would be used to control subsidence. No mining related surface disturbance would occur within 200 feet of the stream channel for the West Fork of Terror Creek without a written finding from the Authorized Officer. These techniques would provide for maximum coal removal while protecting the values associated with the inventoried Wild and Scenic River segment.

## Criterion 2

Federal lands that are within rights-of-way or easements or within surface leases for residential, commercial, industrial, or other public purposes, on federally-owned surface shall be considered unsuitable.

**Exceptions** - A lease may be issued and mining operations approved, in such areas if the surface management agency determines that (i) all or certain types of coal development (e.g., underground mining) will not interfere with the purpose of the right-of-way or easement, or (ii) the right-of-way or easement was granted for mining purposes, or (iii) the right-of-way or easement was issued for a purpose for which it is not being used, or (iv) the parties involved in the right-of-way or easement agree, in writing, to leasing, or (v) it is impractical to exclude such areas due to the location of coal and method of mining and such areas or uses can be protected through appropriate stipulations.

**Analysis** - There is one right-of-way located on the application lands managed by the BLM: a power transmission line (COC-22713). Subsidence effects on the 230/345 kV WAPA transmission line is unlikely. The worst-case angle of draw for subsidence effects from longwall mining would be 25 degrees (BLM, 2000). Table A-1 provides specific details on the potential subsidence effects to the three WAPA towers. Given the distance from the possible subsidence, no impacts are anticipated.

BLM_0018301

Table A-1
**Potential Subsidence Effects to WAPA Towers**

| WAPA 230 KV Electrical Tower (north to south) | Depth of overburden for longwall B 20 nearest the tower (feet) | Surface expression of subsidence (using worst-case $25^0$ angle of draw) (feet) | Distance between tower and surface expression of subsidence (feet) |
|---|---|---|---|
| 4 | 1,060 | 447 | 170 |
| 5 | 1,160 | 461 | 135 |
| 6 | 1,140 | 452 | 371 |

Lands involved in these rights-of-way are suitable for coal leasing after applying the exceptions to the criteria. The power line would be protected by exception (v) above. The power line right-of-way is 125 feet in width and includes access roads (BLM, 2011). In order to protect the power line, the following lease stipulation would be required for Lease COC-61209:

- State-of-the-art mining techniques (pillar and panel widths, rate of coal development and extraction, mine method, determining angle of draw, etc.) would be used to control subsidence. No mining related surface disturbance would occur within 100 feet of the outside line of the power line right-of-way without a written finding from the Authorized Officer and consultation with the right-of-way holder. These techniques would provide for maximum coal removal while insuring that sufficient coal is left in place to prevent subsidence.

There is a General Land Office Order, 6/1/1910, which classifies the lands within the application area for coal. The lands are also within the Paonia-Somerset Known Recoverable Resource Area, COC-20093. No other easements or surface leases for residential, commercial, industrial, or other public purposes are determined to exist within the lease modification area.

## Criterion 3

Federal lands affected by section 522(e)(4) and (5) of the Surface Mining Control and Reclamation Act of 1977 shall be considered unsuitable. This includes lands within 100 feet of the outside line of the right-of-way of a public road, or within 100 feet of a cemetery, or within 300 feet of any public building, school, church, community or institutional building or public park, or within 300 feet of an occupied dwelling.

**Exceptions -** A lease may be issued for lands (i) used as mine access roads or haulage roads that join the right-of-way for a public road, (ii) for which the Office of Surface Mining Reclamation and Enforcement has issued a permit to have public roads relocated, (iii) if, after public notice and opportunity for public hearing in the locality, a written finding is made by the AO that the interests of the public and the landowners affected by mining within 100 feet of a public road will be protected, or (iv) for which owners of occupied dwellings have given written permission to mine within 300 feet of their buildings.

**Analysis -** The Bowie No. 1 Mine and proposed lease tract COC-37210 is accessed from Paonia by the Stevens Gulch public road, which is initially a Delta County road and is asphalt, all-

---

BLM_0018302

weather, two-lane road to the entrances of the Bowie No. 1 Mine (approximately 2.5 miles). Beyond the turnoff to the mine, the Stevens Gulch public road is no longer a county road but is an unpaved gravel road (FS road # 701) leading to the Gunnison National Forest (GNF). Delta County maintains the road under agreement with the GNF. The GNF has acquired easements through the private land for the public to access the NF. The road is not maintained through the National Forest in the winter but is used for snowmobile and other winter access. The overall condition of the Stevens Gulch public road should be considered as fair, and it requires routine maintenance. The road continues through the proposed lease tract and onto the Gunnison National Forest.

Two longwall units are proposed under the Stevens Gulch public road. Longwall unit B21 and B22 both pass under the Stevens Gulch public road. The overburden range for the panels is from 1,750 feet to 2,150 feet. At that depth there would be measurable subsidence but no visible surface cracking (see Geology and Minerals). Therefore, it is expected that there would be no subsidence related disturbance to the road in Stevens Gulch. The Stevens Gulch public road is suitable for coal leasing after applying the exceptions (iii) to the criteria. In order to protect the road, the following lease stipulation would be required for Lease COC-37210:

- State-of-the-art mining techniques (pillar and panel widths, rate of coal development and extraction, mine method, determining angle of draw, etc.) would be used to control subsidence. No mining related surface disturbance would occur within 100 feet of the outside line of the road right-of-way without a written finding from the Authorized Officer and consultation with appropriate agencies. These techniques would provide for maximum coal removal while insuring that sufficient coal is left in place to prevent subsidence.

No occupied dwellings, public buildings, schools, churches, community, or institutional buildings exist within this area.

All of the lands affected by this criterion are suitable for coal leasing with application of the exceptions.

## Criterion 4

Federal lands designated as wilderness study areas shall be considered unsuitable while under review by the Administration and Congress for possible wilderness designation. For any federal land which is to be leased or mined prior to completion of the wilderness inventory by the surface management agency, the environmental assessment or impact statement on the lease sale or mine plan shall consider whether the land possesses the characteristics of a wilderness study area or Lands with Wilderness Characteristics. If the finding is affirmative, the land shall be considered unsuitable, unless issuance of noncompetitive coal leases and mining on leases is authorized under the Wilderness Act and the Federal Land Policy and Management Act of 1976.

**Analysis -** No lands within the review area are designated Wilderness Study Areas or Lands with Wilderness Characteristics.

BLM_0018303

## Criterion 5

Scenic federal lands designated by visual resource management analysis as Class I (an area of outstanding scenic quality or high visual sensitivity) but not currently on the National Register of Natural Landmarks shall be considered unsuitable.  A lease may be issued if the surface management agency determines that surface coal mining operations will not significantly diminish or adversely affect the scenic quality of the designated area.

**Analysis -** No lands within the review area are designated as visual resource management Class I areas.

## Criterion 6

Federal lands under permit by the surface management agency, and being used for scientific studies involving food or fiber production, natural resources, or technology demonstrations and experiments shall be considered unsuitable for the duration of the study, demonstration, or experiment except where mining could be conducted in such a way as to enhance or not jeopardize the purposes of the study, as determined by the surface management agency, or where the principal scientific use or agency give written concurrence to all or certain methods of mining.

**Analysis -** No lands within the review area are under permit for scientific study.

## Criterion 7

All publicly owned places on federal lands which are included in the National Register of Historic Places shall be considered unsuitable.  This shall include any areas that the surface management agency determines, after consultation with the Advisory Council on Historic Preservation and the State Historic Preservation Officer, are necessary to protect the inherent values of the property that made it eligible for listing in the National Register.

**Analysis -** No publicly owned places on federal or fee lands within the review area are included in the National Register of Historic Places.

## Criterion 8

Federal lands designated as natural areas or as National Natural Landmarks shall be considered unsuitable.

**Analysis -** No lands within the review area are designated as natural areas or as National Natural Landmarks.

BLM_0018304

## Criterion 9

Federally designated Critical Habitat for listed Threatened or Endangered plant and animal species, and habitat proposed to be designated as critical for listed Threatened or Endangered plant and animal species or species proposed for listing, and habitat for federal Threatened or Endangered species which is determined by the Fish and Wildlife Service and the surface management agency to be of essential value and where the presence of Threatened or Endangered species has been scientifically documented, shall be considered unsuitable.

**Exceptions -** A lease may be issued and mining operations approved if, after consultation with the Fish and Wildlife Service, the Fish and Wildlife Service determines that the proposed activity is not likely to jeopardize the continued existence of the listed species and/or its Critical Habitat.

**Analysis -** USFWS (2010a) identified 12 species as endangered, threatened, or candidate under the Endangered Species Act (ESA) that may occur in Delta County (see Table A-2). In addition to federally-listed species, the BLM (2009) identified 39 other species as sensitive with the potential to occur within the BLM Uncompahgre Field Office and the general area of the proposed lease modification areas (see Table A-3). Those species known to occur or suspected near the proposed lease modifications were surveyed for during block clearance surveys conducted for the proposed lease modifications and surrounding area.

**Table A-2**
**Federal Threatened, Endangered, or Candidate Species in Delta County**

| Common Name/ Scientific Name | Status[1] | Habitat[2] | Potential Occurrence in the Analysis Area [3] | Discussed in EA |
|---|---|---|---|---|
| **Mammals** | | | | |
| Black-footed ferret *Mustela nigripes* | E, SE | Requires large prairie dog colonies in open habitat such as grasslands, steppe, and shrub steppe. | None | No |
| Canada lynx *Lynx canadensis* | T, SE | Coniferous forests interspersed with thickets of trees and shrubs, rocky outcrops, large woody debris; closely associated with snowshoe hares.  Present on Grand Mesa. | Possible | Yes |
| North American wolverine *Gulo gulo lucus* | C, SE | High elevation boreal and alpine habitats. | None | No |
| **Birds** | | | | |
| Gunnison sage-grouse *Centrocercus minimus* | C, SC | Expansive sagebrush with grasses, forbs, and healthy riparian ecosystems; project outside of expected range. | None | No |
| (Western) Yellow-billed cuckoo [4] *Coccyzus americanus* | C, SC | Riparian forested habitats dominated by cottonwoods. Observed on North Fork of Gunnison River (Beason, 2009). | None | No |
| **Fish** | | | | |

BLM_0018305

| Common Name/ Scientific Name | Status[1] | Habitat[2] | Potential Occurrence in the Analysis Area [3] | Discussed in EA |
|---|---|---|---|---|
| Bonytail *Gila elegans* | E, SE | Eddies, pools, and backwaters near swift current in large rivers of the Colorado River system | Possible | Yes |
| Colorado pikeminnow *Ptychocheilus lucius* | E, SE | Fast, deep, white-water rivers with backwater areas and eddy habitats 2 to 3 feet deep that support aquatic insects, small fish as prey species. | Possible | Yes |
| Humpback chub *Gila cypha* | E, SE | Adults, in habitats ranging from deep turbid rapids often associated with large boulders and steep cliffs to flooded lowlands; young, in slow-moving backwaters. | Possible | Yes |
| Greenback cutthroat trout *Oncorhynchus clarki stomias* | E, ST | Cold, clear, gravely headwater streams and mountain lakes with abundant insects; originally in the Arkansas and South Platte river drainages of Colorado and Wyoming. Recent genetic testing indicates populations exist in the Colorado River drainage. | Possible | Yes |
| Razorback sucker *Xyrauchen texanus* | E, ST | Slow backwater habitats or large rivers and impoundments, not small tributaries or headwaters, with mud, sand or gravel substrate. | Possible | Yes |
| **Plants** | | | | |
| Clay-loving wild buckwheat *Eriogonum pelinophilum* | E, SE | Restricted to the badlands/Adobe Hills east of Delta and Montrose, CO. | None | No |
| Colorado hookless cactus *Sclerocactus glaucus* | E, SE | Rocky hills, alluvial benches, and lower mesa slopes in desert shrub communities from 4,500 to 6,000 feet | None | No |

[1] Status: T – Federal Threatened; E – Federal Endangered; C – Federal Candidate; SE – Colorado Endangered; ST – Colorado Threatened; SC – Colorado Candidate
[2] Source: CPW, 2009; CNHP, 2009.
[3] Potential Occurrence based on habitat associations and known distributions:
   None: May occur in Delta County but restricted distributions are distant and/or habitat is not present in the project area.
   Unlikely: May occur in Delta County and marginally suitable habitat present in the project area.
   Possible: Occurs in Delta County, suitable habitat is present, but not observed in the project area.
   Present: Observed in the project area and/or occupied habitat includes the project area.
[4] Also considered a BLM Sensitive Species within the Uncompahgre Field Office management area.

BLM_0018306

**Table A-3**
**BLM Sensitive Species that May Be Present in or near the Proposed Lease Modifications**

| Common Name/ Scientific Name | Status [1] | Habitat [2] | Potential Occurrence in the Analysis Area [3] | Discussed in EA |
|---|---|---|---|---|
| **Invertebrates** | | | | |
| Great Basin silverspot butterfly *Speyeria okomis nokomis* | | Spring-fed meadows, seeps, marshes, boggy streamside meadows with flowing water. | None | No |
| **Amphibians** | | | | |
| Northern leopard frog *Rana pipiens* | SC | Margins, banks of marshes, ponds, streams, other permanent water. | Present | Yes |
| Boreal toad *Anaxyrus boreas boreas* | SE | Pond margins, marshes, wet meadows, riparian areas in subalpine elevations. Present on Grand Mesa. | None | No |
| Canyon treefrog *Hyla arenicolor* | | Intermittent streams in deep rocky canyons with pinyon-juniper vegetation; project outside of expected range. | None | No |
| **Reptiles** | | | | |
| Longnose leopard lizard *Gambelia wislizenii* | SC | Flat or gently sloping, open shrublands; project outside of expected range. | None | No |
| Milk snake *Lampropeltis trianguium taylori* | | Grasslands, sandhills, canyons, open woodlands ponderosa, pinyon-juniper; known along the North Fork of the Gunnison River. | Possible | Yes |
| Midget faded rattlesnake *Crotalus viridis concolor* | SC | Most terrestrial habitats in west-central Colorado including grasslands, shrublands, pinyon-juniper woodlands, coniferous forests. | Possible | Yes |
| **Fish** | | | | |
| Roundtail chub *Gila robusta* | | Colorado River drainage, mostly large rivers, also streams and lakes; not documented in Terror Creek. | Possible | Yes |
| Bluehead sucker *Catostomus discobolus* | | Headwater streams to large rivers with moderate velocity; not documented in Terror Creek. | Possible | Yes |
| Sucker, flannelmouth *Catostomas latipinnis* | | Larger streams and rivers with riffles, eddies, backwaters; not documented in Terror Creek. | None | No |

A-9

| Common Name/ Scientific Name | Status [1] | Habitat [2] | Potential Occurrence in the Analysis Area [3] | Discussed in EA |
|---|---|---|---|---|
| Colorado River cutthroat trout *Oncorhynchus clarki pleuriticus* | SC | Clear, headwater streams in the Colorado River drainage, clear mountain streams; no known populations of pure strain cutthroats on public lands managed by UFO. | Possible | Yes |
| **Birds** | | | | |
| Long-billed curlew *Numenius americanus* | SC | Short-grass grasslands, wheat fields, dry land agriculture near water. | None | No |
| American peregrine falcon *Falco peregrinus anatum* | SC | Open conifer forests, riparian forests, and cliffs; migrant in western Colorado. | Present | Yes |
| Bald eagle *Haliaeetus leucocephalus* | SC | Reservoirs, rivers, wintering in semidesert and grasslands. | Possible | Yes |
| Brewer's sparrow *Spizella berweri* | | Mostly in sagebrush shrubland but also in mountain mahogany and rabbitbrush, mesas and foothills. | Possible | Yes |
| American white pelican *Pelecanus erythrorhynchos* | | Larger reservoirs, breeding on islands in eastern Colorado. | None | No |
| Columbian sharp-tailed grouse *Tympanuchus phasianellus columbianus* | SC | High elevation grassland areas interspersed with serviceberry, chokecherry, oakbrush, sagebrush, snowberry, and aspen; cultivated crops in spring/summer. | Unlikely | No |
| Northern goshawk *Accipiter gentilis* | | Forests of aspen, ponderosa pine, lodgepole pine; larger trees for nesting. | Possible | Yes |
| Ferruginous hawk *Buteo regalis* | SC | Grassland, semidesert shrublands, rare in pinyon-juniper; nest on isolated structures. | Possible | Yes |
| White-faced ibis *Plegadis chihi* | | Marsh edges, wet meadows, reservoir shorelines. | None | No |
| **Mammals** | | | | |
| Allen's (Mexican) big-eared bat *Idionycteris phyllotis* | | Oak-juniper woodland and ponderosa pine forest; project outside of expected range. | None | No |
| Big free-tailed bat *Nyctinomops macrotis* | | Rocky slopes, canyon lands, roosts in crevices. | None | No |
| Spotted bat *Euderma maculatum* | | Ponderosa pine in montane forest, pinyon- | Possible | Yes |

BLM_0018308

| Common Name/ Scientific Name | Status [1] | Habitat [2] | Potential Occurrence in the Analysis Area [3] | Discussed in EA |
|---|---|---|---|---|
| | | juniper woodlands, aspen, semi-desert shrublands. | | |
| Townsend's big-eared bat *Corynorhinus townsendii* | SC | Montane forests, pinyon-juniper woodlands, semi-desert shrublands. | Possible | Yes |
| Fringed myotis *Myotis thysanodes* | | Ponderosa pine, greasewood, oakbrush, saltbush shrublands. | Possible | Yes |
| Gunnison prairie dog *Cynomys gunnisoni* | | Grasslands and high desert scrub; project outside the current, expected range. | None | No |
| White-tailed prairie dog *Cynomys leucurus* | | Open shrublands, arid grass-shrub, and mountain valleys mostly in semidesert shrublands, also agriculture/pasture. | None | No |
| Kit fox *Vulpes macrotis* | SE | Semidesert shrubland and margins of pinyon-juniper woodlands; saltbush, sagebrush, greasewood. | None | No |
| Desert bighorn sheep *Ovis canadensis nelsoni* | | Steep inaccessible cliffs, areas dominated by grasses. | None | No |
| **Plants** | | | | |
| Grand Junction milkvetch *Astragalus linifolius* | | Pinyon-juniper, sagebrush on Chinle, Morrison Formation; project outside of expected range. | None | No |
| Naturita milkvetch *Astragalus naturitensis* | | Pinyon-juniper, sandstone mesas, ledges, crevices; project outside of expected range. | None | No |
| San Rafael milkvetch *Astragalus rafaelensis* | | Gullied hills, washes, tallus, seleniferous clay, silt, sand; project outside of expected range. | None | No |
| Sandstone milkvetch *Astragalus sesquiflorus* | | Sandstone rock ledges, fissures of domed slickrock, talus under cliffs, sandy washes; project outside of expected range. | None | No |
| Fragile rockbrake *Cryptogramma stelleri* | | Moist, shaded limestone cliffs and ledges. | None | No |
| Uncompahgre bladderpod *Lesquerella vicina* | | Grows on Mancos shale at the ecotone between pinyon-juniper and salt desert scrub; 6,000 to 7,200 feet; project outside of expected range. | None | No |
| Adobe desertparsley *Lomatium concinnum* | | Barren adobe soils derived from Mancos | None | No |

A-11

BLM_0018309

| Common Name/ Scientific Name | Status [1] | Habitat [2] | Potential Occurrence in the Analysis Area [3] | Discussed in EA |
|---|---|---|---|---|
| | | shale formation in shrub-dominated communities; project outside of expected range. | | |
| Paradox lupine *Lupinus crassus* | | Grows on Mancos shale in pinyon-juniper woodlands; project outside of expected range. | None | No |
| Eastwood monkey-flower *Mimulus eastwoodiae* | | Shallow caves, seeps, in canyon walls. No habitat present. | None | No |
| Aromatic Indian breadroot *Pediomelum aromaticum* | | Sandy soils, barren hills, in sagebrush, pinyon-juniper; project outside of expected range. | None | No |

[1] Status: SE – Colorado Endangered; ST – Colorado Threatened; SC – Colorado Candidate
[2] Sources: CNHP, 2009; CPW, 2009; Weber and Wittmann, 1987; Andrews and Righter, 1992; Hammerson, 1986; Woodling, 1985; Fitzgerald et al., 1994.
[3] Potential Occurrence based on habitat associations and known distributions:
  None: May occur in Delta County but restricted distributions are distant and/or habitat is not present in the project area.
  Unlikely: May occur in Delta County and marginally suitable habitat present in the project area.
  Possible: Occurs in Delta County, suitable habitat is present, but not observed in the project area.
  Present: Observed in the project area and/or occupied habitat includes the project area.

No lands within the review area are designated as Critical Habitat, proposed to be designated as Critical Habitat, or determined to be essential habitat for any federally-listed Threatened or Endangered plant or animal species, or species proposed for listing. However, Critical Habitat for the Colorado squawfish, Razorback sucker, Humpback chub, and Bonytail chub does exist off-site in the Colorado River drainage which potentially could be affected by water depletion from this action (USFWS, 1994). The Fish and Wildlife Service has concluded that any water depletion in the upper Colorado River Basin "may affect" these Endangered fish species and their Critical Habitat.

A segment of the West Fork of Terror Creek proposed lease modification tract, is occupied habitat for the Threatened greenback cutthroat trout. The following portions of the lease modification for COC-61209 are within ¼ mile of the stream segment -
Township 13 South, Range 91 West, 6th P.M., Section 5: SWNW, S/2NESENW, S/2SENW, S/2NWSENW, SWSWNE, S/2NWSWNE, W/2NWSE – approximately 105 acres.

Current plans for mining do not include the lands under the West Fork of Terror Creek. The West Fork of Terror Creek is nearly 490 ft. from the closest longwall mining that would occur if the lease modifications are approved. Given a worst-case overburden depth of 600 feet, with an angle of draw of 25 degrees, the effects of surface subsidence are projected to extend approximately 250 feet from the easternmost longwall panel (BLM, 2000). Therefore, no subsidence related disturbance to the flows in Terror Creek or to Threatened greenback cutthroat trout are predicted as a result of proposed mining on the lease modification tracts. Lands are suitable for coal leasing after applying the exceptions to the criteria. In order to protect the West

A-12

BLM_0018310

Fork of Terror Creek and related habitat for the Threatened greenback cutthroat trout, the following lease stipulations would be required for Lease COC-61209:

- State-of-the-art mining techniques (pillar and panel widths, rate of coal development and extraction, mine method, determining angle of draw, etc.) would be used to control subsidence. No mining-related surface disturbance would occur within 200 feet of GBCT occupied habitat, as measured from the normal high water mark, without a written finding from the Authorized Officer. These techniques would provide for maximum coal removal while protecting the values associated with the threatened greenback cutthroat trout habitat.
- Sediment control measures, such as silt fences or straw wattles, would be placed down slope from the pads and access roads to prevent potential sedimentation effects to Terror Creek.
- In order to insure that BMPs relating to the control of sediment from disturbed sites are in place, and functional, Bowie shall, on a monthly basis from May through August, use an independent contractor to inspect Bowie's well pad sites and access roads within the Terror Creek watershed. The independent contractor shall contact Bowie and the BLM Uncompahgre Field Office (970-240-5300), within two business days of discovering sediment control measures that are missing or non-functional. Bowie will have three business days to correct the problem. Ineffective measures would be redesigned and replaced after consultation with BLM. For each year that Bowie operates under this BA, Bowie shall submit the compiled monthly inspection reports to BLM Uncompahgre Field Office by September 30. In the event new sediment control methods are identified or current practices are not working as intended, adaptive management will be used to implement methods that are effective at eliminating offsite movement of soils and sedimentation into resident streams.

- At any time during drilling activities, until successful reclamation or continuing into the future, the point of access to temporary roads shall be blocked with gates, rock barriers, or concrete barriers to prevent vehicles, including Off-Highway Vehicles (OHVs), from using them. Signs identifying the road closure shall be placed at the barricades.
- In order to prevent increased risk of sediment being generated as a result of pumping related disturbance, pumping from East Terror Creek would not take place until after the April and May peak runoff period has past. Therefore, pumping from East Terror Creek would not begin until June. The AO may grant an exception that would allow pumping in May if runoff flows have dropped to the normal mean monthly levels for June (6.9 cfs) and USFWS has concurred via informal consultation.

- To prevent mortality of GBCT due to pumping from the East Fork of Terror Creek, the conservation measures are defined as: pumping during the June and July period would require the use of a screened pump intake, with a maximum ¼ inch size mesh. For the August through September period, when GBCT fry would be present in the stream, pump intakes would be screened with no larger than 1/16th mesh screen. The screen would not be confined to just the pump intake, but must cover a larger area, such as a cylinder or box design which has at least 5 times the surface area of the pump intake. Bowie must submit the final design for this screening fixture to the BLM Western Slope fisheries biologist, Tom Fresques (970-876-9078; t1fresqu@blm.gov), for his approval.

---

A-13

- During the June through September period, if the flows in East Terror Creek drop below the ten year mean monthly flow for October (1.0 cfs), Bowie will not pump water from the East Fork of Terror Creek.

- To prevent impacts to GBCT fry and fingerlings, pumping would not take place during the base flow (low flow) periods of the year; October through March.

- If there are existing roads or disturbance features within the 200-foot buffer along GBCT habitat streams, then no additional surface disturbance will be permitted within those areas. Maintenance of roads or other existing features must remain within the existing road prism or footprint of the feature being maintained.

- The operator shall not store equipment, machinery, or construction materials in any locations that are 200 feet or less from the riparian zones of the streams within the Terror Creek watershed.

- No overstory or understory vegetation will be removed from the riparian zone of the streams in the Terror Creek watershed.

- During construction or maintenance activities in proximity to the 200-foot riparian buffer zone, the edge of the buffer zone shall be marked for avoidance by construction equipment and activities.

- Within the Terror Creek watershed only fresh water, free of chemicals or other contaminants, may be used for dust abatement activities.

- Within the Terror Creek watershed, additional crossings of perennial streams will not be constructed

- The BLM Uncompahgre Field Office hydrologist must approve, in advance, the size and composition of riprap material to be used in the East Fork of Terror Creek.

- Bowie must report their annual water depletions to the BLM Uncompahgre Field Office by September 30 each calendar year. This includes depletions that result from surface activities associated with coal mining related activities within the Action Area, regardless of surface ownership.

- No additional disturbance, such as road widening or upgrading would occur within 200 feet of GBCT occupied habitat, as measured from the normal high water mark, to protect and maintain riparian vegetation and eliminate potential effects to the greenback cutthroat trout, unless exceptions were approved by the Authorized Officer.

- Site-specific surveys for sensitive plants would be conducted onsite prior to the development of any surface facilities or other soil-disturbing activities.

- There would be no surface occupancy or soil-disturbing activities within a 100-foot radius of sensitive plant locations unless exceptions are approved by the Authorized Officer.

- Application of herbicides, surfactants, and other weed control measures would avoid overspray or drift onto desirable species or sensitive plants.

BLM_0018312

## Criterion 10

Federal lands containing habitat determined to be critical or essential for plant or animal species listed by a state pursuant to state law as Endangered or Threatened shall be considered unsuitable.

**Exceptions** - A lease may be issued and mining operations approved if, after consultation with the state, the surface management agency determines that the species will not be adversely affected by all or certain stipulated methods of coal mining.

**Analysis** - No lands within the review area, or off-site that would be affected by this action, have been determined by the state of Colorado as critical or essential habitat for any state-listed Endangered or Threatened animal species. No plant species are listed by the state of Colorado as Threatened or Endangered. Of the Colorado State-listed species shown in the table for Criterion 9, only the greenback cutthroat trout occurs in the proposed lease modification tract for COC-61209. This species is known to occur in the West Fork of Terror Creek, which flows through the lease modification tract boundary, and approximately 490 ft. from any proposed longwall mining. No direct impacts to West Fork of Terror Creek would occur from mining of the proposed lease modification tracts (see Criterion #9).

## Criterion 11

A bald or golden eagle nest site on federal lands that is determined to be active and an appropriate buffer zone of land around the nest site shall be considered unsuitable. Consideration of availability of habitat for prey species and of terrain shall be included in the determination of buffer zones. Buffer zones shall be determined in consultation with the Fish and Wildlife Service.

**Exceptions** - A lease may be issued if (1) it can be conditioned in such a way, either in manner or period of operation, that eagles will not be disturbed during the breeding season, or (2) the surface management agency, with the concurrence of the Fish and Wildlife Service, determines that the golden eagle nest(s) will be moved, or (3) buffer zones may be decreased if the surface management agency determines that the active eagle nests will not be adversely affected.

**Analysis** - Presently, no bald or golden eagle nest sites exist on federal lands within the review area. A buffer zone of one-quarter mile radius around bald and golden eagle nest sites is considered adequate protection. Underground coal mining and nesting bald or golden eagles are compatible on the same tract of land unless surface facilities or surface disturbance cause nest-site abandonment. Lands are suitable for coal leasing after applying the exceptions to the criteria. With respect to bald or golden eagle nests that may be established on the review area during the life of the project, the following special stipulations would apply:

1.  No new permanent surface facilities or disturbance except subsidence would be located within a one-quarter mile radius buffer zone around each bald or golden eagle nest site.

---

A-15

BLM_0018313

2.   No surface activities would be allowed within a one-half mile radius buffer zone around each active eagle nest site from November 15 to July 30 for bald eagles and February 1 to July 15 for golden eagles.

3.   Any proposed surface facilities, disturbance, or activities (as noted above) in or adjacent to these buffer zones would require approval from the surface management agency on a site-specific basis, after consultation with the U.S. Fish and Wildlife Service.

## Criterion 12

Bald and golden eagle roost and concentration areas on federal lands used during migration and wintering shall be considered unsuitable.

**Analysis** - The bald eagle is present as a winter resident along the North Fork of the Gunnison River. The river and adjacent habitats are designated as Bald Eagle Winter Forage Range by CPW (2011), of which a small portion of the designated range overlaps proposed lease COC-61209, including GVB-B19A and access roads. Biological surveys indicate that bald eagle activity has been observed along the North Fork Valley, but that no bald eagles have been sighted in the mine area, or in areas near the mine, for several years. Lands are suitable for coal leasing after applying the exceptions to the criteria.

With respect to bald or golden eagle roost sites or concentration areas which may be established on the review area during the life of the project, the following special stipulation would be applied:

•   No surface activity except subsidence would occur within a one-quarter mile radius of winter roosts between November 15 and March 15.  Development may be permitted at other periods. If periodic visits are required within the buffer zone after development, activity would be restricted to the hours of 10:00 a.m. and 2:00 p.m. from November 15 through March 15.

## Criterion 13

Federal lands containing a falcon (excluding kestrel) cliff nesting site with an active nest and buffer zone of federal land around the nest site shall be considered unsuitable. Consideration of availability of habitat for prey species and of terrain shall be included in the determination of buffer zones. Buffer zones shall be determined in consultation with the Fish and Wildlife Service.

**Exceptions** - A lease may be issued where the surface management agency, after consultation with the Fish and Wildlife Service, determines that all or certain stipulated methods of coal mining will not adversely affect the falcon habitat during the periods when such habitat is used by the falcons.

**Analysis** - An active peregrine falcon nest is located in the upper end of Dove Gulch.  This is the only active peregrine nest known to occur in this general area.  The nest is located over a high

BLM_0018314

ridge and more than two miles from any activity associated with road and pad construction and drilling activity.  It is not expected to be affected by the activities associated with the proposed lease modifications.  Lands are suitable for coal leasing after applying the exceptions to the criteria.

With respect to peregrine falcon nests which may be established in the review area during the life of the project, the following special stipulations would be applied (also see Criterion 14 for additional conditions):

1.  No new permanent surface facilities or disturbance would be located within a one-quarter mile radius buffer zone around each peregrine falcon nest site.

2.  No aboveground activities would be allowed within a one-half mile radius buffer zone around each active peregrine falcon nest site from February 1 to July 15.

3.  Any proposed surface facilities, disturbance, or activities in, or adjacent to, these buffer zones would require approval from the BLM on a site-specific basis, after consultation with the U.S. Fish and Wildlife Service.

## Criterion 14

Federal lands, which are high priority habitat for migratory bird species of high federal interest, on a regional or national basis, as determined jointly by the surface management agency and the Fish and Wildlife Service, shall be considered unsuitable.

**Exceptions -** A lease may be issued where the surface management agency, after consultation with the Fish and Wildlife Service, determines that all or certain stipulated methods of coal mining will not adversely affect the migratory bird habitant during the periods when such habitat is used by the species.

**Analysis –** The Migratory Bird Treaty Act (916 U.S.C. 703-711) identifies numerous bird species of the southwestern U.S. that are assigned a migratory status. BLM signed a Memorandum of Understanding (MOU) with the USFWS in April 2010, which is intended to strengthen migratory bird conservation efforts by identifying and implementing strategies to promote conservation and reduce or eliminate adverse impacts on migratory birds. The focus of BLM's conservation efforts is on migratory species and some non-migratory game bird species that are listed as Birds of Conservation Concern (BCC).  BCC have been identified by the USFWS (2008) for different Bird Conservation Regions (BCR) in the United States to identify those species in the greatest need of conservation action, outside of those species already listed by the USFWS as threatened or endangered. The entire project area is in BCR 16, the Southern Rockies/Colorado Plateau region. The USFWS lists 27 species (see Table A-4) that are BCC in BCR 16 (USFWS, 2008).  Table A-4 also shows the status for each species within the UFO management area and probable presence within the project area (Kingery, 1998; CPW, 2011). Several of the species in Table A-4 were also included in the Endangered, Threatened, and Sensitive Species section.

Based on species' known distributions and habitat associations in western Colorado, nine species are known or have potential to occur in the project area:  bald eagle, golden eagle (*Aquila chrysaetos*), peregrine falcon, prairie falcon (*Falco mexicanus*), Lewis's woodpecker

BLM_0018315

(*Melanerpes lewis*), pinyon jay (*Gymnorhinus cyanocephalus*), Grace's warbler (*Dendroica graciae*), Brewer's sparrow, and Cassin's finch (*Carpodacus cassinii*). Two of these species were observed on-site during surveys: peregrine falcon and golden eagle.

An active peregrine falcon nest is located in the upper end of Dove Gulch. This is the only active peregrine nest known to occur in this general area. The nest is located over a high ridge and more than two miles from any activity associated with road and pad construction, and drilling activity. It is not expected to be affected by the activities associated with the proposed lease modifications.

The bald eagle is present as a winter resident along the North Fork of the Gunnison River. The river and adjacent habitats are designated as Bald Eagle Winter Forage Range by CPW (2011), of which a small portion of the designated range overlaps proposed lease COC-61209, including GVB-B19A and access roads. Biological surveys indicate that bald eagle activity has been observed along the North Fork Valley, but that no bald eagles have been sighted in the mine area, or in areas near the mine, for several years.

**Table A-4**
**Birds of Conservation Concern within BCR 16**

| Common Name<br>Scientific Name | Habitat [1] | Status Within UFO | Presence in Project Area |
|---|---|---|---|
| Gunnison sage-grouse<br>*Centrocercus minimus* | Expansive sagebrush with grasses, forbs, and healthy riparian; project outside of expected range. | Resident | No |
| American bittern<br>*Botaurus lentiginosus* | Dense freshwater marshes and extensive wet meadows. | Migrant | No |
| Bald eagle<br>*Haliaeetus leucocehpalus* | Nests, roosts in large cottonwoods along rivers; near prey or carrion during winter. | Migrant/Winter | Yes |
| Ferruginous hawk<br>*Buteo regalis* | Nests in isolated trees, rock outcrops, artificial structures, ground near prey base. | Migrant | No |
| Golden eagle<br>*Aquila chrysaetos* | Nest on open cliffs and in canyons or in tall trees (cottonwoods) in open country and riparian zones. | Resident | Yes |
| Peregrine falcon<br>*Falco peregrinus* | Nests on high cliff faces, often near water; forages in adjacent habitats. | Resident | Yes |
| Prairie falcon<br>*Falco mexicanus* | Nests in cavities on cliffs, rock outcrops adjacent to open grassland, shrublands. | Resident | Yes |
| Snowy plover<br>*Charadrius alexandrinus* | Barren or sparsely vegetated alkaline flats and river bars. | Migrant | No |
| Mountain plover<br>*Charadrius montanus* | Short-grass prairie and shrub-steppe landscapes, ryland and cultivated farms, and prairie dog towns. | Migrant | No |
| Long-billed curlew<br>*Numenius americanus* | Short-grass grasslands, wheat fields, dry land agriculture near water. | Migrant | No |
| Yellow-billed cuckoo<br>*Coccyzus americanus* | Riparian forested habitats dominated by cottonwoods. | Breeding | No |
| Flammulated owl<br>*Otus flammeolus* | Nests in forest of ponderosa pine and Douglas-fir with aspen, and in aspen stands. | Breeding | No |
| Burrowing owl | Nests in burrows, especially prairie dog / | Breeding | No |

BLM_0018316

| Common Name<br>Scientific Name | Habitat [1] | Status Within UFO | Presence in Project Area |
|---|---|---|---|
| *Athene cunicularia* | badger burrows in grasslands, desert shrub. | | |
| Lewis's woodpecker<br>*Melanerpes lewis* | Nests in open stands of cottonwood riparian or urban stands, also in aspen, oak shrub. | Resident | Yes |
| Willow flycatcher<br>*Empidonax traillii* | Dense riparian habitats along rivers, streams, or other wetlands. | Breeding | No |
| Gray vireo<br>*Vireo vicinior* | Nests in open pinyon-juniper stands with mountain mahogany, deciduous shrub interspersed. | Breeding | No |
| Pinyon jay<br>*Gymnorhinus cyanocephalus* | Nest in pinyon and/or juniper woodlands, feed/cache pinyon nuts, juniper berries. | Resident | Yes |
| Juniper titmouse<br>*Baeolophus griseus* | Nests in pinyon and/or juniper open or dense woodlands, often intermixed with Gambel oak. | Breeding | No |
| Veery<br>*Catharus fuscescens* | Damp deciduous/mixed woodlands with dense understory, wood swaps/lowlands, and damp ravines. | Not present | No |
| Bendire's thrasher<br>*Toxostoma bendirei* | Open farmlands, grasslands, and brushy arid to semi-arid deserts; breeds mainly in grasslands, shrublands or woodlands. | Not present | No |
| Grace's warbler<br>*Dendroica graciae* | Open montane forests, especially oaks, junipers, firs, and pines.. | Breeding | Yes |
| Brewer's sparrow<br>*Spizella breweri* | Nests in sagebrush, occasionally greasewood, rabbitbrush in desert valleys. | Breeding | Yes |
| Grasshopper sparrow<br>*Ammodramus savannarum* | Grasslands with few scattered shrubs. | Not present | No |
| Chestnut-collared longspur<br>*Calcarius ornatus* | Shortgrass or mixed-grass habitats heavily grazed or recently burned. | Not present | No |
| Black rosy-finch<br>*Leucosticte atrata* | Alpine areas usually near rock piles and cliffs; winters in mountain meadows, high deserts, valleys, and plains. | Winter | No |
| Brown-capped rosy-finch<br>*Leucosticte australis* | Nests on cliffs or in caves, rock slides or old buildings above timberline. | Winter | No |
| Cassin's finch<br>*Carpodacus cassinii* | Nests in montane forests with spruce/fir and aspen; also in lower pinyon-juniper woodlands. | Breeding | Yes |

[1] Based on Righter et al. 2004.

Underground activities would have no impacts on migratory bird and/or raptor populations. There is potential for disturbance to migratory birds during drilling, access, and site reclamation activities associated with GVB drilling where vegetation would be disturbed. This includes direct impacts to unidentified active nests, potential mortalities and injuries to birds and eggs in unidentified nests and disturbance to suitable nesting habitat potentially resulting in incidental "take" of migratory birds. To minimize or avoid effects to nesting migratory birds, Bowie would avoid vegetation removal during the migratory bird nesting period (May 15 to August 1).

BLM_0018317

Raptors nesting in the project area could abandon nests because of noise and human presence during the breeding period, which varies by species. Recent surveys within the proposed lease modification areas did not observe raptor nests within woodland habitat 0.25 mile from the project or within cliffs 0.5 mile of the project. It is not expected that construction of the project would affect nesting raptors.

1. A qualified biologist would conduct pre-construction breeding bird and raptor surveys during the breeding period within 0.5 mile of the general disturbance area (drill pads and access roads) if activities would occur during the breeding season (generally May 15 to August 1, but varies by species). Surveys would document active nests. If no active nests are found and a survey report is submitted to and approved by the BLM Biologist, activities may begin within the cleared areas. If active nests are found, development timing would be restricted during the breeding season, as recommended by the BLM UFO.

2. Surface disturbing activities would not occur during the migratory bird nesting period (May 15 through August 1) to prevent potential taking of migratory birds and/or eggs, unless vegetation is removed prior to May 15. Nesting surveys conducted within 2 weeks of surface-disturbing activities that indicate no migratory bird species are nesting or otherwise present within the area to be disturbed may also be considered; however, consultation and approval by BLM would be required.

3. If active nests are identified during project implementation, appropriate measures would be taken in order to reduce impacts to these species, including relocating overland access routes and drill hole locations, and implementing disturbance-free buffer zones and timing limitations for active nests as recommended by the BLM UFO.

4. All unavoidable surface disturbances would require approval of the BLM AO. The BLM would coordinate with USFWS and CPW to determine the type and extent of allowable variances. A site-specific analysis would determine if this stipulation would apply.

## Criterion 15

Federal lands which the surface management agency and the state jointly agree are habitat for resident species of fish, wildlife and plants of high interest to the state and which are essential for maintaining these priority wildlife and plant species shall be considered unsuitable. Examples of such lands which serve a critical function for the species involved include: (i) active dancing and strutting grounds for sage grouse, sharp-tailed grouse, and prairie chicken, (ii) winter ranges crucial for deer, antelope, and elk, (iii) migration corridor for elk, and (iv) extremes of range for plant species.

**Exceptions** - A lease may be issued if, after consultation with the state, the surface management agency determines that all or certain stipulated methods of coal mining will not have a significant long-term impact on the species being protected.

**Analysis** - According to CPW's current mapping of seasonal ranges, elk winter range and mule deer summer range are classified within the project area. A portion of the lease modification tracts have been identified as mule deer winter range and black bear fall concentration area. Surface disturbing activities in this area caused by underground coal mining would impact elk

A-20

and mule deer winter ranges and fall black bear use.  Lands are suitable for coal leasing after applying the exceptions to the criteria. The review area is suitable for coal leasing with inclusion of the following special protective stipulations on those areas that are currently, or may be, designated as crucial winter range and fall black bear concentration during the life of the project:

1.  Facility construction, and major scheduled maintenance would not be authorized within these crucial winter ranges from December 1 through April 30.  All unavoidable surface disturbance within these crucial winter ranges during these times would require approval of the authorized official.

2.  Bear-proof containers would be used and refuse collected frequently to minimize potential for human-bear conflicts at construction sites.  Employee training would include information to reduce bear-human conflicts including to not feed bears.

No other federal lands within the review area, or off-site that would be affected by the Proposed Action are considered critical or essential habitat for resident species of fish, wildlife or plants of high interest to the state of Colorado.

## Criterion 16

Federal lands in riverine, coastal, and special floodplains (100-year recurrent interval) on which the surface management agency determines that mining could not be undertaken without substantial threat of loss of life or property shall be considered unsuitable for all or certain stipulated methods of coal mining.

**Analysis** - The application lands are not within a riverine, coastal or special floodplain.

## Criterion 17

Federal lands which have been committed by the surface management agency to use as municipal watersheds shall be considered unsuitable.

**Analysis** - None of the lands in the proposed lease tracts is within a municipal watershed.

## Criterion 18

Federal lands with National Resource Waters, as identified by states in their water quality management plans, and a buffer zone of federal lands one-quarter mile from the outer edge of the far banks of the water, shall be unsuitable.

**Analysis** - None of the lands in the proposed lease tracts is identified as National Resource Water.

## Criterion 19

Federal lands identified by the surface management agency, in consultation with the state in which they are located, as alluvial valley floors according to the definition in Subpart 3400.0-

---

A-21

BLM_0018319

5(a) of this title, the standards of 30 CFR Part 822, the final alluvial floor guidelines of the Office of Surface Mining Reclamation and Enforcement when published, and approved state programs under the Surface Mining Control and Reclamation Act of 1977, where mining would interrupt, discontinue, or preclude farming, shall be considered unsuitable. Additionally, when mining federal land outside an alluvial valley floor would materially damage the quantity or quality of water in surface or underground water systems that would supply alluvial valley floors, the land shall be considered unsuitable.

**Analysis** - The application lands are not within an alluvial valley floor, but such lands drain into the North Fork of the Gunnison River, along which both surface irrigated and potentially irrigable sites exist. However, material damage to the quality and quantity of water arising on or flowing over the proposed lease tracts is not anticipated.

## Criterion 20

Federal lands in a state to which is applicable a criterion (i) proposed by the state or Indian tribe located in the planning area, and (ii) adopted by rulemaking by the Secretary, shall be considered unsuitable.

**Analysis** - This criterion is not presently in effect in the state of Colorado.

**CONSULTATION AND COORDINATION**

The following agencies and organizations were contacted to gain information pertinent to the application of the 20 coal suitability criteria:

Federal Agencies

    U.S. Department of the Interior
        Fish and Wildlife Service
        Western Colorado Supervisor
        Ecological Services
        764 Horizon Drive, Building B
        Grand Junction, CO 81505-3946

    U.S. Department of the Interior
        Office of Surface Mining
        Reclamation and Enforcement – Western Region
        1999 Broadway, Suite 3320
        Denver, CO 80202

    U.S. Department of Energy

---

A-22

Western Area Power Administration
P.O. Box 3700
Loveland, CO 80539-3700

BLM_0018321

# Appendix B

# Informal Section 7 Consultation for Bowie Resources Underground Coal Mining Associated Surface Activities and Facilities

BLM_0018322



# United States Department of the Interior



FISH AND WILDLIFE SERVICE
Ecological Services
764 Horizon Drive, Building B
Grand Junction, Colorado 81506-3946

IN REPLY REFER TO:
ES/CO:BLM/UFO/Bowie
TAILS 65413-2011-I-0102

February 21, 2012

Memorandum

To:      Field Manager, Bureau of Land Management, Uncompahgre Field Office, Montrose, Colorado

From:    Acting Western Colorado Supervisor, Fish and Wildlife Service, Ecological Services, Grand Junction, Colorado

Subject: Informal section 7 consultation for Bowie Resources Underground Coal Mining Associated Surface Activities and Facilities

The U.S. Fish and Wildlife Service (Service) received your November 30, 2011, request for informal section 7 consultation under the Endangered Species Act. The consultation concerns the Bowie Resources (Bowie), LLC, Underground Coal Mining Associated Surface Activities and Facilities potential effects on greenback cutthroat trout(*Oncorhynchus clarkii stomias*) lineage (GBCT), Colorado pikeminnow (*Ptychocheilus lucius*), humpback chub (*Gila cypha*), bonytail (*Gila elegans*), razorback sucker (*Xyrauchen texanus*), Canada lynx (*Lynx canadensis*), wolverine (*Gulo gulo luscus*), and yellow-billed cuckoo (*Coccyzus americanus*). Beginning on June 6, 2011, we provided comments on several drafts of the BLM's Programmatic Biological Assessment (PBA) for this project. On December 12, 2011, we requested additional information to support the BLM's "may affect, not likely to adversely affect" determination for GBCT. This information was received by our office via email on February 2, 2012, and via letter on February 7, 2012, and hereby amends the PBA.

**Proposed Action**
The proposed action includes surface disturbance associated with underground mining based on Reasonably Foreseeable Development projections for Bowie activities. Surface disturbance would result from the installation of gob vent boreholes, drilling of exploration holes for baseline geologic data, installation of deep bedrock water monitoring wells, construction of future ventilation shafts, and construction or restoration of roads to access these facilities. Proposed activities would take place in a 19,385-acre area (action area) located in Delta County, Colorado, approximately 8 air miles north of Paonia, Colorado. The activities would occur in the watersheds of Terror Creek, Stevens Gulch, Hubbard Creek, Roatcap Creek, and one small

unnamed watershed, all of which are tributaries of the North Fork of the Gunnison River. Lands involved are managed by the Paonia Ranger District of the Grand Mesa, Uncompahgre, and Gunnison National Forest, the Uncompahgre Field Office of the BLM, and private landowners, including Bowie. Within the action area, the Federal government retains rights for all minerals on approximately 17,075 acres; the mineral rights for oil, gas and coal on 476 acres; and the mineral rights for coal on 1,522 acres. There are approximately 312 acres of private surface with private (fee) minerals. Additional details of the proposed action are provided in the PBA (BLM 2011) for this project.

BLM (2011) addresses Bowie's mining-related surface activities and facilities through December 31, 2021, with a maximum of 71.4 acres of new surface disturbance within the Terror Creek watershed over the life of the PBA. An average total of 31.5 acres of disturbance would exist at any one time, with an estimated 18.6 acres of long-term disturbance in the Terror Creek watershed. By September 30 each year, Bowie will submit an annual report that describes site-specific activities or projects covered under the umbrella of this consultation. BLM will determine whether a project falls under the umbrella of the consultation and will coordinate with the Service if there are uncertainties. Reports will contain a brief description of the project, project location, and total acres of disturbance. The BLM will provide annual reports to the Service and will track disturbance to ensure activities do not exceed the 71.4-acre threshold. If disturbance differs from that evaluated in the PBA, or if the 71.4-acre threshold would be exceeded as a result of a planned activity, BLM will reinitiate consultation with the Service. Actions that do not fall under the umbrella of the consultation and the proposed action description will require separate consultation.

**Effects Determinations and Concurrence**
[Note: This letter and our concurrence are based on the information provided in the PBA (BLM 2011). Your letter dated November 30, 2011, requesting informal section 7 consultation provided effects determinations and rationale different than that of the PBA.]

You determined that the proposed action would have no effect on yellow-billed cuckoo or North American wolverine. Therefore, Section 7 consultation and concurrence are not necessary for these species.

BLM (2011) estimates that .15 acre-feet of water would be depleted annually, and 1.6 acre-feet total over the ten-year period, as a result of proposed activities. The Service has determined that water depletions adversely affect the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail and their critical habitats. Small water depletions associated with the project would be addressed and reported under the Programmatic Biological Opinion (PBO) for *Water Depletions Associated with BLM Projects (Excluding Fluid Mineral Development)* (ES/GJ-6-CO-08-F-0010) within the Upper Colorado River Basin in Colorado. All other water depletions not meeting the requirements and conditions of the PBO would need to be addressed under separate section 7 consultation.

Avoidance of direct disturbance of suitable habitat would minimize project impacts on Canada lynx, and disturbance or displacement of animals would be extremely unlikely to occur.

2

BLM_0018324

Therefore, we concur with your determination that the proposed action may affect, but is not likely to adversely affect Canada lynx, due to discountable effects.

A suite of conservation measures designed to protect GBCT will be applied as part of the proposed action, including project setbacks from occupied streams, reclamation standards, erosion/ sediment control measures and implementation monitoring, and measures to avoid take, entrapment, and entrainment of fish during water pumping activities (Appendix A). In particular, no new surface disturbance will occur within 200 feet of GBCT occupied habitat, as measured from the normal high water mark, and maintenance of roads or other existing features within this zone will be limited to the existing road prism or footprints. To clarify, we understand *surface disturbance* to be any project-related disturbance resulting in direct and pronounced alteration, damage, removal, displacement, or mortality of vegetation, soil, or substrates, or similar effects. Also, BLM has committed to ensuring that adequate and proper erosion control measures are implemented and effective, such that adverse effects do not occur to GBCT and its habitat. An *adverse effect* is an effect occurring as a direct or indirect result of the proposed action or its interrelated or interdependent actions, where the effect is not discountable, insignificant, or wholly beneficial. Based on this information, we concur with your determination that the proposed action may affect, but is not likely to adversely affect greenback cutthroat trout, due to discountable and insignificant effects.

**Conclusion**
This concludes section 7 consultation for the Bowie Resources (Bowie), LLC, Underground Coal Mining Associated Surface Activities and Facilities. As provided in 50 CFR §402.16, re-initiation of consultation is required if: 1) new information reveals effects of the agency action that may impact listed species or critical habitat in a manner or to an extent not previously considered, 2) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not previously considered, or 3) a new species is listed or critical habitat designated that may be affected by the action. In addition, the Proposed Action section of this letter provides specific requirements for reinitiation of consultation, per the programmatic terms.

Thank you for your interest in conserving threatened and endangered species. If we can be of further assistance, please contact Charlie Sharp at (970) 243-2778, extension 18.

**Literature Cited**

Bureau of Land Management (BLM). 2011. Biological assessment: Bowie Resources, LLC, underground coal mining associated surface activities and facilities (November draft). Prepared for the BLM Uncompahgre Field Office, Montrose, Colorado, by WestWater Engineering, Grand Junction, Colorado.

3

BLM_0018325

**Appendix A**

BLM Required Conservation Measures:

- In order to insure that BMPs relating to the control of sediment from disturbed sites are in place, and functional, Bowie will, on a monthly basis from May through August, use an independent contractor to inspect Bowie's well pad sites and access roads within the Terror Creek watershed. The independent contractor will contact Bowie and the BLM Uncompahgre Field Office (970-240-5300), within two business days of discovering sediment control measures that are missing or non-functional. Bowie will have three business days to correct the problem. Ineffective measures would be redesigned and replaced after consultation with BLM. For each year that Bowie operates under this BA, Bowie shall submit the compiled monthly inspection reports to BLM Uncompahgre Field Office by September 30. In the event new sediment control methods are identified or current practices are not working as intended, adaptive management will be used to implement methods that are effective at eliminating offsite movement of soils and sedimentation into resident streams.

- In order to prevent increased risk of sediment being generated as a result of pumping related disturbance, pumping from East Terror Creek would not take place until after the April and May peak runoff period has past. Therefore, pumping from East Terror Creek would not begin until June. The AO may grant an exception that would allow pumping in May if runoff flows have dropped to the normal mean monthly levels for June (6.9 cfs) and USFWS has concurred via informal consultation.

- To prevent mortality of GBCT due to pumping from the East Fork of Terror Creek, the conservation measures are defined as: pumping during the June and July period would require the use of a screened pump intake, with a maximum ¼ inch size mesh. For the August through September period, when GBCT fry would be present in the stream, pump intakes would be screened with no larger than 1/16th mesh screen. The screen would not be confined to just the pump intake, but must cover a larger area, such as a cylinder or box design which has at least 5 times the surface area of the pump intake. Bowie must submit the final design for this screening fixture to the BLM Western Slope fisheries biologist, Tom Fresques (970-876-9078; t1fresqu@blm.gov), for his approval.

- During the June through September period, if the flows in East Terror Creek drop below the ten year mean monthly flow for October (1.0 cfs), Bowie will not pump water from the East Fork of Terror Creek.

- To prevent impacts to GBCT fry and fingerlings, pumping would not take place during the base flow (low flow) periods of the year; October through March.

- There will be no new surface disturbing activities within 200 feet of any occupied greenback cutthroat trout habitat, as measured from the normal high water mark.

- If there are existing roads or disturbance features within the 200-foot buffer along GBCT habitat streams, then no additional surface disturbance will be permitted within those areas. Maintenance of roads or other existing features must remain within the existing road prism or footprint of the feature being maintained.

4

BLM_0018326

- The operator shall not store equipment, machinery, or construction materials in any locations that are 200 feet or less from the riparian zones of the streams within the Terror Creek watershed.

- No overstory or understory vegetation will be removed from the riparian zone of the streams in the Terror Creek watershed.

- During construction or maintenance activities in proximity to the 200-foot riparian buffer zone, the edge of the buffer zone shall be marked for avoidance by construction equipment and activities.

- Within the Terror Creek watershed only fresh water, free of chemicals or other contaminants, may be used for dust abatement activities.

- Within the Terror Creek watershed, additional crossings of perennial streams will not be constructed

- The BLM Uncompahgre Field Office hydrologist must approve, in advance, the size and composition of riprap material to be used in the East Fork of Terror Creek.

- Bowie must report their annual water depletions to the BLM Uncompahgre Field Office by September 30 each calendar year. This includes depletions that result from surface activities associated with coal mining related activities within the Action Area, regardless of surface ownership.

- Conditions which will trigger re-initiation of consultation with the USFWS are:

  1. The types of impacts associated with the proposed actions differ from, or exceed those evaluated in this BA.

  2. In the future, species that could be impacted by Bowie's activities in the Action Area are added to the list of Threatened or Endangered species.

  3. Surface disturbance within the Terror Creek watershed exceeds 71.4 acres.

  4. Bowie submits to BLM requests for exceptions to the conservation measures of this BA.

  5. If future genetic information results in a change in GBCT's status as Threatened under the ESA, the conservation measures contained in this BA will be reviewed and updated as appropriate.

- Bowie Best Management Practices (Appendix A of BLM (2011)), including erosion/sedimentation control measures, will be applied to project activities.

5

# Appendix C

# Combined Geologic and Engineering
## And
## Maximum Economic Recovery Report

BLM_0018328

Combined
Geologic and Engineering Report (GER)

and

Maximum Economic Recovery Report (MER)

for

Coal Lease Modifications
To Federal Coal Leases
COC61209
COC37210

applied for by

Bowie Resources, LLC (BRL) July 11, 2011

T.13S., R.91W. 6th Principal Meridian and
T.13S., R.92W. 6th Principal Meridian

**by
Desty Dyer
Mining Engineer
March 2012**

BLM_0018329

GER / MER Report   -   COC61209 and COC37210 Coal Lease Modification Application
Bowie Resources, LLC                                                    P a g e | 1

## LEGAL DESCRIPTION

The legal descriptions for the two separate modification tracts are as follows:

<u>COC-61209 Modification</u>

<u>Township 13 South, Range 91 West, 6th P.M.</u>
Section 5:      SWNW, NWSW, SWSW, NESW, S/2NESENW, S/2SENW, S/2NWSENW, SWSWNE, S/2NWSWNE, W/2NWSE
Section 6:      SENE
containing approximately 265.00 acres.

<u>COC-37210 Modification</u>

<u>Township 13 South, Range 92 West, 6th P.M.</u>
Section 1:      S/2NE, S/2NW, Lots 9 – 12.
containing approximately 237.43 acres.

Note: The lease modifications are located on lands in which BLM manages a portion of the surface (174 acres on COC-61209) and all of the mineral estate (COC-37210 and COC-61209). The lease modification tracts will be referred to hereafter as the MODS.

## LOCATION

The Bowie No. 2 Mine is located in Delta County, Colorado, 5 miles north-northeast of Paonia off of highway 133.  The mine accesses federal coal reserves through coal lease COC61209 while mining from leases COC37210, COC27432, and COC036955 within LMU COC57202 all held by BRL.

## LEASE STATUS

Lease status is as follows:

- **COC-57202 –** Logical Mining Unit (LMU) approximately 6,802 acres – comprised of Federal leases COD036955, COC25079, COC27432, and COC37210.

- **COD036955 –** In LMU approximately 440 acres – Original lease – A small portion near the north boundary projected to be mined in 2012 will result in it being mined out. The lease is bounded by coal outcrop, and Federal leases; therefore, it is not a candidate for modification.

- **COC25079 –** In LMU approximately 311 acres – Is mined out, and is bounded by coal outcrop and Federal leases; therefore, it is not a candidate for modification.

- **COC27432 –** In LMU approximately 1,014 acres – A small portion near the north boundary projected to be mined in 2012 will result in it being mined out. It is bounded by coal outcrop and Federal leases; therefore, it is not a candidate for modification.

- **COC37210 –** In LMU approximately 5,037 acres – Actively producing and holds nearly all remaining mineable reserves – Borders COD036955 and COC27432, on their north, COC53356 on it's south and east, and COC62109 on it's west. Unleased and unmined Federal reserves bound it on the north and west that could be modified into the lease.

- **COC53356 –** Approximately 522 acres – considered mined out and would have no mineable reserves unless modified or economics change to make the remaining in-place coal mineable. Borders COC37210 on the northwest.

BLM_0018330

- **COC61209 –** Approximately 3,904 acres – considered mined out and would have no mineable reserves unless modified or economics change to make the remaining in-place coal mineable. Borders COC37210 on the east. Unleased and unmined Federal coal reserves bound it on the north and northwest which could be modified into the lease.

## STRATIGRAPHY & GEOLOGY

GENERAL -                The Bowie No. 2 Mine is located in the Paonia coal field on the Southern flank of the Piceance Creek structural and sedimentary basin. The area is bounded by Larimide structural and physiographic features as follows: On the East by West Elk and Elk mountains; on the South by the Gunnison Uplift; on the West-SW by the Uncompaghre Uplift; and on the North by the Grand Mesa-Piceance Basin. The local structure dips 4 to 7 degrees NE with minor rolls and faults offsetting this trend in certain areas.

COAL BEDS -   Coal in the Paonia field is found as six identified seams (generally by alphabet starting with A as the lowest seam) within the Mesaverde Group of late Cretaceous age. In the mine permit area, only the B and D seams have hosted producing mines.  Within the MODS, the B-Seam is split into the upper and lower seams and only the lower B-Seam is of mineable thickness and quality.  The A and C seams are not of mineable thickness, the D-Seam is split into three thin seams.  The E and F-Seams are not of mineable thickness.

COAL QUALITY - The B-Seam coal "as received" analysis for the moisture, ash, sulphur, and BTU content based on drill hole samples is expected to be approximately:

     Moisture 7.68 %  Ash 5.74%  Sulphur 0.49%   BTU 12,324

These reserves can meet compliance coal standards for sulfur and ash content for markets currently supplied by BRL.  A wash plant owned by BRL is available to mitigate any non-compliance coal should either in-seam or mining related dilution lower the compliance of the mined product.

## MINING FACTORS

METHOD CONSTRAINTS -        Geologic constraints relating to coal depth and thickness within the MODS, and economic constraints and equipment availability for the applicant dictate that the underground longwall mining method be employed to extract the coal from the MODS. The amount of overburden above the mineable seam on the MODS varies from just under 1,000 ft. on the east to 1,600 ft. on the west with 2,000 ft. on existing lease COC37210 between the two MODS. The purpose of the MODS is to offer an extended area within the federal coal reserve for gateroad development and longwall mining east and west from existing lease COC37210.  Both gateroad development and longwall mining will take place on the MODS.

GER / MER Report  -  COC61209 and COC37210 Coal Lease Modification Application
Bowie Resources, LLC                                                               P a g e | 3

## PRODUCTION FACTORS

| CURRENT | PROJECTED with MODS |
|---|---|
| Short Term Schedule  - Production to meet the market demand is supplied by two active development sections and one longwall block. The permitted mining projections include west mains with longwall panels extended south from those mains. Production rates could vary but are expected to be at 4 million tons per year. All future production is expected to come from federal coal. The sections are scheduled to work on daily rotating shifts with a monthly schedule totaling about 1000 operating shifts per year. | Short Term Schedule  - BRL management would continue to develop and longwall mine at about a 4 million ton per year rate. The MODS would provide opportunity for a logical extension of the Bowie No. 2 Mine B-Seam workings beyond the current mine plan. Mains would be developed north from existing west Mains and from the north Mains gateroads would be developed to facilitate two longwall blocks to the east and two longwall blocks to the west. Three of the four longwall blocks would overlap both the MODS and existing lease COC37210.  Development of the north Mains could begin by mid-2012 and gateroad development could cross onto the MODS by mid-2013. |
| Production Data - The current operation completed mining of the D-Seam in March 2005, and transitioned to the Bowie No. 2 Mine B-Seam portals and workings.  BRL successfully mines coal using the longwall method of mining by developing longwall blocks using continuous miners. Mains and gateroads are developed ahead of longwall mining to allow a longwall move about every two to six months.  Recovery overall is about 65% with a rate of mining at about 1 million tons per year on development going up to 4 million tons per year with added longwall production.  BRL could sustain a production rate of 5 million tons per year in a 3 or 4 month period but not likely in any given 12 month period. | Production Data - The operation would extract coal from the B-Seam with no change in the production data except that the MODS would add recoverable reserves. |
| Mining Equipment -  The following is a list of major equipment currently used by BRL and is typical for use in an underground longwall  operation:<br><br>Continuous Miners 3     Roof Bolters    3<br>Shuttle Cars        9     Utility Scoops  2<br>Utility Haulers     2     Utility Mantrips 4<br>Shield Puller       1     60" Belt Drives 9<br>Shield Hauler       2      Shearer   1<br>Face Shields & Pans 180 (30 spares)<br>Main Mine Fan 1 (with 1 additional during life of mine) | Mining Equipment -  There would be no change. |

BLM_0018332

| GER / MER Report  -   COC61209 and COC37210 Coal Lease Modification Application Bowie Resources, LLC | Page | 4 |

| CURRENT | PROJECTED with MODS |
|---|---|
| Life of Mine - The B-Seam (combined upper and lower) recoverable reserves estimated to remain after January 2012 available to the Bowie No. 2 Mine operation on the current West Mine permit within the LMU total about 8.57 million tons of federal coal. Additional mining could be permitted to the north on the LMU which would add an estimated 4.61 million tons of federal coal to those recoverable reserves bringing the total available in the LMU to 13.18 million tons.  (SEE TABLE UNDER ESTIMATED RECOVERY BELOW). At the projected mining rate of 4 million tons per year, the life of mine would be about 3.3 years **without the MODS**. There are also potential recoverable reserves on unleased federal coal to the north that could be explored in the future. | Life of Mine - The existing combined federal holdings represent about 3.3 years of mine life. The MODS would add about 2.05 million tons and allow an additional 1.20 million tons to be mined on the adjacent existing LMU, bringing the total to about 3.25 million tons thus increase the life of mine from 3.3 to 4.1 years. (SEE TABLE UNDER ESTIMATED RECOVERY BELOW). The result is that about 10 months would be added to the life-of-mine, and a bypass of available federal coal reserves would be avoided.  Actual years of operations on the MODS could last over an extended time since coal production from the adjacent federal coal leases could be realized in conjunction with production from the MODS. Mining in the MODS and in the adjacent LMU could take 4.1 years, and it is likely that the MODS would be mined near the end of the life of mine. |
| Manpower - The current manpower level averages about 295. | Manpower - The manpower requirements would not change. |

## SURFACE FACILITIES

The current surface coal handling facilities of the BRL mining operation located on Bowie fee surface would serve the needs of the operation even with additional coal leased as proposed in the MODS as applied for by BRL.

## TRANSPORTATION

The current transportation infrastructure at the Bowie No. 2 Mine would serve the mining needs of the operation even with the addition of the MODS.  There is a conveyor belt system in place from the train load-out to the current working area underground. This system could be extended to working faces in the MODS.

## ESTIMATED RECOVERY

| Estimated Recoverable B-Seam Tons - Bowie No. 2 Mine  - As of End of January 2012 | | | | |
|---|---|---|---|---|
| Area Name | Mineable Area (Acres) | Mineable Recovery Factor | Average Excavation Ht. (ft.) | Recoverable Tons |
| West Mine LMU 57202 | 735.22 | 63% | 10 | 8,570,000 |
| North COC37210 | 411.45 | 61% | 10 | 4,610,000 |
| COC37210 MOD | 54.44 | 65% | 10 | 653,000 |
| COC61209 MOD | 107.12 | 71% | 10 | 1,397,000 |
| LMU added due to MODS | 78.41 | 83% | 10 | 1,200,000 |
| TOTALS: | 1386.64 | 64% | 10 | 16,430,000 |
| Notes: | Excavation Ht. --> 10.2' LW and 9.5' Development Averages about 10' | | | |
| | Product Density = 1840 tons/acre-ft. | | | |
| | Recovery approximates 100% LW and 31% Development - with higher LW to Development ratio on MODS | | | |

The B-Seam recovery within the MODS should be that for underground development calculated to be 31% in development and 100% in the longwall block, and includes chain pillars in gateroads.  The orientation of Mains

BLM_0018333

| GER / MER Report  -  COC61209 and COC37210 Coal Lease Modification Application |
|---|
| Bowie Resources, LLC                                                    P a g e | 5 |

on the existing LMU at about 2,000' overburden with gateroads development toward lower cover on the MODS makes it reasonable to expect that B-Seam recovery will be enhanced on both federal coal leases COC37210 and COC61209 with the addition of the MODS by facilitating extended longwall blocks.  If the blocks were shortened as a result of the mine layout without the MODS, BLM calculates the total recovery of the B-Seam coal from the combination of both federal coal leases would be diminished by about 1,200,000 tons. Therefore; with those reserves realized plus the **653,000 from the COC37210 Mod and 1,397,000 tons from the COC61209 MOD** the total recovery with the MODS as noted above would be 3,250,000 tons.

## POTENTIAL MARKETS

The current Bowie No. 2 Mine primarily supplies coal for electric power plants. The approximate breakdown of market destinations for the coal is shown below:

1. Electric Utilities (TVA and others)            95-98%
2. Manufacturing Plants (Coke, cement, etc.)      2 - 5%

## MAXIMUM ECONOMIC RECOVERY DETERMINATION

BRL applied for the MODS having determined the availability of mineable coal (constrained by projected quality, seam thickness, and adjacent federal holdings).  It is located in such a way as to allow the Bowie No. 2 mine access to a modest portion of federal coal reserves which in turn allows better mine orientation to remaining federal coal currently held by BRL. Although neighboring coal companies exist in the proximity, there is no indication of interest in the MODS.  It is not possible that a third party would deem the coal resource in the MODS either substantial or valuable enough for them to initiate new surface and underground facilities. - It has been determined by BLM that Maximum Economic Recovery (MER) of the MODS federal lease application can be achieved by underground mining using the longwall method of mining as described above.

There is no logical competitive interest based upon utilization of the lands or mining of the deposits due to the following:

- The applicant is the lessee of record holding the Federal leases adjacent to the modification area.

- This lease modification would allow a continuum of an existing mining block and would not represent an economic venture based on a stand-alone development of the property.

- The adjacent lands are in private ownership or managed by BLM and the impacts associated with developing a new mine portal would be significant.

- The economic investment required in order to mine the modification areas independent of the current leases held by BRL would be unreasonable.

- The only logical access is from the applicant's existing adjacent leases and underground mine with its' associated coal handling surface facilities.

BLM_0018334

# Appendix D

# Example Calculations

## Example Calculations

### 1.)   Horsepower-hour Calculations for Underground Mobile Sources

**Known Parameters:**

1.) Bowie annual diesel fuel use 461,000 (270,000 Under, 191,000 Surf) gal  *source:  Bowie Resources
2.) The average density of the diesel fuel is 7.11 lb/gal                    *source:  LSD MSDS
3.) The LHV based energy density of the diesel fuel is 18,500 btu/gal        *source:  Ave. of literature
4.) Conversion: btu/hp-hr = 2,544.43                                        *source:  Common conversion
5.) $CO_2$ EF = 642.323 g $CO_2$/hp-hr                                      *source:  EPA Nonroad (2008a)
6.) Carbon content of diesel fuel = 2,778 g C/gal                           *source:  40 CFR 600.113
7.) $CO_2$ : C Molecular Weight Ratio = 44/12 = 3.667 (unit less)           *source:  Periodic Table

**Calculate Parameters (Underground Equipment Example):**

1.) Total Available Energy of fuel =
    270,000 gal   x   7.1 lb/gal   x   18,500 btu/lb      =     35,464.5 MMbtu

2.) Energy Converter to HP (Energy IN) =
    35,464,500,000 btu   /   2544.43 btu/hp-hr      =     13,938,092.23 hp-hr

3.) Convert $CO_2$ EF of Diesel Fuel to C EF =
    642.323 g $CO_2$/hp-hr   x   $3.667^{-1}$      =     175.179 g C/hp-hr

4.) Derived hp-hr/gal of fuel from known Carbon Content of fuel =
    2,778 g C/gal   /   175.179 g C/hp-hr      =     15.858 hp-hr/gal

5.) Derived hp-hr from fuel use (Energy Out) =
    15.858 hp-hr/gal   x   270,000 gal      =     4,281,660.0 hp-hr

6.) TE = Energy Out   /   Energy IN   x   100% =
    4,281,660.0 hp-hr   /   13,938,092.23 hp-hr   x   100%      =     **30.72%**

**Conclusions:**

The Thermal Efficiency of the underground equipment is approximately 30.72% based on the EPA Model data for $CO_2$. Although low for typical diesel engines based on the literature, it is realistic for working engines where hp is developed at various RMPs (based on loading and work cycles). Further the EPA Model takes this into account when developing the EFs (see Nonroad Technical Document NR009d "Exhaust and Crankcase Emission factors for Nonroad Engine Modeling – Compression-Ignition"). All emissions estimates are based on the EPA Nonroad Model emissions factors and the total hp-hrs derived in calculated parameter 5 for each equipment class, i.e. underground or surface.

### 2.)   Example Emissions Calculations for Diesel Mobile Sources

**General Equation for all Emissions:**

    Emissions (tons)  =  Total hp-hr (Energy Out[1])   x   NR $EF_E$ g/hp-hr   x   $453.6^{-1}$ g/lb   x   $2000^{-1}$ lb/ton
    <u>Where:</u>
        $EF_E$  =  Either the Underground or Surface Equipment Emissions Factor
        [1] For N2O, substitute (Energy In). EF based on fuel use only.
    **A.) For $N_2O$ (surface)**
        3,028,878.0 hp-hr   x   0.005 g/hp-hr   x   $453.6^{-1}$ g/lb   x   $2000^{-1}$ lb/ton      =      0.016 tons

BLM_0018336

**B.) $NO_x$ (underground)**

4,281,660.0 hp-hr   x   10.163 g/hp-hr   x   453.6$^{-1}$ g/lb   x   2000$^{-1}$ lb/ton   =   47.97 tons

**3.)   Example Emissions Calculations for Gasoline Mobile Sources**

**Known Parameters:**

1.) OMLLC annual unleaded fuel use 11,000 gal   *source:  Bowie Resources
2.) 2004 CAFE for LDGT = 20.7 miles per gallon (mpg)   *source:  NHTSA (2004)
3.) Emissions Factors (grams per vehicle mile traveled (g/VMT) are from 2003 IERA Mobile Source Emissions Tables 4.5, 4.6, 4.7, & 4.50
4.) Gasoline carbon content per gallon = 2,421 g C/gal   *source:  EPA 420-F-05-001, 2005
5.) $CO_2$ : C Molecular Weight  Ratio = 44/12 = 3.667 (unit less)   *source:  Periodic Table

**Calculate Parameters:**

1.) Total Vehicle Miles Traveled (theoretical) =
    11,000 gal   x   20.7 mpg   =   227,700 miles

2.) $CO_2$ Emissions Factor =
    11,000 gal   x   2,421 g C/gal   x   3.667   x   348,257$^{-1}$ miles   =   280.41 g/VMT

**General Equation for all Emissions:**

Emissions (tons)  =  Total Annual Fuel Use (gal)   x   CAFE (mi/gal)   x   EF g/mi   x   453.6$^{-1}$ g/lb   x   2000$^{-1}$ lb/ton

**A.) CO**

11,000 gal   x   20.7 mi/gal   x   2.9 g/mi   x   453.6$^{-1}$ g/lb   x   2000$^{-1}$ lb/ton   =   0.73 tons

**B.) $CO_2$**

11,000 gal   x   20.7 mi/gal   x   428.84 g/mi   x   453.6$^{-1}$ g/lb   x   2000$^{-1}$ lb/ton   =   107.64 tons

BLM_0018337

Table D-1
EPA Nonroad Emissions Factors (g/hp-hr)

| Equipment Type | SCC | PM | $PM_{10}$ | $PM_{2.5}$ | $NMOG^2$ | CO | $NO_X$ | $SO_2$ | $CO_2$ | $CH_4{}^3$ | $N_2O^4$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Underground Mining Equipment | 2270009000 | 1.446 | 1.446 | 1.403 | 2.216 | 8.555 | 10.163 | 0.138 | 642.323 | 0.034 | 0.005 |
| Surface Mining Equipment[1] | 2270002036 2270002051 2270002060 2270002069 2270002033 | 0.535 | 0.535 | 0.519 | 0.652 | 3.458 | 7.393 | 0.116 | 537.869 | 0.010 | 0.005 |
| Passenger Vehicles[5] | LDGT | 0.13 | 0.13 | 0.12 | 0.20 | 2.90 | 0.30 | 0.096 | 428.84 | ND | ND |

[1] Emissions factors from listed SCC equipment was averaged together to produce a composite emissions factor to represent likely equipment present at the facility. The individual equipment emissions did not statistically vary significantly, with the exception of the bore/drill rigs, within the model results. However, the drilling and boring equipment is not expected to be as heavily used as the other surface equipment, and therefore a straight average of all the emissions factors was used to develop the composite factor (conservative) vs. a weighted average which would have considered area equipment population data. Data was not available for site fleet data to produce a facility specific weighted average.

[2] NMOG (Non-Methane Organic Gases) used to represent potentially reactive VOC species that may participate in ground level Ozone formation. NMOG is the sum of crankcase and exhaust emissions.

[3] CH4 is represented from TOG (Total Organic Gases) – NMOG. CH4 is the sum of crankcase and exhaust emissions.

[4] N2O factor derived from EPA Climate Leaders GHG Inventory Protocol (EPA430-K-08-004) Direct Emissions from Mobile Combustion Sources, Appendix A, Table A-6. N2O factor reported as 0.08 g/kg of fuel combusted. Factor was converted to g/hp-hr based on calculated hp-hr from total annual fuel use (Appendix XX, Example TE Calculation).

[5] Passenger vehicle emissions factors are in grams per vehicle mile traveled (g/VMT).

BLM_0018338

October 2012

# Approved Resource Management Plan Amendments/Record of Decision (ROD) for Solar Energy Development in Six Southwestern States





BLM_0018339

**On the cover:**
Typical Solar Fields for Various Technology Types (clockwise from upper left):
Solar Parabolic Trough (Source: Hosoya et al. 2008),
Solar Power Tower (Credit: Sandia National Laboratories. Source: NREL 2010a),
Photovoltaic (Credit: Arizona Public Service. Source: NREL 2010b), and
Dish Engine (Credit: R. Montoya. Source: Sandia National Laboratories 2008).
Reference citations are available in Chapter 1.

Background photo: Parabolic trough facility from an elevated viewpoint
(Credit: Argonne National Laboratory)

BLM_0018340

# Approved Resource Management Plan Amendments/ Record of Decision (ROD) for Solar Energy Development in Six Southwestern States

October 2012

 Bureau of Land Management

## CONTENTS

1   INTRODUCTION .......................................................................... 1

2   OVERVIEW OF ALTERNATIVES ................................................ 2

   2.1   Solar Energy Development Program Alternative—BLM Preferred
         Alternative ........................................................................ 2
   2.2   Solar Energy Zone Program Alternative ................................. 2
   2.3   No Action Alternative .......................................................... 2
   2.4   Environmentally Preferred Alternative .................................. 3

3   DECISION .................................................................................. 3

   3.1   What the Decision Provides .................................................. 3
   3.2   What the Decision Does Not Provide ..................................... 4

4   MANAGEMENT CONSIDERATIONS IN SELECTING THE
    PREFERRED ALTERNATIVE ....................................................... 5

   4.1   Executive Order 13212 ......................................................... 6
   4.2   Energy Policy Act of 2005 .................................................... 7
   4.3   DOI Secretarial Order 3285A1 .............................................. 7

5   PROTESTS ON THE PROPOSED LAND USE PLAN AMENDMENTS ............. 7

6   NOTICE OF CLARIFICATIONS AND MODIFICATIONS MADE TO THE
    PROPOSED SOLAR ENERGY PROGRAM AND SOLAR ENERGY
    PROGRAM POLICIES .................................................................. 8

7   CONSISTENCY AND CONSULTATION REVIEW .............................. 14

   7.1   Governor's Consistency Review ............................................ 14
   7.2   Cooperating Agencies .......................................................... 15
   7.3   Tribal Consultation .............................................................. 16
   7.4   National Historic Preservation Act—Section 106 Consultation ...... 17
   7.5   Endangered Species Act—Section 7 Compliance ...................... 18

8   MITIGATION MEASURES ........................................................... 19

9   MONITORING AND ADAPTIVE MANAGEMENT ............................. 19

10  PUBLIC INVOLVEMENT ............................................................ 20

   10.1  Scoping .............................................................................. 20
   10.2  Public Comments on the Draft Solar PEIS ............................. 20

BLM_0018342

10.3  Public Comments on the Supplement to the Draft Solar PEIS ........................  20

10.4  Release of the Final Solar PEIS ............................................................  21

10.5  Public Comments on the Final Solar PEIS ...............................................  21

10.6  Availability of the Record of Decision ....................................................  21

11    CONSIDERATION OF OTHER BLM PLANS AND POLICIES ...........................  23

12    PLAN IMPLEMENTATION ........................................................................  24

12.1  General Implementation Schedule .........................................................  24

12.2  Plan Maintenance and Data Refinement ................................................  24

12.3  Changing the Plan ..............................................................................  24

13    REFERENCES CITED ...............................................................................  24

APPENDIX A—LAND USE PLAN AMENDMENTS ................................................  27

APPENDIX B—SOLAR ENERGY PROGRAM POLICIES ......................................  146

FIGURES

A-1    Areas Identified for Exclusion Following Publication of the Supplement
       to the Draft Solar PEIS Based on Continued Consultation with
       Cooperating Agencies and Tribes ...........................................................  42

A-2    Land Use Allocations in Arizona as a Result of the Solar PEIS Record
       of Decision ........................................................................................  44

A-3    Land Use Allocations in California as a Result of the Solar PEIS Record
       of Decision ........................................................................................  45

A-4    Land Use Allocations in Colorado as a Result of the Solar PEIS Record
       of Decision ........................................................................................  46

A-5    Land Use Allocations in Nevada as a Result of the Solar PEIS Record
       of Decision ........................................................................................  47

A-6    Land Use Allocations in New Mexico as a Result of the Solar PEIS
       Record of Decision .............................................................................  48

A-7    Land Use Allocations in Utah as a Result of the Solar PEIS Record
       of Decision ........................................................................................  49

BLM_0018343

**TABLES**

A-1     **Land Use Plans Amended and Approximate Acreage Available for Application for Solar Energy Development by Planning Area** ........................ 28

A-2     **Exclusions under BLM's Solar Energy Program** ................................................ 38

A-3     **Solar Energy Zones and Approximate Acreage by State** ................................. 41

A-4     **Individual Plans Specified as Elements of the Programmatic Design Features** ........................................................................................................... 52

A-5     **Solar Energy Zone-Specific Design Features** ....................................................... 129

BLM_0018344

*This page intentionally left blank.*

BLM_0018345

**RECORD OF DECISION**

# 1 INTRODUCTION

This Record of Decision (ROD) describes the U.S. Department of the Interior, Bureau of Land Management's (BLM's), decisions regarding utility-scale solar energy development on BLM-administered lands in six southwestern states (Arizona, California, Colorado, Nevada, New Mexico, and Utah) and approval of these decisions by the Secretary of the Interior. For the purposes of this ROD, utility-scale facilities are defined as projects with capacities of 20 megawatts (MW) or greater that generate electricity that is delivered into the electricity transmission grid. In accordance with the Federal Land Policy and Management Act (FLPMA) (Section 103(c)), public lands are to be managed for multiple uses that take into account the long-term needs of future generations for renewable and non-renewable resources. The Secretary of the Interior is authorized to grant rights-of-way (ROWs) on public lands for systems of generation, transmission, and distribution of electric energy (FLPMA, Section 501(a)(4)).

The BLM has identified a need to respond in a more efficient and effective manner to the high interest in siting utility-scale solar energy development on public lands and to ensure consistent application of measures to avoid, minimize, and mitigate the potential adverse impacts of such development. Through this ROD, the BLM is replacing certain elements of its existing solar energy policies with a comprehensive Solar Energy Program that would allow the permitting of future solar energy development projects to proceed in a more efficient, standardized, and environmentally responsible manner. While the proposed Solar Energy Program will further the BLM's ability to meet the goals of E.O. 13212 and the Energy Policy Act of 2005, it also has been designed to meet the requirements of Secretarial Order 3285A1 (Secretary of the Interior 2010) regarding the identification and prioritization of specific locations best suited for utility-scale solar energy development on public lands.

The ROD documents the BLM's decisions, which consist of land use plan amendments that establish the foundation for a comprehensive Solar Energy Program. In addition, Appendix B of the ROD describes updated and revised BLM policies and procedures related to solar energy development on public lands. These policies and procedures provide internal administrative guidance to the BLM regarding the processing of ROW applications for utility-scale solar energy projects. The proposed action and alternatives were evaluated through the preparation of the *Final Programmatic Environmental Impact Statement for Solar Energy Development in Six Southwestern States* (BLM and DOE 2012). The programmatic environmental impacts statement (PEIS) was prepared jointly by the BLM and the U.S. Department of Energy (DOE) in accordance with the National Environmental Policy Act of 1969 (NEPA), the Council on Environmental Quality's regulations for implementing NEPA (Title 40, Parts 1500–1508 of the *Code of Federal Regulations* [40 CFR Parts 1500–1508]), the DOI and DOE regulations for implementing NEPA (43 CFR Part 46 and 10 CFR Part 1021, respectively), and applicable BLM and DOE authorities.

BLM_0018346

## 2  OVERVIEW OF ALTERNATIVES

Through the Solar PEIS, the BLM evaluated three alternatives for managing utility-scale solar energy development on BLM-administered lands in the six-state study area.  These alternatives included two action alternatives—a solar energy development program alternative and a Solar Energy Zone (SEZ) program alternative—and a no action alternative.  The solar energy development program alternative was identified in the Final Solar PEIS as the BLM's preferred alternative.

### 2.1  SOLAR ENERGY DEVELOPMENT PROGRAM ALTERNATIVE—BLM PREFERRED ALTERNATIVE

Under the solar energy development program alternative (referred to as the "program alternative"), the BLM proposes categories of lands to be excluded from utility-scale solar energy development (about 79 million acres [319,702 km$^2$] proposed for exclusion) and identifies specific locations well suited for utility-scale production of solar energy (i.e., SEZs) where the BLM proposes to prioritize development (about 285,000 acres [1,553 km$^2$] in SEZs). The program alternative emphasizes and incentivizes development within SEZs and proposes a collaborative process to identify additional SEZs.  To accommodate the flexibility described in the BLM's program objectives, the program alternative allows for responsible utility-scale solar energy development in variance areas outside of SEZs in accordance with the proposed variance process (about 19 million acres [82,964 km$^2$] in variance areas).  The program alternative also establishes programmatic design features for utility-scale solar energy development on BLM-administered lands.

### 2.2  SOLAR ENERGY ZONE PROGRAM ALTERNATIVE

Under the SEZ program alternative (referred to as the "SEZ alternative"), the BLM would restrict utility-scale solar energy development to SEZs only, and identify all other lands as exclusion areas for utility-scale solar energy development (approximately 98 million acres [396,600 km$^2$]).  Under the SEZ alternative, the same programmatic design features applicable to the program alternative would apply to utility-scale solar energy development in SEZs.  Under the SEZ alternative, new or expanded SEZs would be identified in the future following the collaborative identification process mentioned above.

### 2.3  NO ACTION ALTERNATIVE

Under the no action alternative, the BLM would continue the issuance of ROW authorizations for utility-scale solar energy development on BLM-administered lands by implementing the requirements of the BLM's existing solar energy policies on a project-by-project basis.  Lands available for solar energy development would include those areas currently allowable under existing applicable laws and statutes (approximately 98 million acres [396,600 km$^2$] in the six-state study area) and in conformance with the approved land use plans.  The BLM would not implement any of the proposed elements of the Solar Energy Program described in the two action alternatives.

BLM_0018347

## 2.4 ENVIRONMENTALLY PREFERRED ALTERNATIVE

The BLM has determined that both of the action alternatives are environmentally preferred over the no action alternative. The impacts of solar energy development itself, however, are largely similar across the two action alternatives. Because the action alternatives represent planning-level decisions (i.e., allocation decisions), differences between the alternatives are primarily found in the location, pace, and concentration of expected solar energy development.

Under both action alternatives, the BLM would exclude categories of lands from utility-scale solar energy development and identify specific locations well suited for utility-scale production of solar energy, where the BLM would prioritize development. The BLM would emphasize and incentivize development within SEZs and proposes a collaborative process to identify additional SEZs. To accommodate the flexibility described in the BLM's program objectives, the program alternative allows for utility-scale solar energy development in variance areas outside of SEZs in accordance with the proposed variance process. The SEZ alternative, in contrast, would allow development only within SEZs. Both BLM action alternatives would also establish programmatic design features that would apply to all utility-scale solar energy projects on BLM-administered lands. These design features represent accepted methods to avoid, minimize, and/or mitigate potential adverse impacts from solar energy development, including associated facilities such as transmission lines, roads, and other infrastructure.

## 3 DECISION

The decision is hereby made to implement a comprehensive Solar Energy Program to administer the development of utility-scale solar energy resources on BLM-administered public lands in six southwestern states: Arizona, California, Colorado, Nevada, New Mexico, and Utah. The decision includes incorporating land use allocations and programmatic and SEZ-specific design features into 89 BLM land use plans in the six-state study area. The land use plan amendments, described in Appendix A of this ROD, include the identification of exclusion areas for utility-scale solar energy ROWs, priority areas for utility-scale solar energy ROWs (i.e., SEZs), and areas potentially available for utility-scale solar energy development outside of exclusion areas and SEZs (i.e., variance areas). Land use plan amendments also establish required programmatic and SEZ-specific design features for solar energy development on public lands to ensure the most environmentally responsible development and delivery of solar energy.

Contemporaneous with this ROD, the BLM is also announcing revised policies and procedures that relate to solar energy development on public lands. These policies and procedures are described in Appendix B of this ROD and provide internal administrative guidance to the BLM regarding the processing of ROW applications for utility-scale solar energy projects.

## 3.1 WHAT THE DECISION PROVIDES

This ROD records the decision of the BLM Director and approval of these decisions by the Secretary of the Interior to establish a comprehensive Solar Energy Program to administer the development of utility-scale solar energy resources on BLM-administered public lands in six southwestern states: Arizona, California, Colorado, Nevada, New Mexico and Utah. This

BLM_0018348

includes land use plan amendments for land use allocations (exclusion areas, variance lands, and SEZs) and design features. The Solar Energy Program decisions will guide the processing of all new utility-scale solar energy applications on BLM-administered lands. The BLM defines "new" applications as any applications filed within proposed SEZs after June 30, 2009, and any applications filed within proposed variance and/or exclusion areas after the October 28, 2011, publication of the Supplement to the Draft Solar PEIS. To complement its land use planning decision, the BLM also describes updates and revisions to various policies and procedures in Appendix B of this ROD.

## 3.2  WHAT THE DECISION DOES NOT PROVIDE

This ROD does not authorize any solar energy development projects or eliminate the need for site-specific environmental reviews for any future utility-scale solar energy development project. The BLM will make separate decisions as to whether or not to authorize individual solar energy projects in conformance with existing land use plans as amended by this ROD. The BLM will complete a site-specific environmental review of all solar energy ROW applications in accordance with NEPA prior to issuing a ROW authorization. All future projects will tier to the analysis in the Solar PEIS to the extent practicable. The extent of this tiering will vary from project to project, as will the necessary level of NEPA documentation. Tiering is defined as using the coverage of general matters in broader NEPA documents in subsequent, narrower NEPA documents (40 CFR 1508.28, 40 CFR 1502.20, 43 CFR 46.140). This allows the tiered NEPA document to concentrate solely on the issues not already addressed. It is expected that the ability to tier will be greatest in the SEZs where in-depth analysis was conducted as part of the Solar PEIS.

The scope of the decision being made is limited to utility-scale solar energy development. For the purposes of the Solar PEIS and associated decision making, utility-scale solar energy development is defined as any project capable of generating 20 MW or more. As a result, the BLM's new Solar Energy Program would apply only to projects of this scale; decisions on projects that are less than 20 MW would continue to be made in accordance with existing land use plan requirements, current applicable policy, and individual site-specific NEPA analyses.

While the Solar PEIS considers the impacts of constructing, operating, and decommissioning the related infrastructure needed to support utility-scale solar energy development, such as roads, transmission lines, and natural gas or water pipelines, the land use plan decisions being made (e.g., exclusions, SEZs) are applicable only to utility-scale solar energy generation facilities. Management decisions for supporting infrastructure will continue to be made in accordance with existing land use plan decisions and current applicable policy and procedures.

None of the land use plan decisions or policies described in this ROD are applicable to private lands or other lands outside the BLM's jurisdiction.

The only land use allocations made through the ROD are to identify exclusion areas, variance lands, and SEZs (see Appendix A). The ROD does not amend any land use plan to open areas for utility-scale solar energy development that existing land use plans have identified as exclusion or avoidance areas.

BLM_0018349

This ROD and the associated land use plan amendments do not provide guidance or direction for pending applications for utility-scale solar energy development on BLM-administered lands. The BLM defines "pending" applications as any applications (regardless of place in line) filed within proposed variance and/or exclusion areas before the publication of the Supplement to the Draft Solar PEIS (October 28, 2011), and any applications filed within proposed SEZs before June 30, 2009. Pending applications will not be subject to any decisions adopted by this ROD. The BLM will process pending solar applications consistent with land use plan decisions in place prior to amendment by this ROD and policies and procedures currently in place (e.g., IM 2011-060 [BLM 2011a] and IM 2011-061 [BLM 2011b]), or as may be modified in the future. Amendments to pending applications would also not be subject to the decisions adopted by this ROD provided they meet the criteria identified in Appendix B, Section B.3.

The decisions in this ROD do not change any regulatory procedures generally applicable to ROWs on BLM-administered lands, including rental fees, cost recovery fees, and bonding requirements. Any regulatory change would require the BLM to pursue rulemaking.

## 4 MANAGEMENT CONSIDERATIONS IN SELECTING THE PREFERRED ALTERNATIVE

The Final Solar PEIS (Chapter 6) presents an analysis of the BLM's three alternatives in terms of their effectiveness in meeting the objectives outlined as part of BLM's purpose and need for action. Chapter 6 considers the extent to which each alternative would assist the BLM in meeting the Executive Orders, Congressional mandates, and Federal agency orders and policies that promote expedited and concentrated Federal action supporting the development of domestic renewable energy resources. For each of the alternatives, this chapter also includes a summary of programmatic-level information on the potential impacts on resources and resource uses from solar energy development by alternative. These considerations in the Final Solar PEIS were used as the basis for the BLM's selection of the program alternative as the Agency's preferred alternative.

The BLM concluded that the program alternative would best meet the BLM's objectives for managing utility-scale solar energy development on BLM-administered lands. These objectives include the following (as described in Section 1.3.1 of the Final Solar PEIS):

- Facilitate near-term utility-scale solar energy development on public lands;

- Minimize potential negative environmental impacts;

- Minimize potential negative social and economic impacts;

- Provide flexibility to the solar industry to consider a variety of solar energy projects (e.g., location, facility size, and technology);

- Optimize existing transmission infrastructure and corridors;

BLM_0018350

- Standardize and streamline the authorization process for utility-scale solar energy development on BLM-administered lands; and

- Meet projected demand for solar energy development (as estimated by the Reasonably Foreseeable Development Scenario [RFDS] developed for the PEIS).

As compared to the no action alternative and the SEZ alternative, the BLM concluded that the program alternative would likely result in a high pace of development at a low cost to the government, developers, and stakeholders. The expected increased pace of development would accelerate the rate at which the economic benefits would be realized at the local, state, and regional levels. At the same time, it would provide a comprehensive approach for ensuring that potential adverse impacts would be minimized. The BLM's analysis of the potential environmental impacts of utility-scale development in the Final Solar PEIS concluded that both the program alternative and the SEZ alternative are environmentally preferred over the no action alternative. The action alternatives would exclude categories of lands from utility-scale solar energy development and identify specific locations well suited for utility-scale production of solar energy where the BLM would prioritize development. Both action alternatives would also establish programmatic design features that would apply to all utility-scale solar energy projects on BLM-administered lands. These design features represent accepted methods to avoid, minimize, and/or mitigate potential adverse impacts from solar energy development, including associated facilities such as transmission lines, roads, and other infrastructure.

The program alternative would make an adequate amount of suitable lands available to support the level of development projected in the RFDS and, as compared to the SEZ alternative, would provide greater flexibility in siting both solar energy facilities and associated transmission infrastructure. Under the program alternative, the land area in SEZs (285,000 acres [1,153 km$^2$]) with an assumed build-out of 80% would be sufficient to meet the RFDS. The additional lands available for application in variance areas (about 19 million acres [82,964 km$^2$]) would provide additional available acreage as well as flexibility in terms of where the projected 24,000 MW of production capacity would be constructed.

The program alternative will further the BLM's ability to meet E.O. 13212 and the Energy Policy Act of 2005, and it has been designed to meet Secretarial Order 3285A1 (Secretary of the Interior 2010) regarding the identification and prioritization of specific locations best suited for utility-scale solar energy development on public lands.

## 4.1  EXECUTIVE ORDER 13212

On May 18, 2001, the President signed E.O. 13212, "Actions to Expedite Energy-Related Projects," which states that "the increased production and transmission of energy in a safe and environmentally sound manner is essential" (*Federal Register*, Volume 66, page 28357, May 22, 2001). Executive departments and agencies are directed to "take appropriate actions, to the extent consistent with applicable law, to expedite projects that will increase the production, transmission, or conservation of energy." E.O. 13212 further states that "For energy-related projects, agencies shall expedite their review of permits or take other actions as necessary to

BLM_0018351

accelerate the completion of such projects, while maintaining safety, public health, and environmental protections. The agencies shall take such actions to the extent permitted by law and regulation and where appropriate."

## 4.2  ENERGY POLICY ACT OF 2005

On August 8, 2005, the Energy Policy Act of 2005 (Public Law [P.L.] 109-58) was signed into law. Section 211 of the Act states, "It is the sense of the Congress that the Secretary of the Interior should, before the end of the 10-year period beginning on the date of enactment of this Act, seek to have approved non-hydropower renewable energy projects located on the public lands with a generation capacity of at least 10,000 megawatts of electricity."

## 4.3  DOI SECRETARIAL ORDER 3285A1

On March 11, 2009, the Secretary of the Interior issued Secretarial Order 3285, which announced a policy goal of identifying and prioritizing specific locations best suited for large-scale production of solar energy on public lands (Secretary of the Interior 2009). The Secretarial Order requires DOI agencies and bureaus to work collaboratively with each other and with other Federal agencies, individual states, tribes, local governments, and other interested stakeholders, including renewable energy generators and transmission and distribution utilities, to encourage the timely and responsible development of renewable energy and associated transmission, while protecting and enhancing the Nation's water, wildlife, and other natural resources; to identify appropriate areas for generation and necessary transmission; to develop best management practices for renewable energy and transmission projects on public lands to ensure the most environmentally responsible development and delivery of renewable energy; and to establish clear policy direction for authorizing the development of solar energy on public lands. On February 22, 2010, Secretarial Order 3285 was amended to clarify departmental roles and responsibilities in prioritizing development of renewable energy. The amended order is referred to as Secretarial Order 3285A1 (Secretary of the Interior 2010).

## 5  PROTESTS ON THE PROPOSED LAND USE PLAN AMENDMENTS

Pursuant to the BLM's land use planning regulations in 43 CFR 1610.5-2, any person who participated in the land use planning process for the Solar PEIS and has an interest that may be adversely affected by the land use planning decisions may protest the proposed planning decisions contained in the Final PEIS. The BLM received 16 protest letters on the proposed land use plan amendments in the Final Solar PEIS. After careful consideration of all issues raised in these protests, the BLM Director concluded the responsible planning team followed all applicable laws, regulations, and policies in developing the proposed plan amendments. Individual protests and responses are published in the Director's Protest Resolution Report (available at http://www.blm.gov/wo/st/en/prog/planning/planning_overview/protest_resolution/ protestsreports.html).

Protest issues included, but were not limited to, allegations regarding the following:

BLM_0018352

- The National Environmental Policy Act (e.g., the statement of purpose and need for the land use plan amendments, the range of alternatives considered, and the analysis of impacts);

- The Federal Land Policy and Management Act (FLPMA) (e.g., the BLM's obligation to minimize impacts and prevent unnecessary and undue degradation);

- The Endangered Species Act (and related BLM policy);

- Tribal Consultation and the National Historic Preservation Act; and

- The BLM's criteria used to determine exclusion areas.

While the Director's resolution of protests did not identify any issues to be remanded, the BLM has made clarifications and modifications to the proposed Solar Energy Program and Solar Energy Program policies as a result of protests, comments, and internal BLM review. These are discussed below.

# 6  NOTICE OF CLARIFICATIONS AND MODIFICATIONS MADE TO THE PROPOSED SOLAR ENERGY PROGRAM AND SOLAR ENERGY PROGRAM POLICIES

Clarifications consist of minor corrections and clarifying statements. Modifications include changes to the proposed Solar Energy Program (the land use plan amendments described in Appendix A) that do not affect the adequacy of the underlying NEPA analysis, and changes to the Solar Energy Program Policies (the internal administrative guidance described in Appendix B).

Clarification—The following application was left off the table of "first in-line" pending applications presented in the Final Solar PEIS (Table B-2):  CACA 49421, Solar Partners V, LLC (Brightsource) (Siberia), application received April 30, 2007, 600 MW, 13,920 acres, CSP/tower, Barstow Field Office.  The BLM maintains a list of first-in-line pending applications on the Solar Energy Program Web page (http://solareis.anl.gov).

Clarification—The policy citations and manuals regarding lands with wilderness characteristics cited in Section 5.3 of the Final Solar PEIS (5-3) are not in effect.  On April 14, 2011, the United States Congress passed the Department of Defense and Full-Year Continuing Appropriations Act, 2011 (Pub. L. 112-10)(2011 CR), which includes a provision (Section 1769) that prohibits the use of appropriated funds to implement, administer, or enforce Secretarial Order 3310 in fiscal year 2011.  The BLM immediately halted implementation of the Order and has remained in full compliance with this prohibition in subsequent fiscal years.  As required by law, the BLM continues to maintain inventories of lands under its jurisdiction, including lands with wilderness characteristics.  Consistent with FLPMA and other applicable authorities, the BLM considers the wilderness characteristics of public lands when undertaking its multiple use

BLM_0018353

land use planning and when making project-level decisions. Two manuals that the BLM released in March of 2012 provide guidance to agency employees on how to conduct these inventories and to consider the inventories in the land use planning process. (BLM Manuals 6310—*Conducting Wilderness Characteristics Inventory on BLM Lands*, and 6320—*Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process*).

Clarification—In Section 9.4.3 of the Final Solar PEIS, the BLM acknowledged that lands with wilderness characteristics will be impacted through solar energy development in the Riverside East SEZ. However, the total acreage of lands with wilderness characteristics was incorrectly stated in the Final Solar PEIS. The Riverside East SEZ contains approximately 20,578 acres of developable lands with wilderness characteristics (and 4,487 acres of lands with wilderness characteristics that overlap with non-developable areas in the SEZ). The BLM has decided not to manage these lands to protect wilderness characteristics, on the basis of the rationale provided in the Final Solar PEIS (Section 9.4.3.2). The BLM posted a revised map of the overlap between the Riverside East SEZ and lands with wilderness characteristics on the Solar Energy Program Web page (http://solareis.anl.gov). The programmatic design features specific to lands with wilderness characteristics (see Appendix A, Section A.4.1.2) will apply to any future solar energy development in these areas. In addition, unavoidable impacts associated with the development of these lands with wilderness characteristics in the Riverside East SEZ will be given consideration in the regional mitigation plan to be established for the SEZ (see Appendix B, Section B.4.4).

Clarification—Exclusion criteria 32 as described in the Final Solar PEIS (Table 2.2-2) and carried forward in this ROD is defined as "Specific areas identified since the publication of the Supplement to the Draft Solar PEIS by the BLM based on continued consultation with cooperating agencies and tribes to protect sensitive natural, visual, and cultural resources" (total of 1,066,497 acres [4,316 km$^2$]). In developing this exclusion, the BLM evaluated all of the exclusions proposed through comments on the Supplement to the Draft Solar PEIS and worked with BLM state and field office resource experts to determine appropriateness for exclusion. In most cases these exclusion areas represent locations where multiple resource conflicts overlap, for example areas where priority tortoise connectivity habitat as identified by the U.S. Fish and Wildlife Service overlap with areas identified as high potential conflict by the National Park Service. This particular exclusion is defined by the map that is presented in Appendix A, Figure A-1 of this ROD. Any decision by the BLM to exclude additional lands from future solar energy development in this category would be required to follow applicable BLM land use planning procedures. Data and finer scale maps for all exclusions will be made available through the Solar Energy Program Web page as appropriate (http://solareis.anl.gov) (note that in some cases, the description of exclusion areas will be withheld from the public to ensure protection of the resource).

Clarification—Although the BLM expects that future utility-scale solar energy development could be proposed jointly on BLM-administered lands and private lands,

BLM_0018354

none of the land use plan decisions or policies described in this ROD are applicable to private lands or other lands outside the BLM's jurisdiction.

Clarification—Regarding the offset of unavoidable impacts described in the Draft Framework for Developing Regional Mitigation Plans for the BLM's Solar Energy Program in the Final Solar PEIS (Appendix A.2.5), the BLM did not specify a preference for the acquisition of private lands as a means to mitigate unavoidable impacts on BLM-administered lands. Instead, the BLM conveyed its intent to comprehensively evaluate land acquisition and long-term management strategies for both public and private lands to fully understand impacts on, for example, local jurisdictions and recreational opportunities, as well as regulatory challenges. In meeting regional objectives, the BLM will give consideration to the full range of mitigation tools available to the agency, including but not limited to land acquisition, mitigation banking, withdrawing BLM-administered lands from other uses, changing land designations or uses, and restoration and enhancement activities. This consideration will necessarily include analysis of potential impacts to local jurisdictions.

Clarification—As stated in the Final Solar PEIS (2-43), the BLM will typically process ROW applications in variance areas on a first-come, first-served basis. However, the BLM has the discretion to apply competitive procedures to variance areas. To clarify, the BLM's existing ROW regulations (43 CFR 2804.23(c)) currently provide authority for identifying public lands under competitive bidding procedures, but limit the competitive process to responding to ROW applications. The existing regulations do not provide authority for issuing competitive leases. The BLM has no intent to use these existing competitive procedures in variance areas except in limited circumstances where two or more applications have been determined by the BLM to have competing interests.

Clarification—SEZ-specific design features are limited to those design features included in Appendix A, Table A-5 of this ROD. In many of the SEZ-specific chapters in the Final Solar PEIS, the BLM included examples of how the programmatic design features would be applied to a particular SEZ given the resources determined to be present through the analysis in the PEIS. These are not to be confused with the unique SEZ-specific design features in Table A-5 and were simply included to highlight potential resource conflicts to be addressed within a particular SEZ.

Clarification—Protests received on the Final Solar PEIS expressed confusion regarding the compatibility of utility-scale solar energy development and Multiple Use Class L (Limited Use) designations in the California Desert Conservation Area (CDCA), as well as lands designated as Class M (Moderate Use), and I (Intensive Use). Though the Final Solar PEIS used the CDCA Class C (Controlled Use) designation as one of its exclusion criteria, the siting of solar energy development projects on Class L, M, and I lands remains consistent with the CDCA Plan. The existing CDCA Plan expressly allows for certain electrical generation facilities, including solar facilities, to be sited in areas designated as Class L, M, or I lands, provided that NEPA requirements are met. In the 1980 CDCA Plan ROD, the Assistant Secretary for Land and Water Resources discussed remaining major issues in the final CDCA Plan before he approved the Plan (p. 10,

BLM_0018355

et seq., CDCA ROD). One of the remaining major issues was the allowance of wind, solar, and geothermal power plants within designated Class L lands (p. 15, CDCA ROD). The CDCA ROD recognized that "these facilities are different from conventional power plants and must be located where the energy resource conditions are available. An EIS will be prepared for individual projects." The recommended decision, which was ultimately approved, noted: "Keep guidelines as they are to allow these power plants if environmentally acceptable. Appropriate environmental safeguards can be applied to individual project proposals which clearly must be situated where the particular energy resources are favorable." Even so, the Solar PEIS ROD, which updates and amends the CDCA plan, clarifies that once NEPA requirements are met for proposed projects in these areas, there are no additional land use plan restrictions specific to Class L, M, or I designations.

Clarification—Several references to the EPA's RE-Powering America's Land Initiative (http://www.epa.gov/renewableenergyland) in the Final Solar PEIS may be misinterpreted as limiting sites to those contaminated sites tracked at the Federal level, and excluding those tracked at the state, local, and/or tribal level. In response, state, local and tribal authorities have been specifically included in appropriate sections of this ROD that discuss the EPA's RE-Powering America's Land Initiative.

Clarification – In the Final Solar PEIS (2-20), exclusion criterion 7 was described as "All areas where the BLM has made a commitment to state agency partners and other entities to manage sensitive species habitat, including but not limited to sage-grouse core areas, nesting habitat, and winter habitat; Mohave ground squirrel habitat; flat-tailed horned lizard habitat; and fringe-toed lizard habitat." Comments and protests received on the Final Solar PEIS expressed confusion over the applicability of this exclusion criteria to Southern Mojave and Sonoran Wildlife Habitat Management Areas (WHMAs) for bighorn sheep and 13 multi-species WHMAs for other special status species established by the Northern and Eastern Colorado Desert Coordinated Management Plan (BLM and CDFG 2002). The BLM did not intend for WHMAs to fall within exclusion criterion 7. This claim is supported by the analysis in the Solar PEIS. For example, the Solar PEIS acknowledges that WHMAs are present within the Riverside SEZ ("WHMAs within the SEZ may provide important connectivity for desert tortoise movements between the DWMAs" [Draft Solar PEIS, p. 9.4-180]).

In response to the comments and protests raised, exclusion criterion 7 (see Appendix A, Table A-2) has been clarified in this ROD to read: "Sage-grouse core areas, nesting habitat, and winter habitat; Mohave ground squirrel habitat; flat-tailed horned lizard habitat; fringe-toed lizard habitat; and all other areas where the BLM has agreements with state agency partners and other entities to manage sensitive species habitat in a manner that would preclude solar energy development." The development restrictions and mitigation requirements adopted in the NECO CMP and other relevant plans remain in effect and would apply to any applications for solar energy development within a WHMA. Such requirements include for example limiting barriers to bighorn sheep movement within and between demes to the extent possible in bighorn sheep WHMAs (NECO CMP 2002) and a 3:1 mitigation ratio for disturbance of Desert Dry Wash

BLM_0018356

Woodland and Desert Chenopod Scrub communities in multi-species WHMAs (NECO CMP 2002). Further, any projects proposed in WHMAs shall not compromise the management goals of those WHMAs, and the required site-specific NEPA analysis would need to analyze the impacts of the project on the WHMAs and its management prescriptions. The BLM will also consider the presence of WHMAs for solar energy ROW applications within variance areas, including documentation from the applicant that the proposed project will minimize adverse impacts on important fish and wildlife habitats and migration/movement corridors (see Appendix B, Section B.5).

Modification—As explained more fully in Appendix B, Section B.5.3, of this ROD, it is important to protect desert tortoise connectivity areas. To assist in that process, the BLM excluded an additional 515,000 acres (2,084 km$^2$) of land that coincides with priority desert tortoise connectivity habitat in the Final Solar PEIS (see Section 2.2.2.3.1 therein). In addition, maps and supporting information regarding priority desert tortoise connectivity habitat, as identified by the U.S. Fish and Wildlife Service (USFWS), have been made available through the Solar Energy Program Web page (http://solareis.anl.gov). An explanation of the map is also provided on the Solar Energy Program Web page. As with all landscape-scale mapping exercises, there are inherent limitations in the ability of the USFWS maps to accurately describe site-specific conditions for desert tortoise connectivity. The maps are intended to be used as a first line screening of variance areas in terms of desert tortoise connectivity habitat. For mapped areas that are in variance areas, applicants will be required to follow a special variance process for desert tortoise (see Appendix B, Section B.5.3) that will require an assessment of site-specific data and ground-truthing of the information provided in the USFWS map to determine whether a site is an acceptable location for utility-scale solar energy development. Considerations for the protection of desert tortoise connectivity habitat have also been added to the programmatic design features in this ROD (see Appendix A, Section A.4.1.11.1).

Modification—Protests and comments received on the Final Solar PEIS continue to express concern about the use of solar insolation as an exclusion criterion in the Solar Energy Program. The BLM chose not to make adjustments to the solar insolation exclusion criteria in this ROD. The BLM believes that restricting the available lands for utility-scale solar energy development based on the quality of the solar radiation will help maximize the efficient use of BLM-administered lands and meet the multiple use intent of FLPMA by reserving for other uses lands that are not ideal for solar energy development. However, as described in this ROD, the BLM's Solar Energy Program provides some flexibility to developers who wish to construct utility-scale projects on lands with insolation values lower than 6.5 kWh/m$^2$/day. In particular, in recognition of expected advances in solar energy technology, changes in market conditions, and changes in other state and Federal policies, the BLM will consider the designation of new SEZs in areas with lower insolation (see Appendix B, Section B.4.5.2.2). This was described in both the Supplement to the Draft Solar PEIS and the Final Solar PEIS as part of the proposed SEZ Identification Protocol and was based primarily on the input from solar industry representatives. Under the framework of the Solar Energy Program, the primary mechanism to expand the lands available for utility-scale solar development will be

BLM_0018357

through the identification of new SEZs. Flexibility for individual projects with respect to solar insolation can be afforded through the land use planning process. Consistent with existing planning regulations, applicants may request that the BLM amend a land use plan to allow for an otherwise nonconforming proposal (ROD citation A.2). For example, an applicant may request a land use plan amendment for an individual utility-scale solar energy project in suitable locations where insolation values are below 6.5 kWh/m$^2$/day. The BLM will consider such requests on a case-by-case basis.

Modification—The requirement presented in the Final Solar PEIS (Section 2.2.2.2.2) that all projects in SEZs determined by the authorized officer to require an EIS level of analysis must be submitted through the State Director to the BLM Washington Office for the Director's concurrence prior to the issuance of an Notice of Intent has been removed in the ROD. Close coordination with the BLM Washington Office will occur for all projects in SEZs irrespective of the level of NEPA analysis required. The determination of level of NEPA analysis will be made by the BLM authorized officer in coordination with the BLM Washington Office, consistent with the Council on Environmental Quality's NEPA regulations (40 CFR Parts 1500-1508), DOI NEPA procedures (43 CFR Part 46), and the BLM NEPA Handbook (H-1790-1).

Modification—Additional language has been added to the description of pending applications in the ROD to describe the circumstances in which amendments to pending applications would be acceptable (see Appendix B, Section B.3).

Modification—Changes have been made to the variance process based on comments received on the Final Solar PEIS (see Appendix B, Section B.5). These changes, which do not substantially affect the proposed action or the adequacy of the NEPA analysis, include the addition of a factor to be considered regarding lands with wilderness characteristics; the addition of text regarding the preference to use contaminated or previously disturbed lands; changes to text regarding the consideration of the availability of lands with SEZs that could meet an applicant's needs; changes to text regarding the use of existing infrastructure (i.e., roads and transmission); changes to text regarding the use of water; changes to text regarding transmission issues; and changes to text regarding the second pass survey for desert tortoise.

Modification—Additional language has been added to the identification protocol for SEZs to include lands with wilderness characteristics in the types of areas to screen for based on landscape-scale information (see Appendix B, Section B.4.5). This addition does not substantially affect the proposed action or the adequacy of the NEPA analysis.

Modification—Changes have been made to the programmatic design features based on comments received on the Final Solar PEIS (see Appendix A, Section A.4.1). These changes, which do not substantially affect the proposed action or the adequacy of the NEPA analysis, include the addition of possible methods to mitigate unavoidable impacts on specially designated areas and lands with wilderness characteristics; changes to text regarding the siting and design for facilities; changes to text regarding water supply; addition of text regarding coordination with affected grazing permittees/lessees; addition

BLM_0018358

of design feature for air-quality related values in Class I areas; addition of text regarding the identification of environmental justice communities; clarifying text regarding unique or important recreation resources; removing text regarding the salvage of intact biological soil crusts; clarifying text regarding soil deposition and erosion; clarifying text regarding monitoring for water use; clarifying text regarding mitigating impacts on ecological resources; removing text regarding Migratory Bird Treaty Act take permits; and the addition of design features that address the conservation recommendations put forth by the USFWS in their Biological Opinion and Conservation Review for the Solar Energy Program (July 20, 2012).

# 7 CONSISTENCY AND CONSULTATION REVIEW

## 7.1 GOVERNOR'S CONSISTENCY REVIEW

On July 24, 2012, the BLM initiated the 60-day Governor's Consistency Review of the Final Solar PEIS in accordance with FLPMA (43 USC 1712(c)(9)), which states that the Secretary of the Interior shall "coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the States and local governments within which the lands are located." It further directs the Secretary to "assure that consideration is given to those State, local and tribal plans that are germane in the development of land use plans for public lands" and "assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans." Thus, FLPMA does not require the BLM to adhere to or adopt the plans of other agencies or jurisdictional entities but rather to give consideration to those plans and make an effort to resolve inconsistencies to the extent practical. In some circumstances, the BLM may be unable to resolve inconsistencies where state plans conflict with Federal law. While state and Federal planning processes are required to be as integrated and consistent as practical, the BLM is not bound by or subject to State plans, planning processes, or planning stipulations.

The States of New Mexico and Arizona provided letters finding that the BLM's proposed land use plan amendments are consistent with State or local plans, policies or programs. The States of Nevada and Colorado did not provide a formal response. Therefore, consistent with the BLM's planning regulations at 43 CFR 1610.3-2(e), the proposed plan amendments are presumed to be consistent with State or local plans, policies, or programs in Nevada and Colorado. The State of California indicated that there are inconsistencies between the proposed land use plan amendments and the local plans, policies, or programs of Inyo, San Bernardino, and Riverside Counties, but did not identify those inconsistencies or recommend changes to the proposed plan amendments. The California Governor's Office of Planning and Research recommended that the BLM continue to coordinate with these local governments, which the BLM will do as it implements its Solar Energy Program. The State of Utah confirmed that the proposed land use plan amendments to identify SEZs are consistent with Utah law and policy, including the Governor's 10-Year Strategic Energy Plan. The State of Utah also indicated that the BLM's exclusion of some lands from solar development may be inconsistent with state law regarding how viewshed, wilderness characteristics, and sage-grouse habitat should be considered. The State of Utah did not identify those inconsistencies or make recommendations about how the proposed plan amendments should be adjusted to comport with applicable state law. However,

BLM_0018359

the BLM will work with the state to discuss and review development opportunities outside of SEZs.

## 7.2  COOPERATING AGENCIES

The Solar PEIS was prepared in close coordination with 19 Federal, state, and local government agencies participating as cooperating agencies.  The following agencies participated as cooperating agencies in the preparation of the Solar PEIS:

- U.S. Department of Defense (DoD);

- U.S. Bureau of Reclamation (BOR);

- U.S. Fish and Wildlife Service (USFWS);

- U.S. National Park Service (NPS);

- U.S. Environmental Protection Agency (EPA), Region 9;

- U.S. Army Corps of Engineers (USACE), South Pacific Division;

- State of Arizona Game and Fish Department (AZGFD);

- State of California, California Energy Commission (CEC);

- State of California Public Utilities Commission (CPUC);

- State of Nevada Department of Wildlife (NDOW);

- N-4 Grazing Board, Nevada;

- State of Utah Public Lands Policy Coordination Office;

- Clark County (Nevada), including Clark County Department of Aviation;

- Doña Ana County (New Mexico);

- Esmeralda County (Nevada);

- Eureka County (Nevada);

- Lincoln County (Nevada);

- Nye County (Nevada); and

- Saguache County (Colorado).

BLM_0018360

The entities listed above are cooperating in the preparation of this PEIS, and Memoranda of Understanding (MOUs) between these agencies and the DOE and/or the BLM have been established, as appropriate. As cooperators, these agencies have been involved in the development of the Draft Solar PEIS, the Supplement to the Draft Solar PEIS, and the Final Solar PEIS. The cooperating agencies were given the opportunity to review the Draft Solar PEIS, the Supplement to the Draft Solar PEIS, and the Final Solar PEIS prior to their publication.

## 7.3  TRIBAL CONSULTATION

The Final PEIS reflects and incorporates the input from Indian tribes obtained through various means. Beginning in June 2008, the BLM wrote to 316 tribes, chapters, and bands with a potential interest in solar energy development on BLM-administered lands in the six-state area. The BLM provided information on the Solar PEIS, invited them to be cooperating parties, and requested government-to-government consultation. Such communication continued in July 2009, October 2011, March and April 2012, and August 2012. Maps, information, Web links, Question and Answer Fact Sheets, CDs of the PEIS, and hard copies of the Supplement were provided and feedback sought. Based on extensive comments provided by tribes, numerous changes were made to the Final PEIS as explained in correspondence sent to tribes in August of 2012. Records indicate that the BLM continued to communicate with 65 tribes on an ongoing and repeated basis via letters, e-mails, and phone calls.

In summary, tribes generally expressed concern that too much land was being made available for solar development by the BLM's preferred alternative (a concern shared by many other stakeholders). In response, the BLM revised the program alternative to emphasize and incentivize solar development within a reduced number of SEZs, some of which had also been reduced in size. Environmental concerns, including tribal issues related to the importance of cultural resources within SEZs, resulted in the elimination of entire SEZs or portions of SEZs from further consideration in the PEIS. A variance process was established to allow development outside of SEZs on an exceptional basis. The process includes a specific requirement for tribal engagement. The list of exclusion areas was also expanded in the Final Solar PEIS. An additional 1 million acres of exclusion areas were added to the program alternative between the Supplement to the Draft Solar PEIS and the Final Solar PEIS, based in part on continued consultation with tribes to protect sensitive visual and cultural resources.

The BLM conducted numerous face-to-face meetings with tribes throughout the PEIS effort, and such consultation continues. The agency issued Instruction Memorandum WO IM 2012-032 in December 2011 and held face-to-face meetings with tribes that had provided feedback on the Draft PEIS. Meetings focused on tribal comments and concerns, the content and purpose of the Supplement, the policies enumerated in the Question and Answer Fact Sheet, Section 106 procedures proposed in the Solar Programmatic Agreement, and timeframes for completing the PEIS. During the preparation of the PEIS, meetings were held with 19 different tribes. State initiatives such as the Tribal Federal Leadership Conference, Renewable Energy and Desert Planning Meetings in California, and the Restoration Energy Design Project in Arizona continue to provide opportunities for tribal input on the planning for solar energy projects. Tribes

BLM_0018361

participated in public scoping meetings in 2008 and 2011. Testimony received from five tribes (Duckwater Shoshone Tribe, Pahrump Paiute Tribe (non-federally recognized), San Miguel Band of Mission Indians, Chemehuevi Indian Tribe, and Colorado River Indian Tribe) was taken into account when the Draft and Final Solar PEIS were completed.

The BLM contracted to complete an ethnographic report of tribal issues, concerns, and important sacred and traditional properties within proposed SEZs in Nevada and Utah. Tribally approved texts describing resources and issues of concern to tribes are posted on the Solar Energy Program Web page (http://solareis.anl.gov). The BLM wrote to all tribes in October 2011. The agency shared ethnographic reports specific to individual SEZs and asked other tribes if they would identify sites of a similar nature and concern to them.

## 7.4  NATIONAL HISTORIC PRESERVATION ACT—SECTION 106 CONSULTATION

The BLM consulted with the Advisory Council on Historic Preservation; the six State Historic Preservation Offices in Arizona, California, Colorado, Nevada, New Mexico, and Utah; the National Trust for Historic Preservation; and Indian tribes in preparing a Programmatic Agreement (PA) governing Section 106 compliance procedures for future solar undertakings. The BLM provided the Draft PA in February 2011 and the Revised Draft PA in late October and early November to tribes for review and comment. In May 2012, PA Version 2.5 was again sent for comment to those tribes with historical and cultural ties to the SEZ and/or variance areas. Detailed feedback provided by the Colorado River Indian Tribes and the Big Pine Paiute Tribe resulted in additions and modifications of compliance procedures in the PA. The Consulting Parties agreed to the final provisions of the Solar PA in August 2012. The final Programmatic Agreement was signed by the Acting BLM Director on September 7, 2012, and was fully executed by all parties on September 24, 2012.

Decisions regarding the identification of historic properties, their evaluation, and treatment of adverse effects will be informed by the processes of inventory, evaluation, and mitigation of effects identified within the Final Solar PA. A sample archeological survey of SEZs within Arizona, California, and Nevada will be completed in November 2012 to provide more up-to-date and complete information for those SEZs. It will allow a projection of the density and distribution of historic properties in the SEZs and help direct development to those portions of SEZs with the fewest conflicts with historic properties. Pre-application meetings with solar applicants will identify the need for additional inventory data. Indian tribes with the historical or cultural ties to the SEZ or variance areas will be invited to participate and will be given the opportunity to identify traditional historic properties through consultations with the BLM and to propose additional ethnographic research.

Opportunities to further improve Section 106 compliance are made possible through completion of Regional Mitigation Planning. The BLM, in consultation with SHPOs, the Advisory Council on Historic Preservation (ACHP), Indian tribes, and other consulting parties, will take steps to collect information on historic properties in a more effective and focused manner than might otherwise be possible through case with case-by-case Section 106 compliance procedures.

BLM_0018362

## 7.5  ENDANGERED SPECIES ACT—SECTION 7 COMPLIANCE

On February 2, 2012, the BLM initiated formal programmatic Endangered Species Act (ESA) consultation with the USFWS on its proposed Solar Energy Program.  This programmatic consultation was completed on July 20, 2012 and included consultation under both Sections 7(a)(1) and 7(a)(2) of the ESA.

The BLM, in consultation with the USFWS, completed a conservation review pursuant to Section 7(a)(1) of the ESA on the overall Solar Energy Program, including the amendment of 89 land use plans.  The conservation review considered BLM's exercise of its authority to contribute to conservation of listed species and avoid potential adverse effects to these species.  The USFWS found that the selection of SEZs, exclusion of certain areas from eligibility for solar energy development, application of design features to all solar energy development that will occur, and the review process applicable to development in variance areas outside of SEZs are likely to contribute to the conservation of listed species.  The elements of the Solar Energy Program dealing with endangered and threatened species can be considered to constitute a program for their conservation as described by Section 7(a)(1) of the ESA.

The BLM, in consultation with the USFWS, also completed a programmatic consultation with the USFWS on the identification of SEZs under Section 7(a)(2) of the ESA, which was initiated through the submission of a programmatic Biological Assessment.  This Biological Assessment described potential effects on ESA-listed species and designated critical habitat from expected solar energy development in SEZs and any appropriate mitigation, minimization, and avoidance measures.  Further Section 7(a)(2) consultation will occur, as necessary, at the level of individual solar energy projects and will benefit from the preceding programmatic consultation and resulting programmatic Biological Opinion for SEZs.

The BLM's programmatic Biological Assessment determined that the expected solar energy development in SEZs may affect but is not likely to adversely affect the following species: northern aplomado falcon (*Falco femoralis septentrionalis*), Utah prairie dog (*Cynomys parvidens*), Pahrump poolfish (*Empetrichthys latos*), southwestern willow flycatcher (*Empidonax traillii extimus*), Mexican spotted owl (*Strix occidentalis lucida*), and Yuma clapper rail (*Rallus longirostris yumanensis*).  The USFWS concurred with these determinations of "may affect, not likely to adversely affect" through their programmatic Biological Opinion dated July 20, 2012.

The BLM's programmatic Biological Assessment identified 17 species as likely to be adversely affected by the expected solar energy development in the SEZs:  desert tortoise (*Gopherus agassizii*), Amargosa niterwort (*Nitrophila mohavensis*), Ash Meadows blazing-star (*Mentzelia leucophylla*), Ash Meadows gumplant (*Grindelia fraxino-pratensis*), Ash Meadows ivesia (*Ivesia eremica*), Ash Meadows milkvetch (*Astragalus phoenix*), Ash Meadows sunray (*Enceliopsis nudicaulis* var. *corrugata*), spring-loving centaury (*Centaurium namophilum*), Ash Meadows naucorid (*Ambrysus amargosus*), Ash Meadows amargosa pupfish (*Cyprinodon nevadensis mionectes*), Ash Meadows speckled dace (*Rhinichthys osculus nevadensis*), Devils Hole pupfish (*Cyprinodon diabolis*), Moapa dace (*Moapa coriacea*), Warm Springs pupfish (*Cyprinodon nevadensis pectoralis*), White River springfish (*Crenichthys baileyi baileyi*), Hiko White River springfish (*Crenichthys baileyi grandis*), and Pahranagat roundtail chub (*Gila*

BLM_0018363

*robusta jordani*).  The USFWS concluded in their programmatic Biological Opinion, dated July 20, 2012, that expected solar energy development in SEZs is not likely to jeopardize the continued existence of these species, and is not likely to destroy or adversely modify designated critical habitat.  The conservation recommendations put forth by the USFWS in their programmatic Biological Opinion have been incorporated into the decisions in this ROD as appropriate.

# 8  MITIGATION MEASURES

The BLM's Solar Energy Program employs a mitigation hierarchy to address potential adverse impacts—avoidance, minimization, and offset of unavoidable impacts.  Avoidance will be achieved through siting decisions and the identification of priority SEZs.  Minimization will be achieved through the application of programmatic design features and SEZ-specific design features (see Appendix A, Sections A.4.1 and A.4.2).  Adherence to the design features included in this ROD will be required for all future utility-scale solar energy development on BLM-administered lands.  Design features are mitigation requirements that have been incorporated into the proposed action to avoid or minimize adverse impacts.  The design features were derived from comprehensive reviews of solar energy development activities; published data regarding solar energy development impacts; existing, relevant mitigation guidance; and standard industry practices (Final Solar PEIS A.2.2).  The Final Solar PEIS in Chapters 8–13 provides an assessment of the effectiveness of the programmatic design features in mitigating adverse impacts from solar energy development within the SEZs.  As necessary, SEZ-specific design features and their potential effectiveness are identified in addition to the programmatic design features.

All utility-scale solar energy development on BLM-administered lands will also have to adhere to applicable Federal, state, and local laws and regulations such as the ESA that seek to avoid and/or minimize adverse impacts.  For those impacts that cannot be avoided or minimized, the BLM will determine, in consultation with affected stakeholders, whether measures to offset or mitigate adverse impacts would be appropriate.  To help accomplish this goal, the BLM will develop regional mitigation plans for each SEZ.  As envisioned, these regional mitigation plans will simplify and improve the mitigation process for future projects in SEZs.

# 9  MONITORING AND ADAPTIVE MANAGEMENT

Required design features and any additional mitigation measures will be identified in ROW authorizations for individual projects.  These measures will be monitored by solar energy project developers and the appropriate Federal agency to ensure their continued effectiveness through all phases of development.  In cases where monitoring indicates that mitigation measures are ineffective at meeting the desired resource conditions, the BLM would take steps to determine the cause and take corrective action using adaptive management strategies.  This information would also be used to inform the authorization of future solar energy development activities on BLM-administered lands.

The BLM has committed to developing and incorporating a larger monitoring and adaptive management strategy into its Solar Energy Program to ensure that data and lessons learned about

BLM_0018364

the impacts of solar energy projects will be collected, reviewed, and, as appropriate, incorporated into BLM's Solar Energy Program in the future. This long-term solar monitoring and adaptive management plan will be based on BLM's Assessment, Inventory and Monitoring (AIM) Strategy developed in 2011. It will also take advantage of and augment other AIM efforts, including Rapid Ecoregional Assessments, the national landscape monitoring framework, greater sage-grouse habitat analysis, and an array of local, management-driven monitoring efforts.

# 10  PUBLIC INVOLVEMENT

## 10.1  SCOPING

A Notice of Intent (NOI) to prepare this PEIS was published in Volume 73, page 30908 of the *Federal Register* on May 29, 2008. This notice initiated the first scoping period, which lasted from May 29 to July 15, 2008. During that period, the BLM and DOE invited the public to provide comments on the scope and objectives of the PEIS, including identification of issues and alternatives that should be considered in the PEIS analyses. Public meetings were held at 11 locations across the six states. Comments were also collected via the Solar PEIS project Web site (http://solareis.anl.gov) and by mail. A second scoping period was announced through a Notice of Availability (NOA) of Maps and Additional Public Scoping published in the *Federal Register* (Volume 74, page 31307) on June 30, 2009. During this scoping period, the agencies solicited comments about environmental issues, existing resource data, and industry interest with respect to 24 proposed solar energy study areas (later the terminology was changed to Solar Energy Zones, or SEZs). Public comments were collected via the project Web site and by mail. It is estimated that approximately 15,900 individuals, organizations, and government agencies provided comments during the first scoping process, and approximately 300 entities provided comments during the second scoping process. The results of the first scoping process were documented in a report issued in December 2008 (DOE and BLM 2008). The comments received during the second scoping process are summarized in Chapter 14 of the Draft Solar PEIS.

## 10.2  PUBLIC COMMENTS ON THE DRAFT SOLAR PEIS

The NOA for the Draft Solar PEIS was published in Volume 75, page 78980 of the *Federal Register* on December 17, 2010. The comment period was open for 134 days, closing on May 2, 2011. The BLM held 14 public meetings in the six-state study area between January and March 2011. More than 86,000 comments were received. The public, as well as many cooperating agencies and key stakeholders, offered suggestions on how the BLM could increase the utility of the document, strengthen elements of the proposed Solar Energy Program, and increase certainty regarding solar energy development on BLM-administered lands. Based on this input, the BLM decided to prepare a Supplement to the Draft Solar PEIS.

## 10.3  PUBLIC COMMENTS ON THE SUPPLEMENT TO THE DRAFT SOLAR PEIS

The NOA for the Supplement to the Draft Solar PEIS was published in Volume 76, page 66958 of the *Federal Register* on October 28, 2011. The comment period was open for 90 days, closing on January 27, 2012. The BLM held five public meetings in the study area between November

BLM_0018365

2011 and January 2012 to present the new information provided in the Supplement. During the public comment period on the Supplement to the Draft Solar PEIS, more than 134,000 comments were received.

## 10.4  RELEASE OF THE FINAL SOLAR PEIS

The NOA for the Final Solar PEIS was published in Volume 77, page 44267 of the *Federal Register* on July 27, 2012. While publication of the NOA of a Final EIS does not trigger a formal public comment period, the BLM reviewed all comments submitted following the publication of the Final Solar PEIS (see below for summary) and used them to make clarifications and modifications in this ROD (reference this ROD section).

## 10.5  PUBLIC COMMENTS ON THE FINAL SOLAR PEIS

The BLM received 15 comment letters on the Final Solar PEIS from county officials, non-governmental organizations, solar energy developers, solar energy industry associations, utility representatives, state and Federal agencies, and tribes. The BLM reviewed all comments received and made clarifications and modifications in this ROD as appropriate (see Section 6). Comments submitted through the protest process were also given consideration by the BLM in developing this ROD (see Section 5).

## 10.6  AVAILABILITY OF THE RECORD OF DECISION

Electronic copies of this ROD with the Approved Plan Amendments are available via the Internet at http://solareis.anl.gov.

Paper and electronic copies may be viewed at the following locations:

*Arizona:*

> Arizona State Office
> One North Central Avenue, Suite 800
> Phoenix, Arizona 85004

> Lake Havasu Field Office
> 2610 Sweetwater Avenue
> Lake Havasu City, Arizona 86406

> Lower Sonoran Field Office
> 21605 N. 7th Avenue
> Phoenix, Arizona 85027

BLM_0018366

*California:*

California State Office
2800 Cottage Way, Suite W–1623
Sacramento, California 95825

California Desert District
22835 Calle San Juan De Los Lagos
Moreno Valley, California 92553

El Centro Field Office
1661 S. 4th Street
El Centro, California 92243

Palm Springs—South Coast Field Office
1201 Bird Center Drive
Palm Springs, California 92262

Barstow Field Office
2601 Barstow Road
Barstow, California 92311

*Colorado:*

Colorado State Office,
2850 Youngfield Street
Lakewood, Colorado 80215

San Luis Valley Public Lands Center
1803 West Highway 160
Monte Vista, Colorado 81144

*Nevada:*

Nevada State Office
1340 Financial Boulevard
Reno, Nevada 89502

Southern Nevada District Office
4701 North Torrey Pines,
Las Vegas, Nevada 89130

Tonopah Field Office
1553 South Main Street
Tonopah, Nevada 89049

BLM_0018367

Caliente Field Office
U.S. Highway 93 Building #1
Caliente, Nevada 89008

*New Mexico:*

New Mexico State Office
301 Dinosaur Trail
Santa Fe, New Mexico 87508

Las Cruces District Office
1800 Marquess Street
Las Cruces, New Mexico 88005

*Utah:*

Utah State Office
440 West 200 South, Suite 500
Salt Lake City, Utah 84101

Cedar City Field Office
176 East D.L. Sargent Drive
Cedar City, Utah 84721

## 11  CONSIDERATION OF OTHER BLM PLANS AND POLICIES

This ROD amends all land use plans in the six-state study area and identifies BLM-administered lands as exclusion areas for utility-scale solar energy development, Solar Energy Zones, or variance lands for utility-scale solar energy development.  The land use plan amendments for utility-scale solar energy development are listed in Table A-1 in Appendix A.  These existing land use plans continue to outline the decisions or protocols for the management of the other resource uses or values within the appropriate planning areas.

In the event there are inconsistencies or discrepancies between previously approved plans and these Plan Amendments, the decisions contained in the Plan Amendments for the Solar Energy Program will be followed.  All future resource authorizations and actions will conform to, or be consistent with, the decisions contained in these Plan Amendments.  All existing operations and activities authorized under permits, contracts, cooperative agreements or other authorizations will be modified, as necessary, to conform to this plan within a reasonable timeframe.  However, this plan does not impact valid existing rights on public lands.  If such authorizations come up for review and can be modified, they will also be brought into conformance with the plan.

BLM_0018368

## 12  PLAN IMPLEMENTATION

### 12.1  GENERAL IMPLEMENTATION SCHEDULE

The decisions of the Plan Amendments and supporting policies go into effect upon signature of the ROD.

### 12.2  PLAN MAINTENANCE AND DATA REFINEMENT

Land use plan decisions and supporting information associated with these Plan Amendments will be maintained to reflect minor changes in data.  Maintenance is limited to refining, documenting, and/or clarifying these land use plan amendments, as provided in 43 CFR 1610.5-4.  Plan maintenance will be documented in supporting records.  Plan maintenance does not require formal public involvement, interagency coordination, or preparation of an environmental assessment or environmental impact statement.

The available GIS data and maps used for the analysis in the Final Solar PEIS are available at the project Web site (www.solareis.anl.gov).  Data used in development of the Plan Amendments are dynamic and in some cases GIS data were incomplete for some planning areas and/or resources.  Thus, please note that all acreages presented in the Plan Amendments (and shown in Appendix A) are estimations, even when presented to the nearest acre.  The data and maps used throughout the Final Solar PEIS are for land use planning purposes only and shall be verified and/or refined by site-specific information as necessary.  Updating data is considered plan maintenance, and is expected to occur over time as the land use plans are implemented.

### 12.3  CHANGING THE PLAN

The Plan Amendments may be changed, should conditions warrant, through a plan amendment process.  A plan amendment may become necessary if changes in circumstances or actions come under consideration that may result in a change in the scope of resource uses or a change in the terms, conditions, or decisions of the approved plan (e.g., significant new information is available, or a proposal or action comes under consideration that is not in conformance with the plan).  The results of monitoring, evaluation of new data, or policy changes and changing public needs might also provide the impetus for an amendment.  Generally, an amendment is issue-specific, but a programmatic amendment process is also possible.  Plan amendments are accomplished with public input and the appropriate level of environmental analysis and NEPA compliance.

## 13  REFERENCES CITED

BLM (Bureau of Land Management), 2011a, *Solar and Wind Energy Applications—Due Diligence*, Instruction Memorandum 2011-060, U.S. Department of the Interior, Washington, D.C., Feb. 7.

BLM, 2011b, *Solar and Wind Energy Applications—Pre-Application and Screening*, Instruction Memorandum 2011-061, U.S. Department of the Interior, Washington, D.C., Feb. 7.

BLM_0018369

BLM and CDFG (Bureau of Land Management and California Department of Fish and Game), 2002, *Proposed Northern and Eastern Colorado Desert Coordinated Management Plan and Final Environmental Impact Statement*, NECO-CMP/FEIS, July.  Available at http://www.blm.gov/ca/news/pdfs/neco2002.

BLM and DOE (Bureau of Land Management and U.S. Department of Energy), 2012, *Final Programmatic Environmental Impact Statement for Solar Energy Development in Six Southwestern States*, FES 12-24, DOE/EIS-0403, July.

DOE and BLM (U.S. Department of Energy and Bureau of Land Management), 2008, *Summary of Public Scoping Comments Received during the Scoping Period for the Solar Energy Development Programmatic Environmental Impact Statement*, Washington, D.C., Oct.

Secretary of the Interior, 2009, *Renewable Energy Development by the Department of the Interior*, Secretarial Order 3285, March 11.  Available at http://www.doi.gov/archive/news/09_News_Releases/SOenergy.pdf.

Secretary of the Interior, 2010, *Renewable Energy Development by the Department of the Interior*, Amendment No. 1 to Secretarial Order 3285A1, Feb. 22.  Available at http://elips.doi.gov/app_so/act_getfiles.cfm?order_number=3285A1.

BLM_0018370

# Final Agency Action and Revised Policies

## Land Use Plan Amendment Decisions

It is the decision of the Bureau of Land Management (BLM) to approve the Proposed Plan Amendments to the 89 Land Use Plans identified in this Record of Decision. The Proposed Plan Amendments and related Final Environmental Impact Statement (EIS) were published on July 27, 2012, in the Federal Register (77 FR 44267). I have resolved all protests and, in accordance with BLM regulations 43 CFR 1610.5-2, my decision on the protests is the final decision of the Department of the Interior. This approval is effective on the date this Record of Decision is signed.

Approved by:

Mike Pool
Acting Director
Bureau of Land Management

10/10/2012
Date

## Revised Policies

Appendix B of this Record of Decision describes revised BLM policies and procedures that relate to solar energy development on public lands. These policies and procedures provide internal administrative guidance to the BLM regarding the processing of right-of-way (ROW) applications for utility-scale solar energy projects, and are effective on the date this Record of Decision is signed.

Approved by:

Mike Pool
Acting Director
Bureau of Land Management

10/10/2012
Date

## Secretarial Approval

I hereby approve these revised policies and procedures and land use plan amendment decisions. My approval of the land use plan decisions constitutes the final decision of the Department of the Interior and, in accordance with the regulations at 43 CFR 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 CFR Part 4. Any challenge to these land use plan decisions must be brought in Federal district court.

Approved by:

Ken Salazar
Secretary
Department of the Interior

10/12/2012
Date

BLM_0018371

# APPENDIX A—LAND USE PLAN AMENDMENTS

## A.1 INTRODUCTION

The U.S. Department of the Interior, Bureau of Land Management, develops land use plans to guide activities, establish management goals and approaches, and establish land use allocations within a planning area. Current land use plans are called resource management plans (RMPs); in the past, such plans were called management framework plans (MFPs), and some of these MFPs are still in use. Analyses conducted in the Solar PEIS support the amendment of land use plans in the six-state study area.

The Plan Amendments in this ROD amend 89 plans to do the following:

1. Identify exclusion areas for utility-scale solar energy development in the six-state study area;

2. Identify priority areas for solar energy development that are well suited for utility-scale production of solar energy (i.e., SEZs);

3. Identify areas potentially available for utility-scale solar energy development outside of SEZs in the six-state study area (i.e., variance areas ); and

4. Establish required programmatic and SEZ-specific design features for solar energy development on public lands to ensure the most environmentally responsible development and delivery of solar energy.

The Plan Amendments affect allocations and management of utility-scale solar energy development on BLM-administered lands and do not affect any required supporting linear infrastructure, such as roads, transmission lines, and natural gas or water pipelines. Management decisions for supporting linear infrastructure, including available lands, are defined in existing applicable land use plans. These plans continue to outline the decisions or protocols for the management of the other resource uses or values within the appropriate planning areas. The amendments would apply only to the siting of utility-scale solar energy generation facilities.

Land use plans that are currently undergoing revision or amendment, and that are not scheduled for completion until after this ROD is signed, will incorporate the land use plan decisions into their ongoing plan revisions upon signature of this ROD. Plans that have recently been revised before this ROD is signed will be amended upon signature of this ROD.

## A.2 LAND USE ALLOCATIONS

The allocations by land use plan and BLM field office are provided in Table A-1. In total, these decisions allocate approximately 78.6 million acres of exclusion areas, 285,000 acres of Solar Energy Zones, and 19.3 million acres of variance areas.

BLM_0018372

**TABLE A-1  Land Use Plans Amended and Approximate Acreage Available for Application for Solar Energy Development by Planning Area[a]**

| Plan/BLM Office | Approximate Acreage in Variance Areas[b] | Developable Acreage in SEZs |
|---|---|---|
| *Arizona[c]* | | |
| Agua Fria NM Plan, Hassayampa Field Office | All lands would be excluded. | None |
| Arizona Strip RMP, Arizona Strip Field Office | 739,340 acres | None |
| Bradshaw–Harquahala RMP, Hassayampa Field Office | 185,323 acres | None |
| Grand Canyon–Parashant NM Plan, Arizona Strip Field Office | All lands would be excluded. | None |
| Gila Box Riparian NCA Plan, Safford Field Office | 11 acres | None |
| Goldwater Range RMP, Lower Sonoran Field Office | 71 acres | None |
| Kingman R.A. RMP, Kingman Field Office | 662,508 acres | None |
| Lake Havasu RMP, Lake Havasu Field Office | 506,107 acres | Brenda SEZ (3,348 acres) |
| Las Cienegas NCA Plan, Tucson Field Office | All lands would be excluded. | None |
| Lower Gila North and South RMP Amendment, Lower Sonoran Field Office | 295,867 acres | Gillespie SEZ (2,618 acres) |
| Phoenix R.A. RMP, Lower Sonoran, Safford, and Tucson Field Offices | 238,880 acres | None |
| Safford RMP, Safford, and Tucson Field Offices | 608,611 acres | None |
| San Pedro Riparian NCA Plan, Tucson Field Office | 143 acres | None |

BLM_0018373

**TABLE A-1  (Cont.)**

| Plan/BLM Office | Approximate Acreage in Variance Areas[b] | Developable Acreage in SEZs |
|---|---|---|
| ***Arizona (Cont.)*** | | |
| Vermilion Cliffs NM Plan, Arizona Strip Field Office | All lands would be excluded. | None |
| Yuma RMP, Yuma Field Office | 144,015 acres | None |
| Total for Arizona | 3,380,877 acres | 5,966 acres |
| ***California[c]*** | | |
| Alturas RMP, Alturas Field Office | All lands would be excluded. | None |
| Arcata RMP, Arcata Field Office | All lands would be excluded. | None |
| Bishop RMP, Bishop Field Office | 31,581 acres | None |
| Caliente RMP, Bakersfield Field Office | 1,496 acres | None |
| California Coastal NM Plan, California State Office | All lands would be excluded. | None |
| California Desert Conservation Area RMP, Barstow, El Centro, Needles, Palm Springs–South Coast, and Ridgecrest Field Offices[d] | 730,616 acres | Imperial East SEZ (5,717 acres) Riverside East SEZ (147,910 acres) |
| Carrizo Plain NM Plan, Bakersfield Field Office | All lands would be excluded. | None |
| Eagle Lake RMP, Eagle Lake Field Office | 11 acres | None |
| Eastern San Diego RMP, El Centro Field Office | 228 acres | None |
| Headwaters Forest Reserve Plan, Arcata Field Office | All lands would be excluded. | None |
| Hollister RMP, Hollister Field Office | All lands would be excluded. | None |

**TABLE A-1  (Cont.)**

| Plan/BLM Office | Approximate Acreage in Variance Areas[b] | Developable Acreage in SEZs |
|---|---|---|
| *California (Cont.)* | | |
| King Range NCA Plan, Arcata Field Office | All lands would be excluded. | None |
| Piedras Blancas Historic Light Station ONA Plan, Bakersfield Field Office | All lands would be excluded. | None |
| Redding RMP, Redding Field Office | All lands would be excluded. | None |
| Santa Rosa and San Jacinto Mountains NM Plan, Palm Springs–South Coast Field Office | All lands would be excluded. | None |
| Sierra RMP, Folsom Field Office | 1 acre | None |
| South Coast RMP, Palm Springs–South Coast Field Office | 2,145 acres | None |
| Surprise RMP, Surprise Field Office | All lands would be excluded. | None |
| Ukiah RMP, Ukiah Field Office | All lands would be excluded. | None |
| Total for California | 766,078 acres | 153,627 acres |
| *Colorado[c]* | | |
| Canyon of the Ancients NM Plan, Canyon of the Ancients NM | All lands would be excluded. | None |
| Glenwood Springs RMP, Glenwood Springs Field Office | All lands would be excluded. | None |
| Grand Junction RMP, Grand Junction Field Office | All lands would be excluded. | None |
| Gunnison RMP, Gunnison Field Office | 3,162 acres | None |
| Gunnison Gorge NCA Plan, Gunnison Field Office | All lands would be excluded. | None |

**TABLE A-1  (Cont.)**

| Plan/BLM Office | Approximate Acreage in Variance Areas[b] | Developable Acreage in SEZs |
|---|---|---|
| *Colorado (Cont.)* | | |
| Kremmling RMP, Kremmling Field Office | All lands would be excluded. | None |
| Little Snake RMP, Little Snake Field Office | All lands would be excluded. | None |
| McInnis Canyons NCA Plan, Grand Junction Field Office | All lands would be excluded. | None |
| Royal Gorge/Northeast RMP, Royal Gorge Field Office | 29,477 acres | None |
| San Juan Public Lands Center RMP, Columbine, Dolores, Pagosa Springs, and Uncompahgre Field Offices | 12,105 acres | None |
| San Luis Valley | 7 acres | None |
| San Luis Valley Public Lands Center RMP, Del Norte, La Jara, and Saguache Field Offices | 50,377 acres | Antonito Southeast SEZ (9,712 acres) La Jara Field Office |
| | | De Tilla Gulch SEZ (1,064 acres) Saguache Field Office |
| | | Fourmile East SEZ (2,882 acres) La Jara Field Office |
| | | Los Mogotes East SEZ (2,650 acres) La Jara Field Office |
| Uncompahgre RMP, Uncompahgre Field Office | All lands would be excluded. | None |
| White River RMP, White River Field Office | All lands would be excluded. | None |
| Total for Colorado | 95,128 acres | 16,308 acres |

BLM_0018376

**TABLE A-1  (Cont.)**

| Plan/BLM Office | Approximate Acreage in Variance Areas[b] | Developable Acreage in SEZs |
|---|---|---|
| **Nevada[c]** | | |
| Black Rock Desert—High Rock Canyon Emigrant Trails NCA Plan Winnemucca District Office | All lands would be excluded. | None |
| Carson City Consolidated RMP, Carson City District | 918,161 acres | None |
| U.S. Department of Energy Plan, Southern Nevada District Office[e] | All lands would be excluded. | None |
| Elko RMP, Elko District Office | All lands would be excluded. | None |
| Ely RMP, Ely District Office | 3,344,963 acres | Dry Lake Valley North SEZ (25,069 acres) |
| Las Vegas RMP, Southern Nevada District Office | 873,518 acres | Amargosa Valley SEZ 8,479 acres) |
| | | Dry Lake SEZ (5,717 acres) |
| Nellis Non-renewal Area Plan, Southern Nevada District Office[e] | All lands would be excluded. | None |
| Nellis Test & Training Range RMP, Southern Nevada District Office[e] | All lands would be excluded. | None |
| Paradise–Denio RMP, Winnemucca District Office | All lands would be excluded. | None |
| Red Rock Canyon NCA Plan, Southern Nevada District Office | 182 acres | None |
| Shoshone–Eureka RMP, Battle Mountain District Office | 663,198 acres | None |
| Sloan Canyon NCA Plan, Southern Nevada District Office | 17 acres | None |

BLM_0018377

**TABLE A-1  (Cont.)**

| Plan/BLM Office | Approximate Acreage in Variance Areas[b] | Developable Acreage in SEZs |
|---|---|---|
| *Nevada (Cont.)* | | |
| Sonoma–Gerlach RMP, Winnemucca District Office | 85,771 acres | None |
| Tonopah RMP, Battle Mountain District Office | 3,190,335 acres | Gold Point SEZ (4,596 acres) |
| | | Millers SEZ (16,534 acres) |
| Wells RMP, Elko District Office | All lands would be excluded. | None |
| Total for Nevada | 9,076,145 acres | 60,395 acres |
| *New Mexico[c]* | | |
| Carlsbad RMP, Carlsbad Field Office | 271,504 acres | None |
| El Malpais NCA Plan, Rio Puerco Field Office | 64 acres | None |
| Farmington RMP, Farmington Field Office | 391,095 acres | None |
| Kasha–Katuwe Tent Rocks NM Plan, Rio Puerco Field Office | All lands would be excluded. | None |
| McGregor Range RMP, Las Cruces District Office | All lands would be excluded. | None |
| Mimbres RMP, Las Cruces District Office | 1,416,196 acres | Afton SEZ (29,964 acres) |
| Rio Grande Corridor | 34 acres | None |
| Rio Puerco RMP, Rio Puerco Field Office | 320,387 acres | None |
| Roswell RMP, Roswell Field Office | 759,743 acres | None |
| Socorro RMP, Socorro Field Office | 656,335 acres | None |

BLM_0018378

**TABLE A-1  (Cont.)**

| Plan/BLM Office | Approximate Acreage in Variance Areas[b] | Developable Acreage in SEZs |
|---|---|---|
| ***New Mexico (Cont.)*** | | |
| Taos RMP, Taos Field Office | 24,191 acres | None |
| White Sands RMP, Las Cruces District Office | 344,972 acres | None |
| Total for New Mexico | 4,184,520 acres | 29,964 acres |
| ***Utah[c]*** | | |
| Box Elder RMP, Salt Lake City Field Office[f] | All lands would be excluded. | None |
| Cedar–Beaver–Garfield–Antimony RMP, Cedar City Field Office | 177,089 acres | Escalante Valley SEZ (6,533 acres) |
| | | Milford Flats South SEZ (6,252 acres) |
| Grand Staircase–Escalante NM Plan, Grand Staircase–Escalante NM | 8 acres | None |
| House Range RMP, Fillmore Field Office[f] | 213,111 acres (all inside the UTTR) | None |
| Kanab RMP, Kanab Field Office | 18,633 acres | None |
| Moab RMP, Moab Field Office | 587 acres | None |
| Monticello RMP, Monticello Field Office | 4,129 acres | None |
| Park City MFP, Salt Lake City Field Office | All lands would be excluded. | None |
| Pinyon MFP, Cedar City Field Office[f] | 474,727 acres (468,540 acres outside the UTTR) (7,125 acres inside the UTTR) | Wah Wah Valley SEZ (5,873 acres) |

BLM_0018379

**TABLE A-1  (Cont.)**

| Plan/BLM Office | Approximate Acreage in Variance Areas[b] | Developable Acreage in SEZs |
|---|---|---|
| ***Utah (Cont.)*** | | |
| Pony Express RMP, Salt Lake City Field Office[f] | All lands would be excluded. | None |
| Price RMP, Price Field Office | 26 acres | None |
| Randolf MFP, Salt Lake City Field Office | All lands would be excluded. | None |
| Richfield RMP, Richfield Field Office | 107,071 acres | None |
| St.  George RMP, St.  George Field Office | 9,402 acres | None |
| Vernal RMP, Vernal Field Office | All lands would be excluded. | None |
| Warm Springs RMP, Fillmore Field Office[f] | 804,974 acres (200,371 acres outside the UTTR) (604,603 acres inside the UTTR) | None |
| Total for Utah | 1,809,759 acres | 18,658 acres |

Abbreviations:  MFP = Management Framework Plan; NCA = National Conservation Area; NM = National Monument; ONA = Outstanding Natural Area; RMP = Resource Management Plan; SEZ = solar energy zone; UTTR = Utah Test and Training Range.

[a]   This table replaces Table C-1 of the Draft Solar PEIS (BLM and DOE 2010) and Table E-1 of the Supplement to the Draft Solar PEIS (BLM and DOE 2011).  Land use plan amendments for the program alternative would include the identification of SEZs and the identification of variance areas; all remaining lands in a planning area would be identified as exclusion areas.  Land use plan amendments for the SEZ alternative would include the identification of SEZs; all remaining lands in a planning area would be identified as exclusion areas.  Totals may be off due to rounding.  This table lists plans as of August 2010.

[b]   These acreage estimates include the acreage in the proposed SEZs.  The estimates were calculated on the basis of the best available geographic information system (GIS) data.  GIS data were not available for the entire set of exclusions listed in Table 2.2-2 of the Final Solar PEIS; thus the exact acreage could not be calculated.  Exclusion areas that could not be mapped because of the lack of data would be identified during the ROW application process.

**Footnotes continued on next page.**

BLM_0018380

**TABLE A-1  (Cont.)**

---

<sup>c</sup>  For state totals, refer to Table 2.2-1 of the Final Solar PEIS.

<sup>d</sup>  The CDCA Plan, while recognizing the potential compatibility of solar energy facilities on public lands, requires that all sites associated with power generation or transmission not identified in that plan be considered through the land use plan amendment process.  Because some SEZ areas have not previously been identified in the CDCA Plan as associated with power generation or transmission, the CDCA Plan must be amended to allow solar energy generation projects and transmission projects in these areas.  The ROD amends the CDCA Plan to identify all SEZ lands within the CDCA as sites associated with power generation or transmission.

<sup>e</sup>  Public lands in these planning areas in Nevada have been temporarily withdrawn for use by another Federal agency.

<sup>f</sup>  Section 2815(d) of the National Defense Authorization Act (NDAA) for fiscal year 2000 (P.L. 106-65) placed a moratorium on planning efforts on BLM-administered lands "adjacent to, or near the Utah Test and Training Range (UTTR) and Dugway Proving Grounds or beneath Military Operating Areas, Restricted Areas, and airspace that make up the UTTR," NDAA § 2815(a), 113 Stat. 512, 852 (1999).  This area encompasses a portion of the lands within the boundaries of the Box Elder, Pony Express, House Range, Warm Springs, and Pinyon land use plans.  Within these areas, decisions related to whether lands would be available for ROW application, and adoption of the policies and design features of the PEIS, cannot be implemented via land use plan amendments at this time.  Solar energy development ROW applications would be deferred until such time as plan amendments or new land use plan(s) address solar energy development.  No SEZs are located within the UTTR affected areas.

BLM_0018381

**Exclusions**

Right-of way exclusion areas are defined as areas that are not available for location of ROWs under any conditions (BLM Land Use Planning Handbook, H-1601-1 [BLM 2005]). The identification of exclusion areas allows the BLM to support the highest and best use of public lands by avoiding potential resource conflicts and reserving for other uses public lands that are not well suited for utility-scale solar energy development. Due to the size and scale of utility-scale solar energy development (typically involving a single use of public lands), the BLM is excluding a broader set of categories than would be identified in a land use plan for other types of ROWs (see Table A-2).

All future utility-scale solar energy development must be in conformance (43 CFR 1601.0-5(b)) with the exclusions adopted through this ROD (see Table A-2) and the associated land use plan amendments. The geographic boundaries for exclusion categories 13, 14, 28, 29, 31, and 32 are explicitly defined through this ROD and its associated maps. The remaining exclusion categories are defined by the presence of a specific land use designation in an applicable land use plan (e.g., Areas of Critical Environmental Concern, exclusion category 3) or the presence of a specific resource or condition (e.g., designated or proposed critical habitat for ESA-listed species, exclusion category 4). The geographic boundaries for such exclusion categories will change over time as land use plans are revised or amended and new information on resource conditions is developed. For the purposes of the Solar PEIS and its associated NEPA analysis, the BLM has mapped and estimated the acreage for all exclusions in the aggregate based on best available existing information.

The identification of any new or modified exclusion category for utility-scale solar energy development would involve planning-level decisions and require the BLM to amend applicable land use plans. Consistent with existing planning regulations, applicants may request that the BLM amend a land use plan to allow for an otherwise nonconforming proposal (BLM Land Use Planning Handbook H-1601-1, Section VII(B) [BLM 2005]). For example, an applicant may request a land use plan amendment for an individual utility-scale solar energy project in suitable locations where insolation values are below 6.5 kWh/m$^2$/day. The BLM will consider such requests on a case-by-case basis.

**Solar Energy Zones**

An SEZ is defined by the BLM as an area within which the BLM will prioritize and facilitate utility-scale production of solar energy and associated transmission infrastructure development. The BLM is identifying 17 SEZs in the six-state study area. These SEZs total approximately 285,000 acres (1,153 km$^2$) of land potentially available for development (see Table A-3). The identification of any new or modified SEZ for utility-scale solar energy development would involve planning-level decisions and require the BLM to amend applicable land use plans. [1]

---

[1] Changes to SEZs established by this ROD must be submitted through the State Director to the BLM Washington Office for the Director's concurrence (see Appendix B, Section B.4.5).

BLM_0018382

**TABLE A-2  Exclusions under BLM's Solar Energy Program**

1. Lands with slopes greater than 5% determined through geographical information system (GIS) analysis using digital elevation models.[a]

2. Lands with solar insolation levels less than 6.5 kWh/m$^2$/day determined through National Renewable Energy Laboratory solar radiation GIS data (http://www.nrel.gov/rredc/solar_data.html).

3. All Areas of Critical Environmental Concern (ACECs) identified in applicable land use plans (including Desert Wildlife Management Areas [DWMAs] in the California Desert District planning area).

4. All designated and proposed critical habitat areas for species protected under the Endangered Species Act (ESA) of 1973 (as amended), or if critical habitat is not yet proposed, then as identified in respective recovery plans or the final listing rule (http://ecos.fws.gov/tess_public/TESSWebpageRecovery?sort=1).

5. All areas for which an applicable land use plan establishes protection for lands with wilderness characteristics.

6. Developed recreational facilities, special-use permit recreation sites (e.g., ski resorts and camps), and all Special Recreation Management Areas (SRMAs) identified in applicable land use plans, except for those in the State of Nevada and a portion of the Yuma East SRMA in Arizona.[b]

7. Sage-grouse core areas, nesting habitat, and winter habitat; Mohave ground squirrel habitat; flat-tailed horned lizard habitat; fringe-toed lizard habitat; and all other areas where the BLM has agreements with state agency partners and other entities to manage sensitive species habitat in a manner that would preclude solar energy development.

8. Greater sage-grouse habitat (currently occupied, brooding, and winter habitat) as identified by the BLM in California, Nevada, and Utah, and Gunnison's sage-grouse habitat (currently occupied, brooding, and winter habitat) as identified by the BLM in Utah.[c]

9. All areas designated as no surface occupancy (NSO) in applicable land use plans

10. All right-of-way (ROW) exclusion areas identified in applicable land use plans.

11. All ROW avoidance areas identified in applicable land use plans.

12. In California, lands classified as Class C in the California Desert Conservation Area (CDCA) planning area.

13. In California and Nevada, lands in the Ivanpah Valley.

14. In Nevada, lands in Coal Valley and Garden Valley.

15. All Desert Tortoise translocation sites identified in applicable land use plans, project-level mitigation plans or Biological Opinions.

16. All Big Game Migratory Corridors identified in applicable land use plans.

17. All Big Game Winter Ranges identified in applicable land use plans.

18. Research Natural Areas identified in applicable land use plans.

BLM_0018383

**TABLE A-2  (Cont.)**

19. Lands classified as Visual Resource Management (VRM) Class I or II (and, in Utah, Class III[d]) in applicable land use plans.

20. Secretarially designated National Recreation, Water, or Side and Connecting Trails and National Back Country Byways (BLM State Director approved) identified in applicable BLM and local land use plans (available at http://www.americantrails.org/NRTDatabase), including any associated corridor or lands identified for protection through an applicable land use plan.

21. All units of the BLM National Landscape Conservation System, congressionally designated National Scenic and Historic Trails (National Trails System Act [NTSA], P.L. 90-543, as amended), and trails recommended as suitable for designation through a congressionally authorized National Trail Feasibility Study, or such qualifying trails identified as additional routes in law (e.g., West Fork of the Old Spanish National Historic Trail), including any trail management corridors identified for protection through an applicable land use plan.  Trails undergoing a congressionally authorized National Trail Feasibility Study will also be excluded pending the outcome of the study.[e]

22. National Historic and Natural Landmarks identified in applicable land use plans, including any associated lands identified for protection through an applicable land use plan.

23. Lands within the boundaries of properties listed in the *National Register of Historic Places* (NRHP) and any additional lands outside the designated boundaries identified for protection through an applicable land use plan.

24. Traditional cultural properties and Native American sacred sites as identified through consultation with tribes and recognized by the BLM.

25. Wild, Scenic, and Recreational Rivers designated by Congress, including any associated corridor or lands identified for protection through an applicable river corridor plan.

26. Segments of rivers determined to be eligible or suitable for Wild or Scenic River status identified in applicable land use plans, including any associated corridor or lands identified for protection through an applicable land use plan.

27. Old Growth Forest identified in applicable land use plans.

28. Lands within a solar energy development application area found to be inappropriate for solar energy development through an environmental review process that occurred prior to finalization of the Draft Solar PEIS.[f]

29. Lands previously proposed for inclusion in SEZs that were determined to be inappropriate for development through the NEPA process for the Solar PEIS (limited to parts of the Brenda SEZ in Arizona; the previously proposed Iron Mountain SEZ area and parts of the Pisgah and Riverside East SEZs in California; parts of the De Tilla Gulch, Fourmile East, and Los Mogotes East SEZs in Colorado; and parts of the Amargosa Valley SEZ in Nevada).

30. In California, all lands within the proposed Mojave Trails National Monument[g] and all conservation lands acquired outside of the proposed Monument through donations or use of Land and Water Conservation Funds.

31. In California, BLM-administered lands proposed for transfer to the National Park Service with the concurrence of the BLM.[h]

BLM_0018384

**TABLE A-2  (Cont.)**

32.  Specific areas identified since the publication of the Supplement to the Draft Solar PEIS by the BLM based on continued consultation with cooperating agencies and tribes to protect sensitive natural, visual, and cultural resources (total of 1,066,497 acres [4,316 km$^2$]; see Figure A-1; note there are some overlapping exclusions).  Data and finer scale maps will be made available through the Solar PEIS project Web site (http://solareis.anl.gov).  Note that in some cases, the description of these areas will be withheld from the public to ensure protection of the resource.

a   Applications may include some lands with up to 10% slope where higher slopes inclusions meet all of the following:  (1) are proximate to variance lands in the application, (2) are not otherwise excluded from development, (3) allow for the avoidance or minimization of resource conflicts, and (4) do not create any significant new or additional conflicts.  In such cases, a land use plan amendment would have to be adopted as part of the project-specific analysis to permit the slope exception.

b   In Nevada, many designated SRMAs are located on semi-degraded lands that might be appropriate for solar development.  Decisions on solar ROW applications within Nevada SRMAs will be made on a case-by-case basis.  A portion of the Yuma East SRMA was identified as a variance area rather than as an exclusion area based on its designation as VRM Class III and as a rural developed recreation setting, both of which allow for modifications to the natural environment.

c   In April 2010, the USFWS published its listing for the greater sage-grouse as "Warranted but Precluded." Inadequacy of regulatory mechanisms was identified as a major threat in the USFWS finding on the petition to list the greater sage-grouse.  The USFWS has identified the principal regulatory mechanism for the BLM as conservation measures in RMPs.  On the basis of the identified threats to the greater sage-grouse and the USFWS's timeline for making a listing decision on this species, the BLM has initiated action to incorporate explicit objectives and adequate conservation measures into RMPs (including PEISs and project EISs) within the next 3 years in order to conserve greater sage-grouse and avoid a potential listing under the ESA.  To meet the objectives of BLM's sage-grouse conservation policy, the Solar PEIS has excluded specifically identified sage-grouse habitat (currently occupied, brooding, and winter habitat) located on BLM public lands in Nevada and Utah.  These exclusions will be subject to change based on the outcome of the BLM's sage-grouse planning efforts and resulting plan amendments.

d   In Utah, VRM Class III lands have also been removed due to the high sensitivity and location proximity to Zion, Bryce, Capital Reef, Arches, and Canyonlands National Parks, and to significant Cultural Resource Special Management Areas (in southeast Utah).

e   National Scenic Trails are comprised of extended pathways located for recreational opportunities and the conservation and enjoyment of the scenic, historic, natural, and cultural qualities of the areas through which they pass (NTSA Sec. 3(a)(2)).

   National Historic Trails are comprised of Federal Protection Components and/or high-potential historic sites and high-potential route segments, including original trails or routes of travel, developed trail or access points, artifacts, remnants, traces, and the associated settings and primary uses identified and protected for public use and enjoyment (NTSA Sec. 3(a)(3)) and may include associated auto tour routes (NTSA Sec. 5(b)(A) and 7(c)).  National Historic Trails or other types of historic trails may also contain properties listed or eligible for listing on the NRHP or National Historic Landmarks.  National Historic Trails are protected and identified as required by law (NTSA Sec.3(a)(3)), through BLM inventory and planning processes.

f   For example, lands considered non-developable in the environmental analyses completed for the Genesis Ford Dry Lake Solar Project, Blythe Solar Project, and Desert Sunlight Solar Project, and some lands previously within the Pisgah and Brenda proposed SEZs.

**Footnotes continued on next page.**

BLM_0018385

TABLE A-2  (Cont.)

g   As described in Senate Bill 138, California Desert Protection Act of 2011, introduced in the 112th Congress.

h   Three specific geographic areas described as (1) the narrow strip of BLM-administered lands between Fort Irwin and Death Valley National Park, (2) an area of public lands on the northeastern side of the Mojave National Preserve adjacent to the California and Nevada border, and (3) an area along the northern boundary of Joshua Tree National Park.

### TABLE A-3  Solar Energy Zones and Approximate Acreage by State[a]

| SEZ (BLM Office/County) | Approximate Acreage |
|---|---|
| *Arizona* | |
| Brenda (Lake Havasu/La Paz) | 3,348 |
| Gillespie (Lower Sonoran/Maricopa) | 2,618 |
| Total | 5,966 |
| *California* | |
| Imperial East (El Centro/Imperial) | 5,717 |
| Riverside East (Palm Springs–South Coast/Riverside) | 147,910 |
| Total | 153,627 |
| *Colorado* | |
| Antonito Southeast (La Jara/Conejos) | 9,712 |
| De Tilla Gulch (Saguache/Saguache) | 1,064 |
| Fourmile East (La Jara/Alamosa) | 2,882 |
| Los Mogotes East (La Jara/Conejos) | 2,650 |
| Total | 16,308 |
| *Nevada* | |
| Amargosa Valley (Southern Nevada/Nye) | 8,479 |
| Dry Lake (Southern Nevada/Clark) | 5,717 |
| Dry Lake Valley North (Ely/Lincoln) | 25,069 |
| Gold Point (Battle Mountain/Esmeralda) | 4,596 |
| Millers (Battle Mountain/Esmeralda) | 16,534 |
| Total | 60,395 |
| *New Mexico* | |
| Afton (Las Cruces/Dona Ana) | 29,964 |
| Total | 29,964 |
| *Utah* | |
| Escalante Valley (Cedar City/Iron) | 6,533 |
| Milford Flats South (Cedar City/Beaver) | 6,252 |
| Wah Wah Valley (Cedar City/Beaver) | 5,873 |
| Total | 18,658 |
| Total | 284,918 |

a   To convert acres to km$^2$, multiply by 0.004047.

BLM_0018386



**FIGURE A-1  Areas Identified for Exclusion Following Publication of the Supplement to the Draft Solar PEIS Based on Continued Consultation with Cooperating Agencies and Tribes**

BLM_0018387

ROWs for utility-scale solar energy development in SEZs will be given priority over all other ROW applications. The BLM may decide to authorize other ROWs or uses in SEZs, however, if they are found to be compatible with utility-scale solar energy development; other compatible uses may include shared access roads, transmission lines, or other generation sources such as geothermal. The identification of an area as an SEZ will not affect previously authorized ROWs, whether or not construction has been initiated on those ROWs. The BLM will consider the processing of pending ROW applications in identified SEZs on a case-by-case basis.

For a full list of policies that will guide utility-scale solar energy development in SEZs, see Appendix B, Section B.4.

**Variance Areas**

A variance area is defined by the BLM as an area that may be available for a utility-scale solar energy ROW with special stipulations or considerations (see avoidance area in the *Land Use Planning Handbook* (BLM 2005a), Appendix C, page 21, Part E.9). The BLM is identifying all lands outside of exclusion areas and SEZs as variance areas for utility-scale solar energy development. Variance areas are open to application but require developers to adhere to the variance process described in Section B.5 of Appendix B. The BLM will consider ROW applications for utility-scale solar energy development in variance areas on a case-by-case basis based on environmental considerations; coordination with appropriate Federal, state, and local agencies and tribes; and public outreach. The responsibility for demonstrating to the BLM and other coordinating parties that a proposal in a variance area will avoid, minimize, and/or mitigate, as necessary, sensitive resources will rest with the applicant. The modification of variance areas would involve planning-level decisions and require the BLM to amend applicable land use plans.

## A.3  SPECIFIC LOCATIONS IDENTIFIED AS EXCLUSION AREAS, SOLAR ENERGY ZONES, AND VARIANCE AREAS

The land use plans to be amended through this ROD are listed in Table A-1. Maps showing the locations of exclusion areas, solar energy zones, and variance areas for states in the six-state study area are presented in Figures A-2 through A-7.

## A.4  DESIGN FEATURES

Design features are mitigation requirements that have been incorporated into the proposed action or alternatives to avoid and/or minimize adverse impacts. The BLM's decision includes amending land use plans in the six-state study areas with (1) programmatic design features that would be required for all utility-scale solar energy projects on BLM-administered lands; and (2) SEZ-specific design features that would be required for projects in individual SEZs.

### A.4.1  Programmatic Design Features

The BLM following programmatic design features will be required for all utility-scale solar energy projects on BLM-administered lands. The programmatic design features are presented by

BLM_0018388



**FIGURE A-2  Land Use Allocations in Arizona as a Result of the Solar PEIS Record of Decision**

BLM_0018389



**FIGURE A-3  Land Use Allocations in California as a Result of the Solar PEIS Record of Decision**

BLM_0018390

**FIGURE A-4  Land Use Allocations in Colorado as a Result of the Solar PEIS Record of Decision**

BLM_0018391



**FIGURE A-5  Land Use Allocations in Nevada as a Result of the Solar PEIS Record of Decision**

BLM_0018392



**FIGURE A-6  Land Use Allocations in New Mexico as a Result of the Solar PEIS Record of Decision**

BLM_0018393



**FIGURE A-7  Land Use Allocations in Utah as a Result of the Solar PEIS Record of Decision**

BLM_0018394

resource type and by four project phases as applicable (i.e., [1] general; [2] site characterization, siting and design, and construction; [3] operations and maintenance; and [4] reclamation and decommissioning).

The programmatic design features address the broad possible range of direct and indirect impacts that may result from utility-scale solar energy development as described in the Draft and Final Solar PEIS (Chapter 5). Utility-scale solar energy development necessarily includes the solar generation facilities themselves, as well as associated transmission facilities, roads, and other infrastructure. Applicants seeking approvals to construct utility-scale solar energy projects on BLM-administered lands will be required to avoid, minimize, and/or mitigate the impacts associated with their project in total. While the programmatic design features that follow address utility-scale solar energy projects comprehensively, the land use plan decisions to be made through the Solar PEIS ROD (e.g., exclusions and SEZs) will only be applicable to utility-scale solar energy generation facilities. Management decisions for supporting infrastructure would continue to be made in accordance with existing land use plan decisions and current applicable policy and procedures.

Application of the programmatic design features is intended to result in the avoidance, minimization, and/or mitigation of potential resource conflicts (e.g., night-sky impacts or impacts on wetlands). Due to site-specific circumstances, not all design features as written will apply to all projects (e.g., a resource is not present on a given site). Some design features may require variations from what is described (e.g., a larger or smaller protective area). In some cases, multiple options for addressing a potential resource conflict are provided. Applicants will be required to work with the BLM to address proposed variations in the design features and to discuss selected options for avoidance, minimization, and/or mitigation of potential resource conflicts. Variations in programmatic design features will require appropriate analysis and disclosure as part of individual project authorizations. Programmatic design features that do not apply to a given project should be described as part of the project case file along with an appropriate rationale. Additional mitigation measures may be identified and required during individual project development and environmental review.

The programmatic design features will apply to all utility-scale solar energy projects on BLM-administered lands, whether those projects are within variance areas or SEZs. Based on the extensive upfront data collection and environmental analysis that has been completed for SEZs, the BLM expects that many of the requirements associated with programmatic design features will be met or substantially met for lands in SEZs. For example, as part of the Solar PEIS, the BLM has undertaken some groundwater modeling for SEZs. The programmatic design feature that requires the collection of such groundwater information therefore may have already been met. Further, because SEZs have been sited to avoid potential resource conflicts, the BLM expects that many design features will not be triggered.

The programmatic design features are not intended to be duplicative of other Federal, state, and/or local requirements. In the early stages of siting and design, project developers should coordinate with appropriate Federal, state, and local agencies to determine what plans, permits, and/or approvals may be needed. Where possible, project developers should seek to consolidate such requirements in coordination with the BLM. In addition, the requirements of individual

BLM_0018395

programmatic design features may be consolidated to further avoid duplication. The programmatic design features are also not intended to be unduly burdensome to the applicant. For example, applicants will not be expected to study resources or collect data beyond what is necessary to disclose and provide knowledge of reasonable avoidance, minimization, and/or mitigation of impacts from a proposed project.

The BLM will require that the planning and minimization activities specified through the programmatic design features be identified and disclosed as part of the project's Plan of Development (POD) to be submitted to the BLM with a ROW application for solar energy development on public lands. In situations where similar activities are required to meet other Federal, state, and/or local permitting requirements, the BLM encourages developers to address these duplicative requirements in separate submittals and append the information to their POD. Examples of such information that may be required for a separate permitting action and appended to the POD include a Stormwater Pollution Prevention Plan, Dust Abatement Plan, and Decommissioning and Site Reclamation Plan (see Table A-4).

### A.4.1.1  Design Features for Lands and Realty

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on lands and realty from solar energy development identified and discussed in Sections 5.2.1 and 5.2.2 of the Draft and Final Solar PEIS.

#### A.4.1.1.1  General

**LR1-1**    Project developers shall consult with the BLM in the early phases of project planning to identify potential land use conflicts and constraints.

(a)  Identification of potential land use conflicts shall include, but is not limited to, the following:

- Identifying potential land use conflicts in proximity to the proposed project. In coordination with the BLM, developers shall consult existing BLM land use plans and local land use plans, as well as with appropriate Federal, state, and local agencies; affected tribes; and adjacent property owners.

- Identifying legal access to private, state, and Federal lands surrounding the solar facilities and the potential to create areas that are inaccessible to the public.

- Considering the effects on the manageability and uses of public lands around boundaries of solar energy facilities.

- Considering the potential effects on prime and unique farmland.

BLM_0018396

**TABLE A-4  Individual Plans Specified as Elements of the Programmatic Design Features[a],[b]**

| Plan Name | Applicable Design Features[c] |
|---|---|
| Decommissioning and Site Reclamation Plan | ER4-1, HMW-1 |
| Dust Abatement Plan | ER1-1, AQC2-1 |
| Hazardous Materials and Waste Management Plan | HMW1-1 |
| Health and Safety Plan | HS1-1 |
| Spill Prevention and Emergency Response Plan | WR2-1 |
| Stormwater Pollution Prevention Plan | WR1-1 |
| Worker Education and Awareness Plan (WEAP) | LR1-1, WHB1-1, WF1-1, ER1-1, P1-1, CR1-1 |

[a]  The need for each plan will be determined on a project-specific basis.

[b]  The number of plans in the Final Solar PEIS has been reduced substantially since the publication of the Draft Solar PEIS.  Information associated with those plans that are no longer shown in this table will alternatively be incorporated into the Plan of Development.

[c]  The design features specifying the need for individual plans are listed in Sections A.2.2.1 through A.2.2.22.

- Evaluating land use impacts and constraints as part of the environmental impact analysis for the project and considering options to avoid, minimize, and/or mitigate adverse impacts in coordination with the BLM.

- Providing notification to existing BLM ROW authorization holders within solar energy development areas, pursuant to Title 43, Part 2807.14 of the *Code of Federal Regulations* (43 CFR 2807.14), to inform them that an application that might affect their existing ROW has been filed and request their comments.

- Proposed solar energy developments within one-quarter mile of any project boundary will require issuance of a Chain of Survey Certificate in conformance with the Departmental standard.  In some cases, Land Description Reviews, Certificates of Inspection and Possession, Boundary Assurance Certificates, resurveys, re-monumentation, and/or referencing of Public Land Survey

BLM_0018397

System (PLSS) corners may be required before the start of any action.

(b)  Methods to minimize land use conflicts and constraints may include, but are not limited to, the following:

- Informing project personnel of all laws and regulations that they may be subject to, such as international borders, limitations on the removal of salable materials such as stone or wood from a project site for personal use, and use of vehicles off of the project site in limited access areas.  This information should be incorporated into a Worker Education and Awareness Plan (WEAP) that is provided to all project personnel prior to entering the project worksite.  The WEAP shall be provided on a regular basis, covering multiple resources, to ensure the awareness of key mitigation efforts of the project worksite during all phases of the project's life.  The base information the WEAP provides shall be reviewed and approved by the BLM prior to the issuance of a Notice to Proceed and incorporate adaptive management protocols for addressing changes over the life of the project, should they occur.

### A.4.1.1.2  Site Characterization, Siting and Design, Construction

**LR2-1**    Solar facilities shall be sited, designed, and constructed to avoid, minimize, and/or mitigate impacts on BLM land use planning designations.

(a)  Methods to minimize impacts on BLM land use planning designations may include, but are not limited to, the following:

- Locating existing designated transmission corridors within the area of a proposed solar energy development project in consultation with the BLM.  Reviewing future transmission capacity in the corridor to determine whether the corridor should be excluded from solar energy development or whether the capacity of the designated transmission corridor can be reduced.  Options to partially relocate the corridor to retain the current planned capacity or to relocate the solar energy project outside the designated corridor may be considered.

- Identifying and protecting evidence of the PLSS and related Federal property boundaries prior to commencement of any ground-disturbing activity.  This will be accomplished by contacting the BLM Cadastral Survey to coordinate data research, evidence examination and evaluation, and locating,

BLM_0018398

referencing, or protecting monuments of the PLSS and related land boundary markers from destruction.  In the event of obliteration or disturbance of the Federal boundary evidence, the responsible party shall immediately report the incident, in writing, to the Authorizing Official.  The BLM Cadastral Survey will determine how the marker is to be restored.  In rehabilitating or replacing the evidence the responsible party will be instructed to use the services of a Certified Federal Surveyor (CFedS), whose procurement shall be per qualification-based selection, or to reimburse the BLM for costs.  All surveying activities will conform to the Manual of Surveying Instructions and appropriate state laws and regulations.  Local surveys will be reviewed by Cadastral Survey before being finalized or filed in the appropriate state or county office.  The responsible party shall pay for all survey, investigation, penalty, and administrative costs.

- Considering opportunities to consolidate access to and other supporting infrastructure for single projects and for cases where there is more than one project in close proximity to another in order to maximize the efficient use of public land and minimize impacts.

## A.4.1.2  Design Features for Specially Designated Areas and Lands with Wilderness Characteristics

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on specially designated areas and lands with wilderness characteristics from solar energy development identified and discussed in Sections 5.3.1 and 5.3.2 of the Draft and Final Solar PEIS.

### A.4.1.2.1  General

**LWC1-1**   Protection of existing values of specially designated areas and lands with wilderness characteristics shall be evaluated during the environmental analysis for solar energy projects, and the results shall be incorporated into the project planning and design.

(a)  Assessing potential impacts on specially designated areas and lands with wilderness characteristics shall include, but is not limited to, the following:

- Identifying specially designated areas and lands with wilderness characteristics in proximity to the proposed projects.  In coordination with the BLM, developers shall consult existing land use plans and updated inventories.

BLM_0018399

- Identifying lands that are within the geographic scope of a proposed solar energy project that have not been recently inventoried for wilderness characteristics or any lands that have been identified in a citizen's wilderness proposal in order to determine whether they possess wilderness characteristics. Developers shall consider including the wilderness characteristics evaluation as part of the processing of a solar energy ROW application for those lands without a recent wilderness characteristics inventory. All work must be completed in accordance with current BLM policies and procedures.

- Evaluating impacts on specially designated areas and lands with wilderness characteristics as part of the environmental impact analysis for the project and considering options to avoid, minimize, and/or mitigate adverse impacts in coordination with the BLM.

(b) Methods to mitigate unavoidable impacts on specially designated areas and lands with wilderness characteristics may include, but are not limited to, the following:

- Acquiring wilderness inholdings from willing sellers.

- Acquiring private lands from willing sellers adjacent to designated wilderness.

- Acquiring private lands from willing sellers within proposed wilderness or Wilderness Study Areas.

- Acquiring other lands containing important wilderness or related values, such as opportunities for solitude or a primitive, unconfined (type of) recreation.

- Restoring wilderness, for example, modifying routes or other structures that detract from wilderness character.

- Contributing mitigation monies to a "wilderness mitigation bank," if one exists, to fund activities such as the ones described above.

- Enacting management to protect lands with wilderness characteristics in the same field office or region that are not currently being managed to protect wilderness character. Areas that are to be managed to protect wilderness characteristics under

BLM_0018400

this approach must be of sufficient size to be manageable, which could also include areas adjacent to current WSAs or adjacent to areas currently being managed to protect wilderness characteristics.

### A.4.1.2.2  Site Characterization, Siting and Design, Construction

**LWC2-1**  Solar facilities shall be sited, designed, and constructed to avoid, minimize, and/or mitigate impacts on the values of specially designated areas and lands with wilderness characteristics.[2]

### A.4.1.3  Design Features for Rangeland Resources—Grazing

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on grazing from solar energy development identified and discussed in Sections 5.4.1.1 and 5.4.1.2 of the Draft and Final Solar PEIS.

### A.4.1.3.1  General

**RG1-1**  Project developers shall consult with the BLM early in project planning to identify activities that could impact rangeland resources and grazing.

(a)  Identifying impacts on rangeland resources and grazing shall include, but is not limited to, the following:

- Identifying rangeland resources and grazing use in proximity to the proposed projects.  In coordination with the BLM, developers shall consult existing land use plans and updated inventories.

- Coordinating with affected grazing permittees/lessees to discuss how a proposed project may affect grazing operations and to address possible alternatives to avoid and minimize impacts, as well as mitigation and compensation strategies.

- Evaluating impacts on rangeland resources and grazing use as part of the environmental impact analysis for the project, and considering options to avoid, minimize, and/or mitigate adverse impacts in coordination with the BLM.  Issues to be considered include, but are not limited to, maintenance or relocation of range improvements and fencing, access to water and water rights, delineation of open range, and traffic management.

---

[2]   See Section 4.3 of the Final Solar PEIS for details on areas included in these categories.

BLM_0018401

*A.4.1.3.2 Site Characterization, Siting and Design, Construction*

**RG2-1**    Roads shall be constructed, improved, and maintained to minimize their impact on grazing operations.  Road design shall include fencing, cattle guards, and speed control and information signs where appropriate.

## A.4.1.4  Design Features for Wild Horses and Burros

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on wild horses and burros from solar energy development identified and discussed in Section 5.4.2.1 and 5.4.2.2 of the Draft and Final Solar PEIS.

*A.4.1.4.1  General*

**WHB1-1**    Project developers shall coordinate with the BLM and other stakeholders early in the project planning process to assess and consider options to avoid, minimize, and/or mitigate impacts on wild horses and burros and their management areas.

(a)  Assessing impacts on wild horses and burros and their management areas shall include, but is not limited to, the following:

- Identifying wild horses and burros and their management areas in proximity to the proposed projects.  In coordination with the BLM, developers shall consult existing land use plans and updated inventories.

- Evaluating potential impacts on wild horses and burros and their management areas as part of the environmental impact analysis for the project and considering options to avoid, minimize, and/or mitigate adverse impacts in coordination with the BLM.

(b)  Methods to minimize impacts on wild horses and burros and their management areas may include, but are not limited to, the following:

- Installing fencing and access control.

- Providing for movement corridors.

- Delineating open range.

- Requiring traffic management measures (e.g., vehicle speed limits).

- Ensuring access to or replacement of water sources.

BLM_0018402

- Incorporating key elements to mitigate impacts on wild horses and burros in a WEAP that is provided to all project personnel prior to entering the project worksite. The WEAP shall be provided on a regular basis, covering multiple resources, to ensure the awareness of key wild horse and burro mitigation efforts of the project worksite during all phases of the project's life. The base information the WEAP provides shall be reviewed and approved by the BLM prior to the issuance of a Notice to Proceed and incorporates adaptive management protocols for addressing changes over the life of the project, should they occur.

### A.4.1.4.2  Site Characterization, Siting and Design, Construction

**WHB2-1**   Project access roads shall be sited, designed, constructed, fenced, and/or improved to minimize potential wild horse and burro collisions. Fences, or other appropriate structures, should be constructed to exclude wild horses and burros from solar energy project site facilities. Either water sources or access routes to water sources for horses and burros should be excluded from the solar energy development area, or alternate water sources or routes should be provided.

### A.4.1.5  Design Features for Wildland Fire

The following design features have been identified to avoid, minimize, and/or mitigate potential fire risks that could be affected by solar energy development as identified and discussed in Sections 5.4.3.1 and 5.4.3.2 of the Draft and Final Solar PEIS.

### A.4.1.5.1  General

**WF1-1**   Project developers shall coordinate with the BLM and other appropriate fire organizations early in the project planning process to determine fire risk and methods to minimize fire risk.

(a) Identifying fire risk shall include, but is not limited to, the following:

- Assessing the potential for fire risk associated with the proposed project in coordination with the BLM and other appropriate fire organizations. Developers shall consult existing land use plans and fire management plans.

- Evaluating fire risk as part of the environmental impact analysis for the project and considering options to avoid, minimize, and/or mitigate such risk in coordination with the BLM.

BLM_0018403

(b) General methods to minimize fire risk shall include, but are not limited to, the following:

- Developing and implementing fire management measures that include providing worker training.

- Incorporating key elements to mitigate the potential for fire into a WEAP that is provided to all project personnel prior to entering the project worksite. The WEAP shall be provided on a regular basis, covering multiple resources, to ensure the awareness of key fire mitigation efforts of the project worksite during all phases of the project's life. The information provided in the WEAP shall be reviewed and approved by BLM prior to the issuance of a Notice to Proceed and incorporate adaptive management protocols for addressing changes over the life of the project, should they occur.

- Incorporating inspection and monitoring measures, including adaptive management protocols, into the POD and other applicable plans to monitor and respond to fire risk during construction, operations, and decommissioning of a solar energy development.

### A.4.1.5.2 Site Characterization, Siting and Design, Construction

**WF2-1**    Solar facilities shall be sited and designed to minimize fire risk.

(a) Methods to minimize fire risk may include, but are not limited to, the following:

- Siting and designing the solar facilities to ensure sufficient room for fire management within the ROW and its facilities to minimize the risk of fire moving outside the ROW and the risk of fire threatening the facility from outside.

- Consulting fire management personnel to determine actions, both active and passive (e.g., vegetation manipulation), that may minimize the need for protective responses by the BLM and state and local fire organizations.

- Developing and implementing measures to integrate vegetation management to minimize the potential to increase the frequency of wildland fires and prevent the establishment of non-native, invasive species on the solar energy facility and its transmission line and roads.

BLM_0018404

### A.4.1.6  Design Features for Public Access and Recreation Impacts

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on public access and recreation from solar energy development identified and discussed in Sections 5.5.1 and 5.5.2 of the Draft and Final Solar PEIS.

### *A.4.1.6.1  General*

**R1-1**   Project developers shall consult with the BLM in the early phases of project planning to identify public access and recreation use areas in and adjacent to a project site.

 (a)  Identifying public access and recreation in and adjacent to a project shall include, but is not limited to, the following:

 • Considering existing public access through or around proposed solar facilities that allows for access to and use of BLM-administered public lands and non-BLM administered lands. Developers shall conduct this assessment in coordination with the BLM and consult existing land use plans, recreation management plans, etc.

 • Identifying legal access to private, state, and Federal lands surrounding the solar facilities to avoid creating areas that are inaccessible to the public.

 • Evaluating impacts on public access and recreation as part of the environmental impact analysis for the project and considering options to avoid, minimize, and/or mitigate adverse impacts in coordination with the BLM.

 (b)  Methods to minimize access and recreation conflicts may include, but are not limited to, the following:

 • Considering replacement of acreage lost for identified recreation opportunities, such as off-highway vehicle use.

 • Considering, to the extent practicable, providing access through or around a solar energy facility to provide for adequate public access and/or recreation.

 • Incorporating environmental inspection and monitoring measures into the POD and other applicable plans to monitor and respond to impacts on recreation during construction, operations, and decommissioning of a solar energy development, including adaptive management protocols.

BLM_0018405

*A.4.1.6.2  Site Characterization, Siting and Design, Construction*

**R2-1**  Solar facilities shall not be sited in areas designated as unique or important recreation resources (such as Special Recreation Management Areas), where it has been determined that a solar facility or other such development of the land would be in direct conflict with the objectives of the relevant management plan.

## A.4.1.7  Design Features for Military and Civilian Aviation

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on military and civilian aviation from solar energy development identified and discussed in Sections 5.6.1 and 5.6.2 of the Draft and Final Solar PEIS.

*A.4.1.7.1  General*

**MCA1-1**  Project developers shall coordinate with the BLM, military personnel, and civilian airspace managers early in the project planning process to identify and minimize impacts on military and civilian airport and airspace use.

(a)  Identifying impacts on military and civilian airport and airspace use shall include, but is not limited to, the following:

• Submitting plans for proposed construction of any facility that is 200 ft (~61 m) or taller and plans for other projects located in proximity to airports to the Federal Aviation Administration (FAA) to evaluate potential safety hazards.

• Consulting with the U.S. Department of Defense (DoD) to minimize and/or eliminate impacts on military operations, and encouraging compatible development.  This consultation will be initiated by the BLM and will include both general discussions for early planning and detailed assessments of specific proposals at the local level.  The BLM will accept formal DoD submissions once they have been vetted through both the Military Departments and the DoD Siting Clearinghouse.

• Evaluating impacts on military and civil aviation as part of the environmental impact analysis for the project and considering options to avoid, minimize, and/or mitigate adverse impacts in coordination with the BLM.

BLM_0018406

### A.4.1.8  Design Features for Soil Resources and Geologic Hazards

The following design features have been identified to avoid, minimize, and/or mitigate potential soil impacts and potential geologic hazards from solar energy development identified and discussed in Sections 5.7.1 and 5.7.2 (soil impacts) and 5.7.3 (geologic hazards) of the Draft and Final Solar PEIS.

#### *A.4.1.8.1  General*

**SR1-1**   Project developers shall coordinate with the BLM and other Federal, state, and local agencies early in the project planning process to assess soil erosion and geologic hazard concerns and to minimize potential impacts.

(a)  Assessing soil erosion and geologic hazard concerns shall include, but is not limited to, the following:

- Identifying soil erosion and geologic hazard concerns on-site and in proximity to the proposed projects.  In coordination with the BLM, developers shall consult existing land use plans, updated inventories, soil surveys, etc.

- Identifying local factors that can cause slope instability (e.g., groundwater conditions, precipitation, earthquake activity, slope angles, and the dip angles of geologic strata).

- Consulting with local Federal, state, and county agencies regarding road design on the basis of local meteorological conditions, soil moisture, and erosion potential.

- Determining the potential safety and resource impacts associated with soil erosion.

- Evaluating soil erosion and geologic hazard concerns as part of the environmental impact analysis for the project and considering options to avoid, minimize, and/or mitigate adverse impacts in coordination with the BLM.

#### *A.4.1.8.2  Site Characterization, Siting and Design, Construction*

**SR2-1**   Solar facilities shall be sited, designed, and constructed to minimize soil erosion and geologic hazard concerns.

(a)  Methods to minimize soil erosion may include, but are not limited to, the following:

BLM_0018407

- Designing structures to meet the requirements of all applicable Federal, state, and county permits and building codes.

- Minimizing ground-disturbing activities.

- Preventing channel erosion from project runoff.

- Controlling culvert outlets with appropriate structures (e.g., rock lining or apron) to reduce soil erosion and scouring.

- Recontouring and revegetating project roads that are no longer needed in order to increase infiltration and reduce soil compaction.

- Considering utilizing originally excavated materials for backfill.

- Controlling project vehicle and equipment speeds to reduce dust erosion.

- Controlling water runoff and directing it to settling or rapid infiltration basins.

- Retaining sediment-laden waters from disturbed, active areas within the project through the use of barriers and sedimentation devices (e.g., berms, straw bales, sandbags, jute netting, or silt fences). Removing sediment from barriers and sedimentation devices to restore sediment-control capacity.

- Placing barriers and sedimentation devices around drainages and wetlands.

- Siting project structures and facilities to avoid disturbance in areas with existing biological soil crusts.

- Replanting project areas with native vegetation at spaced intervals to break up areas of exposed soil and reduce soil loss through wind erosion.

- Minimizing land disturbance (including crossings) in natural drainage systems and groundwater recharge zones (i.e., ephemeral washes and dry lake beds).

- Locating and constructing drainage crossing structures so as not to decrease channel stability or increase water volume or velocity.

BLM_0018408

- Providing adequate space (i.e., setbacks) between solar facilities and natural washes to preserve hydrologic function.

- Considering the use of existing roads, disturbance areas, and borrow pits before creating new infrastructure.  The use of any existing infrastructure shall be analyzed in the environmental analysis for the proposed project.

- Siting, designing, and constructing new roads and walking trails consistent with the appropriate design standards and criteria, such as those described in BLM Manual 9113 and 43 CFR 8342.1.  Roads and trails should follow natural land contours, and hill cuts should be minimized in the project area.

- Avoiding areas with unstable slopes and soils.

- Avoiding excessive grades on roads, road embankments, ditches, and drainages during site preparation and construction.

- Considering use of special construction techniques in areas of steep slopes, erodible soil, and drainageways.

- Considering implementing construction in stages to limit the areas of exposed and unstabilized soils.

- Reducing construction activity timeframes so that ground-disturbing activities take place over as short a timeframe as possible.

- Lessening fugitive dust emissions and site soils compaction by avoiding unpaved surfaces with construction traffic.

- Avoiding clearing and disturbing areas outside the construction zone.

- Clearly identifying construction zone boundaries on the ground (e.g., through the use of construction fencing) to minimize conflict with other resource concerns.

- Avoiding ground disturbance in areas with intact biological soil crusts and desert pavement.

- Burying electrical lines from solar collectors along existing features (e.g., roads or other paths of disturbance) to minimize the overall area of surface disturbance.

BLM_0018409

- Obtaining borrow materials from authorized and permitted sites.

- Conducting construction grading in compliance with industry practice (e.g., the American Society for Testing and Materials [ASTM] international standard methods) and other requirements (e.g., BLM and/or local grading and construction permits).

- Using temporary stabilization devices (i.e., erosion matting blankets, or soil stabilizing agents) for areas that are not actively under construction.

- Salvaging topsoil from all excavation and construction and reapplying it to disturbed areas upon completion of construction.

- Restoring native plant communities as quickly as possible in disturbed areas through natural revegetation or by seeding and transplanting (using weed-free native grasses, forbs, and shrubs), on the basis of BLM recommendations.

- Minimizing soil-disturbing activities on wet soils.

- Performing studies to determine the effects from construction activities on the eolian processes that maintain any nearby sand dunes, if applicable.

- Incorporating environmental inspection and monitoring measures into the POD and other applicable plans to monitor and respond to impacts on soil resources during construction, operations, and decommissioning of a solar energy development, including adaptive management protocols.

(b)  Methods to minimize geologic hazard concerns may include, but are not limited to, the following:

- Building project structures in accordance with the design-basis recommendations in the project-specific geotechnical investigation report.

- Considering special siting, design, and engineering strategies in areas that involve high seismic activity or have potential for flooding or debris flow.

### A.4.1.8.3  Operations and Maintenance

**SR3-1**     Compliance with the conditions for soil resources and geologic hazards shall be monitored by the project developer.  Consultation with the BLM

BLM_0018410

shall be maintained through the operations and maintenance of the project, employing an adaptive management strategy and modifications, as necessary and approved by the BLM.

(a) Methods to maintain the soil erosion and geologic hazard design elements during operations and maintenance of the project shall include, but are not limited to, the following:

- Applying design features developed for the construction phase to similar activities during the operations phase.

- Performing routine site inspections to assess the effectiveness of maintenance requirements for erosion and sediment control systems.

- Maintaining permanent barriers and sedimentation devices to ensure effective control.

- Regularly maintaining catch basins, roadway ditches, and culverts.

- Identifying soil erosion and geologic hazard requirements within the POD and other applicable plans.

**SR3-2**   Permanent stabilization of disturbed areas shall occur during final grading and landscaping of the site and be maintained through the life of the facility.

### A.4.1.8.4  Reclamation and Decommissioning

**SR4-1**   All design features for soil erosion and geologic hazards developed for the construction phase shall be applied to similar activities undertaken during the decommissioning and reclamation phase.

**SR4-2**   To the extent possible, the original grade and drainage pattern shall be re-established.

**SR4-3**   Native plant communities in disturbed areas shall be restored by natural revegetation or by seeding and transplanting (using weed-free native grasses, forbs, and shrubs), on the basis of recommendations by the BLM, once decommissioning is completed.

BLM_0018411

### A.4.1.9  Design Features for Mineral Resources

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on mineral resources from solar energy development identified and discussed in Sections 5.8.1 and 5.8.2 of the Draft and Final Solar PEIS.

#### A.4.1.9.1  General

**MR1-1**   Project developers shall consult with the BLM in the early phases of project planning to identify potential impacts on mineral development activities and ways to minimize potential adverse impacts.

(a)   Assessing impacts on mineral resources shall include, but is not limited to, the following:

- Identifying active mining claims or mineral development activities and potential for mineral development in proximity to a proposed project.  In coordination with the BLM, developers shall consult existing land use plans and updated inventories.

- Evaluating impacts on mineral development as part of the environmental impact analysis for the project and considering options to avoid, minimize, and/or mitigate adverse impacts in coordination with the BLM.

**MR1-2**   All solar energy development ROWs shall contain the stipulation that the BLM retains the right to issue oil and gas or geothermal leases with a stipulation of no surface occupancy within the ROW area.  Upon designation, SEZs will be classified as no surface occupancy areas for oil and gas and geothermal leasing.

#### A.4.1.9.2  Site Characterization, Siting and Design, Construction

**MR2-1**   Solar energy development projects shall be located to minimize conflicts with valid existing mineral rights and/or ongoing mineral development.

### A.4.1.10  Design Features for Water Resources

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on water resources from solar energy development identified and discussed in Sections 5.9.1 and 5.9.2 of the Draft and Final Solar PEIS.

#### A.4.1.10.1  General

The following activities will be undertaken to minimize impacts on water resources.  They are to be done in coordination with the appropriate local, state, and Federal regulating agencies.

BLM_0018412

**WR1-1**     The project developer shall control project site drainage, erosion, and sedimentation related to stormwater runoff. The project developer shall identify site surface water runoff patterns and develop measures that prevent adverse impacts associated with project related soil deposition and erosion throughout and downslope of the project site and project-related construction areas. This shall be implemented within a Stormwater Pollution Prevention Plan and incorporated into the POD, as appropriate.

(a)  Assessing stormwater runoff concerns shall include, but is not limited to, the following:

- Conducting hydrologic analysis and modeling to define the 100-year, 24-hour rainfall for the project area and calculating projected runoff from this storm at the site.

- Demonstrating the project will not increase off-site flooding potential, and including provisions for stormwater and sediment retention on the project site.

- Demonstrating compliance with construction stormwater permitting through the EPA or state-run NPDES program (whichever applies within the state).

- Demonstrating compliance with the EPA requirement that any development larger than 20 acres (0.08 km$^2$) and begun after August 2011 must monitor construction discharges for turbidity concentrations.

(b)  Methods to minimize stormwater runoff concerns may include, but are not limited to, the following:

- Managing runoff from parking lots, roofs, or other impervious surfaces.

- Creating or improving landscaping used for stormwater treatment to capture runoff.

- Considering reduction of impervious surfaces through the use of permeable pavement or other pervious surfaces.

- Maintaining natural drainages and pre-project hydrographs for the project ROW to the extent practicable.

- Maintaining pre-development flood hydrograph for all storms up to and including the 100-year rainfall event.

BLM_0018413

- Incorporating environmental inspection and monitoring measures into the POD and other applicable plans to monitor and respond to impacts from stormwater runoff during construction, operations, and decommissioning of a solar energy development, including adaptive management protocols.

**WR1-2**   Project developers shall conduct hydrologic study (or studies) that demonstrate a clear understanding of the local surface water and groundwater hydrology.

(a)  Assessing surface water and groundwater hydrology may include, but is not limited to, the following:

- Determining the relationship of the project site hydrologic basin to the basins in the region.

- Identifying surface water bodies within the watershed of SEZs or individual projects (including rivers, streams, ephemeral washes/drainages, lakes, wetlands, playas, and floodplains) and identifying the 100-year floodplain of any surface water feature on the site.

- Identifying applicable groundwater aquifers.

- Quantifying physical characteristics of surface water features, such as streamflow rates, stream cross sections, channel routings, seasonal flow rates.

- Quantifying physical characteristics of the groundwater aquifer, such as physical dimensions of the aquifer, sediment characteristics, confined/unconfined conditions, hydraulic conductivity, and transmissivity distribution of the aquifer.

- Quantifying the regional climate, including seasonal and long-term information on temperatures, precipitation, evaporation, and evapotranspiration.

- Quantifying the sustainable yield of surface waters and groundwater available to the project.

- Consulting with the U.S. Army Corps of Engineers (USACE) regarding the siting of solar energy generating facilities in relation to hydrological features that have the potential to be subject to USACE jurisdiction.

BLM_0018414

**WR1-3**   Project developers shall coordinate with the BLM and other Federal, state, and local agencies early in the planning process in order to identify water use for the solar energy project, and to secure a reliable and legally available water supply to meet project water needs.

(a)   Assessing water use shall include, but is not limited to, the following:

- Quantifying water use requirements for project construction, operations, and decommissioning.

- Meeting potable water supply standards of Federal, state, and local water quality authorities (e.g., Sections 303 and 304 of the Clean Water Act [CWA]).

- Identifying wastewater treatment measures and new or expanded facilities, if any, to be included as part of the facility's National Pollutant Discharge Elimination System (NPDES) permit.

(b)   Methods for minimizing water use may include, but are not limited to, the following:

- Utilizing appropriate water sources with respect to management practices for maintaining aquatic, riparian, and other water-dependent resources.

- Considering water conservation measures related to solar energy technology water needs to reduce project water requirements (i.e., use dry cooling, use recycled or impaired water).

- Incorporating environmental inspection and monitoring measures into the POD and other applicable plans to monitor water use during construction, operations, and decommissioning of the solar energy development, including adaptive management protocols.

**WR1-4**   Project developers shall avoid and/or minimize impacts on existing surface water features, including streams, lakes, wetlands, floodplains, intermittent/ephemeral streams, and playas (any unavoidable impacts would be minimized or mitigated) and in nearby regions resulting from the development in accordance with the following:

- All sections of the CWA, including Sections 401, 402, and 404, addressing licensing and permitting issues;

BLM_0018415

- Executive Orders (E.O.s) 11988 and 11990 of May 24, 1977, regarding floodplain and wetland management:  E.O. 11988, "Floodplain Management" (*Federal Register*, Volume 42, page 26951 [42 FR 26951]), and E.O. 11990, "Protection of Wetlands" (42 FR 26961);

- EPA stormwater management guidelines and applicable state and local guidelines;

- Include submittal of a jurisdictional delineation for consultation with the USACE, in accordance with the 1987 wetlands delineation manual and appropriate regional supplement; avoidance, minimization and compensation proposals;

- USACE permit, Nationwide verification, or other approved jurisdiction.  This includes identification of a Least Environmentally Damaging Practicable Alternative (LEDPA) within the environmental analysis.  The USACE permit, Nationwide verification, or approved jurisdiction letter shall be provided to the BLM prior to a decision;

- National Wild and Scenic Rivers System (Public Law 90-542; 16 *United States Code* [U.S.C.] 1271 et seq.); and

- Required CWA Section 303(d) identification of impaired surface water bodies.

### A.4.1.10.2  Site Characterization, Siting and Design, Construction

**WR2-1**   Project developers shall avoid, minimize, and mitigate impacts on groundwater and surface water resources in accordance with the laws and policies above.

(a)  Methods to minimize impacts on surface water and groundwater resources may include, but are not limited to, the following:

- Reclaiming disturbed soils as quickly as possible.

- Preventing the release of project waste materials into stormwater discharges.

- Avoiding impacts on sole source aquifers according to EPA guidelines.

- Developing measures to prevent potential groundwater and surface water contamination and incorporating them into the

BLM_0018416

Spill Prevention and Emergency Response Plan and POD, as appropriate.

- Minimizing land disturbance in ephemeral washes and dry lakebeds. Stormwater facilities shall be designed to route flow through or around the facility using existing washes when feasible, instead of concrete-lined channels.

- Designing culverts and water conveyances to comply with BLM, state, and local standards, or to accommodate the runoff of a 100-year storm, whichever is larger.

- Designing stormwater retention and/or infiltration and treatment systems for storm events up to and including the 100-year storm event.

- Utilizing geotextile matting to stabilize disturbed channels and stream banks.

- Diverting worksite runoff from entering disturbed streams using earth dikes, swales, and lined ditches.

- Placing sediment control devices so that sediment-laden water can pond, thus allowing sediment to settle out.

- Considering placement of check dams (i.e., small barriers constructed of rock, gravel bags, sandbags, fiber rolls, or reusable products) across a swale or drainage ditch to reduce the velocity of flowing water.

- Considering special construction techniques in areas of erodible soil, alluvial fans, and stream channel/wash crossings.

- Backfilling foundations and trenches with originally excavated material.

- Disposing of excess excavated material according to state and Federal laws.

- Maintaining drilling fluids or cuttings in a manner so as not to contact aquatic habitats. Temporary impoundments for storing drilling fluids and cuttings shall be lined to minimize the infiltration of runoff into groundwater or surface water.

- Avoiding washing equipment or vehicles in streams and wetlands.

BLM_0018417

- Constructing entry and exit pits in work areas to trap sediments from vehicles so they do not enter streams at stream crossings.

- Providing for periodic removal of wastewater generated in association with sanitary facilities by a licensed hauler.

- Avoiding the creation of hydrologic conduits between two aquifers.

- Using herbicides and pesticides within the framework of BLM and DOI policies and standard operating procedures, to include the use of only EPA-registered pesticides/herbicides that also comply with state and local regulations.

- Transporting, storing, managing, and disposing of hazardous materials and vehicle/equipment fuels in accordance with accepted best management practices (BMPs) and in compliance with all applicable regulations, and where applicable, the SWPPP.

### A.4.1.10.3  Operations and Maintenance

**WR3-1**    Compliance with the terms and conditions for water resource mitigation shall be monitored by the project developer.  The developer shall consult with the BLM through operations and maintenance of the project, employing an adaptive management strategy and modifications, as necessary and approved by the BLM.

(a)  Maintaining the water resource design elements during operations and maintenance of the project shall include, but not be limited to, the following:

- Monitoring water quantity and quality in areas adjacent to or downstream from development areas through the life of the project to ensure that water flows and water quality are protected.

- Treating of sanitary and industrial wastewater either on-site or off-site to comply with Federal, state, and local regulations.  Any discharges to surface waters would require NPDES permitting.  Any storage or treatment of wastewater on-site must use proper lining of holding ponds and tanks to prevent leaks.

- Implementing monitoring using adaptive management strategies to ensure that long-term water use during operations does not substantially and disproportionately contribute to the long-term

BLM_0018418

decline of groundwater levels or surface water flows and volumes, considering any mitigation measures that have been taken.

### A.4.1.10.4  Reclamation and Decommissioning

**WR4-1**   Reclamation of the project site shall begin immediately after decommissioning to reduce the likelihood of water resource impacts from project activities.  Developers shall coordinate with the BLM in advance of interim/final reclamation to have the BLM or other designated resource specialists on-site during reclamation to work on implementing water resource requirements and BMPs.

(a)   Methods for minimizing water resource impacts associated with reclamation and decommissioning activities may include, but are not limited to, the following:

- Restoring the project area to predevelopment water conditions or to the extent acceptable to the BLM.

- Considering contouring of soil borrow areas, cut-and-fill slopes, berms, water bars, and other disturbed areas to approximate naturally occurring slopes.

- Feathering edges of vegetation to reduce form and line contrasts with the existing landscapes.

- Salvaging and reapplying topsoil from all decommissioning activities during final reclamation.

- Continuing groundwater and surface water monitoring activities for a limited period of time, if appropriate given the specific situation.

### A.4.1.11  Design Features for Ecological Resources

Many design features are similar for different types of ecological resources (plant communities and habitats, wildlife, aquatic resources, and special status species[3]).  Design features for avoiding or minimizing impacts on all these types of ecological resources in general and during

---

[3]   Special status species include the following types of species:  (1) species listed as threatened or endangered under the ESA; (2) species that are proposed for listing, under review, or candidates for listing under the ESA; (3) species that are listed as threatened or endangered by the state or are identified as fully protected by the state; (4) species that are listed by the BLM as sensitive; and (5) species that have been ranked S1 or S2 by the state or as species of concern by the state or USFWS.  Note that some of the categories of species included here do not fit BLM's definition of special status species as defined in BLM Manual 6840.  These species are included here to ensure broad consideration of species that may be most vulnerable to impacts.

BLM_0018419

the various project phases are presented in the following sections.  They were identified to avoid, reduce, and/or mitigate impacts on ecological resources from solar energy development identified and discussed in Section 5.10 of the Draft and Final Solar PEIS.

### A.4.1.11.1  General

**ER1-1**   Project developers shall consult with the BLM and other Federal, state, and local agencies in the early phases of project planning to help ensure compliance with Federal regulations that address the protection of fish, wildlife, and plant resources, with appropriate Federal, state, and local agencies.

(a)   Assessing compliance with pertinent regulations for ecological resources shall include, but is not limited to, the following:

- Developing in coordination with the BLM and USFWS strategies for complying with regulatory requirements of the Bald and Golden Eagle Act.

- Developing in coordination with appropriate Federal and state agencies (e.g., BLM, USFWS, and state resource management agencies) measures to protect birds (including migratory species protected under the Migratory Bird Treaty Act [MBTA]).

- Contacting appropriate agencies (e.g., BLM, USFWS, and state resource management agencies) early in the project planning process to identify potentially sensitive ecological resources such as aquatic habitats, wetland habitats, unique biological communities, crucial wildlife habitats, and special status species locations and habitats located within or in the vicinity of the areas occupied by the solar energy facility and associated access roads and ROWs.

- Reviewing maps and supporting information regarding desert tortoise connectivity habitat made available through the Solar PEIS project Web site (http://solareis.anl.gov) and consulting with the BLM and USFWS early in project planning to receive instructions on the appropriate desert tortoise survey protocols and the criteria the BLM and USFWS will use to evaluate the results of those surveys (see Appendix B, Section B.5.3, for additional information).

- Consulting with the USACE regarding the siting of solar energy generating facilities and energy transmission infrastructure in relation to hydrological features that have the potential to be subject to USACE jurisdiction.

BLM_0018420

- Considering restrictions on timing and duration of activities developed in coordination with the BLM, USFWS, and other appropriate agencies to minimize impacts from project activities on nesting birds (especially passerines and listed species).

- Considering recommendations contained in *Interim Golden Eagle Technical Guidance:  Inventory and Monitoring Protocol and Other Recommendations in Support of Golden Eagle Management and Permit Issuance.*

- Adhering to instruction Memorandum 2010-156, the *Bald and Golden Eagle Protection Act—Golden Eagle National Environmental Policy Act and Avian Protection Plan Guidance for Renewable Energy*, until programmatic permits from the USFWS are available.  The analysis of potential impacts on, and mitigation for, golden eagles shall be made in coordination with the USFWS.

- Avoiding take of golden eagles and other raptors.  Mitigation regarding the golden eagle shall be developed in consultation with the USFWS and appropriate state natural resource agencies. A permit may be required under the Bald and Golden Eagle Protection Act.

- Discussing potential impacts on sensitive habitats resulting from operation of vehicles and construction of structures, including transmission lines, within the environmental analysis.

(b)  Methods to minimize regulatory conflicts for ecological resources may include, but are not limited to, the following:

- Including submittal of a jurisdictional delineation for consultation with the USACE, in accordance with the 1987 wetlands delineation manual and appropriate regional supplement; avoidance, minimization and compensation proposals.

- Identifying an LEDPA and analyzing within the environmental analysis.  A USACE permit, Nationwide verification, or approved jurisdiction letter shall be provided to the BLM prior to a decision.

- Developing measures to ensure protection of raptors in coordination with appropriate Federal and state agencies (e.g., BLM, USFWS, and state resource management agencies).

BLM_0018421

- Developing measures to ensure protection of bats in coordination with appropriate Federal and state agencies (e.g., BLM, USFWS, and state resource agencies).

- Developing measures to ensure mitigation and monitoring of impacts on special status species in coordination with appropriate Federal and state agencies (e.g., BLM, USFWS, and state resource management agencies).

- Consulting with the USFWS upon discovery of federally listed threatened and endangered species during any phase of the project. An appropriate course of action shall be determined to avoid, minimize, or mitigate impacts. All applicable terms and conditions and conservation measures listed in the programmatic Biological Opinion, issued by the USFWS, shall be followed.

- Informing project personnel that only qualified biologists are permitted to handle listed species according to specialized protocols approved by the USFWS.

- Considering plants, wildlife, and their habitats in the facility's Dust Abatement Plan.

- Limiting herbicide use to non-persistent, immobile substances. Only herbicides with low toxicity to wildlife and non-target native plant species shall be used, as determined in consultation with the USFWS. Section 5.10.2.1.5 of the Draft Solar PEIS discusses the potential impacts of herbicides on wildlife. All herbicides shall be applied in a manner consistent with their label requirements and in accordance with guidance provided in the Final Solar PEIS on vegetation treatments using herbicides. Prior to application of herbicide treatments, a qualified person, such as a biologist, shall conduct surveys of bird nests and of special status species to identify the special measures or BMPs necessary to avoid and minimize impacts on migratory birds and special status species.

- Developing a SWPPP for each project that avoids, to the extent practicable, changes in surface water or groundwater quality (e.g., chemical contamination, increased salinity, increased temperature, decreased dissolved oxygen, and increased sediment loads) or flow that result in the alteration of terrestrial plant communities or communities in wetlands, springs, seeps, intermittent streams, perennial streams, and riparian areas (including the alteration of cover and community structure, species composition, and diversity) off the project site.

BLM_0018422

- Utilizing block or check valves on both sides of the waterway or habitat to minimize product release from pipelines that transport hazardous liquids (e.g., oils) that pass through aquatic or other habitats.  Such pipelines shall be constructed of double-walled pipe at river crossings.

- Considering compensatory mitigation and monitoring of significant direct, indirect, and cumulative impacts on, and loss of habitat for, special status plant and animal species.

- Incorporating key elements on the identification and protection of ecological resources (especially for special status species), including knowledge of required design features, in instructions to all personnel.  Incorporate the knowledge into a WEAP that is provided to all project personnel prior to entering the project worksite.  The WEAP shall be provided on a regular basis, so as to ensure the continued ecological awareness of the project worksite during all phases of the project's life.  The base information the WEAP provides shall be reviewed and approved by the BLM prior to the issuance of a Notice to Proceed and incorporate adaptive management protocols for addressing ecological changes over the life of the project, should they occur.

- Planning for vegetation management that is consistent with applicable regulations and agency policies for the control of noxious weeds and invasive plant species (Sections 5.10.1.1.2 and 5.10.1.1.4 of the Draft Solar PEIS discuss the need for local and regional native plants in revegetation and restoration).

- Developing measures for fire management and protection that minimize the potential for a human- or facility-caused fire to affect ecological resources and that respond to natural fire situations (Sections 5.10.1.1.2 and 5.10.1.1.3 of the Draft Solar PEIS discuss the potential impacts of fire on native plant communities).

- Developing measures to investigate the possibility of revegetating parts of the solar array area.

- Designating a qualified biologist who will be responsible for overseeing compliance with all design features related to the protection of ecological resources throughout all project phases, particularly in areas requiring avoidance or containing sensitive biological resources.  This person shall be reviewed and approved by the USFWS and the BLM for designation as a qualified biologist.

BLM_0018423

- Conducting pre-construction surveys, in coordination with BLM, USFWS, and state agency statutes, programs, and policies.

- Conducting seasonally appropriate inspections by a qualified biologist or team of biologists to ensure that important or sensitive species or habitats are not present in or near project areas. Attendees at the inspections may include appropriate Federal agency representatives, state natural resource agencies, and construction contractors, as appropriate. Habitats or locations to be avoided shall be clearly marked.

### A.4.1.11.2 Site Characterization, Siting and Design, Construction

**ER2-1** Solar facilities shall be sited and designed, and constructed to avoid, minimize, or mitigate impacts on ecological resources.

(a) Methods to avoid, minimize, or mitigate impacts on ecological resources may include, but are not limited to the following:

- Siting and designing projects to avoid and minimize direct and indirect impacts on important, sensitive, or unique habitats in the project vicinity, including, but not limited to waters of the United States, wetlands (both jurisdictional and non-jurisdictional), springs, seeps, streams (ephemeral, intermittent, and perennial), 100-year floodplains, ponds and other aquatic habitats, riparian habitat, remnant vegetation associations, rare or unique biological communities, crucial wildlife habitats, and habitats supporting special status species populations (including designated and proposed critical habitat).

- Incorporating measures to exclude tortoises from entering solar energy development sites. Examples include, but are not limited to, tortoise-proof fencing (fence specifications should be consistent with those approved by the USFWS in the Desert Tortoise Field Manual [USFWS 2009]) and tortoise guards at all road access points where desert tortoise-proof fencing is interrupted.

- Reducing the attractiveness of solar energy development and infrastructure areas to opportunistic predators such as desert kit fox, coyotes, and common ravens. Examples include, but are not limited to, litter control programs; measures to discourage the presence of ravens on-site, including elimination of available water sources; designing structures to discourage their use as potential nest sites; use of hazing to discourage raven presence; and active monitoring of the site for presence of ravens.

BLM_0018424

- Considering opportunities to upgrade or maintain crossings along existing facilities (e.g., roads, railroads, and aqueducts) such that desert tortoise occupancy and connectivity are not compromised.

- Avoiding siting projects in designated critical habitat, ACECs, or other specially designated areas that are identified as necessary for special status species and habitat conservation.

- Considering siting projects on previously disturbed lands in close proximity to energy load centers to avoid and minimize impacts on remote, undisturbed lands.

- Designing project facilities to reduce the number of stream crossings within a particular stream or watershed (e.g., access roads and utilities could share common ROWs, where feasible), and locating facilities in pre-disturbed areas to reduce potential for habitat fragmentation.

- Preventing establishment and spread of invasive species and noxious weeds within the ROW and in associated areas where there is ground surface disturbance or vegetation cutting. Developers should consider siting project facilities and activities, including associated roads and utility corridors, out of occupied habitats of special status animal species.

- Determining, in coordination with appropriate Federal and state agencies, the translocation of special status species, including the steps to implement the translocation and the follow-up monitoring of populations in the receptor locations, as determined in coordination with the appropriate Federal and state agencies. Developers should plan for translocation of special status species when appropriate.

- Considering the salvage of Joshua trees (*Yucca Brevifolia*), other Yucca species, and most cactus species in coordination with the local BLM field office.

- Considering conducting interim and final restoration activities as soon as possible after development activities are completed in order to reduce the amount of habitat converted at any one time and to speed up the recovery to natural habitats.

- Implementing revegetation, soil stabilization, and erosion reduction measures to ensure temporary use areas are restored.

BLM_0018425

- Conducting a nesting bird survey or other necessary survey for nesting birds.  If active nests are detected, the nest area shall be flagged, and no activity shall take place near the nest (at a distance determined by the BLM in coordination with the USFWS and/or appropriate state agencies), or until the appropriate agencies agree that construction can proceed with the incorporation of agreed-upon monitoring measures.

- Siting and designing project activities away from habitats occupied by special status animal species.  Developers should consider establishing buffers around sensitive habitats to prevent destructive impacts associated with project activities (e.g., identified in the land use plan or substantiated by best available information or science in consultation with the BLM).

- To the extent practicable, avoiding entry into aquatic habitats, such as streams and springs, during site characterization activities until surveys by qualified biologists have evaluated the potential for unique flora and fauna to be present.

- Planning for and developing measures that identify management practices to minimize increases in nuisance animals and pests in the project area.  The plans should identify nuisance and pest species that are likely to occur in the area, risks associated with these species, species-specific control measures, and monitoring requirements.

- Designing solar facilities to avoid, minimize, and mitigate impacts on wetlands, waters of the United States, and other special aquatic sites.

- Locating and designing individual project facilities to minimize disruption of animal movement patterns and connectivity of habitats.  Section 5.10.2.1.2 of the Draft Solar PEIS discusses the potential impacts of habitat loss and fragmentation on wildlife.

- Avoiding surface water or groundwater withdrawals that adversely affect sensitive habitats (e.g., aquatic, wetland, playa, microphyll woodland, and riparian habitats) and habitats occupied by special status species.

- Designing water intake facilities to minimize the potential for aquatic organisms from surface waters to be entrained in cooling water systems.

BLM_0018426

- Demonstrating, through hydrologic modeling, that the withdrawals required for the project are not going to affect groundwater discharges that support special status species or their habitats.

- Considering the use of fencing and netting for evaporation ponds to prevent their use by wildlife.

- To the extent practicable, locating meteorological towers, solar sensors, soil borings, wells, and travel routes to avoid sensitive habitats or areas where wildlife (e.g., sage-grouse) is known to be sensitive to human activities.

- To the extent practicable, avoiding siting solar power facilities near open water or other areas that are known to attract large numbers of birds.

- To the extent practicable, placing tall structures, such as meteorological towers and solar power towers, to avoid known flight paths of birds and bats.

- Implementing current guidelines and methodologies in the design and analysis of proposed transmission facilities in order to minimize the potential for raptors and other birds to collide or be electrocuted by them.

- Placing mechanisms to visually warn birds (permanent markers or bird flight diverters) on transmission lines at regular intervals to prevent birds from colliding with the lines.

- Designing transmission line support structures and other facility structures to discourage use by raptors for perching or nesting (e.g., by using monopoles rather than lattice support structures or by use of anti-perching devices).

- Considering spanning important or sensitive habitats with transmission line conductors within the limits of standard structure design.

- Using low-water crossings (fords) during the driest time of the year. Developers should consider using rocked approaches to fords and returning the crossing to pre-existing stream channel conditions after the need for a low-water ford has passed.

- Employing noise reduction devices (e.g., mufflers) to minimize the impacts on wildlife and special status species populations.

BLM_0018427

Explosives shall be used only within specified times and at specified distances from sensitive wildlife or surface waters as established by the BLM or other Federal and state agencies.

- Minimizing the number of areas where wildlife could hide or be trapped (e.g., open sheds, pits, uncovered basins, and laydown areas). Movement of a discovered special status species that is hidden or trapped is prohibited. If necessary, the animal should be moved only to remove the animal from the path of harmful activity, until the animal can escape.

- Implementing measures for proper trash removal and storage, such as using secured containers and periodic emptying, on the project site to reduce attractive opportunistic species, such as common ravens, coyotes, and feral cats and dogs.

- Constructing, improving, and maintaining access roads to minimize potential wildlife/vehicle collisions and facilitate wildlife movement through the project area.

- Limiting project vehicle speeds and using shuttle vans and carpooling in areas occupied by special status animal species. Traffic shall yield to wildlife, allowing safe road crossing.

- Utilizing existing access roads, utility corridors, and other infrastructure to the maximum extent feasible.

- Locating staging and parking areas within the site of the utility-scale solar energy facility to minimize habitat disturbance.

- Considering rolled and compacted on-site construction access routes to allow trucks and equipment to access construction locations.

- Minimizing vehicle use off of access roads and foot traffic through undisturbed areas.

- Constructing fences (as practicable) to exclude livestock and wildlife from project facilities.

- Prohibiting project personnel from bringing firearms and pets to project sites.

- Placing food refuse and other garbage in closed containers so it is not available to scavengers.

BLM_0018428

- Reducing the collection, harassment, or disturbance of plants, wildlife, and their habitats (particularly special status species) through employee and contractor education about applicable state and Federal laws.

- Advising personnel to minimize stopping and exiting their vehicles in the winter ranges of large game while there is snow on the ground.

- Coordinating with BLM and appropriate project personnel to handle unreasonable traffic delays caused by wildlife in roads. Utilizing appropriate personnel to move live, injured, or dead wildlife off roads, ROWs, or the project site.

- Reporting any vehicle-wildlife collisions.  Observations of potential wildlife problems, including wildlife mortality, shall be immediately reported to the BLM or other appropriate agency authorized officer.

- Considering road closures or other travel modifications (e.g., lower speed limits, no foot travel) during crucial periods (e.g., extreme winter conditions, calving/fawning seasons, raptor nesting).

- Conducting pre-construction surveys by qualified personnel, such as a qualified biologist, in areas with potential to adversely affect special status species (Section 5.10.4.1.1 of the Draft Solar PEIS) and utilizing approved survey techniques or established species-specific survey protocols to determine the presence of special status species in the project area.

- Considering the number of qualified biological monitors (as determined by the Federal authorizing agency and USFWS) to be on-site during initial site preparation and during the construction period to monitor, capture, and relocate animals that could be harmed and are unable to leave the site on their own.

- Relocating wildlife found in harm's way from the area of the activity.  Qualified personnel shall be required to relocate some animals such as rattlesnakes.

- Establishing a controlled inspection and cleaning area to visually inspect construction equipment arriving at the project area and to remove and collect seeds that may be adhering to tires and other equipment surfaces.

BLM_0018429

- To the extent practicable, avoiding placement of transmission towers within aquatic and wetland habitats, or other sensitive habitats such as riparian habitats. If towers must be placed within these habitats, they shall be designed and installed to not impede flows or fish passage.

- Designing necessary stream crossings to provide in-stream conditions that allow for and maintain uninterrupted movement and safe passage of fish during all project periods.

- Considering cutting trees in stream buffers that are able to grow into a transmission line conductor clearance zone within 3 to 4 years.

- Considering the use of helicopters where access roads do not exist or where access roads could not be constructed without significantly impacting habitats.

### A.4.1.11.3  Operations and Maintenance

**ER3-1**   The developer shall manage vegetation utilizing the principles of integrated pest management, including biological controls to prevent the spread of invasive species, per the *Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States,* and the *National Invasive Species Management Plan, 2009.* Consultation with the BLM shall be maintained through operations and maintenance of the project, employing an adaptive management strategy and modifications, as necessary and approved by the BLM.

(a)  Methods to manage vegetation, including controlling for invasive species, during operations and maintenance of the project may include, but are not limited to, the following:

- Using certified weed-free seed and mulching.

- Cleaning vehicles to avoid introducing invasive weeds.

- Educating project personnel on weed identification, the manner in which weeds spread, and methods for treating infestations.

- Considering periodic monitoring, reporting, and immediate eradication of noxious weed or invasive species occurring within all managed areas.

- Limiting vegetation maintenance and performing maintenance mechanically rather than with herbicides.

BLM_0018430

- Considering retaining short (i.e., less than 7-in. [18-cm] tall) native species during maintenance and operation activities.

- Reducing risk of non-native and nuisance aquatic species introductions. Developers should decontaminate equipment used in surface water, especially equipment used to convey water (i.e., pumps).

- Monitoring for and eradicating invasive species.

- Reestablishing vegetation within temporarily disturbed areas immediately following the completion of construction activities.

- Focusing revegetation efforts on the establishment of native plant communities similar to those present in the vicinity of the project site. Considering dominant native species within the plant communities that exist in adjacent areas and have similar soil conditions for revegetation.

- Considering post-translocation surveys for target species (especially if the target species are special status species) and releasing individuals to protected off-site locations as approved by Federal and state agencies.

**ER3-2**    The developer shall, in consultation with the BLM and appropriate Federal, state, and local agencies, manage projects so as to minimize impacts on ecological resources during operations and maintenance of the project, employing an adaptive management strategy and modifications, as necessary and approved by the BLM.

   (a) Methods to minimize impacts on ecological resources during operations and maintenance of the project shall include, but are not limited to, the following:

- Monitoring for increase in predation of special status species (e.g., desert tortoise, Utah prairie dog, and greater sage-grouse) from ravens and other species that are attracted to developed areas and use tall structures opportunistically to spot vulnerable prey.

- Turning off all unnecessary lighting at night to limit attracting wildlife, particularly migratory birds.

   (b) Other methods for maintaining compliance with ecological resource design elements during operations and maintenance of the project may include, but are not limited to, the following:

BLM_0018431

- Monitoring for and reporting bird mortality species (e.g., raptors) that are associated with power lines to the BLM and the USFWS.

- Monitoring for the effects of groundwater withdrawals on plant communities.

- Monitoring unavoidable impacts on wetlands and waters of the United States.

- For projects that affect desert tortoise linkages, developing and implementing a Desert Tortoise Habitat Linkage Management and Monitoring Plans and a Desert Tortoise Population Connectivity Effectiveness-Monitoring Plan as described in the USFWS Biological Opinion and Conservation Review for the Solar Energy Program (July 20, 2012).

- Removing raptor nests only if the birds are not actively using the nest.

- Considering relocating nests to nesting platforms.  Reporting on relocated or destroyed nests to the appropriate Federal and/or state agencies.

- Coordinating with the USFWS and BLM project personnel in the event that a raptor nest is located on a transmission line support structure.

- Removing raven nests only when inactive (i.e., no eggs or young).  The removal of raven nests may be addressed in the minimization measures that incorporate the most current USFWS guidance (e.g., FONSI, *Implementation of a Desert Tortoise Recovery Plan Task:  Reduce Common Raven Predation on the Desert Tortoise, 2008*).

- Considering trench breakers and/or sealing the trench bottom to maintain the original wetland hydrology where a pipeline trench drains a wetland.

- Minimizing removal of deadfall or overhanging vegetation in streams for crossings.

- Installing fish screens on cooling water intakes to limit the potential for impingement impacts on organisms in surface water sources used for cooling water.

BLM_0018432

- Maintaining areas left in a natural condition during construction (e.g., wildlife crossings) in as natural a condition as possible within safety and operational constraints.

- Avoiding use of guy wires to minimize impacts on birds and bats. If guy wires are necessary, permanent markers (e.g., bird flight diverters) shall be used to increase their visibility.

- Maintaining native vegetation cover and soils and minimizing grading.

- Monitoring unavoidable impacts on wetlands and waters of the United States.

- Instructing personnel to avoid harassment and disturbance of local plants and wildlife.

- Informing personnel of the potential for wildlife interactions around facility structures.

### A.4.1.11.4  Reclamation and Decommissioning

ER4-1    Reclamation of the construction and project site shall begin immediately after decommissioning to reduce the likelihood of ecological resource impacts in disturbed areas as quickly as possible.

(a)  Addressing ecological resource impacts during reclamation and decommissioning shall include, but is not limited to, the following:

- Applying design features developed for the construction phase to similar activities during the decommissioning and reclamation phase.

- Developing and implementing a Decommissioning and Site Reclamation Plan specific to the project, approved by the BLM in consultation with appropriate agencies, that incorporates adaptive management strategies.

- Using weed-free seed mixes of native shrubs, grasses, and forbs of local sources where available, as required in the Decommissioning and Site Reclamation Plan.

- Developing and implementing monitoring measures to ensure successful reclamation per the Decommissioning and Site Reclamation Plan.

BLM_0018433

(b) Other methods to minimize ecological resource impacts during reclamation and decommissioning may include, but are not limited to, the following:

- Lightly raking and/or ripping and reseeding with seeds from low-stature plant species collected from the immediate vicinity in disturbed areas.

- Reclaiming access roads when they are no longer needed, considering seasonal restrictions.

- Filling or grading holes and ruts created by the removal of structures and access roads.

- Considering maximizing area reclaimed during solar energy operations to minimize habitat loss and fragmentation.

- Maintaining a clean and orderly worksite during and after decommissioning to ensure land is clear of debris.

- Planning to return land surfaces to pre-development contours immediately following decommissioning.

- Expediting the reestablishment of vegetation for site stabilization.

- Continuing vegetation reestablishment efforts until all success criteria have been met, as identified within the Decommissioning and Site Reclamation Plan.

- Focusing revegetation on the establishment of native plant communities similar to those present in the vicinity of the project site. Considering dominant native species within the plant communities that exist in adjacent areas and have similar soil conditions for revegetation.

- Leaving the facility fencing in place for several years, or replacing it with new exclusion fencing, to assist reclamation (e.g., the fence could preclude large mammals and vehicles from disturbing revegetation efforts). Shorter times for maintaining fencing may be appropriate in cases where the likelihood of disturbance by cattle and wildlife is low.

BLM_0018434

## A.4.1.12  Design Features for Air Quality and Climate

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on ambient air quality and climate from solar energy development that were identified and discussed in Sections 5.11.1 and 5.11.2 of the Draft and Final Solar PEIS.

### A.4.1.12.1  General

**AQC1-1**   Project developers shall consult with the BLM in the early phases of project planning to help determine the potential conformance to air quality and other potential constraints.

(a)  Assessing conformance to air quality and other related constraints shall include, but is not limited to, the following:

- Identifying air quality and other related constraints associated with the proposed project site.  In coordination with BLM, the appropriate state and local air regulatory authorities shall be consulted to identify air quality and related constraints and requirements.

- Determining any applicable Federal, state, and local laws and regulations related to air quality.

- Considering effects on particulate matter $PM_{10}$ and $PM_{2.5}$ from the solar energy project and its facilities.

- Evaluating the cumulative impacts to air quality and air quality related values in Class I areas.  Such an analysis should include the Reasonably Foreseeable Development Scenario from the Solar PEIS for all SEZs within the region of a proposed project.

- Evaluating potential contributions to air quality impacts as part of the environmental impact analysis for the project and considering options to avoid, minimize and/or mitigate adverse impacts in coordination with the BLM.

### A.4.1.12.2  Site Characterization, Siting and Design, Construction

**AQC2-1**   Solar facilities shall be sited and designed, and constructed to minimize impacts on air quality.

(a)  Methods to minimize air quality impacts shall include, but are not limited to, the following:

BLM_0018435

- Using equipment that meets emission standards specified in the state code of regulations and meets the applicable EPA Tier 3 and Tier 4 emissions requirements.

- Preparing a Dust Abatement Plan for the solar facilities that considers multiple methods for dust suppressant (i.e., water, paving, gravel, and/or regulation-compliant palliatives).

(b) Other methods to minimize air quality impacts and related constraints may include, but are not limited to, the following:

- Considering surfacing access roads with aggregate that is hard enough that vehicles cannot crush it.

- Managing unpaved roads, disturbed areas (e.g., areas of scraping, excavation, backfilling, grading, and compacting), and loose materials generated during project activities as frequently as necessary to effectively minimize fugitive dust generation.

- Using machinery that has air-emission-control devices as required by Federal, state, and local regulations or ordinances.

- Limiting travel to stabilized roads.

- Considering paving the main access road to the main power block and the main maintenance building.

- Enforcing posted speed limits (e.g., 10 mph [16 km/hour]) within the construction site to minimize airborne fugitive dust.

- Covering vehicles that transport loose materials as they travel on public roads, using dust suppressants on truck loads, and keeping loads below the freeboard of the truck bed.

- Installing wind fences around disturbed areas that could affect the area beyond the site boundaries (e.g., nearby residences).

- Suspending soil disturbance activities and travel on unpaved roads during periods of high winds. Site-specific wind speed thresholds shall be determined on the basis of soil properties determined during site characterization.

- Utilizing compatible native vegetative plantings to limit dust generation from stockpiles that will be inactive for a relatively long period.

BLM_0018436

- To the extent practicable, avoiding chemical dust suppressants that emit volatile organic compounds within or near ozone nonattainment areas.

- Considering use of ultra-low sulfur diesel with a sulfur content of 15 parts per million (ppm) or less for project vehicles.

- Limiting the idling time of equipment to no more than 5 minutes, unless idling must be maintained for proper operation (e.g., drilling, hoisting, and trenching).

- Minimizing use of dust palliatives in areas of close proximity to sensitive soil and streams.

- Accessing transmission lines from public roads and designated routes to minimize fugitive dust emissions.

- Minimizing on-site vehicle use and requiring routine preventive maintenance, including tune-ups to meet the manufacturer's specifications, to ensure efficient combustion and minimal emissions.

- Encouraging use of newer and cleaner equipment that meets more stringent emission controls.

- Limiting access to the construction site and staging areas to authorized vehicles only through the designated treated roads.

- Staging construction to limit the areas exposed at any time.

- Considering inspection and cleaning of tires of all construction-related vehicles to ensure they are free of dirt before they enter paved public roadways.

- Cleaning up visible trackout or runoff dirt on public roadways resulting from the construction site (e.g., street vacuum/ sweeping).

- Salvaging topsoil from all excavations and construction activities during reclamation or interim reclamation and reapplying to construction areas not needed for facility operation as soon as activities in that area have ceased.

- Considering atmospheric conditions when planning construction activities to minimize dust.

BLM_0018437

- To the extent practicable, avoiding ground disturbance from construction-related activities in areas with intact biological soil crusts and desert pavement.  Developers should salvage soil crusts for restoration, on the basis of recommendations by the BLM once construction has been completed.

- Incorporating environmental inspection and monitoring measures into the POD and other relevant plans to monitor and respond to air quality during construction, operations, and decommissioning of a solar energy development, including adaptive management protocols.

### A.4.1.12.3  *Operations and Maintenance*

**AQC3-1**   Compliance with the terms and conditions for air quality shall be monitored by the project developer.  Consultation with BLM shall be maintained through operations and maintenance of the project, employing an adaptive management strategy and modifications, as necessary and approved by the BLM.

(a)  Methods for maintaining compliance with the terms and conditions for air quality during operations and maintenance shall include, but are not limited to, the following:

- Monitoring and treating areas that have been graded, scraped, bladed, compacted, or denuded of vegetation ahead of actual construction/assembly.

(b)  Other methods to maintain compliance with the terms and conditions for air quality during operations and maintenance may include, but are not limited to, the following:

- Reapplying palliatives or water as necessary for effective fugitive dust management.

- Considering use of design features for portions of facilities maintained to be free of vegetation during operations, and use of the dust control design features that were listed above under AQC2-1 to limit fugitive dust emissions during the construction phase to minimize fugitive dust emissions from bare surfaces and unpaved access roads.

- Ensuring compliance of all combustion sources with state emission standards (e.g., best available control technology requirements).

BLM_0018438

*A.4.1.12.4  Reclamation and Decommissioning*

**AQC4-1**     Reclamation of the site shall incorporate the design features listed above
for construction under AQC2-1 to reduce the likelihood of air quality
impacts associated decommissioning.

## A.4.1.13  Design Features for Visual Resources

The following design features have been identified to avoid, minimize, and/or mitigate potential
impacts on visual resources from solar energy development identified and discussed in
Section 5.12.3 of the Draft and Final Solar PEIS.

*A.4.1.13.1  General*

**VR1-1**     Project developers shall consult with the BLM in the early phases of
project planning to help determine the proposed project's potential
conformance to VRM class designations and other potential constraints,
thus avoiding costly unforeseen planning implications and re-design.

(a)   Assessing conformance to VRM class designations and identifying
visual resource conflicts shall include, but is not limited to, the
following:

- Consulting with the appropriate BLM field office for VRM class
designations and associated management objectives during the
early phases of project planning, including those related to
project site selection, planning, and design.  The BLM visual
resource inventory (VRI) class values—including those for
scenic quality, sensitivity, and distance zones—shall also be
factored into the project planning, design, and decision making.

- Analyzing how the visual values influence project design and
how the impacts on these values will be minimized through
consideration for the proposed project location and its
relationship to the surrounding viewshed.

- Including a qualified professional, such as a landscape architect,
with demonstrated experience of the BLM's VRM policies and
procedures as part of the developer's and the BLM's respective
planning teams, to evaluate visual resource issues as project
siting options are considered.

- Consulting with the locally based public to provide input on
identifying important visual resources in the project area and on
the siting and design process.  The public shall be involved and

BLM_0018439

informed about the visual site design elements of the proposed solar energy facilities.

- Consulting on viewshed protection objectives and practices with the respective land management for landscapes having special designations, such as Wilderness Areas, National Scenic and Historic Trails, Wild and Scenic Rivers, National Parks, and National Wildlife Refuges located within the project's viewshed. Developers shall demonstrate a concerted effort to reconcile conflicts while recognizing that the BLM retains authority for final decisions determining project approval and conditions.

- For applications that include artifacts and remnants of a National Historic Trail, are located within the viewshed of a National Historic Trail's designated centerline, or include or are within the viewshed of a trail eligible for listing on the *National Register of Historic Places* (NRHP) by virtue of its important historical or cultural values and integrity of setting, evaluating the potential visual impacts on the trail associated with the proposed project; avoiding, minimizing, and/or mitigating adverse effects through the Section 106 consultation process; and identifying appropriate mitigation measures for inclusion as stipulations in the POD.

- Considering landscape settings observed from a unit of the National Park system, National Historic Sites, National Trails, and cultural resources of tribal concern that may be a part of the historic context contributing to the historic significance of the site or trail.

- Project developers are encouraged to obtain topographical data of engineering-design quality and use digital terrain mapping tools at a landscape-viewshed scale for project location selection, site planning and design, visual impact analysis, and visual impact mitigation planning and design. The digital terrain-mapping tools shall be at a resolution and contour interval suitable for site design and accurate placement of proposed developments into the digital viewshed. Visual simulations shall be prepared and evaluated in accordance with BLM Handbook H-8431-1 and other agency directives, to create spatially accurate and realistic depictions of the appearance of proposed facilities. Simulations shall depict proposed project facilities from key observation points (KOPs) and other visual resource sensitive locations.

- Conducting outreach through public forums as necessary to disseminate visual resource information through methods such as

BLM_0018440

offering organized tours of operating solar energy development projects, and using simulations in public presentations.

- Performing visual mitigation planning and design through field assessments, applied global positioning system (GPS) technology, photo documentation, use of computer-aided design and development software, three-dimensional GIS modeling software, and imaging software to depict visual simulations to reflect a full range of visual resource mitigation measures.

### A.4.1.13.2 Site Characterization, Siting Design, and Construction

**VR2-1**     Solar facilities shall be sited and designed to minimize glint and glare.

(a) Identification of glint and glare effects shall include, but is not limited to, the following:

- Assessing and quantifying potential glint and glare effects and determining the potential safety and visual impacts associated with glint and glare using appropriate and commonly accepted software, procedures, and past project examples.

- Having qualified individuals conduct assessments for glint and glare.

(b) Methods to minimize glint and glare effects may include, but are not limited to, the following:

- Limiting use of signs and project construction signs. Beyond those required for basic facility and company identification for safety, navigation, and delivery purposes, commercial symbols or signs and associated lighting on buildings and other structures should be prohibited.

- Utilizing retro-reflective or luminescent markers in lieu of permanent lighting.

- Minimizing off-site visibility of all commercial symbols and signs and associated lighting. Necessary signs should be made of non-glare materials and utilize unobtrusive colors. The reverse sides of signs and mounts should be painted or coated using a suitable color selected from the BLM Standard Environmental Color Chart to reduce contrasts with the existing landscape. However, placement and design of any signs required by safety regulations must conform to regulatory requirements.

BLM_0018441

- Considering off-site mitigation of visual impacts. In some situations, off-site mitigation may serve as a means to offset and/or recover the loss of visual landscape integrity. For example, off-site mitigation could include reclaiming unnecessary roads, removing abandoned buildings, reclaiming abandoned mine sites, putting utility lines underground, rehabilitating and revegetating existing erosion or disturbed areas, or establishing scenic conservation easements. Appropriate off-site mitigation will be determined on a project-specific basis in consultation with the BLM.

**VR2-2**    Solar facilities shall be sited and designed to minimize night-sky effects.

(a)   Identification of night-sky effects shall include, but is not limited to, the following:

- Assessing and quantifying potential lighting impacts on the night sky and nocturnal wildlife, while providing lighting for hazard marking, safety, and other necessary site needs.

- Conducting assessments for night-sky effects by qualified individuals using appropriate and commonly accepted procedures and past project examples.

(b)   Methods to minimize night-sky effects may include, but are not limited to, the following:

- Using minimum intensity lighting that meets safety criteria. When accurate color rendition is not required (e.g., roadway, basic security), lighting shall be amber in color, using low-pressure sodium lamps, yellow LED lighting, or equivalent. When white light is required for accurate color rendition, it shall be equal to or less than 3500° Kelvin color temperature. Bluish-white lighting is discouraged.

- Prohibiting the use of red or white strobe lighting unless the BLM approves its use because of conflicting mitigation requirements.

- Fully shielding all permanent lighting (e.g., full cut-off), except for collision markers required by the FAA or other emergency lighting triggered by alarms.

- Mount lighting so that no light is emitted above an imaginary horizontal plane through the fixture.

BLM_0018442

- Considering lighting control through timers, sensors, dimmers, or switches that are available to facility operators.

- Considering vehicle-mounted lights over permanently mounted lighting for nighttime maintenance activities. When possible, such vehicle-mounted lighting shall be aimed toward the ground to avoid causing glare and skyglow.

**VR2-3**  The siting and design of solar facilities, structures, roads, and other project elements shall explore and document design considerations for reducing visual dominance in the viewshed and shall comply with the VRM class objectives in conformance with VR1-1.

(a) Assessing visual dominance shall include, but is not limited to, the following:

- Conforming with VRM class objectives through the use of the BLM contrast rating procedures defined in BLM Handbook H-8431-1. Visual contrast rating mitigation of visual impacts shall abide by the requirements outlined in the handbook and other BLM directives. Revised project plans and simulations are to be reevaluated by using the contrast rating procedures.

- Selecting KOPs by first determining the extent of the viewshed using the viewshed modeling tools previously cited under VR1-1. The viewshed modeling shall illustrate the areas from which the proposed facilities may be seen out to 25 mi (40 km). From within the areas, KOPs are to be selected at places where people would be expected: scenic overlooks, roads, trails, campgrounds, recreationally active river corridors, residential areas, etc. For the purpose of conducting a visual contrast rating evaluation, the number of KOPs would be reduced to those that serve as the best representations for demonstrating conformance to the respective VRM class objectives. The BLM is consulted on the KOP selections, and reserves the right to require additional KOPs to further determine the extent of visual impacts and conformance to VRM class objectives.

- Integrating visual design elements into the construction plans, details, drawings, and specifications for the project.

- Incorporating facility siting measures to minimize the profile of all facility-related structures to reduce visibility and visual dominance within the viewshed, particularly for facilities proposed within the foreground/middleground distance zone (0–5 mi [0–8 km]) of sensitive viewing locations.

BLM_0018443

(b)  Measures to minimize visual dominance may include, but are not limited to, the following:

- Using existing topography and vegetation as screening or partially screening devices.

- Incorporating visual design elements when planning for grubbing and clearing, vegetation thinning and clearing, grading, revegetation, drainage, and structural measures.

- Minimizing visual dominance of projects by siting projects outside the viewsheds of KOPs or by diminishing dominance through maximizing visible separation with distance.

- Avoiding, when feasible, locating facilities near visually prominent landscape features (e.g., knobs and waterfalls) that naturally draw an observer's attention.

- Avoiding visual "skylining" by placing structures, transmission lines, and other facilities away from ridgelines, summits, or other locations where they would silhouette against the sky from important viewing locations; however, consideration should be given to the potential for increased ground disturbance and other resource impacts.

- Designing linear features (e.g., ROWs and roads) to follow natural land contours rather than straight lines; however, consideration should be given to the potential for increased ground disturbance and other resource impacts.

- Locating linear developments (e.g., transmission lines, pipelines, roads) at the edges of natural clearings or natural lines of transition between vegetation type and topography.

- Considering alternative means of access in visually sensitive areas, to preserve the natural landscape conditions between tower locations.

- Minimizing vegetation and ground disturbance, and taking advantage of existing clearings where feasible.

- Reducing cut and fill for structures and roads by design and location.  Retaining walls, binwalls, half bridges, etc., can be used to reduce cut and fill.

BLM_0018444

- Considering rounded and varied road-cut slopes and the cut-and-fill pitches to reduce contrasts in form and line; encouraging slope cuts to preserve specimen trees and nonhazardous rock outcroppings.

- Considering sculpting and shaping natural or previously excavated bedrock landforms when excavation of these landforms is required. For example, percent backslope, benches, and vertical variations may be integrated into a final landform that repeats the natural shapes, forms, textures, and lines of the surrounding landscape. The earthen landform may be integrated and transitioned into the excavated bedrock landform. Sculpted rock face angles, bench formations, and backslope could adhere to the natural bedding planes of the natural bedrock geology. The color contrast from the excavated rock faces may be removed by color treating with a rock stain. Native vegetation or a mix of native and non-native species (if necessary to ensure successful revegetation) could be reestablished with the benches and cavities created within the created bedrock formation.

- Designing and installing natural-looking earthwork landforms, or vegetative or architectural screening to minimize visual impacts. Considering shape and height of earthwork landforms for adaptation to the surrounding landscape.

- Repeating the size, shape, and characteristics of naturally occurring openings in vegetation for facilities, structures, roads, etc.

- Burying electrical collector lines, pipelines, and communication and local utility lines to minimize additional surface disturbance where feasible (e.g., along roads or other paths of surface disturbance).

- Minimizing visual impacts associated with solar energy and electricity transmission projects by choosing appropriate building and structural materials and surface treatments (i.e., paints or coatings designed to reduce contrast and reflectivity). A careful study of the site should be performed to identify appropriate colors and textures for materials; both summer and winter appearance shall be considered, as well as seasons of peak visitor use. Materials and surface treatments shall repeat and/or blend with the existing form, line, color, and texture of the landscape.

- Considering the typical viewing distances and landscape when choosing colors. Appropriate colors for smooth surfaces often

BLM_0018445

need to be two to three shades darker than the background color to compensate for shadows that darken most textured natural surfaces. The BLM Standard Environmental Color Chart CC-001 and guidance shall be referenced when selecting colors.

- Selecting appropriately colored materials for structures, or stains/coatings to blend with the project's backdrop. Materials, coatings, or paints having little or no reflectivity shall be used whenever possible.

- Color treating solar panel/mirror/heliostat backs/supports to reduce visual contrast with the landscape setting.

- Color treating solar towers to reduce visual contrast.

- Considering multiple-color camouflage technology application projects within sensitive viewsheds and with a visibility distance that is between 0.25 and 2 mi (0.40 and 3.20 km).

- Matching aboveground pipelines' paint or coating to their surroundings.

- Considering the appropriate choice of monopoles versus lattice towers for a given landscape setting to further reduce visual impacts.

- Utilizing nonspecular conductors and nonreflective coatings on insulators for electricity transmission/distribution projects.

- Minimizing the use of signs. Where signs are necessary, they shall be made of non-glare materials and utilize unobtrusive colors. The reverse sides of signs and mounts shall be painted or coated by using the most suitable color selected from the BLM Standard Environmental Color Chart; however, placement and design of any signs required by safety regulations must conform to regulatory requirements.

- Clearly delineating construction boundaries and minimizing areas of surface disturbance; preserving vegetation to the greatest extent possible; utilizing undulating surface disturbance edges; stripping, salvaging, and replacing topsoil; using contoured grading; controlling erosion; using dust suppression techniques; and stabilizing exposed soils.

BLM_0018446

- Preserving existing rocks, vegetation, and drainage patterns to the maximum extent possible.

- Employing brush-beating, mowing, or the use of protective surface matting rather than removing vegetation.

- Considering mulching and spreading slash from vegetation removal over fresh soil disturbances.

- Avoiding leaving slash piles in sensitive viewing areas.

- Considering restoration of disturbed soils by use of weed-free native grasses, forbs, and shrubs representative of the surrounding and intact native vegetation composition and/or using non-native species, if necessary, to ensure successful revegetation.

- Reducing the visual color contrast of graveled surfaces with approved color treatment practices.

- Considering segregating and spreading topsoil from cut-and-fill activities on freshly disturbed areas to reduce color contrast.

- Avoiding leaving topsoil piles in sensitive viewing areas.

- Spreading excess cut and fill material within project disturbance area and vegetate per approved restoration plan requirements while maintaining natural drainage pathways. Where soil cannot reasonably be spread within project disturbance areas, excess cut-and-fill materials should be hauled out to minimize ground disturbance and impacts from piles.

- Removing stakes and flagging from the construction area after completion of construction.

**VR2-4**   Project developer shall perform a pre-construction meeting with BLM or their designated visual/scenic resource specialists, such as a landscape architect, to coordinate the project construction VRM mitigation strategy. Final design and construction documents will be reviewed with regard to the visual mitigation elements, assuring that requirements and commitments are adequately addressed. The review of construction documents will include, but not be limited to, grading, drainage, revegetation, vegetation clearing, and feathering.

### A.4.1.13.3  Operations and Maintenance

**VR3-1**    Compliance with the terms and conditions for VRM mitigation shall be monitored by the project developer.  Consultation with the BLM shall be maintained through operations and maintenance of the project, employing an adaptive management strategy and modifications, as necessary and approved by the BLM.

   (a)  Maintaining the visual resource design elements during operations and maintenance shall include, but is not limited to, the following:

   •   Maintaining revegetated surfaces until a self-sustaining stand of vegetation is reestablished and visually adapted to the undisturbed surrounding vegetation.  No new disturbance shall be created during operations without completion of a VRM analysis and approval by the BLM authorized officer.

   •   Keeping painted and color-treated facilities in good repair and repainting when the color fades or flakes.

   •   Using interim restoration during the operating life of the project as soon as possible after land disturbances.

   •   Including dust abatement and noxious weed control in maintenance activities.

   •   Deploying and operating mirrors/heliostats to avoid high-intensity light (glare) reflected off-site.  Where off-site glare is unavoidable and project site/off-site spatial relationships favor effective results, fencing with privacy slats or similar screening materials should be considered.

### A.4.1.13.4  Reclamation and Decommissioning

**VR4-1**    Reclamation of the construction site shall begin immediately after construction to reduce the likelihood of visual contrasts associated with erosion and invasive weed infestation and to reduce the visibility of temporarily disturbed areas as quickly as possible.  Developers shall coordinate with BLM in advance of interim/final reclamation to have BLM or other designated visual/scenic resource specialists, such as a landscape architect, on-site during reclamation to work on implementing visual resource requirements and BMPs.

   (a)  Methods for minimizing visual contrast associated with reclamation and decommissioning of the project may include, but are not limited to, the following:

BLM_0018448

- Including treatments, such as thinning and feathering vegetation along project edges, enhanced contour grading, salvaging landscape materials from within construction areas, special revegetation requirements (e.g., use of mix of native and non-native species).

- Designing and implementing restoration of the project area to predevelopment visual conditions and the inventoried visual quality rating, or to that of the surrounding landscape setting conditions to the best extent possible or to conditions agreed upon by the BLM.

- Removing aboveground and near-ground-level structures. Some structures may need to be removed to a level below the ground surface to allow reclamation/restoration.

- Considering contouring soil borrow areas, cut-and-fill slopes, berms, water bars, and other disturbed areas to approximate naturally occurring slopes. Contouring to a rough texture would trap seeds and discourage off-road travel, thereby reducing associated visual impacts. Cut slopes can be randomly scarified and roughened to reduce texture contrasts with existing landscapes and aid in revegetation.

- Utilizing native vegetation to establish a composition consistent with the form, line, color, and texture of the surrounding undisturbed landscape.

- Reapplying stockpiled topsoil to disturbed areas, where applicable, or using a mix of native and non-native species if necessary to ensure successful revegetation.

- Removing or burying gravel and other surface treatments.

- Restoring rocks, brush, and forest to approximate pre-existing visual conditions.

- Integrating feathering edges of vegetation to reduce form and line contrasts with the existing landscapes.

**A.4.1.14  Design Features for Noise**

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on the acoustic environment from solar energy development that were identified and discussed in Sections 5.13.1 and 5.13.2 of the Draft and Final Solar PEIS.

BLM_0018449

### A.4.1.14.1  General

**N1-1**     Project developers shall consult with the BLM in the early phases of project planning to assess and minimize the proposed project's noise impacts on sensitive noise receptors.

    (a)  Assessing noise impacts shall include, but is not limited to, the following:

- Taking measurements to assess the existing background ambient sound levels both within and outside the project site and comparing these with the anticipated noise levels proposed at the facility.  The ambient measurement protocols of all affected land management agencies shall be considered and utilized.  Nearby residences and likely sensitive human and wildlife receptor locations shall be identified.

- Conducting assessments for noise impacts by qualified individuals using appropriate and commonly accepted software, procedures, and past project examples.

- Evaluating impacts from noise as part of the environmental impact analysis for the project and considering options to avoid, minimize, and/or mitigate adverse impacts in coordination with the BLM.

### A.4.1.14.2  Site Characterization, Siting and Design, Construction

**N2-1**     The siting and design of solar facilities, structures, roads, and other project elements shall seek to minimize impacts on sensitive noise receptors.

    (a)  Methods to minimize project impacts on sensitive noise receptors may include, but are not limited to, the following:

- Enclosing noisy equipment when located near sensitive receptors.

- Posting warning signs at high-noise areas and implementing a hearing protection program for work areas with noise in excess of 85 dBA.

- Implementing a noise complaint process and hotline, including documentation, investigation, evaluation, and resolution of legitimate project-related noise complaints.

BLM_0018450

- Maintaining project equipment in accordance with manufacturers' specifications. For example, suitable mufflers and/or air-inlet silencers shall be installed on all internal combustion engines (ICEs) and certain compressor components.

- Limiting low-altitude (under 1,500 ft [457 m]) helicopter flights for installation of transmission lines near noise-sensitive receptors to locations where only helicopter activities can perform the installation.

- Scheduling construction activities to minimize disruption to nearby residents and existing operations surrounding the project areas.

- Planning noisy construction activities near sensitive receptors to take place during the least noise-sensitive times of day (i.e., daytime between 7 a.m. and 7 p.m.), and on weekdays.

- Coordinating individual noisy activities to occur at the same time to reduce the frequency of site boundary noise.

- Implementing noise control measures (e.g., erection of temporary wooden noise barriers) where activities are expected near sensitive receptors.

- Notifying nearby residents in advance of noisy activities, such as blasting or pile driving, before and during the construction period.

- Considering siting immobile construction equipment (e.g., compressors and generators) away from nearby residences and other sensitive receptors.

- Siting permanent sound-generating facilities (e.g., compressors, pumps) away from residences and other sensitive receptors. The use of acoustic screening may be required.

- Incorporating low-noise systems (e.g., for ventilation systems, pumps, generators, compressors, and fans) and selecting equipment without prominent discrete tones.

- Siting louvered side(s) of wet cooling tower(s) away from sensitive receptors. Noise impacts may be further reduced by selecting quieter fans and fans that operate at a lower speed, particularly if they operate at night. Silencers on fan stacks may also be used.

BLM_0018451

- Including noise reduction measures such as siting noise sources to take advantage of existing topography and distances and constructing engineered sound barriers and/or berms or sound-insulated buildings to reduce potential noise impacts at the locations of nearby sensitive receptors.

- Incorporating environmental inspection and monitoring measures into PODs or other relevant plans to monitor and respond to impacts from noise during construction, operations, and decommissioning of a solar energy development, including adaptive management protocols.

### A.4.1.14.3  Operations and Maintenance

**N3-1**     Compliance with the terms and conditions for noise shall be monitored by the project developer.  Consultation with the BLM shall be maintained through operations and maintenance of the project, employing an adaptive management strategy and modifications as necessary and approved by the BLM.

(a)  Methods for maintaining compliance with the noise design elements during operations and maintenance may include, but are not limited to, the following:

- Managing noise levels from cooling systems and dish engine technology so that levels at the nearest residences and sensitive receptor areas near the facility boundary are kept within applicable guidelines.

- Operating vehicles traveling within and around the project area in accordance with posted speed limits to reduce vehicle noise levels.

- Scheduling activities to minimize disruption to nearby residents and existing operations surrounding the project areas.

- Notifying nearby residents in advance of noisy activities, such as blasting or pile driving, before and during the reclamation and decommissioning activities.

- Monitoring and maintaining transformer noise levels. Considering installation of new transformers with reduced flux density, which generate noise levels as much as 10 to 20 dB lower than National Electrical Manufacturers Association (NEMA) standard values, or use of barrier walls, partial enclosures, or full enclosures to shield or contain the noise.

BLM_0018452

### A.4.1.14.4  Reclamation and Decommissioning

**N4-1**  Reclamation of the construction site shall minimize the project's noise impacts on sensitive noise receptors.

### A.4.1.15  Design Features for Paleontological Resources

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on paleontological resources from solar energy development that were identified and discussed in Sections 5.14.1 and 5.14.2 of the Draft and Final Solar PEIS.

### A.4.1.15.1  General

**P1-1**  Project developers shall coordinate with the BLM early in the project planning process to identify and minimize impacts on paleontological resources.

(a)  Identifying paleontological resources shall include, but is not limited to, the following:

- Determining in coordination with the BLM whether paleontological resources exist in a project area.

- Determining the potential presence of paleontological resources on the basis of the following:  the sedimentary context of the area and its potential to contain paleontological resources (potential fossil yield classification [PFYC] class, if it is available); a records search of published and unpublished literature for past paleontological finds in the area; coordination with paleontological researchers working locally in potentially affected geographic areas and geologic strata; and/or depending on the extent of existing information, the completion of a paleontological survey.

(b)  Methods to minimize impacts on paleontological resources may include, but are not limited to, the following:

- Instituting BMPs, such as training/education programs (see WEAP bullet below), to reduce the amount of inadvertent destruction to paleontological sites (see also P2-2 below). Project-specific management practices shall be established in coordination with the BLM, incorporating BLM IM 2009-011.

- Planning for management and mitigation of paleontological resources of the project area for areas of known presence or high potential of presence.

BLM_0018453

- Identifying measures to prevent potential looting/vandalism or erosion impacts and addressing the education of workers and the public to make them aware of the consequences of unauthorized collection of fossils on public land.

- Incorporating key elements to mitigate the impacts on paleontological resources into a WEAP that is provided to all project personnel prior to entering the project worksite.  The WEAP shall be provided on a regular basis, covering multiple resources, to ensure the awareness of key mitigation efforts for paleontological resources of the project worksite during all phases of the project's life.  The base information the WEAP provides shall be reviewed and approved by the BLM prior to the issuance of a Notice to Proceed and shall incorporate adaptive management protocols for addressing changes over the life of the project, should they occur.

- Incorporating environmental inspection and monitoring measures into PODs and other relevant plans to monitor and respond to paleontological resource impacts during construction, operations, and decommissioning of a solar energy development, including adaptive management protocols.

### A.4.1.15.2  Site Characterization, Siting and Design, Construction

**P2-1**    Project developers shall use a qualified paleontological monitor during excavation and earthmoving activities in areas with high potential for paleontological resources.

**P2-2**    Project developers shall notify the BLM immediately upon discovery of fossils.  Work shall be halted at the fossil site and continued elsewhere until qualified personnel, such as a paleontologist, can visit the site, determine the significance of the find, and, if significant, make site-specific recommendations for collection or other resource protection.  The area of the discovery shall be protected to ensure that the fossils are not removed, handled, altered, or damaged until the site is properly evaluated and further action determined.

## A.4.1.16  Design Features for Cultural Resources

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on cultural resources from solar energy development that were identified and discussed in Sections 5.15.1 and 5.15.2 of the Draft and Final Solar PEIS.

BLM_0018454

*A.4.1.16.1  General*

**CR1-1**    Project developers shall coordinate with the BLM early in the planning process to identify and minimize cultural resource impacts; the BLM will consult with other Federal, tribal, state, and local agencies as appropriate.

(a)  Determining cultural resource impacts shall include, but is not limited to, the following:

• Initiating Section 106 consultations between the BLM, SHPOs, Indian tribes, and other consulting parties early in the project planning process.  Thresholds for the involvement of and review by the Advisory Council on Historic Preservation (ACHP) include non-routine interstate and/or interagency projects or programs; undertakings adversely affecting National Historic Landmarks; undertakings that the BLM determines to be highly controversial; and undertakings that will have an adverse effect and with respect to which disputes cannot be resolved through formal agreement between the BLM and SHPO, such as a Memorandum of Agreement (MOA).

• Conducting site-specific Section 106 review for individual projects.  The BLM will require the completion of inventory, evaluation, determinations of effect, and treatment in accordance with the Solar PA.  This Solar PA is titled "Programmatic Agreement among the United States Department of the Interior, Bureau of Land Management, the Arizona State Historic Preservation Officer, the California State Historic Preservation Officer, the Colorado State Historic Preservation Officer, the New Mexico State Historic Preservation Officer, the Nevada State Historic Preservation Officer, the Utah State Historic Preservation Officer, and the Advisory Council on Historic Preservation Regarding Solar Energy Development on Lands Administered by the Bureau of Land Management."

(b)  General methods to minimize cultural resource impacts may include, but are not limited to, the following:

• If historic properties that could be adversely affected are present in the project location, developing an MOA tiered to the Solar PA to address the mitigation steps that will be followed to avoid, minimize, or mitigate adverse effects on historic properties.

• Where the BLM determines that a specific proposed solar energy project has the potential to adversely affect historic properties

BLM_0018455

but those effects cannot be determined prior to its approval, the BLM may elect to review a proposed solar energy project using an undertaking-specific PA executed pursuant to 36 CFR 800.6, instead of following the procedures outlined in the overarching Solar PA.

- Using training/educational programs for solar company workers to reduce occurrences of disturbances, vandalism, and harm to nearby historic properties. The specifics of these sensitivity training programs shall be established in project-specific consultations between the applicant, BLM, SHPO, and affected Indian tribes, and will be articulated in a WEAP. Such education and awareness plans will incorporate adaptive management protocols for addressing changes over the life of the project, should they occur.

- Securing a performance and reclamation bond for all solar energy generation facilities to ensure compliance with the terms and conditions of the ROW authorization. When establishing bond amounts and conditions, the BLM authorized officer shall require coverage of all expenses tied to cultural resources identification, protection, and mitigation. These may include, but are not limited to, costs for ethnographic studies, inventory, testing, geomorphological studies, data recovery, curation, monitoring, treatment of damaged sites, and generation and submission of reports (see ROW authorization policies, Section 2.2.1.1 of the Final Solar PEIS).

### A.4.1.16.2  Site Characterization, Siting and Design, Construction

**CR2-1**     Solar facilities shall be characterized, sited and designed, and constructed in coordination with the BLM to minimize cultural resource impacts.

(a)  Methods to minimize impacts on cultural resources shall include, but are not limited to, the following:

- The BLM determining the APE for each proposed solar energy project, to include a review of existing information, and efforts to seek information from and views of tribes and other parties likely to have knowledge of or concerns with historic properties in the APE. This information will be supplemented by discussions at pre-application meetings with the solar energy project applicant, SHPO, and affected tribes regarding project designs, sacred sites, traditional cultural properties (TCPs), and proposed cultural resource inventory strategies.

BLM_0018456

- The BLM consulting the SHPO, affected tribes (regarding the treatment of adverse effects for those property types on which the tribes indicate at pre-application or other meetings they wish to provide input), and any other consulting parties, if *National Register of Historic Places* (NRHP)-eligible properties are present at the site and would be adversely affected. The BLM will seek agreement to avoid, minimize, or mitigate adverse effects on historic properties. The BLM will execute an MOA with the SHPO to conclude the Section 106 process and will file a copy with the ACHP. Where the BLM and the SHPO are unable to execute an MOA, the BLM will invite the ACHP to participate in an undertaking-specific MOA. The MOA will specify the treatment for which the BLM will be responsible, and which will be implemented by the solar applicant.

- Undertaking a Class III inventory of the APE. If the BLM decides to require less than a Class III inventory for the entire APE, the BLM will seek additional views of the SHPO, affected tribes, and other parties and determine the final inventory strategy that best represents a reasonable and good-faith effort to carry out appropriate identification efforts.

- Conducting inventories according to the standards set forth in the Secretary of the Interior's *Standards and Guidelines for Archaeology and Historic Preservation* (48 FR 44716); BLM Handbook H-8110 (*Handbook for Identifying Cultural Resources*); revised BLM Manual 8110; and applicable BLM or SHPO survey, site record, or reporting standards. All inventory data must be provided to the BLM in digitized or paper format that meets BLM accuracy standards, including shape files for surveyed areas.

- Bringing any unexpected discovery of cultural resources during any phase of development (construction, operations and maintenance, or decommissioning) to the attention of the responsible BLM authorized officer immediately, as specified in the PA. Work shall be halted in the vicinity of the find. The area of the find shall be protected to ensure that the resources are not removed, handled, altered, or damaged while they are being evaluated and to ensure that appropriate mitigative or protective measures can be developed and implemented.

(b) Methods to minimize cultural resource impacts may include, but are not limited to, the following:

BLM_0018457

- Including in the MOAs measures for management of historic properties, in situations where historic properties require management or monitoring for avoidance and protection within or near a project's boundaries. Such measures will specify the preparation and implementation of steps to lessen the adverse effects of the undertaking upon those aspects of NRHP eligibility criteria that make the historic properties eligible for nomination to the NRHP.

- Requiring that surface disturbance be restricted or prohibited within the viewshed of such property types when their eligibility is tied to their visual setting to protect NRHP-eligible traditional cultural properties, sacred sites, or historic trails from visual intrusion and to maintain the integrity of their historic setting unless acceptable mitigation is proposed.

- Employing cultural field monitors (appropriate for the resource anticipated) to monitor ground-disturbing activities (for example in geomorphic settings, such as in shifting sands, where buried deposits may be present) in cases where there is a probability of encountering cultural resources during construction that could not be detected during prior Class III inventories. Monitoring plans shall be specified within MOAs.

- Encouraging the use of previously disturbed lands and lands determined by archeological inventories to be devoid of historic properties.

### A.4.1.16.3  Reclamation and Decommissioning

**CR3-1**    Prior to reclamation activities, the BLM may require further planning for treatment of historic properties or planning for mitigation addressing reclamation activities.

**CR3-2**    The BLM shall be notified prior to the demolition or substantial alteration of any building or structure. If judged necessary by the BLM, the developer will be required to evaluate the structures for their significance employing professionally qualified architects or historic architects. If structures slated for demolition are found to be eligible for listing on the NRHP, they will be recorded to Historic American Building Survey and/or Historic American Engineering Record standards before alteration or removal.

**CR3-3**    Project developers shall confine soil-disturbing reclamation and decommissioning activities to previously disturbed areas. Known historic properties will be avoided during these activities.

BLM_0018458

### A.4.1.17  Design Features for Native American Concerns

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts in areas of Native American concern regarding solar energy development; they are identified and discussed in Sections 5.16.1 and 5.16.2 of the Draft and Final Solar PEIS.

#### *A.4.1.17.1  General*

**NA1-1**  The BLM shall consult with federally recognized Indian tribes early in the planning process to identify issues and areas of concern regarding any proposed solar energy project as required by the National Historic Preservation Act (NHPA) and other authorities to determine whether construction and operation of a project is likely to disturb traditional cultural properties or sacred sites, impede access to culturally important locations, disrupt traditional cultural practices, affect movements of animals important to tribes, or visually affect culturally important landscapes.

(a)  Identifying issues and areas of concern to federally recognized Indian tribes shall include, but is not limited to, the following:

- Covering planning, construction, operation, and reclamation activities during consultation.  Agreements or understandings reached with affected tribes shall be carried out in accordance with the terms of MOAs or State Specific Procedures as defined within the Solar PA.

- The BLM consulting with affected Indian tribes during the Section 106 process at the points specified in the Solar PA.

- The BLM consulting with Indian tribes under the terms of the Native American Graves Protection and Repatriation Act (NAGRA).  Any planning for treatment of historic properties or mitigation will take such consultations into account.

- The BLM seeking, during consultation, to develop agreements with affected tribes on how to appropriately respond to input and concerns in advance to save time and avoid confusion.

(b)  Methods to minimize issues and areas of concern to federally recognized Indian tribes may include, but are not limited to, the following:

- Employing standard noise design features for solar facilities located near sacred sites to minimize the impacts of noise on culturally significant areas.

BLM_0018459

- Employing health and safety design features for the general public for solar facilities located near Native American traditional use areas in order to minimize potential health and safety impacts on Native Americans.

- Avoiding known human burial sites. Where there is a reasonable probability of encountering undetected human remains and associated funerary objects by a solar energy project, the BLM will carry out discussions with Indian tribes before the project is authorized, in order to provide general guidance on the treatment of any cultural items (as defined by NAGPRA) that might be exposed.

- Avoiding visual intrusion on sacred sites through the selection of the solar facility location and solar technology. When complete avoidance is not practicable or economically feasible, the BLM shall engage in timely and meaningful consultation with the affected tribe(s) and shall attempt to formulate a mutually acceptable plan to mitigate or reduce the adverse effects.

- Avoiding rock art (panels of petroglyphs and/or pictographs). These panels may be just one component of a larger sacred landscape, in which avoidance of all impacts may not be possible. Mitigation plans for eliminating or reducing potential impacts on rock art shall be formulated in consultation with the appropriate tribal cultural authorities.

- Avoiding springs and other water sources that are or may be sacred or culturally important. If it is necessary for construction, maintenance, or operational activities to take place in proximity to springs or other water sources, appropriate measures, such as the use of geotextiles or silt fencing, shall be taken to prevent silt from degrading water sources. The effectiveness of these mitigating barriers shall be monitored. Measures for preventing water depletion impacts on springs shall also be employed. Particular mitigations shall be determined in consultation with the appropriate Indian tribe(s).

- Avoiding culturally important plant species. When it is not possible to avoid affecting these plant resources, consultations shall be undertaken with the affected Indian tribe(s). If the species is available elsewhere on agency-managed lands, guaranteed access may suffice. For rare or less-common species, establishing (transplanting) or propagating an equal amount of the plant resource elsewhere on agency-managed land accessible to the affected tribe may be acceptable (e.g., for mesquite groves

BLM_0018460

and rice grass fields, identified as tribally important plant species in the ethnographic studies).

- Avoiding culturally important wildlife species and their habitats. When it is not possible to avoid these habitats, solar facilities shall be designed to minimize impacts on game trails, migration routes, and nesting and breeding areas of tribally important species. Mitigation and monitoring procedures shall be developed in consultation with the affected tribe(s).

- Securing a performance and reclamation bond for all solar energy generation facilities to ensure compliance with the terms and conditions of the ROW authorization. When establishing bond amounts and conditions, the BLM authorized officer shall require coverage of all expenses tied to identification, protection, and mitigation of cultural resources of concern to Indian tribes. These may include, but are not limited to, costs for ethnographic studies, inventory, testing, geomorphological studies, data recovery, curation, monitoring, treatment of damaged sites, and generation and submission of reports (see ROW authorization policies, Section 2.2.1.1 of the Final Solar PEIS).

### A.4.1.17.2  Site Characterization, Siting and Design, Construction

**NA2-1**     Prior to construction, the project developer shall provide training to contractor personnel whose activities or responsibilities could affect issues and areas of concern to federally recognized Indian tribes.

### A.4.1.17.3  Operations and Maintenance

**NA3-1**     Consultation with affected federally recognized Indian tribes shall be ongoing during the life of the project.

**NA3-2**     The project developer shall train facility personnel regarding their responsibilities to protect any known resources of importance to federally recognized Indian tribes.

### A.4.1.17.4  Reclamation and Decommissioning

**NA4-1**     The project developer shall confine reclamation and decommissioning activities to previously disturbed areas and existing access roads to the extent practicable.

**NA4-2**     The project developer shall return the site to its pre-construction condition, to the extent practicable and approved by the BLM.

BLM_0018461

### A.4.1.18  Design Features for Socioeconomic Impacts

The following design features have been identified to avoid, minimize, and/or mitigate potential socioeconomic impacts from solar energy development identified and discussed in Sections 5.17.1 and 5.17.2 of the Draft and Final Solar PEIS.

### *A.4.1.18.1  General*

**S1-1**    Project developers shall coordinate with the BLM and other Federal, state, and local agencies to identify and minimize potential socioeconomic impacts.

(a)  Identifying socioeconomic impacts shall include, but is not limited to, the following:

- Assessing the potential for socioeconomic impacts associated with the proposed project in coordination with the BLM and other qualified experts.  Project developers shall collect and evaluate available information describing the socioeconomic conditions in the vicinity of the proposed project, as needed, to predict potential impacts of the project.

- Evaluating socioeconomic impacts as part of the environmental impact analysis for the project and considering options to minimize and/or mitigate impacts in coordination with the BLM.

(b)  Methods to minimize socioeconomic impacts may include, but are not limited to, the following:

- Developing a community monitoring program that would be sufficient to identify and evaluate socioeconomic impacts resulting from solar energy development.  Measures developed for monitoring may include the collection of data reflecting the economic, fiscal, and social impacts of development at the state, local, and tribal level.

- Developing community outreach programs that would help communities adjust to changes triggered by solar energy development.

- Establishing vocational training programs for the local workforce to promote development of skills required by the solar energy industry.

- Developing instructional materials for use in area schools to educate the local communities on the solar energy industry.

BLM_0018462

- Supporting community health screenings.

- Providing financial support to local libraries for the development of information repositories on solar energy, including materials on the hazards and benefits of commercial development. Electronic repositories established by the project developer could also be of great value.

### A.4.1.19  Design Features for Environmental Justice Impacts

The following design features have been identified to avoid, minimize, and/or mitigate potential environmental justice impacts from solar energy development identified and discussed in Sections 5.18.1 and 5.18.2 of the Draft and Final Solar PEIS.

### *A.4.1.19.1  General*

**EJ1-1**    Project developers shall coordinate with the BLM and other Federal, state, and local agencies to identify and minimize the potential for environmental justice impacts.

(a)  Identifying environmental justice impacts shall include, but is not limited to, the following:

- Assessing the potential for environmental justice impacts associated with the proposed project in coordination with the BLM and other qualified experts.  Project developers shall collect and evaluate available information describing the socioeconomic conditions in the vicinity of the proposed project, as needed, to predict potential environmental justice impacts of the project (i.e., environmental, economic, cultural, and health impacts on low-income and minority populations).  This will include the identification of all environmental justice communities in proximity to a proposed project.

- Evaluating environmental justice impacts as part of the environmental impact analysis for the project and consider options to avoid, minimize, and/or mitigate such risk in coordination with the BLM.

(b)  Methods to minimize environmental justice impacts may include, but are not limited to, the following:

- Developing and implementing focused public information campaigns to provide technical and environmental health information directly to low-income and minority groups or to local agencies and representative groups.  Including key

BLM_0018463

information such as any likely impact on air quality, drinking water supplies, subsistence resources, public services, and the relevant preventative/minimization measures that may be taken.

- Providing community health screenings for low-income and minority groups.

- Providing financial support to local libraries in low-income and minority communities for the development of information repositories on solar energy, including materials on the hazards and benefits of commercial development.

- Establishing vocational training programs for the local low-income and minority workforce to promote development of skills for the solar energy industry.

- Developing instructional materials for use in area schools to educate the local communities on the solar energy industry.

- Providing key information to local governments and directly to low-income and minority populations on the scale and timeline of expected solar energy projects and on the experience of other low-income and minority communities that have followed the same energy development path.

- Considering making available information about planning activities that may be initiated to provide local infrastructure, public services, education, and housing.

## A.4.1.20  Design Features for Transportation Impacts

The following design features have been identified to avoid, minimize, and/or mitigate potential transportation impacts from solar energy development identified and discussed in Sections 5.19.1 and 5.19.2 of the Draft and Final Solar PEIS.

### A.4.1.20.1  Site Characterization, Siting and Design, Construction

T2-1    Project developers shall coordinate with the BLM and other Federal, state, and local agencies to identify and minimize impacts on transportation.

(a)  Identifying impacts on transportation shall include, but is not limited to, the following:

- Assessing the potential for transportation impacts associated with the proposed project in coordination with the BLM and other

BLM_0018464

appropriate state and local agencies. Consulting land use plans, transportation plans, and local plans as necessary. The developer may be required to perform traffic studies, analyses, or other studies of the capacity of existing and proposed new roads to physically handle the added wear and tear from increased construction commuter and truck traffic.

- Evaluating transportation impacts as part of the environmental impact analysis for the project and considering options to avoid, minimize, and/or mitigate such risk in coordination with the BLM.

(b) Methods to minimize impacts on transportation may include, but are not limited to, the following:

- Incorporating site access into the local and regional road network. Incorporation must be done under the supervision of the pertinent local, county, state, and Federal agencies.

- Considering public roadway corridors through a site to maintain proper traffic flows and retain more direct routing for the local population.

- Considering implementing local road improvements, providing multiple site access locations and routes, staggering work schedules, and implementing a ride-sharing or shuttle program to minimize daily commutes of construction workers.

- Implementing traffic control measures to reduce hazards for incoming and outgoing traffic and streamline traffic flow, such as intersection realignment and speed limit reductions; installing traffic lights and/or other signage; and adding acceleration, deceleration, and turn lanes on routes with site entrances.

- Incorporating environmental inspection and monitoring measures into the POD and other relevant plans to monitor and respond to transportation impacts during construction, operations, and decommissioning of a solar energy development, including adaptive management protocols.

**A.4.1.21  Design Features for Hazardous Materials and Waste**

The following design features have been identified to avoid, minimize, and/or mitigate potential hazardous materials and waste impacts from solar energy development identified and discussed in Sections 5.20.1 and 5.20.2 of the Draft and Final Solar PEIS.

BLM_0018465

*A.4.1.21.1  General*

**HMW1-1**   Project developers shall coordinate with the BLM and other Federal, state, and local agencies early in the planning process to assess hazardous material and waste concerns and to minimize potential impacts.

(a)   Assessing hazardous material and waste concerns shall include, but is not limited to, the following:

- Identifying expected waste generation streams at the solar energy site and hazardous waste storage locations for consideration in the environmental analysis evaluating the proposed project.

- Conducting site characterization, construction, operation, and decommissioning activities in compliance with applicable Federal and state laws and regulations, including the Toxic Substances Control Act of 1976, as amended (15 USC 2601, et seq.).  An example of complying with applicable law is reporting any release of toxic substances (leaks, spills, etc.) in excess of the reportable quantity established by 40 CFR Part 117 as required by the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, Section 102b.

- Evaluating impacts related to potential hazardous material and waste as part of the environmental impact analysis for the project and considering options to minimize and/or mitigate impacts in coordination with the BLM.

(b)   Methods to minimize hazardous material and waste related impacts shall include, but are not limited to, the following:

- Developing a Hazardous Materials and Waste Management Plan that addresses the selection, transport, storage, and use of all hazardous materials needed for construction, operations, and decommissioning of the facility for local emergency response and public safety authorities and for the designated BLM land manager.  Furthermore, the plan shall address the characterization, on-site storage, recycling, and disposal of all resulting wastes.[4]  At minimum, the plan will discuss facility identification; comprehensive hazardous materials inventory; Material Safety Data Sheets (MSDSs) for each type of hazardous

---

[4]   It is not anticipated that any solar energy facility would have hazardous chemicals present on-site in such quantities as to require development of a Risk Management Plan as specified in 40 CFR Part 68.

BLM_0018466

material; emergency contacts and mutual aid agreements, if any; site map showing all hazardous materials and waste storage and use locations; copies of spill and emergency response plans, and hazardous materials–related elements of a Decommissioning and Site Reclamation Plan.

- Planning for waste management will address all solid and liquid wastes that may be generated at the site in compliance with the CWA requirements to obtain the project's NPDES or similar permit.

- Considering fire management in developing hazardous materials and waste management measures.

- Identifying and implementing prevention measures, including material substitution of less hazardous alternatives, recycling, and waste minimization.

- Establishing procedures for fuel storage and dispensing that consider health and safety of personnel and methods for safe use (i.e., fire safety, authorized equipment use).

- Ensuring vehicles and equipment are in proper working condition to reduce potential for leaks of motor oil, antifreeze, hydraulic fluid, grease, or other hazardous materials.

- Considering establishing schedules regular removal of wastes (including sanitary wastewater generated in temporary, portable sanitary facilities) for delivery and removal by licensed haulers to appropriate off-site treatment or disposal facilities.

### A.4.1.21.2 Site Characterization, Siting and Design, Construction

**HMW2-1**   Solar facilities shall be characterized, sited and designed, and constructed to minimize hazardous materials and waste management design elements.

(a)   Methods to minimize hazardous material and waste management impacts may include, but are not limited to, the following:

- Indemnifying the United States against any liability arising from the release of any hazardous substance or hazardous waste on the facility or associated with facility activities.

- Providing a copy of any report required or requested by any Federal agency or state government as a result of a reportable

BLM_0018467

release or spill of any toxic substances shall be furnished to the BLM authorized officer concurrent with the filing of the reports to the involved Federal agency or state government.

- Designing and operating systems containing hazardous materials in a manner that limits the potential for their release.

- Establishing measures for construction with compatible materials in safe conditions.

- Establishing dedicated areas with secondary containment for offloading hazardous materials transport vehicles.

- Implementing "just-in-time" ordering procedures designed to limit the amounts of hazardous materials present on the site to quantities minimally necessary to support continued operations. Excess hazardous materials shall receive prompt disposition.

- Surveying project sites for unexploded ordnance, especially if projects are within 20 mi (32 km) of a current DoD installation or formerly utilized defense site.

- Siting refueling areas away from surface water locations and drainages and on paved surfaces; features shall be added to direct any spilled materials to sumps or safe storage areas where they can be subsequently recovered.

- Designating hazardous materials and waste storage areas and facilities. Limiting access to designated areas to authorized personnel only.

### A.4.1.21.3  Operations and Maintenance

**HMW3-1**   Compliance with the terms and conditions for hazardous materials and waste management shall be monitored by the project developer. Consultation with the BLM shall be maintained through the operations and maintenance of the project, employing an adaptive management strategy and modifications, as necessary and approved by the BLM.

(a) Methods for maintaining compliance with the terms and conditions for hazardous materials and waste management during operations and maintenance of the project may include, but are not limited to, the following:

- Installing sensors or other devices to monitor system integrity.

BLM_0018468

- Implementing robust site inspection and repair procedures.

### A.4.1.21.4 Reclamation and Decommissioning

**HMW4-1**   Project developers shall maintain emergency response capabilities throughout the reclamation and decommissioning period as long as hazardous materials and wastes remain on-site.

**HMW4-2**   All design features developed for the construction phase shall be applied to similar activities during the reclamation and decommissioning phases.

### A.4.1.22  Design Features To Ensure Health and Safety

The following design features have been identified to avoid, minimize, and/or mitigate potential health and safety impacts from solar energy development identified and discussed in Sections 5.21.1 and 5.22.2 of the Draft and Final Solar PEIS.

### A.4.1.22.1  General

**HS1-1**   Project developers shall coordinate with the BLM and other Federal, state, and local agencies early in the planning process to identify project health and safety risks and methods to minimize those risks.

(a)  Assessing project health and safety risks shall include, but is not limited to, the following:

- Identifying and establishing Federal and state occupational health and safety standards, such as the Occupational Health and Safety Administration's (OSHA's) Occupational Health and Safety Standards, 29 CFR Parts 1910 and 1926, respectively, for all phases of the project.

- Identifying safety zones or setbacks for solar facilities and associated transmission lines from residences and occupied buildings, roads, ROWs, and other public access areas that are sufficient to prevent accidents resulting from various hazards during all phases of development.

(b)  Methods to minimize project health and safety risks may include, but are not limited to, the following:

- Identifying and accounting for general project injury prevention within the POD and the Health and Safety Plan, such as established PPE requirements, respiratory protection, hearing conservation measures, electrical safety considerations, hazardous materials safety and communication, housekeeping

BLM_0018469

and waste handling, confined space identification, and rescue response and emergency medical support, including on-site first-aid capability.

• Implementing training and awareness measures for workers and the general public to minimize and address standard practices (such as OSHA's) for the safe use of explosives and blasting agents; occupational electric and magnetic field (EMF) exposures; fire safety and evacuation procedures; and safety performance standards (e.g., electrical system standards and lighting protection standards). Consider further training for additional health and safety risks from the solar energy project and its ancillary facilities.

• Establishing measures to document training activities and reporting of serious accidents to appropriate agencies.

• Assessing cancer and noncancer risks to workers and the general public from exposure to facility emission sources that exceed threshold levels.

• Considering implementation of measures to reduce site emissions and the cancer and noncancer from exposure to facility emissions.

• Implementing a reporting structure for accidental release of hazardous substances to the environment where project developers shall document the event, including a root cause analysis, a description of appropriate corrective actions taken, and a characterization of the resulting environmental or health and safety impacts. Documentation of the event shall be provided to the permitting agencies and other Federal and state agencies within 30 days.

• Considering manufacturer requirements, and Federal and state standards, when establishing safety zones or setbacks for solar facilities and associated transmission lines.

• Project developers coordinating with the BLM and appropriate agencies (e.g., the DOE and Transportation Security Administration [TSA]) to address critical infrastructure and key resource vulnerabilities at solar facilities in order to minimize and plan for potential risks from natural events, sabotage, and terrorism.

BLM_0018470

*A.4.1.22.2  Site Characterization, Siting and Design, Construction*

**HS1-1**　　Solar facilities shall be characterized, sited and designed, and constructed to minimize risk to health and safety.

　　(a)　Methods to minimize risk to health and safety may include, but are not limited to, the following:

- Designing electrical systems to meet all applicable safety standards (e.g., National Electrical Code [NEC]) and to comply with the interconnection requirements of the transmission system operator.

- Complying with applicable FAA regulations, including lighting requirements, to avoid or minimize potential safety issues associated with proximity to airports, military bases or training areas, or landing strips.

- Considering temporary fencing and other measures for staging areas, storage yards, and excavations during construction or decommissioning activities to limit public access to health and safety risks.

- Planning for traffic management of site access to ensure that traffic flow would not be unnecessarily affected and that specific issues of concern (e.g., the locations of school bus routes and stops) are identified and addressed.  Planning may include measures such as informational signs and temporary lane configurations.  Planning shall be coordinated with local planning authorities.

- Considering use of alternative dielectric fluids that do not contain sulfur hexafluoride ($SF_6$) to reduce the global warming potential.

- Considering measures to reduce occupational EMF exposures, such as backing electrical generators with iron to block the EMF, shutting down generators when work is being done near them, and otherwise limiting exposure time and proximity while generators are running.

*A.4.1.22.3  Operations and Maintenance*

**HS3-1**　　Compliance with the terms and conditions for health and safety shall be monitored by the project developer.  Consultation with the BLM shall be maintained through operations and maintenance of the project,

BLM_0018471

employing an adaptive management strategy and modifications, as necessary and approved by the BLM.

## A.4.1.23  Design Features for National Scenic and Historic Trails, Suitable Trails, and Study Trails

The following design features have been identified to avoid, minimize, and/or mitigate potential impacts on trails from solar energy development that were identified and discussed in Sections 5.3, 5.12 and 5.15 of the Draft and Final Solar PEIS.

### A.4.1.23.1  General

NSHT1-1    Project developers shall consult with the BLM and the trail administering agency early in the project planning to help determine the proposed project's conformance with trail management prescriptions and other potential trail-related constraints.[5]

(a)  Assessing conformance to trail management prescriptions and other potential trail related constraints shall include, but is not limited to, the following:

• Considering National Trail management corridors established through the land use planning process as exclusion areas (see Section 2.2.2.1 of the Final Solar PEIS) in order to prevent substantial interference with the nature and purposes of designated National Scenic and Historic Trails, and to make efforts to avoid activities incompatible with trail purposes (NTSA Sec. 7(c)).  Where no National Trail management corridor is established in a land use plan, or in adequate protections for suitable trails or trails under study, an accepted National Trail inventory process must be conducted by the applicant, in consultation with the trail administering agency. The inventory process will identify the potential area of adverse impact on the resources, qualities, values, and associated settings, and the primary use or uses of the trails within the viewshed; prevent substantial interference; and determine any areas unsuitable for development.  Residual impacts on trails will be avoided, minimized, and/or mitigated to the extent practicable according to program policy standards.

• Determining the size of the area of possible adverse impact through the results of the required inventory, in consultation with the trail administering agency.  There is no current established

---

[5]    Further guidance will be included in the forthcoming BLM National Trails System manual series and other NLCS-related policy manuals.

BLM_0018472

minimum or maximum limit on the size of the area of possible adverse impact. Other design feature requirements and coordination requirements, such as those for Cultural Resources, Recreation and Visitor Services, Visual Resources, or NLCS must also be met.

• Review adequacy of information from National Scenic or Historic Trail inventory projects underway during the development of the Solar PEIS by the BLM at the field office level in coordination with the trail administering agency, and application of the data to determine the area of possible adverse impact for any anticipated development. Such inventory projects may reveal unanticipated or undocumented remnants, artifacts, trail tread or trace, the location of high potential historic sites and high-potential route segments, trail features, and/or the associated settings for National Scenic or Historic Trails adjacent to or within SEZ.

• Applying on-site or off-site mitigation for any residual adverse impact according to program policy standards, and mitigation or impact reduction measures identified for related program areas in this document.

## A.4.2  SEZ-Specific Design Features

The SEZ-specific design features identified in the Final Solar PEIS are listed in Table A-5.

REFERENCES FOR APPENDIX A

BLM (Bureau of Land Management), 2005, *Land Use Planning Handbook*, H-1601-1, U.S. Department of the Interior, Washington, D.C., March.

BLM and DOE (Bureau of Land Management and U.S. Department of Energy), 2010, *Draft Programmatic Environmental Impact Statement for Solar Energy Development in Six Southwestern States*, DES 10-59, DOE/EIS-0403, Dec.

BLM and DOE, 2011, *Supplement to the Draft Programmatic Environmental Impact Statement for Solar Energy Development in Six Southwestern States*, DES 11-49, DOE/EIS-0403D-S, Oct.

USFWS (U.S. Fish and Wildlife Service), 2009, *Desert Tortoise (Mojave Population) Field Manual (*Gopherus agassizii*)*, Region 8, Sacramento, CA.

BLM_0018473

**TABLE A-5  Solar Energy Zone-Specific Design Features**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| **Arizona** | |
| Brenda | *Water Resources*:  Groundwater analyses suggest that full build-out of wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet-cooled projects should utilize water conservation practices. |
| | *Acoustic Environment*:  Because of the proximity of the proposed Brenda SEZ to nearby residences and the Plomosa SRMA and the relatively high noise levels around the SEZ due to U.S. 60, refined modeling would be warranted along with background noise measurements during project-specific assessments. |
| Gillespie | *Lands and Realty*:  Priority consideration should be given to utilizing the existing Agua Caliente Road to provide construction and operations access to the SEZ.  Any potential impacts on the existing country road should be discussed with the county. |
| | *Recreation*.  Because of the potential for solar energy to sever current access routes departing the county road within the SEZ, legal access to the areas to the south should be maintained consistent with existing land use plans. |
| | *Water Resources*:  Groundwater analyses suggest that full build-out of wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet-cooled projects should utilize water conservation practices. |
| | *Wildlife (Mammals)*:  The fencing around the solar energy development should not block the free movement of mammals, particularly big game species. |
| | *Visual Resources*:  Due to potential visual impacts on two Wilderness Areas, visual impact mitigation should be considered for any solar development within the SEZ.  (Note:  Section 8.3.14.3 of the Final Solar PEIS incorrectly includes an SEZ-specific design feature stating that development of power tower facilities should be prohibited within the SEZ.  This error will be corrected through the ROD for the Final Solar PEIS.) |
| | *Cultural Resources*:  Recordation of historic structures through Historic American Building Survey/Historic American Engineering Record protocols through the National Park Service would be appropriate and could be required if any historic structures or features would be affected; for example, if the Gillespie Dam Highway Bridge were used as part of an off-site access route for a solar energy project. |

BLM_0018474

**TABLE A-5  (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
| --- | --- |
| **California**<br>Imperial East | *Specially Designated Areas and Lands with Wilderness Characteristics:*  Because of the potential increase in human use of the two adjacent ACECs, once solar energy facility construction begins, monitoring of the resources of the ACECs will be used to determine whether additional protection measures are needed to protect existing prehistoric resources.<br><br>*Military and Civilian Aviation*:  If power tower facilities are proposed for the SEZ, coordination across the international border should be required to ensure that there is no airspace management concern associated with the Mexicali Airport.<br><br>*Minerals*:  To protect the potential for geothermal leasing under solar energy facilities, ROW authorizations for solar energy facilities should be made subject to future geothermal leasing with no surface occupancy stipulations.<br><br>*Water Resources*:  Groundwater analyses suggest that full build-out of wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet-cooled projects should utilize water conservation practices.<br><br>*Wildlife (Amphibians and Reptiles)*:  The potential for indirect impacts on several amphibian species could be reduced by maximizing the distance between solar energy development and the All American Canal.<br><br>*Wildlife (Amphibians and Birds)*:  Wetland habitats along the southern boundary of the SEZ boundary shall be avoided to the extent practicable.  The wetlands along the southern boundary of the SEZ have been designated as undevelopable, but other wetland areas may exist within the SEZ.<br><br>*Wildlife (Mammals):*  Solar project development shall not prevent mule deer free access to the unlined section of the All American Canal.<br><br>*Special Status Species*:  Occupied habitats for species that are designated as California fully protected species should be completely avoided.  Under California Fish and Game Code Sections 3511, 4700, 5050, and 5515, take or possession of these species is prohibited at any time.  Minimization and mitigation measures cannot be developed for California fully protected species.  This policy applies to the following California fully protected species that may occur in the affected area of the Imperial East SEZ:  California black rail and Yuma clapper rail. |

BLM_0018475

**TABLE A-5  (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| *California (Cont.)* | |
| Imperial East *(Cont.)* | *Acoustic Environment*:  Because of the proximity of the proposed Imperial East SEZ to nearby residences and the East Mesa ACEC, and relatively high noise levels around the SEZ due to I-8 and State Route 98, refined modeling, along with background noise measurements, should be conducted in conjunction with project-specific analyses. |
| | *Cultural Resources*:  Consultation efforts should include discussions on significant archaeological sites and traditional cultural properties and on sacred sites and trails with views of the proposed SEZ.  The possibility for discovering human burials in the vicinity of the proposed Imperial East SEZ, and its location along the Yuma-San Diego Trail interconnecting a sacred landscape and its associated sites should be discussed.  Tribal participation in the Section 106 process will take place according to the Solar Programmatic Agreement (PA), including opportunities for tribal input regarding inventory design and treatment decisions and procedures for inadvertent discoveries during construction and operations. |
| Riverside East | *Specially Designated Areas and Lands with Wilderness Characteristics:*  Once construction of solar energy facilities begins, the BLM would monitor whether there are increases in human traffic to the seven ACECs in and near the SEZ and determine whether additional design features are required to protect the resources in these areas. |
| | *Recreation:*  A buffer area should be established between the Midland Long Term Visitor Area (LTVA) and solar development to preserve the setting of the LTVA.  The size of the buffer should be determined based on the site and visitor-specific criteria. |
| | *Water Resources:*  Groundwater analyses suggest that full build-out of wet-cooled or dry-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet- or dry-cooled projects should utilize water conservation practices. |
| | During site characterization, coordination and permitting with CDFG regarding California's Lake and Streambed Alteration Program would be required for any proposed alterations to surface water features. |
| | The use of groundwater in the Chuckwalla Valley and Palo Verde Mesa should be planned for and monitored in cooperation with the BOR and the USGS in reference to the Colorado River Accounting Surface and the rules set forth in the Law of the River. |

BLM_0018476

**TABLE A-5  (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
| --- | --- |
| **California (Cont.)** | |
| Riverside East *(Cont.)* | *Wildlife (Mammals)*:  The fencing around the solar energy development should not block the free passage of mule deer between the Colorado River and mountains or foothills. |
| | *Wildlife and Special Status Species*:  Within the SEZ, two north–south wildlife corridors of sufficient width (a minimum width of 1.3 mi ([2 km], but wider if determined to be necessary through future site-specific studies) should be identified by the BLM in coordination with the FWS and the California Department of Game and Fish.  These corridors should be identified as non-development areas within the SEZ on the basis of modeling data and subsequent field verification of permeability for wildlife. |
| | *Visual Resources*:  Special visual impact mitigation shall be considered for solar development on lands in the SEZ within areas west of Township 005S and Range 017E and north of Township 006S and Range 016E, as well as north of Sections 26, 27, 28, and 29 of Township 005S and Range 017E. |
| | *Cultural Resources*:  Consultation efforts should include discussions on significant archaeological sites and traditional cultural properties and on sacred sites and trails with views of the proposed SEZ, such as the Salt Song, Cocomaricopa, and *Xam Kwatchan* Trails, which connect spiritual landscapes and sacred sites in the area.  The possibility of discovering human burials in the vicinity of the proposed Riverside East SEZ should also be discussed. |
| | Significant resources clustered in specific areas, such as those surrounding Ford Dry Lake or within the DTC/C-AMA area, which retain sufficient integrity, should be avoided unless impacts can be sufficiently minimized or mitigated. |
| | Monitoring is recommended in sand sheet and colluvium environments similar to those in which buried sites were recently discovered during construction of the Genesis Solar development. |
| | Because the proposed Riverside East SEZ is located adjacent to or near six ACECs, it is possible that the ACECs could be subject to an increase in human and vehicle traffic.  Potential construction vehicle corridors should be discussed prior to development of the proposed SEZ in order avoid possible impacts on historic resources within these ACECs and to determine alternative roads or paths to the development area. |

BLM_0018477

**TABLE A-5  (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| **Colorado**<br>Antonito Southeast | *Lands and Realty:*  Management of the 1,240-acre (5.0-km$^2$) area of public land west of the proposed SEZ boundary should be addressed as part of the site-specific analysis of any future solar development within the SEZ.<br><br>*Specially Designated Areas and Lands with Wilderness Characteristics:*  The SEZ-specific design features for visual resources for this SEZ should be adopted, as they would provide some protection for visual related impacts on the Old Spanish Trail, the CTSR, and the San Antonio WSA.<br><br>Early consultation should be initiated with the entity responsible for developing the management plan for the Sangre de Cristo NHA to understand how development of the SEZ could be consistent with NHA plans/goals.<br><br>*Recreation:*  As projects are proposed for the SEZ, the potential impacts on tourism should be considered and reviewed with local community leaders.<br><br>*Water Resources:*  Groundwater analyses suggest full build-out of wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet-cooled projects would have to reduce water requirements to less than approximately 1,000 ac-ft/yr (1.2 million m$^3$/yr) in order to secure water rights and comply with water management in the San Luis Valley.<br><br>*Wildlife (Birds):*  If present, prairie dog colonies (which could provide habitat or a food source for some raptor species) should be avoided to the extent practicable.<br><br>*Wildlife (Mammals):*  Construction should be curtailed during winter when big game species are present, particularly within elk severe winter range.<br><br>Disturbance near the elk and mule deer resident population areas should be avoided. |

**TABLE A-5  (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| **Colorado (Cont.)** Antonito Southeast *(Cont.)* | Where big game winter ranges intersect or are within close proximity to the SEZ, use of motorized vehicles and other human disturbances should be controlled (e.g., through road closures). |
| | Development in the 253-acre (1-km$^2$) portion of the SEZ that overlaps the pronghorn summer concentration area should be avoided. |
| | *Visual Resources*:  The development of power tower facilities should be prohibited within the SEZ. |
| | Special visual impact mitigation shall be considered for solar development on lands in the SEZ visible from and within 3 mi (5 km) of the centerline of the West Fork of the North Branch of the Old Spanish Trail. |
| | Special visual impact mitigation shall be considered for solar development on lands in the SEZ visible from and within 3 mi (5 km) of the CTSR ACEC and San Antonio WSA. |
| | *Paleontological Resources*:  Avoidance of PFYC Class 4 or 5 areas is recommended for development within the proposed Antonito Southeast SEZ (i.e., the 4-acre [0.016-km$^2$] parcel in the north part of the SEZ).  Where avoidance of Class 4 or 5 deposits is not possible, a paleontological survey or monitoring would be required by the BLM. |
| | *Cultural Resources*:  Development of a Memorandum of Agreement (MOA) may be needed among the BLM, Colorado SHPO, and other parties, such as the Advisory Council on Historic Preservation (ACHP) to address the adverse effects of solar energy development on historic properties.  The agreement may specify avoidance, minimization, or mitigation measures.  Should a MOA be developed to solve adverse effects on the Old Spanish Trail or the West Fork of the North Branch of the Old Spanish Trail, the Trail Administration for the Old Spanish Trail (BLM-NMSO and National Park Service [NPS] Intermountain Trails Office, Santa Fe) should be included in the development of that MOA. |
| | Additional coordination with the CTSR Commission is recommended to address possible mitigation measures for reducing visual impacts on the railroad. |
| De Tilla Gulch | *Recreation*:  As projects are proposed for the SEZ, the potential impacts on tourism should be considered and reviewed with local community leaders. |

BLM_0018479

**TABLE A-5  (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| *Colorado (Cont.)*<br>De Tilla Gulch *(Cont.)* | *Water Resources*:  Application of the design features regarding intermittent/ephemeral water bodies and storm water management should emphasize the need to maintain groundwater recharge for disturbed surface water features within the De Tilla Gulch SEZ.<br><br>*Wildlife (Birds)*:  Prairie dog colonies (which could provide habitat or food resources for some bird species) should be avoided to the extent practicable.<br><br>*Wildlife (Mammals)*:  The extent of habitat disturbance should be minimized within elk severe winter range and pronghorn winter concentration area.<br><br>Construction should be curtailed during winter when big game species are present.<br><br>Where big game winter ranges intersect or are within close proximity to the SEZ, motorized vehicles and other human disturbances should be controlled (e.g., through road closures).<br><br>*Visual Resources*:  The development of power tower facilities should be prohibited within the SEZ.<br><br>*Cultural Resources*:  Development of a Memorandum of Agreement (MOA) may be needed among the BLM, Colorado SHPO, and other parties, such as the Advisory Council on Historic Preservation (ACHP) to address the adverse effects of solar energy development on historic properties.  The agreement may specify avoidance, minimization, or mitigation measures.  Should a MOA be developed to resolve adverse effects on the Old Spanish Trail or the West Fork of the North Branch of the Old Spanish Trail, the Trail Administration for the Old Spanish Trail (BLM-NMSO and National Park Service [NPS] Intermountain Trails Office, Santa Fe) should be included in the development of that MOA |
| Fourmile East | *Specially Designated Areas and Lands with Wilderness Characteristics:*  As part of project-specific analysis, early consultation should be initiated with the entity responsible for developing the management plan for the Sangre de Cristo NHA to understand how development could be consistent with goals of the NHA. |

**TABLE A-5  (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| **Colorado (Cont.)** | *Recreation:*  As projects are proposed for the SEZ, the potential impacts on tourism should be considered and reviewed with local community leaders. |
| | *Soil Resources:*  The need for a study of the eolian processes that maintain the sand dune fields in Great Sand Dunes National Park should be determined.  The study would support the assessment of whether building a solar facility close to the park could have impacts on the sand dunes there (by disrupting these processes). |
| | *Water Resources*:  Groundwater analyses suggest full build-out of wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet-cooled projects would have to reduce water requirements to less than approximately 1,000 ac-ft/yr (1.2 million $m^3$/yr) in order to secure water rights and comply with water management in the San Luis Valley. |
| | *Wildlife (Birds and Mammals)*:  If present, prairie dog colonies (which could provide habitat or a food source for some raptor species) should be avoided to the extent practicable.  This would also reduce impacts on species such as the desert cottontail and thirteen-lined ground squirrel. |
| | To the extent practicable, construction activities should be avoided while pronghorn are on their winter range within the immediate area of the proposed Fourmile East SEZ. |
| | *Visual Resources*:  The development of power tower facilities should be prohibited within the SEZ. |
| | Special visual impact mitigation shall be considered for solar development on lands in the SEZ visible from and within 5 mi (8 km) of the Sangre de Cristo WA and of the centerline of the high-potential segment of the Old Spanish National Historic Trail. |

BLM_0018481

**TABLE A-5  (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| **Colorado (Cont.)** | |
| Fourmile East *(Cont.)* | *Paleontological Resources*:  The depth to the Alamosa Formation within the proposed Fourmile East SEZ should be determined to identify any design features that might be needed in that area if solar energy development occurs. |
| | *Cultural*:  Development of an MOA may be needed among the BLM, Colorado SHPO, and other parties, such as the ACHP, to address the adverse effects of solar energy development on historic properties.  The agreement may specify avoidance, minimization, or mitigation measures.  Should an MOA be developed to resolve adverse effects on the Old Spanish National Historic Trail, the Trail Administration for the Old Spanish Trail (BLM-NMSO and National Park Service [NPS] Intermountain Trails Office, Santa Fe) should be included in the development of that MOA. |
| | The possibility of encountering Native American human remains in the vicinity of the proposed Fourmile East SEZ should be discussed during consultation. |
| Los Mogotes East | *Specially Designated Areas*:  Early consultation should be initiated with the entity responsible for developing the management plan for the Sangre de Cristo NHA to understand how development of the SEZ could be consistent with NHA plans and goals. |
| | *Recreation*:  As projects are proposed for the SEZ, the potential impacts on tourism should be considered and reviewed with local community leaders. |
| | *Water Resources*:  Groundwater analyses suggest full build-out of wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet-cooled projects would have to reduce water requirements to less than approximately 1,000 ac-ft/yr (1.2 million $m^3$/yr) in order to secure water rights and comply with water management in the San Luis Valley. |

BLM_0018482

**TABLE A-5  (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| **Colorado (Cont.)**<br>Los Mogotes East<br>*(Cont.)* | *Wildlife (Amphibians, Reptiles, Birds)*:  The access road should be sited and constructed to minimize impacts on wetlands and riparian areas (if present within the finalized access road location).<br><br>*Wildlife (Birds and Mammals)*:  Prairie dog colonies should be avoided to the extent practicable to reduce impacts on species such as raptors, desert cottontail and thirteen-lined ground squirrel.<br><br>*Wildlife (Mammals)*:  Construction should be curtailed during winter when big game species are present.<br><br>Where big game winter ranges intersect or are close to the SEZ, motorized vehicles and other human disturbances should be controlled (e.g., through temporary road closures when big game are present).<br><br>*Visual Resources*:  The development of power tower facilities should be prohibited within the SEZ.<br><br>*Paleontological Resources*:  Avoidance of PFYC Class 4/5 areas is recommended for development within the proposed Los Mogotes East SEZ and for access road placement.  Where avoidance of Class 4/5 deposits is not possible, a paleontological survey would be required.<br><br>*Cultural Resources*:  Development of a Memorandum of Agreement (MOA) may be needed among the BLM, Colorado SHPO, and other parties, such as the Advisory Council on Historic Preservation (ACHP) to address the adverse effects of solar energy development on historic properties.  The agreement may specify avoidance, minimization, or mitigation measures.  Should a MOA be developed to resolve adverse effects on the Old Spanish Trail or the West Fork of the North Branch of the Old Spanish Trail, the Trail Administration for the Old Spanish Trail (BLM-NMSO and National Park Service [NPS] Intermountain Trails Office, Santa Fe) should be included in the development of that MOA.<br><br>Additional coordination with the CTSR Commission is recommended to address possible mitigation measures for reducing visual impacts on the CTSR. |

BLM_0018483

**TABLE A-5  (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| **Nevada** | |
| Amarosa Valley | *Specially Designated Areas and Lands with Wilderness Characteristics:*  Water use for any solar energy development should be reviewed to ensure that impacts on Death Valley NP, the Ash Meadows National Wildlife Refuge, and ACECs would be neutral or positive. |
| | *Recreation:*  Relocation of the designated route used for desert racing and commercial tours should be considered at the time specific solar development proposals are analyzed. |
| | *Water Resources:*  Groundwater analyses suggest that full build-out of wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet- and dry-cooled projects should utilize water conservation practices. |
| Dry Lake | *Water Resources:*  Groundwater analyses suggest that full build-out of dry-cooled and wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed dry- or wet-cooled projects should utilize water conservation practices. |
| | *Wildlife (Mammals):*  The fencing around the solar energy development should not block the free movement of mammals, particularly big game species. |
| | *Cultural Resources:*  Coordination with the Trail Administration for the Old Spanish Trail and Old Spanish Trail Association is recommended for identifying potential mitigation strategies for avoiding or minimizing potential impacts on the congressionally designated Old Spanish National Historic Trail and also on any remnants of the NRHP-listed sites associated with the Old Spanish Trail/Mormon Road that may be located within the SEZ.  Avoidance of the Old Spanish Trail NRHP-listed site within the southeastern portion of the proposed SEZ is recommended. |
| | *Native American Concerns:*  The Moapa Band of Paiute Indians have specifically requested formal government-to-government contact when construction or land management projects are being proposed on and/or near the Muddy River, the Virgin River, the Colorado River, the Arrow Canyon Range, Potato Woman, and the Apex Pleistocene Lake. |
| | Compensatory programs of mitigation could be implemented to provide access to and/or deliberately cultivate patches of culturally significant plants, like the mesquite groves present within the Dry Lake SEZ, on other public lands nearby where tribes have ready access. |

BLM_0018484

**TABLE A-5  (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| ***Nevada (Cont.)***<br>Dry Lake *(Cont.)* | The BLM should consider assisting the Moapa Band of Paiute Indians with the preparation of forms to nominate identified sacred places as Traditional Cultural Properties, if it is found that all the proper eligibility requirements are met. |
| Dry Lake Valley North | *Lands and Realty:*  Priority consideration should be given to utilizing existing County roads to provide construction and operations access to the SEZ.  Any potential impacts on existing County roads would be discussed with the County.<br><br>*Rangeland Resources (Livestock Grazing):*  Within the Ely Springs cattle allotment, solar development should be sited to minimize the number of pastures affected, and existing range improvements should be relocated in coordination with the grazing permittee.<br><br>*Rangeland Resources (Horses and Burros):*  Installation of fencing and access control, provision for movement corridors, delineation of open range, traffic management (e.g., vehicle speeds), compensatory habitat restoration, and access to or development of water sources should be coordinated with the BLM.<br><br>*Recreation:*  Because of the 11-mi (18-km) length of the SEZ and the potential for solar development to sever current east–west travel routes, legal vehicular access through the area should be maintained.<br><br>*Water Resources:*  Groundwater analyses suggest that full build-out of dry-cooled and wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed dry- or wet-cooled projects should utilize water conservation practices.<br><br>*Wildlife (Mammals):*  The fencing around the solar energy development should not block the free movement of mammals, particularly big game species.<br><br>*Cultural Resources:*  The existing access road that connects the proposed SEZ to U.S. 93 should be upgraded instead of constructing a new access road to reduce ground disturbances and the potential for impacts on cultural resources. |

BLM_0018485

**TABLE A-5 (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| **Nevada (Cont.)** | |
| Gold Point | *Water Resources*:  Groundwater analyses suggest that full build-out of wet- and dry-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet- and dry-cooled projects should utilize water conservation practices. |
| | *Wildlife (Amphibians and Reptiles, Birds, and Mammals)*:  Wash and playa habitats should be avoided.  The major wash (significant unnamed intermittent stream) in the SEZ has been identified as a non-development area, but other avoidable washes may exist within the SEZ. |
| | *Wildlife (Mammals)*:  The fencing around the solar energy development should not block the free movement of mammals, particularly big game species. |
| | *Acoustic Environment*:  Because of the differences in elevation between the proposed Gold Point SEZ and nearby residences to the south, refined modeling will be warranted along with background noise measurements as a part of project-specific analyses. |
| Millers | *Recreation*:  Alternative routes for the Las Vegas–Reno race should be considered consistent with local land use plan requirements. |
| | *Water Resources*:  Groundwater analyses suggest that full build-out of wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet-cooled projects should utilize water conservation practices. |
| | *Wildlife (All)*:  Wash and playa habitats should be avoided.  The Ione Wash and a small wetland area in the SEZ have been identified as non-development areas, but other avoidable wash and playa habitats may exist within the SEZ. |
| | *Wildlife (Mammals)*:  The fencing around the solar energy development should not block the free movement of mammals, particularly big game species. |

BLM_0018486

**TABLE A-5 (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| ***Nevada (Cont.)***<br>Millers *(Cont.)* | *Cultural Resources:* Areas with a high potential for containing significant cultural resources or with a high density of cultural resources should be avoided. However, because of the high likelihood that the area contains prehistoric sites associated with Lake Tonopah and the presence of historic period sites related to the development of the Millers town site, complete avoidance of NRHP-eligible sites may not be possible. In particular, it may not be possible to fully mitigate the loss of such a large number of sites associated with one Pleistocene lake system. |
| ***New Mexico***<br>Afton | *Specially Designated Areas and Lands with Wilderness Characteristics:* The SEZ-specific design features for visual resources should be adopted, as they would provide some protection for visual-related impacts on the Aden Lava Flow WSA.<br><br>*Water Resources:* Groundwater analyses suggest that full build-out of dry-cooled and wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed dry- or wet-cooled projects should utilize water conservation practices.<br><br>*Wildlife (Amphibians and Reptiles, Birds, and Mammals):* Impacts on wash, riparian, playa, rock outcrop, and wetland habitats, which may provide more unique habitats for some species, should be avoided, minimized, or mitigated.<br><br>*Visual Resources:* Special visual impact mitigation should be considered for solar development on lands in the SEZ visible from and within 5 mi (8 km) of the Aden Lava Flow WSA.<br><br>*Paleontological Resources:* Avoidance of the eastern edge of the SEZ may be warranted if a paleontological survey results in findings similar to those known south of the SEZ.<br><br>*Cultural Resources:* Design features for reducing visual impacts on the El Camino Real National Historic Trail, the Butterfield Trail, and Mesilla Plaza National Historic Landmark would also reduce impacts on these cultural resources. Coordination with trails associations and historical societies regarding impacts on El Camino Real de Tierra Adentro, the Butterfield Trail, and Mesilla Plaza, as well as other NRHP-listed properties should be conducted. |

BLM_0018402

**TABLE A-5 (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
|---|---|
| **Utah** | |
| Escalante Valley | *Lands and Realty*:  Priority consideration should be given to utilizing existing county roads to provide construction and operational access to the SEZ. |
| | *Water Resources*:  Groundwater analyses suggest that full build-out of wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet-cooled projects should utilize water conservation practices. |
| | During site characterization, coordination and permitting with the Utah DWR regarding Utah's Stream Alteration Program would be required for any proposed alterations to surface water features. |
| | *Wildlife (All)*:  Ephemeral washes shall be avoided. |
| | *Wildlife (Birds)*:  The steps outlined in the *Utah Field Office Guidelines for Raptor Protection from Human and Land Use Disturbances* should be followed. |
| | *Cultural Resources*:  Avoidance of significant resources clustered in specific areas, such as those in the vicinity of the dunes, is recommended. |
| Milford Flats South | *Lands and Realty*:  Priority consideration shall be given to utilizing existing county roads to provide construction and operational access to the SEZ. |
| | *Water Resources*:  Groundwater analyses suggest that full build-out of wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet-cooled projects should utilize water conservation practices. |
| | During site characterization, coordination and permitting with Utah DWR regarding Utah's Stream Alteration Program would be required for any proposed alterations to surface water features. |
| | *Wildlife (Birds)*:  The steps outlined in the *Utah Field Office Guidelines for Raptor Protection from Human and Land Use Disturbances* should be followed. |

**TABLE A-5  (Cont.)**

| SEZ | SEZ-Specific Design Features[a] |
| --- | --- |
| **Utah (Cont.)**<br>Wah Wah Valley | *Lands and Realty:*  Development may need to be restricted in the northern portion of the SEZ near the ranch development on private land to provide a buffer between private land developments and solar energy facility development.<br><br>*Water Resources:*  Groundwater analyses suggest that full build-out of wet-cooled technologies is not feasible; for mixed-technology development scenarios, any proposed wet-cooled projects should utilize water conservation practices.<br><br>During site characterization, coordination and permitting with Utah DWR regarding Utah's Stream Alteration Program would be required for any proposed alterations to surface water features.<br><br>*Wildlife (Birds)*:  The steps outlined in the *Utah Field Office Guidelines for Raptor Protection from Human and Land Use Disturbances* should be followed.<br><br>*Wildlife (Mammals)*:  The inter-mountain basins big sagebrush shrubland cover type in the southeastern portion of the SEZ, which is the only identified suitable land cover for the elk and sagebrush vole and about a third of the suitable habitat for the American black bear in the SEZ, should be avoided.<br><br>*Native American Concerns:*  Compensatory programs of mitigation could be implemented to provide access to and/or deliberately cultivate patches of culturally significant plants, like the Indian ricegrass fields present within the Wah Wah Valley SEZ, on other public lands nearby where tribes have ready access. |

**Footnotes on next page.**

**TABLE A-5  (Cont.)**

Abbreviations:  ACEC = Area of Critical Environmental Concern; ACHP = Advisory Council on Historic Places; ADWR = Arizona Department of Water Resources; AUM = animal unit month; AZGFD = Arizona Game and Fish Department; BLM = Bureau of Land Management; BMP = best management practice; CDFG = California Department of Fish and Game; CDOW = Colorado Division of Wildlife; CESA = California Endangered Species Act; CTSR = Cumbres & Toltec Scenic Railroad; DOE = Department of Energy; DWMA = Desert Wildlife Management Area; EPA = U.S. Environmental Protection Agency; ESA = Endangered Species Act; KSLA = known sodium leasing area; LTVA—long-term visitor area; NDOW = Nevada Department of Wildlife; NDWR = Nevada Division of Water Resources; NHA = National Heritage Area; NMDGF = New Mexico Department of Game and Fish; NMOSE = New Mexico Office of the State Engineer; NP = National Park; NRHP = *National Register of Historic Places*; PA = Programmatic Agreement; PEIS = programmatic environmental impact statement; PYFC = potential fossil yield classification; ROW = right-of-way; SEZ = solar energy zone; SHPO = State Historic Preservation Office; SNWA = Southern Nevada Water Authority; SRMA = Special Recreation Management Area; USFWS = U.S. Fish and Wildlife Service; VRM = visual resource management; WA = Wilderness Area; WRM = water resource management; WSA = Wilderness Study Area.

[a]   The SEZ-specific design features listed in this table are proposed as an element of BLM's Solar Development Program.  With the signing of the ROD for the Final PEIS, the design features will be required for utility-scale solar energy projects within the applicable SEZs.

[b]   The scientific names of all plants, wildlife, aquatic biota, and special status species are provided in Chapters 8 through 13.

BLM_0018490

## APPENDIX B—SOLAR ENERGY PROGRAM POLICIES

### B.1  INTRODUCTION

The following policies and procedures have been developed in support of the land use allocations decisions being made in this ROD (see Appendix A). Appendix B of the ROD describes updated and revised BLM policies and procedures relating to solar energy development on public lands. These policies and procedures provide internal administrative guidance to the BLM regarding the processing of right-of-way (ROW) applications for utility-scale solar energy projects.

#### B.1.1  New Applications

The BLM defines "new" applications as any applications filed within proposed SEZs after June 30, 2009, and any applications filed within proposed variance and/or exclusion areas after the publication of the Supplement to the Draft Solar PEIS (October 28, 2011). All new applications will be subject to the program elements adopted by the Solar PEIS ROD.

New solar energy ROW applications for lands inside SEZs will be subject to the decisions adopted by this ROD. The BLM may proceed with pre-application meetings as provided for in the regulations at 43 CFR 2804.10(a), as well as public outreach on new applications in SEZs to assist in developing future competitive lease parcels. The BLM may also consider new applications in SEZs as nominations under the competitive leasing process that the BLM is currently considering through rulemaking. The BLM's Advance Notice of Proposed Rulemaking was published on December 29, 2011 (Volume 76, page 81,906 of the *Federal Register*). New applications in variance areas will be subject to the variance process described in Appendix B, Section B.5, of this ROD.

#### B.1.2  Pending Applications

The BLM defines "pending" applications as any applications (regardless of place in line) filed within variance and/or exclusion areas before the publication of the Supplement to the Draft Solar PEIS (October 28, 2011), and any applications filed within SEZs before June 30, 2009. Pending applications are not subject to any of the decisions adopted by this ROD. A current list of first-in-line pending applications is maintained by the BLM on the Solar PEIS project Web page at http://solareis.anl.gov. Although the BLM may process qualified second-in-line and subsequent applications through competitive bid procedures, or if the first-in-line application is closed, these additional applications will not be included on the Web page to avoid double counting of acres and megawatts.

The BLM will process pending solar applications consistent with existing land use plan decisions in place prior to amendment by this ROD. When processing these applications, the BLM will consider its current policies and procedures (e.g., IM 2011-060 [BLM 2011a] and IM 2011-061 [BLM 2011b]), including interagency coordination with DOI agencies, or other applicable policies and procedures that the BLM might adopt in the future. These applications will be treated as project-specific undertakings under Section 106 of the NHPA and the BLM's National Programmatic Agreement. Amendments to pending applications would also not be subject to the

BLM_0018491

decisions adopted by this ROD, provided that such amendments either (1) do not change the boundaries of the pending ROW applications; or (2) are related to avoiding resource or land use conflicts, adapting the project to third-party-owned infrastructure constraints, or using or designating translocation or mitigation lands.

The BLM has determined that, in appropriate circumstances, it can rely on the broad discretion it has under FLPMA to deny ROW applications prior to completing the NEPA process if such applications do not meet due diligence requirements and/or environmental criteria. Such decisions must be made with regard for the public interest and be supported by reasoned analysis and an adequate administrative record. Decisions to deny applications must be assessed on a case-by-case basis. The BLM's denial of an application is generally subject to administrative appeal to the Interior Board of Land Appeals (IBLA).

### B.1.3  Approved Projects

This ROD recognizes all approved solar energy projects on BLM-administered lands. The ROD does not affect the status of any of these approved projects.

### B.2  GENERAL AUTHORIZATION POLICIES FOR SOLAR ENERGY DEVELOPMENT ROWs

The following authorization policies are applicable to all solar energy ROWs on BLM-administered lands. Note that the BLM is currently undertaking rulemaking to consider establishing a competitive process for offering public lands for solar as well as wind energy development within designated leasing areas (i.e., SEZs). Once the rulemaking has been completed, the rule may supersede some of the authorization policies identified in this ROD.

- *ROW Authorizations.* Applications for utility-scale solar energy facilities will be authorized as ROWs under Title V of FLPMA and 43 CFR Part 2800. Applications submitted to the BLM for utility-scale solar energy development will use Form SF-299, Application for Transportation and Utility Systems and Facilities on Federal Land (available at https://www.blm.gov/FormsCentral/show-form.do?nodeId=1011), consistent with the requirements of 43 CFR Part 2804.

  The Secretary of the Interior, with respect to public lands, is authorized to grant, issue, or renew ROWs over, upon, under, or through such lands for systems for generation, transmission, and distribution of electric energy (43 USC 1761(a)(4)). The term "ROW," as defined by FLPMA, includes an easement, lease, permit, or license to occupy, use, or traverse public lands (43 USC 1702(f)). The BLM has prepared a template ROW lease/grant that would be used to authorize utility-scale solar energy development projects (see http://www.blm.gov/wo/st/en/prog/energy/solar_energy.html). Authorizations will include the solar collectors, tower, turbine generator, fossil-fired generator for hybrid systems, thermal storage, access roads, electrical and transmission facilities, and other testing and support facilities.

BLM_0018492

- **Competing Applications.** If the BLM determines that competition exists, the BLM has the regulatory authority to use competitive bid procedures (43 CFR 2804.23). Multiple applications for the same lands can provide an indication of the need to consider a competitive process. The purpose of a competitive process under existing regulations is to determine which application would be processed.

- **Term of ROW.** In accordance with Title V of FLPMA and the BLM's ROW regulations, the term or length of a solar energy ROW authorization is limited to a reasonable term (43 USC 1764(b); 43 CFR 2805.11(b)). The BLM will issue all solar energy ROW authorizations for a term not to exceed 30 years; shorter terms may be justified in some cases. Thirty years provides a reasonable period consistent with the expected needs of a solar energy facility; it also provides for operation periods that are consistent with typical Power Purcahse Agreements. The BLM will also include in each solar energy ROW authorization a specific provision allowing for renewal, consistent with the regulations at 43 CFR 2807.22.

- **Renewal of ROW.** An application for renewal must be submitted at least 120 days prior to the expiration of the existing authorization. The BLM authorized officer will review the application for renewal to ensure the holder is complying with the terms, conditions, and stipulations of the existing authorization instrument and applicable laws and regulations. If renewed, the ROW authorization shall be subject to the regulations existing at the time of renewal and any other terms and conditions the authorized officer deems necessary to protect the public interest.

- **Cost-Recovery Payments.** Applicants must submit a complete an acceptable application and provide a cost-recovery payment before the BLM will initiate processing of a ROW application for utility-scale solar energy development. It is anticipated that most ROW applications for solar energy development will be Category 6, full cost-recovery applications.

- **Valid Existing Rights.** All solar energy ROW authorizations will be issued subject to valid existing rights.

- **Rental Fees.** In accordance with the requirements of Section 504(g) of FLPMA and the provisions of 43 CFR Part 2806, the BLM will require payment of annual rent for use of the public lands for utility-scale solar energy development on the basis of a rental schedule. FLPMA does not provide existing or current authorities for the collection of royalties. The BLM will calculate rents on all solar energy ROW authorizations consistent with the provisions of 43 CFR Part 2806. Some holders or facilities may be exempt from rent pursuant to the Rural Electrification Act of 1936 (REA), as amended (43 CFR 2806.14(d)). Electric facilities that are financed, or are

BLM_0018493

eligible for REA financing, qualify for a rent exemption under the provisions of the Act.

The holder of a solar energy ROW authorization must pay an annual rent in conformance with the regulations (43 CFR 2806.10(a)). Consistent with the current regulations at 43 CFR 2806.50, the BLM has developed a schedule to calculate rental fees for solar energy ROW authorizations. This rental schedule includes a base rent for the acreage of public land included within the solar energy ROW authorization and an additional MW capacity fee based on the total authorized MW capacity for the approved solar energy project on the public land administrated by the BLM. The details of BLM's current rental policy can be found in IM 2010-141, issued June 10, 2010 (BLM 2010) (see Section A.1 of Appendix A of the Draft Solar PEIS).

The BLM may adjust the rental whenever necessary, to reflect changes in fair market value as determined by the application of sound business management principles, and so far as practicable and feasible, in accordance with comparable commercial practices. The rental provisions of the authorization may also be modified consistent with the provisions of any regulatory changes or pursuant to the provisions of new or revised statutory authorities.

- *Due Diligence—Applicant Qualifications.* The ROW regulations (43 CFR 2804.12(a)(5)) require all solar energy applications to include information on the financial and technical capability of the applicant to construct, operate, maintain, and decommission the project. In addition, the BLM will include provisions requiring diligent development in each solar energy ROW authorization. The regulations (43 CFR 2804.26(a)(5)) provide authority to the BLM to deny any application where the applicant cannot demonstrate the technical or financial capability to construct the project or operate the facilities within the ROW.

  The ROW regulations set forth the qualifications that an individual, business, or government entity must possess in order to hold a ROW authorization, including the requirement that the potential grantee be technically and financially able to construct, operate, maintain, and terminate the use of the public lands covered by the authorization (43 CFR 2803.10(b) and 2804.12(a)(5)). In carrying out its obligation to limit ROW authorizations to qualified individuals or entities and to prevent such individuals or entities from holding ROW authorizations merely for the purposes of speculating, controlling, or hindering development on the public lands, the BLM will focus on ensuring that the applicant meets the qualification requirements in the regulations.

  In ensuring that an applicant meets the regulatory requirement to demonstrate its technical and financial capability to construct, operate, maintain, and terminate the proposed solar energy facility (43 CFR 2803.10(b) and

BLM_0018494

43 CFR 2804.12(a)(5)), the BLM will consider a variety of factors, including the following: (1) applicant qualifications can be demonstrated by international or domestic experience with solar or wind energy projects on either Federal or nonfederal lands; (2) the applicant should provide information on the availability of sufficient capitalization to carry out development, including the preliminary study phase of the project and the environmental review and clearance process; and (3) applicants in bankruptcy or with other financial difficulties would generally present financial risk and should be required to provide additional information regarding financial capability. Failure to provide such additional information can be the basis for the BLM authorized officer to deny the application pursuant to the regulations (43 CFR 2804.26(a)(5)). Further evidence of financial and technical capability can include conditional commitments of DOE loan guarantees; confirmed PPAs; engineering, procurement, and construction (EPC) contracts; and supply contracts with credible third-party vendors for the manufacture and/or supply of key components for the solar energy project facilities.

During the assessment of technical and financial capability, the BLM authorized officer should also inform applicants that such requirements are continuous during the application process, and the BLM may periodically seek confirmation of these requirements. The BLM authorized officer should also inform applicants that such technical and financial capability will become a condition of any ROW authorization, and failure to sustain technical and financial capability for the development of an approved project could be grounds for termination of the authorization.

- ***Due Diligence—Plan of Development (POD).*** The BLM requires that a plan of development (POD) be submitted for all solar energy development ROW applications, consistent with the provisions of 43 CFR 2804.25(b). The BLM will not accept a POD that is simply a conceptual plan. The POD must be of sufficient detail to provide the basic information necessary to begin the environmental analysis and review process for a proposed solar or wind energy project on the public lands (technology to be used, proposed location of generation facilities, buildings, infrastructure, etc.). It is critically important that due diligence be demonstrated by the applicant in the timely submittal of an acceptable POD to ensure that the BLM processes those applications that are most likely to result in appropriate renewable energy development on the public lands.

The BLM authorized officer initiates the due diligence process by requesting, in writing, submittal of a sufficiently detailed POD to the BLM for review. The applicant will be requested to provide the POD within 90 days. If the applicant does not respond within 90 days, or if the applicant has responded and the information is not sufficient, the BLM authorized officer will send a second written request with a 60-day response. A final 30-day show cause letter will be provided to the applicant prior to issuing any decision to deny

BLM_0018495

the application for failure to respond pursuant to the regulations (43 CFR 2804.26(a)(6)).

The BLM may also deny an application if the applicant does not provide in a timely manner the processing fees required by 43 CFR 2804.14.

- **Notification to Livestock Grazing Operators.** The BLM will coordinate with any potentially affected grazing permittee/lessee to discuss how a proposed solar energy project may affect grazing operations and to address possible alternatives as well as mitigation and compensation strategies. Upon acceptance of a POD that is likely to adversely affect a current livestock grazing operation, the BLM authorized officer will send a certified letter to the permittee/lessee to serve as the 2-year notification of the BLM's potential decision to cancel the permit/lease, in whole or in part, and devote the public lands to a public purpose that may preclude livestock grazing, as required by 43 CFR 4110.4-2(b). The intent of the 2-year notification is to provide the grazing permittee/lessee time to make any necessary financial, business, or management adjustments should the permit/lease be cancelled (in whole or in part). The letter will also inform the permittee/lessee of its ability to unconditionally waive the 2-year prior notification.

  Upon completion of an environmental assessment (EA) or draft environmental impact statement (EIS) for a solar energy project that may preclude livestock grazing, the BLM authorized officer will issue a separate proposed grazing decision to the grazing permittee/lessee. The proposed grazing decision will (1) state that the effective date of the permit/lease cancellation and issuance of any new permit/lease for any remaining permitted use will be 2 years from the permittee's/lessee's receipt of the certified letter sent by the BLM authorized officer to the permittee/lessee as described in the preceding paragraph; (2) address compensation for range improvements (43 CFR 4110.4-2); and (3) address grazing management changes for the new permit/lease, as well as interim grazing adjustments as appropriate. The BLM will send by certified mail or personal delivery the proposed grazing decision to the affected ROW applicant, grazing permittees/lessees, and any agent and lienholder of record who are affected by the proposed action, terms and conditions, or modifications relating to applications, permits, and agreements. Copies of proposed decisions shall also be sent to the interested public (see 43 CFR 4160.1). The proposed grazing decision will become final unless protested.

- **Performance and Reclamation Bond.** Title V of FLPMA and the ROW regulations authorize the BLM to require a ROW holder to provide a bond to secure the obligations imposed by the ROW authorization (43 USC 1764(i) and 43 CFR 2805.12(g)). The BLM will require a Performance and Reclamation bond for all solar energy projects to ensure compliance with the terms and conditions of the ROW authorization.

BLM_0018496

Acceptable bond instruments include cash; cashier's or certified check; certificate or book entry deposits; negotiable U.S. Treasury securities equal in value to the bond amount; surety bonds from the approved list of sureties (U.S. Treasury Circular 570) (Department of the Treasury 2011) payable to the BLM; irrevocable letters of credit payable to the BLM issued by financial institutions that have the authority to issue letters of credit and whose operations are regulated and examined by a Federal agency; or a policy of insurance that provides the BLM with acceptable rights as a beneficiary and is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction and whose insurance operations are regulated and examined by a Federal or state agency. The BLM will not accept a corporate guarantee as an acceptable form of bond. If a state regulatory authority requires a bond to cover some portion of environmental liabilities, such as hazardous material damages or releases, reclamation, or other requirements for the project, the BLM must be listed as an additional name insured on the bond instrument. This inclusion would suffice to cover the BLM's exposure, should a holder default in any environmental liability listed in the respective state bond. Each bond instrument will be reviewed by the appropriate Regional or Field Solicitor's Office for the DOI prior to its acceptance by the BLM.

The BLM authorized officer will review all bonds on an annual basis to ensure adequacy of the bond amount. The bond will also be reviewed at the time of any ROW assignment, amendment, or renewal. The BLM authorized officer may increase or decrease the bond amount at any time during the term of the ROW authorization, consistent with the regulations (43 CFR 2805.12(g)).

The BLM authorized officer will identify the total amount of the Performance and Reclamation bond in the decision that supports the issuance of the ROW authorization. The BLM will require the holder to post the portion of the bond associated with the activities to be approved by the Notice to Proceed (Form 2800-15; available at https://www.blm.gov/FormsCentral/show-form.do?nodeId=1666) prior to the issuance of that notice. For example, if the Notice to Proceed is limited to an initial phase of development, the bond amount required to be posted before issuance of the Notice to Proceed will be limited to that phase. The bond amount required to be posted would increase with the issuance of a Notice to Proceed for future phases of the project.

The Performance and Reclamation bond will consist of three components for purposes of determining its amount. The first component will address environmental liabilities, including hazardous materials liabilities, such as risks associated with hazardous waste and hazardous substances. This component may also account for herbicide use, petroleum-based fluids, and dust control or soil stabilization materials. If a holder uses herbicides extensively, this component of the bond amount may be significant. The

BLM_0018497

second component will address the decommissioning, removal, and proper disposal, as appropriate, of improvements and facilities. All solar energy projects involve the construction of substantial surface facilities, and the bond amount for this component could be substantial. The third component will address reclamation, revegetation, restoration, and soil stabilization. This component will be determined based on the amount of vegetation retained on-site and the potential for flood events and downstream sedimentation from the site that may result in off-site impacts, including CWA violations or other violations of law. The holder of the ROW authorization can potentially reduce the bond amount for this component by limiting the amount of vegetation removal as part of the project design and limiting the amount of grading required for project construction.

The BLM may also require bond coverage for all expenses tied to cultural resources identification, protection, and mitigation. This may include, but is not limited to, costs associated with ethnographic studies, inventory, testing, geomorphological studies, data recovery, compensatory mitigation programs, curation, monitoring, treatment of damaged sites, and the preparation and submission of reports. Bonding for cultural resource identification, protection, and mitigation is necessary in the event that a ROW holder disturbs a site where such resources are present but discontinues development before taking the necessary steps to complete all analysis, documentation, and proper curation of site contents, and to stabilize or reclaim the cultural and historic properties so that they are returned to a secure condition.

Ultimately, the Performance and Reclamation bond will be a single instrument to cover all potential liabilities. The entire bond amount could be used to address a single risk event, such as a hazardous materials release or groundwater contamination, regardless of the fact that in calculating the total bond amount other risks were also considered. If the bond is used to address a particular risk, the holder would then be required to increase the bond amount to compensate for this use. This approach to establishing a bond is preferable to one allowing holders to maintain separate bonds for each contingency. If separate bonds are held, an underestimation of one type of liability may leave the BLM responsible for making up the difference, because the funds associated with one bond may not be applicable for the purposes of another. Requiring a single, larger bond will ensure that the holders are bonded with a surety that has the capacity to underwrite the entire amount associated with the authorization.

The regulations authorize the BLM to require that applicants submit a Decommissioning and Site Reclamation Plan (DSRP) that defines the reclamation, revegetation, restoration, and soil stabilization requirements for the project area as a component of their POD (43 CFR 2804.25(b)). The DSRP shall require expeditious reclamation of construction areas and the revegetation of disturbed areas to reduce invasive weed infestation and

BLM_0018498

erosion and must be approved by the BLM authorized officer prior to the authorization of the ROW. The approved DSRP will be used as the basis for determining the standard for reclamation, revegetation, restoration, and soil stabilization of the project area and, ultimately, in determining the full bond amount.

The BLM has issued policy guidance for determining bonding requirements for 43 Part CFR 3809 mining operations on the public lands (IM 2009-153 [BLM 2009a]) that provides detailed information about the process for determining the appropriate financial guarantees for intensive land uses on the public lands. This guidance can also be used to assist in calculating the bond amount for utility-scale solar energy development projects on public lands. The guidance requires that mining operators submit a Reclamation Cost Estimate (RCE) to the BLM authorized officer for review to assist in determining the bond amount. Although the ROW regulations do not specifically require that a holder of a ROW submit a RCE to the BLM, the BLM can require a ROW applicant to submit a POD in accordance with 43 CFR 2804.25(b). Because an RCE is key to determining the bond amount, a figure that is set forth in any decision authorizing a solar energy project on the public lands, BLM policy requires all solar energy ROW applicants to submit an RCE as part of the DSRP and the overall POD for a solar energy project. Attachment 1 to IM 2009-153 provides Guidelines for Reviewing RCEs and can be used as a guideline to assist in reviewing RCEs submitted for solar energy projects.

- *Notice to Proceed.* All solar energy ROW authorizations will include a provision that specifies that ground-disturbing activities cannot begin until the BLM authorized officer issues a Notice to Proceed. Each Notice to Proceed will authorize construction or use and occupancy only as therein expressly stated and only for the particular location or use and occupancy therein described (i.e., a construction phase or site location). The holder will not initiate any construction or other surface-disturbing activities on the ROW without such prior written authorization of the BLM authorized officer. The issuance of a BLM Notice to Proceed by the authorized officer could be delayed pending completion of a requirement(s) imposed by another Federal, state, and/or local entity (e.g., permit issuance, mitigation compliance, or biological, opinion issuance).

- *Administrative Appeal.* All final decisions issued by the authorized officer in connection to the authorization of solar energy projects can be appealed under 43 CFR Part 4 and 43 CFR 2801.10. ROW authorizations are issued as full force and effect decisions (43 CFR 2801.10(b)) and will remain effective during any appeal period. Final decisions issued by the Secretary, Deputy Secretary, or Assistant Secretary will not be subject to administrative appeals to the IBLA.

BLM_0018499

- ***Air Navigation Hazards.*** Upon issuance of a ROW authorization that includes meteorological or power towers, or other tall structures that could pose a hazard to air navigation (including DoD training and operations), the BLM, after coordination with the Federal Aviation Administration (FAA) and DoD, will ensure that the locations of such facilities are noted on aerial navigation hazard maps for low-level flight operations that may be undertaken by the BLM and other Federal or state agencies for fire operations, wild horse and burro censuses and gathers, wildlife inventories, facility maintenance, or other activities.

- ***Cadastral Survey Policies.*** Prior to approval of any solar energy ROW application that (1) is within 0.25 mi (0.4 km) of a boundary as described in BLM IM 2011-122 issued May 24, 2011 (BLM 2011a); (2) does not conform to the Public Land Survey System (PLSS); (3) can be located only by protraction diagram; or (4) may potentially affect a body of water, the responsible field office will coordinate with the respective State Office Chief Cadastral Surveyor to ensure adequate Cadastral Survey review of Boundary Evidence. The applicant shall be liable to the BLM for the reasonable cost of such review under the ROW application cost-recovery agreement with the BLM.

  All authorizations for solar energy development on BLM-administered lands will contain the following stipulation:

    Evidence of the PLSS and related Federal property boundaries will be identified and protected prior to commencement of any ground-disturbing activity. This will be accomplished by contacting BLM Cadastral Survey to coordinate data research, evidence examination and evaluation, and locating, referencing or protecting monuments of the PLSS and related land boundary markers from destruction. In the event of obliteration or disturbance of the Federal boundary evidence, the responsible party shall immediately report the incident, in writing, to the authorizing official. The BLM Cadastral Survey will determine how the marker is to be restored. In rehabilitating or replacing the evidence, the responsible party will be instructed to use the services of a Certified Federal Surveyor (CFedS), procurement shall be per qualification-based selection, or reimburse the BLM for costs. All surveying activities will conform to the *Manual of Surveying Instructions* (Manual) (BLM 2009b) and appropriate state laws and regulations. Local surveys will be reviewed by Cadastral Survey before being finalized or filed in the appropriate state or county office. The responsible party shall pay for all survey, investigation, penalties, and administrative costs.

- ***Diligent Development.*** The ROW regulations specify that a ROW authorization conveys to the holder only the rights that the authorization expressly contains (43 CFR 2805.14) and that the holder must comply with all

BLM_0018500

terms and conditions included in the authorization (43 CFR 2805.12). In order to facilitate efficient development of solar energy on the public lands, the BLM will include a requirement in each ROW authorization that the holder begin construction of the initial phase of development within 12 months after issuance of the Notice to Proceed, but no later than 24 months after the effective date of the ROW authorization. Each authorization will also specify that construction must be completed within the timeframes in the approved POD, but no later than 24 months after the start of construction unless the project has been approved for phased development as described below. A Notice to Proceed will be issued for each phase of development.

The BLM will not authorize more than three development phases for any solar energy ROW authorization. If an approved POD provides for phased development, the ROW authorization will include provisions specifying that construction of each phase (following the first) must begin within 3 years of the start of construction of the previous phase.

The BLM authorized officer may suspend or terminate the authorization when the holder fails to comply with the diligent development terms and conditions of the authorization (43 CFR 2807.17). The regulations provide that before suspending or terminating the authorization, the BLM will send the holder a written notice that gives the holder a reasonable opportunity to correct any noncompliance or to start or resume use of the ROW (43 CFR 2807.18). This notice may be satisfied by the BLM sending a Notice of Failure to Ensure Diligent Development.

To address a failure to comply with an authorization's diligent development provisions, the holder must show good cause for any delays in construction, provide the anticipated date of completion of construction, and evidence of progress toward the start or resumption of construction, as well as submitting a written request for extension of the time lines in the approved POD. Good cause may be shown, for example, by delays in equipment delivery, legal challenges, and acts of God. This procedure will apply whether a project has multiple development phases or a single phase.

If, following receipt of a Notice of Failure to Ensure Diligent Development, the holder has satisfactorily complied with each of the requirements of the procedure described above, the authorized officer may grant the holder's request for an extension of the timelines in the approved POD. If, following receipt of such Notice, the holder does not satisfactorily comply with each of the requirements of this procedure, the authorized officer may elect to suspend or terminate the ROW authorization pursuant to 43 CFR 2807.17, where such action is justified.

Each ROW authorization for solar energy development will include terms and conditions requiring the holder to maintain all on-site electrical generation

BLM_0018501

equipment and facilities in accordance with the design standards in the approved POD. In addition, the authorization will specify that any idle, improperly functioning, or abandoned equipment or facilities that have been inoperative for any continuous period of 3 months must be repaired, placed into service, or removed from the site within 30 days from receipt of a written Notice of Failure to Ensure Diligent Development, unless the holder is provided an extension of time by the BLM authorized officer. Upon receipt of such Notice from the BLM authorized officer, the holder must repair, place into service, or remove the equipment or facilities described in the Notice in a timely manner. Alternatively, the holder must show good cause for any delays in repairs, use, or removal; estimate when corrective action will be completed; provide evidence of diligent operation of the equipment and/or facilities; and submit a written request for an extension of the 30-day deadline. If the holder satisfies neither approach, the BLM authorized officer may elect to suspend or terminate the authorization in accordance with 43 CFR 2807.17–2807.19, where such action is justified. In addition, the BLM may use the posted Performance and Reclamation bond to cover the costs for removal of any idle or abandoned equipment and/or facilities.

All solar energy ROW authorizations must include the diligent development provisions as described above in the terms and conditions of the authorization, consistent with the requirements of 43 USC 1765(b) and the ROW regulations at 43 CFR 2801.2.

- ***Operating Standards.*** The authorization holder shall perform all operations in a good and workmanlike manner, consistent with the approved POD, so as to ensure protection of the environment and the health and safety of the public. To ensure compliance with the terms and conditions of the ROW authorization and to ensure that operations are conducted consistent with those terms and conditions, the BLM authorized officer will conduct inspections of such operations and can issue notices of violations. The authorized officer may also order an immediate temporary suspension of operations, orally or in writing, in accordance with 43 CFR 2807.16, to protect public health or safety or the environment.

- ***Access to Records.*** The BLM may require the holder of a solar energy development ROW authorization to provide any pertinent environmental, technical, and financial records, reports, and other information, including PPAs and Interconnection Agreements, related to project construction, operations, maintenance, and decommissioning, including the production and sale of electricity generated from the approved facilities on public land (43 CFR 2805.12(p); 43 USC 1765(b); 43 USC 1764(g); 43 USC 1761(b)). The BLM may use this information for the purpose of monitoring the authorization and for periodic evaluation and adjustment of rental fees or other financial obligations under the authorization.

BLM_0018502

Upon the request of the BLM authorized officer, the appropriate records, reports, or information shall be made available for inspection and duplication by such officer. Any information marked confidential or proprietary will be kept confidential to the extent allowed by law. Failure to cooperate with such request, provide data, or grant access to information or records, may, at the discretion of the BLM authorized officer, result in suspension or termination of the ROW authorization. All solar energy ROW authorizations must include such disclosure provisions in the terms and conditions of the authorization in accordance with the regulations (43 CFR 2807.17).

- *Changes to Terms and Conditions.* The BLM authorized officer may change the terms and conditions of the authorization as a result of changes in legislation, regulations, or as otherwise necessary to protect public health or safety or the environment in accordance with 43 CFR 2801.15(e).

- *Upgrades or Changes to Facility Design or Operation.* Operators of solar power facilities on BLM-administered lands shall coordinate with the BLM and other appropriate Federal, state, and local agencies regarding any planned upgrades or changes to the solar facility design or operation. Proposed changes of this nature may require additional environmental analysis and/or revision of the POD.

- *10-Year Review.* The solar ROW authorization, shall, at a minimum, be reviewed by the BLM authorized officer at the end of the tenth year and at regular intervals thereafter not to exceed 10 years.

- *Transfers or Assignments Require BLM Approval.* The ROW authorization may be assigned (i.e., transfer of interest) consistent with the provisions of the regulations (43 CFR 2807.21(b)). However, all assignments shall be approved by the BLM authorized officer, and the qualifications of all assignees must comply with 43 CFR 2803.10 and the due diligence requirements of the regulations (43 CFR2807.21(c)(1) and 43 CFR 2807.21(d)). The assignment shall not interfere with the BLM's enforcement of the terms and conditions of the authorization or management of the associated public lands. Transfers other than assignments must be approved by the BLM and may result in requirements for submittal of a new application or a Notice of Termination.

## B.3  MONITORING AND ADAPTIVE MANAGEMENT

The BLM has committed to developing and incorporating into its Solar Energy Program a monitoring and adaptive management strategy to ensure that data and lessons learned about the impacts of solar energy projects will be collected, reviewed, and, as appropriate, incorporated into the BLM's Solar Energy Program and individual projects in the future. The BLM presented a framework for developing a monitoring and adaptive management plan for the Solar Energy Program in the Final Solar PEIS (Section A.2.4 of Appendix A). This framework is based on the

BLM_0018503

BLM's Assessment, Inventory and Monitoring (AIM) Strategy for condition and trend monitoring of BLM-managed resources and lands. The BLM commenced a pilot effort for establishing a monitoring and adaptive management strategy for the Solar Energy Program in the summer of 2012. Results of the pilot will be used by the BLM to refine the framework and establish a monitoring and adaptive management strategy for the Solar Energy Program. The BLM will make information about the pilot available through the Solar Energy Program Web site (http://solareis.anl.gov). This will include notification of opportunities for public and stakeholder involvement. The BLM will issue policy and guidance as necessary following the completion of the pilot.

## B.4  SOLAR ENERGY ZONE POLICIES

### B.4.1  Authorization Process for Projects in SEZs

The BLM intends to proceed with a competitive leasing process to facilitate solar energy development projects in SEZs, and has initiated a rulemaking to consider the establishment of such a process. The Advance Notice of Proposed Rulemaking was published on December 29, 2011 (Volume 76, page 81,906 of the *Federal Register*).

Section 501 of FLPMA authorizes the Secretary of the Interior, with respect to public lands, to grant, issue, or renew ROWs over, upon, under, or through such lands for systems for the generation, transmission, and distribution of electric energy (43 USC 1761(a)(4)). This authority includes the issuance of ROW lease authorizations for solar energy generation systems. The existing ROW regulations (43 CFR 2804.23(c)) currently provide authority for identifying public lands under competitive bidding procedures, but limit the competitive process to responding to ROW applications. The purpose of a competitive process under existing regulations is to determine which application would be processed. Through rulemaking, the BLM intends to provide broader authority and a new competitive process for making lands available for solar energy development within SEZs (i.e., designated leasing areas).

The proposed rule may include the following provisions for a competitive process for lands within SEZs:

- **Call for nominations.**  A call for nominations would be published in the *Federal Register* to solicit expressions of interest for parcels of land within individual SEZs. A nomination of a specific parcel would require payment of a nomination fee to be determined by the regulations. (Section 504 of FLPMA provides authority to the BLM to establish reasonable filing fees.)

- **Review of nominations.**  The BLM would review the nominations to determine parcels of land to offer in individual SEZs. The BLM would complete the work necessary to prepare the selected parcels for the competitive offer.

    In preparing selected parcels for competitive offer, the BLM would review existing analysis for an SEZ and consider any new or changed circumstances

BLM_0018504

that may affect the development of the SEZ. The BLM would also work with appropriate Federal, state, and local agencies, and tribes, as necessary, to ensure that the consideration of potential environmental, cultural, or other resource conflicts is brought forward into the review, including information provided through the Solar PEIS. This would include areas identified as having a high potential for conflict with sensitive natural, visual, or cultural resources. This work would ultimately inform how a parcel would be offered competitively (e.g., parcel size and configuration, technology limitations, mitigation requirements, and parcel-specific competitive process). Prior to issuing a notice of competitive offer, the BLM would complete appropriate NEPA analysis to support the offer. This analysis would tier to the analysis for SEZs in the Solar PEIS to the extent practicable.

- **Notice of competitive offer.** A Notice would be published at least 30 days prior to the competitive offer. The Notice would include a legal description of the lands involved, the process for conducting the competitive offer, any development requirements or restrictions, a minimum bid requirement, and the due diligence requirements for the successful bidder to submit a POD for the lands involved in the competitive offer.

- **Bonus bid competitive process or other competitive procedures.** A variety of competitive bid procedures could be defined by the new regulations. These other competitive procedures could include sealed bids, oral auctions or continuous bidding, two-stage bidding, or multiple factor bidding methods. Bonus bids would be handled as Treasury receipts. The accepted bonus bid would be nonrefundable.

- **Issuance of competitive ROW lease authorization.** A ROW lease authorization (lease) would be issued to the successful bidder. The lease would be a 30-year, fixed-term lease with a fixed rental fee. The holder of the lease would be required to submit a POD and cost-recovery fees within the timeframes specified in the lease.

- **Administration of competitive ROW leases.** The leaseholder would submit a POD for authorization prior to the start of any construction. A NEPA review would be required prior to approval of the POD; this NEPA review would be tiered to all previous NEPA analyses for the SEZ and parcel offered competitively. The BLM would include a requirement in each competitive solar ROW lease that the holder begin construction within the timeframes approved in the POD and comply with terms and conditions requiring the holder to maintain all facilities in accordance with the design standards in the approved POD. The BLM would require that a minimum performance bond be provided for all competitive solar ROW leases to ensure compliance with the provisions of the regulations and the terms and conditions of the lease.

BLM_0018505

All solar energy ROW applications received *before* June 30, 2009 for lands in SEZs (defined as "pending" applications; see Section B.1.2) will be processed consistent with existing land use plan decisions in place prior to amendment by this ROD; these applications will not be subject to any decisions adopted by this ROD.

All solar energy ROW applications received *after* June 30, 2009 for lands in SEZs (defined as "new" applications; see Section B.1.1), will be subject to the decisions adopted by this ROD. The BLM may proceed with pre-application meetings as provided for in the regulations at 43 CFR 2804.10(a), as well as public outreach on new applications in SEZs to assist in developing future competitive lease parcels. The BLM may also consider new applications in SEZs as nominations under the competitive leasing process that the BLM is currently considering through rulemaking.

## B.4.2  Review for Projects in SEZs

Utility-scale solar energy development projects in SEZs will be required to comply with NEPA and other applicable laws, including, but not limited to, ESA and NHPA, and applicable regulations and policies. The BLM has taken a number of important steps through the Solar PEIS to facilitate future development in SEZs in a streamlined and standardized manner. For projects in SEZs, the BLM expects to comply with applicable laws, regulations, and policies in the manner described below.

The DOI Secretary, Deputy Secretary, or Assistant Secretary will authorize all utility-scale solar energy projects in SEZs, and the BLM authorized officer will issue authorizations consistent with the Secretary's, Deputy Secretary's, or Assistant Secretary's decision. Authorization of projects in SEZs will therefore not be subject to administrative appeals to the IBLA.

### B.4.2.1  Land Use Plan Conformance

Through this ROD, the BLM is amending land use plans in the six-state study area to adopt those elements of the new Solar Energy Program that pertain to planning. No additional land use plan amendments are expected to be required to approve projects in SEZs.

### B.4.2.2  NEPA

The BLM will complete a site-specific environmental review of all solar energy projects in SEZs in accordance with NEPA prior to issuing a project authorization. As part of the Solar PEIS, the BLM has conducted a thorough environmental review of the proposed SEZs so that future reviews of projects within SEZs can tier to the existing NEPA analysis, thereby limiting the required scope and effort of additional project-specific NEPA analyses. Tiering is defined as using the coverage of general matters in broader NEPA documents in subsequent, narrower NEPA documents (40 CFR 1508.28, 40 CFR 1502.20, 43 CFR 46.140). This allows the tiered NEPA document to concentrate solely on the issues not already addressed.

All future projects in SEZs will tier to the analysis in the Solar PEIS and, as appropriate, the NEPA analysis completed to support the competitive offer. The extent of this tiering, however,

BLM_0018506

will vary from project to project, as will the necessary level of NEPA documentation.  While the
SEZ analysis in the Solar PEIS analyzes the likely environmental effects of utility-scale solar
energy development and identifies required SEZ-specific design features to address many
resource conflicts, further evaluation will typically be required for individual projects.

The BLM authorized officer must determine whether potential environmental impacts associated
with a project are within the scope of analysis considered in the Solar PEIS for a given SEZ
and/or the NEPA analysis completed to support the competitive offer.  If not, the authorized
officer must determine the potential significance of any impacts outside the scope of existing
analysis and complete appropriate NEPA analysis.  No matter the level of NEPA documentation,
tiered analyses for projects in SEZs are expected to be narrowly focused on those issues not
already adequately analyzed in the Solar PEIS and/or the NEPA analysis completed to support
the competitive offer.  Field offices are instructed to incorporate by reference the relevant
portions of the NEPA documents to which project-specific NEPA documents will be tiered.

The level of NEPA documentation to be required for an individual solar energy project in an
SEZ will be determined by the BLM authorized officer in coordination with the BLM
Washington Office, consistent with the Council on Environmental Quality's NEPA regulations
(40 CFR Parts 1500-1508), DOI NEPA procedures (43 CFR Part 46), and the BLM NEPA
Handbook (H-1790-1).

An EA prepared in support of an individual action can tier to a programmatic EIS.  An EA
can be prepared for an action with significant effects, whether direct, indirect, or cumulative,
if the EA tiers to a broader EIS that fully analyzed those significant effects.  Tiering to the
programmatic EIS would allow the preparation of an EA and Finding of No Significant
Impact (FONSI) for the individual action, so long as any additional effects of the
individual action not analyzed in the programmatic EIS are not significant.  The FONSI
in these circumstances may also be called a "Finding of No New Significant Impact"
(43 CFR 46.140(c)).  However, if an individual action is anticipated to have significant effects
not considered in the programmatic EIS, tiering to the EIS cannot provide the necessary analysis
to support a FONSI for the individual action.  In these cases, an EIS would need to be prepared
that tiers, to the extent practicable, to the programmatic EIS (BLM NEPA Handbook H-1790-1,
Section 5.2.2 [BLM 2008]; 43 CFR 46.140(c)).

### B.4.2.3  Public Involvement

Through the Solar PEIS, extensive public involvement specific to solar energy development
in SEZs has occurred.  The BLM will use this input to inform future development in SEZs.
Additional public involvement for projects in SEZs will not be required to exceed the
requirements of NEPA.

### B.4.2.4  Endangered Species Act

The BLM completed programmatic consultation with the USFWS on July 20, 2012 under
Sections 7(a)(1) and 7(a)(2) of the ESA.  The BLM, in consultation with the USFWS, completed
a conservation review pursuant to Section 7(a)(1) of the ESA on the overall Solar Energy

BLM_0018507

Program.  The BLM also completed a programmatic consultation with the USFWS on the potential effects on listed (endangered and/or threatened) species and designated critical habitat from expected solar energy development in SEZs under Section 7(a)(2) of the ESA. See Section 7.5 of this ROD for a summary of the findings and conclusions.

For future projects in SEZs, further Section 7(a)(2) consultation will occur, as necessary, at the level of individual solar energy projects and will benefit from the preceding programmatic consultation and resulting programmatic Biological Opinion for SEZs.  As individual projects are proposed in SEZs under the programmatic consultation approach, project-specific information will be provided that (1) describes each proposed action and the specific areas to be affected; (2) identifies the species and critical habitat that may be affected; (3) describes the anticipated effects from the proposed project; (4) specifies whether the anticipated effects from the proposed project are consistent with those analyzed in the programmatic BO; (5) describes proposed measures to minimize potential effects of the action; and (6) describes additional effects, if any, not considered in the programmatic consultation.  The USFWS will review this information and, if applicable, will complete a BO that includes a project-specific incidental take statement.  This document will generally require less effort to complete as compared to standard Section 7(a)(2) consultation because of the ability to utilize the analysis in the programmatic BO.

## B.4.2.5  National Historic Preservation Act

The BLM has taken numerous actions to comply with requirements of the NHPA in relation to the Solar PEIS, including SEZs.  The BLM consulted with Indian tribes, the State Historic Preservation Offices (SHPOs) from the six states, the Advisory Council on Historic Preservation (ACHP), and the National Trust for Historic Preservation (NTHP).  A Solar PA among the BLM, the six SHPOs, and the ACHP has been executed.  The BLM provided drafts of the Solar PA to all consulting parties, including Indian tribes, as it was being developed and asked for input and criticism.  Detailed suggestions from several tribes were incorporated into the Final Solar PA.

This agreement is titled "Programmatic Agreement among the United States Department of Interior, Bureau of Land Management, the Arizona State Historic Preservation Officer, the California State Historic Preservation Officer, the Colorado State Historic Preservation Officer, the New Mexico State Historic Preservation Officer, the Nevada State Historic Preservation Officer, the Utah State Historic Preservation Officer, and the Advisory Council on Historic Preservation Regarding Solar Energy Development on Lands Administered by the Bureau of Land Management." The Consulting Parties agreed to the final provisions of the Solar PA in August 2012.  The final PA was signed by the Acting BLM Director on September 7, 2012, and was fully executed by all parties on September 24, 2012.

For future solar undertakings proposed on lands administered by the BLM, the agency will consult with the SHPO, Indian tribes, other consulting parties, and the ACHP regarding inventory, eligibility, effect, treatment, and the consideration of post-review discoveries in accordance with the terms of the PA.  Requirements for additional archeological survey, ethnographic studies, or other actions needed to consider and protect historic properties shall be fully explained and agreed to as part of the submission of a POD.  The terms and conditions of

BLM_0018508

the project authorization will require documentation of a completed BLM-approved cultural resources mitigation plan before ground disturbance and construction begin.

### B.4.2.6  Tribal Consultation

As part of the Solar PEIS process, the BLM has consulted and engaged with tribes through various means in order to meet the agency's affirmative responsibilities under the NHPA, NEPA, E.O. 13007 ("Indian Sacred Sites," *Federal Register,* Volume 61, page 26771, May 24, 1996), the American Indian Religious Freedom Information Act, and other statutes.  Beginning in 2008 and continuing through the Final Solar PEIS, the BLM has written to tribes, provided complete documentation, maps, and current information, and requested government-to-government consultation.  Tribes were invited to and participated in public meetings regarding the Draft Solar PEIS and Supplement.  Tribal comments regarding the Draft Solar PEIS affected decisions to eliminate certain SEZs and to reduce and reconfigure the boundaries of those carried forward.

The BLM considers tribal consultation to an open-ended and ongoing process.  For future solar energy projects on lands administered by the BLM, field office cultural staff, in consultation with their Deputy Preservation Officer, will recommend to responsible BLM line officers whether to collect additional archeological or ethnographic data.  These recommendations will be based on dialog resulting from government-to-government consultation and the active involvement of tribes in the evaluation of individual projects in SEZs.  Should new ethnographic research, studies, or interviews be recommended, the BLM cultural staff, in consultation with tribal officials, will provide guidance to BLM line officers about the appropriate scope of work, provisions for safeguarding data confidentiality, and programs of mitigation.

Regional Mitigation Plans will be developed, first as a prototypes for the Dry Lake SEZ in Nevada, and then for all SEZs.  As part of this process, the BLM will consult with Indian tribes, SHPOs, and the ACHP to devise more effective methods to solicit and consider tribal views on the effects of solar energy development on historic properties, traditional cultural properties, landscapes, and resources important in traditional tribal practices and beliefs.

### B.4.3  Incentives for Projects in SEZs

The BLM intends to implement the following policies and procedures for projects in SEZs, and complete the rulemaking items and other initiatives described below, in an effort to help steer future utility-scale solar energy development to the SEZs.

### B.4.3.1  Facilitate Faster and Easier Permitting in SEZs

- Consistent with applicable law, the BLM will endeavor to adhere internally to strict schedules for the completion of environmental reviews for projects in SEZs.

- The DOI will undertake interagency coordination to expedite service and provide priority processing to projects in SEZs, provide a single point of contact for all DOI agencies responsible for coordinating environmental

BLM_0018509

reviews and consultations, ensure timely performance of agencies, and facilitate stakeholder reviews.

- The BLM will maintain its Renewable Energy Coordination Offices in Washington, D.C.; California; Nevada; and Arizona, and will maintain Renewable Energy Coordination Teams in Colorado, New Mexico, and Utah as long as needed to assist with efficient authorization of projects in SEZs.

- The BLM may, through its rulemaking effort, establish a competitive process that results in the immediate issuance of a ROW lease authorization to the successful bidder.

### B.4.3.2  Improve and Facilitate Mitigation

- The BLM will develop regional mitigation plans for SEZs.  Regional mitigation plans will be composed of goals and objectives applicable to individual SEZs.  As envisioned, regional mitigation plans will simplify and improve the mitigation process for future projects in SEZs.  Regional mitigation plans will address mitigation for a variety of resources such as biological resources, ecological resources, cultural resources, visual resources, and socioeconomic factors, as appropriate.  Regional mitigation plans can increase permit efficiencies and financial predictability for developers.  Regional mitigation plans are also expected to enhance the ability of state and Federal agencies to invest in larger scale conservation efforts that benefit sensitive resources through higher quality habitat, improved connectivity between habitat areas, and long-term conservation of landscapes.

- Once regional mitigation plans are developed, the BLM expects that developers will be able to mitigate biological impacts for projects in SEZs through funding conservation priorities that are identified in a regional mitigation plan.

### B.4.3.3  Facilitate the Permitting of Needed Transmission to SEZs

- The BLM will continue to evaluate transmission needs for the currently proposed SEZs, including consideration of available capacity on existing lines and the need for new or modified corridors; efforts will also be made to proactively plan for any new or expanded corridors that may be needed to serve currently proposed SEZs.

- As part of the identification process for new or expanded SEZs, the BLM will simultaneously evaluate their transmission needs, including the need to designate new corridors or modify existing corridors (e.g., modify widths or locations).  Corridor designations or modifications may be achieved through a joint land use planning and NEPA process to the extent practicable.

BLM_0018510

- The BLM will offer incentives to projects that propose to bring transmission to SEZs (e.g., facilitated permitting of needed gen-ties, transmission lines and upgrades by Renewable Energy Coordination Office staff, and identification of priority transmission projects that will receive facilitated permitting).

- The BLM will commit staff from the BLM's Renewable Energy Coordination Offices and Teams to engage in ongoing and comprehensive regional transmission planning efforts, as well as subregional transmission planning affecting SEZs, to ensure the recognition of SEZs as a priority in transmission development.  For example, the BLM will identify a BLM liaison to the Western Electricity Coordinating Council (WECC) and the appropriate subregional planning groups, as well as the California Independent System Operator (CAISO).

- The BLM will seek to establish cooperative agreements, Memoranda of Understanding (MOUs), and/or Memoranda of Agreement (MOAs) with Federal, state, local, and regional agencies, and tribes, as appropriate, to expedite permitting of needed transmission to support SEZ development.

- As part of the ongoing evaluation of the currently proposed SEZs, as well as the identification process for new or expanded SEZs, the BLM will consult with state and regional transmission planning and coordination authorities, state public utility commissions, state energy offices, and transmission system operators to evaluate available capacity on existing and proposed lines and to discuss other potential transmission-related barriers.  In addition, the BLM will use its participation in WECC and subregional planning efforts to help inform the evaluation of currently proposed SEZs and the identification of new or expanded SEZs.

- As part of the Solar PEIS, the BLM requested that the SEZs be reviewed as a case study by the Transmission Expansion Planning Policy Committee (TEPPC) of the WECC as part of the 2012 Study Program.[6]  This request was prioritized as high by the study program, meaning that it will be studied in the first round of TEPPC cases.  For all new or expanded SEZs, the BLM will submit study requests for timely TEPCC analysis as appropriate.

- In preparing parcels in SEZs for competitive offer, the BLM will seek to make the most efficient use of existing corridors, consider opportunities for collocation, and avoid geographically stranding future projects from key transmission interconnection points.

---

[6]  The TEPPC analysis process is an existing, formal, biennial process used by WECC to assess system impacts across the interconnection when adding resources and/or transmission.  It analyzes system congestion and system performance under reliable system operating criteria.

BLM_0018511

### B.4.3.4  Encourage Solar Energy Development on Suitable Lands Adjacent to SEZs

- For projects located jointly on SEZ lands and suitable adjacent public, private, state, tribal, or DoD-withdrawn lands (e.g., lands with low resource conflict or degraded, disturbed, previously disturbed, or contaminated areas), DOI's permitting incentives as described for SEZs would apply to the entire project. However, additional effort may be required to collect necessary data and conduct appropriate environmental analysis for adjoining lands as compared to SEZ lands.

### B.4.3.5  Provide Economic Incentives for Development in SEZs

- The BLM anticipates lower cost recovery for projects in SEZs because of the BLM's extensive upfront data collection and environmental review through the Solar PEIS.

- The BLM may, through its rulemaking effort, adopt a longer phase-in period for rental payments for projects in SEZs (e.g., 10 years), which could effectively reduce the overall cost to operators.

- The BLM may, through its rulemaking effort, establish a fixed megawatt capacity fee rental payment for the life of the authorization for projects in SEZs, which could effectively reduce the overall cost to operators.

- The BLM may, through its rulemaking effort, establish a limited base acreage rental payment for projects in SEZs, which could effectively reduce the overall cost to operators.

- The BLM may, through its rulemaking effort, restructure bonding requirements for projects in SEZs (e.g., a fixed or standard bond per acre), which could result in reduced costs to operators.

- The BLM may, through its rulemaking effort, establish a 30-year fixed term lease with a fixed rental fee for projects in SEZs, which could reduce uncertainty for operators.

### B.4.4  Regional Mitigation Plans for SEZs

As described in the incentive for projects in SEZs (Section B.4.3), the BLM will establish regional mitigation plans for all SEZs.  As envisioned, regional mitigation plans will simplify and improve the mitigation process for future projects in SEZs.  The BLM presented a draft framework for developing regional mitigation plans for SEZs in the Final Solar PEIS (Section A.2.5 of Appendix A).  The BLM commenced a pilot effort for regional mitigation planning in the Dry Lake SEZ in Nevada in summer of 2012.  Results of the pilot will be used by the BLM to refine the framework for developing regional mitigation plans for SEZs.  Lessons learned from the pilot will allow for replication of sound processes across the entire six-state

BLM_0018512

study area that makes up the Solar Energy Program.  The BLM will make information about the pilot available through the Solar Energy Program Web site (http://solareis.anl.gov).  This will include notification of opportunities for public and stakeholder involvement.  The BLM will issue policy and guidance as necessary following the completion of the pilot.

## B.4.5  Identification Protocol for New or Expanded SEZs

The BLM will identify new or expanded SEZs in the context of existing solar market conditions, existing and planned transmission systems, and new (or existing) state or Federal policies affecting the level and location of utility-scale solar energy development.  The BLM will assess the need for new or expanded SEZs at least once every 5 years in each of the six states covered by the Solar PEIS.  The process to identify new or expanded SEZs will be open and transparent, with opportunities for substantial involvement of multiple stakeholders.  The BLM will identify new or expanded SEZs at the state or field office level as an individual land use planning effort or as part of an ongoing land use plan revision.  In all cases, the planning of new or expanded SEZs will tier from the Solar PEIS and utilize information carried forward from the PEIS to assist in the analyses.  It is BLM's goal to complete the work to identify new SEZs and amend applicable land use plans within 12 to 18 months of initiating such efforts.

The BLM will use the following step-by-step process when considering whether to identify new or expanded SEZs.  SEZs should be relatively large areas that provide highly suitable locations for utility-scale solar energy development:  locations where solar energy development is economically and technically feasible, where there is good potential for connecting new electricity-generating plants to the transmission distribution system, and where there is generally low resource conflict.

The four steps described below highlight a sequential process that first assesses demand for additional acres in SEZs; then identifies locations where solar energy development is economically and technically feasible; and then in these larger regions applies relevant environmental, cultural, and other screening criteria to find potential SEZs with low natural, cultural and visual resource conflicts.  The BLM will subsequently use the NEPA and planning processes to make finer-scale adjustments and decisions regarding SEZs.  The four steps are as follows:

- Assess the demand for new or expanded SEZs;

- Establish technical and economic suitability criteria;

- Apply environmental, cultural, and other screening criteria; and

- Analyze proposed SEZs through a planning and NEPA process.

## B.4.5.1  Assess the Demand for New or Expanded SEZs

The BLM will assess the demand for new or expanded SEZs at least once every 5 years in each of the six states covered by the Solar PEIS.  The assessment of demand may take place as part of

BLM_0018513

the regular land use planning process or as a separate effort to determine the role BLM-managed lands should play in broader energy and climate goals. While Federal, state, tribal, and local stakeholder involvement will be essential to the process, BLM State Offices will ultimately be responsible for making the determination that additional SEZ acreage is needed. Acknowledging that significant changes can occur in the interim between assessments, the BLM will also provide for an assessment triggered by a petition process.

Petitions for new or expanded SEZs must be submitted in writing to the appropriate BLM State Director with documentation supporting the request. Petitions must have a rational basis and should be linked to factors such as policy, environmental, and/or market changes (e.g., increase in state or National renewable standards, approval of a foundational transmission line, economic development, population growth, or availability of financial incentives). Developers, environmental stakeholders, local and state governments, industry associations, and others may collectively or individually petition the BLM to consider specific areas for new or expanded SEZs. Petitioners may also request changes in already identified SEZs, such as eliminating or revising boundaries due to changes in status of species or critical habitat under the ESA.[7] In addition to the petition process, the public may also raise the need for new or modified SEZs through the scoping process for individual land use plans.

When considering the demand for new or expanded SEZs, the BLM will take into consideration relevant policy goals and trends in the solar market. The BLM will rely on outside expert consultation, such as the DOE and state energy offices, regarding electricity demands, markets, and renewable energy policies. Utility-approved plans, state public utility forecasts, and regional planning outcomes such as those originating with the California Independent System Operator and the Western Electricity Coordinating Council can all provide useful input into the BLM's determination of demand for additional SEZ acreage. The BLM will also consider the availability of land in existing SEZs when it evaluates the need for new or expanded SEZs. The BLM's assessment of demand may require the development of new state-based Reasonably Foreseeable Development Scenarios that incorporate new Federal or state policies affecting projections.

## B.4.5.2  Establish Technical and Economic Suitability Criteria

In addition to considering the demand for solar energy across a state or region, the BLM's process to identify new or expanded SEZs will take into account technological advances in solar energy generation systems and/or transmission infrastructure, energy load centers and associated flow, existing and planned transmission lines, and any known constraints to development. These additional factors will influence the decision regarding which general region will be chosen for new or expanded SEZs.

A number of factors determine the technical and economic suitability of an area for utility-scale solar energy development, including the quality of the solar resource, terrain, and proximity to existing load and infrastructure. These factors may vary by state and/or region and will continue

---

[7]  Changes to SEZs established by the Solar PEIS ROD must be submitted through the State Director to the BLM Washington Office for the Director's concurrence.

BLM_0018514

to evolve over time.  As part of its SEZ identification process, the BLM will work with outside experts, industry, transmission planning organizations, state and local agencies, and other stakeholders to establish and apply appropriate technical and economic suitability criteria.

### B.4.5.2.1  Size Threshold

An SEZ should generally encompass an area large enough to accommodate multiple utility-scale solar energy projects, provide flexibility for siting, and provide opportunities for shared infrastructure.  SEZs on public lands should also be large enough to generate ample quantities of solar-generated power to justify the effort and expense required to determine whether the area is well suited for solar energy development.  Smaller areas of BLM-administered lands located adjacent to private, state, or other Federal lands that are suitable for solar energy development may, however, be appropriate for consideration as SEZs if they can be used in conjunction with adjacent areas.

### B.4.5.2.2  Solar Insolation Level

Solar insolation levels in areas identified for new or expanded SEZs will typically be high, thus allowing for optimum power production.  Higher insolation values provide significant benefits for solar generation facilities.  For instance, a reduction of 1 $kWh/m^2/day$ in insolation is equivalent to approximately a 10% reduction in efficiency and, in turn, a proportional increase in costs and land use footprint (due to the need for additional solar collection equipment to provide the same quantity of energy).

Under BLM's proposed Solar Energy Program, areas with direct normal solar insolation levels less that 6.5 $kWh/m^2/day$ would not be available for individual applications without an associated land use plan amendment (i.e., they would be excluded).  However, in light of expected technological advances, shifting market conditions, and evolving state and Federal policies, the BLM will allow the identification of new SEZs in areas with insolation levels lower than 6.5 $kWh/m^2/day$, as appropriate.  Providing this type of flexibility for SEZs is consistent with the policy objective identified in this ROD of working with industry and other stakeholders to identify additional SEZs in which there is a combination of industry interest and reduced conflicts.

Different types of insolation are most relevant to the different large-scale solar generating technologies.  For concentrating solar technologies, direct normal insolation is most pertinent, while for photovoltaic (PV) systems, global tilt insolation is the appropriate measure of the solar resource.  As part of the process to identify new or expanded SEZs, the BLM may need to consider both direct normal insolation and global tilt insolation depending on the technologies being contemplated for a given SEZ.

### B.4.5.2.3  Slope Threshold

Most solar generating technologies must be sited on relatively flat ground to ensure that the solar collectors can utilize the solar resource effectively.  Depending on the technology, the required slope can range from less than 2% to more than 5%, although lower slopes are generally better

BLM_0018515

for siting solar energy generation.  Under BLM's proposed Solar Energy Program, areas with slopes greater than 5% would not be available for individual applications (i.e., they would be excluded).

As part of the process to identify new or expanded SEZs, some flexibility in applying the slope criterion may be appropriate, particularly for PV or dish engine technologies that are more tolerant of lands with steeper slopes.  In considering new or expanded SEZs, areas with higher slopes should be otherwise well suited for development.  It is unlikely that lands with slopes of greater than 10% would be technically viable for utility-scale solar production.

### B.4.5.2.4  Load Areas to Be Served

When considering the appropriate locations for new or expanded SEZs, the BLM will determine the load areas likely to be served by needed solar generation.  The BLM should rely on outside expert consultation regarding electricity demands, markets, and renewable energy policies (e.g., DOE, state energy offices).  The BLM should also consider relevant Federal and state policy goals and trends, such as possible retirement of generating facilities and/or state Renewable Portfolio Standard policy (or policies).  For example, the Renewable Portfolio Standard in a given state may have been met, and new solar energy development would be expected to serve new demand in another state.  The location for new SEZs would therefore have to consider existing transmission lines and capacity available to move new generation to load out of state.  Consideration would also have to be made for the elements of the importing state's Renewable Portfolio Standard policy (or policies).

### B.4.5.2.5  Infrastructure Access

As part of the identification of new or expanded SEZs, the BLM will consider proximity to existing infrastructure, such as transmission lines, utility corridors, roads, and a suitable workforce.  Where SEZs can be located close to existing infrastructure, environmental disturbance may be minimized through use of the existing facilities (in some cases, however, transmission lines may be sited in environmentally sensitive areas that are not suitable for locating SEZs).  Use of existing infrastructure may also reduce costs of construction and mitigation, making locations close to existing and useable infrastructure attractive to developers.

New or expanded SEZs should be located in areas sufficiently close to load or in areas where transmission can be reasonably expected to be available in time to serve the quantity of generation planned.  Consideration of such factors will require meaningful participation by the BLM in planning processes for transmission.  The BLM will consult with state and regional transmission planning and coordination authorities, state energy offices, and transmission system operators to evaluate available capacity on existing and proposed lines and to discuss other potential transmission-related barriers.

In considering potential locations for new or expanded SEZs, the BLM should catalog all existing and proposed transmission lines serving an area in relation to the power generation potential from a proposed SEZ.  Consideration should also be given to foreseeable changes in load, such as retirement of generating facilities.  Where new transmission lines are needed, they

BLM_0018516

should be planned to utilize existing ROWs or designated utility corridors to the extent practicable.

It is important to note that efforts to assess the feasibility and cost of supplying transmission to a specific area have a high degree of uncertainty, because new transmission lines are proposed, constructed, and added to the existing transmission grid over time, and because the available capacity on the grid also changes as demand increases and new power sources are added over time. Due to the remote locations of many prime solar resource areas, transmission upgrades and additions will generally be needed to connect those locations to the grid.

The ability to utilize existing paved roads for access to SEZs can also reduce impacts associated with development; therefore, SEZs should be located adjacent to major paved roads where possible. For potential SEZs where existing paved roads are located some distance away, existing dirt roads should be upgraded for site access to the greatest extent possible in order to minimize land disturbance. Finally, the proximity of the SEZ to a potential workforce should be considered to promote sustained workforce success in the SEZ region.

## B.4.6  Apply Environmental, Cultural, and Other Screening Criteria

### B.4.6.1  Program Exclusion Criteria

In an attempt to identify lands with low resource conflicts, BLM state and field offices will consider the presence of program exclusions established through the Solar PEIS on potential SEZ lands. As part of the Final Solar PEIS, the BLM identified a comprehensive list of lands that have been determined to be unsuitable for utility-scale solar energy development ROWs (see Section 2.2.2.1 of the Final Solar PEIS).

### B.4.6.2  Relevant Land Use Plan Decisions

BLM state and field offices undertaking efforts to identify new or expanded SEZs will consider all relevant decisions in existing land use plans (e.g., ROW avoidance and exclusion areas, timing restrictions). Although amendment of existing land use plan decisions may be necessary as part of identifying new or expanded SEZS, such decisions serve as a valuable screen for potential conflicts.

### B.4.6.3  Coordination and Outreach

In order to understand potential resource conflicts and opportunities and/or barriers for solar energy development, BLM state and field offices undertaking efforts to identify new or expanded SEZs will coordinate with appropriate Federal, state, and local agencies, and tribes (including, but not limited to, the agencies described below). The BLM also may decide to reach out to the local public and other stakeholders such as local sportsman groups. Such coordination and outreach would likely result in the development of locally relevant screening criteria to be applied in the identification of new or expanded SEZs.

BLM_0018517

The BLM will consult with state and local (county and/or municipal) governments to identify opportunities for new or expanded SEZs and to consider consistency with officially adopted local plans and policies (e.g., comprehensive land use plans, open space plans, conservation plans) and permit requirements (e.g., special use permits). The BLM will consult with state resource management agencies to discuss potential resource conflicts. The BLM will engage in government-to-government consultation with tribes to identify traditional cultural properties and sacred sites with areas related to new or expanded SEZs. The BLM will consult with appropriate land management agencies for consideration of areas in close proximity to special designations such as the National Parks, National Refuges, and National Forests. The BLM will consult with the DoD for consideration of impacts on military installations and operations. Such consultations may result in agreements not to locate SEZs near specific units, based on an agency's assessment of potential adverse impacts on those units.

### B.4.6.4 Landscape-Scale Information

The BLM will use landscape-scale information (e.g., BLM's rapid ecological assessment, California's Desert Renewable Energy Conservation Plan (DRECP), The Nature Conservancy's eco-regional assessments, and state-level crucial habitat assessment tools) to identify, and to exclude from SEZs, areas of high ecological value or importance. For example, in areas with pre-existing landscape-scale conservation plans, such as the DRECP in California, future SEZs will not be considered in areas needed to achieve biological goals and objectives established in the plan. Other types of areas to screen for based on landscape-scale information may include areas with significant populations of sensitive, rare, and special status species or unique plant communities, important biological connectivity areas, designated wildlife habitat management areas, lands with wilderness characteristics, and areas with high concentrations of ethno-botanical resources of importance for Native American use. Potential landscape-scale information should be evaluated in coordination with relevant Federal, state, and local resource management agencies and tribes.

### B.4.6.5 Degraded, Disturbed, or Previously Disturbed Sites

In identifying potentially suitable lands for SEZs, BLM state and field offices will seek opportunities to locate new or expanded SEZS in degraded, disturbed or previously disturbed areas. Examples include, but are not limited to, the following:

- Lands that have been mechanically altered, such as fallowed agricultural lands;

- Lands that have been "type-converted" from native vegetation through plowing, bulldozing, or other mechanical impact, often in support of agriculture or other land cover change activities (e.g., mining, clearance for development, or heavy offroad vehicle use);

BLM_0018518

- Brownfields and other contaminated or previously contaminated sites,[8] such as those identified by the EPA's RE-Powering America's Land Initiative (http://www.epa.gov/renewableenergyland) or state, local and/or tribal authorities;

- Idle or underutilized industrial sites;

- Lands adjacent to urbanized areas and/or load centers;

- Areas repeatedly burned and invaded by fire-promoting non-native grasses where the probability of restoration is determined to be limited; and

- Areas where collocation of solar energy development with other energy development may be feasible (e.g., wind or oil and gas development).

Amendment of existing land use plan decisions (e.g., ROW avoidance and exclusion areas) may be necessary to allow for new or expanded SEZs on degraded, disturbed, or previously disturbed areas. Sources of information on degraded, disturbed, or previously disturbed areas should include (1) landscape-scale information and landscape-scale ecological assessments (e.g., landscape conservation cooperatives, rapid ecological assessments, and state-level crucial habitat assessment tools), which identify converted or highly degraded lands on BLM-administered and adjacent Federal and nonfederal lands; (2) coordination with the EPA and relevant state agencies that catalog degraded, disturbed, or previously disturbed sites; and (3) outreach to local communicates and the public regarding possible degraded, disturbed, or previously disturbed sites.

### B.4.6.6  Opportunities to Combine Other Federal and Nonfederal Lands

As part of the SEZ identification process, the BLM will take into account opportunities to partner with adjacent Federal and nonfederal landowners (e.g., private, state, tribal, or DoD-withdrawn lands). For example, small SEZs may be appropriate on BLM-administered lands when they are located adjacent to degraded, disturbed, or previously disturbed private lands. This combination of BLM-administered and nonfederal lands could allow for a combined use area, allowing for the expansion of renewable energy development onto well-suited adjacent lands.

### B.4.6.7  Information from BLM Monitoring Efforts

As part of the SEZ identification process, the BLM will review and consider information gathered through its proposed long-term monitoring and adaptive management program (see Appendix A, Section A.2.4). Information gathered through monitoring studies will help the BLM regularly evaluate resource conditions, detect change, and augment its knowledge of potential resource conflicts associated with solar energy development. This information will be used to inform the identification of new priority areas for utility-scale solar energy development.

---

[8]  The EPA and other parties have or will continue to characterize and cleanup these sites to ensure they are protective for people.

BLM_0018519

In addition, the BLM has expanded its knowledge of areas suitable/not suitable for development through the evaluation of individual solar energy ROW applications. Areas eliminated from ROW applications due to resource conflicts (e.g., rare vegetation or desert washes) may provide additional screening criteria for new or expanded SEZs.

## B.4.7  Analyze Proposed SEZs through a Planning and NEPA Process

The BLM will publish a Notice of Intent (NOI) in the *Federal Register* stating its intent to prepare a Land Use Plan amendment (or amendments) to identify a new or expanded SEZ or multiple SEZs and prepare the associated NEPA documentation. The NOI will also begin the formal scoping process (40 CFR 1501.7). Through the scoping process, the BLM will solicit additional input on potential SEZs. The public will be invited to nominate proposed SEZs through the scoping process that meet the objectives of the planning effort. Based on scoping, the BLM will identify a potential SEZ or multiple SEZs or SEZ configurations to be analyzed through the planning and NEPA process. The BLM will document the results of its scoping in a publicly available scoping report (43 CFR 1610.2(d)).

When the BLM is preparing NEPA analyses for new SEZs, its goal will be to produce documents with comprehensive analyses of resources at a level of detail sufficient to allow for tiering of future solar energy projects within the SEZ. Analysis of SEZs will also include appropriate consultations pursuant to the ESA and the NHPA. The potential impacts associated with the development of transmission interconnection and other infrastructure to support the establishment of an SEZ will be considered as part of the NEPA review for the SEZ. The BLM will also seek opportunities to designate any necessary utility corridors that would support the establishment of new or expanded SEZs in a combined planning effort. The BLM will make the draft land use plan amendment and draft NEPA document available for a 90-day public comment period (43 CFR 1610.2(e)). Following the preparation of a proposed land use plan amendment and final NEPA document, and after reviewing and resolving any protests, the BLM would issue a decision about whether to amend affected land use plans.

Through the planning and NEPA process, the BLM will refine SEZ boundaries and may establish SEZ-specific management prescriptions based on resource-specific considerations. Chapter 5 of the Draft Solar PEIS, as updated in the Final Solar PEIS, includes a comprehensive description of the impacts of constructing and operating solar energy generation facilities and related infrastructure and possible mitigation measures in the categories below. This information will be used as a guide to inform the analysis of SEZs. The categories are as follows:

- Lands and realty;

- Specially designated areas and lands with wilderness characteristics;

- Livestock grazing;

- Wild horses and burros;

- Wildland fire;

BLM_0018520

- Recreation;

- Military and civilian aviation;

- Geologic setting and soil resources;

- Minerals;

- Water resources;

- Ecological resources;

- Vegetation and plant communities;

- Wildlife;

- Aquatic biota;

- Special status species;

- Air quality and climate;

- Visual resources;

- Acoustic environment;

- Paleontological resources;

- Cultural resources and Native American concerns;

- Socioeconomics;

- Environmental justice; and

- Cumulative impact considerations.

**B.4.7.1  SEZ-Specific Design Features and Mitigation Plans**

Establishing SEZs in areas where avoidance of sensitive resources is possible is generally the most effective means to ensure resource protection.  When complete avoidance of all sensitive resources is not possible, it may be practical to include some areas within the boundaries of an SEZ, with requirements that no disturbance occur in these areas (i.e., solar facilities would be required to be constructed outside of such areas).  To avoid possible isolation and/or fragmentation of resources, however, the BLM will generally endeavor to avoid designating SEZs with significant numbers and/or acreage of exclusion areas within them.

BLM_0018521

Design features can be effective in minimizing potential resource impacts in new SEZs. In addition to the programmatic design features to be established through this ROD, the BLM may identify and analyze additional SEZ-specific design features as necessary through its planning and NEPA processes. For those impacts expected to result from the build-out of a new SEZ that cannot be avoided or minimized, the BLM will determine appropriate mitigation actions to offset impacts. New SEZ proposals should include an accompanying regional mitigation plan (Section B.4.4).

## B.4.8  SEZs Identified Subsequent to this ROD

The BLM expects that SEZs analyzed and identified through future planning efforts will generally be treated the same as SEZs identified through this ROD (i.e., that proposed projects in these SEZs will generally include the same level of analysis, follow the same authorization process, and receive the same incentives as projects located in SEZs identified through this ROD and refined through the ongoing rulemaking process).

## B.5  VARIANCE AREA POLICIES

The BLM will consider ROW applications for utility-scale solar energy development in variance areas on a case-by-case basis based on environmental considerations; coordination with appropriate Federal, state, and local agencies and tribes; and public outreach. The responsibility for demonstrating to the BLM and other coordinating parties that a proposal in a variance area will avoid, minimize, and/or mitigate, as necessary, sensitive resources will rest with the applicant. The applicant is also expected to demonstrate that the proposed project is compatible with state and local plans and is capable of acquiring all required permits and authorities to implement the project. The USFWS and National Park Service (NPS) have identified sensitive resources areas within variance areas that require special consideration as further described below. The BLM will use current information and best available science in its evaluation of ROW applications in variance areas.

In coordination with other agencies, the BLM will conduct preliminary screening of potential ROW applications in variance areas to assess likely conflicts with sensitive resources and will inform applicants of any anticipated issues with the siting of their project in a proposed location. ROW applications in variance areas will be deemed a lower priority for processing than applications in SEZs. The BLM will typically process ROW applications in variance areas on a first-come, first-served basis. However, the BLM has the discretion to apply competitive procedures to variance areas. In making this determination, the BLM may consider variables such as public interest, market demand for solar energy development in the region (including markets in other states), expressions of interest from other parties, authorized use and/or ownership of adjoining lands, and the purpose of the project.

All ROW applications in variance areas that the BLM determines to be appropriate for continued processing will, at the applicant's expense, be processed in compliance with NEPA and all other applicable laws, regulations, and policies. Applicants applying for a ROW in variance areas assume all risk associated with their application and should understand that their financial

BLM_0018522

commitments in connection with their applications will not be a factor in the BLM's evaluation process.

## B.5.1  Required Preliminary Meetings

The BLM will require prospective applicants in variance areas to schedule and participate in two preliminary meetings with the BLM before filing a ROW application (43 CFR 2804.10(a)).  The purpose of the first preliminary meeting is to discuss the status of BLM land use planning in the area; potential land use and siting constraints; potential environmental issues in the area; NPS and USFWS sensitive resource maps and information; potential alternative site locations for the project; and the variance process itself, including cost-recovery requirements, application requirements, consultation requirements, public involvement requirements, and associated timelines.  The purpose of the second preliminary meeting is to initiate and ensure early coordination with Federal (e.g., NPS, USFWS, and DoD), state, and local government agencies and tribes as contemplated by the regulations (43 CFR 2804.10(b)).  Cost-recovery fees will generally not be required for preliminary meetings.

Through these preliminary discussions, the BLM and coordinating agencies will identify the likely challenges in proceeding with an application in a proposed location and identify natural, visual, and/or cultural resource information that applicants would likely be required to gather to support the variance process.  On the basis of internal review and collaboration with other agencies, the BLM may advise a potential applicant not to submit an application for a particular site and/or technology or to modify its proposed project.  In providing such advice, the BLM will consider factors including, but not limited to the following:

- Lands within an SEZ could meet the potential applicant's needs, including consideration of access to transmission.

- The proposed project will be in conflict with landscape conservation strategies and/or landscape protection, conservation, or restoration objectives established in documents such as the DRECP or an applicable RMP.

- The proposed project poses a high potential for conflict with sensitive natural, visual, and/or cultural resources identified by the BLM, NPS, and/or USFWS.

## B.5.2  ROW Applications in Variance Areas—Process

Following completion of the preliminary meetings described above, an applicant seeking to develop a project in a variance area will be required to submit a ROW application to the BLM (Form SF-299, Application for Transportation and Utility Systems and Facilities on Federal Land).  The POD submitted with an application must be of sufficient detail (as determined by the BLM) to evaluate the suitability of the site for utility-scale solar energy development.  Solar ROW applications in variance areas will typically be required to include a description of the proposed solar technology and the proposed location of solar panels or reflectors, buildings, and other infrastructure such as transmission lines and roads.  Additional specific information

BLM_0018523

required for an application in a variance area is outlined below. The BLM will determine if and when the information is of sufficient detail to initiate coordination activities as described below.

Upon submission and BLM review of a ROW application, a cost-recovery agreement will be established with the applicant (43 CFR 2804.14). An applicant for a ROW in a variance area must establish a cost-recovery account sufficient to cover all costs of the United States associated with accepting, reviewing, and processing the application, including, but not limited to, conducting environmental review and related consultations; conducting inventories for resources such as cultural resources, visual resources, and special status species; and inspecting and monitoring the construction, operation, and decommissioning of the proposed ROW facility.

**B.5.3  ROW Applications in Variance Areas—Factors to Be Considered**

Applicants for utility-scale solar energy development ROWs in variance areas will be required to adhere to the data collection and survey protocols prescribed by resource agencies, including, but not limited to, those outlined below. The BLM will consider a variety of factors when evaluating ROW applications and associated data in variance areas. The focus of the proposed variance process is on collecting the right data and evaluating it with the right parties to assess the appropriateness of a given proposal, rather than on a prescriptive set of measures that would be established at the programmatic level. The BLM believes that this approach allows flexibility to adapt as data and science improve, recognizes the variability and tradeoffs associated with individual applications, and allows for satisfactory protection of resources of concern.

The BLM will consider the following factors, as appropriate, when evaluating ROW applications in variance areas:

- The availability of lands in an SEZ that could meet the applicant's needs, including access to transmission.

- Documentation that the proposed project will be in conformance with decisions in current land use plan(s) (e.g., visual resource management class designations and seasonal restrictions) or, if necessary, represents an acceptable proposal for a land use plan amendment.

- Documentation that the proposed project will be consistent with priority conservation, restoration, and/or adaptation objectives in the best available landscape-scale information (e.g., landscape conservation cooperatives, rapid ecological assessments, and state and regional-level crucial habitat assessment tools [CHATs]).

- Documentation that the proposed project can meet applicable programmatic design features adopted in this ROD (see Appendix A, Section A.4.1).

- Documentation that the applicant has coordinated with state and local (county and/or municipal) governments, including consideration of consistency with officially adopted plans and policies (e.g., comprehensive land use plans, open

BLM_0018524

space plans, and conservation plans) and permit requirements (e.g., special use permits).

- Documentation of the financial and technical capability of the applicant, including, but not limited to, the following:
  – International or domestic experience with solar energy projects on either Federal or nonfederal lands; and
  – Sufficient capitalization to carry out development, monitoring, and decommissioning, including the preliminary study phase of the project and the environmental review and clearance process.

- Documentation that the proposed project is in an area with low or comparatively low resource conflicts and where conflicts can be resolved (as demonstrated through many of the factors that follow).

- Documentation that the proposed project will optimize the use of existing roads.

- Documentation that the proposed project will optimize the capacity of existing and new transmission infrastructure, and avoid duplication in the use of or need for existing and new transmission and transmission interconnection facilities.

- Documentation that the proposed project will make efficient use of the land considering the solar resource, the technology to be used, and the proposed project layout.

- If applicable, documentation that the proposed project will be located in an area identified as suitable for solar energy development in an applicable BLM land use plan and/or by another related process such as the California DRECP (e.g., Development Focus Areas) or Arizona Restoration Design Energy Project (e.g., Renewable Energy Development Areas).

- If applicable, special circumstances associated with an application such as an expansion or repowering of an existing project or unique interagency partnership.

- If applicable, opportunities to combine Federal and nonfederal lands for optimum siting (e.g., combining BLM-administered land with adjacent previously disturbed private lands).

- If applicable, documentation that the proposed project will be located in, or adjacent to, previously contaminated[9] or disturbed lands such as brownfields

---

[9]   EPA and other parties have or will continue to characterize and cleanup these sites to ensure they are protective for people.

BLM_0018525

identified by the EPA's RE-Powering America's Land Initiative (http://www.epa.gov/renewableenergyland) or state, local and/or tribal authorities; mechanically altered lands such as mine-scarred lands and fallowed agricultural lands; idle or underutilized industrial areas; lands adjacent to urbanized areas and/or load centers; or areas repeatedly burned and invaded by fire-promoting non-native grasses where the probability of restoration is determined to be limited.  Preference will be given to proposed projects that are located in, or adjacent to, previously contaminated or disturbed lands under the variance process, assuming all other factors are adequately considered.

- Documentation that the proposed project will minimize adverse impacts on access and recreational opportunities on public lands (including hunting, fishing, and other fish- and wildlife-related activities).

- Documentation that the proposed project will minimize adverse impacts on important fish and wildlife habitats and migration/movement corridors (e.g., utilizing the Western Wildlife CHAT, administered by the Western Governor's Wildlife Council [http://www.westgov.org/wildlife/380-chat] and coordinating with state fish and wildlife agencies).

- Documentation that the proposed project will minimize impacts on lands with wilderness characteristics and the values associated with these lands (e.g., scenic values, recreation, and wildlife habitat).

- Documentation that the proposed project will be designed, constructed, and operated to optimize their specific generation technology's efficiencies with respect to water impacts.

- Documentation that any groundwater withdrawal associated with a proposed project will not cause or contribute to withdrawals over the perennial yield of the basin, or cause an adverse effect on ESA-listed or other special status species or their habitats over the long term.  However, where groundwater extraction may affect groundwater-dependent ecosystems, and especially within groundwater basins that have been over appropriated by state water resource agencies, an application may be acceptable if commitments are made to provide mitigation measures that will provide a net benefit to that specific groundwater resource over the duration of the project.  Determination of impacts on groundwater will likely require applicants to undertake hydrological studies using available data and accepted models.

- Documentation that the proposed project will not adversely affect lands donated or acquired for conservation purposes, or mitigation lands identified in previously approved projects such as translocation areas for desert tortoise.

BLM_0018526

- Documentation that significant cumulative impacts on resources of concern should not occur as a result of the proposed project (i.e., exceedance of an established threshold such as air quality standards).

- *Desert Tortoise*

  Designated desert tortoise conservation areas are excluded from the BLM's proposed Solar Energy Program. These areas include, but are not limited to, critical habitat for desert tortoise and specially designated areas such as BLM-designated ACECs that specifically identified desert tortoise as one of the Relevant and Important Values, National Parks, National Recreation Areas, and NWRs (see Appendix A, Table A-2).

  The USFWS has identified certain other areas that may be important for desert tortoise connectivity (i.e., priority desert connectivity habitat). Recovering desert tortoises throughout their range requires that conservation areas be connected by habitat linkages in which tortoises reside and reproduce. Such areas will need to be free of large-scale impediments from anthropogenic activities. The BLM has excluded from the Solar Energy Program approximately 515,000 acres (2,084 $km^2$) of land that coincides with priority desert tortoise connectivity habitat (see Appendix A, Table A-1, Exclusion #32).

- Maps and supporting information regarding priority desert tortoise connectivity habitat are available through the Solar PEIS project Web site (http://solareis.anl.gov).[10] Developers that propose utility-scale solar energy projects in variance areas that overlap priority desert tortoise connectivity habitat identified on USFWS maps will be required to meet with the BLM and USFWS early in the process as part of the previously mentioned preliminary meetings to receive instructions on the appropriate desert tortoise survey protocols and the criteria the BLM and USFWS will use to evaluate results of those surveys (see outline below). Applicants will be required to work with the BLM and USFWS to survey an appropriately sized area (which may be three to four times larger than the proposed project area) in an attempt to find a suitable project location or configuration that minimizes impacts on desert tortoises. The BLM and USFWS will discourage applications in the highest priority areas, given the anticipated high conflict, higher survey costs, and high mitigation requirements. The survey and data collection activities outlined below will facilitate the assessment of site-specific data and ground-

---

[10] The USFWS expects to update its map of priority connectivity habitat to reflect new information about desert tortoise connectivity habitat. The USFWS will make these map updates available through the Solar PEIS project Web site (http://solareis.anl.gov). These updates to USFWS maps will provide the public with current information regarding USFWS and BLM considerations under the variance process. Any amendment of applicable land use plans, including a decision by the BLM to exclude additional lands from future solar energy development, would follow compliance with all applicable BLM land use planning procedures.

BLM_0018527

truthing of the information provided in the USFWS map to determine whether a site is an acceptable location for utility-scale solar energy development.

– Tortoise density and distribution surveys. Desert tortoise density and distribution surveys will be conducted consistent with approved survey protocols (http://www.fws.gov/ventura/species_information/ protocols_guidelines/index.html) and will be conducted by USFWS-approved desert tortoise authorized biologists unless the USFWS determines authorized biologists are unnecessary (http://www.fws.gov/ ventura/species information/protocols_guidelines/index.html). The spacing and intensity of surveys will be determined in consultation with the BLM and USFWS. Two consecutive survey passes of the potential project development area will be required; the orientation of the second survey pass will be determined in consultation with BLM and USFWS to determine the best orientation based on factors such as topography and glare. Once a refined project site has been selected within the larger survey area, additional surveys could be recommended to ensure effective avoidance of desert tortoises.

– Habitat quality analyses. Evaluate the presence and condition of native vegetation communities (including herbaceous plants), soils, and so forth in the survey area.

– Tortoise connectivity studies. The methodologies for connectivity studies must be approved by the BLM and USFWS and peer reviewed by an accredited scientist prior to data collection. A first study should demonstrate that the linkage area and adjacent Tortoise Conservation Areas (TCAs) contain suitable tortoise habitat of sufficient size to support desert tortoise populations. If sufficient habitat is present, a second study should demonstrate that demographic and genetic connections can be maintained once the proposed project is developed. This should include evaluating existing barriers to connectivity and opportunities for tortoise-to-tortoise interactions at a local and regional scale and the availability of "live-in habitat."

– Corridor width evaluation. Using the site-specific data collected, including desert tortoise density and distribution (from protocol surveys), habitat quality analysis, and the desert tortoise connectivity evaluation, an applicant should identify corridors that will adequately maintain the connectivity around the proposed project. Such corridors must be approved by the BLM and USFWS.

– Survey for areas suitable for tortoise translocation, if applicable.

In evaluating information provided by an applicant, the BLM and USFWS will consider cumulative effects and landscape-level information consistent with desert tortoise recovery goals and objectives and best available science to determine if a project will result in acceptable impacts on desert tortoise. The applicant must provide documentation to the satisfaction of the BLM and USFWS of the following, unless a project is otherwise determined by the BLM and USFWS to have acceptable impacts on desert tortoise:

BLM_0018528

–   The project can be sited and constructed to allow for adequate connectivity corridors as determined by the BLM and USFWS that ensure that the project does not isolate or fragment tortoise habitat and populations;

–   The proposed site contains low tortoise densities consistent with the best available information for the subject geographic area, including data on local desert tortoise densities, when available, and data from the long-term USFWS rangewide monitoring of the Mojave Population of the desert tortoise (http://www.fws.gov/nevada/desert_tortoise/dt_reports.html);

–   The project will result in minimal translocation of adult and sub-adult tortoise to acceptable locations (>160 mm Midline Carapace Length) as determined by the BLM and USFWS;[11]

–   Any necessary mitigation will improve conditions within the connectivity area, and if these options do not exist, necessary mitigation will be applied toward the nearest tortoise conservation area (e.g., an ACEC for which tortoise had been identified in the Relevant and Important Criteria or critical habitat); and

–   A plan is in place to effectively monitor desert tortoise impacts, including verification that desert tortoise connectivity corridors are functional.  The required ESA consultation will further define this monitoring plan.

• *Greater Sage-Grouse*

Greater sage-grouse habitat (i.e., currently occupied, brooding, and winter habitat) as identified by the BLM in California, Nevada, and Utah will be excluded from BLM's proposed Solar Energy Program (see Section 2.2.2.1 of the Final Solar PEIS).

Developers that propose utility-scale solar energy projects in variance areas that overlap the range of the greater sage-grouse will be required to provide documentation of the following, unless a project is otherwise determined by the BLM and USFWS and appropriate state wildlife agencies to have acceptable impacts on greater sage-grouse:[12]

–   Project is at least 4 mi (6 km) from the nearest lek;

–   Project will not adversely affect Preliminary Priority Habitat; and

–   Project will be mitigated through land acquisition or habitat enhancement at a ratio of at least 1:1 for any impact on Preliminary General Habitat as determined by accepted standards of habitat analysis (e.g., habitat

---

[11]  For additional information on the criteria the USFWS will use to assess impacts on desert tortoise and desert tortoise connectivity habitat, see http://www.fws.gov/cno/energy.html.

[12]  Preliminary Priority Habitat (PPH) comprises areas that have been preliminarily identified as having the highest conservation value to maintaining sustainable greater sage-grouse populations.  These areas would include breeding, late brood-rearing, and winter concentration areas.  Preliminary General Habitat (PGH) comprises areas of occupied seasonal or year-round habitat outside of priority habitat.  PPH and PGH have been preliminarily identified by the BLM in coordination with respective state wildlife agencies (BLM 2011c).

BLM_0018529

equivalency analysis [HEA]) and in coordination with the USFWS and the appropriate state wildlife agencies.

- *Protecting Resources and Values of Units of the National Park System and Other Special Status Areas under National Park Service Administration*

The construction and operation of utility-scale solar energy projects and related transmission infrastructure near units of the National Park System and other special areas administered by the NPS, including National Historic Trails, may significantly affect park programs, resources, and values. For example, ecological resources (such as habitat and migration of species) and physical resources (such as wind, water, air, and scenic views) cross park boundaries, and park boundaries often do not represent all of the natural resources, cultural sites, and scenic vistas that make up resources and the quality of the park visitor's experience in these special places.

The NPS has identified areas within the proposed variance areas where utility-scale solar energy development poses a high potential for conflict with the natural, cultural, and/or visual resources administered by the NPS. The BLM has excluded from the Solar Energy Program approximately 821,000 acres (3,322 km$^2$) of land that coincides with NPS-identified areas of high-potential conflict (see Appendix A, Table A-1, Exclusion #32).

Maps and data documenting areas of high-potential conflict with National Parks, historic trails, and other areas under NPS administration are available through the Solar PEIS project Web site (http://solareis.anl.gov).[13] This information will promote public awareness and notify industry where additional documentation may be required to proceed with an application in variance areas. The maps and data are regarded as a first-order approximation of landscape-scale conditions and potential resource conflict and will be updated as new information and analytical tools are developed.

The BLM will utilize these maps and data in the screening of proposed solar energy projects in variance areas. In cases where a utility-scale solar energy development ROW application is submitted in a variance area identified as having a high potential for conflict with the resources of a unit of the National Park System or special areas administered by the NPS, additional documentation will be required. This documentation may include information

---

[13] Maps and data document areas of high potential for conflict with sensitive natural and cultural resources near 33 National Parks and one National Historic Trail. The NPS intends to update its maps and data to reflect new information regarding potential conflicts associated with units of the National Park System and other special areas administered by the NPS. The NPS will make updated maps and data available through the Solar PEIS project Web site (http://solareis.anl.gov). These updates to NPS maps and data will provide the public with current information regarding NPS and BLM considerations under the variance process. Any amendment of applicable land use plans, including a decision by the BLM to exclude additional lands from future solar energy development, would follow compliance with all applicable BLM land use planning procedures.

BLM_0018530

to verify any or all of the following potential resource conditions resulting from the proposed project:

– Increased loading of fine particulates (criteria pollutants: $PM_{2.5}$ and $PM_{10}$ [particulate matter with a diameter of 2.5 μm or less and 10 μm or less, respectively]) and reduced visibility in Class I and sensitive Class II areas;
– Vulnerability of sensitive cultural sites and landscapes, loss of historical interpretive value due to destruction or vandalism;
– Altered frequency and magnitude of floods, and water quantity and quality;
– Reduced habitat quality and integrity and wildlife movement and/or migration corridors, increased isolation and mortality of key species;
– Fragmentation of natural landscapes;
– Diminished wilderness, scenic viewsheds, and night-sky values on landscapes within and beyond boundaries of areas administered by the NPS; and
– Diminished cultural landscape qualities within and beyond boundaries administered by the NPS.

The documentation provided by an applicant must be sufficiently detailed as determined by the BLM and NPS. The documentation should represent the findings of science and the analyses of scientifically trained specialists in the appropriate natural, visual, and/or cultural resource disciplines. The NPS will prepare a response to the BLM regarding (1) whether the proposed project meets NPS protection, conservation, and/or restoration objectives; and (2) whether the resource conflict documentation is adequate to support a finding by the NPS and BLM that the proposed project is likely to avoid a high potential for conflict with resources and values associated with a National Park or other special status area under the administration of the NPS.

The NPS will continue to refine data for determining resource conflict and provide this information to the BLM for use in the variance process. The NPS will assist the BLM in identifying alternate project locations if there is insufficient information to verify potential resource conflict with sensitive resources and values of National Park and other NPS special status areas. In all cases, evaluations will be performed to ensure that natural, visual, and cultural resources of units of the National Park System and other special areas administered by the NPS are protected.

## B.5.4  Public Outreach

To sufficiently gather information on potential issues and barriers and/or opportunities related to a ROW application in a variance area, the BLM will require that a minimum of one public meeting be held as part of the variance process to allow for participation by all interested parties. The public meeting shall be located in close proximity to the community most affected by the proposal and shall be adequately noticed. This variance process requirement for a public meeting will occur before the NEPA process is initiated; comments received, however, may be

BLM_0018531

used to inform the NEPA process for projects that the BLM decides to continue to process. The BLM will also make information regarding ROW applications in variance areas available to the public online via the BLM Web site (www.blm.gov) and the Solar PEIS project Web site (http://solareis.anl.gov).

### B.5.5  BLM Coordination Activities

- As part of the variance process, the BLM will coordinate with appropriate Federal, state, and local government agencies and tribes. The review of ROW applications in coordination with these other entities will help the BLM determine the potential for impacts on important resources; explore ways to avoid, minimize, and/or mitigate such impacts; and ensure consistency with relevant plans, policies, and initiatives. Coordination activities will include the following:

- Consultation with tribes. Government-to-government consultation with tribal staff will provide opportunities for tribes to identify traditional cultural properties and sacred sites with applications in variance areas. Tribes will be invited to attend pre-application meetings with the applicant and the BLM. On the basis of information and discussions arising from the pre-application meetings, the BLM will determine whether there is a need for new ethnographic research to provide sufficient information to adequately consider the effects of solar energy development on issues and resources of concern to tribes. BLM field office cultural staff, including specialists assigned to Renewable Energy Coordination Offices where present, in consultation with their Deputy Preservation Officer, shall recommend to responsible BLM line officers whether to collect additional ethnographic data for a given solar application. Should new ethnographic research, studies, or interviews be recommended, the BLM cultural staff, in consultation with tribal officials, will provide guidance to BLM line officers about the appropriate scope of that work, provisions for safeguarding data confidentiality, and programs of mitigation.

- Coordination with the SHPO. The BLM will consult with the SHPO to determine the steps required to identify historic properties in the area of effect for the ROW application. Additional inventories may include Class II or Class III surveys in areas of direct and indirect effect, depending on the potential for impacts. On the basis of the results of the inventory, determinations of eligibility of sites to the NRHP, determinations of effect, and programs of mitigation would be approved by the BLM and carried out by the applicant prior to ground disturbance.

- Coordination with state fish and wildlife agencies.

- For applications in the DRECP planning area, the BLM will coordinate with California REAT agencies (BLM, USFWS, CDFG, and CEC) to ensure

BLM_0018532

consistency with any DRECP reserve and development area designs.  The REAT agencies will evaluate applications in areas proposed for development, focus areas, and areas proposed for reserves on a case-by-case basis.  The REAT agencies will consider the best available information, including data generated as part of the DRECP planning effort.  The BLM may choose to defer or modify projects on a case-by-case basis if it determines that approval of the proposed project would harm resource values so as to limit the choice of reasonable alternative actions in the DRECP (H-1601-1—*Land Use Planning Handbook* [BLM 2005]).

- Coordination with the NPS to assess the potential for impacts on the resources and values of units of the National Park System and other special status areas under NPS administration (e.g., National Scenic or Historic Trails).

- Coordination with the NPS, USFS, and/or BLM National Trails System Office charged with trail-wide administration or management for National Scenic or Historic Trails to review inventory adequacy or needs, and to assess potential adverse impacts on trails (see Appendix A, Section A.2.2.23, for inventory requirements).  Coordination is also required with the study agency for trails recommended as suitable in congressionally authorized Trail Feasibility Studies or trails undergoing such study.  Coordination is also required with nonprofit National trail organizations for trails subject to exclusion provisions.  Other related program coordination requirements must also be met, such as those for cultural resources, recreation and visitor services, visual resources, or NLCS.

- Coordination with the USFWS on any application that could result in impacts on ESA-listed species and their habitat (including, but not limited to, desert tortoise and sage-grouse), bald and golden eagles, and migratory birds.

- Coordination with state and local (county and/or municipal) governments to determine compatibility with officially adopted plans and policies (e.g., comprehensive land use plans, open space plans, conservation plans) and permit requirements (e.g., special use permits).

- Consultation with the DoD.  The BLM will consult the DoD to minimize and/or eliminate impacts on military operations and encourage compatible development.  This consultation will include both general discussions for early planning and detailed assessments of specific proposals at the local level.  The BLM will accept formal DoD submissions once they have been vetted through both the Military Departments and the DoD Siting Clearinghouse.

- Coordination with the USACE.

- Coordination with the EPA.

BLM_0018533

- Coordination with state and regional transmission planning efforts (e.g., WGA, Nevada Renewable Energy Transmission Access Advisory Committee, New Mexico Renewable Energy Transmission Authority), transmission coordination authorities (e.g., WECC), state energy offices, and transmission system operators to identify any transmission issues associated with the proposed project (e.g., capacity and land use considerations).

- Coordination with railroad industry to determine potential for impacts on railroad ROWs and railroad operations.

- Coordination with any potentially affected grazing permittee/lessee to discuss how the proposed project may affect grazing operations and address possible alternatives, as well as mitigation and compensation strategies.

- Coordination with existing ROW holders to determine potential impacts on existing BLM authorizations.

- Coordination with the owner of any Federal mining claims and/or mineral leases located within the boundaries of the proposed project to determine the potential for impacts on mining claims and/or mineral leases and discuss ways to avoid, minimize, or mitigate such impacts.

## B.5.6  Variance Process Determination

The BLM has determined that, in appropriate circumstances, it can rely on the broad discretion it has under FLPMA to deny ROW applications without completing the NEPA process.  Such decisions must be made with regard for the public interest and be supported by reasoned analysis and an adequate administrative record.  Decisions to deny pending applications must be assessed on a case-by-case basis.  Denial of an application constitutes a "final agency action" and is therefore subject to administrative appeals to the IBLA.

On the basis of a thorough evaluation of the information provided by an applicant and the input of Federal, state, and local government agencies, tribes, and the public, the BLM will determine whether it is appropriate to continue to process, or to deny, a ROW application submitted through the variance process.  Variance evaluations will be conducted and documented at the BLM state and field office levels.  To ensure a consistent application of the variance process, all ROW applications in variance areas that are determined to be appropriate for continued processing will be submitted by the BLM State Director to the BLM Washington Office for the Director's concurrence.

ROW applications in variance areas that the BLM determines to be appropriate for continued processing will generally be processed, at the applicant's expense, in compliance with NEPA and all other applicable laws, regulations, and policies, including but not limited to the ESA, the NHPA, and the NPS Organic Act of 1916.  Many of the actions taken under the variance process, however, could be incorporated into subsequent requirements such as NEPA.  Proposed projects

BLM_0018534

in variance areas will require consideration of alternatives and will likely result in EIS-level NEPA documentation.  Compliance with applicable laws, regulations, and policies could result in substantial changes to a project proposal or application denial.

## B.6 REFERENCES

BLM (Bureau of Land Management), 2005, *Land Use Planning Handbook*, H-1601-1, U.S. Department of the Interior, Washington, D.C., March.

BLM, 2008, *BLM National Environmental Policy Act Handbook*, H-1790-1, National Environmental Policy Act Program, Office of the Assistant Director, Renewable Resources and Planning (WO-200), Washington, D.C., Jan.  Available at http://www.blm.gov/pgdata/etc/ medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.24487.File. dat/h1790-1-2008-1.pdf.

BLM, 2009a, *Instruction Memorandum 2009-153, Financial Guarantees for Notices and Plans of Operations*, U.S. Department of the Interior, Washington D.C., June 19.

BLM, 2009b, *Manual of Surveying*, U.S. Department of the Interior, Washington, D.C.

BLM, 2010, *Solar Energy Interim Rental Policy*, Instruction Memorandum 2010-141, U.S. Department of the Interior, Washington, D.C., June 10.

BLM, 2011a, *Solar and Wind Energy Applications – Due Diligence*, Instruction Memorandum 2011-060, U.S. Department of the Interior, Washington, D.C., Feb. 7.

BLM, 2011b, *Solar and Wind Energy Applications – Pre-application and Sceening*, Instruction Memorandum 2011-061, U.S. Department of the Interior, Washington, D.C., Feb. 7.

Department of the Treasury, 2011, *Companies Holding Certificates of Authority as Acceptable Sureties on Federal Bonds and as Acceptable Reinsuring Companies*, 4810-35, Dept. Circular 570, 2011 Revision, July 1.

BLM_0018535

**BLM**

**United States Department of the Interior**
**Bureau of Land Management**

---

# Environmental Assessment
## for the
## West Elk Coal Lease Modifications Application

---

Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, Colorado 81401

**DOI-BLM-CO-150-2012-13-EA**

**June 2012**



BLM_0018536

# Table of Contents

**Chapter 1** .................................................................................................................**3**

1.1 Introduction: ...................................................................................................... 3

1.2 BLM's Purpose/Need for the Proposed Action: ............................................... 4

1.3 Land Use Plan Conformance: .......................................................................... 4

1.4 Other Related NEPA Documents: .................................................................... 5

1.5 Scoping and Public Involvement and Issues: ................................................ 10

**Chapter 2 – Alternatives and Proposed Action**......................................................**11**

2.1 Description of Proposed Action and Alternatives: .......................................... 11

    2.1.1 No Action Alternative .............................................................................. 11

    2.1.2 Proposed Action Alternative ................................................................... 11

2.2 Alternatives Considered but Eliminated from Detailed Analysis: ................... 15

2.3 Coal Lease Modification Regulations ............................................................. 16

**Chapter 3 - Affected Environment, Environmental Consequences, and Mitigation
Measures**..............................................................................................................**17**

3.1 Air Quality and Atmospheric Values .............................................................. 21

    **3.1.1 *Affected Environment***.......................................................................... 21

    **3.1.2 No Action Alternative Environmental Effects** ........................................ 31

    **Proposed Action Alternative Environmental Effects** ...................................... 41

    ***Cumulative Effects & Climate Change*** ......................................................... 41

3.2 Socioeconomics ............................................................................................ 47

    3.2.1 Affected Environment ............................................................................. 47

    3.2.2 Environmental Impacts Analysis ............................................................ 50

3.3 Environmental Justice ................................................................................... 51

    3.3.1 Affected Environment ............................................................................. 51

3.4 Cumulative Impacts Summary....................................................................... 53

**Chapter 4 – Consultation and Coordination – Tribes, Individuals, Organizations,
Agencies**..............................................................................................................**57**

**List of Preparers**...................................................................................................**58**

BLM_0018537

**U.S. Department of the Interior**
**Bureau of Land Management**

# ENVIRONMENTAL ASSESSMENT

**EA-NUMBER:** DOI-BLM-CO-150-2012-13-EA

**PERMIT/LEASE NUMBER:** COC-1362 and COC-67232

**PROJECT NAME:** West Elk Mine Coal Lease Modifications

**LEGAL DESCRIPTION:**

| Lease Modification Tract Location Acreages | | |
|---|---|---|
| **Lease Modification Tract** | **Location** | **Acreage** |
| COC-1362 | T. 14 S., R. 90 W., 6th P.M.<br>• Sec. 10: SE, NESW;<br>• Sec. 11: SW, S2NW;<br>• Sec. 14: NWNW, NENW, W2SENW, SWNW, NWSW, W2NWSW;<br>• Sec. 15: E2NE, N2SE | Approximately 800 acres |
| COC-67232 | T. 14 S., R. 90 W., 6th P.M<br>• Sec. 11: SWNE, W2SE;SESE<br>• Sec. 14: E2SENW, NE, SE, S2SW, E2NESW;<br>• Sec. 15: SESE;<br>• Sec. 22: E2NE;<br>• Sec. 23: NW, NWNE | Approximately 921 acres |

**APPLICANT:** Mountain Coal Company

# Chapter 1

## 1.1 Introduction:

This preliminary Environmental Assessment (EA) has been prepared in response to the request by the Mountain Coal Company (MCC or the "Proponent") to modify existing Federal coal leases at the West Elk Mine. The West Elk Mine is located 1 mile east of the community of Somerset on the south side of State Highway 133, and approximately 10 miles east of the town of Paonia, in Gunnison County, Colorado.

The Proponent is applying to add approximately 800 acres to lease COC-1362 and approximately 921 acres to lease COC-67232 for a total of approximately 1,721 acres. MCC

3

BLM_0018538

applied for the two coal lease modifications, which are immediately adjacent to their existing Federal coal leases at the West Elk Mine, so that they can continue to mine and sell compliant and super-compliant coal. The West Elk Mine holds approximately 14,395 acres of Federal coal leases, and approximately 3,656 acres of fee coal lands. MCC is in the process of mining E-Seam reserves in existing portions of COC-1362 and COC-67232 leases.

The West Elk Mine is permitted by the State to produce up to 8.5 million tons of coal and coal-refuse annually. The West Elk Mine has been in operation since 1982, and produced approximately 6 million tons of coal in 2011.  The Proposed Action or Proposed Action Alternative would both constitute an expansion of that original mine, continuing mining operations into an additional area. However, neither the Proposed Action nor Proposed Action Alternative would increase annual production beyond previously authorized limits.

## 1.2 BLM's Purpose/Need for the Proposed Action:

**Purpose:**

The BLM purpose is to decide whether to accept the coal lease modifications as applied for by MCC, reject the applications, or modify the proposed lease modifications.

**Need:**

The need is to respond to a request to modify existing leases in accordance with the requirements of the Mineral Leasing Act of 1920 (MLA) and the Mineral Leasing Act for Acquired Lands of 1947 (MLAAL), the Federal Coal Leasing Act Amendments of 1976 (FCLAA), the Federal Land Policy and Management Act of 1976 (FLMPA), National Environmental Policy Act of 1969 (NEPA), the Energy Policy Act of 2005, 43 CFR 3400, and all other applicable laws, rules, regulations, standards, policies, and guidelines. The BLM is required to facilitate the recovery of known Federal coal reserves; to make Federal coal reserves accessible for development; and to foster and encourage the orderly development of domestic coal reserves.

## 1.3 Land Use Plan Conformance:

The Proposed Action and the Proposed Action Alternative were reviewed for conformance (43 CFR 1610.5, BLM 1617.3) with the following plan:

Name of Plans:  Uncompahgre Basin Resource Management Plan (RMP)

Date(s) Approved: 1989 (BLM)

Results:  The RMP made provisions for coal leasing subject to the application of the 20 Coal Unsuitability Criteria (as established in 43 CFR 3461). Federal coal lands not meeting the standards required by each criterion are determined to be unsuitable for coal leasing. A number of criteria have exemptions and exceptions, and the application of these exemptions and exceptions may allow certain types of coal mining.

BLM_0018539

## 1.4 Other Related NEPA Documents:

The following NEPA documents were previously prepared for actions at the West Elk Mine, or other coal mines in the North Fork Valley.  They inform the analysis in this EA.

1) Box Canyon Federal Coal Lease EA and DN (Decision Notice), 1995. Document relates to cumulative effects.

2) Raven Gulch Coal Exploration License EA and DN and Finding of No Significant Impact (FONSI), 1998. Document relates to cumulative effects.

3) Iron Point Exploration License, the Iron Point Coal Lease Tract and the Elk Creek Coal Lease Tract Environmental Impact Statement ("North Fork Coal <u>EIS</u>") and Record of Decision. March 30, 2000. Document relates to cumulative effects.

4) Coal Lease Modifications for Federal Coal Leases C-1362 and COC-56447 EA and DN, 2001. Document relates to cumulative effects.

5) Coal Methane Drainage Project NEPA analyses and related decisions: Decision Memos from 2001; Panel 15 Methane Drainage Wells EA and DN/FONSI, 2001; Panels 16 to 24 EA and DN/FONSI, 2002; Sylvester Road Temporary Road Construction and Box Canyon Methane Drainage Wells EA and DN/FONSI, 2003. Document relates to cumulative effects.

6) West Flatiron Federal Coal Lease EA and DN/FONSI, 2003. Document relates to cumulative effects.

7) Dry Fork Coal Lease-by-Application Final EIS, 2005 and Record of Decision, 2006. Document relates to cumulative effects and effects analysis on parent lease COC-67232.

8) Sylvester Gulch/Long Draw Supplemental EA and DN/FONSI, 2006. Document relates to cumulative effects.

9) Deer Creek Shaft and E Seam Methane Drainage Wells Project FEIS August 2007 Records of Decision August 2007 (Shaft), November 2007, March 2008 and Errata January 2008. Documents relate to cumulative effects, methane capture and existing condition of the affected parent leases.

<u>Incorporated by Reference</u>

Additionally, this EA incorporates by reference the United States Forest Service (USFS) Draft EIS, Federal Coal Lease Modifications COC-1362 & COC-67232 (available for public comment until July 9, 2012, and can be found at: http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/68608_FSPLT2_126547.pdf).  This USFS Draft EIS analyzes the impacts that would be

5

BLM_0018540

associated with the USFS consent decision to modify federal coal leases COC-1362 and COC-67232, and includes all relevant stipulations from the parent leases.  The relevant sections (and USFS Draft EIS page numbers) concerning surface and other ground-disturbance related impacts from the proposed lease modifications are described below:

- Topographic & Physiographic Environment (pp. 77-80): If the No Action Alternative is selected, the coal resource in the proposed lease modification areas would not be mined and the topography of the area would remain unchanged except for natural processes.  If the lease modifications are approved, the act of leasing would cause no topographic change in the area.  However, subsequent underground longwall mining would cause approximately 2,400 acres of subsidence in and around the lease modification area.

- Geology (pp. 80-83):  If the No Action Alternative is selected, the coal resource in the proposed lease modification areas would not be mined and the structural and lithologic integrity of the modification areas would remain in place.  If the lease modifications are approved, the overburden (including existing geologic structure and lithologic continuity) would be altered by subsidence due to the collapse of material into the void caused by extraction of coal.  However, due to the thickness of the overburden in the lease tract, and the absence of bedrock cliffs, it is anticipated that evidence of subsidence would not easily be seen by casual observers.  Additionally, mining of the coal could result in methane loss within the coal bed and recoverability of any gas resource present in geologic formations in and/or above the coal seams could be reduced due to the evacuation of gas through mine ventilation.

- Soils (pp.83-87): If the No Action Alternative is selected, the coal resource in the proposed lease modification areas would not be mined and the soil conditions would exist in their current state affected only by ongoing natural processes and other existing land uses.  If the lease modifications are approved, impacts to the soil resource from subsidence would include cracks – these cracks tend to self-heal due to sloughing and natural filling by soil material.  Additionally, if the lease modifications are approved and subject to the Colorado Roadless Rule, surface use of approximately 73 acres could occur due to access roads, methane drainage, and related activities.  Previous surface disturbance in the area has been revegetated between two and five years after reclamation work is completed.

- Watershed (pp. 87-93):  If the No Action Alternative is selected, there would be no mining-induced effects on water resources in the modification area. Current ongoing activities in the watershed as well as natural variation in spring, seep, and stream flow would continue to occur based on climatic variations.  If the lease modifications are approved, subsidence may alter surface water and groundwater hydrology by altering groundwater flow regimes, surface water drainages, seeps, and ponds.

- Vegetation (pp. 94-98):  If the No Action Alternative is selected, vegetative conditions would continue as they currently exist as modified by other actions in the area discussed in the cumulative effects discussion.  If the lease modifications are approved, subsidence may result in impacts to vegetation from minor landslides; however, the likelihood of vegetative loss due to subsidence is minimal.  Additionally, if the modifications are approved and subject to the Colorado Roadless Rule, the roads and

6

well pads that would be placed in the modification areas would result in a complete loss of existing vegetation.  However, the vegetative habitat would only be removed in the short and mid-term and pursuant to the parent lease stipulations would be revegetated.

- Threatened and Endangered Species (pp. 98-105):  The only listed species with habitat in the proposed lease modification area is the Canada lynx.  If the No Action Alternative is selected, there would be no change to current habitat or population conditions of the Canada lynx.  If the lease modifications are approved, it is not anticipated that there would be any habitat loss due to subsidence.  However, if the lease modifications are approved and subject to the Colorado Roadless Rule, the surface impacts due to road construction and well pad development would result in the following potential effects to lynx:
  - Short-term direct effects of habitat loss / alteration
  - Short-term direct effects from disturbance to denning or foraging
  - Short-term direct effects of mortality from traffic or shooting
  - Impacts from changes in winter access (competition and disturbance)
  - Long-term direct effects as a result of changes in vegetation, which provides denning and foraging habitat

- Sensitive Species (pp. 105 – 118):  The sensitive wildlife species found in the GMUG forest with known habitat, or known or potential sightings are: the American marten, Pygmy shrew, Northern goshawk, Boreal owl, Olive-sided flycatcher, Flammulated owl, Hoary bat, Northern leopard frog, and Purple martin.  Under the No Action Alternative, there would be no coal mined in the proposed lease modifications and therefore no impact to species apart from existing natural conditions and other projects in the species habitat areas.  If the lease modifications are approved, there would be the potential for habitat impacts due to subsidence; however, this is unlikely.  Additionally, if the lease modifications are approved and subject to the Colorado Roadless Rule, there would be impact to habitat due to road construction and well pad development.  These impacts would be short, mid and long-term, but there would be no permanent impact to species due to the stipulations to mitigate impacts and reclaim the habitat areas.

- Sensitive Plants (pp. 118-119):  There are two Forest Service sensitive plant species known to occur or likely to occur in the project area: Rocky Mountain thistle and Colorado tansy-aster.  If the No Action Alternative is selected, there would be no short-term changes to habitat or population conditions of sensitive plant species.  Long-term changes would be dependent on existing natural conditions and other actions in the habitat areas.  If the lease modifications are approved, there would also be no detrimental impact to habitat or population conditions.  The Colorado tasty-aster has not been documented in the project area; however, if populations were encountered they would be avoided or have other mitigation implemented.  If the lease modifications are approved and subject to the Colorado Roadless Rule, there would likely be a beneficial impact to the Rocky Mountain thistle because of the creation of possible disturbance areas suitable for propagation.

- Management Indicator Species (pp. 119-124):  A complete list of GMUG Management Indicator Species (MIS) is presented in Appendix 2 of the Biological Evaluation.  The three MIS analyzed in the Draft EIS are: Elk, Merriam's wild turkey, and Red-napped

7

BLM_0018542

sapsucker.  If the No Action Alternative is selected, there would be no short-term habitat impact for any of the three species and the long-term changes would continue to be dependent on natural conditions and other actions in the habitat areas.  If the lease modifications are approved and are subject to the Colorado Roadless Rule, the following potential effects to each species are:

- o <u>Elk</u>:
    - • Short-term direct effects during construction (visual or auditory disturbance or displacement of individuals from machinery, vehicles and humans)
    - • Long-term direct effects as a result of changes in forage and cover
    - • Long-term indirect effects as a result of changes in human use in the area
- o <u>Merriam's wild turkey</u>:
    - • Short-term direct effects during construction (visual or auditory disturbance or displacement of individuals from machinery, vehicles and humans)
    - • Short-term direct mortality of eggs/nests during construction activities.
    - • Long-term direct effects as a result of changes in forage and cover
    - • Long-term indirect effects as a result of changes in human use in the area
- o <u>Red-naped sapsucker</u>:
    - • Short-term effects of disturbance during construction
    - • Short-term potential for loss of young during construction
    - • Long-term changes to habitat

- <u>Migratory Birds</u> (pp. 124-126):  Table 3.26 of the USFS Draft EIS lists all bird species of conservation concern in the Southern Rockies/Colorado Plateau region. If the No Action Alternative is selected, there would be no current habitat or population changes to any bird species.  If the lease modifications are approved, the act of leasing itself will have no impact on bird species.  However, post leasing development may impact some species protected under the Migratory Bird Treaty Act and parent lease stipulations require surveys and timing restrictions where necessary for certain species.

- <u>Range Resources</u> (pp. 126-128):  If the No Action Alternative is selected, existing grazing would continue in the area without change and range management practices would continue to be implemented on an annual basis.  If the lease modifications are approved, subsidence-induced ground movements would have the potential to damage stock ponds, fences, or stock trails if surface tension cracks form where these features are present.  However, these potential impacts are unlikely.  Additionally, if the lease modifications are subject to the Colorado Roadless Rule, road and drill pad construction could interrupt grazing rotations, damages fences, and/or reduce forage.  The USFS Draft EIS Table 3.27b summarizes potential range impacts from post-lease development.

- <u>Recreation</u> (pp. 128-129):  If the No Action Alternative is selected, current recreation uses and activities would continue and there would be no impact on any recreation uses.  If the lease modifications are approved, there would be no impact on recreation use from subsidence.  However, if the lease modifications are subject to the Colorado Roadless Rule, the presence of drill rigs and heavy equipment could impact the recreational opportunities in the modification areas.  These impacts would be short-term and have no permanent impact on the recreation uses of the area.

BLM_0018543

- Transportation (pp. 129 – 132):  If the No Action Alternative is selected, no additional impacts on the transportation system would be expected. On-going effects related to methane drainage drilling would continue to occur on CR 710/NFSR 710 and NFSR 711 until project completion.  If the lease modifications are approved, there would not be an increase in impacts to local traffic from MCC employees.  Additionally, it is very unlikely that there would be any subsidence related impacts to roads.  If the lease modifications are subject to the Colorado Roadless Rule, there would be increased traffic on NFSR 710 and the possible need to upgrade the road due to the need for over-sized vehicles (such as drill rigs for MDWs) to access the area.

- Roadless (pp. 132-144):  As of the date of availability for the USFS Draft EIS, the 2001 Roadless Rule is in effect and includes the lease modification areas which are in the West Elk Inventoried Roadless Area (IRA).  The 2001 Roadless Rule prohibits any new road construction in IRAs (there are limited exceptions to this prohibition however none apply to the lease modifications analyzed in the USFS Draft EIS).  In 2005, a new Roadless Rule was enacted which allows individual states to petition for state specific roadless rules.  Both the 2001 and 2005 Roadless Rules have been the subject of extensive litigation, but currently neither is enjoined and both are in full force and effect. The State of Colorado has petitioned for a state specific roadless rule and the Final EIS analyzing the Colorado Roadless Rule was released on May 2, 2012.  The Colorado Roadless Rule prohibits new road construction in Colorado Roadless Areas (CRAs); however, it includes an exception that allows for temporary road construction associated with mining in the North Fork Coal Area.  The lease modification areas analyzed in the USFS Draft EIS are within the Sunset CRA and the North Fork Coal Area.  Therefore, if the lease modifications are approved and subject to the Colorado Roadless Rule, construction of 6.5 miles of temporary roads would be allowed in order to drill MDWs.

  If the No Action Alternative is selected, no temporary roads would be constructed and there would be no associated impacts.  If the lease modifications are approved and subject to the 2001 Roadless Rule, there would be no temporary road construction allowed in the West Elk IRA to drill MDWs and such wells would have to be drilled using alternative methods (helicopters, directional drilling, etc.).  If the lease modifications are approved and subject to the Colorado Roadless Rule, temporary road construction would be allowed in the Sunset CRA.  Impacts associated with road construction would be temporary and the area would be restored to baseline conditions following the mining of coal in the modification areas.

- Heritage Resources (pp.144-145):  There are no inventoried cultural resources in the modification areas.  If the No Action Alternative is selected, there would be no effect to historic properties.  If the lease modifications are approved, any post-lease mining activities would be subject to the requirement of lease stipulations relating to cultural resources and there would be no impact to historic properties.

- Visuals (pp. 145-147):  If the No Action Alternative is selected there will be no visual impacts from mining in the lease modification areas – any visual impacts in the area will result from other activities and natural conditions.  If the lease modifications are approved, the visual impacts in the area would be limited because underground access

9

to the coal resource would be through the existing West Elk Mine.  Any subsidence that may result from mining would likely not cause any readily visible impact.  If the lease modifications are approved and subject to the Colorado Roadless Rule, there would be no visual impacts to nearby public roads or Wilderness Areas.

## 1.5 Scoping and Public Involvement and Issues:

The United States Forest Service - Grand Mesa Uncompahgre Gunnison (USFS GMUG), as the responsible Surface Management Agency (SMA), prepared a Notice of Opportunity to Comment in relation to the Proposed Action. The Notice of Opportunity to Comment was published in *the Grand Junction Daily Sentinel* (the newspaper of record) and in the *Delta County Independent* on April 21, 2010. The Notice of Opportunity to Comment asked for public comment on the proposed lease modifications from April 21, 2010 through May 21, 2010. In addition, as part of the public involvement process, the GMUG sent out approximately 120 letters to local, State, Native American Tribal, and other Federal agencies; as well to interested parties, commercial entities, and environmental and user groups. The GMUG also posted scoping materials to their website, as well as to their Schedule of Proposed Actions.

During the comment period, approximately 684 versions of email form letters were received from Wild Earth Guardians and their supporters;1,900 versions of email form letters were received from Defenders of Wildlife and their supporters; 23,771 versions of email form letters were received from the Natural Resources Defense Council and their supporters; 5,647 versions of email form letters were received from Earth Justice and their supporters; 576 hardcopy/faxed form letters were received from local community members in four Colorado Counties; 74 original (or somewhat original) comments were received; and four original comments with attachments were received in response to this scoping effort.

For the preparation of this EA, the BLM interdisciplinary (ID) Team prepared a list of key issues, within the jurisdiction of the agency, to be addressed in this EA (see Table 1 - BLM/Key Issues below).

| Table 1 - BLM Key Issues | | |
|---|---|---|
| **Topic** | **Issue** | **Where Addressed** |
| Air Quality | Effects of the Proposed Action and Proposed Action Alternative may occur on air quality including ambient ozone, PM2.5, PM10, VOCs, Class I areas in compliance with the Clean Air Act. | Chapter 3 |
| | Cumulative effects to air quality associated with coal burning may occur as a result of the Proposed Action and Proposed Action Alternative. | Chapter 3 |
| Socioeconomics | Coal mining activities are vital to the local and regional economies. | Chapter 3 |
| | Coal from the North Fork Valley helps fuel clean coal technology and provide the USA with low-cost, reliable energy. | Chapter 3 |
| Climate Change | Effects on climate change may occur | Chapter 3 |

10

BLM_0018545

| Table 1 - BLM Key Issues | | |
|---|---|---|
| Topic | Issue | Where Addressed |
| | from mining coal which stem from the release of methane through the mine ventilation system, release of methane through any gob vent boreholes and release of CO2 caused by the burning of coal that is mined. | |
| Methane | Consider alternatives to venting including flaring, capture and use, or destroying ventilation air methane (VAM). | Chapters 2 and 3 |
| Evaluation of Impacts | Evaluate the direct, indirect and cumulative impacts of the Proposed Action and Proposed Action Alternative. | Chapter 3 |
| Reasonably Foreseeable Actions | Consider lease action with other reasonably foreseeable actions in North Fork Valley. | Chapter 3 |

# Chapter 2 – Alternatives and Proposed Action

## 2.1 Description of Proposed Action and Alternatives:

### 2.1.1 No Action Alternative

In accordance with Council on Environmental Quality (CEQ) regulations, which require a No Action Alternative be presented in all environmental analyses in order to serve as a "base line" or "benchmark" from which to compare all proposed "action" alternatives, the No Action Alternative is analyzed in this EA.

Under the No Action Alternative, the Proponent's request for the coal lease modifications would not be approved. The Federal coal reserves in the lease modification areas would be bypassed by the current mining operation.

### 2.1.2 Proposed Action Alternative

The Proponent, MCC, is requesting to modify existing Federal coal leases at the West Elk Mine (see Proposed Action Location Map on next page). The Proposed Action, as proposed by MCC, is to add approximately 800 acres to lease COC-1362 and approximately 921 acres to lease COC-67232 for a total of approximately 1,721 acres. Associated methane drainage well installation, and the foreseeable land disturbance includes an additional 73 acres (approximately) of disturbance for 48 additional methane drainage wells and access routes. Under the Proposed Action Alternative, if the BLM receives consent from the USFS, the BLM would issue the lease modifications subject to USFS stipulations attached to the parent leases (see Appendix B) and pursuant to the lease addendums.

BLM_0018546

Proposed Action General Location of Project Area Map



BLM_0018547

Proposed Action Location Map



13

BLM_0018548

**BLM Design Features/Mitigation Measures**

**Methane Flaring, Capture/Use or other Alternatives to Venting**

**Lease Addendum Carried Forward from Parent Lease COC-1362 and Parent Lease COC-67232 Specific to Forest Service Lands:**

Sec. 3. Notwithstanding the language in Sec.2 of this lease and subject to the terms and conditions below, lessee is authorized to drill for, extract, remove, develop, produce and capture for use or sale any or all of the coal mine methane from the above described lands that it would otherwise be required to vent or discharge for safety purposes by applicable laws and regulations. For purposes of this lease, "coal mine methane" means any combustible gas located in, over, under, or adjacent to the coal resources subject to this lease, that will or may infiltrate underground mining operations. Sec. 4. Notwithstanding any other provision of this lease, nothing herein shall, nor shall it be interpreted to, waive, alter or amend lessee's right to vent, discharge, or otherwise dispose of coal mine methane as necessary for mine safety or to mine the coal deposits consistent with permitted underground mining operations and federal and state law and regulation. Lessee shall not be obligated or required to capture for use or sale coal mine methane that would otherwise be vented or discharged if the capture of coal mine methane, independent of activities related to mining coal, is not economically feasible or if the coal mine methane must be vented in order to abate the potential hazard to the health or safety of the coal miners or coal mining activities. In the event of a dispute between lessor and lessee as to the economic or other feasibility of capturing for use or sale the coal mine methane, lessor's remedy as a prevailing party shall be limited to recovery of the compensatory royalties on coal mine methane not captured for use or sale by lessee. Lessee shall have the right to continue all mining activities under the lease, including venting coal mine methane, pending resolution of any dispute regarding the application of the terms of Sections 3 and 4. Sec. 2 (c) COAL MINE METHANE OPERATIONS AND ROYALTIES Notwithstanding the language in Part II, Section 2 (a) of this lease, the royalty shall be 12.5 percent of the value of any coal mine methane that is captured for use or sale from this lease. For purposes of this lease, the term "capture for use or sale" shall not include and the royalty shall not apply to coal mine methane that is vented or discharged and not captured for the economic or safety reasons described in Part I, Section 4 of this lease. Lessee shall have no obligation to pay royalties on any coal mine methane that is used on or for the benefit of mineral extraction at the West Elk coal mine. When not inconsistent with any express provision of this lease, the lease is subject to all rules and regulations related to Federal gas royalty collection in Title 30 of the Code of Federal Regulations now or hereinafter in effect and lessor's rules and regulations related to applicable reporting and gas measurement now or hereinafter in effect.

SEVERABILITY- In the event any provision of this addendum is subject to a legal challenge or is held to be invalid, unenforceable or illegal in any respect, the validity, legality and enforceability of this lease will not in any way be affected or impaired

14

thereby and lessee will retain, in accordance with the terms of this lease, the exclusive right and privilege to drill for, mine, extract, remove or otherwise process and dispose of the coal deposits, upon, or under the lands described in this lease, including the right to vent or discharge coal mine methane for safety purposed as required by applicable laws and regulation.

2.2 Alternatives Considered but Eliminated from Detailed Analysis:

The BLM is required to analyze all reasonable alternatives necessary in order to permit a reasoned choice (40 CFR 1502.14). If the BLM considers alternatives during the environmental analysis process, but decides not to analyze them in detail, the alternatives must still be identified, along with a brief explanation as to why they were eliminated from further analysis (40 CFR 1502.14). An alternative may be eliminated from detailed analysis if:

- it would not fulfill requirements of the FLPMA, or other applicable laws, rules, regulations, policies, standards, or guidelines;

- it would not meet the Purpose and Need for the Proposed Action;

- it is technically or economically infeasible (considering whether implementation of the alternative is likely, given past and current practice and technology)

- it is remote or speculative to implement;

- it is inconsistent with the basic policy objectives for the management of the area [that is, it is not in conformance with the Project Area Resource Management Plan (RMP)];

- it is substantially similar in design to an alternative that is analyzed; and/or

- it would result in substantially similar impacts to an alternative that is analyzed (BLM 2008).

Alternatives that were considered, but eliminated from detailed analysis, are discussed below.

**Approve One Lease Modification Request and Reject the other Modification**

An alternative to approve only one of the two lease modifications requested, while rejecting the other lease modification requested, was considered but eliminated from further analysis. The BLM may modify the lease in order to include all or part of the lands applied for *if* it is determined that:

- the modification serves the interests of the United States;

- there is no competitive interest in the lands or deposits; and

BLM_0018550

- the additional lands or deposits cannot be developed as part of another potential or existing independent operation [43 CFR 3432.2(a)].

The BLM reviewed the lease applications and determined that *both modifications* meet the above-mentioned requirements. In addition, in accordance with the requirements of the MLA, the MLAAL, the FCLAA, the FLMPA, the Energy Policy Act of 2005, 43 CFR 3400, and all other applicable rules, regulations, standards, policies, and guidelines, the BLM is required to facilitate the recovery of known Federal coal reserves; to make Federal coal reserves accessible for development; and to foster and encourage the orderly development of domestic coal reserves. The purpose and need for the BLM, in relation to the Proposed Action and the resulting preparation of this EA, is to respond to the coal lease modifications application as required by law, and to: approve the modifications, as proposed, in order to prevent the bypassing of approximately 10.1 million recoverable tons of Federal coal (considered under the Proposed Action); to approve the modifications, with design features, in order to prevent the bypassing of approximately 10.1 million recoverable tons of Federal coal (considered under the Proposed Action Alternative); or to deny the proposed modifications (considered under The No Action Alternative). The coal lease modification tracts would allow a more efficient mine layout that improves access to more coal reserves in the parent lease area thus preventing bypass of coal reserves within an existing lease. Approving one lease and not the other would not fulfill requirements of the FLPMA, or other applicable laws, rules, regulations, policies, standards, or guidelines; and it would not meet the purpose and need for the Proposed Action.

## 2.3 Coal Lease Modification Regulations

In accordance with 43 CFR 3432.1(a), a lessee may apply for a modification of a lease in order to include coal lands or coal deposits contiguous to those embraced in a lease. Originally, CFR 3432.1(a) stated that "In no event shall the acreage in the application, when combined with the total area added by all modifications made after August 4, 1976, exceed 160 acres or the number of acres in the original lease, whichever is less." However, the Energy Policy Act of 2005 (EPA) (42 USC 16501) increased the limitation for lease modifications from 160 acres to 960 acres.

MCC has filed the application for the modifications in the BLM Colorado State Office having jurisdiction over the mineral estate in the lands involved. The application has described:
- the additional lands desired;
- the lessee's needs or reasons for such modification; and
- the reasons why the modification would be to the advantage of the United States [43 CFR 3432.1(b)].

The BLM has determined that:
- the modification serves the interests of the United States;
- there is no competitive interest in the lands or deposits; and
- the additional lands or deposits cannot be developed as part of another potential or existing independent operation [43 CFR 3432.2(a)].

Upon a decision by BLM to issue the lease modifications, the lands applied for shall be added to the existing leases without competitive bidding; however, the United States shall receive the

16

Fair Market Value of the leases of the added lands, either by cash payment or adjustment of the royalty applicable to the lands added to the leases by the modification [43 CFR 3432.2(c)].

The terms and conditions of the original leases shall be made consistent with the laws, regulations, and each of the leases terms applicable at the time of modification.  Before the leases are modified, the lessee shall file a written acceptance of the conditions imposed in the modified leases and a written consent of the surety under the bond covering the original leases to the modification of the leases and to extension of the bond to cover the additional land [43 CFR 3432.2(b)]. Before modifying a lease, the BLM is required to prepare an EA or an EIS covering the proposed lease area in accordance with 40 CFR parts 1500 through 1508 [43 CFR 3432.2(c)].

The entire surface for the coal lease modifications application involves the USFS as the SMA. Therefore, in compliance with the coal leasing regulations found at 43 CFR 3432.2(d), the BLM has submitted the lease modifications application to the Secretary of Agriculture for consent, for completion or consideration of an EA, for the attachment of appropriate lease stipulations, and for making any other findings prerequisite to lease issuance.

## Chapter 3 - Affected Environment, Environmental Consequences, and Mitigation Measures

## Introduction

### Affected Environment

This section describes the existing condition of the biological, physical, and socioeconomic characteristics found within the Project Area, including human uses, that could be affected (impacted) by the implementation of the proposed alternatives. During an environmental analysis, a description of the present condition of the affected public lands, and their associated resources, provides a basis for identifying and interpreting potential impacts of the alternatives proposed in this EA.

## Resources

### BLM

In accordance with the requirements of the MLA, the MLAAL, the FCLAA, the FLMPA, 43 CFR 3432, and all other applicable laws, rules, regulations, standards, policies, and guidelines, the BLM will decide whether or not to modify existing Federal coal leases at the West Elk Mine by adding approximately 800 acres to coal lease COC-1362 and approximately 921 acres to coal lease COC-67232.

Specifically, the BLM is analyzing the following alternatives:

- No Action Alternative, the BLM would deny the request (the Proposed Action) for the coal lease modifications;

BLM_0018552

- Proposed Action, the BLM would approve the Proposed Action exactly as proposed by the Proponent; or

- Proposed Action Alternative, the BLM would approve the alternative with design features (in the form mitigation measures and pursuant to the Lease Addendums).

This section describes the biological and physical resources found within the Project Area under the jurisdiction of the BLM that may be impacted as the result of the implementation of the Proposed Action Alternative (the leasing decision). These resources include Air Quality and Atmospheric Values; and Socioeconomics.

### USFS

When the surface estate of these lands is managed by another agency, such as the USFS, the BLM is responsible for conducting the environmental impacts analysis for the resources that may be impacted by the implementation of the leasing decision (in this case those associated with air quality and atmospheric values and socioeconomics). The SMA, the USFS in this case, is responsible for conducting the environmental impacts analysis for the affected surface environment (including in relation to such resources as vegetation, wildlife, wetlands and riparian areas, and cultural resources; and to such resources uses as recreation and travel management). The SMA is also responsible for providing "consent" for the BLM's leasing decision.

The USFS, as the responsible SMA, is responsible for the environmental analysis for such surface resources as:

- Topographic and Physiographic Environment;
- Geology;
- Soils;
- Watershed;
- Vegetation;
- Threatened and Endangered Species;
- Sensitive Species;
- Sensitive Plants;
- Management Indicator Species;
- Migratory Birds;
- Range Resources;
- Recreation;
- Transportation System and Roadless;
- Heritage Resources; and
- Visual Resources.

**Therefore, this document does not analyze these resources.  The BLM will not authorize a lease modification until it receives consent from the USFS.**

18

**Table 3.0  Environmental Assessment Resource Areas**

| Resource/Issue | N/A or Not Present | Applicable or Present, No Impact | Applicable & Present and Brought Forward for Analysis | Rationale for No Impact |
|---|---|---|---|---|
| Air Resources | | | X | |
| Areas of Critical Environmental Concern | X | | | |
| Environmental Justice | | | X | |
| Cultural Resources | X | | | |
| Flood Plains | X | | | |
| Fluid Minerals | X | | | |
| Forest Management | X | | | |
| Hydrology/Ground | X | | | |
| Hydrology/Surface | X | | | |
| Invasive/Non-Native Species | X | | | |
| Lands with Wilderness Characteristics | X | | | |
| Native American Religious Concerns | X | | | |
| Migratory Birds | X | | | |
| Paleontology | X | | | |
| Prime and Unique Farmland | X | | | |
| Range Management | X | | | |
| Realty Authorizations | X | | | |
| Recreation/Transportation | X | | | |
| Socioeconomics | | | X | |
| Soils | X | | | |
| Solid Minerals | X | | | |
| T&E and Sensitive Animals | X | | | |
| T&E and Sensitive Plants | X | | | |
| Upland Vegetation | X | | | |
| Visual Resources | X | | | |
| Wastes, Hazardous or Solid | X | | | |
| Water Quality - Surface | X | | | |
| Wetlands/Riparian Zones | X | | | |
| Wild and Scenic Rivers | X | | | |
| Wild Horse & Burro Mgmt | X | | | |
| Wilderness Study Areas | X | | | |
| Wildlife – Aquatic | X | | | |
| Wildlife – Terrestrial | X | | | |

BLM_0018554

## Environmental Consequences

This section describes, and compares, the environmental consequences (impacts) that may result from the implementation of the three proposed alternatives. This section analyses the alternative management actions, and discloses the potential impacts of the proposed alternatives on the human and natural environment. The human environment is considered to include both the natural environment (resources) and the BLM multiple-use and sustained-yield land management environment (resource uses) within the jurisdiction of the agency in relation to the Proposed Action.

**Impact Analysis Methods and Assumptions**

**Analysis of Alternatives**

The analysis of alternatives describes how the implementation of each alternative could affect baseline conditions of individual resources within the Project Area.

**Impact Analysis**

When applicable, definitions of the following types of impacts are included in the evaluation of potential environmental impacts (all possible impacts are not described and, unless otherwise stated, impacts described in this section are assumed to be adverse). Comparison of impacts is intended to provide an impartial assessment to help inform the decision-maker and the public. The impact analysis does not imply or assign a value or numerical ranking to impacts. Actions resulting in adverse impacts to one resource may impart a beneficial impact to other resources. In general, adverse impacts described in this section are considered important if they result from, or relate to, the implementation of any of the alternatives. These impacts are defined as follows:

- **Direct Impacts --** Direct impacts are impacts that are caused by the action, and that occur at the same time and in the same general location as the action.

- **Indirect Impacts --** Indirect impacts often occur at some distance, or time, from the action.

- **Short- or Long-term Impacts --** When applicable, the short-term or long-term aspects of impacts are described. For purposes of this EA, short-term impacts occur during or after the activity or action, and may continue for up to 2 years. Long-term impacts occur beyond the first 2 years.

- **Cumulative Impacts --** Cumulative impacts are impacts that result from the incremental impact of the action when it is added to other past, present, and reasonably foreseeable future actions. Cumulative impacts can result from individually minor; however, collectively significant, actions taking place over a period of time.  For the purposes of this EA, potential cumulative impacts include those that could occur on other Federal and non-Federal lands.

BLM_0018555

## 3.1 Air Quality and Atmospheric Values

This section discloses the affected environment and environmental consequences to air quality that would result from implementing the different alternatives under consideration. The discussion below details laws and regulations related to air quality, the current status of air resources in the area, and potential impacts to air quality that may result from extending the lifetime of the West Elk Mine if the lease modifications occur. This section was produced by BLM and Forest Service Specialists with Environmental Protection Agency (EPA) review.

### 3.1.1 *Affected Environment*

#### *Legal Framework*

The Clean Air Act, passed in 1970 and amended in 1977 and 1990, requires the EPA to set standards for air pollutants to protect the public health and welfare. The standards, known as National Ambient Air Quality Standards, limit the amount of these pollutants that can be present in the atmosphere. The EPA has set standards for six common pollutants known as "criteria" air pollutants—ozone ($O_3$), particulate matter (PM), nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), lead (Pb), and carbon monoxide (CO). There are standards for two categories of particulate matter—one for suspended particles less than 10 micrometers in diameter ($PM_{10}$) and one for fine particles less than 2.5 micrometers in diameter ($PM_{2.5}$). Primary standards are designed to protect public health, while secondary standards are designed to protect public welfare. These standards are shown in Table 3.1a. Units of measure for the standards are parts per million (ppm) by volume, parts per billion (ppb) by volume, and micrograms per cubic meter of air ($\mu g/m^3$).

**Table 3.1a. National Ambient Air Quality Standards**

| Pollutant [final rule cite] | | Primary/ Secondary | Averaging Time | Level | Form |
|---|---|---|---|---|---|
| Carbon Monoxide [76 FR 54294, Aug 31, 2011] | | primary | 8-hour | 9 ppm | Not to be exceeded more than once per year |
| | | | 1-hour | 35 ppm | |
| Lead [73 FR 66964, Nov 12, 2008] | | primary and secondary | Rolling 3 month average | 0.15 $\mu g/m^3$ [1] | Not to be exceeded |
| Nitrogen Dioxide [75 FR 6474, Feb 9, 2010] | | primary | 1-hour | 100 ppb | 98th percentile, averaged over 3 years |
| [61 FR 52852, Oct 8, 1996] | | primary and secondary | Annual | 53 ppb [2] | Annual Mean |
| Ozone [73 FR 16436, Mar 27, 2008] | | primary and secondary | 8-hour | 0.075 ppm [3] | Annual fourth-highest daily maximum 8-hr concentration, averaged over 3 years |
| Particle Pollution [71 FR 61144, Oct 17, 2006] | $PM_{2.5}$ | primary and secondary | Annual | 15 $\mu g/m^3$ | annual mean, averaged over 3 years |
| | | | 24-hour | 35 $\mu g/m^3$ | 98th percentile, averaged over 3 years |
| | $PM_{10}$ | primary and secondary | 24-hour | 150 $\mu g/m^3$ | Not to be exceeded more than once per year on average over 3 years |
| Sulfur Dioxide [75 FR 35520, Jun 22, 2010] | | primary | 1-hour | 75 ppb [4] | 99th percentile of 1-hour daily maximum concentrations, averaged over 3 years |
| [38 FR 25678, Sept 14, 1973] | | secondary | 3-hour | 0.5 ppm | Not to be exceeded more than once per year |

21

(1) Final rule signed October 15, 2008. The 1978 lead standard (1.5 µg/m3 as a quarterly average) remains in effect until one year after an area is designated for the 2008 standard, except that in areas designated nonattainment for the 1978, the 1978 standard remains in effect until implementation plans to attain or maintain the 2008 standard are approved.
(2) The official level of the annual NO2 standard is 0.053 ppm, equal to 53 ppb, which is shown here for the purpose of clearer comparison to the 1-hour standard.
(3) Final rule signed March 12, 2008. The 1997 ozone standard (0.08 ppm, annual fourth-highest daily maximum 8-hour concentration, averaged over 3 years) and related implementation rules remain in place. In 1997, EPA revoked the 1-hour ozone standard (0.12 ppm, not to be exceeded more than once per year) in all areas, although some areas have continued obligations under that standard ("anti-backsliding"). The 1-hour ozone standard is attained when the expected number of days per calendar year with maximum hourly average concentrations above 0.12 ppm is less than or equal to 1.
(4) Final rule signed June 2, 2010. The 1971 annual and 24-hour SO2 standards were revoked in that same rulemaking. However, these standards remain in effect until one year after an area is designated for the 2010 standard, except in areas designated nonattainment for the 1971 standards, where the 1971 standards remain in effect until implementation plans to attain or maintain the 2010 standard are approved

Unlike most other criteria pollutants, ozone is not emitted to the atmosphere directly; it is formed when nitrogen oxides and volatile organic compounds react in the presence of sunlight. In general, ozone concentrations in the lower atmosphere are highest during warmer months and lower in the cooler months. In some parts of the western U.S., high winter-time ozone concentrations have been monitored. The project area is not in an airshed with monitored high winter-time ozone concentrations. The chemical reactions that form ozone are complicated and nonlinear, making it difficult to predict ozone concentrations that will result from increasing the amount of the ozone precursors (i.e., nitrogen oxides and volatile organic compounds) in the atmosphere. The effect of adding nitrogen oxides or volatile organic compounds to the atmosphere on the concentration of ozone depends upon the ratio of the two precursors already present. Ozone formation is also highly dependent on meteorological conditions, including temperature, wind speed, and solar radiation. Ozone in the lower atmosphere is harmful to human health and vegetation. Some fine particulates ($PM_{2.5}$), particularly ammonium sulfate and ammonium nitrate particles, can also be formed in the atmosphere from the interaction of either $SO_2$ or nitrogen oxides and ammonium. These types of $PM_{2.5}$ particles are referred to as secondary particulates, while particles emitted directly from a source are referred to as primary particulates.

Fine particulate matter ($PM_{2.5}$) is chiefly comprised of five mass types: organic mass, elemental carbon (also known as soot or black carbon), ammonium sulfates, ammonium nitrates, and crustal materials (i.e., soil). Primary fine particulate emissions result from combustion processes (including fossil fuel combustion and biomass combustion that occurs in wild fires) and include black carbon. In general, however, black carbon and crustal materials comprise a relatively small proportion of the fine particulate mass suspended in the atmosphere. The largest constituents of fine particulate are usually organic mass, ammonium nitrates, and ammonium sulfates. Secondary particulates do not result from emissions of fugitive dust (which is the largest emissions category from the West Elk Mine), and thus will not be discussed further in this document.

The Clean Air Act contains provisions for protection of air quality in areas that are meeting the ambient air quality standards. This is known as the prevention of significant deterioration (PSD) program. Under this program, areas of the country are designated as Class I, Class II, or Class III. Class I areas are defined as areas of special national or regional natural, recreational, or historic value. The Act established mandatory federal Class I areas including wilderness areas over 5,000 acres in size and national parks over 6,000 acres in size that were in existence in 1977. These areas receive special protection under the Act. All other areas of the country have been designated as Class II. An area's classification determines the maximum amount of additional air pollution, called an increment that can be added beyond a baseline value. Increment consumption analysis falls under the PSD major sources permitting

BLM_0018557

program, which is administrated by the Colorado Air Pollution Control Division. Only small amounts of pollution can be added in Class I areas, while Class II areas permit moderate amounts of pollution to be added. Larger amounts of pollution can be added to Class III areas, but there are as yet no areas in the country designated Class III.

In Colorado, authority to issue construction permits that allow sources to emit air pollutants has been delegated by the Environmental Protection Agency to the state. Stationary sources are classified as major or minor, depending on the amount of pollutants emitted. In general, a construction permit is required for a facility with uncontrolled actual emissions of any criteria pollutant equal to or greater than the amounts listed in Table 3.1b:

**Table 3.1b. Colorado Minor Source Permitting Limits for Attainment Areas**

| Criteria Pollutant | Attainment Area uncontrolled actual emissions in tons per year |
|---|---|
| volatile organic compounds | 5 |
| $PM_{10}$ | 5 |
| Total Suspended Particulates | 10 |
| Carbon Monoxide | 10 |
| Sulfur Dioxide | 10 |
| Nitrogen Oxides | 10 |
| Lead | 200 pounds per year |
| *other Criteria Pollutants | 2 |

* Other criteria pollutants include: fluorides, sulfuric acid mist, hydrogen sulfide, total reduced sulfur, reduced sulfur compounds, and municipal waste combustor emissions. (Source: http://www.cdphe.state.co.us/ap/conperm.html#New or Modified)

In addition, the state can issue ambient air quality standards that are at least as stringent as the national standards. The state tracks the PSD increments in its Class I and Class II areas as part of its permitting program and is responsible for ensuring that the increments are not exceeded.

The Clean Air Act amendments of 1977 set a national goal of preventing future and remedying any existing impairment to visibility in Class I areas that is caused by man-made pollution. The EPA promulgated the Regional Haze Rule in order to meet this goal. Visibility is a measure of not only how far one can see, but how well one can see important characteristics of the landscape such as form, color, geologic features, and texture. Visibility impairment is caused by the scattering of light by gases and particles in the atmosphere. Man-made pollution results in the addition of very small particles to the atmosphere, resulting in haze. A monitoring network was established by the Interagency Monitoring of Protected Visual Environments (IMPROVE) program to measure atmospheric particulate concentrations near Class I areas. The Regional Haze Rule requires states to develop and implement plans to improve visibility in Class I areas in order to achieve "natural" visibility levels within a 60-year period.

Air pollutants that may cause cancer or other harmful effects such as birth defects are classified as hazardous air pollutants (HAPS). EPA is required to control emissions of 187 such hazardous air pollutants. Examples of hazardous air pollutants include benzene, which is found in gasoline; perchlorethlyene, which is emitted from some dry cleaning facilities; and methylene chloride, which is used as a solvent and paint stripper by a number of industries (http://www.epa.gov/ttn/atw/pollsour.html). EPA has issued rules requiring that facilities

23

BLM_0018558

belonging to 96 different classes meeting emissions standards for hazardous air pollutants in order to reduce these emissions. Hazardous air pollution emissions standards can be found on the EPA's web site (http://www.epa.gov/ttn/atw/mactfnlalph.html) as well as information on progress that has been made on reducing toxic emissions (http://www.epa.gov/ttn/atw/allabout.html#progress).

### Physical Environment

The West Elk Mine is located in Section 16, Township 13 South, Range 90 West, one mile east of Somerset on State Highway 133, in Gunnison County, Colorado. The mine has been operating for 29 years and holds about 14,395 acres of federal coal leases and 3656 acres of fee coal lands. Surface facilities include office, warehouse, shop, and coal handling facilities, and are located about 6 miles north of the proposed modifications. These existing facilities would also be used for mining the proposed lease modification areas.

Somerset Colorado is located in the North Fork Gunnison River Valley and rests at approximately 6,040 feet above sea level. The area is rural, has mountainous terrain, and supports a population of approximately 526 residents (2010 US Census). The normal temperatures (minimum and maximum) for the area range from 14.7 to 38.5 °F in January to 56.7 to 90.1 °F in July. The average annual precipitation amounts to approximately 15.07 inches, which according to historical records is relatively evenly distributed throughout the year. Average annual wind resultants are generally from the southeast at a speed of approximately 7.1 mph. The area enjoys sunshine for approximately 70% of the time and has an annual average sky cover of around 52%.

Air quality in the area is generally good. Areas that meet federal ambient air quality standards are classified as being in attainment, while areas not meeting standards are classified as being in nonattainment. Currently there is only one nonattainment area in Colorado for ozone that includes part or all of Denver, Adams, Arapahoe, Boulder, Broomfield, Douglas, Jefferson, Larimer, and Weld counties (roughly the Denver-Boulder-Greeley-Fort Collins metropolitan areas). This area is located along the Front Range approximately 110 miles to the east of the West Elk Mine. The Denver nonattainment area was designated by EPA in 2007 and is based upon the 1997 ozone standard. The ozone standard was revised in 2008, but EPA has not issued new nonattainment designations based upon that standard as of April 2012. EPA has not identified any current nonattainment areas in Colorado for any of the other criteria pollutants.

Colorado maintains a network of monitors that track compliance with ambient air quality standards. Most of the monitors are located in the eastern half of the state, particularly along the more urban Front Range. Western Colorado, by comparison, is relatively sparsely populated, and there are no monitors in the immediate vicinity of the West Elk Mine. There are, however, monitors in some areas of western Colorado, particularly Grand Junction. Table 3.1c shows the maximum monitored values by county for selected locations in the western portion of the state for 2009-2011. Not every county has monitoring, and counties that do have monitors do not necessarily have monitoring for all criteria pollutants. While these monitors cannot provide information regarding air quality in the immediate vicinity of the mine, they do provide insight into regional air quality conditions. There are no $SO_2$ monitors located in the selected counties. The table indicates exceedances of the $PM_{2.5}$ 24-hour standard in Mesa County for 2009 and 2010, but the 3-year average value ending in 2011 indicates that the 24-hour standard was met. The Mesa County monitor is located in Grand Junction, approximately 61 miles from the West Elk Mine. One ozone exceedance occurred in 2011 in La Plata County

24

BLM_0018559

at a monitor located roughly 110 miles from the West Elk mine. No other exceedances of ambient air quality standards are noted in the table. An exceedance occurs whenever an individual measurement is recorded that is above the level of the standard, but as the standards are generally defined as an average of several values, an individual exceedance does not necessarily indicate a violation of an ambient air quality standard. None of the listed monitors indicates a violation of any ambient air quality standard.

**Table 3.1c. Air Pollutant Monitoring Results for Selected Counties in Western Colorado.**

| County | CO 2nd Max 1-hr (ppm) | CO 2nd Max 8-hr (ppm) | NO$_2$ 98th Percentile 1-hr (ppb) | Ozone 2nd Max 1-hr (ppm) | Ozone 4th Max 8-hr (ppm) | PM$_{2.5}$ 98th Percentile 24-hr ($\mu$g/m$^3$) | PM$_{2.5}$ Weighted Mean 24-hr ($\mu$g/m$^3$) | PM$_{10}$ 2nd Max 24-hr ($\mu$g/m$^3$) | PM$_{10}$ Mean 24-hr ($\mu$g/m$^3$) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **2009** | | | | | |
| Delta | | | | | | | | 58 | 25 |
| Garfield | | | | 0.07 | 0.062 | | | 71 | 25 |
| Gunnison | | | | | | | | 86 | 27 |
| La Plata | 1.4 | 0.9 | 47 | 0.08 | 0.071 | 12 | 4.4 | 40 | 20 |
| Mesa | 2.3 | 2.2 | | 0.07 | 0.064 | 41 | 9.6 | 122 | 31 |
| Montezuma | | | | 0.08 | 0.069 | 15 | 6.8 | | |
| San Miguel | | | | | | | | 72 | 18 |
| | | | | **2010** | | | | | |
| Delta | | | | | | | | 115 | 23 |
| Garfield | | | | 0.07 | 0.066 | | | 55 | 26 |
| Gunnison | | | | | | | | 92 | 24 |
| La Plata | 1.2 | 0.7 | 39 | 0.08 | 0.074 | 11 | 4.3 | 88 | 21 |
| Mesa | 1.7 | 1.1 | | 0.08 | 0.068 | 37 | 9 | 131 | 28 |
| Montezuma | | | | 0.08 | 0.066 | 13 | 6 | . | |
| San Miguel | | | | | | | | 52 | 15 |
| | | | | **2011** | | | | | |
| Delta | | | | | | | | 48 | 21 |
| Garfield | | | | 0.07 | 0.066 | | | 73 | 21 |
| Gunnison | | | | 0.07 | 0.064 | | | 74 | 24 |
| La Plata | 1.3 | 0.7 | 38 | 0.08 | 0.077 | 12 | 4.5 | 50 | 18 |
| Mesa | 1.8 | 1.1 | | 0.08 | 0.068 | 22 | 7.1 | 54 | 25 |
| Montezuma | | | | 0.08 | 0.071 | 15 | 6.1 | | |
| San Miguel | | | | | | | | 61 | 16 |

Source: http://www.epa.gov/airdata/ad_rep_con.html

In addition to the state monitors, the EPA maintains a network of rural monitors known as the Clean Air Status and Trends Network (CASTNET). The closest CASTNET monitor is located in Gothic, Colorado, near the West Elk Wilderness approximately 25 miles east of the West Elk Mine. This is the closest ozone monitor to the mine and it has collected ozone data since 1989. The latest available 3-year average of the annual 4th-highest 8-hour ozone concentration (through 2010) was 67 ppb, and the highest value of this statistic since 1991 (the first year it was possible to calculate a 3-year average) was 71 ppb, indicating compliance with the ozone ambient air quality standard.

BLM_0018560

The closest Class I areas to the mine are the Black Canyon of the Gunnison National Park, roughly 24 miles away, and the West Elk Wilderness, which is about 6 miles from the mine. The State of Colorado prepared a state implementation plan for visibility as required under the EPA's Regional Haze Rule that documents the steps the state will take in order to meet the national goal of achieving natural visibility conditions in its Class I areas by 2064. The state examined the West Elk Mine's emissions due to its proximity to the West Elk Wilderness and concluded that it would not have a significant impact on visibility in the wilderness. For this reason the state determined that, in this planning period, it would not be necessary to require additional emissions controls on the mine to meet the visibility goals for the wilderness. (*Colorado Visibility and Regional Haze State Implementation Plan for the Twelve Mandatory Class I Federal Areas in Colorado*, Colorado Air Pollution Control Division, January 7, 2011, http://www.cdphe.state.co.us/ap/regionalhaze.html.)

The plan also included the results of detailed modeling analyses that examined the impacts of regional emissions sources, including those in Colorado, to visibility in all Class I areas in the state. The state developed emissions inventories that examined current emissions (as of 2002) as well as projected emissions through 2018 to evaluate the progress that would be made by 2018 toward the visibility goal. The inventories used in the modeling analysis included the emissions from the West Elk Mine at its permitted rate (as of 2002)[1] and projected using economic growth analyses. The plan was accompanied by individual technical support documents that examined impacts to each of the Class I areas in detail, including the West Elk Wilderness and Black Canyon of the Gunnison. The state will re-examine visibility progress in five year intervals and determine whether additional steps are needed to meet visibility progress goals. Because the annual coal processing rate under any alternative will not exceed the rates analyzed in Colorado's study, no additional visibility analysis was conducted for this EIS.

Air pollutants can be deposited through precipitation (such as rain or snow) or by dry settling processes to surfaces on the ground such as soils and water bodies. Deposition of some types of pollutants, particularly nitrogen and sulfur compounds (e.g., nitrate and sulfate), can lead to acidification of lakes and streams. Acidification of surface waters can negatively affect aquatic organisms such as zooplankton, algae, diatoms, invertebrates, amphibians, and fish. Nitrogen can cause other ecosystem impacts by fertilizing both soils and water. These excess inputs of nitrogen can disrupt the natural flora and fauna by allowing certain species that would not naturally occur in abundance to out-compete those that thrive in pristine nitrogen-limited systems. The end result is an unnatural shift in species composition for sensitive species, which may have a subsequent impact on other components of the ecosystem.

The chemistry of wet precipitation (rain and snow) is monitored by the National Atmospheric Deposition Program (NADP), an interagency organization that maintains a network of samplers located across the country. The nearest NADP monitor to the West Elk Mine is located near Gothic, approximately 25 miles to the east of the mine. Figures 1 and 2 show trend plots of nitrate and sulfate concentrations in wet deposition as measured by the Gothic NADP wet deposition monitor. As indicated on the plots, some years (2006, 2008, 2009, 2010) did not meet the NADP program's completeness criteria, but the trends suggest that concentrations of nitrate and sulfate have decreased somewhat since monitoring began in 1999. Figure 3 shows trends in inorganic wet nitrogen (**N**) deposition (where the amount of nitrogen is the sum of

---

[1] The mine's 2002 permitted emissions rate was at least as high as the current permitted rate (as stated in its 2010 construction permit).

BLM_0018561

nitrogen from nitrate and ammonium in wet deposition). It is important to note that measured wet deposition (as opposed to the concentration of a substance in precipitation) is influenced by the amount of precipitation that occurs, and thus the trend in nitrogen deposition may not reflect trends in the amount of a substance that is present in the atmosphere. However, the plot does show that for years with complete data the deposition of nitrogen at Gothic varied from approximately 1 to 1.5 kilograms per hectare. The National Park Service has set a critical load for nitrogen deposition for Rocky Mountain National Park, located in the Front Range northwest of Denver, of 1.5 kilograms per hectare per year (http://www.nature.nps.gov/air/Studies/criticalloads/criticalLoadExplain.cfm).  A critical load is a level of deposition below which significant harmful ecosystem effects are not known to occur. As the mountainous terrain and sensitive alpine areas found near Gothic (such as the West Elk Wilderness) are similar to those found in Rocky Mountain, this suggests that present levels of nitrogen deposition are not likely to be a problem in the area. No critical load for sulfur deposition has been established by a federal land manager in Colorado.

**Figure 3.1a. Annual trends in nitrate (NO3) concentrations in wet deposition collected by the Gothic, Colorado (CO10) National Atmospheric Deposition Program monitor.**



BLM_0018562

**Figure 3.1b. Annual trends in sulfate (SO₄) concentrations in wet deposition collected by the Gothic, Colorado (CO10) National Atmospheric Deposition Program monitor.**



**Figure 3.1c. Annual trends in nitrogen (N) wet deposition as measured by the Gothic, Colorado (CO10) National Atmospheric Deposition Program monitor.**



**Plot notes (applicable to Figures 1-3):**
The annual weighted mean concentrations and depositions are characterized as meeting or not meeting the NADP's data completeness criteria for the 1-year period.
1. Valid samples for 75% of the time period
2. Valid samples for 90% of the precipitation amount
3. Precipitation amounts for 75 % of the time period
Trend line
The trend line is a smoothed 3-year moving average with a one-year time step. The line is only displayed where the minimum data completeness criteria is met for the 3-year period.
Source: http://nadp.sws.uiuc.edu/sites/siteinfo.asp?net=NTN&id=CO10

Emissions of air pollutants in the region surrounding the mine result from industrial sources, smoke from prescribed and wildfire, mobile sources such as trains and vehicles, off-road vehicles, wind-blown dust from areas

28

of exposed soil such as fields and unpaved roads, road construction, and other activities. State emissions data for Gunnison and Delta counties for 2008 are given in Table 3.1d below.



BLM_0018564

**Table 3.1d. 2008 Emissions Inventory by Source Category for Gunnison and Delta Counties, Colorado, in tons.**

| Source | Delta County | | | | | | Gunnison County | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Benzene | CO | NO2 | PM10 | SO2 | VOC | Benzene | CO | NO2 | PM10 | SO2 | VOC |
| Agricultural Tilling | | | | 270.88 | | | | | | 0.79 | | |
| Aircraft | 0.65 | 288.03 | 1.56 | 5.67 | 0.24 | 27.07 | 0.22 | 121.58 | 4.17 | 2.33 | 0.48 | 9.39 |
| Biogenic | | 2040.81 | 232.53 | | | 16546.90 | | 2681.08 | 192.99 | | | 20474.30 |
| Combustion | 0.00 | 231.14 | 47.37 | 5.12 | 15.18 | 9.91 | 0.00 | 29.73 | 19.55 | 0.62 | 1.82 | 1.81 |
| Construction | | | | 367.98 | | | | | | 400.97 | | |
| Forest and Agricultural Fires | 4.62 | 1051.06 | 34.90 | 130.29 | 7.88 | 61.39 | 16.42 | 3389.85 | 89.51 | 469.02 | 28.64 | 218.40 |
| Non Road | 7.22 | 1206.47 | 248.62 | 27.57 | 0.77 | 270.94 | 16.57 | 2097.71 | 275.42 | 39.32 | 0.84 | 664.81 |
| Oil Gas Area | | 4.97 | 0.11 | 0.00 | | 0.57 | | 23.23 | 20.36 | 2.21 | 0.44 | 54.92 |
| Oil Gas Point | | | | | | | 2.81 | 131.56 | 147.24 | 0.97 | 0.07 | 84.79 |
| Pesticides | | | | | | 27.52 | | | | | | 13.48 |
| Point Source | 0.13 | 0.86 | 6.09 | 378.17 | 0.19 | 17.27 | 1.10 | 38.06 | 36.05 | 215.46 | 0.92 | 60.71 |
| Portables | 0.03 | | | | | 10.49 | 0.05 | | | | | 15.03 |
| Railroad | 0.02 | 22.14 | 224.75 | 5.58 | 12.80 | 8.37 | 0.01 | 8.22 | 83.43 | 2.07 | 4.75 | 3.11 |
| Refueling | 0.15 | | | | | 14.55 | 0.11 | | | | | 10.77 |
| Restaurants | 0.13 | 2.94 | 0.02 | 7.93 | 0.02 | 7.33 | 0.06 | 1.44 | 0.01 | 3.88 | 0.01 | 3.59 |
| Road Dust | | | | 961.00 | | | | | | 1229.75 | | |
| Solvents | | | | | | 116.38 | | | | | | 57.25 |
| Structure Fires | | 1.91 | 0.04 | 0.34 | | 0.35 | | 0.93 | 0.02 | 0.17 | | 0.17 |
| Surface Coating | | | | | | 89.46 | | | | | | 52.22 |
| Tank Trucks | 0.00 | | | | | 0.33 | 0.00 | | | | | 0.29 |
| Vehicles | 14.53 | 5027.39 | 745.32 | 30.95 | 5.80 | 461.62 | 11.49 | 3830.83 | 537.35 | 21.50 | 3.95 | 365.69 |
| Wood burning | 18.52 | 2254.55 | 30.50 | 312.36 | 4.73 | 435.96 | 9.17 | 1115.69 | 15.09 | 154.58 | 2.34 | 215.74 |
| **Total** | **46.00** | **12,132.27** | **1,571.84** | **2,503.85** | **47.61** | **18,106.41** | **58.01** | **13,469.91** | **1,421.20** | **2,543.65** | **44.28** | **22,306.46** |

(Source:  http://www.colorado.gov/airquality/inv_maps_2008.aspx)

30

BLM_0018565

## 3.1.2 No Action Alternative Environmental Effects

It is anticipated that mining operations will continue on existing leases even if the two leases modifications under consideration in this analysis are not granted under the proposed action. The mine life is currently projected for an additional 11-12 years on existing federal coal reserves, with perhaps as much as an additional 2 years on non-federal minerals (fee reserves). The mine currently employs longwall equipment and methods for extracting the underground coal. This practice would continue under the modified leases. Additionally, other activities currently authorized at the site including coal processing and venting of gases would also continue in accordance with the permits and site operations plans that are currently active. The proposed lease modification thus represents a continuation of the existing activity occurring at the mine location, and will not increase the intensity of operations above currently evaluated levels (there is no proposed change in the rate of coal extraction under any alternative). It is therefore possible to infer impacts to air quality due to future mining operations from current conditions.

For purposes of this discussion, emission sources at the West Elk Mine are grouped into three general categories:

1. stationary sources;
2. mobile sources located below ground and above ground at the mine complex; and
3. MDW-related emissions: mobile source, construction, methane, and fugitive dust emissions that result from drilling, operating, and servicing methane drainage wells, constructing well pads, and construction of roads used to access the drainage wells.

These emission sources are discussed below.

Most emissions of criteria pollutants resulting from stationary sources at the mine are in the form of particulate matter. Sources of particulate matter at the mine include various coal handling equipment such as conveyors and transfers, coal storage silos and feeders, coal storage and refuse piles, coal mine ventilation shafts, a coal preparation plant, an emergency generator, miscellaneous exempt [2] sources such as heating equipment, auxiliary generators, and fuel storage tanks, and coal hauling operations. The mine has a permit for $PM_{10}$ emissions issued by the state in 2010 (Construction Permit 09GU1382, issued June 18, 2010). This permit limits the emissions of particulate matter by limiting the total amount of coal that can be processed in a year to 8.5 million tons of coal per year. The permit also limits the sizes of different coal stockpiles that are allowed, the hours of operation of various maintenance activities, the total quantity of refuse material from the coal preparation plant and the and the amount of coal that can be processed by the coal preparation plant. The permit limits the total $PM_{10}$ emissions for the mine's stationary sources to 88.2 tons per year. This classifies the mine as a minor source for particulate matter, as the threshold for major sources is 250 tons per year. The permit also contains a requirement for the operator to follow a fugitive dust control plan that is attached to the permit. The plan applies to coal handling equipment such as conveyors, coal processing equipment, storage silos, storage piles, hauling activities, mine ventilation shafts, and coal preparation plant processing equipment. In addition to the requirements in the construction permit, the Colorado Division of Reclamation, Mining, and Safety (CDRMS) Mining and Reclamation plan includes general air pollution control requirements. These include applying water to any active unpaved roadways, parking areas, and refuse disposal area to control dust emissions from these areas, if required, on a seasonal basis, and compacting and spraying of coal stockpiles when necessary to eliminate particulate emissions created during coal handling. In addition to regular watering (sprinkling) of the regularly travelled gravel roads on the mine site, these roads are treated at least once a year with magnesium chloride for dust suppression.

At the time the permit request was submitted, the state did not require reporting for $PM_{2.5}$ in accordance with the EPA's surrogate policy. This policy allowed states to use $PM_{10}$ emissions as a surrogate for $PM_{2.5}$ due to technical difficulties that existed in analyzing $PM_{2.5}$ emissions (http://www.epa.gov/NSR/documents/20100204repealfs.pdf). As a result, the permit does not contain emissions limits for $PM_{2.5}$. There are no emissions from stationary sources at the mine of other criteria pollutants above minor source permitting thresholds and therefore the permit does not contain limits for criteria pollutants other than particulate matter.

The application for the 2010 permit was accompanied by a dispersion modeling analysis (*PM-10 Dispersion Modeling Study, Coal Prep Plant Modification, West Elk Mine:  Gunnison County, Colorado*, prepared by Air

---

[2] Certain types of sources are specifically exempted from permitting by the State of Colorado under Regulation 3 (http://www.cdphe.state.co.us/ap/conperm.html).

BLM_0018566

Resource Specialists, Inc., February 25, 2010). This analysis was completed to support the mine's permit modification request, which included a proposal to build the coal preparation plant mentioned above. This analysis examined the potential particulate matter emissions that would occur from the new facility, as well as other facilities at the mine. The dispersion modeling analysis also included sources from the nearby Oxbow Mine, and included a background particulate matter concentration to account for other sources of particulate matter not associated with either mine. The analysis estimated the maximum direct impact to $PM_{10}$ concentrations due to the West Elk and Oxbow mines, as well as the resulting ambient air concentrations due to other sources (i.e., the two mines plus the background). The analysis used conservative assumptions in order to ensure that the analysis would not underestimate the particulate matter emissions. The results are shown in Table 3.1e. The maximum predicted concentration of $PM_{10}$ due to the mines and other background sources was 148 $\mu g/m^3$, which is below the primary ambient air quality standard. These results indicate that the area around the mine can be expected to remain within ambient air quality standards for $PM_{10}$.

**Table 3.1e. Maximum Predicted PM$_{10}$ Impacts Due to West Elk Mine and Oxbow Mines**

| Averaging Period | PM10 Model Predicted Impact Due to Mining ($\mu g/m^3$) | Back-Ground ($\mu g/m^3$) | Total Pm-10 Impact ($\mu g/m^3$) | Primary National Ambient Air Quality Standard ($\mu g/m^3$) |
|---|---|---|---|---|
| 24-Hour Average (1st Highest) | 118.89 | 29.0 | 147.89 | 150 |
| Annual Average (1st Highest) | 16.99 | 16.0 | 32.99 | 50 |

The mine is required to periodically submit an air pollution emission notice (APEN) with updated emissions information. The APEN included actual particulate matter emissions (both $PM_{10}$ and $PM_{2.5}$) due to mine operations for 2010. The particulate matter emissions were determined by applying emissions factors to the actual coal production for the year. An emissions factor is a number that estimates emissions of a pollutant from an air pollution source for each unit of activity, such as an hour of operation, a vehicle mile traveled, or a ton of coal produced. The actual values for the particulate matter emissions are presented in Table 3.1f. The table demonstrates that the actual particulate matter emissions in 2010 were within the permitted limits. Coal production for 2010 was also below permitted limits, at 4.8 million tons of coal.

**Table 3.1f. West Elk Stationary Source Particulate Emissions Reported by Air Pollution Emissions Notice for 2010.**

| Emissions Source | 2010 Emissions (tons) | |
|---|---|---|
| | PM10 | PM2.5 |
| Coal processing operations | 77.8535 | 40.1705 |

In addition to the particulate matter emissions sources discussed above, there is one permitted stationary source at the mine that has the potential to emit $SO_2$, $NO_2$, CO, and volatile organic compounds as well as particulate matter. This source is an emergency generator that was installed in 2010. This generator is limited by the state permit to no more than 500 hours of operation per year. The last APEN, submitted in 2010, contained estimated maximum potential emissions due to the operation of the generator. Additional stationary source emissions for the permitted emergency generator, as well as two exempt (unpermitted) generators, are listed in Table 3.1g. Table 3.1g also lists emissions for miscellaneous exempt heating equipment and a diesel storage tank located at the mine.

In addition to the stationary sources there are mobile sources of emissions that are not permitted by the state. These mobile sources include above ground and underground mining equipment. Because a detailed listing of all pieces of equipment, along with important characteristics of the equipment such as age and horsepower, is not available, an exact calculation of emissions from mobile source equipment at the mine cannot be determined. In lieu of this information the BLM used the EPA's NONROAD 2008a model (http://www.epa.gov/otaq/nonrdmdl.htm) to estimate the maximum potential emissions from mobile sources located at the mine based upon the amount of diesel fuel used and its average carbon content. The model takes into account the average temperature and

BLM_0018567

elevation of the area being analyzed. The BLM assigned the mobile sources to specific source categories applicable to underground and surface mining operations and applicable to the counties in which the mine is located. The analysis assumes uncontrolled emissions and therefore provides a conservative estimate of the maximum potential for emissions from the mobile sources at the mine based upon the quantity of diesel fuel used at the mine in 2011. (For further details on how the analysis was performed, see Appendix A.) The resulting estimates are presented in Table 3.1g.



33

BLM_0018568

**Table 3.1g. Estimated Stationary and Mobile Source Emissions for Equipment Located at the Mine (in tons).**

| Mobile Sources[1] | Particulate Matter | | Non-methane Organic Gas NMOG | Carbon Monoxide CO | Nitrogen Oxides (NO+NO$_2$) NO$_X$ | Sulfur Dioxide SO$_2$ | Carbon Dioxide CO$_2$ | Methane CH$_4$ | Nitrous Oxide N$_2$O |
|---|---|---|---|---|---|---|---|---|---|
| | PM$_{10}$ | PM$_{2.5}$ | | | | | | | |
| Underground Mining Equipment | 12.64 | 12.26 | 19.37 | 74.77 | 88.82 | 1.21 | 5,613.98 | 0.29 | 0.14 |
| Surface Mining Equipment | 1.90 | 1.84 | 2.31 | 12.27 | 26.24 | 0.41 | 1,908.74 | 0.04 | 0.05 |
| **Stationary Sources** | | | | | | | | | |
| Diesel Storage Tank[2] | | | 1.99 | | | | | | |
| Emergency Generators[3] | 0.39 | 0.39 | 0.66 | 5.03 | 10.34 | 0.13 | 1,007.47 | 0.05 | |
| Heating Equipment[2] | 4.30 | 4.36 | 2.41 | 35.70 | 43.88 | 0.59 | 51,920.29 | 0.97 | |
| **Total** | 19.23 | 18.85 | 26.74 | 127.77 | 169.28 | 2.34 | 60,450.48 | 1.35 | 0.19 |

[1] Mobile sources emissions are for exhaust only.
[2] These are exempt sources.
[3] Includes emissions from three generators, one that is permitted (permit 10GU1130) and two that are exempt

34

BLM_0018569

The final emissions group includes emissions from the construction and operation of methane drainage wells. Although it is not a criteria pollutant, methane is a greenhouse gas, approximately 21 times more effective than carbon dioxide in terms of its warming potential. Methane is created during the process of coal formation and remains stored in the coal seams and surrounding rock layers. Shallow coal seams, such as those mined via surface mining operations, contain less methane because there is less pressure due to the overburden (i.e., the rock and soil lying on top of the seam) to keep the methane from escaping. Methane is released to the atmosphere when a coal seam is fractured during surface or underground mining. The amount of methane released by mining depends on the carbon content of the coal, the depth of the coal seam (deeper seams generally contain more methane), and the type of mining being conducted. As mining operations progress into different areas of the mine, it is necessary to vent accumulated methane to the atmosphere to prevent concentrations from building up to levels that could result in underground explosions. The main mine ventilation air system serves this purpose but may become inundated with high concentrations of methane[3]; therefore, the mining company drills additional methane ventilation wells to allow methane from the area being mined to be vented to the atmosphere.

Methane is vented from coal mines because it is explosive above 5% concentration (http://www.epa.gov/cmop/faq.html, & Canadian Center for Occupational Health and Safety, 2011). The primary environmental concern over methane venting is its contribution to global greenhouse gas emissions. . For a general discussion of greenhouse gases and climate change, see the section on Cumulative Effects and Climate Change below.

As methane escapes the enclosed space of the mine through vent shafts and vent wells, the gas is rapidly dispersed and diluted with ambient air. Methane vented from the mine is not expected to affect the local environment because it is considered biologically inert (Committee on Toxicology, Board on Toxicology and Environmental Health Hazards, Commission on Life Sciences, National Research Council, 1984). Methane acts as a simple asphyxiant in very high concentrations, displacing oxygen (Committee on Toxicology, Board on Toxicology and Environmental Health Hazards, Commission on Life Sciences, National Research Council, 1984). Methane vented to the atmosphere is effectively diluted, removing any concern of oxygen displacement for respiratory animals. Methane is nontoxic to plants at normal concentrations. (Personal communication, Jeff Sorkin and Dr. Robert Musselman, Plant Physiologist, Rocky Mountain Research Station, April, 16th, 2012)

The amount of methane released by the West Elk Mine has varied considerably over the life of the mine, and is not well correlated with production levels. In general, the amount of methane released has decreased as the mining operations have progressed into a shallower seam, but there is no clear relationship that would make it possible to accurately predict the amount of methane that will be released to the atmosphere during future mining operations. However, during the period from July 2010 through June 2011 the methane released from the West Elk Mine (including methane from drainage wells and ventilation air) was approximately 58,663 tons. In terms of carbon dioxide equivalents, the warming potential of this quantity of methane in the atmosphere is approximately equal to that of 1,231,923 tons of carbon dioxide (http://www.epa.gov/cleanenergy/energy-resources/calculator.html#results).

There are some technologies for mitigating release of methane from coal mines that can be used under some circumstances. In 2009 the BLM Colorado State Office, Deputy State Director, Energy, Lands, and Minerals requested that Mountain Coal Company prepare an economic evaluation report to supplement their existing Resource Recovery and Protection Plan report to address coal mine methane management options at the West Elk Mine[4]. To support an independent analysis of alternatives for methane management, the company retained several consultants to address the options discussed. Several potential technologies that might be used to mitigate methane releases were examined in the report. The results are discussed below.

Flaring the ventilation air methane (i.e., methane vented via the main mine ventilation system) does not appear to be a technologically feasible option due to the high volume of air flow and dilute concentrations of methane. Any option to control ventilation air methane through flaring would result in additional undesirable air impacts from the combustion of make-up fuel that would need to be added to fully oxidize methane within the VAM stream.

A detailed assessment of the capture and centralized collection of methane drainage well (MDW) methane was included. The report also included an analysis of the potential for flaring methane from the drainage wells. The

---

[3] Methane emitted from the main mine ventilation system is known as ventilation air methane, or VAM.

[4] *West Elk E-Seam Gas Economic Evaluation Report*, Mountain Coal Company, LLC, September 24, 2009.

BLM_0018570

overall assessment indicated that the costs for the project, additional potential environmental impacts, regulatory concerns, and the safety considerations below, do not warrant additional detailed analysis at this time. Although flaring may reduce the global greenhouse gas burden, the flaring option is potentially the least desirable methane mitigation option based upon both and environmental and economic efficiency concerns.

The use of flaring to reduce the effects of greenhouse gases on climate change would also have to be approved by the Mine Safety and Health Administration (MSHA), which has the regulatory authority to approve proposed flaring systems intended for use at coal mines in the U.S. The MSHA would need to conduct a thorough review of the proposed flaring system in order to establish the requirements for the system. Currently there are no flaring operations or proposed test operations at active coal mines in the United States. It is not likely that a thorough review, and approval, would occur prior to the development and operation of the mine expansion. If flaring was approved an environmental review would be addressed in a modification to the mine operations permitting.

Another potential methane emission reduction strategy would be to reduce the potential greenhouse gas emissions of the project through methane capture. With respect to the ventilation air methane, no technology currently exists or has been demonstrated to have the capability of handling the volume of ventilation air and dilute concentrations of methane at the West Elk mine to make capture economically feasible. In 2009 the Department of Energy (DOE) released the results of a study to simulate ventilation air methane capture using a non-producing mine (U.S. Department of Energy Cooperative Agreement DE-FC26-02NT41620, at http://www.epa.gov/cmop/docs/vam_executive-summary.pdf). The project demonstrated continued advancements and a viable solution for coal mine ventilation air methane control. However, according to the study the "system is only economically feasible when there is value for greenhouse gas emission reduction", which implies that carbon credits, a cap and trade system, or another market or regulatory based incentivized system (discussed below) for reducing greenhouse gases would be required. There is currently no such system in place in the United States. Non-monetary, voluntary systems exist, but are not specified by regulation and are not tied to permitting, and therefore there is no effective economic incentive. The DOE assessment included carbon credits in their economic feasibility model, which provided a cost basis for controlling ventilation air methane at rates up to 180,000 cubic feet per minute.

The analysis also examined the potential for capturing and/or conditioning the drainage well methane for use on site as fuel for a cogeneration facility (i.e., to produce electricity for sale to the grid) or for sale as pipeline quality natural gas. The study evaluated the gas characteristics and potential quantities of methane that would be realistically produced based on existing well data and testing. This information was then used to engineer a collections system that including options for pipelines, screw compressor configurations for pressure management, dehydration units, control systems, values, and metering. Options for energy generation equipment included reciprocating internal combustion engines (RICE) and combustion turbines. Additional gas processing equipment options for rendering natural gas from the drainage well methane were also presented. The analysis covered multiple scenarios for multiple configurations of equipment. Drainage well methane capture infrastructure would include more miles of road and pipeline construction and surface disturbance than would occur under current operational practices.

For energy production, the RICE proved to be the closest potential candidate for any onsite energy production. The analysis for the production of natural gas from coal mine methane indicated that the levels of contaminants in the gas (including carbon dioxide, oxygen, and nitrogen) were treatable, but that the cost of treatment of the gas, the cost of gas compression, and the distance to access available existing pipeline systems were prohibitive for delivery of the gas as a saleable product. Additionally, the time that it would take to exercise the option would go beyond the timeframe it would take to mine the proposed lease tract. Since this mining project would be an addition to an existing mine, uninterrupted mining would need to take place for this project to be economically viable. For these reasons, methane capture is not a feasible option for mitigation of methane emissions.

Another option for methane emission mitigation would be to use the ventilation air methane. The report provided an assessment of one potential technology, regenerative thermal oxidation (RTO), which could potentially control such dilute levels of ventilation air methane. The technology incorporates adsorption media at the gas inlet to separate out and concentrate the ventilation air methane exhaust to the saturation point of the adsorption media. When fully saturated the media is then regenerated by heating and releasing contaminates from the media, which are fully oxidized via combustion in the process. This process would also require the addition of make-up fuel and would emit non-insignificant quantities of criteria pollutants. While this technology would reduce the global warming potential of the ventilation air emissions (by converting methane to carbon dioxide), it offers no options for energy recovery or use of the resource, and is thus not an economically feasible option for mitigating methane release.

36

A final option for mitigating the global warming potential associated with the release of methane from the mine would be the purchase of emissions offsets and carbon credits. However, there are currently no markets for these products beyond voluntary markets within the United States and no regulatory framework or incentives (permitting or otherwise) to support a trading system, and thus this is also not a feasible mitigation strategy.

The mine is, however, taking other steps to reduce methane emissions. The mining company is a participant in EPA's Coalbed Methane Outreach Program, which is a voluntary program whose goal is to reduce methane emissions from coal mining activities (http://www.epa.gov/cmop/). By working cooperatively with coal companies and related industries, the program helps to address barriers to using coalbed methane instead of emitting it to the atmosphere. In turn, these actions mitigate climate change, improve mine safety and productivity, and generate revenues and cost savings. The West Elk Mine began recovering methane in 2003 to heat mine ventilation air on site. In 2006, the EPA estimated that the mine recovered and used approximately 170 mmcf of methane, although the exact amount was not measured (*Identifying Opportunities for Methane Recovery at U.S. Coal Mines: Profiles of Selected Gassy Underground Coal Mines 2002-2006*).

In addition to methane, other organic gases are released through methane drainage wells in small amounts. There are very few data regarding the types of gases released through drainage wells other than methane. However, one study that was completed as part of the economic evaluation report discussed above also included an analysis of the concentrations of other constituents emitted through the methane drainage wells. This study sampled the exhaust coming from existing methane drainage wells and performed an analysis to determine its constituents. Two samples were collected and analyzed. Table 3.1h shows the major constituents listed in the report.

**Table 3.1h. Analysis of methane drainage well samples.**

| Gas Component | Concentration Units | Sample ID V18-E1-38 15 May 2009 0851 | Sample ID V14-E1-42 15 May 2009 0840 |
|---|---|---|---|
| Methane | % | 60.7 | 34.5 |
| Carbon dioxide | % | 1.5 | 2.3 |
| Nitrogen | % | 28.9 | 50.5 |
| Oxygen | % | 7.8 | 11.9 |
| Ethane | % | 0.91 | 0.62 |
| Propane | % | 0.177 | 0.106 |
| i-Butane | % | 0.023 | 0.027 |
| n-Butane | % | 0.028 | 0.023 |
| i-Pentane | % | 0.0129 | 0.0094 |
| n-Pentane | % | 0.005 | 0.0038 |
| Hexane+ | % | 0.0232 | 0.007 |
| GHV, dry (14.73 psi)* | Btu/scf | 639 | 366 |
| Relative density * | | 0.739 | 0.856 |
| NMHC (Non-Methane Hydrocarbons) | % C | 1.376 | 0.893 |
| | mg/M$^3$ | 0.697 | 0.453 |
| Total sulfur | ppmv | 0.65 | 0.192 |
| | mg/M$^3$ | 0.84 | 2.6 |
| Total organic silicon | ppmv | 0.22 | 0.19 |
| | mg/M$^3$ | 0.26 | 0.23 |
| Total organic chlorine | ppmv | <0.10 | <0.10 |
| | mg/M$^3$ | <0.15 | <0.15 |
| Total organic fluorine | ppmv | <0.1 | <0.1 |
| | mg/M$^3$ | <0.08 | <0.08 |

BLM_0018572

| * Calculation based on 4 major components, 60o F, 14.73 psi<br>ppmv=parts per million by volume<br>mg/M3=milligrams per cubic meter<br>BTU/scf=British Thermal Units per standard cubic foot | | |
|---|---|---|
| | | % C=percent carbon |
| * Calculation based on 4 major components, 60° F, 14.73 psi | | |
| ppmv=parts per million by volume | | |
| mg/M³=milligrams per cubic meter | | |
| BTU/scf=British Thermal Units per standard cubic foot | | |
| % C=percent carbon | | |

Due to the limited number of samples available (two) taken on one individual day (15 May 2009) within a relatively short period of time, it is not known how accurately these values represent average or potential emissions of various non-methane hydrocarbons and other gaseous compounds. As the emissions of methane have proven to be highly variable and not closely related to coal production levels, it is reasonably likely that emissions of other non-methane constituents will be highly variable as well. For this reason no attempt is made here to quantify all non-methane emissions on an annual basis.

There are also emissions associated with the construction of access roads and well pads, and drilling of methane drainage wells. These activities will continue for the remaining lifetime of the mine even if the parcels under consideration are not leased. Under the proposed action, it has been estimated that up to 48 drainage wells may be required over a period of 1.6 years, which corresponds to a rate of 30 per year. It was therefore assumed under this analysis that up to 30 wells and pads might be constructed per year along with 6.5 miles of roads, resulting in a total of 73 acres of disturbance, even under the no action alternative. This is a conservative assumption when compared with historical activities. During 2011, there were just 14 drainage wells constructed at 10 pad locations. Typically 4-6 mine drainage wells are active at any given time. The mining company reclaims well pads and roads when no longer needed. The total, current, actual surface disturbance is approximately 400 acres of more than 17,140 acres in the currently permitted West Elk Mine area (prior to adding the lease modification areas). This figure includes the West Elk Mine's entire site including disturbance on private lands. As of May 2012, 71 acres have been backfilled, graded, and topsoiled. Five acres were reclaimed in 2011.

Given these assumptions, the emissions associated with road construction, well pad construction, and well drilling were estimated using a spreadsheet developed from EPA's document AP 42, *Compilation of Air Pollutant Emission Factors* (http://www.epa.gov/ttnchie1/ap42/), and the EPA NONROAD 2008a model. The construction and drilling of roads and drainage wells is contracted by the mining company, so the exact mix of equipment may vary slightly from the equipment assumed in this analysis. The analysis took into account dust and tailpipe emissions of typical road construction equipment (including a blade, backhoe and roller), one truck mounted drill rig, support vehicles (such as a water truck), and pickup trucks used for well inspection visits. It also included wind erosion of exposed road and well pad surfaces. Average emission factors were taken from AP 42 and conservative estimates were used for the amount of time needed to construct well pads and roads. Well inspection visits were assumed to occur twice daily for a period of one week, and then weekly thereafter, for a total of approximately 30 weeks per year. The analysis did not include any assumptions regarding control of fugitive dust emissions from exposed surfaces on roads or drill pads, although the mining company does water these surfaces periodically to suppress fugitive dust emissions. Actual windblown dust emissions are therefore expected to be less than those assumed in this analysis. Table 3.1i summarizes the estimated well pad and road construction emissions that might be expected per year under these assumptions. Values were rounded to the nearest whole number, resulting in zero values for some types of emissions. It can be seen from the table that the construction-related emissions are relatively small.

BLM_0018573

**Table 3.1i. Total estimated annual emissions from road and drainage well construction and maintenance**

| Activity | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | $SO_2$ | CO | VOC | HAPs | $CO_2$ | $CH_4$ | $N_2O$ | $CO_{2eq}$ | $CO_{2eq}$ metric Tonnes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Well Pad and Road Construction - Fugitive Dust | 11 | 1 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| Heavy Equipment Combustive Emissions | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 153 | 0 | 0 | 153 | 139 |
| Wind Erosion | 4 | 1 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| Commuting Vehicles - Construction | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 3 |
| **Sub-total: Construction** | **16** | **2** | **1** | **0** | **0** | **0** | **0** | **155** | **0** | **0** | **156** | **142** |
| Well & Pipeline visits for Inspection & Repair - Operations | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 | 5 |
| **Sub-total: Operations** | **2** | **0** | **0** | **0** | **0** | **0** | **0** | **5** | **0** | **0** | **5** | **5** |
| | | | | | | | | | | | | |
| **Total Emissions** | **18** | **2** | **1** | **0** | **1** | **0** | **0** | **160** | **0** | **0** | **161** | **146** |

Notes
HAPs = Hazardous Air Pollutants, assumed = VOCs*0.1
$CH_4$ = methane
$CO_2$eq=carbon dioxide equivalents
$NO_x$=nitrogen oxides ($NO+NO_2$)

BLM_0018574

By comparing the reported and estimated emissions in Tables 3.1f, 3.1g and 3.1i, it is apparent that emissions of criteria pollutants are relatively small in comparison with local emissions in Gunnison and Delta counties presented in Table 3.1d. Emissions in these counties as a whole are not high, as they are rural counties and are relatively sparsely populated. Emissions of ozone precursors, volatile organic compounds and nitrogen oxides (NO and $NO_2$), are also low. Furthermore, mining operations are presently occurring at rates representative of those expected under the no-action and proposed action alternatives. Although there are few monitors close to the mine, there is no indication from available data that any violations of ambient air quality are occurring in the mine's vicinity. It is therefore not anticipated that continued mining operations expected under any alternative will have any appreciable effect on criteria pollutant levels in the analysis area. For purposes of this analysis, the levels of emissions discussed in previous sections do not warrant further dispersion modeling to assess impacts to criteria pollutants or photochemical modeling analysis to assess impacts from ozone. As noted earlier, ozone formation is a complex non-linear process and cannot be analyzed without taking into account all emissions sources in an area that may have an impact on the area near the mine. Modeling of ozone formation requires a complex photochemical model that is much more time and resource intensive than a dispersion model. Further modeling of the mine's emissions under these circumstances is highly unlikely to yield any significant impacts to atmospheric pollutant concentrations.

Emissions of greenhouse gases, including methane, carbon dioxide, and nitrous oxide ($N_2O$) are listed in Tables 3.1f, 3.1g and 3.1i. In addition to the figures in these tables, additional emissions of methane from drainage wells were presented in the discussion above. Due to the highly variable nature of the methane emissions from the mine, the figure presented earlier provides only a rough estimate of potential annual methane emissions. Actual methane emissions from future mining activities cannot be accurately predicted. Greenhouse gases, particularly carbon dioxide and nitrous oxide, have the potential to remain in the atmosphere for long periods of time (from tens to hundreds of years) and travel long distances. Their effects are thus widely distributed, rather than localized to the analysis area around the mine, and need to be placed in context with similar emissions on a much larger spatial scale.

For comparison, in 2010 the U.S. emissions of $CO_2$ (including some natural sources) amounted to roughly 6.3 billion tons, emissions of methane totaled approximately 734 million tons in $CO_2$ equivalents, and emissions of $N_2O$ totaled roughly 337 million tons in $CO_2$ equivalents. Total U.S. emissions of greenhouse gases in $CO_2$ equivalents (including other greenhouse gases) was approximately 7.5 billion tons. When carbon sinks (i.e., losses of carbon from the atmosphere due to processes such as uptake by plants) are considered, net U.S. greenhouse gas emissions to the atmosphere were approximately 6.3 billion tons in $CO_2$ equivalents. During the same year, gross greenhouse gases emitted in Colorado totaled roughly 142 million tons in $CO_2$ equivalents, and net emissions (after subtracting carbon sinks) were roughly 113 million tons in $CO_2$ equivalents. (*Final Colorado Greenhouse Gas Inventory and Reference Case Projection*s 1990-2020, EPA 430-R-12-001 *Inventory of U.S. Greenhouse Gas Emissions and Sinks*: 1990 – 2010, April 15, 2012)

On June 20, 2010, Environmental Protection Agency promulgated a rule known as the Tailoring Rule that subjects some greenhouse gas emitting facilities to permitting under the Clean Air Act. This rule initially focuses on the largest emitting facilities. In order to determine whether the tailoring rule will apply to a facility the permitting authority will need to apply a detailed set of criteria. For this mine, the applicable permitting authority will be the State of Colorado. As of this writing (May 2012), the state has not yet reached a determination as to whether or not the mine will be subject to permitting of its greenhouse gas emissions under the Tailoring Rule. If the state decides that the rule applies to the West Elk Mine, the mine will need to obtain an additional permit for its greenhouse gas emissions and comply with any restrictions listed on the permit. If the USFS receives any additional information prior to publication of the FEIS that indicates the Tailoring Rule will apply to the mine and thus additional permits will be required, this information will be disclosed in the final document.

## Indirect Impacts

Mined coal will be transported by rail to various facilities. Transportation by train will result in emissions of pollutants such as carbon monoxide, sulfur dioxide, nitrogen oxides, particulate matter, and volatile organic compounds. Locomotive emissions will also include greenhouse gases such as carbon dioxide. Coal will then be combusted by the destination facilities in order to provide energy for various purposes, principally electricity generation. The types and locations of facilities cannot be determined in advance, and thus there is no way to make reasonable estimates of the amounts of coal that will be burned in any particular facility, or the types and efficiencies of emissions controls that may be present at the destination facility (if any are present). It would therefore be highly speculative to attempt to quantify amounts of greenhouse gases and pollutants that might be emitted when the coal is combusted. In general, it is reasonable to assume that coal combustion will result in

40

emissions of pollutants including sulfur dioxide, nitrogen oxides, volatile organic compounds, particulate matter, sulfuric acid, and mercury. It is also likely that coal combustion-related emissions will contribute to atmospheric concentrations of ozone and secondary particulates when the proper atmospheric conditions are present. Coal combustion will also lead to the emissions of greenhouse gases, principally carbon dioxide. Most facilities that consume coal do not yet have controls to limit the quantities of greenhouse gases emitted to the atmosphere. The amount of carbon dioxide produced will depend on the carbon content of the coal and the degree to which complete combustion is achieved. In general, assuming complete combustion, 1 pound of carbon combines with 2.667 pounds of oxygen to produce 3.667 pounds of carbon dioxide (http://www.eia.gov/coal/production/quarterly/co2_article/co2.html). Without the ability to know the facilities in which the coal will be burned, however, it is too speculative to attempt to quantify total greenhouse gas emissions that will result from burning the coal that will be extracted from the mine under any of the alternatives.

## Proposed Action Alternative Environmental Effects

Under the Proposed Action Alternative, the mining would continue for an additional 1.6 years and additional methane drainage wells would need to be constructed. The emissions associated with the building of the roads and performing well inspections are incorporated into Table 3.1i. The total emissions listed in Table 3.1i are relatively small. Under the Proposed Action Alternative, the direct, indirect, and cumulative impacts that would occur would be the same as those presented under the no action alternative, except that they would continue for an additional 1.6 years.

## *Cumulative Effects & Climate Change*

### *Cumulative Effects*

Emissions from the mine will add to the regional emissions presented in the Gunnison and Delta county emissions table earlier. As the mine is already in operation and the annual rate of coal mining is not expected to increase, the cumulative impacts of the coal mine emissions along with regional emissions are already reflected in the monitoring data presented. The results from the 2010 modeling analysis completed as part of the mine's permit application (see Table 3.1e) contain the cumulative impacts that can be expected to $PM_{10}$ concentrations. Cumulative impacts to visibility were also considered by the state when it completed its regional haze analysis and concluded that impacts from the mine would not be sufficiently large to warrant additional particulate matter controls. Both direct and indirect emissions of greenhouse gases will contribute to regional and national emissions. Because the mine is operating and coal from the mine is being used in various facilities, the figures for national and state greenhouse gas emissions should reflect the cumulative impacts including the mine's operations. Depending upon implementation of an Alternative selected, there may be a reduction (-16.4 months) or an increase (+1.6 years) in duration of emissions compared to baseline because of coal reserves on private or on parent coal leases that may be affected.

### *Climate Change*

According to the U.S. Global Change Research Program (2009), global warming is unequivocal, and the global warming that has occurred over the past 50 years is primarily human-caused. Standardized protocols designed to measure factors that may contribute to climate change, and to quantify climatic impacts, are presently unavailable. As a consequence, impact assessment of specific impacts related to anthropogenic activities on global climate change cannot be accurately estimated. Moreover, specific levels of significance have not yet been established by regulatory agencies. Therefore, climate change analysis for the purpose of this EIS is limited to accounting for GHG emissions changes that would contribute incrementally to climate change. Qualitative and quantitative evaluations of potential contributing factors are included where appropriate and practicable. (Source: http://globalchange.gov/what-we-do/assessment/previous-assessments/global-climate-change-impacts-in-the-us-2009).

For all discussion related to climate change, most of the text was copied directly from government (EPA and State of Colorado) prepared documents that are available to the public. Effects from GHGs may not be measurable for decades or centuries and modeling is very expensive and relies on assumptions. Predicting the degree of impact any single emitter of GHGs may have on global climate change, or on the changes to biotic and abiotic systems that accompany climate change, is not possible at this time. As such, the controversy is to what extent GHG emissions resulting from continued mining may contribute to global climate change, as well as, the accompanying changes to natural systems cannot be quantified or predicted at this time. However, effects are presented in a general manner which we believe consistent with EPA's April 22, 2010 direction to the Rio Grande Field Office of

BLM_0018576

the BLM (Project file, Earth Justice Comments Exhibit). Local effects are from the *Draft Watershed Vulnerability Assessment Pilot Project, Case Study: Grand Mesa, Uncompahgre and Gunnison National Forests* (April 2011).

## Average Temperatures

Accumulation of greenhouse gases (including carbon dioxide) in the atmosphere is *very likely* the cause of most of the increase in global average temperatures (IPCC AR4 WGI 2007).  In North America, temperatures have increased by 2°F in the last 30 years, and "human-induced warming has *likely* caused much of the average temperature increase over the past fifty years" (CCSP SAP 3.3 2008, p. 3). Climate models show a 1°F warming in the Western US over the last 30 years in response to greenhouse gas emissions from human activities (anthropogenic). However, no studies have specifically investigated whether the detected trends in Colorado can be attributed to anthropogenic greenhouse gases (http://cwcb.state.co.us/Home/ClimateChange/ClimateChangeInColoradoReport/).

The Intergovernmental Panel on Climate Change (IPCC) estimates it has warmed 1.2 to 1.4°F (0.7 to 0.8ºC) over the past century and projects a further 3 to 7°F (2 to 4ºC) over the 21st century. The increases may appear minor compared to short-term weather changes from night to day and winter to summer. In global climate terms, however, warming at this rate would be much larger and faster than any of the climate changes over at least the past 10,000 years (IPCC Climate Change 2007: The Physical Science Basis).  Multiple independent measurements confirm widespread warming in the western United States.  In Colorado, temperatures have increased about 2°F in the past 30 years (1977-2006). All regions examined within the state warmed during the last 30 years, except the far southeast corner, in which there was a slight cooling trend.  Climate models project that Colorado will warm 2.5°F (+1.5 to +3.5°F) by 2025 relative to the 1950-1999 baseline and 4°F (+2.5 to +5.5°F) by 2050 with summers showing the larger temperature increase (http://cwcb.state.co.us/Home/ClimateChange/ClimateChangeInColoradoReport/).  Locally, the temperature is expected to increase by approximately 2-3 °C (3.6-5.4 °F) by 2050 (Table 3.1j).

**Table 3.1j. Temperature and Precipitation Climate Change Scenarios for 2050 developed by Barsugli and Mearns for the Gunnison Basin.**

|  | Precipitation (%) | | Temperature (°C) | |
|---|---|---|---|---|
|  | Moderate Scenario | More Extreme Scenario | Moderate Scenario | More Extreme Scenario |
| Annual | ~0.0 | -10.0 | +2.0 to +3.0 | +3.0 |
| Winter | +15.0 | ~0.0 | +2.0 | +3.0 |
| Spring | -12.0 | -15.0 | +2.5 | +3.0 |
| Summer | -15.0 | -20.0 | +3.0 | +4.0 |
| Fall | +4.0 | -10.0 | +2.5 | +3.0 |

## Extreme Temperature

Most scientists think that a warming climate will alter the frequency and severity of extreme temperature events. In general, they expect increases in heat waves and decreases in cold spells. These effects will vary from place to place (IPCC Climate Change and EPA Climate Change Effects, Extreme Events). In Colorado, winter projections show fewer extreme cold months, more extreme warm months, and more strings of consecutive warm winters. Typical projected winter monthly temperatures are between the 10th and 90th percentiles of the historical record. Between today and 2050, typical January temperatures of the Eastern Plains of Colorado are expected to shift northward by approximately 150 miles. In all seasons, the climate of the mountains is projected to migrate upward in elevation, and the climate of the Desert Southwest to progress up into the valleys of the Western Slope (http://cwcb.state.co.us/Home/ClimateChange/ClimateChangeInColoradoReport/).  Locally, there are expected to be fewer extreme cold months, more frequent extreme warm months, and more consecutive warm winters (Table 3.1c).

## Extreme Weather Events

Because warm sea surface temperatures energize hurricanes, a warming climate is likely to make hurricanes more intense. Hurricanes in the future will probably have stronger peak winds and increased rainfall. The relationship between sea surface temperatures and the frequency of hurricanes is less clear. There is currently no scientific consensus on how a warming climate is likely to affect the frequency of hurricanes, but research continues (IPCC Climate Change and EPA Climate Change Effects, Extreme Events).

42

In a warming climate, extreme events like floods and droughts are likely to become more frequent. More frequent floods and droughts will affect water quality and availability. For example, increases in drought in some areas may increase the frequency of water shortages and lead to more restrictions on water usage. An overall increase in precipitation may increase water availability in some regions, but also create greater flood potential (IPCC Climate Change and EPA Climate Change Effects, Water).

## Hydrology & Precipitation

Rising temperatures will intensify the Earth's water cycle. Increased evaporation will make more water available in the air for storms, but contribute to drying over some land areas. As a result, storm-affected areas are likely to experience increases in precipitation and increased risk of flooding. But areas located far away from storm tracks are likely to experience less precipitation and increased risk of drought. In the U.S., warming is expected to cause a northward shift in storm tracks, resulting in decreases in precipitation in areas such as the Southwest U.S. but increases in many areas to the north and east. However, these changes will vary by season and depend on weather fluctuations (IPCC Climate Change  and EPA Climate Change Science, Future Precipitation ).

Sea levels are rising worldwide and along much of the U.S. coast. Tide gauge measurements and satellite altimetry suggest that sea level has risen worldwide approximately 4.8-8.8 inches (0.12-0.22 m) during the last century. A significant amount of sea level rise has likely resulted from the observed warming of the atmosphere and the oceans. The primary factors driving current sea level rise include the expansion of ocean water caused by warmer ocean temperatures (warmer water is less dense), melting of mountain glaciers and small ice caps (resulting in more water in the oceans and less on land), and - to a lesser extent - the melting of the Greenland Ice Sheet and the Antarctic Ice Sheet. The Intergovernmental Panel on Climate Change (IPCC) projects a six-inch to two-foot (0.18-0.59 m) rise in sea level during the 21st century. Sea level rise may be greater if there are sudden increases in ice sheet melt. Such increases have already been observed but their effects have not yet been incorporated into current projections of sea level rise. The stability of the West Antarctic Ice Sheet is of particular concern. A sudden collapse of the ice sheet could raise sea levels 16 to 20 feet (5-6 m). The IPCC is unable to estimate the likelihood or timing of such a collapse, however, due to incomplete understanding of all the processes affecting this ice sheet (IPCC Climate Change 2007: Impacts, Adaptation and Vulnerability and EPA Climate Change Effects, Coastal Zones and Sea Level Rise).

Polar regions are expected to warm more than any other parts of the world. In part, this is because ice has greater reflectivity (also known as albedo) than ocean or land. Melting of highly reflective snow and ice reveals darker land and ocean surfaces, which increases absorption of the sun's heat and further warms the planet, especially in those regions. Polar ice sheets (such as those on Greenland and Antarctica) are some of the largest surface features on our planet. Any changes to them, however small, could have far-reaching effects. Polar ice sheets potentially will accumulate more snow and ice because of an increase in precipitation. However, overall melting due to global warming is expected to reduce the size and extent of the polar ice sheets. Melting of polar ice and land-based glaciers is expected to contribute to sea level rise. In addition to the ice sheets, sea ice is also melting. Though the melting of floating sea ice that covers part of the Arctic Ocean does not affect sea level, sea ice is important for wildlife and for keeping the region cool by reflecting sunlight back to space. If the Arctic loses the reflective surface of ice and then the dark Arctic Ocean absorbs more heat, the northern regions may warm even more rapidly (IPCC Climate Change and EPA Climate Change Effects, Polar Regions).

Coastal areas may be impacted by sea level rise and an increase in storm intensity. Rising seas may contribute to enhanced coastal erosion, coastal flooding, loss of coastal wetlands, and increased risk of property loss from storm surges (IPCC Climate Change  and EPA Climate Change Effects, Coastal Zones and Sea Level Rise).

Increasing temperatures are projected to affect state water resources. In Colorado, no consistent long-term trends in annual precipitation have been detected. Variability is high, which makes detection of trends difficult. Climate model projections do not agree whether annual mean precipitation will increase or decrease by 2050. The multi-model average projection shows little change in annual mean precipitation, although a seasonal shift in precipitation does emerge.   Widespread and large increase in the proportion of precipitation falling as rain rather than snow, and reduction in snow water equivalent (SWE) have been observed elsewhere in the West. In Colorado, however, these changes are smaller and not as significant. Most of the reduction in snowpack in the Western US has occurred below about 8200 ft.  However, most of Colorado's snowpack is above this elevation, where winter temperatures remain well below freezing. Projections show a precipitous decline in lower-elevation (below 8200 ft) snowpack across the West by the mid-21st century. Modest declines are projected (10–20%) for Colorado's high-elevation snowpack (above 8200 ft) within the same timeframe. Between 1978 and 2004, the spring pulse (the onset of streamflows from melting snow) in Colorado has shifted earlier by two weeks. Several

43

BLM_0018578

studies suggest that shifts in timing and intensity of streamflows are related to warming spring temperatures. The timing of runoff is projected to shift earlier in the spring, and late-summer flows may be reduced. These changes are projected to occur regardless of changes in precipitation. Recent hydrology projections suggest declining runoff for most of Colorado's river basins in the 21st century. However, the impact of climate change on runoff in the Rio Grande, Platte, and Arkansas Basins has not been studied as extensively as the Colorado River Basin. The lowest five-year period of Colorado River natural flow since records began in the late 1800s occurred in 2000 to 2004 (9.9 million acre feet per year). Recent hydrologic studies of the Upper Colorado River Basin project multi-model average decreases in runoff ranging from 6% to 20% by 2050 compared to the 20th century average, although one statistical streamflow model projects a 45% decline by 2050. The range of individual model projections within a single study can include both increasing and decreasing runoff due to the range of climate model output used to drive the hydrology models. Ongoing studies are attempting to resolve methodological differences in order to reduce the range of uncertainty in runoff projections. Throughout the West, less frequent and less severe drought conditions have occurred during the 20th century than revealed in the paleoclimate records over the last 1000 years. Precipitation variations are the main driver of drought in Colorado and low Lake Powell inflows, including the recent drought of 2000–07, and these variations are consistent with the natural variability observed in long-term and paleoclimate records However, warming temperatures may have increased the severity of droughts and exacerbated drought impacts (http://cwcb.state.co.us/public-information/publications/Documents/ReportsStudies/ClimateChangeReportFull.pdf). Locally, under a moderate scenario, no substantial change in annual precipitation, but an increase in cool season precipitation and a decrease in warm season precipitation is expected. And under a more extreme scenario, a 10% decrease in annual precipitation, with greater decreases in warm season precipitation. Under a moderate scenario, a decrease in annual natural stream flows of 5 to 10% is expected due to increased temperature, even if annual precipitation remains the same. And under a more extreme scenario, a decrease in precipitation and increase in temperature both act to reduce annual stream flow totals in the range of 20 to 25%. Warming temperatures lead to a later accumulation of snow in the fall, and earlier snowmelt in the spring. However, because of the increased precipitation in winter, and the generally cold, high-elevation nature of the upper Gunnison basin, the mid-winter snowpack may be similar to the present under a moderate scenario. And under a more extreme scenario, this likely represents a hot/dry scenario for much of the West, the potential exists for more frequent dust deposition events, which also may lead to an earlier melt and to reduced water yield from the snowpack. Under a moderate scenario, snowmelt-driven stream flow will occur earlier in the spring by about a week on average. (Note: this shift is due to warming and does not include the effects of dust-on snow, which can result in an even earlier shift in snowmelt. And under a more extreme scenario, snowmelt-driven stream flow will peak about two or more weeks earlier in the spring, though this effect may be less if dust effects on snowmelt are strong. The combined effects of dust and temperature on snowmelt timing tend to be dominated by the dust effects. For more local effects see Table 3.1k.

**Table 3.1k.  Projected Climate Changes to the GMUG.**

| Projected Climate Change | Anticipated Hydrologic Response | Potential Consequences to Resource Values |
|---|---|---|
| Warmer Winter/Spring Temperatures Average daily winter/spring temperature expected to increase > 3°C by 2050. | • Fewer extreme cold months, more frequent extreme warm months, more consecutive warm winters<br>• Later accumulation of snowpack.<br>• Earlier onset of snowpack runoff (1-3 weeks)<br>• Higher winter stream flows<br>• Increased water temperature<br>• Winter precipitation more often rain than snow below 8200 feet<br>• Snowline to move up in elevation. | • Reduced duration of winter snow cover.<br>• Longer period of saturated roadbeds vs frozen roadbeds.<br>• Increased demand for water storage.<br>• Earlier demand for irrigation water.<br>• Decreased summer stream flows.<br>• Potential change to aquatic species reproductive triggers or success.<br>• Increased risk to channel and floodplain infrastructure from higher runoff. |

BLM_0018579

| Projected Climate Change | Anticipated Hydrologic Response | Potential Consequences to Resource Values |
|---|---|---|
| | | • Increased risk to riparian habitat/floodplains from higher flows.<br>• Changes to winter habitat, winter recreation and plant communities. |
| **Warmer Summer Temperatures**<br>Average daily summer temperature expected to increase > 3°C by 2050. | • Increased evapotranspiration<br>• Decreased soil moisture<br>• Reduced summer stream flows<br>• Increased water temperature | • Increased demand for irrigation water.<br>• Shifts in cold water habitat to higher elevations.<br>• Increases in warm water habitat.<br>• Decreased dissolved oxygen in lower elevation streams during the summer.<br>• Aquatic biota mortality and even loss of populations.<br>• Loss of summer stream flow. |
| **Changes in Precipitation**<br>At higher elevations may be slightly greater precipitation during the winter, but likely less total precipitation, especially during warmer months. | • May see higher peak flows associated with snowmelt, earlier in the year.<br>• Lower summer and fall baseflows<br>• Increased soil moisture during spring at lower elevations | • Decreased water availability during irrigation season.<br>• Increased risk to channel and floodplain infrastructure.<br>• Reduced riparian vegetation health and vigor.<br>• Increased landslides and slumps on geologically unstable areas.<br>• Increased potential damage to saturated roadbeds.<br>• Reduced aquatic habitat in summer and fall. |
| **More intense storms**<br>Warmer atmosphere has potential for increase in frequency and magnitude of big storms | • Localized flooding<br>• Increased debris flows<br>• Increased hillslope and channel erosion | • Increased risk to channel and floodplain infrastructure from sediment and high flows.<br>• Increased concern for public safety.<br>• Increased selenium load in streams where Mancos Shale exposure is significant. |

45

BLM_0018580

| Projected Climate Change | Anticipated Hydrologic Response | Potential Consequences to Resource Values |
|---|---|---|
| More frequent and longer periods of drought | • Less soil moisture<br><br>• Reduced groundwater recharge<br><br>• Lower summer and fall baseflow | • Increased erosion associated with natural disturbances associated with drought (e.g. fire).<br><br>• Increased plant stress and susceptibility to insect and disease mortality.<br><br>• Reduced groundwater contribution to baseflows<br><br>• Reduced discharge from springs<br><br>• Reduced wetland/riparian function. |
| Increase winter dust deposition on snowpack | • Accentuate changes to snowpack melt | • Similar to warmer winter consequences. |

## Habitats & Species

Some ecosystems have already been affected by changes in climate. As the climate continues to warm, major changes may occur in ecosystem structure and function, species' ecological interactions, and species' geographic ranges, with predominantly negative consequences for biodiversity. Warmer temperatures and precipitation changes will likely affect the habitats and migratory patterns of many types of wildlife. The range and distribution of many species will change, and some species that cannot move or adapt may face extinction. In addition, climate changes such as increased floods and droughts are predicted to increase the risk of extinction for some plant and animal species, many of which are already at-risk due to other non-climate related factors (IPCC Climate Change and EPA Climate Change Effects, Ecosystems and Biodiversity).  For local effects see Table 3.1k.

## Health

A warming climate will have both positive and negative impacts. Local impacts are the most difficult to predict, making it a challenge to know exactly who or what will be harmed or benefit. Generally, the risk of negative impacts from climate change increases the faster it warms. More rapid climate change makes adapting to change more difficult and costly. This is especially true for vulnerable groups (such as the poor, the very young and older adults) and fragile ecosystems which may struggle to adapt to even small changes. The Intergovernmental Panel on Climate Change (IPCC) suggests that temperature increases above the range of 3.5 to 5.5°F (2 to 3°C) over the next 100 years would dramatically increase the negative impacts of climate change. So a major aim of climate action is to reduce the risk and likelihood of large, rapid warming (IPCC Climate Change 2007: Impacts, Adaptation and Vulnerability).  Longer, more intense and frequent heat waves may cause more heat-related death and illness. There is virtual certainty of declining air quality in cities since greater heat can also worsen air pollution such as ozone or smog. Insect-borne illnesses are also likely to increase as many insect ranges expand. Climate change health effects are especially serious for the very young, very old, or for those with heart and respiratory problems. Conversely, warmer winter temperatures may reduce the negative health impacts from cold weather (IPCC Climate Change 2007: Impacts, Adaptation and Vulnerability and EPA Climate Change Effects, Health).  For local effects see Table 3.1k.

## Food Availability

The supply and cost of food may change as farmers and the food industry adapt to new climate patterns. A small amount of warming coupled with increasing $CO_2$ may benefit certain crops, plants, and forests, although the impacts of vegetation depend also on the availability of water and nutrients. For warming of more than a few degrees, the effects are expected to become increasingly negative, especially for vegetation near the warm end of its suitable range (IPCC Climate Change  and EPA Climate Change Effects, Agriculture and Food Supply). For local effects see Table 3.1k.

46

*Costs*

Warmer temperatures may result in higher energy bills for air conditioning in summer, and lower bills for heating in winter. Energy usage is also connected to water needs. Energy is needed for irrigation, which will most likely increase due to climate change. Also, energy is generated by hydropower in some regions, which will also be impacted by changing precipitation patterns (IPCC Climate Change  and EPA Climate Change Effects, Energy Production and Use). For local effects see Table 3.1k.

*Recreation*

Outdoor recreation activities may benefit from longer periods of warm weather.  However, many other outdoor activities could be compromised by increased beach erosion, increased heat waves, decreased snowfall, retreating glaciers, reduced biodiversity, and changing wildlife habitats (IPCC Climate Change  and EPA Climate Change Effects, Public Lands, Recreational Opportunities, and Natural Resources ). For local effects see Table 3.1k.

## 3.2 Socioeconomics

### 3.2.1 Affected Environment

The analysis area for the proposed lease modifications includes Delta and Gunnison Counties. Currently, the West Elk Mine employs 378 employees, and a majority of these employees, as well as their families, live in communities in Delta County. Gunnison County is also included in this analysis because the lease modifications are located within its jurisdiction. Both Counties receive tax and other revenues as a result of the West Elk Mine operations. No major change in direct employment is anticipated at the West Elk Mine in conjunction with the Proposed Action Alternative, assuming annual production is consistent.

**Population**

Table 3.2a – Population by Category, 2000 and 2010, Delta and Gunnison Counties and the State of Colorado below presents basic population and demographic information for Delta and Gunnison Counties, and for the State of Colorado.

| Table 3.2a - Population by Category, 2000 and 2010, Delta and Gunnison Counties and the State of Colorado | | | |
|---|---|---|---|
| **Population** | **Delta County** | **Gunnison County** | **Colorado** |
| 2000 | 27,834 | 13,956 | 4,302,015 |
| 2010 | 30,952 | 15,324 | 5,029,196 |
| **Percent Change** | **11.2 %** | **9.8 %** | **16.9 %** |
| Male (2010) | 50.4 % | 54.2 % | 50.1 % |
| Female (2010) | 49.6 % | 45.8 % | 49.9 % |
| Under 5 years | 5.7 % | 5.6 % | 7.3 % |
| Under 18 years | 22.1 % | 18.1 % | 24.4 % |
| 65 years and over | 20.2 % | 8.8 % | 10.9 % |
| Percent Minority (2010) | 17.0 % | 10.9 % | 30.0 % |
| Percent Below poverty (2010) | 12.1 % | 13.9 % | 12.6 % |

Source: http://quickfacts.census.gov/qfd/states/08/08051.html, see Reference Section: U.S. Census Bureau 2011.

BLM_0018582

The majority of the workforce for the West Elk Mine, and for supporting businesses, is located within the cities and towns in Delta County. Delta County, which comprises approximately 1,142 square miles, has approximately 24.4 people per square mile and a total population of 30,952 (as of 2010). Between the years of 2000 and 2010, Delta County grew by almost 9 percent. According to the Sonoran Institute (2004), Delta County grew slower than the State of Colorado; however, the County grew faster than the Nation between the years of 1970 and 2000, with an annual average growth rate of 2.7 percent. The median age in Delta County is 42.3 years, with 21.4 percent of the population being under the age of 18; and almost 20 percent of the population being 65 years or older. More than 80 percent of the people age 25 and older in Delta County have graduated from High School, and just over 17 percent have graduated from College (U.S. Census Bureau 2001).

The Town of Delta is the largest town in Delta County. In 2000, the town had a population of approximately 6,400, which was an increase of 75 percent from 1990. Other communities in the County include Cedaredge (with a 2000 population of 1,854); Crawford (with a 2000 population of 366); Hotchkiss (with a 2000 population of 968); Orchard City (with a 2000 population of 2,880); and Paonia (with a 2000 population of 1,497) (U.S. Census Bureau 2000).

In 2009, the U.S. Census Bureau reported that there were 13,391 housing units in Delta County that housed 11,058 households, indicating a vacancy rate of approximately 17 percent. Only 3.7 percent of the vacant houses are classified as seasonal, recreational, or for occasional use. Approximately 8 percent of rental units were classified as vacant. There were approximately 2.43 persons per household. In 2000, Delta County had a home ownership rate of 77.5 percent, which was well above the State average of 67 percent. The median value of an owner-occupied housing unit was $115,500, which was well below the State average of $166,600 (U.S. Census Bureau 2001).

**Local Economic Impact**

The analysis area for the Proposed Action, in relation to economic resources, includes Delta and Gunnison Counties. Most of the personnel employed directly at the West Elk Mine live in Delta County, and most of the businesses and services that provide indirect support to the mine are in Delta County. The indirect businesses that provide support services to the West Elk Mine operations include shipping companies, railroad and rail services, power generating companies, delivery services, and general supply companies and services. Delta County receives the indirect financial benefit and tax revenue from the indirect businesses that support the mine, and the tax base from the workers, and their families, that reside in the County.

The West Elk Mine, the location of the Proposed Action, is in Gunnison County. Gunnison County receives approximately $2 million annually in tax revenues as the result of the coal mining operations at the West Elk Mine. Mining companies are the largest property tax revenue sources for Gunnison County. Gunnison County has identified the areas surrounding the coal mines as the *North Fork Valley Coal Resource Special Area.*

In 2009, Delta and Gunnison Counties, taken together, supported approximately 25,316 full- and part-time jobs, which was an increase of 16,804 jobs from 1970. In Gunnison County, approximately 600 of its 9,004 wage and salary jobs are in the mining sector, which was an

BLM_0018583

increase of 285 jobs from 1970. In 2000, mining employment in Delta County was not reported in U.S. Census Bureau documents because the data was suppressed for confidentiality reasons (Sonoran Institute 2004). In 2009, the unemployment rate in Gunnison County was 4.9 percent, which was much lower than the Statewide average of 8.4 percent for the same period. During the same period, the Delta County unemployment rate of 7 percent was also lower than the Statewide average. (Source: http://www.bls.gov/lau/laucntycur14.txt; see Reference Section: U.S. Bureau of Labor Statistics 2011).

In 2004, the West Elk Mine employed approximately 378 full- and part-time workers, with an annual payroll of approximately $29 million (MCC 2004). In 2001, average mining wages were $50,705, which was more than twice the average wage for other employment sectors in the project area ($23,254). Arch Coal (MCC's parent company) estimates that for every 1 coal job 7 service-sector jobs are supported (MCC 2004). In 2003, the West Elk Mine spent approximately $32 million locally for materials, supplies, and services; royalty and tax payments totaled approximately $13 million (MCC 2004). Total direct economic local direct economic benefits associated with the West Elk Mine exceed $70 million annually (USDA FS 2004).

## Benefit-Cost Analysis

The field of benefit-cost analysis attempts to take a holistic inventory in relation to the implementation of the Proposed Action. The overall economic benefits are weighed against the overall economic costs, taking a wider view than that of the local economic impacts. For the proposed coal lease modifications, 1.6 years (19 months) of additional coal mining activity was examined, with the following conclusions:

- **Benefits --**

  - approximately $400 million recovered in coal (at $40/ton)

  - approximately $46.4 million in payroll;

  - approximately $64.2 million in material, supplies, and services;

  - approximately $32 million in royalties (at 8%)

- **Costs --**

  - approximately $8 million in GHG emissions [383,000 tons of $CO_2$ equivalent methane * $21 per ton of $CO_2$) (Interagency Working Group 2010)];

  - minor costs due to 73 acres of disturbance on National Forest System Lands (resulting in temporary impacts to hunting, recreation, wilderness character, aesthetics, and livestock grazing, as well as possible impacts to water quality)

49

BLM_0018584

3.2.2 Environmental Impacts Analysis

**The No Action Alternative**

Under the No Action Alternative, the coal lease modifications would not be approved; therefore, the coal included in the modifications under the Proposed Action or the Proposed Action Alternative (approximately 10.1 million tons of recoverable coal) would not be mined and the economic and fiscal benefits associated with mining that coal would not be realized by the State or by the Federal government. Currently, approved mining operations and associated economic benefits would continue on the existing West Elk Mine leases; however, these operations would cease earlier than they would if the Proposed Action or the Proposed Action Alternative were approved; and approximately 10.1 million tons of coal would be permanently bypassed. Job losses, including those directly associated with the mine operations, as well as those associated with secondary jobs supported by the mine, would occur following the cessation of operations. The reductions in jobs and associated salaries, local expenditures, and royalty and tax payments would not be realized until after the reserves are depleted. The revenue (taxes and royalties) generated from the sale of the coal from the lease modifications would be lost.

The modifications to the West Elk Mine coal lease also provide access to coal in the current leased tracts; access that, without the approval of the modifications, could become inaccessible. The approval of the Proposed Action or the Proposed Action Alternative combined with current leased tracts could provide for a total of 10 years to 12 years life of mine on Federal and private coal reserves. Under the No Action Alternative the Federal government (the U.S. Treasury Department) would not receive the rents and royalties associated with mining the coal in the lease modifications.

**The Proposed Action Alternative**

Under the Proposed Action the West Elk Mine would continue mining operations using the existing workforce, equipment, and facilities. There would be no new or added employment at the West Elk Mine and no additional demand for housing or municipal services would be anticipated. Mining operations would be extended about 1.6 years in order to mine recoverable coal reserves in the E-Seam.

The BLM estimates that the E-Seam coal in the lease modifications would be mined interspersed with coal from existing leases from the year 2013 through 2016 (with some variations to these timeframes potentially occurring based upon timeframes for permitting, unforeseen mining or geologic circumstances, coal contract variability, etc.). This extension of mining operations would also extend the annual payroll, local expenditures, and taxes and royalty payments for approximately 1.6 years. The local economic impacts noted above from payroll, materials, supplies, and services associated with continued mining would equal approximately $5.83 million per month, which equates to approximately $110.6 million for the 19-month life of mine extension. The BLM receives annual payments from coal lease holders based upon rents at not less than $3.00 per acre. The rental rates are specified in the lease.

BLM_0018585

Royalty payments are 8 percent of the value of the coal removed from an underground mine (43 CFR 3473).

Royalties from the Federal coal are distributed in the following way:

- 50 percent returns to the Federal treasury in the General Fund;

- 50 percent returns to the State where the coal was mined, with a portion of that percentage being returned to the County where the coal was mined.

In Colorado, those funds are managed by the State Department of Local Affairs in the Energy Impact Fund. These monies are distributed on a grant-like basis to Counties affected by energy resource development for community benefit projects.

**Alternative with Design Features**

Under the Proposed Action Alternative (alternative with design features), the West Elk Mine would continue mining operations using the existing workforce, equipment, and facilities. There would be no change in the number of employees needed in order to implement this Alternative. As under the Proposed Action, there is also the assumption that if there is no addition to the workforce, there will be no additional demand for housing or municipal services. Mining operations would be extended throughout the period required to mine recoverable coal reserves in the E-Seam.

The BLM estimates that the E Seam coal in the lease modifications would be mined interspersed with coal from existing leases from the year 2013 through 2016 (with some variations to these timeframes potentially occurring based upon timeframes for permitting, unforeseen mining or geologic circumstances, coal contract variability, etc.). This extension of mining operations would also extend the annual payroll, local expenditures, and taxes and royalty payments for approximately 1.6 years. The local economic impacts noted above from payroll, materials, supplies, and services associated with continued mining would equal approximately $5.83 million per month, which equates to approximately $110.6 million for the 19-month life of mine extension. The BLM receives annual payments from coal lease holders based upon rents at not less than $3.00 per acre.  The rental rates are specified in the lease.

The cost to the West Elk Mine of implementing control measures in the form of stipulations as part of this alternative would be minor. The costs would not significantly reduce the economic benefit to the local economy.

3.3 Environmental Justice

**3.3.1 Affected Environment**

Executive Order (EO) 12898 (February 11, 1994), Federal Actions to Address Environmental Justice in Minority and Low-Income Populations was executed in order to avoid a disproportionate placement of adverse (negative) environmental, economic, social, and/or health impacts resulting from Federal actions and policies on minority and low-income

51

BLM_0018586

populations. Low-income populations are households where the people live below the subsistence or poverty level, as defined by local, States, and/or by the Federal government. The EO also directs Federal agencies to avoid making decisions that discriminate against these communities. Environmental justice means that, to the greatest extent practicable and permitted by law:

- populations are provided the opportunity to comment before decisions are rendered on; and

- populations are allowed to share in the benefits of, are not excluded from, and are not affected in a disproportionately high and adverse manner by government programs and activities affecting human health or the environment.

Analysis for the Proposed Action *and* the Proposed Action Alternative requires the identification of minority and low-income populations that may be affected by any of the alternatives. The area of influence for environmental justice for the Proposed Action *and* the Proposed Action Alternative is Delta County, Colorado, where the majority of West Elk Mine workers, and their families, live. Demographic information on ethnicity, race, and economic status is provided in this section as the baseline against which potential impacts can be identified and analyzed.

**Identification of Minority and Low-Income Populations**

For purposes of this analysis, minority and low-income populations are defined as follows:

- **Minority Populations --** Minority populations are persons of Hispanic or Latino origin of any race; Blacks or African Americans; Native American Indians or Alaska Natives; Asians; and Native Hawaiian and other Pacific Islanders.

- **Low-Income Populations --** Low-income populations are persons living below the poverty level. In 2000, the poverty weighted average threshold for a family of 4 was $17,603 and $8,794 for an unrelated individual. Estimates of these two populations were then developed in order to determine if environmental justice populations exist in Delta County (see Table 3-7).

In 2009, Delta County had a population of 31,322 persons, of which approximately 5,137 (16.4 percent) were minorities; and approximately 3,790 (12.1 percent) were living below the poverty level. Minority populations were lower in Delta County than in the State of Colorado; the low-income population in Delta County was higher than for the State of Colorado. The CEQ identifies minority and low income groups as Environmental Justice populations when either:

1. the population of the affected area exceeds 50 percent, or

2. the population percentage in the affected area is meaningfully greater (generally, taken as being at least 10 percent more) than the population percentage in the general population of the region or State.

BLM_0018587

Neither the minority population percentage nor the low-income population percentage meets the CEQ guidelines. As a result, it is assumed that no Environmental Justice populations exist within the area of influence; therefore, no impact analysis is required.

**Protection of Children**

EO 13045 (April 21, 1997), Protection of Children from Environmental Health Risks and Safety Risks, recognizes a growing body of scientific knowledge that demonstrates that children may suffer disproportionately from environmental health risks and safety risks. These risks arise because:

- children's bodily systems are not fully developed;

- children eat, drink, and breathe more in proportion to their body weight that adults;

- children's size and weight may diminish protection from standard safety features; and

- children's behavior patterns may make them more susceptible to accidents.

Based upon these factors, the President directed each Federal agency to make it a high priority to identify and assess environmental health risks and safety risks that may disproportionately affect (impact) children. The President also directed each Federal agency to ensure that its policies, programs, activities, and standards address disproportionate risks to children that result from environmental health risks or safety risks.

In relation to the Proposed Action and the Proposed Action Alternative, children are seldom present at the coal mining facilities at the West Elk Mine. On occasions where children are present, MCC has taken, and will continue to take, precautions for the safety of children. This includes such precautions as fencing, limitations on access to certain areas, and provision of adult supervision; therefore, no additional impact analysis is required.

### 3.4 Cumulative Impacts Summary

The geographic scope is focused on the North Fork Valley from east of the town of Delta, north to the Mesa/Delta County line, east to the Pitkin County boundary, then south and west along the watershed for the North Fork of the Gunnison River.  This area is approximately 566,700 acres in total with National Forest being 57% (322,400 acres), BLM 11% (61,150 acres), and private land 32% (182,150 acres).  A portion of the private land has the mineral estate reserved to the United States in the patents.

**Past Actions.**  The primary existing (past) disturbances within the proposed leases are associated with mining, oil and gas, livestock grazing, and residential/agricultural development.

Historic mining activities over the past century include the following:
- Hawks Nest Mine;
- Oliver Mine No. 1 and No. 2;
- Bear Mine No. 1, No. 2, and No. 3;
- Edwards Mine;

BLM_0018588

- USS Steel Mine;
- Blue Ribbon Mine;
- King Mine;
- Farmers Mine;
- Oxbow Sanborn Creek; and
- Bowie No. 1 Mine (a.k.a. Orchard Valley Mine).

Over the last century, there has been noticeable subsidence in a number of areas above the historic mines. However, there has been no known damage to overlying resources or to structures attributable to this subsidence. Subsidence may have aggravated or contributed to some landslide movements, but this is difficult to identify given the pre-mining instability of many areas of the valley.

Past oil and gas activity within the region has included coal-bed methane wells and conventional gas wells. The wells within approximately 20 miles of the lease modification areas include:

- 56 total wells drilled.  25 are on private surface/private minerals; 11 are split-estate wells; 20 are on U.S. Forest Service; and no wells are on BLM surface.
- 20 wells are producing and 31 are shut-in.

**Present  Actions.**  Present actions are focused on mining, oil and gas, livestock grazing, and residential/ agricultural development.

Table 3.4a contains recent production data for the three coal mines in the North Fork Valley.

**Table 3.4a - Raw Coal Production - North Fork Valley (NF) - BLM-UFO**
**1 Year Averages**

| Average based on: | Bowie No. 2 | Elk Creek | West Elk | Totals (NF) |
|---|---|---|---|---|
| 5 Year | 2,808,556 | 4,378,814 | 5,721,944 | 12,909,314 |
| 1 Year | 1,873,357 | 3,495,575 | 6,499,048 | 11,867,980 |
| Periods end Sept. 30, 2011 | | | | |

NOTE: The total yearly production for the North Fork Valley is expected to remain about the same between 12 and 13 million tons.  This would result in approximately 3 unit trains per day of 105 cars per unit entering and leaving the North Fork Valley.  Each of these mining operations control coal reserves with a mix of Federal and fee coal; however, 90 percent or more of local production is Federal. As mining progresses, only Federal coal will be available in the reserve base.

- Bowie No. 2 was opened in 1997 as a room-and-pillar mine but converted to a longwall system in late 1999.  It is located northeast of Paonia and is operated by Bowie Resources, LLC with a train loadout northeast of Paonia.  There are 14,543 acres permitted in the combined permits of the Bowie No. 1 and No. 2 accessed by the Bowie No. 2 mine.
- The Elk Creek Mine is a longwall operation north of Somerset, operated by Oxbow Mining, LLC, with a train loadout immediately north of Somerset. There are 13,429 acres permitted.
- The West Elk Mine is a longwall operation located south and east of Somerset and is operated by Mountain Coal Company with a loadout about 1 mile east of Somerset. There

54

are 17,155 acres permitted and the mine is about the 7th largest underground longwall coal mine in the U.S.

The North Fork Branch of the Union Pacific Railroad operates exclusively to serve these coal mines. This line branches from the main line in Grand Junction and passes through Delta, Hotchkiss, Paonia, and Somerset.

On a cumulative analysis basis, the West Elk Mine, as well as the other 2 underground coal mines operating in the North Fork Valley, has a considerable impact on the local economy. Approximately 1,028 coal miners are employed directly by the 3 mines, and an additional 1,748 people in the local area derive their employment from the miner's income, as well as from the purchases of supplies by the mines themselves. The West Elk Mine is responsible for approximately one-third of this overall effect, and the proposed lease modifications will allow the mine to continue operations for 19 additional months. If the lease modifications were not approved, and not offered for sale, nearly 1,000 people in the local area would lose their employment 19 months sooner than they otherwise would.

Continued operation of the coal mines in the North Fork Valley provides a direct beneficial impact to the local economy.  Impacts to businesses that do not depend upon the direct business from resource extraction are more difficult to measure.  There may be minor impacts resulting from the continued mining of non-renewable resources in the North Fork Valley. The impacts would be temporary, consistent within the timeframe of the mining operations.

Oil and Gas Leasing.  There are approximately 418,469 total acres of federal oil and gas mineral estate within the cumulative impacts area.  Approximately 124,192 unleased acres are within inventoried roadless areas which, due to on-going litigation, may have surface use restrictions related to road building if ever nominated for leasing.  Overall, there are 173,646 acres currently leased.  This includes 54,580 acres of inventoried roadless areas which were leased prior to implementation of the USFS roadless rule.  If these pre-2001 leases expire and are subsequently leased again, they will have surface use restrictions for whatever roadless rule may be in place.  Approximately 120,631 acres of Federal oil and gas mineral estate remains available for nomination to be leased at this time.

**Reasonably Foreseeable Actions.**

Underground coal mining would continue in the North Fork Valley. In addition to existing coal leasing and exploration activities, the following are reasonably foreseeable actions:
- Oxbow Mining, LLC (Elk Creek Mine) is in the process of permitting both an additional 786-acre lease (COC70615) with proposed surface disturbance of approximately 5.63 acres on public lands and a 157-acre coal lease modification (COC61357) with no surface disturbance on the GMUG.
- Mountain Coal Company (West Elk Mine) applied to construct, operate, and reclaim up to 159 E Seam MDWs sites that would support 171 individual MDWs, and use or construction of approximately 26.1 miles of roads within the GMUG are in the final process of approval.
- Oxbow Mining, LLC (Oak Mesa Project – coal exploration license) - a proposal to drill 43 exploration drill holes on private and federal lands into federal subsurface holdings.  The entire exploration area covers about 13,873 acres, and temporary surface disturbances from road and pad construction would occur on about 32.86 acres.

BLM_0018590

- Bowie Resources, LLC (Bowie No. 2 Mine) applied for two lease modifications adjacent to current leases to the north under private and public lands and are in the NEPA analysis.  They would add approximately 505 acres, and temporary surface disturbances from road and pad construction would occur on about 16.6 acres.

Additional actions including coal lease modifications and new coal lease applications could be expected in the North Fork Valley.  These factors may affect how long mining would continue in this area; however, it is likely that mining would continue for another decade, if not more.

Pending oil and gas activity includes 22 total permits.
- 9 shale well permits;
- 8 coal-bed methane wells; and
- 5 coal mine methane wells.

It is difficult to forecast future oil and gas development within the cumulative impact assessment region. The area is seeing an increase in development which exceeds the past average.  Activity increases are due to changes in technology for the drilling and development of the unconventional mancos shale wells and wells used to capture methane from coal mines. It is estimated that the area will average 20 new wells per year (assumes at least 2 wells per pad – 10 new pads per year).   This will then create approximately 68 acres of new disturbance per year from oil and gas development.

SG Interests I, Ltd (SG) has proposed a 150 gas well Master Development Plan to develop mineral leases they hold within the Bull Mountain Unit located in Gunnison County, Colorado. SG is proposing to drill and produce 150 wells from approximately 41 individual well pads and associated infrastructure.  Approximately 50% of the wells are targeting coalbed methane production and the other 50% will be exploring other potentially productive natural gas zones encountered by drilling into other geologic zones in the area of the Bull Mountain Unit.

August 2012 Oil and Gas lease sale:  The BLM has deferred all parcels in the Uncompahgre Field Office that were nominated for the August 2012 lease sale.  It is not known which parcels may be leased in the future, or when such leasing would occur.

**Other Activities.**  Other past, present, and reasonably foreseeable development activities within the proposed lease modification areas and vicinity include:
- Historically, fruit orchards along the valley floor and low mesas have been important to the local Paonia economy. More recently, vineyards have replaced some orchards in the area.
- Sheep and cattle are grazed in pastureland around Paonia and also at higher elevations near the mining operations during the summer.
- There are a number of water storage reservoirs and canals around the North Fork Valley to serve agriculture and domestic uses.
- WAPA operates the Curecanti-Rifle 230/345 kV transmission line that parallels Terror Creek.
- Residential developments in the area around the communities of Paonia, Hotchkiss, Crawford, and Delta have been growing in population, with many new houses being built. Most of this development has been down-valley from the coal mines in broader portions of the North Fork Valley. This development has increased the traffic load and demand for maintenance on State Highway 133.

BLM_0018591

- There is little developed recreation in the area; however, the area is widely used for dispersed recreational activities, such as hunting, four-wheeling, hiking, biking picnicking, horseback riding, snowmobiling, and sight-seeing.

Forest treatments timber sales have been limited in the area.

Cumulatively, impacts from the proposed lease modifications could include small increases in deposition of sediment or pollutants into surface waters, increased subsidence within the North Fork Valley, low increase in cumulative emission of GHGs from mine ventilation, and a slight increase in water withdrawal from the Colorado River system that may potentially impact several federally-listed species of fish in downstream portions of the North Fork and Gunnison Rivers. None of these impacts is expected to be major as analyzed in the specific resource sections.  Impacts resulting from the proposed lease modifications could add incrementally to impacts from the other activities discussed above, resulting in a low-level increase in noise, human presence, soil erosion, invasive weeds, wildlife habitat loss, and vegetation loss or conversion. These impacts are discussed in the sections above. Cumulative impacts associated with coal mining are not anticipated to be significant.

## Chapter 4 – Consultation and Coordination – Tribes, Individuals, Organizations, Agencies

The following discussion documents the BLM's consultation and coordination efforts during the preparation of this EA. Consultation and coordination is an ongoing effort, and will continue throughout the entire process of developing the final EA.

Native American Tribes

Federally recognized Native American tribes have a unique legal and political relationship with the government of the United States. Executive Order (EO) 13175 requires Federal agencies to coordinate and consult on a government-to-government basis with sovereign Native American tribal governments whose interests may be directly and substantially affected by activities on federally administered lands. Other laws, rules, regulations, policies, standards, and guidelines require consultation with Native American tribes in order to identify cultural values, religious beliefs, traditional practices, and legal rights that could be affected by BLM actions on public lands. These include the National Historic Preservation Act of 1966 (NHPA), the American Indian Religious Freedom Act of 1978 (AIRFA), the Native American Graves Protection and Repatriation Act of 1990 (NAGPRA), Department of Interior (DOI) Secretarial Order No. 3215 (DOI 2000), 512 Department Manual Chapter 2 (DOI 1995), BLM Manual H-8160-1, Native American Coordination and Consultation (BLM 1994), and EO 13007, Indian Sacred sites.

Consultation with Native American tribes is also part of the scoping process required by the NEPA, as well as a requirement of the FLPMA. Tribal consultation regarding this EA was conducted by the USFS, GMUG National Forests. The following Native American Tribes were consulted:  Ute Mountain Ute Tribe, Southern Ute Tribe and Northern Ute Tribe.

BLM_0018592

## Special Status Species Consultation

Formal consultation with the U.S. Fish and Wildlife Service (USFWS) was conducted by the USFS, GMUG National Forests.

## List of Preparers

An ID Team of resource specialists from the BLM prepared this EA as shown in Table 4.0 – List of Preparers below. The ID Team prepared alternatives, collected data for the analysis, assessed potential impacts associated with the alternatives, and prepared the this document.

| Table 4.0 - List of Preparers | | | |
|---|---|---|---|
| Name | Years of Experience | Discipline | Education |
| **BLM, Colorado State Office** | | | |
| Christina Reed | 2 | Planning and Environmental Coordinator | JD – Environmental and Natural Resources Law BA – Political Science |
| Charlie Beecham | 26 | Chief, Branch of Solid Minerals | BS -- Mining Engineering |
| Matt McColm | 33 | Mining Engineer | BS -- Mining Engineering |
| Chad Meister | 6 | Air Quality Specialist | BS -- Environmental Science |
| David Epstein | 1 | Economist | MS -- Natural Resources Economics |
| | | | |

58

## Appendix A, Example Calculations

This technical appendix provides additional information on the procedures used to estimate direct emissions for underground mobile sources. It also includes a summary table listing all estimated emissions for the mine.

## 1.) Horsepower-hour Calculations for Underground Mobile Sources

To provide acceptable emissions estimates and to fully disclose expected direct emissions from the facilities mobile sources, the EPA's Nonroad model (2008a) was used to generate SCC specific emissions factors (grams per horsepower-hour) for the Delta and Gunnison County based equipment inventories for the year 2000. The year 2000 inventory was chosen to be reasonably conservative, with respect to the fleets overall state of control technology integration that would be expected as the inventory equipment ages and is replaced with newer and better controlled sources. To estimate emissions from the sources, staff had to determine a reasonable thermal efficiency (TE) for the SCC groups in order to estimate the total horsepower-hours the annual fuel use would provide to the equipment. This was necessary because the emissions factors derived from the Nonroad model already account for the overall TE of the equipment, as well as some of the other variables, such as deterioration factors, loading factors, etc. The $CO_2$ emission factor was used to estimate the TE because the model does not rely on a particular control technology, engine class, or equipment type for derivation, and instead calculates the $CO_2$ emissions rates based on the in-use brake specific fuel consumption (BSFC - reported as pounds of fuel per horsepower-hour), which is essentially static across all horsepower classes for all model years.

### Known Parameters:
1.) MCC annual diesel fuel use 670,000 (500k Under, 170k Surface) gal   * source: West Elk Mine
2.) The average density of the diesel fuel is 7.11 lb/gal   * source: LSD MSDS
3.) The LHV based energy density of the diesel fuel is 18,500 btu/gal   * source: Ave. of literature
4.) Conversion: btu/hp-hr = 2,544.43   * source: Common conversion
5.) $CO_2$ EF = 642.323 g $CO_2$/hp-hr   * source: EPA Nonroad (2008a)
6.) Carbon content of diesel fuel = 2,778 g C/gal   * source: 40 CFR 600.113
7.) $CO_2$ : C Molecular Weight Ratio = 44/12 = 3.667 (unit-less)   * source: Periodic Table

### Calculate Parameters (Underground Equipment Example):
1.) Total Available Energy of fuel =
   500,000 gal   x   7.1 lb/gal   x   18,500 btu/lb  ........................................................   = ........................................................................................................................65,767.5 MMbtu

2.) Energy Converter to HP (Energy IN) =
   65,767,500,000 btu   /   2544.43 btu/hp-hr  ............................................................   = ........................................................................................................................25,847,605.34 hp-hr

3.) Convert $CO_2$ EF of Diesel Fuel to C EF =
   642.323 g $CO_2$/hp-hr   x   $3.667^{-1}$  ............................................................... ........................................................................................................................=175.179   g C/hp-hr

4.) Derived hp-hr/gal of fuel from know Carbon Content of fuel =

59

BLM_0018594

2,778 g C/gal  /  175.179 g C/hp-hr ......................................................... .......................................................................................................**= 15.858   hp-hr/gal**

5.)  Derived hp-hr from fuel use (Energy Out) = 15.858 hp-hr/gal  x  500,000 gal  ........................................................... ...................................................................................................................... = ......................................................................................................**7,929,026.54 hp-hr** ......................................................................................................

6.)  TE = Energy Out  / Energy IN  x  100% = 7,929,026.54 hp-hr  /  25,847,605.34 hp-hr  x  100% ..........................................**=30.68%**

## Conclusions:

The Thermal Efficiency of the underground equipment is approximately 30.68% based on the EPA Model data for $CO_2$. Although low for typical diesel engines based on the literature, it is realistic for working engines where hp is developed at various RMPs (based on loading and work cycles).  Further the EPA Model takes this into account when developing the EFs (see Nonroad Technical Document NR009d "Exhaust and Crankcase Emission factors for Nonroad Engine Modeling – Compression- Ignition").  All emissions estimates are based on the EPA Nonroad Model emissions factors and the total hp-hrs derived in calculated parameter 5 for each equipment class, i.e. underground or surface.

**2.)    Example Emissions Calculations for Mobile Sources**

**General Equation for all Emissions:**

Emissions (tons)  =  Total hp-hr (Energy Out[1])  x   NR $EF_E$ g/hp-hr   x  453.6$^{-1}$ g/lb   x  2000$^{-1}$ lb/ton
<u>Where:</u>
$EF_E$  =  Either the Underground or Surface Equipment Emissions Factor
[1] For N2O, substitute (Energy In).  EF based on fuel use only.

**A.) For $N_2O$ (surface)**

8,788,185.82 hp-hr   x   0.005 g/hp-hr   x   453.6$^{-1}$ g/lb   x   2000$^{-1}$ lb/ton   =   .......................0.048 tons

**B.) $NO_X$ (underground)**

7,929,026.54 hp-hr   x   10.163 g/hp-hr   x   453.6$^{-1}$ g/lb   x   2000$^{-1}$ lb/ton   =   .....................88.82 tons

60

BLM_0018595

**Table A1. Direct Criteria and GHG Emissions from Stationary and Mobile Sources in Tons (2011)**

| Stationary Sources | AIRS ID | PM | $PM_{10}$ | $PM_{2.5}$ | NMOG | CO | $NO_x$ | $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Aggregates / Mine Vents / Fugitives (09GU1382) | 11, 12, 13, 14 ,15, 16, 19, 20 | 154.2 | 88.2 | 88.2[1] | NA | NA | NA | NA | NA | NA | NA |
| Diesel Storage Tank (93GU866.XA) | 09 | NA | NA | NA | 1.99[2] | NA | NA | NA | NA | NA | NA |
| Emergency Generator(s) (10GU1130 & Exempt Units) | 21 | 0.39 | 0.39 | 0.39 | 0.66 | 5.03 | 10.34 | 0.13 | 1,007.47 | 0.05 | ND |
| MDW & VAM Exhaust | NA | NA | NA | NA | NA | NA | NA | NA | ND | 58,663[4] | NA |
| Misc. Heating Equipment | NA | 4.73 | 4.30 | 4.36 | 2.41 | 35.70 | 43.88 | 0.59 | 51,920.29 | 0.97 | 0.91 |
| Mobile Sources[3] | SCC | PM | $PM_{10}$ | $PM_{2.5}$ | NMOG | CO | $NO_x$ | $SO_2$ | $CO_2$ | $CH_4$ | $N_2O$ |
| Underground Mining Equipment | 2270009000 | 12.64 | 12.64 | 12.26 | 19.37 | 74.77 | 88.82 | 1.21 | 5,613.98 | 0.29 | 0.14 |
| Surface Mining Equipment | 2270002036 2270002051 2270002060 2270002069 2270002033 | 1.90 | 1.90 | 1.84 | 2.31 | 12.27 | 26.24 | 0.41 | 1,908.74 | 0.04 | 0.05 |
| **Total Direct Emissions** | | 173.86 | 107.43 | 107.06 | 26.742 | 127.77 | 169.28 | 2.34 | 60450.48 | 58664.35 | 1.1 |

[1] All PM10 assumed to be PM2.5, site specific data is not known.  APCD permit 09GU1382 does not include PM2.5 limits or emissions.

[2] Emissions based on APEN exemption threshold in attainment area (2.0 tpy).

[3] Mobile sources emissions are for exhaust only.

[4] The $CO_2e$ of the methane gas is approximately 1,231,919 tons.

BLM_0018596

**Table A.2 EPA Nonroad Emissions Factors** (g/hp-hr)

| Equipment Type | SCC | PM | $PM_{10}$ | $PM_{2.5}$ | $NMOG^2$ | CO | $NO_x$ | $SO_2$ | $CO_2$ | $CH_4{}^3$ | $N_2O^4$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Underground Mining Equipment | 2270009000 | 1.446 | 1.446 | 1.403 | 2.216 | 8.555 | 10.163 | 0.138 | 642.323 | 0.034 | 0.005 |
| Surface Mining Equipment[1] | 2270002036 2270002051 2270002060 2270002069 2270002033 | 0.535 | 0.535 | 0.519 | 0.652 | 3.458 | 7.393 | 0.116 | 537.869 | 0.010 | 0.005 |

[1] Emissions factors from listed SCC (Source Classification Code) equipment was averaged together to produce a composite emissions factor to represent likely equipment present at the facility. The individual equipment emissions did not statistically vary significantly, with the exception of the bore/drill rigs, within the model results. However, the drilling and boring equipment is not expected to be as heavily used as the other surface equipment, and therefore a straight average of all the emissions factors was used to develop the composite factor (conservative) vs. a weighted average which would have considered area equipment population data. Data was not available for site fleet data to produce a facility specific weighted average.

[2] NMOG (Non-Methane Organic Gases) used to represent potentially reactive VOC species that may participate in ground level Ozone formation. NMOG is the sum of crankcase and exhaust emissions.

[3] CH4 is represented from TOG (Total Organic Gases) – NMOG. CH4 is the sum of crankcase and exhaust emissions.

[4] N2O factor derived from EPA Climate Leaders GHG inventory Protocol (EPA430-K-08-004) Direct Emissions from Mobile Combustion Sources, Appendix A, Table A-6. N2O factor reported as 0.08 g/kg of fuel combusted. Factor was converted to g/hp-hr based on calculated hp-hr from total annual fuel use (Appendix A, Example TE Calculation).

# REASONABLE FORESEEABLE DEVELOPMENT SCENARIO FOR OIL AND GAS FOR THE UNCOMPAHGRE FIELD OFFICE, COLORADO



Mancos Shale along the North Fork of the Gunnison River north of Paonia on State Highway 133.



Dakota Sandstone along U.S. 550 near Ridgeway showing coal seam near base of section.



Mesaverde Group showing paleo-river channel along State Highway 133 near McClure Pass.

**DEAN P. STILWELL,
ALFRED M. ELSER, Ph.D.,
AMBER L. ROBBINS, and
STAN W. DAVIS-LAWRENCE**

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

## FINAL REPORT

**February 16, 2012**

BLM_0018598

# UNITED STATES DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT

## WYOMING STATE OFFICE
## RESERVOIR MANAGEMENT GROUP

# FINAL
## Reasonable Foreseeable Development Scenario for Oil and Gas, Uncompahgre Field Office, Colorado
## February 16, 2012

**Prepared By:**

| Signature | Signature | Signature | Signature |
|---|---|---|---|
| Dean P. Stilwell | Alfred M. Elser, Ph.D | Amber L. Robbins | Stan W. Davis-Lawrence |
| Name | Name | Name | Name |
| Geologist, PG-1070 | Geologist | Geologist | Petroleum Engineer |
| Title | Title | Title | Title |
| 02/16/2012 | 02/16/2012 | 02/16/2012 | 02/16/2012 |
| Date | Date | Date | Date |

**Reviewed By:**

Signature

J. David Chase

Name

Chief Reservoir Mgmt. Group

Title

02/16/2012

Date

## INTRODUCTION 8

## GEOLOGIC OVERVIEW 11

## EXPLORATORY AND PRODUCTION ACTIVITY AND OPERATIONS 12

**EXPLORATORY ACTIVITY AND OPERATIONS** 12
**FEDERAL DEVELOPMENT CONTRACTS** 19
**FEDERAL OIL AND GAS UNIT AGREEMENTS** 19
**TYPICAL DRILLING AND COMPLETION SEQUENCE** 21
**DRAINAGE PROTECTION** 22
**HISTORICAL DRILLING AND COMPLETION ACTIVITY AND TECHNIQUES EMPLOYED FOR CONVENTIONAL OIL AND GAS** 23
EARLY EXPLORATION AND DEVELOPMENT ACTIVITY 23
PRODUCING ZONES 24
TECHNOLOGY DEVELOPMENT 25
DRILLING AND COMPLETION ACTIVITY 27
MARGINAL WELLS 28
DEEP WELL DRILLING: GREATER THAN 15,000 FEET 29
DEEP WELL DRILLING AND COMPLETION ACTIVITY: 10,000 TO 15,000 FEET 29
SHALLOWER WELL DRILLING: 5,000 TO 9,999 FEET 29
SHALLOWEST WELL DRILLING: LESS THAN 5,000 FEET 30
SUMMARY OF CURRENT DRILLING TECHNIQUES 31
Directional and Horizontal Drilling and Completion Activity 31
Slimhole Drilling and Coiled Tubing 33
Light Modular Drilling Rigs and Pad Drilling 33
Pneumatic Drilling 34
Measurement-While-Drilling 34
Improved Drill Bits 34
SUMMARY OF CURRENT COMPLETION TECHNIQUES 35
DRILLING AND COMPLETION COSTS 35
**SUMMARY OF CONVENTIONAL OIL AND GAS PRODUCTION AND ABANDONMENT TECHNIQUES** 36
HYDROGEN SULFIDE OCCURRENCE 38
CARBON DIOXIDE 38
ACID GAS REMOVAL AND RECOVERY 39
ARTIFICIAL LIFT OPTIMIZATION 39
GLYCOL DEHYDRATION 40
PRODUCED WATER MANAGEMENT 40
LEAK DETECTION AND LOW-BLEED EQUIPMENT 41
VAPOR RECOVERY UNITS 41
**UNDERGROUND GAS STORAGE** 41

BLM_0018600

**PREVIOUS ASSESSMENTS OF OIL AND GAS RESOURCES**                    **42**

**RECOVERABLE NATURAL GAS RESOURCES – ENERGY INFORMATION
ADMINISTRATION, POTENTIAL GAS COMMITTEE, AND NATIONAL
PETROLEUM COUNCIL**                                                  **42**
ASSUMPTIONS TO THE ANNUAL ENERGY OUTLOOK 2010 WITH PROJECTIONS TO 2035
ENERGY INFORMATION ADMINISTRATION (2010)                             42
THE NATIONAL PETROLEUM COUNCIL (2003)                                43
**ATLAS OF MAJOR ROCKY MOUNTAIN GAS RESERVOIRS (1993)**              **44**
**MAJOR OIL PLAYS IN UTAH AND VICINITY: QUARTERLY TECHNICAL
PROGRESS REPORTS (2003-2008)**                                       **45**
**INVENTORY OF ONSHORE FEDERAL OIL AND NATURAL GAS RESOURCES
AND RESTRICTIONS TO THEIR DEVELOPMENT: PHASE III INVENTORY—
ONSHORE UNITED STATES (2008)**                                       **47**
**OIL AND GAS POTENTIAL AND REASONABLE FORESEEABLE
DEVELOPMENT SCENARIOS IN THE SAN JUAN NATIONAL FOREST AND
BLM PUBLIC LANDS, COLORADO (2006)**                                  **48**
**RESOURCE POTENTIAL AND GEOLOGY OF THE GRAND MESA,
UNCOMPAHGRE, AND GUNNISON (GMUG) NATIONAL FORESTS AND
VICINITY, COLORADO (2004)**                                          **49**
**PETROLEUM SYSTEMS AND GEOLOGIC ASSESSMENT OF OIL AND GAS IN
THE UINTA-PICEANCE PROVINCE, UTAH AND COLORADO (2002)—ALONG
WITH THE PARADOX BASIN (1995) UNITED STATES GEOLOGICAL
SURVEY**                                                             **49**
**A NEW APPROACH TO ASSESSING GAS AND OIL RESOURCES IN THE
INTERMOUNTAIN WEST (2001): RAND SCIENCE AND TECHNOLOGY
ASSESSMENT**                                                         **50**

**ASSESSMENT OF THE COALBED NATURAL GAS RESOURCE**                   **51**

**COALBED NATURAL GAS ACTIVITY**                                     **51**
**SUMMARY OF COAL FIELDS IN THE STUDY AREA**                         **53**
GRAND MESA COAL FIELD                                                53
SOMERSET COAL FIELD                                                  54
CARBONDALE COAL FIELD                                                54
NUCLA-NATURITA COAL FIELD                                            54
TONGUE MESA COAL FIELD                                               55

**OIL AND GAS OCCURRENCE POTENTIAL**                                 **56**

**PROJECTIONS OF FUTURE OIL AND GAS ACTIVITY 2012-2031**             **57**

**OIL AND GAS PRICE ESTIMATES**                                      **58**

BLM_0018601

GAS PRICES                                                        58
OIL PRICES                                                        59
**LEASING**                                                       **60**
**PROJECTIONS OF FUTURE OIL AND GAS DRILLING ACTIVITY**           **61**
PROJECTED OIL AND GAS DRILLING ACTIVITY                           61
PROJECTED COALBED NATURAL GAS DRILLING ACTIVITY                   64
**PROJECTIONS OF FUTURE OIL AND GAS PRODUCTION**                  **66**
**ESTIMATED FUTURE CONVENTIONAL OIL AND GAS PRODUCTION**          **67**
**OTHER POTENTIAL FUTURE OIL AND GAS ACTIVITIES**                 **67**
RESOURCE PLAYS                                                    67
COAL GASIFICATION                                                 71
CARBON DIOXIDE SEQUESTRATION                                      71


**POTENTIAL OIL AND GAS SURFACE DISTURBANCE**                     **72**


**WELL ASSUMPTIONS – WELLS DRILLED, WELLS DRILLED PER DISTURBED SITE (PAD), COMPLETION SUCCESS, AND BUREAU AND FOREST SERVICE MANAGED OIL AND GAS MINERALS**     **73**
**SURFACE DISTURBANCE ASSUMPTIONS**                               **75**
DRILL PADS                                                        75
ACCESS ROADS (ALL WELL CATEGORIES)                                75
PIPELINES                                                         76
**ANALYSIS RESULTS**                                              **76**


**SUMMARY**                                                       **77**


**APPENDIX 1 – U.S. GEOLOGICAL SURVEY ASSESSMENTS OF UNDISCOVERED TECHNICALLY RECOVERABLE OIL AND GAS RESOURCES WITHIN THE UNCOMPAHGRE STUDY AREA**     **78**


**INTRODUCTION**                                                  **78**
**PARADOX BASIN PROVINCE ASSESSMENT**                             **79**
PLAY SUMMARY                                                      79
PLAY DESCRIPTIONS                                                 80
*Salt Anticline Flank*                                            80
*Buried Fault Blocks*                                             80
*Fractured Interbed*                                              80
*Porous Carbonate Buildup*                                        81
*Permian-Pennsylvanian Marginal Clastics*                         81
PLAY RESOURCE RESULTS                                             81
**UINTA-PICEANCE BASIN PROVINCE ASSESSMENT**                      **82**
PLAY SUMMARIES                                                    83
TOTAL PETROLEUM SYSTEMS AND ASSESSMENT UNIT SUMMARIES             83
*Mesaverde Total Petroleum System*                               83

BLM_0018602

*Mancos/Mowry Total Petroleum System*     86
*Phosphoria Total Petroleum System*     87
ASSESSMENT UNIT RESOURCE RESULTS     89

**REFERENCES**     **91**

**GLOSSARY**     **103**

## Figure List

**Figure 1.** The Uncompahgre Field Office and its location within Colorado.
**Figure 2a.** Location of Uncompahgre Study Area within Uncompahgre Field Office.
**Figure 2b.** Location of oil and gas mineral ownership within the Uncompahgre Study Area.
**Figure 3a.** Location and initial status of all conventional oil and gas wells drilled within the Uncompahgre Study Area.
**Figure 3b.** Location and initial status of all coalbed natural gas wells drilled within the Uncompahgre Study Area.
**Figure 4.** Major structural elements and selected geologic units of the Uncompahgre Study Area.
**Figure 5.** Generalized stratigraphic chart of the Paradox basin within the Study Area (after Huffman, 1995; Stevenson and Wray, 2009), with hydrocarbon and carbon dioxide producing zones.
**Figure 6a.** Generalized stratigraphic chart of the Piceance basin within the Study Area (after Johnson and Roberts, 2003), with hydrocarbon producing zones.
**Figure 6b.** Generalized stratigraphic chart of the Mesaverde Group of the Piceance basin within the Study Area (after Hettinger and Kirschbaum, 2002; Cole and Cumella, 2003), with hydrocarbon producing zones.
**Figure 7.** Oil and gas fields within the Uncompahgre Study Area.
**Figure 8.** Location and initial classification of Uncompahgre Study Area oil, gas, and coalbed natural gas wells spudded between January 1, 2000 and December 31, 2009.
**Figure 9.** Location and present status of Uncompahgre Study Area oil, gas, and coalbed natural gas wells spudded between January 1, 2000 and December 31, 2009.
**Figure 10.** Location of oil and gas units and a communitization agreement within the Uncompahgre Study Area.
**Figure 11.** Conventional and coalbed natural gas wells spud by decade within the Uncompahgre Study Area.
**Figure 12.** Conventional and coalbed natural gas wells spud within the Uncompahgre Study Area for 2000-2009.
**Figure 13.** Uncompahgre Study Area locations of all conventional gas and coalbed natural gas wells that have been spudded and not completed and those still in an active status.
**Figure 14.** True vertical depths of vertical, directional, and horizontal wells drilled within the Uncompahgre Study Area.

BLM_0018603

**Figure 15.**  Existing and proposed directional and horizontal borehole locations within the Uncompahgre Study Area.

**Figure 16.**   Geographic distribution of water quality samples across the Uncompahgre Study Area and distribution of sample salinity.

**Figure 17.**  Location of coal fields within the Uncompahgre Field Office.

**Figure 18.**   Potential for occurrence of oil and gas (excluding coalbed natural gas) within the Uncompahgre Study Area.

**Figure 19.**  Potential for occurrence of coalbed natural gas within the Uncompahgre Study Area.

**Figure 20.**   Colorado historical natural gas prices with future natural gas price projections (Energy Information Administration, 2011).

**Figure 21.**  Colorado historical crude oil prices with future oil price projections (Energy Information Administration, 2011).

**Figure 22.**   Leased and unleased Federal oil and gas minerals within the Uncompahgre Study Area.

**Figure 23a.**   Conventional oil and gas development potential and projected drilling densities within the Uncompahgre Study Area for 2010 through 2030.

**Figure 23b.**   Conventional oil and gas development potential and projected drilling densities on Bureau managed oil and gas minerals within the Uncompahgre Study Area for 2010 through 2030.

**Figure 23c.**   Conventional oil and gas development potential and projected drilling densities on Forest Service managed oil and gas minerals within the Uncompahgre Study Area for 2010 through 2030.

**Figure 24a.**   Coalbed natural gas development potential and projected drilling densities within the Uncompahgre Study Area for 2010 through 2030.

**Figure 24b.**   Coalbed natural gas development potential and projected drilling densities on Bureau managed oil and gas minerals within the Uncompahgre Study Area for 2010 through 2030.

**Figure 24c.**   Coalbed natural gas development potential and projected drilling densities on Forest Service managed oil and gas minerals within the Uncompahgre Study Area for 2010 through 2030.

## Table List

**Table 1.**  Historical conventional oil, gas, and water production from formations within the Uncompahgre Study Area.

**Table 2.**  Historical coalbed natural gas, oil, and water production from formations within the Uncompahgre Study Area.

**Table 3.**  Estimated conventional oil and gas development potential classification acres, number of townships, projected average drilling densities, and percentage of the entire Uncompahgre Study Area for each development potential classification type for the period 2010 through 2030.

**Table 4.**  Estimated coalbed natural gas development potential classification acres, number of townships, projected average drilling densities, and percentage of the Uncompahgre Study Area within each development potential classification type for the period 2010 through 2030.

BLM_0018604

**Table 5.** Annual conventional and coalbed natural gas well spuds projected for the Uncompahgre Study Area.

**Table 6a.** Annual conventional natural gas and oil production projected for the Uncompahgre Study Area.

**Table 6b.** Annual conventional natural gas and oil production projected for wells on Bureau managed oil and gas minerals the Uncompahgre Study Area.

**Table 7a.** Annual coalbed natural gas production and associated oil production projected for the Uncompahgre Study Area.

**Table 7b.** Annual coalbed natural gas production and associated oil production projected for wells on Bureau managed oil and gas minerals in the Uncompahgre Study Area.

**Table 8a.** Uncompahgre Study Area surface disturbance associated with new drilled wells and existing wells for the baseline scenario (short-term disturbance) for the 2010-2030 period.

**Table 8b.** Uncompahgre Study Area surface disturbance associated with new active wells and existing wells determined to remain in an active status for the baseline scenario (long-term disturbance) for the 2010-2030 period.

## Appendix 1 Figure List

**Figure A1-1.** Location of the Uinta-Piceance 2002 and Paradox Basin 1995 province boundaries within the Uncompahgre Study Area.

**Figure A1-2.** Location of the 1995 Paradox Basin Province Salt Anticline Flank, Buried Fault Blocks, and Fractured Interbedded Plays within the Uncompahgre Study Area.

**Figure A1-3.** Location of the 1995 Paradox Basin Province Carbonate Buildup and Permian-Pennsylvanian Margin Clastic Plays within the Uncompahgre Study Area.

**Figure A1-4.** Location of the 1995 Piceance Basin Province conventional accumulation plays within the Uncompahgre Study Area.

**Figure A1-5.** Location of the 1995 Piceance Basin Province continuous accumulation plays within the Uncompahgre Study Area.

**Figure A1-6.** Location of the 2002 Uinta-Piceance Basin Mesaverde Total Petroleum System within the Uncompahgre Study Area.

**Figure A1-7.** Location of the 2002 Uinta-Piceance Basin Mesaverde Total Petroleum System Coalbed Gas Assessment Unit within the Uncompahgre Study Area.

**Figure A1-8.** Location of the 2002 Uinta-Piceance Basin Mancos/Mowry Total Petroleum System within the Uncompahgre Study Area.

**Figure A1-9.** Location of the 2002 Uinta-Piceance Basin Phosphoria Total Petroleum System within the Uncompahgre Study Area.

## Appendix 1 Table List

**Table A1-1.** U.S. Geological Survey 1995 assessment of undiscovered conventional accumulation plays in the Paradox Basin Province, Uncompahgre Study Area.

**Table A1-2.** U.S. Geological Survey 1995 assessment of undiscovered conventional and continuous resource plays in the Paradox Basin Province and Uncompahgre Study Area.

**Table A1-3.** U.S. Geological Survey 2002 assessment of undiscovered conventional accumulation assessment units in the Uinta-Piceance Basin Province, Uncompahgre Study Area.

BLM_0018605

**Table A1-4.** U.S. Geological Survey 2002 assessment of undiscovered continuous accumulation assessment units in the Uinta-Piceance Basin Province, Uncompahgre Study Area.

**Table A1-5.** U.S. Geological Survey 2002 assessment of undiscovered conventional and continuous resource assessment units in the Uinta-Piceance Basin Province and Uncompahgre Study Area.

BLM_0018606

# INTRODUCTION

The Uncompahgre Planning Area (hereafter the Planning Area) represents the lands managed by the Uncompahgre Field Office of the Colorado Bureau of Land Management (hereafter the Bureau).  The Uncompahgre Field Office (Figure 1) is responsible for managing more than 900,000 acres of public land in southwestern Colorado, including the Gunnison Gorge National Conservation Area and Wilderness, as well as portions of the newly designated Dominguez-Escalante National Conservation Area and Dominguez Canyon Wilderness Area and four river systems (the Gunnison, San Miguel, Dolores, and Uncompahgre).

 A Resource Management Plan and associated Environmental Impact Statement are currently being prepared for the Planning Area.  The Resource Management Plan will replace the existing 1985 San Juan/ San Miguel Resource Management Plan and the 1989 Uncompahgre Basin Resource Management Plan.  The lands studied for this analysis will henceforth be called the Study Area.  The Study Area (Figure 2a) is located in Delta, Gunnison, Mesa, Montrose, Ouray and San Miguel counties, Colorado.  The area encompasses approximately 675,677 acres of public land, and excludes the Gunnison Gorge National Conservation Area and the Dominguez-Escalante National Conservation Area, which are managed under separate Resource Management Plans.

In support of the Resource Management Plan revision, this reasonable foreseeable development projection technically analyzes the oil and gas resource known to occur and potentially occurring within the Study Area and projects future development potential (See Glossary for development potential) and activity levels for the period 2010 through 2030.

Hydrocarbon activities and projections of future development will be discussed separately for coalbed natural gas (see Glossary for coalbed natural gas and natural gas) and for all other types of oil and gas (hereafter referred to as conventional oil and gas).  When both types of hydrocarbon are being referenced, we will hereafter refer to them as oil and gas.  Figure 3a presents historic and present conventional oil and gas related development areas for all lands within the Study Area.  Figure 3b presents historic and present coalbed natural gas related development areas for all lands within the Study Area.

Our analysis makes a base line projection that assumes future conventional oil and gas and coalbed natural gas related activity levels on all assessed lands within the Study Area will not be constrained by management-imposed conditions (Rocky Mountain Federal Leadership Forum, 2004).  National Forest lands, other Federal agency lands, and State and Private managed lands are included in the base line projection for those lands assessed for future development.  Certain other federally managed lands within the Study Area are not assessed for the potential for future reasonable foreseeable conventional oil and gas and coalbed natural gas related development.  Those lands with legislatively imposed restrictions (no leasing) are not included in this base line projection since activities will not be allowed in the foreseeable future.  Those restricted lands are National Forest managed wilderness, Bureau managed wilderness and wilderness study

BLM_0018607

areas, and Black Canyon of the Gunnison National Park (Figure 2a). In addition, a separate baseline projection is made for just those lands managed by the Bureau.

The reasonable foreseeable development evaluation and projections presented below review and analyze past, present, and potential future exploratory, development, and production operations and activities. It also presents occurrence potential (See Glossary for occurrence potential) for conventional oil and gas, coalbed natural gas, and deep conventional oil and gas (at depths greater than 15,000 feet) as well as available estimates of the hydrocarbon resources that may be present within the Study Area. Additional factors used to project future activities include (but are not limited to) a review of published resource information (including a number of on-line databases) for the area, a call for data from conventional oil and gas and coalbed natural gas operators, a review of petroleum (see Glossary) technology research and development, geophysical activity, and limitations on access and infrastructure. It must be emphasized that the reasonable foreseeable development projections presented are possible and/or likely to happen and should not be considered to be worst-case scenarios, but reasonable and science based projections of the anticipated activity that use logical and technically based assumptions to make those projections (Rocky Mountain Federal Leadership Forum, 2004). Finally, projections of future activity levels for each resource management plan alternative are presented.

The Study Area contains about 3,099,400 surface acres of all mineral ownership types (Figure 2b). Mineral ownership types were obtained from the Bureau's Colorado State Office. This data base may not be a complete and accurate representation of all Federal oil and gas minerals within the Study Area. Oil and gas mineral ownership is not included for lands within the Gunnison Gorge National Conservation Area Planning Area or the Dominguez-Escalante National Conservation Area.

The Study Area contains about 2,162,580 acres of Federal oil and gas mineral ownership (Figure 2b), or about 71 percent of total acres. The remaining 936,820 acres (29 percent) is managed by state and private interests. The Bureau manages a portion of the Federal oil and gas mineral lands in the Study Area (904,096 acres), or about 41.8 percent of the 2,162,580 acres. The Bureau manages all oil and gas minerals beneath BLM Wilderness on Figure 2b. We assume that about 236,614 acres of state and private surface lands within Study Area boundaries overlie Bureau managed oil and gas mineral lands. All Bureau managed oil and gas mineral lands will be covered by decisions made in the associated Resource Management Plan Environmental Impact Statement.

The U.S. Forest Service manages about 1,229,892 acres (Figure 2b), or 56.9 percent of Federal oil and gas mineral lands within the Study Area. The Forest Service manages all oil and gas minerals beneath Forest Service Wilderness on Figure 2b. About 27,123 acres (1.3 percent) are managed by the National Park Service. Decisions made as part of the Resource Management Plan Environmental Impact Statement for the Study Area will not be made for these lands.

BLM_0018608

We would like to thank Ms. Cathy Stilwell of the Bureau of Land Management Wyoming State Office Reservoir Management Group staff for the important Geographic Information System contributions that she has made to this reasonable foreseeable development analysis.  In addition we would like to thank Thane Stranathan of the Bureau of Land Management Uncompahgre Field Office staff for his assistance in preparing the analysis for the surface disturbance section of this document.  We would also like to thank Ryan Taylor (USFS Paonia Ranger District Geologist), Pam Leschak (Bureau of Land Management Tres Rios Field Office Fluid Minerals Geologist), and Pat Gallagher (Bureau of Land Management Colorado State Office Petroleum Engineer) for their comments on the draft of this report.

BLM_0018609

# GEOLOGIC OVERVIEW

Most of the Study Area is within the Colorado Plateau physiographic province, a region of distinct topography and geology. The Colorado Plateau is actually a large basin ringed by highlands and containing many plateaus within western Colorado, northwestern New Mexico, southern and eastern Utah, and northern Arizona. The portion of the Study area lying in and around the Black Canyon of the Gunnison and the area to the east lies within the Southern Rocky Mountains physiographic province.

The major structural elements (uplifts, basins, anticlines, synclines, and faults) and Precambrian, Tertiary igneous, and Mesaverde rock outcrops of the Study Area are shown on Figure 4. The Paradox basin lies mostly in eastern Utah and southwestern Colorado. It has been further divided into smaller tectonic divisions, with the Paradox Fault and Fold Belt area located in the northern part of the larger Paradox basin. The Fault and Fold Belt includes the Nucla-Naturita and Norwood parts of the Study Area and lands to the north as far as the Uncompaghre Uplift. This area is also often termed the Salt Anticline region because it contains a number of salt cored anticlines such as the Paradise Valley Salt Cored Anticline on the southwest side of the Study Area.

Local topography in the Paradox basin portion of the Study Area is dominated by fairly flat or gently dipping mesas that are dissected by steep canyons. Cretaceous aged rock dominates the mesa areas, with older rocks outcropping in the canyons. The Paradox basin developed during Pennsylvanian-Permian time and has been modified by later uplifts. It is a strongly asymmetrical basin with its thickest sequence of sedimentary deposits on its northeast flank and near the adjacent Uncompahgre uplift (Figure 4). Structural relief has been estimated to be greater than 25,000 feet (Molenaar, 1972). Numerous surface igneous dikes and faults are located in the southeast part of the basin in the Sawpit region of the Study Area. Very little historic oil and gas production is reported from the portion of the Paradox basin lying within the Study Area.

The Uncompaghre uplift trends in a northwesterly direction along the northeastern border of the Paradox basin and it lies partly in Colorado and Utah. It occupies the central part of the Study Area. The uplift's southwestern boundary is defined by the thrust fault shown in Figure 4. Major uplift occurred during the Pennsylvanian and Permian (Stone, 1977). "During the Laramide orogeny, the uplift was regionally tilted to the northeast," (Stone, 1977). The Uncompaghre uplift contains a Precambrian core, with Precambrian outcrops shown on Figure 4. No historic oil and gas production has been reported from that portion of the Uncompahgre uplift lying within the Study Area.

The western parts of the San Juan Volcanic Field lie along the eastern border of the Study Area. The area was blanketed by thick volcanic sequences erupted from multiple centers to the southeast and east. The volcanic activity that deposited these sequences occurred from about 30 to 22 million years before present. No historic oil and gas production has been reported from that portion of the San Juan Volcanic Field lying within the Study Area.

BLM_0018610

The Gunnison uplift runs in a northwest-southeast direction, sub parallel to the Grand Mesa syncline (Figure 4). Precambrian rocks outcrop in the core of the uplift. About 60 million years ago, during the Laramide Orogeny, these rocks were uplifted to near the surface. The area was later covered by volcanic rocks that produced the San Juan Volcanic Field. Over time most of the volcanic deposits have been eroded from the area and the Gunnison River has cut down through the Precambrian rocks, creating today's Black Canyon of the Gunnison. No historic oil and gas production has been reported from that portion of the Gunnison uplift lying within the Study Area.

The Piceance basin lies in the northernmost part of the Study Area. The outcrop of the Mesaverde Formation marks the approximate southern boundary of the Piceance basin in the Study Area (Figure 4). The Piceance basin is northwest-trending, is asymmetric in shape (gently dipping strata on its southwest limb), and is Laramide in age. Maximum thickness of sediments in the basin is 27,000 feet (Dunn, 1972) although maximum thickness in the Study Area is much less (probably less than 20,000 feet). Present oil and gas production and coalbed natural gas production in the Study Area comes from Piceance basin sediments.

# EXPLORATORY AND PRODUCTION ACTIVITY AND OPERATIONS

The following discussion brings together known information on past and present exploratory and production operations and activity for the Study Area. Information is presented in the approximate sequence that occurs when project areas or fields (see Glossary) are explored and then developed. The sequence begins when initial exploratory activity begins, and ends when projects are abandoned.

## EXPLORATORY ACTIVITY AND OPERATIONS

The petroleum industry in the United States has historically relied on continual improvements in technology to better understand the oil and gas resource locked in the earth and to find and produce it. Some of the biggest breakthroughs have been:

- the anticlinal theory (1885) that oil and gas tend to accumulate in anticlinal structures, which allowed drillers to locate better drilling spots with improved opportunities to find oil and gas;
- rotary drilling rigs (1900s), which became the chief method of drilling deeper wells (see Glossary for rotary drilling rig);
- seismograph (1914), which allowed one dimensional subsurface imaging;
- well logging (1924), which allowed measurement of subsurface rock and fluid properties;
- offshore drilling (1930s), which allowed drillers to access new areas and basins;
- digital computing (1960s), which allowed two dimensional imaging of data;
- directional drilling (1970s), which allowed more cost efficient management of reservoirs;

BLM_0018611

- three dimensional seismic (1980s), which allowed more accurate subsurface imaging;
- three dimensional modeling and four dimensional seismic (1990s), which allowed the prediction of fluid movement in the subsurface;
- identification of new types of reservoirs and improved exploitation methods (1990s to present) allowed development of heavy oil, tight gas, shale gas, coalbed natural gas, shale oil, and the use of carbon dioxide in the flooding process to increase recoveries; and
- multi-discipline collaboration (2000s), which allows for better drilling decisions, higher success rates, improved risk assessment, and enhanced reservoir development.

Exploratory activity includes:
- the study and mapping of surface and subsurface geologic features to recognize potential oil and gas traps,
- determining a geologic formations potential for containing economically producible oil and gas,
- pinpointing locations to drill exploratory wells to test all potential traps,
- drilling additional wells to establish the limits of each discovered trap,
- testing wells to determine geologic and engineering properties of geologic formation(s) encountered, and
- completing wells that appear capable of producing economic quantities of oil and gas.

A number of components can control and characterize potential oil and gas accumulations (see Glossary) in the Study Area.  Those major components of accumulations can be:

1. Locations of major tectonic features (Figure 4) that have developed over many millions of years.  Some features (anticlines and faults) may improve opportunities for the development of oil and gas reservoirs while others (igneous intrusive and Precambrian rocks) may indicate reduced opportunities for the development of reservoirs.
2. The Paradox and Piceance basins contain thick sections of sediments (Molenaar, 1972 and Dunn, 1972).  In the Paradox basin, thick accumulations of Paleozoic and Mesozoic aged carbonates, sandstones, and shales (potential source and reservoir rocks) exist, with thin near surface coals present in the Dakota Sandstone.  Figure 5 presents a stratigraphic chart for the Paradox Basin portion of the Study Area showing nomenclature used for these accumulations in our report.  Hydrocarbon producing zones (including carbon dioxide production) in the Paradox basin are also shown.  Although few of these zones have been productive in the Study Area, there is potential that additional production from some of these zones could be obtained in the future.
3. The Piceance basin contains thick accumulations of Paleozoic and Mesozoic aged carbonates, sandstones, and shales (potential source and reservoir rocks) exist, with coals present in the Mesaverde Group.  Figure 6a presents a stratigraphic chart for the Piceance basin part of the Study Area showing nomenclature used

BLM_0018612

for these accumulations in our report.  Although no Paleozoic or Cenozoic zones have been productive in the Study Area, there is potential that production from some of these zones could be obtained in the future.  Mesozoic zones (Mesaverde Group, Mancos Shale, Dakota Sandstone, and Morrison Formation) have had the only historic production within the Study Area.  The predominate hydrocarbon producers in the Study Area have been units within the Mesaverde Group.  Since this group has a complicated depositional history authors have been able to further subdivide this group into formations and members (Figure 6b), all of which have been productive, from coal beds and/or sandstones.

4.  Figure 7 shows all oil and gas fields lying within or partly within the Study Area.  These fields help define areas were there has been the greatest historical interest in exploring for and developing the oil and gas resource within the Study Area.  Most fields lie within the Piceance basin on the north end of the Study Area.

5.  Burial and thermal histories that could promote the development and preservation of diagenetic pore-throat traps (see Glossary) and oil and gas generation in the center of the Piceance and Paradox basins.

6.  Structure traps (see Glossary), that have played a role in localizing some oil and gas accumulations within the Study Area.

7.  Stratigraphic traps (see Glossary), have played a role in exploration and development activities within the Study Area.

8.  Pressure regimes, ranging from slightly under-pressured to highly over-pressured, could be important near the center of the Paradox basin and in deeper zones in that part of the Piceance basin within the Study Area.  In areas of abnormally high pressures, productive capacity can be greatly increased.  Over-pressuring also creates problems in drilling and completion, increasing the cost of both.

9.  Secondary porosity, produced by the dissolution of unstable grains (see Glossary) and rock fragments, is important in local accumulations.

We believe that these components are also important in exploring for and developing new oil and gas resources in the Study Area.  In the last 10 years 57 new exploratory and development wells (Figure 8) have been spudded (see glossary).  Thirteen wells have been spudded in the Paradox basin part of the Study Area, with 11 wells initially classed as new field wildcats, one well classed as a wildcat outpost well, and one as a development well.  Three of these wells (one new field wildcat, one wildcat outpost, and one development well) were drilled in the vicinity of Hamilton Creek Field and the remaining nine wildcat wells were scattered across the basin.

Forty-four of the 57 new wells spudded in the past ten years are located in the Piceance basin part of the study area (Figure 8).  Twenty-seven of the 44 wells were initially spudded as coalbed gas tests with two being stratigraphic tests (see Glossary), eight new field wildcats, 16 development wells, and the remaining well a deepening of a development well.  Seventeen new wells in the area were spudded as conventional well tests, with 12 new field wildcats, one wildcat outpost well, one unclassified well, and three development wells.  Most of the new wells in this part of the Piceance basin have been spudded in or around the oil and gas fields shown on Figure 7.

**Wyoming State Office Reservoir Management Group**                          **- 14 -**

BLM_0018613

Potential nonconventional (unconventional) gas resources (see Glossary) make up a portion of the hydrocarbon resource that may be explored for and developed in the Study Area in the future. Nonconventional gas is a potentially large resource, although it is technically challenging to develop. Three types of unconventional gas have potential for future development within the Study Area.

1. Tight Sands Gas – formed in sandstone or carbonate (called tight gas sands) with low permeability, which prevents the gas from naturally flowing to a borehole.
2. Coalbed Natural Gas – formed in coal deposits and adsorbed (see Glossary) by coal particles.
3. Shale Gas – formed in fine-grained shale rock (called gas shales) with low permeability in which gas has been adsorbed by clay particles or is held within minute pores and microfractures.

U. S production from the above types of unconventional reservoirs has increased from 15 percent in 1990 to 41 percent in 2004 (Boswell, 2006) and 43 percent in 2006 (Kuuskraa, 2007a). It accounted for more than half of the reported 196 trillion cubic feet of proved natural gas (see Glossary) in the lower 48 states in 2006 (Kuuskraa, 2007b). The tight sands gas and shale gas types of reservoirs have a lower drilling, completion, and operating risk, lower finding costs, and lower reserve decline rates. Technological advances needed to produce these types of reservoirs have been in:

- Reservoir knowledge,
- Hydrofracing,
- Stimulation,
- Horizontal drilling,
- Drilling fluids, and
- Three-dimensional seismic.

Commonly these types of unconventional gas resources have lower reserves (see Glossary) per well and many wells are required to develop the resource. There is a need for well cost and environmental footprint control when developing these resources.

Of the 57 wells spudded in the last 10 years (January 1, 2000 to December 31, 2009), their type, present status, and percentage of the total were:

| | | | |
|---|---|---|---|
| • Coalbed Gas – Producing | 13 wells | 22.81 percent, |
| • Coalbed Gas – Shut-In or |
| Waiting on Orders | 8 wells | 14.04 percent, |
| • Coalbed Gas – Abandoned | 6 wells | 10.53 percent, |
| • Conventional Gas – Producing | 5 wells | 8.77 percent, |
| • Conventional – Shut-In, |
| Temporarily Abandoned, or |
| Waiting on Orders | 14 wells | 24.56 percent, |
| • Conventional – Spudded | 1 well | 1.75 percent, |
| • Conventional – Abandoned | 8 wells | 14.04 percent, and |
| • Injection – Waiting on Orders | 2 wells | 3.51 percent. |

Locations of these wells are shown in Figure 9. To date only 14 wells (24.56 percent) have been abandoned, while the remaining 43 wells (75.46 percent) are still active. There were a total of 36 new field wildcats, wildcat outpost wells, stratigraphic tests, or

BLM_0018614

unclassified wells drilled for 63.2 percent of the total. Of the 57 boreholes spudded, only one was redrilled as a coalbed natural gas test after an earlier completion as a conventional well. All but three wells were drilled as vertical well tests. The three wells drilled with a directional trajectory are located in the Paradox basin part of the Study Area.

Of the 57 wells spudded in the last 10 years (January 1, 2000 through December 31, 2009), 38.6 percent were drilled in seven fields (Figure 7):

- Spaulding Peak        7 wells,
- Hamilton Creek        3 wells,
- Oil Well Mountain      3 wells,
- Ragged Mountain       3 wells,
- Bull Mountain         2 wells,
- Coal Basin            2 wells, and
- West Muddy Creek     2 wells.

No recent drilling occurred in the three other fields located within the Study Area.

Of the 17 coalbed natural development wells completed during the past 10 years, only two wells (11.76 percent) have been abandoned. An additional 10 wells were drilled as new field wildcats or stratigraphic tests. Four of these wells (40 percent) have been abandoned.

Of the four conventional oil and gas development wells spudded during the past 10 years, all are presently still active (including one spudded well that has not been completed). An additional 24 wells were drilled as wildcats (including one unclassified well). Eight of these wells (33.33 percent) have been abandoned.

Two injection wells have been drilled in the past 10 years and they are classified by the Colorado Oil and Gas Conservation Commission (2010) as waiting on orders.

There were five operators active in the Paradox basin part of the Study Area during the 10-year period from January 1, 2000 to December 31, 2009. They accounted for 13 boreholes drilled there. Encana O & G (USA) Incorporated was the operator for seven wells. Cabot Oil & Gas Corporation and Redwine Resources Incorporated each operated two wells and Cleary Petroleum Corporation and Devon Energy Corporation each drilled one well.

There were only three operators active in the Piceance basin part of the Study Area during the 10-year period from January 1, 2000 to December 31, 2009. They accounted for 44 boreholes drilled there. Gunnison Energy Corporation operated 24 wells, SG Interests I, LTD operated 16 wells, and Aspen Operating Company, LLC operated the remaining four wells.

During the last 10 year period, completions have been made in the Permian Cutler Formation and Pennsylvanian Honaker Trail Formation in the Paradox basin part of the Study Area (Figure 5). In the Piceance basin part of the Study Area, coalbed natural gas

BLM_0018615

completions have been made in coals of the Upper Cretaceous Mesaverde Group (Figure 6b). Conventional completions have also been made in sandstone members of the Upper Cretaceous Mesaverde Group, the Upper Cretaceous Mancos Shale, and the Lower Cretaceous Dakota Sandstone.

Drilling depths for Paradox basin wells drilled in the last 10-year period from January 1, 2000 to December 31, 2009 have ranged from 6,585 to 14,421 feet. Seven wells were drilled to 10,000 feet or deeper. The deepest well was a new field wildcat drilled near the center of the basin in section 4 of township 47 north, range 19 west as a dry hole (Figure 9) on the south flank of the Paradise Valley Salt Cored Anticline (Figure 4). The deepest completed interval was in the Permian Cutler Formation (10,205 to 10,165 feet) in section 7 of township 44 north, range 14 west (Figure 9) at Hamilton Creek Field (Figure 7).

Drilling depths for Piceance basin coalbed natural gas wells drilled in the last 10-year period from January 1, 2000 to December 31, 2009 have ranged from 2,400 to 7,865 feet. Two coalbed natural gas stratigraphic tests only drilled to 460 and 1,240 feet. Cameo Coal (Figure 6b) completions have been as shallow as the 1,738 to 1,800 foot interval and as deep as the 6,845 to 6,928 foot interval. Drilling depths for other types of wells have been in the 3,000 to 9,800 foot range.

Innovative drilling and completion techniques have enabled the United States oil and gas industry to drill fewer dry holes and to recover more oil and gas reserves per well. Smaller accumulations once thought to be uneconomic can now also be produced. In some cases these improvements have also allowed down spacing to occur. Increased drilling success rates have cut the number of both wells drilled and dry holes (U.S. Department of Energy, 1999). The Energy Information Administration (2007a) has projected the increase in percentage of United States wells drilled successfully will be 0.2 percent per year to 2030.

During the last 10 years, exploratory and development activity has concentrated on that part of the Piceance basin within the Study Area to explore for and develop coalbed natural gas resources and other Cretaceous aged sediments. Additional future exploratory drilling will be required to discover new resources in this area and other parts of the Study Area. Since the risk of failure is higher for these types of exploratory activities, the success rates could decline slightly in the future.

Advances in technology have boosted exploration efficiency, and additional future advances will continue this trend. Significant progress that has and will continue to occur is expected in:
- computer processing capability and speed;
- remote sensing and image-processing technology;
- developments in global positioning systems;
- advances in geographical information systems;

BLM_0018616

- three-dimensional and four-dimensional time-lapse imaging technology that permits better interpretation of subsurface traps and characterization of reservoir fluid;
- improved borehole logging tools that enhance our understanding of specific basins, plays (see Glossary), and reservoirs; and
- advances in drilling that allow more cost-efficient tests of undepleted zones in mature fields, testing deeper zones in existing fields, and exploring new regions.

New technologies will allow companies to target higher-quality prospects and improve well placement and success rates. As a result, fewer drilled wells will be needed to find a new trap, and total production per well will increase (U.S. Department of Energy, 1999). Also, drilling fewer wells will reduce surface disturbance and volumes of waste, such as drill cuttings and drilling fluids. An added benefit of improved remote sensing technology is the ability to identify any oil and gas "seeps" so that they can be cleaned up. These seeps can also help pinpoint undiscovered oil and gas.

Technology improvements have also cut the average cost of finding oil and gas reserves in the United States. Finding costs are the costs of adding proven reserves of oil and natural gas via exploration and development activities and the purchase of properties that might contain reserves. The U.S. Department of Energy (1999) estimated finding costs were approximately 2 to 16 dollars per barrel of oil equivalent in the 1970's. Finding costs then dropped to 4 to 8 dollars per barrel of oil equivalent in the 1993 to 1997 period. Finding costs then fluctuated around the higher end of this range for a number of years. During the 2003 to 2005 period, finding costs were 7.05 dollars per barrel of oil equivalent and they then increased by 60.9 percent to 11.34 dollars per barrel for the 2004 to 2006 period (Energy Information Administration, 2007b). Since the 2004 to 2006 period finding costs have increased considerably. During the 2005 to 2007 period they went to 13.72 dollars per barrel and then they jumped by 77 percent to 24.31 dollars per barrel for the 2006 to 2008 period (Energy Information Administration, 2009a). Most of this increase was reported to have come from a rise in exploration and development spending, which was amplified by a drop in reserves found. Producers have been willing to spend more to find oil and gas since prices received during this period had been higher.

Once hydrocarbons have been found, acquired, and developed for production the expense of operating and maintaining wells and related equipment and facilities is tracked. This cost is referred to as a lifting or production cost. During 2006, lifting costs in the United States were 9.09 dollars per barrel of oil equivalent, which was an increase of 20.0 percent from a 2005 cost of 7.57 dollars per barrel (Energy Information Administration, 2007b). Lifting costs increased to 12.16 dollars in 2007 and then increased over 24 percent in 2008 to 15.10 dollars (Energy Information Administration, 2009a). Lifting costs have increased in recent years because more producers have been willing to spend more to produce oil and natural gas since their selling prices for oil and gas have been higher.

BLM_0018617

## FEDERAL DEVELOPMENT CONTRACTS

The United States approves development contracts between operating companies with a number of oil and gas leases sufficient to justify operations for discovery, development, or production of the oil or gas resource. Contracts are approved when the United States determines that conservation of oil and gas products or the public convenience, necessity, or interests of the United States is best served. This program is intended to stimulate exploration on Federal lands. Contracts are usually approved for large, relatively unexplored areas of Federal lands. The contract normally calls for definite exploratory objectives, a timetable for accomplishing those objectives, significant financial expenditures, and it may require a definite drilling obligation. No development contracts presently lie within the Study Area.

## FEDERAL OIL AND GAS UNIT AGREEMENTS

A Federal unit agreement is a contract between the Federal Government and lessees that hold leases over a potential oil and gas reservoir or over oil reservoirs which are candidates for enhanced recovery. Federal units are intended to facilitate the orderly and timely exploration, development, and operation of multiple leases under a single operator. Units may overlie a portion of, or an entire geologic structure. An approved agreement establishes performance obligations, promotes the exploration of unproven acreage or logical enhanced recovery procedures, and permits controlled development of the unit. This process stimulates exploration and/or development of Federal lands and encourages the drilling of the optimum number of wells needed to maximize resource recovery.

A need to conserve oil and gas resources in the United States was identified early in the 20th century and was reinforced by national security issues surrounding the importance of petroleum in fighting the First World War (Avery and Miller, 1934). Congress in 1930 enacted temporary legislation providing for participation in unit operations or cooperative development among lessees of public lands (46 Stat. 1007). The first unit approval (January 6, 1931) in the United States was of the Little Buffalo Basin gas unit in the Bighorn basin of Wyoming. In the following years thousands of units have been created in the United States. Many are still active while others have terminated.

Federal oil and gas leases are incorporated into 11 active conventional oil and gas unit agreement areas that lie wholly within the Field Office boundary (Figure 10). Active units wholly within the Study Area encompass lands totaling 113,438 acres, or approximately 3.7 percent of the total Study Area lands. Additionally, there are two active units with lands partially within the Field Office boundary, but administered by other Field Offices: Hamilton Unit managed by the Dolores Field Office, and Whitewater Unit, managed by the Grand Junction Field Office. Study Area lands within these two units' total 22,589 acres, or approximately 0.7 percent of the total Study Area lands.

All of the above units were initiated as exploratory units and they are in various stages of development. The earliest, the Leon Lake Unit, was approved in 1980. It has since contracted to its producing area. Three other units were also approved in the early 1980s:

BLM_0018618

Ragged Mountain (1980), Coal Basin (1981), and Hamilton (1983). All three have also contracted to their producing areas. Of the remaining nine active units, all have been formed since 2000 and include the Huntsman (2000), Bull Mountain (2003), Somerset (2008), Whitewater (2008), Horn (2008), Deadman Gulch (2010), Spaulding Peak (2011), Iron Point (2011), and Dugout Creek (2011) units.

Six companies operate the 13 active exploratory gas unit agreement areas. These are: Encana O & G (USA) Incorporated (Hamilton and Horn units), Fram Operating LLC (Whitewater Unit), Gunnison Energy Corporation (Leon Lake, Spaulding Peak, Deadman Gulch, and Iron Point units), Petrox Resources Incorporated (Somerset Unit), Riviera Drilling & Exploration Company (Ragged Mountain Unit), and SG Interests I, LTD (Bull Mountain, Coal Basin, Huntsman, and Dugout Creek units).

The largest of the 13 active exploratory units with lands wholly or partially within the Study Area is the Whitewater Unit. The unit covers over 90,400 acres; approximately 22,419 acres are located in the Study Area. This unit's most recent plan of development indicates few wells will be constructed on lands within the Study Area (Fram Operating, 2011).

The exploratory units in the northern part of the Study Area will target coalbed natural gas, shale gas, and/or Upper Cretaceous aged sandstones of the Mesaverde Group (see Figure 6b). At Spaulding Peak unit Gunnison Energy Corporation has proposed drilling 18 gas wells on 15 locations (15 vertical and three directional wells). The project is still in its early exploratory stage, with one Mancos Shale well that is still in a testing and evaluation stage. If results are encouraging, additional exploration will occur.

At Bull Mountain unit, SG Interests has 11 existing wells capable of producing natural gas. They propose as many as 150 wells on as many as 55 multiple-well pads. This unit lies mostly on private surface.

Gunnison Energy Corporation has drilled one shale gas well in the Iron Point unit. It is still in a testing and evaluation stage.

Ragged Mountain and Coal Basin units produce primarily from sandstones of the Cozzette Member and also from the Corcoran Member (Figure 6b). Coalbed natural gas wells have been drilled in Spaulding, Iron Point, Bull Mountain, and Deadman Gulch units.

No units have been approved for secondary recovery, as gas storage, or just for coalbed natural gas production within the Study Area.

## COMMUNITIZATION AGREEMENTS

Communitization Agreements may be authorized when a Federal lease cannot be independently developed and operated in conformity with an established well-spacing or

BLM_0018619

well-development program.  In Colorado, the following circumstances can constitute good reason for communitization to occur.

- Communitization is required in order to form a drilling unit that conforms to acceptable spacing patterns (see Glossary) established by State or Bureau order.
- Adequate engineering and/or geological data is presented to indicate that communitizing two or more leases or unleased Federal acreage will result in more efficient reservoir management of an area.
- Communitization is required when the logical spacing for a well includes both unit and non-unit land.

At present, only one active communitization agreement lies within the Study Area (Figure 10).  This agreement covers an area of about 160 acres and was established for the Corcoran and Cozzette members of the Upper Cretaceous Iles Formation.  The operator is Riviera Drilling & Exploration Company.

## TYPICAL DRILLING AND COMPLETION SEQUENCE

Before an oil or gas well is drilled, an Application for Permit to Drill must be approved by the Colorado Oil and Gas Conservation Commission http://cogcc.state.co.us/.  If the well will be located on Federal lands, an Application for Permit to Drill must also be approved by the Bureau.  Not every approved application is actually drilled.  The drilling and completion sequence for a targeted reservoir in the Study Area generally involves:

- constructing the well pad, associated reserve pits, and the access road prior to moving the drilling equipment on to the well location;
- using rotary equipment, hardened drill bits, weighted drill pipe/collars, and drilling fluids to cool and lubricate the drill bit, which all result in easier penetration of the earth's surface;
- for horizontal boreholes, geosteering (intentional directional control of the borehole based on the results of downhole geological logging measurements) the drill bit to maintain correct hole trajectory and keep a borehole in a particular reservoir to maximize economic production;
- inserting casing and cementing it in place to protect the subsurface and control the flow of fluids (oil, gas, and water) from the reservoir;
- perforating the well casing at the depth of the producing formation to allow flow of fluids from the formation into the borehole (many horizontal well completions do not contain casing in the horizontal part of the borehole);
- hydraulically fracturing and propping fractures open with sized particles and/or acidizing the formation to increase permeability and the deliverability of oil and gas to the borehole;
- inserting tubing into each well to allow for controlled flow of fluids (oil, gas, and water) from the reservoir to the surface;
- installing a wellhead at the surface to regulate and monitor fluid flow and prevent potentially dangerous blowouts;
- reclaiming the portions of the well pad and access road that will not be used in the production phase of the well; and

BLM_0018620

- reclaiming the entire pad and access road if the well is not successful and is immediately plugged and abandoned after drilling, or after the well has ceased production and is plugged and abandoned.

The cost of developing conventional deposits of oil and gas in the Rocky Mountain region is higher than the average for the onshore 48 contiguous states (Cleveland, 2003). Factors that may contribute to higher costs in the Study Area could be:

- access to some well sites can be more difficult when they are remote from the main activity areas and when they are located in steep terrain,
- harsh environments (particularly cold temperatures),
- changes in rig availability,
- changes in development priority as industry focus on certain plays evolves with new discoveries and changes in oil and gas price,
- labor market conditions, and
- restrictions (many of them environmental restrictions of some type) on land use.

Drilling improvements have occurred in new rotary rig types, coiled tubing, drilling fluids, and borehole condition monitoring during the drilling operation. Improvements in technology are allowing directional and horizontal drilling use in many applications. New bit types have boosted drilling productivity and efficiency. New casing designs have reduced the number of casing strings (see Glossary) required. Environmental benefits of drilling and completion technology advances include:

- smaller footprints (less surface disturbance),
- reduced noise and visual impact,
- less frequent maintenance and workovers of producing wells with less associated waste,
- reduced fuel use and associated emissions,
- enhanced well control for greater worker safety and protection of groundwater resources,
- less time on site with fewer associated environmental impacts
- lower toxicity of discharges, and
- better protection of sensitive environments and habitat.

## DRAINAGE PROTECTION

Producing oil and gas wells may cause drainage (migration of hydrocarbons toward the borehole) from nearby lands. This drainage will result in the loss of oil and gas from those lands and result in loss of royalty revenues for landowners. Drainage is most often avoided or reduced by the drilling of a protective well. By protecting Federal lands from drainage the Federal Government may stimulate drilling and development activity in an area and help to insure timely and more efficient management of the producing reservoir.

BLM_0018621

# HISTORICAL DRILLING AND COMPLETION ACTIVITY AND TECHNIQUES EMPLOYED FOR CONVENTIONAL OIL AND GAS

The existence of oil and gas in western Colorado has been known for more than 100 years. Earliest geologic work was done by the King and Hayden surveys of the 1870s and 1880s. Oil and gas seeps were reported during these early years of exploration in other parts of the Piceance basin. Earliest drilling in the region was in 1890 north of the Study Area near the White River gas seeps west of the town of Meeker (Dunn, 1972). In 1902 oil in shallow fractured Mancos Shale was discovered at Rangely field on the northwest edge of the Piceance basin.

## Early Exploration and Development Activity

Information on early periods of exploration and development of oil and gas within the Paradox basin is available from Molenaar (1972) and within the Piceance basin from Dunn (1972).

The earliest known well test in the Study Area appears to have been on the northeast flank of the Uncompahgre uplift in 1907 (IHS Energy Group, 2010). This test was drilled to 1,706 feet and it was dry and abandoned in section 35 of township 49 north, range 10 west (Figure 3a). No additional drilling occurred until the 1920s when a period of surface mapping of anticlinal structures began (Dunn, 1972). The next test in the Study Area was also the earliest known test in the Paradox basin. It was drilled in 1924 to 4,160 feet and was located in section 4 of township 46 north, range 17 west. Shows of oil and gas were encountered before abandonment.

Figure 11 shows the rate that conventional and coalbed natural gas wells were spudded in the Study Area by decade. Little drilling occurred in the Study Area until the late 1940s, apparently due to the regions remoteness from markets and the lack of success in the few wells drilled before then. In addition, the first oil pipeline out of the Piceance basin was not installed until 1945 and the first gas pipeline was not installed until 1955. Outside markets were not easily accessible until these pipelines were installed.

An additional 19 wells were drilled and abandoned at scattered locations across the Study Area before the first producing well was completed in 1947 in the Paradox basin area. A small volume, shallow Mancos Shale gas well (410 feet) was discovered near the town of Ridgeway in township 45 north, range 8 west (Figure 3a). An additional 13 wells have been drilled in the vicinity of this test with only three wells completed as Mancos Shale producers. The state (Colorado Oil and Gas Conservation Commission, 2010) reports that three of the four wells are still productive, but they have no records of production for these wells. The remaining well has apparently been converted to a domestic use of the gas.

Between 1947 and 1957 an additional 42 wells (not including those drilled near the Ridgeway wells) were drilled and abandoned before the next producing well was drilled in the Study Area. This well was the discovery for the Montrose Dome field (Figure 7).

BLM_0018622

This well was completed as a Hermosa Group discovery between 5,138 and 5,196 feet and has since been abandoned.

Between the discovery in 1957 and the next discovery in 1963, an additional 18 wells were drilled and abandoned in the Study Area. This discovery was the first in the Piceance basin area. It was completed as a Mesaverde Group producer between 4,150 and 4,154 feet and has since been abandoned.

Through the year 1999, there were 190 conventional wells spudded that were initially completed as productive gas, oil, or carbon dioxide wells or they were abandoned (wells in an injection, service, temporary abandonment, or shut-in status were not included in this count). Only 26 wells were completed as productive (IHS Energy Group, 2010). During this period the success rate was only 13.68 percent. Figure 12 shows an annual breakdown of conventional wells drilled from 2000 through 2009. During this period 18 conventional wells were spudded that were initially completed as gas productive or they were abandoned (wells in a service, temporary abandonment, or shut-in status were not included in this count). In addition, six wells are in a spudded but not completed status. Ten wells were completed as productive (IHS Energy Group, 2010). During this period the success rate improved to 55.56 percent for completed wells.

The first coalbed natural gas well was spudded in the Piceance basin part of the Study Area in 1982, but was not completed until 1985. Through the year 1999 a total of 5 wells were completed as coalbed natural gas tests and two conventional wells were reentered and completed as coalbed natural gas tests (Figure 11). Only one of the seven wells was originally completed as an abandoned well. Since then an additional five of these wells have been plugged and abandoned and the remaining well is in a shut-in status (Colorado Oil and Gas Conservation Commission, 2010). Figure 12 shows an annual breakdown of coalbed natural gas wells drilled for 2000 through 2009. During this period 24 coalbed natural gas wells were spudded that were initially completed as productive or they were abandoned. In addition, three wells are in a spudded but not completed status. Twenty-two wells were completed as productive (IHS Energy Group, 2010). During this period the success rate was 91.67 percent for completed wells.

All fields in the Study Area are considered to be gas fields. Only two wells were completed as predominantly oil producers and they are now abandoned.

**Producing Zones**

Oil and gas can occur in numerous geologic formations within the Study Area (Figures 5, 6a, and 6b), but the formations with actual reported historic production are much more limited. Reported conventional oil and gas occurring in the Paradox basin part of the Study Area (Figure 4) is reported only from the Permian Cutler Formation, the Pennsylvanian Hermosa Group, and the Honaker Trail Formation (Table 1). One well in each zone has been reported to be productive in the period from 1974 to present (IHS Energy Group, 2010). Only 520 barrels of oil and 227,651,000 cubic feet of gas have

BLM_0018623

been produced from these wells.  Cumulative water production is reported as 4,395 barrels.

All other wells listed in Table 1 produce in the Piceance basin part of the Study Area (Figure 4).  The Dakota Sandstone is Lower Cretaceous in age (Figure 6a), while the remaining zones are from the Upper Cretaceous (Figure 6b).  The Corcoran and Cozzette members of the Iles Formation are productive in most wells in this area.  Cumulative oil production for the 31 Piceance basin wells from 1974 to present (IHS Energy Group, 2010) is reported as 6,010 barrels of oil, 3,023,875,000 cubic feet of gas, and 10,812 barrels of water.

Production from coalbeds comes only from the Piceance basin part of the Study Area (Figure 3b).  Operators in the area were asked to indicate which wells they now classify as coalbed gas wells.  Table 2 shows these wells with their reported production and zones that have produced gas, oil, and water (IHS Energy Group).  It is possible that some of the reported production in the Corcoran and Cozzette members comes from earlier production associated with the sandstones in these two zones before those wells were reentered and completed as coalbed gas zones.  Coalbed production in the Study Area presently only comes from sediments of Upper Cretaceous age (Figure 6b).  Most of the water produced in these wells has been re-injected into a deeper formation in the Hotchkiss Federal 12-89 #18-22D, which lies in section 18 of township 12 south, range 89 west (Figure 3a).  This well began taking water in April of 2007, with 1,701,657 barrels re-injected.

**Technology Development**

"Technology has historically contributed significantly to the ability of the petroleum industry to find, develop, and produce natural gas resources" (National Petroleum Council, 2003).  Reeves et al. (2007) noted strong levels of industry investment in oil and gas recovery research and development during the 1980s and early 1990s and a decline after that.  The National Petroleum Council (2003) postulated that technology improvements would play a lesser role in gas resource enhancement in the 2003-2008 time periods.  They also assumed that technology improvements would play a greater role after 2008 when higher gas prices would motivate industry to invest more in development of technology.  Future average improvement rates for certain types of technology were assumed to be:

- Exploration well success rate              0.53% annual improvement
- Development well success rate              0.46% annual improvement
- Estimated ultimate recovery per well       0.87% annual improvement
- Drilling cost reduction                    1.81% annual improvement
- Completion cost reduction                  1.37% annual improvement
- Initial production rate                    0.74% annual improvement
- Infrastructure cost reduction              1.18% annual improvement
- Fixed operation cost reduction             1.00% annual improvement.

BLM_0018624

Unconventional gas plays, sometimes called resource plays, will be a significant potential component of future exploration and production within the Study Area if reserves can be established. We use the term Resource Play to describe accumulations of hydrocarbons known to exist over a large areal extent and/or thick vertical section, may be self-sourcing, may be developed with horizontal well completions, and are driven by development efficiencies rather than geologic risk. Initial exploration and development for these types of plays will most likely be centered in the northeast part of the Study Area (southeast Piceance basin) and possibly in the Paradox basin area, if the shale gas plays being explored to the south of the Study Area can be extended into the Study Area. The Energy Policy Act of 2005 established funding for unconventional gas research and development and selected the Research Partnership to Secure Energy for America to oversee and manage new projects (Reeves et al., 2007). The goals of this organization are to:

- Increase the volume of the technically recoverable unconventional gas resource base by 30 trillion cubic feet,
- Convert 10 trillion cubic feet of technically recoverable unconventional gas to economically recoverable gas,
- Develop technologies for developing unconventional resources with minimum environmental impact, and
- Emphasize science-building capacity and effective technology dissemination.

Technologies that will be required to tap currently undeveloped unconventional gas resources (Reeves et al., 2007) may be:

- Detection methods to find where the highly productive, naturally fractured "fairways" of a play exist,
- Improving reservoir characterization in order to identify the entire productive pay interval,
- Advanced well stimulation methods to establish the low-end of reservoir quality for using well stimulation to yield economic results, and
- Enhanced recovery technology using injection of nitrogen and/or carbon dioxide to accelerate and increase gas recovery from coals, shales, and possibly tight sands.

With the rise in well drilling and well stimulation costs in recent years there had been concerns that much of the unconventional resource may become uneconomic to pursue. Gobec et al. (2007) have projected that the pursuit of efficiencies and technology improvements will at least partially offset the recent increases in costs. Most recently, costs have begun to level out and in some cases they have decreased in recent months, due to decreases in oil and gas demand and in price. We do not expect costs to increase significantly in the near future. Once oil and gas demand and prices begin to increase again in the long-term, then costs will also likely begin to rise.

The National Petroleum Council (1999) suggested that access restrictions can add 25 thousand dollars to the average cost of drilling a well in the Rocky Mountains. They also suggested that access restrictions can delay drilling activity by an average of two years.

BLM_0018625

**Drilling and Completion Activity**

There have been 254 surface well locations spudded or completed in the Study Area through April 20, 2010 (IHS Energy Group, 2010 and Colorado Oil and Gas Conservation Commission, 2010).  Of the 254 wells spud or completed in the Study Area, 70 wells (27.6 percent) appear to have been located on Bureau managed oil and gas lands.  In addition, 50 wells (19.69 percent) appear to have been located on U.S. Forest Service managed oil and gas lands.

Figure 13 presents the locations of all wells that are in an active status or are locations with a proposal to perform new drilling or additional testing (IHS Energy Group, 2010 and Colorado Oil and Gas Conservation Commission, 2010) as of April 20, 2010.  Of these 82 wells, their well type and present status is:

- Coalbed Gas – Location Filed                        3 wells
- Coalbed Gas – Producing                             13 wells
- Coalbed Gas – Shut-In or Waiting on Orders          9 wells
- Gas – Location Filed                                17 wells
- Gas – Spudded                                       1 well
- Gas – Producing                                     8 wells
- Gas – Domestic Production                           1 well
- Gas – Shut-In, Waiting on Orders, or
  Temporarily Abandoned                               27 wells
- Injection – Water                                   1 well
- Injection – Waiting on Orders                       2 wells.

One well location is listed twice in the above compilation.  A location notice has been filed for one of the above shut-in gas wells to reenter and test for coalbed gas production.  Some of the above gas wells produce some associated oil, but no well in the Study Area presently produces enough oil to qualify it as an oil well.  All three injection wells are, or will be used solely for disposal purposes.

At present only 62 wells shown in Figure 13 have been spudded or drilled to total depth, with the rest having only a drilling location notice filed.  These 62 wells, account for about 24.4 percent of all the 254 oil and gas wells spudded or drilled to total depth within the Study Area.

About 75.6 percent (192 wells) of the 254 total wells have been plugged and abandoned and their surface locations have been reclaimed or are in the process of final reclamation.  Wells have been abandoned because:

- they were "dry" – no hydrocarbons were encountered, hydrocarbons were not present in economic quantities, or mechanical difficulties within a borehole prevented economic oil and gas production;
- they were considered to be stratigraphic tests just drilled to obtain information about subsurface geologic horizons and their depths; or

BLM_0018626

- they initially were capable of producing hydrocarbons but they became uneconomic to produce at a later date or they were used as disposal or service wells and were no longer needed for those purposes.

## Marginal Wells

Low-volume oil and gas wells, known as "marginal" or "stripper" wells, contribute an important percentage of the hydrocarbons produced in the United States. In 2006, about 29 percent of crude oil production and more than 10 percent of natural gas production was credited to marginal wells (Duda and Covatch, 2005). In 2007, their contribution remained relatively constant: approximately 28 and 11 percent, respectively (Interstate Oil and Gas Compact Commission, 2008).

Producing oil or natural gas wells are considered to be "marginal" when their producing rate is at the limit of profitability. The Interstate Oil and Gas Compact Commission (2008) defines marginal or stripper wells as wells that are producing 10 or fewer barrels of oil per day and no more than 60,000 cubic feet per day of natural gas. The majority of marginal wells are owned, maintained, and produced by independent operators rather than integrated exploration and production firms which operate globally. They account for a large proportion of the jobs and corresponding economic growth associated with the petroleum industry in this country (Duda and Covatch, 2005). The Interstate Oil and Gas Compact Commission (2008) estimates that the abandonment of marginal wells in 2007 cost an estimated 719 million dollars of lost Federal royalty revenue and nearly 2,000 jobs nationwide. In addition to the economic and employment impacts, keeping marginal wells in production allows for additional opportunities to use advanced technology to enhance recovery.

In 2008, Colorado ranked 12th of the 30 major producing states in the number of marginal oil wells, and 10th of the 28 major gas producing states (Interstate Oil and Gas Compact Commission, 2008). In the previous year there were 6,866 marginal oil wells that produced 7,170,856 barrels of oil in the state of Colorado, and 10,740 marginal gas wells which produced 102,321,123 thousand cubic feet of gas (data for 2008 was not available at the time of this writing). These totals represent 29.8 and 5.1 percent of the total production of oil and gas for the state, respectively (Interstate Oil and Gas Compact Commission, 2008, and Energy Information Administration, 2010a).

As of June 2009, no marginal oil wells and 18 marginal gas wells (both shut-in and producing) were located within the Study Area (IHS Energy, 2010). None of these wells are located on Bureau managed oil and gas minerals. According to the Interstate Oil and Gas Compact Commission (2008), the average daily production for marginal gas wells in Colorado in 2007 was 26.1 thousand cubic feet of gas. Assuming these averages have not changed significantly since the 2007 data was analyzed, production from marginal wells within the Study Area may account for approximately 172 million cubic feet of gas annually.

BLM_0018627

**Deep Well Drilling: Greater than 15,000 feet**

Dyman et al. (1990, 1993a, 1993b, and 1997) characterized deep wells as those drilled to depths greater than 15,000 feet. Drilling and completing deep wells is very costly due to the extremely high temperatures and variable pressures and hard rock that can be encountered at great depth. Only five of the 252 wells with an available depth measurement (1.98 percent) have been drilled to 15,000 feet or greater (IHS Energy Group, 2010) in the Study Area (Figure 14). All wells are located in the Paradox basin area, with the three westernmost wells located on or near the Paradise Valley Salt Cored Anticline and the other two wells located near the axis of the San Miguel Syncline (Figure 4).

The first deep well in the Study Area was completed in 1958 and the last one in 1992. The deepest well was an 18,354 foot drilled and abandoned wildcat located in section 26 of township 48 north, range 17 west that was spudded in April of 1962 and completed earlier in April almost a year later. It bottomed in the Permian Cutler Formation.

None of the five deep wells were completed as oil or gas producers. In 1988 the U.S. Bureau of Reclamation completed a 16,000 foot injection well in section 30 of township 47 north, range 18 west that penetrated Precambrian rocks. This well is used to dispose of salt-water and appears to be the only deep well still active in the Study Area.

**Deep Well Drilling and Completion Activity: 10,000 to 15,000 feet**

Only 20 of 252 wells (7.94 percent), with an available depth measurement in the Study Area have drilled to the 10,000- to 14,999-foot depth range (IHS Energy Group, 2010). As Figure 14 shows, all wells in this depth range are located in the Paradox basin part of the Study Area. Most wells are concentrated along the Paradise Valley Salt Cored Anticline and the anticlinal trend to the southeast, with three additional wells located between the San Miguel Syncline and the thrust fault that marks the southern boundary of the Uncompaghre Uplift (Figure 4). Most wells have been completed as drilled and abandoned, with one well junked and abandoned (IHS Energy Group, 2010). Presently one well is in a temporarily abandoned status and two are classed as gas wells (Colorado Oil and Gas Conservation Commission, 2010). Both gas wells are considered as Hamilton Creek field producers with one producing from the Cutler Formation and the other from the Hermosa Group. Both wells produce from perforations that extend just beyond the 10,000-foot depth.

**Shallower Well Drilling: 5,000 to 9,999 feet**

There are 68 of 252 wells (26.98 percent), with an available depth measurement, in the Study Area, that were drilled to the 5,000- to 9,999-foot depth range (IHS Energy Group, 2010). As Figure 14 shows, 32 wells in this depth range are scattered across the Paradox basin part of the Study Area, and the other 36 wells lie in the Piceance basin part; from the Mesaverde Formation outcrop (Figure 4) and northward. Completion status of most of the Paradox basin wells has been drilled and abandoned. Four wells were initially

BLM_0018628

completed as gas wells (two at Hamilton Creek field, one at Montrose Dome field and one at an unnamed field) and two were temporarily abandoned (unnamed fields). All the gas wells have been plugged and abandoned and one well has been converted to a shut-in status while the other remains temporarily abandoned. Completions were made in the Cutler and Honaker Trail formations and in the Hermosa Group.

Ten of the 36 wells in the Piceance basin part of the Study Area were drilled as coalbed natural gas wells. Nine wells were completed as coalbed natural gas producers and the remaining well is still recorded as being in a spudded status. Some coalbed natural gas well completions were as deep as the 6,800 to 6,900 foot range. Three of these wells have since been plugged and abandoned while the remaining six are productive, shut-in, or waiting on orders.

Twelve of the remaining 26 wells in the Piceance basin part of the Study Area were initially drilled and abandoned. The status of the others was:
- Spudded                        2 wells,
- Gas                            9 wells,
- Temporarily Abandoned          2 wells, and
- Injection                      1 well.

The gas wells were completed as Cozzette and/or Corcoran member producers. All of the gas wells and temporarily abandoned wells are presently in a shut-in status (Colorado Oil and Gas Conservation Commission, 2010).

### Shallowest Well Drilling: Less than 5,000 feet

The most wells (159 wells, or 63.1 percent of the 252 total wells with an available depth measurement) in the Study Area have drilled to less than 5,000 feet (IHS Energy Group, 2010). Locations of these wells (Figure 14) are:
- on the Paradise Valley Salt Cored Anticline (a small number of this type of well),
- just south of the thrust fault bounding the south flank of the Uncompahgre Uplift and southeast to the vicinity of the town of Ridgeway,
- in flank areas of the Grand Mesa Syncline and the southern flank of the Piceance basin (south of the Mesaverde Formation outcrop, and
- the Piceance basin part of the Study Area.

Twenty-three of the 159 wells in this depth range were drilled as coalbed natural gas wells. Three wells were completed as drilled and abandoned or junked and abandoned, 19 were completed as coalbed natural gas wells, and one was spudded. Nine of these 19 wells still produce, while nine have been plugged and abandoned and one is presently shut-in. Of the remaining 136 wells, 106 wells were drilled and abandoned. Completion status of the remaining 30 wells was:
- Spudded                        4 wells,
- Service                        2 wells,
- Oil                            2 wells,
- Gas                            13 wells,
- Carbon Dioxide                 1 well,

BLM_0018629

- Shut-In                          1 well, and
- Temporarily Abandoned        7 wells.

The oil and carbon dioxide wells have been abandoned as have three of the gas wells, two temporarily abandoned wells, and one service well.  The remaining the remaining 21 wells are still in an active status (Colorado Oil and Gas Conservation Commission, 2010).

## Summary of Current Drilling Techniques

Most Study Area oil and gas wells are recorded as having been drilled vertically (IHS Energy Group, 2010), with only four directional wells and one horizontal well drilled to date (April 20, 2010).  Developments in drilling techniques have allowed for more widespread use of directional and horizontal drilling technology.  Directional drilling has many benefits, but also some limitations.  For instance, directional drilling may be employed to avoid sensitive or inaccessible surface features, increase the area that a borehole contacts a producing formation, and when multiple directional wells are drilled from the same vertical borehole or from the same surface location, reduce drilling time, associated waste volumes and emissions, and provide greater protection of sensitive environments.  Most of this technology will be tested first in other regions where economic returns on investment are higher than in the Study Area.  Where technology is shown to provide significant cost benefits, local operators will apply those methods when appropriate.

### Directional and Horizontal Drilling and Completion Activity

In addition to the benefits of directional and horizontal drilling outlined above, such boreholes will often be allowed to "drift" updip along the flanks of geologic structures (e.g., along the axis of a plunging anticline), thereby naturally contacting more of the producing formation.   Depending on subsurface geology, technology advances now allow operators to deviate boreholes by anywhere from a few degrees to completely horizontal.  Deviation allows operators to reach reservoirs that are not located directly beneath the drilling rig, or to allow the borehole to contact more of the reservoir.  In some cases directional drilling may be used specifically for avoidance of unfavorable surface locations.  Directional wells also have the benefit of providing the operator with the option of drilling multiple wells from the same location, substantially reducing the surface disturbance, potentially avoiding environmentally sensitive areas, and reducing the number of facilities needed.

Drilling and completion costs for directional and horizontal wells are typically significantly higher than for conventional vertical boreholes, even when the cost savings associated with reduced need for surface disturbance is taken into account.  Eustes (2003) and Fritz and others (1991) identified the following specialized requirements and risk factors unique to horizontal and directional drilling that can affect drilling and completion costs for these types of wells:

- specialized equipment (e.g., mud motors, measurement while drilling tools) and specially trained personnel,

BLM_0018630

- a larger drilling rig and associated equipment,
- casing and drilling string modifications to address problems associated with ovality and bending stresses,
- increased risk of borehole damage due to unique tectonic stresses,
- slower penetration rates that lengthen overall drilling time on location, and/or
- increased torque and drag on borehole equipment.

In addition to increased costs, the risk of losing the well due to geologic and/or mechanical failures is also greater in directional and especially horizontal boreholes than in conventional vertical boreholes.   As a result of these increased costs and risk, operators tend to prefer vertical over directional or horizontal boreholes unless special circumstances exist that make such drilling a necessity or economically attractive.   As an example, the geology of a reservoir may be such that a vertical borehole may only contact a few feet of the productive horizon, while a horizontal borehole may be able to contact tens to thousands of feet depending on factors such as how the well is completed and the areal extent of the pool.   In a case such as this, the operator must make the determination that the increased potential for productivity outweighs the additional costs and inherent risks involved in directional and horizontal drilling.

Almost all of the oil and gas wells and all of the coalbed natural gas wells in the Study Area have been drilled vertically.   Only four wells have been drilled directionally and one well has been drilled horizontally (Figure 15).  All four directionally drilled wells have been drilled in the Paradox basin part of the Study Area.  One well was completed in 2007 as a Cutler Formation gas well and it still produces at a measured depth of just over 10,100 feet.  Two other wells were drilled and abandoned (in 1988 and 2002) and the fourth well was temporarily abandoned in 2008 and remains in that status.  Since most directional well bores are S-shaped, the true vertical depth and measured depths (borehole lengths) are usually within a few percent of each other.

The only horizontal well was completed in 1994 in the Piceance basin part of the Study Area (Figure 15) and is presently shut-In.  It was completed as a Cozzette member gas well at just over 6,000 feet in true vertical depth.

On April 20, 2010 there were active proposals for three directional wells and one horizontal well (Figure 15) in the Study Area.  In the Paradox basin part of the Study Area a 10,757 foot directional test to the Cutler Formation was proposed.  In the Piceance basin part of the Study Area a 6,336 foot Corcoran member directional test and a 4,368 foot Cozzette/Corcoran member test were proposed.  Also, in this area a horizontal coalbed natural gas well was proposed to test the Cameo Coal.

Increased use of directional and horizontal boreholes is anticipated in the future.  At the Whitewater unit (Figure 10) the operator has proposed pad drilling with up to 10 directional wellbores per pad.  In additional, we anticipate that any future development of gas shale prospects would likely be via horizontal boreholes.  Gas shale prospects are reviewed in more detail latter in this report under the "Resource Plays" discussion.

BLM_0018631

Slimhole Drilling and Coiled Tubing

Slimhole drilling—a technique used to tap into reserves in mature fields—has not yet been used much in the Rocky Mountain Area.  In eastern Colorado the technology has been used in the Niobrara unconventional gas play.

Coiled tubing—used effectively for drilling in reentry, underbalanced, and highly deviated wells—is often used in slimhole drilling.  Most coiled tubing rigs are limited to relatively shallow drilling.  These types of rigs have been used in the Niobrara play in eastern Colorado and to the north in other parts of the Piceance basin

A review of coiled tubing drilling and intervention (well work during the life of a well) and its advantages, disadvantages, and limitations was presented for the U.S. Department of Energy (2005).  Most likely, future applications may be for drilling shallow development wells (including coalbed natural gas wells), reservoir data monitoring holes, shallow re-entry wells, and deeper exploration holes (Spears & Associates, Inc., 2003). Brown (2006) has reported that slimhole drilling with coiled tubing may soon begin to replace conventional rotary drilling in the shallow depths across the United States.  He reported that cost savings can range from 25 to 35 percent per hole, and other advantages include:
- good hole quality,
- improved safety,
- minimal cuttings, and
- reduced chance of damaging underpressured formations.

Coiled tubing will most likely be first used in some workover situations in the Study Area.  We expect both of these drilling and completion techniques to be used more often in the future.  U.S. Department of Energy (1999) has identified the environmental benefits of using these techniques, which include:
- lower waste volumes,
- smaller surface disturbance areas,
- reduced noise and visual impacts,
- reduced fuel use and emissions, and
- protection of sensitive environments.

Light Modular Drilling Rigs and Pad Drilling

Now in production, new light modular drilling rigs can be more easily used in remote areas and are quickly disassembled and moved.  Rig components are made with lighter and stronger materials and their modular nature reduces surface disturbance impacts. Also, these rigs reduce fuel use and emissions.  Use of this type of rig in the Study Area is not likely in the near future.  Other Rocky Mountain plays (western Wyoming, the Piceance basin north of the Study Area, and North Dakota) have a higher priority for new rigs since more prolific reservoirs are being developed in those locations than reservoirs are known to be capable of within the Study Area.

BLM_0018632

Light modular rigs also have potential for use in situations where pad drilling is being used. Pad drilling refers to the drilling of multiple directional boreholes from one surface location. Pads are the flat graded land surfaces that serve as the foundation for the drilling rig. Since modular rigs allow quicker breakdown and movement to new locations, they reduce time to drill and rig costs. Several formations could conceivably contain resource plays which generally lend themselves to horizontal completions and thus pad drilling. The Mancos Shale in the Piceance basin and the Hovenweep and Gothic shales in the Paradox basin are three such potential plays, though others may exist as well. Gas shale prospects are reviewed in more detail latter in this report under the "Resource Plays" discussion.

Pneumatic Drilling

Pneumatic drilling is a technique in which boreholes are drilled using air or other gases rather than water or other drilling liquids. This type of drilling can be used in mature fields and formations with low downhole pressures and where formations are sensitive to the fluids commonly used in drilling. Few fields in the Study Area are expected to meet these criteria. It is an important tool that can be used when drilling horizontal wells, so it could be used in those types of situations in the future. This type of drilling significantly reduces waste, shortens drilling time, cuts surface disturbance, and decreases power consumption and emissions.

Measurement-While-Drilling

Measurement-while-drilling systems measure borehole and formation parameters during the actual drilling process. These systems allow more efficient and accurate drilling. They can reduce costs, improve safety of operations, reduce time on site, and fewer wells may need to be drilled. At present, measurement-while-drilling would be critical for use in drilling future horizontal boreholes within the Study Area. In the future, use of this type of drilling system may become more widespread and may be used when drilling other types of directional boreholes.

Improved Drill Bits

Advances in materials technology and bit hydraulics have yielded tremendous improvement in drilling performance. Latest-generation polycrystalline diamond compact bits drill 150 to 200 percent faster than similar bits just a few years ago (U.S. Department of Energy, 1999). Additional improvements have continued to be made to enable faster drilling. Environmental benefits of improved bits include:
- lower waste volumes,
- reduced maintenance and workovers,
- reduced fuel use and emissions,
- enhanced well control,
- less time on site, and
- less noise.

BLM_0018633

Reducing time the rig is on the drill site reduces potential impacts on soils, groundwater, wildlife, and air quality.

## Summary of Current Completion Techniques

Standard completion techniques for the Study Area will be described below. Once the operator determines that a well should be completed for production, the first step is to place casing in the borehole and cement it in-place. Since the potential producing zones are then sealed off by the casing and cement, perforations (holes made through the casing and cement and into the formation) are made in order for the oil and/or gas to flow into the borehole. The casing also serves to protect sources of groundwater from contamination by oilfield fluids.

Some form of hydraulic fracturing is then usually used to improve hydrocarbon flow into the borehole. Hydraulic fracturing of reservoirs can enhance well performance, minimize drilling, and allow the recovery of otherwise inaccessible oil and gas resources. The flow of hydrocarbons is restricted in some low-permeability, tight formations and in nonconventional reservoirs (such as coalbed natural gas), but can be stimulated by hydraulic fracturing to produce economic quantities of hydrocarbons. Fluids are initially pumped into the formation at pressures high enough to cause fractures to open in the reservoir rock. Sand slurry is pumped into the opened fractures, which keeps the fractures propped open, allowing hydrocarbons in the reservoir to more easily enter the borehole. Improvements such as carbon dioxide-sand fracturing, new types of additives, and fracture mapping, promise more effective fractures and greater ultimate hydrocarbon recovery.

Only one horizontal well has been drilled to date in the Study Area. New types of horizontal fracturing technology will likely be used to stimulate these types of wells in the future. Development could be similar to that used to stimulate the Bakken Formation Middle Member in North Dakota. For horizontal boreholes, multi-stage fracture stimulations could be used. The Energy Information Administration (2006a) has reported that once the Bakken Formation has been fractured an un-cemented pre-perforated liner is installed in the borehole.

The final completion step is to place production tubing in the borehole to carry the hydrocarbons to the surface. At the surface it is connected to a Christmas tree (a collection of valves) used to control the well's production.

## Drilling and Completion Costs

Expenditures for exploration and development in the United States onshore increased 30 percent from 2005 to 29 billion dollars in 2006 (Energy Information Administration, 2007c). This was more than three times the average annual expenditure level in the 1990s and the highest amount since 1982. Most of the expenditures in 2006 were for development (26 billion dollars).

BLM_0018634

The National Petroleum Council (2003) reported drilling and completion costs for vertical wells in the Uinta-Piceance basin region and the Great Basin & Paradox basin. All cost components such as permitting, location construction, mobilization, rentals and services, tangible items, and stimulations were assumed to be included in these costs. They reported the average gas well cost for wells in four depth ranges.  Those costs for the Uinta-Piceance basin were:

- 0 to 5,000 feet                216 thousand dollars,
- 5,000 to 10,000 feet        570 thousand dollars,
- 10,000 to 15,000 feet      1.574 million dollars, and
- 15,000 to 20,000 feet      4.407 million dollars.

Gas well costs for the Great Basin & Paradox basin were:

- 0 to 5,000 feet                222 thousand dollars,
- 5,000 to 10,000 feet        712 thousand dollars,
- 10,000 to 15,000 feet      1.697 million dollars, and
- 15,000 to 20,000 feet      5.412 million dollars.

Since oil wells have been so rarely drilled within the Study Area, those costs are not included in this report.

Reported dry hole well costs for the Uinta-Piceance basin were estimated to be:

- 0 to 5,000 feet                113 thousand dollars,
- 5,000 to 10,000 feet        295 thousand dollars,
- 10,000 to 15,000 feet      739 million dollars, and
- 15,000 to 20,000 feet      2.506 million dollars.

Reported dry hole well costs for the Great Basin & Paradox basin were estimated to be:

- 0 to 5,000 feet                138 thousand dollars,
- 5,000 to 10,000 feet        288 thousand dollars,
- 10,000 to 15,000 feet      821 million dollars, and
- 15,000 to 20,000 feet      2.468 million dollars.

Since 2003, operators in the Rocky Mountain region had been faced with increases in drilling and completion costs.  Drilling rates had increased 20-50 percent (Rocky Mountain Oil Journal, 2005) and service costs had also increased.  Drilling rates and service costs continued to increase into 2008 and rig shortages affected most of the Rocky Mountain region.  Costs have since declined to some extent and rigs are now available, at least in the short-term.

## SUMMARY OF CONVENTIONAL OIL AND GAS PRODUCTION AND ABANDONMENT TECHNIQUES

Once production begins application of reservoir management procedures are needed to ensure the maximum hydrocarbon production at the lowest possible cost, with minimal waste and environmental impact.  In earlier days, recovery was only about 10 percent of

BLM_0018635

the oil-in-place (see Glossary for in-place) in a given field, and sometimes, the associated natural gas was vented or flared. Newer recovery techniques have allowed the production of up to 50 percent of the oil-in-place. Also, 75 percent or more of the natural gas-in-place in a typical reservoir is now recovered. Operators have also taken significant steps in reducing production costs. U.S. Department of Energy estimated that costs of production had decreased from a range of nine to 15 dollars per barrel of oil equivalent in the 1980's to an average of about five to nine dollars per barrel of oil equivalent in 1999.

Operating costs in the United States have been rising in recent years. Annual Rocky Mountain operating costs rose to about 55,000 dollars per 12,000 foot well in 2005, as reported by Kim (2007).

Since 1990, most reserve additions in the United States (89 percent of oil reserve additions and 92 percent of gas reserve additions) have come from finding new reserves in old fields (U.S. Department of Energy, 1999). The U.S. Department of Energy (1999) reports that about half of new reserve additions in the United States are from more intensive development within the limits of known reservoirs. They report that the other half of reserve additions have come from finding new reservoirs in old fields and extending field limits. Our review indicates that most recent reserve additions in the Study Area have come from development of the coalbed natural gas resource in the Piceance basin area.

The Energy Information Administration (2006b) has shown that the cost of equipping and operating gas wells in the Rocky Mountains is higher than the average for the rest of the onshore 48 contiguous states. Cleveland (2003) indicated a number of reasons why Rocky Mountain gas wells may be more expensive to equip and operate. Reasons for extra costs that may apply to parts of the Study Area are:
- remoteness and cold temperatures which often requires dehydrators and line heaters, more expensive types of steel casing, and insulation of surface equipment;
- workovers and preventive maintenance is more frequent which minimizes shut-in days in the winter when well site access is difficult; and
- lack of rig availability due to its lower drilling priority in the Rockies.

Recovering oil and gas from a geologic reservoir often occurs in a staged process using different recovery techniques (or a combination of techniques) as the reservoir is drained. Traditionally, processes were referred to as primary, secondary, or tertiary depending on when the process was applied. However, as technology has improved and the price of oil and gas has increased, reservoirs that had previously been bypassed are now being tapped using secondary or tertiary processes from the outset. Therefore, the terms "secondary" and "tertiary" are seeing less usage, or are more narrowly defined. "Secondary recovery" has become synonymous with water flooding and gas (not carbon dioxide) injection and "enhanced recovery" broadly encompasses any recovery techniques that are not part of primary recovery or waterflooding. The following definitions will be used in this report:

BLM_0018636

- <u>Primary Recovery</u> - Primary recovery produces oil, gas, and/or water using the natural pressure in the reservoir.  Wells may be stimulated to improve the flow of oil and gas to the borehole.  Other techniques, including artificial lift, pumping, and gas lift, help extend productive life when a reservoir's natural pressure dissipates.
- <u>Secondary Recovery</u> – Stimulation of reservoir production via injection of water into the producing formation thereby driving oil to production wells, or via injection of gas to expand the gas cap and/or regulate the reservoir pressure.  Since there presently are no unplugged oil wells within the Study Area, this process will not be used in the future unless new oil reserves are discovered and first go through the primary recovery process.
- <u>Enhanced Oil Recovery</u> - Injection of fluids (e.g., water, surfactants, polymers, or carbon dioxide) or sources of heat (steam or hot water) to stimulate hydrocarbon flow and move hydrocarbons that were bypassed in earlier recovery phases.  This phase also will not occur within the Study Area unless new oil reserves are discovered and first go through the primary recovery and secondary recovery processes.

## Hydrogen Sulfide Occurrence

Hydrogen sulfide is a colorless, flammable gas that occurs naturally in most crude oil and many natural gas reservoirs (Levorsen, 1967).  Hydrogen sulfide is toxic to humans and animals, and a single breath may provide enough exposure to be fatal (International Programme on Chemical Safety, 1994).  It has a characteristic foul, or "rotten egg" odor, and is heavier than air, so it tends to accumulate in low-lying areas.  Hydrogen sulfide is an impurity that must be removed from oil or natural gas through desulfurization in oil refineries and natural gas "sweetening" plants (natural gas containing hydrogen sulfide is commonly referred to as "sour gas") (Skrtic, 2006).  The presence of hydrogen sulfide in hydrocarbons is problematic not only because it is an impurity that must be removed in processing, but also because it is corrosive to metals both as a free gas and in solution, and because of its toxicity to personnel, wildlife, and the public.  On Federal lands, operators are required by law to follow specific safety practices and have public protection plans in place where hydrogen sulfide can "reasonably be expected to be present in concentrations of 100 parts per million or more in the gas stream" (43 CFR 3160).  To date, no fields in the Study Area have been identified as containing hydrogen sulfide gas.  Nearest known hydrogen sulfide produced with hydrocarbons is at Lisbon Valley field in Utah and at southeast Lisbon field to the south of the Study Area in San Miguel County, Colorado (Wilson et al., 2003).  If future test wells are drilled within the Paradox basin part of the Study Area they could encounter hydrogen sulfide in older sediments such as the Mississippian Leadville Limestone and Devonian McCracken Member of the Elbert Formation.

## Carbon Dioxide

Carbon dioxide has been discovered during oil and gas exploration at numerous places within the Colorado Plateau and Southern Rocky Mountain physiographic provinces.  In

BLM_0018637

the region it has been found in concentrations that exceed 98 percent (Allis et al., 2001). Uses have included dry ice sales, industrial uses, and for injection into oil reservoirs to enhance oil recovery. Enhanced oil recovery has been the dominate use for the carbon dioxide resource.

In the Colorado part of the Paradox basin carbon dioxide in large quantities is found in the Mississippian Leadville Limestone at McElmo Dome field in Montezuma County) and at Doe Canyon, Impel Redd, and Gulf Gillespie fields in Dolores County (Wilson et al., 2003). Smaller quantities are found at Lisbon Valley field in Utah and at southeast Lisbon field to the south of the Study Area in San Miguel County, Colorado (Wilson et al., 2003). If future test wells are drilled within the Paradox basin part of the Study Area they could encounter carbon dioxide in older sediments such as the Mississippian Leadville Limestone.

There is also some potential for carbon dioxide to occur in the Leadville Limestone in the Piceance basin (Wilson et al., 2003). If the Leadville Limestone is encountered in deep tests in that part of the Piceance basin within the Study Area, then carbon dioxide needs to be considered as a potential resource.

One well in the Study Area (section 12, of township 14 north, range 97 west) was completed as a carbon dioxide producer in the Morrison Formation (Figure 3a). That well was completed in 1982 with a test of 408,760 cubic feet of gas. No production was reported from this well and it was plugged and abandoned in 1992 (Colorado Oil and Gas Conservation Commission, 2010).

## Acid Gas Removal and Recovery

Before natural gas or oil can be transported safely, any hydrogen sulfide or carbon dioxide gas must be removed. Special plants are needed to recover these unwanted gases and sweeten the hydrocarbon product for sale. Improvements in the removal process have made it possible to produce sour natural hydrocarbon resources, almost eliminate noxious emissions, and recover almost all of the elemental sulfur and carbon dioxide for later sale or disposal. Presently producing oil and gas formations within the Study Area do not produce hydrogen sulfide or carbon dioxide, or they produce in such minor amounts that removal is not required.

## Artificial Lift Optimization

Artificial lift is used to produce oil once reservoir pressure declines and natural processes can no longer push the oil to the surface. Improvements in artificial lift have enhanced production, lowered costs, and lowered power consumption, which reduce air emissions. Artificial lift could be used in the future if oil production is discovered in the future.

BLM_0018638

**Glycol Dehydration**

In the Study Area, dehydration systems use Glycol to remove water from wet natural gas before the gas can be directed to a pipeline. During operation, these dehydration systems may vent methane, other volatile organic compounds, and hazardous air pollutants. Improvements to these systems have allowed increased gas recovery and have reduced unwanted emissions.

**Produced Water Management**

Coproduction of a variable amount of water with oil and gas and with coalbed natural gas is unavoidable at most locations. Table 1 shows the cumulative volume of produced water from conventional oil and gas wells in the Study Area and Table 2 shows the cumulative volume of water produced with coalbed natural gas. Colorado allows produced water to be disposed of as follows:

1. Injection into a Class II well, permitted in accordance with Rule 325;
2. Evaporation/percolation in a properly permitted pit;
3. Disposal at permitted commercial facilities;
4. Disposal by road spreading on lease roads outside sensitive areas for produced waters with less than 3,500 milligrams per liter total dissolved solids when authorized by the surface owner;
5. Discharge into state waters, in accordance with the Water Quality Control Act and the rules and regulations promulgated thereunder; and
6. Evaporation in a properly lined pit at a centralized Exploration & Production waste management facility permitted in accordance with Rule 908.

Figure 16 documents the geographic distribution of water quality samples across the Study Area and shows the distribution of sampled salinity, expressed as total dissolved solids, in those water samples. This information is from a U.S. Geological Survey (2008a) database of water quality samples. Water quality information is available for only eight samples and total dissolved solids range from 3,659 to 299,590 milligrams per liter. Water quality sample distribution and sampled zones are:

- less than 5,000 milligrams per liter – 1 sample (Cutler Formation),
- 5,000 to 9,999 milligrams per liter – 1 sample (Cutler Formation),
- 10,000 to 49,999 milligrams per liter – 3 samples (Rollins/Cozzette members, Burro Canyon Formation, and Mississippian)
- Greater than 50,000 milligrams per liter – 3 samples (one Devonian and two Mississippian samples).

The Bureau considers total dissolved solids concentrations of less than 10,000 milligrams per liter to be fresh water. Only two of the eight water quality samples fall within this range. The samples from these two wells were also from the shallowest zones tested (less than 4,100 feet). Water quality samples that have a total dissolved solids concentration of greater than 10,000 milligrams per liter are from deeper zones and from older formations.

BLM_0018639

A new freeze-thaw/evaporation process has been shown to be useful in separating out dissolved solids, metals, and chemicals that are contained in water produced along with the oil and gas production of wells.  In 1998, this type of produced water facility was determined to be successful in southwestern Wyoming (PTTC, 2002) and the San Juan basin in New Mexico (Boysen and Boysen, 2008).  It could probably be successfully used in higher elevation/colder climate parts of the Study Area, in locations where production of poor quality water cannot be disposed of by other means.

The Gas Technology Institute tested the performance and costs associated with the application of electrodialysis to produced water management (Hayes, 2004).  Pilots have been run in the Rocky Mountain region and could be used in the Study Area in the future.

### Leak Detection and Low-bleed Equipment

New technology is facilitating the detection of hydrocarbon leaks in equipment.  The replacement of equipment that bleeds significant gas allows for increased worker safety and reduced emissions of methane.  Not allowing gas to bleed from equipment increases recovery rates and usage of this valuable resource.  No record of use of this equipment is available for the Study Area.

### Vapor Recovery Units

Vapor recovery can reduce a lot of the fugitive hydrocarbon emissions that vaporize from crude oil storage tanks, mainly from tanks associated with high-pressure reservoirs, high vapor releases, and large operations.  The emissions usually consist of 40 to 60 percent methane, along with other volatile organic compounds, and hazardous air pollutants (U.S. Department of Energy, 1999).  Where useable, this technology can capture over 95 percent of these emissions.  No record of use of this equipment is available for the Study Area.

## UNDERGROUND GAS STORAGE

Produced gas can be stored in some existing good quality reservoirs that have already been depleted of their native gas content.  The objective of gas storage is to allow lands to be used to store natural gas during periods of excess production so that those supplies can be made available to meet peak gas demands and to maximize the efficiency of the gas delivery system.  At present there are no gas storage projects within the Study Area.

BLM_0018640

# PREVIOUS ASSESSMENTS OF OIL AND GAS RESOURCES

## RECOVERABLE NATURAL GAS RESOURCES – ENERGY INFORMATION ADMINISTRATION, POTENTIAL GAS COMMITTEE, AND NATIONAL PETROLEUM COUNCIL

A number of recent assessments of technically recoverable gas resources have been made for the Rocky Mountain region.  Each estimate has been prepared using somewhat different assumptions.  They all show a large natural gas resource for the Rocky Mountain region.

- The Energy Information Administration (2003) uses a natural gas resource base of 345 trillion cubic feet for the Rocky Mountain region.
- The Potential Gas Committee (2003) estimated 288 trillion cubic feet of natural gas; including 50 trillion cubic feet of proved reserves (see Glossary).
- As part of a study done in compliance with the Energy Policy and Conservation Act Amendments of 2000 (U.S. Departments of Interior, Agriculture, and Energy, 2003) the U.S. Geological Survey estimated the technically recoverable gas resource for five basins in the Rocky Mountain region at 226 trillion cubic feet. Of that total, they estimated a conventional gas resource of 13 trillion cubic feet, tight gas sand and shale gas resources of 127 trillion cubic feet, and 43 trillion cubic feet each of coal-bed natural gas and proved reserves.
- The National Petroleum Council (2003) estimated 284 trillion cubic feet of natural gas for the Rocky Mountain region.  The Council also presented a comparative analysis of their estimates with those of the Energy Information Administration, Potential Gas Committee and U.S. Geological Survey to better understand the factors that influenced the differences among each estimate.

### Assumptions to the Annual Energy Outlook 2010 with Projections to 2035 Energy Information Administration (2010)

In April 2010, the Energy Information Administration released their update for total technically recoverable resources (see Glossary).  As of January 1, 2008, estimated total technically recoverable crude oil resources for the Rocky Mountain region are 20.9 billion barrels of oil (Energy Information Administration, 2010b).  For the total United States, the estimated total technically recoverable resources for crude oil are 208.4 billion barrels of oil.  Total technically recoverable natural gas resources as of January 1, 2008 for the Rocky Mountain region vary based on sources of natural gas.  Natural gas from conventional reservoirs is estimated to have 345.0 trillion cubic feet of total technically recoverable resources in the Rocky Mountain region (2010). Natural gas technically recoverable as shale gas and coal-bed natural gas is estimated at 21.9 and 94.3 trillion cubic feet of gas respectively in the Rocky Mountain region.  Total recoverable natural gas resources in the United States are estimated to be 2,118.7 trillion cubic feet (2010). Marc Humphries, Analyst in Energy Policy from the Congressional Research Service,

BLM_0018641

stated that 37 percent of natural gas and 17 percent of oil in the United States comes from the Rocky Mountain Region (Humphries, 2004).

## The National Petroleum Council (2003)

The National Petroleum Council (2003) has divided remaining natural gas resources into proved natural gas reserves, proved growth reserves, and undiscovered technically recoverable resources (see Glossary for descriptions of each). They further divided undiscovered technically recoverable resources into conventional and unconventional (also known as nonconventional) types (see Glossary for descriptions of each).

As of January 1, 2002, the National Petroleum Council (2003) estimated Rocky Mountain region proved natural gas reserves to be 50 trillion cubic feet. Energy Information Administration (2004) was able to split out proved tight sand gas reserves (26.8 trillion cubic feet) and proved coal-bed natural gas reserves (14.8 trillion cubic feet) for the Rocky Mountain region. Growth of proved gas reserves in the Rockies was estimated at 26 trillion cubic feet (National Petroleum Council, 2003). Finally, undiscovered technically recoverable resources for conventional gas were estimated to be 173 trillion cubic feet, while unconventional gas resources were estimated to be 209 trillion cubic feet (National Petroleum Council, 2003).

The U.S. Department of Energy (2003) has reported that "as geologic knowledge and technology for finding and producing natural gas have improved, the estimated volume of natural gas resources in the Rocky Mountain States has grown." They assumed that as long as investment continued towards expanding the geologic knowledge base and technology progress, then there would be a continued upward trend in future resource assessment volumes and recovery would be expected to continue to increase. These reserve additions will be needed in the future to replace those that are being depleted due to production and consumption.

"The importance of natural gas as a primary energy source in the United States has grown considerably during the past decade" (Curtis and Montgomery, 2002). Rising demand in this country will result in a 1.1 percent average annual increase in our consumption of energy to 2030 (Energy Information Administration, 2007a). During that period natural gas consumption is expected to rise from 21.08 trillion cubic feet in 2005 to 26.9 trillion cubic feet in 2030 (Energy Information Administration, 2007b). Domestic production rose from 17.7 to 19.7 trillion cubic feet (11.3 percent increase) from 1990 to 2000 (Curtis and Montgomery, 2002) and then dropped to 18.3 trillion cubic feet by 2005. It is expected to rise to 20.6 trillion cubic feet by 2030 (Energy Information Administration, 2007b). North American producing areas are expected to provide 75 percent of long-term domestic gas needs, but they will be unable to meet the entire projected demand (National Petroleum Council, 2003). The gap between consumption and production has necessitated a rise in imports and concern about future domestic energy supply.

BLM_0018642

# ATLAS OF MAJOR ROCKY MOUNTAIN GAS RESERVOIRS (1993)

The Atlas of Major Rocky Mountain Gas Reservoirs assessed both the Paradox basin and the Uinta-Piceance basin in 1993 (Morgan and Hemborg, 1993). The Paradox basin has a fold and fault belt in the northern part of the basin. There are salt-cored anticlines in this area. The three main gas producers of the Paradox basin include the Cutler-Honaker Trail, Paradox Formation, and Leadville Limestone plays. Source rocks are primarily from shale in the Paradox Formation. Hydrocarbons are stored in algal mounds of the Paradox Formation.

The Paradox Formation play has eight plays that produced more than 330 billion cubic feet of gas (Morgan and Hemborg, 1993). Reservoirs occur in algal mounds and oolitic bank deposits in the Ismay and Desert Creek zones of the Pennsylvanian Paradox Formation. Gas and oil are produced from these reservoirs. Due to decreased circulation in a past sea, thick deposits of salts and anhydrite were deposited in the area resulting in alternating beds of shale and salt in the Paradox Formation.

An important play in the Paradox basin in the Study Area is the Cutler-Honaker Trail play. Andy's Mesa field had cumulative production of 18.5 billion cubic feet of non-associated gas as of 1993 (Morgan and Hemborg, 1993). The original field pressure was 2,345 psi at 6,915 ft. The last discovery in the Cutler-Honaker Trail play was the Hamilton Creek field in 1976. The Hamilton Creek Field is in Township 44 North, Range 14 West of the Study Area. Monthly field production peaked at 377 million cubic feet of gas in 1970. Production declined to 34.7 million cubic feet of gas per month by 1990. There were 16 total wells drilled in this play with 9 of those wells producing gas (Morgan and Hemborg, 1993).

In the Paradox basin, five reservoirs have produced more than 608 billion cubic feet of gas from the Leadville Limestone. A major field in the Leadville Limestone is the Lisbon field. Just west of the Study Area and in San Miguel County, the Lisbon field produced 538 billion cubic feet of the total 608 billion cubic feet produced in the Leadville Limestone (Morgan and Hemborg, 1993). Also, the Lisbon field has produced 48 million barrels of condensate oil and contains an estimated recoverable reserve of 250 billion cubic feet of gas. The driving mechanism of the migration of hydrocarbons is likely gas expansion and gravity. Although the field is productive, numerous downfalls preclude the field from being highly economic.

The Greater Piceance Plays include those in the Piceance, Uinta, and North Park basins. Six gas plays with 46 major reservoirs are in these basins (Tremain et al., 1993). Cumulative production was 1.867 trillion cubic feet of gas as of 1993. Production is mainly from the Wasatch, Green River, and Mesaverde Formations. The Greater Piceance Plays have produced more gas than any other area in Colorado. The authors of the Atlas suggested that advancements in technology would need to occur to develop more gas in the area.

BLM_0018643

The Mesaverde Group was also analyzed in the Atlas of Major Rocky Mountain Gas Reservoirs. In the Piceance basin, the Mesaverde Group produces gas from lenticular, fluvial sands (Tremain et al., 1993). There are seven major reservoirs that had produced approximately 118 billion cubic feet of gas as of 1993. In addition, 30 smaller reservoirs had produced 30 billion cubic feet of gas. The assessment determined the best technique for producing gas was from "unstimulated wells containing reservoirs with natural fractures" (Tremain et al., 1993).

Cumulative production of natural gas as of December of 1990 in the Upper Mancos Shale of Colorado and Utah was 359.5 billion cubic feet (Tremain, 1993). Production was from 37 fields along the Douglas Creek arch and the margins of the Uinta and Piceance basins. Approximately 87 percent of production was from the Emery Sandstone in the middle Mancos Shale. There were 400 producing wells added since 1976, with an average production of one to two billion cubic feet of gas per well. The decline rate for this area averaged 6 percent as of 1993 (Tremain, 1993).

In the Dakota Sandstone, Cedar Mountain Formation, and Morrison Formation there were 18 major fields that produced more than 362 billion cubic feet of natural gas as of December 31, 1990 (Tremain, 1993). Average drilling depths ranged from 3,000 to 8,800 feet. Many of the reservoirs in this area have high nitrogen and carbon dioxide concentrations. The depositional framework for these formations ranges from fluvial to nearshore marine (Tremain, 1993).

The Entrada and Weber Sandstones were also analyzed in The Atlas of Major Rocky Mountain Gas Reservoirs. The play areas (see Glossary) identified in the atlas, do not extend into the Study Area.

## MAJOR OIL PLAYS IN UTAH AND VICINITY: QUARTERLY TECHNICAL PROGRESS REPORTS (2003-2008)

Another assessment completed in the Paradox basin was "Major Oil Plays in Utah and Vicinity: Quarterly Technical Progress Reports ", by Thomas C. Chidsey, Jr. Reports from July 2003, to February 2008, were analyzed for pertinent data to the Study Area and reviewed below.

The July 2003 report discussed optimal drilling techniques in the Paradox basin. These techniques include increasing mud weight during drilling to 12.5 pounds, centralize treatment facilities, and mix produced water down dip to reduce salt precipitation. The optimal drilling horizon at that time was noted to be the Desert Creek zone of the Paradox Formation in the Blanding sub-basin. Other techniques discussed included disposal of produced water and maintenance of reservoir pressure to create a low-cost waterflood (Chidsey et al., July 2003)

The September 2003 report stated the Paradox basin reservoirs are heterogeneous, which is the principle reason for low recovery rates. Heterogeneity is due to gaps in algal mounds in the Paradox Formation. As of Sept. 2003, horizontal drilling has had no

BLM_0018644

commercial success in the Paradox, except the Greater Aneth field (Chidsey et al., September 2003).

The March 2004 report discusses the Leadville Limestone in the Paradox basin. The Leadville Limestone is a major oil and gas reservoir. Most of the Leadville Limestone is found in the Paradox basin fold and fault belt, which occurs in the southwestern portion of the Study Area (Chidsey et al., March 2004).

The April 2005 report details the Leadville Limestone extensively. It had produced over 53 million barrels of oil and 845 billion cubic feet of gas as of this report. The seals were noted as the clastic beds of the Molas Formation and evaporite beds of the Paradox Formation. Traps include structural traps with closure on anticlines, faults, and fault planes. Source rocks are from the Paradox Formation. The Leadville Limestone has varying porosity and permeability. Dolomitization has partly occurred along with leaching. Fracturing is present in the limestone. To the east of the Study Area, the Leadville Limestone in San Miguel County had an initial reservoir pressure of 2,340 pounds per square inch in the Lisbon Southeast field. Average monthly production was 313 barrels of oil and 50,295 thousand cubic feet of gas. Cumulative production was 164,922 barrels of oil and 16.2 billion cubic feet of gas as of the 2005 report (Chidsey, April 2005).

In the July 2006 report the Paradox Formation was discussed in detail. It was reported that over 500 million barrels of oil and 650 billion cubic feet of gas had been produced in Utah. Most of the gas produced was cycled for pressure maintenance. The characteristics of Paradox Formation oil are sweet, paraffinic, and the average API gravity is 43 degrees. Viscosity ranges from 33 to 49 seconds at 100 degrees Fahrenheit (Chidsey, July 2006).

The November 2006 report also discussed the Paradox Formation. The Cane Creek shale member total organic content is 15 to 28 percent. The Chimney Rock shale member total organic content is 1 to 3 percent with an average vitrinite reflectance of 1.3 to 2.5 percent. The Gothic Shale member has a total organic content of 1.5 to 4 percent and a vitrinite reflectance of 1.3 to 2.5 percent. The Gothic Shale member occurs in the southern part of the Study Area, south of the Uncompahgre Uplift. This report also notes that the Paradox Formation only produced gas in the southeast part of the basin in Colorado (Chidsey, November 2006).

The May 2007 report discusses seals and source rocks for the Paradox Formation. The vertical reservoir seals include shale, halite, and anhydrite. The lateral seals include un-fractured beds, off mound mudstone, wackestone, and anhydrite) and anhydrite. Source rocks are the Cane Creek, Chimney Rock, and Gothic Shales (Chidsey, May 2007).

The February 2008 report detailed sources of carbon dioxide in the Paradox basin. The McElmo Dome field in southwest Colorado is a carbon dioxide source. The Ouray Formation and Leadville Limestone supply carbon dioxide to the Greater Aneth Field southwest of the Study Area (Chidsey et al., February 2008).

BLM_0018645

## INVENTORY OF ONSHORE FEDERAL OIL AND NATURAL GAS RESOURCES AND RESTRICTIONS TO THEIR DEVELOPMENT: PHASE HI INVENTORY—ONSHORE UNITED STATES (2008)

For oversight and regulatory purposes, the Department of Interior is required by the Energy Act of 2000 to report oil and gas resources underlying Federal lands. Restrictions and causes for delays are also required in the report. The Inventory of Onshore Federal Oil and Natural Gas Resources and Restrictions to Their Development: Phase III Inventory—Onshore United States fulfilled this requirement in 2003, 2006, and 2008. The Phase III report (2008) contains the most current Onshore United States inventory.

The 2008 report gave estimates for undiscovered technically recoverable resources, remaining proved ultimate recovery growth, and proved reserves on Federal Lands including the Study Area. The proved liquid reserves in the Uinta-Piceance basin were 254 million barrels of oil. Federal government reserves were 143 million barrels of oil (U.S. Departments of the Interior, 2008). Proved gas reserves in the Uinta-Piceance basin were 7,182 billion cubic feet of gas. Federal government reserves were 3,794 billion cubic feet of gas. These reserve estimates were made in 2008. The Paradox basin proved liquid reserves were 119 million barrels of oil with 36 million barrels of oil on Federal Land. The total proved gas reserves in the Paradox basin were 14,156 billion cubic feet of gas with 7,497 billion cubic feet of gas on Federal Land (2008). .

Of these reserves, different accessibility levels exist that constrain oil and gas development in the Uinta-Piceance basin and Paradox basin. Federal Land in the Uinta-Piceance basin is broken up as follows: 40.4% (5,301,000 acres) is not accessible and there is no leasing or no surface occupancy, 32.4% (4,257,000 acres) is accessible and can be leased but there are timing limitations or controlled surface use, and 27.1% (3,549,000 acres) is accessible and can be leased with standard leasing terms (U.S. Departments of the Interior, 2008). The same accessibility issues relate to the Paradox basin. Federal Land in the Paradox basin is broken up as follows: 59.4% (8,698,000 acres) is not accessible and there is no leasing or no surface occupancy, 14% (2,039,000 acres) is accessible and can be leased but there are timing limitations or controlled surface use, and 26.5% (3,878,000 acres) is accessible and can be leased with standard leasing terms (2008).

Standard leasing terms include conditions of approval and stipulation exception factors. In the Study Area, conditions of approval for the Uncompahgre Field Office include studies of archeology, big game, construction, noise, pipeline, roads, and soil (U.S. Departments of the Interior, 2008). Stipulation exception factors in the Uinta-Piceance basin are big game winter range and raptors with an extended drilling buffer zone of 0.25 miles. In the Paradox basin, big game winter range, raptors, and bald eagle winter roost are the stipulation exception factors. The extended drilling buffer zone is 0.50 miles (2008).

BLM_0018646

The "Inventory of Onshore Federal Oil and Natural Gas Resources and Restrictions to Their Development; Phase III Inventory—Onshore United States" was completed in 2008. Any updates to the proved reserves are in this Reasonable Foreseeable Development Scenario

## OIL AND GAS POTENTIAL AND REASONABLE FORESEEABLE DEVELOPMENT SCENARIOS IN THE SAN JUAN NATIONAL FOREST AND BLM PUBLIC LANDS, COLORADO (2006)

The "Oil and Gas Potential and Reasonable Foreseeable Development Scenarios in the San Juan National Forest and BLM Public Lands, Colorado" (Gault Group Inc., 2006) encompasses lands immediately south of the Study Area. The Reasonable Foreseeable Development Scenarios projected 25 wells per year would be drilled in conventional fields over a 15 year period in the Paradox Basin Province (2006). The San Juan National Forest is southeast of the Paradox Basin Province. Since it is in close proximity to the Study Area it is prudent to discuss the projections made for the San Juan National Forest. Coal-bed natural gas is produced from the Fruitland Formation in the San Juan Basin Province. In the Study Area, the Tongue Mesa coal field also produces from the Fruitland Formation. It was projected that 60 coal-bed natural gas wells per year would be drilled at the current 160 acre spacing (2006). Spacing decreases were anticipated with potential for more wells to be drilled than projected. Also, it was projected that 2 wells per year would be drilled on conventional-type fields. Overall, 1,185 new wells were projected to be drilled over the 15 year period. These wells would produce 19 million barrels of oil and 3.25 trillion cubic feet of gas. The total surface disturbance from wells would be 212 acres per year for a total of 3,181.2 acres over the 15 year period. The total disturbance from pipelines would be 424 to 937 acres (Gault Group Inc., 2006).

## OIL AND GAS POTENTIAL AND REASONABLE FORESEEABLE DEVELOPMENT SCENARIOS IN THE GRAND MESA, UNCOMPAHGRE, AND GUNNISON (GMUG) NATIONAL FORESTS, COLORADO (2004)

The "Oil and Gas Potential and Reasonable Foreseeable Development (RFD) Scenarios in the Grand Mesa, Uncompahgre, and Gunnison (GMUG) National Forests, Colorado" was prepared by Bruce Fowler and Pat Gallagher from the Bureau of Land Management. The report was published August 27, 2004. The report encompasses the entire Study Area and it states that the Piceance basin contains reservoirs mainly in the Mesaverde Group. The Paradox basin contains plays mainly in Paleozoic rocks. From drilling history and industry input, the subject predicted there would be a total of 45 wells drilled over the next 15 years (from 2004 to 2019). Total disturbance was predicted to be 153 acres. After temporary reclamation, the total disturbance was predicted to be 82 acres (Fowler and Gallagher, 2004). Spencer (2006) updated the well projections to 48 sandstone wells and 88 coalbed natural gas wells. Beecham (2010) further updated the projections for the remaining nine years of the analysis (2011-2019). He projected that 103 wells would be drilled from 58 locations. He also modified previous assumptions about acres disturbed.

BLM_0018647

The Grand Mesa National Forest had a high occurrence potential based on major plays including the Williams Fork fluvial sands, Cameo coal zone, and Cozzette/Corcoran reservoirs. The Gunnison National Forest has a high gas potential in the north and decreases to low potential in the southwest as predicted in the Reasonable Foreseeable Development Scenarios for the Grand Mesa, Uncompahgre, and Gunnison National Forests in 2004. The Uncompahgre National Forest shows medium to low oil and gas occurrence potential in the 2004 assessment. Refer to Figures 18 and19, to see our occurrence potential maps (see "Oil and Gas Occurrence Potential") and Figures 23, and 24 to see our development potential maps (see "Projections of Future Oil and Gas Drilling Activity") for the Study Area.

## RESOURCE POTENTIAL AND GEOLOGY OF THE GRAND MESA, UNCOMPAHGRE, AND GUNNISON (GMUG) NATIONAL FORESTS AND VICINITY, COLORADO (2004)

The U.S. Geological Survey assessed the Grand Mesa, Uncompahgre, and Gunnison National Forests and the vicinity in 2004. The report mainly discussed potential mineral deposits, excluding oil and gas. The main content pertinent to the Study Area and this report was the assessment of coal underlying the national forests. Information relating to coal and coal resource potential can be found under "Summary of Coal Fields in the Study Area" in this Reasonable Foreseeable Development scenario. In general, the main coal-bearing formations are of Upper Cretaceous age (U.S. Geological Survey, 2004). The estimated combined coal resource under the Grand Mesa, Uncompahgre, and Gunnison National Forests is 38 billion short tons (Hettinger et al., 2004). Along with the coal resource assessment, this report also discusses the geochemistry of mineral deposits, gravity, aeromagnetics, and radiometrics of the area, and mines and mineralized areas. The report was revised in 2006 by the U.S. Forest Service. The report is titled "Grand Mesa, Uncompahgre, and Gunnison National Forests: Coal Resource and Development Potential Report". Most of the information remains the same but some updates exist.

## PETROLEUM SYSTEMS AND GEOLOGIC ASSESSMENT OF OIL AND GAS IN THE UINTA-PICEANCE PROVINCE, UTAH AND COLORADO (2002)—ALONG WITH THE PARADOX BASIN (1995) UNITED STATES GEOLOGICAL SURVEY

The U.S. Geological Survey is responsible for preparing the National Oil and Gas Resource Assessment for all provinces within the United States. Their overview of the "1995 National Assessment of United States Oil and Gas Resources" (U.S. Geological Survey, 1995) presents information about potential undiscovered accumulations of oil and gas in 71 geologic or structural provinces within the United States. The Uinta-Piceance Basin Province and Paradox Basin Province assessed at that time were partly within the Study Area. The National Oil and Gas Resource Assessment, was updated in 2002. The Uinta-Piceance Basin Province was updated in the 2002 Assessment. The

BLM_0018648

Paradox Basin Province was not updated in the 2002 Assessment. Summaries of the Uinta-Piceance Basin Province (both 1995 and 2002 assessments) and the Paradox Basin Province (1995 assessment) can be found in Appendix I.

The Uinta-Piceance Basin Province boundary for the 1995 U.S. Geological Survey assessment is defined by the Uinta Mountain Uplift to the north and the southern Park Range and Sawatch Uplift on the east. North of the Uncompahgre Uplift axis defines the southern boundary. The Utah thrust belt defines the western boundary (Spencer, 1995). The Douglas Creek arch separates the Uinta-Piceance basin in two halves. In the south-central portion of the Uinta-Piceance Basin Province there is a fold belt and igneous intrusions in the southeast. Numerous folds are in the northeastern Piceance basin along with many normal faults in the western Uinta basin. Normal faulting occurs in the middle of the Uinta-Piceance basin (U.S. Geological Survey Uinta-Piceance Assessment Team, chapter 2, 2003). The southern boundary of the 1995 assessment for the Uinta-Piceance Basin Province matches the northern boundary of the 1995 Paradox Basin Province Boundary. Conversely, the southern boundary of the 2002 Uinta-Piceance Basin Province assessment is defined by Uncompahgre Uplift and the San Rafael Swell. A gap on the east side of the Study Area, between the Uinta-Piceance 1995 and 2002 southern boundaries, was not assessed because there are no play areas or assessment units (see Glossary) covering this gap.

The Paradox Basin Province covers an area of approximately 33,000 square miles in Colorado and Utah and occupies approximately 2,447.94 square miles (1,566,681.48 acres) of the Study Area. The province is 280 miles long and 200 miles wide (Huffman, 1995). Located in southwestern Colorado, the Paradox Basin Province is bounded by the Uncompahgre Plateau to the northeast, the San Juan Dome to the east, and the Monument uplifts, Circle Cliffs, and the Henry Mountains to the west. The San Rafael Swell is the northwest boundary. The Paradox basin, Kaiparowits, Henry Mountains basin, and the Wasatch and Pausaugunt Plateaus are other geologic features in the Paradox Basin Province. The province has thick sequences of Phanerozoic sediments with 5,000 to 8,000 feet of sediment in the central part of the basin. There is greater than 15,000 feet of total sediment in the Paradox basin, Kaiparowits basin, and the Wasatch Plateau (Huffman, 1995). A small gap exists where the San Juan Basin Province boundary comes into the Study Area. The gap had no play areas or assessment units that covered this area, so it was not assessed. Refer to Appendix I for a detailed summary of the 1995 Paradox Basin Province and the 2002 and 1995 Uinta-Piceance Province U.S. Geological Survey Assessments.

## A NEW APPROACH TO ASSESSING GAS AND OIL RESOURCES IN THE INTERMOUNTAIN WEST (2001): RAND SCIENCE AND TECHNOLOGY ASSESSMENT

The William and Flora Hewlett Foundation funded research assessments of natural gas and oil resources of the Rocky Mountain region. The assessment was performed by RAND Corporation, a non-profit research organization aspiring to improve policy and decision making. A number of reports were published as a result of the RAND Science

BLM_0018649

and Technology study (LaTourrette et al, 2002a; LaTourrette et al., 2002b; LaTourrette et al, 2003; and Vidas et al, 2003). The LaTourrette et al., (2002a and 2002b) reports were prepared to:

- review existing resource assessment methodologies and results,
- evaluate recent studies of federal land access restrictions in the Intermountain West,
- consider a set of criteria that can be used to define the "viable" hydrocarbon resource, with particular attention to issues relevant to the Intermountain West,
- develop a more comprehensive assessment methodology for the viable resource, and
- employ this methodology to assess the viable resource in Intermountain West basins.

Issues were raised that the term "technically recoverable" was not inclusive of oil and natural gas that is actually producible. The report continues to state that "technically recoverable" resources do not include exploration and production costs, infrastructure and transportation costs, and environmental impacts (2003). The American Association of Petroleum Geologists' Secretary, Charles J. Mankin, dismissed this contention based on the fact that "viability" of future oil and gas production is more dependent on technology advances and public demand of resources than on cost (Nation, 2002). Therefore, the term and assessment of "technically recoverable" resources is still used today.

In "Assessing Gas and Oil Resources in the Intermountain West" (LaTourrette, p. 16, 2002b), a graph shows Rocky Mountain Region technically recoverable gas resources to be approximately 310 trillion cubic feet of gas. In contrast, the economically recoverable gas at the well head was approximately 60 trillion cubic feet of gas. This difference was emphasized in the RAND reports as to why "viable" resources should be reported instead of "technically recoverable" resources. Debra Knopman, a Senior Engineer at RAND, testified to the Subcommittee on Energy and Mineral Resources that their report is not meant to replace previous assessments, but their suggestions are meant to enhance, build upon, and more clearly define future reports (2002). The RAND Corporation incorporated their approach in the Greater Green River basin (LaTourrette, 2003). The lead author was contacted in August of 2006, and we asked for the information regarding the Greater Green River basin in order to see the details of how the methodology was applied. Unfortunately, that information had been lost and was no longer available. Therefore, their analysis methodology has not been used to analyze the Study Area.

# ASSESSMENT OF THE COALBED NATURAL GAS RESOURCE

## COALBED NATURAL GAS ACTIVITY

The Colorado Plateau contains coal deposits in Colorado, Utah, Arizona, and New Mexico. The major coal deposits are of Cretaceous age with older coals in the western

BLM_0018650

plateau grading to younger coals in the eastern plateau.  These coal deposits are found in the Mount Garfield Formation, Mesaverde Formation, Fruitland Formation, and Dakota Sandstone (Kirschbaum, chapter A, 2000). The Study Area contains the Nucla-Naturita, Tongue Mesa, Somerset, and Grand Mesa coal fields.  Figure 17 shows coal fields within the Study Area.  Coal fields are determined by the U.S. Geological Survey based on four criteria:

- Areas containing significant mineral ownership that is administered by the federal government,
- Areas that have active coal mining,
- Areas where coal-bed methane is currently being produced or coal is the source rock for gas production, and
- Areas that have a high resource or development potential .

In the entire Colorado Plateau, it is estimated that 40 to 68 percent of the coal is recoverable (Kirschbaum, chapter A, 2000).  Intrusives are associated with the Piceance Deep, Somerset, and Carbondale coal fields (Figure 17) and could have influenced gas generation in the nearby coals (Spencer, 1995).

In the Colorado Plateau, the U.S. Geological Survey (2000) estimated 173 trillion cubic feet of in-place coal-bed natural gas resource within the Piceance basin in Colorado, San Juan basin in Colorado and New Mexico, and the Uinta basin in Utah.  Most of the estimated in-place coal-bed gas is outside of the Study Area.  However, exploration for coal bed methane is taking place in the northern part of the Study Area in the Piceance basin.

Only 36 coal-bed natural gas wells have been drilled in the Study Area (Figure 3b).  All 36 wells are in the Piceance basin.  Four wells have been plugged, five wells are locations, and the remaining wells are producing gas (IHS Energy Group, 2010).  A location means the well will likely be drilled or the data has not been updated.  The six companies that drilled the 36 coal-bed natural gas wells were:

- Amoco Production Company,
- BDS International LLC,
- DIA and Associates Inc.,
- Gunnison Energy Corporation,
- Riviera Drilling and Exploration Company, and
- SG Interests, Ltd.

Amoco Production Company drilled four coal-bed natural gas wells from 1982 to 1987 at depths averaging 2,350 feet (IHS Energy Group, 2010).  Two of the wells have no reported production.  Cumulative production for the other two wells is 3,400 thousand cubic feet of natural gas (IHS Energy Group, 2010).   All four wells are plugged and abandoned according to the Colorado Oil and Gas Conservation Commission.

BDS International LLC drilled two coal-bed natural gas wells in 2003.  Average drilling depth was 7,152 feet (IHS Energy Group, 2010).  Cumulative gas production for both wells is 199,642 thousand cubic feet of gas.  Cumulative water production is 7,006

BLM_0018651

barrels of water.  Oil was produced from these two wells along with water and gas. Cumulative oil production is 815 barrels of oil.  Both wells are plugged and abandoned according to the Colorado Oil and Gas Conservation Commission.

DIA & Associates Inc. drilled one coal-bed natural gas well in the Study Area in 1991. The well was completed in 1993 with a total drilled depth of 3,050 feet.  The IHS database reports the well was drilled and abandoned while the Colorado Oil and Gas Conservation Commission reports the well as shut-in.  Production tests show 30 thousand cubic feet of gas and 78 barrels of water were produced.

Gunnison Energy Corporation drilled 16 coal-bed natural gas wells in the Study Area from 2003 to 2007.  Average depth drilled was 2,292 feet.  Cumulative gas production is 1,510,513 thousand cubic feet for all 16 wells (IHS Energy Group, 2010).  Cumulative water production is 1,734,404 barrels of water.  Cumulative oil production is 683 barrels of oil.  Nine out of the 16 wells had reported production.  Two wells are plugged and abandoned.  Three wells are labeled as locations.  The other wells are active gas wells (IHS Energy Group and Colorado Oil and Gas Conservation Commission, 2010).

Riviera Drilling & Exploration Company drilled one well in the Study Area in 1977 with an updated status in 1981.  Its current status is shut-in (Colorado Oil and Gas Conservation Commission, 2010).  The well was drilled to 4,125 feet.  There is no production data for this well.

SG Interest I LTD drilled 12 coal-bed methane wells in the Study Area from 2002 to 2008.  Average drilled depth of the 12 wells is 4,790 feet (IHS Energy Group and Colorado Oil and Gas Conservation Commission, 2010).  Two wells are locations and the remaining 10 wells are active gas wells.  Seven of the 12 wells report production in the IHS Energy Group database.  Cumulative production for the seven wells is 3,099,690 thousand cubic feet of gas, 21,751 barrels of water, and 6,980 barrels of oil (IHS Energy Group, 2010).

## SUMMARY OF COAL FIELDS IN THE STUDY AREA

### Grand Mesa Coal Field

The Grand Mesa coal field is in the northwestern part of the Study Area.  The Mesaverde Formation is the major coal bearing formation in the Grand Mesa coal field.  Coal present in the Mount Garfield Formation has an ash content of 2.1 to 23.3 percent, a sulfur content of 0.4 to 2.2 percent, and a heating value of 8,300 to 13,490 British thermal units (see Glossary) per pound (Kirschbaum et al., chapter B, 2000).  In coal beds greater than five feet thick it is estimated that 8.6 billion short tons of coal are recoverable with an overburden of 6,000 feet (2000).  The Roadside mine is the only active mine in the Grand Mesa coal field.  A small portion of the Grand Mesa coal field is within the Grand Mesa National Forest.  There is a high occurrence potential for coal-bed natural gas in the Grand Mesa Coal Field (Figure 19).  Development potential is moderate in the Grand Mesa Coal Field for coal bed natural gas development (Figure 24).

BLM_0018652

**Somerset Coal Field**

The Somerset coal field is in the north and northeast part of the Study Area. Numerous mines are located in this area. These mines include the West Elk Mine, Sanborn Creek Mine, Bear Creek #3 Mine, and the Bowie Mine #1 (Kirschbaum et al., chapter B, 2000). All of these mines are underground mines. Coal bed thickness ranges from 8.5 to 30 feet with coal zones residing in the Mesaverde Formation. Quality of coal is bituminous, of coking capability, and has an ash content of 2.4 to 29.9 percent. Sulfur content is 0.3 to 3.2 percent and the heating value is 8,160 to 14,380 British thermal units per pound (2000). Eight billion short tons of coal is the resource estimate down to 6,000 feet. Occurrence potential for coal-bed natural gas in the Somerset Coal Field is high. Development potential for coal-bed natural gas in the Somerset Coal Field is moderate.

**Carbondale Coal Field**

The Carbondale Coal Field is in the northeast part of the Study Area in the Piceance basin. Coal is sourced from three zones in the Williams Fork Formation (U.S. Forest Service, 2006). The Illes Formation also sources coal in the Carbondale Coal Field (Kirschbaum et al., chapter B, 2000). The three zones in the Williams Fork Formation are the Cameo-Wheeler, South Canyon, and Coal Ridge zones. Individual coal beds in these zones average 25 feet thick (U.S. Forest Service, 2006). Coal in this area is metamorphosed by igneous intrusions to bituminous and anthracite ranked coal with strong coking abilities. Methane levels range from 1,000 to 4,000 cubic feet of gas per ton and a heating value of 10,160 to 15,190 British thermal units per pound (2006). Ash content is between 1.9 and 16.2 percent. Sulfur content ranges from 0.3 to 2.1 percent (2006). Original in-place estimates of coal were 5.2 billion short tons (Kirschbaum et al, chapter B, 2000). Thirteen mines operated in this field between 1888 and 1990 (2000).

**Nucla-Naturita Coal Field**

The Nucla-Naturita coal field is located in the southwestern part of the Study Area in the Paradox basin. The Dakota Sandstone is the coal bearing formation. The Dakota Sandstone averages 330 feet thick with three to five foot thick mineable coal beds. The quality of coal is as follows: ash content is 6.1 to 12.8 percent, sulfur content is 0.5 to 1.1 percent and the heating value is 10,010 to 13,380 British thermal units per pound (Kirschbaum et al., chapter B, 2000). The estimated resource value is 114 million short tons of coal in a portion of the coal field having an area of 15 square miles. The New Horizon Mine is an active surface mine in the Nucla-Naturita coal field. This mine supplies coal to the Nucla power plant. The Uncompahgre National Forest covers the north and southeast Nucla-Naturita Coal Field. The occurrence potential for coal-bed natural gas ranges from moderate to low potential (Figure 19). Coal-bed natural gas development potential is very low to none in the Nucla-Naturita Coal Field (Figure 24).

BLM_0018653

**Tongue Mesa Coal Field**

Tongue Mesa Coal Field is located in the eastern part of the Study Area (Figure 17). It is within the 1995 Piceance basin boundary and the 1995 Paradox basin boundary. The coal is sourced from the Fruitland Formation in an isolated section of the northern San Juan Mountains. The Uncompahgre National Forest covers the southern half of the Tongue Mesa Coal Field. Multiple coal beds are within the Fruitland Formation. About 200 feet of coal bearing strata is within the Tongue Mesa Coal Field within the Uncompahgre National Forest (Hettinger et al., chapter M, 2004). Maximum coal bed thickness is 40 feet. Minimum coal bed thickness is five feet. The rank of coal is subbituminous with 6.7 to 8.4 percent ash content, 0.5 to 0.9 percent sulfur content, and 9,350 to 10,200 British thermal units per pound (Kirschbaum et al., chapter B, 2000). Estimated resource quantity is as high as 4,000 million short tons (2000). Historically, underground coal mines have operated in this area but currently none are active. The occurrence potential for coal-bed natural gas in the Tongue Mesa Coal Field is moderate. The development potential for coal-bed natural gas is low.

The U.S. Geological Survey analyzed the southern Piceance basin coal. They defined coal beds with greater than 1 feet thick beds and less than 6,000 feet deep as a "coal resource". Coals outside this criterion are non-resources. In the Study Area, the Cameo-Fairfield coal group contains large quantities of the coal and natural gas in the southern part of the Piceance basin. The Cameo-Fairfield coal group is in the Williams Fork, Mount Garfield, and Mesaverde Formations. The coal zones in the Cameo-Fairfield coal group are the Cameo-Wheeler, South Canyon, and Coal Ridge. As much as 140 feet of net coal exists in the Cameo-Fairfield coal group. There are 26 coal beds that make up the 140 feet net coal thickness with each bed ranging from one to 44 feet thick each (Hettinger et al., chapter O, 2000) Coal rank ranges from subbituminous A to anthracite with coking properties. Mineral resources for this area include 34 billion short tons of mineable coal. Thirteen billion short tons of coal are non-minable but may be a good resource for coal-bed methane. Coal with overburden of 3,000 to 14,000 feet deep is non-mineable but contains 170 billion short tons of coal (2000). These deep coal beds currently have small potential for coal-bed methane production because most coal-beds are produced from wells at depths less than 3,000 feet. Potential for mining and natural gas in the Cameo-Fairfield coal is high. Gas content for coals in the Piceance basin is as much as 604 cubic feet per short ton. The U.S. Geological Survey estimated in 2000 that there was 60 billion cubic feet of coal resource per square mile in the deepest part of the Piceance basin.

R.D. Hettinger, L.N.R. Roberts, and M.A. Kirschbaum discuss coal under Forest Service lands that have less than 6,000 feet of overburden in the 2004 report "Coal Resources and Coal Resource Potential". The national forests assessed were the Uncompahgre National Forest, the Grand Mesa National Forest, and the Gunnison National Forest. In areas underlain by the Dakota Sandstone, there is low to moderate potential for development of coal. The Dakota Sandstone has discontinuous, thin coal-beds and is not developed. There is moderate to high development potential in areas underlain by the Fruitland Formation and the Mesaverde Group and Mesaverde Formation. The Mesaverde Group

BLM_0018654

and Formation is a source for natural gas.  There are many constraints on development of coal in these areas.  For example, in underground mining, coal needs to be less than 3,000 feet deep, 3.5 feet thick coal beds or greater, dipping strata less than 12 degrees, and no more than 14 feet of coal can be mined (Hettinger et al., chapter M, 2004).

The Tongue Mesa Cretaceous coal field is in the east part of the Study Area and within the Uncompahgre National Forest.  It has approximately 1,000 feet of section in the Mesaverde Formation, with 200 feet of the section assigned to the Fruitland Formation.  The Fruitland Formation coal has one 20 to 40 feet thick coal-bed and multiple coal-beds that are 5 to 13 feet thick.  The original coal resource of the Fruitland Formation coal is approximately 2,355 million short tons to 4,000 million short tons within and outside the forest service.

# OIL AND GAS OCCURRENCE POTENTIAL

The Bureau has established criteria to use in rating the oil and gas occurrence potential (See Glossary for occurrence potential) of lands studied for planning documents such as the Resource Management Plan to be prepared for the Study Area.  This rating is based on guidance outlined in Bureau of Land Management Handbook H-1624-1 which states:

"Due to the nearly ubiquitous presence of hydrocarbons in sedimentary rock... the following [is used] for classifying oil and gas [occurrence] potential:

- HIGH:  Inclusion in an oil and gas play as defined by the USGS [U.S. Geological Survey] national assessment, or, in the absence of play designation by the USGS, the demonstrated existence of: source rock, thermal maturation, and reservoir strata possessing permeability and/or porosity, and traps. Demonstrated existence is defined by physical evidence or documentation in the literature.
- MEDIUM:  Geophysical or geological indications that the following may be present: source rock, thermal maturation, and reservoir strata possessing permeability and/or porosity, and traps.  Geologic indication is defined by geological inference based on indirect evidence.
- LOW:  Specific indications that one or more of the following may not be present: source rock, thermal maturation, reservoir strata possessing permeability and/or porosity, and traps.
- NONE:  Demonstrated absence of (1) source rock, (2) thermal maturation, or (3) reservoir rock that precludes the occurrence of oil and/or gas. Demonstrated absence is defined by physical evidence or documentation in the literature."

Using the above criteria, we consider that Study Area lands have either high or low potential for the occurrence of oil and gas (excluding coalbed natural gas) as shown in Figure 18.  All areas within the Paradox basin, the Piceance basin, and the Uinta-Piceance basin provinces are contained within specific plays or assessment units designated by the U.S. Geological Survey (1995 and 2003) so are considered to have high occurrence potential.  All areas outside the provinces are designated as low occurrence

BLM_0018655

potential since one or more specific indicators of the presence of hydrocarbons (source rock, thermal maturation, reservoir strata possessing permeability and/or porosity, and traps) may not be present.

A separate map of occurrence potential for coalbed natural gas was prepared (Figure 19). The lands within the Uinta-Piceance Basin, Mesaverde Total Petroleum System (see Glossary), Coalbed Gas Assessment Unit as mapped by the U.S. Geological Survey (2010), were designated as having high occurrence potential. Portions of the Study Area which are known to contain Cretaceous aged sediments that can contain coalbeds, but were not assessed by the U.S. Geological Survey in their most recent assessment, were designated as having medium occurrence potential. The presence of coalbeds indicates that the criterion for a designation of medium occurrence potential is met. All areas outside the high and medium occurrence potential areas are designated as having an occurrence potential of "none" since geologic mapping (Stoeser et al., 2005) shows that in these areas Cretaceous aged rocks have been removed by erosion. Only Cretaceous aged sediments in the Study Area are known to contain coalbeds which act as the source rock and the reservoir strata for coalbed natural gas resources.

# PROJECTIONS OF FUTURE OIL AND GAS ACTIVITY 2012-2031

The Annual Energy Outlook 2011, written by the Energy Information Administration (EIA), focuses on the factors that shape the U. S. energy system over the long term. Key results highlighted in the Annual Energy Outlook 2011 include:

• Strong growth in shale gas production. Shale gas production continues to increase strongly in the Annual Energy Outlook 2011 reference case, growing almost fourfold from 2009 to 2035. Shale gas production grows to 12.2 trillion cubic feet in 2035, when it makes up 47 percent of total U.S. production—up considerably from the 16 percent share in 2009. Shale gas production could become important in the part of the Piceance Basin that lays in the northeast part of the Study Area (Figure 4), if Mancos Shale exploration occurring there is determined to be economically successful. It could also become important in the Paradox basin part of the Study Area (Figure 4) it the Gothic and Hovenweep shale plays extended from their current location to the south of the Study Area.

• Growing use of natural gas and renewables in electric power generation. The role of natural gas in power generation grows due to low natural gas prices and the relatively low capital costs for new natural gas plants that make it more attractive than coal. The share of generation of power from natural gas increases from 23 percent in 2009 to 25 percent in 2035.

• Declining reliance on imported liquid fuels. Although U. S. consumption of liquid fuels continues to grow through 2035, reliance on petroleum imports as a share of total liquids consumption decreases. Total U.S. consumption of liquid fuels rises from about 18.8 million barrels per day in 2009 to 21.9 million barrels per day in 2035. The import share

BLM_0018656

which reached 60 percent in 2005 falls to 42 percent in 2035. Rising fuel prices spur domestic energy production across all fuels.

The above projected increases in demand and in oil and gas prices indicate continued industry emphasis on searching for additional oil and natural gas supplies in the Study Area. The combination of horizontal drilling and hydraulic fracturing technologies has made it possible to produce shale gas and tight gas economically. Much of the Study Area oil and gas supply growth is expected to come from production from existing known reservoirs, with most new reservoir discoveries potentially coming from exploration for nonconventional plays in the continuous assessment units (including shale gas and coalbed natural gas) identified by the U.S. Geological Survey in Appendix 1.

## OIL AND GAS PRICE ESTIMATES

Anticipated oil and gas prices are an important factor controlling the amount of future drilling and production activity in the Planning Area. Kaiser (2012) reported that "unconventional gas resources are abundant, but their development is particularly sensitive to technologic risk, geologic uncertainty, and gas price". Conventional plays in 2010 reportedly had an operational costs break-even price of $3-4 per thousand cubic feet (Schaefer, 2010). The National Petroleum Council (2011) stated "Significant technology advances have unlocked abundant natural gas and oil resources, but the potential benefits can only be realized if developed prudently."

<u>Gas Prices</u>

In 1996, natural gas prices in Colorado started on a general increase (Figure 20). Several peaks and valleys in the price trend have occurred since that time, but by 2005, prices had increased to an average of $7.43 per thousand cubic feet. Colorado wellhead prices declined sharply from 2005 to 2007 ($4.57 per thousand cubic feet), peaking again in 2008. As world economies struggled in 2009, Colorado wellhead gas prices fell to $3.21 per thousand cubic feet. In recent months gas prices have fallen below $3 per thousand cubic feet. "Natural gas in the New York market slipped further below $2.50/MMBTU, and given the more mild weather forecasts, we don't expect this to improve much anytime soon" (Raymond James, 2012).

Data for Figure 20 (historical and projected future natural gas prices) were obtained from the Energy Information Administration (2011). In the Annual Energy Outlook 2012 (Lower 48), average annual wellhead prices for natural gas remain below $5 per thousand cubic feet (nominal dollars) through 2017. The projected prices reflect continued industry success in tapping the Nation's extensive shale gas resource. Natural gas prices rise as production gradually shifts to resources that are less productive and more expensive. Natural gas wellhead prices (nominal dollars) reach $10.24 per thousand cubic feet in 2035. The forecasted natural gas price using 2009 dollars is $6.42 per thousand cubic feet in 2035.

BLM_0018657